**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

| | |
|---|---|
| THE STATE OF MISSOURI,<br>By and through its Attorney General,<br>ERIC S. SCHMITT;<br><br>THE STATE OF LOUISIANA,<br>By and through its Attorney General,<br>JEFF LANDRY;<br><br>          *Plaintiffs*,<br><br>  v.<br><br>JOSEPH R. BIDEN, JR., in his official<br>capacity as President of the United States;<br><br>JENNIFER RENE PSAKI, in her official<br>capacity as White House Press Secretary;<br><br>VIVEK H. MURTHY, in his official<br>capacity of Surgeon General of the United<br>States;<br><br>XAVIER BECERRA, in his official<br>capacity as Secretary of the Department of<br>Health and Human Services;<br><br>DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES;<br><br>DR. ANTHONY FAUCI, in his official<br>capacity as Director of the National Institute<br>of Allergy and Infectious Diseases and as<br>Chief Medical Advisor to the President;<br><br>NATIONAL INSTITUTE OF ALLERGY<br>AND INFECTIOUS DISEASES;<br><br>CENTERS FOR DISEASE CONTROL<br>AND PREVENTION;<br><br>ALEJANDRO MAYORKAS, in his official<br>capacity as Secretary of the Department of | No. _____ |

Homeland Security;

DEPARTMENT OF HOMELAND
SECURITY;

JEN EASTERLY, in her official capacity as
Director of the Cybersecurity and
Infrastructure Security Agency;

CYBERSECURITY AND
INFRASTRUCTURE SECURITY
AGENCY; and

NINA JANKOWICZ, in her official
capacity as director of the so-called
"Disinformation Governance Board" within
the Department of Homeland Security,

       *Defendants.*

## **COMPLAINT**

### **NATURE OF THE ACTION**

1.   In 1783, George Washington warned that if "the Freedom of Speech may be taken away," then "dumb and silent we may be led, like sheep, to the Slaughter."  George Washington, *Address to the Officers of the Army* (March 15, 1783).  The freedom of speech in the United States now faces one of its greatest assaults by federal government officials in the Nation's history.

2.   A private entity violates the First Amendment "if the government coerces or induces it to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint."  *Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring).  "The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly."  *Id.*

3.   That is exactly what has occurred over the past several years, beginning with express and implied threats from government officials and culminating in the Biden Administration's open and

explicit censorship programs.  Having threatened and cajoled social-media platforms for years to censor viewpoints and speakers disfavored by the Left, senior government officials in the Executive Branch have moved into a phase of open collusion with social-media companies to suppress disfavored speakers, viewpoints, and content on social-media platforms under the Orwellian guise of halting so-called "disinformation," "misinformation," and "malinformation."

4.   The aggressive censorship that Defendants have procured constitutes government action for at least five reasons: (1) absent federal intervention, common-law and statutory doctrines, as well as voluntary conduct and natural free-market forces, would have restrained the emergence of censorship and suppression of speech of disfavored speakers, content, and viewpoint on social media; and yet (2) through Section 230 of the Communications Decency Act (CDA) and other actions, the federal government subsidized, fostered, encouraged, and empowered the creation of a small number of massive social-media companies with disproportionate ability to censor and suppress speech on the basis of speaker, content, and viewpoint; (3) such inducements as Section 230 and other legal benefits (such as the absence of antitrust enforcement) constitute an immensely valuable benefit to social-media platforms and incentive to do the bidding of federal officials; (4) federal officials—including, most notably, certain Defendants herein—have repeatedly and aggressively threatened to remove these legal benefits and impose other adverse consequences on social-media platforms if they do not aggressively censor and suppress disfavored speakers, content, and viewpoints on their platforms; and (5) Defendants herein, colluding and coordinating with each other, have also directly coordinated and colluded with social-media platforms to identify disfavored speakers, viewpoints, and content and thus have procured the actual censorship and suppression of the freedom of speech.  These factors are both individually and collectively sufficient to establish government action in the censorship and suppression of social-media speech.

5.   Defendants' campaign of censorship has culminated in the recent announcement of the creation of a "Disinformation Governance Board" within the Department of Homeland Security. "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *United States v. Alvarez*, 567 U.S. 709, 728 (2012) (plurality op.).  Likewise, our constitutional tradition stands against the idea that we need a "Disinformation Governance Board" within our federal domestic-security apparatus.

6.   As a direct result of these actions, there has been an unprecedented rise of censorship and suppression of free speech—including core political speech—on social-media platforms.  Not just fringe views, but perfectly legitimate, responsible viewpoints and speakers have been unlawfully and unconstitutionally silenced in the modern public square.  These actions gravely threaten the fundamental right of free speech and free discourse for virtually all citizens in Missouri, Louisiana, and America, both on social media and elsewhere.

## JURISDICTION AND VENUE

7.   This Court has subject-matter jurisdiction because the federal claims arise under the Constitution and laws of the United States.

8.   Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

**A.     Plaintiffs.**

9.   Plaintiff State of Missouri is a sovereign State of the United States of America. Missouri sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Missouri brings this suit through its Attorney General, Eric S. Schmitt. He

is authorized by Missouri law to sue on the State's behalf. His address is P.O. Box 899, Jefferson City, Missouri 65102.

10. Plaintiff State of Louisiana is a sovereign State of the United States of America. Louisiana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Louisiana brings this suit through its Attorney General, Jeff Landry. He is authorized by Louisiana law to sue on the State's behalf. His offices are located at 1885 North Third Street, Baton Rouge, Louisiana 70802.

11. Missouri and Louisiana, and their agencies and officials, have a sovereign and proprietary interest in receiving free flow of information in public discourse on social-media platforms. Missouri and Louisiana, and their agencies and officials, are constantly engaged in the work of formulating, enacting, advancing and enforcing public policies, and formulating messages and communications related to such policies, and they frequently and necessarily rely on the flow of speech and information on social media to inform public-policy decisions.  Further, information and ideas shared on social media frequently are repeated in, and impact and influence, public discourse outside of social media, which Missouri and Louisiana, and their agencies and officials, also rely upon.

12. Missouri and Louisiana further have a sovereign interest in ensuring that the fundamental values reflected in their own Constitutions and laws, and the fundamental rights guaranteed to their citizens, are not subverted by the unconstitutional actions of federal officials and those acting in concert with them.  Missouri's Constitution provides the highest level of protection for the freedom of speech, protecting it in even more expansive language than that in the First Amendment, and Louisiana's Constitution provides similar protection for free-speech rights.  Defendants' unlawful subversion of Missourians' and Louisianans' fundamental rights and liberties under state law

5

violates both the state and federal Constitutions, and it injures Missouri's and Louisiana's sovereign interests in advancing their own fundamental laws and fundamental policies favoring the freedom of speech.

13. In addition, Missouri and Louisiana have a quasi-sovereign interest in protecting the free-speech rights of the vast majority of their citizens, who constitute "a sufficiently substantial segment of its population." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982).  This falls within Missouri's and Louisiana's "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Id.*  This injury "suffices to give the State standing to sue as *parens patriae*" because "the injury" to Missourians' and Louisianans' free-speech and free-expression rights "is one that the State … would likely attempt to address"—indeed, Missouri and Louisiana have addressed, *see, e.g.,* MO. CONST., art. I, § 8; LA. CONST., art. I, § 7—"through [their] sovereign lawmaking powers." *Alfred L. Snapp*, 458 U.S. at 607.

14. Further, Missouri and Louisiana "ha[ve] an interest in securing observance of the terms under which [they] participate[] in the federal system." *Alfred L. Snapp*, 458 U.S. at 607–08.  This means bringing suit to "ensur[e] that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system." *Id.* at 608.  The rights secured by the First Amendment, and analogous state constitutional provisions, are foremost among the "benefits that are to flow from participation in the federal system." *Id.*  Missouri and Louisiana "have an interest, independent of the benefits that might accrue to any particular individual, in assuring that the benefits of the federal system are not denied to its general population." *Id.*  Missouri and Louisiana sue to vindicate all these interests here.

**B.    Defendants.**

6

15. Defendant Joseph R. Biden, Jr., is President of the United States.  He is sued in his official capacity.

16. Defendant Jennifer Rene Psaki is White House Press Secretary.  She is sued in her official capacity.

17. Defendant Vivek H. Murthy is Surgeon General of the United States.  He is sued in his official capacity.

18. Defendant Xavier Becerra is Secretary of the Department of Health and Human Services.  He is sued in his official capacity.

19. Defendant Department of Health and Human Services (HHS) is a Cabinet-level agency within the Government of the United States.

20. Defendant Anthony Fauci is the Director of the National Institute of Allergy and Infectious Diseases (NIAID) and Chief Medical Advisor to the President.  He is sued in his official capacity.

21. Defendant National Institute of Allergy and Infectious Diseases (NIAID) is a federal agency under the Department of Health and Senior Services.

22. Defendant Centers for Disease Control and Prevention (CDC) is a federal agency under the Department of Health and Human Services.

23. Defendant Alejandro Mayorkas is Secretary of the Department of Homeland Security.  He is sued in his official capacity.

24. Defendant Department of Homeland Security (DHS) is a Cabinet-level agency within the Government of the United States.

25. Defendant Jen Easterly is the Director of the Cybersecurity and Infrastructure Security Agency within the Department of Homeland Security.  She is sued in her official capacity.

26. Defendant Cybersecurity and Infrastructure Security Agency (CISA) is an agency within the Department of Homeland Security that is charged with protecting the United States' cybersecurity and physical infrastructure.

27. Defendant Nina Jankowicz is the director of the newly constituted "Disinformation Governance Board" within the Department of Homeland Security.  She is sued in her official capacity.

## GENERAL ALLEGATIONS

### A. Freedom of Speech Is the Bedrock of American Liberty.

28. The First Amendment of the U.S. Constitution states that "Congress shall make no law … abridging the freedom of speech, or of the press…"  U.S. CONST. amend. I.

29. Article I, § 8 of the Missouri Constitution provides "[t]hat no law shall be passed impairing the freedom of speech, no matter by what means communicated: that every person shall be free to say, write or publish, or otherwise communicate whatever he will on any subject, being responsible for all abuses of that liberty…."  MO. CONST. art. I, § 8.  Article I, § 7 of the Louisiana Constitution provides that "[n]o law shall curtail or restrain the freedom of speech or of the press.  Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom."  LA. CONST. art. I, § 7.  All other State Constitutions likewise protect the freedom of speech as a fundamental right of the first order.

30. The freedom of speech and expression guaranteed by the First Amendment is one of the greatest bulwarks of liberty.  These rights are fundamental and must be protected against government interference.

### 1.  Government officials lack authority to censor disfavored speakers and viewpoints.

31. If the President or Congress enacted a law or issued an order requiring the suppression of certain disfavored viewpoints or speakers on social media, or directing social media to demonetize, shadow-ban, or expel certain disfavored speakers, such a law or order would be manifestly unconstitutional under the First Amendment.

32. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

33. "[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (quotations omitted).

34. "In light of the substantial and expansive threats to free expression posed by content-based restrictions," the Supreme "Court has rejected as 'startling and dangerous' a 'free-floating test for First Amendment coverage ... [based on] an *ad hoc* balancing of relative social costs and benefits.'" *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality op.) (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)).

**2. Merely labeling speech "misinformation" or "disinformation" does not strip away First Amendment protections.**

35. Labeling disfavored speech "misinformation" or "disinformation" does not strip it of First Amendment protection.  "Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements.  This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." *Id.* at 718.

36.  The Supreme Court has thus rejected the argument "that false statements, as a general rule, are beyond constitutional protection."  *Id.*

37. "Permitting the government to decree this speech to be a criminal offense, whether shouted from the rooftops or made in a barely audible whisper, would endorse government authority to compile a list of subjects about which false statements are punishable.  That governmental power has no clear limiting principle.  Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth."  *Id.* at 723 (citing G. ORWELL, NINETEEN EIGHTY–FOUR (1949) (Centennial ed. 2003)).

38. "Were the Court to hold that the interest in truthful discourse alone is sufficient to sustain a ban on speech … it would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition.  The mere potential for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom."  *Id.* at 723.

**3.  Counterspeech, not censorship, is the proper response to supposed "misinformation."**

39. When the Government believes that speech is false and harmful, "counterspeech," not censorship, must "suffice to achieve its interest."  *Id.* at 726.  The First Amendment presumes that "the dynamics of free speech, of counterspeech, of refutation, can overcome the lie."  *Id.*

40. "The remedy for speech that is false is speech that is true.  This is the ordinary course in a free society.  The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth."  *Id.* at 727.

41. "The theory of our Constitution is 'that the best test of truth is the power of the thought to get itself accepted in the competition of the market.'"  *Id.* at 728 (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).

42. "The First Amendment itself ensures the right to respond to speech we do not like, and for good reason.  Freedom of speech and thought flows not from the beneficence of the state but from the inalienable rights of the person.  And suppression of speech by the government can make exposure of falsity more difficult, not less so.  Society has the right and civic duty to engage in open, dynamic, rational discourse.  These ends are not well served when the government seeks to orchestrate public discussion through content-based mandates." *Id.* at 728.

### 4. Americans have a First Amendment right to be exposed to a free flow of speech, viewpoints, and content, free from censorship by government officials.

43. The First Amendment also protects the right to receive others' thoughts, messages, and viewpoints freely, in a free flow of public discourse.  "[W]here a speaker exists …, the protection afforded is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976).

44. The right to receive information is "an inherent corollary of the rights to free speech and press that are explicitly, guaranteed by the Constitution," because "the right to receive ideas follows ineluctably from the sender's First Amendment right to send them." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). "The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers." *Lamont v. Postmaster Gen.*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring).

45. "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

46. "[A]ssuring that the public has access to a multiplicity of information sources is a governmental purpose of the highest order, for it promotes values central to the First Amendment."

*Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 663 (1994).  Indeed, "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public."  *United States v. Midwest Video Corp.*, 406 U.S. 649, 668 n.27 (1972) (plurality op.) (quotations omitted).

**5.  Government officials may not circumvent the First Amendment by inducing, threatening, and/or colluding with private entities to suppress protected speech.**

47. It is "axiomatic" that the government may not "induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (quotations omitted).

48. A private entity violates the First Amendment "if the government coerces or induces it to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint."  *Knight First Amendment Institute*, 141 S. Ct. at 1226 (Thomas, J., concurring). "The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly."  *Id.*

49. Threats of adverse regulatory or legislative action, to induce private actors to censor third parties' speech, violate the First Amendment.  *See Hammerhead Enters. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983) ("Where comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid claim can be stated."); *see also Bantam Books v. Sullivan*, 372 U.S. 58, 68 (1963) (holding that a veiled threat of prosecution to pressure a private bookseller to stop selling disfavored books could violate the First Amendment).

50. The unprecedented control over private speech exercised by social-media companies gives government officials an unprecedented opportunity to circumvent the First Amendment and achieve indirect censorship of private speech.  "By virtue of its ownership of the essential

12

pathway," a social media platform "can . . . silence the voice of competing speakers with a mere flick of the switch." *Turner*, 512 U.S. at 656*; see also Knight First Amendment Inst*., 141 S. Ct. at 1224 (Thomas, J., concurring). "The potential for abuse of this private power over a central avenue of communication cannot be overlooked." *Turner*, 512 U.S. at 656.

