**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

| | |
|---|---|
| STATE OF MISSOURI ex rel. ERIC S. SCHMITT, Attorney General, and | |
| STATE OF LOUISIANA ex rel. JEFFREY M. LANDRY, Attorney General, | Case No. 3:22-cv-01213 |
| *Plaintiffs*, | |
| v. | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*; | |
| *Defendants*. | |

<u>**DECLARATION OF TAMMY GLENN**</u>

1.  My name is Tammy Glenn.  I am over the age of 18 years old and competent to testify about the matters asserted herein.  I am a paralegal in the Missouri Attorney General's Office.

2.  The information listed below is available to the public via the Internet.  I voluntarily downloaded the information listed below and have provided true and correct copies of the publicly available documents as Exhibits to this Declaration.

3.  Attached hereto as Exhibit 1 is the June 7, 2022 letter from Senators Grassley and Hawley and DHS whistleblower documents, which is available at https://www.grassley.senate.gov/imo/media/doc/grassley_hawley_to_deptofhomelandsecuritydisinformationgovernanceboard.pdf.

4.  Attached hereto as Exhibit 2 is the Pew Research Center study "*News Consumption Across Social Media in 2021*", Pew Research Center (Sept. 20, 2021), which is available at

https://www.pewresearch.org/journalism/2021/09/20/news-consumption-across-social-media-in-2021/.

5.   Attached hereto as Exhibit 3 is "*Number of monthly active Facebook users worldwide as of 1st quarter 2022 (in millions)*" Statista (2022), available at https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/.

6.   Attached hereto as Exhibit 4 is "*Facebook users in the United States 2017-2025*", Statista (2022), available at https://www.statista.com/forecasts/1136345/facebook-users-in-the-united-states.

7.   Attached hereto as Exhibit 5 is "*Internet World Stats*", available at https://www.internetworldstats.com/stats26.htm.

8.   Attached hereto as Exhibit 6 is "*Number of Twitter Users 2022/2023: Demographics, Breakdowns & Predictions*", available at https://financesonline.com/number-of-twitter-users/.

9.   Attached hereto as Exhibit 7 is "*Twitter by the Numbers: Stats, Demographics & Fun Facts*", OmniCore (2022), available at https://www.omnicoreagency.com/twitter-statistics/.

10. Attached hereto as Exhibit 8 is "*YouTube User Statistics 2022",* available at https://www.globalmediainsight.com/blog/youtube-users-statistics/.

11. Attached hereto as Exhibit 9 is *"YouTube Revenue and Usage Statistics (2022)",* available at https://www.businessofapps.com/data/youtube-statistics/.

12. Attached hereto as Exhibit 10 is "*Percentage of U.S. Congress members who posted on official social media accounts in 2020*," Statista (2022), available at https://www.statista.com/statistics/958794/congress-members-posted-official-social-media-accounts-usa/.

13. Attached hereto as Exhibit 11 is the report by the  George J. Stigler Center for the Study of the Economy and the State, Univ. of Chicago Booth School of Business, Committee for the Study of Digital Platforms, "*Protecting Journalism in the Age of Digital Platforms*"  (July 1, 2019), available at http://www.columbia.edu/~ap3116/papers/MediaReportFinal.pdf.

14. Attached hereto as Exhibit 12 is the article by Cecilia Kang, et al., "*U.S. and States Say Facebook Illegally Crushed Competition*", NEW YORK TIMES (Dec. 9, 2020), available at https://www.nytimes.com/2020/12/09/technology/facebook-antitrust-monopoly.html.

15. Attached hereto as Exhibit 13 is the article "*Nancy Pelosi warns tech companies that Section 230 is 'in jeopardy'*", TechCrunch (April 12, 2019), available at https://techcrunch.com/2019/04/12/nancy-pelosi-section-230/.

16. Attached hereto as Exhibit 14 is the op-ed by Vivek Ramaswamy and Jed Rubenfeld,  "*Save the Constitution from Big Tech: Congressional threats and inducements make Twitter and Facebook censorship a free-speech violation*", WALL ST. J. (Jan. 11, 2021), at https://www.wsj.com/articles/save-the-constitution-from-big-tech-11610387105.

17. Attached hereto as Exhibit 15 is the Statement of U.S. Senator Mark R. Warner on the Section 230 Hearing (Oct. 28, 2020), at https://www.warner.senate.gov/public/index.cfm/2020/10/statement-of-sen-mark-r-warner-on-facebook-s-decision-to-finally-ban-qanon-from-its-platforms.

18. Exhibit 16 to this Declaration is the public video, published on the U.S. Senate's website, of the statement of Senator Richard Blumenthal in "*Breaking the News: Censorship, Suppression, and the 2020 Election*" Before the S. Comm. on Judiciary, 116th Cong. (2020) (statement of Sen. Richard Blumenthal), which is publicly available at

https://www.judiciary.senate.gov/meetings/breaking-the-news-censorship-suppression-and-the-2020-election.  The statement of Senator Blumenthal occurs at 32:53 to 40:52 of the video.

19. Attached hereto as Exhibit 17 is the article by Yaël Eisenstat & Justin Hendrix, "*A Dozen Experts with Questions Congress Should Ask the Tech CEOs—On Disinformation and Extremism*", JUST SECURITY (Mar. 25, 2021), available at https://www.justsecurity.org/75439/questions-congress-should-ask-the-tech-ceos-on-disinformation-and-extremism/.

20. Attached hereto as Exhibit 18 is the April 20, 2022 Letter of Rep. Tony Cardenas, et al., at https://cardenas.house.gov/imo/media/doc/Meta%20RT%20and%20Spanish%20Language%20Disinformation%20Congressional%20Letter%20Final.pdf.

21. Attached hereto as Exhibit 19 is the New York Times editorial board's interview of Presidential Candidate Joe Biden conducted Dec. 16, 2019, N.Y. Times Editorial Board,  (Jan. 17, 2020), at https://www.nytimes.com/interactive/2020/01/17/opinion/joe-biden-nytimes-interview.html.

22. Attached hereto as Exhibit 20 is the article "*Kamala Harris Wants to Be Your Online Censor-in-Chief*", Reason.com (May 7, 2019), available at https://reason.com/2019/05/07/kamala-harris-promises-to-pursue-online-censorship-as-president/.

23. Attached hereto as Exhibit 21 is CNN's Sept. 30, 2019 article "*Kamala Harris says Trump's Twitter account should be suspended*", CNN.com (Sept. 30, 2019), at https://www.cnn.com/2019/09/30/politics/kamala-harris-trump-twitter-cnntv/index.html.

24. Attached hereto as Exhibit 22 is Kamala Harris's October 1, 2019 tweet, "Hey, @jack. Time to do something about this…." at https://twitter.com/kamalaharris/status/1179193225325826050.

25. Attached hereto as Exhibit 23 is the Biden-Harris campaign's open letter, "*Our Open Letter to Facebook*", available at https://joebiden.com/2961-2/.

26. Attached hereto as Exhibit 24 is the Biden-Harris campaign's online petition, *#Movefastfixit*, at https://joebiden.com/facebook/.

27. Attached hereto as Exhibit 25 is the Sept. 28, 2020 letter from the Biden-Harris campaign to Mark Zuckerberg, CEO of Facebook, at https://www.documentcloud.org/documents/7219497-Facebook-Letter-9-28.html.

28. Attached hereto as Exhibit 26 is the article "*Biden tech advisor: hold social media companies accountable for what their users post*, CNBC.com (Dec. 2, 2020), available at https://www.cnbc.com/2020/12/02/biden-advisor-bruce-reed-hints-that-section-230-needs-reform.html.

29. Attached hereto as Exhibit 27 are redacted emails produced by the federal government in response to FOIA requests involving Dr. Anthony Fauci in January and early February 2020, which are publicly available at https://s3.documentcloud.org/documents/20793561/leopold-nih-foia-anthony-fauci-emails.pdf.

30. Attached hereto as Exhibit 28 are redacted emails produced by the federal government in response to FOIA requests between Dr. Anthony Fauci and Mark Zuckerberg from February and March 2020, which are publicly available at https://s3.documentcloud.org/documents/20793561/leopold-nih-foia-anthony-fauci-emails.pdf.

31. Attached hereto as Exhibit 29 is the White House's published transcript of its May 5, 2021 press briefing, "*Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack, May 5, 2021*", at https://www.whitehouse.gov/briefing-room/press-

briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-tom-vilsack-may-5-2021/.

32. Attached hereto as Exhibit 30 is the White House's published transcript of its July 15, 2021 press briefing, "*Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy, July 15, 2021*", at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/.

33. Attached hereto as Exhibit 31 is the U.S. Surgeon General's Advisory, "*Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment*", (July 15, 2021), at https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf.

34. Attached hereto as Exhibit 32 is the article "*White House Slams Facebook as Conduit for COVID-19 Misinformation*", REUTERS (July 15, 2021), available at https://www.reuters.com/world/us/us-surgeon-general-warns-over-covid-19-misinformation-2021-07-15/.

35. Attached hereto as Exhibit 33 is the New York Times article "'*They're Killing People': Biden Denounces Social Media for Virus Disinformation*", NEW YORK TIMES (July 16, 2021), at https://www.nytimes.com/2021/07/16/us/politics/biden-facebook-social-media-covid.html.

36. Attached hereto as Exhibit 34 is the White House's published transcript of its July 16, 2021 press conference, "*Press Briefing by Press Secretary Jen Psaki, July 16, 2021*", at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/.

37. Attached hereto as Exhibit 35 is the article "'*They should be held accountable': White House reviews platforms' misinformation liability*", USA TODAY (July 20, 2021), available at https://www.usatoday.com/story/news/politics/2021/07/20/white-house-reviews-section-230-protections-covid-misinformation/8024210002/.

38. Attached hereto as Exhibit 36 is the article "*White House says social media networks should be held accountable for spreading misinformation*", CNBC.com (July 20, 2021), at https://www.cnbc.com/2021/07/20/white-house-social-networks-should-be-held-accountable-for-spreading-misinfo.html.

39. Attached hereto as Exhibit 37 is the article "*Facebook takes action against 'disinformation dozen' after White House pressure*", CNN.com (Aug. 18, 2021), at https://www.cnn.com/2021/08/18/tech/facebook-disinformation-dozen/index.html.

40. Attached hereto as Exhibit 38 is the White House's published transcript of its February 1, 2022 press briefing, , "*Press Briefing by Press Secretary Jen Psaki, February 1, 2022*", available at https://www.whitehouse.gov/briefing-room/press-briefings/2022/02/01/press-briefing-by-press-secretary-jen-psaki-february-1-2022/.

41. Attached hereto as Exhibit 39 is the article by Brad Dress, "*Surgeon general demands data on COVID-19 misinformation from major tech firms*, THE HILL (March 3, 2022), at https://thehill.com/policy/healthcare/596709-surgeon-general-demands-data-on-covid-19-misinformation-from-major-tech/.

42. Attached hereto as Exhibit 40 is the White House's published transcript of its April 25, 2022 press briefing, "*Press Briefing by Press Secretary Jen Psaki, April 25, 2022*", available at https://www.whitehouse.gov/briefing-room/press-briefings/2022/04/25/press-briefing-by-press-secretary-jen-psaki-april-25-2022/.

43. Attached hereto as Exhibit 41 is the article by Alexander Hall, "*Liberal Media Used to Warn Against Mailing Votes; Now Big Tech, Left Are Protecting It*" (Oct. 30, 2020), at https://www.newsbusters.org/blogs/free-speech/alexander-hall/2020/10/30/liberal-media-used-warn-against-mailing-votes-now-big.

44. Attached hereto as Exhibit 42 is the article "*Facebook leak reveals policies on restricting New York Post's Biden story*", THE GUARDIAN (Oct. 30, 2020), at https://www.theguardian.com/technology/2020/oct/30/facebook-leak-reveals-policies-restricting-new-york-post-biden-story.

45. Attached hereto as Exhibit 43 is the Dec. 10, 2020 Letter of Rep. Wexton, et al., at https://wexton.house.gov/uploadedfiles/12.10.20_house_democrats_disinformation_roadmap_to_president-elect_biden.pdf.

46. Attached hereto as Exhibit 44 is the article "*Biden team may partner with private firms to monitor extremist chatter online*", CNN.com (May 3, 2021), at https://www.cnn.com/2021/05/03/politics/dhs-partner-private-firms-surveil-suspected-domestic-terrorists/index.html.

47. Attached hereto as Exhibit 45 is the article "*Facebook and tech giants to target attacker manifestos, far-right militias in database*", REUTERS (July 26, 2021), at https://www.reuters.com/technology/exclusive-facebook-tech-giants-target-manifestos-militias-database-2021-07-26/.

48. Attached hereto as Exhibit 46 is the article "*Mayorkas: We're Working with Platforms on 'How They Can Better Use' Their Terms to 'Prevent Harm' from Misinformation*", BREITBART NEWS (Aug. 2, 2021), at https://www.breitbart.com/clips/2021/08/02/mayorkas-were-workgin-with-platforms-on-how-they-can-better-use-their-terms-to-prevent-harm-from-misinformation/.

49. Attached hereto as Exhibit 47 is the article "*Cyber agency beefing up disinformation, misinformation team*", THE HILL (Nov. 10, 2021), at https://thehill.com/policy/cybersecurity/580990-cyber-agency-beefing-up-disinformation-misinformation-team/.

50. Attached hereto as Exhibit 48 is the Cybersecurity and Infrastructure Security Agency's 2020 bulletin "Election Infrastructure Subsector-Specific Plan," available at https://www.cisa.gov/sites/default/files/publications/election_infrastructure_subsector_ specific_plan.pdf.

51. Attached hereto as Exhibit 49 is the CISA bulletin, "*We're in This Together. Disinformation Stops With You.*", available at https://www.cisa.gov/sites/default/files/publications/SLTTCOVIDToolkit_FINAL_508.pdf.

52. Attached hereto as Exhibit 50 is the CISA bulletin, "*Mis-, Dis-, and Malinformation: Planning and Incident Response Guide for Election Officials*", available at https://www.cisa.gov/sites/default/files/publications/mdm-incident-response-guide_508.pdf

53. Attached hereto as Exhibit 51 is the CISA webpage "*Mis, Dis, Malinformation*", available at https://www.cisa.gov/mdm.

54. Attached hereto as Exhibit 52 is the Media Research Center report, "*Protecting the President: Big Tech Censors Biden Criticism 646 Times Over Two Years*" (April 21, 2022), available at https://censortrack.org/protecting-president-big-tech-censors-biden-criticism-646-times-over-two-years.

55. Attached hereto as Exhibit 53 is a true and correct copy of the Complaint in *Alex Berenson v. Twitter, Inc.*, Case No. 3:21-cv-09818 (N.D. Cal. filed Dec. 20, 2021), as it is publicly filed on the Federal Courts' Pacer system.

56. Attached hereto as Exhibit 54 is the op-ed by Alex Berenson, "*My Lawsuit Will Shine a Light on Twitter Censorship*", WALL STREET JOURNAL (May 15, 2022), available at https://www.wsj.com/articles/my-lawsuit-will-shine-a-light-on-twitter-censorship-soical-media-big-tech-facebook-speech-11652634888.

57. Attached hereto as Exhibit 55 is the Feb. 5, 2021 tweet by Senator Mazie Hirono: "Sec 230 was supposed to incentivize internet platforms to police harmful content posted by users.  Instead, the law acts as a shield allowing them to turn a blind eye. The SAFE TECH Act brings Sec 230 into the modern age and makes platforms accountable for the harms they cause." at https://twitter.com/maziehirono/status/1357790558606024705?lang=bg.

58. Attached hereto as Exhibit 56 is the article by David Ingram et al., "*Big Tech met with govt to discuss how to handle election results*", NBC News (Aug. 12, 2020), at https://www.nbcnews.com/tech/tech-news/big-tech-met-gov-t-discuss-how-handle-election-results-n1236555.

59. Attached hereto as Exhibit 57 is the study by Silke Schwarz et al., "*Coronakinderstudien „Co-Ki": erste Ergebnisse eines deutschlandweiten Registers zur Mund-Nasen-Bedeckung (Maske) bei Kindern*", available at https://link.springer.com/article/10.1007/s00112-021-01133-9.

60. Attached hereto as Exhibit 58 is Meta's "Facebook Community Standards – Misinformation," which is available at https://transparency.fb.com/policies/community-standards/misinformation/.

61. Attached hereto as Exhibit 59 is YouTube's "COVID-19 medical misinformation policy," available at https://support.google.com/youtube/answer/9891785?hl=en&ref_topic=10833358.

62. Attached hereto as Exhibit 60 is YouTube's "Elections misinformation policies," available at https://support.google.com/youtube/answer/10835034?hl=en&ref_topic=10833358.

63. Attached hereto as Exhibit 61 is Twitter's "Civic integrity policy," available at https://help.twitter.com/en/rules-and-policies/election-integrity-policy.

64. Attached hereto as Exhibit 62 is Twitter's "COVID-19 misleading information policy," available at https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy.

65. Attached hereto as Exhibit 63 is Twitter's "Synthetic and manipulated media policy," available at https://help.twitter.com/en/rules-and-policies/manipulated-media.

66. Attached hereto as Exhibit 64 is Twitter's blog "Coronavirus: Staying safe and informed on Twitter," available at https://blog.twitter.com/en_us/topics/company/2020/covid-19.

67. Attached hereto as Exhibit 65 is the article "*Biden Administration creates 'Disinformation Governance Board' under DHS to fight 'misinformation,'*" THE POST MILLENNIAL (April 27, 2022), available at https://thepostmillennial.com/breaking-biden-administration-creates-disinformation-governance-board-under-dhs-to-fight-misinformation.

68. Attached hereto as Exhibit 66 is Facebook's "COVID-19 and Vaccine Policy Updates & Protections," available at https://www.facebook.com/help/230764881494641.

69. Attached hereto as Exhibit 67 is the article "*Twitter, Facebook censor Post over Hunter Biden expose*", N.Y. Post (Oct. 14, 2020), available at https://nypost.com/2020/10/14/facebook-twitter-block-the-post-from-posting/.

70. Attached hereto as Exhibit 68 is the article "*Hunter Biden's Laptop Is Finally News Fit to Print*", WALL STREET JOURNAL (March 18, 2022), available at https://www.wsj.com/articles/all-the-news-thats-finally-fit-to-print-hunter-biden-laptop-new-york-post-new-york-times-joe-biden-11647637814?mod=trending_now_video_5.

71. Attached hereto as Exhibit 69 is the article "*Facebook's Lab-Leak About-Face*", Wall Street Journal (May 27, 2021), available at https://www.wsj.com/articles/facebooks-lab-leak-about-face-11622154198.

72. Attached hereto as Exhibit 70 is the January 11, 2022 Letter of Rep. Comer to Secretary Becerra, available at https://republicans-oversight.house.gov/wp-content/uploads/2022/01/Letter-Re.-Feb-1-Emails-011122.pdf.


I swear or affirm under penalty of perjury that the foregoing is true and correct.


Dated: June 14, 2022                                        Signed: */s/ Tammy Glenn*

# EXHIBIT 1



**United States Senate**

WASHINGTON, DC 20510

June 7, 2022

**VIA ELECTRONIC TRANSMISSION**

The Honorable Alejandro N. Mayorkas
Secretary
U.S. Department of Homeland Security

Dear Secretary Mayorkas:

Department of Homeland Security (DHS) information obtained by our offices through protected whistleblower disclosures raises serious concerns about DHS's recently-paused Disinformation Governance Board (DGB) and the role the DGB was designed to play in DHS counter disinformation efforts.  Documents show that, contrary to your May 4, 2022, testimony before the Senate Committee on Homeland Security and Governmental Affairs, the DGB was established to serve as much more than a simple "working group" to "develop guidelines, standards, [and] guardrails" for protecting civil rights and civil liberties.[1]  In fact, DHS documents show that the DGB was designed to be the Department's central hub, clearinghouse and gatekeeper for Administration policy and response to whatever it happened to decide was "disinformation."

Specifically, documents describe a prominent DGB designed to "serve as the departmental forum for governance of DHS policies, plans, procedures, standards, and activities" pertaining to what the government refers to as "mis-, dis-, and mal- information," or "MDM," "that threatens homeland security" as well as the Department's internal and external point of contact for coordination with state and local partners, non-governmental actors, and the private sector.[2]  Internal DHS memoranda also show that in practice, the DGB was expected to function as a "coordination and deconfliction mechanism… conven[ing] to discuss threats, assessments, response actions, and engagements as often as warranted."[3]  According to the DGB's charter,

---

[1] Resources and Authorities Needed to Protect and Secure the Homeland: Hearing before the Senate Committee on Homeland Security and Governmental Affairs, 117th Congress (May 4, 2022).
[2] DHS Disinformation Governance Board Charter (February 24, 2022); The Cybersecurity & Infrastructure Security Agency (CISA), one of nine DHS components with representation on the DGB, defines misinformation as "false, but not created or shared with the intention of causing harm."  CISA defines disinformation as "deliberately created to mislead, harm, or manipulate a person, social group, organization, or country," and it defines malinformation as "based on fact, but used out of context to mislead, harm, or manipulate."  Cybersecurity & Infrastructure Agency, "MIS, DIS, MALINFORMATION", available at https://www.cisa.gov/mdm.
[3] "Ukraine MDM Playbook Version 12, as of 2/14/2022" at 2.  See also DHS Disinformation Governance Board Charter (February 24, 2022).

"DHS-wide or Component specific proposals for funding related to efforts to counter MDM" were also required to be "appropriately coordinated with the Board, including in advance of submitting any final funding proposals."[4]

While DHS components apparently have established methods for defining and analyzing disinformation, and would continue to carry out all of their normal operational functions under a DGB, it appears that the DGB was equipped to review evidence presented by representatives of the various components and guide DHS counter disinformation efforts.[5]  A September 13, 2021, memo prepared in part by Robert Silvers, Under Secretary for Strategy, Policy, and Plans and, according to whistleblower allegations, one of two intended co-chairs of the DGB, outlined specific policy recommendations that should guide DHS efforts to counter disinformation.[6]  The memo states that DHS's "role in responding to disinformation should be limited to areas where there are clear, objective facts."[7] It is unclear how DHS defines "clear, objective facts," and it is unclear what safeguards, if any, DHS has put in place to ensure that individuals charged with determining which issue areas have "clear" and "objective facts" are not influenced by their own ideological and political beliefs.  While the memo boldly asserts that the Department's "counter-disinformation mission, including the choices as to what issue areas to focus on, must not be politicized and must be protected from perceptions of politicization," some of the examples of disinformation given in the memo relate not only to foreign disinformation but issues that have been at the heart of domestic political discourse for the past several years.[8]  For instance, the memo refers to "[c]onspiracy theories about the validity and security of elections" and "[d]isinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks."[9]

Given the significant coordinating role the Department envisioned for the DGB, the consequences of installing Nina Jankowicz, a known trafficker of foreign disinformation and liberal conspiracy theories, as the DGB's first Executive Director, would have been a disaster. Jankowicz once asserted that the Hunter Biden laptop should be viewed as a "Trump campaign product."[10]  Content on the Hunter Biden laptop has since been verified by multiple major news outlets.[11]  In 2016, Jankowicz also sent out multiple tweets spreading the now-debunked claim

---

[4] "DHS Disinformation Governance Board Charter" (February 24, 2022) at 4.

[5] "DHS Disinformation Governance Board Charter" (February 24, 2022); *See also* "Ukraine MDM Playbook Version 12, as of 2/14/2022" at 2, 18.

[6] "DHS Disinformation Governance Board Charter" (February 24, 2022); Memorandum from Robert Silvers, Under Secretary, Office of Strategy, Policy, and Plans, and Samantha Vinograd, Senior Counselor for National Security, Office of the Secretary, for the Secretary (September 13, 2021).

[7] Memorandum from Robert Silvers, Under Secretary, Office of Strategy, Policy, and Plans, and Samantha Vinograd, Senior Counselor for National Security, Office of the Secretary, for the Secretary (September 13, 2021).

[8] *Id.*

[9] *Id.*

[10] Callie Patteson, "Ex-Disinformation Board chief Nina Jankowicz breaks silence, cites death threats" (May 19, 2022), available at https://nypost.com/2022/05/19/ex-disinformation-board-chief-nina-jankowicz-breaks-silence/ .

[11] Craig Timberg, Matt Viser, and Tom Hamburger, "Here's how The Post analyzed Hunter Biden's laptop," *The Washington Post* (March 30, 2022), available at https://www.washingtonpost.com/technology/2022/03/30/hunter-

that President Trump had a "secret server" to communicate with Kremlin-linked Alfa Bank.[12]  In 2020, Jankowicz tweeted that a podcast by Christopher Steele, the author of the debunked Steele Dossier containing Russian disinformation, had provided "some great historical context about the evolution of disinfo."[13]  So this begs the question, if the (former) Executive Director of the DGB is incapable of determining what is and is not disinformation, how could the DGB ever have expected to function properly under her leadership?  We believe that Congress and the American people require full transparency regarding the DGB's creation as well as the role Jankowicz would have played had she remained in her position at DHS.  Toward that end, we are releasing documents we have collected during our investigation as an attachment to this letter.

Documents also suggest that the Department has been working on plans to "operationalize" its relationships with private social media companies to implement its public policy goals.[14]  For example, we obtained draft briefing notes prepared for a scheduled April 28, 2022, meeting between Robert Silvers and Twitter executives Nick Pickles, Head of Policy, and Yoel Roth, Head of Site Integrity.  The notes are marked "TBC," and it is unclear whether the scheduled meeting actually took place.  The briefing notes frame the planned meeting between Silvers and the Twitter executives as "an opportunity to discuss operationalizing public-private partnerships between DHS and Twitter, as well as [to] inform Twitter executives about DHS work on MDM, including the creation of the Disinformation Governance Board and its analytic exchange..."[15]  According to whistleblower allegations, Nina Jankowicz may have been hired because of her relationship with executives at Twitter.  Consistent with these allegations, Silvers' briefing notes state that both Pickles and Roth know Jankowicz.[16]  A recent DHS strategy document further discusses efforts to "[e]mpower partners to mitigate MDM threats."[17]  The document states that in certain cases, federal, state, local, tribal, and territorial or nongovernmental partners "may be better positioned to mitigate MDM Threats based on their capabilities and authorities."[18]  DHS theorizes that "[b]y sharing information, DHS can empower these partners to mitigate threats such as providing information to technology companies enabling them to remove content at their discretion and consistent with their terms of service."[19]

---

biden-laptop-data-examined/;  Katie Benner, Kenneth P Vogel and Michael S. Schmidt,  "Hunter Biden Paid Tax Bill, but Broad Federal Investigation Continues," *The New York Times* (March 16, 2022), available at https://www.nytimes.com/2022/03/16/us/politics/hunter-biden-tax-bill-investigation.html.

[12] Jankowicz, Nina [@wicsipedia].  "Trump had not one, but two secret email servers to communicate w/ influential Russian bank.  Unbelievable."  *Twitter* (November 1, 2016), available at https://twitter.com/wiczipedia/status/793329082167619584; Jankowicz, Nina [@wicsipedia].  "Husband texted me 'you have news to wake up to.' Never thought it would be this. Confirms our worst fears about Trump. I am horrified."  *Twitter* (November 1, 2016), https://twitter.com/wiczipedia/status/793322439505772544.

[13] Jankowicz, Nina [@wicsipedia]. "Listened to this last night- Chris Steele (yes THAT Chris Steele) provides some great historical context about the evolution of disinfo.  Worth a listen" *Twitter* (August 7, 2020), available at https://twitter.com/wiczipedia/status/1291692143262814209.

[14] Draft Briefing Notes, Twitter (April 28, 2022).

[15] *Id.*

[16] *Id.*

[17] "Ukraine MDM Playbook Version 12, as of 2/14/2022" at 17.

[18] *Id.*

[19] *Id.*

Secretary Mayorkas
June 7, 2022
Page 4 of 5

Collectively, whistleblower allegations and the documents we've reviewed raise concerns that DHS could be seeking an active role in coordinating the censorship of viewpoints that it determines, according to an unknown standard, to be "MDM" by enlisting the help of social media companies and big tech.  The DGB's charter also specifically states that the DGB should "serv[e] as the Department's internal and external point of contact for coordination with state, local, tribal, and territorial partners, the private sector, and nongovernmental actors regarding MDM."[20]

The First Amendment of the Constitution was designed precisely so that the government could not censor opposing viewpoints – even if those viewpoints were false.  DHS should not in any way seek to enlist the private sector to curb or silence opposing viewpoints.  It is therefore imperative for DHS to provide additional clarity regarding its policies and procedures for identifying and addressing "MDM," as well as its efforts to "operationalize" public-private partnerships and the steps it is taking to ensure that it does not infringe on the constitutional rights of American citizens.

In order for us to better understand the role of the DGB and DHS's efforts to counter disinformation, we ask that you respond to the following no later than June 21, 2022.

1. Has DHS at any point in time asked or suggested to Twitter, Facebook, TikTok, or any other social media executives that they should censor, flag, add context to, or remove any social media posts that it believes to be disinformation?

2. Has DHS at any point in time asked or suggested to Twitter, Facebook, TikTok, or any other social media executives that they suspend or ban the account(s) of individuals believed to be promoting information it believes to be disinformation?

3. Please provide all documents, including all written and electronic communications, memoranda, and organizational documents, related to the DGB from the point that DHS first considered establishing a DGB until the present.

4. Please provide all documents, including all written and electronic communications and memoranda, related to Nina Jankowicz's selection as Executive Director of the DGB.

5. Please explain why, in your public statements and testimony before Congress, you have not fully explained the key role that the DGB was designed to play in coordinating among DHS components and engaging the assistance of the private sector.

---

[20] "DHS Disinformation Governance Board Charter" (February 24, 2022) at 3.

Secretary Mayorkas
June 7, 2022
Page 5 of 5

6.  Please explain how DHS defines "MDM" and how DHS decides whether a given news story or other piece of information fits its definition of "MDM." Please identify who exactly is ultimately responsible for making this determination.

7.  Please explain the criteria DHS uses when deciding whether to spend taxpayer resources addressing a particular news item or narrative that it has classified as "MDM."

8.  Please describe all safeguards that DHS has put in place to ensure that its efforts to counter the spread of disinformation do not infringe on Americans' constitutional right to free speech.

9.  Did DHS Under Secretary for the Office of Strategy, Policy, and Plans Robert Silvers meet with Twitter executives on April 28, 2022? If so, please provide a summary of topics discussed during the meeting.

10. Please define what DHS means by the phrase, "operationalizing public-private partnerships."

Thank you for your prompt attention to this important matter.


Sincerely,


Charles E. Grassley                          Josh Hawley
U.S. Senator                                 U.S. Senator


Enclosures.

Release Authorized by Senator Grassley and Senator Hawley

PRE-DECISIONAL/DELIBERATIVE
~~UNCLASSIFIED // FOR OFFICIAL USE ONLY~~



U.S. Department of Homeland Security
Washington, DC 20528

**Homeland Security**

September 13, 2021

**INFORMATION**

MEMORANDUM FOR THE SECRETARY

FROM:          Robert Silvers /s/
               Under Secretary
               Office of Strategy, Policy, and Plans

               Samantha Vinograd /s/
               Senior Counselor for National Security
               Office of the Secretary

SUBJECT:       **Organizing DHS Efforts to Counter Disinformation**

---

The spread of disinformation[1] presents serious homeland security risks:

- Conspiracy theories about the validity and security of elections may undermine trust in core democratic institutions, amplify threats against election personnel, and jeopardize the voting rights of vulnerable communities.
- Disinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks undercuts public health efforts to combat the pandemic.
- Foreign terrorists, nation-states, and domestic violent extremist (DVE) groups leverage disinformation narratives to amplify calls to violence, including racially or ethnically motivated and anti-government/anti-authority violence. These actors often amplify and exploit narratives that already exist in public discourse, such as disinformation surrounding the validity of the 2020 election underpinning calls to violence on January 6, 2021.
- Disinformation can complicate the performance of core DHS missions. Falsehoods surrounding U.S. Government immigration policy drive vulnerable populations to pay smugglers to bring them on the dangerous journey to our southern border. Disinformation can hamper emergency responders in the aftermath of natural disasters or other incident responses.

DHS efforts to combat disinformation must account for the sensitivities inherent to this mission:

- The Department must ensure its counter-disinformation efforts do not have the effect of chilling or suppressing free speech and free association or of infringing on individuals' privacy or other First Amendment protected activity.
- The protection of privacy, civil rights, and civil liberties must be incorporated into every step of this work and any overarching framework guiding its execution.

---

[1] The term disinformation will be used to reference any of mis-, dis-, or mal-information, or other terms of art that refer to false information that is intentionally or inadvertently injected into the information environment.

PRE-DECISIONAL/DELIBERATIVE
~~UNCLASSIFIED // FOR OFFICIAL USE ONLY~~

Release Authorized by Senator Grassley and Senator Hawley

Glenn Decl. Ex. 1
Page 6 of 36

Release Authorized by Senator Grassley and Senator Hawley

PRE-DECISIONAL/DELIBERATIVE
UNCLASSIFIED // FOR OFFICIAL USE ONLY

**Subject: Organizing DHS Efforts to Counter Disinformation**
**Page 2**

- The counter-disinformation mission, including the choices as to what issue areas to focus on, must not be politicized and must be protected from perceptions of politicization.
- DHS should not attempt to be an all-purpose arbiter of truth in the public arena. It should instead focus its efforts on disinformation impacting DHS core missions.
- DHS's role in responding to disinformation should be limited to areas where there are clear, objective facts (i.e., medical evidence regarding COVID; factual information about elections administration and security, DVE narratives) and where DHS has particular expertise and a strong oversight structure to ensure legal and policy review of any response efforts.
- DHS has a unique role to play in information sharing across the government, with SLTT entities, and with the public. DHS is uniquely situated to share information in an authoritative way, something that the private sector and academia cannot do. Conversely, information sharing carries risks for the Department and must be accomplished in a way that is perceived as unbiased and viewpoint neutral.
- In addition, the federal government may not always be the ideal or most trusted voice on a given topic. DHS should work closely as appropriate with state, local, tribal, and territorial (SLTT) authorities and private sector partners.

**DHS Functions and Existing Efforts to Counter Disinformation**
DHS components are already engaged in countering disinformation, with activities falling into five functions that are performed by the components themselves or through third-party resources: 1) identification of disinformation relevant to DHS's mission; 2) analysis of its source and influence; 3) information sharing regarding threats posed by disinformation, 4) response to the disinformation threat; and 5) building resilience to disinformation. There is also excellent work being done by interagency partners, the private sector, and academia—particularly concerning identifying and analyzing disinformation—and DHS should leverage this work when possible.

1) *Identification*: Information gathering on disinformation threats and trends.
   - I&A's Homeland Influence Task Force collects information on possible disinformation from publicly available sources as well as other intelligence sources where the collection furthers one of I&A's authorized intelligence missions, such as foreign intelligence and protection of critical infrastructure.
   - CISA gathered information on disinformation related to the elections with SLTT partners leading up to the 2020 election and has limited authority to collect information on disinformation related to critical infrastructure.

2) *Analysis*: Assessing the impact of specific disinformation narratives on the homeland or on DHS missions.
   - I&A, as well as other components engaging in intelligence and analytic functions, produce analysis on disinformation threats, whom they may be targeting, and what attendant risks might arise.

3) *Information Sharing*: Providing timely, quality information on disinformation threats and strategic trends to stakeholders including SLTT authorities, private sector partners, or the public directly.
   - Leading up to the 2020 election, CISA relayed reports of election disinformation from election officials to social media platform operators.

PRE-DECISIONAL/DELIBERATIVE
UNCLASSIFIED // FOR OFFICIAL USE ONLY

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

PRE-DECISIONAL/DELIBERATIVE
~~UNCLASSIFIED // FOR OFFICIAL USE ONLY~~

**Subject:  Organizing DHS Efforts to Counter Disinformation**
**Page 3**

- I&A distributes intelligence products to SLTT partners related to disinformation threats.  Most recently, I&A issued a Public Safety Notification concerning the possible threat of violence motivated by conspiracy theories related to the "reinstatement" of former President Trump.
- The August 13, 2021 National Terrorism Advisory System Bulletin referenced the threat of disinformation spread by foreign and domestic threat actors.

4) *Response*: Factually countering disinformation through public communications channels to mitigate related threats, increase awareness, and improve public safety.
- During the 2020 election, CISA maintained a 'Rumor Control' website to counter foreign disinformation related to the security and conduct of the vote.  CISA sought to 'prebunk' incorrect claims with factual information.
- In your August 12, 2021 public remarks in Brownsville, TX concerning the southwest border, you stated your intention to "debunk false information that has been spread," sharing factual information about the situation on the ground and DHS's border enforcement and policies.

5) *Building Resilience*: Improving the public's ability to detect disinformation through digital and media literacy, where DHS has a unique role to play, programs and civic education.  These programs are coordinated with federal, SLTT, and private sector partners.
- CISA launched a graphic novel series to reach potentially impacted communities in a non-traditional way. The novels educate on the dangers of disinformation and how to detect it.
- PLCY is working with the Department of Education to build resilience to disinformation and CP3 Digital Forums and Community Awareness Briefings could further address digital media literacy, empowering communities to mitigate the harmful effects of content encouraging violence.
- S&T Technology Centers are examining methods to mitigate disinformation, to include leveraging global research leaders on this topic and to provide scientific advice in support of Department initiatives.

**Models to Structure DHS Counter-Disinformation Efforts**
There are many possible ways to structure DHS counter-disinformation efforts moving forward.  The models presented below for your consideration represent a spectrum of options, from fully federating counter-disinformation operations to operational components, to building in varying levels of Headquarters oversight, governance, and coordination.

<u>**Option 1** Fully Federated Model: Operational Components Execute Independently</u>
The DHS counter-disinformation mission would be entirely federated to components, which would report to the Secretary and Deputy Secretary in the ordinary course but would not otherwise be governed by specific headquarters policies or guidance on this topic beyond existing DHS oversight functions.  This model generally resembles the status quo in which components identify and prioritize disinformation threats in their respective mission spaces (sometimes relying on I&A intelligence reports), plan and execute operations, and conduct their own oversight and governance.  It also means that each component operates under its own authorities, including the limits on these authorities.

<u>**Option 2** Governance Board Model: Independent Component Execution Under an Overarching DHS Protective Framework</u>
Execution of DHS counter-disinformation operations would be federated to components, but subject to overarching Department-wide governance requirements to ensure that a common set of issue-agnostic safeguards and oversight tools are employed.  PLCY could convene a governance board that would

PRE-DECISIONAL/DELIBERATIVE
~~UNCLASSIFIED // FOR OFFICIAL USE ONLY~~

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

PRE-DECISIONAL/DELIBERATIVE
UNCLASSIFIED // FOR OFFICIAL USE ONLY

**Subject: Organizing DHS Efforts to Counter Disinformation**
**Page 4**

promulgate policy and legal requirements setting forth baseline requirements that all components must meet in their counter-disinformation work, to include protections ensuring compliance with applicable civil rights and civil liberties, privacy, and legal requirements, such as First Amendment and Privacy Act requirements. Members would include all components conducting counter-disinformation operations as well as CRCL, PRIV, OGC, I&A, S&T, and MGMT.

The board's role would not be prescriptive, instead providing components with guidelines and minimum safeguards applicable across disinformation missions, regardless of the topic. The board could also develop and share with components best practices, to include:
- Risk assessment methodologies to prioritize disinformation threats with a nexus to violence or that pose a direct risk to operations;
- Guidelines for partnering with or procuring counter-disinformation services from the private sector consistent with the sensitivities addressed above; and
- Best practices for auditing or other oversight of counter-disinformation operations.

The board could also convene DHS stakeholders when new disinformation threats emerge or are identified by interagency partners that do not clearly fit within a disinformation mission already being performed by a DHS component. The board would determine who within the Department is best positioned to address the threat, make recommendations to the Secretary as to how the new threat should be addressed, and support whichever operational component is taking on the mission in standing up with appropriate governance.

The board would not play a role in coordinating or overseeing operations. Components would determine the functions they need for their counter-disinformation missions and how they will perform them. For example, a component could conduct identification and analysis itself, or leverage reporting from I&A or another federal agency, or engage private sector services.

Components would also be responsible for partner engagement in their respective mission spaces, including with the interagency, SLTT authorities, private sector entities, tech platforms, and the general public. Components would work together as needed to coordinate engagement with partners to avoid organizations receiving overlapping outreach from multiple parts of the Department.

**Option 3** Disinformation Coordinator Model: Coordinated Oversight and Operations
The most centralized approach could involve a newly-designated Coordinator for Countering Disinformation, modeled after the Department's Counterterrorism Coordinator. The Coordinator would work with components (and potentially non-DHS agencies should the administration encourage such an approach) to develop policies, procedures, and guidelines, and identify required resources to mature the Department's disinformation capabilities. Components would still be responsible for executing their respective disinformation missions, but the Coordinator would regularly convene components to facilitate the identification and analysis of disinformation threats and coordinate operational responses.

The Coordinator would also be responsible for developing homeland security counter-disinformation functions in coordination with components, other federal agencies, international partners, academia, non-profits, and the private sector, to include:
- Instituting Department-wide governance and oversight structures to ensure counter-disinformation efforts satisfy, among other considerations, civil rights and civil liberties, privacy, and legal (including First Amendment) requirements (similar to Option 2 above);

PRE-DECISIONAL/DELIBERATIVE
UNCLASSIFIED // FOR OFFICIAL USE ONLY

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

PRE-DECISIONAL/DELIBERATIVE
~~UNCLASSIFIED // FOR OFFICIAL USE ONLY~~

**Subject: Organizing DHS Efforts to Counter Disinformation**
**Page 5**

- Growing DHS counter-disinformation capacity by ensuring components develop expertise through new hiring, training, and external partner engagement;
- Keeping apprised of the overall disinformation environment and coordinating action with relevant agencies and stakeholders on cross-cutting issues.
- Reviewing and making recommendations with respect to DHS authorities to counter disinformation;
- Developing policies for DHS public communications on disinformation as well as driving engagement with SLTT and private sector entities, including platform operators, together with components;
- Engaging SLTT authorities to respond to the disinformation threat, including through Fusion Centers and state homeland security advisors; and
- Serving as a central point of contact for interagency partners such as the White House, State's Global Engagement Center, DOJ, HHS, DOD, and the Intelligence Community.

*****

PLCY recommends Option 2, to ensure nimbleness and component ownership of their mission spaces, while also providing assurance that all programs across the Department will operate in a manner consistent with our values. All components recommend a fulsome discussion with you to chart the way forward in this challenging space, so that a detailed action and implementation plan can be developed based on your guidance.

PRE-DECISIONAL/DELIBERATIVE
~~UNCLASSIFIED // FOR OFFICIAL USE ONLY~~

Release Authorized by Senator Grassley and Senator Hawley

Glenn Decl. Ex. 1
Page 10 of 36

Release Authorized by Senator Grassley and Senator Hawley

~~UNCLASSIFIED//FOR OFFICIAL USE ONLY~~
PREDECISIONAL//DELIBERATIVE

U.S. Department of Homeland Security
Washington, DC 20528

 **Homeland Security**

January 31, 2022

**ACTION**

MEMORANDUM FOR THE SECRETARY

| | | | |
|---|---|---|---|
| FROM: | Robert Silvers<br>Under Secretary<br>Office of Strategy, Policy, and Plans | ROBERT P SILVERS | Digitally signed by ROBERT P SILVERS Date: 2022.02.01 16:27:36 -05'00' |
| | Jennifer Daskal<br>Acting Principal Deputy General Counsel | JENNIFER C DASKAL | Digitally signed by JENNIFER C DASKAL Date: 2022.02.01 17:56:32 -05'00' |

SUBJECT:   **Disinformation Governance Board Charter**

**Purpose:**  To obtain your approval of the charter for the Disinformation Governance Board.

**Background:**  On September 29, 2021, you directed headquarters and Component leadership to pursue a governance board model to coordinate efforts to counter mis-, dis-, and mal-information (MDM) across the Department.[1]  You emphasized the need for clarity as to the Department's policies, standards, and best practices related to MDM work.  You also concluded that operational efforts to counter MDM should largely be carried out by Components, which would be responsible for their respective mission areas subject to the oversight of the governance board.

Based on that guidance, we developed the attached charter for a DHS Disinformation Governance Board ("the Board") to execute this critical work.  The Board will ensure Departmental efforts to counter MDM are coordinated, deconflicted, and harmonized.  The Board's primary roles are to develop and support the implementation of best practices, policies, and protocols that support the identification, assessment, response, and resilience to MDM threats, and that do so in a way that ensures respect for privacy, civil rights, and civil liberties. The Board will also support and coordinate, in conjunction with the relevant Components, MDM work with other departments and agencies, the private sector, and non-governmental actors.  In addition, the Board will support research and development efforts to understand the MDM threat to homeland security.

The Board will be co-chaired by representatives of the Office of Strategy, Policy, and Plans (PLCY) and the Office of the General Counsel.  Members will include components engaged in

---

[1] This model is presented as Option 2 in the September 13, 2021 memorandum 'Organizing DHS Efforts to Counter Disinformation.'

~~UNCLASSIFIED//FOR OFFICIAL USE ONLY~~
PREDECISIONAL//DELIBERATIVE

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

~~UNCLASSIFIED//FOR OFFICIAL USE ONLY~~
PREDECISIONAL//DELIBERATIVE

**Subject:  Disinformation Governance Board Charter**
**Page 2**

counter-MDM activities or that provide oversight and support for such activities.  Members will be represented by the principal or deputy for their respective Component/Offices.

The Board will meet no less than once per quarter for the first two years of its existence.  It will be supported by a Steering Group, consisting of representatives designated by each Member.  A senior official from within PLCY will serve as Executive Director for the Board and Chair of the Steering Group, to be supported by an Executive Secretariat comprised of staff detailed or assigned to PLCY.  As we build, we may enlist your office's support in obtaining detailees or other staffing.

The Charter has been coordinated with all DHS components that will be Members of the Board.

For your awareness, we attach a copy of the MDM Playbook that PLCY, together with components, developed for countering MDM in a unified way across the Department in the context of the current situation in Ukraine.  We are enthusiastic about the further work that the Disinformation Governance Board can accomplish.

**Timeliness:**  We request your signature of the charter as soon as practicable.

~~UNCLASSIFIED//FOR OFFICIAL USE ONLY~~
PREDECISIONAL//DELIBERATIVE

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

~~UNCLASSIFIED//FOR OFFICIAL USE ONLY~~

**Subject:** **Disinformation Governance Board Charter**
**Page 3**

**Recommendation:** Approve the charter for the Disinformation Governance Board.

Approve/date _____ 2/24/22    Disapprove/date _____

Modify/date _____    Needs discussion/date _____

Attachments:
  A. Disinformation Governance Board Charter
  B. Ukraine MDM Playbook
  C. 'Organizing DHS Efforts to Counter Disinformation' (September 13, 2021)

~~UNCLASSIFIED//FOR OFFICIAL USE ONLY~~

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

~~FOR OFFICIAL USE ONLY~~ / DELIBERATIVE / DRAFT

### DHS Disinformation Governance Board
### Charter

**Section 1.  Purpose**

The DHS Disinformation Governance Board ("Board") will guide and support the Department's efforts to address mis-, dis-, and mal-information that threatens homeland security ("MDM"). Whereas Department Components will lead on operational responses to MDM in their relevant mission spaces, the Board will ensure DHS efforts are coordinated, deconflicted, and harmonized, both within DHS and across the interagency, to ensure efficiency, unity of effort, and promotion of applicable compliance and best practices.

The Board will focus on the following four cross-functional lines of effort to counter MDM, many of which are already underway ("lines of effort"): (1) identifying MDM ("Identification"); (2) assessing and analyzing the risk that such MDM poses to homeland security ("Risk Assessment"); (3) responding to these MDM threats ("Response"); and (4) building resilience to MDM ("Building Resilience").

With respect to each of these lines of effort, the Board will develop and support the implementation of governance policies and protocols that, among other issues, protect privacy, civil rights, and civil liberties; harmonize and support coordination with other departments and agencies, the private sector, and non-governmental organizations; and support research and development efforts to assess and combat MDM.

**Section 2.  Members**

The Board will be co-chaired by representatives of the Office for Strategy, Policy, and Plans (PLCY) and the Office of the General Counsel (OGC).  Standing Board members will be representatives of the following DHS Components: the Management Directorate (MGMT); Office of Intelligence and Analysis (I&A); Science and Technology Directorate (S&T); Privacy Office (PRIV); Office for Civil Rights and Civil Liberties (CRCL); Office of Public Affairs (OPA); Cybersecurity and Infrastructure Security Agency (CISA); Federal Emergency Management Agency (FEMA); and U.S. Customs and Border Protection (CBP). Representatives shall be the Principal or Deputy for their respective Component.  Other Components may be invited to either join the Board or participate on an ad hoc basis, as appropriate and needed.

**Section 3.  Structure**

The Board will be supported by a Steering Group, which will consist of a representative from each Component participating in the Board.  Each representative will be selected by their respective Board member.

Release Authorized by Senator Grassley and Senator Hawley

~~FOR OFFICIAL USE ONLY~~ / DELIBERATIVE / DRAFT

The Board co-chairs will designate a DHS senior official to serve as the Executive Director for the Board and Chair of the Steering Group. The Executive Director will be detailed or assigned to PLCY, where they will be supported by an Executive Secretariat for the Board comprising staff detailed or assigned to PLCY. The Executive Director will attend and may participate in all Board meetings.

### Section 4. Board Responsibilities

Components will lead on MDM-related operational responses and other efforts to counter MDM in their relevant mission spaces. The Board will serve as the central forum in the Department to ensure consistent governance and coordination of such efforts, and adherence to applicable constitutional, statutory, and regulatory authorities and obligations.

The Board's initial responsibilities will include a review of existing MDM governance policies and practices across the Department, including:

- policies, procedures, practices, plans, and standards to ensure compliance with applicable constitutional, statutory, and regulatory obligations;
- policies, procedures, practices, plans, and standards to ensure appropriate privacy and civil rights and civil liberties protections;
- policies, procedures, practices, plans, and standards for interactions with the private, non-profit, and academic sectors; and,
- relevant procurement policies and practices.

Based, in part, on the findings from its initial review, the Board will be responsible for developing MDM-related guidance, best practices, and recommendations regarding: .

- compliance with applicable constitutional, statutory, and regulatory obligations;
- standards for and implementation of appropriate privacy, civil rights, and civil liberties protections;
- procurement guidelines for contracting or funding third parties to support the Department's MDM efforts;
- grant funding and cooperative agreements;
- development and implementation of new technological and data management tools; and,
- any other applicable guidance, best practices, and recommendations to guide the aforementioned four lines of effort.

The Board also will coordinate, deconflict, and harmonize departmental efforts to address MDM, including by:

- receiving regular and routine updates from DHS Components, the Intelligence Community, and other interagency partners on MDM;
- harmonizing and deconflicting activities by DHS Components regarding the lines of effort;
- harmonizing, deconflicting, and coordinating, in conjunction with relevant Components, the Department's external engagement regarding MDM;

Release Authorized by Senator Grassley and Senator Hawley

FOR OFFICIAL USE ONLY / DELIBERATIVE / DRAFT

- serving as the Department's internal and external point of contact for coordination with state, local, tribal, and territorial partners, the private sector, and non-governmental actors regarding MDM; and,
- serving as the Department's internal and external point of contact for receiving, coordinating, responding to, and interacting with interagency partners, including the Executive Office of the President, for policy matters generally related to mis-, dis-, and mal-information, but not related to the performance of intelligence activities.

**Section 5.  Roles and Responsibilities of Board Members**

The co-chairs of the Board will:

➢ convene the Board as needed;
➢ approve the agenda for Board meetings;
➢ preside over Board meetings;
➢ approve summaries of conclusions reached during the Board meetings;
➢ communicate Board decisions and activities to the Secretary and other DHS leadership, as appropriate;
➢ represent the Board to external audiences; and,
➢ take all other actions necessary and proper for the execution of the Board's responsibilities.
➢

The Board Members will:

➢ represent the perspectives of their respective Components at Board meetings;
➢ review any proposals submitted to the Board; and,
➢ ensure that their respective Components implement, execute, and follow Board decisions.

The Executive Director will:

➢ propose agenda items and discussion topics for the Board following Steering Group review;
➢ communicate the positions taken at the Steering Group concerning proposals before the Board;
➢ propose summaries of conclusion for each Board and Steering Group meeting;
➢ implement and execute Board decisions through the Steering Group;
➢ supervise the activities of the Executive Secretariat; and,
➢ represent the Steering Group and, where appropriate and in coordination with the co-chairs, the Department to external audiences on MDM-related matters.

The Steering Group Members will:

➢ represent the perspectives of their respective Components at Steering Group meetings;
➢ review and discuss any proposals to be submitted to the Board;
➢ communicate their considerations of Board proposals to their respective Board Members, the Executive Director, and other members of the Steering Group;

Release Authorized by Senator Grassley and Senator Hawley

FOR OFFICIAL USE ONLY / DELIBERATIVE / DRAFT

> ➤ review and approve summaries of conclusions of Steering Group meetings; and,
> ➤ subject to the direction and guidance of their respective Board Members, help ensure that their respective Components implement, execute, and follow Board decisions.

## Section 6.  Processes & Procedures

The Board will meet regularly at the discretion of the co-chairs and no less than once per quarter for the first two years of the Board's existence.  The Steering Group will meet at the discretion of the Board or Executive Director.  Issues raised and proposals submitted to the Board will be resolved by consensus to the greatest extent possible.  Where there is a disagreement amongst the Board members, the Board will resolve the matter before it by majority vote.  In the absence of consensus, any Board member may elevate, in the form of a written memorandum, an issue to the Secretary or Deputy Secretary where they believe that a decision made by the Board implicates their statutory or other assigned authorities.

The Steering Group is not a voting body.  Instead, its members will discuss all issues brought before it and make their recommendations to the Board.  Steering Group members will support the development of consensus recommendations to the Board to the greatest extent possible.

## Section 7.  Relationship to Other Departmental Governance Bodies

The Board will serve as the departmental forum for governance of DHS policies, plans, procedures, standards, and activities pertaining to MDM that threatens homeland security.  As such, all DHS-wide or Component-specific proposals for funding related to efforts to counter MDM should be appropriately coordinated with the Board, including in advance of submitting any final funding proposals.  Matters raised before the Board may implicate other departmental governance fora already in existence.  Where that occurs, the Board will coordinate its activities with those respective fora through the Executive Director.

## Section 8.  Effective Date

This charter will go into effect when signed by the Secretary of Homeland Security.

## Section 9.  Signature

Alejandro N. Mayorkas
Secretary
U.S. Department of Homeland Security

Feb. 24, 2022
Date

Release Authorized by Senator Grassley and Senator Hawley

FOR OFFICIAL USE ONLY

**Twitter**

**April 28, 2022 (TBC)**

**Overview:**
- You will meet in person with Twitter executives Nick Pickles, Head of Policy, and Yoel Roth, Head of Site Integrity, for XX minutes on public-private partnerships, MDM, and countering DVE. The meeting is off the record and closed press.
  - ➤ You have previously met with Jessica Herrera-Flanigan, Twitter's Vice President of Public Policy and Philanthropy for the Americas.
  - ➤ Please note any other main external participants who will be joining the principal (i.e. co-speakers on a panel).      **Commented [KE1]:** Placeholder:
  - ➤ You will be staffed by [redacted]

**Key Objectives:**
- This meeting is an opportunity to discuss operationalizing public-private partnerships between DHS and Twitter, as well as inform Twitter executives about DHS work on MDM, including the creation of the Disinformation Governance Board and its analytic exchange, and the Department's ongoing DVE work.

**Flow of Show:**     **Commented [KE2]:** Placeholder:
- 1:45 pm ET:    *[Example]* Tech check prior to meeting.

- 2:30 pm ET:    Event concludes.

**Background:**     **Commented [KE3]:** All: Please include any info on recent engagements with Twitter
- **Note:** Nick and Yoel both know DGB Executive Director Nina Jankowicz.
- **Propose** that Twitter become involved in Disinformation Governance Board Analytic Exchanges on Domestic Violent Extremism (DVE) and Irregular Migration.
  - ➤ **Thank** Twitter for its continued participation in the CISA Analytic Exchange on Election Security.
- **Ask** what types of data or information would be useful for Twitter to receive in Analytic Exchanges or other ways the Department could be helpful to Twitter's counter-MDM efforts.

**Participants:**
U/S Silvers
[redacted] Managing Director for Strategy

External:
(Principal), (Role)
(Staffer), (Role)
(Staffer), (Role)

**[PAGE BREAK BEFORE DISCUSSION POINTS]**

FOR OFFICIAL USE ONLY

Release Authorized by Senator Grassley and Senator Hawley

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

2

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

FOR OFFICIAL USE ONLY

**Discussion Points:**

DHS Efforts on MDM

- **Introduce** the Disinformation Governance Board.
  - ➤ The Board will ensure that DHS is actively and efficiently leveraging all its available resources and capabilities to mitigate and counter disinformation with a homeland security nexus, consistent with a deep commitment to protecting privacy and free speech.
  - ➤ The Board will serve as a coordinating mechanism for the Department's outreach to industry, civil society, and international partners on MDM.
  - The Board's initial work plan includes establishing analytic exchanges with industry on countering MDM related to domestic violent extremism and irregular migration.
    - ➤ **Propose** that Twitter be an active participant in these exchanges and thank the company for their continued engagement with CISA's election security exchange.

Operationalizing Public-Private Partnerships ⌐ ⌐ ⌐ ⌐ ⌐ ⌐ ⌐ ⌐ ⌐ ⌐ ⌐ ⌐ ⌐ ⌐ ⌐ ⌐ ⌐ - - - - -    **Commented [KE4]:** CISA and CP3 please add TPs

- •

DVE

- The United States remains deeply concerned regarding the complex, cross-cutting links between MDM and all forms of violent extremism.
- The primary terrorism-related threat to the United States continues to stem from lone offenders or small cells of individuals who are motivated by a range of foreign and/or domestic grievances often cultivated through the consumption of certain online content.
- Key factors contributing to the current heightened threat environment include:
  - ➤ The proliferation of false or misleading narratives, which sow discord or undermine public trust in U.S. government institutions.
  - ➤ Continued calls for violence directed at U.S. critical infrastructure; soft targets and mass gatherings; faith-based institutions, such as churches, synagogues, and mosques; institutions of higher education; racial and religious minorities; government facilities and personnel, including law enforcement and the military; the media; and perceived ideological opponents.
  - ➤ Calls by foreign terrorist organizations for attacks on the United States based on recent events.
- In June, the White House released the first ever *National Strategy for Combatting Domestic Terrorism*. In response, DHS has realigned and dedicated resources to combat domestic violent extremists (DVEs) and would like to have a deeper discussion on our latest assessments.
  - ➤ The DHS Office of Intelligence and Analysis (or I&A) created a domestic terrorism branch within its counterterrorism mission center to ensure DHS develops the expertise necessary to produce sound and timely intelligence, at the lowest classification possible in order to inform our stakeholders.
  - ➤ The Department established a new Center for Prevention Programs and Partnerships (CP3) to improve the Department's ability to combat terrorism and targeted

3

FOR OFFICIAL USE ONLY

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

FOR OFFICIAL USE ONLY

violence, consistent with privacy protections, civil rights and civil liberties, and other applicable laws.
- We are working to improve our ability to identify narratives that are playing out online in effort to counter the threat that is increasingly manifesting through various digital forums

Ukraine
- Together with partners from across the U.S. Government, DHS components – including CISA, FEMA, TSA, the U.S. Coast Guard, and our policy and legal staffs are preparing for a range of potential scenarios.
  - Our goal is to ensure that – well in advance of any potential incident – we are connecting operators from across our government and the private and civil sectors so we can identify and work to remediate an emerging campaign as quickly as possible.
  - Twitter participated in a CISA/FBI led call with social media companies on February 25th to discuss potential of influence operations stemming from the escalating geopolitical issues as it relates to U.S. critical infrastructure.
- Following actions taken by the U.S. and allies, we have seen increased instances of MDM and malign foreign influence on publicly available websites that may be linked to the Russian government, military, and intelligence services in the Russian and Ukrainian languages. These include allegations that the United States is deploying military forces to Ukraine's eastern front and that U.S. intelligence services are staging false-flag attacks in Ukraine to instigate a conflict.

Hard Q&A:
- What questions do we expect and/or know will come up in this meeting?
  - ➢ Please provide a concise recommended response.

Attachments
A. Biographies

Staff Responsible for Briefing Memo:  Nina Jankowicz, Executive Director DHS Disinformation Governance Board, ███████████████

FOR OFFICIAL USE ONLY

4

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

~~FOR OFFICIAL USE ONLY~~/ **DELIBERATIVE**

### DHS Disinformation Governance Board Charter

**Section 1.  Purpose.**  The purpose of the Board is to support the Department's efforts to address mis-, dis-, and mal-information (MDM) that threatens homeland security.  Departmental components will lead on operational responses to MDM in their relevant mission spaces.  The Board will ensure these activities are conducted within a protective governance framework that respects privacy, civil rights, and civil liberties. This work be speaker-agnostic, focusing on the narratives rather than those who originate or spread them. The board will also ensure that Departmental efforts are coordinated and deconflicted to ensure efficiency, unity of effort, and promotion of best practices across the Department's MDM work.

More specifically, the Board's primary roles are three-fold: 1) To develop and implement governance policies for departmental efforts related to MDM, 2) To deconflict departmental efforts to counter MDM narratives that threaten homeland security, including with respect to departmental engagement with third parties; and 3) To streamline and enhance coordination with other departments and agencies and promote best practices for counter-MDM work.

These efforts will focus on four lines of effort (LOEs) that cut across efforts to counter MDM across DHS's many mission spaces:(1) identifying narratives of concern ("Identification"); (2) assessing and analyzing the risk that such narratives pose to homeland security ("Risk Assessment"); (3) responding to these narratives ("Response"); and (4) developing resilience against MDM ("Building Resilience").

**Sec. 2.  Members.**  The Board will be co-chaired by the Office for Strategy, Policy, and Plans (PLCY) and the Office of the General Counsel (OGC).  Standing Board members will be the following: the Management Directorate; the Office of Intelligence and Analysis (I&A); the Science and Technology Directorate (S&T); the Privacy Office (PRIV); the Office for Civil Rights and Civil Liberties (CRCL); the Office of Public Affairs (OPA); the Cybersecurity and Infrastructure Security Agency (CISA); the Federal Emergency Management Agency (FEMA); and U.S. Customs and Border Protection (CBP). Other components may be invited to participate on an ad hoc basis.

**Sec. 3.  Structure.**

Each Board member will be represented by the Principal or Deputy for their respective component.  The Board will be supported by a DHS MDM Steering Group, which will consist of representatives for each component participating in the Board selected by their respective Board member.  In addition, the Secretary will designate a senior official from within the Department to serve as the Executive Agent for the Board and Chair of the Steering Group.  The Executive Agent will be detailed or assigned to PLCY, where they will be supported by an Executive Secretariat for the Board and Steering Group comprising staff detailed or assigned to PLCY.  The Executive Agent will attend and may participate in all Board meetings.

**Sec. 4.  Roles & Responsibilities.**

Department components will lead on operational responses to MDM in their relevant mission space.  The Board will serve as the central forum in the Department to ensure consistent governance and coordination of such efforts.

  ➤ The Board's initial responsibilities will include a review of existing MDM governance policies and practices across the Department, including—
   o Policies, procedures, practices, plans, and standards to ensure compliance with applicable constitutional, statutory, and regulatory obligations;

Release Authorized by Senator Grassley and Senator Hawley

~~FOR OFFICIAL USE ONLY~~/ DELIBERATIVE

- o Policies, procedures, practices, plans, and standards to ensure appropriate privacy and civil rights and civil liberties protections;
- o Policies, procedures, practices, plans, and standards for interactions with the private, non-profit, and academic sectors; and
- o Relevant procurement policies and practices.
- ➢ The Board will also be responsible for developing guidance, best practices, and recommendations with respect to—
  - o Compliance with applicable constitutional, statutory, and regulatory obligations;
  - o Ensuring the implementation of appropriate privacy and civil rights and civil liberties protections;
  - o Proposals for additional or amended departmental authorities or funding, consistent with the processes of the Deputies Management Action Group (DMAG);
  - o Procurement guidelines for contracting with third parties to support the Department's MDM efforts;
  - o Grant funding; and
  - o Any other applicable best practices to guide the lines of effort with respect to identification, risk assessment, response, and building resilience.

The Board also will coordinate and deconflict departmental efforts to address MDM narratives that threaten homeland security. This will include—

- ➢ Receiving regular and routine updates from Departmental components on MDM narratives of concern and the relevant MDM lines of effort;
- ➢ Deconflicting any activities by the Department and relevant components to counter MDM with respect to external outreach to the private and other nongovernmental actors;
- ➢ Serving as a departmental point of contact, in addition to component points of contact, as appropriate, for receiving and assessing concerns about MDM raised by federal, state, local, tribal, private sector, or other nongovernmental partners; and
- ➢ Serving as a departmental point of contact, in addition to component points of contact, for receiving, coordinating, responding to, and interacting with interagency partners, including the Executive Office of the President, for all MDM matters not related to the performance of intelligence activities.

The Co-Chairs of the Board will—

- ➢ Convene the Board;
- ➢ Compose the agenda for Board meetings;
- ➢ Preside over Board meetings;
- ➢ Approve and disseminate summaries of conclusions reached at the Board meetings;
- ➢ Communicate Board decisions and activities as they deem appropriate to the Secretary and Deputy Secretary;
- ➢ Represent the Board to external audiences; and
- ➢ Take all other actions necessary and proper to execution of the Board's responsibilities.

The Board members will—

- ➢ Represent the perspectives of their respective offices or components at Board meetings;
- ➢ Review and either approve or reject any proposals submitted to the Board; and
- ➢ Ensure that their respective components implement, execute, and follow Board decisions.

Release Authorized by Senator Grassley and Senator Hawley

~~FOR OFFICIAL USE ONLY~~/ DELIBERATIVE

The Executive Agent will—

- ➢ Propose agenda items and discussion topics for the Board following Steering Group review;
- ➢ Communicate the position(s) taken at the Steering Group concerning proposals before the Board;
- ➢ Propose summaries of conclusion for each Board meeting;
- ➢ Implement and execute Board decisions through the Steering Group;
- ➢ Supervise the activities of the Executive Secretariat; and
- ➢ Represent the Steering Group and, where appropriate and in coordination with the Co-Chairs, the Department to external audiences on matters concerning MDM.

The Steering Group members will—

- ➢ Represent the perspectives of their respective offices or components at Steering Group meetings;
- ➢ Review and either endorse or oppose any proposals to be submitted to the Board;
- ➢ Communicate their endorsements or oppositions to Board proposals to their respective Board members, the Executive Agent, and other members of the Steering Group; and
- ➢ Subject to the direction and guidance of their respective Board members, help to ensure that their respective components implement, execute, and follow Board decisions.

**Sec. 5. Processes & Procedures.**

The Board will meet regularly and at the discretion of the Co-Chairs, but in any event no less than once per quarter for the first two years of the Board's existence. The Steering Group will meet at the discretion of the Executive Agent. Issues raised and proposals submitted to the Board will be resolved by consensus to the greatest extent possible. Where there is a disagreement amongst the Board members, the Board will resolve the matter before it by majority vote. In the absence of consensus, any Board member may elevate, in a form of a written memorandum, an issue to the Secretary or Deputy Secretary where they believe that a decision made by the Board implicates their statutory or other assigned responsibilities.

The Steering Group is not a voting body. Instead, its members will make recommendations to the Board, as communicated by the Executive Agent. The Steering Group members will endeavor to make consensus recommendations to the Board to the greatest extent possible. The Executive Agent will prepare draft summaries of conclusion after each Board meeting. The Co-Chairs will review and approve the summaries of conclusion before they are socialized with the other Board members.

**Sec. 6. Relationship to Other Departmental Governance Bodies.**

The Board will serve as the senior departmental forum for governance of departmental policies, plans, procedures, standards, and activities pertaining to MDM. As such, all proposals for funding through the DMAG concerning efforts to counter MDM must be coordinated in advance with the Board. Matters raised before the board may implicate other departmental governance fora already in existence. Where that occurs, the Board will coordinate its activities with those respective fora through the Executive Agent.

**Sec. 7. Effective Date.**

The charter will go into effect when signed by the Secretary of Homeland Security.

Release Authorized by Senator Grassley and Senator Hawley

~~UNCLASSIFIED//FOR OFFICIAL USE ONLY~~
**PREDECISIONAL//DELIBERATIVE**

U.S. Department of Homeland Security
Washington, DC 20528

 **Homeland Security**

## ACTION

MEMORANDUM FOR THE SECRETARY

FROM:                    Robert Silvers
                         Under Secretary
                         Office of Strategy, Policy, and Plans

                         Jonathan Meyer
                         General Counsel

SUBJECT:             **DHS Disinformation Governance Board Charter**

**Purpose:** To obtain your approval of the charter for the DHS Disinformation Governance Board.

**Background:** In a September 29, 2021 discussion with headquarters and Component leadership, you directed the Department to pursue a governance board model to coordinate efforts to counter mis-, dis-, and mal-information (MDM).[1] You discussed the benefits of having a mechanism that would develop and coordinate intra-Departmental governance policies, standards, and best practices related to MDM work and that could coordinate efforts to engage private sector stakeholders. Execution of DHS counter-MDM activities would be federated to Components, who would be responsible for their respective mission areas subject to the oversight of the governance board.

Based on your guidance, we have developed the attached charter for a DHS Disinformation Governance Board (Board) to execute this critical work. The Board's primary roles would be three-fold: 1) To develop and implement governance policies for departmental efforts related to MDM; 2) To deconflict, where necessary, departmental efforts to counter MDM narratives that threaten homeland security, including with respect to departmental outreach engagement with third parties; and 3) To streamline and enhance coordination with other departments and agencies and promote best practices for counter-MDM work.

The Board will be co-chaired by the Office of Strategy, Policy, and Plans (PLCY) and the Office of the General Counsel. Members will include all Components and headquarters offices engaged in counter-MDM activities or providing oversight and support for such activities. The Board's guidance will include protections that ensure compliance with applicable law and policy and

---

[1] This model is presented as Option 2 in the September 13, 2021 memorandum 'Organizing DHS Efforts to Counter Disinformation.'

Release Authorized by Senator Grassley and Senator Hawley

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PREDECISIONAL//DELIBERATIVE

**Subject: DHS Disinformation Governance Board Charter**
**Page 2**

protect individuals' privacy, civil rights, and civil liberties. Members will be represented by the principal or deputy for their respective Component/Offices.

The Board will meet no less than once per quarter for the first two years of its existence. It will be supported by a Steering Group, consisting of representatives designated by each member. You will designate a senior official from within the Department to serve as Executive Agent for the Board and Chair of the Steering Group, who would be supported by an Executive Secretariat comprising staff detailed or assigned to PLCY.

Chartering the Board would provide structure and oversight to critical efforts already underway, including: 1) a review of existing policies and practices to protect privacy, civil rights, and civil liberties; 2) developing a framework for the Department to notify specific entities, or in some cases the public, of MDM relevant to homeland security; and 3) reviewing opportunities for deeper information sharing and exchange of best practices with platform operators and other private sector partners.

**Timeliness:** MDM constitutes a significant and immediate threat to homeland security. We request your signature of the charter by January 31 to allow for the first meeting of the Board to occur by the end of February.

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

**Subject: DHS Disinformation Governance Board Charter**
**Page 3**

**Recommendation:** Approve the charter for the DHS Disinformation Governance Board.

Approve/date_____      Disapprove/date_____

Modify/date_____      Needs discussion/date_____

Attachments:
- A. Disinformation Governance Board Charter
- B. 'Organizing DHS Efforts to Counter Disinformation' (September 13, 2021)

Release Authorized by Senator Grassley and Senator Hawley

Glenn Decl. Ex. 1
Page 27 of 36

Release Authorized by Senator Grassley and Senator Hawley

**JOSH HAWLEY**
MISSOURI

115 Russell Senate Office Building
Telephone: (202) 224-6154
Fax: (202) 228-0526
WWW.HAWLEY.SENATE.GOV

**United States Senate**

WASHINGTON, DC 20510-2509

COMMITTEES
JUDICIARY
ARMED SERVICES
HOMELAND SECURITY
AND GOVERNMENTAL AFFAIRS
SMALL BUSINESS
AND ENTREPRENEURSHIP

April 28, 2022

The Honorable Alejandro Mayorkas
Secretary of Homeland Security
U.S. Department of Homeland Security
245 Murray Lane, S.W.
Washington D.C. 20528

**RECEIVED**
**By ESEC at 9:22 am, Apr 28, 2022**

Dear Secretary Mayorkas:

I write with deep concern about the Department of Homeland Security's decision to create a new Disinformation Governance Board. I confess, I at first thought this announcement was satire. Surely no American Administration would ever use the power of Government to sit in judgment on the First Amendment speech of its own citizens. Sadly, I was mistaken. Rather than protecting our border or the American homeland, you have chosen to make policing Americans' speech your priority. This new board is almost certainly unconstitutional and should be dissolved immediately.

For well over a year, your Department has consistently treated competing policy views as disinformation to be monitored or investigated. However, political debates on issues such as immigration, pandemic lockdowns, and foreign policy clearly constitute "core political speech" protected by the First Amendment.[1] The Supreme Court has even gone so far as to say that "Under the First Amendment there is no such thing as a false idea."[2] The apparent broad mandate of this new government entity to "coordinate countering misinformation" in America undermines the argument that it can even exist consistent with the Constitution.[3]

Particularly troubling is your choice to lead the new board, Nina Jankowicz, a supposed "expert" with a long history of partisan attacks. Consider:

- In 2020, she described President Trump's use of the national guard as "a sentence I expect to hear from leaders of authoritarian countries, not the President of the United States."[4]
- In 2021, she quoted with praise an article that said "homegrown fascism predated President Donald Trump."[5]
- She has said America is systemically racist.[6]
- In response to revelations about Hunter Biden's laptop, she tweeted that "50 former natsec officials and 5 former CIA heads that believe the laptop is a Russian influence op. Trump says 'Russia, Russia, Russia.'"[7]

---

[1] *Meyer v. Grant*, 486 U.S. 414, 422 (1988).
[2] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974).
[3] https://www.politico.com/newsletters/playbook/2022/04/27/fauci-pulls-out-of-whcd-is-biden-next-00028131
[4] https://twitter.com/wiczipedia/status/1267589264440729600
[5] https://twitter.com/wiczipedia/status/1321123630403694593
[6] https://twitter.com/wiczipedia/status/1311123042387529734
[7] https://twitter.com/wiczipedia/status/1319463138107031553?s=20&t=EZYZWppGDhzWKhE5ensHnQ

Release Authorized by Senator Grassley and Senator Hawley

Jankowicz has said the new DHS Board will "maintain the Dept's committment [sic] to protecting free speech."[8] This is particularly ironic given Jankowicz's extensive criticism of free speech and the First Amendment. Jankowicz has claimed that "the 'free speech vs censorship' framing is a false dichotomy."[9] And when Elon Musk announced his acquisition of Twitter, she said "I shudder to think about if free speech absolutists were taking over more platforms, what that would look like for the marginalized communities … which are already shouldering … disproportionate amounts of this abuse."[10] Jankowicz has even described opponents of social media speech codes as "first amendment zealots."[11] These statements that question the value of free speech are obviously disqualifying for such a role.

While Democrats have for years controlled the public square through their Big Tech allies, Mr. Musk's acquisition of Twitter has shown just how tenuous that control is. It can only be assumed that the sole purpose of this new Disinformation Governance Board will be to marshal the power of the federal government to censor conservative and dissenting speech. This is dangerous and un-American. The board should be immediately dissolved.

So that Congress can consider remedial legislation, please provide the following responses prior to your expected testimony before the Senate Homeland Security and Governmental Affairs Committee on May 4, 2022:

1. How will this Disinformation Board function? And who exactly will it be monitoring?
2. What analysis did DHS conduct, if any, to ensure that the Disinformation Board and its activities comport with the First Amendment?
3. Why did DHS time its announcement of this governance board directly after Mr. Musk's acquisition of Twitter?
4. Who appointed Ms. Jankowicz to head the board as executive director? Were you aware of her history of partisan conduct prior to her appointment?
5. Has DHS conferred with any private social media company in the creation or operation of this board?

Sincerely,

Josh Hawley
United States Senator

---

[8] https://twitter.com/wiczipedia/status/1519282822158110721
[9] https://twitter.com/JackPosobiec/status/1519397817260904454?s=20&t=ukuMjyeX1tNIuHKa1DmtGw
[10] https://www.npr.org/2022/04/16/1093212502/women-face-disproportionate-attacks-online-one-expert-shares-some-of-the-details
[11] https://twitter.com/wiczipedia/status/1192897252328714240

Release Authorized by Senator Grassley and Senator Hawley

**Department of Homeland Security Response to
Senator Hawley's April 27, 2022 Letter**

**1. How will this Disinformation Board function? And who exactly will it be monitoring?**

For nearly 10 years, different agencies across DHS have worked to address disinformation that threatens our homeland security.  The Department is deeply committed to doing all of its work in a way that protects Americans' freedom of speech, civil rights, civil liberties, and privacy.  In fact, the Disinformation Governance Board is an internal working group that was established with the explicit goal of ensuring these protections are appropriately incorporated across DHS's disinformation-related work and that rigorous safeguards of Americans' fundamental rights are in place.  The working group also seeks to coordinate the Department's engagements on this subject with other federal agencies and a diverse range of external stakeholders.  The working group does not have any operational authority or capability.

The Department is focused on disinformation that threatens the security of the American people, including disinformation spread by foreign states such as Russia, China, and Iran, or other adversaries such as transnational criminal organizations and human smuggling organizations.  Such malicious actors often spread disinformation to exploit vulnerable individuals and the American public, including during national emergencies.

DHS would be failing in its mission if it ignored disinformation that poses a threat to the homeland.  To that end, Components seek to address disinformation related to their authorized missions.  Some examples of that are as follows:
- U.S. Customs and Border Protection (CBP) counters disinformation that cartels and human smugglers spread to migrants to persuade them to cross our southwest border illegally.  CBP's work includes its "Say No to the Coyote" campaign, making clear that entering the United States illegally is a crime.
- In 2012, during Hurricane Sandy, the Federal Emergency Management Agency (FEMA) corrected false information about the safety of drinking water and the location of shelters to protect and serve the hurricane's victims.  FEMA has since built capacity to identify and respond to false information during major disaster responses, including Hurricanes Maria and Ida, during which FEMA provided critical information to protect disaster survivors from targeted scams.  FEMA also ensures that disinformation campaigns do not prevent Americans from accessing federal aid during and after disasters.
- The Cybersecurity and Infrastructure Security Agency (CISA) works with private sector stakeholders to mitigate the risk of disinformation to U.S. critical infrastructure, work that has continued in light of Russia's invasion of Ukraine.

The working group is co-chaired by the DHS Office of Strategy, Policy, and Plans and Office of the General Counsel, and includes other DHS leaders from CISA, FEMA, CBP, the Office for Civil Rights and Civil Liberties, Office of Intelligence and Analysis, Science and Technology Directorate, and Privacy Office.

**2. What analysis did DHS conduct, if any, to ensure that the Disinformation Board and its activities comport with the First Amendment?**

The Department is deeply committed to doing all of its work in a way that protects Americans' freedom of speech, civil rights, civil liberties, and privacy.  In fact, the Disinformation

Release Authorized by Senator Grassley and Senator Hawley

**Department of Homeland Security Response to**
**Senator Hawley's April 27, 2022 Letter**

Governance Board is an internal working group that was established with the explicit goal of ensuring these protections are appropriately incorporated across DHS's disinformation-related work and that rigorous safeguards of Americans' fundamental rights are in place.

It is co-chaired by the DHS Office of Strategy, Policy, and Plans and the Office of the General Counsel, and its membership includes departmental leaders from other DHS components, including those from the Office for Civil Rights and Civil Liberties and the Office of Privacy. The Office for Civil Rights and Civil Liberties and Privacy Officer were consulted prior to the establishment of the Board and through the development and publication of its charter.

Secretary Mayorkas will request that the bipartisan Homeland Security Advisory Council (HSAC) make recommendations for how the Department can most effectively and appropriately address disinformation that poses a threat to the homeland, while protecting free speech and other fundamental rights, and that HSAC Co-Chair Jamie Gorelick and HSAC Member Michael Chertoff lead this effort. Ms. Gorelick is a former U.S. Deputy Attorney General and Mr. Chertoff was Secretary of Homeland Security during President George W. Bush's Administration. At Secretary Mayorkas's request, DHS is exploring additional ways to enhance the public's trust in this important work.

**3. Why did DHS time its announcement of this governance board directly after Mr. Musk's acquisition of Twitter?**

The timing of the announcement was not related to any such external events. The Board's Charter was signed in February 2022.

**4. Who appointed Ms. Jankowicz to head the board as executive director? Were you aware of her history of partisan conduct prior to her appointment?**

Nina Jankowicz was chosen for her eminent qualifications and leadership in the field of online disinformation and malign foreign influence. She is a widely acknowledged expert on online disinformation who has testified multiple times before Congress as well as the UK and European Parliaments. From 2016-2017, under the auspices of the Fulbright program, Ms. Jankowicz served as an adviser to the Ukrainian Foreign Ministry. She worked closely with our Ukrainian allies to combat Russian disinformation meant to destabilize the Ukrainian government and jeopardize its international partnerships. Most recently, she was a Disinformation Fellow at the non-partisan Wilson Center.

**5. Has DHS conferred with any private social media company in the creation or operation of this board?**

The Board is an internal working group that does not have operational capacity. The creation of the Board was not discussed with any external entities prior to the public announcement.

Release Authorized by Senator Grassley and Senator Hawley

.....................................................

(Original Signature of Member)

117TH CONGRESS
2D SESSION

# H. R. __

To direct the Cybersecurity and Infrastructure Security Agency of the
Department of Homeland Security to identify, track, and share with
homeland security stakeholders and the public information regarding
misinformation, disinformation, and malinformation with national or
homeland security implications, and for other purposes.

_____

## IN THE HOUSE OF REPRESENTATIVES

Ms. CLARKE of New York introduced the following bill; which was referred to the Committee on
_____

_____

# A BILL

To direct the Cybersecurity and Infrastructure Security Agency of the
Department of Homeland Security to identify, track, and share with
homeland security stakeholders and the public information regarding
misinformation, disinformation, and malinformation with national or
homeland security implications, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States
of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Strengthening Resilience Against
Disinformation Act of 2022".

Release Authorized by Senator Grassley and Senator Hawley

### SEC. 2. DEFINITIONS OF MDM IN THE HOMELAND SECURITY ACT OF 2002.

Section 2201 of the Homeland Security of 2002 (6 U.S.C. 652) is amended—

(1) by redesignating paragraphs (4), (5), and (6) as paragraphs (7), (8), and (9), respectively; and

(2) by inserting after paragraph (3) the following new paragraphs:

"(4) DISINFORMATION.—The term 'disinformation' means false information that is deliberately created to mislead, harm, or manipulate a person, social group, organization, or country.

"(5) MALINFORMATION.—The term 'malinformation' means information that is based on fact, but used out of context to mislead, harm, or manipulate.

"(6) MISINFORMATION.—The term 'misinformation' means information that is false, but not created or shared with the intention of causing harm.".

### SEC. 3. RESPONSIBILITIES OF THE CISA DIRECTOR RELATING TO MISINFORMATION, DISINFORMATION, AND MALINFORMATION.

(a) IN GENERAL.—Subsection (c) of section 2202 of the Homeland Security Act of 2002 (6 U.S.C. 652) is amended—

(1) in paragraph (13), by striking "and" after the semicolon;

(2) by redesignating paragraph (14) as paragraph (15); and

(3) by inserting after paragraph (13) the following new paragraph:

"(14) carry out activities to identify, track, and share with homeland security stakeholders and the public information regarding misinformation, disinformation, and malinformation, including by carrying out sections 2209(c)(13) and 2220D; and".

(b) NATIONAL CYBERSECURITY AND COMMUNICATIONS INTEGRATION CENTER. Subsection (c) of section 2209 of the Homeland Security Act of 2002 (6 U.S.C. 659) is amended—

Release Authorized by Senator Grassley and Senator Hawley

(1) in subparagraph (11), by striking "and" after the semicolon;

(2) in paragraph (12), by striking the period at the end and inserting "; and"; and

(3) by adding at the end the following new paragraph:

"(13) maintaining capabilities to identify, track, and share with homeland security stakeholders and the public information regarding misinformation, disinformation, and malinformation that, either individually or in the aggregate, is likely to result in demonstrable harm to the national security interests of the United States, including undermining public confidence in democratic institutions or election integrity, or to homeland security, economic security, civil liberties, public health, emergency response, or public safety, or any combination thereof, for the purpose of enhancing the collective response to such misinformation, disinformation, and malinformation, including strengthening national security and promoting strong media literacy and digital resilience, including by carrying out activities in section 2220D.".

### SEC. 4. RUMOR CONTROL PROGRAM OF THE DEPARTMENT OF HOMELAND SECURITY TO COUNTER MISINFORMATION, DISINFORMATION, AND MALINFORMATION.

(a) IN GENERAL.—Subtitle A of title XXII of the Homeland Security Act of 2002 (6 U.S.C. 651 et seq.) is amended by adding at the end the following new section:

### "SEC. 2220D. RUMOR CONTROL PROGRAM TO COUNTER MISINFORMATION, DISINFORMATION, AND MALINFORMATION.

"(a) ESTABLISHMENT.—There is within the center authorized pursuant to section 2209 a public-facing website, known as 'Rumor Control', to carry out sections 2202(c)(14) and 2209(c)(13).

"(b) FUNCTIONS.—In administering the Rumor Control website, the Director shall establish partnerships with relevant public and private sector stakeholders, including the following:

Release Authorized by Senator Grassley and Senator Hawley

"(1) Technology companies that own or operate internet-enabled communications platforms commonly used to spread misinformation, disinformation, or malinformation.

"(2) Non-governmental and civil-society groups, including civil rights and civil liberties organizations, with relevant subject matter expertise or stakeholder relationships, to identify and respond to misinformation, disinformation, and malinformation, and ensure such response is designed to effectively reach and raise awareness among communities or demographics targeted by such content.

"(3) State, Local, Tribal, and territorial governmental agencies.

"(4) Relevant Federal agencies, including Sector Risk Management Agencies, as appropriate.

"(c) INFORMATION PROTECTIONS.—If in the course of carrying out this section personally identifiable information is received by the Agency, the Director shall ensure such information is protected from unauthorized use or disclosure in a manner consistent with the protection of personal information under the Cybersecurity and Information Sharing Act of 2015 (enacted as title I of division N of the Consolidated Appropriations Act, 2016 (Public Law 114–113)).".

(b) CLERICAL AMENDMENT.—The table of contents in section 1(b) of the Homeland Security Act of 2002 is amended by inserting after the item relating to section 2220C the following new item:

"Sec. 2220D. Rumor control program to counter misinformation, disinformation, and malinformation.".

### SEC. 5. REPORT.

Not later than 180 days after the date of the enactment of this Act, and not later than 60 days after each regularly-scheduled general election for Federal office, the Director of the Cybersecurity and Infrastructure Security Agency of the Department of Homeland Security shall submit to the Committee on Homeland Security of the House of Representatives and the Committee on Homeland Security and Governmental Affairs of the Senate a report describing actions taken by the Director in furtherance of sections 2202(c)(14), 2209(c)(13), and 2220D of the Homeland Security Act of 2002, as amended and added by this Act, including

Release Authorized by Senator Grassley and Senator Hawley

specific details regarding the Agency's activities pursuant to subsection (b)(2) of such section 2220D, for the four-year period preceding each such election.

# EXHIBIT 2

5/30/22, 11:05 AM                    News Consumption Across Social Media in 2021 | Pew Research Center



Home > Research Topics > News Habits & Media > News Media Trends > Digital News Landscape >
Social Media & the News

PEW RESEARCH CENTER  |  SEPTEMBER 20, 2021



# News Consumption Across Social Media in 2021

*More than half of Twitter user get news on the site regularly*

BY **MASON WALKER** AND **KATERINA EVA MATSA**

How we did this ⊕

Glenn Decl. Ex. 2
Page 1 of 8



**About half of Americans get news on social media at least sometimes, down slightly from 2020**

*% of U.S. adults who get news from social media ...*

| | Often | Sometimes | Rarely | Never | Don't get digital news |
|---|---|---|---|---|---|
| 2021 | 19% | 29% | 19% | 24% | 9% |
| 2020 | 23 | 30 | 18 | 21 | 7 |

Source: Survey of U.S. adults conducted July 26-Aug. 8, 2021.
"News Consumption Across Social Media in 2021"

**PEW RESEARCH CENTER**

As social media and technology companies face criticism for not doing enough to stem the flow of misleading information on their platforms, a sizable portion of Americans continue to turn to these sites for news. A little under half (48%) of U.S. adults say they get news from social media "often" or "sometimes," a 5 percentage point decline compared with 2020, according to a Pew Research Center survey conducted July 26-Aug. 8, 2021.[1]

Glenn Decl. Ex. 2
Page 2 of 8



**Nearly a third of Americans regularly get news on Facebook**

*% of U.S. adults who ...*

Source: Survey of U.S. adults conducted July 26-Aug. 8, 2021.
"News Consumption Across Social Media in 2021"

**PEW RESEARCH CENTER**

When it comes to where Americans regularly get news on social media, Facebook outpaces all other social media sites.

In a separate question asking users of 10 social media sites whether they regularly get news there, about a third of U.S. adults (31%) say they get news regularly on Facebook, while about one-in-five Americans (22%) say they regularly get news on YouTube. Twitter and Instagram are regular news sources for 13% and 11% of Americans, respectively.

Other social media sites are less likely to be regular news sources. Fewer than one-in-ten Americans say they regularly get news from Reddit (7%), TikTok (6%), LinkedIn (4%), Snapchat (4%), WhatsApp (3%) and Twitch (1%).

The percentage of Americans who get news regularly from these sites has remained largely unchanged since 2020, though the share who regularly get news on Facebook has declined slightly (36% in 2020 vs. 31% in 2021).

Glenn Decl. Ex. 2
Page 3 of 8



**Large portion of Twitter users regularly get news there**

*% of each social media site's users who **regularly** get news there*

Source: Survey of U.S. adults conducted July 26-Aug. 8, 2021.
"News Consumption Across Social Media in 2021"

**PEW RESEARCH CENTER**

When looking at the proportion of each social media site's users who regularly get news there, some sites stand out as being more "newsy" even if their total audience is relatively small. Twitter, for example, is used by 23% of U.S. adults, but more than half of those users (55%) get news on the site regularly. On the other hand, YouTube, though widely used, sees a smaller portion of its users turning to the site for news regularly (30%).

Overall, the percentage of users of each site who regularly get news there has remained relatively stable since 2020, a year that included both a presidential election and the outbreak of the COVID-19 pandemic. However, both Facebook and TikTok buck this trend. The share of Facebook users who say they regularly get news on the site has declined 7 points since 2020, from 54% to 47% in 2021. TikTok, on the other hand, has seen a slight uptick in the portion of users who say they regularly get news on the site, rising from 22% to 29% in this period.

In some cases, there are drastic demographic differences between the people who turn to each social media site for news. For example, White adults make up a majority of the regular news consumers of Facebook and Reddit (60% and 54%, respectively), yet just under four-in-ten Instagram news consumers (36%) are White. Both Black and Hispanic

Glenn Decl. Ex. 2
Page 4 of 8

adults each make up a sizable portion of Instagram's regular news consumers (20% and 33%, respectively). People who regularly get news on Facebook are more likely to be women than men (64% vs. 35%), while two-thirds of Reddit's regular news consumers are men. A majority of regular news consumers on LinkedIn (57%) have a four-year college degree or higher. Younger adults, those ages 18 to 29, are far more likely to regularly get news on both Snapchat and TikTok than other age groups.

The majority of regular news consumers of many sites are Democrats or lean Democratic. This may be related to the relatively young age profile of the news consumer base of these social media sites. No social media site included here has regular news consumers who are more likely to be Republican or lean Republican.

### Demographic profiles and party identification of regular social media news consumers in the U.S.

*% of each social media site's **regular** news consumers who are ...*

| | Facebook | YouTube | Twitter | Instagram | Reddit | TikTok | LinkedIn | Snapchat |
|---|---|---|---|---|---|---|---|---|
| Men | 35% | 56 | 56 | 36 | 67 | 30 | 54 | 40 |
| Women | 64% | 43 | 43 | 63 | 31 | 68 | 44 | 59 |
| Ages 18-29 | 23 | 27 | 43 | 44 | 44 | 52 | 25 | 63 |
| 30-49 | 41 | 40 | 38 | 37 | 47 | 34 | 46 | 32 |
| 50-64 | 22 | 22 | 14 | 13 | 8 | 12 | 20 | 3 |
| 65+ | 14 | 11 | 5 | 5 | 1 | 2 | 8 | 1 |
| High school or less | 41 | 37 | 25 | 33 | 26 | 42 | 18 | 50 |
| Some college | 31 | 35 | 31 | 36 | 33 | 40 | 24 | 35 |
| College+ | 28 | 28 | 43 | 30 | 41 | 17 | 57 | 14 |
| White | 60 | 46 | 46 | 36 | 54 | 38 | 45 | 31 |
| Black | 11 | 16 | 14 | 20 | 7 | 18 | 18 | 21 |
| Hispanic | 20 | 24 | 22 | 33 | 21 | 34 | 20 | 37 |
| Asian* | 5 | 10 | 9 | 7 | 15 | 8 | 13 | 7 |
| Rep/Lean Rep | 44 | 41 | 30 | 33 | 23 | 32 | 41 | 32 |
| Dem/Lean Dem | 52 | 54 | 67 | 62 | 74 | 63 | 54 | 61 |

*Asian adults were interviewed in English only.
Note: Twitch and WhatsApp not shown due to small sample size. White, Black and Asian adults include those who report being only one race and are not Hispanic; Hispanics are of any race.
Source: Survey of U.S. adults conducted July 26-Aug. 8, 2021.
"News Consumption Across Social Media in 2021"

**PEW RESEARCH CENTER**

Next: Acknowledgments

Glenn Decl. Ex. 2
Page 5 of 8

1. In 2020, Pew Research Center made changes to how it asks about news consumption on social media for its annual study of how Americans use social media sites for news. More on these methodological changes can be found here. ⧉



## REPORT MATERIALS

📄 Complete Report PDF

📋 Topline Questionnaire

## TABLE OF CONTENTS ▼

## RELATED

SHORT READ | DEC 14, 2021

### How Americans tweet about the news

REPORT | NOV 15, 2021

### News on Twitter: Consumed by Most Users and Trusted by Many

REPORT | JAN 12, 2021

### News Use Across Social Media Platforms in 2020

REPORT | JUL 30, 2020

### Americans Who Mainly Get Their News on Social Media Are Less Engaged, Less Knowledgeable

REPORT | JAN 1, 1970

## TOPICS

Glenn Decl. Ex. 2
Page 6 of 8

Social Media

Social Media & the News

## MOST POPULAR

**1**  What the data says about gun deaths in the U.S.

**2**  Reddit news users more likely to be male, young and digital in their news preferences

**3**  Key facts about Americans and guns

**4**  The demographics of gun ownership

**5**  Modest Warming in U.S. Views on Israel and Palestinians

Pew Research Center

1615 L St. NW, Suite 800
Washington, DC 20036
USA
(+1) 202-419-4300 | Main
(+1) 202-857-8562 | Fax
(+1) 202-419-4372 | Media Inquiries

### RESEARCH TOPICS

Politics & Policy

International Affairs

Immigration & Migration

Race & Ethnicity

Religion

Generations & Age

Gender & LGBT

Family & Relationships

Economy & Work

Science

Internet & Technology

News Habits & Media

Methodological Research

Full topic list

### FOLLOW US

✉ Email Newsletters

⊙ Facebook

🐦 Twitter

t Tumblr

▶ YouTube

🔊 RSS

**ABOUT PEW RESEARCH CENTER** Pew Research Center is a nonpartisan fact tank that informs the public about the issues, attitudes and trends shaping the world. It conducts public opinion polling, demographic research, media content analysis and other empirical social science research. Pew Research Center does not take policy positions. It is a subsidiary of The Pew Charitable Trusts.

Copyright 2022 Pew Research Center    About    Terms & Conditions    Privacy Policy    Reprints, Permissions & Use Policy

Feedback    Careers

Glenn Decl. Ex. 2
Page 7 of 8

5/30/22, 11:05 AM                    News Consumption Across Social Media in 2021 | Pew Research Center

Glenn Decl. Ex. 2
Page 8 of 8

# EXHIBIT 3

# Number of monthly active Facebook users worldwide as of 1st quarter 2022 (in millions)



Sources
Facebook; Meta Platforms
© Statista 2022

Additional Information:
Worldwide; Meta Platforms; Q3 2008 to Q1 2022



# EXHIBIT 4

TRY OUR CORPORATE SOLUTION FOR FREE!    📞 (212) 419-8294    ✉ vianny.gutierrez-cruz@statista.com

Source: https://www.statista.com/forecasts/1136345/facebook-users-in-the-united-states

## Facebook users in the United States 2017-2025

Published by J. Degenhard, Jul 20, 2021

In 2021, Facebook's user base in the United States amounts to approximately 235.02 million users. The number of Facebook users in the United States is projected to increase to 257.41 million users by 2025. User figures have been estimated by taking into account company filings or press material, secondary research, app downloads and traffic data. They refer to the average monthly active users over the period and count multiple accounts by persons only once.

The shown data are an excerpt of Statista's Key Market Indicators (KMI). The KMI are a collection

**Forecast of the number of Facebook users in the United States from 2017 to 2025**

*(in millions)*



**Details:**

© Statista 2022 🚩

Show source ⓘ

**Source**
→ Show sources information
→ Show publisher information
→ Use Ask Statista Research Service

**Release date**
May 2021

**Region**
United States

**Survey time period**
2017-2019

**Special properties**
All values are estimates.

**Supplementary notes**
The shown forecasts represent a blend of multiple input datasets from both internal (primary) and external (secondary) sources. Whereas primary data are generated via Statista's own surveys like the Global Consumer Survey, secondary input datasets are mostly sourced from international institutions (such as the IMF, the World Bank or the United Nations), national statistical offices, trade associations and from the trade press. These datasets are often incomplete as there are gaps between survey years or no or no reliable information might be available for a specific indicator in a specific country or region. Data for missing years are interpolated by various statistical means, such as linear or exponential interpolation or cubic splines. Data for missing countries or regions are imputed by considering known information from other countries or regions that are found to be similar by cluster analyses like k-means or similar procedures.
Most indicators are composites of multiple input sources with slightly varying methodologies that have been processed by our analysts to be aligned and consistent with each other and with all other indicators in the KMI database. As new data becomes available or methodologies are adapted to suit changing requirements it can be possible

that data is not comparable any longer with

previously published data or is changed retroactively according to the new definitions. Because of the high degree of processing no specific external source can be named for each data point and all data for historical years (usually until the last finished year before the current one) have to be considered Statista estimates. Future years are mostly Statista projections These projections or forecasts are conducted by regression analyses, exponential trend smoothing (ETS) or similar techniques and extrapolate the found historical trend.

"

# EXHIBIT 5

6/8/22, 8:26 AM                          United States Internet and Facebook User Statistics





*Internet Coaching Library*

World Stats | Africa Stats | America Stats | Asia Stats | Europe Stats | EU Stats | Mid East Stats | Oceania Stats | Links

# United States of America
# Internet and Facebook Users Stats
### ( American Internet and Facebook Statistics State by State )

### USA INTERNET AND FACEBOOK USERS - USA STATE BY STATE

| REGION | Population 2010 Est. | Pop. % World | Internet Users, June, 2010 | Internet Penetration | Facebook Subscribers | Facebook Penetration |
|---|---|---|---|---|---|---|
| Total United States | 310,232,863 | 4.5 % | 239,893,600 | 77.3 % | 133,518,980 | 43.0 % |
| Rest of World | 6,535,377,097 | 95.5 % | 1,730,942,797 | 26.5 % | 384,949,520 | 5.9 % |
| WORLD TOTAL | 6,845,609,960 | 100.0 % | 1,970,836,397 | 28.8 % | 518,468,500 | 7.6 % |

NOTES: (1) USA State Internet data is projection for June, 2010, pending Year 2010 U.S. Census processing. (2) Facebook Usage Statistics are for August 31, 2010. (3) Population estimate numbers are based on figures from the U.S. Census Bureau . (4) The Internet usage numbers come from data published by Nielsen , ITU, IWS, and other trustworthy research sources. (5) Data from this table may be cited, giving the due credit and establishing an active link back to Internetworldstats.com. Copyright © 2010, Miniwatts Marketing Group. All rights reserved.



United States Internet Users
Top 5 States - 2010 Q2

Source: Internet World Stats - www.internetworldstats.com/stats26.htm
Estimated USA Internet users are 239,893,600 on June 31, 2010
Copyright © 2010, Miniwatts Marketing Group

### INTERNET USAGE AND FACEBOOK STATISTICS

Glenn Decl. Ex. 5
Page 1 of 4

6/8/22, 8:26 AM                                       United States Internet and Facebook User Statistics

# UNITED STATES - State by State

| 50 STATES + D.C. | Population (2010 Est.) | Population % of USA | Internet users June, 2010 | Internet Penetration | Facebook users August, 2010 | Facebook Penetration |
|---|---|---|---|---|---|---|
| Alabama | 4,758,191 | 1.5 % | 3,092,273 | 65.0 % | 1,599,260 | 33.6 % |
| Alaska | 705,813 | 0.2 % | 593,193 | 84.0 % | 336,440 | 47.7 % |
| Arizona | 6,665,093 | 2.1 % | 5,230,474 | 78.5 % | 2,448,140 | 36.7 % |
| Arkansas | 2,919,815 | 0.9 % | 1,949,869 | 66.8 % | 989,820 | 33.9 % |
| California | 37,350,092 | 12.0 % | 29,758,896 | 79.7 % | 16,673,720 | 44.6 % |
| Colorado | 5,077,553 | 1.6 % | 4,058,749 | 79.9 % | 2,369,420 | 46.7 % |
| Connecticut | 3,555,261 | 1.1 % | 3,074,229 | 86.5 % | 1,398,220 | 39.3 % |
| Delaware | 894,424 | 0.3 % | 719,500 | 80.4 % | 216,140 | 24.2 % |
| District of Columbia | 605,959 | 0.2 % | 463,503 | 76.5 % | 1,576,360 | 260.1 % |
| Florida | 18,732,783 | 6.0 % | 14,764,418 | 78.8 % | 7,839,520 | 41.8 % |
| Georgia | 9,932,505 | 3.2 % | 7,597,608 | 76.5 % | 4,841,900 | 48.7 % |
| Hawaii | 1,308,789 | 0.4 % | 1,081,506 | 82.6 % | 597,100 | 45.6 % |
| Idaho | 1,562,046 | 0.5 % | 1,284,500 | 82.2 % | 518,060 | 33.2 % |
| Illinois | 13,046,084 | 4.2 % | 10,243,294 | 78.5 % | 7,152,340 | 54.8 % |
| Indiana | 6,490,613 | 2.1 % | 4,770,355 | 73.5 % | 2,225,460 | 34.3 % |
| Iowa | 3,039,465 | 1.0 % | 2,354,728 | 77.5 % | 922,240 | 30.3 % |
| Kansas | 2,848,369 | 0.9 % | 2,248,721 | 78.9 % | 1,312,240 | 46.1 % |
| Kentucky | 4,359,450 | 1.4 % | 2,997,542 | 68.8 % | 1,598,020 | 36.7 % |
| Louisiana | 4,539,283 | 1.5 % | 3,071,973 | 67.7 % | 1,643,860 | 36.2 % |
| Maine | 1,332,155 | 0.4 % | 1,102,933 | 82.8 % | 536,480 | 40.3 % |
| Maryland | 5,759,373 | 1.9 % | 4,737,650 | 82.3 % | 2,363,480 | 41.0 % |
| Massachusets | 6,662,878 | 2.1 % | 5,745,853 | 86.2 % | 3,148,580 | 47.3 % |
| Michigan | 10,074,498 | 3.2 % | 7,899,843 | 78.4 % | 3,921,020 | 38.9 % |
| Minnesota | 5,321,556 | 1.7 % | 4,370,006 | 82.1 % | 2,274,240 | 42.7 % |
| Mississippi | 2,983,018 | 1.0 % | 1,769,430 | 59.3 % | 904,460 | 30.3 % |
| Missouri | 6,050,503 | 2.0 % | 4,380,156 | 72.4 % | 2,831,000 | 46.8 % |
| Montana | 985,235 | 0.3 % | 725,139 | 73.6 % | 369,820 | 37.5 % |
| Nebraska | 1,815,500 | 0.6 % | 1,455,917 | 80.2 % | 792,800 | 43.7 % |
| Nevada | 2,670,861 | 0.9 % | 2,137,074 | 80.0 % | 957,680 | 35.9 % |
| New Hampshire | 1,338,495 | 0.4 % | 1,205,558 | 90.1 % | 595,580 | 44.5 % |
| New Jersey | 8,799,248 | 2.8 % | 7,728,426 | 87.8 % | 4,154,820 | 47.2 % |
| New Mexico | 2,030,790 | 0.7 % | 1,380,358 | 68.0 % | 516,280 | 25.4 % |
| New York | 19,746,813 | 6.4 % | 16,091,772 | 81.5 % | 8,544,640 | 43.3 % |
| North Carolina | 9,479,467 | 3.1 % | 6,809,315 | 71.8 % | 4,004,020 | 42.2 % |
| North Dakota | 653,642 | 0.2 % | 496,207 | 75.9 % | 304,260 | 46.5 % |
| Ohio | 11,663,946 | 3.8 % | 8,949,773 | 76.7 % | 4,747,620 | 40.7 % |
| Oklahoma | 3,725,797 | 1.2 % | 2,530,656 | 67.9 % | 1,303,220 | 35.0 % |
| Oregon | 3,865,861 | 1.2 % | 3,327,971 | 86.1 % | 1,724,480 | 44.6 % |
| Pennsylvania | 12,737,230 | 4.1 % | 9,909,482 | 77.8 % | 5,955,960 | 46.8 % |
| Rhode Island | 1,064,277 | 0.3 % | 861,596 | 81.0 % | 561,360 | 52.7 % |
| South Carolina | 4,609,176 | 1.5 % | 3,086,634 | 67.0 % | 1,625,480 | 35.3 % |
| South Dakota | 820,920 | 0.3 % | 598,832 | 72.9 % | 326,560 | 39.8 % |
| Tennessee | 6,362,421 | 2.1 % | 4,638,409 | 72.9 % | 2,530,520 | 39.8 % |

Glenn Decl. Ex. 5
Page 2 of 4

6/8/22, 8:26 AM

United States Internet and Facebook User Statistics

| | | | | | | |
|---|---|---|---|---|---|---|
| Texas | 25,042,738 | 8.1 % | 17,176,661 | 68.6 % | 10,685,000 | 42.7 % |
| Utah | 2,813,835 | 0.9 % | 2,465,247 | 87.6 % | 1,275,660 | 45.3 % |
| Vermont | 628,294 | 0.2 % | 513,123 | 81.7 % | 248,000 | 39.5 % |
| Virginia | 7,965,428 | 2.6 % | 6,193,567 | 77.8 % | 3,101,820 | 38.9 % |
| Washington | 6,734,229 | 2.2 % | 5,772,919 | 85.7 % | 3,889,000 | 57.7 % |
| West Virginia | 1,838,901 | 0.6 % | 1,296,905 | 70.5 % | 527,140 | 28.7 % |
| Wisconsin | 5,714,200 | 1.8 % | 4,744,417 | 83.0 % | 2,302,820 | 40.3 % |
| Wyoming | 549,990 | 0.2 % | 436,437 | 79.4 % | 236,920 | 43.1 % |
| TOTAL U.S.A. | 310,232,863 | 100.0 % | 239,893,600 | 77.3 % | 133,518,980 | 43.0 % |

NOTES: (1) USA State Population data is projection for June, 2010, pending Official Year 2010 U.S. Census results. (2) The Facebook Usage Statistics are for August 31, 2010. Please note D.C. penetration data is out of limits, this is probably due to non-resident Facebook users. (3) USA Internet estimates are based on figures from the U.S. Census Bureau surveys. (4) Other Internet usage numbers come from data published by Nielsen , ITU, IWS, and other trustworthy research sources. (5) Data from this table may be cited, giving the due credit and establishing an active link back to Internetworldstats.com. Copyright © 2010, Miniwatts Marketing Group. All rights reserved.



## United States Internet Penetration
### Top 5 States - 2010 Q2

Source: Internet World Stats - www.internetworldstats.com/stats26.htm
Estimated USA Internet users are 239,893,600 on June 31, 2010
Copyright © 2010, Miniwatts Marketing Group



^ top of page

## Internet World Stats - Web Site Directory

^ top of page

### Internet Usage Stats and Population Statistics

World Stats | Africa Stats | America Stats | Asia Stats | Europe Stats | EU Stats | Middle East Stats | Oceania Stats
Latin America Stats | Top Internet Usage | Top Internet Penetration | Top Internet Languages | Top Ten | Broadband
Internet Arabic Speakers | Internet Chinese Speakers | Internet English Speakers | Internet French Speakers
Internet German Speakers | Internet Portuguese Speakers | Internet Spanish Speakers | World Languages
Caribbean Internet | Central America Internet | North America Internet | South America Internet | Facebook

### Country Links and International Directory

Africa | Asia | North America | Central America | Caribbean | Europe | European Union | EU Enlargement
Middle East | South America | South Pacific and Australia | World Population | Country List | United States

### Internet Marketing Pages

Glenn Decl. Ex. 5
Page 3 of 4

6/8/22, 8:26 AM                     United States Internet and Facebook User Statistics

Broadband Usage | Mobile Internet | Internet Usage | Internet Divide | Internet Growth | Internet Coaching Library
Internet News | Internet Users Associations | Internet Security Stats | Market Reports | Internet Market Research
Press Release Coaching | SEM | SEO | Internet Search | Internet Browsers | B2B Trade Exchanges | Travel Stats

*Site Resources and Services*

Media Kit | Blog | Dictionaries | Tools | Internet Telephone Calls | Conference Calls | Online Profits | NFL Tickets | Privacy
Newsletter | Press Room | Software | e-Learning | Translations | Web Services | Web Stats | Time | Weather | Copyrights

*Country Internet Usage Statistics, Population, Travel and Telecommunications Reports*

Africa | Asia | Americas | Caribbean | Europe | Middle East | South America | South Pacific | USA | Site Links | About Us

*All About
Market Research*                       *Internet World Stats*                       **^ top of page**
                                        **Home Page**

Copyright © 2011-2014, Miniwatts Marketing Group. All rights reserved worldwide. Page updated on February 22, 2014.

Glenn Decl. Ex. 5
Page 4 of 4

# EXHIBIT
# 6



FinancesOnline
REVIEWS FOR BUSINESS

What are you looking for?

SOFTWARE CATEGORIES ▾    FOR REMOTE WORK    + GET LISTED

Home / Research Center / Number of Twitter Users 2022/2023: Demographics, Breakdowns & Predictions

Why is FinancesOnline free ⓘ

# Number of Twitter Users 2022/2023: Demographics, Breakdowns & Predictions



491 shares

f  282

🐦  163

in  46



### How many Twitter users are there?

Twitter has some **330 million monthly active users** (MAU) based on its last reported data that leveraged this metric in the 1st quarter of 2019. As of 2020, Twitter's monetizable daily active users (mDAU) **stands at 166 million**, which represents a 24% growth from 2019. Meanwhile, in the US alone, Twitter has 69.3 million active users as of January 2021.

We live in a very fast-paced world nowadays and people can't be bothered to spend a lot of time reading blogs or full-length news articles. Thus, **the birth of microblogging**—allowing people to share their **thoughts or information in 280 characters (up from 140) or less.**

Can you imagine fitting everything you want to say in one single tweet? Well, no need to. This article will discuss the **relevant Twitter statistics** as well as where its future in order to better understand the microblogging site.

## Number of Twitter Users Table of Contents

1. What is the number of Twitter users per country?
2. Who has the most number of Twitter followers?
3. Who has the most popular tweet of all time?
4. How many Twitter users in the US?
5. What is the number of Twitter users by age?
6. How many Twitter users are there by gender?
7. How many followers does an average Twitter user have?
8. What are the top social media accounts aside from Twitter?
9. How many tweets are sent per day?
10. What is Twitter used for today?
11. How much time do users spend on Twitter?
12. How is Twitter used as a marketing tool for brands?
13. Is Twitter losing popularity?
14. What's next for Twitter?

491 shares

f 282

🐦 163

in 46

## What is the number of Twitter users per country?

**Twitter is particularly popular in the US** and as of January 2021, the microblogging site had 69.3 million active users (DataReportal, 2021). **Japan and India were ranked second and third** with 50.9 and 17.5 million users, respectively. Twitter's user base represents only a fraction of the total social media users in 2020.

## Countries with the Most Twitter Users 2021 (in millions)



Source: Statista, 2021

Designed by FinancesOnline

491 shares

f 282

🐦 163

in 46

## Who has the most number of Twitter followers?

As of May 2020, **former US President Barack Obama is the top Twitter celebrity figure with over 118.09 million followers.** Coming in second is singer Justin Bieber who was followed by 111.78 million.

## Twitter Accounts with the Most Followers Worldwide 2020 (in millions)



Source: Statista, 2020

Designed by FinancesOnline

## Who has the most popular tweet of all time?

A tweet from an unlikely person, **a Japanese billionaire named Yusaku Maezawa**, has become the **most retweeted post of all time** (Brandwatch, 2020). The entrepreneur offered **one million yen ($910,400) each to 100 randomly selected individuals** who retweeted the post and followed his account—to celebrate the bumper sales of his clothing line (Zozo) over the holidays.

Until January 2019, the top spot on the ranking belonged to Carter Wilkerson, who asked fast-food chain Wendy's for free chicken nuggets in exchange for retweets.



## Most Popular Tweets as of February 2020, by Number of Retweets

### (in Millions)

| Tweet | Retweets |
|---|---|
| Yusaku Maezawa: offering 1M yen each to 100 randomly selected people (Jan '19) | 4.2 |
| Yusaku Maezawa: giveaway, with 1bn yen being promises to 1,000 people (Dec '19) | 3.9 |
| Carter Wilkerson: Wendys free chicken nuggets (Apr '17) | 3.4 |
| Ellen DeGeneres: 2014 Oscars photo (Mar '14) | 3.1 |
| Louis Tomlinson: Always in my heart @Harry_Styles . Yours sincerely, Louis (Oct '11) | 2.5 |
| El Rubius: LIMONADA (Aug '16) | 1.6 |
| Barack Obama: "No one is born hating another person because of the color of his skin..." (Aug '17) | 1.5 |
| El Rubius: LIMONADA 2.0 (Sep '18) | 1.3 |
| Jimmy Donaldson (MrBeast): $10k giveaway based on retweet on the occasion of his birthday (May '19) | 1.1 |
| BTS: Duh (emoji) (Jungkook dancing to Billie Eilish's hit "Bad Guy") | 1 |

Source: Brandwatch, 2020

Designed by FinancesOnline

491 shares

f 282

Twitter 163

in 46

## How many Twitter users in the US?

As of the third quarter of 2020, there are 36 million daily active users of Twitter in America (Twitter, 2020). Meanwhile, The number of **US Twitter users is 69.3 million as of** January 2021 (DataReportal, 2021). Overall, the top 10% of Twitter users in the US **generate roughly 80% of tweets on the platform.** The number of **monthly active US Twitter users in the first quarter of 2019 totaled 68 million,** an increase from 66 million in the previous term.

Though recently, **Twitter's user growth is not at par with its investors' expectations**—compared to the previous quarter, the growth only amounted to 3% and has hovered in the low single digits since 2017 as the company continues to struggle to attract and retain users.



## Number of Twitter Daily Active Users (DAU) in the US

### Averaged yearly DAUs in millions

Source: Twitter, 2020

Designed by FinancesOnline

491 shares

f 282
🐦 163
in 46

## What is the number of Twitter users by age?

Unlike other social networking websites like Instagram, which is more popular among teenagers, **Twitter users are primarily in the 35-49 years old age bracket** (DataReportal, 2021). The social networking site also declared that 80% of its users are "affluent millennials."

## Distribution of Twitter users worldwide as of January 2021, by age group ☰



Source: DataReportal; We Are Social; Hootsuite, 2021

Designed by ⌾ FinancesOnline

But it's a different case in the US where **40% of Twitter users are between the age of 18 and 29 years** (Omnicore, 2021).

Usage among US adults decreases as age increases. **Pew Research** reports that 27% of those are aged 30-49, 15% are between 50-64 years old, and 8% are from the 65 and above age bracket (Pew Research, 2019).

## How many Twitter users are there by gender?

Globally, **male users on the Twitter platform outnumber female users.** Based on January 2021 data, 68.5% of Twitter users are male compared to only 31.5% of females (DataReportal, 2021).

## Distribution of Twitter users worldwide as of January 2021, by gender ☰



31.5% female     68.5% male

Source: We Are Social; Hootsuite; DataReportal, 2021

Designed by ⌾ FinancesOnline

## How many followers does an average Twitter user have?

491 shares

f 282
🐦 163
in 46

The last significant research on this was done by Beevolve back in 2012 when they analyzed 36 million profiles and found that the **average Twitter user had 208 followers** (Beevolve, 2012).

Kickfactory updated this metric in 2016, and since Twitter does not share this data, they had to look at roughly 96 million Twitter profiles to get an answer (Kickfactory, 2016). As of 2016, **the average number of followers a Twitter user has is 707 followers**, up 340% since 2012.

## What are the top social media accounts aside from Twitter?

**Almost two billion internet users are using social networks** and these figures are expected to grow as the use of mobile devices and mobile social networks continuously gain traction. **The top social media networks are generally available in multiple languages** and allow users to connect with friends or people beyond geographical, political, or economic confines.

As of January 2021, based on the number of active accounts, **Facebook is still the market leader** and also the first social network to surpass one billion registered accounts while **Pinterest was the fastest independently launched site to reach 10 million unique monthly visitors** (DataReportal, 2021).

491 shares

f 282

t 163

in 46



### Global social networks ranked by number of users 2021

(in millions)

| Network | Users |
|---|---|
| Facebook | 2,740 |
| Youtube | 2,291 |
| WhatsApp | 2,000 |
| Facebook Messenger | 1,300 |
| Instagram | 1,221 |
| Weixin / WeChat | 1,213 |
| TikTok | 689 |
| QQ | 617 |
| Douyin | 600 |
| Sina Weibo | 511 |
| Telegram | |



Snapchat — 498

Kuaishou — 481

Pinterest — 442

Reddit — 430

Twitter — 353

Quora — 300

500

Source: **We Are Social; Hootsuite; DataReportal, 2021**        Designed by  **Finances**Online

491 shares

f  282

🐦  163

in  46

## How many tweets are sent per day?

Twitter's appeal comes from the fact that users can tweet random posts with no filter needed – **users can literally post one after** the other without being judged for posting too much. On average, **6,000 tweets are sent every second,** which corresponds to over **350,000 tweets per minute, 500 million tweets per day, and roughly 200 billion tweets per year** (Dsayce, 2020).

## What is Twitter used for today?

Aside from self-indulging uses like sharing brainfarts and funny memes, Twitter is actually useful in a lot of other ways. It's **most commonly used for getting specific answers and advice** directly from the sources of such knowledgeable people (Lifewire, 2020).

A lot of companies **use Twitter to provide instant customer support.** It provides faster communication lines than traditional customer support via phone. Some of the top brands that have Twitter customer support are **Amazon, UPS, Intel, Starbucks, and Linkedin** among many more (Top Rank Marketing).



Most Common User Activities on Twitter

Source: eMarketer

Designed by FinancesOnline

491 shares

f 282

🐦 163

in 46

## How much time do users spend on Twitter?

As mentioned above, **Twitter's popularity as the go-to source of real-time news worldwide** is the top reason why people visit social networking site. It's a popular outlet to report breaking news. As a matter of fact, **journalists make-up almost a quarter of all verified accounts on Twitter** (Oberlo, 2020).

As such, **the average time spent on Twitter clocks in at 11.05 minutes per session** (SimilarWeb, 2021)—which is not surprising at all, given the fact that a **tweet only has a lifespan of 15 to 20 minutes** (Oberlo, 2020).



Time Spent on Social Media Networks 2021, by Average Visit Duration

(in Minutes)

Source: SimilarWeb

Designed by FinancesOnline

## How is Twitter used as a marketing tool for brands?

Traditional marketing is not enough these days to maintain brand recall with the business' target audience. **Social media platforms play a huge role** when it comes to promoting products and connecting with customers.



491 shares

f 282

🐦 163

in 46



Top brands on Twitter, 2021

(millions of followers)

| Brand | Followers |
|---|---|
| Playstation | 21,250,251 |
| Xbox | 15,689,769 |
| SpaceX | 15,085,233 |
| Chanel | 13,202,827 |
| Samsung Mobile | 12,346,635 |
| Netflix Brasil | 12,074,877 |
| Rockstar Games | 11,847,196 |
| Nintendo of America | 11,209,090 |
| Starbucks Coffee | 10,932,736 |
| Netflix | 10,929,812 |

Source: Socialbakers, 2021        Designed by ☁ **Finances**Online

## Is Twitter losing popularity?

According to Forbes, **Twitter has experienced a steady decline in popularity from 2012-2018** (Forbes, 2019). It is down **more than 100 million users who tweet on a daily basis** and down almost **200 million daily tweets** while no new users have been recorded.

In response to the steep decline, **Twitter is ditching the monthly active user metric and is moving towards monetizable daily active users (mDAU)** count to better measure the number of users for stakeholders and advertisers (The Verge, 2019). This

number doesn't include the total user base, but instead **incorporates users that are using portions of the network that display ads.**

## What's next for Twitter?

Twitter remains a popular social media platform for marketers. In fact, **53% of marketers worldwide used it as a channel for their marketing activities** in 2020 (Social Media Examiner, 2020). Social media in general gives brands the possibility to personally engage with consumers.



**491 shares**



Leading social media platforms used by marketers worldwide, 2020

Source: Social Media Examiner, 2020

Designed by FinancesOnline

Twitter has a great impact on consumer behavior. Digital Marketing Institute reported that about **40% of Twitter users** disclosed that they purchased something after seeing it on Twitter (Twitter). This is an excellent reflection of the steady increase in influence social media has on the purchasing habits of consumers.

However, getting your brand involved on Twitter is not enough. Brands need to consider the **power of social media influencers.** Twitter themselves reported that the **intent of users to purchase increased over five-fold when they are exposed to tweets from both influencers and brands**, compared to merely 2.7 times with just brand tweets (Twitter).

Moreover, influencers on social media like Twitter are also rivaling friends in building consumer trust. When looking for product recommendations, 56% of consumers asked friends for guidance, while 49% of respondents said they relied on influencers. On Twitter, recommendations from influencers resulted in 20% of respondents saying a Tweet from an influencer inspired them to share a product recommendation. Based on these data, we can surmise that branding and marketing strategies should have a combination of tweets from brands and influencers.

Whether you are a startup business or an already established brand, it's crucial to recognize the importance of Twitter when formulating brand strategy. With **about 340 million active users**, there's an extensive pool of consumers to tap on and engage with. You can also look into **general social media trends** to see where Twitter's larger sphere of influence is heading.

**References:**

① Beevolve (2012). *An Exhaustive Study of Twitter Users Across the World*. Retrieved from **Beevolve**

② Brandwatch (2020, July). *The 20 Most-Retweeted Tweets*. Retrieved from **Brandwatch**

③ Burgess, C. (n.d.). *7 Examples of Brands Mastering Twitter for Social Customer Care*. Retrieved from **Top Rank Blog**

④ DataReportal (2021). *Most popular social networks worldwide as of January 2021, ranked by number of active users*. Retrieved from **Statista**

⑤ DataReportal (2021, January). *Distribution of Twitter users worldwide as of January 2021, by age group*. Retrieved from **Statista**

⑥ DataReportal (2021, January). *Leading countries based on number of Twitter users as of January 2021*. Retrieved from **Statista**

⑦ Gil, P. (2020, October). *What is Twitter & How Does It Work?*. Retrieved from **Lifewire**

⑧ Kastrenakes, J. (2019, February 7). *Twitter keeps losing monthly users, so it's going to stop sharing how many*. Retrieved from **The Verge**

⑨ Kickfactory (2016, June). *The Average Twitter User Now has 707 Followers*. Retrieved from **Kickfactory**

⑩ Leetaru, K. (2019, March 4). *Visualizing Seven Years Of Twitter's Evolution: 2012-2018*. Retrieved from **Forbes**

⑪ Lin, Y. (2021, January 25). *10 Twitter Statistics Every Marketer Should Know in 2021 [Infographic]*. Retrieved from **Oberlo**

⑫ Omnicore (2021, January). *Twitter by the Numbers: Stats, Demographics & Fun Facts*. Retrieved from **Omnicore**

⑬ Pew Research Center (2019, June). *Social Media Fact Sheet*. Retrieved from **Pew Research Center**

⑭ Sayce, D. (2020). *The Number of tweets per day in 2020*. Retrieved from **Dsayce**

⑮ SimilarWeb (2021). *twitter.com Overview*. Retrieved from **SimilarWeb**

⑯ Twitter (2016, May 10). *New Research: The value of influencers on Twitter*. Retrieved from **Twitter**

⑰ Twitter (2020). *Investor Relations*. Retrieved from **Twitter**



By **Allan Jay**



Allan Jay is FinancesOnline's resident B2B expert with over a decade of experience in the SaaS space. He has worked with vendors primarily as a consultant in the UX analysis and design stages, lending to his reviews a strong user-centric angle. A management professional by training, he adds the business perspective to software development. He likes validating a product against workflows and business goals, two metrics, he believes, by which software is ultimately measured.

# Leave a comment!

Add your comment below.

Be nice. Keep it clean. Stay on topic. No spam.

| Name (required) | Mail (will not be published) |
|---|---|



**491 shares**

f  282
🐦  163
in  46

POST COMMENT

---

**Finances**Online

**EU Office:** Grojecka 70/13 Warsaw, 02-359 Poland
**US Office:** 120 St James Ave Floor 6, Boston, MA 02116

➕ GET LISTED

| Company | Policies | Content |
|---|---|---|
| About Us | Terms of Use | Write For Us |
| Contact Us | Privacy Policy | For Small Business |
| Add Your Product | Cookies Policy | Top Software |
| Careers | Scoring Methodology | Software reviews |
| Research Center | Do not sell my personal | Software comparisons |
| Research Team | information | Software alternatives |

Copyright © 2022 FinancesOnline. All B2B Directory Rights Reserved.

  

# EXHIBIT 7



Home  ›  Blog  ›  Statistics & Industry Insights  ›  Twitter by the Numbers: Stats, Demographics & Fun Facts

‹  ›                                                    ⠿ Show all

# Twitter by the Numbers: Stats, Demographics & Fun Facts

🕐 February 22, 2022



Enter your search

## Categories

- Company News
- Statistics & Industry Insights
- Infographics
- Guides
- Branding & Web Design
- Practice Growth
- Business Software
- Camera Gear
- Home Office
- Paid Search
- Organic Search
- Social Media Marketing
- Content Marketing

## Company Info

**URL:** https://twitter.com/

**Founded:** March, 2006

**CEO:** Jack Dorsey

**Headquarters:** San Francisco, CA

**Employees:** 6,100 (source)



## Quick Twitter Statistics

# Total Number of Monetizable Daily Active Users:

217 million (source)

Last updated: 21/02/22

# Total Number of Tweets Sent per Day:

500 million (source)

Last updated: 21/02/22

# Q4 2022 Total Twitter Revenue:

$1.57 billion (source)

Last updated: 21/02/22

# The number of US Adults Who Use Twitter:

23% (source)

Last updated: 21/02/22



**Contents** [hide]

Company Info

Quick Twitter Statistics

Fun Facts

Twitter Statistics (Editor's choice)

# Twitter Demographics

- **70.4% of Twitter users** are male, while only 29.6% are female.

- Around **23% of U.S. adults** use Twitter.

- Worldwide monetizable Daily Active Users (mDAU) in Q4 2021 were **217 million.**

- In the US in Q4 2021, there was **38 million** monetizable Daily Active Users (mDAU)

- In the US, **46% of Twitter users report using Twitter daily.**

- **6.45 million** Canadian adults use Twitter.

- **Most of Twitter's audience** is 25 to 34 years old (38.5%.)

## Recent Posts

**How to Use a DSLR/Mirrorless Camera as a Webcam**

June 6, 2022

**The 22 Best Portable Generators for Camping, Power Outages or Construction**

June 1, 2022

**Kajabi vs. Teachable: An Extensive Comparison of the Two Online Learning Platforms**

May 31, 2022

**Kinsta vs WP Engine: Comparison of Two Rivals based on Personal Experience**

- 27% Twitter users live in urban areas, while only 18% come from rural areas.

- People who use Twitter mostly have college degree or more (33%.)

- Twitter is the fifth social network platform in Japan by popularity.

- 25% of U.S. Twitter users are males and 22% of U.S. Twitter users are female.

- 34% of Americans who use Twitter earn $75k+, while 29% of them earn $30k-$49.999.

- The leading countries based on the number of Twitter users are the U.S. (77.75 million users), Japan (58.2 million users) and India (24.45 million users.)

### Number of annual Twitter total users

| Year | Number of users (In millions) |
|------|-------------------------------|
| 2017 | 110 |
| 2018 | 112 |
| 2019 | 139 |
| 2020 | 186 |
| 2021 | 217 |

# Twitter Financial Statistics

- Twitter net worth as of January 2022 is **$35B**.

- Total Twitter revenue for 2021 was $5.08 billion.

- Q4 2021 Twitter revenue totaled $1.57 billion

- Q1 2021 US Twitter revenue totaled $885 million

- Twitter International revenue totaled $683 million in Q4 2021

- Cost per engagement (CPE) increased 39% year-over-year in Q4 2021.

### Twitter revenue per year

| Year | Revenue in USD |
|------|----------------|
| 2012 | 0.3 billion |
| 2013 | 0.6 billion |

May 30, 2022

Kinsta Review: Premium WordPress Hosting Service

May 30, 2022

Glenn Decl. Ex. 7
Page 3 of 10

| | |
|---|---|
| 2014 | 1.4 billion |
| 2015 | 2.2 billion |
| 2016 | 2.5 billion |
| 2017 | 2.4 billion |
| 2018 | 3 billion |
| 2019 | 3.4 billion |
| 2020 | 3.7 billion |
| 2021 | 5.08 billion |

## Twitter Usage Statistics

- In 2021, the average US adult spent 6 minutes on Twitter per day.
- 391 million Twitter accounts have no followers at all.
- 30% of Twitter users say they visit the platform several times a day.
- Around seven-in-ten U.S. Twitter users (69%) say they get news on the site.
- 50% of Canadian Twitter users access the platform daily.
- There are 500 million tweets sent per day by March 2021.

## Twitter Advertising Statistics

- Twitter advertising revenue totaled $1.412.937 in Q4 2021, a 24% increase from Q3 2021.

- Total ad engagements decreased 12% "due to a mix shift toward lower funnel ad formats and 15-second video views, which, although they have higher cost per engagement (CPE), generally have lower engagement rates."

- Cost per engagement (CPE) increased 39% year-over-year according to official Q4 2021 reports.

- Q4 2021 revenue reached $1.57 billion, with ad revenue of $1.41 billion, both up 22% year over year.

# Fun Facts

- Twitter turned 15 in March 2021.

- American Twitter users are more likely to be Democrats than Republicans.

- Twitter suspended 44,000 accounts for promoting terrorism in 2021.

- Every month, around 500 million people access Twitter without logging in.

- The most tweeted emojis of 2020 were 😂 and 😭

- @BarackObama is the most followed person on Twitter with 130 million followers.

- @justinbieber is the most followed musician/ entertainer on Twitter with 114.4 million followers.

- @Cristiano Ronaldo is the most followed sports personality on Twitter with 92.1 million followers.

- @cnnbrk (CNN Breaking News) is the most followed news outlet on Twitter, with 61.3 million followers.

- 44% of all Twitter accounts have been created and left without ever sending a Tweet.

- The average person has 707 followers on Twitter.

- 19% of people will unfollow a brand on Twitter based on poor hashtag usage.

- Twitter is currently blocked in China, Iran, North Korea, and is often inaccessible in Turkmenistan.

- Tweets with GIFs get 55% more engagement than those without. However, only 2% of Tweets contain GIFs.

- Twitter is one of the preferred social network for news consumption.

- 90% of the US population is familiar with Twitter (even if they don't use it.)

# Twitter Statistics (Editor's choice)

# 1. Number of Twitter users

There are currently 217 million monetizable daily active users on Twitter (Twitter, 2022).

Twitter's numbers have been on a gradual rise ever since its launch back in 2006, apart from a few drops from 2015. This trend would continue until the platform hit its peak in Q1 2018 when it clocked in 336 million monthly active users.

*Source: Statista*

The platform hit a downward trend, and by the end of 2018, the numbers fell to 321 million monthly active users. Twitter reported that the decline in the number of monthly active users was mainly related to its crackdown on spam and bot accounts.

What followed was a slight recovery to 330 million monthly active users in Q1 2019, after which Twitter changed its reporting method to 'Monetizable Daily Active Users'. The numbers thereafter would be reported as 145 million in "mDAUs" in Q3 2019.

The latest figures indicate that the average monetizable DAU reached 217 million, up 13% year-over-year.

## 2. USA leads with the highest number of Twitter users in the world

As of January 2022, the USA was the country with the highest number of Twitter users for the previous year with 38 million mDAUs (Twitter, 2022).

The US also has the most Twitter users in the world, with an audience reach of 77.75 million.

*Source: Statista*

As of Q4 2021, Twitter reported that the average US mDAU was 38 million, compared to 37 million in Q4 2020.

# 3. Twitter demographics: Age

Most of Twitter's audience is 25 to 34 years old (38.5%.)

While TikTok and Snapchat have snapped up the younger generation, Twitter also has its target crowd that it appeals to. According to the latest statistics from Statista, it is pretty clear that Twitter appeals to a more mature audience than Snapchat or Instagram.

# 4. Daily Tweet statistics

On average, 500 million tweets are shared every day. This can be further broken down to 6,000 tweets per second, 350,000 tweets per minute, and around 200 billion tweets every year.

The first tweet was sent on March 21, 2006, by Jack Dorsey, the creator of Twitter. It wasn't until May 2009 that Twitter will have seen 1 billion tweets being shared. Today, it only takes at most two days to get a billion tweets shared on the platform.
According to Twitter, the daily limit per user is 2,400 tweets.

# 5. Twitter business statistics

The following are important Twitter statistics for marketers:

82% of B2B content marketers use Twitter for organic content marketing. Twitter is ranked equally as Facebook for this particular statistic.

93% of people that follow small and medium-sized businesses on Twitter plan to buy from them, according to a joint study conducted by Twitter and Research Now. Consequently, 69% of Twitter users claim have bought from SMBs whose content they saw on the platform.

# 6. Ad engagement on Twitter

Although we've seen a 12% ad engagement decrease on Twitter in 2021, the year saw a 13% mDAU increase compared to 2020

With the cost per engagement (CPE) having increased 39% year-over-year, Twitter continues to grow as the marketing hub for business owners. However, the company hints to marketers that different content types perform and would cost differently when used to advertise.

For instance, according to a report by Twitter, video ads save more than 50% on cost-per-engagement.

# 7. The most popular content on Twitter with the highest engagement

Twitter supports various forms of media, including images, text, GIFs, and video. By looking at video marketing statistics, it would be safe to claim that videos will soon take over online content marketing.

Ad engagements shift toward lower funnel ad formats and 15-second video views.

According to Twitter, tweets with videos are 6x more likely to be Retweeted than Tweets with photos and 3x more than Tweets with GIFs.

*Credit: ventureharbour*

# 8. Most popular emojis on Twitter

As we await official communication on the most used emojis in 2021, the most tweeted emoji of 2020 on Twitter was 😂 (laughing/ face with tears of joy emoji), closely followed by 😭 (crying emoji).

According to emojitracker, the laughing/ face with tears of joy emoji is the most popular emoji on the platform, having been used over 3.2 billion times (Emojitracker, 2021)

With much of the world staying home more due to the Coronavirus pandemic, #StayHome was the 3rd biggest hashtag of the year. It's no surprise that the 🏠 (house) emoji usage went up 40%.

Tweets about cooking nearly tripled in 2020 and within the first weeks of the pandemic restrictions, there were on average half a million daily tweets about cooking and baking.

**Note: Please link back to omnicoreagency.com and this page when you reference/quote the statistic.**

Photo Credit: Unsplash



## Salman Aslam

Salman Aslam is the Managing Director at Omnicore, a leading Healthcare Digital Advertising & Marketing Agency helping clients across the globe. You can follow him on Twitter for tweets and rants about latest news, tips and advice on digital marketing.

Related posts

May 20, 2022

April 15, 2022

March 14, 2022

12 Healthcare Marketing Trends of 2022

81 LinkedIn Statistics You Need to Know in 2022

YouTube by the Numbers: Stats, Demographics & Fun Facts

⊞ Read more

⊞ Read more

⊞ Read more

Comments are closed.

## About Omnicore

Omnicore is a Healthcare Digital Marketing Agency

## Company

• Who we Are

• History

## Quick Links

• Resources

• Digital Marketing Deals

## Contact

Omnicore Agency

e. info@omnicoreagency.com

specializing in all facets digital marketing: search, social, PPC, and PR to help grow healthcare practitioners and multi-specialty medical groups.

• Our Philosophy
• Awards & Accreditations
• Careers
• Press

• Privacy & Cookie Policy

© 2009 – 2022 Omnicore Agency. All rights reserved.

# EXHIBIT 8



HOME          OUR SERVICES          MEET THE TEAM          OUR WORK          CONTACT US

Apr
**18**
2022



# YOUTUBE USER STATISTICS 2022

Posted by GMI Blogger Posted in Uncategorized

For sharing videos or advertising, there exists no other platform as rewarding as YouTube on the planet now. There has never been a website in the past decade that gives us opportunities to become popular overnight and make money online by just uploading videos.

Video marketing dominates the content marketing industry today. YouTube, the pioneer video sharing platform and the second largest search engine, experienced a 4.9% growth rate in 2021 according to SEMrush statistics. In 2022, the number of YouTube viewers is expected to hit 210 million in the US alone! As videos continue to impress and engage customers, we are anticipating some amazing things from YouTube in 2022.

Features introduced by the platform in 2021 such as Shorts, Live streaming, Chapters, Premieres and Community Tab encourage content creation and will certainly attract more users. As 2022 progresses, we are definitely seeing a positive rise in the number of YouTube users and subscribers. The likes and shares received by the diverse content uploaded on this platform is astounding. Let us explore the YouTube user statistics for 2022 and try to gauge its relevance in present times.

Glenn Decl. Ex. 8
Page 1 of 25



HOME       OUR SERVICES       MEET THE TEAM       OUR WORK       CONTACT US

- Monthly Active Users on YouTube
- YouTube Users by Year
- YouTube User Engagement
- YouTube Demographics
- YouTube Users by Country in 2022
- YouTube Penetration
- Mobile YouTube Statistics
- Top 10 YouTube Channels Revenue
- Top 5 YouTube Channels
- Top 5 YouTube Celebrities
- Conclusion
- Frequently Asked Questions

### Interesting YouTube Statistics

- According to Statista 2022, over **2.6 billion** people worldwide use YouTube once a month.
- India has the most YouTube users in 2022, estimated at **467 million**.
- Technically, YouTube is the second-largest search engine, after Google.
- YouTube's global advertising revenues in 2021 were estimated to be around **$28.84 billion**.
- YouTube's most subscribed channel is T-Series (213 million subscribers), while the channel which generated the most revenue in 2020 was Ryan's World (29 million subscribers).
- In 2021, YouTube Premium and YouTube Music together have more than **50 million subscribers** around the world.
- YouTube is the second most popular social media platform.
- Every day, people watch over a billion hours of video and generate billions of views.
- Most YouTube users fall in the age group of 15-35.
- More than 70% of YouTube watch time comes from mobile devices.
- The male-female ratio of YouTube viewers is 11:9.
- The top genre watched by YouTube users is comedy (77% users).
- In 2020, the biggest advertiser on YouTube was Apple Inc, having spent **$237.15 million.**
- YouTube accounts for around **25%** of global mobile traffic.
- With 74% of adult users, YouTube is the most popular online platform in the US.



HOME          OUR SERVICES          MEET THE TEAM          OUR WORK          CONTACT US

- 16.4% of YouTube traffic comes from the US, 9.2% from India, and 4.8% from Japan.
- An average YouTube visitor checks nearly nine pages per day.
- In 2020, viewers spent 100 billion hours watching gaming content on YouTube.
- 72% of people used YouTube to consume fitness content in 2020.
- YouTube is the most used social platform for research purposes among B2B decision-makers with 50.9% users.
- Currently, YouTube has 38 million active channels.
- There are more than a hundred local versions of YouTube in over 80 languages.
- Of the top 100 searches on YouTube, 20% are related to music.
- 6% of Google's ad revenues are created from YouTube.
- YouTube is the second most popular platform for influencer marketing.

Here's an infographic narrating the overall user statistics, mobile user statistics and user demographics of YouTube to help you make an intelligent decision.





Glenn Decl. Ex. 8
Page 3 of 25





**HEADQUARTERS**
901 Cherry Avenue, San Bruno, California, United States

**MOST TRAFFICKED WEBSITE**
The second-most trafficked website after Google

# USERS



**TOTAL NUMBER OF DAILY ACTIVE YOUTUBE USERS**

**122+**
MILLION

**PERCENTAGE OF GLOBAL INTERNET POPULATION WATCHING YOUTUBE**

**95%**

**NO. OF COUNTRIES WITH LOCALIZED VERSIONS OF YOUTUBE**

**100**
COUNTRIES

**NUMBER OF LANGUAGES YOUTUBE IS AVAILABLE IN**

**80**
LANGUAGES

# USER ENGAGEMENT



**TOTAL VIDEO WATCH**

**NUMBER OF VIDEOS**



HOME     OUR SERVICES     MEET THE TEAM     OUR WORK     CONTACT US





HOME     OUR SERVICES     MEET THE TEAM     OUR WORK     CONTACT US



Glenn Decl. Ex. 8
Page 6 of 25









HOME          OUR SERVICES          MEET THE TEAM          OUR WORK          CONTACT US

# TOP 5 YOUTUBE CHANNELS
## — BY SUBSCRIBERS —

| 1 | T-SERIES | 213 MILLION |
| 2 | YOUTUBE MOVIES | 150 MILLION |
| 3 | COCOMELON NURSERY RHYMES | 133 MILLION |
| 4 | SET INDIA | 131 MILLION |
| 5 | MUSIC | 116 MILLION |

# TOP 5 MOST VIEWED YOUTUBE VIDEOS

| 1 | BABY SHARK DANCE | 10.44 BILLION |
| 2 | DESPACITO | 7.80 BILLION |
| 3 | JOHNY JOHNY YES | 6.26 |



HOME          OUR SERVICES          MEET THE TEAM          OUR WORK          CONTACT US



**Basic Facts About YouTube**

YouTube has been a part of our lives since 2005, entertaining us with videos, ranging from web series to news, product reviews, music, movies, how-to videos, unboxing and vlogs, uploaded by individuals and organizations from various corners of the world.

In the year 2006, Google bought it from its founding fathers, Jawed Karim, Steve Chen and Chad Hurley for a whopping $1.65 billion.

Now, a decade and a half later, with 2.6 billion users, this video sharing site is the second most visited website after Google and holds a second position in Alexa's global ranking of websites.



HOME          OUR SERVICES          MEET THE TEAM          OUR WORK          CONTACT US



**YouTube – The Second Most Popular Social Media Platform in 2022**

When it comes to popularity, as a social media platform, YouTube ranks second and Facebook, first.

Check out the list of social platforms popular in 2022.

| Platform | Users (Million) |
|---|---|



HOME        OUR SERVICES        MEET THE TEAM        OUR WORK        CONTACT US

| | |
|---|---|
| Instagram | 1478 |
| WeChat | 1263 |
| TikTok | 1000 |
| FB Messenger | 988 |
| Douyin | 600 |
| QQ | 574 |
| Seina Weibo | 573 |
| Kuaishou | 573 |
| Snapchat | 557 |
| Telegram | 550 |
| Pinterest | 444 |
| Twitter | 436 |
| Reddit | 430 |
| Quora | 300 |

## Daily Active Users on YouTube

Daily active users means the number of YouTube users on any given day. These figures help us know how many people access YouTube daily as part of their routine.

- YouTube has over **122 million** active users daily.
- **1 billion** hours of content is watched across the world every day.
- **62%** of YouTube users in the USA access the platform on a daily basis.
- Every minute, more than **500 hours** of new content is uploaded into YouTube.
- On average, a visitor spends **14 minutes and 21 seconds** on YouTube every day.

## Monthly Active Users on YouTube

Monthly active users means the number of YouTube users in a given month. Since only the logged-in users are counted, the actual figures can be higher.

- YouTube has more than **2.6 billion** active users.



- Around half of the internet users around the world has access to YouTube.

## YouTube Users by Year

Today, YouTube has taken the center stage as the main personal entertainment medium. YouTube users have been increasing by leaps and bounds since its launch, for reasons known and unknown. However, simply put, variety is the spice of life for consumers and YouTube rightly provides that. Take a look at the year-on-year YouTube user growth.

| Year | Users |
|------|-------|
| 2021 | 2.6 Billion |
| 2020 | 2.3 Billion |
| 2019 | 2.0 Billion |
| 2018 | 1.8 Billion |
| 2017 | 1.5 Billion |
| 2016 | 1.4 Billion |
| 2015 | 1.2 Billion |
| 2014 | 1.1 Billion |
| 2013 | 1.0 Billion |
| 2012 | 0.8 Billion |

## YouTube User Engagement

User engagement on YouTube is reportedly high when compared to other websites like Facebook, Twitter and video streaming sites like Netflix. YouTube users consume over 1 billion hours of videos daily, which roughly equates to 5 billion videos. According to estimates, a user sticks to the platform for about 11 minutes and 24 seconds on average.

Looking at the frequency and volume of uploads, over 500 hours of video uploads happen every single minute on YouTube. This makes the platform a warehouse of videos with more than 5 billion videos shared so far. Every single visit that happens on YouTube is counted as 6.95 page views approximately.

YouTube is quite democratic in the sense that it offers its visitors the freedom to express their 'likes' and 'dislikes' for videos



HOME          OUR SERVICES          MEET THE TEAM          OUR WORK          CONTACT US

By the way, "Me at the zoo" was the first video that appeared on YouTube and it was uploaded in 2005.





HOME        OUR SERVICES        MEET THE TEAM        OUR WORK        CONTACT US



## YouTube Demographics

YouTube is home to all types of content. From tech news to entertainment and housekeeping ideas– you can find them all on YouTube. As a result, the user demographics of YouTube is diverse. Let's break down the user demographics by age and gender to get a better idea of its popularity.

## YouTube Gender Demographics

Considering the gender of the users, YouTube is more popular with men than women. Male users amount to 53.9% of the YouTube

Glenn Decl. Ex. 8
Page 14 of 25



HOME      OUR SERVICES      MEET THE TEAM      OUR WORK      CONTACT US



**YouTube Age Demographics**

| Age | Proportion |
| --- | --- |
| 18-25 Years | 81% |
| 26-35 Years | 71% |
| 36-45 Years | 67% |
| 46-55 Years | 66% |
| 56+ Years | 58% |

According to the US internet population statistics, the 18-25 year age category makes up the largest visitor base of YouTube with 81%, followed by 26-35 years with 71%. 36-45 and 46-55 age groups



HOME          OUR SERVICES          MEET THE TEAM          OUR WORK          CONTACT US





With local versions available in over 91 countries and 80 different language options to choose from, YouTube is the number one video-sharing platform in the world with more than 95% of the internet population using it.

We saw the different stats of YouTube users across the world. Now, while looking at the number of YouTube users by country, it is evident that India tops the list. In India, around 467 million users are active on YouTube every hour, according to 2022 statistics.

With 240 million users, the USA has the next largest user base for the platform. The other three countries that found a place in the 2022 top 10 list are Indonesia (third), Brazil (fourth), and Russia (fifth). Japan comes in sixth place with more than 93 million users. Mexico has the seventh rank with 74.1 million users, followed by Germany in eighth place with 66 million users. Pakistan holds ninth place and Vietnam tenth place with 55.7 million and 54.2 million users respectively.



HOME     OUR SERVICES     MEET THE TEAM     OUR WORK     CONTACT US

| Country | Users (Data as of January 2022) |
|---|---|
| India | 467 Million |
| USA | 240 Million |
| Indonesia | 127 Million |
| Brazil | 107 Million |
| Russia | 99 Million |
| Japan | 93.8 Million |
| Mexico | 74.1 Million |
| Germany | 66 Million |
| Pakistan | 55.7 Million |
| Vietnam | 54.2 Million |

## YouTube Penetration

According to 2022 YouTube statistics, Netherlands has the highest YouTube penetration with 95% of the population using the platform.

Here is a list of the top 10 countries with the highest YouTube penetration in 2022:

| Rank | Country | YouTube Penetration |
|---|---|---|
| #1 | Netherlands | 95.0% |
| #2 | South Korea | 94.0% |
| #3 | New Zealand | 93.9% |
| #4 | Sweden | 93.8% |
| #5 | UAE | 93.4% |
| #6 | United Kingdom | 92.2% |
| #7 | Switzerland | 92.0% |
| #8 | Denmark | 92.0% |
| #9 | Canada | 91.9% |
| #10 | Spain | 91.6% |



HOME          OUR SERVICES          MEET THE TEAM          OUR WORK          CONTACT US

(and browser) has got a YouTube application to keep their users engaged. Today, more than 70% of users access YouTube on their mobile devices. This is facilitated by the YouTube app, which, as of Dec 2018, has been installed on over 5 billion Android devices.

There are more than 1 billion mobile YouTube views happening every day and an average mobile YouTube viewing session spans more than 45 mins.

### Top 10 YouTube Channels Revenue

YouTube offers a share of its advertising revenue to its content creators (or YouTubers). So, if you have interesting YouTube video ideas, know how to wield camera, and use YouTube video editing software, it is pretty easy to make money online with YouTube. There are hundreds of thousands of professional YouTubers today, earning a decent income from their channels. Here, we look at the top ten highest-grossing YouTube channels of 2020. (2022 data is not available, we will update it as soon as we get it).

| No. | Channels | Revenue (2020) |
|-----|----------|----------------|
| #1 | Ryan's World | $29.5 Million |
| #2 | Mr Beast | $24 Million |
| #3 | Dude Perfect | $23 Million |
| #4 | Rhett and Link | $20 Million |
| #5 | Markiplier | $19.5 Million |
| #6 | Preston | $19 Million |
| #7 | Like Nastya | $18.5 Million |
| #8 | Blippi | $17 Million |
| #9 | David Dobrik | $15.5 Million |
| #10 | Jeffree Star | $15 Million |

### Top 5 YouTube Channels



OME          OUR SERVICES          MEET THE TEAM          OUR WORK          CONTACT US



There are hundreds of thousands of YouTube channels created by both individuals and brands. Based on their subscriber following, the channel that comes first is T-Series (213 Million). YouTube Movies secures the second place with 150 Million subscribers, followed by Cocomelon with 133 Million subscribers. Set India takes the fourth position amassing 131 Million subscribers and Music channel, the fifth with 116 Million subscribers.

| Channels | Subscribers (Data as of April 2022) |
|---|---|
| T-Series | 213 Million |
| YouTube Movies | 150 Million |
| Cocomelon – Nursery Rhymes | 133 Million |
| SET India | 131 Million |



HOME          OUR SERVICES          MEET THE TEAM          OUR WORK          CONTACT US

YouTube has helped many a celebrity to grow and identify their fan base. The top five among them are Canal Kondzilla, a music video director from Brazil. He ranks top with 54,000,000 subscribers and 27,683,764,917 video views. Justin Bieber, the Canadian-born singer, is the next popular celebrity on the platform with 33,100,000 subscribers and 19,278,046,786 video views.



Ed Sheeran of the "Shape of You" fame, comes in third with 43,000,000 subscribers and 19,278,046,786 video views. The fourth



OME          OUR SERVICES          MEET THE TEAM          OUR WORK          CONTACT US

**Conclusion**

Now, coming back to the question…should you be using YouTube to market your business? Of course, it's an emphatic yes! When studies say that 95% of internet users watch YouTube, you're missing out on incredible opportunities if you don't include video marketing in your digital marketing mix.

Recent research also reveals that YouTube has compelled 6 out of 10 people to give up TV shows, it's time to jump on the YouTube wagon. Build your video marketing strategy with us. Video production and YouTube advertising are two of our fortes and we've been offering these niche services ever since we discovered their enormous potential for business growth. As a digital marketing agency operating in Dubai for more than 21 years, we can assure you that YouTube can help your brand build a solid presence online. If you need help with anything related to YouTube, let us know. Not only for YouTube, but you can also seek our assistance in areas such as web design services, SEO services, web development, ecommerce web development and analytics.

**Frequently Asked Questions**

**1. How many videos are on YouTube in 2022?**

In 2022, YouTube has hosted over 694 hours of video spread across 800 million videos. These videos are shown among the 37 million channels on this platform.

**2. What Youtuber has the most subscribers in 2022?**

T-Series, a musical network in India, has the highest number of subscribers in 2022. 213 million YouTube viewers follow this channel. It is followed by YouTube movies with 150 million subscribers.

**3. Which is the longest video on YouTube?**

The longest YouTube video which totals 571 hours, 1 minute and 41 seconds has been created by Jonathan Harchick. It



HOME          OUR SERVICES          MEET THE TEAM          OUR WORK          CONTACT US

Tweet

**Related Posts:**

1. **YOUTUBE SEO – YOUR MINIATURE GUIDE** YouTube, the second largest search engine after Google, is the next best site that internet users visit for information. From...

2. **WHY BRANDS IN MENA SHOULD ADVERTISE ON YOUTUBE RIGHT NOW** Businesses with an audience in the MENA region should take note – the key Pay Per Click advertising channel of 2017 is...

3. **UAE FACEBOOK USER STATISTICS 2020** Did you know Facebook attracted 100 million new users in 2020, amidst the COVID-19 pandemic? If at all the year...

4. **SAUDI ARABIA FACEBOOK USER STATISTICS 2020** Facebook marketing can prove to be an effective social media strategy in Saudi Arabia in the coming days. With about...

No Comments

**Comments**

 HOME    OUR SERVICES    MEET THE TEAM    OUR WORK    CONTACT US

 **Josue Diaz**
Understanding Youtube Statistics is really important; Where did you find all of this? Is it insightslabs.ai that has that data? Your article is really the best! Thank you so much!

Like · Reply ·   2 · 1y

 **Arshiya Fouzia**
Wonderful information,keep sharing such blogs.
<a href="https://www.zuaneducation.com/.../tips-to-become...">professional youtuber</a>

Like · Reply ·   1 · 1y

 **Ramesh Babu**
This is really helpful to grow my youtube channel.
https://www.youtube.com/channel/UCmsUg25czHMqUaP8R2cuyYQ

Thank you again,

Like · Reply ·   2 · 1y

 **Pehowa Painting India**
Excellent

Like · Reply ·   1 · 21w

 **Suleman Jaan**
https://www.youtube.com/channel/UCre4Y9OmMuux2CsWap5lCeA

Like · Reply · 4w

 **Khan G**
Free HD Video Converter Factory is a useful multimedia tool that can convert all your video files to another video file format quickly and easily. Compared to many other video converters, this software has a more professional-looking interface and is also equipped with basic video editing tools.
https://windowsbay.com/hd-video-converter-crack/

Like · Reply · 1w

 **Sehar Tariq**
Get the best SEO services in lahore pakistan . https://www.ss-websolution.com/seo-services/

Like · Reply · 1d

Facebook Comments Plugin

# What we do

Driven by the passion for the medium, our professional team of digital marketing, web design, web development, online advertising, search engine optimization, and social media deliver results that help brands go digital.



HOME          OUR SERVICES          MEET THE TEAM          OUR WORK          CONTACT US



Web Design


Website Maintenance


Social Media


Mobile Apps


SEO


Corporate Presentations


Online Advertising


Listening & Analytics

# The ones
# who echoed our belief
















 OME          OUR SERVICES          MEET THE TEAM          OUR WORK          CONTACT US

# EXHIBIT 9



✉ Subscribe  Advertise

in  𝕏  f

🔍 Menu

- Home
- App Data
- YouTube Revenue and Usage Statistics (2022)

# YouTube Revenue and Usage Statistics (2022)



Mansoor Iqbal

Updated: June 6, 2022

☰ **Content Menu**

- YouTube key statistics
- YouTube overview
- YouTube revenue
- YouTube channels revenue
- YouTube users
- YouTube Premium subscribers
- YouTube vs social apps: users
- More Video App Data

YouTube was launched in 2005. It was founded by three PayPal employees: Chad Hurley, Steve Chen, and Jawed Karim, who ran the company from an office above a small restaurant in San Mateo.

The first video uploaded to the platform was "Me at the zoo", featuring Karim. By the years end, YouTube was hosting over two million videos per day on its website and was averaging over 20 million daily active users.

It wouldn't be long before Google scooped up YouTube, acquiring the startup for $1.65 billion in late 2006. What was considered at the time to be a huge reach for a startup which had shown no capability or interest in generating profit is now recognized as one of the smartest acquisitions of the past two decades.



- Advertisement -

Time magazine would include YouTube on its person of the year cover the same year. The person in question was 'you', specifically content creators, with the cover incorporating a mirror, rather than YouTube itself. As YouTube grew, it added more features to serve content creators, such as ratings, comments, embed functionality, live-streaming and revenue sharing.

Many celebrities have gotten their start through YouTube, with vlogging, gaming and comedy initially being the most popular types of content. On today's YouTube, there are hundreds of channels with millions of subscribers on almost every topic, with the highest grossing channel of 2021 being a kid's toy channel called Ryan's World.

In 2014, YouTube launched a premium service aimed at curbing the loss of revenue from ad-blocking. YouTube Red was unsuccessful in its mission, reaching less than 10 million subscribers before it relaunched as YouTube Premium. YouTube Premium, which bundles ad-free viewing with YouTube Music, hit 30 million subscribers in 2020.



**Free App Market Report: What data stories will you discover?**

Your market's mobile data tells a story. Use our free custom competitive intelligence report to discover insights that give you a competitive edge.

Get Started Now

We have collected data and statistics on YouTube. Read on below to find out more.

## YouTube key statistics

- YouTube generated $28.8 billion revenue in 2021, a 46% increase year-on-year
- Over 2.5 billion people access YouTube once a month
- YouTube's most subscribed channel is T-Series, however Mr. Beast earned the most revenue in 2021
- YouTube Premium reached 50 million subscribers in 2021

## YouTube overview

| Launch date | April 2005 |
|---|---|

| HQ | San Bruno, California |
| --- | --- |
| People | Susan Wojcicki (CEO), Scott Silver (VP, Engineering), Sundar Pichai (Alphabet CEO) |
| Business type | Subsidiary |
| Owner | Alphabet |
| Industry | Video streaming |

## YouTube revenue

YouTube has reported more than 30% revenue growth in the past four years. It generated $28.8 billion in 2021, a 46% increase on 2020 figures.

### YouTube quarterly revenue Q4 2018 to Q1 2022 ($bn)



Source: Company data

Share

### YouTube annual revenue 2010 to 2021 ($bn)

| Year | Revenue ($bn) |
| --- | --- |
| 2010 | 0.8 |
| 2011 | 1.3 |
| 2012 | 1.7 |
| 2013 | 3.1 |

| Year | Revenue ($bn) |
|------|---------------|
| 2014 | 4.2 |
| 2015 | 5.5 |
| 2016 | 6.7 |
| 2017 | 8.1 |
| 2018 | 11.1 |
| 2019 | 15.1 |
| 2020 | 19.7 |
| 2021 | 28.8 |

*Sources: Alphabet, eMarketer, WSJ*

## YouTube channels revenue

YouTube channel Mr. Beast generated the most revenue in 2021, at $54 million. Jake Paul and Markipiler came second and third, respectively.

**Top YouTube channels by revenue 2021 ($mm)**

| Channels | Revenue ($mm) |
|----------|---------------|
| MrBeast | 54 |
| Jake Paul | 45 |
| Markiplier | 38 |
| Rhett and Link | 30 |
| Unspeakable | 28.5 |
| Nastya | 28 |
| Ryan Kaji | 27 |
| Dude Perfect | 20 |
| Logan Paul | 18 |
| Preston Arsement | 16 |

*Sources:  Captiv8, SocialBlade and Pollstar via Forbes*

## YouTube users

YouTube reached 2.5 billion active users in Q2 2021, making it one of the most popular apps in the world, behind only Google and Facebook on total usage.

**YouTube quarterly users Q1 2010 to Q1 2022 (mm)**

Glenn Decl. Ex. 9

Page 4 of 8



Source: Company data and estimations based on download data from AppMagic



Share

**Business of Apps**

**YouTube annual users 2010 to 2021 (bn)**

| Year | Users (bn) |
|------|-----------|
| 2010 | 0.2 |
| 2011 | 0.5 |
| 2012 | 0.7 |
| 2013 | 1 |
| 2014 | 1.1 |
| 2015 | 1.3 |
| 2016 | 1.5 |
| 2017 | 1.6 |
| 2018 | 1.8 |
| 2019 | 2 |
| 2020 | 2.3 |
| 2021 | 2.5 |

*Note: This covers monthly active users. Source: YouTube*

## YouTube Premium subscribers

YouTube Premium combines music streaming with no video ads, and is available for the same price as Spotify. It reached 50 million subscribers in 2021.

**YouTube Premium annual subscribers 2015 to 2021 (bn)**

| Year | Subscribers (mm) |
| --- | --- |
| 2015 | 1.5 |
| 2016 | 3 |
| 2017 | 2.8 |
| 2018 | 10 |
| 2019 | 18 |
| 2020 | 30 |
| 2021 | 50 |

*Note: YouTube launched Premium in 2018, after failing to gain subscribers with YouTube Red. Source: Edison Trends, YouTube*

## YouTube vs social apps: users



Sources: Company Data

DOWNLOAD CHART

Share

Business of Apps

*Want to learn more about social apps? Check out our Social App Report?*

**What is the most subscribed channel on YouTube?**

T-Series is the most subscribed channel on YouTube, with 176 million subscribers as of February 2021

**What is the most viewed video on YouTube?**

Baby Shark Dance by Pinkfrog Kids' Songs and Stories is the most viewed YouTube video as of March 2021, with 8.5 billion views

**Where is YouTube ranked on global engagement?**

Alexa and SimilarWeb both rank YouTube second in global engagement, behind Facebook

**What is the male to female ratio of YouTube viewers?**

Male/female ratio of YouTube viewers stands at 11:9 (We Are Social/Hootsuite)

**How many times has YouTube been downloaded?**

YouTube has been downloaded over five billion times, although it does come pre-installed on Android devices

**How many YouTube channels have over 250,000 subscribers?**

Over 65,000 YouTube channels have hit the 250,000 subscriber mark

**What is the average video length of a YouTube video?**

According to Pew Research Center, the average video length is 12 minutes

**How much content is uploaded to YouTube every minute?**

500 hours of content are apparently uploaded to YouTube, according to The Street

**What was the first YouTube video to reach one million views?**

A Nike ad featuring footballer Ronaldinho was the first to reach one million (The Drum)

**What was the first YouTube video to reach one billion views?**

South Korean artist PSY's Gangnam Style was the first to reach one billion

**How much is YouTube worth?**

YouTube could be worth between $140 and $300 billion if spun-out into its own company (VentureBeat)

# More Video App Data

- Twitch Revenue and Usage Statistics (2022)
- Hulu Revenue and Usage Statistics (2022)
- Netflix Revenue and Usage Statistics (2022)
- Video Streaming App Revenue and Usage Statistics (2022)
- Disney Plus Revenue and Usage Statistics (2022)
- TikTok Revenue and Usage Statistics (2022)



Business of Apps

Get the latest app industry news, analysis and insights.

Glenn Decl. Ex. 9

Enter your work email*

Join

By signing up you agree to our [privacy policy](). You can opt out anytime.

**Connecting the App Industry**

Marketplace | News & Insights | Data | Events

Site Info

- About Us
- Advertise
- Editorial FAQ
- Write for Us
- Submit News Story
- Badges
- Privacy Policy
- Contact Us

Follow Us

 Linked In
 Twitter
 Facebook
 YouTube
 RSS

# EXHIBIT 10

TRY OUR CORPORATE SOLUTION FOR FREE!    📞 (212) 419-8294    ✉ vianny.gutierrez-cruz@statista.com

Source: https://www.statista.com/statistics/958794/congress-members-posted-official-social-media-accounts-usa/

## Percentage of U.S. Congress members who posted on social media accounts 2020

Published by Statista Research Department, Apr 28, 2022

In 2020, 98 percent of U.S. Senators have posted through their official social media accounts on Twitter. In comparison, only 79 percent of Senators went through their official social media accounts to post content on Instagram.

## Percentage of U.S. Congress members who posted on official social media accounts in 2020



Additional Information

© Statista 2022 🚩

Show source ⓘ

**Source**

➜ Show sources information

➜ Show publisher information
➜ Use Ask Statista Research Service

**Release date**
December 2020

**Region**
United States

**Survey time period**
January 1 to November 30, 2020

**Supplementary notes**
Analyzed nearly 800,000 posts made by members
of the 116th Congress on official social media
accounts. Includes activity from official legislative
accounts. For measuring the messages legislators
wrote in their own words, Twitter data does not
include retweets. Instagram and Facebook data
does not include stories.

# EXHIBIT 11



**George J. Stigler Center for the Study of the Economy and the State**

**The University of Chicago Booth School of Business**

**Committee for the Study of Digital Platforms**

**Media Subcommittee**

Report

01 July 2019



# Protecting Journalism in the Age of Digital Platforms[1]

**Media subcommittee members[2]**

Guy Rolnik (Chair)

*University of Chicago*

Julia Cagé

*Sciences Po Paris*

Joshua Gans

*University of Toronto*

Ellen Goodman

*Rutgers University*

Brian Knight

*Brown University*

Andrea Prat

*Columbia University*

Anya Schiffrin

*Columbia University*

**Additional contributors**

Prateek Raj

*IIM Bangalore*

[1] We would like to thank Luigi Zingales, Fiona Scott Morton, James Hamilton, Robert McChesney, Sally Hubbard, Jesse Eisinger, Rodney Benson, Alberto Ibargüen, Betsy Reed and Asher Schechter. We will also like to thank Filippo Lancieri for help in organizing the project, Samantha Eyler-Driscoll for copyediting, and Sebastian Burca, Simone Cavallaro and Rachel Piontek for their invaluable support at the Stigler Center. The Committee in-person meetings were partially supported by a grant from the Alfred P. Sloan Foundation, whom we also thank for supporting this project. Corresponding author: guy.rolnik@chicagobooth.edu

[2] The main proposals of the report represent the opinion of all the Media subcommittee members but some may have disagreements on specific parts of the report.



## Table of Contents

Executive Summary ................................................................................................................ 1

Report from the Media Subcommittee ................................................................................ 5

The Precarious Economics of News ................................................................................... 12

Digital Platforms and Disruption of News ........................................................................ 15

    Production of News ............................................................................................................ 15

    Distribution of News .......................................................................................................... 17

    Consumption of News ........................................................................................................ 19

The Market Response .......................................................................................................... 26

    The Multifaceted Donation Model .................................................................................... 26

    The Newsrooms Collaboration: An Alternative Path for Non-profit Journalism ............. 28

    The Subscription Model ..................................................................................................... 30

    Rating the Sources: The Solution to the Spread of Disinformation? ................................ 30

    Summary ............................................................................................................................ 31

Recommendations ................................................................................................................ 32

Public Funding of News ....................................................................................................... 34

    Existing Subsidies Schemes .............................................................................................. 34

    Our Proposal: Media Vouchers .......................................................................................... 34

    Why do we advocate media vouchers? .............................................................................. 38

Regulation of Media Concentration .................................................................................. 43

    Citizen Welfare Standard ................................................................................................... 43

    Concentration and Media Capture ..................................................................................... 43

    Inadequacy of Exiting Regulation to Prevent Concentration in News Provision .............. 44

    Our Proposal: A Quantifiable Citizen Welfare Criterion for Reviewing Mergers between News Providers ........................................................................................................................... 45

Increasing the Transparency of Digital Platforms ........................................................... 46

    Our Proposal: Transparency Requirements and Voluntary Labeling ................................ 47

Increasing Accountability of Digital Platforms ................................................................ 49

    Section 230 Background ..................................................................................................... 50

    Proposals to Amend Section 230 ...................................................................................... 51

    Our Proposal: Section 230 as a Quid Pro Quo Benefit ..................................................... 53

Conclusion ............................................................................................................................ 54



# EXECUTIVE SUMMARY

While the Internet has contributed immensely to access to and diffusion of information and has opened numerous opportunities to improve life across the globe, it has also brought challenges, risks and harms that may endanger the very democratic and liberal order that many believed it would advance.

Perhaps nowhere are these contradictory trends more present than in the fourth estate—the news media and journalism. The technology that made news creation and diffusion cheaper and faster and gave billions of people a voice has also become a tool used by state and private powers to manipulate and propagate disinformation and hate. It has also disrupted the business model of original news creators, disintermediated them from their consumers and created a new news ecosystem.

Growing concentration in the business sector in the US and the accumulation of market and political power by large corporations across the developed world has attracted more scrutiny in the last decade. It is now clear that the natural tendency toward concentration in modern capitalism is magnified in digital markets, where a handful of corporations enjoying network effects today exercise more power and influence globally than any other private entities have in the last century. Two of those companies—Google and Facebook—are not only giant economic players that have changed most industries, but are also the largest media companies in history. While they maintain that they are technology companies, they not only have unprecedented influence on news production, distribution and consumption, but also are rapidly changing the incentives, behavior and norms of all players in the news media ecosystem.

Headlines evoking a "crisis in the news" and "crisis in journalism" have appeared for more than a decade. To be sure, media scholars and practitioners have described journalism and the news industry in crisis terms time and again in history, mostly after technological shocks. This report does not adopt a crisis narrative. Rather, it soberly reckons with an era of profound change. We believe that changing technologies always warranted updates to the laws and regulations that shape news media. The digital revolution and ascent of dominant digital platforms call for a significant renewal of the rules in this important sphere again.

We demarcate two periods in the digital revolution with regard to its impact on the news ecosystem: the first two decades of the spread of the Internet, and the last decade, characterized by the rise of a handful of digital platforms. Technology had a profound influence on journalism and the news in both periods, but there are important distinctions between the two. The first twenty years after the invention of the World Wide Web saw a dramatic decline in the cost of information distribution and an increase in information accessibility. The news industry had to adjust to advertising and readers shifting to the digital world, which caused a decline in revenues and profitability and the loss of the important business of classified ads. The last decade has seen still more advances in technology, but with a growing share of digital activity and news consumption moving to digital platforms. This decade has been characterized by a profound influence of the platforms on the relationship between news producers and the public and on the very nature of the public sphere.

1

Glenn Decl. Ex. 11
Page 4 of 66

The introduction of new technologies to mass media has always had an influence on the character of news, politics and society. From the printing press and telegraph to radio, television and cable television, each technology brought opportunities and challenges and in turn public demand for new laws and regulations. The challenges brought by the platforms run deep: unbundling of news products; personalization and targeting tools unprecedented in their sophistication and precision; and atomization of the news media. Together these trends have created a new ecosystem of news consumption, more complicated and fragmented than ever—and most importantly—split into billions of individual "feeds" and "editions" for each user.

The news media and journalism are broad subjects with many categories and definitions. This report is focused mainly on what we think is the most important for the functioning of democracies: accountability and investigative journalism. This type of news gathering, investigation and analysis reveals information that is crucial for readers as citizens, and information that powerful actors like to be concealed. Hence, it produces not only private benefits for the consumer but also positive externalities benefitting society at large.

While the authors of this report do not believe that there was ever a "golden age" of quality, independent journalism that can be revived, we believe that digital platforms present formidable new threats to the news media that market forces, left to their own devices, will not be sufficient. In the report we review some of the main market responses that try to improve the sustainability of independent journalism, their contributions and their shortcomings.

Our report is based on the assumptions that independent journalism is a crucial pillar of democracy, but that the production of investigative and accountability journalism

was always underfunded and underproduced by the market—as original producers of this kind of journalism can at best capture only a small fraction of the benefits to society.

The report identifies four areas of immediate concern to the news media:

1. The gradual decimation of the business model that enabled many news outlets to produce accountability and investigative journalism for decades. Especially acute is the collapse in revenues of local news outlets and the closure of such news outlets across the developed world.
2. The shift in news distribution from the traditional news organization to algorithms controlled by digital platforms and the growing concentration, power and control that a handful of these platforms have as gatekeepers of the news across the globe.
3. The opacity of the algorithms that control news distribution and the lack of publicly available information on news consumption in the platforms' ecosystem.
4. The weak economic and legal incentives that these powerful gatekeepers of the news have to prioritize quality content and limit false information.

While the threats to quality news ecosystems are significant, this report does not recommend direct intervention in the management of the platforms and their relationship with users and news producers. Because a handful of platforms exercise gatekeeping power over information, regulatory intervention must be very careful not to put even more power in the hands of those platforms. Any state or regulatory intervention should be measured and limited.

Our policy recommendations are limited to topics that directly relate to the news. Yet they should be read together with the policy recommendations of the subcommittee on market structures listing proposals meant to increase competition in the digital world, give users more power and control over their data

2

Glenn Decl. Ex. 11
Page 5 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

and limit the market power of the platforms and their ability to entrench their dominant market position. The subcommittee members think that opening platforms for competition through interoperability, giving users ownership of their data, and the potential breakup of platforms may contribute to reducing the gatekeeping power of these platforms and positively impact the type of information that users consume.

The dramatic shift of advertising dollars from traditional news outlets to a handful of digital platforms has many stakeholders in the news industry calling for regulatory intervention to reverse or halt this trend. This report takes a different approach: we do not focus on finding ways to return to a "glorious" past when a larger share of advertising was allocated to traditional news outlets.

The report's starting point is that the marriage between quality accountability journalism and advertising revenues was always fraught with conflicts of interests, biases, battles for attention and challenges to the autonomy and integrity of news organizations. A large body of research, evidence and surveys documents the influence of advertisers on the agenda, content and framing of reporting, and direct and indirect bias, censorship and self-censorship caused by dependence on advertising. There is also evidence of biases and distortions in news reporting in the pre-platform era caused by ownership and control of news outlets by tycoons, oligarchs and politically connected business groups. The shift of readers to the Internet and the rise of digital platforms have exacerbated these biases as the business model of many news outlets collapsed; publishers became more dependent on a few large advertisers, and newsrooms were presented for the first time with granular real-time data on the virality of single stories—which enabled them to adopt editorial strategies that market single stories instead of full editions.

Reversing the shift of advertising dollars from the digital platforms back to traditional media may not only prove to be like swimming against the stream—it may further incentivize news outlets to chase clicks and virality. In the race to get more clicks and exposure through the sophisticated, targeted, personalized, advertising-maximizing digital platforms, publishers may give the platforms more power and editorial sway in the curation of the news. Nevertheless, they will always trail behind platforms in the competition to monetize those clicks, as they will find it difficult to compete against the vast data troves and artificial intelligence capabilities held by giant tech companies.

This report sees the seismic shift in the advertising dollars to the online world as an opportunity to create a news ecosystem supported more by paid subscriptions and public funding, and less by advertising. The report does not seek to protect, subsidize or prioritize existing news outlets, but it does assume that journalists will continue to play a central role in production of accountability journalism.

Our main policy recommendations are as follows:

1. Introducing some public funding for news organizations, relying on citizen choice, to support journalism. The allocation mechanism of the funds should be designed to promote competition and entry and limit the entrenchment of incumbent large news media outlets. The funds should be allocated directly by the citizens, independently of any government intervention. Special consideration should be given to the funding of local journalism, where we see most of the aforementioned problems concentrated today. This funding mechanism is highly cost effective: $50 per US adult is likely to be sufficient.
2. All mergers and acquisitions involving news companies should be subject, in

3

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

addition to the standard antitrust review, to a news plurality review. Standard competition policy protects direct consumer welfare, and therefore does not take into account the indirect effect that excessive media concentration can cause on citizen welfare. We propose an approach to quantifying news plurality that is neutral to the identities of the owners of the merging entities and to the platform on which news content is delivered. The proposed approach, based on attention shares, has been used in a recent merger decision in the UK.

3. Developing a new regulatory system that will ensure necessary transparency regarding information flows and algorithms. This can be done through a new regulatory framework and oversight body that sets standards for the disclosure of information and news sources, develop source-based reputational mechanisms and bring to light biases and choices in editorial decisions and algorithms for the presentation of the news. These regulators should produce periodical reports on news consumption and the influence of algorithm design on the distribution of news and the behavior of users.

4. Digital platforms enjoy a hidden subsidy worth billions of dollars by being exempted from any liability for most of the speech on their platforms (Section 230). We do not propose to repeal Section 230 but rather propose that platforms that would like to enjoy this protection should have to agree to take clear measures to prioritize content according to criteria other than the maximization of ad revenue.

The pace of change brought by the Internet is unlike any previous technological shock. The proposals in this report aim to address the main threats we see today to the news media ecosystem, but are far from offering complete solutions to an ecosystem that is changing every year. We believe that after rolling out the main policy recommendations above—additional public funding of journalism, disclosing the vast data that platforms have on news consumption, and taking steps to limit excess concentration of political power by tech and media players—experts, regulators and legislators will be equipped with much more information that will enable us to consider further updates to the regulations governing the news media.

Amid growing threats to democratic values and institutions across many liberal democracies around the globe, a bold plan for strengthening independent, strong and rigorous accountability journalism is needed more than at any time since the dawn of the modern liberal democracies.

4

Glenn Decl. Ex. 11
Page 7 of 66



# REPORT FROM THE MEDIA SUBCOMMITTEE

*Were it left to me to decide whether we should have a government without newspapers, or newspapers without a government, I should not hesitate a moment to prefer the latter.*
—Thomas Jefferson

*Nothing but a newspaper can drop the same thought into a thousand minds at the same moment. . . . To suppose that they only serve to protect freedom would be to diminish their importance: they maintain civilization.*
—Alexis de Tocqueville

*There is not a crime, there is not a dodge, there is not a trick, there is not a swindle, there is not a vice which does not live by secrecy.*
—Joseph Pulitzer

*Journalism is printing what someone else doesn't want printed: everything else is public relations*
—George Orwell (attributed)

What is a democracy? The fundamental principle of our modern political system is "one person, one vote." We believe it should be "one *informed* person, one vote." Hence free, unbiased, high-quality information is indispensable to democratic debate, institutions and processes. It matters for the quality of elections and the accountability of elected representatives. Journalism, by revealing previously undisclosed information, plays a crucial role in combating and reducing corruption and holding the powerful to account, and is also central to the proper functioning of markets and governance of firms.

With the rise of the Internet, information has become more accessible to the public around the world. The Internet gave voice to hundreds of millions of people and enabled them to connect, come together and form digital communities and networks to express their shared interests. However, as accessing information has become easier for the public, there has been an explosion in information, and organizing and filtering it has emerged as a major challenge. Up until a decade ago, it was mostly agreed that the benefits of the digital revolution were significantly higher than the negative impact. But with the rise of the dominance of the digital platforms, we are gradually shifting to a network architecture that consolidates much of the power, activity and resources on the Internet in a handful of platforms—a situation that calls for rethinking the rules of the game in the news media and on the Internet.

Production of high quality news with journalistic rigor has always been costly. While there are large public benefits from news production, the private benefit for news producers has been limited. Traditionally, journalists at news media organizations did the job of producing original reporting, and editors bundled this information into news editions for the public. Classified and display advertising and subscriptions were the primary ways of sustaining the traditional business model. After their rise, digital platforms such as Google and Facebook emerged as organizers and bundlers of information. They aggregate content from original information producers such as news

5

Glenn Decl. Ex. 11
Page 8 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

media companies and bundle this information as curated "feeds" and search results to users. A rising number of users, especially those who are young, get most of their news directly from social media feeds. The disintermediation between readers and original news producers has disrupted the way in which news is produced, organized and consumed in the digital age.

Digital platforms, and the Internet more generally, have disrupted the advertising market for media outlets. Traditionally, classified and display advertising was the major source of revenue and profitability for newspapers. In the 1990s, the entry of online marketplaces like Craigslist in the United States was disruptive to the classified advertising market and led to an increase in subscription prices of newspapers and a decline in their readership.[3] Likewise, with the loss of classified advertising and the associated increased reliance on print advertising, there was an increased bias in news reporting toward these advertisers.[4] Separately, there has been a reduction in demand for print newspapers among readers due to the availability of digital news and the consumption of news via social media platforms. That this is especially true among young individuals suggests that this trend will only accelerate in future years.

**Box 1: Decline of Newspapers in Numbers**

The overall circulation of newspapers has declined since the 1990s with the rise of the Internet in the US. Advertising revenue especially plummeted after 2008, when the fallout from the financial crisis and the rise of digital platforms coincided. The industry did not recover from this decline in advertising revenue, and growth in circulation revenue was too slow to arrest overall revenue decline. A decline in

revenues and circulation has led to a loss of newsroom employment, a critical measure of journalistic depth that has declined in the US over time.



_____

[3] Seamans & Zhu (2013).

[4] Beattie et al. (2018).

CHICAGO BOOTH ▪ Stigler Center
for the Study of the Economy and the State

> Not only have newspapers declined; press freedom is also under threat around the world, as indexed by the World Press Freedom Index.



ability to connect more isolated areas to less isolated ones. This is consistent with evidence the other settings: The introduction of television in the US led to a reduction in local newspaper circulation, and the entry of the *New York Times* into metro areas led to reductions in local newspaper readership.[5]

These issues are particularly acute for newspapers that have traditionally served local markets. Since 2004, 1,800 papers have closed in the US. Six percent of US counties currently have no newspapers, and an additional 46 percent have only one newspaper, usually a weekly. Over one-half of counties are not served by a daily newspaper. A similar trend is seen in democracies like Australia, where the number of journalists in traditional print industries fell by 20 percent from 2014 to 2017, and among regional publishers and broadcasters cost-reduction measures range from the closure of newspapers to the consolidation of broadcasting operations. Similarly, in the UK, 321 local press have seen closure in the last ten years.[6]

Taken together, the reduction in demand on both sides of this market—from paying readers and from advertisers—has put severe financial pressures on traditional media outlets. Since 2007, while digital platforms like Facebook and Google grew exponentially, the advertising revenue of newspapers has dwindled, leading to severe financial strain and a sharp decline in newsroom employment. This disruption of the financing model might also have changed the mix of local versus national news. Given that digital platforms (Facebook, Twitter, Google, etc.) have national distribution, there is a concern that local news has been crowded out in favor of national news. This is consistent with the conjecture that the Internet, and communications technology more generally, may lead to a "death of distance," that is, the overcoming of physical distance and a new

This decline in the number of newspapers has reduced the degree of competition in local news markets, in terms of both readership and advertising. This is in contrast to the promise of digital platforms, which had the potential to reduce barriers to entry and facilitate the sharing of information. Instead, by disrupting newspaper advertising markets and shifting demand from print to digital sources, platforms have reduced pluralism and increased concentration in local newspaper markets.

The loss of local newspapers and the emergence of "news deserts" has important consequences for local governance. For example, local newspaper closures between 1996 and 2015 in the US led to higher borrowing costs for municipalities in the long-

---

[5] Gentzkow (2006), George & Waldfogel (2006).

[6] http://newspaperownership.com; Wilding et al. (2018); Cairncross (2019)

7

Glenn Decl. Ex. 11
Page 10 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

run, even in localities with high Internet usage, as local governments were held less accountable for their public financing decisions.[7] Similarly, a study of newspapers in California found that when there are fewer reporters who cover an area, fewer people run for mayor, and fewer people vote.[8] In other words, a decline in local journalism due to the emergence of digital platforms can have far-reaching consequences for politics and the economy. Again, these findings are in line with evidence from other settings. The introduction of television in the US, for example, led to a reduction in political knowledge and voter turnout.[9] Similarly, increased newspaper coverage of local Congressional representatives is associated with better informed constituents and enhanced representation.[10]

Taken together, the demise of local newspapers, along with evidence on their social benefits, suggests significant challenges for local governance in coming years. While the aforementioned evidence is not directly linked to digital platforms, there is also some direct evidence that the entry of the Internet and digital platforms has displaced traditional media outlets and the associated news coverage, including investigative journalism, and changed political outcomes.[11] For example, the rollout of the Internet in Germany led to a reduction in voter turnout, and researchers[12] attribute this effect to a reduction in television viewership following broadband Internet availability. Studying the rollout of broadband Internet in Italy, researchers[13] documented an initial reduction in voter turnout followed by a later increase as parties harnessed this new technology. In a recent

study, researchers[14] have found that broadband development in the UK has displaced other traditional media with greater news content such as radio and newspapers, and has also decreased voter turnout. This effect, which is most pronounced among the less educated and the young, also leads to lower local government expenditures and taxes, particularly expenditures targeted at less-educated voters. Taken together, emerging evidence suggests that the entry of digital media has displaced, rather than enhanced, traditional news reporting in these areas, leading to reductions in voter turnout and changes in policy outcomes.

While digital platforms' dominance is a relatively new phenomenon of the last decade, it is important to remember that news media have long been ridden with market and non-market forces that subverted and biased their reporting. Political parties, governments, advertisers, large corporations, funders, and audiences are a few of the forces that influenced news media. At the cusp of the twentieth century, advances in technology gave rise to greater independence of news media, as they were able to produce and transmit news at a much lower cost, and led to a shift from partisan to professional journalism.

With the rise of digital platforms, the cost of distributing information went down, which increased the entry of new information producers and increased diversity of voices. Digital platforms became powerful intermediaries between original information producers and readers and unbundled and "atomized" news. They use algorithms to curate personalized content for users based on

---

[7] Gao, Lee & Murphy (2018).

[8] Rubado & Jennings (2019).

[9] Gentzkow (2006).

[10] Snyder & Stromberg (2010).

[11] Falck, Gold & Heblich (2014); Gavazza, Nardotto & Valletti (2018).

[12] Falck et al. (2014).

[13] Campante, Durante, & Sobbrio (2017).

[14] Gavazza et al. (2018).

8

Glenn Decl. Ex. 11
Page 11 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

the unprecedented level of data these platforms have over each individual's private history and preferences. With billions of users, they can thus create billions of "bundles" or editions of news stories with the objective of maximizing advertising revenues. These algorithms are opaque, and while platforms know exactly which individuals are exposed to which stories and why, publishers and the public have very little knowledge about such information. This gives rise to a huge asymmetry between the data and knowledge that the platforms and the public have on news consumption.

Along with atomization of news, platforms have—through their sheer size and market share as curators and aggregators—acquired unprecedented gatekeeping power over news media outlets all over the world, wielding a huge influence on the version of reality that readers see.

As noted above, traditional media were always plagued with biases, and chased attention to get advertising dollars. But those incentives were disciplined partially by reputation concerns, professional norms, and legal liabilities. Digital platforms, in contrast, are not disciplined by such forces. They are protected from most legal liabilities, and their reputation is not tied directly to the content they present as feeds to their users.

Recent research and multiple investigations by news organizations[15] support the assertion that platforms do not have incentives to prioritize quality content. A recent study found that disinformation can spread faster than true news on social media such as Twitter.[16] Not only are users not good at distinguishing reliable and unreliable news; digital platforms at the same time have access to private information about users, enabling them to selectively target visceral, addictive

and at times extremist content. This, coupled with the fact that digital platforms are not held accountable for the published content, has made digital platforms powerful tools of influence, having insight into people's private behavior, but enjoying immunity from any consequences.

## Box 2: Rise of Digital Platforms in Numbers

The revenue growth of digital media is nothing short of spectacular, as evidenced by the market valuations of companies like Alphabet. The share of advertising attributable to digital advertising has roughly doubled since 2010. In 2018, the share of digital advertising (38 percent) was higher than the advertising shares of television (34 percent) and newspapers and magazines (12.2 percent), and it is projected to keep growing in the coming years. Within the digital platforms, advertising revenue is highly concentrated, with two companies controlling over half of it. In particular, in 2018, Google had a 37.1 percent share and Facebook had a 20.6 percent share. Assuming that these trends continue, as predicted, the degree of concentration in advertising markets will dramatically increase in the coming years.



Advertising spending in the U.S. from 2010-2020, by media (Source eMarketer)

---

[15] https://www.theverge.com/interface/2019/4/3/18293293/youtube-extremism-criticism-bloomberg

[16] Cagé & Mazoyer (2019).

9

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

## News Consumption by Media

How many people get their political news from a digital source? The table below shows that the share of Americans who report regular use of the digital platform is large and increasing. Similar patterns are observed in virtually every democratic country in the world. However, the table also shows that television is still the dominant platform for news. These aggregate shares also hide enormous heterogeneity. Television is four times more popular among older adults than among younger adults, and social media consumption is much more popular among younger adults.

Share of US Adults Who Get News Often on Each Platform

|  | TV | News website | Radio | Social Media | Print Newspapers |
|---|---|---|---|---|---|
| 2016 | 57% | 28% | 25% | 18% | 20% |
| 2018 | 49% | 33% | 26% | 20% | 16% |
| 2018 age 18-29 | 16% | 27% | 13% | 36% | 2% |
| 2018 age 50-64 | 65% | 28% | 28% | 14% | 18% |

*Source: Pew Research Center*

## News Consumption by Source

A robust pattern observed in data is that a large share of digital news is actually the online version of traditional media, highlighting that news producers still continue to work in traditional media. The table below covers 36 countries. It shows penetration shares for traditional channels (TV, radio, print) as well as digital media disaggregated by whether the user is viewing a pure Internet source (e.g., *Huffington Post*), a social media or blog platform (e.g., Facebook) or the online version of a TV, radio or print source. As we can see the last modality is more prevalent in most countries.





Three pure digital platforms appear among the top ten US news providers in terms of attention share: Facebook at #2, Yahoo News at #7, and *Huffington Post* at #8. Only the last one produces original content. In the UK, three digital platforms are found among the top ten news organizations: Facebook at #3, Google at #5, and Twitter at #10. Indeed, similar patterns emerge in the 36 countries for

10

Glenn Decl. Ex. 11
Page 13 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

which data are available.[17] Facebook is by far the dominant pure-digital news source, although it is critical to highlight that Facebook is an aggregator and not a producer of original content. It is among the top three in 14 of those countries.



## Summary of Findings

The media landscape is fast-changing. Available evidence indicates the following patterns:

- The share of advertising revenues going to digital platforms is large and increasing. Facebook and Google receive over half of it.

- Television is still the dominant news medium, though the role of digital news is increasing and already dominant in younger generations.

- Although news may be delivered digitally, the content is most likely to come from traditional print and television providers.

- Among the pure-digital news providers, Facebook is by far the dominant player.

The concern with harmful externalities of concentration of power and biases in the news media related with the emergence of new technology is by no means a new phenomenon. Throughout history, such concerns have been answered with new regulations. For example,

with the development of radio, the Federal Radio Commission was founded in 1927 in the US, which evolved into the Federal Communications Commission (FCC) in 1934. As media technology evolved, FCC regulations evolved, too, including the 1941 National TV Ownership Rule, the 1970 Radio/TV Cross-Ownership Restriction, and the 1975 Newspaper/Broadcast Cross-Ownership Prohibition. These regulations attempted to prevent the concentration of ownership of news media in order to support diversity in the market for ideas. As Internet and digital platforms have disrupted the media industry, we have reason to believe that government should again look into the ways in which the negative externalities of the media can be constrained.

The influence of the digital platforms on the news media has been under increased scrutiny and focus since the last US presidential elections, yet much of the focus has been on fake news and the interference of foreign governments in elections through such platforms. But the influence of digital platforms on the news and journalism ecosystem goes much deeper than just the spread of fake news. The business model of news has been severely disrupted by the rise of digital platforms, and news production and consumption have been disintermediated. The business model disruption has reduced the incentive to produce original reporting, and the platform algorithms have rewarded the production of visceral and emotive content.

While there is a great deal of data on the decline of revenues, profits and number of journalists employed by news organizations, the potential public harms from the new news and journalism ecosystems are inflicted on very large and dispersed groups, and they are much more difficult to analyze and measure. This report will focus on these potential harms and

---

[17] Kennedy & Prat (forthcoming).

11

Glenn Decl. Ex. 11
Page 14 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

recommend ways to develop a more sustainable and competitive economic model for a news media ecosystem that produces quality journalism. These recommendations include a new way to increase funding and competition in the news market as well as the transparency and accountability of digital platforms.

# THE PRECARIOUS ECONOMICS OF NEWS

News is an information good—perhaps the purest form of it. Whether it be day-to-day decisions regarding what products to buy, how to manage health, how to prepare for the weather, or political decisions regarding whom to vote for or whether to attend a protest, the news provides information that allows people to make those decisions facing less uncertainty. However, information goods, especially news content such as investigative journalism, have some unique characteristics that give rise to underproduction of news and lower demand. In this section, we explain the unique economics of newsworthy information.

Information, once produced, can be consumed widely without constraint, making it non-rivalrous. Unlike a physical good, when one agent consumes information this does not prevent another agent from doing the same. Also, information, once disseminated, can be distributed by agents other than the agent responsible for its production, making it non-excludable. Both these characteristics of information give rise to underproduction of information, as the producer of information, who incurs the fixed cost of producing news, is unable to accrue the full benefit from producing it, as it is easy to copy and share.

Another important characteristic of information that arises from the demand side is uncertainty. Almost by definition, information is a good whose value is not necessarily known to the consumer at the time of purchase. If

information is revealed to the purchaser, which is what efficient purchases of a good would entail, the purchaser has no incentive to actually pay for the information once disclosed. In such a case the information producer has to resort to trying to sell information without disclosure. What this implies is that the demand for information will be lower than it would otherwise be and will not reflect the value consumers actually place on that information, which will also drive diminished returns for information producers. However, this also means that the production of many information goods will depend on finding means of payment— such as advertising in case of news—that do not involve direct payments from consumers themselves.

> **Box 3: Kenneth Arrow on Economics of Information**
>
> The Nobel prizewinning economist Kenneth Arrow identified indivisibility and inappropriability as characteristics of information that would lead to insufficient production. These generate the challenge of ensuring that the returns to those responsible for producing information (that is, those bearing the costs of production) are closer to the social return for information production. In modern parlance, this is often broken down into two dimensions of the public nature of goods under the terms *non-rivalry* and *non-excludability*.
>
> For information with value that cannot be so easily inferred from past experience with the information provider, there is a special challenge.
>
> Arrow (1962) put it this way:
>
> *[T]here is a fundamental paradox in the determination of demand for information; its value for the purchaser is not known until he has the information, but then he*

12

Glenn Decl. Ex. 11
Page 15 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

has in effect acquired it without cost.[18] Of course, if the seller can retain property rights in the use of the information, this would be no problem, but given incomplete appropriability, the potential buyer will base his decision to purchase information on less than optimal criteria. He may act, for example, on the average value of information in that class as revealed by past experience. If any particular item of information has differing value for different economic agents, this procedure will lead both to a nonoptimal purchase of information at any given price and also to a nonoptimal allocation of the information purchased.

Undersupply and underdemand of information may be more acute for certain type of news. Some news—such as that related to weather, traffic conditions, impending or actual disasters, product reviews, or scientific breakthroughs—is of primary use for individual decision-making. By contrast, other news is of primary use for social decision-making, including how to vote, how to protest and whether to avoid or support particular businesses or organizations. In this situation, the decisions one person is making are part of a collective decision-making process, and, hence, each person will be interested and place value on others who are participating in the decision having access to that news. Apart from the private versus social dimension of the news, news also differs in terms of its timeliness or, more critically, its longevity, that is, how close in time it is to the moment a relevant decision has to be made. This is most obvious with respect to weather and traffic decisions, but may also be of importance for protests or disasters. By contrast, news about corruption or poor policy-making might be of use for the next election, and, therefore, its value does not necessarily depend on its timely provision.

Consider a case of investigative journalism that exposes the corruption of a government official in a particular county. Such news has limited private benefit for readers, and very few users are likely to buy this news story. Yet, the public benefit from exposing this story is large, as it not only exposes a corrupt official but at the same time creates a deterrent for corruption in the future as officials fear similar exposés. Hence, investigative journalism is a public good with limited private benefit. Such investigative journalism is costly to produce and delivers limited immediate private benefits for news media outlets.[19]

There are good reasons to believe that the economic issues associated with the supply and demand for information become stronger as news moves from the private to the social and, perhaps paradoxically, from being of immediate to longer-term use.

A look at the case of investigative journalism helps reveal how the production of such journalism is acutely ridden with issues of underdemand and undersupply. Investigative journalism is the provision of news as the result of a long, complex and often very costly investigation. As a result, it is unlikely to be the kind of news that requires quick action but is released well ahead of a decision point. In addition, it is more likely to involve a social element, whereby the consumption of that news by others raises its value to individuals. For example, an accusation of sexual misconduct against a powerful figure is likely to have a greater impact if it is widely read. Additionally, the longevity of news represents a problem for private provision, as there is time for that news to be provided by others. To see this, imagine that the output of investigative journalism is a 'scoop'—a news output that others do not have. A news outlet might publish a scoop and for a period of time may be the only

---

[18] See Roth (2002), and Gans & Stern (2010).

[19] Hamilton (2016)

13

Glenn Decl. Ex. 11
Page 16 of 66



outlet with that news. If the news has a short half-life, then that period would be valuable in that consumers would have an incentive to consume news in the originating outlet. However, if the news is long-lived, there is no similar time pressure. People will be able to consume the news more easily as it becomes widely reported. Even if this is done with attribution to the original outlet, it is not clear there is any mechanism by which that outlet will benefit disproportionately in terms of consumers willing to consume the news on that originating outlet. Thus, there is a clear production externality for such news caused by the knowledge spillover of that news to other outlets. Consequently, there is limited incentive to become an outlet that is able to invest in generating scoops of this kind.

## Box 4: Biases in News

While this report and many other reports highlight the various potential harms of digital platforms to the business model, distribution and consumption of news, and stress the important contribution of journalism to democracy, it is important to stress that there was no agreed "golden age" of journalism, and it was always subject to multiple forms of capture and biases. Some sources of bias in media are:

- Bias toward political or corporate owners
- Bias toward funders
- Bias toward advertisers
- Bias toward newsmakers who provide access
- Bias toward slant of the audience
- Bias toward a particular ideology

- Bias toward sensational news that boosts ratings

An example of media capture could be due to banks. Recent research[20] showed that Italian newspapers that were more indebted were more more likely to agree with banks, whatever the interest of banks may be. In other words, as newspapers become less financially healthy, the more likely they are to be riddled with biases. This trend is also confirmed in historical research[21], where researchers find that, in the absence of a thriving subscription and advertising base, US newspapers were more likely to be politically captured in the 19th century. Similarly, in Argentina, newspapers that carried more government advertising covered government corruption scandals less between 1998 and 2007, showing evidence of advertiser bias.[22]

Another challenge that news presents that makes it distinctive in terms of the economics of information is that there is always potentially an interested party who will have some control over the news. Thus, news can be pursued independently up to a point, but there is always some area where conflict is to be expected. The only way around this is to have a diversity of news outlets with a consequent diversity of operating interests.

The above challenges of social news and special interest are especially severe in the case of investigative journalism. Coupled with the fact that such journalism—due to its non-rivalrous, non-excludable and uncertain nature—is subject to underdemand and undersupply, we conclude that production and consumption of investigative journalism–type content face many challenges.

---

[20] Zingales (2016)

[21] Gentzkow, Glaeser & Goldin (2006); Petrova (2011)

[22] Di Tella & Franceschelli (2011)

14

Glenn Decl. Ex. 11
Page 17 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

---

**Box 5: Why is investigative journalism difficult to produce?**

Investigative journalism has large public benefits, all of which cannot be captured by producers, but its production incurs *high fixed costs* (e.g., careful collection of evidence and analysis) with a long gestation period, which may lead to dead ends and failure. Such journalism is also *hazardous*, and prone to lawsuits, and may also antagonize stakeholders (advertisers, owners, newsmakers etc.).[23] Finally, due to its public nature, investigative journalism has uncertain benefits. It has been suggested that a key benefit from successful investigative journalism stories tends to be of reputation, and that "investigative journalism is like haute couture . . . . It isn't highly profitable per se, but it helps create brand awareness and it excites the most talented designers... [and is done] when margins are high."[24]

Overall, the production of investigative journalism is like taking a risky bet with few upsides and many downsides. News media firms may take such risky bets to produce investigative coverage only if they have the capacity to produce such "haute couture" content, the power to bundle and distribute such news, to best monetize it, and the incentive to differentiate from the competition.[25]

# DIGITAL PLATFORMS AND DISRUPTION OF NEWS

In this section, we look at the business model of news and discuss how the Internet and the digital platforms have influenced the business model of news at its various stages of production, distribution and consumption of news.

## Production of News

### Reducing the Incentive to Produce Original Content

As consumers move principally to online consumption, it is becoming easier to "steal content" from competitors. This affects media outlets' incentives to produce high-quality (and costly) news content in the Internet era. Recent studies of audience news consumption behavior have indicated that news users increasingly rely on multiple news media and seem to shop for the best news across outlets online.[26] As a consequence, they follow the news on multiple media platforms.[27] It has been well-documented that the Internet has reduced loyalty to any single outlet, in particular for technological reasons.[28] Revealing is the fact that online when coming to a news website through search or social media, most users cannot recall the name of the website's news brand after their visit.[29] According to Reuters data, in France in 2018, consumers of at least one offline media outlet consume on average 2.83 outlets online.[30]

News in online media is not only copied by many, but it is also copied fast. An analysis of French media showed that on average news was delivered to readers of different media outlets in less than 4 minutes in 25 percent of the cases. Also, the analysis found that such high reactivity came with high verbatim copying, as only 32.6 percent of the online

---

[23] Hamilton (2016)

[24] Zingales & Rolnik (unpublished).

[25] Raj & Rolnik (2018)

[26] Athey, Calvano, & Gans (2013).

[27] Picone, Courtois, & Paulussen (2015); Yuan (2011).

[28] Athey, Calvano, & Gans (2013).

[29] Reuters Institute (2017).

[30] Reuters Institute (2018).

15

Glenn Decl. Ex. 11
Page 18 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

content was original.[31] Such a scale of copying online might potentially negatively affect media outlets' newsgathering incentives, as original news producers would capture only a fraction of the audience and of the economic returns to original news production.[32]

While a reactive online media reduces the incentives of news producers to invest in original content, in the long run, producers can gather reputation effects, whereby users do indeed share content from the original content producer more frequently. However, media outlets with a larger fraction of original content are still losing part of the audience they would receive absent copying and consumers' switching across outlets. Furthermore, this negative effect is accentuated by the impact of the platforms on the advertising markets for news media: when attention is spread across publishers, switching consumers actually see fewer ads than their loyal counterparts on a given publisher.

## Platform Duopoly and the Business Model of the News Media

Consumers increasingly consume information on news aggregators such as Google News or Yahoo News, and there is a debate whether these aggregators act on the consumption side as a complement, bringing additional traffic to traditional media outlets online, or as a substitute, stealing the audience for these outlets, and then negatively affecting their news production incentives. Empirical evidence seems to indicate that news aggregators act as a complement on the consumption side. For example, analysis using a shutdown of Google News in Spain in December 2014–January 2015 as a natural experiment found that the removal of Google News reduced overall news consumption by about 20 percent for users affected by the shutdown, and visits to news publishers declined by about 10 percent, a negative shock that particularly affected small publishers.[33] In other words, Google News seems to act as a complement rather than as a substitute, at least for small publishers.

However, even if the "pure aggregators" act as a complement to the traditional media outlets on the consumption side, they may hurt media outlets' incentives to produce original content through their negative impact on the advertising market. Here one may think of the digital platforms all together (i.e., not only Google and Yahoo but also social media platforms such as Facebook and Twitter) and more broadly of all the tech giants rather than just the aggregators. Indeed, with the rise of the digital platforms, the supply of available ad space online has increased far more rapidly than the demand for it, owing mainly to advertising on digital platforms, so that the price has dropped precipitously. As a consequence, traditional media are devoting more and more space for online ads, but are winning fewer and fewer of them. In 2018, Google and Facebook were the dominant digital advertising companies, with a combined 58 percent of the US market, followed by Amazon, whose advertising business is expanding quickly. According to the latest estimates from eMarketer, by 2020, Amazon will have captured a 7 percent share of US digital ad spending, compared with Facebook's 20.8 percent and Google's 35.1 percent.[34]

The growth in digital ad space is far from being shared equally among players in the online advertising ecosystem. Google and Facebook act as a digital duopoly that represented up to 85 percent of all digital advertising growth in 2016. According to the European Audiovisual Observatory (2017) and

---

[31] Cagé, Hervé, & Viaud (2017).

[32] Anderson (2012).

[33] Joan & Gil (2016).

[34] Anderson (2012).

16

Glenn Decl. Ex. 11
Page 19 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

a number of other studies, this digital duopoly even represented all digital advertising growth in the United States by capturing 99 percent of digital ad growth in 2016, and up to 92 percent in France. That is, the share of the digital advertising growth left for traditional news media is nearly zero (and even negative for some news media).

This may even become worse in the future as a consequence of the European Union's General Data Protection Regulation (GDPR). The GDPR will reduce traditional media outlets' ability to collect data online—to protect consumers' privacy, the GDPR requires marketers to secure explicit permission for data-use activities—and thus their capacity to create targeted online advertising. But platforms such as Facebook will continue to collect tons of personal information on their users (with a monopoly on these data) and so become even more competitive on the targeted online advertising market.

**Distribution of News**

Once it has been created, news content needs to be distributed to create value. The fundamental issue that shapes this activity is the fact that, over any time interval, consumer attention is limited. Thus, even if news content is freely available, only a fraction of it will be consumed.

The ascent of digital platforms has negatively impacted the news distribution model. The fact that nowadays the vast majority of consumers prefer to get to news through social platforms and search, rather than going directly to a news website, has been well documented. But given that these access points are limited —again Facebook and Google are here in a nearly duopolistic situation—this gives them market power vis-à-vis the online news media and more generally vis-à-vis all the newsrooms. De facto, the digital platforms aim at dictating the terms of distribution and all dealings with the news media. News publishers

have lost control over distribution; the news is increasingly filtered through algorithms and platforms that are opaque and unpredictable. In particular, each change in Facebook's algorithm has a huge effect on the size of the news websites' audience (implying changes in their revenues). This has been particularly striking in recent years when Facebook has decided to reduce exposure to news, instead prioritizing interactions with family and friends, and leading to a huge drop in the traffic from Facebook to news publishers' websites.

Disaggregation of the Customer

Advertising played an important role in funding traditional news media. Prior to digitization, advertisements would be placed physically in the newspaper or intermittently on television and radio. In equilibrium, advertisers and outlets would come to understand the make-up of consumers and be able to adjust advertising content accordingly. Moreover, there was a sense in which a newspaper or a program could result in the bundling of attention on a regular basis—that is, news consumers might read the paper or watch the nightly news every day. Thus, an advertiser looking to place ads in front of those consumers would know precisely where to find them. This assisted in making each ad more valuable, and the advertiser and outlet would benefit and divide value from such matches.

In principle, digitization would not change anything with regard to this type of product. Indeed, as it became possible to know even more about individual consumers (through data collected about them through, say, their browsing and click behavior), the ability of outlets to match consumers and advertisers should have been enhanced. In non-news related advertising such as search, this promise of more efficient matching was brought about. However, in news related advertising, digitization brought more choice for consumers. In other words, consumers split their attention across outlets by a substantially

17

Glenn Decl. Ex. 11
Page 20 of 66



increased degree and, moreover, would not necessarily follow the editorialized priority for content on the same outlet—picking and choosing what they wanted to pay attention to rather than passively accepting the "flow" of content chosen by editors.

While such fragmentation of attention was a natural and efficient response for consumers, it also meant that the advertising product that outlets were selling became far less straightforward and, instead, the issue of how to put an ad in front of particular types of consumers potentially became harder rather than easier to address. In effect, while before a sales department of a news outlet could tell advertisers about the consumers that it, almost exclusively, could bring to them, with the fragmentation of attention, that sales pitch involved consumers that may also appear in the sales pitch of other outlets. For advertisers, it became harder to identify when consumer attention might be sold and, moreover, who might be selling it. This combination of lower match quality along with greater competition between outlets at the margin is a potential explanation for the dramatic loss in advertising revenue (even independent of classified ads) that occurred from 2000 to the present day.

The breakdown in the coherence of advertising products around news did, however, invite changes to reconstitute it. In each case, these changes were designed to re-aggregate consumers into bundles of attention that could be described, understood and sold to advertisers. We describe each in turn.

## Advertising Networks and Attention Aggregation

One of the issues that created difficulties for the advertising product of news outlets was that it was difficult to track users and which ads they had seen (both within but mostly between outlets). Ad networks (such as DoubleClick, which was acquired by Google) were developed that allowed for tracking—at least

when consumers used a single browser on a single device—and the promise of such tracking was to ensure that consumers received the "right" number of ads from a given advertiser and were not "missed" or served up too many ads, leading to "wasted" impressions.

Such advertising networks allowed advertising markets to become reorganized in a way that was not outlet-centric. The challenge, however, is that this took away another piece of information useful for matching consumers to ads—that is, the self-selection that comes from consumers deciding which content to devote their attention to. Ad networks are very efficient at matching relatively generic ads with consumers or targeting consumers with ads based on their browsing behavior. However, this happens at a higher degree of abstraction than what might attract them in terms of news. News outlets—especially local ones—may have been better able to match local consumers with local businesses. While that is possible for advertising networks, it is possible that something was lost in the transition.

## Subscriptions and Attention Aggregation

As the business model of the media is in crisis, with falling advertising revenues and print subscribers, in recent years, news media firms have been transitioning to charging subscription fees for their digital content. While some news outlets are better able to generate subscription revenue than others—in particular, national or global outlets—this has flow-on effects to the organization of the advertising market. This is because, despite those subscription fees, advertisements continue to be placed in front of subscribers.

Although the free Internet fragmented consumer attention across outlets, when a consumer subscribes to an outlet, it signals that that outlet will grab a higher share of his or her attention. As a result, this makes subscribers' attention a more straightforward product to sell to advertisers. In other words, it can counter

18

Glenn Decl. Ex. 11
Page 21 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

that disaggregation that might otherwise occur, while at the same time making subscription and advertising revenue (to a degree at least) positively associated.

## Social Media and Attention Aggregation

Another way in which attention has been aggregated in a way that makes the advertising product more coherent is social media. Social media has the quality—like the newspapers or nightly news of older times—of managing to regularly and reliably grab a share of consumer attention each day. That means that social media networks can sell advertising products that more consistently match ads and consumers without missed opportunities or waste. This ability of social media to grab the attention of customers gives them an editorial function that curates that news. In other words, the aggregate attention that comes from being able to manage consumer information overload—something that used to be performed by news outlets exclusively—can now be undertaken by these networks and their related aggregators like Google News or Apple News.

## Market Power in Advertising

The analysis of market power in advertising markets related to news (and potentially other) content has always been made more complicated by the two-sided nature of media markets. On the one side, outlets attract consumer attention and compete for it. On the other side, they sell that attention to advertisers. The question is: Having obtained some share of consumer attention, if an outlet chose to decrease the price of ad space, would that put pressure on other outlets to do the same?

The traditional answer is no. Having obtained consumer attention, an outlet is essentially a monopolist over reselling that attention to advertisers. In that sense, regardless of the prices they set, it will have no impact and not be impacted by the ad prices set

for other outlets. In that sense, outlets have market power in the advertising market; to the extent that generates rents, those rents may be wholly or partially dissipated as those outlets compete for consumer attention.

The traditional answer, however, relies on an assumption that each consumer, over a relevant time period, gives all of her attention to a single outlet (which is called *single-homing*). This, in turn, motivates advertisers to advertise wherever consumers happen to be. However, when consumers fragment their attention (what is called *multi-homing*), this assumption no longer holds, and outlets do not have a monopoly over access to that consumer. In this situation, alongside the matching difficulties mentioned above, each outlet is no longer a monopolist in dealing with each advertiser and thus, outlets compete with one another. In this case, as one outlet lowers its ad price, it will put pressure on others to do the same.

## Consumption of News

**Box 6: Bundling and Architecture of Serendipity**

As news is public information, bundling of that information is an important manner in which traditional news outlets have attracted and retained customers. Traditional news outlets sold different news content types as a bundle. To reach a large audience, outlets had an incentive to bundle diverse news. So, a typical newspaper covered content including national, international and local politics, business, sports and page 3 culture, along with classified ads.

The bundling and curating by experts (editors) created additional value, as this curation built an "architecture of

Glenn Decl. Ex. 11

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

serendipity."[35] Sunstein (2008) notes that, "For good lives, good universities, and good societies, the power of self-sorting is at best a mixed blessing. However unpleasant and jarring they can be, unchosen, unanticipated encounters play a crucial role; they are indispensable not only to education but also to citizenship itself. Far from wishing them away, we should welcome them."

Curated bundles of news promoted the discovery of news. While customers chose the quality, slant and niche of their newspapers, they received news as bundles, and so were exposed to news that may be "unpleasant," "jarring," "unchosen," or "unanticipated." Such a system of serendipity limited the degree of self-sorting.

A lab study[36] found that news that catches public attention may be biased towards negative or "horserace" related political content. Given such preferences, news bundling helped the spread (and production) of new content such as investigative journalism, which is of public value but not designed to catch attention and go "viral." Thus, bundling reduced underinvestment in public goods like investigative journalism.[37]

Platforms have for most of their existence insisted that they are not media companies.[38] They have described what they do as offering neutral platforms for connectivity, allowing users to find information of relevance to them. It has now become clear that platforms' moderation of content creates salience. How they do this—what content platforms promote

and what they hide, who is speaking and with what credibility—is not transparent. This opacity works hand in hand with moderation to put people in the flows of content that they cannot assess and cannot escape. The principal method by which platforms create media salience is through their algorithmic design and recommendation engines. Their algorithms are a form of editorial judgment that privileges particular forms and sources of media content.[39] In this way, algorithms shape consumption on an individualized basis.[40] Platforms also exercise editorial judgment by blocking content. Platform moderation, whether by algorithmic design or by human intervention, whether by prioritizing content or blocking it, is an "essential, constant, and definitional part of what platforms do."[41]

### Atomization of News

Traditional news media would produce editions of news that would bundle news of multiple types. To attract a large base, such a bundle would offer a variety of content and viewpoints, and also provided editors the ability to bundle stories of public relevance such as local investigative journalism, such as on local corruption, which would not have grabbed readers' attention otherwise if left to compete for attention on its own. In the digital age, news has been atomized, as users often consume content curated by the algorithmic editing by digital platforms.

The editorial power of digital platforms also influences the editorial decisions of news producers. An analysis of an online news dataset obtained from an Indian English daily newspaper showed that editors give more

---

[35] Sunstein (2008).

[36] Trussler & Soroka (2014)

[37] Hamilton (2016)

[38] See generally Napoli & Caplan (2017) and Pasquale (2016).

[39] Carlson (2018).

[40] Caplan & Boyd (2018).

[41] Gillespie (2018).

20

Glenn Decl. Ex. 11
Page 23 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

coverage to news stories whose articles receive more clicks and that this effect is quantitatively important.[42] Digital platforms and "virality" have become so important to editorial decisions that researchers have found that a number of news stories first originate on social media, and absent their propagation on social media, these stories would never make it to the website of the traditional news publishers.[43]

## Moderation of News Content

### Content filtering

Most Americans encounter a substantial portion of their news media through information platforms. According to the Pew survey, more than 68 percent of American adults get some news from social platforms, with 20 percent doing it often.[44] As of the end of 2016, 45 percent of all traffic to publisher sites came from Facebook. Google was responsible for 31 percent.[45] It may be the case that these numbers may be beginning to decline across the globe, according to Reuters Institute. In some countries, especially authoritarian ones, messaging apps like WhatsApp are becoming more important for news circulation; WhatsApp is used for news by about half of surveyed online users in Malaysia (54 percent) and Brazil (48 percent), and by about one-third in Spain (36 percent) and Turkey (30 percent).[46]

As discussed above, the dominance of information platforms as a distribution mechanism for news impacts the production side of journalism, in terms of reducing the advertising base to fund journalism and

incentivizing news media to produce content that will survive algorithmic sorting.[47] These algorithmic filters also influence what news content is consumed.

Like traditional news publishers, platforms are in the business of selling audience attention to advertisers. They are able to do this with unprecedented efficiency by using personal data to promote content predicted to engage users and thereby provide more value to advertisers. Platforms offer advertisers access to the "data exhaust" of individuals as they move in real space and across devices so they can target the most receptive audience segments.[48] Online advertising "has evolved rapidly from a digital version of conventional ad placement involving agencies and publishers, to what is now a data-driven market focused on audience segmentation and targeted messaging."[49]

Platform companies feed user data into models that produce an advertising technology platform. Using this platform, advertisers can find narrowly segmented audiences and target them through social media feeds and websites with ads ever more precisely tailored to their perceived personal preferences. Platforms develop their predictive models based on inferences from user data including preferences revealed through past consumption or likes.[50] Where advertisers have data, in the form of customer lists or other personal data, the platforms can find audiences that share characteristics and thereby deliver to advertisers what Facebook calls a "lookalike"

---

[42] Sen and Yildirim (2015)

[43] Cagé & Mazoyer (2019)

[44] http://www.journalism.org/2018/09/10/news-use-across-social-media-platforms-2018/.

[45] Bell et al. (2017).

[46] Reuters Institute (2018).

[47] See Bell et al. (2018), p. 28 (news media companies must devote resources to accommodating the platform algorithmic changes); Marwick & Lewis (2017).

[48] Wu (2016), Ghosh & Scott (2018, p. 13).

[49] Ghosh & Scott (2018, p. 5).

[50] Wilding et al. (2018).

21

Glenn Decl. Ex. 11
Page 24 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

audience.[51] Advertising includes not just product promotions but also paid content. Information producers can use data profiling to target audiences using the same approach as product advertisers. There has been considerable controversy, for example, with disinformation providers using these tools to "deepen engagement with known audience segments and broaden engagement to new ones."[52]

Platforms will only be successful in generating user engagement with advertising if they can generate engagement with content. Serving up editorial content, whether user-generated or professionally generated, follows the same logic as serving up advertising. Platforms target individuals with content that will be most engaging based on predictive inferences. The platform may apply content filters based on direct signals from the user, collaborative filters based on the preferences of similar users, or some hybrid of the two.[53] The platforms do not disclose how they filter content. Twitter's "trending topics" are already popular. Facebook News Feed and YouTube's Suggested Videos seek to predict what will become viral in a user's network and amplify it with that use.[54] Facebook explains that its News Feed algorithm attaches a "relevance score" to content based on predictions about a user's likelihood to click, likelihood to spend time with the content, likelihood to like, comment and share, likelihood that the user will find the content informative, likelihood that the content is "clickbait", and likelihood

that the content links to a low-quality web page.[55]

Users can customize their news feeds on social media platforms to a degree, within the constraints of the algorithmic filters that are applied. Facebook friends and Twitter follows shape content exposure.[56] Friends and other influencers people choose are important funnels for what news reaches them.[57] Google allows users to customize their Google News settings and subscribe to channels on YouTube. Individual choice, however, can push back only so far against the forces of algorithmic filtering. YouTube autoplay queues up the next video to carry viewers from one video to the next to keep them on the platform. The addictive qualities of social media platforms keep people attached to the flow of content long after they have left the confines of their "selected" content. Social bots are one way that content providers can hack people's attention to push content on them that they might not have chosen and cannot choose.[58]

Algorithmic filtering does not care in principle about the quality and type of content it promotes. Relevance and engagement are what it cares about. The theory is that if consumers do not like and will not engage with low-quality information, then presumably they will see less of it and vice versa. There are at least two caveats to this revealed preference theory. One is that the preferences accounted for algorithmically are only revealed preferences, not the higher-order considered preferences of public service media theories. The second is that algorithmic filtering stops

---

[51] Ghosh & Scott (2018, p. 16).

[52] Ghosh & Scott (2018, p. 17).

[53] Ricci, Rokach, & Shapira (2011).

[54] Grimmelmann (2018).

[55] https://www.facebook.com/help/publisher/718033381901819?helpref=faq_content

[56] See DeVito (2017) (finding friends on Facebook to be the most important determinant of News Feed choices).

[57] Bergström & Jervelycke Belfrage (2018) .

[58] Shao et al. (2018): ("[B]ots are particularly active in amplifying fake news in the very early spreading moments, … target influential users … [and] may disguise their geographic locations.").

22

offering consumers content that they are not predicted to want. Eli Pariser calls this the *filter bubble*: algorithms drive people into narrower homologous information spaces where the content confirms biases and does not expose them to differences.[59] This theory is challenged by other research that shows algorithmic exposure to multiple viewpoints.[60]

Whether or not algorithmic filtering reduces exposure to alternative viewpoints, it privileges a certain kind of content. This is content that provokes outrage and emotion and tends to extremity. Studies show that filtering algorithms funnel people into more extreme expressions of their particular preferences, including political and cultural ones. Viewpoint amplification encourages engagement.[61] With respect to political viewpoints, this tendency seems to be more pronounced on the right than on the left, with the consumption of highly partisan information asymmetrically concentrated among those with more conservative views.[62]

There is not always a line between human and algorithmic filtering on the platform. The algorithm is created by humans and changed by humans. For example, in January 2018, Facebook announced changes to its News Feed algorithm to prioritize "meaningful content posted by friends and family over the news, videos and posts from brands."[63] As a result, the amount of news shrank from 5 percent to 4 percent of the content on feeds. Facebook also changed its

algorithm to prioritize local news.[64] We do not have good data on what these tweaks do to news consumption, nor are these changes to be relied upon as long-term strategies. Facebook has altered its strategies before, most notably with respect to its "pivot to video." News producers put resources into accommodating the new algorithmic strategy, only to see the strategy change again. Not only can platforms like Facebook or Twitter alter media consumption through algorithmic tweaks, but they can also alter behavior by favoring certain messages.[65] The opacity in the system means that we only know about these tweaks when they are disclosed or, rarely, discovered.

Content blocking

While algorithmic sorting prioritizes information, another mechanism blocks it and ensures that it will not be consumed on the platform. Blocking often, but not always, involves human intervention. Platforms moderate content by two means and at two stages. The means are human or machine. The moments are before and after publication. Before publication, software will block content that can reliably be identified as illegal or otherwise prohibited.[66] This kind of automatic blocking is used to prevent the circulation of content that allegedly violates copyright, has been identified as violating local laws (e.g., child pornography), or violates the platform's terms of service. This form of ex ante content removal is more relevant to user-generated content than to news producers.

---

[59] Pariser (2011). See also Sunstein & Vermeule (2009).

[60] Bakshy, Messing, & Adamic (2015); Fletcher & Kleis Nielsen (2017) (contesting evidentiary basis for the proposition that online audiences are more polarized than offline audiences).

[61] Tufekci (2018).

[62] See Guess, Nyhan, & Reifler (2018) ("pattern of selective exposure was heavily concentrated among a small subset of people—almost six in ten visits to fake

news websites came from the 10 percent of Americans with the most conservative information diets").

[63] Beckett (2018).

[64] https://newsroom.fb.com/news/2018/01/news-feed-fyi-local-news/

[65] See Zittrain (2014) (describing how Facebook and Google can alter voter turnout by tweaking news feed and search results).

[66] Klonick (2018).

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

Most content moderation takes place after it is posted, and is conducted through a combination of human and machine algorithms. The platform, for the most part, reacts to content users have flagged for review. There is little transparency into how they make these decisions or what the results are.[67] "Each social media platform has cobbled together a content moderation labor force consisting of company employees, temporary crowd workers, outsourced review teams, legal and expert consultants, community managers, flaggers, administrators, moderators, super flaggers, nonprofits, activist organizations, and the entire user population."[68] Increasingly, in the wake of public outrage over the use of platforms to incite violence, spread disinformation, recruit terrorists, and otherwise propagate "bad" content, platforms moderate proactively. They remove content and accounts that violate their terms of service without relying on users to tell them to. This moderation is also opaque. Kate Klonick's research suggests that content moderators adopt traditional analogical reasoning, apply multifactor tests, and conduct balancing. Casey Newton's investigative reporting has revealed that Facebook content moderators work under high pressure, often exploitative, conditions that are harmful to their mental health.[69] Their decisions about content are guided by Facebook's public community guidelines, internal supplemental guidance, and episodically updated interpretations in real time that may override that guidance.

### Box 7: Trust in the Age of the Internet

The advent of the Internet and consumption of information online changed how people view, understand and trust the information they receive. Old relationships were upended, and traditional journalism's authority was undermined.

In the absence of the traditional signals of authority, how do audiences gauge trustworthiness? A 2003 study by JD Greer found that they consider whether a site belongs to a person or a well-known outlet, but not whether the advertisements represent reputable organizations.[70] Similarly, a 2007 study of user behavior defined two key elements of credibility as being "site" credibility and "sponsor" credibility, and found that respondents trust news sites more than personal sites.[71] Lack of transparency[72] and use of native advertising are said by consumers to make them less trusting of the media.[73]

Researchers[74] have further found that because traditional clues of credibility (bylines, trusted brands) no longer prevail and it is often not clear on aggregation sites where information originated, online articles with direct quotes from named sources were viewed as more credible then those without.

Just as they did in the Middle Ages, audiences trust information that is familiar and/or comes from friends. Coverage of something that people have experienced may also make them more likely to trust media reports.[75] One study[76] found that fake news headlines that were familiar were perceived as substantially more accurate even when they were clearly

---

[67] Klonick (2018); Chen (2017)

[68] Gillespie (2018).

[69] Newton (2019).

[70] Greer (2003).

[71] Flanagin & Metzger (2007).

[72] Milhorance & Singer (2018).

[73] Amazeen & Muddiman (2018).

[74] Sundar et al. (1998).

[75] Livio & Cohen (2016).

[76] Pennycook & Rand (2017).

24

Glenn Decl. Ex. 11
Page 27 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

implausible or contradicted the respondents' beliefs. Warning labels about the headlines being incorrect had no effect on perceptions of credibility or even caused people to share the information more as readers assumed that a Facebook warning meant the story was true.[77]

Based on a survey using Facebook data on graduate students about non-partisan news issues, researchers found that recommendations from Facebook friends/ opinion leaders caused respondents to trust both the news article and the outlet it came from more, and caused respondents to say they would be more likely to read an outlet in the future.[78]

Through content filtering and blocking, digital platforms have become increasingly influential in determining what information people consume. Hence, while the Internet emerged with the promise of democratizing information access, with the rise of digital platforms as information gatekeepers, information flow and curation has become more concentrated.

The figure[79] below summarizes the differences between the functioning of traditional news media, and the news media after the rise of digital platforms.

A look at the economics of news media shows us that the news media industry has been facing three distinct disruptions with the rise of digital platforms.

- **Advertising disruption**: The production of investigative journalism has become difficult because ad revenues have dwindled with the rise of digital giants, and cash-strapped news media firms cannot afford to produce original journalism-type content.

- **Atomization disruption**: Newspapers have lost the power to bundle news, and news no longer remains picked by professional news editors. Instead, news gets bundled by opaque algorithms designed by a few digital giants, who have become the new gatekeepers of news and information, and whose only goal is to maximize engagement.

- **Accountability disruption**: In the traditional model, editors were responsible for the news they published for public consumption. In the digital model, algorithms designed by digital giants to filter and curate content have little incentive to be public-spirited, as algorithms neither produce the content, nor do they pay the negative externalities. Instead, they are designed to maximize "engagement," which pushes them to prioritize visceral and viral content over news of public interest.



---

[77] Levin (2017).

[78] Turcotte et al. (2015).

[79] Raj and Rolnik (2018)

Glenn Decl. Ex. 11
Page 28 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

# THE MARKET RESPONSE

The market has responded in the last decade to the sharp decline in revenues of news outlets in various ways. Most prominent was the surge in the number of news outlets financed by philanthropists and foundations. Another market response was a gradual shift of outlets to a revenues model based solely or mostly on subscribers. While these market responses try to tackle the revenues or the financing sources, other market responses try to reduce the costs side. Among these are efforts to use technology and computation to perform some of the journalistic work and collaboration between large groups of newspapers on global investigative projects. In the next section we review these market responses and discuss their various shortcomings.

## The Multifaceted Donation Model

Philanthropy is booming in our democracies, in particular in the US, where we see a growing role of private funders in the provision of public goods as government retrenches. Such a phenomenon is not specific to the media industry. As highlighted in Reich, Cordelli and Bernholz (2016), "in the United States and most other countries, we see philanthropy in all areas of modern life," but philanthropy also increasingly supports the provision of information.

The growing role of philanthropy in media funding has been well documented. The *Growth in Foundation Support for Media in the United States* report published in 2013 by Media Impact Funders reports that $1.86 billion was awarded in media-related grants from 2009 to 2011. The investigative website *ProPublica*, created in 2008 by the billionaires

Herbert and Marion Sandler, is funded entirely through philanthropy; its French counterpart, *Disclose*, launched in November 2018, is similarly raising money through crowdfunding and larger donations, including from US foundations (e.g., Open Society). Other examples include First Look Media and *The Intercept*, created by Pierre Omidyar; and recently *The Markup*, a news site to investigate big tech, subsidized by Craig Newmark (the Craiglist founder).

As of today, there are more than 150 nonprofit centers doing investigative journalism in the US, and for-profit newspapers like the *New York Times*—just like foundation-owned newspapers like *The Guardian* in the United Kingdom—have recently set up nonprofit ventures to support their journalism. Interestingly, *The Guardian* has decided to implement a unique business model, where there is no paywall (news is available online for free for all consumers), but where consumers are invited to nonetheless subscribe or donate to the newspaper so as to preserve independent journalism. As of today, *The Guardian* gets more revenue from consumers than from advertising thanks to the success of its membership and contribution model. More than a million people worldwide contributed to *The Guardian* between 2015 and 2018.[80]

Out of the 160 member organizations of the Institute for Nonprofit News (an association founded in 2009 with just 27 members), more than 100 were created between 2007 and 2017.[81] In France, the *Le Monde Afrique* website, launched in 2015 by the daily newspaper *Le Monde*, has received financial support from the Bill & Melinda Gates Foundation. Overall, philanthropy is becoming a very large part of the revenue streams of a

---

[80] https://www.theguardian.com/media/2018/nov/05/guard

ian-passes-1m-mark-in-reader-donations-katharine-viner

[81] Birnbauer (2018).

26

Glenn Decl. Ex. 11
Page 29 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

growing number of news companies. In a series of articles published in the *Columbia Journalism Review*, David Westphal defines philanthropy as "journalism's new patrons."[82]

Concurrently, during the last decade, we have also observed an increasing tendency of out-of-market billionaires to acquire media outlets, often at a very low cost but with even lower profit expectations. Jeff Bezos (Amazon) and *The Washington Post*, Patrick Soon-Shiong (a biotech billionaire entrepreneur) and *The Los Angeles Times*, Marc Benioff (Salesforce) and the *Time* magazine are but a few examples of this new "taste" of tech entrepreneurs with deep pockets for the media industry. While these new media moguls publicly claim that they are acting as philanthropists, it is more accurate to call them "new media patrons." The development of this patronage model is far from specific to the US, as is apparent from the recent entry of telecommunications billionaires on the French media market (e.g., Xavier Niel and *Le Monde*; Patrick Drahi and *Libération*, BFMTV, RMC, etc.), and most recently of the Czech billionaire Kretinski (who made a fortune in the energy sector, and is now buying shares in *Le Monde* and other media outlets). Furthermore, this model has a historical precedent. In the 19th century, before the appearance of the penny papers and the development of mass media, "out of their own funds, wealthy political leaders sometimes provided start-up capital for newspapers."[83] The main difference with today's situation is that while historically the patronage was *political* inasmuch as these newspapers were endorsing political parties, nowadays, a large share of the new media moguls seem to care much less about politics (ensuring that a Republican or a Democrat candidate is elected) but much more about regulation. Or, more precisely, about the assurance of the absence of regulation (in particular in the case of the e-commerce and of the telecommunication sector).

It is important to distinguish between philanthropic funding (via charitable donations) of the media on the one hand, and the patronage model on the other. The philanthropic model consists of creating nonprofit news organizations that are then funded via charitable donations. The patronage model, while it also claims to be philanthropic in spirit (in particular in view of the low profitability of the sector), consists in buying and controlling news media organizations, keeping them as for-profit entities. But in the end, these two models pose similar problems regarding journalists' independence and the disproportionate weight given to the preference of the wealthy. While philanthropy may offer one resource with the potential to fund the production of high-quality journalism, media outlets must resist potential hidden agendas. This is not specific to the media, and the risks of philanthropist funding have already been highlighted in the context of the funding of education, with questions about the power of donors to set research agendas. As highlighted by Reich (2018), we must consider philanthropy "as an act with political dimensions, in the sense that philanthropy can be an expression of political power. … Wealthy elites can pose problems for democratic politics, even—and perhaps especially—when elites direct their wealth toward the public sphere" (p.64).

Both the philanthropic and the patronage model raise the same issue: Power resides where the money is. The media have all too often served as toys for billionaires in

---

[82] Westphal (2018)

[83] Hamilton (2004) similarly highlights that, before the emergence of nonpartisan reporting as a commercial product in the American newspaper markets in the

1870s, the type and amount of information provided depended on the value of the readers as that derived from political patronage.

27

Glenn Decl. Ex. 11
Page 30 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

search of influence. From this point of view, there is no difference between private ownership of for-profit entities and the funding of foundations. Most often, donors indeed retain control over the governance and the purpose of the foundation, and in particular over how the funds are spent. If—to take only one example that shows how complex the situation is, since absent this external funding the newspaper would have cut off its newsroom—being owned by the founder of Amazon raised an independence issue and auto-censorship risk for journalists working at the *Washington Post*, who may for example less easily cover issues linked to e-commerce, what is the difference between being owned directly by Jeff Bezos (as is the case today) or being funded on a daily basis by a hypothetical "Bezos Foundation for the Media" created, funded, and governed by the same Bezos? This answer is simple: There is no difference.

The limits of the foundation model for the media have been well described. Benson (2016) has documented that "foundation donations are not 'free' but rather constitute a redirection of public resources … to nontransparent and unaccountable foundations that have assumed media policy responsibilities." Moreover, foundations prefer funding specific projects rather than general operations, which creates the possibility of conflicts of interest. Obviously, founders will always claim that they never impose changes to the content of the investigations they have funded—and it may well be the case—but do we really expect media outlets to apply for funding to investigate the funders?

Underlining the limits of the foundation model does not mean, however, that we do not need nonprofit journalism. On the contrary. The central question is not one of the corporate form of the news organization (for-profit or not-for-profit) but the one of its governance. A number of interesting initiatives have emerged in recent years, such as the Civil Media Company in 2018, a startup that aims to use

blockchain technology and crypto-economics (more precisely a cryptocurrency based on the Ethereum blockchain) to start hundreds of publications in the United States.

Regarding the donation model, note in conclusion that a growing number of donations are made today by the digital platforms themselves. Google's "Digital News Initiative," for example—initially launched for three years in 2015 with a $150 million fund and relaunched in 2018 with $300 million to be spent over the next three years—can be considered as a foundation-like initiative to support the media. Similarly, the Facebook "Journalism Project" aims at helping local news outlets make use of social media. Another example is the Google News Lab, whose catchphrase is as follows: "We collaborate with journalists and entrepreneurs to help build the future of media." While it is now clear that digital platforms should contribute to the funding of journalism (given they are weakening the economic fundamentals of high-quality news production, and they are making money out of it)—an issue we will come back to in the solution part of this report—it is unclear they should do so as if they were benevolent donors. Because they are not. Furthermore, they should not be free to choose which media outlets to help or not.

## The Newsrooms Collaboration: An Alternative Path for Non-profit Journalism

While we have just highlighted the pros and cons of the donation model for the future of the news media, it is interesting to focus on a new form of nonprofit news organizations, the consortiums of journalisms. The most famous is the International Consortium for Investigative Journalists, a global network of more than 190 investigative journalists in more than 65 countries around the world, which recently exposed the Panama Papers and the Paradise Papers.

28

Glenn Decl. Ex. 11
Page 31 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

More generally, collaborative journalism is growing all around the world. Collaborative journalism is defined by the Center for the Cooperative Media as "the practice of executing journalistic endeavors using a cross-entity approach." Already in 2014, the Pew Research Center noted these collaborations defined "a new era of interest."[84] The website Medium recently listed the best collaborative journalism projects of 2018, among them the BBC Local News Partnership, which gathers together 843 newsrooms within 90 news organizations in the UK sharing local content.[85] In a recent report, the Center for Cooperative Media of Montclair State University identifies six models of collaborative journalism: (i) temporary and separate, (ii) temporary and co-creating, (iii) temporary and integrated, (iv) ongoing and separate, (v) ongoing and co-creating, and (vi) and ongoing and integrated.[86]

What are the advantages of collaborative journalism? The very first one is economically driven. As highlighted above, the media incentives to produce original news are negatively affected nowadays by extensive copying. Collaborative journalism and consortiums of journalists can be an interesting solution for media outlets to reduce the fixed costs associated with costly investigative journalism by sharing them. (In a sense, this is the exact same logic as the one behind the Associated Press at the time of the creation of this nonprofit cooperative.)

Furthermore, investigative journalism increasingly relies on the use of big data, which necessitates costly—and sometimes complicated to use—data-driven technology. The Panama Papers investigation, based on a 2.6 terabyte trove of data, would not have been possible without these new technologies such as automation, algorithms, OCR, etc. Here again, it is much easier for journalists to collaborate across newsrooms. Note, however, that the Panama Papers leaks also would not have been possible without journalists. They involved more than 100 media partners and several hundred journalists. Similarly, for the Paradise Papers investigation, with its files including far more information about US citizens, the ICIJ collaborated with more than 380 journalists working on six continents in 30 languages.

Finally, at a time when there is a growing threat to journalistic independence and press freedom, in particular due to recent changes in media ownership, collaborative journalism can be seen as a way to avoid censorship. The example of the Panama Papers is particularly relevant from this point of view. Given that tens of newsrooms in many different countries were involved, it was impossible for each country to censor some of the findings.

Obviously, all these advantages do not imply that collaborative journalism is the sole solution to the media crisis. There are some downsides to the consortiums of journalists. As highlighted by the Pew Research Center (2014), "things can easily go wrong." The report gives the example of a Knight-funded grant series to pilot eight collaborations between news outlets that had only one active participant when the seed money ran out. But overall, it seems necessary in the future to provide more funding to these initiatives that allow the production of investigative journalism.

---

[84] http://www.journalism.org/2014/12/04/journalism-partnerships/

[85] https://medium.com/centerforcooperativemedia/a-look-at-nine-of-the-best-collaborative-journalism-projects-of-2018-cfd49b3c4865

[86] https://centerforcooperativemedia.org/center-cooperative-media-identifies-6-models-collaborative-journalism-revolution-media/

29

Glenn Decl. Ex. 11
Page 32 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

## The Subscription Model

Despite the observed drop in advertising revenues in recent years, the core business model for effective financing of publishers' websites is still through advertising. Advertising is indeed the largest contributor to publishers' online revenues. Even if pay models are becoming an important part of the business of digital news nowadays, in most countries there is still only a minority of news lovers who pay for online news.[87]

However, it is interesting to highlight that a number of recent and successful media outlets have made the choice to rely only on subscriptions. One of the best illustrations of such a successful strategy is the French pure online publication *Mediapart*. This publication, specialized in investigative journalism, was created in 2008 with a hard paywall model. It has in recent years played a key role in uncovering several corruption scandals involving politicians of both the left and right. At the end of 2012, for example, *Mediapart* revealed that the French budget minister evaded paying tax in France on sums deposited in undeclared Swiss bank accounts. Following *Mediapart*'s allegations, a legal investigation was opened into the tax fraud accusations, and Jérôme Cahuzac resigned before being charged with tax fraud. As of today, *Mediapart* has more than 140,000 subscribers providing revenue of €13.7 million (in 2017). With its 4,700,000 unique visitors per month and 85 staff members, the publication is highly profitable (and has been making a profit for seven years now).

As of today, *Mediapart* can be considered a model for the whole news industry. Why does the subscription model seem to be an interesting path to follow for the future of the news? First, because the collapse of advertising revenues for newspapers is not

new. Even in the United States, where advertising is king, newspaper ad revenues have been declining as a percentage of GDP since 1956—and will continue to do so in the future.[88] Hence publishers need to find alternative sources of revenues. As we have seen above, in today's online world, publishers are competing with a duopoly online (Facebook and Google) and they are no longer competitive, in particular regarding targeted online advertising.

Second, media outlets such are *Mediapart* that are behind a paywall are much less dependent on the digital platforms regarding their traffic. Given the subscription model, their traffic is indeed mostly direct (while we saw before that the vast majority of consumers now prefer to get to news through a side door). This lower reliance on platforms implies that when Facebook decides to modify its algorithm—as it did for example in the summer 2018—a medium such as *Mediapart*, contrary to the majority of the French media, was barely affected.

Other innovative business models in recent years include the one of *The Correspondent*, which is entirely member-funded. Originally launched in 2013 as a Dutch news website funded through a successful crowdfunding campaign, *The Correspondent* just terminated a successful US$2.5 million campaign to launch an English-language "unbreaking news" platform in the summer of 2019.

## Rating the Sources: The Solution to the Spread of Disinformation?

In the vast majority of Western democracies nowadays, a challenge is to fight against the spread of disinformation. The market has developed a number of solutions.

---

[87] Cornia et al. (2017).

[88] Cagé (2015).

30

Glenn Decl. Ex. 11
Page 33 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

One of them is NewsGuard, a browser extension that labels news sources with either a green (for trustworthy) or red (for unreliable) icon. NewsGuard was founded in 2018 and financed by the Knight Foundation and Publicis (among others). In 2019, it has expanded its partnership with Microsoft and is now accessible to users of Microsoft Edge mobile apps on iOS and Android. The company—with a team of roughly 50 journalists—rates more than 2,000 websites.[89] (Similar initiatives in the US include Snopes and PolitiFact.)

In the same spirit, the French daily newspaper *Le Monde* has recently developed Décodex, a database of around 1,000 websites compiled by *Le Monde*'s Décodeurs project in the course of their fact-checking. The Décodex divides websites into four categories: (i) satirical websites, (ii) websites that have published a significant amount of false information, (iii) websites whose approach to verification is questionable, and (iv) news websites.

The main downside of a database like Décodex is its reliability. Obviously, *Le Monde*'s Décodeurs project can be considered trustworthy, and *Le Monde*'s journalists are recognized worldwide as high-quality independent journalists. But other initiatives in other countries can be less reliable. And more importantly, a number of these initiatives may have a hard time convincing citizens that they are actually reliable. Breitbart, for instance, calls NewsGuard "media blacklisters" that "[promote] fake news."[90]

An open question remains: Who is going to investigate the reliability of the newsroom in charge of rating the other newsrooms? From this point of view, an initiative that may be more attractive than

NewsGuard or Décodex is CrossCheck: French media outlets—from the Agence France Press to BuzzFeed through *Libération* and *Le Monde*— decided to team up on a fact-checking initiative. In other words, this initiative combines both collaborative journalism and the rating of sources.

## Summary

News organizations around the world have shown different degrees of success in adjusting to the new realities of the digital world. While some news outlets or media groups were able to gradually transform their businesses into the digital era by investing in online businesses, most news outlets in the developed world had to aggressively cut the number of journalists. We surveyed a number of market responses of news organizations and entrepreneurial journalists to the new reality of the digital age. Chief among these responses is the surge in philanthropy-funded journalism. As noted in the section, this form of funding has created many successful initiatives, famous among them ProPublica in the US. Yet philanthropic-funded journalism can present the same problems that corporate control of news media presented in the past. Philanthropists may be benevolent players in the news ecosystem, but they may have their own agenda and limited interests. In most countries very wealthy individuals or billionaires would be wary or reluctant to finance or be involved in news outlets that pick fights with powerful politicians or business groups. A philanthropy-funded news ecosystem can result in a public discourse and media agenda that is in line with the point of view of a handful of billionaires.

The subscriber model that is proving itself for large established news outlets like the

---

89
https://www.nytimes.com/2019/01/16/business/media/media-steve-brill-fake-news.html

90 Nolte (2019).

31

Glenn Decl. Ex. 11
Page 34 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

*New York Times*, *Wall Street Journal*, or *Financial Times* and new digital native initiatives like *MediaPart* in France offers hope for quality news outlets that have a very distinct brand reputation in their market. But this model will be a partial solution for most countries. News outlets that were able to get significant subscribers revenues to support large newsrooms are usually the top national or global outlets that target very large audiences. The smaller the audience and the more local the reporting, the lower is the likelihood of a subscriber model achieving much success.

# RECOMMENDATIONS

As this report acknowledges in different sections, democratic journalism has always been in "crisis." Nonetheless, the rise of digital platforms and the subsequent disintermediation of the relationship between publishers and users raises some important issues for the future of newsrooms. The question remains of what, if anything, can be done to directly address the platforms' control of the relationship between publishers and readers (a form of bottleneck power).

Digital platforms' bottleneck power manifests in their ability to use monopsony power to pay news outlets less than the competitive price for the news.[91] The previously described changes in news consumption patterns means that news outlets became increasingly dependent on online platforms to access readers, also becoming more dependent on the platforms to tap ever scarcer advertising revenue. This increased platforms' economic power: Not only do they carry news for free, with the only compensation for sharing snippets and other reports being the increased traffic and attention diverted to news outlets' websites. They also squeeze online advertising margins through their control over

this associated ecosystem. To make matters worse, the dependency is one-sided: while platforms like Google and Facebook control ad exchanges and account for the lion's share of traffic to most newspapers, the opposite is not true: Facebook reports that only 4 percent of its News Feed posts are news. This further weakens newspapers' bargaining power, as well exemplified by the examples of Germany and Spain, where platforms simply stopped carrying news after changes in copyright laws required them to pay for news reports. The significant drop in traffic to most newsrooms was such that they were soon acquiescing to the older free-carrying terms in order to stay afloat. Another version of this power is the platforms' ability to maintain as proprietary most user data associated with news consumption—in particular when it is done through the platforms' API instead of on publishers' websites (a process that should rise as aggregators such as Apple News increases in importance).

Countries are struggling to develop tools that can effectively address this bottleneck power, which mostly reflects platforms' tight controls over their ecosystem—a process that may benefit users. Europe's revamped copyright laws hope to force platforms to the bargaining table by granting publishers more control over how their products are shared. While these efforts are laudable, this report is based on the view that the golden era of advertising-funded journalism never existed, such that attempts to return this glorious past seem misguided. That is why we defend a series of mechanisms to help newsrooms survive in a new technological environment: from alternative vouchers to fund the news media to a series of news monitoring obligations that should ameliorate the platforms' bottleneck power by providing more transparency about their actions. Nonetheless,

---

[91] See Cairncross (2019).

32

Glenn Decl. Ex. 11
Page 35 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

if digital platforms continue to control the interaction between newsrooms and users, a regulator should be empowered to take stronger action to reign in platform power and ensure that citizens can continue to access relevant news.

This system would be structured as part of the quid pro quo bargain that shields platforms from liability in exchange for more responsive and public-oriented companies. We endorse some of the suggestions of the Cairncross report—an independent report published in February 2019 that offers an overview of the challenges facing high-quality journalism in the UK—to require platforms to voluntarily adopt a code of conduct in which they clearly state the basis of their relationship with publishers. We would go further, recommending that such a code of conduct include not only economic terms (whether news outlets are rewarded for snippet sharing, etc.), but also a description of what types of user data the platforms will share with publishers and what efforts platforms are taking to distribute meaningful and relevant journalism within their ecosystems. This transparency should level the playing field and allow for competition between publishers to reach the audience. Access to data is particularly important, as it will help publishers establish more meaningful independent subscriber relationships . More data allows for better personalization in general, which will be reflected not only in better ads but, most importantly, in a publisher that is more responsive to the demands of its subscribers. Publishers may, for example, personalize digital editions to reflect the preferences of their readers—a process similar to what services like Apple News promise to do. It may also boost newsroom collaboration efforts, equally benefiting publishers.

# PUBLIC FUNDING OF NEWS

Public support of journalism is not a novel concept. In the US, public funding of the press was common in the nineteenth century in the form of postal and printing subsidies given to publishers to print and distribute newspapers, which were estimated to be around 0.21 percent of the US GDP between 1840 and 1844 (equivalent to $43 billion as 0.2 percent of 2018 US GDP).[92] As the figure below makes clear, in most developed countries, the government financially supports the media one way or another, while the US is an outlier.



*Per capita public funding of public media in US dollars. Source: Benson and Powers (2011), estimates from 2007 to 2009.*

In the US and elsewhere, a growing number of researchers are advocating increased public funding.[93] Most recently, the Cairncross Review recommends first direct funding for local public-interest news outlets, and second the launch of a new innovation fund. A salient argument in opposition to such public funding is the threat to editorial independence. In this section, we propose a "private media voucher" system—funded with public money—to remedy some of the biases that increased public funding of media may induce. We first present our proposal, describe its advantages and shortcomings, and then discuss why we do think that the media voucher system is better not only than the status quo, but also than other

---

[92] McChesney & Nichols 2010 (p. 310).

[93] McChesney & Nichols (2010); McChesney & Pickard (2011); Bollinger (2010).

33

Glenn Decl. Ex. 11
Page 36 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

propositions than have been made recently to guarantee a sustainable future for journalism.

## Existing Subsidies Schemes

There are plenty of examples around the world of government support of the media. While American subsidies to both the press and audiovisual media (e.g., the postal subsidy) are low and have fallen sharply over the past few decades, the US was historically the very first country to introduce subsidies to the press.

The most commonly used subsidy scheme today is the reduced value-added tax (VAT). In most European countries, newspapers indeed benefit from a reduced VAT (although a challenge in many countries remains the extension of the reduced VAT to digital publications). Although it is widely believed that UK newspapers are not subsidized by the government, they in fact pay zero VAT, which amounts to an effective subsidy of several million pounds each year. Furthermore, a number of European countries have also introduced both indirect and direct subsidies to newspapers. Subsidies can be either neutral or discriminatory. Sweden, for example, offers both an operating subsidy and a distribution subsidy; Norway subsidizes the newspaper that is second in circulation in each local market, the smallest paper in certain isolated regions, as well as a national paper that offers dissident and controversial political views; while France offers delivery subsidies and pluralism subsidies, as well as modernization subsidies.[94]

Even in countries where press subsidies are relatively low—as in the UK—the state intervenes in the media through subsidies to the audiovisual sector. The funding of public broadcasting can take different forms, e.g., license fees, income tax charges, parliamentary grants, etc., depending on the countries.

In late 2018, Canada's federal government introduced a tax package worth CAN\$595 million, rolled out over five years, in support of journalism.[95] It includes (i) a temporary, non-refundable tax credit that will allow subscribers to claim 15 percent of the cost of subscriptions of eligible digital news media; (ii) a new category of "qualified" donor for nonprofit journalism; and (iii) a refundable tax credit for qualifying news organizations that "produce a wide variety of news and information of interest to Canadians."

At the local level in the US, in July 2018, the state of New Jersey decided to give \$5 million in funding for innovative projects to improve local news in the state.[96] The public funding will go through the New Jersey Civic Information Consortium, a nonprofit news incubator.

Notwithstanding this growing interest for government subsidies to the media, we think that there are good reasons why there is little public aid for the press in the US as of today. Public funding of news can indeed threaten media editorial independence. We accept this criticism. Given that we have documented in this report that media are in need of new financial resources, we propose an innovative model: publicly funded media vouchers that are privately allocated.

## Our Proposal: Media Vouchers

Our proposal to provide public funding for the news media can be summarized as follows: We propose to give each adult a media voucher worth a certain value—\$50 in our favorite

---

[94] Cagé (2015).

[95]     https://www.niemanlab.org/2018/11/canada-introduces-a-595-million-package-in-support-of-journalism/

[96] https://www.niemanlab.org/2018/07/water-in-a-news-desert-new-jersey-is-spending-5-million-to-fund-innovation-in-local-news/

34

Glenn Decl. Ex. 11
Page 37 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

proposal—per year from the US Treasury, to donate to her favored media outlet(s).[97] This proposal is in the spirit of the "vouchers for equal democracy" proposed by Cagé (2018) (a €7 voucher given each year to each citizen to fund the political party of her choice), as well as the "democracy vouchers" advocated by Lessig (2015) (with a specific focus on elections) and implemented in Seattle for local elections (we discuss below the lessons from the Seattle experience).

This system would work as follows. Every year, when filling her tax returns, each citizen indicates to the tax administration the media outlet(s) to which she wants to allocate her media voucher. The vouchers can be split in up to 10 different $5 vouchers. Technically, to preserve anonymity, this should work like electronic voting: each citizen is provided with a token and the allocation choices should not be linked to the addresses of the token holders (there exist many protocols of anonymous voting on blockchain-based networks that could be used). Resale of the media vouchers will be forbidden by law.

## Which media outlets could benefit from the media vouchers?

We want to guarantee that the list of media outlets eligible to receive voucher funding is as extensive as possible, so as to be sure there is no threat regarding media independence, and that the vouchers are used to fund the production of information (and not of entertainment, for example). We also want to guarantee a high degree of pluralism.

To guarantee that these public subsidies actually subsidize the production of information—and in particular the production of high-quality information—we impose a small number of conditions. To benefit from the media vouchers, the media outlets have to:

-      Hire at least one journalist. This will in practice exclude from the benefit of the media vouchers all aggregators that do not produce any original content. While this threshold may seem too low, we have chosen it on purpose, following the criticisms faced by the Canadian subsidy model described above. To qualify for the subsidies in the Canadian model, media have indeed to "employ more than two journalists as employees." This excludes small news startups.[98] We think that small startups should not be excluded; this is all the more important given that a key priority should be to fund local journalism; at the city or even the county level in the US, media outlets have very small newsrooms.

-      Mostly produce general-interest news. In the majority of the countries where public subsidies exist, there are some conditions associated with who can benefit from them. In France, for instance, to qualify for the majority of the subsidies, media outlets should obtain the "*Information politique et générale*" label. Our approach to "general-interest news" is rather large here; the media vouchers could, for example, be used to fund media outlets that specifically focus on a given topic, e.g., the economy or the environment. Moreover, importantly, we do not condition the format of this news (it can be print, but also audiovisual, etc.). What is important is that general-interest news is actually produced; we think that it may be a good thing to have various production formats. We simply want to guarantee that the vouchers are not used to mostly finance the production of non-news content.

-      Be transparent. The modern media industry suffers from a lack of transparency.

---

[97] We propose here a $50 voucher to keep the total cost reasonable.. As we have highlighted in this report, high-quality information is a public good, and this public good suffers from critical underfunding.

[98]      https://www.niemanlab.org/2019/03/instead-of-helping-canadian-news-startups-a-new-government-subsidy-will-only-prop-up-failed-models/

35

Glenn Decl. Ex. 11
Page 38 of 66

This lack of transparency—in particular regarding ownership—partly explains the very low trust in the media (which we observe not only in the US but also all over the world). Hence for the media outlets to be able to benefit from the media vouchers, they will have to annually publish online (as well as in their print version, for the newspapers) the following information: (i) the detailed list of their owners, for each shareholder with more than 1 percent of the capital shares; (ii) for each of these owners, their main source of revenues (to avoid conflicts of interest). Moreover, they will also have to publish their annual balance sheet. Finally, they will have to make public their articles of association, with detailed information regarding the governance structure. We think that introducing such transparency is important; this condition is along the lines of the public funding of political parties. In Italy, for example, to benefit from the "due per mille" system, political parties have to publish their accounts, their status and the list of their donors.

 -      Be ethical. Finally, while the media outlets meeting the previous criteria will be eligible for media voucher funding independently of their political bias or the tone of their coverage, we think it is nonetheless important to introduce an ethical code created by news media stakeholders. The idea behind such a code is simply to avoid the public funding of disinformation and other harmful content. Compliance with the code will be assessed on an annual basis and the media outlet will have due process and a chance to appeal any adjudication of violation. If a media outlet loses its media vouchers status in a given year, it will nonetheless be considered again the following year (so as to avoid the creation of an opposition from a number of media outlets, which could use their "victimization" status).

Finally, an independent body—which we could call, for example, the Independent News Monitor—will be in charge of validating on an annual basis the exact list of the media outlets that meet these criteria and administering the ethical code. Key is the independence of this body; we believe that it should include representatives of journalists and of media owners, as well as scholars. These members should be named for a four-year nonrenewable term. (This will be, for example, in the spirit of the aforementioned Cairncross Review's proposal to create a new Institute for Public Interest News.)

Obviously, other conditions could be in principle introduced, for example, that to qualify for the media vouchers, a media outlet may not rely for more than a certain share of its revenues on advertising revenues. We leave this dimension for discussion, but we believe nonetheless that the lower the number of conditions, the better.

A focus on local media outlets

In the baseline version of our proposal, all media outlets, as long as they satisfy the previously listed conditions, could be eligible for media voucher funding. We are well aware, however, that local media are currently struggling much more than national media. While a number of national outlets have recovered their audience in recent years—in particular newspapers through the rise in digital subscriptions—and while they still rely on advertising revenues (even if declining), the business model for local news is gone. In print media, the traditional economic model of a local newspaper was to bundle diverse types of content, such as local news, national news, classified ads, etc., into a single product to sell to consumers.[99] But digital platforms have weakened this approach. Classified ads have moved to specialized online outlets (e.g.,

---

[99] See Angelucci, Cagé & Sinkinson (2017).

36

Glenn Decl. Ex. 11
Page 39 of 66

CHICAGO **BOOTH** | Stigler Center
for the Study of the Economy and the State

craigslist.com or monster.com), and soft news about local communities is now provided free of charge on social networks such as Facebook. Similarly, national and international news is now provided almost exclusively by a few of the largest news outlets.

According to a study released in 2018 by the University of North Carolina's School of Media and Journalism,[100] more than one in five local papers has closed in the US over the past decade and a half. Almost 200 counties in the US have no newspaper at all. Importantly, as highlighted in the study, "the people with the least access to local news are often the most vulnerable—the poorest, least educated and most isolated." In a recent conversation (May 2019), *New York Times* executive editor Dean Baquet said, "The greatest crisis in American journalism is the death of local news."[101]

Hence, we think that financial support is of particular urgency for local media. We thus propose the alternative allocation mechanism: to favor the funding of local journalism, citizens should allocate at least half of their vouchers—and can allocate up to 100 percent—to fund local media outlets.

## What happens if a citizen decides not to allocate her voucher?

Obviously, it may happen—even if allocating the media vouchers costs citizens nothing—that a significant fraction of taxpayers decide not to allocate their vouchers (similarly to what happens, for example, with the "presidential fund" in the US: most people do not check the box). Given that we believe it is important that there is a high enough amount of public funding devoted to the production of high-quality news each year, we think that the

vouchers should nonetheless be allocated in this case.

Hence, we propose the following rule: in case a citizen does not choose a media outlet to which to allocate her voucher, then her voucher will be allocated as a function of the allocation of the other vouchers. We think this is the best allocation rule: it relies on the preferences expressed by the citizens and avoids any government intervention.

An alternative allocation rule, to favor the production of local news, would be to allocate these vouchers as a function of the allocation of the other vouchers but only among the local media outlets (in the spirit of the scheme described above).

## How can concentration be avoided?

A possible caveat of our scheme is that it could potentially lead to the allocation of the large majority of the media vouchers to a small number of media outlets, in particular to the best known outlets at the time of the scheme's implementation, while these outlets may not be the ones most in need of public funding, and while we want to favor competition. To avoid such hyperconcentration and guarantee pluralism, we introduce the following threshold: a given media outlet cannot receive more than 1 percent of the total number of media vouchers. In the US, which includes around 260 million adults, no media outlet would be allowed to receive more than 2,6 million vouchers (i.e., $130 million).

What will happen in the event of an "over-allocation", i.e., when more than 1 percent of the adult population decides to (simultaneously) allocate its media vouchers to the same outlet? Then, in this case, we follow the same rule as the one described above in the

---

[100] https://www.usnewsdeserts.com/reports/expanding-news-desert/

[101] https://www.inma.org/blogs/world-congress/post.cfm/trump-vs-new-york-times-the-executive-editor-s-perspective

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

case of non-allocation: the media vouchers are allocated as a function of the allocation of the other vouchers, but only among the media outlets that are below the 1 percent threshold. (Obviously, we can discuss the "optimal" threshold; 1 percent may be too high, and a 0.5 percent threshold may be seen as preferable. We may need a higher threshold especially for smaller countries.)

Note also that, as we highlighted above, we allow the citizens to split their vouchers; while the face value of one voucher is $50, if they wish to, they can split it into up to ten different $5 vouchers. This should stimulate pluralism, as well as buttress the scheme where at least half of the voucher has to be allocated to fund local media (see above).

### Will the vouchers make a difference?

Note that while we want to make sure that the vouchers won't be concentrated among a small number of successful outlets, we nonetheless also want to assure that the vouchers will be an efficient tool that will allow existing or new news outlets to produce high-quality information that citizens can consume.

The $50 media vouchers will guarantee that this is indeed the case. Take the "extreme" example of a large and successful newspaper, the *New York Times*. Given that a single media outlet cannot receive more than 1 percent of all the vouchers, the maximum amount that could be received by the newspaper is equal to $130 million. The typical *New York Times* reporter's annual salary is around $110K (which involves a full cost of around $130K for the newspaper). Hence $130 million corresponds to around 1,000 reporters, a number that has to be compared to the 1,450 journalists who work as of today for the newspaper. The $130 million figure also corresponds to less than a third of the total spending on wages and benefits of the company. Hence, even for a large, profitable media outlet such as the *New York Times*

($112.4 million in operating profits in 2018), the media vouchers could make a difference.

## Why do we advocate media vouchers?

We believe that media vouchers are the best scheme that could be implemented in the future to provide funding for the media. They present a number of important advantages compared to existing schemes. In this section, we will argue that they are better not only than the status quo, but also than other proposals that have been made to sustain journalism in the future.

### Media vouchers and the status quo

The status quo obviously varies from one country to the other. We have highlighted above the existing public subsidy schemes. These schemes are relatively important for existing print media in European countries such as the Nordic countries and France, while they are nearly nonexistent in the UK. The UK government nonetheless spends a great deal of public money to fund the BBC each year.

From a direct public funding point of view, the status quo in the US is almost the complete absence of funding. However, public money is invested indirectly in the media through tax deductions associated with philanthropy (see below). In the first part of this report, we have highlighted the gradual decimation of the business model that enabled many news outlets to produce investigative journalism for decades. If one believes—and we believe—that the journalism crisis raises growing threats to democratic values and institutions, then we need to confront the status quo. In a word, we need to find alternative resources for journalism.

One could argue that in this case, it will be enough in European countries that already subsidize their media to increase the existing amount of public funding (while preserving the existing schemes). We think that we can do better. The main advantage of our public funding (media vouchers) scheme over existing

38

Glenn Decl. Ex. 11
Page 41 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

ones is that it offers a solution to the threat usually—and sometimes quite rightly—associated with **public funding of news**: With media vouchers, dependence on public funding won't compromise the independence of the media. The state intervention will indeed be "neutral": all media outlets will be treated equally, without distinction as to content or opinion. In other words, there will be increased *public funding without application of government discretion*. This advantage results from the fact that in our model the media vouchers are allocated by citizens themselves. Hence we believe that in countries that today provide direct subsidies to their media outlets, it will be preferable in the future to use the same amount of money but allocate it through media vouchers.[102]

Some maintain that from this point of view **tax relief** does not compromise media independence. That is strictly right. But we think that vouchers are nonetheless preferable to tax relief for at least two reasons. First, tax relief disproportionately benefits large media and, depending on the tax relief scheme, large media that are profitable. Media vouchers, on the other hand, will help financially support not only large but also small media, from their emergence onward, and help ensure pluralism. Second, we believe that an additional advantage of vouchers is that they may help reconcile citizens with media. Media suffer from a lack of trust; part of the distrust comes from the fact that citizens doubt that media are independent, in particular because of their funding (either advertising revenues or ownership). Conversely, with media vouchers, citizens would be directly involved in media funding. They may obtain information on the ownership of each media outlet (given that

outlets will have to publish the detailed list of their owners—see above). They may decide to support the more independent outlets. This may help at least to partly reduce the **confidence crisis** and reconcile citizens with their media.

In the US, while there is a shortage of *direct* public funding of the media, we have observed in recent years a rapid increase in philanthropic funding. Hence some argue in favor of the status quo and defend a reform that would facilitate and give more incentives to **philanthropic funding of the media**. One way to do so could be to increase the magnitude of already existing tax deductions attached to philanthropic donations (which include donations to nonprofit media). We have already highlighted above the shortcomings of philanthropic media funding: philanthropists may be benevolent players in the news ecosystem, but they may also have their own agenda and limited interests.

Of course, we are not arguing against philanthropic funding. But rather than using even more public money to financially support wealthy individuals willing to finance the news ecosystem, we think it is preferable to spend additional public money to give to *all citizens*—rather than only the wealthiest—the resources to sustain financially the media outlets of their choice. The issue here is again the one of optimal allocation of resources. A handful of billionaires are no more legitimate than the state to allocate public resources to the media of their choice. To ensure pluralism and preserve media independence, we think it better to decentralize this allocation and leave it with all citizens through media vouchers.

---

[102] Our media voucher scheme could potentially be extended to the aid flows donors direct to the media sector abroad (around $454 million per year of official development assistance), and in particular in sub-Saharan Africa. While there are concerns regarding the way this support is allocated, an innovative scheme— which would reinforce media accountability with respect to citizens—would be to allocate these funds directly to the citizens in the form of vouchers, so that they could subscribe to or sustain the outlet(s) of their choice.

39

Glenn Decl. Ex. 11
Page 42 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

## Media vouchers and alternative funding models

Another alternative to reconcile citizens with media and to sustain the journalism industry—in particular in countries where information is not only underproduced but also underconsumed—would be for the government to **offer to each citizen a free subscription** to a media outlet.[103] Compared to that alternative, our media vouchers proposal has at least two advantages. On the one hand, privacy is preserved (given anonymity, there will be no public information on who allocates vouchers to which media). Second, many media outlets offer free content and do not rely on a subscription model. These outlets would be de facto excluded from the benefit of the subscription alternative, while they could benefit from the vouchers (and we think they should).

Obviously, one possibility could be to combine the voucher model with the free subscription one; hence, we could decide that when a citizen allocates her vouchers to a media outlet, if the outlet's content is behind a paywall online or is a print medium to which one needs to subscribe, then she will automatically obtain a free subscription to this media. We think it would be interesting to also consider this dual model.

Note also that we believe that the proposals made recently (e.g., in the Cairncross Review), as well the current philanthropic support of news, have been focused too much on "**innovation**." We believe that even traditional journalism needs to be funded; the focus should be more on quality news, and less on the technical means used to deliver it.

We also believe that there is no reason to focus exclusively on large investigations that require a great deal of resources. Obviously, we need such investigations but, in particular at the local level, there is also a shortage of day-to-day journalism with deeply locally involved journalists, who sit through most often "boring" government meetings.

We want to emphasize this need for day-to-day journalism. Local journalism is of particular importance in fighting corruption at the local level. Absent local journalism, important events such as council meetings and court hearings are not covered. At the local level, journalists are the only democratic watchdogs—while at the national level there are many more whistleblowers and social media are used as a way to propagate information. Furthermore, local journalism matters not only with respect to politics, but also daily life activities and quality of life more broadly. Historically, local reporters have been the one in charge to publish on the front page a plan to close a local swimming pool, a school or a library. Finally, more local news is also associated with higher voter turnout at local elections.

Large prizes for investigative journalism can be an efficient mechanism to incentivize the production of the specific kind of journalism that democracy needs. They can be complementary to our proposal of increased public funding—but they are not enough. Media outlets are not suffering as of today from a lack of incentives to get a Pulitzer prize; they are suffering from a lack of resources to do journalism, and we observe journalists who at the time of receiving their Pulitzer are working as PR consultants, either because they have been laid off or because journalism's level of pay has driven them out of their job.

---

[103] For example, in 2009, the French government gave teenagers a year's free newspaper subscription on their 18th birthday. This experience was considered a success; however, it has not been renewed.

40

Glenn Decl. Ex. 11
Page 43 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

**Box 8: Investigative Journalism and Prizes**

Relying solely on large prizes to promote investigative journalism creates the risk of creating a superstar media industry, where a few media firms with ample resources hog the limelight. Investigative journalism today has already become like a superstar industry: Until the start of 21st century, local newspapers were the regular winners of the Pulitzer Prize for Investigative Reporting. Since the 2000s (with the dawn of the the Internet age), the Pulitzers have been dominated by superstar newspapers like the *New York Times*. In other words, large prize based incentives cannot be a cure for one of the key aspects of the media crisis: death of local investigative journalism.



Note finally that the $50 voucher level advocated here is not meant to be the only possible level. One could think of higher or lower levels. This is an issue that requires extensive deliberation and experimentation and that we do not plan to settle here.

For the sake of comparison, the licence fee that is used to finance the BBC in the UK is currently equal to £155 per citizen/year. In France, the corresponding *redevance audiovisuelle* amount is €139. In Germany, the public TV licence fee is €210 per year (€17.5 per month).

However, as highlighted above, the main issue with European-style public media funding is that public subsides may open the door for manipulating journalists and inducing pro-government media bias. This threat to editorial independence may explain why the US has been reluctant in recent decades to publicly fund the media. Our proposal opens a new path to supporting the media from the US Treasury without government discretion.

*Lessons from the Seattle voucher experience*

As noted above, the inspiration for the media vouchers proposal comes from both the "vouchers for equal democracy" proposed by Cagé (2018) and the "democracy vouchers" implemented in Seattle for local elections. Hence, it is of interest to draw the lessons from the Seattle experience.

In January 2017, the city of Seattle implemented a "democracy vouchers" system to fund the local elections. In January 2018, all registered voters were mailed an envelope containing four $25 democracy vouchers that they could donate to local political candidates of their choice. These vouchers were taxpayer-funded. To benefit from these vouchers, candidates had to agree to certain limits (with the maximum contribution to candidates set to $500; the initial goal of the vouchers was to get big money out of politics).

Even if hard to evaluate scientifically, this experience is considered overall as a success. First, six candidates benefited from the vouchers and 46,000 vouchers (corresponding to around $1.1 million) were allocated. Second, the candidates who benefited from the vouchers were generally successful at ballot box. Finally, the vouchers shifted the donor pool in an egalitarian direction relative to the

41

Glenn Decl. Ex. 11
Page 44 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

pool of cash donors.[104] In particular, Brian J. McCabe and co-authors documented an increase in involvement by underrepresented groups. This increase is of particular importance for us here. Indeed, the objective of our media vouchers is not only to bring necessary resources to the media, but also to rebuild confidence between citizens and media, and to incentivize people to consume more information. This is particularly important for those who tend not to consume much information.

The limits of media vouchers

Of course, media vouchers alone are not going to solve the journalism crisis entirely. In particular, while they bring a solution on the production side, they would have little *direct* impact on the consumption side. In other words, while media vouchers will lead to the production of more high-quality information, we cannot ensure that it will be consumed. Nonetheless, the voucher allocation may lead to an increase in news consumption. Having to choose on an annual basis which media outlets they want to allocate their media vouchers to may indeed raise citizens' interest in news. The vouchers may also help reconcile citizens with media.

Should we be worried that citizens will "misallocate" their vouchers, in the sense that they may decide to allocate them to media outlets that produce relatively more entertainment and relatively less information, or to media outlets that are biased toward a political party? In other words, can we be sure that the media vouchers system will only support the quality media a social planner would like to support? We cannot know ex ante what will be the result of the allocation—and this is why it could make sense to pilot the

voucher system in a small number of states to begin with. But we think it is essential to have such a *decentralized* allocation, with no government discretion, for two reasons: First, we do not think that the government will do better than citizens at allocating media vouchers, and will likely do worse. Second, we think that this decentralized allocation will be at least as good as what the market alone would do. Note that if the citizens most interested in news are also the ones who most likely to allocate their vouchers, then the decentralized media voucher allocation would most probably lead to more funding of high-quality information than today's market outcome.

Subsidizing inputs versus outputs

Production of journalistic content involves resources—talent and capital—representing fixed costs that must be incurred to generate news of value. Like many informational goods, the benefits and costs of this endeavor can be aligned in two broad ways. First, additional incentives can be created to compensate journalists upon the production of news content. Second, subsidies can be provided to compensate for the costs of producing that content.

In terms of approaches each has tradeoffs. Rewarding journalists based on some measure of the value of news output has the advantage of creating relatively high-powered incentives to actually produce news output with the ascribed value. By contrast, subsidizing journalists' costs risks insufficient effort being directed at providing news content.

The flip side of this tradeoff is a practical matter—one of measurement. How do you measure the value of news content produced in order for it to represent a clear

---

[104] See in particular McCabe (2017) and McCabe & Heerwig (2018).

42

Glenn Decl. Ex. 11
Page 45 of 66

CHICAGO BOOTH █ Stigler Center
for the Study of the Economy and the State

reward to journalists? At present, that is done by attracting and monetizing attention. However, as noted already, the rewards from this are likely to be insufficient for certain types of content with high public value but low mass market appeal. By contrast, while costs pose their own measurement challenges, costs vary across journalistic endeavors in relatively known ways—salaries of journalists, travel, etc.—and certainly by less than the variation in the value of news output. Thus, a relatively simple subsidy can stimulate activity.

For these reasons, we have posited a mechanism that is primarily based on subsidizing inputs rather than directly rewarding outputs. That said, there is an indirect mechanism in our approach. Citizens will be loath to provide subsidizes to news outlets that are not producing news content. In other words, while there are static concerns that subsidies may be ill spent, the dynamic consequences should mitigate those concerns. This is the very same balance that we strike when subsidizing other information public goods such as basic scientific knowledge.

# REGULATION OF MEDIA CONCENTRATION

## Citizen Welfare Standard

Concentration in the media sector creates standard problems associated with a lack of competition in economic markets. These problems include, among other potential harms, lower quality products and higher prices for consumers. Given the two-sided nature of media markets, high levels of concentration in the media sector might also create inefficiencies in the advertising market, with advertising prices set too low. Increasing competition makes prices for consumers fall and product quality increase. These changes lead to increases in standard measures of consumer welfare.

The subcommittee argues that these standard measures of consumer welfare miss key additional benefits of competition in the media sector. These benefits are incorporated into citizen welfare, which recognizes the centrality of the media, and increasingly digital media, to the democratic process. Moreover, these benefits are not typically incorporated into existing regulatory practices.

## Concentration and Media Capture

A distinguishing feature of media is that they should provide citizens with the information needed to keep governments and other political and economic powers accountable. Of course, powerful individuals usually prefer not to be held accountable and may use threats, promises, and other tactics to induce private media outlets to distort and suppress information. This phenomenon of media capture has been documented in a number of contexts and countries.[105] It often involves an informal understanding between owners of private media outlets and public officials: media outlets will produce news coverage that is favorable to the government, and the government will reciprocate with a policy that is favorable to media outlets. Media capture is not limited to political news: Commercial interests, too, can try to distort financial reporting to their advantage via advertising and other means. Once in a while, the mechanisms behind media capture are revealed to the public, as in the case of the Leveson Inquiry in the UK or the secret recording of the conversation between Benyamin Netanyahu and Arnon Mozes in Israel.

How can media capture be prevented? The kind of informal understanding between media owners and public officials described

---

[105] Schiffrin (2017).

43

Glenn Decl. Ex. 11
Page 46 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

above is more difficult to achieve if it requires securing the assent of a large number of owners, especially because a news source that maintains appropriate distance from the state and powerful business actors might gain an audience by being trusted to speak truth to power.[106] Keeping a low level of concentration in the media industry is thus likely to be an effective defense against media capture. These benefits of competition are captured in citizen welfare.

## Inadequacy of Existing Regulation to Prevent Concentration in News Provision

Media concentration is usually achieved through serial acquisitions. Rupert Murdoch's media empire in the US, UK, and other countries is a case in point. The natural remedy is regulation against excessive concentration. However, there is a growing consensus that current regulation is inadequate to achieve this goal, especially in the context of digital platforms.[107] This point is recognized by economists, regulatory authorities, and law scholars.

The current debate on the risk posed by digital platforms sometimes seems to imply that before the Internet era the world was in a golden age of free, pluralistic and independent media. However, almost every democracy in the world had high levels of concentration for television, newspapers and radio during the 1990s. Ownership was typically in the hands of either a state-owned entity under the direct control of the government or a small number of private companies, often owned by government-friendly oligarchs.[108] The most notable exception to this situation was arguably the United States in the second part of the 20th century, when the news industry displayed low

levels of concentration and was mainly perceived to be non-captured. As we shall see next, that was the product of a technological and regulatory environment that no longer exists.

The existing media merger regulatory regime contains two sets of rules, both of which are inadequate for different reasons. The first set of rules involves platform-specific restrictions on media ownership. Many countries, including the US, have prohibitions against excessive ownership within one particular medium, like terrestrial television. These rules were effective when the set of media platform was small and stable. But difficulties with this approach emerged when cable television was introduced, and then further intensified with the advent of the Internet. In a world where the number of media platforms is expanding and the distinctions between them are blurring, those rules look arbitrary and obsolete. Even worse, there is no obvious way of extending them to include all news-providing platforms.

The other source of regulation is standard competition policy. The problem is that this powerful principle-based set of rules is chiefly meant to protect consumer welfare, as described above. In particular, a merger between media companies is blocked if it is likely to lead to higher prices, lower quality, or some other direct harm to consumers. While this criterion is important and should continue to exist and be applied, it does not cover the indirect harm that a media merger can impose on citizens through an increase in the risk of media capture, as described above.

---

[106] Besley and Prat (2003).

[107] Polo (2005), Ofcom (2009), and Prat (2015).

[108] Djankov et al. (2003).

44

Glenn Decl. Ex. 11
Page 47 of 66



## Our Proposal: A Quantifiable Citizen Welfare Criterion for Reviewing Mergers between News Providers

This subcommittee believes that transactions that affect the level of media concentration should be evaluated according to a citizen welfare criterion, alongside the standard consumer welfare criterion. Namely the relevant authority (to be discussed below) should block mergers that significantly increase concentration in news provision, not because they would increase prices or improve product quality but because they impose an increased risk of media capture.

This assessment can in part be made on the basis of objective measures. Recently, both economic theory and regulatory practice have proposed a similar index of media concentration based on attention shares.

On the theory front, researchers like Prat (2018) have proposed a media power index, based on the idea of attention share. The attention share of a news source is first defined at the individual level as the percentage of time that the individual devoted to a media source divided by the total time the individual devotes to all sources. The overall attention share of a source is then defined as the average attention share that the source commands across all voters in the country.

On the regulatory front, in 2018 the UK's Competition and Markets Authority made a landmark decision.[109] The CMA blocked the proposed acquisition of Sky by 21st Century Fox because of a "media plurality consideration." Crucially, the hypothetical effect on plurality was assessed quantitatively. A key element of the assessment was the share of reference metric which is virtually identical to Prat's attention share definition. It showed that the proposed merger would have created a new entity with a larger attention share than of the existing commercial news providers.

The attention share approach has three advantages. First, it is platform-neutral. The unit over which concentration is measured is not a specific platform, but rather citizens' news processing bandwidth. This makes the index robust to the addition of new media or the blurring of borders between two existing media. Second, citizen welfare provides micro-foundations for the measure. In particular, Prat demonstrated that the attention share of a news source determines the upper bound on the ability of that source to influence the voting process through media capture: by putting a cap on attention shares, the regulatory authority can control the worst-case scenario for voters. Third, attention shares can be computed—or at least approximated—with existing data, as the CMA did in the UK and as Kennedy and Prat did for 36 countries.

The attention share approach can be applied to local media, too. Suppose two local news sources wish to merge, or perhaps two media conglomerates that both own a large number of media sources wish to merge, as in the proposed acquisition of Tronc by Sinclair. National-level concentration is obviously not the right measure. Attention shares must be computed in each of the local media markets that would be affected by the merger, with specific reference to local news.

Obviously, the attention share approach is no panacea. At least two important caveats apply. First, just like other concentration indices, such as the Herfindahl index, it should be the beginning, not the end. For instance, it could define thresholds above which the regulatory authority must initiate a plurality investigation.

Second, ownership fragmentation is not the only form of plurality. It is also important

---

[109] Competition and Markets Authority (2018).

45

Glenn Decl. Ex. 11
Page 48 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

that news providers represent the diversity of views and interests in the population. For that goal, however, the right tool is increased public funding, which is discussed in the previous section.

---

**Box 9: Which Regulator Should Enforce Media Plurality?**

Which agency should be given the authority to block media mergers on the basis of plurality considerations? The two natural candidates are the default antitrust authority and the media regulator. The advantages of the latter option are that a media regulator could acquire specialized knowledge in this area and that it would not impose an additional task on the antitrust authority. The potential drawback is that, because of revolving-door practices, industry regulators are often more prone to capture than the antitrust regulator. Joint responsibility between the two agencies is also a reasonable option. In the UK case, the analysis was carried out by Ofcom and the final decision was made by the CMA.

---

# INCREASING THE TRANSPARENCY OF DIGITAL PLATFORMS

Today's Internet has brought with it a fragmentation of where people get their news. There is no longer a single or small set of outlets that command consumer attention. Instead, consumers divide their attention across outlets. This has been facilitated by social media, which aggregate news from a variety of sources. The benefit of that is that there is potential for a greater diversity of outlets and also, potentially, a diversity of where news can come from. The cost is a lack of transparency. To see this, consider individual news items aggregated by social media. While some broad source for those news items is given, because consumers may be one-off or, at best, highly

intermittent consumers of the media outlet, the source of those news items is not readily apparent or top of mind for consumers. It is not easy to evaluate bias in the news or the reputation of the journalists who generated it. As a consequence, the reputation mechanisms that might ensure that high-accuracy news is screened from low-accuracy news break down, with the adverse consequences outlined above.

Moreover, there is even less transparency with respect to editorial content. As mentioned earlier, the choice of editors in terms of what to prioritize was very transparent when news outlets had a single product. Today, those choices are hidden within algorithmically optimized personalization used by social media for that purpose. Thus, if there are biases in the presentation of news or omissions of certain types of news content, it is not readily amenable to investigation. To be sure, personalization has many other benefits, but one of the costs is a loss in transparency whereby the choices made by editors or algorithms can be laid bare for scrutiny. This further exacerbates the impact of information asymmetries in the news.

---

**Box 10: Economics of News Quality**

News dissemination invariably involves someone other than the news consumer evaluating evidence and facts and filtering those to provide the essence of the news to consumers who have limited time and attention to delve deeper into the subject. Hence, news providers know more about how the news was filtered and how well the facts support the summarized contentions than do consumers of the news.

An efficient news market would allow the consumer to take the story at face value, but, even in inefficient markets, if there are other voices in the market, those voices can conduct their own investigations and check for distortions. So long as those

---

CHICAGO **BOOTH** | Stigler Center
for the Study of the Economy and the State

voices are active, the distortions can be brought to light. This has the initial effect of reducing the 'harm' that the distorted news story itself might generate. However, it also has a longer-term effect of reducing the reputation of the news outlet that produced distorted news. This causes fewer consumers to rely on it as a source of news. In other words, outlets have an incentive to develop a reputation for quality, but this incentive only operates if multiple voices and interests can check for deviations from that quality and bring them to light.

In performing its functions as a check on power and authority—whether public or private—the reliability and trustworthiness of the news are critical. However, since the digitization of news content, it has become harder to determine the sources of particular news items or why they might be given priority by certain outlets. Prior to digitization, most news came from outlets that offered a single product to large numbers of consumers. While particular news sources might be hard to identify, the responsibility for the publication lay with the outlet, and, hence, the outlet could be the bearer of a reputation for accuracy. The issue in the reputation mechanism working was whether exit (that is, consumers leaving outlets with a reputation for lower accuracy) served to discipline all outlets for higher accuracy. In other words, the challenge was having enough outlets to provide competitive discipline for each of them. Moreover, ownership and other aspects of bias could be identified and examined. Finally, the editorial decisions as to what news received priority were transparent because the same product was received by all consumers.

## Our Proposal: Transparency Requirements and Voluntary Labeling

### Transparency Requirements

We propose two broad mechanisms that can be used to reduce the crisis in transparency we see today—transparency requirements that provide longer-term information on editorial credibility and other factors, particularly in terms of algorithmic editorial choices, and voluntary labeling that provides underlying information on news sources and carries information on trustworthiness.

There should be transparency around platform editorial decisions. Recall that because consumer attention is scarce, editorial decisions about prioritizing information can direct attention in ways that effectively set the news agenda for the individual. To deal with this issue we propose mandatory transparency about aggregate news targeting, audience reach, ownership, and sponsorship so that individuals, researchers, and civil society groups can understand the forces shaping the news agenda. Covered entities would include existing dedicated news outlets of a certain size, as well as the largest social media sites such as Facebook and Twitter and the largest aggregators such as Google and Apple. The goal here is not to regulate those decisions but to provide visibility into them so that consumers and others can understand editorial decisions and policy—potentially impacting the choice of where they obtain their news information.

The outputs of this transparency would be threefold:

1.      The production of periodical reports on aggregate news distribution and consumption on the Internet and how it is influenced by the changing design of the algorithms that control the news feed. For example: anonymized data on the reach of media content and data explaining those information flows.

CHICAGO **BOOTH** | Stigler Center
for the Study of the Economy and the State

2.      Alerting the public to patterns of news and information consumption (typically of a viral nature) that amplify disinformation, hatred, incitement, or seek to harm democratic processes and institutions.

3.      Making certain kinds of internal reports and analyses that platforms have on news consumption available to regulatory agencies and legislators.

To minimize the natural tendency of any media regulator to be captured by platforms, we propose that in addition to the periodic real-time reports, all data obtained by the regulators, its internal decisions and its interactions with the platforms should also be available to the public after a three-year delay.

---

**Box 11: Possible Transparency Tools**

1.  A public feed, with minimal algorithmic optimization.

2.  A private dashboard to users so they can summarily see the nature of their feed (including the content they see, and the content they don't see).

3.  An API to let users customize their own news feed based on their preferences and knowledge about algorithmic priorities.

4.  A public dashboard visible to the public so they can summarily see the nature of a feed in a given location or globally (like Twitter Trends, but with less editorialization).

5.  A more granular dashboard visible to a regulator so it can see how the algorithm customizes a news feed for different clusters/groups of users.

---

## Labeling

The information asymmetries that pervade news dissemination resemble others consumers face in evaluating product quality. News is a "post-experience" good whose quality often

cannot be assessed until after it has been experienced as true, prescient, enlightening, or not. Labeling of a news source—that is, who has produced it and what entity owns or funds it—is a strategy to reduce post-experience costs. It allows consumers to evaluate the news product before consuming it. Newspaper bylines and mastheads, as well as broadcast ownership reports, all served the function of signaling to consumers the quality of the news source they were getting. Digital intermediation has made these signals fainter, and new digitally native sources often have no labels at all. For instance, it is often difficult for consumers to rate the energy consumption of household appliances. For this reason, governments and nonprofits around the world have developed certification processes whereby manufacturers can have their products tested and a certified label affixed. This gives consumers the confidence to purchase products based on more information.

For the news, it would not be possible to certify the accuracy of individual news items. However, as the goal is to ensure that consumers have the information necessary to evaluate the news, what could be certified is the source of the news and whether the providers meet certain standards. To be sure, what we are proposing here is not government licensing of news outlets. Indeed, the quality certification could be conducted entirely privately. To give consumers confidence to purchase or consume news products with more understanding of the source of the news, we propose a voluntary labeling scheme administered by an independent news monitor. This will allow consumers to quickly obtain information about the interests of the provider (including ownership and conflicts) as well as provide a way to affix market-based reputations to different news sources.

News outlets that choose to can submit ownership and sponsorship information to the independent news monitor to run the labeling mark. When examining any individual news

48

Glenn Decl. Ex. 11
Page 51 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

item, what consumers will see is whether the source of that item has submitted the information. Not having a label does not affect publication of news or even representation of content as news on the Internet. So, it is not a free speech impediment, and it is fully voluntary. For news outlets that wish to exhibit independence so as to provide confidence in the accuracy of their reporting, labeling will be valuable. Some outlets will not want such certification. Consumers will decide how much weight they place on this factor in news consumption. The broad goal is to give consumers, who need to rely on news for debates and decisions, a fighting chance at understanding the interests of those providing the information. This label, of course, could cover other forms of information, including declared interests in advertising and other revenue. However, we do not take a particular position on the complexity of the labeling scheme here.

The government or a standard-setting body might have to help provide a technical standard by which labeling could be associated with news items published on the Internet. This is a technical challenge, but it is one that has been solved previously on the Internet with respect to e-commerce. In summary, we propose establishment of an independent news monitor that can provide trusted information on news sources at the point of publication for any news item.

# INCREASING ACCOUNTABILITY OF DIGITAL PLATFORMS

Section 230 of the Communications Decency Act provides digital platforms with immunity from certain legal claims arising from the content on their networks. This immunity has proven to be an enormous effective subsidy for these intermediaries not enjoyed by legacy media entities like broadcasters, newspapers, or digital native journalistic enterprises that have to contend with more legal exposure. As a libertarian enactment, Section 230 has made the Internet a place of unbridled speech. This should not be confused with freedom from censorship or gatekeeping. As described above, the platforms make many design and content choices to amplify and circulate certain kinds of content and not others. Moreover, the free-for-all that Section 230 nominally creates has the effect of silencing some voices because of harassment, bullying, and other discourse harms.

Jurisdictions outside the US have adopted versions of Section 230, but none provides as much protection.[110] In Europe, platforms have borne more liability and responsibility for removing illegal content. Under the European E-Commerce Directive, for example, intermediaries are exempt from liability for content they host so long as they "play a neutral, merely technical and passive role towards the hosted content." Once they become aware that any hosted content is illegal, the intermediaries "need to remove it or disable access to it expeditiously."[111]     Germany enacted the NetzDG law in 2018, enabling courts to fine social media companies with more than 2 million users up to €50 million if they do not delete posts contravening German hate speech law within 24 hours of receiving a complaint or seven days in more ambiguous cases. There are a number of EU and member state proposals to hold platforms responsible not only for illegal content but also for harmful

---

[110] https://wilmap.law.stanford.edu/map

[111] Directive 2000/31/EC of the European Parliament and of the Council of 8 June 2000 on certain legal aspects

of information society services, in particular electronic commerce, in the Internal Market ('Directive on electronic commerce').

49

Glenn Decl. Ex. 11
Page 52 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

content and to impose a "duty of care" for managing content in the public's interest.[112]

In the US, public upset over platform amplification of harmful content, the failure to filter out harmful and illegal (child pornography, terrorist) content, political disagreements over content salience, and platform usurpation of legacy media advertising revenue has led to calls to reduce the protections of Section 230 and cognate intermediary liability immunities. There seems to be confusion about what exactly Section 230 does and, correspondingly, mistaken views about what limiting the immunity might achieve in terms of platform design. Section 230 has indeed been a windfall for platforms, allowing them to grow at the expense of legacy media. However, the provision is **not** directly responsible for most of the content that today reduces the salience of fact-based journalism and increases various kinds of noise. It is possible that reducing the scope of protection of Section 230 could incentivize platforms to boost exposure to credible news sources while depressing circulation of, or deplatforming entirely, disinformation that might trigger liability. There would be free speech costs (overmoderation) associated with such a move. For this reason, we propose below to preserve Section 230 protections, but to convert it to a safe harbor subsidy available on condition of compliance with various public interest requirements drawn from media and telecommunications policy traditions.

## Section 230 Background

Section 230 was enacted as part of the Telecommunications Act of 1996 to govern "Internet service providers." The ISP to the

ordinary publisher in 1996 was something like the scooter to automobiles today: a useful invention, but one hardly on the verge of dominance. Tarleton Gillespie writes: "At the time Section 230 was crafted, few social media platforms existed. US lawmakers were regulating a web largely populated by ISPs and web 'publishers'—amateurs posting personal pages, companies designing stand-alone websites, and online communities having discussions."[113] Although sometimes viewed as a sweeping libertarian intervention, Section 230 actually began life as a smut-busting provision: an amendment for the "Protection for Private Blocking and Screening of Offensive Material."[114] Its purpose was to allow and encourage Internet service providers to create safe spaces, free of pornography, for children.[115,116]

The goals at the time of adoption were (1) to give new "interactive computer services" breathing room to develop without lawsuits "to promote the continued development of the Internet,"[117] while (2) also encouraging them to filter out harmful content without fear of getting into trouble for under- or overfiltering. Thus Section 230 is both a shield to protect speech and innovation and sword to attack speech abuses on platforms.

The shield part is embodied in Section 230(c)(1): "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." This is not blanket immunity for the distribution of content, and indeed platforms are still liable for their *own* content, and for federal crimes and copyright violations related to third-party content. The immunity is really

---

[112] See, e.g., UK Secretary of State for Digital, Culture, Media & Sport, Online Harms White Paper (April 2019).

[113] Gillespie (2018).

[114] H.R. REP. No. 104-223, Amendment No. 2-3 (1995) (proposed to be codified at 47 USC. § 230).

[115] S. REP. No. 104-23, at 59.

[116] Pub. L. No. 104-104; see H. Conf. Rep. No. 104-458 (1996).

[117] 47 USC. § 230(b)(1).

50

Glenn Decl. Ex. 11
Page 53 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

limited to the speech-related harms that publishers ordinarily face such as defamation and intentional infliction of emotional distress. In other words, a platform like Facebook remains liable for distributing child pornography, which is federal criminal content. It also remains liable for Facebook-authored defamatory content. Facebook cannot, however, be held secondarily liable for defamatory content posted by its users.[118]

The sword part of Section 230 is contained in Section 230(c)(2)(A): "No provider or user of an interactive computer service shall be held liable on account of— any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers being obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." This was designed to avoid the paradoxical situation in which an intermediary tries to moderate its platform to reduce harmful content, but then is subject to liability because it has exercised editorial control.

Section 230 is sometimes characterized as a "get out of jail free card" for platforms. According to Chesney and Citron, "Section 230 has evolved into a kind of super-immunity that, among other things, prevents the civil liability system from incentivizing the best-positioned entities to take action against the most harmful content."[119] To be sure, courts have extended immunity in situations that

almost certainly go beyond what Congress originally intended. For example, platforms have been excused from transmitting otherwise illegal content even when they have solicited and have clear knowledge of that content. Moreover, platforms that do not function as publishers or distributors (e.g., Airbnb) have also invoked Section 230 to relieve them of liability that has nothing to do with free speech.

## Proposals to Amend Section 230

There are currently proposals to revise Section 230, weakening the protections it affords to platforms. One possibility is to insist on more sword—more care to block or deemphasize harmful speech.[120] There are also proposals to weaken the shield and expose platform intermediaries to more liability.[121] Senator Mark Warner has floated a relatively narrow proposal to make platforms liable for state-law torts (defamation, false light, public disclosure of private facts), for failure to take down a deep fake or other manipulated audio/video content after the victim had already secured a judgment against the creator of the offending content.[122] There have been attempts in the past, including from US state Attorneys General, to carve out other exceptions for the enforcement of state law.[123] These have foundered on concerns about the incentives this would create for platforms to block too much speech, including speech of importance to journalists like the

---

[118] *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997).

[119] Chesney & Citron (forthcoming 2019).

[120] One possibility would be to adopt in the US what has already been adopted in Europe, which is a notice-and-takedown regime that requires platforms to remove content upon notice.

[121] See, e.g., Keats Citron & Wittes (2017) (arguing for the conditioning of the benefits of Section 230(c)(1) on reasonable precautions: "No provider or user of an interactive computer service that takes reasonable steps to address unlawful uses of its services shall be treated

as the publisher or speaker of any information provided by another information content provider in any action arising out of the publication of content provided by that information content provider.") The first weakening of Section 230 has already occurred with the Allow States and Victims to Fight Online Sex Trafficking Act (FOSTA), H.R. 1865, 115th Cong. (2018).

[122] https://www.techdirt.com/articles/20180731/10183940336/senator-mark-warner-lays-out-ideas-regulating-Internet-platforms.shtml

[123] https://www.eff.org/files/cda-ag-letter.pdf

51

Glenn Decl. Ex. 11
Page 54 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

distribution of gun permits, which some states prohibit publishing.[124]

Proposals to weaken Section 230 certainly entail risks to free speech. If platforms are liable for the content they transmit, they will likely behave in risk-averse ways to remove content that creates or has the potential to create legal exposure.[125] This could silence speakers and have a disproportionate impact on marginal voices or, in some countries, political dissidents or minority groups. In the copyright context, where the Digital Millennium Copyright Act makes platforms potentially liable for copyright violations, they respond overzealously to take-down requests and implement aggressive filtering technologies that block more content than necessary. Early efforts to increase liability for harmful speech may be headed in the same direction. In Germany, the platforms' transparency reports show that they are blocking content in response to the NetzDG law, although there is not yet evidence of overblocking.[126]

In weighing the costs of any Section 230 contraction against the benefits, it is necessary to identify what those benefits are. Section 230 sceptics may exaggerate these benefits in connection with the speech that, while harmful, is not already circumscribed by law (unlike, say, defamation or incitement). This is because Section 230 is not directly related to some of the most problematic

discourse harms such as disinformation, outrage, hate speech, radicalization, bullying, and intimidation. To take just one example, Facebook's erstwhile program that allowed advertisers to target users based on phrases like "how to burn Jews" and "Jew hater" did not benefit from Section 230 immunity, and so would not likely be affected by its absence. The same is true for most of the algorithmic amplification discussed above. The UK Online Harms White Paper has recognized that removal or substantial weakening of platform immunity (in that case, the EU E-Commerce Directive immunity, which is less generous than that which Section 230 provides) is a disproportionate response, unlikely to create the right incentives, and very likely to harm free speech.

The focus of this report is the platforms' impact on the production, distribution, and consumption of responsible journalism. Does Section 230 increase the amplification of "noise" (e.g., disinformation and outrage) that crowds out and starves good journalism? It is not clear. As a doctrinal matter, this noise is not illegal. Therefore, because Section 230 does not relieve platforms of otherwise applicable liability, it should not, in theory, increase platform tolerance for noise. On the other hand, the availability of Section 230 to excuse other kinds of speech traffic for which there would be a liability, such as

---

[124]   https://www.eff.org/deeplinks/2013/07/state-ags-threaten-gut-cda-230-speech-protections.

[125] See, e.g., Kumar Katyal (2001) ("Because an ISP derives little utility from providing access to a risky subscriber, a legal regime that places liability on an ISP for the acts of its subscribers will quickly lead the ISP to purge risky ones from its system"); and *Zeran v. America Online*, 129 F.3d 327, 333 (4th Cir. 1997) ("Because service providers would be subject to liability only for the publication of information, and not for its removal, they would have a natural incentive simply to remove messages upon [accusation], whether the contents were defamatory or not").

[126]   https://publications.parliament.uk/pa/cm201719/cmselect/cmsctech/822/82208.htm#footnote-077 (Facebook in the first half of 2018 reported "'886 NetzDG reports identifying a total of 1,704 pieces of content', with '218 NetzDG reports' resulting in the deletion or blocking of content. This, Facebook noted, 'amounted to a total of 362 deleted or blocked pieces of content'…Twitter's transparency report, covering the same period, indicated that they received a total of 264,818 complaints of which 'action' was taken on 28,645. … Google, meanwhile, received reports relating to 214,827 'items' on YouTube … of which 56,297 resulted in action, either the item being removed or blocked.").

52

Glenn Decl. Ex. 11
Page 55 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

incitement or defamation, may create a more permissive and careless platform design than would otherwise exist. It is possible that if Section 230 benefits were less generous, platforms would implement safer design features that would also—as a byproduct—amplify truthful or otherwise "beneficial" information. The plan by the UK government to impose a risk-based "duty of care" on platforms seeks to improve the speech environment overall by increasing accountability for certain classes of speech.[127]

## Our Proposal: Section 230 as a Quid Pro Quo Benefit

For reasons having to do with risk reduction and harm prevention, legislators may well amend Section 230 to raise the standard of care that platforms take and increase exposure to tort and criminal liability. Since our focus is on improving the conditions for the production, distribution and consumption of responsible journalism, we have a different kind of proposal. We look at Section 230 as a speech subsidy that ought to be conditioned on public interest requirements, at least for the largest intermediaries who benefit most and need it least. It is a speech subsidy not altogether

different from the provision of spectrum licenses to broadcasters or rights of way to cable providers or orbital slots to satellite operators.[128]

The public and news producers pay for this subsidy. The public foregoes legal recourse against platforms and otherwise sustains the costs of harmful speech. News producers bear the risk of actionable speech, while at the same time losing advertising revenue to the platforms freed of that risk. Media entities have to spend significant resources to avoid legal exposure, including by instituting fact-checking and editing procedures and by defending against lawsuits. These lawsuits can be fatal, as in the case of Gawker Media.[129] More commonly, they face the threat of "death by ten thousand duck-bites" of lawsuits even if those suits are ultimately meritless.[130] The monetary value of Section 230 to platforms is substantial, if unquantifiable.[131]

Section 230 subsidies for the largest intermediaries should be conditioned on the fulfilment of public interest obligations.[132] We address transparency and data sharing requirements in this report that should apply generally to the companies within scope. However, there may be additional requirements

---

[127] The new regime's covered "online harms" include terrorist content, child sexual exploitation and abuse, incitement of violence, harassment and cyberstalking, hate crime, encouraging or assisting suicide, the sale of illegal goods or services, revenge pornography, cyberbullying, and children accessing inappropriate material.

[128] Cleland (2018) estimates that the net benefit to Google, Facebook and Amazon from Section 230 was $510 billion in "riskless disruptive innovation per immunity from civil liability." To this, he adds $755 billion in "socialized costs of platforms' uneconomic riskless disruptions," although this category reaches far beyond direct effects of Section 230 (e.g., addiction, polarization, election manipulation, devaluation of intellectual property, privacy harms). Of note, he also estimates the benefit of "exemption from all FCC economic and public interest regulation" to be $31

billion (e.g., public safety, privacy, children and consumer protection, content requirements).

[129] *Bollea v. Gawker Media*, 913 F.Supp.2d 1325 (2012).

[130] *Fair Hous. Council of San Fernando Valley v. Roommates.Com*, LLC, 521 F.3d 1157, 1174 (9th Cir. 2008).

[131] The difference between the early dismissal of a lawsuit under Section 230 versus later dismissal in the absence of Section 230 protection has been estimated to be worth $485,000 each. https://static1.squarespace.com/static/571681753c44d835a440c8b5/t/5c6c5649e2c483b67d5182 93/1550603849958/Section+230+cost+study.pdf

[132] The size of the intermediary covered should be internationally harmonized to correspond with definitions in the new UK duty of care and European Copyright Directive.

53

Glenn Decl. Ex. 11
Page 56 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

that a regulator would not want to, or could not, impose across the board. For example, the UK has proposed to require platform companies to ensure that their algorithms do not skew towards extreme and unreliable material to boost user engagement. We would not recommend such a regulation, but it might be appropriate to condition Section 230 immunity on such a commitment for the largest intermediaries.

We believe that Section 230 immunity for the largest intermediaries should be premised on requirements that are well-developed in media and telecoms law:
-   Transparency obligations: Whichever of these requirements did not become part of a mandatory regulatory regime could be made a condition of Section 230 immunity. Platforms should give a regulator and/or the public data on what content is being promoted to whom, data on the process and policies of content moderation, and data on advertising practices. These obligations would go some way towards replicating what already exists in the off-platform media environment by virtue of custom and law. Newspaper mastheads, voluntary codes of standards and practices, use of ombudsmen, standardized circulation metrics, and publicly traceable versioning all provide some level of transparency that platforms lack. For broadcasters, there are reporting and public file requirements especially with respect to political advertising and children's programming.

-   Subsidy obligations: Platforms should be required to pay a certain percentage of gross revenue to support the voucher system discussed in this chapter. In the US, telecoms providers have been required to pay into a Universal Service fund in order to advance public interest goals of connectivity. Public

media has not been funded by commercial broadcasters. However, there was once a serious proposal at the advent of digital broadcast television for commercial broadcasters to "pay or play"—that is, to allow them to serve the public interest by subsidizing others to create programming in lieu of doing it themselves.[133]  The nexus between the Section 230 benefit and the journalism subsidy is essentially this: Section 230 unavoidably allows many discourse harms and "noise" in the information environment. A subsidy for more quality "signal" goes some distance towards compensating for these harms. It is important to stress that any tax that would be levied on the platforms has to go to the general budget and not be tied in any way to the voucher scheme proposed here—to prevent a situation whereby news outlets have an incentive to lobby directly or indirectly through their editorial agenda to protect the power and revenues of the platforms.

# Conclusion

Media is central to the democratic process because it provides the information citizens need to make voting decisions and keep government and powerful players in the public and private sector accountable. This report summarizes the evidence on the effect that the growth of digital platforms is having on news provision and reviews possible policy interventions.

The available evidence highlights a number of points:
-   The role of digital media in the democratic process cannot be understood in isolation, as voters, citizens and readers obtain

---

[133]   Advisory Committee on the Public Interest Obligations of Digital Television Broadcasters (1996). See also Sunstein (1999, p. 40) ("What if a broadcaster was willing to give $10 million to PBS in return for every

minute, or every thirty seconds, of relief from a public interest responsibility?").

54

Glenn Decl. Ex. 11
Page 57 of 66



their political information from both old and new platforms.

- There is ample evidence from a variety of historical and geographical contexts that news quality affects voting outcomes and accountability of decisions makers in both the private and public sphere. In turn, news quality—both coverage and impartiality—worsens when the media industry is concentrated and not independent.

- News is a public good. In the 20th century this good was mostly paid for by advertisers. The most direct effect of the rise of the digital economy has been a crisis of that revenue model. Advertising dollars have inexorably shifted from news producers—mostly newspapers—to digital platforms that do not produce news. This effect is particularly strong for local news. Some subscription-based news providers are thriving, but most citizens are not willing to pay for them.

- There is also more nuanced evidence for a reduction in citizens' information and engagement and the echo chamber effect. Evidence on the effect of "fake news" is instead very limited. When we analyze policy interventions, we focus on countries where freedom of expression enjoys strong constitutional protection, and we do not consider generalized content regulation policies. We group possible policy interventions into four categories:

- Revenue model. We consider the pros and cons of a number of possible revenue sources: advertising, subscription, philanthropy, and public funding. The most cost-effective and robust solution is a publicly funded voucher system. The funds are allocated directly by the citizens—independently of any government intervention. A cap is placed on the amount that a particular news organization can receive to promote competition.

- Media plurality. All mergers and acquisitions involving news companies should be subject to a news plurality review in addition to the standard antitrust review. Standard competition policy protects direct consumer welfare, and therefore does not take into account the indirect effect that excessive media concentration can cause on citizen welfare. We propose an approach to quantifying news plurality that is neutral to the identity of the owner of the merging entities and to the platform on which news content is delivered. The proposed approach, based on attention shares, has been used in a recent merger decision in the UK.

- Algorithm regulation. Developing a new regulatory system that will ensure transparency regarding information flows from news sources, practices and algorithms to the public. This will be done by a new regulatory framework and oversight body to set standards for the disclosure of information and news sources, to develop a means for source-based reputational mechanisms and to bring light to biases and choices in editorial decisions and algorithms for the presentation of the news. These regulators will produce periodical reports on news consumption and the algorithms' design influence on the distribution of news and the behavior of users. The digital regulator will set terms and conditions that will allow publishers and original content creators to negotiate with the digital platforms.

- Liability exemption. Digital platforms enjoy a hidden subsidy worth billions of dollars by being exempted from any liability to most of the speech on their platforms (Section 230). We do not propose to repeal Section 230 but rather propose that platforms that would like to enjoy this protection would have to agree to take measures to prioritize content by criteria other than maximization of revenues.

The existence of vibrant independent journalism is an essential part of liberal democracy. Powerful actors in government,

55

Glenn Decl. Ex. 11
Page 58 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

politics and the private sector have always tried to capture, weaken or manipulate the press. As the business model of news media outlets has disintegrated and the production and distribution of news has become more concentrated, there is a growing risk that in many democracies and localities politicians and powerful private actors will not be held accountable for their actions.

Technology will reduce the costs of collecting and analyzing information, but journalists will continue to play the central role in informing the public and holding the powerful to account.

The aim of this report is to offer policy recommendations to preserve independent journalism—not to find ways to aid or subsidize existing news outlets. While other reports and initiatives try to find ways to preserve the news media's revenues from advertising, we believe that this approach is mistaken. Any policy to preserve the free press should try to reduce or eliminate the news media's reliance on politicians, governments,

advertisers, large business groups or billionaires.

Our recommendations represent a significant shift from the status quo. We believe that increased public funding of news media through a competitive process that caps the amount which can be allocated to a single news outlet will create a more competitive and independent news ecosystem.

The success of a handful of large national publications or small niche publications in reaching adequate profitability through the subscription model is encouraging. Nonetheless, for the most part citizens are not willing to pay for this public good—meaning we need to rethink the economic model of the news media.

Recent events across the Western world have demonstrated the fragility of the liberal democratic order, and we believe that waiting longer to see if market forces alone can maintain the free press in the 21st century may be a risky choice.

56

Glenn Decl. Ex. 11
Page 59 of 66



# References

Amazeen, Michelle A. & Ashley R. Muddiman (2018). "Saving media or trading on trust? The effects of native advertising on audience perceptions of legacy and online news publishers." *Digital journalism* 6, no. 2 (2018): 176-195.

Anderson, Simon P. (2012). "Advertising on the Internet." In The Oxford Handbook of the Digital Economy, edited by Martin Peitz and Joel Waldfogel. http://www.oxfordhandbooks.com/view/10.1093/oxfordhb/9780195397840.001.0001/oxfordhb-9780195397840-e-14.

Angelucci, Charles, Julia Cagé, and Michael Sinkinson (2017). "Media Competition and News Diets." CEPR Discussion Paper #12198.

Arrow, K.J. (1962). Economic Welfare and the Allocation of Resources for Invention. In The Rate and Direction of Inventive Activity: Economic and Social Factors (pp. 609-626). Princeton University Press.

Athey, Susan and Mark Mobius (2012). "The Impact of News Aggregators on Internet News Consumption: The Case of Localization".

Athey, Susan, Emilio Calvano, and Joshua Gans (2018). "The Impact of the Internet on Advertising Markets for News Media." Management Science. https://doi.org/10.3386/w19419.

Bakshy, Eytan, Messing, Solomon, & Lada A. Adamic (2015). Exposure to Ideologically Diverse News and Opinion on Facebook, 348 Science 1130.

Beattie, Graham, Ruben Durante, Brian Knight, and Ananya Sen (2017). Advertising Spending and Media Bias: Evidence from News Coverage of Car Safety Recalls. No. w23940. National Bureau of Economic Research.

Beckett, C. (2018). 'Facebook's newsfeed changes: a disaster or an opportunity for news publishers?', London School of Economics Blog, January 20.

Bell, Emily (2016). "Facebook Is Eating the World."

Bell, E.J., Owen, T., Brown, P.D., Hauka, C. & Rashidian, N. (2017). The platform press: How Silicon Valley reengineered journalism, Tow Center for Digital Journalism, Columbia University., https://www.cjr.org/tow_center_reports/platform-press-how-silicon-valley-reengineered-journalism.php/

Benson, Rodney. 2016. "Are Foundations the Solution to the American Journalistic Crisis?"

Benson, R. and Powers, M., 2011. Public media and political independence. Lessons for the Future of Journalism from Around the World. New York: New York University.

Bergström, Annika & Maria Jervelycke Belfrage (2018). News in Social Media, Digital Journalism, 6:5, 583-598, DOI: 10.1080/21670811.2018.1423625

Birnbauer, Bill (2018). The Rise of Nonprofit Investigative Journalism in the United States. Routledge Research in Journalism. Routledge. https://books.google.fr/books?id=PkDjugEACAAJ.

57

Glenn Decl. Ex. 11
Page 60 of 66



Besley, T. J., & Prat, A. (2003). Pension fund governance and the choice between defined benefit and defined contribution plans.

Bollinger, L. C. (2010). Uninhibited, Robust, and Wide-Open. A Free Press for a New Century. Oxford University Press.

Cagé, Julia (2015). Sauver Les Médias: Capitalisme, Financement Participatif et Démocratie. La République Des Idées. Seuil (English version: Saving the Media. Capitalism, Crowdfunding and Democracy, Harvard University Press, 2016). https://books.google.fr/books?id=Qm4PrgEACAAJ.

Cagé, Julia (2017). "Media Competition, Information Provision and Political Participation: Evidence from French Local Newspapers and Elections, 1944-2014."

Cagé, Julia (2018). Le Prix de La Démocratie. Fayard (English version: The Price of Democracy, Harvard University Press, forthcoming).

Cagé, Julia, and Béatrice Mazoyer (2019). "News Breaker or Audience Raider? The Ambivalent Relationship between Twitter and News Media."

Cagé, Julia, Nicolas Hervé, and Marie-Luce Viaud (2017). "The Production of Information in an Online World: Is Copy Right?"

Cairncross, F. (2019). "The Cairncross Review: A sustainable future for journalism." https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/779882/021919_DCMS_Cairncross_Review_.pdf

Calzada, Joan, and Ricard Gil (2016). "What Do News Aggregators Do? Evidence from Google News in Spain and Germany."

Campante, Filipe, Ruben Durante, and Francesco Sobbrio (2017). "Politics 2.0: The multifaceted effect of broadband Internet on political participation." Journal of the European Economic Association 16.4: 1094-1136.

Caplan, R. & Boyd (2018), 'Isomorphism through algorithms: Institutional dependencies in the case of Facebook', Big Data & Society, 14 February.

Carlson, M. (2018). Automating judgment? Algorithmic judgment, news knowledge, and journalistic professionalism. New Media and Society, 20(5), 1755-1772. https://doi.org/10.1177/1461444817706684

Chen, Adrian (2017). The Human Toll of Protecting the Internet from the Worst of Humanity, New Yorker (Jan. 28), http://www.newyorker.com/tech/elements/the-human-toll-of-protecting-the-Internet-from-the-worst-of-humanity [http://perma.cc/AAK8-ZHEV].

Chen, Yuyu and David Yang (2019). The Impact of Media Censorship: 1984 or Brave New World?, forthcoming, American Economic Review.

Chesney, Bobby & Danielle Citron (forthcoming). Deep Fakes: A Looming Challenge for Privacy, Democracy, and National Security, 39.

Cleland, Scott (2018). The Unfair and Deceptive Online-Offline Playing Field of Divergent US Competition and Consumer Protection Policy, Submission for US FTC Fall 2018 Hearings on "Competition and Consumer Protection in the 21st Century" Topic #2: "Competition

Glenn Decl. Ex. 11
Page 61 of 66



and Consumer Protection in Communication, Information, and Media Technology Networks" FTC Project # P181201 (August 7).

Competition and Markets Authority (2018). Anticipated acquisition by 21st Century Fox, Inc of Sky Plc. (July).

Competitions and Markets Authority (2018). 21st Century Fox / Sky Merger Inquiry: Final Report. June. Downloaded from www.gov.uk/cma-cases on 3/4/2019.

Cornia, Alessio, Annika Sehl, Felix Simon, and Rasmus Kleis Nielsen (2017). "Pay Models in European News." Reuters Institute for the Study of Journalism, University of Oxford. http://www. digitalnewsreport. org/publications/2017/pay-models-european-news

DeVito, Michael A. (2017) From Editors to Algorithms. Digital Journalism 5:6, 753-773

Di Tella, R., & Franceschelli, I. (2011). Government advertising and media coverage of corruption scandals. American Economic Journal: Applied Economics, 3(4), 119-51.

Djankov, S., McLiesh, C., Nenova, T., and A. Shleifer (2003). Who owns the media? *The Journal of Law and Economics*.

Drago, Francesco, Tommaso Nannicini, and Francesco Sobbrio (2014). "Meet the Press: How Voters and Politicians Respond to Newspaper Entry and Exit." American Economic Journal: Applied Economics 6 (3): 159–88. https://ideas.repec.org/a/aea/aejapp/v6y2014i3p159-88.html.

European Audiovisual Observatory (2017). "The EU Online Advertising Market – Update 2017."

Falck, Oliver, Robert Gold, and Stephan Heblich (2014). "E-Lections: Voting Behavior and the Internet." American Economic Review 104 (7): 2238–65. https://doi.org/10.1257/aer.104.7.2238.

Flanagin, A. J. & M. J. Metzger (2007). The role of site features, user attributes, and information verification behaviors on the perceived credibility of web-based information. *New media & society*, 9(2), 319-342

Fletcher, Richard & Rasmus Kleis Nielsen (2017). Are News Audiences Increasingly Fragmented? A Cross-National Comparative Analysis of Cross-Platform News Audience Fragmentation and Duplication, 67 J. COMM. 476

Gans, J. S., & Stern, S. (2010). Is there a market for ideas? Industrial and Corporate Change, 19(3), 805-837.

Gao, Pengjie, Chang Lee, and Dermot Murphy (2018). "Financing Dies in Darkness? The Impact of Newspaper Closures on Public Finance."

Gavazza, Alessandro, Mattia Nardotto, and Tommaso Valletti (2018). "Internet and Politics: Evidence from U.K. Local Elections and Local Government Policies." The Review of Economic Studies. https://doi.org/10.1093/restud/rdy028.

Gentzkow, Matthew (2006). "Television and Voter Turnout." Quarterly Journal of Economics 121 (3): 931–72.

Gentzkow, Matthew, Edward Glaeser, and Claudia Goldin (2006). "The Rise of the Fourth Estate: How Newspapers Became Informative and Why It Mattered." In Corruption and Reform: Lessons from America's Economic History. National Bureau of Economic Research.

Glenn Decl. Ex. 11
Page 62 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

Gentzkow, Matthew, and Jesse M Shapiro (2008). "Competition and Truth in the Market for News." Journal of Economic Perspectives 22 (2): 133–54. http://ideas.repec.org/a/aea/jecper/v22y2008i2p133-154.html.

Gentzkow, Matthew, Jesse M Shapiro, and Michael Sinkinson (2011). "The Effect of Newspaper Entry and Exit on Electoral Politics." American Economic Review 101 (7): 2980–3018.

George, L. M., & Waldfogel, J. (2006). The New York Times and the market for local newspapers. *American Economic Review*, *96*(1), 435-447.

Ghosh, Dipayan & Ben Scott (2018). #DIGITALDECEIT: The Technologies Behind Precision Propaganda on the Internet (Jan.) at 5, https://www.newamerica.org/public-interest-technology/policy-papers/digitaldeceit/.

Gillespie, Tarleton (2018). Platforms Are Not Intermediaries, 2 Geo. L. Tech. Rev. 198, 201

Greer, J.D. (2003). "Evaluating the credibility of online information: A test of source and advertising influence." *Mass Communication and Society* 6, no. 1: 11-28

Grimmelmann, James (2018). The Platform Is the Message, 2 Geo. L. Tech. Rev. 217, 227

Guess, Andrew, Nyhan, Brendan, & Jason Reifler, Selective Exposure to Misinformation: Evidence from the consumption of fake news during the 2016 US presidential campaign, Jan. 19, 2018 http://www.dartmouth.edu/~nyhan/fake-news-2016.pdf.

Hamilton, James T. (2004). All the News That's Fit to Shell: How the Market Transforms Information Into News. Princeton University Press. http://books.google.fr/books?id=2ofpb0nid6UC.

Hamilton, James T. 2016. Democracy's Detectives: The Economics of Investigative Journalism. Harvard University Press. https://books.google.fr/books?id=oOCZDAEACAAJ.

Keats Citron, Danielle & Benjamin Wittes (2017). The Internet Will Not Break: Fixing Section 230 Immunity for Bad Samaritans, 86 FORDHAM L. REV. 401.

Kennedy, Patrick and Andrea Prat (forthcoming). "Where Do People Get Their News?" Economic Policy.

Klonick, Kate (2018). The New Governors: The People, Rules, and Processes Governing Online Speech, 131 Harv. L. Rev. 1598, 1637

Kumar Katyal, Neal (2001) Criminal Law in Cyberspace, 149 U. PA. L. REV. 1003, 1007–08.

Lessig, L. (2015). Republic, Lost. The Corruption of Equality and the Steps to End It. Grand Central Publishing.

Levin, S. (2017). Facebook told advertisers it can identify teens feeling'insecure'and'worthless'. The Guardian.

Livio, Oren & Cohen, J. (2018). 'Fool me once, shame on you': Direct personal experience and media trust. *Journalism*, *19*(5), 684-694.

Marwick, Alice and Rebecca Lewis (2017). "Media Manipulation and Disinformation Online," Data & Society, 42-43.

McCabe, Brian (2017). "High-Dollar Donors and Donor-Rich Neighborhoods: Representational Distortion in Financing a Municipal Election in Seattle," *Urban Affairs Review*, pp. 1-30.

60

Glenn Decl. Ex. 11
Page 63 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

McCabe, Brian J. and Jennifer A. Heerwig (2018). "Diversifying the Donor Pool: Did Seattle's Democracy Vouchers Program Reshape Participation in Municipal Campaign Finance?"

McChesney, R., & Nichols, J. (2010). The Death and Life of American Journalism: The Media Revolution that Will Begin the World Again. Nation Book.

McChesney, R. W., & Pickard, V. W. (2011). Will the Last Reporter Please Turn Out the Lights: The Collapse of Journalism and what Can be Done to Fix it. New Press.

Milhorance, Flávia & J. Singer (2018) "Media Trust and Use among Urban News Consumers in Brazil." *Ethical Space: the* International Journal of communication ethics 15, no. 3/4

Napoli, Philip & Robyn Caplan (2017). Why Media Companies Insist They're Not Media Companies, Why They're Wrong, and Why It Matters, 22 FIRST MONDAY, http://firstmonday.org/ojs/index.php/fm/article/view/7051/6124 [https://perma.cc/LC7N-8JX6]

Newton, Casey (2019). The Trauma Floor: The secret lives of Facebook moderators in America, The Verge (Feb. 25), https://www.theverge.com/2019/2/25/18229714/cognizant-facebook-content-moderator-interviews-trauma-working-conditions-arizona

Nolte (2019). "Fact Check: Media Blacklisters NewsGuard Promotes Fake News, Repeatedly Violates Own Standards". Breitbart (Jan. 24) https://www.breitbart.com/the-media/2019/01/24/fact-check-media-blacklisters-newsguard-promotes-fake-news-violates-standards/

Ofcom (2009). Second public service broadcasting review: Putting viewers first. Technical report.

Pariser, Eli (2011). The Filter Bubble: How the New Personalized Web Is Changing What We Read and How We Think. Penguin Publishing Group. https://books.google.fr/books?id=wcalrOI1YbQC.

Pasquale, Frank (2016). Platform Neutrality: Enhancing Freedom of Expression in Spheres of Private Power, 17 THEORETICAL INQUIRIES IN L. 487, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2779270 [https://perma.cc/9X5W-793A].

Pennycook, Gordon, and David G. Rand (2017). "Who falls for fake news? The roles of analytic thinking, motivated reasoning, political ideology and bullshit receptivity." SSRN *Electronic Journal*.

Petrova, M. (2011). Newspapers and parties: How advertising revenues created an independent press. American Political Science Review, 105(4), 790-808.

Pew Research Center (2014). "Journalism Partnerships. A New Era of Interest."

Pew Research Center (2016). "State of the News Media Report 2016."

Picone, Ike, Cédric Courtois, and Steve Paulussen (2015). "When News Is Everywhere." Journalism Practice 9 (1): 35–49. https://doi.org/10.1080/17512786.2014.928464.

Polo, Michele (2005). Regulation for pluralism in the media markets. The Economic Regulation of Broadcasting Markets: Evolving Technology and the Challenges for Policy.

Prat, Andrea (2015). Media capture and media power. In Anderson, S. P., Waldfogel, J., and Strömberg, D., editors, Handbook of Media Economics. Elsevier, North Holland.

61

Glenn Decl. Ex. 11
Page 64 of 66

CHICAGO BOOTH | Stigler Center
for the Study of the Economy and the State

Prat, Andrea (2018). "Media Power," Journal of Political Economy.

Prat, Andrea, and David Strömberg (2005). "Commercial television and voter information."

Prior, Markus (2007). Post-Broadcast Democracy: How Media Choice Increases Inequality in Political Involvement and Polarizes Elections. Cambridge Studies in Public Opinion and Political Psychology. Cambridge University Press. http://books.google.fr/books?id=o37mHuY7OWkC.

Raj, P., and G. Rolnik (2018). " Internet and the Business Model of Journalism". Working Paper.

Reich, R, C Cordelli, and L Bernholz (2016). Philanthropy in Democratic Societies: History, Institutions, Values. University of Chicago Press. https://books.google.fr/books?id=P8o4jgEACAAJ.

Reich, R. (2018). Just Giving: Why Philanthropy Is Failing Democracy and How It Can Do Better. Princeton University Press. https://books.google.fr/books?id=LT1hDwAAQBAJ.

Reuters Institute (2017). "Digital News Report 2017."

Reuters Institute (2018). "Digital News Report 2018."

Ricci, Francesco, Rokach, Lior & Bracha Shapira (2011). Recommender Systems: Introduction and Challenges at 11-12 in Ricci et al., Recommender Systems Handbook.

Roth, A. E. (2002). The economist as engineer: Game theory, experimentation, and computation as tools for design economics. Econometrica, 70(4), 1341-1378.

Rubado, M. E., & Jennings, J. T. (2019). Political Consequences of the Endangered Local Watchdog: Newspaper Decline and Mayoral Elections in the United States. *Urban Affairs Review*, 1078087419838058.

Schiffrin, Anya (ed.) (2017). In the Service of Power: Media Capture and the Threat to Democracy. CIMA.

Seamans, Robert, and Feng Zhu (2013). "Responses to entry in multi-sided markets: The impact of Craigslist on local newspapers." Management Science 60.2: 476-493.

Sen, Ananya, and Pinar Yildirim (2015). "Clicks and Editorial Decisions: How Does Popularity Shape Online News Coverage?"

Shao, Chengcheng, Luca Ciampaglia, Giovanni, Varol, Onur, Yang, Kaicheng, Flammini, Alessandro, and Filippo Menczer (2018). "The Spread of Low-Credibility Content by Social Bots," Nature Communications 9, no. 1 (November 20,): 4787, https://doi.org/10.1038/s41467-018-06930-7

Snyder, James M, and David Stromberg (2010). "Press Coverage and Political Accountability." Journal of Political Economy 118 (2): 355–408.

Stromberg, David (2004). "Radio's Impact on Public Spending." Quarterly Journal of Economics 119 (1).

Sundar, S. Shyam, Sunetra Narayan, Rafael Obregon, and Charu Uppal. (1998). "Does web advertising work? Memory for print vs. online media." *Journalism & Mass Communication Quarterly* 75, no. 4: 822-835

62

Glenn Decl. Ex. 11
Page 65 of 66



Sunstein, Cass (1999). Private Broadcasters and the Public Interest: Notes Toward a 'Third Way', University of Chicago Law School, Olin Law and Economics Program, Discussion Paper No. 65

Sunstein, Cass (2008). "The Architecture of Serendipity." The Harvard Crimson. (Jun. 4) https://www.thecrimson.com/article/2008/6/4/the-architecture-of-serendipity-this-years/.

Sunstein, Cass R. & Adrian Vermeule (2009). Conspiracy Theories: Causes and Cures, 17 J. POL. PHIL. 202.

Trussler, M., & Soroka, S. (2014). Consumer demand for cynical and negative news frames. The International Journal of Press/Politics, 19(3), 360-379.

Tufekci, Zeynep (2018). It's the (Democracy-Poisoning) Golden Age of Free Speech, WIRED (Jan. 16), https://www.wired.com/story/free-speech-issue-tech-turmoil-new-censorship/ [https://perma.cc/7QH4-SFQN].

Turcotte, Jason, C. York, J. Irving, R. M. Scholl, & R. J. Pingree (2015). News recommendations from social media opinion leaders: Effects on media trust and information seeking. *Journal of Computer-Mediated Communication*, *20*(5), 520-535.

Westphal, David (2018). "Journalism's New Patrons: Newspapers deepen embrace of philanthropy". Columbia Journalism Review.

Wilding, D., Fray, P., Molitorisz, S. & McKewon, E. (2018), "The Impact of Digital Platforms on News and Journalistic Content," The Centre for Media Transition 52, https://www.accc.gov.au/system/files/ACCC%20commissioned%20report%20-%20The%20impact%20of%20digital%20platforms%20on%20news%20and%20journalistic%20content%2C%20Centre%20for%20Media%20Transition%20%282%29.pdf

Wu, Tim (2016). *The Attention Merchants*. New York: Vintage Books.

Yuan, Elaine (2011). "News Consumption Across Multiple Media Platforms." Information, Communication & Society 14 (7): 998–1016. https://doi.org/10.1080/1369118X.2010.549235.

Zingales, Luigi (2016). "Are Newspapers Captured by Banks? Evidence From Italy." ProMarket.

Zingales, Luigi, & Guy Rolnik (unpublished). "The Role of Media in Information Age." Working Paper.

Zittrain, Jonathan (2014). Response, Engineering an Election: Digital Gerrymandering Poses a Threat to Democracy, 127 HARV. L. REV. F. 335

# EXHIBIT 12

5/30/22, 10:51 AM                                    Facebook Accused of Breaking Antitrust Laws - The New York Times

The New York Times        https://www.nytimes.com/2020/12/09/technology/facebook-antitrust-monopoly.html

# U.S. and States Say Facebook Illegally Crushed Competition

Regulators are accusing the company of buying up rising rivals to cement its dominance over social media.

 

**By Cecilia Kang and Mike Isaac**

Published Dec. 9, 2020    Updated July 28, 2021

WASHINGTON — The Federal Trade Commission and more than 40 states accused Facebook on Wednesday of buying up its rivals to illegally squash competition, and they called for the deals to be unwound, escalating regulators' battle against the biggest tech companies in a way that could remake the social media industry.

Federal and state regulators of both parties, who have investigated the company for over 18 months, said in separate lawsuits that Facebook's purchases, especially Instagram for $1 billion in 2012 and WhatsApp for $19 billion two years later, eliminated competition that could have one day challenged the company's dominance.

Since those deals, Instagram and WhatsApp have skyrocketed in popularity, giving Facebook control over three of the world's most popular social media and messaging apps. The applications have helped catapult Facebook from a company started in a college dorm room 16 years ago to an internet powerhouse valued at more than $800 billion.

The lawsuits, filed in the U.S. District Court for the District of Columbia, underscore the growing bipartisan and international tsunami against Big Tech. Lawmakers and regulators have zeroed in on the grip that Facebook, Google, Amazon and Apple maintain on commerce, electronics, social networking, search and online advertising, remaking the nation's economy.

President Trump has argued repeatedly that the tech giants have too much power and influence, and allies of President-elect Joseph R. Biden Jr. make similar complaints. The federal case against Facebook is widely expected to continue under Mr. Biden's administration.

The investigations already led to a lawsuit against Google, brought by the Justice Department two months ago, that accuses the search giant of illegally protecting a monopoly. Prosecutors in that case, though, stopped short of demanding that Google break off any parts of its business. At least one more suit against Google, by both Republican and Democratic officials, is expected by the end of the year. In Europe, regulators are proposing tougher laws against the industry and have issued billions of dollars in penalties for the violation of competition laws.

Facebook, the prosecutors said Wednesday, should break off Instagram and WhatsApp, and they said new restrictions should apply to the company on future deals. Those are some of the most severe penalties regulators can demand. Facebook said it planned to vigorously defend itself against the accusations.

"For nearly a decade, Facebook has used its dominance and monopoly power to crush smaller rivals and snuff out competition, all at the expense of everyday users," said Attorney General Letitia James of New York, a Democrat who led the multistate investigation into the company in parallel with the federal agency, which is overseen by a Republican.



Joe Simons, chairman of the Federal Trade Commission, which has been investigating Facebook since last year.    Anna Moneymaker/The New York Times

The lawsuits against Facebook will set off a long legal battle. The company has long denied any illegal anticompetitive behavior and has a deep well of money to put toward its defense. Few major antitrust cases have centered on mergers approved years earlier. The F.T.C. did not block Facebook's deals for Instagram and WhatsApp during the Obama administration.

If the prosecutors succeed, the cases could remake the company, which has experienced only unfettered growth. Mark Zuckerberg, Facebook's chief executive, has described a breakup of the company as an "existential" threat. The company's stock fell 2 percent, to $277.70 a share, after the lawsuits were announced.

The case is also being widely watched as a gauge for future mergers within the technology industry, which have continued to boom during the pandemic. Last month, Facebook said it was buying Kustomer, a customer relationship management start-up, for close to $1 billion.

Facebook said the regulators had ignored important history.

"The most important fact in this case, which the commission does not mention in its 53-page complaint, is that it cleared these acquisitions years ago," Jennifer Newstead, Facebook's general counsel, said in a statement. "The government now wants a do-over, sending a chilling warning to American business that no sale is ever final."

The company has also argued in the past that the market for social media remained competitive. Executives have pointed to the skyrocketing growth of TikTok, the Chinese short-video sharing app, and new growth in Parler, a social media firm popular among conservatives, as evidence that Facebook doesn't have a lock on social networking.

The suit against Facebook shows how important the company has become for how Americans connect to one another. Its namesake product swelled to hundreds of millions of users in just a few short years. But by 2011, the landscape began to change as mobile phones came equipped with capable cameras, and posting photos to social networks grew increasingly popular.

That led to the rise of a competitive threat to Facebook: Instagram. The photo-sharing site, founded in 2010, saw early explosive growth as a company that was native to the smartphone, perfectly timed for mass adoption as waves of consumers gravitated away from desktop devices and toward the mobile computers in their pockets.

The F.T.C. said it found that Mr. Zuckerberg "recognized Instagram as a vibrant and innovative personal social network and an existential threat to Facebook's monopoly power."

Glenn Decl. Ex. 12
Page 2 of 3

But instead of continuing to compete with its own photo-sharing project, Facebook chose to buy its rival. The company repeated the practice with WhatsApp, which was a viable competitor to its own messaging system.

The agency also claims that Facebook maintained its dominance by threatening to cut off third-party software developers from plugging into the social network if they made competing products.

"Our aim," said Ian Conner, who oversees antitrust enforcement at the agency, "is to roll back Facebook's anticompetitive conduct and restore competition so that innovation and free competition can thrive."

The lawsuits set off a chorus of bipartisan support on Capitol Hill.

"Facebook has crushed competition by breaking the law," Representative Ken Buck, a Republican of Colorado and member of the House judiciary committee, wrote on Twitter. "Big Tech's reckoning has just begun."

Representative David Cicilline, a Rhode Island Democrat who led an investigation into the big tech companies, said: "Facebook has broken the law. It must be broken up."

He added, "This marks a major step in our ongoing work to bring the tech industry's monopoly moment to an end."

Federal regulators began looking into Amazon, Apple, Facebook and Google in June 2019, in a sweeping effort to find anticompetitive practices among the tech platforms. States started to investigate not long after.

Cases around Google and Facebook, two companies with clear dominance in their markets of search, social media and online advertising, took shape faster than those against the other companies. Google had been the subject of a search antitrust investigation that closed at the F.T.C. in 2013 without a lawsuit but created a trove of information. Facebook's case quickly coalesced around its prior mergers, which regulators were able to investigate because of its past investigations into those acquisitions, some people close to the investigations said.

The F.T.C. was split on its decision to pursue the lawsuit, with its chairman, Joseph Simons, a Republican appointed by Mr. Trump, and the two Democratic commissioners joined in their vote. The two remaining Republican commissioners voted against the lawsuit.

The state suit was signed by attorneys general from 46 states and the District of Columbia and Guam. Georgia, South Dakota, Alabama and South Carolina did not join the case.

There is a history of states going after large tech companies. In the landmark antitrust suit against Microsoft two decades ago, state attorneys general played a crucial role in pushing the case through years of litigation.

Several Facebook rivals, including Snap, came forward to present evidence of what they said was anticompetitive behavior. Mr. Zuckerberg was interviewed for the federal investigation, and prosecutors collected many of his communications to Facebook employees, investors and the leaders of the rivals he bought and tried to buy.

In a hearing before the House judiciary committee last July, Mr. Zuckerberg was confronted with emails from around the time of the acquisition of Instagram and WhatsApp that showed the Facebook founder saw the companies as competition and potentially a threat. Mr. Zuckerberg said that the acquisitions have not reduced competition and that the emails were taken out of context.

The agency and states said the purchases ended up giving Facebook data on users that fed into its business of behavioral advertising, buttressing its monopoly.

"Facebook has coupled its acquisition strategy with exclusionary tactics that snuffed out competitive threats," the states said in their suit, "and sent the message to technology firms that, in the words of one participant, if you stepped into Facebook's turf or resisted pressure to sell, Zuckerberg would go into 'destroy mode,' subjecting your business to the 'wrath of Mark.'"

Cecilia Kang reported from Washington, and Mike Isaac from San Francisco.

Glenn Decl. Ex. 12
Page 3 of 3

# EXHIBIT 13

6/7/22, 3:19 PM                              Nancy Pelosi warns tech companies that Section 230 is 'in jeopardy' | TechCrunch



Join
TechCrunch+                    Login

Search ⌕

TC Sessions: Climate
Startups
TechCrunch+
Audio
Newsletters
Startup Battlefield
Advertise
Events
More

In a new interview with Recode, House Speaker Nancy Pelosi made some notable commen
the most important law underpinning the modern internet as we know it.

Section 230 of the 1996 Communications Decency Act is as short as it is potent — and it's w
states "No provider or user of an interactive computer service shall be treated as the publish
information provided by another information content provider."

When asked about Section 230, Pelosi referred to the law as a "gift" to tech companies that
law to grow their business. That provision, providing tech platforms legal cover for content cr
allowed services like Facebook, YouTube and many others to swell into the massive compar

---

**Sponsored Content**

**Alpha JWC Ventures Growth Story: Getting from Zero To (Not Yet) A Hero**



Sponsored by **Alpha JWC Ventures**

---

Pelosi continued:

> It is a gift to them and I don't think that they are treating it with the respect that they should, and so I thi
> question mark and in jeopardy… I do think that for the privilege of 230, there has to be a bigger sense
> is not out of the question that that could be removed.

Expect to hear a lot more about Section 230. In recent months, a handful of Republicans in C
the law. Section 230 is what's between the lines in Devin Nunes' recent lawsuit accusing crit

Glenn Decl. Ex. 13
Page 1 of 11

Twitter. It's also the extremely consequential subtext beneath conservative criticism that Twit do not run "neutral" platforms.

While the idea of stripping away Section 230 is by no means synonymous with broader effor the nuclear option. And when tech's most massive companies behave badly, it's a reminder very existences hinge on 26 words that Congress giveth and Congress can taketh away.

Whatever the political motivations, imperiling Section 230 is a fearsome cudgel against even untouchable companies. While it's not clear what some potentially misguided lawmakers wo dismantling the law, Pelosi's comments are a reminder that tech's biggest companies and us lose.

Join
TechCrunch+                    Login

Search Q

TC Sessions: Climate
Startups
TechCrunch+
Audio
Newsletters
Startup Battlefield
Advertise
Events
More

## The consequences of indecency



I wrote the law that allows sites to be unfettered free speech marketplaces. I wrote that sa
Communications Decency Act, to provide vital protections to sites that didn't want to hos
The goal was to protect the unique ability of the internet to be the proverbial marketplac
sites could reflect the ethics of society as a whole.

 TechCrunch

---

**More TechCrunch**



**Here's everything Apple just announced at the WWDC 2022 keynote**



**Upwork co-founder launch that builds fences**



**In iOS 16, apps can trigger real-world actions hands-free**



**How the US Consumer Fin Bureau is set to shake up**

---

## Conversation  1 Comment

Welcome to TechCrunch comments! Please keep conversations courteous and on-topic. See our community guidelines for more information.

🔔 Log in

Glenn Decl. Ex. 13
Page 2 of 11

6/7/22, 3:19 PM                              Nancy Pelosi warns tech companies that Section 230 is 'in jeopardy' | TechCrunch

What do you think?

Sort by **Best** ⌄

Craig Reynolds · 3y ago                                                                    ...

That "marketplace of ideas" has provided the foundation to build clubhouses of hate.

Reply  👍  👎

Powered by ⚙ OpenWeb                                                            Feedback

**Sponsored Content**



**Alpha JWC Ventures Growth Story: Getting from Zero To (Not Yet) A Hero**

Sponsored by Alpha JWC Ventures

Join
TechCrunch+                                    Login

Search ⌕

TC Sessions: Climate
Startups
TechCrunch+
Audio
Newsletters
Startup Battlefield
Advertise
Events
More

Glenn Decl. Ex. 13
Page 3 of 11

Nancy Pelosi warns tech companies that Section 230 is 'in jeopardy' | TechCrunch

**Sponsored Content**



**Alpha JWC Ventures Growth Story: Getting from Zero To (Not Yet) A Hero**

Sponsored by Alpha JWC Ventures

**Join TechCrunch+**        Login

Search Q

TC Sessions: Climate
Startups
TechCrunch+
Audio
Newsletters
Startup Battlefield
Advertise
Events
More

**Sign up for Newsletters**

See all newsletters

☐ Daily

☐

Glenn Decl. Ex. 13
Page 4 of 11

6/7/22, 3:19 PM                         Nancy Pelosi warns tech companies that Section 230 is 'in jeopardy' | TechCrunch



☐ Week in Review

☐ Startups Weekly

☐ Event Updates                                                            **Join**          Login

☐ Advertising Updates                                                      **TechCrunch+**

☐ TechCrunch+ Announcements

☐ TechCrunch+ Events                                                       Search 🔍

☐ TechCrunch+ Roundup

                                                                           TC Sessions: Climate
                                                                           Startups
Email *                                                                     TechCrunch+
                                                                           Audio
                                                                           Newsletters
┌──────────┬──────────┬──────────┬──────────┐
│    f     │    🐦    │    in    │    ✉     │                             Startup Battlefield
└──────────┴──────────┴──────────┴──────────┘                             Advertise
                                                                           Events
**Tags**                                                                   More

Congress    Facebook    nancy pelosi    Section 230    Section 230 of the Communications Decency A...

---

### In iOS 16, apps can trigger real-world actions hands-free

**Sarah Perez**

1:41 PM CDT • June 7, 2022

---

### Arduino sets its sights on enterprise applications with new funding round

**Brian Heater**

1:34 PM CDT • June 7, 2022

---

### Apple chooses Joy (Cons)

**Amanda Silberling**

1:14 PM CDT • June 7, 2022

---

### Instagram now lets you pin up to three posts to your profile

**Aisha Malik**

12:33 PM CDT • June 7, 2022

Glenn Decl. Ex. 13
Page 5 of 11

6/7/22, 3:19 PM                    Nancy Pelosi warns tech companies that Section 230 is 'in jeopardy' | TechCrunch



Join
TechCrunch+              Login

Search ⌕

TC Sessions: Climate
Startups
TechCrunch+
Audio
Newsletters
Startup Battlefield
Advertise
Events
More

**TechCrunch✛**
### It's correction time for Latin American VC activity
**Alex Wilhelm, Anna Heim**
12:30 PM CDT • June 7, 2022

### macOS will soon block unknown USB-C accessories by default
**Zack Whittaker**
12:05 PM CDT • June 7, 2022

### Apple's iOS 16 will fix annoying 'Tapback' spam
**Sarah Perez**
11:58 AM CDT • June 7, 2022

**TC Sessions: Robotics 2022** Jul 21
Join the leaders of the robotics movement online



**Featured Article**
### Why Primetime Partners is betting on the "ageless" population
**Catherine Shu**

Glenn Decl. Ex. 13
Page 6 of 11

6/7/22, 3:19 PM                        Nancy Pelosi warns tech companies that Section 230 is 'in jeopardy' | TechCrunch

11:55 AM CDT • June 7, 2022

## Sign up for Newsletters

Join TechCrunch+          Login

Search ⌕

TC Sessions: Climate
Startups
TechCrunch+
Audio
Newsletters
Startup Battlefield
Advertise
Events
More

See all newsletters

☐ Daily
☐ Week in Review
☐ Startups Weekly
☐ Event Updates
☐ Advertising Updates
☐ TechCrunch+ Announcements
☐ TechCrunch+ Events
☐ TechCrunch+ Roundup

Email *                              Subscribe

## Review: Sonos Ray soundbar is an easy upgrade that will leave you wanting more

Devin Coldewey

11:40 AM CDT • June 7, 2022

## Where we'll be next

**TechCrunch Live**

Jun 8

Learn More

Be a Sponsor

**TechCrunch Live
Breakthrough
and Natel Energy**

Jun 8

Learn More

Be a Sponsor

**TC Sessions: Robotics 2022**

## US Secretary of Labor Marty Walsh will discuss the changing face of work at TC Sessions: Robotics 2022

Lauren Simonds

11:30 AM CDT • June 7, 2022

Glenn Decl. Ex. 13
Page 7 of 11

## Apple loosens some of its App Store Review Guidelines with latest update

Sarah Perez

11:10 AM CDT • June 7, 2022



Join
TechCrunch+        Login

Search Q

TC Sessions: Climate
Startups
TechCrunch+
Audio
Newsletters
Startup Battlefield
Advertise
Events
More

## Peloton hires Amazon Web Services executive Liz Coddington as new CFO in latest shakeup

Aisha Malik

11:03 AM CDT • June 7, 2022



## Game studio HiDef partners with Snap to develop a Bitmoji dance social mobile game

Lauren Forristal

10:42 AM CDT • June 7, 2022



## Volocopter's longer-range drone taxi completes its first test flights

Jon Fingas

10:39 AM CDT • June 7, 2022



**Featured Article**

## PayPal is finally allowing users to move their cryptocurrency to other

Mary Ann Azevedo

10:36 AM CDT • June 7, 2022

**TC Sessions: Climate 2022**

## Check out the roundtables at TC Sessions: Climate 2022

Lauren Simonds

10:30 AM CDT • June 7, 2022

Glenn Decl. Ex. 13
Page 8 of 11

6/7/22, 3:19 PM                    Nancy Pelosi warns tech companies that Section 230 is 'in jeopardy' | TechCrunch



**Join TechCrunch+**          Login

**TechCrunch's Annual Summer Party 2022**

## Grab your ticket now and join over 40 VC firms at TechCrunch's Annual Summer Party

Lauren Simonds
10:24 AM CDT • June 7, 2022

Search 🔍

TC Sessions: Climate
Startups
TechCrunch+
Audio
Newsletters
Startup Battlefield
Advertise
Events
More

## Waymo Via and Uber Freight partner up for the long haul

Rebecca Bellan
10:00 AM CDT • June 7, 2022





**TechCrunch+**

## As investors focus more on profitability, product-led startups may be

Anna Heim
10:00 AM CDT • June 7, 2022

## Take Blip lands $70M to grow its omnichannel messaging service

Kyle Wiggers
10:00 AM CDT • June 7, 2022

**Load More**

Glenn Decl. Ex. 13
Page 9 of 11

6/7/22, 3:19 PM                          Nancy Pelosi warns tech companies that Section 230 is 'in jeopardy' | TechCrunch

**About**

TechCrunch

Staff

Contact Us

Advertise

Crunchboard Jobs

**Legal**

Privacy Policy

Terms of Service

TechCrunch+ Terms

Privacy Dashboard

Code of Conduct

About Our Ads

**Join TechCrunch+**                    Login

Search Q

TC Sessions: Climate

Startups

TechCrunch+

Audio

Newsletters

Startup Battlefield

Advertise

Events

More

Facebook                    Twitter

YouTube                     Instagram

LinkedIn

© 2022 Yahoo.

All rights reserved.

Powered by WordPress VIP.

Glenn Decl. Ex. 13

Page 10 of 11

6/7/22, 3:19 PM                          Nancy Pelosi warns tech companies that Section 230 is 'in jeopardy' | TechCrunch

Glenn Decl. Ex. 13
Page 11 of 11

# EXHIBIT 14

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/save-the-constitution-from-big-tech-11610387105

OPINION | COMMENTARY

# Save the Constitution From Big Tech

Congressional threats and inducements make Twitter and Facebook censorship a free-speech violation.

---

By Vivek Ramaswamy and Jed Rubenfeld

Jan. 11, 2021 12:45 pm ET



PHOTO: BARBARA KELLEY

Facebook and Twitter banned President Trump and numerous supporters after last week's disgraceful Capitol riot, and Google, Apple and Amazon blocked Twitter alternative Parler—all based on claims of "incitement to violence" and "hate speech." Silicon Valley titans cite their ever-changing "terms of service," but their selective enforcement suggests political motives.

Conventional wisdom holds that technology companies are free to regulate content because they are private, and the First Amendment protects only against government censorship. That view is wrong: Google, Facebook and Twitter should be treated as state actors under existing legal doctrines. Using a combination of statutory inducements and

Glenn Decl. Ex. 14
Page 1 of 5

regulatory threats, Congress has co-opted Silicon Valley to do through the back door what government cannot directly accomplish under the Constitution.



🎧 OPINION: POTOMAC WATCH

**The Capitol Riot / Calls for Trump's Exit**

▶    ●──────────────────────────    00:00   | 1x |   🔊

| SUBSCRIBE                                                              ⌄ |

It is "axiomatic," the Supreme Court held in *Norwood v. Harrison* (1973), that the government "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." That's what Congress did by enacting Section 230 of the 1996 Communications Decency Act, which not only permits tech companies to censor constitutionally protected speech but immunizes them from liability if they do so.

The justices have long held that the provision of such immunity can turn private action into state action. In *Railway Employees' Department v. Hanson* (1956), they found state action in private union-employer closed-shop agreements—which force all employees to join the union—because Congress had passed a statute immunizing such agreements from liability under state law. In *Skinner v. Railway Labor Executives Association*(1989), the court again found state action in private-party conduct—drug tests for company employees—because federal regulations immunized railroads from liability if they conducted those tests. In both cases, as with Section 230, the federal government didn't mandate anything; it merely pre-empted state law, protecting certain private parties from lawsuits if they engaged in the conduct Congress was promoting.

Section 230 is the carrot, and there's also a stick: Congressional Democrats have repeatedly made explicit threats to social-media giants if they failed to censor speech those lawmakers disfavored. In April 2019, Louisiana Rep. Cedric Richmond warned Facebook and Google that they had "better" restrict what he and his colleagues saw as harmful content or face regulation: "We're going to make it swift, we're going to make it

strong, and we're going to hold them very accountable." New York Rep. Jerrold Nadler added: "Let's see what happens by just pressuring them."

Such threats have worked. In September 2019, the day before another congressional grilling was to begin, Facebook announced important new restrictions on "hate speech." It's no accident that big tech took its most aggressive steps against Mr. Trump just as Democrats were poised to take control of the White House and Senate. Prominent Democrats promptly voiced approval of big tech's actions, which Connecticut Sen. Richard Blumenthal expressly attributed to "a shift in the political winds."

For more than half a century courts have held that governmental threats can turn private conduct into state action. In *Bantam Books v. Sullivan* (1963), the Supreme Court found a First Amendment violation when a private bookseller stopped selling works state officials deemed "objectionable" after they sent him a veiled threat of prosecution. In *Carlin Communications v. Mountain States Telephone & Telegraph Co.* (1987), the Ninth U.S. Circuit Court of Appeals found state action when an official induced a telephone company to stop carrying offensive content, again by threat of prosecution.

As the Second Circuit held in *Hammerhead Enterprises v. Brezenoff* (1983), the test is whether "comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." Mr. Richmond's comments, along with many others, easily meet that test. Notably, the Ninth Circuit held it didn't matter whether the threats were the "real motivating force" behind the private party's conduct; state action exists even if he "would have acted as he did independently."

Either Section 230 or congressional pressure alone might be sufficient to create state action. The combination surely is. Suppose a Republican Congress enacted a statute giving legal immunity to any private party that obstructs access to abortion clinics. Suppose further that Republican congressmen explicitly threatened private companies with punitive laws if they fail to act against abortion clinics. If those companies did as Congress demands, then got an attaboy from lawmakers, progressives would see the constitutional problem.

Republicans including Mr. Trump have called for Section 230's repeal. That misses the point: The damage has already been done. Facebook and Twitter probably wouldn't have become behemoths without Section 230, but repealing the statute now may simply further empower those companies, which are better able than smaller competitors to

withstand liability. The right answer is for courts to recognize what lawmakers did: suck the air out of the Constitution by dispatching big tech to do what they can't. Now it's up to judges to fill the vacuum, with sound legal precedents in hand.

Liberals should worry too. If big tech can shut down the president, what stops them from doing the same to Joe Biden if he backs antitrust suits against social-media companies? Our Framers deeply understood the need for checks and balances in government. They couldn't anticipate the rise of a new Leviathan with unchecked power to make extraconstitutional political judgments under the mantle of private enterprise.

American democracy is under siege from Silicon Valley's political plutocracy. Next week Mr. Trump will be a private citizen without a Twitter account. Our new class of corporate monarchs will still control whether and how Americans can hear from the president—or anyone else. We have devolved from a three-branch federal government to one with a branch office in Silicon Valley. But there's no democratic accountability for Jack Dorsey and Mark Zuckerberg.

Hard cases make bad law, and Mr. Trump presented America with a hard case last week. The breach of the Capitol is a stain on American history, and Silicon Valley seized on the attack to do what Congress couldn't by suppressing the kind of political speech the First Amendment was designed to protect.

There's more at stake than free speech. Suppression of dissent breeds terror. The answer to last week's horror should be to open more channels of dialogue, not to close them off. If disaffected Americans no longer have an outlet to be heard, the siege of Capitol Hill will look like a friendly parley compared with what's to come.

Ordinary Americans understand the First Amendment better than the elites do. Users who say Facebook, Twitter and Google are violating their constitutional rights are right. Aggrieved plaintiffs should sue these companies now to protect the voice of every American—and our constitutional democracy.

*Mr. Ramaswamy is founder and CEO of Roivant Sciences and author of the forthcoming book "Woke Inc." Mr. Rubenfeld, a constitutional scholar, has advised parties who are litigating or may litigate against Google and Facebook.*

*Appeared in the January 12, 2021, print edition.*

Copyright © 2022 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

Glenn Decl. Ex. 14
Page 5 of 5

# EXHIBIT 15

# PRESS RELEASES

# Statement of U.S. Sen. Mark R. Warner on Section 230 Hearing (/public/index.cfm/pressreleases?ID=494E01A8-21F0-4825-81CA-F640C79FFC01)

Oct 28 2020

WASHINGTON – U.S. Sen. Mark R. Warner (D-VA) released a statement regarding the Senate Commerce Committee's hearing on Section 230 with tech CEOs today:

**"It saddens me that some of my colleagues have joined in the Trump Administration's cynical and concerted effort to bully platforms into allowing dark money groups, right-wing militias and even the President himself to continue to exploit social media platforms to sow disinformation, engage in targeted harassment, and suppress voter participation. We can and should have a conversation about Section 230 – and the ways in which it has enabled platforms to turn a blind eye as their platforms are used to facilitate discrimination and civil rights violations, enable domestic terrorist groups to organize violence in plain sight, assist in stalking and networked harassment campaigns, and enable online frauds targeted at vulnerable users. But that conversation should be thoughtful and not serve as a cudgel to cow the platforms into continued inaction regarding efforts to manipulate their services 6 days ahead of the election."**

Sen. Warner has written and introduced a series of bipartisan bills designed to protect consumers and reduce the power of giant social media platforms like Facebook, Twitter and Google. Among these are the *Designing Accounting Safeguards to Help Broaden Oversight And Regulations on Data (DASHBOARD) Act (https://www.warner.senate.gov/public/index.cfm/2019/6/warner-hawley-*

*introduce-bill-to-force-social-media-companies-to-disclose-how-they-are-monetizing-user-data)* – bipartisan legislation to require data harvesting companies to tell consumers and financial regulators exactly what data they are collecting from consumers and how it is being leveraged by the platform for profit; the *Deceptive Experiences To Online Users Reduction (DETOUR) Act (https://www.warner.senate.gov/public/index.cfm/2019/4/senators-introduce-bipartisan-legislation-to-ban-manipulative-dark-patterns)* – bipartisan legislation to prohibit large online platforms from using deceptive user interfaces to trick consumers into handing over their personal data; and the *Augmenting Compatibility and Competition by Enabling Service Switching (ACCESS) Act (https://www.warner.senate.gov/public/index.cfm/2019/10/senators-introduce-bipartisan-bill-to-encourage-competition-in-social-media)* – bipartisan legislation to encourage market-based competition to dominant social media platforms by requiring the largest companies to make user data portable – and their services interoperable – with other platforms, and to allow users to designate a trusted third-party service to manage their privacy and account settings, if they so choose.

###

Press Releases (/public/index.cfm/pressreleases?type=PressReleases)
Information/Technology (/public/index.cfm/pressreleases?label=Information/Technology)

Permalink:
https://www.warner.senate.gov/public/index.cfm/2020/10/statement-of-sen-mark-r-warner-on-facebook-s-decision-to-finally-ban-qanon-from-its-platforms
(https://www.warner.senate.gov/public/index.cfm/2020/10/statement-of-sen-mark-r-warner-on-facebook-s-decision-to-finally-ban-qanon-from-its-platforms)

# EXHIBIT 16

Public video, published on the U.S. Senate's website, of the statement of Senator Richard Blumenthal in "*Breaking the News: Censorship, Suppression, and the 2020 Election*" Before the S. Comm. on Judiciary, 116th Cong. (2020) (statement of Sen. Richard Blumenthal), which is publicly available at https://www.judiciary.senate.gov/meetings/breaking-the-news-censorship-suppression-and-the-2020-election.  The statement of Senator Blumenthal occurs at 32:53 to 40:52 of the video

# EXHIBIT 17

Justsecurity.org

# A Dozen Experts with Questions Congress Should Ask the Tech CEOs — On Disinformation and Extremism

by Yaël Eisenstat and Justin Hendrix
*March 25, 2021*

On Thursday, March 25th, two subcommittees of the House Energy & Commerce Committee will hold a joint hearing on "the misinformation and disinformation plaguing online platforms." Facebook CEO Mark Zuckerberg, Twitter CEO Jack Dorsey, and Google CEO Sundar Pichai will testify and respond to questions from lawmakers. And Senator Chris Coons (D-DE) has now said that the Senate Judiciary subcommittee he chairs is "very likely" to call Zuckerberg and Dorsey to testify as well, with a focus on how algorithms amplify misinformation and the spread of extremism.

Next Thursday will be the first time the tech CEOs will face Congress since the January 6th siege on the U.S. Capitol, where different groups of individuals incited by disinformation campaigns led by former President Donald Trump and his allies sought to prevent the certification of the presidential election. Questions about the role of the tech platforms in contributing to radicalization and extremism and propagating disinformation related to the election are expected, according to a press release from the Committee. They are also interested in the spread of disinformation about the coronavirus pandemic.

"This hearing will continue the Committee's work of holding online platforms accountable for the growing rise of misinformation and disinformation," Energy and Commerce Committee Chair Frank Pallone, Jr. (D-NJ) and the chairs of the Communications and Technology and Consumer Protection and Commerce subcommittees, Mike Doyle (D-PA) and Jan Schakowsky (D-IL), said in a statement. "For far too long, big tech has failed to acknowledge the role they've played in fomenting and elevating blatantly false information to its online audiences. Industry self-regulation has

failed. We must begin the work of changing incentives driving social media companies to allow and even promote misinformation and disinformation."

Unfortunately, prior Congressional hearings have occasionally highlighted the gap in understanding of tech issues on Capitol Hill, such as Senator Orrin Hatch's much pilloried query on how Facebook makes money, since its service is free for users (Zuckerberg's response- "Senator, we run ads"- is now a meme). The general understanding of these issues has certainly improved; but after four years of such hearings, getting the questions right has never been more urgent, nor the circumstances more severe.

There are signs this hearing may go into a substantial level of detail. Last month, for instance, the Committee sent a letter to Facebook CEO Mark Zuckerberg with requests for specific information, including internal documents and presentations, related to "Facebook's research on divisive content and user behavior, the reported presentations and recommendations made to Facebook executives and their actions in response, and the steps Facebook leadership has taken to reduce polarization on its platform." A similar letter in early March to Google CEO Sundar Pichai requested specific details on YouTube's "policies and practices for combating extremism," asking for specific information about YouTube's recommendation system and content moderation practices. And another letter to Facebook on March 8th requested specific information about "ads showing gun accessories and protective equipment next to content that amplified election misinformation," as well as information about content related to the siege at the Capitol.

It is important that the American public understand how the design choices and business decisions these companies make helped foment and facilitate the violent attack on democracy on January 6th, and how they contribute to radicalization, extremism and the spread of disinformation generally. That's why we asked a range of experts to provide potential questions for lawmakers to pose. Responses came in from:

- Imran Ahmed, CEO of Center for Countering Digital Hate (@Imi_Ahmed)
- Damian Collins, Minister of Parliament for Folkestone and Hythe (@DamianCollins)

- [Renee DiResta](#), Research Manager at the Stanford Internet Observatory ([@noUpside](#))
- [Dr. Mary Anne Franks](#), President of the Cyber Civil Rights Initiative and Professor of Law at the University of Miami ([@ma_franks](#))
- [Bryan Jones](#), Chairman, Tech Policy Press ([@dbryanjones](#))
- [Mor Naaman](#), Professor at Jacobs Technion-Cornell Institute at Cornell Tech and Information Science Department at Cornell University ([@informor](#))
- [Katie Paul](#), Director of the Tech Transparency Project ([@TTP_updates](#))
- [Gretchen Peters](#), Executive Director, Alliance to Counter Crime Online ([@GretchenSPeters](#))
- [Erin Shields](#), National Field Organizer, MediaJustice ([@mediajustice](#))
- [Jonathan Zittrain](#), Professor of Law and Professor of Computer Science, Harvard University ([@zittrain](#))
- Reader submissions are included in an **[addendum.](#)**

We encourage readers to propose additional questions by sending suggestions to [lte@justsecurity.org](#). We will add selected readers' questions to the list with attribution, but let us know if you prefer anonymity.

## Questions for all three Tech CEOs

1. The First Amendment is often erroneously invoked to suggest that your companies cannot or should not restrict content. But as you know, the First Amendment actually gives you, as private businesses, the right to set terms of service as you see fit, including what kind of content and conduct to allow, and to deny the use of your services to those who violate those terms. What specific actions are each of your companies doing to exercise those First Amendment rights to ensure that your platforms and services are not plagued with dangerous misinformation? (Mary Anne Franks)

2. One highly influential piece of misinformation is that the [tech industry is biased](#) against conservative figures and conservative content. Conservative figures and content actually [perform very well](#) on social media sites such as Facebook, even though they [disproportionately violate](#) companies' policies against misinformation and other abuse. Are each of you willing to commit, going forward, to enforcing your policies against

misinformation and other abuses of your policies regardless of accusations of political bias"? (Mary Anne Franks)

3. The principle of collective responsibility is a familiar concept in the physical world. A person can be partly responsible for harm even if he did not intend for it to happen and was not its direct cause. For instance, a hotel can be held accountable for failing to provide adequate security measures against foreseeable criminal activity against its guests. An employer can be liable for failing to address sexual harassment in the workplace. Do you believe that tech companies are exempt from the principle of collective responsibility, and if so, why? (Mary Anne Franks)

4. Do you think your services' responsibilities to address disinformation vary depending on whether the content is organically posted by users, versus placed as paid advertising? (Jonathan Zittrain)

5. Along with law enforcement agencies, Congress is conducting multiple lines of inquiry into January 6th and there may indeed be a National Commission that will have the role of the tech platforms in its remit. Have you taken proactive steps to preserve evidence that may be relevant to the election disinformation campaign that resulted in the January 6th siege on the Capitol, and to preserve all accounts, groups and exchanges of information on your sites that may be associated with parties that participated in it? (Justin Hendrix)

6. Looking beyond content moderation, can you explain what exactly you have done to ensure your tools — your algorithms, recommendation engines, and targeting tools — are not amplifying conspiracy theories and disinformation, connecting people to dangerous content, or recommending hate groups or purveyors of disinformation and conspiracy theories to people? For example, can you provide detailed answers on some of the Capitol riot suspects' use history, to include the following:

- Facebook: Which Facebook groups were they members of? Did Facebook recommend those groups, or did the individuals search for the specific groups on their own? What ads were targeted at them based on either the data you gathered or interests you

inferred about them? Were they connected to any known conspiracy theorists, QAnon believers, or other known January 6th rioters due to Facebook's recommendations?

- YouTube: Of the videos the individuals watched with Stop the Steal content, calls to question the election, white supremacy content and other hate and conspiracy content, how many were recommended by YouTube to the viewer?
- Twitter: Were any of the conspiracy theorists or other purveyors of electoral misinformation and Stop the Steal activity recommended to them as people to follow? Were their feeds curated to show more Stop the Steal and other conspiracy theory tweets than authoritative sources?
- And to all: Will you allow any academics and members of this committee to view the data to answer these questions? (Yael Eisenstat)

7. There is a growing body of research on the disproportionate effects of disinformation and white supremacist extremism on women and people of color. This week, there was violence against the Asian American community- the New York Times reports racist memes and posts about Asian-Americans "have created fear and dehumanization," setting the stage for real-world violence. Can you describe the specific investments you are making on threat analysis and mitigation for these communities? (Justin Hendrix)

## Questions for Facebook CEO Mark Zuckerberg

1. Mr. Zuckerberg, you and other Facebook executives have routinely testified to lawmakers and regulators that their AI finds and removes as much as 99% of some forms of objectionable content, such as terrorist propaganda, human trafficking content and, more recently, child sex exploitation content. It is normally understood to mean that Facebook AI and moderators remove 99% of overall content. But can you define clearly that you mean to say your AI removes 99% of what you remove, rather than the total amount of such content? Does Facebook have evidence about its overall rate of removal of terror content, human trafficking content, and child sexual abuse material (CSAM) that it can provide to this Committee? Studies by the Alliance to Counter Crime Online indicate you are removing only about 25-30%. Can you explain the discrepancy? (Gretchen Peters)

2. Facebook executives like to claim that Facebook is just a mirror to society. But multiple studies — including, apparently, internal Facebook studies — have shown that

Facebook recommendation tools and groups connect bad actors, amplify illegal and objectionable content and amplify conspiracies and misinformation. Why can't you, or won't you, shut down these tools, at least for criminal and disinformation content? (Gretchen Peters)

3. Aside from labeling misinformation or outright deleting it, there's also the possibility of simply making it circulate less. (a) Is an assessment of misinformation taken into account as Facebook decides what to promote or recommend in feeds? (b) Could users be told if such adjustments are to be applied to what they are sharing? (2) Decisions about content moderation often entail obscuring or deleting some information. Would Facebook be willing to automatically document those actions as they happen, perhaps embargoing or escrowing them with independent research libraries, so that decisions might be understood and evaluated by researchers, and trends made known to the public, later on? (Jonathan Zittrain)

4. Why is it that Facebook and Instagram act to remove fewer than one in twenty pieces of misinformation on Covid and vaccines reported to them by users? (Imran Ahmed)

5. There is clear evidence that Instagram's algorithm recommends misinformation from well-known anti-vaxxers whose accounts have even been granted verified status. With lives depending on the vaccine rollout, when will Facebook address this problem and fix Instagram's algorithm? Did Facebook perform safety checks to prevent the algorithmic amplification of Covid-19 misinformation? Why were posts with content warnings, for example content warnings about Covid-19 misinformation, promoted into Instagram feeds? What is the process for suggesting and promoting posts that are not verified first? (Imran Ahmed)

6. Former Facebook policy employees came forward to say that "Mark personally didn't like the punishment, so he changed the rules," when it came to banning Alex Jones and other extremists like the Oath Keepers. What role do you play in the moderation of misinformation and deciding what harmful content qualifies for removal? (Imran Ahmed)

7. 2016 research from Facebook showed that 64% of people who joined FB groups promoting extremist content did so at the prompting of Facebook's recommendation tools. Facebook reportedly changed its policies. You were previously asked in a Senate hearing whether you had seen a reduction in your platform's facilitation of extremist group recruitment since those policies were changed, to which you responded, "Senator, I'm not familiar with that specific study." Are you now familiar with that study, and what's your response now — did you see a reduction in your platform's facilitation of extremist group recruitment since those policies were changed? (Damian Collins)

8. Did Facebook complete the app audit it promised during the Cambridge Analytica scandal? Have you found evidence of other apps harvesting Facebook user data in a similar way to Alexander Kogan's app? Will you make public a list of such apps? (Damian Collins)

9. A Washington Post story referenced internal Facebook research that focused on super spreaders of anti-vaccine content. What are the remedies you are considering to balance freedom of expression while recognizing that a committed handful of people are repeatedly responsible for spreading harmful content across Facebook as well as Instagram? (Renée DiResta)

10. A recent report in MIT *Technology Review* found that there is no single team at Facebook tasked with understanding how to alter Facebook's "content-ranking models to tamp down misinformation and extremism." Will you commit today to create a department at Facebook that has dominion over all other departments to solve these problems, even if it hurts Facebook's short term business interests? (Justin Hendrix)

11. The *Technology Review* report also found that you have limited efforts to explore this question because of the influence of your policy team, in particular Joel Kaplan, Facebook's vice president of global public policy. The Technology Review report said that when deciding whether a model intended to address misinformation is fair with respect to political ideology, the Facebook Responsible AI team determined that "fairness" does not mean the model should affect conservative and liberal users equally. "If conservatives are posting a greater fraction of misinformation, as judged by public consensus, then the model should flag a greater fraction of conservative content. If

liberals are posting more misinformation, it should flag their content more often too." But the article says members of Joel Kaplan's team "followed exactly the opposite approach: they took 'fairness' to mean that these models should not affect conservatives more than liberals. When a model did so, they would stop its deployment and demand a change. Once, they blocked a medical-misinformation detector that had noticeably reduced the reach of anti-vaccine campaigns, the former researcher told me. They told the researchers that the model could not be deployed until the team fixed this discrepancy. But that effectively made the model meaningless." In other words, the change would have literally no impact on the actual problem of misinformation. Is it Facebook's policy to seek political balance even when that means allowing harmful misinformation and disinformation to remain on its platform? (Justin Hendrix)

12. As Facebook continues development of artificial intelligence through its Responsible AI project, how is the company deploying this technology to limit the impact of hate speech, misinformation, and disinformation campaigns on its platform? By recent accounts, Facebook is deploying AI in service of platform growth and not necessarily in the interest of communities they claim to care about. (Erin Shields)

13. With respect to the January 6 attacks, Sheryl Sandberg said, "I think these events were largely organized on platforms that don't have our abilities to stop hate and don't have our standards and don't have our transparency." We now know that Facebook was the most cited social media site in charging documents the Justice Department filed against members of the Capitol Hill mob. Can you provide us an accurate answer to how many people discussed these plans in Facebook groups or on the platform? Of those groups where discussions of Stop the Steal or the events of January 6 occurred, how many had been flagged for violating your own policies? How many remained up, despite either internal flags or reports from external groups? Why did they remain up? (Yael Eisenstat)

14. After a group is found to be engaged in the propagation of disinformation or planning violence, such as the Stop the Steal group that was terminated shortly after the November 3rd election, what steps do you take? Do you continue to monitor the activities of group organizers? Facebook had hundreds of Stop the Steal pages that were not deactivated, and many remained active into this year, even after the Capitol siege.

What steps do you take to limit the propagation of false claims in these groups? Do you monitor how accounts that participate in banned groups later reconnect in new ones? Do you communicate to the participating accounts about why the group was deactivated? (Bryan Jones)

15. In April of last year, the Tech Transparency Project identified 125 Facebook groups devoted to the boogaloo boys, with some sharing tips on tactical organizing and instructions for making gasoline bombs and Molotov cocktails.  Just weeks after TTP's report, multiple boogaloo supporters were arrested by the FBI Joint Terrorism Task Force in Las Vegas on terrorism-related charges. They had met in some of the same Facebook groups identified by TTP. It was not until after these arrests that Facebook said it would stop recommending groups and pages related to the boogaloo movement.  But the problem continued. A short time later, authorities arrested alleged boogaloo supporters Steven Carrillo and Robert Justus for the murder of a Santa Cruz County deputy officer. Both men were members of Facebook boogaloo groups. Facebook finally acted to ban the militant boogaloo movement from its platform on June 30, a month *after* someone was murdered. We saw a similar failure by Facebook to address these issues in the Kenosha shootings, where BuzzFeed News found that the Kenosha Guard militia's event listing was reported 455 times and not removed until after the shooting had taken place. Facebook told the media that it had removed the event, which turned out to be false. The militia group that organized the event actually removed it, not Facebook.  And just this month, the FBI informant in the foiled militia plot to kidnap Michigan Gov. Gretchen Whitmer said that he joined the militia's Facebook group because it was recommended by your algorithms—he didn't even search for it. Facebook vice president for global policy management and counterterrorism Monika Bickert told the Senate Commerce Committee in September 2019 the company has "a team of more than 350 people who are primarily dedicated in their jobs to countering terrorism and hate." Why is it that even with your specialized teams and AI tools, outside researchers and journalists continue to easily find this content on your platform? (Katie Paul)

16. Mr. Zuckerberg, in November you told the Senate Judiciary Committee that "we're also clearly not like a news publisher in that we don't create the content." But an SEC whistleblower petition in spring 2019 found that Facebook was actually auto-generating business pages for white supremacist and terrorist groups, and that these pages created

by Facebook can serve as a rolodex for extremist recruiters. Just weeks after this revelation made headlines, your VP, Monika Bickert, was asked about this auto-generation of extremist content at a House hearing.   One year later, however, little appears to have changed. A May 2020 report from the Tech Transparency Project found that Facebook was still auto-generating business pages for white supremacist groups. How do you expect this Congress, the public, and your investors to trust that your AI can solve these issues when that same AI is not only failing to catch, but actually creating, pages for extremists? (Katie Paul)

17. After the January 6 Capitol insurrection, a report from BuzzFeed News revealed that Facebook's algorithms were offering up advertisements for armor and weapons accessories to users alongside election disinformation and posts about the Capitol riot. After complaints from lawmakers and Facebook employees, you announced that Facebook would be pausing these military gear ads through inauguration—but that doesn't appear to have happened. In the days following Facebook's announcement, BuzzFeed reporters and the Tech Transparency Project continued to find ads for military gear in Facebook feeds, often posted alongside algorithmic recommendations for militia groups. This is yet another instance of your company promising something will be dealt with and not following through. Why should Congress, your investors, or the public believe that you will address harmful content? Thus far, profit has prevailed. (Katie Paul)

## Questions for Google CEO Sundar Pichai

1. To what extent do you view Google Web search as simply about "relevance," rather than tweaking for accuracy? For example, if Google search offers a site containing rank disinformation as the first hit on a given search, under what circumstances, if any, would the company think itself responsible for refactoring the search to surface more accurate information? (Jonathan Zittrain)

2. On a recent Atlantic Council webinar, YouTube CEO Susan Wojcicki explained that YouTube did not implement a policy about election misinformation until after the states certified the election, on December 9.  She said that starting then, a person could no longer allege the election was due to widespread fraud. First, this begs the obvious question: Why did you wait until December 9?  (Yael Eisenstat)

3. She then continued to explain that due to a "grace period" after the policy was finally made, Donald Trump's numerous violations didn't count, and he only has one actual strike against him and will be reinstated when YouTube deems there is no longer a threat of violence. How will you make that assessment? How will you, YouTube, decide that there is no longer a threat of violence? And does that mean you will allow Donald Trump, or others with strikes against them, to reinstate their accounts and be allowed to continue spreading mis- and disinformation and conspiracy theories? (Yael Eisenstat)

4. At the Atlantic Council, when asked about testifying to Congress Wojcicki also said: "If asked, I would always attend and be there." It is my understanding she has turned down numerous requests to testify. Can you confirm that she will attend the next time she is invited by Congress to testify? Youtube is the second most used social media platform boasting 2.3 billion active users each month clocking in 1 billion hours of watch time daily. YouTube has flown under the radar of most as a huge contributor to the erosion of public trust in information and remains reluctant to engage with stakeholders about these policies. The public needs to hear directly from executives approving and instigating the policy decisions that impact content moderation policies on the platform. (Erin Shields)

5. In the months leading up to the election, Google claimed that it would "protect our users from harm and abuse, especially during elections." But an investigation from the Tech Transparency Project (TTP) found that search terms like "register to vote," "vote by mail," and "where is my polling place" generated ads linking to websites that charge bogus fees for voter registration, harvest user data, or plant unwanted software on people's browsers. When questioned about the malicious scam ads, Google told media outlets it had removed some of the ads that charged large fees to register to vote or sought to harvest user data. But a second investigation by TTP less than four months later found that Google continued allowing some kinds of misleading ads, just weeks before the November election. Is Google unable—or unwilling—to fix problems in its advertising apparatus given that a topic like voting, which was the subject of intense national attention and one that Google had promised to monitor closely, continued exhibiting problems the company said it addressed? (Katie Paul)

6. As [research from Cornell](#) and the [Election Integrity Partnership](#) makes clear, YouTube serves as a library of disinformation content that is often used to populate posts on Twitter and Facebook. Because of your three strike system, it is possible that offending content, no matter how popular, can continue to be shared and available from YouTube. Is it reasonable to have a policy where misleading videos can remain intact on YouTube because an account has failed to accrue three strikes? (Mor Naaman)

## Questions for Twitter CEO Jack Dorsey

1. On several occasions you've touted a decentralized version of Twitter, such as "[Bluesky](#)." How do you envision interventions for disinformation taking place on a distributed version of Twitter, if at all, and what business model, if any, would Twitter contemplate for such a version? How far along is it, and how open is it in its conception, whether in code or in participation by other software developers and organizations? (Jonathan Zittrain)

2. Does Twitter believe its labels and other restrictions on Trump and other tweets that shared election disinformation were effective? How exactly do you measure that effectiveness? Why, or why not? What criteria was used to decide on these sanctions and who applied them? (Mor Naaman)

3. As the volume and spread of false claims was becoming obvious, when did you first consider taking action on some of the most prominent accounts spreading disinformation? Researchers have identified several top accounts that were most active in spreading these false claims, including in [research](#) from the Social Technologies Lab at Cornell Tech, and in a report from the [Election Integrity Partnership](#). Was anyone at Twitter tasked with monitoring or understanding this influencer network as it was evolving? Who was responsible for the decision to continue to allow these accounts to use the platform, or to suspend them, and where and when were these decisions made? (Mor Naaman)

4. Mr. Dorsey, following the deadly siege on the US Capitol on January 6th, you [introduced](#) a detailed strike system specifically for civic integrity policy. Has Twitter applied this new policy since its creation? And do you intend to expand the strike system to other problem areas, such as COVID19 misinformation? (Justin Hendrix)

* * *

"Should social media companies continue their pattern of negligence, governments must use every power – including new legislation, fines and criminal prosecutions – to stop the harms being created," Imran Ahmed, CEO of Center for Countering Digital Hate wrote in the introduction to his recent report, *Malgorithm: How Instagram's algorithm publishes misinformation and hate to millions during a pandemic.* "Lies cost lives."

Certainly, Congress learned that lesson all too well when it was attacked on January 6th. As the CEOs prepare their responses, they should keep this in mind. We are well past the point where platitudes and evasions are acceptable- Americans deserve complete answers to the questions our elected Representatives pose.

## ADDENDUM: Reader Submissions

Evan Greer, *Fight for the Future*:

> In March of last year, multiple media reports emerged about Facebook removing large numbers of posts containing legitimate public health information about COVID-19 posted by medical professionals. The company blamed it on "a bug." When YouTube announced it would remove white nationalist content from its platform, the company also took down videos by anti-racist groups like the Southern Poverty Law Center. Facebook has also incorrectly labeled posts about the U.S. government's mass surveillance programs as "misleading," based on a fact-checker who cites a former top NSA lawyer as a source. Over the last several years, researchers found that Big Tech platforms' automated "anti-terrorism" filters regularly removed content from human rights organizations and activists, disproportionately impacting those from marginalized groups outside the U.S.
>
> Attempts to remove or reduce the reach of harmful or misleading content, whether automated or conducted by human moderators, always come with tradeoffs and can lead to the silencing of legitimate speech, remove documentation of human

rights abuses, and undermine social movements who are confronting repressive governments and corporate exploitation.

● Does your company have a way to measure and report on the number of legitimate posts that are inadvertently deleted, labeled, or algorithmically suppressed as part of efforts to remove disinformation?

● Does your company maintain demographic data to assess whether the "collateral damage" of efforts to remove or suppress disinformation has a disproportionate impact on the speech of marginalized groups?

● For Facebook: does your company believe that activist groups opposing racism are the same as white nationalist groups? Why did you ban multiple Black liberation activists and organizations during a purge of accounts ahead of Joe Biden's inauguration? What steps have you taken since to prevent efforts that you claim are intended to address hate and disinformation from silencing anti-racist activists?

● Has your company studied the potential long term impacts of collateral damage to online freedom of expression and human rights caused by haphazard attempts to address online disinformation?

● Will your company commit to moderation transparency, providing researchers and advocates with a complete data set of all posts that are removed or algorithmically suppressed as part of efforts to stem the spread of disinformation so that the potential harm of these efforts can be studied and addressed?

Neil Turkewitz, CEO, Turkewitz Consulting Group:

There are questions about how the tech industry uses its wealth to influence the media, academia, think tanks and government to suppress or counter criticism. Can you please provide the committee with an exhaustive list of all organizations, academics, think tanks, businesses and other enterprises you fund, either directly or indirectly, together with the amount of such funding? To decrease any potential

hardship in terms of workload, feel free to list only funding that exceeds a certain threshold. We leave that to your discretion, but in no event shall you exclude any entity that receives funding that exceeds $50,000.

Dick Reisman, President, Teleshuttle Corp.:

What is your view of adapting Twitter's "Bluesky" initiative to consider decentralization of the filtering of news feeds from your service to an open market from which users can choose? That effort draws on 2019 proposals from Stephen Wolfram and Mike Masnick, which have also recently been eloquently advocated by the Stanford working group on Platform Scale (and in Foreign Affairs and the WSJ). Isn't it antithetical to democracy and a free society for users of your services to have their window into this increasingly large portion of our marketplace of ideas selectively controlled by a few private companies? Wouldn't it reduce the problematic onus on you to moderate the *impression* you impose on your users, by shifting and dispersing that responsibility to services that *act as the user's agents*, giving users *freedom of impression* and minimizing need for restrictions on their *freedom of expression*?

*Published jointly with Tech Policy Press.*

Photo: Zach Gibson/Getty Images

## About the Author(s)

### Yaël Eisenstat

Yaël Eisenstat (@YaelEisenstat) is a Future of Democracy fellow at the Berggruen Institute and a Researcher-in-Residence at Betalab; former Global Head of Elections Integrity Operations for political ads for Facebook; former CIA officer; and former national security advisor to Vice President Biden.

### Justin Hendrix

Justin Hendrix (@justinhendrix) is cofounder and CEO of Tech Policy Press and associate research scientist and adjunct professor at NYU Tandon School of Engineering. Opinions expressed here are his own and do not necessarily reflect the views of any organization or institution.

# EXHIBIT 18

# Congress of the United States
## Washington, DC 20510

April 20th, 2022

Mark Zuckerberg
Chief Executive Officer
Meta Platforms, Inc.
1 Hacker Way
Menlo Park, CA 94025

Dear Mr. Zuckerberg,

We write to you regarding our serious concern with Meta's (formerly Facebook's) lack of progress addressing the pressing issue of Spanish-language disinformation across its platforms. Since the beginning of the year, Russian state-controlled outlets have made a concentrated effort to target Spanish-speaking communities to spread false-narratives leading up to, and in the aftermath of, the invasion of Ukraine. The viral spread of these narratives stands in stark contrast to assurances that Meta made to the public and Members of Congress that it is prioritizing the pressing needs of Hispanic communities in the United States.

In July, twenty-six members of Congress publicly asked Facebook to provide proof of investment in its efforts to combat Spanish and other non-English language misinformation and disinformation on the platform. Facebook did not directly answer the questions provided, and primarily attributed the increased rate of hate-speech takedown globally to "…a whole package of AI technologies [that] made leaps forward in the past year."

Despite your purported progress in combatting Spanish-language disinformation, "Kremlin-owned outlets are winning the information war with Spanish speakers."[1]  In the last week of February, the RT en Español Facebook page saw "nearly double the engagement than its daily average."[2] According to research, Russian state-owned media outlets continue to publish significantly more content referencing Ukraine in Spanish compared to many other leading Spanish language news sites, resulting in 1,600 posts that referenced Ukraine.[3] Russian

---

[1] Russia has taken over Spanish-language airwaves on Ukraine https://foreignpolicy.com/2022/02/09/russia-spanish-ukraine-media/
[2] Ukraine will steal Biden's SOTU spotlight https://www.politico.com/newsletters/the-recast/2022/03/01/ukraine-russia-joe-biden-state-of-the-union-spotlight-00012874
[3] Russia has taken over Spanish-language airwaves on Ukraine https://foreignpolicy.com/2022/02/09/russia-spanish-ukraine-media/

government outlets also saw their Spanish-language efforts outperform U.S. counterparts on audience engagement by a ratio of more than 3 to 1 in the last two weeks of January.[4]

RT en Español's Spanish-language disinformation and propaganda misleads their more than 18 million Facebook followers. Following Putin's invasion of Ukraine, RT en Español's articles spread inaccurate information by reporting Putin's false justification for unwarranted acts of aggression against Ukraine to RT's Spanish-speaking audience and downplayed the invasion as a "special military operation" with the intention to protect Ukrainians.[5]

These lies are designed to undermine a resolute global response necessary to stand against the Russian government's aggression. Facebook has continuously failed to show it is adequately addressing this problem for Spanish-speaking communities, and the success of Russian-sponsored outlets in crowding out the information ecosystem for Spanish speakers serves as proof to this fact. In addition, Spanish-language disinformation and propaganda regarding the invasion of Ukraine is not mentioned once in Facebook's Quarterly Adversarial Threat Report released on April 7th, 2022[6].The spread of these narratives demonstrate that Meta does not see the problem of Spanish-language disinformation in the United States as a critical priority for the health of our democracy.

The lack of Meta's action to swiftly address Spanish-language disinformation globally demonstrates the need for Congress to act to ensure Spanish-speaking communities have fair access to trustworthy information.[7] We request you answer the following questions to ensure Congress has the most relevant information while evaluating solutions to this pressing issue:

1) What steps will Meta take regarding the availability of Spanish-language outlets of Russian state-controlled media on its platforms? How has Meta's efforts to proactively detect and address Russian disinformation across languages changed after Russia's invasion of Ukraine?

2) How is Meta preparing to proactively detect and address foreign disinformation operations targeted at Spanish-speaking communities for future elections within the United States, including the 2022 primaries and general election?

3) Since the original July letter, what new steps has Meta taken to ensure the effectiveness of its algorithmic content detection policies to address disinformation and hate-speech across different languages?

[4] Russia has taken over Spanish-language airwaves on Ukraine https://foreignpolicy.com/2022/02/09/russia-spanish-ukraine-media/
[5] Kremlin-funded news outlet is mainlining Putin's falsehoods to Spanish speakers https://www.mediamatters.org/russias-invasion-ukraine/kremlin-funded-news-outlet-mainlining-putins-falsehoods-spanish-speakers
[6] https://about.fb.com/wp-content/uploads/2022/04/Meta-Quarterly-Adversarial-Threat-Report_Q1-2022.pdf
[7] Misinformation online is bad in English. But it's far worse in Spanish https://www.washingtonpost.com/outlook/2021/10/28/misinformation-spanish-facebook-social-media/

Page 3

4) How does Meta report engagement with content that it eventually takes action on for violating its policies? Are these metrics broken down by language?

5) What elements from Meta's Community Standards and Transparency Report are available to the public broken down by language? Are there any technical barriers that would prevent Meta from providing all transparency reporting on a per-language basis?

6) Will Meta incorporate any transparency regarding the staffing levels, training, and employment status (full-time, vs. contract basis) for its content moderation staff? Are there any technical barriers to providing full reporting on its staffing levels for its content moderation staff according to their language proficiency and cultural context?

We look forward to your prompt response and action.

Sincerely,

_____
Tony Cárdenas
Member of Congress

_____
Ben Ray Luján
United States Senator

_____
Robert Menendez
United States Senator

_____
Amy Klobuchar
United States Senator

_____
Catherine Cortez Masto
United States Senator

_____
Jacky Rosen
United States Senator

_____
Richard Blumenthal
United States Senator

_____
Alex Padilla
United States Senator

_____
Raúl M. Grijalva
Member of Congress

_____
Nydia M. Velázquez
Member of Congress

_____
Lucille Roybal-Allard
Member of Congress

_____
Adriano Espaillat
Member of Congress

_____
Lori Trahan
Member of Congress

Page 4

_____
Jim Costa
Member of Congress

_____
Adam Schiff
Member of Congress

_____
Sean Casten
Member of Congress

_____
Linda T. Sánchez
Member of Congress

_____
Ruben Gallego
Member of Congress

_____
James P. McGovern
Member of Congress

_____
Lloyd Doggett
Member of Congress

_____
Joaquin Castro
Member of Congress

# EXHIBIT 19

The New York Times      THE CHOICE    THE ENDORSEMENT    BERNIE SANDERS    TOM STEYER    CORY BOOKER    E



ION
E
RIAL
RD

len

r vice
nt of
ited

The
editorial
board
is
a
group
of
opinion
journalists
whose
views
are
informed
by
expertise,
research,
debate
and
certain
longstanding
values.

This interview was conducted by the editorial board of The New York Times,
which will announce its Democratic primary endorsement on Jan. 19.

Joe Biden commands a boardroom. Meeting with the Times editorial board [Related: What Is an Editorial Board?] on Dec. 16, he moved fluidly among policy issues, though at times he became tangled in his own syntax and fell back on what President Barack Obama famously referred to as his verbal "flourishes." Mr. Biden said his eight years as vice president and his deep relationships on Capitol Hill, where he represented Delaware in the Senate, would help him step seamlessly back into public office. He promised, "If I'm able to pass what I'm talking about, my administration would go down in history as one of the most progressive administrations in American history."

He also discussed the "creeps" in Silicon Valley, the mistakes of the 2016 Clinton campaign and his current opposition to the federal legalization of marijuana.

Here is a transcript, with annotations in blue, of the 80-minute discussion, which was filmed for a special episode of "The Weekly," The Times's TV show on FX and Hulu. The transcript is unedited. [Related: Learn more about "The Choice", or meet the editorial board members]

**Kathleen Kingsbury: So Mr. Vice President, we're hoping to ask you a few questions that we haven't really heard you answer on the campaign trail yet.**

O.K.

**KK: We have a lot of questions to get through, so please excuse us in advance if we interrupt you. I want to start — you fought corruption in Ukraine. There is no indication that you or your son did anything wrong or were part of any corruption in Ukraine. But you still haven't really answered the question of whether or not you think it's proper for the son of a sitting vice president of the United States to serve on the board of a foreign company that's being investigated for corruption.     In the October Democratic debate, Mr. Biden was asked by CNN's Anderson Cooper about his son's decision to serve on the board of Burisma, a Ukrainian gas company. Mr. Biden said he and his son "did nothing wrong," and he simply "carried out the policy of the United States in rooting out corruption in Ukraine," skirting the underlying question.**

Look, I fought corruption when I was in Ukraine. No one ever suggested I've done anything differently, including all of the president's men and women who testify. And I didn't realize he was on the board until he had been on the board for a while. You all did write, I think, in — I can't remember what month it was — but you indicated, and I think it was '15, that he shouldn't be on the board.     The Times editorial board wrote in 2015: "It should be plain to Hunter Biden that any connection with a Ukrainian oligarch damages his father's efforts to help Ukraine. This is not a board he should be sitting on."

He's acknowledged that he thought it was a mistake. And as you pointed out, the focus here is, can't be taken off the fact who, in fact, violated the Constitution. Did the president of the United States engage in an offense that is a constitutional violation of seeking the influence of a foreign government? It's a legitimate question to ask, but seems to me that the core of it is: No one has suggested I did anything wrong. And I didn't realize he was on the board until after he had been on the board. At the same time, he has come forward and said it was a mistake on his part to be on the board.

**KK: Would you be in favor of a law banning the children of sitting presidents and vice presidents from serving on foreign companies' boards?**

The answer is, I hadn't thought of it that way, but I don't think I would be opposed to it, except if, what happens if there's a — now it wouldn't apply to my family, but what happens if somebody's son or daughter has long been a member of a board of a major corporation that's a multinational corporation? It could be counterproductive, but I don't —

Look, as I said, looking back on it, Hunter has indicated that he thought it was a mistake to do what he did, to get on the board, although no one's indicated he's done anything that is illegal or wrong. The one thing I will do as president is make sure no one in my family, while I'm president of the United States, has any involvement with any foreign government at all. That's also to make sure there's not a repetition of what's taking place in the Trump White House. No one in my family will have an office in the White House. No one in my family will be in on —

**KK: What about the first lady? [LAUGHTER]**

We, the first lady, will have an office, but it won't be in the White House probably. The first lady, since at least the Carter administration, has had an office in the White House's East Wing. It'd probably be in the executive office building. But no one is, in my family, none of my children or anyone related to me, is going to be engaged in anything having to do with the conduct of foreign policy, international affairs, because I think what's — anyway.

WATCH A SPECIAL ENDORSEMENT EPISODE OF "THE WEEKLY"
FX    HULU



1:56:25
**Full Interview: Joe Biden**
00:00                                                           1:56:25

This video excerpt has been edited by "The Weekly."

**Mara Gay: Mr. Vice President, why don't you support reparations for black Americans?    In the September Democratic debate, Mr. Biden was asked about a comment he made in 1975: "I'd be damned if I feel responsible to pay for something that happened 300 years ago." He did not respond directly to the question.**

Well, I do support reparations for black Americans.    Other candidates (and former candidates) in the 2020 field have been vocal proponents of reparations for black Americans, particularly Senator Cory Booker, who has sponsored Senate legislation to form a commission to study reparations. And the best way to get reparations for black Americans — end systemic segregation, and it's real, and it's genuine. I spent my whole career doing that.

The first thing I did as a young councilman and lawyer was to fight redlining, fundamentally alter the way in which we deal with, how we deal with education.    Mr. Biden ran for New Castle County Council in 1970 and made public housing expansion a central part of his campaign. He fought against redlining, a process that designated certain neighborhoods — often those that were predominantly black — as too risky for mortgages. I got deeply involved in the civil rights movement from the time I've been a kid. And so I think that the reparations argument and debate is worth people investigating it. But how do you make that judgment?

In the meantime, there's a lot we have to do right now to deal with the original sin of America, which is slavery. And so I think it's much more productive to move quickly on everything from access to education to loans. I mean, why in God's name is a situation where you can own a home, exact same home, on one side of the street, which is predominantly black, and you own the exact home across the street which is predominantly white, and your home will be valued less and your insurance will cost more? It's wrong. There's a whole range of things we can do legislatively now to deal with this systemic racism that still exists.

**MG: I'm just going to drill down a little bit more on that. You said during the September debate, when asked about reparations, that black parents should, among other things, make sure that you have the record player on at night.    In the September Democratic debate, Mr. Biden was asked about what responsibility Americans should have in confronting the legacy of slavery. He gave a rambling answer that began with segregation and then landed on parenting, saying that parents need to "make sure the television — excuse me, make sure you have the record player on at night, the — make sure that kids hear words, a kid coming from a very poor school — a very poor background will hear four million words fewer spoken by the time we get there." How specifically should the country confront its history of slavery, discrimination and plunder of black America?**

Well, I think you're taking that out of context, but that's O.K.

**MG: Actually, it wasn't out of context.**

No, well, O.K. The idea is that the responsibility rests on those who are still engaged in oppression to stop what they're doing and pay for what they've done if it's criminal. And if it's not criminal, pay for it economically and change the law. So that's the bottom line.

I remember how much trouble Barack got in when he said that parents, black parents, should take responsibility.    Mr. Obama drew ire for a June 2008 speech at a black church in Chicago that invoked his own absent father to tell African-American men that "responsibility does not end at conception." That wasn't my point. My point was to make it clear that there are a number of things we can do now to help parents who have been disadvantaged as a consequence of lack of opportunity to be able to provide more guidance and better guidance for themselves and their families. For example, we have one school psychologist for every 1,507 kids in public schools. It's ridiculous. It's ridiculous. We have virtually no social workers engaged anymore.

What I found was that if, in fact, the people — if I can make an analogy to my father.    Mr. Biden grew up in a middle-class family in Scranton, Pa., and Wilmington, Del. During the 2008 campaign, he often described his resilient father, Joseph Robinette Biden Sr., as his most important influence in life. My father was a well-read, high-school-educated guy, and I had an opportunity to go to different schools and offered some scholarships, some academic, some relating to playing sports. And my dad was one of those guys who said, "You're going to be a college man, no matter what."

I used to say to him, "Why is that so important, Dad?" He said, "They can't take it from you." And so when I had an opportunity to visit campuses, I was surprised my father didn't want to go. I asked my mom, "Why wouldn't Dad go on campus? He's been talking about this as long as I can remember." She said: "Because he's embarrassed. He won't know what to say. He's embarrassed. What happens if someone turns to him and says, 'What about this or that or the other thing?'"

My wife has taught for the last — my deceased wife taught grade school. My present wife of 47 years now has taught in high school and grade school, I mean, junior high, high school, and now she's a college professor, a community college professor.    Mr. Biden lost his first wife, Neilia, and their daughter in a car accident in 1972. And the people who don't show up on the nights when there's a parent-teacher meeting are not people who in fact don't care, but folks from poor backgrounds. They don't show up because they're embarrassed. They're embarrassed the teacher's going to say — and it's hard to say, "Well, I can't read," or "I don't …"

I'm talking about not just people of color, but poor folks. And so there's this about being able to give people a kind of help they desperately want without being embarrassed in getting the help, without being embarrassed that they're seeking the help.

The New York Times    THE CHOICE    THE ENDORSEMENT    BERNIE SANDERS    TOM STEYER    CORY BOOKER    E



Iowans at a campaign event for Joe Biden. Jordan Gale for The New York Times

**Jesse Wegman: Or they're working a second job, right?**

Well, yeah. Well, that's true, but there's also a good deal of it, and check with the educators, there's a good deal is they just don't know what to say many of them. They don't show up. So that's why my wife started this mentoring program, and she, in fact, works with those families, calls them privately and says, "Look, this is your son or your daughter, or blah, blah, blah. This is how we can be helpful this way," embracing people. A lot has to do with, you know, we underestimate, I think, across the board, the degree of pride people have, their pride. They just want to be treated with some dignity and a lot of it doesn't.

**MG: Mr. Vice President, former Mayor Michael Bloomberg has apologized for his record on stop-and-frisk and the decisions that he made in that policy.     Ms. Gay wrote an Editorial Observer after Mayor Bloomberg apologized for his record on stop-and-frisk, which led to the humiliation and harassment of millions of black and Latino New Yorkers. Ms. Gay wrote, "The lure of the White House can make Americans do extraordinary things." Just asking for a little bit of self-reflection here. Is there anything that you have changed your mind about, specifically related I would say to your record, or your thinking, your personal views, on race or busing or anything over the years?**

No, not on race or busing because I think you've all been kind of shocked how much black support I have. Overwhelming black support in my home state. Overwhelming black support with the Black Caucus. Overwhelming black support with the black community because they know me. I've never been ashamed of anything I've done. I've fought for the African-American community and fought for them my entire career.

I made a big mistake in the criminal justice side when I — it's easy to forget it now — but when, all of a sudden, crack was introduced as a great threat to the United States of America. And the guy who did it is a great guy, Daniel Patrick Moynihan, he pointed out it was coming from the Bahamas, and this was going to —     To clarify, Senator Moynihan did not introduce crack to the

United States who wrote a report, in 1965, titled "The Negro Family: The Case for National Action," also known as the Moynihan Report. In it, he argued that black families had been "battered and harassed by discrimination, injustice, and uprooting" and were in a state of crisis. Because the report made no formal policy recommendations, it was widely misunderstood to put blame on black families themselves, rather than broader systems of racial discrimination. (Updated) Representative Tom Malinowski, Democrat from New Jersey, told The Times that when he worked for him in 1988, Mr. Moynihan "proselytized senators that year about how the crack epidemic was devastating low-income communities," serving as a proponent of the antidrug legislation passed that session.

And you had medical folks at the time saying, well, crack, because it immediately penetrates the membrane of the brain and it goes straight to the brain, it's going to have this long-term effect. So we bought on to the idea that crack somehow should be punished much more significantly than, in fact, powdered cocaine. Well, what it meant was somebody snorting powder in the party you guys go to.

I don't mean you. [LAUGHTER] But wealthy neighborhoods, wealthy neighborhoods. If they were to get arrested, which they don't in the first place, but if they get arrested, they get a sentence that's 100 times less than someone is getting convicted of crack. You buy a nickel, anyway. And so from the time we passed that, two years after, I've been trying to change it and have been unable to do it. Barack and I got it down to 10 to one from a hundred to one. It should be zero.    The Fair Sentencing Act of 2010 reduced the sentencing disparity between crack and powdered cocaine. However, Mr. Biden also helped to draft the bipartisan legislation that created that sentencing disparity during the Reagan administration.

But it's put a lot of people in jeopardy, put them in jail, and it's had a disproportionate impact on minority communities, particularly African-American communities. I sorely regret that. We've also learned a lot more about drug abuse overall. It used to be that we thought — I've spent a lot of my career in the Judiciary Committee dealing with this issue. We used to argue — and you tell me when I'm going longer than I should — we used to deal with it in terms of we thought that mental illness was a product of drug abuse. It's the reverse. Mental illness is the reason for drug abuse. It's not the reverse. And that's why, when I wrote the crime bill that everybody for a while there thought that was a massive reason for massive incarceration, which it wasn't, I might add. But what happened was I put in that bill, at the time, drug courts to try to divert anyone arrested for a drug offense to a drug court for rehab, not to go to jail.

**Jeneen Interlandi: Just a quick follow-up on that, sorry.**

Yeah, sure you can.

**JI: But one of the things I had wanted to ask you about was you've called for rescheduling marijuana so that scientists can better study its therapeutic potential.    When asked about legalizing marijuana, Mr. Biden said the drug should first be further studied to ensure it isn't a gateway drug. He then rolled back his comments to say he never claimed that pot is a gateway drug. Virtually all of your opponents have gone further and actually called for full legalization at the federal level.**

They have.

**JI: That's something that most people support in both parties and across most demographics agreed on.    Pew Research has found that two thirds of the country supports marijuana legalization. Can you make the case to me for why to take the more moderate approach when it seems ——**

Because I think science matters. I mean one of the reasons I'm running against the guy I'm running against is science matters, not fiction. Now nobody says, I'm not arguing, and Senator Booker acknowledged, I wasn't arguing that we should in fact, it was a gateway drug. What I'm arguing is there have been studies showing that it complicates other problems if you already have a problem with certain drugs.    Marijuana is the most widely used psychotropic drug after alcohol. Some studies have found that regular marijuana usage is associated with mental illness (although causality has not been established), and many agree there should be further study of its medical effects. So we should just study it and decriminalize it, but study it and find out. Get the medical community to come up with a final definitive answer as to whether or not it does cause it. If it does cause other problems, then make it clear to people. So that's a place you don't not engage in the use of it.

**KK: But most states have already legalized it.**    Thirty-three states have legalized marijuana in some form, according to the National Conference of State Legislators.

Sure they have. I get that, but that doesn't mean the science shouldn't be looked at.

**JI: Couldn't you look at the science and legalize it at the federal level in tandem?**

No. Why would you promote the science if the science would say it'd be a bad idea to legalize it? You've got to find out the facts first.

**KK: O.K., moving on.**

But by the way, let's get something straight here. I've argued for some time total decriminalization. Anyone who has a record, it should be immediately expunged. So when you come to work for The New York Times, and they ask you if you have any problems, any criminal arrests, you don't have to say yes, because it will be completely expunged. And in fact, there should be anyone who is in fact, has been served any time in prison or is in prison, which a few people are these days, that they immediately be released, and the record totally expunged.

---

WATCH A SPECIAL ENDORSEMENT EPISODE OF "THE WEEKLY"
FX    HULU



0:34
'I Ain't Dead, and I'm Not Going to Die'

This video excerpt has been edited by "The Weekly."

---

**Aisha Harris: Mr. Vice President.**

Yes.

**AH: You've expressed very little interest in entertaining millennials' concerns and complaints about the problems that they face, whether it's student debt [BIDEN LAUGHS] — well, you have said, "I have no empathy for it. Give me a break."    In an interview with The Los Angeles Times, Mr. Biden said that he often hears from "the younger generation" about "how tough things are." He said: "I have no empathy for it. Give me a break. Because here's the deal guys, we decided we were going to change the world. And we did. We did. We finished the civil rights movement in the first stage. The women's movement came into being." In terms of things that they've been concerned about, with the way in which the older generations have probably, older generations have made things worse for them as a generation. [BIDEN LAUGHS]**

So do you think that millennials' experience have less of a burden than previous years?

What I said I had no sympathy about — so let's get it straight, O.K.? What I said I had no sympathy about was I was asked the question about why — I made a commencement speech, I don't know which one, either Yale or Harvard, back-to-back two years    Mr. Biden gave the commencement speech at Yale in 2015. — and a study came out showing that, although this was the most generous, most progressive, most involved generation in history, the best educated, which I paid tribute to, because I have three granddaughters are all part of that. My daughter is a social worker with a master's degree doing great work, et cetera.

It always struck me — forget the — don't hold me to the exact number, it was two years ago, three years ago, that something like only 16 percent of young millennials would in fact run for public office.     In the book "Running for Office," the authors, the political scientists Jennifer Lawless and Richard Fox, cite findings that 89 percent of American high school students feel they would never want to run for public office. And only 14 percent — it was a discrepancy of four points between women and men, but less than a quarter.

So I was at a university and they said, "Well, why should we get involved? It's all dirty." I said, "I don't want to hear it. Don't whine to me. I got the same lecture in 1972 when I was in the middle of a — there was a Vietnam War — where I got the same thing, or was told in 1965 when I got involved in the civil rights movement: Don't get involved, but you got to get involved.

**AH: But you did double down on those comments this past summer.**

Sure I did. When they say to me, "I'm not going to get involved." I said, "No, I don't want to hear it. Get involved."

**AH: But some could argue that you're sort of painting a broad brush of the millennials. You have ——**

No, I'm not. I was answering questions. The question was, "Why should I get involved?" I said, "Because it's your responsibility. You have a responsibility."

**AH: So do you think that this younger generation as a whole is not participating enough, and they don't have the same burdens as previous generations?**

No. What's happening is it's awakened now. The point I always make is if, in fact, the generation between 18 and 30 vote in the same percentage as above 30, there would have been 5.2 million more votes cast last year, and we wouldn't have this president we have. In the 2016 election, voter turnout among 18- to 29-year-olds was 46.1 percent according to the Census Bureau. Among people 65 and older, the turnout was 70.9 percent. We wouldn't have him. They sat home, didn't get involved.

Where I come from, you don't say, "Well, that's your choice. That's O.K." Don't lecture me on responsibility — not you. Don't have them lecture me on responsibility, and then not participate. When I got involved, it's not a comparison, it's just a generically comparable thing. When I got involved it was, like, drop out. Go to Haight-Ashbury. Don't get involved. Literally across the board. You don't trust anybody over 30. And all of a sudden things got so damn bad, a generation said, "Enough, enough," and we got involved, and we ran.

I ran in 1972, a kid with no background in terms of money or influence. I'm the first senator I ever knew, and in the state that was then, we didn't call them red and blue, that was a red state.     Mr. Biden ran for Senate as a 29-year-old county councilman, facing off against an older Republican incumbent, Cale Boggs. Mr. Biden's ads portrayed Senator Boggs as out of touch with the concerns of his generation. One ad read: "To Cale Boggs, an unfair tax was the 1948 poll tax. To Joe Biden, an unfair tax is the 1972 income tax." Each one ended with: "Joe Biden. He understands what's happening today." A Wilmington News Journal reporter at the time, Norm Lockman, called this the "dear old dad" approach, painting Senator Boggs as out of touch. Mr. Biden won by a little over 3,000 votes.

Nixon got 64 percent of the vote in my state, and won by 3,200 votes. I went out, and we put together 20,000 volunteers of young people.

**AH: So ——**

Two years before we couldn't do that. But what happens is, look, there's two ways generations get engaged. One by inspirational people like the John Kennedys of the world, and other by really bad presidents, and really bad things that are happening. This guy is engaging [people] everywhere I go. Everywhere I go, there's more and more and more young people. Everywhere I go, I talk about the need for them to get engaged.

And by the way, I do as well with those millennials as anybody else does as a percentage.     Mr. Biden has tended to poll second to Senator Sanders among young voters. Bernie does the best. The old guy like me. He does the best, and I'm the only one that has support across the spectrum

of the newest element of the Democratic Party. So, I mean this idea I'm anti-millennial, I mean ——

**AH: Well, I didn't say that, but ——**

Well, the equivalent. I didn't say you said it, but the implication is I don't care much about it. I care like the devil about them. They are the future.

**KK: Since you just called yourself the old guy — Jimmy Carter has said that he wouldn't be up for the job of the presidency at age 80. He's obviously experienced the job, and lived the job. How do you respond to comments like that? Are you too old to be running for president?**

Watch me. Watch me. All this stuff about lack of energy. Come get in the bus with me, 16 hours a day, 10 days in a row. Come see me.

**AH: Do you have an exercise routine?**

Every morning.

**AH: What is it?**

I do three things. I bike, treadmill and I lift. I have the doctor who is the fellow — when you get to the White House, you get a medical doc who gets assigned to you and one of them was a colonel in the United States Army who, when I had a separated shoulder and I ended up having an operation — seven screws put in the shoulder to put it back together again, doing therapy. And he sends me — if I had my phone, I'd show you — he sends me every morning, every morning, an exercise routine, and I do it every morning. I'm not in bad shape.

**KK: Why haven't you released any health records?**

Oh, I am. I didn't say I didn't — I've always released my health records, and I was asked when I would do it. I had a chance, by the end of the week, you'll have a detailed health record.    On Dec. 17, Mr. Biden released an overview of his medical records that declared him fit for the presidency. The summary was provided by Kevin O'Connor, his physician, who serves as director of executive medicine at George Washington Medical Faculty Associates.

**KK: A complete set of health records?**

Yeah.

**KK: O.K. By the end of this week?    Mr. Biden's medical summary was released the day after his interview with The Times.**

Yes, because I got a chance to go down and see my doc and go through all the tests, and the whole deal. He's about to release a record that lays out what I've had before or what I've gone through, the state of my health, and you're going to be disappointed. I'm in really good health. The recent summary of Mr. Biden's health was the most comprehensive since 49 pages of his medical records were released in 2008. The summary said he is a "healthy, vigorous" 77-year-old.

**KK: We will not be disappointed. So how many push-ups can you do?**

I can do 44, but what I'm doing is that I pulled my bicep on the right. So I'm doing these — if you exercise, I'm doing closed-hand push-ups because outside is putting too much pressure on this one.

**KK: Do you want to show us? No, just kidding. [LAUGHTER]**

If you want me to.

**KK: Let's do it.**

**Michelle Cottle: Yeah. O.K. Don't ever do that in a room.**

Some-New, you think you'll write Biden — anyway. [LAUGHTER]

**BS: You got some ringers in the crowd in case you can't tell.**

**KK: In case you wanted to ——**

**MC: We've been practicing for days.**

**JD: Ringers out here.**

**MG: We're ready.**

I don't doubt it. I don't doubt it. Look, I mean, let me put it this way. I've always been a pretty good athlete. I've stayed engaged. I work out regularly. The worst thing is that, those of you women and men who are athletes, you always think you can still do what you always did, which I keep thinking to myself.

I've adopted Satchel Paige's attitude toward age. He pitched a win when he was 47 years old. A quotation often attributed to the Major League Baseball pitcher Satchel Paige (though its veracity is questioned): "Age is a question of mind over matter. If you don't mind, it don't matter." He was pitching for the St. Louis team, and he'd beat the Cubs, and they come in and, Satch, amazing. Nobody's ever pitched — on your birthday, 47 years old. You pitched a win. How do you feel about your age? He looked at them. He said, "That's not how I look at age, boys." They said, "How do you look?" He said, "Look at it this way. How old would you be if you didn't know how old you were?" I'm 50.

**JW: Do you think it's legitimate for voters to be concerned about people in their later 70s running for the highest office in the world?**

Sure, just like it's legitimate for people to ask about whether you're mature enough when you're 35. I'm not joking. I mean, I went through the same thing when I was 29 years old. Well, wait a minute, are you old enough? And so, it's totally legitimate.

**Binyamin Appelbaum: So we have a 35-year-old limit. Should we have one at the top end too? The Times Debatable newsletter recently considered a range of perspectives on whether the presidency should have an age limit.**

No.

**BA: Should there be a top? Why not?**

Because why would you? Show me where it's been a problem.

**BA: Why 35 then?**

Thirty-five ——

**JW: Well, President Reagan ——**

Well, look, guys. I think you guys are engaging in ageism here. Now look, all kidding aside, I don't think they're — the voters will be able to make a judgment. You'll make a judgment whether or not you think I have all my cognitive capability, I'm physically capable, and I have the energy to do the job. And so.

**MC: So now your message is more you're running on experience, a restoration of sanity, invocations of the Obama era. How do you convince younger voters that you are the person to help move the party into the future? So that's a bit of a nostalgia thing.**

No. By the way, just so you know, my message isn't that I'm going to return to the Obama era. My message is twofold. Number one, the next president of the United States, I think you'd all have to admit, is going to have to be able to do two things. [A PHONE PLACED BY A STAFFER TO RECORD THE INTERVIEW RINGS] What the hell is that?

**KK: You're getting a call.**

Oh.

BS: [That's your staff.

THE CHOICE      THE ENDORSEMENT      BERNIE SANDERS      TOM STEYER      CORY BOOKER      E

I assume I may have — they told me they wanted this to be taped. But two things. One, I think we'd all agree, is going to inherit a divided nation. And secondly, is going to inherit a world in disarray. I think it's fair to say, what's fair to say or not. I believe that my experience in both those areas better equips me than anybody running in either party to deal with both those issues.

I have a record where I have gotten big things done. I've been able to work with the opposition. I've been able to work, not all the time, when I haven't been able to have them join, I've gone out and beaten them, like we did in the 2018 election. What we just did recently in the off-year election.

I went into 24 states, and I went into the red states, and I went into the purple states, and we won. Some of you suggested, when I said we'll win back 41 seats, there goes Biden again. We won 41 seats because I was convinced that the American people understood finally what they didn't understand before.     During the 2018 campaign, Mr. Biden has said, he campaigned in 24 states, promoting the positive effects of Obamacare and other Democratic policies. In November 2018, CNN reported that Biden had traveled to roughly two dozen states to support 65 candidates in preceding months. They didn't know what Obamacare was. They didn't know Obama did it. They didn't even know why they had it. They weren't even sure, and all of a sudden, it starts getting taken away, they're aware of it.

But this is a different world inherited — when I'm president, I'm inheriting a different world than Barack inherited. But some of the things that were left on the table are massive things that are going to have to be dealt with. For example, we've got a world in disarray. Who's going to be able to stand on the stage the first day and command the respect of the world leaders? I think I'm the only one who has that experience. That experience matters a lot.

I'll deal with different problems. My job will be not to go back to the old days, but be able to re-establish our alliances, keep the world from falling apart, keep NATO from disintegrating, etc. The same way, for example, climate change.     The Obama-Biden administration had a number of climate change triumphs, including negotiating the Paris climate accord and pushing through new auto emission standards. The weekend before Mr. Biden met with the editorial board, the annual United Nations climate change conference adjourned with no significant accomplishments. You saw what happened this weekend? We didn't show up. In fact, we tried to raise the ante. I'm one of the guys that put that climate change deal together, but it requires someone who the rest of the world's going to respect when they ask them to come to the United States, a hundred of them, somewhere between 180 and 200 sit down and say, we have to up the ante now. The politics has changed in terms of what is actually happening in the environment.

**KK: You've hinted a little bit that you'd be willing to only serve one term.     Politico reported in December that Mr. Biden signaled to aides he would be willing to serve just a single term.**

I never hinted that. That is simply not true.

**BS: Where'd that come from?**

**KK: Yeah, where does that come from?**

I don't know where it came from, but it did not — it came from somebody who in fact, I guess, thinks that they know me and thinks that maybe, I don't know.

**KK: Who's on your short list for vice president?**

I'm not going to presume that because you'll eat me alive on that. [LAUGHTER] But there's a bunch of people that are qualified. I mean a whole group of people in addition to the ones that are running who aren't running. I can think of, off the top of my head, five women who hold public office who would be completely qualified, who are not running for president. I can think of at least four African-Americans, and I —

**John Broder: Can you name them?**

Yeah, I can, but I'm not going to because what you'll do, Biden's being presumptuous. I don't have the nomination yet.

**BA: Would you pick a running mate over the age of 70?**

Yeah, I would make — No, what I'm going to have to do is to balance just like anybody balances, I'm going to make sure that whoever is picked as vice president, where I'm the nominee, everyone thinks is able to, if I drop dead tomorrow, would be able to take over. Look, the idea that somebody who is 60 can't be diagnosed with stage-four glioblastoma is no different than the idea someone at 77 won't be diagnosed with a terminal disease.

**BA: But you mentioned your adherence to science before. You surely know that the odds increase with age.**

Yeah, they do. They do. But they don't increase like they did. We're in a situation where things are fundamentally different than they were 20 years ago.

**MC: One of the things you have to deal with in addition to just questions about basic age is as long as you've been in public life, you have baggage.**

That's right.

**MC: And you've had in debates, a couple of times, you've had a little trouble answering for positions that you held decades ago, which I think is a bit ridiculous that that's an issue. But those questions aren't going to go away. So have you had time to figure out a strategy for just answering, kind of the basic approach to those?    Some of the aspects of his record that Mr. Biden has struggled to speak to include his position on the Hyde Amendment limiting abortion funding and support for tough-on-crime legislation.**

The answer is yes. If you notice, they've hit me on every single thing I could be hit on so far. That's the good news. Every aspect of my record, period, has been hit. By Trump and by the people I'm running against. And I'm a big boy. My dad used to have an expression. Never complain and never explain. And so, and guess what? I'm still leading in all the polls. O.K.? That's number one.

Number two, if you take a look at what they call these debates, they're not debates. They're 30- to 45-second assertions. Because what comes to me all the time is the attack. I get to speak, but I get to speak in response to an attack.

And one of the things that I have to admit to you, I've had difficulty accommodating, is how do you turn to someone who is attacking you on something that I know they know is not true, and do it in a way that doesn't look like you're being dismissive? Particularly if it's a person of color or if it's a woman.    There were fireworks when Mr. Biden and Kamala Harris clashed on busing and segregation during the June Democratic debate. Senator Harris recalled Mr. Biden's opposition to school busing in the 1970s and shared her own history as "a little girl in California who was a part of the second class to integrate her public schools." Mr. Biden said this was "a mischaracterization of my position across the board." And so I've had to learn how to deal with that. I mean, look, you have a situation where when I was attacked on busing. It's acknowledged now the woman who attacked me had this exact same position I had. Exact. No different. None.

**KK: You have always been known ——**

So what do I say?

**KK: You've been known as a great retail politician, but there have been some kind of odd moments on the campaign trail in the last few months. When you called the guy fat —    Mr. Biden made some awkward headlines when a video seemed to show him responding to a voter's questions about Hunter Biden by saying, "But look, fat, look. Here's the deal."**

I didn't call him fat. That's not true. I started to say fact was, and I decided to back off it. I did not call him fat. No. I honest to God didn't.    A senior adviser for the Biden campaign said in a tweet that Mr. Biden had been saying "facts," not "fat."

**KK: We'll check the tape on that.**

Check it.    Tape checked. Mr. Biden deserves the benefit of the doubt, but he did call the man "a damn liar."

**KK: You know what? I'd really like to move on maybe to a couple of other issues if you don't mind. Lauren, do you want to ——**

Sure! No, I'd rather continue to talk about my age.

**Lauren Kelley:** I have a different topic for you, Mr. Vice President, I'd love to ask you about reproductive rights.

Yes.

**LK: So I think it's fair to say that this is a pretty extraordinary moment for reproductive rights. They're more threatened than they probably have been since Roe v. Wade was passed.     In 2019 Alabama passed one of the country's most restrictive abortion bills and a number of states passed "heartbeat" bills, essentially outlawing all abortions. Many worry that the newly empowered conservative majority in the Supreme Court will hear a case that allows them to overturn Roe v. Wade.**

I agree.

**LK: There are a lot of people who question whether you will go on the offensive for reproductive rights as much as is going to be necessary with Roe v. Wade under threat, given the fact that, while you are pro-choice certainly, you switched your position on Hyde only just recently.     The Hyde Amendment was first passed in 1976 and is renewed annually. It bans all federal funds for abortion except in cases of rape, incest and threats to the woman's life. Mr. Biden supported it for decades until he reversed his position in June. For instance, you also originally argued for greater exemptions to the contraception mandate in Obamacare. So I think there's some concern out there ——**

No, I didn't, by the way.

**LK: You didn't?**

No, I was on the opposite side of that.     News reporting indicates that Mr. Biden was not on "the opposite side" of the contraception mandate debates. He reportedly argued that the contraception mandate would anger Catholic voters and threaten President Obama's 2012 re-election. Read Bloomberg's coverage of Mr. Biden's stance at the time here.

**LK: There was a lot of reporting from the time that said that you were arguing — I think it was a political strategy, right? That it might be read as trampling on religious freedom. But that's not correct?**

No. What is not correct is the idea that — the argument was what the president put out initially was different than what ended up being finally the final position on. And the question was, would I defend the president? I don't want to get into ——

**LK: O.K., how about we focus on Hyde then?**

But anyway. I can explain Hyde.

**LK: Please do.**

First of all, everybody's voted for Hyde. Every single person running has voted ——     Many representatives have had to vote for the Hyde Amendment despite their opposition so as not to torpedo spending bills. Because it is attached to federal government funding bills, most candidates will have to vote for it until its repeal.

**LK: Well, because it's in the spending bill.**

Well, I understand. I got it. But they all, this idea, this is such a principle thing.

**LK: Well, it's principled. I mean, most of the party has been in favor of overturning Hyde.**

No, I understand that. I understand that. Look, let me answer the question directly. I thought that when there were reasonable alternatives and funding mechanisms that did not deny women the opportunity to take advantage of their constitutional rights under Roe v. Wade, as amended by Casey, that in fact it was O.K. to not make other people who had strong views different than that pay for it.     In the past Mr. Biden has ascribed his opposition to certain abortion measures to his Roman Catholic faith. But — let me finish, please.

**LK: Go ahead.**

**Biden jokes:** we decided that we were going to move to, which I wanted to do a long time ago and everybody has, is to have basically universal health care. That option is eliminated. It's not available if it's basically universal health care. You cannot say that the poor women are now going to be covered by Medicaid and/or, and my plan, a Medicare option in to Obamacare and then expect that there's going to be mechanisms by which they could still get the kind of help they got through private contributions and Planned Parenthood, which rated me 100 percent, by the way, during this period and the rest.     In 2008, the Planned Parenthood Action Fund gave Mr. Biden a rating of 100 percent on his support for reproductive rights; in 2007 NARAL Pro-Choice America gave him a 75.

**LK:** Sure.

And so that's why I changed the position.

**LK: Mr. Vice President, though, the thing is, under the Hyde Amendment, it has been the case since 1976 that women who are on Medicaid, women who are in the armed services and other women have not had access to reproductive health care if they can't afford it. So I guess I don't understand how it is, that by changing the health care plan that ——**

I changed the health care plan. That's the only vehicle people are actually going to have because people aren't spending the money on supporting these other alternatives available for people. That's what's changed. And look what the states have done. There's been an all-out attack. Across the board.

**LK: But if you're saying women should have access and they have not had access, poor women specifically, have not had access since 1976 ——**

They haven't had, they have had access to other means by which they could get the help, not as nearly ——

**LK: For many women, that hasn't been the case. Women have suffered. Women have died.     The Hyde Amendment affects Medicaid funding of abortion; it disproportionately affects low-income women and women of color.**

I don't disagree with you.

**KK: If you cannot afford to have the procedure, then you have to turn ——**

But before that, before what existed was, there was vehicles by which there were organizations that provided the procedure for free.     It's not clear which programs Mr. Biden is referring to or what would be impossible under his health care plan. They didn't need to pay for it. But when you make it all a federal program, that makes it impossible.

Here's the deal. If in fact, and I've said this for a while, if in fact this court comes along, all these draconian laws that are being passed and what's happening now? It's all designed to go to the Supreme Court in the hope the Supreme Court will in fact, by a 5-to-4 decision rule against Roe v. Wade and/or amend it some way as it relates to Casey. And if that were to occur, I will immediately send to the United States Congress legislative — legislative — requirement legislating and codifying Roe v. Wade as amended by Casey and put it in the law. And so I strongly support that as the option. It has to be available to all women, all women.

**LK: Right. So I'm going to move on to another topic. You called Anita Hill when you launched your campaign this go around. And what your campaign said was that you expressed your "regret for what she endured" at the time of the Thomas hearings.     Mr. Biden oversaw the 1991 confirmation hearings in which Ms. Hill testified that she had been sexually harassed by the Supreme Court nominee Clarence Thomas.**

**Dr. Hill said a couple of things in response to your phone call. On the one hand, she said that she did not see the way that you conducted the Thomas hearings as being disqualifying to being president. But she also, it seems, felt that it was not really adequate. What she said specifically was, "there needs to be an apology to the other witnesses" — the women who were not called — "and there needs to be an apology to the American public. … There are women and men now who have just really lost confidence in our government to respond to the problem of gender violence." I was just wondering if you would respond to Dr. Hill.     Ms. Hill said she cannot support Mr. Biden for president until he takes responsibility not just for what she endured but also for his failure to call up corroborating witnesses.**

The Anita Hill number one. I did apologize, and you saw the last hearing, went through the same exact thing.   Vice President Biden is referring here to the confirmation hearing of Brett Kavanaugh. The question is how do you deal with — and Professor Hill and I had this discussion. What would be a way to fix the hearing process whereby a senator could not ask a question that was demeaning? The question raised was, should we do it on camera? She argued strongly no, we shouldn't do that. She had thought about that. She thought we shouldn't do that. I've discussed this with a whole group of women who advise me.

What is the way to get by what you saw again in the Blasey Ford position, with whom I met, by the way, [she] asked to meet with me, and I spent some time with.   When Christine Blasey Ford testified about Justice Kavanaugh's alleged sexual misconduct, Mr. Biden hailed her "courageous" testimony. And so we got to figure out a way to in fact, in a he-said, she-said circumstance, how do you prevent a senator from asking a question that in fact would be available to be asked in court if you wanted to do that? I tried to you, remember, I got in shouting matches in that hearing, attacking people who were attacking her, her credibility. I believed her from the beginning. I was opposed to the nominee from the beginning. And when we lost by a single vote, I made a commitment that I kept that I would pass, I was in the process of writing the Violence Against Women Act, which initially women's groups did not support as you'll recall.

**LK: Sure.**

And secondly, I would make sure that there would be women on the Judiciary Committee, and I went out and campaigned for two women on the express commitment they would agree to go on the committee: Dianne Feinstein and Carol Moseley Braun. And they did. And by the way, they're both supporting me.   Senator Feinstein endorsed Mr. Biden in October. Former Senator Moseley Braun did, too, along with defending Mr. Biden after he sparred with Senator Harris. Mr. Biden called Senator Moseley Braun "the only African-American woman that's ever been elected to the U.S. Senate," to which Senator Harris responded: "Nope. That's not true. The other one is here."

**LK: Sure. I think that her response was really more about the other women who could have corroborated her story, who ——**

By the way, if you look at, there were one of the women we did not know about. The one we knew about, the professor from California who ended up being a judge for, I think it was an employment judge. I'm not sure exactly what her — and she was going to come and testify. At the last minute, she decided she wouldn't. She actually signed an affidavit saying, I don't want to come. I asked her, please come. And she understandably, from her perspective, didn't want to be put through the ringer nationally. I guess that's why she didn't come. And so I could've demanded I call her. Now, how much would that help me beat Thomas? If we brought in a witness who was designed to cooperate, that's why she was being called, and she didn't corroborate what she said and remained silent.   Mr. Biden blocked two witnesses from testifying: Sukari Hardnett, who had submitted a sworn affidavit testifying to Justice Thomas's inappropriate behavior, and Angela Wright, who also accused Justice Thomas of harassment. In September 2018, NPR spoke with Ms. Hardnett, who had wanted to corroborate Ms. Hill's testimony and was not invited. That month, The Times spoke with Angela Wright, as well.

**LK: I mean, I think all of those three women have since said that they felt like the process wasn't being handled in a way that they would be heard fairly, but ——**

Well, that may be, but wasn't because I didn't ask them.   As The New Yorker's Jane Mayer has reported, Mr. Biden could have given Ms. Hardnett and Ms. Wright, as well as a third corroborator for Ms. Hill named Rose Jourdain, a chance to testify publicly. Instead they were allowed only to submit depositions or written statements, which, as Ms. Mayer reported, "went into the public record so late that few senators ever saw them — all of which was Biden's call." They were asked.

**LK: O.K.**

I actually had them sign an affidavit saying, I won't come. We sent a lawyer to their, to the hotel because I had planned on having them be there. Look, let me give you an example. Remember when I started the Violence Against Women's hearings? I had to warn every woman who — I believed if we rip the Band-Aid off, we would get progress. But it was ugly ripping the Band-Aid off.   Mr. Biden has said one of the reasons he first began working on legislation addressing violence against women was he was "appalled" by the lack of action on marital rape. He introduced the Violence Against Women Act in 1990. It was written with Representative Louise Slaughter. There was a young woman here in this city who was a model. And she in fact, she was — she wanted to get her, she was on the upper 50s and she lived in a nice apartment complex

with the young man bar in the basement. She wanted to be in a position where she could in fact get back her rent because or her deposit because every time she wanted to go from utility apartment or a, you know, a not utility, you know, the, no bedroom.

**MG: A studio.**

**KK: Efficiency.**

Anyway. To a one-bedroom apartment, the employer would hit on her. So she was doing a shoot somewhere here in the city. She got a call, come stop in the restaurant bar. I have a one-bedroom for you, and everything's O.K. She walked in, sat down, had the discussion. He hit on her again. She got up and left. And you'll remember her. Her name was Marla. She walked outside, and two thugs slashed her face. Remember that?      Marla Hanson, who was a model at the time, rejected the sexual advances of her landlord, Steven Roth, and he arranged an attack by two men who slashed her face with a razor.

**KK: Sure.**

So she said she was willing to come and testify. And I said, "But I want to let you, I want you to testify, but I don't want you to be sandbagged here."

I said, "What did your mother say to you when she found out?"

She said, "Why were you in a bar?" "What did your girlfriends say to you?" "Were you wearing a short skirt? Were you wearing a bra?"

And so I wanted her to know what she was about to go through. Look, we got to change the culture. The culture is what's wrong. That's why I finished the Violence Against Women Act and that's why I started the "It's On Us."      "It's On Us" is a social campaign started by the Obama-Biden administration to fight sexual assault on college campuses.

**JW: Mr. Vice President, can I ask you, since we're talking about Supreme Court nomination hearings, would you give us any names of people that you might consider to nominate to the court?**

No, but there are at least a half a dozen I've already gone through and people I've gone through in the past and who are available now.

**JW: Do you think you would ——**

The moment I do that you, you know what will happen.

**JW: Well, Donald Trump did it in 2016, and it ——      Mr. Trump released 11 names of possible Supreme Court picks on May 18, 2016, and then added 10 more in September 2016. The unorthodox move was largely an effort to rally Republicans behind him by showing he would nominate conservative justices.**

I am not Donald Trump.

**JW: I know you're not.**

Don't ever confuse me with anything having to do with Donald Trump.

**JW: I know. But there's been a criticism of Democrats and people on the left in general, that they don't get the significance of the court to the country and to the policies of the country. And I think what Donald Trump understood, and it seemed to work for him, was that by signifying whom he would choose, it made a difference to a lot of voters. Would you consider doing that? At least once the ——**

I would tell them the kind of person I would choose. I will not ——

**JW: No names?**

No names.

**JW: Can I ask you another ——**

The New York Times   THE CHOICE   THE ENDORSEMENT   BERNIE SANDERS   TOM STEYER   CORY BOOKER   E

**Nick Fox: I was kind of curious what kind of person? What are you looking for in the Supreme Court?**

They have to have an expansive view of the Constitution. Recognize the right to privacy, unenumerated rights that exist in the Constitution. Not the Federalist Society view that if it's not listed, it doesn't exist. And they have to be, they acknowledge the unenumerated rights and a right to privacy in the Constitution, and the "penumbra" [laws] and the Ninth Amendment, then in fact that means I know they will in fact support Roe v. Wade. They'll support a woman's right to choose and a whole range of other things that relate to individual personal rights. That is critical. I've written about it extensively. I've written law review articles about it. I've presided over more judges and more Supreme Court nominees than anybody else has. Look at the people I supported.

When I defeated Bork, I was able to provide a woman's right for a generation because had he won, it would have been over.    Initially, Mr. Biden said he would support Judge Robert Bork's nomination, but as his Democratic colleagues lined up against the nomination, he withdrew his support. That's what I would look at. I'd look at the philosophy of the judge, their background and their judicial temperament, whether or not they have the temperament to be on the court. And there are a number of really qualified people out there. I must tell you, my overall predilection would be to look for and put more women on the court because it's part of getting down through the cultural morass here. Because unless we have courts that look like the public, people lack confidence in them.

**KK: You keep saying that you want to change culture. I think — going back to young people for a moment. I think a lot of them are having trouble believing that, after as long as you've been in Washington, D.C., that you actually do want to change the culture. Because you've had a lot of time in Washington ——**

And I have changed the culture. I wrote the Violence Against Women Act. And none of you supported it. Not you — editorially supported it. I wrote the legislation —

I'm also the guy that made sure Slobodan Milosevic got tried as a war criminal. I'm also the guy who went in and got 150,000 troops out of Iraq. I've done a lot of things that in fact are progressive, very progressive.

And what I'm proposing — the other thing I find interesting is that we talk about whether or not my program is progressive. If I'm able to pass what I'm talking about, my administration would go down in history as one of the most progressive administrations in American history. Because we're talking about fundamental changes in the environment. Fundamental change in dealing with health care. Fundamental change in dealing with education. And it's real.

**KK: And if Mitch McConnell is still in charge of the Senate, how will you get those things passed?**

It takes me to this next point. The next president of the United States, the nominee, has to be able to win in states that in fact are up for grabs, and we can win. I'm beating Trump in Texas, Florida, North Carolina, Georgia and all those Midwestern states, which I will win in a walk. National polls from October showed Mr. Biden to be beating Mr. Trump in Florida, Arizona, Wisconsin and Pennsylvania, but trailing him in North Carolina and tied with him in Michigan. But we have to be able — if we do not engage and nationally in the states where there's a chance to win a House member or a Senate or change the legislative body, we are not doing our job.

Think about all the times when there was real change take place. The presidents have not only gotten elected, they've brought along Democratic majorities. We have to win back the Senate. We have to win, and we can. We can. And so what I think, respectfully, not you, but people are going to have to consider, is O.K., who among the candidates will enhance the prospect we can win a Senate seat in Texas? Who among the prospective candidates is going to enhance the prospect in Georgia —

**KK: It's very early. In 2003 in December, Wesley Clark was leading, winning the polls.    Pew polling from December 2003 showed General Clark and Gov. Howard Dean at 15 percent, Representative Dick Gephardt and Senator Joe Lieberman at 12 percent and Senator John Kerry at 6 percent.**

Oh, she's not married to that. Come on. Be fair. O.K.? Wesley Clark. I know Wes, he's a good guy. I've been consistently leading in the polls after taking all the hits. I go down, and everybody who's hit me is out. They come back. I don't mean it's guaranteed, but look at all of the data.

And so I'm not saying that it's guaranteed I win, but name me a nominee who's taken as many hits from the beginning of them announcing, even I announced late, who has taken the hits. You all declare me, not you, editorially in a broad sense, declare me dead and guess what? I ain't dead. I'm not going to die.

**JW: Mr. Vice President, can I follow up on ——**

**KK: Everybody dies.**

I'm not going to die politically.

**JW: Can I follow up on Katie's question here. You're saying not that you would work with them if Mitch McConnell led the Senate, but that you would have the greatest likelihood ——**

Oh, there are certain places you can work with a Mitch McConnell. For example, look what happened in the taxes. I got him to vote to raise taxes, Republicans, $660 billion. Now, that was unusual circumstance because he had bluffed and said, "You're going to shut down the government." I said, "O.K., go ahead man."     When Bush-era tax cuts were set to expire in 2012, which would have raised $3 trillion in revenue over the next decade, Mr. Biden negotiated with Senator McConnell and they settled at $600 billion. The rest of the tax cuts were made permanent.

**JW: But I think most people ——**

**NF: But you also angered a lot of Democrats by getting an extension of the Bush tax cut and cutting the estate tax.**

Sure I did. But I also saved the damn economy. Be honest. Six hundred and sixty billion dollar increase in taxes. What they're angry is allowing to have the tax cuts stay for people making under four, when in fact they want it to stay for people under two.

**NF: I think what they were angry about was that we didn't try to fight, you didn't try to fight for more and that you accepted too little.**

I fought — fight for more? It was the day we're about to default. You remember how it all happened?

**NF: I do.**

Well, tell me. I don't mean to be argumentative here, but it happened on New Year's Eve day. I'm riding in to meet the president, and I get three phone calls from McConnell, which I didn't take, and I find out he says he'll only deal with Biden. We had 12 hours before we defaulted for the first time in our history.

**NF: What do you think you could accomplish now after even more years of partisanship with Mitch McConnell?**

What Mitch McConnell is finding out, and a lot of Republicans are, that they're going to have a hell of a lot of baggage to carry going in to win their own re-elections.

Look what we just did in Virginia. I campaigned all through Virginia. Look what we just won in Kentucky. I campaigned in Kentucky. You all were saying we can't win that governorship in Kentucky.     In Kentucky in November, Andy Beshear, a Democrat, defeated the incumbent governor, Matt Bevin, who had alienated members of both parties.

I'm pretty good at this, knowing where to go. My point is I can't guarantee anything, but I can guarantee that I know how to campaign to help people win. And in all of those states we're talking about, the Democrat who they most would rather have run in their state to help them raise money and get votes is me. That could change, but at the moment, think about it. Do you think that — name the other candidates. Who's going to go in North Carolina and help that candidate win? There's going to be value added. And don't tell me — I shouldn't say don't tell me. I'm being rude. The fact is if you take a look, it matters who is at the top of the ticket. It matters the resources they have.

**JW: Speaking of those other candidates, several of them have proposed major structural reforms to our government and to our democracy. These include abolishing the Electoral College, expanding the size of the Supreme Court, setting term limits for justices, abolishing the legislative filibuster. Which, if any of these, do you support?    The Times editorial board has supported abolishing the Electoral College: "Fix the Electoral College — Or Scrap It."**

None.

**JW: Why not?**

Because that structural change requires constitutional amendments. It raises problems that are more damaging than the problem that exists. We're in a situation where the reason they gave judges lifetime tenure, you know why.

**JW: And you think with a legislative filibuster in place, even if you control the Senate, but you're going to move any of your agenda?**

Yes.

**JW: How?**

Because there's a lot of things people agree on, though you don't — there's two things. One is that there are a number of areas where you can reach consensus that relate to things like cancer and health care and a whole range of things. I think we can reach consensus on that and get it passed without changing the filibuster rule.

There are other areas where if you were to change the rule, first of all, if you couldn't get it changed, if you can't get 60 votes, the fact that you're going to amend the Constitution on judicial independence is kind of a stretch. And what I love hearing my colleagues say that I'm running with, saying, "Well, I'm going to by executive order." And my mother would say, "Who died and left them boss?" We have three branches of government, equal.

**JW: Agreed. That's why I'm wondering how you're planning to do this with — you had a front-row seat to Republican opposition in the Obama administration.**

Yeah. We still got a lot of things done. Well, I'll tell you what. I was able to get every Democrat to vote on the floor to make sure we passed Obamacare. Number two, I was able to make —

**KK: Which all of your opponents want to change.**

Sure, they want to change. But they don't want to eliminate it. Who's out there saying, "I want to get rid of it"? The ones that want to change it, they're saying, "Look, I know I can't get mine done for three, four, five, 10 years. In the meantime, what are you going to do? I'm going to take Biden's plan in the meantime. I'm going to expand Obamacare."

Come on. Look, part of this is what can reasonably be done that fundamentally changes the dynamic that everybody has access to adequate health care. And the fastest, quickest and most extensive way to do that is my plan to add — take Obamacare, further subsidize it to the tune of another $750 billion over 10 years. Add a public option. Provide for that for anybody who wants it and allow the 160 million Americans who seem to like their hard-negotiated health care keep it if they want it. If they don't want it, they can buy in and/or if they don't have the money, they automatically are into the plan.    Mr. Biden's health care plan would create a public option open to everyone and restrict pharmaceutical pricing. Unlike Senators Warren and Sanders, he does not support "Medicare for all."

**MC: Now related to this, do you think that the Democratic primary, it's been a mistake that so much of it has focused on whether or not to blow up Obamacare and in what way?    Times reporters noted that Senator Warren has moderated her stand on Medicare for all in recent weeks. I mean there are a lot of issues.**

No, I don't think it's a mistake because I think if you take a look at the data and just come out with me — I invite any one of you to travel with me when I do these things and watch the audiences no matter where. I mean just open forum. Watch the audiences. Tell me, do you see any support? Do you see any majority support Obamacare for all — I mean, for Medicare for all in the Democratic primary? If you do, I'd like to know what it is. I don't know where it is. I've been saying that from the beginning.

Now, I want a lot of people who in fact really, really support it, I get it. It's not a bad idea if you have an extra $35 trillion lying around. And you're not going to raise taxes on the middle class and you're only going to do the wealthy.

Look, part of what's going on here, I think, and I'm sorry to get passionate about this, is that what I find people are most looking for is honesty, authenticity and being able to tell you exactly what they're going to do and have a chance of doing it. That's what I find. Now, how many of you in here believe there's any possibility in the next four to six years raising another $35 trillion? The Urban Institute's estimate put the cost of Medicare for all at $34 trillion over the next decade. Do any of you think it's less than that? Do you think maybe $30 trillion in 10 years? And not raise not only taxes for everybody, for the 2 percent tax for the wealthy? That doesn't even get you even close to paying for it.

So what are you going to do? You're going to help the middle class, and you're going to go out there and you're going to provide Medicare for all. If you wave a wand, everybody sleeps, no problem. But now, you have, look what you're paying when you have 16 million people on Medicare with withholding? Now you're going to drop another 280,000 people, million people on it? And taxes aren't going to go up?

**Jeneen Interlandi: Your public option plan has a lot of promising features, but it's still quite a heavy lift. The public option that was attached to the Affordable Care Act did not get through the Senate. What's different this time?**

Gigantic difference.

**JI: And yours is much more ambitious than that earlier one.**

Sure it is. And I'm glad you raised that. Two things. One, every Democratic president since Roosevelt tried to do what Barack got done.    The last successful attempt at health care reform, before President Obama, was President Lyndon Johnson's creation of Medicare and Medicaid.

And it was a really heavy lift to get it done. It was a gigantic step forward. But even when it got done, the arguments are, I can say this now publicly, is — between Barack — and I say take a victory lap, man. We got to let people know. We've got to let people know what was done because they don't know it.

I came up here on the Empire State Building when I convinced the president we should spend $100 billion on climate change issues. And we're talking about new windows and all the things we could do to save energy for public buildings.    The Obama administration proposed the Better Buildings Initiative to provide tax credits and other financing for building owners to retrofit to save energy. The Empire State Building did it before the program was passed, but Mr. Obama and Mr. Biden cited the annual savings of $4.4 million in energy costs from replacing all the windows. And the one of the leaders of the business community was there said, "You know, my" — I think he said live-in help or wherever it was — "came up to me and thanked me for the raise." She said, "The raise is what you got, reduction in the take-home pay withholding." No one knew it was Obama, and no one knew what he did.

**JI: Sorry to interrupt you. There's certainly more public support for the Affordable Care Act now. I think people came around to realize how valuable it was ——**

Why?

**JI: Because they tried to take it away.**

Bingo.

**JI: But it's still a heavy lift, and industry is going to be vehemently opposed to it. You're still going to have to fight a battle, so can you talk a little bit about what your plan is for that?**

That's right. I'm going to have to fight like hell. Well, my plan is for that is to do what I've always done, and that is, be able to convince people. I've been pretty good at it. I find it interesting. My opposition says, "Yeah, it's true. Joe has put together more bipartisan agreements than anybody. Joe is — but that was the old days." It was three years ago.

With regard to, for example, the Cures Act, which came up after he was elected, and two weeks before I got sworn in, convincing over 200, and I think 398 folks in the House to vote for it, when initially it started with 119 as well as, what did get?    The 21st-Century Cures Act was signed into law on Dec. 13, 2016. It was supported by the pharmaceutical industry because it sped up

drug and device approvals. It provided (only) $6.3 billion in total funding. The Senate vote was 94-5. Among the opponents were Senators Warren and Sanders, because it was a victory for the big drug companies. Eighty-nine senators, 90 senators — don't hold me the exact number — when it started off with 48. It's called persuasion. Presidents are supposed to be able to persuade.

And what's happening now is everybody — look, the carny show's gone through town once, and they found out there's no pea under any of the three shells. It's coming back again, and people are going, "Ooh. I didn't know that. You mean to tell me they did this and did that?"

Part of it is the president, God love him, Barack, had everything land on his desk but locusts. I mean, everything. Look what's happened. We were about to go into a major, major depression. I remember getting chastised because I said, "This is the greatest recession in the history of the nation short of a depression." Biden's exaggerating — it was. It was.

**JI: Sorry to keep interrupting you, but just one quick follow-up on this. You've said, and President Obama said, "If you like your private insurance, you can keep your private insurance." In 2013 —    In July, Mr. Biden drew a contrast between Medicare for all and his own health care plan, saying that under his: "If you like your health care plan, your employer-based plan, you can keep it. If in fact you have private insurance, you can keep it."**

I didn't say that, by the way, but go ahead.

**JI: You have been quoted as saying that in multiple places.**

No, it's a long — O.K. Yeah, said we can keep your private insurance. Yep.

**JI: Do you say that not — are you not saying that?**

The doctors. They said you can keep your doctor.

**JI: O.K. You can keep your doctors. What happens if employers curb their own offerings as the public option takes hold? There's a lot of incentive ——**

Bingo. They can automatically go get a public option.

**JI: But they would lose their ——**

Sure they would.

**JI: An employer could take away, if someone likes their private insurance ——**

No, no, here's the deal. If you like your private insurance and your employer keeps it with you, you can keep it.

**JI: But what happens if your employer cancels it?**

If you can't, you come on the Biden plan. You provide that option. You can get a gold plan where you do have nobody — you do not have to pay more than a $1,000 deductible. We significantly reduce drug prices, which, by the way, Republicans are looking to get done, O.K.? What you do is you provide that option. But if you like your plan, if you really like it, I don't think we should come along and say, "You must give it up."

**JI: But if your employer cancels that plan, then you don't get it, you don't have that choice.**

No, you don't have the choice, but you had the choice to — that's why — I'm not saying, I said, if you like your plan, you can keep it, assuming — I should add the obvious — if your employer doesn't take it away from you. O.K.?

But the point is, that's why I set the plan up the way it is. You can automatically buy in much cheaper to get a gold plan, limit to a $1,000 deductible. Get your meds paid for in a reasonable way by setting up a system that exists that, I propose, exists in Germany. That, in fact, you have a group come in from the outside.

We sat together at N.I.H. to set what the value of what you did is. When I did the moonshot, I met with 13 major drug manufacturers, in a private room, and I said, "Tell me, what do you think you should be able to charge for your drugs?" They said, "Based on efficacy." I said, "If you find a drug that cures a particular cancer, we should be able to charge anything you want for it." I said, "No. Wrong. You should in fact, as a matter of public policy, be able to make a significant profit on what you've invested."     Inspired by the death of his son Beau in 2015, Mr. Biden introduced a "moonshot" initiative to end cancer. Efforts to cure cancer have been started periodically since the Nixon administration, though to little effect. The death rate from cancer has dropped only 5 percent since 1950.

The example I gave, if it costs you $10 bucks to get to where you were, you can charge $13 bucks for it, but you can't charge a hundred for it. And that's why we're going to have this system like exists in Germany where, in fact, they set the price, because most are bio-based drugs now, they're no longer chemical-based drugs. And the problem is, it's going to end up being only one or two people who come up with that drug, and therefore to be able to charge exorbitant prices and continue — and you cannot raise the price of that drug beyond the cost of medical inflation unless you can prove you fundamentally altered the drug, or you don't have the patent. So it's a very practical thing.

This is a place where I find, whether you're Republican or Democrat, you think you're getting screwed on drug prices. And you are, in terms of everything from insulin to inhalers and a whole range of other things. So, again, can I guarantee that it gets done? No, but I can tell you what, if anybody can get it done, I can, and I think there's a consensus for it. If you take a look across the board, Democrats and Republicans, just overall polling, they think we have to do something about lowering health care costs. They think they have to do something about making it affordable and eliminating the overwhelming deductibles. They think it's really and critically important that you reduce the cost of necessary drugs across the board. So the same way they told me I couldn't get the Cures Act passed, couldn't do it.

**KK: Sir, we're running out of time ——**

I'm sorry.

**KK: —— and I want to get to some economic questions as well as foreign policy. But before that, we have been asking every candidate the same question, which is, who's someone who has broken your heart?**

I can tell you what has broken my heart but it's not someone who's broken it. It broke my heart when my son died.     Beau Biden, who was the former attorney general of Delaware, died of a rare strain of brain cancer in 2015. Decades earlier, he had survived a car accident that killed Mr. Biden's first wife and daughter. Broke my heart when I was unable to do anything about — I left the house and I got a call saying my wife and daughter were dead.

I don't know whether to be completely straight with you, and how you'll — I learned a lesson a long time ago, that, it was a friend I had, a really good friend. We were in high school, and he was a troubled guy, but I was always — lived down the block from me, and he got in an accident when he was drinking and killed the guy who was riding shotgun. Hit a tree and the fellow died. He was hospitalized a long time, and I was the only one that would go see him.     In 2019, Politico published an article called "How Grief Became Joe Biden's 'Superpower,'" about the profound ways that Mr. Biden's personal losses have shaped him. Mr. Biden declined to speak on the record for the article; he is wary of any perception that he "uses" his tragic experiences in political campaigns. After he was out and recovered, and I insisted that the guys that we hung around with before, that they bring him back, they allow him to come back into the fold. I remember we were sitting, like in the high school days when you've got five guys in a car going home after whatever we were doing and got in an argument, and he turned around and he said something really mean to me. I remember going home. It hurt me more than anything that had happened to me before. Because I thought this guy was my soul mate.

I remember my dad saying to me, Joey, you're always going to be disappointed if you hold people to the same standard you hold yourself to. You're going to be disappointed. Don't expect that people are going to necessarily be prepared to appear in the second edition of "Profiles in Courage." And that's the only time.

From that point on, I never let anyone, man or woman, hurt me in terms of, you know. I get criticized, as you know, and even some serious press people who are not being negative with me say, "Biden doesn't hold a grudge." You know that old saying, "Seek revenge, you got two victims." You're one of them. I've never done that because it's just not worth the effort.

But I have not been hurt by a woman or a man. But what's hurt me is look, a lot of you've been through a lot more than I've been through too. It's not just me. I have a cartoon on my desk, it's about the size of this insert. I guess I was feeling sorry for myself, and my dad was over at my home. This was 20 years after the accident. He thought I was just too down. He went up to a local Hallmark store and came back, you know they sell the things like this that have a gold frame around them in glass, and two etchings in it from the funny papers, "Hagar the Horrible." There's a picture of Hagar in the one standing there and his Viking ship had crashed down to the rocks and the mast was down, and his horns and his helmet were charred. And he's leaning out, he's going, "Why me, God?" And the next, the same exact cartoon, and a voice from heaven says, "Why not? Why not you?" Why not me? What makes me so special? I still have it on my desk, and I've reprinted it for a lot of people, because it's just not. You just got to get up. I'm sorry, I didn't mean to get so. Anyway, there isn't anybody, that is, any woman or man, since I've been a high school kid that has really hurt me.

**NF: Can I kind of bring that down to a more mundane level? You've talked about your relationships with Republicans and honestly sometimes they seem crazy, you can't work with these people. And then see there's an old video going around of Lindsey Graham just saying ——**

I'm having trouble hearing that, sorry.

**NF: You're the greatest. I can't remember the exact words, but saying some ——**

Lindsey Graham?

**NF: Yeah, that he was saying that there's got to be something wrong with you if you can't admire and like Joe Biden.     View the video of Senator Graham talking about Mr. Biden here. You realize that the relationships that you built over the years. And then I think of these guys going after you with nothing. No evidence at all, no reason, and you know that they know it's wrong.**

They're frightened. They're frightened. They lack courage. I know why Lindsey's doing this without talking to him. He'll lose his election in South Carolina.     Senator Graham was initially a fierce critic of Mr. Trump but has become a loyalist. He told The Times Magazine, "If you don't want to get re-elected, you're in the wrong business."

**NF: He could.**

Did you see him? I wish he had more courage because he knows, I mean he — anyway we're on camera, I don't want to get too personal about him. But look, there's just a lot of people I don't expect.

Barack always kids with me. I say to Barack, the president, I call him Mr. President, so I don't mean to be, we are close personal friends, but I don't call him, I just don't want to confuse him with the president, O.K.? When I say, Barack I should say President Obama. I don't want to confuse him with the other guy. And he always was quoting me on the things I'd repeat to him all the time. He said to his friends, "What's it like having Joe?" "He's just like having an older brother. He always just tells me the truth."     There were tensions between President Obama and Vice President Biden — for example the vice president sometimes went off script, frustrating the president. But the two became close friends. In the wake of Mr. Biden's son's death, the president said to him: "Joe, you are my brother." Read The Times long-form account of their relationship, by Peter Baker.

I've never, never once — we've hollered at each other, we've yelled at each other, but always in private. Because that's the role. That's one of the reasons I didn't want to be vice president to begin with, why I said no, because I know what the role is. But he's turned out to be a really close friend. But I'll say things to him. He'll ask me questions about how'd you do this, or how would you deal with that, or interpersonal relationships, or how does the Senate work, and what would you do to get this done? That's why he asked me to be vice president, along that and foreign policy. That's why he asked me to be on the ticket.

**KK: Speaking of foreign policy ——**

And the answer to your profound question is that I always said to him, "Barack, all politics is personal." It's all personal, and international relations is personal. By that I mean, you got to figure out what the other guy or woman is, and know who they are, and for them to know who they are so you don't have any extended expectations about what they'll do or not do. And how they'll respond. I know Lindsey. I think Lindsey is in a very vulnerable position. I wish — did you see when he was shaking hands with the president when he talked about Biden? He was like this. [LAUGHTER] I'm not joking.

And you might expect of people things that are going to cost them greatly to keep a commitment. There used to be the case, where you got to the Senate, if I gave you my word or anybody gave your word, you could count on it. Now it's all situational, the last 15 years. When I give my word, I give my word, and I never yield from it. If I promised you I was going to do something, even though circumstances have changed, I keep the commitment. A lot of people used to do that. A lot of people used to do that, like Teddy and a whole, whole bunch of folks, Chris Dodd and whole bunch of people. Bob Dole. But now it's, I know I said that to you, but you know, things have changed. I didn't realize that this is going to cost me A, B, C or D. That's what I call situational ethics. It's all kind of situational these days. I factor in situations as best I can. Foreign policy, sorry.

**KK: Yes, if you don't mind if we move into foreign policy?**

Sure, no.

**KK: Do you feel comfortable with the United States still having nuclear weapons in Turkey given Erdogan's behavior?   The United States has about 50 nuclear weapons based in Turkey. This began to stir public debate after Turkey's offensive into Syria in October.**

The answer is my comfort level is diminished a great deal. I've spent a lot of time with Erdogan.
   Mr. Biden had to offer President Recep Tayyip Erdogan an official apology in 2014 after remarks he made suggesting Turkey played a role in enabling the rise of ISIS, prompting diplomatic tensions. More than anybody in our administration did because Erdogan concluded that he'd only talk to me because he thought I wasn't anti-Islam. Remember when I made that speech to NATO saying, when he got elected, "You had to reach out. This is an opportunity to bring another Muslim country." And you knew why they were acting the way they did in other countries in Europe, to not reach out at all for the first election. We have had —

**KK: You mean because of anti-Muslim bias?**

Yeah. I've spent a lot of time with him. He is an autocrat. He's the president of Turkey and a lot more. What I think we should be doing is taking a very different approach to him now, making it clear that we support opposition leadership. Making it clear that we are in a position where we have a way which was working for a while to integrate the Kurdish population who wanted to participate in the process in their parliament, etc. Because we have to speak out about what we in fact think is wrong. He has to pay a price. He has to pay a price for whether or not we're going to continue to sell certain weapons to him. In fact, if he has the air defense system that they're flying F-15s through to see how they can try to figure out how to do it.

So I'm very concerned about it. I'm very concerned about it. But I'm still of the view that if we were to engage more directly like I was doing with them, that we can support those elements of the Turkish leadership that still exist and get more from them and embolden them to be able to take on and defeat Erdogan. Not by a coup, not by a coup, but by the electoral process. He got blown out. He got blown out in Istanbul, he got blown out in his party. So what do we do now? We just sit there, and yielded. And the last thing I would've done is yielded to him with regard to the Kurds. The absolute last thing.

I had a couple of those meetings with him about the Kurds, and they did not clamp down at the time. We have to make it clear that if they're looking to, because, at the end of the day, Turkey doesn't want to have to rely on Russia. They've had a bite out of that apple a long time ago. But they got to understand that we're not going to continue to play with them the way we have. So I am very concerned. I am very concerned. I'm very concerned about our airfields and access to them as well. And I think it takes an awful lot of work for us to be able to get together with our allies in the region and deal with how we isolate his actions in the region, particularly in the Eastern Mediterranean in relating to oil and a whole range of other things which take too long to go into. But the answer is yes, I'm worried.

**KK: O.K.**

**Jim Dao: You campaigned on your ability to handle a crisis. If China were to send troops and tanks into Hong Kong to violently crack down on peaceful protesters, how would you handle that?**

Well, that's a very, I'm not sure I should answer it on ——

**JD: Why not?**

Let me explain this way. First of all, the first thing I'd do is go to the United Nations, I would introduce resolutions to condemn them for their actions.     Among all the candidates asked this question, Mr. Biden is the only one who offered a detailed plan of action in response to this question. I would, in fact, try to re-establish the kind of a relationship, when we left, we had with Japan, South Korea, Indonesia and Australia. I would move American warships into the region, like we were trying to do, to take 60 percent of our fleet and have it in Asia. To make it clear to him that he, in fact, is not going to be able to go any further, that there's a price to pay if he were to do that.

I would do the same thing I did when he set up the air identification zone, and I went over to meet with him. And I said, "You've got to just understand, we're not."     When China established an air identification zone in 2013, igniting tensions with Japan, Mr. Biden visited the region and urged President Xi Jinping to show restraint. He said, "What do you expect me to do, take it down?" I said, "No, but we're going to fly through it." We flew a B-53 through it, F-15s through it to make it clear we're not playing that game. We are not going to do it. I would spend the time doing what we've absolutely shredded. I would get the rest of our allies in the world to join us in dealing with sanctions against China. We make up 15 percent of the world's economy. There's another 25 percent that are allies that we have dissed already. They're wondering who the hell — where we are.

I would try to put back together the coalition, and I would, in fact, make it clear what I said to him in my private meetings and they've been public: We are a Pacific power. He said, "Why do you say that?" I said, "Because we are a Pacific power, and you would have never had the economic stability you were able to accomplish, but for the fact we we, the United States, kept the peace." I would make it very clear there are going to be a price to pay in terms of his economy and in terms of the access to other opportunities that China badly needs.

Look, we always talk about China, and there's an 800-pound gorilla, and what they're doing. China has more problems than we could ever contemplate. They don't have enough water. They're talking about a close to $1 trillion project to turn rivers around. Forty percent to 45 percent of the land is filled with cadmium. They cannot produce crops. They are out now deciding that they're in a position where they have a million Uighurs in, essentially, jail and re-education camps in the West. They're in a situation where they're having trouble figuring out how do they hold on to the Tibetan area without getting into a conflict with India. They have a lot of problems, a lot of problems. We should be making it clear that we're not going to do anything to accommodate what they're doing and make it much more difficult for them to engage in how they proceed. It requires diplomacy, requires a show of our resolve that this is where it stops, and it raises a big question about what to do after that. We'll see what happens.

**NF: Some said that a move like that against Hong Kong would also threaten Taiwan. Do you see that?**

Oh no, I do. I absolutely do think it could. And I think it will do the opposite in Taiwan. I think the Taiwanese government will move to try to be more combative with China than it was before, because that's all he talked to me about. I've spent more time, allegedly, with Xi Jinping than any world leader has before we left office, just because the president wanted me to get to know him. He was the vice president, I was vice president, it wasn't appropriate for the president.

So they tell me, the State Department, I had 25 hours of private dinners with him. For real. He's not a stupid fellow. But he also, there's not a democratic, small-D bone in his body. And he'd ask questions like, "Do you really control your military? Do you?" He didn't control the military. The president didn't, the party controlled the military. "Do you really? Do governors have any power?" They don't have any power. That's why they're annexing big chunks of — they have no independent authority to do anything. "What is your national security team? What's the National Security Council do?" I mean, these are the questions.

**AK: Can I ask about our own National Security Council?**

Sure.

**AK: Reporting out from The Washington Post about years and years and years of generals in Afghanistan essentially lying about the conduct of the war.     The Washington Post obtained a trove of government documents revealing that senior American officials failed to tell the truth about the war in Afghanistan and hid evidence that the war could not be won. Eight years as vice president, you know this issue very intimately. Have the American people been lied to about what we're doing there?**

Yes. Yeah.

AK: What do we do about it? And why should they trust you again?

They should trust me because you wrote about I was the only guy who took them on in your editorials. I was the vice president of the United States of America. I was not president of the United States of America, number one.

No. 2, that's why [former Defense Secretary Robert] Gates and I have our problems. Gates talks about, "Biden doesn't know anything about foreign policy." Former Defense Secretary Robert Gates's 2014 memoir, "Duty: Memoirs of a Secretary at War," offered a harsh assessment of the former vice president's foreign policy chops. Mr. Gates wrote that Mr. Biden is "simply impossible not to like" but "wrong on nearly every major foreign policy and national security issue over the past four decades." Because I convinced the president of the United States not to buy into his proposal and for sending — with the Riedel Commission talking. Anyway, thousands and thousands of troops. The problem was that there was, I look, the first thing I did when we got elected, the president asked me to go to Afghanistan before we were sworn in. So I flew to Afghanistan, and I brought along with me Chuck Hagel and John Kerry and General [David] Rodriguez was along, and I came back and I wrote a report saying, "We have no policy." The idea that the Afghans can absorb training of 120,000 forces?

**AK: Do you have a responsibility to say that in public, though?**

No, but my responsibility was to make that fight, and I did fight it. I fought it all along the way.

**KK: But the administration in which you were a vice president did the surge, for instance.**

But it didn't do the surge they wanted to do. Remember, what happened was, the surge was — we were going to have a counterintelligence force in there that were going to go in and we were going to unify that country. I came back and wrote a detailed 54-page report laying out how that is not what we can do. During the December Democratic debate, Mr. Biden reiterated that he opposed the Obama administration's surge in forces in Afghanistan. David Axelrod, former senior adviser to President Obama, tweeted: "Whatever your view or the decision, @JoeBiden was, in fact, a strong voice in WH against the surge in Afghanistan. He described his position accurately."

When that helicopter went down when we were up in the Kunar Valley, I remember standing there, and we were in the wash of the helicopter. Fortunately, [we] had found a place literally not wider than this room to land on. The helicopter blades were over the edge of these pointed mountains where they told us it was 3,000 feet on one side down and 6,000 on the other. I'm looking across, and I see these people on what looked like a goat path. And I asked — they had a sharpshooter with us. I said, "Can they get us from here?" And he picked up, I said, "No, no, no, no, no." He picked up his rifle. I said, "No, I don't — " He said, "No, I'm just measuring." Said, "They're nine-tenths of a mile. No, they can't, but I could."

And I watched. I looked from 1:00 to 4:00, and I saw this village sitting in the middle of this hollow. You could see smoke coming out, it looked like almost an adobe hut. It was a whole village there. The idea you're going to unite them. They're only 17 clicks from Bagram Air Force Base. It would take them a year to get there, figuratively speaking. The idea is you're going to have a united — a united Afghanistan? That we are going to be able to bring into the 21st century from the 14th century, is a ridiculous assertion.

**KK: And yet your administration sent thousands more troops into Afghanistan.**

No, we pulled those. No, by the way, they were asked to send — they sent one-third of the number of troops that were asked. The president was in a ——

**KK: But that doesn't make it easier for the families who lost their loved ones in that conflict. If you truly were concerned, why would we have sent a single ——**

Because I wasn't the president of the United States of America. You will see, when you're able to look at ——

**KK: But you're running on the idea that you have this record, that you have the ability to make these decisions in the past, and you have, and ——**

That's right, I made the decisions, and had I been president, it would have been right. You all acknowledged it, by the way — what you've written. Read Peter Baker's 2009 Times article, "Biden No Longer a Lone Voice on Afghanistan." I'm the guy that said we should, in fact, not —

we should begin a surely a counterterrorist strategy with small bases, and we had to work more with the Pakistanis, who were our biggest problem. You're never going to unite that country as long as the Haqqani Network controls those three. I've written extensively on this.

The fact is that the two things I've, the longer I'm away from it, the things that I, in fact, took issue with, I feel good about because it turns out I was right. But I wasn't able to convince and make an overwhelming case that Gates and all his folks are making the case that, well, for example, they talked about how these folks are with us. I met with the — I'm saying too much. What I can't do is be here undercutting [TAPE CUTS OUT].

I had profound disagreements with Gates and the military on this. They know it. I made my case, I won half the fight because we did not put in 150,000 troops, which they wanted to do.    In 2009, President Obama ordered the deployment of 30,000 more troops to Afghanistan. As one former Bush administration official who I admire came by to see me, and he said, look, I said, "Am I right about this?" He said, "Yeah." He said, "What happens? We leave. Who's going to know?" The idea that you can unite Afghanistan as a coherent country between among China, Russia, Iran and Pakistan is bizarre. Period. That's been my view from the beginning.

**KK: So we're running out of time. I want to ask my colleagues ——**

Ask me easy questions, then.

**KK: Yeah, we're turning to the easy stuff now. Maybe if we could do one tech question, one econ question, how's that?**

**Charlie Warzel: Sure. Mr. Vice President, in October, your campaign sent a letter to Facebook regarding an ad that falsely claimed that you blackmailed Ukrainian officials to not investigate your son. I'm curious, did that experience, dealing with Facebook and their power, did that change the way that you see the power of tech platforms right now?**

No, I've never been a fan of Facebook, as you probably know. I've never been a big Zuckerberg fan. I think he's a real problem. I think ——

**CW: Can you elaborate?**

No, I can. He knows better. And you know, from my perspective, I've been in the view that not only should we be worrying about the concentration of power, we should be worried about the lack of privacy and them being exempt, which you're not exempt. [The Times] can't write something you know to be false and be exempt from being sued. But he can. The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one. For Zuckerberg and other platforms.    Section 230 of the Communications Decency Act says that online platforms aren't held liable for things their users post on them, with some exceptions. In July, The Times's Sarah Jeong weighed in on proposed updates to Section 230, arguing that "we should reopen the debate on C.D.A. 230 only because so much of the internet has changed," but "the discourse will be improved if we all take a moment to actually read the text of C.D.A. 230."

**CW: That's a pretty foundational laws of the modern internet.**

That's right. Exactly right. And it should be revoked. It should be revoked because it is not merely an internet company. It is propagating falsehoods they know to be false, and we should be setting standards not unlike the Europeans are doing relative to privacy. You guys still have editors. I'm sitting with them. Not a joke. There is no editorial impact at all on Facebook. None. None whatsoever. It's irresponsible. It's totally irresponsible.

**CW: If there's proven harm that Facebook has done, should someone like Mark Zuckerberg be submitted to criminal penalties, perhaps?**

He should be submitted to civil liability and his company to civil liability, just like you would be here at The New York Times. Whether he engaged in something and amounted to collusion that in fact caused harm that would in fact be equal to a criminal offense, that's a different issue. That's possible. That's possible it could happen. Zuckerberg finally took down those ads that Russia was running. All those bots about me. They're no longer being run.    In October, a 30-second ad appeared on Facebook accusing Mr. Biden of blackmailing Ukrainian government officials. The ad, made by an independent political action committee, said: "Send Quid Pro Joe Biden into retirement." Mr. Biden's campaign wrote a letter calling on Facebook to take down the ad. He was getting paid a lot of money to put them up. I learned three things. Number one, Putin

doesn't aspire to be president. Number two, Kim Jong-un thinks I should be beaten to death like a rabid dog and three, this president of the United States is spending millions of dollars to try to keep me from being the nominee. I wonder why.

**KK: Under the Obama administration, Silicon Valley's power actually expanded greatly. There are very few mergers blocked. Do you have any regrets about that?**

The reason why I was given presidential power when I was given an assignment is because I kept the disagreements I had with the president just that, as I said at the outset, with the president. One of the reasons he said he picked me was I'd never walked in the Oval Office and be intimidated by being in the Oval Office. I'd always tell him what I thought, but at the end of the day, he gets to make the decision.

There are places where he and I have disagreed. About 30 percent of the time, I was able to convince him to my side of the equation. Seventy percent of the time I wasn't when we disagreed, when he laid something out. And you may recall, the criticism I got for meeting with the leaders in Silicon Valley, when I was trying to work out an agreement dealing with them protecting intellectual property for artists in the United States of America. And at one point, one of the little creeps sitting around that table, who was a multi- — close to a billionaire — who told me he was an artist because he was able to come up with games to teach you how to kill people, you know the ——

**CW: Like video games.**

Yeah, video games. And I was lectured by one of the senior leaders there that by saying if I insisted on what Leahy'd put together and we were, I thought we were going to fully support, that they would blow up the network, figuratively speaking. Have everybody contact. They get out and go out and contact the switchboard, just blow it up.

And then one of these righteous people said to me that, you know, "We are the economic engine of America. We are the ones." And fortunately I had done a little homework before I went and I said, you know, I find it fascinating. As I added up the seven outfits, everyone's there but Microsoft. I said, you have fewer people on your payroll than all the losses that General Motors just faced in the last quarter, of employees. So don't lecture me about how you've created all this employment.

The point is, there's an arrogance about it, an overwhelming arrogance that we are, we are the ones. We can do what we want to do. I disagree. Every industrial revolution, every major technological breakthrough, every single one. We're in the fourth one. The hardest speech I've ever had to make in my life, I was asked to speak at the World Economic Forum, to give an answer on, to speak to the fourth industrial revolution. Will there be a middle class? It's not so clear there will be, and I've worked on it harder than any speech I've ever worked on.

The fact is, in every other revolution that we've had technologically, it's taken somewhere between six years and a generation for a government to come in and level the playing field again. All of a sudden, remember the Luddites smashing the machinery in the Midlands? That was their answer when the culture was changing. Same thing with television. Same thing before that with radio. Same thing, but this is gigantic. And it's a responsibility of government to make sure it is not abused. Not abused. And so this is one of those areas where I think it's being abused. For example, the idea that he cooperates with knowing that Russia was engaged in dealing with using the internet, I mean using their platform, to try to undermine American elections. That's close to criminal.

**CW: I think he would argue that he didn't know about that at the time and ——**

He'd argue it and I don't believe him for a second.

**CW: You don't believe that?**

No, I don't. Nor do you, in your heart. [LAUGHS]

**CW: Some of your opponents right now are in Silicon Valley raising money from these people. Has your campaign steered away from money from Silicon Valley?**

I haven't gone to — there are people in Silicon Valley who are decent people. I'm sure there's people from Silicon Valley have in fact ——

**CW: I am using that as a stand-in for the tech industry, mostly though.**

We're in the industry, look, not everyone in the tech industry is a bad guy, and I'm not suggesting that. What I'm suggesting is that some of the things that are going on are simply wrong and require government regulation. And it's happened every single time there's been a major technological breakthrough in humanities since the 1800s, and this requires it. For example, you have children?

**CW: No.**

Well, when you do and you'll watch them on the internet, it gets a little concerning. What in fact they can see and not see, and whether or not what they're seeing is true or not true. It matters. It matters. It's like — well, anyway.

**KK: Will you indulge us two more questions?     There were, in fact, several questions we wish we had gotten to. Pushing on Mr. Biden's economic proposals more deeply, for one. But immigration was notably absent, too. While Mr. Obama said that he supported comprehensive immigration reform, efforts to win support from Republicans in Congress were unsuccessful. The Obama administration, by executive action, created the Deferred Action for Childhood Arrivals program, which allowed hundreds of thousands of young people brought to the country illegally to avoid deportation and secure work permits. But hundreds of other undocumented immigrants were forcibly returned to their home countries. For more context, read this July 2019 editorial, "All Presidents Are Deporters in Chief."**

Sure.

**KK: All right. Binya?**

**BA: You've talked about the urgency of the climate change. The new NAFTA agreement includes no measures aimed at dealing with climate change. At what point should Democrats stop voting for international agreements that fail to deal with climate change?     Environmental groups criticized 2018 tweaks to the trade agreement, which included no mention of human-caused climate change.**

Well, first of all, the two things that the new NAFTA agreement has, is they have enforcement mechanisms. I've not read them yet. O.K.? I'm told by staff. Enforcement mechanisms that have environmental protections, as well as, not talking for fundamental climate change, but though you cannot compete and disregard existing climate regulations that exist. So environmentalists are at the table, I've been told, and labor's been at the table and they should be. They should be.

Now, if in fact what I propose is as president, I'm, by the way, I'm not joking. I did. I'm the guy that came back and said, we can embarrass Xi Jinping to join the Paris accord. And everybody looked at me like I was nuts. Well, it did. But what happened was that only works if in fact we are the aggressive leader. So number one, I would immediately rejoin the Paris accord, number one. And number two, I would do what the accord calls for. Upping the ante as circumstances change and more science becomes available that we have less time. For example, think of what we should be doing now in the biggest carbon sink in the world, the Amazon. Instead of talking about $2 billion, I'd be organizing, not a joke, organizing the world as I did in Latin America on other issues, like Colombia and so on.     The Obama administration reopened diplomatic ties with Cuba and negotiated trade deals with Colombia and Panama. Anyway, to make sure that they in fact either, and we would provide, the world would provide, $20 to $30 billion for them to be able to make up for what they're going to lose by not having agriculture.

**BA: Those are good programs, but do you think Democrats should vote for an agreement that does not affirm the Paris accord and does not contain any binding commitments to deal with climate change?**

Look, it's like saying would you sign an agreement with Turkey on a base closure because it didn't have that in it? It depends on if it's related to climate. Absolutely they should be part of it.

**BA: But this is not a hypothetical. This is a deal that exists and is coming before the House ——**

It is, but the deal relates to matters of trade, that in fact, there is no circumstance where we are saying anything that we're going to do more or less relative to what we're selling back and forth across the border. Here's an example that would matter. China. China, in fact, in their "Belt and Road" proposal is in fact exporting more dirty coal around the world and is subsidizing more than anybody in the world. The answer is, what we should be saying to them is, you keep your agreement on the climate accord, which you signed up to. If you don't, you will pay a price for it. You will not be able to sell product here. And organize the world to make sure that no, they

could sell our most anywhere. To make sure that they in fact have a requirement to stick to what they committed to. They've already signed it, so I don't know. It's a little bit like saying to me, should we ——

**BA: Why wouldn't you apply that standard to Canada, which is a larger energy exporter than China?**

Well, no, by the way, I would. That's what we should be doing to everybody in the world. I'm basically giving you one example. That's why I oppose what China's, what Canada's doing in terms of the pipelines and the dirty crude they're sending south on us, letting it go forward. We have to do that. We have to. But we can't do a damn thing if we don't meet our responsibility. We make up 15 percent of the problem in the world. We walk away from it all and the rest of the world says, what the hell are you holding me accountable for? You're not doing anything. That's why this president's does such incredible damage, incredible damage to our effort to deal with climate change.

**KK: Your staff is getting a little impatient with us, so allow us our last question, if you don't mind. [LAUGHTER]**

**BS: What are you likely to fail at as president?**

I never start anything thinking I'm going to fail. I really mean it. I never sat down before an exam thinking I'm going to fail it. I never had a football handed to me and think I wasn't going to score. I've never put a ball in my hand — I'm serious. Look, half of winning is believing you can. I think people communicate when they think they're going to fail.

I think it's going to be incredibly difficult, incredibly difficult to deal with what is left of the Republican Party. Which is not the Republican Party. And I think the most important thing that we have to do, and I know some from the beginning suggested I was not, didn't make sense. The single most important thing we have to do is restore the soul of this country. It's been absolutely eviscerated.

President's talking about how he's worried about anti-Semitism. This recent rule about universities. This is the same guy who watched anti-Semites, their veins bulging, coming out of fields, literally carrying torches. It was almost like a movie. Preaching anti-Semitic bile. The same exact thing that was preached and hollered in the streets of Nuremberg in the '30s and throughout Germany, carrying swastikas. Kid gets killed, a young woman. President's asked to comment, and he said there were very fine people on both sides. That's the single most important thing we have to excise. Have you heard him say a word about white supremacy? Have you heard him say a word that would lead anybody to believe he still not decided that the only way to win is divide the country? Pit race, religion ——

**BS: Listen, man, this is our hometown guy, I know extremely well.**

No, I'm sure you do, but it was more a rhetorical question, but I mean, so it really is gigantic. If I only get to do one thing, could wave a wand and say I could solve one problem, that's the first one I solve because unless we solve that one, none of the rest matters a whole lot.

We're not going to be able to unite the country. And if we can't unite the country, this is all for naught. We have a system, the Constitution, and it's like that old thing oft-quoted and sometimes inaccurately quoted about Benjamin Franklin walking out of the — "What have you given us, Mr. Franklin?" "A Republic, if you can keep it." Our democracy is at stake. I truly believe our democracy is at stake.    The story is often told that when Franklin was leaving the Constitutional Convention, he was asked what sort of government had been created and replied: "A republic, if you can keep it."

And I worry about some of the folks, I don't mean anybody around here, some of the folks on the opposite end of the scale in our party think that they should do, not preach hate, but be able to, by executive authority, do what the right thing is. The whole thing requires consensus. None of it works. You're all understandably cynical about can I bring the country together? Can I get anything done? Well, guess what? I refuse to give up on that notion. Not a joke, because if I can't, if somebody can't, say goodbye, man.

Eight years of this guy will fundamentally, I said this in the beginning, you thought it was hyperbole, fundamentally change who we are as a country. Fundamentally we'll not be recognized and not recognize ourselves. And it really is the, the threat.

And what you see is that some bright people on the other team, our team, are buying into the same thing. Well, the way we have to do it, why don't we do what he does? Why don't we do what he does? Not on race. We're going to be the opposite. But if you don't agree on this, boom, we're just going to insist on it. Like for example, I'm the only guy who's ever beaten the N.R.A., nationally and twice. Now I hear, by the way, when I get elected, by executive order, I'm going to eliminate the right to have an assault weapon. Where does the Constitution say you have the authority to do that? You can stop the importation. Where does it say that? Or I'm going to insist that we move forward with the following health care plan. O.K. How do you do that?

**KK: Allow me one last question. I apologize. A lot of the reason that Trump was elected, at least one of the things that we heard a lot in the months following the 2016 election, was people being angry at or let down by government, and that anger fueled has his rise to power. How do you respond to critics who worry that, in fact, that it was something about the Obama administration that gave rise to Trump?**

I didn't, I didn't hear that. You got — I mean I've heard it but some of what I heard is that the Democratic Party, in the last election — and I did 84 events for Hillary, 84 — that the Democratic Party forgot our base. When's the last time we talked to those folks who are working-class white folks? I would go out all the time and the Saturday, excuse me, the Sunday or Monday before I'd go out, Robby Mook or [the former White House chief of staff John] Podesta or someone, [would] come by and ask me where they wanted me to go because some places I was stronger with the African-American community and with white working-class folks. I remember being told at one point where they're going to give up on white working-class folks because they're not making any progress.     Mr. Biden considered a presidential run in 2016, but when he announced he would not in 2015, he helped clear the path for Mrs. Clinton's nomination. He then campaigned for Mrs. Clinton in a number of states including in his hometown Scranton, Pa.

Well, look what's happened. Look what started to seep in, beginning and probably even with candidates during our administration. We stopped showing up at the Polish American club. We stopped showing up, and we all went to you, the really smart people. We had a new kind of coalition we were putting together. College-educated women and college men and boom, boom, boom and so on.

Tell you a story, and I'll end. We found ourselves, I think, and we would have this internal debate toward the end — why I thought, I came back after campaigning for [the former Wisconsin senator] Russ Feingold and said, we're going to lose. I have pretty good tactical political instincts. We're going to lose. Because we weren't doing the kind of retail politics we used to do. We weren't stopping in diners. We weren't going over to the Greek American club. We weren't going into the black community and sitting at the local Y that's in that community.

I'm not joking. Think of the candidate, not just for president. Think across the board. And so I pointed out that over 54 percent of all the voters in Pennsylvania are white, high school educated. Sixty some — and if I remember the numbers, I don't remember exact numbers — in Michigan and Ohio and etc. I actually had the campaign come, someone come with me, not Hillary — and I think she knew — one of the political people come. I said I was going to speak at a Ford Motor plant in the Valley and in Ohio.

And they were talking about how we had to make a distinction between progressive values and working-class values. I said I've never found a distinction. Never found them hard to sell. They told me there were 3,000 people in the plant. This is toward the end of the campaign, second week of October, something like that. And I stood up and said, we've got to elect Hillary, and it was [light clapping]. I said let me tell you why we have to elect Hillary, and there are 3,000, but there are a lot of seats — there are probably 500 seats in the front.

I look down at one guy and said, because your wife deserves to make every damn penny you make, the man she's standing next to. They all cheered. Neighborhoods I come from, guess what, that means you can put four new tires on the car. That means, not a joke. You guys don't even think about it. That's what it means. It means you can replace the water heater. It means you can send your kid back to that community college. It matters about your standard of living.

But guess what? All white guys are just basically, they don't give a damn about women. They don't care about equal pay. You're damn right if they're working guys. The people that don't like equal pay are the people at the top of the heap. I don't like the idea that you're going to get paid as much as a man doing your job. That's not happening on the line.

The second thing I said, I said and, by the way, who somebody marries is none of your business, because I'm so associated with pushing for gay marriage. And they all laugh for a second. I said I'm not asking you to light your home up in rainbows, but you know it's none of your business. I got a standing ovation.

The thing is, I said any man who raises his hand to a woman is a God-darn coward, and deserves to get his ass kicked. They went nuts because they have daughters. They have wives who were victimized.

And then I talked about economic issues, about the issues that affected labor. By the way, without labor, we're dead. If labor doesn't come back, there was no one else to keep the barbarians on the other side of the gate. It's power, power, power. And guess what? I come back, and I meet with a lot of their people: Well, that's because you're middle-class. Joe Biden can do that, but we can't do that.

The other thing we think about, we think that people, if they don't have a good education are ipso facto stupid. President asked me to get Detroit off its feet, back on its feet. For real. He gave me all the good assignments.

One of the things I did — now, I'm serious. Look at it. Look at specifically who handled everything relating to Detroit. Me.     After Detroit filed the country's largest ever municipal bankruptcy, the Obama administration began a close partnership to revive the city's economy. The administration created a Detroit Federal Working Group to improve the bus system, lighting infrastructure, housing market and more. And the good reason, the good news about that, he gave me presidential authority. I could task anyone in the administration. For real. And so I put together a group, that in fact made up of five agencies, to go find all the money Detroit was eligible for they never knew they were eligible for. And we sat down and we put everything from lighting in and transit and so on and so forth.

But then we found out when it got out of bankruptcy, what happened? No one knew how to turn on the streetlights. Not a joke. No one knew how to turn on the water system, maintain the sewer system because black, white, anyone who had that expertise left, abandoned it.

So I had an idea. We went to this outfit that in fact, if you're looking for tech people, you go and they'll supply them to. It's called American — I can't think of the name of it now. And I said, go out and find us people that we can put through a 19-week class at the community college to teach them how to program.

And on the floor I go around, my liberal friends are saying, you can't expect that, man. No. Well guess what? It turns out, there were 50-some women, happen to all be women, all of color but one, all African-American but one. Nineteen weeks, I went to the graduation. Every single one had a job, lowest-paying job $48,000 a year, highest paying $102,000.

You think people are stupid. Went to school with a guy in Delaware and in a little town called Claymont. Went to the same Catholic grade school. Then I went off to a local school that was academically very challenging, a Catholic prep school. It was a very challenging school. He went to the local high school where my wife ended up teaching, and I saw him. He made a lot more money than I made. He was an independent trucker. He was making somewhere between $85,000 and $110,000 bucks a year. In the last 10 years of his life, he busted his neck. I was down at the largest mall in Delaware, and it's big because no tax in Delaware, so New Jersey folks and Pennsylvanians come there. And I'm with my granddaughters three years ago, Christmas shopping. He walks up. I don't have permission to use his name so I won't mention it, but he goes or goes, "Joey, baby!" Grabs my cheek. I thought the Secret Service was going to shoot him. I said, he's a friend.

He said, "What you doing, Joey?" And I remembered who he was and I said, "How you doing, pal?" I said, "You still drive?" And he said, "Nah, Joey, only guys like you who never worked in their life can continue to work."

I said, "Well, how's Tony doing?" His son was the age of my son who died. Said he's in trouble, Joe, he's in trouble. I said, can I help? I thought maybe was a drug problem or something. He said, No, no Joey. He's still driving and he knows he's not going to have a job in five years. We all think — when, in your economic pages, you guys write about automation of trucking, and it's supposed to be in five years, it's going to take more like 10 — that these guys are stupid. They don't get it.

They know it. They're not stupid. We treat them like they're stupid. They know they're in trouble, and nobody's talking to them. Nobody's talking to them. That's what we used to do. That was our base. That's who I'm talking to. There's answers. There's answers.

That's why I'm spending so much time with unions. Unions are scared to death of global warming, and they know it's a problem, but they think they're all going to be lost. We can create 10 million good-paying jobs. I just met with the I.B.W. I can put in new green infrastructure —

550,000 charging stations. And they'll do them. They'll make money. We can move to the E.V. market and own it and we can create millions of good-paying jobs.

I can go down the list. Same with agriculture. Everybody's wondering why Biden's doing so good with rural, rural Iowa. Because I talk about how they can make money by becoming a carbon sink themselves, by planting deep-rooted plants, by absorbing carbon into the soil, by doing a whole range of things and get paid for it. Not just what they grow to eat, but we don't talk to them.

Guys, think about it, this is complicated stuff. And I find the big argument I always have with my staff is I say, "Speak English to me." Not as opposed to Spanish, as opposed to complicated. Without talking down to people, how do you explain? How do you go out and explain? Go to the local bar here with really bright people. Explain to them global warming, as much as you know about it. They don't know, from shinola, what you're talking about, but we can explain it. But we don't do it.

**KK: Well, we try to do that every day.**

No, you do. I don't mean that, but look what we ——

**KK: Speaking of which, we do actually have to put out a newspaper. [LAUGHTER]**

But again, I don't think it's talking down to anybody when you say you write to an eighth-grade population. The thing about The Times that is so special is The Times goes well beyond that. I'm not being critical of you.

I'm just saying generically, think about the people you know, go back to your own neighborhoods. Even if they have a job, they're frightened. They are frightened. But who in a political establishment is talking to them? That's even remotely realistic? And unless we figure that out, folks, we're in real trouble, man, I think.

I'm probably in real trouble after this interview, but thank you very much.

**KK: Thank you.**

**BS: Good to see you.**

Good to see you, thanks.

**BS: I'm from Chester, Pa., by the way. Right across the border.**

Well, you know, and by the way, you know we talked about Chester.

**BS: Two generations of truck drivers.**

That's right, you understand it. I'm not joking. Am I telling the truth? And by the way, the other thing is, you know, we talk about environmental impact. Reason why that part of Pennsylvania and Delaware has the second-highest cancer rate is because when you and I got up in the morning and you turn on the first frost, you turn on your windshield wiper, there'd be an oil slick on your window.    According to the Centers for Disease Control, Kentucky has the highest cancer rate, and Delaware and Pennsylvania have the next highest. People get sick more in states where income is lower, screening rates are lower and smoking is more prevalent.

**BS: Yes.**

Not a joke.

**BS: Oh. absolutely, yes.**

I love the lectures I get about — do you understand?

**KK: I do. Thank you.**

Thank you. I'm going to beat this guy.

**Correction:** *An earlier version of this annotated transcript referred to the Deferred Action for Childhood Arrivals program as an executive order. It was a program created by a memo signed by the Secretary of Homeland Security, not an executive order.*

---

This interview was conducted Dec. 16, 2019, and published Jan. 17, 2020.

Illustrations by Jules Julien; Al Drago/Getty Images



Joe Biden

# EXHIBIT 20

Kamala Harris Wants to Be Your Online Censor-in-Chief

ELECTION 2020

## Kamala Harris Wants to Be Your Online Censor-in-Chief

Resist when politicians declare that speech (even radical speech) is a "threat to our democracy."

SCOTT SHACKFORD | 5.7.2019 2:05 PM


(Ron Sachs/picture alliance / Consolidated/Newscom)

Sen. Kamala Harris is making the potential punishment of social media platforms that don't censor what she sees as hateful speech a focal point of her presidential campaign.

In a speech in Detroit before the National Association for the Advancement of Colored People (NAACP), Harris discussed the growth of domestic terrorism in the United States (and elsewhere), and how those attackers used or embraced radically violent ideas on social media.

Harris wants social media to do more to stop such ideas from being expressed and spread online. It's not clear what she thinks the companies should do specifically, but she's definitely laying the blame on Facebook and Twitter and YouTube for the existence and proliferation of angry people online. Here's the full quote from her speech:

> We will hold social media platforms responsible for the hate infiltrating their platforms, because they have a responsibility to help fight against this threat to our democracy. And if you profit off of hate—if you act as a megaphone for misinformation or cyberwarfare, if you don't police your platforms—we are going to hold you accountable as a community.

It's meaningless anger that feels deliberately substance-free because, really, what she wants with her prosecutor background is to force compliance with whatever rules she puts into place and use the threat of punishment to shut down resistance.

But we know from the horrifying Christchurch, New Zealand, mass murder that these social media platforms were trying as hard as they could to remove videos the shooter was livestreaming and to take down copies as soon as they were posted.

By blaming social media platforms, Harris is confusing the symptom (online expression of violent ideas) with the actual problem (the cultural expansion of more overt desires to punish and hurt the "other"). But the thing about social media platforms is that they are the creations of tangible companies. Harris' mindset is that the threat of punishment is a tool to force compliance to whatever goals she sees as serving "the community," as she defines it. Just ask California parents who were threatened with jail time because of her support for criminal truancy laws when she was a district attorney in San Francisco, and then again later when she was attorney general. She didn't *want* to send parents to jail, mind you. But she was willing to use the law to allow that to happen in order to achieve the goal she wanted.

And we know that Harris already has a record of trying to punish online companies for speech she doesn't approve of. She attempted to bring pimping charges against the publishers of Backpage to try to punish them for sex-trafficking advertisements that appeared on the site.

In this case, her goal is logistically unrealistic. Online communication platforms aren't like newspapers or television shows or radio programs. It's not feasible to expect that social media platforms will be able to accomplish what Harris wants. Instead, her agenda would result in a massive regime of censorship with unpredictable behavior that inspires outrage from those who get targeted. Government-mandated censorship does not lead to peaceful, democratic societies. It leads to anger and rebellion.

We should all be horrified that a candidate for president of the United States believes that unfettered speech is a threat to democracy. But there is some good news: namely, a distinct lack of reaction from the audience. This was a friendly crowd. Her speech was seeded with applause lines, and the listeners typically obliged. But after the above quote (about two-thirds of the way through the speech) there was mostly silence from what I could hear. One person sounded like they shouted words of support. You can listen to yourself here (it's about 12:30 minutes in).

Glenn Decl. Ex. 20
Page 1 of 2

I wouldn't necessarily make too much of the lack of response, but it's perhaps a good indicator that while the desire to control or punish social media platforms may be in the front of politicians' minds, it is not necessarily something that animates the public. Of course, politicians would be the first to benefit from the power to control what messages are allowed on social media—all in the name of protecting "democracy."

**Bonus link:** Over in Europe, online privacy censorship demands (and the technological challenges of trying to comply with them) are being used as a tool by government officials to extract money from rich tech companies. Andrea O'Sullivan explains how. As California's attorney general, Harris' office did attempt to go after airlines and extract money from them because their apps weren't in compliance with California's privacy policy labeling laws. She failed in that effort, but she knows full well that complex online platform regulations are a way to generate revenue.

**SCOTT SHACKFORD** is an associate editor at *Reason*.

ELECTION 2020    KAMALA HARRIS    CENSORSHIP    SOCIAL MEDIA    HATE SPEECH    FACEBOOK    MASS SHOOTINGS    FREE SPEECH    TECHNOLOGY

Glenn Decl. Ex. 20
Page 2 of 2

# EXHIBIT 21

6/7/22, 3:38 PM                                Kamala Harris says Trump's Twitter account should be suspended | CNN Politics

    AudioLive TV

# Kamala Harris says Trump's Twitter account should be suspended

By <u>Chandelis Duster</u>, CNN

Updated 11:27 PM EDT, Mon September 30, 2019



⬜ Video Ad Feedback

Glenn Decl. Ex. 21
Page 1 of 9

**See More Videos**

**Washington (CNN)** — Sen. Kamala Harris said on Monday that President Donald Trump's Twitter account should be suspended following his tweets about the whistleblower whose underline complaint is at the center of the Ukraine scandal.

"The President's tweets and his behaviors about this are just further evidence of the fact that he uses his power in a way that is designed to beat people down instead of lift people up," the California Democrat and 2020 presidential candidate told CNN's Anderson Cooper on "Anderson Cooper 360."

"Frankly, when you look at what he's been tweeting today directed at the whistleblower, directed at so many people, you know, I, frankly, think that based on this and all we've seen him do before, including attacking members of Congress, that he, frankly, should be – his Twitter account should be suspended. I think there is plenty of now evidence to suggest that he is irresponsible with his words in a way that could result in harm to other people. And so the privilege of using those words in that way should probably be taken from him."

When asked if she thought a suspension of his Twitter account would be seen as the social networking giant trying to silence Trump, Harris said it must be agreed that a US president's words should be "not about belittling, much less harming, anyone" and said Trump is using "his words in a way that could subject someone to harm."

"If he's not going to exercise self-restraint, then, perhaps, there should be other mechanisms in place to make sure that his words do not, in fact, harm anyone," she said. "And that's my point. What we want to make sure is that his words do not actually result in harm to anyone."

Trump has rebuked the anonymous whistleblower in a series of tweets, tweeting on Monday "#FakeWhistleblower," and has repeatedly called the whistleblower's complaint "fake." On Sunday, the President said he deserved to meet his "accuser."

Trump said last week that whoever had provided the whistleblower with information about his phone call with Ukrainian President Volodymyr Zelensky is "close to a spy," and that in the old days spies were dealt with differently.

Glenn Decl. Ex. 21
Page 2 of 9

The comment prompted House Intelligence Chairman Adam Schiff of California, Foreign Affairs Chairman Eliot Engel of New York and Oversight Chairman Elijah Cummings of Maryland, all Democrats, to call on the President to stop his "reprehensible witness intimidation" of the whistleblower.

**Paid Links**

Dresses for Women over 65

Compare Auto Insurance Policy

Single Tooth Dental Implants

Average Retirement Savings by Age

10 Stocks to Buy Right Now

Search CNN...

Log In

Live TV

Audio

Glenn Decl. Ex. 21
Page 3 of 9

6/7/22, 3:38 PM                  Kamala Harris says Trump's Twitter account should be suspended | CNN Politics

World

US Politics

Business

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Features

Weather

More



**FOLLOW CNN POLITICS**

   

Terms of Use    Privacy Policy    Do Not Sell My Personal Information    Ad Choices    Accessibility & CC    About

Newsletters    Transcripts

© 2021 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

Glenn Decl. Ex. 21

Page 4 of 9

6/7/22, 3:38 PM                    Kamala Harris says Trump's Twitter account should be suspended | CNN Politics

Glenn Decl. Ex. 21
Page 5 of 9

6/7/22, 3:38 PM                              Kamala Harris says Trump's Twitter account should be suspended | CNN Politics

Glenn Decl. Ex. 21
Page 6 of 9

6/7/22, 3:38 PM                           Kamala Harris says Trump's Twitter account should be suspended | CNN Politics

Glenn Decl. Ex. 21

Page 7 of 9

6/7/22, 3:38 PM                          Kamala Harris says Trump's Twitter account should be suspended | CNN Politics

Glenn Decl. Ex. 21
Page 8 of 9

Kamala Harris says Trump's Twitter account should be suspended | CNN Politics

Glenn Decl. Ex. 21
Page 9 of 9

# EXHIBIT 22



← Tweet

**Kamala Harris** ✓
@KamalaHarris
🏳 United States government official

Hey, @jack. Time to do something about this.
twitter.com/realDonaldTrum...

This Tweet is from a suspended account. Learn more

7:35 PM · Oct 1, 2019 · Sprout Social

**8,293** Retweets    **2,206** Quote Tweets    **41.9K** Likes

# EXHIBIT 23

6/1/22, 4:11 PM                    Our Open Letter To Facebook - Joe Biden for President: Official Campaign Website

 MENU



 DONATE

# OUR OPEN LETTER TO FACEBOOK

Dear Mark Zuckerberg,

Over the past year, the Biden for President campaign has called on Facebook to meet the commitment the company made after 2016 — to use its platform to improve American democracy rather than as a tool to spread disinformation that undermines our elections. The campaign has proposed meaningful ways to check disinformation on your platform and to limit the effect of false ads.

But Facebook has taken no meaningful action. It continues to allow Donald Trump to say anything — and to pay to ensure that his wild claims reach millions of voters. SuperPACs and other dark money groups are following his example. Trump and his allies have used Facebook to spread <u>fear</u> and misleading information about voting, attempting to compromise the means of holding power to account: our voices and our ballot boxes.

**So where do we go from here?**

We have offered the following concrete recommendations to fix the problems in Facebook's platform that pose a threat to free and fair elections.

We call for Facebook to proactively stem the tide of false information by no longer amplifying untrustworthy content and promptly fact-checking election-related material that goes viral.

We call for Facebook to stop allowing politicians to hide behind paid misinformation in the hope that the truth will catch up only after Election Day. There should be a two-week pre-election period during which **all** political advertisements must be fact-checked before they are permitted to run on Facebook.

Together we can make Donald Trump a one term President and defeat Republicans across the country.
**Donate today:**

$15     $32     $50     OTHER

Glenn Decl. Ex. 23
Page 1 of 3

Right now, we're less than 150 days to the election. The time for setting, testing, and implementing meaningful policy to protect our elections is running out.

Facebook — do the right thing. Do your part and change your policies to ensure we have a fair election this November.

**Sign our open letter to Facebook >>**



## LET'S DO THIS. TOGETHER.

Together we can make Donald Trump a one term President and defeat Republicans across the country.
**Donate today:**

$15    $32    $50    OTHER

6/1/22, 4:11 PM                    Our Open Letter To Facebook - Joe Biden for President: Official Campaign Website



Glenn Decl. Ex. 23
Page 3 of 3

# EXHIBIT 24

 MENU



 DONATE

# #MOVEFASTFIXIT

Together we can make Donald Trump a one term
President and defeat Republicans across the country. ⌄
**Donate today:**

$15          $32          $50          OTHER

## TELL FACEBOOK:

 Promote real news, not fake news

 Quickly remove viral misinformation

 End the pre-election "lie" period

 Enforce voter suppression rules against everyone—even the President

## #MoveFastFixIt

### JoeBiden.com/Facebook

After foreign operatives and rightwing trolls used Facebook to hack the 2016

Together we can make Donald Trump a one term President and defeat Republicans across the country. 
**Donate today:**

| $15 | $32 | $50 | OTHER |

Glenn Decl. Ex. 24
Page 2 of 6

We have asked Facebook to take action–responsible action, action that is critical to the health of our democracy. And we will continue to do so. We will not stop.

Our asks are pretty simple:

- They need to promote authoritative and trustworthy sources of election information, rather than the rants of bad actors and conspiracy theorists.

- They need to promptly remove false, viral information

- They need to prevent political candidates and PACs from using paid advertising to spread lies and misinformation — especially within two weeks of election day

- They need clear rules — applied universally, with no exceptions for the President —  that prohibit threats and lies about how to participate in the election.

**We're now less than 150 days to the election. The time for setting, testing, and implementing meaningful policy to protect our elections is running out. We need to move fast and fix Facebook now. Help us make it happen by signing and sharing our petition below.**

## TAKE ACTION

**Sign our open letter to Facebook >>**

Share with friends and family  >>



Together we can make Donald Trump a one term President and defeat Republicans across the country.  ⌄
**Donate today:**

| $15 | $32 | $50 | OTHER |

6/1/22, 4:12 PM                     #MOVEFASTFIXIT - Joe Biden for President: Official Campaign Website



**Direct Message Facebook  >>**

Signed the petition? Tweeted? You can also slide into Facebook's DMs and ask what they are doing, by clicking here on your desktop.

You can also use the copy below:

Facebook,

In 2016, we saw what happens when social media platforms allow disinformation to run rampant. It places the integrity of our elections at risk. As a voter, protecting our elections and democracy is top priority for me, so I'm asking: what are you doing to face-check political advertisements before they are permitted to run? What policies have you enacted since 2016 that stop the spread of misinformation?

I am calling on you to make clear rules — applied to everyone, including Donald Trump — that prohibit threatening behavior and the spread of misinformation. Please let the public know what your plan to enact these policies is.

## READ OUR OPEN LETTER TO FACEBOOK

Dear Mark Zuckerberg,

Over the past year, the Biden for President campaign has called on Facebook to meet the commitment the company made after 2016 — to use its platform to improve

Together we can make Donald Trump a one term President and defeat Republicans across the country.
**Donate today:**

| $15 | $32 | $50 | OTHER |

Glenn Decl. Ex. 24
Page 4 of 6

SuperPACs and other dark money groups are following his example. Trump and his allies have used Facebook to spread fear and misleading information about voting, attempting to compromise the means of holding power to account: our voices and our ballot boxes. Read the full letter >>



**LET'S DO THIS. TOGETHER.**

Together we can make Donald Trump a one term President and defeat Republicans across the country.

**Donate today:**

$15     $32     $50     OTHER

Glenn Decl. Ex. 24
Page 5 of 6

#MOVEFASTFIXIT - Joe Biden for President: Official Campaign Website



Glenn Decl. Ex. 24
Page 6 of 6

# EXHIBIT 25



September 28, 2020

**<u>BY EMAIL</u>**
Mark Zuckerberg
Chairman & Chief Executive Officer
Facebook Inc.
1 Hacker Way
Menlo Park, CA 94025

Dear Mr. Zuckerberg:

Earlier this month, Facebook committed to finally acting on its "responsibility to protect our democracy" by "clearing up confusion about how this election will work" and by "fight[ing] misinformation" about how to participate.  On the same day, Mr. Trump took to your platform to spread falsehoods about mail voting, and Facebook took no meaningful action.  We were told then that Facebook was working to determine how best to apply its new, more aggressive approach.

Three weeks have now passed.  Rather than seeing progress, we have seen regression.  Facebook's continued promise of future action is serving as nothing more than an excuse for inaction.  Millions of people are voting.  Meanwhile, your platform is the nation's foremost propagator of disinformation about the voting process.  This state of affairs cannot be reconciled with a single public statement your company has made about these issues.

Facebook tells the public that it prohibits content that misrepresents concerning "methods for voting," "qualifications for voting," and "whether a vote will be counted"; it also purports to bar calls for "coordinated interference" with voting.  Facebook says that these prohibitions are important because "voting is voice," and because of its purported commitment to free expression, it has a responsibility to "clear[] up confusion about how this election will work" and to "tak[e] steps to reduce the chances" of distrust in our democracy and unrest.  This is part of your commitment, made in early 2017, to do everything required to make sure that Facebook serves as a "force for good in democracy."

Facebook's actual conduct in recent days paints a very different picture.  Last week, Donald J. Trump, Jr. posted a video claiming that those who oppose his father have a "plan to add millions of fraudulent ballots that can cancel your vote and overturn the election."  He then implores viewers not to let that happen:  "We need every able bodied man and woman to join an army for

Trump's election security." This is what the video looks like, with an express call to "Enlist Now!":



Dozens of responsible media voices and political campaigns throughout the country, including ours, brought this content to your immediate attention, as it violates both your policies and your commitment that no one will be permitted to use Facebook's tools to "undermine democracy." Your response was that the video yielded "extensive discussions," which reached the conclusion that it was consistent with your policies. We were assured that the label affixed to the video, buried on the top right corner of the screen where many viewers will miss it, should allay any concerns. When we asked for a written explanation of how assertions that millions of votes will be fraudulent, that millions of others will be "cancelled," and that the solution was to "enlist" in an "army for Trump's election security," could possibly be consistent with your policies that prohibit all of these claims, you provided none.

No company that considers itself a force for good in democracy, and that purports to take voter suppression seriously, would allow this dangerous claptrap to be spread to millions of people. Removing this video should have been the easiest of easy calls under your policies, yet it remains up today.

Meanwhile, Mr. Trump himself has repeatedly taken to your platform to encourage his followers who have voted by mail to show up at their polling place and demand to vote again unless it is demonstrated that their vote has been counted. These posts clearly violated your policies as well by wrongly suggesting that there is considerable doubt about whether mail votes will be counted. They also violate your prohibition of "misrepresentations about voting logistics, methods, or requirements." In many jurisdictions, a voter who shows up to vote in person after already sending in a mail ballot is not permitted to vote. The pertinent question is not whether the ballot has been "counted," as Trump's post suggested -- in many states, that does not happen until Election Day -- but whether it has been returned by the voter.

If Facebook's goal is to accomplish what it has publicly committed to do -- i.e., "clear[] up confusion about how this election will work" -- the solution should have been simple: remove

Mr. Trump's posts, which violate your policies.  Instead, the post was permitted to remain up because, we were told, it did not encourage "illegal" behavior.  That is flatly wrong.  In many states,  the law does not permit a voter to cast a ballot in person after having returned a mail ballot (Arizona, Michigan, Pennsylvania, and Wisconsin prominent among them).  Encouraging illegal behavior is also not the benchmark set by your policies, which prohibit this content.

Unsurprisingly, having received the clear message from Facebook that its platform could be used to create confusion about how to participate in the election, Mr. Trump has done so again and again.  Just this morning, he claimed that "Ballots being returned to States cannot be accurately counted"—in direct contravention of your bar on misrepresentations about whether votes will be counted—and you once again took no action.   Facebook's clear policies, which prohibit Mr. Trump and everyone else from posting such content, should stand in his way.  But by now Mr. Trump clearly understands that Facebook will not hold him to their clearly stated policies.

We have watched with alarm in recent days as Facebook has attempted to portray itself as a passive actor, serving as a mirror of public sentiment--all while your algorithm actually serves as a force that shapes it.  Imagine if, decades ago, the *National Enquirer* had the resources to target every person who glanced at its cover in the supermarket checkout line with endless mailings.  Imagine further that it had the ability to figure out which of those mailers were read when they had been received, so as to influence the content of the next mailer and the next.  Every trip to the mailbox would yield more evidence of a fantastical or hyper-partisan story.  That is what Facebook does, with the daily mail replaced by instantaneous smartphone updates.  It is why a hyperpartisan propaganda organ like the *Daily Wire* is Facebook's top web publisher.  Mr. Trump and his allies are hijacking this model to sow distrust in our democracy.  You have committed not to allow that to happen.  Yet you do allow it to happen—time and again.

Finally, it bears emphasis that, according to recent reporting, Facebook's decision-making continues to be influenced by the preference and identity of those in office.  That is not empowerment of individual voices, which you say is the founding principle of Facebook; instead, it is catering to those who already have power.  And it has nothing to do with free expression.  As you say, "voting is voice."  Facebook has committed to not allow that voice to be drowned out by a storm of disinformation, but has failed at every opportunity to follow through on that commitment.

We will be calling out those failures as they occur over the coming 36 days.

Very truly yours,

Jen O'Malley Dillon
Campaign Manager

# EXHIBIT
# 26

**TECH**

# Biden tech advisor: Hold social media companies accountable for what their users post

**PUBLISHED WED, DEC 2 2020·6:25 PM EST  |  UPDATED THU, DEC 3 2020·11:03 AM EST**

 **Lauren Feiner**
**@LAUREN_FEINER**

WATCH LIVE

**KEY POINTS**

A top tech advisor to Biden, Bruce Reed, indicated at a virtual book launch hosted by Georgetown Law Wednesday that "it's long past time to hold the social media companies accountable for what's published on their platforms."

Reed, who was chief of staff to Biden during his time as vice president, has been highly involved in advocating for tech reform in his years outside of government.

In a chapter co-authored with digital reform advocate Jim Steyer, he wrote, "Washington would be better off throwing out Section 230 and starting over."



U.S. Vice President Joseph Biden arrives for a meeting with his Chief of Staff Bruce Reed (L) June 22, 2011 on Capitol Hill in Washington, DC.
*Win McNamee | Getty Images*


 MARKETS
 CNBC TV
 WATCHLIST
 MENU

Glenn Decl. Ex. 26
Page 1 of 6

A [law protecting the tech industry from being held liable for their users' posts](#) is on shaky ground as President-elect Joe Biden prepares to come into office.

Bruce Reed, a top tech advisor to Biden during his presidential campaign, said at a [virtual book launch hosted by Georgetown Law](#) Wednesday that "it's long past time to hold the social media companies accountable for what's published on their platforms."

Reed, who was chief of staff to Biden during his time as vice president, has advocated for tech reform in his years outside government. He worked as a senior advisor for Jim Steyer's non-profit Common Sense Media, which advocates for digital media issues impacting children, including content moderation reforms.

Common Sense Media has [pushed for reforms to Section 230](#) of the Communications Decency Act, the law that prevents tech companies from being held legally responsible for their users' posts, to require companies to be stricter about moderating content. The law itself currently allows for tech platforms to remove or reduce distribution of posts on their platforms without repercussions, but those decisions are mostly up to the platforms.

Reed and Steyer co-wrote a chapter about Section 230 in "Which Side of History? – How Technology is Reshaping Democracy and Our Lives," the book celebrated at the Georgetown event.

In it, they wrote that if platforms generate revenue from content, they should be held responsible for that content.

"If they sell ads that run alongside harmful content, they should be considered complicit in the harm. Likewise, if their algorithms promote harmful content, they should be held accountable for helping redress the harm. In the long run, the only real way to moderate content is to moderate the business model," they wrote.

The pair also wrote that Congress could continue to chip away at the law by introducing new exceptions to tech's liability protections, or "better yet, it could make platform responsibility a prerequisite for any limits on liability."

Overall, they wrote, "Washington would be better off throwing out Section 230 and starting over."

Biden has [called for Section 230 to be revoked](#) and has been especially critical of [Facebook](#).

President Trump has also pushed for changes through an [executive order](#) and recently said he would [veto a defense spending bill unless it included a repeal of Section 230](#). Still, lasting reform will have to come through Congress, which remains divided on both the fundamental issue with the law and how to correct it. Republicans are most concerned about what they see as censorship of conservative voices, while Democrats are more concerned with how platforms allow misinformation and calls to harm to spread without restriction.

Reed also [played a key role in writing California's new digital privacy law](#) and helping it make it over the finish line during his time at Common Sense. The law has become the de facto standard for many companies in the absence of national privacy legislation.

His experience with that bill gave him optimism about the potential for tech reform after a challenging start. When he first set out to pass the privacy bill, Reed said, "it felt like taking on the railroads in the 1890s." But once legislators

 
MARKETS


CNBC TV


WATCHLIST


MENU

and industry players saw them eyeing a ballot initiative that would let voters decide directly on privacy protections, they came to the table and passed legislation, he said.

"We shouldn't be daunted by what we see in the political landscape," Reed said. "There's broad interest in both parties … for taking up these issues."

While there will be a lot on Biden's plate by the time he is inaugurated in January with the pandemic still raging, Reed said Wednesday it's important tech issues remain at the forefront.

"I think all of these tech issues have to be a priority because they're at the heart of our economy," he said.

**WATCH: How the internet is regulated**



**VIDEO** 14:03
**Who controls the internet**

*Subscribe to CNBC on YouTube.*

**Closing Bell: Overtime**                                            WATCH IN THE APP

UP NEXT | **Fast Money** 05:00 pm ET

**TRENDING NOW**

 Actor Matthew McConaughey gives impassioned speech for gun reform in White House briefing

    
MARKETS         CNBC TV         WATCHLIST         MENU

Glenn Decl. Ex. 26
Page 3 of 6





**Novavax Covid vaccine clears key step on path to FDA authorization after committee backs shot**



**Fed GDP tracker shows the economy could be on the brink of a recession**



**Target expects squeezed profits from aggressive plan to get rid of unwanted inventory**

Sponsored Links  by Taboola

**FROM THE WEB**

**Missouri: Get Generac Backup + USA Solar For No Cost at Install Through This Program.**

Pink Energy

**"Move your money in 2022," Wall street legend warns**

Chaikin Analytics

---

**MORE FROM CNBC**

**Fed GDP tracker shows the economy could be on the brink of a recession**

**Actor Matthew McConaughey gives impassioned speech for gun reform in White House briefing**

**Matthew McConaughey joins White House press briefing to discuss gun control**

**Apple's lead in laptop**

**FROM THE WEB**

**Top analyst warns: The '"Superbubble" is popping**

Investing Outlook

**"Move your money in 2022," Wall street legend warns**

Chaikin Analytics

**NFL Star Rob Gronkowski's Favorite Shoes**

Wolf & Shepherd




MARKETS


CNBC TV


WATCHLIST


MENU

**remarking on, says The Verge's Patel**

------------------------------------------------

**Goldman Sachs raises price targets on big oil**

------------------------------------------------

**Here are the biggest changes coming to your iPhone in Apple's new update**

---

# MORE IN TECHNOLOGY

## Apple is turning your iPhone into fintech service taking on PayPal, Affirm and more

Steve Kovach

**Here's the email Elon Musk sent all Tesla employees about 10%...**

Lora Kolodny



Subscribe to CNBC PRO

CNBC Councils

CNBC on Peacock

Join the CNBC Panel

News Releases

Licensing & Reprints

Supply Chain Values

Advertise With Us

Digital Products

Closed Captioning

   

MARKETS    CNBC TV    WATCHLIST    MENU

Internships                                    Site Map

Podcasts                                       Ad Choices

Careers                                        Help

Contact



## News Tips

Got a confidential news tip? We want to hear from you.

GET IN TOUCH

 **CNBC Newsletters**

Sign up for free newsletters and get more CNBC delivered to your inbox

SIGN UP NOW

Get this delivered to your inbox, and more info about our products and services.

Privacy Policy

Do Not Sell My Personal Information

CA Notice

Terms of Service

© 2022 CNBC LLC. All Rights Reserved. A Division of NBCUniversal

Data is a real-time snapshot *Data is delayed at least 15 minutes. Global Business and Financial News, Stock Quotes, and Market Data and Analysis.

Market Data Terms of Use and Disclaimers

Data also provided by



MARKETS

CNBC TV

WATCHLIST

MENU

Glenn Decl. Ex. 26

Page 6 of 6

# EXHIBIT
# 27

| | |
|---|---|
| **From:** | Fauci, Anthony (NIH/NIAID) [E] |
| **Sent:** | Sat, 1 Feb 2020 18:43:31 +0000 |
| **To:** | Kristian G. Andersen |
| **Subject:** | RE: FW: Science: Mining coronavirus genomes for clues to the outbreak's origins |

Thanks, Kristian.   Talk soon on the call.

**From:** Kristian G. Andersen [b) (6) >
**Sent:** Friday, January 31, 2020 10:32 PM
**To:** Fauci, Anthony (NIH/NIAID) [E] [(b) (6)
**Cc:** Jeremy Farrar [(b) (6) >
**Subject:** Re: FW: Science: Mining coronavirus genomes for clues to the outbreak's origins

Hi Tony,

Thanks for sharing. Yes, I saw this earlier today and both Eddie and myself are actually quoted in it. It's a great article, but the problem is that our phylogenetic analyses aren't able to answer whether the sequences are unusual at individual residues, except if they are completely off. On a phylogenetic tree the virus looks totally normal and the close clustering with bats suggest that bats serve as the reservoir. The unusual features of the virus make up a really small part of the genome (<0.1%) so one has to look really closely at all the sequences to see that some of the features (potentially) look engineered.

We have a good team lined up to look very critically at this, so we should know much more at the end of the weekend. I should mention that after discussions earlier today, Eddie, Bob, Mike, and myself all find the genome inconsistent with expectations from evolutionary theory. But we have to look at this much more closely and there are still further analyses to be done, so those opinions could still change.

Best,
Kristian

On Fri, Jan 31, 2020 at 18:47 Fauci, Anthony (NIH/NIAID) [E] [(b) (6) > wrote:

  Jeremy/Kristian:
    This just came out today.   You may have seen it.   If not, it is of interest to the current discussion.
  Best,
  Tony

  **From:** Folkers, Greg (NIH/NIAID) [E] [(b) (6)
  **Sent:** Friday, January 31, 2020 8:43 PM
  **Subject:** Science: Mining coronavirus genomes for clues to the outbreak's origins

Glenn Decl. Ex. 27
Page 1 of 12

| | |
|---|---|
| **From:** | Fauci, Anthony (NIH/NIAID) [E] |
| **Sent:** | Sun, 2 Feb 2020 16:49:35 +0000 |
| **To:** | Collins, Francis (NIH/OD) [E] |
| **Cc:** | Tabak, Lawrence (NIH/OD) [E] |
| **Subject:** | FW: Teleconference |

Francis:
  Do you have a minute for a quick call?
Tony

**From:** Jeremy Farrar                    (b) (6)
**Sent:** Sunday, February 2, 2020 11:28 AM
**To:** Fauci, Anthony (NIH/NIAID) [E]                    (b) (6) ; Collins, Francis (NIH/OD) [E]
              (b) (6)
**Cc:** Tabak, Lawrence (NIH/OD) [E]                    (b) (6) >
**Subject:** Re: Teleconference

Tedros and Bernhard have apparently gone into conclave....they need to decide today in my view.  If
they do prevaricate, I would appreciate a call with you later tonight or tomorrow to think how we might
take forward.

Meanwhile....

https://www.zerohedge.com/geopolitical/coronavirus-contains-hiv-insertions-stoking-fears-over-
artificially-created-bioweapon

**From:** "Fauci, Anthony (NIH/NIAID) [E]"                    (b) (6)>
**Date:** Sunday, 2 February 2020 at 15:30
**To:** Jeremy Farrar                    (b) (6)>, Francis Collins                    (b) (6)>
**Cc:** "Tabak, Lawrence (NIH/OD) [E]"                    (b) (6)
**Subject:** RE: Teleconference

Jeremy:
  Sorry that I took so long to weigh in on your e-mails with Francis and me.   I was on
conference calls.                                                                                                          (b) (5)
                                                                                                                                  (b) (5)

Best regards,
Tony

**From:** Jeremy Farrar                    (b) (6)>
**Sent:** Sunday, February 2, 2020 7:13 AM

Glenn Decl. Ex. 27
Page 2 of 12

**To:** Collins, Francis (NIH/OD) [E] ⬛⬛⬛ (b) (6) ⬛
**Cc:** Fauci, Anthony (NIH/NIAID) [E] ⬛⬛⬛ (b) (6) >; Tabak, Lawrence (NIH/OD) [E]
< ⬛⬛⬛ (b) (6)
**Subject:** Re: Teleconference

....Really appreciate us thinking through the options... ⬛⬛⬛⬛⬛ (b) (5)
⬛⬛⬛⬛⬛


**From:** Francis Collins < ⬛⬛⬛ (b) (6) >
**Date:** Sunday, 2 February 2020 at 12:03
**To:** Jeremy Farrar < ⬛⬛⬛ (b) (6) >
**Cc:** "Fauci, Anthony (NIH/NIAID) [E]" ⬛⬛⬛ (b) (6), "Tabak, Lawrence (NIH/OD) [E]"
⬛⬛⬛ (b) (6)
**Subject:** RE: Teleconference

Hi Jeremy,

Thanks for forwarding these additional reflections from Mike and Bob. ⬛⬛⬛ (b) (5)
⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ (b) (5)


Francis

**From:** Jeremy Farrar ⬛⬛⬛ (b) (6)
**Sent:** Sunday, February 2, 2020 6:53 AM
**To:** Collins, Francis (NIH/OD) [E] ⬛⬛⬛ (b) (6)
**Cc:** Fauci, Anthony (NIH/NIAID) [E] ⬛⬛⬛ (b) (6) >; Tabak, Lawrence (NIH/OD) [E]
⬛⬛⬛ (b) (6)
**Subject:** Re: Teleconference

Thank you

See thoughts overnight from others.

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ (b) (5)

Glenn Decl. Ex. 27
Page 3 of 12

Jeremy



(b)(5)

NIH-002316

**From:** Francis Collins      (b) (6) >
**Date:** Sunday, 2 February 2020 at 10:27
**To:** Jeremy Farrar      (b) (6)
**Cc:** "Fauci, Anthony (NIH/NIAID) [E]"      (b) (6) , "Tabak, Lawrence (NIH/OD) [E]"
     (b) (6)
**Subject:** RE: Teleconference

Jeremy,

(b) (5)

I'm available any time today except 3:15 – 5:45 pm EST (on a plane) for a call to Tedros.  Let me
know if I can help get through his thicket of protectors.

Francis

**From:** Jeremy Farrar      (b) (6)
**Sent:** Sunday, February 2, 2020 4:48 AM
**To:** Andrew Rambaut <      (b) (6) >
**Cc:** R.A.M. Fouchier      (b) (6) ; Fauci, Anthony (NIH/NIAID) [E]
     (b) (6) Patrick Vallance      (b) (6) ; Drosten, Christian
     (b) (6) >; M.P.G. Koopmans      (b) (6) ; Eddie Holmes
     (b) (6) ; Kristian G. Andersen      (b) (6) ;
Paul Schreier      (b) (6) ; Ferguson, Mike
     (b) (6) ; Collins, Francis (NIH/OD) [E]      (b) (6) >; Tabak, Lawrence
(NIH/OD) [E]      (b) (6) >; Josie Golding      (b) (6)
**Subject:** Re: Teleconference

This is a very complex issue.

I will:

(b) (5)

<div style="text-align:right">(b) (3)</div>

I suggest we don't get into a further scientific discussion here, but wait for that group to be established.

Jeremy

---

**From:** '       (b) (6)
**Date:** Sunday, 2 February 2020 at 09:38
**To:** Jeremy Farrar <      (b) (6) >
**Cc:**      (b) (6) >, "Fauci, Anthony (NIH/NIAID) [E]"
     (b) (6), Patrick Vallance      (b) (6) >, "Drosten,
Christian"      (b) (6), Marion Koopmans <      (b) (6),
Edward Holmes      (b) (6)
     (b) (6), "Kristian G. Andersen"      (b) (6), Paul Schreier
     (b) (6) Michael FMedSci
     (b) (6) >, Francis Collins      (b) (6)
     (b) (6) Josie Golding
     (b) (6)
**Subject:** Re: Teleconference

Dear Jeremey, Ron and all,

Thanks for inviting me on the call yesterday.      (b) (5)
     (b) (5)



Best,
Andrew

On 2 Feb 2020, at 08:40, Jeremy Farrar ⬚⬚⬚⬚⬚⬚ (b) (6)> wrote:

Thanks Ron

Thoughts on that very welcome.

On 2 Feb 2020, at 08:30, R.A.M. Fouchier ⬚⬚⬚⬚ (b) (6)> wrote:

Dear Jeremy and others,

This was a very useful teleconference.

Thanks for organizing this on such short notice,
Kind regards

NIH-002319

Ron

Ron's notes:



(b)(5)



NIH-002321

Glenn Decl. Ex. 27
Page 9 of 12

**Van:** Jeremy Farrar  (b) (6)
**Datum:** zaterdag 1 februari 2020 om 21:59
**Aan:** "Fauci, Anthony (NIH/NIAID) [E]"  (b) (6) >, Patrick Vallance  (b) (6)
**CC:** Christian Drosten  (b) (6) "M. Koopmans"  (b) (6) , "R.A.M. Fouchier"  (b) (6) , Edward Holmes  (b) (6)  (b) (6) , Andrew Rambaut  (b) (6)  "Kristian G. Andersen"  (b) (6) , Paul Schreier  (b) (6)  (b) (6) , "Ferguson, Mike"  (b) (6)  Francis Collins  (b) (6) ,  '  (b) (6) >, Josie Golding  (b) (6)
**Onderwerp:** Re: Teleconference

Thank you to everyone for joining.

There is clearly much to understand understand in this.  This call was very helpful to hear some of our current understanding and the many gaps in our knowledge.  (b) (5)



I hope that is a reasonable approach, please send any thoughts or suggestions.

Once again, thank you for making time over a weekend and for such an informed discussion on a complex issue.

Thank you and best wishes Jeremy

**From:** Jeremy Farrar                                (b) (6)
**Date:** Saturday, 1 February 2020 at 15:34
**To:** "Fauci, Anthony (NIH/NIAID) [E]"                    (b) (6)>, Patrick
Vallance <                              (b) (6)
**Cc:** "Drosten, Christian"                         (b) (6)>, Marion
Koopmans                                    (b) (6)
"                                           (b) (6) Edward
Holmes                                                      (b) (6)
                                             (b) (6)
                              (b) (6) "Kristian G. Andersen"
                  (b) (6), Paul Schreier                              (b) (6)
                                     (b) (6)>, Michael FMedSci
                              (b) (6)
**Subject:** Teleconference

**1st February (2nd Feb for Eddie)**
**Information and discussion is shared in total confidence and not to be**
**shared until agreement on next steps.**

**Dial in details attached.**
**Please mute phones.**
**I will be on email throughout – email Paul or I Paul if any problems**
**If you cannot make it, I will phone you afterwards to update.**

**One Hour**

6am Sydney
8pm CET
7pm GMT
2pm EST
11am PST
*(Hope I have the times right!)*


Thank you for the series of calls and for agreeing to join this call.

**Agenda**
- Introduction, focus and desired outcomes - JF
- Summary – KA
- Comments – EH
- Q&A – All
- Summary and next steps - JF


Kristian Anderson
Bob Garry - I have not been able to contact Bob.   Please forward if you can.
Christian Drosten
Tony Fauci
Mike Ferguson
Ron Fouchier
Eddie Holmes
Marion Koopmans
Stefan Pohlmann
Andrew Rambaut
Paul Schreier
Patrick Vallance

---

Andrew Rambaut
Institute for Evolutionary Biology
Ashworth Laboratories, University of Edinburgh, Edinburgh, EH9 3FL, UK

contact – [       ] **(b) (6)** | http://tree.bio.ed.ac.uk | tel [       ] **(b) (6)**

The University of Edinburgh is a charitable body, registered in Scotland, with registration number SC005336.

# EXHIBIT 28

| From: | Fauci, Anthony (NIH/NIAID) [E] |
|---|---|
| Sent: | Fri, 28 Feb 2020 00:47:19 +0000 |
| To: | Mark Zuckerberg |
| Subject: | RE: |

Mark:

   Thanks for the note.  If we start in April ( ~6-7 weeks from now) with a phase 1 trial of 45 subjects, it will take another 3-4 months to determine safety and some immunogenicity.  The next step is phase 2 for efficacy.  We may need help with resources for the phase 2 trial if we do not get our requested budget supplement.  I believe that we will be OK.  If this goes off track, I will contact you.  Many thanks for the offer.  Much appreciated.

Best regards,

Tony

**Anthony S. Fauci, MD**
**Director**
**National Institute of Allergy and Infectious Diseases**
**Building 31, Room 7A-03**
**31 Center Drive, MSC 2520**
**National Institutes of Health**
**Bethesda, MD 20892-2520**
**Phone:** [(b) (6)]
**FAX: (301) 496-4409**
**E-mail:** [(b) (6)]
**The information in this e-mail and any of its attachments is confidential and may contain sensitive information.  It should not be used by anyone who is not the original intended recipient.  If you have received this e-mail in error please inform the sender and delete it from your mailbox or any other storage devices.  The National Institute of Allergy and Infectious Diseases (NIAID) shall not accept liability for any statements made that are the sender's own and not expressly made on behalf of the NIAID by one of its representatives.**

---

**From:** Mark Zuckerberg [(b) (6)]
**Sent:** Thursday, February 27, 2020 7:16 PM
**To:** Fauci, Anthony (NIH/NIAID) [E] [(b) (6)] >
**Subject:**

Tony:

I was glad to hear your statement that the covid-19 vaccine will be ready for human trials in six weeks. Are there any resources our foundation can help provide to potentially accelerate this or at least make sure it stays on track?

Mark

**From:** Fauci, Anthony (NIH/NIAID) [E]
**Sent:** Tue, 17 Mar 2020 00:23:16 +0000
**To:** Billet, Courtney (NIH/NIAID) [E]
**Cc:** Folkers, Greg (NIH/NIAID) [E];Conrad, Patricia (NIH/NIAID) [E];Stover, Kathy (NIH/NIAID) [E];Routh, Jennifer (NIH/NIAID) [E]
**Subject:** RE: offer from Mark Zuckerberg

I will write to or call Mark and tell him that I am interested in doing this. I will then tell him that you will get for him the name of the USG point of contact. I agree it should be Bill Hall who could then turf to the White House Comms if he wishes

---

**From:** Billet, Courtney (NIH/NIAID) [E] (b) (6)>
**Sent:** Monday, March 16, 2020 6:53 PM
**To:** Fauci, Anthony (NIH/NIAID) [E] <(b) (6)>
**Cc:** Folkers, Greg (NIH/NIAID) [E] (b) (6); Conrad, Patricia (NIH/NIAID) [E] (b) (6); Stover, Kathy (NIH/NIAID) [E] (b) (6)>; Routh, Jennifer (NIH/NIAID) [E] (b) (6)>
**Subject:** ASF: offer from Mark Zuckerberg

Per email below, Mark Zuckerberg has extended a few offers to do videos with you that we would be happy to seek clearance on for you to do, if you are amenable. These would have the weight and impact of television – really, more so. Please advise if you want to do and we will seek clearance with VP office and work with Patty to sort out the logistics.

But an even bigger deal is his offer (b) (4) The sooner we get that offer up the food-chain the better. I gave Bill Hall a heads-up about this opportunity and he is standing by to discuss this with HHS and WH comms, but I didn't want him to do anything without you being aware of the offer. Is it OK if I hand this aspect off to Bill to determine who the best point of contact would be so the Administration can take advantage of this offer, soonest?

Do you plan to call MZ? His cell number is in his message below.

---

**From:** Mark Zuckerberg (b) (6)
**Sent:** Sunday, March 15, 2020 12:18 PM
**To:** Fauci, Anthony (NIH/NIAID) [E] (b) (6)>
**Subject:** Thanks and ideas

Tony:

I wanted to send a note of thanks for your leadership and everything you're doing to make our country's response to this outbreak as effective as possible. I also wanted to share a few ideas of ways we could help you get your message out, but I understand you're incredibly busy, so don't feel a need to reply unless these seem interesting.

This isn't public yet, but we're building a Coronavirus Information Hub that we're going to put at the top of Facebook for everyone (200+ million Americans, 2.5 billion people worldwide) with two goals: (1)

make sure people can get authoritative information from reliable sources and (2) encourage people to practice social distance and give people ideas for doing this using internet tools. This will be live within the next 48 hours.

As a central part of this hub, I think it would be useful to include a video from you because people trust and want to hear from experts rather than just a bunch of agencies and political leaders. This could be done in a number of formats if you're open to it. Probably best would be recording a Q&A where you answer people's top questions, but we'd be open to other formats too.

I'm also doing a series of livestreamed Q&As with health experts to try to use my large following on the platform (100 million followers) to get authoritative information out as well. I'd love to have you do one of these Q&As. This could be the video we put in the Coronavirus Hub or it could be a different thing that we distribute separately, but I think it could be effective as well.

Finally, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  (b)(4)
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇

Again, I know you're incredibly busy, so don't feel the need to respond if this doesn't seem helpful. If it's easy to talk live, give me a call anytime on my mobile phone: ▇▇▇▇▇ (b)(6).

Thanks again for everything you're doing.

Mark

Glenn Decl. Ex. 28
Page 3 of 4

| From: | Fauci, Anthony (NIH/NIAID) [E] |
|---|---|
| Sent: | Tue, 17 Mar 2020 00:22:45 +0000 |
| To: | Mark Zuckerberg |
| Cc: | Conrad, Patricia (NIH/NIAID) [E];Billet, Courtney (NIH/NIAID) [E];Barasch, Kimberly (NIH/NIAID) [C] |
| Subject: | RE: Thanks and ideas |

Mark:

Thank you for your kind note.  I tried to call you, but got voice mail.  FYI, my cell phone number is ⬛⬛⬛ (b) (6)  Your idea and proposal sound terrific.  I would be happy to do a video for your hub.  We need to reach as many people as possible and  convince them to take mitigation strategies seriously or things will get much, much worse. Also, your idea about (b) (4) is vey exciting.  I am copying my Special Assistant, Patty Conrad.  Her office number is (b) (6) ⬛⬛⬛ (b) (6).  Please have your people contact her to arrange for the video.  I am also copying the Director of my Communications and Government Relations group. She can put your people in contact with the best person who could be the US Government point of contact for (b) (4).
Best regards,
Tony

From: Mark Zuckerberg ⬛⬛ (b) (6) >
Sent: Sunday, March 15, 2020 12:18 PM
To: Fauci, Anthony (NIH/NIAID) [E] ⬛⬛ (b) (6) >
Subject: Thanks and ideas

Tony:

I wanted to send a note of thanks for your leadership and everything you're doing to make our country's response to this outbreak as effective as possible. I also wanted to share a few ideas of ways we could help you get your message out, but I understand you're incredibly busy, so don't feel a need to reply unless these seem interesting.

This isn't public yet, but we're building a Coronavirus Information Hub that we're going to put at the top of Facebook for everyone (200+ million Americans, 2.5 billion people worldwide) with two goals: (1) make sure people can get authoritative information from reliable sources and (2) encourage people to practice social distance and give people ideas for doing this using internet tools. This will be live within the next 48 hours.

As a central part of this hub, I think it would be useful to include a video from you because people trust and want to hear from experts rather than just a bunch of agencies and political leaders. This could be done in a number of formats if you're open to it. Probably best would be recording a Q&A where you answer people's top questions, but we'd be open to other formats too.

I'm also doing a series of livestreamed Q&As with health experts to try to use my large following on the platform (100 million followers) to get authoritative information out as well. I'd love to have you do one

# EXHIBIT 29

BRIEFING ROOM

# Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack, May 5, 2021

MAY 05, 2021  •  PRESS BRIEFINGS

James S. Brady Press Briefing Room

12:32 P.M. EDT

MS. PSAKI:  Hi, everyone.

Q    Hi, good afternoon.

MS. PSAKI:  Good afternoon.  Okay.  We have another special guest joining us today: Secretary of Agriculture Tom Vilsack.

As you all know, this is Secretary Vilsack's second turn at the Department of Agriculture, which he led in the Obama-Biden administration from 2009 through 2017, making him the longest-serving member of President Obama's Cabinet.

In those years, Secretary Vilsack fought to put Americans back to work by investing in rural infrastructure, renewable energy, and large-scale conservation partnerships.  Under his leadership, USDA introduced healthier food choices in school meals to benefit 50 million children, and expanded free and reduced-price lunches for millions of kids.

Prior to his appointment — or nomination and confirmation, I should say — Secretary Vilsack served two terms as the Governor of Iowa, in the Iowa State Senate, and as the Mayor of Mount Pleasant, Iowa.

With that, I will turn it over to the Secretary, who will be — take a few questions once he concludes his remarks.

SECRETARY VILSACK:  Jen, thanks very much.  It's certainly a pleasure to be here today with

all of you.

I'm here primarily to talk about food and nutrition security. And you may think that that is just about food and nutrition security, but, in fact, it's about a lot more than that.

When you understand that 25 percent of America's workforce is directly or indirectly impacted by the food and ag industry, that it represents a significant percentage of our GDP, that educational achievement is somewhat dependent on youngsters having healthy and nutritious food as they begin their school year and school day, and the fact that it is a noted effort in reducing poverty, food and nutrition security becomes an important issue. And certainly, we've seen the impact of that during the course of the pandemic.

When the American Rescue Plan was enacted, hunger in the United States was at 14 percent of our population, which was an incredibly high number. Today, as a result of the investments under the American Rescue Plan, we now know that hunger has dipped to 8 percent of America's population. That's a remarkable drop in a six-month period.

It is a result of extending SNAP, as we did in the American Rescue Plan; creating a Summer EBT program that will institute opportunities for nearly 30 million children to have access to nutrition during the summer months; increasing our commitment to WIC; and basically making a down payment, if you will, on hunger reduction.

We have the opportunity, over the course of the next several months, as Congress considers the American Jobs Plan and the American Family Plan, to cement those — those results and to actually build upon them.

There are three key investments for nutrition and food security in the American Families Plan. First, we are going to make permanent this incredible and historic effort to feed kids during the summer months. There are, as I said, nearly 30 million American children who are in free-and-reduced-lunch status in schools.

At the end of the school year, there is no program, other than the summer feeding program, which impacted and affected several million of those 30 million children. Now we have the opportunity to provide each one of these families with a card that looks like this.

This is the Summer EBT card that's available. It allows parents the opportunity to go to the grocery store — as they do with their SNAP card — and be able to purchase additional fruits and vegetables and other wholesome food for their children, ensuring that 30 million kids will

have the opportunity to have nutrition during the summer, which means that they'll be better prepared to begin school ready to learn in the fall.

We're also extending, with this effort, the opportunity to impact free school meals in high-poverty school areas by focusing on the Community Eligibility program that essentially identifies the ability of a school district where SNAP participation is roughly 40 percent to extend free meals to everyone in that school.

This is going to expand opportunities for youngsters to be well fed.  And we know from a recent Tufts study that one of the healthiest places in the country for children to eat is now in America's schools.  So we're going to see that extended, and we're going to focus — with a specific, laser-like focus — on elementary schools to make sure that our youngest learners have the best possible opportunity.

And finally, we're going to invest a billion dollars, with Congress's help and assistance, in trying to figure out strategies that will improve, even more than we already have, the nutritional value and quality of the meals that youngsters receive in schools.

So, these three steps — these three key investments of the American Families Plan will allow us to cement the gains under the American Rescue Plan and, hopefully, impact and reduce hunger to the point, eventually, one day, where we won't have to have a press conference about — about hunger.

So, with that, I'd be happy to take questions.

MS. PSAKI:  Great.  Andrea, do you want to kick us off?

Q   Yeah.  Secretary Vilsack, a couple questions.  One about the mines that you — the mine project that you had previously blocked, and then the Trump administration allowed those to open up.  Do you have any particular view on whether that should be reopened or not?  This is the Twin Metals copper mine.

SECRETARY VILSACK:  There's always a very difficult balance to strike in any of these questions.  And certainly, in this particular one, you're balancing a pristine, incredibly important, and valuable natural site — the Boundary Waters of the Mississippi, a tremendously unique area.  It's one that the late Walter Mondale felt very strongly about, and I know that from a personal experience with the former Vice President.  He called me repeatedly on this issue.

So, you've got that on one hand.  On the other hand, you obviously have jobs and economic opportunity.  And I think the challenge is to try to see if you can strike a balance.  And that's what we attempted to do in the previous administration, and I don't see any reason why we should — why we should change that calculation: trying to find the balance between preserving a pristine area and, at the same time, looking for ways in which job growth, economic growth can take place in rural areas.  And that's what we're going to attempt to do.

There are no final decisions being made on this.  This is obviously something we also have to do in conjunction with the Department of Interior.  They have a stake in this issue as well.

Q    (Inaudible.)

MS. PSAKI:  Alex — oh, I just want to get to a bunch of people, and he has limited time.  So, go ahead, Alex.

Q    Sure.  One way of increasing SNAP benefits is by reforming the Thrifty Food Plan, and I know that that is under review right now.  Can you talk a little bit about what that review entails, and when we should expect results, and how the reforms would be implemented if the program is (inaudible)?

SECRETARY VILSACK:  It's a complicated question, and one that hasn't been reviewed in detail for quite some time.  And we expect and anticipate, during the course of the summer months, that we will complete our review and then have an opportunity, perhaps, to have a conversation about this in the fall.

And this will be appropriately timed because, as you know, the American Rescue Plan called for an extension of the increase in SNAP over the course of the summer months until the end of September.  So it's timely for us to look at this.

I'd simply say that the principles that we're operating under in this area are:

Number one, that the benefit has to be meaningful to fa- — American families.  With the American Rescue Plan, we saw an additional $100 a month for a family of four being added to the groceries — to their grocery purchases.

It also impacts jobs.  As I said before, that SNAP benefit increased and supported tens of thousands of jobs in grocery stores and across the food chain.

It also has to be conveniently available.  It's one of the reasons why, again, the American Rescue Plan has provided opportunities for us to look at online purchasing — make it more convenient.

It has to be operated with integrity, obviously.

And it has to be — we have to look for ways in which we can incent and encourage those dollars to be used in the best way possible to provide the most nutritious benefit to American families.

And that's the goal, and that's what we'll look at when we look at the Thrifty Food Plan.

MS. PSAKI:  Alex.

Q   Secretary, a group of Midwestern farmers, last week, sued over the COVID — a COVID loan forgiveness program, arguing that it's unfair to them because they're white.  Your reaction to that lawsuit?  And do you stand by the program's structure?

SECRETARY VILSACK:  That's a great question.  I appreciate it.  I think I have to take you back 20, 30 years, when we know for a fact that socially disadvantaged producers were discriminated against by the United States Department of Agriculture.  We know this.

We have reimbursed people in the past for those acts of discrimination, but we've never absolutely dealt with the cumulative effect.  And by "cumulative effect," I mean this: When I have the full advantage of all the USDA programs throughout the last 30 years, my operation could grow.  I could invest in more land.  I could get the latest and best technology.  I could plant my crop at just the right time.  I could make more money.  If I had limited access or no access to USDA programs, obviously my operation — significantly limited.

So, the American Rescue Plan's effort is to begin addressing the cumulative effect of that discrimination in terms of socially disadvantaged producers.

Secondly, when you look at the COVID relief packages that had been passed and distributed by USDA prior to the American Rescue Plan, and you take a look at who disproportionately received the benefits of those COVID payments, it's pretty clear that white farmers did pretty well under that program because of the way it was structured.  It's structured on size; it's structured on production.

So I think there is a very legitimate reason for doing what we are doing.  I think it has to be complemented with additional steps, which the American Rescue Plan provides — an equity commission to take a look at whether or not there are systemic barriers that need to be removed at the Department.

And — and also, taking a look at how we might be able to create better technical assistance, better access to land, better access to markets for socially disadvantaged producers and for local and regional food production.

So we're going to continue to proceed forward.  Understand that litigation is going to be what it is, and we're wal- — we'll obviously have the Department of Justice and others do what they do.  An- — but in the meantime, the U.S. Department of Agriculture is going to move forward with that effort.

MS. PSAKI:  Kristen.

Q   Thank you, Secretary Vilsack.  You've just outlined the plans for the ARP funds through the fall to deal with some of the issues around hunger.  How long do you anticipate those funds will last, particularly given that next year's schoolyear will be unique — coming off of a year where most schools have been closed for the better part of the year?  And will you need more funds from Congress to address this (inaudible)?

SECRETARY VILSACK:  Well, I think that's one of the reasons why the President proposed the American Families Plan as a continuation and as — allowing us to basically cement and make more permanent the gains that we've seen from the American Rescue Plan.

In the meantime, we have worked with schools, understanding they are faced with a lot of uncertainty about the upcoming schoolyear.  And so we have already decided that we have available resources to be able to provide for universal free lunch for schools throughout the '21-'22 schoolyear.  And that will extend, I think, until the end of June 2022.

With the passage of the American Families Plan, we would then have the Summer EBT program to provide additional support and help.  And that would give us, I think, enough lead time for school districts to be able to adjust back to what the new normal will be.

In the meantime, we'll be looking at, hopefully, the use of the pilot under the American Rescues — under the American Families Plan, to see if there are ways in which we can incent

additional nutritional value for those meals.  And we'll be using, hopefully, with the passage of the American Families Plan, a more targeted effort in high-poverty schools — elementary schools — to expand universal free — free meals.

Q   Thank you, Secretary.

MS. PSAKI:  Kaitlan.  That will be the last one.

Q   On this idea of a carbon bank, since you've been on the job, what is the feedback that you've gotten from farmers?  And is this something that you think needs congressional approval?

SECRETARY VILSACK:  You know, I was at a meeting yesterday with the Environmental Protection Agency Administrator, Michael Regan.  He did a terrific job.  We had probably 25 farmers.

I was very pleased with the level of support and interest that the farm community has for ways in which they can be engaged in this effort to reduce emissions and to be engaged in this climate effort.

We had multiple questions about this in terms of "How can we do this?" — not "We're against it" or "We are opposed to it" or "We don't think it should happen."  It was, "How can we do this?  How can we be part of this?"

Because farmers understand something very, very fundamental about this: This is the opportunity of a lifetime for us to create additional revenue opportunities for farmers.  Now, why is that important?  Because today, 89.6 percent of American farms — the majority of income does not come from the farm for those farm families.  That means they have to have an off-farm income.

So it's the Department of Agriculture's job to find more, better, and new markets.  Climate provides that opportunity.  Whether it's a fund or whether it's conservation resources, whether it's investments in technology that will allow them to capture methane and reuse it, or whether it's creating new opportunities for bioprocessing and new jobs in rural places, all of that has to be done.

And I think the USDA has — has enormous capacity, an enormous set of tools that can be used to provide the resources to work with the farm community to embrace this future.  And I think they are in agreement with President Biden when he says the net goal here is net-zero

emissions by 2050.  I think that's doable.  And I think in doing it, I think we'll improve income opportunities for farmers, we'll certainly do right by the environment, and I think we'll also have healthier and better soil and cleaner water.

Q    Would it need congressional approval — a carbon bank?

SECRETARY VILSACK:  Well, it needs congressional approval in the sense that you have resources in all of these programs that require funding.  We have a lot of flexibility already at USDA, and we're going to be utilizing that flexibility in a way that creates more, new, and better markets.  And I think farmers are going to find that to be a very — they're going to be very agreeable with that.

Q    Thank you.

MS. PSAKI:  Thank you, Secretary Vilsack.  And as always, if you all have follow-up questions, we are happy to connect you with his team following the briefing.

SECRETARY VILSACK:  Great.

MS. PSAKI:  Thank you.  And we'll love to have you back.

SECRETARY VILSACK:  You bet.  I'll take my notes.  Appreciate it.

MS. PSAKI:  Thank you so much.

I'll just note my first campaign was for the Secretary's gubernatorial race in 2002, so full circle.

A couple of items — additional items for all of you at the top.  This afternoon, President Biden, as you know, will deliver remarks on Amer- — the American Rescue Plan's Restaurant Revitalization Fund — the administration's program to provide relief to restaurants, bars, food trucks, and other food and drink establishments.

As we all know, restaurants were some of the first- and worst-hit businesses in the pandemic. The Restaurant Revitalization Fund provides $28.6 billion in direct relief to restaurants and food and beverage establishments, and prioritizes those that are women-owned, veteran-owned, and owned by other socially and economically disadvantaged individuals by only funding applications from these businesses for the first 21 days of the program.  Then it expands beyond there.

Earlier today, the President also visited one local restaurant that was a beneficiary of relief funding through the Revitalization Fund's pilot program.  Taqueria [Las] Gemelas — I'm going to butcher that and I apologize; I want to go there and have some tacos — is owned in part by Mexican immigrants and, during the pandemic, went from 55 employees to just 7.  So clearly, in great need.

These funds will allow business owners to complete delayed projects, rehire and raise the wages of their staff, pay their rent, and operate with confidence again.  Applications for the program opens up on Monday.  And in just the first two days of the program, 186,200 restaurants, bars, and other eligible businesses in all 50 states; Washington, D.C.; and 5 U.S. territories applied for relief.

Ninety-seven thousand six hundred applications came from restaurants, bars, and other eligible businesses owned and controlled by women, veterans, socially and economically disadvantaged individuals, or some combination of the three.

Sixty-one thousand seven hundred applications came from businesses with under $500,000 in annual pre-pandemic revenue, representing some of the smallest restaurants and bars and businesses in America.  And we look forward to implementing that program.

With that, I think we can go, Alex, to you.  Questions.

Q    So the CDC's summer camp guidance is very strict.  As Dr. Fauci acknowledged today, it requires even adults who have been vaccinated to wear masks outside at all times.  It requires children to be socially distanced.  Can you explain why that contradicts the administration's guidance that vaccinated adults don't have to wear masks outside?

And also, Dr. Fauci suggested that it may change as the science becomes clear, but are — is the administration at all concerned that there won't be compliance with something this strict and there won't be compliance if it continuously changes?

MS. PSAKI:  Sure.  Well, first, I think everyone can expect that the guidance will continue to be updated and will continue to change.  And I think, as a parent myself of kids going to summer school — not summer school, summer camp; don't tell them I said that — (laughter) — you know, they — I would welcome that.

And there's no question what the CDC is trying to do is provide guidance to the American

public — to parents, to families — that they can trust, that they know is reliable — based on medical experts, doctors; based on data — on how they can feel safe.  The guidance that was r- — that was rolled out last week does not convey that when you're outside in a crowd, you cannot — you should not wear a mask.

If you're outside and you're not in a crowd, then you — and you're vaccinated, you don't need to wear a mask.  Obviously, there is nuance in all of these applications, and people are still learning how to apply it.

But as kids are dropping off — as parents, I should say, are dropping off their kids at summer camp; as there are tons of kids, tons of parents, counselors — you know, that certainly wouldn't — wouldn't be someone alone.

But I think what Dr. Fauci was conveying, Alex, is that the data — they're going to continue to look at the data.  And they want to put out updated guidance as they feel comfortable and confident in what they can provide to the American public.

Q    Sure.  And there's a new evaluation of the American Families Plan out by the Penn Wharton Budget Model.  And they found, actually, that the plan would increase the deficit and fail to grow the economy as much as President Biden has claimed.

And so it's — is there a risk, in the long term, that the President might not be able to fully deliver on what he's promised economically?

MS. PSAKI:  Well, first, let me say we strongly agree — disagree with the analysis, as do other independent experts.

According to an analysis out this week from Moody's, GDP in 2030 will be more than $700 billion higher than it would be without the Jobs an- — Family — the Jobs Act — the Jobs Plan and the Families Plan.

This is in large part because labor force participation will be nearly a full percentage point higher due to the effects of the benefits of childcare su- — child support — childcare support and paid family leave.  And that same analysis found that the economic benefits would only increase over time due to increased college enrollment and universal pre-K, which will help some of the 2 million women who are no longer in the workforce get back in.

The Penn Mo- — Wharton Model analysis is also off in a number of important ways.  It gets the

cost of the investments wrong by about $700 billion, even though our estimates come from career officials at OMB.  Moody's, for example, arrived at deficits even lower than the administration when — than we had when it came to the effect of the Families Plan.

And, of course, our plan would be implemented over a series of 8 years and 10 years, and paid for over 15.  So, we're going to rely on the majority of economic analysis out there and our own analysis in here.  And we are confident we'll be able to reach both our job creation projections and, of course, do it in a way we can pay for it.

Q   And one international question: Israeli Prime Minister Benjamin Netanyahu missed the deadline to put together a coalition government yesterday — or a new governing coalition.  Is the President monitoring this situation?  And does the administration have any sort of response or perspective on the possibility of a new coalition government there?

MS. PSAKI:  Well, we do read all of your news coverage, but we are not going to comment publicly on government formation while that process is underway.

Go ahead, Andrea.

Q   Okay, there are a couple follow-ups on Vilsack's answer — Secretary Vilsack's answer on the Twin Metals thing.  Is that a decision that you think will be coming at any point soon?  Or is that just, sort of, carved out?

MS. PSAKI:  I don't have a prediction of that.  I would say I would refer you to the Department of Agriculture.  And they would, of course, be the right source for that information.  We can see if there's more follow up on it, on the timeline.

Q   Okay.  And then, on the issue of the G7 meeting and the subsequent meetings group — Putin.  Have you — do you have any news for us on that front, in terms of timing and also the agenda?

MS. PSAKI:  Not quite yet.  As soon as we have details or any confirmed details of timing, location, date, participation,  we will of course share that with you.  And I would expect we wouldn't have more specifics on an agenda, if and when we have it confirmed, until much closer.

Q   And then just one more on my favorite topic of the WTO.

MS. PSAKI:  Oh, I don't know which one it is.

Q   TRIPS waivers.

MS. PSAKI:  Okay.

Q   TRIPS wai- — (laughter.)  TRIPS waivers.

MS. PSAKI:  Mm-hmm.

Q   So, this morning there was a meeting of the WTO.  Katherine Tai made some comments during an FT session talking about, you know, time being of the essence — really, sort of, underscoring.

There are multiple reports out, also, about, kind of, a division within the administration on this waiver issue.  Can you just really walk us through what your perspective is on this and why?

So the — there's so many people in institutions and organizations now really putting pressure on President Biden to back this waiver.

MS. PSAKI:  Well, I think it's important, first, to just just take a step back and remind everyone that President — the President spoke about his support for this type of a waiver back during the campaign.

But it — we are running a process — we have been running a process in the administration that includes all stakeholders in the administration.  And he is somebody who has welcomed people of different views.  He wants to know the details.  He's a details guy, and he wants to dig into the pros and cons and all of the considerations for any decision.

As we look at this decision, what we're really talking about — I know you know this, Andrea, but for others — we're really talking about the U.S. position as it relates to the WTO process, right?  And that process will take a series of months, and requires a unanimous point of view to move forward.

So what we are — the consideration now is — the U.S. position, our objective overall, as we look at this decision is: How can we provide as much supply in the most cost-effective way to the global community?  And clearly, there are steps we've announced.  We've take — we're in the process of taking — providing 60 million doses to the global community — once we have that

available — that are AstraZeneca doses.

Earlier this week, Pfizer announced they'll also be sending doses, or manufacturing doses, for the global community.  And we're going to continue to work with our partners.  I expect we'll have more — now that the WTO meetings are underway, we'll have more to say very soon on this.

Q   Are you concerned about setting a precedent that could be — so, even if India and South Africa narrow their proposal, which is apparently something that's going on — and maybe you could ask — you could — you could confirm that that is your understanding — even if that proposal is narrowed, are you concerned that you're going to be setting a precedent that could harm U.S. companies in the future — which is what, you know, we hear from U.S. industry?

MS. PSAKI:  Well, clearly as these decisions are weighed, we take intellectual property incredibly seriously.  And we also, though, are in the midst of a historic global pandemic, which requires a range of creative solutions.  And we're looking at it through that prism.

Q   It sounds — I'm sorry, Jen, I just want to be very clear.  It sounds like you're pushing us or leaning towards some kind of a — a waiver of some kind.

MS. PSAKI:  I'm not trying to give you an indication.  That, obviously, would be an announcement or a decision that would be recommended by the USTR and a decision I would expect that would be made by the USTR.  But what I'm trying to give you an understanding of, which I think was your question, is what the considerations are in the thinking and decision.

Q   When do you think a decision will be made?

MS. PSAKI:  Soon.

Go ahead.

Q   I have questions on a couple of different topics.  The first is on the debt limit: Is the White House concerned about being able to avoid a government shutdown and raising the debt limit considering the Treasury is unsure how long it can use the extraordinary measures it has?  And what's the White House's strategy for pressuring Congress to agree to raise or suspended the debt limit?  Or are you leaving that to Treasury to figure out?

MS. PSAKI:  Well, first, I will say that, on the issue at hand, raising or suspending the debt

ceiling does not authorize new spending.  Sometimes — I'm not saying you're confused about that; some people sometimes are.  It merely allows Treasury to meet obligations that Congress has already approved.  So, certainly, they would be in the lead, as they have historically been in most administrations, on making that case.

We expect Congress to act in a timely manner to raise or suspend the debt ceiling, as they did three times on a broad bipartisan basis during the last administration, including the same year that the former President signed into law tax cuts that added $2 trillion to the deficit.

So, we certainly expect they will move forward, that this is something that has been done in a bipartisan basis; Democrats and Republicans have called for it in the past.  And that's what we'll be advocating for.

Q   Senate Minority Leader Mitch McConnell said this morning — when asked about, kind of, the issues within his own party — that, quote, "100 percent of my focus is on stopping this new administration."  And he touted, kind of, the unity within his caucus, from Susan Collins to Ted Cruz.  Are you concerned that it will be difficult to work with Republicans when you're — when you have these kinds of statements coming from their Leader?

MS. PSAKI:  Well, I guess the contrast for people to consider is 100 percent of our focus is on delivering relief to the American people and getting the pandemic under control and putting people back to work.  And we welcome — support engagement and work with the Republicans on that.  And there's — the President has extended an open arm to that.  The door to the Oval Office is open.  He's invited Senator Capito to bring a group of her choosing to the White House next week.  And we think there is opportunity for agreement to deliver on — on relief to the American people.

Q   Just one quick question: A judge, this morning, struck down the CDC's national moratorium on evictions.  Do you have a response to that and the administration's plans to appeal, potentially?

MS. PSAKI:  Yes, I do —  we understand that it's just happened, as you alluded to, this morning. We understand the Department of Justice is reviewing the court's decision and should have more to say later today.  We also recognize, of course, the importance of the eviction moratorium for Americans who have fallen behind on rent during the pandemic.

A recent study estimates that there were 1.55 million fewer evictions filed during 2020 than would be expected, due to the eviction moratorium.  So it's clearly — has had a huge benefit.

But we would expect that a response and any, of course, decision about additional action would come from DOJ. And you may hear more from them today.

Go ahead, Kristen.

Q    Thanks, Jen. Facebook has decided to keep former President Trump off of its platform for now. Senator Ted Cruz tweeted the following: "For every liberal celebrating Trump's social media ban, if the Big Tech oligarchs can muzzle the former President, what's to stop them from silencing you?" What do you make of that comment? Does he have a point?

MS. PSAKI:  Well, let me first say that this is an independent board's decision, and we're not going to have any comment on the future of the former President's social media platform. That's a decision that, it sounds like, the independent board punted back to Facebook to make in the next six months, as I know you all have reported.

The President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections. And we've seen that over the past several months, broadly speaking. I'm not placing any blame on any individual or group; we've seen it from a number of sources.

He also supports better privacy protections and a robust anti-trust program. So his view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public.

Q    You're saying more that needs to be done. Are there any concerns though about First Amendment rights? And where does the White House draw the line on that?

MS. PSAKI:  Well, look, I think we are, of course, a believer in First Amendment rights. I think what the decisions are that the social media platforms need to make is how they address the disinformation, misinformation — especially related to life-threatening issues like COVID-19 and vaccinations that are — continue to proliferate on their platforms.

Q    I want to ask you, also, Jen, about police reform. President Biden said he wanted it done by the first anniversary of George Floyd's death: May 25th. Is he confident that Congress can meet that benchmark? Where do those negotiations stand?

MS. PSAKI:  Well, the negotiations are between members of Congress. So — and he, of course,

is confident in the — those discussions and the work that is happening under the leadership of everyone from Congresswoman Karen Bass to Senator Cory Booker — obviously, Senator Tim Scott, who he called out in his speech just last week.

And we are — we remain — we are in close touch with, of course, negotiators and kept abreast of their progress, but we will wait to see what comes out of those discussions.

Q   If you do the math, though, this puts police reform, in some regard, ahead of the negotiations, one would think, for the American Families Plan, the infrastructure plan, which he set an end-of-the-summer deadline for.  Is this now the President's top priority?  Does he want Congress to tackle this first?

MS. PSAKI:  Well, I would say that the President believes Congress can and should move forward with multiple policies at the same time.  And, certainly, that — that is what is happening on Capitol Hill.  I know those members who are playing central role — roles in these negotiations — and, obviously, they can speak to the frequency of the discussions and the status of them and we defer to them — they will be important participants, of course, in any outcome of negotiations around the American Jobs Plan, but those negotiations can happen simultaneously.

Q   Just finally, Jen, how does he see his role?  I mean, he's the one making this call to get this done.  Has he reached out to Tim Scott — the person who's leading the charge on the GOP side?

MS. PSAKI:  I don't have any calls or engagements to read out to you, but I can say that, as you know, a number of representatives of the families were here just last week, meeting with some senior members of the White House leadership.

The President has talked about how it's long overdue to put in place police reform measures — that that will help rebuild trust in our communities.

He used his joint session speech — the highest-profile moment in a first — in a President's first year — to talk about that and make the case.

And — but the negotiations are happening between members of Congress.  He feels that's the appropriate place for them to be.  And we will continue to use opportunities to call for this moving forward.

Go ahead, Kristin — Kristin?  Kristen?  Kristin?  I got confused.  Kaitlan.

Q    There's a lot of "Ks."  A lot of "Ks."

MS. PSAKI:  There's a lot of "Ks."  It's a Wednesday.  Go ahead, Kaitlan.

Q    That's all right.  Kristin and I also have been dressing alike lately, so it's fine.

MS. PSAKI:  Kristin has a very good mask on today.  This Kristin.  Both of your masks.

Go ahead, okay.

Q    My question is on these restaurant funds.

MS. PSAKI:  Yes.

Q    When will they start being awarded?  And does the President envision having to ask Congress for more money for this?

MS. PSAKI:  Well, on the second piece — well, first, the first awards, as part of the pilot program, will be funded Friday.  So —

Q    Right.  But for this program, not the pilot — the –the sec- — the actual part of it, not the pilot.

MS. PSAKI:  Those who applied this week can expect up to — up to 14 days, on average, from submission to funding.  So it will be a very rapid turnaround.

Q    Okay.  And does he envision asking Congress for more money for this?

MS. PSAKI:  When Congress comes back, we are happy to discuss the best ways to further support small businesses, including restaurants hurt by the crisis.  So he's certainly open to that.

And as I noted, there has already been a large interest in this program.  And there are great needs across the country from these small businesses, from these restaurants that are in communities across the country.

So we will — we're happy to have a conversation with Congress about that.

Q   Okay.  And my question on the patents — you were talking about how the President, last summer, expressed his favor for waiving these so countries would be able to mass produce these vaccines once they're ready.  Of course, that was when they were not ready yet last summer.

MS. PSAKI:  Yeah.

Q   So, just to be clear: Is that still his position?

MS. PSAKI:  That has been — that has been his position.  He also believes that there needs to be an internal policy process.  That's what's been ongoing.

The recommendation — the appropriate process — the recommendation to come from the USTR, and then any announcement about a decision would come from USTR.  And that's how government should function and should work.

And as — and I noted, in response to Andrea's question –there are, of course, considerations, but we're also in the midst of a global pandemic, and we are — our objective is to getting as much supply out into the global community as — as quickly as possible and in the most cost-effective manner as we can.

Q   But what did he communicate to Katherine Tai, his Trade Representative, before these meetings with the WTO on this are underway?

MS. PSAKI:  Well, there have been discussions happening here in — through a policy process.  I don't think his comments he made last summer are a secret.  They're certainly not.

But, again, he's a believer that you need to have all parties at the table — everyone providing information, hearing details, pros and cons of every decision.  And that's exactly what he asked for from his policy teams.

Q   So given what he's heard from the policy teams, from the health experts — people like Dr. Fauci have weighed in publicly about whether this would be helpful in making vaccines right now or if that would be further down the road — but is it — is his position still what he said last summer, which is "absolutely, positively," he will "ensure there are no patents [standing] in the way of other countries and companies' mass producing these lifesaving vaccines?"

MS. PSAKI:  That has been his position, but he is the President of the United States, who believes in the advice, the counsel, the considerations of his policy teams. And that has been the process that's been ongoing over the last several weeks. And I expect we'll have more to say quite soon.

It's also important to note, just — just in response to one of the things you said, that this is not — this would not be — this is about the U.S. position.  There would be an entire process at the WTO that would be — likely be months in the making.

And that's just how the process works.  So there's also a consideration leading up to that.

Q   Okay.  Thank you.

MS. PSAKI:  Okay.  Go ahead.

Q   Thank you, Jen.  Yesterday, you said that the CDC engaged with around 50 stakeholders when coming up with these guidelines for reopening schools.

MS. PSAKI:  Yeah.

Q   So, in addition to the teachers union — the American Federation of Teachers — who are these other roughly 50 stakeholders?

MS. PSAKI:  Well, let me give you — I'm not going to read all 50 because, you know, but — and I'm happy to send them to you after.

But just as an example, while I find this lengthy list:  You know, they include the YMCA.  They include the Council of Chief State School Officers, the National Association of School Nurses, the National Governors Association, Big Cities Health Coalition, Autism Speaks, Council of Great City Schools.

So there's a range of organizations.  And as we were talking about yesterday, the objective is to have a better understanding of implementation, how it would work, and ensure that these guidelines can be implemented and they would not provide harm to the communities that they would be impacting.

Q   But can you just explain maybe just a little bit more — you know why the CDC needs all of this input from so many outside entities?  Why can't it just come up with these science-based

guidelines on its own?

MS. PSAKI:  Well, they do so to ensure that the recommendations are feasible to implement and that they adequately address the safety and wellbeing of individuals the guidance is aimed to protect, and that type of consultation is pretty standard as a part of their consideration processes.

Q   One other topic.

MS. PSAKI:  Sure.

Q   Right now, there is a huge Chinese rocket in outer space that's going to be crashing down to Earth, likely on Saturday, and nobody knows exactly where.  It'll likely be in an ocean, but it could — or pieces of it could come down over a populated area, and this isn't the first time that China has allowed — knowingly allowed something like this to happen.

So does the White House condemn this kind of repeated reckless behavior from China's space program?

MS. PSAKI:  Well, let me first say that U.S. Space Command is aware of and tracking the location of the Chinese Long March 5B in space.  And obviously, the Space Command would have more specifics on that tracking and — and additional details.

The United States is committed to addressing the risks of growing congestion due to space debris and growing activity in space.  And we want to work with the international community to promote leadership and responsible space behaviors.  It's in the shared interests of all nations to act responsibly in space to ensure the safety, stability, security, and long-term sustainability of outer space activities.

So cooperation is a hallmark of our approach.  We're going to work with our international partners on that.  And certainly, addressing this is something we'll do through those channels.

Q   And just a quick follow-up: If this rocket does cause some — some serious damages here on Earth, would the White House enforce China paying some sort of compensation as required by the U.N. Liability — Space Liability Convention?

MS. PSAKI:  Well, again, I think we'd, of course, refer to the advice and guidance from U.S. Space Command and the Department of Defense and others.  But we're not — at this point, we

are certainly tracking its location through U.S. Space Command.  And hopefully, that's not the outcome that we are working through.

Okay.  Go ahead, Eli.

Q    Thanks, Jen.  Just interested if you have any response to some of the moves made this week by a few Republican governors to get rid of, you know, protections that were in place for people — public benefits, also public health restrictions — basically sending the message that the pandemic is over and sort of criticizing Washington — "the CDC bureaucrats," as Ron DeSantis put it — for telling people they still need to wear masks indoors, those sorts of things — saying that the vaccines have worked.

How are you trying to thread that needle by celebrating the progress of all the people who have been vaccinated and keeping these things in place — and also trying to keep people from viewing this through a political lens?  Any outreach to any of these Republican state officials about the message they're sending?  And any response to them from the podium?

MS. PSAKI:  Sure.  Well, first, we not only do a regular — a governors call every single week with governors from across the country, from red states and blue states, to talk about implementation, any changes we're making to allocations — as we talked about just yesterday — but we also have regular engagement with governors and local officials about where the public health guidance is going, questions they have, and even sometimes challenges they have in their communities.

Our position, from the federal government, continues to be that the public health guidelines are in place to keep people safe — not just governors and leaders of states, of course, but people in communities, families, kids, people who are in vulnerable populations.  And that we'll continue to communicate that from the federal level, even as governors are pulling back their implementation in some places where it might be premature.

Q    And as you — the President, yesterday, was talking about transitioning from the mass vaccination centers, largely in urban and suburban areas, and trying —

MS. PSAKI:  Yeah.

Q    — to really be more deliberate, proactive about getting the vaccine to people in outlying areas, rural areas.

Is there any concern about having enough vaccinators to reach people in those areas?  And will this mostly be run through local pharmacies or is there going to be a similar effort to authorize different people in sort of medical fields to be able to administer vaccines?

MS. PSAKI:  Well, we did take that step some time ago to expand the type of individuals who are qualified to be vaccinators, because early on we recognized that it wasn't just about supply, it was also about locations — and obviously, as you alluded to, we've made some changes and adjustments — but also about vaccinators and ensuring that a larger group of individuals — dentists, veterinarians, others — could also be eligible to do the vaccine and get it into people's arms, because we want to ensure that in a range of communities across the country there's a range of options for people who can do exactly that.

So that's not a concern that we are tracking at this point in time — a lack of — because we did a lot of work preparing for those needs.

And I would say that, you know, there were some mass vaccination sites we opened even last week, but what we announced yesterday is a kind of a phased approach based on the phase we're in at this point in time, which is that we are recognizing the daily numbers will go down a bit because we're at such a high percentage rate, relative to where people thought we were at this point in the pandemic.

And we know it will be harder and harder to reach people and meet people where they are, hence the increase, as you suggested, in walk-in hours or the announcement of walk-in hours on mobile units, on partnerships with primary care physicians and doctors to make it even easier and more accessible for people to get the vaccine.

Q   Just one more on tomorrow and the trip to Louisiana.  So far, the President has mostly traveled to states that are, you know, competitive swing states.  Louisiana is obviously a red state, but has been impacted by COVID.

MS. PSAKI:  Except for Texas and Ohio.

Q   Well, okay.  But I mean, there's been a lot of travel to some of these states.  Can you just talk a little bit about the takeaway that people should have when they see the President showing up, you know, in deep-red Louisiana tomorrow, and the issues that he wants to, sort of, draw attention to?

MS. PSAKI:  Sure.  Well, first, the President, when he was elected, knew from day one he was

going to govern for all Americans and that was going to be his objective.  And so, even if it's for people who didn't vote for him, for states who didn't vote for him, his focus is on delivering for them.

So, tomorrow, he'll make two stops in Louisiana.  His focus will be on talking about the American Jobs Plan and how that plan in a historic investment in infrastructure, rebuilding the type of bridges, roads in Louisiana that are long overdue to be upgraded could help not only people's travel and commutes, but also create jobs in these communities.  And it's not about just delivering for people who voted for him or people who have blue checkmarks next to their name because they're Democrats.  And that's part of what this message should shen- — this visit should send.

Go ahead, Hans.

Q   I get that you, sort of, prefer the Moody's model over the Penn Wharton.  I'm just curious if the White House is going to accept whatever CBO and JCT scores the President's proposals at?

MS. PSAKI:  Well, I think our issue with the Penn Wharton Model was the data it was based on, and that it was off.  And so we'll have to look at what the data that any future analysis is based on, and then we'll give an assessment.

Q   Okay.  So even official — you're not embracing whatever the official assessment will be from CBO and JCT?

MS. PSAKI:  Well, Hans, there is no assessment at this point in time.  Our assumption is that they would be abiding by accurate data; so we'll look forward to seeing those assessments.

Q   And then when do you expect those assumptions and data to come in?

MS. PSAKI:  I don't have a prediction of that.

Q   Okay.  Thank you.

MS. PSAKI:  I suggest you ask them.

Go ahead, Alex.

Q   Does President Biden agree with Governor Whitmer's decision on the oil and gas pipeline?

She's citing, essentially, water-quality issues.  It's really angered Canada.  Does President Biden agree with that decision?

MS. PSAKI:  I'd have to take a closer look at the pipeline.  I mean, we have been evaluating on a case-by-case scenario — which — which pipeline are you talking about?

Q   The Enbridge.

MS. PSAKI:  The Enbridge one.  We look at each pipeline through the prism of the impact on the environment and also the impact on the economy, and we make assessments.  So I'd have to talk to our team if that assessment has been concluded or not.

Q   Okay.  And the President is going to be talking about implement — implementation later.  What sort of oversight plans are being talked about, as far as the spending and making sure it's —

MS. PSAKI:  For the restaurant program or just the programs in general?

Q   In general.  In general — Inspector Generals — I mean, can you give us an idea of what sort of oversight is being talked about?

MS. PSAKI:  Well, first, the President came into this job having served as the person overseeing the implementation of the American Rescue and Recovery — of the ARRA — A-R-R-A — back in the early days of the Obama-Biden administration.  He takes waste, fraud, and abuse incredibly seriously.  And we have put in place changes and reforms to programs at SBA and other programs that have been implemented where we've seen incidents of that in the past.

It's also why he has somebody — Gene Sperling — overseeing the American Rescue Plan implementation to ensure there is coordination across government, that we are tracking where we see issues.

And certainly, he's somebody who welcomes oversight and wants to do everything we can to reduce any waste, fraud, and abuse in these programs.

Q   And just finally, I wonder if the President or anyone else in the administration spoke with the Treasury Secretary yesterday, given some of her remarks that she then sought to clarify?

MS. PSAKI:  Well, the Secretary, herself, addressed her remarks later in the afternoon.  So I'm

not aware of any calls yesterday.  She will be here in the briefing room, and they'll have their regular economic briefing on Friday.

Go ahead, in the back.

Q    So I want to talk about climate for a second.  The President had said in his executive order in January that he would call for a Green Procurement Plan for the federal government.

MS. PSAKI:  Mm-hmm.

Q    And part of that was about buying electric cars.  The deadline for that plan was April 27th.  Do you know what the status of it is and why the delay?

MS. PSAKI:  I don't have an update on the status.  It is something, as you noted, he talked about early in the administration and he is absolutely committed to.  But I'm happy to check with our team and see where our report on that lives.

Q    And I also want to ask: Does the Biden administration have a timeline, at this point, for issuing pardons and commutations?

MS. PSAKI:  I don't have any previewing of that to provide and probably won't from here.

Go ahead, in the back.

Q    Yes.  Is the Los Angeles mayor, Eric Garcetti, under active consideration to be the ambassador to India or any other country?

MS. PSAKI:  I don't have any personnel announcements or assessments to make here from the podium.  But, hopefully, we'll have some more formal announcements on ambassadors soon.

Q    And the Tokyo Olympics are 12 weeks out.

MS. PSAKI:  Mm-hmm.

Q    At what point does the President need to make a decision about his attendance and —

MS. PSAKI:  His attendance?

Q   Yes.  And what factors are delaying the announcement?

MS. PSAKI:  Well, I think the President and his team assess any invitation as it comes in, but 12 weeks is some period of time.  I don't have any updates or predictions on whether or not he'll travel or accept the invitation made to attend the Olympics.

Go ahead.

Q   Thanks, Jen.  Two questions.  First, on the large sports arenas that are beginning to allow for fully vaccinated fans in special sections — both Citi Field and Yankee Stadium in New York have made those announcements, and I know there are some others.  Does the administration think that that is a good approach for sports teams to take, and maybe other large event venues?

And are there any concerns about equity when it comes to access to facilities if — particularly, those that were built with some public money, in some cases, I'm sure — when it comes to people who may not have been able to get vaccinated yet?

MS. PSAKI:  Well, first, everyone in the country is eligible to be vaccinated, and certainly at this point in time.  So we are — and we, as we've noted here, have taken a range of steps to ensure we are meeting people where they are, getting these vaccine doses out to communities around the country.

In terms of an assessment of the safety of this approach by sports teams, I'd have to talk to our COVID team about that.  And I think it's unlikely we're going to be weighing into every private sector decision about how they're moving forward once people are vaccinated, but I will check with them on that.

Q   Okay.  And then the other — the other question, if I can follow up on the — the debt limit question just a little bit.

MS. PSAKI:  Sure.

Q   Has there — does the — does the President have a position on whether or not the debt limit itself should exist at all, considering every — every, you know, couple of years we go through this question of: "What are the extraordinary measures?"  And, "How much extra time do we have?"  And we know, at the end of the day, that it's going to have to get raised or else we're going to have some sort of economic calamity.

Does the President have a view on the question, more broadly, of whether or not there even should be a debt limit?

MS. PSAKI:  Well, first, raising or suspending the debt ceiling doesn't authorize new spending; it merely allows Treasury to meet obligations that Congress has already approved.  Right?  It has been the case for many years and there have been bipartisan votes to support.

So, you know, the President does believe that Treasury should be able to meet its obligations and believes that Congress should move forward in a bipartisan manner, as they have historically in the past, including three times during the prior administration.

Go ahead, in the back.

Q    Thanks.  On the G7 trip, is there any advance on whether the President will meet with the Queen?  And, separately, has the President or the First Lady been in contact recently with Prince Harry?

MS. PSAKI:  I don't have any more trip details.  Who among us wouldn't want to go see the Queen?  But I don't have any details to preview at this point in time.  I expect as we get closer to the trip, we'll have more specifics.

And I don't have any calls or engagements with Prince Harry or Meghan Markle to — to read out for you with the President or the First Lady.

Q    Just one follow-up.  Is there a timeline on the announcement for the British ambassador?

MS. PSAKI:  A timeline?

Q    Yeah.

MS. PSAKI:  I don't have a timeline for that.

Q    Any — any names or any — anyone under consideration?

MS. PSAKI:  No names to float out there for you.  Hopefully, we'll have some more ambassadors soon to announce.

Great.

Q    When you say "soon," will that be before or after he makes his decision on going to the Olympics?

MS. PSAKI:  (Laughs.)  I can't order for you, Hans.  There's just so much excitement to stay tuned for around here.  So, we'll see.

Okay.  Thanks everyone.

1:24 P.M. EDT

# EXHIBIT 30

BRIEFING ROOM

# Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy, July 15, 2021

JULY 15, 2021  •  PRESS BRIEFINGS

James S. Brady Press Briefing Room

1:05 P.M. EDT

MS. PSAKI: Hi, everyone. We have another special guest today. Doesn't sing as well as our guest from yesterday — (laughter) — but very knowledgeable.

SURGEON GENERAL MURTHY: Definitely don't ask me to sing.

MS. PSAKI: (Laughs.) Today, we have a special guest, Surgeon General Vivek Murthy. The Surgeon General has been one of our leading voices on public health in the administration, in particular around the COVID-19 response.

Today, he published an advisory on health misinformation as an urgent public health crisis, and he is here to talk more about this issue and take a few of your questions.

With that, I will turn it over.

SURGEON GENERAL MURTHY: Hello, everyone. How are you?

Q  Good, thank you.

SURGEON GENERAL MURTHY: It's nice to see you all today. And thank you, Jen, for that very kind introduction.

As all of you know, we've come a long way in our fight against COVID-19, and we've come a long way thanks to the efforts of many, many people across communities in the United States.

But right now, we are seeing COVID deaths markedly down from their peak in January. We have 160 million people who have been fully vaccinated. And hundreds of thousands of people each day are choosing to get vaccinated. That is all good news.

But we are not out of the woods yet. Millions of Americans are still not protected against COVID-19, and we are seeing more infections among those who are unvaccinated. And that's why I want to talk to you today about one of the biggest obstacles that's preventing us from ending this pandemic.

Today, I issued a Surgeon General's Advisory on the dangers of health misinformation. Surgeon General Advisories are reserved for urgent public health threats. And while those threats have often been related to what we eat, drink, and smoke, today we live in a world where misinformation poses an imminent and insidious threat to our nation's health.

Health misinformation is false, inaccurate, or misleading information about health, according to the best evidence at the time. And while it often appears innocuous on social media apps and retail sites or search engines, the truth is that misinformation takes away our freedom to make informed decisions about our health and the health of our loved ones.

During the COVID-19 pandemic, health misinformation has led people to resist wearing masks in high-risk settings. It's led them to turn down proven treatments and to choose not to get vaccinated. This has led to avoidable illnesses and death. Simply put, health [mis]information has cost us lives.

Now, health misinformation didn't start with COVID-19. What's different now though is the speed and scale at which health misinformation is spreading. Modern technology companies have enabled misinformation to poison our information environment with little accountability to their users. They've allowed people who intentionally spread misinformation — what we call "disinformation" — to have extraordinary reach.

They've designed product features, such as "Like" buttons, that reward us for sharing emotionally-charged content, not accurate content. And their algorithms tend to give us more of what we click on, pulling us deeper and deeper into a well of misinformation.

Now, we need an all-of-society approach to fight misinformation. And that's why this advisory that I issued today has recommendations for everyone.

First, we include recommendations for individuals and families. We ask people to raise the bar

for sharing health information by checking sources before they share, to ensure that information is backed by credible, scientific sources. As we say in the advisory, "If you're not sure, don't share."

Second, we're asking health organizations to proactively address misinformation with their patients. Today, the American Academy of Pediatrics is announcing an educational campaign to help parents navigate online health information. I'm encouraged to see this commitment. And, again, this is just the beginning.

Third, we're asking educational institutions to help improve health information literacy.

We're asking researchers and foundations as well to help us learn more about how health [mis]information spreads and how to stop it.

Today, the Rockefeller Foundation is announcing a $13.5 million commitment to counter health misinformation. The Digital Public Library of America is announcing that they will convene a set of librarians, scholars, journalists, and civic leaders to confront health misinformation together.

Fourth, we're saying we expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms.

Fifth, we're also asking news organizations to proactively address the public's questions without inadvertently giving a platform to health misinformation that can harm their audiences.

And sixth, we know that government can play an important role too by investing in research, by bringing individuals and organizations together to address misinformation, and by supporting groups that are working on this issue.

On a personal note, it's painful for me to know that nearly every death we are seeing now from COVID-19 could have been prevented. I say that as someone who has lost 10 family members to COVID and who wishes each and every day that they had had the opportunity to get vaccinated.

I say that also as a concerned father of two young children who aren't yet eligible for the

vaccine, but I know that our kids are depending on all of us to get vaccinated to shield them from this virus.

Every week, I talk to doctors and nurses across our country who are burning out as they care for more and more patients with COVID-19 who never got vaccinated — all too often because they were misled by misinformation.

We must confront misinformation as a nation. Every one of us has the power and the responsibility to make a difference in this fight. Lives are depending on it.

You can read the full advisory at SurgeonGeneral.gov/HealthMisinformation.

And I hope that you will see it as I do — as a starting point from which we can build a healthier information environment, safeguard our nation against future threats, and ultimately, empower people to lead healthier lives.

Thanks so much for your time. And I'll turn it to Jen.

MS. PSAKI: Andrea.

Q  Andrea Shalal with Reuters. I wanted to ask you whether you see any evidence at all that the misinformation or disinformation that you're seeing comes from any nefarious sources. Are you seeing some structures behind the scenes that point to who or what might be behind them? We've seen Russian disinformation in the past. We've seen, kind of, that hybrid warfare. Are you seeing any indication that there could be nation states behind this disinformation?

SURGEON GENERAL MURTHY: Well, Andrea, thank you for the question. The misinformation that we're seeing comes from multiple sources. Yes, there is disinformation that is coming from bad actors. But what is also important to point out is that much of the misinformation that is circulating online is often coming from individuals who don't have bad intentions, but who are unintentionally sharing information that they think might be helpful.

And that's why, in this advisory, we make it very clear that among the things we're asking individuals to do is to pause before they share, to check sources. And if they're not sure if a source is credible, to not share. You know, one of the things we have said, again, is that when it comes to misinformation, not sharing is caring — unlike what many of our moms taught us earlier in life. (Laughter.)

MS. PSAKI: Go ahead, Kaitlan.

Q  Thank you very much. Surgeon General, is misinformation the number one reason why people are not getting vaccinated?

SURGEON GENERAL MURTHY: Well, Kaitlan, it's one of several reasons why people are not getting vaccinated, but it's a very important one because what we know from polls, Kaitlan, is that two thirds of people who are not vaccinated either believe common myths about the COVID-19 vaccine or think some of those myths might be true. Myths like, "You can get COVID from the vaccine," which is absolutely not true. So we know that it's not the only driver that's leading people not to be vaccinated, but it is a very important one.

Q  And do you personally believe that public figures and public companies that are helping spread misinformation about the vaccine should be held accountable?

SURGEON GENERAL MURTHY: Well, I think in a moment like this when we see misinformation literally costing us our loved ones, costing us lives, all of us have to ask: How we can be more accountable and responsible for the information that we share?

And those of us who may have larger platforms, I think bear a greater responsibility to think about that. But the bottom line is all of us have an important role here to play, and technology companies have a particularly important role.

We know that the dramatic increase in the speed — speed and scale of spreading misinformation has, in part, been enabled by these platforms. So that's why in this advisory today, we are asking them to step up. We know they have taken some steps to address misinformation, but much, much more has to be done. And we can't wait longer for them to take aggressive action because it's costing people their lives.

MS. PSAKI: Go ahead in the middle, and then Rachel. And then, unfortunately, he has to go. Go ahead.

Q  So, the reality is a lot of the health misinformation you were citing came from this lectern last year. I mean, what do you think the best approach is to counter or deal with misinformation that comes from public officials — people in position of authority?

SURGEON GENERAL MURTHY: Well, what I would say is that when it comes to determining what is accurate, in terms of health information, science has to guide us. And the good news is

that we have credible science individuals in our country. We have doctors and nurses in communities. We have public health departments and the CDC. We have medical schools, nursing schools, and healthcare institutions.

These should be our sources of credibility when it comes to evaluating whether information is true or not. I think one of the greatest roles that public leaders can play is to point to scientists and to credible sources and have them speak directly to the public.

I'll note for you that that's one thing that this administration has done is work hard to put science, scientists, and healthcare professionals in front of cameras to — having to speak directly to the public. That's what we have to do more of.

The problem right now is that the voices of these credible health professionals are getting drowned out, and that's one of the reasons we are asking technology companies to help lift up the voices of credible health authorities. It's also why they have to do more to reduce the misinformation that's out there so that the true voices of experts can shine through.

MS. PSAKI: Go ahead, Rachel.

Q  Thank you so much for taking my question. So are there specific elected leaders that you believe are part of the problem with pushing this misinformation?

And we had an ABC News-Washington Post poll that showed that 93 percent of Democrats say they're vaccinated or will be vaccinated, but only 49 percent of Republicans say the same. So, how do you break through to the people who may be trusting some of these elected leaders that are pushing, maybe, some of this misinformation more than they actually trust members of your administration?

SURGEON GENERAL MURTHY: Well, thanks, Rachel. You know, I think about this as I — as I think about doctoring, and as I think about my approach to patients, which is: I recognize that each patient that I was blessed to care for is an individual, you know, regardless of what their political affiliation or their past may be. They're an individual and I — my goal was to understand what their needs and desires were, what their values were, and then to help them improve their health.

We have to take a similar approach here when it comes to reaching people with information about COVID-19 and the vaccine. We've got to recognize that sometimes the most trusted voices are not the ones that had the most followers on social media or are the ones that have

the most, you know, name recognition. Sometimes the most trusted sources are a mother or father or a faith leader or a local doctor or a nurse, and that's why, to reach people with accurate information, what we have to do is partner with those local trusted voices.

That's why, in this advisory, one of the things that we point out an important role for government is to support local organizations, including healthcare professionals, so that they can get out there and speak directly to people and share that information.

These public health efforts move at the speed of trust, and we have to recognize where trust is — you know, where those relationships are — invest in them, support them, so that people can ultimately get the information they need to improve their health.

MS. PSAKI: Thank you so much for joining us.

Q  Jen, I have a follow-up for —

MS. PSAKI: Thank you.

Q  — the Surgeon General on —

MS. PSAKI: I think he has to go, unfortunately. Thank you so much.

SURGEON GENERAL MURTHY: Thank you so much, Jen. Thanks, everyone.

MS. PSAKI: Okay, I think we're getting ready to start the briefing. I think everybody has a lot of questions. So why don't you —

Q  (Inaudible.) You never —

MS. PSAKI: We — we are going to proceed with the briefing, and then we're happy to take lots of questions in the room.

Okay. So, unemployment claims, which you all saw the data come out this morning — today's data on new unemployment claims is further proof that the President's economic plan is working.

Today marked another new pandemic low in initial unemployment claims — the lowest level since March of 2020. And the four-week average of new claims continued to decline, dropping

to its lowest level in 16 months — down 55 percent since when President Biden took office.

This is evidence of the strengthening labor market we're seeing across the economy: Unemployment is down, wages are up, and three million new jobs have been created in five months — the fastest rate in U.S. history.

We just gave you a few headlines over here, just in case you haven't read all of your own coverage. (Laughter.)

And because of the President's Rescue Plan and his work curbing the pandemic, the United States is expected to return to full employment by next year instead of 2024, which was the projection when the President first took office.

Another piece of news today: We heard the President, of course, announce today that $15 billion in Child Tax Credit payments were distributed to tens of millions of families, covering 60 million children. Working families will receive these payments on the 15th of every single month for the next year thanks to the American Rescue Plan.

Eighty-six percent of American families will receive their payment by direct deposit. It will show up in their bank accounts as "Child CTC." Others will receive their check in the mail today or in the next few days.

And just as a reminder: The American Rescue Plan is providing the largest-ever Child Tax Credit. And this is a historic increase that will provide middle-class families with critical tax relief. And many project it will help cut the child poverty rate in half.

I have a little update for all of you on ransomware, as well as vaccines. And then we'll get to your questions.

In April, the President directed agencies to take aggressive action to counter the ransomware threat at home and abroad. We have coordinated these efforts, regularly convening an interagency task force that drives coordinated whole-of-government action to counter ransomware. Participation spans the whole government including law enforcement, the intelligence community, center risk management agencies, regulators, and other national security agencies.

Today, as a part of our ongoing ransomware efforts, the Department of Homeland Security, Department of Justice, Treasury, and State announced new resources and initiatives to protect

American businesses and communities from ransomware attacks.

Those include: The Department of Homeland Security and the Department of Justice launched StopRansomware.gov, a coordinated, federal government, one-stop resource for public- and private-sector organizations to reduce their risk of ransomware attacks.

The Department of Treasury announced a FinCEN exchange on ransomware to discuss efforts by the public and private sectors to increase targeted information sharing and analysis, and pursue criminal actors and networks that engage in such attacks.

And the Department of State announced it will offer up to $10 million in rewards for information leading to the identification or location of any person engaged in state-sponsored, malicious cyber activities.

This is a part of our ongoing efforts and our ongoing work of our interagency process that is a new — a newer initiative in this administration.

Finally, last night, Haiti received 500,000 doses of COVID-19 Moderna vaccines donated by the United States through the COVAX facility. And we will send a significant amount of additional doses to Haiti soon, in consultation with local health authorities.

The embassy in Haiti has worked closely with Haitian health — the heal- — Haitian Health Ministry, Pan American Health Organization, and UNICEF to ensure that these vaccines arrive safely and securely, and that they are also distributed equitably and without interference to the people who need them most.

We remain, of course, a partner of the Haitian people in building a more stable and secure Haiti, including in its fight against COVID-19.

Go ahead, Alex.

Q   Thanks, Jen. Can you talk a little bit more about this request for tech companies to be more aggressive in policing misinformation? Has the administration been in touch with any of these companies and are there any actions that the federal government can take to ensure their cooperation, because we've seen, from the start, there's not a lot of action on some of these platforms.

MS. PSAKI: Sure. Well, first, we are in regular touch with these social media platforms, and

those engagements typically happen through members of our senior staff, but also members of our COVID-19 team, given, as Dr. Murthy conveyed, this is a big issue of misinformation, specifically on the pandemic.

In terms of actions, Alex, that we have taken — or we're working to take, I should say — from the federal government: We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation. We're working with doctors and medical professionals to connect — to connect medical experts with popular — with popular — who are popular with their audiences with — with accurate information and boost trusted content. So we're helping get trusted content out there.

We also created the COVID-19 — the COVID Community Corps to get factual information into the hands of local messengers, and we're also investing, as you all have seen in the President's, the Vice President's, and Dr. Fauci's time in meeting with influencers who also have large reaches to a lot of these target audiences who can spread and share accurate information.

You saw an example of that yesterday. I believe that video will be out Fri- — tomorrow. I think that was your question, Steve, yesterday; I did a full follow-up there.

There are also proposed changes that we have made to social media platforms, including Facebook, and those specifically are four key steps.

One, that they measure and publicly share the impact of misinformation on their platform. Facebook should provide, publicly and transparently, data on the reach of COVID-19 — COVID vaccine misinformation. Not just engagement, but the reach of the misinformation and the audience that it's reaching.

That will help us ensure we're getting accurate information to people. This should be provided not just to researchers, but to the public so that the public knows and understands what is accurate and inaccurate.

Second, that we have recommended — proposed that they create a robust enforcement strategy that bridges their properties and provides transparency about the rules. So, about — I think this was a question asked before — there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms. All of them remain active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns.

Third, it's important to take faster action against harmful posts. As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly.

Finally, we have proposed they promote quality information sources in their feed algorithm. Facebook has repeatedly shown that they have the levers to promote quality information. We've seen them effectively do this in their algorithm over low-quality information and they've chosen not to use it in this case. And that's certainly an area that would have an impact.

So, these are certainly the proposals. We engage with them regularly and they certainly understand what our asks are.

Q  And then, one of the problems with vaccines right now is that they become politicized. You guys — the White House has obviously made the calculation that it's important to be more aggressive in confronting this information, but is there at all a concern that that could backfire and further contribute to politicization? And is there anything that you can do to prevent that at this point?

MS. PSAKI: Well, you're abs- — you're absolutely right, I should say, Alex, in that we have to be very careful and we are mindful of being quite careful of not politicizing the effectiveness of vaccines, the fact that they can save lives — young people, old people, middle-of-the-road people.

It's important for us — we've made a calculation to push back on misinformation. You're right. But that's one of the reasons, as Dr. Murthy was conveying, we have empowered, engaged, funded local voices, because they are often the most trusted voices — doctors, medical experts, clergy — you know, people who are members of — civic leaders in communities.

That's where we are putting most of our resources, even as we are working to combat misinformation that's traveling online or traveling, unfortunately, out of the mouth of elected officials from time to time.

Go ahead.

Q  Just want to follow up on the ransomware —

MS. PSAKI: Sure.

Q  — questions. So the President told us last week that there's this meeting tomorrow of the U.S.-Russian working group on ransomware. Can you say a little bit more about that meeting?

MS. PSAKI: I think it was actually yesterday.

Q  It was? Okay. And can you give us any kind of a further readout of what decisions were made, if any? Last week, the President also said that it made sense to potentially go after servers that were being used in these ransomware attacks. Has the administration made any decisions about whether to proceed with that kind of action?

MS. PSAKI: So I would say that the meeting, which I believe was yesterday — I will double confirm for you, Andrea, and for others — but, is part of ongoing engagement that has been occurring at the expert level since the President met with President Putin.

So it's been ongoing. No one meeting is necessarily decisive; it's about having a continued discussion about our expectations and steps that need to be taken to address ransomware attacks, cyberattacks, and what the capacities are on information of course that we have.

In terms of specific actions, the President, of course, reserves the right and the option to respond in a time and a manner of his choosing should he believe actions warrant. But I'm not going to preview that from the podium today or probably any day.

Go ahead.

Q  So a senior administration official had told us in the aftermath of that conversation that we should expect action within days and weeks, and some of it would be visible, some of it would not be visible. I understand you can't share a lot of information, but can you say whether any action has in fact been taken that perhaps is not visible to us?

MS. PSAKI: There's nothing more I can preview or detail for you from here. I certainly understand the interest.

Go ahead.

Q  The President has designated $10 billion for testing in schools, but we've seen some states,

like Idaho and Iowa — they say they don't even want the money. So is that a mistake? And who should be held responsible if children in those schools get sick?

MS. PSAKI: Well, certainly, we've always said from the beginning that local school districts are going to make decisions about how to use the funding and resources available, but also how they're going to apply the mitigation measures that have been laid out by the CDC. And certainly we would expect that members of their local community, parents, others who care about the health and wellbeing of their children would voice their concern if they have it. But it's always worked that way in terms of local school districts implementing policies.

The role of the CDC is to provide public health information. Our role from the federal government was to secure funding to ensure schools that need resources — they don't all need resources — but have access to those funds should they need it. Many have used it, many have applied it, and many schools will be opening as a result of that funding.

Q  Is there a concern, though, about not being able to even track an outbreak if there is one because of the lack of testing, possibly?

MS. PSAKI: Well, we certainly — the CDC certainly does track where there is a rise in cases. As you see, they put out publicly available data. I expect they would continue to do that. But I would point you to them for more information on how they would track.

Q  Can I just ask one quick follow-up on inflation: We heard from the Fed Chair, Jerome Powell; he's testifying on Capitol Hill this week. He noted that inflation has notably increased but he believes that it will remain elevated in the coming months before moderating.

We've heard from Republicans who say the administration is sort of flooding the economy with cash. Even Democrats like Senator Joe Manchin — I talked to him yesterday — he says that he has concerns about inflation. Is the White House underestimating the impact of all of this government spending that it will have on inflation?

MS. PSAKI: Well, our experts believe — and the data shows and the Federal Reserve Chair, who operates independently, conveyed, yesterday — that most of the price increases we are seeing are expected to be temporary due to the consequences of restarting an economy shut down during the pandemic. And we're seeing that in certain industries more than others as prices go back to where they were pre-pandemic. And that certainly was an ex- — we had an expectation that would be an impact.

So areas like spike in car prices due to supply chain challenges on the — on the restart or a spike in hotel room costs as the hospitality industry gets going — these are — a number of these are transitory or they're impacted by other factors, including supply chain issues, which we're working with Democrats and Republicans to help address through the CHIPS legislation.

But I want to be clear: We take — we understand the threat that inflation poses. We will be vigilant as responses are needed — are needed.

As it relates to legislation: We're continuing to advocate for the way to keep prices in our economy down is to increase the supply of goods that consumers want to buy and keep the costs of producing and getting them to market lower. That's exactly what the President's Bipartisan Infrastructure Framework and the Build Back Better plans will do.

And I would also remind you all, it's an eight-year investment in better roads, bridges, and transit systems. So this is not an immediate influx in the next few months of funding; it's over the course of several years because this is a long-term issue.

And it will also — if, as we — as we work to pass the Build Back Better reconciliation package, increase the availability of childcare, more workers will enter the workforce, increasing our output, and helping to keep prices down.

So we are quite mindful of it. We do monitor it. I would also note the Federal Reserve, who's independent, has also projected that the inflation numbers will come down to about 2.2 next year from where they're projecting for this year, which is something we also watch closely.

Q  Can I follow up on that, Jen?

MS. PSAKI: Go ahead, Kaitlan.

Q  Is the —

MS. PSAKI: Go ahead, Kaitlan.

Q  Are you confident that the government is going to be able to find the parents who qualify for the Child Tax Credit but are outside of the tax system?

MS. PSAKI: Well, we have a — as you've seen as we've implemented a number of our programs to date, we have a means — a number of means of trying to identify individuals who are eligible

for these programs. Some of it is by promotion in communities for individuals who may not have had to pay taxes or may not be in the system.

And certainly we will be vigilant and do everything we can to reach every single person who's eligible, get out the word to communities that they are — that they are maybe people who are eligible, even if they don't make enough money to pay taxes.

Q  So what are the other avenues, specifically, that you're using to find these parents?

MS. PSAKI: Well, I think you've seen us use a number of avenues in the past few months where there were not individuals — as it related to our $1,400 checks that we put out just a few months ago. We put out a website where people could go if they had not paid taxes because they did not make enough money to pay taxes.

We also, of course, work with local communities to get out and make sure — get the word out and make sure people know they are eligible. Again, I would think — I think that, starting today, the vast majority — vast, vast majority of people who are eligible, of course, will get their checks direct — through direct deposit and through direct checks. So, we're talking about a small percentage of individuals who we would be looking to find. And, of course, we will be vigilant about doing everything we can to find them.

Q  And one follow-up on that: Will the President accept a spending bill that does not extend the tax credit for four years like he wants?

MS. PSAKI: Well, there's —

Q  (Inaudible.)

MS. PSAKI: There are a range of details I know you are all eager to see and to have, and there's been reporting about it. We will certainly leave it to Leader Schumer and Democrats on the Hill to put out all of the specific details.

But the President certainly understands that there could be changes, even to his original proposal and even from here as the final negotiations continue.

Q  So, he would accept that? Sorry.

MS. PSAKI: I'm not going to negotiate from here, Kaitlan, but we'll look to see what the final

package looks like.

The President has advocated for an extension of the Child Tax Credit because he thinks it is a benefit that helps working families. That's why he's proposed it in multiple packages, and we'll look to see the final details.

Go ahead, Weijia.

Q  Thank you, Jen. I know you said this is moving, but some Democrats have expressed they believe the Child Tax Credit should be permanent. Does President Biden agree with that or does he think the four-year extension is adequate?

MS. PSAKI: Well, as you know, Weijia, he put in his proposal a five-year extension. He certainly understands that there was going to be — and there was — a range of views. Some wanted it shorter. Some wanted it longer. Some didn't want it at all. That's part of the negotiations and the discussion.

I think one of the calculations here that senators and Congress have to work through is what components can be worked through that you can pay for in the package. That's a factor as it relates to — certainly to the Child Tax Credit, which, as I understand, costs about a billion dollars a year.

So, we'll let them work out the length of it, and we look forward to seeing the de- — the final details made public in the coming days.

Q  On the bipartisan bills —

MS. PSAKI: Yeah.

Q  Some Republicans have just said that — that they're not prepared to vote on something that is not written yet. They just expressed this on the Hill. As Senator Romney said, it would be a dereliction of duty to vote, even procedurally, on something that has not been written. Does the President agree with Senator Schumer's timeline to hold a vote before all the language is finalized?

MS. PSAKI: Well, first, I think it's important to remember that there was an agreement that many senators were a part of — Democrat and Republican — on the framework that is the basis of this piece of legislation — right? — that they agreed to. The President certainly expects that

everyone will stay true to their commitment, as — as he will.

Of course, the President believes that his most important role he can play is to continue to advocate for the key components of what's in this package, why it's important for people to support it in Congress, and why the American people should be excited about investments in roads and railways and bridges and investments in making sure we're addressing our climate crisis.

He will leave the mechanics and the timeline up to Leader Schumer.

Go ahead.

Q  Thank you, Jen. Now that you've had a few days to think about it, does this White House still think the protests in Cuba are happening because people are upset about a rise in COVID cases there or is there some thought, maybe, given to the possibility that they're protesting because they are sick of communism?

MS. PSAKI: Well, Peter, first, I would say: Communism is a failed ideology, and we certainly believe that. It has failed the people of Cuba. They deserve freedom. They deserve a government that supports them, whether that is making sure they have health and medical supplies, access to vaccines, or whether they have economic opportunity and prosperity.

And instead, this has been a government — an authoritarian communist regime — that has repressed its people and has failed the people of Cuba. Hence, we're seeing them in the streets.

But I would note that the ideology of the government, which has failed, has led to a fail- — a lack of access to economic opportunity, to medical supplies, to COVID vaccines. So all of those pieces are true.

Q  And there are protesters now in this country who are chanting, as these protests in Cuba are going on, "Where is Biden?" So, where is he? What is he doing to protect these people who are rising up against the leaders of this failed experiment?

MS. PSAKI: Well, first, he is certainly advocating for and speaking out, as we put out a statement — multiple statements — maybe one of you will ask him a question about Cuba today. I will — I will leave it to all of you to determine that.

But, one, he has made clear that he stands with the Cuban people and their call for freedom

from both the pandemic and from decades of repression and economic suffering to which they've been subjected by Cuba's authoritarian regime.

There's an ongoing review of our own policies. And as we look at those policies, one of the big factors is ensuring we are not doing anything to pad the pockets of a corrupt authoritarian regime. And that is certainly a factor as he's considering, but we're looking closely at how we can help in a humanitarian way, how we can help support the voices of the Cuban people, and there's an ongoing policy review in that regard.

Q  We'd be happy to ask him about it later if he calls on us. (Laughter.) But one more —

MS. PSAKI: Anyone can ask anything they want. But go ahead.

Q  One more for you: Why is the Secretary of State Blinken trying to address human rights in the U.S. by inviting experts — U.N. experts from Cuba and China here?

MS. PSAKI: Well, first, I would say that the Secretary put out an extensive statement on why he is holding — why he believes that we need to play a role in lifting up and pushing countries to do better on human rights, on ending systemic racism in their countries. Certainly, human rights is always going to be a priority for the Biden administration and for this State Department.

As the Secretary said in his statement, he believes responsible nations must not shrink from scrutiny of their human rights record. Rather, they should acknowledge it with the intent to improve it, and also push and lift up and put a — shine a light on other countries that need to do better. And that is the role we're playing here from the United States.

Q  But you just rattled off all these problems with Cuba. They've got dissenters disappearing down there. In China, they've got a million religious minorities in internment camps. Why are they going to come here and tell us how to improve our country?

MS. PSAKI: I certainly don't think that's the format of the event. But lifting up and elevating human rights; systemic racism; the — the steps that have been taken — the poor treatment of Uyghurs, as I think you're referencing here — in China; and pushing other countries with a spotlight on them to do better is certainly a role we can play from the United States.

Go ahead.

Q  Can I ask about South Africa very quickly?

MS. PSAKI: Sure.

Q  There have been days of looting and unrest there in South Africa. They've now destroyed hundreds of businesses. At least 117 people there have been killed. Does the White House have any reaction to what's taking place there? And what, if any, role does the U.S. government have here to help try to quell the situation?

MS. PSAKI: We certainly track and watch closely and certainly have concerns about unrest that we see in the streets in South Africa.

In terms of the specific actions, I think the State Department is probably best equipped, but I'm happy to talk to our national security team if there's anything specifically we can convey from here.

Q  Let me follow up. Yesterday, I asked you about Afghanistan. Is there anything more you can tell us about those Special Immigrant Visas as they relate to the Afghan interpreters, translators, engineers, and others?

MS. PSAKI: Sure. Let me try to provide a little bit more detail on how the process works, which I — you have all understandably been asking about.

So, as I've noted in the past, our immediate focus is on interested and eligible Afghan nationals and their families who have supported the United States and our partners in Afghanistan and are in the application pipeline — so translators, interpreters, others, their family members who are in the process.

There are approximately 20,000 Afghans who have applied. So, those are the individual interpreters or translators; that does not include their family members. And about half that have completed the necessary paperwork to move forward in the process.

I believe, also, the State Department is going to do a more thorough briefing, but I'll just go through as many details as I can from here.

Once individuals — this is how the process works — once individuals are approved through the security vetting process — which their paperwork conclusion does not conclude it; there's another vetting process they would conclude — they may be eligible under humanitarian

parole.

Under that parole, a lot — a large portion of that group could be relocated directly to a military base in the United States where they would receive medical checkups.

Those who have not yet completed their background checks would first be relocated from Afghanistan to either a U.S. military base overseas or to third countries, where they will be safely housed until their visa processing is complete and they can be transferred to the United States.

I would also note we are not considering any location or place for the third-party countries that would not be safe, would not treat them with respect, and not — would not ensure that they are treated humanely through the journey of their process.

Also, on our vetting process — this is a thorough process. There are some of these individuals who have completed their paperwork and are in through the vetting process. Their family members may not be in the same stage of the vetting process, so that may have an impact too of the timeline and how — not the timeline, but of, kind of, how they're moved and where they are moved to.

So — and the third par- — the third-country move would be temporary until they finalize their paperwork and security vetting process is complete.

So that is a little bit more detail on the process. Hopefully, that helps.

Go ahead, Alex.

Q  President — former-President Bush yesterday, in an interview, criticized the withdrawal, and he said he's very concerned about the Afghan women. So what is the U.S. going to do to ensure the safety of those women in Afghanistan after we leave?

MS. PSAKI: Well, first, I would say that the President agrees that we need to ensure we are continuing to support — through humanitarian programs, through security programs — the women of Afghanistan. And we certainly respect the right of the former President to voice his view on — on Afghanistan and the President's decision.

It's not a secret that President Biden and President Bush haven't seen eye to eye on matters relating to the use of military force. So, we respect his right to voice his opinion; we just

disagree.

I would also note that while we continue to provide security and humanitarian assistance, we also intend to have a diplomatic presence on the ground to continue to be a source and resource for individuals in Afghanistan.

Q  And, just secondly, Senator Manchin is quite upset about some of the climate provisions in the 3.5 trillion package. Is the White House reaching out to him? Is it — is the White House prepared to move off of some of that — lessen the — some of the provisions?

MS. PSAKI: Well, we, of course, are in touch with Senator Manchin, I can assure you, as we are in touch with a number of senators who will be — who have been pivotal partners and will continue to be moving forward.

I think there was — one of the concerns I think I saw expressed — but tell me if this is what you were asking about — is fossil fuels. Is that the specific piece?

Q  Right.

MS. PSAKI: So, while of course the pa- — the plan and the package will go a long way in addressing the climate crisis — and that is a huge priority to the President, ensuring that these tax credits are in the reconciliation bill, which is something that did not make it into the bipartisan deal, is something the President has advocated for. And we're eager, of course, to pivot to a clean energy future.

We don't intend to do so just by — just by banning fossil fuels or leaving any working community behind. And what we'd certainly convey to any concerned individuals is that President Biden has formed an interagency working group to mobilize federal investments to support hard-hit coal, oil, and gas, and power plant communities across the country. That working group has already identified 30 billion in existing federal resources that could be accessed by communities.

We don't want to lose — leave communities behind. We still think we can move forward in addressing our climate crisis.

Go ahead, Steve.

Q  A follow-up to that —

MS. PSAKI: First day of your presidency. Congratulations, I think?

Q  Thank you very much. No, it's —

MS. PSAKI: I don't know if it's "congratulations"; it seems hard to make. Go ahead.

Q  — "Thank you" when it's over. (Laughter.)

I wanted to ask a follow-up to Alex's question, and that is: How does the President see his role in the negotiation on the reconciliation bill? Is he an intermediary between some of the more liberal elements of his party and Senator Manchin? Is he a closer? Is he directly involved in this? He went up to Capitol Hill yesterday. What's he going to be doing in the weeks ahead?

MS. PSAKI: He's going to be available for whatever is needed to get these bills across the finish line. And a lot of the discussions are happening, certainly, at a staff level. As you all know, we have a number of very experienced individuals here who have gotten a lot of bills across the finish line: Steve Ricchetti, Ron Klain, Louisa Terrell, and many beyond them. They are playing a big role — Brian Deese — in discussing and having conversations with members.

A lot of the discussions, though, are primarily between the Democratic members themselves about what the final package and the final details look like. Leader Schumer and his team will put out the final details on — on the timeline that works for them.

But I will tell you: The President is available. He's ready. He'll pick up the phone. He'll host people. He'll have snacks, drinks — whatever is needed in order to get these bills across the finish line. And I think leaders in Congress certainly know that.

Oh, go ahead, Brian.

Q  Thanks. Thank you very much. Two questions. One, to follow up on inflation. Inflation surged to 5.4 percent in June — its the largest jump since 2008. You all say it's temporary, but today Axios is reporting the JPMorgan Chase CEO is saying, "I don't think it's only temporary," and that it's a little worse than the Fed predicts. Now, there's a disparity there. How are you going to address what they think may be permanent?

MS. PSAKI: Well, I would say, first, that many outside experts, including the Federal Reserve — even if JPMorgan or Jamie Dimon or whomever it is disagrees — have projected that the — that

the rise of inflation is transitory and have projected a lowering of inflation next year.

We also have seen in the data that some of the issues — and I outlined this a little bit earlier, like the spike in car prices, which we know has a bigger issue — has another issue involved in it, which is the supply chain issues which we're trying to separately address — or hotels and some of the — of the industries that — related to travel that have seen increases because the economy is turning back on.

So we certainly will refer to economic experts out there, the Federal Reserve, and many others who have projected the transitory nature of this, as well as what we see as a number of the factors that are leading to the impact currently.

Q  The second question is about Jeff Flake. Earlier this week, he was nominated to the President to go to Turkey as our envoy. That ambassadorship is — that's a problematic area. What is it exactly in the former senator's background that gives this administration confidence that he can carry out his task there?

MS. PSAKI: Well, he's a former member of the Senate Foreign Relations Committee — someone who played an important role in discussing, debating, and — and working on a range of foreign policy issues as — in his role as a former U.S. senator. So that is a pretty good basis.

Okay. Francesca, go ahead.

Q  Thanks, Jen. I have a foreign policy question.

MS. PSAKI: Sure.

Q  Just to stay on inflation for a moment: What is the White House's message to average Americans, including those who are limited income, though, who are experiencing higher prices right now for food and clothing and other goods and services. You mentioned that it's expected to die down next year, but what is your message to them in the meantime? Is it simply just to wait it out?

MS. PSAKI: That's certainly not what I've ever said, but I will say our message is that we understand the threat that inflation poses. We will be vigilant about any responses needed.

It's important for Americans to know and understand that these impacts are temporary and some of these price increases are a result of the economy turning back on. And experts will tell

you that — whether it's the hotel industry or the airline industry going back to pre-pandemic prices.

I'll also note that the President has taken a number of steps, including ensuring that the vast majority of the American people were getting $1,400 checks, getting the Child Tax Credit out to people's bank accounts today, because he knows that Americans need a little extra help — still need a little extra help as the economy turns back on. So he's committed to helping working people, and it's also important for people understand the transitory nature of inflation.

Q  And can you provide a status update on investigative assistance for Haiti? And also, when can the public expect the administration to make a determination on whether it's changing its policy towards Cuba?

MS. PSAKI: Sure. I don't have anything for you on the timeline on Cuba policy. I will note that we certainly look at the policy through the prism of how we can most help the Cuban people — the people who have been out in the streets looking to have their voices heard in these protests.

And even as we look at individual components of policies that would be under consideration — including, say, remittances — there are a range of factors. There are a number, of course, of people who have called for a return for allowing remit- — remittances to go from family members to individuals in Cuba.

On the flip side of that, or one of the challenges is: the prevention or our desire to prevent remittances or any funding going in the hands or the pockets of leaders in Cuba.

So, these are challenging issues. There's an ongoing review. I don't have a timeline to preview for you.

In terms of Haiti — let me see. I do think I have a little bit of an update for you. Let me see what I have for you.

So we've — we've provided a couple of updates of what we've provided. So, I — just in case you don't have this. The FBI is providing investigative assistance to the Haitian authorities at the request of the government of Haiti. They remain committed to working alongside our international partners to administer justice. That was a specific ask.

We're also continuing to provide ongoing security assistance and — and consultations, as they have also requested. We're still working with leaders in Haiti to refine their requests, and that review is ongoing. We're in regular touch. And as we have additional components to provide, we'll share that with all of you.

Q  I think we have to wrap.

MS. PSAKI: Okay. Let's — go ahead. One more. One more.

Q  Thanks, Jen. I — two quick ones. So, first —

MS. PSAKI: Uh — yeah, I know. I — we're wrapping. It's like a last one.

Q  — Senate and House — Senate and House Democrats say that they want to put citizenship halfway into the reconciliation package. Is the White House supportive of that strategy?

MS. PSAKI: Yep.

Q  Okay. And then — can I squeeze in my last one — (laughter) — since that was so fast?

MS. PSAKI: Sure. That was an easy one. Go ahead.

Q  Okay, so the — Florida's governor and some FEC commissioner in Miami, representatives are calling on Biden to greenlight a plan that would allow the deployment of higher altitude communication balloons to beam Internet into Cuba. Is this something the administration plans to do? And if not, why not?

MS. PSAKI: Well, the lack of Internet access, as you know, which is why you're asking, is a huge issue in Cuba and one that is very challenging for the people of Cuba so they can gain access to accurate information, they can correspond with family members and others.

We are certainly looking at that to see what can be done to address, but in terms of that specific proposal, I don't have an assessment of that. I can see if there's more specifics on it.

Q  Thank you.

MS. PSAKI: Okay. Thanks, everyone. Thanks, everyone.

1:53 P.M. EDT

# EXHIBIT 31

# CONFRONTING HEALTH MISINFORMATION

*The U.S. Surgeon General's Advisory on Building a Healthy Information Environment*

2021

*I am urging all Americans to help slow the spread of health misinformation during the COVID-19 pandemic and beyond. Health misinformation is a serious threat to public health. It can cause confusion, sow mistrust, harm people's health, and undermine public health efforts. Limiting the spread of health misinformation is a moral and civic imperative that will require a whole-of-society effort.*

Vivek H. Murthy, M.D., M.B.A.
Vice Admiral, U.S. Public Health Service
Surgeon General of the United States

# TABLE OF CONTENTS

BACKGROUND     4

WE CAN TAKE ACTION     6

    What Individuals, Families, and Communities Can Do     8

    What Educators and Educational Institutions Can Do     9

    What Health Professionals and Health Organizations Can Do     10

    What Journalists and Media Organizations Can Do     11

    What Technology Platforms Can Do     12

    What Researchers and Research Institutions Can Do     13

    What Funders and Foundations Can Do     14

    What Governments Can Do     15

WHERE WE GO FROM HERE     16

REFERENCES     17

# ABOUT THE ADVISORY

A Surgeon General's Advisory is a public statement that calls the American people's attention to a public health issue and provides recommendations for how that issue should be addressed. Advisories are reserved for significant public health challenges that need the American people's immediate awareness. For additional background, visit SurgeonGeneral.gov.

Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment     3

Glenn Decl. Ex. 31
Page 3 of 22

# BACKGROUND

During the COVID-19 pandemic, people have been exposed to a great deal of information: news, public health guidance, fact sheets, infographics, research, opinions, rumors, myths, falsehoods, and more. The World Health Organization and the United Nations have characterized this unprecedented spread of information as an "infodemic."[1]

While information has helped people stay safe throughout the pandemic, it has at times led to confusion. For example, scientific knowledge about COVID-19 has evolved rapidly over the past year, sometimes leading to changes in public health recommendations. Updating assessments and recommendations based on new evidence is an essential part of the scientific process, and further changes are to be expected as we continue learning more about COVID-19.[2] But without sufficient communication that provides clarity and context, many people have had trouble figuring out what to believe, which sources to trust, and how to keep up with changing knowledge and guidance.[3, 4, 5]

Amid all this information, many people have also been exposed to health misinformation: information that is false, inaccurate, or misleading according to the best available evidence at the time.[6, 7, 8] * Misinformation has caused confusion and led people to decline COVID-19 vaccines, reject public health measures such as masking and physical distancing, and use unproven treatments.[5, 9, 10] For example, a recent study showed that even brief exposure to COVID-19 vaccine misinformation made people less likely to want a COVID-19 vaccine.[11] Misinformation has also led to harassment of and violence against public health workers, health professionals, airline staff, and other frontline workers tasked with communicating evolving public health measures.[12, 13]

Misinformation can sometimes be spread intentionally to serve a malicious purpose, such as to trick people into believing something for financial gain or political advantage. This is usually called "disinformation."[14, 15] But many people who share misinformation aren't trying to misinform. Instead, they may be raising a concern, making sense of conflicting information, or seeking answers to honest questions.[16]

Health misinformation is not a recent phenomenon. In the late 1990s, a poorly designed study, later retracted, falsely claimed that the measles, mumps, rubella (MMR) vaccine causes autism.[17] Even after the retraction, the claim gained some traction and contributed to lower immunization rates over the next twenty years.[18] Just since 2017, we have seen measles outbreaks in Washington State, Minnesota, New York City, and other areas.[19, 20, 21] Health misinformation is also a global problem. In South Africa, for example, "AIDS denialism"—a false belief denying that HIV causes AIDS—was adopted at the highest levels of the national government, reducing access to effective treatment and contributing to more than 330,000 deaths between 2000 and 2005.[22] Health misinformation has also reduced the willingness of people to seek effective treatment for cancer, heart disease, and other conditions.[1, 23, 24, 25]

---

\* *This advisory focuses on health information specifically, not other kinds of misinformation. Defining misinformation is a challenging task, and any definition has limitations. See References for further discussion of the definition used in this Advisory, including the benchmark of 'best available evidence at the time.'*

---

In recent years, the rapidly changing information environment has made it easier for misinformation to spread at unprecedented speed and scale, especially on social media and online retail sites, as well as via search engines.[26, 27] Misinformation tends to spread quickly on these platforms for several reasons.

First, misinformation is often framed in a sensational and emotional manner that can connect viscerally, distort memory, align with cognitive biases, and heighten psychological responses such as anxiety.[28, 29, 30] People can feel a sense of urgency to react to and share emotionally charged misinformation with others, enabling it to spread quickly and go "viral."[24, 31]

> *In recent years, the rapidly changing information environment has made it easier for misinformation to spread at unprecedented speed and scale.*

Second, product features built into technology platforms have contributed to the spread of misinformation. For example, social media platforms incentivize people to share content to get likes, comments, and other positive signals of engagement.[32] These features help connect and inform people but reward engagement rather than accuracy, allowing emotionally charged misinformation to spread more easily than emotionally neutral content.[33] One study found that false news stories were 70 percent more likely to be shared on social media than true stories.[31]

Third, algorithms that determine what users see online often prioritize content based on its popularity or similarity to previously seen content. As a result, a user exposed to misinformation once could see more and more of it over time, further reinforcing one's misunderstanding.[34] Some websites also combine different kinds of information, such as news, ads, and posts from users, into a single feed, which can leave consumers confused about the underlying source of any given piece of content.[35]

The growing number of places people go to for information—such as smaller outlets and online forums— has also made misinformation harder to find and correct.[36] And, although media outlets can help inform and educate consumers, they can sometimes inadvertently amplify false or misleading narratives.[37, 38]

Misinformation also thrives in the absence of easily accessible, credible information.[39, 40] When people look for information online and see limited or contradictory search results, they may be left confused or misinformed.

More broadly, misinformation tends to flourish in environments of significant societal division, animosity, and distrust. For example, distrust of the health care system due to experiences with racism and other inequities may make it easier for misinformation to spread in some communities.[41] Growing polarization, including in the political sphere, may also contribute to the spread of misinformation.[42, 43]

Additional research is needed to better understand how people are exposed to and affected by misinformation and how this may vary across subpopulations based on factors such as race, ethnicity, socioeconomic status, education, age, sexual orientation, gender identity, cultural and religious practices, hobbies and interests, and personal networks.[44]

---

# WE CAN TAKE ACTION

Because it pollutes our information environment, misinformation is harmful to individual and public health. Together, we have the power to build a healthier information environment. Just as we have all benefited from efforts to improve air and water quality, we can all benefit from taking steps to improve the quality of health information we consume. Limiting the prevalence and impact of misinformation will help all of us make more informed decisions about our health and the health of our loved ones and communities.

> *Together, we have the power to build a healthier information environment.*

During the COVID-19 pandemic, there have been significant efforts to address health misinformation. Here are just a few examples:

- Trusted community members, such as health professionals, faith leaders, and educators, have spoken directly to their communities to address COVID-19-related questions (e.g., in town halls, community meetings, via social and traditional media)

- Researchers have identified leading sources of COVID-19 misinformation, including misinformation "super-spreaders" [45]

- Media organizations have devoted more resources to identify and debunk misinformation about COVID-19 [46, 47]

- Some technology platforms have improved efforts to monitor and address misinformation by reducing the distribution of false or misleading posts and directing users to health information from credible sources [48, 49, 50]

- Governments have increased their efforts to disseminate clear public health information in partnership with trusted messengers [51]

But there is much more to be done, and each of us has a role to play. Before posting or sharing an item on social media, for example, we can take a moment to verify whether the information is accurate and whether the original source is trustworthy. If we're not sure, we can choose not to share. When talking to friends and family who have misperceptions, we can ask questions to understand their concerns, listen with empathy, and offer guidance on finding sources of accurate information. [52, 53, 54, 55, 56]

It will take more than individual efforts, however, to address health misinformation. The threat of misinformation raises important questions we must answer **together**: How do we curb the spread of

---

harmful misinformation while safeguarding user privacy and free expression? What kinds of measures should technology platforms, media entities, and other groups adopt to address misinformation? What role is appropriate for the government to play? How can local communities ensure that information being exchanged—online and offline—is reliable and trustworthy? How can we help family and friends who may have been exposed to harmful misinformation?

Addressing health misinformation will require a whole-of-society effort. We can start by focusing on the following areas of action:

- **Equip Americans with the tools to identify misinformation,** make informed choices about what information they share, and address health misinformation in their communities, in partnership with trusted local leaders

- **Expand research that deepens our understanding of health misinformation,** including how it spreads and evolves; how and why it impacts people; who is most susceptible; and which strategies are most effective in addressing it

- **Implement product design and policy changes on technology platforms** to slow the spread of misinformation

- **Invest in longer-term efforts to build resilience against health misinformation,** such as media, science, digital, data, and health literacy programs and training for health practitioners, journalists, librarians, and others

- **Convene federal, state, local, territorial, tribal, private, nonprofit, and research partners** to explore the impact of health misinformation, identify best practices to prevent and address it, issue recommendations, and find common ground on difficult questions, including appropriate legal and regulatory measures that address health misinformation while protecting user privacy and freedom of expression

*Addressing health misinformation will require a whole-of-society effort.*

Glenn Decl. Ex. 31
Page 7 of 22

WE CAN TAKE ACTION

# WHAT INDIVIDUALS, FAMILIES, AND COMMUNITIES CAN DO

**Learn how to identify and avoid sharing health misinformation.** When many of us share misinformation, we don't do it intentionally: We are trying to inform others and don't realize the information is false. Social media feeds, blogs, forums, and group chats allow people to follow a range of people, news outlets, and official sources. But not every post on social media can be considered reliable. And misinformation can flourish in group texts or email threads among friends and family. Verify accuracy of information by checking with trustworthy and credible sources. If you're not sure, don't share.

**Engage with your friends and family on the problem of health misinformation.** If someone you care about has a misperception, you might be able to make inroads with them by first seeking to understand instead of passing judgment. Try new ways of engaging: Listen with empathy, establish common ground, ask questions, provide alternative explanations and sources of information, stay calm, and don't expect success from one conversation.

**Address health misinformation in your community.** Work with schools, community groups such as churches and parent-teacher associations, and trusted leaders such as educators and health care professionals to develop local strategies against misinformation. For example, invite local health professionals to schools or to faith congregations to talk about COVID-19 vaccine facts.

*When many of us share misinformation, we don't do it intentionally: We are trying to inform others and don't realize the information is false...*
*If you're not sure, don't share.*

Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment   8

Glenn Decl. Ex. 31
Page 8 of 22

WE CAN TAKE ACTION

# WHAT EDUCATORS AND EDUCATIONAL INSTITUTIONS CAN DO

**Strengthen and scale the use of evidence-based educational programs that build resilience to misinformation.** Media, science, digital, data, and health literacy programs should be implemented across all educational settings, including elementary, secondary, post-secondary and community settings. In addition to teaching people how to be more discerning about the credibility of news and other content, educators should cover a broader set of topics, such as information overload, internet infrastructure (e.g., IP addresses, metadata), the challenges of content moderation, the impact of algorithms on digital outputs, algorithmic bias, artificial intelligence (AI)-generated misinformation (e.g., deepfakes), visual verification skills, and how to talk to friends and family who are sharing misinformation.

**Educate students and the public on common tactics used by those who spread misinformation online.** Recent research suggests that teaching people how to spot these tactics can reduce people's willingness to share misinformation.[57] Examples of misinformation tactics used by those who deny scientific consensus on health issues include presenting unqualified people as experts; misleading consumers with logical fallacies; setting impossible expectations for scientific research; cherry-picking data or anecdotes; and introducing conspiracy theories.[58]

**Establish quality metrics to assess progress in information literacy.** While there is substantial media and information literacy work being carried out across the United States, there is a need for more consistent and empirically evaluated educational materials and practices.

> *Media, science, digital, data, and health literacy programs should be implemented across all educational settings.*

WE CAN TAKE ACTION

# WHAT HEALTH PROFESSIONALS AND HEALTH ORGANIZATIONS CAN DO

**Proactively engage with patients and the public on health misinformation.** Doctors, nurses, and other clinicians are highly trusted and can be effective in addressing health misinformation.[59] If you are a clinician, take the time to understand each patient's knowledge, beliefs, and values. Listen with empathy, and when possible, correct misinformation in personalized ways. When addressing health concerns, consider using less technical language that is accessible to all patients. Find opportunities to promote patient health literacy on a regular basis.

**Use technology and media platforms to share accurate health information with the public.** For example, professional associations can equip their members to serve as subject matter experts for journalists and effectively communicate peer-reviewed research and expert opinions online.

**Partner with community groups and other local organizations to prevent and address health misinformation.** For example, hospital systems can work with community members to develop localized public health messages. Associations and other health organizations should offer trainings for clinicians on how to address misinformation in ways that account for patients' diverse needs, concerns, backgrounds, and experiences.

*Associations and other health organizations should offer trainings for clinicians on how to address misinformation in ways that account for patients' diverse needs, concerns, backgrounds, and experiences.*

WE CAN TAKE ACTION

# WHAT JOURNALISTS AND MEDIA ORGANIZATIONS CAN DO

**Train journalists, editors, and others to recognize, correct, and avoid amplifying misinformation.** Media organizations should develop in-house training programs and partner with journalism schools, nonprofits, technology platforms, and others to democratize access to high-quality training for all media outlets.

**Proactively address the public's questions.** When something is new—such as a vaccine—people will understandably have questions. By anticipating and proactively answering those questions, media organizations and journalists can help get ahead of misinformation and increase the public's health and information literacy.

**Provide the public with context to avoid skewing their perceptions about ongoing debates on health topics.** For example, when discussing conflicting views on an issue, give readers a sense of where the scientific community stands and how strong the available evidence is for different views. Consider questions like: How much disagreement is there among experts? Is a given explanation plausible even if it is unlikely? If evidence is not equally strong on all sides of an issue, avoid presenting it as such.

**Carefully review information in preprints.** Preprints are research papers published online before peer review. They can provide scientists and the public with useful information, especially in rapidly evolving situations such as a pandemic. However, because preprints have not been independently reviewed, reporters should be careful about describing findings from preprints as conclusive. If reporting on such findings,

include strong caveats where appropriate, seek out expert opinions, and provide readers with context.

**Use a broader range of credible sources— particularly local sources.** Research shows us that people have varying levels of trust in different types of people and institutions.[4] In addition to relying on federal and state public health authorities as sources, build relationships with local health professionals and local trusted, credible health organizations.

**Consider headlines and images that inform rather than shock or provoke.** Headlines are often what audiences will see and remember. If a headline is designed to fact-check a rumor, where possible, lead with the truth instead of simply repeating details of the rumor. Images are often shared on social media alongside headlines and can be easily manipulated and used out of context. Picture desk and social media editors should consider how provocative and medically inaccurate imagery can be a vehicle for misinformation.[60]

*Give readers a sense of where the scientific community stands and how strong the available evidence is for different views.*

Glenn Decl. Ex. 31
Page 11 of 22

WE CAN TAKE ACTION

# WHAT TECHNOLOGY PLATFORMS CAN DO

**Assess the benefits and harms of products and platforms and take responsibility for addressing the harms.** In particular, make meaningful long-term investments to address misinformation, including product changes. Redesign recommendation algorithms to avoid amplifying misinformation, build in "frictions"—such as suggestions and warnings—to reduce the sharing of misinformation, and make it easier for users to report misinformation.

**Give researchers access to useful data to properly analyze the spread and impact of misinformation.** Researchers need data on what people see and hear, not just what they engage with, and what content is moderated (e.g., labeled, removed, downranked), including data on automated accounts that spread misinformation. To protect user privacy, data can be anonymized and provided with user consent.

**Strengthen the monitoring of misinformation.** Platforms should increase staffing of multilingual content moderation teams and improve the effectiveness of machine learning algorithms in languages other than English since non-English-language misinformation continues to proliferate.[61] Platforms should also address misinformation in live streams, which are more difficult to moderate due to their temporary nature and use of audio and video.

**Prioritize early detection of misinformation "super-spreaders" and repeat offenders.** Impose clear consequences for accounts that repeatedly violate platform policies.

**Evaluate the effectiveness of internal policies and practices in addressing misinformation and be transparent with findings.** Publish standardized measures of how often users are exposed to misinformation and through what channels, what kinds of misinformation are most prevalent, and what share of misinformation is addressed in a timely manner. Communicate why certain content is flagged, removed, downranked, or left alone. Work to understand potential unintended consequences of content moderation, such as migration of users to less-moderated platforms.

**Proactively address information deficits.** An information deficit occurs when there is high public interest in a topic but limited quality information available. Provide information from trusted and credible sources to prevent misconceptions from taking hold.[40]

**Amplify communications from trusted messengers and subject matter experts.** For example, work with health and medical professionals to reach target audiences. Direct users to a broader range of credible sources, including community organizations. It can be particularly helpful to connect people to local trusted leaders who provide accurate information.

**Prioritize protecting health professionals, journalists, and others from online harassment,** including harassment resulting from people believing in misinformation.

---

Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment     12

WE CAN TAKE ACTION

# WHAT RESEARCHERS AND RESEARCH INSTITUTIONS CAN DO

**Strengthen the monitoring of health questions, concerns, and misinformation.** Focus on a broader range of content and platforms, as well as on information flow across platforms. For example, examine image- and video-based content and content in multiple languages. To address existing research limitations, expand data collection methods (e.g., recruit social media users to voluntarily share data).

**Assess the impact of health misinformation.** There is an urgent need to comprehensively quantify the harms of health misinformation. For example, how and under what conditions does misinformation affect beliefs, behaviors, and health outcomes? What is the role of emotion, cognition, and identity in causing misinformation to "stick"? What is the cost to society if misinformation is left unchecked?

**Prioritize understanding how people are exposed to and affected by misinformation, and how this may vary for different subpopulations.** Tailor interventions to the needs of specific populations. Invite community members to participate in research design.

**Evaluate the effectiveness of strategies and policies to prevent and address health misinformation.** For example, can flagging certain content as misinformation have unintended consequences? Is it possible to build resilience to misinformation through inoculation methods such as "prebunking"? (*Debunking* involves correcting misinformation once someone has been exposed to it. *Prebunking,* or preemptively debunking, involves warning people about misinformation they might come across so they will be less likely to believe it when exposed.)[57]

*There is an urgent need to comprehensively quantify the harms of health misinformation.*

WE CAN TAKE ACTION

# WHAT FUNDERS AND FOUNDATIONS CAN DO

**Move with urgency toward coordinated, at-scale investment to tackle misinformation.** Assess funding portfolios to ensure meaningful, multi-year commitments to promising research and programs.

**Invest in quantifying the harms of misinformation and identifying evidence-based interventions.** Focus on areas facing private and public funding gaps. Examples could include independent and local journalism, accountability mechanisms for platforms, and community-based health literacy programs.

**Provide training and resources for grantees working in communities disproportionately affected by misinformation** (e.g., areas with lower vaccine confidence).

**Incentivize coordination across grantees to maximize reach, avoid duplication, and bring together a diversity of expertise.** For example, encourage coordination around monitoring health misinformation across multiple languages.

*Assess funding portfolios to ensure meaningful, multi-year commitments to promising research and programs.*

WE CAN TAKE ACTION

# WHAT GOVERNMENTS CAN DO

**Convene federal, state, local, territorial, tribal, private, nonprofit, and research partners** to explore the impact of health misinformation, identify best practices to prevent and address it, issue recommendations, and find common ground on difficult questions, including appropriate legal and regulatory measures that address health misinformation while protecting user privacy and freedom of expression.

**Increase investment in research on misinformation.** For example, more research is needed to better define misinformation, document and process its harms, and identify best practices for preventing and addressing misinformation across mediums and diverse communities.

**Continue to modernize public health communications.** Work to understand Americans' health questions, concerns, and perceptions, especially for hard-to-reach populations. Deploy new messaging and community engagement strategies, including partnerships with trusted messengers. Proactively and rapidly release accurate, easy-to-understand health information in online and in-person settings. Invest in fact-checking and rumor control mechanisms where appropriate.[62]

**Increase resources and technical assistance to state and local public health agencies** to help them better address questions, concerns, and misinformation. For example, support the creation of teams within public health agencies that can identify local misinformation patterns and train public health misinformation and infodemic researchers. Work with local and state health leaders and associations to address ongoing needs.

**Expand efforts to build long-term resilience to misinformation.** For example, promote educational programs that help people distinguish evidence-based information from opinion and personal stories.

*Deploy new messaging and community engagement strategies, including partnerships with trusted messengers. Proactively and rapidly release accurate, easy-to-understand health information in online and in-person settings.*

Glenn Decl. Ex. 31
Page 15 of 22

# WHERE WE GO FROM HERE

> *We are all still learning how to navigate*
> *this new information environment.*
> *But we know enough to be sure that*
> *misinformation is an urgent threat, and*
> *that we can and must confront it together.*

During the COVID-19 pandemic, health misinformation has sowed confusion, reduced trust in public health measures, and hindered efforts to get Americans vaccinated. And misinformation hasn't just harmed our physical health—it has also divided our families, friends, and communities.

While health misinformation has always been a problem, today it spreads at unprecedented speed and scale. We are all still learning how to navigate this new information environment. But we know enough to be sure that misinformation is an urgent threat, and that we can and must confront it together.

The only way to address health misinformation is to recognize that all of us, in every sector of society, have a responsibility to act. Every single person can do their part to confront misinformation. But it's not just an individual responsibility. We need institutions to recognize that this issue is their moral and civic responsibility, too, and that they are accountable.

We have the power to shape our information environment, but we must use that power together. Only then can we work toward a healthier information environment—one that empowers us to build a healthier, kinder, and more connected world.

Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment     16

Glenn Decl. Ex. 31
Page 16 of 22

# REFERENCES

\* Note: Defining "misinformation" is a challenging task, and any definition has limitations. One key issue is whether there can be an objective benchmark for whether something qualifies as misinformation. Some researchers argue that for something to be considered misinformation, it has to go against "scientific consensus" (e.g., Chou, Gaysynsky, & Cappella (2020)). Others consider misinformation to be information that is contrary to the "best available evidence" (e.g., Johns Hopkins Center for Health Security (2021)). Both approaches recognize that what counts as misinformation can change over time with new evidence and scientific consensus. This Advisory prefers the "best available evidence" benchmark since claims can be highly misleading and harmful even if the science on an issue isn't yet settled. At the same time, it is important to be careful and avoid conflating controversial or unorthodox claims with misinformation. Transparency, humility, and a commitment to open scientific inquiry are critical. A second key issue is whether misinformation should include not only false information but also misleading information. This Advisory includes misleading claims in the definition. Consider an anecdote about someone experiencing a rare side effect after a routine surgery. The specific anecdote may be true but hide the fact that the side effect is very rare and treatable. By misinforming people about the benefits and risks of the surgery, the anecdote can be highly misleading and harmful to public health. Going forward, there is a need for further alignment on a shared definition of misinformation. However, we can meaningfully improve the health information environment even without a consensus definition of misinformation. For further discussion on definitions, see Vraga & Bode (2020).

1   WHO, UN, UNICEF, UNDP, UNESCO, UNAIDS, ITU, UN Global Pulse, & IFRC. (2020, September 23). *Managing the COVID-19 infodemic: Promoting healthy behaviours and mitigating the harm from misinformation and disinformation.* World Health Organization. https://www.who.int/news/item/23-09-2020-managing-the-covid-19-infodemic-promoting-healthy-behaviours-and-mitigating-the-harm-from-misinformation-and-disinformation

2   Branswell, H. (2021, April 21). *We know a lot about Covid-19. Experts have many more questions.* STAT News. https://www.statnews.com/2021/04/20/we-know-a-lot-about-covid-19-experts-have-many-more-questions/

3   Smith, R., Cubbon, S., & Wardle, C. (2020, November 12). *Under the surface: Covid-19 vaccine narratives, misinformation & data deficits on social media.* First Draft. https://firstdraftnews.org/vaccinenarratives-full-report-november-2020

4   Baum, M., Ognyanova, K., Chwe, H., Quintana, A., Perlis, R. H., Lazer, D., Druckman, J., Santillana, M., Lin, J., Della Volpe, J., Simonson, M.D., & Green, J. (2021). The COVID states project #14: Misinformation and vaccine acceptance. *OSF Preprints.* http://doi.org/10.31219/osf.io/w974j

5   Roozenbeek, J., Schneider, C., Dryhurst, S., Kerr, J., Freeman, A.L.J., Recchia, G., van der Bles, A.M., & van der Linden, S. (2020). Susceptibility to misinformation about COVID-19 around the

Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment     17

Glenn Decl. Ex. 31
Page 17 of 22

world. *Royal Society Open Science, 7*(10). http://doi.org/10.1098/rsos.201199

6   Chou, W.Y.S., Gaysynsky, A., & Cappella, J. N. (2020). Where we go from here: Health misinformation on social media. *American Journal of Public Health,* 110, S273-S275. http://doi.org/10.2105/AJPH.2020.305905

7   Vraga, E., & Bode, L. (2020). Defining misinformation and understanding its bounded nature: Using expertise and evidence for describing misinformation. *Political Communication,* 37(1), 136-144. http://doi.org/10.1080/10584609.2020.1716500

8   Sell, T.K., Hosangadi, D., Smith, E., Trotochaud, P.V., Gronvall, G.K., Rivera, Y., Sutton, J., Ruiz, A., & Cicero, A. (2021, March 23). *National priorities to combat misinformation and disinformation for COVID-19 and future public health threats: A call for a national strategy.* Johns Hopkins Center for Health Security. https://www.centerforhealthsecurity.org/our-work/publications/national-priorities-to-combat-misinformation-and-disinformation-for-covid-19

9   Chang, A., Schnall, A., Law, R., Bronstein, A.C., Marraffa, J.M., Spiller, H.A., Hays, H.L., Funk, A.R., Mercurio-Zappala, M., Callelo, D.P., Aleguas, A., Borys, D.J., Boehmer, T., & Svendsen, E. (2020). Cleaning and disinfectant chemical exposures and temporal associations with COVID-19 — National Poison Data System, United States, January 1, 2020–March 31, 2020. *MMWR Morbidity and Mortality Weekly Report,* 69, 496-498. http://doi.org/10.15585/mmwr.mm6916e1

10  Gottlieb, M., & Dyer, S. (2020). Information and disinformation: Social media in the COVID-19 crisis. *Academic Emergency Medicine,* 27(7), 640-641. https://doi.org/10.1111/acem.14036

11  Loomba, S., de Figueiredo, A., Piatek, S.J., et al. (2021). Measuring the impact of COVID-19 vaccine misinformation on vaccination intent in the UK and USA. *Nature Human Behavior,* 5, 337–348. http://doi.org/10.1038/s41562-021-01056-1

12  Mello, M. M., Greene, J. A., & Sharfstein, J. M. (2020). Attacks on public health officials during COVID-19. *JAMA, 324*(8), 741. http://doi.org/10.1001/jama.2020.14423

13  Stone, W. (2020, June 3). *Local public health workers report hostile threats and fears about contact tracing.* National Public Radio. https://www.npr.org/sections/health-shots/2020/06/03/868566600/local-public-health-workers-report-hostile-threats-and-fears-about-contact-traci

14  Tucker, J.A., Guess, A., Barbera P, Vaccari, C., Siegel, A., Sanovich, S., Stukal, D., & Nyhan, B. (2018). Social media, political polarization and political disinformation: A review of the scientific literature. *SSRN.* http://doi.org/10.2139/ssrn.3144139

15  Chou, W.S., Oh, A., & Klein, W.M.P. (2018). Addressing health-related misinformation on social media. *JAMA, 320*(23), 2417–2418. http://doi.org/10.1001/jama.2018.16865

**16** Jost, J., Van der Linden, S., Panagopoulos, C., & Hardin, C. (2018). Ideological asymmetries in conformity, desire for shared reality, and the spread of misinformation. *Current Opinion in Psychology*, 23, 77-83. http://doi.org/10.1016/j.copsyc.2018.01.003

**17** Rao, T. S., & Andrade, C. (2011). The MMR vaccine and autism: Sensation, refutation, retraction, and fraud. *Indian journal of psychiatry,* 53(2), 95–96. http://doi.org/10.4103/0019-5545.82529

**18** Hussain, A., Ali, S., Ahmed, M., & Hussain, S. (2018). The anti-vaccination movement: A regression in modern medicine. *Cureus,* 10(7), e2919. http://doi.org/10.7759/cureus.2919

**19** City of New York Office of the Mayor. (2019, April 9). *De Blasio Administration's Health Department declares public health emergency due to measles crisis.* https://www1.nyc.gov/office-of-the-mayor/news/186-19/de-blasio-administration-s-health-department-declares-public-health-emergency-due-measles-crisis/

**20** Clark County Public Health. (2019, January 18). *County declares public health emergency due to measles outbreak.* https://www.clark.wa.gov/public-health/county-declares-public-health-emergency-due-measles-outbreak

**21** Hall, V., Banerjee, E., Kenyon, C., Strain, A., Griffith, J., Como-Sabetti, K., Heath, J., Babta, L., Martin, K., McMahon, M., Johnson, D., Roddy, M., Dunn D., & Ehresmann, K. (2017). Measles outbreak — Minnesota April–May 2017. *MMWR Morbidity and Mortality Weekly Report, 66,* 713–717. http://doi.org/10.15585/mmwr.mm6627a1

**22** Chigwedere, P., Seage, G. R., Gruskin, S., Lee, T. H., & Essex, M. (2008). Estimating the Lost Benefits of Antiretroviral Drug Use in South Africa. *JAIDS Journal of Acquired Immune Deficiency Syndromes,* 49(4), 410–415. https://doi.org/10.1097/qai.0b013e31818a6cd5

**23** Swire-Thompson, B., & Lazer, D. (2019). Public health and online misinformation: Challenges and Recommendations. *Annual Review of Public Health, 41,* 433-451. http://doi.org/10.1146/annurev-publhealth-040119-094127

**24** Chou, W.S., & Budenz, A. (2020). Considering emotion in COVID-19 vaccine communication: Addressing vaccine hesitancy and fostering vaccine confidence. *Health Communication, 35*(14), 1718-1722. http://doi.org/10.1080/10410236.2020.1838096

**25** Wang, Y., McKee, M., Torbica, A., & Stuckler, D. (2019). Systematic literature review on the spread of health-related misinformation on social media. *Social science & medicine (1982), 240,* 112552. http://doi.org/10.1016/j.socscimed.2019.112552

**26** Suarez-Lledo, V., & Alvarez-Galvez, J. (2021). Prevalence of health misinformation on social media: Systematic review. *Journal of Medical Internet Research, 23*(1). http://doi.org/10.2196/17187

Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment     19

Glenn Decl. Ex. 31
Page 19 of 22

**27** Scales, D., Gorman, J., & Jamieson, K. (2021). The Covid-19 infodemic — applying the epidemiologic model to counter misinformation. *New England Journal of Medicine.* http://doi.org/10.1056/NEJMp2103798

**28** Karanian, J.M., Rabb, N., Wulff, A.N., Torrance, M.G., Thomas, A.K., & Race, E. (2020). Protecting memory from misinformation: Warnings modulate cortical reinstatement during memory retrieval. *Proceedings of the National Academy of Sciences, 117* (37), 22771-22779. http://doi.org/10.1073/pnas.2008595117

**29** Acerbi, A. (2019). Cognitive attraction and online misinformation. *Palgrave Communications, 5*(15). http://doi.org/10.1057/s41599-019-0224-y

**30** Freiling, I., Krause, N., & Scheufele, D. (2021). Believing and sharing misinformation, fact-checks, and accurate information on social media: The role of anxiety during COVID-19. *New Media & Society.* http://doi.org/10.1177/14614448211011451

**31** Vosoughi, S., Roy, D., & Aral, S. (2018). The spread of true and false news online. *Science, 359,* 1146-1151. http://doi.org/10.1126/science.aap9559

**32** Lindström, B., Bellander, M., Schultner, D.T., Chang, A., Tobler, P.N., & Amodio, D.M. (2021). A computational reward learning account of social media engagement. *Nature Communications,* 12(1311). http://doi.org/10.1038/s41467-020-19607-x

**33** Brady, W., Gantman, A., & Bavel, J. (2020). Attentional Capture Helps Explain Why Moral and Emotional Content Go Viral. *Journal of Experimental Psychology,* 149(4), 746-756. doi:10.1037/xge0000673

**34** Tang, L., Fujimoto, K., Amith, M. T., Cunningham, R., Costantini, R. A., York, F., Xiong, G., Boom, J. A., & Tao, C. (2021). "Down the rabbit hole" of vaccine misinformation on YouTube: Network exposure study. *Journal of Medical Internet Research, 23*(1), e23262. http://doi.org/10.2196/23262

**35** Donovan, J. (2020). Concrete recommendations for cutting through misinformation during the COVID-19 pandemic. *American Journal of Public Health, 110,* S3. http://doi.org/10.2105/AJPH.2020.305922

**36** Pickard, V. (2020). *Democracy without journalism?: Confronting the misinformation society.* Oxford University Press.

**37** Tsfati, Y., Boomgaarden, H.G., Strömbäck, J., Vliegenthart, R. , Damstra, A., & Lindgren, E. (2020). Causes and consequences of mainstream media dissemination of fake news: Literature review and synthesis. *Annals of the International Communication Association, 44*(2), 157-173. http://doi.org/10.1080/23808985.2020.1759443

Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment    20

Glenn Decl. Ex. 31
Page 20 of 22

**38**  Phillips, W. (2018, May 22). *The oxygen of amplification: Better practices for reporting on extremists, antagonists, and manipulators.* Data & Society. https://datasociety.net/library/oxygen-of-amplification/

**39**  Golebiewski, M. and Boyd, D. (2019, November). *Data voids: Where missing data can be easily exploited.* Data & Society. https://datasociety.net/wp-content/uploads/2019/11/Data-Voids-2.0-Final.pdf

**40**  Cubbon, Seb. (2020, December 15). *Identifying 'data deficits' can pre-empt the spread of disinformation.* First Draft Footnotes. https://medium.com/1st-draft/identifying-data-deficits-can-pre-empt-the-spread-of-disinformation-93bd6f680a4e

**41**  Collins-Dexter, B. (2020, June). *Canaries in the coal mine: COVID-19 misinformation and black communities.* Technology and Social Change project (TaSC) and Shorenstein Center. http://doi.org/10.37016/TASC-2020-01

**42**  Boxell, L., Gentzkow, M., & Shapiro, J. (2020, January). *Cross-country trends in affective polarization* (NBER Working Paper No. 26669). National Bureau of Economic Research. http://www.nber.org/papers/w26669

**43**  Hameleers, M., & van der Meer, T. (2019). ). Misinformation and polarization in a high-choice media environment: How effective are political fact-checkers? *Communication Research, 47*(2), 227-250. http://doi.org/10.1177/0093650218819671

**44**  Seo, H., Blomberg, M., Altschwager, D., & Vu, H. (2020). Vulnerable populations and misinformation: A mixed-methods approach to underserved older adults' online information assessment. *New Media & Society.* http://doi.org/10.1177/1461444820925041

**45**  Center for Countering Digital Hate. (2021, March 24). *The disinformation dozen: Why platforms must act on twelve leading online anti-vaxxers.* https://www.counterhate.com/disinformationdozen

**46**  New York Times. (2021). *Daily distortions.* https://www.nytimes.com/spotlight/disinformation

**47**  Poynter. *Fighting the infodemic: The #CoronaVirusFacts alliance.* https://www.poynter.org/coronavirusfactsalliance/

**48**  Facebook. (2021, May 26). *Taking action against people who repeatedly share misinformation.* https://about.fb.com/news/2021/05/taking-action-against-people-who-repeatedly-share-misinformation/

**49**  Twitter (n.d.). *COVID-19 misleading information policy.* Twitter. https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy

**50**  Beckerman, M. (2021, February 24). *TikTok's H2 2020 transparency report.* TikTok. https://newsroom.tiktok.com/en-us/tiktoks-h-2-2020-transparency-report

Glenn Decl. Ex. 31
Page 21 of 22

**51**  U.S. Department of Health and Human Services. (2021). *We Can Do This COVID-19 public education campaign.* https://wecandothis.hhs.gov/about

**52**  Larson, H.J. (2020). A call to arms: Helping family, friends and communities navigate the COVID-19 infodemic. *Nature Reviews Immunology, 20,* 449–450. http://doi.org/10.1038/s41577-020-0380-8

**53**  Southwell, B., Wood, J., & Navar, A.M. (2020). Roles for health care professionals in addressing patient-held misinformation beyond fact correction. *American Journal of Public Health, 110*(S3), S288-S289. http://doi.org/10.2105/AJPH.2020.305729

**54**  Chen, X., Sin, S.C., Theng, Y.-L., & Lee, C.S. (2016). Deterring the spread of misinformation on social network sites: A social cognitive theory-guided intervention. *Proceedings of the Association for Information Science and Technology.* http://doi.org/10.1002/pra2.2015.145052010095

**55**  Bode, L., & Vraga, E. (2021). Correction experiences on social media during COVID-19. *Social Media & Society, 7*(2). http://doi.org/10.1177/20563051211008829

**56**  Vanderpool, R.C., Gaysynsky, A., & Chou, W.S. (2020). Using a global pandemic as a teachable moment to promote vaccine literacy and build resilience to misinformation. *American Journal of Public Health, 110,* S284-S285. http://doi.org/10.2105/AJPH.2020.305906

**57**  Basol, M., Roozenbeek, J., Berriche, M., Uenal, F., McClanahan, W.P., & van der Linden, S. (2021). Towards psychological herd immunity: Cross-cultural evidence for two prebunking interventions against COVID-19 misinformation. *Big Data & Society, 8*(1). http://doi.org/10.1177/20539517211013868

**58**  Diethelm, P. & McKee, M. (2009). Denialism: what is it and how should scientists respond? *European Journal of Public Health,* 19(1), 2-4. https://doi.org/10.1093/eurpub/ckn139

**59**  Brenan, M. (2018, December 20). *Nurses again outpace other professions for honesty, ethics.* Gallup. https://news.gallup.com/poll/245597/nurses-again-outpace-professions-honesty-ethics.aspx/

**60**  First Draft. (2021, February). *The building blocks of reporting and discussing Covid-19 vaccines.* https://firstdraftnews.org/wp-content/uploads/2021/02/FD0102_Snapshot-3.pdf

**61**  O'Connor, C., & Ayad, M. (2021, April). MENA monitor: *Arabic COVID-19 vaccine misinformation online.* Institute for Strategic Dialogue (ISD). https://www.isdglobal.org/wp-content/uploads/2021/04/MENA-Covid-Vaccine-Misinformation-Monitor-1.pdf

**62**  Masterson, M., Zaheer, A., Small, C., Cable, J., John, J. (2021, May 4). *Rumor control: A framework for countering vaccine misinformation.* Virality Project Policy Analysis. https://www.viralityproject.org/policy-analysis/rumor-control

Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment     22

Glenn Decl. Ex. 31
Page 22 of 22

# EXHIBIT 32

 

 My View     Following     Saved

July 15, 2021 · 6:49 PM CDT
Last Updated a year ago

United States

# White House slams Facebook as conduit for COVID-19 misinformation

**Reuters**                                                                    4 minute read

        

WASHINGTON, July 15 (Reuters) - Facebook is not doing enough to stop the spread of false claims about COVID-19 and vaccines, White House press secretary Jen Psaki said on Thursday, part of a new administration pushback on misinformation in the United States.

Facebook, which owns Instagram and WhatsApp, needs to work harder to remove inaccurate vaccine information from its platform, Psaki said.

She said 12 people were responsible for almost 65% of anti-vaccine misinformation on social media platforms. The finding was reported in May by the Center for Countering Digital Hate, but Facebook has disputed the methodology.

Register now for FREE unlimited access to Reuters.com

**Register**

"All of them remain active on Facebook," Psaki said. Facebook also "needs to move more quickly to remove harmful violative posts," she said.

U.S. Surgeon General Vivek Murthy also raised the alarm over the growing wave of misinformation about COVID-19 and related vaccines, saying it is making it harder to fight the pandemic and save lives.

In his first advisory as the nation's top doctor under President Joe Biden, Murthy called on tech companies to tweak their algorithms to further demote false information and share more data with researchers and the government to help teachers, healthcare workers and the media fight misinformation.

"Health misinformation is a serious threat to public health. It can cause confusion, sow mistrust, harm people's health, and undermine public health efforts. Limiting the spread of health misinformation is a moral and civic imperative," he said in the advisory, first reported by National Public Radio.

False information feeds hesitancy to get vaccinated, leading to preventable deaths, Murthy said, noting misinformation can affect other health conditions and is a worldwide problem.



the Public Health Service before the Senate Health, Education, Labor, and...

Read More

A Facebook spokesperson said the company has partnered with government experts, health authorities and researchers to take "aggressive action against misinformation about COVID-19 and vaccines to protect public health".

"So far we've removed more than 18 million pieces of COVID misinformation, removed accounts that repeatedly break these rules, and connected more than 2 billion people to reliable information about COVID-19 and COVID vaccines across our apps," the spokesperson added.

Facebook has introduced rules against making certain false claims about COVID-19 and its vaccines. Still, researchers and lawmakers have long complained about lax policing of content on its site.

Murthy said at a White House press briefing that COVID-19 misinformation comes mostly from individuals who may not know they are spreading false claims, but also a few "bad actors".

His advisory also urges people not to spread questionable information online. The head of the Center for Countering Digital Hate, a group that tracks COVID-19 misinformation online, said it was inadequate.

"On tobacco packets they say that tobacco kills," the group's chief executive Imran Ahmed told NPR. "On social media we need a 'Surgeon General's Warning: Misinformation Kills.'"

U.S. COVID-19 infections last week rose about 11% from the previous week, with the highest increases in areas with vaccination rates of less than 40%, according to the Centers for Disease

Cases plummeted in the spring as the vaccine rolled out following a winter spike in infections, but shots have slowed and just about 51% of the country has been vaccinated, **Reuters data show**.

"It's been hard to get people to move" from not wanting the COVID-19 vaccine "to recognizing that the risk is still there," Dr. Richard Besser, a former CDC chief who now heads the Robert Wood Johnson Foundation, told MSNBC.

Representatives for the nation's largest tech companies could not be immediately reached for comment on the advisory.

Register now for FREE unlimited access to Reuters.com

**Register**

Reporting by Susan Heavey, Elizabeth Culliford and Diane Bartz; Additional reporting by Andrea Shalal, Doyinsola Oladipo, and Doina Chiacu; Editing by Philippa Fletcher, Heather Timmons and David Gregorio

Our Standards: **The Thomson Reuters Trust Principles.**

## More from Reuters



WH won't send long-range rockets for use 'beyond Ukraine'

Britain's Johnson pays tribute to Queen Elizabeth ahead of...

Trump must testify in



U.S. Senate struggles to unite on guns after Texas massacre

Beto O'Rourke interrupts Texas Gov presser on Uvalde...



## Sustainable Switch

Subscribe to our sustainability newsletter to make sense of the latest ESG trends affecting companies and governments.

Sign up



## Daily Briefing

Subscribe to our newsletter to get all the news you need to start your day.

Sign up



**United States**

Glenn Decl. Ex. 32
Page 7 of 17

# Florida abortion providers file lawsuit challenging 15-week ban

United States · June 1, 2022 · 3:49 PM CDT · 26 min ago

A group of Florida abortion providers including affiliates of Planned Parenthood filed a lawsuit on Wednesday challenging the state's new Republican-backed ban on abortions after 15 weeks of pregnancy, saying the measure violates the state's constitution.

---

Americas

**Biden and Bolsonaro to have wide-ranging talks at Americas summit**

37 min ago

---

World

**Biden to meet NATO's Stoltenberg at White House on Thursday**

an hour ago

---

United States

**Bison gores Yellowstone Park visitor, tosses her in the air**

2:36 PM CDT

---

Business

**Biden announces new weapons package for Ukraine**

12:00 PM CDT

Glenn Decl. Ex. 32
Page 9 of 17

Latest

**Home**

Media

 **Videos**

 **Pictures**

 **Graphics**

Browse

**World**

**Business**

**Legal**

**Markets**

**Breakingviews**

**Technology**

**Lifestyle**

About Reuters

**About Reuters**

**Careers**

**Reuters News Agency**

**Brand Attribution Guidelines**

**Reuters Leadership**

**Reuters Fact Check**

**Reuters Diversity Report**

Stay Informed

**Download the App**

**Newsletters**

---

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

    

---

Thomson Reuters Products

**Westlaw**

Build the strongest argument relying on authoritative content, attorney-editor expertise, and industry defining technology.

**Onesource**

The most comprehensive solution to manage all your complex and ever-expanding tax and compliance needs.

**Checkpoint**

The industry leader for online information for tax, accounting and finance professionals.

**Refinitiv Workspace**

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

**Refinitiv Data Catalogue**

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

**Refinitiv World-Check**

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

**Advertise With Us**    **Advertising Guidelines**

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

**Cookies**    **Terms of Use**    **Privacy**    **Digital Accessibility**    **Corrections**    **Site Feedback**

© 2022 Reuters. All rights reserved

Glenn Decl. Ex. 32
Page 17 of 17

# EXHIBIT 33

**The New York Times** | https://www.nytimes.com/2021/07/16/us/politics/biden-facebook-social-media-covid.html

# *'They're Killing People': Biden Denounces Social Media for Virus Disinformation*

The president's blunt statement capped weeks of frustration in the White House over the spread of vaccine disinformation on Facebook and other platforms.

 

**By Zolan Kanno-Youngs and Cecilia Kang**

Published July 16, 2021    Updated July 19, 2021

> **Sign Up for On Politics, for Times subscribers only.**  A Times reader's guide to the political news in Washington and across the nation. Try the On Politics newsletter for 4 weeks.

WASHINGTON — President Biden unleashed his growing frustration with social media on Friday, saying that platforms like Facebook were "killing people" by allowing disinformation about the coronavirus vaccine to spread online.

Mr. Biden's forceful statement capped weeks of anger in the White House over the dissemination of vaccine disinformation online, even as the pace of inoculations slows and health officials warn of the rising danger of the Delta variant.

Just before boarding Marine One for a weekend in Camp David in Maryland, Mr. Biden was asked what his message was to social media platforms when it came to Covid-19 disinformation.

"They're killing people," he said. "Look, the only pandemic we have is among the unvaccinated, and that — and they're killing people."

Mr. Biden's comments signaled a more aggressive approach to vaccine hesitancy after weeks of coaxing Americans to get vaccinated and dispatching officials and volunteers door to door to encourage people to get shots. He spoke a day after the surgeon general of the United States used his first formal advisory to criticize tech and social media companies to stop dangerous health information that presents "an urgent threat to public health."

The Biden administration has warned of the spread of misinformation about vaccines and the coronavirus from a range of sources, including politicians and news outlets. But this week, White House officials went further and singled out social media companies for allowing false information to proliferate. That came after weeks of failed attempts to get Facebook to turn over information detailing what mechanisms were in place to combat misinformation about the vaccine, according to a person familiar with the matter.

"Our point is that there is information that is leading to people not taking the vaccine, and people are dying as a result," Jen Psaki, the White House press secretary, said before Mr. Biden made his comments. "And we have responsibility as a public health matter to raise that issue."

The spread of false information has become the latest flash point for social media companies. Facebook and other social media sites have struggled with their role as platforms for speech while protecting their users from disinformation campaigns, like Russian efforts to influence presidential elections or false statements about the pandemic.

Facebook rebuffed the president's assertion.

"We will not be distracted by accusations which aren't supported by the facts," said Dani Lever, a company spokeswoman. She pointed to efforts to promote authoritative information about Covid-19 and vaccines that two billion people on the platform have viewed.

Conservative figures in the news media and political leaders have balked at the calls by Democrats to clamp down on people who spread false information, calling the actions censorship and politically biased.

A day before Mr. Biden's statement, Ms. Psaki said the Biden administration had been flagging "problematic posts for Facebook that spread disinformation," prompting questions over how the White House was balancing the First Amendment rights of those online with messaging that undermines public health.

Ms. Psaki said the administration recommended to platforms that they form an enforcement strategy against those promoting false statements about the pandemic, adding that 12 people producing 65 percent of antivaccine misinformation on social media remained active on Facebook. Ms. Psaki seemed to be referring to a statistic from the Center for Countering Digital Hate, a nonprofit that aims to combat disinformation.

"You shouldn't be banned from one platform and not others," Ms. Psaki said.

Glenn Decl. Ex. 33
Page 1 of 2

6/8/22, 8:48 AM                     'They're Killing People': Biden Denounces Social Media for Virus Disinformation - The New York Times

Responding to questions on Friday about potential overreach by the federal government in encouraging Facebook to take down the posts, Ms. Psaki said it was a matter of public health.



Jen Psaki, the White House press secretary, and Dr. Vivek Murthy, the surgeon general, at a news conference on Thursday. Dr. Murthy and other senior administration officials have been in talks with Facebook about curtailing misinformation on the platform.  Shawn Thew/EPA, via Shutterstock

"We raised for them in our direct channels, of which every administration has always had with every social media platform, that we're seeing this trend," she said. "It's troubling. That information is inaccurate."

Since January, senior White House officials, including the surgeon general, Dr. Vivek Murthy, have been in talks with the social media company to stop the spread of false stories about vaccination side effects and other harms.

Despite repeated requests by the White House, Facebook has not shared even basic data on how much vaccine misinformation exists and if the company's efforts to stop its spread are working, according to the person familiar with the talks. When administration officials presented data from CrowdTangle, a content tracking tool owned by Facebook, that showed vaccine misinformation was soaring, company officials dismissed its accuracy.

In another meeting with Dr. Murthy, officials at Facebook noted that it had tried to get "influencers" with big audiences to promote vaccination, as an apparent push against misinformation, the person familiar with the meetings said. Dr. Murthy angrily said that while the company promoted its efforts to encourage vaccination, it did not do enough to defend against bad information.

In one tense meeting in the late spring, according to the person familiar with the matter, a Facebook official responded defensively, "How do you know if your efforts are working?"

Mr. Biden's comments on Friday came as fewer than 50 percent of Americans are fully vaccinated, and many top health experts have called for the president to do more to reach people who have yet to get shots.

While hospitalizations remain low relative to the peaks of the pandemic, local hot spots are emerging as public health officials warn of the spread of the Delta variant. Republican leaders, some of whom have spread disinformation about the vaccine, have begun speaking out more forcefully in favor of getting shots as the virus spreads through conservative communities. The vaccines are effective against the Delta variant.

The White House has sought to push a campaign-like grass-roots effort to encourage Americans to get their shots, enlisting volunteers to go door to door to provide accurate information about vaccines.

Administration officials have been particularly concerned about hesitancy rates among young adults, even recruiting the 18-year-old pop star Olivia Rodrigo to the White House this week to encourage vaccinations.

The White House has also dispatched top officials around the country to promote the vaccine, with some officials even making the case on social media.

Glenn Decl. Ex. 33
Page 2 of 2

# EXHIBIT 34

BRIEFING ROOM

# Press Briefing by Press Secretary Jen Psaki, July 16, 2021

JULY 16, 2021 • PRESS BRIEFINGS

James S. Brady Press Briefing Room

1:20 P.M. EDT

MS. PSAKI:  Hi, everyone.

Q   Hello.

MS. PSAKI:  Happy Friday.

Q   Happy Friday.

MS. PSAKI:  Brian Karem has got some sunglasses on.  Everybody is ready for the weekend.

Okay, I have a couple of items for all of you at the top.

Last week, we launched the Supply Chain Disruption Task Force to monitor, engage, and act on current and emerging supply chain disruptions and bottlenecks.

This afternoon, the White House is hosting a convening of the Supply Chain Disruptions Task Force with Secretary of Commerce Gina Raimondo, Secretary of Housing and Urban Development Marcia Fudge, Director of the National Economic Council Brian Deese, Domestic Policy Advisor Susan Rice, Council of Economic Advisers Chair Cecilia Rouse, and groups representing the full range of the homebuilding supply chain, from loggers and log- — and lumber contractors, labor leaders, realtors, and affordable housing advocates.

At this convening, these administration officials and key stakeholders will discuss strategies to address short-term supply chain disruptions in the

homebuilding sector and how they can work together to address them.

I also wanted to note that yesterday, senior White House officials, led by Susan Rice and Julie Rodriguez, launched the Community Violence Intervention Collaborative announced by the President on June 23rd as part of his comprehensive plan to reduce gun crime.

The Community Violence Intervention is an evidence-based approach that's been shown to reduce violence by as much as 60 percent. CVI prevents gun violence and crime in communities around the country before it happens by intervening in disputes early, and connecting potential perpetrators and victims with services and support to divert them — to divert them away from crime. It's an approach that's been embraced by an increasing number of law enforcement leaders nationally, as well as by mayors of both parties in cities around America. So this will be an ongoing initiative.

Also want to give you an update: I noted earlier this week that there have been 2 million people who now have access to affordable healthcare, thanks to the reopening of the — of the enrollment — special enrollment period.

Yesterday, we launched a "Summer Sprint to Coverage" campaign, leveraging robust paid media, increased community outreach, and more to get Americans signed up. This President Biden is urging Americans who need health insurance to visit HealthCare.gov or to call 1-800-318-2596, if they would prefer, to enroll today. We'll keep talking about this quite a bit until August 15th, which is the end of the timeline.

I also have promised you that I would give you updates on interesting initiatives we're taking to reach people, meet people where they are, as it relates to getting vaccinated. So, on Saturday, NASCAR will host the Get Vaccinated 200. They'll have vaccines on site and will be encouraging vaccinations. This is the type of whole-of-country approach that is reaching people in convenient locations with messengers they trust.

Finally, a quick week ahead:

On Monday, the President and the First Lady will welcome Their Majesties King Abdullah II and Queen Rania of Jordan, and His Royal Highness Crown Prince Hussein, to the White House. Their Majesties' visit will highlight the enduring and strategic partnership between the United States and Jordan, a key security partner and ally of the United States. It will be an opportunity

to discuss the many challenges facing the Middle East and showcase Jordan's leadership role in promoting peace and stability in the region.

On Monday, the President will also deliver remarks on the economic recovery and the progress made under his administration — taking the country from 60,000 new jobs per month to 600,000 new jobs per month, and from 1 percent of Americans vaccinated to more than two thirds of adults with at least one shot.

He'll explain why his Rescue Plan has helped us get here and will continue supporting Americans throughout the year, and why we need the infrastructure agreement and his Build Back Better plan to sustain that growth in the years to come while keeping inflation in check for the long term.

On Tuesday, the President will hold his second Cabinet meeting of his administration — his first in the Cabinet Room — get excited, everyone — and he looks forward to that.

And on Wednesday, the President will travel to Cincinnati, Ohio, to participate in a CNN townhall.

With that, Alex, why don't you kick us off?

Q    Thanks.  I have a few questions on China and then one on the BIF.  Can you talk —

MS. PSAKI:  I love that "BIF" is happening, just to note that.

Q    Yeah, you made it happen.  Can you talk a little bit more about the Hong Kong business advisory, and the latest sanctions and what triggered those?

And also, there have been reports that Wendy Sherman may tack a China visit onto the end of her Asia visit.  Can you talk about what her goal might be with something like that?

And does this mean that we're moving closer to — I know last month there was talk of a potential Biden/President Xi summit.  Are we moving closer to that?

MS. PSAKI:  Sure, well, first, as the President said yesterday, the situation in Hong Kong is continuing to deteriorate, and we continue to see Beijing

assault Hong Kong's autonomy and democratic institutions.  We've seen authorities use the National Security Law to make politically motivated arrests.  And we've seen a general deterioration of fundamental freedoms, which were guaranteed by an international agreement.

So that's why the United States — we announced steps we're taking today to promote accountability and transparency.  On the accountability front, the State Department announced earlier today seven officials who were sanctioned for their actions — threatening the peace, stability, security, and autonomy of Hong Kong.

On the transparency front, today, the U.S. government issued a business advisory — as you noted, Alex, I just wanted to give the full context — for Hong Kong, which is intended to inform businesses and highlight the growing risk for those operating in Hong Kong.

The bottom line is that businesses should be aware that the risks faced in mainland China are now increasingly present in Hong Kong.  And as the President said last month, of course, we will not waver in our support for Hong Kong and all those who stand up for the basic freedoms.

But as businesses are making decisions — and obviously they're making decisions themselves — we want them to be aware of the use of data — accessing of data inappropriately, of the restriction of information.  And they should be aware of that happening on — in Hong Kong, as well as in mainland China.

Q    And then Wendy Sherman and President Xi?

MS. PSAKI:  Got it.  In terms of Wendy Sherman's trip, we — I don't have an update on travel.  We, of course, have been and continue to explore opportunities to engage with PRC officials.  We've been clear we will engage in conversations at the appropriate level when there's an opportunity for them to be substantive and, hopefully, consequential.

So I don't have an update on intended travel.  Obviously, they are quite adept over there at the State Department of adding things as needed.

And as it relates to plans for the President: As we've said, he will look for opportunities to engage with President Xi going forward.  He — we don't have any particular plans at this moment, so no decisions have been made.

But we'll continue to evaluate what's appropriate and what would be constructive in the relationship moving forward.

Q   And then, just on the BIF, there are reports that it could be financed in part by tariffs on carbon-heavy imports, which could end up rising — hiking prices on goods for American families.  Is the White House open to that?  Or would that be a concern similar to the gas tax increase?

MS. PSAKI:  There are ongoing discussions about the final components, of course, as we look to — and I know you are all eager to see bill language and legislative language and, of course, having discussions about the payfors are part of that.

The President's bottom lines have not changed about the fact that that any payfors cannot raise taxes on individuals making less than $400,000 a year, and anything that would impact that would not be something he would support.

Go ahead.

Q   Follow-up on — I can't believe we're calling it the "BIF" —

MS. PSAKI:  (Laughs.)

Q   You note that —

MS. PSAKI:  Those of us old enough think of "Back to the Future"; those who were younger — I don't know what they think of.  But —

Q   I'm in the "Back to the Future" category.  Given the fact that discussions are ongoing, if the discussions are still ongoing come Wednesday, does the President believe that the Senate should vote to take the procedural vote to move forward if there's no bill text or a deal in hand?

MS. PSAKI:  Well, I think, one, Leader Schumer, of course, will be running point and leading the effort to determine and making the determination about the timeline, the process, and the sequencing of votes in the Senate. And we certainly work closely with him, and — but we certainly trust his — his path that he is mapping out for the legislative process.

We have several days, I would note, before Monday for more information to become available.  We'll see what is known.

I will note that the President is quite familiar with the rollercoaster and ups and downs of legislating, having spent 36 years there and even having had some successes over the last few months in working with legislators.  He — we had a productive meeting — members of our team had a constructive, productive meeting yesterday.  And I'd also note that there are a number of Republicans and Democrats who feel the same in terms of the path forward.

Senator Portman said, "We're going to get it done, and we'll end up with a good package."  Senator Cassidy said he did not feel squeezed by the timing.  Senator Romney affirmed there were going — things were going in a good direction.

We certainly understand the ups and downs — no one better than the President.  That's the period of time we're in at this point.

Q    And just — you went through kind of the topline details of this yesterday, but can you elaborate a little bit on the Facebook —

MS. PSAKI:  Sure.

Q    — the administration to Facebook flagging of disinformation.  And there's also some reporting that we've had that Facebook maybe hasn't been as proactive as the White House would like it to be in response to some of the flagging.  So, the process of how the flagging works, and then whether Facebook has been amenable to those requests.

MS. PSAKI:  Sure.  Well, I would say first, it shouldn't come as any surprise that we're in regular touch with social media platforms — just like we're in regular touch with all of you and your media outlets — about areas where we have concern, information that might be useful, information that may or may not be interesting to your viewers.

You all make decisions, just like the social media platforms make decisions, even though they're a private-sector company and different, but just as an example.

So we are ma- — regularly making sure social media platforms are aware of the latest narratives dangerous to public health that we and many other Americans seeing — are seeing across all of social and traditional media.  And we work to engage with them to better understand the enforcement of social media platform policies.

So let me give you an example, just to illustrate it a little bit.  The false narrative that remains active out there about COVID-19 vaccines causing infertility — something we've seen out there, flowing on the internet quite a bit, in other places as well — which has been disproven time and time again.  This is troubling, but a persistent narrative that we and many have seen, and we want to know that the social media platforms are taking steps to address it.  That is inaccurate, false information.

If you are a parent, you would look at that information and then that would naturally raise concerns, but it's inaccurate.  And that is an example of the kind of information that we are flagging or raising.

Q   And then has Facebook been as proactive as the White House would like in terms of its response to those flags?

MS. PSAKI:  Well, I think, as I noted yesterday, Phil, there is more — there are more steps that everyone can take.  And I would just note, again, this is a responsibility of officials speaking, of course, on behalf of the government; it's the responsibility of members of the media; it's the responsibility of citizens and civic leaders and people who are trusted voices in communities around the country.  That has a broad definition.  Social media platforms is one of them.

And as we know, it is also — there are also areas where a lot of people get news and information.  Sometimes those are accurate news items reported by some of your outlets or accurate information shared by a neighbor.

Sometimes there is information that is not.  It is hard to discriminate, as we know.  This is not a new issue, but it is an issue that is impacting people's lives.

So a couple of the steps that we have — you know, that could be constructive for the public health of the country are providing for — for Facebook or other platforms to measure and publicly share the impact of misinformation on their platform and the audience it's reaching, also with the public, with all of you to create robust enforcement strategies that bridge their properties and provide transparency about rules.

You shouldn't be banned from one platform and not others if you — for providing misinformation out there.

Taking faster action against harmful posts.  As you all know, information travels quite quickly.  If it's up there for days and days and days when people see it, you know, there's — it's hard to put that back in a box.

And, of course, promoting quality information algorithms.  I don't know how they work, but they all do know how they work.

So those are some of the steps that we think could be constructive for public health, for public information, for public — and, you know, the right of the public to know.

Go ahead.

Q   Just to quickly follow up on the Facebook aspect of this: You said yesterday that 12 people were producing 65 percent of the misinformation on vaccines on social media platforms.  Do you have a sense of who those people are?  Are they bad actors like Russia?

And Facebook responded yesterday after the press briefing.  They say that they removed 18 million pieces of COVID misinformation; they've connected more than 2 billion people to reliable information.  So does the White House find that sufficient?

MS. PSAKI:  Clearly not, because we're talking about additional steps that should be taken.  And frankly, information that media organizations could detr- — could decide whether you're going to report on or not.  I'm not talking just about the misinformation storyline; I'm talking about these individuals.  I'm talking about, you know, how prevalent the spreading of this information is.

The public has a right to know.  That's the point that we're making.  And we're dealing with a life-or-death issue here, and so everybody has a role to play in making sure there's accurate information.

Obviously, those are steps they have taken.  They're a private-sector company.  They're going to make decisions about additional steps they can take.  It's clear there are more that can be taken.

And I'll actually on — can I just — on the foreign government piece, because I think that's an important point, or an important, interesting question.  The State Department's Global Engagement Center has found that Russia and

China have promoted their own vaccines through messaging that undermines Western origin vaccine development programs.

So, you know, that is more than just competition about vaccines.  The risk and impact there is that this type of information magnifies, you know, the risk of potential side effects associated with Western vaccines.  This is what they're — what the information — some of this misinformation is doing — and misleads the public by falsely alleging that mRNA vaccines are untested and, thus, risky, even though many of them are approved and have gone through the gold standard of the FDA approval process.

So, the PRC, for example, has also suggested that the United States hoards COVID-19 treatments and prevents other countries from acquiring vaccines, despite evidence to the contrary.

But, certainly, pushing information out there that these tested, approved vaccines are ineffective and unhelpful — a lot of people on these platforms, they're not discriminating, as you all know, between the source of the information.  And that is damaging as well.  So we've seen that trend.

Q    And one more, if I could, just on Afghanistan.  Thank you, Jen.

As we look at the withdrawal in Afghanistan, what is your assessment of the Taliban's advancements?  We heard from the President; he said the likelihood that there was going to be the Taliban overrunning everything and owning the whole country is "highly unlikely."  Does the administration still believe that the Afghan government can maintain control of the region?

MS. PSAKI:  I think that what the President was conveying is that it is not inevitable.  And we have provided a range of — a great deal of support, supplies, training.  We're continuing to do that.  We will continue to provide security assistance in the coming months to the Afghan National Forces.  But it is up to them to determine: Are they going to unite as a country?  Are they going to stand up and fight against the Taliban?

And that is — it's really in their hands at this — it will be in their hands, moving forward.

So his point is that it is not inevitable.  There has been no intelligence assessment that has said it is inevitable, even as they — we are assessing what the consequences could be.

Go ahead.

Q   Thanks, Jen.  When you talk about misinformation, it seems like one of the best ways to counteract some of the vaccine misinformation that's out there would be for the FDA to fully authorize these vaccines with the full weight of government approval behind the vaccines.  But now we're hearing that may not happen until January 2022 or even later.  Is the President comfortable with that timeline?

MS. PSAKI:  The President is comfortable with scientists and data experts moving on the timeline that that — they see is appropriate.  And I don't know that we know that to be factually true, to that — that to be the main driver.  I haven't seen data to suggest that, that the main driver of it is if it's formally approved or not.

A lot of the misinformation that is traveling out there is about the consequences and the impact of the vaccine.  It's not always tied to or necessarily tied to whether it's been formally approved or not.

Obviously, that may give medical experts or others some greater level of confidence.  We will see.  But the President is going to leave it to the FDA to determine the timeline.

Q   So the President doesn't have any concerns about the length of time that the approval process takes currently at the FDA?

MS. PSAKI:  He's going to allow them to move at the pace of science.

Q   Okay.  And then I want to ask you about the new reporting about Joint Chiefs Chairman General Milley, who had, apparently, some very serious national security concerns just before President Biden took office.  Did he brief then President-elect Biden about his fears about a strike on Iran or about the possibility of an attempted coup?

MS. PSAKI:  I'm not going to speak to private national security consequ- — or conversations, I should say.  Obviously, the President had many conversations with General Milley — Miller during his time in his role, and most of those — or none of those — do we read out.

I will say that he strongly respects General Miller.  As you know, he had the opportunity to sit down with him on Wednesday, thank him for his

outstanding leadership of the Resolute Support Mission, including overseeing the vast majority of our drawdown from Afghanistan, which is a particular vulnerable period — during a particularly vulnerable period for our troops.

Q    How close does the President think we came to a possible war with Iran or an attempted coup here at home?

MS. PSAKI:  I'm just not going to speak to intelligence matters from here.

Go ahead.

Q    Thanks, Jen.  First on COVID origins: Is the White House worried that China continues stonewalling the World Health Organization investigators and now is saying things like they think maybe COVID-19 got into China through frozen food?

MS. PSAKI:  We are certainly remain- — continue to be concerned, Peter, about misinformation coming from voices in China about, certainly, the origins, their lack of participation in the process, their lack of willingness to provide data and information to the World Health Organization.

As you know, we're — are undergoing our own process here, our 90-day review here.  But certainly, the Chinese providing information, being in — a participant in the process, would aid — aid the effort.

Q    And then speaking of misinformation and the announcement from yesterday: For how long has the administration been spying on people's Facebook profiles looking for vaccine misinformation?

MS. PSAKI:  Well, that was quite a loaded and inaccurate question, which I would refute.

Q    Inaccurate how?

MS. PSAKI:  Well, Peter, first of all, as you know, we're in — we're in a regular touch with — with a range of media outlets —

Q    And we expect that the White House —

MS. PSAKI:  — as —

Q    — is watching Fox —

MS. PSAKI:  Let me finish —

Q    — but I don't think —

MS. PSAKI:  — as we are —

Q    — people posting on Facebook expect that —

MS. PSAKI:  — as we are in regular touch with social media platforms.  This is publicly open information — people sharing information online — just as you are all reporting information on your news stations.

Q    But — okay, so these 12 people who you have on a list — 12 individuals — do they know that somebody at the Surgeon General's office is going through their profile?

MS. PSAKI:  I'm happy to get you the citation of where that comes from.  There's no secret list.  I will tell you that these are people who are sharing information on public platforms — on Facebook — information that is traveling, is inaccurate.

Our biggest concern here — and I, frankly, think it should be your biggest concern — is the number of people who are dying around the country because they're getting misinformation that is leading them to not take a vaccine —

Q    But —

MS. PSAKI:  Young people, old people, kids, children — this is all being — a lot of them are being impacted by misinformation.

Q    The big concern though, I think, for a lot of people on Facebook is that now this is Big Brother watching you.

MS. PSAKI:  They're more concerned about that than people dying across the country because of a pandemic where misinformation is traveling on social media platforms?  That feels unlikely to me.  If you have the data to back that up, I'm happy to discuss it.

Q   Okay, and just about things that are on Facebook: I looked this morning, there are videos of Dr. Fauci from 2020, before anybody had a vaccine, and he's out there saying there's no reason to be walking around with a mask.  So, is the administration going to contact Facebook and ask them to take that down?

MS. PSAKI:  Well, first, I think what Dr. Fauci has said himself — who's been quite public out there — is that science evolves, information evolves, and we make that available in a public way to the American people.

Q   Exactly —

MS. PSAKI:  I have never seen any data to suggest that — that the vaccines cause infertility.  That is information that is irresponsibly traveling.  Okay.

Q   But — I just —

Q   (Cross-talk.)

Q   — just one more — sorry —

Q   (Cross-talk.)

Q   — excuse me, just one more — okay, about —

Q   (Cross-talk.)

Q   About the science — about the science evolving: Facebook used to post — used to block people from posting that COVID may have originated for a lab. That is something this President now admits is a possibility.  So is there any concern that the things you're trying to block or have taken down might someday turn out to be —

MS. PSAKI:  We don't take anything down.  We don't block anything. Facebook and any private-sector company makes decisions about what information should be on their platform.  Our point is that there is information that is leading to people not taking the vaccine, and people are dying as a result.  And we have a responsibility, as a public health matter, to raise that issue.  The responsibility we all have — the government, media platforms, public messengers — to give accurate information.

Go ahead.

Q   About the 12 individuals that are on that separate site — it's not from the White House; I don't have the source in front of me, but we've read it as well. Can you give us a sense of who those individuals are, as was asked before?

And what specifically — you've given a tough message to the social platforms that they should do more — the social media platforms.  What, from this podium, is the message to those individuals — the 12 of them — who are responsible for 65 percent of the misinformation that's out there?

MS. PSAKI:  The message is the same message as it is to every person out there who has a platform, whether that is an elected official or that is a person who is a civic leader: The vaccines are safe.  They're effective.  If people take them, they will save their life, in many cases.

And so our message to everyone who is sharing misinformation is that your — the steps you're taking are irresponsible, they could lead to people's — people getting very sick, and people ultimately losing their lives.  Why don't we all participate in a process that will help provide accurate information out there?

Q   Has the White House participated in any direct contact with these individuals, given the impact they're having, through any avenue to try to say, "Knock it off"?

MS. PSAKI:  No.  And I'm happy to get you guys the — the data on where we got that information —

Q   It's public.

MS. PSAKI:  Yeah, this a publicly available data — we'll get you the citation, is what I mean.

Q   Let me ask you, if I can, then about some of the other numbers as they relate to COVID.  Right now, obviously, due to the Delta variant, COVID cases are up sharply right now.  Testing is down right now.  How concerned is the White House that this variant, COVID, in general, is much more widespread than we're aware of publicly at this time?

MS. PSAKI:  You know, it's a great question.  I don't want to speak out of turn here, because it's really a question for the health and medical experts on how they're tracking it and how concerned they are.

We certainly know, on transmissibility — and based on the CDC data — that the Delta variant is the — is impacting the majority of people who are getting sick with COVID now.  We also know that 99.5 percent of people who are in the hospital are people who are unvaccinated, and people who are dying of COVID — unvaccinated.  The data is very clear.

As Dr. Walensky said on an earlier — an earlier briefing today, this is really becoming a pandemic of the unvaccinated, and that means getting vaccinated, you can save yourself.

Q   Is there anything that the White House is doing differently?  We saw the President, proudly, in Philadelphia, shaking hands with a lot of folks when he was there for his voting rights speech earlier this week.  We saw something similar last week when he was in Illinois.

Given the reporting about some breakthrough cases right now, are there any things that the White House is doing differently as it relates to your own staffing or the President's handling of his, sort of, activities due to those new numbers?

MS. PSAKI:  No, we are vaccinated.  The President is vaccinated.  You are all vaccinated.

Q   Okay, so breakthrough cases are not something that you — that you or Americans —

MS. PSAKI:  We get test- —

Q   — should worry about?

MS. PSAKI:  We still have a testing protocol and process in place for White House staff.  So that — that has continued.

Q   And for those individuals that he would be shaking hands with, there's not any — basically, shaking hands is good if you're vaccinated?

MS. PSAKI:  We have — we abide by public health guidelines as it relates to the President's engagements.  And if public health guidelines changed, which I'm not predicting, we would continue to abide by them.

Go ahead.

Q    Voting rights, Jen?  Voting rights?

MS. PSAKI:  I'll come to you next, April.

Q    Thank you, Jen.  Just a question on the meeting that you're having with the housing industry —

MS. PSAKI:  Yeah.

Q    — today at the White House.  How concerned is the White House about the supply shortage in the industry leading to inflationary pressures?  Is that a serious concern?  Is that why this meeting is being held?

MS. PSAKI:  The — the meeting is being held as part of our effort to connect suppliers who have said, in the past, to our economic experts, they don't always have the opportunity to talk to one another.

We know for — because of the pandemic, there have been supply shortages in areas that have led to a reduction of new building and construction, which has led to also an increase in housing prices, because there are just — certainly just not enough houses on the market.

So that's what it's related to, is an opportunity to discuss with them, bring them all together in a room.  And it's part of our multifaceted effort to address issues in the supply chain.

Q    And one on Cuba.  The President did say yesterday that the United States is trying to reinstate Internet access —

MS. PSAKI:  Yeah.

Q    — for Cubans.  And I was wondering if — if the White House or the administration has reached out to U.S. tech companies — I mean the Googles of the world — to help with that effort.

MS. PSAKI:  So it would really be led — that effort would really be led by the State Department and other appropriate entities within the federal government.

As the President noted yesterday, returning Internet access to Cuba would certainly be something we'd love to be a part of.  It is — we're looking at what our capacities and what our tools are we have.  In terms of more specific —

the specifics, the State Department would be the best entity to talk to about it.

Q    Jen, you said I was next.

MS. PSAKI:  Go ahead.  Oh, sorry, April.  Go ahead.  And then I'll come to you.

Q    On voting rights —

MS. PSAKI:  Yeah.

Q    On Tuesday, President Biden said — he called for activists to act on the issue of voting rights.  What did he mean by that?  Is that to escalate it higher to Republicans so that they can change their minds and maybe stop using the filibuster?

And also, what does he think about what happened yesterday with the arrest of the congresswoman and nine other Black women who peacefully walked through the Senate halls in the Hart building, chanting and singing and were arrested — not taken to a holding cell — holding area, but taken to a jail cell?

MS. PSAKI:  Well, April, first, he — what he meant by speaking out or having your voice heard, or the range of ways he said it, is that in order to make change happen in Washington, often you need to create a grassroots movement that's led by the American people.  And it's not just about whether we can — whether the minds of 10 Republicans can be changed directly by a phone call from a President.  It often requires activism, engagement of vocal opposition or — or excitement from — from members of the public.

That's going to take a lot of different forms — right? — and formats.  It can take letter writing, phone calling.  There's peaceful protesting.  There are a range of mechanisms for that.  And certainly, our country, even in recent years, has a great history of that.

And these — these members who were — some of them were members, I should say —

Q    One member.

MS. PSAKI:  One member who was arrested yesterday — they were peacefully protesting.  I would note that our support for the right to peacefully protest and to voice support for moving forward on voting rights

is exemplified by the fact that the Vice President is currently meeting right now with a number of members — they're here, a number of them are at the White House discussing exactly this issue, because we want to be standing by their side in this effort.

Q    So the — some of the civil rights leaders are here, as you said.  But last week, when the civil rights leaders were here, they said, "This is a summer of action."  They're expecting more protests.  Reverend Barber says he's going to have a bunch of women out on Monday.  There's going to be more protests on Wednesday.  More arrests — they're anticipating arrest to bring more attention to this.  Does the White House support that civil disobedience for arrests?

MS. PSAKI:  We support the right to peacefully protest.  We support people having their voices heard.  And certainly, there are a few issues that are more fundamental to our rights in this country than the right to vote.

Go ahead.

Q    So, thank you —

Q    For Africa, please.

MS. PSAKI:  I'll go to you right next, if that's okay. Go ahead.

Q    Just a clarifying question —

MS. PSAKI:  Sure.

Q    — and then a follow-up on Afghanistan.

MS. PSAKI:  Yeah.

Q    Yesterday, you said that 10,000 SIV applicants — or, excuse me, 20,000 Afghans have applied and that about half of that have completed necessary paperwork to move forward in the process.  Just what's "move forward in the process"?  Does that mean 10,000 SIV applicants will be evacuated?

MS. PSAKI:  No, that's not what it means.  It just means that they're in a later stage of the process.

Q    Right.

MS. PSAKI:  So, it just — it — just giving an update kind of on the (inaudible).  And as I said yesterday, that doesn't include family members; that includes individual interpreters or translators.  So it just means they're farther forward in the process.

There's another step in the process, which is security vetting, which would need to be completed before any individual is relocated to a base in the United States.  Individuals could be relocated to third countries before that process is completed.  So it was just an update kind of on where people stand in the process.

Q   And then just to take a step back, too — why did the administration wait until June 24th to commit to the evacuation? Why not have this be one of the early steps, right when the President announced this in April, I believe, while American troops were still on the ground?  I mean, announcing this just days before the combat mission is essentially over would seem to complicate the mission.

MS. PSAKI:  Well, I would say, first, there's always ongoing discussions, both with our partners in the region and others, before an announcement is made.  And sometimes it requires a process to get to the point where you are making an announcement about the relocation of thousands of individuals out of a country.

Second, I would say: We've also committed to not only relocating these individuals in advance of our men and wo- — servicemen and women coming out of Afghanistan.  We have quite a capable Department of Defense and diplomatic apparatus in Afghanistan and around the world to implement this.

But we've also committed to continuing this process from there and having a diplomatic presence on the ground from there.  So, this is not a process that will end, but this is a process that we announced at a time when a final decision was made, based on a range of factors internally.

Q   And have third countries outside of U.S. territories given the U.S. commitment — the administration commitment that they will house SIV applicants while they're still having their applications processed?

MS. PSAKI:  We're having a range of discussions, as you know.  When we're at the point where we have final agreements, and we don't — and we're — we're

confident that it won't impact the security of individuals who are being relocated, we'll share all of that information with you as well.

Q   But there's no commitments as of today?

MS. PSAKI:  I don't have any updates to provide to you today.

Q   Jen —

MS. PSAKI:  Oh, I'm sorry.  Go ahead.

Q   Yes.  What can Africa expect from this administration in terms of its engagement in helping solving some problems that we are having right now? For example, Angola is fighting corruption.  And also, can we expect some revision in the sanctions in Zimbabwe?

MS. PSAKI:  I don't have any update for you on considerations around sanctions.  I'd point you to the Department of Treasury or the Department of State on that.

We, of course, will remain deeply engaged with our African partners on a range of issues — whether it's corruption, or facing and fighting the COVID pandemic, or economic opportunity and development.

And I would note that we have a number of leaders high up in the government, including our U.N. ambassador, Linda Thomas-Greenfield, who has spent quite a bit of time of working with leaders in the region and playing a front-and-center role for the United States government.  But in terms of specifics on Zimbabwe or Angola, I would point you to the State Department.

Q   Regarding misinformation, do you have any data that shows that children have been affected by misinformation?  And how do you see if we should educate children about these issues?  Because I'm working on a show that will inform little kids about many different things, and I'm also concerned about misinformation.  So, in your research about misinformation, is there any misinformation affecting children as well?

MS. PSAKI:  That's a really interesting question.  I don't have any data at my fingertips.  I will reiterate that, of course, children are not eligible — under the age of 12 — yet for vaccines in the United States.  And health — and health infor- — or decisions about the health of children — as a parent myself — would obviously be made by the parents in — in coordination with doctors.

But I would say there's no question that when there's information — the example I gave earlier about the impact on fertility of — which is inaccurate and false; which is still traveling around the Internet.  If you're a parent, that would give you pause, if you think that is accurate information, about your child and about your child getting vaccinated.

So that's an example.  I don't have data, but just an example that could be applicable.

Go ahead.

Q   Yeah, thank you, Jen.  I had a question about the direct funding to states and cities from the American Rescue Plan —

MS. PSAKI:  Sure.

Q   — the $350 mil- — billion.  I was talking to the Treasury Department; about $200 billion has gone out, and several cities and states have been quick to allocate that money.  But there's other mayors and governors who I've talked to who have spent very little of that funding so far — in some cases, none of it — either because of battles with their state legislatures over the funds, their late budget cycles, lengthy public input processes, or they're simply doing better than expected, revenue wise, and so there hasn't been a sense of urgency for them.

And so, my questions are: You know, does it concern the White House that some places haven't gotten their money out quicker?  And does the White House have a message to governors and mayors that don't have any plans yet to spend their funds?  And finally, does that signal — the situation I described of not — of some folks not spending their money quickly — does that signal that the money wasn't urgently needed?

MS. PSAKI:  Well, I would say, first, the — in the — ensuring that states and local governments had the funding they needed to keep employees on the job, to keep cops on the beat, to rehire them, in many cases, was a priority when we were negotiating the American Rescue Plan for a range of elected officials, including mayors and governors across the country, for good reason.

It sounds like there's some different case-by-case scenarios that have made it more challenging in certain governments and localities.  We have an entire

team here and at the Treasury Department that works closely with them.  It may be most constructive for you to talk directly to them — either Gene Sperling or Jacob Leibenluft — about different issues that are having — happening in different cities or states.

Q    But you have confidence that money is being well spent and that, you know, they're going to get it out to address what you identified as a problem for cities and states?

MS. PSAKI:  Absolutely.  And there is, of course, a range of options that cities and localities have for using the funding.  And we wanted to provide that flexibility on purpose because one city or town or state does not fit all.  One size doesn't fit all, I should say, for cities, towns, and localities.  That was important — that flexibility.

There are still restrictions on how it can be used and how it's implemented.  We, obviously, also — which is not what you're asking, but I'm just going to reiterate —

Q    Yeah.

MS. PSAKI:  — take waste, fraud, and abuse incredibly seriously.  The President is "Sheriff Joe" in his heart and forever.  So that's something we watch, but I would — I would say it might be constructive for you to talk to them directly about the implementation piece, and I'm happy to connect you directly.

Q    Thanks, Jen.  Jen, vaccination rates are actually going up in the five states that have the highest —

MS. PSAKI:  Yeah.

Q    — case rates right now.  What does the White House think is driving that?  And what is being done there that the administration could apply to other hotspots?

MS. PSAKI:  Yeah.  Karen — and I know this was announced on our COVID briefing, for those of you who were not on it — in the past week, the five states with the highest case rates — Arkansas, Florida, Louisiana, Missouri, and Nevada — had a significantly higher rate of people getting newly vaccinated compared to the national average, which we obviously see is a

good sign.  And in the last 10 days, 5 million shots have been administered and millions got their first shots.

It's hard to pinpoint one particular piece.  But what I would say is that we're continuing to work to apply the lessons we've learned over the last few months.  The biggest issue far and away is access, and that means something different in different communities.

In some communities, it is ensuring that people know that they can take time off of work — because of the kind of jobs they're working.  In some communities, it is meeting people where they are: in places of worship; mobile clinics, which is something we're doing a lot in rural communities; walk-up pharmacy appointments; at their workplace or in schools.

We are also continuing to fund, support trusted messengers because we have seen, time and time again, that it is more effective.  And many of you have covered political campaigns; this is not a surprise to most people who have covered a ca- — political campaigns.  Trusted messengers are people in communities — they are neighbors, they are civic leaders, they are clergy.  They're not always the President of the Uni- — sometimes it is, but — and they are medical experts.

And so, we are continuing to support those efforts.  We think that all of those have been effective.  There's still — still more work to be done, but certainly, that's encouraging — those trends that we've seen.

Q    Jen, how concerned are you, though, that things have to get worse in these hotspots before they get better; that fear is driving the vaccination rate?  How concerning is that to the White House?

MS. PSAKI:  Well, that is not our preference.  You know, that is why we have made vaccines so readily available for months now.  That's why we have employed these tactics for months now — making vaccines readily available, accessible, working with trusted messengers and partners.

We also, though, have seen — in some communities where local news stations are covering young people, unfortunately, who are getting sick — some being put on ventilators.  I don't know — I can't tell you from data what impact that is having, but we are seeing, in areas where there are lower vaccination rates, some — some positive signs over the last week.  We'll see if that continues.

Go ahead.

Q   Jen, thank you.  I have two COVID questions and one voting rights question.

MS. PSAKI:  Okay.

Q   I'll try to make it fast.  On COVID, you and Dr. Walensky have used this phrase: "the pandemic of the unvaccinated."  And I am wondering if any part of that is the administration distancing itself from responsibility for the pandemic, because you've been trying to get people vaccinated, or if it's a scare tactic.

MS. PSAKI:  Well, I would say, first, the data speaks for itself, which 99.5 percent of people who are in hospitals because of COVID are unvaccinated. What it is our responsibility to do is provide accurate public health information to the public.  It is also our responsibility to stay at it and continue to communicate, to fund programs, to support trusted messengers, to get out into local communities, to use what we see as creative partnerships, to meet people where they are.

We haven't stopped that.  We haven't halted it.  We haven't even slowed it down.  But certainly, from the public health experts, et cetera — and I repeated what Dr. Walensky said, because she is, of course, a doctor and I am not — it is important for people to understand that the vaccine is safe.  It will keep — it will protect them.  And it is as simple as that sometimes.

Q   On Olivia Rodrigo, was this sort of a one-off thing?  I know that you had worked with other celebrities before and you announced the NASCAR thing, but is there more work with young celebrities or country stars or anything else that's coming?  Or was that more of — part of the month of action that's behind us?

MS. PSAKI:  Wouldn't it be great if this was the cue for like Blake Shelton and Gwen Stefani to come out — (laughter) — from — that would be awesome.  I wish that was happening today.

It is — it is a part of an ongoing effort.  And we want to partner with trusted voices and individuals in communities — many of whom you will never have heard of, and they may have five Twitter followers — if they're on Twitter,

which they probably are not if they're not on the coast and not liberal. (Laughter.)

But we will also use — we'll also work with celebrities.

Q    Slipped that one in, didn't you?

MS. PSAKI:  And we will work — we will also work with individuals like Olivia Rodrigo.  I know I said this the other day, but obviously she's a very well-known pop star.  She's 18 years old.  She doesn't have to use her time to do this.  She is speaking to a broad swath of an audience that I bet you is not watching the White House briefing and is probably not watching the President of the United States.  And we recognize that we need to meet people where they are, including as we use partnerships and medi- — and engage with media as well.

Go ahead.

Q    And I'm very sorry to have one more.  But on voting rights, you know, the President, on Tuesday, called on Congress to pass federal voting legislation. He spoke about the urgency of it.  The question is: What comes next?  Is he going to travel around the country and make this case?  Is he going to go up to the Hill and have meetings specifically about voting rights?  I know that he has talked about, you know, activist need to build the grassroots.  But some activists are sort of pushing back on that idea, saying like, "We can't always be the ones that are asked to do the work."

MS. PSAKI:  He's not saying to do it alone.  He's saying, "I will be with you." But he's also saying that grassroots activism is what is going to move and change the country for the better.  That's always been the case throughout history.  In terms of what he will say and do, I don't have any scheduling announcements for you at this point in time, but he has said this would be a cause of his presidency.  That means he will use his time, use the plat- — his platform to make sure he's speaking about elevating it, engaging in it.

And, as you know, the Vice President — this will be a top priority for her.  She will be front and center for the administration on this issue moving forward.

Go ahead.

Q   Thanks, Jen.  Just given the Wednesday timeline that Senator Schumer has laid out, what will the President be doing over the weekend to help things move along?  Will he be making calls all weekend?  And then what's his response as well to Republicans who are concerned that tougher enforcement in the IRS won't be enough to generate enough revenue?

MS. PSAKI:  Well, first, I would say: The President has proposed a number of ways to pay for these proposals that have — have been out there in the public and has been a part of these ongoing discussions, which are continuing.  And those proposals — he has a number of proposals out there that would more than cover the cost of this — of this infrastructure agreement that do not violate what the Republicans have said is their red line in this case, which is the 2017 tax cuts, regardless of his point of view on that; we'll take that on in the Build Back Better reconciliation package.

In terms of what he will be doing, the President is ready, willing, able, looking forward to playing any constructive role he can play in getting these pieces of legislation across the finish line.  Will that mean phone calls?  Sure.  Will it mean bringing more people to the White House?  It probably will.  But I don't have anything to, kind of, lay out for you here.

Q   And separately, has the intelligence community attributed the Kaseya ransomware attack to the Russian government?  And has it been concluded that the RNC was indeed hacked?

MS. PSAKI:  Well, first, I would say: The RNC put out a statement, when that news came out, saying it was a third party that had their information accessed, not the RNC — a vendor of the RNC's.  I'm not aware of the information there changing.  I would point you to them on that.  The FBI is, of course, doing an investigation and in touch with them.  I don't think they've put out any new information since then.

In terms of the Kaseya attack, we have pointed to the fact that REvil has — many cyber experts have — have attributed — have assessed their engagement here.  We have not attributed the Russian government's involvement in this case.  It's an ongoing — an ongoing review, but we have not — we don't have any new information on that front.

Q   Jen —

Go ahead.

Q   Hi, Jen.  I'm curious if the uptick in the Delta variant, if that is playing any part in where the President is leaning in terms of extending that federal mask policy on public transportation?  I know it's set to expire in September.  Is he leaning towards extending that even more?  We're seeing some health officials say that they want to extend it even now.

MS. PSAKI:  Well, he's going to lean into the advice of his health and medical experts and teams on any steps that need to be taken to keep the American people safe.  Given we're talking about September, I know that feels like a short period of time away.  It is actually some time away.  But he'll continue to receive updates from them on a range of issues as it relates to COVID.  I'm sure they'll discuss this and their views.

Q   And on that same note, he said yesterday that he's going to take into consideration some factors before he talks about what will happen with the European travel ban.  Is that going to play a part into that with the Delta variant coming up?

MS. PSAKI:  Well, as it relates to the travel ban, we certainly know we've made important progress in the pandemic.  We'll continue to put public health first.

The President — all decisions about reopening international travel will be guided by our public health and medical experts.  There are ongoing working groups that are having these discussions to keep open lines of communication.  He will be receiving an update soon, I believe — if not today, then in the coming days — on where things stand.

But we must be vigilant, particularly about the spread of variants.  We'll reopen when health and medical experts expect it is safe to do so.

Go ahead.

Q   Thanks, Jen.  Does the President plan to reappoint the Fed Chairman to another term?

MS. PSAKI:  I have no announcements or pronouncements on the Federal Reserve Chair or any other personnel to convey to you today.

Q   Is there a timeline for that decision?

MS. PSAKI:  I don't have a timeline to project.  I know that there's a timeline for when the — when his — his service is — will need to be reviewed or determined.

Q   Can I do a quick follow-up on that?

MS. PSAKI:  Go ahead.  Let me just get around.  Let me just get around.  Let me just get around.

Go ahead.

Q   I had a question about the Belarus, if I may —

MS. PSAKI:  Sure.

Q   The Belarusian opposition leader, Sviatlana Tsikhanouskaya, will be in Washington next week.  And she said she would meet high-ranking officials.  I was wondering whether you have details about that.

MS. PSAKI:  I don't with me. Let us get it to you after the briefing.  Members of the national security team or the State Department — was she more specific — or just people from the U.S. government?

Q   She just said "high-ranking officials."

MS. PSAKI:  Okay.  Let us get you more information after the briefing.

Reese, who is our special guest from — tell us where you're from.

Q   Oklahoma.

MS. PSAKI:  Who's not been — have you been here before?

Q   I've never been here before.

MS. PSAKI:  Okay.

Q   Dun-dun-dun.  (Laughter.)

MS. PSAKI:  Welcome.

Q   Thank you.  So I — my question is really just about what we kind of touched on — the vaccination rates in like rural country — rural counties.

Especially in Oklahoma, we're seeing a significant rise in COVID cases.  Is there any specific plans that the administration has to help increase vaccination rates in these rural counties that — really, these people don't have any intentions of even getting the vaccine?

MS. PSAKI:  Well, we've talked about this a little bit.  But what we're doing in rural communities is employing a number of the tactics that we've seen work around the country.  So, we also — we know access is a huge issue in rural communities, because people may not le- — live near a pharmacy.  They may not know, still, where to get a vaccine.  We certainly understand that.

So, part of what we're trying to do is deploy and make sure we're expediting our deployment of mobile vaccine units to rural communities to bring the vaccine to people where they are and where they live to make it as easy as possible.  And so, this work is going to continue person to person, community to community.

We're also working with a range of trusted part- — partners, locally, you may — people may not have heard of —  those are also very important trusted voices — but also groups like the National Rural Health Association to make sure that we're deploying effective tactics that they think will work to get vaccines out to communities and meet people where they are.  We've talked about it a little bit here.

And obviously, these states have a combination of rural and city communities, but there are states — states like Arkansas, Louisiana, Missouri — where there are large, rural communities where we have seen an uptick, which is a po- — in terms of vacci- — getting vaccinated, higher than the na- — national average.  That's a positive sign.

We'll look at that and apply those tactics other places — in Oklahoma — to make sure we're continuing to go community by community to meet people where they are.

Go ahead.

Q    And following up on that: I know the administration has said they're not interested in any sort of federal mandate.  Do you encourage, though, employers to require the vaccine for their employees?  Or state and local — I know there's a little bit of discussion about local governments.  Is the White

House encouraging others to require the vaccine of their employees or their residents?

MS. PSAKI:  We know that some employers, hospitals, health systems, colleges, universities, local leaders have chosen to take this step.  And we expect others to do so as well.  But our role we're playing from here is continuing to go community by community, person to person, making sure we are meeting people where they are to get the vaccine out.

We believe that local communities, entities, organizations are going to make decisions about what they need to do to keep their community safe.

Q   And what about for federal workers or members of the military?

MS. PSAKI:  I don't have anything new to report on that.

Go ahead.

Q   Question.  The Justice Department Inspector General's report on the FBI handling the Nassar case — that's the latest embarrassment in a string of embarrassments for the FBI this summer.  Does the President have complete confidence in Christopher Wray?  And what is the administration's message to people who see this bungling and want to know if the FBI is up to task with ransomware, domestic terrorism, and other threats?

MS. PSAKI:  Well, first, I would — I would point you all to the expansive statement that was put out by the FBI in response to the Inspector General's report.  Second, yes, he has confidence in Christopher Wray.  Third, as it relates to ransomware, this is an across-government interagency effort, one that we have not seen done in the past.

I gave a little bit of an update in a readout of it yesterday, where we're tapping into all of the resources and expertise across the federal government.  The FBI has been a key partner in that, as have another — number of entities in our national security team who can play a role in fighting against ransomware.

Go ahead.

Q   (Inaudible.)

MS. PSAKI:  Oh, go ahead.

Q   So —

MS. PSAKI:  And then we'll go — oh, I'm sorry.  Go ahead.  We'll go to you in the back.

Q   Thanks.

MS. PSAKI:  Go ahead.  Go ahead.  Sorry.

Q   Okay.  So, you haven't talked about APEC.  This was a —

MS. PSAKI:  Yeah.

Q   — conversation that the President had this morning.

MS. PSAKI:  No one has asked about it.  Now is the moment.  (Laughter.)

Q   I'm asking right now.  And so there seems to be a convergence between President Biden, President Xi, and also President Putin in terms of making and sharing and distributing vaccines.

My question is the mechanism of it.  We know that APEC supports the TRIPS waiver, as does President Biden.  Was there pressure from APEC member countries to have the U.S. put more diplomatic pressures on WTO countries to pass the patent waivers?

MS. PSAKI:  Well, first, I would say the President's view continues to be exactly as you laid it out there.  This is a long-going — ongoing process.  And Ambassador Tai is our lead representative in these discussions and negotiations.  The APEC summit, for any of you who watched parts of it, was virtual and was individuals delivering sets of remarks.

It wasn't an interactive opportunity, I would say, and President Xi actually delivered prerecorded remarks, so he wasn't even there participating in person.

Q   And just to follow up on the health misinformation —

MS. PSAKI:  Or on virtually live, I should say.  Yes.

Q   Following up on the health misinformation, do you consider claims by some in the conservative circles that ivermectin — am I pronouncing that

right? — as a promising treatment for COVID as misinformation?  I know that the FDA has weighed in on this — I believe in March — but I just wanted the administration's latest position on the drug.

MS. PSAKI:  Information that's inaccurate we consider misinformation.  So I don't think it's more complicated than that.

Go ahead.

Q   (Cross-talk.)

MS. PSAKI:  Go — oh, oh.  Let Ebony go.

Q   (Cross-talk.)

Q   Did you all delay the departure?

Q   (Cross-talk.)

MS. PSAKI:  Did we what?

Q   Have you all delayed the departure?

Q   Yeah, we were supposed to gather at 2:10, but I was told hard out at 2:15.

Q   Yeah, we were supposed to gather.  I'm just making sure that —

MS. PSAKI:  Oh, okay.

Q   Yeah.

MS. PSAKI:  Brian, thank you.  You get an internship or something, I don't know.

We — we have four more minutes left.  So we'll get to as many as we can.

Q   (Cross-talk.)

MS. PSAKI:  Go ahead, Ebony.  Go ahead.  And then we'll go —

Q   (Cross-talk.)

Q   The women that are meeting with the Vice President today, most of which have basically said that they want the President to really talk about the

filibuster — removing it or reforming the filibuster.  And so, with each of the meetings that they're having, still coming out wondering, what is the hope that's going to happen?  Because just about every single woman that is in that room has spoken about it.  That's my first — my first question.

And even though you also said that there isn't a plan right now for the President to go to Arizona or to go to other states,  why isn't there, right now, that kind of plan?  Because they have come out and said that they put — the administration has put a lot on them, but they're waiting to see something back.

MS. PSAKI:  Well, I've laid out for you what we know about our schedule, which is through next Wednesday.  So it doesn't mean that he's not going to go out in the country and talk about a range of important priorities in the future.  And I don't want you to take it that way.  That was not what I was implying.

But we're — we're about — we have about four days out here, in terms of our scheduling, that I can provide to all of you.

As it relates to the women who are in this room, let's see; maybe they'll go to the stakeout and they'll talk about their meeting and their engagement.  And the message that the President is sending, the Vice President is sending is that we're absolutely committed to getting the For the People Act signed into law; that we're committed to advocating for, to elevating voting rights — is an important issue for people across this country.  And I think our actions clearly exemplify that.

Go ahead.

Q   Quickly, a clarifying question —

MS. PSAKI:  Yeah.

Q   — on how you identify this misinformation.  I'm wondering if you could tell us specifically how the administration identifies what is misinformation and how you flag it to Facebook?  That's one.

Two is: How many times had the administration flagged this kind of information?

And then three, how long has this been going?

And then, finally, I know that you are deadly serious about this conversation. You talked about how this is life and death.  But are there any types of safeguards that the administration is putting in place to make certain that they do not chill free speech while they are going after this kind of misinformation?

MS. PSAKI:  First of all, to be crystal clear: Any decision about platform usage and who should be on the platform is orchestrated and determined by private-sector companies.  Facebook is one of them, right?  And there are a range of media who are — also have their own criteria and rules in place, and they implement them.  And that's their decision to do.  That is not the federal government doing that.

It is life and death.  It is a public health issue in the country.  That's why the Surgeon General was here talking about it yesterday.

There are trends, we can see, any — you can all probably see on Facebook and other social media platforms.  And so what we raise are issues like: there is a lot of information out there about — about the false claim that COVID-19 causes infertility.  Everyone in this room knows that's factually inaccurate. We raised for them, in our direct channels — of which every administration has always had with every social media platform — that we are seeing this trend.  It's troubling.  That information is inaccurate.

Q   But specifically, so you're not going after — you're saying these are general areas of misinformation that you should take a look at —

MS. PSAKI:  Yeah.

Q   — and not specific posts.

MS. PSAKI:  Yes, it is also publicly available who the individuals are who have — who have spread most of the information.  It wasn't publicly available by the United States government.  It's publicly available information.  So that's how it works.

Q   (Cross-talk.)

MS. PSAKI:  Okay, thank you, everyone.  I've got to wrap it up.  I'm sorry.

2:17 P.M. EDT

# EXHIBIT 35



POLITICS

# 'They should be held accountable': White House reviews platforms' misinformation liability



**Matthew Brown**
USA TODAY

Published 9:42 a.m. ET July 20, 2021 | **Updated 8:06 p.m. ET July 20, 2021**

**Key Points**

- Section 230 protections for social media companies is under review, related to COVID misinformation.
- Communications director Kate Bedingfield says the White House: 'they should be held accountable.'
- Tensions have run high between White House, Facebook since commends from surgeon general, Biden.

WASHINGTON – The White House is assessing whether social media platforms are legally liable for misinformation spread on their platforms, White House communication director Kate Bedingfield said Tuesday.

"We're reviewing that, and certainly, they should be held accountable," she confirmed during an interview on MSNBC's "Morning Joe."

Bedingfield specified the White House is examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites.

**President backpedals:** Biden reverses course on Facebook, says platform isn't 'killing people' with vaccine misinformation

Relations are tense between the Biden administration and social media platforms, specifically Facebook, over the spread of misinformation online.

Misconceptions and distrust of information about the coronavirus and vaccines have hindered the country's pandemic response, a challenge the administration is determined to address.

**True or false?** Biden said COVID-19 vaccine misinformation on social media is 'killing people.' These are the biggest myths spreading online.

Friday, President Joe Biden said Facebook is "killing people," an assertion he softened Monday. Other officials within the administration have expressed public frustration that misinformation and vaccine hesitancy has created a "pandemic of the unvaccinated."

The White House resisted claims that it is trying to direct the moderation of content on Facebook, though aides, including Surgeon General Vivek Murthy, said they are in "regular contact" with social media platforms about content posted on their sites.

"We are not at war with any social media platform, we are at war with the virus," White House press secretary Jen Psaki said Monday during a briefing. The White House has not asked Facebook to take down any individual social media posts, she said, but the administration monitors publicly available data on what is trending on the platform.

"It's up to social media platforms to determine what their application is of their own rules and regulations," she said.

*Follow Matthew Brown online @mrbrownsir.*

**Is banning Trump from Facebook a First Amendment issue?** Clarence Thomas, other conservatives say it is

# EXHIBIT 36



○ WATCH **LIVE**    

**TECH**

# White House says social media networks should be held accountable for spreading misinformation

PUBLISHED TUE, JUL 20 2021·8:51 AM EDT    UPDATED TUE, JUL 20 2021·12:06 PM EDT


**Jessica Bursztynsky**
**@JBURSZ**

WATCH LIVE

## KEY POINTS

Social media giants should be held accountable for publishing misinformation, the White House's communications director said Tuesday.

The comments are the latest from the Biden administration in a tiff over whether or not social media companies, specifically Facebook, are harming users by showing Covid-19 misinformation.

When asked by MSNBC's Mika Brzezinski whether these companies should be held liable for publishing false information that causes people harm, Kate Bedingfield said the administration is reviewing policies.



Facebook CEO Mark Zuckerberg testifies during a remote video hearing held by subcommittees of the U.S. House of Representatives Energy and Commerce Committee on


MARKETS


CNBC TV


WATCHLIST


MENU

Social media giants should be held accountable for publishing misinformation, the White House's communications director said Tuesday.

The comments are the latest from the Biden administration in a tiff over whether or not social media companies, specifically Facebook, are harming users by showing Covid-19 vaccine misinformation.

When asked by MSNBC's Mika Brzezinski whether these companies should be held liable for publishing false information that causes people harm, Kate Bedingfield said the administration is reviewing policies. That could include amending the Communications Decency Act, or Section 230 of the act.

"We're reviewing that, and certainly they should be held accountable," Bedingfield said. "And I think you've heard the president speak very aggressively about this. He understands this is an important piece of the ecosystem."

White House press secretary Jen Psaki previously said the Biden administration had started "flagging problematic posts for Facebook that spread disinformation," and that the government had proposed changes to major social media platforms.

Tuesday's comments follow a fight between the White House and Facebook, after President Joe Biden last week said that giants like Facebook were "killing people" by allowing disinformation regarding Covid vaccines.

"I mean they really, look, the only pandemic we have is among the unvaccinated, and that's — they're killing people," Biden said Friday.

Facebook responded by saying the company "will not be distracted by accusations which aren't supported by the facts."

Biden later clarified that it wasn't Facebook that was killing people, but the users who were posting the falsehoods. However, he said he hoped Facebook would do more to fight "the outrageous misinformation" about coronavirus vaccines being spread on its platform.

"Again, I would go back to, there are conservative outlets who are creating irresponsible content, that are sharing misinformation about the virus that's getting shared on these platforms," Bedingfield said.

The White House did not immediately respond to CNBC's request for additional comment on Bedingfield's remarks.

*-- CNBC's Kevin Breuninger contributed reporting.*

*Subscribe to CNBC on YouTube.*


MARKETS


CNBC TV


WATCHLIST


MENU



○ WATCH **LIVE**    🔍

**VIDEO**   02:23
**We've seen some weakness in Tech, says Wilmington Trust's Meghan Shue**

## Squawk on the Street

WATCH IN THE APP

UP NEXT | **TechCheck** 11:00 am ET

### TRENDING NOW



1

**Mortgage demand falls to the lowest level in 22 years amid rising rates and slowing home sales**



2

**This 52-year-old early retiree left the U.S. for Portugal with his family—and spends $2,450 per month**



3

**A record-high Social Security cost-of-living adjustment in 2023 may affect program's depletion dates**



4

**Watch: Ukraine President Zelenskyy asks U.S. corporate leaders to leave Russia and move to Ukraine**



5

**Stocks fall as investors weigh rising yields, economic growth concerns**

Sponsored Links  by Taboola

FROM THE WEB


MARKETS


CNBC TV


WATCHLIST


MENU

Glenn Decl. Ex. 36
Page 3 of 5



○ WATCH **LIVE**  

**Top analyst warns: The '"Superbubble" is popping**

**Investing Outlook**



Subscribe to CNBC PRO

CNBC Councils

CNBC on Peacock

Join the CNBC Panel

News Releases

Corrections

Internships

Podcasts

Careers

Contact

Licensing & Reprints

Supply Chain Values

Advertise With Us

Digital Products

Closed Captioning

About CNBC

Site Map

Ad Choices

Help

     

**News Tips**

Got a confidential news tip? We want to hear from you.

GET IN TOUCH

 **CNBC Newsletters**

Sign up for free newsletters and get more CNBC delivered to your inbox

SIGN UP NOW

Get this delivered to your inbox, and more info about our products and services.

Privacy Policy

Do Not Sell My Personal Information

CA Notice

Terms of Service

© 2022 CNBC LLC. All Rights Reserved. A Division of NBCUniversal

Case 3:22-cv-01213-TAD-KDM   Document 10-1   Filed 06/14/22   Page 481 of 926 PageID #: 639



Data also provided by

WATCH **LIVE**

MARKETS

CNBC TV

WATCHLIST

MENU

Glenn Decl. Ex. 36
Page 5 of 5

# EXHIBIT 37

▼ DOW      -0.30%
▼ S&P 500   -0.23%
▲ NASDAQ   +0.21%

Audio   Live TV   Log In

**Fear & Greed Index**
What emotion is driving the market now? Click here to see today's reading

## Facebook takes action against 'disinformation dozen' after White House pressure

By Oliver Darcy, CNN Business
Updated 8:17 PM ET, Wed August 18, 2021

**(CNN Business) —** Facebook on Wednesday announced that it had taken action against the so-called "disinformation dozen," one month after the White House singled out the twelve people and argued that they were responsible for a majority of coronavirus misinformation.

In making the announcement, Monika Bickert, vice president of content policy at Facebook, pushed back against the narrative that the twelve accounts were primarily responsible for the spread of vaccine misinformation, writing that focusing on them "misses the forest for the trees."

But, Bickert said, "Any amount of COVID-19 vaccine misinformation that violates our policies is too much by our standards — and we have removed over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people, for violating our policies."

Bickert added that Facebook had "also imposed penalties on nearly two dozen additional Pages, groups or accounts linked to these 12 people" and "applied penalties to some of their website domains."

The "disinformation dozen" was initially identified in March by the nonprofit Center for Countering Digital Hate which called on Facebook (FB) to shut down pages operated by those people.

The White House seized on that report and hammered the platform in July for allowing the people identified in the report to remain on its platform.

"There's about 12 people who are producing 65% of anti-vaccine misinformation on social media platforms," White House Press Secretary Jen Psaki said at the time.

On Wednesday, after Facebook's action against the "disinformation dozen," a White House spokesperson continued to strongly criticize the company.

"In the middle of a pandemic, being honest and transparent about the work that needs to be done to protect public health is absolutely vital, but Facebook still refuses to be straightforward about how much misinformation is circulating -- and being actively promoted -- on their platform," a White House spokesperson told CNN Business.



**Related Article:** White House turns up heat on Big Tech's Covid 'disinformation dozen'

"It's on everyone to get this right so we can make sure the American people are getting accurate information to protect the health of themselves and their loved ones -- which is why the Administration will continue to push leaders, media outlets, and leading sources of information like Facebook to meet those basic expectations," the spokesperson added.

Facebook said in July that it had taken some action against pages associated with the "disinformation dozen." But the company would not offer more specificity at the time.

Facebook has still not removed every account linked to the group.

Bickert said Wednesday that "the remaining accounts associated with these individuals are not posting content that breaks our rules, have only posted a small amount of violating content, which we've removed, or are simply inactive."

One of those pages not taken down belonged to Robert F. Kennedy Jr., a prominent anti-vaccine figure, who was previously booted from Facebook-owned Instagram, but not Facebook.

At the time, a Facebook spokesperson told CNN, "We don't automatically disable accounts across our apps, because the accounts may post about different things on our different services."

Search CNN...

Audio   Live TV   Log In

## Log In

Live TV

Audio

US

World

Politics

Business

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Audio

CNN Underscored

Weather

More

**FOLLOW CNN BUSINESS**

 



Most stock quote data provided by BATS. Market indices are shown in real time, except for the DJIA, which is delayed by two minutes. All times are ET. Disclaimer. Morningstar: Copyright 2018 Morningstar, Inc. All Rights Reserved. Factset: FactSet Research Systems Inc.2018. All rights reserved. Chicago Mercantile Association: Certain market data is the property of Chicago Mercantile Exchange Inc. and its licensors. All rights reserved. Dow Jones: The Dow Jones branded indices are proprietary to and are calculated, distributed and marketed by DJI Opco, a subsidiary of S&P Dow Jones Indices LLC and have been licensed for use to S&P Opco, LLC and CNN. Standard & Poor's and S&P are registered trademarks of Standard & Poor's Financial Services LLC and Dow Jones is a registered trademark of Dow Jones Trademark Holdings LLC. All content of the Dow Jones branded indices Copyright S&P Dow Jones Indices LLC 2018 and/or its affiliates.

Terms of Use   Privacy Policy   Do Not Sell My Personal Information   Ad Choices   About Us   CNN Store

Newsletters   Transcripts   License Footage   CNN Newsource   Sitemap

© 2022 Cable News Network.  A Warner Bros. Discovery Company.  All Rights Reserved.

Audio   Live TV   **Log In**

Glenn Decl. Ex. 37
Page 3 of 3

# EXHIBIT 38

BRIEFING ROOM

# Press Briefing by Press Secretary Jen Psaki, February 1, 2022

FEBRUARY 01, 2022  •  PRESS BRIEFINGS

James S. Brady Press Briefing Room

2:27 P.M. EST

MS. PSAKI:  All right.  Kristen, welcome back.

Q    Thank you, Jen.  I appreciate it.

MS. PSAKI:  Okay.  We missed you.

A couple of items for you all at the top.  I know there was some good questions yesterday about the status of the infrastructure law implementation, so I just wanted to bring you a few updates that are hopefully helpful to all of you.

In the 79 days since the bill — the law was signed, our team has hit the ground running to get money out the door, engage partners, and provide comprehensive resources to help municipalities unlock funding opportunities so no community is left behind.

To date, over $80 billion has already been allocated and is headed out to states, territories, and local governments.  That includes over $50 billion to states for highways and roads; $14 billion for 500 Army Corps projects; over $5 billion for — to states for bridges; over $7 billion to states for water infrastructure; $3 billion to repair and rebuild over 3,000 airports; $1 billion to support Superfund cleanup to 49 sites; and $239 million in Port Infrastructure Development Grants.

And this is just the beginning, and we'll do our best to provide you all updates in here on the status of these funds being allocated.  State, local, Tribal, and territorial governments will receive over 90 percent of funding from the Bipartisan Infrastructure Law to rebuild their communities.

We mentioned yesterday — or I talked a little bit yesterday about this large guidebook we had put out to provide guidance and information to communities to apply for the part of this that will be through competitive awards.

As we did with the American Rescue Plan, we also know that local leaders have the best sense of where the communities need funding.  And the formula funds in the Bipartisan Infrastructure Law include flexibility to deal with unique local and state challenges.

As we've also said many times, with flexibility comes great responsibility to use funds wisely.  So, to ensure accountability and transparency, Mitch Landrieu and the infrastructure team convened a meeting with inspector general — inspectors generals — general from all agencies with funding from the infrastructure law to discuss oversight and transparency.  He called for each state to appoint an infrastructure implementation lead, and we are committed to showing transparency on how money is allocated and spent.

Also, one other update for all of you at the top.  As you know, the President is headed to New York City on Thursday, and I wanted to give you a quick preview of his trip.

He will be joined on the trip by Attorney General Garland to talk about the steps the administration has taken so far to reduce cri- — gun crime, and how we can be a strong partner for New York City and other cities grappling with increased gun violence over the past two years.

The President and the Attorney General will join with law enforcement officials alongside elected leaders, including Mayor Adams, Governor Hochul, at the New York Police Department headquarters to discuss the work that federal, state, and local law enforcement officials are doing to quickly take guns and repeat shooters off of our streets.

Afterward, President Biden, Attorney General Garland, Mayor Adams, Governor Hochul, and other elected leaders will visit with community violence intervention leader — leaders in Queens to talk about the community-led work to interrupt gun violence.

The President outlined a comprehensive plan last year to tackle gun crime that includes giving cities historic funding through the American Rescue Plan to put more cops on the beat and support community violence intervention programs, as well as initiatives like afterschool programming, creating economic opportunities, and reducing recidivism to address the root causes of gun crime.

The President's budget also doubles federal support for community policing, with $300 million more for cities plus another $200 million for community violence interventions — a total of a

half a billion dollars for these strategies that are proven to reduce gun crime. And he's going to continue to urge Congress to act on that.

Finally, the Department of Justice continues to step up their efforts to combat violent crime and gun trafficking, including through five strike forces launched last year in New York City and other regions.

As the Department of Justice reported just last week, those efforts have resulted in thousands of guns and violent criminals being taken off the streets over the past year. But they will, of course, have more to say on Thursday.

Why don't you kick us off?

Q   Thanks, Jen. It's been a busy news day so I have a few. Off the top, Senator Manchin just said Build Back Better is "dead." Was the White House aware that he felt this way? And what's the path forward for some of those Democratic priorities?

MS. PSAKI: Well, as you know, as a policy, we're not going to get into private conversations we have with Senator Manchin or any other senators about this piece of legislation or our efforts moving forward.

What I will note and where there is strong support moving forward across the Democratic Caucus is on taking steps to lower costs for childcare, for healthcare, for eldercare; on making sure that Medicare can negotiate the cost of prescription drugs; and ensuring the tax system is fair. Whatever you call that, there is strong support for that, strong passion for that, a lot of advocacy for that, and there are a lot of members having continued conversations about it.

Q   And then Russian President Vladimir Putin just said today that the U.S. is ignoring its top security demands but that Moscow is still open for more talks. Is the U.S. open to more talks? If not, what is the step forward with respect to Russia?

MS. PSAKI: Absolutely we are. The door to diplomacy remains open. We don't know what decision President Putin will make. While we've seen the buildup of troops on the border, Secretary — our Secretary of State, Tony Blinken, just spoke this morning with Foreign Minister Lavrov, and he reiterated our commitments and openness to a diplomatic path forward.

Let me give you a little bit more of a readout of that. And I can give you more of an update of some of the other conversations we've been having with a range of counterparts as well.

So, Secretary Blinken — I know the State Department did a bit of a background call on this, but let me give you some highlights: The Secretary emphasized the U.S. willingness, bilaterally and together with Allies and partners, to continue a substantive exchange with Russia on mutual security concerns, which we intend to do in full coordination with our partners and Allies.  He reiterated the United States commitment to Ukraine's sovereignty and territorial integrity, as well as the right of all countries to determine their own foreign policy and alliances.

He also urged immediate Russian de-escalation and the withdrawal of troops and equipment from Ukraine's borders, and was clear that further invasion of Ukraine would be met with swift and severe consequences and urged Russia to pursue a diplomatic path.

Our National Security Advisor, Jake Sullivan, also met with his German counterpart today as part of our regular consultations with our Allies and partners.  But certainly, the door to diplomacy remains open.  As we've said many times, de-escalation will, of course, make that diplomatic path easier moving forward.

Q   And then one more on HHS.  Last week, there was a GAO report warning that HHS may not be prepared for a future pandemic and that it had fallen short in a number of ways in this pandemic.  There have also been reports about White House officials being frustrated with Secretary Becerra's leadership.  So does the President still have confidence in Secretary Becerra?  And has he talked to him about any changes he might want to see at HHS or about his leadership of the department?

MS. PSAKI:  Well, you know how we feel about anonymous sources around here.

Q   They weren't all anonymous.  There were some experts that are publicly criticizing the way HHS has —

MS. PSAKI:  From — from within the government, I'm referring to.

Q   Sure.

MS. PSAKI:  I would just reiterate that the President remains confident in the role of Secretary Becerra.  He is somebody who is an important partner.  He has been leading a range of efforts from the Department of Homeland Security — I mean — Homeland Security — the — from the Department of Health and Human Services.  And we have strong partnerships from the very top down with HHS.

We're less focused on — not at all focused, I should say, on palace intrigue, as much as we are on vaccinating more Americans, fighting the Omicron surge, expanding testing capacity, and

getting more therapeutics out to the American people.  And that's how we believe we and the leadership of the Cabinet will be judged.

Go ahead.

Q    A couple of follow-ups here.  On Ukraine, we've seen some of the major European allies talking directly with Putin.  Emmanuel Macron has spoken with him twice.  The Italian Prime Minister has spoken with him.  Boris Johnson is now traveling to Ukraine.  Why not have the President have a — you know, take more direct involvement like some of these other allies are?

MS. PSAKI:  Well, the President remains certainly open to that if there's a determination that that is the appropriate and most constructive step moving forward.  We also have a very active and engaged Secretary of State, who has had a number of conversations with his counterpart, including this morning, and that's the channel that those conversations are happening through at this point — as well as at many other levels, I should say.

Q    And on the question about Senator Manchin: He also said that no one has reached out to him.  He hasn't been having talks about trying to do this "in chunks," as the President has suggested may be the path forward.  Why not?

MS. PSAKI:  I'm not going to outline from here conversations that we are having with a range of senators and a range of senators are having with each other, but I can assure you we've been in touch with and hav- — with every member of the Democratic Caucus.

Q    And just some housekeeping on the Supreme Court pick.  The Times is reporting that Doug Jones will be the sherpa on the Hill.  Can you confirm that and talk about that decision?

MS. PSAKI:  I don't have anything to confirm yet at this point about what the team will look like that we bring in, as has been done historically, to help sherpa through our nominee whenever that person is selected.

I can reiterate that we intend to have that team in place before the President makes a selection, and that team will be more than one person.

Go ahead, Kristen.

Q    Thank you, Jen.  And thank you for the welcome back.  Following up on the Supreme Court decision, a number of Republicans, as you know and as you've been asked about, have spoken out about the President's pledge to pick a Black woman for the High Court.  How do you

respond specifically to Ted Cruz who, overnight, called it "offensive" — offensive to Black women that he would make that pledge?

MS. PSAKI:  Well, here's what I would say first: Just over a year ago, the previous president also promised to select a woman for the Supreme Court.  Not only were there no complaints about choosing a nominee from a specific demographic — from the same corners — but there was widespread praise of now-Justice Barrett on those grounds with Republican lawmakers widely highlighting that they thought this was positive for women in America.

So, take Senator Cruz himself: He had no objection to Donald Trump promising he'd nominate a woman in 2020.  I repeat: No objection at all.  In fact, he praised her on these grounds during — praised her on these grounds — the nominee.  During her confirmation hearing, Senator Cruz said, quote, "I think you're an amazing role model for little girls.  What advice would you give little girls?"

When President Reagan honored his campaign pledge to place the first woman on the Court, he said it symbolizes the unique American opportunity.  There is no outcry around that.

The President's view is that after 230 years of the Supreme Court being in existence, the fact that not a single Black woman has served on the Supreme Court is a failure in the process, not a failure — or a lack of qualified Black women to serve as Supreme Court justices.

Q   And broadly speaking, we just heard from the President on how he is viewing this pick.  He says he is taking the "advise and consent" role very seriously —

MS. PSAKI:  Yes.

Q   — of the Senate.  If he thought — and I know you've been getting questions around this, but just to kind of put a finer point on it: If he thought that a nominee could get more Republican support, how would that weigh on his decision?

MS. PSAKI:  I talked with him about this exact question this morning because I know a lot of you are asking about it.  And what he reiterated to me is that his focus is on picking the person who is eminently qualified, who is ready to serve and prepared to serve in a lifetime appointment to the Supreme Court, not in navigating the legislative process.

Q   Just yesterday — on different a topic, HBCUs: A number of them have gotten more bomb threats today.  You ca- — yesterday said that the bomb threats were disturbing.  Can you update us on what, if any, more information the White House, the President has about these potential threats?  And is there a concern that it is, in fact, linked to Black History Month?

MS. PSAKI:  Well, we don't have an assessment at this point.  We are continuing to evaluate. Our homeland security advisor here in the White House, Liz Sherwood-Randall, is providing regular updates to senior staff, to the President as well.  And he certainly is aware of the latest instance of bomb threats not just yesterday, but also those this morning.

And let me just reiterate that we condemn these disturbing threats, and our thoughts are with the students, faculty, and staff of these storied institutions.

We have been long supporters and have made historic investments in HBCUs and deeply value the significant role they continue to play in advancing opportunity for Black students across America.  But, right now, we don't have any assessment or new assessment right now.

Q   Any chance that the President — or are there any discussions about the President visiting one of these HBCUs to reaffirm the commitment that the White House has to the protection of the students (inaudible)?

MS. PSAKI:  He has certainly visited HBCUs in the past, Kristen.  Obviously, right now, our focus is on ensuring we are working in close coordination with our law enforcement authorities and ensuring that the leaders of these institutions and the students know that we are watching closely and that we are standing with them as they face these threats.

But I don't have any trip to predict at this point in time.

Q   Jen, can I follow on that, please?  Just one —

MS. PSAKI:  I'll go to you next, April.  Let me just finish Kristen's —

Q   One more, really quickly.

Q   Tomorrow is the one-year anniversary of the Family Reunification Task Force.  As you know, Secretary Mayorkas has told NBC News that the White House is 100 percent supportive of permanent legal status for families separated at the border.  Is that a true statement?  Is that a (inaudible)?

MS. PSAKI:  We stand by Secretary Mayorkas.

Q   Okay.  Thank you.

MS. PSAKI:  Go — April, go ahead.  And then, I'll come back to you.  Go ahead.

Q    Okay.  So, Jen, back on the HBCU bomb threats.  There is a historic issue when it comes to bomb threats in the Black community.

MS. PSAKI:  Mm-hmm.

Q    And with that said, you have people like Lee Merritt calling it "terrorism."  And he's asking for the DOJ, Homeland Security, and U.S. Attorney's Office to investigate — to form a task force, particularly specifically on these issues.  Is there talk around the White House for this to happen?

MS. PSAKI:  Well, what I can tell you, April, is that we take these threats incredibly seriously; that, again, our homeland security advisor is in close touch with law enforcement authorities at a federal and local level.  And we are assessing what we think the origin, the reasoning, the motivation behind it is.  We don't have an assessment of that quite yet.  And I don't want to get ahead of that process.

But we absolutely are behind these HBCUs.  We are — want to make very clear that we take these threats seriously and we deeply value their contributions.

But it's important for law enforcement authorities and others to make an assessment before we make any determinations about next steps.

Q    And does the White House see the irony in this moment with these continued bomb threats of HBCUs, particularly as much of the power structure up and down Pennsylvania Avenue are graduates of HBCUs, starting with the Vice President, Howard University; Cedric Richmond, Morehouse; Joyce Beatty, the head of the CBC, Central State; the House Whip, James Clyburn, South Carolina State.  So, is there irony in this moment?

MS. PSAKI:  I'm not sure I would say — call it "irony," April.  But I would say that it is — it is scary.  It is horrifying.  It is terrible that these students, these faculty, these institutions are feeling under threat.

Now, again, we don't know more details at this point in time, and I don't want to get ahead of law enforcement authorities.  But certainly, given the history you referenced, you know, this is something we're very mindful of and that is why we're so focuses on providing regular updates and seeing what our law enforcement team assess.

Q    And lastly, on the policing executive orders: Reverend Al Sharpton says that there is now a move to break apart the George Floyd Justice in Policing Act for standalone pieces that could possibly go up for a vote and, one way or another, pass or fail.  And they're doing that because

the executive orders don't have as much teeth as a law.  What do you say to this effort to break apart the George Floyd Justice in Policing Act and make each portion a standalone bill?

MS. PSAKI:  Well, what I can't assess from here, April, is whether there'd be support for getting that across the finish line and signed into law.

As you know, the President very much wanted to sign the George Fle- — Floyd Justice in Policing Act into law, and we did not take executive actions becau- — at the time, because we wanted to leave room and space for that process to proceed in a bipartisan manner.

So, I'd really point you to leadership and committee chairs in Congress to see what is possible on that front.

And certainly, we agree, a law is more permanent than executive orders.  That is absolutely true.  But we have not even finalized, nor do I have a preview of exactly when it would be, a police reform executive order.  So, I would also encourage people to wait to assess what that looks like.

Go ahead, Weijia.

Q   Thank you, Jen.  Back to the Supreme Court.

MS. PSAKI:  Sure.

Q   I know the President said he wanted to seek the advice of the Senate, in addition to consent.  Is there anything you can share about his conversation with Senators Durbin and Grassley, and whether he shared his list of potential candidates with them?

MS. PSAKI:  Well, I think they were still meeting when I came out here, or I had not spoken with him yet if it was breaking, so I have not gotten a rundown from him quite yet.

I think he wanted to have an open and engaging conversation with them.  In terms of what specific information he shared, I think it was more of him looking to listen to them and hear what they had to say about — there are a range of names, a range of candidates out there.  But also look to them for their advice and their counsel.

As we have noted before, Senator Durbin has been through seven confirmation hearings for Supreme Court justices.  Senator Grassley is certainly a veteran of these committee processes. The President takes his role seriously and, as he said today and as your referenced, takes the

role of consent of the Senate seriously.  But I don't think we're going to read out too many specifics other than to say he was looking forward to having an engaging conversation.

Q   And since Justice Breyer announced his retirement, has the President spoken personally with any of the candidates who he might be considering?

MS. PSAKI:  We're not going to give a process update or assessment from here, just as a policy. But I can tell you that what we're focused on now is — obviously, the President is continuing to consult with leadership in Congress, as is evidenced — as was evidenced by this morning.  He'll do more of that this week.

There is obviously an ongoing process as we look to name and nominate a Supreme Court justice before the end of this month.  As is, you know, related to Mary's earlier question, we'll also be announcing soon a team that we will be bringing in from the outside.  So, there are a number of steps that are happening at the same time.  But we're not going to be going into specifics of confirming the internal processes.

Q   And you mentioned just a bit ago that he is looking for — to someone who will obviously serve for a lifetime.  Will age be a factor as he considers who to nominate so whoever it is can have a longer imprint on the Court?

MS. PSAKI:  I'm just not going to get into more specifics of what he's looking for.  I mean, I think the President outlined, when he spoke earlier, that he's looking for somebody who is qualified — who is eminently qualified, who is prepared to serve in this role.

There is a range of candidates he's been reviewing bios of for some time now.  But beyond that, I'll let him speak to more specifics.

Q   Thank you.  And then one more question on Russia: How soon could the U.S. move troops to the eastern flank?  And just to clarify: When the President said "it will happen in the near term," did he mean troops that are already stationed in Europe?  Or would some of those troops be the ones based here at home?

MS. PSAKI:  Well, I think we've said previously that there's NATO troops, of course; there's 8,500 of them that we've committed to the NATO — the NATO effort.  That would be a decision made by the Alliance.  Some of those troops are in the United States; some are in Europe.

I don't have anything to preview for you in terms of any additional troops.  Obviously, there are troops currently that are stationed in Eastern European countries.  Some of those troops, of course, are not — many of them are not under the NATO Alliance.

But I don't have anything to predict for you at this point in time.

Q   Thank you, Jen.

MS. PSAKI:  Go ahead.

Q   Thanks, Jen.  A couple quick ones on the Supreme Court first.  Last week, I know you said you'd look for an answer on whether you thought the Vice President could break a tie on a Supreme Court vote.  Have you guys come to a determination on that?

MS. PSAKI:  So, the Vice President has been the tiebreaking vote for a number of judicial appointments — or nominees in the past.  But our intention is, of course, to get broad support for an eminently qualified nominee.

Q   In the Oval, the President evoked the Ninth Amendment as he was talking about the qualifications he's looking for for a judicial nominee.  In the past and in committee hearings, he's certainly brought that amendment up in the context of abortion rights.  Is it a fair reading that that is what he was specifically saying that he was looking for from a candidate here?

MS. PSAKI:  I'm just not going to give any more detail on any qualifications he's looking for at this point in time.  I'm sure we'll have more conversations about that in the days ahead.

Q   And there was a kind of long New Yorker story over the weekend in which a former NSC aide, Andrea Flores, made two claims.  One was that Susan Rice and Ron Klain had opposed expanding asylum access for political reasons, and that the White House, partially because of that, wasn't doing contingency planning for the lifting of Title 42 whenever we get to that point in the pandemic and hadn't, kind of, built out capacity to do that.

So I was wondering if you could kind of respond to, I think, those two points that would suggest that immigration policy has shifted within the White House from the campaign.

MS. PSAKI:  Well, what I can tell you is that — I did not work with Andrea Flores, so I don't know her well, nor can I speak to her role here — but that our policy as an administration has been entirely consistent with what the President committed to on the campaign.  And his effort has been to build a fair, humane, and lawful immigration system and bring it into the 21st century.

Hence, he obviously proposed an immigration bill on his first day in office.  And beyond that, he has taken steps to protect DACA recipients, ended the Muslim ban and the Public Charge Rule, put together the Family Reunification Task Force, restarted the Central American Minors

Program that the previous administration ended, extended or newly desig- — newly designated Temporary Protected Status for a number of countries, and worked with DHS to give clear guidance for internal enforcement.

It's also true that we're still in the midst of a pandemic.  And that is not something, of course, as we've talked about here a bit in the past, that everybody anticipated still being at, at this point in time.  The CDC is obviously the determinant of having Title 42 in place, and that still is in place because of the pandemic that we're in.

But I would also note that we have — and I think this was noted, I believe, in the story — but that we have also been very clear about our view on the MPP program and very clear on our view about the inhumanity of the prior administration and how they handled immigration and that we had every intention of implementing a different approach.

Q   And one last one.  There's been a bit of a controversy this week on the other side of the pond.  Prime Minister Johnson and the actions of him and his staff — a report came out this week.

I'm wondering: Is the President aware of what's going on?  Is he at all worried that that political controversy is impacting, you know, the U.S. and UK's ability to, sort of, press President Putin on the Ukraine situation?  And, you know, has he ever been "ambushed by a cake"?  (Laughs.)  How —

MS. PSAKI:  Has the President ever been ambushed by a cake?  (Laughs.)  Not that I'm aware of.

Q   But just what his reaction is, sort of, to this controversy that's been blowing up.

MS. PSAKI:  You know, I have not spoken with him specifically about the reports in the UK.  But what I can tell you is that he is confident in the important partnership we have with the United Kingdom, the role they play as an important partner in making clear to Russia the unacceptable nature of the buildup of troops and their bellicose rhetoric as it relates to Ukraine.  And that certainly has not changed, despite cakes in anyone's faces.

Go ahead.

Q   Thanks, Jen.  Starting quickly just with Ukraine.  You guys keep holding up this, kind of, diplomatic path for Vladimir Putin.  But as he noted today, you've already rejected both of his, kind of, central demands.  So, what exactly is this a diplomatic path to if you've already

rejected what he's asked for?  And can you kind of sympathize with the fact that he may be feeling like he's strung along and wants to pursue things on another battlefield?

MS. PSAKI:  As in invading a sovereign country?  Which would be the alternative, right?  Right?  Is that what you're saying?

Q   Perhaps.  Perhaps.

MS. PSAKI:  Okay.  Well, here's our view: We don't know what President Putin is going to do.  And it is our responsibility to — and it's an imperative to keep the door to diplomacy open.  That does not mean that we are going to not stand by our own values, which includes the — our belief that — and the belief of NATO countries — that it should be up to NATO members to determine who is able to join NATO and that the door to that should be open.

So if that is one of their claims, we have reiterated the same thing privately that we have reiterated publicly.

In our view, do we have sympathy?  I mean, this is — you know, Secretary Blinken has used some of these analogies in the past, but when the fox is screaming from the top of the henhouse that he's scared of the chickens, which is essentially what they're doing, that fear isn't reported as a statement of fact.  And as you watch President Putin screaming about the fear of Ukraine and the Ukrainians, that should not be reported as a statement of fact.

We know who the fox is in this case.  We have seen the buildup of troops at the border.  We have seen them move troops to Belarus, on another border.

And our role in the United States is to work with other countries around the world to keep that bor- — door to diplomacy open, because certainly all of our preference is to de-escalate and to prevent an invasion from happening.

But that is up to President Putin to make that decision.

Q   And do you think a possible endgame here could be just mutual de-escalation and then live to talk —

MS. PSAKI:  De-escalation in what regard?

Q   — about the issues another day?

MS. PSAKI:  "Mutual de-escalation" — tell me more what you mean by that.

Q   I mean, it's up — I suppose it's up to you to define.  But I mean, you guys have asked for him to move troops back from the border.

MS. PSAKI:  But here's what I'm getting at: We are defin- — it's a mistake, I would say, to define things by the terms that President Putin is defining things.  This is a country and a leader who has, you know, used chemical weapons, who has invaded multiple countries in the past several years, who has taken aggressive steps on the global stage on many occasions.

So, when we talk about mutual de-escalation, Russia has 100,000 troops on the border; they are the aggressor.  We are working with NATO countries to make sure they feel secure in this moment.  NATO is a defensive alliance.  It is not the same thing.  And I think we need to be careful about comparing them as the same thing.

Q   Thank you.  And just to switch gears to Supreme Court.  You guys, obviously, have got this big nomination that you're working on, but there's also huge existential questions hanging over the Supreme Court.  Does the President plan to decide what he's going to do on Supreme Court reform before he makes this nomination?

MS. PSAKI:  He is reviewing the Supreme Court Commission report.  I don't have a prediction of when he will conclude his analysis of that.

Q   And I just asked because the report includes suggestions about things like changing the number of people on the Court, and you would think he would want to know who — if he's going to increase the size of the court, who he's going to put on first.  Right?

MS. PSAKI:  I think, Trevor, his focus right now is on going through a process that takes it — that values the seriousness of the role he has as president, that cons- — where he consults, as you saw today, with Democrats and Republicans to select and nominate an eminently qualified Black woman to serve on the Court.  That's his focus right now.

Q   And finally, there have been some ethical questions about Supreme Court Justice Clarence Thomas.  His wife is — has a number of political affiliations with groups that file amicus briefs before the Court, have other business before the Court.  It's his choice whether or not to recuse himself from those cases; he hasn't.  Does the President feel that there is an ethical issue there that he'd like to see dealt with?

MS. PSAKI:  I have not had a discussion about that with the President or our counsel's office.  I will see if there's any comment we have from here, or it might be a Department of Justice comment.  I'll get back to you.

Go ahead.

Q   Hey, Jen.  How's it going?

MS. PSAKI:  Good.

Q   The Center for American Progress put out a memo today focusing on specific priorities for a more narrow Build Back Better bill, but not listed is the extended Child Tax Credit.  Could the White House (inaudible) support a revised bill that didn't include the extended Child Tax Credit?

MS. PSAKI:  Well, I'm not going to make a prediction or negotiate from here.  Obviously, the President proposed an extension of the Child Tax Credit, as you know, because it helped cut the — child poverty by 40 percent last year.  It's something he would absolutely like to be extended.

There is a question here as to what 50 members of the Democratic caucus will support.  And they support, as we were talking about a little bit earlier, some big fundamental goals, which is important: lowering cost of childcare, healthcare; negotiating prescription drugs.  That's important.  But I can't predict for you here what all 50 of them will support.

Q   Sure.  Last week, the Surgeon General also was asked on MSNBC about Joe Rogan's vaccine comments on Spotify.  And he said that tech companies have an "important role to play" in stopping misinformation because he — they are the "predominant places" where misinformation spreads.

Spotify is putting out advisory warnings on episodes that have to do with COVID-19.  Does the White House and the administration think this is a satisfactory step?  Or do you — do you think that companies like Spotify should go further than just, you know, putting a label on there to say, "Hey, go do your own — you know, check this out.  You know, there's more research you can look at — you know, scientific research regarding COVID"?

MS. PSAKI:  Sure.  Well, last July, I — you probably know, but the Surgeon General also took the unprecedented step to issue an advisory on the risk of misinformation and public health, which is a very significant step.  And amid that, he talked about the role social media platforms have.

So our hope is that all major tech platforms — and all major news sources, for that matter — be responsible and be vigilant to ensure the American people have access to accurate information on something as significant as COVID-19.  And that certainly includes Spotify [sic].

So, this disclaimer — it's a positive step. But we want every platform to continue doing more to call out misinform- — mis- and disinformation while also uplifting accurate information.

I mean, look at the facts, right? You are 16 times more likely to be hospitalized if you're unvaccinated and 68 times more likely to die than someone who is boosted if you're unvaccinated. That's pretty significant. And we think that is something that unquestionably should be the basis of how people are communicating about it.

But, ultimately, you know, our view is it's a — it's a — it's a good step, it's a positive step, but there's more that can be done.

Q    And I have another tech question for you —

MS. PSAKI:  Sure.

Q    — which is: There have been some recent reports that the White House is planning to issue a series of executive actions on cryptocurrencies in the next few weeks. Can you give a timeline on when those are coming and what actually might be in those executive actions?

MS. PSAKI:  I would have to check with our NEC team on that and see if that's something that is coming down the road. But I will check and see if there's anything to predict for you.

Go ahead, Brian.

Q    Thanks a lot, Jen.

MS. PSAKI:  I wanted to first follow up on something you said about the Supreme Court process.

MS. PSAKI:  Sure.

Q    You said that President Biden has been looking at bios for some time now. How long has that been that he's been looking at bios of potential candidates?

MS. PSAKI:  Since last year.

Q    So that was something that started in the transition process? Or —

MS. PSAKI:  No, since last year, not during the transition process.

Q    And what prompted that for him to start looking at bios last year?

MS. PSAKI:  He takes his role incredibly seriously.  And we certainly know and he committed, of course, to the American people he would nominate a Black woman — a qualified Black woman to serve on the Supreme Court.  And so he's just been reviewing a range of bios.

Q   And Justice Breyer notified him on the 27th of January.  Did he get advance notice before that —

MS. PSAKI:  I'm not going to get into any more details.  If Justice Breyer wants to get into details about our communications, he can certainly do that.

Q   And I have a question on Russia as well.  This is — the jailed Russian dissident, Aleksey Navalny —

MS. PSAKI:  Yeah.


Q   — in an interview with Time Magazine, said that the

U.S. is repeatedly falling into Putin's traps — that Putin makes escalations, like he's doing now, and then seeks concessions.

I want to quote Navalny here, where he says, with Putin, the U.S. is acting "like a frightened schoolboy who's been bullied by an upperclassman."  What's President Biden's reaction to this?  Is he — is the U.S. reacting like a "frightened schoolboy"?

MS. PSAKI:  Well, I would say, first, that we have great respect for Aleksey Navalny and the role he's played in speaking out and being vocal, even under duress himself.  And that's to be hugely admired.

I think the President's actions, the administration's actions that have been broadly supported in a bipartisan manner speak for themselves, whether it's our engagement and leadership on the global stage, having more than 200 engagements, leading an effort to have a unified front and making clear about the severity of economic consequences there will be should Russia decide to invade, or whether it is making clear that we are going to continue to stand up for what is a global value, which is the fact that no country should be able to invade another country and take their territory.

I'll let others define that.  I don't think that's a "frightened schoolboy."

Q   So when the President talks about economic actions that — and economic consequences for Russia if it does invade, why not enact some of those sanctions now?  Why not enact those economic consequences now?  Why wait for an invasion?

MS. PSAKI:  Well, we have enacted some sanctions.  But I would say that we think it's an important point of leverage in the discussions.

Go ahead.

Q   Thanks, Jen.  To clarify something you said earlier about the BBB talks —

MS. PSAKI:  Yeah.


Q   — you know, to the extent that you're going to tell

us about them: You said that — you know, rest assured the President — you said, "We've been in touch with every member of the Democratic Caucus."  "We've been in touch…"

MS. PSAKI:  We in the White House.

Q   So that's the leg affairs team, mainly, and the —

MS. PSAKI:  The leg affairs team and senior members of the White House.  We're just not going to detail more specifics.

Q   So you can't say if the President has been involved personally in any of the conversations with (inaudible)?

MS. PSAKI:  The President has talked to a range of senators.  He always does.

Q   Okay.  On the Ukraine-Russia stuff, any plans in the works for another conversation between the President and President Zelenskyy?

MS. PSAKI:  He has talked to him a couple of times in the last few weeks, and we've been in regular contact.  We also are in very close contact from Jake Sullivan's level and Secretary Blinken's level.  So, certainly, it's possible.  We've been in regular touch, but I don't have any call to predict at this point.  He just talked to him a couple days ago.

Q   Sure.  And one other question.  Today, obviously, is the start of Black History Month.  The President issued a couple of tweets about that.

MS. PSAKI:  Yeah.

Q    I wonder what the administration — the President's response is to what has been happening in Texas and other states where a number of books have been banned by school districts.  These are, generally, books that have focused on slavery, on Jim Crow, on civil rights, even on the Obamas.  Does the White House have a position on the books that are being banned by these local school boards?

MS. PSAKI:  I have not discussed this with the President, but I can tell you that, as an administration, we believe in the freedom of speech and expression.  And certainly, we have never been advocates of preventing people from understanding and reading history.

Q    And does the President plan to do more to recognize — commemorate Black History Month this month?

MS. PSAKI:  Absolutely.  Let me see if we can get you some more details.

Go ahead.

Q    Good afternoon, Jen.

MS. PSAKI:  Good afternoon.

Q    A couple of questions for you.  Back to the Supreme Court.

MS. PSAKI:  Sure.

Q    How will the debate over abortion shake the President's selection process?

MS. PSAKI:  The President is going to select an eminently qualified Black woman to serve on the Court, someone — and he's going to do that through consulting with a range of members of Congress, through outside experts, and obviously through engagement with them directly.  But I don't think I'm going to give you more specifics from here.

Q    But that person — will that person have to be pro-abortion?

MS. PSAKI:  I think somebody asked a similar question.  I'm not going to outline litmus tests from here today.

Q    Okay.  Following up on that, the President has said in the past he does not believe that life begins at conception.  When does he believe it begins?

MS. PSAKI:  You know the President's position.  He believes in a woman's right to choose.

Q    But that's not the question I asked.  I said —

MS. PSAKI:  And he's spoken — he's spoken to this in the past.  And I know you ask this every time you come in here, which is your —

Q    (Inaudible.)

MS. PSAKI:  — your absolute right, but I don't think I have anything new to —

Q    But I — that's not — that's not —

MS. PSAKI:  — reveal for you.

Q    The question is: When does he believe life — and essential to the debate over the question of a baby's viability, pro-life Americans — don't you agree? — should know where the President stands on his thinking on this.  It's a fundamental question.

MS. PSAKI:  The President believes in a woman's right to choose.

Q    But his — when does he believe life begins?

MS. PSAKI:  Go ahead.  I think we're going to move on unless you have another question.  Go ahead.

Q    Oh, let's do another question.  One more question —

MS. PSAKI:  Go ahead.

Q    — unrelated to that.

MS. PSAKI:  Okay.

Q    Following up on the question for — on the expanded Child Tax Credit.

MS. PSAKI:  Yep.

Q    You have said time and again that this has taken lots of kids and families out of poverty.

MS. PSAKI:  Yeah.

Q   A tremendous success there.

MS. PSAKI:  Yeah.

Q   But with that now gone — it looks like it's gone, dead — inflation creeping up, high gas prices, high food prices, how quickly are those same kids and families going to go back into poverty, do you fear?

MS. PSAKI:  Well, how it's implemented — first, the President is going to continue to fight for the Child Tax Credit.  It's something he very much believes in.  I just can't predict what a package will look like and what there will be support from 50 senators on.

What I can tell you is that as individuals who are eligible file their taxes, they will get the other half of the Child Tax Credit benefit from last year.  That is not a forever solution, but that is something that many can look ahead to.

The other part of the Build — the President's Build Back Better Agenda that's important, as you're talking about rising costs for people: You know, we have — we have a proposal — the President has a proposal, many Democrats across the board support it, which is — that will lower costs for Americans across the country and all the issues you talked about, things that really weigh on people's family budgets, whether it's healthcare, which is a huge — has a huge impact on people's budgets; childcare, which is contributing to preventing 2 million women from rejoining the workforce.  That's the Build Back Better plan, and that's something that we know will help lower costs for families.

Q   And finally, does the President have a message for those struggling families who are very worried right now not seeing that extra $500 or $1,000 a month or whatever that are saying, "I can't afford the groceries.  I can't afford the gas.  This is getting very stressful"?  A message from the President to those families.

MS. PSAKI:  The President would say, "I am here to fight for you, and I — that's why I'm going to continue to fight to pass legislation that will lower your costs."  And that is a top priority for him.

Go ahead.

Q   Thank you, Jen.  I want to go back to what you said in the beginning about the money that's going to be flowing down to states and that there's going to be an appointment of —

MS. PSAKI:  Infrastructure?

Q    Infrastructure.  Mm-hmm.  An infrastructure lead.  Can you tell me more about who is —
who's going to be appointing that person in each state?  Because there may be concern over
states when you get to, like, Florida, where you have Governor DeSantis saying that the
President is trying to implement "woke-ification" policy and saying that there is no racism
within some of the (inaudible) that have been in the past.  How can there — when you talk
about accountability, how is that process going to go?  And what information may be accessible
to the public as far as reporting?

MS. PSAKI:  Well, we have a huge — several — 100-page book that we put out yesterday about
how people can apply for a range of funding.  And I just outlined for you the money to date that
has been allocated.  And we have taken steps, and we will continue to, to make sure that is as
transparent as possible.

Now, some of these — the funding in this package — as I mentioned, 90 percent of it will go to
local, Tribal, and territorial governments.  So, that really gives the opportunity for a range of
leaders to apply for funding.  And the book is meant to give them the information and access
they need so they don't have to hire lobbyists to do that, so that they can do that on their own.
And we're doing that in part to ensure that equity is at the central — is central to how we're
implementing this bill.

Q    My final question is: What do you say to many organizations — I've talked to several civil
rights organizations — on the process of selecting a Vice President?  They feel like some of the
desires of the Black community have been put on the backburner.  So, when it comes to
selecting a Vice President, why is there no need or no push to speed up the process?  The
President has said he —

MS. PSAKI:  You mean a Supreme Court justice?

Q    A Supreme Court justice.

MS. PSAKI:  Sure.

Q    I'm sorry.  I'm sorry.

MS. PSAKI:  No, it's okay.

Q    A Supreme Court justice.  Why is there no need to speed up that process —

MS. PSAKI:  Of selecting a nominee?  Well, he's going to —

Q   He's going to name one (inaudible).

MS. PSAKI:  He's going to name one this month.

Q   Right — name one this month.  But there has been a little bit of pushback as far as comparing the process — the timing to Amy Coney Barrett, as opposed to what the President is going to do during this time.

We've heard Chuck Schumer say that, but is the — does the President feel the same way as far as moving — how long, how quickly and expeditiously he wants to move this process along?

MS. PSAKI:  I just want to make sure I'm answering the right question.  So, you were saying there's unhappiness in the civil rights community about the pace?  Or are you talking about the Schumer call for the 38 days?

Q   Well, is the President going on board with that to push — to push it that fast?

MS. PSAKI:  Well, the President takes the decision to select an eminently qualified individual to nominate to the Supreme Court very seriously.  He wants that to be a thorough process.  And he's still doing that expeditiously by nominating someone this month.

And he wants, of course, the Senate to move forward expeditiously, but we're not setting artificial deadlines beyond that.

Go ahead in the back.  Okay, we actually have two more, so let me get to them quickly.  Go ahead.

Q   Thank you, Jen.  I have a couple of questions on two different topics.

MS. PSAKI:  Sure.

Q   One is Russia and then immigration.  On Russia, I know the President has — spoke with the Amir of Qatar regarding the role of that country exporting natural gas to the European Union.  But is the U.S. considering increasing its role as a natural gas exporter to the European Union to serve as an alternative to Russian gas?

MS. PSAKI:  We are having a conversation with not just countries but also suppliers about how to help meet any shortage of natural gas that could come about if — if there's an invasion.

Q   Also on Russia: Since Ukraine is not a NATO member, according to the North Atlantic Treaty, NATO cannot really respond militarily to Russia in Ukrainian territory.  But are U.S.

unilateral military actions on the table to support Kyiv?

MS. PSAKI:  You mean sending U.S. troops to Ukraine?

Q   Yeah.

MS. PSAKI:  No.

Q   Okay, no.

And on the other topic that I wanted to ask real quick: This administration is now sending Venezuelan migrants arrested at the U.S.-Mexico border to Colombia under Title 42.  What agreement has been reached with the Colombian government?  Is it similar to the MPP with Mexico?

MS. PSAKI:  Well, I think what we tried to do from the beginning is ensure that, for Venezuelans who are coming — who were coming from a third country, right? — that they were able, at some point, to return to that country.

So, in this case, pursuant to Title 42, we began repatriating Venezuelan nationals who had attempted to unlawfully enter the United States to Colombia, where they had previously resided.  So, it was, you know, a place where they had been living before.

Flights to Colombia with Venezuelan nationals who have legal status are expected to take place on a regular basis and will be operated by U.S. Immigration and Customs Enforcement.  Of course, that requires agreement with the government.

Q   When did that started?  And how temporary is that supposed to be — this program?

MS. PSAKI:  Well, it's — it's just starting now.  And I can — I'm sure I can get you a timeline of when it actually started to commence.

Q   And is there a deadline until when this will be implemented?

MS. PSAKI:  I don't believe we've set a deadline, but I can — I can get that information for you as well.

Go ahead.  Last one.

Q   Thank you, Jen.  One on the Supreme Court and two on COVID, if you'll indulge me.

MS. PSAKI:  Sure.

Q   First, on the Supreme Court: Does President Biden have plans to talk to Senator McConnell — McConnell at all today or this week?

MS. PSAKI:  I expect he will have many more consultations with Democrats and Republicans. I don't have anything yet for you at this point, but hopefully we'll have more in the next 24 hours.

Q   Okay.  And then two quick ones on the pandemic.  First of all, I was wondering if you'd be able to provide an update on the free mask program that the White House was doing?  I'm just curious if there's an update on the how many of the — of the hundreds of millions of masks have been distributed already.

And also, is there a way for Americans to know, you know, if there are masks in their area, if they've been delivered to the area pharmacies — just, you know, sort of, when — when they know that they can go find them in their area?

MS. PSAKI:  Sure.  So, we just announced this last week, but we've already cranked up our shipments.  We've shipped 100 million N95 maks [sic] — masks so far, which is incredible progress.  They're available at thousands of locations around the country.

The initial wave of health centers or for people who are looking to see if they're available near them is available on the Health Resources and Services Administration's website.

And the program, we — we're working to expand it to make it available across all health centers over the coming weeks.

Q   And then lastly, one from our colleague who couldn't be here.  At NewsNation, they reported hearing from people who signed up to receive the free COVID tests through the website — the government website, but they had issues where either the tests were shipped to the wrong address or they never received a confirmation email.

So, what should people do in that case?  Is there a way for them to rectify that?  Does the White House have, like, a response team in case somebody never gets a test that they ordered or anything like that?

MS. PSAKI:  Yeah.  There's a — there's a — there's a "Help" component on the website. Hopefully, it should be easy for people.  There's also a phone number — I'm sure we can get that to you after the briefing — as well that people could call should they have any concerns.

I will note that we confirmed last week that 60 million tests have been — had been ordered as of then.  I don't have an updated number.  Tens of millions of tests have gone out the door and reached the right — right doors.  I think that's the vast, vast, vast majority.

That is earlier than we were scheduled and were planning to get those tests out the doors.

But we can — we can get you the phone number and you can publicize that in your publication.

Thanks, everyone.

Q   Can you make sure we all get a list of what's going on for Black History Month?

MS. PSAKI:  Sure.

Q   Thank you.

3:13 P.M. EST

# EXHIBIT 39

HEALTHCARE

# Surgeon general demands data on COVID-19 misinformation from major tech firms

BY BRAD DRESS - 03/03/22 11:24 AM ET

SHARE          TWEET      ● ● ●    MORE

WATCH: CDC Director Walensky gives update
on COVID-19 guidance

2 minutes left



U.S. Surgeon General Vivek Murthy has reportedly asked Big Tech companies to hand over data regarding COVID-19 misinformation, The New York Times reported on Thursday.

systems.

The Surgeon general last summer issued an advisory calling health misinformation an "urgent threat," and urging tech and social media platforms to redesign algorithms to reduce misinformation amplification and to bolster their monitoring of it.

"It can cause confusion, sow distrust, and undermine public health efforts, including our ongoing work to end the COVID-19 pandemic," Murthy said in a statement in July.

During the pandemic, COVID-19 misinformation has spread rapidly amid contentious debates over masks, vaccinations and basic public health data, including the number of deaths reported by states or federal governments.

Misinformation about vaccinations took center stage earlier this year when Neil Young said he would pull his music off the music platform Spotify in protest over podcast host Joe Rogan, who had interviewed guests questioning the efficacy and safety of COVID-19 vaccines.

President Biden on Wednesday unveiled a new pandemic roadmap. Part of that plan will "equip Americans with tools to identify misinformation and to invest in longer-term efforts to build resilience against health misinformation."

In his notice to major tech platforms, Murthy is requesting specific information on demographics affected by misinformation as well as sources of misinformation and "exactly how many users saw or may have been exposed to instances of Covid-19 misinformation," according to the notice reviewed by The Times.

"Technology companies now have the opportunity to be open and transparent with the American people about the misinformation on their platforms," Murthy said in a statement. "This is about protecting the nation's health."

**TAGS** COVID-19   JOE BIDEN   MISINFORMATION   US SURGEON GENERAL   VIVEK MURTHY

*The Hill has removed its comment section, as there are many other forums for readers to participate in the conversation. We invite you to join the discussion on Facebook and Twitter.*

## Around the Web



**Why Sandals Are Important in Our Life?**

SURSELL

**Doctor Designed Sandals Will Change Your Life**

SURSELL

**At Almost 101, He is the Oldest Living Star**

ITSTHEVIBE

**Missouri: Say Bye to Your Car Insurance if You Live in These Zip Codes**

SMART LIFESTYLE TRENDS

**The Sandals for Standing All Day Without Discomfort**

SHOESHOME

**Totally Fake - the 35 Most Fake Reality Shows People Actually Believed Were Real**

DEFINITION

**Tom Brady's New Yacht is Bigger Than the Titanic**

ITSTHEVIBE

**Drink This Before Bed and Drop Body Weight Like Crazy**

HEALTH

**These Are the Top Financial Advisors in Jefferson City**

**Regarded by Millions as the Comfiest Shoes They've Ever Worn**

**Doctor Designed Sandals Will Change Your Life - Now 70% Off!**

ZEKEAR

**Here Are the Top 5 Mattresses in 2022**

BEST MATTRESS SEARCH

**The Comfy Women's Shoes Are Taking Missouri by Storm.**

SURSELL

**The Animal Most Likely to Kill You in Every State, Missouri is Terrifying**

DEFINITION

**Renowned Phd Economist Who Called the 2008 Crash Makes Next Major Prediction: "S**

ROGUE ECONOMICS

**Say Bye to Your Auto Insurance Bill if You Live in This Zip Code**

AUTO POLICY SAVER

**If You Eat Oatmeal Every Day, This is What Happens**

GUNDRY MD

**Missouri Seniors with No Life Insurance Get a $250k Policy for $18/month**

SMART LIFESTYLE TRENDS

**25 Scientifically Impossible Places That Actually Exist**

DEFINITION

**Awesome New Helmet Designs for All 45 NFL Teams**

STANDARDNEWS

**30 Great American Buildings That Are Lost Forever**

DEFINITION

**Always Place a Ziplock Bag on Your Car Mirror when Traveling Alone, Here's Why**

STANDARDNEWS

**Bumper Stickers Too Funny Not to Laugh at**

STANDARDNEWS

**You Must Watch These Iconic Comedies Before You Die**

DEFINITION

**50 Worst Tourist Traps in America**

DEFINITION

Load More

## Most Popular

| 1 | **Cheney faces pivotal moment with Jan. ...** |

| 2 | **Democrats frustrated by flat-footed ...** |

**4**     **McConnell puts imprint on Senate gun ...**

**5**     **Man says 'excruciating' 17 days ...**

Video



**Watch live: Biden signs bills honoring, improving care for veterans into law**



**Watch live: Matthew McConaughey joins the White House press briefing**

VIDEO



**Watch live: Senate Judiciary Committee holds hearing on the rise of domestic terrorism**

VIDEO



**Watch live: Treasury Secretary Janet Yellen testifies on 2023 budget**

VIDEO



**Watch live: FDA advisory committee discusses Novavax vaccine**

VIDEO

See all Video

**DON'T MISS A BRIEF.**
**SIGN UP FOR OUR DAILY EMAIL.**

Your Email

**Send**



**Resources**

THE HILL APPS

PEOPLE

RSS

**Other Areas**

GALLERIES

CLASSIFIEDS

JOBS

**Contributors**

SUBMIT OPINION CONTENT

**Follow Us On**

**Get the App**



**SUBSCRIPTIONS**

**PRIVACY POLICY**

**TERMS & CONDITIONS**

**CONTACT**

**ADVERTISE**

SUBSCRIBE TO PUSH NOTIFICATIONS

THE HILL 1625 K STREET, NW SUITE 900 WASHINGTON DC 20006 | 202-628-8500 TEL | 202-628-8503 FAX

© 1998 - 2022 NEXSTAR INC. | ALL RIGHTS RESERVED.

# EXHIBIT 40

Press Briefing by Press Secretary Jen Psaki, April 25, 2022 | The White House

BRIEFING ROOM

# Press Briefing by Press Secretary Jen Psaki, April 25, 2022

APRIL 25, 2022  •  PRESS BRIEFINGS

James S. Brady Press Briefing Room

3:20 P.M. EDT

MS. PSAKI:  Hi, everyone.  Okay.  There's nothing happening in the world today, I hear — (laughter) — so this should be a quick one.

I have a couple of items for you at the top, as usual.

Over the past year, businesses have been dealing with frequent freight delay — rail delays and poor service, which has stranded shipments of grain, fertilizer, ethanol, and other critical commodities across the country.  This breakdown in service has also forced grain shippers to pay thousands of extra dollars to guarantee service.

So, on Friday, our administration took emergency action to get goods moving faster and lower shipping costs.  The Surface Transportation Board, which regulates railroads, acted on a bipartisan basis to help bring relief to American businesses that ship their goods by freight rail.

Basically, what they did is: This emergency rule would allow it to address situations where a monopolu- — monopoly railroad isn't providing adequate service and show an alternative railroad to step in.  So if a business wants to move their goods and the railroad that they are contracted with isn't allowing them to move them quickly, this will allow them to have some flexibility, hopefully allowing the movement of more goods, getting them on shelves, lowering costs.

I also wanted to note that while the President is doing everything in his power to lower prices for American families, the Federal Reserve plays an important role, as you all know, in fighting inflation, which is why it's so important that we have all of the seats filled on the Federal Reserve's Board of Governors.

Today and this week, as Congress returns, we're taking a big step forward toward filling these seats with the nominations of Lael Brainard and Lisa Cook making their way to the Senate floor.

We call on the Senate to confirm Dr. Brainard and Dr. Cook. And we also call on the Senate to swiftly take up Jerome Powell and Philip Jefferson's nominations this week as well.

These nominees are eminently qualified, ready to get to work, and deserve bipartisan support. They also will make history.  Lisa Cook would become the first Black woman to ever serve on the Board of Governors, and Philip Jefferson will be only the fourth Black man to serve on the Board of Governors.

Finally, the VA announced today new actions to expand disability and health bene- — benefits to veterans suffering from nine rare respiratory cancers.  Supporting our veterans is a critical part of the President's Unity Agenda.  And with this step, the President is continuing to deliver on the sacred obligation we have to our nation's veterans.

The President urges congress to pass bipartisan legislation to comprehensively address toxic exposures and further ~~delay~~ [deliver] the vital benefits our veterans have earned.

Andrea, welcome back.  Peter, welcome from book leave.  Now they're going to ask me especially hard questions.

Zeke, go ahead.

Q    Thanks, Jen.  Secretary Austin, I believe, said earlier this morning that the U.S. wants to, quote, "see Russia weakened to the degree that it can't do the kinds things that it has done in invading Ukraine."  He said that in regards to Russian military losses, quote, "We want to see them not have the capability to very quickly reproduce that capability."  Is it U.S. policy now to permanently degrade the Russian military?

MS. PSAKI:  Well, I think what Secretary Austin in his press conference was referring to is the fact that if you go back about two months ago, remember President Putin gave a speech where he talked about the aspirations — his aspirations, the aspirations he had for the Russian military — which were to degrade Ukraine, of course; to subsume Ukraine, to take over their sovereignty, their territorial integrity.  Of course, they haven't succeeded at that, but to go beyond that.

So what Secretary Austin was talking about is our objective to prevent that from happening. Obviously, right now, the war is in Ukraine.  They are — we're proud of the Ukrainians' success;

their efforts to fight back, to push back on the Russian military, thanks to their bravery but also to our support.

But, yes, we are — we are also — we are also looking to prevent them from expanding their efforts and President Putin's objectives beyond that, too.

Q   Is there any concern in the White House that that sort of rhetoric plays into their domestic message to their audience about "the West is out trying to get us and contain us," that — by saying you're trying to weaken the Russian military and weaken — it's essentially strengthening Putin's hand at home?

MS. PSAKI:  No.  I would say it's consistent with our view and the President's view and Secretary Austin's view that we are going to do everything we can to push back on President Putin's aspirations to subsume Ukraine, to take over their territorial integrity and their sovereignty, and aspirations he had as of two months ago to go beyond that.

Q   Okay.  And Congress is back in town today.  The President last week said he's going to go back to Congress looking for additional —

MS. PSAKI:  Yeah.

Q   — supplemental Ukraine funding.  Do you have a dollar figure for how much the President need — is going to go ask for and how long that money would last?

MS. PSAKI:  Sure.  Not quite yet.  He is — expect he'll have consultations and conversations with military leadership and, of course, leadership from the State Department over the course of the coming days.  I expect it'll be something later in the week, and expect it'll be a longer-term package or proposal.

Go ahead.

Q   And just a quick one on the breaking news: Twitter agreeing to let Elon Musk purchase — make his — go through with this purchase.  Do you have a response to that?  And does the White House have any concern that this new agreement might have President Trump back on the platform?

MS. PSAKI:  Well, I'm not going to comment on a specific transaction.  What I can tell you as a general matter: No matter who owns or runs Twitter, the President has long been concerned about the power of large social media platforms, what they ha- — the power they have over our everyday lives; has long argued that tech platforms must be held accountable for the harms

they cause.  He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more.  And he's encouraged that there's bipartisan interest in Congress.

In terms of what hypothetical policies might happen, I'm just not going to speak to that at this point in time.

Q   Okay.  On the situation at the border and Title 42, Congressman McCaul said this weekend that Secretary Mayorkas has expressed some frustration directly to him about how the administration is ending Title 42.  He says the Secretary is saying that the Border Patrol, Catholic Charities are already overwhelmed.  So, has the Secretary raised these concerns with President Biden?  And are these concerns that the White House shares?

MS. PSAKI:  Well, I think it's important to remember that Title 42 is not an immigration policy or an immigration authority.  It's a health authority.  So, yes, it was coordinated with the Secretary of Homeland Security and through an interagency process, and there's been planning in the works for months for this possibility that the CDC — to take this action.

Secretary Mayorkas is going to be testifying later this week, multiple times.  I'm sure he will answer that question and multiple other questions, and I will let him speak for himself.

But I would just note that we're continuing to prepare for March — May 23rd and the im- — May 23rd and the implementation, and there is a multipart strategy that Secretary Mayorkas has been leading and overseeing for the past several months.

Q   But has he raised these concerns with the President?

MS. PSAKI:  I'm not going to get into private conversations.  But I think, again, it's important to note this is a CDC decision and authority about when we were — had the health conditions to lift Title 42.  It wasn't an indication of an immigration policy.

Q   Do you not believe that there will not be a surge as a result of Title 42 being lifted come May 23rd?

MS. PSAKI:  Well, the Department of Homeland Security has projected that there could be an increase in people coming to the border, and that's why they've had a six-part, multipart plan and proposal and policy they've been implementing for months now to prepare for that.

Q   Is Title 42 — the potential end to it — the reason that the Congressional Hispanic Caucus is meeting with the President today?

MS. PSAKI:  No.  Actually, if you may remember, the President has been meeting with a number of the caucuses from Congress — from the Congressional Black Caucus; he met with CAPAC. He's been meeting with all of the caucuses, as he did last year.  So, this has been a meeting that's been in the works for some time.

Immigration, certainly we expect to be a part of it, but we expect it to be an expansive meeting.  And I would note the CHC has a stated view and policy on Title 42.

Go ahead.

Q    One of the members of the CHC is Senator Catherine Cortez Masto.  And she said of the Title 42 decision that "This is the wrong way to do this and it will leave the administration unprepared for a surge at the border."  Obviously, this is a subject that's likely to come up in this meeting today.  What is the President's message, primarily especially to these western and border-state Democrats who are concerned about both the impact on immigration as a policy matter but also the political fallout as well?

MS. PSAKI:  I think his — our view and the President's view is that we have a broken immigration system that's been long overdue to be fixed.  He agrees with that, and he's certainly happy to discuss that during this meeting or any other meeting has with members of Congress.

But this is not an immigration policy.  This — Title 42 is a health authority that's determined by the CDC.  And we — we need to have a conversation about immigration reform, and that's vital.  And maybe this is a reminder of that.

Q    Whenever the administration has been asked about immigration reform, the answer seems to be the President introduced the bill in the first week in office, but there's not much more than that more.  Is this an opportunity for the administration to try to move something forward this year?  Or do you believe that campaign politics will just preclude the likelihood of getting it through?

MS. PSAKI:  Well, we welcome that opportunity.  But I'd also remind you that we were supportive of efforts to include some components of immigration reform in the reconciliation packages, and we've been looking for avenues to move it forward and have been supportive of efforts by Democratic senators to do exactly that.

Q    Is there a specific ask of Congress related to Title 42?  That was the position that was articulated last week — that this is not a decision for the President to make but for Congress to make.  What is the decision that Congress should be making?

MS. PSAKI:  That is a discussion we'll have with members of Congress.  We are continuing to prepare to implement the lifting of Title 42, a decision that was made by the CDC.

I would note that there are a range of views on Title 42.  There are some, you noted, who are very vocal about how they would like to see it extended.  There are some who are very vocal about how they would not like to see that happen.

So that's an important discussion that will be happening over the coming days and weeks.

Go ahead, Jacqui.

Q   Thank you, Jen.  I don't believe the White House so far has commented on the death of Bishop Evans, the 22-year-old National Guard Specialist who drowned trying to save two migrants.  I wanted to give you the opportunity to say some words on that.

MS. PSAKI:  Yes.  Thank you for that, Jacqui.  And the news of the confirmation that his body had been found was confirmed just a couple of hours ago.  I would note that, of course, our heart goes out to his family and to his loved ones.

To confirm all the specific details, he went missing on Friday, following his selfless efforts to rescue two migrants who appeared to be drowning who were trying to cross a river in Mexico that went to the United States — went into the U.S., of course.

We know that National Guard personnel, including — including him, risk their lives every day to serve and protect others.  And again, our hearts go out to his family.

I don't have any — in case you may ask, I don't have any updates at this moment in terms of the President's outreach, but if — if that is something I can update you on this afternoon, I will let you know.

Q   Does the White House feel any responsibility for his death, given that there's reporting that he lost his life allegedly trying to save two migrants who were smuggling drugs?  This is a problem that, you know, the administration has been facing for some time and is obviously, as we've been discussing, getting some criticism on.  Is — does the White House feel at all responsible?  And what — what more can you offer to people who, you know, are on the border, in border communities, who are experiencing loss and trials like this?

MS. PSAKI:  Well, of course, we are mourning the loss of his life and we are grateful for the work of every National Guardsman.  I would note that the National Guard worked for the states, and so he is an employee of the Tex- — Texas National Guard, and his efforts and his

operation were directed by there, not by the federal government, in this — in this effort, in this apparatus.

We've — we've long stated that our immigration system is broken.  There needs to be more done to invest in smarter security, to have a more effective asylum processing system.  And we would welcome any efforts to — for any elected officials to work with us on that.

Q   A lot of the border communities often, you know, say that they have requested more from — from the federal government — more manpower to help manage these kinds of — these kinds of issues.  Is that being looked at?  Is that being — is that being —

MS. PSAKI:  Can you give me a more specific request or a specific person or —

Q   Well, you mentioned that, you know, this — this Specialist was a National Guard.  Obviously, you know, the state is in charge of that.  States are in charge of that.  But there have been requests from the Texas governor, from — you know, to send more — you know, to help people who are in this position at the border, who are now trying to deal with an influx of migrants that they know is going to only increase, as you just mentioned, after Title 42 is lifted.

You talked about having a humanitarian, you know, sort of, system in place to deal with people coming across and increase vaccinations and that kind of thing.  But in terms of, you know, law enforcement presence at the border.

MS. PSAKI:  Well, I would just say — if we just dial it back a few years to, kind of, what we inherited here — the former President invested billions of dollars in a border wall that was never going to work or be effective, instead of working towards comprehensive immigration reform.

As part of the President's proposal he put forward on his first day in office, he proposed investing in smarter security at the border — something he'd be happy to work with governors on.  And — and certainly we're open to having that conversation whenever they're ready to do that.

Go ahead, Weijia.

Q   Thanks, Jen.  Just more broadly on the Ukrainian aid.

MS. PSAKI:  Sure.

Q   Since the Russian invasion started, the U.S. has provided more than $5 billion total when you factor in military, economic, humanitarian aid.  Is there a figure that is a cap for what the U.S. is willing and able to provide Ukraine?

MS. PSAKI:  Well, I would say that the range of military assistance that we've provided to date was meant to be frontloaded because of our expectation or anticipation, led by our Department of Defense and military leaders, about the nature of the fight and how it has evolved, right?  That because they're on a terrain now that — where they're in need of long-range military capacity, we've tried to expedite the assistance over the past couple of weeks that they're receiving.

So it might not be, over the next couple of weeks, the same size of assistance week by week.  But in terms of what the next package will look like and what will be passed, I mean, those are discussions and recommendations that the President will get from his military leaders.  We'll have those discussions with Congress.  I'm not in a position to put a cap on it at this point in time.

Q   Okay, got it.  And then just switching over to COVID.  The administration is planning to take new actions to expand Paxlovid.

MS. PSAKI:  Yeah.

Q   Is there anything you can share about how you plan to do that and who might be eligible, since right now it's only for people who are at higher risk?

MS. PSAKI:  Sure.  Well, part of it is even people who are eligible are not taking advantage of the fact that they're eligible.  So, part of our effort is to share more information publicly about who can get access, who can call their doctor and get access to it.

I will tell you, Dr. Jha is going to make his debut in the briefing room tomorrow.  So, he will lay out for you and others more specifically all the steps we're taking to increase knowledge of Paxlovid, who can benefit from it.

I don't think we're intending to — and I'll let him speak to this — say there's going to be an expansion of who's eligible, as much as we're — and I will, obviously, leave that to the health experts to determine — but more we need to focus on making sure that everybody who is eligible knows they're eligible and they can get access to it, because it is very effective in treating COVID.

Q   Thank you, Jen.

MS. PSAKI:  Go ahead.

Q   Yeah.  Just a couple on Twitter.  I wanted to go back and try again.  Are you concerned about the kind of purveyors of election misinformation, disinformation, health falsehoods, sort of, having more of an opportunity to speak there on Twitter?

Is there, you know, any message that you would convey to Elon Musk as the new owner?

MS. PSAKI:  Well, I would just —

Q   And, you know, I would maybe just add to it that, you know, public — publicly traded companies have different levels of — there's different levels of scrutiny that are possible of publicly traded companies.  So, are you concerned about, you know, a billionaire taking control of a company that — where there's already a lot of concentration of power?

MS. PSAKI:  I would say that our concerns are not new.  We've long talked about and the President has long talked about his concerns about the power of social media platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable.

While I know you tried again — I appreciate that — I still don't have a specific comment on this specific transaction.  And at this point, we don't have any sense of what the policies will look like.

Q   Okay.  And then, last week, Daleep Singh made some very strong comments and also Treasury Secretary Yellen made some comments about the positive impact on inflation of lowering tariffs on certain Chinese goods — bicycles, underwear, apparel.  So —

MS. PSAKI:  It's quite a list.

Q   Yeah, it was quite a list.  Is there something cooking?  Can you tell us something?  And do you notice the White House embracing that?  Is that something we could see happen soon?

MS. PSAKI:  So, from the beginning of the administration, we talked about how some of the tariffs implemented by the previous administration were not strategic and instead raised costs on Americans.  And our effort — which has been ongoing, of course — has been to ensure current Section 301 tariffs align appropriately with our economic and trade priorities.

And you mentioned, you know, different goods that are sold.  But, of course, on wages and job opportunities; critical supply chains, where we see critic- — impacts on critical supply chains;

our ability to sustain our technological edge — this is an ongoing process.

And we're certainly looking at where we see costs being raised at a time where we're seeing heightened inflation; certainly, that's on our minds.  It's also about addressing the core issues we have with how China has approached, you know, their engagement around economic issues as well.

So, it's both.

Q    So, can we look for some tariff reductions in some relatively short period of time?

MS. PSAKI:  We're continuing to review it.  I don't have anything at this moment to preview for you, but our focus is on those same categories and areas: where we can impact — where we think they're impacting wages and job opportunities, our technological edge.  That's the prism through which our economic team — Ambassador Tai is, of course, leading this effort, is — is reviewing these sanctions.

Q    And then, just a real quick one on Putin.  So, the sanctions that have been imposed — and I realize they're quite sweeping and large, but on — especially on oligarchs and other people close to Putin — have thus far excluded his girlfriend, whose name I can't quite pronounce — *Kayova*?  *Kayeva*?  Do you have any comment on why you would refrain from sanctioning someone arguably close to Putin?

MS. PSAKI:  Well, I would remind you we're continuing to review sanctions.  No one is safe from our sanctions.  We've already, of course, sanctioned President Putin, but also his daughter, his closest cronies, and we'll continue to review more.

So, I wouldn't — I don't have an analysis at this point because we're still reviewing.  There's more we will likely do.

Go ahead.

Q    Jen, on just the broader strategy of helping Ukraine, there's obviously hurting Russia economically, hurting Russia militarily.  Given that the U.S. has rolled out so many sanc- — economic sanctions already against Russia, and the heavy fighting that we're seeing now, should we expect that the help that the U.S. offers Ukraine, going forward, would be more heavily, like, militarily focused as opposed to economic?  Or is that the wrong way of looking at it, as it's sort of all of the above?

MS. PSAKI:  No, I understand your question.  I think these are all discussions that we're having through the interagency, and there'll be a recommendation made to the President.

I mean, there's no question they need additional military assistance.  As part of Secretary Austin's follow-up to his trip to Ukraine, he was in Germany today meeting to discuss kind of the next steps and what their needs are as the — as the — as the battle and the war continues to evolve.

But they are also going to have significant humanitarian and economic needs as well.  So I would expect that all of them will continue to be touched on.  But these are the discussions that are happening in the interagency process now.

Q   And is there any new, updated U.S. assessment on any discontent or disagreement within Putin's top advisors or inner circle about the direction of the war?

MS. PSAKI:  I don't have any assessment I can read out from here — or any new assessment.

Q   And just one more on a different topic — just on inflation, given that it continues to be such a big concern for so many people.  The President obviously doesn't have the luxury of wandering outside the White House.  He can't, you know, go fill up this car or go to the grocery store.  Can you give us a sense of how he sort of is updated every day, or how he gets a sense of how much does milk cost more today than a week ago?  Just how does he sort of keep up to date on how much more expensive things are for the average American?

MS. PSAKI:  I can assure you that the President sees himself as the kid from Scranton, more than many people who work in his administration, and he is often the person who reminds people and members of his policy team in meetings what the impacts of rising food costs or gasoline costs or other issues are.  He does request and receive regular updates from his economic team.

And often, when he returns from weekends at home in Delaware, he comes back with conversations he had with people as he came out of church or, you know, as he — people he's known for a long time in his community, and they often tell him about how these — how the rising costs impact his life.

So I would say that he stays abreast of these changes and of these increases in costs and the impacts through economic data and briefings, but also through his own conversations whenever he can have them.

Q   Jen?  Jen?

MS. PSAKI:  Go ahead.

Q   I have — I have a question here about — following the recent Palestinian terror attacks from the Temple Mount and previous week of attacks that have killed many Israelis and wounded more, is the Biden administration reconsidering its support of the Palestinian Authority's two-state solution dividing Israel or stopping the welfare payments sent to the Palestinian Authority, who use the money for their pay-to-slay reward system?  And I have a follow-up question.

MS. PSAKI:  Okay.  Well, I would just note that I spoke to this last week, on Wednesday, where I noted that the United States is deeply concerned by the recent violence in Jerusalem and the Temple Mount and across the We- — West Bank.  And we also strongly condemn the recent rocket attack on Israel.

You may or may not have seen also that the President conducted a call with Prime Minister Bennett on Sunday morning.  He accepted an invitation by Prime Minister Bennett — Bennett to visit Israel in the coming months.  No specific date yet.  He took note of the ongoing efforts between Israeli and Palestinian officials to lower tensions and ensure a peaceful conclusion to the holy season of Ramadan.

And he also affirmed our unwavering support for Israel and its defense needs and welcomed the historic $1 billion allocation to replenish Israel's Iron Dome system.

Q   Okay.  The follow-up is: In view of continued Palestinian violence against innocent civilians, is the Biden administration willing to stop payments to the anti-semitic U.N. agency, UNRWA, and support restoring the Jewish cemetery in Vilnius, Lithuania, to its former glory?

MS. PSAKI:  Again, I think — I don't have any changes to announce to our policy.  I spoke to our condemnation of the violence just now as last — and last week as well, and noted also our call to the Prime Minister.

Go ahead.

Q   Thank you.

Q   Jen, a point of clarification on the aid that the U.S. has already allocated to Ukraine.

MS. PSAKI:  Sure.

Q   The President said last week that he had "almost exhausted" his drawdown ability.  So how much, after that announcement of the $800 million on Thursday, does the U.S. have left to provide Ukraine?

MS. PSAKI:  I'm sure I can get you this specific, exact number.  It was almost about $3.5 billion total of drawdown authority, I believe.  I will double-check that number for you.

So what he was referring to is: Because of how quickly we've been moving the military assistance to the Ukrainians on the ground, we anticipated being almost at a near end of that drawdown authority.  So that's why he's going to put forward a new package this week.

Q   And on student debt cancellation: Yesterday, Senator Elizabeth Warren said that the White House has essentially already canceled some student debt by waiving interest on that student debt, and it could use that same exact authority to cancel student debt permanently.  Does the White House agree with that view?  This is about the authority, not whether you will but that you can derive the authority in the same exact way.

MS. PSAKI:  I don't have anything to preview for you in terms of any authority and how — or how it would work.  What I would tell you is that not a single person in this country has paid a dime on student — federal student loans since the President took office.  And what we have said is that he would make a decision about any cancellation of student debt before the conclusion of that pause on student loans, but I don't have anything to preview for you at this point in time.

Q   And a quick follow-up on that.  She said that it was "an issue of racial equity."  Does the White House view this as a racial equity issue?

MS. PSAKI:  Well, again, I think the President views student loan relief, debt relief as something that impacts — yes, it is a racial equity issue, but it is also an issue that impacts many individuals — young people, middle-aged people — of all races.  It is something that he has — he has played — it has been a vital priority to the President, which again is why not a single person has played — paid a penny, a dime — a dime or a penny in student loans since he took office.

Go — go — go ahead, JJ.  I don't want to forget you.  Go ahead.

Q   Oh, thanks.  Two questions on the supplemental funding —

MS. PSAKI:  Yeah.

Q    — and then one Cedric Richmond.

MS. PSAKI:  Yeah.

Q    On the supplemental, has the administration decided to definitely combine the COVID funding with the aid for Ukraine?

MS. PSAKI:  We don't have the mechanism yet.  There's — these are conversations that we'll have with Congress.

Obviously, prior to the recess, there was the proposal that did combine, but — but not — don't have a — don't have a sense yet.

Q    Not quite yet.

And then, is the White House considering extending the Title 42 immigration restrictions as part of a deal with Congress?  Are you considering it?

MS. PSAKI:  Again, this would be Congress having the discussion.  We're continuing to prepare for a May 23rd implementation.  There'll be a range of conversations about this over the coming days.

Q    And then, the New York Times is reporting that Cedric Richmond is leaving.  Is he?  And just last week, he said publicly that he wouldn't leave unless the President asked him to.  So, has something changed there?

MS. PSAKI:  Yes.  Okay.  Well, let me first say that Cedric Richmond has been, continues to be a vital, essential advisor to the President — was on the campaign, continues to be in the White House.  I have been in many meetings with Cedric Richmond, where the President goes to him and looks to him for his political sense, his assessment of Congress.  He trusts him implicitly.

I have nothing to announce at this point, but I can assure you when we have something to announce, it will involve a new important role to — for Cedric Richmond and something the President is excited about and has asked him to do.

Go ahead.

Q    Jen, we saw the readout — we saw the readout from the call with the French President.  Did the President see any larger meaning in the French elections in terms of the support of the Allied effort against Russia?

MS. PSAKI:  I don't have any assessment of that.  Can I — I'll leave that to others to do analysis. The President was pleased with the — with the outcome.

As you know, he spoke with President Macron this morning, and he's looking forward to continuing to work with him in standing up against Russian aggression and standing with the Ukrainian people.

Q   And Ron — just along those lines, Ron Klain tweeted, "An interesting observation...[that] President Macron...secured a double-digit victory...at a time when his approval rating is 36%." Was there anything he was suggesting with that?

MS. PSAKI:  I don't have any more analysis to provide on that front, though I appreciate the question.

Go ahead.

Q   On NATO, reports in Finland and Sweden say that the country — the two countries are preparing to apply to join NATO as early as next month.  Is the White House supportive of that effort?

MS. PSAKI:  Well, those are decisions for these countries to make and for the NATO Alliance to make.  And so we'll leave it to those entities.

Q   And then, just on gun violence.  We learned more about Friday's shooter today from D.C. police, who say he had hundreds of rounds of unspent ammo inside his Connecticut Avenue apartment.  And then, today, the D.C. mayor announced a new police initiative to target violent crime.

Does the President believe he's done all he can do to fight violent crime, gun issues around this country without the intervention of Congress?

MS. PSAKI:  Well, he will continue to look for every authority he has to take steps to address gun violence — violent crimes across the country.

The last time we had data was in 2020, I believe.  And at that time, about 77 percent of homicides were done with a firearm.  And you saw him talk two weeks ago now — it's all running together — but two weeks ago now, I believe, about ghost guns and the steps that he is going to continue to take to address ghost guns, which we have seen have a rising role in — in gun — in gun deaths and gun targeting over the past several months.

I would also note that then, when he was doing that event, he highlighted that two LA sheriff's deputies who have been wounded by a shooter using a ghost gun.  So that's just even an example of how even they're using — these ghost guns are being used to target police as well, which is also a problem.

So, I would say, of course, there are significant steps that Congress can take that would make these laws permanent — that is the President's first preference — whether it's background checks, banning assault weapons.  These are laws that he has led the effort to pass throughout his career, many decades.

But he will continue to look for any steps he can take using his own authorities, as he has done several times since taking office.  I think he's done more than any other president using executive authority.

Go ahead.

Q    Thanks, Jen.  Two questions for you.  President Biden made his first endorsement of the midterm election cycle on Saturday, endorsing Congressman Kurt Schrader.  Why did he decide to weigh in on this race first?  And what would he say to some progressives who are frustrated that he endorsed Schrader over his opponent?

MS. PSAKI:  I certainly understand your question.  I don't make the rules, but the rules are I can't speak a lot about politics from here.  So I would point you to the DNC, and I would point you to Congressman Schrader's office.

Q    Second question for you: There's been a fair bit of speculation about Vladimir Putin's health based on recent videos of him.  Has the White House made an assessment on this matter?  And have concerns been raised internally at all about this topic?

MS. PSAKI:  I don't have any assessment for — to offer from here or any particular comment on the mental health of President Putin.

Go ahead.

Q    Jen, back to Title 42 quickly.

MS. PSAKI:  Yeah.

Q   I want to make sure I'm understanding what you're saying today.  I hear you talking about discussions going forward, the debate that's happening, all of that.  Are you saying that Title 42 — I know you're prepared to lift the current policy on May 23rd.  Are you saying that will happen unless Congress acts?  Or are you saying the White House might do something else?

MS. PSAKI:  Congress would have to take action in order for the date not to be May 23rd.

Q   Okay.  On Hunter Biden: The New York Post is reporting — looking at White House visitor logs, there were 19 visits to the White House while the President was Vice President by Hunter Biden's business partner, including one with the Vice President.  Could you help us understand why that business partner had access and what those meetings were about?

MS. PSAKI:  I don't have any information on that.  I'm happy to check and see if we have any more comment.

Q   And then, former Senator David Perdue, last night, hoping to be a senator again, opened his debate by saying that the election — 2020 election was rigged and stolen.  We know that every court — most courts — courts have ruled that it was fair, there's no evidence of fraud.  But I wonder what you make of those comments.  And has the White House done enough to push back and to make it clear that the election was not stolen?

MS. PSAKI:  I think that speaks to the former President's hold over factions of the Republican Party, not facts.

Go ahead.

Q   Thank you so much, Jen.  Two questions on Brazil.  First, last Friday, President Biden said the United States and rich countries should be paying Brazil to protect the Amazon.  And he said he's trying to get this done.

MS. PSAKI:  Mm-hmm.

Q   So what exactly is he trying to do?  Is he trying to work with other rich countries, negotiating with Brazil?  Is he ready to provide financial support to Brazil?  And how much would that be?

MS. PSAKI:  So the science — in the President's view, and the reason he made these comments, is that the science has only become more clear that the world needs to both strengthen and accelerate emissions reductions.  And part of that goal is conser- — includes conserving global

forest ecosystems that remove carbon from the atmosphere and store more carbon than they emit in a year, serving as carbon sinks.

So President Biden recognized the necessity of mobilizing funding from the whole go- — from world governments and the private sector.  And the Plan to Conserve Global Forest: the Critical Carbon Sinks launched at COP26 aims to mobilize finance from the public and private sector, with a strong focus on ~~levering~~ [leveraging] private-sector finance through market mechanisms.  So that's what he was speaking to and certainly an effort he continues to support.

Q   And there is a delegation today from the State Department in Brazil.  I wonder if this trip has anything to do with the war in Ukraine and perhaps the United States seeking or interested in working with Brazil food and energy security?

MS. PSAKI:  I would really point you to the State Department.  We are working with a range of countries, obviously, on addressing where we see any food shortages around the world.  And, obviously, Ukraine is front and center on the minds of most global leaders.

Q   And just a quick one: Why President Biden has declined to talk with President Bolsonaro?  We know that the Brazilian government its trying — been trying — try more than once.  So why is he declining to —

MS. PSAKI:  I don't have any update.  The President obviously has a busy schedule.  He has spoken with a range of global leaders but not every single one, and you just noted the State Department is in Brazil for a visit.  So I would note we have an ongoing dialogue at a high level.

Go ahead.

Q   Yes, Jen — oh.

MS. PSAKI:  Oh, go ahead.

(Cross-talk by reporters.)

MS. PSAKI:  Oh, okay.  Either one.  Okay.  You're kind of matching today, I'll note.  Yeah, there you go.  In your suits —

Q   We got the memo.  (Laughter.)

MS. PSAKI:  — in blue.

Q    Yeah, so, more people are starting to talk about recession.  Goldman Sachs and Bank of America alluded to it.  You — because of inflation.  The steps that have been taken so far haven't seemed to work to get inflation to come back down.  What additional steps are you guys looking at to curb inflation as well as the feeling that the economy is headed in the wrong direction?

MS. PSAKI:  Well, I would say, first, there are a number of strong economic indicators that we would point to.  We created more jobs last year than any year in American history.  The unemployment rate is at 3.6 percent.

We know that costs are too high.  Inflation, which the Federal Reserve has purview over, still projects that it will moderate by the end of the year.  There are a number of steps they have and they have indicated they have in — the plans to recalibrate.  We support that effort.  They have a lot of power here, in terms of taking steps to address inflation.

We are not — the President is not waiting for that to happen, and he is taking steps to address where we see costs increasing in different areas that impact the American people's pocketbooks.  Whether it's gas prices — obviously, he made an announcement to tap the Strategic Petroleum Reserve; led the global release — led an effort to release from the — globally to bring down gas prices.

We've also taken steps to fix issues with our supply chain to make sure goods are moving as quickly as possible.  And there's a lot of interest — continues to be in Congress — to take steps to lower costs on prescription drugs, healthcare, eldercare, childcare.  Those are all steps that are based on the President's proposals.

Q    (Inaudible) the President has pushed those spending proposals.  The San Francisco Federal Reserve released a report —

MS. PSAKI:  They'd be fully paid for, so they're not actually spending proposals; they're proposals to lower costs that are fully paid for.

Q    The San Francisco Federal Reserve released a report saying that government spending accounted for 3 percent of the inflation that we're seeing now.  So is spending more really the way to go?

MS. PSAKI:  Well, again, I think if you look back at where we were a year and a half ago, we were at the point where there was a significant economic downturn; where people were really suffering, struggling to put food on the table; strug- — people were out of work.  And what we've done — what we did at that time is take steps to help stem that economic downturn.  And that was a decision made that the President continues to believe was in the interest of the American people.

Q   One last quick one on China — the — looking at more lockdowns.  Now Beijing may be involved in that.  Is there anything that the administration is looking at doing to help the supply chains if this clogs up again?

MS. PSAKI:  Yeah.  So, we're — we're — we're following this very closely.  And as you know, there are a couple of different issues at play here.  There's obviously Shenzhen, which has kind of reopened, and they had moved around where their goods were being produced and moved around which ports they were going through.  Shanghai, obviously.  And there were a couple of industries that were being impacted.

We haven't seen, at this point, a decrease in ships coming to our ports in California from Asia.  We obviously are continuing to monitor that.  And Beijing is — has increased their testing, which could be a precursor to a lockdown, but we don't — we don't know at this point.

So what we're doing right now is we're closely monitoring — the State Department is, our economic team is.  And — but we haven't seen a slowdown in ships coming to our ports in California.

If there is an increase as lockdowns decrease in some parts of China, we'll also be prepared for that, because we've been able to take steps to reduce the number of cargo ships there.

Go ahead.

Q   Just one question, Jen.  There's been — there's been a lot of explosions and strange fires at quite significant places in Russia over the last couple of weeks, just most recently in the city of Bryansk.  Its oil containers blew up.  There's a lot of speculation over what's causing it.  And, obviously, one of the theories would be that Ukraine somehow doing it.

What is the U.S. position on Ukraine attacking inside Russian territory?  Is this something that U.S. is encour- — would encourage them to do and try and help them do it — you know, in terms of weapons?  Or is it something maybe where you'd advise the Ukrainians not to go there?

MS. PSAKI:  I don't — we don't have any confirmation of that.  Ukraine is defending their own country, so I'm just not going to speak to a hypothetical.

Q   Yeah, no, I'm not asking for confirmation on things that have happened.  It's just there's obviously a lot of speculation.  And it's kind of an obvious point, right?  Like, they're fighting the Russians tooth and nail inside their own country, quite often near the borders, and the Russians are inside their country.  So, is there a U.S. position on — on whether the Ukrainians should have the right or maybe even be encouraged to take their fight beyond their border?

MS. PSAKI:  Again, that is a hypothetical, so I'm not going to speak to it.  Ukraine's country is being invaded.  Russia is invading their country.  That's what we're supporting them for.  And there's been no confirmation of what you're detailing.  So I'm just not going to speak to it.

Go ahead.

Q   If I may, just — we know that Congressional Hispanic Caucus members are here meeting with the President.  I wonder if immigration and also Title 42 is being discussed.  And I don't know how much you can reveal about that meeting that is taking place this afternoon.

MS. PSAKI:  So I don't have a readout of the meeting at this point in time.  I would note that this is part of the series of meetings, as I noted earlier, that the President is doing with a range of the caucuses in Congress.  He did the Congressional Black Caucus, he did CAPAC, and he did these last year as well.

So we certainly expect immigration to be a topic of discussion, but I would note that the CHC also has a stated position on Title 42 as a caucus, which is that they oppose any change to the decisions that been — that has been made.  So anything could be discussed, but I wouldn't anticipate that being a topic — a major topic.

Q   If I may on Transdniestria —

MS. PSAKI:  Sorry, Matt.  I'll come to you next.  Go ahead.

Q   If I may, on Transdniestria —

MS. PSAKI:  Yeah.

Q   — there appears to have been some kind of attack on the ministry of state security.  We know that Moscow has been talking about this area possibly entering the conflict.  It seemed — it happened on a holiday when there wouldn't have been people in the building.  Does this bear the hallmarks of a false-flag operation of the sort that you've been warning us about?

MS. PSAKI:  Yeah, I've seen the reports.  I don't — obviously we have, of course — but I have — I don't have any confirmation of the specifics or the details at this point in time from here.

Go ahead, Matt.  Matt, did you have a question?

Q   Yeah. I just have two.  The first is: With the CHC coming —

MS. PSAKI:  Yeah.

Q   — some have wanted Biden — the administration to do more on executive actions related to immigration.  And, I guess, just philosophically, does the President believe that he's exhausted most of the things that he can do through executive power?  You had alluded earlier about the legislative push —

MS. PSAKI:  Sure.

Q   — but are there things that he feels like he could still do it through executive actions related to immigration?

MS. PSAKI:   I mean, I think his view is that taking steps and working with Congress to pass comprehensive immigration reform that has smarter security, that does put in place an asylum processing system that works is the best step that will have a lasting impact.

Obviously, we're continuing to assess any executive actions we can take, but he'll, I think, continue to discuss legislative actions as well.

Q   And then, secondly, you had mentioned this at the top — about the toxic exposures and that the President wants comprehensive — for the comprehensive legislation to be passed.  The House has passed a version related to this; the Senate has passed a version.

MS. PSAKI:  Yeah.

Q   The Senate version is sometimes criticized by advocates as not going far enough.  So, does the President have a stance on which piece of legislation he views as addressing this issue comprehensively?  Is he getting involved in that? There's other legislation that's — that hasn't been passed in the Senate that also grapples with this issue.

MS. PSAKI:  Sure.  I mean, obviously, as you know, now the next step is for both bodies of Congress to work together and figure out the path forward.  We did issue a SAP on the PACT Act.  So beyond that, I don't think I have anything more to update you on, on the position.

Go ahead.

Q    Thanks, Jen.  I had a question on Title 42.  At the risk of this being a dumb question: So if the CDC is able to extend Title 42, why is it up to Congress?  Can you just help people understand why it's on Congress to extend it and how (inaudible)?

MS. PSAKI:  Sure.  Congress gave the CDC authority to determine when the conditions would be met to lift Title 42, which again, has never been an immigration authority or an immigration policy; it's always been a health authority.

So when they determined we no longer had the conditions where we had to take action to quickly deport people who came to the country, they made that health decision based on data and science and the CDC decision-making.  Congress would need to make any decision about a change to the authority they gave the CDC.

Q    So the CDC doesn't have the authority to just say, "Things have changed –"?

MS. PSAKI:  If the health and data conditions change, they could certainly make a different decision, I supp- — sure.  But they make decisions based on health and data, not based on politics or where members of Congress sit.

Q    Another coronavirus —

MS. PSAKI:  (Inaudible.)

Q    And, actually, a follow-up on that question and something that was asked earlier.  Does the — is the President willing to sign something if it comes to his desk as part of a legislative package that would change the rules for how Title 42 is administered?  Because if it is, in fact — it is up to Congress ultimately, that would get to the President's desk and he would ultimately have to either sign it or veto it.  Is —

MS. PSAKI:  There's a lot of steps between now and then.  So, at this point, that's very premature.  There are many members who strongly would like to see Title 42 extended.  There are many who strongly have the other point of view.  So, we are not anywhere near that point in time.

Press Briefing by Press Secretary Jen Psaki, April 25, 2022 | The White House

Go ahead.

Q    Jen, the Surgeon General has said that misinformation about COVID amounts to a public health crisis.

MS. PSAKI:  Yeah.

Q    I'm wondering: Regardless of ownership, would the White House be interested in working with Twitter like it has in the past to continue to combat this kind of misinformation?  Or are we in a different part of the pandemic where that kind of partnership is no longer necessary?

MS. PSAKI:  Well, I think we engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue.  But there are also reforms that we think Congress could take and we would support taking, including reforming Section 230, enacting antitrust reforms, requiring more transparency.  And the President is encouraged by the bipartisan support for — or engagement in those efforts.

Q    Jen, on the U.S. and its allies in the Pacific: They're clearly being blindsided by China's security pact with the Solomon Islands, a very strategic location in the Pacific.  Kurt Campbell was down there only last week, and he announced some initiatives on, you know, speeding up the embassy there —

MS. PSAKI:  Yeah.

Q    — and they're sending a hospital boat, that sort of thing.  The question is: Why wouldn't you — why wouldn't the U.S. commit to far more significant security/military initiatives in such a strategic place like that?

And also, I wonder what would the Biden administration want from other countries.  Australia hasn't exactly been very well prepared for this Chinese-Solomon agreement either.

MS. PSAKI:  Yeah, it's a great group of questions.  I have not talked to Kurt Campbell about this since he returned.  I'm not sure if the President has.  I can — I can see if there's anything more we can update you on, on our policies.

Q    Thank you.

Q    Thank you, Jen.  I wanted to —

Q    The President has issued a statement on malaria.  Do you — the President just issued a statement on malaria today.  Since the time you started speaking, almost a hundred children

have died of malaria.  It said two — children — a child dies every two minutes of malaria.  Is the President prepared to increase funding, maybe fight malaria the same way the U.S. has been fighting COVID?

MS. PSAKI:  It's obviously something the President cares deeply about, as we do as an administration.  I don't have anything for you in terms of predictions of additional funding.  I can see if there's anything more from USAID.

Go ahead.

Q    On the coronavirus —

Q    On the TPS, I know the administration has just granted TPS to Cameroonian living in the U.S.  Why not extend it Ethiopia and Nigeria, other African countries that are also in crisis?

MS. PSAKI:  Yeah, I know you've asked me a similar question before.  It's an effort or a process led by the Department of Homeland Security to make a determination about conditions on the ground and an interagency process.  I don't — I don't have anything to predict at this point.  Obviously, they're continuing to assess.

Q    I wanted to ask about your announcement from last week on refugees from Ukraine.

MS. PSAKI:  Yeah.

Q    I know you're supposed to open the portal for applications today from DHS.

MS. PSAKI:  Yep.

Q    Can you talk about how you're preparing the resources to be able to accept what I'm sure is going to be a big influx of applications as soon as that portal opens?

MS. PSAKI:  So the Department of Homeland Security is going to do a briefing this afternoon for more — with more details to provide to you.  And, obviously, they will oversee the process.  And you're right, we certainly anticipate lots of interest on both sides.

Q    Thanks, Jen.

Q    Will there be someone in the White House — I know when you were working on Operation Afghans [sic] Welcome —

MS. PSAKI:  Yeah.

Press Briefing by Press Secretary Jen Psaki, April 25, 2022 | The White House

Q   — there was someone in charge of it from this end.  Is there going to be someone over here that's working on it?

MS. PSAKI:   Sure.  Obviously, Russia and Ukraine, and implementing all of our programs, is a top priority for the national security team.  I'll see if there is one individual who will be responsible.

Thanks so much.

4:08 P.M. EDT

Glenn Decl. Ex. 40
Page 26 of 26

# EXHIBIT 41



# Liberal Media Used to Warn Against Mailing Votes; Now Big Tech, Left Are Protecting It

**Alexander Hall**  *October 30th, 2020 11:50 AM*

Big Tech tyrants pretend that mail-in voting is safe, but the traditional media's past criticisms of mail-in voting have come back to bite them.

The liberal media, Big Tech, and the political establishment have teamed up in an unholy alliance to silence conservatives' concerns that mailing in votes could lead to voter fraud. President Donald Trump was fact-checked by Twitter for condemning "Mail-In Ballots" as "substantially fraudulent" in May. Since then, Big Tech has continued its scorched earth policy against Trump and fellow conservatives for questioning the vulnerabilities of mail-in voting.

Twitter most recently censored Trump's post criticizing mail-in voting on October 26. Twitter cracked down on Trump's tweet regarding "Big problems and discrepancies with Mail In Ballots." Users could not like or directly share the tweet without their posts being labelled as "disputed" and possibly "misleading."

Big Tech has a history of cracking down on Trump and his allies for critiquing the vulnerabilities of mail-in voting. This censorious trend arguably began when Trump was fact-checked by Twitter for condemning "Mail-In Ballots," stating, "There is NO WAY (ZERO!) that Mail-In Ballots will be anything less than substantially fraudulent," this past May.

GOP Chairwoman Ronna McDaniel called out Twitter for censoring critiques of mail-in voting earlier this year: "Twitter falsely claims there is no evidence of mail-in ballot fraud." She added: "That's odd since NJ's all-mail primary this month was 'plagued' by fraud concerns, with 3,000 votes set aside." She later noted that "Ballots were stolen out of mailboxes." Included in the tweet was a NBC article headlined "Close Results In Paterson Vote Plagued By Fraud Claims; Over 3K Ballots Seemingly Set Aside."

Outlets across the political spectrum have recently announced mail-in voting errors and fraud in multiple states.

New Jersey has been beset by multiple scandals regarding mail-in votes. *Washington Examiner* reported how 7,000 New Jersey residents received mail-in ballots for the wrong district. In early October, the Department of



Justice charged a mail carrier with dumping mail and nearly 100 ballots in New Jersey dumpsters.



Other states have faced mail-in ballot scandals as well. The Examiner posted an article about how Texas mayoral candidate Zul Mirza Mohamed was charged with hundreds of felonies relating to voter fraud, including "25 counts of unlawful possession of a ballot without the request of the voter and 84 counts of fraudulent use of a mail ballot application." Even *The Washington Post* added fuel to the fire: "At least 1,400 Virginia voters get duplicate absentee ballots amid rush to meet high demand, officials say," it wrote in late September.

There have been other articles specifically criticizing the hazards of mail-in voting itself from past election seasons. Here are but a few examples of when liberal outlets called out the dangers of mailing votes in the recent past:

**The New York Times** (2012) wrote: "votes cast by mail are less likely to be counted, more likely to be compromised and more likely to be contested than those cast in a voting booth, statistics show," in an article headlined "Error and Fraud at Issue as Absentee Voting Rises." **The Washington Post** *(2012)* wrote a piece that stated, "It may still be possible to steal an American election," citing a case in which "Conspirators allegedly bought off absentee voters" and "faked absentee ballots." **MSNBC** (2014) appealed to authority in a piece by illustrating: "Indeed, election experts say absentee ballot fraud is the most common form of organized voter fraud, since, because of the secret ballot, there's no way to ensure that an in-person voter is voting for the candidate he promised to." **Slate** (2016) acknowledged in a piece headlined "Voter Fraud Exists. Republican Restrictions Won't Stop It" that "The vast majority of voter fraud prosecutions touted by conservative groups like [T]he Heritage Foundation involve absentee ballots that were illegally cast. And the only voting fraud schemes with the potential to actually swing elections involved mail-in ballots."

The liberal establishment is so terrified of conservatives making similar critiques during the 2020 election that Big Tech companies like Facebook have overhauled their rules to protect liberals who have pushed for mail-in ballots.

The Biden campaign in particular pressured Facebook by torching its leadership for allowing a video from Donald Trump Jr. expressing concern over mail-in ballot fraud on the platform. Biden specifically condemned the platform for allowing "this dangerous claptrap to be spread to millions of



**mrcNewsBusters™**

**AMERICA'S MEDIA WATCHDOG**

people." Facebook leadership, shrinking under scrutiny, declared in a Twitter thread that the platform "won't allow ads with content that seeks to delegitimize the outcome of an election."

When reached for comment, election law expert and political law attorney in the Washington, D.C. office of Foley & Lardner LLP Cleta Mitchell responded that there is "not a serious legal difference" between absentee voting and general mail-in voting, in that they have the same general vulnerabilities.

Mitchell clarified beyond a shadow of a doubt that "Any time there is voting taking place outside the supervision and assistance of trained election officials, there is opportunity for mischief."

**Big Tech Restricts Criticism of Mail-In Voting**

Big Tech executives know that they can crush conservative dissent about the issues that decide the fate of the election.

Twitter most recently censored Trump's post criticizing mail-in voting on October 26. Twitter cracked down on Trump's tweet regarding "Big problems and discrepancies with Mail In Ballots," claiming it spread information about the election that "is disputed and might be misleading." Users cannot directly share or like the tweet. Even if users decide to share it as a quote-tweet, their post is automatically labelled: "Some or all of the content shared in this Tweet is disputed and might be misleading about how to participate in an election or another civic process. Learn more."

Facebook declared that public concern over voter fraud will not be tolerated — which simply means the platform plans to censor Trump and conservatives for voicing concerns about the election that will decide America's future.

It's no surprise that Facebook's policy change happened the same week that the Biden campaign demanded Trump's Facebook posts be censored. The Biden campaign's letter, obtained by Axios, proclaimed that Donald Trump Jr's public statements of concern over mail-in voting were dangerous to democracy itself:



> "No company that considers itself a force for good in democracy, and that purports to take voter suppression seriously, would allow this dangerous claptrap to be spread to millions of people. Removing this video should have been the easiest of easy calls under your policies, yet it remains up today."

Twitter also modified its rules, stating: "we may label and reduce the visibility of Tweets containing false or misleading information about civic processes in order to provide additional context" in its Civic integrity policy.

Twitter locked, and later reinstated, the account of former acting Director of National Intelligence Richard Grenell on October 8 after he tweeted a picture of two ballots sent to his friend's parents — both of whom passed away 10 years ago, according to Breitbart.

Trump wrote an August 23 tweet criticizing "Mail Drop Boxes" as a "voter security disaster." Twitter responded by placing an interstitial, or filter, over Trump's tweet. In late May, Twitter fact-checked Trump for suggesting that mail-in ballots could lead to voter fraud, a concern even *The Times* has acknowledged to be valid.

Trump Campaign's National Press Secretary Hogan Gidley was censored for daring to voice concerns about mail-in voter fraud as well. "The Trump campaign's national press secretary had his Twitter account suspended Thursday, just hours before the presidential debate, after he tweeted about his experience of being sent absentee ballot materials intended for someone else," Fox News detailed in late October. Gidley had reportedly been suspended for tweeting about "receiving an envelope in the mail that was addressed to someone else, by the name of 'Daniel.'"

### Liberal Media Acknowledged Flaws of Mail-In Voting … Before COVID-19, 2020 Election

Conservatives can recall when the liberal establishment saw mailing votes as hazardous to democracy.

Republican National Committee Chairwoman Ronna McDaniel scorched Twitter last May. McDaniel cited liberal news sources after the platform fact-checked Trump for addressing the possibility of mail-in voter fraud.



She tweeted that even the liberal media have explained the legitimate reasons for concern about voter fraud. She linked to *The Times* article headlined "Error and Fraud at Issue as Absentee Voting Rises."

"Here's *The New York Times* highlighting how 'votes cast by mail are less likely to be counted, more likely to be compromised and more likely to be contested than those cast in a voting booth,'" tweeted McDaniel.

The record shows, liberal media outlets had no problem with criticizing mail-in voting when it was politically expedient to do so.

*The Post* has addressed voter fraud, particularly from absentee ballots, multiple times. In 2012, when the chief fraud concern was impostors voting at the polls in place of other people, *The Post* was clear that other forms of fraud were comparatively far more real:

> "It may still be possible to steal an American election, if you know the right way to go about it. Recent court cases, from Appalachia to the Miami suburbs, have revealed the tricks of an underground trade: Conspirators allegedly bought off absentee voters, faked absentee ballots, and bribed people heading to the polls to vote one way or another."

Another article by *The Post* that same year suggested similar ideas based on cited research from Carnegie-Knight investigative reporting project's News21:

> "The analysis found that there is more alleged fraud in absentee ballots and voter registration than in any of the other categories. The analysis shows 491 cases of alleged absentee ballot fraud and 400 cases involving registration fraud."

**MSNBC** observed in a 2014 article headlined "Greg Abbott's bogus voter fraud crusade" that, according to "experts," absentee ballot fraud is of the most popular form of voter fraud:

> "Indeed, election experts say absentee ballot fraud is the most common form of organized voter fraud, since, because of the secret ballot, there's no way to ensure that an in-person voter is voting for the candidate he promised to."



Most recently, **Slate** wrote that elections can be swung by mail-in voter fraud in a 2016 piece headlined, "Voter Fraud Exists. Republican Restrictions Won't Stop It":

> "Voter fraud does happen—but it almost never occurs at the polls. Instead, as election law expert and occasional Slate contributor Rick Hasen has explained, voter fraud occurs through absentee ballots. The vast majority of voter fraud prosecutions touted by conservative groups like [T]he Heritage Foundation involve absentee ballots that were illegally cast. And the only voting fraud schemes with the potential to actually swing elections involved mail-in ballots, not impersonation at the polls. (This makes sense: It's much easier to forge a signature, impersonate a voter, or buy a vote in the privacy of one's home than it is in a voting booth at the polls.)"

The same piece noted bluntly: "If Republicans were truly serious about eradicating voter fraud, they would severely restrict absentee voting, permitting it only when voters have a good excuse, like illness."

### 'Opportunity for Mischief': A Legal Expert's Grim Warning

Lawyer Cleta Mitchell confirmed not only the parallel vulnerabilities between mail-in votes and absentee ballots but attested to how both can be used in an attempt to steal the 2020 election.

Mitchell warned: "Any time there is voting taking place outside the supervision and assistance of trained election officials, there is opportunity for mischief."

She also made clear that "The swarming of the election offices with tens of thousands of mail ballots this year, is certain to upend the system which is not prepared to manage all of those pieces of paper." Mitchell illuminated the fact that the electoral system was woefully unprepared for mass mail-in voting:

> "There are lots of opportunities for fraud when ballots or applications are mailed to vacant lots, to dead people, etc., and when partisan campaign operatives are collecting ballots and dumping them into receptacles that no one is observing. That's just one of many scenarios that is of concern."



Mitchell suggested that the Democratic political establishment is eagerly pushing for the most cynical methods to win this current election:

> "The Democrats have been demanding that 'ballot harvesting' be legalized in places where it has been prohibited. Ballot harvesting is where strangers / campaign partisans can collect unlimited ballots and return those on behalf of the voters – big opportunity for fraud in that process."

Mitchell explained that there is "not a serious legal difference" between absentee voting and general mail-in voting, though they are initially distributed in different ways.

Mitchell made the critical distinction that while citizens had to request absentee ballots in the past, mail-in ballots are now being sent en-masse and overwhelming an unprepared system:

> "The voter rolls are so badly maintained, that sending to everyone on the list is a guaranteed way to ultimately be sending ballots to dead people, people who have moved, etc. And once those ballots are sent, there are few safeguards to protect against those ballots being fraudulently voted."

Having individuals with special cases request absentee ballots is one thing, but sending ballots en-masse has a much larger capacity for fraud, Mitchell warned.

***Conservatives are under attack.*** *Contact Twitter's and Facebook's leadership by tweeting at the official @Twitter account  and contact Facebook headquarters at 1-650-308- 7300 or 1-650-543-4800 and demand that Big Tech companies not permit doxxing on their platforms. If you have been censored, contact us at the Media Research Center contact form to be included in our database, and help us hold Big Tech accountable.*

# EXHIBIT 42



 **Facebook**

⏱ **This article is more than 1 year old**

# Facebook leak reveals policies on restricting New York Post's Biden story

**Moderators had to manually intervene to limit distribution of Hunter Biden report**

**Alex Hern**
🐦 **@alexhern**
Fri 30 Oct 2020 09.44 EDT

Facebook moderators had to manually intervene to suppress a controversial New York Post story about Hunter Biden, according to leaked moderation guidelines seen by the Guardian.

The document, which lays out in detail Facebook's policies for dealing with misinformation on Facebook and Instagram, sheds new light on the process that led to the company's decision to reduce the distribution of the story.

"This story is eligible to be factchecked by Facebook's third-party factchecking partners," Facebook's policy communications director, Andy Stone, said at the time. "In the meantime, we are reducing its distribution on our platform. This is part of our standard process to reduce the spread of misinformation. We temporarily reduce distribution pending factchecker review."

In fact, the documents show, the New York Post – like most major websites – was given special treatment as part of Facebook's standard process. Stories can be "enqueued" for Facebook's third-party factcheckers in one of two ways: either by being flagged by an AI, or by being manually added by one of the factcheckers themselves.

Facebook's AI looks for signals "including feedback from the community and disbelief comments" to automatically predict which posts might contain misinformation. "Predicted content is temporarily (for seven days) soft demoted in feed (at 50% strength) and enqueued to fact check product for review by [third-party factcheckers]," the document says.

But some posts are not automatically demoted. Sites in the "Alexa 5K" list, "which includes content in the top 5,000 most popular internet sites", are supposed to keep their distribution high, "under the assumption these are unlikely to be spreading misinformation".

Those guidelines can be manually overridden, however. "In some cases, we manually enqueue content … either with or without temporary demotion. We can do this on escalation and based on whether the content is eligible for fact-checking, related to an issue of importance, and has an external signal of falsity." The US election is such an "issue of importance".

In a statement, a Facebook spokesperson said: "As our CEO Mark Zuckerberg testified to Congress earlier this week, we have been on heightened alert because of FBI intelligence about the potential for hack and leak operations meant to spread misinformation. Based on that risk, and in line with our existing policies and procedures, we made the decision to temporarily limit the content's distribution while our factcheckers had a chance to review it. When that didn't happen, we lifted the demotion."

The guidelines also reveal Facebook had prepared a "break-glass measure" for the US election, allowing its moderators to apply a set of policies for "repeatedly factchecked hoaxes" (RFH) to political content. "For a claim to be included as RFH, it must meet

eligibility criteria (including falsity, virality and severity) and have content policy leadership approval."

The policy, which to the Guardian's knowledge has not yet been applied, would lead to Facebook blocking viral falsehoods about the election without waiting for them to be debunked each time a new version appeared. A similar policy about Covid-19 hoaxes is enforced by "hard demoting the content, applying a custom inform treatment, and rejecting ads".

Facebook acts only on a few types of misinformation without involving third-party factcheckers, the documents reveal. Misinformation aimed at voter or census interference is removed outright "because of the severity of the harm to democratic systems". Manipulated media, or "deepfakes", are removed "because of the difficulty of 'unseeing' content so sophisticatedly edited". And misinformation that "contributes to imminent violence or physical harm" is removed because of the security of imminent physical harm.

The latter policy is not normally applied by ground-level moderation staff, but a special exception has been made for misinformation about Covid-19, the document says. Similar exceptions have been made to misinformation about polio in Pakistan and Afghanistan, and to misinformation about Ebola in the Democratic Republic of the Congo.

Facebook also has a unique policy around vaccine hoaxes. "Where groups and pages spread these widely debunked hoaxes about vaccinations two or more times within 90 days, those groups and pages will be demoted in search results, all of their content will be demoted in news feed, they will be pulled from recommendation systems and type-ahead in search, and pages may have their access to fundraising tools revoked," the document reads.

"This policy is enforced by Facebook and not third-party factcheckers. Thus, our policy of not subjecting politician speech to factchecking does NOT apply here. If a politician shares hoaxes about vaccines we will enforce on that content."

… we have a small favour to ask. Tens of millions have placed their trust in the Guardian's fearless journalism since we started publishing 200 years ago, turning to us in moments of crisis, uncertainty, solidarity and hope. More than 1.5 million supporters, from 180 countries, now power us financially – keeping us open to all, and fiercely independent.

Unlike many others, the Guardian has no shareholders and no billionaire owner. Just the determination and passion to deliver high-impact global reporting, always free from commercial or political influence. Reporting like this is vital for democracy, for fairness and to demand better from the powerful.

And we provide all this for free, for everyone to read. We do this because we believe in information equality. Greater numbers of people can keep track of the global events shaping our world, understand their impact on people and communities, and become inspired to take meaningful action. Millions can benefit from open access to quality, truthful news, regardless of their ability to pay for it.

If there were ever a time to join us, it is now. Every contribution, however big or small, powers our journalism and sustains our future. **Support the Guardian from as little as $1 – it only takes a minute. If you can, please consider supporting us with a regular amount each month. Thank you.**



Glenn Decl. Ex. 42
Page 5 of 5

# EXHIBIT 43



**Congress of the United States**
**House of Representatives**
**Washington, DC 20515**

December 10, 2020

President-elect Joseph R. Biden, Jr.
Biden-Harris Transition Team
1401 Constitution Ave NW
Washington, D.C. 20230

Dear President-elect Biden:

U.S. national security experts have long been sounding the alarm on the threat of disinformation and misinformation from foreign adversaries such as Russia, China, and Iran, but the past few years have made it clear **that we must also protect against domestic online threats through proactive education, prioritized research, and increased transparency**.

Disinformation and misinformation are not partisan issues. They affect our collective public health, safety, and democracy. We founded the Congressional Task Force on Digital Citizenship earlier this year in order to focus our policy efforts on countering online harms by equipping Americans with tools to be resilient against online threats and falsehoods. The COVID-19 pandemic has been called an "infodemic" by the World Health Organization because of the rampant disinformation and misinformation that has spread surrounding it, particularly online.

We have seen a drastic rise in online extremism that has only been heightened during the pandemic and recent elections. There will be future disinformation and misinformation events that will attempt to erode the foundations of our democratic society, and foreign adversaries will look to take advantage of a lack of coordinated national response to these events. As your administration begins the challenge of putting in place evidence-based policies to combat online threats, we urge you to utilize a robust, whole of government system to build citizen resilience to disinformation and misinformation. We hope your administration will consider the following actions:

**Launch a multiagency digital democracy task force.** A new digital democracy task force should be comprised of officials from across the federal government who, with dedicated funding and resources, shall develop a federal strategy to create greater national resilience to online threats as well as explore stronger protections for the democratic process. It should be responsible for rolling out media literacy education across the federal government, including guidance for how best to proactively monitor for disinformation and communicate during a disinformation or misinformation event. Communications strategies from trusted members of the government will be needed to counter disinformation and misinformation, especially as your administration works to ensure that Americans across the country are inoculated against COVID-19.

Glenn Decl. Ex. 43
Page 1 of 3

**Address media deserts and fund media literacy programs with a commitment to truth-seeking**. The loss of independent local news in communities and the increasing number of "news deserts" across the United States has meant that Americans are more frequently being siloed into different news environments online, which report vastly different information and do not offer the same editorial standards to protect against disinformation and misinformation that traditional news media do. As social media platforms post record revenues from engagement, they seldom act as responsible information gatekeepers and, in fact, have financial incentives to direct users to posts that are false, misleading, or emotionally manipulative. At the same time, Americans are left with few tools to discern what is factual reporting.

Your administration could prioritize funding for media literacy and education programs that work to build resilience to disinformation and misinformation. Libraries are in every community, serving all backgrounds and ages, and can be a critical resource in arming individuals with the knowledge and skills to evaluate and understand fast-moving digital information. Investments in quality public broadcasting, reporting, and the next generation of truth-seeking journalists will also help to bolster our society against future "infodemics."

**Support collaboration between government and civic organizations to combat dangerous propaganda and increase funding for evidence-based programs.** Although social media platforms have taken some steps to limit the spread of harmful disinformation and misinformation over the past year, we can still see how easily this content is posted and amplified by bad actors and unknowing citizens. And, as we mentioned above, platforms have financial incentives for engaging posts to reach larger audiences, regardless of the content. However, computer algorithms still make up a majority of content moderation, and platforms have at times refused to take action against accounts and groups promoting violence and hate speech. In 2019, the FBI labeled fringe political conspiracy theories as a domestic terror threat and it is highly troubling how many Americans have adopted these conspiracy theories as truth. With the targeted amplification of these conspiracy theories online, more individuals will be exposed to this extremist content and may be motivated to commit criminal acts.

Your administration could dedicate resources to evidence-based programs within the Department of Homeland Security and the Department of Justice that work to deradicalize individuals in online communities. Civil society and civic organizations also play a crucial role, and your administration could prioritize grant funding for experienced organizations to research the dynamics of radicalization in the online environment, teach vulnerable audiences how to spot propaganda, and build the long-term capacity of civic organizations to provide counter-narratives.

**Collaborate with global allies.** Disinformation and misinformation have become mainstream in 2020; however, our allies have been responding to this threat for years. Canada, as an example, took swift action after watching the events surrounding the 2016 U.S. election and stood up a new government service, the Digital Citizen Initiative, to build citizen resilience to disinformation and support a healthy information ecosystem. France has rolled out several tools that allow for public analysis of platform ad libraries, real-time fact checking to counter disinformation campaigns, and an open resource to help collaboration on countering disinformation and misinformation.

Your administration should seek to partner and collaborate with our global allies on these issues to help set global mechanisms on platform transparency, share information on the evolving digital ecosystems, and develop protocols for citizen resilience to online information. This is a complex, shared issue that recognizes no border. Deliberate collaboration with our allies and partners will provide additional perspectives and solutions we cannot imagine nor execute alone.

Disinformation and misinformation will continue to evolve and our job as policy makers is to keep up, while also looking ahead at building a more resilient society. Infodemics will not go away now that there is a COVID-19 vaccine and conspiracy theories will continue to be exploited. The United States has fallen behind global allies in understanding and working to combat disinformation and misinformation, and foreign adversaries have identified it as a point of weakness for our nation. We encourage you to work with researchers, scholars, and civil society to understand the impact of disinformation and misinformation on American society and we stand ready to assist you in putting forward these new initiatives.

Sincerely,

Jennifer Wexton
Member Task Force
on Digital Citizenship

David N. Cicilline
Member Task Force
on Digital Citizenship

Donald S. Beyer Jr.
Member Task Force
on Digital Citizenship

Zoe Lofgren
Member Task Force
on Digital Citizenship

Bill Foster
Member Task Force
on Digital Citizenship

William R. Keating
Member Task Force
on Digital Citizenship

Yvette D. Clarke
Member Task Force
on Digital Citizenship

Jamie Raskin
Member Task Force
on Digital Citizenship

Elissa Slotkin
Member Task Force
on Digital Citizenship

# EXHIBIT 44

☰  **CNN** politics                    Audio    Live TV    [ Log In ]

# Biden team may partner with private firms to monitor extremist chatter online

By Zachary Cohen and Katie Bo Williams, CNN

Updated 5:12 PM ET, Mon May 3, 2021



**What's fueling the growth of far right-wing terrorism?** 03:30

**Washington (CNN) —** The Biden administration is considering using outside firms to track extremist chatter by Americans online, an effort that would expand the government's ability to gather intelligence but could draw criticism over surveillance of US citizens.

The Department of Homeland Security is limited in how it can monitor citizens online without justification and is banned from activities like assuming false identities to gain access to private messaging apps used by extremist groups such as the Proud Boys or Oath Keepers.

Instead, federal authorities can only browse through unprotected information on social media sites like Twitter and Facebook and other open online platforms. A source familiar with the effort said it is not about decrypting data but rather using outside entities who can legally access these private groups to gather large amounts of information that could help DHS identify key narratives as they emerge.

The plan being discussed inside DHS, according to multiple sources, would, in effect, allow the department to circumvent those limits. In response to CNN's story, DHS said it "is not partnering with private firms to surveil suspected domestic terrorists online" and "it is blatantly false" to suggest that the department is using outside firms to circumvent its legal limits.

"All of our work to address the threat of domestic terrorism is done consistent with the Constitution and other applicable law, and in close coordination with our privacy and civil liberties experts," the DHS statement added.



☰   politics                                    Audio   Live TV   [ Log In ]

would likely be beneficial to both it and the FBI, which can't monitor US citizens in this way without first getting a warrant or having the pretext of an ongoing investigation. The CIA and NSA are also limited on collecting intelligence domestically.

It would, however, involve empowering a unit at DHS that is already under fierce scrutiny for its bungled handling of the Portland riots last summer, an episode that included collecting intelligence reports on journalists and unmasking private citizens, according to a source familiar with a recent internal report on the matter.

That leaves the Biden administration with a key question: how to address mistakes made during the Trump administration while also finding ways to respond to what critics say were blatant failures by US intelligence agencies to act on warnings ahead of the January 6 attack on the US Capitol?

"There's a tension between wanting to empower [DHS's intelligence office] to do this kind of work around domestic terrorism on the one hand and then on the other hand the misuse of its capabilities during the summer of 2020, gives a lot of people on the Hill pause {when it comes to} potentially giving them new authorities, capabilities or resources," a Senate aide told CNN.

DHS officials are exploring ways to enhance the department's information gathering within the bounds of its current authorities, multiple sources told CNN. The department is coordinating with the National Security Council and FBI as part of the effort, sources added.

"There was only limited awareness before January 6 of what violent extremists were planning through social media," said Tom Warrick, a senior fellow at the Atlantic Council who served as DHS Deputy Assistant Secretary for Counterterrorism Policy from 2008 until 2019 and has decades of experience as a career government official at agencies including the State Department.

Warrick added he would expect DHS to "explore whether contractors could help them understand plots and trends" emerging online.

**Related Article:** Acting US Capitol Police chief says intelligence failed to predict scope of January 6 attack

"Whatever gets approved and implemented has to comply with established laws," he said, noting that DHS can only use overt methods to gather information from social media or collect information that is publicly available.

Researchers who already monitor such activity online could act as middlemen to obtain the information. DHS officials maintain the materials provided would only consist of broad summaries or analysis of narratives that are emerging on these sites and would not be used to target specific individuals.

But some of the research firms and non-profit groups under consideration by the DHS periodically use covert identities to access private social media groups like Telegram, and others used by domestic extremist groups. That thrusts DHS into a potential legal gray area even as it plugs an intelligence gap that critics say contributed to the failure to predict the assault on the Capitol.

# Tracking narratives

Pro-Trump supporters storm the US Capitol on January 6, 2021

Much of the planning for the Capitol Hill riot appeared out in the open, on social media platforms and on encrypted apps available to anyone with an internet connection. The DHS is trying to get a better sense of "narratives" that might lead to violence as they emerge across those channels, according to two DHS officials.

But tracking those narratives, particularly in the wake of January 6, increasingly requires access to private groups on encrypted apps as extremist groups migrate from more forward-facing sites like Facebook.

By the time narratives are appearing on Facebook, it is usually too late, one DHS official told CNN.

"Domestic violent extremists are really adaptive and innovative. We see them not only moving to encrypted platforms, but obviously couching their language so they don't trigger any kind of red flag on any platforms," the official added.

Outsourcing some information gathering to outside firms would give DHS the benefit of tactics that it isn't legally able to do in-house, such as using false personas to gain access to private groups used by suspected extremists, sources say.

The department is also working to expand its ability to collect information from public-facing social media sites where users' posts offered clear warning signs about potential violence ahead of the January 6 attack, but were either ignored or underestimated by security officials prior to that date.

But any effort by the intelligence community to wade into the murky area of domestic spying is fraught with political risks, current and former officials say.

Gathering information on US citizens -- no matter how abhorrent their beliefs -- raises instant constitutional and legal challenges. Civil liberties advocates and privacy hawks have long criticized any efforts to collect even publicly available information on Americans in bulk as a violation of Americans' First and Fourth Amendment rights.



Audio    Live TV    Log In

If they can find willing external partners that would help provide access to private groups on these encrypted apps, DHS and its federal partners, including the FBI, would be able to legally identify potential domestic terrorists and access information that could inform investigative efforts, a source familiar with the effort told CNN.

FBI director Christopher Wray has been emphatic during recent public testimony that the bureau does not investigate ideologies or even conspiracy theories in and of themselves, but restricts its social media monitoring to cases where they believe a crime, or potential crime, was committed.

But if the DHS could help provide a broad picture of who was perpetuating the "narratives" of concern, the FBI could theoretically use that pool of information to focus on specific individuals if there is enough evidence of a potential crime to legally do so, the source added, noting the two agencies are working closely with one another in this area.

"What do you do about ideology that's leading to violence? Do you have to wait until it leads to violence?" said one former senior intelligence official.

**Related Article:** Investigators pursuing signs US Capitol riot was planned

"We are exploring with our lawyers, civil rights, civil liberties and privacy colleagues, how we can make use of outside expertise," the DHS official added, referring to the department's efforts related to encrypted applications.

The problem with that, the source familiar with the effort acknowledged, is DHS would be operating in a space that would likely make civil liberties' advocates, not to mention conservatives', hair stand on end.

Privacy advocates on the Hill have already questioned the Defense Intelligence Agency's efforts to get around restrictions on collecting Americans' location data without a warrant by purchasing that data from commercially-available databases.

## Problems in Portland

Federal officers disperse a crowd during a protest at the Immigration and Customs Enforcement detention facility on September 18, 2020 in Portland, Oregon.

Even as the DHS eyes a more robust use of its intelligence authorities, it continues to face fierce scrutiny on Capitol Hill over its handling of the Portland protests last summer — raising the possibility that at least some lawmakers will push back on the effort.

The department -- then led by Trump appointees but staffed by career officials, some of whom remain on the job -- collected and disseminated open source reports on U.S. journalists who were publicly reporting on the protests. The department also sent analysts to Portland to question protesters, according to a public statement by House Intelligence Committee Chairman Adam Schiff, D-Calif. -- a tactic seen by some as a government intrusion on Americans' First Amendment right to protest. Schiff also revealed that the DHS that protects federal property had requested that analysts "extract data" from phones seized from protesters without a warrant, a request that went unfulfilled.

"There were a number of other reports that were issued that shouldn't have been issued," DHS' acting intelligence chief, Joseph Maher, told the committee in October.

DHS's general counsel conducted its own administrative review of the Portland collection practices, which it delivered to the Hill on January 6 -- purely coincidentally. In addition to the concerns about improper collection tradecraft and unmasking -- in which officials request to expose surveilled US citizens' identity internally, a sometimes-controversial request -- the review also found that department leaders created a command climate that created a false sense of urgency and sent untrained, inexperienced collectors to Portland, according to a source familiar with the contents of the report.

A DHS spokesperson said that "upon learning of alleged improper activities at the Office of Intelligence and Analysis (I&A), DHS took immediate action to review I&A activities, including to identify areas that needed resolution and ensure I&A leadership fosters a work environment that encourages diversity of thought and reinforces I&A's duty to preserve the civil rights, civil liberties, and privacy of all persons and communities."

The House Intelligence Committee, which is conducting an ongoing investigation of its own, has also expressed frustration that the department has failed to provide documents it has requested as part of the probe.

 politics                                                    Audio    Live TV    Log In

investigation, so we can complete our work and make recommendations for necessary reforms.

The office is also the subject of a pair of unrelated inspector general probes, one related to possible failures leading up to January 6, and one related to alleged political interference with an intelligence notification.

I&A has long struggled to carve out a niche for itself within the intelligence community. When it comes to domestic terrorism, many of their authorities overlap with the National Counterterrorism Center -- raising questions about what I&A can do better than the more robust NCTC.

"It's perceived by some as just a resource suck that doesn't add tremendous value," said one former senior intelligence official.

*The story has been updated to include the DHS response to CNN's reporting. The headline has also been updated to more precisely describe what sources say is being considered.*

*CNN's Geneva Sands contributed to this story*

---

Search CNN...    🔍

Ⓤ
**Log In**

---

Live TV

Audio

---

US

World

Politics

Business

Opinion

Health

Entertainment



Style

Travel

Sports

Videos

Audio

CNN Underscored

Weather

More

**FOLLOW CNN POLITICS**

Terms of Use    Privacy Policy    Do Not Sell My Personal Information    Ad Choices    About Us

CNN Store    Newsletters    Transcripts    License Footage    CNN Newsource    Sitemap

© 2022 Cable News Network.   A Warner Bros. Discovery Company.   All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

# EXHIBIT 45

 REUTERS®                                  

 My View       Following       Saved

July 26, 2021 · 2:38 PM CDT
Last Updated 10 months ago



# Facebook and tech giants to target attacker manifestos, far-right militias in database

**By Elizabeth Culliford**                                                3 minute read

            

Glenn Decl. Ex. 45
Page 1 of 11



1/5

A militia member with body armor and a Three Percenters militia patch stands in Stone Mountain as various militia groups stage rallies at Stone Mountain, Georgia, U.S. August 15, 2020. REUTERS/Dustin Chambers/File Photo

July 26 (Reuters) - A counterterrorism organization formed by some of the biggest U.S. tech companies including Facebook **(FB.O)** and Microsoft **(MSFT.O)** is significantly expanding the types of extremist content shared between firms in a key database, aiming to crack down on material from white supremacists and far-right militias, the group told Reuters.

Until now, the Global Internet Forum to Counter Terrorism's (GIFCT) database has focused on videos and images from terrorist groups on a United Nations list and so has largely consisted of content from Islamist extremist organizations such as Islamic State, al Qaeda and the Taliban.

Over the next few months, the group will add attacker manifestos - often shared by sympathizers after white supremacist violence - and other publications and links flagged by U.N. initiative Tech Against Terrorism. It will use lists from intelligence-sharing group Five Eyes, adding URLs and PDFs from more groups, including the Proud Boys, the Three Percenters and neo-Nazis.

Reuters.com

The firms, which include Twitter **(TWTR.N)** and Alphabet Inc's **(GOOGL.O)** YouTube, share "hashes," unique numerical representations of original pieces of content that have been removed from their services. Other platforms use these to identify the same content on their own sites in order to review or remove it.

While the project reduces the amount of extremist content on mainstream platforms, groups can still post violent images and rhetoric on many other sites and parts of the internet.

The tech group wants to combat a wider range of threats, said GIFCT's Executive Director Nicholas Rasmussen in an interview with Reuters.

"Anyone looking at the terrorism or extremism landscape has to appreciate that there are other parts... that are demanding attention right now," Rasmussen said, citing the threats of far-right or racially motivated violent extremism.

The tech platforms have long been criticized for failing to police violent extremist content, though they also face concerns over censorship. The issue of domestic extremism, including white supremacy and militia groups, took on **renewed urgency** following the deadly Jan. 6 riot at the U.S. Capitol.

Fourteen companies can access the GIFCT database, including Reddit, Snapchat-owner Snap **(SNAP.N)**, Facebook-owned Instagram, Verizon **(VZ.N)** Media, Microsoft's LinkedIn and file-sharing service Dropbox **(DBX.O)**.

GIFCT, which is now an independent organization, was created in 2017 under pressure from U.S. and European governments after a series of deadly attacks in Paris and Brussels. Its database

Glenn Decl. Ex. 45
Page 3 of 11

mosque shootings in Christchurch, New Zealand.

GIFCT has faced criticism and concerns from some human and digital rights groups over centralized or over-broad censorship.

"Over-achievement in this takes you in the direction of violating someone's rights on the internet to engage in free expression," said Rasmussen.

Emma Llanso, director of Free Expression at the Center for Democracy & Technology, said in a statement: "This expansion of the GIFCT hash database only intensifies the need for GIFCT to improve the transparency and accountability of these content-blocking resources."

"As the database expands, the risks of mistaken takedown only increase," she added.

The group wants to continue to broaden its database to include hashes of audio files or certain symbols and grow its membership. It recently added home-rental giant Airbnb **(ABNB.O)** and email marketing company Mailchimp as members.

Register now for FREE unlimited access to Reuters.com

**Register**

Reporting by Elizabeth Culliford in New York; Editing by Kenneth Li, Lisa Shumaker and Rosalba O'Brien

Our Standards: **The Thomson Reuters Trust Principles.**

## More from Reuters



tornadoes

Robot chef taught to 'taste' food

Scientists reveal image of 'giant' Milky Way black hole

'Gentle giant' black hole revealed in Milky Way

A robot paints art on a car



## Technology Roundup

Sign up to our tech newsletter to get the latest news and trends in the global technology industry.

**Sign up**



## Daily Briefing

Sign up

## Sponsored Content





**Missouri: The List Of The Top Financial Advisor Firms Is Out**

Sponsored by smartasset



**Save for tomorrow with 1.01% APY. Select Markets Only. Member FDIC**

Sponsored by Citi® High-Yield Savings



**7 Retirement Income Strategies Once Your Portfolio Reaches $1 Million**

Sponsored by Fisher Investments



**Earn up to a $1,500 cash bonus with required activities. Member FDIC.**

Sponsored by CITI® CHECKING OFFER

## Sponsored Content

Dianomi



**Missouri: The List Of The Top Financial Advisor Firms Is Out**

Sponsored by SmartAsset



**Man who called 2020 Crash: Huge Event in 2022**

Sponsored by Stansberry Research



**5 Things You Should Never Do With Your Money According to Experts**

Sponsored by The Penny Hoarder



**Unlimited Cash Back Plus a $200 Bonus**

Sponsored by CardCritics

## Sponsored Content

Dianomi



**Consolidate Credit Card Debt With a Personal**



**6 Odd Things Millionaires Do With**



**Grow your tax refunds w/ 1.01% APY.**



**Is 2022 Your Year to Retire? Get**

NerdWallet

Mastercard Tried

Only. Member FDIC.

When to Retire

## Sponsored Content

Dianomi



**Earn cash with a new Citigold® relationship**



**6 Credit Cards You Should**



**Find A Trading Platform With**



**Saving Up for Something? Investing in**

Latest

Home

Media

📹 Videos

📷 Pictures

🖼 Graphics

Browse

World

Business

Legal

Markets

Breakingviews

Technology

Investigations

Lifestyle

About Reuters

About Reuters

Careers

Reuters News Agency

Brand Attribution Guidelines

Reuters Leadership

**Reuters Diversity Report**

Stay Informed

**Download the App**

**Newsletters**

---

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

    

---

Thomson Reuters Products

**Westlaw**

Build the strongest argument relying on authoritative content, attorney-editor expertise, and industry defining technology.

**Onesource**

The most comprehensive solution to manage all your complex and ever-expanding tax and compliance needs.

**Checkpoint**

The industry leader for online information for tax, accounting and finance professionals.

---

Refinitiv Products

**Refinitiv Workspace**

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

**Refinitiv Data Catalogue**

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

**Refinitiv World-Check**

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

**Cookies**    **Terms of Use**    **Privacy**    **Digital Accessibility**    **Corrections**    **Site Feedback**

© 2022 Reuters. All rights reserved

Glenn Decl. Ex. 45
Page 11 of 11

# EXHIBIT 46

advertisement



BREITBART



TRENDING:   GUN CONTROL PUSH    BIDENFLATION    BABY FORMULA CRISIS    OPEN BORDER    MASTERS OF THE UNIVERSE    UKI

# MAYORKAS: WE'RE WORKING WITH PLATFORMS ON 'HOW THEY CAN BETTER USE' THEIR TERMS TO 'PREVENT HARM' FROM MISINFORMATION

 92     EMAIL     PARLER     TWEET

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.

Cookies Settings

Accept All Cookies



On Monday's broadcast of MSNBC's "Andrea Mitchell Reports," DHS Secretary Alejandro Mayorkas stated that the department is working with tech companies "that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring."

Host Andrea Mitchell asked, "You've spoken out about disinformation and the threat that that creates. But what can you do that the FBI isn't already doing on social media?"



Fountain Pens, Rollerball Pens

Pen Chalet

advertisement

Mayorkas responded, "So, we're working together with them. We're working with the tech companies that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring."

He added, "We respect the First Amendment right, but the connectivity between speech and violence, the connectivity between active harm and speech is something that we're very focused on, and it's a difficult challenge. But we're working on it and meeting that challenge, again, because of the great personnel of the Department of Homeland Security and across the federal enterprise."

*Follow Ian Hanchett on Twitter @IanHanchett*

**READ MORE STORIES ABOUT:**

Clips, Politics, Alejandro Mayorkas, Big Tech, disinformation, Social Media



By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.

Cookies Settings

Accept All Cookies

Please let us know if you're having issues with commenting.

**Breitbart News Network Comment Policy**

Please read our Comment Policy before commenting.



213 Comments    Breitbart News Network    🔒 Disqus' Privacy Policy    🔴1 Login ⌄

♡ Favorite  1          🐦 Tweet    f Share                         Sort by Best ⌄

👤    Join the discussion…

LOG IN WITH              OR SIGN UP WITH DISQUS ⑦

                         Name

**Like this article?**

Subscribe to Breitbart News Network to receive daily updates of the latest articles delivered straight to your inbox.

✉ Enter email address          Subscribe                    Hide this message

**Montana1987** • 10 months ago

Make no mistake.

"Preventing disinformation" = Preventing free speech.

44 ⌃ | ⌄ • Reply • Share ›

> **sagitator** ➜ Montana1987 • 10 months ago
>
> Translation: Social media platforms are dictating policy on suppressing free speech.
>
> 19 ⌃ | ⌄ • Reply • Share ›
>
> > **FutureUser@mindspring.com** ➜ sagitator • 10 months ago
> >
> > Why settle for MISinformation from the people, when you can get plenty of DISinformation from the Swamp? (sarc)
> >
> > 3 ⌃ | ⌄ • Reply • Share ›

**catgirldreamer ll** ➜ Montana1987 • 10 months ago

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.

**Cookies Settings**

Accept All Cookies





Farm Inflation: Prices Surge for Chickens, Eggs, Wheat, Corn, and Milk

Farm Inflation: Prices Surge for Chickens, Eggs, Wheat, Corn, and Milk

185 *Comments*



China Desperately Tries to Calm Investors, Claims Lockdowns over for Now

China Desperately Tries to Calm Investors, Claims Lockdowns over for Now

37 *Comments*



BREITBART NEWS

| | | |
|---|---|---|
| Masthead | Privacy Policy | Store |
| About Us | Cookies | Get the App |
| Accessibility Policy Info | Advertise | Newsletters |
| Terms of Use | Contact Us | Send A Tip |
| | Careers | Sitemap |

Enable Accessibility

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.

Cookies Settings

Accept All Cookies



# EXHIBIT 47

# Cyber agency beefing up disinformation, misinformation team

**BY MAGGIE MILLER - 11/10/21 2:52 PM ET**

SHARE            TWEET      • • •    MORE

The Cybersecurity and Infrastructure Security Agency (CISA) is beefing up its disinformation and misinformation team in the wake of a divisive presidential election that saw a proliferation of misleading information online.

"I am actually going to grow and strengthen my misinformation and disinformation team," CISA Director Jen Easterly said during virtual remarks at the RE:WIRED conference on Wednesday.

Easterly noted that earlier this week she had a meeting with "six of the nation's experts" in the disinformation and misinformation space. She stressed her concerns around this being a top threat for CISA, which is charged with securing critical infrastructure, to confront.

"One could argue we're in the business of critical infrastructure, and the most critical infrastructure is our cognitive infrastructure, so building that resilience to misinformation and disinformation, I think, is incredibly important," Easterly said.

"We are going to work with our partners in the private sector and throughout the rest of the government and at the department to continue to ensure that the American people have the facts that they need to help protect our critical infrastructure," she added.

Easterly's comments came a year after CISA came under fire by President Trump for its efforts to push back against election misinformation and disinformation, primarily through setting up a "rumor control" website. Trump fired former CISA Director Chris Krebs, and several other top CISA officials were forced to resign in the weeks following the 2020 presidential election, largely as a result of this effort.

Despite the political pressure, the rumor control site remains up. Easterly pledged in September to continue using the page, and CISA did indeed use the rumor control site to counter election disinformation and misinformation during the recent 2021 elections in 30 states, including the closely watched Virginia governor's race.

"We now live in a world where people talk about alternative facts, post-truth, which I think is really, really dangerous if you get to pick your own facts, and it's particularly corrosive when you talk about matters of election security," Easterly said Wednesday.

"There is a certain percentage of the American people that are not going to be convinced and are not going to listen to the government, we get that, but there is a certain part of the American public that do still trust the government and that do still come to us and that get facts about things that can be difficult to understand," she said.

Microsoft President and Vice Chairman Brad Smith on Wednesday separately sounded the alarm about online disinformation and misinformation impacting issues including elections and COVID-19 vaccine rollout.

Smith specifically warned about the ability of foreign governments to use disinformation to meddle in another country's affairs, an issue that became particularly concerning following Russian efforts to spread disinformation to sway the 2016 U.S. presidential election in favor of Trump.

"It has become in some ways almost a tool of choice to disrupt a democracy, to sow dissent, to cause people to question even fundamental facts like who won the election and is this vaccine safe, or does it work," Smith said in a speech at the Sciences Po Paris School of International Affairs. "In some ways, it may be far more effective, it's certainly less expensive, to launch a government-sponsored disinformation campaign than it is to build a hypersonic missile, and we have some countries that have the resources easily to do both."

**TAGS** BRAD SMITH   CISA   DONALD TRUMP   ELECTION DISINFORMATION   JEN EASTERLY   MICROSOFT   ONLINE DISINFORMATION

*The Hill has removed its comment section, as there are many other forums for readers to participate in the conversation. We invite you to join the discussion on Facebook and Twitter.*

Glenn Decl. Ex. 47
Page 3 of 3

# EXHIBIT 48





# ELECTION INFRASTRUCTURE SUBSECTOR-SPECIFIC PLAN

## An Annex to the NIPP 2013

**2020**

U.S. Department of Homeland Security
Cybersecurity and Infrastructure Security Agency

This Page is Intentionally Left Blank.

Glenn Decl. Ex. 48
Page 2 of 35

# TABLE OF CONTENTS

LETTER FROM THE COUNCIL CHAIRS ................................................................................iv

  2019 Sector-Specific Plan Update ......................................................................................iv

  Key Accomplishments ........................................................................................................iv

EXECUTIVE SUMMARY ............................................................................................................v

1. SUBSECTOR PROFILE ........................................................................................................1

  1.1 Subsector Definition, Authorities, Critical Functions, and Evolution ............................1

  1.1.1 Key Sector Operating Characteristics .........................................................................2

  1.1.2 Components, Systems, and Networks ..........................................................................3

  1.2 Subsector Partners .......................................................................................................5

  1.2.1 Coordinating Councils ...................................................................................................5

  1.2.2 Federal Agency Leadership ..........................................................................................6

  1.2.3 Cross-Sector and Regional Efforts ..............................................................................7

  1.3 Value Proposition for Participation in Subsector Partnership .....................................7

2. RISK MANAGEMENT: ASSESSING AND MITIGATING RISK .............................................8

3. VISION, MISSION, GOALS, AND OBJECTIVES ................................................................11

  3.1 Subsector Vision and Mission .....................................................................................11

  3.2 Joint Goals and Objectives .........................................................................................11

  3.3 Joint Subsector Activities ...........................................................................................12

  3.3.1 Communication ...........................................................................................................13

  3.3.2 Capacity ......................................................................................................................16

  3.3.3 Resources ...................................................................................................................20

4. NATIONAL PREPAREDNESS AND RESILIENCE STRATEGIES .......................................22

  Election Infrastructure Subsector National Preparedness Efforts ....................................22

APPENDIX A: COORDINATING COUNCIL MEMBER PROFILES ..........................................23

  Election Infrastructure Subsector Government Coordinating Council ...............................23

  Election Infrastructure Subsector Coordinating Council ...................................................24

APPENDIX B. GLOSSARY OF TERMS ..................................................................................25

APPENDIX C. ACRONYMS AND ABBREVIATIONS ..............................................................27

APPENDIX D. ELECTION INFRASTRUCTURE AUTHORITIES .............................................28

  Critical Infrastructure Authorities ......................................................................................28

  Other Federal Authorities .................................................................................................29

Glenn Decl. Ex. 48
Page 3 of 35

# LETTER FROM THE COUNCIL CHAIRS

The security and resilience of election infrastructure is crucial to national security. Given election infrastructure's designation as critical infrastructure, the U.S. Department of Homeland Security (DHS), as the Sector-Specific Agency, has established governance structures to collaborate across the community to ensure a unified national effort to secure elections. Most prominently, DHS has partnered with the Election Assistance Commission, other federal entities, and state and local leaders to establish an Election Infrastructure Subsector Government Coordinating Council (GCC) to guide efforts across all levels of government to secure elections. At the same time, industry representatives who support the conduct of elections have established an Election Infrastructure Subsector Coordinating Council (SCC) to partner with the government to bring joint public-private resources to bear for this crucial mission.

This Election Infrastructure Subsector-Specific Plan (SSP) is the strategic plan guiding this shared effort. Published at the beginning of 2020, it will serve as the basis by which industry and government come together to set priorities for security efforts in the face of the immediate threat to our election infrastructure, while also charting a path for ongoing collaboration and capability development in future years. The Plan identifies how key stakeholders are working together to assess and manage the Election Infrastructure Subsector risk landscape and its unique operating conditions to strengthen national security and resilience, as set forth in the [Presidential Policy Directive 21: Critical Infrastructure Security and Resilience (PPD-21)](#) and the [National Infrastructure Protection Plan 2013: Partnering for Critical Infrastructure Security and Resilience (NIPP 2013)](#).

## 2019 Sector-Specific Plan Update

The GCC and SCC jointly crafted this version of the Election Infrastructure Subsector-Specific Plan to reflect the continued growth of the Subsector and the significant progress made since the 2018 midterm election cycle. This Plan combines the mission, goals, and priorities of its public and private sector partners to help foster ongoing collaboration. It also outlines the Subsector's strategic direction for enhancing election infrastructure security.

Since DHS issued its critical infrastructure declaration for elections in 2017, Subsector stakeholders in both the public and private sectors have taken significant steps to understand and reduce risk, improve information sharing and coordination, and strengthen resilience capabilities. This Plan is intended to inform stakeholders—including election officials, members of the Executive Branch and Legislative Branch, nongovernmental organizations (NGOs), and the general public—about ongoing efforts to protect and maintain the integrity of our democratic process against nation-state threats and natural disasters of national significance.

## Key Accomplishments

Since 2017, the GCC and the SCC have made considerable progress in building the Nation's election security. Notable efforts include:

- establishment of GCC and SCC to work in partnership,

- development of the Joint Election Infrastructure SSP,

- establishment of the Election Infrastructure Information Sharing and Analysis Center (EI-ISAC) and the Information Technology Information Sharing and Analysis Center (IT-ISAC) Election Industry Special Interest Group (EI-SIG) for voluntary sharing of threat and intelligence information,

- establishment of the Election Infrastructure Subsector Clearance Program,

- execution of the "Tabletop the Vote" exercises for national preparedness,

- development and deployment of the Last Mile effort, and

- preparation and delivery of legislative communications, including briefings to Members of Congress and their staff.

These achievements clearly demonstrate progress in the development, prioritization, and implementation of effective security approaches and resilience strategies. By no means, however, do they suggest that our efforts are over. Both Councils are dedicated to continuing unified efforts to address the risks to election infrastructure consistent with this Plan. We recognize the degree to which our Nation's security depends on it and are committed to our ongoing partnership in leading the national effort.

Glenn Decl. Ex. 48
Page 4 of 35

# EXECUTIVE SUMMARY

In January 2017, DHS established the Election Infrastructure Subsector under the Government Facilities Sector through a critical infrastructure designation for election infrastructure. The designation makes it clear both domestically and internationally that election infrastructure enjoys all the benefits and protections of critical infrastructure that the U.S. Government has to offer.[1]

DHS issued this designation for elections based on a U.S. intelligence community determination that Russia sought to interfere in the 2016 presidential election through sophisticated, cyber-enabled operations.[2] Specific to election infrastructure, later U.S. Government reporting confirmed compromise attempts by Russian military actors against county and state election offices, as well as U.S. companies supplying software and other technology for administering elections.[3] Findings indicate that, while public-facing election websites and other types of infrastructure related to the registration of voters and voter databases were widely targeted, the Office of the Director of National Intelligence (DNI) concluded that "the types of systems Russian actors targeted or compromised were not involved in vote tallying."[4]

The Subsector has established partnerships among government stakeholders at the local, state, and federal levels and between the public and private sectors, forming both a GCC and an SCC. These bodies provide a mechanism for collaboration between DHS, law enforcement, the intelligence community, and private sector partners to enhance information sharing about risks to the Nation's election systems, identify resources to help mitigate such risks, communicate best practices, address identified vulnerabilities, and enable election officials' access to classified threat information. State and local governments have engaged federal counterparts, other state agencies, and the private sector with the intent to conduct vulnerability assessments on election systems and increase focus on the cybersecurity of election systems.

The SSP complements the National Infrastructure Protection Plan (NIPP) by outlining the application of the NIPP Framework to the unique risk landscape of the Election Infrastructure Subsector. It includes plans for a collaborative process between public and private sector partners in protecting election infrastructure from all hazards and threats, including natural disasters, terrorist attacks, cyberattacks, and other large-scale disruptions. The SSP includes actions and timelines for the Subsector to cooperatively and voluntarily identify and prioritize assets, assess risk, implement protective programs, and, ultimately, measure the effectiveness of this work.

Included is an overview of how the GCC and SCC manage their responsibilities in the areas of partnership/outreach, training and education, and information sharing to ensure a secure and resilient electoral system that is prepared for national cyber emergencies. Notably, this SSP identifies collaborative approaches to navigating risks in the face of limited resources, while not altering or impeding the ability of election infrastructure partners to perform their respective responsibilities under the law.

The document is divided into four main sections, based on the NIPP 2013 Risk Management Framework and other joint Subsector priorities. A brief summary of these sections follows.

1. **Subsector Profile:** Provides a concise description of the Subsector's authorities and operating characteristics, major significant components, organizational structures, and key partners.

2. **Risk Management – Assessing and Mitigating Risk:** Assessing and Mitigating Risk: Describes the Subsector's risk management approach, including collaborative programs, activities, resources, approaches to cybersecurity, and efforts to leverage research and development (R&D).

---

[1] The January 2017 Department of Homeland Security designation defines "election infrastructure" as the following:
*"storage facilities, polling places, and centralized vote tabulations locations used to support the election process, and information and communications technology to include voter registration databases, voting machines, and other systems to manage the election process and report and display results on behalf of state and local governments."*
https://www.dhs.gov/news/2017/01/06/statement-secretary-johnson-designation-election-infrastructure-critical.

[2] U.S. Office of the Director of National Intelligence (USODNI), *Joint Statement from the Department of Homeland Security and Office of the Director of National Intelligence on Election Security, October 7, 2016.*

[3] Special Counsel Robert S. Mueller III, Report on the Investigation Into Russian Interference In The 2016 Presidential Election, March 2019, https://www.justice.gov/storage/report.pdf.

[4] U.S. Office of the Director of National Intelligence (USODNI) *Joint Intelligence Community Assessment, Assessing Russian Activities and Intentions in Recent U.S. Elections,* Jan. 6, 2017. See also: *U.S. Senate Select Committee on Intelligence, Russian Targeting of Election Infrastructure During the 2016 Election,* May 2018.

Glenn Decl. Ex. 48
Page 5 of 35

3. **Vision, Mission, Goals, and Objectives:** Outlines current and future plans for the Subsector to boost collective capabilities for responding to national or large-scale incidents and building resilience across the election's ecosystem through coordinated sharing of intelligence and threat information. Additionally, lists the specific activities the GCC and SCC plan to undertake to address the Subsector's priorities.

4. **National Preparedness and Resilience Strategies:** Describes the importance of preparedness for cyber and physical disruptions to the Subsector, along with resilience efforts the Subsector must undertake to prevent, deter, and mitigate these threats.

Appendices at the end of this plan detail additional support to the major sections of this SSP, including Subsector membership, a glossary of terms, references, and detailed information on risk management.

This SSP will be periodically updated to reflect changes in national priorities, lessons learned, and Subsector composition and structure.

Glenn Decl. Ex. 48
Page 6 of 35

# 1 SUBSECTOR PROFILE

This chapter outlines the makeup of the Election Infrastructure Subsector and its operating characteristics. The section also identifies the Subsector's primary risks, interdependencies, and unique mechanisms for public-private partnership. The Election Infrastructure Subsector is a functions-based subsector with both physical assets and virtual systems and networks to enable the conduct of U.S. elections.

## 1.1 Subsector Definition, Authorities, Critical Functions, and Evolution

The Election Infrastructure Subsector encompasses storage facilities, polling places, and centralized vote tabulation locations used to support the election process, and information and communications technology to include voter registration databases, voting machines, and other systems to manage the election process and report and display results on behalf of state and local governments. It does not address certain risk areas beyond the control of election officials and out of scope of election infrastructure, including political parties, candidates, voters, the media, and other infrastructure used on Election Day, such as electricity and telecommunications networks. This is not to say that there are not potential threats to those entities, but just to acknowledge that they are not the specific purview of the Election Infrastructure Subsector framework. The complexity of accurately defining and protecting the elections ecosystem, with its separate but often interdependent facets, is a key challenge in and of itself.

The Subsector consists of an extremely diverse range of public and private owners and operators of election infrastructure. Most election facilities are government-owned agencies or sites with open access, including polling place operations. Subsector stakeholders must balance security priorities with the need to ensure accessibility, privacy, and transparency. Assets can range from physical sites and hardware to digital operations.

In general, election infrastructure is owned and operated with minimal oversight from federal entities. However, there are a number of times in contemporary U.S. history in which the Federal Government has played a role in extending election access or voting rights protections while recognizing the clear existing constitutional limitations. Specific examples include the Civil Rights Act, the Voting Rights Act of 1965, the Uniformed and Overseas Citizens Absentee Voting Act, the Americans with Disability Act, the National Voter Registration Act (NVRA), the Help America Vote Act (HAVA), and the Military and Overseas Voter Empowerment Act of 2009.

**Figure 1. Federal Laws Relevant to the Election Infrastructure Subsector**



Glenn Decl. Ex. 48
Page 7 of 35

Beyond these limited exceptions, individual states and territories carry out the majority of law and policymaking around the conduct of elections. Each state and territory has a legally designated Chief Election Official charged with overseeing the conduct of elections according to law. According to the National Association of Secretaries of State (NASS), "Ensuring the integrity of the voting process is central to this role, which includes cyber preparedness and contingency planning, as well as administrative and technical support for local election officials."[5]

In some states, state-level officials play a more significant role by managing and maintaining much of the election infrastructure, including voting equipment. But nearly 9,000 local election jurisdictions carry out the rubber-meets-the-road functions of running an election at the county or municipal level. In most states, local officials select and purchase their voting systems from options approved and certified at the federal and/or state levels.

Many state and local election jurisdictions depend on third-party providers for support in conducting day-to-day management and maintenance of their election infrastructure. Industry partners are often information technology (IT)-focused companies and nonprofits, covering various types of election support, including:

- voting and election management systems;
- voter registration systems and electronic pollbooks;
- ballot programmers and printers;
- election data solutions providers;
- voter information tools and look-up features; and
- election supplies to store, transport, and use equipment.

## 1.1.1 Key Sector Operating Characteristics



**Elections are a core facet of democratic governance.** They are critical to the peaceful transition of power, requiring both the verifiable selection of winners as well as losers who can confidently accept an unfavorable outcome. Any attempt to manipulate or interfere with election infrastructure can risk undermining the right to vote, placing undue burdens on voters or impacting public confidence in the process.



**Securing elections requires year-round activity.** Security measures to protect election infrastructure must be implemented when technology is in use, when it is being prepared for use, and when it is not in use. Critical election infrastructure is not limited to technology that is used only during elections. It also includes technology that is in use 365 days per year, such as voter registration systems and election information websites. Further, the technology that is deployed for a specific election, such as electronic pollbooks and vote-casting and tabulation systems, is used for multiple elections per year in most jurisdictions.



**Elections are highly decentralized and deadline driven.** This requires active contingency planning and regional or statewide security coordination and information sharing between public and private partners. There are thousands of local election jurisdictions and hundreds of thousands of poll workers and election staff, as well as varying technology resources and types of providers. No two jurisdictions are exactly alike.

**These key operating characteristics create unique scenarios for the Subsector, including those identified below:**



**State and local election officials are primarily responsible for protecting election infrastructure.** Elections are run at the state and local levels. State and local election officials have implemented innovative measures to secure election infrastructure, often with limited resources. The Federal Government does not administer elections but has broad access to information, tools, and resources which help secure elections. Therefore, DHS and other relevant federal agencies provide important election security support to state and local governments.



**Election administration is given limited resources.** Many election offices face daily budget constraints and staffing shortages while managing a broad portfolio of duties. Identifying sustainable funding for managing risk in a global threat environment is an ongoing challenge, with officials often relying upon the Federal Government for resources, information sharing, and other types of support.

---

[5] National Association of Secretaries of State (NASS), "Securing Elections," January 2020, https://www.nass.org/initiatives/securing-elections.

Glenn Decl. Ex. 48
Page 8 of 35

 **State and local election officials must balance security with access and transparency.** Election agencies operate on principles of open public access and transparency, which can create challenges for adopting security principles and practices. Voting sites can be soft targets due to their open access and limited security barriers, and Election Day workers are mostly volunteers. High-profile elections, particularly in presidential election cycles, may heighten risks to infrastructure.

 **Foreign attempts to interfere in recent U.S. elections have made for major news headlines.** The dynamic between the elections process and related institutions—mainstream and social media, political campaigns, and political parties—is interconnected, but imprecise. Measuring election security efforts using voter turnout or public confidence levels as barometers of success can be equally challenging. However, proactively releasing accurate information and monitoring election-related news stories for accuracy are extremely important.

**Figure 2. Election Infrastructure Subsector Snapshot**



## 1.1.2 Components, Systems, and Networks

As identified by DHS in its designation, the Election Infrastructure Subsector encompasses physical, technological, and human elements necessary to conduct elections. The following is a list of Subsector components and assets:

**KEY PHYSICAL COMPONENTS:** Equipment and materials, facilities, and records that support or provide protection for the Subsector.

- **Voting Locations** – Facilities used by election officials to enable voters to cast ballots in person, which constitutes a significant proportion of total votes. Continuity of the voting process is dependent on the availability of voting locations and their ability to provide security and any other systems required to operate the voting process.

- **Technical Facilities** – Facilities used to house servers and network equipment, which can be a mix of onsite, offsite, or co-located facilities. Also, there may be separate facilities used to generate ballot files and tabulate votes.

- **Storage Facilities** – Includes warehouses or other similar facilities used to house equipment when not in use.

- **Processing Facilities** – Facilities used to print ballots, sample ballots, or polling place supplies. These facilities are either onsite or at a contractor's facility and must have adequate security and protection from the elements to ensure voting processes continue.

- **Administrative Facilities** – State, local and tribal election offices where election officials carry out their election administration duties.

- **Voting Hardware** – Ballots, poll books, machines, and records, as well as the physical equipment that supports digital systems that must be stored securely and protected.

**KEY TECHNOLOGICAL COMPONENTS:** Hardware and software components critical to supporting the election security mission, including computers, servers, databases, and other IT systems and assets used in Subsector activities to fulfill one of the following functions:

- **State and Local Networks** – Systems to conduct daily government functions, which may indirectly impact or connect with election system components, including email networks and other state and local-level systems, such as the Department of Motor Vehicles (DMV) systems.

- **Voter Registration Systems** – Systems used to collect personal voter information, including residency address, age, and other information required to determine voter eligibility and prevent duplicate voting. These systems are maintained at the local jurisdiction, the state level, or a combination of both. Administrative access varies by state and can include security protocols like multifactor authentication.

- **Election Systems** – Systems used to manage the entire voting process, which can include addresses, precincts, political and taxing districts, contest parameters, poll workers, voters, candidates, ballot layout, and the casting of votes.

- **Election Management Systems** – Sets of processing functions and voting system databases that define, develop, and maintain election databases; perform election definitions and setup functions; format ballots; and maintain audit trails.

- **Tabulation Systems** – Systems used to record votes, then accumulate and present them. Votes may be recorded on paper, directly onto voting machines, or both, including through Direct Recording Electronic (DRE) machines, or optical scanners used to cast paper ballots marked by hand or with a Touch Screen Ballot Marking Device (BMD).

- **Results Reporting** – Election-night reporting systems that generate and display unofficial results. These systems can be online systems, locally hosted systems, or a combination of both. These systems operate by uploading count data to the application, which then displays those totals in relationship to the overall population of a given jurisdiction.

- **Public Information Systems** – Systems that provide the public with general information about the election process, upcoming elections, and election results. These systems can also offer individual-level information regarding registration status, provisional ballot status, mail ballot status, or voting location, or support blank ballot delivery.

- **Electronic Poll Books** – Systems used by workers at polling places or voting centers to determine the eligibility of voters and the voters' correct ballot style. Some electronic poll books allow jurisdictions to update voter records or register voters for the first time. Electronic poll books used to update voters' addresses or register new voters typically will be connected to the internet.

- **Internal Production Software and Servers** – Various software platforms and servers that support the election infrastructure environment. This includes but is not limited to geographic information systems (GIS), which support the creation and assignment of eligible voters into various political and election-specific subdivisions.

**KEY HUMAN COMPONENTS:** Personnel with specialized training, certification, knowledge, skills, authorities, or roles whose absence could cause undesirable consequences or hamper the election security mission.

- **Strategic and Operational Positions** – Elected and appointed officials at the state and local level, such as local election officials, state election directors, State Chief Election Officials, industry and non-profit executives, and others who make up the leadership of the Subsector. These individuals operate election systems and have an in-depth understanding of their functionality. Their subject matter expertise ensures the operability of the election system. This includes operators of voting systems and related technology.

- **Temporary/Seasonal Support Positions** – Individuals selected on a short-term basis to carry out specific tasks essential to the conduct of elections, including temporary office staff, poll workers, and individuals outside the direct supervision of election officials.

Glenn Decl. Ex. 48
Page 10 of 35

## 1.2 Subsector Partners

The Federal Government, as well as state, local, tribal, and territorial (SLTT) governments; membership organizations and associations; election technology providers and other commercial entities; non-profit organizations; and academia must actively engage as a community to ensure the security and resilience of the Subsector.

A variety of private sector stakeholders are involved in election-related activities. Media organizations inform the public of election-related news and preliminary election results. Nonpartisan, non-profit organizations fill numerous roles, including compiling security best practices and facilitating state cooperation, voter outreach, and civic engagement.

**Figure 3. Election Infrastructure Subsector Partnership Structure**



### 1.2.1 Coordinating Councils

The Election Infrastructure Subsector has diverse operations that are interdependent and interconnected with those of other infrastructure sectors. Individual Subsector entities proactively manage risk to their own operations and those of their customers through monitoring and mitigation activities. The decentralized nature of the Subsector offers a certain level of inherent resilience, with incidents in one jurisdiction not necessarily affecting neighboring jurisdictions. However, that structure also presents challenges and opportunities for coordinating public and private sector preparedness activities. The GCC and SCC were formed to help bridge this gap and to engage the owners, operators, and providers of election infrastructure assets in Subsector activities.[6]

**Figure 4. Critical Subsector Dependencies**



---

[6] GCC established October 2017. SCC established in February 2018.

Glenn Decl. Ex. 48
Page 11 of 35

## Election Infrastructure Subsector Government Coordinating Council

The Election Infrastructure Subsector GCC is a government partnership council with the primary goal of sharing election security information among governments at the federal, state, and local levels and collaborating on best practices to mitigate and counter threats to election infrastructure. Members include the federal, state and local government agencies that own, operate, or administer physical or digital/cyber assets, systems, and processes related to the conduct of elections or that have responsibility for supporting the security and resilience of those assets, systems, and processes. The GCC consists of 24 state and local government representatives, including Secretaries of State, state election directors, and county/local election administrators. The GCC also has three Federal Government representatives: one from DHS and both the Chair and Vice Chair of the U.S. Election Assistance Commission (EAC). The National Institute of Standards and Technology (NIST), the Department of Defense's Federal Voting Assistance Program (FVAP), the Federal Bureau of Investigation (FBI), and representatives from other divisions of DHS are non-voting, ex officio members of the GCC. The GCC, governed by an operating charter, held its first meeting on October 14, 2017, and convenes in person at least twice a year.

## Election Infrastructure Subsector GCC Executive Committee

The Election Infrastructure GCC formed an executive committee composed of a representative from each of the five stakeholder groups that make up the GCC to drive action on priorities between meetings. Those members are: the Director of the DHS National Risk Management Center (NRMC), the Chair of the EAC, the President of NASS, the President of the National Association of State Election Directors (NASED), and a local election official chosen from among Election Center and International Association of Government Officials (iGO) by the local election officials on the GCC.

## Election Infrastructure Subsector Coordinating Council

The SCC for private sector election infrastructure providers was established in February 2018 with the adoption of its operating charter. The Council provides election industry stakeholders whose services, systems, products, or technology are used by (or on behalf of) state or local governments in administering the U.S. election process with a self-governing forum for voluntary interaction between themselves and with their GCC counterparts, as outlined in PPD-21. The SCC had 29 members organizations as of November 2019, representing the diverse spectrum of state and local election partners involved in supporting Subsector operations, including one ex-officio member: the IT-ISAC's EI-SIG. Members represent the Subsector in discussions with other critical infrastructure sectors as well. The Council meets in person at least twice annually.

## Election Infrastructure SCC Executive Committee

The Election Infrastructure SCC maintains a five-member executive committee to guide the work of the Council and to coordinate with leadership counterparts from the GCC, the Cross-Sector Coordinating Council, and other individual sector councils. Members of the SCC include an elected Chair, a Vice Chair, the Past Chair and two Members-at-Large.

## Working Groups

The GCC and SCC leverage working groups of Subsector representatives to pursue specific initiatives. Through the Critical Infrastructure Partnership Advisory Council (CIPAC), the Councils form joint council working groups made up of GCC and SCC members and subject matter experts. New working groups may be established at the direction of the Executive Committees as needed to take on specific tasks. The GCC and SCC use this working group structure to pursue the goals and objectives outlined in this SSP.

## Subsector Partners

The SCC and GCC are organized to ensure that critical functions and responsibilities in government and the private sector are represented in the partnership.

## 1.2.2 Federal Agency Leadership

### Sector-Specific Agency

DHS is the designated Sector-Specific Agency (SSA) for the Election Infrastructure Subsector. DHS coordinates partnership activities and information sharing and is the primary federal interface with Subsector stakeholders for security and resilience. The Cybersecurity and Infrastructure Security Agency (CISA) fulfills the role of SSA for DHS through the NRMC, with the Assistant Director for the NRMC as a member of the Election Infrastructure Subsector GCC Executive Committee.

Glenn Decl. Ex. 48
Page 12 of 35

## The U.S. Election Assistance Commission

The EAC is an independent, bipartisan federal agency charged with developing guidance to meet requirements set forth under HAVA, developing and adopting voluntary voting system guidelines, and serving as a national clearinghouse of information on election administration. The EAC also accredits testing laboratories, certifies voting systems, disburses HAVA funding when available, and audits state use of HAVA funds.

## 1.2.3 Cross-Sector and Regional Efforts

Members of the Subsector interact with other critical infrastructure sectors through participation in the cross-sector working groups, membership in other sector councils, and periodic discussions with representatives from other sectors. For example, in November 2018, the Election Infrastructure SCC selected a representative to serve on the Critical Infrastructure Cross-Sector Council's Black Sky Hazards Coordination Working Group, which is a joint effort to educate all sectors about the causes and effects of long-term power outages and the importance of developing cross-sector recommendations.

Additionally, DHS and a number of states have initiated regional initiatives for collaboration on preparedness and response activities. Fusion centers, the U.S. National Guard, and Federal Emergency Management Agency (FEMA) coordinators may also be involved in a state or local jurisdiction's cyber or physical security response planning to ensure strong coordination.

The U.S. Postal Service (USPS) is another critical government partner in election administration. Along with handling an increase in voting by mail throughout the country, the USPS plays an essential role in handling ballots for overseas citizens and active duty military voters. Election officials interact with local and regional postal officials to ensure the timely and secure delivery of mail ballots and related voter materials going to and from their offices. USPS National Change of Address (NCOA) Program data is also used to verify the accuracy of state voter registration lists.

## 1.3 Value Proposition for Participation in Subsector Partnership

Partnerships can provide participants mutual access to subject matter experts, training programs, educational opportunities, and information-sharing mechanisms. As the Subsector redoubles efforts to address challenges posed by diverse technologies, evolving threats, and a spectrum of risk across jurisdictions, the Election Infrastructure Subsector partnership structure provides:

- trusted mechanisms for information exchange with the Federal Government and Subsector stakeholders, including for the development, validation, and sharing of best practices;
- improved access to actionable, timely, and accurate threat information;
- access to and influence in the development of exercises, training, tools, and resources to meet evolving operating conditions; and
- inclusive processes for understanding and addressing vulnerabilities.

Participating in the public-private partnership improves SCC members' situational awareness and understanding of Subsector risks, enabling members to more effectively:

- minimize disruptions and improve resilience to ensure free, fair, and secure elections; and
- raise awareness of actions taken in support of preparedness, continuity, and the proactive management of election system risks to maintain and enhance public confidence in election systems.

The Subsector partnership can also be used to address those needs for which no viable private sector solution exists, or to identify high transaction costs or legal barriers that could cause significant coordination or implementation challenges for potential solutions.

Glenn Decl. Ex. 48
Page 13 of 35

# 2. RISK MANAGEMENT: ASSESSING AND MITIGATING RISK

The NIPP 2013 Risk Management Framework[7] provides a common approach for election infrastructure stakeholders to identify their infrastructure, assess and analyze their risks, and identify and prioritize risk management activities. The goals and objectives discussed in this SSP are rooted in this Framework.

## Identifying Infrastructure

Election infrastructure exists at the federal, state, and local levels; is owned/operated by the government and the private sector; and includes a range of physical and IT assets, networks, and systems. Specific infrastructure may be unique to a given jurisdiction, but there are commonalities across all jurisdictions. A detailed description of the components that must be considered as part of any thorough risk analysis and management process is discussed in *Section 1.1.2*.

## Assess and Analyze Risks

Risk assessments examine vulnerabilities, threats, and consequences to ascertain and analyze risks to help election infrastructure stakeholders prioritize management strategies. Individual Subsector members—governments and private sector partners—perform risk assessments for their critical assets.

Completed risk assessments should be documentable, reproducible, and defensible. To support individual stakeholders' efforts to effectively analyze risks and identify interdependencies, Subsector partners employ a variety of mechanisms that include:

- publication of an overall Election Infrastructure Risk Characterization
- classified threat briefings from federal agencies for Subsector members with security clearance, as well as unclassified briefings from private sector firms
- information sharing through established forums, such as Fusion Centers, the Homeland Security Information Network – Election Infrastructure Subsector (HSIN-EIS), the EI-ISAC, the EI-SIG (for private sector providers), conferences, and organizational trainings and exercises
- tabletop exercises hosted by Subsector partners that identify gaps in security, procedures, and communication protocols
- DHS offerings, including vulnerability assessments, cyber assessments, evaluations, informational products, and reviews

## Implementing Risk Management Activities

The Subsector has numerous, diverse risk environments, requiring election infrastructure stakeholders to prioritize their risk management activities to address their specific needs. In addition to individual risk management activities, the Subsector actively participates in risk management activities that include:

- tabletop exercises that include federal partners to test Subsector and individual member plans
- topic-specific workgroups to exchange information, discuss needs, and develop plans to address identified needs
- election security training and exercises for partners across the Subsector, tailored to fit the needs of the individual partner (whether SLTT government or private sector)
- organizational trainings, exercises, and assessments, such as counter-phishing campaigns and cyber hygiene reviews
- promotion of risk-informed security controls and processes, such as risk-limiting audits

Concern for an appropriate degree of public disclosure around election threats and vulnerabilities plays a significant role in determining what information about individual vulnerability assessments partners may share. These voluntary assessments are carefully guarded because they identify specific vulnerabilities in a physical site, a system/process point, or a company/organization. However, Subsector industry providers frequently work with federal, state, and local government agencies to leverage partner resources in conducting risk assessments that contribute to regional or national security and resilience,

---

[7] Under the NIPP 2013 Risk Management Framework, risk is the potential for an adverse outcome from an event, determined by the event's likelihood—a function of the specific threats and vulnerabilities—and associated consequences if the event occurs.

Glenn Decl. Ex. 48
Page 14 of 35

as demonstrated by current SSA initiatives. Time constraints, concerns about exposing vulnerabilities or proprietary information, and assessment-related expenses are factors that may limit the ability of some Subsector partners to participate or share information more broadly.

Risk assessment and mitigation is an ongoing process that requires partners to maintain a high level of threat awareness, as well as the capacity to respond to an increasing number of complex challenges. By applying the NIPP 2013 Risk Management Framework, the Subsector will continually evaluate the threat landscape and adapt as necessary to meet emerging threats and challenges.[8]

A number of resources are also available from the Federal Government that can support Subsector partners. For example, CISA has provided regional coordination and field operations support, including Protective Security Advisors (PSA) and Cybersecurity Advisors to assist owners and operators with voluntary risk assessments. DHS also operates several voluntary programs to allow owners and operators to report vulnerabilities in election technology. The EAC also has a mandatory reporting requirement in place for voting systems manufacturers, which increases visibility of known vulnerabilities for potentially affected users so they can be addressed.[9]

---

[8] National Infrastructure Protection Plan's Risk Management Framework, 2013, https://www.dhs.gov/xlibrary/assets/NIPP_RiskMgmt.pdf.

[9] EAC Voting System Testing and Certification Program Manual: 2.3.2.7. *Report to the Program Director any known malfunction of a voting system holding an EAC Certification*, June 1, 2011.

Glenn Decl. Ex. 48
Page 15 of 35

## FUNDING

 **It is impossible to make an honest assessment of the Election Infrastructure Subsector's risk and the potential to mitigate that risk without an understanding of the chronic resource issues the Subsector faces at all levels of government.** While much of this plan focuses on what can be done to assess and mitigate risk, a certain amount of what can be done is dependent on sufficient funding. If election officials are unable to replace antiquated or unsupported systems in a timely fashion, additional vulnerabilities and risk to the system are created. If election administrators are unable to hire sufficient technical support staff or provide sufficient training to existing staff, this too has real consequences.

The designation of elections as critical infrastructure in 2017 brought resourcing issues to the forefront, particularly at the federal level. In March 2018, Congress appropriated the remaining $380 million in federal funding from HAVA, and the EAC disbursed all funds to the states by August 2018. In December 2019, Congress added another $425 million in one-time funding under HAVA. To complement this effort, the GCC released a procurement guide to help election officials take cybersecurity into account as they spend those funds, as well as potential future funds.

There is widespread agreement among election officials that more resources—and, importantly, more sustained resources—are needed. That theme is shared across the critical infrastructure sectors: one of the key findings of the Nationwide Cybersecurity Review was that SLTT communities consistently rank a lack of sufficient funding as a top-5 security concern.[10] Funding shortages impact both state and local election officials, though in different ways. The one-time disbursement of the remaining HAVA funds forced some states to choose between conducting necessary state-level improvements and providing local election officials with meaningful funds. For example, some states needed to replace, upgrade or harden their statewide voter registration database. In most states, the statewide voter registration database is used at all local election offices and must be protected for election administration purposes, but also to protect voters' personally identifiable information. In other states, it was crucial to replace aging voting equipment at the municipal or county level. These examples show that state and local priorities must both be addressed, and future funding increases are necessary to ensure that state and local election offices do not need to compete for the same limited funding, but have the resources needed to fully protect our democracy.

While such federal infusions are important and welcome, for the Election Infrastructure Subsector to succeed, a government-wide approach to funding elections and election security is needed. Viewing the Subsector as an "infrastructure" of our democracy is important to understanding the need for consistent investment and maintenance to ensure the system is strong. SLTT governments are primarily responsible for the administration of elections and should also be primarily responsible for funding elections. This requires tough choices at the state and local levels, where election funding has too often been neglected. However, the critical infrastructure designation came about because of unprecedented threats by hostile nation-state actors. This new dynamic requires federal investment to assist SLTT governments as well. Such investments will never and should never replace the SLTT role in funding election administration but are needed to increase defensive capacity and coordination amongst SLTT governments and their federal partners to secure the Election Infrastructure Subsector.

Legislative interest in election security has also greatly increased since 2017, both at the state and federal levels. In 2019 alone, Congress held more than a dozen hearings about election security and have testified to the progress made by the sector since 2016. Subsector partners have spent hours educating Members of Congress and state policymakers, as well as the public, about how elections work and the work happening in the Subsector. Election infrastructure partners are committed to ensuring that stakeholders have a clear understanding of election administration and systems, including how they are developed, certified, tested, and secured.

[10] Center for Internet Security (CIS), Nationwide Cybersecurity Review: Summary Report, 2017, https://www.cisecurity.org/wp-content/uploads/2018/10/NCSR-2017-Final.pdf.

# 3. VISION, MISSION, GOALS, AND OBJECTIVES

This chapter outlines the goals and objectives that will guide Subsector partners' ongoing efforts to enhance the security and resilience of the elections they conduct and support. The associated activities are designed to provide direct and indirect support to election administrators, improve awareness of election security efforts and needs within the Subsector and among the public, and, ultimately, promote the sustained investment necessary to ensure continued public confidence in the results of U.S. elections.

## 3.1 Subsector Vision and Mission

### ELECTION INFRASTRUCTURE SUBSECTOR VISION

"A unified government and private sector approach to empower the election stakeholder community to build resilience to election infrastructure risks."

### ELECTION INFRASTRUCTURE SUBSECTOR MISSION

"To coordinate efforts by state and local election officials, private sector and non-profit partners, and the Federal Government to manage risks and secure election infrastructure against new and evolving threats."

---

### PUBLIC CONFIDENCE IN ELECTION OUTCOMES

 **Research into what shapes and affects voter confidence in election results has repeatedly shown that most Americans are generally confident that the election process counts votes accurately and the administration of elections in their communities is well-managed.** In 2018, the Pew Research Center found that about eight in ten American voters went into that year's General Election believing it was very or somewhat likely that votes would be counted as intended.[11] However, social influence and misinformation campaigns seek to erode that confidence by targeting the social underpinnings of our democracy. Though any causal link between voter confidence and turnout is tenuous at best,[12] the members of the Election Infrastructure Subsector believe strongly that all American voters should be assured that their votes will count as cast, and all eligible voters should be able to freely exercise their right to vote without serious disruption or interference.

The Subsector was formed to bolster this confidence and improve our national security posture through the implementation of security best practices, as well as to improve information sharing between American voters and the officials, agencies, and private industry partners and other organizations responsible for overseeing elections.

Research conducted by scholars who focus on voters' experiences when casting a ballot shows that Americans feel more confident that their vote will be counted accurately when the voting process is quick and the election officials/poll workers are professional and knowledgeable.[13] And so the Subsector seeks to speak with a unified and direct message to the American public: every voter deserves a voting experience that is easy to navigate, is transparent, and leaves a secure sense that every vote will be tallied accurately.

---

## 3.2 Joint Goals and Objectives

This section outlines the goals and objectives for how best to support the Subsector's continuing effort to secure the essential belief that Americans have confidence in their elections. This is done by increasing awareness internally and externally, providing direct support to administrators, and securing the necessary short-, medium-, and long-term investments. The goals provide a framework to guide resilience efforts and improve Election Infrastructure Subsector risk management practices.

---

[11] The Pew Research Center, "Elections in America: Concerns Over Security, Divisions Over Expanding Access to Voting," October 29, 2018, https://www.people-press.org/2018/10/29/elections-in-america-concerns-over-security-divisions-over-expanding-access-to-voting/.

[12] MIT Election Data + Science Lab, "Voter Confidence," 2019. https://electionlab.mit.edu/research/voter-confidence.

[13] Ibid.

Glenn Decl. Ex. 48
Page 17 of 35

Table 1. Election Infrastructure Subsector GCC and SCC Joint Goals and Objectives

| JOINT NATIONAL GOALS | JOINT OBJECTIVES |
|---|---|
| **COMMUNICATION** | **Expand availability and increase awareness of threat information and efforts to secure U.S. elections among Subsector partners and the public.**<br><br>**a. INFORMATION SHARING:** Foster a voluntary, multi-directional information-sharing environment which ensures Subsector partners understand threats, risks, and vulnerabilities they face and understand their options for reporting detected or suspected threats or incidents.<br><br>**b. INCLUSION:** Expand the reach of Subsector communication to include more local election jurisdictions and smaller industry providers, as well as other critical infrastructure sectors, to improve coordination and understand critical dependencies.<br><br>**c. AWARENESS:** Play an active role in informing policy makers to help them and the public understand issues around election security to enable the flow of accurate, timely, and relevant information. |
| **CAPACITY** | **Support risk assessment and management, emergency planning, and incident response.**<br><br>**a. READINESS:** Create a continuous training and learning environment for election officials and industry partners to build knowledge and skills around cyber hygiene, risk assessments, and critical infrastructure security and resilience activities.<br><br>**b. RESPONSE:** Provide subject matter expertise to support the creation and routine exercise of election-related incident response plans.<br><br>**c. MITIGATION & PROTECTION:** Strengthen awareness and management of threats to election infrastructure that may result in significant disruption or harm to the conduct of elections, including physical and cybersecurity threats as well as risks associated with dependencies and interdependencies. |
| **RESOURCES** | **Assist Subsector partners in determining priorities, programs, and budgets for securing their entities and assets.**<br><br>**a. INVESTMENT:** Develop consistent and sustainable sources of support from local, state, and federal levels as well as non-profits and the private sector for election security measures that are appropriately flexible and based on the threat landscape.<br><br>**b. RESEARCH:** Identify resource and knowledge gaps in securing election infrastructure to build tools and programs for Subsector-wide use. |

## 3.3 Joint Subsector Activities

This section outlines and describes activities the Subsector has completed, is working on, or plans to complete to meet the goals and objectives above. The activities below are broken up into Communication, Capacity, and Resources to align with the goals. The tables below assign each activity to the appropriate council(s) and provide a status update on how Subsector activities are progressing as the Subsector partnership continues to mature.

The Subsector continues to explore how to best quantify voluntary partnership activities' contribution to risk reduction and enhanced resilience across the election infrastructure landscape. Efforts to assess Subsector efforts are an assessment of our accomplishments as a Subsector and a recognition of future Subsector needs and are not a statement about the efforts of any individual Subsector partner.

Glenn Decl. Ex. 48
Page 18 of 35

## 3.3.1 Communication

Expand availability and increase awareness of threat information and efforts to secure U.S. elections among Subsector partners and the public.

a. **INFORMATION SHARING** - Foster a voluntary, multi-directional information-sharing environment which ensures Subsector partners understand threats, risks, and vulnerabilities they face and their options for reporting detected or suspected threats or incidents.

b. **INCLUSION** - Expand the reach of Subsector communication to include more local election jurisdictions and smaller industry providers, as well as other critical infrastructure sectors, to improve coordination and understand critical dependencies.

c. **AWARENESS** - Play an active role in informing policy makers to help them and the public understand issues around election security to enable the flow of accurate, timely, and relevant information.

| ELECTION SUBSECTOR ACTIVITY | STATUS | COUNCIL |
|---|---|---|
| **Finalize, adopt, and distribute Version 1.0 of the Communications Protocols for voluntary two-way sharing** | **GCC – Complete**, July 2018<br>**SCC – Complete**, October 2018 | **GCC** and **SCC** |
| **Apply lessons learned to improve Subsector-wide communications** | **In Progress** – Communications Working Group assigned to update to Communication Protocol Version 2.0. SCC updated Incident Response & Reporting Guidance in September 2019 | **GCC** and **SCC** |
| **Design and adopt Digital Network to facilitate communication across the Subsector** | **In Progress** – Joint Digital Network Development Working Group assigned to assess needs and make recommendations | **GCC** and **SCC** |
| **Develop and refine an outward-facing strategic communications plan for coordinated messaging** | **In Progress** – Communications Working Group assigned to develop a national emergency response communications plan | **GCC** |
| **Provide members of the Subsector with the knowledge and tools necessarily to educate stakeholders and the public about election security** | **Ongoing** – NASS, NASED, Election Center, iGO, and state conferences and distribution lists regularly provide Subsector members with details about tools and trends they can use to educate themselves and their voters | **GCC** and **SCC** |
| **Establish Information Sharing and Analysis Centers for the Subsector that provide options for governments and private sector partners** | **Complete** – The EI-ISAC established in February 2018 (GCC) and the EI-SIG established within the IT-ISAC in August 2018 (SCC) | **GCC** and **SCC** |
| **Increase membership in the EI-ISAC for state and local election offices and private sector partners, as well as the EI-SIG for private sector partners** | All 50 states and five territories belong to the EI-ISAC, which has more than 2,300 members as of January 2020. The EI-SIG established in 2018 | **GCC** and **SCC** |
| **Increase enrollment in the Subsector Clearance Program in order to increase understanding of risks and threats among Subsector partners** | **Ongoing** – Phase 3 and expanded private sector nominations began in 2019 to increase SLTT and private sector representatives with clearance. As of January 2020, 162 individuals have received clearance | **GCC** and **SCC** |
| **Promote membership growth in the SCC in order to ensure Subsector coverage** | **Ongoing** – As of November 2019, the SCC has 29 members | **SCC** |

| ELECTION SUBSECTOR ACTIVITY | STATUS | COUNCIL |
|---|---|---|
| **Inform policy makers on Subsector efforts around election security** | **Ongoing** – GCC and SCC members regularly testify to Congress and inform state and local policy makers. Jointly, the GCC and SCC issued a statement on the Senate Intelligence Committee Report Volume[14] | **GCC and SCC** |
| **Coordinate with other critical infrastructure sectors to increase readiness for large-scale cross-sector emergencies** | **In Progress** – SCC members engage with the Cross-Sector Coordinating Council, including the Black Sky Hazards Coordination Working Group | **SCC** |

Improving communication across the Subsector is central to the work of both the GCC and SCC. Subsector partners learned from past communication failures and have made substantial progress in information sharing among partners as well as with policy makers and the public. These efforts continue as described below.

## Information Sharing

Information sharing is a critical tenet of the Subsector's objectives; the first substantive document approved by the GCC in 2018 was a set of Communications Protocols that guide how, when, and to whom incidents are reported by SLTT election officials. Currently, the GCC Communications Working Group is evaluating these protocols to apply lessons learned from 2018 to strengthen the document for 2020 and beyond. Meanwhile, the SCC updated its incident reporting and response guidance in September 2019.

The decentralized nature of the Subsector presents challenges related to information sharing: we must build mechanisms for sharing information between the Federal Government and SLTT partners; between states and their local election jurisdictions; and between federal/SLTT governments and private sector partners. Each level is as important as the next, and trust is paramount. Engagement across levels of government and across the Subsector have helped to build trust, and these efforts continue.

DHS uses the Homeland Security Information Network (HSIN) as a digital communications platform in most other critical infrastructure sectors, but the platform has thus far had less success in the Subsector due to challenges around awareness, usability, and accessibility of the platform. A joint Digital Network Development Working Group is reviewing current practices for digital information sharing and making recommendations for improvement. While the Digital Network remains under development, currently, information is typically shared from federal to state to local entities via more informal communication methods, and from local to state to federal using both formal and informal mechanisms. The Working Group is determining how to improve access to and participation in HSIN among election officials and small industry providers, all of whom have struggled with accessing and using the platform.

The establishment and growth of the EI-ISAC are significant components of the Subsector's information and threat intelligence sharing capability. Through the EI-ISAC, SLTT election offices and private sector and non-profit EI-ISAC members can exchange anonymized technical indicators and threat information with each other, federal partners, and the private sector, and the Federal Government is able to efficiently share similar information with SLTT election offices and election infrastructure providers. The EI-ISAC is a member of the National Council of ISACs (NCI), allowing them to take advantage of information from other ISACs, and is collocated with the Multi-State Information Sharing and Analysis Center (MS-ISAC), which serves SLTT governments in other sectors. Further, the MS-ISAC has a representative on the DHS National Cybersecurity and Communications Integration Center (NCCIC) floor, allowing for efficient exchange of information with the Federal Government. Any private sector partner with a contract with a state or local election office is eligible to be a Supporting Member of the EI-ISAC, allowing them to benefit from the information shared by EI-ISAC members.

Additionally, in August 2018, the IT-ISAC approved the formation of an EI-SIG to provide a dedicated and trusted forum within the IT-ISAC for election industry stakeholders to help guard their networks and assets against physical and cyber threats. The goal of the EI-SIG is to scale up the sharing that occurs between election industry providers and other IT companies to help understand the broader threats to election technology and systems. The EI-SIG also helps members build capacity by providing additional services and learning opportunities that are not available to companies as supporting members via the EI-ISAC.

---

[14] U.S. Senate, Select Committee on Intelligence: *United States Senate on Russian Active Measures Campaigns and Interference in the 2016 U.S. Election*, 2019, https://www.intelligence.senate.gov/sites/default/files/documents/Report_Volume1.pdf.

Glenn Decl. Ex. 48
Page 20 of 35

The Election Infrastructure Subsector Clearance Program is another component of information sharing within the Subsector. DHS sponsors security clearances for Subsector stakeholders. The government clearance program started before the private sector clearance program, but both programs continue to grow.

## ELECTION INFRASTRUCTURE SUBSECTOR CLEARANCE PROGRAM

 **State Chief Election Officials are eligible for secret-level security clearance and can designate additional members of their staff to receive clearance.** Nominated local election officials can also receive clearance. This program deployed in phases, starting in 2017:

• **Phase 1 (2017):** State Chief Election Officials and all GCC members

• **Phase 2 (late 2017):** Two additional state-level officials

• **Phase 3 (early 2019):** Up to three additional nominees per state, including one nomination from the State Chief Election Official, one nomination from the head of the state's local election officials' or clerks' association (or other appropriate organization), and one nomination from CISA regional staff.

Uniquely, the Election Infrastructure Subsector experiences regular turnover as a result of elections. New State Chief Election Officials and state-level staff frequently need to be brought into the clearance program. Each State Chief Election Official is able to nominate the staff of their choosing as part of the Phase 2 program, even if there are others in the office who received clearance under the previous State Chief Election Official. Finally, State Chief Election Officials can designate someone else in their office to receive the Phase 1 clearance in their place. State Chief Election Official (Phase 1) clearance has no bearing on the Phase 2 clearances.

Beginning with the creation of the Election Infrastructure SCC, all SCC primary representatives and alternates are eligible for secret-level security clearance. In 2019, the program expanded to include an additional three private sector partners per state or territory, regardless of their relationship to the SCC. The additional three can be nominated by the State Chief Election Official or a DHS representative.

The SCC also coordinates with other critical infrastructure sectors via the Critical Infrastructure Cross-Sector Council to increase readiness for large-scale incidents and emergencies of national or regional significance. The Cross-Sector Council facilitates consultations, information sharing, and coordinated effort across the critical infrastructure sectors and subsectors and with the Federal Government, as well as with the SLTT Government Coordinating Council (SLTT GCC), the Regional Consortium Coordinating Council (RC3), and the NCI.

The Election Infrastructure SCC participates in the Black Sky Hazards Coordination Working Group, which aims to assure awareness and inform preparedness efforts for extended power outages from natural or intentional causes, including an electro-magnetic pulse (EMP) situation that could shut down electricity in an affected area for an extended period of time. Participants representing each sector can contribute and receive valuable preparedness information for sharing with organizations across their respective industries.

## Inclusion

Now that the GCC and SCC have moved beyond establishment, and as Subsector processes mature, Subsector partners are committed to increasing participation in activities among local election officials from small-to-medium jurisdictions, as well as smaller industry providers.

Increasing local membership in the EI-ISAC has been, and continues to be, an important focus for GCC members. DHS representatives, EI-ISAC staff, and state election officials regularly attend local election official conferences and work directly with local election officials to encourage participation in the EI-ISAC. In 2019, the EI-ISAC established an Executive Board composed of a diverse mix of state and local election officials and IT staff. The establishment and launch of the EI-ISAC is one of the most important early accomplishments for the Subsector, and it has greatly improved access to threat information for election officials and industry providers. The Subsector has realized 100 percent participation in the EI-ISAC from state election offices, four of the five U.S. Territories, and the District of Columbia.

Glenn Decl. Ex. 48
Page 21 of 35

However, while local EI-ISAC membership has grown significantly (as of the end of 2019, more than 2,300 local election jurisdictions had joined), more work can be done to extend membership to mid-size and smaller jurisdictions. The initial mission of the EI-ISAC Executive Board is to develop strategies for including more local election jurisdictions. While the Election Infrastructure Subsector takes pride in having the fastest-growing ISAC ever, it is clear that communications and services from the EI-ISAC need to continue to adapt to serve many local election jurisdictions better in order to ensure complete nationwide coverage.

Similarly, the major election industry providers are part of the SCC, but many smaller providers with business or operating interests in U.S. election infrastructure systems or services have yet to actively engage. The SCC has worked with their GCC counterparts to promote the benefits of SCC membership to these stakeholders, and several newer industry providers have also joined. All members of the SCC have the opportunity to join either the EI-ISAC or the EI-SIG, or in many cases, both. A list of EI-ISAC members is available at https://www.cisecurity.org/ei-isac/partners-ei-isac/.

## Awareness

Election infrastructure has generated unprecedented public interest since its establishment as critical infrastructure in 2017. Educating members of the press and the public to better understand the progress made since 2016 remains an ongoing challenge. There is widespread concern that misleading or factually erroneous coverage focusing on vulnerabilities and failures in election systems can undermine voter confidence in the election process and result in long-term, downstream effects on voting. All members of the Subsector take seriously their responsibilities to ensure the security and integrity of elections, but progress can be difficult to measure and monitor.

Subsector partners regularly speak at in-state and national events and to the press, as well as testify before state legislatures and the U.S. Congress to demonstrate improvements and help educate and inform the public and other relevant stakeholders. They have made a concerted effort to empower members of the Subsector with the knowledge and tools necessarily to educate stakeholders and the public about election security.

Recognizing the importance of getting timely and accurate information to the public in the event of a widespread national incident, the GCC Communications Working Group is developing a proposed protocol for coordinated messaging across states and local election jurisdictions. The decentralized nature of elections, as well as the clear role of SLTT governments in running elections, makes this a challenge, as there is no natural spokesperson for the Subsector as a whole. Further, while states have NASS and NASED to communicate important election security information quickly and to the correct people, local election officials are much more difficult to reach during a crisis, both because they are greater in number and diversity, and, critically, because they are often in the field and away from their desks administering elections during high-stress periods.

The GCC and SCC also periodically make statements, both jointly and individually, to inform the public of efforts to secure elections. For example, they issued a joint statement on the Senate Intelligence Committee Report Volume 1 in 2019 that outlined efforts of the Subsector to protect elections from the threats outlined in the report.

## 3.3.2 Capacity

Support risk assessment and management, emergency planning, and incident response.

a.  **READINESS** - Create a continuous training and learning environment for election officials and industry partners to build knowledge and skills around cyber hygiene, risk assessments, and critical infrastructure security and resilience activities.

b.  **RESPONSE** - Provide subject matter expertise to support the creation and routine exercise of election-related incident response plans.

c.  **MITIGATION & PROTECTION** - Strengthen awareness and management of threats to election infrastructure that may result in significant disruption or harm to the conduct of elections, including physical and cybersecurity threats as well as risks associated with dependencies and interdependencies.

Glenn Decl. Ex. 48
Page 22 of 35

| ELECTION SUBSECTOR ACTIVITY | STATUS | COUNCIL |
|---|---|---|
| Develop and deploy an online training environment for election officials | **Incomplete** – Assigned to GCC Training Working Group | GCC |
| Work with the EAC, nonprofits, and others to identify relevant training offerings and expand adoption throughout the Subsector | **Ongoing** – GCC and SCC members have identified some relevant training offerings and promoted them to the broader Subsector, such as the Center for Technology and Civic Life's (CTCL) cybersecurity training for election officials; working groups will be formed to coordinate across the Subsector in 2020 | GCC and SCC |
| Promote Subsector priorities, incident reporting protocols, and security controls for Subsector stakeholders through DHS Last Mile products | **Ongoing** – Last Mile products have been, and continue to be, designed and distributed | GCC and SCC |
| Promote DHS cybersecurity services for broad Subsector use. Provide input to DHS to help evaluate whether technical service offerings are scalable and ensure they empower Subsector members to effectively manage risk | **Ongoing** – 50 states and four territories work with DHS in some way; the GCC continues to promote these services to state and local election officials and provide feedback to DHS. Additionally, numerous SCC companies have taken advantage of these services | GCC and SCC |
| Advance how election entities understand and organize their cyber risk management efforts through common tools, including developing an Election Infrastructure Subsector profile of the NIST cybersecurity framework | **In Progress** – Assigned to the NIST Cybersecurity Framework Working Group | GCC and SCC |
| Work with DHS, the Intelligence Community, and the private sector to better understand risk to the Subsector. Identify obstacles or impediments to effective election infrastructure security and resilience protection programs and develop actions to mitigate them | **Ongoing** – DHS works with other federal agencies, the GCC, the SCC, and other private sector partners to provide classified and unclassified threat briefings | GCC and SCC |
| Address common and known risks by promoting and supporting widespread deployment of audits; Domain Based Message Authentication, Reporting and Conformance (DMARC); the DotGov (.gov) domain, where applicable; Hypertext Transfer Protocol Secure (HTTPS); and Two-Factor Authentication (2FA) by Subsector entities | **Ongoing** – Distribution of DHS Slick Sheets as well as conference presentations and other tools and resources | GCC and SCC |
| Facilitate improvement in vulnerability disclosures, when appropriate, to help close the gap between identification and mitigation | **In Progress** – EI-SIG development and coordination of an industrywide coordinated vulnerability disclosure (CVD) in progress. GCC partners to discuss as part of 2020 priorities | GCC and SCC each addressing separately |
| Explore ways that procurement practices can elevate security design considerations | **Complete** – GCC Funding Considerations document released May 2018. GCC and SCC members provided input on the Center for Internet Security (CIS) Procurement Guide, released April 2019 | GCC and SCC |
| Execute an annual national tabletop exercise (Tabletop the Vote) and support state-specific tabletop exercises. Clarify the roles and responsibilities of Subsector partners in any federal or state-coordinated response, recovery, and reconstitution effort involving incidents/attacks | **Ongoing** – GCC and SCC help to facilitate an annual Tabletop the Vote exercise each year, led by CISA. Subsector members provide operational support to state-level exercises | GCC and SCC |
| Develop incident response plan templates for Subsector-wide voluntary use | **In Progress** – DHS "Incident Handling Overview for Elections" released 2018. New template for SLTTs planned for early 2020. | GCC and SCC each addressing separately |
| Work with trusted advisors to enhance resilience of key physical offices, sites, and facilities, including election equipment storage locations. | **Ongoing/continuous** for Subsector partners | GCC and SCC |

Glenn Decl. Ex. 48
Page 23 of 35

## Readiness

The GCC and SCC are jointly focused on increasing the capacity among election officials and private sector providers to effectively assess and manage risk to improve their security posture. A vital element of the capacity-building goal for the Subsector is providing training and resources that can help individual election entities and private sector providers build their own cybersecurity capabilities. The volume of training offerings related to election security has increased substantially since 2016:

- Federal Virtual Training Environment (FedVTE) training is provided to state and local officials by DHS, in collaboration with the EI-ISAC.

- Nearly every state provides annual training to their local election officials, which has been adapted or expanded in recent years to include cyber training.

- SCC member companies and organizations conduct companywide cyber hygiene training, internal drills and other employee-focused efforts to enhance cyber awareness and safety.

- In partnership with the International Council of E-Commerce Consultants, also known as EC-Council, the IT-ISAC offers professional cybersecurity training to EI-SIG member companies.

- Non-profit organizations and universities, such as the CTCL and Harvard's Belfer Center, also provide resources and training.

Subsector partners are actively promoting these training options among the broader Subsector; however, due to the decentralized nature of election administration and the sheer number of election officials and providers, it remains a challenge to ensure that local election officials and smaller industry providers are engaged in training and have awareness of/ access to these resources.

To help address this challenge, the GCC established a Training Working Group. The group has identified relevant training offerings, including those mentioned above, and has been tasked with developing and deploying an online training environment for election officials.

Finally, to promote recommended security practices, Subsector partners are working with DHS to create and distribute products intended to reach the broadest possible range of stakeholders. These include Last Mile posters for state and local election officials, and the SCC Election Security Guide for private sector providers, both of which provide documentation of shared objectives, incident reporting procedures, and security controls for their respective stakeholder groups. The posters and other products offer visual reminders about cyber hygiene and other pre-election security practices while providing cues for voters who are interested in the steps that election officials take to ensure the integrity of the vote.

## Response

The Subsector continues to focus on preparing state and local election officials, as well as industry providers, for incident response. Annually, the Subsector executes a national tabletop exercise called Tabletop the Vote, a virtual tabletop exercise with participants from across the Federal Government and state and local election offices from nearly every state and territory, as well as industry partners. Partners participate in the development and the execution of this exercise and provide input on how to improve it each year. Tabletop the Vote allows participants to exercise their incident response plans while working through scenarios that include physical and cybersecurity threats. Federal Government partners practice what they would be doing and how they would coordinate and share information during the scenarios, also learning how state and local election offices would respond in a given situation. Feedback on Tabletop the Vote is consistently positive, and the Subsector plans to continue the exercise for the foreseeable future, with a focus on incident response planning.

DHS has worked closely with state and local election partners to simulate election cybersecurity events. One identified gap in incident response preparedness is the lack of incident response plans in many election offices. While state election offices have incident response plans (most of which incorporate state partners, including the State Chief Information Officer [CIO] or National Guard), many local election offices do not yet have incident response plans or have identified that their plans need further development. In response, state election offices, NASS, and NASED have distributed incident response planning resources to local election officials, and DHS is developing an incident response plan template for local election offices, expected by January 2020. Separately, the SCC Incident Management and Emergency Response Working Group was established to facilitate organizational readiness and incident response planning for the private sector to ensure elections continuity and recovery in case of an event with national critical significance and multi-jurisdictional impacts. The Working Group has identified risks and threats in three categories: Cybersecurity, Domestic Terrorism, and Natural Disasters.

Glenn Decl. Ex. 48
Page 24 of 35

Subsector members also participate in and support state-level tabletop exercises. They can be massive endeavors, enabling in-person participation from state and local election officials. Some states have had more than 400 participants from local jurisdictions, state offices, and the Federal Government. Through these exercises, state election officials have helped facilitate the creation and exercise of incident response plans for local election officials that complement the state plan and have helped local election officials understand the complexity of the cyber threats we face. While many states have used the Belfer Center's tabletop exercise as a model, others are thinking creatively about how to adapt the templates for their own use, including expanding the subject matter beyond security.

## Mitigation & Protection

Understanding election infrastructure risk environments is an important aspect of capacity building, as it is key to determining priorities and allocating resources. Subsector partners created a Joint Cybersecurity Framework Working Group to develop a Subsector-specific risk profile using the NIST Cybersecurity Framework to advance how election stakeholders understand and manage their cyber risk. The goal is to allow for more mature risk conversations within the Subsector by building a shared understanding of risk that is applicable across diverse U.S. election stakeholders.

A major need to building a broad understanding of risk to the Subsector is to improve access to timely and actionable intelligence. Although both the Election Infrastructure Subsector Clearance Program and the establishment of the EI-ISAC have helped, opportunities for improvement remain. The Councils are pushing for more rapid release of intelligence through classified briefings, as much specificity as possible to support security decision making, and sharing of related unclassified information to support broader action. To augment information received by the Intelligence Community, the Subsector works with DHS and private sector entities to receive unclassified briefings from private sector cybersecurity firms based on threat intelligence collected from their work in the field, both domestically and internationally.

Based on risk assessment efforts, the Subsector continues to develop its understanding of the need for services and resources within the Subsector. The availability and use of cybersecurity services from DHS, the EI-ISAC, other state agencies, and other providers by election officials, particularly state-level officials, has increased significantly since the declaration of elections as critical infrastructure. The Subsector continues to work with DHS to provide input on the effectiveness of technical services offerings and to promote DHS services to local-level stakeholders and smaller industry providers. Engaging with and providing services to the approximately 9,000 local election jurisdictions in the U.S. presents a range of scalability challenges, including the difficulty in reaching local officials to ensure they know what services are available, how to access them, and what to do with the results.

Though there is significant diversity in how elections are administered throughout the U.S., the Subsector partnership has recommended specific security measures that state and local election officials can implement to address common and known risks. The measures include using the .gov top-level domain and HTTPS for all election websites, using multi-factor authentication (MFA) for all election systems, implementing DMARC for email security, and implementing efficient and effective pre- and post-election audits of voting systems. The Subsector will continue to identify security measures and improvements through assessments and promote identified measures to stakeholders.

Subsector partners have contributed to resources that help election officials apply important security considerations to procurement decisions and documents, including a procurement guide created by the CIS. The GCC also released a funding considerations document in 2018 that provided high-level guidance to state and local election officials considering purchases in the wake of additional 2018 HAVA funding—and is in the process of producing a follow-on document related to money in the Fiscal Year 2020 Appropriations Bill. The purpose of these efforts is to provide instruction and ideas on how to build security into election technology procurements, in addition to educating and building confidence in election officials with respect to interacting with cybersecurity and other technology vendors.

Meanwhile, SCC partners have provided guidance for election entities regarding sound practices in cyber hygiene, physical security, pre- and post-election protocols, and chain of custody practices.

The GCC and SCC are also exploring how to leverage the work of security researchers to improve the security posture of election officials and industry providers. Through the EI-SIG, major voting systems manufacturers released a white paper in August 2019 on their voluntary efforts to establish an industry-wide CVD program, followed by a more formal Request for Information (RFI) in September 2019. SCC members have also begun working with DHS's Critical Product Evaluation program to conduct additional security testing on their elections products. Conversations have begun between DHS, the EAC,

Glenn Decl. Ex. 48
Page 25 of 35

and industry partners to ensure that vulnerabilities discovered via additional testing can be ameliorated within the EAC's certification process in a timely manner. Meanwhile, the GCC is exploring options for a CVD program, potentially through the EI-ISAC.

## 3.3.3 Resources

Assist Subsector partners in determining priorities, programs, and budgets for securing their entities and assets.

a. **INVESTMENT** - Develop consistent and sustainable sources of support from governments at the local, state, and federal levels as well as nonprofits and the private sector for election security measures that are appropriately flexible and based on the threat landscape.

b. **RESEARCH** - Identify resource and knowledge gaps in securing election infrastructure to build tools and programs for Subsector-wide use.

| ELECTION SUBSECTOR ACTIVITY | STATUS | COUNCIL |
|---|---|---|
| **Identify resourcing gaps at the federal, state, and local level and identify existing resources or funding requirements necessary to fill those gaps** | **Incomplete** – GCC will establish Research Working Group. Ongoing GCC engagements with the National Conference of State Legislatures (NCSL), the National Association of Counties (NACo), the National Governors Association (NGA), and others (e.g., National Guard) that may influence ongoing funding environments and/or technical capacity building | **GCC** |
| **Engage stakeholders that may influence ongoing funding environments** | **Ongoing** – Engagement with NCSL, NACo, NGA, and others | **GCC** |
| **Engage stakeholders who may provide resources other than funding** | **Ongoing** – Engagement with the National Association of State Chief Information Officers (NASCIO), NGA, National Guard, and others | **GCC** |
| **Engage with third-party groups that can serve as validators and amplifiers of challenges faced by Subsector stakeholders** | **Ongoing** – Engagement with non-profit and academic researchers who amplify challenges and resource needs (both monetary and nonmonetary) faced by election infrastructure stakeholders | **GCC and SCC** |
| **Work with stakeholders to develop research agenda for election infrastructure** | **Incomplete** –Establish a Research Working Group. GCC and SCC members continue to serve as Subject Matter Experts (SMEs) for ongoing efforts | **GCC and SCC** |

### Investment

The Election Infrastructure Subsector deals with chronic resourcing issues at all levels of government. The designation of elections as critical infrastructure in 2017 has brought state and local election office resourcing to the forefront, particularly among federal appropriators. In March 2018, Congress funded the remaining $380 million, with a five percent match by the states under HAVA, and the EAC worked to disburse funds to all states by August. However, a new provision requiring that states use the money within five years of the President's signature made long-term planning difficult, and the timing of the disbursement meant that SLTT election officials were constrained as to what they could accomplish by the November 2018 election. The one-time nature of this appropriation is also limiting: technology is not a one-time investment, and without sustainable funding, SLTT election officials must budget their share of the funds to ensure that they can afford to maintain the technologies, practices, and trainings that they put into place in 2018 in the future.

In December 2019, Congress added another $425 million in one-time funding, again utilizing the HAVA appropriations formula for equitable distribution of the funds, this time including the Commonwealth of the Northern Mariana Islands for the first time. The EAC took point to distribute the funds. Unlike the 2018 funds, the state match to receive the 2019 funds was 20 percent, an increase over the five percent required in 2018. There is widespread agreement among GCC members that more resources—and, importantly, more sustained resources—will improve election security. Funding shortages affect both state and local election officials, though in different ways.

Glenn Decl. Ex. 48
Page 26 of 35

The problem of adequate funding is not solely a federal issue, though. Election officials often lack adequate state and local funding for the necessary ongoing procurement and maintenance of election technology. Improving funding levels from state and local appropriators is a priority for SLTT election officials.

State election officials, mostly through NASS and NASED, engage with groups who influence resource environments at the state and local level to highlight resource needs including both stable funding and nonmonetary resources such as technical support, help with risk assessments, and surge support for incident response. The clear national importance of election infrastructure has made engagement with other stakeholder groups, including the NGA, NASCIO, NACo, the NCSL, and others easier, and more important, than ever before. These groups are collaborating with SLTT election officials in varying ways to elevate elections in resource conversations, continuity of operations planning, and disaster preparedness. State and local election officials have also engaged with third-party groups who have served as amplifiers of the resourcing challenges faced by Subsector partners. But until the Federal Government creates sustainable funding, and/or until state and local governments step up to support election infrastructure security in a robust fashion across all election jurisdictions, the funding for appropriate election security will continue to be a problem for election administrators.

## Research

Addressing research and development priorities requires Subsector-wide engagement. The GCC and the SCC are working to formalize research and development plans and processes to bring new knowledge, techniques, and capabilities to the Subsector. Collaboration priorities may provide a means for outreach, review of ongoing research and development efforts by the SSA and other federal and state government entities, consideration of gaps in the execution of national research and development priorities, and the opportunity to reach consensus on government and private sector roles and responsibilities. The GCC and SCC intend to establish a Research Working Group to address the funding challenges described above, as well as guide other research as needed. The Working Group will be tasked with identifying the most critical resourcing gaps for the Subsector and identifying existing resources or funding requirements necessary to address those gaps.

Subsector partners recognize the need to be forward-thinking by focusing not only on the assets necessary to administer elections today, but also on elections in the future. Specifically, Subsector partners also plan to work with DHS, NIST, the EAC, and others to develop a research agenda for election infrastructure that will focus on longer term election security past 2020.

# 4. NATIONAL PREPAREDNESS AND RESILIENCE STRATEGIES

Preparedness for cyber and physical disruptions in service is a major focus for the Election Infrastructure Subsector. The recognition of conducting elections as a National Critical Function[15] further highlights the importance of preparedness in the Subsector. State and local election officials must continuously deliver election services throughout the jurisdictions they serve, especially during election and voting periods. This means providing real-time or near real-time access to physical and cyber/digital assets supporting elections even when regular delivery mechanisms have failed due to a natural disaster or security incident. Resilience requires restoring regular services after such events and adapting services and delivery mechanisms in the face of new risks. Backups, both physical and technological, and disaster recovery operations are part of the process of restoring delivery mechanisms.

Presidential Policy Directive 8: National Preparedness (PPD-8) affirms that preparation for national emergencies is a shared responsibility of all levels of government and the private and non-profit sectors. It also calls for a National Preparedness System to help align the efforts of all partners.[16] The Subsector contributes to national preparedness by mitigating risks to election systems and assets.

The National Preparedness Goal describes a vision for preparedness nationwide and identifies the core capabilities necessary to achieve that vision across five mission areas: Prevention, Protection, Mitigation, Response, and Recovery.[17] The nature of election infrastructure and the scope of its functions mean preparedness in the Subsector must include activities from each of these mission areas. Efforts to incorporate the national preparedness mission areas translate to more secure and resilient election infrastructure and, therefore, a more secure and resilient national psyche.

## Election Infrastructure Subsector National Preparedness Efforts

Election infrastructure resilience efforts include measures designed to prevent, deter, and mitigate threats to election administration; reduce vulnerability to misinformation; minimize the consequences on election outcomes and perception; and enable timely, efficient response and restoration following incidents. Every day across the United States, the Subsector organizes and executes its security and resilience programs and activities in a manner consistent with all five of the national preparedness frameworks that correspond to the five mission areas—National Prevention Framework, National Protection Framework, National Mitigation Framework, National Response Framework, and National Disaster Recovery Framework—in addition to the implementation of the National Incident Management System. The programs and activities that contribute to the security and resilience of the Subsector are diverse and developed collaboratively by federal and SLTT governments, including NASS, NASED, the EAC, the GCC and SCC, and private sector and non-profit partners, along with industry associations and others.

---

[15] Cybersecurity and Infrastructure Security Agency, *National Critical Functions Set*, April 30, 2019, https://www.cisa.gov/sites/default/files/publications/national-critical-functions-set-508.pdf.

[16] Department of Homeland Security, *Presidential Policy Directive/PPD-8: National Preparedness*, accessed June 6, 2019, https://www.dhs.gov/presidential-policy-directive-8-national-preparedness.

[17] Federal Emergency Management Agency, *National Preparedness Goal, Second Edition*, September 2015, https://www.fema.gov/media-library-data/1443799615171-2aae90be55041740f97e8532fc680d40/National_Preparedness_Goal_2nd_Edition.pdf.

Glenn Decl. Ex. 48
Page 28 of 35

# APPENDIX A: COORDINATING COUNCIL MEMBER PROFILES

## Election Infrastructure Subsector Government Coordinating Council

The Election Infrastructure Subsector GCC consists of 24 representatives derived from the membership of associations of state and local election officials, plus three Federal Government representatives, as laid out in the Election Infrastructure Subsector GCC Charter.[18] The organizations whose members are represented on this GCC are:

**International Association of Government Officials (iGO):** The iGO has a very large contingent of election officials from around the Nation and world. The Domestic Election Section of iGO is committed to the security of elections from current threats. Three members on the GCC represent the iGO, though other GCC members may also be iGO members. The Association aims to provide professional training and leadership development through the promotion of networking, technology innovations, educational programs, and legislative monitoring on national issues that affect county recorders, election officials, treasurers, and clerks, to better serve the public.[19]

**National Association of Secretaries of State (NASS):** In 40 states, the Secretary of State serves as the Chief Election Official, charged with driving state election policy and ensuring compliance with the rules. NASS has eight members on the GCC. Founded in 1904, NASS is the Nation's oldest non-partisan professional organization for public officials. Membership is open to all 50 states, the District of Columbia, and all U.S. Territories. NASS serves as a medium for the exchange of information between states and fosters cooperation in the development of public policy. The Association has key initiatives in the areas of elections and voting, state business services, and state heritage/archives.[20]

**National Association of State Election Directors (NASED):** The NASED mission is to promote accessible, accurate, and transparent elections in the United States and U.S. Territories. NASED has six positions on the GCC. The Association was formed in 1989 when a group of state election directors and administrators met in Reno, Nevada. The driving issue at that time that spurred the group to organize was the concern that national networks were releasing presidential election results before all polls had closed. HAVA has increased the importance for communication and coordination among state election directors. Though the issues have changed somewhat over the years, the purpose of NASED has remained the same—to serve as an exchange of best practices and ideas.[21]

**National Association of Election Officials:** The National Association of Election Officials, also known as the Election Center, is a non-profit organization built to promote, preserve, and improve democracy.[22] The Election Center may appoint three local election officials to the GCC. Its members are almost exclusively government employees whose jobs are to serve in voter registration and elections administration. This includes voter registrars, election supervisors, election directors, city clerks/city secretaries, county clerks, county recorders, state legislative staff, state election directors and the Secretary of State for each of the individual states, territories, and the District of Columbia. The Election Center provides its members with an alert service, which informs and updates state, city, and other election and voter registration officials regarding legislation, regulations, court decisions, and U.S. Department of Justice rulings that affect the conduct of voter registration or elections administration. Additionally, the Election Center performs research for such governmental units concerning the similarities and differences in state or local laws, regulations, or practices concerning voter registration and elections administration.[23]

**U.S. Department of Homeland Security (DHS):** As the designated SSA for the Election Infrastructure Subsector, DHS's primary role is to build trusted partnerships and advance a national unity of effort to strengthen and maintain secure, functioning, and resilient election infrastructure, as laid out in PPD-21. DHS performs this role (as well as a similar role for other critical infrastructure sectors) via CISA, which encompasses a variety of personnel, capabilities, resources, and technical

---

[18] U.S. Department of Homeland Security (DHS), *EIS GCC Charter*, October 18, 2017, https://www.cisa.gov/sites/default/files/publications/govt-facilities-election-infrastructure-subsector-gcc-charter-2017-508.pdf.

[19] International Association of Government Officials (iGO), "About iGO," accessed May 11, 2018, https://iaogo.org/about/.

[20] National Association of Secretaries of State (NASS), "About NASS," accessed May 11, 2018, http://www.nass.org/index.php/about-nass.

[21] National Association of State Election Directors (NASED), "About NASED's History," accessed May 11, 2018, https://www.nased.org/about-nased/.

[22] National Association of Election Officials, "About Us," accessed May 11, 2018, https://www.electioncenter.org/about-us.html.

[23] Orange County Registrar of Voter, "Our People," accessed May 11, 2018, https://www.ocvote.com/about/our-people/.

Glenn Decl. Ex. 48
Page 29 of 35

expertise that state and local election officials can leverage on a voluntary basis to support the security and resilience of their election infrastructure. Under PPD-21 and the NIPP, DHS provides a venue for a voluntary, structured partnership approach between the government and the private sector for the protection, security, and resilience of critical infrastructure. The Election Infrastructure GCC and SCC are established under this framework.[24]

**U.S. Election Assistance Commission (EAC):** As the primary partner in the Subsector for DHS, the EAC brings election official support and management experience to the table as this new Subsector stands up. The EAC was established by HAVA. It is an independent, bipartisan commission charged with developing guidance to meet HAVA requirements, adopting voluntary voting system guidelines, and serving as a national clearinghouse of information on election administration. The EAC also accredits testing laboratories, certifies voting systems, and audits the use of HAVA funds. Other responsibilities include maintaining the national mail voter registration form developed in accordance with NVRA. HAVA established the Standards Board and the Board of Advisors to advise the EAC. The law also established the Technical Guidelines Development Committee to assist the EAC in the development of voluntary voting system guidelines. The four EAC commissioners are appointed by the President and confirmed by the U.S. Senate. The EAC is required to submit an annual report to Congress as well as testify periodically about HAVA progress and related issues. The Commission also holds public meetings and hearings to inform the public about its progress and activities.[25]

**EAC Board of Advisors:** The EAC Board of Advisors is composed of 35 representatives from the NGA; NCSL; NASS; NASED; NACo; iGO; Election Center; International Association of Clerks, Recorders, Election Officials, and Treasurers; U.S. Commission on Civil Rights; and Architectural and Transportation Barriers Compliance Board. Other members include representatives from the U.S. Department of Justice, Office of Public Integrity, and the Civil Rights Division; the director of the U.S. Department of Defense's FVAP; four professionals from the field of science and technology, one each appointed by the Speaker and the Minority Leader of the U.S. House of Representatives and the Majority and Minority leaders of the U.S. Senate; and eight members representing voter interests, with the chairs and the ranking minority members of the U.S. House of Representatives Committee on House Administration and the U.S. Senate Committee on Rules and Administration each appointing two members.

Following the passage of HAVA, the National Association of County Recorders, Election Officials and Clerks and the International Association of Clerks, Recorders, Election Officials, and Treasurers merged to form the International Association of Government Officials. It advises the EAC through the review of the voluntary voting systems guidelines (VVSG) described in HAVA. This includes the review of the voluntary guidance and best practices recommendations therein. It functions solely as an advisory body under the provisions of the Federal Advisory Committee Act.[26]

**EAC Standards Board:** The Standards Board is a 110-member body designated by HAVA to assist the EAC in carrying out its mandates under the law. The Board consists of 55 state election officials selected by their respective Chief Election Officials, and 55 local election officials selected through a process supervised by the Chief Election Officials. Similar to the EAC Board of Advisors, the Standards Board advises the EAC through review of the VVSG, voluntary guidance, and best practices under HAVA.[27]

## Election Infrastructure Subsector Coordinating Council

The Election Infrastructure SCC is a self-organized, self-run, and self-governed body of organizations representing the private sector components of election infrastructure. Members of the SCC include companies, organizations, or components thereof whose services, systems, products, or technology are used by (or on behalf of) state or local governments in the administration of U.S. elections.

To qualify for membership, the SCC requires organizations to demonstrate working relationships with federal, state, or local election officials, which may include verifiable registration or accreditation with the EAC and/or relevant contractual relationships with SLTT government election offices.[28]

---

[24] U.S. Department of Homeland Security (DHS), "About DHS," accessed May 11, 2018, https://www.dhs.gov/about-dhs.

[25] U.S. Election Assistance Commission (EAC), "About U.S. EAC," accessed May, 11, 2018, https://www.eac.gov/about-the-useac/.

[26] U.S. Election Assistance Commission (EAC), "Advisory Boards: Board of Advisors," accessed May 11, 2018, https://www.eac.gov/about/board-of-advisors/.

[27] U.S. Election Assistance Commission (EAC), "Advisory Boards: Standards Board," accessed May 11, 2018, https://www.eac.gov/about/standards-board/.

[28] U.S. Department of Homeland Security (DHS), EISCC Charter, February 15, 2018, https://www.cisa.gov/government-facilities-election-infrastructure-charters-and-membership.

Glenn Decl. Ex. 48
Page 30 of 35

# APPENDIX B. GLOSSARY OF TERMS

This appendix includes definitions of the terms used in the SSP and adapted from the NIPP. For a broader glossary of election infrastructure terms, please refer to the EAC's *Glossary of Key Election Terminology*.[29]

**All Hazards:** A term that encompasses threats or incidents, natural or man-made, that warrant action to protect life, property, the environment, and public health or safety and minimize disruptions of government, social, or economic activities.

**Consequence:** The effect of an event, incident, or occurrence, including the number of deaths, injuries, and other human health impacts, along with the economic impacts, both direct and indirect, and other negative outcomes to society.

**Critical Infrastructure:** Systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems would have a debilitating impact on security, national economic security, national public health or safety, or any combination thereof.

**Critical Infrastructure Sectors:** A logical collection of assets, systems, or networks that provide a common function to the economy, government, or society; PPD-21 identifies 16 critical infrastructure sectors.

**Cyber:** Describes electronic technologies or components of systems that operate in an internet-connected state, or those that can be connected to the internet.

**Digital:** Describes electronic technologies or components of systems that operate without necessarily being connected to the internet.

**Election Infrastructure Subsector Partners:** The GCC, SCC, and the respective stakeholder groups they represent in efforts to ensure the security and resilience of the Election Infrastructure Subsector.

**Election Systems:** Includes infrastructure to manage voter registration, planning and execution of elections, counting and reporting of election results, and other software and hardware used by election officials.

**Federal Virtual Training Environment (FedVTE):** A free, online, and on-demand cybersecurity training system for federal/SLTT government personnel and veterans. Managed by DHS with support from the U.S. Department of Defense's Defense Information Systems Agency, FedVTE offers more than 800 hours of training on topics such as ethical hacking and surveillance, risk management, and malware analysis. Courses range from beginner to advanced levels. Training is accessible from any internet-enabled computer.

**Government Coordinating Council (GCC):** Consists of representatives from across various levels of government (including federal and SLTT), as appropriate to the operating landscape of each individual sector. These councils enable inter-agency, intergovernmental, and cross-jurisdictional coordination within and across sectors and partner with SCCs on public-private efforts.

**Homeland Security Information Network–Election Infrastructure Subsector (HSIN-EIS):** A trusted network to share Sensitive but Unclassified information with federal, state, local, territorial, international, and private sector partners.

**Lifeline Function:** A function that is essential to the operation of most critical infrastructure sectors. The NIPP 2013 identifies communications, energy, transportation, and water as lifeline functions. Critical infrastructure partners should identify essential functions and resources that impact their businesses and communities.

**Private Sector Clearance Program:** A program administered by DHS designed to facilitate access to security clearances for private sector officials involved in the infrastructure protection mission.

---

[29] U.S. Election Assistance Commission (EAC), "Election Officials: Glossaries of Election Terminology," accessed May 8, 2018, https://www.eac.gov/glossary?pg=1.

Glenn Decl. Ex. 48
Page 31 of 35

**Risk:** The potential for an unwanted outcome resulting from an incident, event, or occurrence, as determined by its likelihood and the associated consequences.

**Sector-Specific Agency (SSA):** A federal department or agency designated by PPD-21 with responsibility for providing institutional knowledge and specialized expertise as well as leading, facilitating, or supporting the security and resilience programs and associated activities of its designated critical infrastructure sector in the all-hazards environment.

**Subsector Coordinating Council (SCC):** SCCs are self-organized, self-run, and self-governed private sector councils consisting of owners and operators and their representatives, which interact on a wide range of sector-specific strategies, policies, activities, and issues. SCCs serve as principal collaboration points between the government and private sector owners and operators for critical infrastructure security and resilience policy coordination and planning and a range of related sector-specific activities. For election infrastructure, the Council includes the owners and operators for the Subsector.

**Subsector Partners:** See "Election Infrastructure Subsector Partners."

**Threat:** A natural or man-made occurrence, individual, entity, or action that has or indicates the potential to harm life, information, operations, the environment, and/or property.

**Vulnerability:** A physical feature or operational attribute that renders an entity open to exploitation or susceptible to a given hazard.

Glenn Decl. Ex. 48
Page 32 of 35

# APPENDIX C. ACRONYMS AND ABBREVIATIONS

| Acronym | Definition |
|---------|------------|
| 2FA | Two-Factor Authentication |
| BMD | Ballot Marking Devices |
| CIIA | Critical Infrastructure Information Act of 2002 |
| CIO | Chief Information Officer |
| CIPAC | Critical Infrastructure Partnership Advisory Council |
| CISA | Cybersecurity and Infrastructure Security Agency |
| CIS | Center for Internet Security |
| CSA | Cyber Security Advisor |
| CTCL | Center for Technology and Civic Life |
| CVD | Coordinated vulnerability disclosure |
| DHS | U.S. Department of Homeland Security |
| DMARC | Domain Based Message Authentication, Reporting and Conformance |
| DMV | Department of Motor Vehicles |
| DNI | Office of the Director of National Intelligence |
| DRE | Direct Recording Electronic |
| EAC | Election Assistance Commission |
| EC-Council | International Council of E-Commerce Consultants |
| EI-ISAC | Election Infrastructure Information Sharing and Analysis Center |
| EMP | Electro-magnetic pulse |
| EO | Executive Order |
| FBI | Federal Bureau of Investigation |
| FedVTE | Federal Virtual Training Environment |
| FEMA | Federal Emergency Management Agency |
| FVAP | Federal Voting Assistance Program |
| GCC | Government Coordinating Council |
| GIS | Geographic Information System |
| HAVA | Help America Vote Act |
| HSIN-EIS | Homeland Security Information Network-Election Infrastructure Subsector |
| HTTPS | Hypertext Transfer Protocol Secure |
| I&A | DHS Office of Intelligence and Analysis |
| iGO | International Association of Government Officials |
| ISAC | Information Sharing and Analysis Center |
| IT | Information technology |

| Acronym | Definition |
|---------|------------|
| MFA | Multi-factor authentication |
| MS-ISAC | Multi-State Information Sharing and Analysis Center |
| NACo | National Association of Counties |
| NASCIO | National Association of State Chief Information Officers |
| NASED | National Association of State Election Directors |
| NASS | National Association of Secretaries of State |
| NCCIC | National Cybersecurity and Communications Integration Center |
| NCI | National Council of Information Sharing and Analysis Centers (ISACs) |
| NCOA | National Change of Address |
| NCSL | National Conference of State Legislatures |
| NGA | National Governors Association |
| NIPP 2013 | National Infrastructure Protection Plan 2013: Partnering for Critical Infrastructure Security and Resilience |
| NIST | National Institute of Standards and Technology |
| NGO | Nongovernmental organization |
| NRMC | National Risk Management Center |
| NVRA | National Voter Registration Act |
| PPD-8 | Presidential Policy Directive 8: National Preparedness |
| PPD-21 | Presidential Policy Directive 21: Critical Infrastructure Security and Resilience |
| PSA | Protective Security Advisor |
| R&D | Research and Development |
| RC3 | Regional Consortium Coordinating Council |
| RFI | Request for information |
| SCC | Subsector Coordinating Council |
| SIG | Special interest group |
| SLTT | State, local, tribal, and territorial |
| SME | Subject matter expert |
| SSA | Sector-Specific Agency or Subsector-Specific Agency |
| SSP | Subsector-Specific Plan |
| USPS | United States Postal Service |
| VVSG | Voluntary voting systems guidelines |

Glenn Decl. Ex. 48
Page 33 of 35

# APPENDIX D. ELECTION INFRASTRUCTURE AUTHORITIES

This appendix provides a brief description of the major authorities and resources that form the basis for the establishment of the Election Infrastructure Subsector security and resilience partnership.

## Critical Infrastructure Authorities

**Homeland Security Act of 2002, as amended:** The Homeland Security Act establishes specific critical infrastructure protection roles and responsibilities for DHS which include:[30]

- developing a comprehensive national plan for securing the critical infrastructure of the United States;

- providing crisis management in response to attacks on critical information systems;

- providing technical assistance to the private sector and other government entities on emergency recovery plans for failures of critical information systems; and

- coordinating with federal agencies to provide specific warning information and advice about appropriate protective measures and countermeasures to state, local, and nongovernment entities.

**Critical Infrastructure Information Act of 2002 (CIIA):** The CIIA establishes protections for critical infrastructure information that is voluntarily shared with DHS for use regarding the security of critical infrastructure and protected systems. CIIA includes measures to ensure against DHS disclosure of protected critical infrastructure information to encourage private and public sector entities to voluntarily share their critical infrastructure information with DHS.[31]

**Presidential Policy Directive 21:** Critical Infrastructure Security and Resilience (PPD-21): This PPD directs the executive branch to develop a situational awareness capability that addresses both physical and cyber aspects of how infrastructure is functioning in near-real time; understand the cascading consequences of infrastructure failures; evaluate and mature the public-private partnership; update the NIPP; and develop a comprehensive research and development plan.[32]

**National Infrastructure Protection Plan 2013:** Partnering for Critical Infrastructure Security and Resilience (NIPP 2013): The NIPP 2013 is informed by significant evolution in the critical infrastructure risk, policy, and operating environments, as well as experience gained and lessons learned from the previous 2009 NIPP. The 2013 plan builds upon prior NIPPs by emphasizing the complementary goals of security and resilience for critical infrastructure. To achieve these goals, cyber and physical security and the resilience of critical infrastructure assets, systems, and networks are integrated into an enterprise approach to risk management. The NIPP 2013 guides the national efforts to manage risk to the Nation's critical infrastructure.[33]

**Executive Order (EO) 13636 – Improving Critical Infrastructure Cybersecurity:** This EO directs the executive branch to develop a technology-neutral, voluntary cybersecurity framework; promote and incentivize the adoption of cybersecurity practices; increase the volume, timeliness, and quality of threat information sharing; incorporate strong privacy and civil liberties protection into every critical infrastructure security initiative; and explore the use of existing regulations to promote cybersecurity.[34]

---

[30] *Homeland Security Act* of 2002, as amended. Pub. L. 107-296, 116 Stat. 2135, (2002).

[31] *Critical Infrastructure Information Act (CIIA)*, 6 U.S.C. 671-674.

[32] The White House, *Presidential Policy Directive: Critical Infrastructure Security and Resilience (PPD-2013)*, February 12, 2013, https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/presidential-policy-directive-critical-infrastructure-security-and-resil.

[33] U.S. Department of Homeland Security (DHS), *National Infrastructure Protection Plan 2013: Partnering for Critical Infrastructure Security and Resilience (NIPP 2013)*, 2013, https://www.cisa.gov/sites/default/files/publications/national-infrastructure-protection-plan-2013-508.pdf.

[34] The White House, *Executive Order 13636 – Improving Critical Infrastructure Cybersecurity*, February 12, 2013, https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/executive-order-improving-critical-infrastructure-cybersecurity.

Glenn Decl. Ex. 48
Page 34 of 35

**Designation of Election Infrastructure as a Subsector of the Government Facilities Critical Infrastructure Sector:** The former DHS Secretary issued a memorandum on January 6, 2017, to officially designate the Election Infrastructure Subsector. The memorandum defines the physical assets and information and communication technologies that constitute the elements of election infrastructure that are considered critical infrastructure. It also directs NPPD (National Protection and Programs Directorate, now CISA) to establish an SSA management office to support the Subsector's institutionalization under the NIPP.[35]

# Other Federal Authorities

**Executive Order 13848:** Following the revelation that foreign adversaries had attempted to interfere in the 2016 election, the U.S. Government took steps to implement policies designed to deter malicious actors from attempting to interfere in future elections.

Executive Order 13848, Imposing Certain Sanctions in the Event of Interference in U.S. Elections, establishes a process for the U.S. Government to implement economic sanctions against the perpetrators of election interference and the entities who support them. The EO empowers the Secretary of the Treasury, in consultation with the Attorney General, Secretary of State, and Secretary of Homeland Security, to block malicious actors' property, restrict their access to financial institutions, and "other measures authorized by law."

Per the EO: "[T]he term 'foreign interference,' with respect to an election, includes any covert, fraudulent, deceptive, or unlawful actions or attempted actions of a foreign government, or of any person acting as an agent of or on behalf of a foreign government, undertaken with the purpose or effect of influencing, undermining confidence in, or altering the result or reported result of, the election, or undermining public confidence in election processes or institutions."[36]

**National Defense Authorization Act:** The 2020 National Defense Authorization Act for Fiscal Year 2020 includes numerous provisions related to election security and establishes several new requirements for federal agencies and departments. Specifically, it requires DHS to:

- with the DNI and FBI, post any counterintelligence threats to political campaigns for federal office on the internet, provide update briefings to Congress, and conduct a post-election assessment;[37]

- report to Congress any foreign government cyberattacks against the U.S. 2016 election;

- with the Intelligence Community, conduct an assessment of U.S. election systems vulnerabilities at least one year prior to any federal election and submit a report to Congress on such; and

- with the DNI and FBI, brief Congress following any significant foreign cyber intrusions or active measures campaigns directed against the U.S. election system.[38]

---

[35] U.S. Department of Homeland Security (DHS), "Statement by Secretary Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector," press release, January 6, 2017, https://www.dhs.gov/news/2017/01/06/statement-secretary-johnson-designation-election-infrastructure-critical.

[36] The White House, *Executive Order 13848 – Imposing Certain Sanctions in the Event of Foreign Interference in a United States Election*, September 12, 2018, https://www.whitehouse.gov/presidential-actions/executive-order-imposing-certain-sanctions-event-foreign-interference-united-states-election/.

[37] *National Defense Authorization Act for Fiscal Year 2020*, Pub. L. 116-92, § 5304, (2019).

[38] *National Defense Authorization Act for Fiscal Year 2020*, Pub. L. 116-92, § 6503-6507, (2019).

Glenn Decl. Ex. 48
Page 35 of 35

# EXHIBIT 49





# We're in This Together.
# Disinformation Stops With You.

"For Position Only"
Logo/Sign Here

## Disinformation and COVID-19: How State and Local Officials Can Respond

State and local officials play a critical role in countering the abundance of false COVID-19 information that is spreading through public information channels. This toolkit is intended to be used by state, local, tribal and territorial officials. COVID-19 is and will continue to be a threat to public health. Throughout the COVID-19 pandemic disinformation, much of it produced and amplified by foreign actors, has consisted of false treatment and prevention measures, unsubstantiated rumors regarding the origin of the virus, and more. As such, it is imperative that State and local officials continually convey timely, trusted, and verified COVID-19 details and developments to their constituents to avert a vacuum of credible information, which can be exploited for misuse as disinformation by bad actors.

What are the different kinds of false information?

- **Misinformation** is false, but not created or shared with the intention of causing harm.

- **Malinformation** is based on fact, but used out of context to mislead, harm, or manipulate.

- **Disinformation is deliberately** created to mislead, harm, or manipulate a person, social group, organization, or country.

All three are harmful, but disinformation is a particular source of concern.

In a February report by the World Health Organization (WHO) report, officials included the term "infodemic" to describe the "overabundance" of information and false information that has arisen in conjunction with the COVID-19 pandemic. State and local government officials should combat ongoing campaigns aimed at undermining the ability of governments to respond to the COVID-19 pandemic. State-level officials should also remind citizens to remain vigilant in their online activities, especially during this time of unprecedented teleworking, virtual education classes, and online personal information gathering regarding the COVID-19 pandemic.

## Core Messaging

See below for messaging that can be used in all public communications, including social media. Provide direct links to your state's health department and underscore that the state pledges to be transparent and will share all public information at that site. Feel free to edit, reuse, and rebrand this document and its content to suit the needs of your constituents.

**Rely on trusted sources.** For situational updates on COVID-19 and stay-at-home guidelines, rely on information provided by state and local health officials, as well as the Centers for Disease Control and Prevention (CDC) at coronavirus.gov and the Cybersecurity and Infrastructure Security Agency (CISA) at cisa.gov/coronavirus.

**Think before you link.** Slow down. Don't immediately click to share posts, memes, videos, or other content you see online. Some of the most damaging disinformation spreads rapidly via shared posts. Check your sources before sharing.

**Be careful what you post.** The information you share online can be misunderstood or repurposed via manipulation. Do a privacy check on your social media accounts and make sure you are not sharing content broadly that you mean only for close family and friends. Be aware that agents of disinformation often steal identities of real people, profile photos, and other information.

**Be wary of manipulative content.** Agents of disinformation are known to create or repurpose emotional videos and photos, and to use sensational terms to divide us. Be especially careful of content that attempts to make people angry or sad or create division.

**Don't become a victim of COVID-19-related scams.** Be wary of dishonest solicitations designed to take your money and gather your personal information. For more information about scams visit www.consumer.ftc.gov/blog/2020/02/coronavirus-scammers-follow-headlines.

# TALKING POINTS:
## Disinformation Stops With You.



"For Position Only"
Logo/Sign Here

- For COVID-19 facts and stay-at-home guidance, rely on state and local health official websites, as well as the CDC (www.cdc.gov) and FEMA's rumor control webpage at fema.gov/coronavirus/rumor-control.

- Misinformation is false, but not created or shared with the intention of causing harm. Malinformation is based on fact, but used out of context to mislead, harm, or manipulate. Disinformation is deliberately created to mislead, harm, or manipulate a person, social group, organization, or country. All three are harmful, especially now.

- Think before sharing content on social media or emails—be sure to check your sources first.

- Be mindful of what you are sharing or posting online—check your privacy settings.

- Watch out for emotionally manipulative content designed to make us angry or sad.

- Take care when viewing or sharing content that uses sensational terms to divide us in a time of crisis.

- Report scams to trusted agencies, such as the Federal Trade Commission or state consumer protection agencies.

This poster was created by the Cybersecurity and Infrastructure Security Agency (CISA), an agency within the Department of Homeland Security (DHS), for the purpose of sharing information related to election security and should not be considered an endorsement of any other entity. See CISA.gov/protect2020 for more information.

Glenn Decl. Ex. 49
Page 2 of 3

# FAQs:

Stopping COVID-19
**Disinformation**

## We're in This Together. Disinformation Stops With You.

**What can our state and local officials do in countering disinformation?**

State and local officials have emerged as some of the most visible government officials during the COVID-19 pandemic. In addition to being empathetic, state officials need to quickly and clearly communicate factual information and appropriate actions.

**What are the best sources for accurate and reliable COVID-19 information?** Your home state health department; your county- level department of public health; U.S. Centers for Disease Control and Prevention (CDC) www.cdc.gov; FEMA's rumor control page at www.fema.gov/rumor-control; and the U.N. World Health Organization (WHO) www.who.int/emergencies/diseases/novel-coronavirus-2019.

**What are the different kinds of false information? Misinformation** is false, but not created or shared with the intention of causing harm. **Malinformation** is based on fact, but used out of context to mislead, harm or manipulate others. **Disinformation** is deliberately created to mislead, harm or manipulate others.



**Who are the primary malign actors associated with the spreading of COVID-related disinformation?**
Russian, Chinese and Iranian state-sponsored elements, as well as domestic extremist groups.

**What are these malign actors trying to accomplish by spreading disinformation?** Their goal is creating chaos, confusion and division. They also want to degrade confidence in U.S. institutions, which in turn undermines our ability to respond effectively to the pandemic.

**Who else is spreading disinformation?** Scammers, cyber criminals and con artists are also taking advantage of fears surrounding COVID-19. They promote questionable awareness and prevention tips, as well as fake information about cases in your neighborhood. They may ask for donations, offer advice on unproven treatments or spread malicious email attachments.

**How is false information spread?**
All kinds of false information are spread through a variety of mediums, including mainstream media, social media, word of mouth, online forums, texts and emails. When people share disinformation, they may be unaware of the true source of a link or email.

**What can our state and local officials tell their constituents about stopping disinformation?** Core messaging should emphasize that "we're all in this together" and that "disinformation stops with you." Basic tips to include are:

- Rely on trusted sources such as the CDC and your health department. For situational updates on COVID-19 and stay-at-home guidelines, rely on state and local health officials.

- Think twice before sharing content online.

- Be careful about posting personal information.

- Be on the lookout for content that seems manipulative or overly emotional.

- Report scams to appropriate federal agencies, such as the Federal Trade Commission or state consumer protection agencies.

"For Position Only" Logo/Sign Here

This poster was created by the Cybersecurity and Infrastructure Security Agency (CISA), an agency within the Department of Homeland Security (DHS), for the purpose of sharing information related to election security and should not be considered an endorsement of any other entity. See CISA.gov/protect2020 for more information.

# EXHIBIT 50

This document was created as part of the Election Infrastructure Government Coordinating Council and Subsector Coordinating Council's Joint Mis/Disinformation Working Group. This document is intended to be used by state, local, tribal, and territorial election officials, and industry partners as part of a larger mis-, dis-, and malinformation (MDM) response strategy. SLTT election officials should consult with their legal officer and other necessary officials in their jurisdiction prior to creating an MDM response program.




# Mis-, Dis-, and Malinformation

## Planning and Incident Response Guide for Election Officials

## OVERVIEW

State, local, tribal, and territorial (SLTT) election officials can take proactive steps to prepare for and respond to the threats of misinformation, disinformation, and malinformation (MDM). This guide is intended to help election officials understand, prepare for, and respond to MDM threats that may impact the ability to conduct elections.

### WHAT IS MDM?

CISA defines mis-, dis-, and malinformation (MDM) as "information activities." This type of content is referred to as either domestic or foreign influence depending on where it originates.

- **Misinformation** is false, but not created or shared with the intention of causing harm.
- **Disinformation** is deliberately created to mislead, harm, or manipulate a person, social group, organization, or country.
- **Malinformation** is based on fact, but used out of context to mislead, harm, or manipulate.

Combined with a lack of public understanding of election processes, the changing landscape of technology and communications creates new risk and evolving vectors for the spread of MDM. This includes inaccurate information about the election process, unsubstantiated rumors, and incomplete or false reporting of results.

### WHERE DOES MDM COME FROM?

MDM can originate from a variety of sources across digital, social, and traditional media, and new MDM topics emerge continuously. Foreign actors have used MDM to target American voters for decades.[1] MDM also may originate from domestic sources aiming to sow divisions and reduce national cohesion. Foreign and domestic actors can use MDM campaigns to cause anxiety, fear, and confusion. These actors are ultimately seeking to interfere with and undermine our democratic institutions.

Even MDM that is not directly related to elections can have an impact on the election process, reducing voter confidence and trust. Election infrastructure related MDM occurs year-round — it is **not just a concern in the months prior to Election Day**. False narratives erode trust and pose a threat to democratic transitions, especially, but not limited to, narratives around election processes and the validity of election outcomes.

---

*Definitions adapted from CISA's MDM Resource Library. For an overview of tactics used by disinformation campaigns—such as manipulating audio and videos, conducting forgeries, and developing proxy websites in order to undermine public confidence and sow confusion—see Tools of Disinformation: Inauthentic Content.*

---

[1] Joint Cybersecurity Advisory: AA20-296B Iranian State-Sponsored Advanced Persistent Threat Actors Threaten Election-Related Systems

1

Glenn Decl. Ex. 50
Page 1 of 6

## HOW DOES MDM IMPACT ELECTION SECURITY?

Depending on the narrative, MDM can have various impacts on election security. Categories may include:

| Impact | Description | Example (from CISA's Rumor Control page) |
|---|---|---|
| *Procedural Interference* | Narratives or content related to election procedures that cause confusion and interfere with officials' ability to smoothly administer an election. | ✔ Reality: Safeguards are in place to prevent home-printed or photocopied mail-in ballots from being counted. ✘ Rumor: A malicious actor can easily defraud an election by printing and sending in extra mail-in ballots. |
| *Participation Interference* | Content that might intimidate or deter voters from participating in the election process. | ✔ Reality: Voters are protected by state and federal law from threats or intimidation at the polls, including from election observers. ✘ Rumor: Observers in the polling place are permitted to intimidate voters, campaign, and interfere with voting. |
| *Delegitimization of Election Results* | Narratives or content that delegitimizes election results or sows distrust in the integrity of the process based on false or misleading claims. | ✔ Reality: Election results reporting may occur more slowly than some voters expect. This alone does not indicate a problem with the counting process or results, or that there are issues affecting the integrity of the election. Official results are not certified until all validly cast ballots have been counted, including ballots that are legally counted after election night. ✘ Rumor: If results as reported on election night change over the ensuing days or weeks, the process is hacked or compromised, so I can't trust the results. |
| *Personnel Security* | Narratives or content that falsely claims election officials or poll workers are the "bad actor" attempting to interfere in election results or processes. | ✔ Reality: Robust safeguards including canvassing and auditing procedures help ensure the accuracy of official election results. ✘ Rumor: A bad actor could change election results without detection. |

## RESPONDING TO MDM

In today's media and information environment, election officials must play a proactive role in responding to MDM. While each MDM narrative will differ, leveraging the *TRUST* model for MDM response can help reduce risk and protect voters.



**T** Tell Your Story   **R** Ready Your Team   **U** Understand and Assess MDM   **S** Strategize Response   **T** Track Outcomes

> *It is important to acknowledge the opportunities and limitations of government-led MDM intervention—particularly where distrust of government may be fueling the narrative. Focus responses where your team has evidence, expertise, or authority to counter the MDM. Also, recruit trusted community partners to amplify your messaging.*

*Categories adapted from the Election Integrity Project's (EIP) final report on misinformation and the 2020 election (Revised March 2021).*

# 1. TELL YOUR STORY

*Public resilience is increased as your team builds relationships with voters and stakeholders. Educate your communities about election processes and MDM-related threats before they occur.*

<u>*Educate voters*</u>: Educating constituents on how to engage in the electoral process and promoting civic learning is critical to countering MDM. **Communicating clearly in tone, language, and medium, as well as leveraging credible voices your audience trusts** will help reach and engage constituents to convey information about important dates/deadlines, polling locations, processes for voting change, and where to find trusted information about elections and election results.

Media literacy includes verifying sources, seeking alternative viewpoints, and finding trusted sources of information. The National Association for Media Literacy Education has members in every state that can work with election officials to develop media literacy content. CISA's Resilience Series graphic novels are a great example of a resource aimed at developing media literacy and critical thinking to counter disinformation.

<u>*Pre-bunk MDM:*</u> Providing constituents with information and resources before MDM activity emerges better equips Americans to identify and question false narratives. In some cases, by leveraging insights from your staff, **you can anticipate where MDM narratives may arise**, such as how election officials secure elections through the use of post-election audits and similar safeguards. Addressing these topics with voters *in advance of* elections and explaining how they are used in MDM narratives can increase resiliency and confidence among voters.

<u>*Build media relationships:*</u> Reach out to local newspaper, radio, television, podcasts and other media outlets to **build working relationships before election cycles**. Invite them to learn more about how election processes secure election results and key voter education details.  Make sure they have a contact in your office. Establishing working relationships with media outlets and journalists helps quickly and pre-emptively debunk or expose MDM activity. It can also help inform accurate reporting around elections, limiting the propagation of misinformation.

# 2. READY YOUR TEAM

*The effectiveness of your response will depend on how much preparation is conducted internally ahead of MDM activity.*

<u>*Establish your response protocol:*</u>  Establish a **clear procedure for responding** to MDM and **educate team members** about the process.

- Understand the procedures for reporting or flagging potential online MDM to social media platforms often used by your constituents. Consult with your legal counsel to ensure you respect constitutional rights and privacy protections and abide by any legal restrictions.
- The Center for Internet Security (CIS) was established to support the cybersecurity needs of the election subsector. The CIS can be leveraged to report real-time MDM via email at misinformation@cisecurity.org. Be sure to include links and screenshots, as well as details on the misinformation and your jurisdiction.
- Determine internal roles and responsibilities, including an escalation process within your jurisdiction to ensure the right teams are talking to one another while responding to MDM activity. Be clear that this is not "just" a communications issue; it requires engagement from across departments to ensure responses are accurate and understandable.
- Designate an individual to be responsible for ensuring this process is established, updated, and shared both internally and with relevant stakeholders at the local, state, tribal, territorial, and federal levels — including your CISA Regional Office.
- Hold or participate in tabletop exercises to increase your team's awareness and understanding of MDM threats, evaluate your overall preparedness, identify deficiencies in your incident response plan, and clarify roles and responsibilities during an incident. CISA can assist in development and execution of these exercises, or CISA's Tabletop in a Box resource can help you talk through possible scenarios with your team and stakeholders as well.

<u>*Build credible information-sharing channels:*</u> MDM can thrive in the absence of easily accessible, credible information. Ensure your agency's website, social media accounts, and other information channels are up to date and active so you can directly respond to MDM. This can help your community have confidence that the messages your organizations disseminate are authoritative and you can further build public confidence in election administration.

3

- [Register your website for a .gov address](#) so the public does not have to guess whether your websites and emails are genuine. CISA makes .gov domains available solely to U.S.-based government organizations and publicly controlled entities **without a fee**.
- Many social platforms (e.g., Facebook, Twitter) will also allow government organizations and users to apply for verification badges. Local election officials should reach out to their state for more information on how to get their accounts verified.
- Consider pre-bunking MDM on your website by responding to common questions relevant to your responsibilities. The Rumor Control Start-Up Guide provides further guidance on establishing this webpage and how to assess which topics to include.

_**Prepare for incoming questions:**_ Ensure your office has methods for fielding public feedback and questions, including **being able to handle a large influx of calls or messages**. Consider creating a shared voicemail and email inbox so that no one person becomes overwhelmed, with a log to track inquiries and responses. These mailboxes should be regularly checked and there should be an established process for determining who will respond. This will enable your team to both uncover MDM that is circulating and keep systems and phone lines functioning during critical periods of MDM activity. Ensure staff are aware of your office's procedures for reporting threats and harassment, and if possible, rotate responsibilities for responding to calls and emails to avoid burnout.

# 3. UNDERSTAND & ASSESS

_It is important to understand, to your best ability, the full nature and scope of the MDM activity._

_**Identify MDM activity**_:  While every election jurisdiction has different resources and capabilities, you should establish a system for identifying and evaluating MDM in your office. Determine if it is appropriate for your office to engage with outside organizations or tools to better understand the risk landscape and monitor for MDM, including your technical systems provider. Monitoring may be proactive, via analytic tools, or reactive, through public feedback channels.

---

**Team Checklist**

- ✓ Understand reporting mechanisms for flagging MDM on social media.
- ✓ Determine roles and responsibilities for MDM response.
- ✓ Designate an individual to oversee the MDM response process.
- ✓ Register your website for a .gov address.
- ✓ Apply for verification badges from social media platforms.
- ✓ Develop a list of common topics and questions vulnerable to MDM.
- ✓ Ensure your communication systems are set up to handle incoming questions.
- ✓ Engage with counsel and, if applicable, your privacy office to ensure protection of constitutional rights and privacy.

---

- **Identify and continuously update a list of key elections-related processes and issues vulnerable to MDM**, whether they are short-term trends or long-term narratives. Ensure all members of your office have access to this list and feel comfortable contributing to it. The person responding to inquiries will therefore have a good sense of what topics people are asking about, and who to contact for answers, even if they don't know how to answer the question themselves.
- **Identify the channels that constituents use to receive information.** MDM content can spread through numerous means, including social media, mainstream media, word of mouth, online forums, messaging apps, and emails. Remember that MDM narratives also often move between channels, so content that appears on one platform may also emerge elsewhere.
- For the high priority topics on your list, including those you worked to pre-bunk, **you may want to take a more proactive approach to monitoring for MDM narratives, to the extent permitted by law**. Consider using analytic tools to search for keywords related to MDM content. Evaluate content reach (how many people are seeing it), engagement (how many people are liking, sharing, or reacting to the content), how many channels it is present on, and whether it has reached mainstream media. Consult with your legal counsel to determine what monitoring is permissible under law and platforms terms of service.
- **Leverage publicly available analytical tools**, such as those recommended by the RAND Corporation's [Fight Disinformation at Home](#) resource, which can help you gain a greater awareness of the information ecosystem.

4

*Assess the Risk*:  The team should identify what plausible risks are associated with MDM narratives and how they may impact election infrastructure. Mapping out existing MDM narratives and their impact on elections infrastructure will help the team be prepared for the online and offline consequences and impact to elections infrastructure.

# 4. STRATEGIZE RESPONSE

*Once you have identified MDM, it is important to craft an effective response, taking into account how the information environment and related technology may evolve.*

*Determine your response:* Based on your risk assessment, prioritize which MDM narratives to respond to. In crafting your communications strategy, consider both timing and medium of response.

- **Not all MDM activity warrants an immediate response**. Deciding which rumors make the cut is an exercise of an organization's judgement — and that judgement may change as MDM narratives evolve and community response changes.
- **Understand your audience** for the MDM intervention. Your community isn't homogeneous, and your audience will change depending on the message you are trying to convey and the medium you use. Adapt your messaging to the audiences you are trying to reach, such as new voters, veterans, individuals in specific geographic regions, or those who speak other languages.

*Apply communications best practices:* In a crisis, specific tactics and language can help build the credibility of your response and reassure voters. Tactics may also look different based on the activity and the audience. A communications strategy might include **social media, radio, local news, or other media platforms** to engage constituents.

> Election officials across the country are combatting election-related MDM.
>
> - The Colorado Secretary of State's office conducted social media and digital outreach to voters and set up a website to educate on the threat misinformation and respond to MDM narratives.
> - The Kentucky Secretary of State's office launched a Rumor Control page on their website to counter MDM narratives around elections.
> - The Wisconsin Elections Commission established a designated FAQ page to answer voter questions about the 2020 election.
> - The Maricopa County, Arizona, Elections Department launched a website to address questions and misconceptions about the 2020 election and has engaged in rumor control efforts across social media.

- Identify where your audience receives information and, if possible and advisable, establish a presence on these platforms. It will likely not be realistic for your office to actively use every platform. Focus on using a smaller number of platforms effectively to establish your handle as a trusted source of information.
- Ensure you have the facts before responding.
- State facts first, rather than repeating a falsehood in your headline.
- Be careful not to amplify the source of the MDM by linking to it directly or sharing original images or videos. If referencing an image, use a screenshot with a text overlay that explains the image is inauthentic or misleading. Consider what privacy protections are necessary for all media shared.
- Consider the length of your response. Shorter statements are more easily digestible and can be helpful when the MDM is easily disproven.
- You do not need to respond to each incident of MDM individually. Point back to your office's previous posts, statements or work if MDM recirculates. Inconsistent messaging can create credibility problems.
- Leverage partnerships and trusted community messengers to counter MDM narratives. **Repetition and consistency are key**. Conveying the same message through multiple mediums and platforms will help reach the broadest audience possible.

5

# 5. TRACK OUTCOMES

*After your response, evaluate the continued prevalence of MDM and evaluate ways to adjust processes moving forward.*

**_Manage and monitor repercussions:_** While MDM narratives may be effectively addressed or accounts spreading disinformation may be removed, manipulators will often find ways to circumvent these changes. Creating new accounts, adapting coded language, altering audio/visual material, and iterating on narratives already identified as objectionable by platforms are all possible adjustments deployed to increase MDM efficacy. It is important to monitor the MDM environment, as resources allow, to remain aware of changes and adjust response tactics accordingly.

**_Reassess response strategy_**: Following an MDM response effort, revisit and reassess your process, including your list of priority topics for media monitoring. In the current information environment, threats are constantly evolving, and the locations, mediums, and narratives of MDM are changing as well.

6

# EXHIBIT 51

 An official website of the United States government    Here's how you know ⌄

TLP:WHITE

REPORT     SUBSCRIBE     CONTACT     SITE MAP



# MIS, DIS, MALINFORMATION

CISA's Mis-, Dis-, and Malinformation (MDM) team is charged with building national resilience to MDM and foreign influence activities. Through these efforts, CISA helps the American people understand the scope and scale of MDM activities targeting elections and critical infrastructure, and enables them to take actions to mitigate associated risks. The MDM team was formerly known as the Countering Foreign Influence Task Force (CFITF).

## ANNOUNCEMENT

**May 27, 2022**: Today, CISA released the **Election Infrastructure Insider Threat Mitigation Guide** which offers election stakeholders guidance on understanding and mitigating the risk of insider threats to elections. This guide defines insider threats, highlights the risks relevant to elections, and offers guidance for establishing an insider threat mitigation program that includes both proactive and reactive measures against potential threats.

- Download/share the Election Infrastructure Insider Threat Mitigation Guide.

Collapse All Sections

# MDM Overview

In May of 2018, a Countering Foreign Influence Task Force (CFITF) was established within CISA's predecessor agency. The CFITF was charged with helping the American people understand the risks from MDM and how citizens can play a role in reducing the impact of MDM on their organizations and communities. In 2021, the CFITF officially transitioned into CISA's MDM team, and the mission evolved to reflect the changing information environment. The MDM team continues to work in close coordination with interagency and private sector partners, social media companies, academia, and international partners on a variety of projects to build resilience against malicious information activities.

## MDM Guiding Principles

TLP:WHITE

Glenn Decl. Ex. 51
Page 1 of 3

TLP:WHITE

The MDM team's guiding principle is the protection of privacy, free speech, and civil liberties. To that end, the MDM team closely consults with the DHS Privacy Office and DHS Office for Civil Rights and Civil Liberties on all activities.

The MDM team is also committed to collaboration with partners and stakeholders. In addition to civil society groups, researchers, and state and local government officials, the MDM team works in close collaboration with the FBI's Foreign Influence Task Force, the U.S. Department of State, the U.S. Department of Defense, and other agencies across the federal government. Federal Agencies respective roles in recognizing, understanding, and helping manage the threat and dangers of MDM and foreign influence on the American people are mutually supportive, and it is essential that we remain coordinated and cohesive when we engage stakeholders.

## What is MDM?

Misinformation, disinformation, and malinformation make up what CISA defines as "information activities". When this type of content is released by foreign actors, it can be referred to as foreign influence. Definitions for each are below.

- **Misinformation** is false, but not created or shared with the intention of causing harm.

- **Disinformation** is deliberately created to mislead, harm, or manipulate a person, social group, organization, or country.

- **Malinformation** is based on fact, but used out of context to mislead, harm, or manipulate.

Foreign and domestic threat actors use MDM campaigns to cause chaos, confusion, and division. These malign actors are seeking to interfere with and undermine our democratic institutions and national cohesiveness. The **resources** provided at the bottom of this page provide examples and more information about MDM activities.

## Building Resilience

The MDM team's plan for building national resilience through public awareness and engagement is focused on engaging three categories of stakeholders to enable a whole-of-society approach:

- Subject Matter Experts (SMEs) – The MDM team engages SMEs to enhance our understanding of the threat and how to mitigate the impact of information activities, to include how best to message to the public. SMEs include researchers, think tanks, and marketing/advertising experts.

- Trusted Voices – The federal government cannot solve the MDM problem on its own. We need both trusted voices and those who can amplify resilience messaging. Trusted voices include state and local government officials, community leaders, and associations. The engagement with trusted voices helps the MDM team reach communities targeted by previous MDM campaigns.

TLP:WHITE

Glenn Decl. Ex. 51
Page 2 of 3

**TLP:WHITE**

- American Public – In addition to working with Trusted Voices, the MDM team develops informational products and tools for use by the American people. Each of us has the power to stop information activities. The MDM team is focused on helping all Americans understand how bad actors are targeting them and what they can do to ensure those actors are not successful.

## Bridging Election Stakeholders and Social Media

The MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms and law enforcement. This activity began in 2018, supporting state and local election officials to mitigate disinformation about the time, place, and manner of voting. For the 2020 election, CISA expanded the breadth of reporting to include other state and local officials and more social media platforms. This activity leverages the rapport the MDM team has with the social media platforms to enable shared situational awareness.

## COVID-19 Response

As COVID-19 spread around the globe, mis-, dis-, and malinformation (MDM) spread as well. COVID-19-related MDM activities seek to undermine public confidence and sow confusion. COVID-19 has demonstrated that a rapidly evolving event creates opportunities for adversaries to act maliciously. It also shows that rapid evolution of accurate information makes older, dated information a potential catalyst of confusion and distrust as well. The MDM team supports the interagency and private sector partners' COVID-19 response efforts via regular reporting and analysis of key pandemic-related MDM trends.

# MDM Resources

- CISA Insights: Preparing for and Mitigating Foreign Influence Operations Targeting Critical Infrastructure
- CISA Insights: COVID-19 Disinformation Activity
- COVID-19 Disinformation Toolkit
- Disinformation Stops With You Infographic Set
- Election Disinformation Toolkit
- Information Manipulation Infographic
- MDM Planning and Incident Response Guide for Election Officials
- Resilience Series: Bug Bytes Graphic Novel
- Resilience Series: Real Fake Graphic Novel
- Rumor Control Page Start-Up Guide
- Social Media Bots Infographic Set
- Tools of Disinformation: Inauthentic Content (also available in Spanish)
- War on Pineapple: Understanding Foreign Interference in 5 Steps

For MDM-related resources, visit the MDM Resource Library.

For additional information on the MDM team's work, please email CFITF@cisa.dhs.gov **TLP:WHITE**

Glenn Decl. Ex. 51
Page 3 of 3

# EXHIBIT 52



# Protecting the President: Big Tech Censors Biden Criticism 646 Times Over Two Years

**Joseph Vazquez and Gabriela Pariseau**  *April 21st, 2022 6:43 AM*

Big Tech's campaign to protect President Joe Biden and his agenda has continued unabated. The Media Research Center found more than 640 examples of bans, deleted content and other speech restrictions placed on those who criticized Biden on social media over the past two years. This included 140 cases of Big Tech censoring people over the *New York Post's* bombshell Hunter Biden story in late 2020.

MRC Free Speech America tallied 646 cases in its CensorTrack database of pro-Biden censorship between March 10, 2020, and March 10, 2022. The tally included cases from Biden's presidential candidacy to the present day.



The worst cases of censorship involved platforms targeting anyone who dared to speak about any subject related to the *New York Post* bombshell Hunter Biden story. The *Post* investigated Hunter Biden and the Biden family's allegedly corrupt foreign business dealings. Big Tech's cancellation of that story helped shift the 2020 election in Biden's favor. Twitter locked the *Post's* account for 17 days. In addition, Twitter slapped a "warning label" on the GOP House Judiciary Committee's website for linking to the *Post* story.

Big Tech even axed those who blamed the current inflation crisis on Biden. For example, Facebook censored Heritage Action, the advocacy arm of the conservative Heritage Foundation, on March 15, simply for posting a video quoting Biden's embarrassing statements on energy policy. Facebook placed an interstitial, or filter, over Heritage Action's video, suppressing the post's reach. The video showed Biden and officials in his administration explaining how his policies would cause gas prices to rise.

But the largest category by far included users who dared to call out Biden's notoriously creepy, touchy-feely behavior around women and children. The 232 cases of comedic memes, videos, or generic posts about Biden's



conduct composed more than one-third of CensorTrack's total instances of users censored for criticizing the president.

In one case, a user reported that Facebook deleted a post that showed three photos of Biden kissing what is reportedly his granddaughter on the lips. It followed with a caption that said: "Find someone who kisses you the way Joe Biden kisses his granddaughter." Snapshots indicated that Facebook claimed the post violated its community standards on "nudity or sexual activity."

Big Tech even went after posts that quoted Biden's own words and made him look awful in retrospect. News outlet Breaking 911 posted screenshots of Instagram posts to its Twitter page on Oct. 21, 2021, showing that Instagram targeted the group for quoting Biden. One tweet quoted Biden sarcastically saying "Freedom! ...I have the freedom to kill you with my COVID. No, I mean, come on! Freedom?!"

The second Breaking 911 screenshot featured Biden lambasting former President Donald Trump's decision to leave the Paris Climate Accords. Biden was quoted saying, "When Pres. Trump pulled out of the Paris Climate Accord...the agreement was that we could not, if we reached beyond 1.5°C increase in temperature, we're gone. Not a joke. Not a joke. And so, we decided that, he pulled out - first thing I committed to do was rejoin that accord." Instagram reportedly removed the posts. According to Breaking 911, "Instagram has again flagged the **@Breaking911** account for directly quoting the President of the United States, claiming our posts promoted 'violence and incitement.'"

The list of censorship targets included an array of prominent influencers on social media: Trump; lawmakers like Sen. Ted Cruz (R-TX) and House Minority Leader Kevin McCarthy (R-CA); news outlets like the *New York Post*, The Washington Free Beacon and The Federalist; satire site The Babylon Bee; celebrities like Donald Trump Jr. and James Woods, and media personalities like Daily Wire host Candace Owens, Salem radio host Sebastian Gorka and radio host Dana Loesch.

MRC Free Speech America's research relied on its CensorTrack database for this study. The database describes why people were censored for blasting Biden. CensorTrack is an MRC database designed to show the proof of the extent of Big Tech censorship of conservatives. The database team has logged over 3,600 overall cases of censorship on multiple Big



Tech platforms concerning a myriad of issues such as elections, COVID-19, climate change and race. Each CensorTrack entry includes a written report backed up by internal records and documentation proving censorship.

**Burying the Evidence: How Big Tech Wiped Out the Hunter Biden Laptop Scandal**

The most important area of Biden censorship showed how Big Tech companies were willing to quash breaking news stories about his son's alleged scandals.

CensorTrack logged 140 instances of users — including lawmakers, organizations, news outlets and media personalities — censored for sharing anything related to the bombshell Hunter Biden laptop story.

The *New York Post* released a story on Oct. 14, 2020, that cited emails from Hunter's laptop reportedly documenting his family's corrupt dealings in Ukraine, two and a half weeks before Election Day. Platforms like Facebook and Twitter went berserk and to great lengths to silence the *Post*, censor any account that dared share the newspaper's reporting and discard the story entirely.

A 2020 MRC poll found that 45 percent of Biden's voters weren't fully aware of the *Post* story precisely because the media and Big Tech tried to whitewash it. "Full awareness" would have led 9.4 percent of Biden voters to abandon him, flipping all six of the swing states he won to Trump.

*The New York Times* finally authenticated the emails over a year later after Big Tech tried to bury the story. *The Times* even tied the documents to an ongoing federal investigation. But Big Tech was on the front lines ensuring that nothing prevented Biden from punching his ticket to the Oval Office.

Twitter was the most aggressive censor when it came to the Biden laptop story. CensorTrack entries show that users could not tweet the story or pictures of the *Post* story.

The worst case of censorship in the Biden laptop subcategory involved one of the most powerful committees in Congress. The GOP House Judiciary Committee tweeted the following: "Twitter has blocked users from tweeting the link to the @nypost's story on Hunter Biden. So we put it on our website for you to read and share." The GOP House Judiciary linked to a press release on its website that contained a republished version initially published



in the *New York Post*. The press release also linked to the original story. When users attempted to click the link to the official press release, they instead received a warning titled: "Warning, this link may be unsafe."

The categories listed for Twitter's warning included "malicious links that could steal personal information or harm electronic devices," "spammy links," "violent or misleading content that could lead to real-world harm," or other content that would violate Twitter's rules if posted directly on Twitter.

Even former White House Press Secretary Kayleigh McEnany found her Twitter account locked when she tried to share the *New York Post* story on Hunter. McEnany told Fox's Sean Hannity that Twitter is holding her "at gunpoint" by refusing to let her access her account until she deleted the tweet.

After releasing its story on Hunter, the 220-year-old *New York Post* was locked out of its account for 17 days. Twitter reportedly said it suppressed the account because of a lack of knowledge of where the article originated, and because it violates Twitter's rules against 'distribution of hacked material,' according to former *Post* reporter Noah Manskar. Then Twitter-CEO Jack Dorsey even claimed after the November 3, 2020 election that blocking the *Post* story was a "mistake," even though the damage was already done.

Conservative Hollywood icons weren't exempt from Twitter's pro-Biden zealotry. Actor James Woods also had his account locked for tweeting about the *New York Post* bombshell. The tweet that got his account censored said: "Sorry you have to read it this way. Twitter is censoring any facts that expose the Biden corruption scams." It is unclear whether he linked to the *New York Post* story or included any photos from the story but Twitter claimed that this tweet violated its "rules against distribution of hacked material" according to screenshots.

Woods removed the tweet and regained access to his account. In another incident, Woods took to Twitter to argue he had been locked out of his account again for posting screenshots from a newly released compromising video of Hunter Biden. Woods said he was willing to delete his tweet in order to regain access to his account "only because I know they're not gonna stop the tsunami that's coming," he said on Twitter.



Reporters and news outlets also were in the censorship crosshairs for Big Tech for pushing the Biden laptop story in some manner. Human Events Daily host Jack Posobiec, while he was working for One America News, took to Parler to report that Twitter had locked his account on Oct. 14, 2020, for posting a Hunter Biden meme.

The meme used four images of Biden to represent four major websites: LinkedIn, Facebook, Instagram, and Craigslist. Each image of him is slightly different, with the Craigslist image being one of him lying in a bed with a crack pipe in his mouth. Posobiec didn't say the excuse Twitter used for blocking the meme.

The National Pulse saw a Facebook post of one of its articles on Hunter's leaked emails showing his friends mocking "f*ggots" and "d*kes" deleted on June 16, 2021. "Facebook is now restricting access to our *EXPLETIVE CENSORED* story on Hunter Biden and his buddies' frequent use of the terms below," tweeted National Pulse Editor-in-Chief Raheem Kassam, referring to the use of the aforementioned slurs. "All roads lead to Zuck. And he knows we know."

**Big Tech Doesn't Want Americans to Know About Biden's Creepy Behavior Around Children and Women**

Big Tech companies have mashed the shut-up button on users who attempt to critique President Biden's notorious reputation for inappropriate conduct when it comes to women and children. MRC CensorTrack tallied a whopping 232 examples of Big Tech silencing content that attempted to call out Biden for his creepy demeanor around women and children.

Biden once boasted that kids liked touching his "hairy legs" in the pool. Another example of his behavior is when he told a 10-year-old girl in 2019, "I'll bet you're as bright as you are good-looking" before placing his hands on her shoulders while talking. The liberal Insider even ran a May 2020 story headlined, "Here are all the times Joe Biden has been accused of acting inappropriately toward women and girls." Big Tech clearly hates it when users mention Biden's inappropriate behavior. This subcategory alone composed over one-third of the total instances that Big Tech stifled criticism of the president.

The pro-Biden TikTok had a conniption over the MRC's video division, MRCTV. MRCTV posted a TikTok short video showing an image of President Joe Biden and the audio from another video saying "I can't eat this



but how exciting is it to smell it." A second frame showed four pictures of Biden appearing to sniff several uncomfortable young women. TikTok removed the video for an unexplained "Community Guidelines" violation, but later restored the video after MRCTV appealed.

In one Jan. 12, 2021, incident, a Twitter user said that the platform locked her account after she posted a video compilation of Joe Biden touching young girls. Twitter forced her to delete the video in order to regain access to her account. Twitter censored another user on Feb. 19, 2021, for tweeting pictures of Biden touching young girls. The platform forced the user to delete the image to regain access to the account. Twitter claimed in both cases that the video and images violated its child sexual exploitation policy, according to screenshots.

Screenshots indicated that Twitter censored a user Aug. 10, 2021 for posting a picture collage showing Biden inappropriately touching young girls (with faces obscured) and a woman. The text over the collage said "Politically inconvenient not sexual exploitation. Stop pretending this is normal." Twitter locked the user's account until he deleted the image. The screenshot also showed that Twitter claimed the image violated its "Child Sexual Exploitation Policy."

***Conservatives are under attack.*** *Contact your representatives and demand that Big Tech be held to account to mirror the First Amendment while providing transparency. If you have been censored, contact us at the Media Research Center contact form, and help us hold Big Tech accountable.*

# EXHIBIT 53

JAMES R. LAWRENCE, III (*pro hac vice* pending)
jlawrence@envisage.law
ANTHONY J. BILLER (*pro hac vice* pending)
ajbiller@envisage.law
ENVISAGE LAW
2601 Oberlin Road, Suite 100
Raleigh, North Carolina 27608
Phone: 919.755.1317
Facsimile: 919.782.0452

SEAN P. GATES (SBN 186247)
sgates@charislex.com
CHARIS LEX P.C.
301 N. Lake Ave., Ste. 1100
Pasadena, CA 91101
Phone: 626.508.1715
Facsimile: 626.508.1730

*Attorneys for Plaintiff Alex Berenson*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **ALEX BERENSON,**<br><br>        **Plaintiff,**<br><br>    v.<br><br>**TWITTER, INC.,**<br><br>        **Defendant.** | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>    1.  **VIOLATION OF THE FIRST AMENDMENT**<br>    2.  **FEDERAL FALSE ADVERTISING AND UNFAIR COMPETITION**<br>    3.  **VIOLATION OF CALIFORNIA COMMON CARRIER LAW**<br>    4.  **VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW**<br>    5.  **BREACH OF CONTRACT**<br>    6.  **PROMISSORY ESTOPPEL**<br>    7.  **VIOLATION OF THE CALIFORNIA CONSTITUTION**<br>    8.  **UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED** |

ENVISAGE LAW

1

COMPLAINT

**INTRODUCTION**

1.      Twitter is the world's preeminent global messenger service and foremost platform for journalism. According to its own mission statement, "defending and respecting the user's voice is one of our core values." Twitter, *Defending and respecting the rights of people using our services*, https://help.twitter.com/en/rules-and-policies/defending-and-respecting-our-users-voice (last visited Dec. 19, 2021). Unfortunately, despite Twitter's supposed commitment to freedom of speech, in the case of independent journalist Alex Berenson, the company broke its promises, its stated policies, and our laws, including a nearly 150-year-old California law that explicitly sets out its obligations as a company in the business of carrying messages.

2.      During 2020 and 2021, Mr. Berenson became a prominent critic of the governmental and public health response to the COVID-19 pandemic. Mr. Berenson made many statements on Twitter which, although controversial at the time, have since become conventional wisdom, most notably about the profound harm to children caused by remote learning and unnecessary school closures.

3.      Mr. Berenson's audience on Twitter soared as the pandemic continued, and in August 2021 his tweets were viewed approximately 182 million times. Despite the controversy around his statements, a senior Twitter executive repeatedly assured Mr. Berenson that the company backed his right to free expression and that he would continue to enjoy access to the platform. Even after he started critically covering the COVID-19 vaccines, in December 2020 the executive assured Mr. Berenson that his reporting "should not be an issue at all." In March 2021, the same executive told Mr. Berenson that "your name has never come up in the discussions around these policies [(i.e., potential censorship of Twitter users who criticized the vaccines and other COVID-19 policies)]."

2

COMPLAINT

ENVISAGE LAW

ENVISAGE LAW

4.      Relying on these assurances, and aware of Twitter's unique size and importance as a medium for journalism, Mr. Berenson did not seriously attempt to build alternate venues for his reporting before late May 2021. At that point, aware that government officials were increasingly calling for Twitter and other social media platforms to censor dissenting views on both COVID-19 policy and the COVID-19 vaccines, he began to publish on Substack, a newsletter platform with a far smaller audience than Twitter. But Twitter remained his primary outlet for journalism, and between May and August 2021, he provided readers thousands of tweets.

5.      Mr. Berenson's relationship with Twitter changed dramatically over the course of one week in July 2021. On Sunday, July 11, Dr. Anthony Fauci, President Joe Biden's Chief Medical Advisor, called Mr. Berenson's comments about COVID-19 vaccine hesitancy "horrifying." By Friday, President Biden himself piled on, blaming social media companies for "killing people" on account of their failure to adequately censor content. Hours after President Biden's comment, Twitter locked Mr. Berenson out of his account for the first time.

6.      On August 28, in the wake of even more calls for censorship from government officials, Twitter permanently suspended Mr. Berenson from its platform, citing "repeated violations of our COVID-19 misinformation rules." Mr. Berenson did not violate those rules. Twitter, on the other hand, broke its promises to Mr. Berenson as well as its policies, and violated his rights as it served the federal government's censorship demands.

7.      Twitter and other social media companies have repeatedly fended off lawsuits like this one using section 230 of the Communications Decency Act of 1996 or CDA. The companies have argued—and many courts have agreed—that section 230 gives them all the legal protections publishers enjoy but none of the obligations. Twitter has also argued that, as a private

3
COMPLAINT

company, it has even more fundamental rights to decide whether to publish material, rights that spring not just from section 230 but from the First Amendment.

8.      This lawsuit is not a rerun of these long-running disputes. For one thing, different laws are at issue, among them a California law that predates the CDA by 124 years and which limits Twitter's right to discriminate against the speech it carries. Enacted in 1872, the law defines any company that "offers to the public to carry persons, property, or messages" as a "common carrier." As the law then explains, "a common carrier must, if able to do so, accept and carry whatever is offered to him."

9.      Courts have repeatedly applied the 1872 law to telephone companies and other technologies that did not exist at the time it was enacted. Carrying messages for the public is, of course, the very core of Twitter's business. As the company itself explains, "Twitter is a social broadcast network that enables people and organizations to publicly share brief messages instantly around the world." Twitter, *About offensive content*, https://help.twitter.com/en/safety-and-security/offensive-tweets-and-content (last visited Dec. 19, 2021).

10.     Section 230, which preempts certain state and local laws, does not shield Twitter from the reach of California's common carrier statute or the California Constitution. Twitter's potential reliance upon section 230 as a defense against Mr. Berenson's claims asserting California speech-protection laws raises federal First Amendment issues that federal courts must adjudicate. If section 230 deprives Mr. Berenson of the benefits of California laws that require Twitter to meet its obligations as a messenger service, then the First Amendment itself is at stake, because section 230, a federal law, "is the source of the power and authority by which" Mr. Berenson's speech "rights are lost or sacrificed." *Ry. Emp. Dep't v. Hanson*, 351 U.S. 225, 232 (1956).

4
COMPLAINT

11. In fact, the Supreme Court has already signaled its awareness of these issues. Earlier this year, the Court's current longest-serving member, Justice Clarence Thomas, openly asked whether companies like Twitter are in fact common carriers subject to the "general requirement to serve all comers." *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1222 (2021) (Thomas, J., concurring).

12. Mr. Berenson also has a uniquely viable claim that Twitter acted on behalf of the federal government in censoring and barring him from to its platform. While courts have generally refused such "state actor" complaints against social media companies, the extraordinarily close nexus between the July 2021 statements by senior executive branch officials—including President Biden himself—calling for censorship by such companies and Twitter's corresponding immediate actions against Mr. Berenson mean that this issue merits closer scrutiny.

13. Finally, courts have repeatedly held that even section 230 cannot and does not protect Twitter from Mr. Berenson's breach of contract and promissory estoppel claims, which again do not depend merely on Twitter's overall terms of service or broad promises about freedom of speech but on specific, repeated representations the company made to Mr. Berenson through a senior Twitter executive over a nearly one-year-period. Nor does section 230 bar Mr. Berenson's Lanham Act and California Unfair Competition Law claims premised on Twitter's false and misleading representations concerning his reporting on the platform.

14. This case raises significant questions about private power and the state of free speech in America. Do our laws place any limitations on Twitter's power to discriminate against speakers—even as it becomes the most important outlet for journalism worldwide, in part because its promises of unfettered free speech have attracted an audience of hundreds of millions

5

COMPLAINT

ENVISAGE LAW

ENVISAGE LAW

of users? In February 2021, in response to complaints from the Indian government, Twitter explained in a blog post that it "exists to empower voices to be heard" and that "[w]e will continue to advocate for the right of free expression on behalf of the people we serve." Twitter Safety, *Updates on our response to blocking orders from the Indian Government*, Feb. 10, 2021, https://blog.twitter.com/en_in/topics/company/2020/twitters-response-indian-government. When it banned Mr. Berenson six months later, Twitter proved otherwise. This lawsuit would be unnecessary if the company had simply followed its own oft-repeated core principles—as well as the general rules it created to monitor posts about COVID-19 and the specific promises it made to Mr. Berenson. Now Twitter, as it has before, will claim that section 230 is a blanket shield protecting it from any consequences for its behavior. But even section 230 does entirely not exempt social media companies from the laws that govern everyone else.

**PARTIES**

15.     Twitter is a Delaware corporation with a principal place of business located at 1355 Market Street, Suite 900, San Francisco, California 94103.

16.     Alex Berenson is a resident of the State of New York.

**JURISDICTION**

17.     Twitter is a citizen of Delaware and California. Mr. Berenson is a citizen of New York. Twitter and Mr. Berenson have complete diverse citizenship. Mr. Berenson seeks damages of more than $75,000. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332.

18.     This case presents questions that arise under the First Amendment. As such, this Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Mr. Berenson's state law claims under 28 U.S.C. § 1367.

6

COMPLAINT

19.     Twitter's headquarters are in San Francisco, California. This Court has general personal jurisdiction over Twitter under the Due Process Clause of the Fourteenth Amendment. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). This Court also has jurisdiction over Twitter pursuant to California's Long-Arm Statute, Cal. Code Civ. Proc. Code § 410.10, which provides that "[a] court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."

**VENUE**

20.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Twitter's headquarters are in this judicial district. Further, Twitter's Terms of Service provide that "[a]ll disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California, United States."

**DIVISIONAL ASSIGNMENT**

21.     Pursuant to Civil L.R. 3-2(c), this case should be assigned to the San Francisco division because a substantial portion of the events giving rise to this case occurred at Twitter's corporate headquarters located in San Francisco.

**LEGAL FRAMEWORK**

**I.      Twitter and the Telegraph**

22.     Twitter's "social media platform . . . allows its users to electronically send messages of limited length to the public." *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 230 (2d Cir. 2019), *cert. granted, judgment vacated sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021). A Twitter "user can post their own messages (referred to as tweeting)" and "may also respond to the messages of others (replying),

7
COMPLAINT

ENVISAGE LAW

republish the messages of others (retweeting), or convey approval or acknowledgement of another's message by 'liking' the message." *Id.*

23.     As one of the world's leading social media websites, the company's user base numbers in the hundreds of millions. According to a 2019 survey, "[a]round one-in-five U.S. adults say they use Twitter." Adam Hughes & Stefan Wojcick, *10 facts about Americans and Twitter*, Pew Res. Ctr., Aug. 2, 2019, https://www.pewresearch.org/fact-tank/2019/08/02/10-facts-about-americans-and-twitter/. "In the three months ended December 31, 2020, [Twitter] had 192 million average [monetizable daily active users or] MDAU," meaning the number of "people, organizations, or other accounts who logged in or were otherwise authenticated and accessed Twitter on any given day." Twitter, Annual Report (Form 10-K), at 39 (Feb. 17, 2021). The company leverages this user base to derive billions of dollars in advertising and licensing revenues. *Id.* at 43.

24.     The ubiquity of the company's platform gives it significant influence over public conversation. Among U.S. adult Twitter users, "more than half of those users (55%) get news on the site regularly." Mason Walker & Katerina Eva Matsa, *News Consumption Across Social Media in 2021*, Pew Res. Ctr., Sept. 20, 2021, https://www.pewresearch.org/journalism/2021/09/20/news-consumption-across-social-media-in-2021/. The demographics of Twitter users are different than the general American population, skewing younger and toward a particular political party, *see id.*, making Twitter a critical platform for engaging with these fellow citizens.

25.     Twitter has significant market power. According to one source, Twitter is now the second-largest social media platform in the world, trailing only Facebook/Meta. StatCounter, *Social Media Stats Worldwide*, https://gs.statcounter.com/social-media-stats (last visited Dec. 19,

8

COMPLAINT

2021). Twitter's market share appears to have increased since 2018, when one report placed the company as the third-largest platform, behind Facebook/Meta and Pinterest. Nina Angelovska, *Facebook Losing Users to Pinterest, Youtube and Twitter (Market Share By Region)*, Forbes (Jan. 7, 2019), https://www.forbes.com/sites/ninaangelovska/2019/01/07/facebook-loosing-users-to-pinterest-youtube-and-twitter-market-share-by-region/?sh=6ab17b227746.

26.     Upon information and belief, these reports underestimate Twitter's market power in the social media messaging market, because Twitter's platform differs significantly from the other entities included in the comparable market in the above-cited reports. Platforms such as Telegram are more like Twitter than Facebook/Meta is. Compared to those entities, Twitter is the clear market leader.

27.     Bolstering its market power, Twitter also boasts a significant patent portfolio, which it can use to exclude new market entrants and competitors. *Twitter Patent Portfolio – A Little Organic and Mostly Acquired*, GreyB, https://www.greyb.com/twitter-patent-portfolio/ (last visited Dec. 19, 2021). The company enjoys other incumbent advantages inherent in having the economies of scale to comply with an ever-growing number of data security and privacy regulations. *See, e.g.*, Cal. Civ. Code §§ 1798.100 to 1798.199.100.

28.     Twitter's role in public debate in the twenty-first century resembles that of the telegraph in the nineteenth. While the telegraph was initially thought to be owned and operated by the government, private companies commercialized the telegraph, creating "the possibility that the private entities that controlled this amazing new technology would use that power to manipulate the flow of information to the public when doing so served their economic or political self-interest." Genevieve Lakier, *The Non-First Amendment Law of Freedom of Speech*, 134 Harv. L. Rev., 2299, 2321 (2021).

9

COMPLAINT

29.      In 1872, the House of Representatives Appropriations Committee reported that "the Government must have its ultimate guarantee in the intelligence of the people," and that telegraph companies "have so hedged themselves in by alliances with press associations that no new or projected journal can have the use of the telegraph at rates not absolutely ruinous." *Id.* at 2322 (quoting H.R. Rep. No. 42-6, at 7 (1872)). The House Committee proposed that the telegraph should be subject to the "same general laws of equality of privileges" that applied to the postal service. *Id.* at 2323 (quoting H.R. Rep. No. 42-6, at 8 (1872)).

30.      The same year, the Senate Committee on Post-Offices and Post-Roads reported on "[t]he danger which would result if the control of the telegraph should pass into the hands of unscrupulous parties." S. Rep. No. 42-20, at 4 (1872). The Committee noted the "influenc[e] [on] public opinion and action in any important crisis [that] is possessed by those who control the telegraph." *Id.* "Such power is too vast to be confided to any private individual," the Committee concluded. *Id.* "It should be held by the Government under such restraints as would prevent its being wielded to the public detriment." *Id.*

31.      Legislatures responded by requiring telegraph operators to serve all comers. "Dozens of states enacted statutes of this sort between 1848 and the early twentieth century, as did the federal government." Lakier, *supra*, at 2320. Legislators justified these "common carrier or quasi-common carrier" statutes on the grounds that they "were necessary to safeguard the democratic nature of the government and the vitality of the press." *Id.* at 2319. "The result was the creation, by the end of the nineteenth century, of a rich body of state and federal common carrier law that not only promoted free speech values but did so quite intentionally in the belief that this kind of regulation was crucial to the preservation of the democratic character of the mass public sphere." *Id.* at 2324.

ENVISAGE LAW

10

COMPLAINT

32.     The Supreme Court has upheld similar regulations against First Amendment challenges. As the Court put it in upholding the constitutionality of the fairness doctrine in, "[t]he right of free speech of a broadcaster, the user of a sound truck, or any other individual does not embrace a right to snuff out the free speech of others." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 387 (1969). "[I]t is idle to posit an unbridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish." *Id.* at 388. The Court explained that "[i]t would be strange if the First Amendment, aimed at protecting and furthering communications, prevented the Government from making radio communication possible by requiring licenses to broadcast and by limiting the number of licenses so as not to overcrowd the spectrum." *Id.* at 389; *see also Associated Press v. United States*, 326 U.S. 1, 20 (1945) ("It would be strange . . . if the grave concern for freedom of the press which prompted adoption of the First Amendment should be read as a command that the government was without power to protect that freedom."); Lakier, *supra*, at 2349-50 (discussing the same).

## II.     The Law Governing Common Carriers and Public Forums

33.     The current longest-serving member of the United States Supreme Court, Justice Clarence Thomas, recently observed that "our legal system and its British predecessor have long subjected certain businesses, known as common carriers, to special regulations, including a general requirement to serve all comers." *Biden*, 141 S. Ct. at 1222 (Thomas, J., concurring). After noting the historical example of the telegraph, *id.* at 1223, Justice Thomas observed that "digital platforms that hold themselves out to the public resemble traditional common carriers." *Id.* at 1224. "If the analogy between common carriers and digital platforms is correct, then an answer may arise for dissatisfied platform users who would appreciate not being blocked: laws that restrict the platform's right to exclude." *Id.* at 1225.

11

COMPLAINT

ENVISAGE LAW

34.     Twitter's home state of California has such a law. In 1872, the very same year the House and Senate Committees released their above-cited reports, California enacted a law defining the duties and obligations of common carriers. Relevant here, under the statute, "[e]very one who offers to the public to carry persons, property, or messages, *excepting only telegraphic messages*, is a common carrier of whatever he thus offers to carry." Cal. Civ. Code § 2168 (emphasis added). (Prior to section 2168 being enacted in 1872, California courts were already applying common carrier principles to telegraph services. *See Parks v. Alta Cal. Tel. Co.*, 13 Cal. 422, 424 (1859).) Notably, nothing in the text of section 2168 requires that a company have market power to be considered a common carrier.

35.     The California courts have applied this law to technologies that did not exist in 1872, finding that telephone and taxicab companies are common carriers. *See, e.g., Goldin v. Pub. Utilities Comm'n*, 23 Cal. 3d 638, 662, 592 P.2d 289, 304 (1979) ("A company providing telephone services to the public is a common carrier (Civ. Code, § 2168), and as such may not discontinue services without good cause." (internal citations omitted)); *Bezera v. Associated Oil Co.*, 117 Cal. App. 139, 143, 3 P.2d 622, 623 (1931) ("The answer of the cab company, by failure to deny, admits that it was engaged in the business of carrying passengers for hire within and about San Francisco and that decedent was riding as a passenger for hire. This admission would seem to bring the cab company within the definition of a common carrier found in section 2168 of the Civil Code.").

36.     As the California Supreme Court has explained, "section 2168 defines a 'common carrier' carrier in expansive terms." *Gomez v. Superior Ct.*, 35 Cal. 4th 1125, 1130, 113 P.3d 41, 44 (2005). The *Gomez* court noted California's "broad" concept of common carrier principles

12

COMPLAINT

such as "carrier of persons for reward" juxtaposed against the narrower view taken by courts in other jurisdictions. *See id.* at 1133-36, 113 P.3d at 45-48.

37.     Twitter's services fit within section 2168's definition of a "common carrier." Twitter holds itself out to the public as an entity willing to carry messages. In this regard, by the company's own admission, Twitter's platform is "capable of delivering billions of *messages*, including images and video, to hundreds of millions of people a day." Twitter, Annual Report (Form 10-K), at 8 (Feb. 17, 2021) (emphasis added). At the same time, the company understands it faces competition from "[c]ompanies that offer products that enable people to create and share ideas, videos, and other content and information." *Id.* Twitter also says it "is an open service that's home to a world of diverse people, perspectives, and information," and that "[y]ou should be able to speak your mind and find credible information easily." Twitter, *Healthy conversations*, https://about.twitter.com/en/our-priorities/healthy-conversations (last visited Dec. 19, 2021).

38.     This Court has applied section 2168 to another twenty-first century technology: the ride-sharing application Uber. In one case, this Court rejected Uber's argument "that it is not a common carrier but that it is a 'broker' of transportation services," *Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 786 (N.D. Cal. 2016), holding that the plaintiff had plausibly alleged "that Uber is a common carrier" under section 2168, *id.* at 787. In another case, this Court also rejected Uber's argument "that it is not a common carrier because of conditions that are placed on who can use and be connected with drivers via the app." *Doe v. Uber Techs., Inc.*, No. 19-CV-03310-JSC, 2019 WL 6251189, at *6 (N.D. Cal. Nov. 22, 2019). This Court noted "[c]ommon carrier liability can attach even for transportation services that are of possible use to only a fraction of the population." *Id.* (internal quotation marks omitted). "In sum, Uber's status

13

COMPLAINT

1    as an app-based transportation network does not preclude it as a matter of law from being held

2    liable as a common carrier." *Id.*[1]

3         39.    Under California law, common carriers like Twitter "must, if able to do so, accept

4    and carry whatever is offered to him, at a reasonable time and place, of a kind that he undertakes

5    or is accustomed to carry." Cal. Civ. Code § 2169. In other words, since it is a common carrier

6    under California law, Twitter must "serve all comers." *Biden*, 141 S. Ct. at 1222 (Thomas, J.,

7    concurring). California law goes further, requiring a "common carrier of messages . . . must

8    transmit messages in the order in which he receives them." Cal. Civ. Code § 2208. "Every person

9    whose message is *refused* or postponed, contrary to the provisions of this Chapter, is entitled to

10   recover from the carrier his actual damages, and fifty dollars in addition thereto." *Id.* § 2209

11   (emphasis added).

12        40.    California case law confirms that a common carrier's right to refuse service is

13   narrow. In *People v. Brophy*, 49 Cal. App. 2d 15, 120 P.2d 946 (1942), which involved the use of

14   telephone services in connection with a bookmaking operation, the court stated that "common

15   carriers are not the censor of public or private morals." 49 Cal. App. 2d at 33. As the *Brophy*

16   court put it, a "telephone company has no more right to refuse its facilities to persons because of

17   a belief that such persons will use such service to transmit information that may enable recipients

18   thereof to violate the law than a railroad company would have to refuse to carry persons on its

19   trains because those in charge of the train believed that the purpose of the persons so transported

20   in going to a certain point was to commit an offense." *Id.*; *cf. Mason v. Western Union Telegraph*

---

[1] This Court ultimately rejected the plaintiff's common carrier theory because she had not alleged facts sufficient to establish "a common carrier/passenger relationship" between her and Uber. *Id.* at *8.

14

COMPLAINT

ENVISAGE LAW

*Co.*, 52 Cal.App.3d 429, 439, 125 Cal. Rptr. 53, 58 (1975) ("We conclude that Western Union has no right of censorship except in the specific instances enumerated in Public Utilities Code section 7904 which instances do not include the right to refuse to transmit telegrams which may allegedly be libelous."). If common carriers cannot bar even libelous material, certainly speech about matters of public concern does not fall within such a carrier's narrow right to exclude. Of course, this case involves the narrow issue of Twitter's right to exclude Mr. Berenson.

41.     As a speech-protective statute, section 2168 supplements the rights guaranteed by the California Constitution. The California Supreme Court has interpreted "sections 2 and 3 of article I of the California Constitution [to] protect speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned." *Robins v. Pruneyard Shopping Ctr.*, 23 Cal. 3d 899, 910, 592 P.2d 341, 347 (1979). In particular, the California Supreme Court noted that the shopping center was not "an individual homeowner or proprietor," but that "[a]s a result of advertising and the lure of a congenial environment, 25,000 persons are induced to congregate daily to take advantage of the numerous amenities offered" there. *Id.* at 911, 592 P.2d at 347. The Supreme Court later affirmed *Pruneyard* against a First Amendment challenge by the shopping center. *Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980).

42.     *Pruneyard*'s logic, and the speech protections that case brings with it, extend to Twitter. As a publicly traded company with a market capitalization greater than $40 billion, Twitter is hardly "an individual homeowner or proprietor." The company induces hundreds of millions of people to use its platform daily. And unlike the shopping center in *Pruneyard*, Twitter's business model revolves around speech—around facilitating a global conversation.

43.     Extending *Pruneyard* to Twitter, or applying section 2168 to the company, would not violate the First Amendment. In *Pruneyard*, the Supreme Court rejected the shopping

15
COMPLAINT

center's argument "that a private property owner has a First Amendment right not to be forced by the State to use [its] property as a forum for the speech of others." *Pruneyard*, 447 U.S. at 85. Distinguishing the case from *Wooley v. Maynard*, 430 U.S. 705 (1977), in which the Supreme Court struck down New Hampshire's mandatory display of "Live Free or Die" on non-commercial license plates, the Court noted the shopping center "is not limited to personal use," but is rather "a business establishment that is open to the public to come and go as they please." *Pruneyard*, 477 U.S. at 87. As noted above, the same is true of Twitter.

44.     The *Pruneyard* Court further explained that "[t]he views expressed by members of the public in passing out pamphlets or seeking signatures for a petition thus will not likely be identified with those of the owner." *Id.* The shopping center owner "can expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand." *Id.*; *see also Biden*, 141 S. Ct. at 1224 (Thomas, J., concurring) (noting "regulations that might affect speech are valid if they would have been permissible at the time of the founding," and that would be particularly true "where a restriction would not prohibit the company from speaking or force the company to endorse the speech"). Twitter is of course free to disavow speech on its platform and often does.

45.     Nor does the Dormant Commerce Clause provide Twitter with the ability to evade section 2168 or *Pruneyard*. The Dormant Commerce Clause "holds that any 'statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority.'" *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1101 (9th Cir. 2013) (quoting *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989)).

46.     In *Rocky Mountain Farmers Union*, the Ninth Circuit upheld California's fuel standards against a Dormant Commerce Clause challenge, finding the standards were based "on

16

COMPLAINT

the harmful properties of fuel" and the standards "do[] not control the production or sale of ethanol wholly outside of California." *Id.* at 1104. "States may not mandate compliance with their preferred policies in wholly out-of-state transactions, but they are free to regulate commerce and contracts within their boundaries with the goal of influencing the out-of-state choices of market participants." *Id.* at 1103. Neither section 2168 nor the California Constitution regulate conduct outside of California since Twitter's censorship decisions emanate from its California headquarters.

**III.      Section 230 of the Communications Decency Act**

47.      Twenty-five years ago, Congress enacted the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (Feb. 8, 1996). Within that statute lies the Communications Decency Act of 1996 or CDA. The CDA is Title V of the Telecommunications Act of 1996 with the heading "Obscenity and Violence." 110 Stat. at 133. Section 230 of the CDA is in Subtitle A of Title VII, which Congress captioned "Obscene, Harassing, and Wrongful Utilization of Telecommunications Facilities," *id.*, tucked alongside requirements to scramble "sexually explicit adult programming," *id.* at 136. Congress placed section 230 of the CDA in section 509 of the Telecommunications Act of 1996 under the family-first heading "Online Family Empowerment." *Id.* at 137.

48.      As one of the architects of section 230 explained at the time, the Internet contains "some offensive material, some things in the bookstore, if you will, that our children ought not to see." 141 Cong. Rec. H8469 (statement by Rep. Cox). Noting that "the existing legal system provides a massive disincentive for the people who might best control the Internet to do so," *id.*, namely the litigation risk for some Internet platforms for policing any content at all, Representative Cox explained section 230 would "protect computer Good Samaritans . . . who

17
COMPLAINT

take steps to screen indecency and offensive materials for their customers," and "keep[]

pornography away from our kids," *id.* at H8470. Then-Representative Wyden, section 230's co-

sponsor, similarly argued that "parents and families are better suited to guard the portals of

cyberspace and protect our children than our Government bureaucrats." *Id.*

49.     Another supporter of section 230 noted that statute "allows parents to make

important decisions with regard to what their children can access, not government." *Id.* at H8472

(statement by Rep. Goodlatte). Critically, Representative Goodlatte stated the law "doesn't

violate free speech or the right of adults to communicate with each other." *Id.*

50.     The operative provision of section 230 is subsection (c):

(c) PROTECTION FOR "GOOD SAMARITAN" BLOCKING AND SCREENING OF OFFENSIVE
MATERIAL

(1) TREATMENT OF PUBLISHER OR SPEAKER
No provider or user of an interactive computer service shall be treated as
the publisher or speaker of any information provided by another information
content provider.

(2) CIVIL LIABILITY
No provider or user of an interactive computer service shall be held liable
on account of--

(A) any action voluntarily taken in good faith to restrict access to or
availability of material that the provider or user considers to be
obscene, lewd, lascivious, filthy, excessively violent, harassing, or
otherwise objectionable, whether or not such material is
constitutionally protected; or

(B) any action taken to enable or make available to information
content providers or others the technical means to restrict access to
material described in paragraph (1).

47 U.S.C. § 230(c).

51.     Section 230 further provides that "[n]o cause of action may be brought and no

liability may be imposed under any State or local law that is inconsistent with this section." *Id.*

18

COMPLAINT

ENVISAGE LAW

§ 230(e)(3). But elsewhere in the Telecommunications Act of 1996, Congress provided that "[t]his Act and the amendments made by this Act [(i.e., section 230)] shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments." Telecommunications Act of 1996, § 601(c)(1), 110 Stat. at 143.

52.     Social media companies like Twitter contend that section 230 effectively nullifies speech-protective state laws, allowing the platforms to censor otherwise constitutionally protected speech. That is an odd outcome given Congress' focus on pornography in the CDA. Congress even explicitly found that "[t]he Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. § 230(a)(3). Interposing section 230 to nullify California's common carrier statute and the free speech and petition guarantees of the California Constitution to facilitate censoring speech about matters of public concern undermines the very free expression Congress said it wanted to encourage, invading the sovereign prerogatives of the States at the same time.

53.     Courts have read section 230 to immunize Internet platforms from liability where plaintiffs sued them for their publishing decisions. *See, e.g.*, *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009) (holding that section 230(c)(1) "protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider"); *Fair Housing Council of San Fernando Valley v. Roommates.Com*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) (en banc) ("And any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.").

54.      Plaintiffs in those cases did not raise the California common carrier statute, Cal. Civ. Code § 2168, or otherwise seek to treat the platforms as a common carrier as opposed to a "publisher or speaker" in section 230(c)(1)'s parlance. Tellingly, Congress addressed the applicability of common carriage principles to "interactive computer services" in section 502 of the CDA, 47 U.S.C. § 223, providing that "[n]othing in this section," which addressed obscene or harassing phone calls, "shall be construed to treat interactive computer services as common carriers or telecommunications carrier." 110 Stat at 135 (codified at 47 U.S.C. § 223(e)(6)). California's common carrier statute is not "in this section," i.e., the California law is not in 47 U.S.C. § 223. If Congress intended to bar treatment of platforms as common carriers, it could have explicitly done so, but did not, which is telling considering the history of common carriage regulation by the States. Lakier, *supra*, at 2320 (noting that "[d]ozens of states enacted [common carriage] statutes of this sort between 1848 and the early twentieth century"). If Congress had wanted to bar the possibility of applying these laws to the Internet, it did not do so with "exceedingly clear language," even though an expansive reading of section 230 would significantly alter the ability of States like California to govern themselves in this area. *Cf. United States Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849–50 (2020) ("Our precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property.").

55.      Moreover, section 230 does not categorically bar breach of contract, promissory estoppel, and least some commercial tort claims. *See Barnes*, 570 F.3d at 1109 (holding that "subsection 230(c)(1) . . . does not preclude" a claim "alleg[ing] breach of contract . . . under the theory of promissory estoppel"); *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946

20

COMPLAINT

F.3d 1040, 1054 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 13, 208 L. Ed. 2d 197 (2020) (holding that "immunity under [section 230] does not extend to anticompetitive conduct").

56.      Ultimately, an expansive, pro-censorship interpretation of section 230, particularly one that disregards speech-protective state laws, presents First Amendment challenges of its own. The First Amendment protects freedom of association. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed."). In *Railway Employees Department v. Hanson*, 351 U.S. 225 (1956), the Supreme Court considered the interplay between a provision of the Nebraska Constitution which prohibited employers from "exclud[ing] persons from employment because of membership in or nonmembership in a labor organization" and a federal statute that empowered employers to "requir[e] all employees within a stated time to become a member of the labor organization." *Id.* at 228.

57.      From the employee's perspective, the Nebraska Constitution granted associational freedoms beyond those guaranteed by the First Amendment, namely associational freedoms enforceable against private employers. Even though "private rights" were at issue, the Supreme Court determined the case raised "justiciable questions" under the First Amendment because "[i]f private rights are being invaded, it is by force of an agreement made pursuant to federal law which expressly declares that state law is superseded." *Id.* at 232. In this regard, the Supreme Court approvingly quoted the Supreme Court of Nebraska's observation that "[s]uch action on the part of Congress is a necessary part of every union shop contract entered into on the railroads as far as these 17 states are concerned for without it such contracts could not be enforced

21
COMPLAINT

therein," *id.* (quoting *Hanson v. Union Pac. R. Co.*, 160 Neb. 669, 698, 71 N.W.2d 526, 547 (Neb. 1955)), before ultimately determining the federal statute did not violate the First Amendment, *id.* at 238.

58.     California's speech-protective laws and section 230 raise First Amendment issues under *Hanson*. Like the right to work provision in the Nebraska Constitution at issue in that case, both the California common carrier statute and the California Constitution provide more protection for speech than the First Amendment in the abstract because they grant rights against private parties. When an "interactive computer service" subject to these state laws censors speech in violation of those laws, it is "by force of" section 230, "a federal law which expressly declares that state law is superseded." *Id.* Federal law is the source of the private censorship, just like the federal statute in *Hanson* was the source of the limits on employee freedom of association, raising "justiciable questions" under the First Amendment.

59.     For independent journalist and best-selling author Alex Berenson, all this was largely academic until July 2021. As detailed below, during Mr. Berenson's decade-plus on Twitter the company largely lived up to its stated commitments to free speech, furnishing him a platform to report on numerous issues, including the COVID-19 pandemic. But then, this past summer, something changed. Despite the company's prior assurances, and just hours after the President of the United States accused social media platforms of "killing people" for not censoring speech about COVID-19 vaccines, the company locked Mr. Berenson out of his account. A month later, it permanently suspended him. How did it come to this?

///

///

COMPLAINT

ENVISAGE LAW

**FACTUAL BACKGROUND**

I.   **Alex Berenson's Use of Twitter Before and During the Early Days of the COVID-19 Pandemic**

60.     Throughout his career, and like many other journalists, Mr. Berenson has used social media to amplify his reporting. Mr. Berenson joined Twitter in November 2009. The company verified his account in or around 2014, affixing a blue check mark to his account, a sign it was "authentic, notable, and active." Twitter, *About Verified Accounts*, https://help.twitter.com/en/managing-your-account/about-twitter-verified-accounts (last visited Dec. 19, 2021). As of January 2020, Mr. Berenson had approximately 7,000 Twitter followers, many of whom were drawn to his previous books and reporting.

61.     In January 2020, Mr. Berenson tweeted for the first time about COVID-19. In that tweet, he shared an article about SARS-CoV-2, the coronavirus that causes COVID-19, by *New York Times* columnist Nicholas Kristof. The tweet attracted one "like." At the time, much of the press did not appreciate that the COVID-19 pandemic would become, as NBC's Lester Holt put it later, "the story of my lifetime." *Ted Johnson, NBC News' Lester Holt On Reporting On The Coronavirus: "We've All Covered The Burning House, But This Time We're In The House" – Q&A*, Deadline (Mar. 18, 2020), https://deadline.com/2020/03/coronavirus-lester-holt-nbc-news-q-and-a-qa-1202886983/.

62.     Mr. Berenson dedicated much of his career to reporting on and breaking important news stories. Beginning in March 2020, his attention increasingly turned to COVID-19. This was as governments around the world, including state and local governments here in the United States, issued far-reaching, and in many ways unprecedented, lockdown orders as part of an effort "flatten the curve" of viral spread and transmission.

23

COMPLAINT

63.     In late March 2020, Mr. Berenson reported on revised epidemiology models published by Professor Neil Ferguson of Imperial College London. In a six-tweet thread published on March 26, 2020, Mr. Berenson discussed Dr. Ferguson's revised mortality estimates, calling them a "remarkable turn" for an academic who had earlier forecast that 500,000 people would die from COVID-19 in the United Kingdom.

64.     Mr. Berenson's March 26 tweet was his first to go "viral." Industrialist and entrepreneur Elon Musk, among other prominent figures, retweeted Mr. Berenson's post. The thread's initial tweet, which is shown below, drew 7,468 likes, 3,743 retweets, and more than 4.6 million impressions. Twitter did not label this tweet false or misleading.



65.     In April 2020, Mr. Berenson continued covering epidemiological models. Specifically, he compared actual hospitalization data in New York and other jurisdictions against projections from the Institute for Health Metrics and Evaluation or IMHE. On April 6, *New York Times* White House correspondent Maggie Haberman noted Mr. Berenson's tweets "are making their way around the White House among some senior officials." Twitter did not label any of Mr. Berenson's reporting false or misleading.

66.     During the month of April 2020, Mr. Berenson's Twitter presence grew exponentially. He added more than 77,000 followers and his tweets from that month garnered

24

COMPLAINT

175 million impressions. As of the start of May, Mr. Berenson had increased his Twitter following by fourteen-fold from its early March 2020 mark, up from 7,000 to 84,000 followers.

67.     Mr. Berenson's reporting drew criticisms, with some calling for his voice to be silenced. At the same time, his work drew support from others across America and around the world who were suffering under lockdown policies.

**II.     Twitter's Evolving Approach to Medical Misinformation During the Early Days of the COVID-19 Pandemic**

68.     In early March 2020, Twitter began to set out its approach to COVID-19. In a March 4, 2020 blog post, the company pledged its support for "[p]rotecting the conversation." The company explained that commitment as follows: "The power of a uniquely open service during a public health emergency is clear. The speed and borderless nature of Twitter presents an extraordinary opportunity to get the word out and ensure people have access to the latest information from expert sources around the world." Twitter Public Policy, *Stepping up our work to protect the public conversation around Covid-19*, (Mar. 4, 2020), https://blog.twitter.com/en_us/topics/company/2020/stepping-up-our-work-to-protect-the-public-conversation-around-covid-19.

69.     The company also expressed its desire to "help people find authoritative health information." *Id.* "With a critical mass of expert organizations, official government accounts, health professionals, and epidemiologists on our service," Twitter explained, "our goal is to elevate and amplify authoritative health information as far as possible." *Id.* Twitter did not define "authoritative health information" in the post.

70.     Twitter stated that it "put additional safeguards in place in order to facilitate the sharing of trusted public health information and to reduce potential harm to users," an effort largely focused on "advertisers [who might] opportunistically use the Covid-19 outbreak to

25

COMPLAINT

target inappropriate ads." *Id.* The company did not forecast censorship. While Twitter encouraged users to "[f]ollow @WHO [(the World Health Organization's Twitter account)] and your local health ministry" and "seek out authoritative health information," the company advised users to "ignore the noise." *Id.*

71.     In a separate blog post published on March 16, 2020, which the company updated twelve days later on April 1, Twitter unveiled its approach to content moderation. The company announced it was "[b]roadening our definition of harm to address content that goes directly against guidance from authoritative sources of global and local public health information." @Vijaya & Matt Derella, *An update on our continuity strategy during COVID-19*, Twitter (Mar. 16, 2020, updated Apr. 1, 2020), https://blog.twitter.com/en_us/topics/company/2020/An-update-on-our-continuity-strategy-during-COVID-19.

72.     Again, the blog post did not elaborate on what the company considered to be "authoritative sources." Twitter stated it would "enforce this [policy] in close coordination with trusted *partners*, including public health authorities and *governments*, and continue to use and consult with information from those sources when reviewing content." *Id.* (emphasis added). Even so, the company explained it did not intend "to limit good faith discussion or expressing hope about ongoing studies related to potential medical interventions that show promise." *Id.* As of March 18, 2020, Twitter reported it had "removed more than 1,100 tweets containing misleading and potentially harmful content from Twitter." *Id.* At that point, Twitter had not labeled or removed any of Mr. Berenson's tweets.

73.     The post further identified eleven categories of information Twitter "will require people to remove." *Id.* The post targeted obvious falsehoods, including claims such as "the news about washing your hands is propaganda for soap companies, stop washing your hands." *Id.* For

Glenn Decl. Ex. 53
Page 26 of 70

other claims, as detailed below, Twitter distinguished between factual assertions, opinions, and specific calls to action or inaction to other Twitter users.

a.     Twitter called for censoring the "[d]enial of global or local health authority recommendations to decrease someone's likelihood of exposure to COVID-19," but required such statements be made "*with the intent to influence people into acting against recommended guidance.*" *Id.* (emphasis added). The company cited the claim "social distancing is not effective" as an example but tied that remark to "actively encouraging people to not socially distance themselves in areas known to be impacted by COVID-19 where such measures have been recommended by the relevant authorities." *Id.*

b.     Twitter stated it would take down discussion of "alleged cures" and "harmful treatments or protection measures" that "are known to be ineffective." *Id.* The company cited "use aromatherapy and essential oils to cure COVID-19" as a claim that could cause harm by inducing Twitter user to delay or forgo needed medical treatment. The other example, "drinking bleach and ingesting colloidal silver will cure COVID-19," was so obviously false that that the company noted such claims would be taken down "even if made in jest." Notably, Twitter said nothing about discussion or debate concerning clinical data, government information, or research articles regarding non-pharmaceutical interventions or vaccines, drugs, or other therapeutics.

c.     The company said it would censor "false or misleading information around COVID-19 diagnostic criteria or procedures," and "[f]alse or misleading claims on how to differentiate between COVID-19 and a different disease." Again, the company targeted content aimed at influencing behavior, which in turn could delay or keep an individual from seeking treatment, not discussion or debate about policy or issues.

27

COMPLAINT

ENVISAGE LAW

74.     On May 11, 2020, Twitter announced further action on COVID-19 information. In another blog post, the company explained it "may use labels and warning messages to provide additional explanations or clarifications in situations." Yoel Roth & Nick Prickles, *Updating our approach to misleading information*, Twitter (May 11, 2020), https://blog.twitter.com/en_us/topics/product/2020/updating-our-approach-to-misleading-information.

75.     The company defined "three broad categories" of "false or misleading content":

- Misleading information — statements or assertions that have been confirmed to be false or misleading by subject-matter experts, such as public health authorities.

- Disputed claims — statements or assertions in which the accuracy, truthfulness, or credibility of the claim is contested or unknown.

- Unverified claims — information (which could be true or false) that is unconfirmed at the time it is shared.

*Id.* The company did not identify any of the "subject-matter experts" or "public health authorities" it considered to be "authoritative sources."

76.     Twitter explained that "disputed claims" and "misleading information" with a "moderate" risk of harm were subject to being labeled with a "link to a Twitter-curated page or external source containing additional information on the claims made within the Tweet." *Id.* The company gave the following as an example of labeled false content:

///

///

///

///

28

COMPLAINT

ENVISAGE LAW



77.     Twitter explained that "misleading information" with a propensity to cause "severe" harm would be removed. *Id.* Meanwhile, a disputed claim that might cause severe harm would be labeled with a "warning." Twitter gave the following as an example:



78.     As with its previous COVID-19 policies, nowhere in the blog post did Twitter bar discussion or analysis of clinical data, government information, or research articles. In a contemporaneous news report on the policy, a Twitter official explained that "[p]eople don't

29

COMPLAINT

ENVISAGE LAW

want us to play the role of deciding for them what's true and what's not true but they do not want people to play a much stronger role providing context." Amanda Seitz, *Twitter to label disputed COVID-19 tweets*, AP News, May 11, 2020, https://apnews.com/article/virus-outbreak-health-us-news-ap-top-news-technology-c8a542e2f22004c0c06cbbe1e1b58a52. To be clear, at least at this point, and viewed in the context of Twitter's prior instruction to its users to "ignore the noise," the company was plotting a course for more speech, not less.

**III.   With Twitter's full knowledge and personal assurances, Mr. Berenson continues to cover COVID-19 on Twitter, and his following grows.**

79.    Mr. Berenson covered COVID-19 throughout March, April, and May 2020. Among other things, during and after that time, Mr. Berenson used his Twitter account to repeatedly criticize universal masking policies, without regard for whether an individual is sick or well, as an effective COVID-19 preventative measure and other non-pharmaceutical interventions such as business and school closures.

80.    On the same day Twitter announced its new labeling policy, and though none of his tweets had been taken down or modified at the time, Mr. Berenson tweeted out his concern that the company was going to start censoring content. A few hours after Mr. Berenson's tweet, Twitter then-CEO Jack Dorsey followed his account. At that point, Twitter's leadership at the highest level was fully aware of Mr. Berenson's reporting.

81.    The same day Mr. Dorsey followed Mr. Berenson, Brandon Borrman, who then served as Twitter's Vice President of Global Communications, contacted Mr. Berenson about censorship issues. "I work at Twitter and saw your Tweets today," Mr. Borrman said. "Would you be open to having a discussion so I can hear you out? I think you have some nuanced points that could be helpful as [sic] try to move ahead."

30

COMPLAINT

82.     Mr. Berenson responded, acknowledging Twitter's legitimate interest in blocking claims "that the virus is not real, or that it's part of a UN conspiracy to sterilize America, or similar nonsense." Mr. Berenson summarized his approach to reporting on COVID-19 as follows:

> I am trying to raise serious, data-driven questions, based wherever possible on government data or peer-reviewed/preprint papers—I think my most recent tweets tonight capture the flavor. Does universal masking work as a broad policy mandate? The truth is the evidence is pretty weak—not that sick people shouldn't wear them, or maybe that people in confined public transportation (aka NY subways) shouldn't, but what states like NY and CA are saying and doing right now far outruns the evidence.

83.     Twitter's communications executive responded the following day. "We are trying to take a more nuanced approach to this that recognizes that there is a huge amount of emotion and vitriol [on] all sides of the issue," Mr. Borrman explained. "We're trying to make sure that factual debate finds a way through the emotion, but we're obviously not successful all the time."

84.     Mr. Borrman explained that "[t]he mask example was a poor one to use."[2] Appearing to draw on Twitter's prior policies which recognized a distinction between debate about policy and calls to violate specific laws, Mr. Borrman explained that

> We're less likely to take action on something regarding the efficacy of masks, and more likely to label something that, for example, directly calls on people to violate a local order to wear masks, regardless of their efficacy. In other words, we're trying to avoid appearing as though we're saying one treatment or solution is good or bad while still recognizing that, even if controversial, there are new laws in place in many locations. Debate over the effectiveness of those laws should continue, but encouragements to directly violate them cross a line.

_____

[2] Upon information and belief, Mr. Borrman was referring to the statement in the above-cited Associated Press article that "[t]he company has been removing bogus coronavirus cures and claims that social distancing or face masks do not curb the virus' spread for several weeks." Seitz, *supra*.

31

COMPLAINT

As Mr. Borrman put it, Twitter is "leading with labeling here, rather than simply deciding between leave up/take down, because we think it will allow the conversation to continue." While the company "will be putting our thumbs on the scale with a label" where there are "pushes to violate local laws," Mr. Borrman said, "I don't expect that you will see major change in how we are addressing things going forward, but if you do, please feel free to reach out to me."

85.     In this e-mail exchange, Mr. Borrman did not raise specific concerns regarding Mr. Berenson's reporting. Instead, he advised Mr. Berenson there was no "major change" coming. While Mr. Berenson certainly criticized the laws Twitter's executive referred to in the e-mail, and reported on the underlying evidentiary basis for them, at no relevant time did he encourage individuals to break those laws.

86.     As a sophisticated commercial entity, Twitter employs counsel and Mr. Borrman had ample time and opportunity to seek out legal counsel to vet the statements and assurances the company made to Mr. Berenson. Upon information and belief, Mr. Borrman sought such counsel and made the statements in the May 12 e-mail message with the benefit of that counsel.

87.     Consistent with Mr. Borrman's assurances, Twitter's treatment of Mr. Berenson stayed the same. Aside from corresponding with Mr. Borrman regarding a "dox" threat, Mr. Berenson had no formal communication with the company. He had no reason to. Upon information and belief, Twitter did not label any of Mr. Berenson's tweets at any point in 2020.

88.     Relying on Twitter's assurances that no "major changes" in its moderation practices were upcoming, Mr. Berenson continued to build his Twitter following, spending hours each day on the platform bringing COVID-19 information to audience. Mr. Berenson invested this time in Twitter at the opportunity cost of investing his time in building a presence on

ENVISAGE LAW

32

COMPLAINT

Telegram and Substack, two alternative platforms to Twitter available to him at the time, or writing books and articles for publication elsewhere.

89.    In June 2020, Mr. Berenson published his first "Unreported Truths" booklet on COVID-19 and lockdowns. After Amazon initially blocked the pamphlet's distribution on its platform, Mr. Berenson brought the issue to his Twitter followers. In what became a national news story, Elon Musk criticized Amazon for the decision, tweeting "[t]ime to break Amazon up." Todd Haselton, *Elon Musk calls for Amazon breakup after Covid-19 skeptic claims it censored his book*, CNBC (June 4, 2020), https://www.cnbc.com/2020/06/04/elon-musk-calls-for-amazon-split-after-alex-berenson-claims-censorship.html. Ultimately, because of this pressure, Amazon reversed course and let Mr. Berenson sell the pamphlets on its platform.

90.    Upon information and belief, Twitter was fully aware of Mr. Berenson's conflict with Amazon. The company was also aware of the content of Mr. Berenson's pamphlets, which presented data and analysis undermining the case for government lockdown measures. Mr. Berenson sold more than 300,000 copies of his "Unreported Truths" pamphlets, and he used to Twitter to generate much of the awareness of those works.

91.    Meanwhile, back on Twitter, Mr. Berenson continued to criticize government lockdowns and mask mandates. In an August 25, 2020 tweet, which is shown below, Mr. Berenson said that "lockdowns have provably failed" and "masks . . . are even more useless."



33

COMPLAINT

Glenn Decl. Ex. 53
Page 33 of 70

This tweet received more than 1,250 likes and retweeted more than 350 times.

92.     Later, in November 2020, Mr. Berenson slammed not only lockdowns and mask mandates, but other non-pharmaceutical interventions such as contact tracing, saying advice from public health experts had "proven useless." That tweet, which garnered more than 4,700 likes and 1,000 retweets, is shown below.



93.     Twitter did not label any of these tweets, or any of Mr. Berenson's other similar tweets, as false or misleading. The company continued to allow Mr. Berenson to report freely and without interference. All of that was consistent with Twitter's specific, individualized prior assurances and representations via Mr. Borrman that "[d]ebate over the effectiveness of those laws should continue," and that Mr. Berenson would not "see major change in how we are addressing things going forward."

**IV.     With the advent of COVID-19 vaccines, Twitter announces new policies on misleading medical information, and the company gives further assurances to Mr. Berenson regarding his access to the platform.**

94.     On November 9, 2020, Pfizer and BioNTech announced positive clinical trial results regarding their COVID-19 vaccine. Far from being "anti-vax," having taken vaccines himself and allowing his children to be vaccinated, Mr. Berenson tweeted that while "more safety data" is needed, "this is legitimately good news," arguing that the emergence of a COVID-19 vaccine might offer a pathway out of the pandemic once and for all.

34

COMPLAINT

ENVISAGE LAW

95.     One week later, on November 16, Moderna released results about its vaccine candidate. Mr. Berenson was again positive, tweeting that the development was "[m]ore good topline vaccine news," while linking to an article in the *Washington Post* with the headline "Moderna's coronavirus vaccine found to be nearly 95 percent effective in a preliminary analysis."

96.     The primary focus of Mr. Berenson's reporting throughout the rest of November and into early December 2020 continued to be other COVID-19 issues, and not vaccines. On December 11, Mr. Berenson tweeted about alleged political pressure related to FDA's authorization of the Pfizer-BioNTech COVID-19 vaccine. Three days later, on December 14, Mr. Berenson tweeted about an article published in *The New England Journal of Medicine* regarding the rate of occurrence of "severe adverse events" in a Pfizer-BioNTech vaccine trial.

97.     Two days later, Twitter announced a new policy regarding misleading COVID-19 vaccine information. Twitter Safety, *COVID-19: Our approach to misleading vaccine information*, Twitter (Dec. 16, 2020), https://blog.twitter.com/en_us/topics/company/2020/covid19-vaccine. The company announced it would start to "remove Tweets which advance harmful or misleading narratives about COVID-19 vaccinations, including" the following:

- False claims that suggest immunizations and vaccines are used to intentionally cause harm to or control populations, including statements about vaccines that invoke a deliberate conspiracy;

- False claims which have been widely debunked about the adverse impacts or effects of receiving vaccinations; or

- False claims that COVID-19 is not real or not serious, and therefore that vaccinations are unnecessary.

35

COMPLAINT

ENVISAGE LAW

*Id.* Twitter also stated "we may label or place a warning on Tweets that advance unsubstantiated rumors, disputed claims, as well as incomplete or out-of-context information." *Id.*

98.     The same day, Twitter also announced a larger "COVID-19 misleading information policy." *COVID-19 misleading information policy*, Twitter (Dec. 16, 2020), https://web.archive.org/web/20201216200114/https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy. The company stated that for content to violate the policy "it must" do the following: (1) "advance a claim of fact, expressed in definitive terms; (2) "be demonstrably false or misleading, based on widely available, authoritative sources"; and (3) "be likely to impact public safety or cause serious harm." *Id.*

99.     The policy set forth five categories of misleading information. The company said it "will label or remove false or misleading about," among other things, "official regulations, restrictions, or exemptions pertaining to health advisories," regarding "[p]ersonal protective equipment (PPE) such as claims about the efficacy and safety of face masks to reduce viral spread." *Id.*

100.     At the same time, Twitter said "[w]e seek to protect robust, public debate about the response to COVID-19, and recognize that the state of scientific knowledge about certain aspects of the pandemic and public response to it (including the development of vaccines) is still relatively nascent." *Id.* To that end, Twitter specifically stated that in the absence of other policy violations, the following are generally not in violation of this policy:

- **Strong commentary, opinions, and/or satire**, provided these do not contain false or misleading assertions of fact.

- **Counterspeech.** We allow for direct responses to misleading information which seek to undermine its impact by correcting the record, amplifying credible information, and educating the wider community about the prevalence and dynamics of misleading information.

36

COMPLAINT

- **Personal anecdotes or first-person accounts.**

- **Public debate about the advancement of COVID-19 science and research, including debate about research related to COVID-19,** such as the effectiveness of treatments and mitigation measures, so long as the claims don't misrepresent research findings.

*Id.*

101.    In the December 16 policy, Twitter also explained that "we are enforcing this policy *in close coordination with trusted partners*, including public health authorities, NGOs and *governments*, and continue to use and consult with information from those sources when reviewing content." *Id.* (emphasis added). Upon information and belief, Twitter's "trusted partners" include agencies of both state and federal governments.

102.    In view of these new policies, Mr. Berenson contacted Twitter executive Brandon Borrman on December 17, looking for assurances that Twitter would continue to allow his reporting on COVID-19 vaccines. Many "people [are] complaining I'm raising questions about the vaccine," Mr. Berenson wrote to Mr. Borrman. "So you know, there's no conspiracy theory nonsense," rather "[e]verything I point to about safety comes from the clinical trial data," and "my broader point is simply that we shouldn't be mandating this for adults."

103.    Mr. Borrman responded less than four hours later. "The points you're raising should not be an issue at all," Mr. Borrman assured Mr. Berenson. "The policy is designed to allow debate and discussion, but to discourage conspiracy theories, etc. Please let me know if you run into any issues."

104.    Mr. Berenson tweeted the e-mail exchange to his followers, and lauded Twitter's commitment to free speech. Given Twitter's assurances, Mr. Berenson continued covering COVID-19 on Twitter, again forgoing the opportunity to build his following and presence on alternative platforms such as Telegram and Substack. Upon information and belief, at the same

37

COMPLAINT

time, Twitter continued to profit from Mr. Berenson's coverage of COVID-19 by monetizing his following through the sale of advertisements.

105.    Mr. Berenson kept on tweeting about mandatory mask policies and lockdowns. On January 28, 2021, Mr. Berenson criticized the media "for refusing to report the real-world evidence" that masks and lockdowns are "useless." Several weeks later, Mr. Berenson again called mask "useless." With respect to vaccines, Mr. Berenson raised questions about side effects and the long-term efficacy of the shots. Mr. Berenson often linked to primary and secondary source materials from which he was drawing these conclusions.

106.    Twitter did not label any of this reporting false or misleading. Nor did the company take any of the posts down. Given Twitter's personal assurances to him, Mr. Berenson had no reason to believe the company would take action against his account or keep him from reporting on Twitter.

**V.    Twitter introduces its new five-strike policy, reassures Mr. Berenson, and declines to "strike" any of his subsequent tweets.**

107.    On March 1, 2021, Twitter announced a new five-strike policy as part of the company's bar on medical misinformation. *COVID-19 misleading information policy*, Twitter (Mar. 1, 2021), https://web.archive.org/web/20210827062904/https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy. Accounts that committed "[r]epeated violations of this policy" are subject to increasing levels of discipline, up to and including permanent suspension for five or more violations. *Id.*

108.    In terms of the mechanics of the five-strike policy, "[t]weets that are labeled *and determined to be harmful* will accrue **1 strike**." *Id.* (emphasis added). Twitter takes no action for the first strike, but the company imposes a 12-hour-ban for second and third strikes. A fourth strike yields a one-week suspension with a fifth leading to permanent suspension. Twitter stated

38

COMPLAINT

ENVISAGE LAW

that "[i]ndividuals will be notified directly when a label or required Tweet removal results in additional account-level enforcement." Twitter Safety, *Updates to our work on COVID-19 vaccine misinformation*, Twitter (Mar. 1, 2021), https://blog.twitter.com/en_us/topics/company/2021/updates-to-our-work-on-covid-19-vaccine-misinformation. In other words, instead of leaving account holders to guess, the company committed to giving users notice of the specific tweets violative of the policy.

109.     The day after Twitter announced the five-strike policy, Mr. Berenson again contacted the company, seeking assurances he could continue reporting on COVID-19 using the platform:

> Just following up on this in the wake of Twitter's announcement yesterday. I intend to continue to write about the vaccines—as always, with a heavy reliance on governmental data (whether from Israel, the US, or elsewhere) and published studies. I appreciate the fact that Twitter has allowed me to provide a risk-benefit analysis that people are generally not seeing elsewhere and I respect that you do not want conspiracy theories, etc, on the site. If your fact-checkers do have questions about something I've written, I hope you will let me know and give me a chance to respond to it before taking any action.

110.     Twitter responded the same day, and again the company assured Mr. Berenson that his work was not being targeted under Twitter's policies. "I will say that your name has never come up in the discussions around these policies," Mr. Borrman said. "If it does I will try to ensure you're given a heads up before an action is taken, but I am not always made aware of them before they're executed. If something happens, please let me know."

111.     With Twitter's express encouragement, and reasonably believing he had no reason to fear censorship, Mr. Berenson kept building his Twitter following at the opportunity cost of time he could have spent on other platforms and activities. He also kept up his relentless, daily coverage of COVID-19 after Twitter's launch of the misleading information and five-strike policy, including the following:

<div align="center">39</div>

<div align="center">COMPLAINT</div>

a.    On March 25, 2021, Mr. Berenson published his fourth *Unreported Truths* booklet, which he promoted on Twitter, and which contained much critical reporting on the COVID-19 vaccines;

b.    He tweeted that "masks are useless" on April 5 and that "civilian masks are useless" on May 8;

c.    On June 24, Mr. Berenson asked whether the CDC "is lying or just stupid?"; and

d.    On July 8, he published the below tweet regarding vaccines and the CDC.



112.    Twitter did not label any of these tweets. And since there was no label, the company did not count any of these tweets as a "strike" against Mr. Berenson's account under the five-strike policy.

40

COMPLAINT

113.   Nevertheless, Twitter did label some of Mr. Berenson's other tweets as misleading. In a March 15 tweet, Mr. Berenson argued that the vaccines on the traditional childhood vaccination schedule are "nothing like the mRNA/LNP biotechnology, which is more properly described as a gene therapy than a vaccine." Twitter labeled this opinion "misleading." As discussed further below, it was not.

114.   On May 29 and 30, Twitter labeled four separate tweets as "misleading." Two of tweets regarded Chinese-made COVID-19 vaccines. Another presented analysis of COVID-19 data from France and the United Kingdom. The fourth tweet dealt with a spike in COVID-19 deaths following a first vaccine dose. Finally, on July 8, Mr. Berenson tweeted a link to an article about issues related to transplanting organs from deceased patients "with vaccine-induced thrombosis and thrombocytopenia" which Twitter labeled "misleading."

115.   Mr. Berenson complained to Mr. Borrman about his company's labeling of the March 15 and May 30 tweets. Mr. Borrman stated he would look into the matter, but he did not respond further. Given Mr. Borrman's prior assurances and Twitter's subsequent silence, Mr. Berenson believed the labeling could have been attributable to the company's use of algorithms, which Twitter was still honing.

116.   Even with the inconsistent labeling, Mr. Berenson continued to utilize Twitter, mindful of the company's prior assurance that his name had "never come up in the discussions around these policies" as well as Mr. Borrman's promise to "try to ensure you're given a heads up before an action is taken." Importantly, none of Mr. Berenson's tweets up until that point had been labeled as a "strike" under the five-strike policy. At no time during this period did Twitter lock Mr. Berenson out of his account nor did Twitter take down or delete any of his tweets.

ENVISAGE LAW

117.    Under California law, "[a] waiver is an intentional relinquishment of a known right; may be expressed or implied; [and] any may be implied from conduct inferentially manifesting an intention to waive. *Salton Cmty. Servs. Dist. v. Southard*, 256 Cal. App. 2d 526, 532–33, 64 Cal. Rptr. 246, 251 (1967). By knowingly failing to flag these tweets, Twitter waived any claims that Mr. Berenson violated the five-strike policy based not only on those tweets, but any future similar statements.

**VI.    Hours after President Joe Biden says social media companies are "killing people," and after other key federal government officials call for social media companies to censor content, Twitter locks Mr. Berenson's account for the first time.**

118.    July 2021 marked the beginning of the end of Mr. Berenson's relationship with Twitter. On Saturday, July 10, Mr. Berenson participated in a panel discussion at a political convention in Dallas, Texas. During the session, Mr. Berenson commented on the government's failure to persuade Americans to take one of the available COVID-19 vaccines. The following day, Dr. Anthony Fauci, President Biden's Chief Medical Advisor, called Mr. Berenson's remarks "horrifying." According to Dr. Fauci, an official Mr. Berenson had criticized repeatedly throughout the COVID-19 pandemic, Mr. Berenson was "someone saying that it's a good thing for people not to try and save their lives." Olafimihan Oshin, *Fauci: 'Horrifying' to hear CPAC crowd cheering anti-vaccination remarks*, The Hill (July 11, 2021), https://thehill.com/homenews/sunday-talk-shows/562453-fauci-horrifying-to-hear-cpac-crowd-cheering-missed-vaccine-goal. Far from encouraging people on toward their deaths, Mr. Berenson was observing that many Americans, particularly younger Americans at demonstrably less risk of from COVID-19, had simply concluded that the risks of taking one of the COVID-19 vaccines outweighed the benefits.

*ENVISAGE LAW*

42

COMPLAINT

119.    The government's rhetoric intensified as the week went on. A report called "The Disinformation Dozen," which identified twelve individuals said to "produce 65% of the shares of anti-vaccine misinformation on social media platforms," was featured in those efforts. Shannon Bond, *Just 12 People Are Behind Most Vaccine Hoaxes on Social Media, Research Shows*, NPR (May 14, 2021), https://www.npr.org/2021/05/13/996570855/disinformation-dozen-test-facebooks-twitters-ability-to-curb-vaccine-hoaxes. Many of the people on the list had a history of general anti-vaccine activism. Mr. Berenson was not included in this blacklist.

120.    On July 15, Surgeon General Vivek Murthy published a report titled "Confronting Health Misinformation." Vivek H. Murthy, *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment* (2021), *available at* https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf. In the report, Surgeon General Murthy cited "The Disinformation Dozen" analysis. *Id.* at 6 n.45. He noted that "while there have been significant efforts to address health misinformation," citing Twitter's COVID-19 policy, *id.* at n.49, Surgeon General Murthy said "there is much more to be done." He explained "[t]he threat of misinformation raises important questions we must answer **together**." *Id.* (emphasis in original). In this regard, later in the report, he called for social media platforms to "[p]rioritize early detection of misinformation 'super-spreaders' and repeat offenders," and recommended the companies "[i]mpose clear consequences for accounts that repeatedly violate platform policies." *Id.* at 12.

121.    In a section of the report captioned "What Governments Can Do," Surgeon General Murthy recommended "invest[ing] in fact-checking and rumor control mechanisms where appropriate." *Id.* at 15. As authority for this recommendation, Surgeon General Murthy cited a report from the Virality Project. *See id.* at 15 n.62. According to that organization, "[t]he

43
COMPLAINT

Virality Project supports information exchange between public health officials, government, and social media platforms through weekly briefings and real-time incident response." *Virality Project Weekly Briefing #31 July 20, 2021 – July 27, 2021*, Virality Project, at 1, https://bit.ly/2YNp2e8. That outlet repeatedly criticized Mr. Berenson's reporting, at the very least providing a basis for government officials to become aware of Mr. Berenson and his reporting if they were not so acquainted previously, if not to identify him as a potential censorship target. *See, e.g.*, *id.* at 3 (calling Mr. Berenson "a frequent spreader of vaccine misinformation"); *Virality Project Weekly Briefing #22 May 18, 2021*, Virality Project, at 7, https://bit.ly/2YZufjg (linking to Mr. Berenson's "prominent anti-vaccine account").

122.    Asked about "actions that the federal government can take to ensure their [(social media companies')] cooperation," Press Secretary Psaki responded that "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff." *Id.* Press Secretary Psaki revealed that the federal government was "flagging problematic posts for Facebook that spread disinformation." *Id.* Upon information and belief, in or around July 2021, the federal government also flagged "problematic posts" for Twitter, including posts by Mr. Berenson.

123.    Press Secretary Psaki explained that the federal government had "proposed changes . . . to social media platforms." *Id.* Among them, Ms. Psaki said the government "recommended—proposed that they [(the companies)] create a robust enforcement strategy that bridges their properties and provides transparency." *Id.* Ms. Psaki even suggested the companies work together so that people banned on one platform do not "remain active" on others. *Id.* She complained that the "disinformation dozen" in particular "remain active on Facebook, despite some even being banned on other platforms." *Id.*

44

COMPLAINT

ENVISAGE LAW

124.     The following day, July 16, Ms. Psaki again called for social media companies to lock arms and "bridge their properties" because "[y]ou shouldn't be banned from one platform and not others if you—for providing misinformation out there." Press Briefing by Press Secretary Jen Psaki, July 16, 2021, https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/. In other words, from the government's perspective, censorship on one platform should extend across the entire social media landscape. Ms. Psaki explained that the government is "in regular touch with social media platforms . . . about areas where have concern." *Id.* Upon information and belief, the "social media platforms" Ms. Psaki referred to included Twitter.

125.     Ms. Psaki further advised that "[a]ny decision about platform usage and who should be on the platform is orchestrated and determined by private-sector companies." *Id.* That is "their decision to do," Ms. Psaki explained. *Id.* "That is not the federal government doing that." *Id.* But echoing Dr. Fauci's statements five days earlier, she said "[i]t is life and death. It is a public health issue in the country." *Id.*

126.     Picking up on these themes, at around the same time of the White House press briefing, in response to a reporter who asked, "On COVID misinformation, what's your message to platforms like Facebook," President Biden said, "They're killing people." *President Biden: "They're killing people"*, C-SPAN, July 16, 2021, https://www.youtube.com/watch?v=gJoOtLn4goY. President Biden's statement caused other media to conclude that the government "blamed" social media companies "for spreading misinformation about the coronavirus and vaccines," creating "stalling U.S. vaccine rates." Lauren Egan, *'They're killing people': Biden blames Facebook, other social media for allowing Covid misinformation*, NBC News (July 16, 2021, 4:10 PM EDT),

45

COMPLAINT

https://www.nbcnews.com/politics/white-house/they-re-killing-people-biden-blames-facebook-other-social-media-n1274232. Tellingly and, upon information and belief, not coincidentally, Mr. Berenson's comments which Dr. Fauci attacked as "horrific" concerned the same subject—vaccine rates that had plateaued despite the government's efforts.

127.     Less than four hours after President Biden's comment and Press Secretary Psaki's briefing, Twitter locked Mr. Berenson's account for the first time. Under the five-strike policy, the lock was apparently his second strike, though the company did not inform him of the first strike. Despite prior assurances that the company would try to give Mr. Berenson a "heads up" before taking action, Twitter gave him no advance notice prior to locking his account. Upon information and belief, Twitter did not make any effort to notify Mr. Berenson.

128.     As for its part, the government kept pressing in. Four days after President Biden's comments, reports circulated that "[t]he White House is assessing whether social media platforms are legally liable for misinformation spread on their platforms." Matthew Brown, *'They should be held accountable': White House reviews platforms' misinformation liability*, USA Today, July 20, 2021, https://www.usatoday.com/story/news/politics/2021/07/20/white-house-reviews-section-230-protections-covid-misinformation/8024210002/. The report noted "[r]elations are tense between the Biden administration and social media platforms," and that the government was "examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites." *Id.*

129.     Upon information and belief, in July 2021, the government encouraged Twitter to censor Mr. Berenson's account. Twitter says that it is "enforcing this policy *in close coordination with trusted partners*, including public health authorities, NGOs and *governments*,

ENVISAGE LAW

ENVISAGE LAW

1   and continue to use and consult with information from those sources when reviewing content."

2   *COVID-19 misleading information policy*, Twitter (Dec. 16, 2020),

3   https://web.archive.org/web/20201216200114/https://help.twitter.com/en/rules-and-

4   policies/medical-misinformation-policy (emphasis added). Moreover, the government's threats

5

6   to take away section 230 protection on account of social media companies' failure to take

7   sufficient steps from the government's perspective to combat medical misinformation provided

8   additional pressure to censor.

9

10          130.    On September 7, Senator Elizabeth Warren appeared to commend Twitter for its

11   COVID-19 misinformation policy, and its decision to ban Mr. Berenson. In a letter to Amazon,

12   Senator Warren suggested that the bookseller apply a similar standard to COVID-19 information

13   in books and other materials available on that platform. Letter from Senator Elizabeth Warren to

14   Andy Jassy, Chief Executive Officer, Amazon, Inc., Sept. 7, 2021, at 5,

15

16   https://www.warren.senate.gov/imo/media/doc/2021.9.7%20Letter%20to%20Amazon%20on%2

17   0COVID%20Misinformation.pdf. In this regard, Senator Warren noted that Twitter "recently

18   ban[ned] Alex Berenson—whose books appear prominently in Amazon searches—from its

19   platform." *Id.*

20

21          131.    "The Supreme Court has articulated four tests for determining whether a private

22   individual's actions amount to state action: (1) the public function test; (2) the joint action test;

23   (3) the state compulsion test; and (4) the governmental nexus test." *Franklin v. Fox*, 312 F.3d

24   423, 444-45 (9th Cir. 2002). Twitter's censorship of Mr. Berenson constitutes state action under

25   at least the joint action and governmental nexus tests.

26

27

28

---

47

COMPLAINT

**ENVISAGE LAW**

**VII.   Twitter permanently suspends Mr. Berenson, violating its rules and breaking its prior promises in the process.**

132.     Twitter's Terms of Service (the "Terms") are one of several documents that purport to govern the legal relationship between the company and account holders. Twitter Terms of Service, https://twitter.com/en/tos (updated August 19, 2021).[3] Individual account owners have no ability to comment, revise, or even to propose revisions to the Terms. The Terms are a contract of adhesion. California law requires such contracts to be construed against the drafter, which in this case is Twitter. *See City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 397, 181 P.3d 142, 158 (2008) (referring to the "special construction rules" that apply to adhesion contracts such as construing terms against the drafter).

133.     The Terms provide that the company "may suspend or terminate your account or cease providing you with all or part of the Services at any time for any or no reason, including, but not limited to, if we reasonably believe: (i) you have violated these Terms or the Twitter Rules and Policies." *Id.* As described further below, Twitter did not cite this passage to justify banning Mr. Berenson from its platform.

134.     Also relevant here, the Terms contain no merger or integration clause. The Terms contain no bar on modification by course of conduct or from trade usage. Under California law, "[t]he terms may be explained or supplemented by course of dealing or usage of trade or by course of performance." Cal. Civ. Proc. Code § 1856(c).

135.     Twitter gave Mr. Berenson no personal notice of his suspension or any explanation as to why he was suspended. Instead, Mr. Berenson learned through media reports

---

[3] Twitter modified the Terms on June 18, 2020 and January 1, 2020, but those modifications have no bearing on this dispute.

48

COMPLAINT

ENVISAGE LAW

that Twitter's permanent suspension of his account was not based on any violation of the Terms. As the company informed NBC, Fox News, and other media outlets, Mr. Berenson was "permanently suspended for repeated violations of our COVID-19 misinformation rules." Michael Ruiz, *Twitter permanently suspends Alex Berenson over coronavirus tweets*, Fox Business, Aug. 28, 2021, https://www.foxbusiness.com/media/twitter-permanently-suspends-alex-berenson-over-coronavirus-tweets.

136.    Twitter's COVID-19 misinformation rules provide a definite, objective standard. The operative medical information policy provides that "for content related to COVID-19 to be labeled or removed under this policy," which is also the predicate for an account incurring a "strike," the content "must" do the following: (1) "advance a claim of fact, expressed in definitive terms; (2) "be demonstrably false or misleading, based on widely available, authoritative sources"; and (3) "be likely to impact public safety or cause serious harm." The five-strike system itself uses the phrase "we will" to describe the policy. The policy contains no reservation of rights to permanently suspend an account or bar a user from the platform for "any or no reason" as the Terms purport to do. Further, the policy was issued after the operative Terms governing Mr. Berenson and Twitter's relationship. To suspend Mr. Berenson from the platform on the basis that he violated these rules, then he must have objectively violated the rules. Mr. Berenson did not do so.

137.    To this day, Mr. Berenson is unaware which tweet was his first strike. His second strike, which coincided with President Biden's charge that social media companies were "killing people," was for the following tweet:

49

COMPLAINT

1
2
3
4
5
6
7
8



9
10   In the tweet, Mr. Berenson linked to another user's analysis of COVID-19 case counts in
11   countries with high vaccination rates

12        138.    The tweet did not violate Twitter's policy, for at least five reasons. First, Twitter
13   never labeled the underlying, linked-to tweet as "misleading," the only factual content in Mr.
14   Berenson's tweet.[4] Second, two days prior to strike two, Twitter took no action when Mr.
15   Berenson tweeted his opinion that "the vaccines are failing," which was based on data that "[t]he
16
17   UK, the most vaccinated major country in the world, reported 42,000 cases" of COVID-19, a
18   "100x" increase from the previous year. Third, Mr. Berenson tweeted his opinion, and the policy
19   expressly provides for protection of opinion. Fourth, Mr. Berenson's reporting in this tweet was
20   much like the reporting Twitter was previously aware of and did not object to. Fifth, despite the
21   company's previous assurances that it would try to give Mr. Berenson a "heads up" prior to
22   acting, Twitter gave him no notice prior to applying the strike.
23
24
25
26

27   ───────────────────
     [4] To this day, the underlying tweet is still not labeled. *See* Corona Realism (@holmenkollin),
28   Twitter (July 16, 2021, 6:59 AM),
     https://twitter.com/holmenkollin/status/1415989536933490688.

COMPLAINT

ENVISAGE LAW

139.   On July 27, Twitter locked Mr. Berenson's account for twelve hours again, his third strike on the platform. The company did not identify the tweet that allegedly violated the Twitter policy. Again, Twitter did not give Mr. Berenson notice prior to locking his account.

140.   Twitter gave Mr. Berenson his fourth strike on July 30 based on the following:



141.   This tweet was true, and not false or misleading. Mr. Berenson cited a pre-print, non-peer-reviewed review of six month safety efficacy data for the Pfizer-BioNTech COVID-19 vaccine. Stephen J. Thomas et al., *Six Month Safety and Efficacy of the BNT162b2 mRNA COVID-19 Vaccine*, July 28, 2021, https://www.medrxiv.org/content/10.1101/2021.07.28.21261159v1.full.pdf. The report noted that "[d]uring the blinded, controlled period, 15 BNT162b2 and 14 placebo recipients died." *Id.* at 6. With this, Mr. Berenson was pointing out that this data showed there was no significant difference in overall mortality between patients who received the Pfizer-BioNTech COVID-19 vaccine and the placebo. To be clear, his comment was not about whether the vaccine studied prevented patients from contracting COVID-19 or whether patients who took the vaccine had

51

COMPLAINT

ENVISAGE LAW

less severe cases of the disease. It was an evidence-based interpretation of overall mortality data and nothing more than that.

142.    Mr. Berenson's reference to the "trial blind" referred to the fact that Pfizer gave patients in the placebo arm of the clinical trial a COVID-19 vaccine after the product received emergency use authorization. As a result, it would not be possible to track long-term overall mortality between the two groups from the original trial without a comparator placebo group. This is what Mr. Berenson meant when he tweeted that the "trial blind is broken now."

143.    Critiquing or otherwise questioning clinical trial design, particularly the circumstances around breaking trial blinds, could hardly be considered controversial or damaging to the public. In a 1998 guidance document, FDA noted that "[b]reaking the blind (for a single subject) should be considered only when knowledge of the treatment assignment is deemed essential by the subject's physician for the subject's care." FDA, *Guidance for Industry, E9 Statistical Principles for Clinical Trials*, at 12 1998), *available at* https://www.fda.gov/media/71336/download.

144.    A month later, during the evening of August 28, Twitter issued its fifth strike against Mr. Berenson, permanently suspending his account. The company did not cite the specific tweet that formed the basis of the fifth strike. Upon information and belief, the tweet below, which the company labeled misleading, served as Twitter's basis for the fifth strike and Mr. Berenson's permanent suspension from the platform.

///

///

///

ENVISAGE LAW



145.    Like the other strikes, this tweet also did not violate Twitter's stated policy. Mr. Berenson's claim that the COVID-19 vaccines do not "stop infection" or "transmission" of COVID-19 was true at the time and is true now. It is undisputed that vaccinated persons can contract and spread COVID-19. On July 30, Dr. Anthony Fauci confirmed that "individuals who are infected through breakthrough infections, namely vaccinated people who ultimately get infected, that they are generally without symptoms or minimally symptomatic, however it is clear that they are capable of transmitting the infection to uninfected individuals." *Dr. Fauci on COVID-19 Spread*, Yahoo Finance, July 31, 2021, https://youtu.be/mP9iHyj1uiU.

146.    Dr. Fauci's July 30 observation remains true today. In a December 2021 editorial in *The New England Journal of Medicine*, Dr. Fauci and two other medical doctors explained that "[a]s important as [the COVID-19 vaccines] are, however, their protective efficacy wanes over time, necessitating booster doses," and that "[v]accination has also been unable to prevent 'breakthrough' infections, allowing subsequent transmission to other people even when the vaccine prevents severe and fatal disease." David M. Morens, Jeffery K. Taubenberger, M.D., Ph.D., and Anthony S. Fauci, *Universal Coronavirus Vaccines—An Urgent Need*, New Engl. J.

Med., Dec. 15, 2021, https://www.nejm.org/doi/full/10.1056/NEJMp2118468. If anything, this article corroborates Mr. Berenson's allegedly ban-worthy tweet, rather than contradict it.

147.    What is more, Twitter amended its COVID-19 misinformation policy in December 2021. On or around December 10, Twitter announced that it would label claims "that people who received the vaccine can spread or shed the virus (or symptoms or immunity) to unvaccinated people." Twitter, *COVID-19 misleading information policy*, Dec. 10, 2021, https://web.archive.org/web/20211210152757/https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy. That change, made more than three months after Mr. Berenson's August 28 tweet, would have arguably brought his prior statement within the scope of the policy. But then Twitter reversed course. On December 16, the day after *The New England of Journal Medicine* article was published, Twitter revised its policy to say it would label claims that "people who have received the vaccine can spread or shed the vaccine (or symptoms, or immunity)" as opposed to the virus. Twitter, *COVID-19 misleading information policy*, Dec. 16, 2021, https://web.archive.org/web/20211216085837/https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy. What that means is that, even today, Mr. Berenson's allegedly ban-worthy claim that the COVID-19 vaccines do not stop infection or transmission does not violate Twitter's policy.

148.    *Snopes* reported that "[a]ccording to the company, the use of the word 'virus' in that context," i.e., in the December 10 iteration of the policy, "was merely a typo, which was corrected on Dec. 16, and did not reflect the true policy anyway." Dan MacGuill, *Did Twitter Prohibit Making an Accurate Claim About COVID-19 Transmission?*, Snopes, Dec. 16, 2021, https://www.snopes.com/fact-check/twitter-ban-covid-vaccine/.  The *Snopes* article quotes a Twitter spokesperson as follows:

54

COMPLAINT

ENVISAGE LAW

ENVISAGE LAW

The earlier language is *not reflective of our enforcement approach*, *past* or present. We've enforced our COVID-19 misleading information policy in line with the corrected language only. *We do not take enforcement action against claims that people who receive the vaccine can spread or shed the virus.*

*Id.* (emphasis added). And yet, in Mr. Berenson's case, contrary to this claim, Twitter took action against his August 28 tweet, including his assertion that the vaccines do not stop transmission of COVID-19.

149.   With respect to the rest of the tweet, Mr. Berenson's recommendation not to think of the COVID-19 vaccines "as a vaccine" turns on the definition of that term. Even though the company could have done so, Twitter's policy does not define the term, so outside sources must be consulted. In a glossary on its website, the CDC defines the term in relevant part as a "suspension of live (usually attenuated) or inactivated microorganisms (e.g. bacteria or viruses) or fractions thereof administered to *induce immunity and prevent infectious diseases* and their sequelae." CDC, *Vaccines & Immunizations, Glossary*, https://www.cdc.gov/vaccines/terms/glossary.html (last updated July 30, 2020) (emphasis added). Similarly, FDA explains on its website that "[v]accines work by mimicking the infectious bacteria or viruses that cause disease. Vaccination stimulates the body's immune system to build up defenses against the infectious bacteria or virus (organism) *without causing the disease.*" FDA, *Vaccine Development – 101*, Dec. 14, 2020, https://www.fda.gov/vaccines-blood-biologics/development-approval-process-cber/vaccine-development-101 (emphasis added). Courts have similarly defined the term. *See, e.g.*, *Dean v. Sec'y of Health & Hum. Servs.*, No. 16-1245V, 2018 WL 3104388, at *9 (Fed. Cl. May 29, 2018) (defining "vaccine" to be "any substance designed to be administered to a human being for the prevention of 1 or more diseases") (quoting 26 U.S.C. § 4132(a)(2)). Finally, California's Sherman Food, Drug, and Cosmetic Law contains two references to the term "vaccine," with the one relevant reference

55

COMPLAINT

relating the term to preventing infection. *See* Cal. Health & Safety Code § 111605 (defining "AIDS-related drug" to include a "vaccine to protect against human immunodeficiency virus (HIV) infection").

150.    Set against this backdrop, it was not false or misleading for Mr. Berenson to claim that the available COVID-19 vaccines are not "vaccines" in the traditional sense, but rather "therapeutics with a limited efficacy window." Further, Mr. Berenson's characterizations of the side effect profile of the vaccines were at very least protected opinions under the terms of Twitter's policy as were his critiques of vaccine mandates.

151.    Twitter gave no notice to Mr. Berenson prior to issuing its fifth strike and permanent suspension from the platform. Again, this was contrary to the prior representations made to him by a company executive. The company also denied Mr. Berenson's appeal to be reinstated to the platform. Further, the tweets that precipitated his suspension from Twitter, the five strikes, were all substantially similar in content and tone to tweets he made in the past with Twitter's knowledge, consent, and apparent approval. Again, Twitter executive Brandon Borrman assured Mr. Berenson, even after he started to tweet about the vaccines, that "your name has never come up in the discussions around these policies."

152.    Recall that to violate Twitter's COVID-19 misinformation policy, a tweet "must," in addition to being "demonstrably false or misleading, based on widely available, authoritative sources," also "be likely to impact public safety or cause serious harm." Upon information and belief, Twitter has no direct evidence that any of the purported five strikes against Mr. Berenson's account affected public safety or caused serious harm.

153.    Mr. Berenson did not violate Twitter's COVID-19 rules. As such, requiring Twitter to carry his messages does not raise compelled speech problems under the First

56

COMPLAINT

**ENVISAGE LAW**

1   Amendment, because the company would not be required to broadcast messages with which it

2   disagrees—i.e., messages that violate the company's rules.

3       154.   In the months leading up to his suspension from the platform, Mr. Berenson's

4   Twitter following continued to grow. Just before he was suspended, Mr. Berenson claimed

5   345,000 followers, a nearly fifty-fold increase over his following from March 2020. In the two

6   months prior to his suspension from Twitter, his tweets received 180 and 182 million views,

7   respectively, while his Twitter profile was viewed 19.5 and 25 million times during the same

8   time period. Upon information and belief, at all relevant times, to include during July and August

9

10  2021, Twitter profited from Mr. Berenson's reporting on the platform.

11

12      155.   Twitter itself competes against Mr. Berenson for an audience regarding COVID-

13  19. Twitter also profits from use of its platform by other media outlets, to include outlets and

14  journalists that compete against Mr. Berenson. With respect to COVID-19, the company

15  acknowledges that "[m]ore people than ever are coming to Twitter to learn about COVID-19."

16  To capitalize on this audience, Twitter explained it is rolling out "experimental settings [to] give

17  newsrooms and journalists over the conversations they start." Twitter, *COVID-19 news coverage*

18  *on Twitter*, https://media.twitter.com/en/articles/best-practice/2020/covid-19-news-coverage-on-

19  twitter (last visited Dec. 19, 2021). The page itself features NBC, Reuters, CBS, and CNN

20  among others.

21

22      156.   Twitter's branding of Mr. Berenson as a spreader of "misinformation" along with

23  the company's complete censorship of his speech provides itself and media outlets the company

24  services with a competitive advantage over Mr. Berenson. Twitter profits not only from the

25  traffic generated by these competitive outlets, but from any ancillary services adjacent to its

26  platform it might be able to sell. At the same time, Twitter's censorship of Mr. Berenson garners

27

28

57

COMPLAINT

the company favor from powerful governmental actors, including the current Administration and members of Congress.

**CLAIMS FOR RELIEF**

**COUNT I**
**VIOLATION OF THE FIRST AMENDMENT**
**Free Speech Clause**
**Petition Clause**
**U.S. Const. Amend. I**

157.    Mr. Berenson re-alleges the preceding paragraphs herein.

158.    In *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), the Supreme Court created an implied cause of action for violations of the Fourth Amendment.

159.    The Ninth Circuit has recognized the applicability of *Bivens* to certain First Amendment claims. *See Gibson v. United States*, 781 F.2d 1334, 1342 (9th Cir. 1986) ("We now follow these circuits in holding that, because plaintiffs have alleged that FBI agents acted with the impermissible motive of curbing . . . protected speech, they have asserted a claim properly cognizable through a *Bivens*-type action directly under the First Amendment.").

160.    Twitter deprived Mr. Berenson of the right to speak on its platform.

161.    At the same time, Twitter deprived Mr. Berenson of the right to petition the federal government for a redress of grievances by tweeting to and interacting with accounts run and managed by the federal government, including @POTUS.

162.    As outlined in detail above, Twitter deprived Mr. Berenson of these rights as part of its "partnership" with the federal government. Upon information and belief, the federal government enticed and coerced Twitter to deprive Mr. Berenson of his right to speak and petition the federal government on the platform.

163.    Twitter's actions in this case constitute state action under the U.S. Constitution.

58

COMPLAINT

164.    Twitter's wholesale censorship of Mr. Berenson's speech and petition rights violates the First Amendment and is actionable as a *Bivens* claim.

**COUNT II**
**FEDERAL FALSE ADVERTISING AND UNFAIR COMPETITION**
**Lanham Act § 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B)**

165.    Mr. Berenson re-alleges the preceding paragraphs herein.

166.    Twitter made false and misleading representations concerning Mr. Berenson's professional activities in commerce, namely, his reporting on COVID-19, including without limitation the following:

a.    That Mr. Berenson committed "repeated violations" of Twitter's COVID-19 misinformation policies;

b.    That Mr. Berenson's tweets regarding Chinese-made COVID-19 vaccines were misleading;

c.    That Mr. Berenson's tweet regarding the Pfizer-BioNTech COVID-19 vaccine trial was false or misleading;

d.    That a tweet from Mr. Berenson regarding an increase in COVID-19 deaths following a first vaccine dose was misleading; and

e.    That Mr. Berenson's tweet linking to an article about issues related to transplanting organs from deceased patients "with vaccine-induced thrombosis and thrombocytopenia" was misleading.

167.    Twitter's false and misleading representations regarding Mr. Berenson have actually deceived and are likely to deceive consumers regarding Mr. Berenson's reporting services and cause them to refrain from reading Mr. Berenson's reporting and/or purchasing his books or pamphlets. At the same time, Twitter's actions make it more likely these consumers get

ENVISAGE LAW

59
COMPLAINT

news from other sources approved by Twitter, to the company's direct and indirect economic benefit.

168.    Twitter's false and misleading representations regarding Mr. Berenson were disseminated in interstate commerce and were made in connection with commercial advertising and/or promotion of Twitter as a source for information concerning COVID-19.

169.    Mr. Berenson's interests in this case fall within the zone of interests protected by the Lanham Act. Twitter's false and misleading representations regarding Mr. Berenson harm his ability to retain and expand his readership and audience, including the relevant market for his reporting and for his books and pamphlets.

170.    These harms suffered by Mr. Berenson are the proximate result of Twitter's false and misleading representations.

171.    This claim concerns Twitter's own statements. Even so, "immunity under [section 230] does not extend to anticompetitive conduct." *Enigma Software*, 946 F.3d at 1054. To the extent Twitter's false and misleading representations conferred a competitive advantage on itself and Mr. Berenson's journalistic competitors, the company cannot claim the benefit of section 230 immunity.

**COUNT III**
**VIOLATION OF CALIFORNIA COMMON CARRIER LAW**
**Cal. Civ. Code §§ 2168, 2169, 2209**

172.    Mr. Berenson re-alleges the preceding paragraphs herein.

173.    Under California law, "[e]very one who offers to the public to carry persons, property, or messages, excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry." Cal. Civ. Code § 2168. In California, "a common carrier must, if able to do

Glenn Decl. Ex. 53
Page 60 of 70

so, accept and carry whatever is offered to him, at a reasonable time and place, of a kind that he undertakes or is accustomed to carry." *Id.* § 2169.

174.    Further, "[e]very person whose message is refused or postponed, contrary to the provisions of this Chapter, is entitled to recover from the carrier his actual damages, and fifty dollars in addition thereto." *Id.* § 2209.

175.    Twitter offers to the public to carry "messages" on its platform.

176.    Twitter is not a telegraphic message service.

177.    Twitter's Terms provide that "[t]he of the State of California, excluding its choice of law provisions, will govern . . . any dispute that arises" between a user and the company.

178.    Twitter has refused and currently refuses to carry Mr. Berenson's messages. The company denied his appeal to be reinstated to the platform.

179.    Mr. Berenson has incurred damages by Twitter's refusal, including but not limited to on account of not being to publish his reporting, promote his booklets and new book, and sell subscriptions to his Substack account.

180.    Twitter's refusal to carry Mr. Berenson's messages violates at least sections 2169 and 2209 of the California Civil Code.

181.    California's common carrier law protects speech against private censorship.

182.    To the extent section 230 applies to the California common carrier law, a federal statute "is the source of the power and authority by which any private rights are lost or sacrificed." *Hanson*, 351 U.S. at 232.

183.    Section 230 is then "the governmental action on which the Constitution operates, though it takes a private agreement," or in the case of social media companies, private actions, "to invoke the federal sanction." *Id.*

<div style="text-align:center">

61

COMPLAINT

</div>

ENVISAGE LAW

ENVISAGE LAW

184.     Using section 230, a federal statute, to nullify the California common carrier statute to facilitate private censorship of Mr. Berenson's speech violates the First Amendment.

185.     Requiring Twitter to carry Mr. Berenson's messages would not violate the company's First Amendment rights. Mr. Berenson did not violate Twitter's Terms or its rules. As a result, application of section 2168 to Twitter would not require the company to carry speech that violates its policies.

## COUNT IV
## VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Professions Code §§ 17200 et seq.

186.     Mr. Berenson re-alleges the preceding paragraphs herein.

187.     The California Unfair Competition Law (the "UCL") prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [California's False Advertising Law]." Cal. Bus. & Prof. Code § 17200.

188.     At a minimum, the following actions by Twitter against Mr. Berenson were unfair, deceptive, and untrue with respect to Mr. Berenson:

a.     The statement that Mr. Berenson committed "repeated violations" of Twitter's COVID-19 misinformation policies;

b.     Labeling Mr. Berenson's tweets regarding Chinese-made COVID-19 vaccines as misleading;

c.     Labeling Mr. Berenson's tweet regarding the Pfizer-BioNTech COVID-19 vaccine trial as false or misleading;

d.     Labeling Mr. Berenson tweet regarding an increase in COVID-19 deaths following a first vaccine dose as misleading; and

62

COMPLAINT

**ENVISAGE LAW**

e.      Labeling Mr. Berenson's tweet linking to an article about issues related to transplanting organs from deceased patients "with vaccine-induced thrombosis and thrombocytopenia" as misleading.

189.    Further, to the extent Twitter maintains that the COVID-19 misinformation rules are not to be objectively read and applied, and that the company can label content regardless of what its rules say, then such is also unfair, deceptive, and untrue.

190.    "An unlawful business practice under [UCL] section 17200 is 'an act or practice, committed pursuant to business activity, that is at the same time forbidden by law.'"  *Hale v. Sharp Healthcare*, 183 Cal. App. 4th 1373, 1383, 108 Cal. Rptr. 3d 669, 677 (2010) (citing *Progressive West Ins. Co. v. Superior Court*, 135 Cal. App. 4th 263, 287, 37 Cal. Rptr. 3d 434, 453 (2005)).  Provided the conduct at issue "is at the time forbidden by law," then "[v]irtually any law—federal, state or local—can serve as a predicate for an action under" the UCL.  *Id.*

191.    To have standing under the UCL, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 322, 246 P.3d 877, 885 (2011).

192.    At a minimum, Twitter's refusal to carry Mr. Berenson's messages constitutes a violation of the California common carrier law. Mr. Berenson has suffered a specific economic injury on account of Twitter's violation of that statute, including but not limited to an account of not being able to publish his reporting, promote his booklets and new book, and sell subscriptions to his Substack account.

63

COMPLAINT

193.    To the extent section 230 applies to the UCL, a federal statute "is the source of the power and authority by which any private rights are lost or sacrificed." *Hanson*, 351 U.S. at 232.

194.    Section 230 is then "the governmental action on which the Constitution operates, though it takes a private agreement," or in the case of social media companies, private actions, "to invoke the federal sanction." *Id.*

195.    Using section 230, a federal statute, to nullify the UCL to facilitate private censorship of Mr. Berenson's speech violates the First Amendment.

196.    Moreover, "immunity under [section 230] does not extend to anticompetitive conduct." *Enigma Software*, 946 F.3d at 1054. To the extent Twitter's censorship conferred a competitive advantage on itself and Mr. Berenson's journalistic competitors, the company cannot claim the benefit of section 230 immunity.

197.    Further, though section 230(e)(2), which provides that "[n]othing in this section shall be construed to limit or expand any law pertaining to intellectual property," has been read to apply only to limited federal intellectual property claims in the Ninth Circuit, *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007), the Third Circuit recently held that the provision "applies to state intellectual property law," *Hepp v. Facebook*, 14 F.4th 404, 212 (3d Cir. 2021). *Hepp* reflects the Supreme Court's commitment to textualism, *see Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1737 (2020) ("Only the written word is law, and all persons are entitled to its benefits."), and should be applied here to find Mr. Berenson's UCL outside the scope of section 230, because unfair competition is a subspecies of intellectual property law.

**COUNT V**
**BREACH OF CONTRACT**

198.    Mr. Berenson re-alleges the preceding paragraphs herein.

64

COMPLAINT

199.     The Terms and Twitter's rules, to include the COVID-19 medical information policy, constitute a binding contract between Twitter and Mr. Berenson.

200.     The contract between Twitter and Mr. Berenson is a contract of adhesion under California law.

201.     Since Twitter is the drafter of the terms of the contract between it and Mr. Berenson, the terms should be construed against the company.

202.     Twitter amended its Terms by promulgating its COVID-19 five-strike policy.

203.     Twitter's rules committed the company to a specific five-strike policy under which content must meet certain defined, objective criteria to be deemed violative. The company is bound to apply that policy objectively and rationally under California's duty of good faith and fair dealing which requires, among other things, "each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement." *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 818, 620 P.2d 141 (1979).

204.     As set forth above, the content Mr. Berenson published did not violate any of Twitter's rules, as defined.

205.     Twitter breached its contract with Mr. Berenson by permanently suspending his account on the basis that he violated the company's COVID-19 misinformation rules.

206.     Mr. Berenson incurred damages on account of Twitter's breach of the contract.

207.     Twitter's breach of contract was intentional and willful.

208.     Since Twitter is a common carrier and its actions against Mr. Berenson were at least willful, the liability waiver the company unilaterally included in its Terms is unenforceable since a "common carrier cannot be exonerated, by any agreement made in anticipation thereof,

65

COMPLAINT

from liability for the gross negligence, fraud, or willful wrong of himself or his servants." Cal. Civ. Code § 2175.

<div align="center">

**COUNT VI**
**PROMISSORY ESTOPPEL**

</div>

209.    Mr. Berenson re-alleges the preceding paragraphs herein.

210.    Twitter made unambiguous, personal promises and assurances to Mr. Berenson over the course of more than a year, including but not limited to the following:

a.    That Mr. Berenson was raising "nuanced points" about the COVID-19 pandemic and the response to the same;

b.    That Twitter was taking a "nuanced approach" to discussion around COVID-19;

c.    That Twitter was "trying to make sure that factual debate finds a way through the emotion";

d.    That Twitter was "trying to avoid appearing as though we're saying one treatment or solution [to COVID-19] is good or bad";

e.    That Twitter is "leading with labeling here, rather than simply deciding between leave up/take down";

f.    That Twitter did not "expect that you will see major change in how we are addressing things going forward";

g.    That the points Mr. Berenson was raising about COVID-19 vaccines in and around December 2020 "should not be an issue at all";

h.    That, as of March 2021, Mr. Berenson's "name has never come up in the discussions around these policies"; and

<div align="center">

66
COMPLAINT

</div>

ENVISAGE LAW

i.      That Twitter would "try to ensure you're given a heads up before an action is taken" against Mr. Berenson's account.

211.    These specific, personal promises amplified the general promises contained in the five-strike policy under which Twitter purported to permanently ban Mr. Berenson. California courts have held vaguer and more open-ended statements than those Twitter made to Mr. Berenson sufficiently definite to support a promissory estoppel claim. *See Garcia v. World Sav., FSB*, 183 Cal. App. 4th 1031, 1045–46, 107 Cal. Rptr. 3d 683, 696 (2010) (surveying cases where courts found various statements to be sufficiently definite, including a "promise to use 'best efforts to acquire land sufficient to support promissory estoppel" and "borrowers promise that 'if' he obtained earthquake insurance, lender would be loss payee").

212.    Further, Twitter had specific knowledge of Mr. Berenson's tweets, and did not object to them. Instead, the company enticed Mr. Berenson to continue using its service.

213.    Mr. Berenson relied on Twitter's promises and assurances by continuing to use the platform.

214.    Mr. Berenson's reliance was reasonable and foreseeable.

215.    Mr. Berenson was injured by his reliance by continuing to build his following on Twitter as opposed to investing time and attention on other available platforms such as Telegram and Substack.

**COUNT VII**
**VIOLATION OF CALIFORNIA CONSTITUTION**
**Free Speech Clause**
**Petition Clause**
**Cal. Const. art. I, §§ 2, 3**

216.    Mr. Berenson re-alleges the preceding paragraphs herein.

67

COMPLAINT

ENVISAGE LAW

217.   The California Supreme Court has interpreted "sections 2 and 3 of article I of the California Constitution protect speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned." *Robins v. Pruneyard Shopping Ctr.*, 23 Cal. 3d 899, 910, 592 P.2d 341, 347 (1979).

218.   Like the shopping center in *PruneYard*, Twitter is held open to the public. Further, unlike the shopping center in that case, Twitter's express purpose is to facilitate speech and communication about issues.

219.   The rule in *Pruneyard* has not yet been extended to social media companies, but the logic of the case warrants application to Twitter.

220.   Under *Pruneyard*, and if extended, Twitter's censorship of Mr. Berenson's speech violates the California State Constitution.

221.   To the extent section 230 applies to the California Constitution, a federal statute "is the source of the power and authority by which any private rights are lost or sacrificed." *Hanson*, 351 U.S. at 232.

222.   Section 230 is then "the governmental action on which the Constitution operates, though it takes a private agreement," or in the case of social media companies, private actions, "to invoke the federal sanction." *Id.*

223.   Using section 230, a federal statute, to nullify the California Constitution to facilitate private censorship of Mr. Berenson's speech violates the First Amendment.

**COUNT VIII**
**UNJUST ENRICHMENT**

224.   Mr. Berenson re-alleges the preceding paragraphs herein.

225.   Twitter claims that it banned Mr. Berenson for repeatedly violating the platform's medical misinformation rules.

68

COMPLAINT

226.   According to Twitter, for at least a certain time period, Mr. Berenson used Twitter in violation of the company's policies, and Twitter profited in the process.

227.   Any profits traceable to Mr. Berenson's reporting are a benefit conferred on Twitter that it should not have received.

228.   Mr. Berenson is entitled to restitution from Twitter.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Berenson respectfully prays that this Court:

A.   Enter an injunction requiring Twitter to comply with California's common carrier statute, the UCL, its contractual obligations, and the promises the company made to Mr. Berenson by requiring Twitter to carry Mr. Berenson's messages as it does other members of the public;

B.   Enjoin Twitter from violating Mr. Berenson's rights under the federal Lanham Act and the California and U.S. Constitutions;

C.   Award Mr. Berenson damages under the federal Lanham Act, the California common carrier law, and the UCL;

D.   Award Mr. Berenson damages for breach of contract;

E.   Award Mr. Berenson reliance damages for promissory estoppel;

F.   Disgorge Twitter of its ill-gotten gains attributable to Mr. Berenson's use of Twitter; and

G.   Award any other relief to Mr. Berenson which this Court deems necessary and proper.

69

COMPLAINT

Glenn Decl. Ex. 53
Page 69 of 70

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ENVISAGE LAW

**DEMAND FOR TRIAL BY JURY**

Mr. Berenson requests a jury trial on all issues so triable.

Respectfully submitted, this 20th day of December 2021.

ENVISAGE LAW

By:     _/s/ James R. Lawrence, III_
        James R. Lawrence, III*
        Anthony J. Biller*
        * *pro hac vice* pending

CHARIS LEX P.C.

By:     _/s/ Sean P. Gates_
        Sean P. Gates

*Attorneys for Plaintiff Alex Berenson*

70

COMPLAINT

# EXHIBIT 54

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/my-lawsuit-will-shine-a-light-on-twitter-censorship-soical-media-big-tech-facebook-speech-11652634888

OPINION | COMMENTARY

# My Lawsuit Will Shine a Light on Twitter Censorship

I got booted for dissent over the Covid vaccines—after Biden said critics were 'killing people.'

By Alex Berenson

May 15, 2022 3:47 pm ET



PHOTO: GREGORY BULL/ASSOCIATED PRESS

Do social-media companies collude with the federal government to suppress speech? On April 29, Judge William Alsup issued a ruling in a case I brought against Twitter that could become a watershed in holding social-media companies accountable for censorship.

This problem became acute at the outset of the Covid-19 pandemic. On Jan. 29, 2020, Twitter declared: "We're committed to playing our part to amplify authoritative, official content across the globe." Facebook essentially forbade discussion that the virus might have leaked from a Chinese lab. Today debate over the lab-leak theory is allowed, but free discussion of the side effects and efficacy of Covid vaccines isn't.

Censorship by these vastly powerful companies is antithetical to the advancement of science and basic democratic principles, both of which require open debate. But the companies and government have closely guarded the secrets of how they work together—including whether and how they target dissenters like me.

Glenn Decl. Ex. 54

Page 1 of 3

After March 2020, I became a prominent skeptic of the U.S. coronavirus response, arguing that neither "nonpharmaceutical" interventions like masks nor vaccine mandates were likely to change the course of the epidemic. Much of what I wrote, though controversial at the time, is now conventional wisdom. Twitter—open to the public, available globally, and a crucial platform for journalism—was my primary outlet.

Twitter officials knew what I was saying. A senior Twitter executive repeatedly told me in 2020 and 2021 that the company didn't believe I was violating its rules. But by July 2021, federal officials, including Anthony Fauci, had grown openly angry at me and others who raised questions about Covid vaccine efficacy and side effects. Their anger intensified after data from Israel and an Independence Day outbreak in Provincetown, Mass., showed that protection from mRNA shots was fading much faster than they had expected.

The White House began publicly pressuring social-media companies to censor vaccine skeptics. A spokeswoman said officials were "reviewing" whether companies could be held liable for "misinformation" posted by users despite Section 230 of the Communications Decency Act, which courts have interpreted to give the companies near-complete immunity for decisions they make to allow or censor content.

On July 16, President Biden said Facebook and other companies were "killing people" by allowing dissenting views about the mRNA vaccines. A few hours later, Twitter locked me out of my account for the first time. (Mr. Biden later said he meant *users* were killing people.)

On Aug. 28, the company permanently banned me for a tweet about mRNA Covid vaccines that began: "It doesn't stop infection. Or transmission." Today no one disputes the truth of that statement, but Twitter claimed the tweet was my "fifth strike" under its Covid "misinformation" policy.

In December I sued Twitter. Because of the protections that Section 230 gives social-media companies, most observers predicted the suit would be dismissed. But Judge Alsup held that I could proceed with my claim for breach of contract. Twitter's "actions plausibly qualify as a clear and unambiguous promise that Twitter would correctly apply its COVID-19 misinformation policy," he wrote.

The ruling includes a schedule for a first round of discovery. Along with allowing me to depose two Twitter executives under oath, he ordered that by June 20 Twitter must produce all documents in its possession about me, "including but not limited to nonparty

complaints or inquiries about plaintiff and/or including possible or actual termination of his account or a strike against his account or a labeling of any of his posts." That order clearly includes Twitter's communications with the government, allowing me to understand how and why the company broke its own policies and promises to me.

Media outlets—which have largely shrugged at or encouraged social-media censorship of views they dislike—largely ignored Judge Alsup's ruling. That doesn't diminish its significance. It offers the potential to shine a light on the so-far hidden connections among Twitter, federal agencies and the White House as they tried to suppress dissent about Covid and the vaccines.

If Twitter tries to win a protective order to keep me from making what documents it provides public, my lawyers and I intend to fight it. As Americans debate the proper scope of Section 230 and the power of these companies, we deserve to know as much as possible about the way they have worked with politicians to mold public opinion.

*Mr. Berenson writes the Unreported Truths blog on Substack and is author of "Pandemia: How Coronavirus Hysteria Took Over Our Government, Rights and Lives."*

*Appeared in the May 16, 2022, print edition.*

Copyright © 2022 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

# EXHIBIT 55



← **Tweet**

**Senator Mazie Hirono** ✓
@maziehirono

···

Sec 230 was supposed to incentivize internet platforms to police harmful content posted by users.

Instead, the law acts as a shield allowing them to turn a blind eye. The SAFE TECH Act brings Sec 230 into the modern age and makes platforms accountable for the harms they cause.



2:37 PM · Feb 5, 2021 · Twitter Web App

**36** Retweets    **1** Quote Tweet    **123** Likes

# EXHIBIT 56

VOTE WATCH

# Big Tech met with govt to discuss how to handle election results

Election results this year are expected to come in later than in previous elections in part because the pandemic has led to a surge in interest in voting by mail.



— A polling place in an elementary school in Herndon, Va., on March 3.

Samuel Corum / Getty Images file

 | SAVE

Aug. 12, 2020, 4:34 PM CDT

**By David Ingram and Kevin Collier**

Nine major U.S. tech companies met with federal government officials Wednesday to discuss how to handle misinformation during this month's political conventions and election results this fall.

"We held the latest in a series of meetings with government partners today where we each provided updates on what we're seeing on our respective platforms and what we expect to see in the coming months," companies including Google, Facebook, Twitter and Reddit said in a joint statement after the meeting.

"Specifically, we discussed preparations for the upcoming conventions and scenario planning related to election results," they said.

The companies did not elaborate on what scenarios they discussed and whether they reached any decisions.

But the discussion, one in a series of monthly meetings between the government and tech companies, lasted less than two hours and included both presentations by the companies and back-and-forth conversation on a variety of topics, according to two sources familiar with the meeting who were not authorized to speak publicly.

Delayed election results raise concerns about mail-in voting



Election results this year are expected to come in later than in previous elections in part because the pandemic has led to a surge in interest in voting by mail. That means the focus on discussion of results could go on for days after in-person voting ends Nov. 3.

President Donald Trump has declined to say whether he will accept the results of the election, and the potentially long count has added to worries about whether he will use the delay to sow doubts.

Company representatives declined to comment further. The statement also included Microsoft, Verizon Media, Pinterest, LinkedIn and the Wikimedia Foundation, which operates Wikipedia and other sites.

Absent from the meeting was the popular social media upstart TikTok, which Trump has threatened to ban and was recently the subject of an executive order because he says its Chinese ownership makes it a security threat. The company has previously said it plans to fight election misinformation on its platform.

### Recommended



TECH NEWS

**FTC Chair Khan plans key work on kids' data privacy online**



ABORTION RIGHTS

**Abortion clinics are ditching emails, texts in favor of encrypted apps as Roe's expected end looms**

The meetings are designed to fill a gap in information-sharing after tech companies such as Facebook said they were taken off guard by security threats and the lack of information coming from federal officials in 2016. Regular meetings started in 2018, and the companies say they're necessary to protect the integrity of this year's election.

The traditional news media has long been scrutinized for how and when it reports election results because those decisions can have wide implications for how Americans and the world interpret an election.

But now there's similar interest in the influence of social media and online platforms, especially after alleged Russian government agents quietly manipulated internet services during the 2016 presidential campaign.

Democrats are due to hold their convention next week and Republicans the week after, almost all virtually because of the coronavirus pandemic.

Some tech companies have already said they're thinking about how to handle a drawn out election. Facebook CEO Mark Zuckerberg told The New York Times this month that his company was considering new rules regarding premature claims of victory or other statements about the results.

According to the industry statement, participants in Wednesday's meeting also included representatives from the FBI's foreign influence task force, the Justice Department's national security division, the Office of the Director of National Intelligence and the Cybersecurity and Infrastructure Security Agency.

The companies said they would continue to meet regularly before the November election.

---

David Ingram

🐦  ✉

David Ingram covers tech for NBC News.

---

Kevin Collier

Kevin Collier is a reporter covering cybersecurity, privacy and technology policy for NBC News.

---

Ken Dilanian contributed.

## Sponsored Stories

by Taboola

AIKIN ANALYTICS

love your money in 2022," Wall street legend warns

ST TECH TREND

frigerate Any Room In 2 Minutes

TALROOFNATION.COM

**e Actual Cost Of Metal Roof May Surprise You**

LF & SHEPHERD

**onk's Favorite "Dressy" Shoes Feel Like Walking On Clouds**

---

---

SPONSORED / CHAIKIN ANALYTICS

# "Move your money in 2022," Wall street legend warns

SPONSORED / BEST TECH TREND

# Refrigerate Any Room In 2 Minutes
Don't waste your money on other AC Units. This Ultra Portable AC is Only $89

SPONSORED / METALROOFNATION.COM

**The Actual Cost Of Metal Roof May Surprise You**
See why over 100,000+ Americans have chosen these stone-coated metal roofs

SPONSORED / WOLF & SHEPHERD

**Gronk's Favorite "Dressy" Shoes Feel Like Walking On Clouds**
Guys, Say Hello to Your New Favorite Casual Dress Shoe—Perfect for the Office

SPONSORED / FAMILY SUVS

**2022's Top Family SUVs. 3 Rows Of Seating, Tons Of Tech & More**

SPONSORED / SELECT JUSTICE

**Diagnosed with Non-Hodgkin's Lymphoma or CLL after Spraying Roundup®?**
Families affected may be entitled to compensation.

SPONSORED / INVESTING OUTLOOK

## Top analyst warns: The "'Superbubble" is popping

SPONSORED / LEAFFILTER PARTNER

## Roofers Tested 17 Gutter Guards... Here's What They Discovered

SPONSORED / DEEJO

### This Only Looks Like A Regular Pocketknife - A Deejo Is Anything But That

SPONSORED / TRY GREEN SALT

### Meet the Stevia of Salt
Green Salt is a low-sodium salt substitute that's better for your heart health. Made from 100% dehydrated Sea Asparagus.

SPONSORED / IQ REPORT

### Jefferson City, Missouri: Are You Aware Of This?

SPONSORED / THEPENNYHOARDER.COM

### When Money Is Tight, These 7 Resources Will Help Nearly Everyone

SPONSORED / NEW CROSSOVER SUVS | SEARCH ADS

## Best Upcoming Electric SUV for 2022
Check out the new and best upcoming electric and hybrid crossover SUVs for 2022.

SPONSORED / ALL THINGS AUTO | SEARCH ADS

## Most Affordable Camper Vans

ABOUT

CONTACT

HELP

CAREERS

AD CHOICES

PRIVACY POLICY

DO NOT SELL MY PERSONAL INFORMATION

CA NOTICE

TERMS OF SERVICE

NBC NEWS SITEMAP

ADVERTISE

© 2022 NBC UNIVERSAL

NEWS                    MSNBC                    TODAY

# EXHIBIT 57


Springer Link

Search 🔍          🛒   Log in

Download PDF

Originalien | Open Access | Published: 22 February 2021

# Coronakinderstudien „Co-Ki": erste Ergebnisse eines deutschlandweiten Registers zur Mund-Nasen-Bedeckung (Maske) bei Kindern

Corona child studies "Co-Ki": first results of a Germany-wide register on mouth and nose covering (mask) in children

Silke Schwarz, Ekkehart Jenetzky, Hanno Krafft M.Sc., Tobias Maurer & David Martin ✉

*Monatsschrift Kinderheilkunde* **169**, 353–365 (2021)

**31k** Accesses | **6** Citations | **415** Altmetric | Metrics

ℹ  A Leserforum to this article was published on 07 September 2021

## Zusammenfassung

### Hintergrund

Bei Kindern- und Jugendlichen häufen sich Narrative über Beschwerden durch das Tragen eines Mund-Nasen-Schutzes (Maske). Weltweit existiert bisher kein Register für mögliche Nebenwirkungen von Masken.

Methode

Im Rahmen des www.Co-Ki.de Multi-Studienkomplexes wurde ein Online-Register aufgebaut, im dem Eltern, Ärzt*innen, Pädagog*innen und andere ihre Beobachtungen zu den Auswirkungen des Tragens einer Maske bei Kindern und Jugendlichen eintragen können. Am 20.10.2020 wurden 363 Ärzt*innen eingeladen, Eintragungen zu tätigen und auf das Register hinzuweisen.

Ergebnisse

Bis zum 26.10.2020 hatten 20.353 Personen an der Umfrage teilgenommen. Allein die Gruppe der Eltern gab Daten zu 25.930 Kindern ein. Die angegebene durchschnittliche Tragedauer der Maske lag bei 270 min am Tag. Die Eingebenden berichten zu 68 %, dass Kinder über Beeinträchtigungen durch das Maskentragen klagen. Zu den Nebenwirkungen zählten Gereiztheit (60 %), Kopfschmerzen (53 %), Konzentrationsschwierigkeiten (50 %), weniger Fröhlichkeit (49 %), Schul-/Kindergartenunlust (44 %), Unwohlsein (42 %), Beeinträchtigungen beim Lernen (38 %) und Benommenheit/Müdigkeit (37 %).

Diskussion

Dieses weltweit erste Register zur Erfassung von Auswirkungen des Tragens eines Mund-Nasen-Schutzes bei Kindern und Jugendlichen widmet sich einer neuen Forschungsfrage. Eine Verzerrung im

Hinblick auf die präferenzielle Dokumentation besonders schwer betroffener Kinder oder den Schutzmaßnahmen grundsätzlich kritisch gegenüberstehenden Personen lässt sich nicht ausschließen. Die Nutzungshäufigkeit und das Symptomspektrum weisen auf die Wichtigkeit des Themas hin und rufen nach repräsentativen Surveys, randomisierten kontrollierten Studien mit verschiedenen Maskensorten und nach einer Nutzen-Risiko-Abwägung der Maskenpflicht bei der vulnerablen Gruppe der Kinder.

## Abstract

### Background

Narratives about complaints in children and adolescents caused by wearing a mask are accumulating. There is, to date, no registry for side effects of masks.

### Methods

In the context of the www.co-ki.de multi-study complex, an online registry has been set up where parents, doctors, pedagogues and others can enter their observations. On 20 October 2020, 363 doctors were asked to make entries and to make parents and teachers aware of the registry.

### Results

By 26 October 2020, a total of 20,353 people had taken part in the survey. The group of parents alone

entered data on a total of 25,930 children. The average reported wearing time of masks was 270 min per day. Of the respondents 68% reported that children complained about impairments caused by wearing the mask. Side effects included irritability (60%), headache (53%), difficulty concentrating (50%), less happiness (49%), reluctance to go to school/kindergarten (44%), malaise (42%) impaired learning (38%) and drowsiness/fatigue (37%).

Discussion

This world's first registry for recording the effects of wearing masks in children is dedicated to a new research question. A bias with respect to the preferential documentation of particularly severely affected children or persons who are fundamentally critical of protective measures cannot be ruled out.

The frequency of use and the spectrum of symptoms registered indicate the importance of the topic and call for representative surveys, randomized controlled trials with various masks and a renewed risk-benefit assessment of mask obligation in the vulnerable group of children.

## Hintergrund und Fragestellung

Die 2020 in Deutschland zur Eindämmung der COVID-19-Pandemie empfohlene Kombination von Vorsorgemaßnahmen, kurz AHA-L(Abstand/Hygiene/Alltagsmaske/Lüften)-Regel,

Glenn Decl. Ex. 57

trägt einen wesentlichen Beitrag zur Eindämmung des Infektionsgeschehens bei. Eltern, Pädagog*innen und Ärzt*innen berichten bei Kindern zunehmend von Problemen und gesundheitlichen Beschwerden, die im Zusammenhang mit dem Tragen eines Mund-Nasen-Schutzes – im Folgenden „Maske" genannt – gesehen werden. Die Frage nach einem Attest zur Befreiung von der Maskenpflicht ist ein neues Phänomen in der pädiatrischen Praxis. Zum Einsatz bei Kindern und Jugendlichen gibt es zu Masken, welche im beruflichen Einsatzgebieten als Medizinprodukt zum Arbeitsschutz zertifiziert sind, keine herstellerunabhängigen Studien. Zudem existieren zu den, vermutlich von der Mehrheit der Kinder getragenen, „Alltagsmasken" aufgrund der verwendeten unbekannten Materialien, keinerlei Erkenntnisse zu Nebenwirkungen bei längerer Nutzung. In Anbetracht der anhaltenden Maßnahmen zur Eindämmung der COVID-19-Pandemie und insbesondere der weitreichenden Verpflichtung des Tragens von Masken bei Kindern und Jugendlichen im Schulunterricht über längere Zeit, besteht daher dringender Forschungsbedarf.

## Studiendesign und Untersuchungsmethoden

In Anlehnung an das Register der Nebenwirkungen von Arzneimitteln am Paul-Ehrlich-Institut (www.nebenwirkungen.pei.de) wurde ein Online-Register aufgebaut, im dem Eltern, Ärzt*innen,

Pädagog*innen und andere Personen ihre
Beobachtungen zu den Auswirkungen des Tragens
einer Maske bei Kindern und Jugendlichen eintragen
können. Am 20.10.2020 wurden die 363 Ärzt*innen
des Co-Ki-Studienverteilers über die Möglichkeit
informiert, dort selbst Eintragungen zu tätigen und
darauf hinzuweisen. Das Register sowie der
Fragebogen sind online auf der Webseite www.co-ki-
masken.de zu finden, als Teil des Co-Ki-
Studienkomplexes (Abb. 1).

**Abb. 1**



Schematische Darstellung der Module im Co-Ki-
Studienkomplex. *Module 1, 2 und 4 sind auf* www.co-
ki.de *zu finden; Modul 3 auf* www.co-ki.masken.de;
*Module 5 beinhaltet repräsentative Untersuchungen in
Schulen und ist in Entwicklung*

Die ins Register eingetragenen Daten umfassen
Informationen bezüglich der Rolle des Eingebenden,
demografische Daten, Vorerkrankungen, Situation

und Dauer des Maskentragens, Art der Maske, Vorhandensein von Klagen des Kindes zu einer Beeinträchtigung über die Maske, Symptomatik, Verhaltensauffälligkeiten, die persönliche Haltung zu den Coronaschutzmaßnahmen der Regierung der Eintragenden und die Möglichkeit, Namen und Mailadresse zu hinterlassen. Ein Ethikvotum der Universität Witten/Herdecke liegt vor.

Ziel dieser ersten Erhebung ist es, subjektive Beschwerden niederschwellig absolut zu quantifizieren und inhaltlich zu klassifizieren. Dies geschieht durch den Bericht von absoluten und relativen Häufigkeiten. Die Verteilung von Geschlecht, Bundesland oder Alter mit bekannten Erwartungswerten gibt erste Hinweise auf die quotierte Repräsentativität des Antwortverhaltens. Mithilfe von explorativen $p$-Werten durch den Chi²-Test werden die Häufigkeiten in den 3 gewählten Altersgruppen verglichen. Bei der Tragezeit in Minuten kam der Kruskal-Wallis H-Test zur Anwendung. Eingeschlossen wurden die Antworten aller teilnehmenden Personen. Ausgeschlossen wurden unvollständige Antworten sowie offensichtliche Falscheingaben. In dieser ersten Analyse werden nur die Antworten aus der größten Gruppe der „Eltern" betrachtet.

## Ergebnisse

Am Abend des 26.10.2020 hatten bereits 20.353 Personen an der Umfrage teilgenommen. Von den Umfrageteilnehmern waren 17.854 (87,7 %) Eltern, 736 (3,6 %) Lehrer*innen, 352 (1,7 %) Ärzt*innen und 1411 (6,9 %) „andere". Zur Auswertung der insgesamt 48.657 Einträge kamen die bereinigten, vollständigen 20.353 Datensätze (41,8 %) von teilnehmenden Eltern, Ärzt*innen und Lehrer*innen. (Den Analysesatz der Einträge der ersten Woche zeigt Abb. 2.) Von den 17.854 eingebenden Eltern (87,7 %) mit insgesamt 25.930 Kindern und Jugendlichen berichtet dieser Artikel. Die Daten der eingebenden Ärzt*innen, Lehrer*innen und anderer Rollen werden separat veröffentlicht.



**Abb. 2**

Analysesatz der Einträge der ersten Woche (20.10.– 26.10.2020) im deutschen Nebenwirkungsregister von

Gesichts- und Mundabdeckungen bei Kindern: www.co-ki-masken.de

Von den 17.854 eintragenden Eltern gaben 6877 (38,5 %) an, einen (Fach-)Hochschulabschluss (Bachelor, Master, Magister, Diplom, Staatsexamen, Promotion) zu haben, 671 (3,8 %) haben einen Meister, 3704 (20,7 %) eine abgeschlossene Lehre und 3040 (17,0 %) Abitur (allgemeine Hochschulreife) bzw. fachgebundene Hochschulreife oder Fachhochschulreife. 2509 (14,1 %) der Teilnehmenden gaben als höchsten Bildungsabschluss einen Realschulabschluss (mittlere Reife, Fachoberschulreife o. Ä.) an, 327 Teilnehmer (1,8 %) haben einen Hauptschulabschluss, 31 Teilnehmer (0,2 %) gaben an, keinen Schul- oder Ausbildungsabschluss zu haben. Der Rest machte keine Eingabe zur Bildung. Die Beteiligung der Eingebenden pro Bundesland entspricht in etwa der Verteilung der Bevölkerung (Abb. 3).

**Abb. 3**



Verteilung der Teilnehmer nach Bundesländern. *Erste Zeile*: Name des Bundeslandes, *zweite Zeile*: Eltern im Register als absolute und relative Häufigkeit (Stand 26.10.2020). *Dritte Zeile*: Bevölkerung in Deutschland im Vergleich als absolute und relative Häufigkeit. Die Verteilung der Eingebenden entspricht in etwa dem jeweiligen Anteil der Bevölkerung

Die demografische Situation der Kinder und Vorerkrankungen bei den Kindern aus Elternsicht sind in Tab. 1 dargestellt. Von den 25.930 durch Eltern eingegebenen Kindern sind 12.248 (47,2 %)

Mädchen und 12.589 (48,5 %) Jungen, bei 62 (0,2 %)
wurde als Geschlecht „divers" angegeben, bei 1031
(4 %) erfolgte keine Angabe. 55,6 % der Kinder waren
im Alter zwischen 7 und 12 Jahren. Bei 79,4 % der
Kinder wurde angegeben, dass sie keinerlei
Vorerkrankungen hatten, 5,9 % hatten Asthma und
1,8 % eine andere Lungenerkrankung, des Weiteren
gab es die Möglichkeit von Freitexteingaben zu
weiteren Vorerkrankungen, die von 8,6 % genutzt
wurde.

**Tab. 1 Demografie und Vorerkrankungen der Kinder ($n$ = 25.926)**

Die Tragesituation von Masken bei den Kindern und
ob irgendeine Form von Beeinträchtigung aus
Elternsicht überhaupt vorhanden war, zeigt Tab. 2.
So gaben beispielsweise 26 % der Eltern an, bei den
Kindern keinerlei Beeinträchtigung wahrzunehmen.
Auf die Frage nach den Situationen, in denen die
Kinder eine Maske tragen, antworteten 81,1 % der
Umfrageteilnehmer, dass das Kind die Maske in der
Schule außerhalb der Klasse trägt, also in Pausen und
auf den Fluren, 48,6 % gaben zudem an, dass das
Kind die Maske auch in der Klasse am Sitzplatz
während des Unterrichtes trägt. 68,5 % der erfassten
Kinder tragen die Maske in Geschäften und 39 % auf
dem Schulweg; 4,6 % der Kinder tragen nie eine
Maske. Einige ältere Kinder tragen eine Maske bei

Abholung der Geschwister im Kindergarten. Eine Maskenbefreiung (Attest) hatten 6,7 % der in der Umfrage erfassten Kinder. Die durchschnittliche Tragedauer der Maske variiert altersbezogen stark; sie lag im Mittel bei 4,5 Std. am Tag, gerade bei den älteren Kindern (13 bis 17 Jahre) mit durchschnittlich 6 Std. wesentlich höher (Tab. 2). Bei 16.913 Kinder (65,2 %) wurde angegeben, dass Stoffmasken getragen werden, gefolgt von OP-Masken.

---

**Tab. 2 Tragesituation der Maske und Beeinträchtigung ($n$ = 25.926)**

---

FPP-Masken werden hingegen kaum von Kindern getragen. Auf die Frage, ob Kinder selbst über Beeinträchtigungen durch das Tragen der Maske klagen, antworteten 67,7 % der Eingebenden für ihre Kindern mit Ja; 26 % mit Nein. Die Frage, ob die Eingebenden selber eine Beeinträchtigung des Kindes durch das Tragen der Maske beobachteten, wurde in 66,1 % mit Ja beantwortet (Tab. 2). Die Einschätzung der gesundheitlichen Beeinträchtigung zeigt Tab. 3. Nach der persönlichen Einstellung zu den Coronaschutzmaßnahmen der Regierung gefragt, hatten 4 % keine Meinung. Es gaben 11,7 % der Teilnehmer an, dass die Maßnahmen strenger sein sollten, für 11,0 % fanden die gegenwärtigen Maßnahmen angemessen und gut, und 41,7 % waren für mildere Maßnahmen. Weitere 31,6 % äußerten

Glenn Decl. Ex. 57

eine andere Meinung als die in der Auswahl angegebene Einstellungsoption. In der Regel beschrieben diese Teilnehmer die Maßnahmen der Politik als unangemessen, nichtnachvollziehbar und undifferenziert.

> **Tab. 3 Symptome bei Kindern im Elternbericht ($n = 25.926$)**

Die Häufigkeitsverteilung der mit Masken assoziierten genannten Nebenwirkungen ist bei den verschiedenen Altersgruppen ähnlich, allen voran Kopfschmerzen, Konzentrationsschwierigkeiten, Unwohlsein, Beeinträchtigung beim Lernen und Benommenheit/Müdigkeit (Tab. 3). Weitere Beschwerden wurden im Freitext beschrieben. Allen voran: 269 Einträge zu verschlechterter Haut, v. a. vermehrte Pickel, Ausschläge und allergische Erscheinungen um den Mundbereich bis hin zu Pilzerkrankungen in und um den Mund. Es gab 151 Einträge zu Nasenbluten, 122 Einträge zu Schulunlust bis hin zu Schulangst/Schulverweigerung, 64 Einträge zu vermehrtem Schwitzen, 52 Eingaben zu Druckstellen und Wunden hinter den Ohren, 46 Eingaben zu wunden oder rissigen und z. T. blutigen Lippen, 31 Einträge zu gesteigerten Migräneanfällen in Frequenz und Ausprägungsgrad, 23 Einträge zu Beeinträchtigungen des Sehens, 13 Einträge zu

Aphthen. Die Einstufung einer etwaigen gesundheitlichen Beeinträchtigung der Kinder, wie sie von den Eltern eingeschätzt wurde, zeigt Tab. 3. Weitere Verhaltensauffälligkeiten bei den Kindern, zeigt Tab. 4, allen voran mit 60,4 % eine erhöhte Gereiztheit, 49,3 % weniger fröhliche Kinder, 44 % Kinder, die nicht mehr zur Schule gehen möchten, jeweils sind v. a. Kinder der Alterskategorie 7 bis 12 Jahre betroffen. Bei 25,3 % der Kinder wurde angegeben, dass sie neue Ängste entwickelt haben (Tab. 4). Zudem erwähnen allein 2672 Einträge bei dieser Frage in der Freitexteingabe explizite Spezifizierungen der Angst oder das Neuauftreten mehrerer Ängste. Neben einer allgemeinen Zukunftsangst sind die Ängste, selbst mit Maske zu ersticken sowie vor dem Tod von Angehörigen durch Corona, am häufigsten vertreten. Hinzu kommt die Angst vor Stigmatisierung sowohl durch das Tragen als auch durch das Nichttragen einer Maske im sozialen Umfeld. Viele Eltern berichten auch von Albträumen und Angststörungen, welche sich auf maskierte Menschen beziehen, deren Mimik und Identität für die Kinder nicht erkennbar ist. Eine detaillierte Auswertung und Publikation der Freitexteingaben ist geplant.

**Tab. 4 Weiteres Verhalten der Kinder, verändert durch das Tragen der Maske, aus Elternsicht ($n$ = 25.926)**

Die optionale Möglichkeit, Namen und E-Mail-Adresse für evtl. Rückfragen zu hinterlassen, wurde von 27,1 % (5513) der Teilnehmenden genutzt. Bei der durchgeführten Validierung mit dem Programm „Bouncer" erwiesen sich 4710 (85,4 %) der E-Mail-Adressen als erreichbar. Für alle Symptome korrelierte das Vorhandensein von Symptomen mit der Einstellung der Eltern zu den Maßnahmen ($p < 0{,}001$). Im Folgenden sei ein Beispiel genannt: von den Eltern, die über Kopfschmerzen bei ihren Kindern berichteten, fanden 97, dass die Maßnahmen strenger sein sollten, 7403, dass die Maßnahme milder sein sollten, und 245, dass die Maßnahmen angemessen und gut seien. In Einzelfällen wurden die Teilnehmer auch per E-Mail kontaktiert, um einzelne Einträge zu validieren.

## Diskussion

Die Brisanz des Themas und das Mitteilungsbedürfnis der Befragten werden durch die „virale" Nutzung des Registers innerhalb weniger Tage nach Veröffentlichung und durch die, 25.930 Kinder in Deutschland (ca. 2 ‰ der Bevölkerung) betreffenden, Einträge durch Eltern deutlich. Die Tatsache, dass 23,1 % der teilnehmenden Eltern die optionale Möglichkeit, Namen und valide E-Mail-Adressen für evtl. Rückfragen zu hinterlassen nutzten, ebenso wie die gleichmäßige Verteilung in den Bundesländern, zeugen von der Ernsthaftigkeit

der Einträge. Gemäß dem Lagebericht des Robert Koch-Institutes (RKI) vom 25.10.2020 gab es in Deutschland insgesamt 429.181 gemeldete Infektionen, mit steigender Tendenz, von denen 8764 (3,6 % der Gemeldeten) unter 10 Jahre alt und 16.548 (6,7 % der Gemeldeten) zwischen 10 und 19 Jahre alt waren [1]. Das sind weniger als die innerhalb einer Woche in diesem Register gemeldeten Kinder. Ob Kinder eine grundsätzlich geringere Neigung als Erwachsene haben, sich mit SARS-CoV-2 zu infizieren und diese Infektion auf Erwachsene so zu übertragen, dass Letztere davon schwer krank werden, ist nach wie vor unklar [2,3,4,5]. Es zeigt sich jedoch, dass infizierte Kinder, v. a. bis zum 10. Lebensjahr, mehrheitlich keine oder nur milde Symptome entwickeln [6,7,8,9]. Selten kommt es bei Kindern bis zum 10. Lebensjahr zu schweren Verläufen. Die bisher, Stand 25.10.2020, einzigen 3 an COVID-19 verstorbenen (bis heute vom RKI nicht genau beschriebenen) Kinder bzw. Jugendlichen hatten chronische Vorerkrankungen [10, 11]. Kinder unter 10 Jahren scheinen in Europa selten Treiber in diesem Infektionsgeschehen zu sein, wobei Daten aus Indien, ein Land mit anderem Hygiene-Hintergrund, durchaus eine gewisse Übertragungsrolle auch Kindern zuschreiben (allerdings ohne Differenzierung zwischen 5-Jährigen und 17-Jährigen) [12]. Eine schottische Studie an 300.000 Haushalten stellte fest: Je kinderreicher der Haushalt, desto geringer die Wahrscheinlichkeit für

eine Hospitalisierung mit COVID-19 bei den Erwachsenen [13]. Eine kürzlich veröffentlichte Studie deutet darauf hin, dass Kinder weniger Aerosol beim Singen und Sprechen emittieren als Erwachsene [14].

Dass das Tragen von Masken bei Erwachsenen grundsätzlich eine sichere, wirksame und kosteneffektive Maßnahme sein kann, um die COVID-19-Pandemie zu verlangsamen, ist unstrittig [15,16,17]. Anhand der vorliegenden Erhebungen kann jedoch davon ausgegangen werden, dass die Maskenpflicht Auswirkungen auf die Lebensqualität und mutmaßlich auch die Gesundheit einzelner Kinder hat und dies von der Politik und Gesellschaft nicht vernachlässigt werden darf. Während viele Kinder die Maske relativ problemlos vertragen, gibt es klar Kinder, denen eine Maske nicht guten Gewissens zugemutet werden kann, gerade auch bei zusätzlich fraglicher Notwendigkeit des Mund-Nasen-Schutzes bei kleineren Kindern. Ein unsachgemäßer Umgang mit Masken, von dem man bei Kindern tendenziell ausgehen kann, erhöht möglicherweise das Risiko einer Erregerverbreitung und -übertragung durch die gesteigerte Tendenz, sich selbst ins Gesicht zu fassen [18]. Eltern, Lehrer*innen und Ärzt*innen berichten von Stigmatisierung, Ausgrenzung und aggressivem Verhalten gegenüber Kindern, die aus psychischen oder medizinischen Gründen keine Maske tragen.

Betrachtet man das Symptomspektrum der Beschwerden, so lässt sich bei 66,1 % der Eingaben eine deutliche und breit gefächerte Beschwerdelast, sowohl im körperlichen (Ausschläge, Kopfschmerzen etc.), wie auch im seelischen (Ängste, Gereiztheit etc.) und im geistigen (Konzentrationsstörung) Bereich bei den Kindern konstatieren. Neben akuten Gesundheitseinschränkungen mit, im Einzelfall als erheblich erlebter, Beeinträchtigung der Gesundheit sind die langfristigen Auswirkungen für die verschiedenen, über das Wohlbefinden hinausgehenden Entwicklungsbereiche, wie beispielsweise Sprache, Spiel, Lernen, Kommunikation, sensomotorische Entwicklung und Empathie von Kindern, schwer abschätzbar. Die häufig genannten Kopfschmerzen und Konzentrationsschwierigkeiten sollten ernsthaft in ihrer Bedeutung für die kognitive Entwicklung erforscht werden. Auffällig ist, dass die Verteilung der Beschwerden gut zu den Lebensaltern passt (Tab. 3 und 4), was die Plausibilität der elterlichen Eingaben unterstützt.

Direkte Auswirkungen der $CO_2$-Konzentration in Innenräumen auf die kognitiven Funktionen sind nachgewiesen worden [19, 20]. Dies ist nicht direkt auf die Atemluft unter den Masken übertragbar, doch könnte es unter verschiedenen Maskentypen zu erhöhter $CO_2$-Konzentration kommen. Dies gilt womöglich besonders für Stoffmasken, die

materialbedingt manchmal eine stärkere Stoffdicke aufweisen und die bei den Kindern im Register mit 65,2 % besonders häufig benutzt wurden. Auch wenn der Maskentyp des Kindes aktuell von den Familien noch im Hinblick auf die Stoffdicke frei gewählt werden kann und somit ein Spielraum zwischen gut atemgängigen und mehrlagigen, eher luftdichten Modellen besteht, bleibt die Problematik bestehen, dass Eltern, ganz unabhängig davon, ob sie selbst die Coronaschutzmaßnahmen befürworten oder nicht, ihre Kinder durch Unwissenheit oder Angst vor Infektion, durch mehrlagige Mundschutze überfordern können. Eine Nutzen-Risiko-Analyse ist also angebracht. Diese ist jedoch dadurch erschwert, dass die Studienlage sowohl hinsichtlich des Nutzens als auch hinsichtlich der Risiken bei Kindern extrem schwach ist. Sowohl die Berechnungen zu einem Nutzen von Masken als auch fast alle Untersuchungen zu den Risiken der Masken beruhen auf Erwachsenen. Es muss auch davon ausgegangen werden, dass die SARS-CoV-2-Schutzstandards für Schulen, wie beispielsweise die der deutschen gesetzlichen Unfallversicherung, nicht überall bekannt sind [21]. Sie beinhalten insbesondere die Empfehlungen zu Erholungszeiten beim Tragen von Masken für Schülerinnen und Schüler mit Kurzpausen und spätestens nach 3 h Tragezeit einer anschließenden Erholungszeit von 15–30 min [21].

Glenn Decl. Ex. 57
Page 19 of 33

Limitierung der Ergebnisse: Auch wenn die rasante Entwicklung des Registers und die hohe Teilnehmerzahl binnen weniger Tage beeindruckend sind, weist diese erste Auswertung des Co-Ki-Masken Registers Limitationen auf. Die Tatsache, dass 38,5 % der Teilnehmenden einen Hochschulabschluss angaben, könnte ein Hinweis sein, dass das Register als Online-Variante und durch die Komplexität nicht allen Personengruppen gleich zugänglich war. Diese Probleme haben alle Online-Register. Ein verzerrtes Berichten auch im Hinblick auf die präferenzielle Dokumentation besonders schwer betroffener Kinder ist nicht auszuschließen. Des Weiteren gelangte der Link zum Register u. a. auch in Social-Media-Foren, welche die Coronaschutzmaßnahmen der Regierung grundsätzlich kritisieren, was sich teilweise in den Ergebnissen zur Abfrage der Einstellung zu den Coronaschutzmaßnahmen der Regierung spiegelt. Zugleich wurde wiederum von anderen Teilnehmern gemeldet, dass ihre Kinder *keine* Beschwerden hatten. Des Weiteren gibt es keine Kontrollgruppe. Die Angaben betreffen Verdachtsfälle von Nebenwirkungen, also medizinische Ereignisse, die im Rahmen der Anwendung von Masken bei Kindern durch die Eltern beobachtet wurden, aber nicht notwendigerweise mit der Maske im Zusammenhang stehen oder von ihr verursacht werden. Sowohl die Geschlechterverteilung als auch die Verteilung der Teilnehmenden nach Bundesländern wie auch die Verteilung der Symptome nach Alter sprechen für

eine Repräsentanz der Nutzer. Die Datensätze zeugen in den Freitexteinträgen mit wenigen Ausnahmen von einer sehr differenzierten Betrachtungsweise und ergeben im Ganzen ein ausgewogenes Gesamtbild mit plausiblem Symptomspektrum und einer gut nachvollziehbaren Beschreibung der Beeinträchtigungen, die bei Kindern im Zusammenhang mit der Maske beobachtet werden. Die Beantwortung von Hunderten eingehender E-Mails durch die Studieninitiatoren mit Fragenbeantwortung zur Existenz des Registers, Spezifizierung und Ergänzung der von Teilnehmenden getätigten Eingaben, ausführlichen Fallschilderungen und Anregungen für weitere Forschung, sind ein weiteres Indiz für die hohe Relevanz des Themas und für die Redlichkeit, mit der viele Teilnehmer sich der Fragestellung widmen. Naturgemäß kann ein offen zugängliches Register niemals alle Eingaben ärztlich gegenvalidieren. Die Registereinträge steigen täglich im mehrstelligen Bereich, und zusätzliche Validitätsprüfungen finden statt, um in absehbarer Zeit weitere belastbarere Daten zur gesundheitlichen Situation von Kindern in Deutschland im Hinblick auf das Tragen eines Mund-Nasen-Schutzes vorlegen zu können. Der Registerfragebogen wird anhand der neuen Symptome, die von den Eltern in den Freitextangaben eingegeben wurden, erweitert und validiert. Beispielsweise sollte das Symptomspektrum

um die sogenannte „Maskenrhinitis" und Nasenbluten erweitert werden.

## Schlussfolgerung

Viele Kinder sind großen Herausforderungen unterworfen, und Familien versuchen, dies bestmöglich zu meistern. Die Zahl der Neuinfektionen ist derzeit auf hohem Niveau. Zumindest für Kinder über 10 Jahre gilt es, die allseits bekannte AHA+L-Regel einzuhalten: Abstand halten, Hygiene beachten, Alltagsmaske tragen sowie regelmäßiges Lüften. In der neuesten Stellungnahme „… zur Verwendung von Masken bei Kindern zur Verhinderung der Infektion mit SARS-CoV-2" [22] heißt es: „Für Kinder gibt es kaum Daten zu möglichen unerwünschten Wirkungen von Masken". Das Co-Ki-Masken Register liefert dazu erste Ergebnisse, und diese rufen nach alters- und situationsabhängigen Studien, die eine fundierte Risiko-Nutzen Analyse ermöglichen. Damit zusammenhängend muss auch die Frage nach der Notwendigkeit von Masken-Attesten klinisch und wissenschaftlich bewertet werden.

Sehr wichtig ist uns, dass unsere Ergebnisse nicht dazu führen, dass Eltern grundsätzlich eine negative Meinung zum Maskentragen bei Kindern entwickeln. Viele Kinder und Jugendliche sind dankbar, dass sie dank der AHA+L-Regeln die Schule weiterbesuchen

dürfen und würden sich von den Erwachsenen eine positive Meinung zu den Masken wünschen, zumal die Art der getragenen Maske normalerweise gewählt werden kann. Des Weiteren gibt es Kinder, für die die Maske eine notwendige Hilfe sein kann, beispielsweise, wenn sie nach einer Chemotherapie immunsupprimiert sind. Unreflektierte negative Äußerungen über die Maske können ein Nocebo-Effekt herbeiführen und Kinder unnötig belasten: Besser ist es, zuzuhören – und ernst zu nehmen, wenn Probleme auftauchen.

## Fazit für die Praxis

- Dieses weltweit erste Register zu Nebenwirkungen der Maske gibt das Symptomenspektrum bei Kindern und Jugendlichen wieder. Ein gewisser Anteil von Kindern und Jugendlichen scheint nichtzuvernachlässigende Beschwerden beim Tragen der Maske zu haben. Diese Kinder sollten nicht stigmatisiert werden.

- Eine genaue Nutzen-Risiko-Analyse ist dringend angebracht. Das Auftreten von berichteten Nebenwirkungen bei Kindern durch das Tragen der Masken muss ernst genommen werden und braucht eine genaue Abklärung der gesundheitlichen Begleitumstände, der Tragesituation der Maske (Dauer, Pausen und Maskentyp) und der schulischen Situation.

- Weiterhin sind alle Eltern, Ärzt*innen, Pädagog*innen und andere zur Teilnahme an www.co-ki-masken.de eingeladen, ihre Beobachtungen zu Wirkungen, die beim Tragen der Mund-Nasen-Bedeckung auftreten, zu dokumentieren. Das Register steht seit dem 01.12.2020 auch in englischer Sprache zur Verfügung.
- Zurückhaltung mit negativen Äußerungen über die Maske ist angebracht, um Nocebo-Effekte zu vermeiden.

## Abbreviations

**AHA-L:**  Abstand/Hygiene/Alltagsmaske/Lüften

**Co-Ki:**  Coronakinderstudien

**COVID-19:**  „Coronavirus disease 2019"

**SARS-CoV-2:**  „Severe acute respiratory syndrome coronavirus 2"(schweres akutes Atemwegssyndrom-Coronavirus Typ 2)

## Literatur

1. Robert Koch Institut (2020) Täglicher Lagebericht des RKI zur Coronavirus-Krankheit-2019 (COVID-19) (Okt). https://www.rki.de/DE/Content/InfAZ/N/Neuartiges_Coronavirus/Situationsberichte/Okt_2020/

2020-10-25-de.pdf?__blob=publicationFile.

Zugegriffen: 17.11.2020

2. Lee P-I, Hu Y-L, Chen P-Y, Huang Y-C, Hsueh P-R (2020) Are children less susceptible to COVID-19? J Microbiol Immunol Infect. https://doi.org/10.1016/j.jmii.2020.02.011

3. Castagnoli R, Votto M, Licari A et al (2020) Severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) infection in children and adolescents: a systematic review. JAMA Pediatr. https://doi.org/10.1001/jamapediatrics.2020.1467

4. National Centre for Immunisation Research and Surveillance (NCIRS) (2020) COVID-19 in schools—the experience in NSW. National Centre for Immunisation Research and Surveillance, Westmead, Australia

5. National Institute for Public Health and the Environment (2020) Children and COVID-19. https://www.rivm.nl/en/novel-coronavirus-covid-19/children-and-covid-19. Zugegriffen: 17.11.2020

6. CDC COVID-19 Response Team (2020)

Coronavirus disease 2019 in children—United States, February 12–April 2, 2020. Mmwr Morb Mortal Wkly Rep 69:422–426

7. Chidini G, Villa C, Calderini E, Marchisio P, De Luca D (2020) SARS-CoV-2 infection in a pediatric department in Milan: a logistic rather than a clinical emergency. Pediatr Infect Dis J. https://doi.org/10.1097/INF.0000000000002687

8. Norwegian Institute of Public Health (2020) The role of children in the transmission of SARS-CoV-2 (COVID-19), 1st update. https://www.fhi.no/en/publ/2020/The-role-of-children-in-the-transmission-of-SARS-CoV-2-COVID-19-1st-update/. Zugegriffen: 20. Mai 2020

9. Schwarz S, Steuber C, Krafft H, Boehm K, Martin D (2020) Pediatric COVID-19 case with regard to the family infection chain and the psychosocial context. Clin Case Rep. https://doi.org/10.1002/ccr3.3331

10. Armann JP, Simon A, Diffloth N et al (2020) Hospitalisierungen von Kindern und Jugendlichen mit COVID-19. Dtsch Arztebl Int 117:373–374

11. Götzinger F, Santiago-García B, Noguera-Julián A et al (2020) COVID-19 in children and adolescents in Europe: a multinational, multicentre cohort study. Lancet Child Adolesc Health. https://doi.org/10.1016/S2352-4642(20)30177-2

12. Laxminarayan R, Wahl B, Dudala SR et al (2020) Epidemiology and transmission dynamics of COVID-19 in two Indian states. Science. https://doi.org/10.1126/science.abd7672

13. Wood R, Thomson EC, Galbraith R et al (2020) Sharing a household with children and risk of COVID-19: a study of over 300,000 adults living in healthcare worker households in Scotland. medRxiv. https://doi.org/10.1101/2020.09.21.20196428v1

14. Muerbe D, Kriegel M, Lange J, Schumann L, Hartmann A, Fleischer M (2020) Aerosol emission of child voices during speaking, singing and shouting. medRxiv. https://doi.org/10.1101/2020.09.17.20196733

15. Howard J, Huang A, Li Z et al (2020) Face masks against COVID-19: an evidence review.

https://doi.org/10.20944/preprints202004.0203.v1

16. Peeples L (2020) Face masks: what the data say. Nature 586:186–189

17. Abbott B, Greenhalgh M, Clair S, Bush J (2020) Making sense of the research on COVID-19 and masks. https://doi.org/10.13140/RG.2.2.11144.03840/1

18. Kappstein I (2020) Mund-Nasen-Schutz in der Öffentlichkeit: Keine Hinweise für eine Wirksamkeit. Krankenhhyg up2date 15:279–295

19. Karnauskas K, Miller S, Schapiro A (2020) Fossil fuel combustion is driving indoor $CO_2$ toward levels harmful to human cognition. GeoHealth. https://doi.org/10.1029/2019GH000237

20. Kommission des Umweltbundesamtes und der Obersten Landesgesundheitsbehörden (2008) Gesundheitliche Bewertung von Kohlendioxid in der Innenraumluft. Mitteilungen der Ad-hoc-Arbeitsgruppe Innenraumrichtwerte der Innenraumlufthygiene. Bundesgesundheitsbl. https://doi.org/10.1007/s00103-008-0707-2

21. Deutsche Gesetzliche Unfallversicherung – DGUV (2020) Corona: Empfehlungen für Schulen. https://www.dguv.de/corona-bildung/schulen/faq/index.jsp. Zugegriffen: 17.11.2020

22. DGPI: Deutsche Gesellschaft für Pädiatrische Infektiologie (2020) Hufnagel PD med M: Stellungnahme von DGPI, bvkj, DGKJ, GPP und SGKJ zur Verwendung von Masken bei Kindern zur Verhinderung der Infektion mit SARS-CoV-2 (Stand 12.11.2020). https://dgpi.de/covid19-masken-stand-10-11-2020/. Zugegriffen: 20. Nov. 2020

## Funding

Open Access funding enabled and organized by Projekt DEAL.

## Author information

Authors and Affiliations

**Fakultät für Gesundheit/Department für Humanmedizin, Universität Witten/Herdecke, Witten/Herdecke, Deutschland**

Silke Schwarz,  Ekkehart Jenetzky, Hanno Krafft M.Sc., Tobias Maurer &  David Martin

**Klinik und Poliklinik für Kinder- und Jugendpsychiatrie und -psychotherapie, Universitätsmedizin Mainz, Mainz, Deutschland**

Ekkehart Jenetzky

**Universitätsklinik für Kinder- und Jugendmedizin, Universität Tübingen, Tübingen, Deutschland**

David Martin

Corresponding author

Correspondence to David Martin.

## Ethics declarations

Interessenkonflikt

S. Schwarz, E. Jenetzky, H. Krafft, T. Maurer und D. Martin geben an, dass kein Interessenkonflikt besteht.

Für diesen Beitrag wurden von den Autoren keine Studien an Menschen oder Tieren durchgeführt. Für die aufgeführten Studien gelten die jeweils dort angegebenen ethischen Richtlinien.

## Additional information

Redaktion

B. Koletzko, München

T. Lücke, Bochum

E. Mayatepek, Düsseldorf

N. Wagner, Aachen

S. Wirth, Wuppertal

F. Zepp, Mainz

## Rights and permissions

**Open Access** Dieser Artikel wird unter der Creative Commons Namensnennung 4.0 International Lizenz veröffentlicht, welche die Nutzung, Vervielfältigung, Bearbeitung, Verbreitung und Wiedergabe in jeglichem Medium und Format erlaubt, sofern Sie den/die ursprünglichen Autor(en) und die Quelle ordnungsgemäß nennen, einen Link zur Creative Commons Lizenz beifügen und angeben, ob Änderungen vorgenommen wurden.

Die in diesem Artikel enthaltenen Bilder und sonstiges Drittmaterial unterliegen ebenfalls der genannten Creative Commons Lizenz, sofern sich aus der Abbildungslegende nichts anderes ergibt. Sofern das betreffende Material nicht unter der genannten Creative Commons Lizenz steht und die betreffende Handlung nicht nach gesetzlichen Vorschriften erlaubt ist, ist für die oben aufgeführten Weiterverwendungen des Materials die Einwilligung des jeweiligen Rechteinhabers einzuholen.

Weitere Details zur Lizenz entnehmen Sie bitte der Lizenzinformation auf

http://creativecommons.org/licenses/by/4.0/deed.de.

Reprints and Permissions

## About this article

### Cite this article

Schwarz, S., Jenetzky, E., Krafft, H. *et al.* Coronakinderstudien „Co-Ki": erste Ergebnisse eines deutschlandweiten Registers zur Mund-Nasen-Bedeckung (Maske) bei Kindern.
*Monatsschr Kinderheilkd* **169,** 353–365 (2021).
https://doi.org/10.1007/s00112-021-01133-9

| Received | Accepted | Published |
|---|---|---|
| 17 November 2020 | 31 December 2020 | 22 February 2021 |

Issue Date
April 2021

DOI
https://doi.org/10.1007/s00112-021-01133-9

Schlüsselwörter

**Mund-Nasen-Schutz**    **Alltagsmasken**

**Maskenpflicht**    **Pädiatrie**    **COVID-19**

Keywords

**Mouth and nose protection**    **Community masks**

**Mask obligation**    **Pediatrics**    **COVID-19**

Not logged in - 168.166.80.218
Not affiliated
**SPRINGER NATURE**

© 2022 Springer Nature Switzerland AG. Part of Springer Nature.

# EXHIBIT 58

Misinformation | Transparency Center



Home → Policies → Facebook Community Standards

# Misinformation

## Policy details

Change log ⌄

## Policy Rationale

Misinformation is different from other types of speech addressed in our Community Standards because there is no way to articulate a comprehensive list of what is prohibited. With graphic violence or hate speech, for instance, our policies specify the speech we prohibit, and even persons who disagree with those policies can follow them. With misinformation, however, we cannot provide such a line. The world is changing constantly, and what is true one minute may not be true the next minute. People also have different levels of information about the world around them, and may believe something is true when it is not. A policy that simply prohibits "misinformation" would not provide useful notice to the people who use our services and would be unenforceable, as we don't have perfect access to information.

Instead, our policies articulate different categories of misinformation and try to

Transparency Center

each category, our approach reflects our attempt to balance our values of expression, safety, dignity, authenticity, and privacy.

We remove misinformation where it is likely to directly contribute to the risk of imminent physical harm. We also remove content that is likely to directly contribute to interference with the functioning of political processes and certain highly deceptive manipulated media. In determining what constitutes misinformation in these categories, we partner with independent experts who possess knowledge and expertise to assess the truth of the content and whether it is likely to directly contribute to the risk of imminent harm. This includes, for instance, partnering with human rights organizations with a presence on the ground in a country to determine the truth of a rumor about civil conflict, and partnering with health organizations during the global COVID-19 pandemic.

For all other misinformation, we focus on reducing its prevalence or creating an environment that fosters a productive dialogue. We know that people often use misinformation in harmless ways, such as to exaggerate a point ("This team has the worst record in the history of the sport!") or in humor or satire ("My husband just won Husband of the Year.") They also may share their experience through stories that contain inaccuracies. In some cases, people share deeply-held personal opinions that others consider false or share information that they believe to be true but others consider incomplete or misleading.

Recognizing how common such speech is, we focus on slowing the spread of hoaxes and viral misinformation, and directing users to authoritative information. As part of that effort, we partner with third-party fact checking organizations to review and rate the accuracy of the most viral content on our platforms (see here to learn more about how our fact-checking program works). We also provide resources to increase media and digital literacy so people can decide what to read, trust, and share themselves.

Finally, we prohibit content and behavior in other areas that often overlap with the spread of misinformation. For example, our Community Standards prohibit fake accounts, fraud, and coordinated inauthentic behavior.

Glenn Decl. Ex. 58
Page 2 of 10

As online and offline environments change and evolve, we will continue to evolve these policies. Pages, Groups, Profiles, and Instagram accounts that repeatedly share the misinformation listed below may, in addition to having their content removed, receive decreased distribution, limitations on their ability to advertise, or be removed from our platforms. Additional information on what happens when Facebook removes content can be found here.

---



# Misinformation we remove:

We remove the following types of misinformation:

### I. Physical Harm or Violence

We remove misinformation or unverifiable rumors that expert partners have determined are likely to directly contribute to a risk of imminent violence or physical harm to people. We define misinformation as content with a claim that is determined to be false by an authoritative third party. We define an unverifiable rumor as a claim whose source expert partners confirm is extremely hard or impossible to trace, for which authoritative sources are absent, where there is not enough specificity for the claim to be debunked, or where the claim is too incredulous or too irrational to be believed.

We know that sometimes misinformation that might appear benign could, in a specific context, contribute to a risk of offline harm, including threats of violence that could contribute to a heightened risk of death, serious injury, or other physical harm. We work with a global network of non-governmental organizations (NGOs), not-for-profit organizations, humanitarian organizations, and international organizations that have expertise in these local dynamics.

### II. Harmful Health Misinformation

We consult with leading health organizations to identify health misinformation likely to directly contribute to imminent harm to public health and safety. The

likely to directly contribute to imminent harm to public health and safety. The harmful health misinformation that we remove includes the following:

- **Misinformation about vaccines.** We remove misinformation primarily about vaccines when public health authorities conclude that the information is false and likely to directly contribute to imminent vaccine refusals. They include:

    a. Vaccines cause autism (Ex: "Increased vaccinations are why so many kids have autism these days.")
    b. Vaccines cause Sudden Infant Death Syndrome (Ex: "Don't you know vaccines cause SIDS?"
    c. Vaccines cause the disease against which they are meant to protect, or cause the person receiving the vaccine to be more likely to get the disease (Ex: "Taking a vaccine actually makes you more likely to get the disease since there's a strain of the disease inside. Beware!")
    d. Vaccines or their ingredients are deadly, toxic, poisonous, harmful, or dangerous (Ex: "Sure, you can take vaccines, if you don't mind putting poison in your body.")
    e. Natural immunity is safer than vaccine-acquired immunity (Ex: "It's safest to just get the disease rather than the vaccine.")
    f. It is dangerous to get several vaccines in a short period of time, even if that timing is medically recommended (Ex: "Never take more than one vaccine at the same time, that is dangerous - I don't care what your doctor tells you!")
    g. Vaccines are not effective at preventing the disease against which they purport to protect. However, for the COVID-19, flu, and malaria vaccines, we do not remove claims that those vaccines are not effective in preventing someone from contracting those viruses. (Ex's: Remove – "The polio vaccine doesn't do anything to stop you from getting the disease"; Remove – "Vaccines actually don't do anything to stop you from getting diseases"; Allow – "The vaccine doesn't stop you from getting COVID-19, that's why you still need to socially distance and wear a mask when you're around others.")
    h. Acquiring measles cannot cause death (requires additional information and/or context) (Ex: "Don't worry about whether you get measles, it can't be fatal.")

     i. Vitamin C is as effective as vaccines in preventing diseases for which vaccines exist.

- **Misinformation about health during public health emergencies.** We remove misinformation during public health emergencies when public health authorities conclude that the information is false and likely to directly contribute to the risk of imminent physical harm, including by contributing to the risk of individuals getting or spreading a harmful disease or refusing an associated vaccine. We identify public health emergencies in partnership with global and local health authorities. This currently includes false claims related to COVID-19 that are verified by expert health authorities, about the existence or severity of the virus, how to cure or prevent it, how the virus is transmitted or who is immune, and false claims which discourage good health practices related to COVID-19 (such as getting tested, social distancing, wearing a face mask, and getting a vaccine for COVID-19). **Click here for a complete set of rules regarding what misinformation we do not allow regarding COVID-19 and vaccines.**

- **Promoting or advocating for harmful miracle cures for health issues.** These include treatments where the recommended application, in a health context, is likely to directly contribute to the risk of serious injury or death, and the treatment has no legitimate health use (ex: bleach, disinfectant, black salve, caustic soda).

### III. Voter or Census Interference

In an effort to promote election and census integrity, we remove misinformation that is likely to directly contribute to a risk of interference with people's ability to participate in those processes. This includes the following:

- Misinformation about the dates, locations, times, and methods for voting, voter registration, or census participation.
- Misinformation about who can vote, qualifications for voting, whether a vote will be counted, and what information or materials must be provided in order to vote.
- Misinformation about whether a candidate is running or not.

- Misinformation about who can participate in the census and what information or materials must be provided in order to participate.
- Misinformation about government involvement in the census, including, where applicable, that an individual's census information will be shared with another (non-census) government agency.
- Content falsely claiming that the U.S. Immigration and Customs Enforcement (ICE) is at a voting location.
- Explicit false claims that people will be infected by COVID-19 (or another communicable disease) if they participate in the voting process.

We have additional policies intended to cover calls for violence, the promotion of illegal participation, and calls for coordinated interference in elections, which are represented in other sections of our Community Standards.

## IV. Manipulated Media

Media can be edited in a variety of ways. In many cases, these changes are benign, such as content being cropped or shortened for artistic reasons or music being added. In other cases, the manipulation is not apparent and could mislead, particularly in the case of video content. We remove this content because it can go viral quickly and experts advise that false beliefs regarding manipulated media often cannot be corrected through further discourse.

We remove videos under this policy if specific criteria are met: (1) the video has been edited or synthesized, beyond adjustments for clarity or quality, in ways that are not apparent to an average person, and would likely mislead an average person to believe a subject of the video said words that they did not say; and (2) the video is the product of artificial intelligence or machine learning, including deep learning techniques (e.g., a technical deepfake), that merges, combines, replaces, and/or superimposes content onto a video, creating a video that appears authentic.

6/10/22, 1:38 PM                                    Misinformation | Transparency Center

Read less

_____

∧  User experiences

See some examples of what enforcement looks like for people on Facebook, such
as: what it looks like to report something you don't think should be on Facebook,
to be told you've violated our Community Standards and to see a warning screen
over certain content.

**Note:** We're always improving, so what you see here may be slightly outdated
compared to what we currently use.

---

USER EXPERIENCE
**Reporting**

( → )

---

USER EXPERIENCE
**Post-report communication**

( → )

---

USER EXPERIENCE
Takedown experience

Glenn Decl. Ex. 58
Page 7 of 10

**Takedown experience**

→

USER EXPERIENCE
## Warning screens

→

## Enforcement

We have the same policies around the world, for everyone on Facebook.

## Review teams

Our global team of over 15,000 reviewers work every day to keep people on Facebook safe.

## Stakeholder engagement

Outside experts, academics, NGOs and policymakers help inform the Facebook Community Standards.

Glenn Decl. Ex. 58
Page 8 of 10

## ⌃ Get help with misinformation

Learn what you can do if you see something on Facebook that goes against our Community Standards.



**Visit our Help Center**

**NEXT**

# Memorialization

**PREVIOUS**

# Inauthentic Behavior

 Meta

Glenn Decl. Ex. 58
Page 9 of 10

Misinformation | Transparency Center

**POLICIES**

**ENFORCEMENT**

**FEATURES**

**OVERSIGHT**

**DATA**


Data Policy     Terms of Service     Cookies

Glenn Decl. Ex. 58
Page 10 of 10

# EXHIBIT 59

# COVID-19 medical misinformation policy

The safety of our creators, viewers, and partners is our highest priority. We look to each of you to help us protect this unique and vibrant community. It's important you understand our Community Guidelines, and the role they play in our shared responsibility to keep YouTube safe. **Take the time to carefully read the policy below**. You can also check out this page for a full list of our guidelines.

YouTube doesn't allow content about COVID-19 that poses a serious risk of egregious harm.

YouTube doesn't allow content that spreads medical misinformation that contradicts local health authorities' (LHA) or the World Health Organization's (WHO) medical information about COVID-19. This is limited to content that contradicts WHO or local health authorities' guidance on:

- Treatment
- Prevention
- Diagnosis
- Transmission
- The existence of COVID-19

**Note**: YouTube's policies on COVID-19 are subject to change in response to changes to global or local health authorities' guidance on the virus. There may be a delay between new LHA/WHO guidance and policy updates given the frequency with which this guidance changes, and our policies may not cover all LHA/WHO guidance related to COVID-19.

Our COVID-19 policies were first published on May 20, 2020.

## What this policy means for you

### If you're posting content

Don't post content on YouTube if it includes any of the following:

**Treatment misinformation**:

- Content that encourages the use of home remedies, prayer, or rituals in place of medical treatment such as consulting a doctor or going to the hospital
- Content that claims that there's a guaranteed cure for COVID-19
- Content that recommends use of Ivermectin or Hydroxychloroquine for the treatment of COVID-19
- Claims that Hydroxychloroquine is an effective treatment for COVID-19
- Categorical claims that Ivermectin is an effective treatment for COVID-19
- Claims that Ivermectin and Hydroxychloroquine are safe to use in the prevention of COVID-19
- Other content that discourages people from consulting a medical professional or seeking medical advice

**Prevention misinformation**: Content that promotes prevention methods that contradict local health authorities or WHO.

- Claims that there is a guaranteed prevention method for COVID-19
  - Claims that any medication or vaccination is a guaranteed prevention method for COVID-19
- Content that recommends use of Ivermectin or Hydroxychloroquine for the prevention of COVID-19
- Claims that Ivermectin and Hydroxychloroquine are safe to use in the prevention of COVID-19
- Claims about COVID-19 vaccinations that contradict expert consensus from local health authorities or WHO

Glenn Decl. Ex. 59
Page 1 of 3

- Claims that an approved COVID-19 vaccine will cause death, infertility, miscarriage, autism, or contraction of other infectious diseases
- Claims that an approved COVID-19 vaccine will contain substances that are not on the vaccine ingredient list, such as biological matter from fetuses (e.g. fetal tissue, fetal cell lines) or animal products
- Claims that an approved COVID-19 vaccine will contain substances or devices meant to track or identify those who've received it
- Claims that COVID-19 vaccines will make people who receive them magnetic
- Claims that an approved COVID-19 vaccine will alter a person's genetic makeup
- Claims that COVID-19 vaccines do not reduce risk of serious illness or death
- Claims that any vaccine causes contraction of COVID-19
- Claims that a specific population will be required (by any entity except for a government) to take part in vaccine trials or receive the vaccine first
- Content that promotes the use of unapproved or homemade COVID-19 vaccines
- Instructions to counterfeit vaccine certificates, or offers of sale for such documents

**Diagnostic misinformation**: Content that promotes diagnostic information that contradicts local health authorities or WHO.

- Claims that approved COVID-19 tests are dangerous or cause negative physical health effects
- Claims that approved COVID-19 tests cannot diagnose COVID-19

**Transmission misinformation**: Content that promotes transmission information that contradicts local health authorities or WHO.

- Content that claims that COVID-19 is not caused by a viral infection
- Content that claims COVID-19 is not contagious
- Content that claims that COVID-19 cannot spread in certain climates or geographies
- Content that claims that any group or individual has immunity to the virus or cannot transmit the virus

**Content that denies the existence of COVID-19:**

- Denial that COVID-19 exists
- Claims that people have not died or gotten sick from COVID-19
- Claims that the death rate of COVID-19 is equal to or less than that of the common cold or seasonal flu
- Claims that COVID-19 is equal to or less transmissible than the common cold or seasonal flu
- Claims that the symptoms of COVID-19 are never severe

This policy applies to videos, video descriptions, comments, live streams, and any other YouTube product or feature. Keep in mind that this isn't a complete list. Please note these policies also apply to external links in your content. This can include clickable URLs, verbally directing users to other sites in video, as well as other forms.

## Examples

Here are some examples of content that's not allowed on YouTube:

- Denial that COVID-19 exists
- Claims that people have not died from COVID-19
- Claims that any vaccine is a guaranteed prevention method for COVID-19
- Claims that a specific treatment or medicine is a guaranteed cure for COVID-19
- Claims that hydroxychloroquine saves people from COVID-19
- Promotion of MMS (Miracle Mineral Solution) for the treatment of COVID-19

- Claims that certain people have immunity to COVID-19 due to their race or nationality
- Encouraging taking home remedies instead of getting medical treatment when sick
- Discouraging people from consulting a medical professional if they're sick
- Content that claims that holding your breath can be used as a diagnostic test for COVID-19
- Videos alleging that if you avoid Asian food, you won't get the coronavirus
- Videos alleging that setting off fireworks can clean the air of the virus and will prevent the spread of the virus
- Claims that COVID-19 is caused by radiation from 5G networks
- Videos alleging that the COVID-19 test is the cause of the virus
- Claims that countries with hot climates will not experience the spread of the virus
- Claims that COVID-19 vaccines kill people who receive them
- Claims that COVID-19 vaccines are a means of population reduction
- Videos claiming that COVID-19 vaccines contain fetal tissue
- Claims that the flu vaccine causes contraction of COVID-19
- Claims that the flu is more contagious than COVID-19
- Claims that COVID-19 vaccines cause contraction of other infectious diseases or makes people more vulnerable to contraction of other infectious diseases
- Claims that COVID-19 vaccines contain a microchip or tracking device
- Claims that achieving herd immunity through natural infection is safer than vaccinating the population
- Claims that COVID-19 never causes serious symptoms or hospitalization
- Claims that the death rate from the seasonal flu is higher than the death rate of COVID-19
- Claims that people are immune to the virus based on their race
- Claims that children cannot or do not contract COVID-19
- Claims that there have not been cases or deaths in countries where cases or deaths have been confirmed by local health authorities or the WHO

## Educational, documentary, scientific or artistic content

We may allow content that violates the misinformation policies noted on this page if that content includes additional context in the video, audio, title, or description. This is not a pass to promote misinformation. Additional context may include countervailing views from local health authorities or medical experts. We may also make exceptions if the purpose of the content is to condemn, dispute, or satirize misinformation that violates our policies. We may also make exceptions for content showing an open public forum, like a protest or public hearing, provided the content does not aim to promote misinformation that violates our policies.

## What happens if content violates this policy

If your content violates this policy, we'll remove the content and send you an email to let you know. If this is your first time violating our Community Guidelines, you'll likely get a warning with no penalty to your channel. If it's not, we may issue a strike against your channel. If you get 3 strikes within 90 days, your channel will be terminated. You can learn more about our strikes system here.

We may terminate your channel or account for repeated violations of the Community Guidelines or Terms of Service. We may also terminate your channel or account after a single case of severe abuse, or when the channel is dedicated to a policy violation. You can learn more about channel or account terminations here.

Glenn Decl. Ex. 59
Page 3 of 3

# EXHIBIT 60

Elections misinformation policies - YouTube Help

# Elections misinformation policies



Certain types of misleading or deceptive content with serious risk of egregious harm are not allowed on YouTube. This includes certain types of misinformation that can cause real-world harm, like certain types of technically manipulated content, and content interfering with democratic processes.

If you find content that violates this policy, report it. Instructions for reporting violations of our Community Guidelines are available here. If you've found multiple videos or comments from a single channel that you would like to report, you can report the channel.

## What these policies mean for you

### If you're posting content

These policies prohibit certain types of content relating to free and fair democratic elections. Don't post elections-related content on YouTube if it fits any of the descriptions noted below.

- **Voter suppression:** Content aiming to mislead voters about the time, place, means, or eligibility requirements for voting, or false claims that could materially discourage voting.
- **Candidate eligibility:** Content that advances false claims related to the technical eligibility requirements for current political candidates and sitting elected government officials to serve in office. Eligibility requirements considered are based on applicable national law, and include age, citizenship, or vital status.
- **Incitement to interfere with democratic processes:** Content encouraging others to interfere with democratic processes. This includes obstructing or interrupting voting procedures.
- **Distribution of hacked materials:** Content that contains hacked info, the disclosure of which may interfere with democratic processes.
- **Election integrity:** Content that advances false claims that widespread fraud, errors, or glitches changed the outcome of select past national elections, after final election results are officially certified. This currently applies to:
  - Any past U.S. Presidential election
  - The 2021 German federal election
  - The 2018 Brazilian Presidential election

Keep in mind that this isn't a complete list.

## Examples

The following types of content are not allowed on YouTube. This isn't a complete list.

Voter suppression

Glenn Decl. Ex. 60
Page 1 of 2

Candidate eligibility

Incitement to interfere with democratic processes

Distribution of hacked materials

Election integrity

Remember these are just some examples, and don't post content if you think it might violate these policies. Please note these policies also apply to external links in your content. This can include clickable URLs, verbally directing users to other sites in video, as well as other forms.

## What happens if content violates this policy

If your content violates this policy, we'll remove the content and send you an email to let you know. If this is your first time violating our Community Guidelines, you'll get a warning with no penalty to your channel. If it's not, we'll issue a strike against your channel. If you get 3 strikes, your channel will be terminated. You can learn more about our strikes system here.

Glenn Decl. Ex. 60
Page 2 of 2

# EXHIBIT 61

Skip to main content

 Help Center (https://help.twitter.com/)

- Using Twitter (https://help.twitter.com/en/using-twitter)
- Managing your account (https://help.twitter.com/en/managing-your-account)
- Safety and security (https://help.twitter.com/en/safety-and-security)
- Rules and policies (https://help.twitter.com/en/rules-and-policies)
- Resources ⌄
    - New user FAQ (https://help.twitter.com/en/resources/new-user-faq)
    - Glossary (https://help.twitter.com/en/resources/glossary)
    - How to get even more Twitter (https://help.twitter.com/en/resources/more-twitter)
    - A safer Twitter (https://help.twitter.com/en/resources/a-safer-twitter)
    - Accessibility (https://help.twitter.com/en/resources/accessibility)

    - Our rules (https://help.twitter.com/en/resources/rules)
    - My privacy (https://help.twitter.com/en/resources/how-you-can-control-your-privacy)
    - Getting Started Guide (https://help.twitter.com/en/resources/twitter-guide)
    - How we address misinformation on Twitter (https://help.twitter.com/en/resources/addressing-misleading-info)

Feedback

Sign in (https://twitter.com/login?redirect_after_login=https://help.twitter.com/en/rules-and-policies/election-integrity-policy)



Contact Us (https://help.twitter.com/forms.html)



1. Civic integrity policy

# Civic integrity policy

1. Help Center ^ (https://help.twitter.com/)
2. Platform integrity and authenticity ^ (https://help.twitter.com/en/rules-and-policies#platform-integrity-and-authenticity)

# Civic integrity policy

## Overview

**October 2021**

**You may not use Twitter's services for the purpose of manipulating or interfering in elections or other civic processes. This includes posting or sharing content that may suppress participation or mislead people about when, where, or how to participate in a civic process. In addition, we may label and reduce the visibility of Tweets containing false or misleading information about civic processes in order to provide additional context.**

The public conversation occurring on Twitter is never more important than during elections and other civic events. Any attempts to undermine the integrity of our service is antithetical to our fundamental rights and undermines the core tenets of freedom of expression, the value upon which our company is based.

We believe we have a responsibility to protect the integrity of those conversations from interference and manipulation. Therefore, we prohibit attempts to use our services to manipulate or disrupt civic processes, including through the distribution of false or misleading information about the procedures or circumstances around participation in a civic process. In instances where misleading information does not seek to directly manipulate or disrupt civic processes, but leads to confusion on our service, we may label the Tweets to give additional context. Given the significant risks of confusion about key election information, we may take these actions even if Tweets contain (or attempt to contain) satirical or humorous elements.

## What is a civic process?

Twitter considers civic processes to be events or procedures mandated, organized, and conducted by the governing and/or electoral body of a country, state, region, district, or municipality to address a matter of common concern through public participation. Some examples of civic processes may include:

Feedback

Glenn Decl. Ex. 61
Page 2 of 10

Twitter's civic integrity policy | Twitter Help

- Political elections
- Censuses
- Major referenda and ballot initiatives

# What is in violation of this policy?

This policy addresses 4 categories of misleading behavior and content:

**Misleading information about how to participate**

We will label or remove false or misleading information about how to participate in an election or other civic process. This includes but is not limited to:

- misleading information about procedures to participate in a civic process (for example, that you can vote by Tweet, text message, email, or phone call in jurisdictions where these are not a possibility);
- misleading information about requirements for participation, including identification or citizenship requirements;
- misleading claims that cause confusion about the established laws, regulations, procedures, and methods of a civic process, or about the actions of officials or entities executing those civic processes; and
- misleading statements or information about the official, announced date or time of a civic process.

**Suppression and intimidation**

We will label or remove false or misleading information intended to intimidate or dissuade people from participating in an election or other civic process. This includes but is not limited to:

Feedback

- misleading claims that polling places are closed, that polling has ended, or other misleading information relating to votes not being counted;
- misleading claims about police or law enforcement activity related to voting in an election, polling places, or collecting census information;
- misleading claims about long lines, equipment problems, or other disruptions at voting locations during election periods;
- misleading claims about process procedures or techniques which could dissuade people from participating; and
- threats regarding voting locations or other key places or events (note that our violent threats policy (https://help.twitter.com/rules-and-policies/violent-threats-glorification) may also be relevant for threats not covered by this policy).

**Misleading information about outcomes**

We will label or remove false or misleading information intended to undermine public confidence in an election or other civic process. This includes but is not limited to:

- disputed claims that could undermine faith in the process itself, such as unverified information about election rigging, ballot tampering, vote tallying, or certification of election results; and
- misleading claims about the results or outcome of a civic process which calls for or could lead to interference with the implementation of the results of the process, e.g. claiming victory before election results have been certified, inciting unlawful conduct to prevent the procedural or practical implementation of election results (note that our violent threats policy may also be relevant for threats not covered by this policy).

**False or misleading affiliation**

You can't create fake accounts which misrepresent their affiliation, or share content that falsely represents its affiliation, to a candidate, elected official, political party, electoral authority, or government entity. Read more about our parody, commentary, and fan account policy. (https://help.twitter.com/rules-and-policies/parody-account-policy)

# What is not a violation of this policy?

Glenn Decl. Ex. 61
Page 4 of 10

Twitter's civic integrity policy | Twitter Help

Not all false or untrue information about politics or civic processes constitutes manipulation or interference. In the absence of other policy violations, the following are generally not in violation of this policy:

- inaccurate statements about an elected or appointed official, candidate, or political party;
- organic content that is polarizing, biased, hyperpartisan, or contains controversial viewpoints expressed about elections or politics;
- discussion of public polling information;
- voting and audience participation for competitions, game shows, or other entertainment purposes; and
- using Twitter pseudonymously or as a parody, commentary, or fan account (https://help.twitter.com/rules-and-policies/parody-account-policy) to discuss elections or politics.

# Who can report violations of this policy?

Accurate reporting of suspected violations of this policy requires information and knowledge specific to an election or civic process. Therefore, we enable reporting of false or misleading information about civic processes in advance of major events, for people located in the relevant countries and locations. We also work with select government and civil society partners in these countries to provide additional channels for reporting and expedited review.

For civic processes with multiple stages or parts, such as primary elections or lengthy campaigns, reporting will be enabled leading up to the first officially-sanctioned event associated with the civic process.

# How can I report violations of this policy?

If the reporting option for this policy is enabled in your country at the relevant time, you can report this content in-app or on desktop.

**In-app**

You can report this content for review in-app as follows:

1. Select **Report Tweet** from the ⌄ icon.
2. Select **It's misleading about a political election or other civic event**.
3. Select the option that best tells us how the Tweet is misleading about voting or participation in civic processes.
4. Submit your report.

**Desktop**

You can report this content for review on desktop as follows:

1. Select **Report Tweet** from the ⌄ icon.
2. Select **It's misleading about a political election or other civic event**.
3. Select the option that best tells us how the Tweet is misleading about voting or participation in a civic process.
4. Submit your report.

Feedback

# What happens if you violate this policy?

The consequences for violating our civic integrity policy depends on the severity and type of the violation and the accounts' history of previous violations. In instances where accounts repeatedly violate this policy, we will use a strike system to determine if further enforcement actions should be applied. We believe this system further helps to reduce the spread of potentially harmful and misleading information on Twitter, particularly for high-severity violations of our rules.

The actions we take may include the following:

**Tweet deletion**

For high-severity violations of this policy, including (1) misleading information about how to participate, and (2) suppression and intimidation, we will require you to remove this content. We will also temporarily lock you out of your account before you

can Tweet again. Tweet deletions accrue 2 strikes.

### Profile modifications

If you violate this policy within your profile information (e.g., your bio), we will require you to remove this content. We will also temporarily lock you out of your account before you can Tweet again. If you violate this policy again after your first warning, your account will be permanently suspended.

### Labeling

In circumstances where we do not remove content which violates this policy, we may provide additional context on Tweets sharing the content where they appear on Twitter. This means we may:

- Apply a label and/or warning message to the content where it appears in the Twitter product;
- Show a warning to people before they share or like the content;
- Turn off people's ability to reply, Retweet, or like the Tweet;
- Reduce the visibility of the content on Twitter and/or prevent it from being recommended;
- Provide a link to additional explanations or clarifications, such as in a Twitter Moment or relevant Twitter policies; and/or
- Turn off likes, replies, and Retweets.

In most cases, we will take all of the above actions on Tweets we label. In some instances, we'll also turn off your ability to reply, Retweet, or like the Tweet. We prioritize producing Twitter Moments in cases where misleading content on Twitter is gaining significant attention and has caused public confusion on our service. Labels applied to Tweets accrue 1 strike.

### Account locks and permanent suspension

For severe or repeated violations of this policy, accounts will be permanently suspended.

Glenn Decl. Ex. 61
Page 7 of 10

Repeated violations of this policy are enforced against on the basis of the number of strikes an account has accrued for violations of this policy:

- 1 strike: No account-level action
- 2 strikes: 12-hour account lock
- 3 strikes: 12-hour account lock
- 4 strikes: 7-day account lock
- 5 or more strikes: Permanent suspension

If you believe that your account was locked or suspended in error, you can <u>submit an appeal</u> (https://help.twitter.com/forms/general?subtopic=suspended).

## Share this article


Tweet

## Was this article helpful?*

 

Submit

Feedback

© 2022 Twitter, Inc.

<u>Cookies</u> (https://help.twitter.com/rules-and-policies/twitter-cookies)

<u>Privacy</u> (https://twitter.com/privacy)

<u>Terms and conditions</u> (https://twitter.com/tos)

English

<u>Help Center</u> (https://help.twitter.com/)



Glenn Decl. Ex. 61
Page 8 of 10

- (https://help.twitter.com/ur.html)
- English (https://help.twitter.com/en/rules-and-policies/election-integrity-policy)
- Español (https://help.twitter.com/es/rules-and-policies/election-integrity-policy)
- 日本語 (https://help.twitter.com/ja/rules-and-policies/election-integrity-policy)
- 한국어 (https://help.twitter.com/ko/rules-and-policies/election-integrity-policy)
- Português (https://help.twitter.com/pt/rules-and-policies/election-integrity-policy)
- Deutsch (https://help.twitter.com/de/rules-and-policies/election-integrity-policy)
- Türkçe (https://help.twitter.com/tr/rules-and-policies/election-integrity-policy)
- Français (https://help.twitter.com/fr/rules-and-policies/election-integrity-policy)
- Italiano (https://help.twitter.com/it/rules-and-policies/election-integrity-policy)
- العربية (https://help.twitter.com/ar/rules-and-policies/election-integrity-policy)
- Nederlands (https://help.twitter.com/nl/rules-and-policies/election-integrity-policy)
- Bahasa Indonesia (https://help.twitter.com/id/rules-and-policies/election-integrity-policy)
- Русский (https://help.twitter.com/ru/rules-and-policies/election-integrity-policy)
- हिन्दी (https://help.twitter.com/hi)
- עברית (https://help.twitter.com/he)
- 简体中文 (https://help.twitter.com/zh-cn)
- 繁體中文 (https://help.twitter.com/zh-tw)
- ภาษาไทย (https://help.twitter.com/th)
- Tiếng Việt (https://help.twitter.com/vi)
- Melayu (https://help.twitter.com/ms)
- Filipino (https://help.twitter.com/fil)
- فارسی (https://help.twitter.com/fa)
- Dansk (https://help.twitter.com/da)
- Suomi (https://help.twitter.com/fi)
- Svenska (https://help.twitter.com/sv)
- Norsk (https://help.twitter.com/no)
- Polski (https://help.twitter.com/pl)
- Magyar (https://help.twitter.com/hu)
- Română (https://help.twitter.com/ro)
- Čeština (https://help.twitter.com/cs)
- Ελληνικά (https://help.twitter.com/el)
- Українська (https://help.twitter.com/uk)
- मराठी (https://help.twitter.com/mr)
- தமிழ் (https://help.twitter.com/ta)
- Български (https://help.twitter.com/bg)
- Català (https://help.twitter.com/ca)
- Hrvatski (https://help.twitter.com/hr)
- Српски (https://help.twitter.com/sr)
- Slovenčina (https://help.twitter.com/sk)

Feedback

Glenn Decl. Ex. 61
Page 9 of 10

Twitter's civic integrity policy | Twitter Help

- ಕನ್ನಡ (https://help.twitter.com/kn)
- پښتو (https://help.twitter.com/ps)
- Dari (https://help.twitter.com/fa-af)
- (https://help.twitter.com/am.html)
- Oromo (https://help.twitter.com/om)
- Tigrinya (https://help.twitter.com/ti)

Feedback

Glenn Decl. Ex. 61

Page 10 of 10

# EXHIBIT 62

Skip to main content

🐦 Help Center (https://help.twitter.com/)
- Using Twitter (https://help.twitter.com/en/using-twitter)
- Managing your account (https://help.twitter.com/en/managing-your-account)
- Safety and security (https://help.twitter.com/en/safety-and-security)
- Rules and policies (https://help.twitter.com/en/rules-and-policies)
- Resources ⌄
  - New user FAQ (https://help.twitter.com/en/resources/new-user-faq)
  - Glossary (https://help.twitter.com/en/resources/glossary)
  - How to get even more Twitter (https://help.twitter.com/en/resources/more-twitter)
  - A safer Twitter (https://help.twitter.com/en/resources/a-safer-twitter)
  - Accessibility (https://help.twitter.com/en/resources/accessibility)

  - Our rules (https://help.twitter.com/en/resources/rules)
  - My privacy (https://help.twitter.com/en/resources/how-you-can-control-your-privacy)
  - Getting Started Guide (https://help.twitter.com/en/resources/twitter-guide)
  - How we address misinformation on Twitter (https://help.twitter.com/en/resources/addressing-misleading-info)

Sign in (https://twitter.com/login?redirect_after_login=https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy)



Contact Us (https://help.twitter.com/forms.html)



1. COVID-19 misleading information policy

# COVID-19 misleading information policy

━

1. Help Center ⌃ (https://help.twitter.com/)
2. Platform integrity and authenticity ⌃ (https://help.twitter.com/en/rules-and-policies#platform-integrity-and-authenticity)

# COVID-19 misleading information policy

## Overview
## December 2021

**You may not use Twitter's services to share false or misleading information about COVID-19 which may lead to harm.**

Even as scientific understanding of the COVID-19 pandemic continues to develop, we've observed the emergence of persistent conspiracy theories, alarmist rhetoric unfounded in research or credible reporting, and a wide range of false narratives and unsubstantiated rumors, which left uncontextualized can prevent the public from making informed decisions regarding their health, and puts individuals, families and communities at risk.

Content that is demonstrably false or misleading and may lead to significant risk of harm (such as increased exposure to the virus, or adverse effects on public health systems) may not be shared on Twitter. This includes sharing content that may mislead people about the nature of the COVID-19 virus; the efficacy and/or safety of preventative measures, treatments, or other precautions to mitigate or treat the disease; official regulations, restrictions, or exemptions pertaining to health advisories; or the prevalence of the virus or risk of infection or death associated with COVID-19.

Feedback

# What is in violation of this policy?

In order for content related to COVID-19 to considered violative under this policy, it must:

- advance a claim of fact, expressed in definitive terms;
- be demonstrably false or misleading, based on widely available, authoritative sources; and
- be likely to impact public safety or cause serious harm

Glenn Decl. Ex. 62
Page 2 of 12

6/10/22, 2:58 PM                                      COVID-19 misleading information policy

**Tweet Removal**

We may require customers to delete Tweets that are found to violate this policy and are severely harmful. We may also temporarily lock you out of your account before you can Tweet or share information again. These tweets will accrue **2 strikes** in accordance with our strike policy stated below. We will require the deletion of Tweets that contain, for example:

Feedback

Glenn Decl. Ex. 62
Page 3 of 12

COVID-19 misleading information policy

1. False claims about COVID-19 that invoke a deliberate conspiracy by malicious and/or powerful forces, such as:
   - The pandemic is a hoax, or part of a deliberate attempt at population control, or that 5G wireless technology is causing COVID-19.
   - COVID-19 is not a real disease.
   - Immunizations are part of a global surveillance, population control or depopulation effort.
   - Vaccines (in general) are dangerous and the adverse effects that have been covered up by governments/the medical industry.
   - Vulnerable groups (such as pregnant women, the elderly, or children) are being experimented on.
   - That COVID-19 vaccines are causing magnetic reactions in individuals who have been vaccinated.
   - That vaccines approved by health agencies (such as Pfizer's Comirnaty vaccine in the United States) did not actually receive full approval/authorization, and therefore that the vaccines are untested, "experimental" or somehow unsafe.

2. Claims that specific groups or people (or other demographically-identifiable identity) are more or less prone to be infected or to develop adverse symptoms on the basis of their membership in that group;

3. False or misleading claims about potentially harmful and unapproved treatments or preventative measures, for example, that chlorine dioxide or Povidone-iodine can be used as a prophylactic or in the treatment of COVID-19.

4. False or misleading information about official regulations, restrictions, or exemptions pertaining to health advisories.

5. Any efforts to promote, advertise, facilitate the sale of, or provide instructions on how to create fraudulent vaccination cards (or other digital records) or "exemption cards."

6. False information about widely accepted testing methodologies, such as that PCR tests are unable to detect the virus.

7. False claims that suggest that vaccines contain deadly and severely harmful ingredients.

8. False affiliation - Accounts which misrepresent their affiliation, or share content that falsely represents its affiliation to a medical practitioner, public health official or agency, research institution, or that falsely suggests expertise on COVID-19 issues.

Glenn Decl. Ex. 62
Page 4 of 12

**Tweet Label**

When Tweets include misleading information about COVID-19, we may place a label on those Tweets that includes corrective information about that claim. In cases where we determine there is potential for harm associated with the misleading claim, we will disable the ability for others to Retweet, Quote Tweet, or engage in other ways to prevent the spread of the misleading information. These tweets will accrue **1 strike** in accordance with our strike policy stated below.

In some cases we may also add labels to provide context in situations where authoritative (scientific or otherwise) opinion might change or is changing over time, in situations where local context is important, or when the potential for harm is less direct or imminent. We may also apply labels on Tweets linking to content from a third-party website that would otherwise violate our policies if the content were posted directly on Twitter. Tweets with labels that meet this criteria will receive a label that provides credible and authoritative information, but **will not accrue a strike** in accordance with our strike policy stated below.

We may apply labels to Tweets that contain, for example:

Feedback

Glenn Decl. Ex. 62
Page 5 of 12

1. False or misleading information about preventative measures one can take to avoid infection, such as claims that face masks cause hypoxia or bacteria pneumonia, or do not work to reduce transmission or to protect against COVID-19.

2. False or misleading information suggesting that unapproved treatments can be curative of COVID-19.

3. False or misleading information regarding the safety or science behind approved or authorized COVID-19 vaccines, such as:

   - The vaccines will cause you to be sick, spread the virus, or would be more harmful than getting COVID-19.
   - Tweets that incite fear or misrepresent the ingredients or contents of COVID-19 vaccines.
   - Tweets that mischaracterize the nature and science behind mRNA vaccines, and how they work.
   - Tweets that claim vaccines alter genetic code.
   - Tweets that misrepresent or misuse official reporting tools/statistics.
   - False or misleading claims that people who have received the vaccine can spread or shed the vaccine (or symptoms, or immunity) to unvaccinated people.

4. False or misleading information that misrepresent the protective effect of vaccines, to make claims contrary to health authorities. Claims that misrepresent research or statistical findings pertaining to the severity of the disease, prevalence of the virus, or effectiveness of widely accepted preventative measures, treatments, or vaccines.

When a label is applied to a Tweet, this typically entails:

- Presenting a warning message on the Tweet
- Showing an additional prompt to warn people before sharing or liking the Tweet;
- Reducing the visibility of the Tweet on Twitter and/or preventing it from being recommended;
- Turning off likes, replies, and Retweets; and/or
- Providing a link to additional explanations or clarifications, such as in a curated landing page or relevant Twitter policies.

# What is not a violation of this policy?

We seek to protect robust, public debate about the response to COVID-19, and recognize that the state of scientific knowledge about certain aspects of the pandemic and public response to it (including the development of vaccines) is still evolving. In the absence of other policy violations, the following are generally not in violation of this policy:

- **Strong commentary, opinions, and/or satire,** provided these do not contain false or misleading assertions of fact.
- **Campaigns against official advisories or recommendations.** People are entitled to organize and campaign around matters that are important to them, so long as they're not advancing false and harmful misinformation in the process.
- **Counterspeech.** We allow for direct responses to misleading information which seek to undermine its impact by correcting the record, amplify credible information, and educate the wider community about the prevalence and dynamics of misleading information.
- **Personal anecdotes or first-person accounts.** We do not enforce the COVID-19 misinformation policy on reports or first-person accounts of side-effects, injury, or harm alleged to have been caused by COVID-19 vaccines, or other matters pertaining to COVID-19.
- **Public debate about the advancement of COVID-19 science and research,** including debate about research related to COVID-19, such as the effectiveness of treatments and mitigation measures, so long as the claims don't intentionally misrepresent research findings.

Feedback

# Who can report violations of this policy?

While we have recently launched a customer report feature (https://twitter.com/TwitterSafety/status/1427706890113495046) in some countries, we primarily enforce this policy in close coordination with trusted partners, including public health authorities, NGOs and governments, and continue to use and consult with information from those sources when reviewing content.

We also leverage proactive detection using a combination of keyword heuristics and machine learning models to identify harmful forms of COVID-19 related misleading information.

# What happens if you violate this policy?

**Strike system**

The consequences for violating our COVID-19 misleading information policy depend on the severity and type of the violation and the account's history of previous violations. In instances where accounts repeatedly violate this policy, we will use a strike system to determine if further enforcement actions should be applied. We believe this system further helps to reduce the spread of potentially harmful and misleading information on Twitter, particularly for high-severity violations of our rules.

Repeated violations of this policy are enforced against on the basis of the number of strikes an account has accrued for violations of this policy:

- 1 strike: No account-level action
- 2 strikes: 12-hour account lock
- 3 strikes: 12-hour account lock
- 4 strikes: 7-day account lock
- 5 or more strikes: Permanent suspension

If you believe that your account was locked or suspended in error, you can <u>submit an appeal.</u> (https://help.twitter.com/forms/general?subtopic=suspended)

**Reducing Visibility of Content Related to COVID-19 Misinformation**

We may reduce the visibility of tweets or accounts that we believe with high confidence to be in violation of the COVID-19 misinformation policy. Limitations on the visibility of Tweets and/or accounts resulting from this framework expire automatically after a limited period of time, but may be re-applied (either manually or automatically) if we determine that the accounts have continued to violate the policy. We may reduce the visibility by:

- Making Tweets and Retweets from those accounts ineligible to appear in certain parts of the Twitter product (such as top Search results)
- Displaying Replies from the account in a lower position in conversations
- Excluding Tweets by the account and/or the actual account in email or in-product recommendations

**Permanent Suspension**

We may immediately permanently suspend accounts that represent the following violative behaviors:

**False affiliation:** If the account is determined to misrepresent their affiliation, or share content that falsely represents its affiliation as a medical practitioner, public health official or agency, research institution, or that falsely suggests expertise on COVID-19 issues.

**Repeated Violations:** If we determine that the account repeatedly violates the COVID-19 misinformation policy over a 30-day time period, or if we have determined that the account has been set up for the expressed purpose of Tweeting false or misleading information about COVID-19.

# Additional resources

Learn more about our work to fight misleading information about COVID-19 here (https://blog.twitter.com/en_us/topics/company/2020/covid-19.html), and our expanded approach to COVID-19 vaccine misleading information here (https://blog.twitter.com/en_us/topics/company/2020/covid19-vaccine.html).

Learn more about our range of enforcement options and our approach to policy development and enforcement.

## Share this article


Tweet

## Was this article helpful?*

   

Submit

© 2022 Twitter, Inc.

Glenn Decl. Ex. 62
Page 9 of 12

Cookies (https://help.twitter.com/rules-and-policies/twitter-cookies)

Privacy (https://twitter.com/privacy)

Terms and conditions (https://twitter.com/tos)

English

 Help Center (https://help.twitter.com/)

Feedback

Glenn Decl. Ex. 62
Page 10 of 12

- [(https://help.twitter.com/ur.html)](https://help.twitter.com/ur.html)
- **English** [(https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy)](https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy)
- **Español** [(https://help.twitter.com/es/rules-and-policies/medical-misinformation-policy)](https://help.twitter.com/es/rules-and-policies/medical-misinformation-policy)
- **日本語** [(https://help.twitter.com/ja/rules-and-policies/medical-misinformation-policy)](https://help.twitter.com/ja/rules-and-policies/medical-misinformation-policy)
- **한국어** [(https://help.twitter.com/ko/rules-and-policies/medical-misinformation-policy)](https://help.twitter.com/ko/rules-and-policies/medical-misinformation-policy)
- **Português** [(https://help.twitter.com/pt/rules-and-policies/medical-misinformation-policy)](https://help.twitter.com/pt/rules-and-policies/medical-misinformation-policy)
- **Deutsch** [(https://help.twitter.com/de/rules-and-policies/medical-misinformation-policy)](https://help.twitter.com/de/rules-and-policies/medical-misinformation-policy)
- **Türkçe** [(https://help.twitter.com/tr/rules-and-policies/medical-misinformation-policy)](https://help.twitter.com/tr/rules-and-policies/medical-misinformation-policy)
- **Français** [(https://help.twitter.com/fr/rules-and-policies/medical-misinformation-policy)](https://help.twitter.com/fr/rules-and-policies/medical-misinformation-policy)
- **Italiano** [(https://help.twitter.com/it/rules-and-policies/medical-misinformation-policy)](https://help.twitter.com/it/rules-and-policies/medical-misinformation-policy)
- **العربية** [(https://help.twitter.com/ar/rules-and-policies/medical-misinformation-policy)](https://help.twitter.com/ar/rules-and-policies/medical-misinformation-policy)
- **Nederlands** [(https://help.twitter.com/nl/rules-and-policies/medical-misinformation-policy)](https://help.twitter.com/nl/rules-and-policies/medical-misinformation-policy)
- **Bahasa Indonesia** [(https://help.twitter.com/id/rules-and-policies/medical-misinformation-policy)](https://help.twitter.com/id/rules-and-policies/medical-misinformation-policy)
- **Русский** [(https://help.twitter.com/ru/rules-and-policies/medical-misinformation-policy)](https://help.twitter.com/ru/rules-and-policies/medical-misinformation-policy)
- **हिंदी** [(https://help.twitter.com/hi)](https://help.twitter.com/hi)
- **עברית** [(https://help.twitter.com/he)](https://help.twitter.com/he)
- **简体中文** [(https://help.twitter.com/zh-cn)](https://help.twitter.com/zh-cn)
- **繁體中文** [(https://help.twitter.com/zh-tw)](https://help.twitter.com/zh-tw)
- **ภาษาไทย** [(https://help.twitter.com/th)](https://help.twitter.com/th)
- **Tiếng Việt** [(https://help.twitter.com/vi)](https://help.twitter.com/vi)
- **Melayu** [(https://help.twitter.com/ms)](https://help.twitter.com/ms)
- **Filipino** [(https://help.twitter.com/fil)](https://help.twitter.com/fil)
- **فارسی** [(https://help.twitter.com/fa)](https://help.twitter.com/fa)
- **Dansk** [(https://help.twitter.com/da)](https://help.twitter.com/da)
- **Suomi** [(https://help.twitter.com/fi)](https://help.twitter.com/fi)
- **Svenska** [(https://help.twitter.com/sv)](https://help.twitter.com/sv)
- **Norsk** [(https://help.twitter.com/no)](https://help.twitter.com/no)
- **Polski** [(https://help.twitter.com/pl)](https://help.twitter.com/pl)
- **Magyar** [(https://help.twitter.com/hu)](https://help.twitter.com/hu)
- **Română** [(https://help.twitter.com/ro)](https://help.twitter.com/ro)
- **Čeština** [(https://help.twitter.com/cs)](https://help.twitter.com/cs)
- **Ελληνικά** [(https://help.twitter.com/el)](https://help.twitter.com/el)
- **Українська** [(https://help.twitter.com/uk)](https://help.twitter.com/uk)
- **मराठी** [(https://help.twitter.com/mr)](https://help.twitter.com/mr)
- **தமிழ்** [(https://help.twitter.com/ta)](https://help.twitter.com/ta)
- **Български** [(https://help.twitter.com/bg)](https://help.twitter.com/bg)
- **Català** [(https://help.twitter.com/ca)](https://help.twitter.com/ca)
- **Hrvatski** [(https://help.twitter.com/hr)](https://help.twitter.com/hr)
- **Српски** [(https://help.twitter.com/sr)](https://help.twitter.com/sr)
- **Slovenčina** [(https://help.twitter.com/sk)](https://help.twitter.com/sk)

Feedback

Glenn Decl. Ex. 62
Page 11 of 12

COVID-19 misleading information policy

- <u>ಕನ್ನಡ</u> (https://help.twitter.com/kn)
- <u>پاڼ پښتو</u> (https://help.twitter.com/ps)
- <u>Dari</u> (https://help.twitter.com/fa-af)
- (https://help.twitter.com/am.html)
- <u>Oromo</u> (https://help.twitter.com/om)
- <u>Tigrinya</u> (https://help.twitter.com/ti)

Feedback

Glenn Decl. Ex. 62
Page 12 of 12

# EXHIBIT 63

Skip to main content

 Help Center (https://help.twitter.com/)

- Using Twitter (https://help.twitter.com/en/using-twitter)
- Managing your account (https://help.twitter.com/en/managing-your-account)
- Safety and security (https://help.twitter.com/en/safety-and-security)
- Rules and policies (https://help.twitter.com/en/rules-and-policies)
- Resources ⌄
    - New user FAQ (https://help.twitter.com/en/resources/new-user-faq)
    - Glossary (https://help.twitter.com/en/resources/glossary)
    - How to get even more Twitter (https://help.twitter.com/en/resources/more-twitter)
    - A safer Twitter (https://help.twitter.com/en/resources/a-safer-twitter)
    - Accessibility (https://help.twitter.com/en/resources/accessibility)

    - Our rules (https://help.twitter.com/en/resources/rules)
    - My privacy (https://help.twitter.com/en/resources/how-you-can-control-your-privacy)
    - Getting Started Guide (https://help.twitter.com/en/resources/twitter-guide)
    - How we address misinformation on Twitter (https://help.twitter.com/en/resources/addressing-misleading-info)

Sign in (https://twitter.com/login?redirect_after_login=https://help.twitter.com/en/rules-and-policies/manipulated-media)

Contact Us (https://help.twitter.com/forms.html)



1. Synthetic and manipulated media policy

# Synthetic and manipulated media policy



1. Help Center ⌃ (https://help.twitter.com/)
2. Platform integrity and authenticity ⌃ (https://help.twitter.com/en/rules-and-policies#platform-integrity-and-authenticity)

# Synthetic and manipulated media policy

## Overview

**You may not share synthetic, manipulated, or out-of-context media that may deceive or confuse people and lead to harm ("misleading media"). In addition, we may label Tweets containing misleading media to help people understand their authenticity and to provide additional context.**

# What is in violation of this policy

In order for content with **misleading media** (including images, videos, audios, gifs, and URLs hosting relevant content) to be labeled or removed under this policy, it must:

- Include media that is significantly and deceptively altered, manipulated, or fabricated, or
- Include media that is shared in a deceptive manner or with false context, and
- Include media likely to result in widespread confusion on public issues, impact public safety, or cause serious harm

We use the following criteria as we consider Tweets and media for labeling or removal under this policy as part of our ongoing work to enforce our rules and ensure healthy and safe conversations on Twitter:

### 1. Is the content significantly and deceptively altered, manipulated, or fabricated?

In order for content to be labeled or removed under this policy, we must have reason to believe that media are significantly and deceptively altered, manipulated, or fabricated. Synthetic and manipulated media take many different forms and people can employ a wide range of technologies to produce these media. Some of the factors we consider include:

Feedback

- whether media have been substantially edited or post-processed in a manner that fundamentally alters their composition, sequence, timing, or framing and distorts their meaning;
- whether there are any visual or auditory information (such as new video frames, overdubbed audio, or modified subtitles) that has been added, edited, or removed that fundamentally changes the understanding, meaning, or context of the media;
- whether media have been created, edited, or post-processed with enhancements or use of filters that fundamentally changes the understanding, meaning, or context of the content; and
- whether media depicting a real person have been fabricated or simulated, especially through use of artificial intelligence algorithms

We will not take action to label or remove media that have been edited in ways that do not fundamentally alter their meaning, such as retouched photos or color-corrected videos.

In order to determine if media have been significantly and deceptively altered or fabricated, we may use our own technology or receive reports through partnerships with third parties. In situations where we are unable to reliably determine if media have been altered or fabricated, we may not take action to label or remove them.

**2. Is the content shared in a deceptive manner or with false context?**

We also consider whether the context in which media are shared could result in confusion or suggests a deliberate intent to deceive people about the nature or origin of the content, for example, by falsely claiming that it depicts reality. We assess the context provided alongside media to see whether it provides true and factual information. Some of the types of context we assess in order to make this determination include:

- whether inauthentic, fictional, or produced media are presented or being endorsed as fact or reality, including produced or staged works, reenactments, or exhibitions portrayed as actual events;
- whether media are presented with false or misleading context surrounding the source, location, time, or authenticity of the media;
- whether media are presented with false or misleading context surrounding the identity of the individuals or entities visually depicted in the media;
- whether media are presented with misstatements or misquotations of what is being said or presented with fabricated claims of fact of what is being depicted

Feedback

We will not take action to label or remove media that have been shared with commentary or opinions that do not advance or present a misleading claim on the context of the media such as those listed above.

In order to determine if media have been shared in a deceptive manner or with false context, we may use our own technology or receive reports through partnerships with third parties. In situations where we are unable to reliably determine if media have been shared with false context, we will not label or remove the content.

### 3. Is the content likely to result in widespread confusion on public issues, impact public safety, or cause serious harm?

Tweets that share misleading media are subject to removal under this policy if they are likely to cause serious harm. Some specific harms we consider include:

- Threats to physical safety of a person or group
- Incitement of abusive behavior to a person or group
- Risk of mass violence or widespread civil unrest
- Risk of impeding or complicating provision of public services, protection efforts, or emergency response
- Threats to the privacy or to the ability of a person or group to freely express themselves or participate in civic events, such as:
    - Stalking or unwanted and obsessive attention
    - Targeted content that aims to harass, intimidate, or silence someone else's voice
    - Voter suppression or intimidation

We also consider the time frame within which the content may be likely to impact public safety or cause serious harm, and are more likely to remove content under this policy if immediate harm is likely to result.

Tweets with misleading media that are not likely to result in immediate harm but still have a potential to impact public safety, result in harm, or cause widespread confusion towards a public issue (health, environment, safety, human rights and equality, immigration, and social and political stability) may be labeled to reduce their spread and to provide additional context.

While we have other rules also intended to address these forms of harm, including our policies on violent threats, civic integrity, COVID-19 misleading information, and hateful conduct, we will err toward removal in borderline cases that might otherwise

not violate existing rules for Tweets that include misleading media.

# What is not a violation of this policy

We seek to protect public conversation surrounding various issues. Media often accompany these conversations and encourage further discourse. In the absence of other policy violations, the following are generally not in violation of this policy:

- **Memes or satire,** provided these do not cause significant confusion about the authenticity of the media;
- **Animations, illustrations, and cartoons,** provided these do not cause significant confusion about the authenticity of the media.
- **Commentary, reviews, opinions, and/or reactions.** Sharing media with edits that only add commentary, reviews, opinions, or reactions allows for further debate and discourse relating to various issues and are not in violation of this policy.
- **Counterspeech.** We allow for direct responses to misleading information which seek to undermine its impact by correcting the record, amplifying credible information, and educating the wider community about the prevalence and dynamics of misleading information.
- **Doctored or fake Tweets, social media posts, or chat messages.** Due to the challenges associated with conclusively verifying whether an alleged Tweet, post, or message existed, we generally do not enforce on doctored or fake Tweets, social media posts, or chat messages under this policy.

# Who can report violations of this policy?

We enforce this policy in close coordination with trusted partners, including <u>our partnership with AP and Reuters</u> <u>(https://blog.twitter.com/en_us/topics/company/2021/bringing-more-reliable-context-to-conversations-on-twitter)</u>, other news agencies, public health authorities, and governments. Our team has open lines of communication with various partners to consult and get various media and claims reviewed.

In Australia, South Korea, and the US, Twitter has <u>begun testing</u> <u>(https://twitter.com/TwitterSafety/status/1427706890113495046?s=20)</u> a new reporting feature that will allow users to report Tweets that seem misleading. As part of the experiment, the phrase "It's misleading" will appear as an option when you select **Report an issue**.

Glenn Decl. Ex. 63
Page 5 of 9

# What happens if you violate this policy?

The consequences for violating our synthetic and manipulated media policy depends on the severity of the violation.

**Tweet Deletion**

For high-severity violations of the policy, including misleading media that have a serious risk of harm to individuals or communities, we will require you to remove this content.

**Labeling**

In circumstances where we do not remove content which violates this policy, we may provide additional context on Tweets sharing the misleading media where they appear on Twitter. This means we may:

- Apply a label and/or warning message to the Tweet
- Show a warning to people before they share or like the Tweet;
- Reduce the visibility of the Tweet on Twitter and/or prevent it from being recommended;
- Turn off likes, replies, and Retweets; and/or
- Provide a link to additional explanations or clarifications, such as in a curated landing page (Twitter Moments) or relevant Twitter policies.

In most cases, we will take a combination of the above actions on Tweets we label. We prioritize producing Twitter Moments in cases where misleading content on Twitter is gaining significant attention and has caused public confusion on our service.

**Account locks**

If we determine that an account has advanced or continuously shares harmful misleading narratives that violate the synthetic and manipulated media policy, we may temporarily reduce the visibility of the account or lock or suspend the account.

If you believe that your account was locked or suspended in error, you can submit an appeal (https://help.twitter.com/forms/general?subtopic=suspended).

# Additional resources

Glenn Decl. Ex. 63
Page 6 of 9

Learn more about our work and how we build rules to fight misleading media here (https://blog.twitter.com/en_us/topics/company/2020/new-approach-to-synthetic-and-manipulated-media).

Learn more about our range of enforcement options and our approach to policy development and enforcement.

## Share this article


Tweet

## Was this article helpful?*

    

Submit

© 2022 Twitter, Inc.

Cookies (https://help.twitter.com/rules-and-policies/twitter-cookies)

Privacy (https://twitter.com/privacy)

Terms and conditions (https://twitter.com/tos)

English

 Help Center (https://help.twitter.com/)

Feedback

Glenn Decl. Ex. 63
Page 7 of 9

Our synthetic and manipulated media policy | Twitter Help

- (https://help.twitter.com/ur.html)
- **English** (https://help.twitter.com/en/rules-and-policies/manipulated-media)
- **Español** (https://help.twitter.com/es/rules-and-policies/manipulated-media)
- **日本語** (https://help.twitter.com/ja/rules-and-policies/manipulated-media)
- **한국어** (https://help.twitter.com/ko/rules-and-policies/manipulated-media)
- **Português** (https://help.twitter.com/pt/rules-and-policies/manipulated-media)
- **Deutsch** (https://help.twitter.com/de/rules-and-policies/manipulated-media)
- **Türkçe** (https://help.twitter.com/tr/rules-and-policies/manipulated-media)
- **Français** (https://help.twitter.com/fr/rules-and-policies/manipulated-media)
- **Italiano** (https://help.twitter.com/it/rules-and-policies/manipulated-media)
- **العربية** (https://help.twitter.com/ar/rules-and-policies/manipulated-media)
- **Nederlands** (https://help.twitter.com/nl/rules-and-policies/manipulated-media)
- **Bahasa Indonesia** (https://help.twitter.com/id/rules-and-policies/manipulated-media)
- **Русский** (https://help.twitter.com/ru/rules-and-policies/manipulated-media)
- **हिंदी** (https://help.twitter.com/hi)
- **עברית** (https://help.twitter.com/he)
- **简体中文** (https://help.twitter.com/zh-cn)
- **繁體中文** (https://help.twitter.com/zh-tw)
- **ภาษาไทย** (https://help.twitter.com/th)
- **Tiếng Việt** (https://help.twitter.com/vi)
- **Melayu** (https://help.twitter.com/ms)
- **Filipino** (https://help.twitter.com/fil)
- **فارسی** (https://help.twitter.com/fa)
- **Dansk** (https://help.twitter.com/da)
- **Suomi** (https://help.twitter.com/fi)
- **Svenska** (https://help.twitter.com/sv)
- **Norsk** (https://help.twitter.com/no)
- **Polski** (https://help.twitter.com/pl)
- **Magyar** (https://help.twitter.com/hu)
- **Română** (https://help.twitter.com/ro)
- **Čeština** (https://help.twitter.com/cs)
- **Ελληνικά** (https://help.twitter.com/el)
- **Українська** (https://help.twitter.com/uk)
- **मराठी** (https://help.twitter.com/mr)
- **தமிழ்** (https://help.twitter.com/ta)
- **Български** (https://help.twitter.com/bg)
- **Català** (https://help.twitter.com/ca)
- **Hrvatski** (https://help.twitter.com/hr)
- **Српски** (https://help.twitter.com/sr)
- **Slovenčina** (https://help.twitter.com/sk)

Feedback

Glenn Decl. Ex. 63

- ಕನ್ನಡ (https://help.twitter.com/kn)
- پاپشتو (https://help.twitter.com/ps)
- Dari (https://help.twitter.com/fa-af)
- (https://help.twitter.com/am.html)
- Oromo (https://help.twitter.com/om)
- Tigrinya (https://help.twitter.com/ti)

Feedback

Glenn Decl. Ex. 63
Page 9 of 9

# EXHIBIT 64

 Blog

Back

highTint

# Coronavirus: Staying safe and informed on Twitter

By
Twitter
Tuesday, 12 January 2021



Link copied successfully

**As the global community faces the COVID-19 pandemic together, Twitter is helping people find reliable information, connect with others, and follow what's happening in real time.**

**Click through the menu below to find the latest updates on our critical work.**

*Editorial note: This blog was first posted on Friday, 3 April 2020 and last updated Tuesday, 12 January 2021, to reflect updated proactive enforcement metrics.*

**1. Helping people find reliable information**

Glenn Decl. Ex. 64
Page 1 of 31

Coronavirus: Staying safe and informed on Twitter

- COVID-19 tab in Explore
- COVID-19 account verification
- Global expansion of the COVID-19 search prompt
- A dedicated COVID-19 event page
- Launch of a new dedicated #KnowTheFacts search prompt
- Direct engagement with organizations working to contain the threat

### 2. Protecting the public conversation

- Clarifying how we assess misleading information
- Updating our approach to misleading information
- Broadening our guidance on unverified claims
- Our ads policy for COVID-19
- Broadening our definition of "harm"
- An update on our content moderation work
- Automated technology and what to expect if you file a report
- Additional triage, quality assurance, and ongoing review of Twitter's rules
- Our zero-tolerance approach to platform manipulation

### 3. Partnering with organizations and public engagement

- Resources for those battling substance abuse disorders, in recovery
- #WorldHealthDay: Clapping for our healthcare heroes
- #WorldHealthDay: Twitter Q&A with the World Health Organization
- #AsktheGov and #AsktheMayor Q&As hosted on Twitter
- Supporting the #BuildforCovid19 Hackathon
- Protecting and supporting journalists
- Working together with industry peers to keep people safe
- Promoting proper handwashing with the #SafeHands emoji
- Building partnerships to protect the public conversation
- #AdsForGood support and additional protections
- Furthering our partnerships
- Donation matching

Glenn Decl. Ex. 64
Page 2 of 31

### 4. Empowering Research of COVID-19 on Twitter

- Enabling study of the public conversation in a time of crisis

### 5. Ensuring site reliability

- How we're keeping the service running and the Tweets flowing
- How we're working differently, and what it means for you

### 6. Keeping our employees and partners safe

- #LoveWhereverYouWork
- Mandatory work from home and supporting our employees
- Suspending noncritical business travel and events

### 7. Sharing Twitter's metrics

- Updated proactive enforcement metrics
- An update to our proactive enforcement and metrics on elevated credible information
- An update on our proactive enforcement and spam detection
- Our platform usage
- Quantifying our efforts to reduce misleading and potentially harmful content

# 1. Helping people find reliable information

*May 18, 2020*
**COVID-19 tab in Explore**

Glenn Decl. Ex. 64
Page 3 of 31

We've added a new tab (https://twitter.com/explore/tabs/covid-19) in Explore so it's easier to find the latest information on COVID-19. The tab will include curated pages highlighting the latest news such as public service announcements, Tweets from public health experts and journalists, as well as stories about how people are coping and helping each other.

This is available in Argentina, Australia, Brazil, Canada, Colombia, Egypt, India, Ireland, Japan, Mexico, New Zealand, Saudi Arabia, Spain, United Arab Emirates, United Kingdom, and United States for people on twitter.com, iOS, and Android.

*March 20, 2020*
**COVID-19 account verification**

*March 4, 2020*
**Global expansion of the COVID-19 search prompt**

Launched six days before the official designation of the virus in January 2020, we continue to expand our dedicated search prompt feature to ensure that when you come to the service for information about COVID-19, you are met with credible, authoritative content at the top of search. We have been consistently monitoring the conversation on the service to make sure keywords — including common misspellings — also generate the search prompt.

In each country where we have launched the initiative, we have partnered with the national public health agency or the World Health Organization (@WHO (https://twitter.com/WHO)) directly. The proactive search prompt is in place with official local partnerships in more than 70 countries around the world.

They include: Australia, Austria, Belgium, Brazil, Brunei, Cambodia, Canada, Cyprus, Denmark, Egypt, Estonia, Finland, France, Germany, Hong Kong, Iceland, India, Indonesia, Ireland, Italy, Japan, Jordan, Korea, Laos, Latvia, Lebanon, Malaysia, Mongolia, Myanmar, Netherlands, New Zealand, Norway, Paraguay, Philippines, Poland, Singapore, Spain, Sri Lanka, Sudan, Sweden, Switzerland, Taiwan, Thailand, Turkey, United Kingdom, United States, Uruguay, Vietnam, and Yemen.

**A dedicated COVID-19 event page**

Glenn Decl. Ex. 64
Page 4 of 31

We have also ensured the <u>Events feature contains credible information about COVID-19</u> (https://twitter.com/i/events/1219057585707315201) and is available at the top of the Home timeline for everyone in 30+ countries.

<u>Read the original post.</u> (https://blog.twitter.com/en_us/topics/company/2020/stepping-up-our-work-to-protect-the-public-conversation-around-covid-19.html)

*January 29, 2020*
**Launch of a new dedicated #KnowTheFacts search prompt**

As the global conversation continues around the spread of COVID-19, we want to share the work we're doing to surface the right information, to promote constructive engagement, and to highlight credible information on this emerging issue. We've seen tens of millions of Tweets on this topic in the past four weeks and that trend looks set to continue.

Given the rapidly evolving nature of the issue and the growing international response, we've launched a new dedicated search prompt to ensure that when you come to the service for information about the #coronavirus, you're met with credible, authoritative information first. In addition, we're halting any auto-suggest results that are likely to direct individuals to noncredible content on Twitter. This is an expansion of our **<u>Know the facts</u>** (https://blog.twitter.com/en_us/topics/company/2019/helping-you-find-reliable-public-health-information-on-twitter.html) prompt, which we specifically put in place for the public to find clear, credible information on immunization and vaccination health.

Our official <u>#coronavirus</u> (https://twitter.com/hashtag/coronavirus) partnerships are now in place in Australia, Austria, Belgium, Brazil, Brunei, Cambodia, Canada, Cyprus, Denmark, Egypt, Estonia, Finland, France, Germany, Hong Kong, Iceland, India, Indonesia, Ireland, Italy, Japan, Jordan, Korea, Laos, Latvia, Lebanon, Malaysia, Mongolia, Myanmar, Netherlands, New Zealand, Norway, Paraguay, Philippines, Poland, Singapore, Spain, Sri Lanka, Sudan, Sweden, Switzerland, Taiwan, Thailand, Turkey, United Kingdom, United States, Uruguay, Vietnam, and Yemen.

**Direct engagement with organizations working to contain the threat**

Finally, our Global Public Policy team is proactively seeking ways to integrate the product with organizations involved in the effort to contain the threat. Experts, NGOs, and governments play a pivotal public service role, using Twitter to reach people with the right information when they need it. We're committed to playing our part to amplify authoritative, official content across the globe.

Glenn Decl. Ex. 64
Page 5 of 31

For more, please follow @TwitterGov (https://twitter.com/TwitterGov) and @Policy
(https://twitter.com/Policy), where we will provide updates as appropriate.

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/authoritative-information-
about-novel-coronavirus.html)

**Back to top**

## 2. Protecting the public conversation

*July 14, 2020*

**Clarifying how we assess misleading information**

Today we are further clarifying our rules against potentially misleading information
about COVID-19.  This update includes additional details on what factors we take
into account when considering content for removal.

Our primary goal with addressing misleading information about COVID-19 has not
changed. We will continue to remove demonstrably false or potentially misleading
content that has the highest risk of causing harm. However, we are providing
additional details about our framework for evaluating a potentially misleading claim,
including when we would or would not require Tweets to include an explicit call to
action (e.g. "everyone should stop wearing masks!") in order to take action.

When evaluating whether or not to remove the most harmful misinformation on our
platform, we consider three criteria:

## 1. Is the content advancing a claim of fact regarding COVID-19?

For a Tweet to qualify as a misleading claim, it must be an assertion of fact (not an
opinion), expressed definitively, and intended to influence others' behavior. Some
examples include information about:

- the origin, nature, and characteristics of the virus;
- preventative measures, treatments/cures, and other precautions;
- the prevalence of viral spread, or the current state of the crisis;
- official health advisories, restrictions, regulations, and public-service announcements;
- how vulnerable communities are affected by/responding to the pandemic.

## 2. Is the claim demonstrably false or misleading?

Under this policy, we consider claims to be false or misleading if (1) they have been confirmed to be false by subject-matter experts, such as public health authorities; or (2) they include information which is shared in a way that could confuse or deceive people. Some of the factors we consider include:

- Whether the content of the Tweet, including media, has been significantly altered, manipulated, doctored, or fabricated;
- Whether claims are presented improperly or out of context;
- Whether claims shared in a Tweet are widely accepted by experts to be inaccurate or false.

## 3. Would belief in this information, as presented, lead to harm?

We will not be able to take enforcement action on every Tweet that contains incomplete or disputed information about COVID-19. Our focus in the COVID-19 policy is narrowed to address those claims that could adversely impact an individual, group, or community. We are most concerned with misleading information that:

- May increase the likelihood of exposure to the virus;
- May have adverse effects on the public health system's capacity to cope with the crisis;
- Could lead to discrimination and avoidance of communities and/or places of business based on their perceived affiliation with protected groups.

**COVID-19 related content that meet all three of the criteria defined above**—i.e. that are claims of fact, demonstrably false or misleading, and likely to cause harm— **may not be shared on Twitter and are subject to removal**. Accounts that break this rule repeatedly may be permanently suspended. Further details about some of the most common types of misleading claims which we will remove under this policy are provided below. (https://blog.twitter.com/en_us/topics/company/2020/covid-19.html#moderation)

We may <u>label or place a warning on tweets</u> (https://blog.twitter.com/en_us/topics/product/2020/updating-our-approach-to-misleading-information.html) to provide additional context in situations where the risks of harm associated with a Tweet are less severe but where people may still be confused or misled. This will make it easier to find facts and make informed decisions about what people see on Twitter. <u>In line with our existing enforcement approach,</u> (https://help.twitter.com/en/safety-and-security/tweet-visibility) Tweets that are labeled under this expanded guidance will have reduced visibility across the service. Reducing the visibility of Tweets means that we will not amplify the Tweets on a number of surfaces across Twitter. However, anyone following the account will still be able to see the Tweet and Retweet.

The world has changed since this pandemic was first declared and public health experts, medical professionals, scientists and researchers now know more about how we can best stay safe and healthy. As the situation evolves and as global health advisories shift to cope with the pandemic, we are committed to ensuring our rules and enforcement actions reflect that evolution.

***May 11, 2020***

**Updating our approach to misleading information**

In serving the public conversation, our goal is to make it easy to find credible information on Twitter and to limit the spread of potentially harmful and misleading content. Starting today, we're introducing new labels and warning messages that will provide additional context and information on some Tweets containing disputed or misleading information related to COVID-19. For more information see the full update to our approach on misleading information <u>here.</u> (https://blog.twitter.com/en_us/topics/product/2020/updating-our-approach-to-misleading-information.html)

***April 22, 2020***

**Broadening our guidance on unverified claims**

Going forward and specific to COVID-19, unverified claims that have the potential to incite people to action, could lead to the destruction or damage of critical infrastructure, or cause widespread panic/social unrest may be considered a violation of our policies. Examples include, "The National Guard just announced that no more

shipments of food will be arriving for two months — run to the grocery store ASAP and buy everything" or "5G causes coronavirus — go destroy the cell towers in your neighborhood!".

## April 2, 2020

**Our ads policy for COVID-19**

In response to the shifting advertising landscape, and in order to support helpful causes during this time, we're now allowing managed clients and partners to advertise content containing implicit or explicit reference to COVID-19 in the following use cases, with restrictions:

- Adjustments to business practices and/or models in response to COVID-19
- Support for customers and employees related to COVID-19

The following restrictions apply to these use cases:

- Distasteful references to COVID-19 (or variations) are prohibited
- Content may not be sensational or likely to incite panic
- Prices of products related to COVID-19 may not be inflated
- The promotion of certain products related to COVID-19 may be prohibited. We currently prohibit the advertising of medical facemasks and alcohol hand sanitizers. Please note that other products may be added to this list and enforcement can be retroactive.
- The mention of vaccines, treatments and test kits is permitted, only in the form of information, from news publishers which have been exempted under the Political Ads Content (https://business.twitter.com/en/help/ads-policies/prohibited-content-policies/political-content.html) policy.

Read more about the policy (https://business.twitter.com/en/help/ads-policies/prohibited-content-policies/inappropriate-content.html).
For more COVID-19 Twitter resources for advertisers, visit marketing.twitter.com/covid19 (http://marketing.twitter.com/covid19).

## April 1, 2020
**Broadening our definition of "harm"**

Glenn Decl. Ex. 64
Page 9 of 31

We have broadened our definition of harm to address content that goes directly against guidance from authoritative sources of global and local public health information. Rather than reports, we are enforcing this in close coordination with trusted partners, including public health authorities and governments, and continue to use and consult with information from those sources when reviewing content.

- We'll continue to prioritize removing content when it has a clear call to action that could directly pose a risk to people's health or well-being, but we want to make it clear that we will not be able to take enforcement action on every Tweet that contains incomplete or disputed information about COVID-19. This is not meant to limit good faith discussion or expressing hope about ongoing studies related to potential medical interventions that show promise.
- Since introducing these policies on March 18, we have removed more than 1,100 Tweets containing misleading and potentially harmful content from Twitter. Additionally, our automated systems have challenged more than 1.5 million accounts which were targeting discussions around COVID-19 with spammy or manipulative behaviors. We will continue to use both technology and our teams to help us identify and stop spammy behavior and accounts.
- We may also apply the public interest notice (https://blog.twitter.com/en_us/topics/company/2019/worldleaders2019.html) in cases where world leaders (https://blog.twitter.com/en_us/topics/company/2019/publicinterest.html) violate the COVID-19 guidelines.

**Automated technology and what to expect if you file a report**

How are we using automated technology during this time?

- To help us review reports more efficiently by surfacing content that's most likely to cause harm and should be reviewed first.
- To help us proactively identify rule-breaking content before it's reported. Our systems learn from past decisions by our review teams, so over time, the technology is able to help us rank content or challenge accounts automatically.
- For content that requires additional context, such as misleading information around COVID-19, our teams will continue to review those reports manually.

What you can expect if you file a report during this time:

- If you've reported an account or Tweet to us, it will take longer than normal for us to get back to you. We appreciate your patience as we continue to make adjustments.
- Because these automated systems don't have all of the context and insight our team has, we'll make mistakes. If you think we've made a mistake, you can let us know and appeal here (https://help.twitter.com/forms/general).

We appreciate your patience as we work to keep our teams safe, while also making sure we're protecting everyone on Twitter. You can always continue to use hide replies, mute, block, reply filters, and the other tools we offer (https://help.twitter.com/en/a-safer-twitter) you to control conversations on the service.

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/An-update-on-our-continuity-strategy-during-COVID-19.html)

*March 27, 2020*

**An update on our content moderation work**

We have broadened our definition of harm to address content that goes directly against guidance from authoritative sources of global and local public health information. Rather than reports, we are enforcing this in close coordination with trusted partners, including public health authorities and governments, and continue to use and consult with information from those sources when reviewing content.

Under this guidance, we will require people to remove Tweets that include:

- Statements which are intended to influence others to violate recommended COVID-19 related guidance from global or local health authorities to decrease someone's likelihood of exposure to COVID-19, such as: "social distancing is not effective," or "now that it's summertime, you don't need a mask anymore, so don't wear your mask!"
- *Note: We will not require the removal of Tweets that include information about or encouragement to participate in demonstrations or protests.*
- Misleading claims that unharmful but ineffective methods are cures or absolute treatments for COVID-19, such as "Coronavirus is vulnerable to UV radiation - walking outside in bright sunlight will prevent COVID-19."
- Description of harmful treatments or preventative measures which are known to be ineffective or are being shared out of context to mislead people, such as "drinking bleach and ingesting colloidal silver will cure COVID-19."
- Denial of established scientific facts about transmission during the incubation period or transmission guidance from global and local health authorities, such as "COVID-19 does not infect children because we haven't seen any cases of children being sick."
- False or misleading information that would allow the reader to diagnose themselves as either having or not having COVID-19, such as "If you can hold your breath for 10 seconds, you don't have coronavirus."
- Unverified claims that have the potential to incite people to action, could lead to the destruction or damage of critical infrastructure, or could lead to widespread panic/social unrest may be considered a violation of our policies. Examples include,  "The National Guard just announced that no more shipments of food will be arriving for two months — run to the grocery store ASAP and buy everything" or "5G causes coronavirus — #BURN5G."
- Tweets offering the sale or facilitation of non-prescription treatments/cures for COVID-19, or those which advertise cures or treatments for COVID-19 that require a prescription or physician consultation.
- Specific and unverified claims made by people impersonating a government or health official or organization such as a parody account of official public health advisors claiming that hydroxychloroquine will prevent COVID-19.
- Claims that specific groups or nationalities are never susceptible to COVID-19, such as "people with dark skin are immune to COVID-19 due to melanin production" or are more susceptible, such as "avoid businesses owned by Chinese people as they are more likely to have COVID-19."

*March 16, 2020*
**Our use of automated technology**

Glenn Decl. Ex. 64
Page 12 of 31

We have increased our use of machine learning and automation to take a wide range of actions on potentially abusive and manipulative content. We want to be clear: while we work to ensure our systems are consistent, they can sometimes lack the context that our teams bring, and this may result in us making mistakes. As a result, we will not permanently suspend any accounts based solely on our automated enforcement systems. Instead, we will continue to look for opportunities to build in human review checks where they will be most impactful. We appreciate your patience as we work to get it right — this is a necessary step to scale our work to protect the conversation on Twitter.

**Additional triage, quality assurance, and our ongoing review of Twitter Rules**

Here are a few more things we are doing to protect the public conversation:

Glenn Decl. Ex. 64
Page 13 of 31

- Building systems that enable our team to continue to enforce our rules remotely around the world.
- We're also increasing our employee assistance and wellness support for everyone involved in this critical work, and ensuring people's privacy and security stay a top priority.
- Instituting a global content severity triage system so we are prioritizing the potential rule violations that present the biggest risk of harm and reducing the burden on people to report them.
- Executing daily quality assurance checks on our content enforcement processes to ensure we're agile in responding to this rapidly evolving, global disease outbreak.
- Engaging with our partners around the world to ensure escalation paths remain open and urgent cases can be brought to our attention.
- Continuing to review the Twitter Rules (https://help.twitter.com/en/rules-and-policies/twitter-rules) in the context of COVID-19 and considering ways in which they may need to evolve to account for new behaviors.
- As we've said on many occasions, our approach to protecting the public conversation is never static. That's particularly relevant in these unprecedented times. We intend to review our thinking daily and will ensure we're sharing updates here on any new clarifications to our rules or major changes to how we're enforcing them.
- Finally, we're encouraged that our service is being used around the world to provide free, authoritative health information, and to ensure that everyone has access to the conversations they need to protect themselves and their families. For more, our dedicated COVID-19 Event page (https://twitter.com/i/events/1219057585707315201) has the latest facts right at the top of your timeline, and we'll continue to share updates @TwitterSafety (https://twitter.com/TwitterSafety) and @TwitterSupport (http://twitter.com/twittersupport).

*March 4, 2020*
**Our zero-tolerance approach to platform manipulation**

The power of a uniquely open service during a public health emergency is clear. The speed and borderless nature of Twitter presents an extraordinary opportunity to get the word out and ensure people have access to the latest information from expert sources around the world.

To support that mission, our global Trust & Safety team is continuing its zero-tolerance approach to platform manipulation and any other attempts to abuse our service at this critical juncture. At present, we're not seeing significant coordinated

platform manipulation efforts around these issues. However, we will remain vigilant and have invested substantially in our proactive abilities to ensure trends, search, and other common areas of the service are protected from malicious behaviors. As ever, we also welcome constructive and open information sharing from governments and academics to further our work in these areas — we're in this together.

*January 29, 2020*
**Preventing platform manipulation**

As the global conversation continues around the spread of COVID-19, we want to share the work we're doing to surface the right information, to promote constructive engagement, and to highlight credible information on this emerging issue.

At present, we're not seeing significant coordinated attempts to spread disinformation at scale about this issue. However, we will remain vigilant and have invested significantly in our proactive abilities to ensure trends, search, and other common areas of the service are protected from malicious behaviors. As ever, those who engage in these practices will be removed from our service. We do not permit platform manipulation and we encourage people to think before sharing or engaging in deliberate attempts to undermine the public conversation.

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/authoritative-information-about-novel-coronavirus.html)

**Back to top**

# 3. Partnering with organizations and public engagement

*April 10, 2020*

**Resources for those battling substance abuse disorders, in recovery**
As people across the country and around the world #StayHome to slow the spread of #COVID19, it's imperative we think about the significant impact these measures have on those experiencing substance use disorders and those in recovery.

In partnership with Center for Safe Internet Pharmacies (https://twitter.com/safemedsonline), Twitter is building on its collaboration with Google (http://www.twitter.com/google), Facebook (https://twitter.com/Facebook), and Microsoft (https://twitter.com/Microsoft) to showcase a variety of resources on TechTogether.co (http://techtogether.co) to support the #RecoveryMovement (https://twitter.com/hashtag/RecoveryMoment). The site is a collection of resources to help those experiencing a substance use disorder and the associated stigma.

*April 7, 2020*
#WorldHealthDay (https://twitter.com/hashtag/WorldHealthDay)

**Clapping for our healthcare heroes**

**Twitter Q&A with the World Health Organization**

*April 2, 2020*
**#AsktheGov & #AsktheMayor Twitter Q&As**

State and local elected officials across America are using Twitter to consistently provide factual information and resources to their constituents and the broader public around #COVID19 (https://twitter.com/hashtag/COVID19). To optimize and elevate this work, Twitter organized two nationwide events where governors and mayors answered constituent questions through Twitter Q&As. These #AsktheGov (https://twitter.com/hashtag/AsktheGov) and #AsktheMayor (https://twitter.com/hashtag/AsktheMayor) events provided an opportunity for hundreds of Americans to receive direct answers from their elected leaders and allowed millions of people to access those critical resources and information.

*March 24, 2020*
**Supporting the #BuildforCovid19 Hackathon**

Twitter supports the COVID-19 Global Hackathon (https://covid-global-hackathon.devpost.com/), an opportunity for developers to build software solutions that drive social impact with the aim of tackling some of the challenges related to the current coronavirus (COVID-19) pandemic.

# March 24, 2020
# Protecting and supporting journalists

All around the world, we've seen our service connecting people with the authoritative health information they need to protect themselves and their loved ones. That work can only be successful if people have access to the news and information they need.

Right now, every journalist is a COVID-19 journalist. From the stories of healthcare workers on the front lines, to analysis of the real human and economic cost of the pandemic, reporters around the world are still writing, still exposing themselves to harm, still giving us the facts. Journalism is core to our service and we have a deep and enduring responsibility to protect that work. This week we're contributing to two critical organizations that are working tirelessly to uphold the fundamental values of a free press during this pandemic.

We're donating 1 million dollars evenly distributed between the Committee to Protect Journalists and the International Women's Media Foundation. These funds will be used to ensure these organizations can continue their work in the face of new economic strains and to directly support journalists. Their shared efforts to advocate for the rights of vulnerable reporters and to guarantee an equal share of voice for women in the industry has never been more relevant or important.

> We are grateful for Twitter's generous support. Our efforts at CPJ are focused on ensuring that journalists around the world have the information and resources they need to cover the COVID-19 pandemic safely. And we are pushing back against governments that are censoring the news, and restricting the work of the press. We need timely, accurate information flowing within countries and across borders so that political leaders, health policy experts, and the public at large can make informed decisions at this critical moment.

Joel Simon

Executive Director, Committee to Protect Journalists (CPJ)

@Joelcpj (https://twitter.com/Joelcpj)

> Right now, there is a great need to support our community of journalists covering, and dealing with, this global pandemic. Based on our decades of work with journalists who operate in dangerous and difficult environments, the IWMF understands the critical role that safety and security plays in the industry. Thanks to the incredible support of Twitter, the IWMF will be able to address the needs of our community of journalists more deeply and robustly. By supporting journalists from diverse communities, together we can support the most representative news possible in this evolving time.

Elisa Lees Muñoz

Executive Director, International Women's Media Foundation (IWMF)

@ElisaLeesMunoz (https://twitter.com/ElisaLeesMunoz)
COVID-19 has been with us for months but the power of the virus is now being felt on all corners of the globe. We're witnessing real-time public conversation on an issue that connects us all on a core human level and our purpose has never been stronger. We will continue to work with our partners as the crisis evolves and are grateful for their journalistic leadership and commitment to the power of the pen.

For more, please follow @TwitterForGood (https://twitter.com/TwitterForGood), @pressfreedom (https://twitter.com/pressfreedom), and @IWMF (https://twitter.com/IWMF).

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/giving-back-covid-19.html)

### *March 16, 2020*
### Working together with government and industry peers to keep people safe

We're working with our peer companies and fellow industry leaders in the US to keep people safe and stop the spread of COVID-19. Through this collaboration, we're working to elevate authoritative health information and provide resources for the most vulnerable populations. To see a hub of online resources and an overview of the work from Internet Association members, visit covid19.internetassociation.org (https://covid19.internetassociation.org/industry/response/).

Here's more on our collaboration with peer companies and the government:

*March 13, 2020*
**Promoting proper handwashing with the #SafeHands emoji**

*March 4, 2020*
**Building partnerships to protect the public conversation**

Our entire company is stepping up its internal and external efforts to build partnerships, protect the public conversation, help people find authoritative health information, raise relief funds, and contribute pro bono advertising support to ensure people are getting the right message, from the right source.

With a critical mass of expert organizations, official government accounts, health professionals, and epidemiologists on our service, our goal is to elevate and amplify authoritative health information as far as possible.

**Global expansion of the COVID-19 search prompt**

Launched six days before the official designation of the virus in January (https://blog.twitter.com/en_us/topics/company/2020/authoritative-information-about-novel-coronavirus.html), we continue to expand our dedicated search prompt feature to ensure that when you come to the service for information about COVID-19, you are met with credible, authoritative content at the top of your search experience. We have been consistently monitoring the conversation on the service to make sure keywords — including common misspellings — also generate the search prompt.

In each country where we have launched the initiative, we have partnered with the national public health agency or the World Health Organization (@WHO (https://twitter.com/WHO)) directly. The proactive search prompt is in place with official local partnerships in more than 70 countries around the world.

They include: Australia, Austria, Belgium, Brazil, Brunei, Cambodia, Canada, Cyprus, Denmark, Egypt, Estonia, Finland, France, Germany, Hong Kong, Iceland, India, Indonesia, Ireland, Italy, Japan, Jordan, Korea, Laos, Latvia, Lebanon, Malaysia, Mongolia, Myanmar, Netherlands, New Zealand, Norway, Paraguay, Philippines, Poland, Singapore, Spain, Sri Lanka, Sudan, Sweden, Switzerland, Taiwan, Thailand, Turkey, United Kingdom, United States, Uruguay, Vietnam, and Yemen.

**#AdsForGood support and additional protections**

Based on our Inappropriate Content Policy (https://business.twitter.com/en/help/ads-policies/prohibited-content-policies/inappropriate-content.html), we will halt any attempt by advertisers to opportunistically use the COVID-19 outbreak to target inappropriate ads. Government entities that want to disseminate public health information will be permitted to promote ads on COVID-19. In the case of COVID-19, we have put additional safeguards into place in order to facilitate the sharing of trusted public health information and to reduce potential harm to users. We are currently prohibiting the promotion of all medical masks and alcohol hand sanitizers due to strong correlation to COVID-19 and instances of inflated prices globally.

In addition, we're committing Ads for Good credits to nonprofit organizations to ensure they can build campaigns to fact-check and get reputable health information to the widest possible audiences. For example, as part of the International Fact-Checking Network (IFCN/@factchecknet (https://twitter.com/factchecknet)), we have supported the Spanish organization @maldita_es (https://twitter.com/maldita_es) and @malditobulo (https://twitter.com/malditobulo), which focuses on mitigating the impact of disinformation on public discourse through fact-checking and data journalism techniques. In Asia, we have partnered with the Taiwan Fact Checking Center (@taiwantfc (https://twitter.com/taiwantfc)), which has been using Twitter to connect with IFCN fact checkers around the world via #CoronavirusFacts (https://twitter.com/hashtag/CoronavirusFacts). They are working in real time to find credible information and debunk rumors in Chinese.

### Furthering our partnerships

Our Global Public Policy team has open lines of communication with relevant multinational stakeholders, including the World Health Organization, numerous global government and public health organizations, and officials around the world, to ensure they can troubleshoot account issues, get their experts verified, and seek strategic counsel as they use the power of Twitter to mitigate harm.

We're also in close contact with our industry peers and will attend all relevant cross-functional meetings. As a uniquely open service, our data is being used in research every day and our researchers hub (https://developer.twitter.com/en/use-cases/academic-researchers) is publicly available. We welcome applications for the use of Twitter data to support research on COVID-19. We will also explore further #DataForGood (https://twitter.com/hashtag/dataforgood) partnerships to assess how our data products can enhance academic and NGO understanding of public health emergencies now and into the future.

**Donation matching**

We've set up a dedicated internal COVID-19 campaign page through our employee donation matching program to support humanitarian response and relief efforts around the world. Any Twitter employee can donate to relevant nonprofit organizations, and Twitter will match donations up to $2,000 per employee.

What can you do?

Looking for advice on how best to use Twitter in a time like this? Follow @WHO (https://twitter.com/WHO?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor) and your local health ministry — seek out the authoritative health information and ignore the noise. See something suspicious or abusive, report it (https://help.twitter.com/en/rules-and-policies/twitter-report-violation) to us immediately. Most importantly, think before you Tweet. Through Twitter Moments (https://twitter.com/i/moments?lang=en), we have curated longer-form content that helps tell the full story of what's happening around COVID-19 globally. For educators and parents, consult our media literacy guide, which was built in partnership with @UNESCO (https://twitter.com/UNESCO), here (https://blog.twitter.com/en_us/topics/company/2019/twitter-launches-new-media-literacy-handbook-for-schools.html).

We're absolutely committed to playing our part and will continue to provide substantive updates as this situation evolves. For more, follow @TwitterSafety (https://twitter.com/TwitterSafety) and @Policy (https://twitter.com/Policy).

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/covid-19.html)

**Back to top**

**4. Empowering Research of COVID-19 on Twitter**

*April 29, 2020*

**Enabling study of the public conversation in a time of crisis**

To further support Twitter's ongoing efforts to protect the public conversation, and help people find authoritative health information around COVID-19, we're releasing a new endpoint into Twitter Developer Labs (https://developer.twitter.com/en/labs) to enable

Glenn Decl. Ex. 64
Page 21 of 31

approved developers and researchers to study the public conversation about COVID-19 in real-time.

The COVID-19 stream endpoint provides access to COVID-19 and Coronavirus related public Tweets in real-time as defined by the criteria (https://developer.twitter.com/en/docs/labs/overview/whats-new/annotations) used to power this topic on Twitter. This is a unique dataset that covers many tens of millions of Tweets daily and offers insight into the evolving global public conversation surrounding an unprecedented crisis. Making this access available for free is one of the most unique and valuable things Twitter can do as the world comes together to protect our communities and seek answers to pressing challenges.

You can read more about this endpoint and the application process on our developer blog (https://blog.twitter.com/developer/en_us/topics/tools/2020/covid19_public_conversation_data.html).

**Back to top**

---

**5. Ensuring site reliability**

## *March 27, 2020*

**How we're keeping the service running and the Tweets flowing**

Keeping the service running and the Tweets flowing is one of our top priorities in these difficult times. Our work has never been more critical and our service has never been in higher demand. In the past few weeks, we have seen more and more people turn to Twitter to participate in the public conversation and follow what's happening in real time.

- The global conversation about COVID-19 and ongoing product improvements are driving up total monetizable DAU (mDAU) (https://www.prnewswire.com/news-releases/twitter-withdraws-q1-guidance-due-to-covid-19-impact-301028477.html), with quarter-to-date average total mDAU reaching approximately 164 million, up 23% from 134 million in Q1 2019 and up 8% from 152 million in Q4 2019.
- We've also seen a 45% increase in our curated events page (https://twitter.com/i/events/1219057585707315201) usage and a 30% increase in Direct Message (DM) usage since March 6.

Glenn Decl. Ex. 64
Page 22 of 31

While many of our teams are transitioning to working from home (https://blog.twitter.com/en_us/topics/company/2020/keeping-our-employees-and-partners-safe-during-coronavirus.html), some of our infrastructure teams have physical responsibilities that are critical to keeping our data centers, and Twitter, up and running. These teams are operating under the "essential services" provisions dedicated in City, County, and State orders to ensure business continuity. We couldn't keep the Tweets flowing without their daily dedication and hard work.

The combination of the new work environment and the increased load on our platform has placed unique stresses on our operations, requiring our engineering teams to work more closely together than ever to respond to new demands, and to plan for the future. From our IT, Network, and Product Engineering teams to our Infrastructure and Data Center teams, we have collectively mobilized to ensure we are able to stay safe and productive under the stress of the new levels of traffic we're seeing on our service.

The effects of COVID-19 on Twitter have already surpassed any event we've seen, and it's possible that as the pandemic continues, we will see additional stress on our service. Beyond Twitter, COVID-19 has also had a far-sweeping impact on our supply chain partners. Whereas normally we'd have months of lead time to add hardware capacity for expected growth, in this case, manufacturing delays in China have compromised the supply chain, resulting in delays in deliveries to our data centers. Our Data Center, SiteOps, Supply Chain, Hardware Engineering, and Mission Critical teams continue to manage the physical infrastructure that underlies the service — expertly innovating to unlock additional capacity in existing supply.

Our teams are actively addressing areas where we need to add capacity to critical services, looking at how we can optimize existing technology to perform better, and planning for how we might adjust to the way people are using Twitter during this time.

It's critical for Twitter to stay up and running through this global crisis. Our teams are focused, and as we make changes to our systems to meet these new demands, we will communicate openly. We will share what we've done, what we've learned, and if we see incidents, what we will do to recover as quickly as possible. Follow @TwitterEng (http://twitter.com/twittereng) to stay up to date.

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/An-update-on-our-continuity-strategy-during-COVID-19.html)

*March 16, 2020*

**How we're working differently, and what it means for you**

**Back to top**

---

**6. Keeping our employees and partners safe**

*May 12, 2020*

**#LoveWhereverYouWork**

Twitter was one of the first companies to go to a work from home model in the face of COVID-19, but we don't anticipate being one of the first to return to offices.

We were uniquely positioned to respond quickly and allow folks to work from home given our emphasis on decentralization and supporting a distributed workforce capable of working from anywhere. The past few months have proven we can make that work. So if our employees are in a role and situation that enables them to work from home and they want to continue to do so forever, we will make that happen. If not, our offices will be their warm and welcoming selves, with some additional precautions, when we feel it's safe to return.

Here's how we're thinking about the next few months:

- Opening offices will be our decision, when and if our employees come back, will be theirs.
- With very few exceptions, offices won't open before September. When we do decide to open offices, it also won't be a snap back to the way it was before. It will be careful, intentional, office by office and gradual.
- There will also be no business travel before September, with very few exceptions, and no in-person company events for the rest of 2020. We will assess 2021 events later this year.

We're proud of the early action we took to protect the health of our employees and our communities. That will remain our top priority as we work through the unknowns of the coming months.

*#LoveWhereverYouWork*

# *March 11, 2020*

### Mandatory work from home and supporting our employees

Our top priority remains the health and safety of our Tweeps, and we also have a responsibility to support our communities, those who are vulnerable, and the healthcare providers who are on the front lines of this pandemic. To continue this push, we are moving beyond our earlier guidance of "strongly encouraging work from home" provided on March 2 and have now informed all employees globally they must work from home.

We understand this is an unprecedented step, but these are unprecedented times. And we will continue to do all that we can to support our Tweeps, including:

### Paying our contractors, vendors and hourly workers

For contractors and hourly workers who are not able to perform their responsibilities from home, Twitter will continue to pay their labor costs to cover standard working hours while Twitter's work-from-home guidance and/or travel restrictions related to their assigned office are in effect.

### Additional resources to support parents

As part of our ongoing global benefits support, Twitter is stepping in to ease additional expenses parents may be experiencing when their normal daycare closes due to COVID-19 by providing reimbursement for the additional daycare expenses incurred.

### Helping Tweeps set up their at-home offices

All employees, including hourly workers, will receive reimbursement toward their home office set up expenses, and we are working with our vendors to ensure our contractors' work-from-home needs are met as well. We listened to employee feedback and expanded our policy to include home office equipment, such as desks, desk chairs, and ergonomic chair cushions. We're also allowing Tweeps to expense online fees while working from home.

### #FlockTalk

Last year, we introduced #FlockTalk (https://blog.twitter.com/en_us/topics/company/2019/inclusion-and-diversity-report-september-2019.html), a program activated when Tweeps want to come together during difficult times to share what's going on with them, find community, and be heard by our leaders. News around COVID-19 is impacting people in a number of different ways — from schools and offices being closed, to serious health concerns, to racism toward communities, we're all dealing with a lot. The Twitter Inclusion & Diversity team (@TwitterTogether (https://twitter.com/TwitterTogether)), in partnership with @TwitterAsians (https://twitter.com/TwitterAsians), will host a virtual #FlockTalk that acknowledges there's a direct correlation between conversations between us, the health of our workplace, and the health of our service.

**Resource guides to make the work-from-home transition easier**

Working from home can be a challenging transition, so we've provided a variety of resource guides to help our employees continue to get the job done. We're listing them here as well because at times like this, sharing insights and learning is so important. We're all in this together and we want to help others outside of Twitter make their transitions to working outside of their offices easier.

Coronavirus: Staying safe and informed on Twitter

- Working-from-home best practices: We have shared the factors to consider to make sure Tweeps are ready to be productive and healthy. Some factors include workspace, communication, self-care, and logging hours. Overall, working from home doesn't change your day-to-day work, it just means you'll be doing it from a different environment.
- Managing a distributed team: Being a people manager means providing a consistent and positive employee experience for everyone on your team, regardless of location. This manager resource guide highlights the three key pillars of management: strategy, growth and care. So what changes when your team is fully distributed? The good news — not much! These pillars still apply whether you manage a distributed or co-located team.
- Virtual interview guide: All interviews at Twitter will be done via video conferencing. A completely virtual interview has its benefits. It is ideal for introducing candidates to remote work cultures, and it is a great opportunity for candidates who will work remotely to get a sense for the experience of interacting with other team members remotely. While this virtual interview guide is not a holistic interview guide, it instead focuses on the aspects of interviewing candidates remotely that differ from interviewing candidates in-person.
- We have also shared guides for working across time zones, using collaboration tools to stay connected, and ergonomic tips for working from home and on-the-go.

We'll continue sharing information as we navigate these changes. It's all in dedication to keeping our Tweeps and everyone around us healthy. We're all in this together!

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/keeping-our-employees-and-partners-safe-during-coronavirus.html)

*March 2, 2020*
**Encouraging employees to work from home**

In addition to the travel, event, and visitor restrictions that we previously shared, today we provided additional guidance as we look to protect the health and safety of our workforce. Beginning today, we are strongly encouraging all employees globally to work from home if they're able. Our goal is to lower the probability of the spread of the COVID-19 for us — and the world around us. We are operating out of an abundance of caution and the utmost dedication to keeping our Tweeps healthy.

We are working to make sure internal meetings, all hands, and other important tasks are optimized for remote participation. We recognize that working from home is not ideal for some job functions. For those employees who prefer or need to come into the offices, they will remain open for business. Our Real Estate & Workplace team is increasing deep-cleaning and sanitizing in all spaces, as well as more visual reminders for personal hygiene best practices and prepackaged, precomposed, and preplated food options.

Working from home will be mandatory for employees based in our Hong Kong, Japan, and South Korea offices due in part to government restrictions. Our criteria will evolve over time as we get more information, and we will communicate to affected Tweeps as appropriate.

While this is a big change for us, we have already been moving toward a more distributed workforce that's increasingly remote. We're a global service and we're committed to enabling anyone, anywhere, to work at Twitter.

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/keeping-our-employees-and-partners-safe-during-coronavirus.html)

*March 1, 2020*
**Suspending noncritical business travel and events**

We recently shared information (https://blog.twitter.com/en_us/topics/company/2020/authoritative-information-about-novel-coronavirus.html) about the work we're doing to surface the right information to promote constructive engagement and to highlight credible information around the spread of #coronavirus (https://twitter.com/hashtag/coronavirus) COVID-19. We will continue to update the public on these efforts this week.

We also have the responsibility of ensuring that the health and safety of our employees and partners is not compromised. We have continued to monitor the situation closely and are adjusting our internal policies to respond to this rapidly evolving situation. On February 29, we informed our people and started notifying partners that we are suspending all noncritical business travel and events.

This policy is effective immediately and will continue until the World Health Organization or Centers for Disease Control deem it appropriate to step back from pandemic precautionary measures or when a vaccine becomes available.

Our goal is to reduce the risk that anyone at Twitter might contract or inadvertently spread the virus. It is important that we take these proactive steps to protect ourselves and others and minimize the spread of COVID-19.

There are enormous transnational efforts underway to tackle this virus. As a global company with a global workforce, we want to do what we can to help the success of these multistakeholder containment efforts. Temporarily suspending travel is an immediate and important step.

We want to thank our people, partners, and customers for their patience and understanding.

<u>Read the original post.</u> (https://blog.twitter.com/en_us/topics/company/2020/keeping-our-employees-and-partners-safe-during-coronavirus.html)

**<u>Back to top</u>**

---

**7. Sharing Twitter's metrics**

*\*After further examining our data, we have made updates to our proactive enforcement metrics published on January 12, 2021 which were previously misinterpreted. The updated metrics are now reflected in the posts below.*

**_January 12, 2021_**

**Updated proactive enforcement metrics**

Since introducing our <u>COVID-19 guidance</u> (https://blog.twitter.com/en_us/topics/company/2020/covid-19.html#misleadinginformation), we have removed **8,493 Tweets** and challenged **11.5 million accounts**. We continue to prioritize removing or annotating potentially harmful and misleading information, to ensure that users receive credible information rather than misinformation.

**_Oct 22, 2020_**

**Updated proactive enforcement metrics**

Glenn Decl. Ex. 64
Page 29 of 31

Since introducing our COVID-19 guidance
(https://blog.twitter.com/en_us/topics/company/2020/covid-19.html#misleadinginformation)  we have
removed **6,466 Tweets** and challenged **8 million accounts**.

**July, 14, 2020**

**An update to our proactive enforcement and metrics on credible information**

Since introducing our COVID-19 guidance we have removed **4,647 Tweets** and
challenged **4.5 million accounts**. It is important to note our approach is not only
about removing or annotating potentially harmful and misleading information, but also
elevating credible information. To date, over 160 million people have visited the
COVID-19 curated page, over two billion times.

**May 4, 2020**

**An update on our proactive enforcement and spam detection**

Since introducing our updated policies on March 18, we have removed more
than **4,074 Tweets** containing misleading and potentially harmful content from
Twitter. Additionally, our automated systems have challenged more than **3.4 million
accounts** which were targeting discussions around COVID-19 with spammy or
manipulative behaviors. We will continue to use both technology and our teams to
help us identify and stop spammy behavior and accounts.

*April 1, 2020*
**Our platform usage**

In the past few weeks, we have seen more and more people turn to Twitter to
participate in the public conversation and follow what's happening in real time.

- The global conversation about COVID-19 and ongoing product improvements are <u>driving up total monetizable DAU (mDAU)</u> <u>(https://www.prnewswire.com/news-releases/twitter-withdraws-q1-guidance-due-to-covid-19-impact-301028477.html)</u>, with quarter-to-date average total mDAU reaching approximately 164 million, up 23% from 134 million in Q1 2019 and up 8% from 152 million in Q4 2019.
- We've also seen a 45% increase in our <u>curated events page</u> <u>(https://twitter.com/i/events/1219057585707315201?)</u> usage and a 30% increase in Direct Message (DM) usage since March 6.

<u>Read the original post.</u> <u>(https://blog.twitter.com/en_us/topics/company/2020/An-update-on-our-continuity-strategy-during-COVID-19.html)</u>

*April 1, 2020*
**Quantifying our efforts to reduce misleading and potentially harmful content**

**Back to top**



<u>(https://www.twitter.com/Twitter)</u>
Twitter Inc.

# EXHIBIT 65

6/10/22, 5:14 PM                    BREAKING: Biden administration creates 'Disinformation Governance Board' under DHS to fight 'misinformation' | The Post Millennial

# PM.

🔍    LOGIN    SUBSCRIBE NOW

**Use code TPM for up to 66% off at MyPillow.com**    ✕

ADVERTISEMENT

***AMERICAN NEWS***  Apr 27, 2022 1:50 PM EST

# BREAKING: Biden administration creates 'Disinformation Governance Board' under DHS to fight 'misinformation'

The Department of Homeland Security is setting up a new board designed to counter misinformation related to homeland security, with a focus specifically on Russia and irregular migration.

ADVERTISEMENT





**Hannah Nightingale**
Washington DC

April 27, 2022 1:50 PM
2 Mins Reading

Glenn Decl. Ex. 65
Page 1 of 6

The Department of Homeland Security is setting up a new board designed to counter misinformation related to homeland security, with a focus specifically on Russia and irregular migration. The board will be called the "Disinformation Governance Board, and will be headed by executive director Nina Jankowicz.



Speaking with the House Appropriations DHS Subcommittee on Wednesday afternoon, DHS Secretary Alejandro Mayorkas said, "Our Undersecretary for Policy, Rob Silvers is co-chair with our Principal Deputy General Counsel, Jennifer Gaskell, in leading a just recently constituted misinformation disinformation governance board. So we're bringing — the goal is to bring the resources of the department together to address this threat."



Jankowicz was previously a disinformation fellow at the Wilson Center, and had advised the Ukrainian Foreign Ministry as part of the Fulbright Public Policy Fellowship, according to _Politico_.

BREAKING: Biden administration creates 'Disinformation Governance Board' under DHS to fight 'misinformation' | The Post Millennial



President Biden has decided the federal government will launch a Disinformation Governance Board under the authority of the Homeland Security Department

Did you just think they would let you have free speech back?

1:30 PM · Apr 27, 2022

♡ 33.7K    💬 Reply    ⬆ Share

Read 2.9K replies

Jankowicz also oversaw Russia and Belarus programs at the National Democratic Institute. She announced the new Board via Twitter on Wednesday.



Nina Jankowicz 🇺🇦🇺🇸 ✓
@wiczipedia

Cat's out of the bag: here's what I've been up to the past two months, and why I've been a bit quiet on here.

Honored to be serving in the Biden Administration @DHSgov and helping shape our counter-disinformation efforts.

politico.com/newsletters/pl...

6:17 AM · Apr 27, 2022

Read the full conversation on Twitter

♡ 5.3K    💬 Reply    ⬆ Share

Read 7.7K replies

Jankowicz has previously said that she was concerned that Twitter had determined early in 2022 to stop limiting speech from users about the 2020 presidential election, saying that "considering the long-term damage these lies do to our democracy," she was "dismayed about this decision."

Her view about elections, whether foreign or domestic, are that they "aren't an end point," but are "an inflection point," and that the policies of social media companies as regards free speech "need to reflect that."

Jack Posobiec, of Human Events Daily, brought receipts.



Jankowicz was an advisor to the government of Ukraine. She also stated her opinion that Hunter Biden's laptop, the contents of which were reported by the *New York Post*, was Russian disinformation. This was entirely false. Jankowicz will be leading the charge against misinformation, of which she believed the laptop actually was an example.



Glenn Decl. Ex. 65
Page 4 of 6



1:48 PM · Apr 27, 2022

♡ 3.2K      ⟲ Reply      ⬆ Share

**Read 159 replies**

Jankowicz also does not appear to be a fan of free speech, saying that setting up free speech in opposition to censorship is "a false dichotomy."



2:27 PM · Apr 27, 2022

♡ 1.5K      ⟲ Reply      ⬆ Share

**Read 101 replies**

*This is a breaking story and will be updated.*

Ads by revcontent

**Around the Web**





**Overweight People Of All Ages Can Lose Belly Fat By This 9 Second Morning Ritual**

Health Truth Finder



**One Bite Of This Keeps Blood Sugar Below 100 (Try Tonight)**

Growthmax



**New Anti-mosquito Device is Changing Outdoor Life in Missouri.**

Keilini

# Join and support independent free thinkers!

We're independent and can't be cancelled. The establishment media is increasingly dedicated to divisive cancel culture, corporate wokeism, and political correctness, all while covering up corruption from the corridors of power. The need for fact-based journalism and thoughtful analysis has never been greater. When you support The Post Millennial, you support freedom of the press at a time when it's under direct attack. **Join the ranks of independent, free thinkers by supporting us today for as little as $1.**

SUPPORT THE POST MILLENNIAL

REMIND ME IN JULY

## The Post Millennial.

   

**Term of Use**

Terms of Service

Terms of Contribution

Privacy Policy

Ad Choices

**Content & Advertising Partnerships**

Experiencing Tech Issue

Need Other Help

**Company**

Careers

About Us

Ethical Journalism Policy

Mission Statement

Copyright ©2022 The Post Millennial All Rights Reserved.

# EXHIBIT 66



### COVID-19 and Vaccine Policy Updates & Protections

Copy link

As people around the world confront this unprecedented public health emergency, we want to make sure that our policies help to protect people from harmful content and new types of abuse related to COVID-19 and vaccines.

We're working to remove COVID-19 content that contributes to the risk of real-world harm, including through our policies prohibiting coordination of harm, peer- to- peer sale of test kits and related goods, hate speech, bullying and harassment, and misinformation that contributes to the risk of imminent violence or physical harm. Some of these policies require additional information and/or context to enforce, the details of which we've outlined below.

Based on input from experts in health communication and related fields, we are also taking additional steps amid the pandemic to reduce the distribution of content that does not violate our policies but may present misleading or sensationalized information about vaccines in a way that would be likely to discourage vaccinations, as outlined in more detail below.

As the situation evolves, we continue to look at content on the platform, assess speech trends, and engage with experts like the World Health Organization (WHO), government health authorities, and stakeholders from across the spectrum of people who ...

Was this helpful?

Yes          No

### Und... prohibit content that:

Glenn Decl. Ex. 66
Page 1 of 24

 **Help Center**

communicable diseases by you or your associates.

## When we have additional information and/or context to identify it, we also prohibit:

- Content coordinating in-person events or gatherings when participation involves or encourages people who have COVID-19 to join.

- Content coordinating interference with the administration of the COVID-19 vaccine.

- Content calling to action, advocating, or promoting that others not get the COVID-19 vaccine.

**Under our Restricted Goods and Services policy, we've taken steps to protect against exploitation of this crisis for financial gain and prohibit the below content when we have additional information and/or context to identify it:**

- Attempts to sell COVID-19 test kits unless offered by a legitimate business. This policy does not extend to offers or requests for mask donations or non-medical masks.

- Makes mention of medical products and COVID-19 and indicates a sense of urgency or claims that prevention is guaranteed.

**Under our Hate Speech policy, we prohibit the below content when we have additional information and/or context to iden**



Was this helpful?

Yes          No

the virus. This does not apply to claims about people based on national origin because we want to allow discussion focused on national-

Glenn Decl. Ex. 66
Page 2 of 24

 **Help Center**

- Mocks people who share a protected characteristic such as race or religion for having COVID-19.

**Under our Bullying and Harassment policy, we prohibit the below content that targets people maliciously when we have additional information and/or context to identify it:**

- Claims that a private individual has COVID-19, unless that person has self-declared or information about their health status is publicly available.

**Under our Community Standards, we remove misinformation during public health emergencies when public health authorities conclude that the information is false and likely to directly contribute to the risk of imminent physical harm, including by contributing to the risk of individuals getting or spreading a harmful disease or refusing an associated vaccine. Since COVID-19 was declared a Public Health Emergency of International Concern (PHEIC) in January 2020, we have applied this policy to content containing claims related to COVID-19 that, according to public health authorities, are (a) false, and (b) likely to contribute to imminent physical harm (of imminent physical harm examples include: increasing the likelihood of exposure to or transmission of t**

Was this helpful?

Yes          No

**step** ... **tent that our systems predict likely violates this COVID-19 misinformation policy, but that**

Glenn Decl. Ex. 66
Page 3 of 24

COVID-19 and Vaccine Policy Updates & Protections | Facebook Help Center

 Help Center

**confirmed to violate the policy then it will be removed from the platform. The goal of this policy is to reduce health harm to people, while also allowing people to discuss, debate and share their opinions, personal experiences, science, and news related to the COVID-19 pandemic. More specifically, we remove false information about:**

- **The existence or severity of COVID-19.** Acknowledging the existence and understanding the severity of COVID-19 is foundational to keeping people safe and aware of the dangers of this public health emergency. We remove claims that deny the existence of the disease or undermine the severity of COVID-19. This includes:

    - Claims that deny the existence of the COVID-19 disease or pandemic (however, we allow discussion or debate regarding whether the COVID-19 pandemic is transitioning to a less severe state, such as an endemic disease)

    - Claims that downplay the severity of COVID-19, such as:

        - In the context of discouraging vaccination or questioning the efficacy of vaccines, claims that COVID-19 is no more dangerous to people than the common flu or cold.



Was this helpful?

Yes        No

kill you than COVID-19

 **Help Center**

figure (requires additional
information and/or context)

- Claims about the cause of COVID-19
  that are linked to 5G communication
  technologies, such as:

  - Claims that COVID-19 social
    distancing orders are really
    just a way to install 5G
    wireless communication
    technology infrastructure

  - Claims that the symptoms of
    COVID-19 are actually the
    effect of 5G communication
    technologies

  - Ex: "No one has died from COVID-
    19," "Social distancing orders are
    really just a way to install 5G
    infrastructure," "COVID-19 is not
    real!"

- **COVID-19 transmission and immunity:**
  Understanding how COVID-19 is transmitted
  and who can be infected is a critical
  component of protecting people from
  getting or spreading the virus. Public health
  authorities state that COVID-19 can be
  transmitted in any location and primarily
  from person to person through small droplets
  from the nose or mouth, which are expelled
  when a person with COVID-19 coughs,
  sneezes or speaks. Public health authorities
  also agree that all people, regardless of age
  or other unique characteristics, can be
  infected with and spread COVID-19. We
  remove false claims about how and where



specific activity or treatment results in
immunity

Glenn Decl. Ex. 66
Page 5 of 24

6/10/22, 5:23 PM                    COVID-19 and Vaccine Policy Updates & Protections | Facebook Help Center

 Help Center

locations

- Claims that COVID-19 can be transmitted from anything other than human-to-human transmission, such as:

  - Claims that COVID-19 is the cause of or transmitted by 5G technologies

  - Claims that COVID-19 is transmitted by the flu shot or flu vaccine, or that getting the flu vaccine or shot makes people more susceptible/likely to get COVID-19

  - Claims that COVID-19 is transmitted by house flies or mosquitoes

  - Claims that COVID-19 vaccines are the cause of or infect people with COVID-19

  - Ex: "Elderly people are immune from COVID-19," "COVID-19 cannot be transmitted in tropical climates," "the COVID-19 vaccine causes COVID-19!"

- **Guaranteed cures or prevention methods for COVID-19:** Public health authorities, such as the WHO, say there is currently nothing that can guarantee recovery or guarantee the average person will not get COVID-19. We have also heard from public health authorities that if people thought there was a guaranteed cure or prevention for COVID-19, they might ... or prevent COVID-19. This includes:



Was this helpful?

Yes        No

Glenn Decl. Ex. 66
Page 6 of 24

 **Help Center**

from getting COVID-19 or can guarantee recovery from COVID-19 before such a cure or prevention has been approved, including:

- Consuming or inhaling specific items

- Medical or herbal remedies

- External remedies for the outer body or skin

- Ex: "Take Vitamin C - it cures COVID-19," "If you take this herbal remedy, you will not get COVID-19," "This topical cream will prevent you from contracting coronavirus."

- **Discouraging good health practices:** There are a number of good health practices public health authorities advise people take to protect themselves from getting or spreading COVID-19. This includes wearing a face mask, social distancing, getting tested for COVID-19 and, more recently, getting vaccinated against COVID-19. Public health authorities have issued full approval and emergency use authorization for several COVID-19 vaccines, so in addition to false claims about face masks, social distancing and testing, we do not allow false claims about the vaccines or vaccination programs which public health experts have advised us could lead to COVID-19 vaccine rejection. This includes false claims about the safety, efficacy, ingredients, development, existence, or conspiracies related to the vaccine or vaccination program. As more information becomes available about COVID-19 vaccines, we will



Was this helpful?

Yes     No

- Claims that wearing a face mask properly does not help

6/10/22, 5:23 PM                          COVID-19 and Vaccine Policy Updates & Protections | Facebook Help Center

 **Help Center**

- Claims that face masks include or are connected to 5G technology or that face masks contain harmful nano worms or harmful particles

- Claims that wearing a face mask can make the wearer physically ill

- Claims that health authorities do not recommend that healthy people wear masks where this is not the current public health guidance (requires additional information and/or context).

- Claims that social/physical distancing does not help prevent the spread of COVID-19

- Claims that can discourage someone from getting a government approved COVID-19 test, including:

  - Claims that COVID-19 can be successfully tested without an approved test

  - Claims that COVID-19 tests actually come pre-infected or can infect you with COVID-19

  - Claims that COVID-19 tests approved by public health authorities cannot detect COVID-19 or that PCR tests cannot distinguish between COVID and the flu



**Was this helpful?**

◻ **Yes**          ◻ **No**

contain harmful nano-particles or nano-worms

Glenn Decl. Ex. 66
Page 8 of 24

 **Help Center**

- Claims about COVID-19 vaccines that contribute to vaccine rejection, including:

  - Claims about the availability or existence of COVID-19 vaccines, specifically:

    - Claims that COVID-19 vaccines do not exist or have not been approved

    - Claims that there are no Food and Drug Administration (FDA) approved COVID-19 vaccines or that the Pfizer/BioNTech vaccine or Moderna vaccine has not received full FDA approval (does not apply to claims about the Pfizer/BioNTech vaccine for children aged 5-15, which is under emergency use authorization)

    - Claims that COVID-19 vaccines are not approved by the FDA if that content also suggests the vaccines are unsafe, ineffective at preventing severe illness or death,



Was this helpful?

Yes        No

FDA has not approved a COVID-19 vaccine, other

Glenn Decl. Ex. 66
Page 9 of 24

6/10/22, 5:23 PM                    COVID-19 and Vaccine Policy Updates & Protections | Facebook Help Center

 **Help Center**

make a clear
distinction between a
full FDA approval and
an Emergency Use
Authorization with
appropriate context
such as
distinguishing
between different
types of COVID
vaccines.

- Claims that
  something other than
  a COVID-19 vaccine
  can vaccinate you
  against COVID-19

- Claims that COVID-19
  vaccines are
  experimental, if the
  context of the claim
  also suggests that
  vaccinated people
  are taking part in a
  medical experiment.

- Claims about the safety or serious
  side effects of COVID-19 vaccines,
  including:

  - Claims that COVID-19
    vaccines kill or seriously harm
    people, which we define as
    leading to any of the
    following harmful side
    effects:

    - Death



Was this helpful?

Yes        No

    - COVID-19 or a new
      COVID-19 strain

Glenn Decl. Ex. 66
Page 10 of 24

6/10/22, 5:23 PM                    COVID-19 and Vaccine Policy Updates & Protections | Facebook Help Center

 Help Center

- Infertility or sterilization

- Birth defects

- Shedding

- Altering DNA

- Blood clots (except in relation to specific vaccines for which public health authorities have found possible links or are officially investigating such reports)

- Neurodegenerative diseases (e.g. Alzheimer's, Ataxia, Huntington's disease, Parkinson's disease, Motor neuron disease, Multiple system atrophy, and Progressive supranuclear palsy)

- Prion's disease

- Bell's palsy

- Erectile dysfunctions

- Cancer

- Diabetes



- Weakened immune system

Glenn Decl. Ex. 66
Page 11 of 24

6/10/22, 5:23 PM                COVID-19 and Vaccine Policy Updates & Protections | Facebook Help Center

 **Help Center**

syndrome (AIDS) or human immunodeficiency virus (HIV)

- Heart attacks (does not apply to claims of myocarditis or other heart conditions)

- Multisystem inflammatory syndrome in children (MIS-C)

- Vulvar aphthous ulcers

- Magnetism

- Meningitis

- Syphilis

- Encephalitis (e.g. Japanese encephalitis)

- Other side-effects which are impossible or irrational, such as taking the vaccine turns you into a monkey (requires additional information and/or context), or gives you "vaccine acquired immune deficiency syndrome," which is not recognized as a



cytotoxic.

Glenn Decl. Ex. 66
Page 12 of 24

6/10/22, 5:23 PM                    COVID-19 and Vaccine Policy Updates & Protections | Facebook Help Center

 **Help Center**

vaccine

- Claims that COVID-19 vaccines are unsafe generally, or for a certain specific group of people, if that group is identified based on protected characteristics or other identifiers not directly related to their personal health, age, or disabilities (e.g. social status, religion, or political views), or that vaccines are unsafe for menstruating women.

- Claims that being near vaccinated people causes adverse effects on unvaccinated people

- Claims that breast milk from vaccinated people is harmful to babies/children

- Claims about the efficacy of COVID-19 vaccines, including:

  - Claims that COVID-19 vaccines are not effective in preventing severe illness or death from COVID-19 (see Common Questions below for how we define the term "effective")

  - Claims that people who are vaccinated are more at risk for getting sick with COVID



Was this helpful?

Yes          No

ingredients, including:

Glenn Decl. Ex. 66
Page 13 of 24

 **Help Center**

prohibited, or harmful ingredients, microchips, animal products, or anything not on the vaccine ingredient list

- Claims that COVID-19 vaccines are untested

- Claims that COVID-19 vaccines contain the mark of the beast

- Claims that people died as a result of the COVID-19 Pfizer/BioNTech vaccine during clinical trials (Note - We allow claims that people died during the COVID-19 Pfizer/BioNTech clinical trials) (requires additional information and/or context).

- Claims that COVID-19 vaccines contain, or were developed, produced or designed from/with human tissue from aborted fetuses / aborted fetal tissue.

- Claims involving conspiracy theories about a COVID-19 vaccine or vaccination program, including:

  - Claims that the COVID-19 vaccines are intended for population control for non-public health purposes

  - Claims that specific populations are being used



Was this helpful?

  Yes      No

reason behind the emergence of COVID variants

Glenn Decl. Ex. 66
Page 14 of 24

 **Help Center**

wearing a face mask doesn't help prevent the spread of COVID," "Social distancing does nothing to reduce COVID in the community," "COVID tests come pre-infected with the disease," "the COVID vaccine will kill you," "the COVID vaccine contains a microchip," "the COVID vaccine causes autism!", "Did you get the COVID vax? Don't worry, there's a way to detox."

- **Access to essential health services:** Public health infrastructure is at the core of the global fight to combat COVID-19. According to the WHO and other public health authorities, previous outbreaks of infectious diseases have shown that disruption to essential services can be more deadly than the outbreak itself, and ensuring access to essential services is the cornerstone of an effective health response. Adverse effects on the public health system's ability to cope with the pandemic can have a direct impact on helping people stay healthy and safe in this health emergency. We remove content that can contribute to physical harm by inaccurately representing the access to or availability of public health infrastructure. When we have additional information and/or context to identify it, we also prohibit:

  - Claims that misrepresent the access, availability, or eligibility of health services, such as hospitals, emergency responders, ambulance response, treatments, vaccines.

    - Claims that hospitals or a specific hospital is closed and

**Was this helpful?**

Yes      No

medical care for COVID-19.

6/10/22, 5:23 PM                    COVID-19 and Vaccine Policy Updates & Protections | Facebook Help Center

 **Help Center**

the number of COVID-19
deaths, to get more money,
or in order to sell people's
organs

- Ex: "Hospitals kill
  patients to increase
  their COVID numbers
  and get more
  money!"

- **We remove content that repeats other false
  health information, primarily about
  vaccines, that are widely debunked by
  leading health organizations such as the
  World Health Organization (WHO) and the
  Centers for Disease Control and Prevention
  (CDC). The goal of this policy is to combat
  misinformation about vaccinations and
  diseases, which if believed directly
  contribute to imminent vaccine refusals. The
  claims we have applied this to include:**

  - Vaccines cause autism

    - Ex: "Increased vaccinations
      are why so many kids have
      autism these days."

  - Vaccines cause Sudden Infant Death
    Syndrome

    - Ex: "Don't you know vaccines
      cause SIDS?"

  - Vaccines cause the disease against
    which they are meant to protect, or
    cause the person to be more likely to
    get the disease

    - Ex: "Taking a vaccine actually

Was this helpful?

Yes          No

  - Vaccines or their ingredients are
    deadly, toxic, poisonous, harmful, or
    dangerous

 Help Center

- Natural immunity is safer than vaccine acquired immunity

  - Ex: "It's safest to just get the disease rather than the vaccine."

- It is dangerous to get several vaccines in a short period of time, even if that timing is medically recommended

  - Ex: "Never take more than one vaccine at the same time, that is dangerous - I don't care what your doctor tells you!"

- Vaccines are not effective to prevent the disease against which they purport to protect. However, for the COVID-19, flu, and malaria vaccines, we do not remove claims that those vaccines are not effective in preventing someone from contracting those viruses (see Common Questions below for more detail on how we define effectiveness for the COVID-19 vaccines).

  - Remove: "The polio vaccine doesn't do anything to stop you from getting the disease."

  - Remove: "Vaccines actually don't do anything to stop you from getting diseases."

  - Allow: "The vaccine doesn't



Was this helpful?

Yes          No

- Acquiring measles cannot cause death (requires additional

6/10/22, 5:23 PM                     COVID-19 and Vaccine Policy Updates & Protections | Facebook Help Center

 **Help Center**

whether you get measles, it can't be fatal"

- Vitamin C is as effective as vaccines in preventing diseases for which vaccines exist.

- **Pages, Groups, profiles, and Instagram accounts that repeatedly post misinformation or coordinate harm (see Coordinating Harm policies at the top of this entry) related to COVID-19, vaccines, and health may face restrictions, including (but not limited to) reduced distribution, removal from recommendations, or removal from our site. On Instagram, accounts that repeatedly post content that violates our policies on COVID-19 or vaccine misinformation may also lose the ability to be tagged or mentioned, or may see pop-ups asking if they'd like to delete certain posts that may violate our policies.**

<u>**Common questions on how we enforce on COVID-19 and health-related misinformation**</u>

**A. How do we treat humor or satire?**

We allow content that is shared with explicit humor or satire. Humor and satire are vital forms of expression - allowing us to convey challenging ideas, build community, and cope in these hard times.

**B. How do we enforce on content shared to condemn or debunk?**

We allow content shared to condemn or debunk.

**C. Ho**            **or**
**anec**



We w                                        g a
pers                                        ur
value                                        ote
or advocate harmful action around that claim.

https://www.facebook.com/help/230764881494641                                              18/24

Glenn Decl. Ex. 66
Page 18 of 24

 Help Center

You can find more information (here) on how to dispute decisions we made to remove content. Content that was directly rated by our fact-checking partners can be appealed directly to them. See more information on our fact-checking program (here).

**E. How does Facebook find COVID-19 and vaccine misinformation?**

We use a combination of human review, technology, and user reports to find and enforce on content that violates these policies, and we encourage people to report content when they see it.

**F. How does Facebook enforce on posts that link to off-platform violating content?**

In special circumstances, we will also remove content containing links to off-platform content when we're made aware that our services are being abused to evade enforcement or drive traffic to off-platform information that violates our COVID-19 and vaccine misinformation rules.

- Ex: A user posts a website with violating content that is encouraging users to post on Facebook in ways that might evade our enforcement.

- Ex: A user posts a website promoting a product that includes violating content in its description, such as a health product falsely claiming to treat toxic chemicals from COVID-19 vaccines.

- Ex: A user posts a website with violating content from an entity previously removed from Facebook for repeatedly violating our COVID-19 and Vaccine misinformation policies.

- E...


Was this helpful?

Yes          No

As w...
misinformation policies, Pages, Groups, profiles and Instagram accounts that post this content may incur penalties, such as reduced distribution or removal.

 Help Center

When we become aware of it, we will remove any Pages, Groups, Events or Instagram Accounts that:

(1) have violated any of our rules on COVID-19 and vaccines; and that

(2) instruct or encourage users to employ code words when discussing vaccines or COVID-19 to evade our detection.

### H. How do our policies on COVID-19 vaccines apply to claims specifically about children?

All COVID-19 vaccine claims apply to people 5 years old and older unless otherwise specified. We will continue to work with public health authorities to assess the falsity of claims about children and vaccines and will update our policies should those experts confirm their falsity and likelihood to contribute to imminent physical harm.

### I. What do we mean by the word "effective" in our COVID-19 vaccine policy?

When we say that we will remove claims that the COVID-19 vaccines are not effective, we are specifically referring to claims that the vaccines do not generally protect against severe illness or death from COVID-19 or that they provide no protection whatsoever in contracting COVID-19. However, we will allow claims that someone can still contract COVID-19 even though they are fully vaccinated. When someone states that the vaccines are not effective against COVID-19 and does not state whether they are referring to the effectiveness of preventing transmission or preventing severe illness or death, we will presume that the person is referring to severe illness or death and remove the content.

Examples:

Remove: "There is no point in being vaccinated beca...



We v...
expe... ...on: it
prote... ...VID-
19 even though a fully vaccinated person can still contract the virus.

Glenn Decl. Ex. 66
Page 20 of 24

6/10/22, 5:23 PM                    COVID-19 and Vaccine Policy Updates & Protections | Facebook Help Center

 Help Center

We will remove this claim because outside experts confirm that COVID-19 vaccines are effective in preventing people from severe illness or death from the virus.

Allow: "Even though you are vaccinated, you can still contract COVID."

We will allow this claim because, while being vaccinated may provide some protection against contracting the virus, outside experts confirm that breakthrough infections can occur.

### Reducing the Distribution of Certain Other Vaccine Content and Removing Pages, Groups, and Instagram Accounts that Violate our COVID-19 and Vaccine Policies and are Dedicated to Discouraging Vaccination

As part of our efforts to improve the quality of health and vaccine content that people encounter during the COVID-19 pandemic, and consistent with the advice of independent health experts, we are also taking additional steps to reduce the distribution of certain other content about vaccines that does not otherwise violate our policies listed above, and remove certain Pages, Groups, and Instagram accounts that have shared content that violates our COVID-19 and vaccine policies and are dedicated to spreading vaccine discouraging information on platform.

Specifically, we are taking additional steps to reduce the distribution of certain content, as outlined below, in News Feed and limit visibility of this content on our recommendations surfaces (learn more here). This includes reducing content, described below, that is sensationalist or alarmist about vaccines, or which dispa... choi... that prom... es stori... vacci... hyperbolic way so as to discourage vaccinations. We may also reduce the distribution of Pages, Groups, and Instagram accounts that are focused on



Was this helpful?

Yes        No

https://www.facebook.com/help/230764881494641                                  21/24

Glenn Decl. Ex. 66
Page 21 of 24

6/10/22, 5:23 PM                           COVID-19 and Vaccine Policy Updates & Protections | Facebook Help Center

 **Help Center**

In addition, Pages, Groups, and Instagram accounts may be removed if they have shared content that violates our COVID-19 and vaccine policies and are also dedicated to sharing other vaccine discouraging information on the platform. Specifically, this type of content includes:

1. Sensational or Alarmist Vaccine Content:

- Content that otherwise does not violate our COVID-19 or vaccine policies above but that suggests that vaccines are ineffective, sacrilegious, unsafe, or irrelevant, in exaggerated, conspiratorial, or sensational terms. This includes content that makes generalizations about vaccine harms or utility in hyperbolic terms or without providing context, or which connects vaccination to a conspiratorial narrative about a purposely hidden widespread health harm, secret, or truth.

  - Ex: "They're coming with these Devil shots for you next -- the sheep of the world need to wake up."

  - Ex: "Just wait until you see the real effects of these experimental COVID jabs! No way there's been sufficient testing. How can we believe they're safe?"

  - Ex. "Don't you see that COVID is just an excuse for totalitarian world domination? Masking, vaccines, none of it matters!"

2. Criticizing the Choice to Receive/Provide Vac...



to vaccinate, or on their choice to vaccinate others, including attacking language used towards vaccinated people or those

https://www.facebook.com/help/230764881494641                                                              22/24

Glenn Decl. Ex. 66
Page 22 of 24

6/10/22, 5:23 PM                    COVID-19 and Vaccine Policy Updates & Protections | Facebook Help Center

 **Help Center**

- Ex: "You're committing child abuse for giving this vaccine."

- Ex: "Only someone clinically insane would get this vaccine!"

3. Promoting Vaccine Refusals and Alternatives:

- Content that otherwise does not violate our COVID-19 or vaccine policies above but that implicitly discourages vaccination by advocating for alternatives or celebrating those who refuse vaccination. This includes promoting alternative treatments or natural immunity, celebrating those who refuse vaccination, and encouraging vaccine refusals without citing medical rationales or guidance.

  - Ex: "These nurses who are taking a stand and refusing this worthless vaccine are my heroes!"

  - Ex: "Sarah, please whatever you do, don't let them jab you."

  - Ex: "What's the point of signing up for an experimental vaccine when there are such great treatments around?"

  - Ex: "So proud of you for bravely refusing to vaccinate just to comply with that mandate! No job is worth this jab."

4.Shocking Stories:

- Content that otherwise does not violate our COVID-19 or vaccine policies above but that shares potentially or actually true events or



  - Ex: "My friend got the vaccine and now has Bell's Palsy, be warned!"

Glenn Decl. Ex. 66
Page 23 of 24

6/10/22, 5:23 PM                    COVID-19 and Vaccine Policy Updates & Protections | Facebook Help Center



**Help Center**

week of getting the new COVID-19 vaccine"

**Was this helpful?**

Yes                    No

**Related Articles**

How does the Facebook Feed Ranking work?

What is the Facebook Safety Advisory Board and what does this board do?

How do I enable or disable Facebook app updates on my phone?

How can I use Facebook to stay updated about the coronavirus (COVID-19)?

What tools does Facebook provide to help me protect my intellectual property in my videos?

© 2022 Meta

About                    Privacy                    Terms and Policies

Ad Choi

Create A



**Was this helpful?**

Yes                    No

Glenn Decl. Ex. 66
Page 24 of 24

# EXHIBIT 67

6/11/22, 5:22 AM                                Facebook, Twitter block The Post from posting

GET 30 DAYS FREE

*NEWS*

# Twitter, Facebook censor Post over Hunter Biden exposé

By Noah Manskar

October 14, 2020    4:14pm    Updated



**NEW YORK POST**                                                                   LOG IN

| Bodybuilder Ryeley Palfi dies in crash hours... | Texas deputy Christopher Lofton fired for... | Tina Fey and Will Ferrell watched Horatio Sanz... | Chicago cop Bruce Dyker resigns after... | Horrific video shows college student allege... | Florida man hunting for flying discs in... |

Glenn Decl. Ex. 67
Page 1 of 10

6/11/22, 5:22 AM                                        Facebook, Twitter block The Post from posting

**Google relents after Post fights censorship of YouTube interview with Jan. 6 rioter**

**Hunter Biden keeps clothes on this time as he grabs lunch with daughter**

Both Twitter and Facebook took extraordinary censorship measures against The Post on Wednesday over its exposés about Hunter Biden's emails — with Twitter baselessly charging that "hacked materials" were used.

The suppression effort came despite presidential candidate Joe Biden's campaign merely denying that he had anything on his "official schedules" about meeting a Ukrainian energy executive in 2015 — along with zero claims that his son's computer had been hacked.

The Post's primary Twitter account was locked as of 2:20 p.m. Wednesday because its articles about the messages obtained from Biden's laptop broke the social network's rules against "distribution of hacked material," according to an email The Post received from Twitter.

Twitter also blocked users from sharing the link to The Post article indicating that Hunter Biden introduced Joe Biden to the Ukrainian businessman, calling the link "potentially harmful."

"In line with our Hacked Materials Policy, as well as our approach to blocking URLs, we are taking action to block any links to or images of the material in question on Twitter," a Twitter spokesperson told The Post in a statement.

The company said it took the step because of the lack of authoritative reporting on where the materials included in The Post's story originated.

     **1** of **2**     

                                                                        LOG IN

| Bodybuilder Ryeley Palfi dies in crash hours… | Texas deputy Christopher Lofton fired for… | Tina Fey and Will Ferrell watched Horatio Sanz… | Chicago cop Bruce Dyker resigns after… | Horrific video shows college student allege… | Florida man hunting for flying discs in… |



Hunter Biden speaking at the Democratic National Convention
DEMOCRATIC NATIONAL CONVENTION/A

In a lengthier statement Wednesday night, the social media company said articles in The Post exposé, "include personal and private information — like email addresses and phone numbers — which violate our rules."

They reiterated the baseless claim that the story relied on hacked material, but added that "commentary on or discussion about hacked materials, such as articles that cover them but do not include or link to the materials themselves, aren't a violation of this policy."

"Our policy only covers links to or images of hacked material themselves," the statement says.

Users who clicked the link on Twitter were shown an alert warning them that the webpage may be "unsafe" and could contain content that would break Twitter's rules if it were shared directly on the platform.



LOG IN

| Bodybuilder Ryeley Palfi dies in crash hours… | Texas deputy Christopher Lofton fired for… | Tina Fey and Will Ferrell watched Horatio Sanz… | Chicago cop Bruce Dyker resigns after… | Horrific video shows college student allege… | Florida man hunting for flying discs in… |

Glenn Decl. Ex. 67
Page 3 of 10

6/11/22, 5:22 AM                                                Facebook, Twitter block The Post from posting

"The seemingly selective nature of this public intervention suggests partiality on the part of Facebook," Hawley wrote. "And your efforts to suppress the distribution of content revealing potentially unethical activity by a candidate for president raises a number of additional questions, to which I expect responses immediately."



1  of  5



Hawley later sent a similar letter to Twitter CEO Jack Dorsey, blasting the company for what

**NEW YORK POST**                                                                    LOG IN

| Bodybuilder Ryeley Palfi dies in crash hours… | Texas deputy Christopher Lofton fired for… | Tina Fey and Will Ferrell watched Horatio Sanz… | Chicago cop Bruce Dyker resigns after… | Horrific video shows college student allege… | Florida man hunting for flying discs in… |

Glenn Decl. Ex. 67
Page 4 of 10



"I ask that you immediately answer these questions and provide the necessary justifications so that your users can feel confident that you are not seeking to influence the outcome of the presidential election with your content removal decisions," Hawley wrote.

| FILED UNDER | CENSORSHIP | FACEBOOK | HUNTER BIDEN | JOE BIDEN | TWITTER | UKRAINE | 10/14/20 |
|---|---|---|---|---|---|---|---|

---

READ NEXT    **Trump won't commit to second term for AG Barr**

---

## SPONSORED STORIES





LOG IN

| Bodybuilder Ryeley Palfi dies in crash hours… | Texas deputy Christopher Lofton fired for… | Tina Fey and Will Ferrell watched Horatio Sanz… | Chicago cop Bruce Dyker resigns after… | Horrific video shows college student allege… | Florida man hunting for flying discs in… |
|---|---|---|---|---|---|



Newlyweds Dustin And Paulina
Live The Good Life In Palm Beach
It's Lonny

Do You Know What's Online About
You For Anyone To See? Almost
Nobody Does.
Intelius



**This job stinks! Putin's bodyguards box up his poop**



**Cops fatally shoot 'potential intruder' at Alabama elementary…**



**Biden: Zelensky didn't want to hear US info on warnings of Russian…**





### NEW YORK POST                                         LOG IN

Bodybuilder
Ryeley Palfi dies
in crash hours…

Texas deputy
Christopher
Lofton fired for…

Tina Fey and Will
Ferrell watched
Horatio Sanz…

Chicago cop
Bruce Dyker
resigns after…

Horrific video
shows college
student allege…

Florida man
hunting for
flying discs in…

Glenn Decl. Ex. 67
Page 6 of 10



### Norton 360 with LifeLock

Feel like you have no choice but to be a little unsafe online at times? Norton 360 with Li

Norton

### [Gallery] 22 Celebrities Who Photobombed Their Fans In Epic Ways

DomesticatedCompanion



### Video shows LA protester tackled to ground in front of Summit of Americas



### California woman says dog who defended her from mountain lion attac…



### Family booted from plane, stranded in Aruba for weeks after autistic teen…

**NEW YORK POST**

LOG IN



| Bodybuilder Ryeley Palfi dies in crash hours… | Texas deputy Christopher Lofton fired for… | Tina Fey and Will Ferrell watched Horatio Sanz… | Chicago cop Bruce Dyker resigns after… | Horrific video shows college student allege… | Florida man hunting for flying discs in… |

Glenn Decl. Ex. 67
Page 7 of 10

## AROUND THE WEB



**Prince Louis's Faces At The Jubilee Have The Public Debating**
NYPost.com



**Family Of Man Who Threatened Brett Kavanaugh Speaks Out**
NYPost.com





**NEW YORK POST**

LOG IN

| Bodybuilder Ryeley Palfi dies in crash hours… | Texas deputy Christopher Lofton fired for… | Tina Fey and Will Ferrell watched Horatio Sanz… | Chicago cop Bruce Dyker resigns after… | Horrific video shows college student allege… | Florida man hunting for flying discs in… |



**Humiliating Olympic Wardrobe Malfunctions Burnt Into Our Retinas**

NickiSwift.com



**The Worst Celebrity Teeth In Hollywood Are Truly Appalling**

NickiSwift.com



**Missing Federal Informant In Trump Probe Found Dead**

Aol.com



**You Can Probably Find These Cleaning Products In Your Fridge**

Housedigest.com

Powered by ZergNet

## RECOMMENDED FOR YOU





**NEW YORK POST**                                              LOG IN

| Bodybuilder Ryeley Palfi dies in crash hours… | Texas deputy Christopher Lofton fired for… | Tina Fey and Will Ferrell watched Horatio Sanz… | Chicago cop Bruce Dyker resigns after… | Horrific video shows college student allege… | Florida man hunting for flying discs in… |

Glenn Decl. Ex. 67
Page 9 of 10

6/11/22, 5:22 AM                                    Facebook, Twitter block The Post from posting

Glenn Decl. Ex. 67
Page 10 of 10

# EXHIBIT 68

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/all-the-news-thats-finally-fit-to-print-hunter-biden-laptop-new-york-post-new-york-times-joe-biden-11647637814

OPINION | REVIEW & OUTLOOK

# Hunter Biden's Laptop Is Finally News Fit to Print

The press that ignored the story in 2020 admits that it's real.

---

By The Editorial Board  Follow
March 18, 2022 6:41 pm ET

Talk about burying the lead—for 17 months. The New York Times has finally acknowledged that Hunter Biden's business dealings are legitimate news. Implicit apology accepted.

The Times waddled in this week with a story on the "tax affairs" of the President's son, including this gem in the 24th paragraph: "Those emails were obtained by The New York Times from a cache of files that appears to have come from a laptop abandoned by Mr. Biden in a Delaware repair shop. The email and others in the cache were authenticated by people familiar with them and with the investigation."

You don't say. This admission comes six months after a Politico writer published a book that also confirmed that the laptop emails were authentic. But the original scoop belonged to the New York Post, which broke its laptop story in October 2020—only to meet a media wall of denial and distortion.

Rather than attempt to confirm the emails, nearly all of the media at the time ignored the story or "fact-checked" it as false. This in-kind contribution to candidate Joe Biden was all the more egregious given other evidence supporting the Post's scoop. Neither Hunter Biden nor the Biden campaign denied that the laptop was Hunter's. And Hunter's former business partner, Tony Bobulinski, went public with documents backing up some of the laptop's contents.

The herd of media conformists also echoed the speculation of obviously partisan "intelligence officials." Some 50 of these officials—headlined by former Obama spooks James Clapper and John Brennan —circulated a statement peddling the Russian "disinformation" line—even as they admitted they had no evidence.

This result was a blackout of the Hunter news, except in a few places, including these pages. Twitter blocked the Post's account for nearly two weeks, and Facebook used algorithms to quash the story. This deprived voters of information they might have wanted to know before Election Day.

There's more for our reborn media sleuths to investigate. Mr. Bobulinski provided these pages with documents showing Hunter was looking to use the Biden name to profit from a business deal with a Shanghai-based company with ties to the Chinese government.

One May 2017 "expectations" email from Hunter associate James Gilliar shows Hunter receiving 20% of the equity in the venture, with another "10 held by H for the big guy." Mr. Bobulinski says the "big guy" is Joe Biden. To this day the Bidens have not had to explain their business arrangement.

The emails make clear that Hunter was cashing in on the Biden name, including as a board member of Burisma, a Ukrainian gas company. That influence-peddling was a potential political liability for Mr. Biden, which was why the facts deserved an airing before the election. They are still relevant, especially with U.S.-China relations so fraught.

The Times won a Pulitzer prize for pushing the Russia collusion narrative, which proved to be much ado about nothing. The New York Post deserves a Pulitzer, but it will probably have to settle for well-earned vindication.

*Appeared in the March 19, 2022, print edition as 'All the News That's Finally Fit to Print.'*

Copyright © 2022 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

# EXHIBIT 69

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/facebooks-lab-leak-about-face-11622154198

OPINION | REVIEW & OUTLOOK

# Facebook's Lab-Leak About-Face

The company acts in tandem with government on speech control.

---

By The Editorial Board  [Follow]

May 27, 2021 6:23 pm ET



A smart phone screen displays a new policy on Covid-19 misinformation with a Facebook website in the background.

PHOTO: ANDREW CABALLERO-REYNOLDS/AGENCE FRANCE-PRESSE/GETTY IMAGES

Question: When does "misinformation" stop being misinformation on social media? Answer: When Democratic government authorities give permission.

Witness Facebook's decision to stop censoring some claims about the origin of Covid-19 the same day President Biden said his Administration will investigate whether a Chinese lab may have been involved.

 OPINION: POTOMAC WATCH

 **The Covid Lab-Leak Theory Gets a Second Look**



00:00   1x

SUBSCRIBE

It's been clear for more than a year that the Wuhan Institute of Virology, which collects and tests coronaviruses, deserved scrutiny over the emergence of the pandemic in Wuhan. Yet Facebook announced in February that it would expand its content moderation on Covid-19 to include "false" and "debunked" claims such as that "COVID-19 is man-made or manufactured." Facebook deployed fact-check warnings against an influential Medium post this month on the origins of the virus by science journalist Nicholas Wade.

As long as Democratic opinion sneered at the lab-leak theory, Facebook dutifully controlled it. But ideological bubbles have a way of bursting, and the circumstantial evidence—most of which has been underlined available for months—finally permeated the insular world of progressive public health. This prompted officials like Anthony Fauci to say more investigation is needed, while the White House issued new intelligence directives reflecting lower certainty of a natural emergence.

Facebook acted in lockstep with the government: "In light of ongoing investigations into the origin of COVID-19 and in consultation with public health experts, we will no longer remove the claim that COVID-19 is man-made or manufactured from our apps," it said Wednesday.

The shift is better late than never, but note the apparent implication: While a political or scientific claim is disfavored by government authorities, Facebook will limit its reach. When government reduces its hostility toward an idea, so will Facebook.

YouTube's Covid-19 policy similarly forbids contradicting "health authorities." The Centers for Disease Control and Prevention is run by a political appointee and its evolving guidance is clearly influenced by political considerations. YouTube, owned by Google,

used this policy to remove a roundtable on virus response with scientists and Florida Gov. Ron DeSantis.

Perhaps the social-media giants think their censorship carries more legitimacy if they can appeal to government. In fact such coordination makes censorship even more suspect. Free speech protects the right to challenge government. But instead of acting as private actors with their own speech rights, the companies are mandating conformity with existing government views.

In 2019 a wiser Mark Zuckerberg, the Facebook CEO, said "I don't think it's right for a private company to censor politicians or the news in a democracy." If he'd stuck to that spirit instead of bending to pressure, he'd have avoided this embarrassment, and the more like it that are sure to come.

*Appeared in the May 28, 2021, print edition.*

Copyright © 2022 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

Glenn Decl. Ex. 69
Page 3 of 3

# EXHIBIT 70

# Congress of the United States
## Washington, DC 20515

January 11, 2022

The Honorable Xavier Becerra
Secretary
U.S. Department of Health and Human Services
200 Independence Ave., SW
Washington, D.C. 20201

Dear Secretary Becerra:

We write to request a transcribed interview of Dr. Anthony Fauci, Director, U.S. National Institute of Allergy and Infectious Diseases (NIAID). Excerpts of emails we are making public today (see enclosed Appendix I) reveal that Dr. Fauci was warned of two things: (1) the potential that COVID-19 leaked from the Wuhan Institute Virology (WIV) and (2) the possibility that the virus was intentionally genetically manipulated. It is imperative we investigate if this information was conveyed to the rest of the government and whether this information would have changed the U.S. response to the pandemic.

Despite Dr. Fauci claiming otherwise on multiple occasions, he was, in fact, aware of the monetary relationship between NIAID, the U.S. National Institutes of Health (NIH), EcoHealth Alliance Inc. (EcoHealth), and the WIV by January 27, 2020.[1] Dr. Fauci also knew that NIAID worked with EcoHealth to craft a grant policy to sidestep the gain-of-function moratorium at the time.[2] This new policy, designed by EcoHealth and agreed to by NIAID, allowed EcoHealth to complete dangerous experiments on novel bat coronaviruses—with very little oversight—that would have otherwise been blocked by the moratorium.[3] In January 2020, Dr. Fauci was also aware that EcoHealth was not in compliance with the terms of its grant that funded the WIV.[4] EcoHealth was required to submit an annual progress report to NIAID by September 30, 2019, and had not yet done so.[5] The Committee subsequently learned that EcoHealth failed to submit these reports presumably to hide a gain-of-function experiment conducted on infectious and potentially lethal novel bat coronaviruses.[6]

By January 27, 2020, Dr. Fauci knew NIAID had funded EcoHealth, the WIV was a subgrantee of EcoHealth, and EcoHealth was not in compliance with its grant reporting, in particular a grant that NIAID knew had gain-of-function potential on novel bat coronaviruses. It

---

[1] Email from Greg Folkers to Anthony Fauci, et. al.  (Jan. 27, 2020) (On file with Comm. Staff); Zachary Basu, *Fauci and Rand Paul clash over NIH funding for Wuhan Institute of Virology,* AXIOS (May 11, 2021).
[2] Sharon Lerner & Mara Hvistendahl, *NIH Officials Worked with EcoHealth Alliance to Evade Restrictions on Coronavirus Experiments,* INTERCEPT (Nov. 3, 2021).
[3] *Id.*
[4] Letter from Lawrence Tabak to James Comer (Oct. 20, 2021).
[5] *Id.*
[6] *Id.*

The Honorable Xavier Becerra
January 11, 2022
Page 2

is unclear if Dr. Fauci reported any of these issues to his superiors. We need to know the entirety of what Dr. Fauci knew and when he knew it.

On February 1, 2020, Dr. Fauci, Dr. Collins, and at least eleven other scientists convened a conference call to discuss COVID-19.[7] It was on this conference call that Drs. Fauci and Collins were first warned that COVID-19 may have leaked from the WIV and, further, may have been intentionally genetically manipulated. Again, it is unclear if either Dr. Fauci or Dr. Collins ever passed these warnings along to other government officials or if they simply ignored them.

Only three days later, on February 4, 2020, four participants of the conference call authored a paper entitled "The Proximal Origin of SARS-CoV-2" and sent a draft to Drs. Fauci and Collins.[8] Prior to final publication in *Nature Medicine*, the paper was sent to Dr. Fauci for editing and approval.[9] It is unclear what, if any, new evidence was presented or if the underlying science changed in that short period of time, but after speaking with Drs. Fauci and Collins, the authors abandoned their belief COVID-19 was the result of a laboratory leak. It is also unclear if Drs. Fauci or Collins edited the paper prior to publication.

On April 16, 2020, more than two months after the original conference call, Dr. Collins emailed Dr. Fauci expressing dismay that the *Nature Medicine* article—which they saw prior to publication and were given the opportunity to edit—did not squash the lab leak hypothesis and asks if the NIH can do more to "put down" the lab leak hypothesis.[10] The next day—after Dr. Collins explicitly asked for more public pressure—Dr. Fauci cited the *Nature Medicine* paper from the White House podium likely in an effort to further stifle the hypothesis COVID-19 leaked from the WIV.[11]

Rather than be transparent with the Committee, HHS and NIH continue to hide, obfuscate, and shield the truth. By continuing to refuse to cooperate with our request, your agencies are choosing to hide information that will help inform the origins of the ongoing pandemic, prevent future pandemics, respond to future pandemics, inform the United States' current national security posture, and restore confidence in our public health experts. HHS and NIH's continued obstruction is likely to cause irreparable harm to the credibility of these agencies. The emails released today raise significant questions, including but not limited to:

1. Did Drs. Fauci or Collins warn anyone at the White House about the potential COVID-19 originated in a lab and could be intentionally genetically manipulated?

2. If these concerns were not shared, why was the decision to keep them quiet made?

---

[7] Email from Jeremy Farrar to Anthony Fauci, et. al. (Feb. 1, 2020) (On file with Comm. Staff).
[8] Email from Jeremy Farrar to Anthony Fauci & Francis Collins (Feb. 4, 2020) (On file with Comm. Staff)
[9] Email from Kristian Andersen to Anthony Fauci, Francis Collins, & Jeremy Farrar (Mar. 6, 2020) (On file with Comm. staff).
[10] Email from Francis Collins to Anthony Fauci, et. al. (Apr. 16, 2020) (On file with Comm. Staff).
[11] John Haltiwanger, *Dr. Fauci throws cold water on conspiracy theory that coronavirus was created in a Chinese lab*, BLOOMBERG (Apr. 18, 2020).

The Honorable Xavier Becerra
January 11, 2022
Page 3

3.  What new evidence, if any, came to light about COVID-19 between February 1, 2020 and February 4, 2020 to alter the belief it originated in a lab?

4.  Did Drs. Fauci or Collins edit the *Nature Medicine* paper entitled "The Proximal Origin of SARS-CoV-2"?

5.  Would having this knowledge earlier have benefitted either vaccine or treatment development?

6.  By February 1, 2020, were Drs. Fauci or Collins aware of the State Department's warnings about WIV safety?

7.  Would this warning have changed the early response to the COVID-19 pandemic?

These questions are vital to understanding this and future pandemic responses. Unfortunately, thus far, HHS and its subordinate agency have hidden behind redactions to shield these emails from public scrutiny. We call on you to immediately lift these redactions and produce the email communications to Congress. Further, considering the import of the above questions, we request Dr. Anthony Fauci be made immediately available to sit for a transcribed interview. Please respond by January 18, 2022 to confirm.

Thank you for your attention to this important matter.

Sincerely,

James Comer
Ranking Member
Committee on Oversight and Reform

Jim Jordan
Ranking Member
Committee on the Judiciary

cc:     The Honorable Carolyn Maloney, Chairwoman
        Committee on Oversight and Reform

        The Honorable Jerrold Nadler, Chairman
        Committee on the Judiciary

## Appendix I

These emails were originally produced redacted via the Freedom of Information Act and subsequently to Committee Republicans. At the request of Committee Republicans and pursuant to the Seven Member Rule, the Department of Health and Human Services made unredacted versions available for an *in camera* review but not available to the public. Committee staff, to the best of their ability, hand transcribed the contents of the emails and excerpts of those transcriptions are reproduced below. Unless otherwise noted, emphasis is added.

### Notes from Participants on February 1, 2020 Conference Call

1. **Email from Dr. Jeremy Farrar to Drs. Francis Collins, Anthony Fauci, and Lawrence Tabak**



1

From Mike Farzan (discoverer of SARS receptor):

1. The RBD didn't look 'engineered' to him – as in, no human would have selected the individual mutations and cloned them into the RBD (I think we all agree)
2. Tissue culture passage can often lead to gain of basic sites – including furin cleavage sites (this is stuff they have seen with human coronaviruses)
3. ==He is bothered by the furin site and has a hard time explain that as an event outside the lab (though, there are possible ways in nature, but highly unlikely)==
4. Instead of directed engineering, changes in the RBD and acquisition of the furin site would be highly compatible with the idea of continued passage of virus in tissue culture
5. Acquisition of the furin site would likely destabilize the virus but would make it disseminate to new tissues.

==So, given above, a likely explanation could be something as simple as passage SARS-live CoVs in tissue culture on human cell lines (under BSL-2) for an extended period of time, accidently creating a virus that would be primed for rapid transmission between humans via gain of furin site (from tissue culture) and adaption to human ACE2 receptor via repeated passage.==

…So, I think it becomes a question of how do you put all this together, whether you believe in this series of coincidences, what you know of the lab in Wuhan, how much could be in nature – accidental release or natural event? ==I am 70:30 or 60:40.==

From Bob [Garry]:

Before I left the office for the ball, I aligned nCoV with the 96% bat CoV sequenced at WIV. Except for the RBD the S proteins are essentially identical at the amino acid level – well all but the perfect insertion of 12 nucleotides that adds the furin site. S2 is over its whole length essentially identical. ==I really can't think of a plausible natural scenario where you get from the bat virus or one very similar to it to nCoV where you insert exactly 4 amino acids 12 nucleotide that all have to be added at the exact same time to gain this function – that and you don't change any other amino acid in S2? I just can't figure out how this gets accomplished in nature.== Do the alignment of the spikes at the amino acid level – its stunning. Of course, in the lab it would be easy to generate the perfect 12 base insert that you wanted. Another scenario is that the progenitor of nCoV was a bat virus with the perfect furin cleavage site generated over

2

evolutionary times. In this scenario RaTG13 the WIV virus was generated by a perfect deletion of 12 nucleotides while essentially not changing any other S2 amino acid. Even more implausible IMO.

That is the big if.

You were doing gain of function research you would NOT use an existing close of SARS or MERSv. These viruses are already human pathogens. What you would do is close a bat virus th[at] had not yet emerged. Maybe then pass it in human cells for a while to lock in the RBS, then you reclone and put in the mutations you are interested – one of the first a polybasic cleavage site.

3

2. **Email from Dr. Francis Collins to Drs. Jeremy Farrar, Anthony Fauci, and Lawrence Tabak**

From: Francis Collins ⬛⬛⬛ (b) (6) >
Date: Sunday, 2 February 2020 at 10:27
To: Jeremy Farrar ⬛⬛⬛ (b) (6)
Cc: "Fauci, Anthony (NIH/NIAID) [E]" ⬛⬛⬛ (b) (6), "Tabak, Lawrence (NIH/OD) [E]" ⬛⬛⬛ (b) (6)
Subject: RE: Teleconference

Jeremy,

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ (b)(5)

I'm available any time today except 3:15 – 5:45 pm EST (on a plane) for a call to Tedros. Let me know if I can help get through his thicket of protectors.

Francis

… Though the arguments from Ron Fouchier and Christian Drosten are presented with more forcefulness than necessary, I am coming around to the view that a natural origin is more likely. But I share your view that a swift convening of experts in a confidence inspiring framework (WHO seems really the only option) is needed, or the voices of conspiracy will quickly dominate, doing great potential harm to science and international harmony…

4

3. **Email from Dr. Andrew Rambaut to Drs. Jeremy Farrar, Anthony Fauci, Patrick Vallance, Christian Drosten, Marion Koopmans, Edward Holmes, Kristian Andersen, Paul Schreier, Mike Ferguson, Francis Collins, and Josie Golding**

From: _____ (b) (6)
Date: Sunday, 2 February 2020 at 09:38
To: Jeremy Farrar < _____ (b) (6) >
Cc: _____ (b) (6) >, "Fauci, Anthony (NIH/NIAID) [E]"
_____ (b) (6) , Patrick Vallance _____ (b) (6) >, "Drosten,
Christian" _____ (b) (6) , Marion Koopmans < _____ (b) (6) ,
Edward Holmes _____ (b) (6) , Paul Schreier
_____ (b) (6) , "Kristian G. Andersen" _____ (b) (6) , Michael FMedSci
_____ (b) (6) >, Francis Collins _____ (b) (6) , Josie Golding
_____ (b) (6)
Subject: Re: Teleconference

Dear Jeremey, Ron and all,

Thanks for inviting me on the call yesterday.                        (b) (5)
                                                                     (b) (7)

[large redacted block]

Best,
Andrew

Thanks for inviting me on the call yesterday. ==I am also agnostic on this – I do not have any experience of laboratory virology and don't know what is likely or not in that context. From a (natural) evolutionary point of view the only thing here that strikes me as unusual is the furin cleavage site.== It strongly suggests to me that we are missing something important in the origin of the virus. My inclination would be that it is a missing host species in which this feature arose because it was selected for in that host. We can see this insertion has resulted in an extremely fit virus in humans – we can also deduce that it is not optimal for transmission in bat species.

… The biggest hinderance at the moment (for this and more generally) is the lack of data and information. There have been no genome sequences from Wuhan for cases more recent than the

5

beginning of January and reports, but no information, about virus from non-human animals in Wuhan. If the evolutionary origins of the epidemic were to be discussed, I think the only people with sufficient information or access to samples to address it would be the teams working in Wuhan.

6

### 4.  **Email from Dr. Ron Fouchier**



… Given the evidence presented and the discussions around it, I would conclude that a follow-up discussion on the possible origin of 2019-nCoV would be of much interest. However, I doubt if it needs to be done on very short term, given the importance of other

7

activities of the scientific community, WHO and other stakeholders at present. It is my opinion that a non-natural origin of 2019-nCoV is highly unlikely at present. Any conspiracy theory can be approached with factual information.

… An accusation that nCoV-2019 might have been engineered and released into the environment by humans (accidental or intentional) would need to be supported by strong data, beyond a reasonable doubt. It is good that this possibility was discussed in detail with a team of experts. However, further debate about such accusations would unnecessarily distract top researchers from their active duties and do unnecessary harm to science in general and science in China in particular.

8

## Reaction to First Draft of *Nature Medicine* "The Proximal Origin of SARS-CoV-2"

### 1. Email from Dr. Anthony Fauci to Drs. Jeremy Farrar and Francis Collins

**From:** "Fauci, Anthony (NIH/NIAID) [E]"                    (b) (6)
**Date:** Tuesday, 4 February 2020 at 13:18
**To:** Francis Collins <              (b) (6)>, Jeremy Farrar              (b) (6)
**Subject:** RE: Prevalence of infection and stage of the epidemic in Wuhan

??                                         (b) (4)

Anthony S. Fauci, MD
Director
National Institute of Allergy and Infectious Diseases
Building 31, Room 7A-03
31 Center Drive, MSC 2520
National Institutes of Health
Bethesda, MD 20892-2520
Phone:                   (b) (6)
FAX: (301) 496-4409
E-mail                (b) (6)
The information in this e-mail and any of its attachments is confidential and may contain sensitive
information.  It should not be used by anyone who is not the original intended recipient.  If you
have received this e-mail in error please inform the sender and delete it from your mailbox or any
other storage devices.  The National Institute of Allergy and Infectious Diseases (NIAID) shall not
accept liability for any statements made that are the sender's own and not expressly made on
behalf of the NIAID by one of its representatives.

…Serial passage in ACE2-transgenic mice

9

**2.   Email from Dr. Jeremy Farrar to Drs. Anthony Fauci and Francis Collins**



…[Eddie Holmes] 60-40 lab. I am 50-50…

10

**3.   Email from Dr. Francis Collins to Drs. Jeremy Farrar and Anthony Fauci**



    …[Eddie Holmes] arguing against engineering but repeated passage
    is still an option…

11

**Government Official Attempts to Stifle the Lab Leak Hypothesis**

1. **Email from Dr. Francis Collins to Drs. Anthony Fauci, Lawrence Tabak, Cliff Lane, and Mr. John Burklow**

> From: Collins, Francis (NIH/OD) [E]                      (b) (6)
> Sent: Thursday, April 16, 2020 5:02 PM
> To: Fauci, Anthony (NIH/NIAID) [E]                      (b) (6)
> Cc: Tabak, Lawrence (NIH/OD) [E]                      (b)(6); Lane, Cliff (NIH/NIAID) [E]
>       (b)(6); Burklow, John (NIH/OD) [E]                      (b) (6)
> Subject: conspiracy gains momentum
>
>                                                                          (b)(5)
>
> https://www.mediaite.com/tv/foxs-bret-baier-sources-increasingly-confident-coronavirus-outbreak-started-in-wuhan-lab/
>
>                                                                          (b) (5)
>
> Francis

==Wondering if there is something NIH can do to help put down this very destructive conspiracy, with what seems to be growing momentum:==

https://www.mediaite.com/tv/foxs-bret-baier-sources-increasingly-confident-coronavirus-outbreak-started-in-wuhan-lab/

==I hoped the Nature Medicine article on the genomic sequence of SARS-CoV-2 would settle this.== But probably didn't get much visibility.

==Anything more we can do?== Ask the National Academy to weigh in?

Francis

12

2.   **Email from Dr. Anthony Fauci to Dr. Francis Collins**



I would not do anything about this right now. It is a shiny object that will go away in times.

13