**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

| | |
|---|---|
| STATE OF MISSOURI ex rel. ERIC S. SCHMITT, Attorney General, and<br><br>STATE OF LOUISIANA ex rel. JEFFREY M. LANDRY, Attorney General,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,<br><br>        *Defendants*. | Case No. 3:22-cv-01213 |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR
<u>PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ 2

TABLE OF AUTHORITIES ........................................................................................................ 3

INTRODUCTION .......................................................................................................................... 7

FACTUAL BACKGROUND ......................................................................................................... 8

    A.    The Importance of Social-Media Platforms as the "Modern Public Square." ............................. 8

    B.    Section 230 of the CDA Subsidized the Creation of This "Modern Public Square." ................ 10

    C.    Social-Media Companies Enjoy Monopoly Power, Raising Grave Antitrust Concerns............. 11

    D.    The Steady Drumbeat of Threats by Federal Officials to Induce Greater Censorship............... 12

    E.    Biden Leads the Charge, Making Threats To Demand More Online Censorship. ..................... 12

    F.    Once in Power, the Biden Administration Leverages Threats To Achieve Censorship. ............ 14

        1.    HHS and White House officials collude with social-media platforms to censor....................... 14

        2.    DHS and White House officials collude with social-media platforms to censor....................... 22

    G.    Federal Officials and Social-Media Companies Admit to Colluding to Censor......................... 30

        1.    Government statements admitting direct collusion........................................................ 30

        2.    Social-media-company statements admitting direct collusion...................................... 31

    H.    Government-Private Collusion Has Achieved Seismic Levels of Online Censorship............... 33

        1.    Censorship affects enormous segments of the States' citizens. .................................... 33

        2.    Censorship of truthful speech on matters of enormous public concern. ....................... 34

        3.    Censorship imposed by many insidious methods. ........................................................ 34

        4.    Compounded effects of censorship. .............................................................................. 35

        5.    Censorship directly linked to federal officials. ............................................................ 36

        6.    Censorship inflicts State-specific injuries on Missouri and Louisiana. ........................ 38

ARGUMENT ............................................................................................................................... 41

    I.    The States Are Likely to Prevail on Counts I and II of the Complaint. .................................... 41

    A.    The States Are Likely To Prevail on Their First Amendment Claim. ....................................... 41

    B.    The States Are Likely to Succeed on Their Ultra Vires Claim. ................................................ 53

    II.    The Other Equitable Factors Support Granting a Preliminary Injunction. ............................... 55

    III.    The Court Should Grant a Three-Phase Preliminary Injunction. .............................................. 56

CONCLUSION ............................................................................................................................. 57

CERTIFICATE OF SERVICE ..................................................................................................... 59

# TABLE OF AUTHORITIES

**Cases**                                                                                       **Page**(s)

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
141 S. Ct. 2485 (2021) ............................................................................ 54

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
458 U.S. 592 (1982) ........................................................................... 39, 40

*American Family Association, Inc. v. City & County of San Francisco,*
277 F.3d 1114 (9th Cir. 2002)................................................................. 44

*Ancient Coin Collectors Guild v. U.S. Customs & Border Protection,*
801 F.Supp.2d 383 (D. Md. 2011) ......................................................... 52

*Ass'n of Club Executives of Dallas, Inc. v. City of Dallas, Texas,*
No. 3:22-CV-00177-M, 2022 WL 1642470 (N.D. Tex. May 24, 2022)................................. 54

*Backpage.com, LLC v. Dart,*
807 F.3d 229 (7th Cir. 2015)................................................... 44, 45, 46

*Bantam Books, Inc. v. Sullivan,*
372 U.S. 58 (1963) ........................................................... 42, 43, 44, 45

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
457 U.S. 853 (1982) ................................................................................ 51

*Biden v. Knight First Amendment Institute at Columbia Univ.,*
141 S. Ct. 1220 (2021) ................................................................... passim

*Blum v. Yaretsky,*
457 U.S. 991 (1982) ........................................................................ 41, 42, 43

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,*
531 U.S. 288 (2001)...................................................................... 41, 42, 47

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.,*
827 F.2d 1291 (9th Cir. 1987)........................................................... 42, 50

*Chamber of Commerce of the U.S. v. Reich,*
74 F.3d 1322 (D.C. Cir. 1996) ......................................................... 52, 53

*Dart v. United States,*
848 F.2d 217 (D.C. Cir.1988) .................................................................. 52

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council,*
485 U.S. 568 (1988) ................................................................................ 54

*Elrod v. Burns*,
    427 U.S. 347 (1976) ................................................................................ 55, 56

*Evans v. Newton*,
    382 U.S. 296 (1966) ...................................................................................... 41

*Fairley v. Andrews*,
    578 F.3d 518 (7th Cir. 2009) ......................................................................... 44

*Ladd v. Livingston*,
    777 F.3d 286 (5th Cir. 2015) ......................................................................... 40

*Louisiana v. Biden*,
    No. 2:21-CV-01074, 2022 WL 438313 (W.D. La. Feb. 11, 2022) .......................... 52

*Lugar v. Edmonson Oil Co.*,
    457 U.S. 922 (1982) ................................................................................ 41, 46

*Lyng v. Payne*,
    476 U.S. 926 (1986) ...................................................................................... 52

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*,
    141 S. Ct. 13 (2020) ........................................................................................ 9

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019) .............................................................................. 43, 46

*Matal v. Tam*,
    137 S. Ct. 1744 (2017) .................................................................................. 51

*Mathis v. Pac. Gas & Elec. Co.*,
    891 F.2d 1429 (9th Cir. 1989) ............................................................ 41, 43, 44

*Mountain States Legal Found. v. Bush*,
    306 F.3d 1132 (D.C. Cir. 2002) ..................................................................... 52

*Nat'l Rifle Ass'n of Am. v. Cuomo*,
    350 F. Supp. 3d 94 (N.D.N.Y. 2018) ...................................................... 42, 43, 51, 55

*Norwood v. Harrison*,
    413 U.S. 455 (1973) ................................................................................ 42, 49

*Okwedy v. Molinari*,
    333 F.3d 339 (2d Cir. 2003) ...................................................................... 44, 45

*Packingham v. North Carolina*,
    137 S. Ct. 1730 (2017) ...................................................................... 7, 8, 50, 51

*Peterson v. City of Greenville*,
    373 U.S. 244 (1963) ........................................................................ 42

*Phelps–Roper v. Nixon*,
    545 F.3d 685 (8th Cir. 2008) ........................................................ 55

*Railway Employes' Department v. Hanson*,
    351 U.S. 225 (1956) ........................................................................ 49

*Rawson v. Recovery Innovations, Inc.*,
    975 F.3d 742 (9th Cir. 2020) .................................................... 47, 48

*Reno v. ACLU*,
    521 U.S. 844 (1997) .......................................................................... 8

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
    515 U.S. 819 (1995) ........................................................................ 50

*Skinner v. Railway Labor Executives Ass'n*,
    489 U.S. 602 (1989) .............................................................. 41, 48, 49

*Solid Waste Agency of N. Cook County. v. U.S. Army Corps of Engineers*,
    531 U.S. 159 (2001) ........................................................................ 54

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
    732 F.3d 535 (5th Cir. 2013) ........................................................ 55

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ........................................................ 37

*Turner Broadcasting System, Inc. v. FCC*,
    512 U.S. 622 (1994) .................................................................. 40, 50

*United States Forest Service v. Cowpasture River Preservation Assn.*,
    140 S. Ct. 1837 (2020) .................................................................... 54

*United States v. Alvarez*,
    567 U.S. 709 (2012) ........................................................................ 40

*United States v. Bass*,
    404 U.S. 336 (1971) ........................................................................ 54

*United States v. Midwest Video Corp.*,
    406 U.S. 649 (1972) ........................................................................ 52

*Utility Air Regulatory Group v. EPA*,
    573 U.S. 302 (2014) ........................................................................ 54

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
    425 U.S. 748 (1976) ................................................................................ 51

*W. Virginia State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ................................................................................ 40

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ................................................................................ 53

**Statutes**

47 U.S.C. § 230 ............................................................................... 9, 10, 11

47 U.S.C. § 230(c)(2)(A) ................................................................................ 9

47 U.S.C. § 230(c)(2)(B) .............................................................................. 10

47 U.S.C. § 230(e)(3) .................................................................................... 10

La. Const. art. I, § 7 ............................................................................... 37, 39

Mo. Const. art. I, § 8 .............................................................................. 37, 39

**Regulations**

*Impact of Health Misinformation in the Digital Information Environment in the United States
    Throughout the COVID-19 Pandemic Request for Information*,
    87 Fed. Reg. 12,712 (March 2, 2022) ............................................... 19, 20

## INTRODUCTION

If the White House spokesperson stood at her podium and repeatedly demanded that private booksellers burn certain books that the federal government disfavors, or else face grave legal consequences, everyone would see the First Amendment problem.  If federal officials sat in on the editorial board meetings of the New York Times and told them what stories they should run if they want to avoid legal problems, everyone would see the First Amendment problem.

This case is worse than these hypotheticals.  Here are the words of Jen Psaki, then-White House spokesperson: "We are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff…. *We're flagging problematic posts for Facebook that spread disinformation*….  We engage with them regularly and they certainly understand what our asks are."  Glenn Decl. Ex. 30, at 9-11 (emphasis added) (Ex. A).  The government's "problematic posts," *id.*, are those that supposedly contain "disinformation and misinformation, especially related to COVID-19, vaccinations, and elections."  Glenn Decl., Ex. 29, at 15.  Along with "members of our senior staff," Glenn Decl. Ex. 30, at 9, officials at HHS and DHS are coordinating and colluding directly with social-media companies to dictate what Americans can and cannot say on their social-media accounts—and doing so under the ever-present threat of grave legal consequences to those companies if they do not comply.

Just last week, two U.S. Senators released explosive internal documents from the Department of Homeland Security that should terrify any American who cares about the freedom of speech.  Glenn Decl. Ex. 1.  These whistleblower documents provide a glimpse into DHS's abortive creation of the so-called "Disinformation Governance Board" under the direction of Nina Jankowicz, a left-wing apparatchik notorious for spouting partisan "disinformation" of her own.

What is most chilling about these documents is not what they reveal, but what they confirm. DHS's so-called "Disinformation Governance Board" ("DGB" or "KGB") was not a novel initiative by the federal government to launch a new censorship program to silence disfavored voices on social media.  On the contrary, as the Complaint here alleges in elaborate detail, ECF 1, that federal social-media censorship program is *already in full swing* at DHS and other federal agencies, on a massive scale.  A scale so massive, in fact, that the DGB was created to centralize, normalize, and impose a bureaucratic structure on the enormous campaign of online censorship that Defendants have already launched.  *See, e.g.,* Glenn Decl. Ex. 1, at 6, 14, 15, 22-23, 25.

From its inception, the DGB was envisioned as an agency for suppressing core political speech about election security and COVID-19 restrictions.  In the internal memo to Secretary Mayorkas advocating for the DGB's creation, the very first two topics of "disinformation" to be targeted were "conspiracies about the validity and security of elections," and "disinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks."  *Id.* at 6.  The whistleblower documents make clear that the DGB's task was not to *establish* a censorship program, but to *oversee* the massive censorship program against free speech on these topics that already exists—both within DHS, and across the federal government.  *Id.* at 14, 15, 22-23, 25.

There is compelling evidence that federal officials, including Defendants here, have adopted an aggressive program to coordinate with private social-media companies to censor and suppress disfavored speech on social media.  This is *ultra vires* and violates the First Amendment.

