# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **The State of Missouri and the State of Louisiana,** | |
| *Plaintiffs*, | |
| v. | Civil Action No. 22-cv-1213 |
| **President Joseph R. Biden, Jr., in his official capacity as President of the United States of America,** | |
| *et. al.,* | |
| *Defendants*. | |

## DEFENDANTS' RESPONSE TO THE STATES' MOTION FOR EXPEDITED DISCOVERY

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 4

ARGUMENT ...................................................................................................................... 8

I.      The Court must first determine whether the States have standing based on their
        pleadings before any discovery is authorized. .................................................... 8

II.     The States are not entitled to any discovery beyond any available, relevant
        administrative record. ....................................................................................... 12

III.    The States cannot show that expedited discovery is necessary or justified here. ............. 14

CONCLUSION ................................................................................................................. 20

i

# TABLE OF AUTHORITIES

**Cases**

*Alabama-Tombigbee Rivers Coal. v. Norton*,
 No. CIV.A.CV-01-S-0194-S, 2002 WL 227032 (N.D. Ala. Jan. 29, 2002)............................ 13

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
 458 U.S. 592 (1982)........................................................................................................... 10

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)........................................................................................................... 10

*Ass'n of Am. Physicians & Surgeons ("AAPS") v. Schiff*,
 518 F. Supp. 3d 505 (D.D.C. 2021) *aff'd*, 23 F.4th 1028 (D.C. Cir. 2022)........................... 4, 5

*Badon v. U.S. Dep't of Agric.*,
 No. CV 20-460-BAJ-RLB, 2021 WL 3201367 (M.D. La. July 28, 2021) ................................ 9

*Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*,
 283 F.3d 208 (4th Cir. 2002) ......................................................................................... 10, 11

*Bellion Spirits, LLC v. United States*,
 335 F. Supp. 3d 32 (D.D.C. 2018) *aff'd*, 7 F.4th 1201 (D.C. Cir. Aug. 6, 2021)..................... 13

*Camp v. Pitts*,
 411 U.S. 138 (1973)........................................................................................................... 12

*Chang v. USCIS*,
 254 F. Supp. 3d 160 (D.D.C. 2017) ................................................................................. 12, 13

*Changizi v. Dep't of Health & Hum. Servs.*,
 No. 2:22-CV-1776, 2022 WL 1423176 (S.D. Ohio May 5, 2022)........................................ 4, 6

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
 370 F.3d 151 (1st Cir. 2004)............................................................................................... 16

*Cheney v. United States Dist. Court for the Dist. of Columbia*,
 542 U.S. 367 (2004)........................................................................................................... 20

*Citibank, N.A, v. Citytrust*,
 756 F.2d 273 (2d Cir. 1985)................................................................................................ 16

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
 401 U.S. 402 (1971) *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 97 (1977) ........ 12

*Dickson v. United States*,
 831 F. Supp. 893 (D.D.C. 1993) .......................................................................................... 11

*ELargo Holdings LLC v., Doe 209.33.29.66,*
    No. 1:16-CV-0480, 2016 WL 1762037 (W.D. La. Apr. 29, 2016) ......................................... 14

*Elrod v. Burns,*
    427 U.S. 347 (1976) ................................................................................................................ 17

*Enochs v. Lampasas Cnty.,*
    641 F.3d 155 (5th Cir. 2011) ..................................................................................................... 8

*GHX Indus. LLC v. Servco Hose & Supply LLC,*
    No. 6:19-CV-01552, 2020 WL 1492920 (W.D. La. Feb. 5, 2020)................................... 15, 18

*Google, Inc. v. Hood,*
    822 F.3d 212 (5th Cir. 2016) ................................................................................................... 17

*GTE Corp. v. Williams,*
    731 F.2d 676 (10th Cir. 1984) ................................................................................................. 16

*H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs.,* LLC,
    No. 3:09-CV-00393-L, 2009 WL 1766095 (N.D. Tex. June 23, 2009) ............................. 15, 17

*Harkness v. Sec'y of Navy,*
    858 F.3d 437 (6th Cir. 2017) ................................................................................................... 13

*Hart v. Facebook Inc.,*
    No. 22-CV-00737-CRB, 2022 WL 1427507 (N.D. Cal. May 5, 2022)............................. 4, 5, 6

*Harvard Pilgrim Health Care of New England v. Thompson,*
    318 F. Supp. 2d 1 (D.R.I. 2004)............................................................................................... 13

*Haverkamp v. Linthicum,*
    6 F.4th 662 (5th Cir. 2021) ....................................................................................................... 8

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.,*
    58 F. Supp. 3d 1191 (D.N.M. 2014) ........................................................................................ 13

*Johnson v. TheHuffingtonPost.com, Inc.,*
    21 F.4th 314 (5th Cir. 2021) .................................................................................................... 10

*Ketcham v. U.S. Nat'l Park Serv.,*
    Case No. 16-CV-00017-SWS, 2016 WL 4268346 (D. Wyo. Mar. 29, 2016)......................... 13

*Lapaglia v. Transamerica Cas. Ins. Co.,*
    155 F. Supp. 3d 153 (D. Conn. 2016)...................................................................................... 11

*Laufer v. Patel,*
    No. 1:20-CV-631-RP, 2021 WL 327704 (W.D. Tex. Feb. 1, 2021) .......................................... 9

*Medina Cty. Env't Action Ass'n v. Surface Transp. Bd.*,
        602 F.3d 687 (5th Cir. 2010) ........................................................................ 12

*Moralez v. Perdue*,
        No. 1:16-CV-00282-AWI-BAM, 2017 WL 2264855 (E.D. Cal. May 24, 2017) ................... 13

