**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| The State of Missouri and the State of Louisiana, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 22-cv-1213 |
| President Joseph R. Biden, Jr., in his official capacity as President of the United States of America, | |
| *et. al.,* | |
| *Defendants*. | |

**<u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

BACKGROUND ....................................................................................................... 4

I.  For years, social media companies have sought to contain content on their platforms that they identify as "misinformation." ..................................................................... 4

II.  Various executive branch officials under multiple administrations have spoken about the harmful effects of misinformation and sought to promote accurate information. ............. 7

III.  Officials from both political parties have explored potential reforms to § 230(c). .......... 14

IV.  The present action. ........................................................................................... 15

LEGAL STANDARD ................................................................................................ 18

ARGUMENT ........................................................................................................... 19

I.  The Court lacks subject-matter jurisdiction over the States' claims ............................... 19

    A.  The States lack Article III standing to bring any of their claims. ......................... 19

        i.  The States do not identify an injury that satisfies Article III. .................. 21

        ii.  The States cannot show any injury that is traceable to the conduct of Defendants, as opposed to third-party social media companies not before this Court ................................................................................... 32

        iii.  The States' alleged injuries are not redressable by any relief they seek... 41

    B.  The States do not identify a waiver of sovereign immunity for any of their claims against the HHS and DHS Defendants. ............................................................ 44

        i.  All claims against the HHS and DHS Defendants must be dismissed because the States do not identify any "discrete agency action" that would waive sovereign immunity. ..................................................................... 46

        ii.  The APA claims against HHS and DHS should be dismissed because the States do not identify a "final agency action." ......................................... 49

II.  The States' claims all fail on the merits. ................................................................. 50

    A.  The States fail to state a plausible First Amendment claim against any of the Defendants. ..................................................................................................... 50

        i.  The States fail to make a plausible allegation of coercion or a similar degree of encouragement. ..................................................................... 52

i

ii.  The States fail to allege that any Defendant specifically directed any social media company to take any specific action against a post by any resident of a Plaintiff State. ..................................................................................... 56

B.  The States fail to state plausible "*ultra vires*" claims. .......................................... 60

C.  The States fail to state plausible APA claims against HHS or DHS. .................. 61

III.  The separation of powers doctrine independently requires dismissal of the President from this action. ................................................................................................................... 63

CONCLUSION ............................................................................................................................. 65

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Action for Children's Television v. FCC,*
    59 F.3d 1249 (D.C. Cir. 1995) ........................................................................... 32

*Alabama-Coushatta Tribe of Texas v. United States,*
    757 F.3d 484 (5th Cir. 2014) ..................................................................... *passim*

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982) ........................................................................ 21, 22, 25, 29

*Allen v. Wright,*
    468 U.S. 737 (1984) ................................................................................... 20, 48

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
    526 U.S. 40 (1999) ............................................................................................ 52

*Arizona v. Biden,*
    31 F.4th 469 (6th Cir. 2022) ............................................................................. 24

*Armstrong v. Exceptional Child Ctr., Inc.,*
    135 S. Ct. 1378 (2015) ...................................................................................... 63

*ASARCO Inc. v. Kadish,*
    490 U.S. 605 (1989) ..................................................................................... 32, 41

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..................................................................................... 18, 62

*Ass'n of Am. Physicians & Surgeons v. Schiff,*
    518 F. Supp. 3d 505 (D.D.C. 2021) ........................................................... *passim*

*Ass'n of Am. Physicians & Surgeons v. Schiff,*
    23 F.4th 1028 (D.C. Cir. 2022) ........................................................ 33, 34, 35, 38

*Atkinson v. Meta Platforms, Inc.,*
    No. 20-17489, 2021 WL 5447022 (9th Cir. Nov. 22, 2021) ............................. 35

*Barnes v. Lehman,*
    861 F.2d 1383 (5th Cir. 1988) ............................................................. 51, 52, 56

*Batterton v. Marshall,*
    648 F.2d 694 (D.C. Cir. 1980) .......................................................................... 62

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth,*
    529 U. S. 217 (2000) ......................................................................................... 55

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................................................... 18, 35

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................................ 49

*Biden v. Knight First Amend. Inst.*,
  141 S. Ct. 1220 (2021) (mem.) ................................................................ 31, 32

*Blum v. Yaretsky*,
  457 U.S. 991 (1982) ................................................................................ *passim*

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) .......................................................................................... 32

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988) ........................................................................................ 62

*Brackeen v. Haaland*,
  994 F.3d 249 (5th Cir. 2021) (en banc) .................................................. 21, 22

*California v. Texas*
  141 S. Ct. 2104 (2021) .................................................................................... 41

*Cambranis v. Blinken*,
  994 F.3d 457 (5th Cir. 2021) .......................................................................... 46

*Car Carriers, Inc. v. Ford Motor Co.*,
  745 F.2d 1101 (7th Cir. 1984) .................................................................. 28, 29

*Changizi v. Dep't of Health & Human Servs.*,
  --- F. Supp. 3d ---, No. 2:22-cv-1776, 2022 WL 1423176 (S.D. Ohio May 5, 2022), *appeal
  docketed*, No. 22-3573 (6th Cir. June 30, 2022)............................................ *passim*

*Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*,
  333 U.S. 103 (1948) ........................................................................................ 64

*Children's Health Defense v. Facebook Inc.*,
  546 F. Supp. 3d 909 (N.D. Cal. 2021) .......................................... 40, 51, 59, 60

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ........................................................................................ 62

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) .................................................................................... 19, 25

*City of New York v. U.S. Dep't of Defense*,
  913 F.3d 423 (4th Cir. 2019) ...................................................................... 47, 48

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ................................................................................ *passim*

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1866) ...................................................................... 63, 64

*Ctr. for Democracy & Tech. v. Trump*,
  507 F. Supp. 3d 213 (D.D.C. 2020) ....................................................... 64

*Dalton v. Specter*,
  511 U.S. 462 (1994) ........................................................................... 64

*Danos v. Jones*,
  652 F.3d 577 (5th Cir. 2011) ............................................................... 61

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008) ........................................................................... 32

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*,
  827 F.2d 1291 (9th Cir. 1987) ............................................................. 39

*Divino Grp. LLC v. Google LLC*,
  No. 19-cv-04749, 2021 WL 51715 (N.D. Cal. Jan. 6, 2021) ................. 51

*Estiverne v. Louisiana State Bar Ass'n*,
  863 F.2d 371 (5th Cir. 1989) ............................................................... 30

*Foley v. Biden*,
  No. 4:21-cv-01098, 2021 WL 7708477 (N.D. Tex. Oct. 6, 2021) ......... 64

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ...................................................................... 63, 64

*Geyen v. Marsh*,
  775 F.2d 1303 (5th Cir. 1985) ............................................................. 60

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ........................................................................ 28

*Glass v. Paxton*,
  900 F.3d 233 (5th Cir. 2018) ............................................................... 44

*Glenewinkel v. Carvajal,*
  No. 3:20-CV-2256-B, 2022 WL 179599 (N.D. Tex. Jan. 20, 2022) ...... 47

*Gov't of Manitoba v. Bernhardt*,
  923 F.3d 173 (D.C. Cir. 2019) ................................................. 22, 23, 24

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999) ........................................................................... 63

*Harrison v. Jefferson Parish Sch. Bd.*,
  No. 20-2916, 2022 WL 539277 (E.D. La. Feb. 23, 2022), *appeal docketed*, No. 22-30143 (5th Cir. Mar. 24, 2022) ............................................................................. 29

*Hart v. Facebook*,
  No. 22-cv-00737, 2022 WL 1427507 (N.D. Cal. May 5, 2022) .................................. *passim*

*Hartford-Empire Co. v. United States*,
    323 U.S. 386 (1945) ........................................................................... 44

*Hotze v. Burwell*,
    784 F.3d 984 (5th Cir. 2015) .............................................................. 28

*Huber v. Biden*,
    No. 21-CV-06580-EMC, 2022 WL 827248 (N.D. Cal. Mar. 18, 2022), *appeal docketed*, No.
    22-15443 (9th Cir. Mar. 25, 2022) ................................................. 34, 36, 42, 51

*Jackson v. Metro. Edison Co.*,
    419 U.S. 345 (1974) ........................................................................... 52

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ........................................................................... 21

*Lance v. Coffman*,
    549 U.S. 437 (2007) ........................................................................... 28

*Lane v. Pena*,
    518 U.S. 187 (1996) ........................................................................... 44

*Lewis v. Clarke*,
    137 S. Ct. 1285 (2017) ....................................................................... 44

*Lloyd Corp. v. Tanner*,
    407 U.S. 551 (1972) ........................................................................... 50

*Louisiana Division Sons of Confederate Veterans v. City of Natchitoches*,
    821 F. App'x 317 (5th Cir. 2020) ....................................................... 53

*Luv n' care, Ltd. v. Jackel Int'l Ltd.*,
    502 F. Supp. 3d 1106 (W.D. La. 2020) ............................................. 4, 19

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...................................................................... *passim*

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ........................................................................... 46

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019) ....................................................................... 50

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ..................................................................... 22, 23, 26

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ..................................................................... 21, 22, 26

*Mayo v. United States*,
    319 U.S. 441 (1943) ........................................................................... 27

*McCormack v. Nat'l Collegiate Athletic Ass'n,*
    845 F.2d 1338 (5th Cir. 1988) ........................................................ 52

*Md. People's Counsel v. FERC,*
    760 F.2d 318 (D.C. Cir. 1985) ........................................................ 24

*Michigan v. EPA,*
    581 F.3d 524 (7th Cir. 2009) ......................................................... 24

*Nat'l Collegiate Athletic Ass'n v. Tarkanian,*
    488 U.S. 179 (1988) ...................................................................... 50

*Nat'l Endowment for the Arts v. Finley,*
    524 U.S. 569 (1998) ................................................................. 1, 55

*Nat'l Res. Def. Council v. Pena,*
    147 F.3d 1012 (D.C. Cir. 1998) ...................................................... 43

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) ...................................................... 64

*Newman v. Google LLC,*
    No. 20-cv-04011, 2021 WL 2633423 (N.D. Cal. June 25, 2021) ......... 51

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) .................................................................. 46, 48

*Ohio v. Thomas,*
    173 U.S. 276 (1899) ...................................................................... 27

*O'Shea v. Littleton,*
    414 U.S. 488 (1973) ...................................................................... 19

*Pelican Ch., Associated Builders & Contractors, Inc. v. Edwards,*
    128 F.3d 910 (5th Cir. 1997) ......................................................... 33

*Pennhurst State Sch. & Hosp. v. Halderman,*
    465 U.S. 89 (1984) .................................................................. 60, 61

*Pennsylvania, by Shapp v. Kleppe,*
    533 F.2d 668 (D.C. Cir. 1976) ........................................................ 25

*Peoples Nat'l Bank v. Off. of the Comptroller of the Currency of the U.S.,*
    362 F.3d 333 (5th Cir. 2004) ......................................................... 49

*Pleasant Grove City v. Summum,*
    555 U.S. 460 (2009) ................................................................. 1, 55

*Prager Univ. v. Google LLC,*
    951 F.3d 991 (9th Cir. 2020) ......................................................... 51

*Raines v. Byrd*,
    521 U.S. 811 (1997) ..................................................................... 31

*Randall D. Wolcott, M.D., P.A. v. Sebelius*,
    635 F.3d 757 (5th Cir. 2011) .................................................... 19

*Renal Physicians Ass'n v. HHS*,
    489 F.3d 1267 (D.C. Cir. 2007) ............................................... 41

*Rendell-Baker v. Kohn*,
    457 U.S. 830 (1982) ............................................................. 50, 59

*Rochester Tel. Corp. v. United States*,
    307 U.S. 125 (1939) .................................................................. 49

*Schlesinger v. Reservists Comm. to Stop the War*,
    418 U.S. 208 (1974) ............................................................. 27, 28

*Sheehan v. Army & Air Force Exch. Serv.*,
    619 F.2d 1132 (5th Cir. 1980), *rev'd on other grounds,* 456 U.S. 728 (1982) .................... 45

*Shurtleff v. City of Boston*,
    142 S. Ct. 1583 (2022) ......................................................... 43, 55

*Sierra Club v. Peterson*,
    228 F.3d 559 (5th Cir. 2000) (en banc) ..................................... *passim*

*Skinner v. Gautreaux*,
    549 F. Supp. 3d 493 (M.D. La. 2021) ................................... 21, 28

*Smith v. Booth*,
    823 F.2d 94 (5th Cir. 1987) ...................................................... 45

*Soc'y of Separationists, Inc. v. Herman*,
    959 F.2d 1283 (5th Cir. 1992) .................................................. 19

*South Carolina v. Katzenbach*,
    383 U.S. 310 (1966) .................................................................. 21

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ............................................................. 19, 26

*St. Tammany Par., ex rel. Davis v. FEMA*,
    556 F.3d 307 (5th Cir. 2009) ................................................... 44

*Staten v. Harrison Cnty., Mississippi*,
    No. 1:19-CV-560-KS-RHW, 2020 WL 1644991 (S.D. Miss. Apr. 2, 2020) ..................... 18

*Staten v. Harrison Cnty.*,
    No. 20-60329, 2021 WL 5766576 (5th Cir. Dec. 3, 2021) ................ 18

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ........................................................................................... 18

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ......................................................................................... 19

*Susan B. Anthony List v. Driehaus,*
    134 S. Ct. 2334 (2014) ..................................................................................... 20

*Taylor-Callahan-Coleman Ctys. Dist. Adult Prob. Dep't v. Dole,*
    948 F.2d 953 (5th Cir. 1991) ...................................................................... 45, 46

*Tenet v. Doe,*
    544 U.S. 1 (2005) ....................................................................................... 64, 65

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) ........................................................................... 49

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ........................................................................... 26

*Totten v. United States,*
    92 U.S. 105 (1876) .......................................................................................... 65

*Transunion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) ............................................................................... 19, 32

*Trump v. Twitter Inc.,*
    --- F. Supp. 3d ---, 2022 WL 1443233, at *6 (N.D. Cal. May 6, 2022), *appeal docketed*, No.
    22-15961 (9th Cir. June 28, 2022)....................................................... 39, 40, 51

*United States v. Mitchell,*
    463 U.S. 206 (1983) ........................................................................................ 44

*United States v. Or. State Med. Soc'y,*
    343 U.S. 326 (1952) ........................................................................................ 44

*Utah Div. of Consumer Prot. v. Stevens,*
    398 F. Supp. 3d 1139 (D. Utah 2019) ............................................................ 24

*Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.,*
    454 U.S. 464 (1982) ............................................................................. 22, 23, 27

*Virginia ex rel. Cuccinelli v. Sebelius,*
    656 F.3d 253 (4th Cir. 2011) ............................................................. 21, 22, 26, 27

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
    576 U.S. 200 (2015) ........................................................................................ 55

*Walmart Inc. v. U.S. Dep't of Justice,*
    517 F. Supp. 3d 637 (E.D. Tex. 2021), *aff'd* 21 F.4th 300 (5th Cir. 2021) .......................... 47

*Warth v. Seldin,*
    422 U.S. 490 (1975) ........................................................................ 22, 31

*West v. Atkins,*
    487 U.S. 42 (1988) ................................................................. 51, 52, 56

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ........................................................................ 20, 27

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) .............................................................................. 64

**United States Code**

5 U.S.C. § 702 ................................................................................... 45, 60

5 U.S.C. § 706 ................................................................................... 61, 62

28 U.S.C. § 1331 ..................................................................................... 45

Act of Oct. 21, 1976,
    Pub. L. No. 94-574, 90 Stat. 2721, codified at 5 U.S.C. § 702 ............................................. 14

Communications Decency Act of 1996,
    Pub. L. No. 104-104, § 509, codified at 47 U.S.C. § 230(c) .................................................. 14

**Rules**

Federal Rule of Civil Procedure 25 ......................................................... 16, 17

Federal Rules of Civil Procedure 12 ............................................................ 18

**Regulations**

Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID–19 Pandemic Request for Information,
    87 Fed. Reg. 12,712 (Mar. 7, 2022) ................................................... 12, 13

Preventing Online Censorship, § 1,
    85 Fed. Reg. 34,079 (published June 2, 2020), rescinded by Executive Order 14,029 of May 14, 2021 (Revocation of Certain Presidential Actions and Technical Amendment), § 1, 86 Fed. Reg. 27,025 (published May 19, 2021) .................................................. 12, 13

**INTRODUCTION**

For years, social media companies have taken independent steps to slow the spread of content that they find misleading or harmful, not only here in the United States but across the globe. Long before this Administration took office, those companies began adopting strategies to limit the spread of such content—often called "misinformation"—on their platforms. Meanwhile, government officials have engaged in a broader debate over the rising influence of social media platforms. As part of that debate, policymakers across the political spectrum have expressed support for legislative reforms impacting social media companies, often citing those companies' efforts to address misinformation as the basis for such reforms. Although this debate is a common one in politics—Justice Scalia called it "the very business of government to favor and disfavor points of view on . . . innumerable subjects"[1]—the States contend that the views expressed by Defendants on these subjects are somehow exceptional and render them responsible for the content moderation choices of all social media platforms. The States thus assert a number of claims, including claims under the First Amendment, in an attempt to secure an injunction that would, ironically, serve as a judicial gag order to prevent the Executive Branch from expressing its views on these matters of important public concern.

