RECEIVED
IN MONROE, LA.

JUL 2 8 2022
AM
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

| | |
|---|---|
| STATE OF MISSOURI *ex rel.* ERIC S. SCHMITT, Attorney General, and STATE OF LOUISIANA ex rel. JEFFREY M. LANDRY, Attorney General,             *Plaintiffs*, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,             *Defendants.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) )      Civil Action No. 3:22-cv-01213 |

**<u>REQUEST FOR LEAVE TO INTERVENE</u>**

1.    And, comes now to the Court, seeking declaratory relief, as authorized under the *Declaratory Judgments Act*, 28 U.S.C. §§ 2201 and 2202, *see also* Fed.R.Civ.Pro. 57, Major Mike Webb, a litigant and *pro se* advocate in *Webb v. Fauci*, Civil Action No. 3:2021-cv-00432 (E.D.Va. 2021), *on appeal* Record No. 21-2394 (4th Cir. 2021), *on appeal* Record No. 21-8242 (U.S. 2022); *see also Webb v. Fauci*, Record No. 21-6868 (U.S. 2022), and presumptive intervenor in *U.S. Navy SEALS 1-26 v. Biden*, Civil Action No. 22-10077 (N.D. Tx. 2021), *on appeal* Record No. 22-10597 (5th Cir. 2022), *on application for prejudgment* Record No. TBD (U.S. 2022), arising from, *inter alia* a claim brought under the *Freedom of Information Act (FOIA)*, 5 U.S.C. § 552, regarding the classification of the infectious dose and/or secondary attack rate, standard epidemiological metrics, *see Principles of Epidemiology in Public Health Practice, Third Edition: An Introduction to Applied Epidemiology and Biostatistics*, "Lesson 3: Measures of Risk: Section 2: Morbidity Frequency Measures," *CDC*, May 18, 2012, for COVID-19, with credible evidence that the biological causative agent, SARS-CoV-2, had not

been zoonotically evolved, as repeatedly alleged by the President's top medical adviser, Anthony Fauci, *see* Jerry Dunleavy, "Fauci says he still thinks nature, not Wuhan lab, 'most likely' origin for COVID-19," *Washington Examiner*, July 17, 2021; *see also* Cecelia Smith-Schoenwalder, "Biden: Intelligence Community Must 'Redouble' Efforts to Find Coronavirus Origin," *U.S. News & World Report*, May 26, 2021, but rather is a biological agent, known early to possess an ophidian codon usage bias, an ophidian codon usage bias, Wei Ji, *et al.*, *Cross-species transmission of the newly identified coronavirus 2019-nCoV*, J. Med. Vir. (April 2020), *epub.* February 19, 2020, a chimerical departure from nature, in an aberration for coronaviruses that only infect mammalian and avian species, Justyna Miłek & Katarzyna Blicharz-Domańska, *Coronaviruses in Avian Species – Review with Focus on Epidemiology and Diagnosis in Wild Birds,* J. Vet. Res. (September 2018), *epub.*, December 10, 2018, and in which clear and convincing evidence established that the U.S. government holds a proprietary interest, by operation of law, meaning that it would have had to have been cultivated in a laboratory. *See Association for Molecular Pathology v. Myriad Genetics*, Docket No. 12-398, 566 U.S. ___ (2013); *Diamond v. Chakrabarty*, 447 U. S. 303 (1980).

<u>**Common Question of Law or Fact**</u>

<u>***Candidate Free Speech***</u>

2.   While intriguingly, Intervenor who has been described as a "litigation hobbyist", Order, *Navy SEALs 1-26 v. Biden*, Civil Action No. 4:21-CV-01236-O (N.D.Tex. May 23, 2022), has received no press attention. *But see* Lowell Feld, "Arlington School Board Member James Lander (D) Draws Porn Tab Guy. . ." *Blue Virginia*, December 28, 2016; mahatmakanjeeves, "Mike Porn Tabs Webb Running for Arlington School Board," Democrat Underground, December 28, 2016; Dan Evon, "Congressional Candidate Posts Screengrab with Porn Tabs," *Snopes* May 17, 2016; Newsroom, "Conservative Congressional Candidate

Accidentally Reveals Porn Tabs," *CBS News*, May 17, 2016; Scott Broadbeck, "Webb: I Was

Testing Porn Sites for Viruses," *ARL Now*, May 17, 2016; Scott Broadbeck, "Most-Read

Arlington Stories of 2016 (#11-15): 13. Congressional Candidate's Apparent Porn Post

Going Viral (18,390 views)," *ARL Now*, December 28, 2016; Justin Wm. Moyer,

"Politicians, take note: Don't post screenshots that show your porn tabs," *Washington Post*,

May 17, 2016; Ryan Bort, "Politicians and Porn: 10 Great Internet Fails," Rolling Stone,

September 14, 2017; Staff, "Politicians and Porn—Five Classic Online Fails," Nigeria

Today, September 15, 2017. *But see also* Newsroom, "Rhode Island Lawmaker Accidentally

Distributes Documents with Porn References," *CBS News*, July 11, 2017.

3. The nation's highest court had once recognized that "closely allied to freedom of speech and

a right which, like free speech, lies at the foundation of a free society", *Shelton v. Tucker*,

364 U. S. 479 (1960), that "it can hardly be doubted that the constitutional guarantee has its

fullest and most urgent application precisely to the conduct of campaigns for political office",

*Monitor Patriot Co. v. Roy*, 401 U. S. 265 (1971), and that "a candidate's expenditure of his

personal funds directly facilitates his own political speech", n.58, *Buckley v. Valeo*, 424 U.S.

1 (1976).

4. As acknowledged by the Federal Elections Commission (FEC), Intervenor had been a

candidate for U.S. Congress seeking placement on the ballot in November 2020. *See Webb v.

FEC*, Civil Action No. 3:2022-CV-0047 (E.D.Va. 2022) (assessing value of candidate

committee receipts and disbursements at $203,047.00); *Webb v. Dept. of Treasury*, Civil

Action No. TBD (D.C. 2022) (challenging assessed civil money fine in the amount of

$12,645.10).

5. Intervenor, publicly acknowledged as  having been "against current government efforts and recommendations for safety during the COVID-19 pandemic", Staff, "Mary Kadera: Democrat," *Progressive Voters Guide*, September 15, 2021; *but see* Scott McCaffery, "Republicans pass on endorsing School Board contender," *Arlington Sun Gazette/Inside NOVA*, October 8, 2021[1]; Michael Lee Pope, "Fauci Flip Flop," *Alexandria Connection*, June 2, 2022, had brought the first filed and longest surviving challenge to the lockdown orders in the Commonwealth, seeking, *inter alia* relief against the lockdowns, in derogation of his rights to free exercise of religion through in-person worship, as averred below, as well as seeking an extension for solicitation of signatures to qualify as a candidate for U.S. Congress, under claim to entitlement to appear on the ballot, as defined under Va. Code § 24.2-504, and to perfect such claim, pursuant to Va. Code § 24.2-506, by presenting, by the second Tuesday in June, at least a total of 1,000 valid signatures from persons within his district, but was granted no temporary restraining order and was denied relief therefrom. *Webb v. Northam*, Case No. Case No. CL20001624 (Alexandria Cir.), *on appeal* Docket No. 210536 (Va. 2021).

6. In the alternative, Intervenor had sought a grant of a pandemic exception, reducing the number of valid signatures required for qualification to appear on the ballot as had been granted to a similarly situated person, *see Omari Faulkner for Virginia, et al. v. Virginia Department of Elections, et al.*, Case No. CL-20-1456 (Richmond GDC. 2020), *on appeal Omari Faulkner for Virginia, et al. v. Virginia Department of Elections, et al.*, Case No. VLW 020-8-024 (Richmond Cir. 2020), but was denied. *Webb v. SBE*, Case No. CL20-2459-

---

[1] "In one of the less surprising moments of the 2021 campaign season, Republicans on Oct. 7 voted – unanimously – to endorse neither Democratic-backed Mary Kadera nor independent Mike Webb in the race to succeed Democrat Monique O'Grady." *Id.*

00 (Richmond Cir. 2020). *See also In Re: Major Mike Webb*, Case Number 20-1997 (4th Cir. 2020).

7. Intervenor, in due diligence, had been fully cognizant that "months of discord about the coronavirus epidemic have transformed the cloth mask into a potent political symbol, touted by Democrats as a key part of communal responsibility, labeled by some GOP leaders as a sign of government overreach and as a scarlet letter pinned on the weak", Ben Guarino, Chelsea Janes & Ariana Eunjung Cha, "Spate of new research supports wearing masks to control coronavirus spread," *Washington Post*, June 13, 2020.

8. Intervenor, in due diligence, had been fully cognizant that nonmedical grade substitutes for medical grade respiratory protection had been rigorously tested a decade prior, and employing "the gold standard efficacy testing apparatus, a Model 8130 Automatic Filter Tester, Staff, "Automated Filter Tester: 8130A," *TSI*, https://www.tsi.com/products/filter-testers/automated-filter-tester-8130a/ (accessed May 30, 2020), as well as a TSI 3160, "the most advanced system available for challenging filters and filter media with submicrometer aerosols," Staff, "Certitest Automated Filter Tester Model 3160," *TSI*, https://www.tsi.com/getmedia/5ee9520b-eadf-4ad9-89a4-1be3c7bd2c5c/3160-Auto-Filter-Test_US_5001197_RevD_Web?ext=.pdf (accessed May 30, 2020).

