**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| STATE OF MISSOURI ex rel. ERIC S. SCHMITT, Attorney General, <br><br> STATE OF LOUISIANA ex rel. JEFFREY M. LANDRY, Attorney General, *et al.*, <br><br>     *Plaintiffs*, <br><br>   v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, <br><br>     *Defendants*. | Case No. 3:22-cv-01213 |

**THE PARTIES' JOINT STATEMENT ON DISCOVERY DISPUTES**

Pursuant to the Court's Order, Doc. 34, at 14, the parties respectfully submit this Joint Statement regarding discovery disputes.

**PLAINTIFFS' POSITION**

On July 19, 2022, pursuant to the Court's Order, the Plaintiffs served interrogatories and document requests upon the Government Defendants seeking the identity of federal officials who have been and are communicating with social-media platforms about disinformation, misinformation, malinformation, and/or any censorship or suppression of speech on social media, including the nature and content of those communications.  Doc. 34, at 13.  Plaintiffs also served third-party subpoenas on five major social-media platforms – Twitter, Facebook and Instagram (both owned by Meta), YouTube, and LinkedIn.  *See* Doc. 34, at 13.   On August 17, 2022, the Government Defendants provided objections and responses to the Plaintiff States' discovery requests, and began a rolling production of documents that was completed on August 26, 2022.

1

The parties met and conferred on multiple occasions in attempt to resolve their disputes.  These efforts resulted in a significant narrowing of the disputes, but disputes remain unresolved as to the following issues:

1. Whether the White House Defendants – the White House Press Secretary and Dr. Fauci in his capacity as Chief Medical Advisor to the President – should be compelled to respond to Plaintiffs' interrogatories and document requests.

2. Whether Defendants should be required, in response to Plaintiffs' interrogatories, to identify federal officials and agencies whom they know of *outside their own agencies* who have or are engaged in communications with social-media platforms about misinformation, disinformation, malinformation, and/or censorship or suppression of speech on social-media, and produce any such communications in their possession.

3. Whether Defendant Health and Human Services (HHS) and Dr. Fauci in his capacity as NIAID Director should be required to provide complete responses to Plaintiffs' interrogatories and document requests.[1]

4. Whether Plaintiffs should be allowed leave of Court to file a Second Amended Complaint adding as Defendants newly identified federal officials and agencies, whose identities have been revealed during the discovery process, and obtain similar expedited discovery against them.

5. Whether Defendants should be permitted to seek reciprocal discovery against Plaintiffs.

The Parties have set forth their respective positions on these disputes below.  Plaintiffs' position is presented first, then Defendants' position.

---

[1] The parties are still engaged in active discussions of issues 2 and 3 listed here in effort to reach agreement.  If they do reach agreement on these issues, they will promptly notify the Court that those issues are resolved.

Under the First Amendment, the federal Government should have no role in policing private speech or picking winners and losers in the marketplace of ideas. But that is what federal officials are doing, on a massive scale – a scale whose full scope and impact is yet to be determined.

Secretary Mayorkas of DHS commented that the federal Government's efforts to police private speech on social media are occurring "across the federal enterprise." Doc. 45, ¶ 233. It turns out that this statement is true, on a scale beyond what Plaintiffs could ever have anticipated. The limited discovery produced so far provides a tantalizing snapshot into a massive, sprawling federal "Censorship Enterprise," which includes dozens of federal officials across at least eleven federal agencies and components identified so far, who communicate with social-media platforms about misinformation, disinformation, and the suppression of private speech on social media—all with the intent and effect of pressuring social-media platforms to censor and suppress private speech that federal officials disfavor. The discovery provided so far demonstrates that this Censorship Enterprise is extremely broad, including officials in the White House, HHS, DHS, CISA, the CDC, NIAID, and the Office of the Surgeon General; and evidently other agencies as well, such as the Census Bureau, the FDA, the FBI, the State Department, the Treasury Department, and the U.S. Election Assistance Commission. And it rises to the highest levels of the U.S. Government, including numerous White House officials. More discovery is needed to uncover the full scope of this "Censorship Enterprise," and thus allow Plaintiffs the opportunity to achieve fully effective injunctive relief. Defendants have objected to producing some of the most relevant and probative information in their possession—*i.e.*, the identities, and nature and content of communications, of White House officials and officials at other federal agencies who are not yet Defendants in this case because they were unknown when Plaintiffs served their discovery six weeks ago. Defendants have objected to producing discovery that would reveal both the height

and the breadth of the federal "Censorship Enterprise."  The Court should overrule these objections and order Defendants to provide this highly relevant, responsive, and probative information.

I.      **Status of Discovery To Date.**

This Court's order granting expedited preliminary-injunction-related discovery authorized Plaintiffs to "serve interrogatories and document requests upon Government Defendants and third party-subpoenas on up to five major social-media platforms seeking the identity of federal officials who have been and are communicating with social-media platforms about disinformation, misinformation, malinformation, and/or any censorship or suppression of speech on social media, including the nature and content of those communications." Doc. 34, at 13.  Pursuant to this Order, on July 18, 2022, Plaintiffs served ten sets of Interrogatories and eight sets of Requests for Production on the Government Defendants, including all Defendants except President Biden. These discovery requests sought the identities of federal officials who are or have engaged in communications with social-media platforms about the topics identified in the Court's Order, as well as the nature and content of those communications.  At the same time, Plaintiffs served third-party subpoenas on Twitter, Facebook, Instagram,[2] YouTube, and LinkedIn, seeking similar information.  *See id.*

Defendants served their objections and responses on August 17, 2022, and they began a rolling production of documents that lasted until August 26, 2022.  During the same time, Plaintiffs and Defendants engaged in extensive discussions in attempt to resolve disputed issues, which resulted in the production (or anticipated production) of additional information.  Plaintiffs also engaged in extensive discussions with the social-media platforms that received third-party

---

[2] Facebook and Instagram are both owned by Meta, so those two were treated as a combined subpoena.

subpoenas, and Plaintiffs obtained responses of relevant information from those social-media platforms.  The discovery provided so far includes significant information that provides a snapshot into the extent of the federal Defendants' social-media censorship activities, and that support and reinforce the allegations in the First Amended Complaint.  It also illustrates the nature and importance of the parties' remaining disputes.

First, the breadth and extent of the federal Defendants' censorship activities is massive.  In their initial response to interrogatories, Defendants initially identified *forty-five* federal officials at DHS, CISA, the CDC, NIAID, and the Office of the Surgeon General (all within only two federal agencies, DHS and HHS), who communicate with social-media platforms about misinformation and censorship.  Ex. 1 (Defendants' Redacted Interrogatory Responses), at 15-18.  But in those responses, Defendants did not provide information about any federal officials at *other* federal agencies of whom they are aware who engage in such communications with social-media platforms about misinformation and censorship, though Plaintiffs had specifically asked for this highly relevant information.  *See id.*  Defendants' document production, however, reveals that such officials at other federal agencies exist—for example, their emails include extensive copying of officials at the Census Bureau, and they also include communications involving the Departments of Treasury and State.  *See* Ex. 2.  The third-party social-media platforms, moreover, have revealed that more federal agencies are involved.  Meta, for example, has disclosed that at least 32 federal officials—including senior officials at the FDA, the U.S. Election Assistance Commission, and the White House—have communicated with Meta about content moderation on its platforms, many of whom were not disclosed in response to Plaintiffs' interrogatories to Defendants.  YouTube disclosed eleven federal officials engaged in such communications, including officials at the Census Bureau and the White House, many of whom were also not disclosed by Defendants.

Twitter disclosed nine federal officials, including senior officials at the State Department who were not previously disclosed by Defendants.

Second, these federal censorship activities include very senior officials within the U.S. Government, *i.e.*, "members of our senior staff," in Jen Psaki's words.  Doc. 42, ¶ 174.  Defendants have steadfastly refused to respond to any interrogatories or document requests directed to the White House officials, such as White House Press Secretary Karine Jean-Pierre and Dr. Fauci in his capacity as Chief Medical Advisor to the President.  But their own document production provides a glimpse into the involvement of several senior White House officials in communications with social-media platforms about censorship – including White House Senior Covid-19 Advisor Andrew Slavitt, Deputy Assistant to the President Rob Flaherty, White House Covid-19 Director of Strategic Communications and Engagement Courtney Rowe, White House Digital Director for the Covid-19 Response Team Clarke Humphrey, among others. *See* Ex. 3.  Further, the social-media platforms have independently disclosed the identities of senior White House officials involved in such communications.  For example, Meta has disclosed the involvement of additional White House officials as White House Counsel Dana Remus and White House Partnerships Manager Aisha Shah, as well as Deputy Assistant to the President Rob Flaherty.  YouTube has disclosed the involvement of White House officials such as Rob Flaherty and Benjamin Wakana, the Director of Strategic Communications and Engagement at the White House COVID-19 Response Team.  Twitter has disclosed the involvement of Andrew Slavitt.

The limited communications produced so far from these high-level officials are particularly relevant and probative, because they provide revealing glimpses into the intensive oversight and pressure to censor that senior federal officials placed on social-media platforms.  For example, after President Biden publicly stated (about Facebook) on July 16, 2021, that "They're killing

6

people," a very senior executive at Meta (Facebook and Instagram) reached out to Surgeon General Murthy to engage in damage control and appease the President's wrath. Ex. 4, at 1. Soon thereafter, the same Meta executive sent a text message to Surgeon General Murthy, noting that "it's not great to be accused of killing people," and expressing that he was "keen to find a way to deescalate and work together collaboratively." Ex. 5, at 1. Such "deescalation" and "working together collaboratively," naturally, involved increasing censorship on Meta's platforms. One week after President Biden's public accusation, on July 23, 2021, that senior Meta executive sent an email to Surgeon General Murthy stating, "I wanted to make sure you saw the steps we took *just this past week* to adjust policies on what we are removing with respect to misinformation, as well as steps taken to further address the 'disinfo dozen': we removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen...." Ex. 3, at 2. Again, on August 20, 2021, the same Meta executive emailed Murthy to assure him that Facebook "will shortly be expanding our COVID policies to further reduce the spread of potentially harmful content on our platform. These changes will apply across Facebook and Instagram," and they included "increasing the strength of our demotions for COVID and vaccine-related content," and "making it easier to have Pages/Groups/Accounts demoted for sharing COVID and vaccine-related misinformation." Ex. 4, at 3. In addition, that senior Meta executive sent a "Facebook bi-weekly covid content report" to Surgeon General Murthy to White House official Andrew Slavitt, evidently to reassure these federal officials that Facebook's suppression of COVID-19 "misinformation" was aggressive enough for their preferences. Ex. 4, at 6-19.

In another, similar exchange, on October 31, 2021, Deputy Assistant to the President Robert Flaherty emailed a contact at Meta with a link to a Washington Post article that complaining about the spread of COVID "misinformation" on Facebook. The email contained only the link to

that story with the subject line, "not even sure what to say at this point." Ex. 3, at 19.  The Facebook employee defended Facebook's practices, and assured Mr. Flaherty that Facebook's internal studies were intended to "improve our defenses against harmful vaccine misinformation," and that Facebook had, in fact, "improved our policies," *i.e.*, increased censorship of online speech.  *Id.* Likewise, Alex Berenson disclosed internal Twitter communications—which Plaintiffs are expecting from Twitter in response to their subpoena—revealing that senior "WH" officials including Andrew Slavitt specifically pressured Twitter to deplatform Berenson, an influential vaccine critic—which Twitter did.  Doc. 45, ¶¶ 187, 309.  This pressure to deplatform Berenson appears to have occurred on April 21, 2021, when four Twitter employees participated in a Zoom meeting with at least three White House officials and one HHS official intended to allow the White House to "partner" with Twitter in censoring COVID-related "misinfo." Ex. 7, at 86.  The meeting invite stated: "White House Staff will be briefed by Twitter on vaccine misinfo.  Twitter to cover trends seen generally around vaccine misinformation, *the tangible effects seen from recent policy changes*, what interventions are currently being implemented in addition to previous policy changes, and ways the White House (and our COVID experts) can *partner* in product work."  *Id.* (emphasis added). The next day, April 22, Twitter employees noted in internal communications that the White House officials had posed "tough" questions during this meeting, including "one really tough question about why Alex Berenson hasn't been kicked off the platform."  *See* https://alexberenson.substack.com/p/the-white-house-privately-demanded.

Such communications from the White House impose maximal pressure on social-media companies, and they clearly get results when it comes to censorship.  And federal officials are fully aware that such pressure is necessary to induce social-media platforms to increase censorship.  CISA Director Jen Easterly, for example, texted with another CISA official about "trying to get us

in a place where Fed can work with platforms to better understand the mis/dis trends *so relevant agencies can try to prebunk/debunk as useful*," and complained about the Government's need to overcome the social-media platforms' "hesitation" to working with the government: "Platforms have got to get more comfortable with gov't.  It's really interesting how hesitant they remain."  Ex. 5, at 4 (emphasis added).

