**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

|  |  |
|---|---|
| STATE OF MISSOURI ex rel. ERIC S. SCHMITT, Attorney General, | |
| STATE OF LOUISIANA ex rel. JEFFREY M. LANDRY, Attorney General, | No. 3:22-cv-01213-TAD-KDM |
| DR. JAYANTA BHATTACHARYA, | |
| JILL HINES, | |
| JIM HOFT, | |
| DR. AARON KHERIATY, and | |
| DR. MARTIN KULLDORFF, | |
| *Plaintiffs*, | |
| v. | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, | |
| *Defendants*. | |

**JOINT STATEMENT REGARDING WITNESS DEPOSITIONS**

1

**Plaintiffs' Position:**

The Court should authorize Plaintiffs to take depositions of 10 key officials who have participated directly in the massive "Censorship Enterprise" of federal officials pressuring social-media platforms to censor the private speech of Americans, for two fundamental reasons.

*First*, based on continued disclosures in discovery and elsewhere, it has become clear that the federal Censorship Enterprise is enormous and far-reaching.  Plaintiffs' Second Amended Complaint names 67 Defendants, spanning at least eleven federal agencies and sub-agencies, and it provides 570 Paragraphs of detailed allegations about federal officials' involvement in procuring censorship of private speech on social media.  Doc. 84.  Plaintiffs sought expedited preliminary-injunction-related discovery to ensure that the parties and the Court would have sufficient information about federal social-media censorship activities to craft meaningful and effective injunctive relief—*i.e.*, relief that can actual stop federal interference in social-media censorship decisions and remove federal-government censorship from the "modern public square." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).  It has since become clear that this task will require both broad and specific information about many federal officials' and agencies' involvement in social-media censorship.  The limited documentary discovery provided so far, while highly revealing on certain issues, does not provide the full scope and nature of federal officials' communications with social-media platforms about censorship.  Depositions will be "the only chance Plaintiffs will have to get this information prior to addressing the preliminary injunction."  Doc. 72, at 7.

*Second*, the limited documentary discovery makes very clear that federal officials have frequently engaged in their most telling and probative communications with social media companies *orally*, not in writing.  As detailed repeatedly below, key communications pressuring

social-media platforms to increase censorship were not committed in writing to emails, but occurred in phone conferences, face-to-face meetings, videoconferences, and similar media. Perhaps not surprisingly, the more senior the federal official involved, the more likely they appear to have been to rely on oral, rather than written, communications to pressure social-media platforms to censor.  It is a primary purpose of depositions to explore the nature and content of highly relevant *oral* communications.  For example, a critical meeting between Rob Flaherty and Andy Slavitt of the White House and Twitter officials occurred on April 21, 2022.  Separate disclosures by Alex Berenson reveal that at this meeting Slavitt and Flaherty orally pressured Twitter to de-platform Berenson.  The documents produced by Government Defendants in this case, however, reflect only a calendar invite with a general description of the topics to be discussed at the meeting.  If Plaintiffs had to rely solely on that calendar invite—and not the fortuitous disclosures that Berenson himself made, outside this case's discovery—Plaintiffs would have little inkling of the content of that critical conversation.  Plaintiffs remain in similar ignorance of the nature and content of many, many other oral communications between a wide range of federal officials and social-media platforms.  Depositions are essential to elucidate the "nature and content of those communications" of "federal officials who have been and are communicating with social-media platforms about disinformation, misinformation, malinformation, and/or any censorship or suppression of speech on social media"—the discovery this Court ordered.  Doc. 34, at 13.

Plaintiffs have met and conferred with the Government about these depositions, without success.  The Government has taken the position that it will not agree to *any* depositions if Plaintiffs seek depositions from the Court of any White House officials.  Ex. 1, at 1.  The Government has also categorically objected to any depositions of any witnesses who were not named as Defendants in the original complaint filed on May 5, 2022—when much less information

about the federal Censorship Enterprise was available.  *Id.*  Plaintiffs do not agree to these artificial

limitations.  As discussed further below, such witnesses are in possession of crucial information

for Plaintiffs' request for preliminary injunction.

**A.     The Court Should Order Depositions of Ten Key Federal Officials Involved in Pressuring Social-Media Platforms to Censor Free Speech.**

The Court has authorized a thirty-day window for depositions, Doc. 34, at 14.  Plaintiffs

respectfully request leave to take depositions of ten federal officials, which is a reasonable number

to accomplish during that period.   Plaintiffs initially proposed 20 witnesses to Government

Defendants, *see* Ex. 1, but after conferring with Defendants, Plaintiffs have carefully reduced their

list of proposed witnesses to the following ten officials: (1) NIAID Director and White House

Chief Medical Advisor Dr. Anthony Fauci, (2) Deputy Assistant to the President and Director of

White House Digital Strategy Rob Flaherty, (3) former White House Senior COVID-19 Advisory

Andrew Slavitt, (4) former White House Press Secretary Jennifer Psaki, (5) FBI Supervisory

Special Agent Elvis Chan, (6) CISA Director Jen Easterly, (7) CISA official Lauren Protentis, (8)

Surgeon General Vivek Murthy, (9) CDC Chief of the Digital Media Branch Carol Crawford, and

(10) Acting Coordinator of the State Department's Global Engagement Center Daniel Kimmage.

Two of these—Slavitt and Psaki—are now former federal officials; the rest are current federal

officials.[1]  Below, Plaintiffs first provide a detailed justification for their request to depose each of

these federal officials, and then address the general objections posed by Government Defendants.

**1.     NIAID Director and White House Chief Medical Advisor Dr. Anthony Fauci.**

Defendant Anthony Fauci is the Director of the National Institute of Allergy and Infectious

Diseases (NIAID) and Chief Medical Advisor to the President.  Dr. Fauci has been a Defendant in

---

[1] If those former officials will not cooperate with DOJ and appear voluntarily for depositions, Rule 45(a)(1)(B) provides for depositions by third-party subpoena if necessary.

this case from its first filing, and he has repeatedly used the substantial weight of his federal authority to squelch and suppress scientific views he disfavors.

Dr. Fauci is directly involved in multiple, far-reaching social-media censorship campaigns against so-called COVID-19 "misinformation."  These are situations where, not just marginal or "fringe" views, but speech backed by great scientific credibility and with enormous potential nationwide impact—but which contradicted Dr. Fauci's preferred narratives—was censored on social media, likely at Dr. Fauci's instigation.  Because these were scientific opinions on matters of public policy backed by great credibility, they were likely to influence speech and thought (and, likely, public policy) on such issues on a nationwide basis—but they were squelched.  Several well-documented examples illustrate this point.

*First*, Dr. Fauci orchestrated a campaign to discredit of the "lab-leak" theory of COVID-19's origins that led to the longstanding censorship of that theory on social media despite powerful evidence supporting it.  Dr. Fauci, "coordinating with others, orchestrated a campaign to discredit the lab-leak hypothesis in early 2020."  Doc. 84, ¶ 139.  "As director of NIAID, Dr. Fauci had funded risky 'gain-of-function' research at the Wuhan Institute of Virology through intermediaries such as EcoHealth Alliance, headed by Dr. Peter Daszak."  *Id.*  "Thus, if the lab-leak theory were established, Dr. Fauci and Dr. Daszak could be potentially implicated in funding the research on viruses that caused the COVID-19 pandemic and killed millions of people worldwide."  *Id.*  "In late January and early February 2020, Dr. Fauci received information from colleagues that suggested that the COVID-19 virus may have originated in a laboratory in Wuhan, China."  *Id.* ¶ 206.  "This revelation threatened to implicate Dr. Fauci in the virus's origins, as he had funded the risky research that, under this theory, led to the virus's origin.  Soon thereafter, Dr. Fauci participated in a conference call with scientists and science-funding authorities intended to

discredit and suppress this lab-leak theory." *Id.* "After the conference call, influential individuals signed public statements that were placed in science journals in attempt to discredit the lab-leak theory." *Id.* In the same time frame, Dr. Fauci engaged in written and oral communications with Mark Zuckerberg about the Government's COVID-19 response. *Id.* ¶ 207. Widespread social-media censorship of the lab-leak hypothesis promptly ensued. *Id.* ¶ 212.

Publicly available emails confirm Dr. Fauci's coordination with Dr. Francis Collins (his then-boss, head of NIH) in a campaign to discredit the lab-leak hypothesis that led to its censorship on social media. *See, e.g.,* Ex. 2 (Jan. 11, 2022 Letter of Reps. Comer and Jordan and Attachments, *at* https://republicans-oversight.house.gov/wp-content/uploads/2022/01/Letter-Re.-Feb-1-Emails-011122.pdf). These emails indicate that, when Dr. Fauci and Dr. Collins convened a phone call on February 1, 2020, with "at least eleven other scientists," *id.* at 2, certain scientists raised grave concerns that SARS-CoV-2 looked bioengineered. *Id.* at App.1, 1-3. Yet three days after this conference call, those same scientists authored a paper for *Nature Medicine* that discredited the lab-leak theory (though, three days earlier on February 1, they had *advocated* the theory to Dr. Fauci). "[A]fter speaking with Drs. Fauci and Collins, the authors abandoned their belief that COVID-19 was the result of a laboratory leak." *Id.* at 2. Instead, they authored an influential paper discrediting it, and "[p]rior to final publication in *Nature Medicine*, the paper *was sent to Dr. Fauci for editing and approval*." *Id.* (emphasis added). In the meantime, Dr. Fauci commenced a course of friendly oral communications with Mark Zuckerberg about the Government's COVID-19 response—the content of which oral communications is yet to be revealed. *See* Ex. 3 (Amended Interrogatory Responses), at 52-54 (detailing a course of at least 13 oral and written communications between Dr. Fauci and Mark Zuckerberg from February 27 to November 30, 2020). Weeks later, on April 16, 2020, Dr. Collins sent an email to Dr. Fauci,

linking to an article by Bret Baier, and "[w]ondering if there is something NIH can do to help put down this very destructive conspiracy [*i.e.*, the lab-leak theory], with what seems to be growing momentum.  I hoped the Nature Medicine article [*i.e.*, the one sent to Fauci for editing and approval] on the genomic sequence of SARS-CoV-2 would settle this…. Anything more we can do?"  Ex. 2, at App.12.  "The next day—after Dr. Collins specifically asked for more public pressure—Dr. Fauci cited the *Nature Medicine* paper from the White House podium likely in an effort to further stifle the hypothesis COVID-19 leaked from the WIV [lab]."  *Id.* at 2 (citing John Haltiwanger, *Dr. Fauci throws cold water on conspiracy theory that coronavirus was created in a Chinese lab*, Bloomberg (Apr. 18, 2020)).  In fact, Dr. Fauci made multiple public statements seeking to squelch the theory—all during the same time frame that he was quietly communicating with Mark Zuckerberg, Ex. 3, at 52-54.  *See, e.g.,* Nsikan Akpan, et al., *Dr. Fauci: No scientific evidence the coronavirus was made in a Chinese lab*, NATIONAL GEOGRAPHIC (May 4, 2020).

This would not be the last time Dr. Collins coordinated with Dr. Fauci to suppress highly credible scientific opinions that they disfavored.  As noted in the Complaint, just a few months later, Dr. Collins sent Dr. Fauci an email demanding a "swift and devastating … take-down" of the Great Barrington Declaration, co-authored by Plaintiffs Dr. Jay Bhattacharya and Dr. Martin Kulldorff.  The Great Barrington Declaration—a cogent and powerful scientific critique of prolonged lockdowns as a response to COVID-19—was published on October 4, 2020.  *See* Doc. 45-3 (Bhattacharya Decl.), ¶¶ 6-11.  "On October 8, 2020, four days after the Declaration's publication, then-Director of NIH, Dr. Francis Collins, emailed Dr. Anthony Fauci … about the Great Barrington Declaration," stating: "Hi Tony and Cliff, See: https://gbdeclaration.org/. This proposal from the three fringe epidemiologists who met with the Secretary seems to be getting a lot of attention – and even a co-signature from Nobel Prize winner Mike Leavitt at Stanford. There

needs to be *a quick and devastating published take-down* of its premises. I don't see anything like that online yet – is it underway? Francis." *Id.* ¶ 14 (emphasis added). Fauci quickly responded by engaging in a series of public statements that were highly critical of the Great Barrington Declaration, describing it as "total nonsense" and "ridiculous." *See, e.g.,* Jessie Hellmann, *Fauci Blasts Herd Immunity Proposal Embraced by White House as 'Total Nonsense,'* THE HILL (Oct. 15, 2020), *at* https://thehill.com/policy/healthcare/521220-fauci-blasts-herd-immunity-proposal-embraced-by-white-house-as-total/.   Immediately after Dr. Collins emailed Dr. Fauci demanding a "quick and devastating … take-down" of the Great Barrington Declaration, a relentless campaign to censor it and its authors on social media ensued. *See id.* ¶¶ 15-33. "[T]he censorship of the Great Barrington Declaration and Plaintiffs Bhattacharya and Kulldorff [occurred] just after a senior HHS official called for a 'quick and devastating … take-down' of the Declaration" to Dr. Fauci.  Doc. 84, ¶ 480.

In addition, Dr. Fauci evidently had a hand in Twitter's permanent suspension of prominent vaccine critic Alex Berenson, whose science-based objections to the vaccination of young, healthy individuals became a specific, high-priority target for the Biden Administration's federal censors. "Alex Berenson disclosed internal Twitter communications revealing that senior 'WH' officials including Andrew Slavitt specifically pressured Twitter to deplatform Berenson, an influential vaccine critic—which Twitter did."  Doc. 84, ¶ 345.  "On July 11, 2021, Dr. Fauci publicly described Berenson's public statements on vaccines as 'horrifying.'  Soon thereafter, after President Biden's subsequent statement that 'They're killing people' by not censoring vaccine 'misinformation,' Twitter caved to federal pressure and permanently suspended Berenson."  Doc. 84, ¶ 347.  In fact, just yesterday, *new* evidence emerged of another link between Dr. Fauci and the termination of Berenson.  On October 13, 2022, Alex Berenson posted on Substack newly

released Twitter emails indicating that a board member of Pfizer (which developed the lead mRNA vaccine criticized by Berenson) pressured Twitter to de-platform Berenson as well, in evident coordination with federal officials. *See* https://alexberenson.substack.com/p/pfizer-board-member-scott-gottlieb. In his communication with Twitter, the Pfizer executive claimed that Berenson's speech should be censored because it posed a threat to the safety of *Dr. Fauci*—raising the concern that Dr. Fauci may be acting through intermediaries in his communications with social-media platforms about censorship. *Id.* Indeed, Berenson himself infers that there was collusion between White House official Andrew Slavitt and the Pfizer executive on this very point. *See id.*

To be sure, the Government has submitted stock interrogatory responses on behalf of Dr. Fauci asserting that he has had no direct communications with social-media platforms about censorship. *See* Ex. 3, at 24, 57 (asserting in generic terms that "NIAID has not identified any communications … between Dr. Fauci and Social-Media Platforms relating to Content Modulation and/or Misinformation"). Plaintiffs should not be required to accept these responses at face value, but should be allowed to test them by questioning under oath, for at least three reasons.

