**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

STATE OF MISSOURI ex rel. ERIC S.
SCHMITT, Attorney General,

STATE OF LOUISIANA ex rel. JEFFREY
M. LANDRY, Attorney General,

DR. JAYANTA BHATTACHARYA,

JILL HINES,

JIM HOFT,

DR. AARON KHERIATY, and

DR. MARTIN KULLDORFF,

        *Plaintiffs*,

  v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States, *et
al.*,

        *Defendants*.

No. 3:22-cv-01213-TAD-KDM

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO STAY DEPOSITIONS PENDING WRIT OF MANDAMUS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

   I.    There Is No Immediate Need for a Stay. .................................................................. 2

  II.   Defendants Fail to Satisfy the Traditional Factors for Stay Pending Appeal. .................... 2

       A.  The Government Makes No Plausible Showing of Irreparable Harm. ........................ 3

       B.  The Government Is Not Likely to Succeed on the Merits. .......................................... 6

            1. Ordering the deposition of Rob Flaherty is well-justified. ................................. 7

            2. Ordering the deposition of Jen Easterly is well-justified. ................................ 11

            3.  Ordering the deposition of Surgeon General Murthy is well-justified. ........... 15

            4. None of the challenged witnesses is a "high-level" or "apex" witness. ........... 17

       C.  Irreparable Harm to Plaintiffs and the Public Interest Oppose a Stay. ....................... 19

CONCLUSION .................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Aliff v. Vervent*, Inc.,
    No. 20CV00697DMSAHG, 2021 WL 2156183 (S.D. Cal. May 27, 2021) ...............................3

*Am. Trucking & Transportation Ins. Co. v. Nelson*,
    No. CV 16-160-M-DLC, 2018 WL 3609538 (D. Mont. July 27, 2018) ....................................4

*Ass'n of Club Executives of Dallas, Inc. v. City of Dallas*,
    No. 3:22-CV-00177-M, 2022 WL 1642470 (N.D. Tex. May 24, 2022)..................................19

*Byrd v. D.C.*,
    259 F.R.D. 1 (D.D.C. 2009)..................................................................................................17

*Center for Effective Government v. U.S. Department of State*,
    7 F. Supp. 3d 16 (D.D.C. 2013)...........................................................................................9

*Cheney v. U.S. Dist. Ct. for D.C.*,
    542 U.S. 367 (2004).............................................................................................................17

*Elrod v. Burns*,
    427 U.S. 347 (1976).............................................................................................................19

*Flanagan v. Wyndham Int'l Inc.*,
    231 F.R.D. 98 (D.D.C. 2005)................................................................................................4

*Florida v. United States*,
    --- F. Supp. 3d ---, 2022 WL 4021934 (N.D. Fla. Sep. 2, 2022) ...........................................19

*Holloway v. 3M Co.*,
    No. EDCV19708JAKKKX, 2019 WL 7173146 (C.D. Cal. Nov. 15, 2019)...........................4

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935).............................................................................................................18

*In re Anderson*,
    560 B.R. 84 (S.D.N.Y. 2016)................................................................................................4

*In re Bryant*,
    745 F. App'x 215 (5th Cir. 2018)......................................................................................1, 6

*In re Dep't of Commerce*,
    136 S. Ct. 16 (2018)..............................................................................................................17

*In re Deputy Orthopaedics, Inc.*,
    870 F.3d 345 (5th Cir. 2017) ...............................................................................................6

*In re E.E.O.C.*,
    709 F.2d 392 (5th Cir. 1983) ...............................................................................................18

*In re F.D.I.C.*,
    58 F.3d 1055 (5th Cir. 1995) ...................................................................................18

*In re First S. Sav. Ass'n*,
    820 F.2d 700 (5th Cir. 1987) ......................................................................................6

*In re Gee*,
    941 F.3d 153 (5th Cir. 2019) .....................................................................................6

*In re Huffines Retail Partners, L.P.*,
    978 F.3d 128 (5th Cir. 2020) ...............................................................................6, 18

*In re Lloyd's Register N. Am. Inc.*,
    780 F.3d 283 (5th Cir. 2015) ......................................................................................6

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ...................................................................................9

*Nken v. Holder*,
    556 U.S. 418 (2009).....................................................................................................3

*Phelps–Roper v. Nixon*,
    545 F.3d 685 (8th Cir. 2008) ...................................................................................19

*Renegotiation Bd. v. Bannercraft Clothing Co., Inc.*,
    415 U.S. 1 (1974).........................................................................................................4

*Sampson v. Murray*,
    415 U.S. 61 (1974).......................................................................................................4

*Odeh-Lara v. Synchrony Bank*,
    No. CV192446PSGAGRX, 2020 WL 11271943 (C.D. Cal. July 30, 2020)...........4

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
    732 F.3d 535 (5th Cir. 2013) ...................................................................................19

*United Healthcare Ins. Co. v. Azar*,
    316 F. Supp. 3d 339 (D.D.C. 2018) ...........................................................................9

*United States v. Morgan*,
    313 U.S. 409 (1941)...................................................................................................17

*United States v. Newman*,
    531 F. Supp. 3d 181 (D.D.C. 2021) .........................................................................17

*United States v. Sensient Colors, Inc.*,
    649 F. Supp. 2d 309 (D.N.J. 2009) ..........................................................................17

