**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

| | |
|---|---|
| STATE OF MISSOURI ex rel. ERIC S. SCHMITT, Attorney General, | |
| STATE OF LOUISIANA ex rel. JEFFREY M. LANDRY, Attorney General, | No. 3:22-cv-01213-TAD-KDM |
| DR. JAYANTA BHATTACHARYA, | |
| JILL HINES, | |
| JIM HOFT, | |
| DR. AARON KHERIATY, and | |
| DR. MARTIN KULLDORFF, | |
| *Plaintiffs*, | |
| v. | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, | |
| *Defendants*. | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO RECONSIDER ORDER AUTHORIZING THE
DEPOSITION OF FBI SUPERVISORY SPECIAL AGENT ELVIS CHAN**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION .............................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND..................................................... 1

ARGUMENT ...................................................................................................................... 9

   I.   Chan Was Directly Involved in FBI's Communication with Meta That Led to the Censorship of the Hunter Biden Laptop Story. ......................................................... 9

  II.  There Are Compelling Additional Reasons to Depose Chan. ................................ 14

      A. LinkedIn's production demonstrates that Chan routinely communicates with social-media platforms about disinformation and censorship. ............................... 15

      B. Chan's public statements independently justify his deposition. ................................. 18

 III. Elvis Chan Is Not a "High-Ranking" Official, and "Exceptional Circumstances" Are Not Required to Depose Him. ....................................................................................... 20

CONCLUSION................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bolden v. Fed. Emergency Mgmt. Agency*,
No. 06-4171, 2008 WL 482727 (E.D. La. Feb. 19, 2008) ....................................................... 22

*Croddy v. FBI*,
No. 00-0651 (EGS), 2005 WL 8168910 (D.D.C. Mar. 30, 2005) ............................................ 21

Deputy Attorney General, *In re United States*,
197 F.3d 310 (8th Cir. 1999) .................................................................................................... 22

*Detoy v. City & Cnty. of San Francisco*,
196 F.R.D. 362 (N.D. Cal. 2000) ............................................................................................. 21

*Florida v. United States*,
--- F. Supp. 3d ---, 2022 WL 4021934 (N.D. Fla. Sep. 2, 2022)......................................... 21, 22

*Holguin v. Cnty. of Los Angeles*,
2011 WL 7128640 (C.D. Cal. Oct. 12, 2011) .......................................................................... 21

*Jameson v. Oakland Cnty.*,
No. 10–10366, 2011 WL 219555 (E.D. Mich. Jan. 24, 2011) ................................................. 21

*K.C.R. v. Cnty. of Los Angeles*,
2014 WL 3434257 (C.D. Cal. July 11, 2014) .......................................................................... 21

*Odom v. Roberts*,
337 F.R.D. 359 (N.D. Fla. 2020) ............................................................................................. 21

*Ricci v. Key Bancshares of Maine, Inc.*,
768 F.2d 456 (1st Cir. 1985) .................................................................................................... 22

*Sargent v. City of Seattle*,
No. C12–1232 TSZ, 2013 WL 1898213 (W.D. Wash. May 7, 2013) ...................................... 21

**Other**

*Den Jones Speaks with Elvis Chan, FBI*, Banyan Security,
https://www.banyansecurity.io/resource/get-it-started-get-it-done/ ........................................18

FBI, https://www.fbi.gov/about/leadership-and-structure/fbi-executives
(visited Nov. 4, 2022) .............................................................................................................22

*FBI's Elvis Chan on What to Expect Before—and After—Nov. 3 Election*, GovInfoSecurity
(Oct. 28, 2020), https://www.govinfosecurity.com/fbi-on-election-theres-going-to-be-lot-
noise-a-15257....................................................................................................................20

FBI Organizational Chart, U.S. Dep't of Justice (Dec. 22, 2020),
https://www.justice.gov/jmd/page/file/1424221/download...................................................22

Miranda Devine, *How the Government Hid the Truth Behind Hunter Biden's Laptop*, NEW YORK POST (Nov. 2, 2022), at https://nypost.com/2022/11/02/how-the-government-hid-the-truth-behind-hunter-bidens-laptop/ ................................................................................................11

## INTRODUCTION

Defendants' Motion to reconsider the deposition of Elvis Chan, Doc. 95, is meritless. Defendants imply that Plaintiffs mischaracterized Meta's disclosure that Chan was directly involved in the communication that led Facebook to censor the Hunter Biden laptop story. This suggestion is baseless. Plaintiffs' counsel provided a detailed refutation of that accusation by letter, and neither Defendants' counsel nor Meta's counsel disputes a single detail of that refutation. Moreover, there are additional compelling reasons to depose Chan—including that he is the principal point of contact between social-media platforms and the FBI Section that combats so-called "disinformation" on social media; that he routinely organizes and participates in oral meetings with social-media platforms about election-related disinformation; and that he has openly boasted about coordinating with social-media platforms to combat misinformation and disinformation. Furthermore, as an Assistant Special Agent in Charge of an FBI field office, Chan is not remotely "high-ranking," and so "exceptional circumstances" are not required to depose him in any event. Defendants' motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

The undersigned counsel for Missouri provided a detailed account of facts relating to Meta's disclosure of Elvis Chan as the FBI official who made the communication that led Facebook to censor the Hunter Biden laptop story in a letter to Meta dated October 26, 2022. This letter is filed as Doc. 96-1, and it is also attached hereto as Exhibit A.

On July 12, 2022, the Court authorized Plaintiffs to serve third-party subpoenas on five social-media platforms "seeking *the identity of federal officials* who have been or are communicating with social-media platforms about disinformation, misinformation, malinformation, and/or any censorship or suppression of speech on social media, including *the*

*nature and content of those communications*."  Doc. 34, at 13 (emphases added).  On July 18, 2022, pursuant to the Court's Order, Plaintiffs served Meta (which owns Facebook and Instagram) with a third-party subpoena seeking that very information, *i.e.*, "the identity of federal officials" who communicate with Facebook and Instagram about misinformation and censorship, and "the nature and content of those communications."  Ex. A, at 1.

