**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

**STATE OF MISSOURI, ET AL.,**

**VERSUS**

**JOSEPH R. BIDEN, ET AL.**

**CIVIL ACTION NO. 3:22-cv-01213**

**JUDGE:  TERRY A. DOUGHTY**

**MAGISTRATE JUDGE: KAYLA D. MCCLUSKY**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**NOTICE OF MOTION AND MOTION TO INTERVENE**
**FOR ACCESS TO DISCOVERY AND FOR ITS FILING AS**
**JUDICIAL RECORD, OR FOR *IN CAMERA* INSPECTION**

F.R.C.P. 5(D)(1)(A), 24(B); 28 U.S.C. § 1651

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................3

NOTICE OF MOTION AND MOTION TO INTERVENE  FOR ACCESS TO DISCOVERY AND FOR ITS FILING AS  JUDICIAL RECORD, OR FOR *IN CAMERA* INSPECTION ........6

STATEMENT OF REQUESTED RELIEF.................................................................7

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION .................9

      A.          The Applicants Have Standing to Intervene. ................................9

             1.    Robert F. Kennedy, Jr. ..............................................12

             2.    Dr. Joseph Mercola ..................................................13

             3.    Ty and Charlene Bollinger........................................14

      B.    The Applicants Are Uniquely Entitled to Intervene. ................................15

      C.    The Case Law Supports the Applicants' Requests. ................................20

      D.    At a Minimum, *in Camera* Inspection Is Warranted. ...........................21

CONCLUSION...................................................................................................24

CERTIFICATE OF SERVICE ................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Brown v. Advantage Eng'g Inc.*,
 960 F.2d 1013 (11th Cir. 1992) ............................................................9

*Cheney v. United States District Court*,
 542 U.S. 367 (2004)............................................................................22

*Cinel v. Connick*,
 792 F. Supp. 492 (E.D. La. 1992) ...............................................22, 23

*EEOC v. Nat'l Children's Ctr., Inc.*,
 146 F.3d 1042 (D.C. Cir. 1998) ...........................................................9

*Flynt v. Lombardi*,
 782 F.3d 963 (8th Cir. 2015) ..................................................9, 10, 21

*Harris v. Nelson*,
 394 U.S. 286 (1969)............................................................................21

*In re Beef Indus. Antitrust Litig.*,
 589 F.2d 786 (5th Cir. 1979) ................................................................9

*In re Sealing & Non-Disclosure of Pen/Trap/2703(d) Orders*,
 562 F.Supp.2d 876 (S.D. Tex. 2008) .................................................20

*Jessup v. Luther*,
 227 F.3d 993 (7th Cir. 2000) ..........................................................9, 10

*Meyer Goldberg, Inc. v. Fisher Foods, Inc.*,
 823 F.2d 159 (6th Cir. 1987) ................................................................9

*Moore v. Tangipahoa Parish Sch. Bd.*,
 507 Fed. Appx. 389 (5th Cir. 2013)....................................................22

*New York v. Microsoft Corp.*,
 206 F.R.D. 19 (D.D.C. 2002)..............................................................20

*Pub. Citizen v. Liggett Grp., Inc.*,
 858 F.2d 775 (1st Cir. 1988)................................................................9

*SEC v. TheStreet.com*,
 273 F.3d 222 (2d Cir. 2001)................................................................20

*United Nuclear Corp. v. Cranford Ins. Co.*,
 905 F.2d 1424 (10th Cir. 1990) ...........................................................9

*United States v. Franklin Parish Sch. Bd.*,
 922 F. Supp.2d 591 (W.D. La. 2013) ......................................................................22

*United States v. N.Y. Tel. Co.*,
 434 U.S. 159 (1977) ................................................................................................22

*Weiss v. Allstate Ins. Co.*,
 No. 06-3774, 2007 U.S. Dist. LEXIS 59963 (E.D. La. Aug. 16, 2007) ......................11, 20, 21

**Docketed Cases**

*Children's Health Defense v. Meta Platforms, Inc., et al.*,
 No. 21-16210 (9th Cir.) (oral argument May 17, 2022) ...........................................17

*Mercola.com, LLC et al. v. Google LLC et al.*,
 No. 3:22-cv-05567 (N.D. Cal.) (filed Sept. 28, 2022) .............................................17

**United States Constitution**

 First Amendment .......................................................................................................6

**Federal Statutes**

 28 U.S.C. § 1651 ...............................................................................................6, 21, 22

**Federal Rules of Appellate Procedure**

Rule 28(j) ....................................................................................................................17

**Federal Rules of Civil Procedure**

 Rule 5(d) ...................................................................................................................20
 Rule 5(d)(1)(A) ..........................................................................................6, 20, 21, 24
 Rule 12(b)(6) .............................................................................................................17
 Rule 24(a) .................................................................................................................10
 Rule 24(b) ..................................................................................................... 6, *passim*
 Rule 24(b)(2) .............................................................................................................10

**Other Authorities**

Center for Countering Digital Hate; Anti-Vax Watch, Disinformation Dozen:
 Two-Thirds of Online Anti-Vaccine Content Originates From Top 12 Anti-
 Vax Leaders, Cision PR Newswire (Mar. 24, 2021),
 https://www.prnewswire.com/news-releases/disinformation-dozen-two-thirds-
 of-online-anti-vaccine-content-originates-from-top-12-anti-vax-leaders-
 301255060.html ......................................................................................................15

