# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| JENNIFER R. PSAKI, | |
| Movant, | |
| v. | Misc. Case No. 1:22-mc-28 |
| STATE OF MISSOURI ex rel. ERIC S. SCHMITT, Attorney General, et al., | Underlying Case No.: 3:22-cv-01213 (W.D. La.) |
| Respondents. | |

## <u>JENNIFER R. PSAKI'S MOTION TO QUASH A SUBPOENA</u>

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, Movant Jennifer R. Psaki, by and through undersigned counsel, moves to quash the November 1, 2022, subpoena directed to her and issued by the State of Missouri, the State of Louisiana, Dr. Aaron Kheriaty, Dr. Martin Kulldorff, Jim Hoft, Dr. Jayanta Bhattacharya, and Jill Hines ("Plaintiffs").

Ms. Psaki's grounds for moving to quash the subpoena are set forth in detail in her Memorandum in Support of this motion filed herewith.

The undersigned certifies that counsel conferred in good faith in an attempt to narrow the dispute prior to filing this motion.

Dated:  November 3, 2022

JENNIFER R. PSAKI

*/s/  Edward E. Bagnell, Jr.*
Edward E. Bagnell, Jr.  (VSB # 74647)
Email:  ebagnell@spottsfain.com
Spotts Fain PC
411 E. Franklin Street, Suite 600
Richmond, VA  23219
Tel. 804 697-2000
Fax: 804 697-2177

- and -

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP

Jeannie S. Rhee*
2001 K Street, N.W.
Washington, DC 20006
jrhee@paulweiss.com

David K. Kessler*
Muamera Hadzic
1285 Avenue of the Americas
New York, NY 10019
dkessler@paulweiss.com
mhadzic@paulweiss.com

*Attorneys for Movant Jennifer R. Psaki*

* Application for admission
*pro hac vice* pending

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of November, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and served a copy by email to the following:

| | |
|---|---|
| D. John Sauer, Mo. Bar No. 58721<br>Solicitor General<br>Justin D. Smith, Mo. Bar No. 63253<br>First Assistant Attorney General<br>Todd Scott, Mo. Bar No. 56614<br>Senior Counsel<br>Michael E. Talent, Mo. Bar No. 73339<br>Deputy Solicitor General<br>Missouri Attorney General's Office<br>Post Office Box 899<br>Jefferson City, MO 65102<br>Tel: (573) 751-8870<br>John.Sauer@ago.mo.gov<br>*Counsel for State of Missouri*<br><br><br>Jenin Younes<br>John J. Vecchione<br>New Civil Liberties Alliance<br>1225 19th Street N.W., Suite 450<br>Washington, DC 20036<br>Direct: (202) 918-6905<br>E-mail: jenin.younes@ncla.legal<br>*Counsel for Plaintiffs Dr. Jayanta Bhattacharya, Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines* | Elizabeth B. Murrill (La #20685)<br>Solicitor General<br>Louisiana Department of Justice<br>1885 N. Third Street<br>Baton Rouge, Louisiana 70804<br>Tel: (225) 326-6766<br>murrille@ag.louisiana.gov<br>*Counsel for State of Louisiana*<br><br><br>John C. Burns<br>Burns Law Firm<br>P.O. Box 191250<br>St. Louis, Missouri 63119<br>P: 314-329-5040<br>F: 314-282-8136<br>E-mail: john@burns-law-firm.com<br>*Counsel for Plaintiff Jim Hoft* |

By: /s/ Edward E. Bagnell, Jr.
Edward E. Bagnell, Jr. (VSB # 74647)
ebagnell@spottsfain.com
SPOTTS FAIN, P.C.
411 E. Franklin Street, Suite 600
Richmond, VA 23219
Telephone: (804) 697-2000
Facsimile: (804) 697-2100
*Counsel for Movant*

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| JENNIFER R. PSAKI, | |
|      Movant, | |
| v. | Misc. Case No. 1:22-mc-28 |
| STATE OF MISSOURI ex rel. ERIC S. SCHMITT, Attorney General, et al., | Underlying Case No.: 3:22-cv-01213 (W.D. La.) |
|      Respondents. | |

## JENNIFER R. PSAKI'S MEMORANDUM IN SUPPORT OF HER MOTION TO QUASH A SUBPOENA

## PRELIMINARY STATEMENT

Pursuant to Rule 45 of the Federal Rules of Civil Procedure and Local Rule 45, Jennifer R. Psaki, by and through undersigned counsel, moves to quash a subpoena for deposition testimony (the "Subpoena") issued by the State of Missouri, the State of Louisiana, Dr. Aaron Kheriaty, Dr. Martin Kulldorff, Jim Hoft, Dr. Jayanta Bhattacharya, and Jill Hines ("Plaintiffs").[1]

This motion arises from Plaintiffs' lawsuit in the United States District Court for the Western District of Louisiana against President Joseph R. Biden, Jr. and 66 other individuals and entities of the U.S. government ("Defendants")—none of whom is Ms. Psaki.  Plaintiffs have alleged a wide-ranging, multi-year effort by the U.S. government to collude with social-media companies to suppress and censor speech in violation of the First Amendment.  On the basis of that lawsuit, Plaintiffs further sought a broad preliminary injunction against all federal government officials currently involved in such alleged conduct, and, in July 2022, obtained expedited, preliminary-injunction-related discovery to enable them, according to their filing, to identify all the members of this alleged conspiracy.  After Defendants provided responses to interrogatories and produced 15,000 pages of responsive documents, Plaintiffs increased the number of named defendants from 13 to the 67 individuals and agencies now being sued.

As part of the targeted discovery to identify all supposed members of the alleged conspiracy and seek certain other information, Plaintiffs further sought and received authorization in October 2022 to depose 10 current and former executive officials—including Ms. Psaki, a private citizen who served as the White House Press Secretary between January 2021 and May 2022.  But the information Plaintiffs purport to need from Ms. Psaki—primarily

---

[1] A copy of the Subpoena and its attachments is included as Exhibit 1 to this memorandum.

the identities of specific federal officials who corresponded with social-media companies and the nature of those communications—is information they have already obtained from Defendants through expedited discovery. Nor have Plaintiffs shown that they cannot obtain any additional information they are authorized to seek from sources other than Ms. Psaki.

This court should quash the Subpoena because it is unduly burdensome. The burdens of preparing and sitting for any wide-ranging deposition are significant, let alone the deposition of a former senior administration official. And imposing that burden on Ms. Psaki, a nonparty private citizen, is entirely unwarranted on this record. The proposed deposition is, at best, a fishing expedition to try to identify additional members of a conspiracy that Plaintiffs have merely alleged to exist, after they have already received extensive expedited discovery and although there exist alternate sources for that information. And the proposed deposition, the scope of which Plaintiffs have not tried to limit in the Subpoena, also would allow Plaintiffs improperly to seek extensive discovery from Ms. Psaki about the merits of their underlying claims, before having to submit their motion for a preliminary injunction to any scrutiny, or to defend their complaint against a motion to dismiss.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 5, 2022 Plaintiffs sued President Biden, several U.S. government entities, including the Department of Homeland Security and the Cybersecurity and Infrastructure Security Agency, and various senior government officials in their official capacities, including Ms. Psaki in her official capacity as White House Press Secretary. WDLA Dkt. 1 ¶¶ 15–27 (listing a total of 13 defendants).[2] As relevant here, Plaintiffs alleged two claims—"Violation of

---

[2] "WDLA Dkt. __" refers to the corresponding docket entry in the underlying lawsuit, *State of Missouri* v. *Joseph R. Biden, Jr., et al.*, 22-CV-01213 (W.D.L.A. May 5, 2022). For the Court's convenience, we have attached key filings to this memo. The Second Amended Complaint (Dkt. 84) is attached as Exhibit 2, the parties' Joint Statement Regarding Witness Depositions (Dkt.

the First Amendment" and "Action in Excess of Statutory Authority"—arising from Defendants'

supposed collusion with social-media platforms since 2020 to classify speech as misinformation

and to censor content related to topics ranging from election integrity to the origins of and

response to COVID-19.  *See id.* ¶¶ 3, 66–99, 241–265; WDLA Dkt. 90 at 2.

As to Ms. Psaki, Plaintiffs alleged that, as White House Press Secretary, she routinely

made statements during press briefings that purportedly admitted to collusion between the

administration and social-media platforms.  *See, e.g.*, WDLA Dkt. 1 ¶¶ 151–152.  Plaintiffs also

alleged that Ms. Psaki "called on social-media companies to censor particular disfavored

speakers," such as when she reiterated the following about Facebook's existing terms of service:

"It's important to take faster action against harmful posts.  As you all know, information travels

quite quickly on social-media platforms; sometimes it's not accurate.  And Facebook needs to

move more quickly to remove harmful, violative posts—posts that will be within their policies

for removal often remain up for days.  That's too long."  *Id.* at ¶ 159; WDLA Dkt. 86 at 15.

On May 13, 2022, Ms. Psaki stepped down from her position as White House Press

Secretary and was replaced by Karine Jean-Pierre.  Declaration of Jennifer R. Psaki ("Decl.")

¶ 4; *see* WDLA Dkt. 86 at 15.

On June 14, 2022, approximately a year after the alleged violations began and forty days

after filing suit, Plaintiffs moved for a preliminary injunction.  WDLA Dkt. 10 at 2.  They

proposed that the district court enter an injunction in "three phrases," first enjoining "the most

egregious of Defendants' practices, which include demanding or urging social-media companies,

either overtly or covertly, to censor speakers, content, and viewpoint that the government

---

86) is Exhibit 3, and the district court's Order Regarding Witness Depositions (Dkt. 90) is
attached as Exhibit 4.

disfavors" and then "grant[ing] expedited preliminary-injunction-related discovery to allow the states to discover the full details and scope of Defendants' social-media-censorship activities." WDLA Dkt. 15 at 57. This discovery would help the court to "fashion more specific relief to prevent ongoing and future unlawful activity." *Id.*

On June 17, Plaintiffs filed a separate motion to expedite "preliminary-injunction-related discovery on a limited basis" to identify "federal officials who are coordinating with social-media platforms on the suppression and censorship of online speech" and the nature of their communications. WDLA Dkt. 18 at 1. Almost a month later, on July 12, 2022, the district court granted the motion for expedited discovery. *See* WDLA Dkt. 34 at 1. Recognizing that "[e]xpedited discovery is not the norm," the court nevertheless found that Plaintiffs had shown good cause for limited discovery, reasoning that their request was tailored to seek evidence to prove the allegations in their pending motion for a preliminary injunction. *Id.* at 9, 11–13. The court allowed Plaintiffs to serve interrogatories and document requests on Defendants, as well as third-party subpoenas on five social-media platforms, "seeking the identity of federal officials" allegedly communicating with social-media platforms about censorship and the nature of those communications. *Id.* at 13. It left open the question of depositions for a later time. *Id.* at 12.

On August 2, 2022, Plaintiffs filed an amended complaint that, among other things, removed Ms. Psaki, in her official capacity as White House Press Secretary, as a defendant and substituted Karine Jean-Pierre, in her official capacity as the new White House Press Secretary. *See* WDLA Dkt. 45 ¶ 24. Ms. Psaki was not named as a defendant in her individual capacity in the amended complaint.

As of August 31, 2022, Defendants had provided responses to numerous interrogatories and produced approximately 15,000 pages of responsive documents. WDLA Dkt. 71 at 31;

WDLA Dkt. 86 at 40.  Based on these productions, Plaintiffs identified new individual and agency defendants, and sought expedited discovery against them too; the parties disputed this expansion of targeted discovery, as well as whether certain officials should be required to respond to interrogatories and production requests, whether Defendants should be required to identify federal officials and agencies outside of their own agencies who allegedly engaged in censorship, and whether Defendants should be allowed reciprocal discovery.  WDLA Dkt. 72 at 2.  The district court denied the request for expedited discovery as to new defendants, and denied out-of-agency discovery and discovery by Defendants, but it ordered current White House Press Secretary (Karine Jean-Pierre) to respond to interrogatories and document requests.  *Id.* at 3–9.

On October 6, 2022, Plaintiffs filed a Second Amended Complaint ("SAC") that named 67 defendant individuals and entities (up from 13 in the original complaint), including Karine Jean-Pierre, in her official capacity.  WDLA Dkt. 84 ¶¶ 26–93.  Ms. Psaki was, again, not named as a defendant.  As in the original complaint, the SAC alleged that Ms. Psaki had made several public, generalized statements purportedly admitting to collusion between the administration and social-media companies, such as:  "[W]e are in regular touch with these social-media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team, given . . . this is a big issue of misinformation, specifically on the pandemic."  *Id.* ¶ 225.  And Plaintiffs again asserted that Ms. Psaki's comments during press briefings, such as statements about the excessive time it sometimes took to remove posts violating social-media platforms' terms of service, were a call for those platforms to censor certain content.  *See, e.g.*, *Id.* ¶¶ 226, 233–37.

On October 14, 2022, Plaintiffs asked the district court for permission to depose "10 key officials"—eight current government employees and two former ones, including Ms. Psaki—

"who have participated directly in the massive 'Censorship Enterprise' of federal officials pressuring social-media platforms to censor" private speech.  WDLA Dkt. No. 86 at 2.  According to Plaintiffs, the discovery authorized to date had "not provide[d] the full scope and nature of federal officials' communications with social-media platforms about censorship," in part because probative communications likely occurred orally, rather than in writing.  *Id.* at 2.  As to Ms. Psaki, Plaintiffs argued that several discrete public statements she made in her capacity as White House Press Secretary show that she has personal knowledge about who participated in these conversations and that the interrogatory responses from Ms. Jean-Pierre did not adequately address Ms. Psaki's own knowledge.  *Id.* at 15–18.  They further argued that a deposition of Ms. Psaki would not intrude on the independence of the Executive Branch's decision-making process because Ms. Psaki herself "was not a decision-maker on these issues," but rather simply "announced the actions of the decision-makers from the White House Press Room." *Id.* at 37.  Further, according to Plaintiffs, [a]sking her to explain her statements, identify the senior members of the team and COVID-19 team, and identify any other White House contacts with social-media platforms is a minimal burden."  *Id.* at 37.

Defendants opposed, arguing that they had already identified the officials who had communicated with social-media platforms in the interrogatory responses and the more than 15,000 pages of documents, including correspondence between officials and social-media companies.  *See id.* at 43; *see, e.g.*, WDLA Dkt. 71 at 5, 407–411 (emails produced by Defendants cited in August 31, 2022 Joint Statement on Discovery Disputes).  They had also performed a search of Ms. Psaki's emails during her time as White House Press Secretary and found *no responsive documents*.  WDLA Dkt. 86 at 54.  Defendants explained that, in light of the information already provided, any further discovery would be unduly burdensome and

duplicative, straying far beyond the limited scope of discovery for the preliminary injunction

motion. *See id.* at 43–44. They further argued that Plaintiffs had not met the exceedingly high

standard—a showing of "exceptional circumstances"—for deposing current and former high-

ranking government officials. *Id.* at 44–45, 51–52.

On October 21, 2022, the district court authorized Plaintiffs to take several depositions,

including of Ms. Psaki. For reasons that are unclear, the court referred to Ms. Psaki as "a

Defendant in this case," although she was no longer a defendant, WDLA Dkt. 90 at 15, and its

entire analysis for granting her deposition consisted of the following:

> [P]laintiffs have proven that Jennifer Psaki has personal knowledge about the issue
> concerning censorship across social media as it related to COVID-19 and ancillary issues
> of COVID-19. The Court has considered that Psaki was a high-ranking official at the
> time that she made the statements at issue, especially as she served as the White House
> Press Secretary. However, this rank does not mitigate the relevance and the need of her
> deposition as it relates to this case. Any burden on Psaki is outweighed by the need to
> determine whether free speech has been suppressed. Lastly, the Court has determined
> that there are substantive reasons for taking the deposition. Extraordinary circumstances
> are present. . . . Psaki has made a number of statements that are relevant to the
> Government's involvement in a number of social-media platforms' efforts to censor its
> users across the board for sharing information related to COVID-19.

*Id.* at 17–18. Although the court stated that it considered "[a]ny burden on Psaki," Ms. Psaki

was not a party to that proceeding, did not appear in that proceeding, and did not have the

opportunity to present her own arguments about the burden of a deposition. *Id.* at 18.

Plaintiffs then served a subpoena on Ms. Psaki that ordered her to testify in Arlington,

Virginia on November 17, 2022. *See* Ex. 1 at 1. The subpoena did not at all define or limit the

scope of the deposition. Although not authorized by the Western District of Louisiana district

court, the Subpoena also sought eight categories of documents from Ms. Psaki. *Id.* at 8–10.

Some of the document requests are directed to specific statements made by Ms. Psaki, but one

calls for "any Documents and Communications that relate to any member of the White House

Communications Team or any other Federal Official communicating with Social-Media Platforms about Content on those Platforms." *Id.* at 10.  Ms. Psaki will file objections to those document requests in due course, consistent with Federal Rule of Civil Procedure 45(d)(2)(B).

On October 28, Plaintiffs agreed to postpone the deposition until December 8, 2022, as part of an agreed-upon briefing schedule for this motion to quash.[3]  On November 1, 2022, Plaintiffs reissued the Subpoena; the new Subpoena is materially the same as the previous subpoena, except with a new date for the deposition.  As of the date of this motion, six months after Plaintiffs first sued the President and officials and agencies of the U.S. government, the Western District of Louisiana has still not ruled on the motion for a preliminary injunction, and no motion to dismiss has been filed.

## ARGUMENT

### I.    Legal Standard

Pursuant to Rule 45(d)(3)(A)(iv), the "court for the district where compliance is required must quash or modify a subpoena" that, among other prohibitions, "subjects a person to undue burden."  Thus, under Rule 45, a motion to quash a subpoena that requires compliance in the Eastern District of Virginia should be brought in the Eastern District of Virginia.

Whether a burden is undue depends on, among other things, the "(1) relevancy of the proposed testimony; (2) need for the testimony; (3) breadth of the subpoena; (4) availability of the testimony by other means; [and] (5) burden on the subpoenaed party in obeying the subpoena."  *Intelligent Verification Sys., LLC* v. *Microsoft Corp.*, No. 2:12CV525, 2014 WL 12544827, at *2 (E.D. Va. Jan. 9, 2014) (citing *Wiwa* v. *Royal Dutch Petroleum Co.*, 392 F.3d

---

[3] The parties will file a proposed order setting forth the agreed-upon briefing schedule, which notices a hearing for November 18, 2022, with Plaintiffs' opposition to this motion due on November 11, and any reply due on November 16.

812, 819 (5th Cir. 2004)).  A subpoena that is overbroad or seeks irrelevant information imposes an undue burden.  *Singletary* v. *Sterling Transp. Co.*, 289 F.R.D. 237, 241 (E.D. Va. 2012) ("[T]he scope of discovery allowed under a subpoena is the same as the scope of discovery allowed under Rule 26.").

When, as here, "a subpoena is directed to a nonparty, courts must give the recipient's nonparty status special weight, leading to an even more demanding and sensitive inquiry than the one governing discovery generally."  *Gilmore* v. *Jones*, 339 F.R.D. 111, 120 (W.D. Va. 2021) (internal quotation marks omitted).  In nonparty cases, courts scrutinize with extra care the burdens of compliance with the subpoena, the purported need for the information sought, and whether it is available via alternative means.  *Id.* ("[E]ven if they have information that falls within the scope of party discovery, nonparties should not be drawn into the parties' dispute without some good reason." (internal quotation marks omitted)); *see Cook* v. *Howard*, 484 F. App'x 805, 812 n.7 (4th Cir. 2012) (a "subpoena [that] seeks information irrelevant to the case or that would require a non-party to incur excessive expenditure of time" is unduly burdensome).  The party serving the subpoena "should be able to explain why it cannot obtain . . . comparable information . . . from one of the parties to the litigation—or, in appropriate cases, from other third parties."  *Gilmore*, 339 F.R.D. at 121.

Further, to protect the independence and orderly operations of the Executive Branch, depositions of current and former high-level officials are only authorized under "exceptional circumstances," such as when the official has "unique first-hand knowledge" that cannot be obtained elsewhere.  *Fed. Deposit Ins. Corp.* v. *Galan-Alvarez*, No. 1:15-MC-00752 (CRC), 2015 WL 5602342, at *3 (D.D.C. Sept. 4, 2015).  The party seeking to subpoena a high-ranking official must show that the testimony sought is "unobtainable in any other way" and

"[e]xhaustion of all reasonable alternative sources." *In re U.S. Dep't of Educ.*, 25 F.4th 692, 704–05 (9th Cir. 2022).

## II.     Argument

This court should quash the Subpoena because it is unduly burdensome to Ms. Psaki. The time and effort required to prepare for a deposition—bearing in mind that Ms. Psaki is a nondefendant private party, and a former high-ranking government official—is entirely unwarranted given the procedural posture of the case, the purpose of the targeted preliminary-injunction-related discovery authorized in the underlying case, and the clearly available alternatives to secure the information that Plaintiffs purport to seek through her testimony. Further, Ms. Psaki joins in Defendants' motion to quash the subpoena, which we understand will be filed on this same docket, on the grounds that Plaintiffs have not demonstrated exceptional circumstances necessary to justify the deposition of a former high-ranking executive official.

### A.     The Subpoena Is Unduly Burdensome

Complying with any deposition subpoena is burdensome and time consuming.  But the burdens inherent in complying with a subpoena are heightened when the deponent is a nonparty who has no stake in the litigation, and include "overbreadth, and invasion of privacy and confidentiality interests of both the subpoena recipients and others who might be affected." *Gilmore*, 339 F.R.D at 125 (citing *Virginia Dep't of Corr.* v. *Jordan*, 921 F.3d 180, 189-90 (4th Cir. 2019) (internal quotation marks omitted)).  It is not clear whether the court in the Western District of Louisiana, which referred to Ms. Psaki as a "defendant," considered her status as a nonparty in analyzing the burden imposed on her, but that consideration is now squarely before this court.  *See* WDLA Dkt. 90 at 15.

Compliance with the nonparty Subpoena would be even more demanding for Ms. Psaki given her role as a former executive official.  Unlike in a typical civilian deposition, Ms. Psaki

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 16 of 332 PageID #:
4300
Case 1:22-mc-00028   Document 5   Filed 11/03/22   Page 12 of 21 PageID# 20

must be prepared to field probing questions about her observations and decisions during her

tenure as White House Press Secretary, and she must also be prepared to do so with attention to

the limitations of her testimony and which of her conversations or recollections might be subject

to executive privilege.  This requires extensive preparation not just with Ms. Psaki's own

counsel, but also with the government and its counsel.  These efforts would be further

complicated by the fact that she no longer possesses relevant materials, such as her White House

emails and documents, that would aid in her preparation.  Ms. Psaki has explained that

complying with the Subpoena and "devot[ing] several days to preparing for the deposition, as

well as attending the deposition itself" would "be highly disruptive to both [her] work and [her]

family."  (Decl. ¶ 5.)  In seeking the Subpoena, Plaintiffs merely dismissed the burden on Ms.

Psaki as "minimal," and did not address any of these sources of burden.  *See* WDLA Dkt. No. 86

at 37.

    Imposing this heavy burden on Ms. Psaki is entirely unwarranted on the record here.

    *First*, the Subpoena offers no limitations on the questions to be asked.  There is no

indication that Plaintiffs intend to limit their questioning to the scope of permitted discovery,

much less what Plaintiffs claimed to seek from Ms. Psaki in preliminary-injunction-related

discovery: "to explain her statements [as Press Secretary], identify the senior members of the

team and COVID-19 team [who interacted with social-media platforms], and identify any other

White House contacts with social media platforms."  WDLA Dkt. 86 at 37.  Ms. Psaki could

therefore be exposed to questions on any number of other topics related to her time as White

House Press Secretary.  *See Gilmore*, 339 F.R.D. at 120 (overbreadth is a "cognizable burden"

on a nonparty).  The inherent costs to a nonparty of sitting for any deposition—both material and

personal—are only exacerbated when a request provides no guideposts for a deponent as she prepares for and faces questioning.

*Second*, even if the scope of the Subpoena were limited, there would be no need for Ms. Psaki's testimony at all because Plaintiffs already have access to the information they purport to seek from her about the identities of federal officials communicating with social-media platforms and the nature of those communications, and can get any additional information from other sources.  *See* WDLA Dkt. 86 at 15.  A court considering the involuntary deposition of a nonparty must give "special weight" to the recipient's nonparty status, scrutinizing "not just the relevance of information sought, but the requesting party's need for it," and whether the "information is available to the requesting party from other sources." *Virginia Dep't of Corr.*, 921 F.3d at 189. The requested information must also "offer some value over and above what the requesting party already has." *Id.*; *accord Gilmore*, 339 F.R.D. at 120.

Here, Plaintiffs have alleged that certain statements made by Ms. Psaki during press briefings—such as, "we are in regular touch with these social media platforms . . . through members of our senior staff"—indicate that she had personal knowledge of the identities of the officials who communicated with social-media platforms and that Plaintiffs could determine who those officials were only by deposing her.  WDLA Dkt. 84 ¶ 225; WDLA Dkt. 86 at 15, 37.  But Defendants have already provided interrogatory responses to Plaintiffs about the identities of those officials and produced documents showing which officials communicated with social-media companies.

For example, when asked in an interrogatory who were the "members of our senior staff" Ms. Psaki was referring to in the above statement, Defendants identified several individuals. WDLA Dkt. 86, Ex. 3 at 77–78.  Plaintiffs also pointed to Ms. Psaki's statement, "[W]e engage

13

with them [i.e., Social-Media Platforms] regularly and they certainly understand what our asks are," and requested that Defendants identify to which platforms she was referring and what the "asks" were. *Id.* at 82. Defendants responded that the social-media platforms included Facebook and YouTube, and pointed to Ms. Psaki's own statements immediately preceding the quoted sentence where she explicitly described the "proposed changes" (*i.e.*, the "asks") that executive officials shared with social-media companies—providing data about the reach of COVID-19, "mov[ing] more quickly to remove" posts that violate the platforms' policies, and "promot[ing] quality information sources in their feed algorithm." *Id.* at 77, 84.

In addition to these interrogatory responses, Defendants produced over 15,000 pages of documents, including emails with social-media companies, which themselves show the identities of officials who corresponded with those companies and reveal the content of those communications. *See, e.g.*, WDLA Dkt. 71 at 407–411; *see* WDLA Dkt. 86 at 43 ("Depositions would not further illuminate the 'nature and content' of the very external communications produced by those within the scope of this Court's discovery order . . . ."). This discovery apparently helped Plaintiffs go from 13 named defendants in their original complaint to 67 in their second amended complaint in October 2022. *See* WDLA Dkt. 71 at 30 (motion to file second amended complaint to add "newly identified federal officials and agencies, *whose identities have been revealed during the discovery process*" (emphasis added)). Therefore, far from being necessary, Ms. Psaki's deposition would be needlessly cumulative and duplicative of already produced information. *See Intelligent Verification Sys., LLC*, 2014 WL 12544827, at *1 (courts should limit discovery that is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive").

In light of the extensive information Plaintiffs have already received, there is no indication that Ms. Psaki can provide information of value beyond what Plaintiffs already have. Defendants have already conducted a search of Ms. Psaki's official emails and found no responsive documents about the topics at issue, consistent with the other record evidence showing that she is not a significant source of information.  WDLA Dkt. 86 at 54.  Plaintiffs themselves have argued that Ms. Psaki did not communicate directly with social-media companies, was not a "decision-maker" on these issues, and simply "announced the actions of [those] decision-makers from the White House Press Room . . . ."  WDLA Dkt. 86 at 36–37. And, to the extent Plaintiffs intend to explore internal White House communications in a deposition, those communications would likely be subject to assertions of executive privilege.

Moreover, even if Ms. Psaki had some additional information about the identities of officials who communicated with social-media groups that was somehow responsive to the scope of preliminary-injunction-related discovery, Plaintiffs have not demonstrated that they "cannot obtain the same information, or comparable information that would also satisfy [their] needs," from sources other than a deposition of Ms. Psaki.  *Virginia Dep't of Corr.*, 921 F.3d at 189; *cf. In re Subpoenas for Documents Issued to ThompsonMcMullan, P.C.,* No. CV 3:16-MC-1, 2016 WL 1071016, at *9 (E.D. Va. Mar. 17, 2016) ("even a more narrowly tailored [nonparty] subpoena would still be inappropriate" where the "information could be obtained from some other source that is . . . less burdensome" (internal quotation marks omitted)).

*Third*, Plaintiffs have not come close to demonstrating the "exceptional circumstances" that are required to justify a deposition of a nonparty who is a former high-ranking government official.  *Galan-Alvarez*, 2015 WL 5602342, at *3 (party seeking to depose a high-ranking official must make a showing of exceptional circumstances); *Franklin Sav. Ass'n* v. *Ryan*, 922

F.2d 209, 211 (4th Cir. 1991); *see Alexander* v. *FBI*, 186 F.R.D. 1, 2 n.1 & 3 (D.D.C. 1998) (White House Press Secretary considered a high-ranking official).  Courts have imposed that high barrier to obtaining depositions of such officials in order to protect the independence of the Executive Branch's decision-making process from invasive judicial scrutiny, and to ensure that "otherwise upstanding individuals" are not discouraged from entering public service for fear of being subject to "indiscriminate" and invasive questioning.  *Galan-Alvarez*, 2015 WL 5602342, at *4.  This doctrine is "no less applicable to former officials than to current officials."  *Id.*; *accord In re U.S. Dep't of Educ.*, 25 F.4th at 705 ("If allowed the minute [high-ranking officials] leave office, overwhelming and unnecessary discovery could also discourage them from taking that office in the first place or leaving office when there is controversy.").

It is therefore "the rarest of cases" in which "exceptional circumstances can be shown" to justify a deposition "where the testimony is available from an alternate witness."  *In Re Bryant*, 745 F. App'x 215, 220 (5th Cir. 2018), as revised (Nov. 30, 2018) (quoting *In re F.D.I.C.*, 58 F.3d 1055, 1062 (5th Cir. 1995)); *see also In re United States*, 985 F.2d 510, 512 (11th Cir. 1993).  Such a deposition should only be entertained where, for example, the former official "has unique first-hand knowledge related to the litigated claims or [where] the necessary information cannot be obtained through other, less burdensome or intrusive means."  *Galan-Alvarez*, 2015 WL 5602342, at *3; *In re U.S. Dep't of Educ.*, 25 F.4th at 703 ("If the information is not absolutely needed for a case, we cannot allow a deposition to disrupt the normal governmental balance of powers.").  "Exhaustion of all reasonable alternative sources is required" before authorizing the deposition of a former high-ranking official.  *In re U.S. Dep't of Educ.*, 25 F.4th at 704.

This is not the rare case where the nonparty deposition of a high-ranking official should be entertained.  The record reflects that Defendants have already provided relevant information and documents identifying officials who, unlike Ms. Psaki, were in contact with social-media companies, and setting forth the nature of those communications.  Moreover, as described above, Plaintiffs have not established that Ms. Psaki has insights about the identities of individuals whom Plaintiffs might want to target in their request for a preliminary injunction, or the nature of their communications with social-media companies, that are absolutely needed for that injunction and that cannot be obtained through any other means, including from other documents or individuals.  *See, e.g.*, *In Re Bryant*, 745 F. App'x at 221 (no "entitlement" to discovery from high-ranking officials merely because they have personal knowledge about an issue if "an alternative witness can provide the relevant information").  Thus Plaintiffs have not met their burden of showing that they have exhausted all reasonable alternative sources for additional information they seek.

For all of these reasons, there is no need for a nonparty deposition of Ms. Psaki, particularly in the context of purportedly narrow, preliminary-injunction-related discovery, and in the complete absence of exceptional circumstances that would justify deposing a former high-ranking official.  Any such deposition would be unduly burdensome.

**B.      Transfer to the Western District of Louisiana Would Be Unwarranted**

Although Rule 45(f) of the Federal Rules of Civil Procedure allows, in limited circumstances, the transfer of a motion to quash a subpoena otherwise properly before the district court in which the subpoena seeks a deposition, none of those circumstances are present here.  Specifically, as a matter of discretion, the court of compliance may transfer a motion to quash "to the issuing court," if "the person subject to the subpoena consents or if the court finds exceptional circumstances."  Fed. R. Civ. P. 45(f).  To the extent that Plaintiffs seek to transfer

this matter to the Western District of Louisiana, Ms. Psaki does not consent.  Furthermore, there are no exceptional circumstances that could overcome Rule 45's "presumption that subpoena-related disputes be litigated in the district designated for compliance."  *Galan-Alvarez*, 2015 WL 5602342, at *3.

Exceptional circumstances may arise when the court issuing a subpoena is in a better position to rule on a motion to quash because of the "highly complex and intricate nature of the underlying litigation," or when transferring would help avoid inconsistent results, as when there are multiple subpoenas, raising similar issues, being challenged in multiple courts.  *Id*.  No such circumstances exist here.  The core issues presented—whether the Subpoena is overbroad and whether a nonparty, former government official should be compelled to testify given the extensive discovery already provided and the procedural posture—are "severable from the merits of the underlying litigation" and do not involve analysis or resolution of "highly complex" facts. *Id.*; *cf. XY, LLC* v. *Trans Ova Genetics*, L.C., 307 F.R.D. 10, 12–13 (D.D.C. 2014) (transferring motion to quash to issuing court in a complex patent action on the issue of relevance of certain evidence, and where requested documents were located in multiple jurisdictions).  Nor is there any risk of an inconsistent result if this Court resolves the motion to quash, because Ms. Psaki is the only nonparty, former official who has been subpoenaed in this case, and she has been served with only a single subpoena.

Moreover, even in evaluating whether exceptional circumstances exist, a court's "prime concern *should be avoiding burdens on local nonparties* subject to subpoenas . . . ."  Fed. R. Civ. P. 45(f) advisory committee's note to 2013 amendments (emphasis added).  The burden on Ms. Psaki would be exacerbated, not avoided, by forcing her, a Virginia resident and nonparty in the

underlying litigation, to litigate the merits of this subpoena in Louisiana, far away from her home and work.  (*See* Decl. ¶ 3, 5.)  As a result, any request to transfer this motion should be denied.[4]

## CONCLUSION

For the foregoing reasons, Ms. Psaki respectfully submits that the Subpoena should be quashed.  *See* Fed. R. Civ. P. 45(d)(3)(A).

---

[4] As of November 2, 2022, no protective order governs discovery in the underlying litigation.  If this Court were to allow any form of deposition to proceed, Ms. Psaki respectfully requests that the Court enter a protective order limiting the use of the deposition to the underlying litigation, and restricting public filing or dissemination of any video clips or excerpts from the deposition.

Dated:  November 3, 2022                 JENNIFER R. PSAKI

                                         */s/  Edward E. Bagnell, Jr.*
                                         Edward E. Bagnell, Jr.  (VSB # 74647)
                                         Email:  ebagnell@spottsfain.com
                                         Spotts Fain PC
                                         411 E. Franklin Street, Suite 600
                                         Richmond, VA  23219
                                         Tel. 804 697-2000
                                         Fax: 804 697-2177

                                              - and -

                                         PAUL, WEISS, RIFKIND,
                                            WHARTON & GARRISON LLP

                                         Jeannie S. Rhee*
                                         2001 K Street, N.W.
                                         Washington, DC 20006
                                         jrhee@paulweiss.com

                                         David K. Kessler*
                                         Muamera Hadzic
                                         1285 Avenue of the Americas
                                         New York, NY 10019
                                         dkessler@paulweiss.com
                                         mhadzic@paulweiss.com

                                         *Attorneys for Movant Jennifer R. Psaki*

                                         * Application for admission
                                         *pro hac vice* pending

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of November, 2022, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, and served a copy by email to the

following:

<table>
<tr>
<td>
D. John Sauer, Mo. Bar No. 58721<br>
Solicitor General<br>
Justin D. Smith, Mo. Bar No. 63253<br>
First Assistant Attorney General<br>
Todd Scott, Mo. Bar No. 56614<br>
Senior Counsel<br>
Michael E. Talent, Mo. Bar No. 73339<br>
Deputy Solicitor General<br>
Missouri Attorney General's Office<br>
Post Office Box 899<br>
Jefferson City, MO 65102<br>
Tel: (573) 751-8870<br>
John.Sauer@ago.mo.gov<br>
*Counsel for State of Missouri*<br><br>

Jenin Younes<br>
John J. Vecchione<br>
New Civil Liberties Alliance<br>
1225 19th Street N.W., Suite 450<br>
Washington, DC 20036<br>
Direct: (202) 918-6905<br>
E-mail: jenin.younes@ncla.legal<br>
*Counsel for Plaintiffs Dr. Jayanta*<br>
*Bhattacharya, Dr. Martin Kulldorff,*<br>
*Dr. Aaron Kheriaty, and Jill Hines*
</td>
<td>
Elizabeth B. Murrill (La #20685)<br>
Solicitor General<br>
Louisiana Department of Justice<br>
1885 N. Third Street<br>
Baton Rouge, Louisiana 70804<br>
Tel: (225) 326-6766<br>
murrille@ag.louisiana.gov<br>
*Counsel for State of Louisiana*<br><br>

John C. Burns<br>
Burns Law Firm<br>
P.O. Box 191250<br>
St. Louis, Missouri 63119<br>
P: 314-329-5040<br>
F: 314-282-8136<br>
E-mail: john@burns-law-firm.com<br>
*Counsel for Plaintiff Jim Hoft*
</td>
</tr>
</table>

By: /s/ Edward E. Bagnell, Jr.
Edward E. Bagnell, Jr. (VSB # 74647)
ebagnell@spottsfain.com
SPOTTS FAIN, P.C.
411 E. Franklin Street, Suite 600
Richmond, VA 23219
Telephone: (804) 697-2000
Facsimile: (804) 697-2100
*Counsel for Movant*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| JENNIFER R. PSAKI, | |
| Movant, | |
| v. | Misc. Case No. _____ |
| STATE OF MISSOURI ex rel. ERIC S. SCHMITT, Attorney General, et al., | Underlying Case No.: 3:22-cv-01213 (W.D. La.) |
| Respondents. | |

**<u>DECLARATION OF JENNIFER R. PSAKI IN SUPPORT OF
HER MOTION TO QUASH A SUBPOENA</u>**

I, Jennifer R. Psaki, hereby declare as follows:

1.     I am over the age of 18, am competent to testify, and make this declaration based on personal knowledge.

2.     I submit this declaration in support of the Motion to Quash the November 1, 2022 subpoena directed to me.  A copy of that subpoena is attached as Exhibit 1 to the Memorandum in Support of the Motion to Quash.

3.     I live in Virginia, and within 100 miles of the U.S. District Court for the Eastern District of Virginia in Alexandria, Virginia.

4.     I served as White House Press Secretary between January 2021 and May 2022.  I now work exclusively in the private sector.

5.     Sitting for a deposition in this matter would be extremely burdensome for me.  Among other things, I understand that I would need to devote several days to

2

preparing for the deposition, as well as attending the deposition itself, and that would be highly disruptive to both my work and my family.

6.     Wherefore, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


                                                    ___/s/ Jennifer R. Psaki___
                                                      Jennifer R. Psaki
Date: November 3, 2022

# EXHIBIT 1

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

Western District of Louisiana ▢

| | |
|---|---|
| State of Missouri, ex rel. Eric S. Schmitt, et al. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   3:22-cv-01213 |
| Joseph R. Biden, Jr., in his official capacity as President of the United States, et al. | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                              Jennifer Psaki

_____
*(Name of person to whom this subpoena is directed)*

☑ Testimony: YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: | Date and Time: |
|---|---|
| 1600 Wilson Blvd., Suite 700, Arlington, VA 22209 | 12/08/2022 9:00 am |

The deposition will be recorded by this method:   video and transcribed

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

            See Exhibit A, attached.

_____

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    11/01/2022

*CLERK OF COURT*

                                                OR

_____          _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   The State of Missouri , who issues or requests this subpoena, are:

D. John Sauer, 815 Olive Street, Suite 200, St. Louis, MO 63101, john.sauer@ago.mo.gov, (573) 751-8870

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  3:22-cv-01213

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

   ❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

   ❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

   $ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00 .

I declare under penalty of perjury that this information is true.

Date: _____       _____
                                          *Server's signature*

                        _____
                                          *Printed name and title*

                        _____
                                          *Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A) *Appearance Not Required.*** A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B) *Objections.*** A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
  **(A) *When Required.*** On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B) *When Permitted.*** To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C) *Specifying Conditions as an Alternative.*** In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A) *Documents.*** A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B) *Form for Producing Electronically Stored Information Not Specified.*** If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C) *Electronically Stored Information Produced in Only One Form.*** The person responding need not produce the same electronically stored information in more than one form.
  **(D) *Inaccessible Electronically Stored Information.*** The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A) *Information Withheld.*** A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B) *Information Produced.*** If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT A

Plaintiffs State of Missouri, State of Louisiana, Dr. Jayanta Bhattacharya, Dr. Martin Kulldorff, Dr. Aaron Kheriaty, Jim Hoft, and Jill Hines, by and through counsel, pursuant to the Federal Rules of Civil Procedure and the October 21, 2022 Order of the U.S. District Court for the Western District of Louisiana (*see* Attachment B), request that Jennifer Psaki comply with the subpoena and produce the documents identified below on or before 9:00 a.m. on November 17, 2022 at 1600 Wilson Blvd., Suite 700, Arlington, VA 22209.  You may bring documents to the deposition for inspection, or in the case of documents held in digital format you may email to: John.Sauer@ago.mo.gov.

## DEFINITIONS

A.    "And," "or" and "and/or" and any other conjunctions or disjunctions used herein shall be read both conjunctively and disjunctively so as to require the production of all Documents (as hereinafter defined) responsive to all or any part of each particular request.

B.    "Any," "each," "every," and "all" shall be read to be inclusive and to require the production of each and every Document (hereinafter defined) responsive to the particular request.

C.    "CDC" means the Centers for Disease Control and Prevention, and any officer, official, employee, or agent of the CDC, as well as all of its divisions, agencies, boards, employees, contractors, and any subordinate agency or entity.

D.    "CISA" means the Cybersecurity and Infrastructure Security Agency within DHS, and any officer, official, employee, or agent of CISA, as well as all of its divisions, agencies, boards, employees, contractors, and any subordinate agency or entity.

E.      "Communication" means any disclosure, transfer, or exchange of information or opinion, however made, including oral, graphic, written, or electronic transmittal of information.

F.      "Content" means any material, including but not limited to messages, videos, photographs, and sound files, posted or sent by users on Social-Media Platform(s).

G.      "COVID-19" refers to the novel coronavirus, SARS-CoV 2, all variant strains, and the disease or illness it causes.

H.      "DHS" means the U.S. Department of Homeland Security, as identified in 5 U.S.C. § 101, and all of its divisions, agencies, boards, employees, contractors, and any subordinate agency or entity, including CISA and the Disinformation Governance Board.

I.      "Document" means without limitation, any written, recorded, graphic, or other material, however produced or reproduced, whether or not claimed to be privileged against discovery on any grounds, including, but not limited to, material in the forms of reports, statements, records, agreements, lists, memoranda, correspondence, personal notes, sound and/or video recordings (or transcripts of recordings), appointment calendars, appointment invitations and responses, worksheets, emails, computer files, or any other documents of any kind whatsoever, irrespective of form.  All attachments or enclosures to a document are deemed to be part of such document.

J.      "Federal Official" means any officer, official, employee, or agent of the federal government or any federal department or agency, or of any division or sub-agency, or any person or contractor acting on their behalf, including but not limited to the Executive Office of the President, the White House, the Department of Homeland Security, the Cybersecurity and Infrastructure Security Agency, the Disinformation Governance Board, the Department of Health

and Human Services, the Centers for Disease Control and Prevention, the Food and Drug Administration, the National Institutes of Health, the National Institute of Allergy and Infectious Diseases, the U.S. Election Assistance Commission, the U.S. Department of State, the U.S. Department of Treasury, the U.S. Department of Justice, the Federal Bureau of Investigation, and the U.S. Census Bureau, among other agencies.  "Federal Official" includes anyone who, at the time of a responsive Communication or Document, was a Federal Official, even if they are no longer a Federal Official.

K.   "HHS" means the U.S. Department of Health and Human Services , as identified in 5 U.S.C. § 101, and all of its divisions, agencies, boards, employees, contractors, and any subordinate agency or entity, including CDC and NIAID.

L.   "Including" means including, but not limited to.

M.   "Information" means data, documents, communications, writings, drawings, graphs, charts, photographs, sound recordings, images, records generated by individuals or machines, or the compilation of any of the foregoing stored in any medium, including electronically stored information.

N.   "Meeting" includes gatherings conducted in person, by telephone, or virtually.

O.   "NIAID" means the National Institute of Allergy and Infectious Diseases as well as all of its divisions, agencies, boards, employees, contractors, and any subordinate agency or entity.

P.   "Person" means any natural person, firm, partnership, association, joint venture, corporation, governmental entity or agency, or other organization or legal or business entity, without any limitation, or any party (including agents or employees) to this litigation.

Q.    "Relates to" or "relating to" means involving, discussing, identifying, referring to, concerning or in any way touching upon the matter sought.

R.    "Social-Media Platform" means any organization that provides a service for public users to disseminate information (typically content that includes messages, videos, photographs, and sound files) to other users or the public and its officers, agents, employees, contractors, and entities used to conduct fact checking or other censorship activities.  These include, but are not limited to YouTube, Facebook, Twitter, NextDoor, LinkedIn, Instagram, WeChat, Reddit, Wikimedia Foundation, Microsoft, and others.

S.    "White House Communications Team" means any person with an email domain of @who.eop.gov, including but not limited to Ron Klain, Kate Bedingfield, Jennifer Psaki, Gina McCarthy, and Karine Jean-Pierre, among others.

T.    "You," or "your" refers to Jennifer Psaki, a former White House Press Secretary for President Joseph R. Biden, Jr.

## INSTRUCTIONS

1.    These requests explicitly seek non-privileged information within your possession, custody, or control and should be construed as such.

2.    If your response to a request is that you do not have possession, custody, or control of a document or communication, please identify who likely has control of the document and its location.

3.    In the event that any information requested is withheld on the basis of a claim of privilege, state the ground(s) of the privilege claimed with sufficient particularity to evaluate the claim, and, if any documents are claimed to be privileged, set forth the author, all recipients,

number of pages, attachments or appendices, present custodian, and a general description (e.g., "letter" or "memorandum") of the document.

4.      Any information not provided on the basis that the disclosure would be burdensome or oppressive should be identified by stating the approximate number of documents to be produced, the approximate number of person-hours to be incurred in the identification, and the estimated cost of responding to the request.  This will make it possible to further narrow any request and potentially identify a reasonable alternative or limitation, and Plaintiffs will meet and confer on that matter.

5.      Each copy or duplicate of a document bearing initials, stamps, comments or notations of any character which are not part of the original text shall be considered a separate document.  Additionally, all drafts (whether typed, handwritten or otherwise) made or prepared in connection with any document shall be considered a separate document.

6.      Documents kept in an electronic or digital format should be produced with all metadata and delivered in their original format or in a manner agreed to by counsel.

7.      Emails must identify all recipients and include attachments, previous threads, and forwards.

8.      The singular of any noun includes the plural.

## REQUESTS FOR PRODUCTION

**REQUEST NO. 1.**  Produce any Documents you consulted, used, or relied on in any manner to prepare for the deposition.

**REQUEST NO. 2.**  Produce any Documents you reference or rely on during your deposition.

**REQUEST NO. 3.**  Produce any Documents and Communications related to the statement you made at a May 5, 2021 White House Press Briefing that "the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections," including Documents that identify the "major platforms," the "amplification" efforts, and what government offices and officials identify "untrustworthy content, disinformation, and misinformation."

**REQUEST NO. 4.**  Produce any Documents and Communications related to the statement you made at a May 5, 2021 White House Press Briefing that the U.S. Government believes "there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public," including any Documents that reflect what more the U.S. Government wants done and what officials are involved in these efforts.

**REQUEST NO. 5.**  Produce any Documents and Communications related to the statement you made at a July 15, 2021 White House Press Briefing that "Well, first, we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team, given, as Dr. Murthy conveyed, this is

a big issue of misinformation, specifically on the pandemic," including Documents identifying the members of our senior staff and the members of our COVID-19 team, any meetings that took place, and any agreements from engagements.


**REQUEST NO. 6.**   Produce any Documents and Communications related to the statements you made at a July 15, 2021 White House Press Briefing that relate to "flagging problematic posts for Facebook," U.S. Government proposals to "create a robust enforcement strategy" for Social Media Platforms, removing harmful posts, and "promot[ing] quality information sources in their algorithm," including Documents showing who suggested these steps, when meetings or communications about the steps occurred, what reforms to Social Media Platform policies were proposed, and the U.S. Government's efforts to influence algorithms.


**REQUEST NO. 7.**   Produce any Documents and Communications that relate to the statements you made at a April 25, 2022 White House Press Briefing that "we engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue," including any Documents reflecting what "social media platforms" that the U.S. Government "engage[s] regularly with," the nature of the engagements, what "steps that can be taken," and whether and how those engagements have "continue[d]."


**REQUEST NO. 8.**   Produce any Documents and Communications that relate to any member of the White House Communications Team or any other Federal Official communicating with Social-Media Platforms about Content on those platforms.

# ATTACHMENT B

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

STATE OF MISSOURI ET AL       CASE NO.  3:22-CV-01213

VERSUS       JUDGE TERRY A. DOUGHTY

JOSEPH R BIDEN JR ET AL       MAG. JUDGE KAYLA D. MCCLUSKY

## MEMORANDUM ORDER
## REGARDING WITNESS DEPOSITIONS

This Court granted [Doc. No. 34] Plaintiffs' Motion for Expedited Preliminary Injunction-Related Discovery [Doc. No. 17] and set an expedited discovery schedule.  The discovery schedule required the parties to meet and confer in good faith regarding any deposition requests.  The parties were required to file a joint statement as to their position on depositions if they could not come to an agreement.  The parties have done so and have submitted the pending Joint Statement Regarding Witness Depositions [Doc. No. 86].  This ruling addresses the witness depositions.

## I.  BACKGROUND

On May 5, 2022, Plaintiffs[1] filed a Complaint[2] against Defendants.[3]  In the Complaint and Amended Complaint,[4] Plaintiffs allege Defendants have colluded with and/or coerced social media companies to suppress disfavored speakers, viewpoints, and content on social media platforms by labeling the content "dis-information," "mis-information," and "mal-information."  Plaintiffs

---

[1] Plaintiffs consist of the State of Missouri, the State of Louisiana, Dr. Aaron Kheriaty, Dr. Martin Kulldorff, Jim Hoft, Dr. Jayanta Bhattacharya, and Jill Hines.
[2] [Doc. No. 1]
[3] Defendants consist of President Joseph R. Biden, Jr., Vivek H. Murthy, Xavier Becerra, Department of Health and Human Services, Dr. Anthony Fauci, National Institute of Allergy and Infectious Diseases, Centers for Disease Control & Prevention, Alejandro Mayorkas, Department of Homeland Security, Jen Easterly, Cybersecurity & Infrastructure Security Agency, and Nina Jankowicz, Karine Jean-Pierre, Carol Y. Crawford, Jennifer Shopkorn, U.S. Census Bureau, U. S. Department of Commerce, Robert Silvers, Samantha Vinograd and Gina McCarthy.
[4] [Doc. No. 45]

allege the suppression of disfavored speakers, viewpoints, and contents constitutes government action and violates Plaintiffs' freedom of speech in violation of the First Amendment to the United States Constitution.  In the Complaint[5] and Amended Complaint[6] Plaintiffs set forth examples of suppression of free speech which include: 1) the Hunter Biden laptop story prior to the 2020 Presidential election; 2) speech about the lab leak theory of COVID-19's origin; 3) speech about the efficiency of masks and COVID-19 lockdowns; 4) speech about election integrity and the security of voting by mail; 5) censorship and suppression of speech by Plaintiffs Dr. Jayanta Bhattacharya and Dr. Aaron Kheriaty, co-authors of the Great Barrington Declaration; 6) censorship and suppression of Jim Hoft, owner of The Gateway Pundit, on social-media platforms; and 7) censorship and suppression of Jill Hines, co-director of Health Freedom Louisiana and Reopen Louisiana on social-media platforms.

Plaintiffs move for the following government officials to be deposed as a part of their limited preliminary injunction discovery. These are:

> (1) NIAID Director and White House Chief Medical Advisor Dr. Anthony Fauci, (2) Deputy Assistant to the President and Director of White House Digital Strategy Rob Flaherty, (3) former White House Senior COVID-19 Advisory Andrew Slavitt, (4) former White House Press Secretary Jennifer Psaki, (5) FBI Supervisory Special Agent Elvis Chan, (6) CISA Director Jen Easterly, (7) CISA official Lauren Protentis, (8) Surgeon General Vivek Murthy, (9) CDC Chief of the Digital Media Branch Carol Crawford, and (10) Acting Coordinator of the State Department's Global Engagement Center Daniel Kimmage.

Defendants oppose Plaintiffs' deposing of all of them.

---

[5] [Doc. No. 1]
[6] [Doc. No. 45]

## II.      APPLICABLE LAW

Expedited discovery is not the norm.  Courts only allow it in limited circumstances.  *Wilson v. Samson Contour Energy E&P, LLC*, 2014 WL 2949457 at 2 (W.D. La. 2014).   In the prior ruling,[7] which granted in part and denied in part Plaintiffs' request for expedited discovery, the Court employed a "good cause" analysis, which took into consideration such factors as the breadth of discovery requests, the purpose for requesting expedited discovery, the burden on the defendants to comply with the requests, and how far in advance of the typical discovery process the request was made.  *GHX Industrial, LLC v. Servco Hose and Supply, LLC*, 2020 WL 1492920 (W.D. La. Feb. 5, 2020).

In addressing the necessity of depositions, the Court previously stated, "whether depositions will be taken will be addressed later."[8]  The party seeking expedited discovery has the burden of establishing that "the scope of the requests" is narrowly tailored to the necessary information sought.[9]  The Court must also consider the "burden on the defendants to comply with the requests."[10]

Top executive department officials should not, absent extraordinary circumstances, be called to testify regarding the reasons for taking official actions.  *In re Office of Inspector Gen. R.R. Ret. Bd.,* 933 F.2d 276, 278 (5th Cir. 1991).  Compelling the testimony of high-ranking government officials is justified only in "extraordinary instances."  *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.* 429 U.S. 252, 268 (1977).  This requirement is commonly referred to as the "apex doctrine."  *United States v. Newman,* 531 F. Supp. 3d 181, 188 (D.D.C. 2021).

---

[7] [Doc. No. 72]
[8] [Doc. No. 34 at 12]
[9] [Id., p. 2]
[10] [Id., p. 1]

3

The "extraordinary circumstances" limitation on the compelled testimony of high-ranking officials is necessary because such orders raise separation of powers concerns. *In re United States (Jackson),* 624 F.3d 1368, 1372 (11th Cir. 2010). Additionally, requiring high-ranking officials to appear for depositions also threatens to "disrupt the functioning of the Executive Branch." *In re Cheney,* 544 F.3d 311, 314 (D.C. Cir. 2008). High-level executives and government officials need some measure of protection from the courts because they are vulnerable to numerous, repetitive, harassing, and abusive depositions. *Asberry v. Sch. Bd. Of Pasco Cnty. Fla.,* 2019 WL 12383128 at 1 (M.D. Fla. Aug. 20, 2019). The general rule prohibiting depositions of high-ranking government officials also applies to former high-ranking officials. *In re United States (Bernanke)*, 542 F. App'x 944, 949 (Fed. Cir. 2013).

As a preliminary requirement for an "exceptional circumstances" analysis, the proponent of the deposition must show "that the official has first-hand knowledge related to the claims being litigated that is unobtainable from other sources." *In re Bryant*, 745 F. App'x 215, 218 n 2. (5th Cir. 2018). After the "first-hand knowledge" threshold is crossed in determining whether exceptional circumstances exist to warrant a deposition, a court must consider (1) the high-ranking status of the deponents; (2) the potential burden that the depositions would impose on them; and (3) the substantive reasons for taking the depositions. *Bryant,* 745 F. App'x at 220.

**A. Defendants' Opposition to Depositions**

Defendants have objected to Plaintiffs' request to depose all ten government officials. Mainly, Defendants' objections are that Plaintiffs have not met their heavy burden of demonstrating that depositions are warranted at this stage because: (1) some of the officials sought to be deposed were not named in the Original Complaint and are outside of the Court-authorized expedited discovery; (2) Plaintiffs' have not demonstrated the "exceptional circumstances"

required for the depositions of high ranking officials; and (3) former officials could not be taken during the thirty-day time period due to the requirements in FED. R. CIV. P. 45.

Each proposed deponent must be examined to determine whether exceptional circumstances exist. Additionally, in its prior Ruling,[11] the Court did not allow additional interrogatories to Defendants added in the Amended Complaint[12] because of the compressed expedited discovery schedule. However, the Court did not intend to prohibit depositions of newly added Defendants, because they can be taken within the expedited discovery schedule.

As it relates to former government officials (i.e., Andrew Slavitt and Jennifer Psaki), FED. R. CIV. P. 45 does not prohibit depositions to be conducted within thirty days. Despite Defendants' threat to file a Motion to Quash the subpoenas, the Court finds that FRCP 45 requirements do not prohibit depositions being taken in a timely manner. Any depositions authorized by this Court of former government officials will have already taken into consideration the burden of the deponent. In the event that these depositions exceed the thirty-day restraint set out in FRCP 45, an extension may be warranted.

Defendants have essentially adopted the same arguments they made in their opposition to Plaintiffs conducting any form of discovery as it related to the preliminary injunction motion. While the Court agrees that obtaining the depositions of high-ranking officials such as the ones requested here is an exceptional circumstance, it will analyze each person that the Plaintiffs requested under the factors laid out in *Bryant*.

### B. Plaintiffs' Arguments

Plaintiffs argue that the depositions of the ten aforementioned officials are necessary for the following reasons.

---

[11] [Doc. No. 72]
[12] [Doc. No. 45]

### 1. Dr. Anthony Fauci—NIAID Director and White House Chief Medical Advisor

Dr. Anthony Fauci ("Dr. Fauci"), who is a Defendant in this case, is the Director of the National Institute of Allergy and Infectious Diseases (NIAID) and Chief Medical Advisor to the President. Plaintiffs move to depose Dr. Fauci for substantial reasons. The Court will discuss them all.

First, Plaintiffs claim that Dr. Fauci is directly involved with multiple social media censorship campaigns against COVID-19 misinformation. Plaintiffs argue that "speech backed by great scientific credibility and with enormous potential nationwide impact" that contradicted Dr. Fauci's views was censored on social media, and it was most likely censored because of the insistence of Dr. Fauci.

The first example of this is Dr. Fauci's efforts to discredit any theory that COVID-19 was the result of a "lab leak." Plaintiffs assert that "Dr. Fauci had funded risky 'gain-of-function' research at the Wuhan Institute of Virology through intermediaries such as EcoHealth Alliance, headed by Dr. Peter Daszak." Which in turn meant that if there were truth behind the lab-leak theory, "Dr. Fauci and Dr. Daszak could be potentially implicated in funding the research on viruses that caused the COVID-19 pandemic and killed millions of people worldwide." In late January and early February 2020, information on the lab-leak theory began to become spread to the public. Soon thereafter, Dr. Fauci participated in a conference call with scientists and science-funding authorities, which may or may not have been about discrediting the lab-leak theory. Plaintiff States assert that "After the conference call, influential individuals signed public statements that were placed in science journals in an attempt to discredit the lab-leak theory." During this time, Plaintiff States also urge that Dr. Fauci engaged in written and oral

communications with Mark Zuckerberg about the Government's COVID-19 response, and allegedly widespread social-media censorship of the lab-leak hypothesis ensued.

Plaintiffs further this argument by pointing out the publicly available emails between Drs. Fauci and Collins regarding their efforts to discredit the lab-leak theory, which Plaintiffs assert led to the censorship of the theory online. These emails indicate that Dr. Fauci and Dr. Collins were both aware of certain scientists' concerns that SARS-CoV-2 looked bioengineered. However, those same scientists authored a paper for Nature Medicine that discredited the lab-leak theory despite that three days earlier on February 1, they had advocated the theory to Dr. Fauci. That paper was also sent to Dr. Fauci for approval.

Plaintiffs allege that Dr. Fauci and Mark Zuckerberg commenced a course of friendly oral communications about the Government's COVID-19 response. Plaintiff States wish to ascertain the contents of these communications in depositions.

On April 16, 2020, Dr. Collins emailed Dr. Fauci a link to a Bret Baier article about the lab-leak theory, expressing concerns over whether "NIH" can help to take down the "very destructive conspiracy" that seems to be growing momentum. He further stated that he hoped the Nature Medicine article "would settle this" and asked what more "we" could do about it. One day after this email, which Plaintiff States argue clearly shows Dr. Collins requesting Dr. Fauci to use more public pressure to stop the theory from circulating, Dr. Fauci cited the Nature Medicine article while speaking from a podium at the White House.[13]

Plaintiffs next cite to Dr. Fauci and Dr. Collins communications regarding the Great Barrington Declaration, a scientific critique of the effects of prolonged lockdowns as a response

---

[13] This was one among many public statements Dr. Fauci made about the illegitimacy of the lab-leak theory.

to COVID-19 co-authored by Dr. Jay Bhattacharya and Dr. Martin Kulldorff, Plaintiffs in this case. Dr. Collins' email regarding the publication read:

> Hi Tony and Cliff, See: https://gbdeclaration.org/. This proposal from the three fringe epidemiologists who met with the Secretary seems to be getting a lot of attention – and even a co-signature from Nobel Prize winner Mike Leavitt at Stanford. There needs to be a quick and devastating published take-down of its premises. I don't see anything like that online yet – is it underway? Francis.[14]

In response, Dr. Fauci began making a series of public statements that were highly critical of the Great Barrington Declaration, describing it as "total nonsense" and "ridiculous."[15] "[T]he censorship of the Great Barrington Declaration and Plaintiffs Bhattacharya and Kulldorff [occurred] just after a senior HHS official called for a 'quick and devastating … take-down' of the Declaration" to Dr. Fauci.[16]

Plaintiffs next assert that Dr. Fauci was involved in Twitter's permanent suspension of the vaccine critic Alex Berenson ("Berenson"). Berenson's tweets consisted of science-based objections to the vaccinations of young, healthy persons, which became a target for Biden-Administration's censors. Plaintiff States argue that "Alex Berenson disclosed internal Twitter communications revealing that senior 'WH' officials including Andrew Slavitt specifically pressured Twitter to de-platform Berenson, an influential vaccine critic—which Twitter did."[17] Dr. Fauci publicly described Berenson's opinions on vaccines as "horrifying."  President Biden followed Dr. Fauci's steps and made a statement that "They're killing people" by not censoring vaccine "misinformation," to which Twitter subsequently permanently suspended Berenson from

---

[14] [Doc. No. 45-3, ¶ 14].
[15] See, e.g., Jessie Hellmann, Fauci Blasts Herd Immunity Proposal Embraced by White House as 'Total Nonsense,' THE HILL (Oct. 15, 2020), at https://thehill.com/policy/healthcare/521220-fauci-blasts-herd-immunity-proposal-embraced-by-white-house-as-total/.
[16] [Doc. No. 84, ¶ 480].
[17] [Doc. No. 84, ¶ 345].

its platform.[18] On October 13, 2022, Berenson posted on Substack Twitter emails indicating that a board member of Pfizer pressured Twitter to de-platform Berenson.[19] In the emails, the Pfizer executive allegedly claimed that Berenson's speech should be censored because it posed a threat to the safety of Dr. Fauci. Which Plaintiffs argue creates an inference that there was collusion between White House official Andrew Slavitt and the Pfizer executive on this very point.

Government Defendants have submitted to Plaintiffs interrogatory responses on behalf of Dr. Fauci, asserting that he has had no direct communications with any social-media platforms regarding censorship.[20] Plaintiffs argue in turn that they should not be required to simply accept those blanket statements as they were submitted, and they argue three reasons why Dr. Fauci should be questioned under oath.

First, Plaintiffs assert that Dr. Fauci has refused to verify under oath his own interrogatory responses in violation of this Court's Order. The NIAID's responses were instead verified by Dr. Jill Harper, who was not named in the Complaint. Accordingly, Dr. Fauci has made no statements under oath regarding his communications with social-media platforms, which violates this Court's Order regarding the discovery that instructed Dr. Fauci to provide interrogatory responses.[21] The Court sees the importance of having Dr. Fauci make statements under oath as it relates to the issues of this matter.

Next, Plaintiffs argue that even if Dr. Fauci can prove he never communicated with social-media platforms about censorship, there are compelling reasons that suggest Dr. Fauci has acted through intermediaries, and acted on behalf of others, in procuring the social-media censorship of credible scientific opinions. Plaintiffs argue that even if Dr. Fauci acted indirectly or as an

---

[18] [Doc. No. 84, ¶ 347].
[19] See https://alexberenson.substack.com/p/pfizer-board-member-scott-gottlieb
[20] [Doc. No. 86-3, p. 24, 57].
[21] [Doc. No. 72, pp. 67].

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 48 of 332 PageID #:
4332
Case 3:22-cv-01213-TAD-KDM   Document 290   Filed 11/07/22   Page 10 of 89 PageID #: 3924

intermediary on behalf of others, it is still relevant to Plaintiffs' preliminary injunction motion. The Court agrees.

Lastly, Plaintiffs argue that Dr. Fauci's credibility has been in question on matters related to supposed COVID-19 "misinformation" since 2020. Specifically, Plaintiffs state that Dr. Fauci has made public statements on the efficacy of masks, the percentage of the population needed for herd immunity, NIAID's funding of "gain-of-function" virus research in Wuhan, the lab-leak theory, and more. Plaintiffs urge that his comments on these important issues are relevant to the matter at hand and are further reasons why Dr. Fauci should be deposed. Plaintiffs assert that they should not be required to simply accept Dr. Fauci's "self-serving blanket denials" that were issued from someone other than himself at face value. The Court agrees.

After reviewing the Plaintiffs and the Defendants' arguments, the Court finds that Plaintiffs have proven that Dr. Fauci has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Dr. Fauci is a high-ranking official, especially as he is the Director of the National Institute of Allergy and Infectious Diseases and Chief Medical Advisor to the President. The Court sees the only potential burden imposed on Dr. Fauci as a result of him being deposed is that of his time. However, the Court acknowledges that any person who is being deposed must sacrifice their time, and it does not see any burden imposed on Dr. Fauci that outweighs the Court's need for the information in order to make the most informative decision on the pending Motion for Preliminary Injunction filed by Plaintiffs. Finally, the Court is aware of a number of substantive reasons why Dr. Fauci's deposition should be taken. The first is the publicly available emails that prove that Dr. Fauci was communicating and acting as an intermediary for others in order to censor information from being shared across multiple social-media outlets. The second is that Dr. Fauci

has yet to give any statements under oath in this matter. The third is that the Court has no doubt that Dr. Fauci was engaging in communications with high-ranking social-media officials, which is extremely relevant in the matter at hand. Additionally, the crux of this case is the fundamental right of free speech. Any burden that may be imposed on Dr. Fauci is wholly outweighed by the importance of Plaintiffs' allegations of suppression of free speech. Accordingly, the Court finds that Plaintiffs have satisfied their burden of proving why a deposition of Dr. Anthony Fauci is necessary in this case, and exceptional circumstance are present. Accordingly, **IT IS ORDERED** that Dr. Anthony Fauci cooperate in the Plaintiffs' request to depose him for purposes of their preliminary injunction discovery.

### 2.   Rob Flaherty—White House Director of Digital Strategy

Plaintiffs move to depose Rob Flaherty ("Flaherty"), who is the Director of Digital Strategy for the White House. Plaintiffs describe him as a "key official in the White House's pressure campaign on social-media companies to increase COVID-19 censorship and social-media companies' policies and responses to COVID-19 vaccine claims."[22] Flaherty is said to have had "extensive" oral meetings with social-media platforms, including Twitter, Meta and YouTube on vaccine hesitancy and combatting misinformation.

Plaintiffs allege that Flaherty consistently communicates with Meta's director of U.S. Public Policy through "Covid Insight Reports," which detail trends/posts by social-media users taken by Meta. Further, Plaintiffs allege that he has held meetings about Meta's platform to address misinformation and to curb vaccine hesitancy. Meta allegedly contacts Flaherty when Covid-19 vaccines are authorized for new groups of people, and they report on Meta's intentions to censor disfavored opinions about vaccine effectiveness for those new groups, all allegedly at the White

---

[22] [Doc. No. 86-5].

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 50 of 332 PageID #:
4334
Case 3:22-cv-01213-TAD-KDM   Document 290   Filed 11/03/2022   Page 31 of 89   PageID #: 3926

House's urging.[23] Plaintiffs argue that Flaherty has specific knowledge and information on Meta's attempts to censor the "Disinformation Dozen."[24][25] Further, Plaintiffs assert that Flaherty has led efforts for the White House to force Meta to explain "how big the [misinformation] problem is, what solutions you're implementing, and how effective they've been."[26] Further, Flaherty supposedly "pressured Meta by sending them an article about misinformation on Facebook with a subject line 'not sure what to say anymore.'"  Flaherty also allegedly knows about the Biden Transition Team's efforts with Meta.[27] Defendants' interrogatory responses detailed that Flaherty participated in virtual meetings with social-media platforms, which Plaintiffs assert were about censorship.[28]

Plaintiffs maintain that deposing Flaherty is essential to this case as it would provide critical information on the White House's pressure campaign to social-media platforms against the "Disinformation Dozen" and other COVID-19 "misinformation" issues, especially as it relates to their leaning on social media companies after press reports were released regarding vaccines, and the White House's involvement over content-modulation policies instilled in Meta and Twitter in their efforts to remove "the most harmful COVID-19 misinformation."[29]

The Court finds that Plaintiffs have proven that Flaherty has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Flaherty is a high-ranking official, especially as he serves as Director of Digital Strategy for the White House. Any burden imposed upon Flaherty is

---

[23] [Id. at 7268–89; 7250].
[24] Supposedly, there are a dozen accounts across social-media that spread the mass of "misinformation" on COVID-19. Government officials have taken to calling these accounts the "Disinformation Dozen".
[25] [Id. at 7322].
[26] [Id. at 7258–59; see also id. at 16279].
[27] [Id. at 16364, 16276].
[28] [Doc. No. 86-3, at 31].
[29] [Doc. No. 86-5, p. 7248-49, 16275].

Case 3:22-cv-01213-TAD-KDM   Document 290   Filed 11/03/2022   Page 13 of 89 PageID #: 3927

outweighed by the need for Plaintiffs to determine whether the fundamental right of free speech has been abridged. Extraordinary circumstances are present to depose this high-ranking official. The substantive reasons for taking Flaherty's depositions are set out herein, and the Court finds the substantive reasons are overwhelming. For reasons further set out herein, Plaintiffs are allowed to depose either Rob Flaherty or Andrew Slavitt. Shall Plaintiffs notify Defendants of their intent to depose Rob Flaherty, **IT IS ORDERED** that Rob Flaherty cooperate with Plaintiffs' request to depose him.

### 3. Andrew Slavitt—White House Senior COVID-19 Advisor

Defendant Andrew Slavitt ("Slavitt") served as the White House's Senior COVID-19 Advisor. Slavitt allegedly "led the charge" for the White House in its campaign with social-media companies to increase the censorship of private speech as it related to COVID-19 through meetings and oral conversations with representatives of multiple social-media platforms. Plaintiffs assert that in Defendants' own documentary discovery, it is revealed that Slavitt received "Facebook bi-weekly covid content reports" from a senior Facebook executive in order for Slavitt to "oversee" Facebook's censorship.[30] Plaintiffs also argue that Slavitt specifically pressured Twitter to de-platform Alex Berenson. This was supposedly done in an oral meeting, so there is no official record of it.[31]

On April 21, 2022, a meeting invitation was sent to Slavitt, which stated:

> White House Staff will be briefed by Twitter on vaccine [misinformation] Twitter to cover trends seen generally around vaccine misinformation, the tangible effects seen from recent policy changes, what interventions are currently being implemented in addition to previous policy changes, and ways the White House (and our COVID experts) can partner in product work.[32]

---

[30] [Doc. No. 84, ¶ 343].
[31] [Doc. No. 84, ¶¶ 345-46.].
[32] [Id. ¶ 345].

The next day, internal Twitter messages reflected that Slavitt had posed "one really tough question about why Alex Berenson hasn't been kicked off the platform."[33]  Plaintiffs describe several other instances where Slavitt engaged in email exchanges with social-media executives that describe censorship of the platforms and the actions the platforms are taking to expand censorship for language they deemed to be "harmful."[34] One email in particular read:

> [O]n March 2, 2021, Meta sent an email assuring Slavitt, Flaherty, and Humphrey that the company is "[c]ombating vaccine misinformation and de-amplifying content that could contribute to vaccine hesitancy" by "improving the effectiveness of our existing enforcement systems (particularly focusing on entities that repeatedly post vaccine misinformation), mitigating viral content that could lead to vaccine hesitancy[.]"[35]

Plaintiffs maintain that Twitter and Meta's Facebook have identified Slavitt as a senior federal official whom they communicated about their efforts to "stop" the spread of alleged "misinformation" regarding COVID-19. Plaintiffs go on to assert that the White House has also identified Slavitt and Flaherty as senior White House Officials who were involved in communications with social-media platforms. Plaintiffs argue these communications centered on censorship.

Plaintiffs also cite to a podcast that Slavitt participated in, wherein he stated, "my time in the White House where I was charged with pushing organizations like Facebook from spewing misinformation."[36] Plaintiffs detail Slavitt's statements made on the podcast, wherein he states that he was "pushing" for the company (i.e., social-media platforms) to be "more responsible" for the

---

[33] [Id. ¶ 346].
[34] [Id. ¶¶ 354, 369].
[35] [Id. ¶ 375.]
[36] Is COVID Misinformation Killing People?, Published Jul 21, 2021, at https://omny.fm/shows/in-the-bubble/is-covid-misinformation-killing-people-with-facebo (audio 5:40)

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 53 of 332 PageID #:
4337
Case 3:22-cv-01213-TAD-KDM   Document 290   Filed 10/21/22   Page 15 of 89 PageID #: 3929

information that was being spread on the platforms. Plaintiffs move to depose Slavitt because of his role as a "self-professed principal enforcer for online censorship."

The Court finds that Plaintiffs have proven that Andrew Slavitt has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Slavitt is a former high-ranking official, especially as he served as the White House's Senior COVID-19 Advisor. Any burden imposed upon Slavitt is outweighed by Plaintiffs' allegations of suppression of free speech. Extraordinary circumstances are present. As the Court has stated, any person who is being deposed must sacrifice their time, and it does not see any burden imposed on Slavitt that outweighs the Court's need for the information in order to make the most informative decision on the pending Motion for Preliminary Injunction filed by Plaintiffs. Lastly, the Court has determined that there are substantive reasons for taking the deposition. As stated above, Slavitt was the White House's Senior COVID-19 Advisor. His role put him in a position that would grant him specific knowledge to the facts at issue. Slavitt's own description of his role on a podcast that he went on showed he has specific knowledge as it relates to these issues. His communications, actions, and orders to and between social-media platforms will be necessary for this Court to make its ruling. Accordingly, as stated above, because Flaherty and Slavitt were both White House officials, in an effort to narrowly tailor this expedited discovery, Plaintiffs are allowed to take the deposition of either Flaherty or Slavitt, but not both. Should Plaintiffs notify Defendants of a desire to depose Andrew Slavitt, **IT IS ORDERED** that Slavitt cooperate as to Plaintiffs' request to depose him.

### 4. Jennifer Psaki—Former White House Press Secretary

Jennifer Psaki (Psaki) is the former White House Press Secretary of President Biden. She is a Defendant in this case. Plaintiffs move to depose Psaki for a multitude of reasons. The most

pressing reason being that during her tenure as White House chief spokesperson, Psaki made a

series of public statements that:

> (1) attested to her personal knowledge of the participation of high-
> level White House officials in pressuring social-media platforms,
> and (2) reinforced the public threats of adverse legal consequences
> to social-media platforms if they do not increase censorship of views
> disfavored by federal officials.  Thus, she both admitted to
> knowledge of pressure to censor from federal officials and directly
> engaged in such pressure herself, in a highly impactful and visible
> fashion.[37]

Plaintiffs' Complaint details the statements Psaki made as they relate to these claims. For example,

on May 5, 2021, Psaki stated at a White House press conference "the major platforms have a

responsibility related to the health and safety of all Americans to stop amplifying untrustworthy

content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and

elections."[38] Psaki stated at another press conference on July 15, 2021, that she administration is

in "regular touch" with social-media platforms and that the engagements happen between

"members of our senior staff" and "members of our COVID-19 team."[39] Psaki also often spoke of

the "Disinformation Dozen" and stated that:

> All [12] of them remain active on Facebook, despite some even
> being banned on other platforms, including Facebook — ones that
> Facebook owns … Facebook needs to move more quickly to remove
> harmful, violative posts — posts that will be within their policies for
> removal often remain up for days.  That's too long. The information
> spreads too quickly.[40]

---

[37] [Doc. No. 86, p. 15].
[38] White House, *Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack,* May 5, 2021, at https://www.whitehouse.gov/briefing-room/press-briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-tom-vilsack-may-5-2021/.
[39] [Doc. No. 86, p. 16].
[40] [Id.]

Psaki also called on social-media platforms for consistency in banning disfavored speakers, stating "You shouldn't be banned from one platform and not others."[41]

Plaintiffs further argue that along with these statements, Psaki also "demanded" "robust strategies" for social-media companies to enforce censorship of "harmful posts." On April 25, 2022, Psaki also stated that President Biden was concerned about social-media platforms and thought they should be held accountable for the harms caused by the spread of "disinformation." She maintained at this press briefing that certain officials within the White House and the Biden Administration maintained "regular" contact with social-media platforms.

Plaintiffs submitted interrogatories to Karine Jean-Pierre, who is Psaki's successor as White House Press Secretary, and asked questions regarding the social-media censorship and Psaki's knowledge of such. Defendants' response to the interrogatories was that they lacked knowledge of the basis of her statements on those issues because Psaki no longer works at the White House. The only relevant responses Defendants supplied in the interrogatories were that Rob Flaherty and Andrew Slavitt were involved in communications with social-media platforms. Plaintiffs move to depose Psaki because they have obtained no statements from Psaki about what her "actual knowledge" of these issues is. Plaintiffs state that they should be allowed to depose her to explore the basis of the "critical statements" alleged in the Complaint and stated above.

The Court finds that Plaintiffs have proven that Jennifer Psaki has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Psaki was a high-ranking official at the time that she made the statements at issue, especially as she served as the White House Press Secretary.

---

[41] White House, *Press Briefing by Press Secretary Jen Psaki*, July 16, 2021, at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/.

However, this rank does not mitigate the relevance and the need of her deposition as it relates to this case. Any burden on Psaki is outweighed by the need to determine whether free speech has been suppressed. Lastly, the Court has determined that there are substantive reasons for taking the deposition. Extraordinary circumstances are present. As stated above, Psaki has made a number of statements that are relevant to the Government's involvement in a number of social-media platforms' efforts to censor its users across the board for sharing information related to COVID-19. Accordingly, **IT IS ORDERED** that Jennifer Psaki cooperate in the Plaintiffs' request to depose her for purposes of their preliminary injunction discovery.

### 5.  Elvis Chan—FBI Supervisory Special Agent

Plaintiffs move to depose Elvis Chan ("Chan"), a named Defendant in this case and the FBI Supervisory Special Agent of Squad CY-1 in the San Francisco Division of the FBI.[42] Plaintiffs argue that Chan has "authority over cybersecurity issues for FBI in that geographical region, which includes the headquarters of major social-media platforms, and he plays a critical role for FBI in coordinating with social-media platforms relating to censorship and suppression of speech on their platforms."[43] Plaintiffs move to depose Chan because they assert he plays a central role in the federal government's suppression of social-media censorship.

In support of this argument, Plaintiffs cite to a podcast where Mark Zuckerberg stated that communications from the FBI led to Facebook censoring stories of the Hunter Biden Laptop.[44] Plaintiffs maintain that in response to their third-party subpoena, Meta's counsel identified Chan as the FBI agent who communicated with Facebook to suppress that story. Plaintiffs move to depose Chan because the Government has not provided documentary discovery with respect to

---

[42] [Doc. No. 84, ¶ 61].
[43] [Id.]
[44] [Doc. No. 86, p. 19].

Chan and because Chan has personal knowledge. They claim that his testimony is relevant and necessary to their preliminary injunction discovery motion.

The Court finds that Plaintiffs have established that Elvis Chan has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Chan was a high-ranking official, especially as he served as the FBI Supervisory Special Agent. However, this rank does not mitigate the relevance and the need of his deposition as it relates to this case. Any burden imposed on Chan by being deposed is outweighed by the need to determine whether the First Amendment right of free speech has been suppressed. There are no burdens imposed on Chan outweighing the Court's need for the information in order to make the most informed decision on the pending Motion for Preliminary Injunction filed by Plaintiffs. Extraordinary circumstances are present here. Lastly, the Court has determined that there are substantive reasons for taking the deposition. As stated above, Chan was identified as the FBI Agent who communicated with Facebook to suppress a story about the Hunter Biden laptop. If he did this, the Court ultimately finds there are reasons to believe that he has interfered in other ways, too. Accordingly, **IT IS ORDERED** that Elvis Chan cooperate in the Plaintiffs' request to depose him for purposes of their preliminary injunction discovery.

### 6. Jen Easterly—CISA Director

Plaintiffs move to depose Jen Easterly ("Easterly"), the Director of CISA within the Department of Homeland Security, because she supervises the "nerve center" of federally directed censorship. Plaintiffs describe the CISA's central role as "directly flagging misinformation to social-media companies for censorship." Plaintiffs also assert that Easterly "claim[s] that social-media speech" by Americans "is a form of 'infrastructure,' and that policing speech online by the

federal government falls within her agency's mission to protect 'infrastructure,' stating that … 'the most critical infrastructure is a cognitive infrastructure.'[45]

Plaintiffs also cite to Easterly's text messages between Easterly and Matt Masterson, a former CISA agent who now works for a social-media platform.[46] Allegedly, these texts center around Easterly and Masterson discussing a "Disinformation Governance Board." The conversations ultimately describe how Easterly seeks greater censorship and that this would be done by federal pressure on social media platforms to increase censorship.

Plaintiffs move to depose Easterly for two reasons. First, they say that her role in the CISA as the director oversees the "nerve center" of the federal government's efforts to censor social-media users. They say that her text messages show that she has unique knowledge about the scope and nature of communications between CISA, DHS, and other federal officials. Second, Plaintiffs assert that in their response to interrogatories, CISA disclosed extensive oral communications and meetings between CISA officials and social-media platforms. No officials were actually identified by the CISA, but Plaintiffs believe that because of her role, Easterly would have detailed knowledge of what the CISA is disclosing. Plaintiffs state that her deposition would be their only chance of obtaining this information prior to addressing the preliminary injunction.

The Court finds that Easterly is a high-ranking official that has personal knowledge of relevant facts. Any burden imposed on Easterly is outweighed by the need to determine whether the First Amendment right of free speech was suppressed. Exceptional circumstances exist here. The substantive reasons for deposing Easterly are set forth herein. Because Easterly and Lauren Protentis both work for CISA, to narrowly tailor the relief sought, Plaintiffs are allowed to depose

---

[45] [Doc. No. 86, citing Doc. No. 84, ¶¶ 290-293, 301, 302, 291].
[46] [Doc. No. 71-5, p. 2-4].

Case 3:22-cv-01213-TAD-KDM   Document 290   Filed 11/03/2022   Page 22 of 89 PageID #: 3935

either Easterly or Lauren Protentis, but not both. Should Plaintiffs notify Defendants of a desire to depose Jean Easterly, **IT IS ORDERED** that she cooperate with Plaintiffs' request to depose her.

### 7.  Lauren Protentis[47]—CISA "Mis- Dis- and Mal-Information Team" Member

Plaintiffs move to depose Protentis because of her membership of the CISA Mis- Dis- and Mal-Information Team ("MDM Team"), whose mission is allegedly a federally induced censorship of social-media speech.   The documentary discovery provided that Protentis was involved in the MDM Team and engaged in oral communications with executives of social-media platforms. Plaintiffs allege these communications were about censorship. Plaintiffs assert that Protentis is a "leader" and "expert" in the MDM Team's efforts to bridge a gap between the federal government and social-media companies to create a line of control over the censorship of social media.[48] Plaintiffs also argue that her contacts with these companies are so "pervasive," that oftentimes "very senior officials" in other departments ask her to introduce them to "points of contact."[49]

Plaintiffs ultimately conclude that Protentis serves as a vital connection between CISA and social-media platforms in the government's censorship efforts, has special knowledge in the election-security space, and provides briefings to the governments of foreign countries on how to interact with social-media companies.   They assert that Protentis' testimony will establish context of the meetings, extent of CISA's election security efforts, tools that the government uses on social-media platforms, and efforts to influence election officials and encourage them to use social-media companies to censor voters ahead of the 2022 election.

---

[47] Defendants indicated that Protentis is on maternity leave, but they did not indicate when she would be returning.
[48] These include Twitter, Google, Microsoft, and Meta.
[49] [Doc. No. 86-6].

The Court finds that Plaintiffs have established that Protentis has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Protentis is a high-ranking official because of her role as a MDM Team Member. The potential burden imposed on Protentis is outweighed by the need to determine whether First Amendment rights of free speech have been suppressed. Exceptional circumstances exist here. The Court finds that there are substantive reasons for taking Protentis' deposition. As stated above, Protentis served a vastly important role between the federal government and the social-media companies. Based on the description above, she served as a connection between these two conglomerates. This is relevant to the issues presented by Plaintiffs in their motion, and her deposition is important to the Court to make an informed determination. Because Easterly and Protentis both work for CISA, to narrowly tailor the relief sought, Plaintiffs are allowed to depose either Easterly or Lauren Protentis, but not both. Should Plaintiffs notify Defendants of a desire to depose Lauren Protentis, **IT IS ORDERED** that she cooperate with Plaintiffs' request to depose her.

### 8. Vivek Murthy—Surgeon General

Plaintiffs next move to depose Surgeon General Dr. Vivek Murthy ("Dr. Murthy") for his public campaign to censor individuals who spread "misinformation" about COVID-19. [Doc. No. 84]. Plaintiffs state that Dr. Murthy has also publicly criticized "tech companies" by asserting that they are responsible for COVID-19 deaths due to their failure to censor "misinformation." Plaintiffs also allege that Dr. Murthy issued a Request for Information (RFI) on March 2, 2022, requesting tech platforms to provide him with information about "misinformation," including the identities of those supposedly spreading it on their sites.[50] Plaintiffs assert that this, along with Dr.

---

[50] [Doc. No. 84, ¶¶ 243-46].

Murthy's other statements, as well as those of President Joseph Biden and Jen Psaki, this RFI "was an intimidation tactic, designed to frighten the tech companies into compliance with his demand to escalate censorship of certain viewpoints on Covid-19 for fear of reprisal in the form of regulation or other legal consequences."[51]

Plaintiffs urge that Dr. Murthy also engages in communications with high-level Facebook executives about the "demand" for greater censorship of COVID-19 "misinformation." Plaintiffs state that they obtained this information through texts and emails through discovery. These establish that Dr. Murthy was engaged in these communications and was even sent "reports" to obtain Dr. Murthy's opinions on censorship.

Plaintiffs move to depose Dr. Murthy because of his direct, routine contact with the senior Meta executive, and at least one phone call with him.  He is the only individual in government privy to these conversations, and thus the only person who can therefore answer questions about the nature and degree of the conversations and clarify whether additional conversations on the topic were held over the phone or in virtual or in-person meetings.

The Court finds that Plaintiffs have established that Dr. Murthy has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Dr. Murthy is a high-ranking official as he serves as Surgeon General. However, this rank does not mitigate the relevance and the need of his deposition as it relates to this case. Further, his actions went beyond the scope of this rank, and the Court finds that those actions must be addressed through a deposition. The potential burden imposed on Dr. Murthy is outweighed by the need to determine whether First Amendment rights of free speech have been suppressed. Exceptional circumstances are present. The Court finds that

---

[51] [Id. ¶ 243].

there are substantive reasons for taking the deposition. As stated above, Dr. Murthy made public statements about how the media companies' failure to censor its users related in COVID-19 deaths. These statements are extremely substantive to the nature of this suit. Accordingly, **IT IS ORDERED** that Dr. Vivek Murthy cooperate in the Plaintiffs' request to depose him for purposes of their preliminary injunction discovery.

### 9. Carol Y. Crawford—CDC's Chief of the Digital Media Branch

Plaintiffs move to depose Defendant Carol Crawford ("Crawford"), the Chief of the Digital Media Branch of the Division of Public Affairs within CDC, because she is allegedly among the government employees most involved in censoring "misinformation" about COVID-19. Plaintiffs state that she participated in emails with employees at Twitter, Meta, and Google/YouTube. Further, they state that she organized "Be on the Lookout" ("BOLO") meetings, which were essentially meetings that attempted to "quell the spread of misinformation" in 2021.[52] Plaintiffs claim that during these meetings, Crawford flagged certain social-media posts, provided examples of types of posts to censor, and urged the participants not to share the information exchanged in the BOLO meetings. She also worked with the Census Bureau in an effort to identify certain social-media users who were allegedly spreading misinformation about the vaccine. Emails from March of 2021 indicate that a meeting between the CDC (including Ms. Crawford), Census, and Google was held to discuss "COVID vaccine mis-info."[53]

Plaintiffs claim that Crawford's communications show that the CDC, the Census Bureau, and other government agencies collaborated with Facebook to censor speech on the platform. Plaintiffs claim that she has been involved in the "censorship enterprise" from the beginning of

---

[52] [Doc. No. 84].
[53] [Doc. No. 86-10].

the pandemic. Plaintiffs detail this by pointing out two phone calls Crawford engaged in with a Facebook employee.[54]

Plaintiffs move to depose Crawford because they claim that her email exchanges demonstrate that she played a key role in directing censorship on social-media platforms. Plaintiffs also suggest that her references to the role of the Census Bureau suggest that she would be able to shed light on that agency's role in efforts to flag "misinformation" the previous year, a topic about which little is known.

The Court finds that Plaintiffs have established that Crawford has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Crawford is a high-ranking official because of her role as the CDC's Chief of the Digital Media Branch. This role, though, is vastly important to the issues at hand, and her rank does not mitigate the relevance and the need of her deposition as it relates to this case. The potential burden imposed on Crawford is outweighed by the need to determine whether First Amendment rights of free speech have been suppressed. Exceptional circumstances exist here. The Court finds that there are substantive reasons for taking the deposition. As stated above, Crawford organized meetings and engaged in a number of communications with social-media officials, and the contents of those meetings and communications are highly important for the issues presented by this case. Accordingly, **IT IS ORDERED** that Carol Crawford cooperate in the Plaintiffs' request to depose her for purposes of their preliminary injunction discovery.

---

[54] [Doc. No. 86-10].

**10. Daniel Kimmage—State Department's Global Engagement Center Coordinator**

Plaintiffs move to depose Daniel Kimmage ("Kimmage"), the Acting Coordinator for the Global Engagement Center ("GEC") at the State Department, because he allegedly works closely with Easterly and CISA to coordinate social-media censorship of speech on election-related issues and election integrity. Plaintiffs allege that in response to third-party subpoena, Twitter identified Kimmage as communicating with it about censorship and content modulation.[55] Allegedly, the purpose of the GEC is to facilitate coordination between the government and the tech sector to combat disinformation. Plaintiffs claim that the GEC works closely with the CISA on issues of censorship.

Plaintiffs claim that Kimmage's GEC collaborated with CISA in 2020 and 2022 to create and fund an alliance of third-party nonprofits called the "Election Integrity Partnership," which supposedly pushed for social-media censorship of free speech about elections in 2020 and continues to do so today in 2022.[56]

These are not the only CISA-GEC election-related censorship activities. Documents produced by LinkedIn demonstrate that Samaruddin K. Stewart, acting on behalf of Kimmage's Global Engagement Center in the State Department, organized repeated face-to-face meetings with LinkedIn and other social-media platforms to discuss censorship.[57] The nature and content of communications at these oral meetings about disinformation between Kimmage's representatives and social-media platforms has not been disclosed. Plaintiffs assert that the Defendants have provided no documentary discovery about Kimmage's GEC and its central role in federal

---

[55] [Doc. No. 84, ¶ 396].
[56] [Id. ¶ 401].
[57] [Doc. No. 84, ¶¶ 422-424].

censorship activities on election-related speech. They claim that Kimmage's deposition is crucial for this reason.

The Court finds that Plaintiffs have established that Kimmage has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Kimmage is a high-ranking official because of his role as the Acting Coordinator for the Global Engagement Center at the State Department. This role, though, is vastly important to the issues at hand, and his rank does not mitigate the relevance and the need of his deposition as it relates to this case. The potential burden imposed on Kimmage is outweighed by the need to determine whether First Amendment rights of free speech have been suppressed. Exceptional circumstances exist here. The Court finds that there are substantive reasons for taking the deposition, as stated above. Accordingly, **IT IS ORDERED** that Daniel Kimmage cooperate in the Plaintiffs' request to depose him for purposes of their preliminary injunction discovery.

### III.     CONCLUSION

For the reasons set forth herein,

**IT IS ORDERED** that to the extent that Plaintiffs move to depose the following parties, the request is **GRANTED:** NIAID Director and White House Chief Medical Advisor Dr. Anthony Fauci; Deputy Assistant to the President and Director of White House Digital Strategy Rob Flaherty **OR** former White House Senior COVID-19 Advisory Andrew Slavitt; former White House Press Secretary Jennifer Psaki; FBI Supervisory Special Agent Elvis Chan; CISA Director Jen Easterly **OR** CISA official Lauren Protentis; Surgeon General Vivek Murthy; CDC Chief of the Digital Media Branch Carol Crawford; and Acting Coordinator of the State Department's Global Engagement Center Daniel Kimmage.

MONROE, LOUISIANA, this 21st day of October 2022.

                                     Terry A. Doughty
                            United States District Judge

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

STATE OF MISSOURI ex rel. ERIC S.
SCHMITT, Attorney General,

STATE OF LOUISIANA ex rel. JEFFREY
M. LANDRY, Attorney General,

DR. JAYANTA BHATTACHARYA,

JILL HINES,

JIM HOFT,

DR. AARON KHERIATY, and

DR. MARTIN KULLDORFF,

       *Plaintiffs*,

  v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States;

KARINE JEAN-PIERRE, in her official
capacity as White House Press Secretary;

VIVEK H. MURTHY, in his official
capacity of Surgeon General of the United
States;

XAVIER BECERRA, in his official
capacity as Secretary of the Department of
Health and Human Services;

DEPARTMENT OF HEALTH AND
HUMAN SERVICES;

DR. ANTHONY FAUCI, in his official
capacity as Director of the National Institute
of Allergy and Infectious Diseases and as
Chief Medical Advisor to the President;

No. 3:22-cv-01213-TAD-KDM

1

NATIONAL INSTITUTE OF ALLERGY
AND INFECTIOUS DISEASES;

CENTERS FOR DISEASE CONTROL
AND PREVENTION;

CAROL Y. CRAWFORD, in her official
capacity as Chief of the Digital Media
Branch of the Division of Public Affairs
within the Centers for Disease Control and
Prevention;

UNITED STATES CENSUS BUREAU,
a.k.a. BUREAU OF THE CENSUS;

JENNIFER SHOPKORN, in her official
capacity as Senior Advisor for
Communications with the U.S. Census
Bureau;

DEPARTMENT OF COMMERCE;

ALEJANDRO MAYORKAS, in his official
capacity as Secretary of the Department of
Homeland Security;

ROBERT SILVERS, in his official capacity
as Under Secretary of the Office of
Strategy, Policy, and Plans, within DHS;

SAMANTHA VINOGRAD, in her official
capacity as Senior Counselor for National
Security in the Office of the Secretary for
DHS;

DEPARTMENT OF HOMELAND
SECURITY;

JEN EASTERLY, in her official capacity as
Director of the Cybersecurity and
Infrastructure Security Agency;

CYBERSECURITY AND
INFRASTRUCTURE SECURITY
AGENCY;

2

GINA McCARTHY, in her official capacity as White House National Climate Advisor,

NINA JANKOWICZ, in her official capacity as director of the so-called "Disinformation Governance Board" within the Department of Homeland Security,

ANDREW SLAVITT, in his official capacity as White House Senior COVID-10 Advisor,

ROB FLAHERTY, in his official capacity as Deputy Assistant to the President and Director of Digital Strategy at the White House,

COURTNEY ROWE, in her official capacity as White House Covid-19 Director of Strategic Communications and Engagement,

CLARKE HUMPHREY, in her official capacity as White House Digital Director for the Covid-19 Response Team,

BENJAMIN WAKANA, in his official capacity as the Deputy Director of Strategic Communications and Engagement at the White House COVID-19 Response Team,

SUBHAN CHEEMA, in his official capacity as Deputy Director for Strategic Communications and External Engagement for the White House Covid-19 Response Team,

DORI SALCIDO, in her official capacity as White House Covid-19 Director of Strategic Communications and Engagement,

TIMOTHY W. MANNING, in his official capacity as White House Covid-19 Supply Coordinator,

DANA REMUS, in her official capacity as

Counsel to the President,

AISHA SHAH, in her official capacity as White House Partnerships Manager,

LAURA ROSENBERGER, in her official capacity as Special Assistant to the President,

MINA HSIANG, in her official capacity as Administrator of the U.S. Digital Service within the Office of Management and Budget in the Executive Office of the President,

U.S. DEPARTMENT OF JUSTICE,

FEDERAL BUREAU OF INVESTIGATION,

LAURA DEHMLOW, in her official capacity as Section Chief for the FBI's Foreign Influence Task Force,

ELVIS M. CHAN, in his official capacity as Supervisory Special Agent of Squad CY-1 in the San Francisco Division of the Federal Bureau of Investigation,

JAY DEMPSEY, in his official capacity as Social Media Team Lead, Digital Media Branch, Division of Public Affairs at the CDC,

KATE GALATAS, in her official capacity as Deputy Communications Director at the CDC,

ERIC WALDO, in his official capacity as Chief Engagement Officer for the Surgeon General,

YOLANDA BYRD, in her official capacity as a member of the Digital Engagement Team at HHS,

CHRISTY CHOI, in her official capacity as
Deputy Director, Office of
Communications, HRSA within HHS,

TERICKA LAMBERT, in her official
capacity as Director of Digital Engagement
at HHS and Deputy Director of the Office
of Digital Strategy at the White House,

JOSHUA PECK, in his official capacity as
Deputy Assistant Secretary for Public
Engagement at HHS,

JANELL MUHAMMED, in her official
capacity as Deputy Digital Director at HHS,

MATTHEW MASTERSON, in his official
capacity as Senior Cybersecurity Advisory
within CISA in the Department of
Homeland Security,

LAUREN PROTENTIS, in her official
capacity as an official of CISA,

GEOFFREY HALE, in his official capacity
as an official of CISA,

ALLISON SNELL, in her official capacity
as an official of CISA,

KIM WYMAN, in her official capacity as
CISA's Senior Election Security Lead,

BRIAN SCULLY, in his official capacity as
an official of DHS and CISA,

ZACHARY HENRY SCHWARTZ, in his
official capacity as Division Chief for the
Communications Directorate at the U.S.
Census Bureau,

LORENA MOLINA-IRIZARRY, in her
official capacity as an official of the Census
Bureau,

KRISTIN GALEMORE, in her official

capacity as Deputy Director of the Office of
Faith Based and Neighborhood Partnerships
at the Census Bureau,

U.S. FOOD AND DRUG
ADMINISTRATION,

ERICA JEFFERSON, in her official
capacity as Associate Commissioner for
External Affairs within the Office of the
Commissioner at the U.S. Food and Drug
Administration,

MICHAEL MURRAY, in his official
capacity as Acquisition Strategy Program
Manager for the Office of Health
Communications and Education at the FDA,

BRAD KIMBERLY, in his official capacity
as Director of Social Media at the FDA,

U.S. DEPARTMENT OF STATE,

LEAH BRAY, in her official capacity as
Acting Coordinator of the State
Department's Global Engagement Center,

SAMARUDDIN K. STEWART, in his
official capacity as Senior Technical
Advisor and/or Senior Advisor for the
Global Engagement Center of the State
Department,

DANIEL KIMMAGE, in his official
capacity as Acting Coordinator for the
Global Engagement Center at the State
Department,

ALEXIS FRISBIE, in her official capacity
as a member of the Technology
Engagement Team at the Global
Engagement Center at the State
Department,

U.S. DEPARTMENT OF TREASURY,

6

WALLY ADEYEMO, in his official
capacity as Deputy Secretary of the
Treasury,

U.S. ELECTION ASSISTANCE
COMMISSION,

MARK A. ROBBINS, in his official
capacity as Interim Executive Director of
the EAC, and

KRISTEN MUTHIG, in her official
capacity as Director of Communications for
the EAC,

       *Defendants*.

## SECOND AMENDED COMPLAINT

### NATURE OF THE ACTION

1.  In 1783, George Washington warned that if "the Freedom of Speech may be taken away,"
then "dumb and silent we may be led, like sheep, to the Slaughter."  George Washington, *Address
to the Officers of the Army* (March 15, 1783).  The freedom of speech in the United States now
faces one of its greatest assaults by federal government officials in the Nation's history.

2.  A private entity violates the First Amendment "if the government coerces or induces it to
take action the government itself would not be permitted to do, such as censor expression of a
lawful viewpoint."  *Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220,
1226 (2021) (Thomas, J., concurring).  "The government cannot accomplish through threats of
adverse government action what the Constitution prohibits it from doing directly."  *Id.*

3.  That is exactly what has occurred over the past several years, beginning with express and
implied threats from government officials and culminating in the Biden Administration's open and
explicit censorship programs.  Having threatened and cajoled social-media platforms for years to
censor viewpoints and speakers disfavored by the Left, senior government officials in the

Executive Branch have moved into a phase of open collusion with social-media companies to suppress disfavored speakers, viewpoints, and content on social-media platforms under the Orwellian guise of halting so-called "disinformation," "misinformation," and "malinformation."

4.   The aggressive censorship that Defendants have procured constitutes government action for at least five reasons: (1) absent federal intervention, common-law and statutory doctrines, as well as voluntary conduct and natural free-market forces, would have restrained the emergence of censorship and suppression of speech of disfavored speakers, content, and viewpoint on social media; and yet (2) through Section 230 of the Communications Decency Act (CDA) and other actions, the federal government subsidized, fostered, encouraged, and empowered the creation of a small number of massive social-media companies with disproportionate ability to censor and suppress speech on the basis of speaker, content, and viewpoint; (3) such inducements as Section 230 and other legal benefits (such as the absence of antitrust enforcement) constitute an immensely valuable benefit to social-media platforms and incentive to do the bidding of federal officials; (4) federal officials—including, most notably, certain Defendants herein—have repeatedly and aggressively threatened to remove these legal benefits and impose other adverse consequences on social-media platforms if they do not aggressively censor and suppress disfavored speakers, content, and viewpoints on their platforms; and (5) Defendants herein, colluding and coordinating with each other, have also directly coordinated and colluded with social-media platforms to identify disfavored speakers, viewpoints, and content and thus have procured the actual censorship and suppression of the freedom of speech.  These factors are both individually and collectively sufficient to establish government action in the censorship and suppression of social-media speech, *especially* given the inherent power imbalance: not only do the government actors here have the power to penalize noncompliant companies, but they have threatened to exercise that authority.

5.  Defendants' campaign of censorship includes the recent announcement of the creation of a "Disinformation Governance Board" within the Department of Homeland Security.  "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *United States v. Alvarez*, 567 U.S. 709, 728 (2012) (plurality op.).  Likewise, our constitutional tradition stands against the idea that we need a "Disinformation Governance Board" within our federal domestic-security apparatus.

6.  Email correspondence between the CDC, the Census Bureau, and major social-media platforms including Twitter, Facebook, and YouTube was released that reveals yet more evidence that Defendants are directing social media censorship.

7.  As a direct result of these actions, there has been an unprecedented rise of censorship and suppression of free speech—including core political speech—on social-media platforms. Many viewpoints and speakers have been unlawfully and unconstitutionally silenced in the modern public square.  These actions gravely threaten the fundamental right of free speech and free discourse for virtually all citizens in Missouri, Louisiana, and America, both on social media and elsewhere.   And they have directly impacted individual Plaintiffs in this case, all of whom have been censored and/or shadowbanned as a result of Defendants' actions.

8.  Under the First Amendment, the federal Government should play no role in policing private speech or picking winners and losers in the marketplace of ideas.  But that is what federal officials are doing, on a massive scale – the full scope and impact of which yet to be determined.

9.  Secretary Mayorkas of DHS commented that the federal Government's efforts to police private speech on social media are occurring "across the federal enterprise."  It turns out that this statement is quite literally true.  This case involves a massive, sprawling federal "Censorship Enterprise," which includes dozens of federal officials across at least eleven federal agencies and

components, who communicate with social-media platforms about misinformation, disinformation, and the suppression of private speech on social media—all with the intent and effect of pressuring social-media platforms to censor and suppress private speech that federal officials disfavor.

10. This Censorship Enterprise is extremely broad, including officials in the White House, HHS, DHS, CISA, the CDC, NIAID, and the Office of the Surgeon General; as well as the Census Bureau, the FDA, the FBI, the State Department, the Treasury Department, and the U.S. Election Assistance Commission, among others. And this effort rises to the highest levels of the U.S. Government, including numerous White House officials overseeing the Censorship Enterprise.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction because the federal claims arise under the Constitution and laws of the United States.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

**A.     Plaintiffs.**

13. Plaintiff State of Missouri is a sovereign State of the United States of America. Missouri sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

14. Eric S. Schmitt is the duly elected Attorney General of Missouri. Under Missouri law, he has authority to bring suit on behalf of the State of Missouri to vindicate the State's sovereign, quasi-sovereign, and proprietary interests, and to protect the constitutional rights of its citizens. *See, e.g.*, Mo. Rev. Stat. § 27.060.

10

15. Plaintiff State of Louisiana is a sovereign State of the United States of America.  Louisiana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

16. Jeffrey M. Landry is the duly elected Attorney General of Louisiana.  Under Louisiana law, he has authority to bring suit on behalf of the State of Louisiana to vindicate the State's sovereign, quasi-sovereign, and proprietary interests, and to protect the constitutional rights of its citizens.

17. Missouri and Louisiana, and their agencies and officials, have a sovereign and proprietary interest in receiving free flow of information in public discourse on social-media platforms.  This includes an interest in preventing the States, their agencies, and their political subdivisions from suffering direct censorship on social-media platforms when they post their own content.  In addition, Missouri and Louisiana, and their agencies and officials, are constantly engaged in the work of formulating, enacting, advancing and enforcing public policies, and formulating messages and communications related to such policies, and they frequently and necessarily rely on the flow of speech and information on social media to inform public-policy decisions.  Further, information and ideas shared on social media frequently are repeated in, and impact and influence, public discourse outside of social media, which Missouri and Louisiana, and their agencies and officials, also rely upon.

18. Missouri and Louisiana further have a sovereign interest in ensuring that the fundamental values reflected in their own Constitutions and laws, and the fundamental rights guaranteed to their citizens, are not subverted by the unconstitutional actions of federal officials and those acting in concert with them.  Missouri's Constitution provides the highest level of protection for the freedom of speech, protecting it in even more expansive language than that in the First Amendment, and Louisiana's Constitution provides similar protection for free-speech rights.  Defendants' unlawful

subversion of Missourians' and Louisianans' fundamental rights and liberties under state law violates both the state and federal Constitutions, and it injures Missouri's and Louisiana's sovereign interests in advancing their own fundamental laws and fundamental policies favoring the freedom of speech.

19. In addition, Missouri and Louisiana have a quasi-sovereign interest in protecting the free-speech rights of the vast majority of their citizens, who constitute "a sufficiently substantial segment of its population." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). This falls within Missouri's and Louisiana's "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Id.* This injury "suffices to give the State standing to sue as *parens patriae*" because "the injury" to Missourians' and Louisianans' free-speech and free-expression rights "is one that the State … would likely attempt to address"—indeed, Missouri and Louisiana have addressed, *see, e.g.,* Mo. CONST., art. I, § 8; LA. CONST., art. I, § 7—"through [their] sovereign lawmaking powers." *Alfred L. Snapp*, 458 U.S. at 607.

20. Further, Missouri and Louisiana "ha[ve] an interest in securing observance of the terms under which [they] participate[] in the federal system." *Alfred L. Snapp*, 458 U.S. at 607–08. This means bringing suit to "ensur[e] that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system." *Id.* at 608. The rights secured by the First Amendment, and analogous state constitutional provisions, are foremost among the "benefits that are to flow from participation in the federal system." *Id.* Missouri and Louisiana "have an interest, independent of the benefits that might accrue to any particular individual, in assuring that the benefits of the federal system are not denied to its general population." *Id.* Missouri and Louisiana sue to vindicate all these interests here.

12

21. Plaintiff Dr. Jayanta Bhattacharya is a former Professor of Medicine and current Professor of Health Policy at Stanford University School of Medicine and a research associate at the National Bureau of Economic Research.  He is also Director of Stanford's Center for Demography and Economics of Health and Aging.  He holds an M.D. and Ph.D. from Stanford University.  He has published 161 scholarly articles in peer-reviewed journals in the fields of medicine, economics, health policy, epidemiology, statistics, law, and public health, among others. His research has been cited in the peer-reviewed scientific literature more than 13,000 times.  He was one of the co-authors of the Great Barrington Declaration, a statement criticizing government-mandated COVID restrictions, which was co-signed by over 930,000 people, including over 62,000 scientists and healthcare professionals.  Dr. Bhattacharya and his audiences have experienced significant censorship and suppression of his speech on social-media caused by Defendants, as detailed in his previously filed Declaration, ECF No. 10-3, which is attached as Exhibit C and incorporated by reference herein.

22. Plaintiff Dr. Martin Kulldorff is an epidemiologist, a biostatistician and a former Professor of Medicine at Harvard University and Brigham and Women's Hospital, from 2015 to November 2021.  Before that, he was Professor of Population Medicine at Harvard University from 2011 to 2015.  He holds a Ph.D. from Cornell University.  He has published over 200 scholarly articles in peer-reviewed journals in the fields of public health, epidemiology, biostatistics and medicine, among others.  His research has been cited in the peer-reviewed scientific literature more than 25,000 times.  He was one of the co-authors of the Great Barrington Declaration, a statement criticizing government-mandated COVID restrictions, which was co-signed by over 930,000 people, including over 62,000 scientists and healthcare professionals.  Dr. Kulldorff and his audiences have experienced significant censorship and suppression of his speech on social-media

13

caused by Defendants, as detailed in his previously filed Declaration, ECF No. 10-4, which is attached as Exhibit D and incorporated by reference herein.

23. Plaintiff Dr. Aaron Kheriaty earned his M.D. from Georgetown University, and completed residency training in psychiatry at the University of California Irvine.  For many years, he was a Professor of Psychiatry at UCI School of Medicine and the Director of the Medical Ethics Program at UCI Health, where he chaired the ethics committee.  He also chaired the ethics committee at the California Department of State Hospitals for several years.  He is now a Fellow at the Ethics & Public Policy Center in Washington, DC, where he directs the program on Bioethics and American Democracy.  He has authored numerous books and articles for professional and lay audiences on bioethics, social science, psychiatry, religion, and culture.  His work has been published in the Wall Street Journal, the Washington Post, Arc Digital, The New Atlantis, Public Discourse, City Journal, and First Things.  He has conducted print, radio, and television interviews on bioethics topics with The New York Times, the Los Angeles Times, CNN, Fox News, and NPR.  He maintains social-media accounts, including the Twitter account @akheriaty, which has over 158,000 followers.  Dr. Kheriaty and his audiences have experienced significant censorship and suppression of his speech on social-media caused by Defendants, as detailed in his previously filed Declaration, ECF No. 10-7, which is attached as Exhibit G incorporated by reference herein.

24. Plaintiff Jim Hoft is the founder, owner, and operator of the popular news website The Gateway Pundit.  He resides in St. Louis, Missouri.  The Gateway Pundit is one of the most popular conservative news sites in the country, with over 2.5 million web searches per day.  Mr. Hoft maintains and operates The Gateway Pundit's social-media accounts, including a Facebook account with over 650,000 followers, an Instagram account with over 205,000 followers, and (until its recent permanent suspension) a Twitter account with over 400,000 followers.  Mr. Hoft and his

audiences have experienced extensive government-induced censorship on social-media platforms, including of his speech on COVID-19 issues and election security issues, as set forth in his Declaration, ECF No. 10-5, which is attached as Exhibit E and incorporated by reference herein.

25. Plaintiff Jill Hines is a resident of Louisiana.  She is the Co-Director of Health Freedom Louisiana, a consumer and human rights advocacy organization.  She also launched, in 2020, a grassroots effort called Reopen Louisiana.  She maintains social-media accounts for both Health Freedom Louisiana and Reopen Louisiana with approximately 13,000 followers.  Ms. Hines and her audiences have experienced extensive government-induced censorship of her speech on social media, including her speech related to COVID-19 restrictions, as set forth in her Declaration, ECF No. 10-12, which is attached as Exhibit L and incorporated by reference herein.

**B.     Defendants.**

26. Defendant Joseph R. Biden, Jr., is President of the United States.  He is sued in his official capacity.

27. Defendant Karine Jean-Pierre is White House Press Secretary.  She is sued in her official capacity.  She is substituted for her predecessor, former White House Press Secretary Jennifer Rene Psaki.

28. Defendant Vivek H. Murthy is Surgeon General of the United States.  He is sued in his official capacity.

29. Defendant Xavier Becerra is Secretary of the Department of Health and Human Services. He is sued in his official capacity.

30. Defendant Department of Health and Human Services (HHS) is a Cabinet-level agency within the Government of the United States.

31. Defendant Anthony Fauci is the Director of the National Institute of Allergy and Infectious Diseases (NIAID) and Chief Medical Advisor to the President.  He is sued in his official capacity.

32. Defendant National Institute of Allergy and Infectious Diseases (NIAID) is a federal agency under the Department of Health and Senior Services.

33. Defendant Centers for Disease Control and Prevention (CDC) is a federal agency under the Department of Health and Human Services.

34. Defendant Carol Y. Crawford is Chief of the Digital Media Branch of the Division of Public Affairs within the Centers for Disease Control and Prevention.  She is sued in her official capacity.

35. Defendant United States Census Bureau, a.k.a. Bureau of the Census ("Census Bureau"), is an agency of the federal government within the Department of Commerce.

36. Defendant Jennifer Shopkorn is Senior Advisor for Communications with the U.S. Census Bureau.  She is sued in her official capacity.

37. Defendant U.S. Department of Commerce is a Cabinet-level agency within the Government of the United States.

38. Defendant Alejandro Mayorkas is Secretary of the Department of Homeland Security.  He is sued in his official capacity.

39. Defendant Robert Silvers is Under Secretary of the Office of Strategy, Policy, and Plans, within the Department of Homeland Security.  He is sued in his official capacity.

40. Defendant Samantha Vinograd is the Senior Counselor for National Security within the Office of the Secretary of DHS.  She is sued in her official capacity.

41. Defendant Department of Homeland Security (DHS) is a Cabinet-level agency within the Government of the United States.

42. Defendant Jen Easterly is the Director of the Cybersecurity and Infrastructure Security Agency within the Department of Homeland Security.  She is sued in her official capacity.

43. Defendant Cybersecurity and Infrastructure Security Agency (CISA) is an agency within the Department of Homeland Security that is charged with protecting the United States' cybersecurity and physical infrastructure.

44. Defendant Gina McCarthy is the White House National Climate Advisor.  She is sued in her official capacity.

45. Defendant Nina Jankowicz is the director of the newly constituted "Disinformation Governance Board" within the Department of Homeland Security.  She is sued in her official capacity.

46. At times relevant to this Complaint, Defendant Andrew Slavitt is or was the White House Senior COVID-19 Advisor.  He is sued in his official capacity.

47. Defendant Rob Flaherty is Deputy Assistant to the President and Director of Digital Strategy at the White House.  He is sued in his official capacity.

48. At times relevant to this Complaint, Defendant Courtney Rowe is or was the White House Covid-19 Director of Strategic Communications and Engagement.  She is sued in her official capacity.

49. Defendant Clarke Humphrey is the White House Digital Director for the Covid-19 Response Team.  She is sued in her official capacity.

50. At times relevant to this Complaint, Defendant Benjamin Wakana is or was the Deputy Director of Strategic Communications and Engagement at the White House COVID-19 Response Team.  He is sued in his official capacity.

51. Defendant Subhan Cheema is Deputy Director for Strategic Communications and External Engagement for the White House Covid-19 Response Team.  He is sued in his official capacity.

52. Defendant Dori Salcido is, on information and belief, the White House Covid-19 Director of Strategic Communications and Engagement.  She is sued in her official capacity.

53. At times relevant to this Complaint, Defendant Timothy W. Manning is or was the White House Covid-19 Supply Coordinator.  He is sued in his official capacity.

54. Defendant Dana Remus was, at times relevant to this Complaint, Counsel to the President, a.k.a. White House Counsel.  She is sued in her official capacity.

55. Defendant Aisha Shah is White House Partnerships Manager.  She is sued in her official capacity.

56. Defendant Laura Rosenberger serves as Special Assistant to the President at the White House.  She has extensive experience in service at the State Department.  She is sued in her official capacity.

57. Defendant Mina Hsiang is Administrator of the U.S. Digital Service within the Office of Management and Budget in the Executive Office of the President.  She is sued in her official capacity.

58. Defendant U.S. Department of Justice ("DOJ") is a Cabinet-level agency within the Government of the United States.

59. Defendant Federal Bureau of Investigation ("FBI") is an investigative agency of the federal Government within the U.S. Department of Justice.  The Foreign Influence Task Force ("FITF") is a task force within the FBI that purportedly investigates and/or addresses foreign influences within the United States.   The FTIF's website states: "The FBI is the lead federal agency responsible for investigating foreign influence operations. In the fall of 2017, Director Christopher

18

Wray established the Foreign Influence Task Force (FITF) to identify and counteract malign foreign influence operations targeting the United States." https://www.fbi.gov/investigate/counterintelligence/foreign-influence.

60. Defendant Laura Dehmlow is the Section Chief for the FBI's Foreign Influence Task Force. She is sued in her official capacity.

61. Defendant Elvis M. Chan is Supervisory Special Agent of Squad CY-1 in the San Francisco Division of the FBI. On information and belief, he has authority over cybersecurity issues for FBI in that geographical region, which includes the headquarters of major social-media platforms, and he plays a critical role for FBI and FITF in coordinating with social-media platforms relating to censorship and suppression of speech on their platforms.

62. Defendant Jay Dempsey is Social Media Team Lead, Digital Media Branch, Division of Public Affairs at the CDC. He is sued in his official capacity.

63. Defendant Kate Galatas is Deputy Communications Director at the CDC. She is sued in her official capacity.

64. Defendant Eric Waldo is Chief Engagement Officer for the Surgeon General. He is sued in his official capacity.

65. Defendant Yolanda Byrd is a member of the Digital Engagement Team at HHS. She is sued in her official capacity.

66. Defendant Christy Choi is Deputy Director, Office of Communications, HRSA within HHS. She is sued in her official capacity.

67. Defendant Tericka Lambert served Director of Digital Engagement at HHS and now serves as Deputy Director of the Office of Digital Strategy at the White House. She is sued in her official capacity.

19

68. Defendant Joshua Peck is Deputy Assistant Secretary for Public Engagement at HHS. He is sued in his official capacity.

69. At times relevant to this Complaint, Defendant Janell Muhammad is or was Deputy Digital Director at HHS. She is sued in her official capacity.

70. At times relevant to this Complaint, Defendant Matthew Masterson is or was Senior Cybersecurity Advisory within CISA in the Department of Homeland Security. He is sued in his official capacity.

71. Defendant Lauren Protentis is a member of the "Mis, Dis, and Mal-information (MDM) Team" within CISA at DHS. She is sued in her official capacity.

72. Defendant Geoffery Hale is a member of the Mis, Dis, and Mal-information (MDM) Team within CISA at DHS. He is sued in his official capacity.

73. Defendant Allison Snell is a member of the Mis, Dis, and Mal-information (MDM) Team within CISA at DHS. She is sued in her official capacity.

74. Defendant Kim Wyman is CISA's Senior Election Security Lead. She is sued in her official capacity.

75. Defendant Brian Scully is a member of DHS's Countering Foreign Influence Task Force, National Risk Management Center, and the Chief of the Mis-, Dis-, Malinformation Team at CISA. He is sued in his official capacity.

76. Defendant Zachary ("Zack") Henry Schwartz is the Division Chief for the Communications Directorate at the U.S. Census Bureau. He is sued in his official capacity.

77. Defendant Lorena Molina-Irizarry served at times relevant to this Complaint as Director of Operations at Census Open Innovation Labs at the Census Bureau and Senior Advisor on the American Rescue Plan Team at the White House. She is sued in her official capacity.

78. Defendant Kristin Galemore is Deputy Director of the Office of Faith Based and Neighborhood Partnerships at the Census Bureau.  She is sued in her official capacity.

79. Defendant U.S. Food and Drug Administration ("FDA") is a federal agency within the U.S. Department of Health and Human Services.

80. Defendant Erica Jefferson is the Associate Commissioner for External Affairs within the Office of the Commissioner at the U.S. Food and Drug Administration.  She is sued in her official capacity.

81. Defendant Michael Murray is the Acquisition Strategy Program Manager for the Office of Health Communications and Education at the FDA.  He is sued in his official capacity.

82. Defendant Brad Kimberly is the Director of Social Media at the FDA.  He is sued in his official capacity.

83. Defendant U.S. Department of State ("State Department") is a Cabinet-level agency within the Government of the United States.

84. Defendant Leah Bray is the Acting Coordinator of the State Department's Global Engagement Center.  She is sued in her official capacity.

85. Defendant Samaruddin K. Stewart is a Senior Technical Advisor and/or Senior Advisor for the Global Engagement Center of the State Department.  He is sued in his official capacity.

86. At times relevant to this Complaint, Defendant Daniel Kimmage is or was the Acting Coordinator for the Global Engagement Center at the State Department.  He is sued in his official capacity.

87. Defendant Alexis Frisbie is a member of the Technology Engagement Team at the Global Engagement Center at the State Department.  She is sued in her official capacity.

88. The State Department operates a "Global Engagement Center" within the State Department that conducts counter-"disinformation" activities.  According to the State Department's website, the Global Engagement Center's mission is "[t]o direct, lead, synchronize, integrate, and coordinate efforts of the Federal Government to recognize, understand, expose, and counter foreign state and non-state propaganda and disinformation efforts aimed at undermining or influencing the policies, security, or stability of the United States, its allies, and partner nations." As alleged further herein, the Global Engagement Center is involved in procuring the censorship of private speech on social media, including of U.S. citizens.  The State Department also maintains an Office of Cyber Coordinator, a.k.a. Office of the Coordinator for Cyber Issues, that has, on information and belief, also been involved in federal social-media censorship activities.

89. Defendant U.S. Department of the Treasury ("Treasury") is a Cabinet-level agency within the Government of the United States.

90. Defendant Wally Adeyemo is the Deputy Secretary of the Treasury.  He is sued in his official capacity.

91. Defendant U.S. Election Assistance Commission ("EAC") is an independent agency within the Government of the United States.  According to its website, the EAC "was established by the Help America Vote Act of 2002 (HAVA).  The EAC is an independent, bipartisan commission charged with developing guidance to meet HAVA requirements, adopting voluntary voting system guidelines, and serving as a national clearinghouse of information on election administration."

92. Defendant Mark A. Robbins is the Interim Executive Director of the EAC.  He is sued in his official capacity.

93. Defendant Kristen Muthig is the Director of Communications for the EAC.  According to the EAC's website, Muthig "manages media relations, communications strategy and supports the commissioners and EAC leadership."  She is sued in her official capacity.

## GENERAL ALLEGATIONS

### A. Freedom of Speech Is the Bedrock of American Liberty.

94. The First Amendment of the U.S. Constitution states that "Congress shall make no law … abridging the freedom of speech, or of the press…"  U.S. CONST. amend. I.

95. Article I, § 8 of the Missouri Constitution provides "[t]hat no law shall be passed impairing the freedom of speech, no matter by what means communicated: that every person shall be free to say, write or publish, or otherwise communicate whatever he will on any subject, being responsible for all abuses of that liberty…."  MO. CONST. art. I, § 8.  Article I, § 7 of the Louisiana Constitution provides that "[n]o law shall curtail or restrain the freedom of speech or of the press.  Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom."  LA. CONST. art. I, § 7.  All other State Constitutions likewise protect the freedom of speech as a fundamental right of the first order.

96. The freedom of speech and expression guaranteed by the First Amendment is one of the greatest bulwarks of liberty.  These rights are fundamental and must be protected against government interference.

### 1. Government officials lack authority to censor disfavored speakers and viewpoints.

97. If the President or Congress enacted a law or issued an order requiring the suppression of certain disfavored viewpoints or speakers on social media, or directing social media to demonetize, shadow-ban, or expel certain disfavored speakers, such a law or order would be manifestly unconstitutional under the First Amendment.

23

98. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

99. "[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (quotations omitted).

100.      "In light of the substantial and expansive threats to free expression posed by content-based restrictions," the Supreme "Court has rejected as 'startling and dangerous' a 'free-floating test for First Amendment coverage ... [based on] an *ad hoc* balancing of relative social costs and benefits.'"   *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality op.) (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)).

## 2. Merely labeling speech "misinformation" or "disinformation" does not strip away First Amendment protections.

101.      Labeling disfavored speech "misinformation" or "disinformation" does not strip it of First Amendment protection.  "Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements. This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." *Id.* at 718.

102.      The Supreme Court has thus rejected the argument "that false statements, as a general rule, are beyond constitutional protection." *Id.*

103.      "Permitting the government to decree this speech to be a criminal offense, whether shouted from the rooftops or made in a barely audible whisper, would endorse government authority to compile a list of subjects about which false statements are punishable.  That

24

governmental power has no clear limiting principle.  Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth."  *Id.* at 723 (citing G. ORWELL, NINETEEN EIGHTY–FOUR (1949) (Centennial ed. 2003)).

104.     "Were the Court to hold that the interest in truthful discourse alone is sufficient to sustain a ban on speech … it would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition.  The mere potential for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom."  *Id.* at 723.

### 3.  Counterspeech, not censorship, is the proper response to supposed "misinformation."

105.     When the Government believes that speech is false and harmful, "counterspeech," not censorship, must "suffice to achieve its interest."  *Id.* at 726.  The First Amendment presumes that "the dynamics of free speech, of counterspeech, of refutation, can overcome the lie."  *Id.*

106.     "The remedy for speech that is false is speech that is true.  This is the ordinary course in a free society.  The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth."  *Id.* at 727.

107.     "The theory of our Constitution is 'that the best test of truth is the power of the thought to get itself accepted in the competition of the market.'"  *Id.* at 728 (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).

108.     "The First Amendment itself ensures the right to respond to speech we do not like, and for good reason.  Freedom of speech and thought flows not from the beneficence of the state but from the inalienable rights of the person.  And suppression of speech by the government can make exposure of falsity more difficult, not less so.  Society has the right and civic duty to engage

in open, dynamic, rational discourse.  These ends are not well served when the government seeks to orchestrate public discussion through content-based mandates." *Id.* at 728.

### 4. Americans have a First Amendment right to be exposed to a free flow of speech, viewpoints, and content, free from censorship by government officials.

109.     The First Amendment also protects the right to receive others' thoughts, messages, and viewpoints freely, in a free flow of public discourse.  "[W]here a speaker exists …, the protection afforded is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976).

110.     The right to receive information is "an inherent corollary of the rights to free speech and press that are explicitly, guaranteed by the Constitution," because "the right to receive ideas follows ineluctably from the sender's First Amendment right to send them." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). "The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers." *Lamont v. Postmaster Gen.*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring).

111.     "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

112.     "[A]ssuring that the public has access to a multiplicity of information sources is a governmental purpose of the highest order, for it promotes values central to the First Amendment." *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 663 (1994).  Indeed, "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *United States v. Midwest Video Corp.*, 406 U.S. 649, 668 n.27 (1972) (plurality op.) (quotations omitted).

**5. Government officials may not circumvent the First Amendment by inducing, threatening, and/or colluding with private entities to suppress protected speech.**

113.     It is "axiomatic" that the government may not "induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (quotations omitted).

114.     A private entity violates the First Amendment "if the government coerces or induces it to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint." *Knight First Amendment Institute*, 141 S. Ct. at 1226 (Thomas, J., concurring).  "The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly." *Id.*

115.     Threats of adverse regulatory or legislative action, to induce private actors to censor third parties' speech, violate the First Amendment.  *See Hammerhead Enters. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983) ("Where comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid claim can be stated."); *see also Bantam Books v. Sullivan*, 372 U.S. 58, 68 (1963) (holding that a veiled threat of prosecution to pressure a private bookseller to stop selling disfavored books could violate the First Amendment).

116.     The unprecedented control over private speech exercised by social-media companies gives government officials an unprecedented opportunity to circumvent the First Amendment and achieve indirect censorship of private speech.  "By virtue of its ownership of the essential pathway," a social media platform "can . . . silence the voice of competing speakers with a mere flick of the switch." *Turner*, 512 U.S. at 656*; see also Knight First Amendment Inst.*, 141 S. Ct. at 1224 (Thomas, J., concurring). "The potential for abuse of this private power over a central avenue of communication cannot be overlooked." *Turner*, 512 U.S. at 656.

27

**B.      The Dominance of Social Media as a Forum for Public Information and Discourse.**

117.      Social media has become, in many ways, "the modern public square." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).  Social media platforms provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id.*

118.      "Today's digital platforms provide avenues for historically unprecedented amounts of speech, including speech by government actors. Also unprecedented, however, is the concentrated control of so much speech in the hands of a few private parties." *Knight First Amendment Institute*, 141 S. Ct. at 1221.

119.      The "concentration" of power in social media companies "gives some digital platforms enormous control over speech." *Id.* at 1224.  Defendants have not hesitated to exploit this power.

120.      For example, on information and belief, Facebook has close to 3 billion registered users worldwide and over 124 million users in the United States, including millions of Missourians and millions of citizens of other States.

121.      On information and belief, Twitter has more than 340 million users worldwide, including approximately 70 million users in the United States.  Approximately 500 million tweets are posted on Twitter every day, and they are accessible to non-Twitter users on the internet. Moreover, Twitter users include large numbers of politicians, journalists, public figures, and others with a disproportionately large impact on public discourse in other forums, so Twitter's impact on public discourse is even larger than its numbers alone reflect.

122.      On information and belief, YouTube has more than 4 billion hours of video views every month.  Videos on YouTube channels are visible to both YouTube users and to the general

public on the internet.  An estimated 500 hours of video content are uploaded to YouTube every minute.

123.     YouTube is extremely popular among politicians and public figures in reaching their audiences.  On information and belief, in 2020, approximately 92 percent of U.S. Senators and 86 percent of U.S. Representatives uploaded content on YouTube.

124.     According to a recent Pew Research study, 66 percent of U.S. adults use Facebook, and 31 percent of U.S. adults say they get news regularly on Facebook.  Walker et al., *News Consumption Across Social Media in 2021*, PEW RESEARCH CENTER (Sept. 20, 2021), *at* https://www.pewresearch.org/journalism/2021/09/20/news-consumption-across-social-media-in-2021/.

125.     According to the same study, 72 percent of U.S. adults say that they use YouTube, and 22 percent of U.S. adults say that they regularly get news on YouTube.  *Id.*

126.     According to the same study, 23 percent of U.S. adults say that they use Twitter, and 13 percent of U.S. adults say they regularly get news on Twitter.  *Id.*  This comprises 55 percent of Twitter users.  *Id.*

127.     According to the same study, 41 percent of U.S. adults say that they use Instagram, and 11 percent of U.S. adults say they regularly get news on Instagram.  *Id.*

128.     The free flow of information and expression on social media directly affects non-users of social media as well.  Social-media users who are exposed to information, ideas, and expression through social media communicate the same information, ideas, and expression with non-social-media users.  News, information, messages, narratives, and storylines that originate on social media are frequently replicated in other forums, such as television, print media, and private discourse.  Further, much content posted on social-media is directly available to non-social-media

29

users.  For example, posts on Twitter are directly accessible on the internet to non-Twitter-users, and content on YouTube is available to the general public on the internet as well.

129.    In the aggregate, these numbers of Americans who (1) use social-media platforms, and (2) regularly use social-media platforms to obtain news and information about matters of public interest, comprise hundreds of millions of Americans, including millions of Missourians and Louisianans, and very substantial segments of the populations of Missouri, Louisiana, and every other State.

130.    There are also many ways for social-media companies to censor or suppress speech on social-media platforms.  Some of these methods are immediately known to the speaker and/or his or her audience, and some are not visible to them.  Censorship, therefore, can occur without the knowledge of the speaker and/or his or her audience.  These methods include, but are not limited to, terminating speakers' accounts, suspending accounts, imposing warnings or strikes against accounts to chill future disfavored speech, "shadow banning" speakers, demonetizing content, adjusting algorithms to suppress or de-emphasize speakers or messages, promoting or demoting content, placing warning labels on content, suppressing content in other users' feeds, promoting negative comments on disfavored content, and requiring additional click-through(s) to access content, among many others.  Many methods, moreover, have a chilling effect on social-media speech, as the threat of censorship (such as suspension, demonetization, or banning) drives speakers to self-censor to avoid making statements that might be deemed to violate the social-media companies' vague, ever-changing, often-hidden, and inconsistently enforced standards for censoring and suppressing speech.  Collectively herein, all these methods of suppressing and/or censoring speech on social media are called "censorship" and/or "suppression" of social-media speech.

131.     The censorship and suppression of free speech on social media functions in most cases as a prior restraint on speech, both through its direct effect and its chilling effects.  A prior restraint is the most severe form of restriction on freedom of expression.

**C.     Public and Private Attempts to Police "Misinformation" or "Disinformation" on Social Media Have Proven Embarrassingly Inaccurate.**

132.     Yesterday's "misinformation" often becomes today's viable theory and tomorrow's established fact.  "Even where there is a wide scholarly consensus concerning a particular matter, the truth is served by allowing that consensus to be challenged without fear of reprisal.  Today's accepted wisdom sometimes turns out to be mistaken."  *Alvarez*, at 752 (Alito, J., dissenting) (emphasis added).  This prediction has proven true, again and again, when it comes to suppressing "misinformation" and "disinformation" on social media.

**1.     The Hunter Biden laptop story.**

133.     Perhaps most notoriously, social-media platforms aggressively censored an October 14, 2020 New York Post exposé about the contents of the laptop of (then-Candidate Biden's son) Hunter Biden, which had been abandoned in a Delaware repair shop and contained compromising photos and email communications about corrupt foreign business deals.  As the New York Post reported at the time, "[b]oth Twitter and Facebook took extraordinary censorship measures against The Post on Wednesday over its exposés about Hunter Biden's emails … The Post's primary Twitter account was locked as of 2:20 p.m. Wednesday because its articles about the messages obtained from Biden's laptop broke the social network's rules against 'distribution of hacked material,' according to an email The Post received from Twitter," even though there were "zero claims that [Hunter Biden's] computer had been hacked."  *Twitter, Facebook censor Post over Hunter Biden exposé*, N.Y. POST (Oct. 14, 2020), *at* https://nypost.com/2020/10/14/facebook-twitter-block-the-post-from-posting/.      "Twitter also

blocked users from sharing the link to The Post article indicating that Hunter Biden introduced Joe Biden to the Ukrainian businessman, calling the link 'potentially harmful.'" *Id.*

134.     As the Wall Street Journal Editorial Board reported, "nearly all of the media at the time ignored the story or 'fact-checked' it as false.  This … was all the more egregious given other evidence supporting the Post's scoop.  Neither Hunter Biden nor the Biden campaign denied that the laptop was Hunter's.  And Hunter's former business partner, Tony Bobulinski, went public with documents backing up some of the laptop's contents."  Editorial Board, *Hunter Biden's Laptop Is Finally News Fit to Print*, WALL ST. J. (March 18, 2022).

135.     Biden, his allies, and those acting in concert with them falsely attacked the Hunter Biden laptop story as "disinformation."  *Id.*   Fifty "intelligence officials—headlined by former Obama spooks James Clapper and John Brennan—circulated a statement peddling the Russian 'disinformation' line—even as they admitted they had no evidence.  Th[e] result was a blackout of the Hunter news, except in a few places…."  *Id.*  Parroting the Biden campaign's false line, both social media platforms and major news organizations treated the story as "disinformation" and aggressively censored it.

136.     In early 2022—over a year and a half later—major news organizations finally admitted that the Hunter Biden laptop story was truthful and rested on reliable sourcing and information.  *Id.*  The Washington Post and the New York Times quietly acknowledged the truth and reliability of the story "17 months" later, in mid-March 2022.  *Id.*

137.     Free-speech advocate Glenn Reynolds aptly described this embarrassing episode as one that permanently damaged the credibility and reputation for fairness of social-media platforms and major media outlets:   "Twitter and other tech giants banned The Post's reporting, since admitted to be accurate, on Hunter Biden's laptop and the damaging information it contained.

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 100 of 332 PageID #:
4384
Case 3:22-cv-01213-TAD-KDM   Document 5-8   Filed 11/06/22   Page 84 of 165 PageID #: 3159

Many social-media giants banned any links to the story, and Twitter even went so far as to stop its users from sharing the story one-on-one through direct messages. (CEO Jack Dorsey later admitted that was a 'total mistake.')  Their purpose was to affect the election's outcome in favor of the Democrats, and they probably did."  Glenn H. Reynolds, '*Censorship is free speech' is the establishment's Orwellian line on Elon Musk's Twitter crusade*, N.Y. POST (Apr. 15, 2022), https://nypost.com/2022/04/14/the-establishments-orwellian-line-on-elon-musks-twitter-crusade/.

### 2. Speech about the lab-leak theory of COVID-19's origins.

138.    Likewise, beginning in February 2020, social-media platforms censored speech advocating for the lab-leak theory of the origins of SARS-CoV-2, the virus that causes COVID-19.  The lab-leak theory postulates that the virus did not originate naturally in bats or other animals, but leaked from a biotech laboratory in Wuhan, China, operated by the Wuhan Institute of Virology.

139.    On information and belief, Defendant Dr. Anthony Fauci, a senior federal government official, coordinating with others, orchestrated a campaign to discredit the lab-leak hypothesis in early 2020.  As director of NIAID, Dr. Fauci had funded risky "gain-of-function" research at the Wuhan Institute of Virology through intermediaries such as EcoHealth Alliance, headed by Dr. Peter Daszak.  Thus, if the lab-leak theory were established, Dr. Fauci and Dr. Daszak could be potentially implicated in funding the research on viruses that caused the COVID-19 pandemic and killed millions of people worldwide.

140.    During the same time frame as he was orchestrating a campaign to falsely discredit the lab-leak theory, Dr. Fauci was exchanging emails with Mark Zuckerberg, the CEO of Facebook, regarding public messaging and the dissemination of COVID-19 information on social-

media.  On information and belief, Dr. Fauci coordinated directly with Facebook and/or other social-media firms to suppress disfavored speakers and content of speech on social media.

141.    Not surprisingly, social-media platforms like Facebook promptly accepted Dr. Fauci's initiative to discredit the lab-leak theory, and they engaged in an aggressive campaign to censor speech advocating for the lab-leak theory on social media on the ground that it was supposedly disinformation.  Facebook "expand[ed] its content moderation on Covid-19 to include 'false' and 'debunked' claims such as that 'COVID-19 is man-made or manufactured.'"  Editorial Board, *Facebook's Lab-Leak About-Face*, WALL ST. J. (May 27, 2021), https://www.wsj.com/articles/facebooks-lab-leak-about-face-11622154198.    This included suppressing speech by highly credentialed and well-respected writers, such as "science journalist Nicholas Wade," *id.*, and scientist Alina Chan.  Other social-media platforms likewise censored speech advocating for the lab-leak hypothesis.

142.    By 2021, however, "the circumstantial evidence" favoring the lab-leak theory "finally permeated the insular world of progressive public health," *id.*, and Fauci and other Biden Administration officials were forced to admit the theory's inherent plausibility.  After a long period of censorship, in May 2021, Facebook and other platforms announced that they would no longer censor social-media speech advocating for the lab-leak theory.

143.    The Wall Street Journal noted the close link between government and social-media platforms in censoring this speech: "Facebook acted in lockstep with the government," indicating that "[w]hile a political or scientific claim is disfavored by government authorities, Facebook will limit its reach.  When government reduces its hostility toward an idea, so will Facebook."  *Id.* "Free speech protects the right to challenge government.  But instead of acting as private actors

with their own speech rights, the companies are mandating conformity with existing government views." *Id.*

144.    There had long been credible—even compelling—evidence of the plausibility of the lab-leak theory, long before social-media companies stopped censoring it.  *See, e.g.,* House Foreign Affairs Committee Minority Staff Report, *The Origins of COVID-19: An Investigation of the Wuhan Institute of Virology* (Aug. 2021), https://gop-foreignaffairs.house.gov/wp-content/uploads/2021/08/ORIGINS-OF-COVID-19-REPORT.pdf (detailing evidence available long before censorship lifted); Nicholas Wade, *The origin of COVID: Did people or nature open Pandora's box at Wuhan?*, BULL. ATOMIC SCIENTISTS (May 5, 2021), https://thebulletin.org/2021/05/the-origin-of-covid-did-people-or-nature-open-pandoras-box-at-wuhan/; ALINA CHAN, VIRAL: THE SEARCH FOR THE ORIGIN OF COVID-19 (Sept. 3, 2021).

145.    Facebook's decision to stop censoring the lab-leak theory did not come until "after almost every major media outlet, and … even the British and American security services, finally confirmed that it is a feasible possibility."  Freddie Sayers, *How Facebook censored the lab leak theory*, UNHERD (May 31, 2021), https://unherd.com/2021/05/how-facebook-censored-the-lab-leak-theory/.  Facebook admitted that its decision to end censorship was made "in consultation with" government officials, *i.e.*, "public health experts."  *Id.*

146.    The reach of Facebook's censorship alone (to say nothing of other platforms that censored the lab-leak theory) was enormous.  Facebook "displayed 'warnings'" on such supposed COVID-19-related misinformation, and claimed that "[w]hen people saw those warning labels, 95% of the time they did not go on to view the original content."  *Id.*  "Moreover, if an article is rated 'false' by their 'fact checkers', the network will 'reduce its distribution'.  This means that,

while an author or poster is not aware that censorship is taking place, the network could be hiding their content so it is not widely disseminated." *Id.*

147.    Ironically, while admitting that it had erroneously censored speech on the lab-leak theory for over a year, Facebook announced that it was "now extending its policy of 'shadow-banning' accounts that promote misinformation.  'Starting today, we will reduce the distribution of all posts in News Feed from an individual's Facebook account if they repeatedly share content that has been rated by one of our fact-checking partners.'  So now, if you share something deemed to contain misinformation multiple times, your account could be silenced; you won't be informed, you won't know to what degree your content will be hidden and you won't know how long it will last—all thanks to group of 'fact-checkers' whose authority cannot be questioned." *Id.*  It is astonishing that "this announcement was made on the very same day as Facebook's admission of error" on the lab-leak theory. *Id.*

### 3.    Speech about the efficacy of mask mandates and COVID-19 lockdowns.

148.    Social-media platforms also aggressively censored speech questioning the efficacy of masks and lockdowns as COVID-19 mitigation measures.  Yet evidence revealed that concerns about the efficacy of these measures were well-founded.

149.    For example, on information and belief, Twitter's "COVID-19 misleading information policy," as of December 2021, noted that Twitter will censor (label or remove) speech claiming that "face masks … do not work to reduce transmission or to protect against COVID-19," among many other restrictions.  *See* Twitter, *Covid-19 misleading information policy*, https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy.   On  information and belief, both Twitter and other social-media platforms have imposed similar policies, imposing

censorship on speech questioning the efficacy of masks and the efficacy of lockdowns as COVID-19 mitigation measures.

150.    On April 8, 2021, YouTube "deleted a video in which Florida Gov. Ron DeSantis and a handful of medical experts," including Plaintiffs Bhattacharya and Kulldorff, "questioned the effectiveness of having children wear masks to stop the spread of COVID-19." *YouTube Purges Ron DeSantis Video Over Claims Children Don't Need to Wear Masks*, THE WRAP (Apr. 8, 2021), https://www.thewrap.com/youtube-purges-florida-governor-video-over-claims-children-dont-need-to-wear-masks/.

151.    On August 10, 2021, "YouTube barred Sen. Rand Paul (R-Ky.) from uploading new videos to the site for seven days, after the ophthalmologist posted a video last week arguing that most masks 'don't work' against the coronavirus." *Rand Paul Suspended from YouTube Over Covid Claims*, FORBES (Aug. 10, 2021), https://www.forbes.com/sites/joewalsh/2021/08/10/rand-paul-suspended-from-youtube-over-covid-claims/?sh=31f1d4e01971.

152.    "When Scott Atlas, a member of the Trump White House's coronavirus task force, questioned the efficacy of masks last year, Twitter removed his tweet.  When eminent scientists from Stanford and Harvard recently told Florida Gov. Ron DeSantis that children should not be forced to wear masks, YouTube removed their video discussion from its platform." *How Facebook uses 'fact-checking' to suppress scientific truth*, N.Y. POST (May 18, 2021), https://nypost.com/2021/05/18/how-facebook-uses-fact-checking-to-suppress-scientific-truth/.

153.    In the same vein, Facebook suppressed a scientist for citing a peer-reviewed study "by a team of researchers in Germany who established an online registry for thousands of parents to report on the impact of masks on their children.  More than half of those who responded said that masks were giving their children headaches and making it difficult for them to concentrate.

37

More than a third cited other problems, including malaise, impaired learning, drowsiness and fatigue." *Id.*

154.    On November 21, 2020, "[t]wo leading Oxford University academics … accused Facebook of 'censorship' after it claimed an article they wrote on face masks amounted to 'false information'." *Two top Oxford academics accuse Facebook of censorship for branding their article on whether masks work 'false information'*, DAILY MAIL (Nov. 21, 2020) https://www.dailymail.co.uk/news/article-8973631/Two-Oxford-academics-accuse-Facebook-censorship-article-warning.html.

155.    No convincing evidence supported the efficacy of mask mandates, while compelling evidence contradicted it, both before and after their implementation.  Tracking the aggregate case numbers in States with and without mask mandates over the course of the COVID-19 pandemic, in a "natural experiment," demonstrates that mask mandates made "zero difference." John Tierney, *The Failed COVID Policy of Mask Mandates*, CITY J. (April 19, 2022), https://www.city-journal.org/the-failed-covid-policy-of-mask-mandates.   Both case rates and mortality rates were "virtually identical." *Id.*  Indeed, "mask mandates were implemented without scientific justification," and "they failed around the world."  *Id.*  "In their pre-Covid planning strategies for a pandemic, neither the Centers for Disease Control nor the World Health Organization had recommended masking the public—for good reason.  Randomized clinical trials involving flu viruses had shown, contrary to popular wisdom in Japan and other Asian countries, that there was 'no evidence that face masks are effective in reducing transmission,' as the WHO summarized the scientific literature."  *Id.*  "Anthony Fauci acknowledged this evidence early in the pandemic, both in his public comments ('There's no reason to be walking around with masks,' he told 60 Minutes) and in his private emails ('I do not recommend you wear a mask,' he told a

colleague, explaining that masks were too porous to block the small Covid virus)." *Id.*  "Instead of carefully analyzing the effects of masks, the CDC repeatedly tried to justify them by misrepresenting short-term trends and hyping badly flawed research, like studies in Arizona and Kansas purporting to show that infections had been dramatically reduced by the mask mandates imposed in some counties.  But in each state, … infection rates remained lower in the counties that did not mandate masks."  *Id.*; *see also, e.g.,* Ian Miller, Unmasked: The Global Failure of COVID Mask Mandates (Jan. 20, 2022).

156.    Ironically, Plaintiff Kulldorff was suspended on Twitter for several weeks for posting that masks endow vulnerable individuals with a false sense of security, because they actually do not work well to protect against viral infection.  This exemplifies the danger of government involvement in social media censorship: preventing a world-renowned epidemiologist from conveying to the public that vulnerable people should not rely on masks for protection could indirectly cause great harm.

157.    Likewise, no convincing evidence supported the efficacy of lockdowns.  Quite the contrary.  In January 2022, a Johns Hopkins meta-analysis reviewed the efficacy of lockdowns as a COVID-19 mitigation measure and found that they had minimal impact, if any, on COVID-19 mortality rates.  The study reached "the conclusion that lockdowns have had little to no effect on COVID-19 mortality… [L]ockdowns in Europe and the United States only reduced COVID-19 mortality by 0.2% on average…. While this meta-analysis concludes that lockdowns have had little to no public health effects, they have imposed enormous economic and social costs where they have been adopted.  In consequence, lockdown policies are ill-founded and should be rejected as a pandemic policy instrument."  Herby et al., *A Literature Review and Meta-Analysis of the Effects of Lockdowns on COVID-19 Mortality*, Studies in Applied Economics (Jan. 2022),

*available    at*    https://sites.krieger.jhu.edu/iae/files/2022/01/A-Literature-Review-and-Meta-Analysis-of-the-Effects-of-Lockdowns-on-COVID-19-Mortality.pdf.

158.    On December 21, 2021, Dr. Leana Wen, a CNN medical commentator and strong advocate for COVID-19 restrictions, tweeted that "cloth masks are little more than facial decorations." *CNN's Leana Wen: 'Cloth Masks Are Little More Than Facial Decorations'*, REASON, *at* https://reason.com/2021/12/21/leana-wen-cloth-mask-facial-decorations-covid-cdc-guidance/.  Twitter did not censor this tweet, even though it undermined the efficacy of mask mandates that permitted the use of cloth masks (*i.e.*, virtually all of them)—undoubtedly because it was advocating for *more* aggressive mitigation measures (*i.e.*, higher-quality masks than cloth masks), not less.

159.    "On September 26, 2021, CDC Director Walensky cited an Arizona study to claim that schools without mask mandates were 3.5 times more likely to experience COVID-19 outbreaks.  However, the study is so flawed that experts have said it 'should not have entered into the public discourse' and that you 'can't learn anything' about mask rules from the study."  March 11, 2022 Letter of U.S. Rep. Cathy McMorris Rodgers, et al., to Surgeon General Murthy, *at* https://republicans-energycommerce.house.gov/wp-content/uploads/2022/03/3.11.22-Letter-to-Surgeon-General-Murthy-Final.pdf.   Yet Director Walensky's statement circulated widely on social media without being censored.

### 4.    Speech about election integrity and the security of voting by mail.

160.    In or around 2020, social-media platforms began aggressively censoring speech that raised concerns about the security of voting by mail, a major election-security issue. Notoriously, social-media platforms aggressively censored core political speech by then-President

Trump and the Trump campaign raising concerns about the security of voting by mail in the run-up to the November 2020 presidential election.

161.    This censorship is ironic because, for many years before 2020, it was a common left-wing talking point to claim that fraud occurred in voting by mail.  In opposing photo-ID requirements for in-person voting, Democrats and their allies frequently claimed that photo IDs for in-person voting were pointless because voting by mail, not in-person voting, presented the real opportunities for fraud.

162.    These Democratic claims of fraud in voting by mail were widely parroted in mainstream media for many years.  For example, in 2012, the New York Times wrote that "votes cast by mail are less likely to be counted, more likely to be compromised and more likely to be contested than those cast in a voting booth, statistics show," in an article headlined "Error and Fraud at Issue as Absentee Voting Rises."  https://www.nytimes.com/2012/10/07/us/politics/as-more-vote-by-mail-faulty-ballots-could-impact-elections.html.  In 2012, The Washington Post published an articles stating that "[i]t may still be possible to steal an American election, if you know the right way to go about it," citing a case in which "[c]onspirators allegedly bought off absentee          voters"          and          "faked          absentee          ballots."  https://www.washingtonpost.com/politics/decision2012/selling-votes-is-common-type-of-election-fraud/2012/10/01/f8f5045a-071d-11e2-81ba-ffe35a7b6542_story.html.   In   2014, MSNBC claimed: "Indeed, election experts say absentee ballot fraud is the most common form of organized voter fraud, since, because of the secret ballot, there's no way to ensure that an in-person voter is voting for the candidate he promised to."  https://www.msnbc.com/msnbc/greg-abbott-bogus-voter-fraud-crusade-msna291356.  In 2016, Slate claimed, in a piece titled, "Voter Fraud Exists. Republican Restrictions Won't Stop It," that "[t]he vast majority of voter fraud

prosecutions touted by conservative groups like the Heritage Foundation involve absentee ballots that were illegally cast.  And the only voting fraud schemes with the potential to actually swing elections involved mail-in ballots."   https://slate.com/news-and-politics/2016/09/voter-fraud-exists-through-absentee-ballots-but-republicans-wont-stop-it.html.

163.    Many other authorities confirm the reasonableness of concerns about security of voting by mail.  For example, in *Crawford v. Marion County Election Board*, the U.S. Supreme Court held that fraudulent voting "perpetrated using absentee ballots" demonstrates "that not only is the risk of voter fraud real but that it could affect the outcome of a close election." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 195–96 (2008) (opinion of Stevens, J.) (emphasis added).

164.    The bipartisan Carter-Baker Commission on Federal Election Reform—co-chaired by former President Jimmy Carter and former Secretary of State James A. Baker—determined that "[a]bsentee ballots remain the largest source of potential voter fraud."  BUILDING CONFIDENCE IN U.S. ELECTIONS: REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM, at 46 (Sept. 2005), at   https://www.legislationline.org/download/id/1472/file/3b50795b2d0374cbef5c29766256.pdf. According to the Carter-Baker Commission, "[a]bsentee balloting is vulnerable to abuse in several ways." *Id.*  "Blank ballots mailed to the wrong address or to large residential buildings might be intercepted." *Id.*  "Citizens who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation." *Id.* "Vote buying schemes are far more difficult to detect when citizens vote by mail." *Id.*  Thus, the Commission noted that "absentee balloting in other states has been a major source of fraud." *Id.* at 35.  It emphasized that voting by mail "increases the risk of fraud." *Id.*  And the Commission recommended that "States … need to do more to prevent … absentee ballot fraud." *Id.* at v.

165.     The U.S. Department of Justice's 2017 Manual on Federal Prosecution of Election Offenses, published by its Public Integrity Section, states: "Absentee ballots are particularly susceptible to fraudulent abuse because, by definition, they are marked and cast outside the presence of election officials and the structured environment of a polling place." U.S. Dep't of Justice, *Federal Prosecution of Election Offenses* 28 (8th ed. Dec. 2017), at https://www.justice.gov/criminal/file/1029066/download.   This Manual reports that "the more common ways" that election-fraud "crimes are committed include … [o]btaining and marking absentee ballots without the active input of the voters involved." *Id.* at 28. And the Manual notes that "[a]bsentee ballot frauds" committed both with and without the voter's participation are "common" forms of election fraud. *Id.* at 29.

166.     Thus, social-media censorship that has occurred since 2020 to suppress speech raising concerns about the security of voting by mail would, if applied even-handedly, suppress statements about the risks of fraud in mail-in voting by the United States Supreme Court, the Carter-Baker Commission co-chaired by President Jimmy Carter, and the U.S. Department of Justice's prosecution manual for election-integrity crimes.  One would not be able to quote Justice Stevens' opinion for the Supreme Court in *Crawford* on social media if it followed its own rules. Raising concerns about election integrity, and questioning the security of voting by mail, became unspeakable on social media only after it became expedient for the Democratic Party and the political Left to suppress these ideas, viewpoints, and concerns.

167.     This censorship of speech, speakers, and viewpoints on such topics and concerns continues to this day, at Defendants' instigation, as alleged further herein.

168.     There is a common theme to all these examples of wrong-headed censorship: Each involved censoring truthful or reliable information that contradicted left-wing political narratives.

What led to the censorship was not the fact that the speech was supposedly false, but that the message was politically inconvenient for Democratic officials and government-preferred narratives. As a result, the ability of politicians and social-media platforms to reliably identify actual "misinformation" and "disinformation" has been proven false, again and again.

### D.   Defendants, Using Their Official Authority, Have Threatened, Cajoled, and Colluded With Social-Media Companies to Silence Disfavored Speakers and Viewpoints.

169.   On information and belief, the individual Defendants and those acting in concert with them have conspired and colluded to suppress Americans' First Amendment and analogous state-law rights to freedom of expression on social-media platforms, and to be exposed to free expression on such platforms, and they have taken many overt actions to achieve this goal.

#### 1.   Section 230 of the CDA subsidized, protected, and fostered the creation of speech-censorship policies in a small, concentrated group of social-media firms.

170.   First, the Defendants did not act in a vacuum. For decades, the federal government has artificially encouraged, protected, fostered, and subsidized the aggregation of control over speech, including the specific power of censorship, by a small group of powerful social-media firms.

171.   In particular, Section 230 of the Communications Decency Act (CDA) artificially empowered and subsidized the growth of social-media companies and their censorship policies by effectively immunizing much censorship on social media from liability. Section 230's unique liability shield fostered the aggregation of power in the field into a concentrated cluster of powerful social-media firms, and it directly fostered, protected, and encouraged the development of speech-censorship policies. This process was greatly accelerated and enhanced by the social-media platforms' success in convincing courts to adopt ever-broadening interpretations of Section 230 immunity, which stray beyond the statutes' text.

172.     "Historically, at least two legal doctrines limited a company's right to exclude." *Knight First Amendment Institute*, 141 S. Ct. at 1222 (Thomas, J., concurring).  "First, our legal system and its British predecessor have long subjected certain businesses, known as common carriers, to special regulations, including a general requirement to serve all comers." *Id.*  "Second, governments have limited a company's right to exclude when that company is a public accommodation.  This concept—related to common-carrier law—applies to companies that hold themselves out to the public but do not 'carry' freight, passengers, or communications."  *Id.*  Absent the artificial immunity created by the overly expansive interpretations of Section 230 immunity, these legal doctrines, and free-market forces, would impose a powerful check on content- and viewpoint-based censorship by social-media platforms.  *See id.*

173.     The CDA was enacted in 1996 for the purpose of promoting the growth of internet commerce and protecting against the transmission of obscene materials to children over the internet.  It was intended to "offer a forum for a true diversity of political discourse," 47 U.S.C. § 230(a)(3), but in recent years Defendants have exploited it to produce the opposite effect.

174.     Section 230 of the CDA, 47 U.S.C. § 230, provides unique liability protections for internet publishers of information, such as social-media companies, which are not available to other publishers, such as those of printed media.  Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  In other words, social-media firms are generally protected from liability for what their users post.

175.     Section 230(c)(2), however, also provides that: "No provider or user of an interactive computer service shall be held liable on account of (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be

obscene, lewd, lascivious, filthy, excessively violent, harassing, or *otherwise objectionable*, *whether or not such material is constitutionally protected*."  47 U.S.C. § 230(c)(2)(A) (emphasis added).  Courts have interpreted Section 230 broadly—beyond its plain textual import—to shield social-media platforms from liability for censoring anything they deem "objectionable," even if it is constitutionally protected speech.

176.     This reading is unreasonable and exceeds what Congress authorized.  Viewpoint and content-based discrimination—now widely practiced by social-media platforms—are the antithesis of "good faith." *Id.*  Moreover, Congress intended the "otherwise objectionable" material in § 230(c)(2)(A) to refer only to content similar to "obscene, lewd, lascivious, filthy, excessively violent, [and] harassing" content referred to in the same list.  *Id.*  But social-media companies have interpreted this liability shield unreasonably broadly, and have convinced courts to adopt overbroad interpretations of Section 230 immunity.  *See, e.g., Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 15 (2020) (statement of Thomas, J., respecting the denial of certiorari) ("[C]ourts have extended the immunity in § 230 far beyond anything that plausibly could have been intended by Congress."); *id.* at 15-18 (discussing and criticizing the overbroad reading of § 230 liability that has shielded social-media firms).

177.     These platforms, therefore, have the best of both worlds: They claim that they are exempt from liability if they leave even atrocious content posted, but they are *also* exempt from liability if they censor anything they deem "objectionable, whether or not such material is constitutionally protected."  47 U.S.C. § 230(c)(2)(A).

178.     Further, Section 230 of the CDA purportedly shields such platforms from liability for colluding with other social-media platforms on how to censor speech: "No provider or user of an interactive computer service shall be held liable on account of … (B) any action taken to enable

or make available to information content providers or others the technical means to restrict access to material described in paragraph (1)."  47 U.S.C. § 230(c)(2)(B).  On information and belief, social-media platforms do, in fact, extensively coordinate with one another in censoring social-media speech.

179.     Section 230 also purports to preempt any state law to the contrary: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).

180.     On information and belief, the immunity provided by Section 230 of the CDA directly contributed to the rise of a small number of extremely powerful social-media platforms, who have now turned into a "censorship cartel."  The liability shield provided by the federal government artificially subsidized, fostered, and encouraged the viewpoint and content-based censorship policies that those platforms have adopted at Defendants' urging.

181.     On information and belief, social-media firms greatly value the immunity provided by § 230 of the CDA, which continues to provide them with artificial liability protections, and credible threats to amend or repeal that immunity are powerful motivators to those platforms. Defendants are aware of this.

182.     On information and belief, the largest and most powerful social-media firms are also greatly concerned about antitrust liability and enforcement, given their dominance in the social-media market(s), and credible threats to impose antitrust liability and/or enforcement are powerful motivators to those platforms as well.  Defendants are aware of this too.

**2.  The campaign of threats against social-media companies to demand censorship.**

183.     Defendant Biden, his political allies, and those acting in concert with him have a long history of threatening to use official government authority to impose adverse legal

consequences against social-media companies if such companies do not increase censorship of speakers and messages disfavored by Biden and his political allies.  Common threats of adverse legal and/or regulatory consequences include the threat of antitrust enforcement or legislation, and the threat of amending or repealing the liability protections of Section 230 of the Communications Decency Act (CDA), among others, if social-media companies fail to engage in more aggressive censorship of viewpoints, content, and speakers disfavored by Defendants.  These threats are effective because they address legal matters of critical concern to dominant social-media firms.

184.    Defendants have leveraged these threats to secure such increased censorship of speakers, content, and viewpoints that they disfavor on social-media platforms; and they have now moved into a phase of open collusion with the threatened companies, cooperating with them directly to censor speech, speakers, and viewpoints that Defendants disfavor.

185.    Threats from Biden, senior government officials in the Biden administration, and those acting in concert with them come in the context of a history of such threats from senior federal officials politically allied with them.  These threats have routinely linked (1) the prospect of official government action in the form of adverse legislation, regulation, or agency action—especially threats of antitrust legislation and/or enforcement and calls to amend or repeal Section 230 of the CDA, among others—with (2) calls for more aggressive censorship and suppression of speakers, viewpoints, and messages that these officials disfavor.  Recent examples include, but are by no means limited to, the following:

- Speaker Nancy Pelosi, April 12, 2019: "I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it.  And it is not out of the question that that could be removed." *Nancy Pelosi warns tech companies that Section 230 is 'in jeopardy'*, TECH CRUCH (April 12, 2019), at https://techcrunch.com/2019/04/12/nancy-pelosi-section-230/.

("When asked about Section 230, Pelosi referred to the law as a 'gift' to tech companies that have leaned heavily on the law to grow their business…. 'It is a gift to them and I don't think that they are treating it with the respect that they should, and so I think that that could be a question mark and in jeopardy… I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it.  And it is not out of the question that that could be removed.'").

- Senator Mark Warner, Oct. 28, 2020: "It saddens me that some of my colleagues have joined in the Trump Administration's cynical and concerted effort to bully platforms into allowing dark money groups, right-wing militias and even the President himself to continue to exploit social media platforms to sow disinformation, engage in targeted harassment, and suppress voter participation.  We can and should have a conversation about Section 230—and the ways in which it has enabled platforms to turn a blind eye as their platforms are used to facilitate discrimination and civil rights violations, enable domestic terrorist groups to organize violence in plain sight, assist in stalking and networked harassment campaigns, and enable online frauds targeted at vulnerable users…."  Statement of U.S. Sen. Mark R. Warner on Section 230 Hearing (Oct. 28, 2020), *at* https://www.warner.senate.gov/public/index.cfm/2020/10/statement-of-sen-mark-r-warner-on-facebook-s-decision-to-finally-ban-qanon-from-its-platforms.

- Then-Senator Kamala Harris, Sept. 30, 2019: "Look, let's be honest, Donald Trump's Twitter account should be suspended." *Kamala Harris says Trump's Twitter account should be suspended*, CNN.com (Sept. 30, 2019), *at* https://www.cnn.com/2019/09/30/politics/kamala-harris-trump-twitter-cnntv/index.html; *see also* https://twitter.com/kamalaharris/status/1179810620952207362.

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 117 of 332 PageID #:
4401
Case 3:22-cv-01213-TAD-KDM   Document 5-8   Filed 11/08/22   Page 50 of 184 PageID #: 3176

- Then-Senator Kamala Harris, Oct. 2, 2019: "Hey @jack [*i.e.*, Twitter CEO Jack Dorsey]. Time to do something about this," providing picture of a tweet from President Trump. https://twitter.com/kamalaharris/status/1179193225325826050.

- Senator Richard Blumenthal, Nov. 17, 2020: "I have urged, in fact, a breakup of tech giants. Because they've misused their bigness and power. …  And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court." *Breaking the News: Censorship, Suppression, and the 2020 Election Before the S. Comm. on Judiciary*, 116th Cong. at 36:10–15 (2020) (statement of Sen. Richard Blumenthal).

- Senator Mazie Hirono, Feb. 5, 2021: "Sec 230 was supposed to incentivize internet platforms to police harmful content by users.  Instead, the law acts as a shield allowing them to turn a blind eye. The SAFE TECH ACT brings 230 into the modern age and makes platforms        accountable        for        the        harm        they        cause." https://twitter.com/maziehirono/status/1357790558606024705?lang=bg.

- March 2021 Joint Hearing of the Communications and Technology Subcommittee, Joint Statement of Democratic Committee Chairs: "This hearing will continue the Committee's work of holding online platforms accountable for the growing rise of misinformation and disinformation. ... For far too long, big tech has failed to acknowledge the role they've played in fomenting and elevating blatantly false information to its online audiences. Industry self-regulation has failed.  We must begin the work of changing incentives driving social media companies to allow and even promote misinformation and disinformation." *See* Yaël Eisenstat & Justin Hendrix, *A Dozen Experts with Questions Congress Should Ask the Tech CEOs—On Disinformation and Extremism*, JUST SECURITY (Mar. 25, 2021),

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 118 of 332 PageID #:
4402
Case 3:22-cv-01213-TAD-KDM   Document 5-8   Filed 09/28/22   Page 51 of 165 PageID 3177

https://www.justsecurity.org/75439/questions-congress-should-ask-the-tech-ceos-on-disinformation-and-extremism/.

- On April 20, 2022, twenty-two Democratic members of Congress sent a letter to Mark Zuckerberg of Facebook (n/k/a "Meta Platforms, Inc."), demanding that Facebook increase censorship of "Spanish-language disinformation across its platforms." The letter claimed that "disinformation" was a threat to democracy, and it made explicit threats of adverse legislative action if Facebook/Meta did not increase censorship: "The spread of these narratives demonstrate that Meta does not see the problem of Spanish-language disinformation in the United States as a critical priority for the health of our democracy. The lack of Meta's action to swiftly address Spanish-language misinformation globally demonstrates the need for Congress to act to ensure Spanish-speaking communities have fair access to trustworthy information." The letter demanded information about Facebook's censorship policies on election-related speech for the upcoming elections: "How is Meta preparing to proactively detect and address foreign disinformation operations targeted at Spanish-speaking communities for future elections within the United States, including the 2022 primaries and general election? … [W]hat new steps has Meta taken to ensure the effectiveness of its algorithmic content detection policies to address disinformation and hate-speech across different languages?" April 20, 2022 Letter of Rep. Tony Cardenas, et al., at https://cardenas.house.gov/imo/media/doc/Meta%20RT%20and%20Spanish%20Language%20D isinformation%20Congressional%20Letter%20Final.pdf.

186.    Comments from two House Members summarize this campaign of pressure and threats: "In April 2019, Louisiana Rep. Cedric Richmond warned Facebook and Google that they had 'better' restrict what he and his colleagues saw as harmful content or face regulation: 'We're going to make it swift, we're going to make it strong, and we're going to hold them very

accountable.' New York Rep. Jerrold Nadler added: 'Let's see what happens by just pressuring them.'" Vivek Ramaswamy and Jed Rubenfeld, Editorial, *Save the Constitution from Big Tech: Congressional threats and inducements make Twitter and Facebook censorship a free-speech violation*, WALL ST. J. (Jan. 11, 2021), https://www.wsj.com/articles/save-the-constitution-from-big-tech-11610387105.

187.     Defendants' political allies have repeatedly used congressional hearings as forums to advance these threats of adverse legislation if social-media platforms do not increase censorship of speakers, speech, content, and viewpoints they disfavor.  They have repeatedly used such hearings to berate social-media firm leaders, such as Mark Zuckerberg of Facebook, Jack Dorsey of Twitter, and Sundar Pichai of Google and YouTube, and to make threats of adverse legal consequences if censorship is not increased.  Such hearings include, but are not limited to, those cited above, as well as an antitrust hearing before the House Judiciary Committee on July 29, 2020; a Senate Judiciary Committee hearing on November 17, 2020; and a House Energy and Commerce Hearing on March 25, 2021.

188.     The flip side of such threats, of course, is the implied "carrot" of retaining Section 230 immunity and avoiding antitrust scrutiny, allowing the major social-media platforms to retain their legally privileged status that is worth billions of dollars of market share.

189.     Starting in or around 2020, if not before, social-media firms have responded to these threats by engaging in increasingly more aggressive censorship of speakers, messages, and viewpoints disfavored by Defendants, senior government officials, and the political left.  "With all the attention paid to online misinformation, it's easy to forget that the big [social-media] platforms generally refused to remove false content purely because it was false until 2020."  Gilead Edelman, *Beware the Never-Ending Disinformation Emergency*, THE WIRED (March 11, 2022), *at*

https://www.wired.com/story/youtube-rigged-election-donald-trump-moderation-

misinformation/.  On information and belief, it was in response to such threats of adverse legal

consequences that social-media companies ramped up censorship in 2020, disproportionately

targeting speakers and viewpoints on the political right.  On information and belief, the examples

of censorship of truthful and reliable speech in 2020, cited above, were motivated in whole or in

part by such threats.

190.      Then-candidate and now-President Biden has led this charge.  He has tripled down

on these threats of adverse official action from his colleagues and allies in senior federal-

government positions.  His threats of adverse government action have been among the most

vociferous, and among the most clearly linked to calls for more aggressive censorship of

disfavored speakers and speech by social-media companies.

191.      For example, on January 17, 2020, then-candidate Biden stated, in an interview

with the New York Times editorial board, that Section 230 of the CDA should be "revoked"

because social-media companies like Facebook did not do enough to censor supposedly false

information in the form of political ads criticizing him—*i.e.*, core political speech.  He stated: "The

idea that it's a tech company is that Section 230 should be revoked, immediately should be

revoked, number one. For Zuckerberg and other platforms."  He also stated, "It should be revoked

because it is not merely an internet company.  It is propagating falsehoods they know to be false....

There is no editorial impact at all on Facebook. None. None whatsoever. It's irresponsible. It's

totally irresponsible."   N.Y. Times Editorial Board, *Joe Biden* (Jan. 17, 2020), *at*

https://www.nytimes.com/interactive/2020/01/17/opinion/joe-biden-nytimes-interview.html.

These claims were specifically linked to Facebook's alleged failure to censor *core political*

*speech—i.e.*, political ads on Facebook criticizing candidate Biden.  *Id.*

192.     Candidate Biden also threatened that Facebook CEO Mark Zuckerberg should be subject to civil liability and even *criminal prosecution* for not censoring such core political speech: "He should be submitted to civil liability and his company to civil liability…. Whether he engaged in something and amounted to collusion that in fact caused harm that would in fact be equal to a criminal offense, that's a different issue. That's possible. That's possible it could happen." *Id.*  In other words, Biden's message—not long before he became President of the United States—was that if Facebook did not censor political ads against him, Zuckerberg should go to prison.  These two threats echoed the same threats made by numerous political allies of the President since 2019, cited above.

193.     During the presidential campaign, now-Vice President Harris made similar threats against social-media firms to pressure them to engage in more aggressive censorship of speakers, content, and viewpoints she disfavors.  For example, in addition to the statements cited above, she stated in 2019: "We will hold social media platforms responsible for the hate infiltrating their platforms, because they have a responsibility to help fight against this threat to our democracy. And if you profit off of hate—if you act as a megaphone for misinformation or cyberwarfare, if you don't police your platforms—we are going to hold you accountable as a community." *Kamala Harris Wants to Be Your Online Censor-in-Chief*, Reason.com (May 7, 2019), *at* https://reason.com/2019/05/07/kamala-harris-promises-to-pursue-online-censorship-as-president/.

194.     In or around June 2020, the Biden campaign published an open letter and online petition (ironically, on Facebook) calling for Facebook to engage in more aggressive censorship of core political speech and viewpoints that then-Candidate Biden disfavored.  The open letter complained that Facebook "continues to allow Donald Trump to say anything — and to pay to

ensure that his wild claims reach millions of voters.  Super PACs and other dark money groups are following his example.  Trump and his allies have used Facebook to spread fear and misleading information about voting…. We call for Facebook to proactively stem the tide of false information by no longer amplifying untrustworthy content and promptly fact-checking election-related material that goes viral.  We call for Facebook to stop allowing politicians to hide behind paid misinformation in the hope that the truth will catch up only after Election Day.  There should be a two-week pre-election period during which **all** political advertisements must be fact-checked before they are permitted to run on Facebook. … Anything less will render Facebook a tool of misinformation that corrodes our democracy."  Biden-Harris, *Our Open Letter to Facebook* (last visited May 5, 2022), https://joebiden.com/2961-2/.

195.     The online petition demanded that Facebook "[p]romote real news, not fake news," "[q]uickly remove viral misinformation," and "[e]nforce voter suppression rules against everyone—even the President [Trump]."  The petition complained that Facebook "continues to amplify misinformation and lets candidates pay to target and confuse voters with lies."  It demanded that Facebook "promote authoritative and trustworthy sources of election information, rather than rants of bad actors and conspiracy theorists," "promptly remove false, viral information," and "prevent political candidates and PACs from using paid advertising to spread lies and misinformation – especially within two weeks of election day."  Biden-Harris, *#Movefastfixit* (last visited May 5, 2022), https://joebiden.com/facebook/.

196.     On September 28, 2020, the Biden-Harris campaign sent a letter to Facebook accusing it of propagating a "storm of disinformation" by failing to censor the Trump campaign's political speech, including social-media political ads.  Sept. 28, 2020 Biden-Harris Letter, *at* https://www.documentcloud.org/documents/7219497-Facebook-Letter-9-28.html.     The letter

accused Facebook of allowing "hyper-partisan" and "fantastical" speech to reach millions of people, and it demanded "more aggressive" censorship of Trump.  *Id.*

197.      A federal lawsuit filed in 2021 alleged that "before and after the November, 2020 election," California government officials "contracted with partisan Biden campaign operatives to police speech online.  The secretary of state of California then sent these flagged tweets to Twitter, Instagram, YouTube and other platforms for their removal." *Harmeet Dhillon: Biden White House 'flags' Big Tech – here's why digital policing is so dangerous*, Fox News (July 16, 2021), *at* https://www.foxnews.com/opinion/biden-white-house-flags-big-tech-digital-policing-harmeet-dhillon. Once in power, Biden and those acting in concert with him would continue this same course of conduct of "flagging" content for censorship by private social-media firms, now using the authority of the *federal* government to "flag" specific speech and speakers for censorship and suppression.

198.      On December 2, 2020—during the presidential transition—Biden's former chief of staff and top technical advisor, Bruce Reed, publicly stated that "it's long past time to hold the social media companies accountable for what's published on their platforms." *Biden Tech Advisor: Hold Social Media Companies Accountable for What Their Users Post*, CNBC.com (Dec. 2, 2020), *at* https://www.cnbc.com/2020/12/02/biden-advisor-bruce-reed-hints-that-section-230-needs-reform.html.  This comment specifically referred to the amendment or repeal of Section 230 of the Communications Decency Act.  *See id.*  Thus, the threat of adverse legal consequences for social-media companies that did not censor opposing political viewpoints was at the forefront of the incoming Biden Administration's public messaging.

199.      Coming into the new Administration, with now-President Biden's political allies in control of both Houses of Congress, social-media companies were on clear notice that the federal

government's involvement in social-media censorship was likely to escalate, and their threats of adverse legislation, regulation, and legal action became more ominous.  On information and belief, this caused a chilling effect on speech by prompting social-media companies to ramp up their own censorship programs against disfavored speech and speakers, to preempt the risk of adverse action against them by the Government.

200.    Once in control of the Executive Branch, Defendants promptly capitalized on these threats by pressuring, cajoling, and openly colluding with social-media companies to actively suppress particular disfavored speakers and viewpoints on social media.

201.    Defendants, those acting in concert with them, and those allied with them routinely seek to justify overt censorship of disfavored speakers and viewpoints by wrapping it in the monikers "misinformation," "disinformation," and/or "malinformation."  Their standard tactic is to label speech that contradicts their preferred political narratives "misinformation," "disinformation," and "malinformation" to justify suppressing it.  Other common buzzwords include calls for a "healthy information ecosystem," "healthy information environment," or "healthy news environment," among others.  This is the Orwellian vocabulary of censorship.  It is deployed aggressively to undermine fundamental First Amendment rights.

202.    As noted above, these labels have proven extremely unreliable.  Defendants' and the political Left's ability to accurately identify "misinformation" and "disinformation" is unreliable because they apply such labels, not based on actual truth or falsity, but based on their current preferred political narrative.  This has resulted, again and again, in the suppression of truthful information under the name of "disinformation" and "misinformation."

**3.  White House and HHS officials collude with social-media firms to suppress speech.**

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 125 of 332 PageID #:
4409
Case 3:22-cv-01213-TAD-KDM   Document 5-8   Filed 10/08/22   Page 58 of 154 PageID # 3184

203.     Before the Biden Administration took office, on information and belief, coordination and collusion between senior HHS officials and social-media companies to censor viewpoints and speakers was already underway.  Once in office, senior officials in the Biden Administration—in the White House, in HHS, and elsewhere—capitalized and greatly expanded on these efforts.

204.     On information and belief, beginning on or around January or February 2020, if not before, Defendant Dr. Anthony Fauci, a senior federal government official, coordinated with social-media firms to police and suppress speech regarding COVID-19 on social media.

205.     Prior to 2020, as head of NIAID, Dr. Fauci had overseen funding of risky gain-of-function research on viruses, including research at the Wuhan Institute of Virology.  This included research funded through intermediaries such as Dr. Peter Daszak and the EcoHealth Alliance, among others.

206.     In late January and early February 2020, Dr. Fauci received information from colleagues that suggested that the COVID-19 virus may have originated in a laboratory in Wuhan, China.  This revelation threatened to implicate Dr. Fauci in the virus's origins, as he had funded the risky research that, under this theory, led to the virus's origin.  Soon thereafter, Dr. Fauci participated in a conference call with scientists and science-funding authorities intended to discredit and suppress this lab-leak theory.  After the conference call, influential individuals signed public statements that were placed in science journals in attempt to discredit the lab-leak theory.

207.     In the same time frame, Dr. Fauci communicated with Facebook CEO Mark Zuckerberg directly regarding public messaging and the flow of information on social media about the government's COVID-19 response.  For example, in a series of emails produced in response to FOIA requests dated from March 15 to 17, 2020, Zuckerberg invited Fauci to make public

statements to be posted for viewing by all Facebook users regarding COVID-19, and also made another proposal that is redacted in FOIA-produced versions but was treated as a high priority by Fauci and NIH staff.

208.    In an email on March 15, 2020, Zuckerberg proposed coordinating with Fauci on COVID-19 messaging to "make sure people can get authoritative information from reliable sources," and suggested including a video message from Fauci because "people trust and want to hear from experts." Zuckerberg proposed including this content in a "hub" that "we're going to put at the top of Facebook" to reach "200+ million Americans, 2.5 billion people worldwide."

209.    In the same email, Zuckerberg made a three-line proposal to Fauci that was redacted by the federal government before the email was produced in a FOIA request.

210.    The next day, NIH's communications director emailed Fauci and strongly recommended that he do the videos for Facebook.  Regarding the redacted proposal from Zuckerberg, she stated: "But an even bigger deal is his offer [REDACTED].  The sooner we get that offer up the food-chain the better." She also stated that her staff was "standing by to discuss this with HHS and WH comms," and requested authority to "determine who the best point of contact would be so the Administration can take advantage of this officer, soonest."  Fauci responded that "I will write or call Mark and tell him that I am interested in doing this.  I will then tell him that you will get for him the name of the USG [on information and belief, shorthand for "U.S. Government"] point of contact."

211.    Fauci responded by email to Zuckerberg on March 17, 2020, agreeing to the collaboration that Zuckerberg proposed and describing his redacted proposal as "very exciting."

212.    As alleged above, around the same time frame as the Zuckerberg-Fauci emails, Facebook and other social-media companies censored and suppressed speakers and speech

advocating for the lab-leak theory of COVID-19's origins, despite the overwhelming circumstantial evidence favoring that theory. This censorship directly implemented the plan, orchestrated by Fauci and others in early 2020, to discredit and suppress the lab-leak theory.

213.    In the same timeframe, Facebook and other social-media companies began an ever-increasing campaign of monitoring, censorship, and suppression of speech and speakers about COVID-19 and issues related to COVID-19. This campaign would dramatically escalate with the advent of the Biden Administration.

214.    On information and belief, those firms coordinated directly with Fauci, CDC, and other government officials regarding censorship and suppression of disfavored speech and speakers.

215.    For example, Facebook's "COVID and Vaccine Policy" states that Facebook "does not allow false claims about the vaccines or vaccination programs which *public health experts have advised us* could lead to COVID-19 vaccine rejection." Facebook, *COVID-19 and Vaccine Policy Updates & Protections*, https://www.facebook.com/help/230764881494641 (emphasis added). On information and belief, Fauci and CDC officials are included among those "public health experts" who "advise[]" Facebook on what to censor. Facebook also censors COVID-19 information as "false," not based on actual truth or falsity, but based on whether the claim contradicts or challenges the pronouncements of Fauci and the CDC. *Id.* This includes strongly supported claims such as "[c]laims that wearing a face mask properly does not help prevent the spread of COVID-19," along with an elaborate list of additional disfavored content and viewpoints subject to censorship. *Id.*

216.    On information and belief, other social-media firms have similar policies and similar practices of coordinating with Fauci and the CDC and with each other, directly or indirectly, on the suppression of disfavored speakers and speech.

217.    Such collusion between HHS officials and social-media companies on the censorship of disfavored speakers and speech accelerated once the Biden Administration took office.

218.    On May 5, 2021, Defendant Psaki gave a White House press conference at which she stated that "[t]he President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections.  And we've seen that over the past several months, broadly speaking…. we've seen it from a number of sources." White House, *Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack, May 5, 2021, at* https://www.whitehouse.gov/briefing-room/press-briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-tom-vilsack-may-5-2021/.

219.    Echoing Biden's past threats to social-media firms, Psaki immediately went on to state that President Biden "supports better privacy protections and *a robust anti-trust program*." *Id.* (emphasis added).  She linked the threat of anti-trust enforcement to the demand for more aggressive censorship by social-media platforms, stating that the President's "view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public."  *Id.*

220.    At a White House press briefing with Psaki on July 15, 2021, Surgeon General Vivek Murthy announced that "health misinformation" constitutes an "urgent public health threat,"

stating that he had "issued a Surgeon General's Advisory on the dangers of health misinformation. Surgeon General Advisories are reserved for urgent public health threats. And while those threats have often been related to what we eat, drink, and smoke, today we live in a world where misinformation poses an imminent and insidious threat to our nation's health."  The White House, *Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy, July 15, 2021*, at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/.

221.     Surgeon General Murthy stated that "[m]odern technology companies have enabled misinformation to poison our information environment with little accountability to their users. They've allowed people who intentionally spread misinformation — what we call 'disinformation' — to have extraordinary reach."  *Id.*  He accused their algorithms of "pulling us deeper and deeper into a well of misinformation."  *Id.*

222.     Surgeon General Murthy explicitly called for more aggressive censorship of social-media speech, stating that "we're saying we expect more from our technology companies. …. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms."  *Id.*  "

223.     He also stated that "technology companies have a particularly important role" to play in combating "misinformation."  He stated: "We know that the dramatic increase in the speed — speed and scale of spreading misinformation has, in part, been enabled by these platforms.  So that's why in this advisory today, we are asking them to step up.  We know they have taken some steps to address misinformation, but much, much more has to be done.  And we can't wait longer for them to take aggressive action because it's costing people their lives."  *Id.*

224.    He also stated: "we are asking technology companies to help lift up the voices of credible health authorities…. [T]hey have to do more to reduce the misinformation that's out there so that the true voices of experts can shine through." *Id.*

225.    At the same press briefing, after the Surgeon General spoke, Defendant Psaki stated: "[W]e are in regular touch with these social media platforms, and those engagements *typically happen through members of our senior staff*, but also members of our COVID-19 team, given, as Dr. Murthy conveyed, this is a big issue of misinformation, specifically on the pandemic." *Id.* (emphasis added).  She added, "*We're flagging problematic posts for Facebook that spread disinformation*." *Id.* (emphasis added).  She stated, "we have recommended—proposed that they create a robust enforcement strategy," *i.e.*, a more aggressive censorship program.  *Id.*

226.    Psaki called on social-media companies to censor particular disfavored speakers, stating: "[T]here's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms. All of them remain active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns." *Id.*  And she called on Facebook and other social-media companies to censor disfavored content and disfavored viewpoints: "[I]t's important to take faster action against harmful posts. As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days.  That's too long. The information spreads too quickly." *Id.*

227.    She stated that "[w]e engage with them [*i.e.*, social-media companies] regularly and *they certainly understand what our asks are*." *Id.* (emphasis added).  She stated that, "we've made

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 131 of 332 PageID #:
4415
Case 3:22-cv-01213-TAD-KDM   Document 5-8   Filed 08/08/22   Page 65 of 165 PageID 3190

a calculation to push back on misinformation," and that "we are working to combat misinformation that's traveling online." *Id.*

228.     The same day, the Surgeon General released his advisory regarding "health misinformation." It defined "health misinformation" as "information that is false, inaccurate, or misleading according to the best available evidence at the time. Misinformation has caused confusion and led people to decline COVID-19 vaccines, reject public health measures such as masking and physical distancing, and use unproven treatments." *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment*, at 4 (July 15, 2021), *at* https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf.

229.     The Surgeon General's advisory called for social-medial companies to "make meaningful long-term investments to address misinformation, including product changes," to "[r]edesign recommendation algorithms to avoid amplifying misinformation," to "build in 'frictions'— such as suggestions and warnings—to reduce the sharing of misinformation," and to "make it easier for users to report misinformation." *Id.* at 12. It called on social-media companies to "[s]trengthen the monitoring of misinformation," and to censor disfavored speakers swiftly and aggressively: "Prioritize early detection of misinformation 'super-spreaders' and repeat offenders. Impose clear consequences for accounts that repeatedly violate platform policies." *Id.*

230.     Facebook responded by stating that it was, in fact, aggressively censoring "health misinformation," and *coordinating with the Government to do so*. "A Facebook spokesperson said the company has *partnered with government experts*, health authorities and researchers to take 'aggressive action against misinformation about COVID-19 and vaccines to protect public health.'" *White House Slams Facebook as Conduit for COVID-19 Misinformation*, REUTERS (July

15, 2021), at https://www.reuters.com/world/us/us-surgeon-general-warns-over-covid-19-misinformation-2021-07-15/ (emphasis added). "'So far we've removed more than 18 million pieces of COVID misinformation, [and] removed accounts that repeatedly break these rules…,' the spokesperson added." *Id.*

231.   Facebook stated that it "has introduced rules against making certain false claims about COVID-19 and its vaccines." *Id.*

232.   The next day, July 16, 2021, a reporter asked President Biden what he thought of COVID misinformation on social media, and he responded, referring to platforms like Facebook, by stating: "They're killing people." *They're Killing People: Biden Denounces Social Media for Virus Disinformation*, N.Y. TIMES (July 16, 2021), *at* https://www.nytimes.com/2021/07/16/us/politics/biden-facebook-social-media-covid.html. The New York Times reported that "this week, White House officials went further and singled out social media companies for allowing false information to proliferate. That came after weeks of failed attempts to get Facebook to turn over information detailing what mechanisms were in place to combat misinformation about the vaccine, according to a person familiar with the matter." *Id.*

233.   The same day, July 16, 2021, Psaki explicitly called for social-media companies to coordinate with *each other* in censoring disfavored speakers, to ensure that such speakers are completely muzzled. "You shouldn't be banned from one platform and not others … for providing misinformation out there." White House, Press Briefing by Press Secretary Jen Psaki, July 16, 2021, *at* https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/. On information and belief, social-media companies have heeded this demand, and they do, in fact, coordinate extensively with each other in censorship of disfavored speakers, speech, and viewpoints on social media.

234.    Psaki also demanded that social-media companies "create robust enforcement strategies," "tak[e] faster action against harmful posts," and "promot[e] quality information algorithms"—which is a euphemism for algorithms that suppress disfavored messages.  *Id.*  When asked whether Facebook's already-aggressive censorship—it claimed to have suppressed 18 million pieces of COVID-19-related "misinformation"—was "sufficient," she responded, "Clearly not, because we're talking about additional steps that should be taken."  *Id.*

235.    Four days later, July 20, 2021, the White House explicitly threatened to amend or repeal the liability protections of § 230 of the Communications Decency Act if social-media companies did not increase censorship of disfavored speakers and viewpoints.  *'They Should Be Held Accountable': White House Reviews Platforms' Misinformation Liability*, USA TODAY (July 20, 2021), *at* https://www.usatoday.com/story/news/politics/2021/07/20/white-house-reviews-section-230-protections-covid-misinformation/8024210002/.  The White House communications director announced that "[t]he White House is assessing whether social media platforms are legally liable for misinformation spread on their platforms."  *Id.*  "We're reviewing that, and certainly, they should be held accountable," she said.  *Id.*

236.    She "specified the White House is examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites."  *Id.*  Media reported that, in connection with this threat, "Relations are tense between the Biden administration and social media platforms, specifically Facebook, over the spread of misinformation online."  *Id.*; *see also, e.g., White House says social media networks should be held accountable for spreading misinformation*, CNBC.com (July 20, 2021), *at* https://www.cnbc.com/2021/07/20/white-house-social-networks-should-be-held-accountable-for-

spreading-misinfo.html.  When asked whether the President is "open to amending 230 when Facebook and Twitter and other social media outlets spread false information that cause Americans harm, shouldn't they be held accountable in a real way?"  White House Communications Director Bedingfield responded, "We're reviewing that and certainly they should be held accountable.  And I think you heard the president speak very aggressively about this.  He understands that this is an important piece of the ecosystem."  *Id.*

237.     After this series of public statements, responding to "White House pressure," Facebook censored the accounts of the 12 specific disfavored speakers whom Psaki accused of spreading health misinformation.  *Facebook takes action against 'disinformation dozen' after White House pressure*, CNN.com (Aug. 18, 2021), *at* https://www.cnn.com/2021/08/18/tech/facebook-disinformation-dozen/index.html.  Psaki had "hammered the platform in July for allowing the people identified in the report to remain on its platform." *Id.*  After they were singled out for censorship by the White House, Facebook "removed over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people, for violating our policies." *Id.*

238.     In the same time frame, Twitter permanently suspended the account of prominent lockdown critic Alex Berenson, despite repeated reassurances from high-level Twitter executives that his account was safe, just days after Dr. Fauci singled him out as a danger for suggesting young people might reasonably decline the vaccine.

239.     On October 29, 2021, the Surgeon General tweeted from his *official* account (as opposed to his personal account, which remains active), in a thread: "We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health misinformation on their platforms.  The time for excuses and half measures is long past.  We need transparency

and accountability now. The health of our country is at stake." *See* https://twitter.com/Surgeon_General/status/1454181191494606854.

240.     Defendants' response to this censorship was to demand still more censorship by social-media platforms, including but not limited to Facebook. "[A]fter Facebook's action against the 'disinformation dozen,' a White House spokesperson continued to strongly criticize the company." *Id.* "'In the middle of a pandemic, being honest and transparent about the work that needs to be done to protect public health is absolutely vital, but Facebook still refuses to be straightforward about how much misinformation is circulating—and being actively promoted— on their platform,' a White House spokesperson told CNN Business. 'It's on everyone to get this right so we can make sure the American people are getting accurate information to protect the health of themselves and their loved ones -- which is why the Administration will continue to push leaders, media outlets, and leading sources of information like Facebook to meet those basic expectations,' the spokesperson added." *Id.*

241.     On February 1, 2022, Psaki was asked at a White House press conference whether the Administration was satisfied with Spotify's decision to affix advisory warnings to Joe Rogan's immensely popular podcast, which featured speakers that contradicted the Administration's messaging about COVID-19 and vaccines, or whether the government "think[s] that companies like Spotify should go further than just, you know, putting a label on" disfavored viewpoints and speakers. Psaki responded by demanding that Spotify and other platforms "do[] more" to block disfavored speech: "[O]ur hope is that all major tech platforms … be vigilant to ensure the American people have access to accurate information on something as significant as COVID-19. So, this disclaimer – it's a positive step. But we want every platform to continue *doing more* to call out … mis- and disinformation while also uplifting accurate information." She stated that

Spotify's advisory warnings are "a good step, it's a positive step, but *there's more that can be done*." White House, *Press Briefing by Press Secretary Jen Psaki, February 1, 2022* (emphases added), *at* https://www.whitehouse.gov/briefing-room/press-briefings/2022/02/01/press-briefing-by-press-secretary-jen-psaki-february-1-2022/.

242.     On March 3, 2022, the Surgeon General issued a formal "Request for Information" on the "Impact of Health Misinformation" on social media. HHS, *Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID-19 Pandemic Request for Information* (RFI), 87 Fed. Reg. 12,712-12,714 (March 2, 2022).

243.     In the RFI, "[t]he Office of the Surgeon General requests input from interested parties on the impact and prevalence of health misinformation in the digital information environment during the COVID–19 pandemic." *Id.* at 12,712. The RFI states that "the speed, scale, and sophistication with which misinformation has been spread during the COVID-19 pandemic has been unprecedented," and it implies that social-media companies are to blame, carrying a clear threat of future regulation: "This RFI seeks to understand both the impact of health misinformation during the COVID–19 pandemic and the unique role that technology and social media platforms play in the dissemination of critical health information during a public health emergency." *Id.* at 12,713.

244.     The RFI seeks specific information about health "misinformation" on such social-media platforms: "Information about how widespread COVID–19 misinformation is on individual technology platforms including: General search engines, content sharing platforms, social media platforms, e-commerce platforms, crowd sourced platforms, and instant messaging systems." *Id.*

245.     The RFI seeks: "Any aggregate data and analysis on how many users were exposed, were potentially exposed, or otherwise engaged with COVID–19 misinformation," where

69

"[e]xposure is defined as seeing content in newsfeeds, in search results, or algorithmically nominated content," and "[p]otential exposure is the exposure users would have had if they could see all the content that is eligible to appear within their newsfeeds." *Id.* at 12,714.  It also seeks "[i]nformation about COVID–19 misinformation policies on individual technology platforms," including "[a]ny aggregate data and analysis of technology platform COVID–19 misinformation policies including implementation of those policies and evaluations of their effectiveness." *Id.*

246.    Media reports aptly described Murthy as "demand[ing]" information about the major sources of COVID-19 misinformation by May 2, 2022.  Brad Dress, *Surgeon General Demands Data on COVID-19 Misinformation from Major Tech Firms*, THE HILL (March 3, 2022), *at*    https://thehill.com/policy/healthcare/596709-surgeon-general-demands-data-on-covid-19-misinformation-from-major-tech/.  "In a formal notice, Murthy requested major tech platforms submit information about the prevalence and scale of COVID-19 misinformation on their sites, from social networks, search engines, crowdsourced platforms, e-commerce platforms and instant messaging systems." *Id.*  "In his notice to major tech platforms, Murthy is requesting specific information on demographics affected by misinformation as well as sources of misinformation and 'exactly how many users saw or may have been exposed to instances of Covid-19 misinformation.'" *Id.*

247.    On or around July 27, 2022, a limited number of emails between CDC officials and representatives of social-media platforms from late 2020 and early months of 2021 became publicly available, over a year after they had been requested under FOIA. These newly revealed emails—which are attached as Exhibit A, and incorporated by reference herein—confirm the allegations of collusion between HHS officials and social-media platforms to censor disfavored speech, speakers, and viewpoints, as alleged herein.

248.    These emails indicate that Defendant Carol Y. Crawford of CDC and other CDC officials frequently communicated and coordinated with social-media platforms, including Facebook/Meta, Twitter, Google/YouTube, and Instagram, regarding the censorship of speech on social-media platforms, including flagging specific content for censorship.   During 2021, Crawford organized "Be On the Lookout" or "BOLO" meetings on "misinformation" with representatives of social-media platforms—including Twitter, Facebook/Meta, and Google/YouTube—in which she and other federal officials colluded and/or collude with those platforms about speech to target for suppression.   These meetings include Crawford and other federal officials flagging specific social-media posts for censorship and providing examples of the types of posts to censor.   Crawford emailed "slides" from the "BOLO" meetings to participants afterwards.   These slides included repeated examples of specific posts on social-media platforms flagged for censorship.   The slides called for "all" social-media platforms to "Be On the Lookout" for such posts.   Crawford cautioned the meeting participants, with respect to these slides, "[p]lease do not share outside your trust and safety teams."

249.    Officials of the Census Bureau participated and/or participate in these BOLO meetings, including Defendant Jennifer Shopkorn and Christopher Lewitzke, who is a Senior Digital Marketing Associate with Reingold, a communications firm that was, on information and belief, acting on behalf of the Census Bureau.   Crawford's emails indicate that the Census Bureau and its officials and agents, such as Lewitzke and Shopkorn, play an important, active, and ongoing role in colluding with social-media platforms to censor disfavored speech.   On March 18, 2021, Crawford emailed Twitter officials and stated that "[w]e are working on a project with Census to leverage their infrastructure to identify and monitor social media for vaccine misinformation," and stated that "[w]e would like the opportunity to work with your trust team on a regular basis to

discuss what we are seeing." She also noted that "I understand that you did this with Census last year as well." Twitter responded by stating, "With our CEO testifying before Congress this week is tricky," but otherwise agreed to the collusive arrangement. Likewise, in subsequent emails to Twitter (on May 6) and Facebook (on May 10), Crawford noted to the social-media platform officials that "[o]ur census team," *i.e.*, Lewitzke and Shopkorn, who were cc'ed on the emails, "has much more info on it if needed" regarding "some example posts" of "misinfo" that she flagged for censorship.

250.    Defendants Crawford and others, including the Census officials and agents Lewitzke and Shopkorn, took other steps to procure the censorship of disfavored speech on social media. For example, on May 10, 2021, Crawford emailed Twitter officials to flag "two issues that we are seeing a great deal of misinfo about," noting that Lewitzke and Shopkorn "ha[ve] much more info on it if needed." The same email included 13 specific Twitter posts as examples of the sort of posts to be censored. On May 6, 2021, Crawford sent a similar email to Meta/Facebook officials, also copying Lewitzke and Shophorn and stating that they have "much more info" about the issue; this email included 16 specific posts from Facebook and Instagram as examples of posts to be targeted for censorship. On May 12, 2021, Crawford emailed Facebook officials to flag "some new info on myths your misinfo folks might be interested in," with links to specific issues of "misinformation" for Facebook to censor. On April 9, 2021, Crawford agreed with a Twitter official that CDC would provide "examples of problematic content" posted on Twitter, and the Twitter official noted that "all examples of misinformation are helpful." Calendar invites from early 2021 indicate that Crawford, Jay Dempsey, and other CDC officials participated in Facebook's "weekly sync with CDC," with "CDC to invite other agencies as needed."

251.    In another exchange of emails, Crawford agreed with Facebook officials that CDC would participate in a COVID-19 "misinfo reporting channel," and arranged for CDC officials to have training on the use of Facebook's "misinfo reporting channel."  On information belief, Crawford's "team" at CDC, as well as Shopkorn and Lewitzke from Census, were "onboarded" onto Facebook's "misinfo reporting channel."  A calendar invite in May 2021 included Crawford, Lewitzke, Shopkorn, other CDC officials, and other Reingold employees who were, on information and belief, acting on behalf of the Census Bureau, to participate in the "onboarding" onto Facebook's "misinfo reporting channel."

252.    Crawford's communications with Facebook indicate that CDC, the Census Bureau, and other government agencies collaborate with Facebook to flag speech regarding both COVID-19 and elections for censorship using "CrowdTangle," which Facebook describes as "a Facebook tool that tracks how content spreads online."  An email from a Facebook official to Crawford stated that, using CrowdTangle, "[w]hen health departments flag potential vaccine misinformation on Facebook and Instagram, we review and remove the content if it violates our policies…  This is similar to how governments and fact-checkers use CrowdTangle ahead of *elections*…." (Emphasis added.)

253.    Additional communications between CDC and social-media platforms reflect an ongoing, close, and continuing collaboration, effectively amounting to a joint enterprise, on censorship of COVID-19 "misinformation" and related issues.  *See* Ex. A.  For example, the communications reflect close coordination on creating and publishing content on behalf of CDC on social-media platforms, and artificially "amplifying" government messaging on social-media to the suppression of private messaging, including a gift of $15 million in Facebook ad credits

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 141 of 332 PageID #:
4425
Case 3:22-cv-01213-TAD-KDM   Document 5-1   Filed 08/02/22   Page 74 of 151 PageID #: 3200

from Facebook to CDC.  They also reflect close coordination on amplifying CDC's content and other related issues.

### 4.  White House and DHS officials collude with social-media firms to suppress speech.

254.     On information and belief, senior officials in the Biden Administration and the Department of Homeland Security are also colluding with social-media companies to suppress disfavored speakers and viewpoints.  These efforts include censorship of disfavored content and viewpoints about election integrity and COVID-19, among other topics, under the guise of suppressing "misinformation" and "domestic terrorism."   These efforts culminated with the Orwellian announcement of the creation of a "Disinformation Governance Board" within DHS.

255.     A direct forum for government officials to call for social-media censorship of election-related "misinformation" was already in place during the general election cycle of 2020.

256.     In August 2020, social-media firms "met with federal government officials to discuss how to handle misinformation during this month's political conventions and election results this fall."  Ingram et al., *Big Tech met with govt to discuss how to handle election results*, NBC News (Aug. 20, 2022), *at* https://www.nbcnews.com/tech/tech-news/big-tech-met-gov-t-discuss-how-handle-election-results-n1236555.

257.     This was one of a "series" of meetings between major social-media companies and government officials about the suppression of election-related "misinformation": "'We held the latest in a series of meetings with government partners today where we each provided updates on what we're seeing on our respective platforms and what we expect to see in the coming months,' companies including Google, Facebook, Twitter and Reddit said in a joint statement after the meeting." *Id.*  "The statement also included Microsoft, Verizon Media, Pinterest, LinkedIn and the Wikimedia Foundation, which operates Wikipedia and other sites." *Id.*

Case 3:22-cv-01213-TAD-KDM  Document 119-1  Filed 11/18/22  Page 142 of 332 PageID #:
4426
Case 3:22-cv-01213-TAD-KDM  Document 5-8  Filed 11/03/22  Page 76 of 165 PageID #: 3201

258.     The discussion was reported as "one in a series of monthly meetings between the
government and tech companies" and involved "back-and-forth conversation on a variety of
topics." *Id.* Neither the "topics" of the "conversation" nor the particular participants on behalf of
the government were disclosed. *Id.* "According to the industry statement, participants in
Wednesday's meeting also included representatives from the FBI's foreign influence task force,
the Justice Department's national security division, the Office of the Director of National
Intelligence and the Cybersecurity and Infrastructure Security Agency." *Id.* "The companies said
they would continue to meet regularly before the November election." *Id.*

259.     On September 28, 2020, the Biden-Harris campaign sent a letter to Facebook
demanding that Facebook take "more aggressive" action to censor statements by President Trump
and the Trump campaign that raised concerns about election security and the security of voting by
mail. Sept. 28, 2020 Biden-Harris Letter, https://www.documentcloud.org/documents/7219497-
Facebook-Letter-9-28.html.    The letter accused Facebook of being a "propagator of
disinformation" for refusing to censor the rival campaign's core political speech, thus promoting
"distrust in our democracy" and threatening to "undermine democracy." *Id.* The Biden-Harris
campaign described the Trump campaign's political speech as "dangerous claptrap" and argued
that "[r]emoving this video should have been the easiest of calls." *Id.* The letter demanded that
Facebook "remove Mr. Trump's posts, which violate your policies." *Id.* (underline in original).

260.     The same letter complained that Facebook's "algorithm" permitted Trump's
political speech to reach millions of people.  It complained about the successful reach on Facebook
of political speech that it opposed, bemoaning the fact that "a hyperpartisan propaganda organ like
the *Daily Wire* is Facebook's top web publisher." *Id.* The Biden-Harris campaign accused
Facebook of allowing speech that it favored "to be drowned out by a storm of disinformation." *Id.*

And it concluded, "We will be calling out those failures [to censor Trump's political speech] as they occur over the coming 36 days," *i.e.*, until the November 2020 general election. *Id.*

261.     On information and belief, responding to prior threats from Defendants and those acting in concert with them, Facebook complied with this demand and did engage in "more aggressive" censorship of the Trump campaign's core political speech from then on, resulting in an aggressive campaign to suppress President Trump and his campaign's political speech, especially on issues related to election security.  In the wake of the Biden-Harris letter, Facebook declared that it "won't allow ads with content that seeks to delegitimize the outcome of an election," and it ramped up censorship of Trump's political speech thereafter.

262.     As one commentator noted, "It's no surprise that Facebook's policy change happened the same week that the Biden campaign demanded Trump's Facebook posts be censored."  Alexander Hall, *Liberal Media Used to Warn Against Mailing Votes; Now Big Tech, Left Are Protecting It* (Oct. 30, 2020), *at* https://www.newsbusters.org/blogs/free-speech/alexander-hall/2020/10/30/liberal-media-used-warn-against-mailing-votes-now-big.

263.     At the same time, "Twitter also modified its rules, stating: 'we may label and reduce the visibility of Tweets containing false or misleading information about civic processes in order to provide additional context' in its Civic integrity policy." *Id.*

264.     Both platforms ramped up censorship of core political speech of President Trump and his campaign, as well as core political speech by others favoring their messages and campaigns, in the critical final month before the 2020 general election, resulting in egregious acts of censorship.  These acts of censorship included suppression of expressions of concern about election security as a result of the massive increase in voting by mail during the 2020 general election.

265.     In perhaps the most notorious example, as noted above, Twitter, Facebook, and other social-media companies censored the New York Post's entirely truthful and carefully sourced article about Hunter Biden's laptop on October 14, 2020, as discussed further above.  This censorship included locking the New York Post's social-media accounts for weeks until after the election.

266.     According to one survey, sixteen percent of Biden voters polled stated that they would have changed their votes if they had known about the Hunter Biden laptop story before the election, which could have changed the outcome of the election.

267.     This censorship required deliberate, aggressive action by social-media firms.  "Facebook moderators had to manually intervene to suppress a controversial New York Post story about Hunter Biden, according to leaked moderation guidelines seen by the Guardian." *Facebook leak reveals policies on restricting New York Post's Biden story*, THE GUARDIAN (Oct. 30, 2020), *at* https://www.theguardian.com/technology/2020/oct/30/facebook-leak-reveals-policies-restricting-new-york-post-biden-story.

268.     At the time, Facebook claimed that the censorship of the Hunter Biden laptop story was "part of our standard process to reduce the spread of misinformation.  We temporarily reduce distribution pending factchecker review." *Id.*  But this was not true.  In fact, Facebook imposed "special treatment" on the New York Post to suppress the story, which included "manually overrid[ing]" Facebook's own guidelines for suppressing so-called "misinformation." *Id.*

269.     On December 10, 2020, nine Democratic House Members in the so-called "Congressional Task Force on Digital Citizenship" (a group of exclusively Democratic members of Congress) sent a letter to President-elect Biden, calling for the incoming Administration to create task forces that would increase censorship of "disinformation and misinformation" on social

media.        Dec.        10,        2020    Letter        of        Rep.        Wexton,        et        al.,        *at*

https://wexton.house.gov/uploadedfiles/12.10.20_house_democrats_disinformation_roadmap_to

_president-elect_biden.pdf.

270.    The letter decried the rise of "news environments online, which report vastly

different information and do not offer the same editorial standards to protect against disinformation

and misinformation that traditional news media do." *Id.*  It criticized social-media platforms for

failing to censor "disinformation" more aggressively: "As social media platforms post record

revenues from engagement, they seldom act as responsible information gatekeepers and, in fact,

have financial incentives to direct users to posts that are false, misleading, or emotionally

manipulative." *Id.*

271.    The letter called on President-elect Biden to "[s]upport collaboration between

government and civic organizations to combat dangerous propaganda." *Id.*   The letter

acknowledged that "social media platforms have taken some steps to limit the spread of harmful

disinformation and misinformation over the past year," but urged that these steps were not nearly

enough, arguing that "we can still see how easily this content is posted and amplified by bad actors

and unknowing citizens," that "platforms have financial incentives for engaging posts to reach

larger audiences, regardless of the content," and that "computer algorithms still make up a majority

of content moderation, and platforms have at times refused to take action against accounts and

groups promoting violence and hate speech." *Id.*

272.    The letter called for President-elect Biden to deploy the U.S. Department of Justice

and the Department of Homeland Security to combat "disinformation," and it called for more direct

government involvement in policing the content of political speech on social media platforms, in

order to "build citizen resilience to disinformation and support a healthy information ecosystem"—which is Newspeak for viewpoint- and content-based censorship.

273.    In announcing the letter, its lead signer, Rep. Wexton, openly stated that Americans lack the sophistication to make their own judgments about truth and falsity of online speech, and that government-approved "gatekeepers" of information should be imposed:  "In the letter, the Members recognize that, while a growing number of people in the U.S. are getting their news from social media platforms, many Americans are ill-equipped to recognize and sift through false, misleading, or emotionally manipulative posts. Additionally, there exists a lack of effective information gatekeepers to protect against disinformation threats online." *See* Dec. 10, 2020 News Release, https://wexton.house.gov/news/documentsingle.aspx?DocumentID=431.

274.    Consistent with this letter, the Biden Administration launched several initiatives designed to inject the power and authority of federal agencies like DHS into policing "disinformation" and "misinformation" online—which, all too often, means censoring core political speech disfavored by government officials.

275.    On information and belief, DHS and its officials are actively engaged in this project of procuring the censorship of disfavored speakers, content, and viewpoints in speech about election integrity.

276.    On May 3, 2021, it was reported that DHS intended to "partner with private firms," *i.e.*, social-media companies, to monitor disfavored speech online.  *Biden team may partner with private firms to monitor extremist chatter online*, CNN.com (May 3, 2021), *at* https://www.cnn.com/2021/05/03/politics/dhs-partner-private-firms-surveil-suspected-domestic-terrorists/index.html.  The purpose of these "partnerships" was to evade legal, constitutional, and ethical problems with DHS's direct surveillance of online speech: "The Department of Homeland

Security is limited in how it can monitor citizens online without justification and is banned from activities like assuming false identities to gain access to private messaging apps." *Id.* "Instead, federal authorities can only browse through unprotected information on social media sites like Twitter and Facebook and other open online platforms." *Id.* "The plan being discussed inside DHS, according to multiple sources, would, in effect, allow the department to circumvent those limits." *Id.* "Outsourcing some information gathering to outside firms would give DHS the benefit of tactics that it isn't legally able to do in-house, such as using false personas to gain access to private groups used by suspected extremists, sources say." *Id.*

277.    As noted above, on May 5, 2021, Defendant Psaki stated at a White House press conference that "[t]he President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and *elections*." White House, Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack, May 5, 2021 (emphasis added), *at* https://www.whitehouse.gov/briefing-room/press-briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-tom-vilsack-may-5-2021/. Psaki immediately went on to state that President Biden "supports better privacy protections and *a robust anti-trust program*." *Id.* (emphasis added). And she stated that the President's "view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public." *Id.*

278.    In the same press conference, Psaki notoriously went on to state, "We're flagging problematic posts for Facebook that spread disinformation." *Id.* On information and belief, especially in light of Psaki's earlier reference to speech about "elections," this statement about

"flagging problematic posts" referred not just to social-media speech about COVID-19, but also social-media speech about election integrity.  *See, e.g., White House says social media platforms should not amplify 'untrustworthy' content*, REUTERS (May 5, 2021), *at* https://www.reuters.com/article/ctech-us-trump-facebook-biden-idCAKBN2CM1XU-OCATC.

279.      In June 2021, the National Security Council released its "National Strategy for Countering Domestic Terrorism."  *See* The White House, *National Strategy for Countering Domestic Terrorism* (June 2021), *at* https://www.whitehouse.gov/wp-content/uploads/2021/06/National-Strategy-for-Countering-Domestic-Terrorism.pdf.      The "National Strategy" repeatedly claimed that "disinformation and misinformation" are important elements of "domestic terrorism."  *Id.* at 9.  It claimed that the "ideologies" of domestic terrorists "connect and intersect with conspiracy theories and *other forms of disinformation and misinformation*."  *Id.* (emphasis added).  It stated that such "elements" of domestic terrorism "can combine and amplify threats to public safety," "*[e]specially on Internet-based communications platforms such as social-media*."  *Id.* (emphasis added).  It stated that DHS and others "are currently funding and implementing or planning" programs to "strengthen[] user resilience to disinformation and misinformation online for domestic audiences."  *Id.* at 20.  The Strategy memo identified, as its "broader priority," the task of "enhancing faith in government and addressing the extreme polarization, *fueled by a crisis of disinformation and misinformation often channeled through social media platforms*, which can tear Americans apart…."  *Id.* at 29 (emphasis added). And it called for DHS and others to "accelerat[e] work to contend with an information environment that challenges healthy democratic discourse," and to "find[] ways to counter the influence and impact" of online disinformation.  *Id.*

81

280.     On July 26, 2021, the Global Internet Forum to Counter Terrorism (GIFCT), an "organization formed by some of the biggest U.S. tech companies including Facebook and Microsoft," which includes DHS on its board of advisors, announced that it is "significantly expanding the types of extremist content shared between firms in a key database," to move from images and videos to content-based speech tracking. *Facebook and tech giants to target attacker manifestos, far-right militias in database*, REUTERS (July 26, 2021), *at* https://www.reuters.com/technology/exclusive-facebook-tech-giants-target-manifestos-militias-database-2021-07-26/.

281.     "GIFCT … was created in 2017 under pressure from U.S. and European governments," and "its database mostly contains digital fingerprints of videos and images related to groups on the U.N. Security Council's consolidated sanctions list and a few specific live-streamed attacks." *Id.* "Until now, the Global Internet Forum to Counter Terrorism's (GIFCT) database has focused on videos and images from terrorist groups on a United Nations list," but now the group announced that it would move into content-based speech tracking. *Id.* On information and belief, DHS officials including Defendants have access to such database(s) as tools to advance censorship of online speech.

282.     Shortly thereafter, on August 2, 2021, DHS Secretary Mayorkas announced that DHS was working directly with social-media companies to censor disfavored speech on social-media platforms.  "On [a] broadcast of MSNBC's 'Andrea Mitchell Reports,' DHS Secretary Alejandro Mayorkas stated that the department is working with tech companies 'that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring.'" *Mayorkas: We're Working with Platforms on 'How They Can*

*Better Use' Their Terms to 'Prevent Harm' from Misinformation*, BREITBART NEWS (Aug. 2, 2021), *at* https://www.breitbart.com/clips/2021/08/02/mayorkas-were-workgin-with-platforms-on-how-they-can-better-use-their-terms-to-prevent-harm-from-misinformation/.

283.    Echoing Psaki's comments at the July 15, 2021 news conference with Surgeon General Murthy, Mayorkas stated: "So, we're working together with them. We're working with the tech companies that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring." *Id.* On information and belief, the reference to "us[ing] their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harms from occurring" refers to government-induced censorship of disfavored viewpoints, speakers, and content.

284.    Mayorkas added that there was a federal-government-wide effort to police speech on social media, stating: "[T]he connectivity between speech and violence, the connectivity between active harm and speech is something that we're very focused on, and it's a difficult challenge. But we're working on it and meeting that challenge, again, because of the great personnel of the Department of Homeland Security and *across the federal enterprise*." *Id.* (emphasis added).

285.    Soon after Mayorkas's August 2, 2021 comments, DHS officials began plotting to create a "Disinformation Governance Board" within DHS. *See* ECF No. 10-1, at 19-23 (Glenn Decl. Ex. 1, at 6-10). On September 13, 2021, senior DHS officials Robert Silvers and Samantha Vinograd sent a memorandum to Secretary Mayorkas recommending the creation of the Disinformation Governance Board. The opening sentence of the Memorandum noted that the Board's purpose would be to combat "[t]he spread of disinformation" regarding "[c]onspiracy

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 151 of 332 PageID #:
4435
Case 3:22-cv-01213-TAD-KDM   Document 5-8   Filed 10/03/22   Page 84 of 165 PageID #: 3210

theories about the validity and security of elections," including "disinformation surrounding the

validity of the 2020 election," and "[d]isinformation related to the origins and effects of COVID-

19 vaccines or the efficacy of masks," which "undercut[] public health efforts to combat the

pandemic." *Id.* at 19.

286.    The same Memorandum noted that CISA was involved in flagging content for

censorship on social-media platforms: "Leading up to the 2020 election, CISA relayed reports of

election disinformation from election officials to social media platform operators." *Id.* at 20.  The

Memorandum called for the Board to perform "partner engagement" with "private sector entities

[and] tech platforms." *Id.* at 22.

287.    In a subsequent Memorandum dated January 31, 2022, DHS officials indicated that

the Board's activities would oversee extensive *pre-existing* social-media censorship activities by

other federal officials and agencies: "The Board will also support and coordinate … MDM work

with other departments and agencies, the private sector, and non-government actors." *Id.* at 24.

This Memorandum attached the Board's Charter, which stated that its mission was to "guide and

support the Department's efforts to address mis-, dis-, and mal-information." *Id.* at 27.  It also

stated that the Board would "harmonize and support coordination with … the private sector." *Id.*

The Charter called for the Board to "coordinate, deconflict, and harmonize departmental efforts to

address MDM," including between "DHS Components" and "interagency partners," and "serving

as the Department's internal and external point of contact for coordination with … the private

sector … regarding MDM." *Id.* at 28-29.

288.    Under continuous pressure from federal officials, including Defendants herein,

social-media firms have imposed increasingly draconian censorship on core political speech about

election integrity.  For example, in March 2022, YouTube imposed a one-week suspension on The

Hill, a well-known political publication covering Congress, for posts that included clips of former President Trump's speech at the CPAC conference and interview on Fox News, which included claims that fraud changed the outcome of the 2020 presidential election.  Gilead Edelman, *Beware the Never-Ending Disinformation Emergency*, THE WIRED (March 11, 2022), *at* https://www.wired.com/story/youtube-rigged-election-donald-trump-moderation-misinformation/.  YouTube relied on its "Elections misinformation policy," under which it censors "Content that advances false claims that widespread fraud, errors, or glitches changed the outcome of *select past national elections*, after final election results are officially certified."  YouTube, *Elections Misinformation Policy*, https://support.google.com/youtube/answer/10835034?hl=en.

289.    This policy is openly content- and viewpoint-based—it applies only to "select" past national elections, and "[u]nder the policy, you can only include those claims if you explicitly debunk or condemn them."  Edelman, *supra*.  On information and belief, this policy is also selective in application, as it is not applied to censor widespread, false Democratic claims that supposed "collusion" between the Trump campaign and Russia changed the outcome of the 2016 presidential election.  And "by asking news hosts to explicitly denounce any mention of election fraud, YouTube isn't just making its own content decisions; it's injecting itself into the editorial processes of actual media outlets."  *Id.*

290.    On November 10, 2021, the Cybersecurity and Infrastructure Security Agency (CISA), an agency within DHS, announced that it was "beefing up its disinformation and misinformation team in the wake of a divisive presidential election that saw a proliferation of misleading information online."  *Cyber agency beefing up disinformation, misinformation team*, THE HILL (Nov. 10, 2021), *at* https://thehill.com/policy/cybersecurity/580990-cyber-agency-beefing-up-disinformation-misinformation-team/.  "'I am actually going to grow and strengthen

85

my misinformation and disinformation team,' CISA Director Jen Easterly said." *Id.* Defendant Easterly said that so-called "disinformation" and "misinformation" pose "a top threat for CISA, which is charged with securing critical infrastructure, to confront." *Id.*

291.     Indulging in a bit of Newspeak of her own, Easterly claimed that social-media speech is a form of "infrastructure," and that policing speech online by the federal government falls within her agency's mission to protect "infrastructure," stating that CISA is "in the business of critical infrastructure, and the most critical infrastructure is our cognitive infrastructure, so building that resilience to misinformation and disinformation, I think, is incredibly important." *Id.*

292.     Easterly announced that CISA was working directly with unnamed "partners in the private sector" and other government agencies to police online speech: "We are going to work with our partners in the private sector and throughout the rest of the government and at the department to continue to ensure that the American people have the facts that they need to help protect our critical infrastructure." *Id.*

293.     With specific reference to hotly disputed election-integrity issues, which comprise core political speech, Easterly stated that Americans should not be allowed to "pick [their] own facts" and make their own decisions about what is true, especially regarding election security: "We now live in a world where people talk about alternative facts, post-truth, which I think is really, really dangerous if you get to pick your own facts, and it's particularly corrosive when you talk about matters of election security." *Id.* Instead, she indicated, federal officials like herself should intervene to help Americans "pick" the right "facts." *Id.*

294.     CISA appears to be the focus of many of DHS's attempts to police the content of speech and viewpoints on social media. On information and belief, CISA maintains a number of task forces, working groups, and similar organizations as joint government-private enterprises,

which provide avenues for government officials to push for censorship of disfavored viewpoints and speakers online.

295.     In a 2020 document entitled "2020 Election Infrastructure Subsector-Specific Plan," *at* https://www.cisa.gov/sites/default/files/publications/election_infrastructure_subsector_specific_plan.pdf, CISA stated that it had partnered to "promote" interaction between election officials and the Center for Technology and Civic Life, the now-notorious nonprofit funded by Mark Zuckerberg that engaged in egregious election interference by injecting hundreds of millions of private dollars and personnel into local election offices in heavily Democratic-favoring areas.

296.     CISA routinely expands the definitions of "misinformation" and "disinformation" to include "malinformation," *i.e. truthful* information that the government believes is presented out of context to contradict left-wing political narratives.  CISA defines "malinformation" as information that is "based on fact, but used out of context to mislead, harm, or manipulate."  *See, e.g.,* CISA, *We're in This Together.  Disinformation Stops with You.* (last visited May 5, 2022), https://www.cisa.gov/sites/default/files/publications/SLTTCOVIDToolkit_FINAL_508.pdf.

297.     CISA's same publication decries the spreading of "false treatment and prevention measures [for COVID-19], *unsubstantiated rumors regarding the origin of the virus*, and more." *Id.* (emphasis added).  On information and belief, "unsubstantiated rumors regarding the origin of the [COVID-19] virus" refers to the lab-leak theory of COVID-19's origins, which (as noted above) is supported by compelling circumstantial evidence, both scientific and historical.

298.     CISA's "Mis-, Dis-, and Malinformation [MDM] Planning and Incident Response Guide for Election Officials," *at* https://www.cisa.gov/sites/default/files/publications/mdm-incident-response-guide_508.pdf, calls for constant policing of speech regarding election integrity, stating that "election infrastructure related MDM occurs year-round," and "[f]alse narratives erode

trust and pose a threat to democratic transitions, especially, but not limited to, narratives around election processes and the validity of election outcomes." *Id.*  The Guide defines MDM to include "[n]arratives or content that delegitimizes election results or sows distrust in the integrity of the process based on false or misleading claims." *Id.*

299.    On February 7, 2022, DHS issued a National Terrorism Advisory Bulletin, available at https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-system-bulletin-february-07-2022.  It begins by stating: "The United States remains in a heightened threat environment fueled by several factors, including an online environment filled with false or misleading narratives and conspiracy theories, and other forms of mis- dis- and mal-information (MDM)." *Id.*  The first critical "factor" contributing to a "heightened threat environment," according to the Bulletin, is "(1) the proliferation of false or misleading narratives, which sow discord or undermine public trust in U.S. government institutions." *Id.*  Again, the first "[k]ey factor contributing to the current heightened threat environment" identified in the Bulletin is "[t]he proliferation of false or misleading narratives, which sow discord or undermine public trust in U.S. government institutions: For example, there is widespread online proliferation of false or *misleading narratives regarding unsubstantiated widespread election fraud and COVID-19*. Grievances associated with these themes inspired violent extremist attacks during 2021." *Id.* (emphasis added).  The Bulletin stated that DHS is directly coordinating with social-media platforms to address so-called "MDM": "DHS is working with public and private sector partners, as well as foreign counterparts, to identify and evaluate MDM, including false or misleading narratives and conspiracy theories spread on social media and other online platforms that endorse or could inspire violence." *Id.*  And it specifically stated that CISA likewise "works with public and private sector partners … [to] increase nationwide cybersecurity resilience." *Id.*

300.     This February 7, 2022 Bulletin echoed statements from prior bulletins indicating that so-called COVID-19 "misinformation" and election-related "misinformation" are domestic terror threats.  For example, DHS's January 27, 2021 National Terrorism Advisory System Bulletin, available at https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-system-bulletin-january-27-2021, stated that "Domestic Violent Extremists" are "motivated by a range of issues, including anger over COVID-19 restrictions [and] the 2020 election results…."  *Id.* Similarly, DHS's August 13, 2021 National Terrorism Advisory System Bulletin, available at https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-system-bulletin-august-13-2021, stated that "violent extremists … may seek to exploit the emergence of COVID-19 variants by viewing the potential re-establishment of public health restrictions across the United States as a rationale to conduct attacks." *Id.*   It stated that "domestic threat actors … continue to introduce, amplify, and disseminate narratives online that promote violence," and included therein "conspiracy theories on perceived election fraud … and responses to anticipated restrictions relating to the increasing COVID cases." *Id.*

301.     On April 12, 2022, CISA published another bulletin announcing that it was coordinating directly with social-media platforms to police "Mis, Dis, Malinformation" (which it calls "MDM").  CISA, *Mis, Dis, Malinformation*, *at* https://www.cisa.gov/mdm.  The bulletin states that, "False or misleading information can evoke a strong emotional reaction that leads people to share it without first looking into the facts for themselves, polluting healthy conversations about the issues and increasing societal divisions." *Id.*   CISA reported that its Countering Foreign Influence Task Force's "mission evolved" during the Biden Administration to address the new "information environment," which (on information and belief) is codespeak for ramping up online censorship: "In 2021, the CFITF officially transitioned into CISA's MDM team,

and the mission evolved to reflect the changing information environment." *Id.* CISA stated that it coordinates directly with social media firms to address "MDM": "The MDM team continues to work in close coordination with interagency and private sector partners, *social media companies*, academia, and international partners on a variety of projects to build resilience against malicious information activities." *Id.* (emphasis added).

302.    On information and belief, the April 12, 2022, CISA bulletin indicates that CISA works directly with social-media companies to flag content for censorship: "The MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms…." *Id.* CISA boasts that it has "expanded the breadth of reporting [MDM] to include … more social media platforms," and that "[t]his activity leverages the rapport the MDM team has with the social media platforms to enable shared situational awareness." *Id.* On information and belief, these statements reflect and express on ongoing practice by government officials of directly colluding with social-media platforms to suppress disfavored speech, viewpoints, content, and speakers on social media. Again, these statements echo Psaki's statement that the Biden Administration is "flagging problematic posts for Facebook," and Mayorkas's statement that DHS is "working with the tech companies that are the platform for much of the disinformation that reaches the American public" to address so-called misinformation and disinformation.

303.    The same bulletin suggests that CISA is directly involved in such "flagging" related to COVID-19 "misinformation." It states that "COVID-19-related MDM activities seek to undermine public confidence and sow confusion," and claims that "the rapid evolution of accurate information makes older, dated information a potential catalyst of confusion and distrust as well." *Id.* Thus, it claims, "[t]he MDM team supports the interagency and *private sector partners'* COVID-19 response efforts via regular reporting and analysis of key pandemic-related MDM

trends." *Id.* On information and belief, these "private sector partners" include social-media firms, and the "reporting and analysis" includes flagging disfavored content for censorship.

304.      On April 27, 2022, Mayorkas announced that DHS was creating a "Disinformation Governance Board" within DHS to combat so-called "misinformation" and "disinformation." *Biden Administration creates 'Disinformation Governance Board' under DHS to fight 'misinformation,'* THE POST MILLENNIAL (April 27, 2022), *at* https://thepostmillennial.com/breaking-biden-administration-creates-disinformation-governance-board-under-dhs-to-fight-misinformation. "The Department of Homeland Security is setting up a new board designed to counter misinformation related to homeland security, with a focus specifically on Russia and irregular migration. The board will be called the 'Disinformation Governance Board,' and will be headed by executive director Nina Jankowicz." *Id.* During congressional testimony, Mayorkas described the endeavor as a "just recently constituted Misinformation/Disinformation Governance Board." *Id.* (video link at 1:40). He stated: "The goal is to bring the resources of the Department together to address this threat." *Id.*

305.      Jankowicz has called for more aggressive censorship of election-related speech by social-media platforms, and has implied that social-media censorship of election-related speech should never relent or be reduced, stating on Twitter: "Considering the long-term damage these lies do to our democracy, I'm dismayed about this decision [not to censor election-related speech more aggressively]. I say this about foreign disinformation and it applies to domestic disinfo too: Elections aren't an end point. They're an inflection point. Policies need to reflect that." *Id.*

306.      On information and belief, DHS's new "Disinformation Governance Board" is intended to be used, and will be used, to increase DHS's efforts to induce and procure the censorship of disfavored content, viewpoints, and speakers on social-media platforms.

307.     From its inception, the DGB was envisioned as an agency for suppressing core political speech about election security and COVID-19 restrictions.  In the internal memo to Secretary Mayorkas advocating for the DGB's creation, the very first two topics of "disinformation" to be targeted were "conspiracies about the validity and security of elections," and "disinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks."

308.     Internal documents of DHS, provided by whistleblowers to U.S. Senators, indicate that the "Disinformation Governance Board" was formulated to create a stronger bureaucratic structure to federal social-media censorship policies and activities that were already in full force, both within DHS and across other federal agencies.  The whistleblower documents make clear that the DGB's task was not to *establish* a censorship program, but to *oversee* the massive censorship program against free speech on these topics that already exists—both within DHS, and across the federal government.

309.     On information and belief, Defendants Robert Silvers and Samantha Vinograd played and play a central role in DHS's censorship activities, including but not limited to the formulation and creation of the "Disinformation Governance Board."  The whistleblower documents cited above strongly support this conclusion.  Silvers and Vinograd co-signed the September 13, 2021 "Memorandum for the Secretary" re "Organizing DHS Efforts to Counter Disinformation" that provided an overview of DHS's disinformation activity and recommended the creation of the DGB.  As noted above, the opening lines of this memo state that "[t]he spread of disinformation presents serious homeland security risks," especially "[c]onspiracy theories about the validity and security of elections" and "[d]isinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks."  The memo reflects detailed knowledge and

active oversight of DHS's "misinformation" and "disinformation" activities.  Further, Defendant Silvers authored the January 31, 2022 memo to the Secretary seeking his "approval of the charter for the Disinformation Governance Board," and he authored a separate memorandum to DHS's general counsel seeking the same approval.  Silvers also is listed as a participant in the April 28, 2022 meeting with Twitter executives Nick Pickles and Yoel Roth organized by Nina Jankowicz, discussed below.

310.     On April 28, 2022, Jankowicz arranged for a meeting between Secretary Mayorkas and/or other senior DHS officials, including Undersecretary Robert Silvers, and "Twitter executives Nick Pickles, Head of Policy, and Yoel Roth, Head of Site Integrity," to discuss "public-private partnerships, MDM, and countering DVE.  The meeting is off the record and closed press."  ECF No. 10-1, at 31 (Glenn Decl. Ex. 1, at 18).  This was to be a cozy meeting: Jankowicz, who drafted the meeting brief, noted that "Nick and Yoel both know DGB Executive Director Nina Jankowicz."  *Id.*  The meeting was to be "an opportunity to discuss operationalizing public-private partnerships between DHS and Twitter."  *Id.*  In the meeting, DHS was to "Propose that Twitter become involved in Disinformation Governance Board Analytic Exchanges on Domestic Violent Extremism (DVE) and Irregular Migration," and to "Thank Twitter for its continued participation in the CISA Analytic Exchange on Election Security."  *Id.*  DHS was also to "Ask what types of data or information would be useful for Twitter to receive in Analytic Exchanges or other ways the Department could be helpful to Twitter's counter-MDM efforts."  *Id.*

**5.  Defendants reinforce their threats and admit further colluding to censor free speech.**

311.     On or around April 25, 2022—two days before DHS announced the creation of its "Disinformation Governance Board"—it was reported that free-speech advocate Elon Musk would acquire Twitter and make it a privately held company.  Left-wing commentators widely decried

this news on the ground that free speech on Twitter would allow the spread of so-called "misinformation" and "disinformation."

312.     On April 25, 2022, Psaki was asked at a White House press briefing to respond to the news that Elon Musk would acquire Twitter, and asked "does the White House have any concern that this new agreement might have President Trump back on the platform?"  White House, *Press Briefing by Press Secretary Jen Psaki, April 25, 2022*, at https://www.whitehouse.gov/briefing-room/press-briefings/2022/04/25/press-briefing-by-press-secretary-jen-psaki-april-25-2022/.

313.     Psaki responded by reiterating the threats of adverse legal consequences to Twitter and other social media platforms, specifically referencing antitrust enforcement and Section 230 repeal: "No matter who owns or runs Twitter, the President has long been concerned about the power of large social media platforms … [and] has long argued that tech platforms must be held accountable for the harms they cause.  He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more.  And he's encouraged that there's bipartisan interest in Congress." *Id.*

314.     At the same press briefing, Psaki was asked: "Are you concerned about the kind of purveyors of election misinformation, disinformation, health falsehoods, sort of, having more of an opportunity to speak there on Twitter?"  She responded by specifically linking the legal threats to the social-media platforms' failure to more aggressively censor free speech: "We've long talked about and the President has long talked about his concerns about the power of social media platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable."

94

315.    Psaki was then asked a question that noted that "the Surgeon General has said that misinformation about COVID amounts to a public health crisis," and then queried, "would the White House be interested in working with Twitter like it has in the past to continue to combat this kind of misinformation?   Or are we in a different part of the pandemic where that kind of partnership is no longer necessary?"  *Id.*

316.    Psaki responded by reaffirming that senior officials within the White House and/or the Administration are continuing to coordinate directly with social-media platforms to censor disfavored speakers and content on social media, and directly linking these efforts to the repeated threat of adverse legal action: "we engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue.  But there are also reforms that we think Congress could take and we would support taking, including reforming Section 230, enacting antitrust reforms, requiring more transparency.  And the President is encouraged by the bipartisan support for — or engagement in those efforts."  *Id.*

**6.  Defendants have successfully procured the censorship of core political speech.**

317.    As a direct result of the conduct alleged herein, Defendants have achieved a great deal of success in procuring the censorship of disfavored speakers, viewpoints, and content on social media, as alleged further herein—including core political speech.

318.    Among other things, they have achieved astonishing success in muzzling public criticism of President Biden.  A recent review by the Media Research Center identified 646 instances over the last two years where social-media firms censored public criticism of then-Candidate and now-President Biden.  *See* Joseph Vasquez and Gabriela Pariseau, *Protecting the President: Big Tech Censors Biden Criticism 646 Times Over Two Years* (April 21, 2022), *at*

https://censortrack.org/protecting-president-big-tech-censors-biden-criticism-646-times-over-two-years.

319.     "The Media Research Center found more than 640 examples of bans, deleted content and other speech restrictions placed on those who criticized Biden on social media over the past two years." *Id.* "MRC Free Speech America tallied 646 cases in its CensorTrack database of pro-Biden censorship between March 10, 2020, and March 10, 2022. The tally included cases from Biden's presidential candidacy to the present day." *Id.*

320.     "The worst cases of censorship involved platforms targeting anyone who dared to speak about any subject related to the *New York Post* bombshell Hunter Biden story. … Big Tech's cancellation of that story helped shift the 2020 election in Biden's favor.  Twitter locked the Post's account for 17 days.  In addition, Twitter slapped a 'warning label' on the GOP House Judiciary Committee's website for linking to the Post story." *Id.* "CensorTrack logged 140 instances of users—including lawmakers, organizations, news outlets and media personalities—censored for sharing anything related to the bombshell Hunter Biden laptop story." *Id.*

321.     "Twitter was the most aggressive censor when it came to the Biden laptop story. CensorTrack entries show that users could not tweet the story or pictures of the Post story."

322.     "Big Tech even axed those who blamed the current inflation crisis on Biden.  For example, Facebook censored Heritage Action, the advocacy arm of the conservative Heritage Foundation, on March 15, simply for posting a video quoting Biden's embarrassing statements on energy policy.  Facebook placed an interstitial, or filter, over Heritage Action's video, suppressing the post's reach.  The video showed Biden and officials in his administration explaining how his policies would cause gas prices to rise." *Id.*

323.     "[T]he largest category by far included users who dared to call out Biden's notoriously creepy, touchy-feely behavior around women and children.  The 232 cases of comedic memes, videos, or generic posts about Biden's conduct composed more than one-third of CensorTrack's total instances of users censored for criticizing the president."  *Id.*

324.     "Big Tech even went after posts that quoted Biden's own words and made him look awful in retrospect."  *Id.*

325.     "The list of censorship targets included an array of prominent influencers on social media: Trump; lawmakers like Sen. Ted Cruz (R-TX) and House Minority Leader Kevin McCarthy (R-CA); news outlets like the New York Post, The Washington Free Beacon and The Federalist; satire site The Babylon Bee; celebrities like Donald Trump Jr. and James Woods, and media personalities like Daily Wire host Candace Owens, Salem radio host Sebastian Gorka and radio host Dana Loesch."  *Id.*

326.     Most recently, social-media platforms are beginning to censor criticisms of the Biden Administration's attempt to redefine the word "recession" in light of recent news that the U.S. economy has suffered two consecutive quarters of reduction in GDP.  *See, e.g., Economist slams Facebook for 'absolutely Orwellian' fact-check upholding Biden's recession denial*, Fox News (Aug. 1, 2022), at https://www.foxnews.com/media/economist-slams-facebook-absolutely-orwellian-fact-check-upholding-bidens-recession-denial.

327.     Thus, Defendants' conduct alleged herein has created, with extraordinary efficacy, a situation where Americans seeking to exercise their core free-speech right to criticize the President of the United States are subject to aggressive prior restraint by private companies acting at the bidding of government officials.  This situation is intolerable under the First Amendment.

**7.  Federal officials open new fronts in their war for censorship of disfavored speech.**

328.     Since this lawsuit was filed, federal officials, including Defendants herein, have expanded their social-media censorship activities and opened new fronts in their war against the freedom of speech on social media.  The frontiers of government-induced censorship are thus expanding rapidly.

329.     For example, on June 14, 2022, White House National Climate Advisor Gina McCarthy spoke at an Axios event titled "A conversation on battling misinformation."  *See* Alexander Hall, *Biden climate advisor demands tech companies censor 'disinformation' to promote 'benefits of clean energy'*, Fox News (June 14, 2022), *at* https://www.foxnews.com/media/biden-climate-advisor-tech-companies-censor-disinformation-promote-benefits-clean-energy (video of her comments embedded in link).  McCarthy publicly demanded that social-media platforms engage in censorship and suppression of speech that contradicts federal officials' preferred narratives on climate change.

330.     During the event, "McCarthy skewered Big Tech companies for 'allowing' disinformation and cheered Congress for 'taking action' to enact more censorship last Thursday." *Id.*  "Axios political reporter Alexi McCammond asked McCarthy how so-called 'rampant mis-and-disinformation around climate change online and in other platforms' has 'made your job harder?'" *Id.*  "McCarthy responded by slamming social media companies: 'We have to get tighter, we have to get better at communicating, and frankly, *the tech companies have to stop allowing specific individuals over and over again to spread disinformation*.'"  *Id.* (emphasis added).  "She suggested further that 'we have to be smarter than that and *we need the tech companies to really jump in*.'"  *Id.* (emphasis added).  "McCammond responded by asking: 'Isn't misinformation and disinfo around climate a threat to public health itself?'  McCarthy asserted that it 'absolutely' is:  'Oh, absolutely.'" *Id.*

331.    Following the Administration's now-familiar playbook, McCarthy explicitly tied these demands for censorship of climate-change-related speech to threats of adverse legislation: "McCarthy also praised Congress directly for pushing social media companies to censor Americans: 'We do see Congress taking action on these issues, we do see them trying to tackle the misinformation that's out there, trying to hold companies accountable.'" *Id.*

332.    Two days later, the White House announced a new task force to address, among other things, "gendered disinformation" and "disinformation campaigns targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists." White House, *Memorandum on the Establishment of the White House Task Force to Address Online Harassment and Abuse* (June 16, 2022), *at* https://www.whitehouse.gov/briefing-room/presidential-actions/2022/06/16/memorandum-on-the-establishment-of-the-white-house-task-force-to-address-online-harassment-and-abuse/.

333.    The June 16 Memorandum decries "online harassment and abuse"—vague terms that, on information and belief, are deliberately adopted to sweep in constitutionally protected speech.   In particular, the Memorandum defines "online harassment and abuse" to include "gendered disinformation," a deliberately broad and open-ended term. *Id.* § 1.  The Memorandum announces plans to target such "gendered disinformation" directed at public officials and public figures, including "women and LGBTQI+ political leaders, public figures, activists, and journalists." *Id.*   The Memorandum creates a Task Force co-chaired by the Assistant to the President for National Security Affairs, which includes the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security, among others. *Id.*

334.    The Task Force is charged with "developing programs and policies to address … *disinformation campaigns* targeting women and LGBTQI+ individuals who are public and

political figures, government and civic leaders, activists, and journalists in the United States and globally." *Id.* § 4(a)(iv) (emphasis added). The Memorandum calls for the Task Force to consult and coordinate with "technology experts" and "industry stakeholders," *i.e.*, social-media firms, to achieve "the objectives of this memorandum," *id.* § 4(b). Those "objectives," of course, include suppressing so-called "disinformation campaigns" against "public and political figures." *Id.* § 4(a)(iv).

335.     The Memorandum again threatens social-media platforms with adverse legal consequences if they do not censor aggressively enough to suit federal officials: "the Task Force shall … submit periodic recommendations to the President on *policies, regulatory actions, and legislation on technology sector accountability* to address systemic harms to people affected by online harassment and abuse." *Id.* § 5(c) (emphasis added).

336.     On June 17, 2022, twenty-one Democratic U.S. Senators and Representatives sent a letter to Sundar Pichai, the CEO of Alphabet Inc., which owns Google, demanding that Google censor, suppress, and de-boost search results and Google Maps results for pro-life pregnancy resource centers.     June 17, 2022 Letter of Sen. Mark Warner, et al., available at https://reason.com/wp-content/uploads/2022/06/26F26BB28841042A7931EEC58AC80E08.anti-abortion-letter-to-google-final.pdf.   The letter's co-signers included many of the Members of Congress who have previously made threats of adverse legal consequences if social-media platforms do not increase censorship—such as Senators Mark Warner, Amy Klobuchar, and Richard Blumenthal.   *Id.*   The letter cited "research by the Center for Countering Digital Hate (CCDH)," *id.*—the same organization that Jen Psaki and the White House coordinated with to demand the censorship of the so-called "Disinformation Dozen," and that coordinated the demonetization of Plaintiff Hoft from Google.   The letter describes pro-life pregnancy resource

centers as "fake clinics," and demands that Google proactively censor search results, mapping results, and advertisements relating to such clinics. *Id.* The letter demands that Google "limit the appearance of anti-abortion fake clinics or so-called 'crisis pregnancy centers' in Google search results, Google Ads, and on Google Maps"; that Google "add user-friendly disclaimers that clearly indicate whether or not a search result does or does not provide abortions"; and that Google take "additional steps to ensure that users are receiving accurate information when they search for health care services like abortion on Google Search and Google Maps." *Id.*

337.     Defendants swiftly doubled down on this demand for social-media censorship of pro-life pregnancy resource centers. On July 8, 2022, the President signed an Executive Order "aimed at protecting abortion rights." Sandhya Raman, *Biden issues executive order responding to abortion ruling*, Roll Call (July 8, 2022), at https://rollcall.com/2022/07/08/biden-issues-executive-order-responding-to-abortion-ruling/. The order directs HHS, DOJ, and the FTC "to examine ways to … curb the spread of misinformation related to abortion." *Id.* The order is entitled "Executive Order on Protecting Access to Reproductive Healthcare Services," available at https://www.whitehouse.gov/briefing-room/presidential-actions/2022/07/08/executive-order-on-protecting-access-to-reproductive-healthcare-services/. Section 4(b)(iv) of the order states: "The Secretary of Health and Human Services shall, in consultation with the Attorney General and the Chair of the FTC, consider options to address deceptive or fraudulent practices related to reproductive healthcare services, including online, and to protect access to accurate information." *Id.*

**8. Discovery reveals a massive federal Censorship Enterprise including all Defendants.**

338.     Plaintiffs reassert and incorporate by reference the Exhibits A-O to the First Amended Complaint, Docs. 45-1 to 45-15, and the Exhibits to their Joint Statement on Discovery

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 169 of 332 PageID #:
4453
Case 3:22-cv-01213-TAD-KDM   Document 65   Filed 11/08/22   Page 105 of 164 PageID #:
3228

Disputes, Docs. 71-1 to 71-13, as if set forth fully herein.  For ease of reference, this Second

Amended Complaint refers to the exhibits to the First Amended Complaint by the same Exhibit

numbers, Exhibits A-O.  Likewise, Docs. 71-1 to 71-13 are incorporated by reference and referred

to by their docket number.  In addition, two additional Exhibits, labeled "Exhibit P" and "Exhibit

Q," comprising additional documents produced by Defendants in discovery, are attached hereto

and incorporated fully by reference herein.

339.     Based on documents produced by Defendants in discovery and other recent public

disclosures, senior federal officials have placed intensive oversight and pressure to censor private

speech on social-media platforms.  All Defendants have been involved in the actions of this

"Censorship Enterprise" in various ways, and these censorship activities continue to the present

and continue to directly cause Plaintiffs irreparable harm.  Representative examples of such federal

censorship activities are set forth herein, but these do not identify all the federally induced acts of

censorship by any means.

340.     After President Biden publicly stated (about Facebook) on July 16, 2021, that

"They're killing people," a very senior executive at Meta (Facebook and Instagram) reached out

to Surgeon General Murthy to engage in damage control and appease the President's wrath.  Soon

thereafter, the same Meta executive sent a text message to Surgeon General Murthy, noting that

"it's not great to be accused of killing people," and expressing that he was "keen to find a way to

deescalate and work together collaboratively."

341.     Such "deescalation" and "working together collaboratively," naturally, involved

increasing censorship on Meta's platforms.  One week after President Biden's public accusation,

on July 23, 2021, that senior Meta executive sent an email to Surgeon General Murthy stating, "I

wanted to make sure you saw the steps we took *just this past week* to adjust policies on what we

102

are removing with respect to misinformation, as well as steps taken to further address the 'disinfo dozen': we removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen...."

342.     Again, on August 20, 2021, the same Meta executive emailed Murthy to assure him that Facebook "will shortly be expanding our COVID policies to further reduce the spread of potentially harmful content on our platform.  These changes will apply across Facebook and Instagram," and they included "increasing the strength of our demotions for COVID and vaccine-related content," and "making it easier to have Pages/Groups/Accounts demoted for sharing COVID and vaccine-related misinformation."

343.     In addition, that senior Meta executive sent a "Facebook bi-weekly covid content report" to Surgeon General Murthy and to White House official Andrew Slavitt, evidently to reassure these federal officials that Facebook's suppression of COVID-19 "misinformation" was aggressive enough for their preferences.

344.     In another, similar exchange, on October 31, 2021, Deputy Assistant to the President Rob Flaherty emailed a contact at Meta with a link to a Washington Post article complaining about the spread of COVID "misinformation" on Facebook.  The email contained only the link to that story with the subject line, "not even sure what to say at this point."  The Facebook official defended Facebook's practices, and assured Mr. Flaherty that Facebook's internal studies were intended to "improve our defenses against harmful vaccine misinformation," and that Facebook had, in fact, "improved our policies," *i.e.*, increased censorship of online speech. *Id.*

345.     Likewise, Alex Berenson disclosed internal Twitter communications revealing that senior "WH" officials including Andrew Slavitt specifically pressured Twitter to deplatform

Berenson, an influential vaccine critic—which Twitter did.  This pressure to deplatform Berenson evidently occurred on April 21, 2021, when four Twitter employees participated in a Zoom meeting with at least three White House officials and one HHS official intended to allow the White House to "partner" with Twitter in censoring COVID-related "misinfo."  The meeting invitation stated: "White House Staff will be briefed by Twitter on vaccine misinfo.  Twitter to cover trends seen generally around vaccine misinformation, *the tangible effects seen from recent policy changes*, what interventions are currently being implemented in addition to previous policy changes, and ways the White House (and our COVID experts) can *partner* in product work." (Emphasis added).

346.     The next day, April 22, Twitter employees noted in internal communications that the White House officials had posed "tough" questions during this meeting, including "one really tough question about why Alex Berenson hasn't been kicked off the platform."  *See* https://alexberenson.substack.com/p/the-white-house-privately-demanded.

347.     On July 11, 2021, Dr. Fauci publicly described Berenson's public statements on vaccines as "horrifying."  Soon thereafter, after President Biden's subsequent statement that "They're killing people" by not censoring vaccine "misinformation," Twitter caved to federal pressure and permanently suspended Berenson.

348.     Such communications from the White House impose maximal pressure on social-media companies, which clearly yields the sought-after results.  And federal officials are fully aware that such pressure is necessary to induce social-media platforms to increase censorship of views that diverge from the government's.  CISA Director Jen Easterly, for example, texted with Matthew Masterson about "trying to get us in a place where Fed can work with platforms to better understand the mis/dis trends *so relevant agencies can try to prebunk/debunk as useful*," and

complained about the Government's need to overcome the social-media platforms' "hesitation" to working with the government: "Platforms have got to get more comfortable with gov't.  It's really interesting how hesitant they remain."

349.    In fact, such pressure from government officials on social-media companies, along with the many public statements alleged in the Complaint, have succeeded on a grand scale.  A veritable army of federal bureaucrats are involved in censorship activities "across the federal enterprise."  There are so many, in fact, that CISA Director Easterly and Matthew Masterson complained in text messages that "chaos" would result if all federal officials were "independently" contacting social-media platforms about so-called misinformation: "Not our mission but was looking to play a coord role so not every D/A is independently reaching out to platforms which could cause a lot of chaos."  On information and belief, as alleged above, the "Disinformation Governance Board" was created to impose a bureaucratic structure on the enormous censorship activities already occurring involving dozens of federal officials and many federal agencies.

350.    These federal bureaucrats have leveraged their clout and pressure on social-media platforms to become deeply embedded in a joint enterprise with social-media companies to procure the censorship of private citizens' speech on social media.  Officials at HHS, including Defendants herein, routinely flag content for censorship, for example, by organizing weekly "Be On The Lookout" meetings to flag disfavored content; sending lengthy lists of examples of disfavored posts to be censored; serving as privileged "fact checkers" whom social-media platforms consult about censoring private speech; and receiving detailed reports from social-media companies about so-called "misinformation" and "disinformation" activities online; among others.

351.    These efforts go back as far as very early 2020, and they continue through the present day, as evidenced by Facebook employees writing to high-level officials in HHS and the

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 173 of 332 PageID #:
4457
Case 3:22-cv-01213-TAD-KDM   Document 5-8   Filed 11/08/20/22   Page 106 of 164 PageID #:
3232

State Department informing them of new attempts to "control information and misinformation related to Corona virus [*sic*] which includes links to WHO page as well as removal of misinformation."

352.     A Facebook employee wrote to Defendants Slavitt, Flaherty, Peck, and Humphrey on March 2, 2021, updating the White House on "vaccine intent" and "shar[ing] survey based data on intent to vaccinate," and relaying the ways that the company was combatting "misinformation." These methods included "improving the effectiveness of our existing enforcement systems (particularly focusing on entities that repeatedly post vaccine misinformation)" and "mitigating viral content that could lead to vaccine hesitancy" while "promoting the vaccine and providing authoritative information."

353.     Upon information and belief, that means ensuring that posts departing from the government's messaging on vaccines are censored and de-amplified through the Facebook algorithm, while those conveying the government's message are amplified.

354.     On March 1, 2021, a Twitter employee wrote to Defendants Slavitt, Flaherty, Peck and Humphrey after a meeting that the company was escalating efforts to remove harmful content about Covid and introducing a strike system—apparently the outcome of the discussion that had just occurred.  This was following an email exchange in February of 2021 in which the same employee had sought to update the four about "additional measure[s] Twitter taking regarding covid [*sic*]."

355.     Likewise, on April 26, 2020, Muhammed wrote to Facebook employees and asked them to take down Facebook pages, and deactivate associated accounts, misrepresenting themselves as Administration for Children and Families Program (ACF).  One of those employees responded, "Absolutely."  *Id.*

356.     Shortly after the inauguration of President Biden, an individual who worked in private sector engagement connected a Facebook employee with Defendants Courtney Rowe and Joshua Peck, and saying that Defendants Flaherty and Humphrey would want to be in touch about misinformation and disinformation.

357.     On February 24, 2021, a different Facebook employee wrote to Defendant Flaherty "Following upon your request for COVID-19 misinfo themes we are seeing," "we are removing these claims from our platforms[.]"  Those themes were Vaccine Toxicity," "False Claims About Side Effects of Vaccine" (including that the vaccines may cause infertility), "Comparing the Covid Vaccine to the Flu Vaccine," and "Downplaying Severity of Covid-19."

358.     Flaherty responded later that day, asking for a "sense of volume on these, and some metrics around the scale of removal for each[]," as well as "misinformation that might be falling outside of your removal policies."  The Facebook employee replied that she could "go into detail on content that doesn't violate like below but could contribute to vaccine hesitancy."

359.     Similarly, on February 19, 2021, Defendant Flaherty, on an email between him, Humphrey, Defendant Courtney Rowe, and Defendant Joshua Peck, and several Facebook employees as well, asked to hear from the company about "mis and dis" and later stated that one of his questions was about "algorithmic productions."  Flaherty also asked if "plans are in the works . . . to replicate the strategy you deployed around lockdowns – the 'stay at home' stickers/promoted Instagram story."  A meeting was apparently held pursuant to Flaherty's request shortly thereafter on March 1, with the subject being "Misinfo & Disinfo."

360.     On May 20, 2021, Mina Hsiang of the Office of Management and Budget wrote to a Google employee, apparently following up on a conversation from the previous day that was

"critically helpful for the nationwide vaccination effort." Hsiang suggested a change to results yielded by a search for "who can get vaccinated now."

361.     The parties continued to collaborate on the subject, and eventually arranged a meeting that was apparently held on May 27, 2021 and scheduled by Defendant Joshua Peck. Defendant Andy Slavitt asked Peck and Hsiang to take his place on the call because he was "slammed."

362.     Sheila Walsh of HHS exchanged emails with employees at YouTube about combating vaccine "misinformation," and arranged a meeting as well.

363.     Defendant Christy Choi, Deputy Director in the Office of Communications within HHS had exchanges with Facebook asking it to change the name of a Facebook page providing "misleading information about vaccine" "[g]iven the administration's focus on getting more Americans vaccinated."

364.     CISA, likewise, has aggressively embraced its "evolved mission" of screening complaints of social-media disinformation and then "routing disinformation concerns" to social-media platforms. CISA routinely receives reports of perceived "disinformation," often from state and local government officials, and forwards them to social-media companies for censorship, placing the considerable weight of its authority as a federal national-security agency behind its demands for suppression of private speech. CISA, therefore, serves as a government clearinghouse for expedited censorship of social-media speech disfavored by government officials.

365.     Moreover, many of these substantive communications from federal officials flagging specific posts and content for censorship also appear to occur through alternative channels of communication. For example, Facebook trained CDC and Census Bureau officials on how to use a "Facebook misinfo reporting channel." Twitter offered federal officials a privileged channel

for flagging misinformation through a "Partner Support Portal." YouTube has disclosed that it granted "trusted flagger" status to Census Bureau officials, which allows privileged and expedited consideration of their claims that content should be censored.

366.    As alleged further herein, federal censorship efforts escalated after President Biden assumed office in January 2021.

367.    The individually named White House Defendants and other Defendants were directly involved in communications with social-media platforms about censorship and suppression of speech on social-media.

368.    For example, Humphrey requested that a Meta employee censor an Instagram parody account of Dr. Fauci, and Meta replied, "Yep, on it!" Soon thereafter, Meta reported that the account had been censored.

369.    As another example, on May 28, 2021, a senior executive of Meta sent an email to Slavitt and Murthy reporting that Facebook had expanded its censorship policies, evidently to satisfy federal officials' demands made at a recent oral meeting. The email stated that a "key point" was that "We're expanding penalties for individual Facebook accounts that share misinformation."

370.    As recently as June 13, 2022, Flaherty demanded that Meta continue to produce periodic "COVID-19 insights reports" to track so-called "misinformation" regarding COVID-19 on Meta's social-media platforms, expressing the specific concern that COVID vaccines for children under 5 would soon be authorized.

371.    Meta got the message. It agreed to continue sending its censorship-tracking reports, and on June 23, 2022, Meta assured Flaherty that it was expanding its censorship of COVID-19 "misinformation" to ensure that speech critical or skeptical of COVID-19 vaccines for children

under 5 years old—a highly controversial topic—would be censored.  Notably, Pfizer's own data established that the vaccine does not stop infection or transmission in this age group, demonstrating the political nature of this censorship.  *See* https://www.nytimes.com/2022/02/28/health/pfizer-vaccine-kids.html.

372.    The White House Defendants were involved in many other communications regarding censorship as well.  For example, in June and July of 2022, Flaherty, Manning, Salcido, and Cheema were included in the email chain with Meta in which Flaherty demanded that Meta continue providing biweekly "COVID-19 Insights" reports to ensure adequate censorship of speech on Facebook and Instagram "as we start to ramp up under 5 vaccines"—*i.e.*, as vaccination of children under 5 for COVID-19 began.  Wakana and Rowe were also involved in similar communications overseeing Meta's misinformation practices.

373.    Again, for example, Flaherty, Wakana, Humphrey, and Rowe participated in a "Twitter // COVID Misinfo" meeting with Twitter on or around March 1, 2021.  And on April 21, 2021, Flaherty and Slavitt, along with White House Confidential Assistant Kelsey V. Fitzpatrick, participated in a meeting with Twitter at which those White House officials demanded greater censorship on Twitter and specifically demanded the de-platforming of Alex Berenson.  The meeting invite for that meeting stated that "White House Staff will be briefed by Twitter on vaccine misinfo.  Twitter to cover trends seen generally around vaccine misinformation, the tangible effects seen from recent policy changes, … and ways the White House (and our COVID experts) can partner in product work."

374.    A senior Meta executive repeatedly copied Slavitt on his emails to Surgeon General Murthy in which he assured the Surgeon General and the White House that Meta was engaging in censorship of COVID-19 misinformation according to the White House's demands.  Among other

things, the Meta executive insisted that "We've expanded penalties for individual Facebook accounts that share misinformation."

375.      Likewise, on March 2, 2021, Meta sent an email assuring Slavitt, Flaherty, and Humphrey that the company is "[c]ombating vaccine misinformation and de-amplifying content that could contribute to vaccine hesitancy" by "improving the effectiveness of our existing enforcement systems (particularly focusing on entities that repeatedly post vaccine misinformation), mitigating viral content that could lead to vaccine hesitancy…."

376.      Among many other reports, Meta reported to Rowe, Manning, Flaherty, and Slavitt that it has "labeled and demoted" "vaccine humor posts whose content could discourage vaccination" during January 2022.  It also reported to the White House that it "labeled and demoted" posts "suggesting natural immunity to COVID-19 infection is superior to immunity by the COVID-19 vaccine."

377.      Likewise, on November 4, 2021, Meta reported to Rowe, Flaherty, and other White House officials that "we updated our misinformation policies for COVID-19 vaccines to make clear that they apply to claims about children…."

378.      On September 18, 2021, regarding a story in the Wall Street Journal about COVID-19 "misinformation" circulating on Facebook, Flaherty demanded that Meta provide an explanation "as we have long asked for, [of] how big the problem is, what solutions you're implementing, and how effective they've been."  Needless to say, the "solutions" evidently referred to policies to censor and suppress more private speech on Meta's platforms, and Meta promised to "brief" the White House on those.

379.      In response to a third-party subpoena, Meta has identified Special Assistant to the President Laura Rosenberger, White House Partnerships Manager Aisha Shah, White House

Counsel Dana Remus, and White House officials Slavitt, Flaherty, and Humphrey; HHS officials Waldo, Byrd, Choi, Lambert, Peck, and Muhammed; EAC officials Muthig and Robbins; CDC officials Crawford and Dempsey; DHS officials Masterson, Protentis, Hale, and Snell; and FDA officials Thorpe, Jefferson, Murray, and Kimberly, among others, as federal officials who may have "communicated with Meta regarding content moderation between January 1, 2020 and July 19, 2022 as it relates to: (i) COVID-19 misinformation; (ii) the Department of Homeland Security's proposed Disinformation Governance Board; (iii) the New York Post story from October 14, 2020 about Hunter Biden's laptop computer; and/or (iv) election security, integrity, outcomes, and/or public confidence in election outcomes (not to include issues of foreign interference or related issues)."

380.    In response to a third-party subpoena, YouTube has identified Schwartz, Faught, Molina-Irizarry, Galemore, Wakana, Flaherty, and Waldo, among others, as federal officials likely to have "communicated with the YouTube custodians about misinformation about COVID, the census, or elections."

381.    In response to a third-party subpoena, Twitter has identified Crawford, Flaherty, Frisbie, Kimmage, Lambert, Murthy, Shopkorn, Slavitt, and Waldo as federal officials "with whom [Twitter] has had meetings or discussions between January 20, 2021 and August 4, 2022 about election integrity, vaccine/Covid misinformation, violent extremism, and similar content moderation issues."

382.    On August 26, 2022, Mark Zuckerberg appeared on Joe Rogan's podcast and revealed that Facebook's censorship of the Hunter Biden laptop story had occurred as a result of communications from the FBI.  Zuckerberg stated: "The FBI basically came to us" and told Facebook to be "on high alert" relating to "a lot of Russian propaganda," that the FBI was "on

notice" that "there's about to be some kind of dump … that's similar to that, so just be vigilant." Zuckerberg stated: "If the FBI … if they come to us and tell us we need to be on guard about something, then I want to take that seriously." On information and belief, the FBI's reference to a "dump" of information was a specific reference to the contents of Hunter Biden's laptop, which was already in the FBI's possession.

383.    Joe Rogan asked Zuckerberg if the FBI has flagged the Hunter Biden laptop story as Russian disinformation specifically, and Zuckerberg stated: "I don't remember if it was that specifically, but [the story] basically fit the pattern" that the FBI had identified. *See* https://www.wptv.com/news/national/fbi-responds-to-mark-zuckerberg-claims-on-joe-rogan-show-about-hunter-bidens-laptop (video commencing around 7:30). This revelation that the FBI had induced Facebook's censorship of the Hunter Biden laptop story was widely recognized as a bombshell revelation of federal law-enforcement influence on social-media censorship.

384.    Pursuant to the third-party subpoena, Meta has identified the FBI's FITF, as supervised by Laura Dehmlow, and Elvis Chan as involved in the communications between the FBI and Meta that led to Facebook's suppression of the Hunter Biden laptop story.

385.    Dehmlow evidently works with CISA on social-media censorship issues. On March 1, 2022, Dehmlow gave a presentation to CISA's Protecting Critical Infrastructure from Misinformation & Disinformation Subcommittee in which Dehmlow indicated that the FBI's FITF "engages … with appropriate partners for information exchange." On information and belief, this "information exchange" includes communications with social-media platforms about censorship and/or suppression of social-media speech.

386.    On information and belief, because major social-media platforms are headquartered in the geographical area of FBI's San Francisco Division, and Elvis Chan is in charge of cyber-

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 181 of 332 PageID #:
4465
Case 3:22-cv-01213-TAD-KDM   Document 5   Filed 11/03/20   Page 115 of 164 PageID #:
3240

related issues for that division, Chan has performed a critical role in communicating with social-media platforms on behalf of the FBI relating to censorship and suppression of speech on social media.

387.     Chan has openly boasted about his official role on behalf of FBI in coordinating with social-media companies.  In a recent podcast, he stated, "Our field office, FBI San Francisco, was very involved in helping to protect the US elections in 2020. … [T]he FBI, the US government working in conjunction with *the private sector*, as well as with election officials from every single state and protectorate, we were really able to do it. …  But completely different from 2016 where we did not.  Even though foreign actors were trying to interfere in our elections, the FBI, the US government working in conjunction with the private sector, as well as with election officials from every single state and protectorate, we were really able to do it."  *See* https://www.banyansecurity.io/resource/get-it-started-get-it-done/ (emphasis added).

388.      Chan's subsequent comments make clear that "government working in conjunction with the private sector" includes the FBI working with social-media companies on censorship and suppression of private speech.  Chan indicated that he works closely with Defendant Jen Easterly, stating, "So Jen Easterly, she's the current director for CISA, she's the one who coined that term shields up. She's a Star Trek fan. She's a Trekkie, I am myself."  *Id.*  Easterly, as alleged herein, quarterbacks CISA's extensive federal government-induced social-media censorship activities.

389.     Chan admits to regular, routine coordination about censorship with social-media platforms, stating of the 2020 election cycle in particular: "we talked with all of these entities I mentioned regularly, at least on a monthly basis. And right before the election, probably on a weekly basis. If they were seeing anything unusual, if we were seeing anything unusual, sharing intelligence with technology companies, *with social media companies*, so that they could protect

their own platforms.  That's where the FBI and the US government can actually help companies." *Id.*  On information and belief, "social media companies" "protect[ing] their own platforms" includes censorship and suppression of speech at the FBI's behest.

390.     Chan bemoaned the fact that there was not a similar level of coordination about censorship between the federal government and social-media companies during the 2016 election cycle: "It seems obvious, but I'm not going to lie, in 2016, there was not that same level of communications between the US government and the private sector." *Id.*  Chan called on social-media platforms to be "more mindful" of federal government warnings on such issues: "But where we in the government are saying, if you are in one of the 17 designated critical infrastructure sectors, of which information technology is one of them, then you need to be more mindful." *Id.*

391.     In a public interview dated October 28, 2020, Chan explicitly encouraged citizens to report "misinformation" or "disinformation" to social-media companies and to the federal government so that such speech could be censored and/or suppressed, stating: "If you are seeing something related to election on your social-media platform, all of them have portals where you can report that sort of information, and *they are being very aggressive in trying to take down any misinformation or disinformation* … [i]f you see anything on election day or before election day, you can always report it to FBI.gov or Justice.gov … *we take all of these very seriously*." *See* https://www.govinfosecurity.com/fbi-on-election-theres-going-to-be-lot-noise-a-15257 (quotes at 7:45-8:48 of video) (emphasis added).  Based on these comments, this includes the FBI "tak[ing] … very seriously" reports of "misinformation" and "disinformation" and inducing social-media companies to censor them.

392.     Documents produced by LinkedIn show Chan repeatedly organizing meetings with representatives of LinkedIn from 2020 through 2022 (the present).  Based on the limited agendas

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 183 of 332 PageID #:
4467
Case 3:22-cv-01213-TAD-KDM   Document 5 Filed 11/08/22   Page 116 of 164 PageID #:
3242

provided, it appears that these meetings included discussions of election-related content and suppression of election-related speech on social media.  On information and belief, Chan organized similar meetings with other major social-media platforms, as in one instance, he notified LinkedIn about a particular proposed time slot for a meeting that another company had already taken that time slot.  Dehmlow was routinely included in these meetings as well.

393.    On information and belief, active coordination between Meta and the FBI on censorship and suppression of speech on social media continues to this day.  For example, Facebook "now appears to be monitoring *private* messages and suppressing material related to the whistleblower complaint of … FBI special agent Steve Friend."  Miranda Devine, *Facebook 'silencing' activity related to FBI whistleblower Steve Friend*, N.Y. Post (Sept. 25, 2022), at https://nypost.com/2022/09/25/facebook-silencing-activity-related-to-fbi-whistleblower-steve-friend/.

394.    After an FBI whistleblower made public allegations critical of political bias at the FBI, the whistleblower's "wife's Facebook account was suspended after she responded to an offer of support from a local chapter" of a supportive "conservative group that advocates for parental rights."  *Id.*  The wife responded to the group with a private message from her Facebook account, stating that "her husband was in the process of obtaining permission from the FBI to speak publicly and asked them to encourage their members to share his whistleblower story on their personal social media accounts."  *Id.*  "About 30 minutes later, Mrs. Friend received a notification from Facebook that her account had been suspended because the 'account, or activity on it, doesn't follow our Community Standards.'"  *Id.*  At the receiving end, "Mrs. Friend's Facebook message disappeared. In its place was a notification saying, 'Message unavailable.'"  *Id.*  Thus, it now

appears that Meta/Facebook is policing *private* messages sent on Facebook to censor and suppress any communications that might be critical of the FBI.

395.    Recent, heavily documented reports indicate that both the State Department and CISA have teamed up with a consortium of four private groups in a close collaboration to achieve social-media censorship of election-related speech beginning in 2020, and that this collaboration is continuing to this day.

396.    Pursuant to third-party subpoena, Twitter has identified personnel associated with the State Department's Global Engagement Center, including Alexis Frisbie and Daniel Kimmage, as likely involved in communications with Twitter about censorship and/or content modulation on issues such as election integrity, vaccine/COVID misinformation, and related subjects.

397.    The State Department reports that "[i]n December 2019, GEC/TET [*i.e.*, State's Global Engagement Center's Technology Engagement Team] established a Silicon Valley location to facilitate public-private coordination and broker constructive engagements between the U.S. government and the tech sector, academia, and research.  The goal is to increase collaboration that results in identifying, exposing, and defending against foreign adversarial propaganda and disinformation."  On information and belief, "collaboration that results in … defending against … disinformation," *id.*, includes censorship of social-media speech.

398.    The Global Engagement Center publishes "Counter Disinformation Dispatches," of which the State Department states: "The Global Engagement Center's Counter Disinformation Dispatches summarize lessons learned about disinformation and how to counter it based on the experiences of frontline counter-disinformation practitioners, for the benefit of those newly engaged in this issue."

399.     The Global Engagement Center provides, as an online "counter-disinfo resource," as link to CISA's website, stating: "An agency of the Department of Homeland Security, the Cybersecurity and Infrastructure Security Agency 'is responsible for protecting the [United States'] critical infrastructure from physical and cyber threats,' including election security."

400.     The State Department has inserted itself in efforts to combat so-called Covid-19 "disinformation."  State provides an online briefing dated January 21, 2022, entitled "COVID-19 Fact Checking: What Journalists Need to Know," which "provides information about fact-checking resources available to journalists to counter COVID-19 and vaccine misinformation, and an overview of counter-misinformation efforts around the world."

401.     According to public reports, "[a]consortium of four private groups worked with the departments of Homeland Security (DHS) and State to censor massive numbers of social media posts they considered misinformation during the 2020 election, and its members then got rewarded with millions of federal dollars from the Biden administration afterwards, according to interviews and documents obtained by [reporters]."  *Outsourced censorship: Feds used private entity to target millions of social posts in 2020*, JUST THE NEWS (Sept. 30, 2022), *at* https://justthenews.com/government/federal-agencies/biden-administration-rewarded-private-entities-got-2020-election.

402.     On information and belief, the purpose and effect of this consortium of private non-profit groups is to allow federal officials at CISA and State to evade First Amendment and other legal restrictions while still operating unlawfully to censor the private election-related speech on Americans on social-media.  Its censorship operations continue to this day.  *See id.*

403.     This consortium of private entities, closely collaborating with CISA and the State Department, calls itself "The Election Integrity Partnership."  This collaborative federal-private

censorship project "is back in action again for the 2022 midterm elections, raising concerns among civil libertarians that a chilling new form of public-private partnership to evade the First Amendment's prohibition of government censorship may be expanding." *Id.*

404.     "The consortium is comprised of four member organizations: Stanford Internet Observatory (SIO), the University of Washington's Center for an Informed Public, the Atlantic Council's Digital Forensic Research Lab, and social media analytics firm Graphika." *Id.*  The consortium "set up a concierge-like service in 2020 that allowed federal agencies like Homeland's Cybersecurity Infrastructure Security Agency (CISA) and State's Global Engagement Center to file 'tickets' requesting that online story links and social media posts be censored or flagged by Big Tech." *Id.*

405.     "Three liberal groups — the Democratic National Committee, Common Cause and the NAACP — were also empowered like the federal agencies to file tickets seeking censorship of content.  A Homeland [*i.e.* DHS]-funded collaboration, the Elections Infrastructure Information Sharing and Analysis Center, also had access." *Id.*

406.     "In its own after-action report on the 2020 election, the consortium boasted it flagged more than 4,800 URLs — shared nearly 22 million times on Twitter alone — for social media platforms. Their staff worked 12-20 hour shifts from September through mid-November 2020, with 'monitoring intensifying significantly' the week before and after Election Day." *Id.* (alterations omitted).

407.     Backed by the authority of the federal government, including DHS, CISA, the State Department, and State's Global Engagement Center, the consortium successfully sought and procured extensive censorship of core political speech by private citizens: "The tickets sought

119

removal, throttling and labeling of content that raised questions about mail-in ballot integrity … and other election integrity issues of concern to conservatives." *Id.*

408.    "The consortium achieved a success rate in 2020 that would be enviable for baseball batters: Platforms took action on 35% of flagged URLs, with 21% labeled, 13% removed and 1% soft-blocked, meaning users had to reject a warning to see them." *Id.*

409.    The consortium's "[p]articipants were acutely aware that federal agencies' role in the effort" raised First Amendment concerns. "For instance, SIO's Renee DiResta said in a CISA Cybersecurity Summit video in 2021 that the operation faced 'unclear legal authorities' and 'very real First Amendment questions.'" *Id.*

410.    One free-speech advocate described the consortium as "the largest federally-sanctioned censorship operation he had ever seen, a precursor to the now-scrapped Disinformation Governance Board and one that is likely to grow in future elections." *Id.* "'If you trace the chronology, you find that there was actually 18 months' worth of institutional work to create this very apparatus that we now know played a significant role in the censorship of millions of posts for the 2020 election and has ambitious sights for 2022 and 2024,' he said." *Id.*

411.    A member of Congress "called the revelations 'stunning' and said the 2020 operation amounted to the federal government sanctioning and outsourcing censorship." *Id.*

412.    "It wasn't just blogs and individual social media users whose content was targeted for removal and throttling as 'repeat spreaders' of misinformation. News and opinion organizations, including the New York Post, Fox News, Just the News and SeanHannity.com were also targeted." *Id.*

413.    "The partnership's members published the 292-page public report in March 2021, though the most recent version is dated June 15, 2021. The launch webinar featured former CISA

Director Christopher Krebs, 'who led the effort to secure electoral infrastructure and the response to mis- and disinformation during the election period.'" *Id.*

414.     "'I think we were pretty effective in getting platforms to act on things they haven't acted on before,' both by *pressuring them to adopt specific censorship policies* and then *reporting violations*, SIO founder and former Facebook Chief Security Officer Alex Stamos told the launch webinar." *Id.* (emphasis added).  "'Platform interventions' [*i.e.*, censorship of specific posts or content] in response to 'delegitimization of election results,' for example, went from uniformly 'non-comprehensive' in August 2020 to 'comprehensive' by Election Day, the report says." *Id.*

415.     "SIO officially launched the partnership 100 days before the election, 'in consultation with CISA and other stakeholders,' the partnership report says.  It attributes the idea to SIO-funded interns at CISA, noting that censorship by that agency and domestic social media monitoring by intelligence agencies would likely be illegal." *Id.* (citing Center for an Informed Public, Digital Forensic Research Lab, Graphika, & Stanford Internet Observatory (2021), *The Long Fuse: Misinformation and the 2020 Election*. Stanford Digital Repository: Election Integrity Partnership. v1.3.0, *at* https://purl.stanford.edu/tr171zs0069 ("EIP Report")).

416.     The EIP Report's executive summary states: "Increasingly pervasive mis- and disinformation, both foreign and domestic, creates an urgent need for collaboration across government, civil society, media, and social media platforms." *Id.*

417.     The consortium was openly biased based on political viewpoint, calling President Trump "the social media Death Star."  "During the launch webinar, the Atlantic Council's Emerson Brooking said they wanted to stop the 'amplification and legitimation' of 'far-right influencers [who] would be doing all they could to try to catch the eye of a Fox News producer,' making it likely that President Trump, 'the social media Death Star,' would see their content." *Id.*

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 189 of 332 PageID #:
4473
Case 3:22-cv-01213-TAD-KDM   Document 5   Filed 11/08/22   Page 122 of 155 PageID #:
3248

418.     The consortium's work included the direct involvement of government officials in censorship decisions.  "Government entities were involved in real-time chats with the partnership and social media platforms over specific content under review."  *Id.*  For example, "[a] chat screenshot in the report shows an unidentified government partner rejecting the Sharpiegate claim that 'sharpies aren't read at all' by ballot-counting machines, and a platform provider responding that it was now reviewing those claims."  *Id.*

419.     Notably, consistent with its carrot-stick approach to private entities on social-media censorship,  the  incoming  Biden  Administration—including  the  State  Department—richly rewarded the private-sector partners in this consortium of censorship, lavishing federal largesse upon them.  "The [consortium's] partners all received federal grants from the Biden administration in the next two years."  *Id.*  "The National Science Foundation awarded the Stanford and UW projects $3 million in August 2021 'to study ways to apply collaborative, rapid-response research to mitigate online disinformation.'"  *Id.*  "UW's press release about the award noted their earlier work on the partnership and praise for the report from ex-CISA director Krebs, who called it 'the seminal report on what happened in 2020, not just the election but also through January 6.'"  *Id.* "Graphika, also known as Octant Data, received its first listed federal grant several weeks after the 2020 election: nearly $3 million from the Department of Defense for unspecified 'research on cross-platform detection to counter malign influence.' Nearly $2 million more followed in fall 2021 for 'research on co-citation network mapping,' which tracks sources that are cited together." *Id.*  "The Atlantic Council … has received $4.7 million in grants since 2021, all but one from the State Department. That far exceeds the think tank's federal haul in previous years, which hadn't approached $1 million in a single year since 2011."  *Id.*

420.     "UW's project, SIO and Graphika also collaborated on the Virality Project, which tracks and analyzes purported 'COVID-19 vaccine misinformation and social media narratives related to vaccine hesitancy.'" *Id.*

421.     The collaboration with CISA on the Election Integrity Project is not the State Department's only involvement in federal social-media censorship activities.  Documents produced so far in discovery from Defendants provide glimpses into the State Department's involvement on many fronts.

422.     For example, on February 4, 2020, Samaruddin K. Stewart, then a "Senior Advisor for the Global Engagement Center of the State Department" reached out to LinkedIn and stated that he was "tasked with building relationships with technology companies … in [Silicon Valley] with interests in countering disinformation," and asked for a meeting.  As the email indicates, Stewart intended to reach out to other social-media platforms as well.

423.     On March 9, 2020, Stewart reached out to LinkedIn again, referring back to their earlier oral meeting, and stated, "I'll send information [to LinkedIn representatives] about gaining access to Disinfo Cloud – which is a GEC [*i.e.* State Department's Global Engagement Center] funded platform that offers stakeholders an opportunity to discovery companies, technology, and tools that can assist with identifying, understanding, and addressing disinformation."  On information and belief, "addressing disinformation" includes the censorship and suppression of private speech.

424.     On July 19, 2021, Stewart organized another meeting with LinkedIn and several State Department colleagues on the topic "countering disinformation."  On information and belief, Stewart engaged in similar meetings and coordination efforts with other social-media platforms as well.

123

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 191 of 332 PageID #:
4475
Case 2:22-cv-01213-TAD-KDM   Document 5-1   Filed 11/08/22   Page 125 of 166 PageID #:
3250

425.     The State Department's Global Engagement Center has worked directly with CISA
and FBI to procure the censorship of specific content on social media.  For example, on March 25,
2020, Alex Dempsey of the State Department forwarded to an FBI agent a report about a video on
social media making ostensibly false allegations about a State Department officer.  Brian Scully
of CISA forwarded the report to Facebook personnel, stating "see the below reporting from our
State Department Global Engagement Center colleagues about disinformation … targeting a
Diplomatic Security Officer."  Facebook responded, "Have flagged for our internal teams.  As
always, we really appreciate the outreach and sharing of this information."  Scully also forwarded
the State Department's report to Twitter and Google/YouTube.  In flagging the content for Google,
Scully commented, "It does appear the FBI has been notified, so you may have already heard from
them."

426.     The State Department's Global Engagement Center, including Stewart and other
State employees, were also involved in organizing a "misinformation and disinformation"
workshop for African governments in May 2021.  Lauren Protentis of CISA and Joe Parentis,
Deputy Coordinator for the State Department's Global Engagement Center, were speakers at the
event.  The event was moderated by Elizabeth Vish of the State Department's Office of Cyber
Coordinator.  The agenda for the event included a presentation by Facebook on "How does
Facebook work with governments to address misinformation and disinformation?"  This included
"Fact checking techniques, how to identify disinformation and misinformation," and "Proven
techniques to take down these articles.  The effectiveness of fake news checkers," "Steps for
stopping already-circulating misinformation," and "International takedown requests."  On
information and belief, these statements reflected the collective experience of CISA and the State
Department in working to achieve social-media censorship of domestic speech in America.

427.     CISA officials—including Defendants Easterly, Masterson, Protentis, Hale, Scully, and Snell, among others, have aggressively embraced the role of mediators of federally-induced censorship.

428.     As noted above, CISA states that its mission includes "directly engaging with social media companies to flag MDM," and that it is "working with federal partners to mature a whole-of-government approach to mitigating risks of MDM," which includes "framing which … interventions are appropriate to the threats impacting the information environment."   CISA repeatedly and frequently flags posts for censorship on social-media platforms, and continues to do so on an ongoing basis.

429.     CISA officials have flagged for censorship even obvious parody accounts, such as accounts parodying the Colorado government that stated in their mock Twitter handles "dm us your weed store location (hoes be mad, but this is a parody account)," and "Smoke weed erry day." To such reports, Twitter responded, "We will escalate.  Thank you," and "We have actioned these account under our civic integrity policy."

430.     CISA also works closely with the Center for Internet Security ("CIS"), an outside third-party group, to flag content for censorship on social media, including election-related speech. *See* Doc. 71-8.  On information and belief, CIS is or was funded by CISA and works as a joint participant with CISA on federal social-media censorship activities.   As early as June 2020, the Center for Internet Security, working with CISA, was planning a "Reporting Portal" for government officials seeking to suppress election misinformation that would allow "social media companies" to "process reports and provide timely responses, to include the removal of reported misinformation from the platform where possible."  Doc. 71-8, at 90.  CIS and CISA work closely to remove so-called "misinformation" by flagging content for removal by social-media companies.

431.     Documents reveal that CISA's authority as a national-security agency within DHS led to prompt responses and swift censorship actions in response to CISA's actions of "flagging" posts for censorship.  *See* Doc. 71-8.  This included many posts on election integrity issues where CISA acted as *de facto* judge of the truthfulness and value of social-media speech.

432.     CISA has also flagged named Plaintiffs' speech for censorship.  For example, in a "disinformation" conference regarding the 2020 election hosted by CISA, one presenter identified the Gateway Pundit, the website hosted by Plaintiff Jim Hoft, as a "repeat spreader" of "false or misleading content about the 2020 election."  The presenter stated that the Gateway Pundit is the second most frequent spreader of election-related disinformation, just above President Trump and his two sons, Donald Jr. and Eric Trump, who were also described as "prolific spreaders of disinformation."  Other supposed "repeat spreaders" of disinformation identified at the CISA-hosted conference included Sean Hannity, Breitbart, James O'Keefe, and Mark Levin.  Gateway Pundit was called "one of the most prolific spreaders of misinformation across the entire [2020] election."  The presenter emphasized that every account identified as a spreader of disinformation was "ideologically pro-Trump" in its political orientation.  *See* Mike Benz, Foundation for Freedom Online, *DHS Encouraged Children to Report Family to Facebook for Challenging US Government Covid Claims*, at foundationforfreedomonline.com.  "In the same training session for state and local election officials, DHS's formal partner group then encouraged the mass reporting of US social media posts for censorship…." *Id.*

433.     CISA's "Protecting Critical Infrastructure from Misinformation & Disinformation Subcommittee Meeting" on March 29, 2022, included the following discussion flagging online speech by Jim Hoft's Gateway Pundit as misinformation warranting censorship: "Misinformation: A news release by Gateway Pundit provided factually inaccurate reporting announcing that

Maricopa County elections officials held an unannounced meeting at the election and tabulation center," while election officials contended that "[t]his meeting was, in fact, a publicly announced tour with members of the public and legislators from both parties."

434.    On February 17, 2022, Lauren Protentis of CISA emailed contacts at Microsoft and stated: "The Department of Treasury has asked our team for appropriate POCs [*i.e.*, points of contact] to discuss social media and influence matters.  We'd like to make a connection to Microsoft if you're amenable?  This is somewhat time-sensitive, so thanks in advance to your attention to this matter."   The email was forwarded to recent CISA alumnus, now Microsoft employee, Matthew Masterson, who exchanged the text messages with Jen Easterly quoted above. Masterson responded, "Send em to me.  I will make sure [the other Microsoft contact] is looped in."  Separately, Masterson's colleague at Microsoft responded that "Matt [Masterson] and I can be the primary POCs for the introduction."  Protentis responded, "We're going to pass your info to Treasury.  They will reach-out directly and provide more information about the nature of this request."

435.    On February 17, 2022, Protentis sent a similar email to Yoel Roth of Twitter (Nina Jankowicz's contact who was scheduled to attend the April 2022 meeting with Robert Silvers and senior DHS officials), asking for a Twitter point of contact for Treasury to "discuss social media and influence matters."  After Roth responded, Protentis stated that "Treasury … will reach-out directly to begin the dialogue and provide more information about the nature of this request."

436.    On February 17, 2022, Protentis reached out to a contact at Google, asking that "[t]he Department of Treasury has asked our team for appropriate POCs to discuss social media and influence matters.  We'd like to make the connection to Google if you're amenable?"  Protentis followed up just over an hour later, stating, "Apologies for the second email, this is somewhat

time-sensitive, so thank you for your prompt attention to this request!"  When the Google contact responded, Protentis replied, "We're going to pass your info to Treasury.  They will reach-out directly and provide more information about the nature of this request."

437.　　On February 17, 2022, Protentis reached out to contacts at Meta/Facebook and stated, "The Deputy Secretary at Treasury [*i.e.*, Defendant Wally Adeyemo] would like to be connected to industry partners to discuss potential influence operations on social media.  We'd like to make the connection to Meta if you're amenable?"  On information and belief, the nearly identically-phrased inquiries to Twitter and Microsoft that Protentis sent on the same day were also sent at Adeyemo's request.

438.　　On information and belief, these messages reflect the participation of Treasury and Adeyemo in federal censorship activities.

439.　　In response to a third-party subpoena, counsel for Meta identified the EAC's Executive Director Mark Robbins and the EAC's Communications Director Kristen Muthig as officials who may "have communicated with Meta regarding content moderation between January 1, 2020 and July 19, 2022 as it relates to: (i) COVID-19 misinformation; (ii) the Department of Homeland Security's proposed Disinformation Governance Board; (iii) the New York Post story from October 14, 2020 about Hunter Biden's laptop computer; and/or (iv) election security, integrity, outcomes, and/or public confidence in election outcomes (not to include issues of foreign interference or related issues)."

440.　　The EIP Report, discussed above, identifies the Election Assistance Commission as a federal agency working on social-media content issues alongside CISA, identified as "the lead on domestic vulnerabilities and coordination with state and local election officials."  The same paragraph states: "The Election Assistance Commission should remain in an amplifying role,

pushing best practices and critical information out broadly to the election community."  EIP Report, at 235.  On information and belief, the EAC's "critical information" that is "push[ed] … out broadly" includes federally induced censorship and/or suppression of social-media speech on the basis of content and viewpoint.

441.      In response to a third-party subpoena, Meta has identified Public Affairs Specialist Valerie Thorpe of the FDA; Michael Murray, who is the Acquisition Strategy for the Office of Health Communications and Education at the FDA; Brad Kimberly, who is the Director, Social Media at the FDA; and Erica Jefferson, Associate Commissioner for External Affairs at the FDA, as officials who may "have communicated with Meta regarding content moderation between January 1, 2020 and July 19, 2022 as it relates to: (i) COVID-19 misinformation; (ii) the Department of Homeland Security's proposed Disinformation Governance Board; (iii) the New York Post story from October 14, 2020 about Hunter Biden's laptop computer; and/or (iv) election security, integrity, outcomes, and/or public confidence in election outcomes (not to include issues of foreign interference or related issues)."

442.      On information and belief, the FDA has participated in federally-induced censorship of private speech on social media about questions of vaccine safety and efficacy, among other subjects.

443.      Pursuant to third-party subpoena, YouTube has identified Census officials Schwartz, Molina-Irizarry, Galemore—as well as Deloitte employees/Census contractors Michael Jaret Saewitz and Caroline Faught—as involved in communications with YouTube about misinformation and content modulation of speech on YouTube.

444.      Census Bureau officials have openly stated that they are working with social-media companies to suppress so-called misinformation and disinformation.  For example, in 2020,

Census boasted that Census "has established the government's first ever Trust & Safety Team" in order to "prevent the spread of fake, false and inaccurate information that can negatively influence 2020 Census participation and response." *Census Partners with Social-Media Platforms, Community Organizations, the Public to Stop Spread of False Information*, at https://www.census.gov/library/stories/2020/02/putting-2020-census-rumors-to-rest.html (Feb. 10, 2020). "Trust & Safety Team" is what social-media platforms like Twitter call their censorship teams.

445.    Evidently, "preventing the spread of fake, false and inaccurate information" includes federally-induced censorship of free speech on social media. Census states that it is "[w]orking with social media platforms such as Facebook, Microsoft, Nextdoor, Google, and Pinterest to update their policies and terms of service to include census-specific activities," and "[c]oordinating with YouTube and Twitter to create processes enabling us to quickly identify and respond to misinformation and disinformation." *Id.* On information and belief, these activities include government-induced censorship of social-media speech. Census states: "These partnerships will help the Census Bureau counter false information that can lead to an undercount by quickly identifying phony information and respond with factual content."

446.    In addition, Census invites private citizens to report suspected false information to the Census Bureau so that Census can arrange for it to be censored. Census directs the public to: "Report inaccurate, suspicious or fraudulent information to the Census Bureau. If you see or hear something, tell us: Report suspicious information and tips to rumors@census.gov. Reach out to us on our verified social media accounts (@USCensusBureau) to ask questions and flag suspicious information. Call the Census Bureau Customer Service Hotline at 1-800-923-8282 to report suspicious activity." *Id.*

447.     As noted above, it is evident that Census responds to such reports by seeking to censor speech and content that it disfavors.   Among other things, YouTube has disclosed that Census officials have been granted "trusted flagger" status to flag content for censorship on social media and receive privileged, expedited treatment for such reports.

448.     Defendant Schwartz was the "operations manager for the Trust & Safety Team and deputy division chief for the Center for New Media and Promotion at the Census Bureau," who authored this report instructing the public to flag disinformation directly to Census.

449.     "Trust & Safety Team" is a euphemism for the authorities within social-media platforms who are in charge of censoring and suppressing disfavored speech, speakers, and content.   Census's creation of a like-named "Trust & Safety Team" was the creation of a federal censorship agency within Census.

450.     On its website, Census boasts that "the U.S. Census Bureau's Trust & Safety Team protected the 2020 Census from misinformation and disinformation."   Census Bureau, Trust & Safety Team, *at* https://www.census.gov/about/trust-and-safety.html.   This page notes that the "Trust & Safety Team's" censorship work continues today across expanded fronts: "We continue to watch for misinformation being shared online, and we work to share facts instead to help support communications around the Census Bureau's commitment to data quality and transparency around these efforts. The team's role has expanded to also support the American Community Survey (ACS), the Economic Census, and other Census Bureau programs and data products."   *Id.*   The same page continues to instruct the public to report so-called "misinformation" to Census for censorship: "Help the Census Bureau's Trust & Safety team by reporting inaccurate, suspicious, or fraudulent information you read, hear, or spot online, including: A rumor in a message board or group claiming the information you provided to the Census Bureau will be publicly disclosed….

An advertisement on social media sharing fake 2020 Census websites and inaccurate information. No matter what you find, let the Census Bureau know by contacting rumors@census.gov." *Id.*

451.     The Trust & Safety Team openly states that it coordinates with social-media platforms to censor speech: "Trust & Safety Team coordinates and integrates our efforts with external technology and social media platforms, partner and stakeholder organizations, and cybersecurity officials…. Leveraging best practices from the public and private sectors, the Trust & Safety Team monitors all available channels and open platforms for misinformation and disinformation about the census. Monitoring allows us to respond quickly to combat potential threats to achieving an accurate count in traditional media, social media and other stakeholder communications. As we discover misinformation and disinformation, the team *will coordinate the responses with partners and stakeholders*." https://www.census.gov/newsroom/blogs/random-samplings/2019/12/why_the_census_burea.html. "Coordinating the responses with partners and stakeholders," evidently, means working with social-media platforms to censor speech.

452.     In other Census publications, Schwartz and other Census officials claim that they are "harnessing the capabilities of social media platforms such as Facebook, Twitter, YouTube and Instagram … enables the Census Bureau to identify and respond to misinformation swiftly before it spreads." https://www.census.gov/library/stories/2019/07/hey-siri-why-is-2020-census-important.html. "The U.S. Census Bureau is partnering with tech giants to … respond to disinformation before it spreads." https://www.census.gov/library/spotlights/2020/tech.html.

453.     Census also states that it has "partner[ed] with search engines" such as Google to de-boost disfavored content and promote Census-favored content above government-disfavored private content. https://www.census.gov/library/spotlights/2020/nextdoor.html.

132

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 200 of 332 PageID #:
4484
Case 3:22-cv-01213-TAD-KDM   Document 51   Filed 10/20/22   Page 135 of 164 PageID #:
3259

454.     Public reports indicate that Census teamed up with "Data & Society's Disinformation Action Lab" at the "Center for an Informed Public" at the University of Washington in a "behind-the-scenes networked response to mis- and disinformation about the 2020 U.S. Census, an effort that provides a model for future multi-stakeholder collaborations to mitigate the impacts of communication harms." https://www.cip.uw.edu/2022/05/31/disinformation-action-lab-data-society-census-misinformation/.

455.     Center for an Informed Public's director is Kate Starbird, who also serves on CISA's advisory committee that advises CISA's social-media censorship activities.  According to CIP, "Beyond the Census Counts Campaign, DAL supported other national civil rights groups, local civil society groups, state and city government officials, and worked with *social media companies*, journalists, and *the Census Bureau itself* — all to protect a complete and fair count from mis- and disinformation."  *Id.* (emphasis added).

456.     As alleged further herein, Census officials also participate in censorship activities relating to so-called COVID-19 misinformation

457.     On information and belief, as further alleged herein, all Defendants have been and are engaged in federally-induced censorship of private speech on social media, in a manner that directly interferes with and injures the free-speech rights of Plaintiffs and their citizens.

**E.  Defendants' Conduct Has Inflicted and Continues to Inflict Grave Injuries on Plaintiffs, Missourians, Louisianans, and all Americans.**

458.     Defendants' conduct, as alleged herein, has inflicted and continues to inflict grave, ongoing injuries on Plaintiffs, Missourians and Louisianans, and all Americans.  Many of these injuries are detailed in the previously filed Declarations submitted in support of the States' Motion

for Preliminary Injunction, ECF Nos. 10-2 to 10-15, which are attached to the First Amended Complaint as Exhibits B to O, and incorporated by reference herein.

### 1. Ongoing injuries inflicted on Plaintiff States.

459.     First, the Defendants' conduct has inflicted and continues to inflict at least eight forms of imminent, continuing, irreparable injury on the Plaintiff States, Missouri and Louisiana.

460.     *First*, both Missouri and Louisiana have adopted fundamental policies favoring the freedom of speech, including on social media.  Missouri's Constitution provides: "[N]o law shall be passed impairing the freedom of speech, no matter by what means communicated… [E]very person shall be free to say, write or publish, or otherwise communicate whatever he will on any subject…."  Mo. Const. art. I, § 8.  Louisiana's Constitution provides: "No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom."  La. Const. art. I, § 7. The federal censorship program directly undermines Missouri's and Louisiana's fundamental policies favoring the freedom of speech, and thus it inflicts a clear and direct injury on the States' sovereignty.  *See Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015).

461.     *Second*, the States and their agencies and political subdivisions have suffered government-induced online censorship directly.   For example, Louisiana's Department of Justice—the office of its Attorney General—was directly censored on YouTube for posting video footage of Louisianans criticizing mask mandates and COVID-19 lockdown measures on August 18, 2021—just after the federal Defendants' most vociferous calls for censorship of COVID "misinformation."  Bosch Decl. ¶ 7.  A Louisiana state legislator was censored by Facebook when he posted content addressing vaccinating children against COVID-19.  Bosch Decl. ¶ 9. St. Louis County, a political subdivision of Missouri, conducted public meetings regarding proposed

county-wide mask mandates, at which some citizens made public comments opposing mask mandates. Flesh Decl. ¶ 7. YouTube censored the entire videos of four public meetings, removing the content, because some citizens publicly expressed views that masks are ineffective. *Id.*

462.    *Third*, State agencies—such as the Offices of the States' Attorneys General—closely track and rely on free speech on social media to understand their citizens' true thoughts and concerns. *See, e.g.,* Flesch Decl. ¶ 4 ("I monitor these trends on a daily or even hourly basis…"); Bosch Decl. ¶ 6. This allows them to craft messages and public policies that are actually responsive to their citizens' concerns. Flesch Decl. ¶ 5; Bosch Decl. ¶¶ 4-6. Censorship of social-media speech directly interferes with this critical state interest, because it "directly interferes with [our] ability to follow, measure, and understand the nature and degree of [constituents'] concerns." Flesh Decl. ¶ 6.

463.    *Fourth*, social-media censorship thwarts the States' ability to provide free, fair, and open political processes that allow citizens to petition their government and advocate for policy changes. Social-media censorship has perverted state and local political processes by artificially restricting access to the channels of advocacy to one side of various issues. For example, social-media censorship prevented Louisiana advocacy groups from organizing effectively to advocate in favor of legislative action on issues of great public import. Hines Decl. ¶¶ 13-14. Likewise, social-media censorship prevented a Missouri parent from circulating an online petition to advocate against mandatory masking at his local school district, a political subdivision of the State. McCollum Decl. ¶¶ 9-17; Gulmire Decl. ¶¶ 11-16, 18-19. Such censorship—which directly interferes with citizens' ability to petition their government—thwarts the States' interest in providing fair and open processes to petition state officials.

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 203 of 332 PageID #:
4487
Case 2:22-cv-01213-TAD-KDM   Document 5-2 Filed 11/05/22   Page 136 of 164 PageID #:
3262

464.      *Fifth*, federally induced social-media censorship directly affects Missouri, because it has resulted in the extensive censorship of Plaintiff Dr. Bhattacharya, who serves as an expert witness for Missouri in a series of lawsuits challenging mask and vaccine mandates.  *See* Bhattacharya Decl. ¶ 4.  Censorship of Dr. Bhattacharya reduces the message and impact of Missouri's own retained expert witness.  *See id.* ¶¶ 17-32.  Likewise, the Missouri Attorney General's Office relied heavily on the high-quality German survey study of 26,000 schoolchildren, finding that 68 percent reported harms from masking in school, in its lawsuits challenging school mask mandates.  That study was censored on social media as a result of Defendants' campaign, and Missouri was lucky to find it because it is in German and not cited on social media.  "Because online censorship acts as a prior restraint on speech," Missouri "will never know exactly how much speech … on social media never reaches [our] eyes because it is censored in advance, or as soon as it is posted."  Flesch Decl. ¶ 11.

465.      *Sixth*, Missouri and Louisiana have a quasi-sovereign interest in protecting the free-speech rights of "a sufficiently substantial segment of its population," and preventing *ultra vires* actions against those rights.  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982).  This falls within Missouri's and Louisiana's "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general."  *Id.*  This injury "suffices to give the State standing to sue as *parens patriae*" because "the injury" to Missourians' and Louisianans' free-speech and free-expression rights "is one that the State[s] … would likely attempt to address through [their] sovereign lawmaking powers."  *Id.* at 607.  Indeed, they have done so.  *See, e.g.,* MO. CONST., art. I, § 8; LA. CONST., art. I, § 7.

466.      *Seventh*, Missouri and Louisiana "ha[ve] an interest in securing observance of the terms under which [they] participate[] in the federal system."  *Alfred L. Snapp*, 458 U.S. at 607–

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 204 of 332 PageID #:
4488
Case 3:22-cv-01213-TAD-KDM   Document 58 Filed 10/20/22   Page 135 of 164 PageID #:
3263

08.  This means bringing suit to "ensur[e] that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system." *Id.* at 608.  Free-speech rights, and protection from *ultra vires* actions destroying them, are foremost among the "benefits that are to flow from participation in the federal system." *Id.*  Missouri and Louisiana "have an interest, independent of the benefits that might accrue to any particular individual, in assuring that the benefits of the federal system are not denied to its general population." *Id.*

467.   *Eighth*, Missouri and Louisiana have a unique interest in advancing, protecting, and vindicating the rights of their citizens who are listeners, readers, and audiences of social-media speech.  As noted above, the First Amendment protects the rights of the speakers' audiences, such as listeners and readers, to have access to protected speech.  *See, e.g., Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982).  As a result of Defendants' censorship, the States' many citizens, as readers and followers of social-media speech, suffer an injury that is individually too diffuse to warrant filing their own lawsuits, yet the injury is all the greater because it is spread among millions of readers.  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963) (holding that, where one plaintiff "is not likely to sustain sufficient … injury to induce him to seek judicial vindication of his [First Amendment] rights," a plaintiff with a greater stake may assert them, lest "infringements of freedom of the press may too often go unremedied").  The States have a "close relationship" with their citizens, as readers and listeners of social-media speech, because they are specifically authorized by state law to vindicate those rights.  And there is a "hindrance" to their citizens' asserting their own rights, because each individual injury is too diffuse to warrant litigation.  *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); *Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956-57 (1984).

137

468.     All these injuries to the State Plaintiffs and their citizens are continuing and ongoing, and they constitute irreparable harm.

**2.  Ongoing injuries inflicted on the private Plaintiffs and their social-media followings.**

469.     The private Plaintiffs Bhattacharya, Hines, Hoft, Kheriaty, and Kulldorff, and their social-media audiences and/or potential social-media audiences (*i.e.*, the larger audiences who would hear them if they were not censored)—who include thousands or millions of Missourians and Louisianans—have suffered and are suffering grave and ongoing injuries as well.  Identical injuries afflict many similarly situated speakers and audiences who have been affected by the government-induced censorship procured by Defendants as well.

470.     Government-induced online censorship affects the private Plaintiffs and enormous segments of Missouri's and Louisiana's populations.  The censorship affects speakers with all sizes of audiences—from small groups of concerned parents seeking to share concerns on neighborhood networking sites, Flesch Decl. ¶ 9; to social-media titans, such as Plaintiff Jim Hoft, who is one of the most influential online voices in the country, with over a million social-media followers, Hoft Decl. ¶¶ 2-3.  Censorship affects some of the most highly credentialed physicians in the world, speaking on matters of core competence, such as Plaintiffs Bhattacharya, Kulldroff, and Kheriaty, scientists and medical professors at Stanford, Harvard, and the University of California.  *See* Bhattacharya Decl. ¶¶ 2-5; Kulldorff Decl. ¶¶ 2-6; Kheriaty Decl. ¶¶ 2-5.

471.     This censorship encompasses social-media accounts with hundreds of thousands of followers, including the private Plaintiffs' accounts, which include many thousands of followers in Missouri and Louisiana.  *See* Hoft Decl. ¶ 3 (Missouri-based speaker with 400,000 Twitter followers, 650,000 Facebook followers, 98,000 YouTube subscribers, 205,000 Instagram followers); Kulldorff Decl. ¶ 7 ("250,800 followers on Twitter and 13,400 contacts and followers

on LinkedIn"); Kheriaty Decl. ¶ 3 (158,000 Twitter followers, even though artificially capped by

Twitter); Allen Decl. ¶ 15 (the entire YouTube channel of a conservative talk-radio station based

in Missouri); Changizi Decl. ¶ 7 (37,000 Twitter followers); Senger Decl. ¶ 3 (112,000 Twitter

followers); Kotzin Decl. ¶¶ 3-4 (31,900 followers); Kitchen Decl. ¶ 32 (over 44,000 Twitter

followers).  These declarants provide only a representative slice of the enormous suppressions

inflicted by Defendants' conduct on countless similarly situated speakers and audiences, including

in Missouri and Louisiana.  *See, e.g.,* Bhattacharya Decl. ¶ 31.

472.     Defendants' censorship squelches Plaintiffs' core political speech on matters of

great public concern.  This includes speech relating to COVID-19 policies—especially speech

criticizing the government's response to COVID-19.  *See, e.g.,* Hoft Decl. ¶¶ 6, 12; Bhattacharya

Decl. ¶¶ 15-31; Kulldorff Decl. ¶¶ 14-30; Kheriaty Decl. ¶¶ 16-17; Hines Decl. ¶¶ 7-14.  It also

extends to speech about election security and integrity, including core political speech.  *See, e.g.*,

Hoft Decl. ¶¶ 7-8, 14; Allen Decl. ¶ 14-15; Flesh Decl. ¶ 8.  And the censorship targets speech

simply because it is critical of the President of the United States.  *See, e.g.,* Hoft Decl. ¶ 10.

473.     Government-induced censorship of Plaintiffs' and others' speech is achieved

through a wide variety of methods, ranging from complete bans, temporary bans, insidious

"shadow bans" (where neither the user nor his audience is notified of the suppression), deboosting,

de-platforming, de-monetizing, restricting access to content, imposing warning labels that require

click-through to access content, and many other ways.  These include temporary and permanent

suspensions of many speakers.  *See, e.g.,* Hoft Decl. ¶¶ 6-8; Kheriaty Decl. ¶ 16; Bhattacharya

Decl. ¶ 16; Changizi Decl. ¶¶ 18-23; Allen Decl. ¶ 15; *see also* Bhattacharya Decl. ¶ 31 ("Twitter,

LinkedIn, YouTube, Facebook, they have permanently suspended many accounts—including

scientists.").  It includes suppressing specific content, such as removing or blocking social-media

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 207 of 332 PageID #:
4491
Case 3:22-cv-01213-TAD-KDM   Document 71-1   Filed 10/20/22   Page 145 of 164 PageID #:
3266

posts and videos.  *See, e.g.,* Hoft Decl. ¶ 14; Bhattacharya Decl. ¶¶ 17-18; Changizi Decl. ¶ 36.  It

includes demonetization by technology firms, *see* Hoft Decl. ¶ 19, and deboosting search results

to bury the most relevant results, Bhattacharya Decl. ¶ 16.  It includes suppressing posts in news

feeds, and imposing advisory labels and "sensitive content" labels, making it more difficult to

access specific content.  *See, e.g.,* Hoft Decl. ¶ 13; Changizi Decl. ¶ 27-28.  It includes insidious

methods of censorship like surreptitious de-boosting and "shadow-banning," where the censor

does not notify the speaker or the audience of the censorship.  Many speakers discover through

circumstantial methods that they have been shadow-banned.  *See, e.g.,* Kheriaty Decl. ¶¶ 14-15.  It

includes indirect methods of shadow-banning such as artificially limiting the number of followers

of a disfavored account.   Kheriaty Decl. ¶¶ 12-13; Changizi Decl. ¶ 31.  All these forms of

censorship directly impact Plaintiffs and their social-media audiences, and they continue to do so.

474.     Such censorship has compounded effects on the freedom of expression, creating

massive distortions in the free marketplace of ideas.  As noted above, much speech is suppressed

in secret, so the speakers and audience never know whether or how much speech was silenced.

*See, e.g.,* Kheriaty Decl. ¶¶ 14-15.  Censorship of the principal speaker, moreover, deters other

speakers from re-tweeting, re-posting, or "amplifying" the content, which suppresses even more

speech and further artificially reduces the speakers' audience.   *See* Hoft Decl. ¶ 15.   And,

perniciously, censorship commonly leads to self-censorship, as online speakers carefully restrict

what they say to avoid the (often financially catastrophic) consequences of a suspension or ban.

*See, e.g.,* Hoft Decl. ¶ 16; Bhattacharya Decl. ¶ 31; Kheriaty Decl. ¶ 16.

475.     Like the injuries to the State Plaintiffs and their citizens, these injuries to the private

Plaintiffs and their audiences are imminent and ongoing, and they constitute irreparable harm.

**3.     Defendants' conduct has directly caused Plaintiffs' injuries.**

476.     For the reasons alleged in greater detail herein, Defendants' conduct has directly caused and continues to directly cause Plaintiffs' injuries.  By their campaign of threats, coordination, and collusion, Defendants have successfully induced social-media platforms to impose acts of censorship that have directly injured all Plaintiffs and their audiences.  These are acts of censorship that the social-media companies, but for Defendants' unlawful conduct, otherwise would not have imposed.

477.     Overwhelming evidence supports the conclusion that Defendants have caused Plaintiffs' injuries, alleged above, by inducing social-media platforms to engage in increased censorship.  As the allegations herein emphasize, there is powerful support for the conclusion of direct causation between Defendants' conduct and Plaintiffs' free-speech injuries.  This evidence includes, but is not limited to, the following:

478.     *First*, as alleged above, in the absence of Defendants' campaign for social-media censorship, market forces and other incentives would have and did restrain social-media platforms from engaging in the social-media censorship alleged herein.  Notably, as noted above, prior to Defendants' campaign of threats and pressure, social-media platforms generally declined to engage in the acts of censorship alleged herein.

479.     *Second*, as alleged above, the campaign of threats of adverse legal consequences from Defendants and their political allies—directly linked to demands for greater censorship—are *highly motivating* to social-media platforms, because they address matters of great import and potential legal vulnerability, such as Section 230 immunity and the prospect of antitrust enforcement.  These threats became even more motivating at the beginning of 2021, when Defendants and their allies took control of the Executive Branch, with all its powerful agencies, and both Houses of Congress, indicating that they had the ability to carry out their threats.  By

responding to these threats, social-media platforms are merely "reacting in predictable ways," and their greatly increased censorship is merely "the predictable effect of Government action on the decisions of third parties." *Department of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).

480.     *Third*, the *timing* of many censorship decisions—coming immediately after Defendants' demands for increased censorship—strongly supports the conclusion that Defendants' conduct has *caused* the censorship of free speech on social media.  As alleged further herein, there are many examples of censorship crack-downs by social-media platforms that immediately followed demands for censorship from federal officials, including Defendants.  These include, but are not limited to, (1) the *en masse* deplatforming of the "Disinformation Dozen" after Jen Psaki publicly demanded it; (2) the censorship of the Great Barrington Declaration and Plaintiffs Bhattacharya and Kulldorff just after a senior HHS official called for a "quick and devastating … take-down" of the Declaration, Bhattacharya Decl. ¶¶ 6, 14; *id.* ¶¶ 15-31; and (3) Twitter's deplatforming of Alex Berenson just after the President stated, "They're killing people" and Dr. Fauci publicly singled out Berenson; among many others.

481.     *Fourth*, Defendants have openly admitted that they and other federal officials are directly involved in specific censorship decisions by social-media platforms.   Among other examples, Jen Psaki publicly admits that "we're flagging problematic posts for Facebook" and that "they certainly understand what our asks are."  Secretary Mayorkas states that "we're working together … with the tech companies that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring," and that this collaboration is happening "across the federal enterprise."  Easterly states that she works directly "with our partners in the private sector and throughout the rest of the government and at the

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 210 of 332 PageID #:
4494
Case 3:22-cv-01213-TAD-KDM   Document 56-1   Filed 11/08/22   Page 145 of 164 PageID #:
3269

department to continue to ensure that the American people have the facts that they need to help protect our critical infrastructure." CISA openly states that its "MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms." And so forth.

482.     *Fifth*, social-media platforms openly admit that they consult with and rely on government officials to identify what content to censor. For example, Facebook's "COVID and Vaccine Policy Updates and Protections" states that Facebook does "not allow false claims about the vaccines or vaccination programs which *public health experts have advised us* could lead to COVID-19 vaccine rejection." (emphasis added). As noted above, "[a] Facebook spokesperson said the company has *partnered with government experts*, health authorities and researchers to take 'aggressive action against misinformation about COVID-19 and vaccines to protect public health.'" Twitter, likewise, admits that it coordinates with government officials in identifying what to censor. For example, its "Civic integrity policy" states that Twitter "will label or remove false or misleading information intended to undermine public confidence in an election or other civic process" and that it "work[s] with select government and civil society partners in these countries to provide additional channels for reporting and expedited review" of so-called "misinformation." Twitter's "COVID-19 misleading information policy" states that it "primarily enforce[s] this policy in close coordination with trusted partners, including public health authorities, NGOs and *governments*, and continue[s] to use and consult with information from those sources when reviewing content." Similarly, YouTube's "COVID-19 medical misinformation policy" states that "YouTube doesn't allow content that spreads medical misinformation that contradicts local health authorities' or the World Health Organization's medical information about COVID-19. … YouTube's policies on COVID-19 are subject to change in response to changes to global or local health authorities' guidance on the virus."

143

483.     *Sixth*, the *content* of the censorship decisions evidences Defendants' direct influence on censorship, because those decisions focus on the areas of concern for Defendants and uniformly favor Defendants' preferred narratives.  For example, Dr. Kheriaty notes that "[t]he pattern of content censored on these social media platforms mirrors closely the CDC and Biden administration policies…. [A]ny content that challenges those federal policies is subject to severe censorship, without explanation, on Twitter and YouTube—even when the information shared is taken straight from peer-reviewed scientific literature."  Kheriaty Decl. ¶ 18.  Regarding shadow-banning in particular, he observes that "[t]he posts most subject to this were those that challenged the federal government's preferred covid policies."  Kheriaty Decl. ¶ 15.  Likewise, the censorship of social-media speech about COVID-19 and election security directly reflects the calls for censorship from federal officials.  Hoft Decl. ¶¶ 4, 16.  Censorship of Hoft's speech has focused on topics specifically targeted for censorship by DHS as "domestic terrorism," including in its National Terrorism Advisory System Bulletin from February 7, 2022.  Hoft Decl. ¶ 20; *id.* Ex. 7, at 1.  Further, this censorship is heavily *one-sided* in the government's favor—"Twitter notoriously suspends only those who question the wisdom and efficacy of government restrictions, or who cast doubt on the safety or efficacy of the vaccines," but "there are no examples of Twitter suspending individuals who have spread misinformation from the other side—by, for example, exaggerating the efficacy of masks or the threat the virus poses to children."  Changizi Decl. ¶¶ 50-51; *see also* Kotzin Decl. ¶ 33.  As Dr. Bhattacharya notes, "Having observed and lived through the government-driven censorship of the Great Barrington Declaration and its co-authors, it is clear to me that these attacks were politically driven by government actors."  Bhattacharya Decl. ¶ 32.

484.     *Seventh*, the revelation of recent internal documents—such as the DGB whistleblower documents, and the CDC emails released last week—demonstrate beyond any

possible doubt that Defendants are *directly involved* in and are *directing* social-media censorship decisions, both by identifying high-level topics of censorship and by identifying specific posts and types of postings for censorship.  CDC and Census Bureau officials demonstrate that this direct, collusive involvement of federal officials in specific and general censorship decisions happens on a wide scale, and the DGB documents quoted above indicate that such "MDM"-censorship activities are occurring "across the federal enterprise."  The documents revealed in discovery and filed with the Court reflect the same practices among all other Defendants, as alleged further herein.

485.      For all these reasons, among others, it is perfectly clear that Defendants' conduct has *caused* the general and specific censorship policies and decisions alleged herein.

486.      For similar reasons, an order and judgment from this Court preventing the continuation of Defendants' conduct will redress Plaintiffs' ongoing injuries.  Defendants' conduct has caused social-media platforms to engage in the censorship decisions that have injured Plaintiffs, and an order ceasing Defendants' conduct will alleviate those injuries.

487.      Defendants are continuing, and are likely to continue, to engage in the unlawful conduct alleged herein.

## CLAIMS FOR RELIEF

### COUNT ONE – VIOLATION OF THE FIRST AMENDMENT
### Against All Defendants

488.      All foregoing Paragraphs are incorporated as if set forth fully herein.

489.      The First Amendment prohibits Congress from making laws "abridging the freedom of speech."  U.S. CONST. amend. I.  This prohibition applies to restrictions on speech by all branches of the federal government.  *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017).

490.     The Constitutions of Missouri, Louisiana, and every other State provide similar or more robust protection for free-speech rights.

491.     An enormous amount of speech and expression occurs of social media. Social-media platforms have become, in many ways, "the modern public square." *Packingham*, 137 S. Ct. at 1737. Social media platforms provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id.* They also permit private citizens to interact directly with public and elected officials.

492.     Social-media platforms are akin to common carriers and/or public accommodations that, under longstanding statutory and common-law doctrines, should be subject to non-discrimination rules in accessing their platforms, which discrimination on the basis of content and viewpoint would violate.

493.     "Historically, at least two legal doctrines limited a company's right to exclude." *Knight First Amendment Institute*, 141 S. Ct. at 1222 (Thomas, J., concurring). "First, our legal system and its British predecessor have long subjected certain businesses, known as common carriers, to special regulations, including a general requirement to serve all comers." *Id.* "Second, governments have limited a company's right to exclude when that company is a public accommodation. This concept—related to common-carrier law—applies to companies that hold themselves out to the public but do not 'carry' freight, passengers, or communications." *Id.* Absent the artificial immunity created by the overbroad interpretations of Section 230 immunity, these legal doctrines—along with private and free-market forces—would impose a powerful check on content- and viewpoint-based discrimination by social-media platforms. *See id.*

494.     As alleged further herein, through Section 230 immunity and other actions, the federal government has abrogated these legal restraints on social-media censorship; it has

artificially subsidized, encouraged, and enabled the emergence of a small group of immensely powerful social-media companies; and it has conferred on that cartel powerful legal shields protecting its ability to censor and suppress speech on social media based on content and viewpoint with impunity.

495.    As alleged further herein, Defendants have coerced, threatened, and pressured social-media platforms to censor disfavored speakers and viewpoints by using threats of adverse government action, including threats of increased regulation, antitrust enforcement or legislation, and repeal or amendment of Section 230 CDA immunity, among others.

496.    As alleged further herein, Defendants also hold out the "carrot" of continued protection under Section 230 and antitrust law, and thus preserving the legally favored status of social-media platforms.  Commentators have aptly summarized this carrot-stick dynamic: "Section 230 is the carrot, and there's also a stick: Congressional Democrats have repeatedly made explicit threats to social-media giants if they failed to censor speech those lawmakers disfavored."  Vivek Ramaswamy and Jed Rubenfeld, *Save the Constitution from Big Tech: Congressional threats and inducements make Twitter and Facebook censorship a free-speech violation*, WALL STREET JOURNAL (Jan. 11, 2021).   "Facebook and Twitter probably wouldn't have become behemoths without Section 230."  *Id.*  "Either Section 230 or congressional pressure alone might be sufficient to create state action. The combination surely is."  *Id.*

497.    As alleged further herein, as a result of such threats and inducements, Defendants are now directly colluding with social-media platforms to censor disfavored speakers and viewpoints, including by pressuring them to censor certain content and speakers, and "flagging" disfavored content and speakers for censorship.  Defendants have thus engaged in joint action with private parties and acted in concert with private parties to deprive Plaintiffs, Missourians,

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 215 of 332 PageID #:
4499
Case 3:22-cv-01213-TAD-KDM   Document 54   Filed 11/08/22   Page 145 of 164 PageID #:
3274

Louisianans, and Americans of their constitutional rights under the First Amendment and related state-law rights.

498.     Defendants' actions constitute government action for at least five independently sufficient reasons: (1) absent federal intervention, common-law and statutory doctrines, as well as voluntary conduct and natural free-market forces, would have restrained the emergence of censorship and suppression of speech of disfavored speakers, content, and viewpoint on social media; and yet (2) through Section 230 of the CDA and other actions, the federal government subsidized, fostered, encouraged, and empowered the creation of a small number of massive social-media companies with disproportionate ability to censor and suppress speech on the basis of speaker, content, and viewpoint; (3) such inducements as Section 230 and other legal benefits (such as the absence of antitrust enforcement) constitute an immensely valuable benefit to social-media platforms to do the bidding of federal government officials; (4) federal officials—including, most notably, Defendants herein—have repeatedly and aggressively threatened to remove these legal benefits and impose other adverse consequences on social-media platforms if they do not increase censorship and suppression of disfavored speakers, content, and viewpoints; and (5) Defendants herein, conspiring and colluding both with each other and social-media firms, have directly coordinated with social-media platforms to identify disfavored speakers, viewpoints, and content and have procured the actual censorship and suppression of them on social media.  These factors, considered either individually or collectively, establish that the social-media censorship alleged herein constitutes government action.  These actions have dramatically impacted the fundamental right of free speech in Missouri, Louisiana, and America, both on social media and elsewhere.

499.     As alleged herein, Defendants have acted in concert both with each other, and with others, to violate the First Amendment and state-level free speech rights.

500.     Defendants' actions violate the First Amendment and analogous state constitutional protections.  The First Amendment is violated where, as here, "if the government coerces or induces it to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint." *Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring).  "The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly." *Id.*

501.     The censorship and suppression of speech that Defendants have induced social-media platforms to impose on disfavored speakers, content, and viewpoints constitute forms of prior restraints on speech, which are the most severe restrictions and the most difficult to justify under the First Amendment.  "One obvious implication of" the First Amendment's text "is that the government usually may not impose prior restraints on speech." *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022).

502.     These actions have injured and continue to injure Plaintiffs, as well as Missouri's, Louisiana's, and other States' citizens, both speakers and users of social media, and they have injured Missourians, Louisianans, and Americans who do not use social media by their predictable effect on the availability of information through social-media users, who often repeat or communicate information presented on social media to non-users.

503.     These actions have also injured and continue to injure Plaintiffs, as well as Missouri's, Louisiana's, and other States' citizens, by broadly chilling the exercise of free-speech rights on social-media platforms.  This injures the First Amendment and state-level rights of all

citizens, both users and non-users of social media, by reducing the availability of free speech in a free marketplace of ideas. Much social-media speech is available to non-users of social media on the internet, and social-media users convey speech and information learned on social media platforms to non-users of social media through many other means. Suppressing speech on social media, therefore, directly impacts the First Amendment rights of non-social media users, as well as users.

504.     Defendants' interference with First Amendment and state free-speech rights of Plaintiffs and virtually all Missourians, Louisianans, and Americans is *per se* unconstitutional, and even if not, it cannot be justified under any level of constitutional scrutiny.

505.     Defendants' interference with First Amendment rights of Plaintiffs and virtually all Missourians and Louisianans also interferes with rights that the States guaranteed to them under their respective state constitutions. Defendants' interference thus undermines the system of rights the States provided to their citizens, effectively limiting the reach of each State's fundamental law and thwarting the fundamental policies of each sovereign State.

506.     Defendants' conduct inflicts imminent, ongoing, and continuing irreparable injury on Plaintiffs, as alleged further herein.

507.     This Court has inherent authority to declare, enjoin, restrain, enter judgment, and impose penalties on Defendants and other federal actors, and those acting in concert with them, to prevent and restrain violations of federal law, including the First Amendment. "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015).

### COUNT TWO – ACTION IN EXCESS OF STATUTORY AUTHORITY
### Against All Defendants

508.     All foregoing Paragraphs are incorporated as if set forth fully herein.

509.     No federal statute authorizes the Defendants' conduct in engaging in censorship, and conspiracy to censor, in violation of Plaintiffs', Missourians', Louisianans', and Americans' free-speech rights.

510.     "An agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986).  Agency actions that exceed the agency's statutory authority are *ultra vires* and must be invalidated.

511.     No statute authorizes any Defendants—including but not limited to White House officials, HHS officials, DHS officials, and any other federal officials or agencies—to engage in the course of conduct regarding the censorship and suppression of speech on social media as alleged herein.

512.     No statute authorizes Defendants—including but not limited to White House officials, HHS officials, DHS officials, and any other federal officials or agencies—to identify what constitutes "misinformation," "disinformation," and/or "malinformation" in public discourse on social-media platforms; to direct, pressure, coerce, and encourage social-media companies to censor and suppress such speech; and/or to demand that private companies turn over information about speech and speakers on their platforms in the interest of investigating "misinformation," "disinformation," and/or "malinformation."

513.     Further, the interpretation of any statute to authorize these actions would violate the non-delegation doctrine, the canon of constitutional avoidance, the major-questions doctrine, the Supreme Court's clear-statement rules, and other applicable principles of interpretation.  No statute may be properly construed to do so.

514.     Defendants and the federal officials acting in concert with them, by adopting the censorship policies and conduct identified herein, have acted and are acting without any lawful authority whatsoever, and without any colorable basis for the exercise of authority.  No federal statute, regulation, constitutional provision, or other legal authority authorizes their social-media-censorship program, and it is wholly *ultra vires*.

515.     Defendants' *ultra vires* actions inflict ongoing irreparable harm on Plaintiffs, as alleged herein.

### COUNT THREE – VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
### Against the HHS Defendants

516.     All foregoing Paragraphs are incorporated as if set forth fully herein.

517.     Defendants HHS, NIAID, CDC, FDA, Becerra, Murthy, Crawford, Fauci, Galatas, Waldo, Byrd, Choi, Lambert, Peck, Dempsey, Muhammed, Jefferson, Murray, and Kimberly are referred to collectively herein as the "HHS Defendants."

518.     As set forth herein, the HHS Defendants' conduct is unlawful, arbitrary and capricious, an in excess of statutory authority under the Administrative Procedure Act.

519.     The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law…."  5 U.S.C. § 706(2)(A)-(D).  The HHS Defendants' conduct violates all of these prohibitions.

520.     Defendants HHS, CDC, and NIAID are "agencies" within the meaning of the APA. Defendants Becerra, Fauci, and Murthy, in their official capacities, are the heads of federal agencies.

521.    The HHS Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action from by which "rights or obligations have been determined," and "from which legal consequences will flow."  *Id.* Defendants' campaign of pressuring, threatening, and colluding with social-media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort.  Such actions reflect the completion of a decisionmaking process with a result that will directly affect Plaintiffs, Missourians, Louisianans, and Americans.  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).  The actions of Defendants alleged herein, on information and belief, reflect and result from a specific, discrete, and identifiable decision of Defendants to adopt an unlawful social-media censorship program.

522.    The HHS Defendants' conduct is arbitrary, capricious, and an abuse of discretion because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem, disregards settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the unlawful nature of the HHS Defendants' conduct, among other reasons.  5 U.S.C. § 706(2)(A).

523.    The HHS Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment rights of Plaintiffs and virtually all Missourians and Louisianans for the reasons discussed herein and in Count One*, supra*.  5 U.S.C. § 706(2)(B).

524.    The HHS Defendants conduct is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because no statute authorizes any of the conduct alleged herein, as discussed in Count Two, *supra*.  5 U.S.C. § 706(2)(C).

525.     The HHS Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to obtain input from the public, before engaging in these unlawful agency policies.   5 U.S.C. § 706(2)(D).

526.     The HHS Defendants' conduct is unlawful under the APA and should be set aside.

### COUNT FOUR – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Against the DHS Defendants

527.     All foregoing Paragraphs are incorporated as if set forth fully herein.

528.     Defendants DHS, CISA, Mayorkas, Easterly, Silvers, Vinograd, Jankowicz, Masterson, Protentis, Hale, Snell, Wyman, and Scully, are referred to collectively herein as the "DHS Defendants."

529.     As set forth herein, the DHS Defendants' conduct is unlawful, arbitrary and capricious, an in excess of statutory authority under the Administrative Procedure Act.

530.     The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law…."   5 U.S.C. § 706(2)(A)-(D).   The DHS Defendants' conduct violates all of these prohibitions.

531.     Defendants DHS and CISA are "agencies" within the meaning of the APA. Defendants Mayorkas and Easterly, in their official capacities, are the heads of federal agencies.

532.     The DHS Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process." *Bennett v. Spear*,

520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action from by which "rights or obligations have been determined," and "from which legal consequences will flow."  *Id.* Defendants' campaign of pressuring, threatening, and colluding with social-media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort.  Such actions reflect the completion of a decisionmaking process with a result that will directly affect Plaintiffs, Missourians, Louisianans, and Americans.  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).  The actions of Defendants alleged herein, on information and belief, reflect and result from a specific, discrete, and identifiable decision of Defendants to adopt an unlawful social-media censorship program.

533.     The DHS Defendants' conduct is arbitrary, capricious, and an abuse of discretion because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem, disregards settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the unlawful nature of the DHS Defendants' conduct, among other reasons.  5 U.S.C. § 706(2)(A).

534.     The DHS Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment and state free-speech rights of Plaintiffs and virtually all Missourians, Louisianans, and Americans for the reasons discussed herein and in Count One*, supra*.  5 U.S.C. § 706(2)(B).

535.     The DHS Defendants conduct is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because no statute authorizes any of the conduct alleged herein, as discussed in Count Two, *supra*.  5 U.S.C. § 706(2)(C).

536.     The DHS Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to

obtain input from the public, before engaging in these unlawful agency policies.  5 U.S.C.

§ 706(2)(D).

537.      The DHS Defendants' conduct is unlawful under the APA and should be set aside.

## COUNT FIVE – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Against the Census Defendants

538.      All foregoing Paragraphs are incorporated as if set forth fully herein.

539.      Defendants Department of Commerce, Census Bureau, Shopkorn, Schwartz,

Molina-Irizarry, and Galemore are referred to collectively herein as the "Census Defendants."

540.      As set forth herein, the Census Defendants' conduct is unlawful, arbitrary and

capricious, and in excess of statutory authority under the Administrative Procedure Act.

541.      The APA authorizes courts to hold unlawful and set aside final agency actions that

are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance

of procedure required by law…."  5 U.S.C. § 706(2)(A)-(D).  The Census Defendants' conduct

violates all of these prohibitions.

542.      Defendants Department of Commerce and Census Bureau are "agencies" within

the meaning of the APA.

543.      The Census Defendants' conduct alleged herein constitutes "final agency action"

because it "marks the consummation of the agency's decisionmaking process."  *Bennett v. Spear*,

520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action by which "rights or

obligations have been determined," and "from which legal consequences will flow."  *Id.*

Defendants' campaign of pressuring, threatening, and colluding with social-media platforms to

suppress disfavored speakers, content, and speech are final agency actions of this sort.  Such

actions reflect the completion of a decisionmaking process with a result that will directly affect Plaintiffs, Missourians, Louisianans, and Americans. *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). The actions of Defendants alleged herein, on information and belief, reflect and result from a specific, discrete, and identifiable decision of Defendants to adopt an unlawful social-media censorship program.

544. The Census Defendants' conduct is arbitrary, capricious, and an abuse of discretion because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem, disregards settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the unlawful nature of the Census Defendants' conduct, among other reasons. 5 U.S.C. § 706(2)(A).

545. The Census Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment and state free-speech rights of Plaintiffs and virtually all Missourians, Louisianans, and Americans for the reasons discussed herein and in Count One*, supra*. 5 U.S.C. § 706(2)(B).

546. The Census Defendants conduct is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because no statute authorizes any of the conduct alleged herein, as discussed in Count Two, *supra*. 5 U.S.C. § 706(2)(C).

547. The Census Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to obtain input from the public, before engaging in these unlawful agency policies. 5 U.S.C. § 706(2)(D).

548. The Census Defendants' conduct is unlawful under the APA and should be set aside.

## COUNT SIX – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Against the FBI Defendants

549.     All foregoing Paragraphs are incorporated as if set forth fully herein.

550.     Defendants U.S. Department of Justice, FBI, Dehmlow, and Chan referred to collectively herein as the "FBI Defendants."

551.     As set forth herein, the FBI Defendants' conduct is unlawful, arbitrary and capricious, and in excess of statutory authority under the Administrative Procedure Act.

552.     The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law…."  5 U.S.C. § 706(2)(A)-(D).  The FBI Defendants' conduct violates all of these prohibitions.

553.     Defendants DOJ and FBI are "agencies" within the meaning of the APA.

554.     The FBI Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action by which "rights or obligations have been determined," and "from which legal consequences will flow."  *Id.* Defendants' campaign of pressuring, threatening, and colluding with social-media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort.  Such actions reflect the completion of a decisionmaking process with a result that will directly affect Plaintiffs, Missourians, Louisianans, and Americans.  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).  The actions of Defendants alleged herein, on information and belief, reflect and result

158

from a specific, discrete, and identifiable decision of Defendants to adopt an unlawful social-media censorship program.

555.    The FBI Defendants' conduct is arbitrary, capricious, and an abuse of discretion because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem, disregards settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the unlawful nature of the FBI Defendants' conduct, among other reasons.  5 U.S.C. § 706(2)(A).

556.    The FBI Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment and state free-speech rights of Plaintiffs and virtually all Missourians, Louisianans, and Americans for the reasons discussed herein and in Count One*, supra*.  5 U.S.C. § 706(2)(B).

557.    The FBI Defendants' conduct is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because no statute authorizes any of the conduct alleged herein, as discussed in Count Two, *supra*.  5 U.S.C. § 706(2)(C).

558.    The FBI Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to obtain input from the public, before engaging in these unlawful agency policies.   5 U.S.C. § 706(2)(D).

559.    The FBI Defendants' conduct is unlawful under the APA and should be set aside.

**COUNT SEVEN – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**Against the State Department Defendants**

560.    All foregoing Paragraphs are incorporated as if set forth fully herein.

561.    Defendants Department of State, Bray, Stewart, Kimmage, and Frisbie are referred to collectively herein as the "State Department Defendants."

562.     As set forth herein, the State Department Defendants' conduct is unlawful, arbitrary and capricious, and in excess of statutory authority under the Administrative Procedure Act.

563.     The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law…."  5 U.S.C. § 706(2)(A)-(D).  The State Department Defendants' conduct violates all of these prohibitions.

564.     Defendant U.S State Department is an "agency" within the meaning of the APA.

565.     The State Department Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action by which "rights or obligations have been determined," and "from which legal consequences will flow."  *Id.* Defendants' campaign of pressuring, threatening, and colluding with social-media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort.  Such actions reflect the completion of a decisionmaking process with a result that will directly affect Plaintiffs, Missourians, Louisianans, and Americans.  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).  The actions of Defendants alleged herein, on information and belief, reflect and result from a specific, discrete, and identifiable decision of Defendants to adopt an unlawful social-media censorship program.

566.     The State Department Defendants' conduct is arbitrary, capricious, and an abuse of discretion because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem, disregards settled reliance interests, rests on pretextual *post hoc* justifications, and

overlooks the unlawful nature of the State Department Defendants' conduct, among other reasons. 5 U.S.C. § 706(2)(A).

567.     The State Department Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment and state free-speech rights of Plaintiffs and virtually all Missourians, Louisianans, and Americans for the reasons discussed herein and in Count One, *supra*.  5 U.S.C. § 706(2)(B).

568.     The State Department Defendants' conduct is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because no statute authorizes any of the conduct alleged herein, as discussed in Count Two, *supra*.  5 U.S.C. § 706(2)(C).

569.     The State Department Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to obtain input from the public, before engaging in these unlawful agency policies. 5 U.S.C. § 706(2)(D).

570.     The State Department Defendants' conduct is unlawful under the APA and should be set aside.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

A.     Declare that Defendants' conduct violates the First Amendment of the U.S. Constitution and analogous provisions of Missouri's, Louisiana's, and other States' Constitutions;

B.     Declare that Defendants' conduct is *ultra vires* and exceeds their statutory authority;

C.      Declare that Defendants' conduct violates the Administrative Procedure Act and is unlawful, and vacate and set aside such conduct;

D.      Preliminarily and permanently enjoin Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from continuing to engage in unlawful conduct as alleged herein;

E.      Preliminarily and permanently enjoin Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from taking any steps to demand, urge, pressure, or otherwise induce any social-media platform to censor, suppress, de-platform, suspend, shadow-ban, de-boost, restrict access to content, or take any other adverse action against any speaker, content or viewpoint expressed on social media; and

F.      Grant such other and further relief as the Court may deem just and proper.

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 230 of 332 PageID #:
4514
Case 3:22-cv-01203-TAD-KDM   Document 5-3   Filed 11/03/22   Page 165 of 164 PageID #:
3289

Dated: October 6, 2022

**ERIC S. SCHMITT**
**Attorney General of Missouri**

/s/ D. John Sauer
D. John Sauer, Mo. Bar No. 58721*
  *Solicitor General*
Justin D. Smith, Mo. Bar No. 63253
  *First Assistant Attorney General*
Todd Scott, Mo. Bar No. 56614*
  *Senior Counsel*
Michael E. Talent, Mo. Bar No. 73339*
  *Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
John.Sauer@ago.mo.gov
*Counsel for State of Missouri*


* admitted *pro hac vice*


/s/ Jenin Younes
Jenin Younes *
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines*

/s/ John C. Burns
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
F: 314-282-8136
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

Respectfully submitted,

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

/s/ Elizabeth B. Murrill
Elizabeth B. Murrill (La #20685)
  *Solicitor General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

## CERTIFICATE OF SERVICE

I hereby certify that, on October 6, 2022, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

|  |  |
|---|---|
| STATE OF MISSOURI ex rel. ERIC S. SCHMITT, Attorney General, | |
| STATE OF LOUISIANA ex rel. JEFFREY M. LANDRY, Attorney General, | No. 3:22-cv-01213-TAD-KDM |
| DR. JAYANTA BHATTACHARYA, | |
| JILL HINES, | |
| JIM HOFT, | |
| DR. AARON KHERIATY, and | |
| DR. MARTIN KULLDORFF, | |
| *Plaintiffs*, | |
| v. | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, | |
| *Defendants*. | |

## JOINT STATEMENT REGARDING WITNESS DEPOSITIONS

**Plaintiffs' Position:**

The Court should authorize Plaintiffs to take depositions of 10 key officials who have participated directly in the massive "Censorship Enterprise" of federal officials pressuring social-media platforms to censor the private speech of Americans, for two fundamental reasons.

*First*, based on continued disclosures in discovery and elsewhere, it has become clear that the federal Censorship Enterprise is enormous and far-reaching. Plaintiffs' Second Amended Complaint names 67 Defendants, spanning at least eleven federal agencies and sub-agencies, and it provides 570 Paragraphs of detailed allegations about federal officials' involvement in procuring censorship of private speech on social media. Doc. 84. Plaintiffs sought expedited preliminary-injunction-related discovery to ensure that the parties and the Court would have sufficient information about federal social-media censorship activities to craft meaningful and effective injunctive relief—*i.e.*, relief that can actual stop federal interference in social-media censorship decisions and remove federal-government censorship from the "modern public square." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). It has since become clear that this task will require both broad and specific information about many federal officials' and agencies' involvement in social-media censorship. The limited documentary discovery provided so far, while highly revealing on certain issues, does not provide the full scope and nature of federal officials' communications with social-media platforms about censorship. Depositions will be "the only chance Plaintiffs will have to get this information prior to addressing the preliminary injunction." Doc. 72, at 7.

*Second*, the limited documentary discovery makes very clear that federal officials have frequently engaged in their most telling and probative communications with social media companies *orally*, not in writing. As detailed repeatedly below, key communications pressuring

social-media platforms to increase censorship were not committed in writing to emails, but occurred in phone conferences, face-to-face meetings, videoconferences, and similar media. Perhaps not surprisingly, the more senior the federal official involved, the more likely they appear to have been to rely on oral, rather than written, communications to pressure social-media platforms to censor.  It is a primary purpose of depositions to explore the nature and content of highly relevant *oral* communications.  For example, a critical meeting between Rob Flaherty and Andy Slavitt of the White House and Twitter officials occurred on April 21, 2022.  Separate disclosures by Alex Berenson reveal that at this meeting Slavitt and Flaherty orally pressured Twitter to de-platform Berenson.  The documents produced by Government Defendants in this case, however, reflect only a calendar invite with a general description of the topics to be discussed at the meeting.  If Plaintiffs had to rely solely on that calendar invite—and not the fortuitous disclosures that Berenson himself made, outside this case's discovery—Plaintiffs would have little inkling of the content of that critical conversation.  Plaintiffs remain in similar ignorance of the nature and content of many, many other oral communications between a wide range of federal officials and social-media platforms.  Depositions are essential to elucidate the "nature and content of those communications" of "federal officials who have been and are communicating with social-media platforms about disinformation, misinformation, malinformation, and/or any censorship or suppression of speech on social media"—the discovery this Court ordered.  Doc. 34, at 13.

Plaintiffs have met and conferred with the Government about these depositions, without success.  The Government has taken the position that it will not agree to *any* depositions if Plaintiffs seek depositions from the Court of any White House officials.  Ex. 1, at 1.  The Government has also categorically objected to any depositions of any witnesses who were not named as Defendants in the original complaint filed on May 5, 2022—when much less information

3

about the federal Censorship Enterprise was available. *Id.* Plaintiffs do not agree to these artificial limitations. As discussed further below, such witnesses are in possession of crucial information for Plaintiffs' request for preliminary injunction.

**A.     The Court Should Order Depositions of Ten Key Federal Officials Involved in Pressuring Social-Media Platforms to Censor Free Speech.**

The Court has authorized a thirty-day window for depositions, Doc. 34, at 14. Plaintiffs respectfully request leave to take depositions of ten federal officials, which is a reasonable number to accomplish during that period. Plaintiffs initially proposed 20 witnesses to Government Defendants, *see* Ex. 1, but after conferring with Defendants, Plaintiffs have carefully reduced their list of proposed witnesses to the following ten officials: (1) NIAID Director and White House Chief Medical Advisor Dr. Anthony Fauci, (2) Deputy Assistant to the President and Director of White House Digital Strategy Rob Flaherty, (3) former White House Senior COVID-19 Advisory Andrew Slavitt, (4) former White House Press Secretary Jennifer Psaki, (5) FBI Supervisory Special Agent Elvis Chan, (6) CISA Director Jen Easterly, (7) CISA official Lauren Protentis, (8) Surgeon General Vivek Murthy, (9) CDC Chief of the Digital Media Branch Carol Crawford, and (10) Acting Coordinator of the State Department's Global Engagement Center Daniel Kimmage. Two of these—Slavitt and Psaki—are now former federal officials; the rest are current federal officials.[1] Below, Plaintiffs first provide a detailed justification for their request to depose each of these federal officials, and then address the general objections posed by Government Defendants.

**1.     NIAID Director and White House Chief Medical Advisor Dr. Anthony Fauci.**

Defendant Anthony Fauci is the Director of the National Institute of Allergy and Infectious Diseases (NIAID) and Chief Medical Advisor to the President. Dr. Fauci has been a Defendant in

---

[1] If those former officials will not cooperate with DOJ and appear voluntarily for depositions, Rule 45(a)(1)(B) provides for depositions by third-party subpoena if necessary.

this case from its first filing, and he has repeatedly used the substantial weight of his federal authority to squelch and suppress scientific views he disfavors.

Dr. Fauci is directly involved in multiple, far-reaching social-media censorship campaigns against so-called COVID-19 "misinformation." These are situations where, not just marginal or "fringe" views, but speech backed by great scientific credibility and with enormous potential nationwide impact—but which contradicted Dr. Fauci's preferred narratives—was censored on social media, likely at Dr. Fauci's instigation. Because these were scientific opinions on matters of public policy backed by great credibility, they were likely to influence speech and thought (and, likely, public policy) on such issues on a nationwide basis—but they were squelched. Several well-documented examples illustrate this point.

*First*, Dr. Fauci orchestrated a campaign to discredit of the "lab-leak" theory of COVID-19's origins that led to the longstanding censorship of that theory on social media despite powerful evidence supporting it. Dr. Fauci, "coordinating with others, orchestrated a campaign to discredit the lab-leak hypothesis in early 2020." Doc. 84, ¶ 139. "As director of NIAID, Dr. Fauci had funded risky 'gain-of-function' research at the Wuhan Institute of Virology through intermediaries such as EcoHealth Alliance, headed by Dr. Peter Daszak." *Id.* "Thus, if the lab-leak theory were established, Dr. Fauci and Dr. Daszak could be potentially implicated in funding the research on viruses that caused the COVID-19 pandemic and killed millions of people worldwide." *Id.* "In late January and early February 2020, Dr. Fauci received information from colleagues that suggested that the COVID-19 virus may have originated in a laboratory in Wuhan, China." *Id.* ¶ 206. "This revelation threatened to implicate Dr. Fauci in the virus's origins, as he had funded the risky research that, under this theory, led to the virus's origin. Soon thereafter, Dr. Fauci participated in a conference call with scientists and science-funding authorities intended to

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 238 of 332 PageID #:
4522
Case 3:22-cv-01213-TAD-KDM   Document 54   Filed 08/31/22   Page 6 of 72 PageID #:  3499

discredit and suppress this lab-leak theory." *Id.* "After the conference call, influential individuals signed public statements that were placed in science journals in attempt to discredit the lab-leak theory." *Id.* In the same time frame, Dr. Fauci engaged in written and oral communications with Mark Zuckerberg about the Government's COVID-19 response. *Id.* ¶ 207. Widespread social-media censorship of the lab-leak hypothesis promptly ensued. *Id.* ¶ 212.

Publicly available emails confirm Dr. Fauci's coordination with Dr. Francis Collins (his then-boss, head of NIH) in a campaign to discredit the lab-leak hypothesis that led to its censorship on social media. *See, e.g.,* Ex. 2 (Jan. 11, 2022 Letter of Reps. Comer and Jordan and Attachments, *at* https://republicans-oversight.house.gov/wp-content/uploads/2022/01/Letter-Re.-Feb-1-Emails-011122.pdf). These emails indicate that, when Dr. Fauci and Dr. Collins convened a phone call on February 1, 2020, with "at least eleven other scientists," *id.* at 2, certain scientists raised grave concerns that SARS-CoV-2 looked bioengineered. *Id.* at App.1, 1-3. Yet three days after this conference call, those same scientists authored a paper for *Nature Medicine* that discredited the lab-leak theory (though, three days earlier on February 1, they had *advocated* the theory to Dr. Fauci). "[A]fter speaking with Drs. Fauci and Collins, the authors abandoned their belief that COVID-19 was the result of a laboratory leak." *Id.* at 2. Instead, they authored an influential paper discrediting it, and "[p]rior to final publication in *Nature Medicine*, the paper *was sent to Dr. Fauci for editing and approval*." *Id.* (emphasis added). In the meantime, Dr. Fauci commenced a course of friendly oral communications with Mark Zuckerberg about the Government's COVID-19 response—the content of which oral communications is yet to be revealed. *See* Ex. 3 (Amended Interrogatory Responses), at 52-54 (detailing a course of at least 13 oral and written communications between Dr. Fauci and Mark Zuckerberg from February 27 to November 30, 2020). Weeks later, on April 16, 2020, Dr. Collins sent an email to Dr. Fauci,

6

linking to an article by Bret Baier, and "[w]ondering if there is something NIH can do to help put down this very destructive conspiracy [*i.e.*, the lab-leak theory], with what seems to be growing momentum. I hoped the Nature Medicine article [*i.e.*, the one sent to Fauci for editing and approval] on the genomic sequence of SARS-CoV-2 would settle this…. Anything more we can do?" Ex. 2, at App.12. "The next day—after Dr. Collins specifically asked for more public pressure—Dr. Fauci cited the *Nature Medicine* paper from the White House podium likely in an effort to further stifle the hypothesis COVID-19 leaked from the WIV [lab]." *Id.* at 2 (citing John Haltiwanger, *Dr. Fauci throws cold water on conspiracy theory that coronavirus was created in a Chinese lab*, Bloomberg (Apr. 18, 2020)). In fact, Dr. Fauci made multiple public statements seeking to squelch the theory—all during the same time frame that he was quietly communicating with Mark Zuckerberg, Ex. 3, at 52-54. *See, e.g.,* Nsikan Akpan, et al., *Dr. Fauci: No scientific evidence the coronavirus was made in a Chinese lab*, NATIONAL GEOGRAPHIC (May 4, 2020).

This would not be the last time Dr. Collins coordinated with Dr. Fauci to suppress highly credible scientific opinions that they disfavored. As noted in the Complaint, just a few months later, Dr. Collins sent Dr. Fauci an email demanding a "swift and devastating … take-down" of the Great Barrington Declaration, co-authored by Plaintiffs Dr. Jay Bhattacharya and Dr. Martin Kulldorff. The Great Barrington Declaration—a cogent and powerful scientific critique of prolonged lockdowns as a response to COVID-19—was published on October 4, 2020. *See* Doc. 45-3 (Bhattacharya Decl.), ¶¶ 6-11. "On October 8, 2020, four days after the Declaration's publication, then-Director of NIH, Dr. Francis Collins, emailed Dr. Anthony Fauci … about the Great Barrington Declaration," stating: "Hi Tony and Cliff, See: https://gbdeclaration.org/. This proposal from the three fringe epidemiologists who met with the Secretary seems to be getting a lot of attention – and even a co-signature from Nobel Prize winner Mike Leavitt at Stanford. There

7

needs to be *a quick and devastating published take-down* of its premises. I don't see anything like

that online yet – is it underway? Francis." *Id.* ¶ 14 (emphasis added).  Fauci quickly responded by

engaging in a series of public statements that were highly critical of the Great Barrington

Declaration, describing it as "total nonsense" and "ridiculous."  *See, e.g.,* Jessie Hellmann, *Fauci

Blasts Herd Immunity Proposal Embraced by White House as 'Total Nonsense*,' THE HILL (Oct.

15, 2020), *at* https://thehill.com/policy/healthcare/521220-fauci-blasts-herd-immunity-proposal-

embraced-by-white-house-as-total/.   Immediately after Dr. Collins emailed Dr. Fauci demanding

a "quick and devastating … take-down" of the Great Barrington Declaration, a relentless campaign

to censor it and its authors on social media ensued.  *See id.* ¶¶ 15-33.  "[T]he censorship of the

Great Barrington Declaration and Plaintiffs Bhattacharya and Kulldorff [occurred] just after a

senior HHS official called for a 'quick and devastating … take-down' of the Declaration" to Dr.

Fauci.  Doc. 84, ¶ 480.

In addition, Dr. Fauci evidently had a hand in Twitter's permanent suspension of prominent

vaccine critic Alex Berenson, whose science-based objections to the vaccination of young, healthy

individuals became a specific, high-priority target for the Biden Administration's federal censors.

"Alex Berenson disclosed internal Twitter communications revealing that senior 'WH' officials

including Andrew Slavitt specifically pressured Twitter to deplatform Berenson, an influential

vaccine critic—which Twitter did."  Doc. 84, ¶ 345.  "On July 11, 2021, Dr. Fauci publicly

described Berenson's public statements on vaccines as 'horrifying.'   Soon thereafter, after

President Biden's subsequent statement that 'They're killing people' by not censoring vaccine

'misinformation,' Twitter caved to federal pressure and permanently suspended Berenson."  Doc.

84, ¶ 347.  In fact, just yesterday, *new* evidence emerged of another link between Dr. Fauci and

the termination of Berenson.  On October 13, 2022, Alex Berenson posted on Substack newly

released Twitter emails indicating that a board member of Pfizer (which developed the lead mRNA vaccine criticized by Berenson) pressured Twitter to de-platform Berenson as well, in evident coordination with federal officials. *See* https://alexberenson.substack.com/p/pfizer-board-member-scott-gottlieb. In his communication with Twitter, the Pfizer executive claimed that Berenson's speech should be censored because it posed a threat to the safety of *Dr. Fauci*—raising the concern that Dr. Fauci may be acting through intermediaries in his communications with social-media platforms about censorship. *Id.* Indeed, Berenson himself infers that there was collusion between White House official Andrew Slavitt and the Pfizer executive on this very point. *See id.*

To be sure, the Government has submitted stock interrogatory responses on behalf of Dr. Fauci asserting that he has had no direct communications with social-media platforms about censorship. *See* Ex. 3, at 24, 57 (asserting in generic terms that "NIAID has not identified any communications … between Dr. Fauci and Social-Media Platforms relating to Content Modulation and/or Misinformation"). Plaintiffs should not be required to accept these responses at face value, but should be allowed to test them by questioning under oath, for at least three reasons.

First and foremost, Dr. Fauci has refused to verify under oath his own interrogatory responses, in violation of the plain terms of this Court's Order. *See* Doc. 72, at 6-7. Instead, Dr. Jill Harper—who is not mentioned in the Complaint—has verified NIAID's responses on behalf of Dr. Fauci. *See* Ex. 3, at 13, 93. Thus, to this day, Dr. Fauci has not made any statement under oath about his communications with social-media platforms. This violates the plain terms of this Court's Order on Discovery Disputes, which directly instructed *Dr. Fauci* to provide interrogatory responses. Doc. 72, at 6-7. In that Order, this Court concluded that "Dr. Fauci's communications would be relevant to Plaintiffs' allegations in reference to alleged suppression of speech relating to the lab-leak theory of COVID-19's origin, and to alleged suppression of speech about the

9

efficiency of masks and COVID-19 lockdowns." *Id.* at 7.  The Court ordered that "*Dr. Fauci* shall provide answers to the Plaintiffs' interrogatories … within twenty-one (21) days from the date of this order." Doc. 72, at 7 (emphasis added).  Dr. Fauci did not comply with the plain terms of this order.  He did not "provide answers to the Plaintiffs' interrogatories," but delegated that task to a subordinate who is a stranger to the case and *who has no first-hand knowledge of Dr. Fauci's highly relevant communications with social-media platforms*.  Plaintiffs raised this issue with the Government, demanding that Dr. Fauci verify his own interrogatory responses, but the Government has refused to do so.  *See* Ex. 4.  Dr. Fauci must respond to questions about his involvement in communications with social-media platforms under oath.  He has declined to do so, despite this Court's order, so he should appear for a deposition to test these unverified representations that he has submitted through a proxy on his behalf.

Second, even if Dr. Fauci had no direct communications with social-media platforms about censorship as the Government contends—which is highly questionable—there are compelling reasons suggesting that Dr. Fauci has both acted through intermediaries, and acted on behalf of others, in procuring the social-media censorship of highly credible scientific opinions like those supporting the lab-leak theory, the Great Barrington Declaration, and the vaccine critiques of Alex Berenson.  These are reflected in the examples discussed above.  If Dr. Fauci has acted through intermediaries to pressure social-media platforms to increase censorship—including through his public statements—or acted as an intermediary on behalf of others (such as Dr. Francis Collins) to achieve censorship on social media, that information is highly relevant to Plaintiffs' preliminary-injunction motion, even if he engaged in no direct communications with social-media platforms himself on these topics.

Finally, many have raised questions about Dr. Fauci's credibility on matters relating to supposed COVID-19 "misinformation" in recent years.  He has made conflicting or misleading public statements on the efficacy of masks, the percentage of the population needed to obtain "herd immunity," NIAID's funding of "gain-of-function" virus research in Wuhan, and the lab-leak theory, among other things.  As two Members of Congress recently noted, "Despite Dr. Fauci claiming otherwise on multiple occasions, he was, in fact, aware of the monetary relationship between NIAID, the U.S. National Institutes of Health (NIH), EcoHealth Alliance Inc. (EcoHealth), and [the Wuhan Institute of Virology] by January 27, 2020.  Dr. Fauci also knew that NIAID worked with EcoHealth to craft a grant policy to sidestep the gain-of-function moratorium at the time.  This new policy, designed by EcoHealth and agreed to by NIAID, allowed EcoHealth to complete dangerous experiments on novel bat coronaviruses—with very little oversight—that would have otherwise been blocked by the moratorium."  Ex. 2, at 1.  Suffice to say that, in light of all the foregoing, Plaintiffs should not be required to accept Dr. Fauci's self-serving blanket denials—issued through a subordinate, not from his own mouth—at face value.  The Court should order Dr. Fauci to participate in a deposition.

## 2. White House Director of Digital Strategy Rob Flaherty.

Rob Flaherty is the Director of Digital Strategy for the White House.  He is a key official in the White House's pressure campaign on social-media companies to increase COVID-19 censorship, and social media companies' policies and responses to COVID-19 vaccine claims.  *See* Ex. 5 (Flaherty Collective Exhibit, pages cited by Bates number).   Flaherty has provided few written communications but held extensive oral meetings with social-media platforms.  Among other things, he has held meetings with Twitter, Meta, and YouTube on vaccine hesitancy and combatting misinformation.  *Id.* at 16275, 16274, 7359–60.  He consistently interfaces with Meta's

director of U.S. Public Policy, who sends "Covid Insights Reports" that detail trends on Covid-19 posts by users and actions taken by Meta, *id.* at 7225, and he has held meetings about Meta's "whole of platform approach" to address misinformation and curb vaccine hesitancy, *id.* at 16282. Meta also knows to reach out to him when new Covid-19 vaccines are authorized for new groups of people, and to report on Meta's intentions to censor disfavored opinions about vaccine effectiveness for those new groups, at the White House's urging.  *Id.* at 7268-89; 7250.  Flaherty has specific knowledge and information on Meta's attempts to censor the Disinformation Dozen. *Id.* at 7322.  Flaherty has led efforts for the White House to get Meta to explain ""how big the [misinformation] problem is, what solutions you're implementing, and how effective they've been." *Id.* at 7258–59; *see also id.* at 16279.  He also connected SG Murthy with a "critical leader of the DNC's misinfo work for a long time."  *Id.* at 7436–37.  He pressured Meta by sending them an article about misinformation on Facebook with a subject line "not sure what to say anymore." Mr. Flaherty also knows about the Biden Transition Team's efforts with Meta.  *Id.* at 16364, 16276. The Government's interrogatory responses identify Flaherty as participating in multiple virtual meetings with social-media platforms about censorship.  Ex. 3, at 31.

As all these documents confirm, Flaherty has repeatedly engaged in key communications with social-media platforms about censorship through oral communications instead of written documents like emails.  Deposing Mr. Flaherty would provide critical information on the White House's pressure campaign on social-media platforms against the Disinformation Dozen and other COVID-19 "misinformation" issues, leaning on social media companies after press reports relating to misinformation on vaccine authorizations, Ex. 5, at 7246–47, and the White House's influence over social media's content-modulation policies like Meta's new action policy and Twitter's

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 245 of 332 PageID #:
4529
Case 3:22-cv-01213-TAD-KDM   Document 84   Filed 10/03/22   Page 13 of 71 PageID #: 3506

efforts to remove the most harmful Covid-19 misinformation.  Ex. 5, at 7248–49, 16275.  His

testimony would be highly relevant and important to the States' preliminary-injunction motion.

### 3.     White House Senior COVID-19 Advisor Andrew Slavitt.

Defendant Andrew Slavitt served as the White House's Senior COVID-19 Advisor.  By

his own admission, Slavitt led the charge for the White House in pushing social-media companies

to increase censorship of private speech about COVID-19, and he did so heavily through oral

conversations and meetings with representatives of social-media platforms.  The Government's

documentary discovery reveals that Slavitt received "Facebook bi-weekly covid content reports"

from a senior Facebook executive to allow Slavitt to oversee Facebook's censorship activities.

Doc. 84, ¶ 343.  Slavitt also specifically pressured Twitter, in an oral meeting, to de-platform Alex

Berenson.  Doc. 84, ¶¶ 345-46.  "Alex Berenson disclosed internal Twitter communications

revealing that senior 'WH' officials including Andrew Slavitt specifically pressured Twitter to

deplatform Berenson, an influential vaccine critic—which Twitter did."  *Id.* ¶ 354.  A meeting

invitation dated April 21, 2022, between Slavitt and Twitter stated: "White House Staff will be

briefed by Twitter on vaccine misinfo.  Twitter to cover trends seen generally around vaccine

misinformation, the tangible effects seen from recent policy changes, what interventions are

currently being implemented in addition to previous policy changes, and ways the White House

(and our COVID experts) can partner in product work."  *Id.* ¶ 345.  The next day, internal Twitter

messages reflected that Slavitt had posed "one really tough question about why Alex Berenson

hasn't been kicked off the platform."  *Id.* ¶ 346.  "On March 1, 2021, a Twitter employee wrote to

Defendants Slavitt, Flaherty, Peck and Humphrey after a meeting that the company was escalating

efforts to remove harmful content about Covid and introducing a strike system—apparently the

outcome of the discussion that had just occurred."  *Id.* ¶ 354.  "As another example, on May 28,

2021, a senior executive of Meta sent an email to Slavitt and Murthy reporting that Facebook had expanded its censorship policies, evidently to satisfy federal officials' demands made at a recent oral meeting.  The email stated that a 'key point' was that 'We're expanding penalties for individual Facebook accounts that share misinformation.'"  *Id.* ¶ 369.

"[O]n March 2, 2021, Meta sent an email assuring Slavitt, Flaherty, and Humphrey that the company is '[c]ombating vaccine misinformation and de-amplifying content that could contribute to vaccine hesitancy' by 'improving the effectiveness of our existing enforcement systems (particularly focusing on entities that repeatedly post vaccine misinformation), mitigating viral content that could lead to vaccine hesitancy….'"  *Id.* ¶ 375.  Both Twitter and Facebook have identified Slavitt as a senior federal official who communicated with them about misinformation and censorship. *Id.* ¶¶ 379, 381.  Likewise, the White House Press Secretary's Office has identified Slavitt and Flaherty as two senior White House officials involved in communicating with social-media platforms about censorship. Ex. 3, at 77-78.

Slavitt has publicly stated in a podcast that his job at the White House was to push social-media platforms to increase censorship.  He refers to "my time in the White House where I was charged with pushing organizations like Facebook from spewing misinformation."  Andrew Slavitt, *Is COVID Misinformation Killing People?*, Published Jul 21, 2021, *at* https://omny.fm/shows/in-the-bubble/is-covid-misinformation-killing-people-with-facebo (audio 5:40).  In the podcast, the same senior Facebook executive noted that Slavitt, as a White House official, had orally demanded the censorship of specific posts in oral meetings: "I remember you and I had a conversation about some posts where I was saying look…. Hey, Andy, you may not like it but this is kind of satire.  … you were saying no its not, it's going to encourage people to think there is some reason for people not to take the vaccine." *Id.* (audio 27:30).  Slavitt stated,

"My job in the WH of course is and remains to push for tougher policies on how these algorithms work" to increase censorship of COVID-19 misinformation. *Id.* (audio 33:10). Slavitt described repeatedly pressuring Facebook to increase censorship in oral meetings while he was at the White House: "The conversations, there were battles where it felt like FB was trying to supply just enough information to win the battle and over and over again maybe the effort to learn enough was thwarted to the point where the frustration levels ran very high…. I don't think just the President, but others around the country, were feeling that more accountably is needed and more accountability is required…. Really a continued view that the company needs to be more responsible." *Id.* (audio 41:05). In short, Slavitt was the White House's self-professed principal enforcer for online censorship. Slavitt has described his job at the White House as "pushing organizations like Facebook from spewing misinformation." This "pushing organizations like Facebook" to increase censorship of private speech occurred heavily through oral and face-to-face meetings. The Court should authorize Plaintiffs to depose Slavitt.

### 4.    Former White House Press Secretary Jennifer Psaki.

Then-White House Press Secretary Jennifer Psaki was an original Defendant in the case and was substituted for Karine Jean-Pierre in her official capacity after Psaki left the White House for a private career in late May 2022. While she was the White House's chief spokesperson, Psaki made a series of public statements—emphasized in the Complaint—that both (1) attested to her personal knowledge of the participation of high-level White House officials in pressuring social-media platforms, and (2) reinforced the public threats of adverse legal consequences to social-media platforms if they do not increase censorship of views disfavored by federal officials. Thus, she both admitted to knowledge of pressure to censor from federal officials and directly engaged in such pressure herself, in a highly impactful and visible fashion.

15

The Complaint details many examples of these statements.  For example, on May 5, 2021, Defendant Psaki gave a White House press conference at which she stated that "[t]he President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections.  And we've seen that over the past several months, broadly speaking…. we've seen it from a number of sources."  White House, *Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack, May 5, 2021*, *at* https://www.whitehouse.gov/briefing-room/press-briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-tom-vilsack-may-5-2021/.

On July 15, 2021, at a White House press briefing, Psaki stated: "[W]e are in regular touch with these social media platforms, and those engagements *typically happen through members of our senior staff*, but also members of our COVID-19 team, given, as Dr. Murthy conveyed, this is a big issue of misinformation, specifically on the pandemic."  *Id.* (emphasis added).  She added, "*We're flagging problematic posts for Facebook that spread disinformation*."  *Id.* (emphasis added).  She stated, "we have recommended—proposed that they create a robust enforcement strategy," *i.e.*, a more aggressive censorship program.  *Id.*  At the same conference, Psaki called on social-media companies to censor particular disfavored speakers, stating: "[T]here's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms. All of them remain active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns."  *Id.*  And she stated: "Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days.  That's too long. The information spreads too quickly."  *Id.*  She

16

stated that "[w]e engage with them [*i.e.*, social-media companies] regularly and *they certainly understand what our asks are.*"  *Id.* (emphasis added).

The next day, July 16, 2021, Psaki explicitly called for social-media companies to coordinate with *each other* in censoring disfavored speakers, to ensure that such speakers are completely muzzled.  "You shouldn't be banned from one platform and not others … for providing misinformation out there."  White House, Press Briefing by Press Secretary Jen Psaki, July 16, 2021,  *at*  https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/.  Psaki also demanded that social-media companies "create robust enforcement strategies," "tak[e] faster action against harmful posts," and "promot[e] quality information algorithms"—which is a euphemism for algorithms that suppress disfavored messages.  *Id.*  When asked whether Facebook's already-aggressive censorship was "sufficient," she said, "Clearly not, because we're talking about additional steps that should be taken."  *Id.*

On April 25, 2022, Psaki reiterated the threats of adverse legal consequences to Twitter and other social media platforms: "No matter who owns or runs Twitter, the President has long been concerned about the power of large social media platforms … [and] has long argued that tech platforms must be held accountable for the harms they cause.  He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more.  And he's encouraged that there's bipartisan interest in Congress."  *Id.*  At the same press briefing, Psaki reaffirmed that senior officials within the White House and/or the Administration are continuing to coordinate directly with social-media platforms to censor disfavored speakers and content on social media: "we engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue."  *Id.*

Plaintiffs have submitted interrogatories to Psaki's successor in office, Karine Jean-Pierre, to probe the basis of Psaki's statements and understand who is "flagging problematic posts for Facebook," what "members of our senior staff" are communicating with social-media platforms about censorship, "what our asks are" to social-media platforms about censorship, who in the White House "engage[s] regularly with all social media platforms about steps that can be taken" to suppress so-called "misinformation," and so forth.  Defendants, however, contend that they lack direct knowledge of the basis for Psaki's statements because Psaki no longer works for the White House.  *See* Ex. 3, at 74-87.  The Government submitted interrogatory responses on behalf of Jean-Pierre that simply provide block quotes from the same press conferences quoted above and provide almost no meaningful information, other than to identify Rob Flaherty and Andrew Slavitt as involved in communications with social-media platforms.  *See id.*  Moreover, the Government has repeatedly couched its responses to the Psaki-related interrogatories in qualifying language such as "it is the understanding of the White House Office of Press Secretary," to emphasize that the Government's interrogatory responses do not reflect *Psaki's* actual knowledge.  *Id.*  Because the Government has failed to provide meaningful responses through Psaki's official successor, Plaintiffs should be allowed to depose Ms. Psaki to explore the basis of the critical statements alleged in the Complaint and related issues.  There is no other avenue to obtain this information.

### 5.     FBI Supervisory Special Agent Elvis Chan.

The Court should order the deposition of FBI Supervisory Special Agent Elvis Chan, who is a named Defendant in the Second Amended Complaint.  *See* Doc. 84, ¶ 61.  Chan is "Supervisory Special Agent of Squad CY-1 in the San Francisco Division of the FIB."  *Id.* He "has authority over cybersecurity issues for FBI in that geographical region, which includes the headquarters of major social-media platforms, and he plays a critical role for FBI and [FBI's Foreign Influence

18

Task Force] in coordinating with social-media platforms relating to censorship and suppression of speech on their platforms." *Id.* There are compelling reasons to believe that Chan plays a central role in federally-induced social-media censorship, but few specific details are yet available, rendering Chan's deposition imperative to ensure effective preliminary injunctive relief.

There has been a recent explosion of disclosures about FBI's direct involvement in social-media censorship. Most notably, on August 26, 2022 (after the First Amended Complaint had been filed), Mark Zuckerberg disclosed on Joe Rogan's podcast that a communication from the FBI led to Facebook's censorship of the Hunter Biden laptop story. *Id.* at 112-13, ¶¶ 382-383. Shortly thereafter, in response to Plaintiffs' third-party subpoena, Meta's counsel identified FBI SSA Elvis Chan as the one who conveyed "the communications between the FBI and Meta that led to Facebook's suppression of the Hunter Biden laptop story." *Id.* ¶ 384.

Meta's revelation is consistent with publicly available information about Elvis Chan. Chan himself "has openly boasted about his official role on behalf of FBI in coordinating with social-media companies." *Id.* ¶ 387. "In a recent podcast, he stated, 'Our field office, FBI San Francisco, was very involved in helping to protect the US elections in 2020. … [T]he FBI, the US government working in conjunction with *the private sector*, as well as with election officials from every single state and protectorate, we really able to do it." *Id.* (emphasis added) (quoting https://www.banyansecurity.io/resource/get-it-started-get-it-done/). "Chan indicated that he works closely with Defendant Jen Easterly," *id.* ¶ 388, who runs the "nerve center" of federal censorship activities through CISA, as discussed below. "Chan admits to regular, routine coordination about censorship with social-media platforms." *Id.* ¶ 389. He has stated of the 2020 election cycle in particular: "we talked with all of these entities I mentioned regularly, at least on a monthly basis. And right before the election, probably on a weekly basis. If they were seeing

anything unusual, if we were seeing anything unusual, sharing intelligence with technology companies, with social media companies, so that they could *protect their own platforms*. That's where the FBI and the US government can actually help companies." *Id.* (emphasis added). "Protect[ing] their own platforms" is a euphemism for censorship of government-disfavored speech. Chan has also publicly called for private citizens to report "misinformation" to the FBI and to social-media companies so that it can be censored: "If you are seeing something related to election on your social-media platform, all of them have portals where you can report that sort of information, and *they are being very aggressive in trying to take down any misinformation or disinformation* … [i]f you see anything on election day or before election day, you can always report it to FBI.gov or Justice.gov … *we take all of these very seriously*." *Id.* ¶ 391 (quoting https://www.govinfosecurity.com/fbi-on-election-theres-going-to-be-lot-noise-a-15257    (7:45-8:48 of video) (emphasis added)).   In other words, according to Chan, the public can report misinformation to the FBI, and the FBI will help "take [it] down."   According to Chan, the FBI is working closely with social-media platforms to be "very aggressive in trying to take down any misinformation or disinformation," with the FBI "tak[ing] all of these very seriously." *Id.*

Despite his central role in interacting with social-media platforms on behalf of the federal government—including its law-enforcement apparatus—the Government Defendants have provided no documentary discovery with respect to Chan.  What little Plaintiffs have obtained, we received from third-party subpoena to LinkedIn.  Documents produced by LinkedIn demonstrate that Chan is active *to this day* in communicating with social-media platforms about censoring speech on behalf of the FBI and the federal government's law-enforcement and domestic-security apparatus.  "Documents produced by LinkedIn show Chan repeatedly organizing meetings with representatives of LinkedIn from 2020 through 2022 (the present).  Based on the limited agendas

provided, it appears that these meetings included discussions of election-related content and suppression of election-related speech on social media.  On information and belief, Chan organized similar meetings with other major social-media platforms, as in one instance, he notified LinkedIn about a particular proposed time slot for a meeting that another company had already taken that time slot.   Dehmlow was routinely included in these meetings as well."  Doc. 84, ¶ 392; *see also* Ex. 6 (LinkedIn documents involving Elvis Chan).  Evidently, Chan routinely engages in similar meetings with other major social-media platforms about disinformation and censorship.

In short, there are compelling reasons to believe that Elvis Chan plays a crucial role in the federal government's social-media-censorship efforts.  But Plaintiffs have received very little documentary evidence regarding Chan's involvement, and none from Government Defendants.  As this Court stated, "[t]his is the only chance Plaintiffs will have to get this information prior to addressing the preliminary injunction."  Doc. 72, at 7.  And it will likely be critical for any preliminary injunction to address Chan's involvement in order to provide effective relief.

### 6.   CISA Director Jen Easterly.

Defendant Jen Easterly is the Director of CISA within the Department of Homeland Security, and thus she supervises the "nerve center" of federally directed censorship.  The Second Amended Complaint includes extensive allegations about Easterly's involvement in federal censorship activities.  *See, e.g.,* Doc. 84, ¶¶ 290-293.  Under her leadership, CISA's "mission evolved" to address the "changing information environment."  *Id.* ¶ 301.  Under Easterly's leadership, CISA boasts that it "serves as a switchboard for routing disinformation concerns to appropriate social media platforms."  *Id.* ¶ 302.  CISA performs a central role in directly flagging "misinformation" to social-media companies for censorship.  "CISA boasts that it has 'expanded the breadth of reporting [MDM] to include … more social media platforms,' and that '[t]his

activity leverages the rapport the MDM team has with the social media platforms to enable shared situational awareness." *Id.* As Director of CISA, Easterly supervises the federal sub-agency that serves as the clearinghouse for inducing social media companies to increase censorship of private speech. Interestingly, Easterly "claim[s] that social-media speech" by Americans "is a form of 'infrastructure,' and that policing speech online by the federal government falls within her agency's mission to protect 'infrastructure,' stating that … 'the most critical infrastructure is cognitive infrastructure….'" *Id.* ¶ 291.

Notably, Easterly has engaged in text messages with Matt Masterson, a former CISA official who now works for a social-media platform. Doc. 71-5, at 2-4. In those text messages, Masterson indicated that "CISA is handling 'operations' … on disinfo" for DHS, and Easterly noted that the newly created Disinformation Governance Board "doesn't change or impact anything we [*i.e.*, CISA] are doing or have already established." *Id.* at 2. Easterly noted that she was directly involved in pushing social-media platforms to greater censorship, and in coordinating the role of other federal agencies to "prepunk/debunk" Americans' social-media speech: "Just trying to get us in a place where Fed can work with platforms to better understand the mis/dis trends so relevant agencies can try to prebunk/debunk as useful…. [I] was looking to play a coord role so not every [agency] is independently reaching out to platforms which could cause a lot of chaos." *Id.* at 3. Easterly thus envisions CISA in an overarching role, just like the "Disinformation Governance Board," and she acts accordingly. Masterson hailed Easterly's "leadership" in pushing for greater censorship, and agreed that social-media platforms need more federal pressure to increase censorship: "Platforms have got to get more comfortable with gov't. It's really interesting how hesitant they remain." *Id.* at 4.

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 255 of 332 PageID #:
4539
Case 3:22-cv-01213-TAD-KDM   Document 85   Filed 10/03/22   Page 24 of 78 PageID #: 3516

Easterly's deposition is critical for two reasons.  First, as the Director of CISA, she oversees the "nerve center" of federal government's censorship efforts on issues such as election integrity and election security.  As the text messages quoted above reveal, she views herself as coordinating what Secretary Mayorkas has described as censorship efforts "across the federal enterprise."  As her former colleague Masterson indicates, she handles "operations" on "disinfo" for DHS.  She thus is very likely to have unique knowledge about the scope and nature of communications with social-media platforms about censorship from CISA, DHS, and potentially other federal officials.  Her testimony allows Plaintiffs a unique opportunity to define for the Court the nature and scope of the communications that they seek to enjoin in their motion for preliminary injunctive relief.

Second, in response to interrogatories, CISA has disclosed extensive, recurring oral communications and meetings between CISA officials and social-media platforms relating to misinformation and censorship.  *See* Ex. 3, at 38-41.  These include, not just individual meetings, but multiple series of recurring meetings with many participants from social-media platforms, hosted by "CISA's Election Security and Resilience subdivision."  *Id.* at 38.  Social-media participants include "Google, Facebook, Twitter, Reddit, Microsoft," as well as "Verizon Media, Pinterest, LinkedIn, and the Wikimedia Foundation."  *Id.* at 38-39.  "CISA and Facebook" have a "recurring meeting" to "plan and set the agenda" for these mass meetings.  *Id.* at 39.  CISA also hosts recurring meetings with social-media platforms through the "CISA Cybersecurity Advisory Committee Meetings," "CISA CSAC, Protecting Critical Infrastructure from Misinformation and Disinformation Subcommittee meetings," and "meetings convened by the Election Infrastructure Subsector Government Coordinating Council" and by the "Election Infrastructure Subsector Coordinating Council Joint MDM Working Group."  *Id.* at 39.  CISA did not identify the individual federal officials participating in any of these many recurring meetings with social-media platforms

23

in its Interrogatory responses. *Id.* at 38-40. Easterly, who oversees the multiple CISA components that conduct these many meetings with social-media platforms about censorship, has unique knowledge of the content and nature of the communications with social-media platforms at these meetings, as the participants in all these meetings report back to her. Documents produced in discovery attest to Easterly's extensive and detailed oversight of these oral and face-to-face meetings with social-media platforms where critical communications about censorship evidently occur. *See* Ex. 7 (Easterly Collective Exhibit). Easterly's deposition is probably "the only chance Plaintiffs will have to get this information prior to addressing the preliminary injunction." Doc. 72, at 7.

### 7.    CISA "Mis- Dis- and Mal-Information Team" Member Lauren Protentis.

Lauren Protentis is a key member of CISA's Election Security Initiative, specifically the so-called "Mis- Dis- and Mal-Information (MDM) Team," whose entire mission appears to be federally-induced censorship of social-media speech. The documentary discovery provided on Protentis reveals that she plays a central role in CISA's "MDM" activities, and that she participates in many unwritten, oral communications with social-media platforms about censorship. *See* Ex. 8 (Protentis Collective Exhibit, cited by Bates number). She appears to lead the MDM Working Group with social media companies, *id.* at 8554; she also leads the MDM Joint Working Group that includes state and local election officials, *id.* at 11885; and she participates in the Election Subsector Coordinating Council (SCC), *id.* at 10900-901, and the bi-monthly USG/Industry sync calls, *id.* at 12079. She is an expert on the coordination and efforts between the federal government and social media companies on combatting so-called "MDM," as she has given briefings hosted by the U.S. State Department to African nations on MDM and private and public sector cooperation. *Id.* at 12201. She has extensive knowledge about the federal government and social

media companies' censorship activities, including Twitter Safety and its Partner Support Portal, *id.* at 12193; Google's operations, *id.* at 10904; Microsoft's "elections-specific externally facing security programs," *id.* at 12302; and Meta's efforts to combat misinformation, *id.* at 12281–82.

Protentis's contacts with social media are so pervasive that very senior officials in other Departments ask her to make introductions to key "points of contact" with the social-media platforms to discuss "social-media and influence matters." *Id.* at 11411 (Deputy Secretary of the Treasury asking Protentis for points of contact at social-media platforms). Protentis also has knowledge about how CISA is helping undisclosed NGOs' contact social media groups on disinformation efforts. *Id.* at 12194. In sum, Ms. Protentis serves as a vital connection between CISA and social-media platforms in the government's censorship efforts, has special knowledge in the election-security space, and even provides briefings to the governments of foreign countries on how to interact with social0media companies. She also has unique knowledge of how federal components like CISA are working through outside third-party organizations, such as NGOs, to outsource their federal censorship activities in attempt to evade the First Amendment. *See, e.g.,* Doc. 84, ¶¶ 395-420. Protentis's testimony will shed light on the content of those meetings, the extent of CISA's election security efforts, the tools that the federal government uses on all the social media platforms, and efforts to influence local election officials and encourage them to use social media companies to censor citizens in the 2022 election.

## 8. Surgeon General Vivek Murthy.

For about a year and a half, Defendant Dr. Vivek Murthy has led a public campaign, in his capacity as Surgeon General, to censor individuals who spread so-called "misinformation"—defined by him—about Covid-19. *See* Doc. 84, ¶¶ 220-24. He has singled out tech companies for particular criticism, making numerous public statements at press conferences and via his official

Twitter account asserting that they are responsible for Covid-19 deaths because they have failed to adequately censor "misinformation."  Not only that, but he issued a Request for Information (RFI) on March 2, 2022, demanding that tech platforms provide him with information about "misinformation," including the identities of those supposedly spreading it on their sites.  Doc. 84, ¶¶ 243-46.  Viewed in the context of Dr. Murthy's other statements, as well as those of President Joseph Biden (accusing tech companies of "killing people" by not censoring vaccine "misinformation") and Jen Psaki, this RFI was an intimidation tactic, designed to frighten the tech companies into compliance with his demand to escalate censorship of certain viewpoints on Covid-19 for fear of reprisal in the form of regulation or other legal consequences.  Doc. 84, ¶ 243.

Murthy has engaged in important oral communications with a high-level Facebook executive about the federal governments' demands for greater censorship of COVID-19 "misinformation."  Texts and emails obtained through discovery in this case establish that Dr. Murthy did not simply make public statements on the topic; rather, he was intimately involved in the censorship project.   For example, a senior executive at Facebook (Meta) told Dr. Murthy, via text message, that those at the company were aggrieved as "it's not great to be accused of killing people"—presumably a reference to President Biden's statement above —and expressed his desire "to find a way to deescalate and work together collaboratively."  Doc. 84, ¶ 340.  The executive reiterated similar sentiments in an email. Ex. 9 (Murthy Collective Exhibit, cited by Bates number), at 6848.  Another email from this executive informed Dr. Murthy that the "latest Facebook bi-weekly covid content report" was attached "as promised/discussed," establishing that a verbal conversation on the topic occurred.  *Id.* at 7030.

On several occasions, the same Facebook executive emailed Murthy to assure him that the company was working to further address "misinformation" and "disinformation," including by

removing pages, groups, and accounts tied to the "disinfo dozen." Doc. 84, ¶¶ 341-43; Ex. 9, at 7031, 15138. The reference to the "disinfo dozen" implied that Murthy had explicitly requested removal of at least those individuals from social media, and possibly others as well. Dr. Murthy clearly had direct, routine contact with the senior Meta executive, and at least one phone call with him. He is the only individual in government privy to these conversations, and thus the only person who can therefore answer questions about the nature and degree of pressure he exerted on the tech companies to comply with his public demands and clarify whether additional conversations on the topic were held over the phone or in virtual or in-person meetings. *See Payne v. District of Columbia*, 279 F.R.D. 1, 7-8 (D.D.C. 2011) (ordering depositions of mayor and city council members due to their participation in conversations pertinent to allegations); *Byrd v. District of Columbia*, 259 F.R.D. 1, 8 (D.D.C. 2009) (ordering depositions of government officials, even if high-ranking, because of their personal knowledge of facts of the case).

9.    **CDC's Chief of the Digital Media Branch Carol Y. Crawford.**

Defendant Carol Crawford is Chief of the Digital Media Branch of the Division of Public Affairs within CDC. As revealed through discovery obtained in this case, Ms. Crawford is among the government employees most involved in censoring "misinformation" about Covid-19. She exchanged numerous emails with employees at Twitter, Meta, and Google/YouTube, and organized "Be On the Lookout" ("BOLO") meetings—which aimed to quell the spread of "misinformation" —during 2021. Doc. 84, ¶ 248.

Ms. Crawford flagged specific social media posts for censorship, provided examples of the types of posts to censor, and cautioned participants not to share slides from BOLO meetings outside of their "trust and safety teams." Doc. 84, ¶¶ 248, 250. Not only that, but her emails demonstrate that she and others at CDC worked with the Census Bureau to "identify and monitor

social media for vaccine misinformation." Doc. 84, ¶ 249. She observed in emails to Twitter employees that the company had worked with Census the previous year to the same end. *Id.* Emails that Ms. Crawford exchanged with Facebook employees established an agreement in which CDC would use a "misinfo reporting channel," that Facebook employees trained them to use. Emails from March of 2021 indicate that a meeting between CDC (including Ms. Crawford), Census and Google was held to discuss "COVID vaccine mis-info." Ex. 10 (Crawford Collective Exhibit, cited by Bates number), at 3130.

Ms. Crawford's communications with Facebook indicate that CDC, the Census Bureau, and other government agencies collaborate with Facebook to flag speech for censorship regarding both Covid-19 and elections using "CrowdTangle," apparently "a Facebook tool that tracks how content spreads online" (according to the company itself). Ms. Crawford has been involved in this censorship enterprise from the very beginning of the pandemic. In February of 2020, Ms. Crawford spoke with a Facebook employee on the phone about "coordination" to "control … misinformation related to Corona virus … which includes links to WHO page as well as removal of misinformation," and in March 2020, Ms. Crawford asked to speak with a Facebook employee about "remov[ing] misinformation," which apparently led to a phone call. *Id.* at 4060, 4404, 4442. An email from a Facebook official to Ms. Crawford stated that "[w]hen health departments flag potential vaccine misinformation on Facebook and Instagram, we review and remove the content if it violates our policies … This is similar to how governments and fact-checkers use CrowdTangle ahead of elections." Doc. 84, ¶ 252. Following an email exchange with a Facebook executive in February of 2022 bearing the subject line "Vaccine Misinformation Questions for CDC," Ms. Crawford asked the employee to discuss the matter by phone. Ex. 10, at 1677.

These email exchanges demonstrate that Ms. Crawford played a key role in directing censorship on social media platforms.  In fact, she is as heavily involved as any federal official when it comes to identifying specific posts and topics for censorship.  Further, her references to the role of the Census Bureau suggest that she would be able to shed light on that agency's role in efforts to flag "misinformation" the previous year, a topic about which little is known.  She clearly takes part in—and likely plays a significant role in—meetings with the tech companies about censoring "misinformation," and participated in at least several phone calls (which do not appear to have been recorded) with employees of tech companies to discuss the same topic.  She is uniquely positioned to shed light on the content of those conversations, what she asked the tech companies what to do, and the degree of pressure exerted upon the companies to comply with the government's demands.  *See Union Sav. Bank of Patchogue, New York v. Saxon*, 209 F.Supp. 319, 319-20 (D.D.C. 1962) (permitting deposition of head of agency as "Plaintiffs allege actions personal to the Defendant and in violation of the United States Code").

**10. State Department's Global Engagement Center Coordinator Daniel Kimmage.**

Defendant Daniel Kimmage is the Acting Coordinator for the Global Engagement Center at the State Department, which works closely with Jen Easterly and CISA to coordinate social-media censorship of speech on election-related issues and election integrity.  As noted in the Complaint, "[t]he State Department operates a 'Global Engagement Center' within the State Department that conducts counter-'disinformation' activities… [T]he Global Engagement Center is involved in procuring the censorship of private speech on social media, including of U.S. citizens."  Doc. 84, ¶ 88.  In response to third-party subpoena, Twitter has identified Kimmage and other State Department officials at the Global Engagement Center as communicating with Twitter about censorship and content modulation.  *Id.* ¶ 396.  The State Department boasts that it

established the Global Engagement Center to "facilitate public-private coordination" and "increase collaboration" between "the U.S. government and the tech sector" to combat disinformation. *Id.* ¶ 397. The Global Engagement Center works closely with CISA, the "nerve center" of government-induced censorship on election issues, on such projects. *Id.* ¶ 399.

Recently, it emerged that Kimmage's Global Engagement Center collaborated with CISA in 2020 and 2022 to create and fund an alliance of third-party nonprofits called the "Election Integrity Partnership," which aggressively and successfully pushed for social-media censorship of free speech about elections and in 2020 and continues to do so today in 2022. *Id.* ¶ 401. The purpose of this effort was to allow CISA and GEC to evade First Amendment restrictions while still funding and pushing for government-induced social-media censorship. *Id.* ¶ 402. This CISA/State Department project, acting under Kimmage's leadership, achieved astonishing success in procuring the censorship of private speech on social media during 2020, and it continues to do so today. "In its own after-action report on the 2020 election, the consortium boasted it flagged more than 4,800 URLs — shared nearly 22 million times on Twitter alone — for social media platforms. Their staff worked 12-20 hour shifts from September through mid-November 2020, with 'monitoring intensifying significantly' the week before and after Election Day." Doc. 84, ¶ 406. "Backed by the authority of the federal government, including DHS, CISA, the State Department, and State's Global Engagement Center, the consortium successfully sought and procured extensive censorship of core political speech by private citizens." *Id.* ¶ 407. "The consortium achieved a success rate in 2020 that would be enviable for baseball batters: Platforms took action on 35% of flagged URLs, with 21% labeled, 13% removed and 1% soft-blocked, meaning users had to reject a warning to see them." *Id.* ¶ 408. The consortium's leader, former Facebook official Alex Stamos, boasted that the CISA-GEC-funded effort successfully lobbied

social-media platforms to change their terms of service to restrict election-related free speech in 2020: "'I think we were pretty effective in getting platforms to act on things they haven't acted on before,' both by pressuring them to adopt specific censorship policies and then reporting violations." *Id.* ¶ 414. "'Platform interventions' [*i.e.*, censorship of specific posts or content] in response to 'delegitimization of election results,' for example, went from uniformly 'non-comprehensive' in August 2020 to 'comprehensive' by Election Day, the report says." *Id.*

These are not the only CISA-GEC election-related censorship activities.  Documents produced by LinkedIn demonstrate that Samaruddin K. Stewart, acting on behalf of Kimmage's Global Engagement Center in the State Department, organized repeated face-to-face meetings with LinkedIn and other social-media platforms to discuss censorship.  Doc. 84, ¶¶ 422-424.  The nature and content of communications at these oral meetings about disinformation between Kimmage's representatives and social-media platforms has not been disclosed.  Indeed, the Government has provided no documentary discovery about Kimmage's GEC and its central role in federal censorship activities on election-related speech.  Kimmage's deposition is crucial for this reason.

**B.      Defendants' Objections to Producing These Witnesses for Deposition Lack Merit.**

The Government Defendants have objected to producing these (or any) witnesses for deposition.  Their main objections are (1) a blanket objection to producing White House officials, and (2) an objection to producing "high-level" or "apex" officials (which they define very broadly).  These objections have no merit.

### 1.      Defendants' blanket objection to deposing White House officials lacks merit.

Once again, Defendants categorically oppose taking any discovery from White House officials.  Their objections largely re-hash the objections they raised to the discovery requests to

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 264 of 332 PageID #:
4548
Case 3:22-cv-01213-TAD-KDM   Document 85   Filed 10/03/22   Page 32 of 71 PageID # 3525

White House Defendants Karine Jean-Pierre and Dr. Fauci, which this Court has already rejected. Doc. 72, at 6-7.  Plaintiffs incorporate by reference their discussion of the Government's objections to discovery from White House officials from Plaintiffs' prior briefing.  *See* Doc. 71, at 10-19.

First, discovery from White House officials is "maximally relevant."  *Id.* at 11.  The descriptions of the testimony sought from White House Defendants Rob Flaherty, Andrew Slavitt, and Jen Psaki provided above emphasize this point.

Second, Defendants' "categorical refusal to provide" *any* witnesses for deposition unless no White House officials are deposed is "inconsistent with this Court's order."  *Id.*  The Court's discovery schedule provides the parties seven days to meet and confer about "any depositions the Plaintiff States wish to take," and then provides that "Plaintiff States will have thirty days after the Court's ruling to take any authorized depositions."  Doc. 34, at 14.  The Government's position that there should be no depositions at all is hard to square with the Court's provision of a thirty-day period for depositions.  And, for all the reasons stated above, there are compelling reasons to take the depositions of many Government witnesses.

Third, to the extent that the Government contends that producing White House officials for deposition would be unduly burdensome, the Court has already considered and addressed that objection.  In its Order granting preliminary-injunction-related discovery, the Court stated that "[c]ertainly, it would be time-consuming to produce the information requested.  However, this issue involves the alleged violation of a constitutional right – the right to free speech.  Therefore, the Court feels the need for this information outweighs the burden to Government Defendants."  Doc. 34, at 12.  Exactly the same reasoning applies to the depositions of White House officials.

Fourth, this Court's analysis of Plaintiffs' request for interrogatory responses and documents requests from White House officials Jean-Pierre and Fauci—which this Court

granted—is directly on-point.  Doc. 72, at 6-7.  There, the Court noted, "the requested information" from White House officials "is obviously very relevant to Plaintiffs' claims."  *Id.* at 6.  This remains true with respect to the requested depositions.   Second, as the Court also noted, "Government Defendants are making a blanket assertion of all communications to social media platforms … based upon executive privilege and presidential communications privilege," but "[t]he White House has waived its claim of privilege in relation to specific documents that it voluntarily revealed to third parties outside the White House."  *Id.* at 6-7 (citing, *inter alia*, *Center for Effective Government v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 25, 27 (D.D.C. 2013)).  Here, as discussed further below, White House Defendants such as Rob Flaherty and Andy Slavitt engaged in extensive communications with third-party social-media platforms pressuring them to engage in greater censorship of private speech.  And Jen Psaki openly stated that she was aware of such communications when she was at the White House.  None of those communications is subject to any plausible claim of privilege, as the Court has already held.  *Id.*  Further, the Court also rejected Defendants' argument that "Plaintiffs must seek discovery from other sources," holding that "[t]his is expedited preliminary-injunction-related discovery.   This discovery was opposed by Government Defendants.  This is the only chance Plaintiffs will have to get this information prior to addressing the preliminary injunction.  This discovery was tailored to the facts alleged in this case.  There was no requirement in this Court's order for the Plaintiffs to get this information from other sources first."  Doc. 72, at 7.  These statements are equally true today.

Finally, the Government may argue that White House officials are "high-level" or "apex" officials who should not be subject to discovery requests because they are too busy and important conducting their official duties to deign to spend time participating in depositions.  This argument is meritless for the reasons discussed below.  Defendants were not too busy to spend a great deal

of time pressuring social-media platforms to violate Plaintiffs' First Amendment rights. They should not be heard to complain that they are too busy to answer questions under oath about the egregious civil-rights violations they perpetrated.

## 2. Defendants' objection to the depositions of "high-level" officials lacks merit.

Defendants have also objected to depositions of "high-level" officials. They interpret "high-level" quite broadly, to include a wide swath of federal officials with unique first-hand knowledge of oral communications about censorship with social-media platforms. Their objection has no merit.

Under the apex doctrine recognized by many courts, a "party attempting to depose a high-ranking government official must demonstrate 'extraordinary circumstances' requiring such a deposition." *United States v. Newman*, 531 F. Supp. 3d 181, 188 (D.D.C. 2021) (Leon, J.); *see also, e.g., In Re Bryant*, 745 F. App'x 215, 220 (5th Cir. 2018) (holding that a request for deposition of a high-level government official should consider (1) "the high-ranking status of the deponents," (2) "the potential burden that the depositions would impose upon them," and (3) "the substantive reasons for taking the depositions"). There is a presumption that ""high ranking government officials are generally not subject to depositions unless they have some personal knowledge about the matter and the party seeking the deposition makes a showing that the information cannot be obtained elsewhere." *Newman*, 531 F. Supp. 3d at 188. Courts have held that the apex doctrine applies, at least in some form, to former officials. *Fed. Deposit Ins. Corp. v. Galan-Alvarez*, No. 1:15-MC-00752, 2015 WL 5602342, at *4 (D.D.C. Sept. 4, 2015). For former officials, the two rationales supporting the apex doctrine are: (1) "[t]he need to protect the integrity of the underlying decision-making process," and (2) to "encourage public service by protecting officials from 'indiscriminate depositions[.]'" *Newman*, 531 F. Supp. 3d at 188.

34

As an initial matter, the apex doctrine simply does not apply here because all Plaintiffs' proposed witnesses satisfy the second prong of the doctrine: "they have some personal knowledge about the matter and the party seeking the deposition makes a showing that the information cannot be obtained elsewhere." *Newman*, 531 F. Supp. 3d at 188. Here, as discussed in detail above for each proposed witness, every such federal official has "personal knowledge about the matter" and "the information cannot be obtained elsewhere." *Id.* Indeed, in every case, critical information is at stake, and depositions provide "the only chance Plaintiffs will have to get this information prior to addressing the preliminary injunction." Doc. 72, at 7. Accordingly, even if these officials were "high-level," which most are not, their depositions would still be warranted. *See, e.g., Church of Scientology of Boston v. I.R.S.*, 138 F.R.D. 9, 12 (D. Mass. 1990) ("An exception to this general rule [against depositions of high-ranking government officers] exists concerning top officials who have direct personal factual information pertaining to material issues in an action ... [and] where the information to be gained ... is not available through any other source."); *Payne v. District of Columbia*, 279 F.R.D. 1, 7-8 (D.D.C. 2011) (ordering depositions of mayor and city council members due to their participation in conversations pertinent to allegations); *Byrd v. District of Columbia*, 259 F.R.D. 1, 8 (D.D.C. 2009) (ordering depositions of government officials, even if high-ranking, because of their personal knowledge of facts of the case). As the Fifth Circuit stated in *Bryant*, "the substantive reasons for taking the depositions" is a key factor. 745 F. App'x at 220. Here, those "substantive reasons" include that the information is not available from any other source—which is the quintessential justification for seeking a "high-level" deposition.

In any event, the only witness sought by Plaintiffs who is arguably "high-level" under the apex doctrine is Jen Psaki, the former White House Press Secretary, who is no longer a federal official. The President, Vice President, Cabinet Secretaries, and U.S. Senators would typically

qualify as high ranking officials. *Newman*, 531 F. Supp. 3d at 188–189 (collecting cases). The principal case providing protection to Assistants to the President noted that the individuals had the "most senior rank within the White House," second only to the Chief of Staff. *Alexander v. FBI*, 186 F.R.D. 1, 3 (D.D.C. 1998). Again, the case hinged on the "substantial likelihood that depositions would significantly interfere with their ability to perform their governmental duties." *Id.* at 4. Even assuming that the Fifth Circuit would agree with the D.C. Circuit, the requested deposition of Ms. Psaki does not conflict with the apex doctrine, to the extent it applies.

Here, Ms. Psaki was the White House Press Secretary at the time key White House announcements were made about efforts to require social media companies to censor private speech. The Press Secretary is an Assistant to the President and would be considered a high-ranking official under D.D.C.'s case law. *Alexander*, 186 F.R.D. at 1. But, even under the DC Circuit's test, she has unique knowledge that cannot be obtained elsewhere. And as a former official, the only rationale that applies is whether a deposition would discourage others from taking the position—it would not.

Defendants freely admit that they "have produced thousands of records of [] communications by officials throughout the government," Doc. 71, at 54, but no communications from the Press Secretary's Office. Although the Amended Responses to the Interrogatories state that documents were collected from Ms. Psaki, Ms. Jean-Pierre, and Mt. Munoz, no document produced to date includes anyone Plaintiffs have identified as anyone associated with the Press Secretary's Office. It is undisputed that then-White House Press Secretary Psaki's statements show not that she communicated with social media companies, but "that others did." Doc. 71, at 54. Yet when asked to identify "members of our senior staff" and "members of our COVID-19 team" that interacted with social media platforms (statements made during White House Press

Briefings), the White House Press Secretary's Office claims it does not understand the question because "it relies on a characterization of a statement made by an individual no longer in government, and the statement does not specify the individuals at issue or the specific communications referenced." Ex. 3, at 74. But that is the whole point—to name the individuals at issue. Instead of answering Plaintiff's question in a direct and simple way, the White House Press Secretary's Office chose to provide transcripts of what reporters asked the office. Moreover, Defendants have objected to the "characterization" of Ms. Psaki's statements and refuses to speculate on what she meant when she made those statements. It is clear that the best, and likely only, source of the information requested is Ms. Psaki.

A deposition could not interfere with a high ranking officials day-to-day duties, because Ms. Psaki is a former employee. Deposing the former Press Secretary is not interfering with the decision making process. Ms. Psaki was not a decision-maker on these issues. Ms. Psaki announced the actions of the decision-makers from the White House Press Room, and as the responses by the Press Secretary's Office show, no employee of the Office communicated with social media companies to engage in content modulation. Ex. 3, at 79–84 (the Office "is unaware of any such communications between employees of the Office and any social media platform that discuss this topic."). Asking her to explain her statements, identify the senior members of the team and COVID-19 team, and identify any other White House contacts with social media platforms is a minimal burden.

The other witnesses simply do not qualify as "high-ranking" under relevant case law. For example, Mr. Flaherty is not a high ranking official. He is the Director of Digital Operations, a relatively new position, and holds the title Deputy Assistant to the President. He reports to the Director of Communications, who is an Assistant to the President. *Alexander*, 186 F.R.D. 1. Even

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 270 of 332 PageID #:
4554
Case 3:22-cv-01213-TAD-KDM   Document 85   Filed 10/03/22   Page 38 of 72 PageID #: 3531

if considered a high ranking official, he has unique personal knowledge of the White House's efforts to suppress private speech that disagreed with the FDA and HHS's conduct in vaccine roll outs.  The White House Press Secretary's Office has named him as the only remaining team member that has personal knowledge of the White House's efforts.  Ex. 3, at 79–84.  And as the White House Press Secretary's Office otherwise claims ignorance.

Likewise, Jen Easterly is not a high-ranking official, and she bears no resemblance to high-ranking officials like the President or Cabinet-level Secretary Mayorkas.  Easterly is the Director of the Cyber Infrastructure and Security Agency within the Department of Homeland Security, and that is not a high ranking position that deserves special protection.  It is not a Cabinet level position, nor is it within the Office of the DHS Secretary.  *See* Department of Homeland Security, Organization, Office of the Secretary (visited Oct. 14, 2022), *at* https://www.dhs.gov/office-secretary.  Instead she is one of *twenty-seven* comparable officials that report to Secretary Mayorkas.  Department of Homeland Security, Organization, Organizational Chart (visited Oct. 14, 2022), *at* https://www.dhs.gov/sites/default/files/publications/21_0402_dhs-organizational-chart.pdf.  Thus, Easterly is classic middle-level management.  She is not in a Cabinet-level position, does not report to the President like Assistants to the President do, and is one of many of Secretary Mayorkas's coequal subordinates.

A similar analysis, moreover, applies to Plaintiffs' other proposed witnesses discussed above—including Dr. Fauci.  Indeed, Dr. Fauci occupies a lower rung on the federal hierarchy than Director Easterly.  While Easterly leads one of 27 components that report to the Secretary of DHS, Fauci leads one of 27 components that report to the Director of NIH, and the Director of NIH leads one of eleven components that report to the Office of the Secretary of HHS.  *See* https://www.hhs.gov/about/agencies/orgchart/index.html (NIH is one of eleven agencies that

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 271 of 332 PageID #:
4555
Case 3:22-cv-01213-TAD-KDM   Document 85   Filed 10/03/22   Page 39 of 41 PageID #: 3532

report to the Operating Division of HHS that reports to the Chief of Staff and Secretary Becerra);

https://www.niaid.nih.gov/research/role#:~:text=For%20more%20than%2060%20years,Institute

s%20of%20Health%20(NIH) ("NIAID is one of the 27 Institutes and Centers of the National

Institutes of Health (NIH)").

The same analysis applies to Surgeon General Murthy.  The Surgeon General is not a

Cabinet-level position.  Rather, the Office of Surgeon General is housed within the Office of the

Assistant Secretary for Health (OASH) within the Department of Health and Human Services.

According to its website, the Office of Surgeon General is one of many components within that

office: "OASH oversees the Department's key public health offices and programs, a number of

Presidential and Secretarial advisory committees, 10 regional health offices across the nation, and

the Office of the Surgeon General and the U.S. Public Health Service Commissioned Corps."

https://www.hhs.gov/ash/index.html.  The Surgeon General, therefore, is at most comparable to

Dr. Fauci in his federal rank, and multiple levels below the Cabinet-level Secretary of HHS.  He

is not a "high-ranking" official immune from deposition.

Thus, neither Dr. Fauci, nor Director Easterly, nor Dr. Murthy, nor any other witness is

"high-ranking" enough to warrant protection from deposition, and all of them are in unique

possession of information that Plaintiffs cannot obtain from any other source at this stage in any

event.  The Government's reliance on this objection fails.

## CONCLUSION

For all these reasons, Plaintiffs respectfully request that the Court order that Plaintiffs

may take the depositions of the ten witnesses identified herein with 30 days of the Court's ruling

on this Joint Statement.

## DEFENDANTS' STATEMENT ON DEPOSITIONS

### INTRODUCTION

A Court may consider evidence outside the administrative record in connection with a request for a preliminary injunction against the Government only in "unusual circumstances." ECF No. 34 at 11. A party may take discovery in order to adduce evidence for a preliminary injunction only with additional "good cause." *Id.*

In this case, despite the usual standards, the Court authorized Plaintiffs to conduct limited discovery in support of their motion for preliminary injunctive relief. *See id.* The Court's authorization was specifically limited to written discovery, while deferring the question of depositions to a later date. *Id.* at 12. Despite the Court's understanding that Plaintiffs would seek only "targeted" written discovery, Plaintiffs served dozens of document requests and over 100 interrogatories, requiring Defendants to produce more than 15,000 pages of documents, as well as interrogatory responses and objections totaling nearly 100 pages, in a compressed timeframe.

Plaintiffs now ask the Court to authorize even more, and inherently more burdensome, discovery. They seek to take depositions. And their proposal for depositions is not "targeted." Even though a party is typically entitled to take no more than 10 depositions during *regular* discovery, Plaintiffs assert that they are entitled to take at least that many during this extraordinary course of *expedited* discovery.

Plaintiffs seek depositions of officials added to the case through the recently-filed Second Amended Complaint, even though the Court already rejected their requests to seek discovery from newly added parties. ECF No. 72 at 3-4. Plaintiffs also seek depositions of high-ranking Government officials without showing exceptional circumstances warranting their depositions. And they seek depositions of nonparty former Government officials. The burdens of coordinating and preparing such high-ranking officials and former officials, subject to subpoena, to provide

40

testimony are self-evident. But Plaintiffs have not justified their broad requests and the attendant burdens with any showing of genuine necessity. The Court has made clear that expedited discovery cannot be for purposes of a "fishing expedition." *Id.* at 12. So Plaintiffs must identify, for any and each would-be deponent, what critical testimony they must have at this juncture in the litigation. They cannot make that showing.

## BACKGROUND

On July 12, 2022, this Court authorized interrogatories and document requests that were "targeted to the specific allegations of Plaintiff States' Complaint." ECF No. 34 at 12. Because Plaintiffs did not seek depositions at that time, the Court stated that "[w]hether depositions will be taken will be addressed later." *Id.* The Court's expedited discovery order directed Plaintiffs to notify Defendants of any depositions they wished to take within 10 days receiving Defendants' written discovery responses. *Id.* at 14. The Court further provided that any depositions ultimately authorized must be completed within a period of 30 days. *Id.*

On October 7, Plaintiffs notified Defendants that they wished to take depositions of the following 20 current or formal Government officials:

1. **Anthony Fauci**, Director of NIAID and Chief Medical Advisor to the President of the United States
2. **Vivek Murthy**, Surgeon General of the United States
3. **Eric Waldo**, Senior Advisor and formerly Chief Engagement Officer at the Office of the Surgeon General (OSG)
4. **Max Lesko**, Chief of Staff at OSG
5. **Jay Dempsey**, Social Media Team Lead, Digital Media Branch, Division of Public Affairs at the Center for Disease Control and Prevention (CDC)
6. **Carol Crawford**, Chief of the Digital Media Branch of the Division of Public Affairs at the CDC
7. **Robert Silvers**, Undersecretary of Homeland Security for the Office of Strategy, Policy, and Plans, Department of Homeland Security (DHS)
8. **Jen Easterly**, Director of Cybersecurity and Infrastructure Security Agency (CISA)
9. **Matthew Masterson**, former Senior Cybersecurity Advisory, CISA
10. **Lauren Protentis**, member of Mis-, Dis-, and Mal-information Team, CISA
11. **Nina Jankowicz**, former Executive Director of Disinformation Governance Board, DHS

12. **Jennifer Psaki**, former White House Press Secretary
13. **Robert Flaherty**, Deputy Assistant to the President and Director of Digital Strategy at the White House
14. **Andrew Slavitt**, former White House Senior Advisor for COVID-19 Response
15. **Jennifer Shopkorn**, Strategy Director, Communications Directorate at the Census Bureau
16. **Zachary Henry Schwartz**, Serving temporarily as Senior Advisor to the Chief of Staff to the Secretary of Commerce
17. **Samaruddin K. Stewart**, former Senior Technical Advisor and/or Senior Advisor for the Global Engagement Center of the United States Department of State
18. **Daniel Kimmage**, Acting Coordinator for the Global Engagement Center at the United States Department of State
19. **Laura Dehmlow**, Section Chief for the Federal Bureau of Investigations (FBI) Foreign Influence Task Force
20. **Elvis Chan**, Assistant Special Agent in Charge of the FBI San Francisco Division's Cyber Branch

The parties have met and conferred over Plaintiffs' proposed list of depositions but have been unable to reach agreement. During the parties' meet and confer discussions, Plaintiffs represented that they intended to reduce this list to around 10 deponents, but they have not actually identified whose deposition they would *not* seek. Not knowing that crucial information, Defendants have drafted their portion of the Joint Statement on the assumption that Plaintiffs will ask the Court to authorize depositions of any and all of the deponents included in their initial list.

## ARGUMENT

### I.   Plaintiffs Have Not Met The Heavy Burden To Demonstrate That Any Depositions Are Warranted At This Stage.

As with any expedited discovery, Plaintiffs bear a heavy burden to demonstrate a need for depositions. "[E]xpedited discovery is not the norm . . . and courts only allow it in limited circumstances." *Wilson v. Samson Contour Energy E & P, LLC*, No. CIV.A. 14-0109, 2014 WL 2949457, at *3 (W.D. La. June 30, 2014). "The party seeking expedited discovery has the burden of establishing" that "the scope of the requests" is "narrowly tailored to the necessary information they seek." *GHX Indus. LLC v. Servco Hose & Supply LLC*, No. 6:19-CV-01552, 2020 WL

1492920, at *2 (W.D. La. Feb. 5, 2020). In determining whether expedited discovery is proper, the Court must also consider the "burden on the defendants to comply with the requests." *Id.* at *1.

Plaintiffs have not met the heavy burden to establish that any deposition testimony is necessary in support of a motion for emergency relief. *See* ECF No. 72 at 4 (emphasizing this expedited discovery process is "for the purpose of gaining the necessary information to address the preliminary injunction"). Although a plaintiff is rarely entitled to expedited discovery, Plaintiffs here have received a substantial amount. Defendants produced more than 15,000 pages of non-privileged responsive e-mails, and they answered numerous interrogatories. Plaintiffs cannot demonstrate that still more discovery—particularly burdensome depositions—is warranted at this stage of the case. *See* ECF No. 34. Through Defendants' responses to-date, Plaintiffs have received precisely what they were after through expedited discovery: information about the identifies of officials communicating with social media platforms as well as the nature and content of those communications. Depositions would not further illuminate the "nature and content" of the very external communications produced by those within the scope of this Court's discovery order, which Plaintiffs now have in their possession. Instead, depositions would almost certainly target *internal* communications and deliberations—in other words, purely privileged matters. *See Skelton v. U.S. Postal Serv.*, 678 F.2d 35, 38 (5th Cir. 1982); *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004).

Moreover, and given the extensive amount of information already produced through written discovery, expedited deposition testimony would be burdensome, unreasonably duplicative, and cumulative. The Court has emphasized the "burden" "the expedited discovery schedule" "has put on all parties in this proceeding." ECF No. 72 at 4. The Government has already spent considerable time and resources in addressing written discovery during this expedited

43

process. The inherently time-consuming process required of depositions would only magnify these burdens. *See Kinetic Concepts, Inc. v. Wake Forest Univ. Health Scis.*, No. SA-11-CV-163-XR, 2014 WL 1787813, at *2 (W.D. Tex. May 5, 2014) ("Unlike" with the "produc[tion]" of a person's "emails," requiring that person to "appear[] for a deposition . . . will . . . involve his own time and will therefore . . . impose a personal burden").

Additionally, even if any deposition testimony were warranted, Plaintiffs have not tailored their requests to genuine needs. Instead, they seek a maximum amount of relief. Indeed, Plaintiffs' initial proposal of 20 depositions not only doubles Rule 30's presumptive limit of 10 depositions for the entire duration of a case; it would result in one deposition on average every business day during the four-week period allotted for any depositions. Plaintiffs' later-expressed intention to pare the list down to around 10, a number that equals the presumptive limit, further underscores the maximalist, rather than targeted, nature of Plaintiffs' requests. And many of the requested depositions involve individuals within the same chain of command, such that the contemplated testimony would be unreasonably cumulative and duplicative.

Plaintiffs fail to show any particularized need for depositions to resolve their preliminary injunction motion, which has been pending for four months. The Court should deny their requests for burdensome and broad-ranging depositions.

## II.   The Proposed Depositions Present Additional Legal And Practical Issues Particular To The Current Officials And Non-Party Former Officials At Issue.

Plaintiffs' proposed depositions present a host of particularized legal and practical problems, which also warrant denial of Plaintiffs' requests. First, many of the depositions that Plaintiffs seek ignore this Court's previous ruling limiting the scope of discovery to the original Complaint on which the preliminary injunction motion is based. *See* ECF No. 34 at 12 (authorizing discovery "targeted to the specific allegations of Plaintiff States' Complaint"). First, Plaintiffs'

deposition list includes officials outside the contours of the original Complaint, including White House officials outside of the White House Office of the Press Secretary, FBI officials, State Department officials, and Census officials. Second, Plaintiffs ignore the high standard for deposing high-level officials. Plaintiffs seek depositions of many high-ranking officials—including Dr. Anthony Fauci, Vivek Murthy, Robert Silvers, Jen Easterly, and Jennifer Psaki, as well as other White House officials—without making any plausible showing that "exceptional circumstances" exist to warrant seeking their depositions. Third, Plaintiffs seek to depose several former officials—Nina Jankowicz, Jennifer Psaki, and Matthew Masterson, and others—who are protected by various procedural requirements in Rule 45 of the Federal Rules of Civil Procedure, which make it infeasible to complete depositions of those officials within 30 days. And as a practical matter, Plaintiffs seek to depose Lauren Protentis, who is on maternity leave.

The breadth of Plaintiffs' requests demonstrates that they are unnecessary and should not be authorized. But if the Court allows any depositions to go forward, it should disallow depositions in the following three categories: (a) those beyond the contours of the original Complaint and expedited discovery requests Plaintiffs served; (b) high-ranking Government officials; and (c) non-party former officials covered by Rule 45.

### A. Plaintiffs' Request To Depose Defendants Not Named In Their Original Complaint Or Subject To Their Written Discovery Requests Goes Beyond The Bounds Of Court-Authorized Expedited Discovery.

Plaintiffs seek depositions of several officials from agencies or entities that were not named in the original Complaint or served with written discovery. But this Court has already rejected Plaintiffs' requests to serve written discovery on these very officials, *see* ECF No. 71 at 24-25, and Plaintiffs' requests to take their depositions fly in the face of the Court's prior order, ECF No. 72 at 3-4. Accordingly, the Court should deny Plaintiffs' request to depose the following officials at

agencies and entities who Plaintiffs did not name in the original Complaint or serve with written

discovery requests:

1. **Robert Flaherty**, Deputy Assistant to the President and Director of Digital Strategy at the White House
2. **Andrew Slavitt**, former White House Senior Advisor for COVID-19 Response
3. **Jennifer Shopkorn**, Strategy Director, Communications Directorate at the Census Bureau
4. **Zachary Henry Schwartz**, serving temporarily as Senior Advisor to the Chief of Staff to the Secretary of Commerce
5. **Samaruddin K. Stewart**, former Senior Technical Advisor and/or Senior Advisor for the Global Engagement Center of the United States Department of State
6. **Daniel Kimmage**, Acting Coordinator for the Global Engagement Center at the United States Department of State
7. **Laura Dehmlow**, Section Chief for the FBI's Foreign Influence Task Force
8. **Elvis Chan**, Assistant Special Agent in Charge of the FBI San Francisco Division's Cyber Branch

As background, in the parties' Joint Statement concerning written discovery, Plaintiffs

asserted that, despite their earlier representations that they sought narrow and targeted discovery,

the Court should authorize expansive discovery into the activities of "newly identified federal

officials" not named in the original Complaint and thus not yet served with discovery requests. *See*

ECF No. 71 at 2, 24-25. Plaintiffs sought in particular to serve discovery on "senior White House

officials and officials at the State Department, the [U.S. Food and Drug Administration (FDA)],

the Census Bureau, the U.S. Election Assistance Commission, . . . the Treasury Department," and

"the FBI." *Id.* at 24. Plaintiffs identified some of the new White House officials by name, including

"Rob Flaherty, Andrew Slavitt, Clarke Humphrey, Courtney Rowe."[2] Plaintiffs acknowledged that

these White House officials and officials at the various agencies or entities were not named in their

original Complaint or the subject of the discovery requests they had served. ECF No. 71 at 20-21,

---

[2] In the original Complaint, Plaintiffs named the White House Press Secretary in addition to naming President Biden separately. The White House Press Secretary was the subject of the original written discovery, but neither Flaherty nor Slavitt, who Plaintiffs now wish to depose, are or were in the White House Office of the Press Secretary.

24-25. They proposed to remedy that defect by seeking to file a Second Amended Complaint and immediately serving new discovery requests. *Id.*

The Court rejected that proposal, concluding that serving discovery on these newly identified officials was not "necessary" for Plaintiffs to obtain "information to address the preliminary injunction" motion. ECF No. 72 at 4. Indeed, the Court has only authorized expedited discovery in the first instance to the extent that it is "targeted to the specific allegations of [the] Complaint" on which the preliminary injunction motion is based. ECF No. 34 at 12. Reiterating that "[e]xpedited discovery is not the norm," that it must be "targeted" and "narrow," and that it must not unduly burden Defendants, the Court thus held that permitting Plaintiffs to serve discovery on these newly identified officials "would be too much." ECF No. 72 at 3-4. Thus, although Plaintiffs would be permitted to file a Second Amended Complaint, and obtain information from newly identified defendants through "any potential merit-related discovery," these officials were not properly subjected to any "additional expedited preliminary-injunction discovery." *Id.* at 4.

Ignoring the Court's September 6 order, Plaintiffs now try again. One day after filing their Second Amended Complaint, they sent the Government a list of 20 officials whose depositions they sought, including *8 officials* who were not identified in the original Complaint. With the exception of one of those officials (a Census employee, who was only added to the case through the First Amended Complaint, and not the original Complaint), all of them were added to the case for the first time to the *Second Amended Complaint*. Plaintiffs apparently seek these officials' depositions on the same theory that the Court rejected when denying additional written discovery: that these officials were identified in documents produced by Defendants or by third-party social-media platforms in response to subpoenas. That does not suffice. Plaintiffs must show that the

47

depositions are "necessary" for resolving their preliminary injunction motion. ECF No. 72 at 4; *see also BKGTH*, 2013 WL 5507297, at *5. The Court already found that written discovery on these officials was not necessary for that purpose. ECF No. 72 at 4. Similarly, it is unnecessary to subject these individuals to deposition to resolve Plaintiffs' preliminary injunction motion.

Compounding the error, Plaintiffs seek to subject these officials to discovery, for the first time, through a deposition—a means inherently more onerous than the written discovery they previously sought. *See Kinetic Concepts*, 2014 WL 1787813, at *2. Again, Plaintiffs have not served written discovery requests on *any* of these 8 defendants who were not identified in the original Complaint, and the Court has already properly rejected Plaintiffs' belated attempts to serve discovery on these officials. The Court should likewise deny Plaintiffs' request to subject these individuals to depositions.

## B. Plaintiffs Cannot Demonstrate The "Exceptional Circumstances" Meriting The Depositions Of "Highly-Ranked Government Officials."

Plaintiffs seek the depositions of several high-ranking officials from the White House, HHS, and DHS. The depositions are improper for multiple reasons. As discussed elsewhere in this statement, the White House officials Plaintiffs seek to depose either are outside the original scope of discovery (Robert Flaherty and Andrew Slavitt), are former officials protected by Rule 45 (Jennifer Psaki and Andrew Slavitt), or both (Andrew Slavitt). Even setting those issues aside, Plaintiffs cannot justify deposing these high-ranking officials. In addition to seeking depositions of high-ranking White House officials, Plaintiffs also seek the depositions of other high-ranking officials across the federal Government, specifically:

1. **Jennifer Psaki**, former White House Press Secretary
2. **Robert Flaherty**, Deputy Assistant to the President and Director of Digital Strategy at the White House
3. **Andrew Slavitt**, former White House Senior Advisor for COVID-19 Response
4. **Vivek Murthy**, Surgeon General of the United States

5. **Anthony Fauci**, Director of NIAID and Chief Medical Advisor to the President of the United States
6. **Jen Easterly**, Director of CISA
7. **Robert Silvers**, Undersecretary of Homeland Security for the Office of Strategy, Policy, and Plans, DHS

As described below, Plaintiffs have not satisfied their high burden for such depositions.

Any such depositions are particularly unjustified at this time when there are alternative sources of information available to inform Plaintiffs' motion for preliminary injunction.

### 1. Plaintiffs Must Satisfy A High Bar For Deposing High-Ranking Government Officials.

The Fifth Circuit agrees with other circuits that "top executive department officials should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions." *In re Office of Inspector Gen.*, *R. R. Ret. Bd.*, 933 F.2d 276, 278 (5th Cir. 1991) (quoting *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985) (citing *United States v. Morgan*, 313 U.S. 409, 422 (1941) (*Morgan II*)), and directing district court to "remain mindful of the requirement that exceptional circumstances must exist before the involuntary depositions of high agency officials are permitted"). As the Supreme Court and lower courts applying *Morgan II* and its predecessor, *Morgan v. United States*, 304 U.S. 1 (1938) (*Morgan I*), have emphasized, compelling the testimony of high-ranking government officials is justified only in "extraordinary instances." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977); *cf. In re Dep't of Com.*, 139 S. Ct. 16, 17 (2018) (mem.) (opinion of Gorsuch, J., joined by Thomas, J.) (agreeing with order staying deposition of Cabinet secretary but concluding that the Court should have gone further to limit depositions and other extra-record discovery because any "extraordinary claim of bad faith against a coordinate branch of government requires an extraordinary justification"). Thus, "[i]nvoluntary depositions of highly-ranked government officials are only allowed when 'exceptional circumstances . . . exist.'" *In re Bryant*,

745 F. App'x 215, 220 (5th Cir. 2018) (per curiam), as revised (Nov. 30, 2018) (unpublished)

(quoting *In re F.D.I.C.*, 58 F.3d 1055, 1060 (5th Cir. 1995)).

      Under that doctrine, the Fifth Circuit has repeatedly disapproved orders and subpoenas

directed personally against high-ranking Government officials. *See, e.g.*, *F.D.I.C.*, 58 F.3d at 1060

(granting mandamus because "the magistrate judge clearly abused his discretion by declining to

quash the deposition notices issued" to three FDIC Directors); *In re Stone*, 986 F.2d 898, 905 (5th

Cir. 1993) (per curiam) (standing order compelling potentially high-ranking government

representative with full settlement authority to attend settlement conference was abuse of

discretion); *accord Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir.

2013); *In re United States (Jackson)*, 624 F.3d 1368, 1376 (11th Cir. 2010); *Bogan v. City of

Boston*, 489 F.3d 417, 423 (1st Cir. 2007). Other circuits have issued writs of mandamus to prevent

compulsion of testimony from high-level Government officials. *See In re McCarthy*, 636 F. App'x

142 (4th Cir. 2015) (EPA Administrator McCarthy); *In re United States (Jackson)*, 624 F.3d at

1372-73 (EPA Administrator Jackson); *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) (per

curiam) (Vice President's Chief of Staff); *In re United States (Reno & Holder)*, 197 F.3d 310, 313-

14 (8th Cir. 1999) (Attorney General and Deputy Attorney General); *In re United States (Kessler)*,

985 F.2d 510, 512-13 (11th Cir. 1993) (per curiam) (FDA Commissioner). Courts have reasoned

that high-ranking officials well beneath the Cabinet rank also warrant protection from depositions.

*See, e.g.*, *United States v. Sensient Colors, Inc.*, 649 F. Supp. 2d 309, 321 (D.N.J. 2009) (EPA

Regional Administrator for Region 2, who "reports directly to the EPA Administrator, who in turn

reports directly to the President of the United States"); *Church of Scientology of Boston v. IRS*,

138 F.R.D. 9, 12 (D. Mass. 1990) (director of Exempt Organizations Technical Division, National

Office of the Internal Revenue Service).

The strict limitation on the compelled testimony of high-ranking officials is necessary for two reasons. *First*, such orders raise significant "separation of powers concerns." *In re United States (Jackson)*, 624 F.3d at 1372; *see Arlington Heights*, 429 U.S. at 268 & n.18; *see also In re Dep't of Com.*, 139 S. Ct. at 17 (opinion of Gorsuch, J.). As *Morgan II* emphasized, administrative decisionmaking and judicial processes are "collaborative instrumentalities of justice and the appropriate independence of each should be respected by the other." 313 U.S. at 422. "Just as a judge cannot be subjected to such a scrutiny, so the integrity of the administrative process must be equally respected." *Id*. (citation omitted). *Second*, as a practical matter, requiring high-ranking officials to appear for depositions also threatens to "disrupt the functioning of the Executive Branch." *Cheney*, 542 U.S. at 386. "[H]igh ranking government officials have greater duties and time constraints than other witnesses." *See FDIC*, 58 F.3d at 1060 (quoting *In re United States*, 985 F.2d at 512). As a result, "[i]f courts did not limit the[] depositions [of high-ranking officials], such officials would spend 'an inordinate amount of time tending to pending litigation.'" *Lederman*, 731 F.3d at 203 (citation omitted). The threat to inter-branch comity is particularly acute where the deposition is sought expressly to test the high-ranking official's credibility or to probe deliberations with other Executive Branch officials. *See FDIC*, 58 F.3d at 1060 (citing *In re United States*, 985 F.2d at 512). Moreover, "high level executives and government officials need some measure of protection from the courts because they are 'vulnerable to numerous, repetitive, harassing, and abusive depositions." *Asberry v. Sch. Bd. of Pasco Cnty., Fla.*, No. 18-cv-02222, 2019 WL 12383128, at *1 (M.D. Fla. Aug. 20, 2019).

In *Bryant*, the Fifth Circuit noted that a lower court had "recognized," as a preliminary requirement for an "exceptional circumstances" analysis, that the proponent of the deposition must show "that the official has first-hand knowledge related to the claims being litigated that is

unobtainable from other sources." 745 F. App'x at 218 n.2; see *Freedom From Religion Found., Inc. v. Abbott*, No. 16-cv-233, 2017 WL 4582804 at \*11 (W.D. Tex. Oct. 13, 2017) (citing *Bogan*, 489 F.3d at 423, which observed that "depositions of high ranking officials may be permitted where the official has first-hand knowledge related to the claim being litigated"). "Agency leaders often send and receive correspondence relative to their actions," but that alone cannot suffice to warrant depositions. *FDIC*, 58 F.3d at 1061. Once the "first-hand knowledge" threshold is crossed, "[i]n determining whether exceptional circumstances exist" to warrant such an extraordinary deposition, a court "must consider (1) 'the high-ranking status of the deponents,' (2) 'the potential burden that the depositions would impose upon them,' and (3) 'the substantive reasons for taking the depositions.'" *Bryant*, 745 F. App'x at 220 (quoting *F.D.I.C.*, 58 F.3d at 1060). "As an overarching consideration, the court must also consider that 'it will be the rarest of cases . . . in which exceptional circumstances can be shown where the testimony is available from an alternate witness.'" *Id.* (quoting *F.D.I.C.*, 58 F.3d at 1062).

The *Bryant* court held that it was premature to issue a writ of mandamus prohibiting the deposition of the chief of staff of a state governor until the magistrate judge "adequately address[ed]" "several important aspects" of the *F.D.I.C.* analysis, including, as relevant here, (a) "whether the information desired can be sought from alternative witnesses or must exclusively come from the" proposed deponent; (b) "whether the information desired can be obtained in another form," *id.*, where it was "likely that written answers to questions, given under oath, would be sufficient," *id.* at 222; and (c) "if it cannot be obtained in another form, whether the scope of the inquiry can be more closely tailored to target only the specific questions raised" at a Rule 30(b)(6) deposition previously taken, *id.* at 220.

Finally, the general rule against depositions of high-ranking officials is "no less applicable to former officials than to current officials[,]" so that "the integrity of the administrative process" continues to be "respected[,]" and so as not to discourage individuals from accepting public service. *See F.D.I.C. v. Galan-Alvarez*, No. 15-mc-752, 2015 WL 5602342 at *4 (D.D.C. Sept. 4, 2015) (quashing subpoena seeking testimony from the former chairperson of the FDIC); *see also In re United States (Bernanke)*, 542 F. App'x 944, 949 (Fed. Cir. 2013) ("[T]he process-inquiry rationale [for prohibiting depositions of high-ranking officials except under exceptional circumstances] hardly becomes inapplicable upon an official's departure from his office[.]"), *accord In re U.S. Dep't of Educ.*, 25 F.4th 692, 705 (9th Cir. 2022). Further, "[s]ubjecting former officials['] decision-making processes to judicial scrutiny and the possibility of continued participation in lawsuits years after leaving public office would serve as a significant deterrent to qualified candidates for public service." *United States v. Wal-Mart Stores, Inc.*, No. 01-cv-152, 2002 WL 562301 at *3 (D. Md. Mar. 29, 2002); *see also Sensient Colors*, 649 F. Supp. 2d at 318; *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1049-50 (E.D. Cal. 2010) (noting the general rule prohibiting depositions of high- ranking government officials applies to former high-ranking officials).

## 2. Plaintiffs Cannot Satisfy The *Morgan* Factors In Their Request For Authorization To Depose Senior White House Officials.

Plaintiffs' request to depose senior White House officials—Jennifer Psaki, Robert Flaherty, and Andrew Slavitt—should be denied. The *Morgan* factors are not met here for any of the three.

All three senior White House officials should be considered high-ranking under *Morgan*. Psaki served as an Assistant to the President and White House Press Secretary prior to leaving government. *See Alexander v. F.B.I.*, 186 F.R.D. 1, 3 (D.D.C. 1998) (finding that the White House Press Secretary, among others, is considered a high-ranking official). Meanwhile, Flaherty is

currently a Deputy Assistant to the President and Director of Digital Strategy at the White House. And, Slavitt was a White House Senior Advisor for COVID-19 Response. *See, e.g., In re United States (Bernanke)*, 542 F. App'x at 949 ("[T]he process-inquiry rationale [for prohibiting depositions of high-ranking officials except under exceptional circumstances] hardly becomes inapplicable upon an official's departure from his office[.]").

Plaintiffs have certainly not shown "exceptional circumstances" to warrant any of their depositions. For Psaki, given that Defendants amended their discovery responses by conducting a reasonable search of Psaki's emails and did not find responsive documents, Plaintiffs cannot demonstrate such a particularized personal knowledge, or that information is not available elsewhere, to warrant burdening a senior advisor to the President. *See generally Bryant*, 745 F. App'x at 220-22. For both Flaherty and Slavitt, Plaintiffs have not exhausted less intrusive means before seeking to impose the burdens and obligations of deposition; neither were previously properly subject to written discovery. *See Bryant*, 745 F. App'x at 222 (emphasizing that high-level depositions do not meet exceptional circumstances if the information could be obtained in a different form).[3] Further, Plaintiffs have alternative sources of information concerning any communications with social media companies, such as from social media companies themselves. *See id*.

Thus, Plaintiffs cannot make the requisite showing under *Morgan* to justify taking the depositions of these high-ranking White House officials. Regardless, Plaintiffs' request to depose these individuals should still be denied given the other deficiencies discussed in this statement. In

---

[3] Although Defendants would have objected to such written discovery in light of the burden imposed on the White House, the point for present purposes is that Plaintiffs first must exhaust alternative forms of discovery before proceeding to depose high-ranking officials. This issue has not been previously addressed as to Flaherty and Slavitt because they were not subject to the original discovery requests. And, just as they were outside the scope of the Court's July discovery order for purposes of written discovery, they should be considered outside the scope of the order for purposes of deposition.

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 287 of 332 PageID #:
4571
Case 3:22-cv-01213-TAD-KDM   Document 85   Filed 11/03/22   Page 55 of 72 PageID #: 3548

particular, Flaherty and Slavitt are not named in the original Complaint, and the Court rejected Plaintiffs' requests to serve discovery on them. And neither Slavitt nor Psaki are in government service and are subject to the time-consuming procedures for subpoenas under Rule 45.

### 3. Plaintiffs Cannot Satisfy The *Morgan* Standard For High-Level HHS Officials: Dr. Vivek Murthy And Dr. Anthony Fauci.

Plaintiffs also seek depositions of two high-ranking HHS officials: Dr. Vivek Murthy and Dr. Anthony Fauci. There should be no dispute that each is considered high-ranking and subject to protection under *Morgan*. Dr. Vivek Murthy is the Senate-confirmed United States Surgeon General who is considered "the Nation's Doctor," and as Vice Admiral of the United States Public Health Service Commissioned Corps, Dr. Murthy commands a uniformed service of several thousand public health officers. *See* HHS, Leadership: Vice Admiral Vivek H. Murthy, M.D. MBA, hhs.gov/about/leadership/vivek-murthy.html (last accessed Oct. 14, 2022). Dr. Fauci has been the Director of the NIAID for nearly 40 years, advising seven Presidents, and is currently Chief Medical Advisor to President Biden. *See NIH*, About: Anthony S. Fauci, M.D., https://www.niaid.nih.gov/about/anthony-s-fauci-md-bio (last accessed Oct. 14, 2022). Plaintiffs cannot meet the heavy burden of demonstrating the exceptional circumstances necessary for taking either official's deposition.

Plaintiffs cannot demonstrate that Dr. Murthy has any specialized personal knowledge concerning their allegations to warrant a deposition. Further, Defendants have proposed adequate alternative witnesses in lieu of Dr. Murthy. *Bryant*, 745 F. App'x at 220. Defendants found, and produced, very little responsive material for Dr. Murthy in response to Plaintiffs' written discovery requests, notwithstanding that Dr. Murthy was a custodian whose emails were searched. Defendants did identify and produce one isolated text message involving Dr. Murthy, but the bare existence of an isolated mobile device text message exchange between Dr. Murthy and a platform

executive (contained in one screenshot produced) cannot suffice to warrant a deposition of Dr. Murthy. *See F.D.I.C.*, 58 F.3d at 1061 ("Agency leaders often send and receive correspondence relative to their actions," including actions potentially affecting private parties, but that "does not of itself subject them to the burdens of litigation discovery."). In contrast, Max Lesko and Eric Waldo are each sufficient alternative witnesses. Lesko is Dr. Murthy's chief of staff and was also a custodian whose emails were searched and included on communications. And Waldo attended the sole meeting Defendants identified in which Dr. Murthy attended, a 30-minute virtual meeting with social media companies. In short, the "information desired can be sought from alternative witnesses" and sources. *Bryant*, 745 F. App'x at 220-22.

Similarly, as with Dr. Murthy, Plaintiffs cannot demonstrate "exceptional circumstance" to warrant Dr. Fauci's deposition. As related to Plaintiffs' allegations, there is little (if anything) to be gained by a deposition of Dr. Fauci. Indeed, in Defendants' amended interrogatory responses, Defendants responded that "based on a reasonable inquiry," "including consultation with Dr. Fauci," "NIAID has not identified any communications, written or oral, between Dr. Fauci and Social-Media Platforms relating to Content Modulation and/or Misinformation." That should be the end of the inquiry, particularly for the current purposes of targeted, preliminary-injunction discovery. Again, Plaintiffs have not demonstrated that Dr. Fauci possesses any particularized personal knowledge related to the subject matter of their preliminary injunction motion. Under these circumstances, a deposition of Dr. Fauci would be an unjustified burden on his time and a distraction from his important public duties. *See Bryant*, 745 F. App'x at 220.

This Court should accordingly reject Plaintiffs' efforts to depose Dr. Murthy and Dr. Fauci, especially in the context of narrow expedited discovery solely to resolve the motion for a preliminary injunction.

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 289 of 332 PageID #:
4573
Case 3:22-cv-01213-TAD-KDM   Document 84   Filed 11/08/22   Page 57 of 72 PageID #: 3550

### 4. Plaintiffs Cannot Satisfy The *Morgan* Standard For High-Level DHS Officials Jen Easterly And Robert Silvers.

There should also be no dispute that Director Jen Easterly and Undersecretary Silvers are high-ranking government officials. Director Easterly, confirmed by the United States Senate, is the head of a federal agency and reports directly to the Secretary and Deputy Secretary of Homeland Security. *See* https://www.dhs.gov/sites/default/files/publications/21_0402_dhs-organizational-chart.pdf (last accessed October 14, 2022). In her role as Director of the CISA, Director Easterly "leads CISA's efforts to understand, manage, and reduce risk to the cyber and physical infrastructure Americans rely on every day." *See* CISA, Leadership: Jen Easterly, https://www.cisa.gov/jen-easterly (last accessed October 14, 2022). Undersecretary Silvers, also confirmed by the United States Senate, reports directly to the Secretary and Deputy Secretary of Homeland Security (DHS), DHS Organizational Chart, https://www.dhs.gov/sites/default/files/publications/21_0402_dhs-organizational-chart.pdf (last accessed October 14, 2022), and "is responsible for driving policy and implementation plans across all of DHS's missions, including counterterrorism; cybersecurity, infrastructure security, and resilience; border security and immigration; international affairs; and trade and economic security," DHS, Leadership: Robert Silvers, https://www.dhs.gov/person/robert-silvers (last accessed Oct. 14, 2022). Plaintiffs cannot meet the heavy burden to take depositions of either Director Easterly or Undersecretary Silvers.

Again, Plaintiffs have not established sufficient "first-hand knowledge" on behalf of Director Easterly or Undersecretary Silvers to subject them to deposition absent "exceptional circumstances." Director Easterly, who oversees election security, did not even begin working at CISA until several months after the 2020 election, and thus does have the personal knowledge of the full scope of Plaintiffs' questions relating to CISA. *See Bryant*, 745 F. App'x at 218 n.2. Thus, as an alternative to Director Easterly, Defendants have offered Geoffrey Hale as a deponent. As

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 290 of 332 PageID #:
4574
Case 3:22-cv-01213-TAD-KDM   Document 85   Filed 11/08/22   Page 58 of 72 PageID #: 3551

the Associate Director of Election Security and Resilience at CISA, Hale often reports to Director Easterly. And he was at the agency during the 2020 election. Further, based on a search of Defendants' productions, Hale appeared to be on substantially more email communications with social media companies than Director Easterly, notwithstanding that both were custodians whose emails were searched. Thus, Defendants have provided an adequate alternative witness that should be more than sufficient for current purposes. *Bryant*, 745 F. App'x at 222. And, similar to Dr. Murthy, the bare existence of isolated mobile text messages exchanged between Director Easterly and employees of platforms (totaling three screen shots produced to Plaintiffs) cannot suffice to warrant a deposition of Director Easterly: Again, "[a]gency leaders often send and receive correspondence relative to their actions," including actions potentially affecting private parties, but that "does not of itself subject them to the burdens of litigation discovery." *F.D.I.C.*, 58 F.3d at 1061.

As for Undersecretary Silvers, Defendants produced only a handful of communications from him, even though he was also a custodian. And Defendants did not identify any responsive meetings attended by Silvers in their interrogatory responses. Accordingly, Plaintiffs cannot show that Silvers has such personalized knowledge to overcome the high bar for such a high-ranking deposition.

Thus, Plaintiffs cannot demonstrate "exceptional circumstances" for the depositions of either Director Easterly or Undersecretary Silvers.

### C. Plaintiffs' Request To Seek Depositions Of Non-Government Employees During The 30-Day Time Period Is Unreasonable And Should Not Be Authorized.

Plaintiffs also seek to depose five officials who are no longer government employees. They are:

1. **Matthew Masterson**, former Senior Cybersecurity Advisory, CISA
2. **Nina Jankowicz**, former Executive Director of Disinformation Governance Board, DHS
3. **Jennifer Psaki**, former White House Press Secretary
4. **Andrew Slavitt**, former White House Senior Advisor for COVID-19 Response
5. **Samaruddin K. Stewart**, former Senior Technical Advisor and/or Senior Advisor for the Global Engagement Center of the United States Department of State

The Court should not authorize Plaintiffs to seek depositions of any of these officials.

Depositions of these third-party, non-government officials would be governed by the time-consuming and complicated procedures required by Rule 45, which are incompatible with the 30-day time limit for depositions set by the expedited discovery schedule. There should be no dispute that any authorized depositions of former officials would be subject to the requirements of Rule 45. *Uebelacker v. Paula Allen Holdings, Inc.*, No. 06-C-316-C, 2006 WL 6021169, at *2 (W.D. Wis. Jan. 3, 2006) ("Because [individuals] no longer work for defendants, they are entitled to receive process under Rule 45."). None of these officials is a party to the case, and they do not become parties simply by virtue of Plaintiffs naming them in their Complaint (whether the original, the first amended, or the second amended). These officials—as with each of the federal officials—are sued in their *official* capacities on behalf of the offices they occupied. An official-capacity defendant who leaves office ceases to be a defendant in the case, and the official's successor in office is *automatically substituted* as a defendant in their place. *See* Fed. R. Civ. P. 25. Thus, although Plaintiffs name these individuals as defendants in the action, the suit lies against the *office* the individuals occupied in their official capacity, not against the defendants themselves in their personal capacity. And because they are non-parties to this action, Rule 45, rather than Rule 30, governs their depositions.

But Rule 45 depositions implicate a host of complications arising from the procedural protections the Rule affords non-parties. For one, before non-parties may be compelled to sit for depositions, they must be served with a subpoena. *See* Fed. R. Civ. P. 45(b) (requiring service of

the subpoena); *see also Weiss v. Allstate Ins. Co.*, 512 F. Supp. 2d 463, 466 (E.D. La. 2007) (citing *Harrison v. Prather*, 404 F.2d 267, 273 (5th Cir. 1968)); *see also Ellis v. La. ex rel. Governor's Off. of Homeland Sec. & Emergency Preparedness*, No. 13-cv-27, 2013 WL 6272294 at *2 (M.D. La. Dec. 4, 2013) (lack of "evidence of personal service on the deponents or notice of the depositions," including proposed deponent who was agency's "former employee and in-house legal counsel," supported quashing deposition subpoenas). For another, non-parties may not be required to travel more than 100 miles to appear for a deposition absent specific circumstances. *See Fradella v. Coca-Cola Co.*, No. 17-cv-9622, 2018 WL 3455707 at *2-3 (E.D. La. July 18, 2018) ("Rule 45(d)(3)(A)(ii) directs the court to quash any subpoena that purports to compel compliance beyond the geographical limits specified in Rule 45(c).").

Aside from those threshold limitations, Rule 45 also affords a non-party and the government the right to move to quash a subpoena. *See In re U.S. Dep't of Educ.*, 25 F.4th at 695 (granting the "[f]ormer United States Secretary of Education Elisabeth DeVos, as well as the U.S. Department of Education (Department), and the current Secretary of Education" mandamus petition to quash former Secretary DeVos's deposition); *Pleasant Gardens Realty Corp. v. H. Kohnstamm & Co*., No. 08-cv-5582, 2009 WL 2982632, at *2 (D.N.J. Sept. 10, 2009) (finding that the United States has standing to challenge subpoenas of its former employees). It is foreseeable that authorizing Rule 45 depositions may cause the parties to be consumed in collateral litigation, including in another court, over motions to quash—all while completing depositions of current parties within the 30-day time period set by the expedited discovery schedule. That means Plaintiffs' request to seek depositions of five non-parties (which would entail completing them subject to these procedures within 30 days) is simply unreasonable.

Plaintiffs' request to depose the specific former officials identified above raises particularized concerns may make litigation over a motion to quash especially likely. As to Jankowicz, her former service as the head of the now-terminated Disinformation Governance Board has drawn on her a barrage of online threats and harassment. *See, e.g.*, NPR, "Fresh Air" With Terry Gross, *How an expert on online disinformation and harassment became the target of both* (May 26, 2022), at https://www.npr.org/2022/05/26/1101439528/how-an-expert-on-online-disinformation-and-harassment-became-the-target-of-both (last accessed October 14, 2022). That harassment raises the serious concern that a deposition of Jankowicz in this action, culminating in potential public release of the deposition transcript, and potentially video, would trigger more harassment—which would be grounds for a potential motion to quash. *See* Fed. R. Civ. P. 26(c)(1)(A) (protective order may be warranted to protect a party or non-party "from annoyance, embarrassment, oppression, or undue burden or expense"); *see also, e.g.*, *Satanic Temple, Inc. v. City of Boston*, No. 21-cv-10102, 2022 WL 1028925 at *5 (D. Mass. Apr. 6, 2022); *Pinson v. U.S. Dep't of Justice*, No. 19-cv-235, 2021 WL 4060556 at *5 (D. Ariz. Sept. 3, 2021), *subsequent determination*, 2021 WL 4942710 (D. Ariz. Oct. 22, 2021); *cf. Alexander v. Jesuits of Mo. Province*, 175 F.R.D. 556, 559 (D. Kan. 1997) (quashing subpoena to prevent harassing deposition of pregnant witness). And Psaki and Slavitt are high-ranking officials whose depositions would not be justified based on any "exceptional circumstance" as set forth by *Morgan*—another basis for a motion to quash. *Supra*; *see also In re United States (Bernanke)*, 542 F. App'x at 949.

For all of these reasons, the Court should deny Plaintiffs' request to seek depositions of these five former government officials, who are non-parties to the case.

**III.    Although No Depositions Are Warranted, If The Court Authorizes Any, It Should Limit Them To Defendants' Compromise Proposal.**

Although Defendants maintain that no depositions are necessary or should be permitted during these expedited preliminary injunction proceedings, and that the subject of depositions should be addressed instead in the normal course of any merits discovery, Defendants nevertheless have offered a compromise position during the parties' meet and confer discussions. In particular, and as explained below, Defendants offered to agree to three depositions subject to reasonable scope limitations.

Should the Court authorize any depositions, it should order that they be conducted within specific parameters consistent with the expedited context in which they would have to be completed. Defendants' compromise proposal is reasonable and provides a workable framework for any depositions authorized by the Court.

**A. Defendants Have Offered A Reasonable Compromise Of Three Focused Depositions.**

In the parties' meet and confer discussions, Defendants offered a reasonable compromise for depositions of three officials, subject to limitations on the scope of questioning. The officials Defendants offered for depositions are the following, with the understanding that these officials would not be deposed again during any merits discovery absent a showing of good cause by Plaintiffs, *see* Fed. R. Civ. P. 30(a)(2)(A)(ii):

1. At Plaintiffs' option, *either* Max Lesko, Chief of Staff to the Surgeon General, *or* Eric Waldo, Senior Advisor and formerly Chief Engagement Officer at the Office of the Surgeon General;

2. At Plaintiffs' option, *either* Carol Crawford, Chief of the Digital Media Branch of the Division of Public Affairs at the CDC, *or* Jay Dempsey, Social Media Team Lead, Digital Media Branch, Division of Public Affairs at the CDC;

3. Geoffrey Hale, Associate Director, Election Security and Resilience, CISA (in lieu of Director Easterly).

Under Defendants' proposal, and subject to and without waiting any privilege or other evidentiary objections, the scope of any depositions would be limited to the subject on which the Court allowed expedited discovery: governmental communications with social media companies since January 1, 2020, that relate to misinformation or content modulation.

Defendants have offered the officials identified above for deposition because: (1) they are current employees of the agency defendants, and their depositions thus would not involve the potentially time-consuming complexities that attempting to depose non-party former officials through the mechanisms of Rule 45 could entail; (2) they are not "highly-ranked" officials whose depositions would be warranted only in "exceptional circumstances;" and (3) they are the most likely to have knowledge relevant to the information sought through expedited discovery.[4]

## B. Defendants' Compromise Properly Respects The Court's Orders.

Defendants' proposed compromise is reasonable and consistent with the bounds of expedited discovery. Should the Court authorize any depositions, Defendants' compromise offer provides an appropriate framework.

*First*, as to the number of deponents offered: Defendants' offer is grounded in both Rule 30's presumptive limit of 10 depositions by either party throughout the entire course of a case and the inherent limits and burdens of the highly expedited time frame in which to complete depositions. "In spite of its broad definition of relevancy for purposes of discovery, the Federal Rules of Civil Procedure recognize a presumptive limit of ten depositions, absent request and leave for more." *Landry v. St. James Par. Sch. Bd.*, No. 99-cv-1438, 2000 WL 1741886, at *2 (E.D. La. Nov. 22, 2000); *Bell v. Fowler*, 99 F.3d 262, 271 (8th Cir. 1996) ("[T]o obtain discovery

---

[4] Lauren Protentis is on maternity leave, and Defendants have proposed her second-line supervisor Geoffrey Hale as one of the deponents in lieu of Director Easterly. It would be unreasonably cumulative and duplicative to require her deposition in addition to Hale, and would serve only as a nuisance, particularly while she is on maternity leave.

depositions beyond ten, leave of court is required."). The purpose of the presumptive limit is "to control discovery, with its attendant costs and potential for delay[.]" *Barrow v. Greenville Indep. Sch. Dist.*, 202 F.R.D. 480, 483 (N.D. Tex. 2001). Thus, a party who seeks go beyond that limit "must demonstrate," "under the Rule 26(b)(2) standards," "the necessity for each deposition" sought. *Id.* at 482-83. "[C]onclusory" assertions that an officials' testimony is material to any element of a claim do not suffice. *Id.* at 483. That burden is only heightened in the expedited discovery context, where depositions must be completed within a highly compressed time frame and where each and every deposition sought must be justified as necessary to resolve the preliminary injunction motion.

Plaintiffs have failed to show a need for any depositions during expedited discovery. Moreover, they certainly have not demonstrated a need for anywhere approaching the presumptive limit of 10 depositions in an entire case, all within a mere 30 days and relating only to their request for preliminary relief. Considering the expedited nature of the proceedings, Defendants took the position in the parties' negotiations that no more than three to five depositions would be appropriate in this initial phase of the case.

*Second*, Defendants' proposal made clear that these officials should not be subject to another deposition in any merits discovery, absent Plaintiffs demonstrating good cause for a second deposition. *Cf. Doucet v. R. & R. Boats, Inc.*, No. 17-cv-421, 2019 WL 13143669 at *2 & nn.14-19 (M.D. La. Oct. 11, 2019) (applying *Kleppinger v. Tex. Dept. of Transp.*, 283 F.R.D. 330, 333 (S.D. Tex. 2012)), and observing that "lack of diligence in obtaining information before the initial or first deposition may result in a court denying leave to conduct a second deposition"). If Plaintiffs insist on deposing witnesses during this phase of the case, then they should not be given

64

"second bites" at these witnesses during the merits phase. *See* Fed. R. Civ. P. 30(a)(2)(A)(ii) (requiring leave of court to take a deposition of someone previously deposed).

*Third*, as to the proposed scope of questioning: Questions concerning governmental communications with social media companies related to misinformation or content modulation would fall within the scope of expedited discovery requested by Plaintiffs and authorized by the Court. In their motion for expedited discovery, Plaintiffs asked the Court to authorize "targeted" discovery concerning the "identities of federal officials who have or are communicating with social-media platforms about disinformation, misinformation, malinformation, or any other form of censorship or suppression of online speech," and the "nature and content of such federal officials' communications with such social-media platforms." ECF No. 34 at 10. The Court's order authorizing expedited discovery adopted Plaintiffs' proposal and ordered expedited discovery within those parameters. *Id.* at 13.

Questions of this nature would therefore be relevant to the merits of Plaintiffs' preliminary injunction motion. Such questions, moreover, would be most likely to be informed by the more than 15,000 pages of documents produced by Defendants in response to Plaintiffs' discovery requests, as well as Defendants' significant responses to Plaintiffs' interrogatories. And such questions would concern information of which the deponent has knowledge, as they would be targeted to communications in which the deponent participated.

*       *       *       *       *

To the extent this Court authorizes depositions and does not adopt Defendants' compromise, it should, at the very least, order no more than **five** depositions of current, non-high-ranking officials. Further, any officials deposed during the expedited discovery period would not be subject to another deposition during any merits discovery permitted, absent a showing by

Plaintiffs of good cause. *See* Fed. R. Civ. P. 30(a)(2)(A)(ii). Additionally, any depositions authorized should be limited in scope, to inquiries seeking information about governmental communications with social media companies since January 1, 2020, related to misinformation or content modulation. *See* ECF No. 34 at 13 (authorizing discovery into the nature and content of communications with social media companies). Finally, this Court should exercise its discretion during these expedited proceedings and order strict time limits of no more than two to four hours per deposition to minimize the burdens on the federal officials and the parties that attend scheduling, preparing, and completing depositions in a matter of a few weeks. *See* Fed. R. Civ. P. 26(b)(2)(A) ("[T]he court may alter the limits in these rules on the number of depositions and interrogatories or on the length of depositions under Rule 30.").

Those limits would meet the needs of expedited discovery and the Court-ordered schedule. Allowing depositions of a limited number of current officials would be more likely to ensure that discovery is proportional to the needs of the case in the expedited preliminary-injunction context and that Defendants are not burdened by cumulative or duplicative depositions of federal officials. Five depositions would also fall comfortably under Rule 30's presumptive limit, thus protecting Plaintiffs' interest in obtaining testimony they deem relevant to their preliminary injunction motion. And this number is consistent with the practical time constraints under the Court's schedule, which allows 30 days to determine the time, place, and manner (e.g., virtual or in-person) of each deposition and then to complete them.

## IV.    Plaintiffs' Continuing Objections About Written Discovery Are Meritless.

Finally, Plaintiffs err in raising objections, in the latest meet-and-confer exchanges, regarding the verifications of Defendants' amended written discovery responses under Rule 33(b)(1). Defendants understand that Plaintiffs intend to raise the issue specifically as to Dr. Fauci

in their portion of this Joint Statement. Plaintiffs' objections are wrong as a matter of law; they certainly cannot rely on their incorrect reading of the law to serve as a purported basis for Dr. Fauci's deposition, to the extent that is what they are arguing.

Defendants properly provided a verification for Dr. Fauci's amended response by Dr. Jill R. Harper, NIAID's deputy director for science management and executive officer, and made clear that the verification that was for Dr. Fauci both as Director of NIAID (one of his government titles) *and* as Chief Medical Advisor to the President (another of his government titles). As the amended response also explained (at 24): "Dr. Fauci does not have any responsive information in his role as Chief Medical Advisor beyond the information provided for Dr. Fauci in his role as Director of NIAID." Moreover, the amended responses stated they were based on, among other things, "consultation with Dr. Fauci."

Lacking any basis for disputing the substantive sufficiency of the amended responses, Plaintiffs' objection appears to be that Dr. Fauci did not provide a verification based on his *personal* knowledge. That assertion is baseless. Given that "[o]fficial-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent," *see Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985), the interrogatories are properly understood as calling for a response from the Government, and for verification of that response by appropriate Government personnel, *see Shepherd v. Am. Broadcasting Cos.*, 62 F.3d 1469, 1481-82 (D.C. Cir. 1995) (verification may be "accomplish[ed] . . . through whatever internal process the [entity] has chosen").

Plaintiffs' effort to impose a "personal knowledge" requirement on the verifier of governmental responses to interrogatories disregards Rule 33(b)(1). Of course, "[i]t is well established that a person who verifies an interrogatory answer need not have any personal

knowledge of the facts submitted." *Jiminez-Carillo v. Autopart Int'l, Inc.*, 285 F.R.D. 668, 669 (S.D. Fla. 2012); *see Suzuki v. Abiomed, Inc.*, 943 F.3d 555, 565 (1st Cir. 2019) (where executive answered interrogatories on behalf of corporation using information available within corporation under Rule 33(b)(1)(B), it was "appropriate[]" to "treat[]" executive's "answers as encompassing all relevant information and data available within" corporation); *Gonzalez Tomasini v. United States Postal Serv.*, No. 17-cv-1552, 2020 WL 13490911 at *1 (D.P.R. July 24, 2020) (citing *Brown v. White's Ferry, Inc.*, 280 F.R.D. 238, 242-43 (D. Md. 2012); and Wright & Miller, 8B *Fed. Prac. & Proc. Civ.* § 2172 n.7 (3d ed.)).

There should be no continuing dispute about the extensive written and documentary discovery Defendants have completed, and instead this Court should resolve the matters concerning depositions as otherwise discussed in this Joint Statement.

Dated: October 14, 2022                                  Respectfully submitted,

**ERIC S. SCHMITT**                                      **JEFFREY M. LANDRY**
**Attorney General of Missouri**                         **Attorney General of Louisiana**

*/s/ D. John Sauer*                                      */s/ Elizabeth B. Murrill*
D. John Sauer, Mo. Bar No. 58721*                        Elizabeth B. Murrill (La #20685)
 *Solicitor General*                                      *Solicitor General*
Justin D. Smith, Mo. Bar No. 63253                       Louisiana Department of Justice
 *First Assistant Attorney General*                      1885 N. Third Street
Todd Scott, Mo. Bar No. 56614*                           Baton Rouge, Louisiana 70804
 *Senior Counsel*                                        Tel: (225) 326-6766
Michael E. Talent, Mo. Bar No. 73339*                    murrille@ag.louisiana.gov
 *Deputy Solicitor General*                              *Counsel for State of Louisiana*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
John.Sauer@ago.mo.gov
*Counsel for State of Missouri*


\*  admitted *pro hac vice*


*/s/ Jenin Younes*
Jenin Younes *
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines*

*/s/ John C. Burns*
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
F: 314-282-8136
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAMES J. GILLIGAN
Special Litigation Counsel, Federal Programs Branch

*/s/ Kyla Snow*
ADAM D. KIRSCHNER (IL Bar No. 6286601)
Senior Trial Counsel
KYLA SNOW (OH Bar No. 96662)
INDRANEEL SUR (D.C. Bar No. 978017)
KUNTAL CHOLERA (D.C. Bar No. 1031523)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
Tel: (202) 514-3259
kyla.snow@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

     I hereby certify that, on October 14, 2022, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

71

# EXHIBIT 4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

STATE OF MISSOURI ET AL                    CASE NO.  3:22-CV-01213

VERSUS                                     JUDGE TERRY A. DOUGHTY

JOSEPH R BIDEN JR ET AL                    MAG. JUDGE KAYLA D. MCCLUSKY

MEMORANDUM ORDER
REGARDING WITNESS DEPOSITIONS

This Court granted [Doc. No. 34] Plaintiffs' Motion for Expedited Preliminary Injunction-

Related Discovery [Doc. No. 17] and set an expedited discovery schedule.  The discovery schedule

required the parties to meet and confer in good faith regarding any deposition requests.  The parties

were required to file a joint statement as to their position on depositions if they could not come to

an agreement.  The parties have done so and have submitted the pending Joint Statement Regarding

Witness Depositions [Doc. No. 86].  This ruling addresses the witness depositions.

I.      BACKGROUND

On May 5, 2022, Plaintiffs[1] filed a Complaint[2] against Defendants.[3]  In the Complaint and

Amended Complaint,[4] Plaintiffs allege Defendants have colluded with and/or coerced social media

companies to suppress disfavored speakers, viewpoints, and content on social media platforms by

labeling the content "dis-information," "mis-information," and "mal-information."   Plaintiffs

---

[1] Plaintiffs consist of the State of Missouri, the State of Louisiana, Dr. Aaron Kheriaty, Dr. Martin Kulldorff, Jim
Hoft, Dr. Jayanta Bhattacharya, and Jill Hines.
[2] [Doc. No. 1]
[3] Defendants consist of President Joseph R. Biden, Jr., Vivek H. Murthy, Xavier Becerra, Department of Health and
Human Services, Dr. Anthony Fauci, National Institute of Allergy and Infectious Diseases, Centers for Disease
Control & Prevention, Alejandro Mayorkas, Department of Homeland Security, Jen Easterly, Cybersecurity &
Infrastructure Security Agency, and Nina Jankowicz, Karine Jean-Pierre, Carol Y. Crawford, Jennifer Shopkorn,
U.S. Census Bureau, U. S. Department of Commerce, Robert Silvers, Samantha Vinograd
and Gina McCarthy.
[4] [Doc. No. 45]

allege the suppression of disfavored speakers, viewpoints, and contents constitutes government action and violates Plaintiffs' freedom of speech in violation of the First Amendment to the United States Constitution.  In the Complaint[5] and Amended Complaint[6] Plaintiffs set forth examples of suppression of free speech which include: 1) the Hunter Biden laptop story prior to the 2020 Presidential election; 2) speech about the lab leak theory of COVID-19's origin; 3) speech about the efficiency of masks and COVID-19 lockdowns; 4) speech about election integrity and the security of voting by mail; 5) censorship and suppression of speech by Plaintiffs Dr. Jayanta Bhattacharya and Dr. Aaron Kheriaty, co-authors of the Great Barrington Declaration; 6) censorship and suppression of Jim Hoft, owner of The Gateway Pundit, on social-media platforms; and 7) censorship and suppression of Jill Hines, co-director of Health Freedom Louisiana and Reopen Louisiana on social-media platforms.

Plaintiffs move for the following government officials to be deposed as a part of their limited preliminary injunction discovery. These are:

> (1) NIAID Director and White House Chief Medical Advisor Dr. Anthony Fauci, (2) Deputy Assistant to the President and Director of White House Digital Strategy Rob Flaherty, (3) former White House Senior COVID-19 Advisory Andrew Slavitt, (4) former White House Press Secretary Jennifer Psaki, (5) FBI Supervisory Special Agent Elvis Chan, (6) CISA Director Jen Easterly, (7) CISA official Lauren Protentis, (8) Surgeon General Vivek Murthy, (9) CDC Chief of the Digital Media Branch Carol Crawford, and (10) Acting Coordinator of the State Department's Global Engagement Center Daniel Kimmage.

Defendants oppose Plaintiffs' deposing of all of them.

---

[5] [Doc. No. 1]
[6] [Doc. No. 45]

## II.     APPLICABLE LAW

Expedited discovery is not the norm.  Courts only allow it in limited circumstances.  *Wilson v. Samson Contour Energy E&P, LLC*, 2014 WL 2949457 at 2 (W.D. La. 2014).  In the prior ruling,[7] which granted in part and denied in part Plaintiffs' request for expedited discovery, the Court employed a "good cause" analysis, which took into consideration such factors as the breadth of discovery requests, the purpose for requesting expedited discovery, the burden on the defendants to comply with the requests, and how far in advance of the typical discovery process the request was made.  *GHX Industrial, LLC v. Servco Hose and Supply, LLC*, 2020 WL 1492920 (W.D. La. Feb. 5, 2020).

In addressing the necessity of depositions, the Court previously stated, "whether depositions will be taken will be addressed later."[8]  The party seeking expedited discovery has the burden of establishing that "the scope of the requests" is narrowly tailored to the necessary information sought.[9]  The Court must also consider the "burden on the defendants to comply with the requests."[10]

Top executive department officials should not, absent extraordinary circumstances, be called to testify regarding the reasons for taking official actions.  *In re Office of Inspector Gen. R.R. Ret. Bd.,* 933 F.2d 276, 278 (5th Cir. 1991).  Compelling the testimony of high-ranking government officials is justified only in "extraordinary instances."  *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.* 429 U.S. 252, 268 (1977).  This requirement is commonly referred to as the "apex doctrine."  *United States v. Newman,* 531 F. Supp. 3d 181, 188 (D.D.C. 2021).

---

[7] [Doc. No. 72]
[8] [Doc. No. 34 at 12]
[9] [Id., p. 2]
[10] [Id., p. 1]

The "extraordinary circumstances" limitation on the compelled testimony of high-ranking officials is necessary because such orders raise separation of powers concerns. *In re United States (Jackson),* 624 F.3d 1368, 1372 (11th Cir. 2010). Additionally, requiring high-ranking officials to appear for depositions also threatens to "disrupt the functioning of the Executive Branch." *In re Cheney,* 544 F.3d 311, 314 (D.C. Cir. 2008). High-level executives and government officials need some measure of protection from the courts because they are vulnerable to numerous, repetitive, harassing, and abusive depositions. *Asberry v. Sch. Bd. Of Pasco Cnty. Fla.,* 2019 WL 12383128 at 1 (M.D. Fla. Aug. 20, 2019). The general rule prohibiting depositions of high-ranking government officials also applies to former high-ranking officials. *In re United States (Bernanke)*, 542 F. App'x 944, 949 (Fed. Cir. 2013).

As a preliminary requirement for an "exceptional circumstances" analysis, the proponent of the deposition must show "that the official has first-hand knowledge related to the claims being litigated that is unobtainable from other sources." *In re Bryant*, 745 F. App'x 215, 218 n 2. (5th Cir. 2018). After the "first-hand knowledge" threshold is crossed in determining whether exceptional circumstances exist to warrant a deposition, a court must consider (1) the high-ranking status of the deponents; (2) the potential burden that the depositions would impose on them; and (3) the substantive reasons for taking the depositions. *Bryant,* 745 F. App'x at 220.

**A. Defendants' Opposition to Depositions**

Defendants have objected to Plaintiffs' request to depose all ten government officials. Mainly, Defendants' objections are that Plaintiffs have not met their heavy burden of demonstrating that depositions are warranted at this stage because: (1) some of the officials sought to be deposed were not named in the Original Complaint and are outside of the Court-authorized expedited discovery; (2) Plaintiffs' have not demonstrated the "exceptional circumstances"

required for the depositions of high ranking officials; and (3) former officials could not be taken during the thirty-day time period due to the requirements in FED. R. CIV. P. 45.

Each proposed deponent must be examined to determine whether exceptional circumstances exist. Additionally, in its prior Ruling,[11] the Court did not allow additional interrogatories to Defendants added in the Amended Complaint[12] because of the compressed expedited discovery schedule. However, the Court did not intend to prohibit depositions of newly added Defendants, because they can be taken within the expedited discovery schedule.

As it relates to former government officials (i.e., Andrew Slavitt and Jennifer Psaki), FED. R. CIV. P. 45 does not prohibit depositions to be conducted within thirty days. Despite Defendants' threat to file a Motion to Quash the subpoenas, the Court finds that FRCP 45 requirements do not prohibit depositions being taken in a timely manner. Any depositions authorized by this Court of former government officials will have already taken into consideration the burden of the deponent. In the event that these depositions exceed the thirty-day restraint set out in FRCP 45, an extension may be warranted.

Defendants have essentially adopted the same arguments they made in their opposition to Plaintiffs conducting any form of discovery as it related to the preliminary injunction motion. While the Court agrees that obtaining the depositions of high-ranking officials such as the ones requested here is an exceptional circumstance, it will analyze each person that the Plaintiffs requested under the factors laid out in *Bryant*.

**B. Plaintiffs' Arguments**

Plaintiffs argue that the depositions of the ten aforementioned officials are necessary for the following reasons.

---

[11] [Doc. No. 72]
[12] [Doc. No. 45]

1.   **Dr. Anthony Fauci—NIAID Director and White House Chief Medical Advisor**

Dr. Anthony Fauci ("Dr. Fauci"), who is a Defendant in this case, is the Director of the National Institute of Allergy and Infectious Diseases (NIAID) and Chief Medical Advisor to the President. Plaintiffs move to depose Dr. Fauci for substantial reasons. The Court will discuss them all.

First, Plaintiffs claim that Dr. Fauci is directly involved with multiple social media censorship campaigns against COVID-19 misinformation. Plaintiffs argue that "speech backed by great scientific credibility and with enormous potential nationwide impact" that contradicted Dr. Fauci's views was censored on social media, and it was most likely censored because of the insistence of Dr. Fauci.

The first example of this is Dr. Fauci's efforts to discredit any theory that COVID-19 was the result of a "lab leak." Plaintiffs assert that "Dr. Fauci had funded risky 'gain-of-function' research at the Wuhan Institute of Virology through intermediaries such as EcoHealth Alliance, headed by Dr. Peter Daszak."  Which in turn meant that if there were truth behind the lab-leak theory, "Dr. Fauci and Dr. Daszak could be potentially implicated in funding the research on viruses that caused the COVID-19 pandemic and killed millions of people worldwide."  In late January and early February 2020, information on the lab-leak theory began to become spread to the public. Soon thereafter, Dr. Fauci participated in a conference call with scientists and science-funding authorities, which may or may not have been about discrediting the lab-leak theory. Plaintiff States assert that "After the conference call, influential individuals signed public statements that were placed in science journals in an attempt to discredit the lab-leak theory." During this time, Plaintiff States also urge that Dr. Fauci engaged in written and oral

communications with Mark Zuckerberg about the Government's COVID-19 response, and allegedly widespread social-media censorship of the lab-leak hypothesis ensued.

Plaintiffs further this argument by pointing out the publicly available emails between Drs. Fauci and Collins regarding their efforts to discredit the lab-leak theory, which Plaintiffs assert led to the censorship of the theory online. These emails indicate that Dr. Fauci and Dr. Collins were both aware of certain scientists' concerns that SARS-CoV-2 looked bioengineered. However, those same scientists authored a paper for Nature Medicine that discredited the lab-leak theory despite that three days earlier on February 1, they had advocated the theory to Dr. Fauci. That paper was also sent to Dr. Fauci for approval.

Plaintiffs allege that Dr. Fauci and Mark Zuckerberg commenced a course of friendly oral communications about the Government's COVID-19 response. Plaintiff States wish to ascertain the contents of these communications in depositions.

On April 16, 2020, Dr. Collins emailed Dr. Fauci a link to a Bret Baier article about the lab-leak theory, expressing concerns over whether "NIH" can help to take down the "very destructive conspiracy" that seems to be growing momentum. He further stated that he hoped the Nature Medicine article "would settle this" and asked what more "we" could do about it. One day after this email, which Plaintiff States argue clearly shows Dr. Collins requesting Dr. Fauci to use more public pressure to stop the theory from circulating, Dr. Fauci cited the Nature Medicine article while speaking from a podium at the White House.[13]

Plaintiffs next cite to Dr. Fauci and Dr. Collins communications regarding the Great Barrington Declaration, a scientific critique of the effects of prolonged lockdowns as a response

---

[13] This was one among many public statements Dr. Fauci made about the illegitimacy of the lab-leak theory.

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 312 of 332 PageID #:
4596
Case 3:22-cv-01213-TAD-KDM   Document 85-1   Filed 09/02/22   Page 8 of 32 PageID #: 3922

to COVID-19 co-authored by Dr. Jay Bhattacharya and Dr. Martin Kulldorff, Plaintiffs in this

case. Dr. Collins' email regarding the publication read:

> Hi Tony and Cliff, See: https://gbdeclaration.org/. This proposal
> from the three fringe epidemiologists who met with the Secretary
> seems to be getting a lot of attention – and even a co-signature from
> Nobel Prize winner Mike Leavitt at Stanford. There needs to be a
> quick and devastating published take-down of its premises. I don't
> see anything like that online yet – is it underway? Francis.[14]

In response, Dr. Fauci began making a series of public statements that were highly critical of the

Great Barrington Declaration, describing it as "total nonsense" and "ridiculous."[15] "[T]he

censorship of the Great Barrington Declaration and Plaintiffs Bhattacharya and Kulldorff

[occurred] just after a senior HHS official called for a 'quick and devastating … take-down' of the

Declaration" to Dr. Fauci.[16]

Plaintiffs next assert that Dr. Fauci was involved in Twitter's permanent suspension of the

vaccine critic Alex Berenson ("Berenson"). Berenson's tweets consisted of science-based

objections to the vaccinations of young, healthy persons, which became a target for Biden-

Administration's censors. Plaintiff States argue that "Alex Berenson disclosed internal Twitter

communications revealing that senior 'WH' officials including Andrew Slavitt specifically

pressured Twitter to de-platform Berenson, an influential vaccine critic—which Twitter did."[17]

Dr. Fauci publicly described Berenson's opinions on vaccines as "horrifying."  President Biden

followed Dr. Fauci's steps and made a statement that "They're killing people" by not censoring

vaccine "misinformation," to which Twitter subsequently permanently suspended Berenson from

---

[14] [Doc. No. 45-3, ¶ 14].
[15] See, e.g., Jessie Hellmann, Fauci Blasts Herd Immunity Proposal Embraced by White House as 'Total Nonsense,'
THE HILL (Oct. 15, 2020), at https://thehill.com/policy/healthcare/521220-fauci-blasts-herd-immunity-proposal-
embraced-by-white-house-as-total/.
[16] [Doc. No. 84, ¶ 480].
[17] [Doc. No. 84, ¶ 345].

its platform.[18] On October 13, 2022, Berenson posted on Substack Twitter emails indicating that a board member of Pfizer pressured Twitter to de-platform Berenson.[19] In the emails, the Pfizer executive allegedly claimed that Berenson's speech should be censored because it posed a threat to the safety of Dr. Fauci. Which Plaintiffs argue creates an inference that there was collusion between White House official Andrew Slavitt and the Pfizer executive on this very point.

Government Defendants have submitted to Plaintiffs interrogatory responses on behalf of Dr. Fauci, asserting that he has had no direct communications with any social-media platforms regarding censorship.[20] Plaintiffs argue in turn that they should not be required to simply accept those blanket statements as they were submitted, and they argue three reasons why Dr. Fauci should be questioned under oath.

First, Plaintiffs assert that Dr. Fauci has refused to verify under oath his own interrogatory responses in violation of this Court's Order. The NIAID's responses were instead verified by Dr. Jill Harper, who was not named in the Complaint. Accordingly, Dr. Fauci has made no statements under oath regarding his communications with social-media platforms, which violates this Court's Order regarding the discovery that instructed Dr. Fauci to provide interrogatory responses.[21] The Court sees the importance of having Dr. Fauci make statements under oath as it relates to the issues of this matter.

Next, Plaintiffs argue that even if Dr. Fauci can prove he never communicated with social-media platforms about censorship, there are compelling reasons that suggest Dr. Fauci has acted through intermediaries, and acted on behalf of others, in procuring the social-media censorship of credible scientific opinions. Plaintiffs argue that even if Dr. Fauci acted indirectly or as an

---

[18] [Doc. No. 84, ¶ 347].
[19] See https://alexberenson.substack.com/p/pfizer-board-member-scott-gottlieb
[20] [Doc. No. 86-3, p. 24, 57].
[21] [Doc. No. 72, pp. 67].

intermediary on behalf of others, it is still relevant to Plaintiffs' preliminary injunction motion. The Court agrees.

Lastly, Plaintiffs argue that Dr. Fauci's credibility has been in question on matters related to supposed COVID-19 "misinformation" since 2020. Specifically, Plaintiffs state that Dr. Fauci has made public statements on the efficacy of masks, the percentage of the population needed for herd immunity, NIAID's funding of "gain-of-function" virus research in Wuhan, the lab-leak theory, and more. Plaintiffs urge that his comments on these important issues are relevant to the matter at hand and are further reasons why Dr. Fauci should be deposed. Plaintiffs assert that they should not be required to simply accept Dr. Fauci's "self-serving blanket denials" that were issued from someone other than himself at face value. The Court agrees.

After reviewing the Plaintiffs and the Defendants' arguments, the Court finds that Plaintiffs have proven that Dr. Fauci has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Dr. Fauci is a high-ranking official, especially as he is the Director of the National Institute of Allergy and Infectious Diseases and Chief Medical Advisor to the President. The Court sees the only potential burden imposed on Dr. Fauci as a result of him being deposed is that of his time. However, the Court acknowledges that any person who is being deposed must sacrifice their time, and it does not see any burden imposed on Dr. Fauci that outweighs the Court's need for the information in order to make the most informative decision on the pending Motion for Preliminary Injunction filed by Plaintiffs. Finally, the Court is aware of a number of substantive reasons why Dr. Fauci's deposition should be taken. The first is the publicly available emails that prove that Dr. Fauci was communicating and acting as an intermediary for others in order to censor information from being shared across multiple social-media outlets. The second is that Dr. Fauci

has yet to give any statements under oath in this matter. The third is that the Court has no doubt that Dr. Fauci was engaging in communications with high-ranking social-media officials, which is extremely relevant in the matter at hand. Additionally, the crux of this case is the fundamental right of free speech. Any burden that may be imposed on Dr. Fauci is wholly outweighed by the importance of Plaintiffs' allegations of suppression of free speech. Accordingly, the Court finds that Plaintiffs have satisfied their burden of proving why a deposition of Dr. Anthony Fauci is necessary in this case, and exceptional circumstance are present. Accordingly, **IT IS ORDERED** that Dr. Anthony Fauci cooperate in the Plaintiffs' request to depose him for purposes of their preliminary injunction discovery.

### 2.  Rob Flaherty—White House Director of Digital Strategy

Plaintiffs move to depose Rob Flaherty ("Flaherty"), who is the Director of Digital Strategy for the White House. Plaintiffs describe him as a "key official in the White House's pressure campaign on social-media companies to increase COVID-19 censorship and social-media companies' policies and responses to COVID-19 vaccine claims."[22] Flaherty is said to have had "extensive" oral meetings with social-media platforms, including Twitter, Meta and YouTube on vaccine hesitancy and combatting misinformation.

Plaintiffs allege that Flaherty consistently communicates with Meta's director of U.S. Public Policy through "Covid Insight Reports," which detail trends/posts by social-media users taken by Meta. Further, Plaintiffs allege that he has held meetings about Meta's platform to address misinformation and to curb vaccine hesitancy. Meta allegedly contacts Flaherty when Covid-19 vaccines are authorized for new groups of people, and they report on Meta's intentions to censor disfavored opinions about vaccine effectiveness for those new groups, all allegedly at the White

---

[22] [Doc. No. 86-5].

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 316 of 332 PageID #:
4600
Case 3:22-cv-01213-TAD-KDM   Document 68   Filed 10/09/22   Page 12 of 29 PageID #: 3926

House's urging.[23] Plaintiffs argue that Flaherty has specific knowledge and information on Meta's attempts to censor the "Disinformation Dozen."[24][25] Further, Plaintiffs assert that Flaherty has led efforts for the White House to force Meta to explain "how big the [misinformation] problem is, what solutions you're implementing, and how effective they've been."[26] Further, Flaherty supposedly "pressured Meta by sending them an article about misinformation on Facebook with a subject line 'not sure what to say anymore.'"  Flaherty also allegedly knows about the Biden Transition Team's efforts with Meta.[27] Defendants' interrogatory responses detailed that Flaherty participated in virtual meetings with social-media platforms, which Plaintiffs assert were about censorship.[28]

Plaintiffs maintain that deposing Flaherty is essential to this case as it would provide critical information on the White House's pressure campaign to social-media platforms against the "Disinformation Dozen" and other COVID-19 "misinformation" issues, especially as it relates to their leaning on social media companies after press reports were released regarding vaccines, and the White House's involvement over content-modulation policies instilled in Meta and Twitter in their efforts to remove "the most harmful COVID-19 misinformation."[29]

The Court finds that Plaintiffs have proven that Flaherty has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Flaherty is a high-ranking official, especially as he serves as Director of Digital Strategy for the White House. Any burden imposed upon Flaherty is

---

[23] [Id. at 7268-89; 7250].
[24] Supposedly, there are a dozen accounts across social-media that spread the mass of "misinformation" on COVID-19. Government officials have taken to calling these accounts the "Disinformation Dozen".
[25] [Id. at 7322].
[26] [Id. at 7258–59; see also id. at 16279].
[27] [Id. at 16364, 16276].
[28] [Doc. No. 86-3, at 31].
[29] [Doc. No. 86-5, p. 7248-49, 16275].

outweighed by the need for Plaintiffs to determine whether the fundamental right of free speech has been abridged. Extraordinary circumstances are present to depose this high-ranking official. The substantive reasons for taking Flaherty's depositions are set out herein, and the Court finds the substantive reasons are overwhelming. For reasons further set out herein, Plaintiffs are allowed to depose either Rob Flaherty or Andrew Slavitt. Shall Plaintiffs notify Defendants of their intent to depose Rob Flaherty, **IT IS ORDERED** that Rob Flaherty cooperate with Plaintiffs' request to depose him.

### 3. Andrew Slavitt—White House Senior COVID-19 Advisor

Defendant Andrew Slavitt ("Slavitt") served as the White House's Senior COVID-19 Advisor. Slavitt allegedly "led the charge" for the White House in its campaign with social-media companies to increase the censorship of private speech as it related to COVID-19 through meetings and oral conversations with representatives of multiple social-media platforms. Plaintiffs assert that in Defendants' own documentary discovery, it is revealed that Slavitt received "Facebook bi-weekly covid content reports" from a senior Facebook executive in order for Slavitt to "oversee" Facebook's censorship.[30] Plaintiffs also argue that Slavitt specifically pressured Twitter to de-platform Alex Berenson. This was supposedly done in an oral meeting, so there is no official record of it.[31]

On April 21, 2022, a meeting invitation was sent to Slavitt, which stated:

> White House Staff will be briefed by Twitter on vaccine [misinformation] Twitter to cover trends seen generally around vaccine misinformation, the tangible effects seen from recent policy changes, what interventions are currently being implemented in addition to previous policy changes, and ways the White House (and our COVID experts) can partner in product work.[32]

---

[30] [Doc. No. 84, ¶ 343].
[31] [Doc. No. 84, ¶¶ 345-46.].
[32] [Id. ¶ 345].

13

The next day, internal Twitter messages reflected that Slavitt had posed "one really tough question about why Alex Berenson hasn't been kicked off the platform."[33]  Plaintiffs describe several other instances where Slavitt engaged in email exchanges with social-media executives that describe censorship of the platforms and the actions the platforms are taking to expand censorship for language they deemed to be "harmful."[34] One email in particular read:

> [O]n March 2, 2021, Meta sent an email assuring Slavitt, Flaherty, and Humphrey that the company is "[c]ombating vaccine misinformation and de-amplifying content that could contribute to vaccine hesitancy" by "improving the effectiveness of our existing enforcement systems (particularly focusing on entities that repeatedly post vaccine misinformation), mitigating viral content that could lead to vaccine hesitancy[.]"[35]

Plaintiffs maintain that Twitter and Meta's Facebook have identified Slavitt as a senior federal official whom they communicated about their efforts to "stop" the spread of alleged "misinformation" regarding COVID-19. Plaintiffs go on to assert that the White House has also identified Slavitt and Flaherty as senior White House Officials who were involved in communications with social-media platforms. Plaintiffs argue these communications centered on censorship.

Plaintiffs also cite to a podcast that Slavitt participated in, wherein he stated, "my time in the White House where I was charged with pushing organizations like Facebook from spewing misinformation."[36] Plaintiffs detail Slavitt's statements made on the podcast, wherein he states that he was "pushing" for the company (i.e., social-media platforms) to be "more responsible" for the

---

[33] [Id. ¶ 346].
[34] [Id. ¶¶ 354, 369].
[35] [Id. ¶ 375.]
[36] Is COVID Misinformation Killing People?, Published Jul 21, 2021, at https://omny.fm/shows/in-the-bubble/is-covid-misinformation-killing-people-with-facebo (audio 5:40)

information that was being spread on the platforms. Plaintiffs move to depose Slavitt because of his role as a "self-professed principal enforcer for online censorship."

The Court finds that Plaintiffs have proven that Andrew Slavitt has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Slavitt is a former high-ranking official, especially as he served as the White House's Senior COVID-19 Advisor. Any burden imposed upon Slavitt is outweighed by Plaintiffs' allegations of suppression of free speech. Extraordinary circumstances are present. As the Court has stated, any person who is being deposed must sacrifice their time, and it does not see any burden imposed on Slavitt that outweighs the Court's need for the information in order to make the most informative decision on the pending Motion for Preliminary Injunction filed by Plaintiffs. Lastly, the Court has determined that there are substantive reasons for taking the deposition. As stated above, Slavitt was the White House's Senior COVID-19 Advisor. His role put him in a position that would grant him specific knowledge to the facts at issue. Slavitt's own description of his role on a podcast that he went on showed he has specific knowledge as it relates to these issues. His communications, actions, and orders to and between social-media platforms will be necessary for this Court to make its ruling. Accordingly, as stated above, because Flaherty and Slavitt were both White House officials, in an effort to narrowly tailor this expedited discovery, Plaintiffs are allowed to take the deposition of either Flaherty or Slavitt, but not both. Should Plaintiffs notify Defendants of a desire to depose Andrew Slavitt, **IT IS ORDERED** that Slavitt cooperate as to Plaintiffs' request to depose him.

### 4.  Jennifer Psaki—Former White House Press Secretary

Jennifer Psaki (Psaki) is the former White House Press Secretary of President Biden. She is a Defendant in this case. Plaintiffs move to depose Psaki for a multitude of reasons. The most

pressing reason being that during her tenure as White House chief spokesperson, Psaki made a series of public statements that:

> (1) attested to her personal knowledge of the participation of high-level White House officials in pressuring social-media platforms, and (2) reinforced the public threats of adverse legal consequences to social-media platforms if they do not increase censorship of views disfavored by federal officials.   Thus, she both admitted to knowledge of pressure to censor from federal officials and directly engaged in such pressure herself, in a highly impactful and visible fashion.[37]

Plaintiffs' Complaint details the statements Psaki made as they relate to these claims. For example, on May 5, 2021, Psaki stated at a White House press conference "the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections."[38] Psaki stated at another press conference on July 15, 2021, that she administration is in "regular touch" with social-media platforms and that the engagements happen between "members of our senior staff" and "members of our COVID-19 team."[39] Psaki also often spoke of the "Disinformation Dozen" and stated that:

> All [12] of them remain active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns … Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days.  That's too long. The information spreads too quickly.[40]

---

[37] [Doc. No. 86, p. 15].
[38] White House, *Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack,* May 5, 2021, at https://www.whitehouse.gov/briefing-room/press-briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-tom-vilsack-may-5-2021/.
[39] [Doc. No. 86, p. 16].
[40] [Id.]

Psaki also called on social-media platforms for consistency in banning disfavored speakers, stating "You shouldn't be banned from one platform and not others."[41]

Plaintiffs further argue that along with these statements, Psaki also "demanded" "robust strategies" for social-media companies to enforce censorship of "harmful posts." On April 25, 2022, Psaki also stated that President Biden was concerned about social-media platforms and thought they should be held accountable for the harms caused by the spread of "disinformation." She maintained at this press briefing that certain officials within the White House and the Biden Administration maintained "regular" contact with social-media platforms.

Plaintiffs submitted interrogatories to Karine Jean-Pierre, who is Psaki's successor as White House Press Secretary, and asked questions regarding the social-media censorship and Psaki's knowledge of such. Defendants' response to the interrogatories was that they lacked knowledge of the basis of her statements on those issues because Psaki no longer works at the White House. The only relevant responses Defendants supplied in the interrogatories were that Rob Flaherty and Andrew Slavitt were involved in communications with social-media platforms. Plaintiffs move to depose Psaki because they have obtained no statements from Psaki about what her "actual knowledge" of these issues is. Plaintiffs state that they should be allowed to depose her to explore the basis of the "critical statements" alleged in the Complaint and stated above.

The Court finds that Plaintiffs have proven that Jennifer Psaki has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Psaki was a high-ranking official at the time that she made the statements at issue, especially as she served as the White House Press Secretary.

---

[41] White House, *Press Briefing by Press Secretary Jen Psaki*, July 16, 2021, at
https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/.

However, this rank does not mitigate the relevance and the need of her deposition as it relates to this case. Any burden on Psaki is outweighed by the need to determine whether free speech has been suppressed. Lastly, the Court has determined that there are substantive reasons for taking the deposition. Extraordinary circumstances are present. As stated above, Psaki has made a number of statements that are relevant to the Government's involvement in a number of social-media platforms' efforts to censor its users across the board for sharing information related to COVID-19. Accordingly, **IT IS ORDERED** that Jennifer Psaki cooperate in the Plaintiffs' request to depose her for purposes of their preliminary injunction discovery.

### 5.   Elvis Chan—FBI Supervisory Special Agent

Plaintiffs move to depose Elvis Chan ("Chan"), a named Defendant in this case and the FBI Supervisory Special Agent of Squad CY-1 in the San Francisco Division of the FBI.[42] Plaintiffs argue that Chan has "authority over cybersecurity issues for FBI in that geographical region, which includes the headquarters of major social-media platforms, and he plays a critical role for FBI in coordinating with social-media platforms relating to censorship and suppression of speech on their platforms."[43] Plaintiffs move to depose Chan because they assert he plays a central role in the federal government's suppression of social-media censorship.

In support of this argument, Plaintiffs cite to a podcast where Mark Zuckerberg stated that communications from the FBI led to Facebook censoring stories of the Hunter Biden Laptop.[44] Plaintiffs maintain that in response to their third-party subpoena, Meta's counsel identified Chan as the FBI agent who communicated with Facebook to suppress that story. Plaintiffs move to depose Chan because the Government has not provided documentary discovery with respect to

---

[42] [Doc. No. 84, ¶ 61].
[43] [Id.]
[44] [Doc. No. 86, p. 19].

Case 3:22-cv-01213-TAD-KDM   Document 119-1   Filed 11/18/22   Page 323 of 332 PageID #:
4607
Case 3:22-cv-01213-TAD-KDM   Document 58   Filed 11/08/22   Page 19 of 29 PageID #: 3933

Chan and because Chan has personal knowledge. They claim that his testimony is relevant and necessary to their preliminary injunction discovery motion.

The Court finds that Plaintiffs have established that Elvis Chan has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Chan was a high-ranking official, especially as he served as the FBI Supervisory Special Agent. However, this rank does not mitigate the relevance and the need of his deposition as it relates to this case. Any burden imposed on Chan by being deposed is outweighed by the need to determine whether the First Amendment right of free speech has been suppressed. There are no burdens imposed on Chan outweighing the Court's need for the information in order to make the most informed decision on the pending Motion for Preliminary Injunction filed by Plaintiffs. Extraordinary circumstances are present here. Lastly, the Court has determined that there are substantive reasons for taking the deposition. As stated above, Chan was identified as the FBI Agent who communicated with Facebook to suppress a story about the Hunter Biden laptop. If he did this, the Court ultimately finds there are reasons to believe that he has interfered in other ways, too. Accordingly, **IT IS ORDERED** that Elvis Chan cooperate in the Plaintiffs' request to depose him for purposes of their preliminary injunction discovery.

### 6. Jen Easterly—CISA Director

Plaintiffs move to depose Jen Easterly ("Easterly"), the Director of CISA within the Department of Homeland Security, because she supervises the "nerve center" of federally directed censorship. Plaintiffs describe the CISA's central role as "directly flagging misinformation to social-media companies for censorship." Plaintiffs also assert that Easterly "claim[s] that social-media speech" by Americans "is a form of 'infrastructure,' and that policing speech online by the

federal government falls within her agency's mission to protect 'infrastructure,' stating that … 'the most critical infrastructure is a cognitive infrastructure.'[45]

Plaintiffs also cite to Easterly's text messages between Easterly and Matt Masterson, a former CISA agent who now works for a social-media platform.[46] Allegedly, these texts center around Easterly and Masterson discussing a "Disinformation Governance Board." The conversations ultimately describe how Easterly seeks greater censorship and that this would be done by federal pressure on social media platforms to increase censorship.

Plaintiffs move to depose Easterly for two reasons. First, they say that her role in the CISA as the director oversees the "nerve center" of the federal government's efforts to censor social-media users. They say that her text messages show that she has unique knowledge about the scope and nature of communications between CISA, DHS, and other federal officials. Second, Plaintiffs assert that in their response to interrogatories, CISA disclosed extensive oral communications and meetings between CISA officials and social-media platforms. No officials were actually identified by the CISA, but Plaintiffs believe that because of her role, Easterly would have detailed knowledge of what the CISA is disclosing. Plaintiffs state that her deposition would be their only chance of obtaining this information prior to addressing the preliminary injunction.

The Court finds that Easterly is a high-ranking official that has personal knowledge of relevant facts. Any burden imposed on Easterly is outweighed by the need to determine whether the First Amendment right of free speech was suppressed. Exceptional circumstances exist here. The substantive reasons for deposing Easterly are set forth herein. Because Easterly and Lauren Protentis both work for CISA, to narrowly tailor the relief sought, Plaintiffs are allowed to depose

---

[45] [Doc. No. 86, citing Doc. No. 84, ¶¶ 290-293, 301, 302, 291].
[46] [Doc. No. 71-5, p. 2-4].

either Easterly or Lauren Protentis, but not both. Should Plaintiffs notify Defendants of a desire to depose Jean Easterly, **IT IS ORDERED** that she cooperate with Plaintiffs' request to depose her.

### 7.  Lauren Protentis[47]—CISA "Mis- Dis- and Mal-Information Team" Member

Plaintiffs move to depose Protentis because of her membership of the CISA Mis- Dis- and Mal-Information Team ("MDM Team"), whose mission is allegedly a federally induced censorship of social-media speech.  The documentary discovery provided that Protentis was involved in the MDM Team and engaged in oral communications with executives of social-media platforms. Plaintiffs allege these communications were about censorship. Plaintiffs assert that Protentis is a "leader" and "expert" in the MDM Team's efforts to bridge a gap between the federal government and social-media companies to create a line of control over the censorship of social media.[48] Plaintiffs also argue that her contacts with these companies are so "pervasive," that oftentimes "very senior officials" in other departments ask her to introduce them to "points of contact."[49]

Plaintiffs ultimately conclude that Protentis serves as a vital connection between CISA and social-media platforms in the government's censorship efforts, has special knowledge in the election-security space, and provides briefings to the governments of foreign countries on how to interact with social-media companies.  They assert that Protentis' testimony will establish context of the meetings, extent of CISA's election security efforts, tools that the government uses on social-media platforms, and efforts to influence election officials and encourage them to use social-media companies to censor voters ahead of the 2022 election.

---

[47] Defendants indicated that Protentis is on maternity leave, but they did not indicate when she would be returning.
[48] These include Twitter, Google, Microsoft, and Meta.
[49] [Doc. No. 86-6].

The Court finds that Plaintiffs have established that Protentis has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Protentis is a high-ranking official because of her role as a MDM Team Member. The potential burden imposed on Protentis is outweighed by the need to determine whether First Amendment rights of free speech have been suppressed. Exceptional circumstances exist here. The Court finds that there are substantive reasons for taking Protentis' deposition. As stated above, Protentis served a vastly important role between the federal government and the social-media companies. Based on the description above, she served as a connection between these two conglomerates. This is relevant to the issues presented by Plaintiffs in their motion, and her deposition is important to the Court to make an informed determination. Because Easterly and Protentis both work for CISA, to narrowly tailor the relief sought, Plaintiffs are allowed to depose either Easterly or Lauren Protentis, but not both. Should Plaintiffs notify Defendants of a desire to depose Lauren Protentis, **IT IS ORDERED** that she cooperate with Plaintiffs' request to depose her.

### 8. Vivek Murthy—Surgeon General

Plaintiffs next move to depose Surgeon General Dr. Vivek Murthy ("Dr. Murthy") for his public campaign to censor individuals who spread "misinformation" about COVID-19. [Doc. No. 84]. Plaintiffs state that Dr. Murthy has also publicly criticized "tech companies" by asserting that they are responsible for COVID-19 deaths due to their failure to censor "misinformation." Plaintiffs also allege that Dr. Murthy issued a Request for Information (RFI) on March 2, 2022, requesting tech platforms to provide him with information about "misinformation," including the identities of those supposedly spreading it on their sites.[50] Plaintiffs assert that this, along with Dr.

---

[50] [Doc. No. 84, ¶¶ 243-46].

22

Murthy's other statements, as well as those of President Joseph Biden and Jen Psaki, this RFI "was an intimidation tactic, designed to frighten the tech companies into compliance with his demand to escalate censorship of certain viewpoints on Covid-19 for fear of reprisal in the form of regulation or other legal consequences."[51]

Plaintiffs urge that Dr. Murthy also engages in communications with high-level Facebook executives about the "demand" for greater censorship of COVID-19 "misinformation." Plaintiffs state that they obtained this information through texts and emails through discovery. These establish that Dr. Murthy was engaged in these communications and was even sent "reports" to obtain Dr. Murthy's opinions on censorship.

Plaintiffs move to depose Dr. Murthy because of his direct, routine contact with the senior Meta executive, and at least one phone call with him.  He is the only individual in government privy to these conversations, and thus the only person who can therefore answer questions about the nature and degree of the conversations and clarify whether additional conversations on the topic were held over the phone or in virtual or in-person meetings.

The Court finds that Plaintiffs have established that Dr. Murthy has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Dr. Murthy is a high-ranking official as he serves as Surgeon General. However, this rank does not mitigate the relevance and the need of his deposition as it relates to this case. Further, his actions went beyond the scope of this rank, and the Court finds that those actions must be addressed through a deposition. The potential burden imposed on Dr. Murthy is outweighed by the need to determine whether First Amendment rights of free speech have been suppressed. Exceptional circumstances are present. The Court finds that

---

[51] [Id. ¶ 243].

there are substantive reasons for taking the deposition. As stated above, Dr. Murthy made public statements about how the media companies' failure to censor its users related in COVID-19 deaths. These statements are extremely substantive to the nature of this suit. Accordingly, **IT IS ORDERED** that Dr. Vivek Murthy cooperate in the Plaintiffs' request to depose him for purposes of their preliminary injunction discovery.

### 9.  Carol Y. Crawford—CDC's Chief of the Digital Media Branch

Plaintiffs move to depose Defendant Carol Crawford ("Crawford"), the Chief of the Digital Media Branch of the Division of Public Affairs within CDC, because she is allegedly among the government employees most involved in censoring "misinformation" about COVID-19. Plaintiffs state that she participated in emails with employees at Twitter, Meta, and Google/YouTube. Further, they state that she organized "Be on the Lookout" ("BOLO") meetings, which were essentially meetings that attempted to "quell the spread of misinformation" in 2021.[52] Plaintiffs claim that during these meetings, Crawford flagged certain social-media posts, provided examples of types of posts to censor, and urged the participants not to share the information exchanged in the BOLO meetings. She also worked with the Census Bureau in an effort to identify certain social-media users who were allegedly spreading misinformation about the vaccine. Emails from March of 2021 indicate that a meeting between the CDC (including Ms. Crawford), Census, and Google was held to discuss "COVID vaccine mis-info."[53]

Plaintiffs claim that Crawford's communications show that the CDC, the Census Bureau, and other government agencies collaborated with Facebook to censor speech on the platform. Plaintiffs claim that she has been involved in the "censorship enterprise" from the beginning of

---

[52] [Doc. No. 84].
[53] [Doc. No. 86-10].

the pandemic. Plaintiffs detail this by pointing out two phone calls Crawford engaged in with a Facebook employee.[54]

Plaintiffs move to depose Crawford because they claim that her email exchanges demonstrate that she played a key role in directing censorship on social-media platforms. Plaintiffs also suggest that her references to the role of the Census Bureau suggest that she would be able to shed light on that agency's role in efforts to flag "misinformation" the previous year, a topic about which little is known.

The Court finds that Plaintiffs have established that Crawford has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Crawford is a high-ranking official because of her role as the CDC's Chief of the Digital Media Branch. This role, though, is vastly important to the issues at hand, and her rank does not mitigate the relevance and the need of her deposition as it relates to this case. The potential burden imposed on Crawford is outweighed by the need to determine whether First Amendment rights of free speech have been suppressed. Exceptional circumstances exist here. The Court finds that there are substantive reasons for taking the deposition. As stated above, Crawford organized meetings and engaged in a number of communications with social-media officials, and the contents of those meetings and communications are highly important for the issues presented by this case. Accordingly, **IT IS ORDERED** that Carol Crawford cooperate in the Plaintiffs' request to depose her for purposes of their preliminary injunction discovery.

---

[54] [Doc. No. 86-10].

## 10. Daniel Kimmage—State Department's Global Engagement Center Coordinator

Plaintiffs move to depose Daniel Kimmage ("Kimmage"), the Acting Coordinator for the Global Engagement Center ("GEC") at the State Department, because he allegedly works closely with Easterly and CISA to coordinate social-media censorship of speech on election-related issues and election integrity. Plaintiffs allege that in response to third-party subpoena, Twitter identified Kimmage as communicating with it about censorship and content modulation.[55] Allegedly, the purpose of the GEC is to facilitate coordination between the government and the tech sector to combat disinformation. Plaintiffs claim that the GEC works closely with the CISA on issues of censorship.

Plaintiffs claim that Kimmage's GEC collaborated with CISA in 2020 and 2022 to create and fund an alliance of third-party nonprofits called the "Election Integrity Partnership," which supposedly pushed for social-media censorship of free speech about elections in 2020 and continues to do so today in 2022.[56]

These are not the only CISA-GEC election-related censorship activities. Documents produced by LinkedIn demonstrate that Samaruddin K. Stewart, acting on behalf of Kimmage's Global Engagement Center in the State Department, organized repeated face-to-face meetings with LinkedIn and other social-media platforms to discuss censorship.[57] The nature and content of communications at these oral meetings about disinformation between Kimmage's representatives and social-media platforms has not been disclosed. Plaintiffs assert that the Defendants have provided no documentary discovery about Kimmage's GEC and its central role in federal

---

[55] [Doc. No. 84, ¶ 396].
[56] [Id. ¶ 401].
[57] [Doc. No. 84, ¶¶ 422-424].

censorship activities on election-related speech.  They claim that Kimmage's deposition is crucial for this reason.

The Court finds that Plaintiffs have established that Kimmage has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Kimmage is a high-ranking official because of his role as the Acting Coordinator for the Global Engagement Center at the State Department. This role, though, is vastly important to the issues at hand, and his rank does not mitigate the relevance and the need of his deposition as it relates to this case. The potential burden imposed on Kimmage is outweighed by the need to determine whether First Amendment rights of free speech have been suppressed. Exceptional circumstances exist here. The Court finds that there are substantive reasons for taking the deposition, as stated above. Accordingly, **IT IS ORDERED** that Daniel Kimmage cooperate in the Plaintiffs' request to depose him for purposes of their preliminary injunction discovery.

### III.    CONCLUSION

For the reasons set forth herein,

**IT IS ORDERED** that to the extent that Plaintiffs move to depose the following parties, the request is **GRANTED:** NIAID Director and White House Chief Medical Advisor Dr. Anthony Fauci; Deputy Assistant to the President and Director of White House Digital Strategy Rob Flaherty **OR** former White House Senior COVID-19 Advisory Andrew Slavitt; former White House Press Secretary Jennifer Psaki; FBI Supervisory Special Agent Elvis Chan; CISA Director Jen Easterly **OR** CISA official Lauren Protentis; Surgeon General Vivek Murthy; CDC Chief of the Digital Media Branch Carol Crawford; and Acting Coordinator of the State Department's Global Engagement Center Daniel Kimmage.

MONROE, LOUISIANA, this 21st day of October 2022.

Terry A. Doughty
United States District Judge