# EXHIBIT B

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |
|---|---|
| JENNIFER R. PSAKI | |
|     Movant, | |
| v. | Misc. Case No. 1:22-mc-28 |
| STATE OF MISSOURI ex rel. ERIC S. SCHMITT, Attorney General, et al., | Underlying Case No. 3:22-cv-01213-TAD-KDM (W.D. La..) |
|     Respondents. | |

## UNITED STATES' MOTION TO QUASH THIRD-PARTY SUBPOENA ISSUED TO JENNIFER PSAKI

Pursuant to Rules 26(c)(1) and 45(d)(3) of the Federal Rules of Civil Procedure, the Defendants in the underlying action (collectively, for purposes of this miscellaneous action, "United States of America") respectfully move to quash a third-party subpoena ordering Jennifer Psaki, the former White House Press Secretary, to appear for a deposition on November 16, 2022 in this District, and for other and further relief as the Court deems just and proper. In support, the United States of America submits its Memorandum in Support of United States' Motion to Quash Third-Party Subpoena Issued to Jennifer Psaki, dated November 1, 2022, and attached exhibits, which are being filed contemporaneously with this motion.

Counsel for the parties met and conferred telephonically in a good faith effort to resolve this dispute, pursuant to Local Rule 37(E), but were unable to do so. Respondents oppose this motion.

Dated:  November 3, 2022            Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JESSICA D. ABER
United States Attorney

JAMES J. GILLIGAN
Special Litigation Counsel, Federal Programs
Branch

ADAM D. KIRSCHNER (IL Bar No. 6286601)
Senior Trial Counsel
KYLA SNOW (OH Bar No. 96662)
INDRANEEL SUR (D.C. Bar No. 978017)
KUNTAL CHOLERA (D.C. Bar No. 1031523)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
Tel: (202) 514-3259
kyla.snow@usdoj.gov

  /s/ *Lauren A. Wetzler*
LAUREN A. WETZLER
Chief, Civil Division
Assistant United States Attorney
2100 Jamieson Ave.
Alexandria, VA 22314
Tel: (703) 299-3752
lauren.wetzler@usdoj.gov

ATTORNEYS FOR THE UNITED STATES OF
AMERICA

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2022, a copy of the document above was served by email to the following counsel of record for Respondents:

*/s/ D. John Sauer*
D. John Sauer, Mo. Bar No. 58721*
  *Solicitor General*
Justin D. Smith, Mo. Bar No. 63253
  *First Assistant Attorney General*
Todd Scott, Mo. Bar No. 56614*
  *Senior Counsel*
Michael E. Talent, Mo. Bar No. 73339*
  *Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
John.Sauer@ago.mo.gov
*Counsel for State of Missouri*

*/s/ Elizabeth B. Murrill*
Elizabeth B. Murrill (La #20685)
  *Solicitor General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

A copy of the document was also transmitted via CM/ECF to counsel for Ms. Psaki at the following address:

Edward E. Bagnell, Jr.  (VSB # 74647)
Email:  ebagnell@spottsfain.com
Spotts Fain PC
411 E. Franklin Street, Suite 600
Richmond, VA  23219
Tel. 804 697-2000
Fax: 804 697-2177

A copy of the document was transmitted via email to additional counsel for Ms. Psaki at the following addresses:

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP

Jeannie S. Rhee*
2001 K Street, N.W.
Washington, DC 20006
jrhee@paulweiss.com

David K. Kessler*
Muamera Hadzic*
1285 Avenue of the Americas
New York, NY 10019
dkessler@paulweiss.com
mhadzic@paulweiss.com

Further, a copy of the document above was also transmitted by email to additional counsel for

Respondents at the following addresses:

Jenin Younes, jenin.younes@ncla.legal
John C. Burns, john@burns-law-firm.com

/s/ *Lauren A. Wetzler*
LAUREN A. WETZLER
Chief, Civil Division
Assistant United States Attorney

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

JENNIFER R. PSAKI

    Movant,

v.                                                                 Misc. Case No. 1:22-mc-28

STATE OF MISSOURI ex rel. ERIC S.                Underlying Case No. 3:22-cv-01213-
SCHMITT, Attorney General, et al.,               TAD-KDM (W.D. La..)

    Respondents.

## [PROPOSED] ORDER GRANTING UNITED STATES' MOTION TO QUASH THIRD-PARTY SUBPOENA ISSUED TO JENNIFER PSAKI

For the reasons set forth in United States' Motion to Quash Third-Party Subpoena Issued to Jennifer Psaki, and upon a finding of good cause shown, it is hereby

**ORDERED** that United States' Motion is **GRANTED**; and it is further

**ORDERED** that Respondents' subpoena for deposition testimony, issued to Jennifer Psaki on November 1, 2022, is **QUASHED**. Respondents are precluded from deposing Jennifer Psaki in the underlying action.

DATED this _____ day of _____, 2022

                                   _____

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| JENNIFER R. PSAKI<br><br>    Movant,<br><br>v.<br><br>STATE OF MISSOURI ex rel. ERIC S. SCHMITT, Attorney General, et al.,<br><br>    Respondents. | Misc. Case No. 1:22-mc-28<br><br>Underlying Case No. 3:22-cv-01213-TAD-KDM (W.D. La..) |

**MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION TO QUASH THIRD-PARTY SUBPOENA ISSUED TO JENNIFER PSAKI**

## INTRODUCTION

Under Rules 26(c)(1) and 45(d)(3) of the Federal Rules of Civil Procedure, Defendants in the underlying action (collectively, for purposes of this miscellaneous action, "United States of America" or "Defendants" or "Federal Government"), move to quash a subpoena ordering former Assistant to the President and Press Secretary Jennifer Psaki to appear for a deposition on December 8, 2022 in this District. *See* Notice of Subpoena ("Psaki Subpoena"), attached hereto as Ex. A. In the action underlying this Rule 45 deposition subpoena dispute, the States of Missouri and Louisiana and four individuals seek injunctive relief based on a theory that the Federal Government purportedly violated the First Amendment by allegedly coercing various social-media companies to suppress the expression of certain viewpoints on their platforms, principally viewpoints related to COVID-19 and vaccination. Without first addressing Plaintiffs' standing or the merits of their claims, the Western Louisiana District Court ordered expedited discovery on Plaintiffs' motion for a preliminary injunction, and on October 21, 2022, that District Court granted Plaintiffs' motion to compel the depositions of several current and former Government officials. As relevant here, that court authorized Plaintiffs to direct a deposition subpoena to Ms. Psaki, a nonparty residing in this District.

Under well-established law barring depositions of high-ranking current or former Government officials, including Assistants to the President, absent "extraordinary circumstances," the challenged subpoena should be quashed. In compliance with the issuing District Court's expedited discovery order, Defendants conducted a reasonable search of Ms. Psaki's White House e-mail account and did not find any responsive communications regarding misinformation or content modulation (the subjects of the lawsuit) between Ms. Psaki and the social-media platforms whose content-moderation decisions are at issue in this case. Plaintiffs therefore cannot

demonstrate that Ms. Psaki has any personal knowledge of the conduct alleged in the operative complaint that is not available elsewhere. Plaintiffs already have relevant, non-privileged documents necessary to supplement their preliminary injunction motion and will receive additional information through the depositions of other witnesses (given that Defendants are currently challenging only some, but not all, of the eight depositions the issuing District Court authorized). Because Plaintiffs are thus unable to make the necessary showing of extraordinary circumstances, their demand for Ms. Psaki's deposition testimony cannot be reconciled with decades of precedent protecting high-ranking officials (both current and former) from compelled testimony in cases challenging Government conduct.

Accordingly, the proper course would be for this Court to quash the deposition subpoena directed to former White House Press Secretary Psaki.

## BACKGROUND

The States of Missouri and Louisiana commenced the underlying action against the Federal Government on May 5, 2022 in the Western District of Louisiana. Compl., ECF No. 1, *Missouri, et al. v. Biden, et al.*, No. 3:22-cv-1213 (W.D. La.).[1] The current, operative complaint (the Second Amended Complaint) renews a First Amendment claim nearly identical to claims unsuccessfully brought, since August 2021, by private parties in other courts—claims that, until now, were universally dismissed for lack of jurisdiction and failure to state a claim. *See Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505, 510 (D.D.C. 2021), *aff'd*, 23 F.4th 1028 (D.C. Cir. 2022); *Hart v. Facebook Inc.*, No. 22-CV-00737-CRB, 2022 WL 1427507 (N.D. Cal.

---

[1] Ms. Psaki served as White House Press Secretary from January 20, 2021, until May 13, 2022, when Ms. Karine Jean-Pierre became White House Press Secretary. The original complaint in the underlying action, filed on May 5, 2022, named Ms. Psaki as a defendant in her official capacity. When Ms. Psaki left the office of White House Press Secretary, she became a nonparty, and Ms. Jean-Pierre, her successor, automatically was substituted as a party. *See* Fed. R. Civ. P. 25(d).

May 5, 2022); *Changizi v. Dep't of Health & Hum. Servs.*, No. 2:22-CV-1776, 2022 WL 1423176 (S.D. Ohio May 5, 2022).

After those cases failed, Missouri and Louisiana repackaged the individuals' allegations into their own action against the Federal Government. In the underlying action, Plaintiffs allege that the Federal Government has coerced or colluded with various social-media platforms—including but not limited to Facebook and Twitter—to suppress categories of social-media speech that the Biden Administration allegedly disfavors. *See* Second Am. Compl., ECF No. 84. In particular, Plaintiffs allege that public statements and other conduct by various Federal Defendants have caused social-media companies to moderate certain speech that relates to COVID-19 and the U.S. elections and has been deemed "misinformation" under the social-media companies' user policies. *See id.*

In their original Complaint, the States named as Defendants the President, the White House Press Secretary, the Department of Health and Human Services (HHS) and several of its components and officials in their official capacities, and the Department of Homeland Security (DHS) and several of its components and officials in their official capacities. *Id.* The States have since amended their Complaint twice, adding individual social-media users as plaintiffs and several more agencies—including the Census Bureau, Federal Bureau of Investigation (FBI), the Department of State, among others—and Federal officials (named in their official capacities) as defendants. First Am. Compl., ECF No. 45; Second Am. Compl., ECF No. 84. No social-media companies are named in the action.

I.     **Plaintiff States' Preliminary Injunction Motion and Court-Authorized Expedited Discovery**

One month after filing the original Complaint, the States moved for a preliminary injunction, *see* Pls.' Mot. for Prelim. Inj., ECF No. 10, and for expedited discovery related to the

preliminary injunction motion, *see* Disc. Mot., ECF No. 17. The Court continued briefing on the preliminary-injunction motion pending resolution of the motion for expedited discovery. *See* Order, ECF No. 19.

The Government opposed the motion for expedited discovery for several reasons, including the contention that the District Court lacks subject-matter jurisdiction over the case because the Plaintiffs lack Article III standing. Opp'n to Mot. for Expedited Disc., ECF No. 26. As the Government explained in its opposition brief, it planned to file a motion to dismiss the case within a matter of days, where it would fully articulate the Article III defects in the Complaint—defects that, again, led multiple other courts to dismiss similar claims without discovery. *Id.* at 9. The Government filed the motion to dismiss on July 12, 2022. Mot. to Dismiss, ECF No. 35. After Plaintiffs filed their First Amended Complaint, the motion was withdrawn subject to refiling to address the new allegations. Notice of Withdrawal of Mot. to Dismiss, ECF No. 53. The Court later granted Plaintiffs leave to file a Second Amended Complaint, and the parties filed a status report proposing a schedule for briefing on a motion to dismiss. *See* Joint Status Report, ECF No. 105.

Also on July 12, 2022, hours before the Government filed its motion to dismiss, the Court granted the States' initial request for expedited discovery. Disc. Order, ECF No. 34. While emphasizing that "[e]xpedited discovery is not the norm" and should be allowed only "in limited circumstances," the Court authorized the States to serve written "discovery requests" that "are targeted to the specific allegations of [the] States' Complaint," in order to resolve the pending preliminary injunction motion. *Id.* at 9, 12. The Court authorized only written discovery and reserved the question "[w]hether depositions will be taken" for a "later" date. *Id.* at 12. The Court authorized discovery into the identities of Federal officials who communicated with social-media

platforms about misinformation or content modulation and the content and nature of such communications. *Id.* at 10.

Additionally, the Court set a schedule for completing expedited discovery and outlined procedures for resolving disputes over written discovery requests and any depositions the States might later wish to take. *Id.* at 13-14. The Order gave the Government 30 days to respond to the States' to-be-served interrogatories and requests for production (RFPs), and gave the parties 30 days to complete any depositions later authorized in the case. *Id.*

## II. The Government Produces Substantial Written Discovery In Response To Plaintiffs' Requests But Locates No Responsive Communications Between Former White House Press Secretary Jennifer Psaki and Social-Media Platforms.

Despite the Court's authorization of "[t]argeted interrogatories and document requests," *id.* at 10, the States' discovery requests have been voluminous and far-reaching. On July 18, 2022, the States served ten sets of Interrogatories and eight sets of RFPs—totaling well over one hundred discovery requests—on a range of federal agencies and officers. *See* Joint Statement on Disc. Disputes, ECF No. 71, at 35. The Federal Government responded to interrogatories and produced roughly 15,000 pages of emails (and their attachments) between officials from the Federal Government and social-media platforms. *Id.*. And after the Court permitted the States to obtain a limited amount of additional written discovery, *see* Order on Joint Statement, ECF No. 72, the Federal Government complied by serving amended interrogatory responses and producing additional documents on September 27, 2022.

Among the documents Plaintiffs sought through discovery were communications between officials from the White House Press Secretary's Office and officials from social-media platforms relating to misinformation and/or content modulation. *See* Defendant Karine Jean-Pierre's Amended Objections & Responses to Plaintiffs' RFPs at 9 (attached as Ex. B). These requests

covered Jennifer Psaki in her official capacity as former White House Press Secretary. After conducting a reasonable search, however, Defendants did not identify responsive documents. *See id.* at 11; *see also* Excerpts of Defendants' Corrected Amended Combined Objections & Responses to Plaintiffs' First Set of Expedited Preliminary-Injunction Related Interrogatories (attached as Ex. C) at 20 (identifying Ms. Psaki as one of the custodians whose emails were searched and reviewed).[2] That is, Defendants located no emails between Ms. Psaki and any official at a social-media company concerning misinformation.

The States also served interrogatories on the White House Press Secretary's Office. *See* Ex. C. Through the Interrogatories, the States asked the Press Secretary's Office to explain Ms. Psaki's public statements in press briefings during July 2021 and April 2022, during which she was asked about the Administration's actions with respect to the spread of misinformation on social-media platforms, among other things. *Id.* at 74-87. In response, Defendants provided portions of the publicly available transcripts of the press briefings that provided the full context for Ms. Psaki's comments. *Id.* In addition, Defendants provided other substantive responses such as it being "the understanding of the White House Office of the Press Secretary (the "Office") that, in referring to individuals who 'engaged with them [i.e., social-media platforms],' Ms. Psaki was not referring to employees of the Office." *Id.* at 84. Thus, as indicated in their discovery responses, Defendants did not uncover evidence of any communications—oral or written—between Ms. Psaki and officials from social-media platforms about misinformation. Nor did Defendants uncover evidence that Ms. Psaki has first-hand knowledge of any such communications.

---

[2] The document was originally marked confidential due to the disclosure of certain names pertaining to agency defendants or social media platforms, but those names are redacted in the attached version. None of those redactions are pertinent to the issues discussed in this motion related to Ms. Psaki.

### III. The Western Louisiana District Court Authorizes Plaintiffs To Seek Depositions of Eight Current And Former Federal Officials, Including Former White House Press Secretary Jennifer Psaki.

On October 7, 2022, the States notified Defendants of depositions they wished to take, after which the parties then had ten days to meet and confer on any disputes over any depositions sought. Disc. Order, at 14. On October 14, the parties filed a joint statement addressing the scope of depositions the Plaintiffs sought. *See* Joint Statement Regarding Witness Dep., ECF No. 86 ("Joint Statement"). The States sought to take depositions of ten current and former federal officials, including many who are high-ranking. *Id.* They identified Ms. Psaki as one of the ten individuals they wish to depose. In their section of the Joint Statement, Defendants objected to Plaintiffs' efforts to depose Ms. Psaki on several grounds. *See id.* at 44-45, 48-55.

Defendants first objected to Ms. Psaki's deposition on the grounds that Plaintiffs could not demonstrate exceptional circumstances warranting the deposition of such a high-ranking Government official. *See id.* at 49-53 (addressing high standard for deposing high-ranking Government officials); *id.* at 53-54 (applying that standard to Ms. Psaki, former Assistant to the President and White House Press Secretary). Defendants underscored that they had conducted a reasonable search of Ms. Psaki's e-mails "and did not find responsive documents." *See id.* at 54.

Defendants further noted that Plaintiffs' efforts to depose specific former officials raised particular concerns that made "litigation over a motion to quash especially likely." *See id.* at 61; *see also* at 60 (underscoring that "[i]t is foreseeable that authorizing Rule 45 depositions may cause the parties to be consumed in collateral litigation, including in another court, over motions to quash—all while completing depositions of current parties within the 30-day time period set by the expedited discovery schedule"). In addition to the interest of those individuals in avoiding harassment, *id.*, Defendants also raised the Government's interest in preventing the extraordinary

depositions of high-ranking officials such as Ms. Psaki absent exceptional circumstances. *Id.* (noting that objecting on those grounds would be "another basis for a motion to quash").

On October 21, the Western Louisiana District Court authorized eight depositions, including the deposition of Jennifer Psaki. *See* Dep. Order, ECF No. 90. Many of the authorized deponents were, like Ms. Psaki, current or former high-ranking government officials. *See id.* (authorizing the depositions of Deputy Assistant to the President and Director of White House Digital Strategy, Robert Flaherty; Director of the Cybersecurity and Infrastructure Security Agency (CISA), Jen Easterly; the Surgeon General, Vivek Murthy; and the Director of the National Institute of Allergy and Infectious Diseases, Dr. Anthony Fauci; among others). In authorizing the depositions of former high-ranking officials, the Court stated it has "already taken into consideration the burden of the deponent[s]" but had no accompanying analysis for that assertion. *See id.* at 5.[3]

Indeed, in analyzing Defendants' objections to Ms. Psaki's deposition as a high-ranking official, the Court remarked that it "considered that Psaki was a high-ranking official at the time that she made the statements at issue, especially as she served as the White House Press Secretary," but, nevertheless authorized her deposition. *See id* at 17. The Court opined that Ms. Psaki "has personal knowledge," *id.*, without acknowledging Defendants' discovery responses, containing Defendants' uncontroverted representation that they found no responsive documents (namely, communications between Ms. Psaki and social-media platforms about misinformation, the subject-matter of the lawsuit). Further, the district court did not assess whether there were alternative

---

[3] Besides Ms. Psaki, the Court also authorized the deposition of another former senior White House official, Andrew Slavitt, but gave Plaintiffs the choice of deposing Mr. Slavitt or a current White House official, Robert Flaherty. Plaintiffs elected to depose Mr. Flaherty and accordingly Ms. Psaki is the only former official currently subject to deposition.

sources for Plaintiffs to obtain the information they sought from Ms. Psaki. *Id*. at 17-18. Rather, the Court simply stated that "there are substantive reasons for taking the deposition." *Id*. at 18.

The Western Louisiana District Court recognized Defendants' anticipated motion to quash any subpoena seeking Ms. Psaki's deposition. *See id*. at 5. Further, it noted that "an extension" to the Court's 30-day period for conducting depositions "may be warranted" in order for the processes pursuant to Rule 45 of the Federal Rules of Civil Procedure to play out. *Id*. The Court later granted an extension to December 9, 2022, for Plaintiffs to take any authorized depositions. *See* Order, ECF No. 99.

### IV. The Government Is Seeking Mandamus Relief From The Western Louisiana District Court's Order As To Certain Depositions.

On October 28, 2022, the Government filed a petition for mandamus with the Court of Appeals for the Fifth Circuit Court, seeking relief from the Western Louisiana District Court's authorization of the depositions of three current officials: Deputy Assistant to the President and Director of White House Digital Strategy, Rob Flaherty; Directory of CISA, Jen Easterly; and the Surgeon General, Vivek Murthy. The Government also moved the Western Louisiana District Court to stay the depositions of those officials pending resolution of the mandamus petition. *See* Defendants' Corrected Motion for Partial Stay of October 21, 2022 Order Pending Petition for Writ of Mandamus, ECF No. 92. The district court denied the stay request. *See* Mem. Order, ECF No. 104.

The Government's mandamus petition argued that it was a clear abuse of discretion for the Western Louisiana District Court to authorize the depositions of these three high-ranking officials without any analysis as to the presence of exceptional circumstances warranting those officials' depositions. *See In re Murthy, Easterly, Flaherty*, No. 22-30697 (5th Cir. October 28, 2022). In particular, the petition explained that the district court did not adhere to the governing legal

standards requiring a showing that a high-ranking official has first-hand knowledge that is unobtainable from other sources and that "exceptional circumstances" warrant the officials' deposition notwithstanding the burdens imposed. *Id. see also In re Bryant*, 745 F. App'x 215, 220 (5th Cir. 2018) (per curiam), *as revised* (Nov. 30, 2018) (unpublished) (quoting *In re F.D.I.C.*, 58 F.3d 1055, 1060 (5th Cir. 1995)); *In re Stone*, 986 F.2d 898, 905 (5th Cir. 1993) (per curiam). The Government's mandamus petition does not seek relief regarding Ms. Psaki's deposition. Rather, consistent with Rule 45, Ms. Psaki is subject to subpoena in the Eastern District of Virginia as a former government official and, as explained herein, Ms. Psaki's deposition should likewise be quashed by this Court.

Pursuant to Local Rule 37(E), counsel for the parties met and conferred telephonically on October 27, 2022 in a good faith effort to resolve this dispute, but were unable to do so. Plaintiffs oppose this motion.

## LEGAL STANDARD

Federal Rule of Civil Procedure 45 governs subpoenas issued to non-parties. *See* Fed. R. Civ. P. 45. Under Rule 45, the Court "must quash or modify a subpoena that . . . subjects a person to undue burden," or that "requires disclosure of privileged or other protected matter, if no exception or waiver applies." Fed. R. Civ. P. 45(d)(3)(A). Because the scope of discovery under Rule 45 tracks Rule 26, standards for discovery under both rules govern a motion to quash. *See Singletary v. Sterling Transport Co.*, 289 F.R.D. 237, 240–41 (E.D. Va. 2012). Rule 26 grants broad discretion to make any order which justice requires "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including to forbid the proposed discovery altogether. Fed. R. Civ. P. 26(c)(1); *see also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984). Under Rule 26(b)(2), in particular, the court "must limit the frequency or

extent of discovery . . . if it determines that . . . the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." { TA \l "Fed. R. Civ. P. 26(b)(2)(C)" \s "dabmci_10be2b7ac1c7459ca7f13f34ff829201_1" \c 9 }Fed. R. Civ. P. 26(b)(2)(C). Rule 45, however, expands on Rule 26 by also taking into account the interest of non-parties. *See Watts v. SEC*, 482 F.3d 501, 509 (D.C. Cir. 2007) (opinion for the Court by Kavanaugh, J.) (Rule 45 "requires district courts supervising discovery to be generally sensitive to the costs imposed on third parties").

Although the party moving to quash ordinarily bears the burden of persuasion, *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019), where, as discussed below, the subpoena is issued to a high-ranking Government official, courts require the party seeking to depose the official to demonstrate that "extraordinary circumstances" justify the deposition, *see In re McCarthy*, 636 F. App'x 142, 143 (4th Cir. 2015); *Intelligent Verification Sys., LLC v. Microsoft Corp.*, No. 2:12-cv-525, 2014 WL 12544827, at *2 (E.D. Va. Jan. 9, 2014).

