# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

JENNIFER R. PSAKI,

     *Movant,*

     v.

STATE OF MISSOURI ex rel. ERIC S.
SCHMITT, ATTORNEY GENERAL, et al.

     *Respondents*.

Misc. No. 1:22mc28

Underlying Action:  Case No. 3:22-cv-1213-TAD-KDM (W.D. La.)

<u>**RESPONDENTS' COMBINED OPPOSITION TO MOTIONS TO QUASH SUBPOENA
OF JENNIFER R. PSAKI**</u>

**INTRODUCTION**

In the underlying case in the Western District of Louisiana, *Missouri v. Biden*, Case No. 3:22-cv-01213 (W.D. La. Aug. 31, 2022), Plaintiffs (Respondents here) State of Louisiana, State of Missouri, and several private plaintiffs (collectively, "Plaintiffs" or "Respondents") claim that federal officials are violating the First Amendment by covertly pressuring and colluding with social-media companies to censor free speech on social-media.

Third-party Movant Jennifer R. Psaki, when she served as White House Press Secretary, made a series of public statements in 2021 and 2022 indicating that such communications are occurring, but without specifying which federal officials and which social-media companies are involved, or what they are saying to each other. For example, on July 15, 2021, at a White House press briefing, she stated, "We're *flagging problematic posts for Facebook* that spread disinformation," she demanded that social-media companies "take faster action against harmful posts," and she stated that "[w[e engage with [social-media companies] regularly and they certainly understand *what our asks are*." The White House, *Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy, July 15, 2021*, at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/ (emphases added) (*July 15 Press Briefing*). On April 25, 2022, she stated that "we engage regularly with all social media platforms about steps that can be taken" to attack so-called "disinformation," and that regular engagement "has continued, and I'm sure it will continue." The White House, *Press Briefing by Press Secretary Jen Psaki, April 25, 2022*, at https://www.whitehouse.gov/briefing-room/press-briefings/2022/04/25/press-briefing-by-press-secretary-jen-psaki-april-25-2022/

2

(*April 25 Press Briefing*). She also specifically called for the censorship and de-platforming of specific speakers whose viewpoints the Government disfavors.  After exhausting reasonably available alternative avenues, Respondents seek a narrow, focused deposition of Ms. Psaki to discover of the basis of such statements, and others like them, to discover "the identity of federal officials" who communicate with social-media platforms about suppression of speech, and "the nature and content" of those communications.  W.D. La. Doc. 34, at 13.[1]  The Louisiana federal court, after carefully considering the parties' arguments, held that the deposition of Ms. Psaki is warranted to discover this very information, and that any burden to Ms. Psaki is outweighed by the need to determine whether an ongoing violation of First Amendment rights is occurring.  W.D. La. Doc. 90, at 17-18.  The Government and Ms. Psaki seek to re-litigate that decision here.

As indicated in that order, Respondents seek to discover the identities of government officials who preemptively censor Americans' online speech and the methods by which they do so.  This information is critical to fashioning effective preliminary injunctive relief which "must 'state its terms specifically' and 'describe in reasonable detail' the conduct restrained or required." *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016).  The Louisiana federal district court has acted expeditiously on Respondents' factual allegations that U.S. Government officials have subjected and continue to "subject the distribution of [citizens'] publications to a system of prior administrative restraints." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).  The limited

---

[1] In this brief, documents filed in this Court are referenced by this Court's docket number as "Doc. __" and citations are to the page number in the case header.  Documents filed in the underlying case, *Missouri v. Biden*, Case No. 3:22-cv-01213 (W.D. La. Aug. 31, 2022), are cited by docket number in that case as "W.D. La. Doc."__

discovery in that case confirms extensive and pervasive efforts, including specially created "government reporting channels," to identify and silence online speech those officials do not like.

Despite U.S. Government officials' (Defendants') attempt to relitigate rulings they lost (but have largely accepted), the narrow question before this Court is whether it is overly burdensome for Ms. Psaki, a former White House Press Secretary and a movant here, to comply with a validly issued subpoena for a deposition and for documents related to that testimony.  It is not.  Ms. Psaki's statements at press briefings show that U.S. officials are "flagging problematic posts" and regularly engaging with social media companies to crack down on misinformation.  She has unique personal knowledge because her former employer turned over no documents on this issue and could not identify anyone because Plaintiffs' quotation of Ms. Psaki was "a statement made by an individual no longer in government, and the statement does not specify the individuals at issue or the specific communications referenced."  Doc. 8-3, at 23 (Defendants' Amended Interrogatory Responses). Because her former employer claims that it does not know what Ms. Psaki meant when she spoke, the deposition is necessary to specify the individuals and the communications.

Ms. Psaki objects that sitting for any deposition will be "extremely burdensome for [her]" because she would "need to devote several days to preparing [sic] for the deposition," and that the deposition itself "would be highly disruptive to both my work and my family."  Psaki Aff. ¶ 5. Those statements only express the strongly-held desire by all deponents that they would rather be somewhere else.  The rules require her to show an undue burden, not just a burden.  Fed. R. Civ. P. 45(d)(3)(A)(iv); *Moon Mountain Farms, LLC v. Rural Cmty. Ins. Co.*, 301 F.R.D. 426, 430 (N.D. Cal. 2014).  Moreover, Respondents have tried accommodating Ms. Psaki, moving the deposition twice (without asking any questions) and requesting her presence during normal

business hours close to her residence and work.  Her counsel likewise did not attempt to identify an obstacle Respondents could ameliorate, instead only reasserting Defendants' objection that "the deposition subpoena should be withdrawn in full."  Resps. Ex. 1.  Though Respondents have limited time to conduct court-approved discovery, they have minimized any logistical burden.

Defendants, joined by Ms. Psaki (collectively Movants), reassert their objections that, as a matter of law, a former White House Press Secretary cannot sit for a deposition.  No precedent so provides.  There is no dispute that Ms. Psaki, as an Assistant to the President, was formerly a high ranking official.  But her personal knowledge cannot be obtained elsewhere, and Movants have failed to show that the deposition would invade "the mental processes of administrative decisionmakers," have a chilling effect on decision-making, or that the deposition would discourage individuals from public service.  Defendants aptly explain why no decision-making processes come into play: "the Press Secretary's function is to receive information from other Government officials about activities across various federal agencies, and to then describe those activities to the news media during press conferences."  Defs. Mem. at 20.  The deposition will ask what her statements meant and who she was speaking about—the very purpose of the discovery authorized here.  And Movants cannot seriously contend that this deposition would discourage others from taking this prestigious role that often leads to great financial success, personal fame, and prestigious and lucrative career opportunities.  *See, e.g.,* Nicole Gaudiano and Oma Seddiq, *How Jen Psaki can cash in on her White House experience*, BUSINESSINSIDER.COM (Updated Apr. 1, 2022 at 11:31 am) ("Psaki should have no shortage of career opportunities after her time in the White House").[2]

---

[2]   *Available at* https://www.businessinsider.com/jen-psaki-white-house-press-secretary-resign-job-opportunities-2021-8.

