## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

The State of Missouri, *et al.*,

     *Plaintiffs*,

        v.

President Joseph R. Biden, Jr., in his official capacity as President of the United States of America, *et al.*,

     *Defendants*.

Civil Action No. 22-cv-1213

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT FOR LACK OF SUBJECT-MATTER JURISDICTION AND FAILURE TO STATE A CLAIM

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

BACKGROUND .................................................................................................... 5

I.     Factual Background ..................................................................................... 5

      A.     Social media companies have long sought to address "misinformation" on their platforms. ........................................................................................... 5

      B.     Executive branch officials under the past two administrations have communicated with social media companies about promoting accurate information and the harms of misinformation online. ................................................................... 7

      C.     The Biden Administration has encouraged social media companies to exercise their discretion to take action against misinformation on their platforms. ............. 9

      D.     Officials from both political parties have explored potential reforms to § 230(c). ................................................................................................. 10

II.    The Present Lawsuit ................................................................................. 12

LEGAL STANDARD .......................................................................................... 15

ARGUMENT ....................................................................................................... 16

I.     The Court lacks subject-matter jurisdiction over Plaintiffs' claims. ............................. 16

      A.     Plaintiffs lack Article III standing to bring any of their claims. ......................... 16

            i.     Plaintiffs do not identify an injury to the States that satisfies Article III. 18

                  a.     Parens Patriae standing is unavailable against the Federal Government. ............................................................................... 18

                  b.     The States fail to allege any direct injury to their interests as States. ............................................................................... 22

            ii.    Plaintiffs do not identify an injury to the individual Plaintiffs that satisfies Article III. ...................................................................................... 31

            iii.   Plaintiffs do not allege any injury that is traceable to the conduct of Defendants as opposed to third-party social media companies not before this Court. .......................................................................................... 32

            iv.   Plaintiffs do not allege injuries that would be redressed by the sweeping injunctive relief they seek ...................................................................... 39

B.     Plaintiffs do not identify a waiver of sovereign immunity for any of their claims against the Agency Defendants........................................................................... 43

  i.     All claims against the Agency Defendants must be dismissed because Plaintiffs do not identify any "agency action" that would waive sovereign immunity............................................................................................................... 45

  ii.    The APA claims against the Agency Defendants should be dismissed because Plaintiffs do not identify a "final agency action." ..................... 48

II.   Plaintiffs' claims all fail on the merits. ............................................................................ 49

A.     Plaintiffs fail to state a plausible First Amendment claim against any of the Defendants............................................................................................................... 49

  i.     Plaintiffs fail to make a plausible allegation of coercion or a similar degree of encouragement................................................................................... 51

      a.    Plaintiffs fail to plausibly allege that statements by federal officials in email correspondence with social media companies are coercive.......................................................... 53

      b.    No Defendant is plausibly alleged to have made an enforceable threat, regulatory or otherwise, based on a platform's content moderation choice........................................ 58

      c.    The government speech doctrine requires rejection of Plaintiffs' coercion theory based on public policy statements. ................................................................................. 63

  ii.    Plaintiffs fail to allege that any Defendant specifically directed any social media company to take any specific action against a post by any Plaintiff or resident of a Plaintiff State. .............................................................. 64

  iii.   The labels Plaintiffs attach to Defendants' alleged conduct are also inadequate to plausibly allege joint "state action."................................. 70

  iv.    Mere discussion of misinformation between federal agencies, or with social media companies, does not constitute "coercion" or "joint action" amounting to state action........................................................... 72

B.     Plaintiffs fail to state plausible "ultra vires" claims........................................... 72

C.     Plaintiffs fail to state plausible APA claims against the Agency Defendants. ..... 73

III.  The separation of powers doctrine independently requires dismissal of the President from this action. ................................................................................................................ 75

CONCLUSION.............................................................................................................................. 76

# TABLE OF AUTHORITIES

## CASES

*Action for Children's Television v. FCC*,
   59 F.3d 1249 (D.C. Cir. 1995) ............................................................................... 59

*Alabama-Coushatta Tribe of Tex. v. United States*,
   757 F.3d 484 (5th Cir. 2014) ............................................................................ *passim*

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
   458 U.S. 592 (1982) ......................................................................................... *passim*

*Allen v. Wright*,
   468 U.S. 737 (1984), *abrogated on other grounds by*
   *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ......... 17, 48

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
   526 U.S. 40 (1999) ........................................................................................... *passim*

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022) ................................................................................ 29, 30

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ................................................................................................ 74

*ASARCO Inc. v. Kadish*,
   490 U.S. 605 (1989) ............................................................................................ 22, 40

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................................... *passim*

*Ass'n of Am. Physicians & Surgeons v. Schiff*,
   518 F. Supp. 3d 505 (D.D.C. 2021), *aff'd* 23 F.4th 1028 (D.C. Cir. 2022) ........... 26, 35, 36, 41

*Ass'n of Am. Physicians & Surgeons v. Schiff*,
   23 F.4th 1028 (D.C. Cir. 2022) ...................................................................... 26, 35, 36, 38

*Atkinson v. Meta Platforms, Inc.*,
   No. 20-17489, 2021 WL 5447022 (9th Cir. Nov. 22, 2021) .................................. 67

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) ............................................................................................. 58, 59

*Barnes v. Lehman*,
   861 F.2d 1383 (5th Cir. 1988) ............................................................................ 52, 64

*Baur v. Veneman*,
   352 F.3d 625 (2d Cir. 2003) ................................................................................... 26

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth*,
   529 U. S. 217 (2000)........................................................................................... 62

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................16, 38, 67

*Bennett v. Spear*,
   520 U.S. 154 (1997)...................................................................................... 33, 48

*Biden v. Knight First Amend. Inst. of Columbia Univ.*,
   141 S. Ct. 1220 (2021), *remanded*, 2021 WL 5548367 (2d Cir. May 26, 2021)................... 27

*Blum v. Yaretsky*,
   457 U.S. 991 (1982)..................................................................................... *passim*

*Brackeen v. Haaland*,
   994 F.3d 249 (5th Cir. 2021), *cert. granted*, 142 S. Ct. 1205 (2022)............................... 17, 19

*California v. Texas*,
   141 S. Ct. 2104 (2021).................................................................................. 30, 40

*Cambranis v. Blinken*,
   994 F.3d 457 (5th Cir. 2021).............................................................................. 45

*Changizi v. Dep't of Health & Hum. Servs.*,
   --- F. Supp. 3d ---, 2022 WL 1423176 (S.D. Ohio May 5, 2022),
   *appeal filed*, No. 22-3573 (6th Cir. June 30, 2022)...................................... *passim*

*Chapman v. Tristar Prods., Inc.*,
   940 F.3d 299 (6th Cir. 2019)............................................................................. 21

*Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*,
   333 U.S. 103 (1948)........................................................................................ 75

*Children's Health Def. v. Facebook, Inc.*,
   546 F. Supp. 3d 909 (N.D. Cal. 2021), *appeal filed sub nom.*,
   *Children's Health Def. v. Meta Platforms, Inc.*, No. 21-16210 (9th Cir. July 21, 2021)... 51, 68

*City of L.A. v. Lyons*,
   461 U.S. 95 (1983)..................................................................................... 17, 32

*City of N.Y. v. U.S. Dep't of Def.*,
   913 F.3d 423 (4th Cir. 2019).............................................................................. 47

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)..................................................................................... *passim*

*Dalton v. Specter*,
    511 U.S. 462 (1994)............................................................................................75

*Danos v. Jones*,
    652 F.3d 577 (5th Cir. 2011)............................................................................72

*Davis v. Fed. Election Comm'n*,
    554 U.S. 724 (2008)..........................................................................................22

*Dep't of Com. v. New York*,
    139 S. Ct. 2551 (2019).......................................................................................30

*Dep't of the Navy v. Egan*,
    484 U.S. 518 (1988)..........................................................................................43

*DHS v. New York*,
    140 S. Ct. 599 (2020)........................................................................................43

*Divino Grp. LLC v. Google LLC*,
    No. 19-cv-04749, 2021 WL 51715 (N.D. Cal. Jan. 6, 2021) ..................................51

*Doe v. Google*,
    No. 21-16934, 2022 WL 17077497 (9th Cir. Nov. 18, 2022).......................................*passim*

*Dorce v. City of N.Y.*,
    2 F.4th 82 (2d Cir. 2021), *remanded*, 2022 WL 2286381 (S.D.N.Y. June 24, 2022) ............32

*E.T. v. Paxton*,
    41 F.4th 709 (5th Cir. 2022).............................................................................32

*Estiverne v. La. State Bar Ass'n*,
    863 F.2d 371 (5th Cir. 1989).............................................................................25

*Flast v. Cohen*,
    392 U.S. 83 (1968)............................................................................................41

*Foley v. Biden*,
    No. 4:21-cv-01098, 2021 WL 7708477 (N.D. Tex. Oct. 6, 2021).........................................74

*Fontenot v. McCraw*,
    777 F.3d 741 (5th Cir. 2015).............................................................................18

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992).....................................................................................74, 75

*Freedom From Religion Found., Inc. v. Obama*,
    641 F.3d 803 (7th Cir. 2011).............................................................................63

*Geyen v. Marsh*,
775 F.2d 1303 (5th Cir. 1985) ...................................................................... 72

*Gill v. Whitford*,
138 S. Ct. 1916 (2018) ........................................................................... 41, 42

*Glenewinkel v. Carvajal*,
No. 3:20-CV-2256-B, 2022 WL 179599 (N.D. Tex. Jan. 20, 2022)...................................... 47

*Gov't of Manitoba v. Bernhardt*,
923 F.3d 173 (D.C. Cir. 2019)...................................................................... 19

*Grupo Mexicano de Desarrollo, S. A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999).......................................................................... 42, 74

*Guillot v. Garrett*,
970 F.2d 1320 (4th Cir. 1992) ..................................................................... 43

*Haig v. Agee*,
453 U.S. 280 (1981)............................................................................... 43

*Hammerhead Enters., Inc. v. Brezenoff*,
707 F.2d 33 (2d Cir. 1983)........................................................................ 60

*Harrison v. Jefferson Parish Sch. Bd.*,
No. 20-2916, 2022 WL 539277 (E.D. La. Feb. 23, 2022), *appeal filed sub nom.*,
*Louisiana v. Jefferson Parish Sch.*, No. 22-30143 (5th Cir. Mar. 24, 2022)......................... 20

*Hart v. Facebook Inc.*,
No. 22-cv-00737, 2022 WL 1427507 (N.D. Cal. May 5, 2022)................................. 35, 37, 41

*Holmes v. Secs. Investor Prot. Corp.*,
503 U.S. 258 (1992)............................................................................... 33

*Huber v. Biden*,
No. 21-cv-06580, 2022 WL 827248 (N.D. Cal. Mar. 18, 2022), *appeal filed*,
No. 22-15443 (9th Cir. Mar. 25, 2022) ..................................................... 38, 40, 51

*Jackson v. Metro. Edison Co.*,
419 U.S. 345 (1974)............................................................................... 52

*Kowalski v. Tesmer*,
543 U.S. 125 (2004)............................................................................... 22

*Lane v. Pena*,
518 U.S. 187 (1996)............................................................................... 44

*Lewis v. Casey,*
    518 U.S. 343 ......................................................................................... 18, 42

*Lewis v. Clarke,*
    137 S. Ct. 1285 (2017) ................................................................................ 44

*Lloyd Corp. v. Tanner,*
    407 U.S. 551 (1972) .................................................................................... 49

*Louisiana Division Sons of Confederate Veterans v. City of Natchitoches,*
    821 F. App'x 317 (5th Cir. 2020) ............................................................ 53, 54

*Louisiana v. Biden,*
    No. 2:21-CV-00778, 2022 WL 3570933 (W.D. La. Aug. 18, 2022) ...................... 30

*Louisiana v. United States,*
    948 F.3d 317 (5th Cir. 2020) ...................................................................... 45

*Lugar v. Edmondson Oil Co.,*
    457 U.S. 922 (1982) ................................................................................ 51, 70

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................................... *passim*

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) .................................................................................... 46

*M.S. v. Brown,*
    902 F.3d 1076 (9th Cir. 2018) ..................................................................... 41

*Manhattan Community Access Corp. v. Halleck,*
    139 S. Ct. 1921 (2019) ...................................................................49, 50, 51, 69

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ........................................................................... *passim*

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ............................................................................18, 19, 28

*Mayo v. United States,*
    319 U.S. 441 (1943) .................................................................................... 24

*McCormack v. Nat'l Collegiate Athletic Ass'n,*
    845 F.2d 1338 (5th Cir. 1988) ..................................................................... 53

*Michigan v. U.S. EPA,*
    581 F.3d 524 (7th Cir. 2009) ....................................................................... 19

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1866) ...................................................................... 74

*Moody v. Farrell*,
    868 F.3d 348 (5th Cir. 2017) .................................................................... 70

*Nat'l Collegiate Athletic Ass'n v. Tarkanian*,
    488 U.S. 179 (1988) ................................................................................... 49

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ............................................................................... 1, 62

*Newdow v. Roberts*,
    603 F.3d 1002 (D.C. Cir. 2010) .......................................................... 74, 75

*Newman v. Google LLC*,
    No. 20-CV-04011, 2021 WL 2633423 (N.D. Cal. June 25, 2021) ......................... 51

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ..................................................................................... 47

*Ohio v. Thomas*,
    173 U.S. 276 (1899) ................................................................................... 24

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ................................................................................... 17

*Pa., by Shapp v. Kleppe*,
    533 F.2d 668 (D.C. Cir. 1976) ................................................................. 21

*Paterson v. Weinberger*,
    644 F.2d 521 (5th Cir. 1981) .............................................................. 15, 16

*Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards*,
    128 F.3d 910 (5th Cir. 1997) .................................................................... 33

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984) ..................................................................................... 72

*Penthouse Int'l, Ltd. v. Meese*,
    939 F.2d 1011 (D.C. Cir. 1991) .......................................................... 59, 60

*Peoples Nat'l Bank v. Off. of the Comptroller of the Currency of the U.S.*,
    362 F.3d 333 (5th Cir. 2004) .................................................................... 48

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009) ................................................................................... 62

*Prager Univ. v. Google LLC*,
 951 F.3d 991 (9th Cir. 2020) ................................................................. 50

*Qureshi v. Holder*,
 663 F.3d 778 (5th Cir. 2011) ................................................................. 48

*R.C. Maxwell Co. v. Borough of New Hope*,
 735 F.2d 85 (3d Cir. 1984) .................................................................... 59

*Raines v. Byrd*,
 521 U.S. 811 (1997) ....................................................................... 16, 27

*Randall D. Wolcott, M.D., P.A. v. Sebelius*,
 635 F.3d 757 (5th Cir. 2011) ................................................................. 16

*Renal Physicians Ass'n v. HHS*,
 489 F.3d 1267 (D.C. Cir. 2007) ............................................................. 40

*Rendell-Baker v. Kohn*,
 457 U.S. 830 (1982) ....................................................................... 49, 66

*Satsky v. Paramount Commc'ns, Inc.*,
 7 F.3d 1464 (10th Cir. 1993) ................................................................. 21

*Schlesinger v. Reservists Comm. to Stop the War*,
 418 U.S. 208 (1974) ....................................................................... 24, 29

*Sheehan v. Army & Air Force Exch. Serv.*,
 619 F.2d 1132 (5th Cir. 1980), *rev'd on other grounds*, 456 U.S. 728 (1982) ...................... 44

*Shurtleff v. Cityy of Boston*,
 142 S. Ct. 1583 (2022) ......................................................................... 62

*Sierra Club v. Peterson*,
 228 F.3d 559 (5th Cir. 2000) ........................................................ 44, 45, 47, 48

*Smith v. Booth*,
 823 F.2d 94 (5th Cir. 1987) ................................................................... 44

*Soc'y of Separationists, Inc. v. Herman*,
 959 F.2d 1283 (5th Cir. 1992) ........................................................... 16, 17

*South Carolina v. Katzenbach*,
 383 U.S. 301 (1966) ............................................................................ 18

*Spokeo, Inc. v. Robins*,
 578 U.S. 330 (2016) ..................................................................... 16, 22, 42

*St. Tammany Par., ex rel. Davis v. FEMA,*
    556 F.3d 307 (5th Cir. 2009)............................................................................... 44

*State of Louisiana v. Biden,*
    45 F.4th 841 (5th Cir. 2022)............................................................................... 42

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998)............................................................................................. 15

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009)........................................................................................... 16

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996)............................................................................ 75

*Taylor-Callahan-Coleman Counties, Dist. Adult Prob. Dep't v. Dole,*
    948 F.2d 953 (5th Cir. 1991)............................................................................. 45

*Tenet v. Doe,*
    544 U.S. 1 (2005)............................................................................................... 75

*Tenth St. Residential Ass'n v. City of Dallas,*
    968 F.3d 492 (5th Cir. 2020)........................................................................ 33, 34

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019)............................................................................. 48

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015)
    *aff'd by equally divided court*, 579 U.S. 547 (2016) ...................................... 23, 30

*Thole v. U.S. Bank N.A.,*
    140 S. Ct. 1615 (2020)....................................................................................... 29

*Totten v. United States,*
    92 U.S. 105 (1875)............................................................................................. 75

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021).................................................................................. 17, 22

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018)....................................................................................... 43

*Trump v. New York,*
    141 S. Ct. 530 (2020)......................................................................................... 30

*Trump v. Twitter, Inc.*,
  ---F. Supp. 3d---, 2022 WL 1443233 (N.D. Cal. May 6, 2022), *appeal filed*,
  No. 22-15961 (9th Cir. June 28, 2022).................................................................... 51

*Tulsa Prof'l Collection Servs., Inc. v. Pope*,
  485 U.S. 478 (1988)............................................................................................... 66

*United States v. Mitchell*,
  463 U.S. 206 (1983)............................................................................................... 44

*United States v. U.S. Dist. Ct. of E.D. Mich.*,
  407 U.S. 297 (1972)............................................................................................... 44

*Va. ex rel. Cuccinelli v. Sebelius*,
  656 F.3d 253 (4th Cir. 2011)........................................................................18, 23, 24

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*,
  454 U.S. 464 (1982)...........................................................................................24, 29, 41

*VDARE Found. v. City of Colo. Springs*,
  11 F.4th 1151 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1208 (2022).......................59, 60, 69

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
  714 F.3d 186 (4th Cir. 2013)................................................................................ 45

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
  576 U.S. 200 (2015)............................................................................................... 62

*Walmart, Inc. v. U.S. Dep't of Justice*,
  517 F. Supp. 3d 637 (E.D. Tx. 2021), *aff'd*, 21 F.4th 300 (5th Cir. 2021)...................... 46, 47

*Washington v. Trump*,
  858 F.3d 1168 (9th Cir. 2017) .............................................................................. 22

*West v. Atkins*,
  487 U.S. 42 (1988)................................................................................................. 52, 64

*Whitlock Const., Inc. v. Glickman*,
  71 F. Supp 2d 1154 (D. Wy. 1999) ....................................................................... 46

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990)............................................................................................... 18, 24

*Williamson v. Tucker*,
  645 F.2d 404 (5th Cir. 1981) ................................................................................ 16

*Wong v. Stripling*,
  881 F.2d 200 (5th Cir. 1989) ................................................................................ 70

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952)....................................................................................................... 75

