**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

| | |
|---|---|
| STATE OF MISSOURI ex rel. ERIC S. SCHMITT, Attorney General, *et al.*,<br><br>   Plaintiffs,<br><br>v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,<br><br>   Defendants. | No. 3:22-cv-01213-TAD-KDM |

**PLAINTIFFS' SUPPLEMENTAL BRIEF ADDRESSING THE FIFTH CIRCUIT'S
<u>NONDISPOSITIVE ORDER REGARDING DEPOSITIONS</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ............................................................................................................. 1

SUMMARY OF ARGUMENT ......................................................................................... 2

ARGUMENT ..................................................................................................................... 5

   I.   The Court Should Authorize Written Discovery from Rob Flaherty to Ascertain Whether a Deposition of Mr. Flaherty is Needed. ............................................................... 5

   II.  The Court Should Authorize the Depositions of Mr. Scully and Ms. Protentis of CISA in Lieu of Ms. Easterly, and Defer Ruling on Ms. Easterly's Deposition Until Those Lower-Level Depositions Are Concluded. .................................................................... 11

      A.  Mr. Scully Has Knowledge of CISA's Involvement in the Election Integrity Partnership and Likely Has Extensive Additional Relevant Information. .................................. 12

      B.  Ms. Protentis Best Approximates an Adequate Substitute for Ms. Easterly as to CISA's Meetings with Social-Media Companies and Ms. Easterly's Coordinator Role in Joint Censorship Efforts. ............................................................................. 15

   III.  The Court Should Conclude That Alternative Sources of the Information in Dr. Murthy's Possession Are Not Available.  In the Alternative, the Court Should Order the Deposition of Eric Waldo and Then Determine If Dr. Murthy's Is Needed. ...................................... 18

   IV.  The Court Should Order the Government to Identify Lower-Ranking Official(s) Who Have the Information in Ms. Psaki's Possession. If the Government Represents That No Such

Official Exists, the Court Should Conclude That Alternative Sources of the Information in

Ms. Psaki's Possession Are Not Available....................................................................... 23

V.  The Court Should Not Pause Discovery While the Parties Brief and the Court Considers the

Government's Long-Overdue, Nearly One-Hundred-Page Motion to Dismiss. ............... 29

CONCLUSION ..................................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Cas. Co. of Reading, Pa. v. Krieger*,
    160 F.R.D. 582 (S.D. Cal. 1995) ................................................................... 20

*Bernard v. Gulf Oil Co.*,
    619 F.2d 459 (5th Cir. 1980) ....................................................................... 31

*F.D.I.C. v. Galan-Alvarez*,
    No. 1:15–mc–00752 (CRC), 2015 WL 5602342 (D.D.C. Sep. 4, 2015)................... 9

*Hay & Forage Indus. v. Ford New Holland, Inc.*,
    132 F.R.D. 687 (D. Kan. 1990)................................................................... 20

*In re Ramu Corp.*,
    903 F.2d 312 (5th Cir. 1990) ....................................................................... 29

*In re U.S. Dep't of Educ.*,
    25 F.4th 692 (9th Cir. 2022) ................................................................... 9, 27

*Littlefield v. Nutribullet, LLC*,
    No. CV 16-6894 MWF (SSx), 2017 WL 10438897 (C.D. Cal. Nov. 7, 2017) ......... 9

*McGinn v. El Paso Cnty.*,
    --- F. Supp. 3d ---, 2022 WL 16924058 (D. Colo. Nov. 14, 2022)........................ 30

*McKnight v. Blanchard*,
    667 F.2d 477 (5th Cir. 1982) ....................................................................... 29

*Neb. Press Ass'n v. Stuart*,
    427 U.S. 539 (1976)................................................................................. 31

*Tierra Blanca Ranch High Country Youth Program v. Gonzalez*,
    329 F.R.D. 694 (D.N.M. 2019)..................................................................... 9

*U.S. Dep't of State*,
    865 F.3d 211 (5th Cir. 2017) (Elrod, J., dissenting from the denial of rehearing *en banc* ....... 32

*United States v. Olano*,
    507 U.S. 725 (1993).................................................................................. 29

**Rules**

Federal Rule of Civil Procedure 33 .................................................................... 28

**Other Authorities**

FEDERAL PRACTICE AND PROCEDURE §2163 (2022)............................................. 20, 28

## INTRODUCTION

On October 21, this Court authorized the depositions of several current and former federal officials as part of preliminary-injunction related discovery in this case. Doc. 90. Defendants filed a petition for a writ of mandamus in the Fifth Circuit as to three of these officials: Deputy Assistant to the President Rob Flaherty, CISA Director Jen Easterly, and Surgeon General Vivek Murthy. *See* Doc. 91, at 1. In addition, Defendants and counsel for former White House Press Secretary Jennifer Psaki moved to quash her deposition in the Eastern District of Virginia. *See* Docs. 119-1, 119-2. The Eastern District of Virginia transferred the motions to this Court, and this Court denied the motions. *See* Doc. 120.

On November 21, the Fifth Circuit issued a nondispositive order in connection with Defendants' mandamus petition. The Fifth Circuit held that Flaherty, Easterly, and Murthy are all high-ranking officials, which means that "exceptional circumstances" must exist to justify their deposition. Doc. 121, at 3. The Fifth Circuit held that this Court must consider whether "the information sought [in deposing these officials] can be obtained through less intrusive, alternative means, such as further written discovery or depositions of lower-ranking officials." *Id.* at 3–4. Accordingly, the Fifth Circuit instructed this Court to "enter an order that addresses the availability of suitable alternative sources for the evidence sought in the proposed depositions." *Id.* at 4–5. In addition, the Fifth Circuit instructed this Court to address "whether further discovery should be paused until a ruling on a timely-filed motion by the Government to dismiss." *Id.* at 5.

In light of the Fifth Circuit's order, this Court directed Plaintiffs to "file a brief . . . providing the Court with suitable, alternative sources, besides from those of Dr. Vivek Murthy, Rob Flaherty, and Jen Easterly, for the evidence sought in the proposed depositions." Doc. 127, at 1. Because Plaintiffs agree that Psaki is a former high-ranking official, Plaintiffs address Psaki's deposition in this brief as well. *See* Doc. 133, at 3.

1

## SUMMARY OF ARGUMENT

All four officials at issue here—Rob Flaherty, Jen Easterly, Vivek Murthy, and Jen Psaki—possess information that is crucial to Plaintiffs' First Amendment claims. The only question is whether Plaintiffs can access this information by alternative, less intrusive means than depositions. *See* Doc. 121, at 4–5 (directing the Court to address this question).

***Rob Flaherty.*** One possible "suitable, alternative source" of information from Flaherty is written discovery (interrogatories and document requests) directed to Flaherty himself. As the Fifth Circuit pointed out, "[P]laintiffs have not [yet] taken any written discovery" from Flaherty. Doc. 121, at 3. Plaintiffs previously sought written discovery from Flaherty, but Defendants vigorously opposed it. Because written discovery may obviate the need for Flaherty's deposition or identify an alternative source for information in Flaherty's possession, Plaintiffs request leave to serve limited document requests and interrogatories on Flaherty. Once Flaherty has responded to Plaintiffs written discovery requests, the parties can address whether his deposition remains necessary.

***Jen Easterly.*** Plaintiffs propose taking two depositions in lieu of Jen Easterly. First, Defendant Brian Scully appears to be an adequate alternative source for one set of critical information in Easterly's possession, namely, CISA's involvement with the so-called "Election Integrity Partnership." Second, as to other sources of critical information in Easterly's possession, Plaintiffs do not believe that a fully adequate alternative source exists. But Plaintiffs would propose Defendant Lauren Protentis as the official who most closely approximates an adequate substitute for Easterly as to other sets of information. Accordingly, Plaintiffs would request leave to depose both Scully and Protentis, if Easterly's deposition is not permitted. After those two depositions, the parties could address whether Easterly's deposition is still needed.

