**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

THE STATE OF MISSOURI, *et al.*,

     *Plaintiffs*,

       v.

PRESIDENT JOSEPH R. BIDEN, JR., IN
HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES OF
AMERICA, *et. al.,*

     *Defendants*.

No. 3:22-cv-1213-TAD-KDM

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO**
**DISMISS THE SECOND AMENDED COMPLAINT FOR LACK OF SUBJECT-**
**MATTER JURISDICTION AND FAILURE TO STATE A CLAIM**

**TABLE OF CONTENTS**

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 2

LEGAL STANDARDS ................................................................................................. 4

ARGUMENT ................................................................................................................ 5

I. The Complaint Alleges the Elements of Standing for All Plaintiffs. ..................... 5

    A. Plaintiffs Allege Injury-In-Fact .................................................................. 5

        1. The individual Plaintiffs allege injury-in-fact ..................................... 6

        2. The Plaintiff States allege injury-in-fact ........................................... 14

            a. The States' fundamental policies favoring free speech. ................ 14

            b. The States experience direct, ongoing censorship injuries. .......... 15

            c. The States' interest in following the free discourse of their citizens. ..... 16

            d. The States' interest in fair processes to petition the government. ........... 20

            e. The States' *parens patriae* standing and quasi-sovereign interests. ...... 21

                i. States may sue the federal government to vindicate their quasi-sovereign interests ........................................................................ 22

                ii. At a minimum, States may sue the federal government to vindicate quasi-sovereign interests rooted in state law .............................. 25

                iii. Plaintiff States have adequately alleged quasi-sovereign interests, including those rooted in state law. ......................................... 26

            f. Special solicitude for the Plaintiff States ................................... 28

        3. States and individual Plaintiffs have third-party standing to assert the First Amendment rights of the audiences of social-media speech. ..................... 29

    B. Plaintiffs Allege Causation/Traceability. .................................................. 32

        1. Plaintiffs' allegations raise compelling inferences of traceability. ............ 33

        2. The Government's arguments on traceability have no merit. ................. 36

    C. Plaintiffs' Injuries Are Redressable. ......................................................... 43

II. Sovereign Immunity Bars None of Plaintiffs' Claims. ...................................... 49

    A. Sovereign Immunity Does Not Bar Plaintiffs' First Amendment Claim ......... 49

    B. Sovereign Immunity Does Not Bar Plaintiffs' *Ultra Vires* Claim ................. 50

    C. Sovereign Immunity Does Not Bar Plaintiffs' APA Claims. ...................... 51

    D. Plaintiffs Have a Valid Cause of Action for All Their Claims. .................... 55

III. Plaintiffs State Plausible Claims on the Merits in All Counts of the Complaint. ............ 56

A.  Plaintiff's First Amendment Claim States a Valid Claim for Relief. ............................... 56

   1.  Plaintiffs allege facts demonstrating government action. ........................................... 57

      a. Significant encouragement, either overt or covert. ................................................. 58

      b. Coercion by federal officials.................................................................................. 60

      c. Joint participation and entwinement. ...................................................................... 64

      d. Subsidization of censorship combined with other factors. ..................................... 67

   2.  Government-induced censorship violates the First Amendment. .............................. 70

   3.  The Government's arguments to the contrary are meritless. ..................................... 71

B.  Plaintiffs' *Ultra Vires* and APA Claims State Valid Claims for Relief........................... 82

C.  Declaratory and Injunctive Relief Are Available Against the President. ........................ 82

CONCLUSION................................................................................................................................ 83

CERTIFICATE OF SERVICE ...................................................................................................... 85

# TABLE OF AUTHORITIES

Page(s)

Cases

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ................................................................................................ passim

*Norton v. Southern Utah Wilderness Alliance*,
    542 U.S. 55 (2004) ................................................................................................ 52, 54

*Ala. Rural Fire Ins. v. Naylor*,
    530 F.2d 1221 (5th Cir. 1976) ............................................................................. 49

*Alabama-Coushatta Tribe of Tex. v. United States*,
    757 F.3d 484 (5th Cir. 2014) .......................................................................... 53, 54, 55

*Alfred L. Snapp & Son, Inc. v. Puerto Ricoex rel. Barez*,
    458 U.S. 592 (1982) .............................................................................................. passim

*American Family Association, Inc. v. City & County of San Francisco*,
    277 F.3d 1114 (9th Cir. 2002) ............................................................................. 61

*Amin v. Mayorkas*,
    24 F.4th 383 (5th Cir. 2022) ............................................................................... 55, 82

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) ................................................................................ 5, 39

*Armstrong v. Exceptional Child Ctr.*,
    575 U.S. 320 (2015) .............................................................................................. 49

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................................. 4, 5

*Ass'n of Am. Physicians & Surgeons v. Schiff*,
    518 F. Supp. 3d 505 (D.D.C. 2021) ................................................................... 40, 41

*Backpage.com, LLC v. Dart*,
    807 F.3d 229 (7th Cir. 2015) ............................................................................... passim

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982) .............................................................................................. 29, 71

*Bennett v. Spear*,
    520 U.S. 154 (1997) .............................................................................................. 32, 46, 55, 56

*Block v. Meese*,
    793 F.2d 1303 (D.C. Cir. 1986) .......................................................................... 46

*Blum v. Yaretsky*,
    457 U.S. 991 (1982) .............................................................................................. 57, 58, 60

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*,
    531 U.S. 288 (2001) .............................................................................................. 57, 58, 65

iii

*Broadrick v. Oklahoma*,
   413 U.S. 601 (1973)....................................................................................... 31, 32

*Cal. Cmtys. Against Toxics v. Env't Prot. Agency*,
   934 F.3d 627 (D.C. Cir. 2019) .................................................................................. 55

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*,
   827 F.2d 1291 (9th Cir. 1987) ............................................................................ 58, 79

*Changizi v. Dept. of Health &Hum. Servs.*,
   2022 WL1423176 (S.D. Ohio, May 5, 2022) .................................................... 40, 42

*Chapman v. Tristar Prods., Inc.*,
   940 F.3d 299 (6th Cir. 2019) ................................................................................... 22

*Citizens for Responsibility & Ethics in Wash. v. Trump*,
   953 F.3d 178 (2d Cir. 2019).................................................................................... 83

*Clapper v. Amnesty International*,
   133 S.Ct., 1138........................................................................................................ 13

*Clark v. Library of Congress*,
   750 F.2d 89 (D.C. Cir. 1984) .................................................................................. 50

*Clinton v. City of New York*,
   524 U.S. 417 (1998)................................................................................................ 83

*Commonwealth v. Mellon*,
   262 U.S. 447 (1923)................................................................................... 22, 23, 24

*Council for Periodical Distributors Ass'n v. Evans*,
   642 F. Supp. 552 (M.D. Ala. 1986) ......................................................................... 47

*Ctr. for Biological Diversity v. Zinke*,
   260 F. Supp. 3d 11 (D.D.C. 2017) .................................................................... 51, 53

*Dalton v. Specter*,
   511 U.S. 462 (1994)................................................................................................ 50

*Danos v. Jones*,
   652 F.3d 577 (5th Cir. 2011) ............................................................................ 50, 51

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019).................................................................................. 5, 32, 46

*Doe v. Google LLC*,
   No. 21-16934, 2022 WL 17077497 (9th Cir. Nov. 18, 2022) ........................... 71, 72

*Dorce v. City of New York*,
   2 F.4th 82 (2d Cir. 2021) ................................................................................... 13, 14

*E.T. v. Paxton*,
   41 F.4th 709 (5th Cir. 2022) ................................................................................... 48

*El Paso Cnty. v. Trump*,
   408 F. Supp. 3d 840 (W.D. Tex. 2019).................................................................... 44

*El Paso Cty., Texas v. Trump*,
   982 F.3d 332 (5th Cir. 2020) ........................................................................ 43

*Evans v. Newton*,
   382 U.S. 296 (1966) .................................................................................... 58

*Ex Parte Young*,
   209 U.S. 123 (1908) .................................................................................... 49

*F.D.I.C. v. Meyer*,
   510 U.S. 471 (1994) .................................................................................... 55

*F.T.C. v. Standard Oil Co. of Cal.*,
   449 U.S. 232 (1980) .................................................................................... 56

*Foley v. Biden*,
   No. 4:21-cv-01098, 2021 WL 7708477 (N.D. Tex. Oct. 6, 2021) ........................................ 83

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ........................................................................ 56, 82, 83

*Georgia v. Tennessee Copper*,
   206 U.S. 230 (1907) .................................................................................... 23

*Geyen v. Marsh*,
   775 F.2d 1303 (5th Cir. 1985) ...................................................................... 50

*Gov't of Manitoba v. Bernhardt*,
   923 F.3d 173 (D.C. Cir. 2019) .......................................................... 21, 24, 26

*Hammerhead Enters. v. Brezenoff*,
   707 F.2d 33 (2d Cir. 1983) ............................................................................ 61

*Harrell v. Fla. Bar*,
   608 F.3d 1241 (11th Cir. 2010) .................................................................... 47

*Hart v. Facebook Inc.*,
   No. 22-cv-00737, 2022 WL 1427507 (N.D. Cal. May 5, 2022) ........................................ 40, 41

*Hawaii v. Trump*,
   859 F.3d 741 (9th Cir. 2017) ........................................................................ 83

*Ironshore Europe DAC v. Schiff Hardin, L.L.P.*,
   912 F.3d 759 (5th Cir. 2019) .......................................................................... 4

*Jama v. Dep't of Homeland Sec.*,
   760 F.3d 490 (6th Cir. 2014) ........................................................................ 54

*John Corp. v. City of Houston*,
   214 F.3d 573 (5th Cir. 2000) ........................................................................ 55

*Kentucky v. Biden*,
   23 F.4th 585 (6th Cir. 2022) .......................................................... 21, 22, 24

*Knight First Amend. Inst. at Columbia Univ. v. Trump*,
   928 F.3d 226 (2d Cir. 2019) ........................................................................ 83

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ................................................................................. 31

*Larson v. Domestic & Foreign Commerce Corp.*,
    337 U.S. 682 (1949) ................................................................................. 49

*Larson v. Valente*,
    456 U.S. 228 (1982) ................................................................................. 48

*Lee v. Verizon Commc'ns, Inc.*,
    837 F.3d 523 (5th Cir. 2016) ..................................................................... 4

*Lloyd Corp. v. Tanner*,
    407 U.S. 551 (1972) ................................................................................. 57

*Louisiana Division Sons of Confederate Veterans v. City of Natchitoches*,
    821 F. App'x 317 (5th Cir. 2020) ............................................................ 73

*Lugar v. Edmonson Oil Co.*,
    457 U.S. 922 (1982) ........................................................................... 57, 64

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................... 32, 43, 45

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019) ....................................................................... 60, 64

*Manker v. Spencer*,
    No. 3:18-cv-372 (CSH), 2019 WL 5846828 (D. Conn. Nov. 7, 2019) ................... 54

*Massachusetts v. E.P.A.*,
    549 U.S. 497 (2007) ......................................................................... passim

*Matal v. Tam*,
    137 S. Ct. 1744 (2017) ..................................................... 2, 70, 71, 78

*Mathis v. Pac. Gas & Elec. Co.*,
    891 F.2d 1429 (9th Cir. 1989) ....................................................... 57, 59, 61

*Meese v. Keene*,
    481 U.S. 465 (1987) ................................................................................. 48

*Michigan v. U.S. E.P.A.*,
    581 F.3d 524 (7th Cir. 2009) .................................................................. 24

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1867) ................................................................... 83

*Missouri v. Illinois*,
    180 U.S. 208 (1901) ................................................................................. 23

*Moody v. Farrell*,
    868 F.3d 348 (5th Cir. 2017) .................................................................. 80

*Nat'l Rifle Ass'n of Am. v. Cuomo*,
    350 F. Supp. 3d 94 (N.D.N.Y. 2018) ....................................................... 59, 70, 76

*Nat'l Treasury Emps. Union v. Nixon,*
    492 F.2d 587 (D.C. Cir. 1974) ................................................................. 83

*Navajo Nation v. Dep't of the Interior,*
    876 F.3d 1144 (9th Cir. 2017) ................................................................ 54

*Near v. Minnesota ex rel. Olson,*
    283 U.S. 697 (1931) ................................................................................ 51

*Neb. Press Ass'n v. Stuart,*
    427 U.S. 539 (1976) ................................................................................ 51

*Nebraska v. Wyoming,*
    515 U.S. 1 (1995) ............................................................................. 23, 24

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) .............................................................. 83

*Norwood v. Harrison,*
    413 U.S. 455 (1973) .......................................................................... 58, 69

*Okwedy v. Molinari,*
    333 F.3d 339 (2d Cir. 2003) ........................................................ 61, 63, 75

*Ortega v. Recreation & Parks Comm'n for Parish of E. Baton Rouge,*
    255 So.3d 6 (La. Ct. App. 2018) ............................................................ 27

*Packingham v. North Carolina,*
    137 S. Ct. 1730 (2017) .............................................................. 29, 70, 71

*Pasadena Republican Club v. W. Justice Ctr.,*
    985 F.3d 1161 (9th Cir. 2021) ................................................................ 72

*Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards,*
    128 F.3d 910 (5th Cir. 1997) ................................................................. 37

*Peterson v. City of Greenville,*
    373 U.S. 244 (1963) ................................................................................ 58

*Philadelphia Co. v. Stimson,*
    223 U.S. 605 (1912) ................................................................................ 49

*Railway Employes' Department v. Hanson,*
    351 U.S. 225 (1956) ................................................................................ 69

*Ramirez v. U.S. Immigr. & Customs,*
    *Enf't,* 310 F. Supp. 3d 7 (D.D.C. 2018) ................................................ 54

*Rawson v. Recovery Innovations, Inc.,*
    975 F.3d 742 (9th Cir. 2020) ........................................................... 64, 65

*Rendell-Baker v. Kohn,*
    457 U.S. 830 (1982) ................................................................................ 57

*Rosenberger v. Rector & Visitors of Univ. of Virginia,*
    515 U.S. 819 (1995) ................................................................................ 70

vii

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
   547 U.S. 47 ................................................................................................ 5

*Scenic Am., Inc. v. U.S. Dep't of Transp.*,
   836 F.3d 42 (D.C. Cir. 2016) ................................................................ 44

*Secretary of State of Md. v. Joseph H. Munson Co.*,
   467 U.S. 947 (1984) .............................................................................. 31

*Sierra Club v. Peterson*,
   228 F.3d 559 (5th Cir. 2000) (en banc) ........................................... 54, 55

*Skinner v. Railway Labor Executives Ass'n*,
   489 U.S. 602 (1989) ......................................................................... 58, 68

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ................................................................... 5, 6, 18

*State of Louisiana v. Biden*,
   45 F.4th 841 (5th Cir. 2022) ............................................................... 45

*State v. Vaughn*,
   366 S.W.3d 513 (Mo. banc 2012) ....................................................... 27

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ......................................................................... 13, 16

*Texas v. Biden*,
   20 F.4th 928 (5th Cir. 2021) ............................................................... 19

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ....................................................... passim

*Toll Bros., Inc. v. Township of Reading*,

   555 F.3d 131 (3d Cir. 2009) ................................................................ 44

*Trudeau v. Fed. Trade Comm'n*,
   456 F.3d 178 (D.C. Cir. 2006) ............................................................ 54

*Turaani v. Wray*,
   988 F.3d 313 (6th Cir. 2021) .............................................................. 47

*Turner Broadcasting System, Inc. v. FCC*,
   512 U.S. 622 (1994) ......................................................................... 57, 70

*Turner v. U.S. Agency for Glob. Media*,
   502 F. Supp. 3d 333 (D.D.C. 2020) .................................................... 47

*United States v. Midwest Video Corp.*,
   406 U.S. 649 (1972) .............................................................................. 71

*Uzuegbunam v. Preczewski*,
   141 S. Ct. 792 (2021) ........................................................................... 48

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976) ............................................................ 27, 28, 29, 71

*VDARE Foundation v. City of Colorado Springs*,
  11 F.4th 1151 (10th Cir. 2021) ................................................................ 75, 76

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
  714 F.3d 186 (4th Cir. 2013) ......................................................................... 52

*W. Virginia State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ........................................................................................ 56

*West v. Atkins*,
  487 U.S. 42 (1988) ..................................................................................... 72, 73

Constitutions and Statutes

5 U.S.C. § 702 ........................................................................... 50, 51, 54, 55

5 U.S.C. § 706(2) ........................................................................................... 82

16 U.S.C. §§ 1333(a), 410bbb–2(a)(1), 460nnn–12(b) ............................... 52

La. Const. art. I, § 7 ............................................................................... 14, 27

Mo. Const. art. I, § 8 .............................................................................. 14, 27

U.S. Const. Amend. I .................................................................................... 28

## INTRODUCTION

Defendants ("the Government") argue that, in demanding censorship of misinformation, they are merely engaging in a "broader debate over the rising influence of social-media platforms." Doc. 128-1, at 1.  This is incorrect.  As the Complaint alleges, Plaintiffs challenge a very specific and unconstitutional form of government speech—*i.e.*, threats, coercion, and joint activity by federal officials to procure censorship of social-media speech by private citizens.   As the Complaint alleges, Defendants have publicly "threaten[ed] to use official government authority to impose adverse legal consequences against social-media companies if such companies do not increase censorship of speakers and messages disfavored by" Defendants.  Doc. 84, ¶ 183.  And "Defendants have leveraged these threats to secure such increased censorship of speakers, content, and viewpoints that they disfavor on social-media platforms; and they have now moved into a phase of open collusion with the threatened companies, cooperating with them directly to censor speech, speakers, and viewpoints that Defendants disfavor." *Id.* ¶ 184.  Federal officials publicly threatening, and privately pressuring and colluding with, social-media platforms to silence Americans' speech based on viewpoint is not part of a "broader debate."  Doc. 128-1, at 1.  It is government-induced censorship that violates the First Amendment.

Defendants claim that Plaintiffs seek a "judicial gag order to prevent the Executive Branch from expressing its views on important matters of public concern."  *Id.*  Defendants' extreme solicitude for the *government*'s ability to speak—at the expense of *private citizens'* free-speech rights—flips the First Amendment on its head.  As the U.S. Supreme Court has explained, the First Amendment requires the exact opposite: "[W]hile the government-speech doctrine is important— indeed, essential—it is a doctrine that is susceptible to dangerous misuse.  If private speech could be passed off as government speech by simply affixing a government seal of approval, government

1

could silence or muffle the expression of disfavored viewpoints." *Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017).   The Government's arguments here are prime examples of the "dangerous misuse" of the government-speech doctrine.   *Id.*   The Complaint alleges extensive and highly effective efforts by federal officials to "silence or muffle the expression of disfavored viewpoints." *Id.*   "A government entity … is entitled to say what it wants to say—but only within limits.   It is not permitted to employ threats to squelch the free speech of private citizens." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 235 (7th Cir. 2015).

**FACTUAL BACKGROUND**

Every allegation in the original complaint (Doc. 1) is also included in the Second Amended Complaint (Doc. 84, referred to as the "Complaint" herein), so the Court's prior analysis of the original complaint remains valid as to the allegations in the Second Amended Complaint.   *See* Doc. 34.   The Complaint incorporates by reference the Declarations attached to the First Amended Complaint, Docs. 45-1 to 45-15, and the discovery materials produced by the Government that have been filed with the Court.   Doc. 84, ¶ 388 (incorporating Docs. 45-1 to 45-15 and Docs. 71-1 to 71-13, as well as two new Exhibits).

In sum, the Complaint alleges that dozens of federal officials, including Defendants, make public and private threats of adverse legal consequences to social-media platforms, combined with both general and specific demands for censorship of private speakers and content.   It alleges that, "Having threatened and cajoled social-media platforms for years to censor viewpoints and speakers disfavored by the Left, senior government officials in the Executive Branch have moved into a phase of open collusion with social-media companies to suppress disfavored speakers, viewpoints, and content on social-media platforms under the Orwellian guise of halting so-called 'disinformation,' 'misinformation,' and 'malinformation.'"   Doc. 84, ¶ 3.

After identifying the parties, the Complaint sets forth fundamental First Amendment principles, *id.* ¶¶ 94-116, and it alleges the importance of social-media platforms as providing the "modern public square" for public discourse, *id.* ¶¶ 117-131.  The Complaint recounts specific examples of recent instances when federal officials have induced censorship of so-called "misinformation," such as the suppression of the Hunter Biden laptop story, the lab-leak theory of COVID-19's origins, speech about mask mandates and election integrity.  *Id.* ¶¶ 132-168.

The Complaint then alleges that the federal government has subsidized and fostered the rise of a "censorship cartel" comprising a tiny group of social-media behemoths through Section 230 immunity under the Communications Decency Act.  *Id.* ¶ 170-182.  It alleges that Defendants, their political allies, and those acting in concert with them have engaged in a campaign of threats to social-media platforms of adverse legal consequences—including stripping away the extremely valuable Section 230 immunity—and that those threats are explicitly linked to demands for greater censorship of speech and viewpoints disfavored by federal officials.  *Id.* ¶¶ 183-202.

