**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

STATE OF MISSOURI ex rel. ERIC S.
SCHMITT, Attorney General, *et al.*,

      Plaintiffs,

v.

JOSEPH R. BIDEN, JR.,
in his official capacity as President of the
United States, *et al.*,

      Defendants.

No. 3:22-cv-01213-TAD-KDM

**PLAINTIFFS' SUPPLEMENTAL BRIEF ADDRESSING THE FIFTH CIRCUIT'S
NONDISPOSITIVE ORDER REGARDING JENNIFER PSAKI'S DEPOSITION**

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ........................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................... 2

    A. Defendants Have Stonewalled to Avoid Disclosing the White House Officials Who Communicate with Social-Media Platforms About Censorship........................................... 2

    B. Defendants Are Withholding Maximally Relevant and Probative Information. ................. 4

ARGUMENT .................................................................................................................. 14

    A. The Court Should Order the Government to Supplement its Interrogatory Responses After Consulting with Psaki, But That Alone Is Not Enough. .................................................. 15

    B. The Court Should Order the Government to Disclose the Identities of White House Officials Who Communicate with Social-Media Platforms About Misinformation and Censorship Within Three Days. ......................................................................................... 16

    C. The Court Should Order Defendants to Produce These White House Officials' Communications With Social-Media Platforms Within Fourteen Days. .......................... 18

CONCLUSION............................................................................................................... 19

CERTIFICATE OF SERVICE ...................................................................................... 22

## TABLE OF AUTHORITIES

Page(s)

Cases

*Am. Cas. Co. of Reading, Pa. v. Krieger*,
    160 F.R.D. 582 (S.D. Cal. 1995) .............................................................................. 16

*City of Las Cruces v. United States*,
    No. 17-809, 2021 WL 330062 (D.N.M. Feb. 1, 2021) ........................................... 15

*Hay & Forage Indus. v. Ford New Holland, Inc.*,
    132 F.R.D. 687 (D. Kan. 1990) .............................................................................. 16

Other Authorities

FEDERAL PRACTICE AND PROCEDURE, § 2163 (2022) .................................................. 16

## INTRODUCTION

On July 12, 2022, this Court ordered discovery into "the identity of federal officials," including White House officials, who communicate with social-media platforms about disinformation, misinformation, and censorship, "including the nature and content of those communications." Doc. 34, at 13.  For six months, Plaintiffs have repeatedly sought and demanded this information from Defendants—*i.e.*, the identity of the *White House* officials who are or have engaged in pressuring and colluding with social-media platforms to censor free speech, and the nature and content of their communications.  One critical source of this information is former White House Press Secretary Jennifer Psaki, who made public statements admitting that she *knows* which White House officials engage with social-media platforms about censorship, and that she *knows* what their "asks are."  The Government, however, has stonewalled these requests and tried to run out the clock on Plaintiffs—first, by providing vague, evasive written responses to Plaintiffs' interrogatories; and second, by hiding behind Psaki's high-level status to block her deposition, while refusing to disclose any lower-level official who has the same information.

As a result, Plaintiffs have been deprived of some of the most relevant, most probative discovery authorized by this Court's order of July 12—*i.e.*, the identities of White House officials who pressure social-media platforms to censor Americans' speech, and the nature and content of their communications.  Because they have thwarted discovery of the identities of those officials, Defendants have also prevented Plaintiffs from obtaining follow-up discovery regarding those officials, either by written discovery requests or depositions.  Indeed, Plaintiffs sought the depositions of the only two officials that Defendants identified in their interrogatory responses to the White House Press Secretary—*i.e.*, Rob Flaherty and Andy Slavitt—and that resulted in highly probative disclosures from Mr. Flaherty last Thursday.  But the Government's delays and vague,

limited disclosures have blocked Plaintiffs from obtaining similar discovery from other White House officials until now, on the very eve of the scheduled close of expedited discovery.

The Court should break this Government-created logjam by ordering the Government, in lieu of Psaki's deposition: (1) to consult with Psaki and amend Defendants' interrogatory responses to reflect her input; (2) to identify which White House officials communicate or have communicated with social-media platform(s) about misinformation, disinformation, and censorship; and (3) order the newly disclosed White House official(s) to respond to written discovery requests, or subpoenas if necessary, seeking "the nature and content of those communications" within 14 days.  As noted in its recent order, Doc. 163, at 1, the Court should leave in place the briefing schedule ordered for the preliminary injunction as to all other discovery, and extend the discovery and briefing schedule for this limited purpose only.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Defendants Have Stonewalled to Avoid Disclosing the White House Officials Who Communicate with Social-Media Platforms About Censorship.