**B.      The Dominance of Social Media as a Forum for Public Information and Discourse.**

51. Social media has become, in many ways, "the modern public square."  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).  Social media platforms provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard."  *Id.*

52. "Today's digital platforms provide avenues for historically unprecedented amounts of speech, including speech by government actors. Also unprecedented, however, is the concentrated control of so much speech in the hands of a few private parties." *Knight First Amendment Institute*, 141 S. Ct. at 1221.

53. The "concentration" of power in social media companies "gives some digital platforms enormous control over speech." *Id.* at 1224.  Defendants have not hesitated to exploit this power.

54. For example, on information and belief, Facebook has close to 3 billion registered users worldwide and over 124 million users in the United States, including millions of Missourians and millions of citizens of other States.

55. On information and belief, Twitter has more than 340 million users worldwide, including approximately 70 million users in the United States.  Approximately 500 million tweets are posted on Twitter every day, and they are accessible to non-Twitter users on the internet.  Moreover, Twitter users include large numbers of politicians, journalists, public figures, and others with a disproportionately large impact on public discourse in other forums, so Twitter's impact on public discourse is even larger than its numbers alone reflect.

56. On information and belief, YouTube has more than 4 billion hours of video views every month.  Videos on YouTube channels are visible to both YouTube users and to the general public on the internet.  An estimated 500 hours of video content are uploaded to YouTube every minute.

57. YouTube is extremely popular among politicians and public figures in reaching their audiences.  On information and belief, in 2020, approximately 92 percent of U.S. Senators and 86 percent of U.S. Representatives uploaded content on YouTube.

58. According to a recent Pew Research study, 66 percent of U.S. adults use Facebook, and 31 percent of U.S. adults say they get news regularly on Facebook.  Walker et al., *News Consumption Across Social Media in 2021*, PEW RESEARCH CENTER (Sept. 20, 2021), *at* https://www.pewresearch.org/journalism/2021/09/20/news-consumption-across-social-media-in-2021/.

59. According to the same study, 72 percent of U.S. adults say that they use YouTube, and 22 percent of U.S. adults say that they regularly get news on YouTube.  *Id.*

60. According to the same study, 23 percent of U.S. adults say that they use Twitter, and 13 percent of U.S. adults say they regularly get news on Twitter.  *Id.*  This comprises 55 percent of Twitter users.  *Id.*

61. According to the same study, 41 percent of U.S. adults say that they use Instagram, and 11 percent of U.S. adults say they regularly get news on Instagram.  *Id.*

62. The free flow of information and expression on social media directly affects non-users of social media as well.  Social-media users who are exposed to information, ideas, and expression through social media communicate the same information, ideas, and expression with non-social-media users.  News, information, messages, narratives, and storylines that originate on social media are frequently replicated in other forums, such as television, print media, and private

discourse.  Further, much content posted on social-media is directly available to non-social-media users.  For example, posts on Twitter are directly accessible on the internet to non-Twitter-users, and content on YouTube is available to the general public on the internet as well.

63. In the aggregate, these numbers of Americans who (1) use social-media platforms, and (2) regularly use social-media platforms to obtain news and information about matters of public interest, comprise hundreds of millions of Americans, including millions of Missourians and Louisianans, and very substantial segments of the populations of Missouri, Louisiana, and every other State.

64. There are also many ways for social-media companies to censor or suppress speech on social-media platforms.  Some of these methods are immediately known to the speaker and/or his or her audience, and some are not visible to them.  Censorship, therefore, can occur without the knowledge of the speaker and/or his or her audience.  These methods include, but are not limited to, terminating speakers' accounts, suspending accounts, imposing warnings or strikes against accounts to chill future disfavored speech, "shadow banning" speakers, demonetizing content, adjusting algorithms to suppress or de-emphasize speakers or messages, promoting or demoting content, placing warning labels on content, suppressing content in other users' feeds, promoting negative comments on disfavored content, and requiring additional click-through(s) to access content, among many others.  Many methods, moreover, have a chilling effect on social-media speech, as the threat of censorship (such as suspension, demonetization, or banning) drives speakers to self-censor to avoid making statements that might be deemed to violate the social-media companies' vague, ever-changing, often-hidden, and inconsistently enforced standards for censoring and suppressing speech.  Collectively herein, all these methods of suppressing and/or

censoring speech on social media are called "censorship" and/or "suppression" of social-media speech.

65. The censorship and suppression of free speech on social media functions in most cases as a prior restraint on speech, both through its direct effect and its chilling effects.  A prior restraint is the most severe form of restriction on freedom of expression.

## C.   Public and Private Attempts to Police "Misinformation" or "Disinformation" on Social Media Have Proven Embarrassingly Inaccurate.

66. Yesterday's "misinformation" often becomes today's viable theory and tomorrow's established fact.  "Even where there is a wide scholarly consensus concerning a particular matter, the truth is served by allowing that consensus to be challenged without fear of reprisal.  Today's accepted wisdom sometimes turns out to be mistaken."  *Alvarez*, at 752 (Alito, J., dissenting) (emphasis added).  This prediction has proven true, again and again, when it comes to suppressing "misinformation" and "disinformation" on social media.

### 1.   The Hunter Biden laptop story.

67. Perhaps most notoriously, social-media platforms aggressively censored an October 14, 2020 New York Post exposé about the contents of the laptop of (then-Candidate Biden's son) Hunter Biden, which had been abandoned in a Delaware repair shop and contained compromising photos and email communications about corrupt foreign business deals.  As the New York Post reported at the time, "[b]oth Twitter and Facebook took extraordinary censorship measures against The Post on Wednesday over its exposés about Hunter Biden's emails … The Post's primary Twitter account was locked as of 2:20 p.m. Wednesday because its articles about the messages obtained from Biden's laptop broke the social network's rules against 'distribution of hacked material,' according to an email The Post received from Twitter," even though there were "zero claims that [Hunter Biden's] computer had been hacked."  *Twitter, Facebook censor Post over*

*Hunter Biden exposé*, N.Y. POST (Oct. 14, 2020), *at* https://nypost.com/2020/10/14/facebook-twitter-block-the-post-from-posting/.   "Twitter also blocked users from sharing the link to The Post article indicating that Hunter Biden introduced Joe Biden to the Ukrainian businessman, calling the link 'potentially harmful.'" *Id.*

68. As the Wall Street Journal Editorial Board reported, "nearly all of the media at the time ignored the story or 'fact-checked' it as false.  This … was all the more egregious given other evidence supporting the Post's scoop.  Neither Hunter Biden nor the Biden campaign denied that the laptop was Hunter's.  And Hunter's former business partner, Tony Bobulinski, went public with documents backing up some of the laptop's contents."  Editorial Board, *Hunter Biden's Laptop Is Finally News Fit to Print*, WALL ST. J. (March 18, 2022).

69. Biden, his allies, and those acting in concert with them falsely attacked the Hunter Biden laptop story as "disinformation."  *Id.*   Fifty "intelligence officials—headlined by former Obama spooks James Clapper and John Brennan—circulated a statement peddling the Russian 'disinformation' line—even as they admitted they had no evidence.  Th[e] result was a blackout of the Hunter news, except in a few places…." *Id.*  Parroting the Biden campaign's false line, both social media platforms and major news organizations treated the story as "disinformation" and aggressively censored it.

70. In early 2022—over a year and a half later—major news organizations finally admitted that the Hunter Biden laptop story was truthful and rested on reliable sourcing and information. *Id.*  The Washington Post and the New York Times quietly acknowledged the truth and reliability of the story "17 months" later, in mid-March 2022.  *Id.*

71. Free-speech advocate Glenn Reynolds aptly described this embarrassing episode as one that permanently damaged the credibility and reputation for fairness of social-media platforms and

major media outlets:  "Twitter and other tech giants banned The Post's reporting, since admitted to be accurate, on Hunter Biden's laptop and the damaging information it contained.  Many social-media giants banned any links to the story, and Twitter even went so far as to stop its users from sharing the story one-on-one through direct messages. (CEO Jack Dorsey later admitted that was a 'total mistake.')  Their purpose was to affect the election's outcome in favor of the Democrats, and they probably did."  Glenn H. Reynolds, '*Censorship is free speech' is the establishment's Orwellian line on Elon Musk's Twitter crusade*, N.Y. POST (Apr. 15, 2022), https://nypost.com/2022/04/14/the-establishments-orwellian-line-on-elon-musks-twitter-crusade/.

### 2.      Speech about the lab-leak theory of COVID-19's origins.

72. Likewise, beginning in February 2020, social-media platforms censored speech advocating for the lab-leak theory of the origins of SARS-CoV-2, the virus that causes COVID-19.  The lab-leak theory postulates that the virus did not originate naturally in bats or other animals, but leaked from a biotech laboratory in Wuhan, China, operated by the Wuhan Institute of Virology.

73. On information and belief, Defendant Dr. Anthony Fauci, a senior federal government official, coordinating with others, orchestrated a campaign to discredit the lab-leak hypothesis in early 2020.  As director of NIAID, Dr. Fauci had funded risky "gain-of-function" research at the Wuhan Institute of Virology through intermediaries such as EcoHealth Alliance, headed by Dr. Peter Daszak.  Thus, if the lab-leak theory were established, Dr. Fauci and Dr. Daszak could be potentially implicated in funding the research on viruses that caused the COVID-19 pandemic and killed millions of people worldwide.

74. During the same time frame as he was orchestrating a campaign to falsely discredit the lab-leak theory, Dr. Fauci was exchanging emails with Mark Zuckerberg, the CEO of Facebook,

regarding public messaging and the dissemination of COVID-19 information on social-media.  On information and belief, Dr. Fauci coordinated directly with Facebook and/or other social-media firms regarding the suppression of disfavored speakers and content of speech on social media.

75. Not surprisingly, social-media platforms like Facebook promptly accepted Dr. Fauci's campaign to discredit the lab-leak theory, and they engaged in an aggressive campaign to censor speech advocating for the lab-leak theory on social media on the ground that it was supposedly disinformation.  Facebook "expand[ed] its content moderation on Covid-19 to include 'false' and 'debunked' claims such as that 'COVID-19 is man-made or manufactured.'"  Editorial Board, *Facebook's Lab-Leak About-Face*, WALL ST. J. (May 27, 2021), https://www.wsj.com/articles/facebooks-lab-leak-about-face-11622154198.  This included suppressing speech by highly credentialed and well-respected writers, such as "science journalist Nicholas Wade," *id.*, and scientist Alina Chan.  Other social-media platforms likewise censored speech advocating for the lab-leak hypothesis.

76. By 2021, however, "the circumstantial evidence" favoring the lab-leak theory "finally permeated the insular world of progressive public health," *id.*, and Fauci and other Biden Administration officials were forced to admit the theory's inherent plausibility.  After a long period of censorship, in May 2021, Facebook and other platforms announced that they would no longer censor social-media speech advocating for the lab-leak theory.

77. The Wall Street Journal noted the close link between government and social-media platforms in censoring this speech: "Facebook acted in lockstep with the government," indicating that "[w]hile a political or scientific claim is disfavored by government authorities, Facebook will limit its reach.  When government reduces its hostility toward an idea, so will Facebook."  *Id.* "Free speech protects the right to challenge government.  But instead of acting as private actors

with their own speech rights, the companies are mandating conformity with existing government views." *Id.*

78. There had long been credible—even compelling—evidence of the plausibility of the lab-leak theory, long before social-media companies stopped censoring it.  *See, e.g.,* House Foreign Affairs Committee Minority Staff Report, *The Origins of COVID-19: An Investigation of the Wuhan Institute of Virology* (Aug. 2021), https://gop-foreignaffairs.house.gov/wp-content/uploads/2021/08/ORIGINS-OF-COVID-19-REPORT.pdf (detailing evidence available long before censorship lifted); Nicholas Wade, *The origin of COVID: Did people or nature open Pandora's box at Wuhan?*, BULL. ATOMIC SCIENTISTS (May 5, 2021), https://thebulletin.org/2021/05/the-origin-of-covid-did-people-or-nature-open-pandoras-box-at-wuhan/; ALINA CHAN, VIRAL: THE SEARCH FOR THE ORIGIN OF COVID-19 (Sept. 3, 2021).

79. Facebook's decision to stop censoring the lab-leak theory did not come until "after almost every major media outlet, and … even the British and American security services, finally confirmed that it is a feasible possibility."  Freddie Sayers, *How Facebook censored the lab leak theory*, UNHERD (May 31, 2021), https://unherd.com/2021/05/how-facebook-censored-the-lab-leak-theory/.  Facebook admitted that its decision to end censorship was made "in consultation with" government officials, *i.e.*, "public health experts."  *Id.*

80. The reach of Facebook's censorship alone (to say nothing of other platforms that censored the lab-leak theory) was enormous.  Facebook "displayed 'warnings'" on such supposed COVID-19-related misinformation, and Facebook itself claimed that "[w]hen people saw those warning labels, 95% of the time they did not go on to view the original content."  *Id.*  "Moreover, if an article is rated 'false' by their 'fact checkers', the network will 'reduce its distribution'.  This

means that, while an author or poster is not aware that censorship is taking place, the network could be hiding their content so it is not widely disseminated." *Id.*

81. Ironically, at the same time Facebook admitted that it had erroneously censored speech on the lab-leak theory for over a year, Facebook announced that it was "now extending its policy of 'shadow-banning' accounts that promote misinformation.  'Starting today, we will reduce the distribution of all posts in News Feed from an individual's Facebook account if they repeatedly share content that has been rated by one of our fact-checking partners.'  So now, if you share something deemed to contain misinformation multiple times, your account could be silenced; you won't be informed, you won't know to what degree your content will be hidden and you won't know how long it will last—all thanks to group of 'fact-checkers' whose authority cannot be questioned." *Id.*  It is astonishing that "this announcement was made on the very same day as Facebook's admission of error" on the lab-leak theory. *Id.*

### 3.     Speech about the efficacy of mask mandates and COVID-19 lockdowns.

82. Social-media platforms also aggressively censored speech questioning the efficacy of masks and lockdowns as COVID-19 mitigation measures.  Yet evidence revealed that concerns about the efficacy of these measures were well-founded.

83. For example, on information and belief, Twitter's "COVID-19 misleading information policy," as of December 2021, noted that Twitter will censor (label or remove) speech claiming that "face masks … do not work to reduce transmission or to protect against COVID-19," among many other restrictions.  *See* Twitter, *Covid-19 misleading information policy*, https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy.   On  information and belief, both Twitter and other social-media platforms have imposed similar policies, imposing

censorship on speech questioning the efficacy of masks and the efficacy of lockdowns as COVID-19 mitigation measures.

84. On April 8, 2021, YouTube "deleted a video in which Florida Gov. Ron DeSantis and a handful of medical experts questioned the effectiveness of having children wear masks to stop the spread of COVID-19." *YouTube Purges Ron DeSantis Video Over Claims Children Don't Need to Wear Masks*, THE WRAP (Apr. 8, 2021), https://www.thewrap.com/youtube-purges-florida-governor-video-over-claims-children-dont-need-to-wear-masks/.

85. On August 10, 2021, "YouTube barred Sen. Rand Paul (R-Ky.) from uploading new videos to the site for seven days, after the ophthalmologist posted a video last week arguing that most masks 'don't work' against the coronavirus." *Rand Paul Suspended from YouTube Over Covid Claims*, FORBES (Aug. 10, 2021), https://www.forbes.com/sites/joewalsh/2021/08/10/rand-paul-suspended-from-youtube-over-covid-claims/?sh=31f1d4e01971.