## FACTUAL BACKGROUND

### A.    The Importance of Social-Media Platforms as the "Modern Public Square."

Social-media platforms are "the modern public square."  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).  They are "for many the principal sources of knowing current events" and for "speaking and listening in the modern public square, and otherwise exploring the vast

8

realms of human thought and knowledge." *Id.* Social-media platforms "provide perhaps the most important and powerful mechanisms available to a private citizen to make his or her voice heard." *Id.* "They allow a person with an Internet connection to 'become the town crier with a voice that resonates farther than it could from any soapbox.'" *Id.* (quoting *Reno v. ACLU*, 521 U.S. 844, 870 (1997)). Social-media "users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 1735. "[S]ocial media users employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Id.*

"The Facebook suite of apps is valuable largely because 3 billion people use it." *Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring); *see also* Glenn Decl. Ex. 2. Facebook has close to 3 billion registered users worldwide and over 235 million users in the United States, including millions of Missourians, Louisianans, and citizens of other States. Glenn Decl. Exs. 3-5. Twitter has more than 330 million users worldwide, including approximately 70 million users in the United States. Glenn Decl. Ex. 6. Approximately 500 million tweets are posted on Twitter every day, and they are accessible to non-Twitter users on the internet. Glenn Decl. Ex. 7. Moreover, Twitter users include large numbers of politicians, journalists, and public figures, so Twitter's impact on public discourse is even larger than its numbers alone reflect. Senger Decl. ¶ 14 (Ex. B). YouTube has more than one billion hours of video views every day. Glenn Decl. Ex. 8. An estimated 500 hours of video content are uploaded to YouTube every minute. Glenn Decl. Ex. 9. In 2020, approximately 92 percent of U.S. Senators and 86 percent of U.S. Representatives uploaded content on YouTube. Glenn Decl. Ex. 10.

"Today's digital platforms provide avenues for historically unprecedented amounts of speech, including speech by government actors. Also unprecedented, however, is the concentrated

control of so much speech in the hands of a few private parties." *Knight First Amendment Institute*, 141 S. Ct. at 1221 (Thomas, J., concurring).   The "concentration" of power in social media companies "gives some digital platforms enormous control over speech." *Id.* at 1224.

**B.      Section 230 of the CDA Subsidized the Creation of This "Modern Public Square."**

This enormous "concentration" of "control," *id.*, over the way Americans speak, listen, and receive news did not happen in a vacuum.  It was directly subsidized, fostered, and encouraged by the federal government in Section 230 of the Communications Decency Act (CDA).

Section 230, 47 U.S.C. § 230, provides unique liability protections for internet publishers, not available to other publishers.   Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  Section 230(c)(2) also provides that: "No provider or user of an interactive computer service shall be held liable on account of (A) any action voluntarily taken in good faith *to restrict access to or availability of material* that the provider or user considers to be … *otherwise objectionable, whether or not such material is constitutionally protected*."  47 U.S.C. § 230(c)(2)(A) (emphasis added).   Courts have interpreted Section 230 broadly—far beyond its plain textual import.  *See, e.g., Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 15-18 (2020) (statement of Thomas, J., respecting the denial of certiorari).  Under Section 230, therefore, social-media platforms have the best of both worlds: They claim to be exempt from liability if they leave even atrocious content posted by third parties, but they also claim immunity if they censor anything they deem "objectionable," even if "such material is constitutionally protected."  47 U.S.C. § 230(c)(2)(A).

Further, Section 230 purportedly shields such platforms from liability for colluding with other social-media platforms on how to censor speech: "No provider or user of an interactive computer service shall be held liable on account of … (B) any action taken to enable or make

available to information content providers or others the technical means to restrict access to material described in paragraph (1)."  47 U.S.C. § 230(c)(2)(B).  Section 230 also purports to preempt any state law to the contrary: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).

It is hard to overstate the value of Section 230 immunity to social-media platforms.  Given the staggering volume of speech on their platforms, this near-blanket grant of immunity is "a hidden subsidy worth billions of dollars."  Glenn Decl. Ex. 11, at 7.

**C.     Social-Media Companies Enjoy Monopoly Power, Raising Grave Antitrust Concerns.**

Section 230 immunity also contributed directly to the emergence of the current monopolistic or oligopolistic structure in the social-media market—complete market dominance by a tiny cartel of behemoths, which coordinate with each other in the suppression of speech.

The existence of such a monopolistic cartel is undeniable.  Facebook has 3 billion users, and "Google search—at 90% of the market share—is valuable relative to other search engines because more people use it."  *Knight First Amendment*, 141 S. Ct. at 1224 (Thomas, J., concurring).  "These network effects entrench these companies.  Ordinarily, the astronomical profit margins of these platforms—last year, Google brought in $182.5 billion total, $40.3 billion in net income— would induce new entrants into the market.  That these companies have no comparable competitors highlights that the industries may have substantial barriers to entry."  *Id.*

 "[T]his concentration gives some digital platforms enormous control over speech.  When a user does not already know exactly where to find something on the Internet—and users rarely do—Google is the gatekeeper between that user and the speech of others 90% of the time."  *Id.* "It can suppress content by deindexing or downlisting a search result or by steering users away

from certain content by manually altering autocomplete results." *Id.* "Facebook and Twitter can greatly narrow a person's information flow through similar means." *Id.* at 1224–25.

Given their monopolistic market power, social-media perceive the threat of robust antitrust scrutiny as grave indeed. For example, in 2020, when a serious antitrust action was filed against Facebook by the federal government and over 40 States, Mark Zuckerberg described the threat of antitrust enforcement as "existential." Glenn Decl. Ex. 12, at 2.

**D.    The Steady Drumbeat of Threats by Federal Officials to Induce Greater Censorship.**

In recent years, senior Democratic officials in the federal government have issued a long series of threats to social-media companies—threats specifically linked to demands for greater censorship of disfavored speech and viewpoints. The threats have deliberately targeted the social-media companies' two most sensitive vulnerabilities: the repeal of Section 230 immunity, and the prospect of rigorous antitrust enforcement. *See, e.g.,* Glenn Decl. Ex. 13 (House Speaker Pelosi); *id.* Ex. 14 (Representatives Cedric Richmond and Jerrold Nadler); *id.* Ex. 15 (Senator Mark Warner); *id.* Ex. 16 (Senator Richard Blumenthal); *id.* Ex. 55 (Senator Mazie Hirono); *id.* Ex. 17 (Democratic Committee Chairs of the House Communications and Technology Subcommittee); *id.* Ex. 18 (22 Democratic Members of Congress). The flip side of such threats, of course, is the implied "carrot" of retaining Section 230 immunity and avoiding antitrust scrutiny, thus allowing the major social-media platforms to retain their legally privileged status.

**E.    Biden Leads the Charge, Making Threats To Demand More Online Censorship.**

Then-candidate and now-President Biden has led this charge. His threats of adverse government action against social-media platforms have been among the most vociferous, and among the most clearly linked to demands for more aggressive censorship of disfavored speech.

12

For example, on January 17, 2020, then-candidate Biden stated that Section 230 of the CDA should be "revoked" because social-media companies like Facebook did not do enough to censor political ads criticizing him.  Biden stated: "Section 230 should be revoked, immediately should be revoked, number one.  For Zuckerberg and other platforms."  Glenn Decl. Ex. 19, at 27. He also stated, "It should be revoked because [Facebook] is not merely an internet company.  It is propagating falsehoods they know to be false.... It's totally irresponsible."  *Id.*  Biden threatened that Facebook CEO Mark Zuckerberg should be subject to civil liability, and possibly even criminal prosecution, for not censoring core political speech: "He should be submitted to civil liability and his company to civil liability…. Whether he engaged in something and amounted to collusion that in fact caused harm that would in fact be equal to a criminal offense, that's a different issue.  That's possible.  That's possible – it could happen."  *Id.*

During the presidential campaign, now-Vice President Harris made similar threats.  For example, she stated in 2019: "We will hold social media platforms responsible for the hate infiltrating their platforms …. if you profit off of hate—if you act as a megaphone for misinformation or cyberwarfare, if you don't police your platforms—we are going to hold you accountable…."  Glenn Decl. Ex. 20, at 1.  She also repeatedly called for Twitter to censor President Trump.  Glenn Decl. Ex. 21; Glenn Decl. Ex. 22.

The Biden-Harris campaign made similar demands.  In June 2020, Biden-Harris published an open letter and online petition (ironically, on Facebook) calling for Facebook to engage in more aggressive censorship of core political speech.  The open letter complained that Facebook "continues to allow Donald Trump to say anything — and to pay to ensure that his wild claims reach millions of voters…. We call for Facebook to proactively stem the tide of false information…."  Glenn Decl. Ex. 23, at 1.  Biden-Harris's online petition demanded that Facebook

"promptly remove false, viral information," and "prevent political candidates and PACs from using paid advertising to spread lies and misinformation." *Id.* Ex. 24, at 3.

On September 28, 2020, Biden-Harris sent a letter to Facebook accusing it of propagating a "storm of disinformation" by failing to censor the Trump campaign's political speech. Glenn Decl. Ex. 25, at 3. The letter accused Facebook of allowing "hyper-partisan" and "fantastical" speech to reach millions, and it demanded "more aggressive" censorship of Trump. *Id.* at 1, 3.

On December 2, 2020—during the presidential transition—Biden's former chief of staff and top technical advisor, Bruce Reed, publicly stated that "it's long past time to hold the social media companies accountable for what's published on their platforms," specifically referring to the amendment or repeal of § 230 of the CDA. Glenn Decl. Ex. 26, at 2.

**F.      Once in Power, the Biden Administration Leverages Threats To Achieve Censorship.**

After the 2020 election, President Biden was set to take office with Democrats in control of both Houses of Congress. Their threats of adverse legal consequences thus became compelling. Once in control, Defendants promptly capitalized by leveraging these threats—which continued with increased vigor—into direct collusion with social-media companies to achieve widespread censorship of particular disfavored speakers and viewpoints on social media.

**1.      HHS and White House officials collude with social-media platforms to censor.**

Collusion to censor disfavored speech was already in place at HHS when the Biden Administration took office, and it radically expanded thereafter. Prior to 2020, as head of NIAID, Dr. Anthony Fauci had overseen funding of risky gain-of-function research on viruses, including research at the Wuhan Institute of Virology. This included research funded through intermediaries such as Dr. Peter Daszak and the EcoHealth Alliance, among others. In late January and early February 2020, Dr. Fauci received information from colleagues that suggested that the COVID-19

14

virus may have originated in a laboratory in Wuhan, China.  This revelation threatened to implicate Dr. Fauci, as he had funded the research that, under this theory, led to the virus's origin.  Soon thereafter, Dr. Fauci participated in a conference call with science-funding authorities intended to discredit and suppress this lab-leak theory.  *See, e.g.,* Glenn Decl. Ex. 27; *id.* Ex. 70.  After the conference call, influential individuals signed public statements that were placed in science journals in attempt to discredit the lab-leak theory.  *See, e.g.*, *id.* Ex. 70.

In the same timeframe, Dr. Fauci communicated with Facebook CEO Mark Zuckerberg directly regarding public messaging and the flow of information on social media about the government's COVID-19 response.  Glenn Decl. Ex. 28.  For example, in a series of emails from March 15 to 17, 2020, Zuckerberg made a three-line proposal to Fauci that was redacted by the federal government before the email was produced in a FOIA request.  *Id.*  Fauci's staff treated the redacted proposal as top priority, *id.*, at 2, and Fauci responded by email to Zuckerberg on March 17, 2020, describing his redacted proposal as "very exciting."  *Id.* at 4.  Shortly after these emails, Facebook and other social-media companies began censoring discussion of the lab-leak theory for the origins of COVID-19, and from then on, "Facebook acted in lockstep with the government" in censoring the lab-leak theory.  Glenn Decl. Ex. 70, at 2.

On October 4, 2020, eminent scientists from Harvard, Stanford, and Oxford published the Great Barrington Declaration, criticizing the lockdown approach to responding to COVID-19 championed by Dr. Fauci and other HHS officials, and calling for a targeted approach called "Focused Protection" instead.  Bhattacharya Decl., ¶¶ 6-11 (Ex. C); Kulldorff Decl., ¶¶ 9-11 (Ex. D).  A few days later, the Director of NIH, Dr. Francis Collins, emailed Dr. Fauci, demanding a "quick and devastating … takedown" of the Declaration.  Bhattacharya Decl. ¶ 14.  Almost

immediately, the Great Barrington Declaration and its authors experienced extensive social-media censorship on multiple platforms.  Bhattacharya Decl., ¶¶ 16-33; Kulldorff Decl. ¶¶ 13-30.