*Mullane v. Almon*,
        339 F.R.D. 659 (N.D. Fla. 2021) .................................................................. 15

*Outdoor Amusement Bus. Ass'n, Inc. v. DHS*,
        No. CV ELH-16-1015, 2017 WL 3189446 (D. Md. July 27, 2017)........................... 13

*Shenzhen Tange Li'An E-Com., Co. v. Drone Whirl LLC*,
        No. 1:20-CV-738-RP, 2020 WL 5237267 (W.D. Tex. Sept. 2, 2020) .................... 15

*Smith v. Potter*,
        400 F. App'x 806 (5th Cir. 2010) .................................................................... 8

*Soileau v. GPS Marine, LLC*,
        No. CV 20-484, 2020 WL 9078308 (E.D. La. May 19, 2020)........................... 14, 18

*South Carolina v. Katzenbach*,
        383 U.S. 301 (1966).................................................................................... 10

*St. Louis Grp., Inc. v. Metals & Additives Corp.*,
        275 F.R.D. 236 (S.D. Tex. 2011)..................................................................... 18

*Steel Co. v. Citizens for a Better Env't*,
        523 U.S. 83 (1998)....................................................................................... 8

*Tafas v. Dudas*,
        530 F. Supp. 2d 786 (E.D. Va. 2008) .............................................................. 13

*Tween Brands Inv., LLC v. Bluestar All., LLC*,
        No. 2:15-CV-2663, 2015 WL 5139487 (S.D. Ohio Sept. 1, 2015) ........................ 15

*Ty, Inc. v. Jones Group, Inc.*,
        237 F.3d 891 (7th Cir. 2001) ......................................................................... 16

*Wilson v. Samson Contour Energy E & P, LLC*,
        No. CIV.A. 14-0109, 2014 WL 2949457 (W.D. La. June 30, 2014) ................ 14, 19

*Young v. Motion Picture Ass'n of Am., Inc.*,
        299 F.2d 119 (D.C. Cir. 1962)....................................................................... 16

**Federal Regulations**

Executive Order 13925 of  May 28, 2020, Preventing Online Censorship,
§ 1, 85 Fed. Reg. 34079, 34079 (published June 2, 2020)........................................................ 1

Executive Order 14,029 of  May 14, 2021 (Revocation of Certain Presidential Actions and
Technical Amendment),
§ 1, 86 Fed. Reg. 27025 (published May 19, 2021)................................................................. 1

## INTRODUCTION

For years, Government officials on both sides of the political aisle have debated the role that social media companies play in political and popular discourse. Both Democrats and Republicans have commented on those companies' content moderation policies. Both Democrats and Republicans have also questioned whether those companies should continue to enjoy statutory protections against tort liability. Indeed, in May 2020, former President Trump issued an Executive Order, entitled "Preventing Online Censorship," in which he directed the Federal Government to narrowly construe protections against liability for social media companies in section 230 of the Communications Decency Act in light of the purported decisions of those companies to provide "warning label[s]" on the speech of some individuals but not others.[1]

The Plaintiff States, Missouri and Louisiana, now ask this Court to constitutionalize this political debate by issuing two extraordinary orders. First, the States request a sweeping preliminary injunction that would have the perverse effect of suppressing public officials' speech on matters of public concern. That injunction would apply to all "Defendants, and their agents, officers, employees, contractors and all those" allegedly "acting in concert with them." ECF No. 10, at 2 (PI Motion). Second, and the topic of the present motion, the States ask this Court to stray from the ordinary course of civil litigation provided by the Federal Rules of Civil Procedure by immediately requiring Defendants to respond to an unspecified number of interrogatories and document requests, and potentially prepare for depositions, on a compressed timeline.

---

[1] Executive Order 13925 of May 28, 2020, Preventing Online Censorship, § 1, 85 Fed. Reg. 34079, 34079 (published June 2, 2020), rescinded by Executive Order 14,029 of May 14, 2021 (Revocation of Certain Presidential Actions and Technical Amendment), § 1, 86 Fed. Reg. 27025 (published May 19, 2021).

But like the political debate that generated them, the claims that the States seek to litigate here are not new, let alone the type that would warrant the extraordinary orders they seek. To the contrary, the Plaintiff States bring claims virtually identical to those that multiple courts, including the D.C. Circuit, have dismissed for lack of subject-matter jurisdiction. In particular, multiple parties, including some who are declarants in this very action, have previously brought suit in other districts arguing that they were affected by social media companies' longstanding misinformation policies. Although social media companies have been taking action against what they have deemed to be misinformation for years—since before this Administration began—those plaintiffs insisted that the actions they were subject to were attributable, not to the private social media companies that took them, but rather to certain comments made by Government officials about the harms of misinformation. Those parties thus asserted, among other things, that the challenged moderation actions amounted to First Amendment violations. However, the courts uniformly dismissed those challenges, concluding that the plaintiffs lacked Article III standing because their allegations did not show that the challenged actions were caused by any Government actor rather than the independent judgments of social media companies.

The States now seek to relitigate the same legal theories here, alleging that some of their residents—few identified by name—have been affected by social media companies' misinformation policies, and that a host of federal agencies and employees are to blame. But as Defendants will show in our forthcoming motion to dismiss, the States' lawsuit does nothing to cure the jurisdictional deficiencies previously identified in the related cases. To the contrary, it adds a new jurisdictional infirmity by attempting to assert *parens patriae* claims against the Federal Government, contravening clear Supreme Court precedent. And the States' conclusory allegations of harm to their "sovereign" interest in protecting the "freedom of speech" or the "free

flow of information" are simply another way of framing the *parens patriae* interest that fails to establish standing to sue. In light of these clear jurisdictional flaws, this Court should not allow the States to take discovery before Defendants have even responded to the Complaint. The Court must first address whether it has jurisdiction before this matter may proceed at all.