The States' key allegations, however, are not new, let alone the type that would warrant the extraordinary relief they seek. To the contrary, the Plaintiff States bring claims virtually identical to those brought by individual users of social media platforms in courts around the country. Those individuals likewise claimed that the federal government was responsible for the independent decisions of social media platforms to take content moderation measures against the

---

[1] *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J. concurring), *quoted at Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009).

individual users' posts. But every court to have considered those claims, including the D.C. Circuit, has dismissed them for lack of subject-matter jurisdiction and failure to state a claim.

Missouri and Louisiana now try again, repackaging those individuals' claims into their own Complaint in this action. But their allegations suffer from the same deficiencies that doomed the earlier suits. And the States inject a new deficiency: They improperly purport to enforce, against the federal government, the rights of their residents under the First Amendment of the Federal Constitution, contrary to binding Supreme Court precedent. This Court should dismiss the States' Complaint for multiple reasons.

As a threshold matter, the States cannot satisfy any of the Article III standing requirements. *First*, they cannot establish an injury that is cognizable under Article III. The Complaint relies on alleged content moderation measures that the social media companies imposed on certain unnamed citizens residing in the States (and elsewhere), but the Supreme Court has made clear that States cannot sue the federal government to enforce the individual rights of their citizens. *Second*, the States have not sufficiently alleged that the asserted injuries stemming from the actions of the identified social media companies were caused by any Defendant as opposed to the independent judgments of those companies under their terms of service with users. Those companies independently chose to combat misinformation years ago, before this Administration took office, and before the federal officials sued here made the comments at issue. Indeed, although the Complaint cites numerous statements by government officials, it does not identify how those statements are connected to the moderation decisions that purportedly harmed their residents. *Third*, there is no reason to conclude the relief the States seek here—including a sweeping and unprecedented injunction that would operate as a gag order on federal officials—would force the social media companies to abandon their policies against misinformation, which after all are

embodied in the terms of service to which users of those companies' platforms have contractually agreed.

Even if the States could somehow remedy these jurisdictional deficiencies, their case would fail on an independent jurisdictional ground. The Complaint's wholesale attack on a broad range of disparate government speech on matters of public concern does not challenge a discrete agency action—much less a final one—that would trigger the applicable waiver of sovereign immunity to sue the federal government. Instead, the States' generalized grievance over the manner in which the government has expressed its policy concerns is precisely the type of suit that the Administrative Procedure Act's (APA) waiver of sovereign immunity does not encompass.

In any event, the States' claims fail on their merits. Several critical flaws undermine their First Amendment claim. Because the alleged misconduct here hinges on content moderation measures by *private* social media companies, the States' First Amendment claim would require a showing that the federal government has coerced, or effectively coerced, those companies to adopt those precise measures. The States, however, fail to make any plausible allegation of such coercion. At most, the Complaint depicts public statements expressing the views of federal officials on public policy questions. The States' efforts to depict those statements as "threats" are implausible, given the absence of any allegation that federal officials announced they would impose any adverse consequences on any social media platforms that did not moderate any particular user-posted content. Nor does the Complaint make any nonconclusory allegation that any federal official called on a social media company to take a specific content moderation measure against any particular State resident. The States instead ask this Court to adopt a view of the First Amendment that would suggest that any comment critical of a social media company (or,

3

for that matter, any company) by the government could be used as the basis for a First Amendment claim to silence government actors of any administration. That would set a dangerous precedent.

The States' inclusion of APA and so-called *ultra vires* claims cannot save the Complaint from dismissal. The States make no effort to argue that the conduct at issue meets the demanding *ultra vires* standard. And the States' threadbare recitation of the elements of an APA claim, unsupported by nonconclusory factual allegations, is insufficient to state a plausible claim for relief. For these reasons, as explained more fully herein, Defendants respectfully request that this Court dismiss Plaintiffs' Complaint.

## BACKGROUND

I.   **For years, social media companies have sought to contain content on their platforms that they identify as "misinformation."[2]**

Social media companies, such as Facebook, Twitter, and YouTube, are private companies that allow users and advertisers to post content subject to terms of service and policies, including various policies directed to what has been termed "misinformation." *See* Compl. ¶¶ 83, 148, 208, ECF No. 1; *id.* ¶¶ 54-61.[3] For several years, these companies have been taking steps to prevent the

---

[2] In deciding a motion to dismiss, the Court may take judicial notice of undisputed facts in the public record. *Luv n' care, Ltd. v. Jackel Int'l Ltd.*, 502 F. Supp. 3d 1106, 1108 (W.D. La. 2020).
[3] For example, in response to congressional questions for a hearing to which the States refer, Compl. ¶ 120 (the House Subcommittee on Antitrust, Commercial, and Administrative Law's July 29, 2020 virtual hearing entitled "Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google"), Google, Inc., which owns YouTube, testified: "Google policies prohibit a range of misconduct by those who place content on our platforms, including dangerous or derogatory content; content that is illegal, promotes illegal activity, or infringes on the legal rights of others; and content that misrepresents the owner's origin or purpose. We, for instance, put significant effort into curbing misinformation in our products, including a policy against news content by foreign state-sponsored news organizations that conceal their affiliations with foreign governments." Sundar Pichai Responses to QFRs at A-34, https://perma.cc/C337-JRWX. In its response to congressional questions for that hearing, Facebook testified: "To track our progress and demonstrate our continued commitment to making Facebook safe and inclusive, we regularly release a Community Standards Enforcement Report, which includes metrics on how Facebook is performing in preventing and removing content that

spread of content on their platforms that they identify as "misinformation." *See id.* ¶ 122 (stating that social media companies began addressing misinformation on their platforms "around 2020, if not before"). Facebook, for example, began targeting "misinformation and false news" on its platform at least as far back as 2017. *See* Meta, *Working to Stop Misinformation and False News* (Apr. 7, 2017), at https://perma.cc/7BMR-7P7X. And in 2019, Twitter announced that it was "working on a new policy to address synthetic and manipulated media." @ TwitterSafety, Twitter, (Oct 21, 2019, 6:07 pm), https://twitter.com/TwitterSafety/status/1186403736995807232.

For some time, those efforts have focused on misinformation related to elections. Facebook has taken measures to stop the spread of "[f]alse news" used "by adversaries in recent elections and amid ethnic conflicts around the world"—and detailed its "Strategy for Stopping False News." Tessa Lyons, Product Manager, Meta, Hard Questions: What's Facebook's Strategy for Stopping False News? (May 23, 2018), https://perma.cc/9ESM-NWFE. In October 2019, the company announced that it was taking "several new measures to help protect the democratic process" in advance of the 2020 elections, including attempts to "[p]revent[] the spread of misinformation" through "clearer fact-checking labels." Guy Rosen, VP of Integrity, Meta, et al., Helping to Protect the 2020 US Elections (Oct. 21, 2019), https://perma.cc/CL5W-7MDQ.

In early 2020, with the onset of the COVID-19 pandemic, the platforms began addressing

---

violates our Community Standards, including fake accounts." Mark Zuckerberg Responses to QFRs at 2, https://perma.cc/86YC-YQ7Q; *see also* Securing U.S. Election Infrastructure, H. Oversight & Reform Subcomm. Hearing, 2019 WL 13187590 (May 22, 2019) (statement of Nathaniel Gleicher, Head of Cybersecurity Policy, Facebook); Russian Online Disinformation Tech Solutions: S. Jud. Comm., Subcomm. on Crime and Terrorism, 2017 WL 5006532 (Oct. 31, 2017) (statement of Sean J. Edgett, Acting General Counsel, Twitter, Inc.); Global Efforts to Defeat Isis: S. Comm. on Foreign Relations, 2016 WL 3523926 (June 28, 2016) (statement of Brett H. McGurk, Special Presidential Envoy); Countering Terrorist Internet Recruitment: S. Comm. on Homeland Security and Governmental Affairs, Subcomm. on Investigations, 2016 WL 3627191 (July 6, 2016) (statement of Sen. Rob Portman).

health misinformation about COVID-19. Facebook noted that, "[e]ver since COVID-19 was declared a global public health emergency in January [2020]," it has worked to "keep harmful misinformation about COVID-19 from spreading on" its platform. Guy Rosen, VP Integrity, Meta, (Apr. 16, 2020), https://perma.cc/XVM4-L6YG. Facebook explained that, "during the month of March [2020], [it] displayed warnings on about 40 million posts related to COVID-19," and that, up to April 2020, it had "removed hundreds of thousands of pieces of misinformation that could lead to imminent physical harm" including "theories like physical distancing is ineffective in preventing the disease from spreading." *Id.* In December 2020, Facebook announced that, in light of "recent news that COVID-19 vaccines will soon be rolling out," Facebook would "start removing false claims about these vaccines . . . on Facebook and Instagram," including "false claims about the safety, efficacy, ingredients or side effects of the vaccines." Kang-Xing Jin, Head of Health, Meta, Keeping People Safe and Informed About the Coronavirus, (Dec. 3, 2020), https://perma.cc/5Z4S-CEVU.

Twitter likewise stated that it "introduc[ed] . . . policies on March 18," 2020, to "address content that goes directly against guidance from authoritative sources of global and local public health information." Vijaya Gadde & Matt Derella, *An update on our continuity strategy during COVID-19* (Mar. 16, 2020; updated Apr. 1, 2020), https://perma.cc/2UAL-YXSH. Twitter explained that it would "require people to remove tweets that include," for example, the "[d]enial of global or local health authority recommendations to decrease someone's likelihood of exposure to COVID-19 with the intent to influence people into acting against recommended guidance." *Id*. The company reported that, within two weeks, it had "removed more than 1,100 tweets containing misleading and potentially harmful content" and "challenged more than 1.5 million accounts which were targeting discussions around COVID-19 with spammy or manipulative behaviors." *Id*. A few

months later, on December 16, 2020, Twitter noted that "vaccine misinformation" in particular "presents a significant and growing public health challenge," and that "[u]nder [its] current policy, [Twitter] already require[s] the removal of Tweets that include false or misleading information about," among other things, "[t]he efficacy and/or safety of preventative measures, treatments, or other precautions to mitigate or treat the disease" and "[t]he prevalence or risk of infection or death." Twitter Safety, COVID-19: Our approach to misleading vaccine information (Dec. 16, 2020), https://perma.cc/5F7C-LMGC. Twitter also stated that it planned to "expand[] [its] policy and may require people to remove Tweets which advance harmful false or misleading narratives about COVID-19 vaccinations," including "[f]alse claims that COVID-19 is not real or not serious, and therefore that vaccinations are unnecessary." *Id.*

YouTube has also been taking action against health misinformation since mid-2020, "prohibit[ing], for example, content that denies the existence of the coronavirus" and "content that explicitly disputes the efficacy of global or local health authority advice regarding social distancing." How has YouTube responded to the global COVID-19 crisis?, https://perma.cc/3DC2-G8YN (accessed June 29, 2022). YouTube further stated that, "[i]n October 2020, [it] expanded [its] COVID-19 medical misinformation policy to remove content about vaccines that contradicts consensus from health authorities." *Id.* Thus, since at least 2017, multiple social media companies independently began developing policies and initiatives to identify, and take action against, misinformation on their platforms.

## II.    Various executive branch officials under multiple administrations have spoken about the harmful effects of misinformation and sought to promote accurate information.

According to the States' own factual allegations, the sources the Complaint relies on, and other sources of which the Court may take judicial notice, various government officials, in both the last Administration and the current one, have tried to persuade social media companies to

address concerns with misinformation on their platforms. Through both Administrations, those government officials have simply done what government officials always do: express their views on policy matters. The present Complaint focuses on speech on policy matters by the Departments of Homeland Security (DHS) and Health and Human Services (HHS), and various components and officials at each agency, as well as the White House Press Secretary, as summarized below.

*DHS.* The Complaint alleges that, for several years, and beginning under the Trump Administration, officials at DHS have corresponded with social media firms and other sectors of society to address "election-related 'misinformation.'" Compl. ¶¶ 179-80. As one example, in 2017, DHS began efforts with both public and private entities to help mitigate threats to the Nation's election systems in light of the "U.S. intelligence community determination that Russia sought to interfere in the 2016 presidential elections." Election Infrastructure Subsector-Specific Plan, CISA (2020), https://perma.cc/9234-DNXZ ("Subsector-Specific Plan"); *see also* Compl. ¶ 215 (citing Subsector-Specific Plan). In the lead-up to the 2020 general election cycle, DHS officials met with tech companies and held "back-and-forth conversations on a variety of topics." Compl. ¶¶ 181-82. In May 2021, a news article reported that DHS was "consider[ing]" "partnering with research firms" to gather information about "extremist groups" "on social media sites" "that could help DHS identify key narratives [used by the groups] as they emerge." *Biden team may partner with private firms to monitor extremist chatter online*, CNN (May 3, 2021), https://perma.cc/L958-G8BQ; Compl. ¶ 200 (referencing article).

DHS's Cybersecurity and Infrastructure Security Agency (CISA), established through its predecessor in 2018, "maintains a number of task forces, working groups, and similar organizations" dedicated to addressing concerns with what the agency defines as

"misinformation," "disinformation," or "malinformation." Compl. ¶¶ 214-21.[4] In 2021, a CISA task force's "mission evolved to reflect the changing information environment." *Id.* ¶ 219 (quoting CISA, *Mis, Dis, Malinformation*, https://perma.cc/2DXP-92ZF ("MDM Bulletin")). The agency's Mis-, Dis-, and Malinformation (MDM) team has published bulletins, guides, and toolkits addressing misinformation related to elections and COVID-19. *Id.* ¶¶ 214-21 (discussing two such guides). Since 2018, the MDM team has "rout[ed] disinformation concerns to appropriate social media platforms." *Id.* ¶ 220; *see also* MDM Bulletin. In 2020, the team "expanded the breadth of reporting" to include "more social media platforms." Compl. ¶ 220.

In August 2021, the Secretary of Homeland Security, Alejandro Mayorkas, stated in a media interview that DHS had advised social media companies about "how they can better use their [T]erms of [U]se to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring." *Id.* ¶ 205. In April 2022, Secretary Mayorkas announced that DHS was creating a "Disinformation Governance Board." *Id.* ¶ 222. According to a news report, the board was "designed to counter misinformation related to homeland security, with a focus specifically on Russia and irregular migration." *Id.*

Although the Complaint generally criticizes the Disinformation Governance Board, it does not allege that the Board was ever fully constituted or took any action whatsoever. And the Complaint contains no nonconclusory allegation that DHS has ever directed a social media company to take any action as to misinformation on the company's platform or otherwise made a "threat" of regulatory action.

---

[4] For the sake of brevity, and because the distinctions between these terms is immaterial to the factual allegations, Defendants use the term "misinformation" to include "disinformation" and "malinformation" as well.

*HHS.* According to the Complaint, HHS and its officials have spoken about misinformation relating to COVID-19 since the onset of the pandemic under the Trump Administration. In particular, in early 2020, the director of the National Institute of Allergy and Infectious Diseases (NIAID) at the U.S. National Institutes of Health (a component of HHS), Dr. Anthony Fauci, corresponded with Facebook to promote an informational video about COVID-19. Compl. ¶¶ 136-46. In March 2020, Facebook allegedly "invited Fauci to make public statements to be posted for viewing by all Facebook users regarding COVID-19" and also "proposed [that the parties] coordinate" to "make sure people can get authoritative information from reliable sources," which would include "a video message from Fauci." *Id.* ¶¶ 140-41.