9. Intervenor was fully cognizant that researchers at the National Institute for Occupational Safety and Health (NIOSH)/National Personal Protective Technology Laboratory—Technology Research Branch had observed that "[a] shortage of disposable filtering facepiece respirators can be expected during a pandemic respiratory infection", and had definitively determined that "[t]he penetration levels of these fabric materials against both polydisperse and monodisperse aerosols were *much higher than the penetrations for the*

*control N95 respirator filter media*" and that "[r]esults obtained in the study show that common fabric materials may provide [only] marginal protection against nanoparticles including those in the size ranges of virus-containing particles in exhaled breath." Samy Rengasamy, *et al.*, *Simple Respiratory Protection—Evaluation of the Filtration Performance of Cloth Masks and Common Fabric Materials Against 20–1000 nm Size Particles*, 54 Ann. Occup. Hyg. 7, pp. 789–798 (2010).

10. Intervenor, in due diligence, was fully cognizant that, under regulatory deference doctrine, "[i]f this choice [of a regulatory agency] represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned", *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) (citations omitted), that "'[j]udicial review of agency action. . . is limited to 'the grounds that the agency *invoked when it took the action*,'" *DHS v. Regents of the University of California*, 591 U.S. ___ (2020) (quoting from *Michigan v. EPA*, 576 U. S., at 743) (emphasis added), that, without more, mere "views could not affect the validity of the statute, nor entitle him to be excepted from its provisions". *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) (citing *Commonwealth v. Connelly,* 163 Massachusetts 539; *Commonwealth v. Has,* 122 Massachusetts 40; *Reynolds v. United States,* 98 U.S. 145; *Regina v. Downes,* 13 Cox C.C. 111.), or that "[t]he only 'competent evidence' that could be presented to the court to prove these propositions was the testimony of experts, giving their opinions." *Id.* (quoting *Commonwealth v. Jacobson,* 183 Massachusetts 242 (1904). *See also* Fed.R.Evid. 701.

11. Intervenor was fully aware, in due diligence, that a hasty review, commissioned by the World Health Organization (WHO), of 172 recent observational studies had determined that "[t]he

credibility of effect modification across settings was, therefore, low"[2], and had determined

that 12 to 16 layer cotton surgical masks might not provided protection against a novel

coronavirus. Derek K. Chu, *et al.*, "Physical distancing, face masks, and eye protection to

prevent person-to-person transmission of SARS-CoV-2 and COVID-19: a systematic review

and meta-analysis," *The Lancet*, June 1, 2020 https://doi.org/10.1016/S0140-6736(20)31142-

9. *See also* Ben Guarino, Chelsea Janes & Ariana Eunjung Cha,"Spate of new research

supports wearing masks to control coronavirus spread," *supra*[3].

12. In due diligence, Intervenor was aware that research upon which the Virginia Governor had

relied, had observed that "historically epidemics are a time of fear, confusion and

helplessness", in research expressly seeking to "advance[] the use of the 'precautionary

principle' as a key consideration in developing policy around use of non-medical masks in

public", Jeremy Howard, *et al.*, "Face Masks Against COVID-19: An Evidence Review,"

*Preprints*, doi:10.20944/preprints202004.0203.v2 (May 13, 2020), a UNESCO precept that

has been expressly rejected by American courts, *Sancho v. U.S. Dept. of Energy*, 578 F.

Supp. 2d 1258 (D. Haw. 2008), and had recommended universal mask wearing "to serve as a

visible signal and reminder of the pandemic,", relying upon "the importance of ritual and

solidarity in human societies", Jeremy Howard, *et al.*, "Face Masks Against COVID-19: An

Evidence Review," *supra* (citing 70), and suggesting that "it is plausible that visible, public

signaling via mask wearing can potentially increase compliance with other health measures

---

[2] "We did not specifically assess the effect of duration of exposure on risk for transmission, although whether or not this variable was judged a risk factor considerably varied across studies, from any duration to a minimum of 1 h." *Id.*
[3] "'Our findings suggest, in multiple ways, that the use of masks is highly protective in health-care and community settings,' said the author of the review, Holger Schünemann, an epidemiologist and physician at McMaster University in Ontario.

But that conclusion came with an important caveat: 'We have low certainty in that," Schünemann said, meaning the authors cannot be strongly confident in the result.'" *Id.*

as well, such as keeping distance and hand-washing." *But see West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943)[4]; *Stanley v. Georgia*, 394 U.S. 557 (1969)[5]. *But see also* Naomi Lim, "'It's not about your rights': Biden calls for three-month, nationwide mask mandate," *Washington Examiner*, August 13, 2020.

13. And, accordingly, in due diligence, Intervenor had brought the first challenge and longest surviving litigation challenge to the nonmedical grade facial coverings mandates in the Commonwealth, for which his arguments were deemed to be only "mere criticisms" and "enigmatic allegations", Order, *Webb v. Northam*, Civil Number Civil Action No. 3:20-CV-497 (E.D.Va. August 25, 2020); *but see U.S. v. United States Gypsum Co.*, 333 U.S. 364 (1948); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and the matter did not prevail, even on appeal to the nation's highest court. *Webb v. Northam*, Civil Number Civil Action No. 3:20CV497 (E.D.Va. 2020), *on appeal Webb v. Northam*, Record Number 20-1968 (4th Cir. 2020), *certiorari denied*, Record No. 21-6170 (U.S. 2021).

### An Interest Related to the Property or Transaction

### *Free Exercise Clause*

14. On information and belief, like one figure in the Abrahamic faith tradition recorded to have, "in the year that King Uziah died", seen "*also* the Lord", but "sitting upon a throne, high and lifted up," where His "train filled the temple", *Isaiah* 6:6 (KJV) (emphasis added), Intervenor was born and groomed in the priestly tradition, as the son, grandson and godson of Negro pastors, with two family churches on the National Historic Registry, as well as the recipient

---

[4] "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, or force citizens to confess by word or act their faith therein." *Id.*
[5] "Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds." *Id.*

of an infamous letter from the Congregation for the Causes of Saints at the Vatican, as in

evidence at Exhibit **A**, and it is of significant note, almost prophetically so, that the Christian

Savior did acknowledge of his faithful adherents, "I send you forth as sheep in the midst of

wolves: be ye therefore wise as serpents, and harmless as doves." *Matthew* 10:16 (KJV).

15. *Divide et impera*, divide and conquer, is an ancient military stratagem and tactic, but there

was bipartisan agreement by December 2020, only after a contentious election, that "China

poses the greatest national security threat to the United States" and there was bipartisan

agreement regarding the clear message from intelligence collection analysis that "the Chinese

Communist Party will stop at nothing to exert its global dominance", noting, while certainly

discordant from popular headlines today, that "[o]ur democratic values are threatened by

China's attempts to supplant American leadership and remake the international community in

their image" and that "[t]he Chinese Communist Party's authoritarian leaders seek to threaten

our free speech, politics, technology, economy, military, and even our drive to counter the

COVID-19 pandemic." Press Release, "STATEMENT: Warner, Rubio on National Security

Threat Posed By China," *Senator Mark Warner*, December 4, 2020. *But see* Dave Ress,

"Rep. Elaine Luria prepares to lead Jan. 6 committee hearing, focusing on threat to

democracy," *Daily Press*, July 20, 2022; Ian Millhiser, "A new Supreme Court case is the

biggest threat to US democracy since January 6," *Vox Media (UK)*, June 30, 2022; Brittany

Shepherd, "Majority of Americans think Jan. 6 attack threatened democracy: POLL," *CNN*,

January 2, 2022; Joan E. Greve, "Historians mark 6 January with urgent warning on threats

to US democracy," *The Guardian (UK)*, January 6, 2022.

16. Truly in this public health crisis, wherein some had, in aspiration, expressed great general

optimism in mankind that "the threat of a pandemic has become very real; however, this

would be the first pandemic in history that could be controlled", WHO, *Coronavirus disease*

*2019 (COVID-19) Situation Report – 50*, March 10, 2020, "[s]urely we have learned by now,

that we underestimate this virus at our peril", Staff, "2021 Year in Review: 'We

underestimate this virus at our peril'," *UNSDG*, December 28, 2021, "all experience hath

shewn, that mankind are more disposed to suffer, while evils are sufferable, than to right

themselves by abolishing the forms to which they are accustomed." *Declaration of*

*Independence*.

17. Before a pandemic declaration, it was acknowledged that "[s]elf-described atheists now

account for 4% of U.S. adults, up modestly but significantly from 2% in 2009; agnostics

make up 5% of U.S. adults, up from 3% a decade ago; and 17% of Americans now describe

their religion as 'nothing in particular,' up from 12% in 2009", while it was also known that

"[o]ver the last decade, the share of Americans who say they attend religious services at least

once or twice a month dropped by 7 percentage points, while the share who say they attend

religious services less often (if at all) has risen by the same degree", "Americans now say

they attend religious services a few times a year or less (54%) than say they attend at least

monthly (45%)," and according to "telephone surveys conducted in 2018 and 2019, 65% of

American adults describe themselves as Christians when asked about their religion, down 12

percentage points over the past decade." Staff, "In U.S., Decline of Christianity Continues at

Rapid Pace," *Pew Research Center*, October 17, 2019.