    In fact, such pressures from government officials on social-media companies, along with the many public statements alleged in the Complaint, have succeeded on a grand scale.  Discovery received so far indicates that a veritable army of federal bureaucrats are involved in censorship activities "across the federal enterprise."  They include the 45 key custodians identified in Plaintiffs' interrogatory responses so far, 32 federal officials identified by Facebook so far, eleven officials identified by YouTube, and nine identified by Twitter (many of which do not overlap, either with each other or Defendants' disclosures).  And Defendants have not yet received interrogatory responses reflecting Defendants' knowledge of federal officials at *other agencies* who communicate with social-media platforms about censorship – but apparently there are many.  So many, in fact, that CISA Director Easterly and another CISA official apparently complained, in an internal text messages, that "chaos" would result if all federal officials were "independently" contacting social-media platforms about so-called misinformation: "Not our mission but was looking to play a coord role so not every D/A is independently reaching out to platforms which could cause a lot of chaos."  Ex. 5, at 4.

    These federal bureaucrats are deeply embedded in a joint enterprise with social-media companies to procure the censorship of social-media speech.  Officials at HHS routinely flag content for censorship, for example, by organizing weekly "Be On The Lookout" meetings to flag disfavored content, Ex. 6; sending lengthy lists of examples of disfavored posts to be censored,

Ex. 6, at 21-22; serving as privileged "fact checkers" whom social-media platforms consult about censoring private speech, Ex. 7; and receiving detailed reports from social-media companies about so-called "misinformation" and "disinformation" activities online, Ex. 4; among others.  CISA, likewise, has aggressively embraced its "evolved mission" of screening complaints of social-media disinformation and then "routing disinformation concerns" to social-media platforms, Doc. 45, ¶¶ 250-251.  CISA routinely receives reports of perceived "disinformation" and forwards them to social-media companies, placing the considerable weight of its authority as a federal national-security agency behind other parties' demands for suppression of private speech.  Ex. 8.

Moreover, many of these substantive communications from federal officials flagging specific posts and content for censorship seem to occur through alternative channels of communication that Plaintiffs have not yet obtained (as the third-party social-media platforms contend they are shielded from discovery by the Stored Communications Act).  For example, Facebook trained CDC and Census Bureau officials on how to use a "Facebook misinfo reporting channel."  Ex. 9.  Twitter offered federal officials a privileged channel for flagging misinformation through a "Partner Support Portal."  Ex. 9, at 69.  YouTube has disclosed that it granted "trusted flagger" status to Census Bureau officials, which allows privileged and expedited consideration of their claims that content should be censored.

In the face of these and many other disclosures, Defendants are refusing to provide some of the most relevant and most probative evidence of the most egregious First Amendment violations.  These issues are addressed below.

## II.    Status of Issues That Remain in Dispute.

### A.    Discovery Responses from the White House Press Secretary and Dr. Fauci as Chief Medical Officer to the President.

As authorized by the Court's order, Plaintiffs served interrogatories and document requests on the White House Press Secretary Karine Jean-Pierre (substituted for Jen Psaki in her official capacity), and Dr. Fauci in his capacity as Chief Medical Officer to the President.  Ex. 1 (Collective Interrogatory Responses); Ex. 10 (Karine Jean-Pierre responses to RFPs); Ex. 11 (Fauci RFP responses).  Defendants have categorically refused to produce any discovery from White House officials, and they have provided no interrogatory responses or responsive documents from them.  *See, e.g.,* Ex. 1, at 6-7, 9-10, 20-21, etc.  The parties have met and conferred on this point and failed to reach agreement.

### 1. Discovery from the White House officials is maximally relevant.

For all the reasons stated above, this discovery from White House officials is maximally relevant.  *See supra* Part I.  Among other things, this discovery will demonstrate the scope, the impact, the coercive pressure, and the powerful impact of the federal Censorship Enterprise.  Needless to say, an email from a senior White House official demanding greater censorship of private speech raises by far the greatest First Amendment concerns.  It is impossible to overstate the relevance and probative value of such communications, of which Defendants have provided several examples above.

### 2. Defendants' objections to this discovery lack merit.

In their Objections and Responses, Defendants have asserted a series of objections to this discovery from and relating to White House officials.  All lack merit.

*First*, Defendants' categorical refusal to provide discovery responses from the White House Press Secretary and Dr. Fauci in his capacity as Chief Medical Advisor is inconsistent with this Court's order.  Both the White House Press Secretary and Dr. Fauci were named as Defendants in their official capacities when Plaintiffs moved for expedited preliminary-injunction-related

discovery.  The Court authorized Plaintiffs to "serve interrogatories and document requests upon Government Defendants," Doc. 34, at 13, and the Court's order did not exclude Ms. Jean-Pierre or Dr. Fauci, who were and are "Government Defendants."  *Id.*  The Court's order, therefore, expressly contemplated that Ms. Jean-Pierre and Dr. Fauci will participate in discovery.

*Second*, Defendants object that producing discovery from White House officials will be "unduly burdensome and disproportional to the needs of the case."  *See, e.g.,* Ex. 1, at 9.  The Court has already considered and rejected this argument.  As the Court noted in its Order, "[c]ertainly, it would be time-consuming to produce the information requested.  However, this issue involves the alleged violation of a constitutional right – the right to free speech.  Therefore, this Court feels the need for this information outweighs the burden to Government Defendants."  Doc. 34, at 12.  This balancing of interests is still true today.  In fact, given the sweeping nature of the Government's censorship activities, and the maximally probative nature of the discovery sought – relating to pressure placed on private companies to censor private speech by some of the most powerful federal officials in the Nation – the value of the discovery decisively outweighs any burden on Defendants, and it is plainly "proportional to the needs of the case."  The fact that *White House* officials are engaged in communications with social-media companies encouraging and pressuring them to censor private speech on social-media places maximal pressure on such companies to comply, and thus raises the greatest of First Amendment concerns.  Thus, the fact that these are extremely senior (and powerful) federal officials makes their communications with social-media platforms all the more probative of the coercion and pressure that has resulted in widespread First Amendment violations.

*Third*, Defendants make a blanket assertion of executive privilege and "presidential communications privilege" as to any and all discovery from the White House. Ex. 1, at 9-10.  This

blanket assertion of privilege is detached from any specific document or communication, because Defendants refused to identify or produce any, so Defendants will be hard-pressed to justify it.  In fact, Defendants do not even clearly assert that this privilege applies to any particular document or communication—they contend only that discovery "*may* have the effect of seeking information protected by the presidential communications privilege." *Id.* at 9 (emphasis added).  Needless to say, the fact that discovery "may" raise privilege concerns, unmoored from any actual document, is an attenuated objection, at best.

In any event, it is clear that the assertion of privilege is meritless, because Plaintiffs have made very clear in meet-and-confer with Defendants that they are not seeking any *internal* White House communications at all.  Instead, Plaintiffs are requesting only the identification and production of *external* communications between White House officials and *third-party social-media platforms* – which is just what the Court authorized in its discovery order.  Doc. 34, at 13 (authorizing discovery of "the identities of federal officials" who communicate with social-media platforms about censorship, "including the nature and content of those communications").  There is no plausible claim of privilege in communications between White House officials and *outside third-parties* like social-media platforms. *See, e.g., In re Sealed Case*, 121 F.3d 729, 741–42 (D.C. Cir. 1997) (holding that "the White House has waived its claims of privilege in regard to the specific documents that it *voluntarily revealed to third parties outside the White House*") (emphasis added); *Center for Effective Government v. U.S. Department of State*, 7 F. Supp. 3d 16, 25, 27 (D.D.C. 2013) (holding that executive privilege applies to "protect the confidentiality of communications as between the President and his advisers," and thus "documents distributed from the Office of the President for non-advisory purposes do not implicate the goals of candor, opinion-gathering, and effective decision-making that confidentiality under the privilege is meant to

protect"); *see also, e.g., UnitedHealthcare Ins. Co. v. Azar*, 316 F. Supp. 3d 339, 349 (D.D.C. 2018) ("[A] document that was privileged as part of the deliberative process can lose its privilege when revealed outside the agency."); *O'Keefe v. Boeing Co.*, 38 F.R.D. 329, 335 (S.D.N.Y. 1965) (rejecting a claim of executive privilege over documents "not in the possession of the Air Force but in the possession of the defendant in this action, the Air Force having voluntarily turned them over to defendant").

The cases that Defendants cite are all distinguishable on this very ground.  In *United States v. Nixon*, "[t]he subpoena directed the President to produce certain tape recordings and documents relating to his conversations *with aides and advisers*," 418 U.S. 683, 686 (1974) (emphasis added)—*i.e.*, *internal*, confidential executive-branch communications between the President and his confidants, not *external* communications with outside third-parties, which are not privileged. *Id.*  The next case the Government cites, *In re Sealed Case*, 121 F.3d 729, 743-44 (D.C. Cir. 1997), involved a subpoena to the White House Counsel for documents resulting from the President's direction "to investigate" the Secretary of Agriculture "in order to advise the President on whether he should take executive action" against him based on allegations of improper gift-taking. *Id.* at 735.  Again, the documents sought were *internal* documents relating to the advice given by the President by the White House Counsel – not *external* communications with social-media platforms.  The same is true of *Judicial Watch, Inc. v. Dep't of Justice*, in which the D.C. Circuit addressed whether "the presidential communications privilege extends into the Justice Department to *internal* pardon documents in the Office of the Pardon Attorney and the Office of the Deputy Attorney General that were not solicited and received by the President or the Office of the President."  *Judicial Watch, Inc. v. Dep't of Justice,* 365 F.3d 1108, 1109 (D.C. Cir. 2004) (emphasis added) (quotation marks omitted). *American Historical Association v. NARA*, likewise,

involved a situation where "Plaintiffs seek access to documents from President Reagan's tenure over which President Bush *has asserted constitutional executive privilege*."  *Am. Hist. Ass'n v. Nat'l Archives & Recs. Admin*., 402 F. Supp. 2d 171, 180 (D.D.C. 2005) (emphasis added).  In short, all the cases submitted by Defendants in support of this objection are plainly distinguishable because they involved plausible claims of privilege.  There are no such claims here.

Further, even if there were any privilege to assert—which there is not—it would be waived in this case.  Defendants have already disclosed numerous communications between White House officials and social-media platforms about misinformation, disinformation, and censorship of social-media speech—including communications involving White House officials like Andrew Slavitt, Courtney Rowe, and Clarke Humphrey, among others.  *See* Ex. 3.  Defendants, evidently, did not believe their own assertion of privilege in communications between White House officials and social-media platforms, because they have already disclosed many such communications, and they should not allowed to assert that privilege selectively to pick-and-choose which White House communications with social-media platforms to disclose.

*Fourth*, Defendants object that Plaintiffs must seek discovery from other sources before imposing any burdens on officials of the White House or the Executive Office of the President.  *See, e.g.,* Ex. 1, at 9.  In particular, they object that discovery from the White House should not be granted because "Plaintiffs have not first exhausted all available opportunities to seek related information from other sources."  *Id.*  This argument is both factually and legally meritless. First, it lacks a factual basis because Plaintiffs *have* pursued "*available* opportunities to seek related information from other sources."   *Id.* (emphasis added).  Because this case is in an expedited preliminary-injunction posture, Plaintiffs simultaneously served third-party subpoenas on five major social-media platforms at the same time as pursuing discovery from Defendants, as this

15

Court authorized.  Doc. 34, at 13.  Plaintiffs then engaged in exhaustive negotiations with those social-media platforms to obtain "related information" from those "other sources," just as Defendants contend we should.  Ex. 1, at 9.  And, despite the compressed time schedule, Plaintiffs obtained lists of federal officials—including several White House officials—who have or are engaged in communications with Twitter, Facebook, Instagram, and YouTube about misinformation and censorship of social-media content.  Facebook and Instagram identified 32 federal officials, including eight current and former White House officials.  YouTube identified 11 federal officials, including five current and former White House officials.  Twitter identified nine federal officials, including at least one White House official.  Plaintiffs promptly forwarded all this information to Defendants as soon as they received it and requested responsive communications from these officials be identified and produced.  Defendants flatly refused.  Thus, Plaintiffs *have* "exhausted all available opportunities to seek related information from other sources." *Id.*

In any event, this objection is legally meritless, because Defendants have invented their "every other source first" rule out of whole cloth.  To the extent that it exists, that rule does not apply to general discovery requests; rather, it applies only to discovery requests that would *force the Executive Branch to assert presidential privileges*.  But, as discussed above, there can be no plausible assertion of privilege in federal officials' communications about censorship with private third-parties outside the White House, such as social-media platforms.  *See, e.g., In re Sealed Case*, 121 F.3d at 741–42 (holding that "the White House has waived its claims of privilege in regard to the specific documents that it voluntarily revealed to third parties outside the White House").  Plaintiffs' discovery requests for communications with *outside third parties* do not implicate any privileges, and thus there is no "every other source first" rule.

16

Defendants' own case law confirms this conclusion.   In their discovery objections, Defendants cite only three cases to support their supposed "every other source first" rule.   First, Defendants rely heavily on *Cheney v. U.S. District Court*, 542 U.S. 367 (2004), which is cited 39 times in their interrogatory responses alone.   *See* Ex. 1.   *Cheney* addressed a discovery order that would have required the Vice President "assert executive privilege to protect sensitive materials from disclosure."   *Id.* at 375.   This burden does not exist in this case.   In *Cheney*, the Court of Appeals had held that, "to guard against intrusion of the President's prerogatives," the Executive "must first assert privilege … with particularity."   *Id.* at 376.   But the Supreme Court held that forcing the Executive Branch to assert presidential privileges with specificity, without adequate cause, would raise separation-of-powers concerns.   *Id.* at 382.   The Supreme Court rejected the lower court's holding that the Government could not pursue mandamus because "the Executive Branch can invoke executive privilege to maintain the separation of powers."   *Id.* at 383.   As the Supreme Court emphasized, the discovery sought potentially privileged material, as "[t]he discovery requests are directed to the Vice President and other senior Government officials who … g[a]ve advice and make recommendations to the President."   *Id.* at 385.   Again, these were *internal* Executive Branch communications.   Here, by contrast, Plaintiffs' discovery requests simply do not require any assertion of Executive privilege, because no such privilege applies to Executive communications with *outside* social-media platforms.