First and foremost, Dr. Fauci has refused to verify under oath his own interrogatory responses, in violation of the plain terms of this Court's Order. *See* Doc. 72, at 6-7. Instead, Dr. Jill Harper—who is not mentioned in the Complaint—has verified NIAID's responses on behalf of Dr. Fauci. *See* Ex. 3, at 13, 93. Thus, to this day, Dr. Fauci has not made any statement under oath about his communications with social-media platforms. This violates the plain terms of this Court's Order on Discovery Disputes, which directly instructed *Dr. Fauci* to provide interrogatory responses. Doc. 72, at 6-7. In that Order, this Court concluded that "Dr. Fauci's communications would be relevant to Plaintiffs' allegations in reference to alleged suppression of speech relating to the lab-leak theory of COVID-19's origin, and to alleged suppression of speech about the

efficiency of masks and COVID-19 lockdowns." *Id.* at 7.  The Court ordered that "*Dr. Fauci* shall provide answers to the Plaintiffs' interrogatories … within twenty-one (21) days from the date of this order." Doc. 72, at 7 (emphasis added).  Dr. Fauci did not comply with the plain terms of this order.  He did not "provide answers to the Plaintiffs' interrogatories," but delegated that task to a subordinate who is a stranger to the case and *who has no first-hand knowledge of Dr. Fauci's highly relevant communications with social-media platforms*.  Plaintiffs raised this issue with the Government, demanding that Dr. Fauci verify his own interrogatory responses, but the Government has refused to do so.  *See* Ex. 4.  Dr. Fauci must respond to questions about his involvement in communications with social-media platforms under oath.  He has declined to do so, despite this Court's order, so he should appear for a deposition to test these unverified representations that he has submitted through a proxy on his behalf.

Second, even if Dr. Fauci had no direct communications with social-media platforms about censorship as the Government contends—which is highly questionable—there are compelling reasons suggesting that Dr. Fauci has both acted through intermediaries, and acted on behalf of others, in procuring the social-media censorship of highly credible scientific opinions like those supporting the lab-leak theory, the Great Barrington Declaration, and the vaccine critiques of Alex Berenson.  These are reflected in the examples discussed above.  If Dr. Fauci has acted through intermediaries to pressure social-media platforms to increase censorship—including through his public statements—or acted as an intermediary on behalf of others (such as Dr. Francis Collins) to achieve censorship on social media, that information is highly relevant to Plaintiffs' preliminary-injunction motion, even if he engaged in no direct communications with social-media platforms himself on these topics.

Finally, many have raised questions about Dr. Fauci's credibility on matters relating to supposed COVID-19 "misinformation" in recent years.  He has made conflicting or misleading public statements on the efficacy of masks, the percentage of the population needed to obtain "herd immunity," NIAID's funding of "gain-of-function" virus research in Wuhan, and the lab-leak theory, among other things.  As two Members of Congress recently noted, "Despite Dr. Fauci claiming otherwise on multiple occasions, he was, in fact, aware of the monetary relationship between NIAID, the U.S. National Institutes of Health (NIH), EcoHealth Alliance Inc. (EcoHealth), and [the Wuhan Institute of Virology] by January 27, 2020.  Dr. Fauci also knew that NIAID worked with EcoHealth to craft a grant policy to sidestep the gain-of-function moratorium at the time.  This new policy, designed by EcoHealth and agreed to by NIAID, allowed EcoHealth to complete dangerous experiments on novel bat coronaviruses—with very little oversight—that would have otherwise been blocked by the moratorium."  Ex. 2, at 1.  Suffice to say that, in light of all the foregoing, Plaintiffs should not be required to accept Dr. Fauci's self-serving blanket denials—issued through a subordinate, not from his own mouth—at face value.  The Court should order Dr. Fauci to participate in a deposition.

### 2.    White House Director of Digital Strategy Rob Flaherty.

Rob Flaherty is the Director of Digital Strategy for the White House.  He is a key official in the White House's pressure campaign on social-media companies to increase COVID-19 censorship, and social media companies' policies and responses to COVID-19 vaccine claims.  *See* Ex. 5 (Flaherty Collective Exhibit, pages cited by Bates number).   Flaherty has provided few written communications but held extensive oral meetings with social-media platforms.  Among other things, he has held meetings with Twitter, Meta, and YouTube on vaccine hesitancy and combatting misinformation.  *Id.* at 16275, 16274, 7359–60.  He consistently interfaces with Meta's

director of U.S. Public Policy, who sends "Covid Insights Reports" that detail trends on Covid-19 posts by users and actions taken by Meta, *id.* at 7225, and he has held meetings about Meta's "whole of platform approach" to address misinformation and curb vaccine hesitancy, *id.* at 16282. Meta also knows to reach out to him when new Covid-19 vaccines are authorized for new groups of people, and to report on Meta's intentions to censor disfavored opinions about vaccine effectiveness for those new groups, at the White House's urging. *Id.* at 7268-89; 7250. Flaherty has specific knowledge and information on Meta's attempts to censor the Disinformation Dozen. *Id.* at 7322. Flaherty has led efforts for the White House to get Meta to explain ""how big the [misinformation] problem is, what solutions you're implementing, and how effective they've been." *Id.* at 7258–59; *see also id.* at 16279. He also connected SG Murthy with a "critical leader of the DNC's misinfo work for a long time." *Id.* at 7436–37. He pressured Meta by sending them an article about misinformation on Facebook with a subject line "not sure what to say anymore." Mr. Flaherty also knows about the Biden Transition Team's efforts with Meta. *Id.* at 16364, 16276. The Government's interrogatory responses identify Flaherty as participating in multiple virtual meetings with social-media platforms about censorship. Ex. 3, at 31.

As all these documents confirm, Flaherty has repeatedly engaged in key communications with social-media platforms about censorship through oral communications instead of written documents like emails. Deposing Mr. Flaherty would provide critical information on the White House's pressure campaign on social-media platforms against the Disinformation Dozen and other COVID-19 "misinformation" issues, leaning on social media companies after press reports relating to misinformation on vaccine authorizations, Ex. 5, at 7246–47, and the White House's influence over social media's content-modulation policies like Meta's new action policy and Twitter's

efforts to remove the most harmful Covid-19 misinformation.  Ex. 5, at 7248–49, 16275.  His testimony would be highly relevant and important to the States' preliminary-injunction motion.

### 3.    White House Senior COVID-19 Advisor Andrew Slavitt.

Defendant Andrew Slavitt served as the White House's Senior COVID-19 Advisor.  By his own admission, Slavitt led the charge for the White House in pushing social-media companies to increase censorship of private speech about COVID-19, and he did so heavily through oral conversations and meetings with representatives of social-media platforms.  The Government's documentary discovery reveals that Slavitt received "Facebook bi-weekly covid content reports" from a senior Facebook executive to allow Slavitt to oversee Facebook's censorship activities. Doc. 84, ¶ 343.  Slavitt also specifically pressured Twitter, in an oral meeting, to de-platform Alex Berenson.  Doc. 84, ¶¶ 345-46.  "Alex Berenson disclosed internal Twitter communications revealing that senior 'WH' officials including Andrew Slavitt specifically pressured Twitter to deplatform Berenson, an influential vaccine critic—which Twitter did."  Id. ¶ 354.  A meeting invitation dated April 21, 2022, between Slavitt and Twitter stated: "White House Staff will be briefed by Twitter on vaccine misinfo.  Twitter to cover trends seen generally around vaccine misinformation, the tangible effects seen from recent policy changes, what interventions are currently being implemented in addition to previous policy changes, and ways the White House (and our COVID experts) can partner in product work."  Id. ¶ 345.  The next day, internal Twitter messages reflected that Slavitt had posed "one really tough question about why Alex Berenson hasn't been kicked off the platform."  Id. ¶ 346.  "On March 1, 2021, a Twitter employee wrote to Defendants Slavitt, Flaherty, Peck and Humphrey after a meeting that the company was escalating efforts to remove harmful content about Covid and introducing a strike system—apparently the outcome of the discussion that had just occurred."  Id. ¶ 354.  "As another example, on May 28,

2021, a senior executive of Meta sent an email to Slavitt and Murthy reporting that Facebook had expanded its censorship policies, evidently to satisfy federal officials' demands made at a recent oral meeting.   The email stated that a 'key point' was that 'We're expanding penalties for individual Facebook accounts that share misinformation.'"   *Id.* ¶ 369.

"[O]n March 2, 2021, Meta sent an email assuring Slavitt, Flaherty, and Humphrey that the company is '[c]ombating vaccine misinformation and de-amplifying content that could contribute to vaccine hesitancy' by 'improving the effectiveness of our existing enforcement systems (particularly focusing on entities that repeatedly post vaccine misinformation), mitigating viral content that could lead to vaccine hesitancy....'"   *Id.* ¶ 375.   Both Twitter and Facebook have identified Slavitt as a senior federal official who communicated with them about misinformation and censorship.  *Id.* ¶¶ 379, 381.  Likewise, the White House Press Secretary's Office has identified Slavitt and Flaherty as two senior White House officials involved in communicating with social-media platforms about censorship.   Ex. 3, at 77-78.

Slavitt has publicly stated in a podcast that his job at the White House was to push social-media platforms to increase censorship.  He refers to "my time in the White House where I was charged with pushing organizations like Facebook from spewing misinformation."   Andrew Slavitt, *Is COVID Misinformation Killing People?*, Published Jul 21, 2021, *at* https://omny.fm/shows/in-the-bubble/is-covid-misinformation-killing-people-with-facebo  (audio 5:40).   In the podcast, the same senior Facebook executive noted that Slavitt, as a White House official, had orally demanded the censorship of specific posts in oral meetings: "I remember you and I had a conversation about some posts where I was saying look.... Hey, Andy, you may not like it but this is kind of satire.  … you were saying no its not, it's going to encourage people to think there is some reason for people not to take the vaccine."   *Id.* (audio 27:30).  Slavitt stated,

"My job in the WH of course is and remains to push for tougher policies on how these algorithms work" to increase censorship of COVID-19 misinformation. *Id.* (audio 33:10). Slavitt described repeatedly pressuring Facebook to increase censorship in oral meetings while he was at the White House: "The conversations, there were battles where it felt like FB was trying to supply just enough information to win the battle and over and over again maybe the effort to learn enough was thwarted to the point where the frustration levels ran very high…. I don't think just the President, but others around the country, were feeling that more accountably is needed and more accountability is required…. Really a continued view that the company needs to be more responsible." *Id.* (audio 41:05). In short, Slavitt was the White House's self-professed principal enforcer for online censorship. Slavitt has described his job at the White House as "pushing organizations like Facebook from spewing misinformation." This "pushing organizations like Facebook" to increase censorship of private speech occurred heavily through oral and face-to-face meetings. The Court should authorize Plaintiffs to depose Slavitt.

### 4.    Former White House Press Secretary Jennifer Psaki.

Then-White House Press Secretary Jennifer Psaki was an original Defendant in the case and was substituted for Karine Jean-Pierre in her official capacity after Psaki left the White House for a private career in late May 2022. While she was the White House's chief spokesperson, Psaki made a series of public statements—emphasized in the Complaint—that both (1) attested to her personal knowledge of the participation of high-level White House officials in pressuring social-media platforms, and (2) reinforced the public threats of adverse legal consequences to social-media platforms if they do not increase censorship of views disfavored by federal officials. Thus, she both admitted to knowledge of pressure to censor from federal officials and directly engaged in such pressure herself, in a highly impactful and visible fashion.

15

The Complaint details many examples of these statements.  For example, on May 5, 2021, Defendant Psaki gave a White House press conference at which she stated that "[t]he President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections.  And we've seen that over the past several months, broadly speaking…. we've seen it from a number of sources."  White House, *Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack, May 5, 2021*, *at* https://www.whitehouse.gov/briefing-room/press-briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-tom-vilsack-may-5-2021/.

On July 15, 2021, at a White House press briefing, Psaki stated: "[W]e are in regular touch with these social media platforms, and those engagements *typically happen through members of our senior staff*, but also members of our COVID-19 team, given, as Dr. Murthy conveyed, this is a big issue of misinformation, specifically on the pandemic."  *Id.* (emphasis added).  She added, "*We're flagging problematic posts for Facebook that spread disinformation*."  *Id.* (emphasis added).  She stated, "we have recommended—proposed that they create a robust enforcement strategy," *i.e.*, a more aggressive censorship program.  *Id.*  At the same conference, Psaki called on social-media companies to censor particular disfavored speakers, stating: "[T]here's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms.  All of them remain active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns."  *Id.*  And she stated: "Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days.  That's too long. The information spreads too quickly."  *Id.*  She

16

stated that "[w]e engage with them [*i.e.*, social-media companies] regularly and *they certainly understand what our asks are*." *Id.* (emphasis added).

The next day, July 16, 2021, Psaki explicitly called for social-media companies to coordinate with *each other* in censoring disfavored speakers, to ensure that such speakers are completely muzzled. "You shouldn't be banned from one platform and not others … for providing misinformation out there." White House, Press Briefing by Press Secretary Jen Psaki, July 16, 2021, *at* https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/. Psaki also demanded that social-media companies "create robust enforcement strategies," "tak[e] faster action against harmful posts," and "promot[e] quality information algorithms"—which is a euphemism for algorithms that suppress disfavored messages. *Id.* When asked whether Facebook's already-aggressive censorship was "sufficient," she said, "Clearly not, because we're talking about additional steps that should be taken." *Id.*

On April 25, 2022, Psaki reiterated the threats of adverse legal consequences to Twitter and other social media platforms: "No matter who owns or runs Twitter, the President has long been concerned about the power of large social media platforms … [and] has long argued that tech platforms must be held accountable for the harms they cause. He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more. And he's encouraged that there's bipartisan interest in Congress." *Id.* At the same press briefing, Psaki reaffirmed that senior officials within the White House and/or the Administration are continuing to coordinate directly with social-media platforms to censor disfavored speakers and content on social media: "we engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue." *Id.*

Plaintiffs have submitted interrogatories to Psaki's successor in office, Karine Jean-Pierre, to probe the basis of Psaki's statements and understand who is "flagging problematic posts for Facebook," what "members of our senior staff" are communicating with social-media platforms about censorship, "what our asks are" to social-media platforms about censorship, who in the White House "engage[s] regularly with all social media platforms about steps that can be taken" to suppress so-called "misinformation," and so forth.  Defendants, however, contend that they lack direct knowledge of the basis for Psaki's statements because Psaki no longer works for the White House.  *See* Ex. 3, at 74-87.  The Government submitted interrogatory responses on behalf of Jean-Pierre that simply provide block quotes from the same press conferences quoted above and provide almost no meaningful information, other than to identify Rob Flaherty and Andrew Slavitt as involved in communications with social-media platforms.  *See id.*  Moreover, the Government has repeatedly couched its responses to the Psaki-related interrogatories in qualifying language such as "it is the understanding of the White House Office of Press Secretary," to emphasize that the Government's interrogatory responses do not reflect *Psaki's* actual knowledge.  *Id.*  Because the Government has failed to provide meaningful responses through Psaki's official successor, Plaintiffs should be allowed to depose Ms. Psaki to explore the basis of the critical statements alleged in the Complaint and related issues.  There is no other avenue to obtain this information.