*Valley Surgical Ctr. v. Cnty. of Los Angeles*,
    No. CV132265DDPAGRX, 2019 WL 13031965 (C.D. Cal. Oct. 7, 2019) ..............5

Other Authorities

HHS Organizational Charts, DEP'T OF HEALTH & HUM. SERV. (Sep. 2, 2022),
      https://www.hhs.gov/about/agencies/orgchart/index.html (visited Oct. 31, 2022) .................19

Office of the Assistant Secretary of Health Organization Chart, DEP'T OF HEALTH & HUM
      SERVS. (Oct. 7, 2021), https://www.hhs.gov/about/agencies/orgchart/oash/index.html
      (visited Oct. 31, 2022) ...........................................................................................................19

Organizational Chart, DEP'T OF HOMELAND SECURITY (April 2, 2021),
      https://www.dhs.gov/sites/default/files/publications/21_0402_dhs-organizational-chart.pdf
      (visited Oct. 31, 2022) ...........................................................................................................18

## INTRODUCTION

Defendants' "Corrected Motion for a Partial Stay of October 21, 2022 Order Pending Petition for Writ of Mandamus and Memorandum in Support," Doc. 92, seeks an indefinite stay of the depositions of White House Digital Director Rob Flaherty, CISA Director Jen Easterly, and Surgeon General Vivek Murthy.   The Government's stay motion is meritless.   There is no immediate need for a stay because Plaintiffs have already consented to a significant extension for these depositions, based on Defendants' claim of scheduling impossibilities, and Defendants have scheduled the three depositions over a month from now, leaving ample time for the Fifth Circuit to rule on the Government's mandamus petition.   Further, Defendants cannot satisfy the traditional four factors for obtaining a stay pending appeal.   Defendants face no irreparable injury, because courts routinely hold that the burdens of preparing for and participating in depositions do not constitute irreparable harm.   Defendants' concerns about the burden of asserting executive privilege(s) in depositions are speculative and meritless, because this Court has already ruled that Defendants have no valid claim of privilege in their communications with social-media platforms about misinformation and censorship.   This Court engaged in a careful, detailed, and thoughtful analysis of the *In re Bryant* standard for each witness, and the Government simply fails to address the overwhelming, detailed factual justification for each deposition, rooted in documents demonstrating each witness's unique first-hand knowledge of the relevant matter, not obtainable from other sources.   An indefinite partial stay of discovery threatens irreparable harm to Plaintiffs, and the public interest overwhelmingly favors prompt vindication of First Amendment rights, which are being violated here on a colossal scale.   The Court should deny the motion to stay the depositions of Mr. Flaherty, Ms. Easterly, and Dr. Murthy.

## I.      There Is No Immediate Need for a Stay.

As an initial matter, Defendants' motion is premature, because (as Defendants admit) the first of the depositions for which they seek relief is scheduled for December 1, and the other two are scheduled for December 6 and December 9.  Doc. 92, at 2 n.3.  Because Defendants represented to Plaintiffs that they had irreconcilable scheduling difficulties, they requested Plaintiffs' consent to extend the deposition period by 18 days, and scheduled the three depositions as to which they seek mandamus relief at the very end of that extended period—all in December.  In the interest of getting the depositions scheduled as soon as possible, Plaintiffs reluctantly agreed to the extension. *See* Doc. 94.  As a result, there is now no immediacy about Plaintiffs' request for a stay.  The first deposition, Mr. Flaherty, is not scheduled until 35 days until after Defendants' motion for stay was filed in this Court, and 31 days after the date of this opposition.  Doc. 92, at 2 n.3.  The other two are scheduled 40 days and 43 days (more than six weeks) after the stay motion was filed.  That is ample time to adjudicate a mandamus petition in the Fifth Circuit.  Accordingly, in response to Defendants' request for consent to this stay motion, Plaintiffs' counsel stated:

> As for your request to stay the depositions of Mr. Flaherty, Dr. Murthy, and Ms. Easterly pending your forthcoming mandamus petition, we do not think any stay is warranted at this time because you are offering them on Dec. 1, 6, and 9—all dates over a month away, the latest over six weeks away.  That is likely adequate time to conclude mandamus proceedings without the need for a stay, and we do not agree to any stay at this time.  If mandamus proceedings continue as the deposition dates draw closer, we are willing to revisit this issue with you at that time.

Thus, Defendants' request for a stay is premature and lacks immediacy, and that is reason enough to deny it.

## II.     Defendants Fail to Satisfy the Traditional Factors for Stay Pending Appeal.

Four factors govern a request for stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be

irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). "The first two factors of the traditional standard are the most critical." *Id.*

Here, those "first two … critical" factors decisively favor Plaintiffs. Defendants show no reasonable likelihood of success on the merits, because they make no meaningful effort to address the overwhelming evidence of critical first-hand knowledge in the unique possession of each deponent. And their showing of "irreparable harm" is baseless, while any delay would impose black-letter irreparable injury of the highest order on Plaintiffs. Finally, the public interest overwhelmingly supports the speedy vindication of First Amendment freedoms, in a case where the Government's misfeasance has affected the free-speech rights to speak and listen to social-media speech of millions of Americans.