Following the subpoena, Plaintiffs engaged in a lengthy process of meeting and conferring with Meta.  During this process, Plaintiffs repeatedly insisted that Meta identify federal officials who had communicated with Meta about misinformation and content modulation on Meta's platforms, as well as the nature and content of their communications—not just who were the generic "points of contact" with the federal government.  Ex. A, at 2.  Ultimately, on August 26, 2022, Meta's counsel proposed a compromise agreement for production of information pursuant to the subpoena.  *Id.*  As the very first point in this agreement, Meta's counsel agreed that Meta would identify federal officials who had "communicated with Meta regarding content moderation" with respect to "the New York Post story from October 14, 2020 about Hunter Biden's laptop computer."  *Id.*  In relevant part, the agreement's first point stated: "Meta will agree to provide a list of the primary contacts within the federal government (Trump or Biden Administration) *who communicated with Meta regarding content moderation* between January 1, 2020 and July 19, 2022 as it relates to: (i) COVID-19 misinformation; (ii) the Department of Homeland Security's proposed Disinformation Governance Board; (iii) *the New York Post story from October 14, 2020 about Hunter Biden's laptop computer*; and/or (iv) election security, integrity, outcomes, and/or public confidence in election outcomes…."  *Id.* (emphases added).

As discussed further below, when Meta identified SSA Elvis Chan, it did so pursuant to this agreement to identify the federal officials "who communicated with Meta regarding content

2

moderation … as it relates to … the New York Post story from October 14, 2020 about Hunter Biden's laptop computer." *Id.*

The day before Meta proposed this agreement—August 25, 2022—"Meta's CEO Mark Zuckerberg appeared on Joe Rogan's podcast and disclosed that a communication from the FBI had led Facebook to censor the Hunter Biden laptop story, which was specifically referenced in Point 1 of the parties' agreement." *Id.* Paragraphs 382 and 383 of the Second Amended Complaint, Doc. 84, describe this disclosure, quoting from Zuckerberg's public comments:

> Mark Zuckerberg appeared on Joe Rogan's podcast and revealed that Facebook's censorship of the Hunter Biden laptop story had occurred as a result of communications from the FBI. Zuckerberg stated: "The FBI basically came to us" and told Facebook to be "on high alert" relating to "a lot of Russian propaganda," that the FBI was "on notice" that "there's about to be some kind of dump … that's similar to that, so just be vigilant." Zuckerberg stated: "If the FBI … if they come to us and tell us we need to be on guard about something, then I want to take that seriously." … Joe Rogan asked Zuckerberg if the FBI had flagged the Hunter Biden laptop story as Russian disinformation specifically, and Zuckerberg stated: "I don't remember if it was that specifically, but [the story] basically fit the pattern" that the FBI had identified.

Doc. 84, ¶¶ 382-83 (quoting podcast video available at https://www.wptv.com/news/national/fbi-responds-to-mark-zuckerberg-claims-on-joe-rogan-show-about-hunter-bidens-laptop, commencing around 7:30).

Thus, Zuckerberg publicly stated that (1) the FBI had made a significant communication warning Facebook about "Russian propaganda" before the New York Post's bombshell story about the Hunter Biden laptop; (2) Zuckerberg "do[es]n't remember" whether that FBI communication specifically mentioned Hunter Biden or his laptop; (3) when it became public, the Hunter Biden laptop story "fit the pattern" that the FBI had flagged; and (4) that FBI communication is what caused Facebook to censor the Hunter Biden laptop story. *See id.* Needless to say, this revelation raised grave concerns about FBI officials influencing and manipulating core political speech of enormous public interest on social media. *See id.*

Upon hearing of the Rogan-Zuckerberg podcast, Plaintiffs immediately demanded that Meta identify the federal official(s) involved in the FBI communication that Mr. Zuckerberg had publicly identified as leading to Facebook's censorship of the Hunter Biden laptop story.  Ex. A, at 3.  Indeed, Meta was required to do so by the plain language of Meta's agreement to identify federal officials "who communicated with Meta regarding content moderation … as it relates to … the New York Post story from October 14, 2020 about Hunter Biden's laptop computer."  *Id.*

On August 28, 2022, Meta provided Plaintiffs an initial list of 32 federal officials who communicate with Meta about content modulation on specified topics on Meta's platforms.  That initial list made no disclosure about the Hunter Biden laptop story, however.  On September 2, 2022, Meta provided Plaintiffs with a supplemental list of eleven additional federal officials who engage in such communications with Meta.  Ex. A, at 3.  After providing that list, in response to Plaintiffs' request for the federal official(s) who made the Hunter Biden laptop communication, Meta's counsel wrote: "Additionally, the FBI contact you requested is the Foreign Influence Task Force (FITF).  FITF's Section Chief is Laura Dehmlow."  Ex. A, at 3.

But Plaintiffs had not requested just the identity of the Section or its chief.  Plaintiffs sought the identity of the federal official who actually made the communication(s) that led to Facebook's censorship of the Hunter Biden laptop story, which Meta had specifically agreed to provide.  *Id.* Accordingly, the next day, Plaintiffs requested clarification from Meta, writing as follows:

> One point of clarification: You have identified the FBI point of contact for communications relating to the Hunter Biden laptop story as the Foreign Influence Task Force, and identified its Section Chief as Laura Dehmlow.  Our subpoena sought the identification of the names of individual federal officials who communicate(d) with Meta about Misinformation and Content Modulation, and our agreement calls for the identification of the names of the officials who engage(d) in such communications.  *Is Ms. Dehmlow, in fact, the official who has and/or is engaged in such communications with Meta?  Or are there other names of FBI officials within (or without) that task force who have engaged in such communications?*  Your clarification is appreciated.