CNN, "White House turns up heat on Big Tech's Covid 'disinformation dozen'"
    (July 16, 2021), https://www.cnn.com/2021/07/16/tech/misinformation-covid-
    facebook-twitter-white-house ................................................................................................16

*Forbes*, "De-platform The Disinformation Dozen" (July 18, 2021),
    https://www.forbes.com/sites/stevensalzberg/2021/07/19/de-platform-the-
    disinformation-dozen/?sh=6617a01b7378; ..........................................................................16

Meta, "How We're Taking Action Against Vaccine Misinformation
    Superspreaders" (Aug. 18, 2021), https://about.fb.com/news/2021/08/taking-
    action-against-vaccine-misinformation-superspreaders/ .......................................................16

OFFICE OF THE MISSOURI ATTORNEY GENERAL, *Missouri, Louisiana
    Serve Discovery Requests, Subpoenas on Top Biden Administration Officials
    and Social Media Giants* (July 19, 2022),
    https://ago.mo.gov/home/news/2022/07/19/missouri-louisiana-serve-
    discovery-requests-subpoenas-on-top-biden-administration-officials-and-
    social-media-giants ...............................................................................................................19

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

STATE OF MISSOURI, ET AL.,                    CIVIL ACTION NO. 3:22-cv-01213

VERSUS                                        JUDGE:  TERRY A. DOUGHTY

                                              MAGISTRATE JUDGE: KAYLA D.
JOSEPH R. BIDEN, ET AL.                       MCCLUSKY

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NOTICE OF MOTION AND MOTION TO INTERVENE
FOR ACCESS TO DISCOVERY AND FOR ITS FILING AS
JUDICIAL RECORD, OR FOR *IN CAMERA* INSPECTION

F.R.C.P. 5(D)(1)(A), 24(B); 28 U.S.C. § 1651

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PLEASE TAKE NOTICE THAT Applicants Robert F. Kennedy, Jr., Dr. Joseph Mercola, and Ty and Charlene Bollinger hereby move for leave to intervene in the above-entitled case for access to discovery and for an Order requiring that such discovery be either filed in the public record pursuant to Fed. R. Civ. P. 5(d)(1)(A) and 24(b) ("Rule"), or else made available to the Applicants. Alternatively, given the extraordinary circumstances presented, Applicants seek an Order under the All Writs Act, 28 U.S.C. Section 1651, requiring submission to the Court for inspection *in camera* of case-discovery that specifically references federal actor/social media platform censorship of the Applicants, or of their affiliated organizations. Such an Order serves the broader public interest in federal government transparency, and avoids a miscarriage of justice by enabling the Applicants to obtain in other pending lawsuits full and fair adjudications of the measures taken against them in contravention of the First Amendment.

**<u>STATEMENT OF REQUESTED RELIEF</u>**

Applicants Robert F. Kennedy, Jr., Dr. Joseph Mercola, Ty and Charlene Bollinger, and their respective affiliated public health-advocacy organizations, Children's Health Defense, Mercola.com, and The Truth About Vaccines (collectively, "Intervenors" or "Applicants") are online publishers of health news, including related to Covid-19, whom the Federal Defendants have worked in conjunction with major social media platforms to censor. These Defendants have colluded with private actors (1) to curb the Applicants' criticism of government response to the Covid-19 pandemic, and (2) to silence the Applicants' disfavored facts and opinions concerning a variety of subjects, including Covid-19's possible lab-leak origin, the comparative benefits of early treatment and natural immunity, and the risks or inefficacy of Covid-19 vaccines authorized for emergency use. (Declaration of Robert F. Kennedy, Jr. ("Kennedy Dec."), Ex. A hereto, at ¶ 2; Declaration of Dr. Joseph Mercola ("Mercola Dec."), Ex. B hereto, at ¶ 2; Declaration of Charlene Bollinger ("Bollinger Dec."), Ex. C hereto, at ¶ 2.)

For their own immediate use in pending litigation against social media platforms and on behalf of the broader public interest, these Applicants request access to case-discovery on an accrual basis as follows:

1.      All written discovery responses (to document requests and interrogatories) from the Federal Defendants and/or social media platforms that contain any of the following search terms:

"misinformation," "misinfo," "disinformation," "disinfo," "malinformation," "malinfo," "MDM," "mask," "masks," "masking," "COVID," "SARS-CoV-2," "lockdown," "conspiracy," "conspiracies," "flag," "flagging," "lab-leak," "lab leak," "antitrust," "anti-trust,"  "Disinformation Dozen," "Disinfo Dozen," "Kennedy," "RFK," "Children's Health Defense," "CHD," "algorithm," "super-

spreader," "Bollinger," "Truth about Vaccines," "Mercola," "vaccine," "anti-vax,"

or "deplatform."[1]

2.       All transcripts and video recordings of depositions taken by the Plaintiff-States in

conjunction with their request for expedited discovery and preliminary injunction. *See* October 21,

2022 Order, Dkt. #90.[2]

3.       All confidentiality agreements between or among the Parties or with third Parties

that either (a) purportedly limit the Federal Defendants' or social media platforms' right to furnish

the Applicants with the discovery requested herein, or (b) set forth criteria governing the Federal

Defendants' or social media platforms' right to redact such discovery from public filings, *e.g.*, that

permit them to redact the identities of particular targets for curbing speech or to redact search terms

or methods, or that restrict them from filing unredacted copies of discovery responses.