## ARGUMENT

### I.   Current and Former High-Ranking Government Officials Are Protected from Depositions Absent Extraordinary Circumstances

"It is well established that high-ranking government officials may not be deposed or called to testify about their reasons for taking official actions absent 'extraordinary circumstances.'" *McCarthy*, 636 F. App'x at 143 (citing, *inter alia*, *Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209, 211 (4th Cir. 1991), and *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985) (in turn citing *United States v. Morgan*, 313 U.S. 409, 422 (1941) (*Morgan II*))).

In *Morgan II*, the Supreme Court countermanded a district court order permitting the deposition of the Secretary of Agriculture, admonishing that he "should never have been subjected

to this examination" because it was improper "to probe [his] mental processes." 313 U.S. at 422. As the Supreme Court and lower courts applying *Morgan II* and its predecessor, *Morgan v. United States*, 304 U.S. 1 (1938) (*Morgan I*), have emphasized, compelling the testimony of high-ranking government officials is justified only in "extraordinary instances." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977).

Consistent with *Morgan*, the Fourth Circuit and other circuits have issued writs of mandamus to preclude the depositions of high-ranking Executive branch officials. *See, e.g.*, *In re McCarthy*, 636 F. App'x at 145 (Environmental Protection Agency (EPA) Administrator); *In re Commodity Future Trading Comm'n*, 941 F.3d 869, 874 (7th Cir. 2019) (Commodity Futures Trading Commission chairman, commissioners, and staff); *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) (Vice President's Chief of Staff); *In re United States ("Holder")*, 197 F.3d 310, 316 (8th Cir. 1999) (Attorney General and Deputy Attorney General); *In re F.D.I.C.*, 58 F.3d at 1063 (members of the Board of Directors of the Federal Deposit Insurance Corporation); *In re United States ("Kessler")*, 985 F.2d 510, 513 (11th Cir. 1993) (per curiam) (Food and Drug Administration Commissioner).

And numerous courts have similarly precluded depositions of former high-ranking officials regarding their conduct while in office. *See, e.g.*, *In re U.S. Dep't of Educ.*, 25 F.4th 692, 695 (9th Cir. 2022) (granting the "[f]ormer United States Secretary of Education Elisabeth DeVos, as well as the U.S. Department of Education (Department), and the current Secretary of Education" mandamus petition to quash former Secretary DeVos's deposition); *see also Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199, 203–04 (2d Cir. 2013) (former deputy mayor); *Raymond v. City of N.Y.*, No. 15-cv-6885, 2020 WL 1067482, at *4 (S.D.N.Y. Mar. 5, 2020) (former police commissioners); *Fed. Deposit Ins. Corp. (FDIC) v. Galan-Alvarez*, No. 1:15-mc-

00752, 2015 WL 5602342, at *4-5 (D.D.C. Sept. 4, 2015) (former FDIC chairperson and senior deputy director); *United States v. Sensient Colors, Inc.*, 649 F. Supp. 2d 309, 316–18 (D.N.J. 2009) (former EPA Administrator); *Croddy v. FBI*, No. 00-cv-0651, 2005 WL 8168910, at *1 (D.D.C. Mar. 30, 2005) (former FBI director); *United States v. Wal-Mart Stores, Inc.*, No. 01-CV-1521, 2002 WL 562301, at *3–4 (D. Md. Mar. 29, 2002) (former Consumer Product Safety Commission chair). Three separate rationales underlie these protections.

*First*, orders compelling current and former high-ranking officials to testify about their official conduct raise significant "separation of powers concerns." *In re United States (Jackson)*, 624 F. 3d 1368, 1372–73 (11th Cir. 2010); *see Arlington Heights*, 429 U.S. at 268 & n.18 ("[J]udicial inquiries into . . . executive motivation represent a substantial intrusion into the workings of other branches of government."). As *Morgan II* emphasized, administrative decisionmaking and judicial processes are "collaborative instrumentalities of justice and the appropriate independence of each should be respected by the other." 313 U.S. at 422. "Just as a judge cannot be subjected to such a scrutiny, so the integrity of the administrative process must be equally respected." *Id.* (citation omitted). For similar reasons, absent "a strong showing of bad faith or improper behavior," discovery into "the mental processes of administrative decisionmakers" is unwarranted. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573–74 (2019) (citation omitted).

*Second*, subjecting high-level Government officials to depositions in civil actions involving their official conduct would impede the exercise of their duties by exerting a chilling effect on official decision-making. *See Lederman*, 731 F.3d at 203. That is, "subjecting officials to interrogation about how they reached particular decisions would impair that decision-making process by making officials less willing to explore and discuss all available options, no matter how

13

controversial." *Walker v. NCNB Nat'l Bank of Fla.*, 810 F. Supp. 11, 12 (D.D.C. 1993); *see also Sykes v. Brown*, 90 F.R.D. 77, 78 (E.D. Pa. 1981) ("Should the agency head be subject to deposition in every resulting case and be repeatedly required to explain the various mental steps he took to reach his decision, the decision may be his last."). Indeed, here, Plaintiffs would like to depose Ms. Psaki on her central job duties as White House Press Secretary, that is, the potentially privileged internal deliberations about what to say in a public press briefing.

*Third*, "a contrary rule might discourage otherwise upstanding individuals from public service." *Galan-Alvarez*, 2015 WL 5602342, at *4 (citation omitted). As multiple courts have recognized, absent limits on the depositions of high-ranking officials, there is "a tremendous potential for abuse or harassment." *K.C.R. v. Cty. of Los Angeles*, No. CV 13-3806, 2014 WL 3434257, at *3 (C.D. Cal. July 11, 2014) (citation omitted); *see In re Stone*, 986 F.2d at 904; *Wal-Mart*, 2002 WL 562301, at *4; *Asberry v. Sch. Bd. of Pasco Cnty., Fla.*, No. 18-cv-2222, 2019 WL 12383128, at *1 (M.D. Fla. Aug. 20, 2019).

The White House Press Secretary, as an Assistant to the President, qualifies as a high-ranking official whose deposition should be barred absent extraordinary circumstances. *See Alexander v. FBI*, 186 F.R.D. 1, 3–4 (D.D.C. 1998) (concluding that White House Press Secretary was high-ranking official, along with other officials classified as "Assistant[s] to the President," considering "the nature of their positions at the White House"). "Although no standard has been established for determining if an official is high-ranking," *Byrd v. District of Columbia*, 259 F.R.D. 1, 6 (D.D.C. 2009), courts determine "on a case-by-case basis," *Sensient Colors*, 649 F. Supp. 2d at 321, whether an individual qualifies as a high-ranking official by considering, for example, the individual's title, place in the governmental hierarchy, and job responsibilities. *See, e.g., Low v. Whitman*, 207 F.R.D. 9, 12 (D.D.C. 2002) (EPA Deputy Chief of Staff is high-ranking official,

where, "[a]s a member of the Senior Executive Service with responsibility for budget, personnel, and resource issues," "position" was "of substantial authority"); *see also Sensient Colors*, 649 F. Supp. 2d at 321 (*Morgan* doctrine applied to EPA Regional Administrator for Region 2, who "reports directly to the EPA Administrator, who in turn reports directly to the President of the United States"); *Church of Scientology of Bos. v. IRS*, 138 F.R.D. 9, 12 (D. Mass. 1990) (*Morgan* doctrine applied to director of Exempt Organizations Technical Division, National Office of the Internal Revenue Service).

The fact that Ms. Psaki no longer holds the position of White House Press Secretary does not alter the analysis. Courts have recognized that the *Morgan* doctrine "is no less applicable to former officials than to current officials," even though any immediate "interference with official duties is absent." *Galan-Alvarez*, 2015 WL 5602342, at *4 (quoting *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1049 (E.D. Cal. 2010)); *see also Wal-Mart*, 2002 WL 562301, at *3–4. There is no serious question under the precedents of the Fourth Circuit or of any other circuit that Ms. Psaki was protected by the *Morgan* doctrine from unwarranted deposition while she was still the White House Press Secretary. *See supra* at 10–11 (collecting cases). The happenstance that she has stepped down from that position does not change the outcome. *In re United States*, 542 F. App'x 944, 949 (Fed. Cir. 2013) ("[T]he process-inquiry rationale [for prohibiting depositions of high-ranking officials except under exceptional circumstances] hardly becomes inapplicable upon an official's departure from his office[.]"), *accord In re U.S. Dep't of Educ.*, 25 F.4th at 705; *Galan-Alvarez*, 2015 WL 5602342, at *4 ("'indiscriminate depositions of high-ranking government officials would . . . likely discourage' people 'from accepting positions as public servants' irrespective of whether those deposed were current or former officials" (quoting *Wal-Mart*, 2002 WL 562301, at *3)). The concerns underlying the *Morgan* doctrine remain even after a high-

ranking official leaves office: If the *Morgan* doctrine "is to have any meaning, the protections must continue upon the official's departure from public service." *Wal-Mart*, 2002 WL 562301, at \*3.

### II. The High-Ranking Deposition Sought Is Especially Inappropriate Here Given The Special Separation of Powers Concerns Raised By Seeking Deposition Testimony From A Former High-Ranking White House Official.

The rule in the Fourth Circuit is that absent "'extraordinary circumstances,' a government decision-maker will not be compelled to testify about his mental processes in reaching a decision, 'including the manner and extent of his study of the record and his consultations with subordinates.'" *Franklin Sav. Ass'n*, 922 F.2d at 211 (quoting *Morgan II*, 313 U.S. at 421–22). That rule warrants especially strong adherence in this case, because the Plaintiffs seek to question a former White House official who functioned as a close advisor to the President. The separation-of-powers concerns raised by an attempt to depose such an official demand that the parties seeking the deposition make an especially compelling demonstration of extraordinary need for the testimony sought.

Discovery directed to the White House triggers especially weighty separation-of-powers concerns. *Cheney v. U.S. Dist. Ct for the Dist. of Columbia*, 542 U.S. 367, 383 (2004). District "courts must narrow overly broad and intrusive discovery requests directed at the highest levels of the Executive Branch, lest 'vexatious litigation . . . distract [the Executive Branch] from the energetic performance of its constitutional duties.'" *Vidal v. Duke*, No. 16-cv-4756, 2017 WL 8773110, at \*4 (E.D.N.Y. Oct. 17, 2017) (alterations in original) (citing *Cheney*, 542 U.S. at 382) (finding magistrate judge order "requiring the White House to identify and assert privilege . . . to specific documents or risk waiving privilege over those documents . . . potentially raises constitutional concerns akin to those at issue in *Cheney*").

In *Cheney*, the Supreme Court held that mandamus relief was available to vacate orders authorizing wide-ranging discovery against the Vice President and others, explaining that "special considerations control" when discovery is directed to senior White House officials. 542 U.S. at 385. In so deciding, *Cheney* followed a long line of authority protecting the confidentiality of presidential communications and emphasizing the requirement for a "focused demonstration of need," *In re Sealed Case*, 121 F.3d 729, 746 (D.C. Cir. 1997); *see generally id.* at 738-40 (reviewing history of presidential communications privilege). *Cheney* held that it is impermissible for a civil litigant to propound broad-based and wide-ranging discovery requests and then require "the Executive Branch to bear the onus of critiquing the unacceptable discovery requests line by line." 542 U.S. at 388. Any such "onus" is even heavier for a deposition, in which each question of a current or former White House official may elicit a response that implicates or is covered by the presidential communications privilege. If permitted to proceed, the deposition of Ms. Psaki would inevitably set the Executive and Judicial Branches "on a collision course" through adjudications of executive privilege, thrusting the court into "the awkward position of evaluating the Executive's claims of confidentiality and autonomy," and "difficult questions of separation of powers and checks and balances" would quickly be pushed to the fore. *Cheney*, 542 U.S. at 389. *Cheney*'s admonition that there is "no support for the proposition that the Executive Branch 'shall bear the burden' of invoking executive privilege" before absolutely necessary, *id.* at 388 (citation omitted), undoubtedly applies to deposition Plaintiffs seek here.

### III. Plaintiffs Cannot Establish that Extraordinary Circumstances Require the Former White House Press Secretary's Deposition.

No "extraordinary circumstances" warrant an expedited deposition of Ms. Psaki concerning the conduct of her official duties as a high-ranking White House official.

First, Plaintiffs have failed to show that Ms. Psaki is likely to provide any testimony relevant to their First Amendment claim. Plaintiffs' claim is that the Federal Government is responsible for certain content-moderation decisions by social-media companies, a claim that would at a minimum require Plaintiffs to show that Federal officials "exercised coercive power or has provided such significant encouragement . . . that the [private conduct at issue] must in law be deemed to be that of the" Government. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). But Plaintiffs have not identified any evidence showing or even suggesting that Ms. Psaki ever communicated with any social-media company in her capacity as Press Secretary about misinformation, much less that she "exercised coercive power" to compel a social-media company to take any action. *Id.* Again, Defendants' discovery searches uncovered no evidence of communications between Ms. Psaki and social-media platforms concerning the removal of misinformation and/or content modulation.

Plaintiffs instead have pointed only to certain innocuous comments that Ms. Psaki made during press briefings about communications that *other* Government officials had with social-media companies. *See* Joint Statement, ECF No. 86, at 15-18. As an initial matter, any limited, second-hand knowledge Ms. Psaki may have concerning communications between other Government officials and social-media companies would not justify the extraordinary deposition Plaintiffs seek here: an expedited deposition of a senior White House official concerning her official acts. *See Blankenship v. Fox News Network, LLC*, No. 2:19-CV-00236, 2020 WL 7234270, at *6 (S.D.W. Va. Dec. 8, 2020) ("Courts decline to force high-ranking government officials to testify even in the face of press reports that describe conduct relevant to the violations alleged in the case."). Indeed, if limited, second-hand knowledge of that type were sufficient, current and former White House Press Secretaries would be subject to depositions in virtually any case

concerning actions taken (or allegedly taken) by the Government. After all, it is the Press Secretary's function to receive information from other Government officials about activities across various federal agencies, and to then describe those activities to the news media during press conferences. Those underlying activities may very well be the subject of litigation, but that cannot mean that the Press Secretary, by virtue of receiving second-hand information about them to communicate about such activities with the public, should be deposed in any such litigation.

Instead of offering any evidence of personal knowledge, Plaintiffs speculate about what Ms. Psaki may have known based on her official remarks in the Press Secretary role. *See* Joint Statement, ECF No. 86, at 15-18. But such speculation of course is insufficient to show unique personal knowledge. *See Galan-Alvarez*, 2015 WL 5602342, at *5 (generalized assertions that FDIC Chairperson "may have attended meetings and requested briefings and documents on Project Themis due to her leadership role" failed to "demonstrate that any knowledge she gained of the project was unique").

Second, Plaintiffs fail to show that any knowledge Ms. Psaki may have concerning communications that other Government officials had with social-media companies is likely to be relevant to their claim—let alone that such knowledge is sufficiently important to their case to constitute extraordinary circumstances justifying her deposition.

Again, Plaintiffs rely on certain general statements that Ms. Psaki made about routine communications between public and private actors, none of which involved any coercion. *See* Joint Statement, ECF No. 86, at 15-18. For example, during one press briefing, Ms. Psaki stated that certain government officials are "in regular touch with social media platforms . . . about areas where [the Administration has] concern" and that the discussions are aimed at "better understand[ing] the enforcement of social media platform policies." Press Briefing by Press

Secretary Jen Psaki, https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021 (July 16, 2021) (hereinafter, "7-16 Press Briefing"); *see also* Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy, https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021 (July 15, 2021) (hereinafter, "7-15 Press Briefing"). Ms. Psaki later reiterated, in general terms, that certain government officials "engage regularly with all social media platforms about steps that can be taken." Press Briefing by Press Secretary Jen Psaki, https://www.whitehouse.gov/briefing-room/press-briefings/2022/04/25/press-briefing-by-press-secretary-jen-psaki-april-25-2022/ (Apr. 25, 2022).

But Ms. Psaki nowhere suggested that those officials *pressured* social-media platforms to take any particular action against any particular users or content. To the contrary, Ms. Psaki stated that "Facebook and any private-sector company" ultimately "makes decisions about what information should be *on their platform*." 7-16 Press Briefing (emphasis added); *see also id.* ("They're . . . private-sector compan[ies]. They're going to make decisions about additional steps they can take."). She further explained:

> [T]o be crystal clear: Any decision about platform usage and who should be on the platform is orchestrated and determined by private-sector companies. Facebook is one of them . . . [a]nd there are a range of media who are—also have their own criteria and rules in place, and they implement them. And that's their decision to do. That is not the federal government doing that.

7-16 Press Briefing. Plaintiffs thus offered no basis for inferring that Ms. Psaki is likely to have relevant information concerning alleged Government *coercion* of social-media companies (even if bare relevance sufficed in this context, which it cannot). And they fail to demonstrate that she personally had any relevant communications with social-media companies in her capacity as Press

Secretary, or that she has any specific knowledge of relevant communications by other Government officials.

In its order authorizing Plaintiffs to pursue a deposition of Ms. Psaki, the Western Louisiana District Court concluded that Ms. Psaki has "personal knowledge of the participation of high-level White House officials in pressuring social-media platforms, and . . . reinforced the public threats of adverse legal consequences to social-media platforms if they do not increase censorship of views disfavored by federal officials." Dep. Order at 16. But that assertion accepted at face value Plaintiffs' glaring mischaracterizations of Ms. Psaki's statements during the relevant press briefings described above. Neither Plaintiffs nor the Western Louisiana District Court quoted from or cited to a single portion of those press briefings in which Ms. Psaki stated, or even suggested, that any Government officials pressured social-media companies to do anything, or issued any threats of adverse legal consequences to social-media companies if they did not increase censorship of viewpoints those officials disfavored.[4] Accordingly, Plaintiffs fail to show that Ms. Psaki is likely to have any first-hand (or even second-hand knowledge) relevant to their claims.

But even if Plaintiffs could show that Ms. Psaki is likely to possess relevant knowledge, they must, but fail to, show that she possesses *unique* knowledge, unavailable elsewhere, such that an expedited deposition of Ms. Psaki is *necessary* for them to litigate their preliminary injunction motion. *See Blankenship*, 2020 WL 7234270, at *6 ("exceptional circumstances" are not present if "the deposition [is not] '*essential to* [the plaintiff's] case'") (emphasis added) (citations omitted).

---

[4] At times, the Western Louisiana District Court's Order misquotes Ms. Psaki. For example, the Court, quoting from the July 15, 2021 press conference, states: "Psaki also 'demanded' 'robust strategies' for social-media companies to enforce censorship of 'harmful posts.'" Order at 17. Ms. Psaki, to the contrary, stated only that government officials "have *recommended — proposed* that" those companies "create a robust enforcement strategy" and that it is "important to take faster action against harmful posts." 7-15 Press Briefing (emphasis added).

Thus far, Defendants have produced roughly 15,000 pages of documents to Plaintiffs, and currently must produce seven other witnesses—excluding Ms. Psaki—for expedited depositions.[5] Plaintiffs do not suggest that the wealth of discovery they have already received, and will continue to receive, is insufficient. Indeed, they have not even identified a single piece of unique information that Ms. Psaki may provide that Plaintiffs could not secure elsewhere. *See id.* at *6 ("[H]igh-ranking government officials 'are generally entitled to limited immunity from being deposed concerning matters about which they have no unique personal knowledge.'" (citation omitted)).

Any notion that Ms. Psaki's testimony is "essential" to Plaintiffs' case is properly rejected, moreover, considering the alternative, and substantially more direct, sources of testimony that are available. Plaintiffs can obtain discovery from the social media platforms themselves. To the extent government officials had communications with those platforms, that information plainly can be obtained from the platforms themselves. This is basis alone to quash the deposition of Ms. Psaki. Indeed, to the extent Plaintiffs seek to depose Ms. Psaki about any communications that she had with the President (or other Government officials) for the purpose of offering or preparing advice to the President, or about Government deliberations or decision-making concerning misinformation or content moderation on social-media platforms, such inquiries should be prohibited because that information would be clearly privileged under the Presidential Communications and Deliberative Process Privileges, respectively. *See* Fed. R. Civ. P. 45(d)(3)(A)(iii); *see also In re Sealed Case*, 121 F.3d 729 (presidential communications and deliberative process privileges); *Cipollone v. Liggett Grp., Inc.*, 812 F.2d 1400 (table), 1987 WL

---

[5] As explained above Defendants are seeking mandamus for three of these witnesses in the Fifth Circuit. Further, Defendants intend to move for reconsideration on a separate fourth witness based on new information provided by a non-party that now calls into question the Western Louisiana District Court's basis for authorizing that deposition.

36515, at *2 (4th Cir. 1987) (per curiam) (deliberative process privilege). Plaintiffs have no need to probe such protected matters that could overcome either privilege. Their case concerns *external* communications between the Government and nonparty social-media platforms and hinges specifically on the purported coercive content and effect of such communications in allegedly causing particular episodes of social-media content moderation. Thus, discovery from the social-media platforms themselves is an alternative source of information.

Likewise, the Federal Defendants have offered other, lower-ranking officials for deposition. Given that the original Complaint focused on episodes of social-media content moderation concerning the COVID-19 pandemic and election security, Defendants offered the following witnesses in an effort to resolve any disputes about depositions: (1) at Plaintiffs' option, either Max Lesko, Chief of Staff to the Surgeon General, or Eric Waldo, Senior Advisor and formerly Chief Engagement Officer at the Office of the Surgeon General; (2) at Plaintiffs' option, either Carol Crawford, Chief of the Digital Media Branch of the Division of Public Affairs at the CDC, or Jay Dempsey, Social Media Team Lead, Digital Media Branch, Division of Public Affairs at the CDC; and (3) Geoffrey Hale, Associate Director, Election Security and Resilience, Cybersecurity and Infrastructure Security Agency. *See* Joint Statement at 62. Those officials are the most likely to have knowledge relevant to the information sought through expedited discovery.

In light of that offer and the other unchallenged depositions Plaintiffs are scheduled to take under the Depositions Order, Ms. Psaki's deposition would be plainly unnecessary, and, for that reason, inappropriate. Courts have made clear that "other less burdensome avenues for obtaining the information" must be "exhausted" before authorizing the deposition of a high-ranking official. *Microsoft*, 2014 WL 12544827, at * 2 (citation omitted); *see also Simplex*, 766 F.2d at 587 (noting that no extraordinary circumstances exist where party failed to show information was unavailable

"from published reports and available agency documents"). Courts have, moreover, refused to authorize depositions or live testimony of high-ranking officials—both current and former—if "other persons can provide the information sought[.]" *In re Holder*, 197 F.3d at 314; *see also In re Jackson*, 624 F.3d at 1373 (granting writ of mandamus directing district court to allow EPA to substitute Assistant Administrator for EPA Administrator at court hearing); *Galan-Alvarez*, 2015 WL 5602342, at *5 (granting motion to quash subpoena seeking testimony from FDIC Chairperson where FDIC had "made available four other officials, all of whom had greater involvement in the day-to-day progress of the bank's closure"). Further, even if Plaintiffs were able to demonstrate that information from Ms. Psaki is necessary, a deposition of a high-ranking official should not be the first resort. *See Blankenship*, 2020 WL 7234270, at *6 ("exceptional circumstances" are present only if "the evidence the deposition will elicit 'is not available through any alternative source or less burdensome means'" (citation omitted)).