Finally, as Movants have raised this option, exceptional circumstances do exist to transfer this dispute.  This motion to quash is but one part of a complex dispute where uniformity, including on issues such as Executive Privilege and exceptional circumstances, is highly desired.  The Louisiana federal court has already reviewed hundreds of pages of documentary evidence and extensive briefing, and it concluded that "Psaki has made a number of statements that are relevant to the Government's involvement in a number of social-media platforms' efforts to censor its users across the board for sharing information related to COVID-19," and that "[a]ny burden on Psaki is outweighed by the need to determine whether free speech has been suppressed." Doc. 5-2, at 18.  Movants have sought a writ of mandamus on other allegedly "high-ranking" current officials from the U.S. Court of Appeals for the Fifth Circuit.  Those issues will inform the Louisiana district court's rulings, and granting a transfer would avoid the risk of inconsistent rulings.  The court may, in its discretion, transfer this dispute to the issuing court.

## FACTUAL BACKGROUND

In aid of Respondents' motion for a preliminary injunction, the Louisiana federal court authorized Respondents to serve written discovery seeking two things: (1) "the identity of federal officials who have been and are communicating with social-media platforms about disinformation, misinformation, malinformation, and/or any censorship or suppression of speech on social media," and "the nature and content of those communications." W.D. La. Doc. 34, at 13.  It also authorized limited third-party subpoenas to social-media platforms.  *Id.*

In response to these requests, Defendants produced more than 15,000 pages of documents and disclosed more than 45 officials who communicate with social media platforms about censoring misinformation.  W.D. La. Doc. 71, at 5.  According to Ms. Psaki's successor, there

were no emails between the Press Secretary's Office and social media platforms relating to censorship efforts.  Defs. Mem. at 7 (citing Defs. Ex. B).

The Interrogatories asked about public statements Ms. Psaki made from the White House Press Briefing Room.  In particular, they asked the Press Secretary to identify "members of our senior staff" and "our COVID-19 team" that regularly engaged with social-media platforms and what "asks" have been made to social-media platforms by anyone regularly in touch with social media companies.  Doc. 8-2, at 23. Respondents also asked to identify all communications with any social-media platform relating to the "12 people who are producing 65 percent of the anti-vaccine misinformation," also known as the "Disinformation Dozen." *Id.* at 29.  The Interrogatory asked them to identify all persons that "engage[d] regularly with all social media platforms about steps that can be taken" with respect to Misinformation and engagement that "will continue." *Id.* at 31–34. The White House Press Secretary's Office responded that the Interrogatories were "vague because [they] rel[y] on a characterization of a statement made by an individual no longer in government, and the statement does not specify the individuals at issue or the specific communications referenced." *Id.*  In other words, Ms. Psaki's official successor said that if Ms. Psaki's public statements did not identify that person or the communications, the Office did not know what she was referring to. *See id.*  So when the successor-Defendant identified two White House officials, that identification was not based on actual knowledge, and did not purport to provide a comprehensive response. *See id.* at 27 (responding that "*[i]t is the understanding* of the White House Office of the Press Secretary that, in making this statement, Ms. Psaki was referencing the following individuals….") (emphasis added).  Similarly, the White House Press Secretary's Office refused to identify all the social media companies or all the people that regularly

7

engaged with social media companies—even though the Office spoke at length on these topics. *See id.* at 33–34.  In lieu of explaining its statements, the Office provided block quotes of the publicly filed transcripts or stated that there were no communications between the Office and social-media companies on those topics.  *See id.* at 25–29, 31, 33, 36.

Due to these limited responses, the district court authorized Respondents to take the deposition of Ms. Psaki, a former federal official, within 30 days of October 21, 2022.  That day, Respondents asked Defendants whether they would produce Ms. Psaki.  Respondents followed up the next business day, and Defendants responded later that day but did not address Ms. Psaki's status.  On October 25, Respondents issued the first subpoena setting the deposition for November 17, 2022.  At Defendants' request, Respondents held the subpoena. The next day, Defendants accepted service on behalf of Ms. Psaki and requested the date be changed to November 16, 2022, due to a pre-existing conflict.  Respondents obliged and served a subpoena with the requested date.

After another round of negotiations, the parties agreed to extend the time to conduct depositions until December 9, with the court's consent, and move Ms. Psaki's deposition to December 8, 2022.  The third subpoena commanded her appearance at deposition located in Arlington, VA, at a location convenient for Ms. Psaki.  As with all previous subpoenas, it included eight requests for documents that lie squarely within the scope of discovery ordered by the Louisiana district court.  *See* W.D. La. Doc. 34, at 13.

On November 3, 2022, Movants filed separate motions to quash.  Docs. 5, 7.  The parties also agreed on an expedited schedule to resolve any disputes.  Doc. 10.

**ARGUMENT**

Motions to quash and issue a protective order require a court to find good cause to do so, usually based on the factor enumerated in Rule 26(b) or Rule 45. *Intelligent Verification Sys., LLC v. Microsoft Corp.*, No. 2:12CV525, 2014 WL 12544827, at *1 (E.D. Va. Jan. 9, 2014). Courts give special weight to the undue burden consideration as applied to non-parties because they should not be drawn into parties' litigation without a good reason. *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019). Nevertheless, "[w]hen a non-party claims that a subpoena is burdensome and oppressive, the non-party must support its claim by showing how production would be burdensome." *In re Subpoena Duces Tecum to AOL, LLC*, 550 F. Supp. 2d 606, 612 (E.D. Va. 2008) (Lee, J.); *Intelligent Verification Sys.*, 2014 WL 12544827, at *1 ("The burden of proving that a subpoena is oppressive is on the party moving to quash.").