**STATUTES**

5 U.S.C. § 551...............................................................................................45, 46, 73

5 U.S.C. § 702 ................................................................................................. 3, 45

5 U.S.C. § 706 ....................................................................................................... 73

28 U.S.C. § 1331 ................................................................................................... 44

47 U.S.C. § 230.............................................................................................. 10, 11

Act of Oct. 21, 1976,
   Pub. L. No. 94-574, 90 Stat. 2721, *codified at* 5 U.S.C. § 702 (1982).................... 72

Communications Decency Act of 1996,
   Pub. L. No. 104-104, 10 Stat. 56, *codified at* 47 U.S.C. § 230(c) .......................... 10

**RULES**

Fed. R. Civ. P. 12 ................................................................................... *passim*

**REGULATIONS**

Exec. Order No. 13,925, Preventing Online Censorship,
   85 Fed. Reg. 34,079 (May 28, 2020)....................................................................... 11

Exec. Order No. 14,029, Revocation of Certain Presidential Actions and Technical
   Amendment,
   86 Fed. Reg. 27,025 (May 14, 2021)....................................................................... 11

**UNITED STATES CONSTITUTION**

U.S. Const. art II, § 2............................................................................................. 44

**OTHER AUTHORITIES**

Don't Push My Buttons Act, S. 2335, 117th Cong. (2021) ...................................... 12

Ending Support for Internet Censorship Act, S. 1914, 116th Cong. (2019)............................. 12

Jeffrey K. Tulis & Russell Muirhead, *The Rhetorical Presidency* 4 (2017 ed.)........................ 63

Justice Against Malicious Algorithms Act of 2021, H.R. 5596, 117th Cong............................. 12

Limiting Section 230 Immunity to Good Samaritans Act, S. 3983, 116th Cong. (2020)............ 12

*Making the Internet Safe for Kids: The Role of ISP's and Social Networking Sites: Hearing Before the Subcomm. on Oversight & Investigations, of the H. Comm. on Energy & Com.*, 109th Cong. 214-16 (2006) ................................................................................................ 5

S. 2972, 117th Cong. (2021) ............................................................................................ 12

Stopping Big Tech's Censorship Act, S. 4062, 116th Cong. (2020) .......................................... 12

## INTRODUCTION

For years, social media companies have independently taken steps to slow the spread of content that they find misleading or harmful, not only here in the United States but worldwide. Long before this Administration took office, those companies adopted strategies to limit the spread of such content—often called "misinformation"—on their platforms. President Biden has urged social media companies to continue their efforts to address the spread of misinformation on their platforms. Meanwhile, government officials have engaged in a broader debate over the rising influence of social media platforms. As part of that debate, policymakers across the political spectrum have expressed support for legislative reforms affecting social media companies, often citing those companies' efforts to address misinformation as the basis for such reforms. Although this kind of debate is a common one in politics—Justice Scalia called it "the very business of government to favor and disfavor points of view on . . . innumerable subjects"[1]—Plaintiffs contend that the views expressed by Defendants on these subjects, and the views Defendants expressed to the social media companies themselves, somehow render Defendants responsible for social media platforms' content moderation choices. Plaintiffs—two states and a handful of individuals—thus assert a number of claims, including claims under the First Amendment, in an attempt to secure an injunction that would, itself, serve as a judicial gag order to prevent the Executive Branch from expressing its views on important matters of public concern.

Plaintiffs' key allegations, however, are not new, and they fare no better than those previously raised and rejected. To the contrary, Plaintiffs bring claims virtually identical to those brought by individual users of social media platforms (including some who are now participating in this action as declarants) in courts around the country. Those individuals likewise claimed that

---

[1] *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J. concurring).

the Federal Government was responsible for social media platforms' independent decisions to take content moderation measures against the individual users' posts. But every court to have considered those claims, including the D.C. Circuit, has dismissed them for lack of subject-matter jurisdiction and failure to state a claim.

Plaintiffs now try again, repackaging those individuals' claims into their own Complaint in this action. But their allegations suffer from the same deficiencies that doomed the earlier individual suits. This Court should dismiss the Plaintiffs' Second Amended Complaint (hereinafter "Complaint") for multiple reasons.[2]

As a threshold matter, Plaintiffs cannot satisfy any of the Article III standing requirements. *First*, Plaintiffs fail to establish a cognizable injury under Article III. The Complaint relies on alleged content moderation measures that certain social media companies have imposed on individual citizens. Those allegations do not support standing for the States of Missouri and Louisiana (hereinafter "Plaintiff States" or "States"). The Supreme Court has made clear that states cannot sue the Federal Government to enforce the individual rights of their citizens. And the States' allegations of direct injury to their purported, novel "sovereign interest" in protecting the free speech of their residents likewise fails to allege a cognizable injury-in-fact. Nor does the addition of a few individual plaintiffs to the case cure that legal deficiency: neither the States nor the individuals plausibly allege a certainly impending future injury that would support prospective injunctive relief. *Second*, Plaintiffs have not plausibly alleged that any asserted injuries stemming from social media companies' content moderation decisions have been caused by any Defendant as opposed to the independent judgments of those companies. Social media companies began

---

[2] For convenience, Defendants use the term "Complaint" to refer to the operative Complaint—that is, the Second Amended Complaint, ECF 84.

combatting misinformation on their platforms years ago, before this Administration took office, and before the federal officials sued here made the comments at issue. Indeed, although the Complaint cites numerous statements by government officials, it does not identify how those statements are connected to the social media companies' decisions that purportedly harmed any Plaintiff. *Third*, there is no reason to conclude that the relief Plaintiffs seek here—including a sweeping and unprecedented injunction that would operate as a gag order on federal officials—would force the social media companies to abandon their policies against misinformation, which are embodied in the terms of service to which users of those companies' platforms have contractually agreed.

Even if Plaintiffs could somehow remedy these standing deficiencies, their claims against the agencies must be dismissed on an independent jurisdictional ground: Plaintiffs fail to allege a waiver of sovereign immunity. The Complaint's wholesale attack on a broad range of disparate government speech on matters of public concern does not, for example, challenge "agency action" as defined by the Administrative Procedure Act ("APA")—much less a final agency action—as required to trigger the APA's waiver of sovereign immunity, 5 U.S.C. § 702. Instead, Plaintiffs' generalized grievance over the manner in which various agency officials have expressed policy concerns or recommendations is precisely the type of suit that the APA's waiver of sovereign immunity does not encompass.

In any event, Plaintiffs' claims fail on their merits. Several critical flaws undermine their First Amendment claim. Because the alleged misconduct here hinges on content moderation measures by *private* social media companies, Plaintiffs' First Amendment claim would require a showing that the Federal Government has coerced, or effectively coerced, those companies to adopt those precise measures. Plaintiffs, however, fail to make any plausible allegation of such

coercion. At most, the Complaint depicts statements by public officials expressing the views of those officials on public policy questions or providing social media companies and the public with information related to healthcare, cybersecurity, or other issues within their realms of expertise. Plaintiffs' claims that those statements were "threats" are implausible given the absence of any allegation that federal officials stated they would impose any penalty on a social media platform that did not moderate particular user-posted content. Nor does the Complaint make any nonconclusory allegation that any federal official called on a social media company to take a specific action against any *particular* State Plaintiff or State Plaintiff resident. Plaintiffs instead ask this Court to adopt a view of the First Amendment that would suggest that any comment critical of a social media company (or, for that matter, any company) by the Government could be used as the basis for a First Amendment claim to silence government officials of any administration. That would set a dangerous precedent.

Plaintiffs' inclusion of APA and so-called *ultra vires* claims cannot save the Complaint from dismissal. Plaintiffs make no effort to allege facts indicating that the conduct at issue meets the demanding *ultra vires* standard. And Plaintiffs' threadbare recitation of the elements of an APA claim, unsupported by nonconclusory factual allegations, is insufficient to state a plausible claim for relief. For these reasons, as explained more fully herein, Defendants respectfully request that this Court dismiss Plaintiffs' Complaint.

# BACKGROUND

## I.     Factual Background

### A.  Social media companies have long sought to address "misinformation" on their platforms.

Social media companies, such as Facebook, Twitter, and YouTube, are private companies that allow users and advertisers to post content on their digital communications platforms subject to their terms of service and policies. *See* SAC ¶¶ 120-127, 149, 194, 263, 363, 482. Since the emergence of the first social media companies in the early 2000s, these companies have moderated content uploaded to their platforms. *See, e.g.*, *Making the Internet Safe for Kids: The Role of ISP's and Social Networking Sites: Hearing Before the Subcomm. on Oversight & Investigations, of the H. Comm. on Energy & Com.*, 109th Cong. 214-16 (2006) (statement of Chris Kelly, Chief Privacy Officer, Facebook.com, Inc.); *see also id.* at 219 (statement of Michael Agnus, Executive Vice President & General Counsel, MySpace). Today, each company requires users and advertisers to agree to extensive conditions—including conditions related to content moderation—in exchange for authorization to use its services.[3]

For years, social media companies have taken steps to prevent the spread of content on their platforms that they deem to be "misinformation." Facebook, for example, pledged to take significant steps to combat misinformation on its platform in the wake of the 2016 U.S. presidential election. *See* Mark Zuckerberg, Facebook (Nov. 18, 2016) (providing an "update" on what

---

[3] *See Terms of Service*, YouTube, (Jan. 5, 2022), https://perma.cc/H8BU-LKQD ("If you choose to upload Content, you must not submit to the Service any Content that does not comply with this Agreement (including the YouTube Community Guidelines) or the law."); *Terms of Service*, Twitter, https://perma.cc/LPC6-GM69 (last visited Nov. 20, 2022) ("We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment."); *Terms of Service*, Facebook, https://perma.cc/7398-Y29C (last visited Nov. 20, 2022) ("If we learn of [violating] content. . . , we may take appropriate action based on our assessment that may include . . . removing content.").

5

Facebook is "doing about misinformation," and noting that the company has "been working on this problem for a long time"), https://www.facebook.com/zuck/posts/10103269806149061. And in October 2019, Facebook redoubled its efforts, announcing that it was taking "several new measures to help protect the democratic process" in advance of the 2020 elections, including attempts to "[p]revent[] the spread of misinformation" through "clearer fact-checking labels." Guy Rosen, *et al.*, *Helping to Protect the 2020 US Elections*, Meta (Oct. 21, 2019), https://perma.cc/CL5W-7MDQ.

In early 2020, the companies began addressing health misinformation about COVID-19 on their platforms. Twitter, for example, introduced policies to "address content that goes directly against guidance from authoritative sources of global and local public health information." Vijaya Gadde & Matt Derella, *An update on our continuity strategy during COVID-19* (Mar. 16, 2020; updated Apr. 1, 2020), https://perma.cc/2UAL-YXSH. The company reported that, during a two-week period in March 2020, it had "removed more than 1,100 tweets containing misleading and potentially harmful content" and "challenged more than 1.5 million accounts which were targeting discussions around COVID-19 with spammy or manipulative behaviors." *Id*. Meta (which owns Facebook and Instagram) has likewise acknowledged that, "[e]ver since COVID-19 was declared a global public health emergency in January [2020]," it has worked to "keep harmful misinformation about COVID-19 from spreading on" its platforms. Guy Rosen, *An Update on Our Work to Keep People Informed and Limit Misinformation About COVID-19*, Meta (Apr. 16, 2020), https://perma.cc/XVM4-L6YG. As Facebook reported in April 2020, "during the month of March [2020], [it] displayed warnings on about 40 million posts related to COVID-19," and had "removed hundreds of thousands of pieces of misinformation that could lead to imminent physical harm," including "theories like physical distancing is ineffective in preventing the disease from

spreading." *Id.* YouTube, too, has taken action against health misinformation since mid-2020, "prohibit[ing], for example, content that denies the existence of the coronavirus" and "content that explicitly disputes the efficacy of global or local health authority advice regarding social distancing." *How has YouTube responded to the global COVID-19 crisis?*, Youtube, https://perma.cc/3DC2-G8YN. YouTube further stated that, "[i]n October 2020, [it] expanded [its] COVID-19 medical misinformation policy to remove content about vaccines that contradicts consensus from health authorities." *Id.*

The social media companies have at times taken these steps to combat misinformation in consultation with outside entities. Facebook's COVID-19 policy, for example, explains that the company "want[s] to make sure that [its] policies help to protect people from harmful content" and, to that end, Facebook is "engag[ing] with experts like the World Health Organization (WHO), government health authorities, and stakeholders from across the spectrum of people who use our service" to update its policies. *COVID-19 and Vaccine Policy Updates & Protections*, Facebook Help Center, https://perma.cc/JVB5-G45G (last visited Nov. 20, 2022). Likewise, in January 2020, Twitter announced that it was "direct[ly] engag[ing] . . . with organizations [working to] contain the threat" of COVID-19, including "[e]xperts, NGOs, and governments." Jun Chu & Jennifer McDonald, *Helping the world find credible information about novel #coronavirus*, Twitter (Jan. 29, 2020), https://perma.cc/63SP-CNLQ.

### B. Executive branch officials under the past two Administrations have communicated with social media companies about promoting accurate information and the harms of misinformation online.

Various federal agencies and officials, in both the Trump and the Biden Administrations, have spoken with various sectors of society, including social media companies, about recognizing and combatting misinformation. At the same time, various officials have promoted accurate

information about elections and COVID-19. The Complaint's factual allegations and the sources on which the Complaint relies discuss some of those efforts.

For example, since at least 2017, the Department of Homeland Security (DHS) has provided resources to several sectors of society—including local election officials and tech companies—to "enhance[e] election infrastructure security" by, among other things, "reduc[ing]" election infrastructure's "vulnerability to 'misinformation.'" *See, e.g.*, "Election Infrastructure Subsector-Specific Plan," https://perma.cc/9234-DNXZ (cited at SAC ¶¶ 255-56, 295) (discussing the agency's election infrastructure security work since 2017). And since 2018, a task force at DHS has published bulletins, guides, and toolkits addressing misinformation related to elections and COVID-19, *id.* ¶¶ 295-99 (citing various publications), and has "rout[ed] disinformation concerns to appropriate social media platforms," *id.* ¶ 302 (quoting Cybersecurity and Infrastructure Security Agency (CISA), *Mis, Dis, Malinformation*, *"Building Resilience,"* https://perma.cc/2KVY-VWKR).

Since the emergence of the COVID-19 pandemic in early 2020, the Department of Health and Human Services (HHS) and some of its officials and subcomponents have sought to promote accurate public health information and address the spread of misinformation online. Among other things, employees at the Centers for Disease Control and Prevention ("CDC") have provided scientific information to social media companies and helped the companies identify certain inaccurate claims about COVID-19 and vaccines. *See, e.g.*, SAC ¶ 250.

These types of activities and communications have continued in recent years under the Biden Administration. *See, e.g.*, *id.* ¶ 302 (quoting Cybersecurity and Infrastructure Security Agency (CISA), *Mis, Dis, Malinformation*, *"Building Resilience,"*); *id.* ¶ 228 (citing a July 2021 Surgeon General Advisory on Misinformation).

8

**C. The Biden Administration has encouraged social media companies to exercise their discretion to take action against misinformation on their platforms.**

The Biden Administration has echoed social media companies' concerns about the potential harms from misinformation, while emphasizing that the companies, as private entities, bear the responsibility for setting and enforcing their own policies concerning misinformation on their platforms. *See, e.g.*, SAC ¶ 219 (citing a White House press briefing). In May 2021, for example, the White House Press Secretary expressed the President's view regarding social media platforms' "responsibility" to "stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections," but added that the President "believe[s] in First Amendment rights" and that "social media platforms need to make" "the decisions" regarding "how they address the disinformation" and "misinformation" that "continue to proliferate on their platforms." Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack (May 5, 2021), https://perma.cc/4ZGE-N9QL (cited at SAC ¶¶ 218-19).

Similarly, a July 2021 Surgeon General Advisory described harms caused by misinformation on social media. While the Advisory offered "recommendations" for social media platforms to address such harms, it did not impose any obligations on social media platforms or cabin their discretion to make their own determinations about what constitutes misinformation and how (or whether) to combat it. *Confronting Health Information: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment*, https://perma.cc/KMU4-Q3RB ("Advisory") (cited at SAC ¶¶ 228-29). The Advisory expressly noted the importance of social media companies "safeguarding . . . free expression" and stressed that "it is important to be careful and avoid conflating controversial or unorthodox claims with misinformation," because "[t]ransparency, humility, and a commitment to open scientific inquiry are critical." *Id.* at 12, 17.

In a joint press briefing with the Surgeon General on the day that Advisory was released, the White House Press Secretary stated that the Government was "flagging . . . for Facebook" "problematic posts . . . that spread disinformation." Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy (July 15, 2021), https://perma.cc/Y3YQ-L8MD ("July 15, 2021 Press Briefing") (cited at SAC ¶¶ 220-27). In the following day's briefing, the Press Secretary clarified that "flagging . . . problematic posts" referred to "regularly making sure social media platforms are aware of the latest narratives dangerous to public health" and "engag[ing] with them to better understand the enforcement of social media platform policies." Press Briefing by Press Secretary Jen Psaki (July 16, 2021), https://perma.cc/HE54-LB2R ("July 16, 2021 Press Briefing") (cited at SAC ¶¶ 232-34). She also emphasized that the Government does not "take anything down" or "block anything" and that social media platforms themselves, as "private-sector compan[ies]," "make[] decisions about what information should be on their platform[s]." *Id.*

### D. Officials from both political parties have explored potential reforms to § 230.

Section 230(c) of the Communications Decency Act of 1996 ("CDA"), Pub. L. No. 104-104, § 509, 10 Stat. 56, codified at 47 U.S.C. § 230(c)—commonly referred to as "Section 230"—immunizes for certain liability purposes "interactive computer service" providers (including social media companies) from being treated as the publisher or speaker of content created by third parties and hosted by the service, *see* 47 U.S.C. § 230(c)(1), or for removing or restricting access to certain types of offensive material, *see id.* § 230(c)(2).[4] In enacting § 230, Congress found that online

---

[4] Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The law also provides: "No provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." *Id.* § 230(c)(2)(A).

platforms offered "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." *Id.* § 230(a)(3). Accordingly, Congress declared that "the policy of the United States" is "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." *Id.* § 230(b)(2).

The Complaint alleges that various officials affiliated with the Democratic Party, in Congress and in current Executive Branch service, have advocated for limitations on § 230. SAC ¶¶ 183-202. The Complaint does not explain, however, that limitations have been urged by members of both political parties. Former President Trump, for example, issued an executive order directing "all executive departments and agencies" to "ensure that their application of section 230(c)" is "narrow." Exec. Order No. 13,925, Preventing Online Censorship, § 1, 85 Fed. Reg. 34,079, 34,079 (May 28, 2020), rescinded by Exec. Order No. 14,029, Revocation of Certain Presidential Actions and Technical Amendment, § 1, 86 Fed. Reg. 27,025 (May 14, 2021). President Trump also vetoed the National Defense Authorization Act for Fiscal Year 2021 because it "fail[ed] even to make any meaningful changes to Section 230" which, in the former President's view, "must be repealed." Presidential Veto Message to the House of Representatives for H.R. 6395 (Dec. 23, 2020), https://perma.cc/KFS7-CK2G.