2

**Dr. Vivek Murthy.** Plaintiffs maintain that this Court rightly concluded that exceptional circumstances exist that justify deposing Murthy. Publicly available documents as well as documents produced in discovery indicate three independently sufficient justifications for deposing Murthy: (1) Murthy held a series of calls with Facebook officials where he reportedly pressured them to be more aggressive in combating misinformation; (2) Murthy held a call with a senior Facebook executive that built on a prior discussion of "what the White House expects from [Facebook] on misinformation" in which Murthy urged Facebook to "do more" and "identified 4 specific recommendations for improvement"; and (3) Murthy is the only Office of the Surgeon General ("OSG") official Plaintiffs know is personally involved in the so-called "Virality Project," which coordinates collaborative censorship efforts between social-media companies and government officials on COVID-19-related speech. No adequate alternative source exists for Murthy's knowledge of what he said on these calls (and may still be saying) and of the OSG's involvement in the Virality Project. The Court should enter an order making findings to this effect to substantiate its conclusion that exceptional circumstances exist to justify deposing Murthy. In the alternative, if Murthy's deposition is not permitted, Plaintiffs would request leave to depose Eric Waldo, the official who most closely approximates an adequate substitute for Murthy. After the deposition of Waldo, the parties could address whether the deposition of Dr. Murthy is still warranted.

**Jennifer Psaki.** Ms. Psaki made public statements indicating that she knows the identities of federal officials—including senior White House officials—who communicate with social-media platforms about censorship ("flagging problematic posts") and make demands ("asks") for increased censorship. The identities of such officials and the nature and content of their communications are centrally relevant to Plaintiffs' preliminary-injunction motion. Doc. 34, at

13.   While insisting that Psaki is not the only source for the information that Plaintiffs seek from her, Defendants have steadfastly refused to reveal the identit(ies) of the other officials who have the information. The Court should put an end to Defendants' gamesmanship by ordering Defendants to identify and produce lower-ranking official(s) who have the information that Plaintiffs seek from Psaki, if such official(s) exist(s). If such officials exist, then Plaintiffs would agree to depose them instead of Ms. Psaki.  If such officials do not exist, then the information is available from no one but Ms. Psaki, and there are exceptional circumstances that warrant her deposition. But if Defendants—who alone know the identities of these officials (assuming they exist), and decline to disclose them, while *also* vigorously opposing the deposition of Ms. Psaki— refuse to reveal this knowledge, then Plaintiffs have no alternative but to depose Ms. Psaki.

Finally, the Court need not, and should not, pause further discovery while the parties brief and the Court considers Defendants' prolix and long-overdue motion to dismiss. Defendants already had an opportunity to present the substance of their standing arguments to this Court in opposing preliminary-injunction-related discovery, and this Court rightly rejected them. Defendants have since delayed filing a renewed motion to dismiss for months and waived any objection to proceeding with expedited discovery. Meanwhile, Plaintiffs continue to suffer irreparable harm while their preliminary-injunction motion remains pending.  To pause preliminary-injunction-related discovery for weeks pending resolution of a motion to dismiss that the Government delayed filing for *six and a half months* after this case was first filed would be inequitable and wholly improper.

**ARGUMENT**

I.     **The Court Should Authorize Written Discovery from Rob Flaherty to Ascertain Whether a Deposition of Mr. Flaherty is Needed.**

The Fifth Circuit noted that "with respect to Flaherty, it appears that the plaintiffs have not taken any written discovery at all." Doc. 121, at 3.  That is correct, but it is not for lack of trying. Flaherty was not originally a defendant in this case because Plaintiffs were not aware of his involvement in pressuring social-media platforms to censor COVID-19-related speech, as that involvement was not publicly available.  Plaintiffs became aware of Flaherty's role only when they received initial written discovery from HHS and the CDC. Flaherty was included on highly probative email chains that also included HHS and CDC officials. These emails provided compelling evidence that Flaherty was pressuring and colluding with social-media platforms to censor speech.  Plaintiffs immediately sought written discovery directly from Flaherty in the Joint Statement on Discovery Disputes, asking the Court's leave to file a second amended complaint and "serve expedited discovery requests on newly identified federal officials who are pressuring social-media platforms to engage in censorship." Doc. 71, at 25–26.  Plaintiffs sought authorization to serve "interrogatories and document requests on the newly named Defendants," including Flaherty. *Id.* at 26. Defendants vigorously opposed this request, *id.* at 57–62, and the Court ruled in Defendants' favor on this point, authorizing the Second Amended Complaint but not allowing additional discovery against Flaherty and the other new Defendants at that time, Doc. 72, at 3-4.

Having successfully opposed written discovery against Flaherty in this Court, Defendants, in a dizzying reversal, complained to the Fifth Circuit that this Court erred by ordering Flaherty's deposition *without first authorizing written discovery against Flaherty—i.e.*, the very written discovery that they stridently urged this Court *not* to order in August.  *See* Doc. 71, at 57–62.  As the Fifth Circuit noted, Doc. 121, at 3, written discovery against Flaherty may illuminate whether

it is necessary to depose Flaherty—*e.g.,* it may reveal the content of Flaherty's oral communications with social-media platforms, or it may identify a lower-level subordinate who participated in the same meetings and thus may serve as an adequate substitute for Flaherty. Plaintiffs have received only an artificially narrow snapshot of Flaherty's written communications—*i.e.*, those that happened to include relevant HHS or CDC officials who responded to Plaintiffs' initial written discovery requests.  And Plaintiffs have had no opportunity to serve interrogatories on Flaherty at all.

Thus, the Court should authorize Plaintiffs to serve written discovery on Flaherty in lieu of his deposition at this time.  Once written discovery responses are provided, the parties can then meet and confer about whether a deposition is still needed.  Flaherty's responses may obviate the need for his deposition.

Plaintiffs' need for discovery from Flaherty arises from the ongoing meetings about censorship and content modulation that Flaherty repeatedly holds with representatives of social-media companies, involving collusion and pressure to censor speech about COVID-19. To cite just a few examples among many, in March 2021, Flaherty organized a "Misinfo & Disinfo" meeting with several Facebook employees after pressing a Facebook representative on what "misinformation . . . might be falling outside [Facebook's] removal policies" and how being "on [Facebook's] list for removal hasn't historically meant that it was removed," and the Facebook representative promised to "go into more detail" in a meeting rather than over email. Ex. A (Flaherty meeting invitations), at 1–2; Doc. 86-5, at 39.  In October 2021, Flaherty and a "team" of Facebook employees had a meeting where they discussed, among other things, a change to Facebook's "current misinfo policies . . . based on the conversation [unidentified Facebook employees] had with [unidentified CDC officials]." Doc. 86-5, at 4–5; *see also* Doc. 71-3, at 5

(email from Facebook to "Rob and Team" regarding "misinformation and harm policies on Facebook and Instagram" and how Facebook "expanded these policies in coordination with the CDC"). Flaherty had requested the meeting "to discuss what you all [at Facebook] are planning" as far as how to address "mis-and-disinformation on feed and in groups" and "the wide reach of [vaccine-]hesitancy-inducing content on your platform." Doc. 86-5, at 6.

Flaherty holds similar meetings with representatives of other social-media companies. For example, he held a meeting with Twitter employees about "building on [Twitter's] continued efforts to remove the most harmful COVID-19 misleading information from the service," after which a Twitter representative followed up to confirm that "we are committed to working with stakeholders in the public . . . sector[] to address the reliability of covid information online and look forward to continued dialogue about joint efforts." Doc. 86-5 at 37. Flaherty also organized a meeting with Google employees whose agenda included "YouTube's efforts to combat misinfo, what interventions YouTube is currently trying, and ways the White House (and our COVID experts) can partner in product work." Doc. 86-5 at 32.