The Complaint then alleges that, against the background of this campaign of threats, federal officials at the White House and HHS are pressuring and colluding with social-media platforms to suppress disfavored speech and speakers.  *Id.* ¶¶ 203-253.  The Complaint makes similar allegations of threats, pressure, and collusion regarding White House and DHS officials to procure the social-media censorship of speakers and view they disfavor.  *Id.* ¶¶ 254-310.

The Complaint alleges that Defendants, through this conduct, have successfully procured the censorship of core political speech on the basis of viewpoint and content.  *Id.* ¶¶ 317-327.  It also alleges that, recently, federal officials have greatly expanded the topics on which they are seeking social-media censorship.  *Id.* ¶¶ 328-337.  The Complaint then includes over 100

paragraphs of detailed allegations of private communications involving collusion, coercion, and pressure from federal officials to social-media platforms about censorship. *Id.* ¶¶ 338-457.

The Complaint contains detailed allegations explaining how Plaintiffs—both private individuals, and the two Plaintiff States—are injured by Defendants' conduct. *Id.* ¶¶ 458-475. It explains how these injuries are traceable to Defendants' conduct, *id.* ¶¶ 476-487, and are redressable by a favorable court ruling, *id.*

The Complaint includes a First Amendment claim (Count I, *id.* ¶¶ 488-507), a claim that Defendants acted in excess of statutory authority (Count II, *id.* ¶¶ 508-515), and APA claims against the federal agency Defendants (Counts III-VII, ¶¶ 516-570).[1]

## LEGAL STANDARDS

A complaint survives a Rule 12(b)(6) motion to dismiss if its nonconclusory allegations, accepted as true, make it plausible that the plaintiffs are entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 680–81 (2009). Defendants turn this standard on its head, insisting that Rule 12(b)(6) requires dismissal unless the complaint renders *implausible* every conceivable alternative on which the plaintiffs are *not* entitled to relief. *See, e.g.,* Doc. 128-1, at 35, 38. That is not the law. "The question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim

---

[1] Defendants' "Factual Background" section, Doc. 128-1, at 5-12, contains a long series of factual allegations that are absent from the Complaint, Doc. 84, and are not supported by any evidence or subject to judicial notice. *See id.* This is plainly improper. For purposes of a 12(b)(6) motion to dismiss, "[t]he court's review is limited to the complaint," whose "well-pleaded facts are assumed true," along with "any documents attached to the complaint" and "any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Ironshore Europe DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 763 (5th Cir. 2019). Likewise, for purposes of a facial attack on subject-matter jurisdiction like the one Defendants bring here, "the court simply considers the sufficiency of the allegations in the complaint," which are "presumed to be true." *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 533 (5th Cir. 2016) (quotation marks omitted).

plausible." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 189 (2d Cir. 2012).  Because "the plausibility standard is lower than a probability standard," there may be "more than one plausible" inference to draw from the allegations.  *Id.* at 189–90.  "[O]n a Rule 12(b)(6) motion it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives"; rather, the court must draw "all reasonable inferences" in the plaintiff's favor.  *Id.* at 185, 190; *cf. Iqbal*, 556 U.S. at 682.

## ARGUMENT

### I.   The Complaint Alleges the Elements of Standing for All Plaintiffs.

To establish standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision*." Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Further, to satisfy Article III, only one Plaintiff needs to establish standing.  "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc*., 547 U.S. 47, 52 n. 2 (2006), *quoted in Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015); *see also, e.g., Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019). Here, all Plaintiffs have standing.

### A.   Plaintiffs Allege Injury-In-Fact.

First, Defendants argue that Plaintiffs have not alleged an injury-in-fact.  Doc. 128-1, at 16-32.  These arguments are meritless.  As this Court has held, "[a] plaintiff seeking to establish an injury in fact must show that it suffered 'an invasion of a legally protected interest' that is 'concrete,' 'particularized,' and 'actual or imminent, not conjectural or hypothetical.'"  Doc. 34, at 4 (quoting *Spokeo*, 136 S. Ct. at 1548).  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"  *Id.* (quoting *Spokeo*, 136 S. Ct. at 1548).  "A 'concrete' injury must be 'de facto,' that is, it must 'actually exist.'"  *Id.* (quoting *Spokeo*, 136 S.

Ct. at 1548).  "'Concrete' is not however, necessarily synonymous with 'tangible.'  Intangible injuries can nevertheless be 'concrete.'"  *Id.* (quoting *Spokeo*, 136 S. Ct. at 1548-49).

### 1.  The individual Plaintiffs allege injury-in-fact.

First, Defendants argue that "the individual Plaintiffs" do not "sufficiently allege Article III injuries-in-fact."  Doc. 128-1, at 31-32.  This is incorrect.  Each individual Plaintiff alleges imminent, ongoing injuries from government-induced social-media censorship.  *See* Doc. 84, ¶¶ 21-25, 469-475; Docs. 45-3, 45-4, 45-5, 45-7, 45-12 (individual Plaintiffs' Declarations).

The Complaint alleges that "[t]he private Plaintiffs Bhattacharya, Hines, Hoft, Kheriaty, and Kulldorff, and their social-media audiences … who include thousands … of Missourians and Louisianans—have suffered and are suffering grave and ongoing injuries."  *Id.* ¶ 469.  It alleges that government-induced "censorship encompasses social-media accounts with hundreds of thousands of followers, including the private Plaintiffs' accounts, which include many thousands of followers in Missouri and Louisiana."  *Id.* ¶ 471.  It alleges that "Defendants' censorship squelches Plaintiffs' core political speech on matters of great public concern."  *Id.* ¶ 472.  It alleges that the individual Plaintiffs are suffering a wide variety of forms of social-media censorship, all on an *ongoing* basis, as a result of Defendants' conduct.  *Id.* ¶ 473.  These include temporary and permanent suspensions of many speakers," and "suppressing specific content, such as removing or blocking social-media posts and videos."  *Id.*  The Complaint alleges that this censorship "includes demonetization by technology firms and deboosting search results to bury the most relevant results."  *Id.*  "It includes suppressing posts in news feeds, and imposing advisory labels and "sensitive content" labels, making it more difficult to access specific content."  *Id.*  "It includes insidious methods of censorship like surreptitious de-boosting and 'shadow-banning,' where the censor does not notify the speaker or the audience of the censorship."  *Id.*

For each of these points, the Complaint cites specific paragraphs in the fifteen sworn Declarations incorporated by reference in the Complaint, *see id.* ¶ 338 (incorporating the 15 Declarations by reference). The Complaint alleges that "[a]ll these forms of censorship directly impact Plaintiffs and their social-media audiences, and *they continue to do so*." *Id.* (emphasis added). And it alleges that "these injuries to the private Plaintiffs and their audiences are imminent and ongoing, and they constitute irreparable harm." *Id.* ¶ 475.

Defendants do not seriously dispute that the Complaint alleges censorship injuries as to each individual Plaintiff. Doc. 128-1, at 31-32. Instead, they contend that the individual Plaintiffs allege only injuries that occurred "*in the past*," and that they "offer no nonconclusory allegations … of certainly impending injuries," *i.e.*, ongoing or future injuries. *Id.* at 31. This is demonstrably incorrect. This Court has already rejected this argument, holding that "[t]he alleged injuries are 'imminent' and allegedly 'on-going,' due to allegations of social media suspensions, removals of disfavored viewpoints, and censorship." Doc. 34, at 5. The individual Plaintiffs allege both *ongoing* censorship injuries and the expectation of imminent, future *new* injuries.

The Complaint alleges that the "private Plaintiffs" and their audiences of millions "are suffering grave and ongoing injuries." Doc. 84, ¶ 469. It alleges that government-induced censorship "squelches Plaintiffs' core political speech on matters of great public concern." *Id.* ¶ 472. These injuries are "achieved through a wide variety of methods," all of which inflict *ongoing* harm that Plaintiffs continue to experience through the present day. *Id.* ¶ 473. "All these forms of censorship directly impact Plaintiffs and their social-media audiences, and they continue to do so." *Id.*

These ongoing injuries from past acts of censorship are *in addition to* the individual Plaintiffs' reasonable expectation of imminent future acts of censorship that they will continue to

suffer at the hands of government-induced censorship: "these injuries to the private Plaintiffs and their audiences are *imminent* and ongoing, and they constitute irreparable harm." *Id.* ¶ 475.

The individual Plaintiffs' Declarations—which the Complaint incorporates in full, Doc. 84, ¶¶ 388, 458—reinforce and provide specific evidence to support these allegations. For example, Dr. Bhattacharya attests that, "Because of my views on COVID-19 restrictions, I have been specifically targeted for censorship by federal government officials." Doc. 45-3, ¶ 5. He notes that "[t]he Great Barrington Declaration received an immediate backlash from senior government officials who were the architects of the lockdown policies, such as Dr. Anthony Fauci…" *Id.* ¶ 13. "Because it contradicted the government's preferred response to COVID-19, the Great Barrington Declaration was immediately targeted for suppression by federal officials." *Id.* ¶ 14. He specifically alleges an ongoing "campaign" of social-media censorship: "Instead, what followed was a relentless *covert* campaign of social-media censorship of our dissenting view from the government's preferred message." *Id.* ¶ 15. This "covert campaign" includes numerous acts of censorship that continue to inflict harm to this day, including the de-boosting of search results in Google, *id.* ¶16; the removal of links to the Great Barrington Declaration in Reddit discussions, *id.*; the ongoing removal of a YouTube video discussing the Declaration with Governor DeSantis, *id.* ¶¶ 17-18; the removal of personal Tweets, *id.* ¶¶ 25-26; the removal of LinkedIn posts, *id.* ¶¶ 28-29; and account termination by LinkedIn, *id.* ¶ 30. Dr. Bhattacharya's allegations both identify ongoing harms from past censorship, and raise the strong inference that he is imminently likely to experience future acts of censorship as well. *See id.* ¶¶ 32-33.

Dr. Kulldorff's Declaration includes similar allegations that support the same factual conclusions and inferences. Doc. 45-4. Like Dr. Bhattacharya, he attests that there is "an organized campaign against the Great Barrington Declaration," *id.* ¶ 14, which entails the

likelihood of future acts of censorship against it.  He notes that the GBD "was censored on social media in an apparent attempt to prevent it from … 'getting a lot of attention,'" *id.* ¶ 15; including Google deboosting search results, *id.*, and Facebook removing content related to it, *id.* ¶ 16.  Dr. Kulldorff also identifies an ongoing campaign of censorship against his personal social-media accounts, including censored personal Tweets on Twitter, *id.* ¶¶ 17-18; censored posts criticizing mask mandates, *id.* ¶ 19; ongoing self-censorship to avoid further censorship penalties, *id.* ¶¶ 20, 27; removal of YouTube content, *id.* ¶ 21; removal of LinkedIn posts, *id.* ¶¶ 22-25; and the ongoing permanent suspension of his LinkedIn account, *id.* ¶ 26.   Again, these factual statements attest both to ongoing injuries and support a strong expectation of imminent future injuries.

Dr. Kheriaty, likewise, attests to both ongoing injuries and the expectation of future injuries.  Doc. 45-7.  He describes suffering artificial limitations on the number of followers on his social-media accounts, *id.* ¶¶ 12-13; "shadow banning" of social-media posts that "challenge[] the federal government's preferred covid policies," *id.* ¶¶ 14-15; self-censorship to avoid further adverse consequences or permanent bans, *id.* ¶ 16; and removal of content from YouTube, *id.* ¶ 17.  Dr. Kheriaty specifically notes that the problem of "shadow banning" his social-media posts is ongoing and increasing, as it "intensified in 2022."  *Id.* ¶ 15.  Further, he notes that "[t]he pattern of content censored on these social media platforms mirrors closely the CDC and Biden administration policies." *Id.* ¶ 18.  Again, Dr. Kheriaty's testimony identifies both ongoing injuries and the imminent threat of future censorship injuries.

The same is true of Plaintiff Jim Hoft's Declaration.  Doc. 45-5.  Hoft attests both ongoing injuries and the imminent expectation of future injuries.  Hoft notes that his Gateway Pundit "social media accounts have experienced censorship on all major social-media platforms," which "has followed and reflected the calls for censorship from federal government officials, including in the

Biden Administration." *Id.* ¶ 4.  These acts of censorship include suspensions from his Twitter account and another personal Twitter account, *id.* ¶¶ 6-7, 10; a permanent ban from his Twitter account, *id.* ¶ 8; labels applied to Twitter posts on personal accounts, *id.* ¶ 9; warning labels imposed on Facebook posts and other restrictions on his Facebook account, *id.* ¶ 12; permanent removal of content posted on Facebook, *id.* ¶ 13; prevention of sharing of Facebook-posted content, *id.*; removal of content from YouTube, *id.* ¶ 14; imposition of sanctions on Mr. Hoft's followers for re-posting or amplifying his speech, *id.* ¶ 15; engaging in self-censorship to avoid permanent bans or other more serious sanctions from the social-media platforms, *id.* ¶ 16; and demonetization by Google, *id.* ¶ 19; *see also id.* ¶¶ 18-20.

Plaintiff Jill Hines makes similar allegations.  Doc. 45-12.  She continues to suffer ongoing social-media censorship, and the acts of censorship include application of warnings on Facebook content, *id.* ¶ 8; the reduction of her reach to audiences on Facebook, *id.*; removal of content and sanctions, including 30-day suspensions, from Facebook, *id.* ¶ 9; 24-hour suspensions that prevented her from organizing people to advocate to the Louisiana legislature, *id.* ¶ 10; shadow-banning and dramatically restricting the reach of her speech to its audiences, *id.* ¶ 10; and the complete de-platforming of Facebook groups intended to organize Louisianans to petition their government, *id.* ¶¶ 13-14.  Ms. Hines states that "[r]emoving our closed group at such a crucial time effectively stopped our ability to communicate with our representatives in the state legislature." *Id.* ¶ 14.  "To say the cards are stacked against me is an understatement." *Id.* ¶ 16.

Notably, Ms. Hines attests that the censorship campaign against her social-media speech is *ongoing*, noting that "[p]osts pointing to lack of safety of masking were and *are targeted*, as well as articles that mention adverse events of vaccinations, including VAERS data." *Id.* ¶ 9 (emphasis added).  She continues to suffer specific, new acts of censorship, including right up to the time

when she executed her Declaration on June 9, 2022: "The most recent restriction [was] in late May 2022."  Ms. Hines notes that "[m]y personal Facebook page, and the Facebook pages of both Health Freedom Louisiana and Reopen Louisiana, *are all under constant threat* of being completely deplatformed.  My personal account is *currently* restricted for 90 days."  *Id.* ¶ 12.  Ms. Hines reports that acts of censorship of her COVID-19-related speech have occurred continuously up to the present: "Over the last year and a half since we noticed social-media censorship beginning in October 2020, my pages have been hit with numerous "fact checks" and "community standards" violations."  *Id.* ¶ 11.  Ms. Hines also attests that these restrictions on so-called COVID-related "misinformation" are directly traceable to federal officials.  *Id.* ¶ 4.

Mr. Hoft's experience with continuing and new acts of censorship is, if anything, even more dramatic.  For example, the Complaint alleges that the Department of Homeland Security's CISA and the State Department's Global Engagement Center coordinated with private groups to create the "Election Integrity Partnership," which successfully lobbies social-media platforms to adopt more restrictive censorship policies toward election-related speech and then aggressively pushes for those platforms to censor specific posts and social-media accounts, on a massive scale.  Doc. 84, ¶¶ 401-420.  The Complaint specifically alleges that this is an *ongoing* project that continues to engage in these censorship activities through the present day, *id.* ¶¶ 403, 410—including pressuring the platforms to censor literally *millions* of election-related posts disfavored by the Government and its partners.  *Id.* ¶ 406 (noting that consortium staff work 12-to-20 hours a day to demand censorship of 22 million tweets on Twitter alone).  The Election Integrity Partnership's public report—which the Complaint incorporates by reference, Doc. 84, ¶ 415; *see also* Doc. 134-4 (EIP Report)—cites Mr. Hoft's website, The Gateway Pundit, 47 times, describing The Gateway Pundit as one of the two "top misinformation-spreading websites in our dataset"

11

whose content is repeatedly flagged for censorship in "tickets" calling for Facebook, Twitter, and others to remove its content. Doc. 134-4, at 51. EIP provides a Table indicating that EIP has flagged The Gateway Pundit's content for censorship in 46 incidents encompassing 29,207 Tweets and 840,740 Retweets. *Id.* at 207. In fact, the EIP devotes an entire section of its report to The Gateway Pundit, *id.* at 214-216—calling it "among the most active spreaders of election-related misinformation" and boasting that EIP flagged its content in 29,207 Tweets, 840,750 retweets, 13 YouTube videos with 4 million views, and 20 Instagram posts with more than 132,000 engagements. *Id.* As the Complaint alleges that the EIP is continuing to operate in this and future election cycles, it is not just imminent and likely, but perfectly obvious, that the EIP does and will continue to target Mr. Hoft's social-media speech for censorship.

The Complaint further alleges that Defendants continue to target Mr. Hoft's content for censorship, independent of their participation in the EIP. It alleges that, "in a 'disinformation' conference regarding the 2020 election hosted by CISA, one presenter identified the Gateway Pundit, the website hosted by Plaintiff Jim Hoft, as a 'repeat spreader' of 'false or misleading content about the 2020 election,'" and that "[i]n the same training session for state and local election officials, DHS's formal partner group then encouraged the mass reporting of US social media posts for censorship." Doc. 84, ¶ 432. In other words, CISA specifically identified The Gateway Pundit as a "repeat spreader" of misinformation, and called for state and local election officials to report The Gateway Pundit's content to CISA for censorship. *Id.* The Complaint also alleges that Mr. Hoft's content was again specifically flagged as "misinformation" during CISA's March 29, 2022, "Protecting Critical Infrastructure from Misinformation & Disinformation Subcommittee Meeting." *Id.* ¶ 433. Future acts of government-induced censorship of Mr. Hoft's speech are both imminent and inevitable.

Just like Ms. Hines and Mr. Hoft, all the individual Plaintiffs allege that they are subject to ongoing targeting for censorship by federal officials.  *See supra*; Docs. 45-3, 45-4, 45-7.  These allegations are far more than sufficient to allege an imminent injury, which requires only a "substantial risk" of future censorship.  "An allegation of future injury may suffice if … there is a 'substantial risk' that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty International*, 133 S.Ct., 1138, 1147, 1150 n. 5 (2013)).  Plaintiffs here easily satisfy the "substantial risk" standard, as it is a virtual certitude that they will suffer future acts of Government-induced censorship.  Here, as in *SBA List*, "the threat of future [censorship] … is substantial."  *Id.* at 164.  "Most obviously, there is a history of past [censorship] here," which is "good evidence that the threat of [further censorship] is not 'chimerical.'"  *Id.* (citation omitted).  And "the threat is even more substantial given that" Government agencies repeatedly identify and flag the individual Plaintiffs as "repeat spreaders" of misinformation.  *Id.* Moreover, Government-induced censorship "is not a rare occurrence," *id.*, as the Complaint and incorporated documents allege hundreds of incidents encompassing millions of social-media posts. Under such circumstances, "the prospect of future enforcement is far from 'imaginary or speculative.'"  *Id.* at 165 (quoting *Babbitt*, at 298).  Moreover, the "burdens" that the threat of censorship "impose on electoral speech are of particular concern here."  *Id.*

Defendants attempt to dismiss Plaintiffs' ongoing injuries on the ground that they are supposedly merely the continuing effects of past wrongs—akin to ongoing pain and suffering from a past physical injury.  Doc. 128-1, at 32 (citing *Dorce v. City of New York*, 2 F.4th 82, 95-96 (2d Cir. 2021)).  This is incorrect.  As the Complaint plainly alleges, the ongoing harms for which Plaintiffs seek redress are not merely the *initial* impositions of these censorship penalties, but their *continued maintenance and enforcement*.  Thus, Defendants' reliance on *Dorce* is misplaced.

There, the plaintiffs complained of "continuing pain and suffering from a defendant's past" actions. 2 F.4th at 96. As Second Circuit pointed out, "an injunction against future actions by a defendant does not remedy the harm done by that defendant's past acts." *Id.* Here, the Plaintiffs seek relief from both ongoing and future wrongs, not just from present harm due to past wrongs.

### 2.  The Plaintiff States allege injury-in-fact.

Defendants argue that the State Plaintiffs fail to allege injury-in-fact.  Doc. 128-1, at 18-30.  This Court has already rejected these arguments.  Doc. 34, at 4-5.  The Court held that "Plaintiff States have alleged both individual and quasi-sovereign *parens patriae* interests," that "the Plaintiff States' alleged injuries are both particularized and concrete," and that "[t]he alleged injuries are 'imminent' and allegedly 'on-going,' due to allegations of social media suspensions, removal of disfavored viewpoints, and censorship."  *Id.* at 5.  The Complaint alleges that several forms of imminent, ongoing harm to the Plaintiff States.  Doc. 84, ¶ 459.