On July 12, 2022, this Court authorized Plaintiffs to seek expedited discovery of "the identity of federal officials who have been and are communicating with social-media platforms about disinformation, misinformation, malinformation, and/or any censorship or suppression of speech on social media, including the nature and content of those communications."  Doc. 34, at 13.  One of the reasons the Court entered this order was that Psaki publicly admitted that such communications from White House officials are occurring—by stating, for example, that "members of our senior staff" are "flagging problematic posts for Facebook" and presenting "asks" about social-media censorship, and that such "engag[ing] regularly" in such communications "will continue."  Doc. 84, ¶¶ 225, 227, 316.  But Psaki did not publicly identify who those White House officials are, or disclose what they are saying to social-media platforms.

2

Six months later into expedited discovery, despite repeated requests, the Government still has not revealed this information.  The Government has never made any comprehensive disclosure of which White House officials communicate with social-media platforms about misinformation, disinformation, and censorship, or what they are saying, despite the Court's order authorizing discovery on these issues six months ago.  Doc. 34, at 13.  Instead, the Government has attempted to make narrow, plainly underinclusive disclosures, and frame them as complete.  For example, in response to interrogatories requesting the identities of the federal officials referred to in Psaki's statements, the White House Press Secretary identified only *two* officials: Rob Flaherty and Andy Slavitt, *see* Doc. 86-3, at 77-78—both of whom had already been disclosed to Plaintiffs because they were cc'ed on HHS's communications with social-media platforms, which the Government was already required to produce.  The Government, therefore, sought to disclose nothing new in its response to this interrogatory.  In fact, we now know that the Government did not even consult with Psaki in responding to this interrogatory, despite its recent admission that it had an obligation to do so.  Doc. 142, at 30-31.

This disclosure of Rob Flaherty and Andy Slavitt as the "members of our senior staff" who communicate with social-media platforms is woefully underinclusive—as wave after wave of disclosures from other sources demonstrate.  For example, the Government's document production from the HHS defendants identified several other White House officials who are or have engaged in such communications—including Courtney Rowe, Benjamin Wakana, Clarke Humphrey, Dori Salcido, Subhan Cheema, and Mina Hsiang.  *See, e.g.*, Doc. 84, ¶¶ 359, 372, 373.  In response to third-party subpoena, Meta (Facebook and Instagram) identified still more such White House officials—including former White House Counsel Dana Remus, White House Partnerships Manager Aisha Shah, and Special Assistant to the President Laura Rosenberger.  Doc. 84, ¶ 379.

And just last Thursday, January 5, 2021, the Government's document production from Rob Flaherty in lieu of his deposition identified *still more* yet-undisclosed White House officials who participate in such communications—including Christian Tom, Michael LaRosa, Anita Dunn, Anthony Bernal, and Jesse Lee. *See* Flaherty Emails (Exhibit A), at 4, 48–49, 58–67, 68–70.

The Government, therefore, has evaded making a comprehensive disclosure of White House officials who are pressuring and colluding with social-media platforms to censor Americans' speech on social media. It has done so by providing vague and evasive interrogatory responses from the White House Press Secretary, professing ignorance of Psaki's knowledge because she is a former employee, and using Psaki's high-level status to block her deposition while *refusing to disclose any lower-level officials who have the same knowledge.*

Moreover, the Government has also limited its disclosures about White House communications to a single *topic*: COVID-19-related speech. But there are compelling reasons to believe that the White House is pressuring and colluding with social-media platforms to censor speech on *other* topics as well. For example, Meta's disclosure of Laura Rosenberger (a Special Assistant to the President on foreign affairs) and Dana Remus (former White House Counsel) strongly suggests that White House officials are pressuring social-media platforms on other topics, including *election-related* speech. And the White House's public statements raise grave concerns that such speech is likely occurring through other channels and on other topics as well—such as climate-related speech, "gendered disinformation," and abortion-related speech—and through other likely avenues, such as the Office of the White House Climate Advisor and the White House's "Task Force to Address Online Harassment and Abuse." *See* Doc. 84, ¶¶ 328-337.

### B. Defendants Are Withholding Maximally Relevant and Probative Information.

As Plaintiffs have long contended, such communications from White House officials are maximally relevant and probative, because they involve maximal pressure on the social-media

platforms to comply with White House demands.  Last Thursday's disclosures of emails from Rob Flaherty to social-media platforms vividly illustrate this reality.  Plaintiffs did not receive these responsive, highly relevant, probative communications until last Thursday, January 5, 2023—because the Government disclosed Flaherty in response to interrogatories, Plaintiffs sought Flaherty's deposition, and the Court ordered this written discovery in lieu of Flaherty's deposition. Plaintiffs *should have* been able to pursue similar discovery from other White House officials whose identities the Government has effectively withheld by failing to disclose them in interrogatory responses and blocking Psaki's deposition.  This is exactly the discovery that this Court authorized on July 12, *see* Doc. 34, at 13, and that Plaintiffs are still struggling to obtain. The Court should remedy the situation by ordering the immediate disclosure of the identities of such White House officials, and ordering expedited responses to written discovery from them.