86. "When Scott Atlas, a member of the Trump White House's coronavirus task force, questioned the efficacy of masks last year, Twitter removed his tweet.  When eminent scientists from Stanford and Harvard recently told Florida Gov. Ron DeSantis that children should not be forced to wear masks, YouTube removed their video discussion from its platform."  *How Facebook uses 'fact-checking' to suppress scientific truth*, N.Y. POST (May 18, 2021), https://nypost.com/2021/05/18/how-facebook-uses-fact-checking-to-suppress-scientific-truth/.

87. In the same vein, Facebook suppressed a scientist for citing a peer-reviewed study "by a team of researchers in Germany who established an online registry for thousands of parents to report on the impact of masks on their children.  More than half of those who responded said that masks were giving their children headaches and making it difficult for them to concentrate.  More

than a third cited other problems, including malaise, impaired learning, drowsiness and fatigue."
*Id.*

88. On November 21, 2020, "[t]wo leading Oxford University academics … accused
Facebook of 'censorship' after it claimed an article they wrote on face masks amounted to 'false
information'." *Two top Oxford academics accuse Facebook of censorship for branding their
article on whether masks work 'false information'*, DAILY MAIL (Nov. 21, 2020)
https://www.dailymail.co.uk/news/article-8973631/Two-Oxford-academics-accuse-Facebook-
censorship-article-warning.html.

89. No convincing evidence supported the efficacy of mask mandates, while compelling
evidence contradicted it, both before and after their implementation.  Tracking the aggregate case
numbers in States with and without mask mandates over the course of the COVID-19 pandemic,
in a "natural experiment," demonstrates that mask mandates made "zero difference."  John
Tierney, *The Failed COVID Policy of Mask Mandates*, CITY J. (April 19, 2022), https://www.city-
journal.org/the-failed-covid-policy-of-mask-mandates.  Both case rates and mortality rates were
"virtually identical."  *Id.*  Indeed, "mask mandates were implemented without scientific
justification," and "they failed around the world."  *Id.*  "In their pre-Covid planning strategies for
a pandemic, neither the Centers for Disease Control nor the World Health Organization had
recommended masking the public—for good reason.  Randomized clinical trials involving flu
viruses had shown, contrary to popular wisdom in Japan and other Asian countries, that there was
'no evidence that face masks are effective in reducing transmission,' as the WHO summarized the
scientific literature."  *Id.*  "Anthony Fauci acknowledged this evidence early in the pandemic, both
in his public comments ('There's no reason to be walking around with masks,' he told 60 Minutes)
and in his private emails ('I do not recommend you wear a mask,' he told a colleague, explaining

that masks were too porous to block the small Covid virus)." *Id.*  "Instead of carefully analyzing the effects of masks, the CDC repeatedly tried to justify them by misrepresenting short-term trends and hyping badly flawed research, like studies in Arizona and Kansas purporting to show that infections had been dramatically reduced by the mask mandates imposed in some counties.  But in each state, … infection rates remained lower in the counties that did not mandate masks." *Id.*; *see also, e.g.,* IAN MILLER, UNMASKED: THE GLOBAL FAILURE OF COVID MASK MANDATES (Jan. 20, 2022).

90. Likewise, no convincing evidence supported the efficacy of lockdowns.  Quite the contrary. In January 2022, a Johns Hopkins meta-analysis reviewed the efficacy of lockdowns as a COVID-19 mitigation measure and found that they had minimal impact, if any, on COVID-19 mortality rates.  The study reached "the conclusion that lockdowns have had little to no effect on COVID-19 mortality… [L]ockdowns in Europe and the United States only reduced COVID-19 mortality by 0.2% on average…. While this meta-analysis concludes that lockdowns have had little to no public health effects, they have imposed enormous economic and social costs where they have been adopted.  In consequence, lockdown policies are ill-founded and should be rejected as a pandemic policy instrument."  Herby et al., *A Literature Review and Meta-Analysis of the Effects of Lockdowns on COVID-19 Mortality*, STUDIES IN APPLIED ECONOMICS (Jan. 2022), *available at* https://sites.krieger.jhu.edu/iae/files/2022/01/A-Literature-Review-and-Meta-Analysis-of-the-Effects-of-Lockdowns-on-COVID-19-Mortality.pdf.

91. On December 21, 2021, Dr. Leana Wen, a CNN medical commentator and strong advocate for COVID-19 restrictions, tweeted that "cloth masks are little more than facial decorations." *CNN's Leana Wen: 'Cloth Masks Are Little More Than Facial Decorations'*, REASON, *at* https://reason.com/2021/12/21/leana-wen-cloth-mask-facial-decorations-covid-cdc-guidance/.

Twitter did not censor this tweet, even though it undermined the efficacy of mask mandates that permitted the use of cloth masks (*i.e.*, virtually all of them)—undoubtedly because it was advocating for *more* aggressive mitigation measures (*i.e.*, higher-quality masks than cloth masks), not less.

92. "On September 26, 2021, CDC Director Walensky cited an Arizona study to claim that schools without mask mandates were 3.5 times more likely to experience COVID-19 outbreaks. However, the study is so flawed that experts have said it 'should not have entered into the public discourse' and that you 'can't learn anything' about mask rules from the study."  March 11, 2022 Letter of U.S. Rep. Cathy McMorris Rodgers, et al., to Surgeon General Murthy, *at* https://republicans-energycommerce.house.gov/wp-content/uploads/2022/03/3.11.22-Letter-to-Surgeon-General-Murthy-Final.pdf.   Yet Director Walensky's statement circulated widely on social media without being censored.

### 4.      Speech about election integrity and the security of voting by mail.

93. In or around 2020, social-media platforms began aggressively censoring speech that raised concerns about the security of voting by mail, a major election-security issue.  Notoriously, social-media platforms aggressively censored core political speech by then-President Trump and the Trump campaign raising concerns about the security of voting by mail in the run-up to the November 2020 presidential election.

94. This censorship is ironic because, for many years before 2020, it was a common left-wing talking point to claim that fraud occurred in voting by mail.  In opposing photo-ID requirements for in-person voting, Democrats and their allies frequently claimed that photo IDs for in-person voting were pointless because voting by mail, not in-person voting, presented the real opportunities for fraud.

95. These Democratic claims of fraud in voting by mail were widely parroted in mainstream media for many years.  For example, in 2012, the New York Times wrote that "votes cast by mail are less likely to be counted, more likely to be compromised and more likely to be contested than those cast in a voting booth, statistics show," in an article headlined "Error and Fraud at Issue as Absentee Voting Rises."  https://www.nytimes.com/2012/10/07/us/politics/as-more-vote-by-mail-faulty-ballots-could-impact-elections.html.  In 2012, The Washington Post published an articles stating that "[i]t may still be possible to steal an American election, if you know the right way to go about it," citing a case in which "[c]onspirators allegedly bought off absentee voters" and "faked absentee ballots."  https://www.washingtonpost.com/politics/decision2012/selling-votes-is-common-type-of-election-fraud/2012/10/01/f8f5045a-071d-11e2-81ba-ffe35a7b6542_story.html.  In 2014, MSNBC claimed: "Indeed, election experts say absentee ballot fraud is the most common form of organized voter fraud, since, because of the secret ballot, there's no way to ensure that an in-person voter is voting for the candidate he promised to."  https://www.msnbc.com/msnbc/greg-abbott-bogus-voter-fraud-crusade-msna291356.  In 2016, Slate claimed, in a piece titled, "Voter Fraud Exists. Republican Restrictions Won't Stop It," that "[t]he vast majority of voter fraud prosecutions touted by conservative groups like the Heritage Foundation involve absentee ballots that were illegally cast.  And the only voting fraud schemes with the potential to actually swing elections involved mail-in ballots."  https://slate.com/news-and-politics/2016/09/voter-fraud-exists-through-absentee-ballots-but-republicans-wont-stop-it.html.

96. Many other authorities confirm the reasonableness of concerns about security of voting by mail.  For example, in *Crawford v. Marion County Election Board*, the U.S. Supreme Court held that fraudulent voting "perpetrated using absentee ballots" demonstrates "that not only is the risk

of voter fraud real but that it could affect the outcome of a close election." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 195–96 (2008) (opinion of Stevens, J.) (emphasis added).

97. The bipartisan Carter-Baker Commission on Federal Election Reform—co-chaired by former President Jimmy Carter and former Secretary of State James A. Baker—determined that "[a]bsentee ballots remain the largest source of potential voter fraud." BUILDING CONFIDENCE IN U.S. ELECTIONS: REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM, at 46 (Sept. 2005), at   https://www.legislationline.org/download/id/1472/file/3b50795b2d0374cbef5c29766256.pdf. According to the Carter-Baker Commission, "[a]bsentee balloting is vulnerable to abuse in several ways." *Id.*  "Blank ballots mailed to the wrong address or to large residential buildings might be intercepted." *Id.*  "Citizens who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation." *Id.* "Vote buying schemes are far more difficult to detect when citizens vote by mail." *Id.*  Thus, the Commission noted that "absentee balloting in other states has been a major source of fraud." *Id.* at 35.  It emphasized that voting by mail "increases the risk of fraud." *Id.*  And the Commission recommended that "States … need to do more to prevent … absentee ballot fraud." *Id.* at v.

98. The U.S. Department of Justice's 2017 Manual on Federal Prosecution of Election Offenses, published by its Public Integrity Section, states: "Absentee ballots are particularly susceptible to fraudulent abuse because, by definition, they are marked and cast outside the presence of election officials and the structured environment of a polling place." U.S. Dep't of Justice, *Federal Prosecution of Election Offenses* 28 (8th ed. Dec. 2017), at https://www.justice.gov/criminal/file/1029066/download.  This Manual reports that "the more common ways" that election-fraud "crimes are committed include … [o]btaining and marking absentee ballots without the active input of the voters involved." *Id.* at 28. And the Manual notes

that "[a]bsentee ballot frauds" committed both with and without the voter's participation are "common" forms of election fraud.  *Id.* at 29.

99. Thus, social-media censorship that has occurred since 2020 to suppress speech raising concerns about the security of voting by mail would, if applied even-handedly, suppress statements about the risks of fraud in mail-in voting by the United States Supreme Court, the Carter-Baker Commission co-chaired by President Jimmy Carter, and the U.S. Department of Justice's prosecution manual for election-integrity crimes.  One would not be able to quote Justice Stevens' opinion for the Supreme Court in *Crawford* on social media if it followed its own rules.  Raising concerns about election integrity, and questioning the security of voting by mail, became unspeakable on social media only after it became expedient for the Democratic Party and the political Left to suppress these ideas, viewpoints, and concerns.

100.     This censorship of speech, speakers, and viewpoints on such topics and concerns continues to this day, at Defendants' instigation, as alleged further herein.

101.     There is a common theme to all these examples of wrong-headed censorship: Each involved censoring truthful or reliable information that contradicted left-wing political narratives. What led to the censorship was not the fact that the speech was supposedly false, but that the message was politically inconvenient for Democratic officials and government-preferred narratives.  As a result, the ability of politicians and social-media platforms to reliably identify actual "misinformation" and "disinformation" has been proven false, again and again.

**D.     Defendants, Using Their Official Authority, Have Threatened, Cajoled, and Colluded With Social-Media Companies to Silence Disfavored Speakers and Viewpoints.**

102.     On information and belief, the individual Defendants and those acting in concert with them have conspired and colluded to suppress Americans' First Amendment and analogous

state-law rights to freedom of expression on social-media platforms, and to be exposed to free expression on such platforms, and they have taken many overt actions to achieve this goal.

1. **Section 230 of the CDA subsidized, protected, and fostered the creation of speech-censorship policies in a small, concentrated group of social-media firms.**

103.     First, the Defendants did not act in a vacuum.  For decades, the federal government has artificially encouraged, protected, fostered, and subsidized the aggregation of power over speech, including the specific power of censorship, by a small group of powerful social-media firms.

104.     In particular, Section 230 of the Communications Decency Act (CDA) artificially empowered and subsidized the growth of social-media companies and their censorship policies by effectively immunizing much censorship on social media from liability.  Section 230's unique liability shield fostered the aggregation of power in the field into a concentrated cluster of powerful social-media firms, and it directly fostered, protected, and encouraged the development of speech-censorship policies.  This process was greatly accelerated and enhanced by the social-media platforms' success in convincing courts to adopt ever-broadening interpretations of Section 230 immunity, which stray beyond the statutes' text.

105.     "Historically, at least two legal doctrines limited a company's right to exclude." *Knight First Amendment Institute*, 141 S. Ct. at 1222 (Thomas, J., concurring).  "First, our legal system and its British predecessor have long subjected certain businesses, known as common carriers, to special regulations, including a general requirement to serve all comers."  *Id.*  "Second, governments have limited a company's right to exclude when that company is a public accommodation.  This concept—related to common-carrier law—applies to companies that hold themselves out to the public but do not 'carry' freight, passengers, or communications."  *Id.* Absent the artificial immunity created by the overbroad interpretations of Section 230 immunity,

these legal doctrines, and free-market forces, would impose a powerful check on content- and viewpoint-based censorship by social-media platforms.  *See id.*

106.      The CDA was enacted in 1996 for the purpose of promoting the growth of internet commerce and protecting against the transmission of obscene materials to children over the internet.  It was intended to "offer a forum for a true diversity of political discourse," 47 U.S.C. § 230(a)(3), but in recent years Defendants have exploited it to produce the opposite effect.

107.      Section 230 of the CDA, 47 U.S.C. § 230, provides unique liability protections for internet publishers of information, such as social-media companies, which are not available to other publishers, such as those of printed media.  Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  In other words, social-media firms are generally protected from liability for what their users post.

108.      Section 230(c)(2), however, also provides that: "No provider or user of an interactive computer service shall be held liable on account of (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or *otherwise objectionable*, *whether or not such material is constitutionally protected*."  47 U.S.C. § 230(c)(2)(A) (emphasis added).  Courts have interpreted Section 230 broadly—beyond its plain textual import—to shield social-media platforms from liability for censoring anything they deem "objectionable," even if it is constitutionally protected speech.

109.      This reading is unreasonable and exceeds what Congress authorized.  Viewpoint and content-based discrimination—now widely practiced by social-media platforms—are the antithesis of "good faith."  *Id.*  Moreover, Congress intended the "otherwise objectionable" material

30

in § 230(c)(2)(A) to refer only to content similar to "obscene, lewd, lascivious, filthy, excessively violent, [and] harassing" content referred to in the same list.  *Id.*  But social-media companies have interpreted this liability shield unreasonably broadly, and have convinced courts to adopt overbroad interpretations of Section 230 immunity.  *See, e.g., Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 15 (2020) (statement of Thomas, J., respecting the denial of certiorari) ("[C]ourts have extended the immunity in § 230 far beyond anything that plausibly could have been intended by Congress."); *id.* at 15-18 (discussing and criticizing the overbroad reading of § 230 liability that has shielded social-media firms).

110.    These platforms, therefore, have the best of both worlds: They claim that they are exempt from liability if they leave even atrocious content posted, but they are *also* exempt from liability if they censor anything they deem "objectionable, whether or not such material is constitutionally protected."  47 U.S.C. § 230(c)(2)(A).

111.    Further, Section 230 of the CDA purportedly shields such platforms from liability for colluding with other social-media platforms on how to censor speech: "No provider or user of an interactive computer service shall be held liable on account of … (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1)."  47 U.S.C. § 230(c)(2)(B).  On information and belief, social-media platforms do, in fact, extensively coordinate with one another in censoring social-media speech.