In the Biden Administration, the calls for such censorship dramatically increased.  On May 5, 2021, Defendant Psaki gave a White House press conference at which she stated, "[t]he President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections."  Glenn Decl. Ex. 29, at 15.  Echoing Biden's past threats to social-media firms, Psaki immediately went on to state that President Biden "supports … a robust anti-trust program."  *Id.*  She linked the threat of anti-trust enforcement to the demand for more aggressive censorship by social-media platforms, stating that "there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public."  *Id.*

At a White House press briefing on July 15, 2021, Surgeon General Vivek Murthy announced that "health misinformation" constitutes an "urgent public health crisis," stating that he had "issued a Surgeon General's Advisory on the dangers of health misinformation. … [T]oday we live in a world where misinformation poses an imminent and insidious threat to our nation's health."  Glenn Decl. Ex. 30, at 1-2.  Surgeon General Murthy stated that "[m]odern technology companies have enabled misinformation to poison our information environment with little accountability to their users.  They've allowed people who intentionally spread misinformation — what we call 'disinformation' — to have extraordinary reach."  *Id.* at 2.  Surgeon General Murthy explicitly called for more aggressive censorship of social-media speech, stating that "we expect more from our technology companies. …. We're asking them to monitor misinformation more closely.  We're asking them to consistently take action against misinformation super-spreaders on

their platforms." *Id.* at 3.  He also stated that "technology companies … have taken some steps to address misinformation, but much, much more has to be done.  And we can't wait longer for them to take aggressive action…." *Id.* at 5.

At the same press briefing, Psaki stated: "[W]e are in regular touch with these social media platforms, and those engagements *typically happen through members of our senior staff*…." *Id.* at 9-10 (emphasis added).  She added, "*We're flagging problematic posts for Facebook that spread disinformation*." *Id.* at 10 (emphasis added).  She stated, "we have recommended—proposed that they create a robust enforcement strategy." *Id.*  Psaki then called on social-media companies to censor twelve particular speakers, the so-called "Disinformation Dozen," stating: "[T]here's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms.  All of them remain active on Facebook, despite some even being banned on other platforms." *Id.*  Psaki called on Facebook and other social-media companies to censor disfavored speech more aggressively: "[I]t's important to take faster action against harmful posts…. Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days.  That's too long. The information spreads too quickly." *Id.* at 11.  Referring to social-media platforms, Psaki stated that "[w]e engage with them regularly and *they certainly understand what our asks are*." *Id.* (emphasis added).  She stated that, "we've made a calculation to push back on misinformation," and that "we are working to combat misinformation that's traveling online." *Id.*

The same day, the Surgeon General released his advisory regarding "health misinformation."  Glenn Decl. Ex. 31.  The Surgeon General's advisory called for social-media companies to ramp up online censorship, *i.e.*, to "make meaningful long-term investments to address misinformation, including product changes," to "[r]edesign recommendation algorithms

to avoid amplifying misinformation," to "build in 'frictions'— such as suggestions and warnings— to reduce the sharing of misinformation," and to "make it easier for users to report misinformation." *Id.* at 12. It called on social-media companies to "[s]trengthen the monitoring of misinformation," and to censor disfavored speakers more swiftly and aggressively: "Prioritize early detection of misinformation 'super-spreaders' and repeat offenders. Impose clear consequences for accounts that repeatedly violate platform policies." *Id.*

Facebook responded by stating that it was already aggressively censoring "health misinformation," and *coordinating with the Government to do so*. "A Facebook spokesperson said the company has *partnered with government experts*, health authorities and researchers to take 'aggressive action against misinformation about COVID-19 and vaccines to protect public health.'" Glenn Decl. Ex. 32, at 4.

The next day, July 16, 2021, a reporter asked President Biden what he thought of COVID misinformation on social media, and he responded by stating of platforms like Facebook: "They're killing people." Glenn Decl. Ex. 33, at 1. The same day, July 16, 2021, Psaki explicitly called for social-media companies to coordinate with *each other* in censoring disfavored speakers. "You shouldn't be banned from one platform and not others … for providing misinformation out there." Glenn Decl. Ex. 34, at 7. Psaki also demanded that social-media companies "create robust enforcement strategies," "tak[e] faster action against harmful posts," and "promot[e] quality information algorithms"—which is a euphemism for algorithms that suppress disfavored messages. *Id.* at 7-8. When asked whether Facebook's censorship was "sufficient," she responded, "Clearly not, because we're talking about additional steps that should be taken." *Id.* at 8.

Social-media companies immediately responded to Biden's statement that "They're killing people" by increasing online censorship. "A few hours" after this statement, New York Times

18

reporter Alex Berenson, a prominent critic of the government's COVID-19 policies, was locked out of his Twitter account.  Glenn Decl. Ex. 54, at 2 ("A few hours later, Twitter locked me out of my account for the first time."); *see also* Glenn Decl. Ex. 53.  Though it had taken no action against him until then, Twitter permanently banned Berenson soon thereafter.  *Id.*

Four days later, July 20, 2021, the White House explicitly threatened to amend or repeal the liability protections of § 230 of the Communications Decency Act if social-media companies did not increase censorship of disfavored speakers and viewpoints.  Glenn Decl. Ex. 35.  When asked whether the President is open to amending § 230 because Facebook and other platforms do not censor misinformation aggressively enough, White House Communications Director Bedingfield responded, "We're reviewing that, and certainly they should be held accountable.  And I think you've heard the president speak very aggressively about this.  He understands that this is an important piece of the ecosystem."  Glenn Decl. Ex. 36, at 2.

Then, responding to "White House pressure," Facebook censored the accounts of the "Disinformation Dozen," the 12 specific disfavored speakers whom Psaki accused of spreading health misinformation. Glenn Decl. Ex. 37.  After they were singled out for suppression, Facebook "removed over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people, for violating our policies."  *Id.*

Defendants responded by demanding still more censorship.  "[A]fter Facebook's action against the 'disinformation dozen,' a White House spokesperson continued to strongly criticize the company."  *Id.*  "'It's on everyone to get this right so we can make sure the American people are getting accurate information to protect the health of themselves and their loved ones -- which is why the Administration will continue to push leaders, media outlets, and leading sources of information like Facebook to meet those basic expectations.'"  *Id.*

19

On February 1, 2022, Psaki was asked at a White House press conference whether the Administration was satisfied with Spotify's decision to affix advisory warnings to Joe Rogan's immensely popular podcast, which featured speakers that contradicted the Administration's messaging about COVID-19 and vaccines.  Glenn Decl. Ex. 38.  Psaki responded by demanding that such platforms "do[] more" to censor disfavored speakers: "[O]ur hope is that all major tech platforms … be vigilant to ensure the American people have access to accurate information on something as significant as COVID-19….  we want every platform to continue doing more to call out … mis- and disinformation.… there's more that can be done."  *Id.* at 15-16.

To keep the pressure on social-media companies, HHS next opened a new threat—an additional threat of regulation.  On March 3, 2022, the Surgeon General issued a formal "Request for Information" on the "Impact of Health Misinformation" on social media.  HHS, *Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID-19 Pandemic Request for Information* (RFI), 87 Fed. Reg. 12,712-12,714 (March 2, 2022).  In the RFI, "[t]he Office of the Surgeon General request[ed] input from interested parties on the impact and prevalence of health misinformation in the digital information environment during the COVID–19 pandemic."  *Id.* at 12,712.  The RFI stated that "the speed, scale, and sophistication with which misinformation has been spread during the COVID-19 pandemic has been unprecedented," and it implied that social-media companies were to blame: "This RFI seeks to understand both the impact of health misinformation during the COVID–19 pandemic and the unique role that technology and social media platforms play in the dissemination of critical health information during a public health emergency."  *Id.* at 12,713.

The RFI sought specific information about health "misinformation" on social-media platforms: "Any aggregate data and analysis on how many users were exposed, were potentially

exposed, or otherwise engaged with COVID–19 misinformation." *Id.* at 12,714.  It also sought "[i]nformation about COVID–19 misinformation policies on individual technology platforms," including "[a]ny aggregate data and analysis of technology platform COVID–19 misinformation policies including implementation of those policies and evaluations of their effectiveness." *Id.* Media reports aptly described Murthy as "demand[ing]" information about the major sources of COVID-19 misinformation by May 2, 2022.  Glenn Decl. Ex. 39.

Other threats continued in the same time frame.  Around April 25, 2022—two days before DHS announced the creation of its "Disinformation Governance Board"—it was reported that free-speech advocate Elon Musk would acquire Twitter and make it a privately held company.  On April 25, 2022, Psaki was asked "does the White House have any concern that this new agreement might have President Trump back on the platform?"  Glenn Decl. Ex. 40, at 3.  Psaki responded by stating: "No matter who owns or runs Twitter, the President has long been concerned about the power of large social media platforms … [and] has long argued that tech platforms must be held accountable for the harms they cause.  He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms…. And he's encouraged that there's bipartisan interest in Congress…." *Id.* at 3-4.  Psaki specifically linked these threats of adverse government action to the social-media platforms' failure to censor free speech more aggressively: "We've long talked about and the President has long talked about his concerns about the power of social media platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable." *Id.* at 9.  Psaki also reaffirmed that senior officials within the Administration coordinate directly with social-media platforms to censor disfavored speakers and content: "we engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will

21

continue.  But there are also reforms that we think Congress could take and we would support taking, including reforming Section 230, enacting antitrust reforms…. And the President is encouraged by the bipartisan support for — or engagement in those efforts." *Id.* at 24.

### 2. DHS and White House officials collude with social-media platforms to censor.

DHS officials have followed the same playbook, focusing on censoring disfavored speech and viewpoints relating to election security and integrity, as well as COVID-19.

As with HHS, an arrangement for government officials to push for social-media censorship of election-related "misinformation" was already in place in 2020.  In August 2020, social-media firms "met with federal government officials…to discuss how to handle misinformation during this month's political conventions and election results this fall."  Glenn Decl. Ex. 57, at 2.  This was one of a "series" of meetings between major social-media companies and government officials about the suppression of election-related "misinformation," and it included Google, Facebook, Twitter, Reddit, Microsoft, Verizon Media, Pinterest, LinkedIn, and the Wikimedia Foundation. *Id.*  "According to the industry statement, participants in Wednesday's meeting also included representatives from the FBI's foreign influence task force, the Justice Department's national security division, the Office of the Director of National Intelligence and the Cybersecurity and Infrastructure Security Agency."  *Id.* at 4.  "The companies said they would continue to meet regularly before the November election."  *Id.*

On September 28, 2020, the Biden-Harris campaign sent a letter to Facebook demanding that Facebook take "more aggressive" action to censor statements by President Trump and the Trump campaign that raised concerns about election security and the security of voting by mail. Glenn Decl. Ex. 25.  The letter accused Facebook of being a "propagator of disinformation" for refusing to censor the rival campaign's core political speech, threatening to "undermine democracy."  *Id.* at 1-2.  Biden-Harris described Trump's speech as "dangerous claptrap" and

argued that "[r]emoving this video should have been the easiest of easy calls." *Id.* at 2.  The letter demanded that Facebook "remove Mr. Trump's posts, which violate your policies." *Id.* at 2-3.

The same letter complained that Facebook's "algorithm" permitted Trump's political speech to reach millions of people.  It bemoaned the fact that "a hyperpartisan propaganda organ like the *Daily Wire* is Facebook's top web publisher." *Id.* at 3.  Biden-Harris accused Facebook of allowing speech that it favored "to be drowned out by a storm of disinformation." *Id.*  And it concluded, "We will be calling out those failures [to censor Trump's political speech] as they occur over the coming 36 days," *i.e.*, until the November 2020 general election. *Id.*

Facebook complied with this demand.  In the wake of the Biden-Harris letter, Facebook declared that it "won't allow ads with content that seeks to delegitimize the outcome of an election," and it ramped up censorship of the Trump campaign's political speech thereafter.  Glenn Decl. Ex 41, at 3. As one commentator noted, "It's no surprise that Facebook's policy change happened the same week that the Biden campaign demanded Trump's Facebook posts be censored." *Id.*  At the same time, "Twitter also modified its rules, stating: 'we may label and reduce the visibility of Tweets containing false or misleading information about civic processes in order to provide additional context' in its Civic integrity policy." *Id.* at 4.