Even if those jurisdictional hurdles could be surmounted, discovery would not be permitted here. The States assert claims against federal agencies and officials under the Administrative Procedure Act ("APA"), and the Supreme Court has repeatedly noted that there is a strong presumption against extra-record discovery in an APA suit. Although there are certain exceptions to this rule, the States make no attempt to invoke any in their brief; nor could they, as the Defendants have not yet had the opportunity to produce an administrative record for any claims that would survive a motion to dismiss. The Court should decline their request for expedited discovery on this basis alone.

But even if the States could overcome these threshold problems, their expedited discovery request would still be unjustified. Expedited discovery is rare, and is authorized only when a party shows that it has a pressing need—*i.e.*, some irreparable harm or other similar good cause—that outweighs any burden that expedited discovery would impose on the defendant. Here, the States make little effort to show that they will suffer irreparable harm (or in fact any harm) absent expedited discovery, and for good reason: an action taken by a private social media company does not constitute a First Amendment violation unless it is caused by, and is also legally attributable to, the Government. But again, as multiple courts have found, allegations of general comments made by Government officials concerning the harms of misinformation do not demonstrate that the moderation practices of private, independent social media companies were caused by those comments. And importantly, the States make no concrete allegation that any particular resident in

their States will imminently be subject to some action by a social media company because of any coercion by a Defendant.

Additionally, even if the States could establish some urgent need for discovery to protect against imminent harm, it would be an emergency of their own making. The States allege that Defendants' unlawful conduct began as early as 2020, and many of the alleged Government statements they cite occurred in mid-2021. Yet the States waited until May 5, 2022, to bring suit. Then, they waited another forty days—until June 14, 2022—to move for preliminary relief, and then finally moved for expedited discovery on June 17, 2022. The Court should not require Defendants to conduct broad, invasive discovery on a highly compressed schedule when the States have moved at a leisurely pace. The Court should deny the States' Motion for Expedited Discovery.

## BACKGROUND

Over the past year, multiple groups and individuals have filed suits in various jurisdictions alleging that they were the subject of content-moderation measures by prominent, private social media companies for violating those companies' misinformation policies, and they claimed that those remedial actions amounted to First Amendment violations because they were attributable to certain statements made by Government officials. *See Ass'n of Am. Physicians & Surgeons ("AAPS") v. Schiff*, 518 F. Supp. 3d 505, 510 (D.D.C. 2021), *aff'd*, 23 F.4th 1028 (D.C. Cir. 2022); *Hart v. Facebook Inc.*, No. 22-CV-00737-CRB, 2022 WL 1427507 (N.D. Cal. May 5, 2022); *Changizi v. Dep't of Health & Hum. Servs.*, No. 2:22-CV-1776, 2022 WL 1423176 (S.D. Ohio May 5, 2022).[2] All of those courts found that the plaintiff(s) involved lacked standing.

---

[2] Internal quotations marks and citations are omitted throughout this brief unless otherwise stated herein.

In *AAPS*, for example, the plaintiff medical organization alleged that several online platforms—including Facebook and Twitter—took action in response to certain vaccine-related content posted by the plaintiff. *AAPS*, 518 F. Supp. 3d at 510-11. The plaintiff claimed that those actions were attributable to certain statements made by Congressman Adam Schiff and therefore violated its First Amendment rights. In support, the plaintiff alleged, among other things, that "Congressman Schiff sent letters to Google and Facebook to encourage them to use their platforms to prevent what [Congressman] Schiff asserted to be inaccurate information on vaccines" and that "Congressman Schiff . . . challenged the immunity that interactive computer services have under Section 230 of the [Communication Decency Act of 1996]" in an attempt "to put the technology companies on notice that they would need to comply with Congressman Schiff's position or risk his undertaking legislative action against [Section 230]." *Id.* at 510. The district court held that the plaintiff lacked standing because the plaintiff could not establish a causal link between Congressman Schiff and the actions at issue given the "innumerable other potential causes for the actions taken by the technology companies," and also because "[i]t [was] pure speculation that any order directed at Congressman Schiff would affect the behavior of the third-party technology companies not before the Court." *Id.* at 516. The D.C. Circuit unanimously affirmed the district court's decision, agreeing that the plaintiff failed to establish the requisite causal link. *AAPS*, 23 F.4th at 1034.

In *Hart*, a social media user asserted a similar First Amendment claim against multiple parties, including Facebook, Twitter, President Biden, and Surgeon General Murthy. 2022 WL 1427507, at *1. The plaintiff there alleged that Facebook and Twitter took certain actions against him for violating their misinformation policies, and that those actions were attributable to federal Government actors, including White House officials and Surgeon General Murthy. *See id.* at *2-

3. In support, the plaintiff alleged that Press Secretary Psaki had made a number of comments suggesting that White House officials were in contact with social media companies and that Surgeon General Murthy had made a number of public comments about the need to contain misinformation on social media platforms. *See id.* at *3. The district court nevertheless held that the plaintiff lacked standing, explaining that his "injury has no causal relationship with the [Government's alleged] actions, and no court order as to the [Government] could redress it." *Id.* at *10.