Facebook has allegedly adopted a policy that "does not allow false claims about the vaccines or vaccination programs which public health experts have advised . . . could lead to COVID-19 vaccine rejection." *Id.* ¶ 148 (emphasis removed). The Complaint alleges, "[o]n information and belief," that Dr. "Fauci and CDC officials are included among those 'public health experts' who 'advise[]' Facebook." *Id.* The Complaint further alleges that, "[o]n information and belief," Dr. Fauci "coordinated" with social media platforms over how they should deal with content concerning the "lab-leak theory" on the origins of COVID-19. *Id.* ¶¶ 72-76, 139-44. The Complaint, however, contains no nonconclusory allegations concerning what that "coordination" included. Dr. Fauci is not alleged to have threatened any regulatory action against those companies if they failed to take steps to prevent misinformation.

Later, in July 2021, the Surgeon General issued an advisory discussing the role of misinformation in the pandemic, and offering various audiences—including "individuals," "educational institutions," "health organizations," and "governments"—"recommendations" to address misinformation. Confronting Health Misinformation: The U.S. Surgeon General's

Advisory on Building a Healthy Information Environment, at 3 (July 15, 2021), https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf ("Advisory"); *see also* Compl. ¶¶ 161-62 (discussing Advisory). On the single page addressing "technology platforms," the Advisory proposed a number of general strategies. For example, the Advisory noted that technology platforms may counter misinformation by "[d]irect[ing] users to a broader range of credible sources," or "build 'frictions' . . . to reduce the sharing of misinformation," which may include "suggestions and warnings" on certain posts. Advisory at 12.

The Advisory explicitly noted that "[d]efining 'misinformation' is a challenging task," and that there is no "consensus definition of misinformation." *Id.* at 17; *see also id.* at 4 ("any definition" of "misinformation will have "limitations"). It also cautioned against imposing an overly stringent definition of "misinformation," noting that "it is important to be careful and avoid conflating controversial or unorthodox claims with misinformation," because "[t]ransparency, humility, and a commitment to open scientific inquiry are critical." *Id.* at 17. The Advisory encouraged social media companies to consider "potential unintended consequences of content moderation, such as migration of users to less-moderated platforms." *Id.* at 12. It stressed that, in considering "[w]hat kinds of measures" they may "adopt to address misinformation," social media companies should consider the importance of "safeguarding . . . free expression." *Id.* at 7. The Advisory did not purport to impose any obligations on social media companies, nor to displace their discretion to decide whether any particular post contains misinformation, and if so, what remedial action may be proper.

In early March 2022, the Surgeon General also issued a public request for information concerning "the impact and prevalence of health misinformation in the digital information environment during the COVID-19 pandemic." Impact of Health Misinformation in the Digital

Information Environment in the United States Throughout the COVID–19 Pandemic Request for Information, 87 Fed. Reg. 12,712 (Mar. 7, 2022) ("RFI"); *see also* Compl. ¶¶ 173-74 (discussing the RFI). The RFI sought multiple categories of information, including "[i]nformation about how . . . misinformation has affected quality of patient care." RFI at 12,713-14. The RFI also sought information on "how widespread COVID-19 misinformation is on individual technology platforms." *Id.* 12,713. The RFI provided that those who intend to provide responsive information had to do so by May 2, 2022. *See id.* Like the Advisory, the RFI imposed no requirement on any party; responses were voluntary, and the RFI does not penalize those who choose not to respond.

*The White House.* The Complaint also references instances in which the White House, through the Press Secretary, has expressed concerns about misinformation on social media platforms, especially as relates to COVID-19 and elections. For example, in May 2021, the Press Secretary shared "[t]he President's view . . . that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, misinformation, especially related to COVID-19, vaccinations, and elections." White House, Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack, https://www.whitehouse.gov/briefing-room/pressbriefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculturetom-vilsack-may-5-2021/ (May 5, 2021) ("5-5 Press Briefing"); Compl. ¶¶ 151-52 (discussing 5-5 Press Briefing). The Press Secretary, however, stressed that it was ultimately up to "the social media platforms" to make "decisions" about "how they address the disinformation, misinformation—especially related to life-threatening issues like COVID-19 and vaccinations that are—continue to proliferate on their platforms." 5-5 Press Briefing. During that same press briefing, the Press Secretary stated, in passing, that the President "also supports better privacy protections and a robust anti-trust program." *Id.* The Press Secretary

provided no further detail on that comment, nor did she state that any government official would take any particular action, antitrust or otherwise, if social media companies did not take additional actions against misinformation.

Later, in July 2021, the Press Secretary stated that certain government officials are "in regular touch with social media platforms . . . about areas where [the Administration has] concern" and that the discussions are aimed at "better understand[ing] the enforcement of social media platform policies." Press Briefing by Press Secretary Jen Psaki, https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021 (July 16, 2021) ("7-16 Press Briefing"); *see also* Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy, https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021 (July 15, 2021) ("7-15 Press Briefing"); Compl. ¶¶ 158-60, 166-67 (discussing both Press Briefings). The Press Secretary indicated that certain government officials have "flagged," for Facebook, certain posts that those officials believed contain misinformation. *See* 7-15 Press Briefing. The Press Secretary stressed, however, that social media companies were ultimately free to decide whether and how to combat misinformation on their platforms. *See* 7-16 Press Briefing ("Facebook and any private-sector company" ultimately "makes decisions about what information should be on their platform."); *see also id.* at 7 ("They're . . . private-sector compan[ies]. They're going to make decisions about additional steps they can take."). Again, the Complaint contains no allegation indicating that any White House official has expressed, to any social media platform, that the government would take any enforcement action against that platform if it did not take additional actions against misinformation.

### III.    Officials from both political parties have explored potential reforms to § 230(c).

Section 230(c) of the Communications Decency Act of 1996 ("CDA") (Pub. L. No. 104-104, § 509, codified at 47 U.S.C. § 230(c)) immunizes for certain liability purposes an "interactive computer service" provider (*e.g.*, a social media company) from being treated as the publisher or speaker of content created by third parties and hosted by the service, *see* 47 U.S.C. § 230(c)(1), or for removing or restricting access to certain types of offensive material, *see id.* § 230(c)(2). In enacting § 230(c), Congress made findings describing online platforms as offering "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." *Id.* § 230(a)(3). Accordingly, "the policy of the United States" is "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." *Id.* § 230(b)(2).

The Complaint alleges that various officials affiliated with the Democratic Party, in Congress and in current Executive Branch service, have urged limitations on § 230(c). Compl. ¶¶ 116-32. The Complaint does not explain, however, that similar limitations have been urged by members of both political parties. For example, in June 2020, President Trump underscored his previous concerns about perceived misuse of § 230(c), issuing an executive order directing "all executive departments and agencies" to "ensure that their application of section 230(c)" is "narrow." Executive Order 13925 of May 28, 2020, Preventing Online Censorship, § 1, 85 Fed. Reg. 34,079, 34,079 (published June 2, 2020), rescinded by Executive Order 14,029 of May 14, 2021 (Revocation of Certain Presidential Actions and Technical Amendment), § 1, 86 Fed. Reg. 27,025 (published May 19, 2021).

Republican lawmakers have also expressed concerns over § 230(c), with several

introducing legislation that would amend it.[5] More recent proposed amendments include those by Republican Senators, such as the Don't Push My Buttons Act, S. 2335, 117th Cong. (2021) (proposed legislation sponsored by Senator John Kennedy that would remove the liability protection in § 230 for a platform that collects certain information), and a bill that would repeal § 230 altogether, *see* S. 2972, 117th Cong. (2021) (sponsored by Senator Lindsey Graham).[6]

As the Complaint alleges, President Biden has also participated in the public debate over § 230. The Press Secretary stated that the President has "been concerned about the power of large social media platforms . . . [and] has long argued that tech platforms must be held accountable for the harms they cause" and that the President "has been a strong supporter of fundamental reforms to achieve that goal, including reforms to [§] 230, enacting antitrust reforms, requiring more transparency, and more." Compl. ¶ 227. The Press Secretary noted that the President was "encouraged that there's bipartisan interest in Congress" to reform § 230. *Id.*

## IV.    The present action.

Missouri and Louisiana commenced this action on May 5, 2022, challenging the content moderation measures taken by "social-media platforms," Compl. ¶ 6—including but not limited

---

[5] *Compare* Ending Support for Internet Censorship Act, S. 1914, 116th Cong. (2019) (proposed legislation sponsored by Senator Josh Hawley before 2020 Executive Order issued that would amend § 230 to "encourage" online platforms "to provide content moderation that is politically neutral"), *with* Limiting Section 230 Immunity to Good Samaritans Act, S. 3983, 116th Cong. (2020) (proposed legislation sponsored by Senator Josh Hawley after 2020 Executive Order issued that would amend § 230 to "provide accountability for bad actors who abuse the Good Samaritan protections provided under that Act"); *see also* Stopping Big Tech's Censorship Act, S. 4062, 116th Cong. (2020) (proposed legislation sponsored by Senator Kelly Loeffler after 2020 Executive Order issued that would amend § 230 to "require" that online platforms "meet certain standards to qualify for liability protections").

[6] In support of a previous bill that would have repealed § 230 about two years after the bill's introduction, Senator Graham stated: "The time has come for these largely unregulated Big Tech giants to either be broken up, regulated, or subject to litigation for their actions . . . . It's time we put the Section 230 protections these companies enjoy on the clock." Press Release, *Graham Introduces Bill To Incentivize Section 230 Reform* (Dec. 15, 2020), https://perma.cc/A6HU-QL84..

to Facebook, Twitter, Instagram, and YouTube, *id.* ¶¶ 51-61, 181—since early "2020, if not before," *id.* ¶ 122. But no social media company is a named defendant in this suit. Rather, the States bring claims against various federal government officials and agencies, alleging that they are responsible for a virtually limitless number of content moderation decisions applied to virtually every user of social media residing in Missouri or Louisiana, or even any social media user across the United States. *Id.* ¶¶ 248-57 (alleging that Defendants have "interfere[d] with First Amendment . . . rights of virtually all Missourians, Louisianans, and Americans"). According to the States, disparate government speech by government officials under the Trump and Biden Administrations—from COVID-19 informational videos by Dr. Fauci posted on Facebook, to documents published by HHS and DHS in 2020 and 2021, to statements by the White House Press Secretary that the current President (like the former President and Senators across the political divide) supports reform to § 230, *see supra* 7-15—has coerced all social media companies into suppressing user speech that relates to COVID-19 or elections or is otherwise "disfavored" by the current President and "his political allies." *Id.* ¶ 116.

The Complaint names the following Defendants: President Biden, in his official capacity as President of the United States and Jennifer Psaki, in her official capacity as White House Press Secretary[7]; the Department of Health and Human Services and several of its officials[8] (the "HHS Defendants"); and the Department of Homeland Security and one of its components and its

---

[7] Pursuant to Federal Rule of Civil Procedure 25(d), Jennifer Psaki should be substituted as a party by the current White House Press Secretary, Karine Jean-Pierre.

[8] Specifically: Vivek Murthy, in his official capacity as Surgeon General of the United States; Xavier Becerra, in his official capacity as the Secretary of the Department of Health and Human Services; the National Institute of Allergy and Infectious Diseases (NIAID); Dr. Anthony Fauci, in his official capacity as Director of NIAID; and the Centers for Disease Control and Prevention (CDC) (collectively, "HHS Defendants").

officials[9] (the "DHS Defendants"). The States bring claims under the Constitution and the APA in four counts. In counts one and two, the States claim that the actions by Defendants, "as alleged [in the Complaint]," to "coerce[], threaten[], and pressure[]," and to "directly collud[e] with social-media platforms to censor disfavored speakers and viewpoints," violate the First Amendment and are "*ultra vires*" because "[n]o federal statute authorizes the Defendant's conduct in engaging in censorship, and conspiracy to censor, in violation of Missourians', Louisianans', and Americans' free-speech rights." *Id.* ¶¶ 241-65. In counts three and four, the States claim that, "[a]s set forth [in the Complaint]," the conduct of the HHS and DHS Defendants is "unlawful, arbitrary and capricious, and in excess of statutory authority under the [APA]." *Id.* ¶¶ 266-87.

As relief, the States seek a series of broad declarations that all of Defendants' "conduct" is unlawful, and an equally broad injunction prohibiting "Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from continuing to engage in" the allegedly unlawful conduct, including issuing agency publications and speaking about potential legislative reforms. Compl. at p.83, Prayer for Relief. In other words, the States seek an ambiguous injunction restraining the federal government from exercising its *own* speech on matters of public concern.

On May 14, 2022, the States moved for a three-phased preliminary injunction, ECF No. 10, and on May 17, 2022, the States moved for expedited discovery, ECF No. 17. The Court continued the deadline to respond to the motion for preliminary injunction, ECF No. 19, and

---

[9] Specifically: Alejandro Mayorkas, in his official capacity as Secretary of DHS; the Cybersecurity and Infrastructure Security Agency (CISA); Jen Easterly, in her official capacity as Director of CISA; and Nina Jankowicz, in her official capacity as Director of the DHS Disinformation Governance Board (collectively, "DHS Defendants").

granted the motion for expedited discovery on July 12, 2022, ECF No. 34.[10]

## LEGAL STANDARD

Defendants move to dismiss this action for lack of subject-matter jurisdiction and for failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and (b)(6), respectively. "When facing a challenge to subject-matter jurisdiction and other challenges on the merits, [courts] must consider first the Rule 12(b)(1) jurisdictional challenge prior to addressing the merits of the claim." *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 487 (5th Cir. 2014).[11]

Federal district courts have a duty to ensure that it is acting within the scope of its jurisdictional authority*, see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998), and Plaintiffs, "as the party asserting federal subject-matter jurisdiction, ha[ve] the burden of proving that this requirement has been met," *Alabama-Coushatta*, 757 F.3d at 487; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "When considering a motion to dismiss under Rule 12 (b)(1), the Court may also take judicial notice of matters of public record." *Staten v. Harrison Cnty., Mississippi*, No. 1:19-CV-560-KS-RHW, 2020 WL 1644991, at *4 (S.D. Miss. Apr. 2, 2020), *aff'd as amended sub nom. Staten v. Harrison Cnty.*, No. 20-60329, 2021 WL 5766576 (5th Cir. Dec. 3, 2021).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

[10] In that order, the Court found that the States had standing based on the limited discussion presented in the parties' discovery briefs. Defendants respectfully suggest that the more complete discussion presented herein demonstrates why the States fail Article III's requirements.

[11] Internal citations and quotation marks are omitted throughout this brief, unless otherwise stated.

While the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as . . . factual allegation[s]" are "disentitle[d] . . . to th[is] presumption of truth." *Id*. at 678, 681. "Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011). The Court may also "take judicial notice of matters of public record" "in deciding a 12(b)(6) motion." *Luv n' care, Ltd. v. Jackel Int'l Ltd.*, 502 F. Supp. 3d 1106, 1108 (W.D. La. 2020).

## ARGUMENT

## I.    The Court lacks subject-matter jurisdiction over the States' claims.

### A.  The States lack Article III standing to bring any of their claims.

To establish standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). These elements ensure "that there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). "Especially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative." *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1287 (5th Cir. 1992). After all, "[f]ederal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities." *Transunion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

Moreover, to obtain prospective equitable relief—as the States seek here—it is not enough to allege a past injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1973) ("Past exposure to illegal conduct does not in itself show a

19

present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). Rather, the States must demonstrate that they face a "real and immediate threat" of future harm. *Lyons*, 461 U.S. at 102. An "allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2340 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414–15 n.5 (2013)) (cleaned up). Allegations that rely on "a highly attenuated chain of possibilities" are insufficient to show the required "certainly impending" threatened injury. *Clapper*, 568 U.S. at 410, 416.

Additionally, where, as here, "the plaintiff[s] [are] not [themselves] the object of [a] government action," standing "is ordinarily 'substantially more difficult' to establish." *Defenders of Wildlife*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). "In that circumstance, causation and redressability ordinarily hinge on the . . . the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume to either control or predict." *Id.* The burden rests with "the plaintiff," then, "to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury." *Id.* Put otherwise, the Supreme Court has adhered to its "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 413-14 (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158-60 (1990)). "The party invoking federal jurisdiction bears the burden of establishing" standing. *Defenders of Wildlife*, 504 U.S. at 561.