18. A robust effort that had prepared essentially an "intelligence dump", and now identified as

the "Religious Restrictions project", that had been acknowledged to have been "a long time

in the making", before the emergence of a febrile infection giving rise to a pneumonia of

unknown etiology began making headline news, that had been targeted specifically at

Christian churches, Drew Silver, "Q&A: Why we studied American sermons and how we did it," *Pew Research Center*, December 16, 2019, a time when it was reported that "[t]he Chinese military officially put into service the CNS Shandong, its second aircraft carrier, on 17 December 2019", Clement Charpentreau, "Not a casino this time: China launches second aircraft carrier," *Aerotime*, December 17, 2019[6], and some have identified an "invisible enemy", D. M. Shaw, *Invisible Enemies: Coronavirus and Other Hidden Threats*, 17 J. Bioeth. Inq. 4, pp. 531-534 (December 2020), doi: 10.1007/s11673-020-10015-w, *Epub* August 25, 2020, and "[a]ll warfare is deception", while one military strategist had observed that "the general who wins a battle makes many calculations in his temple ere the battle is fought", and that "[t]he general who loses a battle makes but few calculations beforehand", concluding that "[t]hus do many calculations lead to victory, and few calculations to defeat: how much more no calculation at all!" Sun Tsu, *The Art of War*, Lionel Giles translation (May 1994), *updated* December 28, 2005.

19. As national public health authorities have suggested, "this virus isn't stupid", but "human behavior in this pandemic hasn't served us very well", Meg Tirrell, "CDC director says the Covid pandemic's end date depends on human behavior," *MSNBC*, October 8, 2021, and, notwithstanding that fact that it was early reported that "[m]ore than half of all U.S. adults (55%) say they have prayed for an end to the spread of coronavirus", that "[l]arge majorities of Americans who pray daily (86%) and of U.S. Christians (73%) have taken to prayer during the outbreak – but so have some who say they seldom or never pray and people who say they do not belong to any religion (15% and 24%, respectively)", Staff, "Most Americans

---

[6] The *Shandong*, China's first domestically built aircraft carrier, joined its first aircraft carrier, a re-engineered former Soviet warship, the *Liaoning*, in 2017. Bill Ide, "China Launches Second Aircraft Carrier," *VOA*, April 26, 2017.

Say Coronavirus Outbreak Has Impacted Their Lives," *Pew Research Center*, March 30, 2020.

20. While it was reported that "[o]ver the past six months, the Commonwealth's COVID mitigation efforts have proven to be extremely effective in preventing further spread of the virus and keeping Virginians healthy", the count was as few as only 15 challenges, Lowell Feld, "AG Mark Herring Again Successfully Defends Virginia's COVID Safety Measures," *Blue Virginia*, August 24, 2020, in a state that heralds itself as the birth of religious freedom, the source of the *Virginia Statute for Religious Freedom*, described as "one of the most important documents in early U.S. religious history", marking "the end of a ten-year struggle for the separation of church and state in Virginia, and it was the driving force behind the religious clauses of the *First Amendment of the U.S. Constitution*, ratified in 1791," Matthew Harris, Staff, "First Amendment Encyclopedia: Virginia Statute for Religious Freedom," *MTSU*, https://mtsu.edu/first-amendment/article/880/virginia-statute-for-religious-freedom (accessed July 23, 2022), but, voluntarily declaring themselves nonessential, finding other priorities, of public record, religious freedom advocates were found to be few in the Commonwealth, with few exceptions. Caleb Parke, "Virginia drops criminal charges against pastor who held 16-person church service," *Fox News*, July 16, 2020; Denise Lavoie, "Virginia Defends Coronavirus Restrictions in Church Lawsuit," *NBC Washington*, May 7, 2020; Eddie Callahan (NBC29), "Attorneys for Northam, churchgoers come to agreement on removing certain COVID-19 restrictions," *WDBJ7*, September 22, 2020.



21. While Intervenor has received no reward in damages, one California pastor was successful in obtaining damages for the unlawful restrictions imposed against places of worship, Jaclyn Cosgrove, "L.A. County could pay $400,000 settlement to church that fought COVID-19

mandates," *L.A. Times*, August 27, 2021, and the former Virginia Governor, Ralph Northam,

the nation's only physician serving as a state governor, Alan Suderman, "Northam, Nation's

Only Doctor Governor, Offers Sober Voice on Coronavirus," *NBC Washington*, April 9,

2020, has publicly "conceded that he could not legally limit in-person worship ceremonies,

noting that the recent Supreme Court decision against the state of New York prevented him

from doing that" Charles Spiering, "Gov. Ralph Northam Tightens Coronavirus Restrictions:

You Don't Have to Sit In Church for God to Hear Your Prayers," *Breitbart*, December 10,

2020, and, in effect, he had conceded to a violation for the *Freedom of Access to Clinic*

*Entrances (FACE) Act,* 18 U.S.C. § 248(a)(2), having, "by force or threat of force or by

physical obstruction, intentionally injure[d], intimidate[d] or interfere[d] with or attempt[ed]

to injure, intimidate[d] or interfere[d] with any person lawfully exercising or seeking to

exercise the *First Amendment* right of religious freedom at a place of religious worship". *But*

*see In Re: Major Mike Webb*, Record No. 22-1422 (4th Cir. 2022), *on application for*

*prejudgment Webb v. U.S. Dist. Ct. for E.D. Va.*, Record No. 22-5089 (U.S. 2022) (petition

for writ of mandamus to compel convening grand jury under Fed.Rc.Crim.Pro. 6(a)). *See*

*also Webb v. Northam*, Civil Action No. 3:22-cv-00222-DJN, (E.D.Va. 2022), *on*

*interlocutory appeal of denial of leave to proceed in forma pauperis* Record No. 22-1669

(4th Cir. 2022); *on final appeal of dismissal*, Record No. 22-1627 (4th Cir. 2022), *on petition*

*for certiorari* Record No. TBD.

22. Intervenor, in due diligence, during the first challenges brought against the lockdowns had

made note of the fact, not raised by any others, that they had been imposed, under an *ultra*

*vires* declaration, there not being found any reported cases in any affected area before the

*Declaration of a Communicable Disease*, *see* Jeremy M. Lazarus, "Faces of leadership:

Virginia Health Commissioner M. Norman Oliver is on front line of fight," *Richmond Free Press*, March 26, 2020, updated March 27, 2020 ("On Feb. 7, a month before the first case of coronavirus was diagnosed in Virginia, Dr. Oliver declared the virus a public health threat"), in disregard for the controlling law, in direct contravention and violation of a requirement under the controlling statute, Va. Code § 44-146.17 (Effective until March 1, 2021), which provides, in relevant part, that "[s]uch executive orders declaring a state of emergency may address exceptional circumstances that exist relating to an order of quarantine or an order of isolation concerning a communicable disease of public health threat that is issued by the State Health Commissioner for an affected area of the Commonwealth pursuant to Article 3.02 (§ 32.1-48.05 et seq.) of Chapter 2 of Title 32.1," (emphasis added), and did not prevail. *Webb v. Northam*, Case No. Case No. CL20001624 (Alexandria Cir.), *on appeal* Docket No. 210536 (Va. 2021).

23. According to recent reports, two years into a pandemic, "Dr. Anthony Fauci, White House Press Secretary Karine Jean-Pierre, other Biden administration officials and five social media companies have 30 days to respond to subpoenas in a lawsuit alleging collusion to suppress freedom of speech"; however, "[m]eans of knowledge, with the duty of using them, are, in equity, equivalent to knowledge itself", *Cordova v. Hood*, 84 U.S. 1 (1873).

24. And, as raised in a recent application for prejudgment before the nation's highest court, one litigation hobbyist was contemporaneously aware, with no law firm or legal staff, "[t]he failure to get our inspectors on the ground in those early months will always hamper any investigation into the origin of COVID-19", Briefing Room, "Statement by President Joe Biden on the Investigation into the Origins of COVID-19," *The White House*, May 26, 2021; however, shortly after the declaration of a public health emergency of international concern



(PHEIC), issued when there were 7,818 confirmed cases globally, and 7,736 in China, and only 170 total fatalities to a novel coronavirus that had spread to 18 countries, including Finland, India and Philippines, all with "travel history to Wuhan City", WHO, *Novel Coronavirus(2019-nCoV) Situation Report – 10*, January 30, 2020, a robust examination, conducted by 1,800 teams of at least five epidemiologists, had examined 55,924 confirmed cases in China, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, dated  February 16-24, 2020, 19 times more cases than had even yet been reported in the United States by mid-march, Jessie Yeung, *et al.*, "March 15 coronavirus news," *CNN*, March 15, 2020 (US cases grow: There are now more than 3,000 cases of the novel coronavirus in the US, according to government agencies and the CDC."), it had been clinically determined, despite an "overall aim. . . to control the source of infection, block transmission and prevent further spread", empirical data driven observations that had found a pattern of clustered outbreaks[7], "where family clusters appear to have driven the outbreak", and presenting variable secondary attack rates (SARs) from 0.9% to 4.8%, prompting a clinical conclusion that "it is not clear whether this correlates with the presence of an infectious virus", despite an assignment of a relatively high $R_0$ of 2-2.5, a measure of transmissibility risk that had, in the past, been expressly rejected by the Centers for Disease Control & Prevention (CDC), Paul Delameter, *et al.*, *Complexity of the Basic Reproduction Number ($R_0$)*, 25 Emerging Infectious Diseases 1 (January 2019)[8], and, "[j]udicial review of

---

[7] Operations personnel had attempted to utilize a "de-densification process" to "decrease[] student cases numbers", but found had surprisingly found not only an increase in reported cases, but also "98.6% of cases were breakthrough infections, and proportionately more named close contacts who became COVID-positive in this period (22.6%) than previously (4.4% between August 23 and November 27). Something had clearly changed in the university setting, as similar outbreaks were not yet being seen in the off-campus community or neighboring counties." Genevive R. Meredith, *et al.*, *Routine Surveillance and Vaccination on a University Campus During the Spread of the SARS-CoV-2 Omicron Variant*, 5 JAMA Netw Open. 5, pp. e2212906, May 18, 2022.