In fact, *Cheney* directly supports the appropriateness of discovery here.   First, the Supreme Court in *Cheney* held that, in contrast to criminal cases, "the right to production of relevant evidence in civil proceedings does not have the same 'constitutional dimensions.'"   *Id.* at 384.   But here, where the White House communications at issue *perpetrate ongoing violations of the First Amendment*, the discovery sought plainly does have "constitutional dimensions."   *Id.*   For the same

reasons, in this case, "a court's ability to fulfill its constitutional responsibility to resolve cases and controversies within its jurisdiction hinges on the availability of certain indispensable information." *Id.* at 385. *Cheney* expressed concern that "production of confidential information would … disrupt the functioning of the Executive Branch," *id.* at 386, but here the information is not "confidential." And finally, Plaintiffs here, in compliance with the Court's order, have issued narrow, targeted discovery requests seeking only the identities of federal officials and that nature and content of their communications about misinformation and censorship with social-media platforms. *See* Doc. 34, at 13. This contrasts sharply with "the overly broad discovery requests" at issue in *Cheney*, which asked for "everything under the sky." *Id.* at 386-87.

In addition, Defendants cite *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2009). This case is distinguishable on exactly the same ground. *Karnoski* vacated a discovery order and directed the trial court to reconsider it "because the district court did not fulfill its obligation 'to explore other avenues, *short of forcing the Executive to invoke privilege.*'" *Id.* at 1207 (quoting Cheney, 542 U.S. at 390) (emphasis added). Here, by contrast, Plaintiffs' discovery orders will not "forc[e] the Executive to invoke privilege," *id.*, because there is no plausible claim of privilege in the White House's communications with social-media companies outside the White House. Finally, Defendants cite an unpublished docket-text order of the District of Massachusetts that appears on PACER only as a docket entry with no document attached to it. Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019). Defendants' citation of an unpublished docket entry with no opinion attached to it attests to the paucity of authority supporting their position. In any event, the order[3] provides no support for Defendants' position, because it specifically states that

---

[3] Reproduced from PACER, the docket entry states in full: "Judge Denise J. Casper: ELECTRONIC ORDER entered re 74 MOTION to Compel Responses to White House Discovery Requests. In light of Plaintiffs' motion to compel, D. 74, Defendants' opposition, D. 77, and

"the Court does not necessarily agree with Defendants' analysis and application of *Cheney v. U.S. District Court for the District of Columbia*," and merely allowed the parties to "supplement the record as to the pending motion to compel discovery" as an "interim step."

In short, the Court should order Defendants to provide complete interrogatory responses and responsive documents from Defendants White House Press Secretary Karine Jean-Pierre and Dr. Fauci in his capacity of Chief Medical Advisor to the President.

### B. Defendants Must Identify and Provide Communications of Federal Agencies and Officials of Whom They Are Aware, *Outside* Their Own Agencies, Who Have Engaged in Responsive Communications With Social-Media Platforms.

Plaintiffs served Interrogatory No. 1 on all Defendants except the President (which, after the parties' negotiations, Defendants call "Common Interrogatory No. 1."). *See* Ex. 1, at 13. Interrogatory No. 1 asks Plaintiffs to "[i]dentify every officer, official, employee, staff member, personnel, contractor, or agent of [eah Defendant] *or any other federal official or agency* who has communicated or is communicating with any Social-Media Platform regarding Content Modulation and/or Misinformation." *Id.* (emphasis added). Thus, Interrogatory No. 1 asks each Government Defendant to identify, not just federal officials *within their own agency*, but also

---

Plaintiffs' reply, D. 79-1, and having heard oral argument on the motion, D. 85, the Court ORDERS as follows. Responses to requests for written discovery shall continue and be completed, including as to those sought from the United States Department of Homeland Security ("DHS"). After the completion of such discovery responses and the completion of the deposition of DHS (which the Court understands, at the request of the parties, D. 80, is currently stayed, D. 81), Plaintiffs may supplement the record as to the pending motion to compel discovery from the White House, particularly as to issue of any continuing need for discovery sought from the White House after full discovery is received from DHS. Although the Court does not necessarily agree with Defendants' analysis and application of Cheney v. U.S. District Court for the District of Columbia, 542 U.S. 367 (2004), the Court concludes that this Order is an appropriate interim step in this case at this juncture. Accordingly, within two weeks after the completion of the DHS deposition, Plaintiffs may file a supplemental memorandum in support of their pending motion to compel. Defendants may then respond to such supplemental filing two weeks after the filing of the same. In light of this Order, the Court, at the moment, otherwise reserves any ruling on Plaintiffs' motion, D. 74. (Hourihan, Lisa) (Entered: 05/15/2019)."

federal officials of which they are aware at *other federal agencies* (including White House officials, if they know) who communicate with social-media platforms about misinformation and censorship. *Id.* In responding to these interrogatories, Defendants simply ignored the phrase "any other federal official or agency," and provided responses that identified only federal officials in *their own* agencies. *See id.* at 15-18. Thus, in response to this interrogatory, Defendants identified 45 federal officials, but *only* federal officials at CDC, NIAID, CISA, DHS, and the Office of the Surgeon General, and none at any other federal agency. *Id.* Plaintiffs have repeatedly requested that Defendants supplement their interrogatory responses to provide this critical information about federal officials at other federal agencies, but Defendants have refused to do so, without any clear legal basis.

It is clear that Defendants are withholding significant, highly relevant information on this point. Through the information received in response to third-party subpoenas, the documentary discovery received so far, and recent explosive public disclosures (such as Mark Zuckerberg's recent revelation about the FBI's "disinformation" activities on Joe Rogan's podcast), there has come an avalanche of revelations that many federal officials at *other* federal agencies are engaged in responsive communications about disinformation, misinformation, and censorship of private speech. For example, Defendants' interrogatory responses identify no White House officials. But Defendants' own document production includes several White House officials involved in such communication—such as Rob Flaherty, Andrew Slavitt, Clarke Humphrey, Courtney Rowe, and others—while Meta, Twitter, and YouTube have identified still more White House officials. Defendants' interrogatory responses did not identify any officials at the FDA, the U.S. Election Assistance Commission, or the State Department, but Meta's response to the third-party subpoena so far have identified senior FDA officials and U.S. Election Assistance Commission officials, and

Twitter's response so far has identified senior State Department Officials.  Defendants did not identify any Census Bureau officials, but YouTube disclosed several Census Bureau officials, and the emails Defendants produced reflect extensive involvement of CDC officials.  Defendants did not identify any FBI officials, but six days ago (while Plaintiffs were negotiating with Meta about producing this very kind of information), Mark Zuckerberg revealed on Joe Rogan's podcast that Facebook's censorship of the Hunter Biden laptop story was the result of an FBI "disinformation" advisory—and the FBI responded by stating publicly that it "*routinely*" issues such "disinformation" related communications to social-media platforms. Ex. 12, at 2-3.  In short, Defendants are plainly withholding highly relevant, responsive information by artificially narrowing their interrogatory responses on this point.

Further, the information sought (and withheld so far) is of critical and central relevance to Plaintiffs' request for expedited preliminary-injunction-related discovery.  As Plaintiffs emphasized in their motion for expedited discovery, discovering the identities of federal officials who are communication with social-media platforms about disinformation and censorship is essential to Plaintiffs' ability to receive meaningful injunctive relief. *See, e.g.,* Doc. 18, at 1-3.  As stated in that Motion, which the Court granted, "[t]he current lack of specific details about which federal officials are directly coordinating with social-media companies to censor Americans' speech, and about the content and nature of communications between such federal officials (both known and unknown) and social-media platforms, threatens to frustrate the Court's ability to grant effective preliminary injunctive relief…." *Id.* at 3.  "A fully effective preliminary injunction … will enjoin the specific actors most directly engaged in such unlawful activity, and their specific unlawful conduct. Some of these actors' identities are known, but many are not, and few of their secret, direct communications with social-media platforms have been revealed." *Id.*  Even if

Plaintiffs obtain an injunction to prevent the currently named Defendants from urging and pressuring social-media companies to engage in censorship of private speech, such an injunction would have little practical effect if senior White House officials, FBI officials, FDA officials, State Department officials, EAC officials, and many others, are all allowed to continue imposing similar pressure.

Finally, responding to Interrogatory No. 1 involves no plausible claim of privilege (it requests the identities of federal officials who are communicating with *third-party* social-media platforms), and it is in no way unduly burdensome. The Defendant agencies and officials evidently know this information, and they must disclose it.

### C.     Defendants Should Provide Complete Interrogatory Responses from HHS and from Dr. Fauci in his Capacity as NIAID Director, and Produce Responsive Communications as Applicable.

Defendants also artificially limited the scope of their responses to Interrogatory responses from HHS and from Dr. Fauci in his capacity as NIAID director. (They refused to provide any discovery at all relating to Dr. Fauci's capacity as Chief Medical Advisor to the President, *see supra*, Part II.A) These artificial limitations, which lack any legal basis, appear likely to deprive Plaintiffs of highly relevant information. Plaintiffs have met and conferred with Defendants about this issue, but it remains unresolved.

*First*, as to HHS's responses: Plaintiffs named as Defendants, and served discovery requests on, *both* HHS itself *and* three of its components: CDC, NIAID, and the Surgeon General. *See* Ex. 1, at 3 ("As the least burdensome sources of information consistent with Rules 26 and 33 that is potentially responsive to the Interrogatories, HHS has identified the Office of the Surgeon General (OSG), NIAID, and CDC…"). In other words, HHS did not provide any information from *its own* senior officials in responses to interrogatories—instead, it solely provided information

from its components in the Surgeon General's Office, NIAID, and CDC, all of whom were already subject to the same interrogatories.  HHS, thus, effectively exempted itself from the discovery responses through this "identification."  But on August 28, 2022, in response to Plaintiffs' third-party subpoena, Meta disclosed several HHS officials as likely engaged in responsive communications with Meta about modulation of content on Facebook and Instagram—including very senior HHS officials *outside* NIAID, the CDC, and the Office of the Surgeon General.  Meta's identifications include, for example, HHS's Deputy Assistant Secretary for Public Engagement, the head of HHS's Digital Engagement Team, the Deputy Director of the Office of Communications in HRSA, and HHS's Deputy Digital Director, among others—none of whom was disclosed in HHS's responses to Plaintiffs' interrogatories.  Thus, HHS's decision to "identify" NIAID, CDC, and OSG as its components "likely" to have discoverable information appears crafted to avoid disclosing the identities and communications of *the most senior HHS officials* involved in such communications with social-media platforms.  HHS should be required to provide complete responses, in addition to the responses of CDC, NIAID, and OSG, in response to all Plaintiffs' discovery requests (to include both Interrogatories and the accompanying Requests for Production, *see* Ex. 13, which seek production of the relevant communications).

*Second*, as to Dr. Fauci's responses: In responding to discovery requests directed to Dr. Fauci in his capacity as NIAID director, the *only* step Defendants took to identify responsive information was to engage in keyword searches of Dr. Fauci's NIAID government email account. *See, e.g.,* Ex. 1, at 46, 48.  Further, in response to Interrogatories 1 to 5, Defendants did not provide separate responses from Dr. Fauci at all, but merely responded on behalf of NIAID—again, by searching Dr. Fauci's government email account and the email accounts of other NIAID custodians for key words and taking no other action to locate responsive information.  *See id.* at 48.  Based

on these responses and Plaintiffs' meet-and-confer with Defendants, it has become clear that Defendants' counsel never actually *inquired of Dr. Fauci* about what he knows of his relevant communications with social-media platforms, and thus that critical input is not reflected in the responses. Thus, for example, in responding to Plaintiffs' interrogatories to identify and produce all relevant communications with social-media platforms, Defendants' responses include no information about Dr. Fauci's oral communications with social-media companies, or communications through any medium other than Dr. Fauci's NIAID email account.

Again, this artificially narrowed approach appears tailored to avoid the production of highly relevant information. The First Amended Complaint includes extensive allegations about Dr. Fauci and his communications with social-media companies like Meta. And the discovery produced so far raises the concern that there may be responsive information. For example, in March 2020, Mark Zuckerberg provided Dr. Fauci with his personal cell phone number, demonstrating the opportunity for follow-up phone conversations. And on August 28, 2022, Meta disclosed Dr. Fauci in its list of 32 federal officials who may have communicated with Meta about content modulation on Facebook and Instagram. In his interrogatory responses, Dr. Fauci is required to identify and describe the "nature and content" of any such communications, and in response to requests for production, he is obligated to produce any such written communications not already produced. After meeting and conferring, Defendants have agreed to supplement Dr. Fauci's responses to Interrogatories 8 and 9 directed to Dr. Fauci, but they have not agreed to supplement Dr. Fauci's responses to Interrogatories 1 to 5 directed to Dr. Fauci, and they have not agreed to produce any responsive communications identified in those responses. Dr. Fauci should be ordered to provide complete responses to all seven interrogatories served on Dr. Fauci, and to produce relevant documents identified in those responses.