### 5.    FBI Supervisory Special Agent Elvis Chan.

The Court should order the deposition of FBI Supervisory Special Agent Elvis Chan, who is a named Defendant in the Second Amended Complaint.  *See* Doc. 84, ¶ 61.  Chan is "Supervisory Special Agent of Squad CY-1 in the San Francisco Division of the FIB."  *Id.* He "has authority over cybersecurity issues for FBI in that geographical region, which includes the headquarters of major social-media platforms, and he plays a critical role for FBI and [FBI's Foreign Influence

Task Force] in coordinating with social-media platforms relating to censorship and suppression of speech on their platforms." *Id.* There are compelling reasons to believe that Chan plays a central role in federally-induced social-media censorship, but few specific details are yet available, rendering Chan's deposition imperative to ensure effective preliminary injunctive relief.

There has been a recent explosion of disclosures about FBI's direct involvement in social-media censorship. Most notably, on August 26, 2022 (after the First Amended Complaint had been filed), Mark Zuckerberg disclosed on Joe Rogan's podcast that a communication from the FBI led to Facebook's censorship of the Hunter Biden laptop story. *Id.* at 112-13, ¶¶ 382-383. Shortly thereafter, in response to Plaintiffs' third-party subpoena, Meta's counsel identified FBI SSA Elvis Chan as the one who conveyed "the communications between the FBI and Meta that led to Facebook's suppression of the Hunter Biden laptop story." *Id.* ¶ 384.

Meta's revelation is consistent with publicly available information about Elvis Chan. Chan himself "has openly boasted about his official role on behalf of FBI in coordinating with social-media companies." *Id.* ¶ 387. "In a recent podcast, he stated, 'Our field office, FBI San Francisco, was very involved in helping to protect the US elections in 2020. … [T]he FBI, the US government working in conjunction with *the private sector*, as well as with election officials from every single state and protectorate, we were really able to do it." *Id.* (emphasis added) (quoting https://www.banyansecurity.io/resource/get-it-started-get-it-done/). "Chan indicated that he works closely with Defendant Jen Easterly," *id.* ¶ 388, who runs the "nerve center" of federal censorship activities through CISA, as discussed below. "Chan admits to regular, routine coordination about censorship with social-media platforms." *Id.* ¶ 389. He has stated of the 2020 election cycle in particular: "we talked with all of these entities I mentioned regularly, at least on a monthly basis. And right before the election, probably on a weekly basis. If they were seeing

19

anything unusual, if we were seeing anything unusual, sharing intelligence with technology companies, with social media companies, so that they could *protect their own platforms*.  That's where the FBI and the US government can actually help companies."  *Id.* (emphasis added).  "Protect[ing] their own platforms" is a euphemism for censorship of government-disfavored speech.  Chan has also publicly called for private citizens to report "misinformation" to the FBI and to social-media companies so that it can be censored: "If you are seeing something related to election on your social-media platform, all of them have portals where you can report that sort of information, and *they are being very aggressive in trying to take down any misinformation or disinformation* … [i]f you see anything on election day or before election day, you can always report it to FBI.gov or Justice.gov … *we take all of these very seriously*."  *Id.* ¶ 391 (quoting https://www.govinfosecurity.com/fbi-on-election-theres-going-to-be-lot-noise-a-15257    (7:45-8:48 of video) (emphasis added)).   In other words, according to Chan, the public can report misinformation to the FBI, and the FBI will help "take [it] down."   According to Chan, the FBI is working closely with social-media platforms to be "very aggressive in trying to take down any misinformation or disinformation," with the FBI "tak[ing] all of these very seriously."  *Id.*

Despite his central role in interacting with social-media platforms on behalf of the federal government—including its law-enforcement apparatus—the Government Defendants have provided no documentary discovery with respect to Chan.  What little Plaintiffs have obtained, we received from third-party subpoena to LinkedIn.  Documents produced by LinkedIn demonstrate that Chan is active *to this day* in communicating with social-media platforms about censoring speech on behalf of the FBI and the federal government's law-enforcement and domestic-security apparatus.  "Documents produced by LinkedIn show Chan repeatedly organizing meetings with representatives of LinkedIn from 2020 through 2022 (the present).  Based on the limited agendas

provided, it appears that these meetings included discussions of election-related content and suppression of election-related speech on social media.  On information and belief, Chan organized similar meetings with other major social-media platforms, as in one instance, he notified LinkedIn about a particular proposed time slot for a meeting that another company had already taken that time slot.   Dehmlow was routinely included in these meetings as well."  Doc. 84, ¶ 392; *see also* Ex. 6 (LinkedIn documents involving Elvis Chan).  Evidently, Chan routinely engages in similar meetings with other major social-media platforms about disinformation and censorship.

In short, there are compelling reasons to believe that Elvis Chan plays a crucial role in the federal government's social-media-censorship efforts.  But Plaintiffs have received very little documentary evidence regarding Chan's involvement, and none from Government Defendants. As this Court stated, "[t]his is the only chance Plaintiffs will have to get this information prior to addressing the preliminary injunction."  Doc. 72, at 7.  And it will likely be critical for any preliminary injunction to address Chan's involvement in order to provide effective relief.

### 6.    CISA Director Jen Easterly.

Defendant Jen Easterly is the Director of CISA within the Department of Homeland Security, and thus she supervises the "nerve center" of federally directed censorship.  The Second Amended Complaint includes extensive allegations about Easterly's involvement in federal censorship activities.  *See, e.g.,* Doc. 84, ¶¶ 290-293.  Under her leadership, CISA's "mission evolved" to address the "changing information environment."  *Id.* ¶ 301.  Under Easterly's leadership, CISA boasts that it "serves as a switchboard for routing disinformation concerns to appropriate social media platforms."  *Id.* ¶ 302.  CISA performs a central role in directly flagging "misinformation" to social-media companies for censorship.  "CISA boasts that it has 'expanded the breadth of reporting [MDM] to include … more social media platforms,' and that '[t]his

activity leverages the rapport the MDM team has with the social media platforms to enable shared situational awareness." *Id.* As Director of CISA, Easterly supervises the federal sub-agency that serves as the clearinghouse for inducing social media companies to increase censorship of private speech. Interestingly, Easterly "claim[s] that social-media speech" by Americans "is a form of 'infrastructure,' and that policing speech online by the federal government falls within her agency's mission to protect 'infrastructure,' stating that … 'the most critical infrastructure is cognitive infrastructure….'" *Id.* ¶ 291.

Notably, Easterly has engaged in text messages with Matt Masterson, a former CISA official who now works for a social-media platform. Doc. 71-5, at 2-4. In those text messages, Masterson indicated that "CISA is handling 'operations' … on disinfo" for DHS, and Easterly noted that the newly created Disinformation Governance Board "doesn't change or impact anything we [*i.e.*, CISA] are doing or have already established." *Id.* at 2. Easterly noted that she was directly involved in pushing social-media platforms to greater censorship, and in coordinating the role of other federal agencies to "prepunk/debunk" Americans' social-media speech: "Just trying to get us in a place where Fed can work with platforms to better understand the mis/dis trends so relevant agencies can try to prebunk/debunk as useful…. [I] was looking to play a coord role so not every [agency] is independently reaching out to platforms which could cause a lot of chaos." *Id.* at 3. Easterly thus envisions CISA in an overarching role, just like the "Disinformation Governance Board," and she acts accordingly. Masterson hailed Easterly's "leadership" in pushing for greater censorship, and agreed that social-media platforms need more federal pressure to increase censorship: "Platforms have got to get more comfortable with gov't. It's really interesting how hesitant they remain." *Id.* at 4.

Easterly's deposition is critical for two reasons.  First, as the Director of CISA, she oversees the "nerve center" of federal government's censorship efforts on issues such as election integrity and election security.  As the text messages quoted above reveal, she views herself as coordinating what Secretary Mayorkas has described as censorship efforts "across the federal enterprise."  As her former colleague Masterson indicates, she handles "operations" on "disinfo" for DHS.  She thus is very likely to have unique knowledge about the scope and nature of communications with social-media platforms about censorship from CISA, DHS, and potentially other federal officials. Her testimony allows Plaintiffs a unique opportunity to define for the Court the nature and scope of the communications that they seek to enjoin in their motion for preliminary injunctive relief.

Second, in response to interrogatories, CISA has disclosed extensive, recurring oral communications and meetings between CISA officials and social-media platforms relating to misinformation and censorship.  *See* Ex. 3, at 38-41.  These include, not just individual meetings, but multiple series of recurring meetings with many participants from social-media platforms, hosted by "CISA's Election Security and Resilience subdivision."  *Id.* at 38.  Social-media participants include "Google, Facebook, Twitter, Reddit, Microsoft," as well as "Verizon Media, Pinterest, LinkedIn, and the Wikimedia Foundation."  *Id.* at 38-39.  "CISA and Facebook" have a "recurring meeting" to "plan and set the agenda" for these mass meetings.  *Id.* at 39.  CISA also hosts recurring meetings with social-media platforms through the "CISA Cybersecurity Advisory Committee Meetings," "CISA CSAC, Protecting Critical Infrastructure from Misinformation and Disinformation Subcommittee meetings," and "meetings convened by the Election Infrastructure Subsector Government Coordinating Council" and by the "Election Infrastructure Subsector Coordinating Council Joint MDM Working Group."  *Id.* at 39.  CISA did not identify the individual federal officials participating in any of these many recurring meetings with social-media platforms

in its Interrogatory responses. *Id.* at 38-40. Easterly, who oversees the multiple CISA components that conduct these many meetings with social-media platforms about censorship, has unique knowledge of the content and nature of the communications with social-media platforms at these meetings, as the participants in all these meetings report back to her. Documents produced in discovery attest to Easterly's extensive and detailed oversight of these oral and face-to-face meetings with social-media platforms where critical communications about censorship evidently occur. *See* Ex. 7 (Easterly Collective Exhibit). Easterly's deposition is probably "the only chance Plaintiffs will have to get this information prior to addressing the preliminary injunction." Doc. 72, at 7.

### 7. CISA "Mis- Dis- and Mal-Information Team" Member Lauren Protentis.

Lauren Protentis is a key member of CISA's Election Security Initiative, specifically the so-called "Mis- Dis- and Mal-Information (MDM) Team," whose entire mission appears to be federally-induced censorship of social-media speech. The documentary discovery provided on Protentis reveals that she plays a central role in CISA's "MDM" activities, and that she participates in many unwritten, oral communications with social-media platforms about censorship. *See* Ex. 8 (Protentis Collective Exhibit, cited by Bates number). She appears to lead the MDM Working Group with social media companies, *id.* at 8554; she also leads the MDM Joint Working Group that includes state and local election officials, *id.* at 11885; and she participates in the Election Subsector Coordinating Council (SCC), *id.* at 10900-901, and the bi-monthly USG/Industry sync calls, *id.* at 12079. She is an expert on the coordination and efforts between the federal government and social media companies on combatting so-called "MDM," as she has given briefings hosted by the U.S. State Department to African nations on MDM and private and public sector cooperation. *Id.* at 12201. She has extensive knowledge about the federal government and social

media companies' censorship activities, including Twitter Safety and its Partner Support Portal, *id.* at 12193; Google's operations, *id.* at 10904; Microsoft's "elections-specific externally facing security programs," *id.* at 12302; and Meta's efforts to combat misinformation, *id.* at 12281–82.

Protentis's contacts with social media are so pervasive that very senior officials in other Departments ask her to make introductions to key "points of contact" with the social-media platforms to discuss "social-media and influence matters." *Id.* at 11411 (Deputy Secretary of the Treasury asking Protentis for points of contact at social-media platforms). Protentis also has knowledge about how CISA is helping undisclosed NGOs' contact social media groups on disinformation efforts. *Id.* at 12194. In sum, Ms. Protentis serves as a vital connection between CISA and social-media platforms in the government's censorship efforts, has special knowledge in the election-security space, and even provides briefings to the governments of foreign countries on how to interact with social0media companies. She also has unique knowledge of how federal components like CISA are working through outside third-party organizations, such as NGOs, to outsource their federal censorship activities in attempt to evade the First Amendment. *See, e.g.,* Doc. 84, ¶¶ 395-420. Protentis's testimony will shed light on the content of those meetings, the extent of CISA's election security efforts, the tools that the federal government uses on all the social media platforms, and efforts to influence local election officials and encourage them to use social media companies to censor citizens in the 2022 election.

### 8.    Surgeon General Vivek Murthy.

For about a year and a half, Defendant Dr. Vivek Murthy has led a public campaign, in his capacity as Surgeon General, to censor individuals who spread so-called "misinformation"— defined by him—about Covid-19. *See* Doc. 84, ¶¶ 220-24. He has singled out tech companies for particular criticism, making numerous public statements at press conferences and via his official

Twitter account asserting that they are responsible for Covid-19 deaths because they have failed to adequately censor "misinformation."  Not only that, but he issued a Request for Information (RFI) on March 2, 2022, demanding that tech platforms provide him with information about "misinformation," including the identities of those supposedly spreading it on their sites.  Doc. 84, ¶¶ 243-46.  Viewed in the context of Dr. Murthy's other statements, as well as those of President Joseph Biden (accusing tech companies of "killing people" by not censoring vaccine "misinformation") and Jen Psaki, this RFI was an intimidation tactic, designed to frighten the tech companies into compliance with his demand to escalate censorship of certain viewpoints on Covid-19 for fear of reprisal in the form of regulation or other legal consequences.  Doc. 84, ¶ 243.

Murthy has engaged in important oral communications with a high-level Facebook executive about the federal governments' demands for greater censorship of COVID-19 "misinformation."  Texts and emails obtained through discovery in this case establish that Dr. Murthy did not simply make public statements on the topic; rather, he was intimately involved in the censorship project.   For example, a senior executive at Facebook (Meta) told Dr. Murthy, via text message, that those at the company were aggrieved as "it's not great to be accused of killing people"—presumably a reference to President Biden's statement above —and expressed his desire "to find a way to deescalate and work together collaboratively."  Doc. 84, ¶ 340.  The executive reiterated similar sentiments in an email. Ex. 9 (Murthy Collective Exhibit, cited by Bates number), at 6848.  Another email from this executive informed Dr. Murthy that the "latest Facebook bi-weekly covid content report" was attached "as promised/discussed," establishing that a verbal conversation on the topic occurred.  *Id.* at 7030.

On several occasions, the same Facebook executive emailed Murthy to assure him that the company was working to further address "misinformation" and "disinformation," including by

removing pages, groups, and accounts tied to the "disinfo dozen."  Doc. 84, ¶¶ 341-43; Ex. 9, at 7031, 15138.  The reference to the "disinfo dozen" implied that Murthy had explicitly requested removal of at least those individuals from social media, and possibly others as well.  Dr. Murthy clearly had direct, routine contact with the senior Meta executive, and at least one phone call with him.  He is the only individual in government privy to these conversations, and thus the only person who can therefore answer questions about the nature and degree of pressure he exerted on the tech companies to comply with his public demands and clarify whether additional conversations on the topic were held over the phone or in virtual or in-person meetings.  *See Payne v. District of Columbia*, 279 F.R.D. 1, 7-8 (D.D.C. 2011) (ordering depositions of mayor and city council members due to their participation in conversations pertinent to allegations); *Byrd v. District of Columbia*, 259 F.R.D. 1, 8 (D.D.C. 2009) (ordering depositions of government officials, even if high-ranking, because of their personal knowledge of facts of the case).