**A.  The Government Makes No Plausible Showing of Irreparable Harm.**

The sole basis for the Government's claim of irreparable injury is that it contends that its witnesses will be "burdened in both preparing and sitting for a deposition, all of which may ultimately prove unnecessary if the Court of Appeals grants the mandamus petition." Doc. 92, at 3. This argument is legally and factually erroneous. It is legally erroneous because courts routinely hold that the ordinary burdens of discovery, such as preparing for and participating in depositions, do not constitute "irreparable harm." And it is factually erroneous because Plaintiffs have already agreed to a lengthy extension for all three witnesses, such that their depositions are over a month away, and Defendants face no imminent threat of injury of any kind.

First, courts routinely hold that ordinary discovery burdens, like those associated with preparing for and participating in depositions, do not constitute "irreparable harm." *See, e.g.*, *Aliff v. Vervent*, Inc., No. 20CV00697DMSAHG, 2021 WL 2156183, at *2 (S.D. Cal. May 27, 2021) (holding that the burdens of "engaging in class-wide discovery" pending review of the denial of

arbitration did not "constitute[] irreparable harm"); *id.* (holding that "participating in depositions while their appeal … is pending" did not constitute irreparable harm, and noting that "[o]n a motion to stay proceedings pending appeal, as here, nearly all courts have concluded that incurring litigation expenses [from discovery] does not amount to an irreparable harm"); *In re Anderson*, 560 B.R. 84, 92 (S.D.N.Y. 2016) (holding that "[t]he mere fact that discovery would continue pending a Second Circuit ruling is not sufficient to show that Credit One would be irreparably harmed if the stay is denied," and that "the risk of continued litigation" was not "sufficient to satisfy the requirement of some showing of irreparable injury"); *Am. Trucking & Transportation Ins. Co. v. Nelson*, No. CV 16-160-M-DLC, 2018 WL 3609538, at *4 (D. Mont. July 27, 2018) ("The expense of litigation does not generally constitute irreparable harm.") (citing *Renegotiation Bd. v. Bannercraft Clothing Co., Inc.*, 415 U.S. 1, 94 (1974)).  When it comes to discovery burdens, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough."  *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *see also, e.g., Odeh-Lara v. Synchrony Bank*, No. CV192446PSGAGRX, 2020 WL 11271943, at *1 (C.D. Cal. July 30, 2020) ("The Court does not find that a single deposition constitutes irreparable harm."); *Flanagan v. Wyndham Int'l Inc.*, 231 F.R.D. 98, 105 (D.D.C. 2005) (rejecting the victim's "general claim that as a minor she should not have to testify again about events surrounding Hornby's sexual molestation of her," and holding that this concern about psychological trauma from the deposition failed to rise to the level of irreparable harm).

The Government speculates that it may assert executive privilege(s) to avoid answering certain questions during the witnesses' depositions.  But the mere fact that a deponent may face questions on topics he or she does not wish to answer does not constitute "irreparable harm." *Holloway v. 3M C*o., No. EDCV19708JAKKKX, 2019 WL 7173146, at *1 (C.D. Cal. Nov. 15,

2019) ("Defendant's concern regarding the scope of the depositions does not constitute irreparable harm."). And the fact that a deponent may assert privilege to certain questions in a deposition is not "irreparable harm," especially where the district court arranges a procedure for prompt adjudication of such assertions of privilege. *Valley Surgical Ctr. v. Cnty. of Los Angeles*, No. CV132265DDPAGRX, 2019 WL 13031965, at *3 (C.D. Cal. Oct. 7, 2019) ("Valley Surgical also has not shown irreparable prejudice if the depositions go forward. … The Federal Rules also contain procedures for objection to production of documents that are alleged to be privileged."). Moreover, as discussed further below, this Court has already held that the Government has no valid claim of privilege in federal officials' communications with social-media platforms about censorship, Doc. 72, at 6, so the Government's concerns about invoking executive privilege are particularly speculative and baseless.

Second, the threatened harm lacks a factual basis because, as noted above, Plaintiffs have already agreed—at Defendants' insistence and based on their representations of scheduling difficulties—to extend the 30-day deposition period by 18 days to December 9. And Defendants have scheduled the three witnesses at issue here on December 1, December 6, and December 9 – all over a month away. That allows ample time to adjudicate a mandamus petition.

The Government raises the concern that "high-level … government officials need some measure of protection from the courts because they are vulnerable to numerous, repetitive, harassing, and abusive depositions." Doc. 92, at 4-5. But the Government does not identify *any* other attempt by *any* litigant to depose Mr. Flaherty, Dr. Murthy, or Ms. Easterly, so its concern about "numerous, repetitive, harassing" depositions is unfounded. Moreover, to the extent that the Government contends that this Court ordered "harassing" and "abusive" depositions of these three witnesses in its order on depositions, Doc. 90, that contention is baseless. As discussed below, the

Court's order was based on an extensive and detailed factual justification for each deposition that Defendants still have not attempted to refute.