*Id.* (emphasis added).  Thus, Plaintiffs specifically inquired whether Ms. Dehmlow was the official who had actually made the communication(s), or whether other FBI official(s) had done so.  *Id.*

Meta did not immediately respond to this request for clarification.  *See id.* at 3-4.  On September 12, 2022, Plaintiffs reached out to Meta again to request this clarification, as Meta has specifically agreed to identify the FBI official who had actually made the communication.  *Id.* at 4.  Three days later, on September 15, in a phone conference with Plaintiffs, Meta's counsel orally identified "Elvis Chan" as the FBI official who was directly involved in the Hunter Biden laptop-related communication(s) with Meta.  *Id.*  This identification was made in specific response to Plaintiffs' request that Meta identify the FBI official(s) actually involved in the communication(s), and pursuant to Meta's specific agreement to identify federal official(s) who "communicated with Meta regarding content moderation … as it relates to … the New York Post story from October 14, 2020 about Hunter Biden's laptop computer."  *Id.* at 2.

Moreover, the same day of Meta's disclosure of "Elvis Chan"—September 15, 2022— Plaintiffs' counsel sent Meta's counsel an email recounting that Meta had identified SSA Chan as directly "involved" in the communication that led to the censorship of the Hunter Biden laptop story.  That email stated:

> Finally, as referenced in today's call, we continue to request communications between Meta and FBI's Foreign Influence Task Force, especially as it relates to the Hun[t]er Biden laptop story.  Reg represented today that he did not believe there are written communications involving the FBI field officer in California ***whom you mentioned was involved***, but we request any written communications that may exist, including but not limited to Laura Dehmlow, whose name Dan disclosed on September 2.

Ex. A, at 4 (emphasis added).  Thus, it is clear—and Meta does not directly deny—that Meta identified Elvis Chan, not just as a "primary point of contact" between Meta and FBI's Foreign Influence Task Force, but as the FBI official who was directly involved in the communication(s) to Meta that led to Facebook's censorship of the Hunter Biden laptop story.  As Plaintiffs' counsel

wrote, "that was the very information that I had requested in writing in my September 3 and September 12 emails that led to this disclosure, the very information we had been seeking for weeks in our conferences with Meta, the very information requested by our third-party subpoena, and the very information that Judge Doughty authorized us to seek in the July 12 discovery order, Doc. 34—*i.e.*, the identity of federal official(s) involved in communications with social-media platforms about disinformation and censorship."  Ex. A, at 4.

Having received this information from Meta, Plaintiffs reported it to the Court in a series of truthful and accurate representations.  First, in the Second Amended Complaint filed on October 6, 2022, Plaintiffs alleged that Meta's counsel had identified "Elvis Chan" as "involved in the communications between the FBI and Meta *that led to Facebook's suppression of the Hunter Biden laptop stor*y."  Doc. 84, ¶ 384 (emphasis added).  That is exactly what Meta disclosed to Plaintiffs on September 15, 2022.  Likewise, on October 14, in the Joint Statement on Depositions, Plaintiffs stated the following, quoting Paragraph 384 of the Second Amended Complaint: "in response to Plaintiffs' third-party subpoena, Meta's counsel identified FBI SSA Elvis Chan as the one who conveyed 'the communications between the FBI and Meta that led to Facebook's suppression of the Hunter Biden laptop story.'"  Doc. 86, at 19 (quoting Doc. 84, ¶ 384).  Again, this is exactly what Meta disclosed to Plaintiffs on September 15, 2022.

Based on Plaintiffs' representations, on October 21, in the Order on Depositions, the Court summarized these disclosures as follows: "Plaintiffs maintain that in response to their third-party subpoena, Meta's counsel identified Chan as the FBI agent who communicated with Facebook to suppress that story."  Doc. 90, at 18.  That is a fair and accurate summary of what Plaintiffs represented to the Court, which itself is a fair and accurate description of Meta's disclosures.

Nevertheless, in the morning of October 25, 2022, counsel for Meta called the undersigned counsel for Missouri and notified him that Meta would be sending Plaintiffs a letter later that day disputing the accuracy of the Court's statement.  Meta's counsel stated that sending this letter was important to Meta's "relationship with the FBI."  Plaintiffs' counsel suggested that, if Meta had any dispute about what was disclosed, Meta's letter should provide a specific and detailed account of what the FBI actually stated in its communication(s) with Meta that led to the suppression of the Hunter Biden laptop story—information that both Meta and the Government possess, and persistently refuse to disclose.

Needless to say, Meta did not do so.  Later that morning, Plaintiffs' counsel received by email from Meta's counsel, cc'ing the Government's trial counsel, a roughly one-page letter disputing the accuracy Court's statement in the Order on Depositions quoted above, Doc. 90, at 18, in vague and cryptic terms.  *See* Oct. 25, 2022 Letter from Meta's Counsel, attached as Exhibit B (also filed as Doc. 96).

Meta's letter claimed that Plaintiffs' representations to the Court were "different from what we communicated to you," and that the Court's statement "is incorrect."  *Id.* at 1.  But Meta's letter provides no basis for these conclusions.  First, Meta's letter stated that "[w]e identified Mr. Chan as Meta's primary individual point of contact on the FBI's Foreign Influence Task Force."  *Id.* at 1.  That statement is correct, but incomplete.  As recounted in detail above, Meta also identified Chan as directly involved in the communication(s) from the FBI to Meta that led to Facebook's censorship of the Hunter Biden laptop story.  Second, Meta's letter stated that "we informed you that we had not identified any emails between Mr. Chan and Meta about Hunter Biden's laptop."  *Id.*  That statement is also correct—as the undersigned counsel acknowledged in the September 15 email quoted above, which also described Chan as "involved" in the communication(s).  Ex. A, at

7

3.  But, quite obviously, the failure to locate *emails* is fully consistent with Chan having conveyed the communication, because communications can be made *orally* rather than in writing (and in numerous other written media besides email, such as text messages).  The fact that Meta found no emails from Chan to Meta about the Hunter Biden laptop story, therefore, is also fully consistent with Chan's having made the relevant communication(s) and with Plaintiffs' account of Meta's disclosure, detailed above.  (And in fact, documents produced by LinkedIn demonstrate that Chan's routine practice is to communicate with social-media platforms through *oral meetings.  See* Doc. 86-6, at 1-121.)