Reportedly, the case-discovery documents are already being shared by the Plaintiff-States'

counsel with other attorneys, e.g., counsel for former President Donald J. Trump, for their use in

separate private litigation. Additionally, Federal Defendants' counsel has expressed that no

---

[1]       During a meet-and-confer on November 11, 2022, *see infra* n.2, the Department of Justice, on behalf of the Federal Defendants, indicated that those Defendants' unwillingness to agree to this requested intervention was not to prevent access to the content of the case-discovery, but based upon the burden the request places upon the parties. (Declaration of Shelly Maturin ("Maturin Dec."), Ex. D hereto, at ¶ 2.) In light of that concern, the Applicants are willing to work with the Court or the parties in order to tailor or reduce this list of terms, if appropriate.

[2]       On November 14, 2022, in follow up to the November 11 meet-and-confer, *see supra* n.1 and *infra* n.3, counsel for the Appellants received an email from the Department of Justice's Indraneel Sur offering, as compromise to the request to intervene, "to provide [the Applicants] with Personally Identifiable Information ('PII')-redacted transcripts of the currently scheduled expedited discovery depositions once all those depositions are completed." (Maturin Dec. ¶ 3.) Although the email states that this compromise "would obviate the need for motions practice as to your clients' intervention" (*id.*), such is not the case, because the Appellants remain without access to the universe of material documents they seek. At this time, the Appellants also request access to unredacted copies of the transcripts, as well as videotapes of the depositions.

agreement precludes such sharing, only that the Federal Defendants themselves are unwilling to undertake any such burdens. Under these circumstances, and in light of the showing of particularized need and legal entitlement set forth below, this Court should issue the requested relief, and order the parties to make the case-discovery available to these Applicant-Intervenors without limitation.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

### A.    The Applicants Have Standing to Intervene.

Permissive intervention is available, at the Court's discretion, upon timely application "when an applicant's claim or defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b). The overwhelming weight of authority, including in the Fifth Circuit, holds that Rule 24(b) intervention is "the procedurally correct course" for non-parties seeking to challenge or modify protective orders, *In re Beef Indus. Antitrust Litig.*, 589 F.2d 786, 789 (5th Cir. 1979), and to advance "third-party claims of access to information generated through judicial proceedings," *Flynt v. Lombardi*, 782 F.3d 963, 966 (8th Cir. 2015); *see also, e.g.*, *Jessup v. Luther*, 227 F.3d 993, 999 (7th Cir. 2000) ("In sum, the district court sealed a portion of its proceedings and records pursuant to the Parties' request. When it took this action, the Newspaper's presumptive right to access was implicated, and the Newspaper should have been allowed to intervene for the limited purpose of challenging the district court's order."). Further, "the force of precedent . . . compels a flexible reading of Rule 24(b)." *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1045-46 (D.C. Cir. 1998) (quoting *Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 783 (1st Cir. 1988)); *see also Brown v. Advantage Eng'g Inc.*, 960 F.2d 1013, 1015-16 (11th Cir. 1992); *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990); *Meyer Goldberg, Inc. v. Fisher Foods, Inc.*, 823 F.2d 159, 162 (6th Cir. 1987).  Here, it is the broader public interest in Court-ordered disclosure of depositions and discovery (entered as judicial

records) that "'in the language of Rule 24(b)(2) [is] a question of law . . . in common between the Parties [to the original suit] and the [would-be intervenor].'" *Flynt*, 782 F.2d at 966 (quoting *Jessup*, 227 F.3d at 999).

In light of this case law, this Court's denial of a differently situated applicant's earlier request for intervention by right under Rule 24*(a)* for all purposes is inapposite. *See* Dkt. #42 (July 29, 2022 Order) at 2 (applicant shares "'same ultimate objective' as [Plaintiff-States] [and] has not overcome [the] presumption of adequate representation"), at 3 (intervention would "likely slow down the expedited discovery schedule previously set"). The legal standards for assessing that Rule 24(a) intervenor's application do not apply to this more-circumscribed application pursuant to Rule 24(b).

After meet-and-confers conducted with all cooperative[3] Parties pursuant to this Court's Local Rules ("LR") 7.4.1 and 7.6, the Applicants have been unable to obtain consent for the filing and granting of this motion. This Motion does not challenge the adequacy of the Plaintiff-States' representation in pursuit of their ultimate objective. But if "ultimate objective" analysis is relevant here, the Plaintiff-States' objection to this limited request clearly reflects that their ultimate