Here, the issuing District Court's cursory analysis authorizing Plaintiffs to seek Ms. Psaki's deposition did not consider the availability of alternative, more direct sources of information, and it did not consider alternative means less burdensome. That analysis therefore cannot support denial of the motion to quash the subpoena now before this Court. Indeed, Ms. Psaki has confirmed in her own motion that a deposition would be "highly disruptive." *See* Decl. of Jen Psaki ¶ 5, ECF No. 5-1.

### IV. This Case Is Not A "Rare" One Warranting Rule 45(f) Transfer To The District In Which The Underlying Litigation Is Pending.

If, in response to this motion, the Plaintiffs seek transfer of this action to the Western District of Louisiana under Rule 45(f), the Court should deny such a transfer. Indeed, Defendants highlighted to the Western Louisiana District Court that "[i]t is foreseeable that authorizing Rule 45 depositions may cause the parties to be consumed in collateral litigation, including in another

court, over motions to quash—all while completing depositions of current parties within the 30-day time period set by the expedited discovery schedule." *See* Joint Statement, ECF No. 86, at 60. "Transfers of subpoena-related motions from the enforcing district to the issuing district can be made if the parties and persons subject to the subpoena consent to the transfer or, absent consent, in 'exceptional circumstances.' The 'exceptional circumstances' standard was selected to ensure that transfer is a rare event." 9A Charles Wright & Arthur Miller, *Federal Practice and Procedure* § 2463.1 (3d ed.). Such "rare" transfer would be inappropriate here for at least two reasons.

*First*, the issuing district has not addressed arguments Ms. Psaki may raise as a nonparty under Rule 45 regarding undue burden. *See Jordan*, 921 F.3d at 194 ("Nonparties faced with civil discovery requests deserve special solicitude."); *see also Watts*, 482 F.3d at 509 (Rule 45 "requires district courts supervising discovery to be generally sensitive to the costs imposed on third parties."). Indeed, the issuing District Court explicitly recognized that Rule 45 proceedings—distinct from the proceedings underlying the Depositions Order—could arise from the Depositions Order. *See* Depositions Order at 5. The issuing District Court itself therefore never applied Rule 45; it decided a different issue under a different legal standard.

*Second*, Ms. Psaki's interest in having this Court, Ms. Psaki's home forum, decide whether she must comply with a subpoena for her testimony or documents is not outweighed by other considerations here. "[A] plaintiff's choice of venue is entitled to substantial weight in determining whether transfer is appropriate." *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015) (citation omitted). That would mean substantial weight should be given to the venue of where Ms. Psaki is domiciled and the motion to quash is brought. Judicial economy interests do not overcome that "substantial weight," where, as here, the only questions presented arise under federal law, given that "all federal courts are

25

presumed to be equally knowledgeable regarding matters of federal law," *ComScore, Inc. v. Integral Ad Science, Inc.*, 924 F. Supp. 2d 677, 691-92 (E.D. Va. 2013) (citing, *inter alia*, 15 Wright, Miller, & Cooper, *Federal Practice and Procedure: Jurisdiction* 2d § 3854 at 469(4th ed.)), and where, also, the issuing District Court has not ruled on any motion to dismiss or other dispositive motions, *see* pp. 3-5, *supra*.

### V.  Defendants Will Serve Any Appropriate Objections To Plaintiffs' Command For Document Productions From Ms. Psaki Within the 14 Days Provided by Rule 45(d).

The subpoena served on Ms. Psaki includes a command for production of documents. Under Federal Rule of Civil Procedure 45(d)(2)(a), any objections to that command must be served within 14 days of the date the subpoena was served[6]—here, by November 15, 2022. Defendants will assess their equities and respond, if necessary, to the command with any objections by the November 15 deadline. Defendants note, however, that they have already conducted a search of Ms. Psaki's White House e-mails for documents responsive to the same requests included with the Rule 45 subpoena, in response to Plaintiffs' requests for production issued during written discovery in the underlying action. In any event, the Western Louisiana District Court has not authorized additional document discovery. Its Discovery Order required Plaintiffs to serve interrogatories and requests for production of documents by July 18, 2022. Plaintiffs' new command for document productions from Ms. Psaki falls outside the Western Louisiana District Court's deadlines for written discovery. But again, Defendants will raise any and all appropriate objections to the subpoena for documents within the 14-day period provided by Rule 45(d).

---

[6] This is the earlier of the dates between the time specified for compliance, which is December 8. *See* Fed. R. Civ. P. 45(d)(2)(B).

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Quash should be granted, and Plaintiffs

should be precluded from deposing the former White House Press Secretary, Jennifer Psaki.

Dated: November 3, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JESSICA D. ABER
United States Attorney

JAMES J. GILLIGAN
Special Litigation Counsel, Federal Programs
Branch

ADAM D. KIRSCHNER (IL Bar No. 6286601)
Senior Trial Counsel
KYLA SNOW (OH Bar No. 96662)
INDRANEEL SUR (D.C. Bar No. 978017)
KUNTAL CHOLERA (D.C. Bar No. 1031523)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
Tel: (202) 514-3259
kyla.snow@usdoj.gov

 /s/ Lauren A. Wetzler
LAUREN A. WETZLER
Chief, Civil Division
Assistant United States Attorney
2100 Jamieson Ave.
Alexandria, VA 22314
Tel: (703) 299-3752
lauren.wetzler@usdoj.gov

ATTORNEYS FOR THE UNITED STATES OF
AMERICA

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2022, a copy of the document above was served by email to the following counsel of record for Respondents:

/s/ D. John Sauer
D. John Sauer, Mo. Bar No. 58721*
 *Solicitor General*
Justin D. Smith, Mo. Bar No. 63253
 *First Assistant Attorney General*
Todd Scott, Mo. Bar No. 56614*
 *Senior Counsel*
Michael E. Talent, Mo. Bar No. 73339*
 *Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
John.Sauer@ago.mo.gov
*Counsel for State of Missouri*

/s/ Elizabeth B. Murrill
Elizabeth B. Murrill (La #20685)
 *Solicitor General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

A copy of the document was also transmitted via CM/ECF to counsel for Ms. Psaki at the following address:

Edward E. Bagnell, Jr.  (VSB # 74647)
Email:  ebagnell@spottsfain.com
Spotts Fain PC
411 E. Franklin Street, Suite 600
Richmond, VA  23219
Tel. 804 697-2000
Fax: 804 697-2177

A copy of the document was transmitted via email to additional counsel for Ms. Psaki at the following addresses:

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP

Jeannie S. Rhee*
2001 K Street, N.W.
Washington, DC 20006
jrhee@paulweiss.com

David K. Kessler*
Muamera Hadzic*
1285 Avenue of the Americas
New York, NY 10019
dkessler@paulweiss.com
mhadzic@paulweiss.com

Further, a copy of the document above was also transmitted by email to additional counsel for

Respondents at the following addresses:

Jenin Younes, jenin.younes@ncla.legal
John C. Burns, john@burns-law-firm.com


                                        /s/ Lauren A. Wetzler
                                        LAUREN A. WETZLER
                                        Chief, Civil Division
                                        Assistant United States Attorney

# Exhibit A

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Western District of Louisiana ⬚ ▾

| | |
|---|---|
| State of Missouri, ex rel. Eric S. Schmitt, et al. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  3:22-cv-01213 |
| Joseph R. Biden, Jr., in his official capacity as President of the United States, et al. | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                    Jennifer Psaki

_____
*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: | Date and Time: |
|---|---|
| 1600 Wilson Blvd., Suite 700, Arlington, VA 22209 | 12/08/2022 9:00 am |

The deposition will be recorded by this method:   video and transcribed

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

   See Exhibit A, attached.

_____

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   11/01/2022

| *CLERK OF COURT* | |
| OR | |
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   The State of Missouri
, who issues or requests this subpoena, are:

D. John Sauer, 815 Olive Street, Suite 200, St. Louis, MO 63101, john.sauer@ago.mo.gov, (573) 751-8870

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 3:22-cv-01213

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

    ❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

    ❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

    $ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
  **(A) Appearance Not Required.** A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B) Objections.** A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**

  **(A) When Required.** On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B) When Permitted.** To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C) Specifying Conditions as an Alternative.** In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  **(A) Documents.** A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B) Form for Producing Electronically Stored Information Not Specified.** If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C) Electronically Stored Information Produced in Only One Form.** The person responding need not produce the same electronically stored information in more than one form.
  **(D) Inaccessible Electronically Stored Information.** The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  **(A) Information Withheld.** A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B) Information Produced.** If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT A

Plaintiffs State of Missouri, State of Louisiana, Dr. Jayanta Bhattacharya, Dr. Martin Kulldorff, Dr. Aaron Kheriaty, Jim Hoft, and Jill Hines, by and through counsel, pursuant to the Federal Rules of Civil Procedure and the October 21, 2022 Order of the U.S. District Court for the Western District of Louisiana (*see* Attachment B), request that Jennifer Psaki comply with the subpoena and produce the documents identified below on or before 9:00 a.m. on November 17, 2022 at 1600 Wilson Blvd., Suite 700, Arlington, VA 22209. You may bring documents to the deposition for inspection, or in the case of documents held in digital format you may email to: John.Sauer@ago.mo.gov.

## DEFINITIONS

A.      "And," "or" and "and/or" and any other conjunctions or disjunctions used herein shall be read both conjunctively and disjunctively so as to require the production of all Documents (as hereinafter defined) responsive to all or any part of each particular request.

B.      "Any," "each," "every," and "all" shall be read to be inclusive and to require the production of each and every Document (hereinafter defined) responsive to the particular request.

C.      "CDC" means the Centers for Disease Control and Prevention, and any officer, official, employee, or agent of the CDC, as well as all of its divisions, agencies, boards, employees, contractors, and any subordinate agency or entity.

D.      "CISA" means the Cybersecurity and Infrastructure Security Agency within DHS, and any officer, official, employee, or agent of CISA, as well as all of its divisions, agencies, boards, employees, contractors, and any subordinate agency or entity.

E.      "Communication" means any disclosure, transfer, or exchange of information or opinion, however made, including oral, graphic, written, or electronic transmittal of information.

F.      "Content" means any material, including but not limited to messages, videos, photographs, and sound files, posted or sent by users on Social-Media Platform(s).

G.      "COVID-19" refers to the novel coronavirus, SARS-CoV 2, all variant strains, and the disease or illness it causes.

H.      "DHS" means the U.S. Department of Homeland Security, as identified in 5 U.S.C. § 101, and all of its divisions, agencies, boards, employees, contractors, and any subordinate agency or entity, including CISA and the Disinformation Governance Board.

I.      "Document" means without limitation, any written, recorded, graphic, or other material, however produced or reproduced, whether or not claimed to be privileged against discovery on any grounds, including, but not limited to, material in the forms of reports, statements, records, agreements, lists, memoranda, correspondence, personal notes, sound and/or video recordings (or transcripts of recordings), appointment calendars, appointment invitations and responses, worksheets, emails, computer files, or any other documents of any kind whatsoever, irrespective of form.  All attachments or enclosures to a document are deemed to be part of such document.

J.      "Federal Official" means any officer, official, employee, or agent of the federal government or any federal department or agency, or of any division or sub-agency, or any person or contractor acting on their behalf, including but not limited to the Executive Office of the President, the White House, the Department of Homeland Security, the Cybersecurity and Infrastructure Security Agency, the Disinformation Governance Board, the Department of Health

and Human Services, the Centers for Disease Control and Prevention, the Food and Drug Administration, the National Institutes of Health, the National Institute of Allergy and Infectious Diseases, the U.S. Election Assistance Commission, the U.S. Department of State, the U.S. Department of Treasury, the U.S. Department of Justice, the Federal Bureau of Investigation, and the U.S. Census Bureau, among other agencies. "Federal Official" includes anyone who, at the time of a responsive Communication or Document, was a Federal Official, even if they are no longer a Federal Official.

K.      "HHS" means the U.S. Department of Health and Human Services , as identified in 5 U.S.C. § 101, and all of its divisions, agencies, boards, employees, contractors, and any subordinate agency or entity, including CDC and NIAID.

L.      "Including" means including, but not limited to.

M.      "Information" means data, documents, communications, writings, drawings, graphs, charts, photographs, sound recordings, images, records generated by individuals or machines, or the compilation of any of the foregoing stored in any medium, including electronically stored information.

N.      "Meeting" includes gatherings conducted in person, by telephone, or virtually.

O.      "NIAID" means the National Institute of Allergy and Infectious Diseases as well as all of its divisions, agencies, boards, employees, contractors, and any subordinate agency or entity.

P.      "Person" means any natural person, firm, partnership, association, joint venture, corporation, governmental entity or agency, or other organization or legal or business entity, without any limitation, or any party (including agents or employees) to this litigation.

Q.      "Relates to" or "relating to" means involving, discussing, identifying, referring to, concerning or in any way touching upon the matter sought.

R.      "Social-Media Platform" means any organization that provides a service for public users to disseminate information (typically content that includes messages, videos, photographs, and sound files) to other users or the public and its officers, agents, employees, contractors, and entities used to conduct fact checking or other censorship activities. These include, but are not limited to YouTube, Facebook, Twitter, NextDoor, LinkedIn, Instagram, WeChat, Reddit, Wikimedia Foundation, Microsoft, and others.

S.      "White House Communications Team" means any person with an email domain of @who.eop.gov, including but not limited to Ron Klain, Kate Bedingfield, Jennifer Psaki, Gina McCarthy, and Karine Jean-Pierre, among others.

T.      "You," or "your" refers to Jennifer Psaki, a former White House Press Secretary for President Joseph R. Biden, Jr.

## INSTRUCTIONS

1.      These requests explicitly seek non-privileged information within your possession, custody, or control and should be construed as such.

2.      If your response to a request is that you do not have possession, custody, or control of a document or communication, please identify who likely has control of the document and its location.

3.      In the event that any information requested is withheld on the basis of a claim of privilege, state the ground(s) of the privilege claimed with sufficient particularity to evaluate the claim, and, if any documents are claimed to be privileged, set forth the author, all recipients,

number of pages, attachments or appendices, present custodian, and a general description (e.g., "letter" or "memorandum") of the document.

4.      Any information not provided on the basis that the disclosure would be burdensome or oppressive should be identified by stating the approximate number of documents to be produced, the approximate number of person-hours to be incurred in the identification, and the estimated cost of responding to the request.  This will make it possible to further narrow any request and potentially identify a reasonable alternative or limitation, and Plaintiffs will meet and confer on that matter.

5.      Each copy or duplicate of a document bearing initials, stamps, comments or notations of any character which are not part of the original text shall be considered a separate document.  Additionally, all drafts (whether typed, handwritten or otherwise) made or prepared in connection with any document shall be considered a separate document.

6.      Documents kept in an electronic or digital format should be produced with all metadata and delivered in their original format or in a manner agreed to by counsel.

7.      Emails must identify all recipients and include attachments, previous threads, and forwards.

8.      The singular of any noun includes the plural.

## REQUESTS FOR PRODUCTION

**REQUEST NO. 1.**  Produce any Documents you consulted, used, or relied on in any manner to prepare for the deposition.

**REQUEST NO. 2.**   Produce any Documents you reference or rely on during your deposition.

**REQUEST NO. 3.**   Produce any Documents and Communications related to the statement you made at a May 5, 2021 White House Press Briefing that "the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections," including Documents that identify the "major platforms," the "amplification" efforts, and what government offices and officials identify "untrustworthy content, disinformation, and misinformation."

**REQUEST NO. 4.**   Produce any Documents and Communications related to the statement you made at a May 5, 2021 White House Press Briefing that the U.S. Government believes "there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public," including any Documents that reflect what more the U.S. Government wants done and what officials are involved in these efforts.

**REQUEST NO. 5.**   Produce any Documents and Communications related to the statement you made at a July 15, 2021 White House Press Briefing that "Well, first, we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team, given, as Dr. Murthy conveyed, this is

a big issue of misinformation, specifically on the pandemic," including Documents identifying the members of our senior staff and the members of our COVID-19 team, any meetings that took place, and any agreements from engagements.

**REQUEST NO. 6.**   Produce any Documents and Communications related to the statements you made at a July 15, 2021 White House Press Briefing that relate to "flagging problematic posts for Facebook," U.S. Government proposals to "create a robust enforcement strategy" for Social Media Platforms, removing harmful posts, and "promot[ing] quality information sources in their algorithm," including Documents showing who suggested these steps, when meetings or communications about the steps occurred, what reforms to Social Media Platform policies were proposed, and the U.S. Government's efforts to influence algorithms.

**REQUEST NO. 7.**   Produce any Documents and Communications that relate to the statements you made at a April 25, 2022 White House Press Briefing that "we engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue," including any Documents reflecting what "social media platforms" that the U.S. Government "engage[s] regularly with," the nature of the engagements, what "steps that can be taken," and whether and how those engagements have "continue[d]."

**REQUEST NO. 8.**   Produce any Documents and Communications that relate to any member of the White House Communications Team or any other Federal Official communicating with Social-Media Platforms about Content on those platforms.

# ATTACHMENT B

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

| | |
|---|---|
| **STATE OF MISSOURI ET AL** | **CASE NO.  3:22-CV-01213** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **JOSEPH R BIDEN JR ET AL** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

### MEMORANDUM ORDER
### REGARDING WITNESS DEPOSITIONS

This Court granted [Doc. No. 34] Plaintiffs' Motion for Expedited Preliminary Injunction-Related Discovery [Doc. No. 17] and set an expedited discovery schedule.  The discovery schedule required the parties to meet and confer in good faith regarding any deposition requests.  The parties were required to file a joint statement as to their position on depositions if they could not come to an agreement.  The parties have done so and have submitted the pending Joint Statement Regarding Witness Depositions [Doc. No. 86].  This ruling addresses the witness depositions.

### I.  BACKGROUND

On May 5, 2022, Plaintiffs[1] filed a Complaint[2] against Defendants.[3]  In the Complaint and Amended Complaint,[4] Plaintiffs allege Defendants have colluded with and/or coerced social media companies to suppress disfavored speakers, viewpoints, and content on social media platforms by labeling the content "dis-information," "mis-information," and "mal-information."  Plaintiffs

---

[1] Plaintiffs consist of the State of Missouri, the State of Louisiana, Dr. Aaron Kheriaty, Dr. Martin Kulldorff, Jim Hoft, Dr. Jayanta Bhattacharya, and Jill Hines.
[2] [Doc. No. 1]
[3] Defendants consist of President Joseph R. Biden, Jr., Vivek H. Murthy, Xavier Becerra, Department of Health and Human Services, Dr. Anthony Fauci, National Institute of Allergy and Infectious Diseases, Centers for Disease Control & Prevention, Alejandro Mayorkas, Department of Homeland Security, Jen Easterly, Cybersecurity & Infrastructure Security Agency, and Nina Jankowicz, Karine Jean-Pierre, Carol Y. Crawford, Jennifer Shopkorn, U.S. Census Bureau, U. S. Department of Commerce, Robert Silvers, Samantha Vinograd and Gina McCarthy.
[4] [Doc. No. 45]

allege the suppression of disfavored speakers, viewpoints, and contents constitutes government action and violates Plaintiffs' freedom of speech in violation of the First Amendment to the United States Constitution.  In the Complaint[5] and Amended Complaint[6] Plaintiffs set forth examples of suppression of free speech which include: 1) the Hunter Biden laptop story prior to the 2020 Presidential election; 2) speech about the lab leak theory of COVID-19's origin; 3) speech about the efficiency of masks and COVID-19 lockdowns; 4) speech about election integrity and the security of voting by mail; 5) censorship and suppression of speech by Plaintiffs Dr. Jayanta Bhattacharya and Dr. Aaron Kheriaty, co-authors of the Great Barrington Declaration; 6) censorship and suppression of Jim Hoft, owner of The Gateway Pundit, on social-media platforms; and 7) censorship and suppression of Jill Hines, co-director of Health Freedom Louisiana and Reopen Louisiana on social-media platforms.

Plaintiffs move for the following government officials to be deposed as a part of their limited preliminary injunction discovery. These are:

> (1) NIAID Director and White House Chief Medical Advisor Dr. Anthony Fauci, (2) Deputy Assistant to the President and Director of White House Digital Strategy Rob Flaherty, (3) former White House Senior COVID-19 Advisory Andrew Slavitt, (4) former White House Press Secretary Jennifer Psaki, (5) FBI Supervisory Special Agent Elvis Chan, (6) CISA Director Jen Easterly, (7) CISA official Lauren Protentis, (8) Surgeon General Vivek Murthy, (9) CDC Chief of the Digital Media Branch Carol Crawford, and (10) Acting Coordinator of the State Department's Global Engagement Center Daniel Kimmage.

Defendants oppose Plaintiffs' deposing of all of them.

---

[5] [Doc. No. 1]
[6] [Doc. No. 45]

## II.      APPLICABLE LAW

Expedited discovery is not the norm.  Courts only allow it in limited circumstances.  *Wilson v. Samson Contour Energy E&P, LLC*, 2014 WL 2949457 at 2 (W.D. La. 2014).   In the prior ruling,[7] which granted in part and denied in part Plaintiffs' request for expedited discovery, the Court employed a "good cause" analysis, which took into consideration such factors as the breadth of discovery requests, the purpose for requesting expedited discovery, the burden on the defendants to comply with the requests, and how far in advance of the typical discovery process the request was made.  *GHX Industrial, LLC v. Servco Hose and Supply, LLC*, 2020 WL 1492920 (W.D. La. Feb. 5, 2020).

In addressing the necessity of depositions, the Court previously stated, "whether depositions will be taken will be addressed later."[8]  The party seeking expedited discovery has the burden of establishing that "the scope of the requests" is narrowly tailored to the necessary information sought.[9]  The Court must also consider the "burden on the defendants to comply with the requests."[10]

Top executive department officials should not, absent extraordinary circumstances, be called to testify regarding the reasons for taking official actions.  *In re Office of Inspector Gen. R.R. Ret. Bd.,* 933 F.2d 276, 278 (5th Cir. 1991).  Compelling the testimony of high-ranking government officials is justified only in "extraordinary instances."  *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.* 429 U.S. 252, 268 (1977).  This requirement is commonly referred to as the "apex doctrine."  *United States v. Newman,* 531 F. Supp. 3d 181, 188 (D.D.C. 2021).

---

[7] [Doc. No. 72]
[8] [Doc. No. 34 at 12]
[9] [Id., p. 2]
[10] [Id., p. 1]

3

The "extraordinary circumstances" limitation on the compelled testimony of high-ranking officials is necessary because such orders raise separation of powers concerns. *In re United States (Jackson),* 624 F.3d 1368, 1372 (11th Cir. 2010). Additionally, requiring high-ranking officials to appear for depositions also threatens to "disrupt the functioning of the Executive Branch." *In re Cheney,* 544 F.3d 311, 314 (D.C. Cir. 2008). High-level executives and government officials need some measure of protection from the courts because they are vulnerable to numerous, repetitive, harassing, and abusive depositions. *Asberry v. Sch. Bd. Of Pasco Cnty. Fla.,* 2019 WL 12383128 at 1 (M.D. Fla. Aug. 20, 2019). The general rule prohibiting depositions of high-ranking government officials also applies to former high-ranking officials. *In re United States (Bernanke)*, 542 F. App'x 944, 949 (Fed. Cir. 2013).

As a preliminary requirement for an "exceptional circumstances" analysis, the proponent of the deposition must show "that the official has first-hand knowledge related to the claims being litigated that is unobtainable from other sources." *In re Bryant*, 745 F. App'x 215, 218 n 2. (5th Cir. 2018). After the "first-hand knowledge" threshold is crossed in determining whether exceptional circumstances exist to warrant a deposition, a court must consider (1) the high-ranking status of the deponents; (2) the potential burden that the depositions would impose on them; and (3) the substantive reasons for taking the depositions. *Bryant,* 745 F. App'x at 220.