I.    **Ms. Psaki has failed to show that the court-authorized subpoena imposes an undue burden.**

Ms. Psaki has not and cannot show that sitting for a deposition during normal business hours, on a day that she has communicated works best for her, and at a convenient location, is an undue burden. *First*, she claims that the subpoena's scope offers no limitations on the questions to be asked. Psaki Mem. at 12. But Ms. Psaki also recognizes that the subpoena is limited to the topics authorized by the issuing court. *See id.* at 15 (Even if she had additional information "that was somehow responsive to the scope of preliminary-injunction-related discovery… ."). Psaki Mem. at 5. *Second*, she has not made the requisite showing of facts as to why the deposition and producing documents in her possession related to the deposition would be unduly burdensome. *John v. Keller Williams Realty, Inc.*, No. 619CV1347ORL40DCI, 2019 WL 7482200, at *2 (M.D. Fla. Nov. 19, 2019). ("Claims of undue burden should be supported by a statement (generally an

affidavit) with specific information demonstrating how the request is overly burdensome."). *Third*, she claims that there is no need for her testimony because Defendants had already identified those officials and produced documents showing which officials communicated with social-media companies. Psaki Mem. at 13. But that is counsel's argument, not a statement of fact, and relies on Defendants' representations, the same parties who stated they did not know what Ms. Psaki meant when she made statements during White House press briefings. Doc. 8-3, at 23–36. Finally, she asserts that "exceptional circumstances" do not exist to "justify a deposition of a nonparty who is a former high-ranking government official." Psaki Mem. at 15. This is not an undue burden issue under the Federal Rules but rather an issue of whether a former high-ranking official should be protected under the apex doctrine in these circumstances. We address this issue in section II.

Ms. Psaki's objection to the "unlimited" scope of the subpoena is unsupportable and is an objection that could have been resolved under counsel's obligation to engage in a meet and confer. The deposition's scope is set by the court order granting discovery in the underlying case: Respondents are authorized to seek the "identities of federal officials" that are communicating with social media companies and "the nature and content" of those communications. W.D. La. Doc. 34, at 13. Ms. Psaki's public statements demonstrate that she has highly relevant first-hand knowledge of these questions. Thus, in authorizing Respondents to depose Ms. Psaki, the district court found that she "has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19" and that she "made a number of statements that are relevant to the Government's involvement in a number of social-media platforms' efforts to censor its users across the board for sharing information related to COVID-19." Doc. 5-2, at 28–29. Specifically, the district court noted that Respondents sought the deposition "to explore the basis of the 'critical statements' alleged in the Complaint and stated above" in its order. *Id.* at 28.

10

Respondents' position has not changed, and they seek Ms. Psaki's testimony to explain her statements related to identifying federal officials who communicate with social-media platforms about censoring Americans' speech, and the nature and content of those communications.  Thus, the subpoena does not seek a "wide-ranging deposition," Psaki Mem. at 3, but a specific, narrow, and focused inquiry; and the orders authorizing this subpoena show that it is narrowly tailored to target critical information.  Moreover, counsel admits as much by recognizing that this subpoena seeks information "that was somehow responsive to the scope of preliminary-injunction-related discovery… ."  Psaki Mem. at 5.

Additionally, Movant's counsel never raised this objection with Plaintiffs' counsel, who would have pointed to the court's orders (including Attachment B to the subpoena).  *See* Doc. 5-2, at 12. Instead, Movant's counsel only requested that "the deposition subpoena should be withdrawn in full." Resps. Ex. 1.  Because the scope of the subpoena is a burden that only the individual client may raise, *United States v. Idema*, 118 Fed. App'x 740, 744 (4th Cir. 2005), failing "to meet and confer in person or by telephone with his or her opposing counsel in a good-faith effort to narrow the area of disagreement," before seeking a hearing date, is inconsistent with this Court's Local Rule 7.1.3.

Ms. Psaki has failed to show by specific facts that sitting for any deposition would be an undue burden.  *In re Subpoena Duces Tecum to AOL, LLC*, 550 F. Supp. 2d at 612 ("[T]he non-party must support its claim by showing how production would be burdensome.").  Ms. Psaki only claims that she would need "to devote several days to preparing [sic] for the deposition," and that

---

[3] Respondents also note that it is preferable to modify a subpoena to cure any issues and that the refusal to meet and confer on this objection substantially impaired any attempt they could make to modify the subpoena.

the deposition itself "would be highly disruptive to both my work and my family."  Psaki Aff. ¶ 5.

"Almost any subpoenaed party could make the same undue burden arguments that [Ms. Psaki] makes here."  *Moon Mountain Farms, LLC*, 301 F.R.D. at 430 (internal quotation marks omitted).

"The fact that any time may be required by [Ms. Psaki] to prepare for or attend a deposition is not a cognizable burden—let alone an undue burden—on [a non-party]."  *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19-MD-2885, 2020 WL 6274824, at *6–*7 (N.D. Fla. Oct. 26, 2020) (applying APA arbitrary and capricious standard and Rule 45).  Private counsel's estimate that this is not a "typical civilian" deposition does not reflect any burden that *the subpoena* imposes on Ms. Psaki but rather alleged burdens her former employer imposes.  Psaki Mem. at 11.  Further, it is implausible to assert that a deposition causes an undue burden for an official who "describe[d] [governmental] activities to the news media during press conferences," and answered questions from the press.  Defs. Mem. at 19.

Ms. Psaki claims that there is no need for her testimony because Defendants have already identified some officials and produced documents showing which officials communicated with social-media companies.  Psaki Mem. at 13.  But the responses from the White House Press Secretary's Office, on behalf of Ms. Psaki's official successr, expressly disclaim being able to answer the question unless Ms. Psaki's answers at the briefing room somehow answered the question.  Doc. 8-3, at 26–36. Even when the Office identified two White House officials, that representation came after the objection saying the Office did not know what Ms. Psaki's statement meant, and the representation was qualified with the limitation that this was merely the "understanding" of the current office.  *Id.* at 27.  Nor did the White House Press Secretary identify the social-media platforms with whom White House officials were communicating about the censorship of American's speech; again, the Office only named two companies but claimed that the list was non-exhaustive.  *Id.* at 33.  There is no evidence or

representation by the White House Press Secretary's Office that it personally knew the answers it gave to be accurate.  And as there are no documents from the successor-Defendant, the only person who knows what Ms. Psaki meant in those critical statements is Ms. Psaki.  Thus, the record supports that Ms. Psaki has unique knowledge that is unavailable from other sources.