More recently, bipartisan groups of lawmakers have introduced new proposals to amend § 230.[5] Those proposals include the Don't Push My Buttons Act, S. 2335, 117th Cong. (2021)

---

[5] *Compare* Ending Support for Internet Censorship Act, S. 1914, 116th Cong. (2019) (proposed legislation sponsored by Senator Josh Hawley (R-MO) before Executive Order 13,925 issued that would amend § 230 to "encourage" online platforms "to provide content moderation that is politically neutral"), *with* Limiting Section 230 Immunity to Good Samaritans Act, S. 3983, 116th Cong. (2020) (proposed legislation sponsored by Senator Hawley after Executive Order 13,925 issued that would amend § 230 to "provide accountability for bad actors who abuse the Good

(sponsored by Sen. John Kennedy (R-LA)); the Justice Against Malicious Algorithms Act of 2021, H.R. 5596, 117th Cong.; and a bill that would repeal § 230 altogether, *see* S. 2972, 117th Cong. (2021) (sponsored by Sen. Lindsey Graham (R-SC)). President Biden has also participated in the public debate over § 230. The White House Press Secretary stated in April 2022 that the President has "been concerned about the power of large social media platforms . . . [and] has long argued that tech platforms must be held accountable for the harms they cause." SAC ¶ 313. She elaborated that the President "has been a strong supporter of fundamental reforms to achieve that goal, including reforms to [§] 230, enacting antitrust reforms, requiring more transparency, and more." *Id.* The Press Secretary also noted that the President was "encouraged that there's bipartisan interest in Congress" to reform § 230. *Id.*

## II.     The Present Lawsuit

The States of Missouri and Louisiana commenced the underlying action against the Federal Government on May 5, 2022. Compl., ECF 1. In their original Complaint, the States named as defendants the President, the White House Press Secretary, HHS, DHS, and several DHS and HHS components and officials in their official capacities. *Id.* The States have amended their Complaint twice. Most recently, the States filed the operative complaint, the Second Amended Complaint, on October 6, 2022. ECF 84. That pleading adds as plaintiffs five individual social media users— Jayanta Bhattacharya, Jill Hines, Jim Hoft, Aaron Kheriaty, and Martin Kulldorff—who allege personally to have experienced "censorship" of content they posted on social media platforms. *See* Decl. of Dr. Jayantha Bhattacharya ¶¶ 16, 18, ECF 45-3 ("Bhattacharya Decl."); Decl. of Dr.

---

Samaritan protections provided under that Act"); *see also* Stopping Big Tech's Censorship Act, S. 4062, 116th Cong. (2020) (proposed legislation sponsored by Senator Kelly Loeffler (R-GA) after Executive Order 13,925 issued that would amend § 230 to "require" that online platforms "meet certain standards to qualify for liability protections").

Martin Kulldorff ¶¶ 15-25, ECF 45-4 ("Kulldorff Decl."); Decl. of Jim Hoft ¶¶ 6-14, ECF 45-5 ("Hoft Decl."); Decl. of Dr. Aaron Kheriaty ¶¶ 12-17, ECF 45-7 ("Kheriaty Decl."); Decl. of Jill Hines ¶¶ 8-14, ECF 45-12 ("Hines Decl."). The Complaint names sixty-seven Federal agencies and officials as defendants, including President Biden; HHS; DHS; the Departments of Commerce, Justice, State, and the Treasury; the Census Bureau; the CDC; the Food and Drug Administration; the Federal Bureau of Investigation (FBI); and numerous White House and agency officials in their official capacities. No social media company is a named defendant in this suit.

Plaintiffs allege that the Biden Administration is engaging in a "massive, sprawling federal 'Censorship Enterprise,'" in violation of the First Amendment, by "coerc[ing] . . . social-media platforms" and "collud[ing] with social-media companies to suppress disfavored speakers, viewpoints, and content on social-media platforms." SAC ¶¶ 3, 9, 495. More specifically, Plaintiffs allege that Defendants and other "political allies" of President Biden have "a long history of threatening to use official government authority to impose adverse legal consequences against social-media companies"—namely, "threats of antitrust legislation and/or enforcement and calls to amend or repeal Section 230." *Id.* ¶¶ 183, 185. Plaintiffs aver that those "threats" have been effective because "social-media firms greatly value the immunity provided by § 230" and are "greatly concerned about antitrust liability and enforcement." *Id.* ¶¶ 181-82. Defendants allegedly "leveraged these threats to secure . . . increased censorship of speakers, content, and viewpoints that they disfavor on social-media platforms" and have "now moved into a phase of open collusion with the threatened companies, cooperating with them directly to censor speech, speakers, and viewpoints that Defendants disfavor." *Id.* ¶ 184.

Against that background, the Complaint purports to describe "[r]epresentative examples of . . . federal censorship activities" carried out by Defendants. *Id.* ¶ 339; *see also id.* ¶¶ 254-457

(describing White House and agency activities). Those "examples" include: Government officials working with social media companies to promote public health messages, *see, e.g.*, *id.* ¶¶ 207-08 (Dr. Fauci agreeing to Mark Zuckerberg's proposal to make "public statements" for viewing on Facebook); White House and agency statements urging greater oversight by social media companies of misinformation on their platforms, *see, e.g.*, *id.* ¶¶ 277-78 (statements from the White House Press Secretary), *id.* ¶ 220 (statements by Surgeon General Murthy); efforts by agency officials to partner with or provide expertise or informational materials to social media companies to equip them to recognize and combat misinformation on their platforms, *see, e.g.*, *id.* ¶¶ 247-253 (CDC), *id.* ¶¶ 290-310 (CISA); and examples of White House or agency staff "reporting" content to the social media companies for review, *see, e.g.*, *id.* ¶ 250 (CDC and Twitter discussing "examples of problematic content" shared by CDC); *see also, e.g.*, *id.* ¶ 365 (describing how the social media companies allegedly enabled federal officials to report misinformation through dedicated channels).

Plaintiffs assert claims for relief under the First Amendment and the APA in seven counts. In Counts One and Two, Plaintiffs allege that the actions by Defendants, "as alleged [in the Complaint]," to "coerce[], threaten[], and pressure[]," and to "directly collud[e] with social-media platforms to censor disfavored speakers and viewpoints," violate the First Amendment, *id.* ¶¶ 488-507 (Count One), and are "*ultra vires*" because "[n]o federal statute authorizes the Defendants' conduct in engaging in censorship, and conspiracy to censor, in violation of Missourians', Louisianans', and Americans' free-speech rights," *id.* ¶¶ 508-15 (Count Two). In Counts Three through Seven, Plaintiffs allege that, "[a]s set forth [in the Complaint]," the conduct of HHS, DHS, Census, FBI, and the State Department (collectively, the "Agency Defendants") is "unlawful, arbitrary and capricious, and in excess of statutory authority under the [APA]." *Id.* ¶¶ 516-26

(Count Three – HHS), *id.* ¶¶ 527-37 (Count Four – DHS), *id.* ¶¶ 538-48 (Count Five – Census), *id.* ¶¶ 549-59 (Count Six – FBI), *id.* ¶¶ 560-70 (Count Seven – State).

Plaintiffs seek broad declaratory and injunctive relief. In particular, they request a court order prohibiting "Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from continuing to engage in" the allegedly unlawful conduct. SAC, Prayer for Relief ¶ D. Plaintiffs further ask the Court to "enjoin Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from taking any steps to demand, urge, pressure, or otherwise induce any social-media platform to" take any content-moderation measure, in whatever form, "against any speaker, content or viewpoint expressed on social media." *Id.* ¶ E.

## LEGAL STANDARD

Defendants move to dismiss this action for lack of subject-matter jurisdiction and for failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and (b)(6), respectively. Courts "must consider first the Rule 12(b)(1) jurisdictional challenge prior to addressing the merits of the claim." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 487 (5th Cir. 2014); *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). A motion to dismiss under Rule 12 (b)(1) may be either "facial" or "factual." *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). An attack is "factual" if the defendant "submits affidavits, testimony, or other evidentiary materials." *Id.* An attack is "facial" if it is "based on the lack of jurisdiction on the face of the complaint." *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981). Where, as here, a defendant makes a facial attack, "the plaintiff is left with [the] safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised," *id.*, and the Court

must determine whether "[the plaintiff's] jurisdictional allegations are sufficient," *Paterson*, 644 F.2d at 523.

To survive a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as . . . factual allegation[s]" are "disentitle[d] . . . to th[is] presumption of truth." *Id*. at 678, 681. The 12(b)(6) analysis "may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011).

## ARGUMENT

### I.     The Court lacks subject-matter jurisdiction over Plaintiffs' claims.

#### A.   Plaintiffs lack Article III standing.

To establish standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). These elements ensure "that there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The "standing inquiry [must be] especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997); *see also Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1287 (5th Cir. 1992). After all, "[f]ederal courts

do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

Moreover, to obtain prospective equitable relief—as Plaintiffs seek here—it is not enough to allege a past injury. *See City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). Rather, Plaintiffs must demonstrate that they face a "real and immediate threat" of future harm. *Lyons*, 461 U.S. at 102. "[T]hreatened injury must be certainly impending to constitute injury in fact, and [ ] allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 414 n.5 (2013) (cleaned up) (emphasis added); *accord Brackeen v. Haaland*, 994 F.3d 249, 292 (5th Cir. 2021), *cert. granted*, 142 S. Ct. 1205 (2022). Allegations that rely on "a highly attenuated chain of possibilities" are insufficient to show the required "certainly impending" threatened injury. *Clapper*, 568 U.S. at 410, 416.

Additionally, where, as here, "the plaintiff[s] [are] not [themselves] the object of [a] government action," standing "is ordinarily 'substantially more difficult' to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984) (*abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). "In that circumstance, causation and redressability ordinarily hinge on the . . . unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume to either control or predict." *Id.* The burden rests with "the plaintiff," then, "to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury." *Id.* Put otherwise, the Supreme Court has adhered to its "usual reluctance to endorse standing theories that

rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 413-14 (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158-60 (1990)). "The court must evaluate each plaintiff's Article III standing for each claim; 'standing is not dispensed in gross.'" *Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) (*Lewis v. Casey,* 518 U.S. 343, 358 n. 6 (1996)).

i.   <u>Plaintiffs do not identify an injury to the States that satisfies Article III.</u>

Plaintiffs assert two theories of Article III injury-in-fact on behalf of the States. First, they assert and seek to vindicate alleged injuries to the States' residents—and indeed, "all Americans," SAC ¶ 458—under a theory of *parens patriae* standing. *Id.* ¶ 465. Second, Plaintiffs attempt, in various ways, to allege direct injuries to the States' "sovereign" interests. *Id.* ¶¶ 459-64, 466-68. Neither theory has merit.

a.  *Parens Patriae standing is unavailable against the Federal Government.*

First, Plaintiffs allege that the States have a quasi-sovereign interest in "protecting the free speech rights" of their residents that supports standing under a theory of *parens patriae*. *Id.* ¶ 19. But Supreme Court precedent forecloses *parens patriae* actions by states against the Federal Government. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923)); *see also South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966). This limitation (often referred to as the "*Mellon* bar") derives from the Federal Government's own sovereign relationship with the nation's citizens, which precludes states from asserting those citizens' interests against the Federal Government. *See Mellon*, 262 U.S. at 485-86 ("[I]t is no part of [a state's] duty or power to enforce [the rights of its citizens] in respect of their relations with the federal government."); *Va. ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011) ("When a state brings a suit seeking to protect individuals from a federal statute, it usurps this sovereign prerogative of the federal government,"

and "[a] state has no interest in the rights of its individual citizens sufficient to justify such an invasion of federal sovereignty."). It is "the United States, and not the state[s], which represents [those citizens] as parens patriae[.]" *Mellon*, 262 U.S. at 486; *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007). That is the case whether the claims asserted arise under the Constitution or the APA. *See Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 181 (D.C. Cir. 2019) (APA does not give states *parens patriae* action against Federal Government).

Although this Court preliminarily determined that *Massachusetts v. EPA* supports Article III standing under a theory of *parens patriae*—contrary to *Mellon* and *Snapp*—it reached that conclusion without the benefit of full briefing on subject matter jurisdiction. *See* Mem. Ruling & Order at 6-7, ECF 34 ("Discovery Order") (entered before Defendants' Motion to Dismiss filed the same day). As several courts of appeals have emphasized, *Massachusetts v. EPA* did not overrule the long-standing *Mellon* bar. *See Gov't of Manitoba*, 923 F.3d at 183 ("[W]e are unpersuaded by Missouri's argument that *Massachusetts v. EPA* alters our longstanding precedent that a State in general lacks *parens patriae* standing to sue the federal government."). Indeed, in *Massachusetts v. EPA*, the state did not seek to vindicate the rights of its citizens as *parens patriae*. Instead, it "assert[ed] its [own] rights" under the Clean Air Act to remedy an alleged injury to state property. *Massachusetts*, 549 U.S. at 520 n.17. *Cf. Michigan v. U.S. EPA*, 581 F.3d 524, 529 (7th Cir. 2009) (noting that the injury in *Massachusetts v. EPA* was one to the state's coastal lands). The Supreme Court held that Massachusetts had "alleged a [concrete and] particularized injury in its capacity as a landowner," as rising sea levels had "begun to swallow Massachusetts' coastal land" and the state risked permanent losses to "a significant fraction" of its "coastal property." *Massachusetts*, 549 U.S. at 522-23; *see also id.* at 539 (Roberts, J., dissenting). While the Court's opinion at times describes the state's interest in protecting its own "coastal property" as "quasi-

sovereign," it did not hold that a state has an interest in vindicating its citizens' rights against the federal government. *See id.* at 521-23. *Massachusetts* thus offers no support for the States' attempt to circumvent the *Mellon* bar.

Even if a *parens patriae* theory were available, Plaintiffs' allegations here would be insufficient to invoke it. In particular, Plaintiffs do not plausibly allege any state interest that exists "apart from the interests of particular private parties," as they must to sustain a *parens patriae* action. *Snapp*, 458 U.S. at 605; *Harrison v. Jefferson Parish Sch. Bd.*, No. 20-2916, 2022 WL 539277, at *12 (E.D. La. Feb. 23, 2022) ("[A] State must articulate an interest *apart from the interests of particular private parties . . . .*" (emphasis added)), *appeal filed sub nom. Louisiana v. Jefferson Parish Sch.*, *appeal docketed*, No. 22-30143 (5th Cir. Mar. 24, 2022). Rather, Plaintiffs merely quote language directly from the Supreme Court's decision in *Snapp* to assert, in conclusory fashion, that they have a "quasi-sovereign interest in the health and well-being—both physical and economic—of [their] residents in general," and "an interest in securing observance of the terms under which [the States'] participate[] in the federal system," specifically to ensure "that the benefits of the federal system are not denied to its general population." SAC ¶¶ 465-66 (quoting *Snapp*, 458 U.S. at 607-08). These conclusory statements, without more, cannot possibly support a finding of *parens patriae* standing. Were it otherwise, any putative state plaintiff could successfully establish *parens patriae* standing simply by asserting "the interests of particular private parties," *Snapp*, 458 U.S. at 607, and quoting directly from *Snapp* regarding the additional "quasi-sovereign interest[s]" that Plaintiffs list in the Complaint, *id.* "In such situations, the State is no more than a nominal party." *Id.* at 602; *see also Satsky v. Paramount Commc'ns, Inc.*, 7 F.3d 1464, 1469 (10th Cir. 1993) (*parens patriae* does not allow states to "sue to assert the rights of private individuals").

Moreover, where, as here, the rights of only private individuals are at stake, the private individuals themselves are better positioned to pursue available remedies on their own behalf. *See Pa., by Shapp v. Kleppe*, 533 F.2d 668, 675 n.42 (D.C. Cir. 1976) (even where *parens patriae* standing is permissible, "[t]he arguments in favor of allowing such standing become less compelling[] as it becomes more feasible to achieve complete relief through suits by the parties actually aggrieved"). Of course, several individuals allegedly harmed by social media companies' content-moderation decisions are seeking relief on their own behalf *in this very case*, just as other individuals have done repeatedly in courts around the country. *See, e.g.*, *Changizi v. Dep't of Health & Hum. Servs.*, --- F. Supp. 3d ---, 2022 WL 1423176 (S.D. Ohio May 5, 2022), *appeal filed*, No. 22-3573 (6th Cir. June 30, 2022). By suing side-by-side with those individuals and raising no cognizable State-specific interest distinct from the free-speech rights asserted by the individuals themselves, the States operate as precisely the type of nominal party that lacks standing under a theory of *parens patriae* (even assuming, contrary to precedent, that the States could otherwise rely on that theory in an action against the Federal Government).

Finally, Plaintiffs' invocation of third-party standing doctrine to support the States' effort to sue on behalf of their residents has no merit. *See* SAC ¶ 467 (alleging an interest in their citizens' purported right to "read[] and follow[]" "social-media speech," and alleging the elements of third-party standing). As an initial matter, in the context of state standing, the doctrine of third-party standing is subsumed by *parens patriae*. *See, e.g.*, *Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 305 (6th Cir. 2019) (explaining that *parens patriae* is a form of third-party standing); *see also Washington v. Trump*, 858 F.3d 1168, 1188 (9th Cir. 2017) (Bea, J., dissenting from the denial of rehearing en banc) (explaining that permitting states to "assert the [constitutional] rights of their residents . . . under third-party standing doctrine renders *Katzenbach* and *Mellon* meaningless").

21

Plaintiffs also appear to rely on third-party standing to assert a novel and all-encompassing theory of injury on behalf of "millions of [social media] readers" whose "rights . . . to have access to protected speech" have allegedly been violated. *See* SAC ¶ 467. Plaintiffs' assumption that the States are permitted to aggregate alleged injuries to millions of individual social media users simply cannot be squared with the Supreme Court's admonition that "the doctrine of standing to sue is not a kind of gaming device that can be surmounted merely by aggregating the allegations of different kinds of plaintiffs, each of whom may have claims that are remote or speculative taken by themselves." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (opinion of Kennedy, J., joined by Rehnquist, C.J., and Stevens and Scalia, JJ.). That is, "standing is not dispensed in gross." *TransUnion*, 141 S. Ct. at 2208 (citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). And in any event, even to assert third-party standing a litigant must demonstrate past or certainly impending injury-in-fact itself, *see, e.g.*, *Kowalski v. Tesmer*, 543 U.S. 125 (2004), which the States have not done here, as explained further below.

> b.  *The States fail to allege any direct injury to their interests as States.*

Nor do Plaintiffs make any plausible allegation that the States *themselves* have been subject to any cognizable injury that is "concrete and particularized and actual or imminent, not conjectural or hypothetical." *See Spokeo*, 578 U.S. at 339.

Plaintiffs allege five distinct injuries that they say Defendants have caused and will continue to cause: (1) Defendants' conduct "undermines Missouri's and Louisiana's fundamental policies favoring the freedom of speech," SAC ¶ 460; (2) "the States and their agencies and political subdivisions have suffered government-induced online censorship directly," *id.* ¶ 461; (3) "[c]ensorship of social-media speech . . . directly interferes with [the States'] ability to follow, measure, and understand the nature and degree of [constituents'] concerns," *id.* ¶ 462;

(4) "censorship . . . thwarts the States' interest in providing fair and open processes to petition state officials," *id.* ¶ 463; and (5) "censorship directly affects Missouri, because it has resulted in the extensive censorship of Plaintiff Dr. Bhattacharya, who serves as an expert witness for Missouri in a series of lawsuits challenging mask and vaccine mandates," *id.* ¶ 464. Although separately enumerated, these alleged "injuries" overlap in substantial part. And none supports an injury-in-fact that satisfies Article III.