According to the documents Plaintiffs have received, Flaherty is the only individual who participated in each of the above-referenced meetings. No single social-media-company representative participated in all of them; indeed, no single social-media *company* was represented in all of them. Other government officials participated in some of the meetings, but as far as Plaintiffs know, no single official—other than Flaherty—participated in all. Perhaps written discovery on Flaherty will disclose the identities of other lower-level individual(s) with knowledge of those meetings, but none is apparent from the limited written discovery received so far.

Andrew Slavitt is not an adequate substitute for Flaherty. Mr. Slavitt appears to have participated in only the last of the above-referenced meetings, the one about YouTube. *See* Ex. A,

at 3–4 (Slavitt not included on Twitter meeting invitation); Doc. 86-5, at 37 (Slavitt not included on Twitter meeting follow-up); Doc. 86-5, at 4–5 (Slavitt not included on October Facebook meeting follow-up); Ex. A, at 1–2 (Slavitt not included on March Facebook meeting invitation); *but see* Doc. 86-5, at 36 (Slavitt included on what appears to be March Facebook meeting follow-up). In fact, Slavitt left the Government in June 2021 after only a five-month stint in the Biden Administration. *See* Maeve Sheehey, *Andy Slavitt Stepping Down from White House Covid-19 Response Role*, POLITICO (June 9, 2021), https://www.politico.com/news/2021/06/09/andy-slavitt-steps-down-covid-19-response-role-492572. Thus, Slavitt was gone well before many of the critical meetings and communications involving Flaherty—which continue up through the close of the written discovery period in 2022—took place. *See, e.g.*, Doc. 86-5, at 17 (August 2021) (Facebook email to Flaherty requesting a call, apparently seeking the Government's approval before proceeding with an announcement "related to vaccine misinformation"); *id.* at 7 (September 2021); *id.* at 2–3 (October 2021) (Flaherty expressing disappointment with the amount of COVID-19-related misinformation on Facebook and Facebook employee responding defensively that Facebook's content-removal practices were consistent with "what we briefed on"); *id.* 4–5 (October 2021) (Facebook confirming its oral pledge to Flaherty and three other federal officials to censor "claims about child vaccinations," a "change" Facebook was willing "to make . . . based on the conversation we had last week with the CDC"); Doc. 71-3, at 6 (June 2022) (Flaherty instructing Facebook to continue its biweekly report on censorship of COVID-19 misinformation). To be clear, Slavitt was *independently* deeply involved in Defendants' censorship enterprise—for example, he played a critical role in pressuring Twitter to deplatform Alex Berenson—which is why Plaintiffs sought to depose him in addition to Flaherty. *See* Doc. 86, at 11–15. But Slavitt is

8

an alternative source for only a fraction of the crucial information in Flaherty's possession (and vice-versa).

Furthermore, even if Slavitt did have access to all the crucial information in Flaherty's possession (and he does not), Slavitt would not be an adequate alternative deponent for purposes of the apex doctrine for the simple reason the Slavitt was at least as high ranking as, if not *higher* ranking, than Flaherty. *Compare* Doc. 86, at 42 (Slavitt was "White House Senior Advisor"), *with id.* (Flaherty is "Deputy Assistant to the President").  Defendants vigorously contend that the apex doctrine "is no less applicable to former officials than to current officials." Doc. 119-2, at 22 (quoting *F.D.I.C. v. Galan-Alvarez*, No. 1:15–mc–00752 (CRC), 2015 WL 5602342, at *4 (D.D.C. Sep. 4, 2015)). The apex doctrine directs courts to ask whether crucial information in a high-ranking official's possession can reasonably be obtained "by a *less intrusive* method" than deposing the official, "such as through written discovery or by deposing *lower-ranking* employees." *Tierra Blanca Ranch High Country Youth Program v. Gonzalez*, 329 F.R.D. 694, 697 (D.N.M. 2019) (emphases added). It is not at all clear that Slavitt, the White House's Senior Advisor for COVID-19 matters, is lower ranking than the White House digital director.

In sum, to piece together what transpired at the meetings referenced above (as well as other relevant meetings that discovery to date indicates took place) from sources other than Flaherty would require questioning numerous social-media-company representatives and/or numerous government officials, some of whom (such as Slavitt) may be higher ranking than Flaherty. That would not be reasonably feasible, especially on an expedited-discovery schedule, and it would likely be more burdensome for the Government than a single deposition of Flaherty. *See In re U.S. Dep't of Educ.*, 25 F.4th 692, 704 (9th Cir. 2022) (requiring "[e]xhaustion of all *reasonable* alternative sources" before deposing a high-ranking official (emphasis added)); *Littlefield v.*

*Nutribullet, LLC*, No. CV 16-6894 MWF (SSx), 2017 WL 10438897, at *7 (C.D. Cal. Nov. 7, 2017) (authorizing the deposition of a high-ranking official because "it does not appear that the information [the official] possesses is *readily or realistically* available from other sources" (emphasis added)).

That said, one potential source of that information which is less intrusive than a deposition is interrogatories and document requests directed to Mr. Flaherty. The Fifth Circuit suggested this alternative, noting that "the plaintiffs have not [yet] taken any written discovery" from Flaherty. Doc. 121, at 3. In particular, Defendants have not produced documents pertinent to communications with social-media companies involving only Flaherty, or only Flaherty and other White House officials; Plaintiffs' limited knowledge of Flaherty's role in Defendants' censorship efforts is based on the discovery responses of other Defendants. Although on the current record it does not appear that the critical information in Flaherty's possession is available from other sources, perhaps written discovery will reveal the information, or else reveal the identity of a lower-ranking official who knows the information. Accordingly, Plaintiffs suggest that the Court defer ruling on "the availability of suitable alternative[s]" to deposing Flaherty until Plaintiffs have had an opportunity to collect written discovery from Flaherty. *Id.* at 4. Plaintiffs propose that the Court order Plaintiffs to serve written interrogatories and document requests on Flaherty within three business days of its ruling on the current dispute, and order Flaherty to respond within fourteen days.  To be sure, if Flaherty is vague and evasive in his discovery responses, that would tend to support a continued request for his deposition. In any event, once the written discovery is complete, the parties can meet and confer and report to the Court about whether Flaherty's deposition remains necessary.

II.     **The Court Should Authorize the Depositions of Mr. Scully and Ms. Protentis of CISA in Lieu of Ms. Easterly, and Defer Ruling on Ms. Easterly's Deposition Until Those Lower-Level Depositions Are Concluded.**

Plaintiffs sought Easterly's deposition for multiple reasons. One crucial reason is that Plaintiffs seek to discover the nature and scope of CISA's ongoing involvement under Easterly's direction with the Election Integrity Partnership ("EIP"), which has publically announced that it works with CISA to increase social-media platforms' censorship activities. As a substitute for Easterly on this point, Plaintiffs request leave to depose Defendant Brian Scully, the Chief of CISA's so-called "Mis-, Dis-, Malinformation Team." *Id.* ¶ 75; Ex. B (supplemental Protentis documents), at 10 (organizational chart featuring Scully). The Government's discovery indicates that Scully is an adequate alternative source for information about CISA's involvement in EIP. Further, as the leader of the so-called "Mis- Dis- Malinformation Team," Scully likely has highly relevant knowledge of CISA's ongoing involvement in other forms of social-media censorship activities, which may further obviate the need for Ms. Easterly's deposition.

In addition, Plaintiffs sought Easterly's deposition because (among other reasons) she participates in and oversees at least five series of recurring meetings about content modulation with social-media companies, and because she plays a key role as the coordinator of joint censorship efforts between government entities and social-media companies. As an alternative to Easterly on these points, Plaintiffs request the deposition Lauren Protentis. To be sure, Protentis is only a partial substitute for Easterly. Only Easterly can speak to the full range of recurring meetings on content modulation between CISA and social-media companies, and only Easterly can testify to the full range of her efforts to personally coordinate joint censorship efforts between government entities and social-media companies. But Protentis more closely approximates an adequate substitute for Easterly on these points than any other lower-ranking official that Plaintiffs are able to identify based on current information.  Notably, Protentis is in charge of "engagement" for the

"MDM Team," so she appears to play a central role in direct communications with social-media platforms about censorship, and the emails produced by Defendants in discovery reflect this role.