### a.  The States' fundamental policies favoring free speech.

First, "both Missouri and Louisiana have adopted fundamental policies favoring the freedom of speech, including on social media." *Id.* (citing Mo. Const. art. I, § 8, and La. Const. art. I, § 7).  The Complaint alleges that "[t]he federal censorship program directly undermines Missouri's and Louisiana's fundamental policies favoring the freedom of speech, and thus it inflicts a clear and direct injury on the States' sovereignty." *Id.* (citing *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015)).  This Court has upheld this allegation as an injury-in-fact: "the Plaintiff States have standing to regulate enforcement of their laws and constitution, which guarantees residents of Missouri and Louisiana free speech." Doc. 34, at 5.  The Fifth Circuit's opinion in *Texas* supports this Court's holding.  *Texas* held that "States have a sovereign interest in the power to create and enforce a legal code."  809 F.3d at 153.  "Pursuant to that interest, states may have standing based on (1) federal assertions of authority to regulate matters they believe they

control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law…." *Id.* (citations omitted).  All three of these factors are present here, where the federal censorship program (1) involves a covert "federal assertion[] of authority to regulate matters" that the States seek to control by guaranteeing free-speech rights; (2) effectively "preempts" state constitutional provisions by conflicting directly with their fundamental purpose of guaranteeing free-speech rights to Missouri and Louisiana citizens; and (3) interferes with the enforcement of state law by defeating the free-speech policies of Missouri's and Louisiana's constitutions.

Defendants argue that this sovereign injury should be disregarded because "the Complaint points to no federal law that interferes with the States' ability to regulate behavior or provide for the administration of a state program."  Doc. 128-1, at 23.  On the contrary, even worse than a "federal law" that interferes with their fundamental policy, the States allege extensive extra-legal, unauthorized, unconstitutional actions by federal officials that directly interfere with the States' fundamental policies.  Defendants also argue that "the conduct here does not threaten any interest in the States' sovereign territory or any other proprietary interest," Doc. 128-1, at 23, but the States' sovereign interests are not limited to territorial and pocketbook interests, as *Texas* held.

### b.  The States experience direct, ongoing censorship injuries.

Second, the Complaint alleges that "the States and their agencies and political subdivisions have suffered government-induced online censorship directly."  Doc. 84, ¶ 461.  "For example, Louisiana's Department of Justice—the office of its Attorney General—was directly censored on YouTube for posting video footage of Louisianans criticizing mask mandates and COVID-19 lockdown measures on August 18, 2021—just after the federal Defendants' most vociferous calls for censorship of COVID 'misinformation.'" *Id.* (citing Bosch Decl., Doc. 45-6, ¶ 7).  In addition, "[a] Louisiana state legislator was censored by Facebook when he posted content addressing vaccinating children against COVID-19." *Id.* (citing Bosch Decl., Doc. 45-13, ¶ 9).  Likewise,

"St. Louis County, a political subdivision of Missouri, conducted public meetings regarding proposed county-wide mask mandates, at which some citizens made public comments opposing mask mandates." *Id.* (quoting Flesh Decl., Doc. 45-6, ¶ 7). Missouri's open-meetings law required St. Louis County to post publicly the videos of those meetings, but "YouTube censored the entire videos of four public meetings, removing the content, because some citizens publicly expressed views that masks are ineffective." *Id.*

Defendants argue that the First Amendment does not protect the speech of States' agencies and municipalities, Doc. 128-1, at 25, but the question here is whether the States have suffered an injury-in-fact under Article III, not whether they have suffered a violation of First Amendment rights. Defendants also argue that the States' allegations fail to show "certainly impending" injuries, Doc. 128-1, at 25, but that argument is meritless for the same reasons discussed above as to the private Plaintiffs' injuries. Like the individual Plaintiffs' injuries, the States and their subdivisions suffer both ongoing harms from censorship and the reasonable expectation of future censorship. *See supra*; *SBA* List, 573 U.S. at 158. Defendants argue that Plaintiffs do not specify who posted the videos of St. Louis County meetings, but that is also incorrect, as the Flesch Declaration makes clear that St. Louis County itself posted the videos. Doc. 45-6, at 3 n.1.

### c. The States' interest in following the free discourse of their citizens.

Third, the States allege that they themselves have an interest in reading and following the free, uncensored voices of their citizens on social-media. Doc. 84, ¶ 462. "State agencies—such as the Offices of the States' Attorneys General—closely track and rely on free speech on social media to understand their citizens' true thoughts and concerns." *Id.*

Patrick Flesch, Director of Constituent Services for the Missouri Attorney General's Office, explains that he is "personally involved in, receiving, reviewing, and responding to thousands of communications from Missouri constituents per year." Doc. 45-6, ¶ 3. He explains

that being able to follow Missourians' uncensored speech on social media is essential for him to do his job effectively, as understanding Missourians' true thoughts and concerns on policy matters like election integrity and COVID-19 is necessary to craft policies and messages that are responsive to constituents' actual concerns.  Doc. 45-6, ¶ 3-4.  This "includes monitoring activity and mentions on multiple social media platforms, including Facebook, Twitter, and YouTube." *Id.*  "I monitor these sorts of trends *on a daily or even hourly basis* when needed on behalf of the Office."  *Id.* (emphasis added).

Defendants' mass-censorship program suppresses vast amounts of relevant speech, and thus it directly interferes with Missouri's interest in following and understanding its citizens' true concerns on social media, as Mr. Flesch explains in detail: "Issues regarding COVID-19 responses (such as mask mandates imposed by municipalities and school districts on schoolchildren) and election security and integrity have been of critical importance to Missourians in recent months and years. … It is very important for me to have access to free public discourse on social media on these issues so I can understand what Missourians are actually thinking, feeling, and expressing about such issues, and so I can communicate effectively with them." *Id.* ¶ 5.  "[O]nline censorship of free public discourse on social-media companies has hampered my ability to follow Missourians' speech on these issues."  *Id.* ¶ 6.

Ashley Bosch, Communications Officer for the Louisiana Department of Justice, attests to the very same injuries on behalf of the State of Louisiana: "Part of my job is to gather and synthesize topical subject matters that are important to Louisiana citizens, on behalf of the Department."  Doc. 45-13, ¶ 4.  "Understanding what subject matters and issues are important to Louisianans is critical for the Department to formulate policies and messaging that will address the concerns expressed by our constituents."  *Id.*  This "includes monitoring activity and mentions

17

on social media platforms, including Facebook, Instagram, Twitter, and YouTube." *Id.*  Doc. 45-13, ¶ 4.  "It is very important for me to have access to free public discourse on social media on these issues so I can understand what our constituents are actually thinking, feeling, and expressing about such issues, and so I can communicate properly with them." *Id.* ¶ 5.  "Online censorship of Louisiana citizens by social media companies interferes with my ability to follow Louisianans' speech on these issues."  *Id.* ¶ 6.

Defendants argue that "[t]hese allegations are too conclusory and abstract to satisfy the pleading standard that applies in the context of a facial attack on subject-matter jurisdiction."  Doc. 128-1, at 26.  That is incorrect.  The just-described allegations in the Flesch and Bosch Declarations are in no way "conclusory"; they are quite specific and detailed.  *See supra*; Doc. 45-6, ¶¶ 4-6; Doc. 45-13, ¶¶ 4-5.  And they are not "abstract" in any way, but fully "concrete."  As this Court has correctly held, "[a] 'concrete' injury must be 'de facto,' that is, it must 'actually exist.' *'Concrete' is not however, necessarily synonymous with 'tangible.'  Intangible injuries can nevertheless be 'concrete.'"*  Doc. 34, at 5 (quoting *Spokeo*, 136 S. Ct. at 1548-49) (emphasis added).  This logic directly refutes the Government's argument here.

Next, Defendants argue that "[t]he States make no attempt to articulate what speech they have been unable to 'follow' or how any of their public messaging or policies have been affected as a result."  Doc. 128-1, at 26.  On the contrary, Mr. Flesch and Ms. Bosch provide specific examples of censored speech that would directly affect their ability to craft policies and messages for their constituents.  *See* Doc. 45-6, ¶ 5 ("Issues regarding COVID-19 responses (such as mask mandates imposed by municipalities and school districts on schoolchildren) and election security and integrity have been of critical importance to Missourians in recent months and years."); *id.* ¶ 7 (describing YouTube's censorship of St. Louis County's video and stating, "[t]his video is just the

sort of information that is important for me to review, and yet it was unavailable for a critical period of time due to online censorship of speech questioning the efficacy of mask mandates"); *id.* ¶ 8 (providing another example of "a conservative talk radio station in Missouri, NewsTalk STL, had its entire YouTube channel suspended because it aired an interview discussing election integrity"); Doc. 45-13, ¶ 5 ("For example, mask and vaccine mandates for students have been a very important source of concern and public discussion by Louisiana citizens over the last year."); Doc. 45-13, ¶ 10 ("Louisianans' speech about the efficacy of COVID-19 restrictions, and speech about issues of election security and election integrity are matters of great interest and importance to me in my work on behalf of the Louisiana Department of Justice.").

Finally, the Government contends that "this theory of injury … is overly broad," because it would supposedly "expand the bounds of what constitutes an injury in the First Amendment context beyond any discernable limit."  Doc. 128-1, at 27.  This argument relies on the "generous use of strawmen."  *Texas v. Biden*, 20 F.4th 928, 1003 n.21 (5th Cir. 2021), *rev'd and remanded on other grounds*, 142 S. Ct. 2528 (2022).  Contrary to the Government's contention, the States do not contend here that they "have an interest in accessing *any* speech posted, by *any* person, on *any* online platform."  Doc. 128-1, at 27.  Here, the States contend that they have an interest in accessing free, uncensored social-media speech by their constituents on specifically identified matters of imminent public concern, such as election integrity and COVID-19 restrictions, when such speech has been subject to a massive campaign of interference and censorship by federal officials, detailed in hundreds of Paragraphs in the Complaint.  This censorship hampers the States' ability to understand what their constituents actually think and feel on matters of enormous public importance.  For the Government to describe this specific, detailed concern as "wholly abstract and widely dispersed," Doc. 128-1, at 27, is baseless.  It is not "abstract" but "concrete" for the

19

reasons this Court has aptly explained.  Doc. 34, at 5.  And it is only "widely dispersed" because of the astonishing reach of the federal government's social-media censorship activities.

### d. The States' interest in fair processes to petition the government.

Fourth, the States allege that they have a strong interest in maintaining fair, even-handed, and open processes for petitioning their own governments and political subdivisions, and that federal officials are interfering with and distorting those processes by causing massive social-media censorship of online groups attempting to organize and communicate with the government. Doc. 84, ¶ 463.  The Complaint alleges that "social-media censorship thwarts the States' ability to provide free, fair, and open political processes that allow citizens to petition their government and advocate for policy changes." *Id.*  "Social-media censorship has perverted state and local political processes by artificially restricting access to the channels of advocacy to one side of various issues." *Id.*  The Complaint provides multiple specific examples of this ongoing injury: "For example, social-media censorship prevented Louisiana advocacy groups from organizing effectively to advocate in favor of legislative action on issues of great public import." *Id.* (citing Hines Decl., Doc. 45-12, ¶¶ 13-14).  "Likewise, social-media censorship prevented a Missouri parent from circulating an online petition to advocate against mandatory masking at his local school district, a political subdivision of the State." *Id.* (citing McCollum Decl., Doc. 45-14, ¶¶ 9-17).  "Such censorship … thwarts the States' interest in providing fair and open processes to petition state officials." *Id.*

The Declarations of Jill Hines, Joshua McCollum, and Jessica Marie Gulmire—which the Government ignores—provide specific and concrete details about how such interference occurs. *See* Doc. 45-12, ¶¶ 13-14; Doc. 45-14, ¶¶ 9-17; Doc. 45-15, ¶¶ 11-16, 18-19.  For example, Plaintiff Jill Hines explains that "two of our Facebook groups were completely deplatformed, effectively disbanding a group of more than two thousand people who were organized to engage in direct

advocacy to our state legislature, on two separate occasions." Doc. 45-12, ¶ 13. She attests that "[t]he last post I made in our HFL Group on July 13, 2021, was a 'call to action' for the upcoming Veto Session, asking people to contact legislators regarding health freedom legislation.." *Id.* ¶ 14. Suppressing these Facebook groups directly interfered with state officials' ability to receive free and fair communications of their constituents' concerns: "Removing our closed group at such crucial time effectively stopped our ability to communicate with our representatives in the state legislature." *Id.* It also provides a biased and one-sided process, whereby only those whose views are favored by Defendants may organize through social-media to petition state government.

### e. The States' *parens patriae* standing and quasi-sovereign interests.

Next, the States assert two quasi-sovereign injuries: the "quasi-sovereign interest in protecting the free-speech rights of 'a sufficiently substantial segment of [each State's] population,'" Doc. 84, ¶ 465; and the "interest in securing observance of the terms under which [they] participate[] in the federal system," including the interest in ensuring "that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system," *id.* ¶ 466 (quoting *Alfred L. Snapp*, 458 U.S. at 607-08. Defendants argue that Plaintiff States lack *parens patriae* standing to sue the federal government. *See* Doc. 128-1, at 18–20. But this Court has already rejected "Government Defendants' contention that the Plaintiff States do not have the authority to bring a *parens patriae* suit against the Federal Government." Doc. 34, at 6–7. Nothing in Defendants' latest motion should cause the Court to reconsider that ruling.

Defendants claim that it is settled law that States lack *parens patriae* standing to sue the federal government, *see* Doc. 128-1, at 18–20, but that is simply wrong. In fact, a circuit split exists on the question. *Compare Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 181–83 (D.C. Cir. 2019) ("[A] State in general lacks *parens patriae* standing to sue the federal government."), *with Kentucky v. Biden*, 23 F.4th 585, 596–98 (6th Cir. 2022) (holding that although "states may not

invoke th[e] third-party-standing conception of *parens patriae* to sue the United States, . . . the second, more modern conception of *parens patriae* generally *is* permissible"). Under the better-reasoned Sixth Circuit opinion in *Kentucky* (which Defendants conspicuously omit to cite), each of Plaintiffs States' theories of *parens patriae* standing is sound.

### i. States may sue the federal government to vindicate their quasi-sovereign interests.

As the Supreme Court explained in *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600–01 (1982), the term "*parens patriae* lawsuit" has two meanings. First, it can refer to a lawsuit that the State maintains on behalf of individuals unable to represent themselves (a "third-party" *parens patriae* lawsuit). *Snapp*, 458 U.S. at 600; *see also Kentucky*, 23 F.4th at 596. Second, it can refer to a lawsuit that the State brings to vindicate its "quasi-sovereign" interests, that is, the interests of its citizenry as a whole (a "quasi-sovereign-interest" *parens patriae* lawsuit). *Snapp*, 458 U.S. at 600–01; *see also Kentucky*, 23 F.4th at 596; *Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 305 (6th Cir. 2019). Everyone agrees that a State lacks standing to bring a third-party *parens patriae* lawsuit against the federal government. *E.g.*, *Kentucky*, 23 F.4th at 596. But here, Plaintiff States are bringing a quasi-sovereign-interest *parens patriae* lawsuit. *See* Doc. 84, ¶¶ 13, 15, 19. So the question for this Court is when, if ever, a State has standing to assert its quasi-sovereign interests against the federal government.

Defendants' formulaic invocation of the so-called "*Mellon* bar" does not answer this question. *See* Doc. 128-1, at 19–20 (citing *Commonwealth v. Mellon*, 262 U.S. 447 (1923)). The Court did hold in *Mellon*—though it allowed for the possibility of exceptions—that States generally lack *parens patriae* standing to bring federal-constitutional challenges to federal statutes. 262 U.S. at 485.  But the Court did not specify which kind of "*parens patriae*" standing it had in mind. Indeed, the distinction between third-party and quasi-sovereign-interest *parens patriae*

22

lawsuits had not yet crystallized in American law when the Court decided *Mellon*. *See Snapp*, 458 U.S. at 600–08 (articulating the distinction and tracing the development of the quasi-sovereign-interest *parens patriae* lawsuit in American law during the first half of the twentieth century).

Prior to *Massachusetts v. E.P.A.*, 549 U.S. 497 (2007), it was unclear whether *Mellon* applied only to third-party *parens patriae* lawsuits or also to quasi-sovereign-interest *parens patriae* lawsuits. On the one hand, *Mellon* involved a statute applicable to infants, and the Court explicitly denied that the case implicated any "quasi sovereign rights" of the plaintiff State. 262 U.S. at 479, 484–85. Additionally, in a later case, the Court permitted Wyoming to bring a cross-claim against the United States "to vindicate [Wyoming's] quasi-sovereign interests." *Nebraska v. Wyoming*, 515 U.S. 1, 20 (1995) (internal quotation marks and emphasis omitted). These considerations suggested that *Mellon* applied only to third-party *parens patriae* lawsuits.

On the other hand, as an example of the kind of *parens patriae* suit it had in mind, *Mellon* cited a case that nearly fifty years later would be classified as a case about quasi-sovereign interests. *See Mellon*, 262 U.S. at 485 (citing *Missouri v. Illinois*, 180 U.S. 208 (1901)); *Snapp*, 458 U.S. at 602–04 (classifying *Missouri* as a case about quasi-sovereign interests). Additionally, in *Snapp*, the Court cited *Mellon* in *dicta* for the proposition that "a State does not have standing as *parens patriae* to bring an action against the Federal Government," and although the Court did not specify which form of *parens patriae* suit it was referring to, the context was a discussion of quasi-sovereign-interest *parens patriae* lawsuits. 458 U.S. at 608–10 & n.16.

Fortunately, the Court clarified the scope of the *Mellon* bar in *Massachusetts*. In *Massachusetts*, the majority relied on *Georgia v. Tennessee Copper*, 206 U.S. 230 (1907), which had upheld States' rights "to litigate as *parens patriae* to protect quasi-sovereign interests," to conclude that Massachusetts had standing to sue the EPA to "protect[] its quasi-sovereign

interests." 549 U.S. at 518–21 & n.17. The dissent objected on the ground that *Mellon* and *Snapp* "cast significant doubt on a State's standing to assert a quasi-sovereign interest . . . against the Federal Government." *Id.* at 540 (Roberts, C.J., dissenting). The majority replied: "Not so. *Mellon* itself disavowed any such broad reading when it noted that the Court had been 'called upon to adjudicate, not rights of person or property, not rights of dominion over physical domain, [and] *not quasi-sovereign rights actually invaded or threatened*.'" *Id.* at 520 n.17 (majority opinion) (quoting *Mellon*, 262 U.S. at 484–85) (emphasis added by *Massachusetts* majority). The majority then cited *Nebraska* as evidence that *Mellon* permitted States to sue the federal government to vindicate their quasi-sovereign interests. *Id.*

To be sure, in *Bernhardt*, the D.C. Circuit applied *Mellon* to bar a quasi-sovereign-interest *parens patriae* lawsuit against the federal government even after *Massachusetts*. But *Bernhardt* is unpersuasive. The Sixth Circuit, in a more recent opinion, summarized why:

> We reject the D.C. Circuit's analysis [in *Bernhardt*] for two reasons. First, it mistakenly conflates quasi-sovereign-interest suits with third-party *parens patriae* suits to suggest that *Mellon* categorically bars both. [*Bernhardt*, 923 F.3d] at 182. Yet as we have shown, *Mellon* does not. That case invalidates the traditional third-party-standing conception of *parens patriae*, but it does not invalidate (or even address) the quasi-sovereign-interest theory. *See Massachusetts*, 549 U.S. at 520 n.17, 127 S. Ct. 1438. And second, the D.C. Circuit's putative "*Bernhardt* bar" conflicts with Supreme Court precedent. As the Court recognized in *Massachusetts v. EPA*, post-*Mellon* precedent endorses the view that a state has "standing to bring a cross-claim against the United States to vindicate its 'quasi-sovereign' interests which are 'independent of and behind the titles of its citizens.'" *Id.* (quoting *Nebraska v. Wyoming*, 515 U.S. 1, 20, 115 S. Ct. 1933, 132 L.Ed.2d 1 (1995)).

*Kentucky*, 23 F.4th at 598.

Unable to defend *Bernhardt*'s analysis on the merits, Defendants add a citation of *Michigan v. U.S. E.P.A.*, 581 F.3d 524 (7th Cir. 2009). Doc. 128-1, at 19. But in *Michigan*, the Seventh Circuit explicitly denied that the plaintiff State had "a quasi-sovereign interest at stake." 581 F.3d at 529. Thus, the Seventh Circuit's conclusion that *parens patriae* standing to sue the United States

was unavailable in that case has no relevance here. The question for this Court, which *Michigan* did not address, is whether States have *parens patriae* standing to sue the federal government when they *do* have a quasi-sovereign interest at stake.  On that question, the Court should follow the Sixth Circuit's well-reasoned opinion in *Kentucky* and reaffirm the conclusion it reached the first time it considered Defendants' standing arguments.  Doc. 34, at 6-7.