The emails of Rob Flaherty disclosed last Thursday demonstrate that such discovery is likely to be maximally relevant and probative.  These emails demonstrate that White House officials aggressively pressure social-media platforms to censor speech that they disfavor, and they do so very effectively.  Flaherty and his White House colleagues have subjected social-media companies to profanity, *see* Ex. A, at 55 ("Are you guys f*cking serious?"); petty and incessant demands, *id.* at 37 ("[W]e've gone a million rounds on this . . . .") (quibbling with the wording of the tag Facebook added to a video on COVID-19); and textbook gaslighting techniques, *see id.* at 17 (telling Facebook that its lax censorship practices were to blame for the January 6 riots and demanding "some assurances, based in data, that you are not doing the same thing" again).  And where strong language, persistence, and psychological manipulation fail, they resort to outright threats. *See id.* at 10 (warning Facebook that "we have been considering our options on what to do about" Facebook's refusal to accede to all the White House's censorship demands).  As Flaherty

ominously notified one platform, the White House's demands for censorship arise from "the highest (and I mean highest) levels of the W[hite ]H[ouse]." *Id.* at 39. The latest discovery production offers a glimpse into how far White House officials are going to press them.

 To be sure, Flaherty and his colleagues sometimes strike a cordial tone when social-media companies bow to their demands. But even then, they invariably follow up with additional demands for censorship. For example, after a discussion with White House official Andrew Slavitt, Facebook promised to go beyond "removing vaccine misinformation" to "reducing the virality of content discouraging vaccines *that does not contain actionable misinformation*." *Id.* at 15 (emphasis added). "This is *often-true content*," Facebook explained, "but it can be framed as sensation[al]." *Id.* (emphasis added). Flaherty applauded Facebook for acceding to the White House's demands to remove "often-true" content that does not violate Facebook's policies, and congratulated Facebook for recognizing that the real "problem does not sit in 'microchips'-land" but instead lies in "often-true" content that happens to contradict the White House's preferred narrative. *Id.* at 14–15. "If you're downranking sensational stuff—great," Flaherty said. *Id.* at 14. Then came the additional demands: "[B]ut I want to know how effective you've seen that be from a market research perspective. And then, what interventions are being taken on 'skepticism'?" *Id.*

 Likewise, in a follow-up email after a call with YouTube, Flaherty congratulated YouTube on its success in suppressing disfavored speech, including true speech that does not clearly violate YouTube's policies (*i.e.*, "borderline" content). "[Y]ou said you reduced watch time by 70% on 'borderline' content, which is impressive," Flaherty said. *Id.* at 39. He also stated that he "appreciated [YouTube's] unequivocal response that [it is] not recommending anti-vaccine content." *Id.* Then came the demands: "[B]ut we want to make sure the work extends to the broader problem." *Id.* "Clearly, more work to be done here." *Id.* "I am feeling a bit like I don't have a full

sense of the picture here. We speak with other platforms on a semi-regular basis. We'd love to get in this habit with you. Perhaps bi-weekly?" *Id.* at 40.

On another occasion, Facebook boasted to Flaherty and two of his colleagues of its "announcements today about running the largest worldwide campaign to promote authoritative COVID-19 vaccine information and *expanding our efforts to remove false claims* on Facebook and Instagram about COVID-19, COVID-19 vaccines and vaccines in general during the pandemic." *Id.* at 7 (emphasis added). Among other things, Facebook announced that "[g]roups, pages, and accounts on Facebook and Instagram that repeatedly share [allegedly] debunked claims may be removed altogether." *Id.* at 8. Flaherty replied, "Thanks." *Id.* at 7. But then he added: "This line, of course, stands out: *that repeatedly share these debunked claims may be removed altogether*. Can you share a little more about your framework here?" *Id.* Flaherty pushed for a stricter censorship policy: "May, of course, is very different from 'will.'" *Id.* And he pressed Facebook on "[h]ow [it was] handling things that are dubious, but not provably false." *Id.* Flaherty also took the opportunity to inquire about the extent of Facebook's "reforms" to address "political violence spurred by Facebook groups" and ask whether "there [are] other growth vectors you are controlling for." *Id.* at 6. He suggested discussing further by phone. *Id.*