112.    Section 230 also purports to preempt any state law to the contrary: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).

113.     On information and belief, the immunity provided by Section 230 of the CDA directly contributed to the rise of a small number of extremely powerful social-media platforms, who have now turned into a "censorship cartel."  The liability provided by the federal government artificially subsidized, fostered, and encouraged the viewpoint and content-based censorship policies that those platforms have adopted at Defendants' urging.

114.     On information and belief, social-media firms greatly value the immunity provided by § 230 of the CDA, which continues to provide them with artificial liability protections, and credible threats to amend or repeal that immunity are powerful motivators to those platforms. Defendants are aware of this.

115.     On information and belief, the largest and most powerful social-media firms are also greatly concerned about antitrust liability and enforcement, given their dominance in the social-media market(s), and credible threats to impose antitrust liability and/or enforcement are powerful motivators to those platforms as well.  Defendants are aware of this too.

**2.  The campaign of threats against social-media companies to demand censorship.**

116.     Defendant Biden, his political allies, and those acting in concert with him have a long history of threatening to use official government authority to impose adverse legal consequences against social-media companies if such companies do not increase censorship of speakers and messages disfavored by Biden and his political allies.  Common threats of adverse legal and/or regulatory consequences include the threat of antitrust enforcement or legislation, and the threat of amending or repealing the liability protections of Section 230 of the Communications Decency Act (CDA), among others, if social-media companies fail to engage in more aggressive censorship of viewpoints, content, and speakers disfavored by Defendants.  These threats are effective because they address legal matters of critical concern to dominant social-media firms.

117.     Defendants have leveraged these threats to secure such increased censorship of speakers, content, and viewpoints that they disfavor on social-media platforms; and they have now moved into a phase of open collusion with the threatened companies, cooperating with them directly to censor speech, speakers, and viewpoints that Defendants disfavor.

118.     Threats from Biden, senior government officials in the Biden administration, and those acting in concert with them come in the context of a history of such threats from senior federal officials politically allied with them.  These threats have routinely linked (1) the prospect of official government action in the form of adverse legislation, regulation, or agency action— especially threats of antitrust legislation and/or enforcement and calls to amend or repeal Section 230 of the CDA, among others—with (2) calls for more aggressive censorship and suppression of speakers, viewpoints, and messages that these officials disfavor.  Recent examples include, but are by no means limited to, the following:

- Speaker Nancy Pelosi, April 12, 2019: "I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it.  And it is not out of the question that that could be removed." *Nancy Pelosi warns tech companies that Section 230 is 'in jeopardy'*, TECH CRUCH (April 12, 2019), at https://techcrunch.com/2019/04/12/nancy-pelosi-section-230/. ("When asked about Section 230, Pelosi referred to the law as a 'gift' to tech companies that have leaned heavily on the law to grow their business…. 'It is a gift to them and I don't think that they are treating it with the respect that they should, and so I think that that could be a question mark and in jeopardy… I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it.  And it is not out of the question that that could be removed.'").

- Senator Mark Warner, Oct. 28, 2020: "It saddens me that some of my colleagues have joined in the Trump Administration's cynical and concerted effort to bully platforms into allowing dark money groups, right-wing militias and even the President himself to continue to exploit social media platforms to sow disinformation, engage in targeted harassment, and suppress voter participation.  We can and should have a conversation about Section 230—and the ways in which it has enabled platforms to turn a blind eye as their platforms are used to facilitate discrimination and civil rights violations, enable domestic terrorist groups to organize violence in plain sight, assist in stalking and networked harassment campaigns, and enable online frauds targeted at vulnerable users…."  Statement of U.S. Sen. Mark R. Warner on Section 230 Hearing (Oct. 28, 2020), *at* https://www.warner.senate.gov/public/index.cfm/2020/10/statement-of-sen-mark-r-warner-on-facebook-s-decision-to-finally-ban-qanon-from-its-platforms.

- Then-Senator Kamala Harris, Sept. 30, 2019: "Look, let's be honest, Donald Trump's Twitter account should be suspended." *Kamala Harris says Trump's Twitter account should be suspended*, CNN.com (Sept. 30, 2019), *at* https://www.cnn.com/2019/09/30/politics/kamala-harris-trump-twitter-cnntv/index.html; *see also* https://twitter.com/kamalaharris/status/1179810620952207362.

- Then-Senator Kamala Harris, Oct. 2, 2019: "Hey @jack [*i.e.*, Twitter CEO Jack Dorsey]. Time to do something about this," providing picture of a tweet from President Trump. https://twitter.com/kamalaharris/status/1179193225325826050.

- Senator Richard Blumenthal, Nov. 17, 2020: "I have urged, in fact, a breakup of tech giants. Because they've misused their bigness and power. …  And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is

way too broad and victims of their harms deserve a day in court." *Breaking the News: Censorship, Suppression, and the 2020 Election Before the S. Comm. on Judiciary*, 116th Cong. at 36:10–15 (2020) (statement of Sen. Richard Blumenthal).

- Senator Mazie Hirono, Feb. 5, 2021: "Sec 230 was supposed to incentivize internet platforms to police harmful content by users.  Instead, the law acts as a shield allowing them to turn a blind eye. The SAFE TECH ACT brings 230 into the modern age and makes platforms accountable for the harm they cause." https://twitter.com/maziehirono/status/1357790558606024705?lang=bg.

- March 2021 Joint Hearing of the Communications and Technology Subcommittee, Joint Statement of Democratic Committee Chairs: "This hearing will continue the Committee's work of holding online platforms accountable for the growing rise of misinformation and disinformation. ... For far too long, big tech has failed to acknowledge the role they've played in fomenting and elevating blatantly false information to its online audiences. Industry self-regulation has failed.  We must begin the work of changing incentives driving social media companies to allow and even promote misinformation and disinformation." *See* Yaël Eisenstat & Justin Hendrix, *A Dozen Experts with Questions Congress Should Ask the Tech CEOs—On Disinformation and Extremism*, JUST SECURITY (Mar. 25, 2021), https://www.justsecurity.org/75439/questions-congress-should-ask-the-tech-ceos-on-disinformation-and-extremism/.

- On April 20, 2022, twenty-two Democratic members of Congress sent a letter to Mark Zuckerberg of Facebook (n/k/a "Meta Platforms, Inc."), demanding that Facebook increase censorship of "Spanish-language disinformation across its platforms."  The letter claimed that "disinformation" was a threat to democracy, and it made explicit threats of adverse legislative

action if Facebook/Meta did not increase censorship: "The spread of these narratives demonstrate that Meta does not see the problem of Spanish-language disinformation in the United States as a critical priority for the health of our democracy.  The lack of Meta's action to swiftly address Spanish-language misinformation globally demonstrates the need for Congress to act to ensure Spanish-speaking communities have fair access to trustworthy information."  The letter demanded information about Facebook's censorship policies on election-related speech for the upcoming elections: "How is Meta preparing to proactively detect and address foreign disinformation operations targeted at Spanish-speaking communities for future elections within the United States, including the 2022 primaries and general election? … [W]hat new steps has Meta taken to ensure the effectiveness of its algorithmic content detection policies to address disinformation and hate-speech across different languages?"  April 20, 2022 Letter of Rep. Tony Cardenas, et al., at https://cardenas.house.gov/imo/media/doc/Meta%20RT%20and%20Spanish%20Language%20Disinformation%20Congressional%20Letter%20Final.pdf.

119.     Comments from two House Members summarize this campaign of pressure and threats: "In April 2019, Louisiana Rep. Cedric Richmond warned Facebook and Google that they had 'better' restrict what he and his colleagues saw as harmful content or face regulation: 'We're going to make it swift, we're going to make it strong, and we're going to hold them very accountable.' New York Rep. Jerrold Nadler added: 'Let's see what happens by just pressuring them.'"  Vivek Ramaswamy and Jed Rubenfeld, Editorial, *Save the Constitution from Big Tech: Congressional threats and inducements make Twitter and Facebook censorship a free-speech violation*, WALL ST. J. (Jan. 11, 2021), https://www.wsj.com/articles/save-the-constitution-from-big-tech-11610387105.

120.     Defendants' political allies have repeatedly used congressional hearings as forums to advance these threats of adverse legislation if social-media platforms do not increase censorship of speakers, speech, content, and viewpoints they disfavor.  They have repeatedly used such hearings to berate social-media firm leaders, such as Mark Zuckerberg of Facebook, Jack Dorsey of Twitter, and Sundar Pichai of Google and YouTube, and to make threats of adverse legal consequences if censorship is not increased.  Such hearings include, but are not limited to, those cited above, as well as an antitrust hearing before the House Judiciary Committee on July 29, 2020; a Senate Judiciary Committee hearing on November 17, 2020; and a House Energy and Commerce Hearing on March 25, 2021.

121.     The flip side of such threats, of course, is the implied "carrot" of retaining Section 230 immunity and avoiding antitrust scrutiny, allowing the major social-media platforms to retain their legally privileged status that is worth billions of dollars of market share.

122.     Starting in or around 2020, if not before, social-media firms have responded to these threats by engaging in increasingly more aggressive censorship of speakers, messages, and viewpoints disfavored by Defendants, senior government officials, and the political left.  "With all the attention paid to online misinformation, it's easy to forget that the big [social-media] platforms generally refused to remove false content purely because it was false until 2020."  Gilead Edelman, *Beware the Never-Ending Disinformation Emergency*, THE WIRED (March 11, 2022), *at* https://www.wired.com/story/youtube-rigged-election-donald-trump-moderation-misinformation/.  On information and belief, it was in response to such threats of adverse legal consequences that social-media companies ramped up censorship in 2020, disproportionately targeting speakers and viewpoints on the political right.  On information and belief, the examples

of censorship of truthful and reliable speech in 2020, cited above, were motivated in whole or in part by such threats.

123.     Then-candidate and now-President Biden has led this charge.  He has tripled down on these threats of adverse official action from his colleagues and allies in senior federal-government positions.  His threats of adverse government action have been among the most vociferous, and among the most clearly linked to calls for more aggressive censorship of disfavored speakers and speech by social-media companies.

124.     For example, on January 17, 2020, then-candidate Biden stated, in an interview with the New York Times editorial board, that Section 230 of the CDA should be "revoked" because social-media companies like Facebook did not do enough to censor supposedly false information in the form of political ads criticizing him—*i.e.*, core political speech.  He stated: "The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one. For Zuckerberg and other platforms."  He also stated, "It should be revoked because it is not merely an internet company.  It is propagating falsehoods they know to be false.... There is no editorial impact at all on Facebook. None. None whatsoever. It's irresponsible. It's totally irresponsible."   N.Y. Times Editorial Board, *Joe Biden* (Jan. 17, 2020), *at* https://www.nytimes.com/interactive/2020/01/17/opinion/joe-biden-nytimes-interview.html. These claims were specifically linked to Facebook's alleged failure to censor *core political speech*—*i.e.*, political ads on Facebook criticizing candidate Biden.  *Id.*

125.     Candidate Biden also threatened that Facebook CEO Mark Zuckerberg should be subject to civil liability and even *criminal prosecution* for not censoring such core political speech: "He should be submitted to civil liability and his company to civil liability…. Whether he engaged in something and amounted to collusion that in fact caused harm that would in fact be equal to a

criminal offense, that's a different issue. That's possible. That's possible it could happen." *Id.*  In other words, Biden's message—not long before he became President of the United States—was that if Facebook did not censor political ads against him, Zuckerberg should go to prison.  These two threats echoed the same threats made by numerous political allies of the President since 2019, cited above.

126.     During the presidential campaign, now-Vice President Harris made similar threats against social-media firms to pressure them to engage in more aggressive censorship of speakers, content, and viewpoints she disfavors.  For example, in addition to the statements cited above, she stated in 2019: "We will hold social media platforms responsible for the hate infiltrating their platforms, because they have a responsibility to help fight against this threat to our democracy.  And if you profit off of hate—if you act as a megaphone for misinformation or cyberwarfare, if you don't police your platforms—we are going to hold you accountable as a community." *Kamala Harris Wants to Be Your Online Censor-in-Chief*, REASON.COM (May 7, 2019), *at* https://reason.com/2019/05/07/kamala-harris-promises-to-pursue-online-censorship-as-president/.

127.     In or around June 2020, the Biden campaign published an open letter and online petition (ironically, on Facebook) calling for Facebook to engage in more aggressive censorship of core political speech and viewpoints that then-Candidate Biden disfavored.  The open letter complained that Facebook "continues to allow Donald Trump to say anything — and to pay to ensure that his wild claims reach millions of voters.  Super PACs and other dark money groups are following his example.  Trump and his allies have used Facebook to spread fear and misleading information about voting…  We call for Facebook to proactively stem the tide of false information by no longer amplifying untrustworthy content and promptly fact-checking election-related

material that goes viral.  We call for Facebook to stop allowing politicians to hide behind paid misinformation in the hope that the truth will catch up only after Election Day.  There should be a two-week pre-election period during which **all** political advertisements must be fact-checked before they are permitted to run on Facebook. … Anything less will render Facebook a tool of misinformation that corrodes our democracy."  Biden-Harris, *Our Open Letter to Facebook* (last visited May 5, 2022), https://joebiden.com/2961-2/.

128.     The online petition demanded that Facebook "[p]romote real news, not fake news," "[q]uickly remove viral misinformation," and "[e]nforce voter suppression rules against everyone—even the President [Trump]."  The petition complained that Facebook "continues to amplify misinformation and lets candidates pay to target and confuse voters with lies."  It demanded that Facebook "promote authoritative and trustworthy sources of election information, rather than rants of bad actors and conspiracy theorists," "promptly remove false, viral information," and "prevent political candidates and PACs from using paid advertising to spread lies and misinformation – especially within two weeks of election day."  Biden-Harris, *#Movefastfixit* (last visited May 5, 2022), https://joebiden.com/facebook/.

129.     On September 28, 2020, the Biden-Harris campaign sent a letter to Facebook accusing it of propagating a "storm of disinformation" by failing to censor the Trump campaign's political speech, including social-media political ads.  Sept. 28, 2020 Biden-Harris Letter, *at* https://www.documentcloud.org/documents/7219497-Facebook-Letter-9-28.html.   The letter accused Facebook of allowing "hyper-partisan" and "fantastical" speech to reach millions of people, and it demanded "more aggressive" censorship of Trump.  *Id.*

130.     A federal lawsuit filed in 2021 alleged that "before and after the November, 2020 election," California government officials "contracted with partisan Biden campaign operatives to

40

police speech online.  The secretary of state of California then sent these flagged tweets to Twitter, Instagram, YouTube and other platforms for their removal." *Harmeet Dhillon: Biden White House 'flags' Big Tech – here's why digital policing is so dangerous*, Fox News (July 16, 2021), *at* https://www.foxnews.com/opinion/biden-white-house-flags-big-tech-digital-policing-harmeet-dhillon. Once in power, Biden and those acting in concert with him would continue this same course of conduct of "flagging" content for censorship by private social-media firms, now using the authority of the *federal* government to "flag" specific speech and speakers for censorship and suppression.