Facebook and Twitter ramped up censorship of core political speech in the critical final month before the 2020 general election, resulting in egregious acts of censorship.  These acts of censorship included suppression of expressions of concern about election security as a result of the massive increase in voting by mail during the 2020 general election.  In perhaps the most notorious example, Twitter, Facebook, and other social-media companies censored the New York Post's entirely truthful and carefully sourced article about Hunter Biden's laptop on October 14, 2020.  This censorship included locking the New York Post's social-media accounts for weeks

until after the election.  Glenn Decl. Exs. 67-68.   "Facebook moderators had to manually intervene to suppress a controversial New York Post story about Hunter Biden, according to leaked moderation guidelines seen by the Guardian."  Glenn Decl. Ex. 42, at 1.

On December 10, 2020, nine Democratic House Members in the so-called "Congressional Task Force on Digital Citizenship" sent a letter to President-elect Biden, calling for the incoming Administration to create task forces to increase censorship of "disinformation and misinformation" on social media.  Glenn Decl. Ex. 43.  The letter decried the rise of "news environments online, which report vastly different information and do not offer the same editorial standards to protect against disinformation and misinformation that traditional news media do."  *Id.* at 2.  It criticized social-media platforms for failing to censor "disinformation" more aggressively: "As social media platforms post record revenues from engagement, they seldom act as responsible information gatekeepers and, in fact, have financial incentives to direct users to posts that are false, misleading, or emotionally manipulative."  *Id.*  The letter called for President-elect Biden to deploy the Department of Homeland Security to combat "disinformation," and it called for government involvement in policing political speech on social media platforms. *Id.*

Consistent with this letter, the Biden Administration launched several initiatives designed to inject the power and authority of DHS into policing "disinformation" and "misinformation" online.  On May 3, 2021, it was reported that DHS intended to "partner with private firms" to monitor disfavored speech online.  Glenn Decl. Ex. 44.  The purpose of these "partnerships" was to evade legal, constitutional, and ethical problems with DHS's direct surveillance of online speech.  *Id.* at 1.  "The plan being discussed inside DHS, according to multiple sources, would, in effect, allow the department to circumvent those limits."  *Id.*  "Outsourcing some information

gathering to outside firms would give DHS the benefit of tactics that it isn't legally able to do in-house, such as using false personas to gain access to private groups…." *Id.* at 3.

On May 5, 2021, Psaki stated at a White House press conference that "[t]he President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and *elections*." Glenn Decl. Ex. 29, at 15 (emphasis added). Psaki immediately went on to state that President Biden "supports better privacy protections and *a robust anti-trust program*." *Id.* (emphasis added). And she stated that the President's "view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public." *Id.* And on July 15, 2021, Psaki stated that "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff," and "[w]e're flagging problematic posts for Facebook that spread disinformation." Glenn Decl. Ex. 30, at 9-10.

Shortly thereafter, on August 2, 2021, DHS Secretary Mayorkas announced that DHS was working directly with social-media companies to censor disfavored speech on social-media platforms. Mayorkas stated: "we're working together with them. We're working with the tech companies that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring." Glenn Decl. Ex. 46, at 2. *Id.* Mayorkas added that there was a federal-government-wide effort to police speech on social media, stating: "[T]he connectivity between speech and violence, the connectivity between active harm and speech is something that we're very focused on, and it's a difficult challenge. But we're working

on it and meeting that challenge, again, because of the great personnel of the Department of Homeland Security and *across the federal enterprise*." *Id.* (emphasis added).

Soon afterward, on September 13, 2021, senior DHS officials submitted to Secretary Mayorkas a memorandum recommending the creation of a "Disinformation Governance Board" within DHS. Glenn Decl. Ex. 1, at 6. The memo asserted that "[t]he spread of disinformation presents serious homeland security risks," especially "[c]onspiracy theories about the validity and security of elections," and "[d]isinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks." *Id.* The purpose of the Board was to oversee and coordinate *pre-existing* social-media censorship activities throughout DHS and across the federal government. *Id.* at 14, 15, 22-23 (noting that the Board's first task would be to conduct a "review of existing MDM governance policies and practices across the Department," including "policies, procedures, practices, plans, and standards for interactions with the private … sector[]"). On September 29, 2021, the Secretary directed DHS to establish the DGB "to coordinate efforts to counter mis-, dis-, and mal-information (MDM)," to create "a mechanism that would develop and coordinate intra-Departmental" efforts against "MDM," and to "coordinate efforts to engage *private sector stakeholders*." *Id.* at 25 (emphasis added).

On November 10, 2021, the Cybersecurity and Infrastructure Security Agency (CISA), an agency within DHS, announced that it was "beefing up its disinformation and misinformation team in the wake of a divisive presidential election that saw a proliferation of misleading information online." Glenn Decl. Ex. 47, at 1. "'I am actually going to grow and strengthen my misinformation and disinformation team,' CISA Director Jen Easterly said." *Id.* Easterly said that so-called "disinformation" and "misinformation" pose "a top threat for CISA, which is charged with securing critical infrastructure, to confront." *Id.* She claimed CISA is "in the business of critical

infrastructure, and the most critical infrastructure is our cognitive infrastructure, so building that resilience to misinformation and disinformation … is incredibly important." *Id.* at 2.

Easterly announced that CISA was working directly with unnamed "partners in the private sector" and other government agencies to police online speech: "We are going to work with our partners in the private sector and throughout the rest of the government and at the department to continue to ensure that the American people have the facts that they need to help protect our critical infrastructure." *Id.* With specific reference to election-integrity issues, Easterly stated that Americans should not be allowed to "pick [their] own facts" and make their own decisions about what is true: "We now live in a world where people talk about alternative facts, post-truth, which I think is really, really dangerous if you get to pick your own facts, and it's particularly corrosive when you talk about matters of election security." *Id.* Instead, she indicated, federal officials like herself should intervene to help Americans "pick" the right "facts." *Id.*

Under Easterly's direction, CISA maintains a number of task forces, working groups, and similar organizations as joint government/private enterprises, which provide avenues for government officials to push for censorship of disfavored viewpoints and speakers online. In a 2020 document entitled "2020 Election Infrastructure Subsector-Specific Plan," Glenn Decl. Ex. 48, CISA stated that it had partnered to "promote" interaction between election officials and the Center for Technology and Civic Life, the now-notorious nonprofit funded by Mark Zuckerberg that engaged in egregious election interference by injecting hundreds of millions of private dollars and personnel into local election offices in heavily Democratic-favoring areas. *See id.* at 23.

DHS expands the definitions of "misinformation" and "disinformation" to include "malinformation," *i.e. truthful* information that the government believes is presented out of context to contradict government-favored political narratives. CISA defines "malinformation" as truthful

information that is "based on fact, but used out of context to mislead, harm, or manipulate." Glenn Decl. Ex. 49, at 1. CISA's same publication decries "false treatment and prevention measures [for COVID-19], unsubstantiated rumors regarding the origin of the virus, and more." *Id.*

Likewise, CISA's "Mis-, Dis-, and Malinformation Planning and Incident Response Guide for Election Officials," Glenn Decl. Ex. 50, calls for constant policing of speech regarding election integrity, stating that "election infrastructure related MDM occurs year-round," and "[f]alse narratives erode trust and pose a threat to democratic transitions, especially, but not limited to, narratives around election processes and the validity of election outcomes." *Id.* at 1. The Guide defines "MDM" to include "[n]arratives or content that delegitimizes election results or sows distrust in the integrity of the process based on false or misleading claims." *Id.* at 2.

In the same vein, DHS's Domestic Terrorism Bulletin issued on February 7, 2022, identified "false or misleading narratives regarding … widespread election fraud and COVID-19" as forms of "domestic terrorism" that cause "violent extremist attacks": "For example, there is widespread online proliferation of false or misleading narratives regarding unsubstantiated *widespread election fraud and COVID-19.* Grievances associated with these themes inspired violent extremist attacks during 2021." Hoft Decl. (Ex. E), Ex. 7, at 1.

On April 12, 2022, CISA published another bulletin announcing that it was coordinating directly with social-media platforms to police "Mis, Dis, Malinformation" (so-called "MDM"). Glenn Decl. Ex. 52. The bulletin states that, "False or misleading information can evoke a strong emotional reaction that leads people to share it without first looking into the facts for themselves, polluting healthy conversations about the issues and increasing societal divisions." *Id.* CISA reported that its Countering Foreign Influence Task Force's "mission evolved" during the Biden Administration to address the new "information environment": "In 2021, the CFITF officially

28

transitioned into CISA's MDM team, and the mission evolved to reflect the changing information environment." *Id.* CISA stated that it coordinates directly with social media firms to address "MDM": "The MDM team continues to work in close coordination with interagency and private sector partners, *social media companies*, academia, and international partners on a variety of projects to build resilience against malicious information activities." *Id.* (emphasis added).

CISA's "Mis, Dis, Malinformation" bulletin openly boasts that CISA works directly with social-media companies to flag content for censorship: "The MDM team *serves as a switchboard for routing disinformation concerns to appropriate social media platforms*…." *Id.* (emphasis added). CISA boasts that it has "expanded the breadth of reporting [MDM] to include … more social media platforms," and that "[t]his activity leverages the rapport the MDM team has with the social media platforms to enable shared situational awareness." *Id.*

The same bulletin suggests that CISA is directly involved in "flagging" COVID-19 "misinformation." It states that "COVID-19-related MDM activities seek to undermine public confidence and sow confusion," and claims that "the rapid evolution of accurate information makes older, dated information a potential catalyst of confusion and distrust as well." *Id.* Thus, "[t]he MDM team supports the interagency and private sector partners' COVID-19 response efforts via regular reporting and analysis of key pandemic-related MDM trends." *Id.*

On April 27, 2022, Mayorkas announced that DHS was creating a "Disinformation Governance Board" within DHS to combat so-called "misinformation" and "disinformation." Glenn Decl. Ex. 65. During congressional testimony, Mayorkas described the endeavor as a "just recently constituted misinformation/disinformation governance board." *Id.* (video link at 1:40). He stated: "The goal is to bring the resources of the department together to address this threat." *Id.* Nina Jankowicz was announced to lead the Board. *Id.*

On April 28, 2022, Jankowicz planned a meeting between Secretary Mayorkas and Twitter executives Nick Pickles and Yoel Roth.  Glenn Decl. Ex. 1, at 18.  This was to be a cozy meeting: Jankowicz noted in the pre-meeting brief that "Nick and Yoel both know DGB Executive Director Nina Jankowicz."  *Id.*  The meeting was "to discuss operationalizing public-private partnerships between DHS and Twitter," and to "[p]ropose that Twitter become involved in Disinformation Governance Board Analytic Exchanges."  *Id.*  Such "analytic exchanges" would expand upon preexisting speech-suppression collaboration: The Secretary was to "[t]hank Twitter for its continued participation in the CISA Analytic Exchange on Election Security."  *Id.*  The Secretary was to "[a]sk what types of data or information would be useful for Twitter to receive in Analytic Exchanges or other ways the Department could be helpful to Twitter's counter-MDM efforts."  *Id.*

## G.   Federal Officials and Social-Media Companies Admit to Colluding to Censor.

Both the federal Defendants and their social-media "partners" have openly, and repeatedly, admitted that federal officials are directly coordinating and colluding with social-media firms to procure the censorship of disfavored speakers, content, and viewpoints.