In *Changizi*, multiple social media users brought a First Amendment claim virtually identical to that in *Hart*. 2022 WL 1423176, at *1. Like the *Hart* plaintiff, the *Changizi* plaintiffs alleged that social media companies moderated their speech, and they claimed that the companies' moderation measures were attributable to certain alleged statements made by Government officials, including the Surgeon General. *See id.* at *1-2. The court held that the plaintiffs lacked standing, stating that, even accepting their well-pled allegations as true, the "past and current disciplinary measures were (and are) the product of" the social media companies' "own legitimate discretion, not" the alleged "command[s]" of the Federal Government. *Id.* at *10-12. And regardless, the court concluded, the plaintiffs "failed to show that the relief they s[ought] could sufficiently redress their alleged injuries." *Id.* Defendants are unaware of any case involving a similar First Amendment claim where a court has found that the plaintiffs had standing.

Nevertheless, the Plaintiff States now bring suit, essentially recycling the First Amendment claims dismissed in *AAPS*, *Hart*, and *Changizi*. In support of their Motion for Preliminary Injunction, the States rely on, among other things, declarations from the very same plaintiffs whose claims were dismissed for lack of standing in *Changizi*. *See* ECF Nos. 10-2, 10-9, 10-10. Although the States' Complaint adds several new executive agencies and officials as defendants in this case,

their theory is the same: they assert that individual users have been subject to content moderation measures, consistent with social media companies' terms of service, and they assert that those measures are somehow attributable to the Federal Government because of certain statements that Government officials made both in public and directly to social media companies concerning misinformation. *See* ECF No. 1 (Complaint). Although the States complain that they were subject to certain moderation measures by social media companies in the past, *see* ECF No. 15 (PI Brief) at 38, the States do not identify any imminent moderation measure that has been threatened against them by a social media company. They instead largely claim to have standing based on moderation measures that may be taken against their residents. *See* ECF No. 15 (PI Brief) at 38-41.

Although the States' claim relies on statements made by Government officials in or around May 2021, and they allege that social media companies have been targeting misinformation on their platforms since "2020, if not before," Compl. ¶¶ 67, 72-73, 88, 93, 122, 151, the States waited until June 14, 2022 to move for a preliminary injunction, *see* ECF No. 10 (PI Motion). The States now move for expedited discovery, and assert that Defendants should provide interrogatory responses, produce documents, and potentially prepare witnesses for depositions on an extraordinarily compressed timeline. Plaintiffs do not provide the particular interrogatories and document requests they would serve, but assert that those requests would generally seek "the identities of federal officials who have been and are communicating with social-media platforms about" misinformation and actions taken against any particular content "on social media, and . . . the nature and content of those communications." ECF No. 17 (Discovery Motion), at 2.

Under the States' requested schedule, once they serve interrogatories and document requests, Defendants would have only "fourteen days" to "provide objections and responses, if any, as well as responsive documents to Plaintiffs." *Id.* at 2. Then, "within ten days of receiving

objections, responses, and documents, Plaintiffs" would "notify Defendants whether, based on the discovery responses received, they seek any depositions." *Id.* The States ask the Court to authorize expedited discovery and enter this accelerated schedule that dramatically alters the time that Defendants would ordinarily have under the Federal Rules of Civil Procedure, all before the Court has had a chance to determine whether, in light of *AAPS*, *Hart*, and *Changizi*, it even has jurisdiction to entertain this dispute.

<u>A</u><u>RGUMENT</u>

The Court should deny the States' Motion for Expedited Discovery because (i) the Court must first determine whether it has jurisdiction to proceed with this matter at all before any discovery is authorized, (ii) the States are not entitled to discovery beyond any available, relevant administrative record, and (iii) the States cannot satisfy the requirements for expedited discovery.

**I.     The Court must first determine whether the States have standing based on their pleadings before any discovery is authorized.**

The States' Complaint has serious jurisdictional defects, which the Court should address under Rule 12(b) before entertaining the possibility of discovery. "Courts are instructed to examine their jurisdiction at every stage of the litigation," *Enochs v. Lampasas Cnty.*, 641 F.3d 155, 161 (5th Cir. 2011), including "at the pleading stage" where "the plaintiff's burden is to allege a plausible set of facts establishing jurisdiction," *Haverkamp v. Linthicum*, 6 F.4th 662, 668 (5th Cir. 2021). A lawsuit may not proceed further unless a court has first assured itself of its subject-matter jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (the "first and fundamental question" in every case "is that of jurisdiction"—a "requirement that . . . as a threshold matter spring[s] from the nature and limits of the judicial power of the United States and is inflexible and without exception"). Courts thus routinely stay discovery when there is a pending motion to dismiss on jurisdictional grounds. *See*, *e.g.*, *Smith v. Potter*, 400 F. App'x 806, 813 (5th

Cir. 2010) (concluding that the district court did not abuse its discretion in "grant[ing]" a "motion to stay discovery pending . . . the motion to dismiss for lack of jurisdiction."); *Badon v. U.S. Dep't of Agric.*, No. CV 20-460-BAJ-RLB, 2021 WL 3201367, at *2 (M.D. La. July 28, 2021) ("Defendant's Motion to Dismiss raises the threshold issue of subject-matter jurisdiction," and so "the Court finds good cause to stay discovery pending resolution of Defendant's Motion to Dismiss."); *Laufer v. Patel*, No. 1:20-CV-631-RP, 2021 WL 327704, at *2 (W.D. Tex. Feb. 1, 2021) ("Because standing is a threshold jurisdictional requirement, the Court agrees with Defendants that discovery should be stayed until the District Court has determined whether it has jurisdiction over this case.").