Here, the States assert two theories of Article III standing. First, they assert injuries to their residents—or, indeed, all "Americans," Compl. ¶ 255-56—under a theory of *parens patriae*

standing. *Id.* ¶¶ 13-14. Second, the States attempt, in various ways, to allege injuries to their "sovereign" interests. *Id.* ¶¶ 11-12. Neither theory has merit.[12]

    i.   <u>The States do not identify an injury that satisfies Article III.</u>

*Parens patriae standing*. First, the States allege that they have standing to "protect[] the free speech rights" of their residents. Compl. ¶¶ 13-14. According to the States, that interest constitutes a "quasi-sovereign interest" giving them standing to bring suit as *parens patriae*. *Id.*

But Supreme Court precedent forecloses *parens patriae* actions by states against the federal government. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923)); *see also Brackeen v. Haaland*, 994 F.3d 249, 292 n.13 (5th Cir. 2021) (en banc) (op. of Dennis, J.), *cert. granted*, 142 S. Ct. 1205 (2022) (citing *South Carolina v. Katzenbach*, 383 U.S. 310, 324 (1966)). This limitation derives from the federal government's own sovereign relationship with the nation's citizens, which precludes states from asserting those citizens' interests against the federal government. *See Mellon*, 262 U.S. at 485-86 ("[I]t is no part of [a state's] duty or power to enforce [the rights of its citizens] in respect of their relations with the federal government."); *Virginia ex*

---

[12] The States do not allege third-party standing in the Complaint but suggest in a footnote in their Reply Brief in Support of their Motion for Expedited Discovery ("Disc. Reply Br.") that they seek to rely on that theory, too. Disc. Reply Br. 2 n.1, ECF No. 28. Because this theory was not alleged in the Complaint, it should be disregarded. *Skinner v. Gautreaux*, 549 F. Supp. 3d 493, 499 (M.D. La. 2021) (declining to consider bystander liability claim not alleged in the complaint but instead raised in a brief in response to motion to dismiss). Regardless, the States offer no support for the notion that third-party standing doctrine is an independent basis for states to bring suit against the federal government, as an end-run around the long-settled bar precluding *parens patriae* suits by states to vindicate their residents' rights against the federal government. *See infra* at 21-13. But even if the Court applied that doctrine, the States' standing allegations would fail, as the third-party individuals on whose behalf the States seek to bring suit are fully capable of protecting their own interests, *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004)—as they have sought to do through their own lawsuits filed around the country. *See Changizi*, 2022 WL 1423176; *Hart*, 2022 WL 1427507; *AAPS I*, 518 F. Supp. 3d 505. Indeed, the States here rely on alleged injuries to several declarants here who were plaintiffs in *Changizi*. Changizi Decl.; Kotzin Decl.; Senger Decl.

*rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011) ("When a state brings a suit seeking to protect individuals from a federal statute, it usurps this sovereign prerogative of the federal government," and "[a] state has no interest in the rights of its individual citizens sufficient to justify such an invasion of federal sovereignty."). It is "the United States, and not the state[s], which represents [those citizens] as parens patriae[.]" *Mellon*, 262 U.S. at 486; *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007). That principle governs whether the claims asserted arise under the Constitution or the APA. *See Brackeen*, 994 F.3d at 292 n.13 (op. of Dennis, J.) (rejecting states' contention "they have standing to bring an equal protection challenge in *parens patriae* on behalf of citizens other than the Individual Plaintiffs"); *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 181 (D.C. Cir. 2019) (APA does not give states *parens patriae* action against federal government).

The States' attempt to compare their alleged interest in protecting individuals' free speech rights to the quasi-sovereign interests recognized in *Snapp* is thus self-defeating. *See* Compl. ¶¶ 13-14 (invoking the quasi-sovereign interests recognized in *Snapp*). In that case, the Supreme Court *reaffirmed* that states have *no* quasi-sovereign interest that would support a *parens patriae* action against the federal government. 458 U.S. at 610 n.16. The States' request that this Court nonetheless be the first to conclude that states have a quasi-sovereign interest in enforcing their residents' constitutional rights against the federal government would not only contradict *Snapp* itself—it would upend the settled principle that Article III "serves to prevent the judicial process from being used to usurp the powers of the political branches," *Clapper*, 568 U.S. at 408, by preserving the "proper—and—properly limited—role of the courts in a democratic society," *Warth v. Seldin*, 422 U.S. 490, 498 (1975). After all, if the States have standing to vindicate *this* constitutional right of their residents against the federal government, why not every other? *Cf. Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S.

464, 489-90, n.26 (1982) ("Were we to recognize standing premised on an 'injury' consisting solely of an alleged violation of a personal constitutional right to a government that does not establish religion, a principled consistency would dictate recognition of respondents' standing to challenge execution of every capital sentence on the basis of a personal right to a government that does not impose cruel and unusual punishment, or standing to challenge every affirmative-action program on the basis of a personal right to a government that does not deny equal protection of the laws, to choose but two among as many possible examples as there are commands in the Constitution." (cleaned up)).

In their Discovery Reply Brief, ECF No. 28, the States assert, without any authority, that *Massachusetts v. EPA* overruled the long-held rule that States are precluded from bringing *parens patriae* actions against the federal government. *See* Disc. Reply Br. 6. They are wrong, as their own argument demonstrates. The States are correct to this extent: The Supreme Court in *Massachusetts v. EPA* concluded that the state had standing to bring suit to "assert *its* rights," not the rights of its citizens. *Id.* at 6-7 (emphasis added) (quoting *Massachusetts*, 549 U.S. at 520 n.17). Massachusetts, the Court found, had "alleged a [concrete and] particularized injury in its capacity as a landowner," namely, rising sea levels that had "begun to swallow Massachusetts' coastal land" and that threatened permanent losses to "a significant fraction of coastal property" that Massachusetts owned. *Massachusetts*, 549 U.S. at 519, 522-23; *see also id.* at 539 (Roberts, J., dissenting) (noting that the majority's standing analysis rested on allegations of direct injury to the state's proprietary interests in its own coastal property). While the majority at times described the state's interests as "quasi-sovereign," it nowhere held that the interest at issue gave it standing to bring suit on behalf of its citizens; much less did it the majority reverse, sub silentio, the long-standing *Mellon* bar. *See Manitoba*, 923 F.3d at 183 ("[W]e are unpersuaded by Missouri's

23

argument that *Massachusetts v. EPA* alters our longstanding precedent that a State in general

lacks *parens patriae* standing to sue the federal government."); *accord Michigan v. EPA*, 581 F.3d

524, 529 (7th Cir. 2009) (noting that the injury in *Massachusetts v. EPA* was one to the state's own

coastal lands; *see also Arizona v. Biden*, 31 F.4th 469, 476 (6th Cir. 2022) (Sutton, C.J.)

(*Massachusetts v. EPA* does not relieve states from meeting the "case or controversy requirements

of injury, causation, and redressability" to show *direct* injury to their own interests).

Even if a *parens patriae* theory were available, the States' allegations would be insufficient

to invoke it. To start, the Complaint does not identify a concrete injury to any one of the States'

residents (let alone to a "substantial segment" of them)—a necessary predicate to any quasi-

sovereign harm. *See Md. People's Counsel v. FERC*, 760 F.2d 318, 320 (D.C. Cir. 1985) (Scalia,

J.) ("[T]he citizen interests represented" in a *parens patriae* suit must be "concrete interests which

the citizens would have standing to protect in the courts themselves"); *see also Utah Div. of

Consumer Prot. v. Stevens*, 398 F. Supp. 3d 1139, 1145 (D. Utah 2019) ("[A] sovereign must allege

injury in fact to the citizens it purports to represent as *parens patriae*." (cleaned up)); *see also id.*

at 1145-46 (discussing cases). The Complaint does not identify even a single Missouri or Louisiana

resident whose speech has been moderated by a social media company in the past, let alone a

resident whose speech "certainly" will be subject to any moderation in the immediate future, as is

necessary for injunctive relief. *Clapper*, 568 U.S. at 410. The Court should not consider the

declarations attached to the States' Motion for Preliminary Injunction, ECF No. 15 (and not the

Complaint itself), but even if it were to do so, those declarations are of no help. Although those

declarants[13] point to instances in which social media companies moderated their content in the

---

[13] Only a handful of the declarants asserting that a social media company took content moderation
measures against their speech say they are residents of Missouri or Louisiana. Hoft Decl., ECF

*past*, the declarants fail to allege facts sufficient to support a plausible conclusion that they are likely to be subjected to such moderation in the future. *See Lyons*, 461 U.S. at 102.[14]

The States also do not allege any interest that exists "apart from the interests of particular private parties," as they would be required to do to sustain a *parens patriae* action. *Snapp*, 458 U.S. at 602. Rather, they reiterate that their interest is solely in vindicating individuals' free-speech rights. But the individuals allegedly harmed by social media companies' content moderation measures are in a better position that the States to pursue available legal remedies. *See Pennsylvania, by Shapp v. Kleppe*, 533 F.2d 668, 675 n.42 (D.C. Cir. 1976) (even where *parens patriae* standing is permissible, "[t]he arguments in favor of allowing such standing become less compelling, as it becomes more feasible to achieve complete relief through suits by the parties actually aggrieved"). And of course, many individuals have brought lawsuits on their own behalf— including several declarants in this very action. *Changizi v. Dep't of Health & Human Servs.*, --- F. Supp. 3d ---, No. 2:22-cv-1776, 2022 WL 1423176 (S.D. Ohio May 5, 2022), *appeal docketed*, No. 22-3573 (6th Cir. June 30, 2022); *Hart v. Facebook*, No. 22-cv-00737, 2022 WL 1427507 (N.D. Cal. May 5, 2022) (slip copy); *Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505 (D.D.C. 2021) ("*AAPS I*"), *aff'd Ass'n of Am. Physicians & Surgeons v. Schiff*, 23 F.4th 1028 (D.C. Cir. 2022) ("*AAPS II*"); *see* Changizi Decl., ECF No. 10-9; Kotzin Decl., ECF No. 10-10; Senger Decl., ECF No. 10-2.

---

No. 10-5; Allen Decl., ECF No. 10-8; Hines Decl., ECF No. 10-12; McCollum Decl., ECF No. 10-14; Gulmire Decl., ECF No. 10-15.

[14] *See* Hoft Decl. ¶¶ 6-8 (Twitter conduct of January-February 2021), *id.* ¶ 12(a) alleging Facebook conduct regarding August 2020 post); *id.* ¶ 12(b) (alleging Facebook conduct regarding September 2020 post); Hines Decl. ¶¶ 13-14 (July 2021 Facebook conduct); Gulmire Decl. ¶¶ 10-12 (Facebook conduct regarding July 2021 article); *id.* ¶ 18 (March 2022 Facebook conduct); Allen Decl. ¶ 15 (March 2022 YouTube conduct as to NewsTalkSTL channel).

*Direct injuries to the States.* Nor do the States make any plausible allegation that *they* have been subject to any cognizable injury that is "concrete and particularized and actual or imminent, not conjectural or hypothetical." *See Spokeo*, 578 U.S. at 339. The States purport to have two types of sovereign interests: (1) "advancing their own fundamental laws and fundamental policies favoring the freedom of speech," Compl. ¶ 12; and (2) "receiving free flow of information in public discourse on social-media platforms . . . to inform public-policy decisions," *id.* ¶ 11. *See also* Pls.' Mem. in Supp. of Motion for Prelim. Inj., ("PI Br."), ECF No. 15 (restating these same alleged interests in five purportedly different ways); Disc. Reply Br. 7 (same). Neither alleged sovereign interest supports an injury-in-fact that satisfies Article III.

As an initial matter, the States' appeals to generalized interests in advancing the freedom of speech raise only "abstract questions of political power, or sovereignty, [or] of government" that *Mellon* itself stressed courts are "without authority" to adjudicate.262 U.S. at 485. The States do not allege any actual (or threatened) invasion of their ability to "create and enforce a legal code" based on federal interference with a state regulatory or administrative program. *See Texas v. United States*, 809 F.3d 134, 153 & n.40 (5th Cir. 2015) (citing *Virginia*, 656 F.3d at 269 ("[O]nly when a federal law interferes with a state's exercise of its sovereign 'power to create and enforce a legal code'" that "regulate[s] behavior or provide[s] for the administration of a state program" "does it inflict on the state the requisite injury-in-fact.")); *Mellon*, 262 U.S. at 479, 482 (no concrete injury to state based on allegation that federal statute placing conditions on appropriations to states had "usurp[ed]" the "power of local self-government reserved to the states by the Tenth Amendment," where statute did not "require the state[] to do or to yield to anything"). And the conduct alleged here plainly does not threaten any interest in the States' sovereign territory (nor do the States allege that it does). *See Massachusetts*, 549 U.S. at 519.

The States do not allege that the federal government has directly interfered with their policy-making authority in any manner whatsoever. Instead, they argue that the federal government has violated the States' own constitutional provisions. Compl. ¶ 12. Yet, the states' constitutions protect their residents from *state*, not federal government, interference with individual free speech rights. It is the Federal Constitution that guarantees citizens' freedoms with respect to the federal government, and states have no role in enforcing the Federal Constitution against the federal government. *See Mayo v. United States*, 319 U.S. 441, 445 (1943) ("A corollary to th[e]" Supremacy Clause of the Constitution "is that the activities of the Federal Government are free from regulation by any state.").[15]

Thus, the States allege nothing more than a generalized interest in ensuring that the federal government follows the First Amendment. In particular, the States posit that the conduct alleged in the Complaint "thwart[s] the fundamental [free-speech] policies of each sovereign State" simply *because* it violates the First Amendment. Compl. ¶ 258; *id.* ¶ 12 (alleging that Defendants' conduct violates the First Amendment, and therefore the States' own laws and policies favoring the freedom of speech). Yet the Supreme Court "has repeatedly held that an asserted right to have the Government act in accordance with the law is not sufficient standing alone to confer jurisdiction on a federal court." *Whitmore*, 495 U.S. at 160; *see Valley Forge*, 454 U.S. at 482 (The "requirements of standing are not satisfied by 'the abstract injury in nonobservance of the Constitution asserted by . . . citizens.'" (quoting *Schlesinger v. Reservists Comm. to Stop the War*,

---

[15] As one form of relief sought here, the States ask the Court to "[d]eclare that Defendants' conduct violates the First Amendment of the U.S. Constitution *and analogous provisions of Missouri's, Louisiana's, and other States' Constitutions*," Compl. p.83, Prayer for Relief (emphasis added), in direct contravention of this established principle under the Supremacy Clause. *See Virginia*, 656 F.3d at 270 ("[T]he Constitution . . . withholds from Virginia the power to enforce [state law] against the federal government." (citing *Ohio v. Thomas*, 173 U.S. 276, 283 (1899))).

418 U.S. 208, 223 n.13 (1974))). "This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [the Supreme Court] ha[s] refused to countenance in the past." *Lance v. Coffman*, 549 U.S. 437, 442 (2007); *see Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018). Indeed, the States' theory of injury would allow *every* state to bring a claim against the federal government for *every* alleged violation of an individual's First Amendment right to free speech. But "standing to sue may not be predicated upon an interest . . . which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share." *Schlesinger*, 418 U.S. at 220; *see also Hotze v. Burwell*, 784 F.3d 984, 995 (5th Cir. 2015) ("[I]ncreased health-insurance premiums is a paradigmatic 'generalized grievance.'").