[8] "The basic reproduction number ($R_0$), also called the basic reproduction ratio or rate or the basic reproductive rate, is an epidemiologic metric used to describe the contagiousness or transmissibility of infectious agents. $R_0$ is affected

agency action. . . is limited to 'the grounds that the agency invoked when it took the action,'"

*DHS v. Regents of the University of California*, 591 U.S. ___ (2020) (quoting from *Michigan v. EPA*, 576 U. S. 743 (2015)).

### Conditions for Grant of Leave to Intervene

25. Pursuant to Fed.R.Civ.Pro. 24(a), "[o]n timely motion, the court *must permit* anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute; or (2) *claims an interest relating to the property or transaction that is the subject of the action*, and is *so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interes*t, unless existing parties adequately represent that interest" (emphasis added), and Intervenor possesses a credible claim of interest to the transaction, as a litigant now on appeal to the nation's highest court, being so situated that disposing of the action in his abence may impair or impede Intervenor's ability to protect his interest.

26. Pursuant to Fed.R.Civ.Pro. 24(b), "[o]n timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) *has a claim or defense that shares with the main action a common question of law or fact*", (emphasis added), and Plaintiffs having brought a prayer for relief  to "declare that Defendants' conduct violates the *First Amendment of the U.S. Constitution*"; "that Defendants' conduct is *ultra vires* and exceeds their statutory authority"; and "that Defendants' conduct violates the *Administrative Procedure Act* and is unlawful", so as to



---

by numerous biological, sociobehavioral and environmental factors that govern pathogen transmission and, therefore, is usually estimated with various types of complex mathematical models, which make $R_0$ *easily misrepresented, misinterpreted, and misapplied*. $R_0$ is *not a biological constant for a pathogen, a rate over time, or a measure of disease severity*, and $R_0$ *cannot be modified through vaccination campaigns*. $R_0$ is rarely measured directly, and modeled $R_0$ values are *dependent on model structures and assumptions*. Some $R_0$ values reported in the scientific literature are *likely obsolete*.  $R_0$ must be estimated, reported, and *applied with great caution* because this basic metric is far from simple." *Id.* (emphasis added)

compel them to "vacate and set aside such conduct"; and seeking to "[p]reliminarily and permanently enjoin Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from continuing to engage in unlawful conduct as alleged herein; and. . . [g]rant such other and further relief as the Court may deem just and proper", ECF No. 1, Intervenor "*has a claim or defense that shares with the main action a common question of law or fact*". Fed.R.Civ.Pro. 24(b).

27. Pursuant to Fed.R.Civ.Pro. 24(b)(3), "[i]n exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."

28. "The Court must consider three factors to determine whether an application to intervene is timely: (1) the stage of the proceedings; (2) the reason for any delay in moving to intervene; and (3) whether the parties would be prejudiced." *ABM Indus. Inc.*, 249 F.R.D., at 588 (citing *Northwest Forest Resource Council v. Glickman*, 82 F.3d 825 (9th Cir.1996)).

29. Furthermore, "[a] motion to intervene must be served on the parties as provided in Rule 5" and "[t]he motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed.R.Civ.Pro. 24(c).

### Expert Testimony Qualification

30. In a recent application for a partial stay that had been presented to Justice Samuel Alito and referred to the full U.S. Supreme Court, Justice Brett Kavanaugh had concluded:

> I concur in the Court's decision to grant the Government's application for a partial stay of the District Court's preliminary injunction for a simple overarching reason: Under Article II of the *Constitution*, the President of the United States, not any federal judge, is the Commander in Chief of the Armed Forces. In light of that bedrock constitutional principle, "courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Department of Navy v. Egan*, 484 U.S. 518, 530 (1988). As the Court has long emphasized, moreover, the "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a

military force are essentially professional military judgments." *Gilligan v. Morgan*, 413 U. S. 1, 10 (1973). Therefore, it is "difficult to conceive of an area of governmental activity in which the courts have less competence." *Ibid.*  *Austin v. U.S. Navy SEALs 1-26*, Record No. 21A-477 (U.S., March 25, 2022).

31. However, under Fed.R.Evid. 702, "[a] witness who is qualified as an expert *by knowledge, skill, experience, training, or education* may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will *help the trier of fact to understand the evidence or to determine a fact in issue*; (b) the testimony is *based on sufficient facts or data*; (c) the testimony is the *product of reliable principles and methods*; and (d) the expert has *reliably applied the principles and methods to the facts* of the case." (emphasis added)

32. In a seminal case on vaccinations, this nation's highest court stated, regarding that an appellant, whose "views could not affect the validity of the statute, nor entitle him to be excepted from its provisions", 2 25 S. Ct. 358, 49 L. Ed. 643 (1905) (citing *Commonwealth v. Connelly,* 163 Massachusetts 539; *Commonwealth v. Has,* 122 Massachusetts 40; *Reynolds v. United States,* 98 U.S. 145; *Regina v. Downes,* 13 Cox C.C. 111.), that "[t]he only 'competent evidence' that could be presented to the court to prove these propositions was the testimony of experts, giving their opinions." *Id.* (quoting *Commonwealth v. Jacobson,* 183 Massachusetts 242 (1904). *See also* Fed.R.Evid. 701[9].

33. Under the Fed.R.Evid. 901(a), "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that

---

[9] "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *Id.*

the item is what the proponent claims it is", and, in accordance with Fed.R.Evid. 901(b)(1), examples may include "[t]estimony that an item is what it is claimed to be".

34. And, under Fed.R.Evid. 703, "[a]n expert may base an opinion *on facts or data in the case that the expert has been made aware of or personally observed*", and, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted", *"[b]ut if the facts or data would otherwise be inadmissible*, the proponent of the opinion may disclose them to the jury *only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect*." (emphasis added)

35. Historically, even in one landmark case on the issue of civil rights, expert testimony was dispositive in gaining a favorable outcome for the appellee. Staff, "Kenneth and Mamie Clark Doll," *NPS*, February 10, 2021, Kenneth and Mamie Clark Doll - Brown v. Board of Education National Historic Site (U.S. National Park Service) (nps.gov) (accessed September 8, 2021).

36. Moreover, under Fed.R.Civ.Pro. 26(a)(2)(A), "[i]n addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Pursuant to Fed.R.Civ.Pro. 26(a)(2)(B), "[u]nless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness", for which purpose the present application serves.

37. However, "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)",

Fed.R.Civ.Pro.26(b)(3)(A), and "[a] party must make the initial disclosures at or within 14 days after the parties' Rule 26(f) conference. . ." Fed.R.Civ.Pro.26(a)(1)(C).

### *Curriculum Vitae* **of Intervenor**

38. Intervenor is the petitioner and *pro se* litigant in multiple litigations brough against the government response to the current public health crisis, to include:

    a.  *Webb v. Northam, et al.*, Case Number CL20001624 (Alexandria Cir. 2020), *on appeal* Record Number 210536 (Va. 2021), *on petition for certiorari*, Record No. 21-___ (U.S. 2021) (first and longest surviving litigation against the lockdown orders in the Commonwealth of Virginia);

    b.  *In Re: Major Mike Webb*, Case Number CL21001829 (Alexandria Cir. 2021), *on appeal* Record No. TBD (Va. 2022) (petition for writ of mandamus to compel the Commonwealth Attorney to charge the Sheriff for failure to perfect service of process upon the Governor and Commonwealth Defendants);

    c.  *Webb v. Wilson,* Case Number CL21001769 (Alexandria Cir. 2021), *on appeal Webb v. Wilson*, Record No. TBD (Va. 2021) (injunction action against PRIDE Month Proclamation, encouraging gay men to party during a public health crisis);

    d.  *Webb v. Northam*, Civil Number Civil Action No. 3:20CV497 (E.D.Va. 2020), *on appeal Webb v. Northam*, Record Number 20-1968 (4th Cir. 2020), *certiorari denied*, Record No. 21-6170 (U.S. 2021) (first filed and longest surviving litigation brought against the nonmedical grade facial coverings mandates in the Commonwealth of Virginia);

    e.  *Webb v. Fauci, et al.*, Civil Action No. 3:21CV432 (E.D.Va. 2021), *on appeal* Record No. 21-2394 (4th Cir. 2021) (first action brought against the vaccines mandates in the Commonwealth of Virginia, and, in relevant part, an injunction action to compel the

White House to respond to a request for information submitted under the *Freedom of Information Act (FOIA)*, 5 U.S.C. § 552, regarding whether or not the infectious dose and secondary attack rate for SARS-CoV-2 is classified information); and

 f.  *Webb v. Fauci*, Record No. 21-6868 (U.S. 2022) (application for prejudgment decision to enjoin the White House from withholding documents requested under the *FOIA* and to compel a summary judgment against Facebook, Inc. for violations of the *Freedom of Access to Clinic Entrances (FACE) Act*).