**D.     The Court Should Permit Plaintiffs to File a Second Amended Complaint and Serve Expedited Discovery Requests on Newly Identified Federal Officials Who Are Pressuring Social-Media Platforms to Engage in Censorship.**

As noted above, even the limited discovery provided so far has produced an avalanche of revelations about new federal officials, not previously publicly disclosed, who are or have engaged in communications with social-media platforms about misinformation, disinformation, and censorship of private speech.  These include senior White House officials and officials at the State Department, the FDA, the Census Bureau, the U.S. Election Assistance Commission, and the Treasury Department, among others.  Moreover, six days ago, Mark Zuckerberg disclosed the involvement of the FBI in communications about "disinformation" with social-media platforms, and the FBI confirmed that it "routinely" send such communications.  With each of these new revelations, Plaintiffs have approached Defendants and requested that they supplement their discovery responses to include responsive communications from the newly disclosed federal officials.  Defendants have refused to do so, on the grounds that none of these newly discovered officials have been sued or served with discovery as yet, and that it would be unduly burdensome to identify and produce their communications.  Plaintiffs have replied that these officials have not yet been sued or served because their identities and involvement were concealed from the public until now, and that receiving discovery from these officials is essential to Plaintiffs' ability to receive effective injunctive relief.  *See* Doc. 18, at 1-3.  Again, an injunction against officials at DHS and HHS will have limited effect if senior officials at the White House, the FBI, the FDA, the State Department, the Census Bureau, the EAC, and other federal agencies may continue to pressure social-media companies to censor private speech.

To address Defendants' objection that these officials and agencies have not been sued or served with discovery, Plaintiffs propose the following procedure: Within two business days of

this Court's ruling on these disputed discovery issues, if not before, Plaintiffs will file a Second Amended Complaint with leave of the Court that names as Defendants additional federal officials and agencies that Plaintiffs have identified so far whom current information indicates are or have engaged in communications with social-media platforms about misinformation, disinformation, malinformation, and any censorship and suppression of speech on social media. In addition, within two business days of this Court's ruling on these disputed discovery issues, Plaintiffs will serve interrogatories and document requests on the newly named Defendants, seeking the same discovery this Court has already authorized—*i.e.*, "the identity of federal officials who have been and are communicating with social-media platforms about disinformation, misinformation, malinformation, and/or any censorship or suppression of speech on social media, including the nature and content of those communications." Doc. 34, at 13. The Court should order the new Defendants to respond in 14 days to those discovery requests, as the Government has already been on notice of Plaintiffs' request for this information for several days. This approach will accommodate Defendants' objections while avoiding interjecting undue delays into the ongoing discovery schedule already adopted by the Court. *See* Doc. 34, at 13-15.

> **E.     The Court Should Not Authorize Defendants' Last-Minute, Retaliatory Request for "Reciprocal Discovery."**

Yesterday, the day before this Joint Statement is due, Defendants notified Plaintiffs that they would request "reciprocal discovery" against the Plaintiffs in this Joint Statement, if the Court ordered any further discovery from Defendants. Defendants declined to specify the precise nature of the discovery they would seek, and they declined to provide copies of any potential discovery requests. Plaintiffs' only specific information about this request, therefore, comes from one previous email chain from August 27, 2022, in which Defendants' counsel stated "we want to note that if Plaintiffs are going to seek additional discovery, we may also seek discovery from

Plaintiffs," and stated that Defendants might seek discovery of communications between State officials and social-media platforms.  *See* Ex. 12, at 2.  To the extent Defendants make this request, the Court should reject it, for several reasons.

*First*, the request is untimely.  Plaintiffs moved for expedited preliminary-injunction-related discovery on June 17, 2022—ten weeks ago.  Docs. 17, 19.  The Court granted this motion on July 12, 2022—six weeks ago.  Doc. 34.  The Court adopted a specific, detailed discovery plan for such discovery, under which the parties have been operating for six weeks.  During all this time, Defendants never suggested that they would request reciprocal discovery until August 27, 2022.  Ex. 12, at 2.  This suggestion came very late in the process, and just as Plaintiffs were requesting highly relevant disclosures that the Government seems particularly eager to avoid making—*i.e.*, the communications between the FBI and Meta that led to the censorship of the Hunter Biden laptop story on Facebook and Instagram.  *See* Ex. 12, at 2-3.  Under the circumstances, the request is plainly untimely and would serve no useful purpose but to delay the adjudication of Plaintiffs' motion for preliminary injunction, which has been pending since June 14, 2022.

*Second*, the discovery is evidently sought for an ulterior, improper purpose—*i.e.*, to retaliate against Plaintiffs and attempt to deter Plaintiffs from seeking particularly relevant and probative disclosures from the Government.  In particular, Defendants raised this issue of seeking "reciprocal discovery" for the very first time only in response to Plaintiffs' demand for the FBI's communications with Meta that led to the censorship of the Hunter Biden laptop story, which Mark Zuckerberg disclosed in an explosive revelation on Joe Rogan's podcast last Thursday.  Ex. 12, at 2-3.  Moreover, the FBI's public response to this disclosure stated that it "***routinely***" engages in such disinformation-related communications with social-media platforms.  *Id.* at 3.  Naturally, the

Government is eager to avoid making such disclosures.  *See id.* at 1-2.  Furthermore, the Government's threat to seek such discovery explicitly *admitted that the Government does not think such discovery would be probative* on any disputed issues.  *Id.*  The Government's attorney explicitly stated, of the discovery DOJ plans to seek: "*Of course, we do not suggest that we necessarily find those communications to be problematic.*"  *Id.* at 2 (emphasis added).  In other words, DOJ admits that it would not be seeking such discovery for its probative value.  Thus, the context demonstrates that the Government seeks such discovery only for an improper, ulterior purpose—namely, to retaliate against Plaintiffs for their own discovery requests and to seek to deter Plaintiffs from pursuing particularly relevant, probative information.

*Third*, the retaliatory discovery the Government belatedly seeks would have little or no probative value—as the Government itself admits.  *See id.*  The Government threatened that it will seek communications between State officials and social-media companies about censorship.  *See id.*  But the Government does not contend that such State officials have engaged in a long campaign of threats and coercive pressure against social-media companies to pressure them to comply with such requests, as Plaintiffs allege the *federal* officials have done in great detail.  *See* Doc. 45. Further, unlike the federal Government, neither Missouri nor Louisiana has a unitary executive branch; their Attorneys General are separately elected by the people, and authorized under State law with full authority to represent the State's interests in court.  Statements by other state officials who report to separately elected officials thus are not attributable to Missouri and Louisiana's Attorneys General, and thus they would be discoverable only through third-party subpoenas, not discovery requests directed to Missouri's and Louisiana's Attorneys General.  Even more, the First Amended Complaint includes several *private* Plaintiffs, for whom such communications would have no plausible relevance to their claims.  In addition, the First Amendment does not contain an

"unclean hands" exception, and even if State officials unlawfully pressured social-media platforms to censor speech, that would have no relevance to the Government's violations of the First Amendment.

Finally, in yesterday's meet-and-confer, the Government stated for the first time that it might seek "reciprocal discovery" related to Plaintiffs' standing.  But this Court has already addressed this issue in detail and determined that Plaintiffs have standing, Doc. 34, at 3-9, and Defendants provide no plausible reason to revisit that conclusion.  Therefore, such discovery would serve no useful purpose.  Moreover, discovery regarding Plaintiffs' standing, if appropriate at all, would be the proper subject of a "factual attack" on the Court's jurisdiction brought under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  Defendants were served with the Complaint on May 10, 2022, and thus they have had almost four months to file such a motion, but they have never done so.  If they wish to seek jurisdictional discovery regarding Plaintiffs' standing, they should file a Rule 12(b)(1) motion and a motion for jurisdictional discovery, to which Plaintiffs could respond and the Court could rule in due course.  They should not be allowed to belatedly interject this issue to retaliate and delay Plaintiffs' motion for preliminary-injunction-related discovery that was filed 10 weeks ago and granted six weeks ago.

* * *

WHEREFORE, for the reasons stated, Plaintiffs respectfully request that this Court:

1. Order Defendants White House Press Secretary Karine Jean-Pierre and Dr. Fauci in his capacity as Chief Medical Advisor to the President to provide complete responses to Plaintiffs' interrogatories and document requests.

2. Order all Defendants who were served with Interrogatories to identify federal officials and agencies *outside their own agencies* who have or are engaged in communications with social-

media platforms about misinformation, disinformation, malinformation, and/or censorship or suppression of speech on social-media, and produce any such communications in their possession.

3. Order Defendant Health and Human Services (HHS) and Dr. Fauci in his capacity as NIAID Director to provide complete responses to Plaintiffs' interrogatories and document requests as discussed herein.

4. Grant Plaintiffs leave to file a Second Amended Complaint suing newly identified federal officials and agencies, whose identities have been revealed during the discovery process, and to serve similar expedited discovery requests on them, within two business days of the Court's ruling on these disputed issues, and order those new Defendants to respond within 14 days.

5. Deny Defendants' belated and retaliatory request to seek reciprocal discovery against Plaintiffs.

**DEFENDANTS' POSITION**

Plaintiffs moved for "leave to conduct specific, targeted, narrow discovery in support of their Motion for Preliminary Injunction." Pls.' Mem. in Support of their Mot. for Expedited Prelim. Inj.-Related Disc. at 3, ECF No. 18 ("Mot."). This Court granted their request in part, noting that "[e]xpedited discovery is not the norm" and should be "reasonable[] . . . in light of all the surrounding circumstances," Mem. Ruling and Order at 9, ECF No. 34 ("Order"), and authorizing discovery "targeted to the specific allegations of Plaintiff States' Complaint" "for purposes of the pending Motion for Preliminary Injunction," *id.* at 12.

The discovery that Plaintiffs ultimately sought was anything but reasonably tailored. Nevertheless, in the thirty days provided by this Court, Defendants provided written responses and objections to requests for production, while also producing substantive interrogatory responses and roughly 15,000 pages of documents. Given this breadth of produced information, Plaintiffs cannot suggest that they are lacking in the facts that they deemed necessary at the outset of this case to litigate their pending preliminary injunction motion. Nonetheless, Plaintiffs ask this Court to resolve a series of unjustified disputes that would only prolong Plaintiffs' purportedly time-sensitive motion. Plaintiffs, in short, seek to treat the extraordinary discovery process authorized by this Court as if it were the full discovery process provided by the Federal Rules of Civil Procedure, faulting Defendants for objecting to requests that are grossly disproportionate to this stage of the proceedings while they themselves seek to expand their already-too-broad requests after the prescribed deadline.

In an effort to resolve outstanding discovery disputes, Defendants have proposed to respond to certain additional targeted requests that may be completed expeditiously and thereby aid the swift resolution of the preliminary injunction motion, as Plaintiffs originally sought. The

Court should decline to order the expansive additional discovery sought by Plaintiffs and instead should, at most, order the targeted, supplemental interrogatory responses that Defendants have offered in the parties' meet and confer. *Infra* Section II. Such a process would allow the parties to resolve promptly any issues relating to depositions and then to complete briefing on the preliminary injunction motion and Defendants' forthcoming motion to dismiss Plaintiffs' Amended Complaint.

If the Court were inclined to order the more expansive discovery Plaintiffs demand, it should do so only after resolving the pending motion for preliminary injunction and forthcoming motion to dismiss and addressing the significant jurisdictional issues at the heart of this case. Defendants' motion to dismiss the original Complaint raised serious arguments that Plaintiffs lack Article III standing—arguments not before the Court when it reached a preliminary decision on standing in its discovery order, including under Supreme Court precedent foreclosing *parens patriae* actions by states against the federal government. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923)). This Court's preliminary conclusion otherwise for the limited purposes of granting expedited discovery targeted to the Complaint, predated the full briefing on this issue. And while the States have now added individual plaintiffs to the action in an attempt to shore up their standing, Defendants' forthcoming motion to dismiss the Amended Complaint will demonstrate why the individual plaintiffs' claims suffer from the same fundamental jurisdictional defects identified in Defendants' original motion. In particular, like the States, the individual plaintiffs cannot show causation and redressability for purposes of Article III standing, as the alleged injuries hinge on the "unfettered choices made by independent" social media companies "not before the court and whose exercise of broad and legitimate discretion the [C]ourt[] cannot presume to either

control or predict." *Defenders of Wildlife*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). For that reason, among others, courts across the country have dismissed claims by individual users of social media materially similar to the individual plaintiffs' claims here.[4] Authorizing the extensive discovery that Plaintiffs demand—essentially, on the whole of the federal government—before the Court resolves the forthcoming motion to dismiss addressing whether this Court has jurisdiction to hear the case at all, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998), would impose needless and additional extensive burdens on the parties and the Court.