9. **CDC's Chief of the Digital Media Branch Carol Y. Crawford.**

Defendant Carol Crawford is Chief of the Digital Media Branch of the Division of Public Affairs within CDC.  As revealed through discovery obtained in this case, Ms. Crawford is among the government employees most involved in censoring "misinformation" about Covid-19.  She exchanged numerous emails with employees at Twitter, Meta, and Google/YouTube, and organized "Be On the Lookout" ("BOLO") meetings—which aimed to quell the spread of "misinformation" —during 2021.  Doc. 84, ¶ 248.

Ms. Crawford flagged specific social media posts for censorship, provided examples of the types of posts to censor, and cautioned participants not to share slides from BOLO meetings outside of their "trust and safety teams."  Doc. 84, ¶¶ 248, 250.  Not only that, but her emails demonstrate that she and others at CDC worked with the Census Bureau to "identify and monitor

social media for vaccine misinformation."  Doc. 84, ¶ 249.  She observed in emails to Twitter employees that the company had worked with Census the previous year to the same end.  *Id.* Emails that Ms. Crawford exchanged with Facebook employees established an agreement in which CDC would use a "misinfo reporting channel," that Facebook employees trained them to use. Emails from March of 2021 indicate that a meeting between CDC (including Ms. Crawford), Census and Google was held to discuss "COVID vaccine mis-info."  Ex. 10 (Crawford Collective Exhibit, cited by Bates number), at 3130.

Ms. Crawford's communications with Facebook indicate that CDC, the Census Bureau, and other government agencies collaborate with Facebook to flag speech for censorship regarding both Covid-19 and elections using "CrowdTangle," apparently "a Facebook tool that tracks how content spreads online" (according to the company itself).  Ms. Crawford has been involved in this censorship enterprise from the very beginning of the pandemic.  In February of 2020, Ms. Crawford spoke with a Facebook employee on the phone about "coordination" to "control … misinformation related to Corona virus … which includes links to WHO page as well as removal of misinformation," and in March 2020, Ms. Crawford asked to speak with a Facebook employee about "remov[ing] misinformation," which apparently led to a phone call.  *Id.* at 4060, 4404, 4442. An email from a Facebook official to Ms. Crawford stated that "[w]hen health departments flag potential vaccine misinformation on Facebook and Instagram, we review and remove the content if it violates our policies … This is similar to how governments and fact-checkers use CrowdTangle ahead of elections."  Doc. 84, ¶ 252.  Following an email exchange with a Facebook executive in February of 2022 bearing the subject line "Vaccine Misinformation Questions for CDC," Ms. Crawford asked the employee to discuss the matter by phone.  Ex. 10, at 1677.

These email exchanges demonstrate that Ms. Crawford played a key role in directing censorship on social media platforms.  In fact, she is as heavily involved as any federal official when it comes to identifying specific posts and topics for censorship.  Further, her references to the role of the Census Bureau suggest that she would be able to shed light on that agency's role in efforts to flag "misinformation" the previous year, a topic about which little is known.  She clearly takes part in—and likely plays a significant role in—meetings with the tech companies about censoring "misinformation," and participated in at least several phone calls (which do not appear to have been recorded) with employees of tech companies to discuss the same topic.  She is uniquely positioned to shed light on the content of those conversations, what she asked the tech companies what to do, and the degree of pressure exerted upon the companies to comply with the government's demands.  *See Union Sav. Bank of Patchogue, New York v. Saxon*, 209 F.Supp. 319, 319-20 (D.D.C. 1962) (permitting deposition of head of agency as "Plaintiffs allege actions personal to the Defendant and in violation of the United States Code").

**10. State Department's Global Engagement Center Coordinator Daniel Kimmage.**

Defendant Daniel Kimmage is the Acting Coordinator for the Global Engagement Center at the State Department, which works closely with Jen Easterly and CISA to coordinate social-media censorship of speech on election-related issues and election integrity.  As noted in the Complaint, "[t]he State Department operates a 'Global Engagement Center' within the State Department that conducts counter-'disinformation' activities… [T]he Global Engagement Center is involved in procuring the censorship of private speech on social media, including of U.S. citizens."  Doc. 84, ¶ 88.  In response to third-party subpoena, Twitter has identified Kimmage and other State Department officials at the Global Engagement Center as communicating with Twitter about censorship and content modulation.  *Id.* ¶ 396.  The State Department boasts that it

established the Global Engagement Center to "facilitate public-private coordination" and "increase collaboration" between "the U.S. government and the tech sector" to combat disinformation. *Id.* ¶ 397. The Global Engagement Center works closely with CISA, the "nerve center" of government-induced censorship on election issues, on such projects. *Id.* ¶ 399.

Recently, it emerged that Kimmage's Global Engagement Center collaborated with CISA in 2020 and 2022 to create and fund an alliance of third-party nonprofits called the "Election Integrity Partnership," which aggressively and successfully pushed for social-media censorship of free speech about elections and in 2020 and continues to do so today in 2022. *Id.* ¶ 401. The purpose of this effort was to allow CISA and GEC to evade First Amendment restrictions while still funding and pushing for government-induced social-media censorship. *Id.* ¶ 402. This CISA/State Department project, acting under Kimmage's leadership, achieved astonishing success in procuring the censorship of private speech on social media during 2020, and it continues to do so today. "In its own after-action report on the 2020 election, the consortium boasted it flagged more than 4,800 URLs — shared nearly 22 million times on Twitter alone — for social media platforms. Their staff worked 12-20 hour shifts from September through mid-November 2020, with 'monitoring intensifying significantly' the week before and after Election Day." Doc. 84, ¶ 406. "Backed by the authority of the federal government, including DHS, CISA, the State Department, and State's Global Engagement Center, the consortium successfully sought and procured extensive censorship of core political speech by private citizens." *Id.* ¶ 407. "The consortium achieved a success rate in 2020 that would be enviable for baseball batters: Platforms took action on 35% of flagged URLs, with 21% labeled, 13% removed and 1% soft-blocked, meaning users had to reject a warning to see them." *Id.* ¶ 408. The consortium's leader, former Facebook official Alex Stamos, boasted that the CISA-GEC-funded effort successfully lobbied

social-media platforms to change their terms of service to restrict election-related free speech in 2020: "'I think we were pretty effective in getting platforms to act on things they haven't acted on before,' both by pressuring them to adopt specific censorship policies and then reporting violations." *Id.* ¶ 414. "'Platform interventions' [*i.e.*, censorship of specific posts or content] in response to 'delegitimization of election results,' for example, went from uniformly 'non-comprehensive' in August 2020 to 'comprehensive' by Election Day, the report says." *Id.*

These are not the only CISA-GEC election-related censorship activities. Documents produced by LinkedIn demonstrate that Samaruddin K. Stewart, acting on behalf of Kimmage's Global Engagement Center in the State Department, organized repeated face-to-face meetings with LinkedIn and other social-media platforms to discuss censorship. Doc. 84, ¶¶ 422-424. The nature and content of communications at these oral meetings about disinformation between Kimmage's representatives and social-media platforms has not been disclosed. Indeed, the Government has provided no documentary discovery about Kimmage's GEC and its central role in federal censorship activities on election-related speech. Kimmage's deposition is crucial for this reason.

**B.    Defendants' Objections to Producing These Witnesses for Deposition Lack Merit.**

The Government Defendants have objected to producing these (or any) witnesses for deposition. Their main objections are (1) a blanket objection to producing White House officials, and (2) an objection to producing "high-level" or "apex" officials (which they define very broadly). These objections have no merit.

**1.    Defendants' blanket objection to deposing White House officials lacks merit.**

Once again, Defendants categorically oppose taking any discovery from White House officials. Their objections largely re-hash the objections they raised to the discovery requests to

White House Defendants Karine Jean-Pierre and Dr. Fauci, which this Court has already rejected. Doc. 72, at 6-7. Plaintiffs incorporate by reference their discussion of the Government's objections to discovery from White House officials from Plaintiffs' prior briefing. *See* Doc. 71, at 10-19.

First, discovery from White House officials is "maximally relevant." *Id.* at 11. The descriptions of the testimony sought from White House Defendants Rob Flaherty, Andrew Slavitt, and Jen Psaki provided above emphasize this point.

Second, Defendants' "categorical refusal to provide" *any* witnesses for deposition unless no White House officials are deposed is "inconsistent with this Court's order." *Id.* The Court's discovery schedule provides the parties seven days to meet and confer about "any depositions the Plaintiff States wish to take," and then provides that "Plaintiff States will have thirty days after the Court's ruling to take any authorized depositions." Doc. 34, at 14. The Government's position that there should be no depositions at all is hard to square with the Court's provision of a thirty-day period for depositions. And, for all the reasons stated above, there are compelling reasons to take the depositions of many Government witnesses.

Third, to the extent that the Government contends that producing White House officials for deposition would be unduly burdensome, the Court has already considered and addressed that objection. In its Order granting preliminary-injunction-related discovery, the Court stated that "[c]ertainly, it would be time-consuming to produce the information requested. However, this issue involves the alleged violation of a constitutional right – the right to free speech. Therefore, the Court feels the need for this information outweighs the burden to Government Defendants." Doc. 34, at 12. Exactly the same reasoning applies to the depositions of White House officials.

Fourth, this Court's analysis of Plaintiffs' request for interrogatory responses and documents requests from White House officials Jean-Pierre and Fauci—which this Court

granted—is directly on-point.  Doc. 72, at 6-7.  There, the Court noted, "the requested information" from White House officials "is obviously very relevant to Plaintiffs' claims."  *Id.* at 6.  This remains true with respect to the requested depositions.   Second, as the Court also noted, "Government Defendants are making a blanket assertion of all communications to social media platforms … based upon executive privilege and presidential communications privilege," but "[t]he White House has waived its claim of privilege in relation to specific documents that it voluntarily revealed to third parties outside the White House."  *Id.* at 6-7 (citing, *inter alia*, *Center for Effective Government v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 25, 27 (D.D.C. 2013)).  Here, as discussed further below, White House Defendants such as Rob Flaherty and Andy Slavitt engaged in extensive communications with third-party social-media platforms pressuring them to engage in greater censorship of private speech.  And Jen Psaki openly stated that she was aware of such communications when she was at the White House.  None of those communications is subject to any plausible claim of privilege, as the Court has already held.  *Id.*  Further, the Court also rejected Defendants' argument that "Plaintiffs must seek discovery from other sources," holding that "[t]his is expedited preliminary-injunction-related discovery.   This discovery was opposed by Government Defendants.  This is the only chance Plaintiffs will have to get this information prior to addressing the preliminary injunction.  This discovery was tailored to the facts alleged in this case.  There was no requirement in this Court's order for the Plaintiffs to get this information from other sources first."  Doc. 72, at 7.  These statements are equally true today.

Finally, the Government may argue that White House officials are "high-level" or "apex" officials who should not be subject to discovery requests because they are too busy and important conducting their official duties to deign to spend time participating in depositions.  This argument is meritless for the reasons discussed below.  Defendants were not too busy to spend a great deal

of time pressuring social-media platforms to violate Plaintiffs' First Amendment rights.  They should not be heard to complain that they are too busy to answer questions under oath about the egregious civil-rights violations they perpetrated.

### 2.    Defendants' objection to the depositions of "high-level" officials lacks merit.

Defendants have also objected to depositions of "high-level" officials.  They interpret "high-level" quite broadly, to include a wide swath of federal officials with unique first-hand knowledge of oral communications about censorship with social-media platforms.  Their objection has no merit.

Under the apex doctrine recognized by many courts, a "party attempting to depose a high-ranking government official must demonstrate 'extraordinary circumstances' requiring such a deposition."  *United States v. Newman*, 531 F. Supp. 3d 181, 188 (D.D.C. 2021) (Leon, J.); *see also, e.g., In Re Bryant*, 745 F. App'x 215, 220 (5th Cir. 2018) (holding that a request for deposition of a high-level government official should consider (1) "the high-ranking status of the deponents," (2) "the potential burden that the depositions would impose upon them," and (3) "the substantive reasons for taking the depositions").  There is a presumption that ""high ranking government officials are generally not subject to depositions unless they have some personal knowledge about the matter and the party seeking the deposition makes a showing that the information cannot be obtained elsewhere."  *Newman*, 531 F. Supp. 3d at 188.  Courts have held that the apex doctrine applies, at least in some form, to former officials.  *Fed. Deposit Ins. Corp. v. Galan-Alvarez*, No. 1:15-MC-00752, 2015 WL 5602342, at *4 (D.D.C. Sept. 4, 2015).  For former officials, the two rationales supporting the apex doctrine are: (1) "[t]he need to protect the integrity of the underlying decision-making process," and (2) to "encourage public service by protecting officials from 'indiscriminate depositions[.]'"  *Newman*, 531 F. Supp. 3d at 188.

As an initial matter, the apex doctrine simply does not apply here because all Plaintiffs'
proposed witnesses satisfy the second prong of the doctrine: "they have some personal knowledge
about the matter and the party seeking the deposition makes a showing that the information cannot
be obtained elsewhere." *Newman*, 531 F. Supp. 3d at 188.  Here, as discussed in detail above for
each proposed witness, every such federal official has "personal knowledge about the matter" and
"the information cannot be obtained elsewhere." *Id.*  Indeed, in every case, critical information is
at stake, and depositions provide "the only chance Plaintiffs will have to get this information prior
to addressing the preliminary injunction." Doc. 72, at 7.  Accordingly, even if these officials were
"high-level," which most are not, their depositions would still be warranted. *See, e.g., Church of
Scientology of Boston v. I.R.S.*, 138 F.R.D. 9, 12 (D. Mass. 1990) ("An exception to this general
rule [against depositions of high-ranking government officers] exists concerning top officials who
have direct personal factual information pertaining to material issues in an action ... [and] where
the information to be gained ... is not available through any other source."); *Payne v. District of
Columbia*, 279 F.R.D. 1, 7-8 (D.D.C. 2011) (ordering depositions of mayor and city council
members due to their participation in conversations pertinent to allegations); *Byrd v. District of
Columbia*, 259 F.R.D. 1, 8 (D.D.C. 2009) (ordering depositions of government officials, even if
high-ranking, because of their personal knowledge of facts of the case).  As the Fifth Circuit stated
in *Bryant*, "the substantive reasons for taking the depositions" is a key factor.  745 F. App'x at
220.  Here, those "substantive reasons" include that the information is not available from any other
source—which is the quintessential justification for seeking a "high-level" deposition.