### B. The Government Is Not Likely to Succeed on the Merits.

In order to prevail on its writ of mandamus challenging this Court's exercise of its broad discretion over discovery matters, the Government faces a very demanding standard.  Issuing mandamus requires both "a clear abuse of discretion" and a "patently erroneous result." *In re Lloyd's Register N. Am. Inc.*, 780 F.3d 283, 290 (5th Cir. 2015); *see also In re Huffines Retail Partners, L.P.*, 978 F.3d 128, 131–32 (5th Cir. 2020) ("[W]e will only grant mandamus relief when [the district court's] errors produce a patently erroneous result."); *In re Deputy Orthopaedics, Inc*., 870 F.3d 345, 350–51 (5th Cir. 2017) (similar).  The standard is even more demanding where, as here, the challenged ruling falls within the Court's exercise of discretion: "If the issue 'is one committed to the discretion of the trial court, a clear and indisputable right to the issuance of the writ of mandamus will arise only if the district court has clearly abused its discretion, such that it amounts to a judicial usurpation of power.'"  *In re Gee*, 941 F.3d 153, 158–59 (5th Cir. 2019) (quoting *In re First S. Sav. Ass'n*, 820 F.2d 700, 707 (5th Cir. 1987)).  The Government cannot satisfy this exacting standard in its challenge to this Court's detailed, carefully reasoned order on depositions.  Doc. 90.  On the contrary, its stay motion rehashes unconvincing arguments that this Court has already rejected, and fails to grapple with the powerful factual justification presented for each deposition.

The Government contends that this Court applied the wrong legal standards in considering whether to order the depositions of "high-ranking" government officials.  *See* Doc. 92, at 5 (arguing that the Court "failed to hold Plaintiffs to the proper legal standard").  This is plainly incorrect.  As the Government concedes, and this Court noted in its Order on depositions, Doc. 90, at 4, the Fifth Circuit's standards for granting "high-level" depositions are set forth in *In re Bryant*,

6

745 F. App'x 215, 218 n.2 (5th Cir. 2018).  That case recognizes "a two-step test that a proponent must satisfy to depose a high-ranking government official. First, the proponent must demonstrate that the official has first-hand knowledge related to the claims being litigated that is unobtainable from other sources."  *Id.*  "Second, the proponent must show that exceptional circumstances exist meriting the deposition."  *Id.*  "The exceptional circumstances factor itself has three prongs … the high-ranking status of the deponents, the potential burden that the depositions would impose upon them, [and] the substantive reasons for taking the depositions."  *Id.* (quotation omitted).

This Court cited and applied this precise standard in its Order on depositions.  Doc. 90, at 4.  The Government contends that this Court failed to consider these factors as to Mr. Flaherty, Dr. Murthy, or Ms. Easterly in its Order on depositions, Doc. 92, at 5-6, but that is plainly incorrect.  The Court's order reflects a careful, detailed, and explicit consideration of all relevant factors for each of these witnesses.  Doc. 90, at 11-13 (Flaherty), 19-21 (Easterly), 22-24 (Murthy).  The Court's careful reasoning lies well within the Court's broad discretion over discovery matters.

### 1.  Ordering the deposition of Rob Flaherty is well-justified.

The Government raises a series of arguments regarding the deposition of Mr. Flaherty, all of which are meritless.

First, the Government argues that Mr. Flaherty lacks "personal knowledge of relevant matters," Doc. 92, at 9—*i.e.*, the Government's communications with social-media platforms about misinformation and censorship.  This argument is baseless, and it directly contradicts the Government's own discovery.  In support of the request to depose Mr. Flaherty, Plaintiffs submitted, and the Court considered in detail, extensive documents establishing that Mr. Flaherty repeatedly participated in direct oral communications and meeting with social-media platforms and pressured them for greater censorship.  *See* Doc. 86, at 11-13 (summarizing Mr. Flaherty's

relevant knowledge); Doc. 86-5 (providing 41 pages of communications with social-media platforms involving Mr. Flaherty, many relating to oral meetings); Doc. 90, at 11-13.

Among many other things, Mr. Flaherty directly participated in the oral meeting where he and Andrew Slavitt pressured Twitter to de-platform Alex Berenson—critical information that the Government's discovery did not reveal.  Doc. 86, at 3; *see also* Doc. 86-5, at 32 (calendar invite for the meeting with Twitter about Alex Berenson).  Mr. Flaherty emailed Nick Clegg, as senior Facebook executive, with a link to a Washington Post story about misinformation on Facebook, stating "not even sure what to say at this point."  Doc. 86-5, at 2.  Mr. Flaherty repeatedly participated in oral meetings with social-media platforms about so-called COVID "misinformation," as documents filed by Plaintiffs repeatedly attest.  *See* Doc. 86-5, at 3 (message to Flaherty from Facebook stating, "Thanks again for taking the time to meet with us on Monday…"); *id.* at 4 (Flaherty setting up a meeting with Facebook about "mis-and-disinformation on feed and in groups" on Facebook); *id.* at 7 (Flaherty telling Facebook he is "happy to talk about" Facebook's misinformation problem, and demanding information about "what solutions you're implementing, and how effective they've been"); *id.* at 9 (Facebook official "circl[ing] back" with Flaherty after an oral meeting to assure him that "we're also updating our misinformation policies" to increase censorship); *id.* at 17 (Facebook telling Flaherty "thanks for making time" for a conversation earlier that day "related to vaccine misinformation"); *id.* at 32 (Flaherty sending a meeting invite to seven Google officials for "YouTube Vaccine Misinfo Briefing"); *id.* at 35 (Flaherty connecting Vivek Murthy with "a critical leader of the DNC's misinfo work for a long time," who "has also been helping us think through mis/dis on the COVID side"); *id.* at 36 (Facebook telling Flaherty "[t]hanks for taking the time to connect yesterday," and assuring Flaherty as a follow-up that Facebook is "[c]ombatting vaccine misinformation" by "improving

the effectiveness of our existing enforcement systems (particularly focusing on entities that repeatedly post vaccine misinformation)"); *id.* at 37 (Twitter telling Flaherty "Thanks again for meeting with us today," and assuring Flaherty that "[a]s discussed, we are building on our continued efforts to remove … COVID-19 misleading information from the service"); *id.* at 40 (Facebook telling Flaherty, "Thanks for the productive meeting yesterday").   Thus, Plaintiffs presented overwhelming evidence of Mr. Flaherty's unique first-hand knowledge of communications with social-media platforms about censorship, not obtainable from any other source, in their Joint Statement on Depositions.  Doc. 86, at 11-13; Doc. 86-5.  The Government's suggestion that Mr. Flaherty lacks first-hand knowledge is utterly baseless.