Meta's letter then claimed that Plaintiffs' representation in the Joint Statement on Depositions that "Meta's counsel identified FBI SSA Elvis Chan as the one who conveyed 'the communications between the FBI and Meta that led to Facebook's suppression of the Hunter Biden laptop story" is "different from what we communicated to you." Ex. B, at 1.  On the contrary, that is *exactly* what Meta "communicated to" Plaintiffs during the September 15 phone call, as recounted in detail above, and Meta's terse letter does not elaborate on how it is supposedly "different."  *Id.*  Then, Meta accused the Court of misinterpretation, stating that "[t]his statement was then interpreted by the Judge as 'Meta's counsel identified Chan as the FBI agent who communicated with Facebook *to suppress [the Hunter Biden laptop] story*,'" which Meta claims "is also an incorrect statement."  *Id.* (emphasis in original).  Once again, Meta does not explain exactly *how* the Court's statement is supposedly "incorrect," and (as discussed above) it provides a fair and accurate summary of Plaintiffs' fair and accurate description of Meta's disclosure.

Meta's counsel copied Defendants' litigation counsel on its October 25 letter, which was sent by email at 1:45 p.m.  Less than two hours later, at 3:40 p.m., Defendants' litigation counsel sent an email to Plaintiffs' counsel, accusing Plaintiffs of "misstat[ing] the facts" to the Court,

based entirely on Meta's letter.  Defendants demanded that Plaintiffs "withdraw the deposition of

Mr. Chan" and urged that the supposed "misstatement" should be "brought to the Court's

attention."  The next day, October 26, 2022, Plaintiffs' counsel responded to Meta with a five-page

detailed letter, recounting the precise course of communications between Meta and Plaintiffs that

had led to the disclosure of Elvis Chan, and decisively refuting the suggestion that Plaintiffs had

made any "misstatement" of the facts or that the Court had made any misinterpretation of it.  Ex.

A.  Plaintiffs' counsel copied DOJ's counsel on the responsive letter dated October 26.  *Id.*

Neither Meta's counsel nor DOJ's counsel has ever disputed any specific statement made

in Plaintiffs' detailed account provided in that October 26 letter.  Ex. A.  Further, Plaintiffs' counsel

has also offered to make available to DOJ the lengthy email chains with Meta's counsel quoted in

the October 26 letter, but DOJ has not requested them.  Instead, the Government filed its thinly

supported and meritless Motion to Reconsider the deposition of Elvis Chan.  Doc. 95.

## ARGUMENT

The Government's motion to reconsider the deposition of Elvis Chan is baseless, for at

least three reasons.  First, the Government's suggestion that Plaintiffs have misstated Meta's

disclosure about Elvis Chan is wrong, as recounted in detail above.  Second, there are

overwhelming justifications to depose Chan, even aside from the Hunter Biden laptop story.  Third,

Chan is not remotely "high-level," and so "extraordinary circumstances" are not necessary to

require his deposition.  All that is required is that his testimony might lead to admissible

evidence—a very low bar, which Plaintiffs clear by miles.

**I.      Chan Was Directly Involved in FBI's Communication with Meta That Led to the
        Censorship of the Hunter Biden Laptop Story.**

The sole basis of the Government's motion for reconsideration is Meta's vague, one-page

letter.  Ex. B.  This letter disputes the accuracy of Plaintiffs' account of their disclosure to the

Court, but it fails to explain what Meta claims the inaccuracy is, and it fails to provide any account of Elvis Chan's actual communication(s) with Meta.  The Government received Plaintiffs' detailed response to Meta's letter, which cites and quotes Plaintiffs' contemporaneous communications with Meta, and refutes any suggestion of misstatement by Plaintiffs.  Ex. A.

As an initial matter, Chan's deposition is fully justified by facts that the Government and Meta *admit*.  The Government does not, and cannot, dispute that Meta agreed to disclose the federal officials "who communicated with Meta regarding content moderation … as it relates to … the New York Post story from October 14, 2020 about Hunter Biden's laptop computer."   Ex. A, at 2.  The Government does not, and cannot, dispute that, pursuant to this agreement, Meta disclosed the FBI's FITF as the source of the communication: "the FBI contact you requested is the Foreign Influence Task Force (FITF).  FITF's Section Chief is Laura Dehmlow."  Ex. A, at 3.  Meta does not, and cannot, dispute that Meta then disclosed Elvis Chan at least as the "primary individual point of contact" between Meta and FITF—the FBI Section that was the source of the Hunter Biden laptop-related communications.   Ex. B, at 1.   These disclosures alone provide an overwhelming justification to depose Chan.

But there is much more.  As recounted in detail above and in Exhibit A—details that remain undisputed—Meta actually disclosed that Chan was involved in the communication(s) with Meta that led to the suppression of the Hunter Biden laptop story.  Meta's one-page letter states that Plaintiffs' description to the Court was "different from what we communicated to you," but fails to explain *how* Meta thinks it is different.  And this claim, in a letter sent six weeks after the relevant phone call, directly contradicts the contemporaneous email that Missouri's counsel sent to Meta *the same day as the phone call* in which Meta made the disclosure.  That email recounted that Meta had disclosed Chan as "involved" in the Hunter Biden laptop communication(s).