---

[3]    On October 26, 2022, Applicants' counsel sent a letter-proffer to Federal Defendants' counsel requesting their consent to the filing and granting of this motion, or to meet and confer by November 2 (seven days later). On October 31, defense counsel responded by email: "The parties are currently conducting expedited discovery proceedings on a highly compressed and resource intensive schedule, and the Federal Defendants are not available to discuss the question you pose in connection with proposed intervention until, at a minimum, after December 9, 2022." (Maturin Dec. at ¶ 2.) Yet, on November 9, Defendants moved for a protective order sealing all witness deposition audiovisual recordings, *see* Dkt. #110, which bears directly on Applicants' intervention request. On November 11, 2022, counsel met and conferred, but could not resolve the dispute, despite a follow-up email received on November 14, 2022. (Maturin Dec. at ¶ 3.) After informal meet and confers, counsel also could not secure the consent of the Plaintiff-States, nor did separate counsel for the individual Plaintiffs respond to their meet-and-confer request, after which counsel informed all Parties' counsel that this motion would be filed and noticed for hearing after December 12, 2022 (after the expedited discovery cut-off), *see* Dkt. # 90, or on a later date set by the Court. (Maturin Dec. at ¶ 4.)

objective does not align with that of the Applicants. Specifically, the Applicants' objective here is to obtain timely access to case discovery, the disclosure of which serves the broader public interest in federal government transparency,[4] and which is highly material to their own pending cases.

Nor will this request for access to discovery pose any threat of delay. The relief Applicants seek imposes only a *de minimis* burden (if any) on the parties or witnesses: that of sharing the electronic discovery in toto, or of conducting discrete word-searches on documents already produced or forthcoming, and sharing those results along with copies of witness depositions and confidentiality agreements. Moreover, on information and belief, the Plaintiff-States have already agreed to share the documents with another third-party, former President Donald J. Trump, in connection with litigation to which he is connected. It is for this Court, rather than the Plaintiff-States, to choose "winners" and "losers" among the third-party supplicants who come in search of records which, in these Applicants' cases, are highly-probative of their own speech-suppression.

Under such circumstances, the Applicants have standing to seek access to the *Missouri v. Biden* discovery described *supra* on their own behalf and for the general public. *See, e.g.*, *Weiss v. Allstate Ins. Co.*, No. 06-3774, 2007 U.S. Dist. LEXIS 59963, at **4, 10 (E.D. La. Aug. 16, 2007) (granting non-profit intervenor's request to lift from under seal Allstate adjuster manuals used to reduce or deny homeowners' Hurricane Katrina claims; unlike litigants, intervenor was "more focused on broader issue of public access" to documents that were "important to the public interest, both in Louisiana and nationwide"). The interest of the Applicants on their own behalf is as follows:

---

[4] The Federal Defendants' objective to shield this discovery from public view entirely and from Applicants in particular may be reasonably inferred from their moving for a protective order to seal the witness deposition audiovisual recordings, and refusing to share written discovery or the completed deposition transcripts at any time absent Applicants' waiver of entitlement to the written discovery. *See* fn. 1, *supra*.

1.      **Robert F. Kennedy, Jr.**

Kennedy is a world-renowned attorney and author.  Over decades of legal service, he has fought and won major battles against governments and large corporations on behalf of the poor, children, minorities, and the environment, often on the basis of facts that were at first denied and derided, but later proven true. Children's Health Defense, the non-profit organization Mr. Kennedy founded and serves as chairman, is dedicated to informing the public about, and fighting against, threats to children's health.  During the Covid-19 pandemic, Kennedy, CHD, and *The Defender* (CHD's weekly electronic newsletter) became important sources of news about Covid-19 and the Covid-19 vaccines for hundreds of thousands of people. Kennedy and CHD adhere to the highest standards of accuracy and scientific expertise in all of their news reporting, supporting every claim they publish with links to scientific studies and government databases, and employing a board of eminent scientific advisors to ensure accuracy. (Kennedy Dec. ¶ 3.)

Prior to being shadow-banned and ultimately de-platformed, Kennedy had 800,000 followers on Instagram and millions of viewers on YouTube. In late 2020 and early 2021, Kennedy reported (accurately): (a) that according to U.S. health authorities' own estimates, Covid-19's infection fatality rate ("IFR") among children and adults under 50 was lower than the widely reported IFR for the seasonal flu; (b) that official Covid-19 mortality figures were likely inflated because such figures included all deaths of individuals who had tested positive for Covid-19, rather than only deaths caused by Covid-19; (c) that a leading, internationally recognized physician had testified to Congress about ivermectin's ("IVM's") life-saving potential as a treatment for Covid-19; and (d) that the Covid-19 vaccines presented certain undisclosed risks and dangers. As a result of publishing these claims, Kennedy was de-platformed from Instagram (where he had 800,000

followers) on February 11, 2021, and both he and CHD were de-platformed from Facebook on August 17, 2022, and from YouTube on or about September 29, 2021.  (*Id.* ¶¶ 4-5.)