**A. Defendants' Opposition to Depositions**

Defendants have objected to Plaintiffs' request to depose all ten government officials. Mainly, Defendants' objections are that Plaintiffs have not met their heavy burden of demonstrating that depositions are warranted at this stage because: (1) some of the officials sought to be deposed were not named in the Original Complaint and are outside of the Court-authorized expedited discovery; (2) Plaintiffs' have not demonstrated the "exceptional circumstances"

required for the depositions of high ranking officials; and (3) former officials could not be taken during the thirty-day time period due to the requirements in FED. R. CIV. P. 45.

Each proposed deponent must be examined to determine whether exceptional circumstances exist. Additionally, in its prior Ruling,[11] the Court did not allow additional interrogatories to Defendants added in the Amended Complaint[12] because of the compressed expedited discovery schedule. However, the Court did not intend to prohibit depositions of newly added Defendants, because they can be taken within the expedited discovery schedule.

As it relates to former government officials (i.e., Andrew Slavitt and Jennifer Psaki), FED. R. CIV. P. 45 does not prohibit depositions to be conducted within thirty days. Despite Defendants' threat to file a Motion to Quash the subpoenas, the Court finds that FRCP 45 requirements do not prohibit depositions being taken in a timely manner. Any depositions authorized by this Court of former government officials will have already taken into consideration the burden of the deponent. In the event that these depositions exceed the thirty-day restraint set out in FRCP 45, an extension may be warranted.

Defendants have essentially adopted the same arguments they made in their opposition to Plaintiffs conducting any form of discovery as it related to the preliminary injunction motion. While the Court agrees that obtaining the depositions of high-ranking officials such as the ones requested here is an exceptional circumstance, it will analyze each person that the Plaintiffs requested under the factors laid out in *Bryant*.

### B. Plaintiffs' Arguments

Plaintiffs argue that the depositions of the ten aforementioned officials are necessary for the following reasons.

---

[11] [Doc. No. 72]
[12] [Doc. No. 45]

### 1. Dr. Anthony Fauci—NIAID Director and White House Chief Medical Advisor

Dr. Anthony Fauci ("Dr. Fauci"), who is a Defendant in this case, is the Director of the National Institute of Allergy and Infectious Diseases (NIAID) and Chief Medical Advisor to the President. Plaintiffs move to depose Dr. Fauci for substantial reasons. The Court will discuss them all.

First, Plaintiffs claim that Dr. Fauci is directly involved with multiple social media censorship campaigns against COVID-19 misinformation. Plaintiffs argue that "speech backed by great scientific credibility and with enormous potential nationwide impact" that contradicted Dr. Fauci's views was censored on social media, and it was most likely censored because of the insistence of Dr. Fauci.

The first example of this is Dr. Fauci's efforts to discredit any theory that COVID-19 was the result of a "lab leak." Plaintiffs assert that "Dr. Fauci had funded risky 'gain-of-function' research at the Wuhan Institute of Virology through intermediaries such as EcoHealth Alliance, headed by Dr. Peter Daszak." Which in turn meant that if there were truth behind the lab-leak theory, "Dr. Fauci and Dr. Daszak could be potentially implicated in funding the research on viruses that caused the COVID-19 pandemic and killed millions of people worldwide." In late January and early February 2020, information on the lab-leak theory began to become spread to the public. Soon thereafter, Dr. Fauci participated in a conference call with scientists and science-funding authorities, which may or may not have been about discrediting the lab-leak theory. Plaintiff States assert that "After the conference call, influential individuals signed public statements that were placed in science journals in an attempt to discredit the lab-leak theory." During this time, Plaintiff States also urge that Dr. Fauci engaged in written and oral

communications with Mark Zuckerberg about the Government's COVID-19 response, and allegedly widespread social-media censorship of the lab-leak hypothesis ensued.

Plaintiffs further this argument by pointing out the publicly available emails between Drs. Fauci and Collins regarding their efforts to discredit the lab-leak theory, which Plaintiffs assert led to the censorship of the theory online. These emails indicate that Dr. Fauci and Dr. Collins were both aware of certain scientists' concerns that SARS-CoV-2 looked bioengineered. However, those same scientists authored a paper for Nature Medicine that discredited the lab-leak theory despite that three days earlier on February 1, they had advocated the theory to Dr. Fauci. That paper was also sent to Dr. Fauci for approval.

Plaintiffs allege that Dr. Fauci and Mark Zuckerberg commenced a course of friendly oral communications about the Government's COVID-19 response. Plaintiff States wish to ascertain the contents of these communications in depositions.

On April 16, 2020, Dr. Collins emailed Dr. Fauci a link to a Bret Baier article about the lab-leak theory, expressing concerns over whether "NIH" can help to take down the "very destructive conspiracy" that seems to be growing momentum. He further stated that he hoped the Nature Medicine article "would settle this" and asked what more "we" could do about it. One day after this email, which Plaintiff States argue clearly shows Dr. Collins requesting Dr. Fauci to use more public pressure to stop the theory from circulating, Dr. Fauci cited the Nature Medicine article while speaking from a podium at the White House.[13]

Plaintiffs next cite to Dr. Fauci and Dr. Collins communications regarding the Great Barrington Declaration, a scientific critique of the effects of prolonged lockdowns as a response

---

[13] This was one among many public statements Dr. Fauci made about the illegitimacy of the lab-leak theory.

to COVID-19 co-authored by Dr. Jay Bhattacharya and Dr. Martin Kulldorff, Plaintiffs in this case. Dr. Collins' email regarding the publication read:

> Hi Tony and Cliff, See: https://gbdeclaration.org/. This proposal from the three fringe epidemiologists who met with the Secretary seems to be getting a lot of attention – and even a co-signature from Nobel Prize winner Mike Leavitt at Stanford. There needs to be a quick and devastating published take-down of its premises. I don't see anything like that online yet – is it underway? Francis.[14]

In response, Dr. Fauci began making a series of public statements that were highly critical of the Great Barrington Declaration, describing it as "total nonsense" and "ridiculous."[15] "[T]he censorship of the Great Barrington Declaration and Plaintiffs Bhattacharya and Kulldorff [occurred] just after a senior HHS official called for a 'quick and devastating … take-down' of the Declaration" to Dr. Fauci.[16]

Plaintiffs next assert that Dr. Fauci was involved in Twitter's permanent suspension of the vaccine critic Alex Berenson ("Berenson"). Berenson's tweets consisted of science-based objections to the vaccinations of young, healthy persons, which became a target for Biden-Administration's censors. Plaintiff States argue that "Alex Berenson disclosed internal Twitter communications revealing that senior 'WH' officials including Andrew Slavitt specifically pressured Twitter to de-platform Berenson, an influential vaccine critic—which Twitter did."[17] Dr. Fauci publicly described Berenson's opinions on vaccines as "horrifying."  President Biden followed Dr. Fauci's steps and made a statement that "They're killing people" by not censoring vaccine "misinformation," to which Twitter subsequently permanently suspended Berenson from

---

[14] [Doc. No. 45-3, ¶ 14].
[15] See, e.g., Jessie Hellmann, Fauci Blasts Herd Immunity Proposal Embraced by White House as 'Total Nonsense,' THE HILL (Oct. 15, 2020), at https://thehill.com/policy/healthcare/521220-fauci-blasts-herd-immunity-proposal-embraced-by-white-house-as-total/.
[16] [Doc. No. 84, ¶ 480].
[17] [Doc. No. 84, ¶ 345].

its platform.[18] On October 13, 2022, Berenson posted on Substack Twitter emails indicating that a board member of Pfizer pressured Twitter to de-platform Berenson.[19] In the emails, the Pfizer executive allegedly claimed that Berenson's speech should be censored because it posed a threat to the safety of Dr. Fauci. Which Plaintiffs argue creates an inference that there was collusion between White House official Andrew Slavitt and the Pfizer executive on this very point.

Government Defendants have submitted to Plaintiffs interrogatory responses on behalf of Dr. Fauci, asserting that he has had no direct communications with any social-media platforms regarding censorship.[20] Plaintiffs argue in turn that they should not be required to simply accept those blanket statements as they were submitted, and they argue three reasons why Dr. Fauci should be questioned under oath.

First, Plaintiffs assert that Dr. Fauci has refused to verify under oath his own interrogatory responses in violation of this Court's Order. The NIAID's responses were instead verified by Dr. Jill Harper, who was not named in the Complaint. Accordingly, Dr. Fauci has made no statements under oath regarding his communications with social-media platforms, which violates this Court's Order regarding the discovery that instructed Dr. Fauci to provide interrogatory responses.[21] The Court sees the importance of having Dr. Fauci make statements under oath as it relates to the issues of this matter.

Next, Plaintiffs argue that even if Dr. Fauci can prove he never communicated with social-media platforms about censorship, there are compelling reasons that suggest Dr. Fauci has acted through intermediaries, and acted on behalf of others, in procuring the social-media censorship of credible scientific opinions. Plaintiffs argue that even if Dr. Fauci acted indirectly or as an

---

[18] [Doc. No. 84, ¶ 347].
[19] See https://alexberenson.substack.com/p/pfizer-board-member-scott-gottlieb
[20] [Doc. No. 86-3, p. 24, 57].
[21] [Doc. No. 72, pp. 67].

intermediary on behalf of others, it is still relevant to Plaintiffs' preliminary injunction motion. The Court agrees.

Lastly, Plaintiffs argue that Dr. Fauci's credibility has been in question on matters related to supposed COVID-19 "misinformation" since 2020. Specifically, Plaintiffs state that Dr. Fauci has made public statements on the efficacy of masks, the percentage of the population needed for herd immunity, NIAID's funding of "gain-of-function" virus research in Wuhan, the lab-leak theory, and more. Plaintiffs urge that his comments on these important issues are relevant to the matter at hand and are further reasons why Dr. Fauci should be deposed. Plaintiffs assert that they should not be required to simply accept Dr. Fauci's "self-serving blanket denials" that were issued from someone other than himself at face value. The Court agrees.

After reviewing the Plaintiffs and the Defendants' arguments, the Court finds that Plaintiffs have proven that Dr. Fauci has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Dr. Fauci is a high-ranking official, especially as he is the Director of the National Institute of Allergy and Infectious Diseases and Chief Medical Advisor to the President. The Court sees the only potential burden imposed on Dr. Fauci as a result of him being deposed is that of his time. However, the Court acknowledges that any person who is being deposed must sacrifice their time, and it does not see any burden imposed on Dr. Fauci that outweighs the Court's need for the information in order to make the most informative decision on the pending Motion for Preliminary Injunction filed by Plaintiffs. Finally, the Court is aware of a number of substantive reasons why Dr. Fauci's deposition should be taken. The first is the publicly available emails that prove that Dr. Fauci was communicating and acting as an intermediary for others in order to censor information from being shared across multiple social-media outlets. The second is that Dr. Fauci

has yet to give any statements under oath in this matter. The third is that the Court has no doubt that Dr. Fauci was engaging in communications with high-ranking social-media officials, which is extremely relevant in the matter at hand. Additionally, the crux of this case is the fundamental right of free speech. Any burden that may be imposed on Dr. Fauci is wholly outweighed by the importance of Plaintiffs' allegations of suppression of free speech. Accordingly, the Court finds that Plaintiffs have satisfied their burden of proving why a deposition of Dr. Anthony Fauci is necessary in this case, and exceptional circumstance are present. Accordingly, **IT IS ORDERED** that Dr. Anthony Fauci cooperate in the Plaintiffs' request to depose him for purposes of their preliminary injunction discovery.

### 2. Rob Flaherty—White House Director of Digital Strategy

Plaintiffs move to depose Rob Flaherty ("Flaherty"), who is the Director of Digital Strategy for the White House. Plaintiffs describe him as a "key official in the White House's pressure campaign on social-media companies to increase COVID-19 censorship and social-media companies' policies and responses to COVID-19 vaccine claims."[22] Flaherty is said to have had "extensive" oral meetings with social-media platforms, including Twitter, Meta and YouTube on vaccine hesitancy and combatting misinformation.

Plaintiffs allege that Flaherty consistently communicates with Meta's director of U.S. Public Policy through "Covid Insight Reports," which detail trends/posts by social-media users taken by Meta. Further, Plaintiffs allege that he has held meetings about Meta's platform to address misinformation and to curb vaccine hesitancy. Meta allegedly contacts Flaherty when Covid-19 vaccines are authorized for new groups of people, and they report on Meta's intentions to censor disfavored opinions about vaccine effectiveness for those new groups, all allegedly at the White

---

[22] [Doc. No. 86-5].

House's urging.[23] Plaintiffs argue that Flaherty has specific knowledge and information on Meta's attempts to censor the "Disinformation Dozen."[24][25] Further, Plaintiffs assert that Flaherty has led efforts for the White House to force Meta to explain "how big the [misinformation] problem is, what solutions you're implementing, and how effective they've been."[26] Further, Flaherty supposedly "pressured Meta by sending them an article about misinformation on Facebook with a subject line 'not sure what to say anymore.'" Flaherty also allegedly knows about the Biden Transition Team's efforts with Meta.[27] Defendants' interrogatory responses detailed that Flaherty participated in virtual meetings with social-media platforms, which Plaintiffs assert were about censorship.[28]

Plaintiffs maintain that deposing Flaherty is essential to this case as it would provide critical information on the White House's pressure campaign to social-media platforms against the "Disinformation Dozen" and other COVID-19 "misinformation" issues, especially as it relates to their leaning on social media companies after press reports were released regarding vaccines, and the White House's involvement over content-modulation policies instilled in Meta and Twitter in their efforts to remove "the most harmful COVID-19 misinformation."[29]

The Court finds that Plaintiffs have proven that Flaherty has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Flaherty is a high-ranking official, especially as he serves as Director of Digital Strategy for the White House. Any burden imposed upon Flaherty is

---

[23] [Id. at 7268-89; 7250].
[24] Supposedly, there are a dozen accounts across social-media that spread the mass of "misinformation" on COVID-19. Government officials have taken to calling these accounts the "Disinformation Dozen".
[25] [Id. at 7322].
[26] [Id. at 7258–59; see also id. at 16279].
[27] [Id. at 16364, 16276].
[28] [Doc. No. 86-3, at 31].
[29] [Doc. No. 86-5, p. 7248-49, 16275].

outweighed by the need for Plaintiffs to determine whether the fundamental right of free speech has been abridged. Extraordinary circumstances are present to depose this high-ranking official. The substantive reasons for taking Flaherty's depositions are set out herein, and the Court finds the substantive reasons are overwhelming. For reasons further set out herein, Plaintiffs are allowed to depose either Rob Flaherty or Andrew Slavitt. Shall Plaintiffs notify Defendants of their intent to depose Rob Flaherty, **IT IS ORDERED** that Rob Flaherty cooperate with Plaintiffs' request to depose him.

### 3. Andrew Slavitt—White House Senior COVID-19 Advisor

Defendant Andrew Slavitt ("Slavitt") served as the White House's Senior COVID-19 Advisor. Slavitt allegedly "led the charge" for the White House in its campaign with social-media companies to increase the censorship of private speech as it related to COVID-19 through meetings and oral conversations with representatives of multiple social-media platforms. Plaintiffs assert that in Defendants' own documentary discovery, it is revealed that Slavitt received "Facebook bi-weekly covid content reports" from a senior Facebook executive in order for Slavitt to "oversee" Facebook's censorship.[30] Plaintiffs also argue that Slavitt specifically pressured Twitter to de-platform Alex Berenson. This was supposedly done in an oral meeting, so there is no official record of it.[31]

On April 21, 2022, a meeting invitation was sent to Slavitt, which stated:

> White House Staff will be briefed by Twitter on vaccine [misinformation] Twitter to cover trends seen generally around vaccine misinformation, the tangible effects seen from recent policy changes, what interventions are currently being implemented in addition to previous policy changes, and ways the White House (and our COVID experts) can partner in product work.[32]

---

[30] [Doc. No. 84, ¶ 343].
[31] [Doc. No. 84, ¶¶ 345-46.].
[32] [Id. ¶ 345].

Case 3:22-cv-01213-TAD-KDM   Document 119-2   Filed 11/18/22   Page 62 of 139 PageID #:
4678
Case 1:22-cv-01213-TAD-KDM   Document 91   Filed 11/09/22   Page 25 of 37 PageID #: 3928

The next day, internal Twitter messages reflected that Slavitt had posed "one really tough question about why Alex Berenson hasn't been kicked off the platform."[33]  Plaintiffs describe several other instances where Slavitt engaged in email exchanges with social-media executives that describe censorship of the platforms and the actions the platforms are taking to expand censorship for language they deemed to be "harmful."[34] One email in particular read:

> [O]n March 2, 2021, Meta sent an email assuring Slavitt, Flaherty, and Humphrey that the company is "[c]ombating vaccine misinformation and de-amplifying content that could contribute to vaccine hesitancy" by "improving the effectiveness of our existing enforcement systems (particularly focusing on entities that repeatedly post vaccine misinformation), mitigating viral content that could lead to vaccine hesitancy[.]"[35]

Plaintiffs maintain that Twitter and Meta's Facebook have identified Slavitt as a senior federal official whom they communicated about their efforts to "stop" the spread of alleged "misinformation" regarding COVID-19. Plaintiffs go on to assert that the White House has also identified Slavitt and Flaherty as senior White House Officials who were involved in communications with social-media platforms. Plaintiffs argue these communications centered on censorship.

Plaintiffs also cite to a podcast that Slavitt participated in, wherein he stated, "my time in the White House where I was charged with pushing organizations like Facebook from spewing misinformation."[36] Plaintiffs detail Slavitt's statements made on the podcast, wherein he states that he was "pushing" for the company (i.e., social-media platforms) to be "more responsible" for the

---

[33] [Id. ¶ 346].
[34] [Id. ¶¶ 354, 369].
[35] [Id. ¶ 375.]
[36] Is COVID Misinformation Killing People?, Published Jul 21, 2021, at https://omny fm/shows/in-the-bubble/is-covid-misinformation-killing-people-with-facebo (audio 5:40)

information that was being spread on the platforms. Plaintiffs move to depose Slavitt because of his role as a "self-professed principal enforcer for online censorship."

The Court finds that Plaintiffs have proven that Andrew Slavitt has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Slavitt is a former high-ranking official, especially as he served as the White House's Senior COVID-19 Advisor. Any burden imposed upon Slavitt is outweighed by Plaintiffs' allegations of suppression of free speech. Extraordinary circumstances are present. As the Court has stated, any person who is being deposed must sacrifice their time, and it does not see any burden imposed on Slavitt that outweighs the Court's need for the information in order to make the most informative decision on the pending Motion for Preliminary Injunction filed by Plaintiffs. Lastly, the Court has determined that there are substantive reasons for taking the deposition. As stated above, Slavitt was the White House's Senior COVID-19 Advisor. His role put him in a position that would grant him specific knowledge to the facts at issue. Slavitt's own description of his role on a podcast that he went on showed he has specific knowledge as it relates to these issues. His communications, actions, and orders to and between social-media platforms will be necessary for this Court to make its ruling. Accordingly, as stated above, because Flaherty and Slavitt were both White House officials, in an effort to narrowly tailor this expedited discovery, Plaintiffs are allowed to take the deposition of either Flaherty or Slavitt, but not both. Should Plaintiffs notify Defendants of a desire to depose Andrew Slavitt, **IT IS ORDERED** that Slavitt cooperate as to Plaintiffs' request to depose him.

### 4. Jennifer Psaki—Former White House Press Secretary

Jennifer Psaki (Psaki) is the former White House Press Secretary of President Biden. She is a Defendant in this case. Plaintiffs move to depose Psaki for a multitude of reasons. The most

pressing reason being that during her tenure as White House chief spokesperson, Psaki made a

series of public statements that:

> (1) attested to her personal knowledge of the participation of high-
> level White House officials in pressuring social-media platforms,
> and (2) reinforced the public threats of adverse legal consequences
> to social-media platforms if they do not increase censorship of views
> disfavored by federal officials.   Thus, she both admitted to
> knowledge of pressure to censor from federal officials and directly
> engaged in such pressure herself, in a highly impactful and visible
> fashion.[37]

Plaintiffs' Complaint details the statements Psaki made as they relate to these claims. For example,

on May 5, 2021, Psaki stated at a White House press conference "the major platforms have a

responsibility related to the health and safety of all Americans to stop amplifying untrustworthy

content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and

elections."[38] Psaki stated at another press conference on July 15, 2021, that she administration is

in "regular touch" with social-media platforms and that the engagements happen between

"members of our senior staff" and "members of our COVID-19 team."[39] Psaki also often spoke of

the "Disinformation Dozen" and stated that:

> All [12] of them remain active on Facebook, despite some even
> being banned on other platforms, including Facebook — ones that
> Facebook owns … Facebook needs to move more quickly to remove
> harmful, violative posts — posts that will be within their policies for
> removal often remain up for days.  That's too long. The information
> spreads too quickly.[40]

---

[37] [Doc. No. 86, p. 15].
[38] White House, *Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack,* May 5, 2021, at https://www.whitehouse.gov/briefing-room/press-briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-tom-vilsack-may-5-2021/.
[39] [Doc. No. 86, p. 16].
[40] [Id.]

Psaki also called on social-media platforms for consistency in banning disfavored speakers, stating "You shouldn't be banned from one platform and not others."[41]

Plaintiffs further argue that along with these statements, Psaki also "demanded" "robust strategies" for social-media companies to enforce censorship of "harmful posts." On April 25, 2022, Psaki also stated that President Biden was concerned about social-media platforms and thought they should be held accountable for the harms caused by the spread of "disinformation." She maintained at this press briefing that certain officials within the White House and the Biden Administration maintained "regular" contact with social-media platforms.

Plaintiffs submitted interrogatories to Karine Jean-Pierre, who is Psaki's successor as White House Press Secretary, and asked questions regarding the social-media censorship and Psaki's knowledge of such. Defendants' response to the interrogatories was that they lacked knowledge of the basis of her statements on those issues because Psaki no longer works at the White House. The only relevant responses Defendants supplied in the interrogatories were that Rob Flaherty and Andrew Slavitt were involved in communications with social-media platforms. Plaintiffs move to depose Psaki because they have obtained no statements from Psaki about what her "actual knowledge" of these issues is. Plaintiffs state that they should be allowed to depose her to explore the basis of the "critical statements" alleged in the Complaint and stated above.

The Court finds that Plaintiffs have proven that Jennifer Psaki has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Psaki was a high-ranking official at the time that she made the statements at issue, especially as she served as the White House Press Secretary.

---

[41] White House, *Press Briefing by Press Secretary Jen Psaki*, July 16, 2021, at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/.

However, this rank does not mitigate the relevance and the need of her deposition as it relates to this case. Any burden on Psaki is outweighed by the need to determine whether free speech has been suppressed. Lastly, the Court has determined that there are substantive reasons for taking the deposition. Extraordinary circumstances are present. As stated above, Psaki has made a number of statements that are relevant to the Government's involvement in a number of social-media platforms' efforts to censor its users across the board for sharing information related to COVID-19. Accordingly, **IT IS ORDERED** that Jennifer Psaki cooperate in the Plaintiffs' request to depose her for purposes of their preliminary injunction discovery.

### 5.  Elvis Chan—FBI Supervisory Special Agent

Plaintiffs move to depose Elvis Chan ("Chan"), a named Defendant in this case and the FBI Supervisory Special Agent of Squad CY-1 in the San Francisco Division of the FBI.[42] Plaintiffs argue that Chan has "authority over cybersecurity issues for FBI in that geographical region, which includes the headquarters of major social-media platforms, and he plays a critical role for FBI in coordinating with social-media platforms relating to censorship and suppression of speech on their platforms."[43] Plaintiffs move to depose Chan because they assert he plays a central role in the federal government's suppression of social-media censorship.