Movants' claim that the other discovery provided is a sufficient substitute for Ms. Psaki's testimony is incorrect.  The desired information is not only highly relevant to the underlying merits of whether Defendants instituted a system of prior restraints on Americans' online speech, it is extremely relevant to understanding the "who, what, and how" of the regular engagement with social-media companies that Ms. Psaki referenced for Respondents to craft effective preliminary relief.  *See Scott*, 826 F.3d at 211.  The absence of any documents from the successor-Defendant only makes that need more compelling—because it demonstrates that apparently, Defendants do not know what the former White House Press Secretary meant at her press briefings.  Without documents or a Defendant who actually knows the answer, Ms. Psaki is the only one that can provide the information needed.

Under these circumstances, Respondents have compelling reasons to ask a former official to explain public statements she made in the course of her public duties, on a matter of enormous public importance—whether and to what extent government officials have induced social-media platforms to censor Americans' freedom of speech.

## II.    Ms. Psaki has unique knowledge and no justification exists to apply the apex doctrine to a former official providing factual information that only she knows.

Plaintiffs agree that Ms. Psaki was formerly a "high-ranking" official when she served as White House Press Secretary, an Assistant to the President.   Under the apex doctrine, "[d]epositions of high ranking officials may be permitted" provided that "the official has first-hand knowledge related to the claim being litigated" and no "other available avenues of discovery" exist

13

to access the information. *Bogan v. City of Boston*, 489 F.3d 417, 423–24 (1st Cir. 2007); *accord Lederman v. N.Y. City Dep't of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir. 2013); *In re United States*, 197 F.3d 310, 314 (8th Cir. 1999); *Intelligent Verification Sys.* 2014 WL 12544827, at *2. This rule applies to a *forme*r high-ranking official, but with far lessened concern for interfering with the daily duties of the official, *United States v. Newman*, 531 F. Supp. 3d 181, 188 (D.D.C. 2021), and—contrary to the Government's suggestion that White House officials warrant special treatment—regardless of whether the official is a White House official, *id. See also Alexander v. F.B.I.*, 186 F.R.D. 1, 3–4 (D.D.C. 1998).

Both conditions for deposing a high-ranking official are met and no other justification exists to prevent deposing Ms. Psaki.

## A. Defendants have shown that Ms. Psaki possesses unique, first-hand knowledge relevant to Respondents' claims.

The district court properly found that Ms. Psaki has unique, first-hand knowledge because Defendants objected that "they lacked knowledge of the basis of her statements on those issues because Psaki no longer works at the White House." Doc. 5-2, at 28. Movants criticize the Louisiana federal court's finding for not adequately explaining each factor to their satisfaction. Defs. Mem. at 21; *see* Psaki Mem. at 8. But the court need not explain the obvious: Defendants without knowledge cannot answer the Interrogatory. As Section I explains, each of the Interrogatory Responses qualified that Defendants did not know what Ms. Psaki meant because her statements did not specifically answer the question Plaintiffs posed. According to Defendants, only Ms. Psaki knows what she was referring to when she made those statements.

At issue are multiple statements by Ms. Psaki that announced regular communications between the federal officials and social-media platforms, stating that federal officials were telling

social-media platforms what speech was offensive, and that the social-media platforms were not doing enough.  For example, at one press briefing, she stated:

> We are flagging problematic posts for Facebook that spread disinformation. . . . Facebook needs to move more quickly to remove harmful, violative posts—posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly. . . . We engage with [social-media companies] regularly and they certainly understand what our asks are.

*July 15cPress Briefing*.  Consistent with the authorized discovery, Respondents asked for the successor-Defendant to identify these officials, communications, and social-media companies referenced in this statement and what she meant.

Ms. Psaki's numerous public statements (indicating that federal officials pressure or collude with social-media companies to suppress speech) show that, in Defendants' own words, she "receive[d] information from other Government officials about activities across various federal agencies" and then described it for the press.  Defs. Mem. at 19.  Defendants claim this is somehow second-hand knowledge, but if it was second-hand knowledge, then the successor-Defendant would have access to that same information and be able to answer the Interrogatory.  But Defendants have established that they cannot.

Furthermore, Ms. Psaki's public statements indicate that she has first-hand knowledge of who in the federal government was providing social-media companies with directions on censorship and what the contents of those directions were. She stated that censorship-related "engagements typically happen through members of our senior staff, but also members of our COVID-19 team, given, as Dr. Murthy conveyed, this is a big issue of misinformation, specifically on the pandemic." *July 15 Press Briefing*. And she stated that these officials have specific "asks" that they regularly communicate to social-media companies and that the social-media companies "certainly understand." *Id.* Ms. Psaki seemed to indicate that one of these "asks" was to censor "12

15

people who are producing 65 percent of anti-vaccine misinformation on social media platforms," expressing frustration that all twelve "remain active on Facebook, despite some even being banned on other platforms." *Id.* The specifics of who is communicating censorship-related "asks" to social-media companies and what those communications contain (beyond, apparently, the deplatforming of the so-called "Disinformation Dozen," *see* Doc. 5-3, at 100, W.D. La. Doc. 84, ¶ 336, are highly relevant to Respondents' First Amendment claims. So are the specifics of who is "flagging problematic posts for Facebook that spread disinformation" and what "flagging" means in this context. *July 15 Press Briefing*. Therefore, Ms. Psaki "has first-hand knowledge related to the claim being litigated." *Bogan*, 489 F.3d at 423.

Finally, Defendants contend that Plaintiffs have mischaracterized Ms. Psaki's statements. *E.g.*, Defs. Mem. at 21 ("Ms. Psaki nowhere suggested that those officials *pressured* social-media platforms to take any particular action against any particular users or content."). This argument merely reinforces the pressing need to ask Ms. Psaki directly what she meant by making the critical statements. Not only do statements, like the one referenced above, undermine Defendants' suggestion, Defendants' efforts reinforce that Ms. Psaki's statements can be interpreted in different ways. Respondents are authorized to find out what she meant, and Defendants' speculation is not a substitute for the testimony.