As an initial matter, the States do not allege a sovereign interest that has been recognized as cognizable for Article III purposes by the Supreme Court or the Fifth Circuit. Plaintiffs do not allege, for instance, any actual (or threatened) invasion of their "power to create and enforce a legal code." *Texas v. United States*, 809 F.3d 134, 156 (5th Cir. 2015), *aff'd by equally divided court*, 579 U.S. 547 (2016). Nor could they: the Complaint points to no federal law that interferes with the States' ability to "regulate[] behavior or provide[] for the administration of a state program." *See Va. ex rel. Cuccinelli*, 656 F.3d at 269 ("[O]nly when a federal law interferes with a state's exercise of its sovereign 'power to create and enforce a legal code'" that "regulate[s] behavior or provide[s] for the administration of a state program" "does it inflict on the state the requisite injury-in-fact."), *cited favorably in Texas*, 809 F.3d at 153 & n.40. And the conduct alleged here does not threaten any interest in the States' sovereign territory or any other proprietary interest (nor do the States allege that it does).[6]

---

[6] Plaintiffs make stray mentions of a purported "proprietary interest," SAC ¶¶ 13-17, but do not allege any harm to their land, business venture, or other property owned by the States and thus fail to make any non-conclusory allegations of an injury-in-fact on that basis. *See Snapp*, 458 U.S. at 601 (states may suffer direct injury to proprietary interest such as their ownership in land or participation in a business venture); *Massachusetts*, 549 U.S. at 522-23 (holding that Massachusetts suffered a direct injury based on rising sea levels affecting costal land owned by the state).

Each of the States' five alleged injuries to their purported "sovereign interests" suffers from additional problems.

To begin, the States' primary contention that the Federal Government has engaged in conduct that violates state and Federal constitutional free speech guarantees, *see, e.g.*, SAC ¶ 461 (the States' "first" injury); *see also id.* ¶¶ 18, 95, 490, 505, is inadequate for Article III purposes. As to the States' constitutional provisions, they protect their residents from *state*, not federal, interference with individual free speech rights. Even if those state constitutions purported to grant their citizens rights against the Federal Government, the Federal Constitution would "withhold[] from [the States] the power to enforce [state law] against the federal government." *Va. ex rel. Cuccinelli*, 656 F.3d at 270 (citing *Ohio v. Thomas*, 173 U.S. 276, 283 (1899)). And while the Federal Constitution guarantees citizens' freedoms with respect to the Federal Government, the States likewise have no role in enforcing the Federal Constitution against the Federal Government. *See Mayo v. United States*, 319 U.S. 441, 445 (1943) ("A corollary to th[e]" Supremacy Clause of the Constitution "is that the activities of the Federal Government are free from regulation by any state.").

In reality, this particular alleged injury constitutes nothing more than a generalized interest "held in common by all members of the public": an interest in ensuring the Government acts in accordance with the First Amendment. *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220 (1974). But the Supreme Court "has repeatedly held that an asserted right to have the Government act in accordance with the law is not sufficient standing alone to confer jurisdiction on a federal court." *Whitmore*, 495 U.S. at 160; *see also Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 482 (1982) (The "requirements of standing

are not satisfied by 'the abstract injury in nonobservance of the Constitution asserted by . . . citizens.'" (citation omitted)). That admonition governs here.

Second, the States' contention that "their agencies and political subdivisions have suffered government-induced online censorship directly," SAC ¶ 461 (the States' "second" injury), fails too. Even assuming the First Amendment protects the speech of the States' agencies and municipalities, *but see Estiverne v. La. State Bar Ass'n*, 863 F.2d 371, 379 (5th Cir. 1989) ("[T]he first amendment does not protect government speech."), the States' allegations here fall short of showing any "certainly impending" interference with such speech, as is required to obtain prospective injunctive relief. *See Clapper*, 568 U.S. at 414 n.15. Plaintiffs cite only two prior instances of alleged content moderation of videos posted to YouTube: (1) a video recording posted by the Louisiana Department of Justice that was allegedly "censored by YouTube" on August 18, 2021, SAC ¶ 461 (citing Decl. of Ashley Bosch Decl. ¶ 7)[7]; and (2) videos of St. Louis County "public meetings" that were allegedly "remove[ed]" by YouTube on an unidentified date, but (as the declaration attached to the Complaint shows) at least as far back as October 2021, if not before, *id.* ¶ 461 (citing Flesh Decl. ¶ 7 & n.1, which cites an October 7, 2021 news article about alleged events). With respect to the latter, Plaintiffs do not specify who—whether the municipality itself or any resident unaffiliated with the Missouri government—posted the videos of the St. Louis County meetings; they thus fail to allege a direct injury to the State's speech under any theory. Even setting aside that flaw in the allegations, the States' reliance on alleged instances of YouTube's moderation of one or two videos posted more than one year ago comes nowhere close

---

[7] Bosch also attests that a "state legislator was censored on Facebook," SAC ¶ 461, but she does not specify whether that legislator was acting in an official capacity or, more fundamentally, how any content moderation of a legislator's speech injures the State itself.

to plausibly alleging any threat of a future injury at all, much less a "certainly impending" one. *Clapper*, 568 U.S. at 414 n.15.[8]

Third, the States allege an injury to their ability to "follow, measure, and understand" their residents' speech in order to "craft messages and public policies." SAC ¶ 462 (Plaintiffs' "third" injury). These allegations are too conclusory and abstract to satisfy the pleading standard that applies in the context of a facial attack on subject-matter jurisdiction. *See Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003) ("[T]he requirement of concrete injury recognizes that if an injury is too abstract, the plaintiff's claim may not be capable of, or otherwise suitable for, judicial resolution."); *cf. Iqbal*, 556 U.S. at 678-79 (explaining that the Federal Rules "do[] not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions"). The States make no attempt to articulate what speech they have been unable to "follow" or how any of their public messaging or policies have been affected as a result. *See Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505, 513 (D.D.C. 2021) ("*AAPS I*"), aff'd 23 F.4th 1028 (D.C. Cir. 2022) ("*AAPS II*") (rejecting similar allegations by a private party that policies adopted by Facebook and Pinterest have prevented her from "conveniently access[ing] information about vaccination" when she did not allege either "how accessing [such] materials ha[d] been made more difficult for her" or that she could not access such information elsewhere). Instead, they merely speculate that they might "never know exactly how much speech" has been "censored" by social media companies.

---

[8] Even if, despite those shortcomings, these allegations could support a finding of injury-in-fact, the injury would pertain only to specific content-moderation decisions made by YouTube alone. *See* ECF 45-13 (Bosch Decl. ¶ 7) (explaining that YouTube removed the Louisiana Department of Justice's video because, according to YouTube, "YouTube does not allow content that spreads medical misinformation that contradicts[] local health authorities[] or the World Health Organization (WHO) medical information about COVID-19."). These videos would not provide a basis for challenging content-moderation decisions by every social media company identified in the Complaint.

*See* SAC ¶ 464. But like the allegations of possible surveillance in *Clapper*, the States' musings about what might possibly have been censored are too vague and speculative to satisfy Article III. 568 U.S. at 411-12.

Moreover, this theory of injury—a general interference with receiving speech on social media—is overly broad. The States' allegations rest on the assumption that any company's content-moderation action would interfere with the States' general interest in "closely track[ing]," "on a daily or even hourly basis," "speech on social media," so that they can "understand their citizens' true thoughts and concerns." SAC ¶ 462 (citing Flesch Decl. ¶ 4). In other words, the States presume to have an interest in accessing *any* speech posted, by *any* person, on *any* online platform, simply based on the possibility that the speech might relate to the States' policies. *See id.* This "wholly abstract and widely dispersed" injury, *Raines*, 521 U.S. at 829, would expand the bounds of what constitutes an injury in the First Amendment context beyond any discernable limit: under Plaintiffs' theory, any moderation of an individual's content posted online would *automatically* injure the State, even if the individual lives outside the State's boundaries. The Constitution "contemplates a more restricted role for Article III courts." *Id.* at 828. And it would "seem[] rather odd to say that" states have an interest, sovereign or proprietary, in accessing all speech posted on a social media platform that is run by a "private company"—which has "unrestricted authority to do away with" the platform altogether. *Biden v. Knight First Amend. Inst. of Columbia Univ.*, 141 S. Ct. 1220, 2221 (2021) (mem.) (Thomas, J., concurring in the vacatur and remand of the case as moot), *remanded*, 2021 WL 5548367 (2d Cir. May 26, 2021).

Fourth, the States' asserted injury to their "political processes," SAC ¶ 463 (the States' "fourth" injury), does not contain any allegations regarding harm to the *States*. Instead, the State's allegations hinge on an *advocacy group's* efforts to petition government, *see id.* (citing Hines

Decl., contending that Plaintiff Hines' advocacy group's Facebook pages were "deplatformed" in 2021), and a *Missouri parent's* "circulat[ion] [of] an online petition," *id.* (citing McCollum Decl., which discusses, in vague terms, the circumstances surrounding the August 2021 closing of the parent's Nextdoor account). The States point to no actual interference by a Defendant with Missouri's or Louisiana's conduct as a state. Like the States' purported interest in "following" their resident's speech, their alleged injury to their political processes is too broad to be cognizable—it raises only "abstract questions of political power, or sovereignty, [or] of government," which *Mellon* itself stressed courts are "without authority" to adjudicate. 262 U.S. at 485. The Supreme Court in *Mellon* rejected as insufficient for Article III purposes Massachusetts' allegation that a federal statute interfered with its interest in maintaining the "power of local self-government reserved to the states by the Tenth Amendment." *Id.* at 479. The States' generalized interest in a particular "state and local political process," *see* SAC ¶ 463, is no more concrete than Massachusetts' interest in "self-government." *Mellon*, 262 U.S. at 479.

And fifth, while Missouri claims that unspecific allegations of online "censorship of Plaintiff Dr. Bhattacharya" "directly affects" the State, the only injury Missouri identifies connected to such allegations is a "reduc[tion]" in "the message and impact of" *Plaintiff Bhattacharya's* speech. SAC ¶ 464 (the States' "fifth" injury). Again, Missouri identifies no injury to its own interests, including any purported interest in receiving Dr. Bhattacharya's speech. To the contrary, Missouri apparently has "relied heavily" on the very study by Dr. Bhattacharya that Missouri contends was removed from certain social media platforms. *Id.* Thus, Missouri's own allegations undermine any suggestion that alleged content moderation of Dr. Bhattacharya's speech interfered with any interest in receiving his speech. More fundamentally, Missouri's attempt to tie its injury-in-fact to alleged interference with Dr. *Bhattacharya's* ostensible interest

in increasing the "message and impact of" *his* speech contradicts what the Supreme Court emphasized in *Snapp*: "[i]nterests of private parties are obviously not in themselves sovereign interests," nor do they "become such simply by virtue of the State's aiding in their achievement." *Snapp*, 458 U.S. at 602.

For all of these reasons, the States fail to allege an injury-in-fact. Although this Court, in granting Plaintiffs' request to take expedited discovery to support their preliminary-injunction motion, found the States had standing, Discovery Order at 4-9, that ruling issued without the benefit of briefing demonstrating the legal insufficiencies of Plaintiffs' allegations. The Court reasoned principally that if the States "do not have standing under the facts alleged," then no one "would [ ] ever have standing to address these claims[.]" *Id.* at 9. But the Supreme Court "has long rejected" the "assumption" that if particular litigants "have no standing to sue, no one would have standing," as "a reason to find standing." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1621 (2020) (quoting *Valley Forge*, 454 U.S. at 489, in turn quoting *Schlesinger*, 418 U.S. at 227).

The Court also relied in its standing analysis on the "special solicitude" accorded to states in certain circumstances. Discovery Order at 6 (citing *Massachusetts*, 549 U.S. at 520 & n.17). Yet the Court did not explain how any "special solicitude" independently supports a finding of standing outside the "normal inquiry," *id.* at 6, and that conclusion finds no support in Supreme Court and Fifth Circuit precedent. Although the Court in *Massachusetts v. EPA* found that the state was entitled to "special solicitude," it also emphasized that the state had "satisfied the *most demanding* standards of the adversarial process" as to all three elements of the standing inquiry. 549 U.S. at 498-99 (emphasis added). Thus, as other courts have acknowledged, *Massachusetts v. EPA* did not purport to relax the Article III "requirements of injury, causation, and redressability" for states. *See Arizona v. Biden*, 40 F.4th 375, 385 (6th Cir. 2022). Rather, the Supreme Court's conclusion

that the state was entitled to special solicitude merely acknowledged that states "may incur 'quasi-sovereign' injuries that private parties cannot," *id.*—such as injuries to their "physical territory or lawmaking function," *Texas v. United States*, 809 F.3d 134, 151–55 (5th Cir. 2015), *as revised* (Nov. 25, 2015). "But while . . . .[s]tates may have more theories of injury available to them, that does not allow them to bypass proof of injury in particular or Article III in general." *Arizona*, 40 F.4th at 385. Since *Massachusetts v. EPA*, moreover, the Supreme Court has consistently analyzed state standing applying the same Article III standards that apply to non-state litigants. *See, e.g.*, *California v. Texas*, 141 S. Ct. 2104, 2116-20 (2021); *Trump v. New York*, 141 S. Ct. 530, 534-37 (2020) (per curiam); *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019).

Plaintiffs are not entitled to "special solicitude" under the Fifth Circuit's understanding of *Massachusetts v. EPA* either. The Fifth Circuit applies a two-pronged test when determining whether a state plaintiff is entitled to special solicitude: the state must allege the violation of (1) "a congressionally accorded procedural right" that (2) affects their "quasi-sovereign interests in, for instance, [their] physical territory or lawmaking function." *Louisiana v. Biden*, No. 2:21-CV-00778, 2022 WL 3570933, at *8 (W.D. La. Aug. 18, 2022) (Doughty, J.) (citing *Massachusetts*, 549 U.S. at 520-21); *see also Texa*, 809 F.3d at 151–55. The States fail to meet either criterion here. Plaintiffs allege no "congressionally accorded procedural right" belonging to the States; instead, they allege direct violations of the First Amendment rights of individual citizens. The States cannot rely on the procedural right provided by the APA because, as explained below, the States have failed to satisfy the APA's jurisdictional requirements that a plaintiff challenge a discrete and final "agency action." *See infra* p. 43. Thus, the APA's procedural rights are thus unavailable to the States as a jurisdictional matter. Nor do the States allege any injury to a quasi-sovereign interest such as an interest in their "physical territory or lawmaking function." *Supra* p.

18. Accordingly, even if states in some cases may receive special solicitude that relaxes any element of Article III standing, the States here cannot.

      ii.    <u>Plaintiffs do not identify an injury to the individual Plaintiffs that satisfies Article III.</u>

Nor do the individual Plaintiffs sufficiently allege Article III injuries-in-fact. Those individuals allegedly suffered social media content moderation *in the past*. *See* SAC ¶¶ 21-25 (alleging that each individual Defendant "ha[s] experienced extensive government-induced censorship of [his or her] speech on social media").[9] Plaintiffs offer no nonconclusory allegations, however, of certainly impending injuries sufficient to support the *prospective* relief sought. *See Clapper*, 568 U.S. at 415; *see also Lujan*, 504 U.S. at 564 n.2 (noting that the concept of imminent injury "has been stretched beyond the breaking point where, as here, the plaintiff alleges only an injury at some indefinite future time"). Indeed, the Complaint offers no allegations whatsoever regarding any impending harm to the individual Plaintiffs other than the following conclusory statement: "Like the injuries to the State Plaintiffs and their citizens, these injuries to the private Plaintiffs and their audiences are imminent and ongoing, and they constitute irreparable harm." SAC ¶ 475. That conclusory allegation is insufficient to survive a Rule 12(b)(1) motion to dismiss.

---

[9] *See also* Hoft Decl. ¶¶ 6-8 (alleging that Twitter suspended his news website's account in February 2021 after it "posted video footage" from Election Night 2020 in Detroit of "two deliveries of vans . . . bringing shipments . . . of ballots"), *id.* ¶ 12(a)-(b) (alleging that Facebook removed news articles about COVID-19 from August and September 2020); Bhattacharya Decl. ¶ 16 (alleging that Facebook removed links to Bhattacharya's report on COVID-19, the "Great Barrington Declaration," in February 2021) *id.* ¶ 18 (alleging that YouTube removed a video of a roundtable discussing mask policies for children in March 2021); Kulldorff Decl. ¶ 17 (March 2021 Twitter conduct); *id.* ¶ 19 (November 2021 Twitter conduct); *id.* ¶ 22 (August 2021 LinkedIn conduct); Kheriaty Decl. ¶¶ 11, 15 (2020 and 2021 Twitter conduct that "intensified in 2022"); Hines Decl. ¶¶ 13-14 (July 2021 Facebook conduct). And even when the alleged social media company "censorship" occurred in 2022, Plaintiffs have not shown (rather than speculated) that such content moderation is likely to recur.

*See E.T. v. Paxton*, 41 F.4th 709, 715 (5th Cir. 2022) ("[O]pening the courthouse to these kinds of increased-risk claims would drain the 'actual or imminent' requirement of meaning.").

The individual Plaintiffs' declarations, which the Complaint incorporates by reference, are equally unhelpful. Plaintiff Bhattacharya, for example, attests that Facebook and YouTube removed links to a publication he co-authored (the "Great Barrington Declaration") and a video of his participation at a March 2021 roundtable. *See* Bhattacharya Decl. ¶¶ 16-18. Those alleged instances of content moderation occurred in March 2021 at the latest—nearly *twenty months ago.* *Id.* Plaintiffs offer no factual allegations to support the contention that any content moderation of Plaintiff Bhattacharya—or any other individual Plaintiff—is certainly impending. *Clapper*, 568 U.S. at 413-14. The same is true for those individual Plaintiffs who allege that their social media accounts remain suspended, such as Plaintiff Hoft. *See* Hoft Decl. ¶ 8. Even assuming that the past suspension of an account "was severe or inflicts continuing damages" because it remains suspended, that would not "change [the] rule" that "'[p]ast wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy' with respect to potential future similar wrongs." *Dorce v. City of N.Y.*, 2 F.4th 82, 95-96 (2d Cir. 2021) (quoting *Lyons*, 461 U.S. at 103), *remanded*, 2022 WL 2286381 (S.D.N.Y. June 24, 2022).[10]

  iii. <u>Plaintiffs do not allege any injury that is traceable to the conduct of Defendants as opposed to third-party social media companies not before this Court.</u>

Even assuming Plaintiffs allege an adequate injury based on some content moderation decisions that social media companies have made or may make in the future, they do not

---

[10] Indeed, as discussed below, Plaintiffs' requested injunction would not remedy any ongoing harm caused by a "suspension" that is currently in effect on a platform (even apart from the legal and technological reality that Defendants do not control social media company "suspensions"). "[A]n injunction against future actions by a defendant does not remedy the harm done by that defendant's past acts." *Dorce*, 2 F.4th at 96. That is especially true here, where Plaintiffs' alleged injuries were caused by the decisions of non-parties who would not be subject to any injunctive relief.

sufficiently allege that those decisions were (or will be) attributable to Defendants rather than the companies' "independent action." *Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards*, 128 F.3d 910, 916 (5th Cir. 1997); *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (alleged injuries cannot be "th[e] result [of] the independent action of some third party not before the court"). To satisfy Article III's causation requirement, Plaintiffs must show that there is a "*direct* relation between the injury asserted and the injurious conduct [of the defendant] alleged." *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 502 (5th Cir. 2020) (emphasis added) (quoting *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)).