Thus, Plaintiffs request leave to depose Scully and Protentis, both of whom are already Defendants in this case, in lieu of Easterly. Plaintiffs request to depose Protentis in addition to, rather than in lieu of, Scully because there is no evidence that Protentis has information related to EIP. Plaintiffs have not been able to locate a single document linking Protentis to EIP.

### A.     Mr. Scully Has Knowledge of CISA's Involvement in the Election Integrity Partnership and Likely Has Extensive Additional Relevant Information.

One critical fund of information that Plaintiffs seek from Easterly is the nature and scope of CISA's ongoing involvement with EIP. According to its own public report, EIP "was formed out of a recognition that the vulnerabilities in the current information environment require urgent collective action." Ex. C (EIP Report), at x. EIP complains that "no government agency in the United States has the explicit mandate to monitor and correct election mis- and disinformation." *Id.* at 2. To fill this censorship void, a group of federal officials—*CISA interns*—approached the Stanford Internet Observatory, "and, in consultation with CISA and other stakeholders, a coalition was assembled with like-minded partner institutions." *Id.* (emphasis added). According to EIP's "operational timeline," it had an initial discussion on June 23, 2020 and a "[m]eeting with CISA to present [the] EIP concept" on July 9 before launching its website on July 27. *Id.* at 3. EIP is partially funded by the federal Government. *See id.* at xiii (acknowledging "financial support" from "U.S. National Science Foundation" grants and the "Atlantic Council," and providing a link to an Atlantic Council's "donor[]" list, which includes the U.S. Department of State, U.S. Department of Energy, U.S. Marine Corps, and U.S. Mission to NATO).

According to Alex Stamos, the Director of the Stanford Internet Observatory who oversees EIP activities, there are "two steps" in EIP's approach to "effectively pushing platforms to do

stuff": "get good [censorship] policies, and then say 'this is how [given content] is violating [those policies].'" FFOSourceClips, *EIP - Bragging That They Pushed the Envelope on Censorship Policies*, RUMBLE 0:36–38, 1:36–40 (Sep. 29, 2022), https://rumble.com/v1lzhvy-eip-bragging-that-they-pushed-the-envelope-on-censorship-policies-threat-of.html (video clip showing Stamos speaking about EIP). Regarding the first step, Stamos boasts that the EIP successfully pushes social-media platforms to adopt more aggressive censorship policies: "Now we're not going to take credit for all the changes [social-media companies] made [to their censorship policies], but we had to update this thing like eight or nine times." *Id.* at 1:13–18. "[P]utting these people in a grid to say, 'you're not handling this . . . ' creates a lot of pressure inside the companies and forces them to kind of grapple with these issues." *Id.* at 1:19–29.

Regarding the second step, EIP's retrospective report explains that EIP uses "an internal ticketing workflow management system" to flag content, posts, and speakers for censorship to social-media platforms. Ex. C, at 8. "Each identified informational event was filed as a unique ticket in the system." *Id.* "Tickets were submitted by both trusted external stakeholders," including CISA and other governmental entities, "and internal EIP analysts." *Id.* at 8, 11–12. If a ticket was assessed for "mitigation," then EIP would "tag [social-media] platform partners . . . for action" and "communicate with EIP's partners in government." *Id.* at 9–10. Between September 3 and November 19, 2020, EIP "processed 639 in-scope tickets," comprising many thousands of URLs and *tens of millions* of distinct social-media posts. *Id.* at 27. Thirty-five percent "of the URLs [EIP] shared with Facebook, Instagram, Twitter, TikTok, and YouTube were either labeled, removed, or soft blocked." *Id.* A screenshot of an example ticket shows an online chat-style discussion among an "EIP member," a "Government partner," and a "Platform partner" about claims that had been assessed and tagged "for action." *Id.* at 10, 30.

EIP openly states that it is a joint enterprise that includes the direct participation of three federal government partners, including CISA and the State Department's Global Engagement Center. *Id.* at 8, 12. Notably, these "trusted partners," *i.e.*, federal officials, are authorized to submit "tickets" to social-media platforms through EIP to demand censorship of individual speakers and content on social-media, and those federal officials evidently do so. *See id.*

Summing up, the EIP was originated by the federal government (CISA), is partially funded by the federal Government, and holds itself out as a joint federal-private enterprise with a twofold purpose: (1) to pressure social-media platforms to adopt more restrictive content-modulation policies, and (2) to pressure the platforms to enforce those policies against speech that the EIP's constituents (including federal officials) disfavor. Federal officials at CISA and the State Department *directly participate* in EIP's operations by submitting "tickets" to demand censorship of speakers and content on social media. EIP boasts that it procured the censorship of nearly 22 million Tweets during the 2020 election cycle alone, *id.* at 183, to say nothing of other social-media platforms like Facebook. And EIP boasts that it is continuing its operations today. *See The Election Integrity Partnership in 2022: Our Work Ahead*, ELECTION INTEGRITY PARTNERSHIP (July 31, 2022), https://www.eipartnership.net/blog/about-eip-2022 ("The EIP is continuing its nonpartisan and collaborative work in the 2022 election cycle."). Particularly relevant here, EIP's report mentions named Plaintiff Jim Hoft's website The Gateway Pundit 49 times, claiming that it repeatedly (and successfully) pressures social-media platforms to censor Mr. Hoft's speech. *See generally* Ex. C.

Uncovering the extent of CISA's involvement with EIP is crucial to Plaintiffs' claims. As the agency head, Easterly is certainly well positioned to address questions about the scope of CISA's involvement in EIP's work. Nonetheless, documents produced in discovery strongly

suggest that Brian Scully, Chief of CISA's "MDM Team," is an alternative source for this information. Specifically, numerous documents indicate that Scully was a government contact in three-way discussions among EIP, social-media platforms, and CISA. *See, e.g.*, Ex. D (Scully documents), at 12, 23–24, 43–44, 51–53, 70. And at least one document suggests that Scully is among EIP's primary points of contact in CISA. *See id.* at 25 (email from Scully to Twitter explaining that "[EIP] will also let *CISA* know when they are reporting something to you so *I* can give you a heads up" (emphases added)). Thus, Scully is an adequate, lower-ranking alternative to Easterly as to information about CISA's involvement with EIP.  Moreover, as head of the "MDM Team," *see* Ex. B, at 10, Scully likely has extensive relevant knowledge of CISA's extensive social-media censorship activities in addition to CISA's involvement in the EIP.

**B.**     **Ms. Protentis Best Approximates an Adequate Substitute for Ms. Easterly as to CISA's Meetings with Social-Media Companies and Ms. Easterly's Coordinator Role in Joint Censorship Efforts.**

Plaintiffs also seek to depose Ms. Easterly because of her unique roles in overseeing recurring meetings about content modulation with social-media companies and coordinating joint censorship efforts between government entities and social-media companies. Although no official is an entirely adequate substitute for Easterly on these points, Protentis comes closest.