> ### ii.  At a minimum, States may sue the federal government to vindicate quasi-sovereign interests rooted in state law.

Even if this Court were to adopt *Bernhardt*'s reasoning (which it should not), Plaintiff States would still have *parens patriae* standing to bring their claims. One of Missouri's arguments in *Bernhardt* was that *Mellon* was distinguishable because Missouri sought to enforce its "rights or those of its citizens under federal statutes," whereas the plaintiff State in *Mellon* sought to "challenge the validity of a federal statute." *Bernhardt*, 923 F.3d at 406. The D.C. Circuit denied the significance of the distinction. According to the D.C. Circuit, "the vertical federalism interest underlying the *Mellon* bar" is that "an individual's dual citizenship in both state and nation, with separate rights and obligations arising from each, suggests that both units of government act as *parens patriae* within their separate spheres of activity." *Id.* at 408. Because "matters of federal law fall within the sovereignty of the Federal Government," the D.C. Circuit reasoned, it is the province of the federal government to act as *parens patriae* as to citizens' rights under federal law, and this authority "should not, as a rule, be subject to the intervention of states seeking to represent the same interest[s] of the same citizens." *Id.* Seeing "no reason to treat *parens patriae* actions alleging constitutional claims against the federal government differently from those alleging federal statutory claims," the D.C. Circuit rejected Missouri's argument. *Id.*

Here, Plaintiff States are suing as *parens patriae* to vindicate not only quasi-sovereign interests rooted in federal law, *see, e.g.*, Doc. 84, ¶¶ 466–67, but also quasi-sovereign interests

rooted in *state* law, *see, e.g.*, *id.* ¶¶ 19, 460, 465. Under the D.C. Circuit's reasoning, Plaintiff States would be barred from asserting quasi-sovereign interests rooted in *federal* law. But, even under that reasoning, they are not barred from asserting quasi-sovereign interests rooted in *state* law. On the contrary, if "both units of government act as *parens patriae* within their separate spheres of activity," *Bernhardt*, 923 F.3d at 408, then *only* the States have the authority to act as *parens patriae* as to their citizens' interests based on state law.

To be sure, some of the language in *Bernhardt* suggests a categorical ban on *parens patriae* lawsuits against the federal government. *E.g.*, *id.* at 179.  But as applied to *parens patriae* suits brought to vindicate quasi-sovereign interests rooted in state law, any such suggestion was (1) *dictum* insofar as *Bernhardt* involved an issue of federal law, and (2) not only unsupported but contradicted by the reasoning underlying the court's holding. Therefore, even if this Court were to find *Bernhardt*'s reasoning persuasive, it should conclude that Plaintiff States have *parens patriae* standing to assert their quasi-sovereign interests rooted in state law.

### iii. Plaintiff States have adequately alleged quasi-sovereign interests, including those rooted in state law.

Finally, Defendants argue that "[e]ven if a *parens patriae* theory were available, Plaintiffs' allegations here would be insufficient to invoke it." Doc. 128-1, at 20–21. This argument is meritless. One kind of injury to a State's quasi-sovereign interests is an "injury to a sufficiently substantial segment of [the State's] population." *Snapp*, 458 U.S. at 607. Although "the Court has not attempted to draw any definitive limits on the proportion of the population of the State that must be adversely affected," it has explained that "[o]ne helpful indication . . . is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Id.* A second kind of quasi-sovereign injury is the exclusion of "the State and its residents . . . from the benefits that are to flow from participation in the federal system." *Id.* at 608.

Here, Plaintiffs have alleged extensive federal censorship activities limiting the free flow of information on social-media platforms used by "millions of Missourians and Louisianans, and very substantial segments of the populations of Missouri, Louisiana, and every other State." Doc. 84, ¶¶ 9, 129. The Complaint details how this censorship regime harms "enormous segments of Missouri's and Louisiana's populations," affecting "speakers with all sizes of audiences—from small groups of concerned parents seeking to share concerns on neighborhood networking sites" to "social-media titans" to "some of the most highly credentialed physicians in the world," *id.* ¶ 470. According to the Complaint, private Plaintiffs *alone* have "many thousands of followers in Missouri and Louisiana," and the suppression of private Plaintiffs' speech is "only a representative slice of the enormous suppressions inflicted by Defendants' conduct on countless similarly situated speakers and audiences, including in Missouri and Louisiana." *Id.* ¶ 471.

These allegations are more than enough to state an "injury to a sufficiently substantial segment of [Plaintiff States'] population[s]." 458 U.S. at 607. The constitutions of both Missouri and Louisiana guarantee the right of freedom of expression, *see* MO. CONST. art. I, § 8; LA. CONST. art. I, § 7, understood to encompass both the right to speak and the right to listen, *see Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976) (upholding the "First Amendment right to receive information and ideas" as well as to speak them); *State v. Vaughn*, 366 S.W.3d 513, 517 n.3 (Mo. banc 2012) (indicating that analysis of article I, section 8 of the Missouri constitution tracks First Amendment analysis); *Ortega v. Recreation & Parks Comm'n for Parish of E. Baton Rouge*, 255 So.3d 6, 12 n.4 (La. Ct. App. 2018) (same for article I, section 7 of the Louisiana constitution). Thus, Defendants cannot seriously dispute that this "injury is one that [Plaintiff States], if [they] could, would likely attempt to address through [their] sovereign lawmaking powers." *Snapp*, 458 U.S. at 607.  It is enshrined in their constitutions.

Moreover, the Complaint's allegations also indicate that Plaintiff States and their residents are being "excluded from the benefits that are to flow from participation in the federal system." *Id.* at 608; *see* Doc. 84, ¶ 466. Like the Missouri and Louisiana constitutions, the U.S. Constitution guarantees the right of freedom of expression, U.S. Const. Amend. I, understood to encompass both the right to speak and the right to listen, *Va. State Bd.*, 425 U.S. at 756–57. By denying both Plaintiff States themselves, *see* Doc. 84, ¶¶ 461–62, and their residents, *see id.* at ¶¶ 464, 467, 470–71, of these rights, Defendants are dexcluding Plaintiff States and their residents "from the benefits that are to flow from participation in the federal system." *Snapp*, 458 U.S. at 608.

### f.   Special solicitude for the Plaintiff States.

Finally, the States are entitled to "special solicitude" in the standing analysis, as this Court has already held: "Although this Court has found that Plaintiff States have proven standing through the normal inquiry, they also can establish standing as a result of special solicitude. Plaintiff States assert a constitutionally bestowed right (free speech), and the government action at issue affects the Plaintiff States' quasi-sovereign interests (of protecting its citizens from suppression of free speech)." Doc. 34, at 6.  This Court's holding draws direct support from *Texas v. United States*, which held that Plaintiff States were entitled to "special solicitude" in the standing analysis for a lawsuit against the federal government raising APA claims: "It is of considerable relevance that the party seeking review here is a sovereign State and not ... a private individual" because "States are not normal litigants for the purposes of invoking federal jurisdiction." *Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015) (quoting *Massachusetts v. EPA*, 549 U.S. at 518.  Relying on *Massachusetts v. EPA*, the Fifth Circuit noted that the Supreme Court "identified two additional considerations that entitled Massachusetts 'to special solicitude in [the Court's] standing analysis.' First, the Clean Air Act created a procedural right to challenge the EPA's decision…. Second, the EPA's decision affected Massachusetts's 'quasi-sovereign' interest." *Texas*, 809 F.3d at 151

28

(quoting *Massachusetts*, 549 U.S. at 516-17).  Both these considerations are present here.  First, *Texas* and *Massachusetts* both involved APA claims, while here the States assert both First Amendment and APA claims, which equally raise "question eminently suitable to resolution in federal court."  *Texas*, 809 F.3d at 151 (quoting *Massachusetts*, 549 U.S. at 516-17).  Second, the States assert a "quasi-sovereign" interest in protecting the welfare of a "substantial segment" of their population—*i.e.*, the millions of Louisianans and Missourians who are potential audiences, readers, and listeners of free discourse on social media.  *See supra*.

### 3.   States and individual Plaintiffs have third-party standing to assert the First Amendment rights of the *audiences* of social-media speech.

As noted, Plaintiffs assert free-speech injuries to both themselves *and their audiences*, who are deprived of access to Plaintiffs' speech by ongoing social-media censorship.  *See* Doc. 84, ¶¶ 109-112.  The First Amendment protects the right to receive others' thoughts, messages, and viewpoints freely, in a free flow of public discourse. "[W]here a speaker exists …, the protection afforded is to the communication, to its source and to its recipients both."  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976).  The right to receive information is "an inherent corollary of the rights to free speech and press that are explicitly guaranteed by the Constitution," because "the right to receive ideas follows ineluctably from the sender's First Amendment right to send them."  *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982).  "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more."  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

The Complaint repeatedly alleges First Amendment injuries to the *audiences* of Plaintiffs' speech, as well as other speakers' speech.  *Id.* ¶ 21 ("Dr. Bhattacharya *and his audiences* have experienced significant censorship and suppression of his speech on social-media caused by

Defendants…"); *id.* ¶ 22-25 (same for other named Plaintiffs); *id.* ¶ 469 (alleging that these injuries extend to "thousands or millions of Missourians and Louisianans").  It alleges that Government-induced "censorship encompasses social-media accounts with hundreds of thousands of followers," besides those of the named Plaintiffs, "which include many thousands of followers in Missouri and Louisiana," *id.* ¶ 471—such as those of Alex Berenson, the "Disinformation Dozen," and many others.  It alleges that "[a]ll these forms of censorship directly impact Plaintiffs *and their social-media audiences*, and they continue to do so."  *Id.* ¶ 473 (emphasis added).

Both the States and the individual Plaintiffs have third-party standing to assert the injuries of the *audiences* of social-media speech, *i.e.*, the millions of Missourians, Louisianans, and Americans who are deprived access to speech that is censored on social-media.  Those audiences and potential audiences have First Amendment rights to read social-media speech that the Government censors.  Moreover, these First Amendment rights are extremely diffuse and fragile—while the *speakers* may have strong interests (and financial incentives) to challenge censorship, the injuries spread across millions of potential *audience* members are typically too diffuse to create an incentive to challenge the enormous power of the federal government and Big Tech.

Under such circumstances, the States and the individual Plaintiffs have standing to assert the First Amendment rights of those audiences, provided they also have Article III injuries of their own (which they do).  In *Bantam Books, Inc. v. Sullivan*, the Supreme Court upheld the right of a book publisher to assert the more diffuse third-party First Amendment rights of book distributors against a government-sponsored book ban.  372 U.S. 58, 64 n.6 (1963).  The Court noted that "pragmatic considerations argue strongly for the standing of publishers in cases such as the present one" to assert the First Amendment rights of third parties.  *Id.*  "The distributor who is prevented from selling a few titles is not likely to sustain sufficient economic injury to induce him to seek

judicial vindication of his rights. The publisher has the greater economic stake, because suppression of a particular book prevents him from recouping his investment in publishing it." *Id.* "Unless [the publisher] is permitted to sue," the Court reasoned, "infringements of freedom of the press may too often go unremedied." *Id.* For such reasons, the Court has been "quite forgiving" in allowing third-party standing for First Amendment claims. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). "Within the context of the First Amendment" in particular, "the Court has enunciated other concerns that justify a lessening of prudential limitations on standing." *Id.* (quoting *Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984)). And the Supreme Court "has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." *Id.* (alterations omitted). Here, both these criteria are present: the case involves First Amendment rights, and "enforcement of the challenged restriction against the litigant" [*i.e.*, the Government-induced social-media censorship] will "result indirectly in violation of third parties' [*i.e.*, social-media audiences'] rights." *Id.*

Thus, an "exception" to the ordinary third-party standing doctrine has "been carved out in the area of the First Amendment." *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973). "It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." *Id.* at 611-12. "As a corollary, the Court has altered its traditional rules of standing to permit" assertions of third-party rights "in the First Amendment area." *Id.* at 612. "Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very

existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* These principles apply equally here.

### B. Plaintiffs Allege Causation/Traceability.

The second element of standing is causation or traceability, which requires plaintiffs to allege facts indicating that their injuries are "fairly traceable to the challenged conduct of the defendant." Doc. 34, at 4 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). This Court has already held that Plaintiffs "easily" satisfy the traceability requirement. Doc. 34, at 5. The Court noted that "the causation required for standing purposes can be established with 'no more than de facto causality.'" Doc. 34, at 5 (quoting *Dep't of Comm. v. New York*, 139 S. Ct. 2551, 2556 (2019)). "The plaintiff need not demonstrate that the defendant's actions are 'the very last step in the chain of causation.'" Doc. 34, at 5 (quoting *Bennett v. Spear*, 520 U.S. 154, 169-70 (1997)). The Court held that "Plaintiff States easily meet this requirement based on allegations of suppression of disfavored speakers, viewpoints, and content of its citizens, and based upon alleged violations of Plaintiff States' laws and constitutions." Doc. 34, at 5. This conclusion is just as true with respect to the Second Amended Complaint, which includes all the allegations of the original Complaint, and many more besides. *Compare* Doc. 1 *with* Doc. 84. Moreover, in so holding, this Court correctly recognized that a relaxed standard for traceability applies to claims brought by the Plaintiff States, Louisiana and Missouri, because they are entitled to "special solicitude" in "satisfying [their] burden to demonstrate the traceability and redressability elements…." Doc. 34, at 4 (citing *Massachusetts*, 549 U.S. at 520; *Texas v. United States*, 809 F.3d 134, 151–55 (5th Cir. 2015), *as revised* (Nov. 25, 2015)). Nothing in the Government's motion to dismiss provides any convincing reason for this Court to revisit these holdings.

**1.  Plaintiffs' allegations raise compelling inferences of traceability.**

The Complaint alleges facts that raise, not just "plausible," but compelling inferences of causation and traceability.  The Government largely ignores these allegations, but the Second Amended Complaint summarizes them at Paragraphs 476-485.  Having made extensive allegations of pressure from federal officials on social-media platforms to increase censorship, and having provide numerous specific examples of concrete acts of censorship directly injuring Plaintiffs that are attributable to such pressure from federal officials, the Second Amended Complaint summarizes its inference of causation by alleging that "Defendants' conduct has directly caused and continues to directly cause Plaintiffs' injuries." Doc. 84, ¶ 476.  "By their campaign of threats, coordination, and collusion, Defendants have successfully induced social-media platforms to impose acts of censorship that have directly injured all Plaintiffs and their audiences." *Id.*  "These are acts of censorship that the social-media companies, but for Defendants' unlawful conduct, *otherwise would not have imposed*." *Id.* (emphasis added).  As the Complaint alleges, "[o]verwhelming evidence supports the conclusion that Defendants have caused Plaintiffs' injuries, alleged above, by inducing social-media platforms to engage in increased censorship," *id.* ¶ 477, and this evidence comes from at least seven sources:

"*First,*" the Complaint alleges, "in the absence of Defendants' campaign for social-media censorship, market forces and other incentives would have and did restrain social-media platforms from engaging in the social-media censorship alleged herein." Doc. 84, ¶ 478.  "Notably, as noted above, prior to Defendants' campaign of threats and pressure, social-media platforms generally declined to engage in the acts of censorship alleged herein." *Id.*; *see also id.* ¶ 189 ("[P]latforms generally refused to remove false content purely because it was false until 2020.").

"*Second,*" the Complaint alleges, "the campaign of threats of adverse legal consequences from Defendants and their political allies—directly linked to demands for greater censorship—are

*highly motivating* to social-media platforms, because they address matters of great import and potential legal vulnerability, such as Section 230 immunity and the prospect of antitrust enforcement." Doc. 84, ¶ 479.  And the Complaint alleges that "[t]hese threats became even more motivating at the beginning of 2021, when Defendants and their allies took control of the Executive Branch, with all its powerful agencies, and both Houses of Congress, indicating that they had the ability to carry out their threats."  *Id.*

"*Third*," the Complaint alleges, "the *timing* of many censorship decisions—coming immediately after Defendants' demands for increased censorship—strongly supports the conclusion that Defendants' conduct has caused the censorship of free speech on social media." Doc. 84, ¶ 480.  "As alleged further herein, there are many examples of censorship crack-downs by social-media platforms that immediately followed demands for censorship from federal officials, including Defendants."  *Id.*  "These include, but are not limited to, (1) the *en masse* deplatforming of the 'Disinformation Dozen' after Jen Psaki publicly demanded it; (2) the censorship of the Great Barrington Declaration and Plaintiffs Bhattacharya and Kulldorff just after a senior HHS official called for a 'quick and devastating … take-down' of the Declaration; and (3) Twitter's deplatforming of Alex Berenson just after the President stated, 'They're killing people' and Dr. Fauci publicly singled out Berenson; among many others."  *Id.*

"*Fourth*," the Complaint alleges, "Defendants have openly admitted that they and other federal officials are directly involved in specific censorship decisions by social-media platforms." Doc. 84, ¶ 481.   The Complaint provides numerous examples: "Jen Psaki publicly admits that 'we're flagging problematic posts for Facebook' and that 'they certainly understand what our asks are.'"  *Id.*  "Secretary Mayorkas states that 'we're working together … with the tech companies that are the platform for much of the disinformation that reaches the American public, how they

can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring,' and that this collaboration is happening 'across the federal enterprise.'" *Id.* "Easterly states that she works directly 'with our partners in the private sector and throughout the rest of the government and at the department to continue to ensure that the American people have the facts that they need to help protect our critical infrastructure.'" *Id.* "CISA openly states that its 'MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms.'" *Id.* The Complaint raises many similar examples. It is not "speculative" to infer that federal officials are doing exactly what they publicly admit they are doing.

"*Fifth*," the Complaint alleges, "social-media platforms openly admit that they consult with and rely on government officials to identify what content to censor." Doc. 84, ¶ 482. The Complaint alleges specific public comments and quotations from Facebook's, Twitter's, and YouTube's terms of service to back up this allegation. *Id.* Among other things, Facebook admits that it has "partnered with government experts" to decide what social-media speech to censor. *Id.* Twitter "admits that it coordinates with government officials in identifying what to censor," and its terms of service state that it "enforce[s] this [censorship] policy in close coordination with … governments." *Id.* The Complaint provides other examples as well. Again, it is not "speculative" to infer that social-media platforms engage in censorship decisions under government direction and influence, when the social-media platforms openly admit that they do so.

"*Sixth*," the Complaint alleges, "the *content* of the censorship decisions evidences Defendants' direct influence on censorship, because those decisions focus on the areas of concern for Defendants and uniformly favor Defendants' preferred narratives." Doc. 84, ¶ 483. Again, the Complaint provides highly specific examples. "For example, Dr. Kheriaty notes that '[t]he pattern

of content censored on these social media platforms mirrors closely the CDC and Biden administration policies…. [A]ny content that challenges those federal policies is subject to severe censorship, without explanation, on Twitter and YouTube—even when the information shared is taken straight from peer-reviewed scientific literature.'" *Id.* (quoting Kheriaty Decl., Doc. 45-7, ¶ 18). "Regarding shadow-banning in particular, [Dr. Kheriaty] observes that '[t]he posts most subject to this were those that challenged the federal government's preferred covid policies.'" *Id.* (quoting Kheriaty Decl., Doc.45-7, ¶ 15). "Likewise, the censorship of social-media speech about COVID-19 and election security directly reflects the calls for censorship from federal officials." *Id.* (citing Hoft Decl., Doc. 45-5, ¶¶ 4, 16). "Further," the Complaint alleges, "this censorship is heavily *one-sided* in the government's favor." *Id.* (quoting Changizi Decl., Doc. 45-9, ¶¶ 50-51).

"*Seventh*," the Complaint alleges, the Government's own internal documents "demonstrate beyond any possible doubt that Defendants are *directly involved in* and are *directing* social-media censorship decisions, both by identifying high-level topics of censorship and by identifying specific posts and types of postings for censorship." Doc. 84, ¶ 484. "CDC and Census Bureau officials demonstrate that this direct, collusive involvement of federal officials in specific and general censorship decisions happens on a wide scale, and the DGB documents quoted above indicate that such 'MDM'-censorship activities are occurring 'across the federal enterprise.'" *Id.* "The documents revealed in discovery and filed with the Court reflect the same practices among all other Defendants, as alleged further herein." *Id.*; *see also id.* ¶¶ 338-457; Docs. 71-1 to 71-13.

## 2.  The Government's arguments on traceability have no merit.

Notwithstanding this long list of compelling allegations, the Government raises a series of arguments to argue that the Complaint fails to allege facts supporting a plausible inference of traceability.  Doc. 128-1, at 32-39.  All are meritless.

First, the Government argues that the Complaint fails to allege that the social-media platforms' censorship decisions are "attributable to Defendants rather than the companies' 'independent action.'"  Doc. 128-1, at 33 (quoting *Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards*, 128 F.3d 910, 916 (5th Cir. 1997)).  But the Complaint repeatedly alleges that the social-media platforms would *not* have engaged in the complained-of censorship without the pressure from federal officials, and it provides an overwhelming, factually-based justification for that conclusion.  *See supra*, Part I.B.1.