Flaherty's tone becomes decidedly less cordial when social-media companies resist White House demands for more censorship. His emails reveal a pattern where lower-level White House officials pressure social-media companies to censor particular content, *see, e.g.*, *id.* at 1 (flagging a Tweet, requesting that it be "removed ASAP," and instructing Twitter to "keep an eye out for tweets that fall in this same genre"), and escalate the matter to Flaherty if their demands are not met. For example, on November 30, 2021, White House officials Christian Tom and Michael LaRosa demanded that Twitter "put a label or remove" a satirical video of First Lady Jill Biden

that they claimed had been misleadingly doctored. *Id.* at 65. Twitter promptly "create[d] an event page," *id.* at 64, which alerted users that the video had been edited for "comedic" effect, *A video of first lady Jill Biden reading to children was manipulated to include profanity, according to fact-checkers*, TWITTER (Nov. 30, 2021), https://twitter.com/i/events/1465769009073123330. Unsatisfied, Tom and LaRosa ordered Twitter to "apply the 'Manipulated Media' disclaimer to the video asset itself," both at "the linked tweet below and the original source." Ex. A, at 64. For weeks, Tom and LaRosa badgered Twitter about the video. *Id.* at 58–67. Twitter explained—repeatedly—that although it "appreciate[d their] continued partnership and [they should]n't hesitate to let [Twitter] know if [they] have additional Tweets for review, anytime," the particular video in question did not qualify for censorship under its policies. *Id.* at 59–60, 63. After more than a dozen emails, Tom and LaRosa escalated the matter to Flaherty, who replied to Twitter: "New to the thread here, but this all reads to me like you all [at Twitter] are bending over backwards to say that this isn't causing confusion on public issues. . . . Total Calvinball."[1] *Id.* at 58. A senior-level Twitter executive then emailed Flaherty proposing to resolve the matter by phone. *Id.* After that phone conversation, it appears that the Tweet that prompted the exchange is no longer available. *See id.* at 65 (linking to https://twitter.com/ArtValley818_/status/1465442266810486787?s=20, which is no longer available).

An especially acrimonious exchange occurred when Facebook initially rebuffed demands from Flaherty and Slavitt to remove popular posts by Fox News hosts Tucker Carlson and Tomi

---

[1] "Calvinball" refers to a game in the cartoon "Calvin and Hobbes" where the participants make up the rules of the game as they go along.

Lahren. "Number one on Facebook. Sigh," Slavitt wrote to one Facebook representative about

Tucker Carlson's post.  *Id.* at 38.  Flaherty separately emailed another Facebook representative:

> Since we've been on the phone – the top post about vaccines today is [T]ucker
> Carlson's saying they don't work. Yesterday was Tomi Lehren [sic] saying she
> won't take one. This is exactly why I want to know what "Reduction" actually looks
> like – if 'reduction' means "pumping our most vaccine hesitant audience with
> [T]ucker Carlson saying it doesn't work" then…I'm not sure it's reduction!

*Id.* at 22. The Facebook representative replied: "Thanks—I saw the same thing when we hung up.

Running this down now." *Id.* Later, a senior-level Facebook executive followed up with both

Flaherty and Slavitt.  First, he pointed out that Carlson's post "was not the most popular post about

vaccines on Facebook today." *Id.* at 37. "Regardless of popularity," he continued, "the Tucker

Carlson video *does not qualify for removal under our policies*. That said, the video is being labeled

with a pointer to authoritative COVID information, it's not being recommended to people, and it

is *being demoted*." *Id.* (emphases added). Facebook made this concession to White House

pressure—that it was "demot[ing]" Tucker Carlson's content, *id.*—even though the video

contained no "explicit misrepresentations" and did not even qualify for a fact check, *id.* at 36.

But the concession was not enough for Flaherty. "I guess this is a good example of your

rules in practice then," he snapped. *Id.* at 37. "How was this [post] not violative?" "Moreover: you

say reduced and demoted. What does that mean? There's 40,000 shares on the video. . . . How

effective is that?" *Id.* "Not for nothing but last time we did this dance, it ended in an insurrection."

*Id.* Less than two days later, Flaherty followed up impatiently: "These questions weren't

rhetorical[.]" *Id.* at 36. The executive wrote back apologizing "for the delay" in responding and

assured Flaherty and Slavitt  that "[t]he video received 50% demotion for seven days while in the

queue to be fact checked, and *will continue to be demoted even though it was not ultimately fact*

*checked.*" *Id.* (emphasis added). Flaherty and the Facebook executive held a call to discuss. *Id.* at 33, 36.