131.     On December 2, 2020—during the presidential transition—Biden's former chief of staff and top technical advisor, Bruce Reed, publicly stated that "it's long past time to hold the social media companies accountable for what's published on their platforms." *Biden Tech Advisor: Hold Social Media Companies Accountable for What Their Users Post*, CNBC.com (Dec. 2, 2020), *at* https://www.cnbc.com/2020/12/02/biden-advisor-bruce-reed-hints-that-section-230-needs-reform.html.  This comment specifically referred to the amendment or repeal of Section 230 of the Communications Decency Act.  *See id.*  Thus, the threat of adverse legal consequences for social-media companies that did not censor opposing political viewpoints was at the forefront of the incoming Biden Administration's public messaging.

132.     Coming into the new Administration, with now-President Biden's political allies in control of both Houses of Congress, social-media companies were on clear notice that the federal government's involvement in social-media censorship was likely to escalate, and their threats of adverse legislation, regulation, and legal action became more ominous.  On information and belief, this caused a chilling effect on speech by prompting social-media companies to ramp up their own

censorship programs against disfavored speech and speakers, to preempt the risk of adverse action against them by the Government.

133.     Once in control of the Executive Branch, Defendants promptly capitalized on these threats by pressuring, cajoling, and openly colluding with social-media companies to actively suppress particular disfavored speakers and viewpoints on social media.

134.     Defendants, those acting in concert with them, and those allied with them routinely seek to justify overt censorship of disfavored speakers and viewpoints by wrapping it in the monikers "misinformation," "disinformation," and/or "malinformation."  Their standard tactic is to label speech that contradicts their preferred political narratives "misinformation," "disinformation," and "malinformation" to justify suppressing it.  Other common buzzwords include calls for a "healthy information ecosystem," "healthy information environment," or "healthy news environment," among others.  This is the Orwellian vocabulary of censorship.  It is deployed aggressively to undermine fundamental First Amendment rights.

135.     As noted above, these labels have proven extremely unreliable.  Defendants' and the political Left's ability to accurately identify "misinformation" and "disinformation" is unreliable because they apply such labels, not based on actual truth or falsity, but based on their current preferred political narrative.  This has resulted, again and again, in the suppression of truthful information under the name of "disinformation" and "misinformation."

**3.  White House and HHS officials collude with social-media firms to suppress speech.**

136.     Before the Biden Administration took office, on information and belief, coordination and collusion between senior HHS officials and social-media companies to censor viewpoints and speakers was already underway.  Once in office, senior officials in the Biden

Administration—in the White House, in HHS, and elsewhere—capitalized and greatly expanded on these efforts.

137.     On information and belief, beginning on or around January or February 2020, if not before, Defendant Dr. Anthony Fauci, a senior federal government official, coordinated with social-media firms to police and suppress speech regarding COVID-19 on social media.

138.     Prior to 2020, as head of NIAID, Dr. Fauci had overseen funding of risky gain-of-function research on viruses, including research at the Wuhan Institute of Virology.  This included research funded through intermediaries such as Dr. Peter Daszak and the EcoHealth Alliance, among others.

139.     In late January and early February 2020, Dr. Fauci received information from colleagues that suggested that the COVID-19 virus may have originated in a laboratory in Wuhan, China.  This revelation threatened to implicate Dr. Fauci in the virus's origins, as he had funded the risky research that, under this theory, led to the virus's origin.  Soon thereafter, Dr. Fauci participated in a conference call with scientists and science-funding authorities intended to discredit and suppress this lab-leak theory.  After the conference call, influential individuals signed public statements that were placed in science journals in attempt to discredit the lab-leak theory.

140.     In the same time frame, Dr. Fauci communicated with Facebook CEO Mark Zuckerberg directly regarding public messaging and the flow of information on social media about the government's COVID-19 response.  For example, in a series of emails produced in response to FOIA requests dated from March 15 to 17, 2020, Zuckerberg invited Fauci to make public statements to be posted for viewing by all Facebook users regarding COVID-19, and also made another proposal that is redacted in FOIA-produced versions but was treated as a high priority by Fauci and NIH staff.

43

141.     In an email on March 15, 2020, Zuckerberg proposed to coordinate with Fauci on COVID-19 messaging to "make sure people can get authoritative information from reliable sources," and he proposed including a video message from Fauci because "people trust and want to hear from experts."  Zuckerberg proposed including this content in a "hub" that "we're going to put at the top of Facebook" to reach "200+ million Americans, 2.5 billion people worldwide."

142.     In the same email, Zuckerberg made a three-line proposal to Fauci that was redacted by the federal government before the email was produced in a FOIA request.

143.     The next day, NIH's communications director emailed Fauci and strongly recommended that he do the videos for Facebook.  Regarding the redacted proposal from Zuckerberg, she stated: "But an even bigger deal is his offer [REDACTED].  The sooner we get that offer up the food-chain the better."  She also stated that her staff was "standing by to discuss this with HHS and WH comms," and requested authority to "determine who the best point of contact would be so the Administration can take advantage of this officer, soonest."  Fauci responded that "I will write or call Mark and tell him that I am interested in doing this.  I will then tell him that you will get for him the name of the USG [on information and belief, shorthand for "U.S. Government"] point of contact."

144.     Fauci responded by email to Zuckerberg on March 17, 2020, agreeing to the collaboration that Zuckerberg proposed and describing his redacted proposal as "very exciting."

145.     As alleged above, around the same time frame as the Zuckerberg-Fauci emails, Facebook and other social-media companies censored and suppressed speakers and speech advocating for the lab-leak theory of COVID-19's origins, despite the overwhelming circumstantial evidence favoring that theory.  This censorship directly implemented the plan, orchestrated by Fauci and others in early 2020, to discredit and suppress the lab-leak theory.

146.     In the same timeframe, Facebook and other social-media companies began an ever-increasing campaign of monitoring, censorship, and suppression of speech and speakers about COVID-19 and issues related to COVID-19.  This campaign would dramatically escalate with the advent of the Biden Administration.

147.     On information and belief, those firms coordinated directly with Fauci, CDC, and other government officials regarding censorship and suppression of disfavored speech and speakers.

148.     For example, Facebook's "COVID and Vaccine Policy" states that Facebook "does not allow false claims about the vaccines or vaccination programs which *public health experts have advised us* could lead to COVID-19 vaccine rejection."  Facebook, *COVID-19 and Vaccine Policy Updates & Protections*, https://www.facebook.com/help/230764881494641 (emphasis added).  On information and belief, Fauci and CDC officials are included among those "public health experts" who "advise[]" Facebook on what to censor.  Facebook also censors COVID-19 information as "false," not based on actual truth or falsity, but based on whether the claim contradicts or challenges the pronouncements of Fauci and the CDC.  *Id.*  This includes strongly supported claims such as "[c]laims that wearing a face mask properly does not help prevent the spread of COVID-19," along with an elaborate list of additional disfavored content and viewpoints subject to censorship.  *Id.*

149.     On information and belief, other social-media firms have similar policies and similar practices of coordinating with Fauci and the CDC and with each other, directly or indirectly, on the suppression of disfavored speakers and speech.

150.     Such collusion between HHS officials and social-media companies on the censorship of disfavored speakers and speech accelerated once the Biden Administration took office.

151.     On May 5, 2021, Defendant Psaki gave a White House press conference at which she stated that "[t]he President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections.  And we've seen that over the past several months, broadly speaking…. we've seen it from a number of sources." White House, *Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack, May 5, 2021, at* https://www.whitehouse.gov/briefing-room/press-briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-tom-vilsack-may-5-2021/.

152.     Echoing Biden's past threats to social-media firms, Psaki immediately went on to state that President Biden "supports better privacy protections and *a robust anti-trust program*." *Id.* (emphasis added).  She linked the threat of anti-trust enforcement to the demand for more aggressive censorship by social-media platforms, stating that the President's "view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public."  *Id.*

153.     At a White House press briefing with Psaki on July 15, 2021, Surgeon General Vivek Murthy announced that "health misinformation" constitutes an "urgent public health threat," stating that he had "issued a Surgeon General's Advisory on the dangers of health misinformation. Surgeon General Advisories are reserved for urgent public health threats. And while those threats have often been related to what we eat, drink, and smoke, today we live in a world where

misinformation poses an imminent and insidious threat to our nation's health." The White House, *Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy, July 15, 2021*, at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/.

154.     Surgeon General Murthy stated that "[m]odern technology companies have enabled misinformation to poison our information environment with little accountability to their users. They've allowed people who intentionally spread misinformation — what we call 'disinformation' — to have extraordinary reach." *Id.* He accused their algorithms of "pulling us deeper and deeper into a well of misinformation." *Id.*

155.     Surgeon General Murthy explicitly called for more aggressive censorship of social-media speech, stating that "we're saying we expect more from our technology companies. …. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms." *Id.* "

156.     He also stated that "technology companies have a particularly important role" to play in combating "misinformation." He stated: "We know that the dramatic increase in the speed — speed and scale of spreading misinformation has, in part, been enabled by these platforms. So that's why in this advisory today, we are asking them to step up. We know they have taken some steps to address misinformation, but much, much more has to be done. And we can't wait longer for them to take aggressive action because it's costing people their lives." *Id.*

157.     He also stated: "we are asking technology companies to help lift up the voices of credible health authorities…. [T]hey have to do more to reduce the misinformation that's out there so that the true voices of experts can shine through." *Id.*

158.     At the same press briefing, after the Surgeon General spoke, Defendant Psaki stated: "[W]e are in regular touch with these social media platforms, and those engagements *typically happen through members of our senior staff*, but also members of our COVID-19 team, given, as Dr. Murthy conveyed, this is a big issue of misinformation, specifically on the pandemic." *Id.* (emphasis added).  She added, "*We're flagging problematic posts for Facebook that spread disinformation*."  *Id.* (emphasis added).  She stated, "we have recommended—proposed that they create a robust enforcement strategy," *i.e.*, a more aggressive censorship program.  *Id.*

159.     Psaki called on social-media companies to censor particular disfavored speakers, stating: "[T]here's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms. All of them remain active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns."  *Id.*  And she called on Facebook and other social-media companies to censor disfavored content and disfavored viewpoints: "[I]t's important to take faster action against harmful posts. As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days.  That's too long. The information spreads too quickly."  *Id.*

160.     She stated that "[w]e engage with them [*i.e.*, social-media companies] regularly and *they certainly understand what our asks are*."  *Id.* (emphasis added).  She stated that, "we've made a calculation to push back on misinformation," and that "we are working to combat misinformation that's traveling online."  *Id.*

161.     The same day, the Surgeon General released his advisory regarding "health misinformation."  It defined "health misinformation" as "information that is false, inaccurate, or

48

misleading according to the best available evidence at the time.  Misinformation has caused confusion and led people to decline COVID-19 vaccines, reject public health measures such as masking and physical distancing, and use unproven treatments." *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment*, at 4 (July 15, 2021), *at* https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf.

162.   The Surgeon General's advisory called for social-medial companies to "make meaningful long-term investments to address misinformation, including product changes," to "[r]edesign recommendation algorithms to avoid amplifying misinformation," to "build in 'frictions'— such as suggestions and warnings—to reduce the sharing of misinformation," and to "make it easier for users to report misinformation." *Id.* at 12.  It called on social-media companies to "[s]trengthen the monitoring of misinformation," and to censor disfavored speakers swiftly and aggressively: "Prioritize early detection of misinformation 'super-spreaders' and repeat offenders. Impose clear consequences for accounts that repeatedly violate platform policies." *Id.*

163.   Facebook responded by stating that it was, in fact, aggressively censoring "health misinformation," and *coordinating with the Government to do so*.  "A Facebook spokesperson said the company has *partnered with government experts*, health authorities and researchers to take 'aggressive action against misinformation about COVID-19 and vaccines to protect public health.'" *White House Slams Facebook as Conduit for COVID-19 Misinformation*, REUTERS (July 15, 2021), at https://www.reuters.com/world/us/us-surgeon-general-warns-over-covid-19-misinformation-2021-07-15/ (emphasis added). "'So far we've removed more than 18 million pieces of COVID misinformation, [and] removed accounts that repeatedly break these rules…,' the spokesperson added." *Id.*

49

164.     Facebook stated that it "has introduced rules against making certain false claims about COVID-19 and its vaccines." *Id.*

165.     The next day, July 16, 2021, a reporter asked President Biden what he thought of COVID misinformation on social media, and he responded, referring to platforms like Facebook, by stating: "They're killing people." *They're Killing People: Biden Denounces Social Media for Virus Disinformation*, N.Y. TIMES (July 16, 2021), *at* https://www.nytimes.com/2021/07/16/us/politics/biden-facebook-social-media-covid.html.   The New York Times reported that "this week, White House officials went further and singled out social media companies for allowing false information to proliferate. That came after weeks of failed attempts to get Facebook to turn over information detailing what mechanisms were in place to combat misinformation about the vaccine, according to a person familiar with the matter." *Id.*

166.     The same day, July 16, 2021, Psaki explicitly called for social-media companies to coordinate with *each other* in censoring disfavored speakers, to ensure that such speakers are completely muzzled.  "You shouldn't be banned from one platform and not others … for providing misinformation out there."  White House, Press Briefing by Press Secretary Jen Psaki, July 16, 2021, *at*   https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/.   On information and belief, social-media companies have heeded this demand, and they do, in fact, coordinate extensively with each other in censorship of disfavored speakers, speech, and viewpoints on social media.

167.     Psaki also demanded that social-media companies "create robust enforcement strategies," "tak[e] faster action against harmful posts," and "promot[e] quality information algorithms"—which is a euphemism for algorithms that suppress disfavored messages.  *Id.*  When asked whether Facebook's already-aggressive censorship—it claimed to have suppressed 18

50

million pieces of COVID-19-related "misinformation"—was "sufficient," she responded, "Clearly not, because we're talking about additional steps that should be taken." *Id.*

168.    Four days later, July 20, 2021, the White House explicitly threatened to amend or repeal the liability protections of § 230 of the Communications Decency Act if social-media companies did not increase censorship of disfavored speakers and viewpoints. *'They Should Be Held Accountable': White House Reviews Platforms' Misinformation Liability*, USA TODAY (July 20, 2021), *at* https://www.usatoday.com/story/news/politics/2021/07/20/white-house-reviews-section-230-protections-covid-misinformation/8024210002/.  The White House communications director announced that "[t]he White House is assessing whether social media platforms are legally liable for misinformation spread on their platforms." *Id.*  "We're reviewing that, and certainly, they should be held accountable," she said. *Id.*

169.    She "specified the White House is examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites." *Id.* Media reported that, in connection with this threat, "Relations are tense between the Biden administration and social media platforms, specifically Facebook, over the spread of misinformation online." *Id.*; *see also, e.g., White House says social media networks should be held accountable for spreading misinformation*, CNBC.com (July 20, 2021), *at* https://www.cnbc.com/2021/07/20/white-house-social-networks-should-be-held-accountable-for-spreading-misinfo.html.  When asked whether the President is "open to amending 230 when Facebook and Twitter and other social media outlets spread false information that cause Americans harm, shouldn't they be held accountable in a real way?"  White House Communications Director Bedingfield responded, "We're reviewing that and certainly they should be held accountable.  And

I think you heard the president speak very aggressively about this.  He understands that this is an important piece of the ecosystem."  *Id.*

170.     After this series of public statements, responding to "White House pressure," Facebook censored the accounts of the 12 specific disfavored speakers whom Psaki accused of spreading health misinformation.  *Facebook takes action against 'disinformation dozen' after White House pressure*, CNN.com (Aug. 18, 2021), *at* https://www.cnn.com/2021/08/18/tech/facebook-disinformation-dozen/index.html.   Psaki had "hammered the platform in July for allowing the people identified in the report to remain on its platform."  *Id.*  After they were singled out for censorship by the White House, Facebook "removed over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people, for violating our policies."  *Id.*

171.     Defendants responded to this censorship by demanding still more censorship by social-media platforms, including but not limited to Facebook.  "[A]fter Facebook's action against the 'disinformation dozen,' a White House spokesperson continued to strongly criticize the company."  *Id.*  "'In the middle of a pandemic, being honest and transparent about the work that needs to be done to protect public health is absolutely vital, but Facebook still refuses to be straightforward about how much misinformation is circulating—and being actively promoted— on their platform,' a White House spokesperson told CNN Business.  'It's on everyone to get this right so we can make sure the American people are getting accurate information to protect the health of themselves and their loved ones -- which is why the Administration will continue to push leaders, media outlets, and leading sources of information like Facebook to meet those basic expectations,' the spokesperson added."  *Id.*

172.     On February 1, 2022, Psaki was asked at a White House press conference whether the Administration was satisfied with Spotify's decision to affix advisory warnings to Joe Rogan's immensely popular podcast, which featured speakers that contradicted the Administration's messaging about COVID-19 and vaccines, or whether the government "think[s] that companies like Spotify should go further than just, you know, putting a label on" disfavored viewpoints and speakers.  Psaki responded by demanding that Spotify and other platforms "do[] more" to block disfavored speech: "[O]ur hope is that all major tech platforms … be vigilant to ensure the American people have access to accurate information on something as significant as COVID-19. So, this disclaimer – it's a positive step.  But we want every platform to continue *doing more* to call out … mis- and disinformation while also uplifting accurate information."  She stated that Spotify's advisory warnings are "a good step, it's a positive step, but *there's more that can be done*."  White House, *Press Briefing by Press Secretary Jen Psaki, February 1, 2022* (emphases added), *at* https://www.whitehouse.gov/briefing-room/press-briefings/2022/02/01/press-briefing-by-press-secretary-jen-psaki-february-1-2022/.