### 1.   Government statements admitting direct collusion.

First, federal officials have repeatedly stated that they are colluding with social-media companies to censor.  On July 15, 2021, Psaki stated: "[W]e are in regular touch with these social media platforms, and those engagements *typically happen through members of our senior staff*…." Glenn Decl. Ex. 30, at 9-10 (emphasis added).  She added, "*We're flagging problematic posts for Facebook that spread disinformation*."  *Id.* at 10 (emphasis added).  Referring to social-media platforms, Psaki stated that "[w]e engage with them regularly and *they certainly understand what our asks are*."  *Id.* at 11 (emphasis added).  Similarly, on April 25, 2022, Psaki stated "we engage regularly with all social media platforms about steps that can be taken." Glenn Decl. Ex. 40, at 24.

Secretary Mayorkas stated, on August 2, 2021, that DHS is "working with tech companies 'that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring.'" Glenn Decl. Ex. 46, at 2. Easterly stated that CISA works directly "with our partners in the private sector and throughout the rest of the government and at the department to continue to ensure that the American people have the facts that they need to help protect our critical infrastructure." Glenn Decl. Ex. 47, at 2. CISA openly states that it "continues to work in close coordination with interagency and private sector partners, *social media companies*, academia, and international partners on a variety of projects to build resilience against malicious information activities." Glenn Decl. Ex. 52. CISA's "MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms...." *Id.*

DHS's February 7, 2022 National Terrorism Advisory System Bulletin states that the "widespread online proliferation of false or misleading narratives regarding unsubstantiated widespread election fraud and COVID-19" is a form of domestic terrorism that has "inspired violent extremist attacks during 2021." Hoft Decl. Ex. 7, at 1. In fact, the Bulletin advises that "mis- dis- and malinformation" is the *principal* domestic-terrorism threat facing the United States: "The United States remains in a heightened threat environment fueled by several factors, *including* an online environment filled with false or misleading narratives and conspiracy theories, and other forms of mis- dis- and mal-information (MDM) introduced and/or amplified by foreign and domestic threat actors." *Id.* (emphasis added).

## 2.  Social-media-company statements admitting direct collusion.

Social-media companies, too, admit that they are directly colluding with federal officials in a massive censorship program. For example, Facebook's "COVID and Vaccine Policy Updates and Protections" states that Facebook "does not allow false claims about the vaccines or

31

vaccination programs which *public health experts have advised us* could lead to COVID-19 vaccine rejection."  Glenn Decl. Ex. 66, at 7 (emphasis added). "A Facebook spokesperson said the company has *partnered with government experts*, health authorities and researchers to take 'aggressive action against misinformation about COVID-19 and vaccines to protect public health.'"  Glenn Decl. Ex. 32, at 4 (emphasis added); *see also* Glenn Decl. Ex. 59, at 4 (Facebook's Community Standards) ("We remove misinformation … when *public health authorities* conclude that the information is false….") (emphasis added).

Twitter, likewise, admits that it coordinates with government officials in identifying what to censor.  Its "Civic integrity policy" states that Twitter "will label or remove false or misleading information intended to undermine public confidence in an election or other civic process" and that it "work[s] with select government and civil society partners in these countries to provide additional channels for reporting and expedited review" of so-called "misinformation."  Glenn Decl. Ex. 61, at 4-5.  Twitter's "COVID-19 misleading information policy" states that it "primarily enforce[s] this policy in close coordination with trusted partners, including public health authorities, NGOs and governments, and continue to use and consult with information from those sources when reviewing content."  Glenn Dec. Ex. 62, at 7.  Twitter's "Synthetic and manipulated media policy" states that Twitter "enforce[s] this policy in close coordination with trusted partners, including … governments.  Our team has open lines of communication with various partners to consult and get various media and claims reviewed."  Glenn Decl. Ex. 63, at 5.  Twitter's blog "Coronavirus: Staying safe and informed on Twitter" states that "[w]e have broadened our definition of harm to address content that goes directly against guidance from authoritative sources of global and local public health information," and "we are enforcing this in close coordination

with trusted partners, including public health authorities and governments, and continue to use and consult with information from those sources when reviewing content."  Glenn Decl. Ex. 64, at 10.

Similarly, YouTube's "COVID-19 medical misinformation policy" states that "YouTube doesn't allow content that spreads medical misinformation that contradicts local health authorities' or the World Health Organization's medical information about COVID-19. … YouTube's policies on COVID-19 are subject to change in response to changes to global or local health authorities' guidance on the virus."  Glenn Decl. Ex. 59, at 1.

**H.    Government-Private Collusion Has Achieved Seismic Levels of Online Censorship.**

The Defendants' scheme of censorship is *ultra vires*, and it continues to inflict massive injuries to the freedom of expression in Missouri, Louisiana, and America.

### 1.    Censorship affects enormous segments of the States' citizens.

Government-induced online censorship affects enormous segments of Missouri's and Louisiana's populations.  The censorship affects speakers with all sizes of audiences—from small groups of concerned parents seeking to share concerns on neighborhood networking sites, Flesch Decl. ¶ 9 (Ex. F); to social-media titans, such as one of the most influential conservative websites in the country, with over a million social-media followers, Hoft Decl. ¶ 2.  It affects some of the most highly credentialed physicians in the world, speaking on matters of core competence, such as scientists and medical professors at Stanford, Harvard, and the University of California.  *See* Bhattacharya Decl. ¶¶ 2-5; Kulldorff Decl. ¶¶ 2-6; Kheriaty Decl. ¶¶ 2-5 (Ex. G).

This censorship encompasses social-media accounts with hundreds of thousands of followers, including many thousands of followers in Missouri and Louisiana.  *See* Hoft Decl. ¶ 2 (400,000 Twitter followers, 650,000 Facebook followers, 98,000 YouTube subscribers, 205,000 Instagram followers); Kulldorff Decl. ¶ 7 ("250,800 followers on Twitter and 13,400 contacts and followers on LinkedIn"); Kheriaty Decl. ¶ 3 (158,000 Twitter followers, even though artificially

capped by Twitter); Allen Decl. ¶ 15 (Ex. H) (the entire YouTube channel of a conservative talk-radio station based in Missouri); Changizi Decl. ¶ 7 (Ex. I) (37,000 Twitter followers); Senger Decl. ¶ 3 (112,000 Twitter followers); Kotzin Decl. ¶¶ 3-4 (Ex. J) (31,900 followers); Kay Decl. ¶ 32 (Ex. K) (over 44,000 Twitter followers).  These declarants are only a tiny snapshot of the enormous suppressions inflicted by Defendants' conduct.  *See, e.g.,* Bhattacharya Decl. ¶ 31.

> ### 2.    Censorship of truthful speech on matters of enormous public concern.

Defendants' censorship squelches truthful speech of core political speech on matters of great public concern.  This includes speech relating to COVID-19 policies—especially speech criticizing the government's response to COVID-19.  *See, e.g.,* Hoft Decl. ¶¶ 6, 12; Bhattacharya Decl. ¶¶ 15-31; Kulldorff Decl. ¶¶ 14-30; Kheriaty Decl. ¶¶ 16-17; Changizi Decl. ¶¶ 18-23; Senger Decl. ¶¶ 5-7; Kotzin Decl. ¶¶ 6-19; Kay Decl. ¶¶ 17-19, 26-29; Hines Decl. ¶¶ 7-14 (Ex. L); Gulmire Decl. ¶¶ 11-13 (Ex. O).  It also extends to speech about election security and integrity, including core political speech.  *See, e.g.*, Hoft Decl. ¶¶ 7-8, 14; Allen Decl. ¶ 14-15; Flesh Decl. ¶ 8; Gulmire Decl. ¶ 8.  And the censorship targets speech simply because it is critical of the President of the United States.  *See, e.g.,* Hoft Decl. ¶ 10; Glenn Decl. Ex. 52.

> ### 3.    Censorship imposed by many insidious methods.

Government-induced censorship is achieved through a wide variety of methods, ranging from complete bans, temporary bans, insidious "shadow bans" (where neither the user nor his audience is notified of the suppression), deboosting, de-platforming, de-monetizing, restricting access to content, imposing warning labels that require click-through to access content, and many other ways.  These include temporary and permanent suspensions of many speakers.  *See, e.g.,* Hoft Decl. ¶¶ 6-8; Kheriaty Decl. ¶ 16; Bhattacharya Decl. ¶ 16; Changizi Decl. ¶¶ 18-23; Allen Decl. ¶ 15; *see also* Bhattacharya Decl. ¶ 31 ("Twitter, LinkedIn, YouTube, Facebook, they have permanently suspended many accounts—including scientists.").  It includes suppressing specific

content, such as removing or blocking social-media posts and videos.  *See, e.g.,* Hoft Decl. ¶ 14; Bhattacharya Decl. ¶¶ 17-18; Changizi Decl. ¶ 36.  It includes demonetization by technology firms, *see* Hoft Decl. ¶ 19, and deboosting search results to bury the most relevant results, Bhattacharya Decl. ¶ 16.  It includes suppressing posts in news feeds, and imposing advisory labels and "sensitive content" labels, making it more difficult to access specific content.  *See, e.g.,* Hoft Decl. ¶ 13; Changizi Decl. ¶ 27-28.  It includes insidious methods of censorship like surreptitious de-boosting and "shadow-banning," where the censor does not notify the speaker or the audience of the censorship.  Many speakers discover through circumstantial methods that they have been shadow-banned.  *See, e.g.,* Kheriaty Decl. ¶¶ 14-15; Changizi Decl. ¶ 22; Kay Decl. ¶ 33.  It includes indirect methods of shadow-banning such as artificially limiting the number of followers of a disfavored account.  Kheriaty Decl. ¶¶ 12-13; Changizi Decl. ¶ 31.

### 4. Compounded effects of censorship.

Such censorship has compounded effects on the freedom of expression, creating massive distortions in the free marketplace of ideas.  As noted above, much speech is suppressed in secret, so the speakers and audience never know whether or how much speech was silenced.  *See, e.g.,* Kheriaty Decl. ¶¶ 14-15.  Censorship of the principal speaker, moreover, deters other speakers from re-tweeting, re-posting, or "amplifying" the content, which suppresses even more speech and further artificially reduces the speakers' audience.  *See* Hoft Decl. ¶ 15.  And, perniciously, censorship commonly leads to self-censorship, as online speakers carefully restrict what they say to avoid the (often financially catastrophic) consequences of a suspension or ban.  *See, e.g.,* Hoft Decl. ¶ 16; Bhattacharya Decl. ¶ 31; Changizi Decl. ¶ 39; Changizi Decl. ¶¶ 40-42; Kotzin Decl. ¶ 29-31; Kay Decl. ¶ 35; Kheriaty Decl. ¶ 16.

5.      **Censorship directly linked to federal officials.**

This censorship includes many instances where the evidence directly links the acts of censorship to action by federal officials. Psaki's explicit, public demand for the censorship of the so-called "Disinformation Dozen" across social-media platforms—followed the next day by Biden's ominous statement that Facebook and other platforms are "killing people" by not censoring aggressively enough—led directly to the complete banning of those individuals across social-media platforms. Glenn Decl. Exs. 30, 33, 37. Twitter imposed no restrictions on Alex Berenson until "[a] few hours" after the President accused social-media companies of "killing people." Glenn Decl. Ex. 54. Likewise, the authors of the Great Barrington Declaration experienced a tsunami of online censorship right after the Director of NIH emailed Dr. Fauci and demanded a "quick and devastating … takedown" of the Declaration. Bhattacharya Decl. ¶¶ 6, 14; *id.* ¶¶ 15-31. "Having observed and lived through the government-driven censorship of the Great Barrington Declaration and its co-authors, it is clear to me that these attacks were politically driven by government actors." *Id.* ¶ 32. Similarly, the censorship of social-media speech about COVID-19 and election security directly reflects the calls for censorship from federal officials. Hoft Decl. ¶ 4, 16. Jim Hoft's demonetization by Google was caused by the left-wing, anti-free speech group Center for Countering Digital Hate, which also coordinated with the federal government in procuring the suppression of the "Disinformation Dozen." Hoft Decl. ¶¶ 18-19. Censorship of speech has focused on topics specifically targeted for censorship by DHS as "domestic terrorism," including in its National Terrorism Advisory System Bulletin from February 7, 2022. Hoft Decl. ¶ 20; *id.* Ex. 7, at 1.