On July 12, 2022—Defendants' current deadline to respond to the Complaint—Defendants expect to file a Rule 12(b) motion to dismiss explaining that the States lack Article III standing. The Court should resolve that motion before *any* discovery is allowed, much less expedited discovery. As noted above, multiple courts have held that plaintiffs asserting legal theories virtually identical to the one the States assert here lacked standing. *See supra* at 4-6. And it is even clearer that the States lack standing in this case. Although the States argue that they were previously subject to moderation measures by social media platforms, *see* ECF No. 15 (PI Motion) at 38, they do not allege that any social media platform will soon again subject them to those measures, or that they will directly suffer any other imminent injury (as is necessary for prospective relief). Instead, the States' purported injuries are largely, if not entirely, derivative of actions that social media companies may purportedly take against their residents. *See* ECF No. 15 (PI Motion) at 38-41. Thus, not only must the States overcome the jurisdictional issues identified by the courts in *AAPS*, *Hart*, and *Changizi*—*e.g.*, the States must show that their residents are at imminent risk of being subject to moderation measures by social media companies at the direction of some

Defendant[3]—but they must also show that, contrary to Supreme Court precedent, they can somehow bring a *parens patriae* suit against the Federal Government. *Cf. South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966) (A "State [does not] have standing as the parent of its citizens" to bring claims "against the Federal Government, the ultimate parens patriae of every American citizen."); *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) ("A State does not have standing as parens patriae to bring an action against the Federal Government."). The States' claims thus raise a number of serious jurisdictional questions, which Defendants plan to address in greater depth in their forthcoming motion to dismiss.

Importantly, the States cannot justify the expedited discovery they seek from Defendants here by suggesting that they may uncover some unspecified evidence that would support standing. As an initial matter, as noted above, the Court must first assess whether any non-conclusory factual allegations in the Complaint establish the States' standing to sue. *See supra* at 8-9. The States are not entitled to a fishing expedition just because discovery could potentially uncover additional facts that would remedy the deficiencies in the Complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009) (if a plaintiff's "complaint is deficient under Rule 8, [it] is not entitled to discovery, cabined or otherwise."); *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 326 (5th Cir. 2021) ("To merit jurisdictional discovery" a party must "show that it is likely to produce the facts needed to withstand dismissal;" "a jurisdictional fishing expedition" is not justified "based on a plaintiff's general averments that more discovery will prove [the court's] jurisdiction."); *Base Metal Trading,*

---

[3] The States also allege that they may be injured because they may be unable to hear from constituents who are prevented from posting on a social media platform. This theory still hinges on the States' ability to show that any of their constituents will suffer some adverse action by a social media platform *because of a Defendant*. Further, this theory suffers from another flaw: the Complaint contains no nonconclusory allegation that any specific constituent will soon be subject to some remedial action *and* plans to try to communicate with a Plaintiff State through social media.

*Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208, 216 n.3 (4th Cir. 2002) (the district court did not abuse its discretion in "failing to permit jurisdictional discovery" because "the plaintiff simply want[ed] to conduct a fishing expedition in the hopes of discovering some basis of jurisdiction"); *Lapaglia v. Transamerica Cas. Ins. Co.*, 155 F. Supp. 3d 153, 156 (D. Conn. 2016) ("Absent a court's ability to require at least facially plausible allegations of subject matter jurisdiction, any plaintiff would be free to assert extravagant, unfounded, and conclusory claims of jurisdiction, and a court would be faced with no option in response but to impose expensive and time-consuming discovery, all of which ill-serves the aim of the federal rules to secure the just, speedy, and inexpensive determination of every action and proceeding."); *Dickson v. United States*, 831 F. Supp. 893, 900 (D.D.C. 1993) ("Basic fact-finding should precede the filing of a lawsuit; the insufficiency of the Plaintiff's Complaint does not warrant any form of discovery for . . . jurisdiction.").

In any event, discovery from Defendants could not establish that the States have standing, or that they have shown irreparable harm. The States' asserted injuries are based on content moderation decisions by private social media companies, and their claims here hinge on whether those companies would change their behavior in response to a court order limiting the speech of Government officials. Discovery from the Defendants would not be relevant to those questions, all of which focus on the decision-making of third parties not before the court.[4] Accordingly,

---

[4] Defendants recognize that the States also seek leave to take third party discovery from social media platforms. *See* ECF 17 (Discovery Motion) at 2. Although Defendants believe that even that request is improper at this juncture, in light of the threshold jurisdictional issues and APA limitations on discovery, they note that any such discovery, if authorized, would still not resolve the jurisdictional deficiencies presented by the present lawsuit. Among other issues, the third-party social media companies would still not be parties to this suit, and this Court could accordingly not issue any order that would require those companies to change their practices.

before any discovery is authorized here, the Court should first resolve Defendants' forthcoming Rule 12(b) motion to dismiss to determine whether the States' allegations establish standing.

## II.    The States are not entitled to any discovery beyond any available, relevant administrative record.

The States' request for expedited discovery is also improper because this case involves claims against federal agencies, and so the States are entitled to no discovery beyond any available, relevant administrative record. The Supreme Court has made clear that the "review" of an agency determination or action "is to be based on" any "administrative record that was before the [agency] at the time [it] made [its] decision." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 97 (1977); *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review" of an agency determination "should be the administrative record already in existence, not some new record made initially in the reviewing court"); *Medina Cty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010) (in a lawsuit against a federal agency, the "general presumption" is "that review is limited to the record compiled by the agency"). The Fifth Circuit has explained that discovery beyond the administrative record may be appropriate only if, after the production of that record, a plaintiff could demonstrate some inadequacy therein; *e.g.*, if "the agency deliberately or negligently excluded documents that may have been adverse to its decision." *Medina,* 602 F.3d at 706.