More fundamentally, the States' asserted sovereign interests fail because they derive entirely from free speech rights "guaranteed to their *citizens*," not to the States. Compl. ¶ 12 (emphasis added); *id.* ¶ 258 ("Defendants' interference with First Amendment rights of virtually all Missourians and Louisianans . . . undermines the system of rights the States provided to their citizens"). Throughout the Complaint, the States affirm that their interest is in protecting free speech rights belonging to their residents. *See, e.g.*, *id.* ¶ 255 ("These actions have injured Missouri's, Louisiana's, and other States' citizens"); *id.* ¶ 256 ("This injures the First Amendment and state-level rights of all citizens . . . ."). Although the Court should not consider the States' new, extra-Complaint allegations raised in their briefs in support of the Motion for Preliminary Injunction and the Motion for Expedited Discovery, including those in declarations not attached to or referenced in the Complaint,[16] even those documents confirm that the States' true interest is

---

[16] "[I]t is axiomatic that the complaint may not be amended by briefs in opposition to a motion to dismiss." *Skinner*, 549 F. Supp. 3d at 499 (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) (plaintiffs' briefs should not be used as a way of "embellish[ing] . . . conclusory allegations of the complaint")).

in vindicating their citizens' rights. There, the States emphasize that their purported sovereign interests revolve around the rights of advocacy groups to petition the government, PI Br. 39, a Missouri parent who sought to "circulat[e] an online petition," *id.*, and an expert witness who published a declaration online, *id.* at 40. But "[i]nterests of private parties are obviously not in themselves sovereign interests," nor do they "become such simply by virtue of the State's aiding in their achievement." *See Snapp*, 458 U.S. at 602 (distinguishing between "sovereign interests, proprietary interests, [and] private interests pursued by the State as a nominal party"); *cf. Harrison v. Jefferson Parish Sch. Bd.*, Civ. A. No. 20-2916, 2022 WL 539277, at *12 (E.D. La. Feb. 23, 2022) ("[A] State must articulate an interest *apart from the interests of particular private parties . . . .*" (emphasis added)), *appeal docketed*, No. 22-30143 (5th Cir. Mar. 24, 2022).

The States also contend—in their preliminary injunction brief, but not in their Complaint—that their "subdivisions have suffered online censorship directly." *See* PI Br. 38. Even if such an allegation were properly averred in the Complaint, it would not show any concrete injury. It is unclear what the basis of this alleged injury is, as the States do not elaborate, other than to cite two declarations submitted with their preliminary injunction motion. But those perfunctory declarations fail to substantiate any allegations of a direct injury to the States. In them, State agency officials aver that YouTube has previously taken actions against certain video recordings that have allegedly interfered in the past with the officials' ability to "monitor" residents' speech. *See* Flesch Decl. ¶ 7, ECF No. 10-6 (stating that, for an unspecified "period of time," YouTube "censored" videos of residents criticizing COVID-19 prevention measures, which prevented an official from "review[ing]" that speech); *see also* Bosch Dec. ¶ 7, ECF No. 10-13 (stating that, in August 2021, YouTube "censored" videos of "citizens expressing their opinions on the government's responses and proposals to COVID-19" and that "[o]nline censorship of Louisiana citizens by social media

companies interferes with [a Louisiana Justice Department official's] ability to follow Louisianans' speech on these issues"). Thus, these allegations of injury are indistinguishable from the States' second category of purported "sovereign" interests in simply "receiving" information, which fail for the reasons stated below. Moreover, the States do not explain how they could not, during whatever period of time the videos were "censored," watch the recordings of the events described using their own media (rather than the platform provided by YouTube).[17]

The States' additional alleged interest in "receiving [a] free flow of information"—both on and offline—to inform their public policies and messaging is likewise insufficient to show injury-in-fact. *See* Compl. ¶ 11 ("ideas shared on social media frequently are repeated in, and impact and influence, public discourse outside of social media, which Missouri and Louisiana, and their agencies and officials, also rely upon"). To start, the States do not identify what specific information they seek related to any particular policy and how their access to that information will be cut off by any action of Defendants. *See AAPS I*, 518 F. Supp. 3d at 513 (rejecting similar allegations by a private party that policies adopted by Facebook and Pinterest have prevented her from "conveniently aceess[ing] information about vaccination" when she did not allege either "how accessing [such] materials ha[d] been made more difficult for her" or that she could not access such information elsewhere). Nor do they allege that any particular resident who plans to

---

[17] For the first time in their Reply Brief, the States posit that they have suffered "censorship in their capacity as speakers," pointing to these same declarations. Disc. Reply Br. 7. Even if the First Amendment protected the speech of the States' agencies and municipalities, *but see Estiverne v. Louisiana State Bar Ass'n*, 863 F.2d 371, 379 (5th Cir. 1989) ("[T]he first amendment does not protect government speech."), the States' declarations do not explain how the actions of a social media company have interfered with affirmative speech *by the States* as opposed to their residents. Rather, the States contend that the videos depicted public meetings where residents were given a platform to express *their* views on COVID-19 prevention measures. Indeed, the Missouri official's declaration does not even state that any recording at issue was posted to YouTube by the State or its subdivisions as opposed to any of its residents. *See* Flesch Decl. ¶ 7.

soon try and communicate with a Plaintiff State through social media will be subject to some content moderation measure. The States' "nebulous allegation" that they cannot benefit from the free flow of information on social media platforms (and even "in public discourse outside of social media," Compl. ¶ 11), is not a "distinct and palpable" injury that is cognizable under Article III, *AAPS I*, 518 F. Supp. 3d at 513 (quoting *Warth*, 422 U.S. at 501). And their mere speculation that they might "never know exactly how much speech" has been "censored" by social media companies, PI Br. at 40, is, like the allegations of possible surveillance in *Clapper*, too vague and speculative to satisfy Article III. 568 U.S. at 411-12.

Moreover, this theory of injury is overly broad. The States' allegations rest on the assumption that any company's content-moderation action would interfere with the States' general interest in "closely track[ing]," "on a daily or even hourly basis," "speech on social media," so that they can "understand their citizens' true thoughts and concerns." PI Br. at 39 (citing Flesch Decl. ¶ 4). In other words, the States presume to have an interest in accessing *any* speech posted, by *any* person, on *any* online platform, regardless of whether the speech was directed at the States, simply based on the possibility that the speech might relate to the States' policies. *See id.* This "wholly abstract and widely dispersed" injury, *Raines v. Byrd*, 521 U.S. 811, 829 (1997), would expand the bounds of what constitutes a state injury in the First Amendment context beyond any discernable limit: Under that approach, any moderation of an individual's content posted online would *automatically* injure the State, even if the individual lives outside the State's boundaries. The Constitution "contemplates a more restricted role for Article III courts." *Raines*, 521 U.S. at 828. And it would "seem[] rather odd to say that" states have an interest, sovereign or proprietary,[18]

---

[18] The States' single, stray reference to a purported "proprietary interest" in receiving information, without any factual elaboration, *see* Compl. ¶ 11, is plainly insufficient to show injury-in-fact.

in accessing all speech posted on a social media platform that is run by a "private company"—which has "unrestricted authority to do away with" the platform altogether. *Biden v. Knight First Amend. Inst.*, 141 S. Ct. 1220, 2221 (2021) (mem.) (Thomas, J., concurring in the vacatur and remand of the case as moot).[19]

For all of these reasons, the States fail to allege an injury-in-fact.

    ii.    <u>The States cannot show any injury that is traceable to the conduct of Defendants, as opposed to third-party social media companies not before this Court.</u>

Even assuming the States alleged an adequate injury based on some content moderation decisions that social media companies have made or may make, they do not sufficiently allege that those decisions were (or will be) attributable to Defendants rather than the companies' independent

---

[19] The States also err in contending, Disc. Reply Br. 2 n.1, that their Article III standing to contest the alleged comments of Defendants at issue can be compared to the standing the Supreme Court granted (via a footnote) in reaching the merits of an "informal censorship" regime in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). That case involved a state's commission to "Encourage Morality in Youth," which was empowered by state legislative resolution to deem a non-obscene publication "objectionable for sale, distribution or display to youths." After making such a determination, that commission would urge the publication's distributor not to carry it and would "refer the matter to the local police for investigation and possible prosecution under the state obscenity law." *See Action for Children's Television v. FCC*, 59 F.3d 1249, 1260 (D.C. Cir. 1995) (citing 372 U.S. at 61-62). The Court upheld the standing of publishers of several disputed books to litigate a First Amendment challenge in part because a disputed book's "publisher has the greater economic stake," compared to the distributor, "because suppression of a particular book prevents him from recouping his investment in publishing it." 372 U.S. at 64 n.6. To begin with, the States' suggestion that they are permitted to aggregate, for standing purposes, the claims of individuals cannot be squared with current precedent, given that "the doctrine of standing to sue is not a kind of gaming device that can be surmounted merely by aggregating the allegations of different kinds of plaintiffs, each of whom may have claims that are remote or speculative taken by themselves." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (opinion of Kennedy, J., joined by Rehnquist, C.J., and Stevens and Scalia, JJ.). That is, "standing is not dispensed in gross." *Transunion*, 141 S. Ct. at 2208 (citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). And even on its own terms, *Bantam Books* lends the States no support in their bid to assert injury based on past episodes of content moderation by nonparty platforms that purportedly resulted in lost receipt of information by State residents. *See* Reply Br. at 2 n.1. In the States' scenario, those residents are the purported holders of the First Amendment right to "listen," and there is no ground for concluding that the States have any "greater economic stake" in an alleged injury so inflicted such that the State can proceed as the publishers did in *Bantam Books*.

judgment. *Pelican Ch., Associated Builders & Contractors, Inc. v. Edwards*, 128 F.3d 910, 916 (5th Cir. 1997). If anything, the States' allegations show the opposite. The Complaint recognizes that social media companies have each adopted their own policies that define "misinformation," outline how they will identify it, and specify the disciplinary actions they may take against those who post it on their platforms (including actions that they have taken prior to this Administration). *See* Compl. ¶ 148 (referencing Facebook's "COVID and Vaccine Policy"); *id.* ¶ 208 (Facebook guidelines governing misinformation); *id.* ¶ 83 (Twitter's "COVID-19 misleading information policy"); *id.* ¶ 192 (YouTube's "Elections misinformation policy"). The same is true for the declarations by individual users of social media that the States attached to their motion for preliminary injunction. *See, e.g.*, Allen Decl. ¶ 10, ECF No. 10-8 (including excerpts from emails from YouTube stating that it has "reviewed [the affiant's] content and unfortunately" concluded that "it violate[d]" the company's "medical misinformation policy"); McCollum Decl. ¶ 6, ECF No. 10-14 (stating that Nextdoor removed one of his posts based on its conclusion that the post violated the platform's discrimination community guideline). Any such content moderation measures by social media companies against any individual users because of user speech "were not taken by [Defendants]," but "instead . . . by independent third parties Facebook, Google, Amazon, Twitter, . . . YouTube," and any other social media company referenced in the States' Complaint or brief. *See AAPS II*, 23 F.4th at 1033.[20]

---

[20] There is also no merit to the States' conclusory assertion that social-media companies have "heeded" a purported call by the Press Secretary for them to coordinate with each other to administer misinformation policies. The declarations show that the companies, applying their individual policies, may reach different conclusions about similar information. *See* Allen Decl. ¶ 18 (asserting that Facebook, like YouTube, has taken content moderation measures against the declarant's COVID-19 and election speech, but that Facebook has "not permanently banned [that] content as YouTube has done").

Failing to sufficiently allege a link between any particular episode of content moderation against a Plaintiff State or its residents and a specific federal official, the States opt for a more speculative theory of causation that has been rejected by multiple courts. The States speculate that social media companies are only taking action against particular user posts containing misinformation because of some Defendants' public statements about potential § 230 reform, antitrust enforcement, and the need for social media companies to "step up" their efforts to combat misinformation. *See, e.g.*, Compl. ¶¶ 156, 227. According to the States, those public statements constitute "threats" that have "coerced" social media companies into taking content moderation measures against any number of users. *Id.* ¶¶ 3, 248. Yet none of those public comments advocates for any particular action by any identified social media company, nor carries the "threat" of regulatory penalty by the Executive Branch for any noncompliance. *Cf. Huber v. Biden*, No. 21-CV-06580-EMC, 2022 WL 827248, at *5 (N.D. Cal. Mar. 18, 2022) (lacking averment "that the Biden Administration dictated to Twitter any specific prescription of any particular course of action," pleading instead made "conclusory and generalized statements" of "conspiracy" between platforms and government defendants), *appeal docketed*, No. 22-15443 (9th Cir. Mar. 25, 2022). Such "broad" statements by various officials in the political Branches are "plainly not enough" to attribute social media companies' content moderation measures to the public officials—even accepting as true the allegation "that such requests carried the clear subtext of potential 'adverse regulatory action.'" *Changizi*, 2022 WL 1423176, at *11 n.5. The States' causation theory thus hinges on an "analytical leap based on bald speculation." *AAPS I*, 518 F. Supp.3d at 515. Indeed, accepting the States' theory would essentially mean that *every* decision by *every* social media company to moderate speech on its platform—at least as pertains to COVID-19, elections, or any other unspecified speech that the States say is "disfavored by Biden and his political allies,"

Compl. ¶ 116—is traceable to government officials' statements over multiple administrations. That is implausible.

Moreover, the implausibility of the States' theory of causation is apparent in light of the "obvious alternative explanation[s]," *cf. Twombly*, 550 U.S. at 567, for social media companies' decisions to combat misinformation on their platforms separate and apart from any purportedly coercive actions by Defendants. For example, it is "entirely possible" that social media companies concluded that combatting misinformation by taking steps to moderate certain posted content was "necessary to save [themselves] from losing other sources of revenue, such as advertisers (or other users) who do not want to be associated with a company that passively allows 'misinformation' to spread." *Changizi*, 2022 WL 1423176, at *11 n.5. Or it may be that they have "simply chose[n] to prioritize tackling the spread of perceived COVID-19 mistruths over [their] profitability." *Id.* The undeniable "widespread societal concerns about online misinformation," offer a "far [more] plausible" explanation for social media platforms' longstanding efforts to combat misinformation through content moderation measures than any alleged pressure from Defendants through public entreaties to "do more." *AAPS II*, 23 F.4th at 1034-35. Indeed, the Complaint contains no factual matter showing that social media companies' decisions to moderate any particular user's posts— much less the posts of residents in Missouri or Louisiana in particular—resulted not from "self-interested business" considerations, but rather from generic statements by government officials. *Cf. Atkinson v. Meta Platforms, Inc.*, No. 20-17489, 2021 WL 5447022, at *1 (9th Cir. Nov. 22, 2021) (allegation that federal officials coerced platform to act against plaintiff failed where pleading "cast" platform "decision to adopt community standards as a self-interested business decision"). For example, nowhere do the States allege that a social media company has stated that

it only chose to take content moderation measures because it felt coerced into doing so by any Defendant.

To the contrary: the States aver that social media companies have been combatting misinformation on their platforms for years—and since long before President Biden took office in January 2021. The Complaint alleges that social media companies' efforts concerning misinformation have been ongoing since at least "*2020*, if not before." Compl. ¶ 122 (emphasis added). In fact, companies were addressing misinformation since at least *2017*. *See* Adam Mosseri, Meta, *Working to Stop Misinformation and False News*, Meta (Apr. 7, 2017), at https://perma.cc/7BMR-7P7X; *see also Huber*, 2022 WL 827248, at *5 ("Twitter ha[d] the independent reason and authority to suspend Plaintiff's account pursuant to its terms of service[,] which predated the government's statements about COVID-19 disinformation."). Thus, the chronology of events firmly *undermines* any inference of a causal link.

In their Discovery Reply Brief, the States proclaim that they have addressed this chronological issue by alleging that certain federal government officials have been making statements about social media companies and misinformation since 2019. *See* Disc. Reply Br. 9. But as noted above, social media companies have been addressing misinformation since at least 2017, years before the 2019 statements the States refer to. Regardless, the bulk of the alleged government statements the States rely on were made starting in mid-2021, *see supra* at 7-13, and the States cannot show that a handful of additional comments from 2019 and 2020 establish the requisite causal link. The only alleged statements from 2019 that the States rely on come from legislators who are not parties to this action. *See, e.g.*, Compl. ¶ 118 (statements from Speaker Pelosi, then-Senator Harris, and Congressman Richmond). And although the States allege that, in 2020, Dr. Fauci communicated with Facebook about disinformation, the Complaint does not

plausibly describe any mechanism through which such scattered alleged statements from one government official could control every single subsequent decision by every social media company. Accordingly, the relevant timeline shows that social media companies decided to combat misinformation for their own business reasons (as described above), independent of any government statements. The States thus cannot demonstrate that any moderation actions taken against them, or any of their residents, flowed from a statement by any Defendant rather than the independent judgments of private social media companies. And, in any event, the States' attempt to link the decisions of social media companies to government officials during the *prior Administration* defeats their own theory that social media companies' decisions are attributable to the *current Administration*.