**39.** Intervenor is the most junior commissioned officer to have ever served as both the *Aide de Camp* to the Commander, as in evidence at Exhibit **B**, as well as the Operations Officer for all U.S. Army counterintelligence in the Continental United States (CONUS), as in evidence at Exhibit **C**.

**40.** And, in these capacities, Intervenor had the unique opportunity to serve in a critical staff role during the formation of the Armed Forces Medical Intelligence Center (AFMIC), *see generally* DODD 6420.1, *Armed Forces Medical Intelligence Center (AFMIC)*, September 30, 1996 , the precursor to the National Medical Intelligence Center (NMIC), *see generally* DODI 6420.01, National Center for Medical Intelligence (NCMI), March 20, 2009, *incorporating* Change 3, *effective* September 8, 2020, which was the subject of the ABC News report, Josh Margolin & James Gordon Meek, "Intelligence report warned of coronavirus crisis as early as November: Sources 'Analysts concluded it could be a cataclysmic event,' a source said," *ABC News*, April 8, 2020.

**41.** In addition, Intervenor served as a Company Commander in the U.S. Army Reserve, in which capacity, during Annual Training, he had the responsibility for proper instruction of initial entry for training (IET) soldiers on topics to include proper tactics, techniques and

procedures for conduct of operations in environments contaminated by biological agents, and was responsible during monthly unit training assemblies (UTAs) for conducting sustainment training for drill instructors and other soldiers assigned to that training unit, as in evidence at Exhibit **D**.

42. Intervenor further has been certified as an instructor in a train-the-trainer (T3) course for composite risk management (CRM), in accordance with DA Pam 385-30 *Safety: Risk Management*, Para 1-8, December 2, 2014.

43. In addition, Intervenor has been creditable experience as a *FOIA* analyst, having performed such other duties as assigned, while serving in both the capacities of *Aide de Camp* and Operations Officer, as well as while serving as the Adjutant/S1 for a basic training unit, while in the U.S. Army Reserve, as in evidence at Exhibit **E**, as well as in employment as a *FOIA* analyst with Immigration and Customs Enforcement (ICE), and as a government contractor, serving as the Acting *FOIA* Supervisor with Axiom Corporation of Atlanta, a contracted agent for the Centers for Disease Control & Prevention (CDC).

44. Intervenor has provided paralegal support to intellectual property cases specifically involving pharmaceutical products with premier law firms, to include: Fitzpatrick, Cella, Harper & Scinto, Whitman, Breed, Abbott & Morgan, LLC, Dilworth Paxson LLP, Blank Rome LLP and Reed Smith LLP.

45. Intervenor has never authored any publications, nor testified as an expert, and is not being compensated.

### **Stage of the Proceedings**

46. It was recently reported that "[a] media release from Schmitt, a candidate for the Republican Party's nomination for the seat of retiring U.S. Senator Roy Blunt, stated information

requested was identifying all communications with any social media platform relating to content modulation and/or misinformation".

**47.** However, as noted in a complaint raising allegations of crimes against humanity to the International Crime Commission (ICC), as in evidence at Exhibit **F**, *but see* Matthew Lee, "US formally declares Russian troops have committed war crimes in Ukraine," *Associated Press*, March 23, 2022, it is a matter of public record that Intervenor had had his social media account disabled on Facebook, a matter in which, since February 14, 2022, his defendant, Facebook Inc./META Platforms, Inc., has failed to reply to the Chief Justice, or issue a waiver of argument, *see Webb v. Fauci*, Record No. 21-6868 (U.S. 2022), and the subject of an action brought under the *Freedom of Access to Clinic Entrances (FACE) Act*, 18 U.S.C. § 18 U.S.C. § 248(a)(2), a matter that had been on petition for prejudgment relief before after his account had been disabled, at least under the peculiar pretext of "security reasons", on July 19, 2021, as in evidence at Exhibit **G**, less than two weeks after filing a complaint in the U.S. District Court for the Eastern District of Virginia, Alexandria Division, raising an inference of retaliation, under *Reid v. MSPB*, 508 F.3d 674 (Fed. Cir. 2007), which articulates a timing/knowledge test to determine whether conduct is retaliatory, and the complainant need only demonstrate that "the deciding official knew of the [protected activity]. . . and that the adverse action was initiated within a reasonable time[10] of [the same]"[11], and just four days after the White House had indicated that it would be flagging actions and identifying problematic accounts on social media, and it was reported:

---

[10] *See Inman v. Department of Veterans Affai*rs, 112 M.S.P.R. 280 (2009) (a reasonable time of 15 months); *Redschlag v. Department of the Army*, 89 M.S.P.R. 589 (2001) (a reasonable time of 18 months); *Russell v. DoJ*, 76 M.S.P.R. 317 (1997) (a reasonable time of 7 months); *Easterbrook v. DoJ*, 85 M.S.P.R. 60 (2000) (a reasonable time of 7 months).
[11] Under the timing/knowledge test, a complainant "need not demonstrate the existence of a retaliatory motive. . . to establish that [the protected activity]. . . was a contributing factor", *Kewley v. HHS*, 153 F.3d 1357 (Fed. Cir. 1998) (quoting *Marano v. DoJ*, 2 F.3d 1137(Fed. Cir. 1993)), and "[o]nce the knowledge/timing test has been met, an

White House press secretary Jen Psaki said Thursday the Biden administration is identifying "problematic" posts for Facebook to censor because they contain "misinformation" about COVID-19.

Psaki disclosed the government's role in policing social media during her daily press briefing after Surgeon General Vivek Murthy called on companies to purge more pandemic posts.

The demand for censorship — and Psaki's admission of government involvement — follows a series of flip-flops from health officials who contradicted themselves throughout the pandemic on issues such as mask efficacy, as well as censorship of claims that later gained credibility, such as the theory that COVID-19 leaked from a Chinese lab. Steven Nelson, "White House 'flagging' posts for Facebook to censor over COVID 'misinformation'" *New York Post*, July 15, 2021[12]

*See also* Melissa Quinn, "Biden says he's asked intelligence community to 'redouble' efforts in examining origins of COVID-19," *CBS News*, May 27, 2021[13].

48. According to the U.S. Department of Defense (DoD), "terrorism" is defined as "the unlawful use--or threat--of force or violence against people or property to coerce or intimidate governments or societies, often to achieve political, religious, or ideological objectives", FM 7-98, *Operations in Low-Intensity Conflict*, October 19, 1992, Chapter 3-1, and, under Chapter 3-12, "[c]ombatting terrorism, more than any other form of warfare, requires knowledge of the enemy's goals and abilities", and "[i]ntelligence officers, supporting a deploying unit, must always consider the terrorist's concerns when developing EEIs and a list of local terrorism indicators", to include as priority intelligence requirements (PIR),

---

administrative judge must find that the appellant has shown that. . . [the protected activity] was a contributing factor. . . , even if, after a complete analysis of all of the evidence, a reasonable factfinder could not conclude that the appellant's [protected activity]. . . was a contributing factor". *Schnell v. Department of the Army*, 114 M.S.P.R. 83 (2010).

[12] "Psaki and Murthy would not answer a shouted question about the fact that Dr. Anthony Fauci, President Biden's chief medical adviser and the government's top infectious diseases expert, has himself vacillated on COVID-19 information. Fauci did not promote mask-wearing in February, March and early April 2020 as the respiratory virus spread in the US, despite the historical use of masks to counter airborne viruses and their successful early adoption in East Asia. But Fauci later pushed even wearing two masks at a time." *Id.*

[13] "President Biden said. . . he ha[d] ordered the U.S. intelligence community to 'redouble' its efforts to investigate the origins of COVID-19 after a new report fueled questions about whether the virus originated in a lab in Wuhan, China." *Id.*

"[r]eligious, political, ethnic affiliation, or a combination of these", as well as "[i]mportant dates (religious holidays, martyrdom anniversaries)", or as famously stated on the anniversary of the execution of Julius and Ethel Rosenberg, *see* Staff, "This Day in History: June 19: 1953, June 19, Julius and Ethel Rosenberg executed for espionage," *History*, https://www.history.com/this-day-in-history/rosenbergs-executed (accessed March 1, 2022), by Virginia Governor Ralph Northam, "Symbols are important." 13 News Now, "Pharrell Williams Joins Virginia Governor Ralph Northam for an Announcement in Richmond," *YouTube*, June 16, 2019, https://youtu.be/LuLVsYltY08 (accessed June 28, 2021).

## Reason for Any Delay in Moving to Intervene

49. At least Courts of the Commonwealth have held that "[t]he defense of necessity traditionally addresses the dilemma created when physical forces beyond the actor's control render 'illegal conduct the lesser of two evils", *Buckley v. City of Falls Church*, 7 Va.App. 32 (1988) (quoting *U.S. v. Bailey*, 444 U.S. 394 (1980)), and, in *stare decisis*, had reiterated the rule: "The essential elements of this defense include: (1) a reasonable belief that the action was necessary to avoid an imminent threatened harm; (2) a lack of other adequate means to avoid the threatened harm; and (3) a direct causal relationship that may be reasonably anticipated between the action taken and the avoidance of the harm. [footnote omitted]" *Id.* (citing *U.S. v. Cassidy*, 616 F.2d 101 (4th Cir.1979)).