Furthermore, even if the Court were to continue to conclude that it has subject matter jurisdiction over the case, the Court should resolve Plaintiffs' pending preliminary injunction motion before allowing Plaintiffs to conduct any further written discovery, including by serving new requests on non-Defendant federal agencies and officials. Plaintiffs seek further discovery to, among other things, determine whether other federal actors beyond like HHS and DHS have communicated with social media companies about the harms of misinformation—communications which, as Defendants will argue, are routine and do not amount to a First Amendment violation. The Court should thus first assess, through a decision on the preliminary injunction motion, whether communications of that nature do indeed run afoul of the First Amendment. If it agrees with Defendants that those communications—which occurred even in the last Administration— are not problematic, then the additional discovery Plaintiffs seek would not support a viable First

---

[4] *Changizi v. Dep't of Health & Hum. Servs.*, --- F. Supp. 3d ---, 2022 WL 1423176 (S.D. Ohio May 5, 2022), *appeal filed,* No. 22-3573 (6th Cir. June 30, 2022); *Hart v. Facebook Inc.*, Case No. 22-cv-00737-CRB, 2022 WL 1427507 (N.D. Cal. May 5, 2022); *Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505 (D.D.C. 2021) ("*AAPS I*"), *aff'd* 23 F.4th 1028 (D.C. Cir. 2022).

Amendment claim and would thus be unnecessary. Alternatively, the Court's clarification of the issues in dispute on the merits would provide a helpful guide to the scope of future discovery (if any) to resolve those claims.

At the very least, if the Court is inclined to authorize extensive additional discovery prior to ruling on these motions, it should stay the discovery for a period of thirty days to allow the Solicitor General to consider whether or not to seek immediate appellate review.

## I.  Background to the Current Dispute

Plaintiffs moved for expedited discovery in June 2022 and, in their supporting memorandum, stated repeatedly that they sought "leave to conduct specific, targeted, narrow discovery in support of their Motion for Preliminary Injunction." Mot. at 3; *id.* at 1 (Plaintiffs seek "expedited preliminary-injunction-related discovery on a limited basis"); *id.* at 12 (noting that Plaintiffs seek "narrow, carefully targeted discovery—such as responding to targeted interrogatories and document requests"). Plaintiffs also asked the Court to set a compressed discovery schedule and acknowledged that their "requested discovery" would have to "be reasonably tailored to [those] time constraints[.]" *Id.* at 10 (*citing Amos v. Taylor*, No. 4:20-CV-7-DMB-JMV, 2020 WL 5809972, at *6 (N.D. Miss. Aug. 26, 2020)) The Court ultimately authorized expedited discovery, and set a compressed schedule, under which Defendants had "thirty days following receipt of Plaintiff States' discovery requests" to provide "responses and/or objections" to those requests. The Court emphasized, however, that "[e]xpedited discovery is not the norm" and that it must be "reasonable[] . . . in light of all the surrounding circumstances." Order at 9.

Despite the States' repeated representations that they sought only "narrow" and "carefully targeted discovery," Mot. at 12, they ultimately served ten sets of interrogatories[5] and eight sets of requests for the production of documents—totaling well over one hundred discovery requests—on a slew of federal agencies and officers. On an expedited timeframe, Defendants identified relevant custodians, pulled relevant documents, loaded those documents into a review platform, reviewed and processed them, and ultimately produced roughly 15,000 pages of documents along with interrogatory responses.

The parties then engaged in a meet and confer process in which Defendants made additional efforts to address objections raised by Plaintiffs, and to do so as expeditiously as possible. As a consequence of the parties' initially productive meet and confer process, several disputes were resolved. For instance, at Plaintiffs' request: Defendants agreed to produce organizational charts from Defendant agencies that technically fell outside the bounds of authorized discovery; Defendants agreed to produce additional email communications between Dr. Fauci and Mark Zuckerberg that fell outside the scope of discovery; Defendants agreed to provide Plaintiffs with an "overlay" file to allow them to extract certain metadata from the documents that the time constraints of expedited discovery did not practically permit Defendants to produce along with the 15,000 pages of documents; Defendants agreed to provide additional responses to specific interrogatories; and the parties reached several other agreements. On Friday, August 27, the parties

---

[5] Plaintiffs initially served 110 interrogatories. Prior to the 30-day deadline for service of objections and responses, Defendants objected to the interrogatories because they exceeded the 25-interrogatory limit in the Federal Rules. During subsequent discussions, Plaintiffs agreed to select the first five interrogatories served on CDC to apply to all Defendants on whom interrogatories had been served (the "Common Interrogatories") and to select twenty additional interrogatories directed at particular Defendants as specified by Plaintiffs ("Additional Interrogatories").

jointly sought a modest extension to the deadline for filing this Joint Statement because of the progress they were making during their meet-and-confer discussions.

Nonetheless, Plaintiffs contend that they are entitled to even more discovery. Just over the past several days, Plaintiffs have raised new disputes and demanded additional discovery from officials not named in the Complaint or the preliminary injunction motion. Plaintiffs do not suggest, however, that additional discovery is necessary to resolve their pending preliminary-injunction motion, as they must in the context of expedited discovery. *BKGTH Prods., LLC v. Does 1-20*, CIV.A. No. 13-5310, 2013 WL 5507297, at *5 (E.D. La. Sept. 30, 2013) ("A party seeking expedited discovery must narrowly tailor their requests in scope to the *necessary* information they seek." (emphasis added)); *Amos v. Taylor*, No. 4:20-CV-7-DMB-JMV, 2020 WL 7049848, at *5 (N.D. Miss. Dec. 1, 2020) (the "party seek[ing] to compel *expedited discovery*" must show "that the requested discovery falls within the scope of permitted expedited discovery— in other words, that it is narrowly tailored to obtain information relevant to a preliminary injunction determination" (emphasis in original)). Instead, they argue only that they requested additional information, and that such information may be relevant to their claims, as one would in the process of ordinary civil discovery. Although Plaintiffs initially sought a quick resolution of their preliminary injunction motion, *see* Mot. at 3 n.1 (claiming that the issues in this litigation "are particularly time-sensitive and urgent"), they now effectively ask the Court to extend and expand the discovery process originally authorized by this Court.

Although Plaintiffs have described for Defendants, in general terms, the discovery-related relief they planned to seek, Plaintiffs failed to provide a copy of their section of this Joint Statement in advance of filing to ensure that Defendants could address all of the disputes raised, or any questionable and unproven characterizations included, in Plaintiffs' section. Nevertheless, based

on Plaintiffs' oral and written communications, Defendants understand that the disputes Plaintiffs

plan to raise herein will fall within two categories: (1) disputes over discovery requests served on

July 18; and (2) disputes over new discovery requests proposed for the first time in the parties'

meet and confer discussions, which requests have not been served on any Defendant. As

Defendants contend below, none of Plaintiffs' demands has merit. Defendants' expedited

discovery responses and productions to date have been reasonable, and Plaintiffs do not contest

that are able to litigate their preliminary injunction motion with the materials they have received.

**II.    Defendants responded adequately to Plaintiffs' discovery requests served on July 18 and have offered reasonable compromises to address Plaintiffs' demands exceeding the expedited discovery that the July 12 Order allowed.**

Plaintiffs raise several objections to the adequacy of Defendants' searches for information

responsive to the interrogatory and document requests served on July 18. For the items for which

Defendants have proposed compromises, as specified below, the parties were still conferring up to

the time of filing and continue to confer in hopes of reaching a resolution on their own. To the

extent no agreement is reached, Plaintiffs' requests for broad discovery must be denied and

Defendants' proposed reasonable compromises should otherwise be adopted. First, Plaintiffs

request that Defendant agencies respond to interrogatories and document requests by identifying

officials across the federal government who have communicated with social media companies.

Although this request is facially unreasonable in the context of expedited discovery, Defendants

offer below a reasonable compromise. The Court should not grant Plaintiffs' unreasonable request

for responses that go beyond the scope of authorized expedited discovery. Second, Plaintiffs seek

broad supplemental discovery responses from Dr. Fauci, beyond Defendants' agreement to

provide, over the next three weeks in a manner consistent with the demands of expedited discovery,

responses to specific and targeted discovery requests directed to Dr. Fauci. Third, Plaintiffs assert

that Defendants' search for HHS custodians was unreasonable and demand that they conduct a

new search through every HHS component, despite HHS's prior due diligence to identify custodians most likely to have responsive information and to focus their searches for information and documents, using Plaintiffs' search terms, on those custodians. The Court should deny this request because Plaintiffs do not show that additional searches of officials in agency components that were not the focus of Plaintiffs' allegations is necessary to resolve the preliminary injunction motion or proportional to the needs of the case. And their conclusory assertion that the agency has actively concealed information is unsupported and contradicted by its already voluminous production of documents in response to Plaintiffs' requests. Fourth, Plaintiffs' request that Defendants respond to interrogatories on behalf of DHS by conducting additional ESI searches would impose disproportional and undue burdens on Defendants. Fifth, Plaintiffs' request for intrusive discovery from the White House, before exhausting alternative avenues (and before the Court resolves the forthcoming motion to dismiss), goes beyond the scope of Plaintiffs' initial requests, is unnecessary to resolve the preliminary injunction motion, and raises significant separation of powers concerns. This request, likewise, must be denied.

A.   *Plaintiffs are not entitled to additional searches pertaining to agencies not named in the Complaint.*

Plaintiffs first demand that, in response to interrogatories, Defendants identify officials outside their own agencies, and across the entire federal government, who have communicated with social media companies—even if conduct of those officials is not even mentioned, let alone alleged to be illegal, in the original Complaint. The dispute centers on Common Interrogatory 1, in conjunction with requests seeking production of all documents relied on in responding to that request. As originally served, Common Interrogatory 1 reads: "Identify every officer, official, employee, staff member, personnel, contractor, or agent of" recipient Defendant "or any other

federal official or agency who has communicated or is communicating with any Social-Media Platform regarding Content Modulation and/or Misinformation."

Especially in the context of expedited discovery, it would be unduly burdensome and disproportional to the needs of this case to require Defendants to sift through thousands of communications and identify officials from outside agencies who have communicated with social media companies, in response to Plaintiffs' interrogatories. Complying with this request would not only be impossible within the expedited period provided for current discovery, it would be unnecessary in light of the thousands of external communications Defendants have already produced. Through those productions, much of this information is *already available* to Plaintiffs. It would be far less burdensome for Plaintiffs to consult these documents. Fed. R. Civ. P. 26(b)(2)(C)(i) (a district court must limit the scope of discovery if "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive). As written, Plaintiffs' requests that Defendants identify government actors who were not even alleged through bare legal conclusions, let alone facially plausible allegations in the Complaint, to have engaged in the conduct alleged in the Complaint or related preliminary injunction motion for which expedited discovery was authorized, are not "targeted" or "reasonable," Order at 12.

Nonetheless, recognizing that the Court's July 12 Order authorizes expedited discovery targeted to the original Complaint so that Plaintiffs can attempt to build a record to support their preliminary injunction application, Defendants offered reasonable compromises to address Plaintiffs' requests. In particular, during the meet-and-confer, Defendants offered in good faith to focus the inquiry underlying Common Interrogatory 1 by drawing on what is *known* to those agency Defendant custodians who currently are employed by the agency Defendants—*i.e.*, asking

those currently-employed custodians to identify other agencies known to have communicated, or to be in communication with, platforms concerning misinformation.[6] Because responding to the interrogatory as so reformulated entails significant additional efforts to interview the custodians beyond the efforts Defendants diligently undertook within the initial 30 days the Court set for responding to Plaintiffs' expedited discovery requests and interrogatories, Defendants proposed to provide their response to the reformulated interrogatory three weeks from the filing of this Joint Statement. Any other response would be unduly burdensome and disproportional to the needs of the case, especially in the context of expedited discovery.

Defendants' proposed compromise would not entail conducting any additional searches for information or documents from non-Defendant agencies that are not within their custody or control. Nor should it require Defendants to undertake any new searches. Doing so would be immensely more burdensome and would effectively require a re-opening of document discovery for which Defendants have already provided voluminous responses. Thus, Defendants' proposal is the only reasonable construction of Common Interrogatory 1 that accounts for the practical limitations inherent in expedited preliminary injunction discovery as authorized by this Court.

**Requested Relief:**   Accordingly, should the Court find any remaining dispute, it should adopt Defendants' reasonable compromise proposal, setting the due date for the response to new Common Interrogatory 6 at three weeks from today, *i.e.*, September 21, 2022, and ordering that the response be *without* any new searches for ESI. Further, although Defendants maintain their objections to discovery on the White House as outlined below, under this proposal, an agency

---

[6] Common Interrogatory No. 6 as Defendants proposed it on August 29 would read: "Identify non-Defendant federal agencies or officials who are known to have communicated or to be communicating with any Social-Media Platform regarding Content Modulation or Misinformation, excluding communications produced by Defendants to date in this action or described in their interrogatory responses of August 17, 2022."

Defendant will identify White House officials but only subject to personal knowledge and when the agency and the White House participated in the communication(s) at issue. (Defendants have accepted Plaintiffs' request that the response to Common Interrogatory 6 cover the same period as Plaintiffs' other requests, *i.e.*, from January 1, 2020.)

B. *The Court should reject Plaintiffs' expansive requests for supplemental responses from Dr. Fauci.*

To narrow the disputed issues, Defendants offered to supplement their responses to two interrogatories as to Dr. Fauci: Additional Interrogatory No. 5 (Dr. Fauci No. 8), and Additional Interrogatory No. 6 (Dr. Fauci No. 9). Plaintiffs signaled approval of that offer but insisted that any further response be based on additional searches of electronically stored information—a condition to which Defendants could not agree. Defendants' proposed compromise was reasonable in light of the severe time constraints resulting from the expedited discovery timetable. At any rate, Plaintiffs quickly pivoted to making new demands that Defendants supplement their answers to other interrogatories (Common Interrogatory Nos. 1-5) addressed to Dr. Fauci—demands not previously aired in the initial two meet-and-confer sessions. The Court should reject the contention that Defendants should be required to provide responses to any more of the interrogatories directed at Dr. Fauci than Defendants have agreed to provide, as Defendants have offered reasonable responses within the time constraints of expedited discovery.