In any event, the only witness sought by Plaintiffs who is arguably "high-level" under the
apex doctrine is Jen Psaki, the former White House Press Secretary, who is no longer a federal
official.  The President, Vice President, Cabinet Secretaries, and U.S. Senators would typically

qualify as high ranking officials.  *Newman*, 531 F. Supp. 3d at 188–189 (collecting cases).  The principal case providing protection to Assistants to the President noted that the individuals had the "most senior rank within the White House," second only to the Chief of Staff.  *Alexander v. FBI*, 186 F.R.D. 1, 3 (D.D.C. 1998).  Again, the case hinged on the "substantial likelihood that depositions would significantly interfere with their ability to perform their governmental duties."  *Id.* at 4.  Even assuming that the Fifth Circuit would agree with the D.C. Circuit, the requested deposition of Ms. Psaki does not conflict with the apex doctrine, to the extent it applies.

Here, Ms. Psaki was the White House Press Secretary at the time key White House announcements were made about efforts to require social media companies to censor private speech.  The Press Secretary is an Assistant to the President and would be considered a high-ranking official under D.D.C.'s case law.  *Alexander*, 186 F.R.D. at 1.  But, even under the DC Circuit's test, she has unique knowledge that cannot be obtained elsewhere.  And as a former official, the only rationale that applies is whether a deposition would discourage others from taking the position—it would not.

Defendants freely admit that they "have produced thousands of records of [] communications by officials throughout the government," Doc. 71, at 54, but no communications from the Press Secretary's Office.  Although the Amended Responses to the Interrogatories state that documents were collected from Ms. Psaki, Ms. Jean-Pierre, and Mt. Munoz, no document produced to date includes anyone Plaintiffs have identified as anyone associated with the Press Secretary's Office.  It is undisputed that then-White House Press Secretary Psaki's statements show not that she communicated with social media companies, but "that others did."  Doc. 71, at 54.  Yet when asked to identify "members of our senior staff" and "members of our COVID-19 team" that interacted with social media platforms (statements made during White House Press

Briefings), the White House Press Secretary's Office claims it does not understand the question because "it relies on a characterization of a statement made by an individual no longer in government, and the statement does not specify the individuals at issue or the specific communications referenced." Ex. 3, at 74.  But that is the whole point—to name the individuals at issue.  Instead of answering Plaintiff's question in a direct and simple way, the White House Press Secretary's Office chose to provide transcripts of what reporters asked the office.  Moreover, Defendants have objected to the "characterization" of Ms. Psaki's statements and refuses to speculate on what she meant when she made those statements.  It is clear that the best, and likely only, source of the information requested is Ms. Psaki.

A deposition could not interfere with a high ranking officials day-to-day duties, because Ms. Psaki is a former employee.  Deposing the former Press Secretary is not interfering with the decision making process.  Ms. Psaki was not a decision-maker on these issues.  Ms. Psaki announced the actions of the decision-makers from the White House Press Room, and as the responses by the Press Secretary's Office show, no employee of the Office communicated with social media companies to engage in content modulation. Ex. 3, at 79–84 (the Office "is unaware of any such communications between employees of the Office and any social media platform that discuss this topic.").  Asking her to explain her statements, identify the senior members of the team and COVID-19 team, and identify any other White House contacts with social media platforms is a minimal burden.

The other witnesses simply do not qualify as "high-ranking" under relevant case law.  For example, Mr. Flaherty is not a high ranking official.  He is the Director of Digital Operations, a relatively new position, and holds the title Deputy Assistant to the President.  He reports to the Director of Communications, who is an Assistant to the President. *Alexander*, 186 F.R.D. 1.  Even

if considered a high ranking official, he has unique personal knowledge of the White House's efforts to suppress private speech that disagreed with the FDA and HHS's conduct in vaccine roll outs.   The White House Press Secretary's Office has named him as the only remaining team member that has personal knowledge of the White House's efforts.  Ex. 3, at 79–84.  And as the White House Press Secretary's Office otherwise claims ignorance.

Likewise, Jen Easterly is not a high-ranking official, and she bears no resemblance to high-ranking officials like the President or Cabinet-level Secretary Mayorkas.  Easterly is the Director of the Cyber Infrastructure and Security Agency within the Department of Homeland Security, and that is not a high ranking position that deserves special protection.  It is not a Cabinet level position, nor is it within the Office of the DHS Secretary.  *See* Department of Homeland Security, Organization, Office of the Secretary (visited Oct. 14, 2022), *at* https://www.dhs.gov/office-secretary.   Instead she is one of *twenty-seven* comparable officials that report to Secretary Mayorkas.  Department of Homeland Security, Organization, Organizational Chart (visited Oct. 14, 2022), *at* https://www.dhs.gov/sites/default/files/publications/21_0402_dhs-organizational-chart.pdf.   Thus, Easterly is classic middle-level management.  She is not in a Cabinet-level position, does not report to the President like Assistants to the President do, and is one of many of Secretary Mayorkas's coequal subordinates.

A similar analysis, moreover, applies to Plaintiffs' other proposed witnesses discussed above—including Dr. Fauci.  Indeed, Dr. Fauci occupies a lower rung on the federal hierarchy than Director Easterly.  While Easterly leads one of 27 components that report to the Secretary of DHS, Fauci leads one of 27 components that report to the Director of NIH, and the Director of NIH leads one of eleven components that report to the Office of the Secretary of HHS.  *See* https://www.hhs.gov/about/agencies/orgchart/index.html (NIH is one of eleven agencies that

report to the Operating Division of HHS that reports to the Chief of Staff and Secretary Becerra); https://www.niaid.nih.gov/research/role#:~:text=For%20more%20than%2060%20years,Institute s%20of%20Health%20(NIH) ("NIAID is one of the 27 Institutes and Centers of the National Institutes of Health (NIH)").

The same analysis applies to Surgeon General Murthy.  The Surgeon General is not a Cabinet-level position.  Rather, the Office of Surgeon General is housed within the Office of the Assistant Secretary for Health (OASH) within the Department of Health and Human Services. According to its website, the Office of Surgeon General is one of many components within that office: "OASH oversees the Department's key public health offices and programs, a number of Presidential and Secretarial advisory committees, 10 regional health offices across the nation, and the Office of the Surgeon General and the U.S. Public Health Service Commissioned Corps." https://www.hhs.gov/ash/index.html.  The Surgeon General, therefore, is at most comparable to Dr. Fauci in his federal rank, and multiple levels below the Cabinet-level Secretary of HHS.  He is not a "high-ranking" official immune from deposition.

Thus, neither Dr. Fauci, nor Director Easterly, nor Dr. Murthy, nor any other witness is "high-ranking" enough to warrant protection from deposition, and all of them are in unique possession of information that Plaintiffs cannot obtain from any other source at this stage in any event.  The Government's reliance on this objection fails.

## CONCLUSION

For all these reasons, Plaintiffs respectfully request that the Court order that Plaintiffs may take the depositions of the ten witnesses identified herein with 30 days of the Court's ruling on this Joint Statement.

## DEFENDANTS' STATEMENT ON DEPOSITIONS

### INTRODUCTION

A Court may consider evidence outside the administrative record in connection with a request for a preliminary injunction against the Government only in "unusual circumstances." ECF No. 34 at 11. A party may take discovery in order to adduce evidence for a preliminary injunction only with additional "good cause." *Id.*

In this case, despite the usual standards, the Court authorized Plaintiffs to conduct limited discovery in support of their motion for preliminary injunctive relief. *See id.* The Court's authorization was specifically limited to written discovery, while deferring the question of depositions to a later date. *Id.* at 12. Despite the Court's understanding that Plaintiffs would seek only "targeted" written discovery, Plaintiffs served dozens of document requests and over 100 interrogatories, requiring Defendants to produce more than 15,000 pages of documents, as well as interrogatory responses and objections totaling nearly 100 pages, in a compressed timeframe.

Plaintiffs now ask the Court to authorize even more, and inherently more burdensome, discovery. They seek to take depositions. And their proposal for depositions is not "targeted." Even though a party is typically entitled to take no more than 10 depositions during *regular* discovery, Plaintiffs assert that they are entitled to take at least that many during this extraordinary course of *expedited* discovery.

Plaintiffs seek depositions of officials added to the case through the recently-filed Second Amended Complaint, even though the Court already rejected their requests to seek discovery from newly added parties. ECF No. 72 at 3-4. Plaintiffs also seek depositions of high-ranking Government officials without showing exceptional circumstances warranting their depositions. And they seek depositions of nonparty former Government officials. The burdens of coordinating and preparing such high-ranking officials and former officials, subject to subpoena, to provide

testimony are self-evident. But Plaintiffs have not justified their broad requests and the attendant burdens with any showing of genuine necessity. The Court has made clear that expedited discovery cannot be for purposes of a "fishing expedition." *Id.* at 12. So Plaintiffs must identify, for any and each would-be deponent, what critical testimony they must have at this juncture in the litigation. They cannot make that showing.

## BACKGROUND

On July 12, 2022, this Court authorized interrogatories and document requests that were "targeted to the specific allegations of Plaintiff States' Complaint." ECF No. 34 at 12. Because Plaintiffs did not seek depositions at that time, the Court stated that "[w]hether depositions will be taken will be addressed later." *Id.* The Court's expedited discovery order directed Plaintiffs to notify Defendants of any depositions they wished to take within 10 days receiving Defendants' written discovery responses. *Id.* at 14. The Court further provided that any depositions ultimately authorized must be completed within a period of 30 days. *Id.*

On October 7, Plaintiffs notified Defendants that they wished to take depositions of the following 20 current or formal Government officials:

1. **Anthony Fauci**, Director of NIAID and Chief Medical Advisor to the President of the United States
2. **Vivek Murthy**, Surgeon General of the United States
3. **Eric Waldo**, Senior Advisor and formerly Chief Engagement Officer at the Office of the Surgeon General (OSG)
4. **Max Lesko**, Chief of Staff at OSG
5. **Jay Dempsey**, Social Media Team Lead, Digital Media Branch, Division of Public Affairs at the Center for Disease Control and Prevention (CDC)
6. **Carol Crawford**, Chief of the Digital Media Branch of the Division of Public Affairs at the CDC
7. **Robert Silvers**, Undersecretary of Homeland Security for the Office of Strategy, Policy, and Plans, Department of Homeland Security (DHS)
8. **Jen Easterly**, Director of Cybersecurity and Infrastructure Security Agency (CISA)
9. **Matthew Masterson**, former Senior Cybersecurity Advisory, CISA
10. **Lauren Protentis**, member of Mis-, Dis, and Mal-information Team, CISA
11. **Nina Jankowicz**, former Executive Director of Disinformation Governance Board, DHS

41

12. **Jennifer Psaki**, former White House Press Secretary
13. **Robert Flaherty**, Deputy Assistant to the President and Director of Digital Strategy at the White House
14. **Andrew Slavitt**, former White House Senior Advisor for COVID-19 Response
15. **Jennifer Shopkorn**, Strategy Director, Communications Directorate at the Census Bureau
16. **Zachary Henry Schwartz**, Serving temporarily as Senior Advisor to the Chief of Staff to the Secretary of Commerce
17. **Samaruddin K. Stewart**, former Senior Technical Advisor and/or Senior Advisor for the Global Engagement Center of the United States Department of State
18. **Daniel Kimmage**, Acting Coordinator for the Global Engagement Center at the United States Department of State
19. **Laura Dehmlow**, Section Chief for the Federal Bureau of Investigations (FBI) Foreign Influence Task Force
20. **Elvis Chan**, Assistant Special Agent in Charge of the FBI San Francisco Division's Cyber Branch

The parties have met and conferred over Plaintiffs' proposed list of depositions but have been unable to reach agreement. During the parties' meet and confer discussions, Plaintiffs represented that they intended to reduce this list to around 10 deponents, but they have not actually identified whose deposition they would *not* seek. Not knowing that crucial information, Defendants have drafted their portion of the Joint Statement on the assumption that Plaintiffs will ask the Court to authorize depositions of any and all of the deponents included in their initial list.

## ARGUMENT

**I.      Plaintiffs Have Not Met The Heavy Burden To Demonstrate That Any Depositions Are Warranted At This Stage.**

As with any expedited discovery, Plaintiffs bear a heavy burden to demonstrate a need for depositions. "[E]xpedited discovery is not the norm . . . and courts only allow it in limited circumstances." *Wilson v. Samson Contour Energy E & P, LLC*, No. CIV.A. 14-0109, 2014 WL 2949457, at *3 (W.D. La. June 30, 2014). "The party seeking expedited discovery has the burden of establishing" that "the scope of the requests" is "narrowly tailored to the necessary information they seek." *GHX Indus. LLC v. Servco Hose & Supply LLC*, No. 6:19-CV-01552, 2020 WL

1492920, at *2 (W.D. La. Feb. 5, 2020). In determining whether expedited discovery is proper, the Court must also consider the "burden on the defendants to comply with the requests." *Id.* at *1.

Plaintiffs have not met the heavy burden to establish that any deposition testimony is necessary in support of a motion for emergency relief. *See* ECF No. 72 at 4 (emphasizing this expedited discovery process is "for the purpose of gaining the necessary information to address the preliminary injunction"). Although a plaintiff is rarely entitled to expedited discovery, Plaintiffs here have received a substantial amount. Defendants produced more than 15,000 pages of non-privileged responsive e-mails, and they answered numerous interrogatories. Plaintiffs cannot demonstrate that still more discovery—particularly burdensome depositions—is warranted at this stage of the case. *See* ECF No. 34. Through Defendants' responses to-date, Plaintiffs have received precisely what they were after through expedited discovery: information about the identifies of officials communicating with social media platforms as well as the nature and content of those communications. Depositions would not further illuminate the "nature and content" of the very external communications produced by those within the scope of this Court's discovery order, which Plaintiffs now have in their possession. Instead, depositions would almost certainly target *internal* communications and deliberations—in other words, purely privileged matters. *See Skelton v. U.S. Postal Serv.*, 678 F.2d 35, 38 (5th Cir. 1982); *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004).

Moreover, and given the extensive amount of information already produced through written discovery, expedited deposition testimony would be burdensome, unreasonably duplicative, and cumulative. The Court has emphasized the "burden" "the expedited discovery schedule" "has put on all parties in this proceeding." ECF No. 72 at 4. The Government has already spent considerable time and resources in addressing written discovery during this expedited

process. The inherently time-consuming process required of depositions would only magnify these burdens. *See Kinetic Concepts, Inc. v. Wake Forest Univ. Health Scis.*, No. SA-11-CV-163-XR, 2014 WL 1787813, at *2 (W.D. Tex. May 5, 2014) ("Unlike" with the "produc[tion]" of a person's "emails," requiring that person to "appear[] for a deposition . . . will . . . involve his own time and will therefore . . . impose a personal burden").

Additionally, even if any deposition testimony were warranted, Plaintiffs have not tailored their requests to genuine needs. Instead, they seek a maximum amount of relief. Indeed, Plaintiffs' initial proposal of 20 depositions not only doubles Rule 30's presumptive limit of 10 depositions for the entire duration of a case; it would result in one deposition on average every business day during the four-week period allotted for any depositions. Plaintiffs' later-expressed intention to pare the list down to around 10, a number that equals the presumptive limit, further underscores the maximalist, rather than targeted, nature of Plaintiffs' requests. And many of the requested depositions involve individuals within the same chain of command, such that the contemplated testimony would be unreasonably cumulative and duplicative.