The Government argues that "[t]he only reason to depose Director Flaherty would be to discover internal government deliberations, which are highly likely to be privileged."  Doc. 92, at 9.  In light of Flaherty's repeated participation in *direct* oral communications with social-media platforms about censorship—including the many meetings cited above—this assertion is baseless. As this Court has already held, Flaherty's communications with social-media platforms about censoring Americans' speech are not privileged.  "The White House has waived its claim of privilege in relation to specific documents that it voluntarily revealed to third parties outside the White House."  Doc. 72, at 6 (citing *Center for Effective Government v. U.S. Department of State*, 7 F. Supp. 3d 16, 25, 27 (D.D.C. 2013); *In re Sealed Case*, 121 F.3d 729, 741-42 (D.C. Cir. 1997); and *United Healthcare Ins. Co. v. Azar*, 316 F. Supp. 3d 339, 349 (D.D.C. 2018)).   The Government cannot manufacture a separation-of-powers issue by making baseless assertions of executive privilege as to *external* communications that are not privileged.

The Government urges that Flaherty must lack first-hand knowledge because he "was not even named in the original Complaint that formed the basis of the preliminary-injunction motion

that discovery was meant to inform." Doc. 92, at 9. Again, this argument is baseless. Mr. Flaherty's involvement in these many meetings with social-media platforms, pressuring them to censor Americans' private speech, was not public knowledge when the original Complaint was filed. It was not until Plaintiffs prevailed on their motion for expedited discovery that documents reflecting Flaherty's extensive involvement became known. Once Plaintiffs became aware of Flaherty's involvement, they amended their Complaint to name him as a Defendant—as this Court specifically authorized them to do. Doc. 72, at 4. Obtaining injunctive relief against newly disclosed officials such as Flaherty—who continues to pressure social-media platforms to censor Americans' speech to this day—is essential to Plaintiffs' ability to obtain meaningful, effective injunctive relief.

Next, the Government contends that the Court's Order "fail[ed] to consider less burdensome means for obtaining the purportedly necessary information," *i.e.*, seeking the information from "the [social-media] companies themselves." Doc. 92, at 9. Here, the Government rehashes an argument that this Court has already considered and rejected:

> Government Defendants' argument that Plaintiffs must seek discovery from other sources also fails. This is expedited preliminary-injunction related discovery. This discovery was opposed by Government Defendants. This is the only chance Plaintiffs will have to get this information prior to addressing the preliminary injunction. This discovery was tailored to the facts alleged in this case. There was no requirement in this Court's order for the Plaintiffs to get this information from other sources first.

Doc. 72, at 7. Further, as this Court noted, Plaintiffs already have sought and obtained information from other sources, including by serving third-party subpoenas on the social-media platforms: "Additionally, Plaintiffs have also submitted interrogatories and production requests to the third party social medical platforms." *Id.* But information from the social-media platforms is no adequate substitute for Mr. Flaherty's testimony. The social-media platforms were the recipients of Mr. Flaherty's and the other Defendants' pressure campaign to boost censorship. They do not

10

have the same first-hand knowledge of Mr. Flaherty's communications, motivations, or actions. Obtaining information from social-media platforms is not the same as deposing Mr. Flaherty.

### 2.   Ordering the deposition of Jen Easterly is well-justified.

The Government contends that Jen Easterly lacks "unique, first-hand knowledge" of matters relevant to the Complaint.  Doc. 92, at 7.  Again, this argument is baseless.  Ms. Easterly oversees CISA, and under Easterly's leadership, CISA boasts that it "serves as a switchboard for routing disinformation concerns to appropriate social media platforms."  Doc. 84, ¶ 302.  The Government's discovery overwhelmingly confirms CISA's role at the nerve center of federal pressure on social-media platforms to engage in censorship, and Easterly's unique knowledge of that role.  *See* Doc. 86, at 21-24 (describing Easterly's knowledge in detail, and citing documents). The Government describes Easterly as "oversee[ing] the U.S. Government's efforts to promote the security and resilience of the Nation's election infrastructure," Doc. 92, at 7—but Easterly "claim[s] that social-media speech" by Americans "is a form of 'infrastructure,' and that policing speech online by the federal government falls within her agency's mission to protect 'infrastructure,' stating that … 'the most critical infrastructure is cognitive infrastructure….'" Doc. 84, ¶ 291.  Easterly's text messages with Matt Masterson show that she views CISA and herself as coordinating censorship efforts "across the federal enterprise."  Doc. 71-5, at 3-4; Doc. 86, at 23.