Defendants—who were not parties to any of the communications between Plaintiffs and Meta, and lack any firsthand knowledge of those events—now claim that "[t]he principal factual basis of the Court's initial decision on ASAC Chan's deposition … is now demonstrably inaccurate."  Doc. 95, at 4.  That statement is baseless.  Neither Defendants nor Meta dispute Plaintiffs' account of Meta's communications about Chan.  And Defendants have no basis to do so, because they were not parties to those communications.

Defendants argue that a "general advisory communication" about Russian disinformation from the FBI that caused the censorship of core political speech would not violate the First Amendment.  Doc. 95, at 6.  That assertion is highly questionable and fact-dependent.  But here, there are compelling reasons to believe that the FBI—through Elvis Chan—did much *more* than issue a "general advisory communication" about "Russian disinformation."

Notably, despite their claims that Plaintiffs have misstated or misinterpreted Chan's role in communicating with Meta, neither the Government nor Meta has ever disclosed the precise content of the FBI's communication(s), other than Mark Zuckerberg's vague description on Joe Rogan's podcast—which indicated that FBI warned of "Russian propaganda," and that the Hunter Biden laptop story "fit the pattern" of the FBI's warning.  *See supra.*  But two further pieces of information provide critical context here.  *First*, as has been widely reported, and as the FBI does not deny, the FBI was already in possession of Hunter Biden's laptop at the time of the communication(s) with Meta and the New York Post's story, so the FBI *knew* that the Hunter Biden laptop story was based in fact, not "Russian propaganda."  *See, e.g.,* Miranda Devine, *How the Government Hid the Truth Behind Hunter Biden's Laptop*, NEW YORK POST (Nov. 2, 2022), at https://nypost.com/2022/11/02/how-the-government-hid-the-truth-behind-hunter-bidens-laptop/ (attached as Ex. C).  According to Mac Isaac, the owner of the repair shop where Hunter Biden

left the laptop, he notified the FBI of the laptop in the summer of 2019.  *Id.*  "On Dec. 9, 2019, [FBI] agents arrived at his store with a subpoena and took the laptop and a hard-drive copy."  *Id.*  "As he left, [the FBI agent] told Mac Isaac: "It is our experience that nothing ever happens to people that don't talk about these things."  *Id.*  "[A]n hour later," on December 9, 2019, the same FBI agent who made this menacing statement "called [Isaac] *for technical help to access the drive*. The laptop was never seen again."  *Id.* (emphasis added).  In other words, the FBI had obtained the laptop *and accessed its contents* long before the FBI's 2020 communication(s) to social-media platforms like Meta about so-called "Russian propaganda."

*Second*, there is another publicly available account of the FBI's communications with social-media platforms that led to the censorship of the Hunter Biden laptop story.  This account comes from Twitter, and it contradicts both Meta's insinuations and the Government's suggestion that the FBI made a "general advisory communication."  Twitter, like Facebook, aggressively censored the laptop story in 2020—going so far as to suspend the New York Post's Twitter account for two weeks until after the 2020 election.  Twitter, like Facebook, did so *after receiving a communication from the FBI* (and other federal law-enforcement and national-security officials) that was evidently intended to suppress the story.  But Twitter, unlike Facebook, has provided more detail about what federal officials actually said to Twitter to cause them to censor the laptop story.

In a sworn declaration filed in an FEC proceeding, Twitter's Head of Site Integrity, Yoel Roth, stated that, during 2020, he "had regular meetings with the Office of the Director of National Intelligence, the Department of Homeland Security, *the FBI*, and *industry peers* regarding election security."  Ex. D, Roth Decl. ¶ 10 (emphases added).  ("Industry peers" likely includes Facebook.) "During these weekly meetings, the federal law enforcement agencies communicated that they

expected 'hack-and-leak operations' by state actors might occur in the period shortly before the 2020 presidential election, likely in October." *Id.* ¶ 11.  "[Roth] was told in these meetings that the intelligence community expected that individuals associated with political campaigns would be subject to hacking attacks and that material obtained through those hacking attacks would likely be disseminated over social media platforms, including Twitter. These expectations of hack-and-leak operations were discussed throughout 2020." *Id.*  Roth "also learned in these meetings that there were rumors that a hack-and-leak operation ***would involve Hunter Biden***." *Id.* (emphasis added).

In other words, during 2020, the FBI—which had obtained Hunter Biden's laptop from the repair-shop owner in 2019, had accessed its contents in 2019, and knew full well that those contents *were not the result of an illegal hack*—notified Twitter in 2020 that there might be a "hack-and-leak operation" perpetrated by foreign governments that "would involve Hunter Biden," and that would occur "likely in October" of 2020.  This revelation appears carefully crafted to imply that, when materials from Hunter Biden's laptop appeared, they were the result of an illegal hacking operation by foreign (Russian) "state actors," not lawfully obtained by the repair-shop after being abandoned by its owner—an implication that the FBI knew to be false.  Sure enough, when the Hunter Biden laptop story broke in October 2020, Twitter "preliminarily determined that the information in the [New York Post] articles could have been obtained through hacking," as the FBI had misleadingly warned, and Twitter censored it under Twitter's "Distribution of Hacked Materials Policy."  *Id.* ¶¶ 13, 16.  This process raises the concern that the FBI may have manipulated information it provided to Twitter in law-enforcement and national-security briefings to suppress the laptop story by discrediting the story in advance with misleading information.

Ironically, the Government has submitted information to the Court in this case that corroborates the inference that the FBI, through Elvis Chan, provided misleading information to Meta to procure the censorship of the Hunter Biden laptop story without justification.  In its portion of the Joint Statement on Discovery Disputes, the Government quoted congressional testimony from Mark Zuckerberg on October 28, 2020, on which he stated, "one of the threats that the FBI has alerted our companies and the public to, was the possibility of *a hack and leak operation* in the days and weeks leading up to this election."  Doc. 71, at 61-62 (emphasis added).  The Government tied this statement about a "hack and lack operation," which echoes the first half of Yoel Roth's disclosure, directly to the FBI's communications about the Hunter Biden laptop.  *Id.* Warning about a "hack and leak operation" by a foreign state—which, as Twitter disclosed, was tied to "Hunter Biden"—is far more specific than a "general advisory communication" about "Russian disinformation."