        2.     **Dr. Joseph Mercola**

Dr. Joseph Mercola, the founder and owner of Mercola.com, is a board-certified family medicine osteopathic physician, three-time *New York Times* bestselling author, fellow of the American College of Nutrition since October 2012, and former chairman of the family medicine department at St. Alexius Medical Center. Dr. Mercola has written more than 30 scientific studies and reports on topics ranging from the dangers of aspartame to mercury toxicity. For more than two decades, Dr. Mercola has been "ahead of the curve" on natural health innovation. In 1999, for example, Dr. Mercola reported on the dangers of the nonsteroidal anti-inflammatory drug Vioxx, five years before manufacturer Merck withdrew the drug from the market because of its potential to cause adverse cardiovascular effects. In 2001, he warned against the use of mercury in dentistry, 16 years before the Minamata Convention on Mercury banned the import and export of dental amalgam containing mercury. In 2006, he advised against ingestion of the artificial sweetener aspartame based on its connection to leukemia and other health conditions, nine years before *The Washington Post* reported on such dangers. Dr. Mercola's work for public health has included supporting California Ballot Proposition 37 relating to GMO food labeling, promoting the regenerative agriculture movement, and partnering with Caminos de Agua to assist rural communities in Mexico to access clean, uncontaminated water. (Mercola Dec. ¶ 3.)

In 1997, Dr. Mercola founded Mercola.com as a portal for natural health information and resources, one of the first websites established to serve users interested in holistic medicine. Today Mercola.com routinely ranks as one of the top-ten natural health websites, with more than one million newsletter subscribers and more than 10 million page views per month. Nevertheless,

Facebook and Twitter have "gray-listed" or "ghosted" (*i.e.*, hidden from public view by means not disclosed to Dr. Mercola) the Mercola accounts, making them more difficult to find and lowering their place in algorithm results. In addition, beginning late in 2020, Twitter (without providing any actual notification) began blocking users from sharing any links to the Mercola.com website or articles thereon. On September 29, 2021, YouTube de-platformed Dr. Mercola and his organization without notice, in violation of YouTube's own terms of service and community guidelines. Based on that de-platforming, Dr. Mercola and Mercola.com have filed an action for breach of contract, among other counts, in the United States District Court for the Northern District of California. (*Id.* ¶ 4.)

### 3.     Ty and Charlene Bollinger

Ty and Charlene Bollinger are residents of Tennessee and co-founders of the health-advocacy groups The Truth About Cancer, CancerTruth, The Truth About Vaccines, and The United Medical Freedom SuperPac. They are Christians, authors, filmmakers, and health-freedom advocates. Ty and Charlene make films and write books to bring awareness to real health solutions and advocate for the right to self-determination of all Americans and all citizens of the world. They have published a *New York Times* best-selling book, *The Truth About Cancer*, which has sold more than 250,000 copies and helped countless people treat and beat their cancer and regain their health. Their films cover different solutions for health and wellness, and advance public conversation and understanding on this vital issue. They regard being able to help so many people around the world as the fulfillment of a calling and a blessing beyond measure. Ty and Charlene have received countless testimonies from readers and viewers who were sent home to die, but who are alive and well after watching the Bollingers' films or reading their books. In their films and books, Ty and Charlene have featured doctors and scientists who are on the cutting edge of saving lives. They

have used social media platforms to stay in touch with their many fans and connect with other influencers to spread information that fosters health freedom and solutions. (Bollinger Dec. ¶ 3.)

Ty and Charlene were de-platformed from five Twitter channels, each of which had tens of thousands of followers, shortly after March 30, 2021. Their account The Truth About Vaccines was de-platformed from Instagram on March 25, 2021; their personal Instagram account was de-platformed on October 21, 2021; their The Truth About Vaccines account was de-platformed from YouTube on May 17, 2021; their The Truth About Cancer account, which had more than 200,000 subscribers and more than 40 million views, was de-platformed from YouTube on July 22, 2021; their The Truth About Cancer account was de-platformed from Vimeo on November 9, 2021; and most recently, their The Truth About Vaccines account was de-platformed from Vimeo on May 13, 2022. They continue to be heavily shadow-banned on Facebook. (*Id.* ¶ 4.)

### B.    The Applicants Are Uniquely Entitled to Intervene.

The Applicants are prominent figures among 12 specifically disfavored speakers collectively slandered as the "Disinformation Dozen."[5] In fact, all of the Applicants' censored

---

[5]    The term "Disinformation Dozen" was promulgated in March 2021 by groups calling themselves the Center for Countering Digital Hate (CCDH) and Anti-Vax Watch, a purported "alliance of concerned individuals who are seeking to educate the American public about the dangers of the anti-vax industry." *See, e.g.*, https://www.prnewswire.com/news-releases/disinformation-dozen-two-thirds-of-online-anti-vaccine-content-originates-from-top-12-anti-vax-leaders-301255060.html (last visited Nov. 14, 2022). ***Before*** undertaking its purported "research"—and without any definition of what constitutes "anti-vaccine" content other than its own opinion—CCDH "identified a dozen individuals who appeared to be extremely influential creators of digital anti-vaccine content." Facebook (Meta Platforms) itself indicated that there was no scientific underpinning for CCDH and Anti-Vax Watch's assertion that a particular dozen actors account for any specific percentage of so-called vaccine misinformation:

> In recent weeks, there has been a debate about whether the global problem of COVID-19 vaccine misinformation can be solved simply by removing 12 people from social media platforms. People who have advanced this narrative contend that these 12 people are responsible for 73% of online vaccine misinformation on Facebook. ***There isn't any evidence to support this claim.***

content is provably true, or protected opinion or criticism of government, or both. Further, the Applicants and their respective organizations have been de-platformed by social media firms working *in collusion with the federal government*, in violation of their free-speech rights and counter to the goal of an informed citizenry with access to a full marketplace of ideas. Thus, for the same reasons that (presumably) justified the Plaintiff-States' addition of five individual plaintiff-victims, these Applicants should have access to all case-discovery that references them by name or refers to banning the content for which they were ghosted or de-platformed. The fact that those five newly added individual plaintiffs now have access to such discovery—and the apparent fact that such discovery also is being shared with a third party, former President Donald J. Trump—undermines any legitimate need for confidentiality from the general public that may formerly have been advanced or found persuasive by public entity parties suing or defending this action. Notably, in the parties' November 11 meet-and-confer, *see supra* n.2, the Department of Justice, on behalf of the Federal Defendants, did *not* assert confidentiality concerns as a reason for opposing the Applicants' request, and stated that the Department would not object to the Plaintiff-States sharing the discovery with the Applicants; instead, the Department cited the burden imposed upon parties to the Action in making a production to the Applicants. (Maturin Dec. ¶ 2.) In order to mitigate any concern of burden, the Applicants are willing either (1) to access the discovery platform (or receive the entire universe of documents) and download the targeted documents (by

---

Meta, "How We're Taking Action Against Vaccine Misinformation Superspreaders" (Aug. 18, 2021), https://about.fb.com/news/2021/08/taking-action-against-vaccine-misinformation-superspreaders/ (emphasis added). Nevertheless, the "Disinformation Dozen" charge has been continually repeated by federal government and media outlets and used to justify action taken against the parties pre-identified by CCDH, including the Applicants here. *See, e.g.*, *Forbes*, "De-platform The Disinformation Dozen" (July 18, 2021), https://www.forbes.com/sites/stevensalzberg/2021/07/19/de-platform-the-disinformation-dozen/?sh=6617a01b7378; CNN, "White House turns up heat on Big Tech's Covid 'disinformation dozen'" (July 16, 2021), https://www.cnn.com/2021/07/16/tech/misinformation-covid-facebook-twitter-white-house.

search terms enumerated *supra*) themselves and at their own expense, or (2) to narrow the list of search terms if too many documents are indicated by the terms proposed herein.

Two of the three Applicants—Kennedy (specifically CHD, of which he is chairman) and Mercola—are involved in pending litigation to which such material is directly pertinent. *See Children's Health Defense v. Meta Platforms, Inc., et al.*, No. 21-16210 (9th Cir.) (oral argument May 17, 2022) (appeal from Rule 12(b)(6) dismissal **with prejudice** for failure to state **plausible** claim of federal actor-private platform collusion); *Mercola.com, LLC et al. v. Google LLC et al.*, No. 3:22-cv-05567 (N.D. Cal.) (filed Sept. 28, 2022). CHD, for example, has no alternative means of obtaining these materials; CHD's FOIA requests directed to the CDC and HHS have been pending since June 18, 2021 and April 13, 2022, respectively. To date, those requests have garnered fewer than 300 pages of redacted records, from the CDC, which were provided only on November 15, 2022, after the meet-and-confers referenced above. No documents, redacted or otherwise, have been provided by HHS. (Maturin Dec. ¶ 5.) In light of their active cases and, in particular, CHD's adverse decision now on appeal, it is urgent and imperative that these Applicants receive **all** case-discovery[6] that shines light on—indeed, may well prove—collusive conduct by and between federal government actors and social media platforms to censor and de-platform the Applicants' accounts. To the extent this Court finds the public interest in disclosure unpersuasive,

---

[6]     By July 22, 2022 FRAP 28(j) letter, CHD informed the Ninth Circuit of this Court's Order granting Plaintiff-States' discovery requests of federal officials and agencies, and social media platforms including Meta, and CHD's expectation that "significant pertinent material may be forthcoming shortly as a consequence of the Order." *Children's Health Defense v. Meta Platforms, Inc., et al.*, *supra*, Dkt. #62. Indeed, on August 31, Plaintiff-States filed such material with this Court to compel further responses from the Federal Defendants. (Dkt. ##71, 71-1 to 71-12.) On September 6, CHD sought judicial notice of that material in the Ninth Circuit. *See Children's Health Defense v. Meta Platforms, Inc., et al.*, *supra*, Dkt. ##70, 73. Thus, CHD will supplement the appellate record in the Ninth Circuit further with pertinent material it receives as a Rule 24(b) discovery intervenor.

these Applicants have made a showing of private entitlement which, if granted, would scarcely "open the floodgates" to other purported intervenors.

Significantly, the Plaintiff-States themselves now ***specifically allege*** that "[a]fter this series of public statements [in May through July, 2021], responding to 'White House pressure,' Facebook censored the accounts of the ***12 specific disfavored speakers*** whom [former White House Press Secretary Jen] Psaki accused of spreading health misinformation." Dkt. #84 (2d Am. Compl.) at 67 (emphasis supplied). (Regarding the dozen specific disfavored speakers, see *supra* n.5.) Moreover, as they have further alleged, case-discovery to date "confirm[s] the allegations of collusion between HHS officials and social-media platforms to censor disfavored speech, speakers, and viewpoints, as alleged herein"—conduct that has only continued to intensify since summer 2021. *Id.* at 70; *see also id.* at 71 (holding of regular "BOLO" meetings in which federal officers flag specific posts for censorship on social media platforms), 102-03 (additional steps taken against "Disinformation Dozen" in conjunction with Meta employee's texts and emails with Surgeon General Vivek Murthy, days after President Biden's demand for action); 107-11 (Meta email to White House senior official Flaherty "following up on your request," "we are removing those claims" [relating to Covid-19 vaccine toxicity and side-effects, comparison with flu vaccine, and censoring speech critical or skeptical of Covid-19 vaccine for children]); 142-43 (federal actors' statements about "flagging problematic posts" and "working together" with social media "partners").