In support of this argument, Plaintiffs cite to a podcast where Mark Zuckerberg stated that communications from the FBI led to Facebook censoring stories of the Hunter Biden Laptop.[44] Plaintiffs maintain that in response to their third-party subpoena, Meta's counsel identified Chan as the FBI agent who communicated with Facebook to suppress that story. Plaintiffs move to depose Chan because the Government has not provided documentary discovery with respect to

---

[42] [Doc. No. 84, ¶ 61].
[43] [Id.]
[44] [Doc. No. 86, p. 19].

Chan and because Chan has personal knowledge. They claim that his testimony is relevant and necessary to their preliminary injunction discovery motion.

The Court finds that Plaintiffs have established that Elvis Chan has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Chan was a high-ranking official, especially as he served as the FBI Supervisory Special Agent. However, this rank does not mitigate the relevance and the need of his deposition as it relates to this case. Any burden imposed on Chan by being deposed is outweighed by the need to determine whether the First Amendment right of free speech has been suppressed. There are no burdens imposed on Chan outweighing the Court's need for the information in order to make the most informed decision on the pending Motion for Preliminary Injunction filed by Plaintiffs. Extraordinary circumstances are present here. Lastly, the Court has determined that there are substantive reasons for taking the deposition. As stated above, Chan was identified as the FBI Agent who communicated with Facebook to suppress a story about the Hunter Biden laptop. If he did this, the Court ultimately finds there are reasons to believe that he has interfered in other ways, too. Accordingly, **IT IS ORDERED** that Elvis Chan cooperate in the Plaintiffs' request to depose him for purposes of their preliminary injunction discovery.

### 6. Jen Easterly—CISA Director

Plaintiffs move to depose Jen Easterly ("Easterly"), the Director of CISA within the Department of Homeland Security, because she supervises the "nerve center" of federally directed censorship. Plaintiffs describe the CISA's central role as "directly flagging misinformation to social-media companies for censorship." Plaintiffs also assert that Easterly "claim[s] that social-media speech" by Americans "is a form of 'infrastructure,' and that policing speech online by the

19

federal government falls within her agency's mission to protect 'infrastructure,' stating that … 'the most critical infrastructure is a cognitive infrastructure."[45]

Plaintiffs also cite to Easterly's text messages between Easterly and Matt Masterson, a former CISA agent who now works for a social-media platform.[46] Allegedly, these texts center around Easterly and Masterson discussing a "Disinformation Governance Board." The conversations ultimately describe how Easterly seeks greater censorship and that this would be done by federal pressure on social media platforms to increase censorship.

Plaintiffs move to depose Easterly for two reasons. First, they say that her role in the CISA as the director oversees the "nerve center" of the federal government's efforts to censor social-media users. They say that her text messages show that she has unique knowledge about the scope and nature of communications between CISA, DHS, and other federal officials. Second, Plaintiffs assert that in their response to interrogatories, CISA disclosed extensive oral communications and meetings between CISA officials and social-media platforms. No officials were actually identified by the CISA, but Plaintiffs believe that because of her role, Easterly would have detailed knowledge of what the CISA is disclosing. Plaintiffs state that her deposition would be their only chance of obtaining this information prior to addressing the preliminary injunction.

The Court finds that Easterly is a high-ranking official that has personal knowledge of relevant facts. Any burden imposed on Easterly is outweighed by the need to determine whether the First Amendment right of free speech was suppressed. Exceptional circumstances exist here. The substantive reasons for deposing Easterly are set forth herein. Because Easterly and Lauren Protentis both work for CISA, to narrowly tailor the relief sought, Plaintiffs are allowed to depose

---

[45] [Doc. No. 86, citing Doc. No. 84, ¶¶ 290-293, 301, 302, 291].
[46] [Doc. No. 71-5, p. 2-4].

either Easterly or Lauren Protentis, but not both. Should Plaintiffs notify Defendants of a desire to depose Jean Easterly, **IT IS ORDERED** that she cooperate with Plaintiffs' request to depose her.

### 7.  Lauren Protentis[47]—CISA "Mis- Dis- and Mal-Information Team" Member

Plaintiffs move to depose Protentis because of her membership of the CISA Mis- Dis- and Mal-Information Team ("MDM Team"), whose mission is allegedly a federally induced censorship of social-media speech.  The documentary discovery provided that Protentis was involved in the MDM Team and engaged in oral communications with executives of social-media platforms. Plaintiffs allege these communications were about censorship. Plaintiffs assert that Protentis is a "leader" and "expert" in the MDM Team's efforts to bridge a gap between the federal government and social-media companies to create a line of control over the censorship of social media.[48] Plaintiffs also argue that her contacts with these companies are so "pervasive," that oftentimes "very senior officials" in other departments ask her to introduce them to "points of contact."[49]

Plaintiffs ultimately conclude that Protentis serves as a vital connection between CISA and social-media platforms in the government's censorship efforts, has special knowledge in the election-security space, and provides briefings to the governments of foreign countries on how to interact with social-media companies.  They assert that Protentis' testimony will establish context of the meetings, extent of CISA's election security efforts, tools that the government uses on social-media platforms, and efforts to influence election officials and encourage them to use social-media companies to censor voters ahead of the 2022 election.

---

[47] Defendants indicated that Protentis is on maternity leave, but they did not indicate when she would be returning.
[48] These include Twitter, Google, Microsoft, and Meta.
[49] [Doc. No. 86-6].

The Court finds that Plaintiffs have established that Protentis has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Protentis is a high-ranking official because of her role as a MDM Team Member. The potential burden imposed on Protentis is outweighed by the need to determine whether First Amendment rights of free speech have been suppressed. Exceptional circumstances exist here. The Court finds that there are substantive reasons for taking Protentis' deposition. As stated above, Protentis served a vastly important role between the federal government and the social-media companies. Based on the description above, she served as a connection between these two conglomerates. This is relevant to the issues presented by Plaintiffs in their motion, and her deposition is important to the Court to make an informed determination. Because Easterly and Protentis both work for CISA, to narrowly tailor the relief sought, Plaintiffs are allowed to depose either Easterly or Lauren Protentis, but not both. Should Plaintiffs notify Defendants of a desire to depose Lauren Protentis, **IT IS ORDERED** that she cooperate with Plaintiffs' request to depose her.

### 8.   Vivek Murthy—Surgeon General

Plaintiffs next move to depose Surgeon General Dr. Vivek Murthy ("Dr. Murthy") for his public campaign to censor individuals who spread "misinformation" about COVID-19. [Doc. No. 84]. Plaintiffs state that Dr. Murthy has also publicly criticized "tech companies" by asserting that they are responsible for COVID-19 deaths due to their failure to censor "misinformation." Plaintiffs also allege that Dr. Murthy issued a Request for Information (RFI) on March 2, 2022, requesting tech platforms to provide him with information about "misinformation," including the identities of those supposedly spreading it on their sites.[50] Plaintiffs assert that this, along with Dr.

---

[50] [Doc. No. 84, ¶¶ 243-46].

Murthy's other statements, as well as those of President Joseph Biden and Jen Psaki, this RFI "was an intimidation tactic, designed to frighten the tech companies into compliance with his demand to escalate censorship of certain viewpoints on Covid-19 for fear of reprisal in the form of regulation or other legal consequences."[51]

Plaintiffs urge that Dr. Murthy also engages in communications with high-level Facebook executives about the "demand" for greater censorship of COVID-19 "misinformation." Plaintiffs state that they obtained this information through texts and emails through discovery. These establish that Dr. Murthy was engaged in these communications and was even sent "reports" to obtain Dr. Murthy's opinions on censorship.

Plaintiffs move to depose Dr. Murthy because of his direct, routine contact with the senior Meta executive, and at least one phone call with him.  He is the only individual in government privy to these conversations, and thus the only person who can therefore answer questions about the nature and degree of the conversations and clarify whether additional conversations on the topic were held over the phone or in virtual or in-person meetings.

The Court finds that Plaintiffs have established that Dr. Murthy has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Dr. Murthy is a high-ranking official as he serves as Surgeon General. However, this rank does not mitigate the relevance and the need of his deposition as it relates to this case. Further, his actions went beyond the scope of this rank, and the Court finds that those actions must be addressed through a deposition. The potential burden imposed on Dr. Murthy is outweighed by the need to determine whether First Amendment rights of free speech have been suppressed. Exceptional circumstances are present. The Court finds that

---

[51] [Id. ¶ 243].

there are substantive reasons for taking the deposition. As stated above, Dr. Murthy made public statements about how the media companies' failure to censor its users related in COVID-19 deaths. These statements are extremely substantive to the nature of this suit. Accordingly, **IT IS ORDERED** that Dr. Vivek Murthy cooperate in the Plaintiffs' request to depose him for purposes of their preliminary injunction discovery.

### 9. Carol Y. Crawford—CDC's Chief of the Digital Media Branch

Plaintiffs move to depose Defendant Carol Crawford ("Crawford"), the Chief of the Digital Media Branch of the Division of Public Affairs within CDC, because she is allegedly among the government employees most involved in censoring "misinformation" about COVID-19. Plaintiffs state that she participated in emails with employees at Twitter, Meta, and Google/YouTube. Further, they state that she organized "Be on the Lookout" ("BOLO") meetings, which were essentially meetings that attempted to "quell the spread of misinformation" in 2021.[52] Plaintiffs claim that during these meetings, Crawford flagged certain social-media posts, provided examples of types of posts to censor, and urged the participants not to share the information exchanged in the BOLO meetings. She also worked with the Census Bureau in an effort to identify certain social-media users who were allegedly spreading misinformation about the vaccine. Emails from March of 2021 indicate that a meeting between the CDC (including Ms. Crawford), Census, and Google was held to discuss "COVID vaccine mis-info."[53]

Plaintiffs claim that Crawford's communications show that the CDC, the Census Bureau, and other government agencies collaborated with Facebook to censor speech on the platform. Plaintiffs claim that she has been involved in the "censorship enterprise" from the beginning of

---

[52] [Doc. No. 84].
[53] [Doc. No. 86-10].

Case 3:22-cv-01213-TAD-KDM   Document 119-2   Filed 11/18/22   Page 73 of 139 PageID #:
4689
Case 3:22-cv-01213-TAD-KDM   Document 91   Filed 11/08/22   Page 25 of 39 PageID #: 3939

the pandemic. Plaintiffs detail this by pointing out two phone calls Crawford engaged in with a Facebook employee.[54]

Plaintiffs move to depose Crawford because they claim that her email exchanges demonstrate that she played a key role in directing censorship on social-media platforms. Plaintiffs also suggest that her references to the role of the Census Bureau suggest that she would be able to shed light on that agency's role in efforts to flag "misinformation" the previous year, a topic about which little is known.

The Court finds that Plaintiffs have established that Crawford has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Crawford is a high-ranking official because of her role as the CDC's Chief of the Digital Media Branch. This role, though, is vastly important to the issues at hand, and her rank does not mitigate the relevance and the need of her deposition as it relates to this case. The potential burden imposed on Crawford is outweighed by the need to determine whether First Amendment rights of free speech have been suppressed. Exceptional circumstances exist here. The Court finds that there are substantive reasons for taking the deposition. As stated above, Crawford organized meetings and engaged in a number of communications with social-media officials, and the contents of those meetings and communications are highly important for the issues presented by this case. Accordingly, **IT IS ORDERED** that Carol Crawford cooperate in the Plaintiffs' request to depose her for purposes of their preliminary injunction discovery.

---

[54] [Doc. No. 86-10].

### 10. Daniel Kimmage—State Department's Global Engagement Center Coordinator

Plaintiffs move to depose Daniel Kimmage ("Kimmage"), the Acting Coordinator for the Global Engagement Center ("GEC") at the State Department, because he allegedly works closely with Easterly and CISA to coordinate social-media censorship of speech on election-related issues and election integrity. Plaintiffs allege that in response to third-party subpoena, Twitter identified Kimmage as communicating with it about censorship and content modulation.[55] Allegedly, the purpose of the GEC is to facilitate coordination between the government and the tech sector to combat disinformation. Plaintiffs claim that the GEC works closely with the CISA on issues of censorship.

Plaintiffs claim that Kimmage's GEC collaborated with CISA in 2020 and 2022 to create and fund an alliance of third-party nonprofits called the "Election Integrity Partnership," which supposedly pushed for social-media censorship of free speech about elections in 2020 and continues to do so today in 2022.[56]

These are not the only CISA-GEC election-related censorship activities. Documents produced by LinkedIn demonstrate that Samaruddin K. Stewart, acting on behalf of Kimmage's Global Engagement Center in the State Department, organized repeated face-to-face meetings with LinkedIn and other social-media platforms to discuss censorship.[57] The nature and content of communications at these oral meetings about disinformation between Kimmage's representatives and social-media platforms has not been disclosed. Plaintiffs assert that the Defendants have provided no documentary discovery about Kimmage's GEC and its central role in federal

---

[55] [Doc. No. 84, ¶ 396].
[56] [Id. ¶ 401].
[57] [Doc. No. 84, ¶¶ 422-424].

censorship activities on election-related speech.  They claim that Kimmage's deposition is crucial for this reason.

The Court finds that Plaintiffs have established that Kimmage has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19. The Court has considered that Kimmage is a high-ranking official because of his role as the Acting Coordinator for the Global Engagement Center at the State Department. This role, though, is vastly important to the issues at hand, and his rank does not mitigate the relevance and the need of his deposition as it relates to this case. The potential burden imposed on Kimmage is outweighed by the need to determine whether First Amendment rights of free speech have been suppressed. Exceptional circumstances exist here. The Court finds that there are substantive reasons for taking the deposition, as stated above. Accordingly, **IT IS ORDERED** that Daniel Kimmage cooperate in the Plaintiffs' request to depose him for purposes of their preliminary injunction discovery.

### III.    CONCLUSION

For the reasons set forth herein,

**IT IS ORDERED** that to the extent that Plaintiffs move to depose the following parties, the request is **GRANTED:** NIAID Director and White House Chief Medical Advisor Dr. Anthony Fauci; Deputy Assistant to the President and Director of White House Digital Strategy Rob Flaherty **OR** former White House Senior COVID-19 Advisory Andrew Slavitt; former White House Press Secretary Jennifer Psaki; FBI Supervisory Special Agent Elvis Chan; CISA Director Jen Easterly **OR** CISA official Lauren Protentis; Surgeon General Vivek Murthy; CDC Chief of the Digital Media Branch Carol Crawford; and Acting Coordinator of the State Department's Global Engagement Center Daniel Kimmage.

MONROE, LOUISIANA, this 21st day of October 2022.

Terry A. Doughty
United States District Judge

# Exhibit B

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **The State of Missouri and the State of Louisiana,** | |
| *Plaintiffs,* | |
| v. | Civil Action No. 22-cv-1213 |
| **President Joseph R. Biden, Jr., in his official capacity as President of the United States of America, *et. al.,*** | |
| *Defendants.* | |

### DEFENDANT KARINE JEAN-PIERRE'S AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFFS' REQUESTS FOR THE PRODUCTION OF DOCUMENTS

Pursuant to Federal Rules of Civil Procedure 26 and 34, Defendant Karine Jean-Pierre, in her official capacity as White House Press Secretary, by and through her undersigned counsel, hereby submits the following objections and responses to Plaintiffs' Requests for the Production of Documents ("RFPs"). Defendant has amended these objections and responses in a manner consistent with the Court's September 6, 2022, Order (ECF No. 72).

### Objections to Definitions and Instructions

1.      Defendant objects to the definitions of "Content Modulation," and the related term "Misinformation," including to the extent that Plaintiffs' definition of "Content Modulation" covers actions by Social Media Companies beyond those taken against content containing Misinformation and against users posting content containing Misinformation (such as actions taken as to any post on "efficacy of COVID-19 restrictions" or on "security of voting by mail"). For purposes of these Responses and Objections, Defendant generally defines "Misinformation" in a manner consistent with Plaintiffs' definition of that term:  "any form of speech . . . considered to be potentially or actually incorrect, mistaken, false, misleading, lacking proper context, disfavored, having the

1

tendency to deceive or mislead . . . including but not limited to any content or speech considered by any federal official or employee or Social-Media Platform to be 'misinformation,' 'disinformation,' 'malinformation,' 'MDM,' 'misinfo,' 'disinfo,' or 'malinfo.'" *See* RFP, Definition O. A broader definition of "Content Modulation," or "Misinformation," would cover subject-matter that goes beyond the scope of, and would thus not be relevant to, Plaintiffs' claims.

2.      Defendant objects to the definitions of CDC, CISA, DHS, HHS, NIAID, and White House Communications Team to the extent those definitions include "any . . . agent," "contractors" and "any subordinate agency or entity" of those agencies on the ground that those definitions are overbroad and may include persons and entities that are not under the supervision or control of any Defendant. Further, Defendant also objects to the definition of "White House Communications Team" for the additional reason that such a definition is not proportional to the needs of the case to the extent Plaintiffs seek information beyond the possession of the White House Office of the Press Secretary upon which this request is served.

3.      Defendant objects to the definition of "document" to the extent it includes "documents retained on personal devices and/or in personal email accounts or other personal accounts." Documents found on personal devices or within electronic personal accounts would not be in the custody or control of any Defendant.

4.      Defendant objects to the definition of "Social-Media Platform" as overbroad, because it includes "*any* organization that provides a service for public users to disseminate . . . content . . . to other users or the public," along with any "contractors, or any other person . . . acting on behalf of the Social-Media Platform . . . as well [as] subcontractors or entities used to conduct fact-checking or any other activities relating to Content Modulation." The Complaint contains no nonconclusory allegation that Defendant communicated with each and every organization that allows users to "disseminate . . . content" to other users, along with any persons or entities affiliated with those

organizations. Defendant will construe "Social-Media Platform" to encompass Facebook, Instagram, Twitter, LinkedIn, and YouTube.

5.      Defendant objects to the definition of "You" and "Your" as overbroad as it includes "any officers, officials, employees, agents, staff members, contractors, or other(s) acting at the direction of Jennifer Rene Psaki, in her official capacity as Press Secretary, or at the direction of her successor." Such a definition is not proportional to the needs of the case to the extent it is interpreted to extend beyond the White House Office of the Press Secretary, especially given the expedited, abbreviated discovery process where Defendant has only a limited amount of time to conduct a document search and produce responsive documents. Defendant has interpreted this request as applying solely to the White House Office of the Press Secretary.

6.      Defendant objects to Instruction 1. Plaintiffs cite to no authority requiring a recipient of discovery requests to "describe the efforts [it has] made to locate . . . document[s]" that are not in its custody and control "and identify who has control of the document and its location."

7.      Defendant objects to Instruction 2 to the extent it exceeds the requirements of F.R.C.P. 26(b)(6).

8.      Defendant objects to Instruction 3. Plaintiffs cite to no authority indicating that, if Defendant objects to a request on burden grounds, Defendant must "stat[e] the approximate number of documents to be produced, the approximate number of person-hours to be incurred in the identification, and the estimated cost of responding to the request." Further, it is unclear how Defendant could provide that type of information without conducting certain burdensome document searches and reviews that Defendant sought to avoid through their objections. As required by the Federal Rules of Civil Procedure, Defendant will "state with specificity the grounds for objecting to the request [at issue], including the reasons" for the objection. F.R.C.P. 34(b)(2)(B).

9.      Defendant objects to Instruction 5 to the extent it requires Defendant to produce

electronic documents "with all metadata and delivered in their original format." Plaintiffs may identify the precise categories of metadata they want Defendant's productions to contain, and Defendant can determine whether she can provide those categories of metadata without an undue burden.

10.     Defendant objects to Instruction 6 to the extent that it requires Defendant to produce documents in a format other than the format in which they are "kept in the usual course of business." F.R.C.P. 34 (b)(2)(E). Defendant also objects to Instruction 6 to the extent that it requests the production of all e-mail "forwards" for e-mails produced to Plaintiffs. That request may call for the production of documents that are not found in Defendant's e-mail files.

11.     Defendant objects to Instruction 8, which applies these requests to the Office of the White House Press Secretary from January 1, 2020, to the present, as unduly broad.  Ms. Psaki served as White House Press Secretary from January 20, 2021, until May 13, 2022, when Ms. Jean-Pierre became White House Press Secretary. Defendant interprets these requests as applying to when Ms. Psaki served as White House Press Secretary from January 20, 2021, through May 13, 2022, and when Ms. Jean-Pierre began serving as White House Press Secretary until the date the requests were served, i.e., from May 13, 2022, to July 18, 2022. Anything else would be disproportional to the needs of the case. Such disproportionality is further aggravated by the discovery burden being placed on White House officials. *See Cheney v. U.S. District Court*, 542 U.S. 367, 385 (2004).

### General Objections Applicable to All Requests

1.     The general objections set forth below apply to each and every discovery request discussed below. In asserting Defendant's objections to specific discovery requests, Defendant may assert an objection that is the same as, or substantially similar to, one or more of these objections. Defendant may do so because the language of the discovery request itself may signal particular and specific concerns that the discovery request at issue may be objectionable based on the grounds

stated. The fact that Defendant may specifically reference some of the objections described immediately below in their objections to Plaintiffs' individual requests, but not others from the same list, does not indicate that Defendant has waived any of these objections as to any of Plaintiffs' requests.

2.      Defendant respectfully maintains that discovery is inappropriate in a matter such as this one challenging federal agency action. *See generally Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985).

3.      Defendant objects to Plaintiffs' discovery requests to the extent that they seek (a) attorney work product; (b) communications protected by the attorney-client privilege; (c) information protected by the deliberative process privilege or law enforcement privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e) information protected by any form of executive privilege; or (f) information covered by any other applicable privilege or protection.

4.      Defendant objects to these document requests seeking discovery from the White House as unduly burdensome and disproportionate to the needs of the case. *See generally Cheney,* 542 U.S. at 367. Plaintiffs' discovery requests propounded on White House officials would create an undue burden, distract them from their critical executive responsibilities, and violate the separation of powers. *See id.* at 385. Further, Plaintiffs' request for information from the White House is unduly burdensome and disproportionate to the needs of the case when Plaintiffs have not first exhausted all available opportunities to seek related information from other sources. *See* Order, *Centro Presente*, No. 1:18-CV-10340 (D. Mass. May 15, 2019) (requiring the plaintiff to exhaust all discovery on other defendants before considering whether there was a "continuing need for discovery sought on the White House"); *Cf. Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019) (vacating "district court's discovery orders because the district court did not fulfill its obligation 'to explore other

avenues, short of forcing the Executive to invoke privilege'") (quoting *Cheney,* 542 U.S. at 390)). Notwithstanding this objection, the Office of the Press Secretary has amended its responses in a manner consistent with the Court's September 6, 2022, Order.

Moreover, to the extent the discovery seeks internal communications involving White House personnel, it is inappropriate because it may have the effect of seeking information protected by the presidential communications privilege, a "presumptive privilege" "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution" that attaches to presidential communications. *United States v. Nixon,* 418 U.S. 683, 708 (1974). *See In re Sealed Case*, 121 F.3d 729, 743-44 (D.C. Cir. 1997). Although the presidential communications privilege can be overcome by showing a "specific need" in a criminal case, *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1112 (D.C. Cir. 2004), the presumption against disclosure is even higher in a civil case like this one. *Am Historical Ass'n v. Nat'l Archives & Records Admin.*, 402 F. Supp. 2d 171, 181 (D.D.C. 2005). Such discovery violates the separation of powers and creates an undue burden and distraction from those individuals' critical executive responsibilities. *See Cheney*, 542 U.S. at 389.

5.    Defendant objects to each Request to the extent it seeks documents that are not in the custody or control of any Defendant.