## B.   Respondents cannot access the information in Ms. Psaki's possession by other means.

Respondents cannot access Ms. Psaki's relevant, first-hand knowledge through "other available avenues of discovery." *Bogan*, 489 F.3d at 424. When deciding whether alternative avenues of discovery are available, courts employ a reasonableness test. The question is not whether another person exists somewhere who knows the information, regardless of whether the person can be ascertained or located. Instead, the question is whether the information can be

"reasonably obtained" by an alternative avenue of discovery.  *Sanstrom v. Rosa*, No. 93 Civ. 7146 (RLC), 1996 WL 469589, at *5 (S.D.N.Y. Aug. 16, 1996); *Am. Broad. Cos. v. U.S. Info. Agency*, 599 F. Supp. 765, 769 (D.D.C. 1984); *see also In re U.S. Dep't of Educ.*, 25 F.4th 692, 704 (9th Cir. 2022) (requiring "[e]xhaustion of all *reasonable* alternative sources" (emphasis added)); *Littlefield v. Nutribullet, LLC*, No. CV 16-6894 MWF (SSx), 2017 WL 10438897, at *7 (C.D. Cal. Nov. 7, 2017) (authorizing the deposition of a high-ranking official because "it does not appear that the information [the official] possesses is *readily or realistically* available from other sources" (emphasis added)).

No "reasonable alternative sources" are available here.  *U.S. Dep't of Educ.*, 25 F.4th at 704. The Government emphasizes that the federal officials and social-media representatives involved in the communications Ms. Psaki referenced know who they are and what "asks" the federal officials made.  Defs. Mem., at 22–23. But Respondents have no reasonable way of ascertaining who these individuals are that Ms. Psaki meant or even which social-media companies were represented in the discussions.  This is not for lack of trying—in fact, Respondents *did* exhaust "all reasonable alternative sources" for the critical information in Ms. Psaki's possession. *U.S. Dep't of Educ.*, 25 F.4th at 704.  Respondents served detailed interrogatories on Ms. Psaki's successor in office. But the White House Press Secretary's Office returned vague responses disclaiming knowledge of the basis of Ms. Psaki's statements because Ms. Psaki no longer works for the White House. *See* Doc. 8-3, at 23–36.

For example, one of Respondents' interrogatories concerned Ms. Psaki's statement that "we engage with [social-media companies] regularly and they certainly understand what our asks are." *Id.* at 31. Respondents asked (1) "what Social-Media Platform(s) are included in any such

engagement(s)," (2) what "asks" the Government has of them, and (3) what communications are involved in such engagements and "asks." *Id.* On the first point, the Press Secretary's Office responded: "It is the understanding of the Office that the social media platforms referenced in this statement include, but are not necessarily limited to, Facebook and YouTube." *Id.* at 33. On the second point, the Press Secretary's office provided no new information at all but simply referred back to Ms. Psaki's public statements that did not answer the question. *Id.* And on the third point, the Press Secretary's Office responded that it was the Office's "understanding" that the officials regularly engaging with social-media companies were not employees of the Office and that the Office was "unaware of any communications between employees of the Office and any social media platform that discuss this topic." *Id.*

Defendants' general lack of awareness and lack of personal knowledge reinforce that there are no other reasonably available alternatives. Respondents still do not know which companies Ms. Psaki was referring to, the specifics of the "asks" Mr. Psaki referring to, or how and from where these asks originate. All Defendants provided is that the White House Press Secretary's Office speculates that the list of companies includes *but is not limited to* Facebook and YouTube and that the "asks" originated from officials outside the White House Press Secretary's Office. As explained above, the missing information is highly relevant to Respondents' claims, which rely on allegations that federal officials have been pressuring and continue to pressure social-media companies to suppress speech based on its content. As the Press Secretary's Office indicated when it referred Respondents back to Ms. Psaki's own statements, the only person who can "provide the necessary information" is Ms. Psaki herself. *Bogan*, 489 F.3d at 423.

Finally, Defendants argue that "even if Plaintiffs were able to demonstrate that information from Ms. Psaki is necessary, a deposition . . . should not be the first resort." Defs. Mem., at 24. But Federal Rule of Civil Procedure 33 permits service of interrogatories only on parties. *See* Fed. R. Civ. P. 33. As Defendants observe, Ms. Psaki is no longer a party to the underlying case. Defs. Mem., at 2 n.1. In any event, interrogatories and written questions are "rarely an adequate substitute for oral depositions," *Zito v. Leasecomm Corp.*, 233 F.R.D. 395, 397 (S.D.N.Y. 2006), and this case is no exception. To properly understand what Ms. Psaki's knows about the contents of communications between federal officials and social-media companies, Respondents need the flexibility to "frame [their] questions on the basis of answers to previous questions." CHARLES WRIGHT & ALAN MILLER, FEDERAL PRACTICE AND PROCEDURE § 2163 (2022); *see also Am. Cas. Co. of Reading, Pa. v. Krieger*, 160 F.R.D. 582, 589–90 (S.D. Cal. 1995); *Hay & Forage Indus. v. Ford New Holland, Inc.*, 132 F.R.D. 687, 689–91 (D. Kan. 1990). An oral deposition of Ms. Psaki is the only reasonable means of obtaining information in Ms. Psaki's possession that is central to Respondents' claims.

## C. No other rationale justifies quashing the deposition.

Defendants assert that even if exceptional circumstances are present, the Court should quash the subpoena because it raises "separation-of-powers" concerns, and that the deposition would exert "a chilling effect on official decision-making" and would otherwise discourage citizens from entering public service. Defs. Mem. at 14–15. None of these assertions is convincing.

*First*, Defendants show that the separation of powers and decision-making concerns are one and the same. *Compare* Defs. Mem. at 14 ("discovery into 'the mental processes of administrative decisionmakers' is unwarranted"), *with id.* (depositions about official conduct would cause a "chilling effect on official decision-making."). In *Newman*, Judge Leon explains that there are three factors: (1)

19

protecting the independence of official decision making, (2) letting officials perform "without disruption or diversion," and (3) the potential discouragement from civil service.  531 F. Supp. 3d at 188.  He also explained that the second factor does not apply to former officials.  *Id.* at 189.

    *Second*, Ms. Psaki's deposition does not impact the independence of the mental processes of decision makers.  The deposition is not seeking her advice to the President, and as Ms. Psaki points out, Respondents have maintained that Ms. Psaki is not a decision-maker.  Psaki Mem. at 5.  Defendants, who include Ms. Psaki's successor, confirm that Respondents are correct.  Defs. Mem. at 20 ("After all, it is the Press Secretary's function to receive information from other Government officials about activities across various federal agencies, and to then describe those activities to the news media during press conferences.").  Gathering information and reporting it to the press is not a decision-making process, and certainly a deposition has no chilling effect as compared to the White House Press Corps's questions.  Further, the focus of Plaintiffs' inquiry is not internal discussions with White House officials, but the external communications between federal officials and social-media platforms relating to the censorship of speech on social-media.  W.D. La. Doc. 34, at 13.  Federal officials' communications with third-party social media platforms are not privileged under any theory.