To establish causation, Plaintiffs speculate that social media companies take action against certain content on their platforms because of some of Defendants' (and non-defendants') public statements about potential § 230 reform or antitrust enforcement, and general urging to social media companies to combat misinformation. SAC ¶¶ 494-96. According to Plaintiffs, various such statements by individual government officials, some of whom are not even a part of the Executive Branch, *id.* ¶ 185, amount to a "campaign for social-media censorship," *id.* ¶ 478. They further allege that: (1) "in the absence of Defendants' campaign for social-media censorship, market forces and other incentives would . . . restrain social-media platforms from engaging in the social-media censorship alleged herein;" and (2) "the campaign of threats of adverse legal consequences from Defendants and their political allies . . . are *highly motivating* to social-media platforms" and "became even more motivating" in 2021; and so (3) the social media platforms are "responding to these threats" and "merely 'reacting in predictable ways'" by "greatly increas[ing] censorship" at Defendants' direction, *id.* ¶¶ 478-80.

As an initial matter, Plaintiffs' causation theory is not tailored to any specific actions taken by a social media company against a particular individual's content. To be sure, the Complaint

highlights a few decisions by social media companies to moderate the content of some individual users, *see, e.g.*, SAC ¶ 238 (Alex Berenson), including the individual named Plaintiffs, *see* Bhattacharya Decl. ¶¶ 16, 18; Kulldorff Decl. ¶¶ 15-25; Hoft Decl. ¶¶ 6-14; Kheriaty Decl. ¶¶ 12-17; Hines Decl. ¶¶ 8-14—but the Complaint contains no allegations linking *Defendants'* alleged "campaign of threats" to those specific decisions. Instead, Plaintiffs take scattershot aim at *every* content-moderation decision by positing that Defendants have created a coercive status quo under which no decision to moderate content on COVID-19, election security, or other topics allegedly "disfavored by Biden and his political allies," SAC ¶ 183, is ever made by the social media companies themselves as opposed to the Federal Government. These non-specific allegations necessarily fail to establish a "direct relation between the injury asserted and the injurious conduct . . . alleged." *See Tenth St. Residential Ass'n*, 968 F.3d at 502.

Even setting that aside, Plaintiffs' theory suffers another fundamental defect. There is no plausible, *non-speculative* allegation that social media companies are or were responding to Defendants' alleged "threats," rather than enforcing their own content-moderation policies—or that in the absence of such "threats," unspecified "market forces" would have constrained the social media companies from doing so. Plaintiffs purport to infer a causal link from the mere timing of various social media companies' content moderation decisions, SAC ¶¶ 481, 483, and the fact that some social media companies' policies state that they consult or partner with government officials to identify authoritative health information, *id.* ¶¶ 482, 484. But social media companies host billions of users' content on their platforms and make innumerable decisions about what content to moderate on their platforms every day. *See supra* Background § I.A. That some of those decisions coincidentally occurred close in time to statements by disparate government officials does not "plausibly suggest" that the decisions are causally linked to an alleged "campaign of

threats of adverse legal consequences from Defendants and their political allies," SAC ¶ 479, or that the decisions would not occur in the absence of such alleged "threats." Thus, Plaintiffs' speculation is insufficient under the plausibility standard articulated under *Twombly* and *Iqbal* to attribute social media companies' decisions to Defendants. It is just as likely (if not more likely) that the companies' decisions reflect independent judgments based on their own policies and subjective business interests. *See Iqbal*, 556 U.S. at 680 (explaining that, in *Twombly*, "parallel conduct was consistent with an unlawful agreement, [but] the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior").

As discussed above, Plaintiffs are not the first to advance the coercion-based theory of causation raised in the Complaint. To the contrary, several nearly identical First Amendment cases have been filed in district courts across the country, each one has advanced a similar theory of causation, and each one has been dismissed for failure to satisfy Article III's causation requirement. *See, e.g*, *Changizi*, 2022 WL 1423176, at *8-11; *Hart v. Facebook Inc.*, No. 22-cv-00737, 2022 WL 1427507 (N.D. Cal. May 5, 2022); *Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505 (D.D.C. 2021), *aff'd*, 23 F.4th 1028 (D.C. Cir. 2022) ("*AAPS II*"); *cf. Doe v. Google*, No. 21-16934, 2022 WL 17077497 (Nov. 18, 2022) (similar rationale albeit under Rule 12(b)(6)). There is nothing materially distinct about this case that should compel a different conclusion.

For example, in *AAPS I*, the plaintiffs alleged that various companies took content moderation measures against them because of public statements by Congressman Adam Schiff. *See* 518 F. Supp. 3d at 510. The plaintiffs alleged that early in 2019, Congressman Schiff sent letters and made a press statement that "encourage[d]" certain companies to

"prevent . . . inaccurate information on vaccines" from spreading on their platforms. *Id.* at 510. Later that same year, the plaintiffs alleged, Congressman Schiff made statements at a hearing that "challenged the immunity that interactive computer services have under [§] 230 of the [CDA]," which "put the technology companies on notice that they would need to comply with Congressman Schiff's position or risk his undertaking legislative action against [§ 230]." *Id.* (citation omitted). The District Court for the District of Columbia in *AAPS I* found it implausible that these public statements coerced the companies into taking specific action with respect to specific content on their platforms. *Id.* at 515. The court observed that the allegations "ignore[d]" "the innumerable other potential causes for the actions taken by the technology companies." *Id.* at 516. And it noted that Congressman Schiff never "mention[ed]" the plaintiffs or "advocate[ed] for any specific actions." *Id.* at 515-16. The court further noted that the statements were made "after the technology companies took many of the actions" at issue, and thus the plaintiffs "fail[ed] to establish a chronological chain of causation between" the representative's statements and the challenged content moderation measures. *Id.* at 516 n.12. The D.C. Circuit affirmed for the same reasons. *See AAPS II*, 23 F.4th at 1033 (noting that Facebook and Twitter had been taking action against misinformation since at least early 2019).

The Southern District of Ohio reached similar conclusions in *Changizi*, 2022 WL 1423176. There, the plaintiffs—which included several of the declarants here—alleged that Twitter took content moderation measures against them because of a "public campaign" headed by "President Biden, [the] White House Press Secretary," and "the Surgeon General," in which each official "expressed a range of critical views related to the spread of COVID-19 'misinformation' on social media platforms." *Id.* at *4, 8. Those public comments included reports that the Biden Administration was "examining how misinformation fits into the liability protections granted by

Section 230." *Id.* at *5. The *Changizi* plaintiffs alleged that Twitter suspended or "de-boost[ed]" their accounts "right around the time" or "just *days* after" various public statements were made, and that the "timeline of events" thus raised an "inference of causality" between the federal defendants' statements and Twitter's actions. *Id.* at *8. As in *AAPS I*, the court in *Changizi* concluded that the plaintiffs failed to sufficiently allege that Twitter's actions were attributable to the Government because: (1) the plaintiffs did not "account for the 'innumerable other potential causes' that may have driven, or currently drive, Twitter's behavior, including 'widespread societal concerns about online misinformation,'" *id.* at *10; and (2) Twitter had established and was enforcing its COVID-19 policy well before "the Biden Administration began to broadly ask social media companies to 'do more' to combat COVID-19 'misinformation,'" *id.* at *9. These "oversights," the court concluded, better supported "the notion that Twitter's past and current disciplinary measures were (and are) the product of its own 'legitimate discretion,'" and not any federal official's demands. *Id.* at *10 (citation omitted).

Finally, the Northern District of California concluded the same in *Hart*, 2022 WL 1427507. There, a social media user alleged that Facebook and Twitter took certain content moderation actions against him that were attributable to Federal Government officials, including White House officials and Surgeon General Murthy. *Id.* at *2. Specifically, the plaintiff alleged that Press Secretary Psaki had made a number of comments suggesting that White House officials were in contact with social media companies and that Surgeon General Murthy had made a number of public comments about the need to contain misinformation on social media platforms. *See id.* at *3. As in *AAPS* and *Changizi*, the *Hart* court found that the plaintiff's allegations were "vague" and "implausible" and failed to "connect[] the Federal Defendants' conduct to his injury." *Id.* at *10. *Cf. Huber v. Biden*, No. 21-cv-06580, 2022 WL 827248, at *5 (N.D. Cal. Mar. 18, 2022)

(lacking averment "that the Biden Administration dictated to Twitter any specific prescription of any particular course of action," the complaint instead made "conclusory and generalized statements" of "conspiracy" between platforms and government defendants), *appeal filed*, No. 22-15443 (9th Cir. Mar. 25, 2022).

Plaintiffs here face the same obstacles that resulted in dismissal of those actions. First, as noted above, Plaintiffs ignore the "obvious alternative explanation[s]," for social media companies' decisions to combat misinformation on their platforms. *Twombly*, 550 U.S. at 567. The companies might well have concluded that content moderation was "necessary to save [themselves] from losing other sources of revenue, such as advertisers (or other users) who do not want to be associated with a company that passively allows 'misinformation' to spread," or perhaps they "simply chose to prioritize tackling the spread of perceived COVID-19 mistruths over [their] profitability." *Changizi*, 2022 WL 1423176, at *11 n.5. The undeniable "widespread societal concerns about online misinformation" offer a "far [more] plausible" explanation for social media platforms' longstanding efforts to combat misinformation through content moderation measures than any alleged pressure from Defendants through public entreaties to "do more." *AAPS II*, 23 F.4th at 1034-35.

Second, Plaintiffs' allegations raise the same chronological problems as in these predecessor actions. As Plaintiffs themselves allege, social media companies have been combatting misinformation on their platforms for years—and since long before President Biden took office in January 2021. *See* SAC ¶ 189. Thus, the chronology of events firmly *undermines* any inference of a causal link. *See Huber*, 2022 WL 827248, at *5 ("Twitter ha[d] the independent reason and authority to suspend Plaintiff's account pursuant to its terms of service[,] which predated the government's statements about COVID-19 disinformation.").

38

Plaintiffs attempt to rectify this causation problem by alleging that social media companies "ramped up" efforts to combat misinformation on their platforms starting in 2020 only at Defendants' urging. *See* SAC ¶ 189.[11] Again, Plaintiffs offer no non-speculative allegations to support that theory. The Complaint lacks any indication, beyond Plaintiffs' subjective impressions, that social media companies' behavior materially changed at any point in 2020 or afterwards. Even if that were true, the Complaint fails plausibly to allege that any "ramp up" in social media activity was attributable to Defendants' "threats." *Id.* ¶¶ 478-80. That some Democratic policymakers (who are not defendants in this action)—like Republican policymakers, *supra* Background I.D— have advocated for § 230 reform, *see* SAC ¶ 185, does not make Plaintiffs' speculations concerning social media companies' motivations for combatting misinformation on their platforms any more plausible.

Accordingly, Plaintiffs fail to plausibly allege the requisite causal link to establish Article III standing. The Court should join the several courts to have considered this issue and dismiss the Complaint for failure to allege causation.

iv.   <u>Plaintiffs do not allege injuries that would be redressed by the sweeping injunctive relief they seek.</u>

Plaintiffs also fail to sufficiently allege that the expansive injunction they seek would likely redress their alleged injuries (even assuming they were plausible). *Defs. of Wildlife*, 504 U.S. at 561. "Whether an injury is redressable depends on the relationship between the judicial relief requested and the injury suffered." *California*, 141 S. Ct. at 2215; *cf. Renal Physicians Ass'n v.*

---

[11] Plaintiffs also allege that various legislators made statements in 2019 that also coerced social media companies into action, but those officials are neither part of the Executive Branch nor parties to this action. *See, e.g.*, SAC ¶¶ 185-86 (statements from Speaker Pelosi, then-Senator Harris, and Congressman Richmond). Of course, if Plaintiffs are correct that statements by members of Congress coerced social media companies to take certain actions, this would be yet another, independent reason for a lack of causation concerning the Defendants.

*HHS*, 489 F.3d 1267, 1278 (D.C. Cir. 2007) (no redressability where "the undoing of the governmental action will not undo the harm, because the new status quo is held in place by other forces").

Plaintiffs seek a sweeping injunction prohibiting Defendants "from continuing to engage in unlawful conduct as alleged" throughout their Complaint. SAC Prayer for Relief ¶ D. Such an injunction would not redress any alleged injury here, because, ultimately, whether to take action against any "misinformation" on any private platform turns on "unfettered choices made by independent actors not before the court[], and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Defs. of Wildlife*, 504 U.S. at 562 (quoting *ASARCO*, 490 U.S. at 615 (opinion of Kennedy, J.)). No injunction against Defendants could require every platform, SAC ¶¶ 117-31—none of which is before this Court—to rescind or modify their policies on misinformation. Thus, no matter the relief entered here, users of social media would still be bound by private Terms of Service and policies constraining platform use, including as to misinformation. *See, e.g.*, *Huber*, 2022 WL 827248, at *5 ("Plaintiff does not dispute that she, like all Twitter users, is subject to Twitter's User Agreement as a condition of using her account," which agreement incorporates Terms of Service allowing for the suspension or termination of accounts for violating, among other things, its "COVID-19 Policy"). The Court "cannot presume" to "control" platform misinformation policies or the application of those policies to particular content posted by users (including individual Plaintiffs) bound by platform terms of service. *Defs. of Wildlife*, 504 U.S. at 562.

Nor is it "likely, as opposed to merely speculative," that an injunction against Defendants would cause social media companies independently to decide to rescind or modify their misinformation policies. *Id.* at 561. Those policies, including those focused on COVID-19 and

elections, have existed in some form since well before this Administration began, and they apply to billions of users across the globe. *See supra* p. 4-7. They also apply to a whole host of information—not only information affecting the United States—arising in different contexts around the world. *See id*. The Complaint supplies no reason to conclude that the companies will abandon their own business judgment and self-interest and stop engaging in content moderation against what they perceive to be misinformation. *See AAPS I*, 518 F. Supp. 3d at 516; *Changizi*, 2022 WL 1423176, at *11-12; *see also Hart*, 2022 WL 1427507, at *10.

Plaintiffs' proposed injunction would also take the Court far beyond the limits of Article III. It would require for its enforcement that this Court effectively become a permanent monitor of government speech at the highest levels. "[I]n the context of Article III standing," however, "federal courts must respect their 'proper—and properly limited—role . . . in a democratic society.'" *M.S. v. Brown*, 902 F.3d 1076, 1087 (9th Cir. 2018) (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018)); *see also Valley Forge*, 454 U.S. at 475 ("The importance of [Article III standing] should not be underestimated as a means of 'defin[ing] the role assigned to the judiciary in a tripartite allocation of power.'" (quoting *Flast v. Cohen*, 392 U.S. 83, 95 (1968)). To fully redress Plaintiffs' purported harms, the Court would have to enjoin government officials not only from engaging with social media companies directly, but also from engaging in a wide range of government speech, including making press statements and issuing advisories related to misinformation. It would not be enough, moreover, for the Court merely to issue the injunction Plaintiffs request—that is, an order "enjoin[ing] Defendants, their officers, officials, agents, servants, employees, attorneys, and all other persons acting in concert or participation with them, from continuing to engage in unlawful conduct." SAC Prayer for Relief ¶ D. As the Fifth Circuit recently made clear, the Court's order would have to "state its terms specifically and describe in

reasonable detail the conduct restrained or required." *State of Louisiana v. Biden*, 45 F.4th 841, 846 (5th Cir. 2022). On Plaintiffs' theory of harm, that order would necessarily have to include far-reaching bans on government speech. If "the law of Article III standing" is to "serve[] to prevent the judicial process from being used to usurp the powers of the political branches," then it must preclude the Court from issuing such broad injunctive relief. *Spokeo*, 578 U.S. at 338.

The sweeping injunction the Complaint seeks also would take the Court far beyond the contours of this case. In any case, an injunction must be limited to restraining the Federal Defendants' conduct towards the particular Plaintiffs before the Court—not the nation as a whole. Under Article III, "a plaintiff's remedy must be limited to the inadequacy that produced [his] injury." *Gill*, 138 S. Ct. at 1930. The Supreme Court has consistently disapproved relief that "improper[ly]" "grant[ed] a remedy beyond what was necessary to provide relief to [the injured parties]." *Lewis v. Casey*, 518 U.S. 343, 360 (1996). The nationwide relief effectively sought in the Complaint is irreconcilable with those limitations because, by definition, it would extend to parties who were not "plaintiff[s] in th[e] lawsuit, and hence were not the proper object of th[e court's] remediation." *Id.* Such relief is properly rejected, not only as a matter of Article III redressability, but also as a matter of equitable limitations on the Court's authority enforced under Rule 12(b)(6), given that this Court's authority is generally confined to the relief "traditionally accorded by courts of equity" in 1789. *See Grupo Mexicano de Desarrollo, S. A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999). English and early American "courts of equity" thus typically "did not provide relief beyond the parties to the case," and the sort of universal remedy Plaintiffs seek in the Complaint is "inconsistent with longstanding limits on equitable relief and the power of Article III courts" and impose a severe "toll on the federal court system." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425, 2427 (2018) (Thomas, J., concurring); *see DHS v. New York*, 140 S. Ct. 599,

599-601 (2020) (Gorsuch, J., concurring in the grant of stay). At a minimum, then, the injunction sought must be narrowed, under constitutional or equitable limitations, to relief concerning the two States and the individual Plaintiffs in this action, without purporting to restrain the Defendants as to nonparties.

Finally, Plaintiffs' proposed injunction would threaten to interfere with the President's responsibility to safeguard the nation's security and implement foreign policy. *See Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988) (the Government's interest in national security is "compelling"); *Guillot v. Garrett*, 970 F.2d 1320, 1324 (4th Cir. 1992) (Luttig, J.) ("[F]oreign policy [is] the province and responsibility of the Executive.'" (quoting *Egan*, 484 U.S. at 529; *Haig v. Agee*, 453 U.S. 280, 293-94 (1981))). Indeed, Plaintiffs appear to contend that any communication between a federal agency and a private entity, including a social media company, about foreign sources of misinformation violates the First Amendment if the communication relates to misinformation. SAC ¶¶ 299, 387-88, 397. But considering the President's responsibility for the implementation of foreign policy and the protection of national security, Executive agencies must be permitted to conduct investigations and harm-prevention efforts that may require communicating with social media platforms, among other private companies, about misinformation—whether from a foreign government (*e.g.*, China or Iran), or from a foreign entity (*e.g.*, Al Qaida or ISIS). Plaintiffs' request that the Court enjoin such conduct, SAC, Request for Relief ¶ D., would thus encroach on the constitutional prerogatives of the Executive Branch. *See* U.S. Const. art. II, § 2, cl. 1; *United States v. U.S. Dist. Ct. of E.D. Mich.*, 407 U.S. 297, 310 (1972).

### B. Plaintiffs do not identify a waiver of sovereign immunity for any of their claims against the Agency Defendants.

Plaintiffs' claims against the agencies and their officials are claims against the United States. *Lewis v. Clarke*, 137 S. Ct. 1285, 1290-91 (2017). Yet "[i]t is axiomatic that the United

States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). Plaintiffs bear the burden of showing that the government has consented to suit through an "unequivocal waiver of sovereign immunity." *St. Tammany Par., ex rel. Davis v. FEMA*, 556 F.3d 307, 315 (5th Cir. 2009). Any waiver of sovereign immunity, moreover, is "strictly construed, in terms of its scope, in favor of the" Government. *Lane v. Pena*, 518 U.S. 187, 192 (1996).