The Government provided interrogatory responses identifying at least five sets of recurring meetings about misinformation between social-media platforms and CISA's various branches and committees. *See* Doc. 86-3, at 38–40. One set of meetings features CISA's "Election Security and Resilience" ("ESR") subdivision, another involves CISA and Facebook planning and setting the agenda for the ESR subdivision meetings, a third involves CISA's "Cybersecurity Advisory Committee" ("CSAC"), a fourth is limited to CSAC's Subcommittee for "Protecting Critical Infrastructure from Misinformation and Disinformation" ("MDM Subcommittee"), and a fifth consists of "meetings convened by Election Infrastructure Subsector Government Coordinating

Council (EIS-GCC) and Election Infrastructure Subsector Coordinating Council (EI-SCC) Joint MDM Working Group." *See id.*

Documents produced in discovery attest to Easterly's participation in some of these oral and face-to-face meetings with social-media platforms, and extensive and detailed oversight of the others. *See, e.g.*, Doc. 86-7, at 6 (noting with respect to CSAC that "[s]ubcommittee members will discuss recommendations to socialize their efforts with Director Easterly"); *id.* at 8 (email to CSAC's MDM Subcommittee stating that "[w]e've been asked to provide an initial set of recommendations to Director Easterly and the committee at the June meeting"); *id.* at 10 (noting that Facebook officials would "find 30 minutes on the Director's calendar" to discuss "2022 Elections"). What discovery does not indicate is anyone other than Easterly who can speak to what occurred during the meetings in each of the five categories listed above. Though Plaintiffs specifically asked for this information, CISA did not identify the federal officials who participate in most of the recurring meetings with social-media platforms in its interrogatory responses; nor did CISA provide any specific dates, times, places, or topics of meetings. *Id.* at 38–40. All CISA provided was a link to agendas, summaries, and participant lists for the CSAC meetings (which indicate Easterly's personal participation in all CSAC meetings), and a link to a list of CSAC's MDM Subcommittee members. *Id.* at 39. Thus, aside from the CSAC and CSAC MDM Subcommittee meetings, Plaintiffs have no way to ascertain who other than Easterly knows what happens during the recurring meetings on misinformation with social-media platforms. Because the meetings involve different CISA subdivisions, Easterly is likely the only official with knowledge of what happens during all the meetings as opposed to just a subset of them.

That said, it is likely that Protentis is familiar with what occurs during a significant and relevant subset of the meetings. Protentis helps to organize the recurring ESR subdivision meetings

as well as the recurring meetings between CISA and Facebook to plan and set the agenda for the larger ESR subdivision meetings. *See* Ex. B, at 1–9; Doc. 86-8, at 7. Additionally, Protentis is a member of the Joint MDM Working Group. Doc. 86-8, at 6; *see also id.* at 3 (indicating that Protentis presented on MDM at a March 31, 2022 EI-SCC meeting). Therefore, Protentis can speak to what occurs in three of the five recurring meetings that Easterly oversees.

In addition to overseeing CISA's recurring meetings on censorship with social-media companies, Easterly also oversees CISA's role "as a switchboard for routing disinformation concerns to appropriate social media platforms." *Mis, Dis, Malinformation*, CISA, https://www.cisa.gov/mdm (accessed Nov. 28, 2022).  In a text thread with a Microsoft executive about how "platforms have got to get more comfortable with gov't" in connection with "mis/dis trends," Easterly explained that she sees herself as "play[ing] a coord role so not every [department and agency] is independently reaching out to platforms." Doc. 71-5, at 4. Easterly apologized to the Microsoft executive for not "ring[ing] last week," suggesting that she speaks regularly with representatives of social-media companies by phone in connection with her role as coordinator for private-public partnership on censorship of misinformation. *Id.* The documents Plaintiffs received in discovery indicate that the partnership Easterly is personally coordinating involves CISA flagging content to social-media companies for censorship through an "Elections Misinformation Reporting Portal," Doc. 71-8, at 1, which apparently operates alongside EIP's "ticketing" system. As the official who plays the "coord role" in CISA's collaboration with social-media companies on censoring misinformation, Easterly is likely the only official who can speak to the full workings and scope of that collaboration. Doc. 71-5, at 4.

That said, Protentis likely has as much familiarity as any other lower-ranking official about Easterly's "coord role." *Id.* Protentis serves as "Engagements Lead" on CISA's "MDM Team,"

which indicates that she plays a lead role in communicating with social-media companies on so-called "MDM" issues. *See* Ex. B, at 10. Thus, it is likely that Protentis is at least as involved as any other lower-ranking official in CISA's "switchboard" function "routing disinformation concerns to appropriate social media platforms." *Mis, Dis, Malinformation*, CISA.

*   *   *

In conclusion, as the best available alternative source of the information in Easterly's possession, Plaintiffs propose the depositions of Brian Scully and Lauren Protentis.  After the conclusion of those two lower-level depositions, the parties can meet and confer on whether the deposition of Ms. Easterly is still needed.

**III.    The Court Should Conclude That Alternative Sources of the Information in Dr. Murthy's Possession Are Not Available.  In the Alternative, the Court Should Order the Deposition of Eric Waldo and Then Determine If Dr. Murthy's Is Needed.**

Exceptional circumstances exist to justify Murthy's deposition because he has firsthand knowledge of information that is crucial to Plaintiffs' claims and that is not reasonably available through alternative means. The Court should enter an order articulating the sound factual basis for its conclusion that Murthy's deposition is justified given the circumstances. In the alternative, the Court should enter an order authorizing the deposition of Eric Waldo, Murthy's chief of staff, and determine after this lower-level deposition whether the deposition of Dr. Murthy is still needed.

For months, Murthy participated in "talks with [Facebook] to stop the spread of false stories about vaccination side effects and other harms," including at least one "tense" meeting and another where "Dr. Murthy angrily said that . . . [Facebook] did not do enough to defend against bad information." Zolan Kanno-Youngs et al., *"They're Killing People": Biden Denounces Social Media for Virus Disinformation*, NEW YORK TIMES (July 16, 2021), https://www.nytimes.com/2021/07/16/us/politics/biden-facebook-social-media-covid.html. Uncovering the specifics of what was said during these meetings is crucial to Plaintiffs' claims, as

18

is the question whether and to what extent such meetings are still ongoing. Yet Defendants, astonishingly, *did not identify or describe these meetings in their response to Plaintiffs' interrogatories*. Plaintiffs do not know and have no way of ascertaining the identities of any of the meetings' participants other than Murthy. Thus, Plaintiffs cannot access the crucial information they seek from an alternative source or in an alternative form. This alone is a sufficient justification for deposing Murthy notwithstanding his high-ranking status.

But there is more. The written discovery that Defendants did produce indicates that Murthy held at least one additional, *ad hoc* meeting where he pressured Facebook to censor disfavored speech. *Id.* On July 16, 2021, Nick Clegg, Facebook's President of Global Affairs, told Murthy that "it's not great to be accused of killing people," Doc. 71-5, at 1, after President Biden had accused Facebook of exactly that "by allowing disinformation about the coronavirus vaccine to spread online," Kanno-Youngs, *"They're Killing People"*. In a separate message the same day, Clegg indicated to Murthy that their "teams [had] met today to better understand the scope of what the White House expects from us on misinformation going forward" but that Clegg "would appreciate the opportunity to speak directly to discuss a path forward with you and how we can continue to work together." Doc. 71-4, at 1–2. Clegg explained that to date he had "appreciated the way you and your team have approached our engagement" but that "the way we were singled out over the past few days has been . . . unproductive to our joint efforts." *Id.*

 Murthy replied to the second message offering "to speak directly about how we move forward." Doc. 86-9, at 1–2. A subsequent email from Clegg began, "Thanks again for taking the time to meet earlier today." Doc. 86-5, at 15. Clegg proceeded to summarize the steps Facebook was taking "to adjust policies on what we are removing with respect to misinformation," including deplatforming the "disinfo dozen" and "expand[ing] the group of false claims that we remove."