The Government argues that the Complaint relies solely on public threats and "general urging to social media companies to combat misinformation."  Doc. 128-1, at 33.  The Government ignores huge swaths of the Complaint which allege that, in addition to these public-pressure statements and threats, federal officials engaged in extensive *private* communications with social-media platforms to pressure and collude with them on censorship, including highly specific content-moderation decisions.  *See, e.g.,* Doc. 84, ¶¶ 248-252, 301-303, 316, 338-457.  The Complaint alleges a multi-prong approach: years of public statements from Defendants and politically allied senior federal officials threatening severe adverse legal consequences to social-media platforms to increase censorship, *see id.* ¶¶ 183-202, coupled with extensive private communications between federal officials and social-media platforms designed to pressure and collude regarding specific individual censorship decisions, *id.* ¶¶ 338-457.   These critical private communications demanding censorship were conducted against the backdrop of the public threats of adverse legal consequences.  *See id.* ¶¶ 248-252, 301-303, 316, 338-457.

The Government's related contention that "Plaintiffs' causation theory is not tailored to any specific actions taken by a social media company against a particular individual's content," Doc. 128-1, at 33, is demonstrably incorrect.  The Complaint, supporting Declarations, and the

Government's own discovery documents contain repeated allegations—backed by overwhelming evidence—of "specific actions taken by a social media company against a particular individual's content" in direct response to federal-official communications and federal-official pressure.  *See, e.g.,* Doc. 84, ¶¶ 432-433 ("CISA has also flagged named Plaintiffs' speech for censorship," including Jim Hoft's the Gateway Pundit); *id.* ¶ 415 (incorporating the Election Integrity Partnership's report by reference, which cites The Gateway Pundit 47 times as a purveyor of supposed "misinformation" that was flagged for censorship); *id.* ¶ 248 (alleging that Defendant Crawford organized "BOLO" meetings where she and other federal officials "flagg[ed] specific social-media posts for censorship and provid[ed] examples of the types of posts to censor"); *id.* ¶ 341 (alleging that Facebook removed "17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen" in direct response to federal pressure); *id.* ¶¶ 345-347 (alleging that Twitter deplatformed Alex Berenson—who had many followers in Louisiana and Missouri—in response to federal pressure from the White House and Dr. Fauci); *id.* ¶ 364 (alleging that CISA repeatedly and successfully flags specific social-media posts for censorship).  Indeed, the Government admits that the Complaint "highlights a few decisions by social media companies to moderate the content of some individual users, including the individual named Plaintiffs"—then citing dozens of such allegations.  Doc. 128-1, at 34 (citing Doc. 84, ¶ 238; Bhattacharya Decl. ¶¶ 16, 18; Kulldorff Decl. ¶¶ 15-25; Hoft Decl. ¶¶ 6-14; Kheriaty Decl. ¶¶ 12-17; Hines Decl. ¶¶ 8-14).

The Government argues that "the Complaint contains no allegations linking *Defendants'* alleged 'campaign of threats' to those specific decisions."  Doc. 128-1, at 34.  That is demonstrably incorrect.  The Complaint alleges that federal officials made *specific demands* and/or *specifically pressured* social-media platforms to make those individual, specific censorship decisions, and that they did so deliberately against the backdrop of repeated public threats of adverse legal

consequences from Defendants such as President Biden, Jen Psaki, and their political allies in Congress.   The Government just ignores these allegations of the Complaint.

Next, Plaintiffs argue that "[t]here is no plausible, *non-speculative* allegation that social media companies are or were responding to Defendants' alleged 'threats,' rather than enforcing their own content-moderation policies."  Doc. 128-1, at 35.  Again, this argument is demonstrably false.  The Complaint contains dozens of pages of non-speculative allegations, summed up in elaborate detail in Paragraphs 476-485.  Doc. 84, ¶¶ 248-252, 301-303, 316, 338-457.  There are numerous specific, concrete, non-speculative allegations that social-media platforms responded to pressure from federal officials to engage in specific acts of content moderation that directly injured Plaintiffs.  *See id.*; *see, e.g., id.* ¶¶ 345-347 ("Twitter caved to federal pressure and permanently suspended Berenson"); *id.* ¶¶ 340-343 (alleging that a senior Meta executive responded to federal pressure by emailing the White House and Surgeon General Murthy with reports on how Facebook had both changed its content-moderation policies to censor more claims and taken specific acts of censorship against specific disfavored speakers demanded by the White House); *id.* (alleging that "such pressure from government officials on social-media companies, along with the many public statements alleged in the Complaint, have succeeded on a grand scale," and identifying examples).

The Government argues that it is supposedly "just as likely" that the social-media platforms engaged in all these censorship decisions based on "independent judgments based on their own policies."  Doc. 128-1, at 35.  As noted above, this argument rests on an unjustifiable distortion of the *Iqbal/Twombly* standard.  *See supra*, Legal Standards.  If Plaintiffs and the Government advance competing inferences from the facts that are *both* plausible, that is not a basis for dismissal under *Iqbal* and *Twombly*—that is a basis for factual discovery and trial on the merits.  *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 189 (2d Cir. 2012).  In any event, the

39

Government is plainly wrong in contending that "[i]t is just as likely (if not more likely) that the companies' decisions reflect independent judgments based on their own policies." Doc. 128-1, at 35. Based on the facts alleged in the Complaint, only the most obtuse or biased of observers could believe that social-media platforms are oblivious to federal pressure and simply engage in "independent judgments based on their own policies." *Id.* Alex Berenson provides a clear example of this. Internal Twitter communications show that Twitter employees knew that Alex Berenson was *not* violating "their own policies" and persistently resisted censoring him, *id.*, yet Twitter suspended and deplatformed him after public pressure from President Biden and Dr. Fauci, combined with a private pressure campaign from Andy Slavitt, Rob Flaherty, and others in the White House. The *only* plausible inference from these facts—and many others like them—is that the social-media platforms are bowing the federal pressure and censoring speech that they would otherwise permit on their platforms.

Finally, the Government cites several cases in which supposedly "nearly identical" First Amendment claims were dismissed "for failure to satisfy Article III's causation requirement." Doc. 128-1, at 35-38 (citing and discussing *Changizi*, 2022 WL 1423176, at *8-11; *Hart v. Facebook Inc.*, No. 22-cv-00737, 2022 WL 1427507 (N.D. Cal. May 5, 2022); and *Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505 (D.D.C. 2021), *aff'd*, 23 F.4th 1028 (D.C. Cir. 2022) ("AAPS II"). This Court has already considered and rejected Plaintiffs' reliance on these very cases. Doc. 34, at 7-8 & n.7 (discussing *Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505, 510 (D.D.C. 2021), *aff'd* 23 F.4th 1028 (D.C. Cir. 2022); *Hart v. Facebook, Inc*. 2022 WL 1427507 (N.D. Cal. May 5, 2022); and *Changizi v. Dept. of Health & Hum. Servs.*, 2022 WL 1423176 (S.D. Ohio, May 5, 2022)). As this Court noted, "[e]ach of the above cases were factually intensive. Based upon the specific facts of each case, the court found the plaintiffs

had not plausibly alleged injury-in-fact and causation." Doc. 34, at 8. The Court held: "In the present case, this Court finds Missouri and Louisiana have plausibly alleged injury-in-fact, causation, and redressability. The Plaintiff States' eighty-four-page Complaint sets forth much more detailed allegations and evidence against federal agencies and officials than the cases cited by Government Defendants." *Id.* The same reasoning applies to Plaintiffs' Second Amended Complaint, which contains 164 pages of detailed allegations, including all the allegations that were included in the original 84-page Complaint.

As Plaintiffs noted in their previous briefing, Doc. 30, at 7-9, Defendants' cases are both unpersuasive and plainly distinguishable. They were filed long before evidence of the massive federal censorship activities became publicly available, and thus they were based on much less extensive allegations of causation. In *Schiff*, the plaintiffs relied on public statements of a single Congressman from 2019—Adam Schiff—and they made no allegations of coordination between Schiff and Twitter. *Schiff*, 518 F. Supp. 3d 505, 516. As to causation, the district court held that the plaintiff's theory "depends on an analytic leap based on bald speculation," 518 F. Supp. 3d at 515, and its theory of redressability was based on "pure speculation," *id.* at 516. The "nebulous" allegations in that case, *id.* at 513, bear no resemblance to the extensive allegations here.

*Hart*, likewise, focused on a handful of statements by federal officials that largely post-dated the acts of censorship of which Hart complained. *See Hart v. Facebook Inc.*, No. 22-CV-00737-CRB, 2022 WL 1427507, at *3 (N.D. Cal. May 5, 2022). *Hart* emphasized that the chronology of events alleged in the Complaint undermined the theory of causation. *Id.* at *6. The opposite is true here, where the repeated chronological linking—federal pressure, immediately followed by acts of censorship—strongly supports an inference of causation.

41

In *Changizi*, the district court placed primary emphasis on the fact that Twitter began censoring COVID-19 "misinformation" in March 2020, while the plaintiffs challenged public statements by Biden Administration officials starting in 2021. *Changizi v. Dep't of Health & Hum. Servs.*, No. 2:22-CV-1776, 2022 WL 1423176, at *9 (S.D. Ohio May 5, 2022). Here, the States specifically allege that federal officials—including named Defendants such as Dr. Fauci and NIH—were pressuring and colluding with social-media companies to procure censorship by early 2020. *Changizi* also faulted the plaintiffs for not suing more federal defendants, such as Jen Psaki. *See Changizi*, 2022 WL 1423176, at *9 n.1. Even if that were relevant, Plaintiffs' Second Amended Complaint suffers from no such deficiency. Doc. 84, ¶¶ 26-93 (suing 67 federal defendants, including the White House Press Secretary). Finally, the *Changizi* court complained that, "even assuming that members of the Biden Administration did have 'discussions' with 'technology companies,' it is entirely unclear who participated in these talks, when they occurred, or what they supposedly entailed." *Id.* That is not true here, in light of the expedited discovery ordered by the Court, which the Complaint incorporates in detail. Doc. 84, ¶¶ 338-457.

In short, the Government's description of these cases as "nearly identical," Doc. 128-1, at 35, is incorrect. Each of these cases is plainly distinguishable because it involved far more limited factual allegations than those in Plaintiffs' Complaint. Doc. 34, at 6-7. The Government argues that the Complaint's theory of causation suffers from "chronological problems," based on the Government's unpled "facts," but that is wrong for multiple reasons. First, the Complaint alleges that federal-official collusion and pressure began in early "2020, if not before": "Starting in or around 2020, if not before, social-media firms have responded to these threats by engaging in increasingly more aggressive censorship of speakers, messages, and viewpoints disfavored by Defendants, senior government officials, and the political left." Doc. 84, ¶ 189. This includes

specific allegations that Dr. Fauci, among others, engaged in efforts to procure censorship of disfavored viewpoints beginning in early 2020. Doc. 84, ¶¶ 139-141. Moreover, the Complaint alleges that, before federal pressure began in 2020, social-media platforms generally did *not* censor supposed "misinformation," and "generally refused to remove false content purely because it was false until 2020." Doc. 84, ¶ 189.

Finally, the Government argues that "Plaintiffs offer no non-speculative allegations to support that theory" that social-media companies "'ramped up' efforts to combat misinformation on their platforms starting in 2020." Doc. 128-1, at 39. Again, this is plainly false, as the Complaint offers dozens of allegations and examples of increased censorship after Defendants' pressure campaign began in 2020. *See* Doc. 84, ¶¶ 338-457.

### C.      Plaintiffs' Injuries Are Redressable.

For closely related reasons, Plaintiffs' injuries are also redressable. As this Court has held, under the third element of standing, the plaintiff must show that his injury is "likely to be redressed by a favorable decision." Doc. 34, at 4 (citing *Lujan v. Defenders. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Moreover, as this Court has held, "States are not normal litigants for purposes of invoking federal jurisdiction." *Id.* "Rather, a state is afforded 'special solicitude' in satisfying its burden to demonstrate the traceability and redressability elements of the traditional standing inquiry whenever its claims and injury meet certain criteria…." *Id.* (citing *Massachusetts*, 549 U.S. at 520–21; *Texas*, 809 F.3d at 151–55). As discussed above, Louisiana and Missouri satisfy those criteria here, and so their burden to satisfy redressability is relaxed. As this Court has held, "[t]he redressability element of standing to sue requires a plaintiff to demonstrate 'a substantial likelihood that the requested relief will remedy the alleged injury in fact.'" Doc. 34, at 6 (quoting *El Paso Cty., Texas v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020)). Applying this standard, this Court has already held that "Plaintiff States meet this [redressability] requirement. Stopping of

the alleged suppression of supposed disfavored speakers, viewpoints, and content would address Plaintiff States' alleged injuries." *Id.*

Further, causation and redressability are closely related, and where an injury is traceable to a defendant's conduct, it is typically redressable as well. *See, e.g., Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 54 (D.C. Cir. 2016) ("[C]ausation and redressability are closely related, and can be viewed as two facets of a single requirement."); *Toll Bros., Inc. v. Township of Reading*, 555 F.3d 131, 142 (3d Cir. 2009) ("Redressability . . . is closely related to traceability, and the two prongs often overlap." (quotation marks omitted)); *El Paso Cnty. v. Trump*, 408 F. Supp. 3d 840, 852 (W.D. Tex. 2019).

Nothing in the Government's Motion to Dismiss provides any reason for the Court to revisit its conclusion that Plaintiffs' injuries are redressable. *See* Doc. 128-1, at 39-43. In fact, Defendants present no argument to dispute this Court's commonsense, irrefutable conclusion that "stopping the alleged suppression of supposed disfavored speakers, viewpoints, and content would address Plaintiff States' alleged injuries." Doc. 34, at 6. Instead, Defendants speculate that Plaintiffs will seek an "expansive" and "sweeping" injunction, *id.* at 39, and argue that this "expansive" and "sweeping" injunction will fail to satisfy Article III, *see id.*

Defendants' arguments are both premature and meritless. They are premature because Plaintiffs are currently engaged in expedited preliminary-injunction-related discovery for the very purpose of allowing Plaintiffs and the Court to identify the precise scope of injunctive relief. *See* Doc. 34, at 13. As Plaintiffs have contended for months, identifying *which* federal officials are pressuring and colluding with social-media platforms to censor Americans' speech, and *what their precise conduct is* to procure that censorship, is essential to crafting specific, appropriately tailored injunctive relief to remedy Plaintiffs' injuries. The Government's new-found insistence that "the

44

Court's order would have to 'state its terms specifically and describe in reasonable detail the conduct restrained or required,'" Doc. 128-1, at 41-42 (quoting *State of Louisiana v. Biden*, 45 F.4th 841, 846 (5th Cir. 2022)), is ironic.  That is exactly what *Plaintiffs* have urged for months in pressing the need for expedited preliminary-injunction-related discovery, which Defendants have resisted and delayed at every turn.  Once expedited discovery is concluded, Plaintiffs will be able to propose to the Court specific, reasonably detailed injunctive relief.

Moreover, even if they were not premature, the Government's arguments are meritless.  Plaintiffs foreshadowed the scope of injunctive relief that they anticipate seeking in the most natural place—in their Motion for Preliminary Injunction, Doc. 10, which the Government ignores.  In that motion, Plaintiffs sought to enjoin Defendants from "taking any steps to demand, urge, encourage, pressure, or otherwise induce any social-media company or platform for online speech, or any employee, officer, or agent of any such company or platform, to censor, suppress, remove, de-platform, suspend, shadow-ban, de-boost, restrict access to content, or take any other adverse action against any speaker, content, or viewpoint expressed on social media."  Doc. 10, at 2; *see also* Doc. 15, at 57.  This relief—which focuses on the direct communications from federal Executive-branch officials named as Defendants to social-media platforms—is far more specific and detailed than the "sweeping," "expansive" preliminary injunction that Defendants speculate Plaintiffs will seek.

In light of this, Defendants' arguments are meritless.  First, Defendants argue that "whether to take action against any 'misinformation' on any private platform turns on 'unfettered choices made by independent actors not before the court[], and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'"  Doc. 128-1, at 40 (quoting *Defs. of Wildlife*, 504 U.S. at 562).  On the contrary, as discussed in detail addressing

causation/traceability above, the Complaint plausibly alleges that federal pressure from Defendants has caused and continues to cause social-media platforms to engage in much greater censorship than they otherwise would do, both by pressuring them to expand content-moderation policies and by pressuring them to engage in specific acts of censorship directly injuring Plaintiffs—including in cases where the platforms internally admit that the speech *does not violate their policies*. Thus, Plaintiffs "me[e]t their burden of showing that third parties will likely react in predictable ways." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). Plaintiffs' "theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Id.* (citing *Bennett v. Spear*, 520 U.S. 154, 169–170). "Because Article III 'requires no more than de facto causality,'" Article III "is satisfied here." *Id.* (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)). Here, the effect of Defendants' federal-official pressure on social-media platforms is not just "predictable"; it is demonstrable, based on dozens of examples of private communications between federal officials and social-media platforms demonstrating the social-media platforms' immediate reactions to federal pressure by increasing censorship. Doc. 84, ¶¶ 338-457; *see also, e.g., id.* ¶ 348 ("Such communications from the White House impose maximal pressure on social-media companies, which clearly yields the sought-after results."). The Court's conclusion naturally follows: "Stopping of the alleged suppression of supposed disfavored speakers, viewpoints, and content would address Plaintiff States' alleged injuries." Doc. 34, at 6.

The Government argues that, absent federal pressure, social-media platforms would still engage in just as much censorship based on their "business judgment and self-interest." Doc. 128-1, at 41. But the Complaint alleges precisely the opposite. Based on dozens of specific allegations, Doc. 84, ¶¶ 338-457, the Complaint alleges that "in the absence of Defendants' campaign for

social-media censorship, market forces and other incentives would have and did restrain social-media platforms from engaging in the social-media censorship alleged herein," Doc. 84, ¶ 478; and that, "prior to Defendants' campaign of threats and pressure, social-media platforms generally declined to engage in the acts of censorship alleged herein." *Id.*

Moreover, in the First Amendment context, plaintiffs are not required to prove that the censorship would cease absent government involvement.  Rather, so long as the Government's actions are deemed unconstitutional by virtue of the chilling effect they cause, Plaintiffs "simply need not contend with them," *Harrell v. Fla. Bar*, 608 F.3d 1241, 1257 (11th Cir. 2010), and redressability has been established.  *See also Council for Periodical Distributors Ass'n v. Evans*, 642 F. Supp. 552, 559 (M.D. Ala. 1986), *aff'd in relevant part*, 827 F.2d 1483 (11th Cir. 1987). Thus, *even if* social media platforms continued to censor Plaintiffs' accounts, so long as the calculus for any future censoring decisions omits government's "cajol[ing], coerc[ion], [or] command[s]," *Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021), their First Amendment injury has been redressed, *see also Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 361 (D.D.C. 2020) ("[A]n order enjoining defendants from further interference with [plaintiff's] First Amendment rights would restore her editorial discretion and eliminate any chilling effects.").

Next, the Government argues that an injunction "would require for its enforcement that this Court effectively become a permanent monitor of government speech at the highest levels." Doc. 128-1, at 41.  Again, this argument is premature and speculative, and addresses a strawman. An injunction against specific federal officials preventing them from pressuring social-media platforms to censor the private speech of Americans on social-media would not require this Court to become a "permanent monitor of government speech," and it is not yet determined whether an injunction against "press statements" and "advisories against misinformation" will be sought or

necessary.  *Id.*  Moreover, Plaintiffs have not sued any Members of Congress or legislative officials, so any injunctive relief will not implicate the Speech and Debate Clause.

As for Defendants' argument that a broader injunction would be necessary to "*fully* redress Plaintiffs' purported harms," Doc. 128-1, at 41, Plaintiffs are not required to seek relief that "*fully*" redresses their harms – the substantial likelihood that judicial relief would *partially* redress Plaintiffs' injuries satisfies Article III.  *See, e.g.*, *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) (holding that nominal damages constitute sufficient redress for standing purposes even if they "cannot provide full redress"); *Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007) (holding that the plaintiff State had standing where its injury "would be reduced to some extent" by a favorable decision); *Meese v. Keene*, 481 U.S. 465, 476–77 (1987); *Larson v. Valente*, 456 U.S. 228, 243 & n.15 (1982) (holding that redressability requires only that the plaintiff "will be given substantial and meaningful relief by a favorable decision," not that "a favorable decision will relieve his every injury"); *E.T. v. Paxton*, 41 F.4th 709, 721 (5th Cir. 2022).

Finally, the Government speculates that an injunction as to a small subset of the challenged conduct in the Complaint—*i.e.*, social-media speech originated by foreign actors—"would threaten to interfere with the President's responsibility to safeguard the nation's security and implement foreign policy."  Doc. 128-1, at 42.  This argument is meritless.  Like the entire federal Government, the President and the Executive Branch are subject to the constraints of the First Amendment, even when safeguarding security and implementing foreign policy.  The President and the Executive Branch have no authority to "safeguard the nation's security and implement foreign policy" by procuring the suppression of the social-media speech of American citizens based on content and viewpoint.  To the extent that the Government contends that any particular

aspect of an injunction would unduly interfere with foreign policy or national security, that is an issue to be raised in briefing regarding the scope of preliminary injunctive relief.