Facebook attempted to placate the White House a few weeks later, sending Flaherty and Courtney Rowe a lengthy email detailing ways in which Facebook "and [its] partners have been using trusted messengers and personalized messaging on our platforms to increase vaccine acceptance." *Id.* at 46. But Flaherty made clear that promotion of speech in favor of the vaccine was not enough; the White House wanted *suppression of speech questioning the vaccine*. "Hard to take any of this seriously when you're actively promoting anti-vaccine pages in search," Flaherty declared tersely, citing a Tweet. *Id.* "Thanks Rob," Facebook replied. "[B]oth of the accounts featured in the Tweet have been removed from Instagram entirely for breaking our policies. We'll look into what happened." *Id.* at 45. Facebook apologized profusely for failing to censor what the White House demanded: "Our goal is to not recommend accounts like those shown in the tweet in search, which again shouldn't have been on our platform to begin with." *Id.* Facebook then tried to redirect the conversation to its accomplishments: "We . . . us[e] . . . technology to find accounts on Instagram that discourage vaccines, and remove these accounts from search altogether. We've also removed accounts that primarily discourage vaccination from appearing where we recommend new accounts to follow . . . ." *Id.* "We clearly still have work to do," Facebook concluded, "but wanted to ensure you were aware of the authoritative resources we're pointing people to first as we continue investing in removing accounts from search that may discourage vaccination." *Id.*

In reply, Flaherty emphasized once again that promotion of pro-vaccine messages was not enough; the White House wanted suppression of anti-vaccine messages. "Sure," he said sarcastically, "[t]hey're first connected to authoritative information, but then you . . . present[] an

anti-vaccine account . . . alongside, at level, with those pinned [authoritative] accounts!" *Id.* The notion that a social-media platform would expose users to both sides of an issue on which the government has taken an "authoritative" position is completely unacceptable to the White House. *Id.*; *see also id.* at 14–15, 68–70 (expressing outrage at Twitter for adding a label to one of President Biden's Tweets that White House official Jesse Lee insisted was an accurate statement on a "technical [economic] question," while encouraging Facebook to censor admittedly true claims that run counter to the White House's narrative).

Flaherty then lectured Facebook on its poor censorship performance. "'[R]emoving bad information from search' is one of the easy, low-bar things you guys do to make people like me think you're taking action," he said. *Id.* at 45. "If you're not getting *that* right, it raises even more questions about the higher bar stuff." *Id.* Flaherty castigated Facebook for lagging behind its peers:

> YouTube, for all their warts, has done pretty well at promoting authoritative info in search results while keeping the bad stuff off of those surfaces. Pinterest doesn't even show you any results other than the official information when you search for "vaccines." I don't know why you guys [at Facebook] can't figure this out.

*Id.* Flaherty brushed aside Facebook's fear that "deleting more expressions of vaccine hesitancy might be more counterproductive to the goal of vaccine uptake because it could . . . potentially reinforce the notion that there's a cover-up." *Id.* at 42. Even if Facebook chooses not to "remove vaccine hesitant stuff" altogether, Flaherty replied, "slowing it down seems reasonable." *Id.* at 41.

Like a supervisor overseeing a problematic employee, Flaherty resorted to micromanaging Facebook's censorship processes. Predictably, he focused on Facebook's "demotion efforts, which I don't think we have a good handle on (and . . . it doesn't seem like you do either). Not to sound like a broken record, but how much content is being demoted, and how effective are you at mitigating reach, and how quickly?" *Id.* Flaherty descended to the level of specific posts, pointing out one that was "still up and seems to have gotten pretty far. And it's got 365k shares with four

comments." *Id.* "[H]ow does something like that happen?" Flaherty asked incredulously. *Id.* Flaherty proceeded to demand a tailored report of the top 100 vaccine-related contents on Facebook's platforms so that he could monitor Facebook's progress. *Id.* at 41–42; *see also id.* at 24 (requesting "a 24 hour report-back" from Facebook on misinformation on its platforms after news spread linking the Johnson & Johnson vaccine to blood clots).

Another hardball tactic that Flaherty and his colleagues employ is to accuse social-media companies of reneging on promises they made, sometimes in email but other times orally, to censor disfavored content. For example, in one email thread, Flaherty accused Facebook of "hiding the ball" despite "commit[ting] to us that you'd level with us" and referred to Facebook's allegedly inconsistent statements during calls about "borderline content" and "what actions [Facebook] ha[d] been taking to mitigate it as part of [its] 'lockdown'" on vaccine-hesitant speech. *Id.* at 11–12. In another thread, Flaherty linked to a post and commented to YouTube: "I think we had a pretty extensive back and forth about the degree to which you all are recommending anti-vaccination content. You were pretty emphatic that you are not. This seems to indicate that you are. What's going on here?" *Id.* at 51.