173.     On March 3, 2022, the Surgeon General issued a formal "Request for Information" on the "Impact of Health Misinformation" on social media.  HHS, *Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID-19 Pandemic Request for Information* (RFI), 87 Fed. Reg. 12,712-12,714 (March 2, 2022).

174.     In the RFI, "[t]he Office of the Surgeon General requests input from interested parties on the impact and prevalence of health misinformation in the digital information environment during the COVID–19 pandemic."  *Id.* at 12,712.  The RFI states that "the speed, scale, and sophistication with which misinformation has been spread during the COVID-19 pandemic has been unprecedented," and it implies that social-media companies are to blame,

carrying a clear threat of future regulation: "This RFI seeks to understand both the impact of health misinformation during the COVID–19 pandemic and the unique role that technology and social media platforms play in the dissemination of critical health information during a public health emergency." *Id.* at 12,713.

175.    The RFI seeks specific information about health "misinformation" on such social-media platforms: "Information about how widespread COVID–19 misinformation is on individual technology platforms including: General search engines, content sharing platforms, social media platforms, e-commerce platforms, crowd sourced platforms, and instant messaging systems." *Id.*

176.    The RFI seeks: "Any aggregate data and analysis on how many users were exposed, were potentially exposed, or otherwise engaged with COVID–19 misinformation," where "[e]xposure is defined as seeing content in newsfeeds, in search results, or algorithmically nominated content," and "[p]otential exposure is the exposure users would have had if they could see all the content that is eligible to appear within their newsfeeds." *Id.* at 12,714.  It also seeks "[i]nformation about COVID–19 misinformation policies on individual technology platforms," including "[a]ny aggregate data and analysis of technology platform COVID–19 misinformation policies including implementation of those policies and evaluations of their effectiveness." *Id.*

177.    Media reports aptly described Murthy as "demand[ing]" information about the major sources of COVID-19 misinformation by May 2, 2022.  Brad Dress, *Surgeon General Demands Data on COVID-19 Misinformation from Major Tech Firms*, THE HILL (March 3, 2022), *at*    https://thehill.com/policy/healthcare/596709-surgeon-general-demands-data-on-covid-19-misinformation-from-major-tech/.  "In a formal notice, Murthy requested major tech platforms submit information about the prevalence and scale of COVID-19 misinformation on their sites, from social networks, search engines, crowdsourced platforms, e-commerce platforms and instant

messaging systems." *Id.* "In his notice to major tech platforms, Murthy is requesting specific information on demographics affected by misinformation as well as sources of misinformation and 'exactly how many users saw or may have been exposed to instances of Covid-19 misinformation.'" *Id.*

### 3. White House and DHS officials collude with social-media firms to suppress speech.

178.    On information and belief, senior officials in the Biden Administration and the Department of Homeland Security are also now colluding with social-media companies to suppress disfavored speakers and viewpoints.  These efforts include censorship of disfavored content and viewpoints about election integrity, among other topics, under the guise of suppressing "misinformation" and "domestic terrorism."  These efforts culminated with last week's Orwellian announcement of the creation of a "Disinformation Governance Board" within DHS.

179.    A direct forum for government officials to call for social-media censorship of election-related "misinformation" was already in place as the general election cycle of 2020 heated up.

180.    In August 2020, social-media firms "met with federal government officials to discuss how to handle misinformation during this month's political conventions and election results this fall."  Ingram et al., *Big Tech met with govt to discuss how to handle election results*, NBC News (Aug. 20, 2022), *at* https://www.nbcnews.com/tech/tech-news/big-tech-met-gov-t-discuss-how-handle-election-results-n1236555.

181.    This was one of a "series" of meetings between major social-media companies and government officials about the suppression of election-related "misinformation": "'We held the latest in a series of meetings with government partners today where we each provided updates on what we're seeing on our respective platforms and what we expect to see in the coming months,'

companies including Google, Facebook, Twitter and Reddit said in a joint statement after the meeting." *Id.* "The statement also included Microsoft, Verizon Media, Pinterest, LinkedIn and the Wikimedia Foundation, which operates Wikipedia and other sites." *Id.*

182.     The discussion was reported as "one in a series of monthly meetings between the government and tech companies" and involved "back-and-forth conversation on a variety of topics." *Id.* Neither the "topics" of the "conversation" nor the particular participants on behalf of the government were disclosed. *Id.* "According to the industry statement, participants in Wednesday's meeting also included representatives from the FBI's foreign influence task force, the Justice Department's national security division, the Office of the Director of National Intelligence and the Cybersecurity and Infrastructure Security Agency." *Id.* "The companies said they would continue to meet regularly before the November election." *Id.*

183.     On September 28, 2020, the Biden-Harris campaign sent a letter to Facebook demanding that Facebook take "more aggressive" action to censor statements by President Trump and the Trump campaign that raised concerns about election security and the security of voting by mail. Sept. 28, 2020 Biden-Harris Letter, https://www.documentcloud.org/documents/7219497-Facebook-Letter-9-28.html.   The letter accused Facebook of being a "propagator of disinformation" for refusing to censor the rival campaign's core political speech, thus promoting "distrust in our democracy" and threatening to "undermine democracy." *Id.* The Biden-Harris campaign described the Trump campaign's political speech as "dangerous claptrap" and argued that "[r]emoving this video should have been the easiest of calls." *Id.* The letter demanded that Facebook "remove Mr. Trump's posts, which violate your policies." *Id.* (underline in original).

184.     The same letter complained that Facebook's "algorithm" permitted Trump's political speech to reach millions of people.  It complained about the successful reach on Facebook

of political speech that it opposed, bemoaning the fact that "a hyperpartisan propaganda organ like the *Daily Wire* is Facebook's top web publisher." *Id.* The Biden-Harris campaign accused Facebook of allowing speech that it favored "to be drowned out by a storm of disinformation." *Id.* And it concluded, "We will be calling out those failures [to censor Trump's political speech] as they occur over the coming 36 days," *i.e.*, until the November 2020 general election. *Id.*

185. On information and belief, responding to prior threats from Defendants and those acting in concert with them, Facebook complied with this demand and did engage in "more aggressive" censorship of the Trump campaign's core political speech from then on, resulting in an aggressive campaign to suppress President Trump and his campaign's political speech, especially on issues related to election security. In the wake of the Biden-Harris letter, Facebook declared that it "won't allow ads with content that seeks to delegitimize the outcome of an election," and it ramped up censorship of Trump's political speech thereafter.

186. As one commentator noted, "It's no surprise that Facebook's policy change happened the same week that the Biden campaign demanded Trump's Facebook posts be censored." Alexander Hall, *Liberal Media Used to Warn Against Mailing Votes; Now Big Tech, Left Are Protecting It* (Oct. 30, 2020), *at* https://www.newsbusters.org/blogs/free-speech/alexander-hall/2020/10/30/liberal-media-used-warn-against-mailing-votes-now-big.

187. At the same time, "Twitter also modified its rules, stating: 'we may label and reduce the visibility of Tweets containing false or misleading information about civic processes in order to provide additional context' in its Civic integrity policy." *Id.*

188. Both platforms ramped up censorship of core political speech of President Trump and his campaign, as well as core political speech by others favoring their messages and campaigns, in the critical final month before the 2020 general election, resulting in egregious acts

of censorship.  These acts of censorship included suppression of expressions of concern about election security as a result of the massive increase in voting by mail during the 2020 general election.

189.     In perhaps the most notorious example, as noted above, Twitter, Facebook, and other social-media companies censored the New York Post's entirely truthful and carefully sourced article about Hunter Biden's laptop on October 14, 2020, as discussed further above.  This censorship included locking the New York Post's social-media accounts for weeks until after the election.

190.     According to one survey, sixteen percent of Biden voters polled stated that they would have changed their votes if they had known about the Hunter Biden laptop story before the election, which could have changed the outcome of the election.

191.     This censorship required deliberate, aggressive action by social-media firms. "Facebook moderators had to manually intervene to suppress a controversial New York Post story about Hunter Biden, according to leaked moderation guidelines seen by the Guardian." *Facebook leak reveals policies on restricting New York Post's Biden story*, THE GUARDIAN (Oct. 30, 2020), *at* https://www.theguardian.com/technology/2020/oct/30/facebook-leak-reveals-policies-restricting-new-york-post-biden-story.

192.     At the time, Facebook claimed that the censorship of the Hunter Biden laptop story was "part of our standard process to reduce the spread of misinformation.  We temporarily reduce distribution pending factchecker review." *Id.*  But this was not true.  In fact, Facebook imposed "special treatment" on the New York Post to suppress the story, which included "manually overrid[ing]" Facebook's own guidelines for suppressing so-called "misinformation." *Id.*

193.     On December 10, 2020, nine Democratic House Members in the so-called "Congressional Task Force on Digital Citizenship" (a group of exclusively Democratic members of Congress) sent a letter to President-elect Biden, calling for the incoming Administration to create task forces that would increase censorship of "disinformation and misinformation" on social media.     Dec.     10,     2020     Letter     of     Rep.     Wexton,     et     al.,     *at* https://wexton.house.gov/uploadedfiles/12.10.20_house_democrats_disinformation_roadmap_to _president-elect_biden.pdf.

194.     The letter decried the rise of "news environments online, which report vastly different information and do not offer the same editorial standards to protect against disinformation and misinformation that traditional news media do." *Id.* It criticized social-media platforms for failing to censor "disinformation" more aggressively: "As social media platforms post record revenues from engagement, they seldom act as responsible information gatekeepers and, in fact, have financial incentives to direct users to posts that are false, misleading, or emotionally manipulative." *Id.*

195.     The letter called on President-elect Biden to "[s]upport collaboration between government and civic organizations to combat dangerous propaganda." *Id.* The letter acknowledged that "social media platforms have taken some steps to limit the spread of harmful disinformation and misinformation over the past year," but urged that these steps were not nearly enough, arguing that "we can still see how easily this content is posted and amplified by bad actors and unknowing citizens," that "platforms have financial incentives for engaging posts to reach larger audiences, regardless of the content," and that "computer algorithms still make up a majority of content moderation, and platforms have at times refused to take action against accounts and groups promoting violence and hate speech." *Id.*

196.     The letter called for President-elect Biden to deploy the U.S. Department of Justice and the Department of Homeland Security to combat "disinformation," and it called for more direct government involvement in policing the content of political speech on social media platforms, in order to "build citizen resilience to disinformation and support a healthy information ecosystem"—which is Newspeak for viewpoint- and content-based censorship.

197.     In announcing the letter, its lead signer, Rep. Wexton, openly stated that Americans lack the sophistication to make their own judgments about truth and falsity of online speech, and that government-approved "gatekeepers" of information should be imposed:  "In the letter, the Members recognize that, while a growing number of people in the U.S. are getting their news from social media platforms, many Americans are ill-equipped to recognize and sift through false, misleading, or emotionally manipulative posts. Additionally, there exists a lack of effective information gatekeepers to protect against disinformation threats online."  *See* Dec. 10, 2020 News Release, https://wexton.house.gov/news/documentsingle.aspx?DocumentID=431.

198.     Consistent with this letter, the Biden Administration launched several initiatives designed to inject the power and authority of federal agencies like DHS into policing "disinformation" and "misinformation" online—which, all too often, means censoring core political speech disfavored by government officials.

199.     On information and belief, DHS and its officials are actively engaged in this project of procuring the censorship of disfavored speakers, content, and viewpoints in speech about election integrity.

200.     On May 3, 2021, it was reported that DHS intended to "partner with private firms," *i.e.*, social-media companies, to monitor disfavored speech online.  *Biden team may partner with private firms to monitor extremist chatter online*, CNN.com (May 3, 2021), *at*

https://www.cnn.com/2021/05/03/politics/dhs-partner-private-firms-surveil-suspected-domestic-terrorists/index.html.  The purpose of these "partnerships" was to evade legal, constitutional, and ethical problems with DHS's direct surveillance of online speech: "The Department of Homeland Security is limited in how it can monitor citizens online without justification and is banned from activities like assuming false identities to gain access to private messaging apps."  *Id.*  "Instead, federal authorities can only browse through unprotected information on social media sites like Twitter and Facebook and other open online platforms."  *Id.* "The plan being discussed inside DHS, according to multiple sources, would, in effect, allow the department to circumvent those limits."  *Id.*  "Outsourcing some information gathering to outside firms would give DHS the benefit of tactics that it isn't legally able to do in-house, such as using false personas to gain access to private groups used by suspected extremists, sources say."  *Id.*

201.    As noted above, on May 5, 2021, Defendant Psaki stated at a White House press conference that "[t]he President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and *elections*."  White House, Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack, May 5, 2021 (emphasis added), *at* https://www.whitehouse.gov/briefing-room/press-briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-tom-vilsack-may-5-2021/.  Psaki immediately went on to state that President Biden "supports better privacy protections and *a robust anti-trust program*."  *Id.* (emphasis added).  And she stated that the President's "view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public."  *Id.*

202.     In the same press conference, Psaki notoriously went on to state, "We're flagging problematic posts for Facebook that spread disinformation." *Id.*  On information and belief, especially in light of Psaki's earlier reference to speech about "elections," this statement about "flagging problematic posts" referred not just to social-media speech about COVID-19, but also social-media speech about election integrity.  *See, e.g., White House says social media platforms should not amplify 'untrustworthy' content*, REUTERS (May 5, 2021), *at* https://www.reuters.com/article/ctech-us-trump-facebook-biden-idCAKBN2CM1XU-OCATC.