Likewise, Dr. Kheriaty notes that "[t]he pattern of content censored on these social media platforms mirrors closely the CDC and Biden administration policies. In my experience using these platforms to discuss covid topics, any content that challenges those federal policies is subject

to severe censorship, without explanation, on Twitter and YouTube—even when the information shared is taken straight from peer-reviewed scientific literature." Kheriaty Decl. ¶ 18.  Regarding shadow-banning in particular, he observes that "[t]he posts most subject to this were those that challenged the federal government's preferred covid policies."  Kheriaty Decl. ¶ 15.

The timing of online censorship also reflects the direct involvement of federal officials, as censorship has repeatedly ramped up immediately after Defendants' most vociferous calls for increased censorship.  For example, after many posts highly critical of COVID-19 restrictions, censorship of Dr. Changizi began in earnest at the same time as Jen Psaki's first public comments calling for greater censorship of such content.  Changizi Decl. ¶¶ 18-23, 30, 42-47.  Dr. Changizi's "general de-platforming" began in May 2021, when Psaki gave her first major press conference demanding greater censorship on social media.  *Id.* ¶ 30.  Mr. Kotzin notes that aggressive censorship of his accounts began just after "the Surgeon General's Request for 'health misinformation' in March."  Kotzin Decl. ¶ 35.

Further, the censorship is heavily *one-sided*—it suppresses truthful speech criticizing government policies, but permits wild falsehoods that support government's preferred narratives. As Dr. Changizi notes, "Twitter notoriously suspends only those who question the wisdom and efficacy of government restrictions, or who cast doubt on the safety or efficacy of the vaccines," but "there are no examples of Twitter suspending individuals who have spread misinformation from the other side—by, for example, exaggerating the efficacy of masks or the threat the virus poses to children."  Changizi Decl. ¶¶ 50-51.  "[T]here are no examples of Twitter suspending individuals who have spread factually incorrect information that supports government policies…. Twitter suspends only those who question the wisdom and efficacy of government restrictions, or those who cast doubt on the necessity, safety or efficacy of the vaccines."  Kotzin Decl. ¶ 5.

6.      **Censorship inflicts State-specific injuries on Missouri and Louisiana.**

This federal censorship campaign inflicts State-specific harms on Missouri and Louisiana.

*First*, both Missouri and Louisiana have adopted fundamental policies favoring the freedom of speech, including on social media.  Missouri's Constitution provides: "[N]o law shall be passed impairing the freedom of speech, no matter by what means communicated… [E]very person shall be free to say, write or publish, or otherwise communicate whatever he will on any subject…."  MO. CONST. art. I, § 8.  Louisiana's Constitution provides: "No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom."  LA. CONST. art. I, § 7.  The federal censorship program directly undermines Missouri's and Louisiana's fundamental policies favoring the freedom of speech, and thus it inflicts a clear and direct injury on the States' sovereignty.  *See Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015).

*Second*, the States' agencies and political subdivisions have suffered online censorship directly.  For example, Louisiana's Department of Justice was censored on YouTube for posting video footage of Louisianans criticizing mask mandates and COVID-19 lockdown measures on August 18, 2021—just after the federal Defendants' most vociferous calls for censorship of COVID "misinformation."  Bosch Decl. ¶ 7 (Ex. M).  A Louisiana state legislator was censored by Facebook when he posted content addressing vaccinating children against COVID-19.  Bosch Decl. ¶ 9.  St. Louis County, a political subdivision of the State of Missouri, conducted public meetings attended regarding proposed county-wide mask mandates, at which some citizens made public comments opposing mask mandates.  Flesh Decl. ¶ 7.  As required by Missouri's open-records law, video of these meetings was publicly posted on YouTube, but YouTube censored the entire videos of four public meetings, removing the content, because some citizens publicly expressed views that masks are ineffective.  *Id.*

38

*Third*, State agencies—such as the Offices of the States' Attorneys General—closely track and rely on free speech on social media to understand their citizens' true thoughts and concerns. *See, e.g.,* Flesch Decl. ¶ 4 ("I monitor these trends on a daily or even hourly basis…"); Bosch Decl. ¶ 6.  This allows them to craft messages and public policies that are actually responsive to their citizens' concerns.  Flesch Decl. ¶ 5; Bosch Decl. ¶¶ 4-6.  Censorship of social-media speech directly interferes with this critical state interest, because it "directly interferes with [our] ability to follow, measure, and understand the nature and degree of [constituents'] concerns."  Flesh Decl. ¶ 6. "If we do not know what Missourians' true concerns are, how can we craft messages and policies that are responsive to our citizens?"  *Id.* ¶ 11.

*Fourth*, social-media censorship thwarts the States' attempts to have free, fair, and open political processes that allow citizens to petition their government and advocate for policy changes.  Social-media censorship has perverted state and local political processes by artificially restricting access to the channels of advocacy to one side of various issues.  For example, social-media censorship prevented Louisiana advocacy groups from organizing effectively to advocate in favor of legislative action on certain issues of great public import.  Hines Decl. ¶¶ 13-14.  Likewise, social-media censorship prevented a Missouri parent from circulating an online petition to advocate against mandatory masking at his local school district, a political subdivision of the State. McCollum Decl. ¶¶ 9-17 (Ex. N); Gulmire Decl. ¶¶ 11-16, 18-19.  Such censorship—which directly interferes with citizens' ability to petition their government—thwarts the States' interest in providing fair and open processes to petition state officials.  Censorship perverts the State's political processes by shutting citizens out of them on the basis of viewpoint.  It thus renders ineffective the democratic processes that the States have adopted for their citizens.  *See id.*

*Fifth*, federally induced social-media censorship has directly affected Missouri, because it has resulted in the extensive censorship of Dr. Bhattacharya, who serves as an expert witness for Missouri in a series of lawsuits challenging mask and vaccine mandates. *See* Bhattacharya Decl. ¶ 4. Censorship of Dr. Bhattacharya reduces the message and impact of Missouri's own retained expert witness. *See id.* ¶¶ 17-32. Likewise, the Missouri Attorney General's Office relied heavily on the high-quality German survey study of 26,000 schoolchildren, finding that 68 percent reported harms from masking in school, in its lawsuits challenging school mask mandates. Glenn Decl. Ex. 57. That study was censored on social media as a result of Defendants' campaign, and Missouri was lucky to find it because it is in German and not cited on social media. ECF 1, ¶ 89. "Because online censorship acts as a prior restraint on speech," Missouri "will never know exactly how much speech … on social media never reaches [our] eyes because it is censored in advance, or as soon as it is posted." Flesch Decl. ¶ 11.

*Sixth*, Missouri and Louisiana have a quasi-sovereign interest in protecting the free-speech rights of "a sufficiently substantial segment of its population," and preventing *ultra vires* actions against those rights. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). This falls within Missouri's and Louisiana's "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Id.* This injury "suffices to give the State standing to sue as *parens patriae*" because "the injury" to Missourians' and Louisianans' free-speech and free-expression rights "is one that the State[s] … would likely attempt to address through [their] sovereign lawmaking powers." *Alfred L. Snapp*, 458 U.S. at 607. Indeed, they have done so. *See, e.g.,* MO. CONST., art. I, § 8; LA. CONST., art. I, § 7.

*Seventh*, Missouri and Louisiana "ha[ve] an interest in securing observance of the terms under which [they] participate[] in the federal system." *Alfred L. Snapp*, 458 U.S. at 607–08. This

means bringing suit to "ensur[e] that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system." *Id.* at 608. Free-speech rights, and protection from *ultra vires* actions destroying them, are foremost among the "benefits that are to flow from participation in the federal system." *Id.* Missouri and Louisiana "have an interest, independent of the benefits that might accrue to any particular individual, in assuring that the benefits of the federal system are not denied to its general population." *Id.*

**ARGUMENT**

"To be entitled to a preliminary injunction, a movant must establish (1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." *Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015). All four of these factors favor an injunction here.

**I.     The States Are Likely to Prevail on the Merits of Counts I and II of the Complaint.**

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641 (1994). "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *United States v. Alvarez*, 567 U.S. 709, 728 (2012). The federal Defendants' conduct here radically perverts these fundamental values.

**A.     The States Are Likely To Prevail on Their First Amendment Claim.**

First, the States are likely to prevail on their First Amendment claim, Count I of the Complaint. ECF 1, ¶¶ 243-261. Count I alleges a series of prior restraints on speech, targeting

41

disfavored viewpoints, content, and speakers, that are manifestly unconstitutional under the First Amendment if the censorship is attributable to federal officials. *Id.* And the States are likely to prove that this censorship is "fairly attributable to" such federal[1] officials. *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982).

"[T]here is no single test to identify state actions and state actors," and the Supreme Court's "cases have identified a host of facts that can bear on the fairness of such an attribution" of state action. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 294, 296 (2001). The question of state action is a "necessarily fact-bound inquiry," and "the criteria lack rigid simplicity." *Id.* at 295, 298. These include: [1] "a challenged activity may be state action when it results from the State's exercise of 'coercive power,'" *id.* (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)); [2] "when the State provides 'significant encouragement, either overt or covert,'" to private conduct, *id.* (quoting *Blum*, 457 U.S. at 1004); [3] "when a private actor operates as a 'willful participant in joint activity with the State or its agents,'" *id.* (quoting *Lugar v. Edmonson Oil*, 457 U.S. 922, 941 (1982)); and [4] "when [the private action] is 'entwined with governmental policies,' or when government is 'entwined in [its] management or control,'" *id.* (quoting *Evans v. Newton*, 382 U.S. 296, 299 (1966)). Further, "specific features" of the government's action may "combine" to create a compelling case for state action, especially where a federal statute has immunized private conduct. *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 615 (1989).

All these factors are present here: (1) significant encouragement, (2) coercion, (3) joint participation, and (4) legal immunity combined with other factors. Indeed, the governmental

---

[1] "The standards for determining whether an action is governmental are the same whether the purported nexus is to the state or to the federal government." *Mathis v. Pac. Gas & Elec. Co.*, 891 F.2d 1429, 1432 n.3 (9th Cir. 1989).

action here is flagrant, and this case is "nowhere near the margin." *Brentwood*, 531 U.S. at 305. Further, these standards should be rigorously enforced, because "[i]t is characteristic of the freedoms of expression in general that they are vulnerable to gravely damaging yet barely visible encroachments." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963).  Thus, "the freedoms of expression must be ringed about with adequate bulwarks." *Id.*

### 1. Significant Encouragement, Both Overt and Covert.

It is "axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973).  For this reason, a state or the federal government "normally can be held responsible for a private decision" when it "has provided such *significant encouragement, either overt or covert*, that the choice must in law be deemed to be that of the [government]." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (emphasis added).

In applying this standard, courts have held that it does not matter whether the government action is "the real motivating force behind" the suppression of speech—that question is "immaterial." *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co*., 827 F.2d 1291, 1295 (9th Cir. 1987); *see also Peterson v. City of Greenville*, 373 U.S. 244 (1963) (finding state action "even assuming, as respondent contends, that the manager would have acted as he did independently of the existence of the ordinance").  "Further, the government actor need not have direct power to take adverse action over a targeted entity for comments to constitute a threat, provided the government actor has the power to direct or encourage others to take such action." *Nat'l Rifle Ass'n of Am. v. Cuomo*, 350 F. Supp. 3d 94, 115 (N.D.N.Y. 2018).

"[B]ackchannel threats" and "backroom exhortations" can establish a "system of informal censorship" that violates this doctrine.  *Id.* at 106, 111.  Where the government had a "policy …

43

to encourage and pressure" private actors "into adopting" the government's preferred policy (here, censorship), there is "significant encouragement, overt or covert" constituting government action. *Mathis*, 891 F.2d at 1431.  Where the government's exhortations are "backed up by threats of enforcement or of formal rulemaking," this standard is satisfied.  *Id.* at 1434.