Plaintiffs in the present case assert two claims under the APA, and these black-letter principles of law therefore apply. It makes no difference that plaintiffs also present the same allegations in a separate "First Amendment" claim and an *ultra vires* claim. For decades, courts across the country have recognized that constitutional claims challenging agency action are likewise reviewed based on any relevant administrative record. *See Chang v. USCIS*, 254 F. Supp.

3d 160, 161 (D.D.C. 2017); *Harkness v. Sec'y of Navy*, 858 F.3d 437, 451 n.9 (6th Cir. 2017) (noting that a constitutional claim "is properly reviewed on the administrative record"); *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 58 F. Supp. 3d 1191, 1232 (D.N.M. 2014) ("The presence of a constitutional claim does not take a court's review outside of the APA . . . and courts must . . . respect agency fact-finding and the administrative record when reviewing agency action for constitutional infirmities . . . ."); *Bellion Spirits, LLC v. United States*, 335 F. Supp. 3d 32, 44 (D.D.C. 2018), *aff'd*, 7 F.4th 1201 (D.C. Cir. Aug. 6, 2021); *Outdoor Amusement Bus. Ass'n, Inc.* v. *DHS*, No. CV ELH-16-1015, 2017 WL 3189446, at *21 (D. Md. July 27, 2017); *Moralez v. Perdue*, No. 1:16-CV-00282-AWI-BAM, 2017 WL 2264855, at *3 (E.D. Cal. May 24, 2017); *Ketcham v. U.S. Nat'l Park Serv.*, Case No. 16-CV-00017-SWS, 2016 WL 4268346, at *1-2 (D. Wyo. Mar. 29, 2016); *Tafas v. Dudas*, 530 F. Supp. 2d 786, 803 (E.D. Va. 2008); *Harvard Pilgrim Health Care of New England v. Thompson*, 318 F. Supp. 2d 1, 10 (D.R.I. 2004); *Alabama-Tombigbee Rivers Coal. v. Norton*, No. CIV.A.CV-01-S-0194-S, 2002 WL 227032, at *5-6 (N.D. Ala. Jan. 29, 2002).

The record review rule applies here, and the States are thus precluded from seeking discovery from any agency beyond any relevant administrative record that may exist. It is unclear what specific agency action the States are challenging —which, as Defendants will discuss further in their forthcoming motion to dismiss, provides an independent basis for dismissing this lawsuit— and it is accordingly unclear whether there is an administrative record for the relevant agency action and what the scope of that record would be. The proper course for now would be for the Court to determine, on review of Defendants' forthcoming motion to dismiss, whether the States are challenging any discrete agency action. The Defendants could then determine whether there is an administrative record for any such agency action and produce any administrative record that

13

may exist. The States cannot sidestep this process, skirt the record review rule, and demand

expedited, extra-record discovery at the outset of this case.

## III.    The States cannot show that expedited discovery is necessary or justified here.

Even if the States could clear the threshold hurdles discussed above, the States cannot

satisfy the relevant standard for expedited discovery. "[E]xpedited discovery is not the norm . . .

and courts only allow it in limited circumstances." *Wilson v. Samson Contour Energy E & P, LLC*,

No. CIV.A. 14-0109, 2014 WL 2949457, at *3 (W.D. La. June 30, 2014). Several courts in this

Circuit have stated that a party seeking expedited discovery must show "good cause" to "deviate

from the normal course of discovery." *Id.* at *3-4. To satisfy the "good cause" standard, the party

seeking expedited discovery must first "show that [it] is subject to irreparable harm or that" there

is some "other pressing need for the discovery [it] seeks," such as "a risk that evidence would be

lost or destroyed."[5] *Wilson*, 2014 WL 2949457, at *3-4; *see also Soileau v. GPS Marine, LLC*, No.

CV 20-484, 2020 WL 9078308, at *3 (E.D. La. May 19, 2020) ("irrespective of the standard

applied, [e]xpedited discovery" is "allowed . . .when there is some showing of irreparable harm

that can be addressed by limited, expedited discovery").

The party must also show that its "need for expedited discovery outweighs the prejudice to

the responding party." *ELargo Holdings LLC v. Doe 209.33.29.66*, No. 1:16-CV-0480, 2016 WL

1762037, at *1 (W.D. La. Apr. 29, 2016). The Court must consider "the breadth of the discovery

requests," the "burden on the defendants to comply with the requests, and how far in advance of

---

[5] The State's motion notes that courts have applied two different tests for expedited discovery, with some courts analyzing the request for "good cause" while others have applied a more rigorous "preliminary injunction" analysis. *See* Pls.' Mot. at 4. Whichever test applies, however, each requires some demonstration of urgent need for the information at issue. Accordingly, whether it is "irreparable harm" or some "other pressing need for the discovery she seeks" (*e.g.*, potential loss of evidence), the extent of harm is a necessary factor in the analysis, *Wilson*, 2014 WL 2949457, at *3-4.

the typical discovery process the request was made." *GHX Indus. LLC v. Servco Hose & Supply LLC*, No. 6:19-CV-01552, 2020 WL 1492920, at *1 (W.D. La. Feb. 5, 2020). "The party seeking expedited discovery has the burden of establishing good cause and the scope of the requests must be narrowly tailored to the necessary information they seek." *Id.* at *2. The States fail to satisfy their burden here.