That is not the Complaint's only chronological problem. The States also seek to link platform decisions to target COVID-19 and election misinformation to statements of past *non-government* officials. For example, the Complaint refers to statements that then-presidential-candidate Biden made in 2020. Compl. ¶ 124-27. But that cannot show that content moderation measures predating 2021 were attributable to current executive branch officials. After all, past content moderation episodes cannot have been caused by "governmental actors from the future." *Hart*, 2022 WL 1427507, at *6.

Furthermore, although the States attempt to rely on snippets from statements of Democratic policymakers (who are not defendants in this action) urging § 230 reform, they ignore the larger policy debate that has led lawmakers from both political parties—including former President Trump—to urge the reform or repeal of § 230. *See supra* at 14-15. Accepting the States' causation allegations would validate the incoherent notion that statements by public officials urging § 230 reform constitute "threats" *only* when spoken by Democrats, but not when spoken by Republicans.

37

The deficiencies in the States' causation allegations echo the deficiencies that prompted other courts to dismiss, for lack of Article III standing, claims against social media platforms by users seeking to impose liability for particular acts of content moderation that purportedly flowed from government coercion or collusion. For example, in *AAPS I*, the plaintiff alleged that certain companies took moderation measures against the plaintiff because Congressman Adam Schiff sent letters and made public statements that "encourage[d]" certain companies to "prevent . . . inaccurate information on vaccines" and "challenged the immunity that interactive computer services have under" § 230. 518 F. Supp. 3d at 510, 515. The District Court for the District of Columbia concluded that the plaintiff failed to sufficiently allege Article III standing in part because it lacked sufficient allegations that the purported "harms stem[med] from . . . Congressman Schiff." *Id.* at 515. The court observed that the plaintiff "ignore[d]" "the innumerable other potential causes for the actions taken by the technology companies" and that the alleged "statements made by Congressman Schiff" did "not mention [the plaintiff]" or "advocate for any specific actions." *Id.* at 515-16. The court further noted that the statements were made "after the technology companies took many of the actions" at issue, and thus the plaintiff "fail[ed] to establish a chronological chain of causation between" the representative's statements and the challenged content moderation measures. *Id.* at 516 n.12. The D.C. Circuit affirmed for the same reasons. *See AAPS II*, 23 F.4th at 1033 (noting that Facebook and Twitter had been taking action against information since at least early 2019).

The District Court for the Southern District of Ohio reached similar conclusions in *Changizi*. 2022 WL 1423176. There, the plaintiffs—which included several of the declarants here[21]—alleged that Twitter took content moderation measures against them because of a "public

---

[21] *See* Changizi Decl., ECF No. 10-9; Kotzin Decl., ECF No. 10-10; Senger Decl., ECF No. 10-2.

campaign" headed by "President Biden, [the] White House Press Secretary," and "the Surgeon General," in which each official "expressed a range of critical views related to the spread of COVID-19 'misinformation' on social media platforms." *Id.* at *4, 8. Those public comments included reports that the Biden Administration was "examining how misinformation fits into the liability protections granted by Section 230[.]" *Id.* at *5. As in *AAPS I*, the court in *Changizi* concluded that the plaintiffs failed to sufficiently allege that Twitter's actions were attributable to the government because: (1) the plaintiffs did not "account for the 'innumerable other potential causes' that may have driven, or currently drive, Twitter's behavior, including 'widespread societal concerns about online misinformation,'" *id.* at *10; and (2) Twitter had established and was enforcing its COVID-19 policy well before "the Biden Administration began to broadly ask social media companies to 'do more' to combat COVID-19 'misinformation,'" *id.* at *9. *See also Hart*, 2022 WL 1427507 (dismissing a similar claim for the same reasons).

Plaintiffs here face the same obstacles that resulted in dismissal of those actions: (i) the States similarly ignore the "innumerable other potential causes for the actions taken by" independent social media companies, (ii) there is no nonconclusory allegation that Defendants "mention[ed]" any particular individual or "advocate[d] for any specific actions" against such individuals, and (iii) the companies were already policing misinformation before Defendants made any statements about § 230 or the perceived value of doing more to address misinformation.[22] Accordingly, the States fail to sufficiently allege causation for Article III purposes.

---

[22] Contrary to the States' contention, Disc. Reply Br. 5, *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1295-96 (9th Cir. 1987), does not support their effort, for Article III standing purposes, to trace injury to the decisions of independent nonparty social media companies. *Carlin* was not an Article III standing case, and even if it were, that could not overcome the causation and redressability requirements as clarified in more recent Supreme Court precedents described above, including in *Clapper*. And even as to the "state action" doctrine, *Carlin* is far

In their Discovery Reply Brief, the States try to establish causation through six arguments, all of which collapse into two general points: (i) certain social media content moderation efforts occurred after certain government statements were made, and (ii) social media companies have been moderating content with which certain government officials have happened to take issue. Disc. Reply Br. 4-6. But neither argument establishes causation. As a threshold matter, the States misunderstand the relevant causation inquiry. It is not enough for them to show that Defendants caused some content moderation actions in general; they must show that Defendants caused the precise content moderation actions that purportedly caused harm to *the States*. The States do not make that showing. First, with respect to the States' "timing" argument, the States do not identify a single action taken against them or their residents that happened shortly after a Defendant made a relevant statement. Regardless, correlation does not show causation. The content moderation actions may have coincidentally occurred after a Defendant made a statement about misinformation for other reasons. For example, it may be that, at those times, all parties had a good

---

afield. There, a local prosecutor wrote to the defendant "threatening to prosecute if the company continued to provide [certain telephone] lines to" the plaintiff for operation of a business the prosecutor determined "violated an Arizona statute prohibiting the distribution of sexually explicit material to minors." *Id.* at 1293. There is no historical or traditional basis, let alone one in precedent, for equating a prosecutor's "threat" to bring a *criminal prosecution* to the official speech at issue here, which never purported to exercise the power of criminal prosecution, or even civil enforcement, or actually to exercise any other power, against any particular social media company. *See Trump v. Twitter Inc.*, --- F. Supp. 3d ---, 2022 WL 1443233, at *6 (N.D. Cal. May 6, 2022), *appeal docketed*, No. 22-15961 (9th Cir. 2022) (rejecting *Carlin* analogy because complaint's "ambiguous and open-ended statements to the effect that 'we may legislate' something unfavorable to Twitter or the social media sector" was not akin to "a deputy county attorney threatening prosecution against a private company under a specific law"), *appeal docketed*, No. 22-15961 (9th Cir. June 28, 2022); *Children's Health Defense v. Facebook Inc.*, 546 F. Supp. 3d 909, 932-33 (N.D. Cal. 2021) (rejecting *Carlin* analogy because complaint lacked allegations that officials "directed Facebook or Zuckerberg to take any specific action with regard to CHD or its Facebook page"), *appeal docketed*, No. 21-16210 (9th Cir. Jul. 21, 2021); *Informed Consent Action Network v. YouTube LLC*, --- F. Supp. 3d ---, 2022 WL 278386, at *7 (N.D. Cal. Jan. 31, 2022) (rejecting *Carlin* analogy because "alleged government threats" in *Carlin* "were buttressed by . . . the threat of criminal prosecution–[a] capabilit[y] individual members of Congress lack").

reason for focusing on misinformation; *e.g.*, the rise of a new COVID-19 variant. Second, the Court also cannot infer the requisite causal link simply because social media companies have targeted content that government officials allegedly do not favor. Not only do the States fail to identify a single moderation action against them, or their citizens, that targeted that type of content, but there are many other reasons why the social media companies may have targeted that content. For example, the social media companies may have independently decided that they believe that that content is harmful. Accordingly, the States fail to demonstrate that any moderation action that affects them flowed, not from the independent judgment of private social media companies, but from several stray remarks by Defendants.

       iii.    <u>The States' alleged injuries are not redressable by any relief they seek.</u>

The States also fail to sufficiently allege that any equitable relief would likely redress any injury alleged here. *Defenders of Wildlife*, 504 U.S. at 561. "Whether an injury is redressable depends on the relationship between the judicial relief requested and the injury suffered." *California v. Texas*, 141 S. Ct. 2104, 2215 (2021); *cf. Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1278 (D.C. Cir. 2007) (no redressability where "the undoing of the governmental action will not undo the harm, because the new status quo is held in place by other forces"). The States seek an injunction prohibiting Defendants "from continuing to engage in unlawful conduct as alleged" throughout their Complaint. Compl. at 83, Prayer for Relief. Granting the injunction requested would not redress any alleged injury here, because, ultimately, whether to take action against any "misinformation" on any social media platform turns on "unfettered choices made by independent actors not before the court[], and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Defenders of Wildlife*, 504 U.S. at 562 (quoting *ASARCO*, 490 U.S. at 615 (opinion of Kennedy, J.)).

No injunction against Defendants could require every social media company, including Facebook, Twitter, YouTube, Google, Instagram, Reddit, and any other mentioned by the States, Compl. ¶¶ 51-65—none of whom is before this Court—to rescind or modify their policies on misinformation. Thus, no matter the relief entered here, users of social media would still be bound by each company's own Terms of Service and policies for the use of their platforms, including those related to misinformation. *See, e.g.*, *Huber*, 2022 WL 827248, at *5 ("Plaintiff does not dispute that she, like all Twitter users, is subject to Twitter's User Agreement as a condition of using her account," which agreement incorporates Terms of Service allowing for the suspension or termination of accounts for violating, among other things, its "COVID-19 Policy"). The Court "cannot presume" to "control" the content or enforcement of those third-party companies' misinformation policies, to which every user is bound through their terms of service. *Defenders of Wildlife*, 504 U.S. at 562.

Nor is it "likely, as opposed to merely speculative," that an injunction against Defendants would result in social media companies independently deciding to rescind or modify their misinformation policies. *Id.* at 561. Those policies, including those focused on COVID-19 and elections, have existed in some form since well before this Administration began and apply to billions of users across the globe. *See supra* at 4-7. And they apply to a whole host of information— not only those affecting the United States—arising in different contexts around the world. *See id.* The Complaint supplies no reason to conclude that the companies will veer away from their own business judgment and self-interest and stop engaging in content moderation against what they perceive to be misinformation.

Again, *AAPS* and *Changizi* are instructive. In *AAPS*, the court concluded that the plaintiff lacked Article III standing not only because the plaintiff failed to sufficiently allege causation, but

also because "[i]t [was] pure speculation that any order directed at Congressman Schiff . . . would result in the [technology] companies changing their behavior" towards the plaintiff. *AAPS I*, 518 F. Supp. 3d at 516. The court stressed that it was "not plausible" that Facebook or Twitter would suddenly "revise their policies on medical misinformation" as a result of an injunction restraining Congressman Schiff's activities. *Id.* And in *Changizi*, the court concluded that the plaintiffs failed to allege "that their requested relief is 'substantially likely' to mitigate Twitters' enforcement of its COVID-19 Policy," particularly given that Twitter had long been taking action against misinformation on its platform well before the actions alleged in the complaint. 2022 WL 1423176, *11-12; *see also Hart*, 2022 WL 1427507, at *10 (various content moderation measures taken by Facebook and Twitter had "no causal relationship with the Federal Defendants' actions, and no court order as to the Federal Defendants could redress it").

The States' failure to seek an injunction that would likely redress the injury they describe also suffers from a glaring timing problem. They purport to seek relief predicated on *past* episodes of social media platform content moderation, and based on those past episodes, they request relief enduring into the *future* that would essentially foreclose the federal government from speaking on matters of public concern. Even if the Court could enter such an injunction consistent with the government-speech doctrine, *see infra* at 55 (citing *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589 (2022)), relief that would punish the Federal Government for past episodes of social media content moderation cannot satisfy the redressability element: "Injunctive relief principally serves a remedial purpose, not a punitive one, and thus the injunction's collateral punitive effects do not by themselves satisfy Article III's redressability requirement." *See Nat'l Res. Def. Council v. Pena*, 147 F.3d 1012, 1022 (D.C. Cir. 1998) (punitive aspect of injunction could not support redressability because court "may not impose penalties in the guise of preventing future

violations") (citing *Hartford-Empire Co. v. United States*, 323 U.S. 386, 409 (1945)); *see also United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952) ("The sole function of an action for injunction is to forestall future violations").[23]

**B.  The States do not identify a waiver of sovereign immunity for any of their claims against the HHS and DHS Defendants.**

The States' claims against the agencies and their officials are claims against the United States. *Lewis v. Clarke*, 137 S. Ct. 1285, 1290-91 (2017) ("[L]awsuits brought against employees in their official capacity represent only another way of pleading an action against an entity of which an officer is an agent, and they may also be barred by sovereign immunity."). Yet "[i]t is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). The States bear the burden of showing that the government has consented to suit through an "unequivocal waiver of sovereign immunity." *St. Tammany Par., ex rel. Davis v. FEMA*, 556 F.3d 307, 315 (5th Cir. 2009). Any waiver of sovereign immunity, moreover, is "strictly construed, in terms of its scope, in favor of the" government. *Lane v. Pena*, 518 U.S. 187, 192 (1996).

---

[23] As to either Article III traceability or redressability, any purported injury to declarants from "ongoing *self-censorship* on social media," Disc. Reply Br. 3, also cannot show standing. At most, the declarants describe their wholly subjective impressions that if they were to post (unspecified) content, platform content moderation measures could ensue. But that requires piling inference on inference, by speculating about uncertain future posts, and uncertain platform moderation measures under governing terms of service, and uncertain responses by the platforms to relief ordered against the Federal Defendants. Such a "chain of contingencies" defies the "usual 'reluctan[ce] to endorse standing theories that require guesswork as to how independent decision makers will exercise their judgment.'" *Glass v. Paxton*, 900 F.3d 233, 239 (5th Cir. 2018) (quoting *Clapper*, 568 U.S. at 413). Moreover, some declarants have avoided posting certain content because, for reasons of their own, they prefer to remain on a particular platform rather than to move to an alternative platform with less restrictive terms of service. *Compare, e.g.*, Kitchen Decl. ¶ 35, ECF No. 10-11, *with id.* ¶ 36 (purporting to "self-censor[]" on Twitter, but not on multiple other platforms declarant uses). Such choices "inflict[] harm on" declarants "based on their fears" that no court order could redress. *See Clapper*, 568 U.S. at 416.

The Complaint cites no waiver of sovereign immunity for any of the States' claims against the HHS and DHS Defendants.[24] It is not enough that the States assert their claims "arise under the Constitution and laws of the United States," Compl. ¶ 7, presumably relying on 28 U.S.C. § 1331. While that statute provides subject-matter jurisdiction, it "does not constitute a waiver of sovereign immunity." *Smith v. Booth*, 823 F.2d 94, 97 (5th Cir. 1987).

Nor could the States correctly rely on 5 U.S.C. § 702,[25] which provides a limited waiver of sovereign immunity for actions against federal agencies "seeking relief other than money damages." *Sheehan v. Army & Air Force Exch. Serv.*, 619 F.2d 1132, 1139 n.12 (5th Cir. 1980), *rev'd on other grounds,* 456 U.S. 728 (1982). For § 702 to effectuate a sovereign immunity waiver as to the States' constitutional, APA and so-called "*ultra vires*" claims against the agencies and their officials, the States "must identify some 'agency action' affecting [them] in a specific way, which is the basis of his entitlement for judicial review." *Alabama-Coushatta*, 757 F.3d at 489; *Sierra Club v. Peterson*, 228 F.3d 559, 567 (5th Cir. 2000) (en banc) (plaintiffs must seek relief from "discrete" and identifiable agency action). That requirement applies whether judicial review is sought under the APA or instead under "a statutory or non-statutory cause of action that arises completely apart from the general provisions of the APA," *Alabama-Coushatta*, 757 F.3d at 489, including constitutional claims, *see Taylor-Callahan-Coleman Ctys. Dist. Adult Prob. Dep't*

---

[24] The HHS and DHS Defendants include the agencies and their officers sued in their official capacity.

[25] Section 702 provides: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party." 5 U.S.C. § 702.