50. Any delay on the part of Intervenor is overshadowed by the delay of parties only now seeking to address this matter after even the President has acknowledged that "we know what we need to do to beat this virus: Tell the truth", noting the tragic milestone that found 527,726 American fatalities, "more deaths than in World War One, World War Two, the Vietnam War, and 9/11 combined", Briefing Room, "Remarks by President Biden on the Anniversary of the COVID-19 Shutdown," *The White House*, March 11, 2021, it was known

that "[n]ationwide, Black people have died at 1.4 times the rate of white people", and that "[w]e've lost at least 73,462 Black lives to COVID-19 to date", with "Black people account[ing] for 15% of COVID-19 deaths where race is known." Staff, "The COVID Racial Data Tracker," *COVID Tracking Project*, March 7, 2021.

51. "'Information' means any knowledge that can be communicated or documentary material, regardless of its physical form or characteristics, that is *owned by, produced by or for, or is under the control of the United States Government*." Part I, Section 1.1(b), Executive Order 12,958, *Classified National Security Information*, April 17, 1995.  (emphasis added)

52. "'Information' means may information or material, regardless of its physical form or characteristics, *that is owned by, produced by or for, or is under the control of the United States Government*." Section 6.1(b), Executive Order No. 12,356, *National Security Information*, April 2, 1982. (emphasis added)

53. If this information is owned by, produced by or for, or is under the control of the United States government, despite reports to the contrary, by simple operation of law, as a product not of nature, it would, of necessity, have to have been cultivated in a laboratory. *Association for Molecular Pathology v. Myriad Genetics*, Docket No. 12-398, 566 U.S. ___ (2013); *Diamond v. Chakrabarty*, 447 U. S. 303 (1980).

54. On March 23, 2021, as in evidence at Exhibit **H,** the Intervenor had presented a request for information, under the authority of the *FOIA* to request any and all documents pertaining to whether the secondary attack rate and/or the infectious dose for COVID-19, standard epidemiological metrics of risk, were classified information, a request acknowledged as received by the White House on that very same day, as in evidence at Exhibit **I.**

**55.** Celebrating his first 100 days after Joe Biden had assumed the office of the Presidency, the

White House took credit for "consistently vaccinating 2.5 million Americans per day", "200

million shots in the first 100 days," and had identified the most vulnerable populations

thusly:

> As of today, 71 percent of individuals 65 and over have received at least one shot. That's
> important because seniors sadly account for 80 percent of COVID deaths. Overall, more
> than 1 in 3 adults have had at least one dose, and more than 47 million adult Americans
> are now fully vaccinated. Briefing Room, "Press Briefing by White House COVID-19
> Response Team and Public Health Officials," *White House*, March 26, 2021.

**56.** After the tolling of the deadline for a response to the *FOIA* request, with urgency, to task the

Intelligence Community to redouble efforts one month after the deadline had tolled for a

response. *See* Kate Sullivan, Donald Judd and Phil Mattingly, Biden tasks intelligence

community to report on Covid origins in 90 days, *CNN*, May 27, 2021.

**57.** It is generally acknowledged that *Reid v. Merit Systems Protection Board*, 508 F.3d 674

(Fed. Cir. 2007) articulates a timing/knowledge test to determine whether conduct is

retaliatory, and the complainant need only demonstrate that "the deciding official knew of the

[protected activity]. . . and that the adverse action was initiated within a reasonable time[14] of

[the same]".

**58.** Under the timing/knowledge test, a complainant "need not demonstrate the existence of a

retaliatory motive. . . to establish that [the protected activity]. . . was a contributing factor",

*Kewley v. HHS*, 153 F.3d 1357 (Fed. Cir. 1998) (quoting *Marano v. DoJ*, 2 F.3d 1137(Fed.

Cir. 1993)), and "[o]nce the knowledge/timing test has been met, an administrative judge

must find that the appellant has shown that. . . [the protected activity] was a contributing

---

[14] *See Inman v. Department of Veterans Affairs*, 112 M.S.P.R. 280 (2009) (a reasonable time of 15 months);
*Redschlag v. Department of the Army*, 89 M.S.P.R. 589 (2001) (a reasonable time of 18 months); *Russell v. DoJ*, 76
M.S.P.R. 317 (1997) (a reasonable time of 7 months); *Easterbrook v. DoJ*, 85 M.S.P.R. 60 (2000) (a reasonable time
of 7 months).

factor. . . , even if, after a complete analysis of all of the evidence, a reasonable factfinder

could not conclude that the appellant's [protected activity]. . . was a contributing factor".

*Schnell v. Department of the Army*, 114 M.S.P.R. 83 (2010).

59. Under 5 U.S.C. § 552(a)(6)(C)(i), "[a]ny person making a request to any agency for records

under paragraph (1), (2), or (3) of this subsection *shall be deemed to have exhausted his*

*administrative remedies* with respect to such request if the agency fails to comply with the

applicable time limit provisions of this paragraph", and "[o]n complaint, the district court of

the United States in the district in which the complainant resides, or has his principal place of

business, or in which the agency records are situated, or in the District of Columbia, has

jurisdiction to enjoin the agency from withholding agency records and to order the

production of any agency records improperly withheld from the complainant", 5 U.S.C. §

552(a)(4)(B); so, the Court, *sua sponte*, at all times possessed the authority, at its discretion,

to grant injunctive relief, which never occurred, again piercing the veil of judicial immunity,

in derogation of a substantive right to due process and equal protection.

60. Moreover, on October 29, 2021, it was reported that "[t]he US intelligence community

released a declassified report. . . that confirmed that it has not reached a conclusion on the

origins of Covid-19, though it offered fresh details on how the intelligence community

approached its 90-day investigation into the matter",  Katie Bo Lillis, "US Intelligence

community releases full declassified report that does not determine origin of Covid-19,"

*CNN*, October 29, 2021, the very same day that the Trial Court had issued an order

dismissing the action, for dubious reasons, an order that has yet to have been delivered to the

Intervenor in the mail.

61. After discovering the dismissal action during a visit to the Court to redouble efforts to have a summons issued by the Trial Court, the Intervenor promptly, filed a notice of appeal, filed an appeal of the dismissal with the Fourth Circuit and filed an application for prejudgment injunctive relief on the *FOIA* claim with the Supreme Court, the last action of which was denied certiorari on March 7, 2022, with Justice Samuel Alito abstaining from participation, while the appeal filed with the Fourth Circuit has languished since its filing in December, even without any responsive replies from the Appellee parties.

62. Over a million American deaths have been attributed to a biological agent that, beyond a reasonable doubt, is the property of the Government, while 83.4% of Americans over the age of five have been administered at least one dose, Staff, "COVID Data Tracker," *CDC*, July 21, 2022, https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-total-admin-rate-total (accessed July 23, 2022), based upon the misrepresentation of a material fact that these countermeasure products were designed to address a disease that had occurred in nature, false representations knowingly made, with intent to mislead, placing the American people in false reliance thereon, establishing a *prima facie* case of fraud.

63. It is well-established that the Centers for Disease Control & Prevention (CDC), has admitted that"[t]he infectious dose of SARS-CoV-2 needed to transmit infection has not been established", Staff, "Scientific Brief: SARS-CoV-2 Transmission," *CDC*, May 7, 2021, a metric required to determine the proper correlates of protection to develop an effective vaccine, without the requirement for large stage three clinical trials, Shuo Feng, *et al.*, *Correlates of protection against symptomatic and asymptomatic SARS-CoV-2 infection*, MedRix, June 24, 2021, doi: https://doi.org/10.1101/2021.06.21.21258528, a metric not even discussed by Dr. Anthony Fauci in a White House Briefing, Joe La Palca, "New Evidence

Points To Antibodies As A Reliable Indicator Of Vaccine Protection," *NPR*, August 23,

2021, until the same day that the Pfizer vaccine was rushed to approval at the Food & Drug

Administration. New Release, "FDA Approves First COVID-19 Vaccine; Approval Signifies

Key Achievement for Public Health," *FDA*, August 23, 2021.