Additional Interrogatory No. 5, concerning communications with Mark Zuckerberg of Facebook, reads: "Identify all Communications with Mark Zuckerberg from January 1, 2020 to the present, including but not limited to those referenced in Paragraphs 142-145 of the Complaint." Additional Interrogatory No. 6, concerning communications with social media platforms related to COVID-19, reads: "Identify all Communications with any Social-Media Platform that relate to the Great Barrington Declaration, the authors of the Great Barrington Declaration, the original

signers of the Great Barrington Declaration," other various individuals, "the Wuhan Institute of Virology, EcoHealth Alliance, and/or any member of the so-called 'Disinformation Dozen.'"

As to each of these interrogatories, Defendants reasonably identified the communications from Dr. Fauci they produced in response to Plaintiffs' parallel RFPs, stating that those responses provided a more expeditious and significantly less burdensome method for Plaintiffs to obtain the information sought, considering the expedited nature of the discovery here and the broad scope of the Interrogatories. Fed. R. Civ. P. 26(b)(2)(C)(i); *see also* Fed. R. Civ. P. 33(d).

Plaintiffs objected, contending that Defendants were required to undertake "separate effort to inquire of Dr. Fauci whether he is aware of any other (non-email) communications, whether oral or written" and seeking from Dr. Fauci "good-faith and comprehensive efforts," including as to "communications via channels other than his government email." Although Defendants had reasonably confined their document production and related interrogatory responses to email communications in an effort to provide meaningful discovery within the 30-day timetable the Court's July 12 Order imposed, Defendants nevertheless proposed to provide additional substantive responses to the two interrogatories,[7] and Plaintiffs initially indicated acceptance of that offer, while stressing their untenable demand that any further response be based on new searches of ESI.

Plaintiffs, however, came back with another demand. They asserted that Defendants must supplement their responses to various Interrogatories served on Dr. Fauci (Common Interrogatory Nos. 1-5), purportedly based on Facebook's designation of Dr. Fauci as one official who communicated with the platform. But the fact that Dr. Fauci communicated with Facebook is not

---

[7] In the same agreement, Plaintiffs' accepted Defendants' offer to supplement two interrogatories as to DHS, discussed below.

new (indeed, it is prominently alleged in the Complaint), and cannot warrant supplementation of existing interrogatory responses, let alone sustain a demand for any additional interrogatories. Defendants have already produced email communications between Dr. Fauci and social media companies. Indeed, at Plaintiffs' request during meet-and-confer sessions, Defendants also agreed to produce—and did produce on Friday, August 26—additional emails between Dr. Fauci and Mark Zuckerberg that were in their custody and control but that were not responsive to Plaintiffs' discovery requests. Facebook's confirmation that it communicated with Dr. Fauci simply repeats a fact already known to Plaintiffs before they filed this action, and cannot support requiring supplemental or additional interrogatory responses here.

*Requested Relief:* At any rate, should the Court find any remaining dispute, it should adopt Defendants' reasonable compromise proposal, under which Defendants would provide, by three weeks from today, as to Dr. Fauci, supplemental responses on Additional Interrogatory Nos. 5 and 6, and on Common Interrogatories Nos. 2, 3, and 4. That task omits Common Interrogatory Nos. 1 and 5: Defendants are responding to Common 6 in lieu of Common No. 1 as explained above, and Common No. 5 seeks the results of searches of documents also produced so no supplementation is proper. Again, the Court should clarify that the further response as to Dr. Fauci is permitted to be made on the existing documents Defendants produced, not on new ESI.

C.  *The Court should reject Plaintiffs' expansive requests for supplemental responses from DHS.*

Subject to the meet-and-confer, Defendants have also offered to supplement responses to two interrogatories as to DHS: Additional Interrogatory No. 11 (DHS No. 9), and Additional Interrogatory No. 12 (DHS No. 13). Additional Interrogatory No. 11, concerning DHS's alleged contacts with unspecified "tech companies," reads: "Identify all 'the tech companies' with which DHS is 'working together' to 'prevent harm from occurring,' as Secretary Mayorkas stated on

August 2, 2021, as discussed in Paragraph 207-208 of the Complaint, including the nature of the work and all Communication(s) relating to such work." DHS objected on the grounds, among others, that Plaintiffs had not specified the "tech companies" about which they inquired, and provided a narrative response explaining that the nature of the work that the agency performs includes "respond[ing] to Misinformation that poses a threat to the homeland."

Additional Interrogatory No. 12, concerning communications with platforms about misinformation not only by the whole of DHS, but by the whole of the Federal Government, reads: "Identify every federal agency, group, sub-group, department, component, division, sub-division, officer, official, employee, agent, or other person or entity within the federal government, both within and without DHS, that communicates or has communicated with any Social-Media Platform regarding Misinformation and/or Content Modulation, including but not limited to any person or entity whose activity is or was to be subject to oversight by the Disinformation Governance Board, including the nature of their coordination with the Social-Media Platform(s)." DHS objected on the grounds, among others, that the interrogatory called on DHS to obtain information not reasonably available to it within the compressed expedited discovery period, about agencies whose alleged conduct is not challenged in either of Plaintiffs' pleadings and which is not within DHS's custody and control.

After Plaintiffs contended that the initial responses to those two interrogatories were not "meaningful," DHS nevertheless offered to provide a further response after the filing of this Joint Statement, but in signaling their approval of that offer, Plaintiffs stressed their demand that any further responses be based on new ESI searches—a condition Defendants cannot meet given the severe time constraints of the expedited discovery process, and because it would be disproportional to the needs of Plaintiffs' preliminary injunction application. Again, Defendants are willing to

44

supplement their responses to these interrogatories within three weeks of the filing of this Joint Statement, so long as it is not subject to the requirement to do new burdensome ESI searches.

**Requested Relief:**  Accordingly, the Court should resolve the dispute on this point, should one remain, by adopting Defendants' reasonable compromise proposal, under which, without searching for any new ESI, Defendants will supplement Additional 11 and Additional 12 for DHS by three weeks from today's joint statement filing.

D. *Requiring HHS to conduct a search for responsive material through the entire agency would exceed the scope of the allegations of the Complaint and preliminary injunction motion and would cause disproportionate burden.*

Plaintiffs also challenge the adequacy of HHS's identification of custodians likely to have relevant information, and they request that Defendants immediately conduct a search of all of HHS—an agency of 80,000 employees—for communications with social media platforms. This request remains untenable. It proceeds from the faulty premise that Plaintiffs are entitled to discovery from every HHS employee—regardless of whether the discovery sought would be "necessary" to resolve their preliminary injunction motion, *BKGTH Prods., LLC*, 2013 WL 5507297, at *5, let alone whether it is "proportional to the needs of the case," or would impose undue "burden or expense" on Defendants, *see* Rule 26(b)(1). Plaintiffs' request would be unreasonable in an ordinary discovery context. *See Coleman v. Am. Red Cross*, 23 F.3d 1091, 1098 (6th Cir. 1994) (upholding district court order denying motion to compel request to search every file in Red Cross National Headquarters "for any documents that might be of any relevance to the matter in the case" because the request was "overly burdensome," particularly when thousands of pages of documents productions, interrogatory responses, and depositions provided other ways of obtaining relevant information). It is all the more unreasonable in the expedited discovery context presented here.

HHS's search for relevant custodians was reasonable and tailored to the discovery authorized by the Court. The Court ordered expedited discovery "targeted to the specific allegations of Plaintiff States' Complaint." Order at 12. In searching for responsive information, the agencies identified custodians in the relevant components based on their understanding of each individual's role at the agency and their involvement in the types of communications alleged in the Complaint and sought through Plaintiffs' discovery requests. *See* Rule 33(b)(1)(A) (stating that interrogatories must be answered "by the party to whom they are directed"); Rule 34(2)(A) (providing that "[t]he party to whom the request is directed must respond" or object); *see also In re Epipen Mktg., Sales Pracs. & Antitrust Litig.*, MDL No. 2785, 2018 WL 1440923, at *2 (D. Kan. Mar. 15, 2018) ("[T]he party responding to discovery requests is typically in the best position to know and identify those individuals within its organization likely to have information relevant to the case."). After all, the Complaint is what "give[s] the defendant fair notice of what ... the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The notice-pleading rule "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

The agency's efforts, moreover, must be understood in the context of the expedited discovery process here. To respond to Plaintiffs' requests within the time allotted, the agencies were required to identify custodians within a matter of *days*. The agencies thus reasonably focused their efforts on identifying the custodians who were most likely to have responsive information. *See June Med. Servs., LLC v. Gee*, No. CV 16-444-BAJ-RLB, 2018 WL 5269813, at *2 (M.D. La. Oct. 23, 2018) (finding that a search of 23 custodians after an inquiry into those who were most likely to have discoverable information was reasonable). And because Plaintiffs specifically identified and served discovery on three HHS components—the Centers for Disease Control

(CDC), the National Institute of Allergy and Infectious Diseases (NIAID), the Office of the Surgeon General (OSG)—it is unsurprising that the officials identified as most likely to have responsive information would be employed by those components.

Moreover, in order to respond to Plaintiffs' discovery requests within the condensed time period allotted, after identifying custodians most likely to have responsive documents, HHS immediately began collecting, searching, and producing their responsive documents—using all of the expansive search terms Plaintiffs provided—within the month-long period authorized by the Court. HHS ultimately produced thousands of email communications in the identified custodians' custody and control. And in response to Plaintiffs' interrogatories, HHS identified the designated custodians by name and title, nothing that they had been identified after "a reasonable inquiry under the circumstances of abbreviated, expedited discovery."

Given these extensive efforts, Plaintiffs err in contending that HHS's search for custodians most likely to have responsive documents was inadequate because the very components named in the Complaint and discovery requests were the components HHS identified as having responsive information. First, Plaintiffs' demand that HHS search the ESI of officials from ever HHS component would collapse the distinction between various components and operating divisions that comprise the agency. HHS includes eleven operating components—including the Substance Abuse and Mental Health Services Administration, the Agency for Toxic Substances and Disease Registry, and the Food and Drug Administration—and employs approximately 80,000 individuals around the world. https://www.hhs.gov/careers/working-hhs/agencies (last accessed Aug. 30, 2022).[8] Plaintiffs apparently would have HHS conduct extensive searches of each of these

---

[8] DHS likewise includes numerous components and employs approximately 240,000 individuals. *See About DHS*, https://www.dhs.gov/about-dhs (last accessed Aug. 30, 2022).

components for potentially responsive records, even if the component's activities are nowhere mentioned in the Complaint underlying the preliminary injunction application. But under Rule 26(b)(1), it would be disproportional and unduly burdensome for HHS, in identifying the "information available to" the agency for purposes of answering an interrogatory, *see* Rule 33(b)(1)(B), or producing documents, *see* Rule 34, to be compelled to answer as to the activities of officials from every corner of the agency, even when their conduct is not alleged to be at issue in the Complaint. Even if Plaintiffs' request that Defendants search the entirety of HHS were compatible with Rules 26, 33, and 34—and it is not, for the reasons specified in Defendants' objections and responses—Defendants could not feasibly respond to such a request without conducting an inquiry into agency activities that could not be completed within the highly compressed timetable for expedited discovery as the Court authorized it.

Indeed, Plaintiffs do not dispute that the additional searches they demand would impose significant burdens on HHS that would be incompatible with the expedited discovery permitted by the Court. Instead, in the parties' meet and confer sessions, they baselessly accused HHS of intentionally concealing relevant and responsive information based on what Plaintiffs describe as a "list" of individuals from Meta of federal officials who have communicated with the company "about content modulation on a specified list of topics."[9] According to Plaintiffs, that "list" identifies additional individuals at HHS who have communicated with social media companies, who were not identified as custodians in HHS's interrogatory responses. But Plaintiffs offer no details about the nature or frequency of the communications those officials are said to have had with the platform. The platform apparently did not indicate whether those individuals

---

[9] Defendants have not seen Plaintiffs' request to Meta for this list or Meta's description of the types of communications the named officials are said to have had with the company and are only going by Plaintiffs' characterization of the list in email communications.

communicated with its officials about misinformation, or even whether they communicated with the platform on more than one occasion. Plaintiffs' bald assertion that Defendants have failed to conduct adequate searches, based solely on this list of names apparently devoid of any specificity, lacks any factual basis. Moreover, Plaintiffs' accusation that Defendants have actively *concealed* responsive information is not only lacking any factual support, is contradicted by the responses Defendants have already provided: Defendants' document productions—again, of roughly 15,000 pages of email communications—contain some of the very names Plaintiffs wrongly assert Defendants have attempted to hide. Nor would the agency, or any Defendant, have any incentive to conceal information: the communications Plaintiffs challenge here are not unlawful or remarkable.