Plaintiffs fail to show any particularized need for depositions to resolve their preliminary injunction motion, which has been pending for four months. The Court should deny their requests for burdensome and broad-ranging depositions.

## II.    The Proposed Depositions Present Additional Legal And Practical Issues Particular To The Current Officials And Non-Party Former Officials At Issue.

Plaintiffs' proposed depositions present a host of particularized legal and practical problems, which also warrant denial of Plaintiffs' requests. First, many of the depositions that Plaintiffs seek ignore this Court's previous ruling limiting the scope of discovery to the original Complaint on which the preliminary injunction motion is based. *See* ECF No. 34 at 12 (authorizing discovery "targeted to the specific allegations of Plaintiff States' Complaint"). First, Plaintiffs'

deposition list includes officials outside the contours of the original Complaint, including White House officials outside of the White House Office of the Press Secretary, FBI officials, State Department officials, and Census officials. Second, Plaintiffs ignore the high standard for deposing high-level officials. Plaintiffs seek depositions of many high-ranking officials—including Dr. Anthony Fauci, Vivek Murthy, Robert Silvers, Jen Easterly, and Jennifer Psaki, as well as other White House officials—without making any plausible showing that "exceptional circumstances" exist to warrant seeking their depositions. Third, Plaintiffs seek to depose several former officials—Nina Jankowicz, Jennifer Psaki, and Matthew Masterson, and others—who are protected by various procedural requirements in Rule 45 of the Federal Rules of Civil Procedure, which make it infeasible to complete depositions of those officials within 30 days. And as a practical matter, Plaintiffs seek to depose Lauren Protentis, who is on maternity leave.

The breadth of Plaintiffs' requests demonstrates that they are unnecessary and should not be authorized. But if the Court allows any depositions to go forward, it should disallow depositions in the following three categories: (a) those beyond the contours of the original Complaint and expedited discovery requests Plaintiffs served; (b) high-ranking Government officials; and (c) non-party former officials covered by Rule 45.

### A. Plaintiffs' Request To Depose Defendants Not Named In Their Original Complaint Or Subject To Their Written Discovery Requests Goes Beyond The Bounds Of Court-Authorized Expedited Discovery.

Plaintiffs seek depositions of several officials from agencies or entities that were not named in the original Complaint or served with written discovery. But this Court has already rejected Plaintiffs' requests to serve written discovery on these very officials, *see* ECF No. 71 at 24-25, and Plaintiffs' requests to take their depositions fly in the face of the Court's prior order, ECF No. 72 at 3-4. Accordingly, the Court should deny Plaintiffs' request to depose the following officials at

agencies and entities who Plaintiffs did not name in the original Complaint or serve with written

discovery requests:

1. **Robert Flaherty**, Deputy Assistant to the President and Director of Digital Strategy at the White House
2. **Andrew Slavitt**, former White House Senior Advisor for COVID-19 Response
3. **Jennifer Shopkorn**, Strategy Director, Communications Directorate at the Census Bureau
4. **Zachary Henry Schwartz**, serving temporarily as Senior Advisor to the Chief of Staff to the Secretary of Commerce
5. **Samaruddin K. Stewart**, former Senior Technical Advisor and/or Senior Advisor for the Global Engagement Center of the United States Department of State
6. **Daniel Kimmage**, Acting Coordinator for the Global Engagement Center at the United States Department of State
7. **Laura Dehmlow**, Section Chief for the FBI's Foreign Influence Task Force
8. **Elvis Chan**, Assistant Special Agent in Charge of the FBI San Francisco Division's Cyber Branch

As background, in the parties' Joint Statement concerning written discovery, Plaintiffs

asserted that, despite their earlier representations that they sought narrow and targeted discovery,

the Court should authorize expansive discovery into the activities of "newly identified federal

officials" not named in the original Complaint and thus not yet served with discovery requests. *See*

ECF No. 71 at 2, 24-25. Plaintiffs sought in particular to serve discovery on "senior White House

officials and officials at the State Department, the [U.S. Food and Drug Administration (FDA)],

the Census Bureau, the U.S. Election Assistance Commission, . . . the Treasury Department," and

"the FBI." *Id.* at 24. Plaintiffs identified some of the new White House officials by name, including

"Rob Flaherty, Andrew Slavitt, Clarke Humphrey, Courtney Rowe."[2] Plaintiffs acknowledged that

these White House officials and officials at the various agencies or entities were not named in their

original Complaint or the subject of the discovery requests they had served. ECF No. 71 at 20-21,

---

[2] In the original Complaint, Plaintiffs named the White House Press Secretary in addition to naming President Biden separately. The White House Press Secretary was the subject of the original written discovery, but neither Flaherty nor Slavitt, who Plaintiffs now wish to depose, are or were in the White House Office of the Press Secretary.

24-25. They proposed to remedy that defect by seeking to file a Second Amended Complaint and immediately serving new discovery requests. *Id.*

The Court rejected that proposal, concluding that serving discovery on these newly identified officials was not "necessary" for Plaintiffs to obtain "information to address the preliminary injunction" motion. ECF No. 72 at 4. Indeed, the Court has only authorized expedited discovery in the first instance to the extent that it is "targeted to the specific allegations of [the] Complaint" on which the preliminary injunction motion is based. ECF No. 34 at 12. Reiterating that "[e]xpedited discovery is not the norm," that it must be "targeted" and "narrow," and that it must not unduly burden Defendants, the Court thus held that permitting Plaintiffs to serve discovery on these newly identified officials "would be too much." ECF No. 72 at 3-4. Thus, although Plaintiffs would be permitted to file a Second Amended Complaint, and obtain information from newly identified defendants through "any potential merit-related discovery," these officials were not properly subjected to any "additional expedited preliminary-injunction discovery." *Id.* at 4.

Ignoring the Court's September 6 order, Plaintiffs now try again. One day after filing their Second Amended Complaint, they sent the Government a list of 20 officials whose depositions they sought, including *8 officials* who were not identified in the original Complaint. With the exception of one of those officials (a Census employee, who was only added to the case through the First Amended Complaint, and not the original Complaint), all of them were added to the case for the first time to the *Second Amended Complaint*. Plaintiffs apparently seek these officials' depositions on the same theory that the Court rejected when denying additional written discovery: that these officials were identified in documents produced by Defendants or by third-party social-media platforms in response to subpoenas. That does not suffice. Plaintiffs must show that the

depositions are "necessary" for resolving their preliminary injunction motion. ECF No. 72 at 4; *see also BKGTH*, 2013 WL 5507297, at *5. The Court already found that written discovery on these officials was not necessary for that purpose. ECF No. 72 at 4. Similarly, it is unnecessary to subject these individuals to deposition to resolve Plaintiffs' preliminary injunction motion.

Compounding the error, Plaintiffs seek to subject these officials to discovery, for the first time, through a deposition—a means inherently more onerous than the written discovery they previously sought. *See Kinetic Concepts*, 2014 WL 1787813, at *2. Again, Plaintiffs have not served written discovery requests on *any* of these 8 defendants who were not identified in the original Complaint, and the Court has already properly rejected Plaintiffs' belated attempts to serve discovery on these officials. The Court should likewise deny Plaintiffs' request to subject these individuals to depositions.

### B. Plaintiffs Cannot Demonstrate The "Exceptional Circumstances" Meriting The Depositions Of "Highly-Ranked Government Officials."

Plaintiffs seek the depositions of several high-ranking officials from the White House, HHS, and DHS. The depositions are improper for multiple reasons. As discussed elsewhere in this statement, the White House officials Plaintiffs seek to depose either are outside the original scope of discovery (Robert Flaherty and Andrew Slavitt), are former officials protected by Rule 45 (Jennifer Psaki and Andrew Slavitt), or both (Andrew Slavitt). Even setting those issues aside, Plaintiffs cannot justify deposing these high-ranking officials. In addition to seeking depositions of high-ranking White House officials, Plaintiffs also seek the depositions of other high-ranking officials across the federal Government, specifically:

1. **Jennifer Psaki**, former White House Press Secretary
2. **Robert Flaherty**, Deputy Assistant to the President and Director of Digital Strategy at the White House
3. **Andrew Slavitt**, former White House Senior Advisor for COVID-19 Response
4. **Vivek Murthy**, Surgeon General of the United States

5. **Anthony Fauci**, Director of NIAID and Chief Medical Advisor to the President of the United States
6. **Jen Easterly**, Director of CISA
7. **Robert Silvers**, Undersecretary of Homeland Security for the Office of Strategy, Policy, and Plans, DHS

As described below, Plaintiffs have not satisfied their high burden for such depositions.

Any such depositions are particularly unjustified at this time when there are alternative sources of information available to inform Plaintiffs' motion for preliminary injunction.

### 1. Plaintiffs Must Satisfy A High Bar For Deposing High-Ranking Government Officials.

The Fifth Circuit agrees with other circuits that "top executive department officials should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions." *In re Office of Inspector Gen.*, *R. R. Ret. Bd.*, 933 F.2d 276, 278 (5th Cir. 1991) (quoting *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985) (citing *United States v. Morgan*, 313 U.S. 409, 422 (1941) (*Morgan II*)), and directing district court to "remain mindful of the requirement that exceptional circumstances must exist before the involuntary depositions of high agency officials are permitted"). As the Supreme Court and lower courts applying *Morgan II* and its predecessor, *Morgan v. United States*, 304 U.S. 1 (1938) (*Morgan I*), have emphasized, compelling the testimony of high-ranking government officials is justified only in "extraordinary instances." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977); *cf. In re Dep't of Com.*, 139 S. Ct. 16, 17 (2018) (mem.) (opinion of Gorsuch, J., joined by Thomas, J.) (agreeing with order staying deposition of Cabinet secretary but concluding that the Court should have gone further to limit depositions and other extra-record discovery because any "extraordinary claim of bad faith against a coordinate branch of government requires an extraordinary justification"). Thus, "[i]nvoluntary depositions of highly-ranked government officials are only allowed when 'exceptional circumstances . . . exist.'" *In re Bryant*,

745 F. App'x 215, 220 (5th Cir. 2018) (per curiam), as revised (Nov. 30, 2018) (unpublished) (quoting *In re F.D.I.C.*, 58 F.3d 1055, 1060 (5th Cir. 1995)).

Under that doctrine, the Fifth Circuit has repeatedly disapproved orders and subpoenas directed personally against high-ranking Government officials. *See, e.g.*, *F.D.I.C.*, 58 F.3d at 1060 (granting mandamus because "the magistrate judge clearly abused his discretion by declining to quash the deposition notices issued" to three FDIC Directors); *In re Stone*, 986 F.2d 898, 905 (5th Cir. 1993) (per curiam) (standing order compelling potentially high-ranking government representative with full settlement authority to attend settlement conference was abuse of discretion); *accord Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir. 2013); *In re United States (Jackson)*, 624 F.3d 1368, 1376 (11th Cir. 2010); *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007). Other circuits have issued writs of mandamus to prevent compulsion of testimony from high-level Government officials. *See In re McCarthy*, 636 F. App'x 142 (4th Cir. 2015) (EPA Administrator McCarthy); *In re United States (Jackson)*, 624 F.3d at 1372-73 (EPA Administrator Jackson); *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) (per curiam) (Vice President's Chief of Staff); *In re United States (Reno & Holder)*, 197 F.3d 310, 313-14 (8th Cir. 1999) (Attorney General and Deputy Attorney General); *In re United States (Kessler)*, 985 F.2d 510, 512-13 (11th Cir. 1993) (per curiam) (FDA Commissioner). Courts have reasoned that high-ranking officials well beneath the Cabinet rank also warrant protection from depositions. *See, e.g.*, *United States v. Sensient Colors, Inc.*, 649 F. Supp. 2d 309, 321 (D.N.J. 2009) (EPA Regional Administrator for Region 2, who "reports directly to the EPA Administrator, who in turn reports directly to the President of the United States"); *Church of Scientology of Boston v. IRS*, 138 F.R.D. 9, 12 (D. Mass. 1990) (director of Exempt Organizations Technical Division, National Office of the Internal Revenue Service).

The strict limitation on the compelled testimony of high-ranking officials is necessary for two reasons. *First*, such orders raise significant "separation of powers concerns." *In re United States (Jackson)*, 624 F.3d at 1372; *see Arlington Heights*, 429 U.S. at 268 & n.18; *see also In re Dep't of Com.*, 139 S. Ct. at 17 (opinion of Gorsuch, J.). As *Morgan II* emphasized, administrative decisionmaking and judicial processes are "collaborative instrumentalities of justice and the appropriate independence of each should be respected by the other." 313 U.S. at 422. "Just as a judge cannot be subjected to such a scrutiny, so the integrity of the administrative process must be equally respected." *Id*. (citation omitted). *Second*, as a practical matter, requiring high-ranking officials to appear for depositions also threatens to "disrupt the functioning of the Executive Branch." *Cheney*, 542 U.S. at 386. "[H]igh ranking government officials have greater duties and time constraints than other witnesses." *See FDIC*, 58 F.3d at 1060 (quoting *In re United States*, 985 F.2d at 512). As a result, "[i]f courts did not limit the[] depositions [of high-ranking officials], such officials would spend 'an inordinate amount of time tending to pending litigation.'" *Lederman*, 731 F.3d at 203 (citation omitted). The threat to inter-branch comity is particularly acute where the deposition is sought expressly to test the high-ranking official's credibility or to probe deliberations with other Executive Branch officials. *See FDIC*, 58 F.3d at 1060 (citing *In re United States*, 985 F.2d at 512). Moreover, "high level executives and government officials need some measure of protection from the courts because they are 'vulnerable to numerous, repetitive, harassing, and abusive depositions." *Asberry v. Sch. Bd. of Pasco Cnty., Fla.*, No. 18-cv-02222, 2019 WL 12383128, at *1 (M.D. Fla. Aug. 20, 2019).

In *Bryant*, the Fifth Circuit noted that a lower court had "recognized," as a preliminary requirement for an "exceptional circumstances" analysis, that the proponent of the deposition must show "that the official has first-hand knowledge related to the claims being litigated that is

unobtainable from other sources." 745 F. App'x at 218 n.2; see *Freedom From Religion Found., Inc. v. Abbott*, No. 16-cv-233, 2017 WL 4582804 at *11 (W.D. Tex. Oct. 13, 2017) (citing *Bogan*, 489 F.3d at 423, which observed that "depositions of high ranking officials may be permitted where the official has first-hand knowledge related to the claim being litigated"). "Agency leaders often send and receive correspondence relative to their actions," but that alone cannot suffice to warrant depositions. *FDIC*, 58 F.3d at 1061. Once the "first-hand knowledge" threshold is crossed, "[i]n determining whether exceptional circumstances exist" to warrant such an extraordinary deposition, a court "must consider (1) 'the high-ranking status of the deponents,' (2) 'the potential burden that the depositions would impose upon them,' and (3) 'the substantive reasons for taking the depositions.'" *Bryant*, 745 F. App'x at 220 (quoting *F.D.I.C.*, 58 F.3d at 1060). "As an overarching consideration, the court must also consider that 'it will be the rarest of cases . . . in which exceptional circumstances can be shown where the testimony is available from an alternate witness.'" *Id.* (quoting *F.D.I.C.*, 58 F.3d at 1062).