The Government has provided interrogatory responses identifying numerous, recurring, and massive meetings about social-media censorship between social-media platforms and CISA's various branches and committees.  *See* Doc. 82-3, at 38-41.  These include, not just individual meetings, but multiple series of recurring meetings with many participants from social-media platforms, hosted by "CISA's Election Security and Resilience subdivision."  *Id.* at 38.  Social-media participants include "Google, Facebook, Twitter, Reddit, Microsoft," as well as "Verizon

Media, Pinterest, LinkedIn, and the Wikimedia Foundation." *Id.* at 38-39.  "CISA and Facebook"

have a "recurring meeting" to "plan and set the agenda" for these mass censorship meetings.  *Id.*

at 39.   CISA also hosts recurring meetings with social-media platforms through the "CISA

Cybersecurity Advisory Committee Meetings," "CISA CSAC, Protecting Critical Infrastructure

from Misinformation and Disinformation Subcommittee meetings," and "meetings convened by

the Election Infrastructure Subsector Government Coordinating Council" and by the "Election

Infrastructure Subsector Coordinating Council Joint MDM Working Group." *Id.* at 39.

Though Plaintiffs specifically asked for this information, CISA did not identify any

individual federal officials who participate in any of these many recurring meetings with social-

media platforms in its Interrogatory responses; nor did CISA provide any specific dates, times,

places, or topics of meetings.  *Id.* at 38-40.  Easterly, who oversees the multiple CISA components

that conduct these many meetings with social-media platforms about censorship, is the only person

with unique knowledge of the participants and content and nature of the communications with

social-media platforms at these meetings, as the participants in all these meetings report back to

her.  Moreover, she also directly participates in oral communications with social-media platforms.

Documents produced in discovery attest to Easterly's extensive and detailed oversight of these oral

and face-to-face meetings with social-media platforms where critical communications about

censorship evidently occur.   *See, e.g.,* Doc. 86-7, at 6 (noting with respect to CISA's

"Cybersecurity Advisory Committee" that "[s]ubcommittee members will discuss

recommendations to socialize their efforts with Director Easterly"); *id.* at 8 (email to CISA

subcommittee stating that "[w]e've been asked to provide an initial set of recommendations to

Director Easterly and the committee at the June meeting," reflecting both reporting back to

Easterly and her direct involvement in meetings); *id.* at 10 (noting that Director Easterly was

"mov[ed] … to BCC" on an email chain with Facebook officials and that the group, including Facebook officials, would "find 30 minutes on the Director's calendar" to discuss "2022 Elections").   Thus, the Government's own documents demonstrate that Easterly directly participates in meetings with social-media platforms about censorship, that the many CISA components that communicate with social-media platforms about censorship report back to her, and that CISA routinely pressures social-media platforms to censor election-related and other speech.   Easterly's deposition is probably "the only chance Plaintiffs will have to get this information prior to addressing the preliminary injunction."  Doc. 72, at 7.

The Government argues that Easterly "did not even assume her position at CISA until July 2021 … and thus does not have personal knowledge regarding the full range of Plaintiffs' inquiries relating to CISA."  Doc. 92, at 8.  This argument is meritless.  Easterly, as Director of CISA, is in the best position to testify about the "full range" of CISA's activities.  *Id.*  Moreover, Plaintiffs' Complaint specifically alleges that federal censorship efforts—*especially* those at CISA— aggressively accelerated once the Biden Administration took office, and Easterly, as CISA Director for the current Administration, is by far the best positioned to describe CISA's current, ongoing, and expanding censorship efforts.  Indeed, CISA itself represents that, under Easterly's direction, CISA's "mission evolved" to address the "changing information environment," *i.e.*, to increase censorship activities.  Doc. 84, ¶ 301.

Defendants contend that, "as an alternative to Director Easterly, they have offered Geoffrey Hale as a deponent," and they state that he "often reports to Easterly."  Doc. 92, at 8.  Defendants' vague statement that Hale "often reports" to Easterly makes no showing that Hale provides an adequate substitute for Easterly's detailed first-hand knowledge of CISA's censorship activities. Defendants do not contend that the participants in CISA's many recurring meetings about

censorship with social-media platforms report back to Hale, or that Hale has first-hand knowledge of these oral meetings. Most notably, Defendants do not contend that Hale has knowledge of all the meetings and communications occurring between CISA's subsectors and social-media platforms to encourage greater censorship—which lie at the heart of the discovery sought here. Easterly has that knowledge; Defendants do not claim that Hale does.

Defendants also contend that they "located and produced very little [*sic*] relevant documents from Director Easterly in response to written discovery requests." Doc. 92, at 8. This is simply incorrect, as discussed above. *See* Doc. 86-7 (sampling of relevant documents regarding Easterly's first-hand knowledge). Defendants provided pages 38-41 of their Amended Interrogatory Responses, Doc. 86-3, which attest to dozens of massive, recurring *oral* meetings between social-media platforms and CISA subgroups—all of whose CISA participants report back to Easterly. The fact that Easterly and CISA routinely communicate with social-media platforms *orally*, rather than in writing, does not mean that Easterly lacks relevant information or first-hand knowledge. Further, the written documents that Easterly did produce—such as the text messages with Matt Masterson—are extremely revealing and probative about CISA's coordinating role for censorship "across the federal enterprise," and CISA's efforts to overcome social-media platforms' "hesitan[cy]" about federally-induced censorship. *See* Doc. 71-5, at 3-4.