Was Meta one of Twitter's "industry peers" that participated in the same meetings as Twitter recounted by Yoel Roth?  Were the FBI's communications to Meta that led to Facebook's censorship of the story—issued through Elvis Chan, and possibly others such as Laura Dehmlow— similarly manipulated to fraudulently induce Meta to censor the story that the FBI knew was valid and legitimate?  What did Elvis Chan and other federal official(s) actually say to Twitter, Facebook, and other social-media platforms to induce them to censor the Hunter Biden laptop story?  Chan should answer these questions under oath—as the Court has already ordered him to do.  Doc. 90, at 18-19.

## II.    There Are Compelling Additional Reasons to Depose Chan.

This Court found, in its Order of Depositions, that there were compelling additional reasons to authorize Chan's deposition, in addition to the Hunter Biden laptop story.  *See* Doc. 90, at 19

14

(finding that "Elvis Chan has personal knowledge about the issue concerning censorship across social media"); *id.* ("[T]he Court ultimately finds there are reasons to believe that [Chan] has interfered in other ways").  Even if the Hunter Biden laptop censorship were not at issue, there would still be compelling reasons to depose Elvis Chan.

### A.    LinkedIn's production demonstrates that Chan routinely communicates with social-media platforms about disinformation and censorship.

The Government has produced no documents from the FBI that relate to Elvis Chan's involvement in communications about disinformation and censorship.  The limited documents that Plaintiffs received that relate directly to Chan's involvement in such communications came from the third-party subpoena to LinkedIn. *See* Doc. 86-6.  Yet even those limited documents demonstrate that Chan routinely engages in oral meetings with social-media platforms about disinformation, and that he continues to schedule such meetings to this day.  These documents—which consist almost entirely of calendar invites for oral meetings and terse email chains setting up oral meetings—demonstrate that Chan engages in recurring oral meetings with multiple social-media platforms that relate to election-related "disinformation," and that he increases the frequency of these meetings during election cycles (such as the one occurring right now).

These documents indicate that Chan is scheduling such meetings *now*, relating to the current 2022 election cycle, not just in 2020.  *See, e.g.*, Doc. 86-6, at 38 (February 4, 2022 email referring ahead to the quarterly "June meeting" in 2022); *id.* at 46 (May 5, 2022 email listing FBI agents to participate in in-person meeting); *id.* at 50 (follow-up email to LinkedIn dated June 14, 2022, referring to an in-person meeting the day before).  The documents repeatedly allude to the fact that Chan schedules similar meetings with *other* social-media platforms, in addition to LinkedIn, on the same basis and during the same timeframes.  *See, e.g., id.* at 47 ("We are hoping to have this [June 2022 quarterly meeting]  be an in-person meeting at your San Francisco facility

as we are scheduling meetings with other companies in town during the same period"); *id.* at 41 ("[A]t least one other company has said they will host us in-person"); *id.* at 47 ("It's time for our next round of FITF quarterly meetings!"); *id.* at 61-62 (indicating that "the next round of quarterly meetings" includes meetings with other companies); *id.* at 84 ("Another company just beat you to that time slot."). And this, of course, is consistent with Meta's disclosure of Chan as the "primary individual point of contact" between Meta and FBI's "Foreign Influence Task Force."

LinkedIn's electronic communications with Chan demonstrate that the dominant focus of Chan's meetings with social-media platforms is *election-related* speech. *See, e.g.*, Doc. 86-6, at 10 (setting up a meeting with LinkedIn in August 2020 to discuss "Planning for U.S. Elections," including "FBI Posture," "Your Posture," and "Information sharing channels and methods"); *id.* at 19 (asking LinkedIn to coordinate on "election security messaging"); *id.* at 30 (asking, for future quarterly meetings, "What are the topics we want to discuss? … Elections only?"); *id.* at 99 (noting that "Chan" would discuss "Election logistics"); *id.* at 102 ("Election Command Post Status Update"); *id.* at 116 (noting that FBI would be "standing up its Election Command Post" on election day, and inviting social-media platforms to "share any election related issues to the above communication channels during [that] period"). The LinkedIn documents reflect that Chan and his FBI colleagues ramp up the frequency of these oral meetings during election cycles. *See, e.g., id.* at 1 (calendar invite to LinkedIn in September 2020, stating "increased cadence touch point before election" and noting "Agenda TBD"); *id.* at 3 (following up with another meeting on October 13, 2020); *id.* at 5 (again noting "Agenda TBD" for the October 13, 2020 meeting); *id.* at 6 (describing the October 13, 2020 meeting as "our last bilateral sync ahead of the election"); *id.* at 7 (setting up a December 2020 meeting for a "Post Election Hot Wash – what went well, what didn't go well, what do we need to do differently for next time"); *id.* at 15 ("I'm tentatively

penciling in the week of October 12th for our last set of meetings before the elections").  Chan, separately, has also publicly stated that this is so.  *See infra*, Part II.B.

These FBI meetings with social-media platforms are large meetings, each involving a dozen or more FBI officials descending on social-media platforms to discuss election-related disinformation issues.  *See, e.g., id.* at 39 ("On our side, the contingent would be approximately 9-11 people."); *id.* at 46 ("I think our final count will be 12-13 people."); *id.* at 47 ("our contingent would be about 12 people").  They include powerful FBI officials.  For example, Laura Dehmlow, the Section Chief for the FITF—whose name Meta disclosed in connection with the communication(s) that led to the suppression of the Hunter Biden laptop story—routinely participates personally in these meetings, along with Elvis Chan and others.  *See* Doc. 86-6, at 1, 3, 5, 7, 34, 35, 36, 46, 56, 64, 69, 72, 74, 76, 82, 87, 90, 92, 97, 104, 117, 119.