In this regard, the Plaintiff-States' amended complaint clearly reflects the discovery yielded by their subpoenas duces tecum that listed "Kennedy" and "Disinformation Dozen" as specific search terms, and their interrogatories that sought, *inter alia*, "all communications with any Social-Media Platform that refer or relate to [] any member of the so-called 'Disinformation

Dozen.'" *See* OFFICE OF THE MISSOURI ATTORNEY GENERAL, *Missouri, Louisiana Serve Discovery Requests, Subpoenas on Top Biden Administration Officials and Social Media Giants* (July 19, 2022), https://ago.mo.gov/home/news/2022/07/19/missouri-louisiana-serve-discovery-requests-subpoenas-on-top-biden-administration-officials-and-social-media-giants (providing links to subpoenas).

To date, the Applicants are aware of multiple references to the purported "Disinformation Dozen," *see supra* n.5, in the case discovery made public in court filings. *See, e.g.*, Dkt. #71-3 at 2 (senior Meta executive said in email to Surgeon General Vivek Murthy: "I wanted to make sure you saw the steps we took just this past week to adjust policies on what we are removing with respect to misinformation, as well as steps taken to further address the 'disinfo dozen': we removed 17 additional Pages, Groups, and Instagram accounts tied to the 'disinfo dozen' (so a total of 39 Profiles, Pages, Groups, and IG accounts deleted thus far, resulting in every member of the disinfo dozen having had at least one such entity removed). We are also continuing to make 4 other Pages and Profiles, which have not yet met their removal thresholds, more difficult to find on our platform. We also expanded the group of false claims that we remove, to keep up with recent trends of misinformation that we are seeing."); Dkt. #71-4, at 13 ("We've specifically investigated the people sometimes identified in the media as the 'Disinfo Dozen.' We've applied penalties to some of their website domains as well as any posts, including their website content, are moved lower in News Feed."), 14 ("We have examined the distribution patterns of the so-called 'Disinfo Dozen' . . . .").

The Applicants may reasonably infer from those responsive records that there are likely other—*perhaps many other*—such references to the purported "Disinformation Dozen," or to the Applicants individually, which the Plaintiff-States have not publicly filed simply because they

were not germane to any particular discovery dispute.  This adventitious circumstance, however, should not be allowed to impair the Applicants' fundamental right of access to discovery that specifically relates to the suppression of their speech and viewpoints, for which they are seeking redress in the courts.

### C.       The Case Law Supports the Applicants' Requests.

*New York v. Microsoft Corp.*, 206 F.R.D. 19, 24 (D.D.C. 2002), determined in the context of a high-profile case that third-party media representatives were permitted to intervene for the limited purpose of accessing deposition videotapes and transcripts of Microsoft's five key control persons. Clearly, in ***this*** high-profile case, the ongoing depositions of eight control persons in the federal government are significant, newsworthy events, shedding first light on otherwise covert conduct between them and the leading social media platforms. The Applicants note that this Court has now found "extraordinary circumstances" to compel depositions of eight executive government officials with firsthand knowledge of collusion with, and pressure exerted on, social media platforms to censor COVID-related speech.  (Dkt. #90 (Oct. 21, 2022 Order) at 3-4, *et seq.*) The Court "sees the importance of having [Dr. Fauci, and presumably the others] make statements under oath[,]" particularly "as [he, like the others] has yet to give any statements under oath." (*Id.* at 9, 10-11.)

More broadly, Rule 5(d)(1)(A) expressly permits the Court to order the Parties to file any pre-trial case-discovery (*e.g.*, document requests and interrogatories) even before these are used in the proceeding, although the 2000 amendment to Rule 5(d) provides no presumption of public access. *See, e.g.*, *SEC v. TheStreet.com*, 273 F.3d 222, 233 n.11 (2d Cir. 2001); *In re Sealing & Non-Disclosure of Pen/Trap/2703(d) Orders*, 562 F.Supp.2d 876, 890 (S.D. Tex. 2008). Even more than the successful intervenors in *Microsoft* and *Weiss*, *supra*, these Applicants are uniquely entitled to an Order for Rule 5(d)(1)(A) and 24(b) public-filing of discovery and intervention for

the purpose of inspection. Such action is manifestly in the public interest. The Applicants are readily able to demonstrate compelling need for the records sought based on (1) their online news publisher status, (2) materiality to their own related litigation, and (3) lack of alternatives for access. *See, e.g.*, *Flynt*, *supra* (permitting publisher Larry Flynt to intervene in Missouri execution protocol litigation to obtain judicial records where unsealing of such records furthered public interest); *Weiss*, *supra*. While there is no protective order in place here for the Court to lift, or any sealed records to unseal,[7] that is a mere happenstance of "private ordering" by the parties and third parties. Certainly, the Court's Rule 5(d)(1)(A) authority to order that the discovery be filed and thereby made available to the Applicants who have otherwise made the requisite showing of entitlement is not diminished by such private ordering.