6.    Defendant objects to each Request to the extent it seeks all communications and documents from each Defendant relating to the substantive topic identified in the Request. The parties are currently involved in an expedited, abbreviated discovery process where Defendant has only a limited amount of time to conduct a document search and produce responsive documents.

7.    Defendant specifically reserves the right to make further objections as necessary to the extent additional issues arise regarding the meaning of and/or information sought by Plaintiffs' discovery requests.

<u>**Objections and Responses to Specific Requests for the Production of Documents**</u>

<u>**Request 1:**</u> Produce all Documents identified, referred to, or relied on in answering Plaintiffs' Interrogatories to You, including all Communications identified in response to those Interrogatories.

<u>**Response:**</u> In addition to the foregoing general objections, Defendant objects to this Request as vague because it is unclear what it means to "rel[y]" on a document, as compared to "referr[ing]" to a document, in answering an Interrogatory. Defendant also objects to this Request to the extent it requests internal, deliberative documents, materials covered by the attorney client or work product privileges, or other privileged materials, as the Request broadly seeks any and all documents relied on in responding. Additionally, challenges to administrative agency action are ordinarily not subject to discovery.

Further, Defendant objects to this Request on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportionate to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-CV-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d at 1207 (9th Cir. 2019); *Cheney,* 542 U.S. at 390. Additionally, discovery propounded on White House officials would create an undue burden, distract them from their critical executive responsibilities, and violate the separation of powers. *See Cheney*, 542 U.S. at 385. Finally, Defendant objects to this request to the extent it is directed to internal documents protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such documents, the request imposes a burden on Defendant to locate documents, review them, and justify their withholdings that is disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged documents. *See Cheney*, 542 U.S. at 389.

Subject to and without waiving the above objections, as amended and in accordance with the Court's September 6, 2022 Order, the Office of the Press Secretary refers Plaintiffs to the  transcripts of

press briefings identified in Defendant's answers to the Interrogatories and available at https://www.whitehouse.gov/briefing-room/press-briefings/.

**Request 2:** Produce all Communications with any Social-Media Platform relating to Misinformation and/or Content Modulation.

      **Response:** In addition to the foregoing general objections, Defendant objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of this case. This Request calls for *any and all* communications from Defendant or any employee or subordinate of Defendant, to *any and all* Social-Media Platforms, even if those platforms are not at issue in the Complaint. Defendant cannot conduct an exhaustive search to uncover all documents responsive to this Request, and process those documents for production, under the current, abbreviated expedited discovery schedule. Defendant also understands this request to seek only communications between the Office of the Press Secretary and third parties outside the government. To the extent that this request seeks internal documents or records referring to such communications, Defendant objects to the request as not proportional to the needs of the case, as it would require an extensive search of internal records that would not be possible to complete in the expedited period provided for current discovery. Defendant also objects to such a request to the extent it would seek internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to such communications. Additionally, challenges to administrative agency action are ordinarily not subject to discovery.

      Further, Defendant objects to this Request on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportionate to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-CV-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d at 1207 (9th Cir. 2019); *Cheney,* 542 U.S. at 390. Additionally, discovery propounded on White House officials would create an undue burden, distract them from their critical executive

responsibilities, and violate the separation of powers. *See Cheney*, 542 U.S. at 385. Finally, Defendant objects to this request to the extent it is directed to internal documents protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such documents, the request imposes a burden on Defendant to locate documents, review them, and justify their withholdings that is disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged documents. *See Cheney*, 542 U.S. at 389.

Subject to and without waiving the above objections, as amended in accordance with the Court's September 6, 2022 Order, the Office of the Press Secretary searched for non-privileged e-mail communications between the Office of the Press Secretary and employees of Facebook, Twitter, LinkedIn, Instagram, and YouTube (the "Social-Media Platforms") concerning Misinformation located within e-mail files that (i) were collected from custodians within the Office of the Press Secretary who, after the Office of the Press Secretary's internal inquiry, were identified as most likely to possess information responsive to the subject of Plaintiffs' request (the "Custodial Social Media E-mails"),[1] and (ii) contain one or more of Plaintiffs' Search Terms. Defendant, however, has not identified any such responsive documents.

**Request 3:** Produce all Communications with any Social-Media Platform that contain any of the Search Terms.

**Response:** In addition to the foregoing general objections, Defendant objects to this Request as unduly burdensome, overbroad, and not proportional to the needs of this case. This Request calls for *any and all* specified documents from Defendant or any employee or subordinate of Defendant. Defendant

---

[1] The Office of the Press Secretary collected, from those custodians, e-mail correspondence with Social-Media Platform employees who had e-mail addresses with the domain names of @meta.com, @fb.com, @facebook.com, @twitter.com, @instagram.com, @linkedin.com, @youtube.com, @microsoft.com, and @google.com.

cannot conduct an exhaustive search to uncover all documents responsive to this Request, and process those documents for production, under the current, abbreviated expedited discovery schedule. Furthermore, this Request covers documents that are not relevant to Plaintiffs' claims and that do not fall within scope of discovery authorized by the Court. The Court authorized the service of discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications." ECF No. 34 at 13. This Request, however, would require the production of any document that contains any of Plaintiffs' Search Terms, regardless of whether that document pertains to content moderation with respect to misinformation on social media platforms. Plaintiffs' Search Terms include many broad terms that could be found in e-mails that have nothing to do with misinformation, such as "election," "antitrust," and "Kennedy." Defendant also understand this Request to seek only communications between the Office of the Press Secretary and third parties outside the government. To the extent that this Request seeks internal documents or records referring to such communications, Defendant objects to the request as not proportional to the needs of the case, as it would require an extensive search of internal records that would not be possible to complete in the expedited period provided for current discovery. Defendant also objects to this Request to the extent it seeks internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to such communications. Additionally, challenges to administrative agency action are ordinarily not subject to discovery.

Further, Defendant objects to this Request on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportionate to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-CV-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d at 1207 (9th Cir. 2019); *Cheney,* 542 U.S. at 390. Additionally, discovery propounded on

White House officials would create an undue burden, distract them from their critical executive responsibilities, and violate the separation of powers. *See Cheney*, 542 U.S. at 385. Finally, Defendant objects to this request to the extent it is directed to internal documents protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such documents, the request imposes a burden on Defendant to locate documents, review them, and justify their withholdings that is disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged documents. *See Cheney*, 542 U.S. at 389.

Subject to and without waiving the above objections, as amended in accordance with the Court's September 6, 2022 Order, the Office of the Press Secretary searched for non-privileged e-mail communications between the Office of the Press Secretary and employees of the Social-Media Platforms concerning Misinformation within a review population consisting of Custodial Social Media E-mails that contain one or more of Plaintiffs' Search Terms. Defendant, however, has not identified any such responsive documents.

**Request 4:** Produce organizational charts of any Social-Media Platform that identify the persons with whom You communicate relating to Misinformation and/or Content Modulation.

**Response:** In addition to the foregoing general objections, Defendant objects to this Request to the extent it seeks organizational charts for third party Social-Media Platforms that would not ordinarily be kept by Defendant in the ordinary course of business. Accordingly, this Request would not be proportional to the needs of the case, particularly in light of the Court's order permitting Plaintiffs to seek such information directly from the third parties themselves. Defendant also objects to this Request because it calls for documents that are not relevant to Plaintiffs' claims and that do not fall within the scope of discovery authorized by the Court. The Court authorized the service of discovery requests concerning "the identity of federal officials who have been and are communicating with social-media

platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications." ECF No. 34 at 13. The organizational charts identified in this Request would not identify any "federal officials" who have been "communicating with social-media platforms" about misinformation, nor would it describe the contents of those communications. Additionally, challenges to administrative agency action are ordinarily not subject to discovery.

Further, Defendant objects to this Request on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportionate to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-CV-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d at 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials would create an undue burden, distract them from their critical executive responsibilities, and violate the separation of powers. *See Cheney*, 542 U.S. at 385. Finally, Defendant objects to this request to the extent it is directed to internal documents protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such documents, the request imposes a burden on Defendant to locate documents, review them, and justify their withholdings that is disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged documents. *See Cheney*, 542 U.S. at 389.

In accordance with the Court's September 6, 2022 Order, Defendants are not relying on the objections in the foregoing paragraph against responding to discovery served on the White House but maintain all other objections to responding to this request.

**Request 5:** Produce all Documents and Communications relating to any communication or coordination between Social-Media Platform and any "member of our senior staff" and/or "member of our COVID-19 team," who are "in regular touch with … social media platforms," as You stated at

a White House press briefing on or around July 15, 2021.

**Response:** In addition to the foregoing general objections, Defendant objects to this Request as vague because it relies on a characterization of a statement made by an individual no longer in government, and the statement does not specify the individuals at issue or the specific communications referenced. Defendant further objects to this Request as unduly burdensome and not proportional to the needs of the case. This Request calls for *any and all* specified documents from Defendant or any employee or subordinate of Defendant. To conduct an exhaustive search to uncover all documents responsive to this Request, and process those documents for production, under the current, abbreviated expedited discovery schedule would be impractical, unduly burdensome, and disproportionate to the needs of the case. Defendant also objects to this Request as overbroad because it calls for documents that are not relevant to Plaintiffs' claims and that do not fall within scope of discovery authorized by the Court. The Court authorized the service of discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications." ECF No. 34 at 13. This Request appears to call for communications with Social-Media Platforms regardless of whether they pertain to content moderation with respect to misinformation. Defendant also objects to this Request to the extent it seeks internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to such communications. Additionally, challenges to administrative agency action are ordinarily not subject to discovery.

Further, Defendant objects to this Request on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportionate to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-CV-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d at 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on

13

White House officials would create an undue burden, distract them from their critical executive responsibilities, and violate the separation of powers. *See Cheney*, 542 U.S. at 385. Finally, Defendant objects to this request to the extent it is directed to internal documents protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such documents, the request imposes a burden on Defendant to locate documents, review them, and justify their withholdings that is disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged documents. *See Cheney*, 542 U.S. at 389.

Subject to and without waiving the above objections, as amended in accordance with the Court's September 6, 2022 Order, the Office of the Press Secretary searched for non-privileged e-mail communications between the Office of the Press Secretary and employees of the Social-Media Platforms concerning Misinformation within a review population consisting of Custodial Social Media E-mails that contain one or more of Plaintiffs' Search Terms. Defendant, however, has not identified any such responsive documents.

**Request 6:** Produce all Communications with any Social-Media Platform involving any member of the White House Communications Team that relate to Misinformation and/or Content Modulation.

**Response:** In addition to the foregoing general objections, Defendant objects to this Request to the extent it seeks documents that are not in the Defendant's custody or control as White House Press Secretary, namely, Communications with any Social-Media Platform involving members of the White House Communications Team, which Plaintiffs define to include "any person with an email domain of @who.eop.gov." Defendant further objects to this Request as unduly burdensome and not proportional to the needs of the case. This Request calls for *any and all* specified documents from any person with an email domain of @who.eop.gov. Even if all of those documents were in Defendant's custody or control, it would be impractical, unduly burdensome, and disproportionate to the needs of the case for Defendant

to conduct an exhaustive search to uncover all documents responsive to this Request, and process those documents for production, under the current, abbreviated expedited discovery schedule. Defendant also understands this Request to seek only communications between the Office of the Press Secretary and third parties outside the government. To the extent that this Request seeks internal documents or records referring to such communications, the Request would be even more disproportional to the needs of the case, as it would require an extensive search of internal records that would not be possible to complete in the expedited period provided for current discovery. Defendant also objects to this Request to the extent it seeks internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to such communications. Additionally, challenges to administrative agency action are ordinarily not subject to discovery.

Further, Defendant objects to this Request on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportionate to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-CV-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d at 1207 (9th Cir. 2019); *Cheney,* 542 U.S. at 390. Additionally, discovery propounded on White House officials would create an undue burden, distract them from their critical executive responsibilities, and violate the separation of powers. *See Cheney*, 542 U.S. at 385. Finally, Defendant objects to this request to the extent it is directed to internal documents protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such documents, the request imposes a burden on Defendant to locate documents, review them, and justify their withholdings that is disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged documents. *See Cheney*, 542 U.S. at 389.

Subject to and without waiving the above objections, as amended in accordance with the

Court's September 6, 2022 Order, The Office of the Press Secretary searched for non-privileged e-mail communications between the Office of the Press Secretary and employees of the Social-Media Platforms concerning Misinformation within a review population consisting of Custodial Social Media E-mails that contain one or more of Plaintiffs' Search Terms. Defendant, however, has not identified any such responsive documents.

**Request 7:** Produce all Communications with any Social-Media Platform that relate to the "12 people who are producing 65 percent of the anti-vaccine misinformation on social-media platforms," as You stated at a White House press briefing on or around July 15, 2021.

      **Response:** In addition to the foregoing general objections, Defendant objects to this Request as vague because it relies on a characterization of a statement made by an individual no longer in government, and the statement does not specify the individuals at issue or the specific communications referenced. Defendant further objects to this Request as unduly burdensome and not proportional to the needs of the case. This Request calls for *any and all* specified documents from Defendant or any employee or subordinate of Defendant. To conduct an exhaustive search to uncover all documents responsive to this Request, and process those documents for production, under the current, abbreviated expedited discovery schedule would be impractical, unduly burdensome, and disproportionate to the needs of the case. Defendant also objects to this Request as overbroad because it calls for documents that are not relevant to Plaintiffs' claims and that do not fall within scope of discovery authorized by the Court. The Court authorized the service of discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications." ECF No. 34 at 13. This Request appears to call for communications with Social-Media Platforms regardless of whether they pertain to content moderation with respect to misinformation. Defendant also objects to this Request to the extent it seeks internal, deliberative documents discussing such communications,

16

Case 3:22-cv-01213-TAD-KDM   Document 119-2   Filed 11/18/22   Page 94 of 139 PageID #:
4710
Case 1:22-mc-00028   Document 8-2   Filed 11/03/22   Page 18 of 24 PageID# 439

attorney client documents, or other privileged materials relating to such communications. Additionally, challenges to administrative agency action are ordinarily not subject to discovery.

Further, Defendant objects to this Request on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportionate to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-CV-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d at 1207 (9th Cir. 2019); *Cheney,* 542 U.S. at 390. Additionally, discovery propounded on White House officials would create an undue burden, distract them from their critical executive responsibilities, and violate the separation of powers. *See Cheney*, 542 U.S. at 385. Finally, Defendant objects to this request to the extent it is directed to internal documents protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such documents, the request imposes a burden on Defendant to locate documents, review them, and justify their withholdings that is disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged documents. *See Cheney*, 542 U.S. at 389.

Subject to and without waiving the above objections, as amended in accordance with the Court's September 6, 2022 Order, The Office of the Press Secretary searched for non-privileged e-mail communications between the Office of the Press Secretary and employees of the Social-Media Platforms concerning Misinformation within a review population consisting of Custodial Social Media E-mails that contain one or more of Plaintiffs' Search Terms. Defendant, however, has not identified any such responsive documents.

**Request 8:** Produce all Documents and Communications with any Social-Media Platforms that You "engage with … regularly" that relate to "what [Y]our asks are" to such Social-Media Platform(s), as You stated at the White House press briefing on or around July 15, 2021.

**Response:** In addition to the foregoing general objections, Defendant objects to this Request as vague because it relies on a characterization of a statement made by an individual no longer in government, and the statement does not specify the individuals at issue or the specific communications referenced. Defendant further objects to this Request as unduly burdensome and not proportional to the needs of the case. This Request calls for *any and all* specified documents from Defendant or any employee or subordinate of Defendant. To conduct an exhaustive search to uncover all documents responsive to this Request, and process those documents for production, under the current, abbreviated expedited discovery schedule would be impractical, unduly burdensome, and disproportionate to the needs of the case. Defendant also objects to this Request as overbroad because it calls for documents that are not relevant to Plaintiffs' claims and that do not fall within scope of discovery authorized by the Court. The Court authorized the service of discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications." ECF No. 34 at 13. This Request appears to call for communications with Social-Media Platforms regardless of whether they pertain to content moderation with respect to misinformation. Defendant also objects to this Request to the extent it seeks internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to such communications. Additionally, challenges to administrative agency action are ordinarily not subject to discovery.

Further, Defendant objects to this Request on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportionate to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-CV-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d at 1207 (9th Cir. 2019); *Cheney,* 542 U.S. at 390. Additionally, discovery propounded on White House officials would create an undue burden, distract them from their critical executive

Case 3:22-cv-01213-TAD-KDM   Document 119-2   Filed 11/18/22   Page 96 of 139 PageID #:
4712
Case 1:22-mc-00028   Document 8-2   Filed 11/03/22   Page 20 of 24 PageID# 441

responsibilities, and violate the separation of powers. *See Cheney*, 542 U.S. at 385. Finally, Defendant objects to this request to the extent it is directed to internal documents protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such documents, the request imposes a burden on Defendant to locate documents, review them, and justify their withholdings that is disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged documents. *See Cheney*, 542 U.S. at 389.

Subject to and without waiving the above objections, as amended in accordance with the Court's September 6, 2022 Order, The Office of the Press Secretary searched for non-privileged e-mail communications between the Office of the Press Secretary and employees of the Social-Media Platforms concerning Misinformation within a review population consisting of Custodial Social Media E-mails that contain one or more of Plaintiffs' Search Terms. Defendant, however, has not identified any such responsive documents.

**Request 9:** Produce all Documents and Communications relating to any "government experts" who have "partnered with" Facebook or any Social-Media Platform to address Misinformation and/or Content Modulation.

**Response:** In addition to the foregoing general objections, Defendant objects to this Request as vague because it relies on a characterization of statement made by a third-party outside of government, and the statement does not specify the individuals at issue or the specific communications referenced. Defendant further objects to this Request as unduly burdensome and not proportional to the needs of the case. This Request calls for *any and all* specified documents from Defendant or any employee or subordinate of Defendant. To conduct an exhaustive search to uncover all documents responsive to this Request, and process those documents for production, under the current, abbreviated expedited discovery schedule would be impractical, unduly burdensome, and disproportionate to the needs of the case.

19

Defendant also objects to this Request as overbroad because it calls for documents that are not relevant to Plaintiffs' claims and that do not fall within scope of discovery authorized by the Court. The Court authorized the service of discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications." ECF No. 34 at 13. This Request appears to call for communications with Social-Media Platforms regardless of whether they pertain to content moderation with respect to misinformation. Defendant also objects to this Request to the extent it seeks internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to such communications. Additionally, challenges to administrative agency action are ordinarily not subject to discovery.

Further, Defendant objects to this Request on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportionate to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-CV-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d at 1207 (9th Cir. 2019); *Cheney,* 542 U.S. at 390. Additionally, discovery propounded on White House officials would create an undue burden, distract them from their critical executive responsibilities, and violate the separation of powers. *See Cheney*, 542 U.S. at 385. Finally, Defendant objects to this request to the extent it is directed to internal documents protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such documents, the request imposes a burden on Defendant to locate documents, review them, and justify their withholdings that is disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged documents. *See Cheney*, 542 U.S. at 389.

Subject to and without waiving the above objections, as amended in accordance with the

Court's September 6, 2022 Order, The Office of the Press Secretary searched for non-privileged e-mail communications between the Office of the Press Secretary and employees of the Social-Media Platforms concerning Misinformation within a review population consisting of Custodial Social Media E-mails that contain one or more of Plaintiffs' Search Terms. Defendant, however, has not identified any such responsive documents.

**Request 10:** Produce all Documents and Communications relating to Your claim that federal officials "engage[] regularly with all social media platforms about steps that can be taken" to address Misinformation on social media, which engagement "has continued, and … will continue," as You stated at the April 25, 2022 White House press briefing.

  **Response** In addition to the foregoing general objections, Defendant objects to this Request as vague because it relies on a characterization of statement made by a third-party outside of government, and the statement does not specify the individuals at issue or the specific communications referenced. Defendant further object to this Request as unduly burdensome and not proportional to the needs of the case. This Request calls for *any and all* specified documents from Defendant or any employee or subordinate of Defendant. To conduct an exhaustive search to uncover all documents responsive to this Request, and process those documents for production, under the current, abbreviated expedited discovery schedule would be impractical, unduly burdensome, and disproportionate to the needs of the case. Defendant also objects to this Request as overbroad because it calls for documents that are not relevant to Plaintiffs' claims and that do not fall within scope of discovery authorized by the Court. The Court authorized the service of discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications." ECF No. 34 at 13. This Request appears to call for communications with Social-Media Platforms regardless of whether they pertain to content moderation with respect to misinformation. Defendant also object to

this Request to the extent it seeks internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to such communications. Additionally, challenges to administrative agency action are ordinarily not subject to discovery.

Further, Defendant objects to this Request on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportionate to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-CV-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d at 1207 (9th Cir. 2019); *Cheney,* 542 U.S. at 390. Additionally, discovery propounded on White House officials would create an undue burden, distract them from their critical executive responsibilities, and violate the separation of powers. *See Cheney*, 542 U.S. at 385. Finally, Defendant objects to this request to the extent it is directed to internal documents protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such documents, the request imposes a burden on Defendant to locate documents, review them, and justify their withholdings that is disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged documents. *See Cheney*, 542 U.S. at 389.

Subject to and without waiving the above objections, as amended in accordance with the Court's September 6, 2022 Order, The Office of the Press Secretary searched for non-privileged e-mail communications between the Office of the Press Secretary and employees of the Social-Media Platforms concerning Misinformation within a review population consisting of Custodial Social Media E-mails that contain one or more of Plaintiffs' Search Terms. Defendant, however, has not identified any such responsive documents.

Dated: September 27, 2022                Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney General

JAMES J. GILLIGAN
Special Litigation Counsel, Federal Programs Branch

*/s/ Kuntal Cholera*
ADAM D. KIRSCHNER (IL Bar No. 6286601)
Senior Trial Counsel
KYLA SNOW (OH Bar No. 96662)
INDRANEEL SUR (D.C. Bar No. 978017)
KUNTAL CHOLERA (D.C. Bar No. 1031523)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
Kyla.Snow@usdoj.gov
Indraneel.Sur@usdoj.gov
Kuntal.Cholera@usdoj.gov

*Attorneys for Defendants*

# Exhibit C

NON-CONFIDENTIAL // REDACTED

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **The State of Missouri and the State of Louisiana,** | |
| *Plaintiffs*, | |
| v. | Civil Action No. 22-cv-1213 |
| **President Joseph R. Biden, Jr., in his official capacity as President of the United States of America,** *et. al.,* | |
| *Defendants*. | |

**DEFENDANTS' CORRECTED AMENDED COMBINED OBJECTIONS AND RESPONSES TO
PLAINTIFFS' FIRST SET OF EXPEDITED
PRELIMINARY-INJUNCTION RELATED INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33 and the Local Rules of the U.S.

District Court for the Western District of Louisiana, Defendants, by and through counsel, provide

the following combined objections and responses to Plaintiffs' First Set of Expedited Preliminary-

Injunction Related Interrogatories ("Plaintiffs' First PI Interrogatories" or "Interrogatories")

served on July 18, 2022 on the following Defendants: Dr. Anthony Fauci; Centers for Disease

Control and Prevention ("CDC"); Surgeon General Vivek H. Murthy; U.S. Department of Health

and Human Services ("HHS"); National Institute of Allergy and Infectious Diseases ("NIAID");

U.S. Department of Homeland Security ("DHS"); Cybersecurity and Infrastructure Security

Agency ("CISA"); Jen Easterly, Director of CISA; Nina Jankowicz (former Executive Director of

the DHS Disinformation Governance Board); and White House Press Secretary Karine Jean-Pierre

(collectively, "Defendants"). Consistent with the agreement of the parties, Defendants have

combined the objections and responses to address duplication of certain interrogatories among

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

Defendants but have addressed each interrogatory for each Defendant to which each interrogatory is directed. Defendants have amended these objections and responses in a manner consistent with the Court's September 6, 2022, Order (ECF No. 72).