    Finally, though alleging that Respondents improperly dismissed the "discouragement" effect as "minimal," Psaki Mem. at 11, it is unlikely that the prospect of a single, narrowly focused deposition after leaving office would deter any highly-qualified official from seeking the coveted role of White House Press Secretary, which opens the door to many further opportunities.[4]

---

[4] *See, e.g.,* Gaudiano and Seddiq, *How Jen Psaki can cash in on her White House experience* ("Psaki should have no shortage of career opportunities after her time in the White House");a Dylan Byers, *Former White House press secretary Kayleigh McEnany joins Fox News*, NBC News, March 2, 2021 (Kayleigh McEnany); Kate Bennett, *Melania Trump's closest White House adviser to release book*, CNN, September 13, 2021 (Stephanie Grisham); Andrew DeMillo, *Sarah Huckabee Sanders 1st woman elected Arkansas governor*, AP News, November 9, 2022 (Sarah Huckabee Sanders); Claire Zillman, *Sean Spicer Has a New Job*, Fortune, September 5, 2017

None of Defendants' arguments justifies any protection by this Court for a former executive official.

### III.     The Motions To Quash Should Be Transferred to the Western District of Louisiana

These motions to quash may more accurately be described as "motions for reconsideration" over issues arising from highly complicated and expedited, complex litigation in the Western District of Louisiana.  Movants collectively spend fourteen pages describing cases not before any court, Defs. Mem. at 2–3, preliminary motions for expedited discovery the Defendants do not challenge, *id.* at 3–4, motions Defendants withdrew or did not file, *id.*, lengthy negotiations with Defendants to provide any discovery ordered by the Louisiana federal court, *id.* at 5–6, multiple federal court orders managing the expedited discovery, *id.* at 6–8, and Defendants' view of the merits of their newly filed mandamus petition in the Fifth Circuit that does not challenge the deposition of Ms. Psaki, *id.* at 9–10.  This is all in hope that this Court, with its limited exposure to the ongoing complex, multi-court litigation described above, will opine on the merits or need for any proceedings before a different district court.  Because these motions and the multi-forum litigation present exceptional circumstances, Respondents request that the motions be transferred to the Western District of Louisiana pursuant to Rule 45(f) to help avoid inconsistent results between the adjudication of the motions here, the rulings of the Western District of Louisiana, and the Fifth Circuit's anticipated ruling on a mandamus petition raising related issues.

The parties agree that "[w]here exceptional circumstances exist, a court may transfer such

---

(Sean Spicer on reality dancing show); Veronica Stracqualursi, *Obama press secretary Josh Earnest named United Airlines spokesman*, CNN, May 4, 2018 (Josh Earnest); Darren Samuelsohn and Anna Palmer, *Carney Cashes in*, Politico, July 7, 2014 (Jay Carney).

a subpoena-related motion sua sponte," *Victim Servs., Inc. v. C.F.P.B.*, 298 F. Supp. 3d 26, 28 (D.D.C. 2018), under Rule 45(f).  Civil Rules Advisory Committee has further "identified four examples of exceptional circumstances," three of which are relevant here: first, "an issue in the subpoena-related motion that already has been presented to the issuing court or bears significantly on its management of the underlying action"; second, "a risk of inconsistent rulings on subpoenas served in multiple districts"; and third, "overlapping issues between the subpoena-related motion and the merits of the underlying action." 9A CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV. § 2463.1 & n.7.60 (3d ed.) ("WRIGHT & MILLER") (discussing Advisory Committee Notes on the 2013 Amendments to Rule 45); *see also, e.g.*, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 842 (1999) (relying on examples from Advisory Committee notes). "Presumably the Note's list is not exhaustive." WRIGHT & MILLER § 2463.1. And indeed, "many courts have transferred" subpoena-related motions "based on judicial economy," *id.*, suggesting that this also qualifies in some cases.

*First*, movants largely present issues that have already been presented to the Louisiana district court, and those issues bear significantly on that court's management of the expedited discovery schedule.  Defendants initially refused to provide any discovery from White House officials, including the current Press Secretary, on the grounds that Respondents had not exhausted other purported sources of discovery; that Ms. Psaki's public statements as Press Secretary did not indicate that anyone from her office had relevant communications with social-media platforms; and thus that Respondents had failed to make the heightened showing (which again is "exceptional circumstances") to justify burdening purportedly high-ranking officials with discovery. *See* Joint Statement on Discovery Disputes, W.D. La. Doc. 71, at 49–56.   The court rejected these

arguments, finding that "the requested information is obviously very relevant to Respondents' claims" and "tailored to the facts alleged in the case," that "[t]his is the only chance Plaintiffs will have to get this information prior to addressing the preliminary injunction," and that any "burden on the White House" was "no more a burden than the other discovery requests Government Defendants have already answered." Order on Discovery Disputes, W.D. La. Doc. 72, at 5–7. The court did not allow Respondents to pursue *all* their discovery requests, deeming some requests unwarranted in expedited discovery. *See id*. at 5. But given the demonstrated need for the information requested from the Press Secretary, the court ordered a response to Respondents' interrogatories and document requests.

Defendants next objected to depositions, including the deposition of Ms. Psaki, on similar grounds. They argued that the deposition was unnecessary given the 15,000 pages of documents already produced; that Respondents had failed to show exceptional circumstances, which some courts have also required for depositions of *former* high-ranking officials, given that Defendants' purportedly "reasonable search of Psaki's emails . . . did not find responsive documents"; and that sitting for the deposition would be unduly burdensome. Doc. 5-4, at 43–45, 50–56. The court again rejected those arguments, finding "that Plaintiffs have proven that Jennifer Psaki has personal knowledge about the issue concerning censorship across social media as it related to COVID-19 and ancillary issues of COVID-19," that her "rank" as White House Press Secretary "does not mitigate the relevance and the need of her deposition as it relates to this case," and thus that "[e]xtraordinary circumstances are present" and "[a]ny burden on Psaki is outweighed by the needed to determine whether free speech has been suppressed." Doc. 5-2, at 26–29. The court again did not allow Plaintiffs to conduct all their requested depositions "in an effort to narrowly

tailor this expedited discovery." *Id.* at 26. But given the demonstrated need for the information sought from Ms. Psaki, the court authorized Plaintiffs' deposition request.