The Complaint relies on no waiver of sovereign immunity for any of Plaintiffs' claims against the agencies or their officials. It is not enough that Plaintiffs assert that their claims "arise under the Constitution and laws of the United States," SAC ¶ 11, presumably relying on 28 U.S.C. § 1331. While that statute provides subject-matter jurisdiction, it "does not constitute a waiver of sovereign immunity." *Smith v. Booth*, 823 F.2d 94, 97 (5th Cir. 1987).

Nor could Plaintiffs rely on 5 U.S.C. § 702, which provides a limited waiver of sovereign immunity for actions against federal agencies seeking relief other than money damages. *Sheehan v. Army & Air Force Exch. Serv.*, 619 F.2d 1132, 1139 n.12 (5th Cir. 1980), *rev'd on other grounds,* 456 U.S. 728 (1982). For § 702 to effectuate a sovereign immunity waiver as to Plaintiffs' constitutional, APA, and so-called "*ultra vires*" claims against the agencies and their officials, Plaintiffs "must identify some 'agency action' affecting [them] in a specific way, which is the basis of his entitlement for judicial review." *Alabama-Coushatta*, 757 F.3d at 489; *Sierra Club v. Peterson*, 228 F.3d 559, 567 (5th Cir. 2000) (en banc). That requirement applies whether judicial review is sought under the APA or instead under "a statutory or non-statutory cause of action that arises completely apart from the general provisions of the APA," *Alabama-Coushatta*, 757 F.3d at 489, including constitutional claims, *see Taylor-Callahan-Coleman Counties. Dist. Adult Prob. Dep't v. Dole*, 948 F.2d 953, 956 (5th Cir. 1991) (APA and Fifth Amendment claims); *Cambranis*

44

*v. Blinken*, 994 F.3d 457, 462 (5th Cir. 2021) (constitutional claim). Furthermore, for APA claims (such as those Plaintiffs have attempted to assert in Counts Three through Seven), there is an additional requirement: the challenged "agency action" must also be "final." *Alabama-Coushatta*, 757 F.3d at 489; *Sierra Club*, 228 F.3d at 565.

Plaintiffs' claims against the Agency Defendants must be dismissed because Plaintiffs do not point to any "agency action," much less a "final" one—that would trigger § 702's waiver of sovereign immunity as to any of their claims.

      i.   <u>All claims against the Agency Defendants must be dismissed because Plaintiffs do not identify any "agency action" that would waive sovereign immunity.</u>

The APA creates a cause of action that entitles persons "suffering legal wrong because of *agency action*, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" to judicial review thereof. 5 U.S.C. § 702 (emphasis added). "[A]gency action" is itself a defined term under the APA, meaning "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). "[T]he term 'action' as used in the APA 'is a term of art that does not include all conduct such as, for example, constructing a building, operating a program, or performing a contract.'" *Louisiana v. United States*, 948 F.3d 317, 321 (5th Cir. 2020) (quoting *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 194 (4th Cir. 2013)). Moreover, "the agency action being challenged must be 'circumscribed [and] discrete.'" *Id.* (quoting *Vill. of Bald Head Island*, 714 F.3d at 194). An agency "action" does not encompass an "entire 'program'" of agency administration, "consisting principally of [ ] many individual actions." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990). Such "wholesale" attacks on all of government conduct, *Alabama-Coushatta*, 757 F.3d at 490, "cannot be laid before the courts for wholesale correction under the APA," *Lujan*, 497 U.S. at 893.

Plaintiffs do not identify any circumscribed and discrete "agency action" within the meaning of the APA, 5 U.S.C. § 551(13). Instead, they take aim at various forms of speech by government officials expressing views on policy matters, *see* SAC ¶ 220 (citing July 15, 2021 Press Briefing in which Surgeon General Murthy described misinformation as "an urgent public health threat"); issuing advisories, guides, or other publications, *id.* ¶¶ 295-99 (publications by CISA or DHS), *id.* ¶ 228 (Surgeon General Advisory); responding to inquiries for scientific information, ECF 71-7 at 51 (incorporated into the Complaint, *see* SAC ¶ 338) (email from Facebook to CDC asking whether claims about COVID-19 vaccines were true); or similar activities, *e.g.*, SAC ¶¶ 207-08 (Dr. Fauci responding to Zuckerberg invitation to participate in a video message to be posted to the Facebook platform). These actions fall within the types of activities—for instance, DOJ statements of an intent to sue, *Walmart, Inc. v. U.S. Dep't of Just.*, 517 F. Supp. 3d 637, 649 (E.D. Tx. 2021), *aff'd*, 21 F.4th 300 (5th Cir. 2021), or an agency official's "threat[]" to pull funding from a project, *Whitlock Const., Inc. v. Glickman*, 71 F. Supp 2d 1154, 1159 (D. Wy. 1999)—that courts have held are not reviewable "agency action[s]," under the APA, 5 U.S.C. § 551(13).

Plaintiffs compound this error by attempting to challenge individual comments by government officials in the aggregate and labeling those comments a "campaign." *E.g.*, SAC ¶ 521. In doing so, Plaintiffs "structure[]" their Complaint "as a blanket challenge to all of the Government's" speech and conduct purportedly relating in any way to misinformation on social media platforms. *Alabama-Coushatta*, 757 F.3d at 490; c*f. Glenewinkel v. Carvajal*, No. 3:20-CV-2256-B, 2022 WL 179599, at *4-5 (N.D. Tex. Jan. 20, 2022) (sovereign immunity not waived absent challenge to "particular and identifiable action taken" by agency). Even assuming any activity or speech identified in the Complaint by itself constituted an "agency action" (and none

does), such a wholesale attack on an array of distinct agency conduct is anything but "circumscribed [and] discrete." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). And Plaintiffs cannot evade the discrete action requirement by relying on "certain specific examples of conduct" that are one piece of an allegedly unlawful "campaign." *Walmart*, 517 F. Supp. 3d 637 at 655; *see also Alabama-Coushatta*, 757 F.3d at 491 ("Even if the Tribe were to name some specific agency actions as examples of the agencies' alleged wrongdoing, it remains that the challenge is directed at the federal agencies' broad policies and practices[.]").

The "distinction between discrete acts, which are subject to judicial review, and programmatic challenges, which are not, 'is vital to the APA's conception of the separation of powers.'" *Walmart*, 517 F. Supp. 3d at 655 (quoting *City of N.Y. v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019)). The APA's waiver of sovereign immunity does "not contemplate[]" that kind of "pervasive oversight by federal courts." *Norton*, 542 U.S. at 66-67; *see also Sierra Club*, 228 F.3d at 567. Indeed, the relief sought here puts these separation of powers concerns on full display. Plaintiffs ask for a generalized pronouncement that "Defendants' conduct violates the First Amendment of the U.S. Constitution and analogous provisions of Missouri's, Louisiana's, and other States' Constitutions," accompanied by an injunction prohibiting "Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from continuing to engage in unlawful conduct." SAC, Prayer for Relief ¶¶ A, D. In other words, Plaintiffs ask the Court to enter a comprehensive, impermissible "obey-the-law" injunction against the entire Federal Government and invite precisely the kind of "pervasive oversight" (though how such a vague injunction would be manageable or enforceable is unclear) over a range of government conduct—even pure political speech—that separation of powers principles preclude. *Cf. Allen*, 468 U.S. at 760.

Accordingly, the Court should dismiss each of Plaintiffs' claims against the Agency Defendants for failure to show an unequivocal waiver of sovereign immunity.

      ii.    <u>The APA claims against the Agency Defendants should be dismissed because Plaintiffs do not identify a "final agency action."</u>

In *Alabama-Coushatta*, the Fifth Circuit concluded that identifying a "final agency action" is an additional condition necessary to invoke the waiver of sovereign immunity as applied to APA claims, 757 F.3d at 489, and other decisions make clear that lack of finality implicates subject-matter jurisdiction, *see, e.g.*, *Texas v. EEOC*, 933 F.3d 433, 440-41 n.8 (5th Cir. 2019); *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011). Because Plaintiffs do not challenge a discrete "agency action," they necessarily fail to challenge a "final agency action." This provides an additional basis for dismissing Plaintiffs' claims arising under the APA (Counts Three through Seven). SAC ¶¶ 516-70. "Finality" turns on a two-part test. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 178. "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Id.* at 178; *see also Sierra Club*, 228 F.3d at 565. Yet agency action is not "final" if it "does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future [ ] action." *See Peoples Nat'l Bank v. Off. of the Comptroller of the Currency of the U.S.*, 362 F.3d 333, 337 (5th Cir. 2004).

Plaintiffs' allegations fail both parts of the *Bennet* test. Here, Plaintiffs allege that the "final agency action" covers all of the Agency "Defendants' conduct alleged." SAC ¶ 521. Yet nowhere do Plaintiffs identify any agency action that marks the consummation of a decisionmaking process, let alone one that fixes any right or obligation or carries any legal consequence. The Complaint instead describes the Plaintiffs' disagreement with a range of agency speech. Such speech, whether

considering discrete instances of speech or taking the speech in the aggregate, does not satisfy the *Bennett* test.

## II.    Plaintiffs' claims all fail on the merits.

### A. Plaintiffs fail to state a plausible First Amendment claim against any of the Defendants.

Multiple parties, including Plaintiffs here, have tried to show that the content moderation decisions of private social media companies are subject to the First Amendment. But the First Amendment "safeguard[s] the rights of free speech" by imposing "limitations on *state action*, not on action by" private parties. *Lloyd Corp. v. Tanner*, 407 U.S. 551, 567 (1972) (emphasis added). Although a plaintiff, in limited circumstances, may establish a First Amendment claim based on private conduct if that conduct "can fairly be seen as state action," *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982), the Supreme Court has cautioned that courts should generally "avoid[] the imposition of responsibility on [the Government] for" private "conduct it could not control," *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988). The Supreme Court recently reaffirmed this principle in *Manhattan Community Access Corp. v. Halleck*, where it rejected the argument that a private entity's decisions over the content it would allow on a publicly accessible television broadcast constituted "state action." 139 S. Ct. 1921 (2019). The Court emphasized that "enforcing that constitutional boundary between the governmental and the private" is necessary to "protect[] a robust sphere of individual liberty" and allow private entities to "exercise editorial discretion over the speech" in forums they control. *Id.* at 1928-30.[12]

---

[12] Although *Halleck* involved private (as opposed to government) defendants, the Supreme Court applies the same state-action requirements in cases like this one where plaintiffs sue public officials for private conduct. *Compare Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982) (applying state-action requirements to determine whether government defendants were liable for private conduct), *with Halleck*, 139 S. Ct. at 1929-32 (relying on *Blum*'s state-action requirements to determine whether private defendants were liable as state actors).

*Halleck* thus stressed that "a private entity can qualify as a state actor" only "in a few limited circumstances." 139 S. Ct. at 1928. That case concerned the "public function" test, whereby a private entity's decisions may be subject to constitutional restrictions when it "performs a traditional, exclusive public function." *Id.* The Court rejected the argument the "operation of a public forum for speech" constitutes a "traditional, exclusive public function," *id.* at 1930, thus precluding parties from arguing that restrictions on social media platforms are subject to the First Amendment simply because they are online forums for speech, *see, e.g., Prager Univ. v. Google LLC*, 951 F.3d 991, 995-99 (9th Cir. 2020) (concluding that YouTube is not a state actor, in light of *Halleck* and prior decisions).

In attempts to evade *Halleck*'s holding, multiple litigants, including Plaintiffs here, have turned to other "test" for state action. Those are: (1) the compulsion test, under which a plaintiff must allege that the "the government compel[led] the private entity to take a particular action," 139 S. Ct. at 1928 (citing *Blum*, 457 U.S. at 1004-05); and (2) the joint action test, under which a plaintiff must allege that "the government act[ed] jointly with the private entity," *id.* (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941-42 (1982)).

Plaintiffs' allegations appear to invoke both the compulsion and the joint action tests. The Complaint most prominently alleges that Defendants applied "pressure" concerning the companies' content moderation decisions, *see, e.g.,* SAC ¶¶ 288, 348, 478, 495, or, in other words, that Defendants' conduct amounted to "[G]overnment-induced censorship," *see, e.g., id.* ¶¶ 24, 25, 469-70, 473. These allegations of "pressure" and "induce[ment]" appear primarily intended to state a claim of compelled action. *Cf. Halleck*, 139 S. Ct. at 1928. Additionally, however, Plaintiffs label the companies' alleged content-moderation measures as products of "collusion," *see, e.g.,* SAC ¶¶ 302, 476, 484, and a "*conspiracy* to censor," *id.* ¶ 509 (emphasis added), which apparently

attempts to invoke the joint-action exception. Neither theory can avert Rule 12(b)(6) dismissal, though, as the Complaint is deficient under both a compelled-action and a joint-action analysis.

Like litigants to go before them, however, Plaintiffs here fail to plausibly allege a claim under either theory of state action. Indeed, a recent decision of the Ninth Circuit rejected as implausible a First Amendment claim against Google that advanced both theories. *See Doe v. Google LLC*, No. 21-16934, 2022 WL 17077497, at *9 (9th Cir. Nov. 18, 2022). There, the plaintiffs alleged that "events involving federal officials regarding YouTube, Google, or general social media platform moderation policies" in 2019 and 2020, including House Speaker comments about § 230 and House resolution mentioning social media company conduct, made YouTube's content moderation decisions into state action under the compulsion or joint action tests. *Id.* at *9 (referring to the "joint action" theory as the "Governmental nexus" theory). Yet those events, the Ninth Circuit reasoned, "lack[ed] force of law, rendering them incapable of coercing YouTube to do much of anything," and so were insufficient to plausibly allege state action. *Id.* at *2.[13] For the reasons explained below, Plaintiffs' allegations here likewise fail to state a First Amendment claim under either state action theory.

   i. <u>Plaintiffs fail to plausibly allege coercion or a similar degree of encouragement under the compulsion test.</u>

Under *Blum*, the Government "can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or

---

[13] *See also Divino Grp. LLC v. Google LLC*, No. 19-cv-04749, 2021 WL 51715, at *6 (N.D. Cal. Jan. 6, 2021); *accord Trump v. Twitter, Inc.*, ---F. Supp. 3d---, 2022 WL 1443233, at *7 (N.D. Cal. May 6, 2022), *appeal filed*, No. 22-15961 (9th Cir. June 28, 2022); *Huber*, 2022 WL 827248, at *9-10; *Children's Health Def. v. Facebook, Inc.*, 546 F. Supp. 3d 909, 931-32 (N.D. Cal. 2021), *appeal filed sub nom.*, *Children's Health Def. v. Meta Platforms, Inc.*, No. 21-16210 (9th Cir. July 21, 2021); *Newman v. Google LLC*, No. 20-CV-04011, 2021 WL 2633423, at *9-10 (N.D. Cal. June 25, 2021).

covert, that the choice must in law be deemed to be that of the" Government. 457 U.S. at 1004.

"Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify

holding the" Government "responsible for those initiatives." *Id.* at 1004-05.

Further, when pursuing such a claim of state action, in addition to establishing coercion or

a degree of encouragement approaching it, a plaintiff must also show that the Government called

on the private party to take the *precise action* at issue—*i.e.*, by "dictat[ing] the decision" made "in

[that] particular case," *id.* at 1010, or insisting that the private party follow a "rule of decision" that

would have *required* that action, *West v. Atkins*, 487 U.S. 42, 52 n.10 (1988); *see also Barnes v.*

*Lehman*, 861 F.2d 1383, 1387 (5th Cir. 1988) ("Regulations that dictate procedures, forms, or even

penalties *without dictating the challenged action* do not convert private action into state action.").

It is not enough to show that the Government recommended a general policy under which

the private party retained discretion over whether to take the particular action at issue. *See West*,

487 U.S. at 52 n.10 (a "private party's challenged decisions could satisfy the state-action

requirement if they were made on the basis of some rule of decision for which the State is

responsible," but private party "decisions . . . based on independent professional judgments" would

not constitute state action); *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974) (the "exercise

of the choice allowed by" a government policy "where the initiative comes from [the private party]

and not from the [Government], does not make [the] action in doing so 'state action'" under the

Constitution); *cf. Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) ("Action taken by

private entities with the mere approval or acquiescence of the State is not state action.").

Plaintiffs' Complaint contains no plausible allegation that any Defendant coerced, or

encouraged to a degree amounting to coercion, a social media company to take specific action

against misinformation. *See Sullivan*, 526 U.S. at 52; *McCormack v. Nat'l Collegiate Athletic*

*Ass'n*, 845 F.2d 1338, 1346 (5th Cir. 1988) (the Government is not responsible for private conduct "unless [it] has coerced or encouraged the party's decision to the extent that it was essentially the [Government's] choice"). Plaintiffs appear to allege that two categories of speech by certain government officials amounts to "coercion": (i) statements about the need to combat misinformation in various sectors, including online; and (ii) suggestions about possible antitrust actions against social media companies, or the need to reform § 230, but without any nonconclusory allegation of a connection between such statements and the actions of social media companies taken against specific individuals. *See supra* at 7-15. Accordingly, Plaintiffs have failed to state a claim under the First Amendment.

> a. *Plaintiffs fail to plausibly allege that statements by federal officials in email correspondence with social media companies are coercive.*

To start, Plaintiffs cannot establish "coercion" based on alleged statements by various Defendants, made both publicly and in discussions with social media companies, about their views on misinformation. The Fifth Circuit's decision in *Louisiana Division Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 319 (5th Cir. 2020), is instructive. There, the plaintiff, the Sons of Confederate Veterans, applied to march in a city parade coordinated by a private business association. 821 F. App'x at 318-19. In a letter, the Mayor asked the association to "prohibit the display of the Confederate battle flag in that year's parade," and two days later, the association denied the plaintiff's request to march in the parade. *Id.* at 319. The plaintiff argued that the association's decision amounted to "state action," and was thus subject to a First Amendment claim. The Fifth Circuit disagreed, noting that the "Mayor's letter" contained only "a request," and that "the decision to deny the [plaintiff's] parade application rested with the [association], not the City." *Id.* at 320. The court explained that "[r]esponding agreeably to a request and being all but forced by the coercive power of a governmental official are different

categories of responses." *Id.*; *see also Doe*, 2022 WL 17077497, at *2 (explaining that "acts . . . specifically directed at YouTube" that "lack force of law" are "incapable of coercing YouTube to do much of anything").

Similarly, here, even if certain Defendants "requested" that, or urged, social media companies do more to contain misinformation, any content moderation decisions made by social media companies ultimately "rested with" those companies. *La. Div. Sons*, 821 F. App'x at 320. Even emphatic requests or strongly worded urging, *see, e.g.*, SAC ¶ 347 (President Biden saying failing to take action against misinformation results in "killing people"), do not plausibly amount to coercion. Government officials, of course, express their policy views on a range of subjects every day. Here, Plaintiffs allege that various government officials have urged large social media companies, with billions of users worldwide, to "step up" efforts to combat perceived misinformation. *Id.* ¶ 223. Such statements, whether made publicly or privately, do not plausibly equate to "forc[ing]" those companies, "by the coercive power of" the Government, *La. Div. Sons*, 821 F. App'x at 320, to take specific action against any specific content posted by a social media user (including a Plaintiff here)—much less *all* content on social media companies' platforms with which the President or various government agencies allegedly disagree, *see* SAC ¶ 183. Those statements, moreover, "lack force of law," and are thus "incapable of coercing [social media companies] to do much of anything." *Doe*, 2022 WL 17077497, at *2.