*Id.* Clegg continued: "We hear your call for us to do more and, as I said on the call, we're committed to working together . . . . You have identified 4 specific recommendations for improvement and we want to make sure to keep you informed of our work on each." *Id.*

The contents of Murthy's oral conversation(s) with Clegg are central to Plaintiffs' claims. It appears that no one besides Murthy and Clegg participated in this conversation. Serving and enforcing a third-party subpoena on Clegg, a senior Facebook executive based in London, is not a realistic alternative to deposing Murthy. *See* Gareth Corfield & James Warrington, *Sir Nick Clegg Returns to London in Latest Meta Move*, THE TELEGRAPH (Aug. 3, 2022), https://www.telegraph.co.uk/technology/2022/08/03/sir-nick-clegg-quits-silicon-valley-london-latest-meta-move/. Therefore, Plaintiffs cannot access the crucial information in Murthy's possession from another source. And Plaintiffs have already served written discovery requests on Murthy, but he provided no detail whatsoever on these meeting(s), and in fact he failed to even identify them in response to interrogatories. Moreover, written discovery is inadequate to probe in detail the contents of an oral communication like the one between Clegg and Murthy. *See, e.g.*, CHARLES WRIGHT & ALAN MILLER, FEDERAL PRACTICE AND PROCEDURE §2163 (2022); *Am. Cas. Co. of Reading, Pa. v. Krieger*, 160 F.R.D. 582, 589–90 (S.D. Cal. 1995); *Hay & Forage Indus. v. Ford New Holland, Inc.*, 132 F.R.D. 687, 689–91 (D. Kan. 1990). Therefore, Plaintiffs cannot access the highly relevant information in Murthy's possession in another form.

A third independently sufficient basis for deposing Murthy is his personal involvement in the so-called "Virality Project," which is a COVID-19 censorship spin-off from the "Election Integrity Partnership" discussed above. After the 2020 election, "[t]he research institutions that comprised the Election Integrity Partnership . . . along with new partners" embarked on "the Virality Project," applying EIP's approach to perceived "misinformation" about elections to so-

called "misinformation" about COVID-19. Ex. E (Virality Project Report), at 10. The Virality Project's retrospective report indicates that it "built strong ties with several federal government agencies, most notably the Office of the Surgeon General (OSG) and the CDC," *id.* at 17, and the only official that it mentions in connection with its ties to the OSG is Murthy himself, *id.* at 20, 142–43. The Virality Project employs substantially the same "ticketing" process as the EIP to identify perceived misinformation, loop in "external stakeholders" including government officials, and "refer[]" the disfavored content to social-media companies for "action," that is, censorship. *Id.* at 30. The Virality Project boasts that its streamlined workflow enabled it "to call attention to—and enable public health or government partners to disrupt—[what they deemed] false and misleading narratives early in their development." *Id.* at 20.

Needless to say, the direct involvement of the U.S. Surgeon General in this federal-private censorship project to suppress dissenting views about COVID-19 on social media raises questions of grave First Amendment concern. Uncovering the extent of Murthy's involvement in the Virality Project is crucial to Plaintiffs' claims. But Murthy's responses to Plaintiffs' written discovery requests do not shed any light on this involvement. For example, they do not specify which officials served as Government partners in censorship discussions among the Virality Project, the Government, and social-media companies. Nor do the documents produced in discovery shed any light on the matter. Notably, whereas many documents link Scully to EIP, Plaintiffs have not been able to locate a single document that links an OSG official other than Murthy to the Virality Project. Thus, Plaintiffs have no alternative, lower-ranking source for information about OSG's involvement with the Virality Project. As the agency head and the only official known to have been personally involved with the Virality Project, Murthy is uniquely positioned to address questions about the scope of OSG's involvement in the Virality Project's work.

In sum, three independently sufficient grounds exist for deposing Murthy. The first is that Murthy held a months-long series of "talks" with Facebook "to stop the spread of false stories about vaccination side effects and other harm," including one discussion where Murthy "angrily said that . . . [Facebook] did "not do enough to defend against bad information." Kanno-Youngs, *"They're Killing People"*. The second is that Murthy had a conversation with a senior Facebook executive where Murthy "call[ed on Facebook] to do more" to censor misinformation and "identified 4 specific recommendations for improvement," building on an earlier discussion between Facebook and federal officials that had clarified "what the White House expects from [Facebook] on misinformation going forward." Doc. 71-4, at 1–2; Doc. 86-5, at 15. The third is that—even after Plaintiffs served written discovery on Murthy and OSG—Murthy remains the only official Plaintiffs know to be personally involved in the Virality Project, which coordinates collaborative censorship efforts between social-media companies and government officials on COVID-19-related speech. Plaintiffs' only reasonably available means of discovering what exactly was said during Murthy's series of talks with Facebook and Murthy's conversation with Clegg, as well as the nature and scope of the OSG's involvement in the Virality Project, is to depose Murthy. The Court should enter an order making findings to this effect to substantiate its conclusion that exceptional circumstances exist to justify deposing Murthy.

In the alternative, the Court should order the deposition of Eric Waldo. To be clear, Plaintiffs do not concede that Waldo is an adequate alternative to Murthy. Defendants have proffered Waldo as a lower-ranking alternative to Murthy, but Defendants have made no representations as to whether Waldo has knowledge of the matters that Dr. Murthy knows. Plaintiffs are aware of no evidence in or out of the record indicating that Waldo has firsthand knowledge either of what transpired during the critical meetings discussed above or of the nature

of OSG's partnership with the Virality Project—and Defendants have made no assurances about Waldo's knowledge. But Plaintiffs agree that Waldo comes closer than any other official to being an adequate alternative to Murthy, in part because Waldo represented Murthy's office in other conversations with social-media companies that are relevant to Plaintiffs' claims. *See* Ex. F (Waldo documents). Therefore, if upon reconsideration this Court were to conclude that exceptional circumstances justifying deposing Murthy do not exist (and it should not), then the Court should order the deposition of Waldo instead.  After the deposition of Waldo, the parties could meet and confer to address whether Dr. Murthy's deposition is still needed.

## IV. The Court Should Order the Government to Identify Lower-Ranking Official(s) Who Have the Information in Ms. Psaki's Possession. If the Government Represents That No Such Official Exists, the Court Should Conclude That Alternative Sources of the Information in Ms. Psaki's Possession Are Not Available.

As to Ms. Psaki, Defendants play a classic game of "heads I win; tails you lose." As explained below, there can be no dispute that Psaki possesses information that is crucial to Plaintiffs' claims. When Plaintiffs attempted to access this information from an alternative source by serving interrogatories on Psaki's successor in office, the White House Press Secretary's Office disclaimed knowledge of the information because Psaki no longer works for the White House. *See* Doc. 86-3, at 74–87. But when Plaintiffs sought to depose Psaki, Defendants complained that Plaintiffs had not shown that the information was unavailable from another source. Doc. 119-2, at 28–31. The Court should end this game by ordering Defendants to identify and make available for a deposition lower-ranking official(s) who have the information described below, if such official(s) exists. If no such official exists, then exceptional circumstances justify Psaki's deposition because there is no alternative source for the information.

When she was Press Secretary, Psaki made numerous statements indicating that she knows there are regular communications between the federal officials and social-media platforms about

censorship which involve federal officials telling social-media platforms what speech is offensive and that the social-media platforms are not doing enough to censor it.  For example, at one press briefing, Psaki stated:

> We are flagging problematic posts for Facebook that spread disinformation. . . . Facebook needs to move more quickly to remove harmful, violative posts— posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly. . . . We engage with [social-media companies] regularly and they certainly understand what our asks are.

*Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy* ("July 15 Press Briefing"), THE WHITE HOUSE (July 15, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/.

Psaki's public statements indicate that she has first-hand knowledge of who in the federal government is providing social-media companies with directions on censorship and what the contents of those directions are. She stated that censorship-related "engagements typically happen through members of our senior staff, but also members of our COVID-19 team, given, as Dr. Murthy conveyed, this is a big issue of misinformation, specifically on the pandemic." *July 15 Press Briefing*. And she stated that these officials have specific demands—"asks"—that they regularly communicate to social-media companies and that the social-media companies "certainly understand." *Id.* Psaki seemed to indicate that one of these "asks" was to censor "12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms," expressing frustration that all twelve "remain active on Facebook, despite some even being banned on other platforms." *Id.* The specifics of who is communicating censorship-related "asks" to social-media companies and what those "asks" include (beyond, apparently, the deplatforming of the so-called "Disinformation Dozen," *see* Doc. 84, ¶ 336) are highly relevant to Plaintiffs' First Amendment

claims. So are the specifics of who is "flagging problematic posts for Facebook that spread disinformation" and what "flagging" means in this context. *July 15 Press Briefing*.