## II.    Sovereign Immunity Bars None of Plaintiffs' Claims.

Next, Defendants argue that sovereign immunity bars all of Plaintiffs' claims. Doc. 128-1 at 43–49. In fact, sovereign immunity bars none of Plaintiffs' claims.

### A.    Sovereign Immunity Does Not Bar Plaintiffs' First Amendment Claim.

As to Plaintiffs' First Amendment claim (Count I), Defendants' assertion of sovereign immunity is a nonstarter. Since *United States v. Lee*, the Supreme Court has recognized that sovereign immunity does not bar court orders enjoining federal officials from violating the Constitution. 106 U.S. 196 (1882); *see also, e.g.*, *Ex Parte Young*, 209 U.S. 123, 159–60 (1908) (holding that sovereign immunity does not bar suits against state officials in their official capacity for an injunction barring them from violating the Constitution); *Philadelphia Co. v. Stimson*, 223 U.S. 605, 618–21 (1912) (applying *Ex Parte Young* to federal officials); *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690–98 (1949) (confirming that *Lee* remains good law and clarifying that it applies to constitutional claims but not common-law tort claims); *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 327 (2015) (recognizing "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers"); *accord, e.g.*, *Ala. Rural Fire Ins. v. Naylor*, 530 F.2d 1221, 1226 (5th Cir. 1976).

Defendants do not even acknowledge the "constitutional exception to the doctrine of sovereign immunity." *Larson*, 337 U.S. at 696.  It is black-letter law that sovereign immunity does not apply to suits against officials in their official capacity for injunctions preventing them from violating the Constitution. *See, e.g.*, *Philadelphia Co.*, 223 U.S. at 620. The theory behind this doctrine is that "the conduct against which specific relief is sought is beyond the officer's powers and is, therefore, not the conduct of the sovereign." *Larson*, 337 U.S. at 690; *see also Ex Parte*

*Young*, 209 U.S. at 159–60. Because sovereign immunity is not implicated, Plaintiffs do not need to cite a waiver. *E.g.*, *Clark v. Library of Congress*, 750 F.2d 89, 102 (D.C. Cir. 1984).

Moreover, even if a waiver were required, Congress has provided one. In 5 U.S.C. § 702, Congress waived sovereign immunity for anyone "suffering legal wrong because of agency action" and "seeking relief other than money damages." As explained in Section C, *infra*, the legal wrongs that Plaintiffs allege consist of "agency action[s]" for purposes of § 702, and Plaintiffs are seeking declaratory and injunctive relief. *See* Doc. 84, at 161–62. Therefore, even if Plaintiffs' First Amendment claim implicated sovereign immunity (and it does not), it falls within the scope of § 702's waiver.

### B.      Sovereign Immunity Does Not Bar Plaintiffs' *Ultra Vires* Claim.

Defendants' assertion of sovereign immunity as to Plaintiffs' *ultra vires* claim (Count II) fares no better. Sovereign immunity is no bar to suits for injunctive relief against federal officials in their official capacity when the plaintiff alleges that the officials are acting beyond their statutory authority, *Larson*, 337 F.3d at 701-02.  Defendants cite *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985), for the proposition that "[t]he Fifth Circuit has expressed doubts about the continued validity of the . . . *ultra vires* exception to sovereign immunity." Doc. 128-1, at 72 n.19. But the Supreme Court referred approvingly to the *ultra vires* exception after *Geyen*, in *Dalton v. Specter*, 511 U.S. 462, 472 (1994). Since then, the Fifth Circuit has treated the *ultra vires* exception as good law. *See Danos v. Jones*, 652 F.3d 577, 583 (5th Cir. 2011).

To be sure, as Defendants point out, a plaintiff invoking the "*ultra vires* exception to sovereign immunity" must "allege facts sufficient to establish that the officer was acting without any authority whatsoever, or without any colorable basis for the exercise of authority," not just "that the actions of the officer are illegal or unauthorized." *Id.*; *see* Doc. 128-1 at 72. But the Complaint clears this hurdle easily. It alleges that Defendants are engaged in *de facto* prior

restraints, *see Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 703, 711–13 (1931), which the Supreme Court has described as "the most serious and least tolerable infringement on First Amendment rights," *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). It alleges that Defendants' regime of prior restraints "falls upon the communication of news and commentary on current events," making the damage to First Amendment rights "particularly great." *Id.*; *see, e.g.*, Doc. 84 ¶ 24. And it alleges—with detail and specificity, spanning 570 paragraphs and incorporating hundreds of pages of documents—that Defendants' regime of prior restraint is "massive" in scale, encompassing "dozens of federal officials across at least eleven federal agencies and components." Doc. 84 ¶ 9. Tellingly, Defendants fail to come forward with a single statute that they are prepared to argue purports to provide any "colorable basis" for such blatantly unconstitutional conduct. *Danos*, 652 F.3d at 583. The notion that such a statute exists is absurd.

Moreover, like Plaintiffs' First Amendment claim, Plaintiffs' *ultra vires* claim falls within the scope of § 702's waiver of sovereign immunity in that Plaintiffs allege "legal wrong because of agency action" and "seek[] relief other than money damages." § 702. Therefore, even if a waiver were required for Plaintiffs' *ultra vires* claim, Congress has provided one.

## C.   Sovereign Immunity Does Not Bar Plaintiffs' APA Claims.

Defendants' assertion of sovereign immunity also fails as to Plaintiffs' APA claims (Counts III–VII). Section 702's waiver of sovereign immunity covers these claims because they are requests for equitable relief based on legal wrongs inflicted by agency action.

Defendants' only argument to the contrary is that Plaintiffs fail to attribute the legal wrongs they allege to "agency action" as required by § 702. Defendants emphasize that "agency action" for § 702 purposes must be "discrete," Doc. 128-1, at 45, *i.e.*, something "that a court can competently compel" or prohibit through an injunction, *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 20 (D.D.C. 2017) (Jackson, J.). According to Defendants, directing and

collaborating with social-media companies to censor speech based on its content is not "discrete" in this sense. Doc. 128-1, at 46–47.

Defendants are mistaken. In *Norton v. Southern Utah Wilderness Alliance*, the Supreme Court explained that the requirement of a "discrete" agency action means only that courts may not supervise agencies' "compliance with broad [legal] mandates." 542 U.S. 55, 66 (2004); *accord Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 194 (4th Cir. 2013).  For example, a court may not order compliance with the statutory mandates

> to "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance," or to "manage the [New Orleans Jazz National] [H]istorical [P]ark in such a manner as will preserve and perpetuate knowledge and understanding of the history of jazz," or to "manage the [Steens Mountain] Cooperative Management and Protection Area for the benefit of present and future generations."

*Norton*, 542 U.S. at 66–67 (quoting 16 U.S.C. §§ 1333(a), 410bbb–2(a)(1), 460nnn–12(b)). Exercising oversight of agency performance at this level of generality would entail "judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve" and "inject[] the judge into day-to-day agency management." *Id.*

Here, Plaintiffs are challenging not a "[g]eneral deficienc[y]," *id.* at 66, but rather a specific constitutional violation: "pressuring" and "colluding with social-media platforms to censor disfavored speakers and viewpoints," Doc. 84 ¶ 497. Unlike an injunction against, say, managing wild burros in a way that disrupts a thriving natural ecological balance, *Norton*, 542 U.S. at 67, an injunction against pressuring and colluding with private entities to censor disfavored speakers and viewpoints is no "vague, undefined corrective measure," *Vill. of Bald Head Island*, 714 F.3d at 194. Determining whether a given agency action violates the latter injunction would not "entangl[e the Court] in abstract policy disagreements" that it "lack[s] both expertise and information to resolve." *Norton*, 542 U.S. at 66. On the contrary, censorship by *de facto* prior restraint is precisely

the kind of "specific action that a court can competently" enjoin. *Ctr. for Biological Diversity*, 260 F. Supp. 3d at 20; *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963).

On Defendants' telling, Plaintiffs are not really alleging censorship but only taking issue with how federal "officials express[ed] views on policy matters." Doc. 128-1, at 46. The most cursory reading of the Complaint demonstrates that this is false. "Censor" and its cognates (e.g., "censorship") appear 441 times in the Complaint. Defendants avoid the obvious import of the Complaint's allegations by cherry-picking quotes from their context. For example, to show that Plaintiffs are really just "tak[ing] aim at various forms of speech by government officials expressing views on policy matters," Defendants point to Plaintiffs' citation of Dr. Murthy's assertion that misinformation is an "urgent public health threat." Doc. 128-1, at 46 (citing Doc. 84 ¶ 220). But they ignore what Plaintiffs allege next, which is that Murthy proceeded "explicitly [to] call[] for more aggressive censorship of social-media speech, stating that . . . '[w]e're asking [social-media companies] to consistently take action against misinformation super-spreaders on their platforms,'" Doc. 84 ¶ 222—as well as what Plaintiffs allege later, which is that Murthy was directly involved in pressuring and working together with "a very senior executive at Meta (Facebook and Instagram)" to "increase[e] censorship on Meta's platforms," *id.* ¶¶ 340–42. Plaintiffs are not asking the Court to supervise Defendants' general approach to "expressing views on policy matters," Doc. 128-1, at 46, but to enjoin discrete First Amendment violations.

Next, Defendants argue that Plaintiffs pleaded *too many* discrete incidents where federal officials violated the First Amendment. Doc. 128-1, at 46–47. As Defendants see it, agencies and their officials are immune from suit provided that their constitutional violations are frequent enough to constitute a "practice[]." *Id.* (quoting *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 491 (5th Cir. 2014)). Defendants are mistaken. The "aggregation of specific and

discrete claims is reviewable under the APA. A complaint asserting them may not be dismissed as a 'broad' and 'programmatic' attack upon a federal agency." *Manker v. Spencer*, No. 3:18-cv-372 (CSH), 2019 WL 5846828, at *13 (D. Conn. Nov. 7, 2019). In suggesting otherwise, "Defendants confuse aggregation of similar, discrete purported injuries—claims that many people were injured in similar ways by the same type of agency action—for a broad programmatic attack." *Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 21 (D.D.C. 2018).

The Fifth Circuit case that Defendants cite, *Alabama-Coushatta*, does not support their position. *Alabama-Coushatta* affirmed the dismissal of the plaintiff's complaint not because the plaintiff identified numerous "specific agency actions," but because the plaintiff's "challenge [wa]s directed" not at these actions but "at the federal agencies' broad policies and practices." 757 F.3d at 491. Here, Plaintiffs' challenge is to the specific conduct alleged, namely, censorship of speech, not a broad policy or practice that Plaintiffs view as "[g]eneral[ly] deficien[t]." *Norton*, 542 U.S. at 66. Therefore, Plaintiffs' challenge satisfies § 702's discrete-action requirement. *See Sierra Club v. Peterson*, 228 F.3d 559, 567 (5th Cir. 2000) (en banc).

Finally, Defendants argue that Plaintiffs cannot invoke § 702's waiver of sovereign immunity as to their APA claims unless they allege agency action that is not only discrete but final. Doc 128-1, at 48–49. The finality requirement does not appear in § 702's waiver of sovereign immunity. Instead, it appears in § 704's provision of a cause of action under the APA. Accordingly, most circuits treat finality as necessary only to have a cause of action under the APA, not to qualify for § 702's waiver of sovereign immunity. *See, e.g.*, *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1168–72 (9th Cir. 2017); *Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 494 n.4 (6th Cir. 2014); *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 187 (D.C. Cir. 2006). That said, the status of Fifth Circuit law on this point is unclear. Older cases treated the finality requirement as

54

jurisdictional, *e.g.*, *Sierra Club*, 228 F.3d at 569, and *Alabama-Coushatta* stated in *dicta* that § 704's finality requirement "has been read into § 702 in cases" brought under the APA, 757 F.3d at 489. But recently the Fifth Circuit cast doubt on these precedents, noting that they "may be out of step with recent Supreme Court rulings" and citing sister-circuit precedent treating the finality requirement as only an element of a cause of action under the APA. *Amin v. Mayorkas*, 24 F.4th 383, 389 n.2 (5th Cir. 2022). The *Amin* court left open whether circuit "precedent treating the finality requirement as jurisdictional survives." *Id.*

Below, Plaintiffs address the finality requirement in the context of explaining why they have asserted a cause of action under the APA. But Plaintiffs' arguments there apply with equal force here if § 702 is interpreted to contain a finality requirement.

**D.      Plaintiffs Have a Valid Cause of Action for All Their Claims.**

A valid cause of action is a distinct requirement from the presence of subject-matter jurisdiction and the absence of sovereign or another form of immunity. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 483–84 (1994); *John Corp. v. City of Houston*, 214 F.3d 573, 585 n.19 (5th Cir. 2000). Defendants do not dispute that Plaintiffs have a valid cause of action for their First Amendment and *ultra vires* claims. For a cause of action as to their APA claims, Plaintiffs rely on 5 U.S.C. § 702 and 704, which authorizes judicial review of "final agency action." Defendants argue that Plaintiffs cannot satisfy the finality requirement. Doc 128-1, at 48–49.

In *Bennett v. Spear*, the Supreme Court specified "two conditions [that] must be satisfied for agency action to be 'final.'" 520 U.S. at 177–78. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (citations and quotation marks omitted). The second requirement is to be applied "pragmatic[ally]," *Cal. Cmtys. Against Toxics v. Env't Prot.*

*Agency*, 934 F.3d 627, 637 (D.C. Cir. 2019), and requires no more than that the action have a "direct and immediate effect" on the party challenging it, *F.T.C. v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980). Thus, the finality inquiry asks "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 796–97 (1992).

Both of *Bennett*'s conditions are satisfied here. According to the Complaint, Defendants are not merely having an internal discussion about whether to use social-media companies as instrumentalities by which to censor speech; they have affirmatively decided and begun to do so. Defendants' censorship actions result from "the consummation of [their] decisionmaking process." *Bennett*, 520 U.S. at 178 (quotation marks omitted). And these actions do not merely concern internal agency affairs but rather "directly affect" parties outside the federal government, including Plaintiffs. *Franklin*, 505 U.S. at 796–97. Specifically, the Complaint indicates that Defendants' censorship actions directly affect all Plaintiffs by silencing their speech, *see* Doc. 84, ¶¶ 7, 461, and that Defendants' censorship actions are inflicting at least seven additional categories of irreparable harm on Plaintiff States, *id.* ¶¶ 459–60, 462–67. Thus, Defendants' actions as alleged in the Complaint "reflect the completion of a decisionmaking process with a result that will directly affect Plaintiffs" as well as other "Missourians" and "Louisianans." *Id.* ¶¶ 521, 532, 543, 554, 565.

III.     **Plaintiffs State Plausible Claims on the Merits in All Counts of the Complaint.**

   A.     **Plaintiff's First Amendment Claim States a Valid Claim for Relief.**

   "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the

ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641 (1994).  Defendants grievously violate these principles.

### 1.   Plaintiffs allege facts demonstrating government action.[2]

Defendants urge that the First Amendment imposes limitations only on "*state* action, not action by private parties."  Doc. 128-1, at 49 (citing *Lloyd Corp. v. Tanner*, 407 U.S. 551, 567 (1972)).  But Defendants concede that Plaintiffs "may establish a First Amendment claim based on private conduct if that conduct 'can fairly be seen as state action.'"  *Id.* (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)).  The Complaint alleges facts that support the compelling inference that the challenged censorship decisions by social-media platforms are "fairly attributable" to Defendants.  *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982).

The Supreme Court has recognized that "there is no single test to identify state actions and state actors," and the Supreme Court's "cases have identified a host of facts that can bear on the fairness of such an attribution" of state action.  *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 294, 296 (2001).  Government action is a "necessarily fact-bound inquiry," and "the criteria lack rigid simplicity."  *Id.* at 295, 298.  As relevant here, government action exists in at least five circumstances: [1] "a challenged activity may be state action when it results from the State's exercise of 'coercive power,'" *id.* (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)); [2] "when the State provides 'significant encouragement, either overt or covert,'" to private conduct, *id.* (quoting *Blum*, 457 U.S. at 1004); [3] "when a private actor operates as a 'willful participant in joint activity with the State or its agents,'" *id.* (quoting *Lugar v. Edmonson*

---

[2] Plaintiffs use "government action" herein instead of "state action" to avoid confusion, because Plaintiffs challenging the government action here include States, and the relevant "government" is the federal government.  Regardless, "[t]he standards for determining whether an action is governmental are the same whether the purported nexus is to the state or to the federal government."  *Mathis v. Pac. Gas & Elec. Co.*, 891 F.2d 1429, 1432 n.3 (9th Cir. 1989).

*Oil*, 457 U.S. 922, 941 (1982)); and [4] "when [the private action] is 'entwined with governmental policies,' or when government is 'entwined in [its] management or control,'" *id.* (quoting *Evans v. Newton*, 382 U.S. 296, 299 (1966)).  Further, [5] "specific features" of the government's action may "combine" to create a compelling case for state action, especially where a federal statute has immunized private conduct.  *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 615 (1989).

These factors are present here: (1) significant encouragement, (2) coercion, (3-4) joint participation and entwinement, and (5) legal immunity combined with other factors.  Indeed, the governmental action here is flagrant, and this case is "nowhere near the margin." *Brentwood*, 531 U.S. at 305.  Further, these standards should be rigorously enforced, because "[i]t is characteristic of the freedoms of expression in general that they are vulnerable to gravely damaging yet barely visible encroachments." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963).  Thus, "the freedoms of expression must be ringed about with adequate bulwarks." *Id.*

### a.  Significant encouragement, either overt or covert.

It is "axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973).  A state or the federal government "normally can be held responsible for a private decision" when it "has provided such *significant encouragement, either overt or covert*, that the choice must in law be deemed to be that of the [government]." *Blum*, 457 U.S. at 1004.

In applying this standard, it does not matter whether the government action is "the real motivating force behind" the suppression of speech—that question is "immaterial." *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1295 (9th Cir. 1987); *see also Peterson v. City of Greenville*, 373 U.S. 244 (1963) (finding state action "even assuming, as respondent contends, that the manager would have acted as he did independently of the existence of the ordinance").

"[B]ackchannel threats" and "backroom exhortations" can establish a "system of informal censorship" that violates this doctrine.  *Nat'l Rifle Ass'n of Am. v. Cuomo*, 350 F. Supp. 3d 94, 106, 111 (N.D.N.Y. 2018).  Where the government had a "policy … to encourage and pressure" private actors into adopting the government's preferred policy, there is "significant encouragement" constituting government action.  *Mathis v. Pac. Gas & Elec. Co.*, 891 F.2d 1429, 1431 (9th Cir. 1989).  Where the government's exhortations are "backed up by threats of enforcement or of formal rulemaking," this standard is particularly applicable.  *Id.* at 1434.

The Complaint contains numerous allegations of such "significant encouragement, either overt or covert" from Defendants.  *See, e.g.,* Doc. 84, ¶ 226 (alleging that Jen Psaki demanded the censorship of the "Disinformation Dozen" and publicly demanded faster censorship of "harmful posts" on Facebook); *id.* ¶ 227 (alleging that Psaki stated that "we engage with them regularly and they certainly understand what our asks are," and that these "asks" include demands for increased censorship); *id.* ¶¶ 228-229 (detailed allegations about the Surgeon General's health advisory calling for greater censorship of social-media "misinformation"); *id.* ¶ 233 (alleging that Jen Psaki demanded that social-media platforms coordinate with each other to censor disfavored speech); *id.* ¶ 234 (alleging that Psaki demanded more "robust enforcement strategies" from platforms to "take faster action" against supposedly harmful speech); *id.* ¶ 239 (alleging that Surgeon General Murthy publicly stated, "We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health misinformation on their platforms. The time for excuses and half measures is long past. We need transparency and accountability now."); *id.* ¶ 241 (alleging that Jen Psaki demanded that social-media platforms "do more" to increase censorship, in addition to Spotify's restrictions on Joe Rogan's podcast); *id.* ¶¶ 242-246 (alleging that the Surgeon General issued a formal "Request for Information" to social-media platforms as an implied threat of future

regulation to pressure them to increase censorship); *id.* ¶¶ 256-257 (alleging series of meetings to encourage censorship of election-related "misinformation," which included federal officials from the FBI, DOJ, ODNI, and CISA); *id.* ¶¶ 282-284 (alleging that DHS is working with social-media platforms to demand censorship of misinformation and that this is happening "across the federal enterprise'"); *id.* ¶ 300 (alleging that DHS publishes repeated terrorism advisory bulletins indicating that "misinformation" and "disinformation" on social-media platforms are "domestic terror threats"); *id.* ¶ 330.  Moreover, the Complaint contains over 100 paragraphs of allegations detailing such "significant encouragement" in *private* (*i.e.* "covert") communications between Defendants and social-media platforms.  *Id.* ¶¶ 338-457.