Flaherty and his colleagues also use mainstream-media reports on misinformation on social-media platforms as opportunities to berate social-media companies and demand stricter censorship. When the Washington Post ran a story suggesting that Facebook was conducting internal research on misinformation that it had not shared with the government, Flaherty accused Facebook of "playing a shell game." *Id.* at 11–12. He stated, "We are gravely concerned that your service is one of the top drivers of vaccine hesitancy – period." *Id.* at 11. Slavitt chimed in: "I do feel like, relative to others, interactions with Facebook are not straightforward and the problems are worse—like you are trying to meet a minimum hurdle instead of trying to solve the problem

. . . . We have urgency and don't sense it from you all." *Id.* at 10. In another exchange, Flaherty used a BuzzFeed article "highlighting Youtube [sic] misinformation that is spreading through the Vietnamese community" as an opportunity to remind YouTube that there was "more work to be done." *Id.* at 39. "[W]e remain concerned that YouTube is 'funneling' people into hesitance and intensifying people's hesitancy," Flaherty warned. "This is a concern that is shared at the highest (and I mean the highest) levels of the WH, so we'd like to continue a good-faith dialogue about what is going on under the hood." *Id.*

Finally, when pressure and demands fail, White House officials resort to threats. After expressing his disappointment in Facebook for "trying to meet a minimum hurdle," Slavitt declared with exasperation that "100% of the questions I asked have never been answered and weeks have gone by." Ex. A, at 10. "Internally we have been considering our options on what to do about it," he warned, abruptly ending the email. *Id.*

Ironically, the White House's relentless pressure campaign came back to bite it. Like a serpent eating its own tail, the White House pushed social-media companies to censor so aggressively that, eventually, the President's own Instagram account was inadvertently swept into his own net. In July 2021, White House officials noticed that "follower growth on @potus" had slowed. *Id.* at 56–57. In response to their inquiries, Instagram explained that "it was an internal technical issue that we can't get into, but it's now resolved." *Id.* at 55. "Are you guys f*cking serious?" Flaherty exploded. "I want an answer on what happened here and I want it today." *Id.* A few weeks later, Flaherty got his answer. Apparently, after months of haranguing by White House officials, *see, e.g.*, *id.* at 5–8, 9, 10–12, 13–16, 17–21, Meta (the parent corporation of Facebook and Instagram) ramped up its censorship of COVID-19 vaccine-hesitancy. Instagram deployed an algorithm that used "posting far above normal vaccine-related content" as a proxy for "promot[ing]

vaccine hesitancy." *Id.* at 54. Due to "over-enforcement on [this] signal," the algorithm "removed [some] otherwise eligible accounts from being recommended as an account to follow"—including, in a stroke of irony, the President's Instagram account. *Id.* at 54–56.  Needless to say, having aggressively demanded the censorship of *others* for months, the White House was absolutely livid when its own speech was accidentally swept into the net.

## ARGUMENT

Despite the Court's authorization, Doc. 34, at 13, the Government has shielded critical information—the identities of White House officials who communicate with social-media platforms about censorship—from disclosure during expedited discovery.  The Complaint identifies Psaki as a key individual with actual knowledge of such White House officials and their communications, and Plaintiffs have requested disclosure of this information from the White House Press Secretary since July.  But Defendants took the position, in interrogatory responses, that Psaki was by then a former employee, and they could only guess what officials she was referring to when she made these her public disclosures.  The Government made a partial identification of two officials, Rob Flaherty and Andy Slavitt, whom it knew it was going to disclose anyway, and then claimed it had no way of knowing who else was involved.  When the Court ordered Psaki's deposition to fill in this gap, the Government engaged in a scorched-earth effort to block the deposition and prevent this information being disclosed, which has succeeded to this day, on the very brink of the deadline to complete expedited preliminary-injunction-related discovery.  In the course of those efforts, the Government admitted that it never even consulted with Psaki about what White House officials she knows about, even though the Government had an obligation to do so.  The Court should put a stop to this gamesmanship. The Court should order the Government to make immediate disclosures to remedy the problem, and it should extend the

discovery period only to the extent necessary to do so—while leaving the briefing schedule for the preliminary injunction in place as to all other issues.