203.     On July 26, 2021, the Global Internet Forum to Counter Terrorism (GIFCT), an "organization formed by some of the biggest U.S. tech companies including Facebook and Microsoft," which includes DHS on its board of advisors, announced that it is "significantly expanding the types of extremist content shared between firms in a key database," to move from images and videos to content-based speech tracking.  *Facebook and tech giants to target attacker manifestos, far-right militias in database*, REUTERS (July 26, 2021), *at* https://www.reuters.com/technology/exclusive-facebook-tech-giants-target-manifestos-militias-database-2021-07-26/.

204.     "GIFCT … was created in 2017 under pressure from U.S. and European governments," and "its database mostly contains digital fingerprints of videos and images related to groups on the U.N. Security Council's consolidated sanctions list and a few specific live-streamed attacks." *Id.*  "Until now, the Global Internet Forum to Counter Terrorism's (GIFCT) database has focused on videos and images from terrorist groups on a United Nations list," but now the group announced that it would move into content-based speech tracking.  *Id.*  On information and belief, DHS officials including Defendants have access to such database(s) as tools to advance censorship of online speech.

205.     Shortly thereafter, on August 2, 2021, DHS Secretary Mayorkas announced that DHS was working directly with social-media companies to censor disfavored speech on social-media platforms.  "On [a] broadcast of MSNBC's 'Andrea Mitchell Reports,' DHS Secretary Alejandro Mayorkas stated that the department is working with tech companies 'that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring.'"  *Mayorkas: We're Working with Platforms on 'How They Can Better Use' Their Terms to 'Prevent Harm' from Misinformation*, BREITBART NEWS (Aug. 2, 2021),  *at*  https://www.breitbart.com/clips/2021/08/02/mayorkas-were-workgin-with-platforms-on-how-they-can-better-use-their-terms-to-prevent-harm-from-misinformation/.

206.     Echoing Psaki's comments at the July 15, 2021 news conference with Surgeon General Murthy, Mayorkas stated: "So, we're working together with them. We're working with the tech companies that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring."  *Id.*  On information and belief, the reference to "us[ing] their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harms from occurring" refers to government-induced censorship of disfavored viewpoints, speakers, and content.

207.     Mayorkas added that there was a federal-government-wide effort to police speech on social media, stating: "[T]he connectivity between speech and violence, the connectivity between active harm and speech is something that we're very focused on, and it's a difficult challenge. But we're working on it and meeting that challenge, again, because of the great

personnel of the Department of Homeland Security and *across the federal enterprise*." *Id.* (emphasis added).

208.     Under continuous pressure from federal officials, including Defendants herein, social-media firms have imposed increasingly draconian censorship on core political speech about election integrity.  For example, in March 2022, YouTube imposed a one-week suspension on The Hill, a well-known political publication covering Congress, for posts that included clips of former President Trump's speech at the CPAC conference and interview on Fox News, which included claims that fraud changed the outcome of the 2020 presidential election.  Gilead Edelman*, Beware the Never-Ending Disinformation Emergency*, THE WIRED (March 11, 2022), *at* https://www.wired.com/story/youtube-rigged-election-donald-trump-moderation-misinformation/.  YouTube relied on its "Elections misinformation policy," under which it censors "Content that advances false claims that widespread fraud, errors, or glitches changed the outcome of *select past national elections*, after final election results are officially certified."  YouTube, *Elections Misinformation Policy*, https://support.google.com/youtube/answer/10835034?hl=en.

209.     This policy is openly content- and viewpoint-based—it applies only to "select" past national elections, and "[u]nder the policy, you can only include those claims if you explicitly debunk or condemn them."  Edelman, *supra*.  On information and belief, this policy is also selective in application, as it is not applied to censor widespread, false Democratic claims that supposed "collusion" between the Trump campaign and Russia changed the outcome of the 2016 presidential election.  And "by asking news hosts to explicitly denounce any mention of election fraud, YouTube isn't just making its own content decisions; it's injecting itself into the editorial processes of actual media outlets."  *Id.*

210.     On November 10, 2021, the Cybersecurity and Infrastructure Security Agency (CISA), an agency within DHS, announced that it was "beefing up its disinformation and misinformation team in the wake of a divisive presidential election that saw a proliferation of misleading information online." *Cyber agency beefing up disinformation, misinformation team*, THE HILL (Nov. 10, 2021), *at* https://thehill.com/policy/cybersecurity/580990-cyber-agency-beefing-up-disinformation-misinformation-team/.  "'I am actually going to grow and strengthen my misinformation and disinformation team,' CISA Director Jen Easterly said." *Id.*  Defendant Easterly said that so-called "disinformation" and "misinformation" pose "a top threat for CISA, which is charged with securing critical infrastructure, to confront." *Id.*

211.     Indulging in a bit of Newspeak of her own, Easterly claimed that social-media speech is a form of "infrastructure," and that policing speech online by the federal government falls within her agency's mission to protect "infrastructure," stating that CISA is "in the business of critical infrastructure, and the most critical infrastructure is our cognitive infrastructure, so building that resilience to misinformation and disinformation, I think, is incredibly important." *Id.*

212.     Easterly announced that CISA was working directly with unnamed "partners in the private sector" and other government agencies to police online speech: "We are going to work with our partners in the private sector and throughout the rest of the government and at the department to continue to ensure that the American people have the facts that they need to help protect our critical infrastructure." *Id.*

213.     With specific reference to hotly disputed election-integrity issues, which comprise core political speech, Easterly stated that Americans should not be allowed to "pick [their] own facts" and make their own decisions about what is true, especially regarding election security: "We now live in a world where people talk about alternative facts, post-truth, which I think is really,

really dangerous if you get to pick your own facts, and it's particularly corrosive when you talk about matters of election security." *Id.* Instead, she indicated, federal officials like herself should intervene to help Americans "pick" the right "facts." *Id.*

214.     CISA appears to be the focus of many of DHS's attempts to police the content of speech and viewpoints on social media.  On information and belief, CISA maintains a number of task forces, working groups, and similar organizations as joint government-private enterprises, which provide avenues for government officials to push for censorship of disfavored viewpoints and speakers online.

215.     In a 2020 document entitled "2020 Election Infrastructure Subsector-Specific Plan," *at* https://www.cisa.gov/sites/default/files/publications/election_infrastructure_subsector_ specific_plan.pdf, CISA stated that it had partnered to "promote" interaction between election officials and the Center for Technology and Civic Life, the now-notorious nonprofit funded by Mark Zuckerberg that engaged in egregious election interference by injecting hundreds of millions of private dollars and personnel into local election offices in heavily Democratic-favoring areas.

216.     CISA routinely expands the definitions of "misinformation" and "disinformation" to include "malinformation," *i.e. truthful* information that the government believes is presented out of context to contradict left-wing political narratives.  CISA defines "malinformation" as information that is "based on fact, but used out of context to mislead, harm, or manipulate." *See, e.g.,* CISA, *We're in This Together.  Disinformation Stops with You.* (last visited May 5, 2022), https://www.cisa.gov/sites/default/files/publications/SLTTCOVIDToolkit_FINAL_508.pdf.

217.     CISA's same publication decries the spreading of "false treatment and prevention measures [for COVID-19], *unsubstantiated rumors regarding the origin of the virus*, and more." *Id.* (emphasis added).  On information and belief, "unsubstantiated rumors regarding the origin of

the [COVID-19] virus" refers to the lab-leak theory of COVID-19's origins, which (as noted above) is supported by compelling circumstantial evidence, both scientific and historical.

218.     CISA's "Mis-, Dis-, and Malinformation [MDM] Planning and Incident Response Guide for Election Officials," *at* https://www.cisa.gov/sites/default/files/publications/mdm-incident-response-guide_508.pdf, calls for constant policing of speech regarding election integrity, stating that "election infrastructure related MDM occurs year-round," and "[f]alse narratives erode trust and pose a threat to democratic transitions, especially, but not limited to, narratives around election processes and the validity of election outcomes." *Id.*  The Guide defines MDM to include "[n]arratives or content that delegitimizes election results or sows distrust in the integrity of the process based on false or misleading claims." *Id.*

219.     On April 12, 2022, CISA published another bulletin announcing that it was coordinating directly with social-media platforms to police "Mis, Dis, Malinformation" (which it calls "MDM").  CISA, *Mis, Dis, Malinformation*, *at* https://www.cisa.gov/mdm.  The bulletin states that, "False or misleading information can evoke a strong emotional reaction that leads people to share it without first looking into the facts for themselves, polluting healthy conversations about the issues and increasing societal divisions." *Id.*  CISA reported that its Countering Foreign Influence Task Force's "mission evolved" during the Biden Administration to address the new "information environment," which (on information and belief) is codespeak for ramping up online censorship: "In 2021, the CFITF officially transitioned into CISA's MDM team, and the mission evolved to reflect the changing information environment." *Id.*  CISA stated that it coordinates directly with social media firms to address "MDM": "The MDM team continues to work in close coordination with interagency and private sector partners, *social media companies*,

academia, and international partners on a variety of projects to build resilience against malicious information activities." *Id.* (emphasis added).

220.     On information and belief, the April 12, 2022, CISA bulletin indicates that CISA works directly with social-media companies to flag content for censorship: "The MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms…." *Id.*  CISA boasts that it has "expanded the breadth of reporting [MDM] to include … more social media platforms," and that "[t]his activity leverages the rapport the MDM team has with the social media platforms to enable shared situational awareness." *Id.*  On information and belief, these statements reflect and express on ongoing practice by government officials of directly colluding with social-media platforms to suppress disfavored speech, viewpoints, content, and speakers on social media.    Again, these statements echo Psaki's statement that the Biden Administration is "flagging problematic posts for Facebook," and Mayorkas's statement that DHS is "working with the tech companies that are the platform for much of the disinformation that reaches the American public" to address so-called misinformation and disinformation.

221.     The same bulletin suggests that CISA is directly involved in such "flagging" related to COVID-19 "misinformation."   It states that "COVID-19-related MDM activities seek to undermine public confidence and sow confusion," and claims that "the rapid evolution of accurate information makes older, dated information a potential catalyst of confusion and distrust as well." *Id.*   Thus, it claims, "[t]he MDM team supports the interagency and *private sector partners'* COVID-19 response efforts via regular reporting and analysis of key pandemic-related MDM trends." *Id.*   On information and belief, these "private sector partners" include social-media firms, and the "reporting and analysis" includes flagging disfavored content for censorship.

222.     On April 27, 2022, Mayorkas announced that DHS was creating a "Disinformation Governance Board" within DHS to combat so-called "misinformation" and "disinformation." *Biden Administration creates 'Disinformation Governance Board' under DHS to fight 'misinformation,'* THE POST MILLENIAL (April 27, 2022), *at* https://thepostmillennial.com/breaking-biden-administration-creates-disinformation-governance-board-under-dhs-to-fight-misinformation. "The Department of Homeland Security is setting up a new board designed to counter misinformation related to homeland security, with a focus specifically on Russia and irregular migration. The board will be called the 'Disinformation Governance Board,' and will be headed by executive director Nina Jankowicz." *Id.* During congressional testimony, Mayorkas described the endeavor as a "just recently constituted Misinformation/Disinformation Governance Board." *Id.* (video link at 1:40).  He stated: "The goal is to bring the resources of the Department together to address this threat." *Id.*

223.     Jankowicz has called for more aggressive censorship of election-related speech by social-media platforms, and has implied that social-media censorship of election-related speech should never relent or be reduced, stating on Twitter: "Considering the long-term damage these lies do to our democracy, I'm dismayed about this decision [not to censor election-related speech more aggressively].  I say this about foreign disinformation and it applies to domestic disinfo too: Elections aren't an end point.  They're an inflection point.  Policies need to reflect that." *Id.*

224.     On information and belief, DHS's new "Disinformation Governance Board" is intended to be used, and will be used, to increase DHS's efforts to induce and procure the censorship of disfavored content, viewpoints, and speakers on social-media platforms.

**4.  Defendants reinforce their threats and admit further colluding to censor free speech.**

225.     On or around April 25, 2022—two days before DHS announced the creation of its "Disinformation Governance Board"—it was reported that free-speech advocate Elon Musk would acquire Twitter and make it a privately held company.  Left-wing commentators widely decried this news on the ground that free speech on Twitter would allow the spread of so-called "misinformation" and "disinformation."

226.     On April 25, 2022, Psaki was asked at a White House press briefing to respond to the news that Elon Musk would acquire Twitter, and asked "does the White House have any concern that this new agreement might have President Trump back on the platform?"  White House, *Press Briefing by Press Secretary Jen Psaki, April 25, 2022*, at https://www.whitehouse.gov/briefing-room/press-briefings/2022/04/25/press-briefing-by-press-secretary-jen-psaki-april-25-2022/.

227.     Psaki responded by reiterating the threats of adverse legal consequences to Twitter and other social media platforms, specifically referencing antitrust enforcement and Section 230 repeal: "No matter who owns or runs Twitter, the President has long been concerned about the power of large social media platforms … [and] has long argued that tech platforms must be held accountable for the harms they cause.  He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more.  And he's encouraged that there's bipartisan interest in Congress."  *Id.*

228.     At the same press briefing, Psaki was asked: "Are you concerned about the kind of purveyors of election misinformation, disinformation, health falsehoods, sort of, having more of an opportunity to speak there on Twitter?"  She responded by specifically linking the legal threats to the social-media platforms' failure to more aggressively censor free speech: "We've long talked about and the President has long talked about his concerns about the power of social media

platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable."

229.    Psaki was then asked a question that noted that "the Surgeon General has said that misinformation about COVID amounts to a public health crisis," and then queried, "would the White House be interested in working with Twitter like it has in the past to continue to combat this kind of misinformation?  Or are we in a different part of the pandemic where that kind of partnership is no longer necessary?"  *Id.*

230.    Psaki responded by reaffirming that senior officials within the White House and/or the Administration are continuing to coordinate directly with social-media platforms to censor disfavored speakers and content on social media, and directly linking these efforts to the repeated threat of adverse legal action: "we engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue.  But there are also reforms that we think Congress could take and we would support taking, including reforming Section 230, enacting antitrust reforms, requiring more transparency.  And the President is encouraged by the bipartisan support for — or engagement in those efforts."  *Id.*

**5.  Defendants have successfully procured the censorship of core political speech.**

231.    As a direct result of the conduct alleged herein, Defendants have achieved a great deal of success in procuring the censorship of disfavored speakers, viewpoints, and content on social media, as alleged further herein—including core political speech.

232.    Among other things, they have achieved astonishing success in muzzling public criticism of President Biden.  A recent review by the Media Research Center identified 646 instances over the last two years where social-media firms censored public criticism of then-Candidate and now-President Biden.  *See* Joseph Vasquez and Gabriela Pariseau, *Protecting the*

*President: Big Tech Censors Biden Criticism 646 Times Over Two Years* (April 21, 2022), *at* https://censortrack.org/protecting-president-big-tech-censors-biden-criticism-646-times-over-two-years.