As detailed above in the Statement of Facts, these standards are amply satisfied here.  The federal Defendants have engaged in a long campaign of "significant encouragement," both "overt" and "covert," to demand censorship of disfavored speakers, viewpoints, and content.  *See* Statement of Facts, *supra*, Parts A-H.  This has included both threats of adverse legal consequences combined with demands for increased censorship, as well as "backchannel" communications that involve "flagging problematic posts" for censorship.  *Id.*

## 2. Coercion by Federal Officials.

Further, the "significant encouragement" in this case rises to the level of coercion.  "Under [the Supreme Court's] cases," "when the government compels the private entity to take a particular action," that constitutes government action.  *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019); *see also Blum*, 457 U.S. at 1004 (government action where the government "has exercised coercive power").  The First Amendment is implicated "if the government coerces or induces it to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint."  *Knight First Amendment*, 141 S. Ct. at 1226 (Thomas, J. concurring).  "The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly."  *Id.*  Coercion includes "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation."  *Bantam Books*, 372 U.S. at 67.  After all, "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around."  *Id.* at 68.

44

For this reason, "a public official who tries to shut down an avenue of expression of ideas and opinions through 'actual or threatened imposition of government power or sanction' is violating the First Amendment." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (Posner, J.) (quoting *American Family Association, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002)). "Threatening penalties for future speech goes by the name of 'prior restraint,' and a prior restraint is the quintessential first-amendment violation." *Id.* at 235 (quoting *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009)). "[A] public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights even if the public-official defendant lacks direct regulatory or decisionmaking authority over the plaintiff or a third party that facilitates the plaintiff's speech." *Okwedy v. Molinari*, 333 F.3d 339, 340–41 (2d Cir. 2003).

Simply put, the government "is not permitted to employ threats to squelch the free speech of private citizens." *Backpage.com*, 807 F.3d at 235. "The mere fact that [the private party] might have been willing to act without coercion makes no difference if the government did coerce." *Mathis*, 891 F.2d at 1434. "[S]uch a threat is actionable and thus can be enjoined even if it turns out to be empty…. But the victims in this case yielded to the threat." *Backpage.com*, 807 F.3d at 230-31. Further, even a vaguely worded threat can constitute government coercion. *See Okwedy*, 333 F.3d at 341-42. But here, the threats have been repeated and explicit, and "the threats ha[ve] worked." *Backpage.com*, 807 F.3d at 232.

The threats in this case have far exceeded—in number, scope, and coercive power—the threats at issue in cases like *Bantam Books*, *Backpage.com*, *Okwedy*, and others. They include a threat of criminal prosecution from the future President of the United States, Glenn Decl. Ex. 19 (NY Times Biden interview); threats of repealing or amending CDA Section 230 immunity, a *de*

*facto* subsidy worth many billions of dollars, Glenn Decl. Ex. 11, 13; threats of imposing antitrust scrutiny and enforcement on social-media firms, which they view as an "existential" threat, Glenn Decl. Ex. 12; and an additional threat of regulation if censorship is not pursued more aggressively, 87 Fed. Reg. 12,712-12,714.  Even an "implicit threat of retaliation" can constitute coercion, *Okwedy*, 333 F.3d at 344, and here the threats are open and explicit.  As discussed above, these threats have been *explicitly linked* to demands for more aggressive censorship, again and again.

Moreover, these threats were made against the backdrop of a steady drumbeat of similar threats—including extremely aggressive threats—from  Defendants' political allies in Congress, including some of the most senior and powerful Members of Congress, *see* Glenn Decl. Exs. 15, 16, 18, and they came to complete fruition when President Biden took power with both Houses of Congress under his party's control.   Even "a defendant without such direct regulatory or decisionmaking authority can also exert an impermissible type or degree of pressure."  *Okwedy*, 333 F.3d at 343.  But here, Defendants control the Presidency and both Houses of Congress.  The prospect that they have power make good on their threats makes them particularly compelling.

Defendants' "operation [i]s in fact a scheme of state censorship effectuated by extralegal sanctions; they act[] as an agency not to advise but to suppress." *Bantam Books*, 372 U.S. at 72.  "The First Amendment forbids a public official to attempt to suppress the protected speech of private persons by threatening that legal sanctions will at his urging be imposed unless there is compliance with his demands." *Backpage.com*, 807 F.3d at 231.  "A government entity … is entitled to say what it wants to say—but only within limits.  It is not permitted to employ threats to squelch the free speech of private citizens." *Id.* at 235.

Defendants' program is "a formula for permitting unauthorized, unregulated, foolproof, lawless government coercion.  The formula consists of coupling threats with denunciations of the

activity that the official wants stamped out, for the target of the denunciation will be reluctant to acknowledge that he is submitting to threats but will instead ascribe his abandonment of the activity to his having discovered that it offends his moral principles." *Id.* at 237–38.

### 3. Joint Participation of Federal Officials and Private Actors.

Further, even if there had been no threats, pressure, or encouragement (overt and covert) of any kind, there would still be government action here. "[A] private entity can quality as a state actor … when the government acts jointly with the private entity." *Halleck*, 139 S. Ct. at 1928 (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941–942 (1982)). Such joint action is present here, to an extraordinary degree. Federal officials have not merely made threats and demanded censorship by private entities at arms' length. They have established an elaborate set of working groups and other formal and informal methods of communication to enable direct, ongoing collaboration and collusion on the censorship program. *See, e.g.,* Glenn Decl. Ex. 1. They have sat at the table with social-media companies and "flag[ged] problematic posts" for censorship. Glenn Decl. Ex. 30, at 10. They have demanded the de-platforming of specific disfavored speakers. Glenn Decl. Ex. 37. And they have set up an elaborate censorship apparatus of ongoing government-private collaboration to achieve online censorship. Glenn Decl. Ex. 1.

"Private persons [who are] jointly engaged with state officials in the prohibited action, are acting 'under color' of law …. It is enough that he is a willful participant in joint activity with the State or its agents." *Lugar*, 457 U.S. at 941. Thus, "a private party's joint participation with state officials in the [challenged action] is sufficient to characterize that party as a 'state actor' for purposes of the Fourteenth Amendment." *Id.* Here, where federal officials are "flagging problematic posts" for social-media companies to get them censored, and engaging in a host of

47

equally collusive activities, there is "joint participation with [federal] officials" in violation of the First Amendment.

Likewise, courts "have recognized that private parties may act under color of state law when the state significantly involves itself in the private parties' actions and decisionmaking at issue." *Rawson v. Recovery Innovations, Inc*., 975 F.3d 742, 753 (9th Cir. 2020). Where a government official was "heavily involved in the decisionmaking process" of the private actor, *id.* at 754, or "where the State has "so far insinuated into a position of interdependence with the private party that it was a joint participant in the enterprise," *id.* at 748 (cleaned up), government action occurs. Again, the evidence here is overwhelming that federal officials have made themselves "heavily involved in the decisionmaking process" with respect to online censorship by private companies, and that they have "significantly involve[d]" themselves "in the private parties' actions and decisionmaking at issue." *Id.* at 753, 754. At bare minimum, federal officials are "joint participant[s] in the enterprise" of social-media censorship. *Id.* at 748.

Again, government action occurs when there is "a symbiotic relationship between the [government] and the [private party]," *Brentwood*, 531 U.S. at 294, or when the private entity is "entwined with governmental policies," *id.* at 296. Here, due to the campaign of threats leading to open collusion, there is "pervasive entwinement of … public officials" in the odious practices of social-media censorship, constituting "entwinement from top down." *Id.* at 298, 300.

Finally, government action occurs where the government has "specifically authorized or approved the private parties' actions," when the private action "received clear state imprimatur," and/or when the government "affirmatively command[s]" the private action. *Rawson*, 975 F.3d at 754-55. Again, all these factors are met here. The federal Defendants have "specifically authorized or approved" online censorship by vociferously demanding greater censorship, they

48

have given "clear state imprimatur" to such decisions by directly insinuating themselves into them, and they have "affirmatively command[ed]" tech companies to engage in greater online censorship.  *Id.*  These factors, also, lead inexorably to the conclusion of government action.

### 4. CDA Immunity Combined with Other State-Action Factors.

Finally, government action is present here for yet another reason: The federal government has effectively subsidized, authorized, and encouraged the practices of online censorship by granting them legal immunity in Section 230 of the CDA.  This subsidy and immunity, combined with the other factors discussed above, rises to the level of government action.

In *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 602–03 (1989), the Supreme Court held railroads' drug testing of their employees constituted government action when the Government, by regulation, had specifically authorized (but not required) railroads to adopt a policy of drug testing their employees, had preempted state laws restricting such testing, and had shielded the railroads from liability for such testing.  *Id.*  The Supreme Court reasoned that "specific features of the regulations *combine* to establish that the Government has actively encouraged, endorsed, and participated in the testing."  *Id.* at 602 (emphasis added).  "Specifically," the Court reasoned (1) "the regulations pre-empt state laws covering the same subject matter," (2) "the Government has removed all legal barriers to the testing authorized by [the regulation]," and (3) the regulation "makes plain a strong preference for testing and a governmental desire to share the fruits of such intrusions." *Id.* at 602-03.

All these factors are present here.  Section 230 of the CDA purports to preempt state laws to the contrary, and thus the federal government has purported to "remove[] all legal barriers to" the censorship immunized by Section 230 of the CDA (especially as over-broadly interpreted by many courts); and federal officials have made "plain a strong preference for [censorship] and a

governmental desire to share in the fruits of such intrusions," *id.*, for all the reasons discussed above.  As in *Skinner*, that evidence provides "clear indices of the Government's encouragement, endorsement, and participation" in censorship, which "suffice to implicate the [First] Amendment."  *Id.* at 615–16.

In fact, the Supreme Court has found government action on far lesser showings, such as in *Railway Employes' Department v. Hanson*, 351 U.S. 225, 231–32 (1956), where it found government action in the fact that a federal statute had authorized close-shop agreements, preempting the laws of 17 states.  The Supreme Court reasoned: "If private rights are being invaded, it is by force of an agreement made pursuant to federal law which expressly declares that state law is superseded.  In other words, the federal statute is the source of the power and authority by which any private rights are lost or sacrificed."  *Id.*  In light of Section 230 of the CDA and the many other factors here, the same conclusion follows here as well.

*Skinner*'s and *Hanson*'s conclusions of government action, moreover, draw strong support from the Supreme Court's state-action decisions addressing segregation.  In *Norwood*, the Supreme Court emphasized that "[a] State may not grant the type of tangible financial aid here involved if that aid has a significant tendency to facilitate, reinforce, and support private discrimination."  *Norwood*, 413 U.S. at 466.  Here, Section 230 immunity constitutes *de facto* "tangible financial aid" worth billions of dollars per year, and as tech firms have convinced courts to interpret it very broadly, this immunity "has a significant tendency to facilitate, reinforce, and support private" censorship—since it directly immunizes such censorship.  *Id.*  Combined with other factors, as in *Skinner*, that is a basis for finding government action as well.

### 5. Government-Induced Censorship Violates First Amendment Rights.

Given a finding of government action, the First Amendment violations here are unquestionable, egregious, and incredibly harmful. "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 137 S. Ct. at 1735. "By virtue of its ownership of the essential pathway," a social media platform "can ... silence the voice of competing speakers with a mere flick of the switch." *Turner*, 512 U.S. at 656*; see also Knight First Amendment Inst.*, 141 S. Ct. at 1224 (Thomas, J., concurring). "The potential for abuse of this private power over a central avenue of communication cannot be overlooked." *Turner*, 512 U.S. at 656.

Many censorship decisions constitute complete bans on speakers and viewpoints on social media, but "[t]he First Amendment does not permit a flat-out ban…." *Carlin*, 827 F.2d at 1296. Moreover, online censorship functions as a prior restraint, and "[e]ven when a speaker has repeatedly exceeded the limits of the First Amendment, courts are extremely reluctant to permit the state to close down his communication forum altogether." *Id.* Furthermore, the censorship at issue here constitutes overt viewpoint discrimination, which is anathema under the First Amendment. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). "Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* But that is exactly what Defendants are doing here.