*First*, they fail to show that they will suffer any irreparable harm absent expedited discovery, or that there is some other pressing need for expedited discovery. As an initial matter, the States are wrong to suggest that they can satisfy this standard simply by filing a preliminary injunction motion. *See Mullane v. Almon*, 339 F.R.D. 659, 666 n.2 (N.D. Fla. 2021) ("expedited discovery is not automatically granted merely because a party seeks a preliminary injunction"); *Tween Brands Inv., LLC v. Bluestar All., LLC*, No. 2:15-CV-2663, 2015 WL 5139487, at *3 (S.D. Ohio Sept. 1, 2015) ("Although requests for expedited discovery typically arise in connection with a motion for preliminary injunction, such requests are not automatically granted simply because a motion for preliminary injunction is pending."). To the contrary, the States' delay in bringing suit and moving for preliminary relief undermines any assertion that they are suffering, or will suffer, some imminent, an irreparable harm necessary to satisfy the "good cause" standard. *See*, *e.g.*, *H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs.*, LLC, No. 3:09-CV-00393-L, 2009 WL 1766095, at *4 (N.D. Tex. June 23, 2009) ("Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief."); *Shenzhen Tange Li'An E-Com., Co. v. Drone Whirl LLC*, No. 1:20-CV-738-RP, 2020 WL 5237267, at *4 (W.D. Tex. Sept. 2, 2020) ("Plaintiffs' delay in seeking injunctive relief suggests a lack of urgency . . .").

Courts in other circuits have similarly reached the common-sense conclusion that a plaintiff's "[d]elay in seeking enforcement of [his] rights . . . tends to indicate at least a reduced need for . . . drastic, speedy action." *Citibank, N.A, v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985); *see also Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151,163 (1st Cir. 2004) ("[D]elay between the institution of an action and the filing of a motion for preliminary injunction, not attributable to intervening events, detracts from the movant's claim of irreparable harm."); *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered."); *Young v. Motion Picture Ass'n of Am., Inc.*, 299 F.2d 119, 121 (D.C. Cir. 1962) ("The delay in filing this action negatives any finding of urgency necessary to justify the interlocutory relief sought."); *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984) (a "[d]elay . . . undercuts the sense of urgency . . ."). As explained above, the States' legal theory relies on actions that social media companies have allegedly been taking since 2020,[6] and a number of statements Government officials allegedly made in mid-2021, and yet they

---

[6] *See* Hoft Decl. (Dkt. 10-5) ¶¶ 6-8 (Twitter conduct of January-February 2021), *id.* ¶ 12(a) (alleging Facebook conduct regarding August 2020 post); *id.* ¶ 12(b) (alleging Facebook conduct regarding September 2020 post); Bhattacharya Decl. (Dkt. 10-3) ¶ 16 (February 2021 Facebook conduct and previous conduct of Google and Reddit); *id.* ¶ 18 (YouTube conduct regarding March 2021 video); *id.* ¶¶ 20-33 & n.7 (relying on May 2022 video describing alleged platform conduct toward Bhattacharya, Kulldorff, and others "these last two years"); Kulldorff Decl. (Dkt. 10-4) ¶¶ 8 & n.1, 13 & n.4 (apparently relying on same May 2022 video as Bhattacharya Decl. ¶¶ 20-33 & n.7); *id.* ¶ 17 (March 2021 Twitter conduct); *id.* ¶ 19 (November 2021 Twitter conduct); *id.* ¶ 22 (August 2021 LinkedIn conduct); Kheriaty Decl. (Dkt. 10-7) ¶¶ 11, 15 (2020 and 2021 Twitter conduct that "intensified in 2022"); Changizi Decl. (Dkt. 10-9) ¶ 18 (April 2021 Twitter conduct); *id.* ¶ 19 (June 2021 Twitter conduct); *id.* ¶¶ 20, 23 (December 2021 Twitter conduct); Senger Decl. (Dkt. 10-2) ¶¶ 4-7 (October 2021 and March 2022 Twitter conduct); Kotzin Decl. (Dkt. 10-10) ¶ 13 (September 2021 Twitter conduct); Kitchen Decl. (Dkt. 10-11) ¶¶ 18, 32 (September 2021 Medium conduct); Hines Decl. (Dkt. 10-12) ¶¶ 13-14 (July 2021 Facebook conduct); Gulmire Decl. (Dkt. 10-15) ¶¶ 10-12 (Facebook conduct regarding July 2021 article); Flesch Decl. (Dkt. 10-6) ¶ 7 & n.1 (relying on October 2021 newspaper article); ECF No. 15 (PI Brief) at 38 (citing Bosch Decl. (Dkt. 10-13) ¶ 7 regarding August 2021 incident)). And even when the alleged social

waited another year—until May 2022—to bring this action, and then waited another forty days to move for preliminary relief. *See supra* at 7-8. Given that there "is no apparent urgency to the request for injunctive relief," *H.D. Vest*, 2009 WL 1766095, at *4, there is similarly no urgency to the expedited discovery motion. If the States have no issue with waiting months, if not years, to pursue remedies for their alleged injuries, it is unclear why highly unusual, immediate discovery is necessary to avoid prejudice to them.