*v. Dole*, 948 F.2d 953, 956 (5th Cir. 1991) (turning to § 702's waiver of sovereign immunity for APA and Fifth Amendment claims); *Cambranis v. Blinken*, 994 F.3d 457, 462 (5th Cir. 2021) ("Cambranis . . . relies on the sovereign immunity waiver contained in § 702 in order to bring his constitutional claim, seeking declaratory relief, against a department of the United States."). Furthermore, for APA claims (such as those the States have attempted to assert in their counts three and four), there is an additional requirement: the challenged "agency action" must also be "final." *Alabama-Coushatta*, 757 F.3d at 489; *Sierra Club*, 228 F.3d at 565.

The Complaint must be dismissed in its entirety because the States do not point to any discrete "agency action"—let alone a "final" one—that would trigger § 702's waiver of sovereign immunity as to any of their claims.

i. <u>All claims against the HHS and DHS Defendants must be dismissed because the States do not identify any "discrete agency action" that would waive sovereign immunity.</u>

Instead of challenging discrete "agency action[s]," the Complaint is "structured as a blanket challenge to *all* of the Government's" speech and conduct purportedly relating in any way to misinformation on social media platforms. *Alabama-Coushatta*, 757 F.3d at 490. Such a "wholesale" attack on government conduct does not satisfy § 702's "agency action" requirement. *Id.* Rather, the States must seek judicial review of an "identifiable action or event," *id.*, or, put differently, a "circumscribed, discrete agency action[]," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). Generalized challenges to an "entire 'program'" of agency administration, "consisting principally of . . . many individual actions," "cannot be laid before the courts for wholesale correction under the APA." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990).

Yet that is exactly what the States attempt in their 287-paragraph pleading. They seek review of conduct ranging from speech by the President, Compl. ¶ 165, and the Press Secretary, Compl. ¶¶ 166-69, 172, 201-02, 226-30, to publications by HHS, Compl. ¶¶ 161-65, 173-77, to all

46

publications and initiatives by DHS regarding information posted online, Compl. ¶¶ 178-82, 200, 205-07, 210-13, 215-24. The breadth of conduct and speech challenged in the Complaint is anything but "discrete." *Cf. Glenewinkel v. Carvajal*, No. 3:20-CV-2256-B, 2022 WL 179599, at *4-5 (N.D. Tex. Jan. 20, 2022) (finding no waiver of sovereign immunity because prisoners' Eighth Amendment claim was a broad "programmatic challenge" rather than a challenge to a "particular and identifiable action taken" by the Bureau of Prisons as to COVID-19).

The States cannot evade the discrete action requirement by relying on "certain specific examples of conduct" that are one piece of an allegedly unlawful "campaign." *Walmart Inc. v. U.S. Dep't of Justice*, 517 F. Supp. 3d 637, 655 (E.D. Tex. 2021), *aff'd* 21 F.4th 300 (5th Cir. 2021). Ultimately, the States' challenge is not to any "specific action[]," *Alabama-Coushatta*, 757 F.3d at 491, but instead to a wide range of actions and speech, past and future. *See, e.g.*, Compl. ¶ 5. *See Alabama-Coushatta*, 757 F.3d at 491 ("Even if the Tribe were to name some specific agency actions as examples of the agencies' alleged wrongdoing, it remains that the challenge is directed at the federal agencies' broad policies and practices[.]"); *Sierra Club*, 228 F.3d at 567 ("[T]he environmental groups [cannot] challenge an entire program by simply identifying specific allegedly-improper final agency actions within that program[.]"); *Walmart*, 21 F.4th at 309 ("[E]ven a few specific actions [a]re not enough to sustain a challenge 'directed at the federal agencies' broad policies and practices.).

This discreteness requirement is not a mere technicality. "The distinction between discrete acts, which are subject to judicial review, and programmatic challenges, which are not, 'is vital to the APA's conception of the separation of powers.'" *Walmart*, 517 F. Supp. 3d at 655 (quoting *City of New York v. U.S. Dep't of Defense*, 913 F.3d 423, 431 (4th Cir. 2019)). "Courts are well-suited to reviewing specific agency decisions," but are "woefully ill-suited . . . to adjudicate

generalized grievances asking" for wholesale review of government "performance or operations." *New York*, 913 F.3d at 431. The latter would force courts "either to enter a disfavored 'obey the law' injunction, . . . or to engage in day-to-day oversight of the executive's administrative practices." *Id.* The APA's waiver of sovereign immunity does "not contemplate[]" that kind of "pervasive oversight by federal courts." *Norton*, 542 U.S. at 66-67; *see also Sierra Club*, 228 F.3d at 567 (reversing an injunction "barring almost all timber harvesting in the Texas forests," because it amounted to "a general judicial review of the Forest Service's day-to-day operations" (alterations omitted)).

The relief sought here puts these separation of powers concerns on full display. The States ask for a generalized pronouncement that "Defendants' conduct violates the First Amendment of the U.S. Constitution and analogous provisions of Missouri's, Louisiana's, and other States' Constitutions," accompanied by an injunction prohibiting "Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from continuing to engage in unlawful conduct." Compl. at Prayer for Relief ¶¶ A., D. In other words, the States ask the Court to enter a comprehensive "obey-the-law" injunction against the entire federal government and invite precisely the kind of "pervasive oversight" (though how such a vague injunction would be manageable or enforceable is unclear) over a range of government conduct—even pure political speech—that separation of powers principles preclude. *Cf. Allen*, 468 U.S. at 760 ("A federal court is not the proper forum to press general complaints about the way in which government goes about its business." (cleaned up)).

Accordingly, the Court should dismiss each of the States' claims against the HHS and DHS Defendants for failure to show an unequivocal waiver of sovereign immunity.

ii.   The APA claims against HHS and DHS should be dismissed because the States do not identify a "final agency action."

Because the States do not challenge a "discrete agency action," they necessarily fail to challenge a "final agency action." In *Alabama-Coushatta*, the Fifth Circuit concluded that identifying a "final agency action" is an additional condition for the waiver of sovereign immunity as applied to APA claims, 757 F.3d at 489, and other decisions make clear that lack of finality implicates subject-matter jurisdiction, *see, e.g.*, *Texas v. EEOC*, 933 F.3d 433, 440-41 n.8 (5th Cir. 2019). Therefore, this provides an additional basis for dismissing the APA-specific claims against DHS and HHS at counts three and four of the Complaint.

Determining whether an agency action is "final" turns on a two-part test. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Id.* at 178; *see also Sierra Club*, 228 F.3d at 565. Conversely, agency action is not "final" if it "does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future . . . action." *Peoples Nat'l Bank v. Off. of the Comptroller of the Currency of the U.S.*, 362 F.3d 333, 337 (5th Cir. 2004) (quoting *Rochester Tel. Corp. v. United States,* 307 U.S. 125, 130 (1939)).

The States' allegations fail both parts of the *Bennet* test. Here, the States allege that the "final agency action" covers all of the DHS or HHS "Defendants' conduct alleged." Compl. ¶ 271. Yet nowhere do the States identify any agency action that marks the consummation of a decisionmaking process, let alone one that fixes any right or obligation or carries any legal consequence. The Complaint instead describes the States' disagreement with a range of agency speech—none of which, on its own, satisfies the *Bennett* test, much less in the aggregate.

49

II.     **The States' claims all fail on the merits.**

    A.     **The States fail to state a plausible First Amendment claim against any of the Defendants.**

Multiple parties, including the States here, have long tried to show that the content moderation decisions of private social media companies are subject to the First Amendment. But the First Amendment "safeguard[s] the rights of free speech" by imposing "limitations on *state action*, not on action by" private parties. *Lloyd Corp. v. Tanner*, 407 U.S. 551, 567 (1972) (emphasis added). Although a plaintiff, in limited circumstances, may establish a First Amendment claim based on private conduct if that conduct "can fairly be seen as state action," *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982), the Supreme Court has cautioned that courts should generally "avoid[] the imposition of responsibility on [the government] for" private "conduct it could not control," *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988). The Supreme Court recently reaffirmed this principle in *Manhattan Cmty. Access Corp. v. Halleck*, where it rejected the argument that a private entity's decisions over the content it would allow on a publicly accessible television broadcast constituted "state action." *See* 139 S. Ct. 1921 (2019). The Court emphasized that "enforcing that constitutional boundary between the governmental and the private" is necessary to "protect[] a robust sphere of individual liberty" and allow private entities to "exercise editorial discretion over the speech" in forums they control. *Id.* at 1928-30.

*Halleck* thus stressed that "a private entity can qualify as a state actor" only "in a few limited circumstances." *Id.* at 1928. That case concerned the "public function" test, whereby a private entity's decisions may be subject to Constitutional restrictions when it "performs a traditional, exclusive public function." *Id.* The Court rejected the argument the "operation of a public forum for speech" constitutes a "traditional, exclusive public function," *id.* at 1930, thus precluding parties from arguing that restrictions on social media platforms are subject to the First

Amendment simply because they are online forums for speech, *see, e.g., Prager Univ. v. Google LLC*, 951 F.3d 991, 995-99 (9th Cir. 2020) (concluding that YouTube is not a state actor, in light of *Halleck* and prior decisions). In attempts to evade *Halleck*'s holding, multiple parties, including the States here, have turned to a different legal theory: that the content moderation decisions of private social media companies constitute "state action" because those decisions were allegedly compelled by the government.[26] Like the parties before them, the States here fail to satisfy the rigorous state-action test.

Under that test, the government "can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the" government. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). "Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the" government "responsible for those initiatives." *Id.* at 1004-05. Further, when pursuing such a claim of state action, in addition to establishing coercion or a degree of encouragement approaching it, a plaintiff must also show that the government called on the private party to take the *precise action* at issue—*i.e.*, by "dictat[ing] the decision" made "in [that] particular case," *id.* at 1010, or insisting that the private party follow a "rule of decision" that would have *required* that action, *West v. Atkins*, 487 U.S. 42, 52 n.10 (1988); *see also Barnes v. Lehman*, 861 F.2d 1383, 1387 (5th Cir. 1988) ("Regulations that dictate procedures, forms, or even penalties *without dictating the challenged action* do not convert private action into state action."). It is not enough to show that the government recommended a general policy under which the

---

[26] *See, e.g., Divino Grp. LLC v. Google LLC*, No. 19-cv-04749, 2021 WL 51715, at *6 (N.D. Cal. Jan. 6, 2021); *accord Trump*, 2022 WL 1443233 at *7; *Huber*, 2022 WL 827248, at *9-10; *Children's Health Defense*, 546 F. Supp. 3d at 931-32; *Newman v. Google LLC*, No. 20-cv-04011, 2021 WL 2633423, at *9-10 (N.D. Cal. June 25, 2021).

private party retained discretion over whether to take the particular action at issue. *See West*, 487 U.S. at 52 n.10 (a "private party's challenged decisions could satisfy the state-action requirement if they were made on the basis of some rule of decision for which the State is responsible," but private party "decisions . . . based on independent professional judgments" would not constitute state action); *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974) (the "exercise of the choice allowed by" a government policy "where the initiative comes from [the private party] and not from the [government], does not make [the] action in doing so 'state action'" under the Constitution); *cf. Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) ("Action taken by private entities with the mere approval or acquiescence of the State is not state action.").

The States have not alleged that, under this stringent test, any Defendant is responsible for any moderation decision a social media company has made with respect to any resident of a Plaintiff State.

> i. <u>The States fail to make a plausible allegation of coercion or a similar degree of encouragement.</u>

The States' Complaint contains no plausible allegation that any Defendant coerced, or encouraged to a degree amounting to coercion, a social media company to take *any* type of action against misinformation. *See Am. Mfrs. Mut.*, 526 U.S. at 52; *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1346 (5th Cir. 1988) (the government is not responsible for private conduct "unless [it] has coerced or encouraged the party's decision to the extent that it was essentially the [government's] choice."). Here, the States appear to allege that two categories of speech by certain government officials amounts to "coercion": (i) general statements about the need to combat misinformation in various sectors, including online; and (ii) suggestions about possible antitrust actions against social media companies, or the need to reform § 230, but without any nonconclusory allegation of a connection between such statements and the actions of social

media companies taken against specific individuals. *See supra* at 7-15. Accordingly, Plaintiffs have failed to state a claim under the First Amendment.

To start, the States cannot establish any "coercion" or the like based on alleged statements by various Defendants, made both publicly and in discussions with social media companies, about their views on misinformation. It matters not that, in expressing their views, various Defendants have stated that social media companies should "step up" efforts to combat perceived misinformation. Compl. ¶ 156. On this point, *Louisiana Division Sons of Confederate Veterans v. City of Natchitoches* is instructive. 821 F. App'x 317, 319 (5th Cir. 2020). There, the plaintiff, the Sons of Confederate Veterans, applied to march in a city parade coordinated by a private business association. *Id.* at 318-19. In a letter, the Mayor asked the association to "prohibit the display of the Confederate battle flag in that year's parade," and two days later, the association denied the plaintiff's request to march in the parade. *Id.* at 319. The plaintiff argued that the association's decision amounted to "state action," and was thus subject to a First Amendment claim. The Fifth Circuit disagreed, noting that the "Mayor's letter" contained only "a request," and that "the decision to deny the [plaintiff's] parade application rested with the [association], not the City." *Id.* at 320. At most, the association "accepted the Mayor's request," and the court explained that "[r]esponding agreeably to a request and being all but forced by the coercive power of a governmental official are different categories of responses." *Id.* Similarly, here, even if certain Defendants "requested" that social media companies do more to contain misinformation, any content moderation decisions on social media platforms "rest[] with" those companies," and so those companies are not being "forced by the coercive power of a governmental official." *See id.*

The States also cannot satisfy the "coercion" requirement through their allegations that certain government actors generally stated that § 230 should be reformed to reduce social media

companies' immunity, or that those companies should come under greater antitrust scrutiny. As a threshold matter, it is unclear how these comments could be viewed as "threats" given that no Defendant could unilaterally take any of those actions. An amendment to § 230 would require Congressional action; the Defendants—Executive branch officials—cannot amend it alone. And only the Department of Justice or the Federal Trade Commission can choose to bring an antitrust action on behalf of the federal government against a private company. Furthermore, even if certain government actors have generally expressed support for to the reform of § 230, or a potential antitrust action, the States do not allege that any government official has said that they would refrain from pursuing those remedies if social media companies intensified their content moderation measures with respect to particular individuals in the Plaintiff States. Nor does the Complaint contain any nonconclusory allegation that a social media company has said that it took a content moderation measure because it felt coerced by any Defendant's statements.

The obvious alternative explanation for the statements the States describe as "coercive" is that they are routine expressions of political opinion on matters of public concern. How to deal with the influence of social media platforms on the direction of public discourse, and the rapid speed with which information spreads online, is an issue that many in the public and private sector have been discussing and debating for some time. As the States' own allegations show, social media companies and various government officials have been participating in that ongoing conversation since well before this Administration began. Part of the conversation about the power of social media companies has included debate over legislative reforms or the availability of antitrust actions. The legislative and executive debate about whether § 230(c) sufficiently meets current perceived needs does not reflect one-sided comments or steps by the Biden Administration and its "political allies." Compl. ¶¶ 116-35. Rather, Democratic and Republican legislators alike—

in addition to former President Trump—have made comments about or pushed for legislation to constrain content moderation decisions by social media platforms. *See supra* at 14-15. These attempts to address perceived problems concerning § 230(c) show that the Defendants' comments or steps in this area are not part of an impermissible effort to project federal power over social media companies, but instead simply reflect engagement in a dynamic policy debate about the conduct of social media platforms.

Moreover, inferring misconduct from these political policy statements would contradict settled First Amendment principles recognizing that "[i]t is the very business of government to favor and disfavor points of view." *Nat'l Endowment for the Arts*, 524 U.S. at 598 (Scalia, J., concurring). "When the government wishes to state an opinion" or "formulate policies," it "naturally chooses what to say and what not to say." *Shurtleff*, 142 S. Ct. at 1589 (citing *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207-08 (2015)). "The Constitution . . . relies . . . on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks." *Id.* (citing *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U. S. 217, 235 (2000)). The Supreme Court has illustrated this principle through an example relevant here: the government must have the "freedom to select the messages it wishes to convey" otherwise "[h]ow could [it] effectively develop programs designed to encourage and provide vaccinations?" *Walker*, 576 U.S. at 207-08 (quoting *Summum*, 555 U.S. at 468). So, "when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position." *Id.* at 208. That type of standard government speech cannot, and does not, amount to the type of "coercion" necessary to convert private conduct into state action. That conclusion does not change simply because the government is advocating action by a social media company, rather than an energy company, the

healthcare sector, the news media, or any of the multitude of other companies that the government calls to action on a daily basis.