64. No subpoena is required to determine what has been known in the open source, *i.e.*, that these

countermeasures products that were approved for private label marketing had been developed

"on the basis of. . . [the former Health & Human Services (HHS) Secretary's] determination

of a public health emergency that has a significant potential to affect national security[15][16] or

the health and security of United States citizens living abroad", 85 Fed. Reg. 63, 18250, April

1, 2020, and approved by the Food & Drug Administration (FDA), not on the basis of an

effectiveness test, as required by the controlling regulations, 21 CFR § 314.125, but on the

basis of a mere preprint of an efficacy study, Stephen J. Thomas, *et al.*, *Six[-]Month Safety*

*and Efficacy of the BNT162b2 mRNA COVID-19 Vaccine*, MedR$_x$IV, July 28, 2021,

https://doi.org/10.1101/2021.07.28.21261159[17][18]. in pharmacology that

---

[15] "Regular retired members and members of the retired Reserve must be managed to ensure
they are accessible for national security and readiness requirements." DoD Directive 1352.01, *Management and
Mobilization of Regular and Reserve Retired Military Members*," Section 1.2(c), December 8, 2016.
[16] Under 8 U.S.C. § 1189(d)(2), "the term 'national security' means the national defense, foreign relations, or
economic interests of the United States".
[17] Stephen J. Thomas, *et al.*, *Six[-]Month Safety and Efficacy of the BNT162b2 mRNA COVID-19 Vaccine*,
MedR$_x$IV, July 28, 2021, https://doi.org/10.1101/2021.07.28.21261159, it was only established, with regard to
effectiveness, that, by its title and narrative, there was no expressed intent to satisfy an effectiveness standard for an
approved use, and acknowledged the only statement that it could, given the parameters of the defined emergency
usage of a biological agent being deployed, stating that "although non-neutralizing viral antigen-binding antibody
levels rise between the first and second BNT162b2 dose, *serum neutralizing titers are low or undetectable during
this interval*", "[o]ther immune mechanisms (*e.g.*, innate immune responses, CD4+ or CD8+ T-cell responses, B-
cell memory responses, antibody-dependent cytotoxicity) *may contribute* to protection" and that such "[e]fficacy
peaked at 96.2% during the interval from 7 days to <2 months post-dose 2, and declined gradually to 83.7% from 4
months post-dose 2 to the data cut-off, an average decline of ~6% every 2 months", below the effectiveness
standards for approval of an *NDA* or *ANDA*.
[18] In Marion F. Gruber, *Emergency Use Authorization (EUA) for an Unapproved Product Review Memorandum
(Pfizer-BioNTech COVID-19 Vaccine/ BNT162b2)*, December 11, 2020, there was presented a categorically
exclusive goal, stating that "[t]he primary efficacy endpoint is incidence of COVID-19 among participants *without
evidence of SARS-CoV-2 infection before or during the 2-dose vaccination regimen*" (emphasis added). This
document also conceded that "[d]ata are limited to assess the effect of the vaccine against transmission of SARS-

**65.** It is clear that, under federal laws of the United States,  pursuant to 18 U.S.C. § 1001(a),

> Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
>
>> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>>
>> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
>>
>> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
>
> shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

**66.** It is clear that, under the laws of the Commmonwealth,

> A party alleging fraud must prove by clear and convincing evidence (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him. *Winn v. Aleda Constr. Co.*, 227 Va. 304, 308, 315 S.E.2d 193, 195 (1984). Clear and convincing evidence is such proof as will establish in the trier of fact a firm belief or conviction concerning the allegations that must be established." *Thompson v. Bacon*, 245 Va. 107 (1993) (quoting *Walker Agency, Inc. v. Lucas*, 215 Va. 535 (1975).

**67.** And, it is clear, on the record, that public officials, elected and appointed had engaged in conduct of such character and had ample cause to evade a court that might hold them accountable for their actions, finding sufficient motive, means and opportunity. *Bowen v. Maynard*, 799 F.2d 593 (10th Cir.1986) ("Additionally, there was no evidence that "Slick," unlike Crowe, had motive, opportunity, and ability to kill the bartender.").

---

CoV-2 from individuals who are infected despite vaccination", that "[t]wo serious cases of suspected but unconfirmed COVID-19 were reported, both in the vaccine group, and narratives were reviewed", and that there were "8 COVID-19 cases in the vaccine group", falling short of the standard for a full approval.

**Prejudice to Parties**

***Military Law***

68. "On October 17, 2006, the Uniform Code of Military Justice (UCMJ) was amended to extend

UCMJ jurisdiction over persons serving with or accompanying U.S. armed forces in the field

in times of declared war or a contingency operation (references (a) and (b))." Robert M.

Gates, *Memorandum for Secretaries of the Military Departments, Chairman of the Joint*

*Chiefs of Staff, Under Secretaries of Defense and Commanders of Combatant Commands*,

"UCMJ Jurisdiction Over DoD Civilian Employees, DoD Contractor Personnel, and Other

Persons Serving With or Accompanying the Armed Forces Overseas During Declared War

and in Contingency Operations," *DOD*, March 10, 2008.

69. Under military law, codified in the Uniform Code for Military Justice (UCMJ),

> (A) Except as provided in subparagraph (B), a preliminary hearing shall be held before
> referral of charges and specifications for trial by general court-martial. The preliminary
> hearing shall be conducted by an impartial hearing officer, detailed by the convening
> authority in accordance with subsection (b).
>
> (B) Under regulations prescribed by the President, a preliminary hearing need not be held
> if the accused submits a written waiver to the convening authority and the convening
> authority determines that a hearing is not required. 10 U.S.C. § 832(a)(1).

70. Pursuant to 10 U.S.C. § 832(a)(2),

> The purpose of the preliminary hearing shall be limited to determining the following:
>
>> (A) Whether or not the specification alleges an offense under this chapter.
>> (B) Whether or not there is probable cause to believe that the accused committed
>> the offense charged.
>>
>> (C) Whether or not the convening authority has court-martial jurisdiction over the
>> accused and over the offense.
>>
>> (D) A recommendation as to the disposition that should be made of the case.

***Transnational Terror***

71. Under 18 U.S.C. § 2332b(d)(1), "[t]he prosecution is not required to prove knowledge by any defendant of a jurisdictional base alleged in the indictment", and, in electing a right to remain silent, at least with regards to criminal conduct involving terrorism, "[a] person acts with the requisite knowledge if he is aware of (*or willfully blinds himself* to) a significant likelihood that his or her conduct will materially support the organization's terrorist ends", *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), and, under Fed.R.Crim.Pro. 6(a), "[w]hen the public interest so requires, the court must order that one or more grand juries be summoned."

72. Under 18 U.S.C. § 2332b(a)(1)(A), "[w]hoever, involving conduct transcending national boundaries and in a circumstance described in subsection (b). . . kills, kidnaps, maims, commits an assault resulting in serious bodily injury, or assaults with a dangerous weapon any person within the United States. . . in violation of the laws of any State, or the United States, shall be punished as prescribed in subsection (c)", which provides, in relevant part, that "[w]hoever violates this section shall be punished. . . for a killing, or if death results to any person from any other conduct prohibited by this section, by death, or by imprisonment for any term of years or for life", 18 U.S.C. § 2332b(c)(1)(A).

73. However, under 18 U.S.C. § 2332b(b)(1)(C), for jurisdictional purposes, "the victim, or intended victim, is the United States Government, *a member of the uniformed services*, or any official, officer, employee, or agent of the legislative, executive, or judicial branches, or of any department or agency, of the United States" (emphasis added), and, to date, a total of 94 uniformed service members have been fatalities to COVID-19. Staff, "Spotlight: Coronavirus: DoD Response," https://www.defense.gov/Spotlights/Coronavirus-DOD-Response/ (accessed March 30, 2022).

74. At least in the Sixth Circuit, where it was found that, where "the object crimes alleged. . . were part of a broader conspiracy 'intended to promote' enumerated crimes of terrorism", it has been held that "[t]he terrorism enhancement applies no matter which object crimes were assumed in the guilty verdict, so there is no need to determine beyond a reasonable doubt that. . .[a defendant or defendants] conspired to commit any one of the named object crimes in particular." *U.S. v. Graham*, 275 F.3d 490 (6th Cir. 2001). Similarly, the Seventh Circuit has held that,"[i]f the act is among the litany of crimes listed in § 2332b(g)(5)(B), which include a bevy of the most harmful and odious acts in the criminal code, including everything from murder and torture to the destruction of government property, and it was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct,' then it is a federal crime of terrorism", *U.S. v. Christianson, 586 F.3d 532 (7th Cir. 2009)* (quoting 18 § 2332b(g)(5)(B)), "[a]nd for all intents and purposes at sentencing, that person is a terrorist. *Id.*

### *A Right to Be Heard*

75. The Virginia State Attorney General has described in pleadings the current public health crisis as a "a once-in-a-century pandemic", characterized as "threaten[ing] irreparable harm to an unknown (and unknowable) number of people", and prompting the argument that "the scope of [a court's] review . . . must be limited to a determination of whether the [executive's] actions were taken in good faith and whether there is some factual basis for [the Governor's] decision that the restrictions he imposed were necessary to maintain order." Opp. Brief, *Hughes v. Northam*, Civil Action No. CL20-415 (Russell Cy. Cir.) (quoting *U.S. v. Chalk*, 441 F.2d 1277 (4th Cir. 1971).

76. The esteemed Attorney General, however, appears to suggest that such license is plenary, and eternal, and appears to omit the bounds upon that license even acknowledged by that precedential authority, which expressly articulated the condition that "'[a]ll power may be abused if placed in unworthy hands'", *id.* (quoting *Luther*, 48 U.S. (7 How.), at 1, and that "[t]he courts cannot prevent abuse of power, but can sometimes correct it". *Id.*

77. Yet, while neither a practicing nor licensed, nor even formally trained, litigator, Intervenor is yet aware that "[t]he fundamental requisite of due process of law is the opportunity to be heard", *Grannis v. Ordean*, 234 U.S. 385 (1914), and that such should occur "at a meaningful time and in a meaningful manner", *Armstrong v. Manzo*, 380 U.S. 545 (1965).