     ***Requested Relief:***  Notwithstanding the foregoing, the Court should resolve the dispute about HHS, should one remain, by adopting Defendants' reasonable compromise proposal, under which, without searching for any new ESI, Defendants will supplement, by three weeks from today, the responses to Common Interrogatories Nos. 2 through 4, for HHS (where HHS would also respond to Common Interrogatory 6, as outlined above), based on a reasonable inquiry to HHS's Immediate Office of the Secretary ("IOS"). In that regard, because Common Interrogatory 5 seeks the results of searches of documents also produced, no supplementation is proper from HHS as to Common Interrogatory 5.

     E.  *Plaintiffs are not entitled to discovery from the White House.*

     Plaintiffs have served wide-ranging discovery requests on two advisors to the President: (1) Karine Jean-Pierre in her official capacity as White House Press Secretary; and (2) Dr. Anthony Fauci in his official capacity as Chief Medical Advisor to the President. The discovery served on these White House officials is broad in scope, ranging from asking White House officials to answer

questions on behalf of the entire federal government to seeking records of internal communications that implicate serious separation of powers concerns. *See, e.g.*, Common Interrogatory No. 2;[10] Request for Production to Ms. Jean-Pierre No. 9.[11]

Plaintiffs have done so without first exhausting other avenues for related information. Indeed, the agency Defendants have produced thousands of documents, including documents revealing the very communications Plaintiffs also seek directly from the White House. And Plaintiffs have sought, and in some instances already obtained, information from third-party social media companies that Plaintiffs assert were communicating with the federal government, including the White House, about misinformation. Rather than exhausting other avenues first, Plaintiffs sought discovery from these White House officials in the first instance. Such an approach unnecessarily embroils this Court in a separation of powers dispute that may otherwise be avoided.

That conclusion is underscored by the fact that Plaintiffs seek such information immediately at the outset of this case, rather than in the normal course of civil discovery. The current procedural posture only heightens the concerns identified by the Supreme Court, as discussed below. Here, Plaintiffs seek White House records not only before they have evaluated information received from other parties, but before this Court has even decided a motion to dismiss. This Court should reject Plaintiffs' efforts to seek discovery from the White House at this stage of the litigation, in which Plaintiffs argued they needed limited and targeted discovery to

---

[10] Plaintiffs asked all Defendants, including Ms. Jean-Pierre and Dr. Fauci, to "'[i]dentify every officer, official, employee, staff member, personnel, contractor, or agent of' recipient Defendant '*or any other federal official or agency* who has communicated or is communicating with any Social-Media Platform regarding Content Modulation and/or Misinformation.'" (emphasis added).

[11] Plaintiffs requested the White House Office of the Press Secretary through Ms. Jean-Pierre to "[p]roduce all Documents and Communications *relating to any* 'government experts' who have 'partnered with' Facebook or any Social-Media Platform to address Misinformation and/or Content Modulation." (emphasis added).

inform the resolution of their motion for a preliminary injunction, and instead proceed to consideration of that motion as informed by the thousands of documents the various Defendants have already produced.

Because seeking such wide-ranging discovery from the White House implicates serious separation of powers concerns, courts are extremely cautious before allowing such discovery, especially when other avenues for related information have been not yet been exhausted. *See generally Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004); *see also* Order, *Centro Presente v. Biden*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (Dkt. No. 89) (requiring plaintiff to exhaust all discovery on other defendants before considering whether there was "continuing need for discovery sought from the White House"); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019) (vacating "district court's discovery orders because the district court did not fulfill its obligation 'to explore other avenues, short of forcing the Executive to invoke privilege'" (quoting *Cheney*, 542 U.S. at 390)). The burden imposed on the White House by discovery orders is an "important factor" to be considered by courts, due to the special deference and "the high respect that is owed to the office of the Chief Executive[.]" *Cheney*, 542 U.S. at 385 (citation omitted).

Courts have routinely recognized the weighty separation-of-powers concerns triggered by discovery directed to the White House. That is why "courts must narrow overly broad and intrusive discovery requests directed at the highest levels of the Executive Branch, lest 'vexatious litigation . . . distract [the Executive Branch] from the energetic performance of its constitutional duties.'" *Vidal v. Duke*, No. 16-CV-4756, 2017 WL 8773110, at *4 (E.D.N.Y. Oct. 17, 2017) (alterations in original) (citing *Cheney*, 542 U.S. at 382) (finding that a magistrate's order "requiring the White House to identify and assert privilege with respect to specific documents or risk waiving privilege over those documents . . . potentially raises constitutional concerns akin to those at issue in

*Cheney*"); Order at 4, *In re Kirstjen M. Nielsen, Secretary of Homeland Security*, No. 17-3345 (2d. Cir. Dec. 27, 2017) (Dkt. No. 171) (explaining that a discovery order covering White House documents would "creat[e] possible separation of powers issues"). Plaintiffs must demonstrate that the requests are limited to essential information that cannot otherwise be obtained. *See Karnoski*, 926 F.3d at 1205; *Lardner v. U.S. Dep't of Just.*, No. 03-0180, 2005 WL 758267, at \*9 (D.D.C. Mar. 31, 2005) (citing *Cheney* for the proposition that "a court must screen a request for presidential documents to ensure that the discovery is essential to the proceedings").

In measuring the burden imposed, the Court must consider the extensive discovery—including roughly 15,000 pages of documents—already produced by the agency Defendants. Against that background, there is no warrant for steering this case into conflict with the separation of powers by allowing Plaintiffs to pursue expedited discovery from the White House. At most, discovery implicating these weighty constitutional concerns should be deferred to a later stage of this litigation and allowed then only if it is necessary to resolution of the case. This Court should therefore deny Plaintiffs' request to compel expedited discovery on the White House.

1. *Discovery requests on the White House Office of the Press Secretary.*

Plaintiffs' discovery requests on the White House Office of the Press Secretary[12] are facially unreasonable. Contrary to the principles discussed above, Plaintiffs have not exhausted other avenues before seeking these communications from the White House Office of the Press Secretary. Again, the burden imposed on the White House by discovery orders is an "important factor" to be considered by courts, due to the special deference and "the high respect that is owed

---

[12] The Office of the Press Secretary is separate from the White House Communications Office. Plaintiffs have not served any discovery on the Communications Office, and the Director of the Communications Office is not named as a defendant in the original Complaint on which the Court-authorized discovery is based.

to the office of the Chief Executive[.]" *Cheney*, 542 U.S. at 385 (citation omitted). Further, Rule 26(b) of the Federal Rules of Civil Procedure directs a district court to limit the scope of discovery if "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive[.]" Fed. R. Civ. P. 26(b)(2)(C)(i). Although there is often a presumption in favor of disclosure of non-privileged material, "[i]n some circumstances, . . . the requesting party should be required to assume a heavy burden of persuasion before any discovery is allowed." *See Cheney*, 542 U.S. at 392 (Stevens, concurring); *see also* Order at 9 (noting that "[e]xpedited discovery is not the norm" and that it must be "reasonable[] . . . in light of all the surrounding circumstances").

Plaintiffs cannot meet this burden. Again, they have not exhausted other avenues for such information. Plaintiffs did not even evaluate the material that they obtained from other Defendants prior to serving discovery on the White House. Those Defendants produced thousands of records, including records of communications that involved White House personnel. But Plaintiffs do not identify any personnel in the White House Office of the Press Secretary as participants in or recipients of those communications, again suggesting that such discovery is altogether unwarranted.

To the extent Plaintiffs are seeking external communications with social media companies, it is Defendants' understanding that Plaintiffs served subpoenas on social media companies seeking the very same material. Although it possible that the social media companies may object, in full or in part, to the subpoenas, it is Defendants' understanding that at least some social media companies have responded by identifying the individuals they communicated with across the government, including at the White House. Notably, based on Plaintiffs' own representations during the meet-and-confer about the companies' responses, it does not appear that the social

media companies have identified anyone from the White House Office of the Press Secretary, where this discovery was served. Regardless, the scope of those responses by the third-party social media companies should first be resolved before burdens are imposed on the White House.

A party should not be allowed to engage in a fishing expedition for communications of a senior advisor to the White House, such as the White House Press Secretary, based on such a scarce record. The reference involving the Office of the Press Secretary to which Plaintiffs point to suggest the involvement of the Press Secretary or her Office in the conduct alleged in the Complaint are statements made by the former Press Secretary, Jennifer Psaki. But those statements do not suggest that anyone from the Office of the Press Secretary communicated with social media companies; they suggest that *others* did. And Defendants have produced thousands of records of such communications by officials throughout the government; there is no need for Plaintiffs to rummage through the email and other traffic from the Office of the Press Secretary. The information provided by the other Defendants in response to both document productions and interrogatories substantially similar to those served on the White House Press Secretary should be more than sufficient for the current stage of the litigation; *i.e.*, limited discovery in anticipation of a motion for preliminary injunction.

Moreover, Plaintiffs' requests on the White House are not cabined or narrow; to the contrary, they also seek communications internal within the government. As an initial matter, Defendants have objected to all of Plaintiffs' discovery requests that seek internal governmental communications as not proportional to the needs of the case, because they would have required an extensive search of internal records that was not possible within the expedited period provided for current discovery and would be unnecessary in light of the thousands of external communications

Defendants have agreed to produce from various Defendants. Thus, on this basis alone the Court should reject any effort by Plaintiffs to compel the White House Office of the Press Secretary.

The burdens on the White House are further magnified for discovery seeking internal White House communications. *See Cheney*, 542 U.S. at 390 (rejecting the requirement that such privileges must be initially logged given the burdens inherent in doing so in such a situation). Unlike other Government officials, the President maintains unique "constitutional responsibilities and status . . . ." *Nixon v. Fitzgerald*, 457 U.S. 731, 753 (1982). Rather than put the White House to the substantial and constitutionally intrusive burden of searching for responsive documents and invoking privilege over each document to which a privilege might apply, under *Cheney*, the district court must hold the plaintiff to a heightened standard of relevance and need. As the Supreme Court explained, "precedents provide no support for the . . . requirement that the Executive Branch bear the burden of invoking executive privilege with sufficient specificity and of making particularized objections. Indeed, those precedents suggest just the opposite." *Cheney*, 542 U.S. at 371.

In the end, Plaintiffs are not entitled to such far-ranging discovery on the White House Office of the Press Secretary, particularly at this stage at this litigation. *See Karnoski*, 926 F.3d at 1205 (finding that plaintiffs must meet a "heightened standard" where they "must make a preliminary showing of need demonstrating 'that the evidence sought [is] directly relevant to issues that are expected to be central to the trial' and 'is not available with due diligence elsewhere.'") (quoting *In re Sealed Case*, 121 F.3d 729, 754 (D.C. Cir. 1997)). As explained above, even interrogatories and document production requests that seek external communications from the White House Office of the Press Secretary impose improper burdens—burdens that are heightened to the extent the Plaintiffs seek to expand their requests beyond that Office (the only one that they actually served). And in no event should this Court permit Plaintiffs' even more burdensome

requests for internal documents that implicate concerns about privilege and the constitutional separation of powers. *See, e.g.*, *Cheney*, 542 U.S. at 390. Again, Plaintiffs have not exhausted all available alternative sources and demonstrated that the material they seek from the White House Office of the Press Secretary is essential and not substantially available through other avenues.

2. *Discovery served on Dr. Fauci in his capacity as Chief Medical Advisor to the President.*

Defendants have already averred to Plaintiffs that "they are unaware of any separate White House e-mail account belonging to Dr. Fauci" and "that, to their understanding, Dr. Fauci's direct reports and staff are affiliated with the National Institute of Allergy and Infectious Diseases." Further, Defendants have searched and provided responsive documents from Dr. Fauci and the NIAID. Likewise, Defendants have provided information in response to interrogatories directed at Dr. Fauci and the NIAID. Accordingly, the dispute concerning Dr. Fauci is whether anything more is required beyond what Defendants have already done. But to the extent Dr. Fauci has any other information in his capacity advising the President, the production of such information would implicate core constitutional concerns outlined above, recognized by *Cheney* and its progeny. Again, the current phase of discovery is limited to development of a record necessary to support Plaintiffs' preliminary injunction motion. Given the breadth of information of Defendants have already produced concerning Dr. Fauci and the weighty separation of powers concerns that would be implicated if he were required to respond to discovery requests in his capacity as Chief Medical Advisor to the President, this Court should not allow Plaintiffs to obtain discovery from him in that role, at least at this stage. That is especially true when Plaintiffs, again, did not explore all other avenues before seeking such discovery.

Accordingly, Defendants ask this Court to consider their responses for Dr. Fauci in his capacity as Director of NIAID sufficient for the present purposes and reject Plaintiffs' invitation to intrude into the constitutional issues delineated by *Cheney* and its progeny.

3. *This Court should stay any order compelling discovery against the White House.*

Finally, to the extent that this Court agrees with Plaintiffs and orders discovery on the White House, in any form, Defendants respectfully request that this Court stay its order for 30 days to give the Solicitor General sufficient time to consider the government's appellate options prior to complying with the discovery requests. Such a stay was contemplated by the Supreme Court in *Cheney*, which explained that a dispute over White House discovery is distinct "from the category of ordinary discovery orders where interlocutory appellate review is unavailable, through mandamus or otherwise." *See Cheney*, 542 U.S. at 381-82. And should Defendants seek further review, Defendants respectfully ask that this Court continue its stay of its order pending completion of such appellate proceedings. *See* Order, *In re Donald J. Trump*, No. 18-72159 (9th Cir. Sept. 17, 2018) (Dkt. No. 36) (staying district court discovery order pending Ninth Circuit's consideration of the Government's petition for a writ of mandamus concerning White House discovery); *see also Karnoski*, 926 F.3d at 1204-06 (vacating that discovery order). This Court should protect the White House from responding to such discovery until Defendants can fully consider their appellate options and, if the Solicitor General determines in favor of seeking appellate review, until that review is complete.