The *Bryant* court held that it was premature to issue a writ of mandamus prohibiting the deposition of the chief of staff of a state governor until the magistrate judge "adequately address[ed]" "several important aspects" of the *F.D.I.C.* analysis, including, as relevant here, (a) "whether the information desired can be sought from alternative witnesses or must exclusively come from the" proposed deponent; (b) "whether the information desired can be obtained in another form," *id.*, where it was "likely that written answers to questions, given under oath, would be sufficient," *id.* at 222; and (c) "if it cannot be obtained in another form, whether the scope of the inquiry can be more closely tailored to target only the specific questions raised" at a Rule 30(b)(6) deposition previously taken, *id.* at 220.

Finally, the general rule against depositions of high-ranking officials is "no less applicable to former officials than to current officials[,]" so that "the integrity of the administrative process" continues to be "respected[,]" and so as not to discourage individuals from accepting public service. *See F.D.I.C. v. Galan-Alvarez*, No. 15-mc-752, 2015 WL 5602342 at *4 (D.D.C. Sept. 4, 2015) (quashing subpoena seeking testimony from the former chairperson of the FDIC); *see also In re United States (Bernanke)*, 542 F. App'x 944, 949 (Fed. Cir. 2013) ("[T]he process-inquiry rationale [for prohibiting depositions of high-ranking officials except under exceptional circumstances] hardly becomes inapplicable upon an official's departure from his office[.]"), *accord In re U.S. Dep't of Educ.*, 25 F.4th 692, 705 (9th Cir. 2022). Further, "[s]ubjecting former officials['] decision-making processes to judicial scrutiny and the possibility of continued participation in lawsuits years after leaving public office would serve as a significant deterrent to qualified candidates for public service." *United States v. Wal-Mart Stores, Inc.*, No. 01-cv-152, 2002 WL 562301 at *3 (D. Md. Mar. 29, 2002); *see also Sensient Colors*, 649 F. Supp. 2d at 318; *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1049-50 (E.D. Cal. 2010) (noting the general rule prohibiting depositions of high- ranking government officials applies to former high-ranking officials).

### 2. Plaintiffs Cannot Satisfy The *Morgan* Factors In Their Request For Authorization To Depose Senior White House Officials.

Plaintiffs' request to depose senior White House officials—Jennifer Psaki, Robert Flaherty, and Andrew Slavitt—should be denied. The *Morgan* factors are not met here for any of the three.

All three senior White House officials should be considered high-ranking under *Morgan*. Psaki served as an Assistant to the President and White House Press Secretary prior to leaving government. *See Alexander v. F.B.I.*, 186 F.R.D. 1, 3 (D.D.C. 1998) (finding that the White House Press Secretary, among others, is considered a high-ranking official). Meanwhile, Flaherty is

currently a Deputy Assistant to the President and Director of Digital Strategy at the White House. And, Slavitt was a White House Senior Advisor for COVID-19 Response. *See, e.g., In re United States (Bernanke)*, 542 F. App'x at 949 ("[T]he process-inquiry rationale [for prohibiting depositions of high-ranking officials except under exceptional circumstances] hardly becomes inapplicable upon an official's departure from his office[.]").

Plaintiffs have certainly not shown "exceptional circumstances" to warrant any of their depositions. For Psaki, given that Defendants amended their discovery responses by conducting a reasonable search of Psaki's emails and did not find responsive documents, Plaintiffs cannot demonstrate such a particularized personal knowledge, or that information is not available elsewhere, to warrant burdening a senior advisor to the President. *See generally Bryant*, 745 F. App'x at 220-22. For both Flaherty and Slavitt, Plaintiffs have not exhausted less intrusive means before seeking to impose the burdens and obligations of deposition; neither were previously properly subject to written discovery. *See Bryant*, 745 F. App'x at 222 (emphasizing that high-level depositions do not meet exceptional circumstances if the information could be obtained in a different form).[3] Further, Plaintiffs have alternative sources of information concerning any communications with social media companies, such as from social media companies themselves. *See id*.

Thus, Plaintiffs cannot make the requisite showing under *Morgan* to justify taking the depositions of these high-ranking White House officials. Regardless, Plaintiffs' request to depose these individuals should still be denied given the other deficiencies discussed in this statement. In

---

[3] Although Defendants would have objected to such written discovery in light of the burden imposed on the White House, the point for present purposes is that Plaintiffs first must exhaust alternative forms of discovery before proceeding to depose high-ranking officials. This issue has not been previously addressed as to Flaherty and Slavitt because they were not subject to the original discovery requests. And, just as they were outside the scope of the Court's July discovery order for purposes of written discovery, they should be considered outside the scope of the order for purposes of deposition.

particular, Flaherty and Slavitt are not named in the original Complaint, and the Court rejected Plaintiffs' requests to serve discovery on them. And neither Slavitt nor Psaki are in government service and are subject to the time-consuming procedures for subpoenas under Rule 45.

### 3. Plaintiffs Cannot Satisfy The *Morgan* Standard For High-Level HHS Officials: Dr. Vivek Murthy And Dr. Anthony Fauci.

Plaintiffs also seek depositions of two high-ranking HHS officials: Dr. Vivek Murthy and Dr. Anthony Fauci. There should be no dispute that each is considered high-ranking and subject to protection under *Morgan*. Dr. Vivek Murthy is the Senate-confirmed United States Surgeon General who is considered "the Nation's Doctor," and as Vice Admiral of the United States Public Health Service Commissioned Corps, Dr. Murthy commands a uniformed service of several thousand public health officers. *See* HHS, Leadership: Vice Admiral Vivek H. Murthy, M.D. MBA, hhs.gov/about/leadership/vivek-murthy.html (last accessed Oct. 14, 2022). Dr. Fauci has been the Director of the NIAID for nearly 40 years, advising seven Presidents, and is currently Chief Medical Advisor to President Biden. *See NIH*, About: Anthony S. Fauci, M.D., https://www.niaid.nih.gov/about/anthony-s-fauci-md-bio (last accessed Oct. 14, 2022). Plaintiffs cannot meet the heavy burden of demonstrating the exceptional circumstances necessary for taking either official's deposition.

Plaintiffs cannot demonstrate that Dr. Murthy has any specialized personal knowledge concerning their allegations to warrant a deposition. Further, Defendants have proposed adequate alternative witnesses in lieu of Dr. Murthy. *Bryant*, 745 F. App'x at 220. Defendants found, and produced, very little responsive material for Dr. Murthy in response to Plaintiffs' written discovery requests, notwithstanding that Dr. Murthy was a custodian whose emails were searched. Defendants did identify and produce one isolated text message involving Dr. Murthy, but the bare existence of an isolated mobile device text message exchange between Dr. Murthy and a platform

executive (contained in one screenshot produced) cannot suffice to warrant a deposition of Dr. Murthy. *See F.D.I.C.*, 58 F.3d at 1061 ("Agency leaders often send and receive correspondence relative to their actions," including actions potentially affecting private parties, but that "does not of itself subject them to the burdens of litigation discovery."). In contrast, Max Lesko and Eric Waldo are each sufficient alternative witnesses. Lesko is Dr. Murthy's chief of staff and was also a custodian whose emails were searched and included on communications. And Waldo attended the sole meeting Defendants identified in which Dr. Murthy attended, a 30-minute virtual meeting with social media companies. In short, the "information desired can be sought from alternative witnesses" and sources. *Bryant*, 745 F. App'x at 220-22.

Similarly, as with Dr. Murthy, Plaintiffs cannot demonstrate "exceptional circumstance" to warrant Dr. Fauci's deposition. As related to Plaintiffs' allegations, there is little (if anything) to be gained by a deposition of Dr. Fauci. Indeed, in Defendants' amended interrogatory responses, Defendants responded that "based on a reasonable inquiry," "including consultation with Dr. Fauci," "NIAID has not identified any communications, written or oral, between Dr. Fauci and Social-Media Platforms relating to Content Modulation and/or Misinformation." That should be the end of the inquiry, particularly for the current purposes of targeted, preliminary-injunction discovery. Again, Plaintiffs have not demonstrated that Dr. Fauci possesses any particularized personal knowledge related to the subject matter of their preliminary injunction motion. Under these circumstances, a deposition of Dr. Fauci would be an unjustified burden on his time and a distraction from his important public duties. *See Bryant*, 745 F. App'x at 220.

This Court should accordingly reject Plaintiffs' efforts to depose Dr. Murthy and Dr. Fauci, especially in the context of narrow expedited discovery solely to resolve the motion for a preliminary injunction.

### 4. Plaintiffs Cannot Satisfy The *Morgan* Standard For High-Level DHS Officials Jen Easterly And Robert Silvers.

There should also be no dispute that Director Jen Easterly and Undersecretary Silvers are high-ranking government officials. Director Easterly, confirmed by the United States Senate, is the head of a federal agency and reports directly to the Secretary and Deputy Secretary of Homeland Security. *See* https://www.dhs.gov/sites/default/files/publications/21_0402_dhs-organizational-chart.pdf (last accessed October 14, 2022). In her role as Director of the CISA, Director Easterly "leads CISA's efforts to understand, manage, and reduce risk to the cyber and physical infrastructure Americans rely on every day." *See* CISA, Leadership: Jen Easterly, https://www.cisa.gov/jen-easterly (last accessed October 14, 2022). Undersecretary Silvers, also confirmed by the United States Senate, reports directly to the Secretary and Deputy Secretary of Homeland Security (DHS), DHS Organizational Chart, https://www.dhs.gov/sites/default/files/publications/21_0402_dhs-organizational-chart.pdf (last accessed October 14, 2022), and "is responsible for driving policy and implementation plans across all of DHS's missions, including counterterrorism; cybersecurity, infrastructure security, and resilience; border security and immigration; international affairs; and trade and economic security," DHS, Leadership: Robert Silvers, https://www.dhs.gov/person/robert-silvers (last accessed Oct. 14, 2022). Plaintiffs cannot meet the heavy burden to take depositions of either Director Easterly or Undersecretary Silvers.

Again, Plaintiffs have not established sufficient "first-hand knowledge" on behalf of Director Easterly or Undersecretary Silvers to subject them to deposition absent "exceptional circumstances." Director Easterly, who oversees election security, did not even begin working at CISA until several months after the 2020 election, and thus does have the personal knowledge of the full scope of Plaintiffs' questions relating to CISA. *See Bryant*, 745 F. App'x at 218 n.2. Thus, as an alternative to Director Easterly, Defendants have offered Geoffrey Hale as a deponent. As

the Associate Director of Election Security and Resilience at CISA, Hale often reports to Director Easterly. And he was at the agency during the 2020 election. Further, based on a search of Defendants' productions, Hale appeared to be on substantially more email communications with social media companies than Director Easterly, notwithstanding that both were custodians whose emails were searched. Thus, Defendants have provided an adequate alternative witness that should be more than sufficient for current purposes. *Bryant*, 745 F. App'x at 222. And,  similar  to  Dr. Murthy, the bare existence of isolated mobile text messages exchanged between Director Easterly and employees of platforms (totaling three screen shots produced to Plaintiffs) cannot suffice to warrant a deposition of Director Easterly: Again, "[a]gency leaders often send and receive correspondence relative to their actions," including actions potentially affecting private parties, but that "does not of itself subject them to the burdens of litigation discovery." *F.D.I.C.*, 58 F.3d at 1061.

As for Undersecretary Silvers, Defendants produced only a handful of communications from him, even though he was also a custodian. And Defendants did not identify any responsive meetings attended by Silvers in their interrogatory responses. Accordingly, Plaintiffs cannot show that Silvers has such personalized knowledge to overcome the high bar for such a high-ranking deposition.

Thus, Plaintiffs cannot demonstrate "exceptional circumstances" for the depositions of either Director Easterly or Undersecretary Silvers.

### C. Plaintiffs' Request To Seek Depositions Of Non-Government Employees During The 30-Day Time Period Is Unreasonable And Should Not Be Authorized.

Plaintiffs also seek to depose five officials who are no longer government employees. They are:

1. **Matthew Masterson**, former Senior Cybersecurity Advisory, CISA
2. **Nina Jankowicz**, former Executive Director of Disinformation Governance Board, DHS
3. **Jennifer Psaki**, former White House Press Secretary
4. **Andrew Slavitt**, former White House Senior Advisor for COVID-19 Response
5. **Samaruddin K. Stewart**, former Senior Technical Advisor and/or Senior Advisor for the Global Engagement Center of the United States Department of State

The Court should not authorize Plaintiffs to seek depositions of any of these officials.

Depositions of these third-party, non-government officials would be governed by the time-consuming and complicated procedures required by Rule 45, which are incompatible with the 30-day time limit for depositions set by the expedited discovery schedule. There should be no dispute that any authorized depositions of former officials would be subject to the requirements of Rule 45. *Uebelacker v. Paula Allen Holdings, Inc.*, No. 06-C-316-C, 2006 WL 6021169, at *2 (W.D. Wis. Jan. 3, 2006) ("Because [individuals] no longer work for defendants, they are entitled to receive process under Rule 45."). None of these officials is a party to the case, and they do not become parties simply by virtue of Plaintiffs naming them in their Complaint (whether the original, the first amended, or the second amended). These officials—as with each of the federal officials—are sued in their *official* capacities on behalf of the offices they occupied. An official-capacity defendant who leaves office ceases to be a defendant in the case, and the official's successor in office is *automatically substituted* as a defendant in their place. *See* Fed. R. Civ. P. 25. Thus, although Plaintiffs name these individuals as defendants in the action, the suit lies against the *office* the individuals occupied in their official capacity, not against the defendants themselves in their personal capacity. And because they are non-parties to this action, Rule 45, rather than Rule 30, governs their depositions.

But Rule 45 depositions implicate a host of complications arising from the procedural protections the Rule affords non-parties. For one, before non-parties may be compelled to sit for depositions, they must be served with a subpoena. *See* Fed. R. Civ. P. 45(b) (requiring service of

the subpoena); *see also Weiss v. Allstate Ins. Co.*, 512 F. Supp. 2d 463, 466 (E.D. La. 2007) (citing *Harrison v. Prather*, 404 F.2d 267, 273 (5th Cir. 1968)); *see also Ellis v. La. ex rel. Governor's Off. of Homeland Sec. & Emergency Preparedness*, No. 13-cv-27, 2013 WL 6272294 at *2 (M.D. La. Dec. 4, 2013) (lack of "evidence of personal service on the deponents or notice of the depositions," including proposed deponent who was agency's "former employee and in-house legal counsel," supported quashing deposition subpoenas). For another, non-parties may not be required to travel more than 100 miles to appear for a deposition absent specific circumstances. *See Fradella v. Coca-Cola Co.*, No. 17-cv-9622, 2018 WL 3455707 at *2-3 (E.D. La. July 18, 2018) ("Rule 45(d)(3)(A)(ii) directs the court to quash any subpoena that purports to compel compliance beyond the geographical limits specified in Rule 45(c).").