Finally, the Government argues that "the Depositions Order also failed to address less burdensome alternatives to a deposition of Director Easterly, such as potentially additional interrogatories." Doc. 92, at 8-9. This argument is richly ironic, because until recently, the Government vigorously contended that Plaintiffs had *exceeded* the number of permissible interrogatories, and insisted that Plaintiffs withdraw many interrogatories to reduce the number. For the Government to contend that Plaintiffs should serve *more* interrogatories, after insisting for

weeks that Plaintiffs had served *too many*, is a bit much.  In any event, Plaintiffs, pursuant to the Court's order, have *already* served detailed interrogatories on Easterly.  But she did not provide detailed responses.  In fact, like Dr. Fauci, she provided *no responses on her own behalf at all*—instead, she delegated to CISA the task of responding to the interrogatories directed to her, even though Plaintiffs had served separate sets of interrogatories on Easterly and CISA.  And CISA's responses on her behalf lacked detailed and useful information, but were vague to the point of evasiveness.  *See, e.g.,* Doc. 86-3, at 38-41.  For example, its description of the "recurring meeting" with a "monthly cadence" between "CISA's Election Security and Resilience" division and social-media platforms fails to identify any specific dates, individual participants, or topics of discussion at such meetings.  *Id.* at 38-39.  A similar vagueness, and persistent failure to identify individual participants, dates, times, or topics of discussion, pervades CISA's description of other meetings provided in response to interrogatories.  *Id.* at 39-41.  Thus, when Plaintiffs served Easterly with detailed interrogatories, she declined to respond on her own behalf at all and submitted stock responses through her agency, which provided vague statements devoid of useful information.  It is too late for a do-over now.

### 3.  Ordering the deposition of Surgeon General Murthy is well-justified.

For similar reasons, the Court's order for the deposition of Surgeon General Murthy is well justified, and the Government's arguments to the contrary are meritless.  The Government's own documents reflect repeated, critical communications between Surgeon General Murthy and senior executive(s) at social-media platforms, such as Facebook's President of Global Affairs, Nick Clegg (former Deputy Prime Minister of the United Kingdom).  *See* Doc. 71-4; Doc. 86; Doc. 86-9.  Several examples demonstrate Dr. Murthy's critical first-hand knowledge, based on his direct participation in oral conversations and meetings with social-media platforms.

For example, on July 12 and 19, 2021, Murthy emailed with Clegg and they arranged a phone call for after Clegg returned from Spain to discuss Clegg's "concerns" and "moving forward" on the topic of misinformation.  Doc. 86-9, at 1-2.  Clegg offered to "jump on a call at any point" with Murthy, *id.* at 2; in response, Dr. Murthy noted that he is "happy to speak directly about how we move forward" to discuss Facebook increasing censorship, and asked, "let me know the best way to schedule some time later this week and we'll make it happen."  *Id.* at 1.  Facebook assured Murthy and Andrew Slavitt that "[w]e are expanding penalties for individual Facebook accounts that share misinformation," that "[w]e've added more context about Pages that repeatedly share false claims," and "[w]e've redesigned notifications when they share content that a fact-checker later rates."  *Id.* at 4.

Dr. Murthy and Clegg on July 23, 2021 had an exchange in which Clegg assured Dr. Murthy that Facebook was working to address misinformation and disinformation, including by removing pages, groups and accounts tied to the disinformation dozen.  Doc. 84, ¶¶ 341-42.  This exchange reflected that a conversation occurred in which Dr. Murthy had asked Clegg or someone else at Meta to do that.  Clegg also sent biweekly content reports to Dr. Murthy and Slavitt to reassure them that Facebook's suppression of misinformation was aggressive enough for their preferences.  Doc. 86-9, at 2-4.  This again strongly suggests that off-the record conversations took place in which they had been told to do this.

On July 16, 2021, in a text exchange, Nick Clegg told Dr. Murthy that it wasn't great to be accused of killing people and he was "keen to find a way to deescalate and work together collaboratively."  Doc. 71-5, at 1; Doc. 84, ¶ 343.  The same text chain indicated that Dr. Murthy had "connect[ed] with [Clegg] this week" and was "looking forward to working together."  *Id.*

16

In sum, Dr. Murthy's communications with Clegg make clear—particularly in context—that Dr. Murthy had direct, routine contact with social-media platforms like Facebook, and there are matters referred to that make clear other conversations took place off the record about suppressing "misinformation."  Some of Clegg's statements ("it's not great to be accused of killing people") and the fact he had "concerns," suggest that he was not eager, at least at first, to carry out Dr. Murthy's orders.  Thus, the question of the degree and nature of the pressure exerted on Clegg is something that only Dr. Murthy can answer, and this bears directly on the First Amendment claim. There's simply no other way to know how many such conversations occurred, and4/ what was said—and especially how much pressure was exerted on Clegg and other social-media platforms—without being able to ask the Surgeon General himself.

### 4.  None of the challenged witnesses is a "high-level" or "apex" witness.

In its Order on depositions, the Court assumed without deciding that all the Government's witnesses are "high-level."  *See* Doc. 90.  In fact, the "apex" doctrine does not apply to Ms. Easterly, Dr. Murthy, or Mr. Flaherty, because they are not high-level witnesses.  This is an independent reason that the mandamus petition is unlikely to prevail on the merits.