Chan's electronic communications with LinkedIn also include cryptic references to alternative communication channels between the FBI and social-media platforms.  Doc. 86-6, at 21 (referring to "the content in 'Information Sharing 5,'" an unidentified portal); *id.* at 26 ("I'll be sending you a Teleporter link with new indicators … Please be on the lookout for a Teleporter email … to download the file.").  And they allude to similar meetings between social-media platforms and "other FBI components."  *Id.* at 33 ("I know there are meetings with other FBI components going on…").

Thus, even this tiny snapshot of Chan's communications with social-media platforms, provided by his electronic communications with LinkedIn alone, provides a compelling basis to depose Chan.  Chan routinely communicates with social-media platforms in oral meetings on behalf of the FBI about election-related "disinformation" on social-media, he is currently

17

scheduling and participating in such meetings for the 2022 election cycle, and he is the principal

point of contact for the FBI Section that induced the suppression of the Hunter Biden laptop story.

**B.      Chan's public statements independently justify his deposition.**

The Government accuses Plaintiffs of relying on "self-serving allegations" that they claim

"embellished certain innocuous, public statements" made by Chan.  Doc. 95, at 2.  On the contrary,

especially viewed in light of Meta's disclosures and LinkedIn's document production, Chan's

public statements are anything but "innocuous."  *Id.*  In fact, in his public statements, Chan boasts

about colluding with social-media platforms to suppress speech on social media.

Chan has spoken openly about his official role on behalf of FBI in coordinating with social-

media companies.  In a recent podcast, he stated, "Our field office, FBI San Francisco, was very

involved in helping to protect the US elections in 2020. … [T]he FBI, the US government working

in conjunction with *the private sector*, as well as with election officials from every single state and

protectorate, we were really able to do it. …  But completely different from 2016 where we did

not.  Even though foreign actors were trying to interfere in our elections, the FBI, the US

government working *in conjunction with the private sector*, as well as with election officials from

every single state and protectorate, we were really able to do it."  *See Den Jones Speaks with Elvis

Chan, FBI*, BANYAN SECURITY,  https://www.banyansecurity.io/resource/get-it-started-get-it-

done/ (emphasis added).

Chan's subsequent comments make clear that "government working in conjunction with

the private sector" includes the FBI working with social-media companies on censorship and

suppression of private speech.  Chan indicated that he works closely with CISA Director Jen

Easterly, stating, "So Jen Easterly, she's the current director for CISA, she's the one who coined

that term shields up. She's a Star Trek fan. She's a Trekkie, I am myself."  *Id.*  Easterly

quarterbacks CISA's extensive federal government-induced social-media censorship activities.

*See* Doc. 71-5, at 3 (Easterly explaining her "coord role" in working with social-media companies to "prebunk/debunk" misinformation).

Chan admits to regular, routine coordination with social-media platforms about election-related disinformation, stating of the 2020 election cycle in particular: "we talked with all of these entities I mentioned regularly, at least on a monthly basis.  And right before the election, probably on a weekly basis. If they were seeing anything unusual, if we were seeing anything unusual, sharing intelligence with technology companies, *with social media companies*, so that they could protect their own platforms.  That's where the FBI and the US government can actually help companies."  *Dem Jones Speaks with Elvis Chan, supra* (emphasis added).  "Seeing anything unusual," evidently, refers to perceived "disinformation," and "protecting their own platforms" refers to censorship.

Chan also bemoaned the fact that there was not a similar level of coordination about censorship between the federal government and social-media companies during the 2016 election cycle—evidently referring to the propagation of "disinformation" on social media: "It seems obvious, but I'm not going to lie, in 2016, there was not that same level of communications between the US government and the private sector."  *Id.*  Chan called on social-media platforms to be "more mindful" of federal-government warnings about election-related speech: "But where we in the government are saying, if you are in one of the 17 designated critical infrastructure sectors, of which information technology is one of them, then you need to be more mindful."  *Id.*

In a public interview dated October 28, 2020, Chan explicitly encouraged citizens to report "misinformation" or "disinformation" to social-media companies and to the federal government so that such speech could be censored and/or suppressed, stating: "If you are seeing something related to election on your social-media platform, all of them have portals where you can report

that sort of information, and *they are being very aggressive in trying to take down any misinformation or disinformation* … [i]f you see anything on election day or before election day, you can always *report it to FBI.gov or Justice.gov … we take all of these very seriously*." *See FBI's Elvis Chan on What to Expect Before—and After—Nov. 3 Election*, GOVINFOSECURITY (Oct. 28, 2020), https://www.govinfosecurity.com/fbi-on-election-theres-going-to-be-lot-noise-a-15257 (quotes at 7:45-8:48 of video) (emphases added).  Thus, Chan admits that both the FBI and social-media companies, working together, "take … very seriously" reports of "misinformation and disinformation."  He notes that social-media companies are being "very aggressive in trying to take down any misinformation and disinformation," and in the same breath, urges citizens to report misinformation to the FBI and DOJ.  Chan's remarks provide a powerful basis to infer that the FBI plays a direct role in pressuring social-media platforms to remove so-called "misinformation or disinformation."  *Id.*  This, too, is an independent reason to authorize his deposition.

III.   **Elvis Chan Is Not a "High-Ranking" Official, and "Exceptional Circumstances" Are Not Required to Depose Him.**

Plaintiffs' motion for reconsideration is meritless for yet another reason as well: Chan is not "high-level," and thus no showing of "extraordinary circumstances" is required to justify his deposition.  All that is required is the ordinary discovery standard of relevance—*i.e.*, whether the deposition is reasonably calculated to lead to the discovery of relevant information—which Chan easily satisfies.  Here, Chan is not the FBI Director, nor a senior official within the Director's office, nor a Section Chief, nor even the head of an FBI satellite office.  He is a second-tier managing FBI agent in FBI's San Francisco division.  In other words, he is a career FBI agent, and one of the principal tasks of such law-enforcement agents is to testify.