### D.      At a Minimum, *in Camera* Inspection Is Warranted.

The All Writs Act, 28 U.S.C. § 1651, empowers the Court to issue all writs necessary or appropriate "to assist [it] in conducting factual inquires." *Harris v. Nelson*, 394 U.S. 286, 300 (1969) (citation omitted); 28 U.S.C. § 1651 ("The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."). The Applicants seek access to discovery that is plainly material (if not dispositive) that is not available to them by any other means. To avoid the potential miscarriage of justice that could result from lack of access to such material, the Applicants ask that this Court, at a minimum, require the Federal Defendants to lodge **under seal** an **unredacted** copy of the responsive records for the Applicants' review. This Court is empowered to issue such an Order, and review of those records is both necessary and warranted.

---

[7]      The Applicants note, in this regard, that the Federal Defendants have now moved for a protective order sealing all witness deposition audiovisual recordings (Dkt. #110), and have proposed as a compromise that the Applicants be provided with no audiovisual recordings and only redacted versions of the deposition transcripts (Maturin Dec. ¶ 3).

In *Cheney v. United States District Court*, 542 U.S. 367, 380 (2004), the Supreme Court set forth three conditions that must be satisfied before issuance of a writ under § 1651:

> First, the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires. . . . Second, the petitioner must satisfy the burden of showing that [his] right to issuance of the writ is "clear and indisputable." Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances.

*Id.* at 380-81. The Court's power to issue a writ under § 1651 extends to non-parties. *See Moore v. Tangipahoa Parish Sch. Bd.*, 507 Fed. Appx. 389, 396 (5th Cir. 2013) (citing *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 174 (1977); *see also United States v. Franklin Parish Sch. Bd.*, 922 F. Supp.2d 591, 600 (W.D. La. 2013) (granting in part the DOJ's request under the All Writs Act to compel a non-party, the Louisiana Department of Education, to provide responses to interrogatories and requests for production). The proposition that the greater power includes the lesser applies here. The Court's power to compel a non-party's response, *see Franklin Parish Sch. Bd.*, *supra*, is surely capacious enough to include non-party Applicants' request for access to party discovery which has already been compelled and produced.

Here, the Applicants meet all three conditions for issuance of the extraordinary writ "to achieve the ends of justice entrusted to it." *New York Tel. Co.*, 434 U.S. at 173. First, despite their due diligence in other venues, they have no practical means to obtain this material discovery. Further, there is a potential risk that these records may be lost or destroyed if this Court does not order their filing for *in camera* inspection. *See, e.g.*, *Cinel v. Connick*, 792 F. Supp. 492, 496 (E.D. La. 1992) (ordering Parties and all others to furnish to court *in camera* inventory of former priest-defendant's alleged child pornography materials, which were in their actual or constructive possession and to preserve such materials to prevent destruction or unavailability of relevant evidence). As in *Cinel*, this Court should exercise its power to "see to it that all Parties' rights of

access to possibly relevant evidence are preserved." *Id.* at 497.  Second, those portions of the case-discovery that are now a matter of public record contain ***far more than*** a *prima facie* indication of joint action by and between the Federal Defendants and social-media platforms to censor and blacklist the Applicants in particular. Third, the writ is appropriate under the circumstances because it is narrowly tailored to the Applicants' demonstrable need; it may avert a serious miscarriage of justice should final judgments be entered (or affirmed on appeal) against them in other pending actions while these very material records—indeed, potentially ***dispositive*** records—remain secret and still-operative. Every day that the social media platforms continue to de-platform the Applicants and refuse to reinstate their accounts and pages is a day when the federal government censorship through collusion with social media platforms continues unabated. Finally, inspection under seal fully respects and accords protection to whatever legitimate privileges either the Federal Defendants or the platforms may still possess in the undisclosed records.

## <u>CONCLUSION</u>

For the reasons stated above, the Applicants respectfully request that this Court grant their motion to intervene for access to the witness depositions, document discovery, and party agreements sought under Rules 5(d)(1)(A) and 24(b) in their own behalf and for the general public, or alternatively, for *in camera* inspection of those records and production to them of all relevant evidence.

Dated:  November 17, 2022     Respectfully submitted,

                 _____

                 G. SHELLY MATURIN, II
                 (La. Bar#26994)
                 Maturin Law
                 322 Heymann Blvd., Suite 1
                 Lafayette, LA 70503
                 Telephone: (337) 362-3514
                 E-mail: shelly@maturinlaw.com

                 Attorney for Applicant-Intervenors
                 ROBERT F. KENNEDY, JR.
                 DR. JOSEPH MERCOLA
                 TY and CHARLENE BOLLINGER

## **CERTIFICATE OF SERVICE**

This is to certify that a copy of the above and foregoing has been served on all known

counsel of record via facsimile transmission, e-mail and/or by placing same in the U.S. Mail,

properly addressed and postage pre-paid on this 17th day of November, 2022.


/s/ G. Shelly Maturin, II

_____

G. SHELLY MATURIN, II