Defendants' combined objections and responses are based on information known to Defendants at this time and are made without prejudice to additional objections should Defendants subsequently identify additional grounds for objection. The objections have been formulated in contemplation of Federal Rule of Civil Procedure 26(b)(1), which generally permits discovery of matters not privileged that may be relevant to the claims or defenses in a civil action. In presenting their objections, Defendants do not waive any further objection in pretrial motions practice or at trial to the admissibility of evidence on the grounds of relevance, materiality, privilege, competency, or any other appropriate ground.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.    Defendants object to the definitions of "Content Modulation," and the related term "Misinformation," including to the extent that Plaintiffs' definition of "Content Modulation" covers actions by Social Media Companies *beyond* those taken against content containing Misinformation and against users posting content containing Misinformation (such as actions taken as to any post on "efficacy of COVID-19 restrictions" or on "security of voting by mail"). For purposes of these Responses and Objections, Defendants generally define "Misinformation" in a manner consistent with Plaintiffs' definition of that term: "any form of speech . . . considered to be potentially or actually incorrect, mistaken, false, misleading, lacking proper context, disfavored, having the tendency to deceive or mislead . . . including but not limited to any content or speech considered by any federal official or employee or Social-Media Platform to be 'misinformation,' 'disinformation,' 'malinformation,' 'MDM,' 'misinfo,' 'disinfo,' or

2

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

'malinfo.'" *See* Interrogatories, Definition O.

2.      Defendants object to the definitions of CDC, CISA, DHS, HHS, NIAID, and White House Communications Team to the extent those definitions include "any . . . agent," "contractors" and "any subordinate agency or entity" of those agencies on the ground that those definitions are overbroad and may include persons and entities that are not under the supervision or control of any Defendant. In particular, HHS and DHS also object to the extent any Interrogatory seeks a Department-wide response as unduly burdensome and disproportionate to the needs of the case. As the least burdensome sources of information consistent with Rules 26 and 33 that is potentially responsive to the Interrogatories, (i) DHS has identified its Headquarters (HQ), and (ii) HHS has identified the Office of the Surgeon General (OSG), NIAID, and CDC, and the four HHS employees identified in the Court's September 6, 2022 Order. Further, Defendant also objects to the definition of "White House Communications Team" for the additional reason that such a definition is not proportional to the needs of the case to the extent Plaintiffs seek information beyond the possession of the White House Office of the Press Secretary upon which Plaintiffs served Interrogatories.

3.      The individual Defendants Dr. Fauci, Dr. Murthy, Ms. Easterly, and Ms. Jean-Pierre, construe the Complaint and Amended Complaint as seeking relief against them each in their official capacity as head of agencies of various components of agencies or other offices of the Federal Government, including NIAID, HHS, CISA, and the Office of the White House Press Secretary, and, accordingly, each individual Defendant objects or responds to each Interrogatory exclusively through his or her corresponding agency Defendant. Individual Defendant Jankowicz has no successor in office, and the Disinformation Governance Board is paused. Moreover, DHS interprets any relief sought as against Ms. Jankowicz in her official capacity within DHS HQ,

3

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

and, accordingly, she objects or responds to each Interrogatory exclusively through DHS. Defendants object to any Interrogatory seeking from an individual Defendant a response that can be provided by that individual Defendant's corresponding agency in a manner that is less burdensome to Defendants and proportional to the needs of the case.

4. Defendants object to the definition of "communication" to the extent it is meant to cover anything beyond e-mail exchanges, as overbroad and disproportional to the needs of the case, particularly in light of the expedited nature of the discovery now ongoing

5. Defendants object to the definition of "document" to the extent it includes "documents retained on personal devices and/or in personal e-mail accounts or other personal accounts." Documents found on personal devices or within electronic personal accounts would not be in the custody or control of any Defendant. Defendants further object on the grounds that this definition is an unwarranted invasion of the privacy of non-parties and seeks information protected by the Privacy Act, 5 U.S.C. § 552a, et seq.

6. Defendants object to the definition of "identify" to the extent it calls for disclosure of information covered by any applicable privilege or protection over, among other elements, a person's "email address, and present or last known address and telephone number

7. Defendants object to the use of the undefined term "Meeting" in a manner incompatible with, and calculating to expand the obligations imposed by, the Government in the Sunshine Act, 5 U.S.C. 552b.

8. Defendants object to the definition of "Social-Media Platform" as overbroad, because it includes "*any* organization that provides a service for public users to disseminate . . . content . . . to other users or the public," along with any "contractors, or any other person . . . acting on behalf of the Social-Media Platform . . . as well [as] subcontractors or entities used to

4

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

conduct fact-checking or any other activities relating to Content Modulation." Such a definition is overbroad because the Complaint (and the Amended Complaint) contains no nonconclusory allegation that Defendants communicated with each and every organization that allows users to "disseminate . . . content" to other users, along with any persons or entities affiliated with those organizations. Defendants will construe "Social-Media Platform" to encompass Facebook, Instagram, Twitter, LinkedIn, and YouTube.

9.        Defendants object to the definition of "You" an "Your" in each Interrogatory as overbroad, as it includes "any officers, officials, employees, agents, staff members, contractors, and other(s)" acting at the direction, or on behalf, of any Defendant served with any Interrogatory. Such a definition also is not proportional to the needs of the case, especially given the expedited, abbreviated discovery process in which Defendants have only a limited amount of time to respond to Plaintiffs' Interrogatories. Defendants interpret any Interrogatory relying on this definition as applying solely to the named Defendants upon whom the Interrogatory was served insofar as a response to such Interrogatory by such Defendant is consistent with Rules 26 and 33. In particular, Plaintiffs' allegations against each individual Defendant concerns actions taken in that individual's official capacity, and, accordingly, the agency Defendant corresponding to and that employed each individual Defendant is the proper party for objecting and responding to Plaintiffs' Interrogatories, as explained in Paragraphs 2 and 3 above.

10.        Defendant Jean-Pierre objects to the definition of "You" and "Your" as overbroad as it includes "any officers, officials, employees, agents, staff members, contractors, or other(s)" acting at the direction of Jennifer Rene Psaki, in her official capacity as Press Secretary, or at the direction of her successor." Such a definition is not proportional to the needs of the case to the extent it is interpreted to extend beyond the Office of the White House Press Secretary, especially

5

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

given the expedited, abbreviated discovery process where Defendant has only a limited amount of time to conduct a document search and produce responsive documents. Defendant has interpreted this request as applying solely to the Office of the White House Press Secretary.

11.     Defendants object to Instruction 1. Plaintiffs cite to no authority requiring a Defendant to "describe the efforts [it has] made to locate . . . document[s]" that are not in its custody and control "and identify who has control of the document and its location."

12.     Defendants object to Instruction 2 to the extent it exceeds the requirements of Fed. R. Civ. P. 26(b)(6). Defendants specifically decline to produce privileged information. Defendants further object to any requirement that they produce a privilege log for privileged material not otherwise properly within the scope of discovery or as to which no privilege log would be required under Federal Rule of Civil Procedure 26(b)(5).

13.     Defendants object to Instruction 3. Plaintiffs cite to no authority indicating that, if Defendants object to an Interrogatory on burden grounds, Defendants must "stat[e] the approximate number of documents to be produced, the approximate number of person-hours to be incurred in the identification, and the estimated cost of responding to the request." Further, it is unclear how Defendants could provide that type of information without conducting certain burdensome searches and reviews that Defendants sought to avoid through their objections.

14.     Defendants object to Instruction 5 to the extent it requires Defendants to respond based on production of electronic documents "with all metadata and delivered in their original format." Plaintiffs may identify the precise categories of metadata they want Defendants' productions to contain, and Defendants can determine whether they can provide those categories of metadata without an undue burden.

15.     Defendants object to Instruction 6 to the extent that it requires Defendants to

6

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

respond based on production of documents in a format other than the format in which they are "kept in the usual course of business." Fed. R. Civ. P. 34(b)(2)(E). Defendants object to Instruction 6 to the extent that it requests the production of all e-mail "forwards" for e-mails produced to Plaintiffs. That Instruction may call for the production of documents that are not found in the e-mail files of the relevant custodians used by Defendants.

16.      Defendant objects to Instruction 8, which applies these requests to the Office of the White House Press Secretary from January 1, 2020, to the present, as unduly broad. Ms. Psaki served as White House Press Secretary from January 20, 2021, until May 13, 2022, when Ms. Jean-Pierre became White House Press Secretary. Defendant interprets these requests as applying to when Ms. Psaki served as White House Press Secretary from January 20, 2021, through May 13, 2022, and when Ms. Jean-Pierre began serving as White House Press Secretary until the date the requests were served, i.e., from May 13, 2022, to July 18, 2022. Anything else would be disproportional to the needs of the case. Such disproportionality is further aggravated by the discovery burden being placed on White House officials. *See Cheney v. U.S. District Court*, 542 U.S. 367, 385 (2004).

**GENERAL OBJECTIONS APPLICABLE TO ALL INTERROGATORIES**

1.      The general objections set forth below apply to each and every Interrogatory discussed below. In asserting Defendants' objections to any particular Interrogatory, Defendants may assert an objection that is the same as, or substantially similar to, one or more of these objections. That Defendants may refer, with particularity, to some, but not all, of the general objections described immediately below in their objections to Plaintiffs' individual Interrogatories, does not indicate that Defendants have waived any of these general objections as to any of Plaintiffs' Interrogatories.

7

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

2.      Defendants object to any discovery taking place in this case to the extent Plaintiffs assert cognizable claims seeking review of governmental agency action, including claims under Administrative Procedure Act, because resolution of any such claims should be based upon the "administrative record" in this case. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). That said, Defendants understand that the Court has allowed preliminary-injunction-related expedited discovery to proceed. Thus, while preserving their broad objection to any and all discovery, Defendants make objections stated below in light of the current procedural posture of the case.

3.      Defendants object to each Interrogatory insofar as it is directed to any Defendant that is head of a Defendant agency as overly broad, unduly burdensome, and disproportional in light of the extraordinarily expedited discovery schedule in this case, given that Plaintiffs have not first sought the information from the agency itself, or through alternative, less burdensome means. *See* Fed. R. Civ. P. 26(b)(2)(C).

4.      Defendants object to each Interrogatory as overbroad, unduly burdensome, and disproportional to the needs of the case, insofar as it purports to require a response from each agency concerning components of the agency or concerning governmental entities outside the agency whose actions are not challenged in the Complaint or Amended Complaint and whose information is not reasonably available to the agency or agency component whose alleged conduct is challenged in the Complaint or Amended Complaint. Defendant agencies include numerous components and employ thousands of individuals. Any construction of an Interrogatory that would require a Defendant agency to furnish information held by all such individuals, or require a Defendant agency to furnish information held by non-party agencies of the Federal Government, would be massively burdensome and disproportional to the needs of

8

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

this case. Each Defendant agency will identify appropriate individuals within the agency who will review and respond to each Interrogatory. *See, e.g.*, *In re Epipen*, MDL No. 2785, 2018 WL 1440923, at *2 (D. Kan. Mar. 15, 2018) ("[T]he party responding to discovery requests is typically in the best position to know and identify those individuals within its organization likely to have information relevant to the case.").

5.      Defendants object to the Interrogatories to the extent that they seek (a) attorney work product; (b) communications protected by the attorney-client privilege; (c) information protected by the deliberative process privilege or law enforcement privilege or other similar privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e) information protected by any form of executive privilege; or (f) information covered by any other applicable privilege or protection.

6.      Defendants object to any Interrogatory seeking discovery from the White House as unduly burdensome, and disproportional to the needs of the case. *See generally Cheney*, 542 U.S. at 367. Plaintiffs' Interrogatories directed to White House officials would create an undue burden, distract them from their critical executive responsibilities, and violate the separation of powers. *See id.* at 385. That burden is especially undue at this stage of the litigation given that Defendants' motion to dismiss the Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is forthcoming. Further, the Interrogatories seeking response from the White House are unduly burdensome and disproportional to the needs of the case when Plaintiffs have not first exhausted all available opportunities to seek related information from other sources. *See* Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring plaintiff to exhaust all discovery on other defendants before considering whether there was "continuing need for discovery sought on the White House"); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir.

9

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

2019) (vacating "district court's discovery orders because the district court did not fulfill its obligation 'to explore other avenues, short of forcing the Executive to invoke privilege'" (quoting *Cheney*, 542 U.S. at 390)). Notwithstanding this objection, Defendants have amended their responses in a manner consistent with the Court's September 6, 2022, Order.

7.      Moreover, to the extent any Interrogatory a response requires review of information involving White House personnel, it is inappropriate because it may have the effect of seeking information protected by the presidential communications privilege, a "presumptive privilege" "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution" that attaches to presidential communications. *United States v. Nixon*, 418 U.S. 683, 708 (1974); *see In re Sealed Case*, 121 F.3d 729, 743-44 (D.C. Cir. 1997). Although the presidential communications privilege can be overcome by showing a "specific need" in a criminal case, *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1112 (D.C. Cir. 2004), the presumption against disclosure is even higher in a civil case like this one, *Am Historical Ass'n v. Nat'l Archives & Records Admin.*, 402 F. Supp. 2d 171, 181 (D.D.C. 2005). Such discovery violates the separation of powers and creates an undue burden and distraction from those individuals' critical executive responsibilities. *See Cheney*, 542 U.S. at 389.

8.      Defendants object to each Interrogatory to the extent it seeks information or documents that are not in the custody or control of any Defendant.

9.      Defendants object to each Interrogatory to the extent it seeks responses based on all communications and documents from each Defendant relating to the substantive topic identified in the Interrogatory. The parties are currently involved in an expedited, abbreviated discovery process in which Defendants have only a limited amount of time to respond.

10.      Defendants specifically reserve the right to make further objections as necessary

10

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

to the extent additional issues arise regarding the meaning of and/or information sought by Plaintiffs' Interrogatories.

## PRELIMINARY STATEMENT REGARDING
## EXCESSIVELY NUMEROUS INTERROGATORIES

1.       Contrary to Fed. R. Civ. P. 33(a) and to LR33.1 of the Local Civil Rules, Plaintiffs erroneously and improperly served on July 18, 2022 First PI Interrogatories totaling 110 enumerated interrogatories as to 10 recipient Defendants. Even excluding duplicative interrogatories served on separate Defendants (at least in substance, if not form), there would still have been 34 distinct interrogatories.

2.       Either number exceeds the 25 interrogatories permitted by the Federal Rules of Civil Procedure. *Global Tubing, LLC v. Tenaris Coiled Tubes, LLC*, No. 17-cv-3299, 2020 WL 12443175 at *2 (S.D. Tex. Nov. 25, 2020) (quoting 8B Charles Alan Wright et al., *Federal Practice & Procedure* § 2168.1 (3d ed. 2020)); *accord Kleiman v. Wright*, No. 18-cv-80176, 2020 WL 1666787 at *1 (S.D. Fla. Apr. 3, 2020); *Vinton v. Adam Aircraft Indus., Inc.*, 232 F.R.D. 650, 664 (D. Colo. 2005); *see also Zito v. Leasecomm Corp.*, 233 F.R.D. 395, 399 (S.D.N.Y. 2006); *see, e.g.*, *Am. Council of Blind of Metro. Chi. v. Chi.*, No. 19-cv-6322, 2021 WL 5140475 at *1-2 (N.D. Ill. Nov. 4, 2021); *Fair Housing Ctr. of Centr. Ind. v. Welton*, No. 18-cv-01098, 2019 WL 2422594 at *5 (S.D. Ind. June 10, 2019). In a similar vein, LR33.1 of the Local Civil Rules, concerning "Number of Interrogatories," provides as follows (emphasis added): "No party shall serve on any other party *more than 25 interrogatories in the aggregate* without leave of court." Adherence to the 25-interrogatory limitation is especially appropriate at this stage of the instant action, where Defendants are already addressing extensive requests for production of documents ahead of the Rule 26 conference for the limited purpose of providing Plaintiffs with additional information concerning the already-filed application for a preliminary injunction. *Cf.*

11

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

*Gray v. Price*, No. 19-cv-10383, 2020 WL 12721645 at *5 (E.D. Mich. Feb. 12, 2020).

3.    After alerting Plaintiffs to this issue in an August 1, 2022, letter, and following additional e-mail correspondence with Plaintiffs, the parties agreed on August 11, 2022 to resolve the excessive numerosity problem as follows: Plaintiffs requested that (*a*) each Defendant recipient is to answer Interrogatories 1 through 5 of the First PI Interrogatories directed to CDC, with the reference to the CDC (in Interrogatory 1) to "be adjusted to refer to the recipient of the interrogatory," and (*b*) certain Defendants are to answer additional interrogatories, totaling 20, specified by Plaintiffs, and Plaintiffs did not object to Defendants' proposal that all remaining interrogatories be deemed withdrawn.

4.    Defendants have set forth more fully below their objections and responses to the 5 "Common" and 20 "additional" Interrogatories specified by Plaintiff on August 11, 2022, and preserve all other objections with respect to all other Interrogatories served on July 18, 2022 (the "Withdrawn Interrogatories"), to the extent they are not deemed withdrawn. In particular, Defendants object to those Interrogatories as exceeding the numerical limit in FRCP 33(a) and LR33.1 of the Local Civil Rules.

**SIGNATURES FOR RESPONSES**

1.    Insofar as an Interrogatory is not objected to through the undersigned counsel, Defendants respond to them below, as amended and in accordance with the Court's September 6, 2022 Order, with the signatures of the following (attached):

a.  For OSG: Max Lesko, Chief of Staff, OSG

b.  For NIAID: Jill R. Harper, Ph.D., Deputy Director for Science Management and Executive Officer, NIAID

c.  For CDC: Carol Crawford, Health Communications Specialist and Director,

12

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

Division of Digital Media, CDC

    d.  For DHS: Samantha Vinograd, Acting Assistant Secretary of Homeland Security for Counterterrorism, Threat Prevention, and Law Enforcement Policy

    e.  For CISA: Geoffrey Hale, Lead of Election Security & Resilience, CISA

    f.  For the four HHS employees identified in the Court's September 6, 2022 Order: Carol Maloney, Executive Officer/Deputy Agency Chief FOIA Officer, Office of the Assistant Secretary of Public Affairs

    g.  For the White House Office of the Press Secretary: Robert E. Dornbush III, Chief of Staff and Special Assistant to the Press Secretary

    h.  For Dr. Fauci, as Director of NIAID and Chief Medical Advisor to the President: Jill R. Harper, Ph.D., Deputy Director for Science Management and Executive Officer, NIAID

## OBJECTIONS AND RESPONSES TO SPECIFIC INTERROGATORIES

**Common Interrogatory No. 1:**

    **"Identify every officer, official, employee, staff member, personnel, contractor, or agent of" recipient Defendant "or any other federal official or agency who has communicated or is communicating with any Social-Media Platform regarding Content Modulation and/or Misinformation"**

    **OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants further object to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case. This Interrogatory calls for identifying "personnel" or "contractor[s]" of any Defendant or any employee or subordinate of any Defendant who have communicated with any and all "Social-Media Platform[s]," even if those platforms are not at issue in the Complaint (or in

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

the Amended Complaint), and including each platform's "officers, agents, employees, contractors, or any other person employed by or acting on behalf of [such] Social-Media Platform." Defendants cannot conduct an exhaustive search to uncover all possible responsive information under the current, abbreviated expedited discovery schedule. Such expedited discovery is especially burdensome given that Defendants' motion to dismiss the Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is forthcoming. Defendants also object to the Interrogatory to the extent a response requires review of internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to agency communications. Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, a statutory national security privilege, presidential communications privilege or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportional to the needs of the case, insofar as it purports to require a response from each agency concerning components of the agency or concerning governmental entities outside the agency whose actions are not challenged in the Complaint or Amended Complaint and whose information is not reasonably available to the agency or agency component whose alleged conduct is challenged in the Complaint or Amended Complaint.

Further, Defendants object to this Interrogatory on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportional to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15,

14

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials would create an undue burden, distract them from their critical executive responsibilities, and violate the separation of powers. *See Cheney*, 542 U.S. at 385. That burden is especially undue at this stage of the litigation given that Defendants' motion to dismiss the Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is forthcoming. Additionally, Defendants object to this Interrogatory to the extent a response requires review of information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Additionally, Defendants object to this Interrogatory to the extent it is directed to information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

Defendants further object to this Interrogatory as unreasonably cumulative and duplicative of Plaintiffs' Requests for Production 2 and 3, in response to which Defendants are producing non-privileged e-mail communications between Defendants and employees of the "Social-Media Platforms" concerning Misinformation located within a review population consisting of e-mail files that (i) are collected from custodians who, having been identified through Defendants' internal inquiry, are known to have communicated with employees of the Social-Media Platforms, and (ii) contain one or more reasonable search terms calculated to identify which of the communications identified in (i) relate to Misinformation. Those Requests for Production provide a more expeditious and significantly less burdensome method for Plaintiffs to obtain the information sought, considering the expedited nature of the discovery here and the broad scope of

15

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

this Interrogatory.

Additionally, Defendants object to this Interrogatory as overbroad and disproportional to the needs of the case, particularly in light of the expedited nature of the discovery, to the extent "communication" is meant to cover anything beyond e-mail exchanges. Defendants also object to the Interrogatory as overbroad and disproportional to the needs of the case to the extent it requests that responding agencies identify every individual who may have been included on any e-mail exchange, whether as sender or recipient or simply copied on the e-mail, between any Defendant and a social media company.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following responses, as amended in accordance with the Court's September 6, 2022 Order, by Defendants, HHS, NIAID, CDC, DHS, CISA, White House Office of the Press Secretary, and Dr. Fauci in his role as Chief Medical Advisor to the President.

**HHS:**

**Four HHS employees identified in the Court's September 6, 2022 Order:** Subject to and without waiving any of the foregoing objections, and based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery, HHS refers to the documents being produced in response to Requests For Production 2 and 3, and states further that the custodians whose e-mails were collected are the following current and former HHS personnel, as required by the Court's September 6, 2022 Order:

- Joshua Peck, Deputy Assistant Secretary for Public Engagement, Office of the Assistant Secretary for Public Affairs (ASPA)

- Tericka Lambert, former Director of Digital Engagement, COVID-19 Public Education Campaign, ASPA

16

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

- Janell Muhammad, former Deputy Director, COVID-19 Public Education Campaign, ASPA[1]

- Christy Choi, Deputy Director, Office of Communications, Health Resources and Services Administration (HRSA)

**OSG**: Subject to and without waiving the above objections, OSG refers to the documents being produced in response to Requests For Production 2 and 3, and states further that the custodians whose e-mails were collected include the following current and former OSG personnel:

- Dr. Vivek Murthy, U.S. Surgeon General

- Max Lesko, Chief of Staff

- Eric Waldo, Chief Engagement Officer for the U.S. Surgeon General

- Daniel Tartakovsky, Associate Director of Science and Policy

- Adam Beckman, Senior Advisor

- Ann Kim, Chief Innovation and Design Officer

- Kyla Fullenwider, Senior Advisor

**NIAID**: Subject to and without waiving the above objections, NIAID refers to the documents being produced in response to Requests For Production 2 and 3, and states further that the custodians whose e-mails were collected include the following current NIAID personnel:

- Anthony S. Fauci, M.D., Director, NIAID

- Courtney Billet, Director, Office of Communications and Government Relations, NIAID

- Jennifer Routh, Scientific Communications Editor, News and Science Writing Branch, Office of Communications and Government Relations, NIAID

---

[1] As of November 2021, Ms. Muhammad has served a different role in a different component of HHS. Nevertheless, her emails through July 18, 2022, were collected and reviewed.