Defendants' arguments have not improved in this forum.  These issues have already been thoroughly briefed, considered, and decided in the underlying action. And the resulting orders are the product of the Louisiana federal court's management of that action, which should bear more weight here because this is not ordinary discovery: The district court found a heightened need exists to identify federal officials engaging in censorship and how they communicate it to social media companies. W.D. La. Doc. 34, at 13.  A tight discovery timeline may itself be exceptional. *See Fed. Home Loan Mortgage Corp. v. Deloitte & Touche LLP*, 309 F.R.D. 41, 44 (D.D.C. 2015) (granting transfer to "avoid interference with the time-sensitive discovery schedule set" in the underlying action); *Google, Inc. v. Digital Citizens All.*, 2015 WL 4930979, at *3 (D.D.C. July 31, 2015) (similar). More generally, courts are appropriately reluctant to disrupt discovery in other courts.  *See Flynn*, 216 F. Supp. 3d at 48 (transfer warranted in light of the "real risk that refusing to transfer could disrupt the very well-managed discovery in the underlying litigation," which was set to close the next month, even though the case was relatively young and not complex); *Wultz*, 304 F.R.D. at 46–47 (transfer warranted where a ruling would "inevitably disrupt" discovery management by the issuing judge, who was "intimately involved" with the issues and "in a better position" to consider "any implications the resolution of the motion will have on the underlying litigation"); *In re UBS Fin. Servs., Inc. of Puerto Rico Sec. Litig.*, 113 F. Supp. 3d 286, 288 (D.D.C. 2015) ("Transferring the motion not only prevents disruption of [the issuing judge's] management of this case, but promotes judicial economy and avoids possible inconsistent results in discovery orders."); *Duck v. United States Sec. & Exch. Comm'n*, 317 F.R.D. 321, 325 (D.D.C. 2016)

(similar); *Deloitte*, 309 F.R.D. at 43–44 (similar).   At each turn, Defendants have raised these objections and the federal court has found them lacking.   Quashing Ms. Psaki's deposition would disrupt the balance struck by the Louisiana federal court between Plaintiffs' need to identify government officials and programs censoring Americans' speech and the need to advance this case to close expedited discovery and adjudicate these preliminary motions.

*Second*, the instant motions present a risk of inconsistent rulings on depositions sought in multiple districts—and indeed, inconsistent rulings with regards to the very subpoena at issue here. Ms. Psaki agrees that those qualify as exceptional circumstances.   Psaki Mem. at 18.   According to the Defendants, permitting this deposition requires "adjudications of executive privilege, thrusting the court into 'the awkward position of evaluating the Executive's claims of confidentiality and autonomy,' and 'difficult questions of separation of powers and checks and balances.'" Defs. Mem. at 17.   Yet, they fail to acknowledge that they attempt to raise similar "difficult questions" in the ongoing mandamus proceedings Defendants initiated in the Fifth Circuit, especially as they claim that all these defendants are high ranking executive officials.   Ms. Psaki also asserts that the demands of executive privilege limitations would require "extensive preparation" with both private and government counsel. Psaki Mem. at 5; *see also id.* at 15 ("those communications would likely be subject to assertions of executive privilege.").   Her claim that as the only former official at issue her case differs significantly, *id.* at 18, receives no support from Defendants who claim that "[t]he fact that Ms. Psaki no longer holds the position of White House Press Secretary does not alter the analysis."   Defs. Mem. at 15.

The instant motions invite this Court into direct conflict with another federal court. "Courts routinely transfer subpoena-related motions—even over objection" where "the issuing court is grappling with related issues." *In re Nonparty Subpoenas Duces Tecum*, 327 F.R.D. 23, 26 (D.D.C. 2018). The same comity concerns apply only more strongly where the issuing court (here the

Western District of Louisiana) has *already* grappled with identical issues.  Indeed, even a "potential for inconsistent rulings should be avoided and weighs in favor of a single judicial officer deciding all of these disputes." *See Wultz v. Bank of China, Ltd*, 304 F.R.D. 38, 46 (D.D.C. 2014). This does not even consider that even in the litigation's nascent stage, the relevant documents number in the hundreds of pages. The Louisiana federal court, which is well-familiar with those documents, is necessarily better-positioned to resolve the instant motions in a timely manner.

*Third*, the motions to quash raise issues that overlap significantly with the merits of the underlying action. Plaintiffs claim that various federal officials and agencies unconstitutionally pressured social-media platforms to censor disfavored speech.  And in Plaintiffs' view, Ms. Psaki's public statements as Press Secretary—where she admitted, for example, that "[w]e're flagging problematic posts for Facebook"—are primary indicators of the existence of this censorship. *July 15 Press Briefing*.  These statements are central to the merits of Plaintiffs' claim and, more immediately, the preliminary-injunction motion. Yet in its motion to quash, movants spend multiple pages debating the relevance of these statements and attempting to portray them as "innocuous." Defs. Mem. at 18–21. Thus, the motions here depend in large part on merits arguments that, again, are already before another court, which is yet another reason to transfer the motions to that court.  *See, e.g.*, *Flynn v. FCA US LLC*, 216 F. Supp. 3d 44, 47 (D.D.C. 2016) ("As other courts have noted, the relevance argument advanced emphasizes the need for the court where the underlying matter lies to decide the matter." (internal quotation marks omitted)); *F.D.I.C. v. Galan–Alvarez*, 2015 WL 5602342, at *3 (D.D.C. Sept. 4, 2015) (relevance determinations require a court "to delve into the intricacies of the underlying dispute").

These considerations outweigh Ms. Psaki's alleged burdens in this case. "Nor is it clear

that litigating *this motion* in the [Western District of Louisiana] will cost very much at all," *Moon Mountain Farms, LLC*, 301 F.R.D. at 430 (emphasis added), since "[t]ransferring a *motion* to the jurisdiction where the underlying litigation is pending . . . will require few, if any, modifications of the written submissions." *Wultz*, 304 F.R.D. at 45; *see also In re Nonparty Subpoenas Duces Tecum*, 327 F.R.D. at 25 ("[T]hese motions are already fully briefed, making the burden light[.]"); *Flynn*, 216 F. Supp. 3d at 49 (noting the "strong possibility that [deponent's] counsel will not even need to leave [the home forum] to litigate the motion"). And where Movant has failed to show any burden, as here, the home forum factor receives less weight. *See Flynn*, 216 F. Supp. 3d at 48 (finding the absence of any burden "perhaps most important[t] given the guidance in the relevant Advisory Committed Note that the prime concern when considering whether to transfer a motion to quash is avoiding burdens on local nonparties subject to subpoenas" (internal quotation marks omitted)).