The e-mail correspondence Plaintiffs attach to their Complaint, *see* SAC ¶ 338, underscores that the various Defendants' statements to social media companies that Plaintiffs challenge here are far short of being "coercive." Indeed, the statements in those e-mails illustrate that, rather than compelling a social media company to take specific action against particular content, government employees provided information or made recommendations that the

companies, as private entities, could take into consideration and respond to as they deemed appropriate. The Complaint's inflammatory assertion that "Discovery reveals a massive federal Censorship Enterprise including all Defendants," *see* SAC p.101, Part D-8 section heading, is a bare legal conclusion that rests only on mischaracterization of the alleged contacts between Defendants and the platforms and the context in which those contacts occurred. The documents Plaintiffs attach to their filings in this case demonstrate the conclusory and unsupported nature of Plaintiffs' allegations.

For example, some communications show government officials relaying examples of content on platforms that contained misinformation and social media companies determining whether and how their policies applied to that content. In one communication, CISA relayed to Twitter an email from the Office of the Secretary of State for the State of Washington, which wrote CISA to "flag" several "tweets that include misinformation and/or false allegations of election fraud." ECF 71-8 at 51-53. Twitter then responded on November 11, 2020, that "[a]ll Tweets have been labeled, with the exception of two from" a particular Twitter account which "were not found to violate *our* policies." *Id.* (emphasis added); *see also* ECF 71-8 at 14-15 (10/23/20 Twitter e-mail to CISA stating that "under *our* civic integrity policy" "[w]e have actioned" several Twitter accounts "reported" by State of Maryland as "containing election misinformation" (emphasis added)).

Other communications show government officials recommending actions that companies could take to combat misinformation generally, which the companies took under consideration. For instance, an August 20, 2021 e-mail from Facebook to White House and HHS employees noted that "[t]he White House described four *recommendations* to social media platforms in July, which cover access to authoritative information, enforcement and speed of enforcement, and

transparency," and stated that the platform "will shortly be expanding *our* COVID policies to further reduce the spread of potentially harmful content on *our* platform . . . across Facebook and Instagram." ECF 71-4 at 3 (emphases added). That e-mail also stated that Facebook had "taken action against people who repeatedly post content that violates *our* policies. Since the beginning of the pandemic, we have removed over 3,000 accounts, Pages, and groups for repeatedly violating *our* rules against spreading COVID and vaccine misinformation," and "[w]e continue to notify people when content that they have interacted with is removed for violating *our* policies on COVID and vaccines." ECF 71-4 at 4 (emphases added).[14]

These and other communications reflect that the recognition by Government employees and the social media companies themselves that the companies retained discretion over how to handle specific content on their platforms. Indeed, in much of CISA's election correspondence incorporated into the Complaint, the agency expressly stated "that it neither has nor seeks the ability to remove or edit what information is made available on social media platforms. CISA makes no recommendations about how the information [that] it is sharing should be handled or used by social media companies." ECF 71-8 at 7, 11, 14, 17, 37, 51, 81, 101. "Additionally, CISA will not take any action, favorable or unfavorable, toward social media companies based on

---

[14] *Accord* ECF 45-1 at 209-11 (2/8/21 Facebook e-mail to CDC providing "our announcements today about running the largest worldwide campaign to promote authoritative COVID-19 vaccine information and expanding *our* efforts to remove false claims on Facebook and Instagram about COVID-19, COVID-19 vaccines and vaccines") (emphasis added); *see also* ECF 71-9 at 76 (9/29/21 Google e-mail to HHS employee "to share an update *we* recently made to *YouTube's policies* pertaining to vaccine-related misinformation") (emphasis added); ECF 71-2 at 51 (3/24/21 Facebook e-mail stating that briefing for CDC would be provided by platform's "Misinformation Manager" and another employee, both described as "work[ing] on *our* COVID-19 policies") (emphasis added); ECF 71-3 at 5 (6/22/22 Facebook e-mail stating that the platform "[w]anted to ensure you were aware of *our* policy updates following the early childhood vaccine approvals") (emphasis added); ECF 71-3 at 15 (11/4/21 Facebook e-mail to White House and HHS employees stating that platform "updated *our* misinformation policies for COVID-19 vaccines to make clear they apply to claims about children") (emphasis added).

decisions about how or whether to use this information." ECF 71-8 at 7, 11, 14, 17, 37, 51, 81, 101.

Plaintiffs also draw on correspondence between CDC and various social media platforms that reflects the agency providing information or making recommendations and suggestions regarding misinformation without purporting to direct the platforms to take any particular actions. For example, in a July 21-24, 2020 e-mail exchange between CDC and Google, after CDC "suggest[ed]" a Spanish language change to YouTube's proposed addition of a "visual banner and video clip" regarding mask wearing, a Google employee "shared the *recommended* change with our product team." ECF 71-7 at 68-72 (emphasis added). In that discussion, a CDC employee addressed a "comment" about the "vaccine being rushed" by analyzing the comment and concluding: "We *recommend* separating these two statements." ECF 71-7 at 68 (emphases added).

These communications reflect CDC functioning as a source of scientific information about the vaccines, not as the authoritative arbiter over whether any particular Plaintiffs' social media content warranted removal under platform policies. Although Plaintiffs may believe that the platforms should not trust CDC's scientific information, that does not render CDC *responsible* for the platforms' choices about how to implement their content policies based on that information.

The social media companies' policies point to the same conclusion. For example, "[u]nder our Community Standards," Facebook explained, "we remove misinformation when public health authorities conclude that the information is false and likely to contribute to imminent violence or physical harm." ECF 71-9 at 26. "For the duration of the COVID public health emergency, we remove content that repeats other false health information, primarily about vaccines, that are widely debunked by leading health organizations such as the World Health Organization (WHO) and [CDC]." ECF 71-9 at 32. Other exchanges between social media companies and CDC

consistent with these policies are incorporated into the Complaint. In one email from July 26, 2021, a Facebook employee described to CDC three particular claims about "possible side effect[s]" and characteristics of COVID-19 vaccines, and requested: "[W]e were hoping your team could help us understand if [the three claims] are false and can lead to harm?" ECF 71-7 at 51. Similarly, in a June 3, 2022 email, a Facebook employee thanked CDC for "your help debunking claims about COVID vaccines and children," and asked, as to several specified claims about the vaccines, "could you please let us know whether the CDC is able to debunk the following as false and harmful for young children?" ECF 71-7 at 4. And it was in that advisory context (disregarded by Plaintiffs, SAC ¶ 248) that CDC asked the platforms to "Please Be On the Lookout for" certain false or misleading statements about the vaccines without purporting to direct the platforms to take any particular content moderation measures concerning the statements identified. ECF 45-1 at 31-33, 39-43, 49-51.[15]

Thus, the materials incorporated into the Complaint underscore Plaintiffs' failure to allege that any Defendants' conduct purported to compel the platforms' private choices regarding the removal of content—let alone any of *Plaintiffs'* content—so as to attribute the platforms' choices to the Government. *Sullivan*, 526 U.S. at 52-54.

        *b. No Defendant is plausibly alleged to have made an enforceable threat, regulatory or otherwise, based on a platform's content moderation choice.*

Plaintiffs also cannot satisfy the "coercion" requirement through their allegations that certain officials opined that § 230 should be reformed to reduce social media companies'

---

[15] Plaintiffs allege that Facebook and Twitter provided tools where CDC officials could flag posts that contain misinformation, SAC ¶ 365, but they do not allege that any CDC official used such tools to demand that either company remove any specific post by Plaintiff (or by anyone else) from its platform. The emails incorporated into the Complaint do not reflect any such demands either. *See* ECF 71-2 (email exchange in which Twitter notes the availability of a reporting portal and CDC employee asks questions about how to use it).

immunity, or that those companies should come under greater antitrust scrutiny. In that regard, Plaintiffs err in relying on *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). *See* SAC ¶¶ 115, 467. That case involved a state's commission to "Encourage Morality in Youth," empowered by legislative resolution to deem a non-obscene publication "objectionable for sale, distribution or display to youths." *Action for Children's Television v. FCC*, 59 F.3d 1249, 1260 (D.C. Cir. 1995) (citing *Bantam Books*, 372 U.S. at 61-62). After deeming a publication "objectionable," that commission would urge the publication's distributor not to carry it and would "refer the matter to the local police for investigation and possible prosecution under the state obscenity law." *See id.* (citing *Bantam Books*, 372 U.S. at 61-62). Notably, "the Supreme Court described the [state commission] notices as 'instruments of regulation' 'phrased virtually as orders' that contributed to a 'form of effective state regulation superimposed upon the State's criminal regulation of obscenity.'" *VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1162-63 (10th Cir. 2021) (quoting *Bantam Books*, 372 U.S. at 68-70), *cert. denied*, 142 S. Ct. 1208 (2022). *Bantam Books* held that "the . . . regulatory system (its notices, blacklists, police visitations, and implied criminal sanctions) 'create[d] hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law.'" *Id.*

The Complaint's allegations bear no resemblance to the systematic governmental regulation of speech found in *Bantam Books*. Instead, they describe circumstances more akin to the situation in *VDARE*, 11 F.4th at 1163. There, the Tenth Circuit held that a nonprofit foundation failed to make plausible allegations of state action where a private resort cancelled the foundation's event booking on the heels of municipal officials' condemnation of "hate speech" (prompting expressions of the officials' satisfaction at the cancellation). *Id.* In reaching this conclusion, the Tenth Circuit rejected analogy to *Bantam Books* and instead found more guidance in several other

decisions in which official remarks were "devoid" of "any enforceable threats." *Id.* (quoting *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85, 88-89 (3d Cir. 1984)); *see id.* at 1161-68 (applying, *inter alia*, *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1014-15 (D.C. Cir. 1991) (Silberman, J.), and *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 37 (2d Cir. 1983) (cited at SAC ¶ 115)). Those cases teach that Free Speech Clause violations akin to *Bantam Books* do not arise from official expressions that "contain[] no threat to prosecute, nor intimation of intent to proscribe the distribution of" specific speech. *VDARE*, 11 F.4th at 1165 (quoting *Penthouse Int'l*, 939 F.2d at 1015).

At most, Plaintiffs allege isolated episodes in which federal officials engaged in rhetoric about misinformation on social media platforms. *E.g.*, SAC ¶¶ 345-47. The Complaint is "devoid" of any "enforceable threat" to "prosecute" and lacks "intimation of intent to proscribe the distribution" of any individual's speech on the companies' platforms. *VDARE*, 11 F.4th at 1163. As *VDARE* illustrates, Plaintiffs have made no plausible allegation of state action in the Complaint remotely resembling *Bantam Books*.

Nor can the averments about § 230 reform or antitrust enforcement cure that deficiency. SAC ¶ 185. To begin with, it is unclear how the alleged comments about amending § 230 or bringing antitrust suits could be viewed as "threats" given that no Defendant could unilaterally take such actions. An amendment to § 230 would require action by the Congress and the President; the Defendants—Executive branch officials—cannot amend a statute on their own. And only the Antitrust Division of the Department of Justice (not the FBI) or the Federal Trade Commission can choose to bring an antitrust action on behalf of the Federal Government against a private

company.[16] Furthermore, even if certain government officials have generally expressed support for the reform of § 230, or a potential antitrust action, Plaintiffs do not allege that any government officials have said that they would refrain from pursuing those remedies if social media companies intensified their content moderation measures with respect to any individual Plaintiff or particular residents of the Plaintiff States. Nor does the Complaint contain any nonconclusory allegation that a social media company has said that it took a particular content moderation measure because it inferred the existence of a "threat" from any Defendant's statements.

The statements that Plaintiffs describe as "coercive" are routine expressions of political opinion on matters of public concern. Whether and how to deal with the influence of social media platforms on the direction of public discourse, and the rapid speed with which information spreads online, is an issue that many in the public and private sectors have been discussing and debating for some time. As the States' own allegations show, social media companies and various government officials have been participating in that ongoing conversation since well before this Administration began. Part of the conversation about the power of social media companies has included debate over legislative reforms or the availability of antitrust actions. The legislative and executive debate about whether § 230(c) sufficiently meets current perceived needs does not reflect one-sided comments or steps by the Biden Administration and its "political allies." SAC ¶¶

---

[16] Notably, the Federal Trade Commission filed a civil antitrust suit against Facebook in 2020, *FTC v. Facebook, Inc.*, No. 20-cv-3590 (D.D.C.) (public redacted version of under-seal complaint filed Jan. 13, 2021). In that case, the FTC alleged that conduct by Facebook, including acquisition of Instagram and WhatsApp, was harmful to competition. *See id.* ECF 1. The commencement of this suit prior to the Biden Administration undermines the plausibility of the Complaint's notion that antitrust enforcement "[t]hreats" came only "from Biden, senior government officials in the Biden administration, and those acting in concert with them." SAC ¶ 185. *Cf. Doe*, 2022 WL 17077497 at *2 (DOJ "antitrust lawsuit against Google for maintaining monopolies in general search services and search advertising" among events found insufficient to plausibly allege state action by YouTube).

183-99. Rather, Democratic and Republican legislators alike—in addition to former President Trump—have pushed for legislation to constrain content moderation decisions by social media platforms. *See supra* p. 10. These attempts to address perceived problems concerning § 230(c) show that the Defendants' comments or steps in this area are not part of an impermissible effort to project federal power over social media companies, but instead reflect engagement in a dynamic policy debate about the conduct of social media platforms. *Cf. Doe*, 2022 WL 17077497 at *2-3 (House Speaker comments "on possibly removing the protection provided to social media platforms under § 230" among events found insufficient to turn show "state action" under compulsion or nexus theories).

### c. The government speech doctrine requires rejection of Plaintiffs' coercion theory based on public policy statements.

Moreover, Plaintiffs' attempt to infer misconduct from assorted political policy statements would contradict settled First Amendment principles recognizing that "[i]t is the very business of government to favor and disfavor points of view." *Nat'l Endowment for the Arts*, 524 U.S. at 598 (Scalia, J., concurring). "When the government wishes to state an opinion" or "formulate policies," it "naturally chooses what to say and what not to say." *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589 (2022) (citing *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207-08 (2015)). The Constitution "relies . . . on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks." *Id*. (citing *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U. S. 217, 235 (2000)). The Supreme Court has illustrated this principle through an example relevant here: the Government must have the "freedom to select the messages it wishes to convey," otherwise "[h]ow could [it] effectively develop programs designed to encourage and provide vaccinations?" *Walker*, 576 U.S. at 207-08 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009)). So, "when the government speaks it is entitled to promote

a program, to espouse a policy, or to take a position." *Id.* at 208. That type of standard government speech does not, and cannot, amount to the type of "coercion" necessary to convert private conduct into state action. That conclusion does not change simply because the Government is advocating action by a social media company, rather than an energy company, a health care company, a news company, or any of the multitude of other companies whose activities affect the socio-economic well-being of the American people on a daily basis.

Reduced to their essence, Plaintiffs' allegations relating to the President's public policy statements seek merely to challenge the exercise of the President's bully pulpit as illegitimate under the Constitution. In doing so, Plaintiffs betray a misunderstanding of constitutional law and threaten to trench deeply on the President's prerogatives. "A President frequently calls on citizens to do things that they prefer not to do—to which, indeed, they may be strongly opposed on political or religious grounds." *Freedom From Religion Found., Inc. v. Obama*, 641 F.3d 803, 806 (7th Cir. 2011). Indeed, popular rhetoric is a core aspect of the modern presidency—a tool that presidents have used to galvanize private actors for more than a century. *See* Jeffrey K. Tulis & Russell Muirhead, *The Rhetorical Presidency* 4 (2017 ed.). No one supposes that every request a President (or an agency) makes of a private entity causes actions by the private entity to be considered those of the Government; rather, private actions can be attributed to the government for constitutional purposes only when the government has "exercised coercive power" to the point of dictating private decisions. *Blum*, 457 U.S. at 1004. Nevertheless, Plaintiffs urge the Court to draw the line of "coercive" conduct at Executive Branch speech that is critical of private entities—perhaps even contemplative of legislative reforms that would affect those entities—and that urges them to take actions that the President supports. Drawing Plaintiffs' preferred line, however, would ignore the realities of presidential decisionmaking and unduly circumscribe the President's power to

63

communicate with the electorate. Applying Plaintiffs' logic beyond the contours of this case, moreover, would unduly constrain state governments' ability to communicate with private entities.

ii.   Plaintiffs fail to plausibly allege that a Defendant directed a social media company to take specific action against a post of any Plaintiff, as the compulsion test also requires.

Plaintiffs' First Amendment claim also fails because it does not plausibly allege the additional requirement for showing that the Government is responsible for private conduct: that any Defendant specifically "dictat[ed] the challenged action[s]" (*e.g.*, by specifically directing any social media company to take any precise content moderation against a Plaintiff or any resident of a Plaintiff State), *Barnes*, 861 F.2d at 1387; *Blum*, 457 U.S. at 1010, or that any Defendant instructed any social media company to follow a "rule of decision" that would have required those actions (*e.g.*, by directing any social media company to adopt a policy under which it would *have* to take action against content posted by a Plaintiff or any residents of the Plaintiff States), *West*, 487 U.S. at 52 n.10.

First, Plaintiffs do not allege that any Defendant has required social media companies to follow a "rule of decision" under which a company would be required to define misinformation in a particular manner, much less in a manner that would obligate the companies to take specific types of action against specific content posted by any Plaintiff (or any resident of Plaintiff States) on their platforms. To the contrary, Plaintiffs' Complaint illustrates that while federal officials have spoken generally about the need to control the spread of misinformation, including its spread on social media, they have acknowledged that "[d]efining misinformation is a challenging task, and any definition has limitations." Advisory at 17 (cited at SAC ¶ 228). With that in mind, the Surgeon General has expressly urged social media companies to exercise their discretion in a way that "avoid[s] conflating controversial or unorthodox claims with misinformation." *Id.* And as

stated above, the Press Secretary has also emphasized that the social media companies make the ultimate decision as to whether and how to address misinformation on their platforms. *Supra* p. 9.

Second, no Defendant is alleged to have dictated that a particular social media company take any particular content moderation measure with respect to any Plaintiff or resident of a Plaintiff State. *See, e.g.,* SAC ¶ 130 (noting the various measures a social media company may take, including promoting or demoting content or suspending or terminating accounts). Although Plaintiffs allege that CISA hosted a conference and a meeting at which Hoft's "news website," *see id.* ¶ 24, was "identified" or "discussed" as a "spreader[] of misinformation," *id.* ¶ 432-33,[17] the Complaint does not allege that such identification or discussion resulted in any of the particular content moderation measures that platforms have applied to Hoft's website. To the contrary, multiple Defendants have expressly acknowledged that private platforms retain discretion in determining whether and how to take action against misinformation. The Surgeon General's Advisory, for example, proposes a range of potential content moderation measures—including just labeling posts that contain misinformation—and cautions that companies should assess whether any measure might have "unintended consequences" or unjustifiably impede "free expression." *Supra* p. 11; Advisory at 12 (noting that offending content may be "labeled" or "downranked," and that social media companies may address misinformation by "[p]rovid[ing] information from trusted and credible sources"). The Press Secretary also reiterated that although government officials endorsed several strategies for containing misinformation, social media companies ultimately had to decide which strategies (if any) to adopt. *See supra* pp. 12-13. She explained:

---

[17] Plaintiffs cite to a news article for their allegation that CISA "flagged [Hoft's] name for censorship" during a conference "hosted by CISA," SAC ¶ 432, but the article cited does not appear to support the allegation that CISA hosted the conference in which an unidentified presenter allegedly mentioned Hoft's website.