In addition to her remarks indicating Government involvement in censoring views about COVID-19, Psaki made troubling remarks suggesting *White House* involvement in censoring social-media speech about *elections*, which raises First Amendment concerns of the first order. At one press briefing, Psaki stated that "[t]he President's view is that the major platforms have a responsibility . . . to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, *and elections*." *Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack* ("May 5 Press Briefing"), THE WHITE HOUSE (May 5, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-tom-vilsack-may-5-2021/ (emphasis added). And the statement is even more troubling in context. Immediately after articulating the President's view that social-media companies must "stop amplifying untrustworthy content" and "disinformation," Psaki noted that the President supports "a robust anti-trust program. So his view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public." *Id.*

The conjunction of Psaki's insistence that social-media companies must crack down harder on disinformation with the seemingly unrelated remark that, by the way, the President supports "a robust anti-trust program" provides a clear threat to social-media platforms. *Id.* The full context of Psaki's statements strongly implies that the White House was seeking to leverage antitrust law— including the threat of antitrust enforcement action—to coerce social-media companies into stricter censorship policies regarding election- and COVID-19-related speech. Any reasonable social-

media platform would understand Psaki's message—increase censorship of election-related and COVID-related speech, or else face potential antitrust scrutiny.

Plaintiffs are not the only ones who were left with this impression. Psaki's answer to the previous question ended with the statement quoted above. The very next question she received reads as follows: "You're saying more that needs to be done. Are there any concerns though about First Amendment rights? And where does the White House draw the line on that?" *Id.* Psaki's response was not reassuring. After a token nod to the First Amendment, she repeated her warning to social-media companies to enforce stricter censorship policies:

> Well, look, I think we are, of course, a believer in First Amendment rights.  I think what the decisions are that the social media platforms need to make is how they address the disinformation, misinformation—especially related to life-threatening issues like COVID-19 and vaccinations that are—continue to proliferate on their platforms.

*Id.*

Subsequent events corroborated the reporter's concern that the White House was seeking to leverage the threat of legal liability to pressure social-media companies into stricter censorship of speech. On July 20, 2021, the White House announced that it was "examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites." Matthew Brown, *'They Should Be Held Accountable': White House Reviews Platforms' Misinformation Liability*, USA TODAY (July 20, 2021), https://www.usatoday.com/story/news/politics/2021/07/20/white-house-reviews-section-230-protections-covid-misinformation/8024210002/. "We're reviewing that, and certainly, [the companies] should be held accountable [for the misinformation on their platforms]," the White House Communications Director explained. *Id.* The announcement prompted the media to observe

that "[r]elations are tense between the Biden administration and social media platforms, specifically Facebook, over the spread of misinformation online." *Id.*

Psaki's knowledge of which "senior members" of the White House staff are "engag[ing] with [social-media companies] regularly" and "flagging problematic posts for Facebook" is crucially relevant to Plaintiffs' claims. *July 15 Press Briefing.* So is Psaki's knowledge of what "asks" are being made by those senior federal officials. *Id.* (stating in the context of discussing censorship of misinformation that social-media companies "certainly understand what our asks are"). And to the extent that Psaki's remarks indicate knowledge of White House officials using the threat of legal liability to pressure social-media companies into censoring speech, especially speech about elections, that too is crucially relevant to Plaintiffs' claims. *See May 5 Press Briefing.*

Unless and until Defendants identify an official who shares this crucial knowledge, Plaintiffs have no alternative to deposing Psaki. Plaintiffs have already done everything in their power to "[e]xhaust[] . . . all reasonable alternative sources." *U.S. Dep't of Educ.*, 25 F.4th at 704. Plaintiffs served detailed interrogatories on Ms. Psaki's successor in office asking about the critical statements above. But the White House Press Secretary's Office stonewalled by returning vague responses disclaiming knowledge of the basis of Psaki's statements because Psaki no longer works for the White House. *See* Doc. 86-3, at 74–87.

For example, one of Plaintiffs' interrogatories concerned Psaki's statement that "we engage with [social-media companies] regularly and they certainly understand what our asks are." *Id.* at 82. Plaintiffs asked (1) "what Social-Media Platform(s) are included in any such engagement(s)," (2) what "asks" the Government has of them, and (3) what communications are involved in such engagements and "asks." *Id.* On the first point, the Press Secretary's Office responded: "It is the understanding of the Office that the social media platforms referenced in this statement include,

27

but are not necessarily limited to, Facebook and YouTube." *Id.* at 84. On the second point, the Press Secretary's office provided no new information at all but simply referred back to Psaki's public statements that did not answer the question. *Id.* And on the third point, the Press Secretary's Office responded that it was the Office's "understanding" that the officials regularly engaging with social-media companies were not employees of the Office and that the Office was "unaware of any communications between employees of the Office and any social media platform that discuss this topic." *Id.*

Taken at face value, Defendants' general lack of awareness and lack of personal knowledge suggest that there are no reasonably available alternatives to deposing Psaki. Plaintiffs still do not know which federal officials Psaki was referring to, which social-media companies Psaki was referring to, the specifics of the "asks" Psaki was referring to, or how these "asks" are communicated. All Defendants provided is that the White House Press Secretary's Office speculates that the list of companies includes *but is not limited to* Facebook and YouTube and that the "asks" originate from officials outside the White House Press Secretary's Office. As explained above, the missing information is highly relevant to Plaintiffs' claims. Based on the Press Secretary's Office response referring Plaintiffs back to Psaki's own statements, it appears that the only person who can provide the necessary information is Psaki herself.

Nor is written discovery directed to Psaki herself (as opposed to her successor in office) an available alternative. Federal Rule of Civil Procedure 33 permits service of interrogatories only on parties, and Psaki is no longer a party. And in any event, to discover what Psaki knows about the contents of communications between federal officials and social-media companies, Plaintiffs need the flexibility to "frame [their] questions on the basis of answers to previous questions." WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2163. Unless and until Defendants identify a

lower-ranking official who has the crucial information in Psaki's possession, an oral deposition of Psaki is the only reasonable means of obtaining this information.

Accordingly, the Court should order Defendants to identify lower-ranking official(s) who have the information that Plaintiffs seek from Psaki, if such official(s) exists. If Defendants fail to identify such an official, then the Court should conclude that alternative sources for the information in Psaki's possession do not exist and continue to order the deposition of Ms. Psaki.

## V.       The Court Should Not Pause Discovery While the Parties Brief and the Court Considers the Government's Long-Overdue, Nearly One-Hundred-Page Motion to Dismiss.

Finally, the Court should not pause discovery until the parties have briefed and the Court has ruled on Defendants' long-delayed, lengthy motion to dismiss. As an initial matter, Defendants waived any objection to proceeding with expedited discovery without waiting for their second motion to dismiss by acquiescing in expedited discovery for four months without appellate challenge. *See United States v. Olano*, 507 U.S. 725, 733 (1993) ("[W]aiver is the intentional relinquishment or abandonment of known right." (quotation marks omitted)). When Defendants finally petitioned the Fifth Circuit for a writ of mandamus, they challenged only this Court's decision to authorize the depositions of Flaherty, Easterly, and Murthy. Defendants have waived any objection to proceeding with expedited discovery prior to a ruling on their motion to dismiss.