Furthermore, all this "encouragement" was all the more "significant" because it occurred against the backdrop of repeated, aggressive *threats* of adverse legal consequences if the "encouragement" to increase censorship was disregarded—as discussed immediately below.  *See* Doc. 84, ¶ 183 (summarizing this "overt" *and* "covert" pressure campaign).

### b.  Coercion by federal officials.

Furthermore, the "significant encouragement" in this case rises to the level of coercion. *See* Doc. 84, ¶ 183 (summarizing this "overt" and "covert" campaign).  "Under [the Supreme Court's] cases," "when the government compels the private entity to take a particular action," that constitutes government action.  *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019); *see also Blum*, 457 U.S. at 1004.  The government violates the First Amendment when "the government coerces or induces it to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint."  *Knight First Amendment*, 141 S. Ct. at 1226 (Thomas, J. concurring).  "The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly."  *Id.*  Coercion includes

"the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation." *Bantam Books*, 372 U.S. at 67.

For this reason, "a public official who tries to shut down an avenue of expression of ideas and opinions through 'actual or threatened imposition of government power or sanction' is violating the First Amendment." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (Posner, J.) (quoting *American Family Association, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002)). "Threatening penalties for future speech goes by the name of 'prior restraint,' and a prior restraint is the quintessential first-amendment violation." *Id.* at 235. "[A] public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights…." *Okwedy v. Molinari*, 333 F.3d 339, 340–41 (2d Cir. 2003).

Simply put, the government "is not permitted to employ threats to squelch the free speech of private citizens." *Backpage.com*, 807 F.3d at 235. "The mere fact that [the private party] might have been willing to act without coercion makes no difference if the government did coerce." *Mathis*, 891 F.2d at 1434. "[S]uch a threat is actionable and thus can be enjoined even if it turns out to be empty…." *Backpage.com*, 807 F.3d at 231. Further, even a vaguely worded threat can constitute government coercion. *See Okwedy*, 333 F.3d at 341-42. But here, the threats have been repeated and explicit, and "the threats ha[ve] worked." *Backpage.com*, 807 F.3d at 232; *see also, e.g., Hammerhead Enters. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983); *Bantam Books,* 372 U.S. at 68 (veiled threat of prosecution to private bookseller violated the First Amendment).

The allegations of such threats by federal officials—including Defendants, their political allies, and those acting in concert with them—in the Complaint here are far more extensive and far more coercive than in these other cases where government action was found. *See* Doc. 84, ¶ 4

(summarizing the coercive impact of the threat campaign).  The Complaint alleges that "social-media firms greatly value the immunity provided by § 230 of the CDA … and credible threats to amend or repeal that immunity are powerful motivators to those platforms." Doc. 84, ¶ 181.  And it alleges that "the largest and most powerful social-media firms are also greatly concerned about antitrust liability and enforcement … and credible threats to impose antitrust liability and/or enforcement are powerful motivators to those platforms as well."  *Id.* ¶ 182.

The Complaint alleges numerous threats and pressure, both public and private, against social-media platforms to leverage these incentives to coerce them to comply with Defendants' preferences on censorship.  *See, e.g.*, Doc. 84, ¶¶ 183-202 (detailed allegations of a long, continuing campaign of threats against social-media platforms to pressure them to censor); *id.* ¶¶ 185-186 (long list of threats from senior federal officials that "link[] (1) the prospect of official government action in the form of adverse legislation, regulation, or agency action—especially threats of antitrust legislation and/or enforcement and calls to amend or repeal Section 230 of the CDA, among others—with (2) calls for more aggressive censorship and suppression of speakers, viewpoints, and messages that these officials disfavor"); *id.* ¶ 186 (Rep. Nadler: "Let's see what happens by just pressuring them."); *id.* ¶ 187 ("Defendants' political allies have repeatedly used congressional hearings … to berate social-media firm leaders, … and to make threats of adverse legal consequences if censorship is not increased."); *id.* ¶ 190 (alleging that President Biden's "threats of adverse government action have been among the most vociferous, and among the most clearly linked to calls for more aggressive censorship of disfavored speakers and speech by social-media companies"); *id.* ¶ 191-192 (alleging that Biden threatened civil liability and even criminal prosecution against Mark Zuckerberg if Facebook did not increase censorship of political speech); *id.* ¶¶ 193-196 (alleging additional threats against social-media platforms from President Biden

and Vice President Harris); *id.* ¶ 198 (alleging threats during the Presidential transition to pressure social-media platforms to increase censorship, including threat of repealing Section 230 of the CDA); *id.* ¶ 199 ("Coming into the new Administration, with now-President Biden's political allies in control of both Houses of Congress, … their threats of adverse legislation, regulation, and legal action became more ominous."); *id.* ¶¶ 218, 219, 277, 278, 313, 314, 316 (alleging a long series of similar threats from former White House Press Secretary Psaki, including threats of CDA Section 230 immunity repeal and antitrust enforcement); *id.* ¶¶ 220-223 (alleging that Surgeon General Murthy accused social-media platforms of "poison[ing] our information environment" by failing to censor social-media speech, and demanded greater censorship); *id.* ¶ 232 (alleging that President Biden stated of social-media platforms, "They're killing people" by not censoring enough health misinformation); *id.* ¶¶ 235-236 (alleging that, "four days later … the White House explicitly threatened to amend or repeal the liability protections of § 230 of the Communications Decency Act if social-media companies did not increase censorship"); *id.* ¶¶ 242-246 (alleging that the Surgeon General issued a formal "Request for Information" to social-media platforms as an implied threat of future regulation to pressure them to increase censorship); *id.* ¶¶ 259-261 (alleging additional threats and demands to demand greater censorship of election-related "disinformation"); *id.* ¶¶ 269-273, 288, 331, 335, etc.

The threats in this case far exceed—in number, scope, and coercive power—the threats at issue in cases like *Bantam Books*, *Backpage.com*, *Okwedy*, and others.  Moreover, even "a defendant without such direct regulatory or decisionmaking authority can also exert an impermissible type or degree of pressure."  *Okwedy*, 333 F.3d at 343.  But here, Defendants controlled the Presidency and both Houses of Congress, and had authority to carry out the threats.  Doc. 84, ¶ 479 ("These threats became even more motivating at the beginning of 2021, when

Defendants and their allies took control of the Executive Branch, with all its powerful agencies, and both Houses of Congress, indicating that they had the ability to carry out their threats.").

Defendants' "operation [i]s in fact a scheme of state censorship effectuated by extralegal sanctions; they act[] as an agency not to advise but to suppress." *Bantam Books*, 372 U.S. at 72. "The First Amendment forbids a public official to attempt to suppress the protected speech of private persons by threatening that legal sanctions will at his urging be imposed unless there is compliance with his demands." *Backpage.com*, 807 F.3d at 231. "A government entity … is entitled to say what it wants to say—but only within limits. It is not permitted to employ threats to squelch the free speech of private citizens." *Id.* at 235.

### c. Joint participation and entwinement.

Further, even if there had been no threats, pressure, or encouragement (overt and covert) of any kind, there would still be government action here. "[A] private entity can qualify as a state actor … when the government *acts jointly with the private entity*." *Halleck*, 139 S. Ct. at 1928 (emphasis added). Such joint action is present here, to an extraordinary degree. Federal officials have established an elaborate set of working groups and other formal and informal methods of communication to enable direct, ongoing collaboration and collusion on the censorship program.

"Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law …. It is enough that he is a willful participant in joint activity with the State or its agents." *Lugar*, 457 U.S. at 941. Thus, "a private party's joint participation with state officials in the [challenged action] is sufficient to characterize that party as a 'state actor'…." *Id.* Likewise, courts "have recognized that private parties may act under color of state law when the state significantly involves itself in the private parties' actions and decisionmaking at issue." *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 753 (9th Cir. 2020). Where a government official was "heavily involved in the decisionmaking process" of the private actor, *id.* at 754, or

"where the State has "so far insinuated into a position of interdependence with the private party that it was a joint participant in the enterprise," *id.* at 748 (brackets omitted), government action occurs.  The allegations here are overwhelming that federal officials are "heavily involved in the decisionmaking process," and that they have "significantly involve[d]" themselves "in the private parties' actions and decisionmaking at issue."  *Id.* at 753, 754.

Relatedly, government action occurs when there is "a symbiotic relationship between the [government] and the [private party]," *Brentwood*, 531 U.S. at 294, or when the private entity is "entwined with governmental policies," *id.* at 296.  Here, due to the campaign of threats leading to collusion in private, there is "pervasive entwinement of … public officials" in social-media censorship, constituting "entwinement from top down."  *Id.* at 298, 300.

Finally, government action occurs where the government has "specifically authorized or approved the private parties' actions," when the private action "received clear state imprimatur," and/or when the government "affirmatively command[s]" the private action.  *Rawson*, 975 F.3d at 754-55.  Again, all these factors are met here.

The Complaint repeatedly alleges such joint activity, entwinement, and specific authorization.  "Once in control of the Executive Branch, Defendants promptly capitalized on these threats by pressuring, cajoling, and openly colluding with social-media companies to actively suppress particular disfavored speakers and viewpoints on social media."  Doc. 84, ¶ 200; *see also, e.g., id.* ¶¶ 207-214 (alleging coordination between Dr. Fauci and social-media platforms to procure censorship of viewpoints disfavored by Dr. Fauci); *id.* ¶¶ 215-216 (alleging that Dr. Fauci and CDC officials serve as "public health experts" who advise social-media platforms on what to censor); *id.* ¶ 225 (alleging that Jen Psaki stated that "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff,"

65

and that "we're flagging problematic posts for Facebook"); *id.* ¶ 230 (alleging that Facebook is coordinating with the Government to censor health information by partnering with "government experts"); *id.* ¶ 248 ("Crawford of CDC and other CDC officials frequently communicated and coordinated with social-media platforms, including Facebook/Meta, Twitter, Google/YouTube, and Instagram, regarding the censorship of speech on social-media platforms, including flagging specific content for censorship," and providing details); *id.* ¶ 249 ("Officials of the Census Bureau … play an important, active, and ongoing role in colluding with social-media platforms to censor disfavored speech"); *id.* ¶¶ 250-253 (additional specific allegations of coordination between CDC and Census officials and social-media platforms to censor specific content); *id.* ¶¶ 282-283 ("DHS Secretary Alejandro Mayorkas stated that the department is working with tech companies … to … prevent harm from occurring."); *id.* ¶ 286 ("Leading up to the 2020 election, CISA relayed reports of election disinformation from election officials to social media platform operators."); *id.* ¶¶ 292-293 (alleging that CISA is working with "partners in the private sector … to continue to ensure that the American people have the facts that they need," and that this would ensure that Americans do not get to "pick their own facts"); *id.* ¶ 294 (alleging that "CISA maintains a number of task forces, working groups, and similar organizations as joint government-private enterprises, which provide avenues for government officials to push for censorship of disfavored viewpoints and speakers online"); *id.* ¶ 301 ("CISA published another bulletin announcing that it was coordinating directly with social-media platforms to police 'Mis, Dis, Malinformation,'" stating that CISA works "continues to work in close coordination with … social media companies" on this issue); *id.* ¶ 302 (alleging that CISA publicly states that it "works directly with social-media companies to flag content for censorship," in that "[t]he MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms"); *id.* ¶ 316 (alleging that Jen Psaki

stated that "we engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue"); *id.* ¶¶ 338-457 (over 100 paragraphs alleging dozens of examples of close coordination between Defendants and social-media platforms on censorship, and incorporating by reference hundreds of pages of Government-produced emails and documents attesting to such close coordination); *id.* ¶ 350 ("Officials at HHS, including Defendants herein, routinely flag content for censorship," and providing specific examples); *id.* ¶ 364 ("CISA routinely receives reports of perceived "disinformation," often from state and local government officials, and forwards them to social-media companies for censorship..."); *id.* ¶¶ 388-389 (alleging that the FBI is "working with social-media companies on censorship and suppression of private speech," and that the FBI "admits to regular, routine coordination about censorship with social-media platforms"); *id.* ¶ 393 (alleging that "active coordination between Meta and the FBI on censorship and suppression of speech on social media continues to this day"); *id.* ¶ 395 (alleging that "both the State Department and CISA have teamed up with a consortium of four private groups in a close collaboration to achieve social-media censorship of election-related speech … and that this collaboration is continuing to this day"); ¶¶ 395-420 (alleging two joint enterprises between CISA, the State Department, private non-profits, and social-media platforms to push for censorship of specific content, called the "Election Integrity Partnership" and the "Virality Project"); *id.* ¶ 430 (alleging that CISA works closely with the "Center for Internet Security" to "flag content for censorship on social media, including election related speech," and designed a "Reporting Portal" to allow government officials to have an exclusive channel to demand censorship); etc.

### d.    Subsidization of censorship combined with other factors.

Further, government action is present here for yet another reason: The federal government has effectively subsidized, authorized, and encouraged the practices of online censorship by

granting them legal immunity in Section 230 of the CDA. This subsidy and immunity, combined with the other factors discussed in detail above, rises to the level of government action.

In *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 606-612 (1989), the Supreme Court held railroads' drug testing of their employees constituted government action when the Government, by regulation, had specifically authorized (but not required) railroads to adopt a policy of drug testing their employees, had preempted state laws restricting such testing, and had shielded the railroads from liability for such testing. *Id.* The Supreme Court explained: "[S]pecific features of the regulations *combine[d]* to convince us that the Government did more than adopt a passive position toward the underlying private conduct." *Id.* at 615 (emphasis added). The Court reasoned that (1) the regulations preempted state laws "covering the same subject matter"; (2) "[t]he Government has removed all legal barriers to the testing authorized by [the regulation]"; and (3) the regulation "made plain not only [the government's] strong preference for testing, but also its desire to share the fruits of such intrusions." *Id.*

All these factors are present here. Section 230 of the CDA purports to preempt state laws to the contrary, and thus the federal government has purported to "remove[] all legal barriers to" the censorship immunized by Section 230 of the CDA; and federal officials have "made plain not only [their] strong preference for [censorship], but also [their] desire to share in the fruits of such intrusions." *Id.* As in *Skinner*, that evidence provides "clear indices of the Government's encouragement, endorsement, and participation" in censorship, which "suffice to implicate the [First] Amendment." *Id.* at 615–16.

The Complaint explicitly alleges such subsidization, authorization, and preemption occurred through Section 230: "[T]hrough Section 230 of the Communications Decency Act (CDA) and other actions, the federal government subsidized, fostered, encouraged, and

empowered the creation of a small number of massive social-media companies with disproportionate ability to censor and suppress speech on the basis of speaker, content, and viewpoint."  Doc. 84, ¶ 4.  It reinforces that allegation with detailed allegations about how such subsidization and authorization have occurred.  *See, e.g.,* Doc. 84, ¶ 170 ("For decades, the federal government has artificially encouraged, protected, fostered, and subsidized the aggregation of control over speech, including the specific power of censorship, by a small group of powerful social-media firms."); *id.* ¶¶ 171-183 (detailed allegations about the federal subsidization of a "censorship cartel" through CDA § 230 immunity and other mechanisms).

The Supreme Court has found government action on far lesser showings, such as in *Railway Employes' Department v. Hanson*, 351 U.S. 225, 231–32 (1956), where a federal statute had authorized close-shop agreements, preempting the laws of 17 states.  The Supreme Court reasoned: "If private rights are being invaded, it is by force of an agreement made pursuant to federal law which expressly declares that state law is superseded.  In other words, the federal statute is the source of the power and authority by which any private rights are lost or sacrificed." *Id.*  The same conclusion follows here as well.

*Skinner*'s and *Hanson*'s conclusions of government action, moreover, draw strong support from *Norwood*, where the Supreme Court emphasized that "[a] State may not grant the type of tangible financial aid here involved if that aid has a significant tendency to facilitate, reinforce, and support private discrimination."  *Norwood*, 413 U.S. at 466.  Here, Section 230 immunity constitutes *de facto* "tangible financial aid" worth billions of dollars per year, and this immunity "has a significant tendency to facilitate, reinforce, and support private" censorship.  *Id.*  Combined with other factors, as in *Skinner*, that is a basis for finding government action as well.

### 2.   Government-induced censorship violates the First Amendment.

Given a finding of government action, the First Amendment violations alleged here are unquestionable.  "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 137 S. Ct. at 1735.   "[B]y virtue of its ownership of the essential pathway," a social media platform "can ... silence the voice of competing speakers with a mere flick of the switch." *Turner*, 512 U.S. at 656*; see also Knight First Amendment Inst*., 141 S. Ct. at 1224 (Thomas, J., concurring). "The potential for abuse of this private power over a central avenue of communication cannot be overlooked." *Turner*, 512 U.S. at 657.

 Moreover, online censorship functions as a prior restraint, and "[e]ven when a speaker has repeatedly exceeded the limits of the First Amendment, courts are extremely reluctant to permit the state to close down his communication forum altogether." *Id.*  Furthermore, the censorship at issue here constitutes overt viewpoint discrimination, which is anathema under the First Amendment.  "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).  "Viewpoint discrimination is thus an egregious form of content discrimination.  The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*  But that is exactly what Defendants are doing here.

Defendants cannot defend their overt censorship program by invoking the government's own right to speak.  "The government-speech doctrine provides that the government does not need to be viewpoint-neutral when it chooses to express its own viewpoint on a topic of public interest." *NRA*, 350 F. Supp. 3d at 112 (citing *Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017)).  "But while the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to

dangerous misuse." *Matal*, 137 S. Ct. at 1758.  If this doctrine were applied too broadly, "government could silence or muffle the expression of disfavored viewpoints." *Matal*, 137 S. Ct. at 1758.

Finally, Defendants' censorship program is particularly pernicious because it inflicts widespread injury on the *audiences* of social-media speech, whose injuries are typically too diffuse for them to effectively assert their own rights.  The First Amendment protects listeners' rights to receive others' thoughts, messages, and viewpoints freely—but such listeners seldom have the resources to sue to vindicate their own interests.  "[W]here a speaker exists …, the protection afforded is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976).  "[T]he right to receive ideas follows ineluctably from the sender's First Amendment right to send them." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982).  "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 137 S. Ct. at 1735. "[T]he widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *United States v. Midwest Video Corp*., 406 U.S. 649, 668 n.27 (1972) (plurality op.) (quotations omitted).  Defendants' censorship activities strike at the heart of these fundamental values.

### 3.  The Government's arguments to the contrary are meritless.

Notwithstanding all these allegations, the Government argues that the Complaint fails to plausibly allege government action.  Doc. 128-1, at 49-72.  These arguments are meritless.

*First*, the Government relies on an unpublished, non-precedential decision from the Ninth Circuit, *Doe v. Google LLC*, No. 21-16934, 2022 WL 17077497 (9th Cir. Nov. 18, 2022).  Doc. 128-1, at 51.  But *Doe* involved nothing like the detailed allegations in this case.  *See id.*  The

plaintiffs in *Doe* were deplatformed by YouTube on October 15, 2020, and so they asserted no allegations involving the Biden Administration, which had not yet taken office. *Id.* at *1. Instead, they cited only "seven events involving federal officials," some of which were "only tangentially related to YouTube's content moderation decisions." *Id.* at *2. These limited allegations bear no resemblance to the Complaint's extensive allegations outlined above. Further, *Doe* held that a few public statements by Members of Congress, without more, "are insufficient to show that anyone linked to the federal government was 'so far insinuated' or 'inextricably intertwined' with YouTube's content-moderation decisions that those decisions could be 'fairly attributable' to the government." *Id.* at *3 (quoting *Pasadena Republican Club v. W. Justice Ctr.*, 985 F.3d 1161, 1167 (9th Cir. 2021)). Again, the Complaint here contains abundant allegations of "insinuated" and "intertwined" conduct showing that specific censorship decisions are "fairly attributable" to the government. *Id. Doe* does not support the Government's argument here.

*Second*, the Government argues that, "when pursuing such a claim of state action, … a plaintiff must also show that the Government called on the private party to take *the precise action* at issue." Doc. 128-1, at 52. This argument fails for two reasons. First, the Complaint contains many allegations that federal officials demanded specific censorship decisions directed to specific speakers and content, *see, e.g.,* Doc. 84, ¶¶ 338-447, and thus the Complaint plainly *does* allege that "the Government called on the private party to take the *precise action* at issue." Doc. 128-1, at 52. Second, the Government's "precise action" test does not exist anyway. To support the test, the Government relies heavily on dicta in a footnote in *West v. Atkins*, 487 U.S. 42, 52 n.10 (1988). But that footnote states that "the private party's challenged decisions could satisfy the state-action requirement if they were made on the basis of some rule of decision for which the State is responsible." *Id.* Thus, *West* indicates that, if "the State is responsible" for a "rule of decision"

that calls for social-media platforms to increase censorship—for example, if the government pressures the platform to adopt more stringent content-moderation policies that require censorship of additional forms of speech—that *does* constitute government action.  *See id.*  And that is the only test that makes any sense.  For example, the Complaint alleges that social-media platforms, under federal pressure, repeatedly changed their content-moderation policies to add lists of specific claims about COVID-19 and elections that would be targeted for removal.  These new policies, which effectively dictated the censorship of specific claims on social-media, are plainly "attributable" to the government.