A.     **The Court Should Order the Government to Supplement its Interrogatory Responses After Consulting with Psaki, But That Alone Is Not Enough.**

The Government previously offered to consult with Jen Psaki and amend its interrogatory responses to reflect her input.   Doc. 142, at 30 (offering to "amend [Defendants'] previous interrogatory responses … to include information obtained from Psaki in response to those inquiries").   Indeed, as the Government has now conceded, it has been under an *obligation* to do so since July 18, 2022, when it received Plaintiffs' first sets of written discovery requests, and yet it has never done so.   *See* Doc. 142, at 30-31 (Defendants acknowledging "an *obligation* in responding to interrogatory 'extends to information that a party may obtain with reasonable effort, including that held by … former employees, even if they are not personally known to the party'") (quoting *City of Las Cruces v. United States*, No. 17-809, 2021 WL 330062, *8 (D.N.M. Feb. 1, 2021)) (emphasis added); *see also id.* at 31 (Defendants representing that "Psaki's counsel … advised that Psaki would be willing to cooperate in providing information responsive to Plaintiffs' interrogatories, *if she indeed possesses any*") (emphasis added).   Defendants' offer to amend their responses to reflect Ms. Pskai's actual knowledge is, in fact, something that they have a *duty* to do, without a court order, and that performance is long overdue.

But consulting with Psaki and amending their interrogatory responses to reflect her actual knowledge is plainly insufficient to substitute for Psaki's deposition.  As Plaintiffs' noted in their prior brief on this topic, the phrase "if she indeed possesses any" in Defendants' offer, quoted above, is "ominous."   Doc. 146, at 14.   Given the Government's long efforts at evasion to conceal this very information, it is clear that "the Government will almost certainly dutifully relay that Psaki has no meaningful information to add."   *Id.*   "Psaki will not be under oath in this scenario,

and the Government's representative will merely be dutifully relaying vague or meaningless information." *Id.* "This is exactly why written discovery is not an adequate substitute for a deposition. To obtain truthful and detailed information, follow-up questioning is often imperative." *Id.* (citing CHARLES WRIGHT & ALAN MILLER, FEDERAL PRACTICE AND PROCEDURE, § 2163 (2022); *Am. Cas. Co. of Reading, Pa. v. Krieger*, 160 F.R.D. 582, 589-90 (S.D. Cal. 1995); and *Hay & Forage Indus. v. Ford New Holland, Inc.*, 132 F.R.D. 687, 689-91 (D. Kan. 1990)).

The Court should certainly order the Government to fulfill its obligation to consult with Psaki and amend its responses to reflect her knowledge, but the Government's offer—to do something it admits it is already obligated to do—falls far short of providing an adequate substitute for her deposition.

### B. The Court Should Order the Government to Disclose the Identities of White House Officials Who Communicate with Social-Media Platforms About Misinformation and Censorship Within Three Days.

Second, the Court should order Defendants to identify lower-level official(s) with knowledge who should immediately disclose "the identity of [White House] officials who have been and are communicating with social-media platforms about disinformation, misinformation, malinformation, and/or censorship or suppression of speech on social media." Doc. 34, at 13.

The Court should "order Defendants to identify … lower-ranking official(s) who have the information Plaintiffs seek from Psaki, *i.e.*, the identities of federal officials within the White House who communicate with social-media platforms about misinformation, disinformation, and censorship, and the nature and content of those communications." Doc. 146, at 13 (brackets and quotation marks omitted). As noted above, Defendants have never disclosed this critical information, and have instead relied on Psaki's high-ranking and former-employee status to shield this information from disclosure. Yet, from other sources, Plaintiffs have been able to identify

many White House officials who engage in such communications that Defendants have not disclosed, and there are likely many more as well. *See supra*, Statement of Facts, Part A. The Court should order the Government to identify, within three days of its ruling, lower-level White House official(s) who know which officials within the White House (including the Executive Office of the President) communicate or have communicated with social-media platforms about misinformation, disinformation, and censorship, and it should order those newly designated officials—on the same day—to disclose "the identity of" *all* White House "officials who have been and are communicating with social-media platforms about disinformation, misinformation, malinformation, and/or any censorship or suppression of speech on social media," Doc. 34, at 13—*i.e.*, the very information that this Court ordered the Government to provide on July 12, six months ago. *See also* Doc. 146, at 13-16 (discussing this request).

Such disclosures are highly relevant and probative. First, as Plaintiffs have long contended, pressure from White House officials is maximally relevant and probative because it is maximally coercive to social-media platforms. *See, e.g.*, Doc. 84, ¶ 348 ("[C]ommunications from the White House impose maximal pressure on social-media companies, which clearly yields the sought-after results."). The newly-disclosed Flaherty emails, discussed above, provide a vivid demonstration of the effectiveness of such White House pressure. *See supra*, Statement of Facts, Part B. Second, as Plaintiffs have long contended, to grant *effective* preliminary injunctive relief, the Court must know *whom to enjoin* and *what precise conduct to enjoin*. This necessarily entails discovery of exactly what the Court ordered six months ago—the identities of federal officials (especially White House officials) who communicate with social-media platforms about misinformation, disinformation, and censorship. Doc. 34, at 13.