233.     "The Media Research Center found more than 640 examples of bans, deleted content and other speech restrictions placed on those who criticized Biden on social media over the past two years." *Id.* "MRC Free Speech America tallied 646 cases in its CensorTrack database of pro-Biden censorship between March 10, 2020, and March 10, 2022. The tally included cases from Biden's presidential candidacy to the present day." *Id.*

234.     "The worst cases of censorship involved platforms targeting anyone who dared to speak about any subject related to the *New York Post* bombshell Hunter Biden story. … Big Tech's cancellation of that story helped shift the 2020 election in Biden's favor.  Twitter locked the Post's account for 17 days.  In addition, Twitter slapped a 'warning label' on the GOP House Judiciary Committee's website for linking to the Post story." *Id.*  "CensorTrack logged 140 instances of users—including lawmakers, organizations, news outlets and media personalities—censored for sharing anything related to the bombshell Hunter Biden laptop story." *Id.*

235.     "Twitter was the most aggressive censor when it came to the Biden laptop story. CensorTrack entries show that users could not tweet the story or pictures of the Post story."

236.     "Big Tech even axed those who blamed the current inflation crisis on Biden.  For example, Facebook censored Heritage Action, the advocacy arm of the conservative Heritage Foundation, on March 15, simply for posting a video quoting Biden's embarrassing statements on energy policy.  Facebook placed an interstitial, or filter, over Heritage Action's video, suppressing the post's reach.  The video showed Biden and officials in his administration explaining how his policies would cause gas prices to rise." *Id.*

72

237.     "[T]he largest category by far included users who dared to call out Biden's notoriously creepy, touchy-feely behavior around women and children.  The 232 cases of comedic memes, videos, or generic posts about Biden's conduct composed more than one-third of CensorTrack's total instances of users censored for criticizing the president."  *Id.*

238.     "Big Tech even went after posts that quoted Biden's own words and made him look awful in retrospect."  *Id.*

239.     "The list of censorship targets included an array of prominent influencers on social media: Trump; lawmakers like Sen. Ted Cruz (R-TX) and House Minority Leader Kevin McCarthy (R-CA); news outlets like the New York Post, The Washington Free Beacon and The Federalist; satire site The Babylon Bee; celebrities like Donald Trump Jr. and James Woods, and media personalities like Daily Wire host Candace Owens, Salem radio host Sebastian Gorka and radio host Dana Loesch."  *Id.*

240.     Thus, Defendants' conduct alleged herein has created, with extraordinary efficacy, a situation where Americans seeking to exercise their core free-speech right to criticize the President of the United States are subject to aggressive prior restraint by private companies acting at the bidding of government officials.  This situation is intolerable under the First Amendment.

### CLAIMS FOR RELIEF

### COUNT ONE – VIOLATION OF THE FIRST AMENDMENT
### Against All Defendants

241.     All foregoing Paragraphs are incorporated as if set forth fully herein.

242.     The First Amendment prohibits Congress from making laws "abridging the freedom of speech."  U.S. CONST. amend. I.  This prohibition applies to restrictions on speech by all branches of the federal government.  *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017).

243.    The Constitutions of Missouri, Louisiana, and every other State provide similar or more robust protection for free-speech rights.

244.    An enormous amount of speech and expression occurs of social media.  Social-media platforms have become, in many ways, "the modern public square."  *Packingham*, 137 S. Ct. at 1737.  Social media platforms provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard."  *Id.*  They also permit private citizens to interact directly with public and elected officials.

245.    Social-media platforms are akin to common carriers and/or public accommodations that, under longstanding statutory and common-law doctrines, should be subject to non-discrimination rules in accessing their platforms, which discrimination on the basis of content and viewpoint would violate.

246.    "Historically, at least two legal doctrines limited a company's right to exclude." *Knight First Amendment Institute*, 141 S. Ct. at 1222 (Thomas, J., concurring).  "First, our legal system and its British predecessor have long subjected certain businesses, known as common carriers, to special regulations, including a general requirement to serve all comers."  *Id.*  "Second, governments have limited a company's right to exclude when that company is a public accommodation. This concept—related to common-carrier law—applies to companies that hold themselves out to the public but do not 'carry' freight, passengers, or communications."  *Id.* Absent the artificial immunity created by the overbroad interpretations of Section 230 immunity, these legal doctrines—along with private and free-market forces—would impose a powerful check on content- and viewpoint-based discrimination by social-media platforms.  *See id.*

247.    As alleged further herein, through Section 230 immunity and other actions, the federal government has abrogated these legal restraints on social-media censorship; it has

artificially subsidized, encouraged, and enabled the emergence of a small group of immensely powerful social-media companies; and it has conferred on that cartel powerful legal shields protecting its ability to censor and suppress speech on social media based on content and viewpoint with impunity.

248.    As alleged further herein, Defendants have coerced, threatened, and pressured social-media platforms to censor disfavored speakers and viewpoints by using threats of adverse government action, including threats of increased regulation, antitrust enforcement or legislation, and repeal or amendment of Section 230 CDA immunity, among others.

249.    As alleged further herein, Defendants also hold out the "carrot" of continued protection under Section 230 and antitrust law, and thus preserving the legally favored status of social-media platforms.  Commentators have aptly summarized this carrot-stick dynamic: "Section 230 is the carrot, and there's also a stick: Congressional Democrats have repeatedly made explicit threats to social-media giants if they failed to censor speech those lawmakers disfavored."  Vivek Ramaswamy and Jed Rubenfeld, *Save the Constitution from Big Tech: Congressional threats and inducements make Twitter and Facebook censorship a free-speech violation*, WALL STREET JOURNAL (Jan. 11, 2021).  "Facebook and Twitter probably wouldn't have become behemoths without Section 230."  *Id.*  "Either Section 230 or congressional pressure alone might be sufficient to create state action. The combination surely is."  *Id.*

250.    As alleged further herein, as a result of such threats and inducements, Defendants are now directly colluding with social-media platforms to censor disfavored speakers and viewpoints, including by pressuring them to censor certain content and speakers, and "flagging" disfavored content and speakers for censorship.  Defendants have thus engaged in joint action with

private parties and acted in concert with private parties to deprive Missourians, Louisianans, and Americans of their constitutional rights under the First Amendment and related state-law rights.

251.    Defendants' actions constitute government action for at least five independently sufficient reasons: (1) absent federal intervention, common-law and statutory doctrines, as well as voluntary conduct and natural free-market forces, would have restrained the emergence of censorship and suppression of speech of disfavored speakers, content, and viewpoint on social media; and yet (2) through Section 230 of the CDA and other actions, the federal government subsidized, fostered, encouraged, and empowered the creation of a small number of massive social-media companies with disproportionate ability to censor and suppress speech on the basis of speaker, content, and viewpoint; (3) such inducements as Section 230 and other legal benefits (such as the absence of antitrust enforcement) constitute an immensely valuable benefit to social-media platforms to do the bidding of federal government officials; (4) federal officials—including, most notably, Defendants herein—have repeatedly and aggressively threatened to remove these legal benefits and impose other adverse consequences on social-media platforms if they do not increase censorship and suppression of disfavored speakers, content, and viewpoints; and (5) Defendants herein, conspiring and colluding both with each other and social-media firms, have directly coordinated with social-media platforms to identify disfavored speakers, viewpoints, and content and have procured the actual censorship and suppression of them on social media.  These factors, considered either individually or collectively, establish that the social-media censorship alleged herein constitutes government action.  These actions have dramatically impacted the fundamental right of free speech in Missouri, Louisiana, and America, both on social media and elsewhere.

252.     As alleged herein, Defendants have acted in concert both with each other, and with others, to violate the First Amendment and state-level free speech rights.

253.     Defendants' actions violate the First Amendment and analogous state constitutional protections.  The First Amendment is violated where, as here, "if the government coerces or induces it to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint." *Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring).  "The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly." *Id.*

254.     The censorship and suppression of speech that Defendants have induced social-media platforms to impose on disfavored speakers, content, and viewpoints constitute forms of prior restraints on speech, which are the most severe restrictions and the most difficult to justify under the First Amendment.  "One obvious implication of" the First Amendment's text "is that the government usually may not impose prior restraints on speech." *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022).

255.     These actions have injured Missouri's, Louisiana's, and other States' citizens, both speakers and users of social media, and they have injured Missourians, Louisianans, and Americans who do not use social media by their predictable effect on the availability of information through social-media users, who often repeat or communicate information presented on social media to non-users.

256.     These actions have also injured Missouri's, Louisiana's, and other States' citizens by broadly chilling the exercise of free-speech rights on social-media platforms.  This injures the First Amendment and state-level rights of all citizens, both users and non-users of social media,

by reducing the availability of free speech in a free marketplace of ideas.  Much social-media speech is available to non-users of social media on the internet, and social-media users convey speech and information learned on social media platforms to non-users of social media through many other means.  Suppressing speech on social media, therefore, directly impacts the First Amendment rights of non-social media users, as well as users.

257.    Defendants' interference with First Amendment and state free-speech rights of virtually all Missourians, Louisianans, and Americans is *per se* unconstitutional, and even if not, it cannot be justified under any level of constitutional scrutiny.

258.    Defendants' interference with First Amendment rights of virtually all Missourians and Louisianans also interferes with rights that the States guaranteed to them under their respective state constitutions.  Defendants' interference thus undermines the system of rights the States provided to their citizens, effectively limiting the reach of each State's fundamental law and thwarting the fundamental policies of each sovereign State.

259.    This Court has inherent authority to declare, enjoin, restrain, enter judgment, and impose penalties on Defendants and other federal actors, and those acting in concert with them, to prevent and restrain violations of federal law, including the First Amendment.  "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015).

## COUNT TWO – ACTION IN EXCESS OF STATUTORY AUTHORITY
### Against All Defendants

260.    All foregoing Paragraphs are incorporated as if set forth fully herein.

261.     No federal statute authorizes the Defendants' conduct in engaging in censorship, and conspiracy to censor, in violation of Missourians', Louisianans', and Americans' free-speech rights.

262.     "An agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986).  Agency actions that exceed the agency's statutory authority are *ultra vires* and must be invalidated.

263.     No statute authorizes any Defendants—including but not limited to White House officials, HHS officials, DHS officials, and other senior federal officials—to engage in the course of conduct regarding the censorship and suppression of speech on social media as alleged herein.

264.     No statute authorizes Defendants—including  but not limited to White House officials, HHS officials, DHS officials, and other senior federal officials—to identify what constitutes "misinformation," "disinformation," and/or "malinformation" in public discourse on social-media platforms; to direct, pressure, coerce, and encourage social-media companies to censor and suppress such speech; and/or to demand that private companies turn over information about speech and speakers on their platforms in the interest of investigating "misinformation," "disinformation," and/or "malinformation."

265.     Further, the interpretation of any statute to authorize these actions would violate the non-delegation doctrine, the canon of constitutional avoidance, the major-questions doctrine, the Supreme Court's clear-statement rules, and other applicable principles of interpretation.  No statute may be properly construed to do so.

### COUNT THREE – VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
### Against the HHS Defendants

266.     All foregoing Paragraphs are incorporated as if set forth fully herein.

267.     Defendants HHS, NIAID, CDC, Becerra, Murthy, and Fauci are referred to collectively herein as the "HHS Defendants."

268.     As set forth herein, the HHS Defendants' conduct is unlawful, arbitrary and capricious, an in excess of statutory authority under the Administrative Procedure Act.

269.     The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law…."  5 U.S.C. § 706(2)(A)-(D).  The HHS Defendants' conduct violates all of these prohibitions.

270.     Defendants HHS, CDC, and NIAID are "agencies" within the meaning of the APA. Defendants Becerra, Fauci, and Murthy, in their official capacities, are the heads of federal agencies.

271.     The HHS Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action from by which "rights or obligations have been determined," and "from which legal consequences will flow."  *Id.* Defendants' campaign of pressuring, threatening, and colluding with social-media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort.  Such actions reflect the completion of a decisionmaking process with a result that will directly affect Missourians, Louisianans, and Americans.  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

272.     The HHS Defendants' conduct is arbitrary, capricious, and an abuse of discretion because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem,

disregards settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the unlawful nature of the HHS Defendants' conduct, among other reasons.  5 U.S.C. § 706(2)(A).

273.     The HHS Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment rights of virtually all Missourians and Louisianans for the reasons discussed herein and in Count One*, supra*.  5 U.S.C. § 706(2)(B).

274.     The HHS Defendants conduct is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because no statute authorizes any of the conduct alleged herein, as discussed in Count Two, *supra*.  5 U.S.C. § 706(2)(C).

275.     The HHS Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to obtain input from the public, before engaging in these unlawful agency policies.  5 U.S.C. § 706(2)(D).

276.     The HHS Defendants' conduct is unlawful under the APA and should be set aside.

### COUNT FOUR – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Against the DHS Defendants

277.     All foregoing Paragraphs are incorporated as if set forth fully herein.

278.     Defendants DHS, CISA, Mayorkas, Easterly, and Jankowicz are referred to collectively herein as the "DHS Defendants."

279.     As set forth herein, the DHS Defendants' conduct is unlawful, arbitrary and capricious, an in excess of statutory authority under the Administrative Procedure Act.

280.     The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law…."  5 U.S.C. § 706(2)(A)-(D).  The DHS Defendants' conduct violates all of these prohibitions.

281.     Defendants DHS and CISA are "agencies" within the meaning of the APA. Defendants Mayorkas and Easterly, in their official capacities, are the heads of federal agencies.

282.     The DHS Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action from by which "rights or obligations have been determined," and "from which legal consequences will flow."  *Id.* Defendants' campaign of pressuring, threatening, and colluding with social-media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort.  Such actions reflect the completion of a decisionmaking process with a result that will directly affect Missourians, Louisianans, and Americans.  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

283.     The DHS Defendants' conduct is arbitrary, capricious, and an abuse of discretion because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem, disregards settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the unlawful nature of the DHS Defendants' conduct, among other reasons.  5 U.S.C. § 706(2)(A).

284.     The DHS Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment and state free-speech rights of virtually all Missourians, Louisianans, and Americans for the reasons discussed herein and in Count One*, supra*.  5 U.S.C. § 706(2)(B).

285.     The DHS Defendants conduct is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because no statute authorizes any of the conduct alleged herein, as discussed in Count Two, *supra*.  5 U.S.C. § 706(2)(C).

286.     The DHS Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to obtain input from the public, before engaging in these unlawful agency policies.  5 U.S.C. § 706(2)(D).

287.     The DHS Defendants' conduct is unlawful under the APA and should be set aside.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

A.     Declare that Defendants' conduct violates the First Amendment of the U.S. Constitution and analogous provisions of Missouri's, Louisiana's, and other States' Constitutions;

B.     Declare that Defendants' conduct is *ultra vires* and exceeds their statutory authority;

C.     Declare that Defendants' conduct violates the Administrative Procedure Act and is unlawful, and vacate and set aside such conduct;

D.     Preliminarily and permanently enjoin Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from continuing to engage in unlawful conduct as alleged herein; and

E.     Grant such other and further relief as the Court may deem just and proper.

Dated: May 5, 2022

Respectfully submitted,

**ERIC S. SCHMITT**
**Attorney General of Missouri**

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

<u>/s/ D. John Sauer</u>
D. John Sauer, Mo. Bar No. 58721*
  *Solicitor General*
Justin D. Smith, Mo. Bar No. 63253*
  *First Assistant Attorney General*
Todd Scott, Mo. Bar No. 56614*
  *Senior Counsel*
Michael E. Talent, Mo. Bar No. 73339*
  *Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
John.Sauer@ago.mo.gov
*Counsel for State of Missouri*

<u>/s/ Elizabeth B. Murrill</u>
Elizabeth B. Murrill (La #20685)
  *Solicitor General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70802
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

* *pro hac vice* application forthcoming