Defendants cannot defend their overt censorship program by invoking the government's own right to speak. "The government-speech doctrine provides that the government does not need to be viewpoint-neutral when it chooses to express its own viewpoint on a topic of public interest." *NRA*, 350 F. Supp. 3d at 112 (citing *Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017)). "But while the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to dangerous misuse." *Id.* If this doctrine were applied too broadly, "government could silence or muffle the expression of disfavored viewpoints." *Matal*, 137 S. Ct. at 1758. "For this reason, we must exercise great caution before extending our government-speech precedents." *Id.* And here, where federal officials have gone far beyond merely expressing their own viewpoints, but have aggressively pushed for the censorship of opposing viewpoints, the government-speech doctrine has no application.

Finally, Defendants' censorship program is particularly pernicious because it inflicts widespread injury on the *audiences* of social-media speech, whose injuries are typically too diffuse to effectively assert their own rights. The First Amendment protects listeners' rights to receive others' thoughts, messages, and viewpoints freely—but such listeners seldom have the resources to sue to vindicate their own interests. "[W]here a speaker exists …, the protection afforded is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976). "[T]he right to receive ideas follows ineluctably from the sender's First Amendment right to send them." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 137 S. Ct. at 1735. "[T]he widest possible dissemination of information from diverse and antagonistic sources is essential to the

welfare of the public." *United States v. Midwest Video Corp.*, 406 U.S. 649, 668 n.27 (1972) (plurality op.) (quotations omitted).  In its very breadth, Defendants' censorship program strikes at the heart of these fundamental values.

> **B.      The States Are Likely to Succeed on Their *Ultra Vires* Claim.**

In addition to being unconstitutional under the First Amendment, Defendants' actions are also *ultra vires* and therefore lawless.  *See* ECF 1, ¶¶ 262-267.  No federal statute authorizes the White House, HHS, DHS, or any other federal agency or official to establish a nationwide social-media censorship program.  Nor does any provision of Article II authorize the Executive Branch to launch a massive campaign of viewpoint-based discrimination and censorship on social media.

Defendants have no lawful authority to launch a social-media censorship program that violates the First Amendment.  "An agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986).  Actions that exceed the agency's statutory authority are *ultra vires*.  "*Ultra vires* review is available to review 'whether the President has violated the Constitution, the statute under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action.'" *Louisiana v. Biden*, No. 2:21-CV-01074, 2022 WL 438313, at *19 (W.D. La. Feb. 11, 2022) (quoting *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, 801 F.Supp.2d 383, 406 (D. Md. 2011)); *see also, e.g., Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002); *Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996).  "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Commerce*, 74 F.3d at 1328 (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir.1988)).  Here, the DHS and HHS Defendants both have "violated the Constitution," and "did not have statutory authority to take a particular action." *Louisiana*, 2022 WL 438313, at *19.

Like the actions of HHS and DHS, the actions of the President and White House officials are also unlawful as *ultra vires*.  It is "untenable to conclude that there are no judicially enforceable limitations on presidential actions, besides actions that run afoul of the Constitution or which contravene direct statutory prohibitions…."  *Chamber of Commerce*, 74 F.3d at 1332.  "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  Where "[t]here is no statute that expressly authorizes the President to take" an action, "[n]or is there any act of Congress … from which such a power can fairly be implied," the action is not authorized by an act of Congress.  *Id.*  Absent statutory authority, "if the President had authority to issue the order he did, it must be found in some provision of the Constitution."  *Id.* at 587.

Neither the Constitution nor any federal statute confers authority on the President or the Executive Branch to conduct a social-media censorship program.  There is no "Censorship Clause" in Article II, and no Clause in Article II remotely authorizes the Executive to adopt such a program. Nor could any of the existing Clauses bear an interpretation that would authorize sweeping violations of the First Amendment.  "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343 U.S. at 587.  On the contrary, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.  *Id.* at 637 (Jackson, J., concurring).  Defendants' conduct is "incompatible with the express … will of Congress," *i.e.*, our nation's First Congress that adopted the First Amendment.  *Id.*

Moreover, if the government were to cite any statute to support its policies, the interpretation of any such statute to authorize these actions would violate the non-delegation

doctrine, the canon of constitutional avoidance, the major-questions doctrine, the Supreme Court's clear-statement rules, and other applicable principles of interpretation.  "We expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast 'economic and political significance.'"  *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs*., 141 S. Ct. 2485, 2489 (2021) (quoting *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014)). "Our precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power…."  *Id.* (quoting *United States Forest Service v. Cowpasture River Preservation Assn*., 140 S. Ct. 1837, 1850 (2020)).  In addition, "[w]here an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result."  *Solid Waste Agency of N. Cook County. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 172 (2001).  "This concern is heightened where the administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power."  *Id.* (citing *United States v. Bass*, 404 U.S. 336, 349 (1971).  And "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."  *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

## II.  The Other Equitable Factors Support Granting a Preliminary Injunction.

Because the States are likely to succeed on their First Amendment and *ultra vires* claims, analyzing the remaining *Ladd* factors is not difficult.  Because this case involves First Amendment injuries, "the Court need not analyze factors (2) and (4), threat of irreparable injury and whether an injunction would be in the public interest, respectively; because Plaintiffs allege a First Amendment violation, these factors are presumed and weigh in favor of an injunction."  *Ass'n of Club Executives of Dallas, Inc. v. City of Dallas, Texas*, No. 3:22-CV-00177-M, 2022 WL

1642470, at *3 (N.D. Tex. May 24, 2022); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). "Accordingly, the Court" need only address whether "Plaintiffs have shown a likelihood of success on the merits and the balance of hardships." *Id.*

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Thus, a showing of likelihood of success on a First Amendment claim necessarily establishes irreparable injury. *Phelps–Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) (concluding that if the movant "can establish a sufficient likelihood of success on the merits of her First Amendment claim, she will also have established irreparable harm as the result of the deprivation"). The same principle applies to the *ultra vires* claim premised on injuries to freedom of expression. "Injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter.*, 732 F.3d at 539. Moreover, the public interest overwhelmingly favors restoring the freedom of speech from the restraints attested by the States' declarants.

The balancing of harms also favors an injunction. On one side of the scale, the First Amendment injuries at stake are *per se* irreparable and colossal in magnitude—they involve government conduct that tramples the First Amendment rights of millions of people, both speakers and their audiences. On the other side of the scale, the Government has no cognizable interest in maintaining an unconstitutional program of social-media censorship in flagrant violation of the First Amendment. With weighty First Amendment interests on one side of the scale, and nothing on the other, the balancing of harms is easy to conduct.

## III.   The Court Should Grant a Three-Phase Preliminary Injunction.

As discussed above, Defendants have openly conceded—even boasted about—their social-media censorship activities in broad outline to their political allies and a compliant media. But

many fundamental details of their conduct remain secret, which is unsurprising because "conspiracies are by their very nature secretive operations." *NRA*, 350 F. Supp. 3d at 137.  The complete scope of Defendants' social-media-censorship operations remains shrouded from the public view.  Until the States and the Court learn the fundamental details and scope of this conspiracy, a court order may address its broad outlines, but more effective relief dismantling its full operations will require additional information.  In the meantime, however, the States and their citizens experience ongoing irreparable harm.  *Elrod*, 427 U.S. at 373.

For these reasons, the States respectfully request that the Court issue a preliminary injunction in three phases:  (1) First, the Court should immediately enter a preliminary injunction targeting the most egregious of Defendants' practices, which include demanding or urging social-media companies, either overtly or covertly, to censor speakers, content, and viewpoint that the Government disfavors.  (2) Second, the Court should grant expedited preliminary-injunction-related discovery to allow the States to discover the full details and scope of Defendants' social-media-censorship activities.  (3) Third, once the expedited discovery process is completed, the Court should fashion more specific relief to prevent ongoing and future unlawful activity.

## CONCLUSION

For the reasons stated, the States respectfully request that this Court:

(1) Immediately enter a preliminary injunction preventing Defendants, and their agents, officers, employees, contractors and all those acting in concert with them, from taking any steps to demand, urge, encourage, pressure, or otherwise induce any company or platform for online speech, or any employee, officer, or agent of any such online company or platform, to censor, suppress, remove, de-platform, suspend, shadow-ban, de-boost, or take any other adverse action against any speaker, content, or viewpoint expressed on social-media;

(2) Grant the States' separately filed Motion for Expedited Preliminary-Injunction-Related Discovery, and authorize the States to take discovery from Defendants and third parties to identify the details and scope of Defendants' social-media censorship activities, discussed herein; and

(3) After the conclusion of such preliminary-injunction-related discovery, enter more specific preliminary injunctive relief to provide fully effective relief to address the details and scope of the conduct challenged herein.

Dated: June 14, 2022                                              Respectfully submitted,

**ERIC S. SCHMITT**                                              **JEFFREY M. LANDRY**
**Attorney General of Missouri**                                 **Attorney General of Louisiana**

/s/ D. John Sauer                                                /s/ Elizabeth B. Murrill
D. John Sauer, Mo. Bar No. 58721*                                Elizabeth B. Murrill (La #20685)
  *Solicitor General*                                              *Solicitor General*
Justin D. Smith, Mo. Bar No. 63253                               Louisiana Department of Justice
  *First Assistant Attorney General*                             1885 N. Third Street
Todd Scott, Mo. Bar No. 56614                                    Baton Rouge, Louisiana 70804
  *Senior Counsel*                                               Tel: (225) 326-6766
Michael E. Talent, Mo. Bar No. 73339*                            murrille@ag.louisiana.gov
  *Deputy Solicitor General*                                     *Counsel for State of Louisiana*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
John.Sauer@ago.mo.gov
*Counsel for State of Missouri*


* admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 14, 2022, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.  In addition, on June 14, 2022, I caused a true and correct copy of the foregoing to be sent by certified mail to all Defendants at the following addresses:

U.S. Attorney
Western District of Louisiana
800 Lafayette St #2200
Lafayette, LA 70501-6832

Centers For Disease Control & Prevention
1600 Clifton Road
Atlanta, GA 30329-4027

Attn: Civil Process Clerk
US Attorney General
950 Pennsylvania Ave. NW
Washington, DC 20530-0001

Alejandro Mayorkas
Secretary of Homeland Security
Office of General Counsel
2707 Martin Luther King Jr Ave. SE
Washington, DC 20528

Jen Easterly CISA Agency Stop 0380
Department of Homeland Security
245 Murray Lane
Washington, DC 20528-0380

General Counsel MS 0485
Department of Homeland Security
2707 Martin Luther King Jr. SE
Washington, DC 20528

Jennifer Rene Psaki
The White House
1600 Pennsylvania Ave. NW
Washington, DC 20500

Cybersecurity And Infrastructure Security Agency Stop 0380
Department of Homeland Security
245 Murray Lane
Washington, DC 20528-0380

Vivek H. Murthy
Office of Surgeon General
US Department of Health & Human Services
200 Independence Ave SW
Washington, DC 20201

Nina Jankowicz
c/o Department of Homeland Security
2707 Martin Luther King Jr SE
Washington, DC 20528

Xavier Becerra
US Department of Health and Human Services
200 Independence Ave SW
Washington, DC 20201

Brandon Brown
US Attorney for W.D. Louisiana
300 Fannin Street Suite 3201
Shreveport, LA 71101

Dr. Anthony Fauci
National Institute of Allergy & Infectious Diseases
5601 Fishers Lane MSC 9806
Bethesda MD 20892-8906

Office of General Counsel
Department of Health and Human Services
200 Independence Ave SW
Washington, DC 20201

US Attorney General
Attn: Assistant Attorney General for Administration
950 Pennsylvania Avenue NW
Washington, DC 20530

National Institute of Allergy & Infectious Diseases
5601 Fishers Lane MSC 9806
Bethesda, MD 20892-8906

The Honorable Joseph R. Biden, Jr. President of the United States
The White House
1600 Pennsylvania Ave. NW
Washington, DC 20500

*/s/ D. John Sauer*