Even setting aside those delays, the States are still unable to show any risk of imminent harm. Although courts have held that First Amendment violations could constitute irreparable injury, *see Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion), a First Amendment injury, like any other, must be imminent and non-speculative to satisfy the irreparable injury requirement, *see Google, Inc. v. Hood*, 822 F.3d 212, 227-28 (5th Cir. 2016) ("[I]nvocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury."). Here, the States' contention that they are at risk of some imminent harm depends on their theory that moderation measures taken by private social media companies, consistent with their terms of service and longstanding misinformation policies, were caused by, and are also legally attributable to, the Government. As explained above, multiple courts have already found that facts similar to those alleged by the States here do not show that those moderation measures are caused by any Government actor. *See supra* at 4-6. As noted, the forthcoming Rule 12(b) motion will

---

media company conduct occurred in 2022, the States have not shown (rather than speculated) that the more recent conduct is likely to recur, such that the resulting harm would be irreparable if not explored through expedited discovery in *this* action. *See* Gulmire Decl. ¶ 18 (March 2022 Facebook conduct); Kulldorff Decl. ¶ 26 (January 2022 LinkedIn conduct); Kay Decl.¶¶ 26-27 (May 2022 temporary Twitter suspension); Allen Decl. (Dkt. 10-8) ¶ 15 (March 2022 YouTube conduct as to NewsTalkSTL channel); Flesch Decl. ¶ 8 & n.2 (apparently describing same March 2022 YouTube conduct as Allen Decl. ¶ 15); *see also* Kotzin Decl. ¶ 15 (March 2022 Twitter conduct); *id.* ¶¶ 17, 19 (April 2022 Twitter conduct after PI motion in declarant's prior suit).

explain why the States have likewise failed to show that any content moderation measures that social media platforms may take against the States' residents would be caused by any Defendant, much less that there is an "imminent" risk that they will be injured by any such action in the future.

Compounding the error, although the States allege that they will suffer certain irreparable harms if the Court does not issue *preliminary relief*, they do not establish a type of irreparable harm typically necessary for *expedited discovery*. None of their submissions show that, for example, if discovery is not expedited, relevant evidence may "be lost or destroyed with time." *Cf. Soileau*, 2020 WL 9078308, at *3. And, of course, this action seeks injunctive relief against Government officials and agencies; it does not involve assertion of a right to money or assets that could become unrecoverable absent expedited discovery and judicial monitoring. *See* Compl., at 83.

Although the States assert they want discovery to support their preliminary injunction motion, they fail to show that the discovery they seek is "*necessary*" for them to litigate that motion. *GHX Indus. LLC*, 2020 WL 1492920, at *2 (emphasis added). The States have already moved for a preliminary injunction without the aid of expedited discovery, and in their motion they state that they believe the evidence they have already submitted is sufficient. The States cannot obtain expedited discovery by speculating that they might happen upon evidence that is relevant to their claims; if "that reason alone" could "constitute good cause," then "expedited discovery would be the norm instead of the exception, and there would be no substantive purpose for Federal Rule 26(d)(1)." *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 242 (S.D. Tex. 2011).

The States also contend that expedited discovery is necessary for the Court to fashion relief. *See* Pls.' Mot. at 8-9. In particular, the States argue that discovery could reveal the precise Federal

Government officials that have had relevant communications with social media companies and who would thus be subject to a potential preliminary injunction. *See id.* The scope of relief, of course, is relevant only if the States prevail on their preliminary injunction motion, despite the obvious jurisdictional flaws described above. Accordingly, the States fail to "show that [they will be] subject to irreparable harm or that" there is some "other pressing need for the discovery [they] seek[]." *Wilson*, 2014 WL 2949457 at * 3-4.

*Second*, and in contrast to the absence of any imminent threat of harm to the States, expedited discovery would impose a certain, undue burden on Defendants. The States seek discovery, apparently from each Defendant, over "the identities of federal officials who have been and are communicating with social-media platforms about" misinformation and actions taken against certain content "on social media, and . . . the nature and content of those communications." ECF No. 17 (Discovery Motion) at 2. The States thus intend to ask all Defendants—multiple Executive Branch officials and agencies—to conduct a search to identify *any* "federal official" that they may be aware of that has had relevant communications with social media platforms, determine the modes of those communications, and pull copies of all of those communications— all within fourteen days. Defendants would have to provide this information through interrogatory responses, which would require each Defendant to conduct an internal search that could include discussions with multiple agency officials, including senior officials. Defendants would also have to produce documents, which would likewise require a number of steps, each of which could consume significant resources. This process would be costly and could take a significant amount of time, particularly in light of the extraordinary breadth of the States' discovery requests.

Moreover, the States' motion here is especially problematic because it appears to seek an order authorizing discovery from the White House, thus forcing the "[j]udiciary . . . into the

difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives," pushing "to the fore difficult questions of separation of powers and checks and balances" and setting "coequal branches of the Government . . . on a collision course." *Cheney v. United States Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 385, 389-90 (2004). As the Supreme Court noted, "[t]hese occasions for constitutional confrontation between the two branches should be avoided whenever possible." *Id.* Such a confrontation is particularly unwarranted here, where Defendants will soon be filing a motion to dismiss demonstrating that the Court lacks jurisdiction and where the States have not established that they will establish any irreparable harm absent expedited discovery.

## CONCLUSION

For all of the above reasons—because the Court must assure itself of its jurisdiction before proceeding further, the States are not entitled to extra-record discovery, there is no irreparable harm or other pressing need warranting expedited discovery, and expedited discovery would impose an unwarranted burden on Defendants—the Court should deny the States' Motion for Expedited Discovery.


Dated:  July 1, 2022                    Respectfully submitted,

                                         BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ERIC WOMACK
Assistant Director, Federal Programs Branch

*/s/ Kuntal Cholera*

KYLA SNOW
INDRANEEL SUR
KUNTAL CHOLERA
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch

1100 L. Street, NW
Washington D.C. 20005
Kyla.Snow@usdoj.gov
Indraneel.Sur@usdoj.gov
Kuntal.Cholera@usdoj.gov

*Attorneys for Defendants*