> ii.  <u>The States fail to allege that any Defendant specifically directed any social media company to take any specific action against a post by any resident of a Plaintiff State.</u>

Even if the States had alleged some governmental action that rose to the level of coercion, their First Amendment claim against Defendants would still fail because they cannot satisfy the other requirement for showing that the government is responsible for private conduct: that any Defendant specifically "dictat[ed] the challenged action[s]" (*e.g.*, by specifically directing any social media company to take any precise action against a resident of a Plaintiff State), *Barnes*, 861 F.2d at 1387; *Blum*, 457 U.S. at 1010, or that any Defendant instructed any social media company to follow a "rule of decision" that would have *required* those actions (*e.g.*, by directing any social media company to adopt a policy under which it would *have* to take action content posted by against residents of the Plaintiff States), *West*, 487 U.S. at 52 n.10.

First, the States do not allege that any Defendant specifically called on any social media to target any particular post by a resident of the Plaintiff States. Although the States allege that certain persons affiliated with the Defendants "flagg[ed]" posts for social media companies, Compl. ¶ 202, the Complaint contains no nonconclusory allegation indicating that a flagged post came from any resident of the Plaintiff States. Nor do the States allege that any Defendant has required social media companies to follow a rule of decision under which they would have to target any posts by residents of the Plaintiff States. Although various Defendants have spoken generally of the need to address "misinformation," Plaintiffs do not allege that the government has called on any social media company to define "misinformation" in a manner that would necessarily encompass posts by residents of the Plaintiff States. Instead, multiple Defendants have expressly stated that the term "misinformation" has no clear definition. The Surgeon General acknowledged that there was no

concrete definition of "misinformation," and that when companies are deciding whether particular posts contain misinformation, they should "avoid conflating controversial or unorthodox claims with misinformation." Advisory at 17. Likewise, the Press Secretary clarified that social media companies must make the ultimate decision as to how they will address misinformation. *See supra* at 12-13.

Second, no Defendant has dictated that a particular social media company take any particular *content moderation measure* with respect to any specific State resident's post. *See, e.g.,* Compl. ¶ 64 (noting the various measures a social media company may take, including promoting or demoting content or suspending or terminating accounts). Rather, multiple Defendants have expressly acknowledged that determining whether and how to take action against misinformation is up to the discretion of social media companies. The Surgeon General's Advisory, for example, proposes a range of potential content moderation measures—including just labeling posts that contain misinformation—and cautions that companies should assess whether any measure might have "unintended consequences" or unjustifiably impede "free expression." *Supra* at 11; Advisory at 12 (noting that offending content may be "labeled" or "downranked," and that social media companies may address misinformation by "[p]rovid[ing] information from trusted and credible sources"). The Press Secretary also reiterated that although government officials endorsed several strategies for containing misinformation, social media companies ultimately had to decide which strategies (if any) to adopt. *See supra* at 12-13. She further explained:

> [T]o be crystal clear: Any decision about platform usage and who should be on the platform is orchestrated and determined by private-sector companies. Facebook is one of them . . . [a]nd there are a range of media who are—also have their own criteria and rules in place, and they implement them. And that's their decision to do. That is not the federal government doing that.

7-16 Press Briefing, at 30. Accordingly, none of the alleged comments made by the Defendants disturbed any social media company's discretion to determine which posts contained "misinformation," and, if so, what to do about them. Social media companies necessarily exercise their independent judgment if they conclude that any posts by residents of the Plaintiff States contain misinformation and that remedial measures are appropriate. Those actions are attributable to the *social media companies*, not the Defendants.

*Blum* is instructive. The plaintiffs there, Medicaid recipients in nursing homes, asserted constitutional claims against a state government based on the decisions of private physicians to transfer the plaintiffs to lower cost nursing homes. 457 U.S. at 991. The plaintiffs argued that they were transferred only because of government regulations requiring nursing homes to transfer patients to lower cost facilities when the higher cost facilities are not "medically necessary." *See id.* at 994, 1008. The plaintiffs thus argued that the government was ultimately responsible for the transfer decisions made by the plaintiffs' private physicians. But the Supreme Court rejected this argument, noting that although the government imposed a general "medical necessity" transfer requirement, the factual determination of "whether [a] patient's care is medically necessary"—and thus whether the patient will ultimately be transferred—is "made by [a] private part[y]" (the physician). *Id.* at 1006-08. Thus, the government "regulations themselves d[id] not dictate the decision to . . . transfer in a particular case." *Id.* at 1010. The Court further explained:

> [A]lthough . . . transfers are made possible and *encouraged* [by the government regulations] for efficiency reasons, they can occur only after the decision is made that the patient does not need the care he or she is currently receiving. The [government] is simply not responsible for *that* decision . . . [and] if a particular patient objects to his transfer to a different nursing facility, the 'fault' lies not with the [government] but ultimately with the judgment, made by concededly private parties, that he is receiving expensive care that he does not need.

*Id.* at 1008 n.19 (emphasis added); *see also Rendell-Baker*, 457 U.S. at 841 (noting that the Court found state action lacking in *Blum* even though "[b]oth state and federal regulations encouraged the nursing homes to transfer patients to less expensive facilities when appropriate").

The same reasoning applies even more forcefully here. Unlike in *Blum*, where the private parties' decisions were governed by federal regulation, here, social media companies' content moderation decisions are not governed by such regulations. After all, no federal regulation adopts an official definition of the term "misinformation" or directs social media companies when to take action concerning it. Moreover, just as the private parties in *Blum* exercised their own judgment to determine whether certain care met the regulatory definition of "medical necessity," the social media companies here are exercising their own judgment to determine when a post contains "misinformation" (or sufficient "misinformation" to warrant content moderation) under their policies. *See supra* at 12-13. Although Defendants have at most encouraged the companies to take steps regarding misinformation, Plaintiffs do not allege that any Defendant "dictate[d] the decision" over whether misinformation was present "in [any] particular" post made by a resident of a Plaintiff State. *Blum*, 457 U.S. at 1010.

For similar reasons, the Northern District of California recently dismissed a nearly identical suit. In *Children's Health Defense v. Facebook, Inc.*, the plaintiff claimed that Facebook violated the First Amendment by "censor[ing] [the plaintiff's] vaccine safety speech" on the platform at the encouragement of Congressman Schiff and the Centers for Disease Control ("CDC"). 546 F. Supp. 3d at 915. In particular, the plaintiff alleged that Congressman Schiff "urge[d] that Facebook implement specific algorithms to identify, censor and remove all so-called 'vaccine misinformation,'" and that the CDC "works with 'social media partners,'" including Facebook, "in its 'Vaccine with Confidence' initiative." *Id.* at 916, 919. The plaintiff alleged that, as a result

of governmental pressure, Facebook took action against certain posts by the plaintiff identifying the allegedly "severe health dangers of certain vaccines and technologies." *Id.* at 919. Yet the court concluded that neither Congressman Schiff nor the CDC was responsible for the content moderation decisions Facebook took with respect to the plaintiff's post. It explained: "the phrase 'vaccine misinformation' is a general one that could encompass many different types of speech and information about vaccines," and thus the "general statements" by Congressman Schiff and the CDC concerning "vaccine misinformation" did not "mandate[] the particular actions that Facebook took with regard to [the plaintiff's] Facebook page." *Id.* at 926, 930. The court further noted that Facebook took those "particular actions" based on "its own algorithms and standards for detecting 'vaccine misinformation.'" *Id* at 930. The same is true here, as the States similarly fail to allege that Defendants dictated a finding that any specific post by a resident of a Plaintiff State contains misinformation and warrants any content moderation measure. Those particular decisions are neither "coerc[ed]" nor taken only upon "such significant encouragement" that they "must in law be deemed to be that of the" Defendants. *Blum*, 457 U.S. at 1004.

### B.  The States fail to state plausible "*ultra vires*" claims.

The States' so-called "*ultra vires*" claim in Count Two must be dismissed because the States have failed to allege conduct that satisfies the demanding standard for an *ultra vires* claim.[27] For that type of claim, Plaintiffs must "do more than simply allege that the actions of

---

[27] The Fifth Circuit has expressed doubts about the continued validity of the court-created exception to sovereign immunity in light of the 1976 amendments to the APA. *See Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985) (recognizing that the "principal purpose" of the 1976 Amendments—which "waived sovereign immunity for suits seeking nonmonetary relief through nonstatutory judicial review of agency action" —"was to do away with the ultra vires doctrine and other fictions surrounding sovereign immunity" (citing Act of Oct. 21, 1976, Pub. L. No. 94-574, § 1, 90 Stat. 2721, 2721 (codified at 5 U.S.C. § 702 (1982))); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 116 (1984) (noting that "the *ultra vires* doctrine [is] a narrow and questionable exception" to sovereign immunity).

the officer are illegal or unauthorized." *Danos v. Jones*, 652 F.3d 577, 583 (5th Cir. 2011). Rather, they must allege that a federal official acted "without any authority whatever," or without any *colorable basis* for the exercise of authority." *Id.* (quoting *Pennhurst*, 465 U.S. at 101 n.11) (emphasis added). The States have not sufficiently alleged that Defendants lack "any authority whatsoever" to engage in standard, nonbinding speech—the kind of speech government officials engage in when they participate in news media interviews or speak from the lectern. Perhaps recognizing this, the States try to support their *ultra vires* claim by claiming that Defendants have acted in violation of the First Amendment and the APA. *See* Compl. ¶¶ 263, 274, 285. However, as explained in *supra* at 50-60 and *infra* at 61-63, the First Amendment and APA claims lack merit.

### C.  The States fail to state plausible APA claims against HHS or DHS.

Counts Three and Four appear to allege, in perfunctory fashion, various theories in support of APA claims against HHS and DHS. Compl. ¶¶ 269, 280 (reciting elements of causes of action under 5 U.S.C. § 706(A)-(D)).

As an initial matter, as explained above, *see supra* at 46-49, the States' APA claims fail because the Complaint does not identify any discrete and final agency action that could be subject to judicial review. *Id.* § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). But these claims also fail on their merits.

First, to the extent the States contend that HHS or DHS have acted "contrary to constitutional right," *Id.* § 706(2)(B)," their APA claims simply duplicate their First Amendment claim. *See* Compl. ¶¶ 273-74 (referring back to the allegations in count one to support this claim). For the reasons stated above, the States fail to plausibly allege a First Amendment claim against any Defendant. *See supra* at 50-60. The States' duplicative APA claim necessarily fails as well.

Second, contrary to the States' characterization of the challenged remarks as "in excess of statutory authority," 5 U.S.C. § 706(2)(C), because "[n]o statute authorize[d]" them, Compl. ¶ 264, government officials need no express statutory authorization to simply engage in speech. Although "an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (emphasis added), "an agency without legislative rulemaking authority may" still "issue . . . non-binding statements," *Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980). A "legislative-type rule," or "substantive rule," is one that is "binding" or has the "force of law," and "affect[s] individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979). Here, the comments at issue are not "legislative" or "substantive" rules that require Congressional authorization. They are simply nonbinding statements that convey the policy views of government officials. Thus, Plaintiffs fail to state a claim for relief on this basis as well.

Third, while the Complaint invokes 5 U.S.C. § 706(2)(A) or (D), it merely offers "labels and conclusions," and "formulaic recitation[s] of the elements of a cause of action," without "further factual enhancement." *Iqbal*, 556 U.S. at 678. The Complaint appears to throw in every possible *legal* theory on which a claim for relief could be based under these subsections of the APA. *See* Compl. ¶¶ 272, 275 (alleging that the HHS and DHS Defendants' conduct "is arbitrary, capricious, and an abuse of discretion," and thus in violation of 5 U.S.C. § 706(2)(A), "because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem, disregards settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the unlawful nature of [Defendants'] conduct, among other reasons"); *id.* ¶¶ 283, 286 (alleging that the HHS and DHS Defendant's "conduct was 'without observance of procedure required by law,'" and thus in violation of 5 U.S.C. § 706(2)(D), "because it is a substantive policy or series of policies that

affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process"). Yet those bare legal conclusions are not supported by any factual allegations about the actions of HHS or DHS.

The States thus fail to state any basis for entitlement to relief under the APA, and counts three and four therefore should be dismissed.

## III. The separation of powers doctrine independently requires dismissal of the President from this action.

At any rate, the President is properly dismissed from this action because the requested equitable and declaratory relief is categorically unavailable against him. By history and tradition, injunctive relief has long been unavailable against the President under Supreme Court precedent concerning the separation of powers. Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.,* 135 S. Ct. 1378, 1384 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Here, there is no tradition of equitable relief against the President.

More than a century and a half ago the Supreme Court concluded that it had "no jurisdiction of a bill to enjoin the President in the performance of his official duties; and that no such bill ought to be received by" the Court. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 498, 501 (1866). *Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (plurality opinion), more recently underscored that conclusion. The plurality observed that *Mississippi v. Johnson* "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." *Id.* at 802. But it repeated that "in general," the Court lacked jurisdiction to issue an injunction against the President "in the performance of his official duties"—calling this relief "extraordinary" such that it should "raise[] judicial eyebrows." *Id.* at 802–03

63

(cleaned up). And Justice Scalia's concurrence was in accord with that conclusion. *See id.* at 826 (Scalia, J., concurring in part and concurring in the judgment) ("I think it clear that no court has authority to direct the President to take an official act."); *id.* at 827 (describing *Mississippi* as "emphatically disclaim[ing] the authority" to "issue an injunction requiring the President to take specified executive acts"); *see Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 224-25 (D.D.C. 2020) (recognizing Justice Scalia's concurrence as "signaling that it was supported by a majority of the Justices"), *vacated as moot on appeal*, No. 21-5062 (D.C. Cir. Aug. 9, 2021). And the Supreme Court has repeatedly refused to second-guess the legality of the President's discretionary decisions. *See, e.g.*, *Dalton v. Specter*, 511 U.S. 462, 474-75 (1994); *Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 114 (1948); *Mississippi*, 71 U.S. at 499. Of course, "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Franklin*, 505 U.S. at 828 (Scalia, J., concurring in part); *see, e.g., Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585-89 (1952).

In other words, as "to the President, courts do not have jurisdiction to enjoin him and have never submitted the President to declaratory relief[.]" *Foley v. Biden*, No. 4:21-cv-01098, 2021 WL 7708477, at *2 (N.D. Tex. Oct. 6, 2021) (quoting *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010)). As a result, here, the Court should dismiss him as a Defendant however else the Court rules on the Rule 12(b)(1) or 12(b)(6) grounds for dismissal.[28]

---

[28] The bar against injunctive or declaratory relief against the President applies even if it is not considered "jurisdictional." To be sure, courts have repeatedly described the bar against as jurisdictional in character. *See Franklin*, 505 U.S. at 802-03; *Newdow*, 603 F.3d at 1013 ("With regard to the President, *courts do not have jurisdiction to enjoin him*, and have never submitted the President to declaratory relief[.]" (emphasis added)). But even if that bar were considered non-jurisdictional, it still would be a "threshold" basis for ending the case without further inquiry into

## CONCLUSION

The States assert claims over which the Court lacks jurisdiction, and which lack merit, all in an attempt to obtain a gag order against large swaths of the federal government. The Court should decline to suppress the speech of federal government officials under the guise of protecting the speech rights of others. The Court should grant Defendants' Motion to Dismiss the States' claims for lack of subject-matter jurisdiction or for failure to state a claim.

Dated:  July 12, 2022                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney General

                                         ERIC WOMACK
                                         Assistant Director, Federal Programs Branch

                                         */s/ Kyla Snow*
                                         KYLA SNOW (Ohio Bar No. 96662)
                                         INDRANEEL SUR
                                         KUNTAL CHOLERA
                                         Trial Attorneys
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L. Street, NW
                                         Tel: (202) 514-3259
                                         Washington D.C. 20005
                                         Kyla.Snow@usdoj.gov

                                         *Attorneys for Defendants*

---

the merits. *Cf. Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005) ("unique and categorical" rule of *Totten v. United States*, 92 U.S. 105 (1876), prohibiting suits based on covert espionage agreements, is sort of "threshold question" court may "resolve[] before addressing jurisdiction").