78. Similarly, this unrepresented litigant is fully aware that, in due process, not derogated, is defined as "the process that is due under particular circumstances and does not invariably mandate trial-type proceedings", *Sec'y of Labor v. T.P. Mining, Inc.*, 8 FMSHRC 687 (1986), which at least one case within the confines of his federal jurisdiction had described as a substantive right derogated in irreparable harm, *Cohen v. Rosenstein*, 691 F. App'x 728, (Mem)–730 (4th Cir. 2017), a material finding for a grant of injunctive relief upon infringement thereof, a legal cause of action even recognized, even if in dissent, by the Virginia State Attorney General. *See* Opp. Brief, *Hughes v. Northam*, *supra.* (quoting *School Bd. of Richmond v. Wilder*, 73 Va. Cir. 251 (City of Richmond Cir. Ct. 2007))[19].

### *Speedy Trial*

79. Under 18 U.S.C. § 1961(1)(A), "'racketeering activity' means. . . any act or threat *involving murder*, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter,

---

[19] "[a] party seeking injunctive relief 'must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.*

or dealing in a controlled substance or listed chemical (as defined in section 102 of the *Controlled Substances Act*), *which is chargeable under State law and punishable by imprisonment for more than one year*", (emphasis added) and, under 18 U.S.C. § 2332b(a)(1)(A), a predicate offense under the federal racketeering statute, 18 U.S.C. § 1961(G), "[w]hoever, involving conduct transcending national boundaries and in a circumstance described in subsection (b). . . kills, kidnaps, maims, commits an assault resulting in serious bodily injury, or assaults with a dangerous weapon any person within the United States. . . in violation of the laws of any State, or the United States, shall be punished as prescribed in subsection (c)", which provides, in relevant part, that "[w]hoever violates this section shall be punished. . . for a killing, or if death results to any person from any other conduct prohibited by this section, by death, or by imprisonment for any term of years or for life", 18 U.S.C. § 2332b(c)(1)(A).

80. However, under 18 U.S.C. § 2332b(b)(1)(C), for jurisdictional purposes, "the victim, or intended victim, is the United States Government, *a member of the uniformed services*, or any official, officer, employee, or agent of the legislative, executive, or judicial branches, or of any department or agency, of the United States" (emphasis added), and, to date, a total of 95 uniformed service members have been fatalities to COVID-19. Staff, "Spotlight: Coronavirus: DoD Response," https://www.defense.gov/Spotlights/Coronavirus-DOD-Response/ (accessed July 22, 2022).

81. It is clear that "courts must 'recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify'", *U.S. v. Knowles*, 390 F. App'x 915 (11th Cir. 2010) (quoting *Barker v. Wingo*, 407 U.S. 514 (1972)), and a defendant "cannot avoid a speedy trial by forcing the government to run the

gauntlet of obtaining formal extradition and then complain about the delay that he has caused

by refusing to return voluntarily to the United States", because "affirmative resistance of the

government's efforts to secure his presence in the United States constitute an intentional

relinquishment of his right to a constitutional speedy trial"; hence,  precluding a right to then

"complain of the delay that he himself caused". *U.S. v. Manning*, 56 F.3d 1188 (9th

Cir.1995).

82. In the analysis of a denial of speedy trial, under the *Sixth Amendment*, "[t]he length of the

delay is the starting point of the analysis, and it is not necessary to consider the other three

factors if the delay is not presumptively prejudicial", and "[t]he length of delay is not

presumptively prejudicial". *Bland v. Commonwealth*, No. 0937-16-1, 2017 WL 5318340, at

*1–4 (Va. Ct. App. Nov. 14, 2017) (citing *Barker*, 407 U.S., at 514.). *But see Doggett v. U.S.*,

505 U.S. 647 (1992) ("Simply to trigger a speedy trial analysis, an accused must allege that

the interval between accusation and trial has crossed the threshold dividing ordinary from

'presumptively prejudicial' delay, 407 U.S., at 530–531, 92 S.Ct., at 2192, since, by

definition, he cannot complain that the government has denied him a 'speedy' trial if it has,

in fact, prosecuted his case with customary promptness.").

83. In *U.S. v. Cain*, 671 F.3d 271 (2d Cir. 2012), the Court explained:

> The Supreme Court's decision in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33
> L.Ed.2d 101 (1972) sets forth the four factors that must be considered in analyzing
> whether a defendant's constitutional right to a speedy trial has been violated: (1) the
> length of the delay; (2) the reasons for the delay; (3) whether the defendant asserted his
> right in the run-up to the trial; and (4) whether the defendant was prejudiced by the
> failure to bring the case to trial more quickly. *See id.* at 530, 92 S.Ct. 2182; *see also
> United States v. Jones*, 129 F.3d 718, 724 (2d Cir.1997). These factors "must be
> considered together with such other circumstances as may be relevant," and "have no
> talismanic qualities." *Barker*, 407 U.S. at 533, 92 S.Ct. 2182. Rather, they require courts
> to "engage in a difficult and sensitive balancing process." *Id.*

84. It is well-established that "by definition, [a defendant] cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness" *Doggett v. U.S.*, 505 U.S. 647 (1992), and while "a showing of prejudice is not a prerequisite to finding a *[S]ixth [A]mendment* violation, courts generally have been reluctant to find a speedy trial violation in the absence of genuine prejudice." *U.S. v. Jones*, 129 F.3d 718 (2d Cir.1997).

85. As stated in *Attorney General of Israel v. Eichmann*, 36 I.L.R. 5 (Supreme Court of Israel, 1961), "Article 6 of the *Charter of the Nuremberg Tribunal* provides, *inter alia*:

> 'The following acts, or any of them, are crimes coming within the jurisdiction of the Tribunal for which there shall be individual responsibility:
>
>> (c) Crimes against humanity: namely murder, extermination, enslavement, deportation, and other inhumane acts committed against any civilian population, before or during the war, or persecutions on political, racial or religious grounds in execution of or in connexion with any crime within the jurisdiction of the Tribunal whether or not in violation of the domestic law of the country where perpetrated.'" *Id.*

86. At least according to that tribunal, considering allegations of crimes against humanity, in violation of Section 1(b) of the Israeli Law  and Article 6 of the *Charter of the Nuremberg Tribunal*, described by that court as "catastrophe which recently befell the Jewish People - the massacre of millions of Jews in Europe", dispositive was the fact that, "undoubtedly the accused knew the value of the tale about 'administration of tonics,' to which he put his signature." *Eichmann*, 36 I.L.R., at 5.

<u>**Unconditional Right by Statute**</u>

87. Under the *FOIA*, as noted above, "Any person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph." 5 U.S.C. § 552(a)(6)(C)(i).

88. Moreover, pursuant to Fed.R.Civ.P. 24(a), "[o]n timely motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest", statutory substantive rights, in derogation of equal protection and due process, that have thus far been denied, an irreparable harm, *see Cohen v. Rosenstein*, 691 F. App'x 728, (Mem)–730 (4th Cir. 2017), entitled to injunctive relief. *School Bd. of Richmond v. Wilder*, 73 Va. Cir. 251 (City of Richmond Cir. Ct. 2007).

89. Additionally, in accordance with Fed.Civ.Pro. 24(b)(1), "[o]n timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact."

### Claim that Shares with the Main Action

90. Pursuant to Fed.R.Civ.Pro. 24(b), "[o]n timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) *has a claim or defense that shares with the main action a common question of law or fact*. (emphasis added)

91. If, even in equity and within the inherent powers of the court to ensure the administration of justice an unconditional right to intervene were not found, clearly, upon the similar facts and similar defendants, a Court could not fail to find a common claim with the main action, making a grant of intervention in this case proper.

**Prayer for Relief**

92. It having been established, after a presumptive assertion of executive privilege, *see U.S. v. Nixon*, 418 U.S. 683 (1974), not having entered any appearance or argument, on March 7, 2022, *see Webb v. Fauci*, Record No. 21-6868 (U.S. 2022), that the Government can neither confirm nor deny, *see Phillippi v CIA*, 546 F.2d 1009 (1976), that the standard epidemiological metrics of infectious dose and/or secondary attack rate are classified information, which, under Executive Order 12,958, *Classified National Security Information*, April 17, 1995, could not be so unless the government owned the biological causative agent, Intervenor, as authorized under the *Declaratory Judgments Act*, 28 U.S.C. §§ 2201 and 2202, *see also* Fed.R.Civ.Pro. 57, seeks specific declaratory relief that the Government confirm that it owns the causative biological agent for COVID-19.

**Conclusion, Certification and Verification**

93. All the above statements are true to the best of my knowledge, and I understand that a false statement in this Verified Complaint may subject me to penalties of perjury.

94. Intervenor agrees to provide the Clerk's Office with any changes to my address where case-related papers may be served.

95. Intervenor understands that his failure to keep a current address on file with the Clerk's Office may result in the dismissal of his case.

96. Intervenor further declares under penalty of perjury that no attorney has prepared, or assisted in the preparation of this document.

**WHEREFORE**, Petitioner prays, for the reasons argued above, for a grant of relief in the

form of intervention in the above referenced matter, and such other equitable relief as

deemed proper by the Court.


Major Mike Webb
955 S. Columbus Street, #426
Arlington, Virginia  22204
Phone: (856) 220-1354
Email: GiveFaithATry@gmail.com

Executed on: _____7-28-22_____ (Date)

Subscribed, acknowledged and sworn to before me, the undersigned Notary Public in the

County of ___Arlington_____, in the Commonwealth of Virginia, this

___23___ day of ___July_____, 20 _22___.

_____
NOTARY PUBLIC

My commission expires: 06/30/2025    Registration Number: _____