**III.    The Court should reject Plaintiffs' attempts to re-open preliminary-injunction-related discovery by making new discovery requests for the first time during the parties' meet and confer discussions.**

Plaintiffs ask the Court to compel Defendants to respond to a number of new discovery requests directed to agencies and officials that were not defendants when the Court authorized

expedited discovery (and many of which are not even defendants now). Those discovery requests are improper.

First, the Court did not authorize Plaintiffs' new discovery requests. In the Court's expedited discovery order, it allowed the "Plaintiff States [to] serve interrogatories and document requests upon *Government Defendants*," which the Court defined as those who were Defendants *at the time of the Court's order*. Order at 1 n.1, 13 (emphasis added).[13] Additionally, the Court ordered Plaintiffs to serve their discovery requests "[w]ithin five business days after" the Court's July 12, 2022 expedited discovery order (*i.e.*, by July 19, 2022). *Id.* at 13. Here, Plaintiffs' new discovery requests are directed to agencies and officials who were not "Government Defendants" when the Court authorized discovery, and Plaintiffs did not serve their requests by July 19, 2022. Thus, the Court did not authorize Plaintiffs' new discovery requests, and their requests therefore seek impermissible expedited discovery under Federal Rule of Civil Procedure 26.

To be clear, this argument applies to Plaintiffs' new discovery requests on White House officials outside of the Office of the Press Secretary. Plaintiffs initially served discovery only on the White House *Press Secretary*. They did not serve discovery on the White House as a whole. Thus, their new discovery requests on White House officials outside of the Office of the Press Secretary were not served by the July 19, 2022, deadline set by the Court. And as explained above, Defendants object to White House discovery, particularly at this stage of the litigation, but, regardless, these particular requests were not properly served.

---

[13] "Government Defendants consist of Joseph R. Biden, Jr., Jennifer Rene Psaki, Vivek H. Murthy, Xavier Becerra, Department of Health and Human Services, Anthony Fauci, National Institute of Allergy and Infectious Diseases, Centers for Disease Control and Prevention, Alejandro Mayorkas, Department of Homeland Security, Jen Easterly, Cybersecurity and Infrastructure Security Agency, and Nina Jankowicz." Order at 1 n.1.

Second, Plaintiffs' new discovery requests are unjustified because they have failed to establish that they have standing to sue, and seek relief against, any of the new agencies and officials from whom they seek discovery. As explained in Defendants' opposition to Plaintiffs' expedited discovery motion, a court must first assess whether Plaintiffs have standing to sue prior to allowing the litigation against the parties in question to move forward. *See Haverkamp v. Linthicum*, 6 F.4th 662, 668 (5th Cir. 2021); *Steel Co.*, 523 U.S. at 94–95; Defs.' Disc. Resp., ECF No. 26, at 8-12. Here, Plaintiffs make no attempt to show that any have suffered any injury as a result of any comments made by the agencies and officials from whom they now seek new discovery. Thus, the Court can deny these belated expedited discovery requests for this reason alone.

Third, Plaintiffs' new discovery requests are incompatible with the compressed discovery schedule Plaintiffs demanded and the Court set. Plaintiffs argued that they needed expedited discovery because they needed a quick decision on the preliminary injunction motion. *See* Mot. at 3 n.1 (the "issues" raised in the preliminary injunction motion are allegedly "time-sensitive and urgent"). The Court thus ordered an expedited discovery schedule that gave Defendants only a few weeks to provide discovery responses. *See* Order at 13. This schedule did not contemplate a process whereby Plaintiffs could serve new and additional discovery requests on a rolling basis. *See id.* (allowing Plaintiffs to serve discovery "[w]ithin five business days after" the Court's order). Plaintiffs' new discovery requests, if allowed, would require a drastic change to the nature and schedule of this discovery process. The Court would have to institute a new schedule whereby Plaintiffs could serve their new discovery requests,[14] and Defendants would be given a meaningful

---

[14] Plaintiffs thus far have not properly served Defendants with the new discovery requests consistent with Federal Rule of Civil Procedure 34. Plaintiffs simply described their new discovery request in informal emails. Further, Plaintiffs' demand for discovery responses encompasses

amount of time—at a minimum, another 30 days—to respond to those discovery requests. Plaintiffs, however, have objected to any material extension in the discovery process.

Fourth, Plaintiffs' new discovery requests are unnecessary for them to litigate their preliminary injunction motion. That motion seeks relief against those who were Defendants when the motion was filed, and Plaintiffs do not even argue that they need any additional information or evidence to litigate the motion against those parties. Thus, Plaintiffs are not entitled to any further expedited discovery. *See BKGTH Prods., LLC*, 2013 WL 5507297, at *5 ("A party seeking expedited discovery must narrowly tailor their requests in scope to the *necessary* information they seek." (emphasis added)). If Plaintiffs believe they can litigate their motion now, and if they believe they need a prompt resolution of that motion, then the Court need not, and should not, authorize any further, time-consuming discovery.

Fifth, the discovery process Plaintiffs now request—where they submit new discovery requests seriatim as they learn new information—would be inefficient. Plaintiffs simply note that various other federal government agencies and officials may have been communicating with social media companies about misinformation, and thus they want discovery over whether those communications were occurring. But Plaintiffs are assuming those communications would be improper. Rather than allow Plaintiffs to conduct a multi-stage investigation into several components of the federal government, the parties should be directed to first litigate the pending preliminary injunction motion and secure a decision over whether the communications at issue amount to a First Amendment violation. A legal determination on that issue could illuminate whether further discovery into other federal agencies and officials relating to those types of

---

federal agencies and officials who are not parties and thus Plaintiffs would have to comply with any requirement to seek information from non-parties. *See generally U.S. ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

communications would even be useful. If the Court agrees with Defendants that those communications are unproblematic, then Plaintiffs' new, requested discovery would be unnecessary. And even if the Court disagrees with Defendants, the parties can then secure a final determination on that question by litigating it through the appellate process—all before the federal government absorbs enormous discovery-related burdens as a result of Plaintiffs' new, sprawling discovery requests.

Plaintiffs rely on a number of arguments to justify their new requests. None has merit. First, Plaintiffs assert that they need discovery over the officials purportedly engaging in the communications at issue so that they can properly frame their request for relief. But Plaintiffs' preliminary injunction motion seeks relief against the agencies and officials who were defendants when that motion was filed, and it is unclear how Plaintiffs are unable to frame their request for relief against *those* defendants unless they obtain discovery into *other* agencies and officials. Regardless, if the Court finds that injunctive relief is proper, the Court can simply issue relief against the agency at issue. An injunction need not identify—and thus Plaintiffs do not need discovery over—each and every person who has engaged in allegedly improper communications.

Plaintiffs also argue that they could not serve their new discovery requests earlier because new information purportedly came to light only recently. As an initial matter, Plaintiffs fail to demonstrate that they could not have uncovered this information earlier. For example, Plaintiffs seek new discovery from the FBI based on certain recent comments by Mark Zuckerberg concerning communications Facebook had with the FBI. But Mark Zuckerberg made virtually identical comments nearly two years ago, at an October 28, 2020 Senate hearing. There, he stated: "[W]e've been able to build partnerships across the industry," including "with law enforcement and the intelligence community, to be able to share signals" and "one of the threats that the FBI

has alerted our companies and the public to, was the possibility of a hack and leak operation in the days or weeks leading up to this election." https://www.rev.com/blog/transcripts/tech-ceos-senate-testimony-transcript-october-28 (last accessed Aug. 30, 2022). Thus, this information has been in the public domain for years, as Plaintiffs' own Complaint acknowledges. *See also* Compl. ¶ 182 (relying on NBC News article to assert that platforms stated they met with, among other agencies, "the FBI's foreign influence task force").

In any event, even if Plaintiffs could not have uncovered the information at issue earlier, their new requests are nonetheless still incompatible with the discovery schedule currently in place. *See supra*. Thus, again, if Plaintiffs want the Court to expand the scope of authorized discovery, they cannot object to a commensurate extension of the discovery schedule.

Plaintiffs have also indicated that they intend to move for leave to amend their Complaint and add as Defendants the new agencies and officials from whom they now seek discovery. As an initial matter, Defendants expect to oppose Plaintiffs' motion for leave to amend their Complaint, including on futility grounds. Regardless, amending their Complaint to incorporate new parties would not address all of the deficiencies in their new discovery requests. Plaintiffs would still have to move for expedited discovery against those parties, and Defendants would oppose that. Further, as explained above, any new discovery would be inconsistent with Plaintiffs' representation that they need a prompt decision on the preliminary injunction motion.

Accordingly, the Court should not compel Defendants to respond to Plaintiffs' belated, unjustified discovery requests. Should the Court authorize these new discovery requests, Defendants reiterate their request that the Court provide sufficient time for the Solicitor General to consider options for appellate review.

**IV.     If the Court is inclined to authorize any additional discovery, and extend the discovery period, the Court should permit Defendants to take discovery from the Plaintiffs.**

Defendants have thus far expended significant resources and produced thousands of pages of documents in what was billed as a narrow, targeted discovery process. If Defendants are required to provide additional discovery, and expend additional resources, Plaintiffs should not be spared from those burdens, especially since they too may have documents that are highly relevant to this litigation. In any order authorizing additional discovery, the Court should thus allow Defendants to take discovery from Plaintiffs on a number of issues. First, Defendants should be permitted to take discovery from Plaintiffs on any communications they may have had with social media companies about misinformation. Public reports suggest that at least one official in Missouri may have engaged in these communications. *See* https://www.news-leader.com/story/news/politics/2021/09/14/missouris-health-director-plans-state-covid-response-fight-misinformation-masks-vaccination/8332397002/ (last accessed Aug. 30, 2022) (the Director of the Missouri Department of Health and Senior Services claimed he wanted to "improve [ ] messaging . . . for social media," and "battl[e] misinformation"). If the Plaintiff States have alerted social media companies of misinformation on their platforms, that would further confirm that those types of communications are routine and lawful. Additionally, Defendants should also be permitted to serve document requests and/or interrogatories relating to Plaintiffs' standing theories. Responses to those discovery requests would be relevant to Plaintiffs' allegations concerning actions that social media companies may have taken directly against them or against their residents. This discovery would shed light on when those actions occurred, how often they occurred, and the context in which they occurred—information that would be relevant to whether those actions could be attributed to any Defendant. The Court should subject these discovery

requests to the same schedule that would be applied to any new discovery requests authorized against Defendants.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| The State of Missouri and the State of Louisiana,<br><br>*Plaintiffs*,<br><br>v.<br><br>President Joseph R. Biden, Jr., in his official capacity as President of the United States of America,<br>*et. al.,*<br><br>*Defendants*. | Civil Action No. 22-cv-1213 |

### [DEFENDANTS' PROPOSED] ORDER

Having considered the Parties' Joint Statement concerning the expedited discovery requests authorized by the Court, ECF No. 34, **IT IS ORDERED** that:

1.  Other than the supplemental interrogatory responses Defendants have agreed to provide Plaintiffs by September 21, 2022, all further relief Plaintiffs seek in the Parties' Joint Statement is hereby **DENIED**.

2.  The Parties shall otherwise follow the schedule set out in this Court's Order, ECF No. 34.

MONROE, LOUISIANA, this _____ day of September 2022.

_____
Terry A. Doughty
United States District Judge

65

Dated: August 31, 2022                              Respectfully submitted,

**ERIC S. SCHMITT**                                 **JEFFREY M. LANDRY**
**Attorney General of Missouri**                    **Attorney General of Louisiana**

*/s/ D. John Sauer*                                 */s/ Elizabeth B. Murrill*
D. John Sauer, Mo. Bar No. 58721*                   Elizabeth B. Murrill (La #20685)
 *Solicitor General*                                 *Solicitor General*
Justin D. Smith, Mo. Bar No. 63253                  Louisiana Department of Justice
 *First Assistant Attorney General*                1885 N. Third Street
Todd Scott, Mo. Bar No. 56614*                      Baton Rouge, Louisiana 70804
 *Senior Counsel*                                   Tel: (225) 326-6766
Michael E. Talent, Mo. Bar No. 73339*               murrille@ag.louisiana.gov
 *Deputy Solicitor General*                         *Counsel for State of Louisiana*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
John.Sauer@ago.mo.gov
*Counsel for State of Missouri*


\*  admitted *pro hac vice*


*/s/ Jenin Younes*
Jenin Younes \*\*
John J. Vecchione \*\*
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines*
\*\* admitted *pro hac vice*

*/s/ John C. Burns*
John C. Burns \*\*\*
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
F: 314-282-8136
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

\*\*\* application for admission forthcoming


BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ERIC WOMACK
Assistant Director, Federal Programs Branch

*/s/ Kuntal Cholera*
ADAM KIRSCHNER
KYLA SNOW
INDRANEEL SUR
KUNTAL CHOLERA
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
Kyla.Snow@usdoj.gov
Indraneel.Sur@usdoj.gov
Kuntal.Cholera@usdoj.gov

*Attorneys for Defendants*




**CERTIFICATE OF SERVICE**


I hereby certify that, on August 31, 2022, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

67