Aside from those threshold limitations, Rule 45 also affords a non-party and the government the right to move to quash a subpoena. *See In re U.S. Dep't of Educ.*, 25 F.4th at 695 (granting the "[f]ormer United States Secretary of Education Elisabeth DeVos, as well as the U.S. Department of Education (Department), and the current Secretary of Education" mandamus petition to quash former Secretary DeVos's deposition); *Pleasant Gardens Realty Corp. v. H. Kohnstamm & Co.*, No. 08-cv-5582, 2009 WL 2982632, at *2 (D.N.J. Sept. 10, 2009) (finding that the United States has standing to challenge subpoenas of its former employees). It is foreseeable that authorizing Rule 45 depositions may cause the parties to be consumed in collateral litigation, including in another court, over motions to quash—all while completing depositions of current parties within the 30-day time period set by the expedited discovery schedule. That means Plaintiffs' request to seek depositions of five non-parties (which would entail completing them subject to these procedures within 30 days) is simply unreasonable.

Plaintiffs' request to depose the specific former officials identified above raises particularized concerns may make litigation over a motion to quash especially likely. As to Jankowicz, her former service as the head of the now-terminated Disinformation Governance Board has drawn on her a barrage of online threats and harassment. *See, e.g.*, NPR, "Fresh Air" With Terry Gross, *How an expert on online disinformation and harassment became the target of both* (May 26, 2022), at https://www.npr.org/2022/05/26/1101439528/how-an-expert-on-online-disinformation-and-harassment-became-the-target-of-both (last accessed October 14, 2022). That harassment raises the serious concern that a deposition of Jankowicz in this action, culminating in potential public release of the deposition transcript, and potentially video, would trigger more harassment—which would be grounds for a potential motion to quash. *See* Fed. R. Civ. P. 26(c)(1)(A) (protective order may be warranted to protect a party or non-party "from annoyance, embarrassment, oppression, or undue burden or expense"); *see also, e.g.*, *Satanic Temple, Inc. v. City of Boston*, No. 21-cv-10102, 2022 WL 1028925 at *5 (D. Mass. Apr. 6, 2022); *Pinson v. U.S. Dep't of Justice*, No. 19-cv-235, 2021 WL 4060556 at *5 (D. Ariz. Sept. 3, 2021), *subsequent determination*, 2021 WL 4942710 (D. Ariz. Oct. 22, 2021); *cf. Alexander v. Jesuits of Mo. Province*, 175 F.R.D. 556, 559 (D. Kan. 1997) (quashing subpoena to prevent harassing deposition of pregnant witness). And Psaki and Slavitt are high-ranking officials whose depositions would not be justified based on any "exceptional circumstance" as set forth by *Morgan*—another basis for a motion to quash. *Supra*; *see also In re United States (Bernanke)*, 542 F. App'x at 949.

For all of these reasons, the Court should deny Plaintiffs' request to seek depositions of these five former government officials, who are non-parties to the case.

### III.   Although No Depositions Are Warranted, If The Court Authorizes Any, It Should Limit Them To Defendants' Compromise Proposal.

Although Defendants maintain that no depositions are necessary or should be permitted during these expedited preliminary injunction proceedings, and that the subject of depositions should be addressed instead in the normal course of any merits discovery, Defendants nevertheless have offered a compromise position during the parties' meet and confer discussions. In particular, and as explained below, Defendants offered to agree to three depositions subject to reasonable scope limitations.

Should the Court authorize any depositions, it should order that they be conducted within specific parameters consistent with the expedited context in which they would have to be completed. Defendants' compromise proposal is reasonable and provides a workable framework for any depositions authorized by the Court.

### A.   Defendants Have Offered A Reasonable Compromise Of Three Focused Depositions.

In the parties' meet and confer discussions, Defendants offered a reasonable compromise for depositions of three officials, subject to limitations on the scope of questioning. The officials Defendants offered for depositions are the following, with the understanding that these officials would not be deposed again during any merits discovery absent a showing of good cause by Plaintiffs, *see* Fed. R. Civ. P. 30(a)(2)(A)(ii):

1. At Plaintiffs' option, ***either*** Max Lesko, Chief of Staff to the Surgeon General, ***or*** Eric Waldo, Senior Advisor and formerly Chief Engagement Officer at the Office of the Surgeon General;

2. At Plaintiffs' option, ***either*** Carol Crawford, Chief of the Digital Media Branch of the Division of Public Affairs at the CDC, ***or*** Jay Dempsey, Social Media Team Lead, Digital Media Branch, Division of Public Affairs at the CDC;

3. Geoffrey Hale, Associate Director, Election Security and Resilience, CISA (in lieu of Director Easterly).

Under Defendants' proposal, and subject to and without waiting any privilege or other evidentiary objections, the scope of any depositions would be limited to the subject on which the Court allowed expedited discovery: governmental communications with social media companies since January 1, 2020, that relate to misinformation or content modulation.

Defendants have offered the officials identified above for deposition because: (1) they are current employees of the agency defendants, and their depositions thus would not involve the potentially time-consuming complexities that attempting to depose non-party former officials through the mechanisms of Rule 45 could entail; (2) they are not "highly-ranked" officials whose depositions would be warranted only in "exceptional circumstances;" and (3) they are the most likely to have knowledge relevant to the information sought through expedited discovery.[4]

### B. Defendants' Compromise Properly Respects The Court's Orders.

Defendants' proposed compromise is reasonable and consistent with the bounds of expedited discovery. Should the Court authorize any depositions, Defendants' compromise offer provides an appropriate framework.

*First*, as to the number of deponents offered: Defendants' offer is grounded in both Rule 30's presumptive limit of 10 depositions by either party throughout the entire course of a case and the inherent limits and burdens of the highly expedited time frame in which to complete depositions. "In spite of its broad definition of relevancy for purposes of discovery, the Federal Rules of Civil Procedure recognize a presumptive limit of ten depositions, absent request and leave for more." *Landry v. St. James Par. Sch. Bd.*, No. 99-cv-1438, 2000 WL 1741886, at *2 (E.D. La. Nov. 22, 2000); *Bell v. Fowler*, 99 F.3d 262, 271 (8th Cir. 1996) ("[T]o obtain discovery

---

[4] Lauren Protentis is on maternity leave, and Defendants have proposed her second-line supervisor Geoffrey Hale as one of the deponents in lieu of Director Easterly. It would be unreasonably cumulative and duplicative to require her deposition in addition to Hale, and would serve only as a nuisance, particularly while she is on maternity leave.

depositions beyond ten, leave of court is required."). The purpose of the presumptive limit is "to control discovery, with its attendant costs and potential for delay[.]" *Barrow v. Greenville Indep. Sch. Dist.*, 202 F.R.D. 480, 483 (N.D. Tex. 2001). Thus, a party who seeks go beyond that limit "must demonstrate," "under the Rule 26(b)(2) standards," "the necessity for each deposition" sought. *Id.* at 482-83. "[C]onclusory" assertions that an officials' testimony is material to any element of a claim do not suffice. *Id.* at 483. That burden is only heightened in the expedited discovery context, where depositions must be completed within a highly compressed time frame and where each and every deposition sought must be justified as necessary to resolve the preliminary injunction motion.

Plaintiffs have failed to show a need for any depositions during expedited discovery. Moreover, they certainly have not demonstrated a need for anywhere approaching the presumptive limit of 10 depositions in an entire case, all within a mere 30 days and relating only to their request for preliminary relief. Considering the expedited nature of the proceedings, Defendants took the position in the parties' negotiations that no more than three to five depositions would be appropriate in this initial phase of the case.

*Second*, Defendants' proposal made clear that these officials should not be subject to another deposition in any merits discovery, absent Plaintiffs demonstrating good cause for a second deposition. *Cf. Doucet v. R. & R. Boats, Inc.*, No. 17-cv-421, 2019 WL 13143669 at *2 & nn.14-19 (M.D. La. Oct. 11, 2019) (applying *Kleppinger v. Tex. Dept. of Transp.*, 283 F.R.D. 330, 333 (S.D. Tex. 2012)), and observing that "lack of diligence in obtaining information before the initial or first deposition may result in a court denying leave to conduct a second deposition"). If Plaintiffs insist on deposing witnesses during this phase of the case, then they should not be given

64

"second bites" at these witnesses during the merits phase. *See* Fed. R. Civ. P. 30(a)(2)(A)(ii) (requiring leave of court to take a deposition of someone previously deposed).

*Third*, as to the proposed scope of questioning: Questions concerning governmental communications with social media companies related to misinformation or content modulation would fall within the scope of expedited discovery requested by Plaintiffs and authorized by the Court. In their motion for expedited discovery, Plaintiffs asked the Court to authorize "targeted" discovery concerning the "identities of federal officials who have or are communicating with social-media platforms about disinformation, misinformation, malinformation, or any other form of censorship or suppression of online speech," and the "nature and content of such federal officials' communications with such social-media platforms." ECF No. 34 at 10. The Court's order authorizing expedited discovery adopted Plaintiffs' proposal and ordered expedited discovery within those parameters. *Id.* at 13.

Questions of this nature would therefore be relevant to the merits of Plaintiffs' preliminary injunction motion. Such questions, moreover, would be most likely to be informed by the more than 15,000 pages of documents produced by Defendants in response to Plaintiffs' discovery requests, as well as Defendants' significant responses to Plaintiffs' interrogatories. And such questions would concern information of which the deponent has knowledge, as they would be targeted to communications in which the deponent participated.

*     *     *     *     *

To the extent this Court authorizes depositions and does not adopt Defendants' compromise, it should, at the very least, order no more than *five* depositions of current, non-high-ranking officials. Further, any officials deposed during the expedited discovery period would not be subject to another deposition during any merits discovery permitted, absent a showing by

Plaintiffs of good cause. *See* Fed. R. Civ. P. 30(a)(2)(A)(ii). Additionally, any depositions authorized should be limited in scope, to inquiries seeking information about governmental communications with social media companies since January 1, 2020, related to misinformation or content modulation. *See* ECF No. 34 at 13 (authorizing discovery into the nature and content of communications with social media companies). Finally, this Court should exercise its discretion during these expedited proceedings and order strict time limits of no more than two to four hours per deposition to minimize the burdens on the federal officials and the parties that attend scheduling, preparing, and completing depositions in a matter of a few weeks. *See* Fed. R. Civ. P. 26(b)(2)(A) ("[T]he court may alter the limits in these rules on the number of depositions and interrogatories or on the length of depositions under Rule 30.").

Those limits would meet the needs of expedited discovery and the Court-ordered schedule. Allowing depositions of a limited number of current officials would be more likely to ensure that discovery is proportional to the needs of the case in the expedited preliminary-injunction context and that Defendants are not burdened by cumulative or duplicative depositions of federal officials. Five depositions would also fall comfortably under Rule 30's presumptive limit, thus protecting Plaintiffs' interest in obtaining testimony they deem relevant to their preliminary injunction motion. And this number is consistent with the practical time constraints under the Court's schedule, which allows 30 days to determine the time, place, and manner (e.g., virtual or in-person) of each deposition and then to complete them.

**IV.   Plaintiffs' Continuing Objections About Written Discovery Are Meritless.**

Finally, Plaintiffs err in raising objections, in the latest meet-and-confer exchanges, regarding the verifications of Defendants' amended written discovery responses under Rule 33(b)(1). Defendants understand that Plaintiffs intend to raise the issue specifically as to Dr. Fauci

in their portion of this Joint Statement. Plaintiffs' objections are wrong as a matter of law; they certainly cannot rely on their incorrect reading of the law to serve as a purported basis for Dr. Fauci's deposition, to the extent that is what they are arguing.

Defendants properly provided a verification for Dr. Fauci's amended response by Dr. Jill R. Harper, NIAID's deputy director for science management and executive officer, and made clear that the verification that was for Dr. Fauci both as Director of NIAID (one of his government titles) *and* as Chief Medical Advisor to the President (another of his government titles). As the amended response also explained (at 24): "Dr. Fauci does not have any responsive information in his role as Chief Medical Advisor beyond the information provided for Dr. Fauci in his role as Director of NIAID." Moreover, the amended responses stated they were based on, among other things, "consultation with Dr. Fauci."

Lacking any basis for disputing the substantive sufficiency of the amended responses, Plaintiffs' objection appears to be that Dr. Fauci did not provide a verification based on his *personal* knowledge. That assertion is baseless. Given that "[o]fficial-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent," *see Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985), the interrogatories are properly understood as calling for a response from the Government, and for verification of that response by appropriate Government personnel, *see Shepherd v. Am. Broadcasting Cos.*, 62 F.3d 1469, 1481-82 (D.C. Cir. 1995) (verification may be "accomplish[ed] . . . through whatever internal process the [entity] has chosen").

Plaintiffs' effort to impose a "personal knowledge" requirement on the verifier of governmental responses to interrogatories disregards Rule 33(b)(1). Of course, "[i]t is well established that a person who verifies an interrogatory answer need not have any personal

knowledge of the facts submitted." *Jiminez-Carillo v. Autopart Int'l, Inc.*, 285 F.R.D. 668, 669 (S.D. Fla. 2012); *see Suzuki v. Abiomed, Inc.*, 943 F.3d 555, 565 (1st Cir. 2019) (where executive answered interrogatories on behalf of corporation using information available within corporation under Rule 33(b)(1)(B), it was "appropriate[]" to "treat[]" executive's "answers as encompassing all relevant information and data available within" corporation); *Gonzalez Tomasini v. United States Postal Serv.*, No. 17-cv-1552, 2020 WL 13490911 at *1 (D.P.R. July 24, 2020) (citing *Brown v. White's Ferry, Inc.*, 280 F.R.D. 238, 242-43 (D. Md. 2012); and Wright & Miller, 8B *Fed. Prac. & Proc. Civ.* § 2172 n.7 (3d ed.)).

There should be no continuing dispute about the extensive written and documentary discovery Defendants have completed, and instead this Court should resolve the matters concerning depositions as otherwise discussed in this Joint Statement.

Dated: October 14, 2022

**ERIC S. SCHMITT**
**Attorney General of Missouri**

*/s/ D. John Sauer*
D. John Sauer, Mo. Bar No. 58721*
  *Solicitor General*
Justin D. Smith, Mo. Bar No. 63253
  *First Assistant Attorney General*
Todd Scott, Mo. Bar No. 56614*
  *Senior Counsel*
Michael E. Talent, Mo. Bar No. 73339*
  *Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
John.Sauer@ago.mo.gov
*Counsel for State of Missouri*


*   admitted *pro hac vice*


*/s/ Jenin Younes*
Jenin Younes *
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines*


*/s/ John C. Burns*
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
F: 314-282-8136
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

Respectfully submitted,

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

*/s/ Elizabeth B. Murrill*
Elizabeth B. Murrill (La #20685)
  *Solicitor General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAMES J. GILLIGAN
Special Litigation Counsel, Federal Programs Branch

*/s/ Kyla Snow*
ADAM D. KIRSCHNER (IL Bar No. 6286601)
Senior Trial Counsel
KYLA SNOW (OH Bar No. 96662)
INDRANEEL SUR (D.C. Bar No. 978017)
KUNTAL CHOLERA (D.C. Bar No. 1031523)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
Tel: (202) 514-3259
kyla.snow@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 14, 2022, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

<u>*/s/ D. John Sauer*</u>