It is well established that "the president and cabinet-level officials" are high ranking. *United States v. Newman*, 531 F. Supp. 3d 181, 188 (D.D.C. 2021); *see, e.g., Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004) (Vice President); *United States v. Morgan*, 313 U.S. 409 (1941) (Secretary of Agriculture).  But "no standard has been established" for determining who else qualifies as high ranking, *Byrd v. D.C.*, 259 F.R.D. 1, 6 (D.D.C. 2009), leaving courts to decide officials' status "on a case-by-case basis," *United States v. Sensient Colors, Inc.*, 649 F. Supp. 2d 309, 321 (D.N.J. 2009).  Unsurprisingly, then, appellate courts rarely grant mandamus to quash the depositions of non-Cabinet officials.  *See, e.g., In re Dep't of Commerce*, 136 S. Ct. 16 (2018)

(Mem.) (staying an order authorizing the deposition of the Secretary of Commerce but declining to stay an order authorizing the depositions of sub-Cabinet-level officials).  In the absence of a governing standard, failure to treat non-Cabinet officials as "high ranking" will rarely be "patently erroneous," as required for mandamus.  *Huffines Retail Partners*, 978 F.3d at 132.

Defendants rely on two cases where the Fifth Circuit granted mandamus to quash the deposition of a non-Cabinet official on the ground that the official was high ranking.  *See In re F.D.I.C.*, 58 F.3d 1055 (5th Cir. 1995); *In re E.E.O.C.*, 709 F.2d 392 (5th Cir. 1983)).  Both cases involved heads of *independent agencies*.  *See F.D.I.C.*, 58 F.3d at 1057 (FDIC directors); *E.E.O.C.*, 709 F.2d at 393 (EEOC commissioner). Independent-agency heads are directly analogous to Cabinet Secretaries insofar as they sit "at the very top of [their agency's] organizational chart." *Florida v. United States*, --- F. Supp. 3d ---, 2022 WL 4021934, at *4 (N.D. Fla. Sep. 2, 2022). If anything, independent-agency heads are even higher ranking than many Cabinet Secretaries because many Cabinet Secretaries lead executive agencies, and independent-agency heads typically enjoy greater independence from the President than executive-agency heads. *See Humphrey's Executor v. United States*, 295 U.S. 602, 625–26 (1935).

Unlike independent-agency heads, the officials whose depositions Defendants seek mandamus to quash are not analogous to Cabinet Secretaries.  As Deputy Assistant to the President, Flaherty is two levels removed from the President.  Easterly, who serves under a Cabinet Secretary, is even further removed from the "apex" of the federal government. *See* Organizational Chart, DEP'T OF HOMELAND SECURITY (April 2, 2021), https://www.dhs.gov/sites/default/files/publications/21_0402_dhs-organizational-chart.pdf (visited Oct. 31, 2022).  In fact, Easterly is one of at least 24 officials at similar level who report to Secretary Mayorkas, who then reports to the President.  *Id.*  As for Murthy, he is at least three

levels removed from the President and two levels removed from a Cabinet official, reporting to the Assistant Secretary of Health who reports to the Secretary of Health and Human Services. *See* Office of the Assistant Secretary of Health Organization Chart, DEP'T OF HEALTH & HUM. SERVS. (Oct. 7, 2021), https://www.hhs.gov/about/agencies/orgchart/oash/index.html (visited Oct. 31, 2022); HHS Organizational Charts, DEP'T OF HEALTH & HUM. SERV. (Sep. 2, 2022), https://www.hhs.gov/about/agencies/orgchart/index.html (visited Oct. 31, 2022).  In short, none of these officials is "high-level" under any clearly applicable standard, and the Court's decision to authorize their depositions is not "patently erroneous" by any means.  *Lloyd's*, 780 F.3d at 290.

### C.  Irreparable Harm to Plaintiffs and the Public Interest Oppose a Stay.

Delaying the depositions indefinitely threatens to impose irreparable harm on Plaintiffs, and the public interest decisively opposes entering a stay.  Because "Plaintiffs allege a First Amendment violation," the "threat of irreparable injury and whether an injunction would be in the public interest … are presumed and weigh in favor of" Plaintiffs.  *Ass'n of Club Executives of Dallas, Inc. v. City of Dallas*, No. 3:22-CV-00177-M, 2022 WL 1642470, at *3 (N.D. Tex. May 24, 2022); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013).  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also, e.g., Phelps–Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) (concluding that if the movant "can establish a sufficient likelihood of success on the merits of her First Amendment claim, she will also have established irreparable harm as the result of the deprivation").  "Injunctions protecting First Amendment freedoms are always in the public interest," *Texans for Free Enter.*, 732 F.3d at 539, and so an indefinite stay of discovery necessary to adjudicate Plaintiffs' motion for preliminary injunction contradicts the public interest.

**CONCLUSION**

Defendants' motion to stay the three depositions should be denied.

Dated: October 31, 2022

**ERIC S. SCHMITT**
**Attorney General of Missouri**

*/s/ D. John Sauer*
D. John Sauer, Mo. Bar No. 58721*
  *Solicitor General*
Justin D. Smith, Mo. Bar No. 63253
  *First Assistant Attorney General*
Todd Scott, Mo. Bar No. 56614*
  *Senior Counsel*
Michael E. Talent, Mo. Bar No. 73339*
  *Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
John.Sauer@ago.mo.gov
*Counsel for State of Missouri*


*  admitted *pro hac vice*

*/s/ Jenin Younes*
Jenin Younes *
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines*

*/s/ John C. Burns*
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
F: 314-282-8136
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

Respectfully submitted,

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

*/s/ Elizabeth B. Murrill*
Elizabeth B. Murrill (La #20685)
  *Solicitor General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on November 1, 2022, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*