In its Order on Depositions, the Court assumed without deciding that Chan was "high-level," *see* Doc. 90, at 19—but the Court later noted that this assumption was "questionable," even as to witnesses well above Chan's level.  Doc. 104, at 4 n.9.  Here, the argument that Chan is "high-level" would distort the case law beyond recognition.

Some courts—but not all—have recognized chief law-enforcement officers in State and local governments as high-ranking officials. *See Sargent v. City of Seattle*, No. C12–1232 TSZ, 2013 WL 1898213, at *2–3 (W.D. Wash. May 7, 2013) (agreeing that "a chief law enforcement officer is a high-ranking official"); *Odom v. Roberts*, 337 F.R.D. 359, 364 (N.D. Fla. 2020) (collecting cases holding that a sheriff is high ranking within local government); *but see Detoy v. City & Cnty. of San Francisco*, 196 F.R.D. 362, 369 (N.D. Cal. 2000) ("A chief of police is not necessarily a high government official ...."). Some courts have extended high-ranking status to officials "closely connected to" chief law-enforcement officers, *Florida v. United States*, --- F. Supp. 3d ---, 2022 WL 4021934, at *4 (N.D. Fla. Sep. 2, 2022), such as a county law-enforcement agency's "second in command," *K.C.R. v. Cnty. of Los Angeles*, 2014 WL 3434257, at *5 (C.D. Cal. July 11, 2014), while others have not, *e.g., Holguin v. Cnty. of Los Angeles*, 2011 WL 7128640, at *3–4 (C.D. Cal. Oct. 12, 2011).   But Plaintiffs are aware of *no* court that has considered law-enforcement officers more than two levels removed from the chief officer to be high-ranking. *See, e.g., Jameson v. Oakland Cnty.*, No. 10–10366, 2011 WL 219555, at *2 (E.D. Mich. Jan. 24, 2011) (assuming that police officers other than the sheriff were not high-ranking).

Accordingly, some courts consider the head of federal law-enforcement agencies such as the FBI Director, the CIA Director, and the Attorney General to be high-ranking officials.  *See, e.g., Croddy v. FBI*, No. 00-0651 (EGS), 2005 WL 8168910 (D.D.C. Mar. 30, 2005).  And some courts may hold that officials "closely connected" to these top officials, *Florida*, 2022 WL

4021934, at * 4, such as the Deputy Attorney General, *In re United States*, 197 F.3d 310, 313–14 (8th Cir. 1999), to be "high-level."  But officials more than two levels removed from top officials are definitely *not* high-level. *See Florida*, 2022 WL 4021934, at *4 (concluding that an official at least two levels removed from a federal agency's top official was not high ranking); *Bolden v. Fed. Emergency Mgmt. Agency*, No. 06-4171, 2008 WL 482727, at *2 (E.D. La. Feb. 19, 2008) (same); *cf. Ricci v. Key Bancshares of Maine, Inc*., 768 F.2d 456, 462 (1st Cir. 1985) (emphasizing an immunity doctrine's applicability to "low-ranking and high-ranking officials alike" before applying it to officials identified merely as "FBI agents").

Defendants state that Elvis Chan is the Assistant Special Agent in Charge ("ASAC") of the San Francisco Division of the Federal Bureau of Investigation.  Doc. 95, at 1.  He is more than two levels removed from the FBI Director, and thus he is definitely not high-level by any standard.  In fact, Plaintiffs were unable to ascertain exactly how many levels removed Mr. Chan is from the FBI Director because the FBI's organizational chart does not extend as far down as Mr. Chan's position. See FBI Organizational Chart, U.S. Dep't of Justice (Dec. 22, 2020), https://www.justice.gov/jmd/page/file/1424221/download.  Chan is at least four levels below the FBI Director, as the org chart indicates that the Special Agents in Charge of Field Offices report to the Deputy Director who reports to the Director, and Chan is at least one level below the Special Agent in Charge.  Furthermore, Mr. Chan does not appear on the FBI's list of forty-one top executives other than the Director. FBI Executives, FBI, https://www.fbi.gov/about/leadership-and-structure/fbi-executives (visited Nov. 4, 2022).

Thus, Elvis Chan is not a high-ranking official. *See Florida*, 2022 WL 4021934, at *4 (concluding that an official "several tiers below ... the cabinet-level official" who was absent from "the leadership list found on [the agency's] website" was not high-ranking).  In fact, the

Government does even not argue that he is.  Instead, the Government argues that Chan is "a management-level FBI official" who "should not have to divert time away from his official duties to participate in an expedited deposition."  Doc. 95, at 1-2.  The case law directly contradicts this contention.  In fact, testifying is *central to the role of law-enforcement officers*, including FBI agents.  The notion that the ASAC of the FBI's San Francisco Field Office cannot be required to testify about grave civil-rights violations absent "extraordinary circumstances" lacks any support in law.

## CONCLUSION

Defendants' motion to reconsider the deposition of Elvis Chan should be denied.

Dated: November 7, 2022

Respectfully submitted,

**ERIC S. SCHMITT**
**Attorney General of Missouri**

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

*/s/ D. John Sauer*
D. John Sauer, Mo. Bar No. 58721*
  *Solicitor General*
Justin D. Smith, Mo. Bar No. 63253
  *First Assistant Attorney General*
Todd Scott, Mo. Bar No. 56614*
  *Senior Counsel*
Michael E. Talent, Mo. Bar No. 73339*
  *Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
John.Sauer@ago.mo.gov
*Counsel for State of Missouri*

*/s/ Elizabeth B. Murrill*
Elizabeth B. Murrill (La #20685)
  *Solicitor General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

*  admitted *pro hac vice*

*/s/ Jenin Younes*
Jenin Younes *
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines*

*/s/ John C. Burns*
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
F: 314-282-8136
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on November 7, 2022, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

25