17

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

- Kathy Stover, Chief, News and Science Writing Branch, Office of Communications and Government Relations, NIAID

**CDC**: Subject to and without waiving the above objections, CDC refers to the documents being produced in response to Requests For Production 2 and 3, and states further that the custodians whose e-mails were collected include the following current and former CDC personnel:

- Carol Crawford, Health Communications Specialist/Chief, Digital Media Branch
- Jay Dempsey, Health Communications Specialist
- Kate Galatas, Associate Deputy Director
- Ansley Hynes, Public Health Analyst
- Cynthia Jorgenson, Associate Director for Health Communications Science
- Tanya Hamburger, Health Communications Specialist
- Jessica Kolis, Health Communications Specialist
- Kathleen Layton, Health Communications Specialist
- Kristen Nordlund, Public Affairs Specialist
- Dagny Olivares, Supervisory Health Communications Specialist
- Jessica Schindelar, Health Communications Specialist
- Martha Sharan, Health Communications Specialist
- Lynn Sokler, Health Communications Specialist
- Dia Taylor, Deputy Chief Operating Officer
- Christopher Voegeli, Behavioral Scientist
- Elisabeth Wilhelm, Health Communications Specialist

**DHS**: Subject to and without waiving any of the foregoing objections, and based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery, DHS refers to the documents being produced in response to Requests For Production 2 and 3, and states further that

18

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

the custodians whose e-mails were collected include the following current and former DHS personnel:

- Nina Jankowicz, former Executive Director of the DHS Disinformation Governance Board

- Robert Silvers, Under Secretary of Homeland Security for Strategy, Policy, and Plans

- Samantha Vinograd, Acting Assistant Secretary of Homeland Security for Counterterrorism and Threat Prevention

- ██ DHS 1 ██, former Assistant Secretary of Homeland Security for Counterterrorism and Threat Prevention

- ██ DHS 2 ██, Director, Private Sector Engagement, Office of Intelligence and Analysis

- ██ DHS 3 ██, Associate Director for Strategic Engagement, DHS Center for Prevention Programs and Partnerships

- ██ DHS 4 ██, Acting Assistant Secretary of Homeland Security for Cyber, Infrastructure, Risk and Resilience

- ██ DHS 5 ██, former Acting Assistant Secretary of Homeland Security for Counterterrorism and Threat Prevention

**CISA**: CISA has identified the following custodians as having relevant communications, as produced in response to Requests For Production 2 and 3:

- Jen Easterly, Director, CISA

- Christopher Krebs, former Director, CISA

- Matthew Masterson, former Senior Election Lead, CISA

19

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

- Geoff Hale, Lead, Election Security and Resilience (ESR), National Risk Management Center (NRMC), CISA

- Brian Scully, Chief, Mis-, Dis-, and Malinformation (MDM) Team, NRMC, CISA

- Lauren Protentis, Engagements Lead, MDM Team, NRMC, CISA

In addition to the custodians identified above, CISA has identified the following current and former agency personnel as appearing in the communications produced in response to Plaintiffs' Requests For Production:

- ████ CISA 1 ████, Resilience Lead, MDM Team, NRMC, CISA

- ████ CISA 2 ████, Analysis and Response Lead, MDM Team, NRMC, CISA

- ████ CISA 3 ████, Analyst, MDM Team, NRMC, CISA

- ████ CISA 4 ████, former Analyst, Countering Foreign Influence Task Force (CFITF) (which was the predecessor to the MDM team), NRMC, CISA

**White House Office of the Press Secretary:** Subject to and without waiving any of the foregoing objections, as amended in accordance with the Court's September 6, 2022, Order, and based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery, the White House Office of the Press Secretary refers to the documents being produced in response to Requests For Production 2 and 3, and states further that the custodians whose e-mails were collected include the following current and former White House Office of Press Secretary personnel:

- Jennifer Psaki, in her official capacity as White House Press Secretary from January 20, 2021 to May 13, 2022.

- Karine Jean-Pierre, White House Office of the Press Secretary

- Kevin Munoz, White House Office of the Press Secretary

20

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

**White House Chief Medical Advisor**:

- Dr. Fauci does not have a White House email address, and no one at the White House reports to him. Thus, there were no emails to search. Therefore, for responsive documents related to Dr. Fauci, Defendants direct Plaintiffs to any documents already produced in response to Plaintiffs' requests as served on Dr. Fauci in his capacity as Director of NIAID. Those documents were located after a reasonable search of Dr. Fauci's NIAID email account and were produced without regard to whether Dr. Fauci was acting in his capacity as Director of NIAID or Chief Medical Advisor to the President.

**Common Interrogatory No. 2:**

    **Identify all Communications with any Social-Media Platform relating to Content Modulation and/or Misinformation.**

    **OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants further object to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case. This Interrogatory calls for information from any Defendant or any employee or subordinate of any Defendant, to any and all "Social-Media Platform[s]," even if those platforms are not at issue in the Complaint (or in the Amended Complaint), and including each platform's "officers, agents, employees, contractors, or any other person employed by or acting on behalf of [such] Social-Media Platform." Defendants cannot conduct an exhaustive search to uncover all possible responsive information under the current, abbreviated expedited discovery schedule. Such expedited discovery is especially burdensome given that Defendants' motion to dismiss the Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is forthcoming. Defendants also understand this Interrogatory to seek only a response based on

21

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

forthcoming. Defendants also object to the Interrogatory to the extent a response requires review of internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to agency communications. Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, a statutory national security privilege, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44.

Additionally, Defendants object to this Interrogatory as overbroad and disproportional to the needs of the case, particularly in light of the expedited nature of the discovery, to the extent "communication" is meant to cover anything beyond e-mail exchanges.

Further, Defendant objects to this Interrogatory as unreasonably cumulative and duplicative of Common Interrogatories 1 through 5.

**RESPONSE:** Subject to and without waiving the above objections, Defendant CISA responds on behalf of Ms. Easterly, and refers to the response to Common Interrogatories 1 through 5 and the accompanying documents, *see generally* Fed. R. Civ. P. 33(d).


**Additional Interrogatory No. 17 (Ms. Jean-Pierre No. 6):**

Identify all "members of our senior staff" and/or "members of our COVID-19 team" who are "in regular touch with … social media platforms," as [Jennifer Psaki] stated at a White House press briefing on or around July 15, 2021, including the nature of the communication and/or coordination.

**OBJECTIONS:** Defendant incorporates by reference the above objections. Defendant further objects to this Interrogatory on the ground that it is vague because it relies on a characterization of a statement made by an individual no longer in government, and the statement does not specify the individuals at issue or the specific communications referenced. Defendant further

74

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

objects to this Interrogatory as unduly burdensome and not proportional to the needs of the case. This Request calls for a response based on *any and all* specified "communications" from Defendant or any employee or subordinate of Defendant. Defendants cannot conduct an exhaustive search to uncover all possible responsive information under the current, abbreviated expedited discovery schedule. Defendant also objects to this Interrogatory as overbroad because it calls for a response based on documents that are not relevant to Plaintiffs' claims and that do not fall within scope of discovery authorized by the Court. The Court authorized the service of discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications." ECF No. 34 at 13. This Interrogatory appears to call for a response based on communications with Social-Media Platforms regardless of whether they pertain to content moderation with respect to misinformation. Defendant also objects to this Interrogatory to the extent it seeks internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to such communications. Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, a statutory national security privilege, presidential communications privilege, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44.

Further, Defendant objects to this Interrogatory on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportionate to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-CV-10340 (D. Mass. May 15, 2019);

75

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

*Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney,* 542 U.S. at 390. Additionally, discovery propounded on White House officials would create an undue burden, distract them from their critical executive responsibilities, and violate the separation of powers. *See Cheney*, 542 U.S. at 385. That burden is especially undue at this stage of the litigation given that Defendants' motion to dismiss the Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is forthcoming. Additionally, Defendant objects to this request to the extent it is directed to information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

Further, Defendant objects to this Interrogatory as unreasonably cumulative and duplicative of Plaintiffs' Interrogatories 1 through 5, in response to which certain Defendants are producing documents as described herein.

**RESPONSE:** Subject to and without waiving any of the foregoing objections, as amended in accordance with the Court's September 6, 2022, Order, and based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery, the White House Office of the Press Secretary provides the following response:

At a July 15, 2021, press briefing, Ms. Psaki was asked the following question and provided the following response:

Q: Can you talk a little bit more about this request for tech companies to be more aggressive in policing misinformation? Has the administration been in touch with any of these companies and are there any actions that the federal government can take to ensure their cooperation, because we've seen, from the start, there's not a lot of action on some of these platforms.

MS. PSAKI: Well, first, we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also

76

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

members of our COVID-19 team, given, as Dr. Murthy conveyed, this is a big issue of misinformation, specifically on the pandemic.

In terms of actions, Alex, that we have taken — or we're working to take, I should say — from the federal government: We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation. We're working with doctors and medical professionals to connect — to connect medical experts with popular — with popular — who are popular with their audiences with — with accurate information and boost trusted content. So we're helping get trusted content out there.

We also created the COVID-19 — the COVID Community Corps to get factual information into the hands of local messengers, and we're also investing, as you all have seen in the President's, the Vice President's, and Dr. Fauci's time in meeting with influencers who also have large reaches to a lot of these target audiences who can spread and share accurate information.

You saw an example of that yesterday. I believe that video will be out Fri- — tomorrow. I think that was your question, Steve, yesterday; I did a full follow-up there.

There are also proposed changes that we have made to social media platforms, including Facebook, and those specifically are four key steps.

One, that they measure and publicly share the impact of misinformation on their platform. Facebook should provide, publicly and transparently, data on the reach of COVID-19 — COVID vaccine misinformation. Not just engagement, but the reach of the misinformation and the audience that it's reaching.

That will help us ensure we're getting accurate information to people. This should be provided not just to researchers, but to the public so that the public knows and understands what is accurate and inaccurate.

Second, that we have recommended — proposed that they create a robust enforcement strategy that bridges their properties and provides transparency about the rules. So, about — I think this was a question asked before — there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms. All of them remain active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns.

Third, it's important to take faster action against harmful posts. As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly.

77

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

Finally, we have proposed they promote quality information sources in their feed algorithm. Facebook has repeatedly shown that they have the levers to promote quality information. We've seen them effectively do this in their algorithm over low-quality information and they've chosen not to use it in this case. And that's certainly an area that would have an impact.

So, these are certainly the proposals. We engage with them regularly and they certainly understand what our asks are.

Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy, July 15, 2021, available at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/.

It is the understanding of the White House Office of the Press Secretary ("the Office") that, in making this statement, Ms. Psaki was referencing the following individuals as "members of our senior staff" or "COVID-19 team" within the White House: Robert Flaherty and Andrew Slavitt.

With respect to the nature of the communications with social media platforms referenced in the July 15 press conference, the Office refers to the full statement quoted above. Ms. Psaki further conveyed her understanding of the nature of such communications in additional statements, including in press conferences on July 16, 2021, and July 19, 2021. Portions of those press conference are quoted below.

Q And just — you went through kind of the topline details of this yesterday, but can you elaborate a little bit on the Facebook —

MS. PSAKI: Sure.

Q — the administration to Facebook flagging of disinformation. And there's also some reporting that we've had that Facebook maybe hasn't been as proactive as the White House would like it to be in response to some of the flagging. So, the process of how the flagging works, and then whether Facebook has been amenable to those requests.

MS. PSAKI: Sure. Well, I would say first, it shouldn't come as any surprise that we're in regular touch with social media platforms — just like we're in regular touch with all of

78

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

you and your media outlets — about areas where we have concern, information that might be useful, information that may or may not be interesting to your viewers.

You all make decisions, just like the social media platforms make decisions, even though they're a private-sector company and different, but just as an example.

So we are ma- — regularly making sure social media platforms are aware of the latest narratives dangerous to public health that we and many other Americans seeing — are seeing across all of social and traditional media. And we work to engage with them to better understand the enforcement of social media platform policies.

So let me give you an example, just to illustrate it a little bit. The false narrative that remains active out there about COVID-19 vaccines causing infertility — something we've seen out there, flowing on the internet quite a bit, in other places as well — which has been disproven time and time again. This is troubling, but a persistent narrative that we and many have seen, and we want to know that the social media platforms are taking steps to address it. That is inaccurate, false information.

If you are a parent, you would look at that information and then that would naturally raise concerns, but it's inaccurate. And that is an example of the kind of information that we are flagging or raising.

Press Briefing by Press Secretary Jen Psaki, July 16, 2021, available at

https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/.

Q Thank you. Will the White House publicly release information on posts that it considers misinformation on vaccines that it's asked Facebook to block?

MS. PSAKI: First of all, we've not asked Facebook to block any individual posts. The way this works is that there are trending — there are trends that are out there on social media platforms. You're aware of them. We're aware of them. Anyone in the public can be aware of them.

There's also data that we look at that many media platforms, like many of you, also look at data in terms of trends and you report on it, which is not — to be expected, given the number of people who get their information from social media.

It's up to social media platforms to determine what their application is of their own rules and regulations. And so we just certainly raise where we have concerns about information that's inaccurate that is traveling out there in whatever platform it's traveling on.

79

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

Press Briefing by Press Secretary Jen Psaki, July 19, 2021, available at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/19/press-briefing-by-press-secretary-jen-psaki-july-19-2021/.

**Additional Interrogatory No. 18 (Ms. Jean-Pierre No. 7):**

Identify all Communications with any Social-Media Platform relating to "12 people who are producing 65 percent of the anti-vaccine misinformation on social-media platforms," as [Jennifer Psaki] stated at a White House press briefing on or around July 15, 2021.

**OBJECTIONS:** Defendant incorporates by reference the above objections. Defendant further objects to this Interrogatory on the ground that it is vague because it relies on a characterization of a statement made by an individual no longer in government, and the statement does not specify the individuals at issue or the specific communications referenced. Defendant further objects to this Interrogatory as unduly burdensome and not proportional to the needs of the case. This Interrogatory calls for a response based on any and all specified documents from Defendant or any employee or subordinate of Defendant. Defendants cannot conduct an exhaustive search to uncover all possible responsive information under the current, abbreviated expedited discovery schedule. Such expedited discovery is especially burdensome given that Defendants' motion to dismiss the Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is forthcoming. Defendant also objects to this Interrogatory as overbroad because it calls for documents that are not relevant to Plaintiffs' claims and that do not fall within scope of discovery authorized by the Court. The Court authorized the service of discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications." ECF No. 34 at 13. This

80

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

Interrogatory appears to call for a response based on communications with Social-Media Platforms regardless of whether they pertain to content moderation with respect to misinformation. Defendants also object to the Interrogatory to the extent a response requires review of internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to agency communications. Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, a statutory national security privilege, presidential communications privilege, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44.

Further, Defendant objects to this Interrogatory on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportionate to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-CV-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials would create an undue burden, distract them from their critical executive responsibilities, and violate the separation of powers. *See Cheney*, 542 U.S. at 385. That burden is especially undue at this stage of the litigation given that Defendants' motion to dismiss the Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is forthcoming. Additionally, Defendant objects to this Interrogatory to the extent it is directed to information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

(if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

Further, Defendant objects to this Interrogatory as unreasonably cumulative and duplicative of Common Interrogatories 1 through 5, in response to which certain Defendants are producing documents as described herein.

**RESPONSE:** Subject to and without waiving any of the foregoing objections, as amended in accordance with the Court's September 6, 2022, Order, and based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery, the White House Office of the Press Secretary provides the following response:

The White House Office of the Press Secretary ("the Office") is unaware of any such communications between employees of the Office and any social media platform that discuss this topic.

**Additional Interrogatory No. 19 (Ms. Jean-Pierre No. 8):**

**On or around July 15, 2021, You stated that "we engage with them [i.e., Social-Media Platforms] regularly and they certainly understand what our asks are." Identify what Social-Media Platform(s) are included in any such engagement(s), and identify "what our asks are," including Communication(s) relating to such engagement(s) and ask(s).**

**OBJECTIONS:** Defendant incorporates by reference the above objections. Defendant further objects to this Interrogatory on the ground that it is vague because it relies on a characterization of a statement made by an individual no longer in government, and the statement does not specify the individuals at issue or the specific communications referenced. Defendant further objects to this Interrogatory as unduly burdensome and not proportional to the needs of the case. This Interrogatory calls for a response based on any and all specified documents from Defendant or any employee or subordinate of Defendant. Defendants cannot conduct an exhaustive

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

search to uncover all possible responsive information under the current, abbreviated expedited discovery schedule. Such expedited discovery is especially burdensome given that Defendants' motion to dismiss the Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is forthcoming. Defendant also objects to this Interrogatory as overbroad because it calls for documents that are not relevant to Plaintiffs' claims and that do not fall within scope of discovery authorized by the Court. The Court authorized the service of discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications." ECF No. 34 at 13. This Interrogatory appears to call for a response based on communications with Social-Media Platforms regardless of whether they pertain to content moderation with respect to misinformation. Defendants also object to the Interrogatory to the extent a response requires review of internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to agency communications. Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, a statutory national security privilege, presidential communications privilege, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44.

Further, Defendant objects to this Interrogatory on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportionate to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-CV-10340 (D. Mass. May 15,

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials would create an undue burden, distract them from their critical executive responsibilities, and violate the separation of powers. *See Cheney*, 542 U.S. at 385. That burden is especially undue at this stage of the litigation given that Defendants' motion to dismiss the Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is forthcoming. Additionally, Defendant objects to this Interrogatory to the extent it is directed to information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

Further, Defendant objects to this Interrogatory as unreasonably cumulative and duplicative of Common Interrogatories 1 through 5, in response to which certain Defendants are producing documents as described herein.

**RESPONSE:** Subject to and without waiving any of the foregoing objections, as amended in accordance with the Court's September 6, 2022, Order, and based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery, the White House Office of the Press Secretary provides the following response:

It is the understanding of the White House Office of the Press Secretary (the "Office") that, in referring to individuals who "engaged with them [i.e., social-media platforms]," Ms. Psaki was not referring to employees of the Office. It is the understanding of the Office that the social media platforms referenced in this statement include, but are not necessarily limited to, Facebook and YouTube. With respect to "what our asks are," the Office refers to Ms. Psaki's statements, set

84

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

forth above in response to Interrogatory 17, in which she conveyed her understanding of the nature

of the "engagement(s)" or "ask(s)." The Office is unaware of any communications between

employees of the Office and any social media platform that discuss this topic.

**Additional Interrogatory No. 20 (Ms. Jean-Pierre No. 10):**

      **Identify all person(s) who "engage[s] regularly with all social media platforms about steps that can be taken" to address Misinformation on social media, which engagement "has continued, and … will continue," as You stated at the April 25, 2022 White House press briefing, including all Communications with any Social-Media Platform involved in such engagement.**

      **OBJECTIONS:** Defendant incorporates by reference the above objections. Defendant

further objects to this Interrogatory on the ground that it is vague because it relies on a

characterization of a statement made by an individual no longer in government, and the statement

does not specify the individuals at issue or the specific communications referenced. Defendant

further objects to this Interrogatory as unduly burdensome and not proportional to the needs of the

case. This Interrogatory calls for a response based on any and all specified documents from

Defendant or any employee or subordinate of Defendant. Defendants cannot conduct an exhaustive

search to uncover all possible responsive information under the current, abbreviated expedited

discovery schedule. Such expedited discovery is especially burdensome given that Defendants'

motion to dismiss the Amended Complaint for lack of subject-matter jurisdiction and other

deficiencies is forthcoming. Defendant also objects to this Interrogatory as overbroad because it

calls for documents that are not relevant to Plaintiffs' claims and that do not fall within scope of

discovery authorized by the Court. The Court authorized the service of discovery requests

concerning "the identity of federal officials who have been and are communicating with social-

media platforms about [misinformation and] any censorship or suppression of speech on social

media, including the nature and content of those communications." ECF No. 34 at 13. This

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

Interrogatory appears to call for a response based on communications with Social-Media Platforms regardless of whether they pertain to content moderation with respect to misinformation. Defendants also object to the Interrogatory to the extent a response requires review of internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to agency communications. Defendant also objects to this Request to the extent it seeks internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to such communications. Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, a statutory national security privilege, presidential communications privilege, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44.

Further, Defendant objects to this Interrogatory on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportionate to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-CV-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials would create an undue burden, distract them from their critical executive responsibilities, and violate the separation of powers. *See Cheney*, 542 U.S. at 385. That burden is especially undue at this stage of the litigation given that Defendants' motion to dismiss the Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is forthcoming. Additionally, Defendant objects to this Interrogatory to the extent it is directed to information protected by the presidential communications privilege or other

86

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

Further, Defendant objects to this Interrogatory as unreasonably cumulative and duplicative of Common Interrogatories 1 through 5, in response to which certain Defendants are producing documents as described herein.

**RESPONSE:** Subject to and without waiving any of the foregoing objections, as amended in accordance with the Court's September 6, 2022, Order, and based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery, the White House Office of the Press Secretary provides the following response:

At an April 25, 2022, press briefing, Ms. Psaki was asked the following questions and provided the following responses:

Q Jen, the Surgeon General has said that misinformation about COVID amounts to a public health crisis.

MS. PSAKI: Yeah.

Q I'm wondering: Regardless of ownership, would the White House be interested in working with Twitter like it has in the past to continue to combat this kind of misinformation? Or are we in a different part of the pandemic where that kind of partnership is no longer necessary?

MS. PSAKI: Well, I think we engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue. But there are also reforms that we think Congress could take and we would support taking, including reforming Section 230, enacting antitrust reforms, requiring more transparency. And the President is encouraged by the bipartisan support for — or engagement in those efforts.

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

Press Briefing by Press Secretary Jen Psaki, April 25, 2022, available at

https://www.whitehouse.gov/briefing-room/press-briefings/2022/04/25/press-briefing-by-press-

secretary-jen-psaki-april-25-2022/.

The White House Office of the Press Secretary ("the Office") understands the

"engage[ments]" in this statement to refer to "engage[ments]" about COVID-19 misinformation.

Accordingly, the Office incorporates by reference its response to Interrogatory No. 17 above.

The Office is unaware of any communications between employees of the Office and any social

media platform that discuss this topic.

88

NON-CONFIDENTIAL // REDACTED

NON-CONFIDENTIAL // REDACTED

Dated: November 3, 2022                Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAMES J. GILLIGAN
Special Litigation Counsel, Federal Programs Branch

*/s/ Kyla Snow*
ADAM D. KIRSCHNER (IL Bar No. 6286601)
Senior Trial Counsel
KYLA SNOW (OH Bar No. 96662)
INDRANEEL SUR (D.C. Bar No. 978017)
KUNTAL CHOLERA (D.C. Bar No. 1031523)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
Tel: (202) 514-3259
kyla.snow@usdoj.gov

*Attorneys for Defendants*

89

NON-CONFIDENTIAL // REDACTED

**VERIFICATION**

I, Robert E. Dornbush III, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the interrogatory response of the Office of the Press Secretary to Plaintiffs' First Set of Expedited Preliminary-Injunction Related Interrogatories dated July 18, 2022, Common Interrogatories Numbers 1-5 and Additional Interrogatories Numbers 17-20, contained in the Responses of the Office of the Press Secretary, is true and correct, to the best of my knowledge.

Dated: September 27, 2022

Robert E. Dornbush III
Chief of Staff and Special Assistant to the Press Secretary
Office of the Press Secretary