Defendants' additional argument that the Louisiana district court has not considered Ms. Psaki's arguments "regarding undue burden," Defs. Mem. at 25, does not alter this analysis. As an initial matter, that court explicitly *did* consider the anticipated burden on Ms. Psaki, but it found that burden to be outweighed by the Court's interest in ascertaining whether grievous First Amendment violations had occurred. Doc. 5-2, at 29 (concluding that "[a]ny burden on Psaki is outweighed by the need to determine whether free speech has been suppressed"). Defendants do not, and cannot, suggest that the Western District of Louisiana is unable to consider Ms. Psaki's specific arguments about alleged undue burden. Finally, Defendants argue that the Louisiana federal court "has not ruled on any motions to dismiss or other dispositive motions" and that this Court is equally equipped to address the federal-law issues raised in the instant motions. Defs.

Mem. at 25–26.  Respondents note that they are the only party that has a motion pending before the Louisiana federal court, and that the record already shows the Louisiana federal court has speedily addressed Defendants' concerns in several discovery orders.  This Court is clearly capable of resolving these motions, but as Defendants want this Court to review nearly every filing in the underlying action and opine on the actions of another district court.  Exceptional circumstances exist to transfer this case to the issuing court.

**IV.   The Court should reject Movants' attempt to bifurcate the hearing on the subpoena by responding at a later time to the commands to bring documents to the deposition**.

After reaching an agreement on an expedited hearing schedule for a motion to quash this subpoena, Doc. 10, Movants now wish to interject delay and serve their objections to eight document requests attached to the subpoena at a later time.  The Court should reject this out of hand.  The point of agreeing to an expedited briefing schedule was to handle all objections to the subpoena at the same time to resolve all issues before the newly agreed December 8 deposition date.  If this tactic is permitted, Ms. Psaki's deposition would come and go before even this speedy court could rule on a separate motion to compel a response to the deposition-related document subpoena.

Moreover, the requests for documents are consistent with the scope of discovery authorized by the Louisiana federal district court and not objectionable.  Requests 1 and 2 ask for documents used to prepare for and relied on during the deposition.  Doc. 5-2 at 9–10.  This is standard third-party practice, so that Respondents have a claim to documents Ms. Psaki uses for to prepare for the deposition after she spends "several days" in extensive witness preparation.  Psaki Aff. ¶ 5. Requests 3 through 7 ask for documents and communications related to specific statements made by Ms. Psaki described in the complaint.  Doc. 5-2, at 10–11.  Request 8 asks for documents and

communications that, consistent with the scope of discovery, would identify federal officials engaging in censorship by communicating with social-media platforms.  Doc. 5-2, at 11.  The Court should reject Movants' attempt to bifurcate this expedited proceeding, grant Respondents access to necessary documents, and order Ms. Psaki to comply with the subpoena as a whole.

## CONCLUSION

For all these reasons, Respondents request that the motions to quash should be overruled, or in the alternative, Respondents request that the Court transfer the motions for speedy resolution by the U.S. District Court for the Western District of Louisiana.  Additionally, Respondents request that this Court reject any attempt to bifurcate the expedited schedule the parties agreed on and grant any other relief as seems just and proper.

Dated: November 11, 2022                          Respectfully submitted,

                                                  **ERIC S. SCHMITT**
                                                  **Attorney General of Missouri**

                                                  */s/ Jeff P. Johnson*
                                                  Jeff P. Johnson, VSB No. 86830
                                                  *Deputy Solicitor General*
                                                  D. John Sauer*
                                                  *Solicitor General*
                                                  Office of Missouri Attorney General
                                                  P.O. Box 899
                                                  Jefferson City, MO 65102
                                                  Tel: (314) 340-7366
                                                  Fax: (573) 751-0774
                                                  jeff.johnson@ago.mo.gov
                                                  john.sauer@ago.mo.gov
                                                  *Counsel for Respondent State of Missouri*
                                                  *and all Respondents*

Counsel for Additional Respondents:

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

Elizabeth B. Murrill (La #20685)
  *Solicitor General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
 Tel: (225) 326-6766
murrille@ag.louisiana.gov

*/s/ Michael Weitzner*
Brian W. Barnes*
Megan M. Wold*
Joseph O. Masterman*
Michael Weitzner (VSB No. 45049)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
bbarnes@cooperkirk.com
mwold@cooperkirk.com
jmasterman@cooperkirk.com
mweitzner@cooperkirk.com
*Counsel for Respondent State of Louisiana*

*/s/ John J. Vecchione*
John J. Vecchione
Jenin Younes
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
john.vecchione@ncla.legal
jenin.younes@ncla.legal
*Counsel for Respondents Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines*

John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119

P: 314-329-5040
F: 314-282-8136
E-mail: john@burns-law-firm.com

*Counsel for Respondent Jim Hoft*

*Pro Hac Vice forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of November, 2022, a true and correct copy of the forgoing was served electronically via the Court's electronic filing system upon the following counsel of record:

Edward E. Bagnell, Jr. (VSB # 74647)
SPOTTS FAIN PC
411 E. Franklin Street, Suite 600
Richmond, VA 23219
Tel. 804 697-2000
Fax: 804 697-2177
ebagnell@spottsfain.com

and

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Jeannie S. Rhee
2001 K Street, N.W.
Washington, DC 20006
jrhee@paulweiss.com

David K. Kessler
Muamera Hadzic
1285 Avenue of the Americas
New York, NY 10019
dkessler@paulweiss.com
mhadzic@paulweiss.com

*Counsel for Movant Jennifer R. Psaki*

Jessica D. Aber
Lauren A. Wetzler
Chief, Civil Division
Assistant United States Attorney
2100 Jamieson Ave.
Alexandria, VA 22314
Tel:  (703) 299-3752
Lauren.wetzler@usdoj.gov

and

32

Adam D. Kirchner (IL Bar No. 6286601)
Kyla Snow (OH Bar No. 96662)
Indraneel Sur (D.C. Bar No. 978017)
Kuntal Cholera (D.C. Bar No. 1031523)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
Tel: (202) 514-3259
adam.kirchner@usdoj.gov
indraneel.sur@usdoj.gov
kuntal.cholera@usdoj.gov
kyla.snow@usdoj.gov

*Counsel for Movant United States of America*

*/s/ Jeff P. Johnson*