> [T]o be crystal clear: Any decision about platform usage and who should be on the
> platform is orchestrated and determined by private-sector companies. Facebook is
> one of them . . . [a]nd there are a range of media who are—also have their own
> criteria and rules in place, and they implement them. And that's their decision to
> do. That is not the federal government doing that.

July 16, 2021 Press Briefing at 30. Accordingly, none of the alleged comments made by the

Defendants disturbed any platform's discretion to determine which posts contained

"misinformation," and, if so, what to do about them.

Private platforms necessarily exercise their independent judgment if they conclude that any

posts by Plaintiffs or residents of the Plaintiff States contain misinformation and that remedial

measures are appropriate. Those actions are attributable to the *social media companies*, not the

Defendants. For example, *Blum* held that certain medical necessity decisions made by a

physician—decisions that caused the State to adjust the patient's Medicaid benefits—were not

properly attributed to the State. 457 U.S. at 1006-07. State officials did not make those decisions.

Nor were they made based on criteria established by the State. Because the physicians and nursing

home administrators' determinations regarding medical necessity "ultimately turn on medical

judgments made by private parties according to professional *standards that are not established by

the State*," *id.* at 1008 (emphasis added), the Court held that those decisions could not be attributed

to the State, *id.* at 1009; *see also id.* at 1009 n.19 ("[T]he judgment, made by concededly private

parties, that [the individual] is receiving expensive care that he does not need" is "a medical one");

*Rendell-Baker*, 457 U.S. at 841 (state action was lacking in *Blum* even though "[b]oth state and

federal regulations *encouraged* the nursing homes to transfer patients to less expensive facilities

when appropriate") (emphasis added).

Given that "[p]rivate use [even] of state-sanctioned private remedies or procedures does

not rise to the level of state action," *Sullivan*, 526 U.S. at 53 (quoting *Tulsa Prof'l Collection*

*Servs., Inc. v. Pope*, 485 U.S. 478, 485 (1988)), and given also that this case does not even involve private remedies "sanctioned" by the Government under law, the Complaint's "coercion" allegations are even weaker than the contentions rejected in *Blum*, *Sullivan*, and similar cases. Here, federal regulations do not govern private social media companies' content moderation decisions. And, as noted, no agency has purported to *impose on the platforms* a definition of "misinformation," let alone required the platforms to apply any such definition to particular content. To the contrary: Just as the private parties in *Blum* exercised their own judgment to determine whether certain care met the regulatory definition of "medical necessity," social media companies exercise private judgment to determine whether to moderate any content on their platforms deemed to be "misinformation." As discussed above in the context of Article III standing, *see supra* pp. 32-39, the platforms have substantial private business reasons for maintaining such content moderation policies. A platform's "decision to adopt community standards," and to enforce those standards consistent with terms of service to which users have agreed, is a "self-interested business decision" supplying an "obvious alternative explanation" for the content moderation episodes Plaintiffs have strained to depict as the result of purported "coercion" here. *See Twombly*, 550 U.S. at 567; *Atkinson v. Meta Platforms, Inc.*, No. 20-17489, 2021 WL 5447022, at *1 (9th Cir. Nov. 22, 2021).

To be sure, the Complaint highlights some occasions in which some officials strongly implored social media companies to take greater action against misinformation on their platforms. *See* SAC ¶ 233 (citing July 16, 2021 Press Briefing); *id.* ¶ 232 (quoting an article about President Biden's statements). But even strong urgings, using heated rhetoric, are fundamentally distinct from actions that "dictate the decision," or so "significant[ly] encourage[]," a social media company to take *specific* action against *specific* content that the company's action must be

attributed to the Government. *See Blum*, 457 U.S. at 1004, 1010.[18] Moreover, while the Complaint reflects that, on occasion, social media companies may have *informed* government officials about how they applied their policies related to misinformation, including any changes they had made to their policies, *see* SAC ¶ 345 (alleging meeting in which Twitter informed some White House staff on the policy changes Twitter had made), such allegations only confirm that the companies retained full control over what policies to adopt and how to apply them in any given circumstance.

In nevertheless attempting to depict the challenged correspondence between the Government and the platforms as a "massive federal Censorship Enterprise including all Defendants" (SAC, Part D-8 section heading), the Complaint asserts that Plaintiffs have identified "[r]epresentative examples of [ ] federal censorship activities," SAC ¶ 339, but the "examples" on which the Complaint fixates are far from "representative." In that regard, the Complaint emphasizes assertions that Twitter "permanently suspended" Alex Berenson—who Plaintiffs allege is "an influential vaccine critic"—because that platform "caved to federal pressure," including in an April 21, 2021 meeting in which "White House officials," including Andrew Slavitt, former White House Senior Advisor for COVID-19 Response, "posed 'tough' questions . . . including 'one really tough question about why Alex Berenson hasn't been kicked

---

[18] Instructive here is *Children's Health Defense v. Facebook, Inc.*, where Facebook allegedly violated the Free Speech Clause by "censor[ing] [the plaintiff's] vaccine safety speech" on the platform at the encouragement of a Congressman and CDC. 546 F. Supp. 3d at 915. The plaintiff alleged that, as a result of governmental pressure, Facebook took action against certain posts by the plaintiff. *Id.* at 919. Yet the court concluded that neither the Congressman nor CDC was responsible for Facebook's content moderation decisions as to plaintiff: The "phrase 'vaccine misinformation' is a general one that could encompass many different types of speech and information about vaccines," and thus the "general statements" by Congressman Schiff and the CDC concerning "vaccine misinformation" did not "mandate[] the particular actions that Facebook took with regard to [the plaintiff's] Facebook page." *Id.* at 926, 930. Facebook took those "particular actions" against plaintiff, the court determined, based on the platform's "own algorithms and standards for detecting 'vaccine misinformation.'" *Id* at 930.

off the platform.'" *Id.* ¶¶ 345-47 (quoting Berenson's account of events on Substack drawn from his separate civil action against Twitter); *see also id.* ¶ 480 (relying on Berenson allegations as though they connect Defendants' conduct to content moderation measures applied to individual Plaintiffs). But as noted above, Plaintiffs make no allegation (let alone a plausible one) that Slavitt or any other federal official made an "enforceable threat" to exercise regulatory authority over Twitter if that platform did not apply content moderation measures in a particular manner to Berenson's posts. *VDARE*, 11 F.4th at 1163. Hence this allegation fails to support a claim of state action. And, in any event, Berenson is not a Plaintiff here, so the episode depicted still would not plausibly allege state action by any Defendant against any Plaintiff in this case—nor would it justify the sweeping relief requested.

> iii.   The labels Plaintiffs attach to Defendants' alleged conduct are also inadequate to plausibly allege joint state action.

For essentially the same reasons that the Complaint fails to plausibly allege that the platforms' challenged content moderation decisions constituted government-compelled conduct under *Blum*, the Complaint also fails to plausibly allege that those decisions reflect "collusion," *i.e.*, that the Government and the platforms acted jointly as the Supreme Court understood that concept in *Lugar*. *Halleck*, 139 S. Ct. at 1928. When considering the sufficiency of a complaint under the Federal Rules, the Court must focus on the *conduct* alleged in the Complaint and its accompanying materials, while disregarding the types of labels and conclusions that Plaintiffs attach to that conduct. *Iqbal*, 556 U.S. at 678. The conduct alleged in the Complaint, when viewed through the lens of "joint action" rather than coercion, falls short of stating a claim for relief.

*First*, this case is far afield from *Lugar* because it does not involve a government-created system in which one private party's allegations cause exertion of federal power against another private party. *Lugar* concerned a state statutory prejudgment attachment procedure under which,

following a private creditor's mere "alleg[ation], in an *ex parte* petition," of a "belief that" the debtor "was disposing of or might dispose of his property in order to defeat" the creditor, public officials would, without exercising their independent judgment, spring into action against the debtor—namely, a state court clerk would "issue[] a writ of attachment," and a county sheriff would "execut[e]" it, "effectively sequester[ing]" the debtor's property. 457 U.S. at 924-25. That was "sufficient" for state action, *Lugar* held, because "the State ha[d] *created a system* whereby state officials will attach property on the *ex parte* application of one party to a private dispute." *Id.* at 939 n.21 (emphasis added); *cf. id.* at 942; *Sullivan*, 526 U.S. at 58. Social media companies have never needed a government-created system to moderate content on their platforms. Nor have Plaintiffs shown that a Government official's recommendation that a post contains misinformation automatically results in a company's content-moderation measures against that post. Rather, it is each private company that on its own initiative and self-interested business judgment formulates and enforces its policies about misinformation and other concerns. Each company makes and enforces such choices without resort to a Government "system" remotely comparable to the one in *Lugar*. *Cf. Wong v. Stripling,* 881 F.2d 200, 202 (5th Cir. 1989) (private hospital revocation of physician's staff privileges, consistent with common law, did not become state action through statute requiring that revoking hospital "comply with its own bylaws in making staffing decisions" but that did not "compel staff discipline or delegate any authority previously held exclusively by the state").

*Second*, Fifth Circuit cases applying the "joint action" test for state action have concentrated on, among other factors, whether the private party and government officials formed a "preconceived plan" to achieve the "specific conduct of which the plaintiff complains." *See Moody v. Farrell*, 868 F.3d 348, 352-54 (5th Cir. 2017) ("conspiracy or joint action" tests failed

where those circumstances were lacking). Here, even if recommendations or suggestions Defendants allegedly made about categories of social media content on particular platforms influenced companies' actual content moderation decisions, the Complaint contains no non-conclusory allegations from which it could be found that those specific decisions were part of preconceived plans formed between the companies and the Government to accomplish the "specific" episodes of content-moderation that they allege resulted from Defendants' recommendations or suggestions at all. *Cf. Doe*, 2022 WL 17077497 at \*2-3 (nexus theory of state action not facially plausible where content creators "failed to show any link between the alleged actions by the [House] Speaker and the House and YouTube's decision to remove [content creators'] channels").

> iv. <u>Mere discussion of misinformation between federal agencies, or with social media companies, does not constitute "coercion" or "joint action" amounting to state action.</u>

Furthermore, the Complaint lacks facially plausible allegations of "coercion" or "joint action" by multiple agencies and their employees whom Plaintiffs have named as Defendants for one of two reasons: (1) they allegedly discussed the topic of misinformation with other federal agencies, or (2) they allegedly discussed the topic of misinformation with social media platforms. These Defendants include the Treasury Department and its Deputy Secretary, Wally Adeyemo, *see* SAC ¶¶ 432-37, and Mina Hsiang, in her official capacity as Administrator of the U.S. Digital Service within the Office of Management and Budget, *see id.* ¶¶ 360-61.

As to these Defendants, the Complaint is devoid of a single plausible allegation that they have communicated with a social media company in a manner that has coerced that company to take any specific content moderation measure against content on posted on its platform by a specific individual. These Defendants should be dismissed from this case out of hand.

*        *        *        *        *

In sum, Plaintiffs fail to plausibly allege that Defendants dictated or were otherwise responsible for any content-moderation measures that social media companies have taken regarding any specific posts by Plaintiffs or residents of the Plaintiff States. Those particular decisions are not attributable to Defendants under any applicable test for state action.

## B.  Plaintiffs fail to state plausible "*ultra vires*" claims.

Plaintiffs' so-called "*ultra vires*" claim in Count Two must be dismissed because Plaintiffs have failed to allege conduct that satisfies the demanding standard for an *ultra vires* claim.[19] To state such a claim, Plaintiffs must "do more than simply allege that the actions of the officer are illegal or unauthorized." *Danos v. Jones*, 652 F.3d 577, 583 (5th Cir. 2011). Rather, they must allege that the official acted "without any authority whatever," or without any "*colorable basis* for the exercise of authority." *See id.* (emphasis added). Plaintiffs have not sufficiently alleged that Defendants lack "any authority whatsoever" to engage in standard, nonbinding speech, SAC ¶ 514—the kind of speech government officials engage in when they participate in news media interviews or speak from the lectern. Perhaps recognizing this, Plaintiffs try to support their *ultra vires* claim by claiming that Defendants have acted in

---

[19] The Fifth Circuit has expressed doubts about the continued validity of the court-created *ultra vires* exception to sovereign immunity in light of the 1976 amendments to the APA. *See Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985) (recognizing that the "principal purpose" of the 1976 Amendments—which "waived sovereign immunity for suits seeking nonmonetary relief through nonstatutory judicial review of agency action" —"was to do away with the ultra vires doctrine and other fictions surrounding sovereign immunity" (citing Act of Oct. 21, 1976, Pub. L. No. 94-574, § 1, 90 Stat. 2721, 2721, codified at 5 U.S.C. § 702 (1982)); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 116 (1984) (noting that "the *ultra vires* doctrine [is] a narrow and questionable exception" to sovereign immunity).

violation of the First Amendment and the APA. *See, e.g.*, SAC ¶¶ 511, 524, 535. However, as explained above and below, the First Amendment and APA claims lack merit.

### C. Plaintiffs fail to state plausible APA claims against the Agency Defendants.

Counts Three through Seven appear to allege, in perfunctory fashion, various theories in support of APA claims against the Agency Defendants. SAC ¶ 519, 530, 541, 552, 563 (reciting elements of causes of action under 5 U.S.C. § 706(2)(A)-(D)). As an initial matter, as explained above, *see supra* pp. 46-49, Plaintiffs' APA claims are jurisdictionally deficient because the Complaint does not identify any "agency action," as defined by 5 U.S.C. § 551(13), much less discrete and final agency action that could be subject to APA review. But these claims also fail on their merits.

*First*, to the extent Plaintiffs contend that the Agency Defendants have acted "contrary to constitutional right," *id.* § 706(2)(B)," their APA claims simply duplicate their First Amendment claim. *See* SAC ¶¶ 523-24, 534-35, 545-46, 556-57, 567-68 (referring back to the allegations in Count One to support this claim). For the reasons stated above, Plaintiffs fail to plausibly allege a First Amendment claim against any Defendant. *See supra* pp. 50-60. Plaintiffs' duplicative APA claim necessarily fails as well.

*Second*, while the Complaint invokes 5 U.S.C. § 706(2)(A) or (2)(D), it merely offers "labels and conclusions," and "formulaic recitation[s] of the elements of a cause of action," without "further factual enhancement." *Iqbal*, 556 U.S. at 678. The Complaint appears to throw in every possible *legal* theory on which a claim for relief could be based under these subsections of the APA. *See, e.g.*, SAC ¶¶ 522, 525 (alleging that the Agency Defendants' conduct "is arbitrary, capricious, and an abuse of discretion," and thus in violation of 5 U.S.C. § 706(2)(A), "because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem, disregards

settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the unlawful nature of [Defendants'] conduct, among other reasons"); *id. e.g.*, ¶¶ 533, 536 (alleging that the Agency Defendant's "conduct was 'without observance of procedure required by law,'" and thus in violation of 5 U.S.C. § 706(2)(D), "because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process"). Yet those bare legal conclusions are not supported by any factual allegations about the actions of the Agency Defendants.

Plaintiffs thus fail to state any basis for entitlement to relief under the APA, and Counts Three through Seven therefore should be dismissed.

## III.   The separation of powers doctrine independently requires dismissal of the President from this action.

Plaintiffs' claims against the President should be dismissed for an additional reason: their requested equitable and declaratory relief is categorically unavailable against him. By history and tradition, injunctive relief has long been unavailable against the President under Supreme Court precedent concerning the separation of powers. Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320, 327 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano,* 527 U.S. at 319. Here, there is no tradition of equitable relief against the President. Instead, more than a century and a half ago the Supreme Court concluded that it had "no jurisdiction of a bill to enjoin the President in the performance of his official duties; and that no such bill ought to be received by" the Court. *Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 498, 501 (1866). In other words, as "to the President, courts do not have jurisdiction to enjoin him and have never submitted the President

to declaratory relief[.]" *Foley v. Biden*, No. 4:21-cv-01098, 2021 WL 7708477, at *2 (N.D. Tex.

Oct. 6, 2021) (quoting *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010)).

     *Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (plurality opinion), underscored

that point. The plurality observed that *Mississippi v. Johnson* "left open the question whether the

President might be subject to a judicial injunction requiring the performance of a purely

'ministerial' duty." *Id.* at 802. But it repeated that "in general," the Court lacked jurisdiction to

issue an injunction against the President "in the performance of his official duties"—calling this

relief "extraordinary" such that it should "raise[] judicial eyebrows." *Id.* at 802–03 (cleaned up);

*see also id.* at 826 (Scalia, J., concurring in part and concurring in the judgment) ("I think it clear

that no court has authority to direct the President to take an official act.") The Supreme Court has

thus repeatedly refused to second-guess the legality of the President's discretionary decisions. *See,

e.g.*, *Dalton v. Specter*, 511 U.S. 462, 474-75 (1994); *Chi. & S. Air Lines, Inc. v. Waterman S. S.

Corp.*, 333 U.S. 103, 114 (1948). "A court—whether via injunctive or declaratory relief—does not

sit in judgment of a President's executive decisions." *Newdow*, 603 F.3d at 1012 (citing, *inter alia*,

*Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996)). Of course, "[r]eview of the legality of

Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt

to enforce the President's directive." *Franklin*, 505 U.S. at 828 (Scalia, J., concurring in part); *see,

e.g., Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585-89 (1952). As a result, here, the

Court should dismiss him as a Defendant however else the Court rules on the Rule 12(b)(1) or

12(b)(6) grounds for dismissal.[20]

---

[20] The bar against injunctive or declaratory relief against the President applies even if it is not
considered "jurisdictional." To be sure, courts have repeatedly described the bar as jurisdictional
in character. *See Franklin*, 505 U.S. at 802-03; *Newdow*, 603 F.3d at 1013 ("With regard to the
President, *courts do not have jurisdiction to enjoin him*, and have never submitted the President to

# CONCLUSION

For the reasons set forth above, the Court should grant Defendants' Motion to Dismiss

Plaintiffs' claims for lack of subject-matter jurisdiction and for failure to state a claim.

Dated: November 22, 2022          Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

JAMES J. GILLIGAN
*Special Litigation Counsel, Federal Programs Branch*

*/s/ Kyla Snow*
ADAM D. KIRSCHNER (IL Bar No. 6286601)
*Senior Trial Counsel*
KYLA SNOW (OH Bar No. 96662)
INDRANEEL SUR (D.C. Bar No. 978017)
AMANDA K. CHUZI (D.C. Bar No. 1738545)
*Trial Attorneys*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
Tel: (202) 514-3259
kyla.snow@usdoj.gov

*Attorneys for Defendants*

---

declaratory relief[.]" (emphasis added)). But even if that bar were considered non-jurisdictional, it
still would be a "threshold" basis for ending the case without further inquiry into the merits. *Cf.
Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005) ("unique and categorical" rule of *Totten v. United States*,
92 U.S. 105 (1875), prohibiting suits based on covert espionage agreements, is sort of "threshold
question" court may "resolve[] before addressing jurisdiction").