In any case, even if Defendants had not waived the issue, the Court should not stay discovery until it has resolved Defendants' motion to dismiss. The decision whether to grant such a stay lies "within the trial court's wide discretion to control the course of litigation, which includes authority to control the scope and pace of discovery." *In re Ramu Corp.*, 903 F.2d 312, 318 (5th Cir. 1990). "This authority has been held to provide the court the 'general discretionary power to stay proceedings before it in control of its docket and in the interests of justice.'" *Id.* (quoting *McKnight v. Blanchard*, 667 F.2d 477, 479 (5th Cir. 1982)).

For at least three reasons, the interests of justice do not favor a stay here. First, Plaintiffs continue to suffer irreparable harm every day their preliminary-injunction motion remains pending. *See McGinn v. El Paso Cnty.*, --- F. Supp. 3d ---, 2022 WL 16924058, at *2 (D. Colo. Nov. 14, 2022) (considering "the potential prejudice to the plaintiff of a delay" when deciding whether to "stay[] discovery until the Court rules on [the defendants'] motion to dismiss"). So do millions of Americans who are not represented before this Court. *See id.* (considering "the interests of persons not parties to the civil litigation" and "the public interest" generally). The Government's own documents attest to ongoing collusion and pressure by federal officials, up to the end of the discovery period and beyond.

To cite just a few examples: As recently as June 22, 2022, Facebook reassured Flaherty and other White House officials regarding "early childhood vaccine approvals," that "all COVID-19 vaccine related misinformation and harm policies on Facebook and Instagram apply to people 6 months or older," and that "[w]e expanded these policies in coordination with the CDC and ensured that we also included false claims that might be connected to children." Doc. 71-3, at 5. Three days earlier, CDC officials had urged Facebook to censor claims that COVID-19 vaccines are ineffective for children ages six months to four years. Doc. 71-7, at 2, 4. Meanwhile, "CISA has a burgeoning MDM [Mis-, Dis-, and Mal-Information] effort" that includes "directly engaging with social media companies to flag MDM," with focus in calendar year 2022 on the midterm elections. Doc. 71-8, at 2. Spearheading this effort is the MDM Subcommittee, which has been working under Easterly's direction to "continu[e]/refin[e] the mission of Rumor Control" for the 2022 midterm elections. Doc. 86-7, at 14. CISA "wants to insure that it is set up to extract lessons learned from 2022 and apply them to the agency's work in 2024." Doc. 71-8, at 2. Accordingly,

the MDM Subcommittee is working under Easterly's direction to perfect its "mission of Rumor Control" in time for the 2024 elections. Doc. 86-7, at 14.

To make matters worse, events since the close of written discovery suggest that, unless and until the district court provides Plaintiffs with injunctive relief, Defendants' censorship is likely to increase and expand to include new topics. On October 31, 2022, *The Intercept* reported that it had obtained a leaked "draft copy of DHS's Quadrennial Homeland Security Review, DHS's capstone report outlining the department's strategy and priorities in the coming years," which indicated that "[DHS] plans to target 'inaccurate information' on a wide range of topics, including 'the origins of the COVID-19 pandemic and the efficacy of COVID-19 vaccines, racial justice, U.S. withdrawal from Afghanistan, and the nature of U.S. support to Ukraine.'" *Truth Cops: Leaked Documents Outline DHS's Plan to Police Disinformation*, THE INTERCEPT (Oct. 31, 2022), https://theintercept.com/2022/10/31/social-media-disinformation-dhs/.

The regime of *de facto* prior restraint that Defendants have erected in collaboration with social-media companies, removing posts expressing disfavored viewpoints "as soon as possible," Doc. 71-7, at 4, is inflicting "irremediable loss" every day on Plaintiffs, the citizens of Plaintiff States, and millions of other Americans. *See Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 609 (1976) (Brennan, J., concurring). Weighed against this "los[s]" of and "prejudice[]" to the First Amendment rights of millions, *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 470 (5th Cir. 1980), the inconvenience to Defendants of continuing to cooperate in discovery while a motion to dismiss that conceivably could terminate the case remains pending is trifling. *See Neb. Press*, 427 U.S. at 559 (majority opinion) (describing prior restraints as "the most serious and least tolerable infringement on First Amendment rights" and observing that the "irreversible" damage they cause is "particularly great when the prior restraint falls upon the communication of news and

commentary on current events"); *Def. Distrib. v. U.S. Dep't of State*, 865 F.3d 211, 212 (5th Cir. 2017) (Elrod, J., dissenting from the denial of rehearing *en banc*) (describing "a content-based prior restraint" as "the most egregious deprivation of First Amendment rights possible").

Second, the Court has already considered whether Plaintiffs have standing and rightly concluded that they do. Doc. 34, at 3–9. Defendants appear to have forgotten this fact when they incorrectly represented to the Eastern District of Virginia that "the Western Louisiana District Court ordered expedited discovery" "[w]ithout first addressing Plaintiffs' standing." Doc. 119-2, at 8. That is false. This Court devoted six pages to standing in its order granting Plaintiffs' motion for expedited discovery. Doc. 34, at 3–9. The Court specifically addressed the arguments that Defendants had raised as to Plaintiffs' original Complaint and concluded that, contrary to Defendants' arguments, Plaintiffs have standing. *See id.* Although it is conceivable that Defendants' second attempt to convince the Court otherwise might succeed, it is not likely. Thus, not only is the inconvenience to Defendants of continuing to cooperate with discovery trifling by comparison to the irreparable harm Defendants are inflicting on millions of Americans every day, but the risk that that inconvenience could be avoided if the Court were to put the case on hold while it considers Defendants' latest motion to dismiss is low.

Third, Defendants unreasonably delayed in filing their motion to dismiss. After (1) voluntarily withdrawing their first motion to dismiss on August 8, 2022, Doc. 53, Defendants (2) sought an extension to answer Plaintiffs' Amended Complaint, Doc. 54; then (3) promised a "forthcoming motion to dismiss," Doc. 71, at 32; then (4) sought a stay of briefing on Plaintiffs' Amended Complaint, Doc. 73; then (5) sought an extension of the deadline to file a joint status report proposing a briefing schedule for its motion to dismiss, Doc. 87; and then (6) did not file the promised motion to dismiss until November 22, 2022, Doc. 128—nearly seven months after

Plaintiffs filed their original Complaint, Doc. 1. The Court should not reward Defendants' unreasonable delay by pausing discovery while the parties brief and the Court considers Defendants' long-overdue, and extremely long, motion to dismiss.

## CONCLUSION

Plaintiffs respectfully ask the Court (1) to authorize expedited written discovery as to Mr. Flaherty prior to deciding whether exceptional circumstances justify his deposition; (2) to authorize the depositions of Mr. Scully and Ms. Protentis as substitutes for Ms. Easterly and then determine after those lower-level depositions whether Ms. Easterly's deposition is still needed; (3) to enter an order articulating why alternative sources for the information in Dr. Murthy's possession are not available, or, in the alternative, to authorize the deposition of Eric Waldo before determining whether Dr. Murthy's deposition is still needed; (4) to order Defendants to identify lower-ranking official(s) who have the information that Plaintiffs seek from Ms. Psaki, if such officials exist; and (5) not to stay discovery while the parties brief and the Court decides Defendants' motion to dismiss.

Dated: November 29, 2022

**ERIC S. SCHMITT**
**Attorney General of Missouri**

*/s/ D. John Sauer*
D. John Sauer, Mo. Bar No. 58721*
  *Solicitor General*
Justin D. Smith, Mo. Bar No. 63253
  *First Assistant Attorney General*
Kenneth C. Capps, Mo. Bar No. 70908*
  *Assistant Attorney General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
John.Sauer@ago.mo.gov
*Counsel for State of Missouri*


*  admitted *pro hac vice*

*/s/ Jenin Younes*
Jenin Younes *
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines*

*/s/ John C. Burns*
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
F: 314-282-8136
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

Respectfully submitted,

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

*/s/ Elizabeth B. Murrill*
Elizabeth B. Murrill (La #20685)
  *Solicitor General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on November 29, 2022, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*