*Third*, Defendants rely on another unpublished, non-precedential decision, *Louisiana Division Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 319 (5th Cir. 2020), to argue that Defendants' public statements about their "views on misinformation" cannot constitute government action.  Doc. 128-1, at 53.  But once again, that case bears no resemblance to the Complaint here.  *Louisiana Division Sons of Confederate Veterans* involved a single statement by a town mayor to private parade organizers, asking them to avoid displaying the Confederate battle flag in a privately organized parade, with no threats of any adverse legal consequences.  821 F. App'x at 319.  The court held that there was no evidence of government coercion or pressure: "Responding agreeably to a request and being all but forced by the coercive power of a governmental official are different categories of responses, and the scant evidence offered here would not allow a factfinder to hold for the SCV on the point."  *Id.* at 320.  The Complaint here, by contrast, alleges coercion, pressure, and joint action in elaborate detail.  The Government argues that "emphatic requests or strongly worded urging" do not constitute coercion, Doc. 128-1, at 54, but the Complaint here alleges much more—it alleges express and implied threats of grave adverse legal consequences.

*Fourth*, the Government argues that "the email correspondence Plaintiffs attach to their Complaint" indicates that the statements to social-media platforms are not coercive.  Doc. 128-1, at 54.  This is plainly untrue with respect to many emails, which contain pressure and implied threats at least, but the argument suffers from a more fundamental defect—it overlooks that the Complaint alleges that these email communications occurred against the backdrop of highly coercive *public* threats, and that the private communications "leveraged" the public threats to demand greater censorship.  The *combination* of those public, coercive threats with private email communications demanding specific acts of censorship creates a compelling inference of government action.  *See, e.g.,* Doc. 84, ¶ 184 ("Defendants have leveraged these threats to secure such increased censorship of speakers, content, and viewpoints that they disfavor on social-media platforms; and they have now moved into a phase of open collusion with the threatened companies, cooperating with them directly to censor speech, speakers, and viewpoints that Defendants disfavor.").  Thus, Defendants' lengthy and tendentious characterization of their own emails, attempting to cast them in the most favorable light to Defendants, Doc. 128-1, at 54-58, is both legally erroneous and misses the point.  Not only must these emails be viewed in the light most favorable to *Plaintiffs* at the pleading stage, but they also must be viewed in light of the Complaint's extensive allegations of additional express and implied threats.

Defendants' characterizations, in any event, are indefensible.  For example, Defendants argue that "[t]hese communications reflect the CDC functioning as a source of scientific information about the vaccines, not as the authoritative arbiter over whether any particular Plaintiffs' social media content warranted removal under platform policies."  Doc. 128-1, at 57.  On the contrary, the emails reflect the exact opposite—that the CDC's opinion was frequently the *sole* arbiter of whether social-media platforms would censor specific content relating to COVID-

19.    *See, e.g.,* Doc. 71-7 at 2-5 (CDC "debunking" claims about vaccines for Facebook, and Facebook requesting CDC's position on specific claims Facebook "currently remove[s]", and noting in April 2022 the CDC was able to debunk claims Facebook was removing); *id.* at 6-7 (Facebook "hold[ing] on [its] policy changes" about child vaccines until getting "the final word from [CDC]"); *id.* at 8-13 (CDC responding to vaccine claims encountered by Facebook was "hugely helpful" for Facebook "to remove these misinfo claims ASAP"); *id.* at 24-27 (Facebook posing more claims to CDC for fact-checking, and noting "as a result of our work together" Facebook updated vaccine content policies to remove "false claims"); *id.* at 28-31 (Facebook requesting certain "misinformation claims" about vaccines be "debunked" by CDC "by the end of day" to enable Facebook to remove "harmful claims ASAP"); *id.* at 49-52 (Facebook seeking "global source of truth" for "vaccine adverse effects" and CDC expressing it would "love to" set monthly misinfo/debunking meetings about "claims" as suggested by Facebook); *id.* at 61 (Twitter advising it has "actioned" specific Tweets conveyed by the CDC about vaccines); etc.

Fifth, Defendants argue that this case is "akin to the situation in" *VDARE Foundation v. City of Colorado Springs*, 11 F.4th 1151, 1162-63 (10th Cir. 2021).  Doc. 128-1, at 58-60. Defendants argue that *VDARE* creates a requirement that, to constitute coercion amounting to government action, the government officials must make "enforceable threats."  *Id.* at 60.  This requirement is not present in *VDARE* and would contradict the overwhelming weight of authority. Appellate decisions routinely hold that the government official making the threat does not need to have authority to carry out the threat.  *See, e.g., Backpage.com*, 807 F.3d at 230-31 (holding that "such a threat [of adverse government action] is actionable and thus can be enjoined even if it turns out to be empty"); *Okwedy v. Molinari*, 333 F.3d 339, 340–41 ("[A] public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First

Amendment rights even if the public-official defendant lacks direct regulatory or decisionmaking authority over the plaintiff or a third party that facilitates the plaintiff's speech."); *NRA*, 350 F. Supp. 3d at 115 ("Further, the government actor need not have direct power to take adverse action over a targeted entity for comments to constitute a threat…."). Likewise, *Bantam Books* stated that coercion includes "the threat of invoking legal sanctions and *other means of coercion, persuasion, and intimidation*." *Bantam Books*, 372 U.S. at 67 (emphasis added). Defendants' "enforceable threat" requirement, therefore, does not exist. Moreover, even if it did, it is satisfied here. The Complaint clearly alleges that, once the Biden Administration entered office with both Houses of Congress in control of its political allies, the threats of Section 230 repeal or reform and antitrust legislation or enforcement became "enforceable," because the incoming Administration had the practical authority to carry them out. Doc. 84, ¶ 479.

The case that Defendants rely on for this point, *VDARE*, is plainly distinguishable. *VDARE* involved a single statement by the mayor of Colorado Springs that "denounced 'hate speech' and relayed that the City wouldn't be providing municipal resources for VDARE's upcoming private conference in the City." 11 F.4th at 1156. "The day after the Mayor issued the statement, a private resort in the City cancelled its contract to host VDARE's upcoming conference." *Id.* The mayor's statement explicitly avoided making any threats to the private entities. *Id.* at 1157. These facts, obviously, are nothing like the extensive allegations of threats, public and private pressure, and collusion discussed above. Moreover, *VDARE* did not purport to adopt an "enforceable threat" requirement for state action. It merely noted that the absence of any "enforceable threat" – or any threat at all – was a relevant factor to consider in determining whether coercion exists, and held that "nothing in the City's Statement plausibly threatens the Resort with legal sanction." *Id.* at 1163-64. Here, by contrast, there are overwhelming allegations of plausible threats. *Id.*

*Sixth*, the Government argues that "it is unclear how the alleged comments about amending § 230 or bringing antitrust suits could be viewed as 'threats' given that no Defendant could unilaterally take such actions."  Doc. 128-1, at 60.  But, as noted above, a threat of adverse legal consequences is still coercive even if the government official making the threat does not have full authority to make the threat.  In any event, the Complaint alleges that the threats became particularly forceful once the Biden Administration took office with its political allies in control of both Houses of Congress, indicating that Defendants *could* "take such actions" with help of political allies in Congress.  Doc. 84, ¶ 187.  Moreover, the Attorney General is appointed by and removable by the President, so the President's threat that DOJ could institute antitrust actions *is* an action that "Defendant[s] could unilaterally take."  Doc. 128-1, at 60.

*Seventh*, Defendants argue that "[t]he statements that Plaintiffs describe as 'coercive' are routine expressions of political opinion on matters of public concern."  Doc. 128-1, at 61.  This is flatly untrue and plainly mischaracterizes the Complaint.  The Complaint repeatedly and specifically alleges—supported by detailed quotations of public statements—that the threats of adverse legal consequences such as Section 230 repeal and/or antitrust scrutiny *were explicitly linked to* demands for greater censorship.  These were not merely expressions on matters of public concern but specific demands that private publishers censor speech or face adverse legal consequences.

*Eighth*, Defendants argue that "the Government must have the 'freedom to select the messages it wishes to convey.'"  Doc. 128-1, at 62-64.  This argument misses the mark.  The Government's "freedom to select the messages it wishes to convey," *id.* at 62, is limited by the more fundamental principle, required by the First Amendment, that "[a] government entity … is not permitted to employ threats to squelch the free speech of private citizens."  *Backpage.com*, 807

F.3d at 235.   Moreover, as noted above, in *Matal v. Tam*, the Supreme Court powerfully emphasized that the *government's* freedom of speech must give way when it is exercised in a manner that would trample the free speech of ordinary citizens.   *Matal*, 137 S. Ct. at 1758. Defendants argue that "popular rhetoric is a core aspect of the modern presidency," Doc. 128-1, at 63, but neither the President nor any other federal official may exercise that "rhetoric" to make threats to "silence or muffle the expression of disfavored viewpoints," 137 S. Ct. at 1758.

   *Ninth*, the Government argues that the Complaint does not allege that Defendants "specifically direct[ed] any social media company to take any precise content moderation against a Plaintiff or any resident of a Plaintiff State."  Doc. 128-1, at 64.  This argument fails for several reasons.  First, as discussed above, Defendants' "specific dictating" requirement lacks any support in the case law.  Second, the Complaint *does* allege that Defendants "specifically direct[ed] any social media company to take any precise content moderation against a Plaintiff," *id.*—for example, it specifically alleges that both CISA and the joint federal-private enterprise called the Election Integrity Partnership repeatedly and successfully demanded the censorship of Plaintiff Jim Hoft's speech.  Likewise, the Complaint specifically alleges that federal officials pressured and colluded with social-media platforms to censor the speech of the co-authors of the Great Barrington Declaration, including Plaintiffs Dr. Bhattacharya and Dr. Kulldorff.  Doc. 84, ¶ 480. And it alleges that federal officials are responsible for inducing Twitter to artificially limit Dr. Kheriaty's followers.  *Id.* ¶¶ 23, 483.  These are among many other examples.  Further, Defendants completely overlook the First Amendment rights of the *audiences* of social-media speech—*i.e.*, the many thousands of Louisianans and Missourians who would read and receive the censored speech—including the followers of Jim Hoft, Dr. Kheriaty, Dr. Kulldorff, Dr. Bhattacharya, and Jill Hines.

Relatedly, Defendants argue that "Plaintiffs do not allege that any Defendant has required social media companies to follow a 'rule of decision' under which a company would be required to define misinformation in a particular manner."  Doc. 128-1, at 64.  Again, this is incorrect. Among many other examples, federal officials specifically demanded the censorship of the "Disinformation Dozen," who had many followers in Missouri and Louisiana.  Doc. 84, ¶¶ 336, 471, 480.  CDC officials specifically dictated to social-media platforms exactly what medical claims should be censored.  Doc. 71-7, at 1-13.  Federal officials repeatedly demanded more stringent content-moderation policies, including such specific demands that Jen Psaki publicly stated that "they know what our asks are."  Doc. 84, ¶¶ 480-481.

*Tenth*, Defendants argue that "[p]rivate platforms necessarily exercise their independent judgment…. Those actions are attributable to the *social media companies*, not the Defendants." Doc. 128-1, at 66.  The problem for Defendants is that the Complaint alleges the exact opposite, and provides extensive, detailed factual allegations supporting the opposite inference.  At best, this is a factual dispute that is not appropriate for resolution in a motion to dismiss, which considers only the sufficiency of the Complaint's allegations and draws every reasonable factual inference in *Plaintiffs'* favor.  *See* Doc. 84, ¶ 476; *see also Carlin*, 827 F.2d at 1295 (indicating that "the real motivating force behind" the suppression of speech is "immaterial" anyway).

*Eleventh*, Defendants challenge the allegations regarding the White House's pressure to deplatform Alex Berenson by arguing that no "enforceable threat" was made.  Doc. 128-1, at 68-69 (citing *VDARE*).  As discussed above, the "enforceable threat" requirement does not exist, and in any event, the aggressive pressure from Andy Slavitt and Rob Flaherty to deplatform Alex Berenson was made against the background of numerous, highly menacing enforceable threats. Doc. 84, ¶ 479.  Defendants also argue that "Berenson is not a Plaintiff here, so the episode

depicted still would not plausibly allege state action by any Defendant against any Plaintiff in this case," Doc. 128-1, at 69, but this overlooks that Berenson has many social-media followers in Louisiana and Missouri, whose interests the States represent. *See* Doc. 84, ¶ 471.

*Twelfth*, Defendants argue that "mere labels" cannot establish joint action, but that the Court must focus on "the *conduct* alleged in the Complaint and its accompanying materials." Doc. 128-1, at 69. But "the *conduct* alleged in the Complaint" includes dozens of specific examples of joint participation, where Defendants were directly involved in dictating specific censorship decisions to social-media platforms. Defendants argue "this case is far afield from *Lugar* because it does not involve a government-created system in which one private party's allegations cause exertion of federal power against another private party." Doc. 128-1, at 69. But *Lugar* never purported to hold that such a formal "government-created system" is the *only* way that the joint-participation test could be satisfied. In any event, the Complaint *does* allege an elaborate "government-created system" for federal officials to influence social-media censorship decisions—for example, by setting up long series of formal meetings to discuss censorship, setting up privileged reporting channels to demand censorship, funding and establishing federal-private partnerships to procure censorship of disfavored viewpoints, among others. *See* Doc. 84, ¶ 9.

Next, Defendants argue that "Fifth Circuit cases applying the 'joint action' test for state action have concentrated on, among other factors, whether the private party and government officials formed a 'preconceived plan' to achieve the 'specific conduct of which the plaintiff complains.'" Doc. 128-1, at 70 (citing *Moody v. Farrell*, 868 F.3d 348, 352-54 (5th Cir. 2017)). This argument fails because, as the Government admits, the existence of such a "preconceived plan" is but one factor to be considered "among other factors," *id.*, and those other factors provide overwhelming evidence of joint action. Moreover, the Complaint does allege many "preconceived

plans" between federal officials and social-media platforms including, for example, multiple agreements to set up privileged reporting channels for federal officials to report content for censorship, and detailed agreements to implement federal-private censorship enterprises such as the Election Integrity Project and the Virality Project.  Doc. 84, ¶¶ 401-420.  Finally, Defendants overlook that *Moody* adopted the "preconceived plan" factor in a highly specific context which is not relevant here.  *Moody* held that "evidence that a private citizen reported criminal activity or signed a criminal complaint does not suffice to show state action on the part of the complainant in a false arrest case," and that to overcome this presumption, "[t]he plaintiff must further 'show that the police in effecting the arrest acted in accordance with a "preconceived plan" to arrest a person merely because he was designated for arrest by the private party, without independent investigation.'"  868 F.3d at 353.  This is not a false arrest case, and so the "preconceived plan" requirement is not applicable here, regardless of how it may apply elsewhere.

Finally, Defendants argue that the Complaint lacks plausible allegations that two named Defendants—Ming Hsiang of OMB, and Deputy Treasury Secretary Wally Adeyemo—participated in federal censorship activities.  Doc. 128-1, at 71.  Again, this is incorrect.  As to Ms. Hsiang, the Complaint alleges that she was directly involved in setting up and participating in meeting(s) between YouTube and White House officials to dictate the specific results of Google searches relating to COVID-19 vaccines.  Doc. 84, ¶¶ 360-361.  These represent highly relevant First Amendment violations.  As to Mr. Adeyemo, the Complaint alleges that he went through Lauren Protentis at CISA—the agency that "routes disinformation concerns" to social-media platforms—to set up meetings with at least three major social-media platforms to discuss "social media and influence matters," and "potential influence operations on social media."  Doc. 84, ¶¶ 434-437.  The Complaint alleges that these messages "reflect the participation of Treasury and

Adeyemo in federal censorship activities." *Id.* ¶ 438.  Combined with the extensive allegations about other federal officials coordinating with CISA to engage in similar censorship activities, these allegations suffice to allege First Amendment violations against Mr. Adeyemo and Treasury.

**B.**     **Plaintiffs' *Ultra Vires* and APA Claims State Valid Claims for Relief.**

Defendants also briefly urge dismissal of Plaintiffs' *ultra vires* and APA counts for failure to state a claim. Defendants' only argument as to the *ultra vires* count is that Plaintiffs failed to allege facts showing that Defendant federal officials acted "without any authority whatever." Doc. 128-1, at 72–73. Plaintiffs already explained when discussing sovereign immunity why this argument fails. *See supra*, Part II. As to the APA counts, Defendants argue that Plaintiffs' allegations are insufficient to support the conclusion that Defendants' actions were "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). *See* Doc. 128-1, at 73–74. But as explained above, Plaintiffs' allegations are more than sufficient to support the conclusion that Defendants' actions were "not in accordance with law," "contrary to constitutional right," and "in excess of statutory . . . authority." § 706(2)(A)–(C).  Moreover, Plaintiffs adequately allege that Defendants failed to observe "procedure required by law," § 706(2)(D), because "they never engaged in any notice-and-comment process" even though their actions affected First Amendment legal rights, Doc. 84 ¶¶ 525, 536, 547, 558, 569. *See Amin v. Mayorkas*, 24 F.4th 383, 392 (5th Cir. 2022).

**C.**     **Declaratory and Injunctive Relief Are Available Against the President.**

Defendants argue that courts are categorically barred from granting injunctive or declaratory relief against the President.  Doc. 128-1, at 74–75.  Not so.  To be sure, "injunctive relief against the President himself is extraordinary." *Franklin v. Massachusetts*, 505 U.S. 788,

802 (1992) (plurality opinion) (citing *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 498–99

(1867)). But "extraordinary" does not mean "categorically barred." *See Nat'l Treasury Emps.*

*Union v. Nixon*, 492 F.2d 587, 609 (D.C. Cir. 1974) (recognizing the possibility of enjoining the

President); *Citizens for Responsibility & Ethics in Wash. v. Trump*, 953 F.3d 178, 199 & n.12 (2d

Cir. 2019) (same), *vacated as moot*, 141 S. Ct. 1262 (2021) (Mem.). A court may enjoin the

President if the plaintiffs' injuries cannot be redressed by enjoining other officials. *See Hawaii v.*

*Trump*, 859 F.3d 741, 788 (9th Cir. 2017) (concluding that "the extraordinary remedy of enjoining

the President [wa]s not appropriate" only because "Plaintiffs' injuries c[ould] be redressed fully

by injunctive relief against the remaining Defendants"), *vacated as moot*, 138 S. Ct. 377 (Mem.).

In any event, this Court has the authority to grant declaratory relief against the President.

Defendants cite statements by the D.C. Circuit and the Northern District of Texas that courts "have

never submitted the President to declaratory relief." Doc. 128-1, at 74–75 (quoting *Foley v. Biden*,

No. 4:21-cv-01098, 2021 WL 7708477, at \*2 (N.D. Tex. Oct. 6, 2021) (quoting *Newdow v.*

*Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010))). Neither statement is binding on this Court, and

each is incorrect. *See Clinton v. City of New York*, 524 U.S. 417, 421, 425 n.9, 449 (1998); *Nat'l*

*Treasury Emps. Union*, 492 F.2d at 616; *Knight First Amend. Inst. at Columbia Univ. v. Trump*,

928 F.3d 226 (2d Cir. 2019), *vacated as moot sub nom. Biden v. Knight First Amend. Inst. at*

*Columbia Univ.*, 141 S. Ct. 1220 (2021) (Mem.). Defendants also cite Justice Scalia's concurrence

in *Franklin*, where he opined that "we cannot issue a declaratory judgment against the President."

505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment). But Justice Scalia

made this statement before *Clinton*, where the Court did that over his dissent. *See* 524 U.S. 417.

## CONCLUSION

Defendants' Motion to Dismiss should be denied.

Dated: January 5, 2023

**ANDREW BAILEY**
**Attorney General of Missouri**

*/s/ D. John Sauer*
D. John Sauer, Mo. Bar No. 58721*
  *Deputy Attorney General*
Charles F. Capps, Mo. Bar No. 72734**
  *Deputy Solicitor General*
Todd Scott, Mo. Bar No. 56614
  *Senior Counsel*
Michael E. Talent, Mo. Bar No. 73339*
  *Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
John.Sauer@ago.mo.gov
*Counsel for State of Missouri*


*/s/ Jenin Younes*
Jenin Younes*
John J. Vecchione*
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
Email: jenin.younes@ncla.legal
*Counsel for Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines*


*/s/ John C. Burns*
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
F: 314-282-8136
E-mail: john@burns-law-firm.com
*Counsel for Jim Hoft*


* admitted *pro hac vice*

Respectfully submitted,

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

*/s/ Elizabeth B. Murrill*
Elizabeth B. Murrill (La #20685)
  *Solicitor General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

** application for admission *pro hac vice* pending

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 5, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*