**C.      The Court Should Order Defendants to Produce These White House Officials'
Communications With Social-Media Platforms Within Fourteen Days.**

In addition, the Court should order Defendants to disclose "the nature and content of those
communications" between White House officials and social-media platforms, by responding to
written discovery and producing their communications within fourteen days.  Doc. 34, at 13.

As this Court previously held, Plaintiffs are entitled to discovery of "the nature and content
of those communications" between White House officials and social-media platforms.  Doc. 34,
at 13.  The Court should order those White House officials to do so by responding to written
discovery requests within fourteen days.  The Court recently adopted a very similar approach for
the deposition of Rob Flaherty, authorizing such written discovery in lieu of a deposition.  Doc.
148, at 4.  The Court "authorized that written discovery be served on Flaherty, such as
interrogatories and requests for production of documents, rather than a deposition."  *Id.*  The Court
ordered that "Flaherty shall provide his answers by January 5, 2023."  *Id.*  And the Court cautioned
that, "[s]hould the written discovery answers be vague, evasive, or non-responsive, Plaintiffs will
be allowed to resubmit a request for Flaherty's oral deposition."  *Id.*  As a result of this order,
Plaintiffs obtained the highly relevant, highly probative Flaherty emails.  *See* Ex. A.  A similar
order should apply to other White House officials who—just like Flaherty—communicate with
social-media platforms about misinformation, and censorship.

The Court should enter a similar order here, with modifications to reflect that the deadline
for preliminary-injunction-related discovery is about to expire.  Once the newly designated, lower-
level official(s) have identified the White House officials who communicate or have
communicated with social-media platforms about misinformation, disinformation, and censorship,
the Court should authorize Plaintiffs to serve discovery requests, including interrogatories and

document requests—or (if necessary) subpoenas—on the identified White House officials who engage in such communications within three business days, and order those officials to respond within 14 days.  If Defendants object or refuse to comply with such discovery requests and/or subpoenas, the Court should renew its order for the deposition of Psaki (and other official(s), if necessary). *See* Doc. 148, at 4.  The Court should leave in place the supplemental briefing schedule that it has already adopted for the motion for preliminary injunction as it pertains to the discovery already concluded, *see* Doc. 148, at 9, and direct the parties to file separate supplemental briefs on a parallel schedule to address the White House-specific disclosures discussed herein.  *See* Doc. 163, at 1 (noting that "[t]he court will also consider an extension of the expedited preliminary injunction-related discovery only for purposes of this matter").

## CONCLUSION

As less intrusive alternatives to a deposition of Jennifer Psaki, the Court should order the Government to:

(1)     supplement its interrogatory responses after consulting with Psaki;

(2)     within three business days, identify, through disclosures by lower-level official(s), all White House officials who have been or are communicating with social-media platforms about disinformation, misinformation, malinformation, and/or any censorship or suppression of speech on social media; and

(3)     disclose "the nature and content of such communications" between such newly-identified White House officials by responding to written discovery requests (interrogatories, document requests, and if necessary, subpoenas) addressed to them within 14 days after they are served by Plaintiffs within three business days of the disclosures ordered in (2).

19

If Defendants object or fail to comply with these requests, the Court should order the deposition of Psaki, and other official(s) if necessary.   The Court should leave in place the previously ordered briefing schedule for all other discovery and adopt a schedule for separate briefing to address this discovery in lieu of Psaki's deposition.

Dated: January 11, 2023                                    Respectfully submitted,

**ANDREW BAILEY**                                          **JEFFREY M. LANDRY**
**Attorney General of Missouri**                           **Attorney General of Louisiana**

_/s/ D. John Sauer_                                        _/s/ Elizabeth B. Murrill_
D. John Sauer, Mo. Bar No. 58721*                          Elizabeth B. Murrill (La #20685)
  _Deputy Attorney General_                                _Solicitor General_
Charles F. Capps, Mo. Bar No. 72734*                       Louisiana Department of Justice
  _Deputy Solicitor General_                               1885 N. Third Street
Todd A. Scott, Mo. Bar No. 56614*                          Baton Rouge, Louisiana
  _Senior Counsel_                                         Tel: (225) 326-6766
Kenneth C. Capps, Mo. Bar. No. 70908*                      murrille@ag.louisiana.gov
  _Assistant Attorney General_                             _Counsel for State of Louisiana_
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
John.Sauer@ago.mo.gov
_Counsel for State of Missouri_


*  admitted _pro hac vice_

_/s/ Jenin Younes_
Jenin Younes *
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
_Counsel for Plaintiffs Dr. Jayanta Bhattacharya,_
_Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines_

_/s/ John C. Burns_
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
E-mail: john@burns-law-firm.com
_Counsel for Plaintiff Jim Hoft_

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 11, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*