## Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE WESTERN DISTRICT OF LOUISIANA
3    MONROE DIVISION
4    - - - - - - - - - - - - - x
5    THE STATE OF MISSOURI    :
6    et al.,                  :
7         Plaintiffs,    : No.
8    v.          : 3:22-cv-01213-TAD-KDM
9    JOSEPH R. BIDEN, JR.,    :
10   et al.,                  :
11        Defendants.    :
12   - - - - - - - - - - - - - x
13
14       Videotaped Deposition of BRIAN J. SCULLY
15          Thursday, January 12, 2023
16              9:06 a.m.
17
18
19
20
21   Job No.: 138046
22   Pages 1 through 376
23   Reported by: Cassandra E. Ellis, RPR
24
25

## Page 2

1         Deposition of BRIAN J. SCULLY, held
2    pursuant to agreement, before Cassandra E. Ellis,
3    Certified Shorthand Reporter -- Hawaii #475,
4    Certified Court Reporter - Washington #3484,
5    Certified Shorthand Reporter - California -
6    #14448, Registered Professional Reporter #823848,
7    Certified Realtime Reporter, Realtime Systems
8    Administrator, and Notary Public of the District
9    of Columbia.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1         A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFF:
3       D. JOHN SAUER, ESQUIRE
4       TODD SCOTT, ESQUIRE
5       KENT CAPPS, ESQUIRE
6       JOSH DIVINE, ESQUIRE
7       MISSOURI ATTORNEY GENERAL'S OFFICE
8       Supreme Court Building
9       221 W. High Street
10      P.O. Box 899
11      Jefferson City, Missouri  65101
12      (573) 751-8870
13      John.sauer@ago.mo.gov
14      Todd.scott@ago.mo.gov
15
16   ON BEHALF OF DEFENDANT:
17      JOSHUA E. GARDNER, ESQUIRE
18      INDRANEEL SUR, ESQUIRE
19      DEPARTMENT OF JUSTICE
20      1100 L Street, Northwest
21      Washington, D.C.  20530
22      (202) 514-3259
23      Joshua.e.gardner@usdoj.gov
24      Indraneel.sur@usdoj.gov
25

## Page 4

1      A P P E A R A N C E S   C O N T I N U E D
2    ON BEHALF OF DEFENDANTS:
3       JESSICA SCHAU NELSON, ESQUIRE
4       Senior Counsel, Special
5       Litigation and Matters
6       Cybersecurity and Infrastructure
7       Security Agency
8       (202) 870-3578
9       Jessica.SchauNelson@cisa.dhs.gov
10
11      MATTHEW FLEISCHMAN, ESQUIRE
12      OFFICE OF THE GENERAL COUNSEL
13      U.S. DEPARTMENT OF HOMELAND SECURITY
14      (202) 746-8414
15      matthew.fleischman@hq.dhs.gov
16
17
18
19   ALSO PRESENT:
20   Joseph E. Ellis, Certified Legal Video Specialist
21
22
23
24
25

1 (Pages 1 to 4)

**BRIAN J. SCULLY  1/12/2023**

---

Page 5

```
 1        C O N T E N T S
 2   EXAMINATION OF BRIAN J. SCULLY          PAGE
 3     By Mr. Sauer                  11
 4
 5
 6            E X H I B I T S
 7       (Attached to the Transcript)
 8   BRIAN J. SCULLY  Deposition Exhibit     PAGE
 9   Exhibit 1  EIP The Long Fuse:           69
10     Misinformation and the 2020 Election
11   Exhibit 2  The Virality Project Memes   138
12     Magnets and Microchips Narrative
13     Dynamics around COVID-19 VACCINES
14   Exhibit 6  Audio Transcription Event:   368
15     Atlantic council: Lightning talk:
16     Election Integrity Partnership
17     JUNE 24, 2021
18   Exhibit 7  Audio Transcription Event: CISA  369
19     Cyber Security Summit 2021: Responding
20     to Mis, Dis, and mal-information
21     OCTOBER 27, 2021
22
23
24
25
```

Page 6

```
 1        E X H I B I T S   C O N T I N U E D
 2       (Attached to the Transcript)
 3   BRIAN J. SCULLY  Deposition Exhibit     PAGE
 4   Exhibit 9  Assortment of Documents Bates  156
 5     Stamped MOLA_DEFSPROD_00008353-355,
 6     9676-680,8356-358, 10679-682,
 7     10603-605, 13661-663,13511-517,
 8     7633-634, 8349-352, 13729-734,
 9     9603-605, 7583-587, 7574-576,
10     10538-541, 7564-566, 8768-769,
11     10512-516, 10523-526, 8496-498,
12     8756-758, 8778-780, 10492-494
13   Exhibit 10  Assortment of Documents     212
14     Bates Stamped MOLA_DEFSPROD_00008722-725,
15     10449-453, 13603-609, 8739-741, 8696-700,
16     10420-422, 8521-522, 8693-694, 8710-711,
17     8695, 8663-667, 8660-662, 8689, 8679,
18     8668-669, 8649-650, 8634, 8636-639,
19     8631-632, 8628-630, 8640-643
20   Exhibit 11  12/01/2020 E-mail(s) Bates  227
21     Stamped MOLA_DEFSPROD_00008600-604
22   Exhibit 12  Defendants' Amended Combined  190
23     Objections and Responses to Plaintiffs'
24     First Set of Expedited Preliminary-
25     Injunction Related Interrogatories
```

Page 7

```
 1        E X H I B I T S   C O N T I N U E D
 2       (Attached to the Transcript)
 3   BRIAN J. SCULLY  Deposition Exhibit     PAGE
 4   Exhibit 13  Declaration of Yoel Roth dated  243
 5     12/17/2020
 6   Exhibit 14  Excerpts of 11/29/2022 Elvis  249
 7     Chan Deposition
 8   Exhibit 15  04/14/2022 E-mail string Bates  252
 9     Stamped MOLA_DEFSPROD_00014552-553
10   Exhibit 16  09/16/2020 E-mail Bates Stamped  252
11     MOLA_DEFSPROD_00013671
12   Exhibit 17  Assortment of Documents Bates  252
13     Stamped MOLA_DEFSPROD_00014551, 14545,
14     14552-553, 15741-743, 14526-529,
15     14545-547, 7598-600, 7654-659, 12076-079,
16     13599, 13696-701
17   Exhibit 18  Assortment of Documents Bates  277
18     Stamped MOLA_DEFSPROD_00007669-670,
19     10298-300, 8188-189, 10718, 9703,
20     7484-487, 7552-554, 10564-565, 8519,
21     10392-394, 10389-391, 8625-627,
22     8623-627, 10410-412, 8595, 8586-587,
23     8554-557, 12223-224,12053-059
24
25
```

Page 8

```
 1        E X H I B I T S   C O N T I N U E D
 2       (Attached to the Transcript)
 3   BRIAN J. SCULLY  Deposition Exhibit     PAGE
 4   Exhibit 19  Elections Misinformation     363
 5     Reporting Portal Bates Stamped
 6     MOLA_DEFSPROD_00012672
 7   Exhibit 21  CNN Politics Web Article CNN  364
 8     Exclusive DHS rejects plan to protect
 9     Election officials from harassment as
10     Midterms loom
11   Exhibit 23  The Hill Web article Cyber   335
12     Agency beefing up disinformation,
13     Misinformation team
14   Exhibit 24  10/18/2022 CISA Mis, Dis,    365
15     Mal-information Team Announcement
16   Exhibit 27  Cyberscoop Article CISA      301
17     Expands efforts to fight election
18     Disinformation ahead of `challenging'
19     2024 vote, dated 08/12/2022
20   Exhibit 28  01/28/2022 E-mail Bates      306
21     Stamped MOLA_DEFSPROD_00011450-451
22   Exhibit 29  Text Messages Bates Stamped  309
23     MOLA_DEFSPROD_00015749-751
24
25
```

2 (Pages 5 to 8)

BRIAN J. SCULLY  1/12/2023

Page 9

E X H I B I T S   C O N T I N U E D
(Attached to the Transcript)

BRIAN J. SCULLY   Deposition Exhibit        PAGE

Exhibit 30  The Intercept_ Truth Cops        319
Article Leaked Documents Outline
DHS's Plan to Police Disinformation,
Dated 10/31/2022

Exhibit 31  OIG Report DHS Needs a           328
Unified Strategy to Counter
Disinformation Campaigns, dated
08/10/2022

Exhibit 46  CISA Draft Report to the CISA    352
Director, dated 06/22/2022 Bates
Stamped MOLA_DEFSPROD_00015459-463

Exhibit 49  The Breakdown Article Brian       345
Scully on government response to
Disinformation, dated 06/18/2020

Exhibit 52  02/17/2022 E-mail string Bates    349
Stamped MOLA_DEFSPROD_00015736-737

Exhibit 59  02/11/2022 E-mail Bates Stamped   359
MOLA_DEFSPROD_00011414-415

Exhibit 61  NRMC Election Security Initiative 13
Organizational Chart - August 2022

Exhibit 62  LinkedIn Profile of Jack Cable    194
Public Interest Technologist

Page 10

P R O C E E D I N G S

1     THE VIDEOGRAPHER:  We are on the
2  record.  Today's date is January 12th, 2023, and
3  the time is now 9:06 a.m.  This is the video
4  recorded deposition of Brian Scully in the
5  matter of the State of Missouri, et al.,
6  plaintiff, versus Joseph R. Biden, Junior, et
7  al., defendants, Case Number
8  3:22-CV-01213-TAD-KDM in the United States
9  District Court for the Western District of
10  Louisiana, Monroe Division.
11     This deposition is being held via
12  Zoom.
13     The reporter's name is Cassandra
14  Ellis.  My name is Robyn Ellis.  I'm the legal
15  videographer.  We are with Lexitas Legal.
16     Would the attorneys present please
17  introduce themselves and parties they represent.
18     MR. SAUER:  John Sauer, from the
19  Missouri Attorney General's Office, on behalf of
20  the plaintiffs.  And I'm joined by my colleague,
21  Todd Scott, who's in the room with the witness,
22  also of the Missouri Attorney General's Office.
23     MR. GARDNER:  And this is Josh
24  Gardner, with the United States Department of

Page 11

1  Justice, on behalf of the defendants, and
2  witness does reserve the right to read and sign.
3     With me today is Jessica Nelson,
4  with CISA.  Matt Fleischman, with the Department
5  of Homeland Security and Indraneel Sur, with my
6  office, the Department of Justice.  We all
7  represent the defendants.
8     THE VIDEOGRAPHER:  Would the court
9  reporter please swear in the witness.
10     (Witness sworn)
11     THE VIDEOGRAPHER:  You may proceed.
12     BRIAN J. SCULLY
13  having been duly sworn, testified as follows:
14     EXAMINATION
15  BY MR. SAUER:
16     Q.  Mr. Scully, could you please state
17  your full name for the record?
18     A.  Sure.  Brian Joseph Scully.
19     Q.  How long -- or what is your current
20  job title?
21     A.  Brand P for the MDM branch, at the
22  National Risk Management Center, which is part
23  of the Department of Homeland Security.
24     Q.  How long have you had that
25  particular job?

Page 12

1     A.  Almost -- almost four years, I
2  started in January 2019.
3     Q.  What did you do before that?
4     A.  I was a deputy for the countering
5  and foreign influence task force, starting in
6  April-ish, April/May 2018.
7     Q.  And what was your -- what was your
8  job before that one?
9     A.  I was a director for policy and
10  strategy in the Office of Infrastructure
11  Protection.
12     Q.  Have you ever given a deposition
13  before?
14     A.  I have not.
15     Q.  So this is your first one?
16     A.  This is my first deposition.
17     Q.  Can I just go over some common
18  ground rules with you?
19     First of all, obviously what you
20  and I say is being transcribed by the court
21  reporter, so can we make an effort not to talk
22  too fast?
23     A.  Yep.
24     Q.  And could you give -- I saw you nod
25  your head there, and then you said yes.  Could

**BRIAN J. SCULLY  1/12/2023**

Page 13

1  you try and give a verbal answer to my
2  questions, you know, don't rely on uh-huh or
3  uhn-uhn or head shaking as we go forward today.
4      A.  Yes, I can do that.
5      Q.  Can we make an effort not to
6  interrupt each other, because that results in a
7  kind of confused transcript.
8      A.  Of course.
9      Q.  Okay.  And then can you make an
10  effort to listen carefully to the question that
11  I'm asking you, and respond to the question that
12  I ask, instead of discussing some other
13  tangential topic as the day goes forward?
14      A.  Of course.
15      Q.  And you understand --
16      A.  Yes.
17      Q.  You understand that at the end of
18  the day, if your attorney wants to ask you some
19  follow-up questions he may have the opportunity
20  to do that.
21          But when -- as I ask questions, I
22  would ask you to focus on the questions I'm
23  asking you, and respond to those; is that fair?
24      A.  That's fair.
25          (Exhibit No. 61 was marked for

Page 14

1  identification.)
2  BY MR. SAUER:
3      Q.  Let me start by showing you an
4  exhibit, and I apologize, this exhibit is out of
5  numerical order already, so I'm e-mailing it to
6  your counsel right now.  It's pre-marked Exhibit
7  61, but it will be the first exhibit we look at
8  today.
9          And I'm going to pull it up on the
10  screen share.  Can you see that screen share?
11  I'm going to zoom in a little bit.
12          MR. GARDNER:  Hey, John, it hasn't
13  come through yet, the e-mail, so it's just --
14  unfortunately, that's kind of far away, it's a
15  little challenging to see, but as soon as we get
16  your e-mail we'll pull it up.
17          MR. SAUER:  You said you can't see
18  what's on the screen share if I zoom in?
19          MR. GARDNER:  As you make it larger
20  it's easier, but I don't want to speak for what
21  the witness can and can't see.
22          THE WITNESS:  Yeah, I can see it.
23  BY MR. SAUER:
24      Q.  Okay.  I'm happy to wait until it
25  arrives on the e-mail.  I just want to make

Page 15

1  sure, because I think the day's going to go more
2  smoothly, if I can direct your attention to
3  stuff on the screen share.
4          So you can see the screen share,
5  sir?
6      A.  Yes, I can.
7      Q.  Okay.  Just looking at the top of
8  this document, do you recognize it as an org
9  chart for August 2022, of a subdivision of CISA?
10      A.  Yes.
11      Q.  And what -- what -- are you
12  familiar with this org chart?
13      A.  Somewhat familiar with it, yes.
14      Q.  I just want to direct your
15  attention over here on the right side of the
16  page, you see here where it lists you as the
17  chief of the mis, dis and mal-information team?
18      A.  Okay.
19      Q.  Is that your job title?
20      A.  Yes.
21      Q.  Yeah, what, exactly -- generally
22  speaking, what do you do as the chief of the
23  mis, dis and mal-information team for CISA, the
24  Cyber Security and Infrastructure Security
25  Agency?

Page 16

1      A.  So I -- obviously I manage the
2  team, as a team lead.  So I manage the staff,
3  set priority, things like that.
4          The purpose of the team is to build
5  national resilience to MDM, targeting critical
6  infrastructure.
7      Q.  Generally speaking, what kind of
8  activities are involved in building resilience
9  to critical infrastructure -- or sorry --
10      A.  We felt -- sure.
11          So principally what we do is
12  develop products for public awareness and
13  education or products for key stakeholders to
14  help them understand how MDM works and steps
15  they can take to mitigate the risks.
16      Q.  Do you do anything else, besides
17  developing products?
18      A.  We engage with different
19  stakeholders, civil society groups, obviously
20  other federal partners, private sector
21  organizations, and then we -- we do some
22  analysis of open source reporting, and we do --
23  obviously, you know, in 2020 we did some
24  switchboard work on behalf of election
25  officials.

BRIAN J. SCULLY  1/12/2023

Page 17

1      Q.   Switchboard work, what does that
2    mean?
3      A.   It was essentially an audit
4    official to identify something on social media
5    they deemed to be disinformation aimed at their
6    jurisdiction.  They could forward that to CISA
7    and CISA would share that with the appropriate
8    social media companies.
9      Q.   And what was the purpose of sharing
10   it with social media companies?
11     A.   Mostly for informational awareness
12   purposes, just to make sure that the social
13   media companies were aware of potential
14   disinformation.
15     Q.   Was there an understanding that if
16   the social media platforms were aware of
17   disinformation that they might apply their
18   content moderation policies to it?
19     A.   Yes.  So the idea was that they
20   would make decision on the content that was
21   forwarded to them based on their policies.
22     Q.   Whereas, if it hadn't been brought
23   to their attention then they obviously wouldn't
24   have moderated it as content; correct?
25     A.   Yeah, I suppose that's true, as far

Page 18

1    as I'm aware of it.
2      Q.   Directing your attention to the org
3    chart again, can you -- I would sort of walk
4    through the people here on your team and ask
5    you, kind of who they are and what they do, so
6    starting on the right column, I see Lauren
7    Protentis on as the engagements lead; who is she
8    and what does she do for your team?
9      A.   So she was -- she's a -- she's the
10   engagements lead.  So her job was engaging with
11   key stakeholders, interagency partners, private
12   sector partners, essentially a majority of
13   our outreach and engagement efforts, she managed
14   those.
15     Q.   Outreach and engagement to key
16   stakeholders, does that include social media
17   platforms?
18     A.   It did, yeah.
19     Q.   When you say:  "It did," does she
20   still do this or does she no longer communicate
21   with social media platforms?
22     A.   Well, she's on the -- she's been on
23   maternity leave since September, so she's --
24   she's not currently doing it, when she returns
25   to CISA that would be her role.

Page 19

1      Q.   Who's doing it while she's gone?
2      A.   And she -- I'm sorry, could you
3    repeat that?
4      Q.   Who's -- who's playing that role in
5    her absence?
6      A.   I am.
7      Q.   Okay.  And so for the past, I
8    guess, three or four months you've served as
9    essentially the active engagements lead for the
10   MDM team?
11     A.   Correct.
12     Q.   And that goes back, I think you
13   said, to September of 2022; is that right?
14     A.   Correct.
15     Q.   When do you expect Ms. Protentis to
16   return?
17     A.   Her maternity leave ends in a
18   couple of weeks, I believe the 23rd, potentially
19   being gone on a detail assignment, so probably
20   January 2024.
21     Q.   Oh, so you don't expect her back
22   for another year, because of the detail?
23     A.   Correct.
24     Q.   Is the detail in -- relate to
25   anything having to do with mis, dis or

Page 20

1    mal-information?
2      A.   I believe that will be part of her
3    portfolio on the detail, yeah.
4      Q.   Where is she going, if I may ask?
5      A.   The National Security Council.
6      Q.   And in her absence, you're serving
7    as the kind of person who directly communicates
8    with social media platforms, among other
9    stakeholders?
10     A.   Correct.
11     Q.   I should mention, you used the
12   shorthand earlier, MDM, and I assume it will
13   come up again today.  When you use that, you're
14   referring to mis, dis and mal-information;
15   right?
16     A.   Correct.
17     Q.   I think sometimes CISA refers to MD
18   to refer to mis and disinformation; is that
19   right?
20     A.   I'm not sure I've ever seen us use
21   MD, but that would be proactive in the context,
22   yeah.
23     Q.   Turning your attention back to the
24   period from September of 2022 to the present,
25   what sorts of communications have you had with

LEXITAS LEGAL
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 21

1   social media platforms in Ms. Protentis's stead?
2       A.  Two -- I would say two general
3   types of communications, one, we did regular
4   sync meetings between government and industry,
5   so federal partners and different social media
6   platforms.  So it's just a coordinated meeting.
7           Facebook was the industry lead, so
8   I would have coordination calls with them prior
9   to the meetings, just to set the agenda for the
10  meetings, so that was one.
11          And then two, if a platform was
12  putting out a public statement -- or not public
13  statement -- public report on policies or
14  activities, we would often get a briefing on
15  that or at least get an awareness that it was
16  going out.
17          Those are the two main types of
18  communications.
19      Q.  Did you -- were you involved in the
20  last -- in the period since September 2022, and
21  have you been involved in flagging any
22  misinformation or disinformation issues for
23  social media platforms?
24      A.  No, not that we recall.  We didn't
25  do switchboarding in 2022.

Page 22

1       Q.  So when was that decision made not
2   to do switchboarding in 2022?
3       A.  I believe it was back in April that
4   that decision was made?
5       Q.  Who made that decision?
6       A.  April 2022.
7       Q.  Was that early or late April, do
8   you know?
9       A.  I don't.  I don't recall.
10      Q.  Who made that decision?
11      A.  I -- I heard about it through Geoff
12  Hale, who is -- is a senior org chart would be
13  my supervisor.  I believe he received that
14  guidance from the director, Director Easterly.
15      Q.  So in -- some time around -- was
16  this late April?
17      A.  Honestly, I don't recall.  It's
18  even possible it was in May by the time -- my
19  memory's a little foggy on it -- but the
20  earliest it was is probably mid April.
21      Q.  Do you know --
22      A.  And it could have gone any time
23  into early May.
24      Q.  So the earliest would have been
25  late April, but possibly early May is when that

Page 23

1   decision was made; correct?
2       MR. GARDNER:  Objection.
3   BY MR. SAUER:
4       Q.  Correct?
5       MR. GARDNER:  Sorry.  Objection,
6   mischaracterizes the witness's previous
7   testimony.
8       A.  Yeah, the earliest would have been
9   mid April --
10      Q.  The earliest would have been mid
11  April?
12      A.  -- probably.
13      Q.  Okay.  And then possibly beginning
14  of May?
15      A.  Yeah.
16      Q.  And you said -- you called this
17  switchboarding.
18      A.  Mm-hmm.
19      Q.  Switchboarding refers to routing
20  particular disinformation concerns to social
21  media platforms so they can evaluate them under
22  the content modulation -- modulation policies;
23  correct?
24      A.  So switchboarding is CISA's role in
25  forwarding reporting received from election

Page 24

1   officials, state/local election officials, to
2   social media platforms.
3       Q.  CISA forwarded disinformation
4   concerns from many other sources, besides state
5   and local election officials, to social media
6   platforms?
7       A.  I don't believe so, not that I
8   recall.
9       Q.  Turning back to the two kinds of
10  interactions you had with social media
11  platforms, the last months since September of
12  2022, the first one you mentioned was, I
13  believe, a sync meeting between social media
14  platforms and the US government; correct?
15      A.  Correct.
16      Q.  How often did those occur?
17      A.  They started as monthly, until, I
18  think, October.  And then we did a couple of
19  biweekly, I believe two biweekly meetings --
20      Q.  What was the purpose of the --
21      A.  -- prior to the election.
22      Q.  What was the purpose of these
23  meetings?
24      A.  Generally speaking, from a CISA
25  perspective, we would -- we would provide kind

6 (Pages 21 to 24)

**BRIAN J. SCULLY  1/12/2023**

Page 25

```
 1  of -- we would try to educate the platforms on
 2  how elections actually function, how they're
 3  administered, potential threats to the election
 4  administration, things like that.
 5          So CISA's -- you know, has some
 6  expertise in the election security space.  So
 7  our role in the meetings was generally to
 8  provide kind of expertise on how elections
 9  actually work to the platforms.
10          Q.  And you said that was your role.
11      Were there other federal agencies
12  involved in these meetings?
13          A.  There were, and -- and that role
14  was generally Geoff Hale.  My role in the
15  meetings was generally to just oversee them,
16  facilitate the meetings.
17          Other agencies would provide
18  high-level reviews or strategic intelligence
19  briefs, if they had any -- anything to share
20  that was unclassified.
21          Q.  What sorts of -- first of all, what
22  agencies participated?
23          A.  DOJ, FBI, ODNI, and then DHS.
24          Q.  When you say DHS, was that just
25  CISA, you and Geoff Hale, or were there other
```

Page 27

```
 1  saying to social media platforms, are they
 2  saying, hey, you're going to see this kind of
 3  content popping up on Facebook and Twitter and
 4  so forth, and, you know, therefore, we want you
 5  to be alert to it, what kind of -- what's the
 6  purpose of giving them these briefings?
 7          A.  So generally speaking, it's hard
 8  for me to speak directly to the I&A reporting
 9  because, you know, I don't recall all the
10  details of it, but generally speaking, it was
11  more strategic-level.  So high-level things that
12  they might be seeing, actors that might be
13  interested in undermining confidence in the
14  elections.
15          If they were seeing potential
16  domestic terrorism type threats, those sorts of
17  things, generally speaking, at least as long as
18  I recall, there was never any discussion of
19  specific content.
20          Q.  Did they identify specific domestic
21  actors who they believed might try to undermine
22  confidence in election outcomes through social
23  media?
24          A.  Not that I recall.
25          Q.  Let me ask this:  Who, on the
```

Page 26

```
 1  components of DHS involved?
 2          A.  The Office of Intelligence and
 3  Analysis of DHS also participated.
 4          Q.  And that's called IA; is that
 5  correct?
 6          A.  Correct.
 7          Q.  And what was -- what did they say
 8  at these meetings, I&A?
 9          A.  If they put out unclassified
10  reporting, under their normal mandate, they
11  would just talk about the reporting that they --
12  that they published, that was related to
13  election security.
14          Q.  What kind of reporting did they do,
15  is it about foreign influence or is it about
16  domestic threats, what kind of reporting do they
17  do?
18          A.  I'm not a hundred percent certain
19  of their -- their mission of authority.  I
20  believe and recall what they talked about, they
21  certainly talked about foreign threats.  I'm not
22  sure -- they may have also talked a little bit
23  about domestic terrorism threats, but I think
24  that -- but I'm not 100 percent certain.
25          Q.  Like what sorts of things are they
```

Page 28

```
 1  government side of these meetings, who
 2  participates on behalf of -- who participated on
 3  behalf of CISA?
 4          A.  Geoff Hale and myself were the
 5  primaries, and then you might have others who
 6  were in listen-only mode.  So Kim Wyman, for
 7  example, would sometimes be in listen-only mode.
 8  Allison Snell would sometimes be essentially the
 9  deputy or, slash, chief of staff of the --
10  underneath Geoff, she would sometimes be in
11  listen-only mode.  And then obviously when
12  Lauren was pre-maternity leave she would also be
13  on.
14          Q.  And then for I&A, who was on these
15  meetings?
16          A.  In 2022, I believe Luke Beckman was
17  the lead.  And then they would, depending on,
18  you know, what product they were briefing, they
19  would bring an analyst on, so those would
20  change.
21          Q.  Do you remember any other human
22  beings, besides Luke Beckman, from I&A, who
23  participated in these meetings in the period of
24  time we're talking about, from September 2022 to
25  the present?
```

7 (Pages 25 to 28)

## BRIAN J. SCULLY  1/12/2023

Page 29

1    A.  I don't know.  Like I -- Luke was
2    the kind of principal lead, and who I coordinate
3    with, I don't recall the analysts' names that
4    they might have on there now.
5        Q.  What's his title?
6        A.  Honestly, I don't know.  I believe
7    he's in the cyber mission center, but they are
8    odd up there, so I'm not entirely sure what his
9    title was, sorry.
10       Q.  You mentioned FBI had
11   representatives at these meetings; is that
12   right?
13       A.  Correct.
14       Q.  Who from FBI participated in these
15   meetings?
16       A.  I recall Laura Dehmlow, at least
17   one, and I forget who -- who the other folks
18   were.
19       Q.  How many FBI people?
20       A.  Generally, there would be one,
21   maybe two.
22       Q.  How about Elvis Chan, was he on
23   these meetings?
24       A.  Oh, good reminder.  Thank you.
25       Yes, he would be on some of them,

Page 30

1    as well.  I forgot about Elvis.
2        Q.  Do you remember anyone else,
3    besides him?
4        A.  There would be, again, periodically
5    other people would be on from different parts of
6    FBI, but again, Laura was usually who we
7    coordinated through, and I don't really
8    remember -- I don't really remember the other
9    names, sorry.
10       Q.  When you say Laura, that's Laura
11   Dehmlow is who you coordinated through?
12       A.  Correct.
13       Q.  When you say:  You coordinated
14   through them, what kind of coordination did CISA
15   do with FBI as it pertained to these meetings?
16       A.  Yeah, so basically coordinating
17   time and the logistics of the meeting, and then
18   two, if they had any particular agenda items
19   they wanted to raise, you know, when we were
20   putting together the agenda, I would just check
21   with them to see if they had any -- any
22   particular agenda items they wanted to raise.
23       Q.  What sort of agenda items did they
24   raise?
25       A.  I don't believe in the time I was

Page 31

1    working, you know, in the timeframe we're
2    talking about, I don't believe that they raised
3    any.
4        Q.  Do you have -- how about before
5    that, when Ms. Protentis was still handling the
6    meetings?
7        A.  Not -- not that I recall.  Yeah, I
8    don't -- I don't -- I don't recall, in
9    particular, yeah, sorry.
10       Q.  And I take it these meetings, we've
11   been talking about them in the period from last
12   September until now, but they're actually going
13   on intermittently, at least, for years; right?
14       A.  Yeah, so the first meeting we had
15   with -- between federal and -- and industry was
16   in 2018.
17       Q.  Yeah, we're talking -- we're now
18   kind of four years in, and then in terms of
19   their frequency I take it they -- they --
20   they're less frequent when you're further away
21   from election, and they become monthly as the
22   election gets closer, and then they become
23   weekly or biweekly, you know, within the last
24   month or so before an election; is that right?
25       A.  I would say 2018, 2019 they were

Page 32

1    very infrequent, so we maybe did them quarterly
2    or less.  And then sometime in 2020 we started
3    monthly.  And then, like you said, as we got
4    closer to the election they would pick up.  And
5    then after the election they would -- we would
6    spread them back out again.
7        But 2018 and 2019 was different
8    than 2020 and beyond.
9        Q.  And is there a plan to have these
10   meetings continue in 2023?
11       A.  Not currently.
12       Q.  So you don't know -- you don't know
13   whether there's going to be quarterly meetings
14   or anything like that in 2023?
15       A.  Correct.
16       Q.  Who from DOJ was at these meetings?
17       A.  Rodney Patton -- Patton.
18       Q.  Anyone else?
19       A.  No, not that I recall.
20       Q.  How do you spell his last name?
21       A.  I believe it's P-a-t-t-o-n.
22       Q.  Like the general?
23       A.  Yes.
24       Q.  What -- what is his title at DOJ?
25       A.  I don't know what his title is, but

8 (Pages 29 to 32)

**BRIAN J. SCULLY  1/12/2023**

Page 33

1   I believe he's in the national security
2   division.
3        Q.   Was national security division of
4   DOJ participating in these meetings leading up
5   to the 2020 election?
6        A.   Yes.
7        Q.   Who from NSD participated in those
8   meetings?
9        A.   I believe it was Rodney, back then,
10  as well.
11       Q.   Do you remember anyone else?
12       A.   Adam Hickey may have jumped on a
13  couple.
14       Q.   Is he also from the national
15  security division of DOJ?
16       A.   I believe so, yeah.
17       Q.   Is that H-i-c-k-e-y?
18       A.   Yes.
19       Q.   What, if anything, did DOJ say in
20  these meetings?
21       A.   Generally speaking, they didn't say
22  anything.  Yeah, I don't recall in 2022 or even
23  back in 2020 that they were -- were particularly
24  active in the meetings.
25       Q.   Do you remember anyone from DOJ

Page 34

1   saying anything at any point?
2        A.   I mean, I'm -- I'm sure they did,
3   but I don't recall.
4        Q.   Do you remember anyone from DOJ
5   ever, you know, putting an agenda items on the
6   calendar for these meetings?
7        A.   I don't, no.
8        Q.   How about ODNI, the Office of the
9   Director of National Intelligence, what human
10  being from there participated in these meetings
11  in 2022?
12       A.   Is it okay if I ask my attorneys a
13  quick question?
14       Q.   The question --
15       MR. GARDNER:  Is it about a
16  privilege?
17       THE WITNESS:  Yeah.
18       MR. GARDNER:  Yeah, John, if you
19  want him to answer that question we'll need to
20  recess quickly so he can consult with counsel
21  about these issues of privilege.
22       MR. SAUER:  Let's go off the
23  record.
24       THE VIDEOGRAPHER:  The time is now
25  9:32.  We're off the record.

Page 35

1        (Recess.)
2        THE VIDEOGRAPHER:  The time is now
3   9:34.  We're back on the record.
4        MR. GARDNER:  And counsel, I will
5   instruct the witness not to answer that question
6   on the basis of the National Security Act, that
7   information is extraordinarily protected.
8        MR. SAUER:  Before we proceed, I --
9   I'm announcing, for the record, that Mr. Kent
10  Capps, from the Missouri Attorney General's
11  Office joined the call on behalf of plaintiffs
12  in the last break.
13  BY MR. SAUER:
14       Q.   Was there anyone -- how many
15  individuals from ODNI participated in these
16  meetings in 2022?
17       A.   I believe there were two to three.
18       Q.   Without telling me who they are, do
19  you remember who they are?
20       A.   I remember one's name and one's
21  position, the second one's position.
22       Q.   How about 2020, how many --
23       A.   Again, it was -- it was three or
24  four.
25       Q.   Do you remember who they were?

Page 36

1        A.   I remember the lead person's name.
2        Q.   Did people from ODNI speak in these
3   meetings during 2022?
4        A.   Yes.
5        Q.   What did they say?
6        A.   Again, generally speaking, if they
7   had some strategic intelligence, unclassified,
8   strategic intelligence reporting, they might
9   share a quick summary of that.  It was fairly
10  limited in the timeframe from September
11  through -- through the election, though.
12       Q.   Were you in the meetings prior to
13  September of 2022, when Ms. Protentis was still
14  at your team?
15       A.   I joined several of them over the
16  summer, a couple -- couple of them over the
17  summer, prior to her departure.  And that was
18  just the meetings, themselves, not necessarily
19  the coordination meetings prior to the actual
20  sync meetings.
21       Q.   So the coordination meeting, is
22  that a bilateral meeting that happens between
23  CISA and Facebook?
24       A.   Yes, CISA and Facebook, and then we
25  would do CISA with the interagency.  We would

**BRIAN J. SCULLY  1/12/2023**

Page 37

1  do -- federal interagency partners would do a
2  coordination meeting.
3      **Q.  That would be separate from the**
4  **meeting with Facebook?**
5      A.  Correct.
6      **Q.  Would there be two preparatory**
7  **meetings, one between CISA --**
8      A.  Generally, yes.
9      **Q.  One between --**
10     A.  Sorry.
11     **Q.  -- CISA and Facebook, and one**
12 **between CISA and other federal agencies?**
13     A.  Yes, that is correct.
14     **Q.  Turning back to what ODNI said at**
15 **these meetings in 2022, what do you remember,**
16 **more specifically, that they said?  Did they**
17 **ever raise a specific threat advisory?**
18     A.  Not that I recall.  I -- again,
19 generally speaking, it was -- it was -- I don't
20 recall specifics, so I'll just say that upfront.
21     And generally speaking, it was --
22 it was higher level, kind of strategic of what a
23 threat actor may be considering or thinking
24 about.
25     **Q.  And do they identify specific**

Page 38

1  **threat actors?**
2      A.  Potential state actors, yeah, so
3  other countries.
4      **Q.  How about domestic actors?**
5      A.  No, not that I recall.
6      **Q.  Did anyone on the US government**
7  **side, in these meetings, identify domestic**
8  **actors in the lead-up to the 2022 election?**
9      A.  They -- they may identify domestic
10 actors, generally, but not -- to my
11 recollection, there's no mention of specific
12 actors, individuals, or groups that I recall.
13     **Q.  What social media platforms**
14 **participated in these meetings?**
15     A.  So obviously Facebook, Twitter,
16 Microsoft, Google, Reddit generally
17 participated, I believe sometimes LinkedIn would
18 join.  They're a subsidiary of Microsoft, so
19 generally we worked through Microsoft.  Those
20 are the ones that I recall.
21     I believe there are others, as
22 well, at different times, that maybe
23 participated in a meeting or two.
24     But from September 2022 to the
25 election, I think it was principally the five I

Page 39

1  mentioned.
2      **Q.  How about Wiki Media Foundation?**
3      A.  I know they participated in some, I
4  don't know how frequently, and if it -- I don't
5  recall them participating from September on, but
6  it's possible.
7      **Q.  Were concerns about misinformation**
8  **and disinformation on social media platforms**
9  **discussed in these meetings in the 2022**
10 **timeframe?**
11     A.  Yes.
12     **Q.  What -- what was -- what was said**
13 **about those concerns and by whom?**
14     A.  Again, it was a more general
15 approach.  So from a CISA MDM team perspective,
16 if we were developing any products we would
17 discuss those.  We didn't -- we released, I
18 believe, two sets of products in that timeframe.
19     And in others, if there was the
20 intelligence community, if they're reporting
21 included foreign actors who were potentially
22 going to use information operations, they might
23 mention that in their briefings.  But I don't
24 remember specific, you know, what the specifics
25 of every kind of mention were.

Page 40

1      **Q.  But you --**
2      A.  And then the platforms -- sorry, to
3  give you both sides, that was just the
4  government side -- the platforms, they might
5  share some high-level trend information from
6  public reporting that they put out.  So a lot of
7  the platforms do their own regular reports on
8  what they're seeing on their platforms and what
9  they're -- what actions they're taking.  And so
10 the platforms, themselves, would share that type
11 of information.
12     **Q.  So they would report to the**
13 **government on what sorts of mis and**
14 **disinformation they were seeing on their**
15 **platforms and what content moderation actions**
16 **they were taking with respect to it?**
17     A.  So they would share essentially
18 what they were getting ready to make public or
19 what they had already made public.  So they
20 would share kind of what they're seeing in their
21 public reports, and then potentially provide
22 some additional context around that.
23     So as I mentioned, most of the
24 platforms would put out regular public reporting
25 on what they were doing and what actions they

10 (Pages 37 to 40)

**BRIAN J. SCULLY  1/12/2023**

Page 41

1  were taking.  And so they would share that, and
2  if the government had questions or was looking
3  for additional context they would often talk
4  about that, they would generally talk about any
5  new tactics that they were seeing.
6          Most of what they -- my
7  recollections for the time period we're talking
8  about here, from September 2022 to the election
9  in 2022, I recall most of it was foreign based.
10         But, you know, when we -- often
11  what you see overseas essentially makes its way
12  to the United States.  So they would share kind
13  of trends and tactics that they were seeing, but
14  again, it was all based on public reporting that
15  they put out.
16         Q.  And you say that this -- all these
17  things that they're doing all relate to
18  misinformation and disinformation on the
19  platforms; correct?
20         A.  They don't call it misinformation
21  or disinformation, generally, on the platforms.
22  They generally define it as coordinated
23  inauthentic behavior.
24         So they -- so -- so that's how they
25  would describe it.  They wouldn't normally kind

Page 42

1  of say misinformation or disinformation.  And
2  they would each kind of define coordinated and
3  inauthentic behavior differently.
4          I don't -- so I don't know that
5  they would agree.  I don't want to speak for the
6  platforms, obviously.  I don't know if they
7  would agree that they were framing it as
8  misinformation or disinformation.
9          Q.  From the CISA MDM teams
10  perspective, is coordinated inauthentic behavior
11  typically a kind of mis and disinformation?
12         A.  It could lead to mis or
13  disinformation, for sure, yeah.  But it's not
14  always mis or disinformation.
15         Q.  So the coordinated and inauthentic
16  behavior may be a source of mis or
17  disinformation of particular concern?
18         A.  It could be, yeah.  It could be an
19  indicator.
20         Q.  Let me ask this:  Turning back to
21  the org chart, that should be on the screen,
22  below Ms. Protentis, is Chad Josiah, who's
23  described as the resilience lead.  What is his
24  role on your team?
25         A.  So he manages the production of our

Page 43

1  products.  So, you know, for putting out a fact
2  sheet or, for example, we have several graphic
3  novels that we've developed, he would work and
4  manage that process to get the products out, so
5  the review process, the drafting process, things
6  like that.
7          Q.  These products you're referring to,
8  I take it those are written, publicly available
9  bulletins or other written work products
10  discussing disinformation and misinformation; is
11  that right?
12         A.  Correct.  All of our product are
13  available on our website.
14         Q.  Below him is Alex Zaheer, analyst;
15  what does he do?
16         A.  He's a more junior analyst.  He
17  supports essentially across our three lines of
18  work.  So he helps Chad on some, he helps Warren
19  on some of the engagement work, and then he
20  supports Rob Schaul, who leads our analysis work
21  in doing analysis activities, but he kind of
22  cuts across all three.
23         Q.  And Rob Schaul is listed over there
24  on the left side as analysis and response lead;
25  correct?

Page 44

1          A.  Yes.
2          Q.  What does he do?
3          A.  So he does a couple things, so one,
4  he leads our engagement with international
5  partners; two, he builds relationships with the
6  research community, both in academia, across the
7  federal government, as well as in the private
8  sector; and then, three, he pulls that together
9  to identify new reporting or research about MDM
10  that might be of interest to the team; and then
11  the fourth bucket of it is he helps develop kind
12  of analytic type products.
13         So right now, for example, we're
14  working on a risk framework to help our
15  stakeholders understand how to determine if an
16  MDM campaign is a risk to them or not.
17         So he would help kind of on that
18  side of things.
19         Q.  Okay.  There was -- so he talks to
20  international partners; who are they?
21         A.  It varies.  Generally, all of our
22  engagements with international partners come
23  through the State Department or the CISA
24  international office.
25         We have engaged with NATO, G7 at

11 (Pages 41 to 44)

Page 45

1  the kind of multilateral level, with the CFI,
2  counter foreign interference forum, that
3  includes several countries.  And then we have
4  different bilateral engagements.  A lot of
5  countries want to come and talk to us, and so
6  we'll do basically MDM 101 for different
7  countries at their request.
8       Q.  So this is both -- these are both
9  foreign governments and foreign nongovernmental
10  organizations?
11      A.  Yeah.  I suppose if you consider
12  the multilateral organizations, like NATO and G7
13  as nongovernmental, but essentially we're only
14  talking to government -- foreign government
15  officials.
16      Q.  So the purpose of those discussions
17  is to, what, track misinformation that is
18  circulating in foreign countries that might come
19  to the United States?
20      A.  No, that's not the purpose of the
21  meetings.
22      Q.  Then what's the purpose?
23      A.  The purpose of the meetings is to
24  share information about -- from a CISA
25  perspective, share information about resilience

Page 46

1  building.  So there's some countries that are
2  much more mature and have been doing it for a
3  long time.  So we try to learn from them kind of
4  what they're doing, what works, what doesn't
5  work.
6       So that's, again, from a CISA
7  perspective, that's primarily our engagement
8  with these groups.
9       Q.  And then you mentioned that
10  Mr. Schaul coordinates with academic and
11  research partners; is that correct?
12      A.  He doesn't coordinate, he builds
13  relationships with, so that we can -- you know,
14  if you have questions about reporting they put
15  out or public reports that they have, public
16  research, things like that, then we can have
17  conversations with them about that research.
18      Q.  Who -- who -- who -- who do you
19  have relationships like that with?
20      A.  We have relationships with a range
21  of different entities.  So from an academic
22  standpoint, we've talked to folks at Harvard, at
23  Clemson, University of Washington, Stanford, I
24  believe we talked to people at Georgetown and
25  American University, Michigan University,

Page 47

1  University of Michigan.
2       Essentially, if there's an academic
3  research that puts out a report that we think is
4  of interest, and kind of reflects our work, we
5  try to have conversations with them to try to
6  understand what their research findings are, and
7  in a non-profit stage, you know, the Alliance
8  For Securing Democracy, the Digital Frameworks
9  Research Lab -- sorry, for the court reporter, I
10  know I'm talking quickly.  So, you know, groups
11  like that.
12      And then from a private sector
13  perspective we talk to groups like Graphika,
14  Alethia Group (phonetic), and organizations like
15  those, who, again, kind of do that sort of work,
16  mandates, you know, different organizations.
17      So again, the idea is to have a
18  relationship with them so if they put out some
19  reporting or some research publicly, that we can
20  set up a meeting and kind of learn more about
21  what they're seeing and what they're doing.
22      Q.  And has that kind of coordination
23  gone on not from the last year but before the
24  2020 election cycle?
25      A.  Yeah.

Page 48

1       Q.  And I think you mentioned a few
2  entities there that includes Stanford and the
3  University of Washington, Graphika; correct?
4       A.  Correct.
5       Q.  And all those organizations were --
6  were involved in something called Election
7  Integrity Partnership; right?
8       A.  Yep.
9       Q.  Yeah, what is the Election
10  Integrity Partnership?
11      A.  I mean, it's a collaboration
12  amongst -- I believe in 2020 it's amongst those
13  four -- amongst four organizations, to -- to
14  better understand what was going on in the
15  information environment around elections.
16      Q.  And you say were those four -- you
17  say those four organizations, I think I
18  mentioned three, Stanford, University of
19  Washington and Graphika, and was the Atlanta
20  Council involved in that?
21      A.  Yeah, I believe the Digital
22  Forensic Research Lab was involved.
23      Q.  And then were there other
24  collaborators, besides those four, on the
25  Election Integrity Partnership?

LEXITAS LEGAL
www.lexitaslegal.com        Phone: 1.800.280.3376        Fax: 314.644.1334

BRIAN J. SCULLY  1/12/2023

Page 49

1      A.  I think those were the official
2  members of the partnership.  I -- I don't know
3  if you mean something different about
4  collaborators.
5      Q.  Well, let me ask this:  Was CISA --
6  did CISA have any involvement in the Election
7  Integrity Partnership?
8      A.  Involvement in the sense that a
9  couple of our interns came up with the idea and
10  that we had some communications with them, yes.
11      Q.  What kinds of communications did
12  you have with them?
13      A.  So we received some briefings on
14  the work that they were doing.  And then, like I
15  said, we had some interns that ended up working
16  on it.  Those are principally -- principally the
17  communications.
18         We had some communications early on
19  in the process, when they were making decisions,
20  when Stanford was trying to figure out what the
21  gap was.
22         So yeah, so it was just general,
23  like you would have with any other research
24  organization.
25      Q.  So it was no different than the

Page 50

1  communications you had with other research
2  organizations?
3      A.  I think the one difference, I would
4  say, is that we -- we probably connected them
5  with other -- so we connected them with the
6  Center For Internet Security, and we connected
7  them with some of the election official groups,
8  so the National Association of Secretaries of
9  State and the National Association of State
10  Election Directors, and then we facilitated some
11  meetings between those three.
12      Q.  Let me ask you this:  You said you
13  had -- I take it you said some CISA interns came
14  up with the idea; is that right?
15      A.  Correct.
16      Q.  And who are those interns?
17      A.  I'm not going to give their names.
18      Q.  Who were those interns?
19      A.  Yeah, I'm not going to give those
20  names.
21      Q.  Who were -- you have no --
22      A.  The Stanford students -- Stanford
23  students have seen substantial amount of
24  harassment from public reporting.  I'm not going
25  to include my interns in that.

Page 51

1      Q.  Are you -- you're declining to
2  answer the question without an instruction?
3      A.  Correct.
4      Q.  And you said those interns were
5  also involved in the Election Integrity
6  Partnership; correct?
7      A.  I believe they worked for the
8  Stanford Internet Observatory, as well, so yes.
9      Q.  And they were working for CISA and
10  Stanford Internet Observatory on the project?
11      A.  When they came up with the idea,
12  they -- obviously they were just interns.  After
13  their internships a couple of interns remained
14  as interns.  Several others went back to
15  Stanford, as students, and did not remain as
16  interns.  Two of the interns ended up working on
17  both in the fall; correct.
18      Q.  You said two of the interns who
19  were CISA interns, in the fall of 2020, worked
20  on the Election Integrity Partnership; is that
21  right?
22      A.  They worked at the Stanford
23  Internet Observatory, which was part of the
24  Partnership.
25      Q.  Were there any other interactions

Page 52

1  between CISA and the Election Integrity
2  Partnership, that you're aware of?
3      A.  So just to say so we had some
4  initial conversation with the interns.  We had a
5  conversation with the Stanford Internet
6  Observatory folks about the gap.
7         I believe we received a briefing
8  from them, or two, on kind of what they were
9  putting together.
10         We facilitated some meetings
11  between Stanford folks, the Center For Internet
12  Security, and election officials, where they had
13  discussions about how they would work together.
14         And then I -- I'm sure we had some
15  conversations, kind of throughout, when they
16  were -- particularly when they were putting out
17  public reporting about what they were seeing.
18         I wouldn't be surprised if there
19  were some other kind of brief conversations in
20  there, but I'm not recalling.
21         But those are generally the
22  categories of the conversations we had.
23      Q.  Did the Election Integrity
24  Partnership, or a similar collaboration of any
25  kind, operate during the 2022 election cycle?

13 (Pages 49 to 52)

BRIAN J. SCULLY  1/12/2023

Page 53

1          MR. GARDNER:  Objection, vague.
2   BY MR. SAUER:
3          Q.  You may answer.
4          A.  So I believe the EIP did operate,
5   but I'm not -- I'm not certain what they did.
6          Q.  How do you know they operated in
7   2022?
8          A.  I believe they put out a public --
9   some public reporting.
10         Q.  Did you have --
11         A.  But I --
12         Q.  Go ahead.
13         A.  We did not have communications with
14   them.  They gave us a briefing, early on, about
15   what they were thinking about, and that was the
16   extent of our communications with them on that
17   stuff.
18         Q.  When did that briefing occur?
19         A.  I believe it was May/June of 2022.
20         Q.  Who was at that briefing on your
21   end, CISA?
22         A.  On my end, it was me, I believe
23   Geoff Hale.  Who else was in that?  I think one
24   of our -- I think that may have been it, but
25   there might have been one other staff person

Page 54

1   there, as well.  But it was primarily Geoff Hale
2   and myself, that I recall.
3          Q.  Who was in the briefing on the EIP
4   side?
5          A.  Renée DiResta was the lead, and
6   then one of their staff, I believe his name was
7   John, but honestly I forget what his name is.
8          Q.  So just two people?
9          A.  That I recall, yeah.
10         Q.  What did they say in the briefing?
11         A.  Essentially, they just walked
12   through what their plans were for 2022, some of
13   the lessons learned from 2020, that was
14   essentially the gist of the conversation.
15         Q.  What were their plans for 2022?
16         A.  It sounded like they were going to
17   do something similar to what they did in 2020 in
18   terms of trying to support election officials.
19         Q.  Did they indicate that they were
20   coordinating with state and local election
21   officials?
22         A.  I think that was their goal with
23   the -- with the work with state and local
24   election officials.  I'm not sure how they would
25   describe it.

Page 55

1          Q.  Sorry, I think you said this
2   earlier, and I can't remember.
3              When did this briefing occur, would
4   you say it was in May or June of 2022?
5          A.  I believe it was around that
6   timeframe.  My timeline recollections are awful,
7   so I apologize for that, but I think it was
8   around that timeline.
9          Q.  Did you --
10         A.  Things all blur together.
11         Q.  Did they -- in fact, let me ask
12   you:  Did they invite CISA to participate again?
13         A.  No.  CISA didn't -- I mean, I
14   wouldn't say CISA participated in 2020, so it
15   wouldn't have been again, so it would have been
16   participate for -- kind of for the first time.
17         Q.  Did they invite CISA to have any
18   role, at all, in what they were doing?
19         A.  Not that I recall.
20         Q.  Why were they giving you a
21   briefing, then?
22         A.  I think they should know our role
23   in the federal government for election security.
24   And we have, you know, an established
25   relationship with them.  So I think they were

Page 56

1   just going around and making sure -- again, I
2   don't -- I don't want to speak for them, but my
3   sense was that they were just kind of briefing
4   people who -- who were involved in election
5   security at the federal level.
6          Q.  Do you -- do you know -- do you
7   have any knowledge of what they actually did,
8   after that briefing, during the 2022 election
9   cycle?
10         A.  No.  I know -- like I said, the
11   reason I -- I think they were operating was
12   there was a couple of public reports, one -- at
13   least one public report, that I recall, that I
14   thought was pretty good, but was it about
15   specific disinformation, it was basically how to
16   think about whether or not a narrative poses
17   risks.
18             As I mentioned earlier, we were
19   particularly interested in understanding how to
20   determine if MDM creates risk.  And we thought
21   their products was pretty good on that.
22         Q.  You used a phrase earlier, that I
23   did -- I passed over, and I didn't understand, a
24   specific gap that we were talking about putting
25   together the I&P in the first place.  What's the

14 (Pages 53 to 56)

**BRIAN J. SCULLY  1/12/2023**

Page 57

1   gap that you're referring to?
2        A.  Sure.  So we had a conversation
3   with the interns, and they were asking questions
4   about kind of needs that the election officials
5   have, generally.
6        One of the gaps that we identified
7   from 2018 is, as you know, most election
8   officials their offices are fairly low staff,
9   low resourced, and so there was no -- they
10  didn't have capabilities to try to identify
11  disinformation targeting their jurisdictions,
12  and so was essentially the gap is that most
13  election offices throughout the country just
14  didn't have that capacity or capability to be
15  monitoring so that they could identify anything
16  that would be potentially target their
17  jurisdictions, so that was the gap.
18       Q.  So the gap is that state and local
19  election officials don't -- just don't have the
20  bandwidth or capacity to monitor mis and
21  disinformation on social media that may affect
22  their jurisdictions; right?
23       A.  Correct.
24       Q.  And then I take it was it the
25  interns' idea that the Election Integrity

Page 58

1   Partnership could be set up to kind of fill in
2   that gap, was that the idea?
3        A.  Again, I don't want to speak for
4   the interns.  But at that point I don't think
5   they were necessarily thinking about more of a
6   partnership.
7        I think the conversation was more
8   along the lines of this may be something that
9   the Stanford Internet Observatory could look
10  into, and then I think they went back and talked
11  to their folks at the Stanford Internet
12  Observatory and the idea was formed from there.
13       So I don't think that was the
14  interns' initial thought was to have the EIP.
15       Q.  Was there discussions of having
16  CISA fill that gap, for example, by doing
17  routing disinformation concerns to social media
18  platforms?
19       A.  With the -- there's no conversation
20  with the interns about CISA filling the gap, no.
21       Q.  How about internally to CISA, did
22  CISA view itself as kind of helping fill that
23  gap by, you know, helping state and local
24  election officials addressing this mis and
25  disinformation concern?

Page 59

1        A.  Our focus generally was not to play
2   that role, no.  We -- we weren't looking to
3   identify -- monitor social media to share with
4   platforms.
5        Q.  You mentioned that you -- I think
6   you mentioned you put EIP in touch with CIS, the
7   Center For Internet Security; is that right?
8        A.  Correct.
9        Q.  What is the Center For Internet
10  Security.
11       A.  I don't -- I don't know how to
12  describe them.  They're essentially, as I
13  understand it, they're non-profit that oversees
14  the multi-state ISAC and the election
15  infrastructure subsector information sharing and
16  analysis center, that's what ISAC stands for, so
17  that's my understanding of what they do.  I
18  don't know what else they do.  I know them in
19  those two contexts.
20       Q.  And those two contexts are
21  overseeing an ISAC, I-S-A-C, that involves
22  multiple states; is that right?
23       A.  Correct.
24       Q.  Now, and that's a -- basically a
25  sharing collaborative that they facilitate

Page 60

1   amongst state and local election officials; is
2   that right?
3        A.  Yeah, it's a general woven artifact
4   is information sharing with the sector.  So each
5   sector -- not each -- most sectors have their
6   own information sharing and analysis center.
7   They're independently stood up to serve those
8   sectors.
9        And so CIS was the one who was
10  responsible for kind of running the two that I
11  mentioned.
12       Q.  I'm sorry, what were those two, can
13  you identify them again?
14       A.  Sure.  The multistate ISAC and the
15  election infrastructure subsector ISAC.  And
16  just as a reminder of what ISAC is Information
17  Sharing and Analysis Center.
18       Q.  And those are, I think, referred to
19  as the EI-ISAC and the MS-ISAC; is that right?
20       A.  That's correct.
21       Q.  And both of those, I take it,
22  involve basically information sharing amongst
23  state and local election officials; is that
24  right?
25       A.  I believe only the election

15 (Pages 57 to 60)

**BRIAN J. SCULLY  1/12/2023**

---

Page 61

1   infrastructure one is focussed on -- on election
2   officials.  I believe the multistate one is
3   broader across state and local government, but
4   includes a broader set.  I'm not sure if
5   election officials are involved in the
6   multistate.
7        Q.  Is the Center For Internet Security
8   funded, in part, by CISA?
9        A.  To the best of my knowledge, CISA
10  provides funding for the EI-ISAC.
11       Q.  Okay.  And do you know how -- how
12  is that funding provided, is it grants or how is
13  it provided?
14       A.  I don't believe it's a grant, but
15  I'm not 100 percent certain what the -- what the
16  actual mechanism is, vehicle for the money to go
17  there.
18       Q.  But they're --
19       A.  My understanding is that it's
20  statutory, as well, but I could be wrong, also,
21  so I don't want to speak too much.
22       Q.  But you're aware that CISA does
23  provide funding for CIS to operate the EI-ISAC;
24  is that right?
25       A.  My understanding is that they

---

Page 62

1   provide funding to the EI-ISAC.  I don't know if
2   the goes -- if the EI-ISAC is an organization,
3   and the money goes to them or if the money goes
4   to CIS, and then they filter it down to the
5   EI-ISAC.  I'm not sure how it works, in
6   practice.
7       Q.  Does CIS operate the EI-ISAC, I
8   mean, does it kind of run it?
9       A.  Yeah, that's essentially how I see
10  it, yeah.
11       Q.  And then you say you put them in
12  touch, or CISA put the EIP in touch with CIS in
13  2020, do you remember that?
14       A.  Yes.
15       Q.  How did that happen?
16       A.  So CISA's general position on -- on
17  the switchboarding role was that it wasn't a
18  role we necessarily wanted to play, because it's
19  very resource intensive.  And so we had been
20  working with election officials to try to find
21  an alternate way for them to have that role,
22  somebody play that role.
23       They seemed to settle on the Center
24  For Internet Security.  And so since the EIP was
25  working on the same mission, we wanted to make

---

Page 63

1   sure that they were all connected.
2       Q.  And so the same mission, I take it,
3  is the switchboarding role that you've talked
4  about before?
5       A.  Correct.
6       Q.  Yeah, so I take it CISA was playing
7  a switchboarding role in 2020, but you mentioned
8  that that's resource intensive and it wasn't
9  something that you guys wanted to be principally
10  responsible for; right?
11       A.  Something we didn't want to be
12  responsible for, at all.  But election officials
13  asked if we could continue serving in that role
14  until they kind of got something else set up.
15       Q.  And you did do that, right, in 2020
16  you mentioned earlier that CISA performed a
17  switchboarding function; right?
18       A.  Correct, in 2020.
19       Q.  And then Center For Internet
20  Security performs a switchboarding function,
21  too; is that right?
22       A.  Yeah.  So yes, yes and no.  So yes
23  in the sense they were receiving reporting
24  directly from election officials.  In the early
25  part of 2020, they would forward what they were

---

Page 64

1   receiving election officials to us at CISA, and
2   then we would push that to the social media
3   platform; as 2021 moved along, CIS more
4   frequently provided that directly to the
5   platforms, themselves.
6       And so I would say early on in the
7   process, the switchboarding generally came
8   through CISA.  Later on in the process, it was
9   more of a mixed bag of how the switchboarding
10  worked.
11       Q.  And then did EIP play a
12  switchboarding role, too?
13       A.  I believe EIP did report stuff to
14  the platforms, themselves, yes.
15       Q.  And was there coordination between
16  the switchboarders, so to speak, CISA and EIP
17  and CIS?
18       A.  Most of the coordination was
19  between CISA and the Centers For Internet
20  Security.
21       There was a point where one of the
22  platforms was concerned about too much kind of
23  duplicate reporting coming in, and so we did
24  have some conversations with EIP and CIS on how
25  to kind of better manage that activity to make

---

16 (Pages 61 to 64)

Page 65

```
 1   sure we weren't overwhelming the platforms.
 2       Q.  In other words, like Twitter or
 3   Facebook would be hearing from CIS and CISA and
 4   EIP about a disinformation concern; correct?
 5       A.  Yeah.  Generally speaking, yes,
 6   I'll just leave it there, yes, that's correct.
 7       Q.  And then --
 8       A.  Twitter, in particular, reached out
 9   to us and had some concerns about that.
10       Q.  And I take you talked to EIP and
11   talked to CIS about creating a more streamlined
12   process through the platforms?
13       A.  I don't think it was necessarily a
14   streamlined process.  We just wanted to make
15   sure that there was -- that there was awareness
16   for the platform.
17           So I think, to be honest with you,
18   I don't recall how we ended up following this,
19   in practice.  But I think it was just we would
20   let everybody know when we were setting
21   something up through CIS.  We would let CIS
22   know, and I think CIS, through that
23   relationship, would like EIP know.
24           But I don't recall, specifically,
25   how we ended up kind of solving that problem.
```

Page 66

```
 1       Q.  But at least there was, I guess,
 2   kind of communication among CISA, the EIP, and
 3   CIS about who was reporting various concerns in
 4   an attempt to kind of de-duplicate what's being
 5   sent to the social media platforms?
 6       A.  Yeah, I don't recall being directly
 7   from CISA to EIP.  Like I said, I think we
 8   mostly worked it through CIS.
 9       Q.  Was there -- for example, was there
10   direct e-mail communication between EIP and
11   CISA?
12       A.  I'm sure there was.
13       Q.  I mean, was it your practice to
14   copy the CISA's -- or sorry -- the EIP's tips,
15   e-mail address when you were -- you or CIS was
16   reporting a disinformation concern to a social
17   media platform?
18       A.  No, that was not standard practice.
19       Q.  Did CIS do that?
20       A.  I don't know.  That's a good
21   question.  I don't know.
22       Q.  Why don't we --
23       A.  Just to be clear, you're -- sorry,
24   just to be clear, you were asking if they were
25   sending EIP when they sent e-mail to social
```

Page 67

```
 1   media platforms; correct.
 2       Q.  Yeah.
 3       A.  Yeah, I'm not sure.  Sorry.
 4       Q.  When -- when was EIP copied by CIS
 5   or you on disinformation e-mails, if ever?
 6       A.  I don't believe we ever -- CISA
 7   ever copied EIS on e-mails we sent to platforms.
 8   I don't -- but where we were forwarding -- if we
 9   were forwarding something we received from an
10   election official to the platform, I don't
11   believe CISA ever copied EIP, certainly not to
12   my recollection.  It wasn't kind of our process.
13           I can't speak for the Center For
14   Internet Security.  I don't -- I don't recall
15   who they were including on theirs.
16       Q.  Did you notify EIP if you were
17   flagging a disinformation concern for a social
18   media platform in any way?
19       A.  Not that I -- not directly, that I
20   recall.  We would -- we would generally copy the
21   Center For Internet Security.
22       Q.  Was it your understanding that they
23   were communicating with EIP?
24       A.  CIS?  Yeah, that was essentially
25   the -- their relationship was between those two,
```

Page 68

```
 1   yeah.
 2       Q.  So in other words, you had the
 3   understanding that CIS had a relationship of
 4   communication and coordination with the Election
 5   Integrity Partnership; right?
 6       A.  Yes.  Correct.
 7       Q.  And then you would notify CIS if
 8   you were reporting something to a social media
 9   platform on the understanding that they were
10   coordinating with EIP on what was being
11   reported; correct?
12       A.  No.  The reason we -- we would
13   coordinate with CIS was generally most of the
14   reporting we received from an election official
15   came through CIS.  And so we just wanted to let
16   them know that we were -- we had set it up so
17   that they had awareness of kind of where the
18   report had gone.  And so that was the rationale
19   for us coordinating with CIS.
20       Q.  And did you have the understanding
21   that CIS was coordinating with EIP on what was
22   being reported?
23       A.  I -- that would be speculating on
24   exactly what they were doing there.  I'm not
25   sure.
```

17 (Pages 65 to 68)

BRIAN J. SCULLY  1/12/2023

Page 69

1      Q.  You didn't know what they were
2  doing?
3      A.  I mean, I know they coordinated on
4  things.  I don't know the full nature of what
5  they were coordinating on, I don't want to put
6  words in their mouth.
7          (Exhibit No. 1 was marked for
8  identification.)
9          MR. SAUER:  Let's look at Exhibit
10  1.  I've sent that to your counsel.
11         MR. GARDNER:  Yeah, we've got it up
12  here.
13  BY MR. SAUER:
14     Q.  Can you also see it on the screen
15  share?
16     A.  Yes.
17     Q.  Are you familiar with this
18  document?
19     A.  Yes.
20     Q.  In other words, is this the report
21  that the Election Integrity Partnership did in
22  2021, about its activities in the 2020 election?
23     A.  Correct.
24     Q.  Had you read it before or how did
25  it get on your attention?

Page 70

1      A.  Yeah, I've read portions of it
2  before, and some of the folks briefed us on it.
3      Q.  Who are the folks that briefed you
4  on it?
5      A.  Alex Stamos and Renée DiResta.
6      Q.  When did that briefing occur?
7      A.  I'm sorry, when or where?
8      Q.  When did that briefing occur?
9      A.  It was late spring, early summer
10  2021.
11     Q.  This would have been around the
12  time that the report was released?
13     A.  Yeah, sometime after that.
14     Q.  And Alex Stamos is at Stanford
15  Internet Observatory; right?
16     A.  Yes.
17     Q.  Does he also serve on some CISA
18  committees or subcommittees?
19     A.  I don't know.
20     Q.  Renée DiResta, is she also at
21  Stanford -- Stanford Internet Observatory; is
22  that right?
23     A.  Yes.  Yes, last I checked.
24     Q.  Do you remember what they said in
25  the briefing?

Page 71

1      A.  I think they just walked through
2  kind of what they did and how they did it,
3  explained what they kind of learned, how they
4  viewed some of the issues, things like that.
5      Q.  Who participated in the briefing,
6  other than you, for CISA?
7      A.  So I received a briefing when I was
8  at the National Security Council.  So it was a
9  National Security Council colleague of mine,
10  Marybeth Foley (phonetic).
11     Q.  Did CISA receive a briefing?
12     A.  I don't know for certain.
13     Q.  Did you do -- I can't remember if
14  you said this -- did you do a detail on the
15  National Security Council in that timeframe?
16     A.  From January 2021 to March 2022 I
17  was on detail to the National Security Council.
18     Q.  Why did they report to the National
19  Security Council?
20         MR. GARDNER:  Objection, calls for
21  speculation.
22  BY MR. SAUER:
23     Q.  You may answer.
24     A.  Yeah, I don't know why.
25     Q.  I mean, were they reporting back to

Page 72

1  you because you had communicated with them back
2  in 2020 or was it a report to your agency?
3          MR. GARDNER:  Objection, compound,
4  calls for speculation.
5      A.  Yeah, again, I don't -- I don't
6  know why they -- why they wanted to brief us.
7      Q.  Can you see the document on the
8  screen share?
9      A.  Yep.
10     Q.  Scrolling down here on the third
11  page of the document, they list the participants
12  here.  Are these the same participants that you
13  talked about earlier?
14     A.  Yeah.
15     Q.  Yeah?  And I think you mentioned
16  Stanford Internet Observatory includes Alex
17  Stamos and Renée DiResta; correct?
18     A.  Yes.
19     Q.  And then the University of
20  Washington, Center For an Informed Public, is
21  that where Dr. Kate Starbird works?
22     A.  I believe so, yes.
23     Q.  And is she also on a CISA
24  subcommittee?  Actually, isn't she on the MDM
25  subcommittee for the CSAC?

BRIAN J. SCULLY  1/12/2023

Page 73

1      A.  I believe that's correct, yeah.
2      Q.  And is she also involved in the
3  Election Integrity Partnership?
4      A.  Yeah, that's my understanding.
5      Q.  Jumping ahead just a tiny bit, past
6  the table of contents, here in the executive
7  summary, on page six, little Roman six, you see
8  here it says:  Election Integrity Partnership
9  was formed to enable realtime information
10 exchange between election officials, government
11 agencies, civil society organizations, social
12 media platforms, the media, and the research
13 community; correct?
14     A.  Yeah, I see that sentence.
15     Q.  There's a reference to both
16 election officials and government agencies
17 engaging in realtime information exchange with
18 social media platforms; correct?
19     A.  Yes.
20     Q.  What -- do you know what government
21 agencies engaged in realtime information
22 exchange under the aegis of the EIP?
23     A.  I don't know who they're referring
24 to.
25     Q.  Did CISA do that, at all?  Did CISA

Page 74

1  share information with EIP?
2      A.  Generally speaking, no.
3      Q.  How about more specifically, did
4  anyone at CISA share information with the EIP?
5      A.  I mean, that's very broad.  Did we
6  share information?  Can you be more specific
7  about what type of information you're asking
8  that we shared?  We had conversations with them,
9  so in that sense we shared information.  Is
10 there something in particular that you're asking
11 about?
12     Q.  Sure.  What conversations did you
13 have with them?  I know you summarized them
14 earlier, can you be more specific?
15     A.  Yeah, I mean, I think that summary
16 actually is -- is probably as specific as I can
17 get.  Like I said, we -- we had conversations
18 with Stanford about the gap.  They gave us some
19 briefings on what they were doing, how they were
20 doing it.
21         Prior to the election, we had some
22 conversations with them to facilitate and
23 coordinate meetings, as I mentioned.  And then
24 when they put public reporting out, if we had
25 questions about it, we would probably have

Page 75

1  conversations with them around that, as well.
2      Q.  Was there any communication from
3  government officials to EIP about specific
4  disinformation concerns?
5      A.  Not that I'm aware of, no.
6      Q.  Who at CISA was involved in any
7  interactions with the Election Integrity
8  Partnership?
9      A.  In addition to the two interns, the
10 primary interaction was myself and Matt
11 Masterson.
12     Q.  Are you aware of anyone else at
13 CISA communicating with them?
14     A.  It's possible, but I don't recall,
15 and it certainty wouldn't have been -- you know,
16 they would have just been part of a meeting with
17 either Matt or myself.
18     Q.  How about Lauren Protentis, did she
19 communicate?
20     A.  She wasn't part of the MDM team in
21 2020.
22     Q.  How about --
23     A.  So she would not have been
24 communicating them.
25     Q.  How about Geoff Hale?

Page 76

1      A.  I -- I wouldn't be surprised if
2  Geoff was on some of the conversations, but I
3  don't recall -- I don't recall him
4  participating.
5      Q.  How about Director Easterly?  I
6  guess she wasn't director back then.  How about
7  Director Krebs?
8      A.  I believe Director Krebs had a
9  relationship with Alex Stamos.  So he may have
10 had conversations in that context.  I don't -- I
11 don't believe he had -- necessarily had
12 conversations in relation to EIP.
13     Q.  And then, in fact, when he left
14 CISA he joined Alex Stamos at the Stanford
15 Internet Observatory or he joined Alex Stamos in
16 some capacity, didn't he?
17     A.  I believe they started a business
18 together, yes.
19     Q.  Do you know what that business was?
20     A.  I'm sorry?
21     Q.  Do you know what that business was?
22     A.  I believe the name of it is
23 Krebs -- Krebs/Stamos Group.
24     Q.  Do you know what it does?
25     A.  I believe cyber security theft.

19 (Pages 73 to 76)

Page 77

1  I'm not entirely sure.
2       Q.  Does it do anything related to
3  misinformation and disinformation?
4       A.  I don't know, if they do it hasn't
5  been something they've been promoting, that I'm
6  aware of.
7       Q.  Are you aware of any communications
8  between Director Krebs -- Krebs and Alex Stamos
9  while he -- while Krebs was still director?
10       MR. GARDNER:  Objection, vague.
11       A.  Yeah, it's really vague.
12  Again what --
13       Q.  Any communications is broad and not
14  vague.
15       I want to know if you have any
16  communications of any kind between Director
17  Krebs and Alex Stamos when Krebs was still
18  director of CISA?
19       MR. GARDNER:  Same objection.
20       A.  I believe they -- Director Krebs
21  may have participated in a couple of meetings
22  that I'm aware of, that Stamos was also in, but
23  beyond that I'm -- I'm not familiar with --
24  obviously not going to be familiar with Krebs's
25  direct communications with Stamos.

Page 78

1       Q.  What meetings were they both
2  involved in, if you recall?
3       A.  So I can recall an event that
4  occurred out in Stanford, that Krebs spoke at
5  for the Stanford Internet Observatory, for
6  example.  I believe the first government
7  industry sync Stamos was the Facebook lead, at
8  the time.  This was before he went to Stanford
9  Internet Observatory, and Director Krebs
10  participated in that meeting, so meetings like
11  that.
12       Beyond that, I don't have a real
13  understanding of how they communicated with each
14  other.
15       Q.  Was there any discussion of the
16  Election Integrity Partnership at the meetings
17  you're aware of?
18       A.  Not that I'm aware of, no.
19       Q.  Turning back to the screen share,
20  it talks about election officials, engaging in
21  realtime information sharing with social media
22  platforms, among others; do you see that?
23       A.  Yeah, as part of that same
24  sentence, right; is that what you're referring
25  to?

Page 79

1       Q.  Yeah.
2       A.  Yeah.
3       Q.  Are you aware of state and local
4  election officials engaging in realtime
5  information sharing with the election
6  integrity -- you know, with social media
7  platforms through the Election Integrity
8  Partnership?
9       A.  I -- I don't know the relationship
10  between EIP and election officials.  I'm not
11  sure if they're referring to direct reporting to
12  them from election officials or if they're
13  referring to reporting through the Center for
14  Internet Security, I'm just not sure what
15  they're referring to there.
16       Q.  How about through the Center For
17  Internet Security, was there election reporting
18  through them?
19       A.  Yeah, so generally speaking, the
20  reporting that CISA received came through the
21  Center For Internet Security.
22       Q.  Gotcha.
23       And how about -- did -- did --
24  as -- to the extent you understand, did EIP
25  receive reporting through the Center of Internet

Page 80

1  Security, you know, kind of from election
2  officials through the internet security to the
3  Election Integrity Partnership?
4       MR. GARDNER:  Objection, lack of
5  foundation.
6  BY MR. SAUER:
7       Q.  You may answer.  Do you know if --
8       A.  Yeah, I -- I'm not -- I'm not sure
9  what their full relationship was and how they
10  were sharing, what the specifics were.  It
11  wouldn't surprise me if CIS had shared some with
12  EIP, but I just don't know.
13       Q.  You mentioned Matt Masterson, and I
14  think you said that he was involved in briefing
15  with the EIP; is that correct?
16       A.  No.  He was involved -- involved
17  in -- in conversations with Stanford Internet
18  Observatory.  He probably -- generally, all of
19  our -- so just to take a step back, generally
20  our communications, when VIPs stood up, were
21  still at the Stanford Internet Observatory.
22       So the conversations I'm aware of
23  with Masterson were generally at the Stanford
24  Internet Observatory.  He was also briefed -- I
25  seem to recall he was probably in some of the

**BRIAN J. SCULLY  1/12/2023**

Page 81

```
 1    briefings I was in or conversations when we had
 2    questions about reporting that they did, public
 3    reporting.
 4            So I don't know how to kind of
 5    thread the needle between, you know, when they
 6    were just conversations with Stanford Internet
 7    Observatory and when they would be considered
 8    conversations with the EIP.
 9        Q.  And that, I take it, you said
10    thread the needle, I take it that's kind of a
11    fuzzy distinction, because the EIP is a
12    collaboration that involves the Stanford
13    Internet Observatory; correct?
14        A.  Right.
15        Q.  Do you know -- do you know -- let
16    me ask you this:  What discussions do you know
17    of between Matt Masterson and Stanford Internet
18    Observatory that related in any way to the EIP?
19        A.  I think it would have just been if
20    we had questions about public reporting.
21        Q.  What is --
22        A.  Kind of once they were up and
23    running.
24            So he was involved in some of the
25    conversations before, you know, the first couple
```

Page 82

```
 1    that I talked to about, kind of in our
 2    engagement with Stanford Internet Observatory,
 3    he was involved, I know, in at least one of the
 4    conversations about that.
 5            And then, after that, I don't think
 6    he was particularly involved, but he may have
 7    been involved, and we had some briefings for --
 8    or not briefings, I don't think is the right
 9    word, where we had conversations with them about
10    public reporting we put out.
11        Q.  When you say public reporting, what
12    do you mean?
13        A.  So the EIP put out regular kind of
14    blog posts, excuse me, regular blog posts on
15    what they were seeing, so -- so it was publicly
16    available information.
17        Q.  And -- and did you -- did they
18    discuss, you know, those blog posts with Matt
19    Masterson or you before they were posted?
20        A.  Not that I recall.
21        Q.  And what discussions did you have
22    with the public reporting?
23            MR. SCOTT:  John, just one second,
24    it looks like the video is frozen on our end.
25    Does it appear frozen on your end, as well.
```

Page 83

```
 1            MR. SAUER:  I see a little
 2    interference.  Shall we go off the record?
 3            THE WITNESS:  There's interference
 4    with the top and the bottom.  I'm not seeing
 5    that.  Still, we can go off -- we can go off the
 6    record and try to fix that.
 7            MR. SAUER:  Let's go off the
 8    record.
 9            THE VIDEOGRAPHER:  The time is now
10    10:27.  We are off the record.
11            (Recess.)
12            THE VIDEOGRAPHER:  The time is now
13    10:40.  We are back on the record.
14    BY MR. SAUER:
15        Q.  Mr. Scully, I think we were talking
16    about Matt Masterson before we had the
17    technical -- technical difficulty.
18            Generally speaking, do you know
19    what role he had, if any, in originating the
20    concept for the Election Integrity Partnership?
21        A.  So his primary role was the same as
22    mine, in terms of just clarifying the gap that
23    election officials faced for the folks at the
24    Stanford Internet Observatory early on in the
25    process.
```

Page 84

```
 1        Q.  And is that something that you
 2    discussed with the interns when they came up
 3    with the idea?  Did the interns come to you or
 4    Mr. Masterson and talk about the gap?
 5        A.  I'm sorry, so are you referring
 6    specifically to the gap?
 7        Q.  Yeah.
 8        A.  Yeah, so the gap came from our --
 9    the gap came from myself.
10        Q.  That was your idea, that there is a
11    gap, and you shared that with the interns?
12        A.  I'm not sure I would say that was
13    my idea.  That was -- that was just kind of from
14    lessons learned from 2018, I think across the
15    election community.
16            I don't know that I would say that
17    that was -- that was something that we came up
18    with on our own.
19        Q.  Is that something you shared with
20    the interns?
21        A.  It is something I shared with the
22    interns, correct.
23        Q.  And then the interns came up with
24    the idea of putting together the Election
25    Integrity Partnership as a way of assisting
```

21 (Pages 81 to 84)

**BRIAN J. SCULLY  1/12/2023**

Page 85

1  state and local election authorities of filling
2  that gap; right?
3       A.  I don't -- I don't know what the
4  exact process was, essentially they identified
5  the gap.  They went back and talked to the folks
6  at the Stanford Internet Observatory.  And
7  somewhere in that sausage making process, along
8  the way, they decided that this partnership
9  would be the best approach to take.
10      Q.  In that timeframe, did they also
11 have discussions with you about putting together
12 something like this?
13      A.  I'm sure they mentioned it to us
14 somewhere along the line, that this was
15 something they were thinking about, but I
16 don't -- I don't know that it went beyond that.
17      Q.  How about Mr. Masterson, did they
18 discuss it with him?
19      A.  Again, I'm not familiar with all of
20 Matt's communications with these folks, but he
21 was in the meeting where we talked about the gap
22 with Stamos, in particular.  And I believe
23 Stamos mentioned that as an option during that
24 call.  I don't know if he had any other
25 conversations with them.  I don't know about

Page 86

1  that.
2       Q.  When did that meeting with Alex
3  Stamos occur?
4       A.  Sometime in the summer of 2020, it
5  would have -- yeah, I don't know.  The exact
6  date would be hard for me to figure out, sorry.
7  Yeah, the interns -- sorry -- the interns
8  probably arrived in the May timeframe, so we
9  probably would have had had that conversation --
10 the initial conversation sometime in June.  And
11 then probably Stamos, you know, a week or two
12 after that, so probably June/July, I would say.
13      Q.  Was Mr. Masterson in the meeting
14 where you discussed the gap with the interns?
15      A.  Not that I recall, no.
16      Q.  What did Mr. Stamos say in this
17 meeting you recall from the June to July
18 timeframe of 2020?
19      A.  Essentially, he just wanted to
20 confirm that we agreed with the interns that
21 this was a gap.
22      Q.  What -- what was said about the gap
23 in that meeting, that you remember?
24      A.  Yeah, it was basically along the
25 lines he just said, hey, the interns told me

Page 87

1  that there's a gap for election officials where
2  most of them don't have the resources to do --
3  to identify disinformation that may be targeting
4  their jurisdictions, is that -- did the interns
5  give me that information correctly.  He was
6  thinking about potentially doing something, and
7  he obviously didn't want to spend time and
8  resources doing something if there wasn't, in
9  fact, a gap.
10      Q.  How long did this meeting occur or
11 last, do you think?
12      A.  That's all of maybe 10 or 15
13 minutes.
14      Q.  Was there any other communications
15 with Mr. Stamos during this timeframe?
16      MR. GARDNER:  Objection, vague,
17 also calls for speculation.
18 BY MR. SAUER:
19      Q.  Do you remember any?
20      A.  So I don't recall any conversations
21 I had with him in that timeframe.  I obviously
22 can't speak for Masterson.
23      Q.  Okay.  Scroll ahead to page XII.
24 There's a thank you there for contributors, and
25 you see Kate Starbird is on that list; do you

Page 88

1  see that?  You can look at the screen share.
2       A.  Yes.
3       Q.  You're there?  Yeah, do you know --
4       A.  Yeah, I got it.
5       Q.  Do you know how she contributed to
6  the Election Integrity Partnership?
7       A.  I don't.
8       Q.  And I see Alex Stamos up here,
9  obviously kind of set the thing off; right?  Do
10 you know how else he was involved?
11      A.  I don't.
12      Q.  Okay.  Down here it says the
13 Election Integrity Partnership would like to
14 thank Matt Masterson for additional feedback; do
15 you see that?
16      A.  I do.
17      Q.  Do you know what feedback
18 Mr. Masterson provided to the Election Integrity
19 Partnership?
20      A.  I don't.
21      Q.  When did Mr. Masterson leave CISA
22 and go to Microsoft?
23      A.  So Matt left CISA, I believe, in
24 January 2021.  I don't think he started at
25 Microsoft until early 2022.

**BRIAN J. SCULLY  1/12/2023**

Page 89

1      Q.  Oh, do you know what he did in the
2  intervening year?
3      A.  I believe he -- he worked -- he was
4  a fellow at the Stanford Internet Observatory.
5      Q.  Oh, so he went from CISA to work
6  with Alex Stamos's group at the Stanford
7  Internet Observatory?
8      A.  That's my understanding, yes.
9      Q.  And Mr. Masterson is thanked here,
10  in this spring of 2021, I take it he was at the
11  Stanford Internet Observatory by then?
12      A.  I don't know when he officially
13  started.
14      Q.  I'm going to jump ahead to page 2
15  of the executive summary.  So if you're
16  following on the PDF it would be the 20th page
17  of the PDF.
18          There's a discussion here where it
19  says:  The initial idea for the partnership came
20  from four students that the Stanford Internet
21  Observatory funded to complete volunteer
22  internships at CISA; right?
23      A.  Correct.
24      Q.  Okay.  You've declined to identify
25  them, early in your testimony.  Do you know who

Page 90

1  they are?  Who are those four students?  Do you
2  know who they are?
3      A.  I know for certain who two are, I
4  believe I know who the third is, I'm unsure who
5  the fourth is.
6      Q.  What -- what were they doing in
7  their internships for CISA at the time they
8  originated this idea?
9      A.  They had different activities, so
10  they supported across the election security
11  initiative, broadly.  So tying to think if I can
12  recall specific tasks that they had.
13      Q.  And then, if you look to the next
14  two sentences, it talks about responsibilities
15  for election information security is divided
16  across government offices, and it goes on to say
17  that, yet, no government agency in the United
18  States has the explicit mandate to monitor and
19  correct election mis and disinformation;
20  correct?
21      A.  I'm sorry, is that the next page?
22      Q.  If you look at the screen share,
23  can you read that?  I can zoom in, if that
24  helps.
25          MR. GARDNER:  A few sentences below

Page 91

1  where he was reading.
2          THE WITNESS:  Okay.  Got you.
3  BY MR. SAUER:
4      Q.  So it says:  Yet, no government
5  agency in the United States has the explicit
6  mandate to monitor and correct misinformation
7  and disinformation; correct?
8      A.  Sorry, I'm just trying to read and
9  catch up.
10      Q.  I'm just asking if you see where it
11  says that.
12      A.  Yeah, I see where it says that.
13      Q.  And it seems to me that they're
14  talking about a slightly different gap than the
15  one you talked about earlier; right?  They're
16  saying there's a gap in federal government
17  authority to monitor and correct election mis
18  and disinformation, right, as opposed to a gap
19  among the capacity for state and local election
20  authorities to do it; right?
21      A.  To be honest, I don't know what
22  they're referencing, so I don't -- I don't want
23  to speculate on what they're trying to say
24  there.
25      Q.  Let me ask you this:  Do you think

Page 92

1  there's a gap in the authority of federal
2  government agencies to monitor and correct
3  election mis and disinformation?
4          MR. GARDNER:  Objection to the
5  extent it calls for a legal conclusion.
6  BY MR. SAUER:
7      Q.  Do you think that?
8      A.  Yeah, I'm not a -- I'm not a
9  lawyer, I don't want to comment on the legal
10  authorities of the departmental agencies.
11      Q.  I'm just asking whether you
12  think --  I'm not asking for your legal
13  conclusion, I'm asking whether you think there's
14  a gap in the authority of federal agencies that
15  makes them unable to monitor and correct mis and
16  disinformation?
17          MR. GARDNER:  Same objection, calls
18  for a legal conclusion.
19      A.  Yeah, by definition, an authority
20  is a legal determination I'm not comfortable
21  making.
22      Q.  Let me ask you this:  As a
23  practical matter, do you believe there's a gap
24  in the ability, as opposed to the authority, the
25  ability of federal government agencies to

**LEXITAS LEGAL**
**www.lexitaslegal.com**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**

Page 93

1  monitor and correct mis and disinformation?
2      MR. GARDNER:  Objection, vague.
3  BY MR. SAUER:
4      Q.  You may answer.
5      A.  Yeah, can you clarify exactly what
6  you're asking?  I just want to make sure I
7  understand what you're trying to get at.
8      Q.  I'm using your word, a gap; right?
9      A.  Yes.
10      Q.  You just called it a gap, earlier,
11  and that's a practical word, it's not a legal
12  conclusion?
13      A.  Correct.
14      Q.  So I'm asking you, you talked about
15  a gap with respect to the capacities of state
16  and local election authorities; correct?
17      A.  That's correct, yeah.
18      Q.  Do you think there's a similar gap
19  with respect to the ability of federal
20  government agencies to respond to mis and
21  disinformation on social media?
22      MR. GARDNER:  Same objection,
23  vague.
24      A.  I -- I think the federal government
25  certainly would have the capability, if it chose

Page 94

1  to use it, and had the authority to do it.
2      Q.  Do you think it hasn't chosen to
3  use that capability?
4      A.  So generally speaking, I'm trying
5  to understand your question.  So is there a gap
6  in the federal government's ability to, what, to
7  provide information on social media about what's
8  online on their platforms, is that what you're
9  asking?
10      Q.  I'm asking if there was a gap in
11  the federal government's ability to, you know,
12  take any kind of action to correct mis and
13  disinformation on social media?
14      MR. GARDNER:  Same objection, to
15  the extent it calls for a legal conclusion.
16      A.  Yeah, I don't know that there's a
17  gap in the federal government's ability to do
18  it.
19      Q.  Well, let me ask this:  It goes on
20  to say -- let me ask you this:  This notion that
21  the report says that no government agency in the
22  United States has the explicit mandate to
23  monitor and correct election mis and
24  disinformation, is that something that was
25  discussed with the CISA interns who originated

Page 95

1  the EIP?
2      A.  Not that I recall, no.
3      Q.  Do you remember any discussions of
4  that with anyone else, suggesting that, you
5  know, there's no government agency in United
6  States with an explicit mandate to monitor and
7  correct election mis and disinformation?
8      A.  No, not that I -- not that I
9  recall.  It's possible, though.
10      Q.  It goes on to say:  This is
11  especially true for election disinformation that
12  originates from within the United States, which
13  would likely be excluded from law enforcement
14  action under the first amendment, is not
15  appropriate for study by intelligence agencies
16  restricted from operating in the United States;
17  connect?
18      A.  That's what the sentence says, yes.
19      Q.  Do you agree with that sentence?
20      MR. GARDNER:  Objection, calls for
21  a legal conclusion.
22  BY MR. SAUER:
23      Q.  Do you?
24      MR. GARDNER:  Same objection.
25      A.  I'm sorry, I'm reading the

Page 96

1  sentence.
2      Yeah, this definitely gets into
3  legal authority stuff that I would not want to
4  comment on.
5      Q.  And the next sentence says:  As a
6  result, during the 2020 election local and state
7  election officials, who had a strong partner on
8  election system and overall cyber security
9  efforts in CISA, were without a clearinghouse
10  for assessing mis and disinformation targeting
11  their voting operations; correct?
12      A.  Yeah, that's what this sentence
13  says.
14      Q.  That, to me, sounds like it's
15  talking about the same gap you talked about
16  earlier, and that's state and local election
17  officials were without a clearinghouse for
18  assessing mis and disinformation targeting their
19  voting operations; right?
20      A.  That's how I read that sentence,
21  yeah.
22      Q.  Yeah, and I take it that this
23  report links that gap to gaps that they perceive
24  in federal authority; right?
25      MR. GARDNER:  Objection, calls for

24 (Pages 93 to 96)

BRIAN J. SCULLY  1/12/2023

---

Page 97

1    speculation.
2         A.  Yeah, I don't want to speculate on
3    what they're trying to do there.
4         Q.  Okay.  Next sentence says:
5    Students approach SIO leadership in the early
6    summer, and in consultation with CISA and other
7    stakeholders a coalition was assembled with
8    like-minded partner institutions; do you see
9    that?
10        A.  I do.
11        Q.  Well -- let me ask you this:  It
12   says, in consultation with CISA, what
13   consultation with CISA do you recall relating to
14   the assembling of this coalition?
15        A.  I don't recall any consultation
16   with relation to the assembly of the coalition.
17        Q.  Well, you don't recall anyone
18   consulting with CISA about putting together the
19   Election Integrity Partnership?
20        MR. GARDNER:  Objection,
21   mischaracterizes the witness's previous
22   testimony.
23        A.  Yeah, so I don't recall any
24   consultation with us about who would be involved
25   in the -- in the EIP, who their members would be

---

Page 98

1    or anything like that.
2         Q.  Do you remember any consultation of
3    any kind about starting up the EIP in any
4    connection?
5         A.  Just what I referred to earlier,
6    the conversations with the interns and the
7    conversation with Stamos about verifying the gap
8    existed.
9         Q.  How about Mr. Masterson, is it
10   possible they consulted with him?
11        MR. GARDNER:  Objection, calls for
12   speculation.
13        A.  Yeah, I don't know what
14   conversations Matt had with them.
15        Q.  Do you know whether he had any
16   conversations with them relating to the
17   commencement of the EIP?
18        A.  I don't.
19        Q.  And the next page of the document,
20   they provide an operational timeline; do you see
21   that?
22        A.  I do.
23        Q.  And here, the second entry in their
24   operational timeline, is -- I'm having trouble
25   highlighting -- it says:  July 9th of 2020,

---

Page 99

1    meeting with CISA to present EIP concept; do you
2    see that?
3         A.  Yep, I see that.
4         Q.  Do you know what meeting that is
5    referring to?
6         A.  I don't know specifically what
7    meeting that's referring to, no.
8         Q.  Would that -- to your mind, would
9    that describe the 10 to 15 minute phone call you
10   had with Alex Stamos about the gap that you
11   talked about earlier?  Would you have described
12   that phone call as a meeting with the EIP for
13   EIP to present -- for -- to present the EIP
14   concept to CISA?
15        A.  That 10 to 15 minute phone call
16   only included Stamos, that I recall.  So I don't
17   know that I would frame it as a meeting to
18   present the EIP concept.
19        As I mentioned earlier, he did kind
20   of raise the possibility of setting up some sort
21   of a partnership, during that call, so that
22   could be what his -- what his thinking was, but
23   I don't know what he's referring to there.
24        Q.  What kind of a partnership did he
25   talk about in that call?

---

Page 100

1         A.  He just said he thought he -- he
2    was thinking about potentially just getting
3    other -- other similar institutions involved.
4         I don't recall it -- I don't even
5    recall if he mentioned any names or not.  I
6    think it was more of a generic, where he didn't
7    think Stanford could necessarily do it on its
8    own, and would consider kind of forming some
9    sort of partnership.
10        Q.  Did he talk about forming any kind
11   of partnership with CISA?
12        A.  No.
13        Q.  So he didn't ask CISA to play any
14   role in the concept he was putting together?
15        A.  No.  Again, beyond -- sorry, just
16   to -- beyond what I've talked about earlier, you
17   know, I think he knew he would need us helping
18   him connect with election officials.
19        Q.  So he -- to the extent he -- okay.
20        So he was asking for your help in
21   connecting with election officials in that
22   meeting?
23        A.  I believe that was one of the asks,
24   but I don't -- it could have been then, it could
25   have been at another time, if that happened.

BRIAN J. SCULLY  1/12/2023

Page 101

1    **Q.  Is there a later conversation with**
2  **Mr. Stamos?**
3      A.  I don't recall, but that's what I
4  think there was a fifth call.  But again, I
5  don't -- you know, this was several years ago,
6  and my memory's a little foggy on timelines and
7  everything that happened.
8      **Q.  But to the best of your**
9  **recollection, at some point he asked for CISA's**
10  **assistance in connecting with state and local**
11  **election officials; right?**
12      A.  Yeah.
13      **Q.  Is that when you put him in touch**
14  **with the Center For Internet Security?**
15      A.  I think they way initially put him
16  in touch with the National Association, so the
17  two I mentioned earlier, the National
18  Association of Secretary's of State, and the
19  National Association of State Election
20  Directors.  I'm not entirely -- I don't recall
21  when, exactly, Center For Internet Security got
22  involved.
23      **Q.  At some point, did you put him --**
24  **put him in touch with CIS?**
25      A.  So we put the Stanford Internet

Page 102

1  Observatory in touch with them.  I forget if it
2  was Alex, himself, or if it was somebody from
3  the team there.
4      **Q.  So at some point you put them in**
5  **touch with CIS.  And were you involved in**
6  **further communications with CIS and anyone at**
7  **EIP?**
8      A.  Yeah, so as I mentioned earlier, I
9  facilitated some meetings between them, involved
10  between them and election officials.
11      **Q.  What sort of -- can you unpack that**
12  **a little bit, you facilitated some meetings**
13  **between -- was that both EIP and CIS?**
14      A.  Right.  So I facilitated meetings,
15  some meetings between EIP and CIS to make sure
16  that they were -- they didn't have relationship
17  before the -- they didn't know each other.
18          So we just facilitated getting them
19  together to talk and figure out how they were
20  going to work together.
21      **Q.  Got you.  And who was at those**
22  **meetings from EIP?**
23      A.  I don't recall.
24      **Q.  How about CIS, who did you put them**
25  **in touch with at CIS?**

Page 103

1      A.  I only recall the CIS person's
2  first name was Aaron.  I'm blanking on his last
3  name, at this point.  I suspect there were other
4  people from CIS on the call, as well, but he
5  was -- Aaron was my principal contact at CIS.
6  And that's Aaron, A-a-r-o-n.
7      **Q.  And I take it the purpose of that**
8  **meeting was to set up a direct line of**
9  **communication between CIS and EIP?**
10      A.  Correct.
11      **Q.  And then did you mention that you**
12  **facilitated other meetings, for example, between**
13  **EIP and NASED or National Association of**
14  **Secretaries of State?**
15      A.  Yeah, my recollection is that we
16  did facilitate.  We put them in contact.  I
17  don't -- I don't know if we were on the calls or
18  not, I don't recall, but -- but I seem to recall
19  we did put them in contact.
20      **Q.  Okay.  And specifically you mean**
21  **you put EIP --**
22      A.  EIP in.
23      **Q.  -- in contact with NASED and NASOS;**
24  **is that what it's called?**
25      A.  Just NASS, but yes.

Page 104

1      **Q.  Okay.  And so, yeah, sorry, for**
2  **clarity, you put EIP in contact with both NASED**
3  **and NASS; correct?**
4      A.  And just to be clear, we put SIO
5  folks in contact with them.
6      **Q.  Okay.**
7      A.  But they were part of EIP, so
8  that's kind of the -- I don't know when EIP was
9  stood up in relation to the conversations,
10  because I don't really know when the
11  conversations occurred, either.  So just so
12  you're clear, we worked through the SIO when we
13  made those connections.
14      **Q.  Got you.  Do you remember who at**
15  **the SIO was involved in those connections?**
16      A.  I don't.
17      **Q.  And again, SIO is short for**
18  **Stanford Internet Observatory; correct?**
19      A.  Correct.
20      **Q.  Do you know, what was the timeframe**
21  **of those, you know, connections that you**
22  **facilitated with, you know, Stanford Internet**
23  **Observatory folks and CIS, NASED and NASS?**
24      A.  I don't know for certain, but I
25  would guess they were late July or August.

26 (Pages 101 to 104)

Page 105

1   Q.  So this would have been around the
2   time that the EIP is kind of ramping up its
3   activities?
4   A.  Yeah, I don't -- I mean, I don't
5   know when they were ramping up their activities,
6   but I would assume it was around that time.
7   Q.  Let me scroll down, so you can see
8   this on the screen share, it's page 8.  Is that
9   size on the screen share visible to you?
10  A.  Somewhat.
11  Q.  Do you see here on page 8 there's a
12  kind of graphic where the EIP report lists four
13  major stakeholders, government, civil society,
14  platforms and media; right?
15  A.  Yep, I see that.
16  Q.  You got an arrow from government, a
17  black arrow that flows from government to intake
18  queue; correct?
19  A.  Yep.
20  Q.  Do you know what that's referring
21  to, did the government -- do you know what
22  governments as stakeholders submitting
23  information for the intake queue for the EIP?
24  A.  I don't know if, specifically, what
25  that's in reference to, no.  I mean, I would

Page 106

1   think it was election officials, but I don't --
2   I don't know.
3   Q.  How about CISA, would CISA ever
4   receive a report from election officials and
5   pass it along to EIP?
6   A.  I don't recall us doing that.  It
7   wasn't part of our process, and -- and we would
8   just send it to the platforms, ourselves, so I
9   don't know that we would send it to EIP.
10  Q.  How about CIS, do you know if they
11  did that on behalf of state and local officials?
12  A.  Did CIS forward messages that
13  election officials sent to them to EIP?
14  Q.  Yeah, about disinformation.
15  A.  I would think so, but I don't know
16  for certain.
17  Q.  And you see there's a red arrow
18  down here at the bottom, from tier 3:
19  Mitigation, and then that flows back to
20  government.
21  Were you aware of EIP reporting
22  back to CISA about what happened with
23  disinformation or misinformation reports?
24  A.  I don't recall that there was
25  communication when -- so just let me take a step

Page 107

1   back.  So you're asking if we were familiar with
2   when EIP would send reports to the platforms,
3   were we aware of that?
4   Q.  Correct.
5   A.  Generally speaking, we were not --
6   as far as I know we were not aware.  I wouldn't
7   say generally.
8   As far as I'm aware, we were not in
9   the loop when they were communicating with
10  platforms.
11  Q.  And I apologize, I split the screen
12  on screen share.  Actually, stay with that
13  graphic for a minute.  Up here in the corner, it
14  says, tier one:  Detection intake.  On-call data
15  gathering, triage, and response; do you see
16  that?
17  A.  I do.
18  Q.  Do you know how the Election
19  Integrity Partnership gathered data about what
20  was being said on social media in 2020?
21  A.  I don't know the specifics of how
22  they did that, no.
23  Q.  Did you have any understanding at
24  all, other than obviously receiving reports from
25  CIS, NASED and NASS?

Page 108

1   A.  My understanding was that they
2   monitored social media in some way.
3   Q.  Yeah, do you have any idea how they
4   did it?  I mean, there's different ways of doing
5   that, do you know how they did it?
6   A.  I don't know what tools or
7   capabilities they used, no.
8   Q.  Down here below the graphic, it
9   talks about tickets being submitted to the EIP,
10  it says tickets were submitted both by trusted
11  expert stakeholders detailed in section 1.4 on
12  page 11, an internal EIP analysts; correct?
13  A.  Yes.
14  Q.  Do you know who the trusted
15  external stakeholders were?
16  A.  I don't.
17  Q.  Do you know whether CISA, at least
18  EIP considered CISA a trusted external
19  stakeholder?
20  MR. GARDNER:  Objection, calls for
21  separation.
22  BY MR. SAUER:
23  Q.  Do you know.
24  A.  I suspect if we scroll down to page
25  11 we'll find out who the stakeholders were.

**BRIAN J. SCULLY  1/12/2023**

Page 109

1    Q.  Good idea.  So here at the bottom
2  of page 11, section 1.4, discussing external
3  stakeholders; do you see where we are?
4       A.  Getting there.  And 11, external
5  stakeholders.  Yep.
6       Q.  It says:  The EIP serve as a
7  connector for many stakeholders, who both
8  provided inputs and received outputs; correct?
9       A.  Yep.
10      Q.  Okay.  And then flipping to the
11 next page, 12, first sentence:  External
12 stakeholders include government, civil society,
13 social media companies, and news media entities;
14 correct?
15      A.  Correct.
16      Q.  It says:  Government and civil
17 society partners could create tickets or send
18 notes to EIP analysts; right?
19      A.  That's what it says, yes.
20      Q.  It goes on to say:  They use these
21 procedures to flag incidents to be emerging
22 narratives to be assessed by EIP analysts;
23 correct?
24      A.  That's what it says, correct.
25      Q.  And do you know what government's

Page 110

1  partners were creating tickets to flag incidents
2  or merging narratives to the EIP?
3       A.  I don't.
4       Q.  Immediately below that paragraph,
5  they mention some government officials; right?
6       A.  Yep.
7       Q.  Right there, it says:  Four major
8  stakeholder groups in that graphic in the middle
9  of page 12; right?
10      A.  Yep.
11      Q.  And there's three that are listed
12 there; right?
13      A.  Mm-hmm.
14      Q.  There's Election Infrastructure
15 ISAC; right?
16      A.  Correct.
17      Q.  And that's the EI-ISAC that CISA
18 funds the Center For Internet Security to
19 operate; is that right?
20      A.  Again, I don't know if the money
21 goes directly to the EI-ISAC.  I don't know how
22 the money flows, but EI-ISAC is part of CIS and
23 we do fund the EI-ISAC.
24      Q.  Yeah, and then the next one listed
25 is CISA?

Page 111

1       A.  Mm-mmm.
2       Q.  And the next one is listed as the
3  GEC; right?
4       A.  Correct.
5       Q.  So do you know why CISA is listed
6  there, why the EIP listed CISA as a major
7  stakeholder group in the EIP?
8           MR. GARDNER:  Objection, calls for
9  speculation.
10      A.  Yeah, I don't know why.
11      Q.  Down at the bottom, it says:  Four
12 major stakeholder groups that collaborated with
13 the EIP.  Do you believe that CISA collaborated
14 with the EIP?
15      A.  Did we have conversations with
16 representatives of the EIP?  Yes.  If that's
17 considered collaboration then I guess we
18 collaborated with the EIP.
19      Q.  Tell me about those conversations.
20 I know you mentioned a couple of them or a few
21 of them, already.  I take it those included a
22 call with Alex Stamos to talk about the gap;
23 right?
24      A.  Yep.
25      Q.  And it included facilitating

Page 112

1  meetings between the EIP and NASED and NASS;
2  correct?
3       A.  Yes.
4       Q.  And it included in some -- I take
5  it, it included in some connection putting EIP
6  in touch with Center For Internet Security;
7  correct?
8       A.  That's correct.
9       Q.  And I take it were you kind of
10 putting them in touch with the EI-ISAC people
11 for the Centers For Internet Security?
12      A.  I don't recall that we put them in
13 touch with the EI-ISAC people.  We put them in
14 contact with CIS-specific people.
15      Q.  And, in particular, I think you
16 mentioned someone called Aaron; is that right?
17      A.  Yes, Aaron, Aaron, as far as I'm
18 aware, did not work for the EI-ISAC.  He worked
19 just for CIS.
20      Q.  What other conversations with
21 representatives of EIP do you recall, other than
22 those four we just listed?
23      A.  As I mentioned earlier, I believe
24 we had some conversations when they put out
25 public reports.  If we had any questions about

28 (Pages 109 to 112)

**BRIAN J. SCULLY  1/12/2023**

Page 113

```
 1   those public reports I believe we have had a
 2   couple conversations about that.
 3       Q.  Sorry, go ahead and finish.
 4       A.  No, I think that's -- I think
 5   that's it, that I recall.
 6       Q.  Who was involved in those
 7   conversations about the public reports?
 8       A.  Again, it would likely be
 9   Masterson, and then there probably would have
10   been some staff.  So I don't know specifically,
11   but there would have been other election
12   security staff, and probably other MDM-specific
13   team staff.  But I don't recall who,
14   specifically, it would have been.  It could have
15   shifted, you know, based on who was available,
16   and things like that, so -- so I don't recall.
17       Q.  About how many conversations of
18   that nature, relating to public reports, do you
19   recall?
20       A.  To be honest, I don't recall any,
21   specifically.  I just know that we had a few.
22   And so I -- I don't want to make up a number for
23   you, but it was -- it was probably somewhere
24   between two and four.
25       Q.  And were you on the two and four
```

Page 114

```
 1   conversations or did other people have them?
 2       A.  I mean, those are the ones that I
 3   recall, so those are the ones I would have been
 4   on, I don't know if there are others that other
 5   people from CISA would have been on, that I was
 6   not.
 7       Q.  Okay.  What was discussed in the --
 8   about their public reporting in the
 9   conversations you were involved in?
10       A.  We would just ask questions about
11   tactics and things like that, what they were
12   seeing.
13       Q.  What kind of contacts would they
14   have?
15       A.  They were just fairly brief
16   conversations -- sorry -- they were just fairly
17   brief conversations, based on blog posts.  So if
18   we had a question about jurisdiction being
19   targeted or a new tactic or things like that, we
20   would just ask them kind of questions about that
21   sort of thing.
22       Q.  And what -- when you said tactics,
23   those are kind of online tactics for spreading
24   social media misinformation and disinformation?
25       A.  Correct.  Like we were talking
```

Page 115

```
 1   about earlier, the coordinated inauthentic
 2   behavior.  So were they using things like bots
 3   or stuff like that, kind of what was their --
 4   the technique that they were using to
 5   distribute.
 6       Q.  Were people at CISA following their
 7   blog posts to sort of, you know, get information
 8   from them?
 9       MR. GARDNER:  Objection, calls for
10   speculation.
11       A.  Yeah, can you specify what you mean
12   by people?
13       Q.  Was anyone at CISA following the
14   EIP's public reports?
15       MR. GARDNER:  Same objection.
16       A.  I can only speak for myself.  I was
17   following the public reports.
18       Q.  Okay.  How about anyone -- how
19   about anyone on your team?
20       MR. GARDNER:  Same objection.
21       A.  Yeah, I mean, I -- they likely
22   were, but, you know, I couldn't say for certain.
23       Q.  And so --
24       A.  The only job requirement -- there's
25   nobody responsible on my team, as part of their
```

Page 116

```
 1   job, to regularly file to the EIP reporting.
 2       Q.  I take it you did it, and saw some
 3   stuff you thought was interesting; is that
 4   right?
 5       A.  Yeah.
 6       Q.  And then are you the one who
 7   decided to reach out to them and ask questions
 8   about follow-up questions about stuff that they
 9   posted?
10       A.  Yeah.
11       Q.  And then do you remember anything
12   specific about the tactics they flagged in their
13   blog posts?
14       A.  I don't.
15       Q.  Who did you talk to at the EIP when
16   you reached out?
17       MR. GARDNER:  Objection to the form
18   of the question.
19       A.  I don't recall.
20       Q.  Was it Mr. Stamos?
21       A.  It could have been Alex, it could
22   have been Renée.  I forget, kind of, how they --
23   I forget how we connected with them.
24       Q.  Did you already know Alex Stamos
25   and Renée DiResta when these conversations
```

29 (Pages 113 to 116)

**BRIAN J. SCULLY  1/12/2023**

Page 117

1  started happening in the summer of '20?
2      A.  I knew Alex Stamos from previous --
3  from when he was at Facebook.  And then, as I
4  mentioned, Masterson and I went out to an event
5  that Stamos hosted when he got to the Stanford
6  Internet Observatory.  So I knew him.  Renée, I
7  think I may have had a conversation or two with,
8  prior, but I didn't know her as well as Alex.
9      Q.  You say you knew him when he was at
10  Facebook.  What was your interactions with him
11  then?
12      A.  He headed the team at Facebook that
13  we did the coordination for some of the initial
14  government industry meetings.  So if you recall
15  back then, essentially the first meeting was
16  back in 2018, Alex was the Facebook lead for
17  that meeting.
18      Q.  So he was the contact person at
19  Facebook that would be in those meetings that
20  involved CISA and ODNI and DOJ and the FBI?
21      A.  Correct.
22      Q.  I just want to flip one page in the
23  report.  Up here on the screen share, do you see
24  up here they have a comment that says:
25  Additionally, the Countering Foreign Influence

Page 118

1  Task Force, a subcomponent of CISA, aided in the
2  reporting process and in implementing resilience
3  efforts to counter misinformation; do you see
4  that sentence?
5      A.  I do.
6      Q.  I take it the counter -- countering
7  and foreign influence task force is now called
8  the MDM team that you lead; right?
9      A.  Yeah, that's correct.
10      Q.  Were you the leader of that team
11  then called the CFITF in 2020?
12      A.  I was.
13      Q.  Do you know what the report means
14  when at it says that the CFITF, which was your
15  team, aided in the reporting process?
16      MR. GARDNER:  Objection, calls for
17  speculation.
18      A.  Yeah, I -- I don't know,
19  specifically, what they're referencing.  My
20  assumption would be they're referencing a
21  switchboarding we discussed earlier.
22      Q.  Tell me about that switchboarding.
23  I take it your testimony earlier was that you --
24  you were switchboarding or routing
25  disinformation concerns to social media

Page 119

1  platforms and that there was coordination with
2  CIS and EIP on how they should be reported;
3  correct?
4      A.  No, that's not correct.
5      Q.  Okay.
6      A.  So I believe what my testimony said
7  earlier is that you would receive -- generally
8  receive reporting through one of three ways, one
9  of those was through the Center For Internet
10  Security, two-fifths of that we would then
11  forwarded to the platforms.
12      I don't recall any reporting
13  directly coming from EIP.  So generally
14  speaking, that's, you know, adding EIP into your
15  question I think is incorrect.
16      Q.  What were the other two ways, you
17  said there were three ways, one is you get
18  them --
19      A.  Yep.
20      Q.  -- through Center for Internet
21  Security, what are the other two?
22      A.  So the other two ways, sometimes
23  election officials would send them in to CISA
24  central, which is CISA's kind of ops center
25  block room type setup.  And then the third way

Page 120

1  was they would just send direct to a CISA
2  employee, often -- often Matt Masterson, who had
3  relationships with many of the election
4  officials.  So those were the principal ways we
5  received reporting from election officials.
6      Q.  So through the CIS, kind of
7  directly to -- was there a kind of e-mail
8  address for reporting misinformation that CISA
9  maintained?
10      A.  Not specific to misinformation.  It
11  was -- CISA central had their own e-mail
12  address, and obviously Matt had his.  We had an
13  internal CFITF e-mail address, but I don't
14  believe we -- we put that out for election
15  officials to send messages to, I don't recall us
16  doing that.
17      Q.  And then sometimes they would go to
18  straight to Mr. Masterson?
19      A.  Right.
20      Q.  And then I take it you -- did you
21  coordinate with CIS on what you were reporting
22  to social media platforms?
23      A.  Only in the sense that we would let
24  them know when we reported something to a
25  platform, again, to avoid duplication or, you

30 (Pages 117 to 120)

**BRIAN J. SCULLY  1/12/2023**

Page 121

1  know, most of the reporting that I recall in
2  2020 came through CIS.  And so we just wanted to
3  let them know that we were acting on what they
4  sent us.
5        For reporting that didn't come
6  through CIS, we would often let them know after
7  we had shared it with the platforms that we had
8  shared something with the platforms for their
9  arrangement.
10       Q.  And then I take it you said
11  earlier, your understanding is that CIS was
12  coordinating with EIP?
13       A.  Again, they had a relationship.  I
14  don't know how I would characterize what they
15  were -- what they were doing with the EIP.
16       Q.  Do you know what interactions they
17  had, at all, other than the ones we talked about
18  between CIS and EIP?
19       A.  I mean, I can't specifically say
20  what they were doing.  They had a relationship.
21  They shared information.  I don't know kind of
22  the extent of that or kind of what their
23  policies and procedures were for what they were
24  doing.  So I know they were sharing stuff.  I
25  don't know what, how or when, towards the

Page 122

1  questions.
2        Q.  I'm going to jump ahead to page 35
3  of this report.
4        A.  35?  All right.
5        Q.  That's going to be on page 53 of
6  the PDF?
7        A.  Almost there, sorry.  All right.
8  I'm on 35.
9        Q.  If you look here on the last
10  sentence before that heading on the page, it
11  says, according to the EIP, interestingly, just
12  one percent of tickets related to COVID-19, and
13  less than one percent related to foreign
14  interference; do you see that?
15       A.  I do.
16       Q.  Is that consistent with your
17  understanding of the reports that you were
18  making to social media platforms in that
19  timeframe that only a small minority related to
20  before and afters?
21       MR. GARDNER:  Objection, lack of
22  foundation, calls for speculation.
23  BY MR. SAUER:
24       Q.  If you know.
25       A.  So CISA does not do attribution.

Page 123

1  We didn't do analysis of what we received from
2  election officials.  So we would not know what
3  percentage were foreign derived.
4        Q.  So you would receive reports and
5  you would forward them onto social media
6  platforms, you know, for consideration under
7  their content moderation policies, without
8  assessing whether they were originated from
9  foreign or domestics sources?
10       A.  That's correct.
11       Q.  In other words, a report would come
12  in, and you, like, didn't take steps to see
13  whether this came from a foreign or domestic
14  source?
15       A.  Correct.
16       Q.  You would just pass it along to the
17  social media platforms?
18       A.  Right.
19       Q.  Are you familiar with the gateway
20  pundit?
21       A.  Am I familiar with it?  Yeah.
22       Q.  How do you know about it, what is
23  the gateway pundit, on your understanding?
24       A.  It's some sort of a website.
25       Q.  How do you know about it?

Page 124

1        A.  I believe they've written some
2  articles about CISA.
3        Q.  How did that get on your radar
4  screen?
5        A.  Articles probably in our clips.
6        Q.  Do you remember hearing --
7        A.  I don't -- I don't --
8        Q.  Go ahead.
9        A.  I don't recall specifically how
10  they got on my radar.
11       Q.  Do you remember hearing of them in
12  any other connection, other than writing
13  articles about CISA?
14       A.  I do think of the general kind of
15  recall.  Yeah, I think probably just as a
16  general fact that it had news on it I think is
17  probably the extent of what I know.
18       I'm sure I've just seen them, you
19  know, in reading other stories and things like
20  that, I don't -- I don't -- honestly, I don't
21  know how I came to know them.
22       Q.  Are you aware of anyone at CISA
23  raising concerns that the gateway pundit might
24  be spreading misinformation or disinformation?
25       A.  No.

31 (Pages 121 to 124)

**BRIAN J. SCULLY  1/12/2023**

Page 125

```
1           Q.  I'm going to jump far down in this
2    document to page 196.
3           A.  Let me see if there's a quick way
4    for me to get down there.
5           Q.  Yeah, it's page 213 of the PDF.
6           MR. GARDNER:  I think you can go
7    here.  That's a lot.
8           THE WITNESS:  Sorry.
9           MR. GARDNER:  Yeah, you have to
10   scroll.  All right, John, we're getting there.
11          THE WITNESS:  It's two what in the
12   PDF?  I'm sorry.
13   BY MR. SAUER:
14          Q.  It's page 214 of the PDF.
15          A.  Okay.  196.  Almost there.  Sorry.
16   Okay.  Yep.
17          Q.  Okay.  Do you see here, there's a
18   whole section that begins:  The gateway pundit
19   interval?
20          A.  I see that.
21          Q.  In the first sentence of that says:
22   The gateway pundit was among the most active
23   spreaders of election-related misinformation in
24   our analyses; correct?
25          A.  That's what it says.
```

Page 126

```
1           Q.  Does that ring a bell, at all?  Do
2    you recall anyone at CISA ever raising the
3    concern that the gateway pundit was a spreader
4    of so-called election-related misinformation?
5           MR. GARDNER:  Objection.  Asked and
6    answered.
7    BY MR. SAUER:
8           Q.  Do you recall that?
9           A.  Yep.  As I said earlier, I don't
10   recall any examples of that, no.
11          Q.  Jump ahead to page 211.  This is
12   page 229 of the PDF.
13          A.  Almost there.  Okay.  211, policy.
14          Q.  Yeah, chapter six.
15          A.  Gotcha.
16          Q.  There at the introduction, at the
17   very beginning, it says:  Platform policies
18   establish the rules of participation in social
19   media communities; correct?
20          A.  Yes.
21          Q.  It says:  Recognizing the
22   heightened rhetoric and the use of mis and
23   disinformation during the 2020 election, all the
24   major platforms made significant changes to
25   election integrity policies, both as the
```

Page 127

```
1    campaigns kicked off and through the weeks after
2    election day; correct?
3           A.  Yes.
4           Q.  And let me ask you this:  Are you
5    aware of social media platforms like Twitter and
6    Facebook and YouTube and so forth changing their
7    election integrity policies to limit
8    election-related misinformation and
9    disinformation during 2020?
10          A.  I'm aware that they changed
11   policies.  I don't know -- again, I don't know
12   that they needed mis and disinformation as their
13   terminology, so I don't want to go there.  But I
14   do recall that they changed policies in 2020
15   related to election security.
16          Q.  How did you know that, at the time,
17   did they report it to you?
18          A.  They -- they did talk about some of
19   it in our regular sync meetings.  And then I
20   believe there's some media coverage and public
21   statements that they made about their changes.
22          Q.  In the sync meetings, were there
23   any questions on the government side?  Did the
24   government ask:  What are you doing to change
25   your policies?
```

Page 128

```
1           A.  I don't recall that.  I think,
2    generally speaking, the platforms would just
3    talk, you know, on a regular course of the
4    conversation they would -- that would be one of
5    their briefing points, that they were making
6    significant changes.  But it wasn't an essential
7    part of the conversations, generally speaking.
8           Q.  Were you aware of anyone in the
9    federal government kind of asking or encouraging
10   them to change their content moderation policies
11   to address election integrity?
12          A.  Not that I'm aware of, no.
13          Q.  Do you recall, was it placed on the
14   agenda for the sync meetings?
15          A.  Was what placed on the agenda?
16          Q.  Changes in content moderation
17   policies.
18          A.  Not that I recall.
19          Q.  Do you know how it came up in those
20   meetings?
21          A.  Again, I think, you know, part of
22   the meetings were generally different
23   participants providing updates on what they were
24   doing relating to election security.  And my
25   recollection is, is that platforms might raise
```

**LEXITAS LEGAL**
**www.lexitaslegal.com**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**

**BRIAN J. SCULLY  1/12/2023**

Page 129

1  those sorts of things during that portion of the
2  agenda.
3      Q.  Did they ever separately e-mail you
4  to notify you of a content policy update?
5      A.  Not that I recall, though it's
6  certainly possible.  You know, I would get press
7  releases that they would put out sometimes, they
8  would forward to me.  But I don't recall
9  specific e-mail on that.
10      Q.  Do you know whether anyone at the
11  Center For Internet Security discussed content
12  policy changes with the social media platforms?
13      A.  I don't.
14      Q.  Do you know whether anybody at CISA
15  did so during the 2020 election cycle?
16      A.  Not that I'm aware of, no.
17      Q.  How about Mr. Masterson?
18      A.  Not that I'm aware of.
19      Q.  What was Mr. Masterson's title or
20  what was his role at CISA during this timeframe
21  in 2020?
22      A.  He was the senior -- I don't know
23  what his exact title was, but he was a senior
24  election security person at CISA.
25      Q.  So did you report to him when you

Page 130

1  were the head the countering foreign influence
2  task force?
3      A.  No.  Matt was what I call a
4  political appointee, so for organizational
5  reasons I reported up to Geoff and Geoff
6  reported to a normal chain of command.  So there
7  was something weird about Matt being a political
8  appointee and where he could sit in the org
9  chart, so none of us technically reported up to
10  him.
11      Q.  So he was -- but he was -- as a
12  political appointee is higher than you in the
13  org chart?
14      A.  Yeah.
15      Q.  Okay.  And did you coordinate with
16  him on the sort of -- sort of disinformation and
17  misinformation related activities that CISA was
18  engaged in, in 2020?
19      MR. GARDNER:  Objection, vague.
20      A.  Yeah, could you be a little more
21  clear in what you're asking, please?
22      Q.  Well, did you work with Matt
23  Masterson on election disinformation and
24  misinformation related issues in 2020?
25      A.  Yes.

Page 131

1      Q.  Okay.  What sort of work did you do
2  with him?
3      A.  Again, a majority of our work, as I
4  mentioned earlier, was resilience building, so
5  trying to develop products, public education,
6  public awareness, product to help election
7  officials, those sort of things.  And then I
8  would have discussed with him -- he would have
9  been familiar with the switchboarding work that
10  we were doing.
11      Q.  Did he participate in the
12  switchboarding work?
13      A.  Not beyond when he would receive
14  e-mails, he forwarded them to us.
15      Q.  Well, he would send them to you to
16  be switchboarded, so to speak?
17      A.  Yeah, I mean, he would send them to
18  me or the team e-mail address.
19      Q.  Oh, and you mentioned earlier that
20  he had close relationships with social media
21  platforms?
22      A.  No, I don't think I ever said that.
23  He had close relationships with election
24  officials.
25      Q.  Oh, okay.  Did you also mention

Page 132

1  that he was in -- he had contacts with social
2  media platforms?
3      A.  Again, he would have participated
4  in the sync meetings that I talked about, the
5  government industry syncs.  If we had a briefing
6  or something at other meetings he would likely
7  participate.  Those are the only communications
8  I'm aware of, but he may have had others.  I'm
9  not sure.
10      Q.  Are you aware of anyone at the
11  Election Integrity Partnership communicating
12  with the social media platforms about changing
13  their policies to, you know, kind of restrict
14  election-related misinformation?
15      A.  I am not, no.
16      Q.  Is that something, that idea of
17  advocating to the social media platforms to
18  adopt more restrictive policies on
19  election-related misinformation, is that
20  something that's -- that you recall coming up in
21  any meetings or discussions in 2020?
22      A.  So did we ever have -- so one, if
23  you can clarify who the meetings were with, that
24  you're asking about.
25      Q.  I'm asking --

33 (Pages 129 to 132)

**BRIAN J. SCULLY  1/12/2023**

Page 133

1       A.  Or the general -- did anyone at
2    CISA meet to discuss changes in platform policy?
3    To the best of my recollection, the answer is
4    no, we never meant to discuss asking the
5    platforms to make any changes to their policies.
6       Q.  Do you recall -- I take it that was
7    a response as to internal meetings, are you
8    aware of any meetings with anyone external to
9    CISA to discuss, you know, changes in platform
10   policies?
11      A.  I'm not aware of any external
12   meetings along those lines.
13      Q.  Do you recall any communications of
14   any kind that related to that in 2020?
15      A.  Any communications that related to
16   what?  To -- to platforms changing their
17   policies?  Any communications -- with -- I mean,
18   that's a very broad -- I mean, it's possible
19   that somebody at CISA, along the way, had a
20   conversation about that, but I don't recall any
21   specific conversations where we sat down to talk
22   specifically about that.  I don't -- I don't
23   recall any of that.  It's a very broad answer,
24   so I don't want to say definitively that nobody
25   at CISA ever had any conversations in 2020 about

Page 134

1    policy changes.
2       Q.  How about you, do you recall
3    communicating with anyone outside of CISA about
4    social media platform policy changes in 2020?
5       A.  I don't.  I don't.
6       Q.  Have you ever heard of the Virality
7    Project?
8       A.  I have.
9       Q.  What is the Virality Project?
10      A.  My understanding, that's Stanford's
11   attempt to mimic the EIP for COVID.
12      Q.  How do you know about that?
13      A.  Good question.  I believe they sent
14   me some of their public reports.
15      Q.  The Virality Project did?
16      A.  Yes.
17      Q.  Who -- who would have sent those to
18   you?  Was it the same people involved in -- same
19   people involved in the Election Integrity
20   Partnership?
21      A.  I think Alex was involved, and I
22   believe Renée was involved.  I don't know if the
23   rest were similar or not.  I don't recall who
24   was sending it, the exact individual who was
25   forwarding me their reports.

Page 135

1       Q.  Was that --
2       A.  And to be honest, I'm not sure if
3    they sent them directly to me or if they went to
4    somebody else in government who forwarded it to
5    me.
6       Q.  Okay.  Was there -- did you have an
7    oral conversation with anyone associated with
8    the Virality Project about what they do?
9       A.  Not specifically about what they
10   do, but I did have some conversations where they
11   were asking us for -- asking me, not us -- for
12   any connections I had with HHS or CDC.
13      Q.  And did you provide them with
14   connections?
15      A.  I did not.
16      Q.  What did you -- what did you say in
17   that conversation?
18      A.  I don't recall that I had any --
19   any relevant points of contacts to provide them.
20      Q.  Did you have any other
21   conversations with them relating to the Virality
22   Project?
23      A.  Not -- not substantial.  I'm trying
24   to think.  I mean, I -- most of that work took
25   place when I was over at the National Security

Page 136

1    Council, so I had substantially less
2    communication.
3       But I believe there were some
4    informal kind of not work conversations that I
5    may have had with Alex, in particular, and maybe
6    Renée, as well.
7       Q.  You believe when you were detailed
8    to the National Security Council you had
9    conversations with Alex Stamos and Renée DiResta
10   about the Virality Project?
11      A.  Just in the sense that it was
12   something that they were doing, and that was
13   when I think Alex asked if I had any contacts is
14   when I was at the National Security Council.
15      Q.  Did you and Alex discuss anything
16   else about it?  And let me ask you this:  Did he
17   give you any kind of overview what they planned
18   to do in the Virality Project?
19      A.  Not beyond that it was similar to
20   what they did with the -- with the EIP, that was
21   the extent.  We didn't get into any details or
22   anything like that.
23      Q.  And he asked you for contacts at --
24   at kind of federal kind of health agencies?
25      A.  Yeah, that's my recollection of

34 (Pages 133 to 136)

**BRIAN J. SCULLY  1/12/2023**

---

Page 137

1   what he was asking for.
2        Q.  And did you have any other
3   discussions with him that related to Virality
4   Project?
5        A.  Not that I recall.  I don't know
6   that we ever got briefed on their work, so I
7   don't think there was anything like that.  So I
8   think to the extent was, you know, that
9   conversation about that, and then, like I said,
10  I believe I received some of their reports, the
11  public reports.
12       Q.  And you say either they or someone
13  within government forwarded you with their
14  public reports?
15       A.  Right, yeah, I don't recall exactly
16  how I got them.  I think it was from -- the
17  Virality Project, itself, but I'm not a hundred
18  percent certain of that.
19       Q.  And let me ask you this:  Was CISA
20  active in -- in -- or take any activities to
21  follow or address information -- misinformation
22  relating to COVID-19?
23       A.  I believe we did at least one
24  product for our critical infrastructure
25  stakeholders related to COVID-19.

---

Page 138

1        Q.  How about --
2        A.  It should be on our -- sorry.
3            It should be on our public website.
4        Q.  How about switchboarding, did CISA
5   do any switchboarding related to COVID-19
6   misinformation concerns?
7        A.  No.
8        Q.  And again, the switchboarding
9   that -- when I use that term I'm using your term
10  for kind of routing disinformation concerns and
11  misinformation concerns to the social media
12  platforms; correct?
13       A.  Correct, yeah, as far as I'm aware
14  there was no -- there was none of that occurred
15  related to COVID.
16       MR. SAUER:  I'm going to pull up
17  Exhibit 2 on the screen share, which has also
18  been e-mailed to you, which is the Virality
19  Project's public reporter.
20            (Exhibit No. 2 was marked for
21  identification.)
22       MR. GARDNER:  Hold on one second,
23  John.
24       MR. SAUER:  Which is the Virality
25  Project's public report, Virality,

---

Page 139

1   V-i-r-a-l-i-t-y.
2        MR. GARDNER:  Yeah, hold on, John.
3   Hold on, John.  Hold on.  Got it.
4   BY MR. SAUER:
5        Q.  You mentioned -- before we turn to
6   the document, you mentioned that you had
7   conversations with Alex Stamos and Renée DiResta
8   about the Virality Project.  What were the
9   nature of the conversations with Renée DiResta?
10       A.  They were at the same time as the
11  conversations with Alex.  I believe it was
12  similar content.  And I don't -- it wasn't a
13  lengthy conversation, it was just, hey, we're
14  doing something, I believe.
15       Q.  Mm-hmm.  Did she ask you for any
16  context or anything like that?
17       A.  I'm sorry, could you repeat that?
18       Q.  Did she ask you for any context or
19  anything like that?
20       A.  Not that I recall, but I think she
21  was with Alex when we had that conversation.
22       Q.  So you believe it was the same
23  conversation with Alex and Renée happened at the
24  same time?
25       A.  Yeah, I believe we were having a

---

Page 140

1   meeting, they were briefing us about -- so I
2   think this was connected to when I got the brief
3   on the report, the election report, when I was
4   at the White House.  I think that's when they
5   mentioned that they were going to potentially do
6   something similar around COVID, and asked if we
7   had any contacts.
8        Q.  And did you -- and I take it you
9   said earlier you didn't have any contacts;
10  right?
11       A.  Yeah, I didn't have any good
12  contacts at CDC or HHS.
13       Q.  Did you ask anyone else in
14  government if they had contacts that would be
15  useful to them?
16       A.  I don't recall doing that, so I
17  don't think so.
18       Q.  Did you notify people at the White
19  House about, you know, the briefing you got from
20  them or the information you got from them?
21       A.  So I'm sure I talked to my
22  supervisor about the election briefing.  I may
23  have mentioned, although I don't recall if I did
24  or not, that they were going to do something
25  similar for -- for COVID.

BRIAN J. SCULLY  1/12/2023

Page 141

1  **Q.  What did you report back about the**
2  **election briefing?  I take it that's the long**
3  **fuse report from the Election Integrity Project**
4  **right, or partnership; right?**
5        A.  Yeah, just to the extent we -- just
6  in general, we met with them kind of shared kind
7  of their lessons learned, kind of what some of
8  their big takeaways were.  I don't recall what
9  the specifics were.  It was a brief kind of
10  conversation in passing.
11        **Q.  Who was your supervisor at that**
12  **time?**
13        A.  Kaitlin Gegovich (phonetic).
14        **Q.  Looking at the Virality Project**
15  **report, skipping ahead to page 4 of the report?**
16        A.  4, 4, or Roman numeral four?
17        **Q.  Regular four.**
18        A.  Gotcha.
19        **Q.  Is there's recommendations --**
20        A.  Okay.  Okay.
21        **Q.  Is there a recommendation here to**
22  **implement misinformation and disinformation**
23  **center of excellence housed within the cyber**
24  **security infrastructure security agency; do you**
25  **see that?**

Page 142

1        A.  I do.
2        **Q.  So Stanford recommends that the**
3  **government create a misinformation and**
4  **disinformation center of excellence housed**
5  **within CISA; correct?**
6            MR. GARDNER:  Objection.  He said
7  it calls for speculation.
8        A.  That's what the sentence says.
9        **Q.  Did they ever discuss --**
10        A.  What they meant by that, I don't
11  know what they meant.
12        **Q.  Did they ever -- did Alex Stamos or**
13  **Renée DiResta ever discuss that with you, you**
14  **know, having CISA take on a new and more**
15  **formalized roll with respect to misinformation**
16  **and disinformation?**
17        A.  Not that I recall.  I don't think I
18  was ever briefed on this report, so I don't
19  recall having that conversation.
20        **Q.  Do you know of anyone -- they**
21  **talked to anyone else at CISA about that?**
22        A.  I don't know.  I don't know.
23        **Q.  By the time of this report, in**
24  **2021, Matt Masterson was actually working for**
25  **the Stanford Internet Observatory; correct?**

Page 143

1        A.  I believe so, yeah.
2        **Q.  Have you ever read this report**
3  **before?**
4        A.  I think I read a little bit of it,
5  but I don't think I read the whole -- I don't
6  recall.  I haven't read the whole thing.  I
7  shouldn't say I don't recall.  I haven't read
8  the whole thing.
9        **Q.  Do you know when you read it?**
10        A.  I don't.
11        **Q.  Do you know why you read it?**
12        A.  I mean, I would read it, generally
13  speaking, I'm interested in understanding what
14  researchers find related to mis, dis and
15  mal-information.
16        **Q.  I'm sorry, relating to what?**
17        A.  What researchers find, understand,
18  what they're learning relating to mis, dis and
19  mal-information.
20        **Q.  And did you have any takeaways from**
21  **this report, that informed your work at the MDM**
22  **team?**
23        A.  I don't think there's anything
24  specific that we took from this, from a product
25  standpoint or anything like that.

Page 144

1        **Q.  Do you know how -- do you know how**
2  **the Virality Project tracked, you know,**
3  **misinformation narratives about COVID vaccines**
4  **on social media?**
5        A.  I don't.
6        **Q.  I'm going to jump ahead to page 30**
7  **of the report, very usefully that's also page 30**
8  **of the PDF.**
9        A.  Making things easier.
10        **Q.  I think they learned a lesson after**
11  **the first report.**
12        A.  Yeah.
13        **Q.  Reference here to your --**
14        A.  Okay.  Got you.
15        **Q.  There's a reference here to tiered**
16  **ticket analysis, it says:  Their analysis**
17  **consisted of lateral -- lateral research that**
18  **used Crowd Tangle and Google searches to assess**
19  **the spread of the incident or content and so**
20  **forth; do you see that?**
21        A.  I do.
22        **Q.  What Crowd Tangle is?**
23        A.  I believe Crowd Tangle was a
24  Facebook-owned social media monitoring service.
25        **Q.  And is that something that's**

36 (Pages 141 to 144)

BRIAN J. SCULLY  1/12/2023

Page 145

1    available to the public?  Can the public kind of
2    subscribe to Crowd Tangle?
3            MR. GARDNER:  Objection.
4    BY MR. SAUER:
5        Q.  Or is it kind of a --
6            MR. GARDNER:  Objection.  Sorry.
7    Sorry, thought you were done, John, please, are
8    you done?
9            MR. SAUER:  Yeah.
10           MR. GARDNER:  Sorry, objection,
11   lack of foundation.
12       A.  So I don't know -- I don't know the
13   nature of Crowd Tangle, if it's publicly
14   available or not.
15       Q.  Have you ever heard of it before?
16       A.  I have.
17       Q.  In what connection have you heard
18   of it?
19       A.  Just talking, you know, in the
20   general, mis, dis, mal-information research
21   community, I know it's a tool that some
22   researchers use.
23       Q.  Okay.  Next page of the report,
24   there's a reference to collecting video --
25   there's a reference to -- it says:  The

Page 146

1    engagement data or video view data for links
2    associated with each ticket is collected
3    differently depending on the social media
4    platform in question, colon; do you see that?
5        A.  I do.
6        Q.  It talks about how Facebook and
7    Instagram, they used Crowd Tangle API; right?
8        A.  I see that, yeah.
9        Q.  What is -- do you know what API
10   stands for?
11       A.  I don't.
12       Q.  Okay.  Same question, then, as to
13   it says Twitter API, YouTube, API, do
14   you know what API refers to?
15       A.  I --
16           MR. GARDNER:  Objection, asked and
17   answered.
18       A.  Yeah, I don't know, that's a little
19   above my technical knowledge.
20       Q.  Let's jump ahead to page 143.
21       A.  Okay.
22       Q.  Okay.  Here under:  Maintain clear
23   channels of communication across all levels of
24   government; do you see that?
25       A.  I do.

Page 147

1        Q.  And then there in this sentence it
2    says -- or sorry, in this paragraph -- it says:
3    For example, as voting-related mis and
4    disinformation arose in the 2020 presidential
5    election, the Election Infrastructure
6    Information Sharing and Analysis Center, EI-ISAC
7    served a critical role in sharing information in
8    the Election Integrity Partnership in pushing
9    its rapid response analysis back out to election
10   stakeholders across the states; right?
11       A.  That's what the sentence says,
12   yeah.
13       Q.  And I take it, we asked you this
14   before, but are you aware of the EI-ISAC
15   sharing -- serving a critical role in sharing
16   information with the EIP during 2020?
17       A.  I -- I'm not.  My understanding and
18   recollection it was Center For Internet
19   Security, it's of course possible that the
20   Stanford folks are conflating the EI-ISAC with
21   the Center For Internet Security, kind of we
22   talked about earlier, they're kind of part of
23   the same organization, but I'm not aware of
24   those sorts of direct communications with
25   EI-ISAC.

Page 148

1        Q.  What is the difference between the
2    EI-ISAC and the CIS?  My understanding was that
3    the CIS was a non-profit, and EI-ISAC is kind of
4    like a program that it runs, that allows for
5    information sharing among state and local
6    election officials, is that the distinction of
7    what's the difference?
8            MR. GARDNER:  Objection, form.
9    BY MR. SAUER:
10       Q.  You may answer.
11       A.  What's the difference between what,
12   CIS and EI-ISAC.
13       Q.  Yeah, what's the distinction
14   between them.
15       A.  I mean, I don't -- to be honest, I
16   don't fully know what the distinction is, my
17   understanding is it's roughly, as you kind of
18   stated it, right, is CIS is an umbrella
19   organization that has organizations underneath
20   it.  I don't know what the operating
21   relationship is between the EI-ISAC and CIS.  If
22   it's a direct line, I just don't know how they
23   operate that way.
24           But my understanding is that the
25   CIS has its own staff, and that those staff and

37 (Pages 145 to 148)

**BRIAN J. SCULLY  1/12/2023**

Page 149

1  their own funding, and that that staff and
2  funding is what supported the 2020 election
3  switchboarding work.
4      **Q.  So, in other words, you think the**
5  **CIS was -- was switchboarding to EIP during**
6  **2020?**
7      A.  I'm not sure that's what I said.  I
8  mean, the relationship that I understood was
9  between CIS and EIP, what specifically they were
10  doing as part of that relationship I'm not --
11  again, I don't necessarily want to speak to,
12  because I'm not 100 percent sure how it worked.
13      **Q.  Well, is the EI-ISAC kind of a**
14  **vehicle in which CIS receives reports of**
15  **misinformation and disinformation from state and**
16  **local election officials?**
17          MR. GARDNER:  Objection, lack of
18  foundation, calls for speculation.
19      A.  Yeah, I don't know how -- how the
20  EI-ISAC played in this switchboarding role.
21      **Q.  Down here at the bottom of the same**
22  **page there's another reference to the**
23  **recommendations to implement a misinformation**
24  **and disinformation center of excellence housed**
25  **within the federal government; correct?**

Page 150

1      A.  Yeah.
2      **Q.  And that there in that paragraph it**
3  **specifically recommends that it be housed within**
4  **the federal government at CISA; correct?  See**
5  **where I've highlighted?**
6      A.  Yeah, I'm just reading that now.
7          Yeah, that's what the sentence
8  says, yeah.
9      **Q.  Do you have any recollection -- let**
10  **me ask you this:  I think you testified earlier**
11  **you don't remember discussing that**
12  **recommendation with anyone; correct?**
13      A.  Correct.
14      **Q.  Okay.  How about any discussions of**
15  **changing or increasing CISA's role in -- in kind**
16  **of tracking or monitoring online dis and**
17  **misinformation?**
18          MR. GARDNER:  Objection to the
19  extent that answers calls for the disclosure of
20  information, subject to the local process
21  privilege.  I would instruct the witness not to
22  answer.  To the extent that you can answer that
23  without disclosing information related to the
24  privilege you can do so.
25          THE WITNESS:  I'm sorry, can you

Page 151

1  repeat the question, just to make sure I
2  understand it.
3          MR. SAUER:  Let's break it down.
4  BY MR. SAUER:
5      **Q.  Do you recall any discussions with**
6  **anyone outside of CISA about expanding CISA's**
7  **role in addressing misinformation and**
8  **disinformation concerns on social media?**
9      A.  CISA's role, expanding CISA's role,
10  yeah.  Yes.
11      **Q.  Okay.  What conversations do you**
12  **remember about that?**
13      A.  So we were piloting a capability
14  that would allow us to monitor narratives
15  online.
16      **Q.  Now, when was this piloted?**
17      A.  I believe it was -- we did one
18  short pilot, I believe, in summer 2020, so I
19  believe it was all 2020.
20      **Q.  What -- what -- what sort of**
21  **pilighting -- can you explain what you mean by**
22  **pilighting -- I'm sorry -- piloting something to**
23  **track mis and disinformation online?**
24      A.  So it wasn't necessarily to track,
25  it was to understand the information

Page 152

1  environment, what narratives were -- were kind
2  of perking up.  The piloting was, as I'm sure
3  you're aware, there was extensive -- extensive
4  privacy rules around that sort of work, and so
5  it was just kind of piloting it to see if it
6  would work, if it did what we wanted it to do.
7          In particular, we were trying to
8  predict the likely impact of narratives on
9  stakeholders.  And so we weren't sure if the
10  predictive activity that we were doing actually
11  worked, so we wanted to test that, and then we
12  wanted to just get a sense of the privacy and
13  other kind of rules that might be in play and if
14  it's something that we could -- we could do.
15      **Q.  What exactly was the pilot?  I**
16  **mean, what -- what -- did you have a computer**
17  **program that would, you know, go out and track**
18  **what people were saying on social media?  What**
19  **exactly was the pilot?  I don't understand.**
20          MR. GARDNER:  I'll object on the
21  grounds that that calls for disclosure of
22  information subject to deliberative process
23  privilege.  I instruct the witness not to
24  answer.
25          MR. SAUER:  Yeah, the deliberative

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 153

1   process privilege only applies when there is no
2   indication of any government wrongdoing.  Our
3   court has already found that there's at least a
4   substantial concern that there were significant
5   first amendment violations, here, so I ask you
6   to withdraw the objection.
7           MR. GARDNER:  I understand your
8   position and I decline your invitation.
9   BY MR. SAUER:
10      Q.   Are you declining to answer the
11  question, sir?
12      A.   Yes.
13      Q.   So in that case, can you kind of
14  explain more generally what this pilot project
15  involved in 2020, to track social media on the
16  internet?
17          MR. GARDNER:  To the extent that
18  that calls for the disclosure of information
19  subject to the deliberative process privilege I
20  instruct the witness not to answer.
21          To the extent that you can answer
22  that question at a high level of generality, you
23  may do so.
24      A.   Yeah, so as I mentioned, our
25  mission is to build the variance to MDM

Page 154

1   targeting critical infrastructure.
2           So essentially what we were trying
3   to understand is if we could predict the likely
4   impact of MDM narrative in terms of increasing
5   risks to critical infrastructure by a better
6   understanding the information environment, so
7   the pilot was essentially trying to test that
8   theory out.
9       Q.   Yeah, kind of, again, at a high
10  level of generality, how do you test that theory
11  out?
12      A.   So the predictive model essentially
13  was to say -- say you had an image, it would
14  pull particular components of an image out and
15  based on -- I don't want to get too -- I don't
16  know that I understand the black box that they
17  used all that well, if I were trying to test it,
18  but there was a methodology that they used to do
19  that, and so we were just trying to see if that
20  methodology, in fact, worked from a
21  disinformation standpoint.
22      Q.   When you say:  They, who's they?
23  Is this people at CISA or is there a contractor
24  that created a product?
25      A.   It was a contractor.

Page 155

1       Q.   What contractor?
2       A.   I believe the company was Limbik.
3       Q.   Sorry, can you spell that?
4       A.   L-i-m-b-i-k.
5           And then there was a separate
6   pilot, that's more generically around
7   situational awareness of potential narratives
8   online, that didn't feed into the -- into the
9   predictive modeling.
10      Q.   Was that a Limbik product, too,
11  that second pilot?
12      A.   No, that was a -- that was a
13  different contractor, and I forget who it was.
14      Q.   Did either of these pilots ever get
15  any actual programming, something that you used?
16      A.   No.  The rules we operated the
17  pilot on was that none of it could be used for
18  operational purposes, because there's privacy
19  requirements around that.  And so essentially we
20  were just using it for internal deliberations in
21  terms of if the -- if the tools were helpful or
22  not.
23      Q.   Did you conclude that they were
24  helpful?
25          MR. GARDNER:  Object on the grounds

Page 156

1   of deliberative process privilege.  I instruct
2   the witness not to answer.
3           MR. SAUER:  To be clear, I'm asking
4   for the conclusion, not the deliberation.
5   BY MR. SAUER:
6       Q.   Did you conclude that they would be
7   useful?
8           MR. GARDNER:  Same objections, same
9   instructions.
10          THE WITNESS:  Yeah, I'm not going
11  to answer.
12          MR. SAUER:  I've e-mailed around
13  Exhibit 9.
14          (Exhibit No. 9 was marked for
15  identification.)
16  BY MR. SAUER:
17      Q.   And if you have a minute to look at
18  it, I'm also putting on the screen share, it's a
19  collection of e-mails from October of 2020,
20  produced by the government, involving CISA.  And
21  I think they relate to the switchboarding you
22  testified there about earlier.
23          Do you see the -- the document?
24      A.   I do.
25      Q.   Just look here on the first page,

**BRIAN J. SCULLY  1/12/2023**

Page 157

1    there's an e-mail, if you look here, kind of on
2    Thursday, October 1st, at 4:23 p.m., it shows
3    misinformation reports sending an e-mail to you,
4    to CISA central, which I think you mentioned
5    earlier, to CFITF e-mail address, and -- and
6    misinformation reports; do you see that?
7        A.  I do.
8        Q.  And this is a -- I take it, some
9    report that relates to misinformation in social
10   media from CIS; correct?
11       A.  Let me just scroll to the beginning
12   of the e-mail chain.
13           Yeah, this is a report I received
14   from CIS.
15       Q.  And when CIS e-mailed you this
16   report, if you look here, towards the top or
17   right in the middle of the first page, CIS --
18   first of all, it's signed by Walter Oberes and
19   Aaron Wilson; correct?
20       A.  Yeah.
21       Q.  And that Aaron, is that the Aaron
22   you talked about earlier, as your CIS contact?
23       A.  It is, correct.
24       Q.  And how about -- who's Walter
25   Oberes?

Page 158

1        A.  I don't know.
2        Q.  Okay.  And he -- they say:
3    Brian -- referring to you -- we know many are
4    already aware of this case, but the impact seems
5    to be escalating.  Our hope is the platforms can
6    do more to take down the misinformation;
7    correct?
8        A.  That's what this says, correct.
9        Q.  And then it goes on to say:  The
10   EIP has been tracking this spread under ticket
11   EIP-243, and has more examples; correct?
12       A.  Correct.
13       Q.  Did they commonly tell you when the
14   EIP was tracking online misinformation, as well
15   as CIS?
16       A.  I don't think that was common, no.
17       Q.  Okay.  Were you aware, at the time,
18   of what an EIP ticket was?
19       A.  I understood that EIP was using a
20   ticketing system.  That's the extent of it, so
21   that's what I assumed it was.
22       Q.  And how did you know that?
23       A.  That they were using a ticketing
24   system?
25       Q.  Yeah.

Page 159

1        A.  So as I mentioned earlier, we did
2    get some briefs from them when they were setting
3    things up, to let us know how they would work,
4    and there was mention of a ticketing system
5    during that, those conversations.
6        Q.  When you received this report you
7    forwarded it onto Facebook, correct, directly
8    above?
9        A.  I did.
10       Q.  And you said --
11       A.  Correct.
12       Q.  And you said:  This is not
13   Facebook-related reporting, but thought it would
14   be of interest to your team; right?
15       A.  Right.
16       Q.  Why did you forward it onto
17   Facebook if it appears to relate to tweets or
18   Twitter, as opposed to Facebook?
19       A.  Well, it related to Twitter and I
20   believe YouTube, if I'm reading this correctly.
21       Q.  Yeah, why did you forward it onto
22   Facebook?
23       A.  There's a lot of ways that people
24   generate traffic to YouTube, in particular, but
25   Twitter, as well, is by posting it across

Page 160

1    platforms.
2            So something like this, it would
3    sometimes share across other platforms that we
4    thought there might be -- it might be relevant
5    content showing up on their platforms.
6        Q.  In other words, if the
7    disinformation or misinformation might be
8    spreading to other platforms you would notify
9    not just the platform reported, but other
10   platforms, as well, so that they could be aware
11   of this content; is that what you did?
12       A.  Yeah.  So if I'm reading this
13   correctly, it sounds like it literally jumped
14   platforms.  So maybe I'm misreading.  And so,
15   yeah, sometimes we would just -- we would share.
16       Q.  When you say:  We would share, you
17   mean you would share it with other platforms
18   than the one that was currently hosting the
19   reported content?
20       A.  Correct.
21       Q.  Okay.  Just scrolling down a few
22   pages, there a page with a Bates number 9676 at
23   the bottom.
24       A.  9676.
25       Q.  It's page 7 of the PDF.

**BRIAN J. SCULLY  1/12/2023**

Page 161

1    A.  Let me just make sure I got the
2  right one.  Got it.
3    Q.  And again, on this one, here's
4  another e-mail, and you said:  Hi Richard, this
5  is not Google-specific reporting, but thought it
6  might be of interest to your team; correct?
7    A.  Correct.
8    Q.  And there's this other situation
9  where a misinformation report had come in that
10  related to a content of other platforms, and you
11  shared it with a different platform; right?
12    A.  This looks like the same example we
13  talked about above.
14    Q.  Oh, yeah, because this is the one
15  being tracked under ticket EIP243?
16    A.  I believe it's the same.  Reading
17  the e-mail it looks the same.
18    Q.  Is this something that was kind of
19  a common practice when you were performing this
20  switchboarding function that you described in
21  2020, that you would report misinformation
22  concerns, not just platform directly affected,
23  but other platforms, as well, to get ahead of
24  it, so to speak?
25    MR. GARDNER:  Objection, asked and

Page 162

1  answered.  You can answer.
2    A.  I wouldn't say it was a common
3  practice, but we did do it period -- did it
4  periodically.
5    Q.  Let me jump ahead to Bates number
6  8356.
7    A.  Which PDF page is that?
8    Q.  That looks like it's going to be
9  page 12 of the PDF.
10    A.  Okay.  All right.  Just so you
11  know, for the e-mail, the PDF page numbers are
12  going to be a lot more helpful.
13    Q.  Sure.
14    A.  So 8357, is that what I'm looking
15  at?
16    Q.  56, I think it's the page before.
17    A.  Oh, the one above?  I got you.
18    Q.  So, yeah, and I think this still
19  relates to the same ticket; right?  If you look
20  at the middle of the page, you're still dealing
21  with the same report from CIS that has that same
22  EIP ticket number; correct?
23    A.  Yeah, it appears correct.
24    Q.  And this one you passed this onto
25  Twitter; right?

Page 163

1    A.  Mm-hmm.
2    Q.  And that was the platform that was
3  directly affected; right?
4    A.  Correct.
5    Q.  And then talking to Twitter, at the
6  very top, there, you said, you know, good
7  afternoon, suspect you are -- you all are
8  already aware of these issues, we wanted to pass
9  along this reporting from Sonoma County,
10  California, to see if there's anything you can
11  share on how you're approaching; right?
12    A.  Mm-hmm.
13    Q.  Is that -- sorry, can you answer it
14  with a yes or no?
15    A.  Oh, I'm sorry.
16    Yes.
17    Q.  Is that something you did when you
18  were serving the switchboarding function was ask
19  the social media platforms to report back how
20  they had addressed the contents reported?
21    A.  Generally we would do that if the
22  election official asked.
23    Q.  Why did you do that?
24    A.  Well, the -- the election official
25  reported something, they just wanted to know if

Page 164

1  a decision was made often, not often, sometimes.
2    And so if the platform was open to
3  sharing if they had made a decision or not, we
4  would just push that back to the election
5  officials so they were aware --
6    Q.  So --
7    A.  -- of where the platform landed.
8    Q.  So CISA would, if the state or
9  local official wanted to know, you know, whether
10  the reported misinformation had been actioned in
11  some way, CISA would ask the social media
12  platform to report that back, and then CISA
13  would relay that to the social media -- sorry --
14  to the state or local official; is that right?
15    A.  Yeah, we did that periodically,
16  where we would ask if the decision was made and
17  if we can share back.
18    Q.  Did you do --
19    A.  The platforms got better, along the
20  way, of communicating directly with the election
21  officials, themselves.
22    Q.  Sometimes they would report back
23  directly, later in the process, especially?
24    A.  Yeah, I believe it got better kind
25  of as time went on.

41 (Pages 161 to 164)

**BRIAN J. SCULLY  1/12/2023**

Page 165

1    Q.  Did you do anything else with that
2  information, about whether and how the reported
3  misinformation had been actioned by the social
4  media platform?
5    A.  Did we do anything else with it?
6    No.  No.  I mean, if it came to CIS
7  we would push the response from the platform
8  back up to CIS.  If the information we received
9  from the election official came direct to us we
10  would push that back, just back to the election
11  official.
12    Q.  How about anyone else, would anyone
13  else be notified how they acted?
14    A.  I think we may have put a notation
15  in the tracking spreadsheet we kept, if a
16  platform said something returned.  But that was
17  an internal set of documents that would go to --
18  normally our attorneys, the privacy folks, would
19  let you see the tracking list review,
20  periodically.
21    Q.  So there was an internal
22  spreadsheet created by CISA to track these
23  reports?
24    A.  Yes.
25    Q.  And did you enter, you know, all of

Page 166

1  your switchboarding activity reports into that
2  spreadsheet?
3    A.  Yeah, we did the best we could to
4  make sure everything was captured in there.
5    Q.  Does that spreadsheet still exist?
6    A.  I believe -- I would assume so.
7    Q.  Who else -- or who would enter the
8  information in this spreadsheet?
9    A.  So the MDM team took shifts, in
10  terms of receiving and doing -- like I said, it
11  was very resource intensive for us, and so other
12  members of the MDM team would have asserted
13  stuff in there, as well, if it was their shifts.
14    Q.  Who would have -- who took shifts,
15  other than you?
16    A.  So back then it would have been
17  myself, Chad, Rob, from that org chart, sorry,
18  Rob Schaul, Chad Josiah, who else was doing it
19  back then, myself, Alex Zaheer, an intern, which
20  I'm not going to name, and I think that was it.
21    Q.  Let me see if I caught all --
22    A.  I think that was it.
23    Q.  Let me see if I caught all those
24  e-mails, Chad Josiah did that?
25    A.  Mm-hmm.

Page 167

1    Q.  And then I think you said Rob
2  Schaul did that, S-c-h-a-u-l; corrects?
3    A.  Correct, and then Alex Zaheer, who
4  also should be on the org chart.
5    Q.  How do you spell letter name?
6    A.  His name, Alex, A-l-e-x,
7  Z-a-h-e-e-r.
8    Q.  Okay.  Anyone else?
9    A.  There's an intern.
10    Q.  Can you name the intern, please?
11    A.  No, I'm not going to name the
12  intern.
13    Q.  Are you refusing to answer that
14  question without an instruction, again?
15    A.  Yes.
16    Q.  Okay.  Anyone else?
17    A.  I feel like there was, but I'm
18  forgetting names, right now.  But those would
19  have been the principal -- oh, John Stafford,
20  sorry.
21    Q.  What's his role at CISA?
22    A.  He is not at CISA any longer.  He
23  left sometime in 2021.
24    Q.  Okay.  What was his role?
25    A.  He was an analyst by -- like the

Page 168

1  others.
2    Q.  And would all those people be
3  involved in e-mails like the ones we're looking
4  at here in October 9 -- sorry -- in Exhibit 9,
5  where word would come in from, you know, CIS or
6  somebody like that, they would forward it onto a
7  social media platform?
8    A.  Yeah, so they would -- if -- if
9  they received something, they would play that
10  switchboard role and they would forward it to
11  the platforms.
12    Q.  And then would they, like you,
13  report back sometimes to CIS or whatever
14  reporter on how things had been actioned?
15    A.  I don't recall if they did that or
16  not.  If the -- if the platform sent something
17  back on their own, which sometimes happened, as
18  well, they would report that.  I don't know that
19  they did anything beyond that.
20    Q.  Did any of them communicate with
21  anyone at the Election Integrity Partnership?
22    A.  Well, the intern, I believe, worked
23  both, although, when he was on duty, he was only
24  working for us.  Beyond that, I don't -- I don't
25  know.  I don't know that we would have

LEXITAS LEGAL
www.lexitaslegal.com        Phone: 1.800.280.3376        Fax: 314.644.1334

**BRIAN J. SCULLY  1/12/2023**

Page 169

1   conversations, not about the switchboarding, I
2   wouldn't think.
3        Q.   You say the intern worked both, you
4   mean the intern part of the time was working for
5   CISA and part of the time was working for EIP?
6        A.   So my understanding -- so the
7   intern was a Stanford student, so he worked part
8   time for us.  On election day, when he would
9   have been on the agenda, he was just working for
10  us.
11            And my understanding is he also did
12  some work for the Stanford Internet Observatory.
13  I don't know what that work entailed, if it was
14  EIP-specific or not.  But yeah, he was -- he did
15  do some stuff with the Stanford Internet
16  Observatory, I'm just not a hundred percent
17  certain of the nature of it.
18       Q.   Do you know whether he was involved
19  in tracking misinformation and disinformation
20  for the Stanford Internet Observatory?
21       A.   I don't know if that intern was
22  responsible for that or doing that work.
23       Q.   Was that the only intern during
24  2020 who was simultaneously working part time
25  for CISA, and also working with Stanford

Page 170

1   Internet Observatory?
2        A.   No.  There was one other, as I
3   mentioned earlier, there were two.
4        Q.   And so, I see, in other words, it
5   wasn't sequential.  Those two interns, did they
6   maintain their part-time internship at CISA
7   through the election -- the end of the election
8   cycle in 2020?
9        A.   Correct.  They were summer interns,
10  full-time summer interns, and then they went
11  back, they continued their studies at Stanford
12  and part-time interns of us.
13       Q.   Okay.  So they also, I take it,
14  when they went back to Stanford for the fall
15  semester they also worked for the Stanford
16  Internet Observatory?
17       A.   That's my understanding, correct.
18       Q.   And at least one of those interns
19  was involved in doing these switchboarding
20  e-mails like we're looking at in Exhibit 9;
21  right?
22       A.   Correct.
23       Q.   Okay.  What -- what did the other
24  intern do during this timeframe for CISA?
25       A.   He also did some of the

Page 171

1   switchboarding.
2        Q.   Okay.  So should we add intern
3   number two is also a -- a person who engages in
4   switchboarding e-mails?
5        A.   Correct.
6        Q.   Are you declining to disclose the
7   name of intern number two, as well?
8        A.   Intern number two is on our staff
9   now.
10       Q.   What's his name?
11       A.   Alex.
12       Q.   Alex what?
13       A.   Zaheer.
14       Q.   So Alex Zaheer was -- was he one of
15  the interns who originated the idea of the EIP?
16       A.   Correct.
17       Q.   What's his role in CISA now?
18       A.   He is an analyst on the MDM team.
19       Q.   What does he do for CISA?
20       A.   He works on the MDM team.  He
21  does -- we talked about him earlier in the org
22  chart discussion.
23       Q.   I'm sorry, I don't remember, what
24  does he do?
25       A.   So he steps across the range of

Page 172

1   work, he does some analysis, he does some
2   engagement, he does some product development
3   work.
4        Q.   What's engagement?  Does he talk to
5   social media platforms for CISA?
6        A.   He does not, no.
7        Q.   Does he still do any work for
8   Stanford Internet Observatory?
9        A.   No, not that I'm aware of.
10       Q.   When was he involved in working for
11  Stanford Internet -- Stanford Internet
12  Observatory, to your knowledge?
13       A.   I don't know.  It would have been
14  before he graduated, as far as I'm aware.
15       Q.   I'm asking you again, what's the
16  name of intern number one, the one who was
17  involved in routing disinformation concerns to
18  social media platforms, during the 2020
19  election, whose name you haven't disclosed yet?
20       A.   I'm still not going to disclose his
21  name.
22            MR. SAUER:  Counsel, on the break
23  let's talk about that.
24  BY MR. SAUER:
25       Q.   Moving on a little bit, if I could

43 (Pages 169 to 172)

Page 173

1   direct your attention back to -- or actually,
2   let's jump ahead in the Exhibit 9.  Actually,
3   let me -- let's stay on this page.
4          A.  Which page?
5          Q.  I think we're on page 11 of the
6   PDF.
7          A.  Okay.
8          Q.  Or actually, I'm sorry, let's jump
9   ahead to page 10603 Bates, and then that's going
10  to be page 18 of the PDF.
11         A.  All right.  Okay.  I'm on page 18.
12         Q.  Okay.  If you look here, this is a
13  reporting chain of a misinformation concern from
14  you to Twitter, on October 10th; correct?
15         A.  Yes, that's what it appears to be.
16         Q.  And you're making this report at --
17  on the Saturday afternoon; right?  Or is that an
18  early Saturday morning?  It looks like it's a
19  Saturday afternoon, at 12:52 p.m., there at the
20  bottom of the page; do you see that?
21         A.  I do.
22         Q.  So you talked about this being
23  resource intensive.  Were you guys staffing, you
24  know, the misinformation reports and doing the
25  switchboarding on nights and weekends?

Page 174

1          A.  So we ramped up as we got closer to
2   the election.  At this stage I think it was
3   primarily me that would receive them over the
4   weekends.  I forget when we started -- when I
5   started handing some of that off to my team to
6   also pick it up over the weekends.
7          But at some point, we did have
8   people on the schedule.  It didn't mean that
9   they were 24/7 waiting for things, they just
10  needed to monitor their phones in case something
11  came in.
12         Q.  How -- so somebody was kind of
13  tasked with -- I think you called them shifts,
14  earlier -- someone was tasked with covering a
15  shift at all times, not at all times, but at
16  times over the weekend?
17         A.  Yeah, particularly as we got closer
18  to the election.  I wouldn't say it was the
19  entire election cycle, it was -- I don't know
20  when it started, but probably sometime in
21  mid-October when -- when we started just shifts
22  so that people could review, before that it was
23  mostly me that would receive them from CIS.
24         Q.  And -- and then how about did you
25  ever have it where you were doing shifts in the

Page 175

1   meddling of the night.
2          A.  No.  I mean, technically, you would
3   be on for a day, if you're on your shift.  But
4   there wasn't an expectation, if something came
5   in at 3:00 in the morning, that you were
6   forwarding it on.
7          Q.  How because between 11:00 and 12:00
8   at night?
9          A.  Yeah, I mean if you were awake at
10  11:00 or 12:00 at night, I think that we would
11  push it on, and then obviously on election --
12  election night we were -- we were up until at
13  least midnight.  So if we received anything we
14  would push it forward.
15         But again, it was more when we got
16  into kind of off hours you just ask people to
17  monitor their phones, if they could, and if
18  something came in just to push it forward.  But
19  the expectation that, as per this e-mail, that
20  they would be responsible for forwarding
21  something.
22         Q.  Let me ask you this:  If you look
23  at this e-mail chain we're looking at, where it
24  says you would forward on a concern at 12:52
25  p.m., and looks like about 20 minutes later, on

Page 176

1   a Saturday afternoon, maybe Saturday morning,
2   for them, Twitter responds and says:  Thanks,
3   Brian, we will escalate; do you see that?
4          A.  Yes.
5          Q.  So it looks like the people at
6   Twitter are monitoring their phones to respond
7   promptly to your reports; is that right?
8          A.  I mean, that would -- I don't know
9   what their monitoring behavior was, in this case
10  she certainly responded relatively quickly on a
11  Saturday.
12         Q.  And that's not the only case, it
13  happens again and again and again, where you get
14  almost immediate responses from not just
15  Twitter, but Facebook and others; correct?
16         A.  I mean, don't know.  I'd have to --
17  I'm sure you could show me documents that would
18  who that, but I honestly don't know the
19  timelines of sends and returns.
20         Q.  Well, you remember them pinging you
21  back promptly and being very responsive when you
22  would make reports like this?
23         A.  They were generally responsive in
24  making sure that we knew that they received it,
25  yeah.

44 (Pages 173 to 176)

**BRIAN J. SCULLY  1/12/2023**

Page 177

1    Q.  And not just received it, for
2  example, in this case, not long after that, at
3  6:30 p.m. the same day, she notifies you:  These
4  tweets have actioned for violations of our
5  policies; right?
6    A.  That's what the e-mail says, yep.
7    Q.  And was that timeframe typical,
8  were they turning around, you know, content that
9  was flagged and taking action on it within hours
10  of your reports?
11    A.  It's hard to say, because they
12  didn't always get back to us if they hadn't
13  taken an action.  So I don't know if I would
14  say that's typical.
15        You know, sometimes they would let
16  us know, sometimes they wouldn't.  Generally
17  speaking, I think they made their decisions
18  relatively quickly.  So I would assume if they
19  did get back to me it would be relatively
20  quickly.  But I can't speak to their timing or
21  their processes or any of that stuff.  A lot of
22  times they just didn't let us know --
23    Q.  But the more response --
24    A.  -- to be honest, if they received
25  it.

Page 178

1    Q.  Sorry to interrupt.
2    A.  Yeah, I just wanted to say,
3  normally we would get a note that they received
4  the messages I forwarded to them.  We often
5  didn't receive any kind of notification that
6  they had taken action, no action, or what their
7  decision was, so it's hard to say kind of what
8  their typical timeline was for making decisions.
9    Q.  Let me ask you this:  Were they
10  more responsive to you, as a representative of a
11  federal national security agency, than they were
12  to ordinary people who made such reports, if you
13  know?
14        MR. GARDNER:  Objection.
15  Objection, lack of foundation, calls for
16  speculation.
17    A.  Yeah, I have no clue.  I don't know
18  what the timeline was, generally.
19    Q.  Were there ever discussions between
20  you or anyone at CISA and any one of the
21  platforms about making sure the platforms are
22  monitoring their e-mails for the -- the
23  government's reports of misinformation?
24    A.  No.
25    Q.  How about in the synch meetings

Page 179

1  that you talked about, between the USG and the
2  industry, was it ever brought up that, hey, you
3  know, we're going to have people standing by and
4  watching for misinformation reports so we can
5  move quickly on them?
6    A.  Not that I recall.  I believe on
7  election night several of the platforms set up
8  their own operations center.  But I don't know
9  that there's ever a conversation about -- from
10  the government expecting platforms to have any
11  particular timeline.
12    Q.  Again, these sort of e-mail --
13  e-mails that we're looking at here in Exhibit 9,
14  from you to the platform and the platforms
15  responding back about misinformation that you
16  guys have switchboarded to them, I take it
17  there's a set of e-mails like this, for not just
18  you, but also for Chad Josiah, Rob Schaul, Alex
19  Zaheer, John Stafford, and an intern that you
20  haven't named yet; right?
21        MR. GARDNER:  Objection, compound.
22    A.  So if I'm understanding your
23  question, would you find e-mails from those
24  individuals to platforms notifying them or
25  forwarding information from an election

Page 180

1  official, so yes.
2        Would there likely be -- it's hard
3  for me to know if -- if they always responded
4  back, beyond the received, which I think was
5  pretty standard.
6        So I would assume that you would
7  find change with other members of the team,
8  where they sent something over to a platform and
9  the platform said received, so yeah, if that's
10  your question.
11    Q.  So in other words, at least those
12  five individuals I just listed were involved,
13  separate from the e-mails that we're looking at
14  that involved you, they were sending their own
15  e-mails, when it was their shift, to social
16  media platforms, flagging disinformation
17  concerns?
18    A.  Yeah, that's correct.  But keep in
19  mind, over the entire course of the election I
20  think we forwarded about 200 e-mails, total.  So
21  I would imagine the vast majority of them are
22  mine, because for a period of time I was the
23  principal one relaying it.
24        But then to answer your question,
25  yes, there's probably other e-mail chains with

45 (Pages 177 to 180)

BRIAN J. SCULLY  1/12/2023

Page 181

```
1     those five representatives on it.
2         MR. GARDNER:  So we've now been
3     going almost two hours.  I think now would
4     probably be a good time for a break.
5         MR. SAUER:  Let me ask one more
6     question, that's right on this topic, and how
7     about that or one little set of questions.
8         MR. GARDNER:  Sure.
9     BY MR. SAUER:
10        Q.  Did you ever discuss with Alex
11    Zaheer what he did for the Election Integrity
12    Partnership?
13        A.  I'm sure I had conversations with
14    Alex about his work with SIO, which was part of
15    the larger integrity partnership.
16        Q.  What did you discuss with him about
17    his work for SIO?
18        A.  I think he just talked about that
19    he was participating in it, I don't know the
20    specifics of the conversation, but that he was
21    participating in it, and he was one of the
22    people that were working with the ticketing
23    system.
24        Q.  When you say:  Working with the
25    ticketing system, what did he say he was doing
```

Page 182

```
1     with the ticketing system?
2         A.  I don't recall.  I mean, I was -- I
3     don't know how the ticketing system works, so I
4     don't know, kind of, how his role would have
5     played in there, what it was.
6         Q.  When you refer to the ticketing
7     system, is that the system that Stanford had for
8     receiving reports of disinformation that they
9     would analyze?
10        A.  Correct.
11        Q.  How about the other intern, the one
12    you haven't named yet, did you ever discuss with
13    that intern the work he did for the Stanford
14    Internet Observatory?
15        A.  I don't -- I don't recall.  I don't
16    think -- certainly not in the level of detail
17    with Alex.  Obviously Alex came to work for us,
18    so I have a little more familiarity with what he
19    did with SIO.  So I don't -- I didn't have a
20    clear understanding of the other intern's role.
21        Q.  What did the other intern go on to
22    do?
23        A.  I don't know.  As far as I know,
24    he's still at Stanford.  But I don't know if he
25    graduated.
```

Page 183

```
1         MR. SAUER:  Why don't we take a
2     break there.
3         MR. GARDNER:  Okay.  I mean, it is
4     now -- oh, let's go off the record.
5         THE VIDEOGRAPHER:  The time is now
6     12:34.  We're off the record.
7         (Recess.)
8         THE VIDEOGRAPHER:  The time is now
9     1:41 p.m.  We are back on the record.
10        MR. GARDNER:  Thank you.  And as I
11    had mentioned before we got back on the record,
12    the witness wanted to say something before we
13    began.
14        THE WITNESS:  So the intern that
15    did both SIO and CISA push forwarding was Pierce
16    Lowary.
17    BY MR. SAUER:
18        Q.  And is that L-o-w-a-r-y?
19        A.  I believe so, yeah.
20        Q.  And that intern worked
21    simultaneously with CISA and the EIP?
22        A.  And SIO was a member of the EIP.
23        Q.  Right.  What did he do for SIO
24    while this was going on, do you know?
25        A.  I don't.
```

Page 184

```
1         Q.  What did he do for CISA while this
2     was going on?
3         A.  Again, he was part-time in the
4     fall, so he would support the analytic stuff,
5     and then, as I mentioned, he did some work in
6     terms of the switchboarding.  I'm not --
7     obviously not sure the extent of the e-mails or
8     anything like that, that he would have forwarded
9     over to the platforms.
10        Q.  Now, Pierce Lowary was involved in
11    forwarding e-mails over to the platforms?
12        A.  Correct.
13        Q.  And that's in addition to Chad
14    Josiah, Rob Schaul, Alex Zaheer, John Stafford,
15    and yourself; correct?
16        A.  Correct.
17        Q.  Anyone else, in 2020, who would
18    engage in those switchboarding e-mails?
19        A.  I believe that was all.
20        Q.  Was Pierce --
21        A.  From my recollection.
22        Q.  Was Pierce Lowary one of the four
23    interns who originated the idea of the EIP?
24        A.  Yes.
25        Q.  Okay.  Who were the other two?
```

46 (Pages 181 to 184)

**BRIAN J. SCULLY  1/12/2023**

Page 185

```
 1           A.  I don't --
 2           Q.  Well, let me -- what about Alex
 3   Zaheer, was he one of the ones?
 4           A.  Alex was one.
 5           Q.  The idea --
 6           A.  It got --
 7           MR. GARDNER:  Hold on, guys, you
 8   keep talking over each other.  So let Mr. Sauer
 9   ask the question and then please answer.
10           John, can you re-ask it?
11   BY MR. SAUER:
12           Q.  Was Alex Zaheer one of the four
13   interns who originated the idea of the EIP?
14           A.  He was.
15           Q.  And he went on, like Mr. Lowary, to
16   simultaneously work for CISA and for Stanford
17   Internet Observatory during the 2020 election
18   cycle?
19           A.  Correct.
20           Q.  Who were the other two interns who
21   originated the idea?
22           A.  The fourth intern I do not know who
23   they're referring to, so I'm not sure who that
24   is.
25           The first intern is Isabella
```

Page 186

```
 1   Camargo, I forget the rest of her last name, I'm
 2   sorry.  I'd have to look.
 3           Q.  Is it Isabella Garcia-Camargo?
 4           A.  Yes.
 5           Q.  Okay.  When did she intern for
 6   CISA?
 7           A.  Over the summer of 2020.
 8           Q.  Did she do that into the fall?
 9           A.  She did not.
10           Q.  Did she go on in the fall to work
11   for Stanford -- Stanford Internet Observatory?
12           A.  Yes.
13           Q.  And did she work for Stanford
14   Internet Observatory during the summer, when she
15   was also working for CISA?
16           A.  Yes.
17           Q.  Who is Ayelet Drazen, D-r-a --
18           A.  Hold on a second, I'm sorry, can
19   you repeat that last question?
20           Q.  Which question, who is Ayelet
21   Drazen?
22           A.  No, the one before.
23           Q.  Did she work for Stanford Internet
24   Observatory during the time she was also working
25   for CISA?
```

Page 187

```
 1           A.  I don't believe so, but I'm not
 2   sure kind of their arrangement in the SIO front.
 3   I think SIO was -- I think SIO may have been --
 4   I'm not sure how that worked with SIO when
 5   they're interns, but she did not work for us in
 6   the fall, when she was working for SIO, that I'm
 7   certain of, so I don't know what the
 8   relationship was over the summer internship.
 9           Q.  What -- what did she do for CISA?
10           A.  Again, like the other analysts,
11   typical intern stuff, supporting product
12   development, helping with, you know, any
13   research projects, standard kind of intern work
14   across the three panels I mentioned before,
15   engagement, product development, and analysis
16   research.
17           Q.  Who is Ayelet Drazen, D-r-a-z-e-n,
18   first name A-y-e-l-e-t?
19           A.  I don't know.
20           Q.  Who is Ashwin Ramaswami?
21           A.  I believe he was one of the
22   election security interns.
23           Q.  During 2020 at CISA?
24           A.  At least the summer of 2020.  I
25   don't -- I don't know, kind of, how long he
```

Page 188

```
 1   stuck around.  I didn't really work with him.
 2           Q.  Is he another Stanford intern?
 3           A.  Yeah, I believe so.
 4           Q.  Did he go on to work for the
 5   Stanford Internet Observatory?
 6           A.  I don't know.  I don't know.
 7           Q.  How about Jack Cable, C-a-b-l-e?
 8           A.  He was a Stanford intern.  I
 9   don't -- I don't know what he did, after, just
10   for the summer, that I'm aware of, but I'm not
11   entirely sure.  He didn't work on the MDM stuff
12   with me.
13           Q.  What did he do at CISA, do you
14   know?
15           A.  He was more cyber-focused, so I'm
16   not entirely sure, really, what his projects
17   are.
18           Q.  Just a second, I'm e-mailing you
19   two new exhibits.
20           Let me ask this:  Were you involved
21   in -- Mr. Scully, were you involved in preparing
22   CISA's discovery responses to written discovery
23   in this case?
24           A.  I believe I provided names of the
25   team.  And the IT folks searched my records for
```

47 (Pages 185 to 188)

## BRIAN J. SCULLY  1/12/2023

Page 189

```
 1    me.
 2         Q.  You provided names?
 3         A.  Don't ask --
 4         Q.  Names of the team, what does that
 5    mean?
 6         A.  So I believe I provided names of
 7    the people who are part of the MDM team or the
 8    CFITF.
 9         Q.  So you provided names of key
10    custodians, for example, who might have relevant
11    e-mails in their inboxes, stuff like that?
12         A.  Right.
13         Q.  Okay.  Were you involved in
14    drafting interrogatory responses?
15         A.  If I recall correctly, I reviewed
16    some of them.
17         Q.  Did you review the ones that were
18    submitted on behalf of CISA?
19         A.  Yeah, those would have been the
20    only ones I reviewed.
21         Q.  Before the break, you mentioned
22    that there were about 200 e-mails that CISA
23    forwarded to serve this switchboarding function
24    of routing disinformation concerns to the social
25    media platforms in 2020; right?
```

Page 190

```
 1         A.  Yeah, give or take a few.  I don't
 2    know the exact number, but it's about 200.
 3         Q.  How do you know how many there
 4    were.
 5         A.  Well, as I mentioned previously, we
 6    kept a tracking spreadsheet.  Everything we sent
 7    over we logged.
 8         Q.  Would you consult that tracking
 9    spreadsheet when you were preparing or working
10    on responding to written discovery in this case?
11         A.  I don't recall that I did, it's
12    possible, but I don't recall doing it.
13         (Exhibit No. 12 was marked for
14    identification.)
15    BY MR. SAUER:
16         Q.  Let me show you Exhibit 12.
17         A.  Okay.  That's a complaint.
18         Q.  It should be amended interrogatory
19    responses that have been filed publicly
20    with the Court as document 86-3?
21         MR. GARDNER:  I'd like to take a
22    look.  Hold on.
23         THE WITNESS:  I don't know.
24         MR. GARDNER:  Hold on one sec.
25    Yeah, that's right.  That's right.
```

Page 191

```
 1         THE WITNESS:  Okay.
 2    BY MR. SAUER:
 3         Q.  Can you go to page 19 of that
 4    document?  I've also got it up on the screen
 5    share.
 6         A.  All right.  Page 19?  Okay.  I'm at
 7    19.
 8         Q.  In here, at the bottom of page 19,
 9    you see where it says:  CISA, colon?
10         A.  Yes.
11         Q.  It's identifying people with
12    relevant communications response to our
13    discovery requests.
14         CISA has identified the following
15    custodians as having relevant communications as
16    produced in the response to requests two and
17    three; correct?  Do you see that?
18         A.  I do.
19         Q.  CISA custodians listed are Jen
20    Easterly, Christopher Krebs, Matt Masterson,
21    Geoff Hale, Brian Scully, and Lauren Protentis;
22    right?
23         A.  Yep.
24         Q.  So these other people, Chad Josiah,
25    Rob Schaul, Alex Zaheer, John Stafford, Pierce
```

Page 192

```
 1    Lowary, who were involved in forwarding e-mails
 2    to social media platforms to flag them, were not
 3    disclosed in this part of the interrogatories;
 4    correct?
 5         A.  I think if you scroll down another
 6    paragraph, you would see most of those names.
 7         Q.  Yeah, that's extremely interesting,
 8    isn't it?  Very next paragraph it says, oh,
 9    we've also identified some other people as
10    appearing in the communications you produced,
11    and it lists four of those five people, Chad
12    Josiah, Robert Schaul, Alex Zaheer, John
13    Stafford; right?
14         A.  Yes, that's who is listed there.
15         Q.  It appears --
16         A.  I don't know that that's
17    interesting.
18         Q.  It's interesting that CISA knew
19    about the involvement of these people and
20    relevant communications, but didn't search their
21    inboxes in response to our discovery requests;
22    isn't that what this indicates?
23         A.  I have no idea what this indicates.
24         Q.  Well, let me ask you this:  You
25    testified before the break that those four
```

**BRIAN J. SCULLY  1/12/2023**

Page 193

```
 1    people there, plus Pierce Lowary, who you just
 2    disclosed, all forwarded disinformation reports
 3    to social media platforms as part of the
 4    switchboarding function; isn't that right?
 5        A.  They were all part of the
 6    switchboarding function.  I don't know who sent
 7    e-mails or how many e-mails or any of that.
 8        Q.  But you testified that they took
 9    shifts and sent e-mails to social media
10    platforms reporting this information; correct?
11        A.  They took shifts, and if they
12    received something they would have sent an
13    e-mail.  But without going through the
14    spreadsheet that I mentioned I wouldn't know if
15    an actual individual was on a shift, sent one,
16    but that would be my expectation that they did.
17        Q.  What was the last --
18        A.  There were generally two people
19    per -- there were generally two people per
20    shift, so it's possible that just one of those
21    two people were sending e-mails.
22        Q.  Pierce Lowary is not identified
23    anywhere in these discovery responses, is he?
24        A.  I mean, he's not identified in
25    these.  This is a small section.  I don't know
```

Page 194

```
 1    if he is elsewhere.
 2        Q.  Well, you said you reviewed them
 3    when they were being prepared.  Do you remember
 4    seeing his name anywhere -- anywhere in the
 5    government's discovery responses?
 6        A.  I don't recall, but I wouldn't
 7    have -- I don't think I would have reviewed the
 8    entire document, so I don't know.
 9        Q.  Who would have --
10        A.  Obviously, I didn't see the final
11    document.
12        Q.  Who would have reviewed the final
13    document?
14        MR. GARDNER:  Objection, calls for
15    speculation.
16    BY MR. SAUER:
17        Q.  If you know.
18        A.  Yeah, I don't know.
19        MR. SAUER:  Exhibit 62, which I've
20    also e-mailed you.
21        MR. GARDNER:  John, did you say 62?
22        MR. SAUER:  62, should be the most
23    recent one in your inbox.
24        THE WITNESS:  Okay.  Okay.
25        (Exhibit No. 62 was marked for
```

Page 195

```
 1    identification.)
 2    BY MR. SAUER:
 3        Q.  Here's Jack --
 4        A.  Is it the -- sorry, go ahead.
 5        Q.  This is Jack Cable's publicly
 6    available online LinkedIn profile; do you see
 7    that?
 8        A.  I do.
 9        Q.  If you scroll down, a fifth page of
10    this document, it looks like he was a research
11    assistant at Stanford Internet Observatory from
12    2019 to 2021; correct?
13        A.  That's what it says, yep.
14        Q.  And that he ended in June of 2021,
15    correct, at SIO?
16        A.  That's what it says, yeah.
17        Q.  And immediately below that, it
18    looks like he was an election security technical
19    advisor at CISA from June 2020 to January 2021;
20    correct?
21        A.  That's what he says.
22        Q.  So he also overlapped, for an
23    entire year, in working simultaneously for CISA
24    and for the SIO; correct?
25        MR. GARDNER:  Objection, lack of
```

Page 196

```
 1    foundation.
 2    BY MR. SAUER:
 3        Q.  According to his LinkedIn profile?
 4        MR. GARDNER:  Same objection.
 5        A.  LinkedIn profile says he worked at
 6    CISA for eight months.
 7        (Reporter admonition.)
 8        THE WITNESS:  Sorry.
 9        A.  The LinkedIn profile said he worked
10    at CISA for eight months.
11        Q.  Right.  Does the LinkedIn profile
12    also indicate that during those same eight
13    months, from June of 2020 to January of 2021, he
14    also was an intern -- a research assistant at
15    Stanford?
16        A.  It appears that way, yep.
17        Q.  Were you aware that Jack Cable was
18    working for Stanford Internet Observatory while
19    he was also interning for CISA?
20        A.  No.  Jack didn't work for me, so I
21    didn't really pay attention to what he was
22    doing.
23        Q.  He shares this simultaneous
24    employment with SIO and CISA, along with Alex
25    Zaheer and Pierce Lowary; correct?
```

49 (Pages 193 to 196)

**BRIAN J. SCULLY  1/12/2023**

---

Page 197

1          MR. GARDNER:  Objection, lack of
2  foundation.
3  BY MR. SAUER:
4          Q.   Correct?
5          A.   I'm sorry, could you repeat the
6  question?
7          Q.   Pierce Lowary and Alex Zaheer also
8  simultaneously worked for CISA and SIO; correct?
9          A.   They did.
10         Q.   And then, if you scroll up a little
11 bit, to the page before, it looks like he went
12 on to work for the Krebs-Stamos Group; were you
13 aware of that?
14         A.   No, I don't think so.
15         Q.   And then he went on to work for the
16 senate; correct?  Does that ring a bell?
17         A.   I mean, it's what it says here.
18         Q.   So you didn't know what Jack Cable
19 went on to do after he left CISA?
20         A.   No, I didn't really pay attention
21 to what -- like I said, he didn't work for me,
22 so I didn't really follow him.  In fact, I'm --
23 a couple of my interns I'm not sure what they're
24 doing, either.
25         Q.   Let's go back to Exhibit 9.

---

Page 198

1          Is it possible that Jack Cable was
2  another one of the interns who originated the
3  EIP?  You mentioned there's one, and you're not
4  sure if it was them?
5          MR. GARDNER:  Objection, calls for
6  speculation.
7          A.   Yeah, I wouldn't know.  I wouldn't
8  know.
9          Q.   Let's go to page 8769 in this
10 document, Exhibit 9.
11         A.   Do you know what the PDF page is,
12 John?
13         Q.   I'm scrolling down to it, so I'll
14 tell you as soon as I know the answer.
15         A.   Okay.
16         Q.   I think it's PDF page 62.
17         A.   All right.
18         Q.   All right.  If you see here, it
19 looks like Alex Zaheer, on October 30th, sends a
20 report about misinformation to CFITF, which is
21 the CISA reporting e-mail address; correct?
22         MR. GARDNER:  John, I'm sorry, are
23 you going to post this on the -- on the live
24 screen for us?
25         MR. SAUER:  I'm sorry, I didn't

---

Page 199

1  realize it wasn't up.  Can you see it on the
2  screen share?
3          MR. GARDNER:  Yeah, we got it now.
4  Thank you.
5  BY MR. SAUER:
6          Q.   Alex Zaheer, on October 30th, sends
7  an e-mail to CFITF; correct?
8          A.   Yep.
9          Q.   And he's actually --
10         A.   Yes.
11         Q.   He says:  FYSA, EIP has reported
12 the following to EI-ISAC and Twitter from EIP,
13 and then he reports on an EIP ticket; correct?
14         A.   Correct.
15         Q.   And then this -- you responded to
16 him, Thanks Alex; do you see that on the page
17 before?
18         A.   Yes.
19         Q.   And then you sent an e-mail, it's
20 not clear to whom, saying:  FYI, the EIP,
21 submitted the below to Twitter, no need to
22 respond.  But it looks like you were saying that
23 to Twitter; right?
24         A.   Yeah, there's no header there, so
25 I'm not certain, but that's what it appears.

---

Page 200

1          Q.   It appears that from your intern,
2  who was simultaneously working for EIP, you
3  received a report of alleged misinformation and
4  submitted it onto Twitter; right?
5          A.   Yeah.
6          Q.   And then -- and that was an
7  EIP-specific report; correct?
8          A.   Yep.
9          Q.   And then Twitter responded and
10 said, thanks Brian, we received that report from
11 the EIP and escalated it; correct?
12         A.   Yes.
13         Q.   And then she goes on to specify to
14 you the action they took against that; correct?
15         A.   Yeah, on a contextual label
16 pursuant to their policy on civic integrity,
17 yeah.
18         Q.   Were there other instances where
19 this occurred, where an EIP report was forwarded
20 to you, and you forwarded it onto -- to a social
21 media platform?
22         A.   As I said earlier, it's possible,
23 but I don't recall.
24         Q.   How about --
25         A.   It was our standard practice.

---

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

BRIAN J. SCULLY  1/12/2023

Page 201

1      Q.  How about the other five people who
2  were monitoring these misinformation reporting
3  e-mails, did they ever review that, do you know?
4          MR. GARDNER:  Objection, calls for
5  speculation.
6      A.  Yeah, I don't know.  Again, it
7  wasn't part of our normal process, so I'm not
8  sure.
9      Q.  Would that be reflected in this
10 spreadsheet you referred to multiple times?
11     A.  Yeah, it should be.
12     Q.  So if there was -- if the EIP is
13 referenced or is the originator of the report
14 you would note that in the spreadsheet?
15     A.  I believe so.  I believe we would
16 have the case number.
17     Q.  Can you scroll back up to page 33
18 of the PDF?
19     A.  Yep.
20     Q.  It's Bates 8349.
21     A.  8349, yep.
22     Q.  You see at the top of this page
23 there's a misinformation report from Oregon,
24 that's being sent on by the CIS, Center For
25 Internet Security, reporting e-mail; do you see

Page 202

1  that?
2      A.  Yes.
3      Q.  And it's sent to you and a couple
4  other CISA e-mails or -- CISA e-mails, there in
5  the first line; right?
6      A.  Yep.
7      Q.  In the second line it's sent to
8  tips@2020partnership.atlassian.net; do you see
9  that?
10     A.  I do.
11     Q.  What is that?
12     A.  I don't know.
13     Q.  Is that the reporting e-mail for
14 tips to the 2020 Election Integrity Partnership?
15         MR. GARDNER:  Objection, calls for
16 speculation, also, asked and answered.
17     A.  Yeah, I don't know what it is.
18     Q.  Is it your testimony that you're
19 not aware whether or not that's the reporting
20 e-mail for the EIP?
21     A.  Yeah, I'm not aware -- the answer
22 is, I'm not aware of what e-mail that is.
23     Q.  Were you aware that -- did you
24 notice that CIS was commonly forwarding these
25 reports to both you and that

Page 203

1  tips@2020partnership e-mail?
2      A.  I'm not sure that I paid that much
3  attention to it, no.
4      Q.  You didn't notice --
5      A.  Again, yeah, I wasn't -- I guess
6  that I wasn't aware of what processes they were
7  following.
8      Q.  So you didn't know they were
9  looping in the EIP on their reports; is that
10 what you're saying?
11     A.  I don't recall it, but again, as we
12 discussed earlier, it could have been part of
13 the effort to deconflate for the platforms.
14     Q.  Up here on page 51 of the PDF,
15 scrolling to the bottom of that page down to 52,
16 here's another CIS report.  Once again, it's
17 sent to you at -- to CISA e-mails and
18 tips@2020partnership@atlassian.net; correct?
19     A.  Yeah, I see the e-mail address in
20 there.
21     Q.  And you don't recall that being --
22 you getting copied -- that being copied on
23 e-mails of this nature?
24     A.  I don't.
25     Q.  Really briefly, jumping ahead to

Page 204

1  page 10539, page 55, once again, CIS is copying
2  you and tips@2020partnership.atlassian.net;
3  correct?
4      A.  That's the e-mail, yes.
5      Q.  Jumping ahead to page 7565, here's
6  a report from the Colorado secretary of state's
7  office.  Do you see, we're on page 59 of the
8  PDF, where they're reporting it to EI-ISAC,
9  CISA, and Stanford Partners; correct?
10     A.  That's what the e-mail says, yep.
11     Q.  It says Stanford is presumably --
12         MR. GARDNER:  Objection, calls for
13 speculation.
14     A.  Yeah, I don't know what they mean
15 by Stanford.
16     Q.  Do you think Stanford might be some
17 other Stanford entity to which state and local
18 election officials are reporting disinformation
19 concerns --
20         MR. GARDNER:  Objection.
21 BY MR. SAUER:
22     Q.  -- during the 2020 cycle?
23         MR. GARDNER:  Objection, calls for
24 speculation, lacks foundation.
25 ///

51 (Pages 201 to 204)

Page 205

BY MR. SAUER:
Q.  Do you know?
A.  I don't know.
Q.  Scrolling above this, again, CIS forwards this to you and tips22020partnership, that reporting e-mail or that e-mail address; correct?
A.  Are you up on -- what page are you on now?
Q.  Page 58 of the PDF, immediately above, shows CIS forwarding that report from Colorado secretary of state's office to both you and tips@2020partnership.atlassian.net?
A.  So Colorado sends to CIS, CIS sends to me, CISA, and atlassian.net, okay.
Q.  And you forward this onto -- to Twitter; correct, immediately above that?
A.  So again, there's no header, but the response is from Twitter, so that's what I assume.
Q.  And you -- they say -- you say: Please see below reporting from Colorado.  These do not appear to be connected to the imposter parody accounts previously shared; correct?
A.  Correct.

Page 206

Q.  And Twitter responds within 15 minutes:  We will escalate.  Thank you; correct?
A.  Correct.
Q.  Okay.  And if you scroll down a couple pages, you see that Colorado secretary of state's office has flagged some parody or imposter accounts, including one with 14 followers; correct?
A.  What page are you on?
Q.  59 of the PDF.
A.  59 of the PDF?  I don't see what you're talking about there.  This is the same e-mail chain we were just talking about.
Q.  Maybe look up at the screen share, can you see where secretary of state's office has forwarded a screen shot of a Twitter account, it's got 14 followers?
A.  I do.
Q.  And secretary of state's office in Colorado says:  These are concerning to us here in Colorado because of their recent FBI/CISA warnings about impersonation accounts; correct?
A.  That's what it says, yep.
Q.  So they say that we're reporting this because it -- because it's the sort of

Page 207

things that the FBI and CISA warned us may warrant reporting; right?
A.  I mean, I don't want to speak for the secretary of state, but that's kind of how the account sentence reads.
Q.  Did you -- in fact, were you involved in warning state and local election officials about impersonation accounts spreading false information about the election?
A.  I'm sure I would have reviewed a document that went out along those lines.  I'm not aware of the document, but I'm sure if it went out I would have reviewed it.
Q.  Do you remember reviewing it?
A.  They put out -- in 2020 we put out a couple of joint FBI and CISA products.  I don't remember specifically which one this is, but it certainly sounds like something we would do.
Q.  Okay.  Scrolling down, there's another one they're flagging here, that if you didn't know, it has two followers; correct?
A.  So it appears.
Q.  And you forwarded that onto Twitter, and Twitter said:  We'll escalate;

Page 208

right?
A.  Yes.  They said they will escalate.
Q.  Moving onto page 10512, just a few pages down, that's going to be page 63 of the PDF.
A.  Okay.
Q.  Do you see here in the middle, here, it's an inquiry from Twitter, and she says:  Hey Brian, can we talk about CIS misinformation reporting duplicate reports to EIP, possible to have just you escalate; correct?
A.  Yeah, that's what the e-mail says.
Q.  What is she talking about, is this the duplicate reporting issue that you talked about earlier, where they were getting reports from you and EIP and CIS?
A.  That's what I would imagine it is, yeah.
Q.  Okay.  Do you remember anything about this?  We're talking about October 27th, so, you know, maybe a week before the 2020 election, do you remember the social media platform is having this concern about duplicate reports from CIS and EIP?

BRIAN J. SCULLY  1/12/2023

Page 209

1        A.  I remember Twitter, in particular,
2  having that concern.
3          Our screen is screwy again.
4          THE REPORTER:  Can we go off the
5  record?
6          MR. SAUER:  Yeah, we can go off the
7  record.
8          THE VIDEOGRAPHER:  The time is now
9  2:11 p.m.  We're off the record.
10          (Recess.)
11          THE VIDEOGRAPHER:  The time is now
12  2:13 p.m.  We are back on the record.
13  BY MR. SAUER:
14        Q.  Okay.  So -- and then, Mr. Scully,
15  you responded to this:  So here's the deal, EIP
16  will only report something to Twitter if they
17  have additional context to provided based on
18  their research; correct?
19        A.  That's what I wrote, yes.
20        Q.  How did you know that was going to
21  be their policy or their practice, did you talk
22  to EIP?
23        A.  I would imagine I did.
24        Q.  Who did you talk to?
25        A.  I don't recall.

Page 210

1        Q.  And that he goes on -- or you go on
2  to say, they will not send Twitter reporting
3  unless it has that additional context that would
4  help you make a decision; correct?
5        A.  Yep.
6        Q.  And then it says:  EIP will also
7  let CISA know when they are reporting something
8  to you so I can give you a heads up; correct?
9        A.  Yep.
10        Q.  Is that what happened after this
11  e-mail, did EIP report to you when they were
12  reporting something to the social media
13  platforms?
14        A.  I don't recall that, in practice.
15  Although, obviously, we just went through each
16  one e-mail that did that.  I don't remember it
17  being a common thing but, again, I don't -- I
18  don't know.  It's possible.
19        Q.  Okay.  And then it says:  EIP will
20  continue to use the CIA -- CIS case number to
21  facilitate identifying duplicative reports;
22  correct?
23        A.  Yep.
24        Q.  So EIP was talking to CIS enough to
25  know what CIS's misinformation reporting case

Page 211

1  numbers were; right?
2        A.  I don't know.  I don't know if
3  that's true.
4        Q.  Were you aware that EIP was using
5  CIS's case numbers, because you said it in this
6  e-mail?
7        A.  Yep, I mean, if that's what I
8  wrote, that's probably what they were doing.
9        Q.  Okay.  Do you remember discussing
10  that with CIS or EIP that they were going to,
11  you know, kind of share case numbers?
12        A.  I don't recall any such
13  specificity.  I know we had a conversation.  I
14  recall that we had conversations about how to
15  de-duplicate, make sure we weren't overtaxing
16  Twitter, in particular.
17        Q.  And that de-duplication process
18  involved some kind of coordination between you,
19  EIP and CIS; correct?
20        A.  Again, reading this, it appears we
21  are just making sure we are sending something
22  over and everybody is aware of it.
23        Q.  Right.  So everybody would tell
24  everybody else that they were sending something
25  over, and there was an attempt to avoid sending

Page 212

1  duplicative reports to Twitter?
2          MR. GARDNER:  Objection, compound.
3  BY MR. SAUER:
4        Q.  Correct?
5        A.  Yeah, can you -- can you break
6  that -- can you start that over again?
7        Q.  Was there an agreement for EIP and
8  CIS and CISA to coordinate and let each other
9  know what they were reporting to platforms like
10  Twitter?
11        A.  I think that's generally right,
12  yeah.
13          MR. SAUER:  Let me send you a
14  couple more exhibits, 10 and 11.  I'm going to
15  pull up 10 on the screen share while you're
16  waiting.
17          MR. GARDNER:  John, do you -- John,
18  did you send them over?
19          MR. SAUER:  Yeah.  They should be
20  in your inbox.
21          MR. GARDNER:  Yeah, I'm looking.
22          MR. SAUER:  They're in my sent box.
23          MR. GARDNER:  Okay.  I believe you.
24  Hold on.
25          (Exhibit No. 10 was marked for

53 (Pages 209 to 212)

**BRIAN J. SCULLY  1/12/2023**

---

Page 213

1    identification.)
2    BY MR. SAUER:
3         Q.  Let me ask this:  Can you see it on
4    the screen share?
5         A.  I can.
6         MR. GARDNER:  You haven't shared it
7    yet, John.
8         THE WITNESS:  Trick question.
9    BY MR. SAUER:
10        Q.  Now can you see it on the screen
11   share?
12        A.  Yes.
13        Q.  Just looking here at the first
14   page, you know, this exhibit is a collection of
15   your switchboarding e-mails from November of
16   2020, do you see you, are copied here on
17   misinformation report from CIS on November 2nd
18   of 2020?
19        A.  Yes.
20        Q.  Once again, CIS continues to copy
21   tips@2020partnership.atlassian.net; do you see
22   that?
23        A.  I do.
24        Q.  Does that ring a bell for you about
25   what that e-mail is, after we talked about that

---

Page 214

1    last e-mail, where you were arranging to
2    coordinate with EIP about de-duplicating reports
3    to social media platforms?
4         A.  I forget.  I don't recall the
5    e-mail.  If you tell me that that was the tips
6    for the 2020 EIP I would believe you.
7         Q.  Okay.  Let me scroll down a page to
8    Bates 13603.
9         A.  What page was that?  I'm sorry.
10        Q.  Bates 13603, 10 of the PDF.
11        A.  Okay.
12        Q.  You see here there's a report from
13   the Iowa secretary of state's office on November
14   2nd, that's sent to CIS; do you see that?
15        A.  Just scrolling through it, sorry.
16   Give me a second.  Yes.
17        Q.  And then it looks like the Iowa
18   secretary of state's office also sent this to
19   three FBI e-mail addresses; right, with the
20   recipients redacted, FBI number two, FBI number
21   three, and FBI number four; correct?
22        MR. GARDNER:  Lack of -- objection,
23   lack of foundation.
24        A.  I don't see the e-mail addresses
25   you're referring to.

---

Page 215

1         Q.  Do you see @FBI, if you look on the
2    screen share, @FBI.gov?
3         MR. GARDNER:  Same objections.
4    BY MR. SAUER:
5         Q.  With the handle omitted, three
6    e-mails?
7         A.  Okay.
8         Q.  Were you aware of the FBI being
9    involved in receiving misinformation reports
10   from state and local elections officials?
11        A.  Generally speaking, we tell
12   election officials to report what they saw to
13   either DHS or the FBI, and it would end up where
14   it needed to be.
15        Q.  So you told them to report it to
16   either DHS or the FBI?
17        A.  Correct.
18        Q.  Who at the FBI was receiving those
19   kinds of reports?
20        A.  I don't know.  I think it --
21        Q.  Go ahead.
22        A.  Generally speaking, the FBI has
23   field offices, and so the idea was if they
24   were -- election officials had established
25   relationships with the FBI field office and the

---

Page 216

1    elections coordinator in that office, and that's
2    where they wanted to report it, that they could
3    do so.
4         Q.  So there was -- these FBI officials
5    tended to be FBI field officers -- officers?
6         A.  I don't want to speculate, but --
7    but again, that was, you know, us trying to --
8    to help the election officials, just if they had
9    something they needed to report, if they had as
10   many different options to do that as possible.
11        Q.  Okay.  Do you know what FBI did
12   with its misinformation reports, was it
13   switchboarding them like you guys were doing?
14        A.  I don't know, to be honest.
15        Q.  Is that notion that you could
16   forward things to the FBI, is that something
17   that was discussed in those USG
18   industry-specific meetings you talked about?
19        A.  I -- not that I recall, but it's
20   possible we -- we talked to them about the
21   guidance we gave to election officials, that
22   election officials could it either way, but I
23   don't recall specific conversations along those
24   lines.
25        Q.  Can you scroll down to the page 27

---

54 (Pages 213 to 216)

**BRIAN J. SCULLY  1/12/2023**

Page 217

1    of the PDF.
2        A.  Let's go.  Okay.
3        Q.  If you look here, kind of at the
4    bottom of this text chain, Aaron Wilson, he's
5    your contact at CIS; right?
6        A.  Correct.
7        Q.  And he's forwarding something to --
8    November 3rd, with a report about alleged
9    election misinformation; right?
10       A.  Well, poll worker Erie PA says
11   announces on Instagram they will throw away
12   Pro-Trump votes, that's what you're talking
13   about?
14       Q.  Yeah.
15       A.  That's the subject of the e-mail.
16       Q.  He uses the EIP case number for
17   this report; correct?
18       A.  He does.
19       Q.  And he sent it to CISA at the CFITF
20   e-mail; correct?
21       A.  He does, correct.
22       Q.  And the CFITF e-mail forwards it to
23   you, and you forward it to Matt Masterson at
24   Facebook; correct?
25       A.  No, that's not correct.  I -- Matt

Page 218

1    was still at CISA at the time.  I forwarded it
2    to Saleela Salahuddin at Facebook.
3        Q.  Copying Matt Masterson?
4        A.  I'm sorry?
5        Q.  Copying Matt Masterson?
6        A.  Yeah, who was at CISA.  You said he
7    was at Facebook.  I just wanted to make sure
8    that that was clear that he was still --
9        Q.  I'm sorry, I meant to say and
10   Facebook, not at Facebook?
11       A.  Gotcha.
12       Q.  And then Facebook came back to you
13   for clarification; right?  Do you recall that?
14       A.  So we -- sorry, go ahead.
15       Q.  Go ahead, what were you going to
16   say?
17       A.  I said, just to be clear, we
18   forwarded the statement from Pennsylvania about
19   that incident to Facebook and Matt Masterson.
20       Q.  And so --
21       A.  That's what is here.
22       Q.  And they -- and it looks like
23   Facebook asked you, could you please confirm
24   that, A, the worker in question who was
25   supposedly destroying Pro-Trump ballots is not a

Page 219

1    poll worker, or B, that he did not, in fact,
2    destroy ballots or at least there's no evidence
3    he did.
4        So Facebook asked you, Brian Scully
5    and Matt Masterson, for that clarification;
6    right?
7        A.  They did.
8        Q.  Yeah, and then you responded:  Not
9    sure I understand the distinction you're trying
10   to make, but both components of the narrative
11   are false.  The person is not a poll worker and
12   no ballots were destroyed.  I suppose that makes
13   the entire thing a hoax; correct?
14       A.  Yeah, that was my response.
15       Q.  What was your basis for concluding
16   that both components of the narrative were
17   false?
18       A.  I believe the statements from
19   Pennsylvania.  I assume if you have that
20   document we can take a look and confirm.
21       Q.  You read the statement from
22   Pennsylvania and reported its content back to
23   Facebook?
24       A.  Correct.
25       Q.  Okay.  Did you -- did that happen

Page 220

1    from time to time, where you wouldn't just
2    forward the disinformation concern, but then you
3    would provide, you know, information that would
4    help debunk it through the social media network?
5        A.  I think I frame it a little
6    differently, if social media platforms needed
7    additional information from an election official
8    we would try to support that.  There was also
9    one time when I believe it was Facebook had a
10   question about DHS immigration and customs
11   enforcement having agents going places where we
12   also provided a response back on a specific
13   piece.
14       But generally speaking, we would do
15   what we did here, which is if the -- if the
16   jurisdiction made a public statement or if there
17   was additional information the jurisdiction
18   could provide, and the platforms asked for it,
19   that we would try to facilitate getting the
20   information they asked for.
21       Q.  Did you merely relay that
22   information, the sort of debunking information
23   from the election official, would you sometimes
24   find it on your own and helpfully supply it to
25   the social media platform?

**LEXITAS LEGAL**

**BRIAN J. SCULLY  1/12/2023**

Page 221

1       A.  If it was a public statement, I'm
2  sure we pulled it ourselves.  If there was not a
3  public statement, I would imagine we would go
4  back to the election official.
5       Q.  But you might --
6       A.  I don't know --
7       Q.  Go ahead.
8       A.  Sorry, I don't want to say that
9  every case was exactly like that, but again, if
10  there was a public statement that was put out by
11  the jurisdiction, we would -- we would defer to
12  that.
13       Q.  Did you take any steps to find
14  out -- for example, suppose there's a public
15  statement that disputes what a private citizen
16  has said on Facebook or Twitter, would you go
17  further research to figure out who was telling
18  the truth or would you just relay the official
19  government explanation of the incident to the
20  social media platforms?
21       A.  We would relay the -- the official
22  statement from the jurisdiction.
23       Q.  I take it sometimes you would go
24  find that official statement on your own, and
25  sometimes you would reach out to the state or

Page 222

1  local jurisdiction to see if they issued a
2  statement?
3       A.  Yeah, we would find, I think it
4  implies that we were doing a rigorous search.
5  Generally, we would be aware if a jurisdiction
6  put out a statement and we would just pull it
7  ourselves.
8       Q.  Look ahead to --
9       A.  And sometimes --
10       Q.  Go ahead.
11       A.  Sorry.
12          Sometimes we would reach out to the
13  jurisdiction and they would just provide the
14  statements that they had already made public, as
15  well.
16       Q.  Would you relay that to the social
17  media platform?
18       A.  Yeah, if they were asking for
19  additional information we would.
20       Q.  Here's another one, page 35 of the
21  PDF, Bates 8663.  Do you see that on the screen
22  share?
23       A.  I'm scrolling down to it.  8663?
24       Q.  Yeah.
25       A.  Yep.

Page 223

1       Q.  And here in this e-mail chain it
2  looks like it's another situation where Twitter
3  asked for some clarification, for example, she
4  says, on November 6th, have Pennsylvania state
5  officials provided initial information to you on
6  the authenticity of the video or the
7  circumstances under -- underpinning it; do you
8  see that?
9       A.  I do.
10       Q.  And then you respond, scrolling
11  back up, you say:  There are two reports in the
12  e-mail chain, and you explain what you
13  understand what Pennsylvania is saying about the
14  disputed information; right?
15       A.  Sorry, I'm just scrolling down to
16  make sure I understand the context of the chain.
17          Okay.  Sorry.  Could you repeat the
18  question?
19       Q.  Sure.  My question is:  You
20  provided clarification to the social media
21  platform about what you believe the Pennsylvania
22  reporter meant; correct?
23       A.  I don't believe that is correct.
24       Q.  Well, did you say, for example, on
25  the authenticity Pennsylvania states in the very

Page 224

1  first e-mail that they believe the videos are
2  false and we're reaching out to our partners to
3  validate; correct?
4       A.  Correct.
5       Q.  Okay.  And then, later that day, if
6  you scroll up, you say:  Hey, to Twitter, just
7  came across this debunk of the video on Twitter;
8  correct?
9       A.  Yes.
10       Q.  And then -- so you are looking
11  around to find information that would debunk it;
12  correct?
13       A.  I don't know if that's correct.
14  It's possible somebody just let us know that
15  there was something there.
16       Q.  And then 17 minutes later Twitter
17  responds, thank you so much, we applied a label
18  to the tweet; correct?
19       A.  Yes, that's what they said back,
20  correct.
21       Q.  Scroll down to page 8669.
22       A.  What page of the PDF?
23       Q.  46.
24       A.  46?
25       Q.  Yes.  And here you've got a

56 (Pages 221 to 224)

**BRIAN J. SCULLY  1/12/2023**

---

Page 225

1 misinformation report from the secretary of
2 state of Arizona's office; do you see that?
3      A.  Yes.
4          Q.  It says:  This post is on a private
5 Facebook page, above.  I've included a screen
6 shot; correct?
7      A.  That's what the Arizona e-mail
8 says, yep.
9          Q.  How did they -- was that unusual
10 for them to report statements on a private
11 Facebook page?
12     A.  I don't -- I don't know.  We didn't
13 do any analysis of that kind.
14         Q.  Okay.  So you don't know whether
15 someone was monitoring how posts appeared on a
16 private Facebook page containing alleged
17 misinformation?
18     A.  I don't know how Arizona secretary
19 of state came across that information, no.
20         Q.  Dropping ahead to page 864, now.
21 Here at 954 --
22     A.  I'm sorry.
23     Q.  Sorry.
24     A.  54?
25     Q.  Oh, sorry, page 54 of the PDF, yes,

---

Page 226

1 sorry.  Actually, no, I'm sorry, that's not the
2 right page.
3      A.  Okay.
4          Q.  No, sorry, page 59 of the PDF?
5      A.  59?  Okay.
6          Q.  Here's a chain on Tuesday, November
7 10th, at 7:23 in the evening, you forwarded a
8 report of information -- misinformation to
9 Twitter; correct, at 7:23?
10     A.  Yeah, that's what appears, there's
11 no he header on the e-mail, but considering the
12 responses is from Twitter, I assume that's who I
13 sent it to.
14         Q.  And Twitter responds in two
15 minutes, we will escalate; right?
16     A.  Yep.
17         Q.  And then Twitter responds here a
18 few minutes later, after midnight, at 12:11
19 a.m., hey, we labeled all the tweets except two;
20 right?
21     A.  Yes.
22         Q.  So Twitter was working on this well
23 into the evening, along with -- were you guys
24 doing that well into the evening?
25         MR. GARDNER:  Objection, compound.

---

Page 227

1 BY MR. SAUER:
2          Q.  Timeframe?
3      A.  So was Twitter working on it well
4 into the evening?  I mean, I guess.  Were we?
5 Again, if somebody was checking the phone, most
6 of the post-election stuff would have been me.
7 We would have done something with it, but it
8 wasn't a requirement.
9          (Exhibit No. 11 was marked for
10 identification.)
11 BY MR. SAUER:
12         Q.  And showing you Exhibit 11, which
13 should be in your inbox.
14         MR. GARDNER:  Yeah, I think that's
15 right.
16     Q.  Okay.
17         Q.  On the last page of this PDF,
18 there's an e-mail from Aaron Wilson?
19         MR. GARDNER:  I'm sorry, John, do
20 you want to post it on the screen?
21         MR. SAUER:  Oh, thank you.
22         MR. GARDNER:  You don't need to, if
23 you don't want to, I mean, we have the --
24         MR. SAUER:  I got it, I mean, I
25 thought it was up.

---

Page 228

1 BY MR. SAUER:
2          Q.  Last -- see it, last page of the
3 PDF, there's a report from CIS.
4      A.  Yeah.
5          Q.  Actually, this is, interstingly, a
6 report from CIS to Gwinnet County; right?  Where
7 they say:  Hi Kristi, the EI-ISAC and our
8 partners at the Election Integrity Partnership
9 are tracking a social media post that's getting
10 traction very quickly; right?
11     A.  Yes, that's what the e-mail reads,
12 yeah.
13         Q.  So this is a situation where the
14 reporting was actually originated by CIS or EIP
15 or actually, according to this e-mail, both of
16 them.  They're the ones who noticed the
17 misinformation, online, first; right?
18         MR. GARDNER:  Objection to form.
19 BY MR. SAUER:
20         Q.  Correct?
21     A.  That's what -- that's what the
22 e-mail appears to say, yeah.
23         Q.  And they reached out, you know,
24 proactively to Gwinnett County asking them to
25 debunk it; right?

---

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

**BRIAN J. SCULLY  1/12/2023**

Page 229

1      A.  Yeah, they're just trying to get
2   what was actually going on, yeah.
3      Q.  Yeah, they say:  We're tracking a
4   social media post that's gaining traction very
5   quickly.  It's likely a misunderstanding, but
6   being portrayed as a nefarious act.  If you can
7   clarify for us what is being shown, if it even
8   happened, we can work with the social media
9   platforms to try to have the post removed as
10  misinformation; correct?
11     A.  Yeah, that's what he wrote.
12     Q.  And then Gwinnett County comes back
13  with a -- a -- an explanation of the post;
14  correct?
15     A.  Yes.
16     Q.  And that's forwarded to Twitter by
17  CIS, along with their explanation; correct?
18        Well, actually, before they report
19  it to Twitter they report it to you; right?
20  Here's there's an e-mail that says --
21     A.  Yeah.
22     Q.  -- Brian and EIP --
23     A.  Yes.
24     Q.  Right?  So Brian --
25     A.  Yep.

Page 230

1      Q.  And EIP is Election Integrity
2   Partnership; right?
3      A.  Yep.
4      Q.  And that's what CIS says, and they
5   sent this to --
6      A.  Yes.
7      Q.  -- your e-mail, two CISA e-mails,
8   their own e-mail and
9   tips@2020partnership.atlassian.net; right?
10     A.  Yep.
11     Q.  So they sent this e-mail, where
12  they say:  Brian and EIP, to you, two CISA
13  accounts, their own account, and
14  tips@2020partnership.atlassian.net; right?
15     A.  Yep.
16     Q.  So it appears that that
17  tips@2020partnership e-mail is an EIP e-mail;
18  right?
19        MR. GARDNER:  Objection, asked and
20  answered, multiple times.
21  BY MR. SAUER:
22     Q.  Does that refresh your memory?
23     A.  I wouldn't say refreshes my memory,
24  but it's going on CISA or CIS e-mail there, so
25  it's probably a reasonable assumption to make.

Page 231

1      Q.  Then you forward this on, having
2   received the report from CIS; right?
3      A.  Yep.
4      Q.  And then @Twitter reports back to
5   you, and says, they labeled the tweet and are
6   taking steps to limit trending; right?
7      A.  Yes.
8      Q.  What does that mean to take steps
9   to limit trending; do you know?
10        MR. GARDNER:  Objection, calls for
11  speculation.
12     A.  Yeah, I don't know.  Twitter has a
13  range of tools that they use.  I couldn't
14  possibly speculate on what they were doing here.
15     Q.  Let's put Exhibit 12 back up.
16        These are the interrogatory
17  responses.
18        MR. GARDNER:  Yeah, hold on one
19  second, John.  You said 12?
20        MR. SAUER:  Yeah.
21        MR. GARDNER:  Hold on one second.
22        MR. SAUER:  Go to page 38.
23        THE WITNESS:  38.
24        MR. SAUER:  Yeah, if you would.
25        THE WITNESS:  Okay.  I'm on page

Page 232

1   38, John.
2   BY MR. SAUER:
3      Q.  Oh, sorry, I'm on page 28.  My
4   mistake.
5      A.  All right.
6      Q.  38 asks that here, you see where it
7   says CISA, and it says:  CISA responds that
8   meetings taking place with the social media
9   platforms relating to misinformation include,
10  but are not limited to, and then there's a
11  bullet list; right?
12     A.  I think that is 38, not 28.
13     Q.  Yeah, it should be on page 38?
14     A.  Sorry.  I thought you said 28.  Let
15  me get back down there.
16     Q.  Oh, I meant I was mistaken.
17     A.  Okay.  So there's a table, am I
18  looking below the table or above the table?
19  Below the table?
20     Q.  Yeah.
21     A.  Got you.  Okay.
22     Q.  Okay.
23     A.  I'm sorry, what am I looking for?
24     Q.  Were you involved in identifying
25  meetings between CISA and social media platforms

58 (Pages 229 to 232)

BRIAN J. SCULLY  1/12/2023

Page 233

1  relating to misinformation in responding to
2  discovery requests?
3       A.  Yes, I believe I was.
4       Q.  What meetings did you identify?
5       A.  Certainly these, the recurring
6  meetings listed here, that we talked about, the
7  preparation meeting we talked about, going
8  through the list, MDM, joint MDM working group,
9  I think I missed -- those are the ones I would
10  have identified.
11       Q.  Start with the first one, first
12  bullet point, a recurring meeting usually
13  entitled USG industry meeting, which has
14  generally had a monthly cadence; right?
15       A.  Yep.
16       Q.  And that is the one that you refer
17  to as the sync meeting between industry and
18  social media platforms; correct?  I'm sorry,
19  industry --
20       A.  Right.  Yes, that's correct.
21       Q.  And you list there, I think seven
22  or eight social media platforms, and the
23  response, Google, Facebook, Twitter, Reddit,
24  Microsoft, and then Verizon Media, Pinterest,
25  LinkedIn and Wiki Media Foundation; correct?

Page 234

1       A.  Right, that's correct.
2       Q.  And when you say this generally has
3  a -- had a monthly cadence, in fact, far away
4  from elections it was only quarterly, and then
5  it became monthly close to elections, and became
6  weekly before the 2020 election; right?
7       A.  I would say from summer of 2018 to
8  2020 they were -- to early 2020 they were
9  quarterly.  Sometime in 2020 they became monthly
10  and then as we got closer to the election in
11  2020 they became weekly.
12       Q.  Why did they become weekly close to
13  the election?
14       A.  They were mostly just touch points
15  in case anything kind of popped up.  Those are
16  much less formal than the monthly ones.  We
17  didn't have an agenda for those, just an
18  opportunity for folks to share, if they had any
19  questions or anything like that.
20       Q.  What sort of stuff did folks share
21  in these weekly touch point meetings?
22       A.  So from a CISA perspective, we
23  generally provide updates on any election
24  security-related issues.  So if -- you know, if
25  there were any administrative kind of problems

Page 235

1  that say we're having, speaking along those
2  lines, the other federal partners, if they had
3  any, again, kind of strategic, unclassified.
4  Intelligence reporting that they felt was
5  relevant, they might share that.  And then the
6  platforms, I don't know what they were sharing
7  generally.  I don't -- probably just general
8  trends that they might be seeing on the
9  platforms, but I don't recall specifically what
10  they talked about.
11       Q.  And all these things that they
12  share are related to election misinformation and
13  misinformation on social media platforms?
14       A.  No.  It also included cyber
15  security, in fact, I would say most of it -- I
16  wouldn't say most of it -- a lot of it was cyber
17  security.  And then there was a little bit on
18  any physical threats that were occurring.
19       Q.  So that -- that's if someone was
20  actually threatening poll workers, something
21  like that?
22       A.  Correct.
23       Q.  And so in addition to physical
24  threats, there were cyber security and issues
25  related to misinformation and disinformation?

Page 236

1       A.  Correct.
2       Q.  Is anything else discussed in these
3  meetings?
4       A.  I mean, I think those are the
5  main -- main topics that I recall.
6       Q.  Was -- was the risk of hack and
7  leak operations or hack and dump operations
8  discussed in these meetings?
9       A.  I don't -- I don't recall a
10  specific incident of that, but it's definitely
11  possible.  It's a tactic that had been used in
12  the past.
13       Q.  Did you remember you raising
14  concerns about hack and leak operations?
15       A.  Me, personally, I don't recall
16  myself raising that, but it's possible.
17       Q.  How about -- how about Laura
18  Dehmlow, did she ever raise that, discuss hack
19  and leak operations?
20       A.  Again, I don't know.  It was a
21  tactic that had been used globally, previously.
22  So it wouldn't surprise me if there was some
23  discussion of that somewhere in these meetings.
24       Q.  Do you remember anyone on the
25  government side discussing it?

59 (Pages 233 to 236)

**BRIAN J. SCULLY  1/12/2023**

---

Page 237

1    A.  Not specifically, no.
2        Q.  How about on the industry side,
3    anyone from the social media platforms
4    discussing hack and leak operations?
5        A.  Yeah, unfortunately, I just don't
6    have that kind of recollection of conversations.
7    So no, I don't specifically remember that.
8    Again, it's possible, and I wouldn't be
9    surprised.
10       Q.  How about Elvis Chan, you know who
11   he is; right?
12       A.  I do.
13       Q.  Did he ever -- do you remember him
14   ever talking about hack and leak issues in these
15   meetings in 2020?
16       A.  Again, I don't have any specific
17   recollection of that, but it's always possible,
18   for sure.
19       Q.  How about Matt Masterson?
20       A.  Same answer, you know, it's
21   possible, but I don't recall specific
22   conversations.
23       Q.  Let me e-mail you a couple more
24   exhibits.
25       A.  Sure.

---

Page 238

1        Q.  Do you know Yoel Roth is?
2        A.  Yes, I know who Yoel Roth is.
3        Q.  Do you know him personally?
4        A.  Only in the fact that I've met him
5    a couple times.  He was at meetings, you know,
6    some of these synch meetings he would be at.
7        Q.  Were these meetings related to
8    misinformation with CISA?
9        A.  Again, these are regular sync
10   meetings that we talked about, it's also I do
11   recall we had some Twitter-only calls, as well,
12   that he participated in, so again, it's general
13   meetings would be of conversations.
14       Q.  What was -- what was discussed in
15   the Twitter-only meetings?
16       A.  Similar, basic
17   relationship-building stuff would be some of it,
18   so, you know, just going and making sure we know
19   who's who, and having conversations about, you
20   know, just relationship-building sides.  I also
21   believe we had some briefings from them on some
22   of their public reports, if I recall correctly,
23   so things like that.  There wasn't a ton of
24   them.
25       Q.  Is this public reporting related to

---

Page 239

1    misinformation and disinformation issues?
2        A.  Yeah, again, I don't know if that's
3    what they called it, but that was kind of our
4    interpretation of it.  I think they used
5    coordinated and in-authenticated or so, but I
6    don't recall if Twitter -- if Twitter
7    articulated it.
8        Q.  You would view those briefings in
9    those bilateral meetings with Twitter as
10   relating to misinformation and disinformation on
11   social media?
12       A.  Yeah, some of that, and some of it
13   I'm sure kind of talking him through how
14   elections work, because a lot of education they
15   weren't super familiar with the election
16   administration, how they worked, and a different
17   role and responsibility, you know, about
18   elections.  So again, we tried to educate as
19   much as we could.
20       Q.  Were there bilateral meetings with
21   other social media platforms, like this, where
22   misinformation was discussed in any way?
23       A.  Yeah, again, generally, from a
24   relationship-building standpoint, particularly
25   early on in the process, we would meet -- we met

---

Page 240

1    with the platforms just to talk about kind of
2    what our role, what we would do, kind of how the
3    relationship should act.
4            So just as an example, we could
5    relate to the K-theoretical.  In those
6    meetings we wanted to make sure that the
7    platforms understood we would never ask them to
8    undertake any specific actions.  So we would
9    reiterate that in all of our meetings.  And, you
10   know, that was something we continued throughout
11   the process.
12           We would educate them on -- on
13   elections, as I mentioned.  We would talk to
14   them a little bit about our resilience-building
15   work, as I discussed.  They would just kind
16   of -- again, relationship-building type stuff,
17   very general kind of conversations.
18       Q.  What you describe as the process,
19   is that the process of, you know, referring
20   disinformation concerns to them, that we've been
21   talking about today?
22       A.  We did have conversations, but I
23   think I was referring to the election processes,
24   how the election processes worked.
25       Q.  You said early, when you said early

---

**LEXITAS LEGAL**

**BRIAN J. SCULLY  1/12/2023**

Page 241

```
 1    in the process, you meant early in the election
 2    process?
 3         A.  Oh, yeah, sorry.
 4         Q.  You would have -- you had meetings
 5    with -- bilateral meetings with Twitter and
 6    Facebook and other social media companies?
 7         A.  Right.  So in 2018 we didn't have
 8    any relationships with the platforms, at all.
 9    So in our initial stages of trying to build
10    those relationships we would go meet with each
11    platform one-on-one, just to make sure we could
12    kind of talk to, understand what their concerns
13    are, and then, you know, basic
14    relationship-building stuff.
15         Q.  Did those bilateral meetings happen
16    in 2020, as well?
17         A.  I would say they probably --
18    probably had bilateral meetings in 2020.  I'm
19    not remembering any specific, off the top of my
20    head, but I believe prior to starting the
21    switchboarding work, in 2020, we had
22    conversations with each platform individually.
23         Q.  Those would be when you talk about
24    what you would be doing in the switchboarding
25    area; right?
```

Page 242

```
 1         A.  Yeah, kind of what we would be
 2    doing, and again, to reaffirm our position that
 3    we would never ask them to take any specific
 4    actions, that they should make decisions based
 5    on their term of service.
 6         Q.  So you're specifically talking
 7    about the fact that you would be sending them
 8    reports about disinformation during the election
 9    cycle?
10         A.  Yeah, we would be forwarding them
11    reports from different election officials, yeah.
12         Q.  Just putting Exhibit 12 back up,
13    here.
14         Let me show you where in your
15    interrogatory responses you disclosed those
16    bilateral meetings with social media platforms
17    here in --
18         MR. GARDNER:  Hold on.  We're --
19    we're pulling 12 back up, John.  Hold on.
20         MR. SAUER:  Page 38 to 39, it
21    actually goes onto 40.
22         MR. GARDNER:  Yeah, hold on.  Whoa
23    whoa, whoa, whoa, yeah, almost there.  You said
24    38, John?
25         MR. SAUER:  Page 38.
```

Page 243

```
 1    BY MR. SAUER:
 2         Q.  There's a list of five bullet
 3    points.
 4         A.  Okay.  I'm sorry, what was your
 5    question?
 6         Q.  Can you show me where on this
 7    interrogatory response you disclosed, for
 8    example, bilateral meetings between CISA and
 9    Twitter or CISA and Facebook relating to the
10    misinformation reporting that we've been talking
11    about?
12         A.  So I don't want to speak on behalf
13    of whoever submitted the final product, but my
14    assumption would be that they would be on the
15    preparation meeting.  But I'm not -- I'm not
16    sure how they captured those in here.
17         Q.  Were those the same as preparation
18    meetings for the USG industry meeting?
19         A.  I probably wouldn't consider them
20    to be the same, but there's -- there are similar
21    types of meetings.
22         (Exhibit No. 13 was marked for
23    identification.)
24    BY MR. SAUER:
25         Q.  Let's get Exhibit 13 back up.
```

Page 244

```
 1         Do you see this as a document filed
 2    before the FEC, entitled:  Declaration of Yoel
 3    Roth?
 4         A.  Okay.
 5         Q.  And scrolling, have you seen this
 6    document before?
 7         A.  I have not.
 8         Q.  Scroll down to paragraph 11.  Start
 9    with paragraph 10.  Mr. Roth says in this
10    declaration, he says, since 2018 I have had
11    regular meetings with the office of the director
12    of National Intelligence, the Department of
13    Homeland Security, the FBI, and industry peers
14    regarding election security; right?
15         A.  Yep.
16         Q.  Was this a description of the --
17    the sync meetings that we talked about today,
18    between US government and social media
19    platforms?
20         MR. GARDNER:  Objection, lack of
21    foundation, calls for speculation.
22    BY MR. SAUER:
23         Q.  Do you see that?
24         A.  Yeah, I don't know what he's
25    talking about, obviously I can't tell for
```

**BRIAN J. SCULLY  1/12/2023**

---

Page 245

1    certain what he's talking about.
2         Q.  No?  Since 2018 has the Department
3    of Homeland Security had regular meetings with
4    social media platforms --
5         A.  Yep.
6         Q.  -- ODNI and the FBI?
7              MR. GARDNER:  Objection, lack of
8    foundation.
9         A.  Yes.
10        Q.  Yes, it has, because you've
11   testified about them repeatedly today, so there
12   obviously is a foundation, isn't there?
13             You have been personally involved
14   in multiple meetings, these sync meetings,
15   between USG and industry, and they involve seven
16   or eight social media platforms, ODNI, the
17   Department of Homeland Security, specifically
18   CISA, and the FBI, didn't they?
19        A.  We had regular meetings, as I
20   talked about.  Whether or not that is what Yoel
21   is also talking about, here, I can't say.  But I
22   don't think that's a bad inference to make.
23        Q.  Okay.  Scroll down to paragraph 11:
24   During these weekly meetings the federal law
25   enforcement agencies communicated that they

---

Page 246

1    expected hack and leak operations by state
2    actors might occur in the period shortly before
3    the 2020 presidential election, likely in
4    October; do you see that?
5         A.  Yes.
6         Q.  Do you recall that kind of
7    communication occurring in any of these sync
8    meetings that occurred in 2020?
9         A.  Again, I don't specifically recall.
10   But as I said earlier, it's certainly possible,
11   because it was a common tactic.
12        Q.  But you don't remember any federal
13   agencies talking about hack and leak operations
14   in these meetings, but you don't dispute that it
15   could have happened?
16        A.  That's correct, yes.
17        Q.  Okay.  Next sentence, Mr. Roth
18   says:  I was told in these meetings that the
19   intelligence community expected that individuals
20   associated with political campaigns would be
21   subject to hacking attacks, and that the
22   material obtained through those hacking attacks
23   would likely be disseminated over social media
24   platforms, including Twitter; do you see that?
25        A.  I do.

---

Page 247

1         Q.  Do you recall that being
2    communicated in any of these sync meetings?
3         A.  Again, it's -- I don't remember
4    specifics, but it would not surprise me if this
5    was discussed.
6         Q.  Next sentence, Mr. Roth says:
7    These expectations of hack and leak operations
8    were discussed throughout 2020.
9              Does that ring a bell?  Do you
10   recall this being raised multiple times and
11   repeatedly in these sync meetings?
12        A.  Again, it's the same response.  I
13   don't have specific memories of every item that
14   was requested or very good memory of the
15   conversations, in general.  But I would
16   definitely not be surprised if these were
17   included in those conversations.
18        Q.  Okay.  And then the very next
19   sentence, spilling onto page 3, I also learned
20   in these meetings that there were rumors that a
21   hack and leak operation would involve Hunter
22   Biden; do you see that?
23        A.  I do.
24        Q.  Do you recall any mention of Hunter
25   Biden in any of these meetings with social media

---

Page 248

1    platforms?
2         A.  I don't.
3         Q.  So you don't know -- do you -- do
4    you dispute that Mr. Roth remembers it
5    correctly?
6         A.  I mean, I have no basis to dispute
7    or not dispute.
8         Q.  Okay.
9         A.  These aren't topics that CISA would
10   be briefing on, so it's possible another agency
11   did brief on them.
12        Q.  How about the FBI, do you remember
13   the FBI, Laura Dehmlow and Elvis Chan, saying
14   anything about Hunter Biden during these
15   meetings?
16        A.  I don't.
17        Q.  How about ODNI?
18        A.  I don't, no.
19        Q.  How about DOJ, national security
20   division?
21        A.  I don't, no.
22        Q.  This is dated December 17th, 2020,
23   so that would have been within a couple of
24   months of these meetings, a month or two of the
25   last meeting; is that right?

---

62 (Pages 245 to 248)

Page 249

1        A.  I'm sorry, what was -- could you
2   repeat that?  I just want to make sure I
3   understand what you're asking.
4        Q.  I was just scrolling down to the
5   fourth page of the document, where it's dated
6   December 17th, 2020.
7        A.  Oh.
8        Q.  Do you see that?
9        A.  Yep.
10       Q.  So this declaration would be
11   executed close in time to the meetings that are
12   being discussed; correct?
13       A.  Correct.
14           MR. SAUER:  I'm going to e-mail you
15   Exhibit 14.
16           MR. GARDNER:  John, did you say 14?
17           MR. SAUER:  Exhibit 14, yeah, do
18   you have that?
19           MR. GARDNER:  Yeah, we already have
20   that, the deposition of Elvis Chan.
21           MR. SAUER:  Yeah.  Sorry, guys.
22           (Exhibit No. 14 was marked for
23   identification.)
24   BY MR. SAUER:
25       Q.  This is the third page of this

Page 250

1   document.
2        A.  Okay.
3        Q.  There's an exchanges here where Mr.
4   Chan is asked -- he refers to the federal law
5   enforcement agencies, plura, in that sentence,
6   do you see that answer, yes; do you see where
7   that is?
8        A.  Line four?
9        Q.  Yeah.
10       A.  Is that what you're referring to?
11       Yeah, you're referring to the
12   question at line four?
13       Q.  Right.
14       A.  Okay.  Yeah, I see that.
15       Q.  And Mr. Chan was asked the question
16   on line eight, whether other federal law
17   enforcement agencies, other than the FBI, talked
18   about hack and leak operations; do you see that?
19       A.  I do.
20       Q.  And he says he doesn't think of any
21   other federal law enforcement agencies, there at
22   line 15.  The only federal law enforcement
23   agency I remember conveying our concern about
24   hack and leak operations was the FBI; right?
25       A.  That's his response, correct.

Page 251

1        Q.  And then he was asked, how about
2   any other agency, not law enforcement.  And he
3   answered, as I mentioned, I believe CISA would
4   have had the same concern as the FBI; right?
5        A.  That was his response, yep.
6        Q.  And I asked him:  That was relayed
7   through Mr. Masterson and Mr. Scully, I think
8   you said, correct?  And he answered, correct;
9   right?
10       A.  Okay.  Yep.
11       Q.  Do you remember either you or
12   Mr. Masterson relaying a concern about hack and
13   leak operations in those meetings?
14       A.  I don't.
15       Q.  Next page of the document, page
16   222, fourth page of the PDF, you testify:  I
17   believe that the senior election official from
18   ODNI would also flag -- flag that as a concern;
19   correct?
20       A.  Yes.  That's what he says, yes.
21       Q.  Do you remember anyone from ODNI
22   raising a concern about hack and leak operations
23   in these meetings?
24       A.  Again, as I said in your previous
25   questions, I don't recall specifics, but it

Page 252

1   wouldn't surprise me if -- if they were
2   mentioned.
3           MR. SAUER:  I'm sending you Exhibit
4   15 by e-mail.
5           (Exhibit No's. 15, 16 and 17 were
6   marked for identification.)
7           MR. GARDNER:  John, are you
8   intending to screen share?
9           MR. SAUER:  Yeah, I'm doing that
10   right now.
11          MR. GARDNER:  We're still waiting
12   for the exhibit.
13          MR. SAUER:  Sorry.  I think I got
14   my exhibits switched up.  Yeah, here, I'm
15   showing you exhibit -- I think it will be
16   Exhibits 15, 16 and 17.  You know, the one that
17   I thought was 15 is 16, the one that I thought
18   was 16 is 15, so I'm showing you Exhibit 16.
19          MR. GARDNER:  So when we receive
20   your e-mail do you want us to pull up the
21   document marked 16?
22          MR. SAUER:  Yeah, you should have
23   received it already.
24          MR. GARDNER:  Yeah, not yet.
25          MR. SAUER:  There should be an

63 (Pages 249 to 252)

**BRIAN J. SCULLY  1/12/2023**

Page 253

1    e-mail with 15, 16 and 17 all attached.
2         MR. GARDNER:  Yeah, not yet.
3         MR. SAUER:  Really?  Well --
4         MR. GARDNER:  Oh, here we go.
5    Do you want us to pull up 16 first?
6         MR. SAUER:  Yeah.
7         MR. GARDNER:  Okay.  John, I have
8    15 here, and I got set up -- I see what's
9    happening.  Hold on.  Yeah, sorry.
10        MR. SAUER:  It's a one-page e-mail,
11   it should be up.
12        MR. GARDNER:  Yep.  Yeah.
13   BY MR. SAUER:
14        Q.  Here's a -- Mr. Scully, you see an
15   e-mail here from Facebook to you and
16   Mr. Masterson, as well as Allison Snell and
17   Geoff Hale; correct?
18        A.  I do.
19        Q.  And there it indicates that there
20   it's called today's industry statement; right?
21        A.  Joint industry statement.
22        Q.  Right.  And they say -- and
23   Facebook says to you, I wanted to ensure you had
24   the statement we will look to release following
25   today's meeting; right?

Page 254

1         A.  Correct.
2         Q.  And then, under the joint industry
3    statement, it talks about how there are these
4    meetings that have been going on; right?
5         A.  Yes.
6         Q.  And then it says -- the majority of
7    the statement says:  At today's meeting we
8    specifically discussed three things; right?
9         A.  Yes.
10        Q.  And the second one of those says:
11   Ways to counter targeted attempts to undermine
12   election conversation before, during, and after
13   the election; right?
14        A.  It does.
15        Q.  And the industry statement goes on
16   to say:  This includes preparing for possible
17   so-called hack and leak operations, attempted to
18   use platforms and traditional media to amplify
19   unauthorized information drops; correct?
20        A.  Correct.
21        Q.  Does that -- and so the industry
22   prepared a public statement saying that hack and
23   leak operations were discussed at one of these
24   meetings; correct?
25        A.  Correct.  Yes.

Page 255

1         Q.  Does that refresh your memory, at
2    all, about hack and leak operations being raised
3    at these sync meetings in 2020?
4         A.  Again, I don't have any specific
5    recollections of the conversations.  But as I
6    said a few times, now, it doesn't surprise me
7    that they would discuss the common tactic used
8    globally.
9         Q.  Were you aware of any pending
10   investigations, at that time, into possible
11   hack -- actual possible hack and leak
12   operations?
13        A.  No.
14        Q.  I'm showing you what should be
15   Exhibit 15.
16        MR. GARDNER:  Got it.
17        THE WITNESS:  Okay.
18   BY MR. SAUER:
19        Q.  And here's an e-mail from Lauren
20   Protentis to people at Facebook and CISA, that
21   refers to the prep USG industry called monthly,
22   in the subject line; correct?
23        A.  Yes, correct.
24        Q.  And I think you testified earlier
25   that Facebook was kind of the point for the

Page 256

1    industry.  And so there would be a preparatory
2    meetings between CISA and Facebook to kind of
3    set the agenda for the big monthly meeting that
4    involved all the platforms and at least four
5    agencies; right?
6         A.  That's correct, yeah.
7         Q.  Okay.  Here it says, among other
8    things, industry prompts, themes, narratives,
9    approaches you anticipate for races you think
10   will be targeted, right, is number two?
11        A.  Yes.
12        Q.  Okay.  What's that talking about,
13   are they asking that industry to report back on
14   what themes and narratives on social media they
15   anticipate may happen in certain election races?
16        A.  So I'm not -- I'm not sure what,
17   specifically, they were talking about here.
18   It's possible they were trying to understand if
19   they were particularly they were being targeted
20   by foreign actors, but I don't know, that's --
21        Q.  How about themes and narratives?
22        A.  Yeah, I think that would be
23   pretty --
24        Q.  Go ahead.
25        A.  I think that would be the same kind

**LEXITAS LEGAL**
**www.lexitaslegal.com**     **Phone: 1.800.280.3376**     **Fax: 314.644.1334**

**BRIAN J. SCULLY  1/12/2023**

Page 257

1   of idea.  Again, as I mentioned earlier, in a
2   lot of these calls the intelligence community
3   would provide kind of high-level assessments of
4   unclassified reporting that they had done.
5        Q.  What does industry prompts mean?
6        A.  Generally speaking, it would be the
7   questions that industry had for government.
8        Q.  So industry --
9        A.  For --
10       Q.  Go ahead.
11       A.  Actually, let me rephrase.  Sorry.
12           I think in this case it's --
13   it's -- I'm not sure, that's how I would have
14   interpreted it, but based on where it is in the
15   agenda I'm not sure that's what Warren meant.
16       Q.  In other words, these questions of
17   government for industry say, hey, social media
18   platforms tell us what themes, narratives,
19   approaches you're anticipating for the upcoming
20   election?
21       A.  No, my -- my interpretation of this
22   is that it's industry questions for government,
23   because the government portion of the agenda.
24   So industry, if possible, would like to hear
25   government's perspective on these questions.

Page 258

1        Q.  Did government share that with the
2   social media platforms in these meetings?  Did,
3   you know, the federal agencies talk about what
4   themes and narratives and approaches they
5   anticipated on social media for election races?
6           MR. GARDNER:  Objection, compound.
7           THE WITNESS:  Yeah, can you just
8   kind of break that question down for me?
9   BY MR. SAUER:
10       Q.  In the actual meetings did the
11   federal agencies provide information to the
12   social media platforms about the themes and
13   narratives they anticipated seeing on social
14   media for particular races, election races?
15       A.  I don't think it was ever broken
16   down by particular races.  I think there were --
17   again, there was intelligence.  If there's
18   intelligence that was unclassified they could be
19   shared about, targets and things like that, the
20   intelligence community would share that.
21           But generally speaking, I don't
22   think that we would necessary get down to the
23   individual race level, but again, I'm not -- I
24   don't have a memory of every specific item that
25   was discussed.

Page 259

1        Q.  How about do you remember themes
2   and narratives being discussed, like, hey, we
3   expect people to be, you know, talking about --
4   expect, you know, social media postings to
5   reflect this theme or that narrative?
6        A.  So I think there are two components
7   to this one.  I believe there are some
8   discussion about would we have seen historically
9   in the past, and may see going forward.  So --
10   so I believe there might have been some
11   discussion around that.
12           And then if -- again, if the intel
13   communities had reporting talked about foreign
14   actor efforts, they would share those.
15           I don't recall, specifically, what
16   was discussed.  So I -- I don't know if -- what
17   level of detail, if any, they got down to in
18   those conversations.
19           And I'm not even -- to be honest,
20   I'm not even sure if I attended this meeting.  I
21   think I either just got back from my detail or
22   it was right before I got back to my detail, so
23   I'm not sure I attended this one.
24       Q.  I'm going to share Exhibit 17.
25       A.  Okay.

Page 260

1        Q.  And this is a collection of
2   e-mails, again.
3           Here on the first page, in April of
4   2022, this year, Lauren Protentis is sharing the
5   agenda for one of these USG sync meetings.  And,
6   among other things, she says:  One-pager
7   reminder; do you know what she's talking about?
8        A.  Yeah, she -- we had asked industry
9   to provide a one-page summary of their content
10   moderation rules that we could share with
11   election officials.
12       Q.  What's the purpose of that, a
13   one-page summary of their content moderation
14   rules?
15       A.  So we -- we would receive a lot of
16   questions from election officials about how
17   different platforms made decisions about their
18   terms of service.  And we thought this was a way
19   to help the platforms be more transparent with
20   election officials.  So we asked them to just
21   put together kind of a one-page summary.
22       Q.  A one-page summary of basically
23   what their content moderation policies were as
24   applies to election misinformation?
25       A.  Yeah, that we could share with

65 (Pages 257 to 260)

BRIAN J. SCULLY  1/12/2023

Page 261

1  election officials.
2      Q.  I take it, then, the election
3  officials when they see something on social
4  media that they view as disinformation or
5  misinformation would be educated on whether or
6  not it violates that platform's policy; is that
7  right?
8      A.  I'm not sure that was the full
9  expectation, but I think it was just to try to
10  provide some transparency and some understanding
11  of how the platforms make a decision.
12      Q.  And why is it useful?  I take it
13  this was your idea, CISA's idea, not -- it
14  wasn't something that the election officials
15  have asked for?
16      A.  To be honest, it asks of maybe
17  before I returned, so I'm not entirely certain,
18  but I suspect it was some combination of
19  election officials asking.  We got a lot of
20  questions over the years about that, and us
21  just, you know, raising it with the platforms
22  the way they're trying to help the election
23  officials.
24      Q.  Jumping ahead, 15743, should be on
25  the 7th page of the PDF, there's a discussion in

Page 262

1  the April --
2      MR. GARDNER:  Are you at that now?
3      THE WITNESS:  Sorry, I just
4  accidentally got out.  I'm going to the page.  I
5  think I'm there.
6  BY MR. SAUER:
7      Q.  There's a discussion, a bullet
8  point in the agenda for the August 2020 USG
9  industry meeting of election-day coordination.
10      Do you know what -- what that was
11  discussed under that?
12      A.  Yeah, and just to be clear, you
13  know, we just jumped from 2022 back to 2020;
14  right?
15      Q.  Yeah.
16      A.  Okay.  Yeah, so CISA regularly set
17  up an operation center on election day, around
18  the election.  And the platforms and some of the
19  other agencies do the same.  But I think it was
20  just a conversation about how all the different
21  organizations were going to be managing on
22  election day.
23      Q.  What is the nature of a -- what is
24  CISA's election day operation do, does it
25  receive disinformation reports?

Page 263

1      A.  It's more of a -- so just taking a
2  step back, right, essentially what CISA does is
3  it invites key stakeholders to CISA to
4  facilitate information sharing about what's
5  going on within the elections.
6      Most of it is cyber related, but
7  the NAV and NAFTA that we talked about earlier
8  were there, and so if they heard reporting up
9  through their members, they might mention it.
10      Generally speaking, you might
11  have -- in 2020 have a little different,
12  because of COVID.  But generally speaking, we
13  would have somebody from our team there who we
14  would have a team kind of working on the chats.
15      And so the switchboard reporting
16  might come in and in 2018, for example, our guy
17  was sitting in the room, in 2020 I think I was
18  the only one in the room, maybe one other from
19  our team.  And then they would -- you know, so
20  that's -- I don't know if that helps clarify.  I
21  think I just talked in mode right there.
22      Q.  When you say in the room, is there,
23  like, a physical location where CISA and NASED
24  and NASS and social media platforms all have
25  people or what room are we talking about?

Page 264

1      A.  Yeah, so in 2020, CISA had a room
2  where we had some of our stakeholders attend in
3  person.  I don't have a full list of who was
4  there.  It was obviously not substantial, due to
5  COVID restrictions.  But we would have federal
6  partners, and we have NASS and NASED there.
7      I don't know who else was there,
8  but I believe there was a couple other, you
9  know, maybe election security vendors, folks
10  like that, just to facilitate information
11  sharing in case an incident occurred.
12      Q.  Who were the federal partners?
13      A.  I don't -- I don't believe in 2020
14  we had too many in the room, but CISA's watch
15  center operations for CISA central I talked
16  about earlier, they're our liaisons for many of
17  the different agencies, and then we had
18  connectivity with FBI, DOJ, NEI, I&A, things
19  like that.  Again, 2020 all you need due to the
20  pandemic.
21      Q.  And part of what happens in this
22  election-day operation is that NASED and NASS
23  may receive misinformation reports from their
24  members and report them up to you guys; right?
25      A.  Generally speaking, it would --

LEXITAS LEGAL
www.lexitaslegal.com        Phone: 1.800.280.3376        Fax: 314.644.1334

**BRIAN J. SCULLY  1/12/2023**

Page 265

```
1    they would handle them themselves, with the
2    platforms, but I'm sure there were examples of
3    where they sent it to us.
4         Q.  And then would you guys perform the
5    same misinformation routing function and pass
6    that along to the platforms?
7         A.  Yeah, correct.
8         Q.  Okay.  This happened again in 2022,
9    was there an election-day operation?
10        A.  It was an election operation center
11   in 2022.  We didn't do switchboarding in 2022,
12   as we discussed earlier.
13        Q.  You say you didn't do
14   switchboarding in 2022, did you relay --
15        A.  Correct.
16        Q.  -- misinformation or disinformation
17   concerns to social media platforms at any time
18   during the 2022 election cycle?
19        A.  Not that I recall, no.
20        Q.  How did the state and local
21   election officials relay those concerns to the
22   social media platforms, did they do a --
23        A.  Yeah, my understanding was
24   two-fold, one, I think some of the platforms
25   developed a little more robust infrastructure to
```

Page 266

```
1    engage with election officials, themselves.  And
2    then I also believe that CIS was up and running,
3    but I'm not certain what -- kind of how it all
4    worked.
5         Q.  So you believed that CIS continued
6    to receive disinformation/misinformation reports
7    from state and local election officials during
8    the 2022 election cycle, and relay them directly
9    to social media platforms?
10        A.  Yeah, I'm speculating a bit on
11   that, because I'm not particularly familiar with
12   what they actually did in 2020, but that was the
13   general understanding I had.
14        Q.  Did they copy you on those reports,
15   like they were doing in 2020?
16        A.  They were not, no.
17        Q.  Why not?  Did you tell them not to?
18   Did you say:  Don't copy us on these or did they
19   just stop?
20        A.  Yeah, we discussed earlier, CISA
21   didn't -- was not doing switchboarding in 2022,
22   so there's no reason for them to copy us.
23        Q.  And did you tell --
24        A.  But I --
25        Q.  Go ahead.
```

Page 267

```
1         A.  So I didn't have a conversation,
2    myself, with CIS about it, so I'm not sure who
3    told them not to do it.
4         Q.  Turning back to the 2022 election
5    day operation, was that another case where CISA,
6    NASED, NASS, and other federal agencies all had
7    representatives in one room?
8         A.  I -- I think there was some federal
9    representative there, like I said, most of that
10   would -- would be in the ops center.  There were
11   other nongovernment partners there, like -- like
12   I said, like the -- the vendors, election
13   security, election system vendors and folks like
14   that.
15        Q.  What -- what's the ops center?
16        A.  That's essential, that's kind of
17   the 24/7 situational awareness that CISA runs.
18   And my understanding is that it has liaisons
19   from across the federal agencies.
20        Q.  And were you there at the -- at the
21   ops center in 2022 election day?
22        A.  So the room we would be in would be
23   a separate room.  We wouldn't actually be on the
24   ops center floor.  We called it a situational
25   awareness room.
```

Page 268

```
1         Q.  On election -- were you there?
2         A.  I was in the situational awareness
3    room on election day in 2022, yep.
4         Q.  Any misinformation or
5    disinformation concerns arise on election day in
6    2022?
7         A.  I don't think there was too much.
8    I'm not recalling specific incidents.  I would
9    imagine the two were, but I don't think there
10   was very much, if there was.
11        Q.  What happened?
12        A.  I'm sorry, that's not very clear.
13   I just don't recall if there's
14   anything specific.  I have a general sense that
15   there were a couple of items, but I don't think
16   there was very much.
17        Q.  What happened to the ones that did
18   occur or that did arise, did they get routed to
19   different platforms?
20        A.  No, I think it -- no, if any of
21   those were mentioned, I think it was just in
22   general conversation of what might be happening,
23   but we didn't have anything on social media
24   platforms.
25        Q.  Did NASED and NASS route things to
```

**LEXITAS LEGAL**

**BRIAN J. SCULLY  1/12/2023**

Page 269

1    social media platforms?
2         A.  I don't -- I don't know for
3    certain.  I would -- I would guess they did.
4         Q.  Jumping ahead in Exhibit 17, page
5    14545, it's page 12 of the PDF, here's an
6    agenda from one of these sync meetings from July
7    of 2022; do you see that?
8         A.  Is it 14545?
9         Q.  Yeah, page 12 of the PDF.
10        A.  Just making sure.  Sorry, it's
11   weird how it shows the pages here.  Yeah, okay.
12   Yep.
13        Q.  And then Lauren Protentis, here, is
14   circulating an agenda for a sync meeting;
15   correct?
16        A.  This looks like it's for a prep
17   meeting.
18        Q.  Prep meeting?  Okay.
19             And then here in item four, it
20   says:  CISA elections infrastructure risks,
21   Scully; correct?
22        A.  Yep.
23        Q.  So is that referring to the plan
24   that you -- and do you have a briefing on
25   election infrastructure risks at the big sync

Page 270

1    meeting?
2         A.  Yeah, I believe normally Geoff Hale
3    would do that, I believe this meeting Geoff was
4    going to be unavailable, so they asked me to
5    cover the election infrastructure portion of the
6    agenda.
7         Q.  Now, what you said about them, what
8    does that mean, election infrastructure risks,
9    does that refer to informational infrastructure?
10        A.  No, that's -- again, that's kind of
11   the broader understanding of how elections
12   function, so the systems, physical security,
13   things like that.  It would just be an update on
14   kind of where things stand across kind of the
15   broader election infrastructure community.
16        Q.  Below that, item six, it says:
17   FBI, domestic, adversarial actor update, down
18   below; do you see that?
19        A.  I do.
20        Q.  Do you recall Laura Dehmlow giving
21   a briefing at that meeting you were at about a
22   domestic adversarial actor?
23        A.  I don't, and I -- I -- if I recall
24   correctly, and I don't know if you have the
25   actual agenda for the meeting, I think the --

Page 271

1    that changed.
2         Q.  Oh, you don't think she gave
3    that -- that -- that briefing?
4         A.  I don't believe so, no.
5         Q.  What kind of domestic adversarial
6    actors is the FBI's foreign influence task force
7    concerned about?
8         A.  I don't know.
9         Q.  Let's jump ahead to page 7599.
10             MR. GARDNER:  John, before we go
11   on, we've been going about two hours, again.  I
12   think now would probably be a good time for a
13   break.
14             MR. SAUER:  I just got a few more
15   questions about this document.  Can you keep
16   going for a couple more minutes.
17             MR. GARDNER:  Sure, we can do that.
18   BY MR. SAUER:
19        Q.  Let's just -- here, 7599.
20        A.  What page are we on?
21        Q.  That is page 16 of the PDF?
22        A.  Okay.
23        Q.  Do you see here on the bottom half
24   of the page, on July 1st, 2020, Facebook sends
25   e-mail to you and Matt Masterson, Matt and

Page 272

1    Brian, thank you so much for the outreach on our
2    next sync; right?
3         A.  Yep.
4         Q.  And then she gives a proposed
5    agenda for a meeting that she proposes having on
6    July 15th of 2020; correct?
7         A.  Yes.
8         Q.  And then, in that agenda, there's
9    an item here, under number two, that says:
10   Hack/leak and USG attribution speed/process; do
11   you see that?
12        A.  Yep.
13        Q.  What was that referring to?
14        A.  I -- I don't recall.  You know, I
15   would have to speculate based on what it says
16   here.
17        Q.  So you don't remember hack/leak
18   being put on the agenda for one of these
19   meetings?
20        A.  Again, as I said earlier, I don't
21   remember all the agenda items on the meetings or
22   specific discussion points.  But I'm not
23   surprised that it's on here, no.
24        Q.  Do you know why Facebook would have
25   put that on?

**LEXITAS LEGAL**
**www.lexitaslegal.com**       **Phone: 1.800.280.3376**       **Fax: 314.644.1334**

Page 273

1          MR. GARDNER:  Objection, calls for
2   speculation.
3   BY MR. SAUER:
4          Q.  If you know.
5          A.  I don't know.
6          Q.  And then what is --
7          A.  I mean, again --
8          Q.  Go ahead.
9          A.  Sorry, just as I said, you know, a
10   few times, right, it's not surprising, it was a
11   common tactic that was used globally.  But I
12   don't know why they -- if there was a specific
13   reason that they put it on here.
14          Q.  What -- how about that, in the
15   second half of that line, USG attribution
16   speed/process; right?  Do you know what that
17   means?
18          A.  I don't, CISA doesn't do
19   attributions, so I'm not sure what that could be
20   related to.
21          Q.  Attribution, when you say CISA does
22   not do attribution, what does that mean?
23          A.  Well, the way I would look at
24   attribution would be attributing specific actors
25   to something.

Page 274

1          Q.  That was --
2          A.  In the MDM context CISA does not do
3   attribution.
4          Q.  So attribution is figuring out who
5   is the actual source of the social media
6   posting?
7          A.  I mean, if you're talking about a
8   social media posting, that would be attribution.
9   If you're talking about hack and leak, I assume
10   that would be known as the attribution to who
11   the hacker and leaker was.
12          Q.  So this, then, could be a
13   discussion of -- you know -- and by the way,
14   this is listed there under 40 minutes deep dive
15   topics; right?
16          A.  Mm-hmm.
17          Q.  Do you know if you participated in
18   that July 15th, 2020 meeting?
19          A.  I would imagine I did, but I -- you
20   know, I would have to go back and look at my
21   calendar.  I don't know for certain.
22          Q.  You don't know -- sorry.
23          You don't know about whether there
24   was a deep dive on hack/leak and USG
25   attributions, the process?

Page 275

1          A.  I don't know for certain.  I mean,
2   I would have to go back.  Do you have the actual
3   agenda that we used for the meeting or just the
4   proposed one by -- by Facebook?
5          Q.  No, let me ask you this:  I take it
6   you -- you interpret, in the context of hack and
7   leak, USG attribution, USG is United States
8   government; right?
9          A.  Yeah, that's what I would assume it
10   is.
11          Q.  Attribution, I take it, is having
12   the USG, the government, figure out who did the
13   hack and the leak; right?  That's what
14   attribution means in this context?
15          A.  Assuming I was connected to hack
16   and leak, I obviously don't know what this is
17   specifically referring to, but if I were reading
18   that bullet point that's how I would read it,
19   that the attribution was USG attributing a hack
20   and leak.
21          Q.  Okay.  And then the question is
22   how -- how fast speed and how USG would go about
23   doing it; right, speed/process?
24          A.  Again, that's what the agenda says.
25   I don't know exactly what that means.

Page 276

1          MR. SAUER:  Let's take a break
2   there.
3          MR. GARDNER:  10 minutes good?
4          MR. SAUER:  Yeah.  How long have we
5   been on the record.
6          THE VIDEOGRAPHER:  The time is now
7   3:34 p.m.  We are off the record.
8          (Recess.)
9          THE VIDEOGRAPHER:  The time is now
10   3:50.  We are back on the record.
11          MR. SAUER:  Before we go back to
12   questioning, I'm formally requesting, on the
13   record, a supplementation of the document
14   production directed to CISA custodians.  If you
15   look at those pages where the key custodians are
16   disclosed, we've had testimony today that that
17   list of custodians at ESI should have been
18   searched, should have included the five names
19   that the witness has testified to today, Chad
20   Josiah, Rob Schaul, Adam Zaheer, John Stafford
21   and Pierce Lowary.
22          And, in fact, I think it's
23   astonishing that four of those names are
24   specifically identified as copied on e-mails
25   from the key custodians, but whose ESI was not

69 (Pages 273 to 276)

Page 277

1    searched.
2            So I request supplementation by
3    tomorrow, which is the close of fact discovery.
4    We were entitled to that going back to August.
5    And this is the first time we've heard about
6    this, one day before the close of discovery.
7            So I'm asking for those e-mails
8    from those custodians, including their
9    communications with social media platforms, and
10   it now appears there were communications with
11   the EIP, potentially, those be produced by
12   tomorrow.
13           MR. GARDNER:  I understand your
14   request.  We'll take it back.
15           MR. SAUER:  Thanks.
16           (Exhibit No. 18 was marked for
17   identification.)
18   BY MR. SAUER:
19       Q.  Let's go to Exhibit 18, it should
20   be in your e-mail.
21           MR. GARDNER:  Yeah, hold on one
22   second.
23   BY MR. SAUER:
24       Q.  This document is another one of
25   these collective exhibits of a bunch of CISA

Page 278

1    e-mails involving you.
2            If you look at the first page, in
3    the middle, here, it indicates there's reporting
4    that you are forwarding from the state
5    department's global engagement centers about
6    disinformation on YouTube, and you're forwarding
7    it onto it -- to social media platform; do you see
8    that?
9        A.  Yes.
10       Q.  Yeah.  Let me ask this:  What role
11   does the state department's global engagement
12   center have in addressing misinformation and
13   disinformation on social media?
14       A.  I don't know what the specific
15   authorities are.
16       Q.  Do you know what they do,
17   generally?
18       A.  Yeah, but also, just to be clear,
19   that this e-mail is regarding a State Department
20   employee that was targeted overseas, I believe.
21   So I -- to answer your -- to answer your
22   question, I believe they -- they have a mandate
23   to deal with information operations overseas.
24       Q.  Do you interact with them, at all,
25   in your MDM team activities?

Page 279

1        A.  Yes.
2        Q.  How do you interact with them?
3        A.  In a couple ways.  So one, they do
4    a lot of reporting on what they're seeing
5    overseas, particularly as it relates to actions.
6    So it's a good source of understanding tactics
7    and things like that, that are occurring
8    overseas.
9            We often see what happens overseas
10   end up showing up domestically.  So it's a good
11   source of information for that.
12           They also have a tech demo program
13   that they run, where they bring in different
14   tech companies that work in the information
15   operations space.  So we'll go -- we have
16   members of the team that will go and watch some
17   of the demo.
18           So I think those are the two main
19   ones.  We -- trying to think if there's others.
20       Q.  Do you know George Beebe,
21   B-e-e-b-e?
22       A.  Do I know George?  I'm sorry, could
23   you spell that again?
24       Q.  B-e-e-b-e.
25       A.  The name does not sound familiar.

Page 280

1        Q.  Do you know if the GEC was involved
2    in the Election Integrity Partnership in any
3    way?
4        A.  I don't.  I know you showed me a
5    document earlier, that they were listed, but I
6    don't know what they did.
7        Q.  Okay.  Second page, here, where
8    this lists information report, you said -- it
9    indicates, in the last sentence there, the
10   journalist tells me there's a YouTube channel
11   run by Americans falsely claiming that this
12   diplomatic officer is patient zero for COVID-19;
13   correct?
14       A.  I'm sorry, what page are you on?
15       Q.  Second page of the PDF.
16       A.  Okay.  Yes, that's what the e-mail
17   says.
18       Q.  So you said -- well, maybe
19   overseas, it looks like the thing they're
20   challenging is something posted by Americans;
21   correct?
22       A.  I -- I don't know.  I mean, that's
23   just a YouTube channel run by Americans, that's
24   what they say, yeah.
25       Q.  You forward this onto him; right?

LEXITAS LEGAL
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 281

1   A.  I believe that's true, yes.
2       Q.  Scrolling down to page 10718 -- by
3   the way, did you flag these accounts?  If you
4   look here on the 11th page of the PDF for a
5   section --
6       A.  Sorry, page 11 of the PDF?
7       Q.  Yeah, here there's a screen shot of
8   unofficialcogov, and the Twitter handle, says:
9   DM us your weed store location, open
10  parentheses, hoes be mad, but this is a parody
11  account; correct?
12      A.  It appears I forwarded it to
13  Twitter, yes.
14      Q.  Okay.  And then that was the only
15  one, and the next page there's one you forwarded
16  to Twitter that says:  Smoke, weed, erry day, I
17  think they mean every day.  The official
18  (unofficial) Twitter account of the State of
19  Colorado; right?
20      A.  Yeah, it seems to be part of the
21  same e-mail in Colorado.
22      Q.  Those two accounts you forwarded to
23  Twitter, you forward those to Twitter for
24  consideration; correct?
25      A.  Yeah.

Page 282

1       Q.  And then, sorry, moving back a
2   little bit of the document, I apologize, on the
3   9th page there's an e-mail on September 25th of
4   2020, from you to Twitter, saying, good morning,
5   do you all have five minutes for a quick call
6   today.  I'd like to give you a quick update on
7   our reporting process this year.  Do you know
8   what that was about?
9       A.  I don't --
10      Q.  It looks like --
11      A.  -- know specifically what it's
12  about, no.
13      Q.  It looks like the specific subject
14  you mentioned was:  Election disinfo reporting;
15  correct?
16      A.  Let me scroll down.  Do you have
17  the rest of the e-mail chain?  Obviously it
18  appears to be a reply to something.  Am I
19  missing something, here?
20      Q.  Well, this is all we've got.  It
21  says --
22      A.  Oh, there's no -- there's no
23  header, again.
24      Q.  But -- but Twitter's response to
25  you, says:  Re:  Election disinfo reporting?

Page 283

1       A.  Yeah.
2       Q.  Okay.  Do you know -- do you
3   remember having a call with them about your
4   process reporting election disinformation on
5   that date?
6       A.  I don't.
7       Q.  Next page, 9703, tenth page of the
8   PDF, there's an e-mail from Twitter to you and
9   Matt Masterson, in September of 2020, where it
10  says:  Hi Matthew and Brian, hope you're doing
11  very well.  We want to give you an update today.
12  We're updating our civic integrity policy.  Our
13  existing policy does such and such, and it says,
14  starting next week we will label or remove false
15  or misleading information intended to undermine
16  public confidence in an election or other civic
17  process; right?
18      A.  Yep.
19      Q.  Do you know why they gave you this
20  report?
21          MR. GARDNER:  Objection, calls for
22  speculation.
23      A.  Yeah, I don't know why they
24  specifically -- it looks like there's ways to
25  public information about it, so as I mentioned

Page 284

1   earlier, sometimes they would -- they're putting
2   things out publicly they would just give us a
3   heads up.
4       Q.  Now, have you ever asked them to
5   give you a heads up or Matt Masterson ask them
6   to give you a heads up about changes in their
7   content moderation policies?
8       A.  Not that I recall.
9       Q.  Page 8519, sorry, I'm in the wrong
10  spot on the document.
11          Let me ask you this:  Do you
12  remember sharing a -- with Facebook, a
13  disinformation report about CISA and Director
14  Krebs, does that ring a bell, where the
15  disinformation was disinformation about your own
16  agency?
17      A.  I don't recall that, specifically,
18  no.
19      Q.  Here it is, 19th page of the PDF.
20      A.  19?
21      Q.  Yeah, page 19 of the PDF.
22      A.  Okay.
23      Q.  And it says:  Good afternoon -- you
24  sent an e-mail on November 5th of 2020 to
25  Facebook, saying, good afternoon Facebook,

71 (Pages 281 to 284)

**BRIAN J. SCULLY  1/12/2023**

Page 285

1  wanted to share this disinfo report about CISA
2  and Director Krebs; do you know what that was
3  about?
4       A.  I don't.
5       Q.  And your second --
6       A.  I don't recall.
7       Q.  The second line says:  IG disinfo
8  report; do you know what IG means?
9       A.  It appears, based on the link in
10  the e-mail, that it was referring to Instagram.
11       Q.  By you don't remember -- you don't
12  remember a specific -- anything specific
13  relating to Director Krebs, do you?
14       A.  No, I don't.
15       Q.  Let's scroll ahead a few pages, to
16  10394.
17       Well, let me ask this:  Do you
18  remember disinformation about Director Krebs
19  circulating in that timeframe, just after the
20  2020 election?
21       A.  I recall that he was named on an
22  Iranian-driven enemies of the people list.
23  Beyond that, I don't -- I don't recall any other
24  specific MDM related to the director, no.
25       Q.  Okay.  Scroll down to the 22nd page

Page 286

1  of the PDF.
2       A.  Okay.  Okay.
3       Q.  Do you see here, you sent an e-mail
4  to Facebook on November 10th, 2020, saying:
5  Good morning, Director Krebs is particularly
6  concerned about the hammer and scorecard
7  narrative that is making the rounds; do you see
8  that?
9       A.  Yep.
10       Q.  Do you know what that was, the
11  hammer and scorecard narrative?
12       A.  If I remember correctly, it was
13  something about the NSA, and maybe a different
14  federal agency, conspiring to change votes or
15  something along those lines.  Like there's new
16  technology that the NSA developed.  I forget the
17  specifics of the narrative, itself, but it's
18  something along those lines.
19       Q.  So this is a narrative on social
20  media suggesting that the federal government is
21  engaging in intellectual or sort of election
22  interference in some way?
23       A.  I think it could have been social
24  media, it could have been other media.  I'm not
25  sure what I was referring to when I said making

Page 287

1  the rounds.  I don't recall.
2       Q.  Okay.  Well, your next sentence
3  says:  Wanted to see if you all, meaning
4  Facebook, have been tracking this narrative and
5  if there's anything you can share around
6  amplification; right?
7       A.  Yep.
8       Q.  What does amplification mean?
9       A.  If a particular narrative is being
10  amplified.
11       Q.  So, in other words, you wanted to
12  know -- you're asking Facebook to tell you
13  whether or not that narrative is being amplified
14  on its platform?
15       A.  Correct.  That's how I read that,
16  yeah.
17       Q.  Okay.  And then Facebook responds
18  by saying:  Our teams are actively -- actively
19  monitoring developments on this at this time and
20  to the extent you or USG have information about
21  confirmed misinformation or other information of
22  note, we absolutely welcome that; correct?
23       A.  Yep, that's what they wrote.
24       Q.  And they follow up by saying:
25  Wanted to follow up on the below to say that our

Page 288

1  teams have confirmed that we have third-party
2  fact checker verification that the "hammer and
3  scorecard" narrative is false; right?
4       A.  Yes, that's what they say.
5       Q.  And they go on to report to you:
6  Our systems are labeling and downranking the
7  contents as identified; correct?
8       A.  Yes.
9       Q.  Is that consistent with other
10  e-mails, where they report back to you on how
11  they've taken action against a content that you
12  have flagged?
13       A.  Yeah, generally consistent, I
14  think.
15       Q.  Let's jump ahead to the 10390, that
16  is going to be page 24 of the PDF, and here at
17  the bottom of the page you sent the very same
18  e-mail to Twitter, as well; right?
19       A.  Yep.
20       Q.  Director Krebs is very concerned
21  about the hammer and scorecard narrative, and
22  I'm wondering if you have been tracking this
23  one, if there's anything you can share in terms
24  of sharing and amplification; correct?
25       A.  Yeah, that's what I wrote.

72 (Pages 285 to 288)

**BRIAN J. SCULLY  1/12/2023**

Page 289

1      Q.  The usual context says:  We have
2  been tracking this issue.  I will allow Yoel to
3  follow up with detailed information; right?
4      A.  Yes.
5      Q.  And that's Yoel Roth; right?
6      A.  I believe so, yeah, that's -- let's
7  see, yep.
8      Q.  He was then the chief content
9  modulation officer for Twitter, right, ahead of
10  their trust and safety team?
11      A.  I don't recall what his title was,
12  but he certainly was in charge of some trust and
13  safety, safety stuff.
14      Q.  Trust and safety, that means
15  enforcing content moderation policies; right?
16      A.  I suspect that's one of the
17  responsibilities.
18      Q.  He comes back to you with a kind of
19  detailed report here at the top of the page
20  about what Twitter's been doing on this, he
21  says, we've been tracking the hammer/scorecard
22  issue closely, particularly since Director
23  Krebs's tweet on the subject, which is pretty
24  unambiguous as debunks go; correct?
25      A.  That's what he wrote, yeah.

Page 290

1      Q.  Do you recall Director Krebs
2  debunking this in a tweet?
3      A.  I suspect, and I keep on, let me
4  just add, I don't recall Director Krebs'
5  specific tweet.  Two, its possible, as part of
6  our universe reality page, and Director Krebs
7  would put a new item up on our universe reality
8  page, he would tweet out the new universe
9  reality entry, but I'm not aware of the specific
10  tweet, but that would be my guess as to what was
11  going on.
12      Q.  Were you aware that the social
13  media platforms were following the rumor page
14  posted by CISA and using that as a debunking
15  method for content on their platforms?
16      A.  We had a sense they were doing
17  that, yeah.
18      Q.  And that's kind of the point of it,
19  right, the point of the rumor page is to debunk
20  things; right?
21      A.  No.  The point of the page is just
22  to provide accurate information about rumors
23  that we were hearing.
24      Q.  Okay.  You were aware, I think you
25  just said, that the social media platforms, like

Page 291

1  Twitter, were following the page and using it to
2  fact check, essentially, things that people were
3  posting on their platforms?
4      A.  Yeah.  So the platforms are looking
5  for a place to get accurate information about
6  different things that they were seeing on their
7  platforms.  And I know some of them used the
8  universe reality page to do that.
9      Q.  And, in fact, this e-mail indicates
10  that they used it to debunk the hammer/scorecard
11  narrative, if the tweet that Director Krebs did
12  refers to the rumor page; correct?
13      A.  I'm sorry, could you repeat the
14  question?
15      Q.  Actually, let's move on to the page
16  8625, it's a couple pages down, on page 27 of
17  the PDF.  Here you're flagging, on Friday,
18  November 13th of 2020, you've been flagging a
19  tweet for Twitter.  And at one point you say, at
20  11:26 p.m. on a Friday night, you e-mail Twitter
21  and say:  Some Friday night fun for the two of
22  us, hope you are well; right?
23      A.  Yeah.
24      Q.  So you were forwarding and routing
25  disinformation concerns to social media

Page 292

1  platforms near midnight on a Friday?
2      A.  It appears so.
3      Q.  And they were responding in
4  realtime, for example, 7 minutes later, at 11:33
5  p.m., Twitter's responding to you late on a
6  Friday night; correct?
7      A.  Yeah.
8      Q.  And she says, among other things,
9  we have labeled so many tweets tonight, so I'm
10  afraid that the answer is there isn't any
11  tonight; correct?
12      A.  I'm sorry, what are you asking?
13      Q.  Directly above, she said:  We've
14  labeled so many tweets tonight that it isn't
15  ending tonight; correct?
16      A.  We have labeled so many tweets
17  tonight, so I am afraid that for now the answer
18  is that it isn't ending tonight?
19      Q.  Right.
20      A.  Yes, that's what she wrote.
21      Q.  This is based on an exchange a
22  little lower down, that you flagged something on
23  Dominion machines for her, at 11:20 p.m.  And
24  she responded at 11:21 p.m., within one minute,
25  saying, thanks, Brian, we will escalate;

73 (Pages 289 to 292)

**BRIAN J. SCULLY 1/12/2023**

Page 293

1  correct?
2      A.  Yep, that's what the timestamps
3  say.
4      Q.  Were you getting -- you were kind
5  of reporting misinformation on social media late
6  at night to social media platforms during this
7  timeframe?
8      A.  I accidently closed -- that's page
9  24?
10     Q.  Yeah.
11     A.  Sorry.  Yeah, as I said, if I were
12  on my phone, and I saw something come in, I
13  would push it along.
14     Q.  Jump ahead to -- and was it common
15  for Twitter or Facebook or other platforms to
16  respond almost immediately, even near midnight
17  on a Friday?
18     A.  I mean, it's hard to say common.  I
19  know it happened.  They were generally pretty
20  responsive.  Common's a pretty loose term so,
21  you know, I don't know how to respond to that.
22     Q.  But you say they were generally
23  responsive, and that includes prompt in their
24  responses to you?
25     A.  Correct.  Right.  So they were

Page 294

1  prompt in letting me know that they had received
2  any e-mail that I sent them, that's essentially
3  what I was talking about.
4      Q.  Let's go to 8557, it's page 42 of
5  the PDF.
6      A.  42?  Okay.
7      Q.  Here it looks like Facebook is
8  e-mailing Lauren Protentis and saying that:  I
9  wanted to share our account security doc that
10  we've been working on, and we're grateful for
11  any feedback; right?
12     A.  Yep.
13     Q.  Do you know what account security
14  document they're talking about, here in April
15  15th of 2022?
16     MR. GARDNER:  Objection, calls for
17  speculation.
18     A.  Yeah, I don't know what specific
19  documents they're talking about.
20     Q.  Is it possible this is the
21  one-pager that we were talking about earlier,
22  does that ring a bell?
23     MR. GARDNER:  Objection, calls --
24  objection, calls for speculation.
25     A.  Yeah, I don't -- I don't -- I don't

Page 295

1  know.
2      Q.  Okay.  Next page, Lauren Protentis,
3  thanks so much for sending, this looks great.
4  The only thing I recommend is any steps for
5  flagging or escalating MDM content, if possible;
6  right?
7      A.  Yeah, that's what Lauren said.
8      Q.  And she said:  I think then that
9  this -- I think, then, that would make this a
10  comprehensive product on both the critical needs
11  of officials, account security, and MDM
12  concerns; correct?
13     A.  Yeah, that's what she wrote.
14     Q.  She says:  We discussed this a bit
15  in our in-person meting a few weeks ago; right?
16     A.  Yep.
17     Q.  Okay.  Were you aware of Lauren
18  asking for Facebook to produce a document and
19  asking them to include steps for planning or
20  escalating MDM content for officials?
21     A.  I was not aware of this document,
22  no.  I know that the -- I knew those
23  conversations about the one-pagers we discussed
24  earlier, but I'm not -- I'm not entirely sure
25  what this is referring to.

Page 296

1      Q.  Well, I think you said earlier the
2  one-pagers would talk about what their content
3  moderation policies are?
4      A.  Right.
5      Q.  If you look higher, on that same
6  page, Facebook is replying to Lauren and saying,
7  would it be -- would it work to just provide my
8  e-mail when you share out this one-pager; right?
9  Do you see that?
10     A.  So I'm scrolling up.
11     Q.  When you share out this one-pager;
12  do you see that?
13     A.  Yes.
14     Q.  Okay.  So -- so does it seem that
15  Lauren is talking about the one-pager that all
16  the social media platforms were asked to provide
17  for state and local elections; is that what's
18  going on?
19     A.  Again, I'm not sure.  It could be
20  two different one-pagers that she's talking
21  about, one on account security and one that
22  Lauren was working on, I wouldn't be -- again, I
23  wouldn't be surprised if they were similar, but
24  I -- I can't -- I don't know.
25     Q.  Regardless, for the purpose of this

74 (Pages 293 to 296)

**BRIAN J. SCULLY  1/12/2023**

Page 297

1    one-pager, Lauren is specifically asking that
2    they add to it a procedure for state officials
3    to flag and escalate MDM content; correct?
4        A.  It appears she's asking for a
5    process for election officials to report MDM
6    content to Facebook, yeah.
7        Q.   Jump ahead to 12223, here on the --
8    starting at the 48th page of the PDF and
9    spilling to the 49th page, there's another
10   e-mail from Lauren Protentis, this time to
11   people at Microsoft, which is subject is
12   one-pager for election officials; do you see
13   that?
14       A.  Did you say 48?
15       Q.  Yeah, 48, spilling over onto 49,
16   it's -- the header's on 48 and the -- oh, I'm
17   sorry, 43.  Bad eyesight.  Sorry.  It really
18   looks like an 8.
19       A.  That's okay.
20       Q.  Sorry, 43.
21       A.  I understand that.
22           Okay.  So one-pager for election
23   officials, got the header, okay.
24       Q.  And in this e-mail Lauren says to
25   Microsoft:  META is working with industry

Page 298

1    partners to create one-pagers for election
2    officials, in the lead-up to the midterms, that
3    provide steps to create secure accounts --
4    secure accounts and to report MDM; do you see
5    that?
6        A.  I do.
7        Q.  And she said:  We'll be sharing
8    these products at our various engagements with
9    officials, presumably meaning state and local
10   election officials; right?
11           MR. GARDNER:  Objection, calls for
12   speculation.
13       A.  Yeah, I mean, obviously, I don't
14   know what she means by officials, but I think
15   that's a fair assumption.
16       Q.  And that's a one-pager for election
17   officials; correct?
18       A.  Yes.
19       Q.  Skipping ahead to 22053, page 45 of
20   the PDF, going onto 46.
21       A.  Okay.
22       Q.  You see here, on May 11, 2022,
23   Lauren Protentis is writing to Twitter:  Hope
24   this e-mail finds you well, wanted to circle
25   back on this and see if you have any questions.

Page 299

1    The team has a few upcoming engagements with
2    elections officials for this one-pager, would be
3    particularly helpful to share as a leave behind;
4    correct?
5        A.  Yes, that's what she's written.
6        Q.  And Twitter goes back and says:
7    I'll have a one-pager for you later today, just
8    getting the final signoff; right?
9        A.  Correct.
10       Q.  And then, once he sends it to him,
11   scrolling back up, first, she says:  State and
12   local officials in New Hampshire, Illinois, will
13   be the first recipients of this; right?  There
14   at the top of the page.
15           The first line on page 45 of the
16   PDF Lauren says --
17       A.  Yeah, the e-mail chain is a little
18   funky, so I was just trying to read and make
19   sure the e-mails were connected.
20           Okay.  So Twitter provided the
21   one-pager.  Lauren said thanks.  State and local
22   officials in New Hampshire and Illinois will be
23   the first recipients to this?  Okay.  Sorry.
24       Q.  Then she follows up with another
25   e-mail, saying:  Actually, one question, is

Page 300

1    there a way to include something about how to
2    report disinformation; do you see that?
3        A.  Yep.  Yep.
4        Q.  And Twitter says:  The best way for
5    them to do that is to contact gov@twitter.com;
6    right?
7        A.  Yep.
8        Q.  And I can add that to the doc if
9    that would be helpful; correct?
10       A.  Correct.
11       Q.  And Lauren says:  That would be so
12   helpful if you could add that to the doc.  Thank
13   you; right?
14       A.  Yep.
15       Q.  And Twitter says:  They do; right?
16       A.  Mm-hmm.
17       Q.  So that's the second time she's
18   pushed the social media platform to expand the
19   one-pager to include a reporting process for MDM
20   for the state and local election officials;
21   correct?
22       A.  I'm not sure that's how I would
23   characterize it.  I think she's just trying to
24   make sure that election officials have the
25   information they need if they want to report.

**LEXITAS LEGAL**
**www.lexitaslegal.com**      **Phone: 1.800.280.3376**      **Fax: 314.644.1334**

**BRIAN J. SCULLY  1/12/2023**

|  | Page 301 |
|---|---|
| 1 | I'm not sure it's expanding.  I don't know. |
| 2 | You're making it more dramatic than it was, I |
| 3 | think. |
| 4 | **Q.  Well, suffice to say that she's** |
| 5 | **asking Twitter to include information** |
| 6 | **specifically about how do you report MDM;** |
| 7 | **correct?** |
| 8 | A.  About how election officials should |
| 9 | support MDM, correct. |
| 10 | **Q.  And Twitter had not included that** |
| 11 | **in theirs, and she asked them to put it in and** |
| 12 | **they did; right?** |
| 13 | A.  It appears so, yeah. |
| 14 | **Q.  Same thing happened, actually, with** |
| 15 | **YouTube in your earlier e-mail, right, they** |
| 16 | **hadn't included it in a one-pager, and she asked** |
| 17 | **them to put it in; correct?** |
| 18 | A.  I don't recall that e-mail.  Which |
| 19 | e-mail is that? |
| 20 | (Exhibit No. 27 was marked for |
| 21 | identification.) |
| 22 | BY MR. SAUER: |
| 23 | **Q.  Let's move on, actually.** |
| 24 | **I'm going to e-mail you some new** |
| 25 | **exhibits.** |

|  | Page 302 |
|---|---|
| 1 | **I'm pulling up Exhibit 27, which** |
| 2 | **should also be popping up in your inbox.** |
| 3 | **There's a news report entitled:  CISA expands** |
| 4 | **efforts to fight election disinformation ahead** |
| 5 | **of challenging 2024 vote; do you see that?** |
| 6 | MR. GARDNER:  Yeah.  I'm sorry, |
| 7 | John, we're still waiting for your -- oh, just |
| 8 | got it.  Hold on.  Hold up.  You said 27? |
| 9 | MR. SAUER:  Yeah. |
| 10 | MR. GARDNER:  Here you go. |
| 11 | THE WITNESS:  Okay. |
| 12 | BY MR. SAUER: |
| 13 | **Q.  Do you see the headline:  CISA** |
| 14 | **expands efforts to fight election disinformation** |
| 15 | **ahead of challenging 2024 vote; do you see that?** |
| 16 | A.  I do. |
| 17 | **Q.  What steps are you aware of CISA** |
| 18 | **taking to expand its efforts to fight election** |
| 19 | **disinformation going into the next election** |
| 20 | **cycle, 2024?** |
| 21 | A.  At this time, I'm not aware of any. |
| 22 | **Q.  This is dated August 12th, 2022, if** |
| 23 | **you scroll down.** |
| 24 | A.  Sure. |
| 25 | **Q.  Were you aware of any discussions** |

|  | Page 303 |
|---|---|
| 1 | or efforts -- any efforts at that time? |
| 2 | A.  When this was written, in August of |
| 3 | 2022?  I'm sorry, what time? |
| 4 | **Q.  Well, I'm just saying, are you** |
| 5 | **aware, around August of 2022, did CISA -- was** |
| 6 | **CISA expanding efforts to fight disinformation?** |
| 7 | A.  No, no specific efforts, that I'm |
| 8 | aware of, I believe there might have been some |
| 9 | additional funding requested in the budget, but |
| 10 | I'm not sure if that actually went up or not. |
| 11 | **Q.  What -- what efforts did CISA** |
| 12 | **undertake to fight election disinformation** |
| 13 | **during the 2022 election cycle?** |
| 14 | A.  We put out a couple of sets of |
| 15 | products. |
| 16 | **Q.  Anything else?** |
| 17 | A.  Not -- not that I recall.  We |
| 18 | honestly we didn't do a ton in 2022. |
| 19 | **Q.  What were you guys doing, you're** |
| 20 | **the MDM team, what did you do to fight MDM?** |
| 21 | A.  So again, our -- as I mentioned, |
| 22 | our role is to build resilience, so we put out |
| 23 | the two sets of products, as I mentioned. |
| 24 | Earlier in 2022, we put out additional products. |
| 25 | I'm sure we gave some stakeholders to build |

|  | Page 304 |
|---|---|
| 1 | relationships. |
| 2 | But generally speaking, we did a |
| 3 | lot of foundational work to better understand |
| 4 | how it functions, those sorts of things, as |
| 5 | opposed to very election-specific activities. |
| 6 | **Q.  Here in the article it says:  The** |
| 7 | **danger -- in the second paragraph -- it says:** |
| 8 | **The danger of disinformation has become an** |
| 9 | **incredibly difficult problem, CISA Director Jen** |
| 10 | **Easterly said on Friday; do you see that?** |
| 11 | A.  I do. |
| 12 | **Q.  And it goes on in his report:  That** |
| 13 | **Easterly has taken several specific steps to** |
| 14 | **fight the problem, including bringing Kim Wyman,** |
| 15 | **former Secretary of State of Washington into** |
| 16 | **CISA to bolster its election work; correct?** |
| 17 | A.  That's what the article says, yep. |
| 18 | **Q.  What has Kim Wyman done to fight** |
| 19 | **election-related disinformation at CISA?** |
| 20 | MR. GARDNER:  Objection. |
| 21 | Objection, lack of foundation, calls for |
| 22 | speculation. |
| 23 | BY MR. SAUER: |
| 24 | **Q.  You may answer.** |
| 25 | A.  Yeah, can you be more specific |

**LEXITAS LEGAL**
**www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334**

**BRIAN J. SCULLY  1/12/2023**

Page 305

1    about what you're trying to get to?
2        Q.   Well, what does Kim Wyman do at
3    CISA?
4        A.   Kim Wyman is essentially the new
5    Matt Masterson.  So she's a senior advisor to
6    the director on election security.  Most of her
7    work has been engagement with election
8    officials.  I also think she was CISA's
9    representative on the CSAC for MDM.
10        So beyond some public speaking
11   and -- and the CSAC work, I'm not sure what else
12   she would have done, would have been doing on
13   MDM.
14        Q.   Down here at the very last
15   paragraph, second page of the document, sorry,
16   this is hard to highlight, very last paragraph,
17   it says:  While it's not CISA's role to police
18   social media Easterly said her team has
19   discussions with platforms, but they're more to
20   understand large trends, not specific tweets; is
21   that right?
22        A.   That's what the article says, yeah.
23        Q.   Do you have discussions with
24   platforms discussing large trends of online
25   disinformation?

Page 306

1        A.   Yeah, I think that's consistent
2    with what we talked about from the sync meetings
3    and the discussions around the public reporting
4    that the platforms have done.
5        Q.   Any other time when there would
6    be -- where there was discussions with platforms
7    about disinformation trends?
8        A.   I think it's just the two, the
9    normal sync meetings we discussed, and then the
10   normal if they were putting up public reporting
11   we might get a briefing on it.  I'm trying to
12   think if we ever received -- yeah, I think those
13   are the big things.  We may have done a briefing
14   where we had a platform maybe talk about -- talk
15   with election officials, but I'm not sure if I'm
16   remembering that correctly, so just those two, I
17   think, would be the main ones.
18        (Exhibit No. 28 was marked for
19   identification.)
20        MR. SAUER:  Exhibit 28.
21        MR. GARDNER:  Should be right
22   there.
23        THE WITNESS:  Okay.
24   BY MR. SAUER:
25        Q.   Should be on the screen share, too.

Page 307

1        Here's an e-mail chain, starting
2    with Facebook sending an e-mail directly to Jen
3    Easterly, saying she had spoken to Facebook
4    about receiving a briefing from us on 2022
5    election approach; do you see that there, the
6    second page of the document, the beginning of
7    the chain?
8        A.   I do.
9        Q.   Were you aware that Easterly had
10   reached out to Facebook directly and asked for,
11   I guess in January of 2022, a briefing on how
12   Facebook planned to approach the election?
13        A.   I was not.
14        Q.   Facebook says:  We're happy to do
15   this with your team at your convenience, and
16   we'd also love to discuss further how we might
17   help support the JCDC effort; do you see that?
18        A.   I do.
19        Q.   What does JCDC stand for?
20        A.   I was afraid you were going to ask
21   me that.  I don't know exactly what it -- what
22   it stands for, I think it's joint cyber
23   something or another.  Sorry, I -- I forget the
24   exact acronym, too many acronyms.
25        Q.   Is it a committee or a subdivision

Page 308

1    within CISA or within DHS?
2        A.   I believe it's a -- it's an effort
3    by CISA to -- to collaborate with private sector
4    on cyber defense.
5        Q.   Okay.  And Director Easterly
6    responds to Facebook saying:  Looping in Kris
7    and teammates to please follow up; do you see
8    that?
9        A.   I do.
10        Q.   And then Kris Rose; do you know who
11   Kris Rose is?
12        A.   My understanding is counselor for
13   the director, for Director Easterly.
14        Q.   So -- and he says:  Thank you,
15   Director.  Moving you to BCC; does that stand
16   for blind carbon copy?
17        A.   That would be my understanding.
18        Q.   And he says per Geoff, G-e-o-f-f, I
19   presume that's a Geoff Hale; right?
20        A.   Yeah.
21        Q.   Sounds like we may want to discuss
22   three primary topics that include 2022
23   elections; right?
24        A.   Mm-hmm.
25        Q.   Risk management in the face of

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

**BRIAN J. SCULLY  1/12/2023**

|  | Page 309 |
|---|---|

1   influence of operations; do you know what that
2   means?
3        A.   I mean, I don't know what context
4   he was saying it here, but generally speaking,
5   that's CISA's mission to reduce risks to
6   critical infrastructure.  So I assume it's risk
7   management from critical infrastructure to
8   influence of operations.
9        Q.   And JCDC, that's the thing you
10  testified before?
11       A.   Yeah.
12       Q.   Do you know -- let me ask you this:
13  Were you included in this meeting between
14  Director Easterly and Facebook?
15       A.   I was not, in fact, I don't know if
16  the meeting actually ever occurred.
17       Q.   Do you know if Geoff Hale
18  participated?
19       A.   I -- I don't.
20            (Exhibit No. 29 was marked for
21  identification.)
22  BY MR. SAUER:
23       Q.   Let's look at Exhibit 29.
24       A.   Okay.
25       Q.   Here's a series of text messages

|  | Page 311 |
|---|---|

1        A.   I'm sorry, what was the last part?
2        Q.   What else does he do for Facebook
3   on misinformation?
4        A.   Again, I think he would articulate
5   the inoffensive behavior, coordinating
6   inoffensive behavior.  So I don't know if he
7   would talk about it in the context of
8   disinformation.  But my understanding is he
9   leads the team one of the teams that deals with
10  the coordinated inoffensive behavior.
11       Q.   Let me ask you about Rob Silvers.
12  Do you know who Rob Silvers?
13       A.   Yes.
14       Q.   Who's Rob Silvers?
15       A.   He heads up the DHS office of
16  policy.  I don't know what his back title is,
17  assistant secretary or secretary, something like
18  that.
19       Q.   So he's in the secretary's office?
20       A.   I believe he reports up to the
21  secretary, yeah.
22       Q.   He -- he -- and Mr. Gleicher says
23  to Jen Easterly:  Do you have any context you
24  can share in the role Rob Silvers is playing on
25  disinfo; right?

|  | Page 310 |
|---|---|

1   that were produced to us as coming from Director
2   Easterly.
3            So do you see the blue text, that
4   would be Director Easterly, the other side, in
5   the gray, is the interlocutor here on the first
6   page is this gentleman from Facebook; do you see
7   that?
8        A.   Yeah.
9        Q.   This -- he -- he -- he issued a
10  series of texts.  Do you know why he would be
11  texting Director Easterly, does he know her?
12            MR. GARDNER:  Objection, compound.
13  Objection, calls for speculation.
14       A.   Yeah, I -- I don't know is the
15  short answer.  I don't know what their
16  relationship is.
17       Q.   Do you know him, Mr. Gleicher?
18       A.   Yeah, I know Nathanial Gleicher,
19  yeah.
20       Q.   Does he interact with CISA about
21  misinformation issues on Facebook?
22       A.   He does, he participates in the
23  monthly regular meetings that we talked about.
24       Q.   What else does he do, do you know,
25  for Facebook on --

|  | Page 312 |
|---|---|

1        A.   Yep, that's what the text says.
2        Q.   I understand his team is a task
3   force set up, and it was suggested that his team
4   is handing policy on disinfo while CISA is
5   handling operations; right?
6        A.   Yeah, that's what Nathaniel wrote.
7        Q.   What is -- what was your
8   understanding of Rob Silver being involved in
9   policy on disinformation?
10       A.   So that is the DHS office of
11  policy.  He would be involved in most, I would
12  say, policy activities related to any topic that
13  crossed the department, including
14  disinformation.
15       Q.   And Director Easterly says she's
16  happy to chat with Mr. Gleicher; right?
17       A.   Yep.
18       Q.   You don't know if they actually
19  talked to each other, do you?
20       A.   I don't.
21       Q.   She goes on to say:  Rob is running
22  a governance board to look at potential new
23  areas of confronting MDM; correct?
24       A.   That's what she wrote, yeah.
25       Q.   Then she says:  It doesn't change

78 (Pages 309 to 312)

**BRIAN J. SCULLY  1/12/2023**

Page 313

1  or impact anything, we, meaning CISA, are doing
2  or have already established; right?
3      A.  Yes, that's what she wrote.
4      Q.  What were the potential -- what
5  potential new areas of confronting MDM were
6  discussed, do you know?
7      MR. GARDNER:  Objection, lack of
8  foundation.
9      A.  I don't have any clue.
10     Q.  Next page, there's an e-mail from
11 Matt Masterson to the director; right?
12     A.  Yep.
13     Q.  This is a -- Matt Masterson know
14 the director well, I take it he was a political
15 appointee, did you say that?
16     A.  In previous administration --
17 excuse me -- yeah, he was a political appointee.
18 I don't know what his relationship with the
19 director was, so I don't know how well he knew
20 her.
21     Q.  What was the director's role in the
22 previous administration, was she at CISA?
23     A.  No.  Director Easterly was not at
24 CISA, no.
25     Q.  Who was she?

Page 314

1      A.  I'm sorry?
2      Q.  Was she in government?
3      A.  Prior to the -- in the previous
4  administration?
5      Q.  Yeah.
6      A.  I don't know.  I think her
7  immediate previous job was in the private
8  sector, but I don't know how long and if she
9  spent any time, at all, in the -- in the
10 previous administration in government.
11     Q.  And here, Director Easterly says to
12 Matt Masterson, just trying to get us in a place
13 where FED can work with platforms to better
14 understand the mis, dis trends so relevant
15 agencies can try to prebunk/debunk as useful;
16 correct?
17     A.  That's what she wrote, yeah.
18     Q.  And that discussion of trends is
19 similar to her statement in the media article we
20 just looked at about how CISA is interacting
21 with social media platforms to identify trends;
22 correct?
23     A.  She mentioned trends in both,
24 correct.
25     Q.  And here she -- the reason she

Page 315

1  wants to understand the trends from the
2  platforms is so that the relevant agencies can
3  try to prebunk or debunk the mis and
4  disinformation; correct?
5      A.  Yeah, I think that's what she's
6  saying.
7      Q.  Can you do that at CISA, when you
8  find out about a trend do you go try to work
9  with another federal agency to prebunk or debunk
10 it?
11     A.  So again, from a resilience-
12 building perspective, you know, what we try to
13 do is provide accurate information about those
14 issues and topics that are relevant to us.  So
15 from an election perspective we would try to
16 provide appropriate information about elections,
17 so that the universe reality page would be an
18 example of that, it would fall more potentially
19 into the debunking side.
20     Prebunking is trying to understand
21 ahead of time what could happen so you could
22 fill information gaps.
23     And so that's generally kind of how
24 resilience works.  So yeah, we would -- we would
25 try to do some of that.

Page 316

1      I don't know -- so we worked a
2  little bit with the FBI, on products or
3  resilience-based products, as I mentioned.  I
4  say that's probably -- we worked, as I mentioned
5  earlier, we worked with the GAC initiative about
6  tactics and such.
7      So those are the types of things
8  that we would do to, again, help people
9  understand how MDM works and steps they can take
10 to reduce the risks.
11     Q.  Her next text here, Director
12 Easterly's next text says:  Not our mission, but
13 was looking to play a coord role so not every
14 D/A is independently reaching out to platforms
15 which could cause a lot of chaos; right?
16     A.  That's what she wrote, yep.
17     Q.  What does D/A mean, is that
18 department or agency?
19     MR. GARDNER:  Objection, calls for
20 speculation.
21 BY MR. SAUER:
22     Q.  If you know.
23     A.  That's -- that is one of our common
24 abbreviations for department and agency, but I'm
25 not sure if that's what she's referring to here.

79 (Pages 313 to 316)

**BRIAN J. SCULLY  1/12/2023**

Page 317

1    Q.  Do you know -- let me ask this:  Do
2  you believe that if every federal department and
3  agency is independently reaching out to the
4  platforms that could cause chaos?
5    A.  Yeah, I think chaos might be a
6  little strong.  But, you know, it does create
7  challenges and provides the platforms
8  opportunities to play departments off each
9  other.
10    Q.  Does -- does CISA try to play a
11  coordinating role in that, in other words,
12  coordinating between the federal agencies and
13  the social media platforms on disinformation and
14  misinformation issues?
15    A.  So we did do that as it relates to
16  the sync meetings we discussed throughout the
17  testimony.  Beyond that, we didn't -- we didn't
18  attempt to play a substantial role in terms of
19  coordinating them.
20    Q.  Let me ask you this:  Matt
21  Masterson responds to this e-mail or this text
22  and says:  We'll get there, and that kind of
23  leadership really helps.  Platforms have got to
24  get more comfortable with government.  It's
25  really interesting how hesitant they remain;

Page 318

1  correct?
2    A.  That's something I wrote.
3    Q.  Is that consistent with your
4  experience that the social media platforms have
5  to be kind of pushed or encouraged to coordinate
6  with the government on misinformation issues?
7    A.  I don't think that's how I would
8  characterize it.  You know, we operate in a
9  voluntary kind of manner, so it's voluntary
10  whether -- for CISA, again, for CISA, the MDM
11  team, so it's always up to the platforms what
12  level of engagement they want to have with us.
13    Q.  Do you know whether Masterson and
14  Easterly had any further discussion of these
15  issues?
16    A.  I don't know.
17    Q.  Let me send you a couple more
18  exhibits.  And while they are coming, do you
19  know, were you involved, at all, in the
20  formation --
21    MR. GARDNER:  I'm sorry, John, I'm
22  sorry, the witness just asked me if we can take
23  a break.
24    MR. SAUER:  Oh.
25    THE WITNESS:  Just a few minutes,

Page 319

1  bathroom break.
2    MR. SAUER:  Well, why don't we make
3  it five, and try to make it the last break of
4  the day.  How long have we been on the record?
5    MR. SCOTT:  We got back on at 3:50,
6  so it's 4:40, so it's 50 minutes in, we have an
7  hour and 10 minutes left.
8    MR. GARDNER:  He's been reliable.
9  We need to do this off the record, first of all.
10    THE VIDEOGRAPHER:  The time is now
11  4:42.  We are off the record.
12    (Recess.)
13    THE VIDEOGRAPHER:  The time is
14  4:53.  We are back on the record.
15    (Exhibit No. 30 was marked for
16  identification.)
17  BY MR. SAUER:
18    Q.  Exhibit 30 should be in your inbox.
19  I'll put it up on the screen share.
20    Here's an article in The Intercept
21  called Truth Cops, Leaked Documents Outline
22  DHSA's Plans to Police Disinformation; do you
23  see that?
24    A.  Yeah, we don't have it on here, but
25  I saw the headline in your screen share.

Page 320

1    Q.  Okay.  Sorry.  But scrolling down,
2  still on the first page, it says:  The
3  Department of Homeland Security is quietly
4  broadening its effort to curb speech it
5  considers dangerous; do you see that?
6    A.  I see that in the article, yep.
7    Q.  Are you aware of DHS broadening its
8  efforts to address disinformation?
9    A.  I am not, no.
10    Q.  Has CISA been expanding its MDM
11  team?
12    A.  As I mentioned earlier, we have
13  not.
14    Q.  Let me ask you this:  Scrolling
15  down here, third page of the document, it says:
16  There is also a formalized process for
17  government officials to directly flag content on
18  Facebook or Instagram and request that it be
19  throttled or suppressed through a special
20  Facebook portal that requires a government or
21  law enforcement e-mail to use; do you see that?
22    A.  Yeah, I see that in the article.
23    Q.  And it actually provides a link for
24  it, Facebook.com/Xtakedowns/login; are you aware
25  of that reporting channel for government

80 (Pages 317 to 320)

**BRIAN J. SCULLY  1/12/2023**

Page 321

1  officials?
2      A.  I am not, no.
3      Q.  On the next page, fourth page of
4  the document, it says:  According to a draft
5  copy of DHS's quadrennial Homeland Security
6  review, DHS's capstone report outlining the
7  department's strategy and priorities in the
8  coming years, the department plans to target
9  inaccurate information on a wide range of
10  topics; do you see that?
11      A.  Yeah, I see that in the article.
12      Q.  Are you aware of the document
13  that's a draft of the quadrennial Homeland
14  Security review?
15      A.  I know it says quadrennial Homeland
16  Security review is, I don't know if I've seen
17  the draft of the most recent one.
18      Q.  Have you seen any drafts of the
19  most recent one?
20      A.  Not that I recall.
21      Q.  When does it -- when does it get
22  finalized?
23      A.  I -- I -- I don't know.
24      Q.  It says:  Including the origins of
25  the COVID-19 pandemic and the efforts of the

Page 322

1  COVID-19 vaccines, racial justice, US withdrawal
2  from Afghanistan, and the nature of US support
3  for Ukraine, in quotes; do you see that?
4      A.  I do.
5      Q.  Are you aware of discussions
6  anywhere in DHS about addressing misinformation
7  about the origins of the COVID-19 pandemic?
8      A.  I am not.
9      Q.  So how about the efficacy of
10  COVID-19 vaccines?
11      A.  Yes, I'm aware of some discussions
12  on that.
13      Q.  What discussions are you aware of?
14      A.  So it was a -- as I mentioned
15  earlier, our building critical infrastructure
16  help in public health is one of the sectors of
17  critical infrastructure, so we engage with CDC
18  and HHS to help them.  We've also put out one
19  product, sometime in mid 2020, for
20  infrastructure stakeholders about COVID-related
21  disinformation.
22      Q.  What do you do to assist CDC and
23  HSH?
24      A.  For the most part, not a lot, to be
25  honest.  Like I said, we did the one product

Page 323

1  related to them, and we just participate in
2  meetings with them.  From our perspective,
3  again, we're trying to understand trends, how
4  this information is spreading tactics so we can
5  help the public, the public and organizations,
6  critical infrastructure organizations, as well
7  as some others, understand the risks from MDM
8  and how it works and what they can do about it.
9      Q.  Do you -- do you obtain information
10  from CDC and HHS about how COVID vaccine
11  misinformation spreads?
12      A.  I believe that they provided some
13  briefings on that, yeah.
14      Q.  And do you also provide briefings
15  to them or information to them?
16      A.  We did some work on the kind of
17  bio-lab narratives, so this is essentially
18  foreign governments, whenever anything happens,
19  whether biological and sometimes not, they will
20  point to US biolabs as being the culprit behind
21  it, and so as part of our resilience-building
22  efforts we're trying to understand how foreign
23  actors have used that narrative over time.
24          And so we, starting back in the
25  '80s, probably since back in the '80s, the

Page 324

1  Russians were using that.  Usually they're
2  saying at Fort Detrick or some other kind of US
3  entity is a biolab, and that's where whatever it
4  starts.
5          We saw this with COVID.  We saw
6  this Monkey Pox.  We saw this around Ukraine.
7  And so, again, just helping people understand
8  that a lot of these disinformation narratives
9  are recycled over time, for different issues, as
10  a way to help build resilience.
11      Q.  How about racial justice, are you
12  doing anything to address misinformation about
13  racial justice issue?
14      A.  CISA has not, to my knowledge, done
15  anything related to racial justice.
16      Q.  How about other DHS components, do
17  they do anything on that?
18      A.  Not that I'm aware of, but
19  obviously I don't know everything that they do.
20      Q.  How about US withdrawal from
21  Afghanistan, does CISA work on that?
22      A.  Not that I'm aware of.
23      Q.  And how about other DHS components?
24      MR. GARDNER:  Objection, calls for
25  speculation.

81 (Pages 321 to 324)

**BRIAN J. SCULLY  1/12/2023**

| Page 325 |
| --- |

1      A.  Yeah, I -- I'm not aware of what
2   other components are doing.
3          **Q.  And then the nature of US support**
4   **to Ukraine?**
5      A.  So there was a department stood
6   out, what's called the Unified Coordination
7   Group, when Russia invaded Ukraine, to
8   coordinate DHS activities related to the crisis.
9   As a part of that there was an MDM component,
10  and a member of the MDM team was detailed to
11  lead the MDM component of the Russian/Ukraine
12  work.  I believe it lasted about two months.
13         **Q.  What did they do?**
14     A.  The Unified Coordination Group.
15  Sorry.
16         **Q.  What did that group do?**
17     A.  So most of it took place while I
18  was out, so I don't have a super clear
19  understanding of everything, but generally
20  speaking, they provided a -- they would monitor
21  open source researching.
22         So we talk about third-party
23  researchers, we put out reports, and things like
24  that, and they would provide situational
25  awareness, at least from our perspective, CISA

| Page 326 |
| --- |

1   perspective, they would provide situational
2   awareness up to the MDM Unified Coordination
3   Group.
4          **Q.  Who at CISA participated in that?**
5      A.  So Rob Schaul from the MDM team was
6   detailed to the Unified Coordination Group, and
7   then several members of the team would have been
8   monitoring open source.
9          So we have the open source
10  reporting.  These are third-party research
11  reports, things like that, to point to
12  information to just make leadership aware.
13         **Q.  Did they -- did that group**
14  **communicate with social media platforms about**
15  **disinformation relating to Ukraine?**
16     A.  By that group, do you mean Unified
17  Coordination Group?
18         **Q.  Correct.**
19     A.  I -- I don't know.
20         **Q.  Rob Schaul would know that?**
21     A.  He led the team, so I suspect he
22  might.
23         **Q.  Do you know if that team**
24  **communicated with social media platforms, at**
25  **all?**

| Page 327 |
| --- |

1      A.  I don't know.  There was a call, at
2   some point, early, between -- between critical
3   infrastructure and I believe some social media
4   around that, but I wasn't around for that call
5   so I don't really know the nature of what was
6   discussed or anything along those lines.
7          **Q.  There was a call between -- and I'm**
8   **sorry, I couldn't hear clearly what you said --**
9   **there was a call between social media platforms**
10  **and -- and who?**
11     A.  So I believe the way I understand
12  the call is it facilitated a call with critical
13  infrastructure, the critical infrastructure
14  community, to private sector companies, sector
15  risk management agencies, folks that were
16  involved in critical infrastructure security.  I
17  believe, my understanding is that call did
18  include some social media platforms.
19         **Q.  And you -- but you don't know what**
20  **was said in that call?**
21     A.  No, I wasn't -- I wasn't back at
22  CISA yet.
23         **Q.  Do you know when the call occurred?**
24     A.  It would have been in probably the
25  February -- February time -- timeframe, I would

| Page 328 |
| --- |

1   think.
2          **Q.  February 2022?**
3      A.  Correct.
4          (Exhibit No. 31 was marked for
5   identification.)
6   BY MR. SAUER:
7          **Q.  I'm putting up Exhibit 31 on the**
8   **screen share.  You should have it in front of**
9   **you.**
10     A.  Okay.  I got it.
11         **Q.  Here's a report from the Office of**
12  **the Inspector General, entitled:  DHS needs a**
13  **unified strategy to counter disinformation**
14  **campaigns; do you see that?**
15     A.  I do.
16         **Q.  Are you familiar with this OIG**
17  **report?**
18     A.  Mostly familiar with it, yeah.
19         **Q.  Were you aware that they -- do you**
20  **know what the day of the report is?**
21     A.  Says August 10th, 2022.
22         **Q.  And I take it this report is**
23  **recommending that here to what we have found,**
24  **DHS needs unified strategy or -- to address**
25  **disinformation; right?  Right here, it says:**

82 (Pages 325 to 328)

BRIAN J. SCULLY  1/12/2023

Page 329

1    DHS does not yet have a unified department-wide
2    strategy to effectively counter disinformation
3    that originates from both foreign and domestic
4    sources; correct?
5        A.  I'm trying to find that.  Okay.
6        Q.  Yeah.
7        A.  DHS does not yet have a unified
8    strategy.  Correct, yeah, that's what's written
9    there.
10        Q.  Do you share that view, do you
11   think DHS lacks a department-wide strategy?
12        A.  Yes.
13        Q.  Do you think that different
14   components of DHS are engaging in different sort
15   of MDM-related activities without coordinating
16   with each other?
17        A.  Yeah, I think that's a fair
18   assumption.
19        Q.  Were you aware that this
20   recommendation was made for DHS to do internal
21   and external coordination better?
22        A.  Was I aware that this report was
23   stating that DHS needs to do better in internal
24   and external coordination?
25        Q.  Yeah.

Page 330

1        A.  I -- I don't know if that's what it
2    says, is there a page in here where that
3    recommendation is or those recommendations?
4        Q.  Let's go to page 7.
5        Q.  Is this PDF 7 or document page 7?
6        Q.  Good question.  It's PDF 9,
7    document --
8        A.  PDF 9?  Okay.
9        Q.  It's here underneath the graphic
10   novels images, there's a paragraph that begins:
11   More recently; do you see that?
12        A.  Yep.
13        Q.  It says:  In January 2021 CISA
14   transitioned its countering foreign influence
15   task force to promote more flexibility to focus
16   on general MDM; right?
17        A.  Mm-hmm, that's what it says.
18        Q.  And that CISA's got 15 dedicated
19   part- and full-time staff; is that still true?
20        A.  No.
21        Q.  I'm sorry, the MDM team has 15
22   staff; is that still true?
23        A.  No.
24        Q.  How many does it have?
25        A.  Right now, we have five full-time

Page 331

1    staff plus one on maternity leave, so six.  And
2    then we have one, two, two contractor's
3    support -- no, three contractor's supporting us.
4        Q.  Did at some time you have 15 people
5    working on this on the MDM team?
6        A.  I suspect at the height of the team
7    if you add in all the contractors there it
8    probably got close to 15, but I'm not sure of
9    the exact number.
10        Q.  When was the height of the team?
11        A.  Staff plus contractors was
12   probably -- good question.  When was the height
13   of the team?  We didn't have much contract
14   support in 2020, so I would probably say 2021,
15   while I was gone.
16        Q.  It says:  The MDM team focuses on
17   disinformation activities targeting elections
18   and critical infrastructure.  According to a
19   CISA official, the MDM team counters all types
20   of disinformation, to be responsive to current
21   events; is that right?
22        A.  That's what the document says, yep.
23        Q.  Is that true that the MDM team
24   counters all types of disinformation to be
25   responsive to current events?

Page 332

1        A.  We, again, try to build resilience
2    and reduce risks to critical infrastructure.  So
3    I -- you know, if the event could impact
4    critical infrastructure, that would be something
5    we would consider addressing.
6        Q.  Does critical infrastructure
7    include cognitive infrastructure?
8        A.  Not through national policy.
9        Q.  Okay.  Let me go two pages further,
10   paragraph -- page 9, it says:  For example,
11   according to an ODNI official, prior to the
12   November 2020 elections CISA and I&A joined in
13   weekly teleconferences to coordinate
14   intelligence community activities to counter
15   election-related disinformation; correct?
16        A.  That's what the document says, yes.
17        Q.  Were you aware of those calls,
18   that's a coordinating call between CISA, I&A and
19   ODNI?
20        A.  No, that was a coordinate -- so
21   yeah, from the call, but the calls were DNI-led
22   coordination calls of the intelligence
23   community.  CISA was there mostly from an
24   observer standpoint, to do as an election
25   security lead.  But it was -- it was an intel

LEXITAS LEGAL
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

**BRIAN J. SCULLY  1/12/2023**

| Page 333 |
|---|

1    community-focused coordination and conversation.
2        Q.  Who from CISA participated in those
3    calls?
4        A.  I think it was just a random -- a
5    random mix.  Geoff did not generally participate
6    in them.  I didn't generally participate in
7    them, although I think I did maybe once or
8    twice, normally somebody at the staff level.
9            Yeah, we have an intel office in
10   CISA, so I suspect that at least somebody from
11   the intel office was on the calls.  But I think
12   it was just, you know, it was who's available at
13   the staff level would go participate at that
14   time.
15       Q.  Was disinformation, you know, how
16   to combat disinformation on social media, is
17   that discussed in these calls?
18           MR. GARDNER:  Objection, calls for
19   speculation, lack of foundation.
20       A.  My understanding, my recollection
21   of the calls, at least the couple I was on, it
22   was generally the intel community talking about
23   what products they were developing, what
24   analysis they were doing, things along those
25   lines.

| Page 334 |
|---|

1        Q.  The next sentence says:  The office
2    of the DNI official stated the teleconferences
3    continue to occur every two weeks after the 2020
4    elections, and were still taking place at the
5    time of this audit in August of 2022; do you see
6    that?
7        A.  I do.
8        Q.  Yeah, what -- are those calls still
9    going on today, every two weeks?
10       A.  I don't know.  That was -- that's
11   a -- THAT they're still continuing to November
12   of 2022 is news to me.  So yeah, I don't -- as
13   far as I know, we weren't participating in them.
14   I wouldn't be surprised if there was some calls
15   going on, but I don't recall.  The intel
16   community doesn't tell community things when I
17   was involved in that.
18       Q.  Why don't I e-mail you another
19   exhibit, 27.
20           MR. GARDNER:  John, if you just
21   spoke, I couldn't hear you, but sound wasn't
22   coming through.
23           MR. SAUER:  I'm sorry.  Yeah,
24   actually, I'm going to skip that one.  I meant
25   Exhibit 23, which I'm now e-mailing you.

| Page 335 |
|---|

1            MR. GARDNER:  Not Exhibit 27?
2            MR. SAUER:  27 should look familiar
3    to you.  We talked about it already.
4            MR. GARDNER:  Okay.  Just to be
5    clear, are we talking about 27 now or a
6    different exhibit?
7            MR. SAUER:  23.
8            MR. GARDNER:  Okay.  Don't have
9    that yet, but as soon as we do.
10           MR. SAUER:  And I'm putting it up
11   on the screen share, too.
12           (Exhibit No. 23 was marked for
13   identification.)
14   BY MR. SAUER:
15       Q.  Here's a November 2021 report on
16   public comments by Director Easterly and The
17   Hill; do you see that?
18       A.  Yes.
19       Q.  It says:  The title is cyber agency
20   beefing up disinformation misinformation team;
21   correct?
22       A.  Correct.
23       Q.  And in the first paragraph says:
24   CISA is beefing up its disinformation and
25   misinformation team in the wake of a dismissive

| Page 336 |
|---|

1    precedential election that saw a proliferation
2    of misleading online information; correct?
3        A.  Yeah, that's what the article says.
4        Q.  Were you aware of efforts to beef
5    up the misinformation team in November of '21?
6        A.  No, not specific efforts.  I was
7    over at the National Security Council at the
8    time.
9        Q.  When did you come back from that
10   detail?
11       A.  The detail officially ended in
12   early March, and I took some leave and started
13   back at CISA in early to mid April.
14       Q.  And the director says in the next
15   paragraph:  I'm actually going to grow and
16   strengthen my misinformation and disinformation
17   team; do you see that?
18       A.  I do.
19       Q.  I know you were on detail then, are
20   you aware of efforts to grow and strengthen the
21   team, for example, by adding new people?
22       A.  Again as I mentioned earlier in my
23   testimony, my understanding is there was some
24   budget increase that was proposed.  I don't -- I
25   don't know if that moved forward or not, from

**LEXITAS LEGAL**
**www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334**

**BRIAN J. SCULLY  1/12/2023**

Page 337

1    the department.
2        Q.  Is the -- do these remarks coincide
3    with what you said was kind of the high point,
4    when you had 15 people on the MDM team, was that
5    around, you know, November 2021?
6        A.  It's hard to say for sure.  I'm
7    not -- I'm not sure how they're counting
8    positions.  So I don't think we ever had 15
9    federal employees.  So there's, you know, it
10   seems to me like they were probably counting
11   contract support, so -- so it's hard for me to
12   say exactly when that would have been.
13       Q.  You say there was, in this
14   timeframe, some attempt to get budget authority
15   to add people to the MDM team?
16       A.  It was my understanding that there
17   was a request for additional funds made to the
18   budget.  But again, I don't know, the budget
19   process is a little bit of a mystery to me, so
20   I'm not sure what exactly happened along the
21   way, if it ended up in the -- you know, in the
22   budget requests or what.
23       Q.  The next paragraph says that
24   Easterly noted that earlier this week she had a
25   meeting with six of the nation's experts in that

Page 338

1    misinformation and disinformation space; do you
2    see that?
3        A.  I do.
4        Q.  Do you know who she met with?
5        A.  I don't.
6        Q.  Do you know who are six of the
7    nation's experts in disinformation and
8    misinformation?
9        A.  I mean, I could come up with a list
10   of experts.  I don't know if that's who she met
11   with.
12       Q.  She stressed her concerns around
13   this being a top threat for CISA; correct?
14       A.  That's what the article says, yep.
15       Q.  And it goes on to quote her,
16   saying:  One could argue we're in the business
17   of critical infrastructure, and the most
18   critical infrastructure is our cognitive
19   infrastructure; correct?
20       A.  That's what the quote says, yep.
21       Q.  Do you -- do you -- do you -- does
22   the MDM team view protecting our cognitive
23   infrastructure as part of its mission?
24       A.  No.  We look at the -- again, the
25   international policy there's, like, 16 sectors,

Page 339

1    and those are the critical infrastructure
2    factors we look to protect.  So we wouldn't
3    include cognitive infrastructure in that list.
4        Q.  One of them is election
5    infrastructure; is that right?
6        A.  Election infrastructure is actually
7    a subsector of the government's stability
8    structure.
9        Q.  So if someone posts information on
10   social media implying that, you know, ballots
11   were being shredded by poll workers, what
12   infrastructure is that a threat to?
13       MR. GARDNER:  Objection, calls for
14   a hypothetical.
15       A.  Yeah, I would rather not answer
16   hypotheticals.
17       Q.  You have no instruction not to
18   answer, please answer the question.
19       MR. GARDNER:  Same objection.
20       A.  Yeah, I'm not answering a
21   hypothetical.
22       Q.  Please answer the questions.  If
23   someone posts on social media --
24       A.  Can you give me an example of the
25   post?

Page 340

1        Q.  If you look at all the posts we
2    looked at earlier in your e-mails, where, for
3    example, suppose someone posts the hammer and
4    scorecard conspiracy on social media, and
5    Director Krebs tells you to reach out to social
6    media platforms to see what they're doing about
7    it, how does the posting about the hammer and
8    scorecard narrative on social media threaten
9    critical infrastructure?
10       A.  So it -- so generally speaking,
11   this mis, mal-information threatens critical
12   infrastructure in a number of ways, it could be
13   operational impact, so in the case of the
14   elections, disrupting election operations,
15   things along those lines.  It could be human
16   impact, so again, see election example, there's
17   a lot of threats of violence made against
18   election officials, making it harder to do their
19   jobs.
20       So a multitude of ways that
21   disinformation could impact critical
22   infrastructure, like I said, we -- you know,
23   there's financial, there's reputational, there's
24   just a multitude of ways that this
25   disinformation could affect critical

85 (Pages 337 to 340)

**BRIAN J. SCULLY  1/12/2023**

Page 341

1   infrastructure.
2          Q.  Does infrastructure have a
3   reputational interest?
4          A.  Does infrastructure have a
5   reputational interest?
6          MR. GARDNER:  Objection, vague.
7          THE WITNESS:  Yeah, could you be a
8   little more specific.
9   BY MR. SAUER:
10         Q.  You just used the word, you said
11  there's financial, there's reputational, what do
12  you mean by that?  What is the reputational
13  threat to critical infrastructure from social
14  media postings?
15         A.  Well, I wouldn't -- I wasn't saying
16  specifically from social media postings.  I was
17  saying from fraud, from mis, dis and
18  mal-information, a reputational risk could come
19  about if the integrity or the public confidence
20  in a particular sector was critical to that
21  sector's functioning.
22         So I think the financial services
23  would probably be a good example.  So if there's
24  a loss of confidence by the American public in
25  financial services, financial systems of the

Page 342

1   United States, that could create national
2   security concerns.
3          Q.  Explain that to me, how would a
4   loss of confidence in the financial system
5   create national security concerns?
6          A.  Lots of ways, you can have runs on
7   banks, such as the banking, you could have, you
8   know, other sorts of issues related to that, so
9   yeah, so there's -- you know, if there's a loss
10  of confidence, if there's a run on banks and
11  there's a run on the financial systems, those
12  sorts of things can create physical harms,
13  operational harms.
14         So again, if we go back to the list
15  of potential harms, the reputational could lead
16  to operational, right?  So banks could be
17  overwhelmed with people showing up trying to
18  take money out.  They could be overwhelmed with
19  people showing up elsewhere at other facilities
20  and disrupt our operations.  So it's a full
21  range of potential risks.  A lot of these are
22  cascading, and so, yeah.
23         Q.  So is it part of the MDM team's job
24  and CISA's job to counter disinformation that
25  creates reputational risks to, for example, the

Page 343

1   financial services industry?
2          A.  So again, our mission is to build
3   resilience.  And so we would work -- if the
4   financial services sector wanted us to work with
5   them, to develop products to help them
6   understand how mis, dis and mal-information
7   could impact their -- their sector, we would --
8   we would work with them on that yes.
9          Q.  What sorts of mis, dis and
10  mal-information might undermine confidence in
11  the financial services?
12         A.  I don't know.  We haven't -- we
13  haven't dealt with that.  We're not financial
14  services experts, so we generally defer to a
15  department or agency.
16         So in this case, Treasury, the
17  sector risk management agency responsible for
18  the financial services sector, so our expertise
19  with the MDM team is understanding MDM and
20  potentially to mitigate risks and to build
21  resilience, and so we wouldn't be the experts on
22  the actual financial services MDM.
23         Q.  So everything you just said about
24  the financial services was a lengthy
25  hypothetical?

Page 344

1          A.  Like I said, I don't like getting
2   into hypotheticals.
3          Q.  You did for awhile, there.
4          Scrolling down in the same
5   document, it says -- there's a quote from
6   Director Easterly, where she says now --
7          MR. GARDNER:  Sorry, hold on.
8          MR. SAUER:  Can you guys hear me
9   now?
10         MR. GARDNER:  Yeah.
11         MR. SAUER:  Okay.
12  BY MR. SAUER:
13         Q.  Quote from Director Easterly, we
14  now live in a world where people talk about
15  alternative facts, post truth, which I think is
16  really, really dangerous, if you get to pick
17  your own facts, and it's particularly corrosive
18  when you talk about matters of election
19  security; right?
20         A.  That's the quote, yeah.
21         Q.  And is that kind of consistent with
22  what the MDM team does, it tries to prevent a
23  situation where Americans get to pick their own
24  facts?
25         MR. GARDNER:  Objection, vague.

86 (Pages 341 to 344)

**BRIAN J. SCULLY  1/12/2023**

Page 345

```
 1        A.  I -- I -- that's -- no, that's not
 2  consistent with what we do.
 3        Q.  So that's -- that's not a -- you
 4  don't think Director Easterly's description is
 5  very fair?
 6        MR. GARDNER:  Objection,
 7  mischaracterizes the witness's previous
 8  testimony.
 9        A.  Yeah, if I understand your question
10  you said that CISA played a role in alternate
11  facts and post truths and things like that, and
12  CISA does not do that sort of thing.
13        MR. SAUER:  Sending you a few more
14  exhibits by e-mail.  You should be getting two
15  e-mails, the first one with three attachments,
16  and the second one with one.
17        It may take a minute.  It's loading
18  slowly on my end.  Okay.  I'm opening Exhibit
19  49, and I'll put that on the screen share.
20        (Exhibit No. 49 was marked for
21  identification.)
22  BY MR. SAUER:
23        Q.  Did you give an interview to the
24  Berkman Klein Center on June 18th of 2020?
25        A.  I don't recall the specific date,
```

Page 346

```
 1  but I did give them an interview, so that's
 2  probably about right.
 3        Q.  And this is an interview by The
 4  Breakdown.  And do you recall doing this
 5  interview?
 6        A.  I do.
 7        Q.  On the third page of the document,
 8  you say:  For us, in particular -- oops, it
 9  didn't highlight well -- for us, in particular,
10  you see here, it's the second bullet -- for us,
11  in particular, we're trying to reduce the amount
12  that Americans engage with disinformation;
13  right?
14        A.  Yes.
15        Q.  Is that -- to your mind, is that a
16  good summary of what the MDM team does, it tries
17  to reduce the amount that Americans engage with
18  disinformation?
19        A.  That's the general idea behind
20  resilience-building, yeah.
21        Q.  What is engaging with
22  disinformation?
23        A.  Amplifying it, re-tweeting it,
24  resending it, things like that.
25        Q.  How about liking it on social
```

Page 347

```
 1  media, is that a form of engagement?
 2        A.  Yep.
 3        Q.  How about just reading it, is that
 4  a form of engagement?
 5        A.  No.
 6        Q.  So if you're reading disinformation
 7  is not engagement with it?
 8        A.  Correct.
 9        Q.  But -- but so engagement is taking
10  some affirmative step further, like you said,
11  amplify, like, repost, that's kind of
12  disinformation, in your view, I'm sorry, that's
13  engagement; correct?
14        A.  Yes.
15        Q.  And it's part of CISA's or the --
16  CISA's job to try to reduce the amount that that
17  happens; right?
18        A.  I wouldn't characterize it that
19  way.  I would say the ultimate goal of building
20  resilience is that people are less likely to
21  amplify mis and disinformation.
22        Q.  And that's what you're trying to do
23  at the MDM team, is reduce the amount that
24  Americans engage with disinformation?
25        A.  Yeah, through public awareness and
```

Page 348

```
 1  public engagement and things like that, yep.
 2        Q.  The last page of the document, you
 3  say -- here there's a paragraph where you say:
 4  The question is, we have people calling for more
 5  monitoring of speech on platforms.  And then you
 6  go on to say:  We have to built the platforms
 7  that this is a lie and they need to take it down
 8  or we're asking the platforms to do that; right?
 9        A.  Yeah, that's what -- that's what
10  the quote is, yep.
11        Q.  Okay.  Is that, in fact, what the
12  MDM team is doing or I guess it was countering
13  foreign influence task force team was doing in
14  2020 when it was routing disinformation concerns
15  to Facebook, were you telling them to --
16        A.  No.
17        Q.  Go ahead.
18        A.  No.  Essentially what this quote is
19  saying is that in the general conversation about
20  how to address mis and disinformation there are
21  a lot of people saying that we should -- the
22  government should be the ones taking things
23  down, or the government should be asking the
24  platforms to do certain things, and that's not
25  necessarily the right spot for government to be.
```

87 (Pages 345 to 348)

**BRIAN J. SCULLY  1/12/2023**

---

Page 349

1    Q.  So when you say:  We have to tell
2  the platforms that this is a lie and they need
3  to take it down, you're attributing that view to
4  other people, not yourself?
5    A.  Yeah, so that's generally what we
6  hear a lot, you go out and you talk to different
7  groups about disinformation that's just a common
8  theme that we would hear from people that we
9  should be doing.
10      And as I mentioned, the rest of the
11  quote is -- is -- it's just not a question of
12  what we should be doing.  There's lots of issues
13  and things like that there.  So that's what I
14  was trying to get across there.
15      (Exhibit No. 52 was marked for
16  identification.)
17  BY MR. SAUER:
18    Q.  Exhibit 52.
19    A.  52?  I've got it.
20      MR. SAUER:  How long have we been
21  on the record.
22      MR. SCOTT:  So I have an unofficial
23  tally of six hours and 32 minutes.
24      MR. SAUER:  Okay.  Exhibit --
25      MR. GARDNER:  I agree.

---

Page 350

1  BY MR. SAUER:
2    Q.  Exhibit 52, if we go in this
3  e-mail -- excuse me, there's an e-mail from
4  Lauren Protentis copying Allison Snell and Geoff
5  Hale and Rob Schaul to a contact at Google; do
6  you see that?
7    A.  Mm-hmm.
8    Q.  And she says, this is in February
9  17th of 2022; do you see that?
10    A.  I do.
11    Q.  And she says:  Hi Richard, I hope
12  this e-mail finds you well.  The Department of
13  Treasury has asked our team for an appropriate
14  POCs -- I assume that means points of contact --
15  to discuss social media and influence matters.
16  We would like to make a connection to Google, if
17  you're amenable; do you see that?
18    A.  I do.
19    Q.  What -- do you know why Treasury
20  reached out to CISA to get a contact for -- at
21  social media platforms to discuss social media
22  and influence matters?
23      MR. GARDNER:  Objection, lack of
24  foundation.
25    A.  I -- I don't know why Treasury

---

Page 351

1  reached out, but CISA obviously, as we discussed
2  earlier, has points of contact in various social
3  media companies.
4    Q.  Does that happen from time to time,
5  that other agencies would reach out to CISA and
6  say:  Can you put us in touch with a social
7  media contact?
8    A.  It's -- it's happened a couple
9  times.  I don't -- I don't -- I don't recall how
10  many, and it's -- it's been awhile, I think,
11  but -- so if that qualifies as time to time.
12    Q.  Do you know what Lauren Protentis
13  meant when she talked about social media
14  influence matters, do you know what that means?
15      MR. GARDNER:  Objection, calls for
16  speculation.
17    A.  Yeah, I don't know what she means.
18    Q.  Were you on detail when this e-mail
19  was sent?
20    A.  I was.
21    Q.  Do you remember any discussions
22  with anyone about the Department of Treasury
23  reaching out to discuss -- I'm sorry -- wanting
24  to be put in place in contact with social media
25  platforms?

---

Page 352

1    A.  I don't, no.
2    Q.  There's a follow up e-mail from
3  Ms. Protentis, saying:  Apologies for the second
4  e-mail, this is somewhat time sensitive.  Do you
5  know why Treasury was raising a time sensitive
6  concern -- concern?
7      MR. GARDNER:  Objection, calls for
8  speculation.
9    A.  I don't know.
10    Q.  Do you know if Treasury ever
11  connected with the social media platform?
12    A.  I don't know.
13      (Exhibit No. 46 was marked for
14  identification.)
15  BY MR. SAUER:
16    Q.  I'm pulling up Exhibit 46.  It
17  should be in the second e-mail I sent you a
18  moment ago.
19    A.  I got it.
20    Q.  Here's a draft report to the CISA
21  director, dated June 22nd, 2022; correct?
22    A.  Yes.
23    Q.  This is from the CISA cyber
24  security advisory committee; correct?
25    A.  It appears so, yep.

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

BRIAN J. SCULLY  1/12/2023

Page 353

1          Q.  I believe you said in your
2   interrogatory responses that this also has an
3   MDM subcommittee; is that right?
4          A.  Yes, that's correct.
5          Q.  Do you participate in those
6   committees, either the security advisory
7   committee or the MDM subcommittee?
8          A.  I don't.
9          Q.  Who participates from -- does
10  anyone participate from the MDM team in those --
11  those committees?
12         A.  Not from the MDM team, no.
13         Q.  So no one on the MDM team
14  participates in the committees?
15         A.  No.
16         Q.  Who from CISA participates, do you
17  know?
18         A.  Kim Wyman is, as I mentioned
19  earlier, I think, that was one of her
20  responsibilities, and then Geoff Hale
21  participated.
22         Q.  And then who else, from outside
23  CISA, participates in these meetings?
24             MR. GARDNER:  Objection, lack of
25  foundation.

Page 354

1          A.  I don't know who's -- I don't know
2   who's in the -- the participant list.  I believe
3   it's all publicly available online.
4          Q.  Turning to the second page of this
5   document.
6          A.  Okay.  Recommendations?
7          Q.  Yeah.  First bullet point, do you
8   see there, it says:  CISA should focus on MD --
9   I assume that's mis and disinformation?
10         A.  Is that a question?
11         Q.  Yeah.  Is that --
12             MR. GARDNER:  Objection, calls for
13  speculation, lack of foundation.
14  BY MR. SAUER:
15         Q.  Does MD refer to mis and
16  disinformation?
17         A.  In the context, I would say that it
18  does, but I don't -- I don't know what they
19  meant by it.
20         Q.  It says:  CISA should focus on MD
21  that risks undermining critical functions of
22  American society, including sub-bullet one, MD
23  that suppresses election participation or
24  falsely undermines confidence in election
25  procedures and outcomes; correct?

Page 355

1          A.  Correct.
2          Q.  So the advisory committee is
3   recommending that CISA focus on election-related
4   disinformation; right?
5             MR. GARDNER:  Objection, lack of
6   foundation.
7          A.  That's how I would read that
8   sentence, correct.
9          Q.  Okay.  Second bullet point says:
10  MD that undermines critical functions carried
11  out by other key democratic institutions, such
12  as the courts or by other sectors, such as the
13  financial system or public health measures;
14  right?
15         A.  That's what it says, yep.
16         Q.  You talked about the financial
17  system, earlier, and interestingly that's raised
18  in this recommendation.  Are you aware of CISA
19  doing anything to address MD that undermines the
20  financial system?
21         A.  So we've -- as I mentioned earlier,
22  we -- we're working with Treasury to develop a
23  product to help the financial services sector
24  understand MDM risks to the sector.
25         Q.  What risks have there been to that

Page 356

1   sector?  And I don't remember any runs on banks,
2   you know, recently, what risks?
3          A.  So again, as I mentioned earlier,
4   we're not the experts in financial services, so
5   we, you know, depend on the financial services
6   sector to kind of work us through, help us work
7   through what those risks are, we're pretty early
8   in the process, so we're still kind of working
9   through those sorts of questions.
10         Q.  Do you know what, what was the
11  impetus for doing that product in the first
12  place?  Was someone worried about MDM that would
13  undermine financial services?
14         A.  I -- I don't -- I don't know why
15  Treasury reached out to us and discussed that, I
16  don't recall.
17         Q.  Is that unrelated to the last
18  e-mail we saw, where they wanted to talk to
19  social media platforms about social media and
20  influence matters?
21             MR. GARDNER:  Objection, calls for
22  speculation, lack of foundation.
23         A.  Yeah, I don't know.  I don't know
24  if the two are connected.
25         Q.  Okay.  The bottom of the same page,

LEXITAS LEGAL
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

**BRIAN J. SCULLY  1/12/2023**

Page 357

1   there's a bullet recommending that CISA should
2   consider MD across the information ecosystem;
3   right?
4         A.  Yep.
5         Q.  And it goes down in the second
6   sub-bullet there, it says:  CISA should approach
7   the MD problems with the entire information
8   ecosystem in mind, this includes social media
9   platforms of all sizes, mainstream media, cable
10  news, hyper partisan media, talk radio and other
11  online resources; do you see that?
12        A.  I do.
13        Q.  Has CISA been taking steps to
14  consider or address misinformation in these
15  other venues, besides social media, for example,
16  mainstream media?
17        A.  No.  What I would say is that,
18  generally speaking, we -- we -- I believe it's
19  generally too much of a focus on just the social
20  media platform, and MDM that kind of flows
21  through social media.  When potentially it's MDM
22  that flows through all different sources of
23  media communication.
24        So that's kind of how we think
25  about it, we try not to just focus on MDM, but

Page 358

1   we don't do anything counter to your point.
2   Again, we built resilience helping people
3   understand what's going on and how to mitigate
4   the risks.
5         Q.  Do you try to build resilience to
6   MDM on -- in cable news?
7         A.  I mean, generically speaking, all
8   of our resilience activity would be useful
9   regardless of how -- we try to make it as broad
10  as possible so it's applicable anywhere that
11  somebody may come across MDM.
12        Q.  How about hyper partisan media,
13  what does that mean, do you know?
14        MR. GARDNER:  Objection, calls for
15  speculation.
16        A.  I don't know what it's meant in
17  this context, but again, we try to be general
18  enough in our kind of guidance to help people
19  understand.
20        We're essentially agnostic of where
21  it's coming from, we just want people to be able
22  to understand where -- what it is, how it works,
23  and things they can do to mitigate those risks.
24        Q.  I take it, then, the MDM team would
25  agree with this recommendation that CISA should

Page 359

1   approach the MDM problem, you know, with a whole
2   information universe in mind, including
3   mainstream media, cable news, hyper partisan
4   media, talk radio, and other online resources?
5         MR. GARDNER:  Objection, form.
6         A.  What I would say, from a
7   resilience-building standpoint, we generally
8   don't -- try not to hone too much on any one
9   particular medium for communication.  There's
10  obviously tactics that fall across multiple, but
11  we don't generally try to hone in on any one in
12  particular.
13        (Exhibit No. 59 was marked for
14  identification.)
15  BY MR. SAUER:
16        Q.  I'm pulling up Exhibit 59.
17        A.  Okay.
18        Q.  And then here's a cyber security
19  advisory committee e-mail to a group, I assume
20  it's the committee members; does that look right
21  to you or do you not know?
22        MR. GARDNER:  Objection, lack of
23  foundation, calls for speculation.
24        A.  Yeah, I don't -- I don't know who
25  all the members are, so it would be hard for me

Page 360

1   to say if that's the case.
2         Q.  Here's some people that are copied
3   on this e-mail from the CISA cyber security
4   advisory committee e-mail, the first one is Kate
5   Starbird; right?
6         A.  Yeah.
7         Q.  Do you know who she is?
8         A.  She's a professor at the University
9   of Washington.
10        Q.  She was involved in the Election
11  Integrity Partnership that we talked about
12  earlier; right?
13        A.  I believe so, yeah.
14        Q.  Next one is Vijaya Gadde or Gadde,
15  do you know who she is?
16        A.  I don't know.
17        Q.  Was she a senior official at
18  Twitter, at the time, do you know?
19        MR. GARDNER:  Objection, calls for
20  speculation.
21        A.  I don't know.
22        Q.  I see you've got Kim Wyman and
23  Geoff Hale on this e-mail.  They were the two
24  that you testified earlier are involved in the
25  cyber security advisory committee for CISA;

**BRIAN J. SCULLY  1/12/2023**

Page 361

1  right?
2      A.  Yep.
3      Q.  And then lower down, there's a list
4  of -- we have identified a list of potential
5  subject matter experts to potentially brief at
6  our biweekly meetings, bios attached; do you see
7  that?
8      A.  I do.
9      Q.  So -- and that's a list of, I take
10 it, experts who would provide briefings at the
11 advisory committee's meetings; is that how you
12 read that?
13         MR. GARDNER:  Objection, lack of
14 foundation, calls for speculation.
15     A.  So the paragraph reads:  Identify a
16 list of subject matter experts.  Please be
17 prepared to provide your feedback.  I'm sorry,
18 what was your question again?
19     Q.  Let me just ask:  Is the third
20 expert on the list is Renée DiResta; right?
21     A.  Yeah.
22     Q.  And she's at Stanford Internet
23 Observatory; right?
24     A.  Correct.
25     Q.  You were involved in conversations

Page 362

1  with her, because she was a part of the Election
2  Integrity Partnership; right?
3      A.  We should have Stanford Internet
4  Observatory, we were certainly involved in
5  conversations with her, as I talked about
6  earlier.
7      Q.  And those conversations were
8  related to the commencement of the Election
9  Integrity Partnership; right?
10     A.  I -- I don't know if she was
11 involved in the early conversations, before it
12 stood up.  I know Stamos was there, I don't know
13 if Renée was there in those early conversations.
14     Q.  Was she in some conversations
15 between -- with you about the EIP?
16     A.  As I mentioned earlier, she briefed
17 us about the 2022 EIP work.  I don't recall
18 conversations in 2020, but again, it wouldn't
19 surprise me if she was involved in those.
20         MR. SAUER:  Let's go off the
21 record.
22         THE VIDEOGRAPHER:  The time is now
23 5:46 p.m.  We are off the record.
24         (Recess.)
25         THE VIDEOGRAPHER:  The time is now

Page 363

1  5:53 p.m.  We're back on the record.
2          MR. SAUER:  Are we back on the
3  record?
4          THE VIDEOGRAPHER:  Yes.
5          MR. SAUER:  Oh, sorry.
6          (Exhibit No. 19 was marked for
7  identification.)
8  BY MR. SAUER:
9      Q.  Exhibit 19, I put it on the screen
10 share.
11         Here's a proposal from CIS, Center
12 For Internet Security, to create an election
13 misinformation reporting portal, and it talks
14 about the benefits to election officials being
15 in a single place for reporting mis and
16 disinformation across multiple social media
17 platforms.
18         Do you know if this proposal was
19 ever implemented to create a single election
20 misinformation reporting portal?
21     A.  I -- I don't know.  I'm not
22 entirely sure.  I don't know that I've seen
23 this, I don't know if I've seen this proposal
24 before, so I'm not certain.
25     Q.  So you don't know?

Page 364

1      A.  It sounds like what they were
2  trying to do, that we discussed earlier, but I
3  don't know to what extent it was, to your
4  question, to what extent it was stood up or
5  established.
6      Q.  You don't know to what extent that
7  CIS managed to implement this proposal for an
8  elections misinformation reporting portal?
9      A.  Yeah, or if they -- if they did it
10 at all.
11         (Exhibit No. 21 was marked for
12 identification.)
13 BY MR. SAUER:
14     Q.  Exhibit 21, it's on the screen
15 share, this is a CNN political report, September
16 of 2022.  If you go to the third -- fourth page
17 of the document, in this report it says:  While
18 the anti-doxing and foreign influence parts of
19 the proposal remain stalled, work on the online,
20 quote, portal for election officials to flag
21 misinformation to social media platforms
22 predated the proposal and continues today,
23 according to people familiar with it.
24         So are you aware of ongoing work,
25 at least as of September of 2022, to set up an

**LEXITAS LEGAL**
www.lexitaslegal.com       Phone: 1.800.280.3376       Fax: 314.644.1334

**BRIAN J. SCULLY  1/12/2023**

Page 365

1  online portal for election officials to flag
2  misinformation to social media platforms.
3       A.  So I think as I testified to
4  earlier, my understanding is that CIS did do
5  something along the lines, I just don't know the
6  extent of it.
7       Q.  And you don't know whether or when
8  it -- it might be completed?
9       A.  Correct.
10           (Exhibit No. 24 was marked for
11  identification.)
12  BY MR. SAUER:
13       Q.  Exhibit 24, here's a CISA bulletin
14  that's on your website called --
15       A.  Mm-hmm.
16       Q.  -- misinformation, you go to the
17  third page.
18       A.  Correct.
19       Q.  Are you familiar with this
20  bulletin?
21       A.  Actually, I think this may be our
22  website.  I'm not sure if it's a bulletin.
23       Q.  It is on your website.  I don't
24  know if it's a bulletin, either.
25           Let me ask you this:  Here on the

Page 366

1  third page, it says:  Bridging election
2  stakeholders and social media, and under there
3  it says:  The MDM team serves as a switchboard
4  for routing disinformation concerns to
5  appropriate social media platforms and law
6  enforcement; correct.
7       A.  It does, yep.
8       Q.  You guys refer stuff to law
9  enforcement, too?
10       A.  Yes, if there was -- particularly
11  if there was violence, promoted in whatever was
12  sent to us from an election official.
13       Q.  Anything else involved that would
14  be reported to law enforcement, other than
15  threats of violence?
16       A.  So we would generally share
17  whatever we received from the election officials
18  with the FBI, in case there was an ongoing
19  investigation related to whatever it was that we
20  forwarded to them.
21       Q.  And is this still true, I mean,
22  it's on your website today, is it still true
23  that the MDM team serves as a switchboard for
24  routing disinformation concerns to appropriate
25  social media platforms?

Page 367

1       A.  No.  Like I said earlier, we didn't
2  do this in 2022, so we should change that to
3  served.  Thank you for finding that.
4       Q.  And I take it you -- you testified
5  earlier that that decision was made in late
6  April or early May of 2022?
7       A.  That's my recollection.
8       Q.  Do you know why the decision was
9  made?
10       A.  I don't, but as I also mentioned,
11  it was something that we were comfortable with,
12  from the MDM team perspective, because of heavy
13  burden on our resources.
14       Q.  You anticipate serving in a
15  switchboard in the future or do you not know
16  whether you will?
17       A.  That's not my decision to make,
18  so -- so I don't want to speak on behalf of the
19  director or future directors.
20       Q.  You don't know what the director's
21  plans are for the future when it comes to
22  serving as a switchboard for routing
23  disinformation concerns?
24       A.  I don't know what direct --
25  Director Easterly's position is, and obviously I

Page 368

1  wouldn't know any future director's position on
2  that, either.
3           (Exhibit No. 6 was marked for
4  identification.)
5  BY MR. SAUER:
6       Q.  Exhibit 6?
7       A.  Okay.
8       Q.  Here's a public comments by Renée
9  DiResta about -- about the Election Integrity
10  Project.  And let me put it on the screen share.
11           On the third page, call -- which is
12  called page 2 of the transcript, she talks -- or
13  sorry, it's quoting Alex Stamos, saying that the
14  EIP started with our team at Stanford sending a
15  group of interns to work with CISA; right?  Do
16  you see that?
17       A.  Yep.
18       Q.  It talks about the sort of stuff we
19  talked about the gap earlier, about how there's
20  a lack of capability, about disinformation.
21           But Stamos says they lack a funding
22  and legal authorization to do the kinds of work
23  that will be necessary to truly understand how
24  election disinformation was operated; correct?
25       A.  That's what he says, yep.

**BRIAN J. SCULLY   1/12/2023**

Page 369

1    Q. And he goes on to say: Our
2  partners in government, most particularly those
3  in CISA and DHS, but also state and local
4  governments whom we worked with; correct?
5    A. He says that, yes.
6    Q. Were CISA and DHS partners of the
7  EIP, in your view?
8    A. We generally describe any external
9  organization that we have a relationship as a
10  partner. So I think that probably, you know --
11  so yeah.
12    Q. Okay. So in a sense that you were
13  a partner of the EIP, fair to say?
14    A. Again, we would say that of any
15  external entity that we have a relationship
16  with.
17     (Exhibit No. 7 was marked for
18  identification.)
19  BY MR. SAUER:
20    Q. On the screen share I put Exhibit
21  7, which is now public comments from Renée
22  DiResta from the EIP; do you see it up there?
23    A. Sorry, you are on Exhibit 7?
24    Q. Yeah.
25    A. Yep.

Page 370

1    Q. If you go to page 2 of the
2  transcript, which is page 4 of the PDF, and
3  it -- it quotes Renée DiResta, again, talking
4  about the students from Stanford doing an
5  internship at CISA and identifying a gap, right,
6  that was the word we used earlier?
7    A. Mm-hmm.
8    Q. It talks about how there was no
9  clear federal lead to coordinate, and it wasn't
10  prepared to identify it; correct?
11    A. I don't --
12    Q. It says that gap, the federal
13  government wasn't prepared to identify and
14  analyze election mis and disinfo; correct?
15    A. Correct. That's what she says,
16  yep.
17    Q. And she says there was no clear
18  federal lead to coordinate the work and so
19  forth?
20    A. Correct.
21    Q. And she says: There were unclear
22  legal authorities, including very clear first
23  amendment questions; right?
24    A. That's what she says.
25    Q. That's a reference to the federal

Page 371

1  government taking the leadership role and
2  analyzing to respond to election mis and
3  disinformation; correct?
4    A. I'm not seeing that in here, is
5  that a sentence or are you asking me to --
6    Q. I'm just --
7    A. -- interpret what Renée is saying?
8    Q. Yeah, interpret, is that how you
9  read it? That's how I read it.
10     MR. GARDNER: I'm sorry, can you --
11  John, can you re-ask that question?
12  BY MR. SAUER:
13    Q. Let me ask you this: Were there
14  any discussions of -- that you're aware of,
15  relating to the EIP, that related to unclear
16  legal authorities, including very real first
17  amendment questions, when it comes to direct
18  involvement of the federal government?
19    A. I'm not aware, but, in general,
20  conversations about MDM, first amendment comes
21  up.
22    Q. Did it come up with the CISA
23  interns who originated the idea of the EIP?
24    A. I don't -- I don't recall that
25  being the nature of the conversation. I think

Page 372

1  it was really mostly around gaps for election
2  officials. But as you probably picked up, I
3  don't remember in detail the conversations that
4  well that long ago.
5     MR. SAUER: I think that's all the
6  questions I have.
7     MR. GARDNER: Well, the government
8  has no questions. We just, again, we emphasize
9  that the witness will read and sign.
10     THE VIDEOGRAPHER: This
11  concludes -- this concludes the deposition of
12  Brian Scully. The time is now 6:04 p.m. We are
13  off the record.
14     THE REPORTER: Mr. Sauer, when do
15  you need the transcript?
16     MR. SAUER: Could we have it
17  expedited within two days, that's -- Ben, I
18  think our standard request for these is two
19  business days?
20     MR. GARDNER: Yes.
21     THE REPORTER: And Mr. Gardner,
22  will you be purchasing a copy.
23     MR. GARDNER: Yes, ma'am, we'll be
24  purchasing a copy.
25     THE REPORTER: And you want the

**LEXITAS LEGAL**
www.lexitaslegal.com      Phone: 1.800.280.3376      Fax: 314.644.1334

**BRIAN J. SCULLY  1/12/2023**

## Page 373

```
 1        same delivery?
 2            MR. GARDNER:  Yes, ma'am.
 3            THE REPORTER:  Is it okay if I
 4   e-mail you spelling questions on Monday?
 5            MR. GARDNER:  You have until
 6   Tuesday, with the holiday.
 7            (Signature having not been waived,
 8   the deposition of BRIAN SCULLY was concluded at
 9   6:04 p.m.)
10            ACKNOWLEDGMENT OF DEPONENT
11            I, BRIAN SCULLY, do hereby acknowledge
12   that I have read and examined the foregoing
13   testimony, and the same is a true, correct and
14   complete transcription of the testimony given by
15   me and any corrections appear on the attached
16   Errata sheet signed by me.
17
18   _____  _____
19      (DATE)           (SIGNATURE)
20
21
22
23
24
25
```

## Page 374

```
 1        CERTIFICATE OF SHORTHAND REPORTER
 2            I, Cassandra E. Ellis, Registered
 3   Professional Reporter, the officer before whom the
 4   foregoing proceedings were taken, do hereby
 5   certify that the foregoing transcript is a true
 6   and correct record of the proceedings; that said
 7   proceedings were taken by me stenographically and
 8   thereafter reduced to typewriting under my
 9   supervision; and that I am neither counsel for,
10   related to, nor employed by any of the parties to
11   this case and have no interest, financial or
12   otherwise, in its outcome.
13            IN WITNESS WHEREOF, I have hereunto set
14   my hand this 17th day of January 2023.
15
16
17   _____
18   CASSANDRA E. ELLIS, CSR-HI, CSR-VA, CCR-WA, RPR,
19   CRR
20   REALTIME SYSTEMS ADMINISTRATOR
21   NOTARY PUBLIC
22
23
24
25
```

## Page 375

```
 1            LEXITAS LEGAL
 2
 3   January 17, 2023
 4
 5   JOSHUA E. GARDNER, ESQUIRE
     DEPARTMENT OF JUSTICE
 6   1100 L STREET, NORTHWEST
     WASHINGTON, D.C.  20530
 7
     IN RE: THE STATE OF MISSOURI, et al. v. JOSEPH R.
 8            BIDEN, JR., et al.
 9
10   Dear JOSHUA E. GARDNER:
11   Please find enclosed your copies of the deposition of
12   BRIAN J. SCULLY taken on January 12, 2023 in the
13   above-referenced case. Also enclosed is the original
14   signature page and errata sheets.
15   Please have the witness read your copy of the
16   transcript, indicate any changes and/or corrections
17   desired on the errata sheets, and sign the signature
18   page before a notary public.
19   Please return the errata sheets and notarized
20   signature page within 30 days to our office at 1608
21   Locust Street, Kansas City, MO 64108 for filing.
22   Sincerely,
23
24   Lexitas Legal
25   Enclosures
```

## Page 376

```
 1            ERRATA SHEET
 2   Witness Name: BRIAN J. SCULLY
 3   Case Name: THE STATE OF MISSOURI, et al. v. JOSEPH R.
              BIDEN, JR., et al.
 4   Date Taken: JANUARY 12, 2023
 5   Page #_____  Line #_____
 6   Should read: _____
 7   Reason for change: _____
 8
 9   Page #_____  Line #_____
10   Should read: _____
11   Reason for change: _____
12
13   Page #_____  Line #_____
14   Should read: _____
15   Reason for change: _____
16
17   Page #_____  Line #_____
18   Should read: _____
19   Reason for change: _____
20
21   Page #_____  Line #_____
22   Should read: _____
23   Reason for change: _____
24
25   Witness Signature: _____
```

94 (Pages 373 to 376)

**BRIAN J. SCULLY  1/12/2023**

Page 377

```
 1     STATE OF _____)
 2
 3     COUNTY OF _____)
 4
 5     I, BRIAN J. SCULLY, do hereby certify:
 6         That I have read the foregoing deposition;
 7         That I have made such changes in form
 8     and/or substance to the within deposition as might
 9     be necessary to render the same true and correct;
10         That having made such changes thereon, I
11     hereby subscribe my name to the deposition.
12         I declare under penalty of perjury that the
13     foregoing is true and correct.
14         Executed this _____ day of _____,
15     20___, at _____.
16
17
18
19         _____
20         BRIAN J. SCULLY
21
22         _____
23         NOTARY PUBLIC
24     My Commission Expires:
25
```

**LEXITAS LEGAL**

**www.lexitaslegal.com**       **Phone: 1.800.280.3376**       **Fax: 314.644.1334**

**BRIAN J. SCULLY 1/12/2023**

**A**

A-a-r-o-n
 103:6
A-l-e-x
 167:6
A-y-e-l-e-t
 187:18
a.m 1:16
 10:4
 226:19
Aaron 103:2
 103:5,6
 112:16,17
 112:17
 157:19,21
 157:21
 217:4
 227:18
abbrevia...
 316:24
ability
 92:24,25
 93:19 94:6
 94:11,17
able 358:21
above-re...
 375:13
absence 19:5
 20:6
absolutely
 287:22
academia
 44:6
academic
 46:10,21
 47:2
accident...
 262:4
accidently
 293:8
account
 206:17
 207:5
 230:13
 281:11,18
 294:9,13
 295:11
 296:21
accounts

205:24
206:7,22
207:8
230:13
281:3,22
298:3,4
accurate
 290:22
 291:5
 315:13
acknowledge
 373:11
ACKNOWLE...
 373:10
acronym
 307:24
acronyms
 307:24
act 35:6
 229:6
 240:3
acted 165:13
acting 121:3
action 94:12
 95:14
 177:9,13
 178:6,6
 200:14
 288:11
actioned
 164:10
 165:3
 168:14
 177:4
actions 40:9
 40:15,25
 240:8
 242:4
 279:5
active 19:9
 33:24
 125:22
 137:20
actively
 287:18,18
activities
 16:8 21:14
 43:21
 69:22 90:9

105:3,5
130:17
137:20
278:25
304:5
312:12
325:8
329:15
331:17
332:14
activity
 64:25
 152:10
 166:1
 358:8
actor 37:23
 259:14
 270:17,22
actors 27:12
 27:21 38:1
 38:2,4,8
 38:10,12
 39:21
 246:2
 256:20
 271:6
 273:24
 323:23
actual 36:19
 61:16
 155:15
 193:15
 255:11
 258:10
 270:25
 274:5
 275:2
 343:22
Adam 33:12
 276:20
add 171:2
 290:4
 297:2
 300:8,12
 331:7
 337:15
adding
 119:14
 336:21

addition
 75:9
 184:13
 235:23
additional
 40:22 41:3
 88:14
 209:17
 210:3
 220:7,17
 222:19
 303:9,24
 337:17
Addition...
 117:25
address
 66:15
 120:8,12
 120:13
 128:11
 131:18
 137:21
 157:5
 198:21
 203:19
 205:6
 320:8
 324:12
 328:24
 348:20
 355:19
 357:14
addressed
 163:20
addresses
 214:19,24
addressing
 58:24
 151:7
 278:12
 322:6
 332:5
administ...
 25:3
administ...
 25:4
 239:16
 313:16,22
 314:4,10

administ...
 234:25
Administ...
 2:8 374:20
admonition
 196:7
adopt 132:18
adversarial
 270:17,22
 271:5
advisor
 195:19
 305:5
advisory
 37:17
 352:24
 353:6
 355:2
 359:19
 360:4,25
 361:11
advocating
 132:17
aegis 73:22
affect 57:21
 340:25
affirmative
 347:10
Afghanistan
 322:2
 324:21
afraid
 292:10,17
 307:20
afternoon
 163:7
 173:17,19
 176:1
 284:23,25
afters
 122:20
agencies
 25:11,17
 25:22
 37:12
 73:11,16
 73:21 92:2
 92:10,14
 92:25

| | | | | |
|---|---|---|---|---|
| 93:20 | 272:21 | 293:14 | alleged | analyses |
| 95:15 | 275:3,24 | 297:7 | 200:3 | 125:24 |
| 136:24 | agents | 298:19 | 217:8 | analysis |
| 245:25 | 220:11 | 302:4,15 | 225:16 | 16:22 26:3 |
| 246:13 | agnostic | 315:21 | Alliance | 43:20,21 |
| 250:5,17 | 358:20 | 348:17 | 47:7 | 43:24 |
| 250:21 | ago 101:5 | aided 118:1 | Allison 28:8 | 59:16 60:6 |
| 256:5 | 295:15 | 118:15 | 253:16 | 60:17 |
| 258:3,11 | 352:18 | aimed 17:5 | 350:4 | 123:1 |
| 262:19 | 372:4 | al 1:6,10 | allow 151:14 | 144:16,16 |
| 264:17 | agree 42:5,7 | 10:6,8 | 289:2 | 147:6,9 |
| 267:6,19 | 95:19 | 375:8,8 | allows 148:4 | 172:1 |
| 314:15 | 349:25 | 376:3,3 | alternate | 187:15 |
| 315:2 | 358:25 | alert 27:5 | 62:21 | 225:13 |
| 317:12 | agreed 86:20 | Alethia | 345:10 | 333:24 |
| 327:15 | agreement | 47:14 | alternative | analyst |
| 351:5 | 2:2 212:7 | Alex 43:14 | 344:15 | 28:19 |
| agency 4:7 | ahead 8:18 | 70:5,14 | amenable | 43:14,16 |
| 8:12 15:25 | 53:12 73:5 | 72:16 76:9 | 350:17 | 167:25 |
| 72:2 90:17 | 87:23 | 76:14,15 | amended 6:22 | 171:18 |
| 91:5 94:21 | 89:14 | 77:8,17 | 190:18 | analysts |
| 95:5 | 113:3 | 86:2 88:8 | amendment | 108:12 |
| 141:24 | 122:2 | 89:6 99:10 | 95:14 | 109:18,22 |
| 178:11 | 124:8 | 102:2 | 153:5 | 187:10 |
| 248:10 | 126:11 | 111:22 | 370:23 | analysts' |
| 250:23 | 141:15 | 116:21,24 | 371:17,20 | 29:3 |
| 251:2 | 144:6 | 117:2,8,16 | American | analytic |
| 284:16 | 146:20 | 134:21 | 46:25 | 44:12 |
| 286:14 | 161:23 | 136:5,9,13 | 341:24 | 184:4 |
| 315:9 | 162:5 | 136:15 | 354:22 | analyze |
| 316:18,24 | 173:2,9 | 139:7,11 | Americans | 182:9 |
| 317:3 | 195:4 | 139:21,23 | 280:11,20 | 370:14 |
| 335:19 | 203:25 | 142:12 | 280:23 | analyzing |
| 343:15,17 | 204:5 | 166:19 | 344:23 | 371:2 |
| agenda 21:9 | 215:21 | 167:3,6 | 346:12,17 | and/or |
| 30:18,20 | 218:14,15 | 171:11,12 | 347:24 | 375:16 |
| 30:22,23 | 221:7 | 171:14 | amount 50:23 | 377:8 |
| 34:5 | 222:8,10 | 179:18 | 346:11,17 | Announce... |
| 128:14,15 | 225:20 | 181:10,14 | 347:16,23 | 8:15 |
| 129:2 | 256:24 | 182:17,17 | amplific... | announces |
| 169:9 | 257:10 | 184:14 | 287:6,8 | 217:11 |
| 234:17 | 261:24 | 185:2,4,12 | 288:24 | announcing |
| 256:3 | 266:25 | 191:25 | amplified | 35:9 |
| 257:15,23 | 269:4 | 192:12 | 287:10,13 | answer 13:1 |
| 260:5 | 271:9 | 196:24 | amplify | 34:19 35:5 |
| 262:8 | 273:8 | 197:7 | 254:18 | 51:2 53:3 |
| 269:6,14 | 285:15 | 198:19 | 347:11,21 | 71:23 80:7 |
| 270:6,25 | 288:15 | 199:6,16 | Amplifying | 93:4 133:3 |
| 272:5,8,18 | 289:9 | 368:13 | 346:23 | 133:23 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 148:10 | 14:4 55:7 | 256:9 | 319:20 | 94:10 |
| 150:22,22 | 107:11 | 257:19 | 320:6,22 | 100:20 |
| 152:24 | 282:2 | 258:4 | 321:11 | 107:1 |
| 153:10,20 | appear 82:25 | approaching | 336:3 | 128:9 |
| 153:21 | 205:23 | 163:11 | 338:14 | 130:21 |
| 156:2,11 | 373:15 | appropriate | articles | 132:24,25 |
| 162:1 | appeared | 17:7 95:15 | 124:2,5,13 | 133:4 |
| 163:13 | 225:15 | 315:16 | articulate | 135:11,11 |
| 167:13 | appearing | 350:13 | 311:4 | 137:1 |
| 180:24 | 192:10 | 366:5,24 | articulated | 156:3 |
| 185:9 | appears | April 22:3,6 | 239:7 | 172:15 |
| 198:14 | 159:17 | 22:7,16,20 | artifact | 222:18 |
| 202:21 | 162:23 | 22:25 23:9 | 60:3 | 228:24 |
| 237:20 | 173:15 | 23:11 | Ashwin | 249:3 |
| 250:6 | 192:15 | 260:3 | 187:20 | 256:13 |
| 278:21,21 | 196:16 | 262:1 | asked 63:13 | 261:19 |
| 292:10,17 | 199:25 | 294:14 | 101:9 | 277:7 |
| 304:24 | 200:1 | 336:13 | 126:5 | 287:12 |
| 310:15 | 207:23 | 367:6 | 136:13,23 | 292:12 |
| 339:15,18 | 211:20 | April-ish | 140:6 | 295:18,19 |
| 339:18,22 | 226:10 | 12:6 | 146:16 | 297:1,4 |
| answered | 228:22 | April/May | 147:13 | 301:5 |
| 126:6 | 230:16 | 12:6 | 161:25 | 348:8,23 |
| 146:17 | 277:10 | area 241:25 | 163:22 | 371:5 |
| 162:1 | 281:12 | areas 312:23 | 202:16 | asks 100:23 |
| 202:16 | 282:18 | 313:5 | 218:23 | 232:6 |
| 230:20 | 285:9 | argue 338:16 | 219:4 | 261:16 |
| 251:3,8 | 292:2 | Arizona | 220:18,20 | assembled |
| answering | 297:4 | 225:7,18 | 223:3 | 97:7 |
| 339:20 | 301:13 | Arizona's | 230:19 | assembling |
| answers | 352:25 | 225:2 | 250:4,15 | 97:14 |
| 150:19 | applicable | arose 147:4 | 251:1,6 | assembly |
| anti-doxing | 358:10 | arrangement | 260:8,20 | 97:16 |
| 364:18 | applied | 121:9 | 261:15 | asserted |
| anticipate | 224:17 | 187:2 | 270:4 | 166:12 |
| 256:9,15 | applies | arranging | 284:4 | assess |
| 367:14 | 153:1 | 214:1 | 296:16 | 144:18 |
| anticipated | 260:24 | arrived 86:8 | 301:11,16 | assessed |
| 258:5,13 | apply 17:17 | arrives | 307:10 | 109:22 |
| anticipa... | appointee | 14:25 | 318:22 | assessing |
| 257:19 | 130:4,8,12 | arrow 105:16 | 350:13 | 96:10,18 |
| anybody | 313:15,17 | 105:17 | asking 13:11 | 123:8 |
| 129:14 | approach | 106:17 | 13:23 57:3 | assessments |
| API 146:7,9 | 39:15 85:9 | article 8:7 | 66:24 74:7 | 257:3 |
| 146:13,13 | 97:5 307:5 | 8:11,16 | 74:10 | assignment |
| 146:14 | 307:12 | 9:5,15 | 91:10 | 19:19 |
| Apologies | 357:6 | 304:6,17 | 92:11,12 | assist |
| 352:3 | 359:1 | 305:22 | 92:13 93:6 | 322:22 |
| apologize | approaches | 314:19 | 93:14 94:9 | assistance |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 101:10 | atlassia... | 273:22,24 | awake 175:9 | 326:12 |
| assistant | 205:15 | 274:3,4,8 | aware 17:13 | 328:19 |
| 195:11 | attached 5:7 | 274:10 | 17:16 18:1 | 329:19,22 |
| 196:14 | 6:2 7:2 | 275:7,11 | 52:2 61:22 | 332:17 |
| 311:17 | 8:2 9:2 | 275:14,19 | 75:5,12 | 336:4,20 |
| assisting | 253:1 | attribut... | 77:6,7,22 | 355:18 |
| 84:25 | 361:6 | 273:19 | 78:17,18 | 364:24 |
| associated | 373:15 | 274:25 | 79:3 80:22 | 371:14,19 |
| 135:7 | attachments | Audio 5:14 | 106:21 | awareness |
| 146:2 | 345:15 | 5:18 | 107:3,6,8 | 16:12 |
| 246:20 | attacks | audit 17:3 | 112:18 | 17:11 |
| Association | 246:21,22 | 334:5 | 124:22 | 21:15 |
| 50:8,9 | attempt 66:4 | August 9:23 | 127:5,10 | 65:15 |
| 101:16,18 | 134:11 | 15:9 | 128:8,12 | 68:17 |
| 101:19 | 211:25 | 104:25 | 129:16,18 | 131:6 |
| 103:13 | 317:18 | 262:8 | 132:8,10 | 155:7 |
| Assortment | 337:14 | 277:4 | 133:8,11 | 267:17,25 |
| 6:4,13 | attempted | 302:22 | 138:13 | 268:2 |
| 7:12,17 | 254:17 | 303:2,5 | 147:14,23 | 325:25 |
| assume 20:12 | attempts | 328:21 | 152:3 | 326:2 |
| 105:6 | 254:11 | 334:5 | 158:4,17 | 347:25 |
| 166:6 | attend 264:2 | authenti... | 160:10 | awful 55:6 |
| 177:18 | attended | 223:6,25 | 163:8 | awhile 344:3 |
| 180:6 | 259:20,23 | authorities | 164:5 | 351:10 |
| 205:20 | attention | 85:1 91:20 | 172:9,14 | Ayelet |
| 219:19 | 15:2,15 | 92:10 | 188:10 | 186:17,20 |
| 226:12 | 17:23 18:2 | 93:16 | 196:17 | 187:17 |
| 274:9 | 20:23 | 278:15 | 197:13 | |
| 275:9 | 69:25 | 370:22 | 202:19,21 | **B** |
| 309:6 | 173:1 | 371:16 | 202:22,23 | B 5:6 6:1 |
| 350:14 | 196:21 | authority | 203:6 | 7:1 8:1 |
| 354:9 | 197:20 | 26:19 | 207:12 | 9:1 219:1 |
| 359:19 | 203:3 | 91:17 92:1 | 211:4,22 | B-e-e-b-e |
| assumed | attorney 3:7 | 92:14,19 | 215:8 | 279:21,24 |
| 158:21 | 10:20,23 | 92:24 94:1 | 222:5 | back 19:12 |
| Assuming | 13:18 | 96:3,24 | 255:9 | 19:21 |
| 275:15 | 35:10 | 337:14 | 290:9,12 | 20:23 22:3 |
| assumption | attorneys | authoriz... | 290:24 | 24:9 32:6 |
| 118:20 | 10:17 | 368:22 | 295:17,21 | 33:9,23 |
| 230:25 | 34:12 | available | 302:17,21 | 35:3 37:14 |
| 243:14 | 165:18 | 43:8,13 | 302:25 | 42:20 |
| 298:15 | attributing | 82:16 | 303:5,8 | 51:14 |
| 329:18 | 273:24 | 113:15 | 307:9 | 58:10 |
| astonishing | 275:19 | 145:1,14 | 320:7,24 | 71:25 72:1 |
| 276:23 | 349:3 | 195:6 | 321:12 | 76:6 78:19 |
| Atlanta | attribution | 333:12 | 322:5,11 | 80:19 |
| 48:19 | 122:25 | 354:3 | 322:13 | 83:13 85:5 |
| Atlantic | 272:10 | avoid 120:25 | 324:18,22 | 106:19,22 |
| 5:15 | 273:15,21 | 211:25 | 325:1 | 107:1 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 141:1 | 342:14 | 222:21 | 51:7 52:7 | 224:1 |
| 147:9 | 363:1,2 | **bathroom** | 53:4,8,19 | 233:3 |
| 163:19 | **bad** 245:22 | 319:1 | 53:22 54:6 | 238:21 |
| 164:4,12 | 297:17 | **BCC** 308:15 | 55:5 60:25 | 241:20 |
| 164:17,22 | **bag** 64:9 | **Beckman** | 61:2,14 | 251:3,17 |
| 165:8,10 | **ballots** | 28:16,22 | 64:13 67:6 | 259:7,10 |
| 165:10 | 218:25 | **Beebe** 279:20 | 67:11 | 264:8,13 |
| 166:16,19 | 219:2,12 | **beef** 336:4 | 72:22 73:1 | 266:2 |
| 168:13,17 | 339:10 | **beefing** 8:12 | 76:8,11,17 | 270:2,3 |
| 170:11,14 | **bandwidth** | 335:20,24 | 76:22,25 | 271:4 |
| 173:1 | 57:20 | **began** 183:13 | 77:20 78:6 | 278:20,22 |
| 176:21 | **banking** | **beginning** | 85:22 | 281:1 |
| 177:12,19 | 342:7 | 23:13 | 88:23 89:3 | 289:6 |
| 179:15 | **banks** 342:7 | 126:17 | 90:4 92:23 | 303:8 |
| 180:4 | 342:10,16 | 157:11 | 100:23 | 308:2 |
| 183:9,11 | 356:1 | 307:6 | 111:13 | 311:20 |
| 197:25 | **based** 17:21 | **begins** | 112:23 | 317:2 |
| 201:17 | 41:9,14 | 125:18 | 113:1 | 323:12 |
| 209:12 | 113:15 | 330:10 | 119:6 | 325:12 |
| 218:12 | 114:17 | **behalf** 3:2 | 120:14 | 327:3,11 |
| 219:22 | 154:15 | 3:16 4:2 | 124:1 | 327:17 |
| 220:12 | 209:17 | 10:20 11:1 | 127:20 | 353:1 |
| 221:4 | 242:4 | 16:24 28:2 | 134:13,22 | 354:2 |
| 223:11 | 257:14 | 28:3 35:11 | 136:3,7 | 357:18 |
| 224:19 | 272:15 | 106:11 | 137:10,23 | 360:13 |
| 229:12 | 285:9 | 189:18 | 139:11,14 | **believed** |
| 231:4,15 | 292:21 | 243:12 | 139:22,25 | 27:21 |
| 232:15 | **basic** 238:16 | 367:18 | 143:1 | 266:5 |
| 242:12,19 | 241:13 | **behavior** | 144:23 | **bell** 126:1 |
| 243:25 | **basically** | 41:23 42:3 | 151:17,18 | 197:16 |
| 256:13 | 30:16 45:6 | 42:10,16 | 151:19 | 213:24 |
| 259:21,22 | 56:15 | 115:2 | 155:2 | 247:9 |
| 262:13 | 59:24 | 176:9 | 159:20 | 284:14 |
| 263:2 | 60:22 | 311:5,6,10 | 161:16 | 294:22 |
| 267:4 | 86:24 | **beings** 28:22 | 164:24 | **Ben** 372:17 |
| 274:20 | 260:22 | **believe** | 166:6 | **benefits** |
| 275:2 | **basis** 35:6 | 19:18 20:2 | 168:22 | 363:14 |
| 276:10,11 | 219:15 | 22:3,13 | 179:6 | **Berkman** |
| 277:4,14 | 248:6 | 24:7,13,19 | 183:19 | 345:24 |
| 282:1 | **Bates** 6:4,14 | 26:20 | 184:19 | **best** 61:9 |
| 288:10 | 6:20 7:8 | 28:16 29:6 | 187:1,21 | 85:9 101:8 |
| 289:18 | 7:10,12,17 | 30:25 31:2 | 188:3,24 | 133:3 |
| 298:25 | 8:5,20,22 | 32:21 33:1 | 189:6 | 166:3 |
| 299:6,11 | 9:13,18,20 | 33:9,16 | 201:15,15 | 300:4 |
| 311:16 | 160:22 | 35:17 | 212:23 | **better** 48:14 |
| 319:5,14 | 162:5 | 38:17,21 | 214:6 | 64:25 |
| 323:24,25 | 173:9 | 39:18 | 219:18 | 154:5 |
| 327:21 | 201:20 | 46:24 | 220:9 | 164:19,24 |
| 336:9,13 | 214:8,10 | 48:12,21 | 223:21,23 | 304:3 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 314:13 | 295:14 | 212:5 | 54:10 55:3 | 179:2 |
| 329:21,23 | 316:2 | 258:8 | 55:21 56:3 | **bucket** 44:11 |
| **beyond** 32:8 | 337:19 | 271:13 | 56:8 70:6 | **budget** 303:9 |
| 77:23 | **biweekly** | 276:1 | 70:8,25 | 336:24 |
| 78:12 | 24:19,19 | 318:23 | 71:5,7,11 | 337:14,18 |
| 85:16 | 31:23 | 319:1,3 | 80:14 | 337:18,22 |
| 100:15,16 | 361:6 | **Breakdown** | 128:5 | **build** 16:4 |
| 131:13 | **black** 105:17 | 9:15 346:4 | 132:5 | 153:25 |
| 136:19 | 154:16 | **Brian** 1:14 | 140:1,19 | 241:9 |
| 168:19,24 | **blanking** | 2:1 5:2,8 | 140:22 | 303:22,25 |
| 180:4 | 103:2 | 6:3 7:3 | 141:2 | 324:10 |
| 285:23 | **blind** 308:16 | 8:3 9:3,15 | 248:10 | 332:1 |
| 305:10 | **block** 119:25 | 10:5 11:12 | 269:24 | 343:2,20 |
| 317:17 | **blog** 82:14 | 11:18 | 270:21 | 358:5 |
| **Biden** 1:9 | 82:14,18 | 158:3 | 271:3 | **building** 3:8 |
| 10:7 | 114:17 | 176:3 | 306:11,13 | 16:8 46:1 |
| 247:22,25 | 115:7 | 191:21 | 307:4,11 | 131:4 |
| 248:14 | 116:13 | 200:10 | **briefings** | 315:12 |
| 375:8 | **blue** 310:3 | 208:9 | 27:6 39:23 | 322:15 |
| 376:3 | **blur** 55:10 | 219:4 | 49:13 | 347:19 |
| **big** 141:8 | **board** 312:22 | 229:22,24 | 74:19 81:1 | **builds** 44:5 |
| 256:3 | **bolster** | 230:12 | 82:7,8 | 46:12 |
| 269:25 | 304:16 | 272:1 | 238:21 | **built** 348:6 |
| 306:13 | **bots** 115:2 | 283:10 | 239:8 | 358:2 |
| **bilateral** | **bottom** 83:4 | 292:25 | 323:13,14 | **bullet** |
| 36:22 45:4 | 106:18 | 372:12 | 361:10 | 232:11 |
| 239:9,20 | 109:1 | 373:8,11 | **briefly** | 233:12 |
| 241:5,15 | 111:11 | 375:12 | 203:25 | 243:2 |
| 241:18 | 149:21 | 376:2 | **briefs** 25:19 | 262:7 |
| 242:16 | 160:23 | 377:5,20 | 159:2 | 275:18 |
| 243:8 | 173:20 | **Bridging** | **bring** 28:19 | 346:10 |
| **bio-lab** | 191:8 | 366:1 | 279:13 | 354:7 |
| 323:17 | 203:15 | **brief** 52:19 | **bringing** | 355:9 |
| **biolab** 324:3 | 217:4 | 72:6 | 304:14 | 357:1 |
| **biolabs** | 271:23 | 114:15,17 | **broad** 74:5 | **bulletin** |
| 323:20 | 288:17 | 140:2 | 77:13 | 365:13,20 |
| **biological** | 356:25 | 141:9 | 133:18,23 | 365:22,24 |
| 323:19 | **box** 3:10 | 248:11 | 358:9 | **bulletins** |
| **bios** 361:6 | 154:16 | 361:5 | **broadening** | 43:9 |
| **bit** 14:11 | 212:22 | **briefed** 70:2 | 320:4,7 | **bunch** 277:25 |
| 26:22 73:5 | **branch** 11:21 | 70:3 80:24 | **broader** 61:3 | **burden** |
| 102:12 | **Brand** 11:21 | 137:6 | 61:4 | 367:13 |
| 143:4 | **break** 35:12 | 142:18 | 270:11,15 | **business** |
| 172:25 | 151:3 | 362:16 | **broadly** | 76:17,19 |
| 197:11 | 172:22 | **briefing** | 90:11 | 76:21 |
| 235:17 | 181:4 | 21:14 | **broken** | 338:16 |
| 240:14 | 183:2 | 28:18 52:7 | 258:15 | 372:19 |
| 266:10 | 189:21 | 53:14,18 | **brought** | |
| 282:2 | 192:25 | 53:20 54:3 | 17:22 | **C** |

**BRIAN J. SCULLY 1/12/2023**

| | | | | |
|---|---|---|---|---|
| **C** 3:1 4:1,1 | 253:20 | 333:3,11 | 342:22 | 67:13,21 |
| 5:1 6:1 | 255:21 | 333:17,18 | **case** 10:8 | 72:20 |
| 7:1 8:1 | 267:24 | 333:21 | 153:13 | 79:13,16 |
| 9:1 10:1 | 319:21 | 334:8,14 | 158:4 | 79:21,25 |
| **C-a-b-l-e** | 325:6 | 339:13 | 174:10 | 101:14,21 |
| 188:7 | 365:14 | 351:15 | 176:9,12 | 110:18 |
| **cable** 9:24 | 368:12 | 352:7 | 177:2 | 112:6 |
| 188:7 | **calling** | 354:12 | 188:23 | 119:9,20 |
| 196:17 | 348:4 | 356:21 | 190:10 | 119:24 |
| 197:18 | **calls** 21:8 | 358:14 | 201:16 | 129:11 |
| 198:1 | 71:20 72:4 | 359:23 | 210:10,25 | 141:23 |
| 357:9 | 87:17 92:5 | 360:19 | 211:5,11 | 142:4 |
| 358:6 | 92:17 | 361:14 | 217:16 | 147:6,18 |
| 359:3 | 94:15 | **Camargo** | 221:9 | 147:21 |
| **Cable's** | 95:20 | 186:1 | 234:15 | 149:24 |
| 195:5 | 96:25 | **campaign** | 257:12 | 179:8 |
| **cadence** | 98:11 | 44:16 | 264:11 | 201:24 |
| 233:14 | 103:17 | **campaigns** | 267:5 | 262:17 |
| 234:3 | 108:20 | 9:10 127:1 | 340:13 | 264:15 |
| **calendar** | 111:8 | 246:20 | 343:16 | 265:10 |
| 34:6 | 115:9 | 328:14 | 360:1 | 267:10,15 |
| 274:21 | 118:16 | **capabili...** | 366:18 | 267:21,24 |
| **California** | 122:22 | 57:10 | 374:11 | 278:12 |
| 2:5 163:10 | 142:7 | 108:7 | 375:13 | 345:24 |
| **call** 35:11 | 149:18 | **capability** | 376:3 | 363:11 |
| 41:20 | 150:19 | 57:14 | **Cassandra** | **centers** |
| 85:24 99:9 | 152:21 | 93:25 94:3 | 1:23 2:2 | 64:19 |
| 99:12,15 | 153:18 | 151:13 | 10:14 | 112:11 |
| 99:21,25 | 178:15 | 368:20 | 374:2,18 | 278:5 |
| 101:4 | 194:14 | **capacities** | **catch** 91:9 | **central** |
| 103:4 | 198:5 | 93:15 | **categories** | 119:24 |
| 111:22 | 201:4 | **capacity** | 52:22 | 120:11 |
| 130:3 | 202:15 | 57:14,20 | **caught** | 157:4 |
| 282:5 | 204:12,23 | 76:16 | 166:21,23 | 264:15 |
| 283:3 | 231:10 | 91:19 | **cause** 316:15 | **certain** |
| 327:1,4,7 | 238:11 | **Capps** 3:5 | 317:4 | 26:18,24 |
| 327:9,12 | 244:21 | 35:10 | **CCR-WA** | 53:5 61:15 |
| 327:12,17 | 257:2 | **capstone** | 374:18 | 71:12 90:3 |
| 327:20,23 | 273:1 | 321:6 | **CDC** 135:12 | 104:24 |
| 332:18,21 | 283:21 | **captured** | 140:12 | 106:16 |
| 368:11 | 294:16,23 | 166:4 | 322:17,22 | 115:22 |
| **called** 23:16 | 294:24 | 243:16 | 323:10 | 137:18 |
| 26:4 48:6 | 298:11 | **carbon** | **center** 11:22 | 169:17 |
| 93:10 | 304:21 | 308:16 | 29:7 50:6 | 187:7 |
| 103:24 | 310:13 | **carefully** | 52:11 59:7 | 199:25 |
| 112:16 | 316:19 | 13:10 | 59:9,16 | 245:1 |
| 118:7,11 | 324:24 | **carried** | 60:6,17 | 256:15 |
| 174:13 | 332:17,21 | 355:10 | 61:7 62:23 | 261:17 |
| 239:3 | 332:22 | **cascading** | 63:19 | 266:3 |

BRIAN J. SCULLY 1/12/2023

| | | | | |
|---|---|---|---|---|
| 269:3 | 206:13 | 132:12 | 269:14 | 208:9,17 |
| 274:21 | 217:4 | 133:16 | 285:19 | 208:25 |
| 275:1 | 223:1,12 | 150:15 | circumst... | 210:20,24 |
| 348:24 | 223:16 | channel | 223:7 | 211:10,19 |
| 363:24 | 226:6 | 280:10,23 | CIS 59:6 | 212:8 |
| certainly | 282:17 | 320:25 | 60:9 61:23 | 213:17,20 |
| 26:21 | 299:17 | channels | 62:4,7,12 | 214:14 |
| 67:11 | 307:1,7 | 146:23 | 64:3,17,24 | 217:5 |
| 93:25 | chains | chaos 316:15 | 65:3,11,21 | 228:3,6,14 |
| 129:6 | 180:25 | 317:4,5 | 65:21,22 | 229:17 |
| 182:16 | challenges | chapter | 66:3,8,15 | 230:4,24 |
| 207:18 | 317:7 | 126:14 | 66:19 67:4 | 231:2 |
| 233:5 | challenging | characte... | 67:24 68:3 | 266:2,5 |
| 246:10 | 14:15 | 121:14 | 68:7,13,15 | 267:2 |
| 289:12 | 280:20 | 300:23 | 68:19,21 | 363:11 |
| 362:4 | 302:5,15 | 318:8 | 80:11 | 364:7 |
| certainty | challeng... | 347:18 | 101:24 | 365:4 |
| 75:15 | 8:18 | charge | 102:5,6,13 | CIS's 210:25 |
| 176:10 | Chan 7:7 | 289:12 | 102:15,24 | 211:5 |
| CERTIFICATE | 29:22 | chart 9:23 | 102:25 | CIS-spec... |
| 374:1 | 237:10 | 15:9,12 | 103:1,4,5 | 112:14 |
| Certified | 248:13 | 18:3 22:12 | 103:9 | CISA 5:18 |
| 2:3,4,5,7 | 249:20 | 42:21 | 104:23 | 8:14,16 |
| 4:20 | 250:4,15 | 130:9,13 | 106:10,12 | 9:12,12 |
| certify | change 28:20 | 166:17 | 107:25 | 11:4 15:9 |
| 374:5 | 127:24 | 167:4 | 110:22 | 15:23 17:6 |
| 377:5 | 128:10 | 171:22 | 112:19 | 17:7 18:25 |
| CFI 45:1 | 180:7 | chat 312:16 | 119:2 | 20:17 24:3 |
| CFITF 118:11 | 286:14 | chats 263:14 | 120:6,21 | 24:24 |
| 118:14 | 312:25 | check 30:20 | 121:2,6,11 | 25:25 28:3 |
| 120:13 | 367:2 | 291:2 | 121:18 | 30:14 |
| 157:5 | 376:7,11 | checked | 148:2,3,12 | 36:23,24 |
| 189:8 | 376:15,19 | 70:23 | 148:18,21 | 36:25 37:7 |
| 198:20 | 376:23 | checker | 148:25 | 37:11,12 |
| 199:7 | changed | 288:2 | 149:5,9,14 | 39:15 42:9 |
| 217:19,22 | 127:10,14 | checking | 157:10,14 | 44:23 |
| Chad 42:22 | 271:1 | 227:5 | 157:15,17 | 45:24 46:6 |
| 43:18 | changes | chief 15:17 | 157:22 | 49:5,6 |
| 166:17,18 | 126:24 | 15:22 28:9 | 158:15 | 50:13 51:9 |
| 166:24 | 127:21 | 289:8 | 162:21 | 51:19 52:1 |
| 179:18 | 128:6,16 | chose 93:25 | 165:6,8 | 53:21 |
| 184:13 | 129:12 | chosen 94:2 | 168:5,13 | 55:12,13 |
| 191:24 | 133:2,5,9 | Christopher | 174:23 | 55:14,17 |
| 192:11 | 134:1,4 | 191:20 | 201:24 | 58:16,20 |
| 276:19 | 284:6 | CIA 210:20 | 202:24 | 58:21,22 |
| chain 130:6 | 375:16 | circle | 203:16 | 61:8,9,22 |
| 157:12 | 377:7,10 | 298:24 | 204:1 | 62:12 63:6 |
| 173:13 | changing | circulating | 205:4,11 | 63:16 64:1 |
| 175:23 | 127:6 | 45:18 | 205:14,14 | 64:8,16,19 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 65:3 66:2 | 164:8,11 | 267:5,17 | 369:3,6 | 182:20 |
| 66:7,11 | 164:12 | 269:20 | 370:5 | 199:20 |
| 67:6,11 | 165:22 | 273:18,21 | 371:22 | 218:8,17 |
| 70:17 71:6 | 167:21,22 | 274:2 | CISA's 23:24 | 262:12 |
| 71:11 | 169:5,25 | 276:14 | 25:5 62:16 | 268:12 |
| 72:23 | 170:6,24 | 277:25 | 66:14 | 278:18 |
| 73:25,25 | 171:17,19 | 284:13 | 101:9 | 325:18 |
| 74:4 75:6 | 172:5 | 285:1 | 119:24 | 335:5 |
| 75:13 | 178:20 | 290:14 | 150:15 | 370:9,17 |
| 76:14 | 183:15,21 | 302:3,13 | 151:6,9,9 | 370:22 |
| 77:18 | 184:1 | 302:17 | 188:22 | clearing... |
| 79:20 | 185:16 | 303:5,6,11 | 261:13 | 96:9,17 |
| 88:21,23 | 186:6,15 | 304:9,16 | 262:24 | clearly |
| 89:5,22 | 186:25 | 304:19 | 264:14 | 327:8 |
| 90:7 94:25 | 187:9,23 | 305:3 | 305:8,17 | Clemson |
| 96:9 97:6 | 188:13 | 308:1,3 | 309:5 | 46:23 |
| 97:12,13 | 189:18,22 | 310:20 | 330:18 | clips 124:5 |
| 97:19 99:1 | 191:9,14 | 312:4 | 342:24 | close 131:20 |
| 99:14 | 191:19 | 313:1,22 | 347:15,16 | 131:23 |
| 100:11,13 | 192:18 | 313:24 | citizen | 234:5,12 |
| 106:3,3,22 | 195:19,23 | 314:20 | 221:15 | 249:11 |
| 108:17,18 | 196:6,10 | 315:7 | City 3:11 | 277:3,6 |
| 110:17,25 | 196:19,24 | 317:10 | 375:21 | 331:8 |
| 111:5,6,13 | 197:8,19 | 318:10,10 | civic 200:16 | closed 293:8 |
| 114:5 | 198:21 | 320:10 | 283:12,16 | closely |
| 115:6,13 | 202:4,4 | 324:14,21 | civil 16:19 | 289:22 |
| 117:20 | 203:17 | 325:25 | 73:11 | closer 31:22 |
| 118:1 | 204:9 | 326:4 | 105:13 | 32:4 174:1 |
| 119:23 | 205:15 | 327:22 | 109:12,16 | 174:17 |
| 120:1,8,11 | 207:1,16 | 330:13 | claiming | 234:10 |
| 122:25 | 210:7 | 331:19 | 280:11 | clue 178:17 |
| 124:2,13 | 212:8 | 332:12,18 | clarific... | 313:9 |
| 124:22 | 217:19 | 332:23 | 218:13 | CNN 8:7,7 |
| 126:2 | 218:1,6 | 333:2,10 | 219:5 | 364:15 |
| 129:14,20 | 230:7,12 | 335:24 | 223:3,20 | coalition |
| 129:24 | 230:24 | 336:13 | clarify 93:5 | 97:7,14,16 |
| 130:17 | 232:7,7,25 | 338:13 | 132:23 | cognitive |
| 133:2,9,19 | 234:22 | 345:10,12 | 229:7 | 332:7 |
| 133:25 | 238:8 | 350:20 | 263:20 | 338:18,22 |
| 134:3 | 243:8,9 | 351:1,5 | clarifying | 339:3 |
| 137:19 | 245:18 | 352:20,23 | 83:22 | coincide |
| 138:4 | 248:9 | 353:16,23 | clarity | 337:2 |
| 142:5,14 | 251:3 | 354:8,20 | 104:2 | collaborate |
| 142:21 | 255:20 | 355:3,18 | clear 66:23 | 308:3 |
| 150:4 | 256:2 | 357:1,6,13 | 66:24 | collabor... |
| 151:6 | 262:16 | 358:25 | 104:4,12 | 111:12,13 |
| 154:23 | 263:2,3,23 | 360:3,25 | 130:21 | 111:18 |
| 156:20 | 264:1,15 | 365:13 | 146:22 | collabor... |
| 157:4 | 266:20 | 368:15 | 156:3 | 48:11 |

BRIAN J. SCULLY 1/12/2023

| | | | | |
|---|---|---|---|---|
| 52:24 | 358:11 | 210:17 | 77:25 | 26:1 |
| 81:12 | 371:22 | 246:11 | 80:20 | 154:14 |
| 111:17 | comes 229:12 | 255:7 | 85:20 | 219:10,16 |
| collabor... | 289:18 | 273:11 | 87:14 | 259:6 |
| 59:25 | 367:21 | 293:14,18 | 102:6 | 324:16,23 |
| collabor... | 371:17,20 | 316:23 | 132:7 | 325:2 |
| 48:24 49:4 | comfortable | 349:7 | 133:13,15 | 329:14 |
| colleague | 92:20 | Common's | 133:17 | compound |
| 10:21 71:9 | 317:24 | 293:20 | 147:24 | 72:3 |
| collected | 367:11 | commonly | 191:12,15 | 179:21 |
| 146:2 | coming 64:23 | 158:13 | 192:10,20 | 212:2 |
| collecting | 119:13 | 202:24 | 277:9,10 | 226:25 |
| 145:24 | 132:20 | communicate | communities | 258:6 |
| collection | 310:1 | 18:20 | 126:19 | 310:12 |
| 156:19 | 318:18 | 75:19 | 259:13 | comprehe... |
| 213:14 | 321:8 | 168:20 | community | 295:10 |
| 260:1 | 334:22 | 326:14 | 39:20 44:6 | computer |
| collective | 358:21 | communic... | 73:13 | 152:16 |
| 277:25 | command | 72:1 78:13 | 84:15 | concept |
| colon 146:4 | 130:6 | 245:25 | 145:21 | 83:20 99:1 |
| 191:9 | commence... | 247:2 | 246:19 | 99:14,18 |
| Colorado | 98:17 | 326:24 | 257:2 | 100:14 |
| 204:6 | 362:8 | communic... | 258:20 | concern |
| 205:12,14 | comment 92:9 | 20:7 | 270:15 | 42:17 |
| 205:22 | 96:4 | communic... | 327:14 | 58:25 65:4 |
| 206:5,20 | 117:24 | 67:23 | 332:14,23 | 66:16 |
| 206:21 | comments | 75:13,24 | 333:22 | 67:17 |
| 281:19,21 | 335:16 | 107:9 | 334:16,16 | 126:3 |
| Columbia 2:9 | 368:8 | 132:11 | communit... | 153:4 |
| column 18:6 | 369:21 | 134:3 | 333:1 | 173:13 |
| combat | Commission | 164:20 | companies | 175:24 |
| 333:16 | 377:24 | communic... | 17:8,10,13 | 208:24 |
| combination | committee | 66:2,10 | 109:13 | 209:2 |
| 261:18 | 307:25 | 68:4 75:2 | 241:6 | 220:2 |
| Combined | 352:24 | 103:9 | 279:14 | 250:23 |
| 6:22 | 353:7 | 106:25 | 327:14 | 251:4,12 |
| come 14:13 | 355:2 | 136:2 | 351:3 | 251:18,22 |
| 20:13 | 359:19,20 | 146:23 | company | 352:6,6 |
| 44:22 45:5 | 360:4,25 | 246:7 | 155:2 | concerned |
| 45:18 84:3 | committee's | 357:23 | complaint | 64:22 |
| 121:5 | 361:11 | 359:9 | 190:17 | 271:7 |
| 123:11 | committees | communic... | complete | 286:6 |
| 161:9 | 70:18 | 20:25 21:3 | 89:21 | 288:20 |
| 168:5 | 353:6,11 | 21:18 | 373:14 | concerning |
| 263:16 | 353:14 | 49:10,11 | completed | 206:20 |
| 293:12 | common 12:17 | 49:17,18 | 365:8 | concerns |
| 336:9 | 158:16 | 50:1 53:13 | component | 23:20 24:4 |
| 338:9 | 161:19 | 53:16 77:7 | 325:9,11 | 39:7,13 |
| 341:18 | 162:2 | 77:13,16 | components | 58:17 65:9 |

BRIAN J. SCULLY  1/12/2023

66:3 75:4
118:25
124:23
138:6,10
138:11
151:8
161:22
172:17
180:17
189:24
204:19
236:14
240:20
241:12
265:17,21
268:5
291:25
295:12
338:12
342:2,5
348:14
366:4,24
367:23
**conclude**
155:23
156:6
**concluded**
373:8
**concludes**
372:11,11
**concluding**
219:15
**conclusion**
92:5,13,18
93:12
94:15
95:21
156:4
**confidence**
27:13,22
283:16
341:19,24
342:4,10
343:10
354:24
**confirm**
86:20
218:23
219:20

**confirmed**
287:21
288:1
**conflating**
147:20
**confronting**
312:23
313:5
**confused**
13:7
**connect**
95:17
100:18
**connected**
50:4,5,6
63:1
116:23
140:2
205:23
275:15
299:19
352:11
356:24
**connecting**
100:21
101:10
**connection**
98:4 112:5
124:12
145:17
350:16
**connections**
104:13,15
104:21
135:12,14
**connecti...**
264:18
**connector**
109:7
**consider**
45:11
100:8
243:19
332:5
357:2,14
**consider...**
123:6
281:24
**considered**

81:7
108:18
111:17
**considering**
37:23
226:11
**considers**
320:5
**consisted**
144:17
**consistent**
122:16
288:9,13
306:1
318:3
344:21
345:2
**conspiracy**
340:4
**conspiring**
286:14
**consult**
34:20
190:8
**consulta...**
97:6,12,13
97:15,24
98:2
**consulted**
98:10
**consulting**
97:18
**contact**
103:5,16
103:19,23
104:2,5
112:14
117:18
157:22
217:5
300:5
350:5,14
350:20
351:2,7,24
**contacts**
114:13
132:1
135:19
136:13,23

140:7,9,12
140:14
**containing**
225:16
**content**
17:18,20
17:24
23:22 27:3
27:19
40:15
123:7
128:10,16
129:4,11
139:12
144:19
160:5,11
160:19
161:10
177:8
219:22
260:9,13
260:23
284:7
288:11
289:8,15
290:15
295:5,20
296:2
297:3,6
320:17
**contents**
73:6
163:20
288:7
**context**
20:21
40:22 41:3
76:10
139:16,18
209:17
210:3
223:16
274:2
275:6,14
289:1
309:3
311:7,23
354:17
358:17

**contexts**
59:19,20
**contextual**
200:15
**continue**
32:10
63:13
210:20
334:3
**continued**
170:11
240:10
266:5
**continues**
213:20
364:22
**continuing**
334:11
**contract**
331:13
337:11
**contractor**
154:23,25
155:1,13
**contract...**
331:2,3
**contractors**
331:7,11
**contributed**
88:5
**contribu...**
87:24
**convenience**
307:15
**conversa...**
52:4,5
54:14 57:2
58:7,19
86:9,10
98:7 101:1
117:7
128:4
133:20
135:7,17
137:9
139:13,21
139:23
141:10
142:19

**BRIAN J. SCULLY 1/12/2023**

| | | | | |
|---|---|---|---|---|
| 179:9 | 295:23 | 117:13 | 43:12,25 | 157:10,19 |
| 181:20 | 361:25 | 119:1 | 46:11 48:3 | 157:23 |
| 211:13 | 362:5,7,11 | 211:18 | 48:4 50:15 | 158:7,8,11 |
| 254:12 | 362:13,14 | 262:9 | 51:3,6,17 | 158:12 |
| 262:20 | 362:18 | 325:6,14 | 57:23 59:8 | 159:7,11 |
| 267:1 | 371:20 | 326:2,6,17 | 59:23 | 160:20 |
| 268:22 | 372:3 | 329:21,24 | 60:20 63:5 | 161:6,7 |
| 333:1 | **conveying** | 332:22 | 63:18 65:4 | 162:22,23 |
| 348:19 | 250:23 | 333:1 | 65:6 67:1 | 163:4 |
| 371:25 | **coord** 316:13 | **coordinator** | 68:6,11 | 167:3 |
| **conversa...** | **coordinate** | 216:1 | 69:23 | 170:9,17 |
| 46:17 47:5 | 29:2 46:12 | **copied** 67:4 | 72:17 73:1 | 170:22 |
| 52:15,19 | 68:13 | 67:7,11 | 73:13,18 | 171:5,16 |
| 52:22 | 74:23 | 203:22,22 | 80:15 | 173:14 |
| 64:24 74:8 | 120:21 | 213:16 | 81:13 | 176:15 |
| 74:12,17 | 130:15 | 276:24 | 84:22 | 180:18 |
| 74:22 75:1 | 212:8 | 360:2 | 89:23 | 182:10 |
| 76:2,10,12 | 214:2 | **copies** | 90:19,20 | 184:12,15 |
| 80:17,22 | 318:5 | 375:11 | 91:6,7,17 | 184:16 |
| 81:1,6,8 | 325:8 | **Cops** 9:4 | 92:2,15 | 185:19 |
| 81:25 82:4 | 332:13,20 | 319:21 | 93:1,13,16 | 191:17 |
| 82:9 85:25 | 370:9,18 | **copy** 66:14 | 93:17 | 192:4 |
| 87:20 98:6 | **coordinated** | 67:20 | 94:12,23 | 193:10 |
| 98:14,16 | 21:6 30:7 | 213:20 | 95:7 96:11 | 195:12,15 |
| 104:9,11 | 30:11,13 | 266:14,18 | 103:10 | 195:20,24 |
| 111:15,19 | 41:22 42:2 | 266:22 | 104:3,18 | 196:25 |
| 112:20,24 | 42:10,15 | 308:16 | 104:19 | 197:4,8,16 |
| 113:2,7,17 | 69:3 115:1 | 321:5 | 105:18 | 198:21 |
| 114:1,9,16 | 239:5 | 372:22,24 | 107:4 | 199:7,13 |
| 114:17 | 311:10 | 375:15 | 108:12 | 199:14 |
| 116:25 | **coordinates** | **copying** | 109:8,14 | 200:7,11 |
| 128:7 | 46:10 | 204:1 | 109:15,23 | 200:14 |
| 133:21,25 | **coordina...** | 218:3,5 | 109:24 | 203:18 |
| 135:10,21 | 30:16 | 350:4 | 110:16 | 204:3,9 |
| 136:4,9 | 54:20 | **corner** | 111:4 | 205:7,17 |
| 139:7,9,11 | 68:10,19 | 107:13 | 112:2,7,8 | 205:24,25 |
| 151:11 | 68:21 69:5 | **correct** | 114:25 | 206:2,3,8 |
| 159:5 | 121:12 | 17:24 | 117:21 | 206:22 |
| 169:1 | 311:5 | 19:11,14 | 118:9 | 207:22 |
| 181:13 | 317:11,12 | 19:23 | 119:3,4 | 208:12 |
| 211:14 | 317:19 | 20:10,16 | 123:10,15 | 209:18 |
| 216:23 | 329:15 | 23:1,4,23 | 125:24 | 210:4,8,22 |
| 237:6,22 | 332:18 | 24:14,15 | 126:19 | 211:19 |
| 238:13,19 | **coordina...** | 26:5,6 | 127:2 | 212:4 |
| 240:17,22 | 21:8 30:14 | 29:13 | 138:12,13 | 214:21 |
| 241:22 | 36:19,21 | 30:12 | 142:5,25 | 215:17 |
| 247:15,17 | 37:2 47:22 | 32:15 37:5 | 149:25 | 217:6,17 |
| 255:5 | 64:15,18 | 37:13 | 150:4,12 | 217:20,21 |
| 259:18 | 68:4 | 41:19 | 150:13 | 217:24,25 |

BRIAN J. SCULLY  1/12/2023

219:13,24
223:22,23
224:3,4,8
224:12,13
224:18,20
225:6
226:9
228:20
229:10,14
229:17
233:18,20
233:25
234:1
235:22
236:1
246:16
249:12,13
250:25
251:8,8,19
253:17
254:1,19
254:20,24
254:25
255:22,23
256:6
265:7,15
269:15,21
272:6
280:13,21
281:11,24
282:15
287:15,22
288:7,24
289:24
291:12
292:6,11
292:15
293:1,25
295:12
297:3
298:17
299:4,9
300:9,10
300:21
301:7,9,17
304:16
312:23
314:16,22
314:24

315:4
318:1
326:18
328:3
329:4,8
332:15
335:21,22
336:2
338:13,19
347:8,13
352:21,24
353:4
354:25
355:1,8
361:24
365:9,18
366:6
368:24
369:4
370:10,14
370:15,20
371:3
373:13
374:6
377:9,13
**corrections**
373:15
375:16
**correctly**
87:5
159:20
160:13
189:15
238:22
248:5
270:24
286:12
306:16
**corrects**
167:2
**corrosive**
344:17
**council** 5:15
20:5 48:20
71:8,9,15
71:17,19
136:1,8,14
336:7
**counsel** 4:4

4:12 14:6
34:20 35:4
69:10
172:22
374:9
**counselor**
308:12
**counter** 9:9
45:2 118:3
118:6
254:11
328:13
329:2
332:14
342:24
358:1
**countering**
12:4
117:25
118:6
130:1
330:14
348:12
**counters**
331:19,24
**counting**
337:7,10
**countries**
38:3 45:3
45:5,7,18
46:1
**country**
57:13
**County** 163:9
228:6,24
229:12
377:3
**couple** 19:18
24:18
33:13
36:16,16
44:3 49:9
51:13
56:12
77:21
81:25
111:20
113:2
197:23

202:3
206:5
207:16
212:14
237:23
238:5
248:23
264:8
268:15
271:16
279:3
291:16
303:14
318:17
333:21
351:8
**course** 13:8
13:14
128:3
147:19
180:19
**court** 1:1
2:4 3:8
10:10 11:8
12:20 47:9
153:3
190:20
**courts**
355:12
**cover** 270:5
**coverage**
127:20
**covering**
174:14
**COVID** 134:11
138:15
140:6,25
144:3
263:12
264:5
323:10
324:5
**COVID-19**
5:13
122:12
137:22,25
138:5
280:12
321:25

322:1,7,10
COVID-re...
322:20
**create**
109:17
142:3
298:1,3
317:6
342:1,5,12
363:12,19
**created**
154:24
165:22
**creates**
56:20
342:25
**creating**
65:11
110:1
**crisis** 325:8
**critical**
16:5,9
137:24
147:7,15
154:1,5
295:10
309:6,7
322:15,17
323:6
327:2,12
327:13,16
331:18
332:2,4,6
338:17,18
339:1
340:9,11
340:21,25
341:13,20
354:21
355:10
**crossed**
312:13
**Crowd** 144:18
144:22,23
145:2,13
146:7
**CRR** 374:19
**CSAC** 72:25
305:9,11

BRIAN J. SCULLY 1/12/2023

| | | | | |
|---|---|---|---|---|
| CSR-HI | 204:22 | 277:6 | 367:5,8,17 | 29:16 |
| 374:18 | 242:9 | 281:16,17 | decisions | 30:11 |
| CSR-VA | 265:18 | 319:4 | 49:19 | 236:18 |
| 374:18 | 266:8 | 328:20 | 177:17 | 248:13 |
| culprit | 302:20 | 374:14 | 178:8 | 270:20 |
| 323:20 | 303:13 | 377:14 | 242:4 | delibera... |
| curb 320:4 | | day's 15:1 | 260:17 | 156:4 |
| current | **D** | days 372:17 | declaration | delibera... |
| 11:19 | D 3:3 4:1 | 372:19 | 7:4 244:2 | 155:20 |
| 331:20,25 | 6:1 7:1 | 375:20 | 244:10 | delibera... |
| currently | 8:1 9:1 | de-dupli... | 249:10 | 152:22,25 |
| 18:24 | 10:1 | 66:4 | declare | 153:19 |
| 32:11 | D-r-a 186:17 | 211:15 | 377:12 | 156:1 |
| 160:18 | D-r-a-z-e-n | de-dupli... | decline | delivery |
| custodians | 187:17 | 214:2 | 153:8 | 373:1 |
| 189:10 | D.C 3:21 | de-dupli... | declined | demo 279:12 |
| 191:15,19 | 375:6 | 211:17 | 89:24 | 279:17 |
| 276:14,15 | D/A 316:14 | deal 209:15 | declining | Democracy |
| 276:17,25 | 316:17 | 278:23 | 51:1 | 47:8 |
| 277:8 | danger 304:7 | dealing | 153:10 | democratic |
| customs | 304:8 | 162:20 | 171:6 | 355:11 |
| 220:10 | dangerous | deals 311:9 | deconflate | department |
| cuts 43:22 | 320:5 | dealt 343:13 | 203:13 | 3:19 4:13 |
| cyber 5:19 | 344:16 | Dear 375:10 | dedicated | 10:25 11:4 |
| 8:11 15:24 | data 107:14 | debunk 220:4 | 330:18 | 11:6,23 |
| 29:7 76:25 | 107:19 | 224:7,11 | deemed 17:5 | 44:23 |
| 96:8 | 146:1,1 | 228:25 | deep 274:14 | 244:12 |
| 141:23 | date 10:3 | 290:19 | 274:24 | 245:2,17 |
| 235:14,16 | 86:6 283:5 | 291:10 | DEFENDANT | 278:19 |
| 235:24 | 345:25 | 315:3,9 | 3:16 | 312:13 |
| 263:6 | 373:19 | debunking | defendants | 316:18,24 |
| 307:22 | 376:4 | 220:22 | 1:11 4:2 | 317:2 |
| 308:4 | dated 7:4 | 290:2,14 | 6:22 10:8 | 320:3 |
| 335:19 | 8:19 9:7 | 315:19 | 11:1,7 | 321:8 |
| 352:23 | 9:10,13,17 | debunks | defense | 325:5 |
| 359:18 | 248:22 | 289:24 | 308:4 | 337:1 |
| 360:3,25 | 249:5 | December | defer 221:11 | 343:15 |
| cyber-fo... | 302:22 | 248:22 | 343:14 | 350:12 |
| 188:15 | 352:21 | 249:6 | define 41:22 | 351:22 |
| Cyberscoop | day 13:13,18 | decided 85:8 | 42:2 | 375:5 |
| 8:16 | 127:2 | 116:7 | definitely | departme... |
| Cybersec... | 169:8 | decision | 96:2 | 278:5,11 |
| 4:6 | 175:3 | 17:20 22:1 | 236:10 | 321:7 |
| cycle 47:24 | 177:3 | 22:4,5,10 | 247:16 | departme... |
| 52:25 56:9 | 224:5 | 23:1 164:1 | definition | 329:1,11 |
| 129:15 | 262:17,22 | 164:3,16 | 92:19 | departme... |
| 170:8 | 262:24 | 178:7 | definiti... | 92:10 |
| 174:19 | 267:5,21 | 210:4 | 133:24 | departments |
| 185:18 | 268:3,5 | 261:11 | Dehmlow | 317:8 |

departure
  36:17
depend 356:5
depending
  28:17
  146:3
DEPONENT
  373:10
deposition
  1:14  2:1
  5:8  6:3
  7:3,7  8:3
  9:3  10:5
  10:12
  12:12,16
  249:20
  372:11
  373:8
  375:11
  377:6,8,11
deputy 12:4
  28:9
derived
  123:3
describe
  41:25
  54:25
  59:12  99:9
  240:18
  369:8
described
  42:23
  99:11
  161:20
description
  244:16
  345:4
desired
  375:17
destroy
  219:2
destroyed
  219:12
destroying
  218:25
detail 19:19
  19:22,24
  20:3  71:14
  71:17

182:16
259:17,21
259:22
336:10,11
336:19
351:18
372:3
detailed
  108:11
  136:7
  289:3,19
  325:10
  326:6
details
  27:10
  136:21
Detection
  107:14
determin...
  92:20
determine
  44:15
  56:20
Detrick
  324:2
develop
  16:12
  44:11
  131:5
  343:5
  355:22
developed
  43:3
  265:25
  286:16
developing
  16:17
  39:16
  333:23
development
  172:2
  187:12,15
developm...
  287:19
DHS 8:8  9:8
  25:23,24
  26:1,3
  215:13,16
  220:10

308:1
311:15
312:10
320:7
322:6
324:16,23
325:8
328:12,24
329:1,7,11
329:14,20
329:23
369:3,6
DHS's 9:6
  321:5,6
DHSA's
  319:22
difference
  50:3  148:1
  148:7,11
different
  16:18  21:5
  30:5  32:7
  38:22  45:4
  45:6  46:21
  47:16  49:3
  49:25  90:9
  91:14
  108:4
  128:22
  155:13
  161:11
  216:10
  239:16
  242:11
  260:17
  262:20
  263:11
  264:17
  268:19
  279:13
  286:13
  291:6
  296:20
  324:9
  329:13,14
  335:6
  349:6
  357:22
differently

42:3  146:3
220:6
difficult
  304:9
difficulty
  83:17
Digital 47:8
  48:21
diplomatic
  280:12
direct 15:2
  15:14
  66:10
  77:25
  79:11
  103:8
  120:1
  147:24
  148:22
  165:9
  173:1
  367:24
  371:17
directed
  276:14
Directing
  18:2
directly
  20:7  27:8
  63:24  64:4
  66:6  67:19
  110:21
  119:13
  120:7
  135:3
  159:7
  161:22
  163:3
  164:20,23
  266:8
  292:13
  307:2,10
  320:17
director
  9:13  12:9
  22:14,14
  34:9  76:5
  76:6,7,8
  77:8,9,16

77:18,20
78:9
244:11
284:13
285:2,13
285:18,24
286:5
288:20
289:22
290:1,4,6
291:11
304:9
305:6
308:5,13
308:13,15
309:14
310:1,4,11
312:15
313:11,14
313:19,23
314:11
316:11
335:16
336:14
340:5
344:6,13
345:4
352:21
367:19,25
director's
  313:21
  367:20
  368:1
directors
  50:10
  101:20
  367:19
DiResta 54:5
  70:5,20
  72:17
  116:25
  136:9
  139:7,9
  142:13
  361:20
  368:9
  369:22
  370:3
dis 5:20

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 8:14 15:17 | 351:23 | 262:7 | 87:3 90:19 | 305:25 |
| 15:23 | **discussed** | 272:22 | 91:7,18 | 306:7 |
| 19:25 | 39:9 84:2 | 274:13 | 92:3,16 | 311:8 |
| 20:14 | 86:14 | 314:18 | 93:1,21 | 312:9,14 |
| 143:14,18 | 94:25 | 318:14 | 94:13,24 | 315:4 |
| 145:20 | 114:7 | **discussions** | 95:7,11 | 317:13 |
| 150:16 | 118:21 | 45:16 | 96:10,18 | 319:22 |
| 314:14 | 129:11 | 52:13 | 106:14,23 | 320:8 |
| 341:17 | 131:8 | 58:15 | 114:24 | 322:21 |
| 343:6,9 | 203:12 | 81:16 | 118:25 | 324:8 |
| **disclose** | 216:17 | 82:21 | 124:24 | 326:15 |
| 171:6 | 236:2,8 | 85:11 95:3 | 126:23 | 328:13,25 |
| 172:20 | 238:14 | 132:21 | 127:9,12 | 329:2 |
| **disclosed** | 239:22 | 137:3 | 130:16,23 | 331:17,20 |
| 172:19 | 240:15 | 150:14 | 138:10 | 331:24 |
| 192:3 | 247:5,8 | 151:5 | 141:22 | 332:15 |
| 193:2 | 249:12 | 178:19 | 142:4,16 | 333:15,16 |
| 242:15 | 254:8,23 | 302:25 | 147:4 | 335:20,24 |
| 243:7 | 258:25 | 305:19,23 | 149:15,24 | 336:16 |
| 276:16 | 259:2,16 | 306:3,6 | 151:8,23 | 338:1,7 |
| **disclosing** | 262:11 | 322:5,11 | 154:21 | 340:21,25 |
| 150:23 | 265:12 | 322:13 | 160:7 | 342:24 |
| **disclosure** | 266:20 | 351:21 | 169:19 | 346:12,18 |
| 150:19 | 295:14,23 | 371:14 | 172:17 | 346:22 |
| 152:21 | 306:9 | **disinfo** | 180:16 | 347:6,12 |
| 153:18 | 313:6 | 282:14,25 | 182:8 | 347:21,24 |
| **discovery** | 317:16 | 285:1,7 | 189:24 | 348:14,20 |
| 188:22,22 | 327:6 | 311:25 | 193:2 | 349:7 |
| 190:10 | 333:17 | 312:4 | 204:18 | 354:9,16 |
| 191:13 | 351:1 | 370:14 | 220:2 | 355:4 |
| 192:21 | 356:15 | **disinfor...** | 235:25 | 363:16 |
| 193:23 | 364:2 | 8:12,18 | 239:1,10 | 366:4,24 |
| 194:5 | **discussing** | 9:6,10,17 | 240:20 | 367:23 |
| 233:2 | 13:12 | 17:5,14,17 | 242:8 | 368:20,24 |
| 277:3,6 | 43:10 | 20:18 | 261:4 | 371:3 |
| **discuss** | 109:2 | 21:22 | 262:25 | **disinfor...** |
| 39:17 | 150:11 | 23:20 24:3 | 265:16 | 266:6 |
| 82:18 | 211:9 | 39:8 40:14 | 268:5 | **dismissive** |
| 85:18 | 236:25 | 41:18,21 | 278:6,13 | 335:25 |
| 133:2,4,9 | 237:4 | 42:1,8,11 | 283:4 | **dispute** |
| 136:15 | 305:24 | 42:13,14 | 284:13,15 | 246:14 |
| 142:9,13 | **discussion** | 42:17 | 284:15 | 248:4,6,7 |
| 181:10,16 | 27:18 | 43:10 | 285:18 | **disputed** |
| 182:12 | 78:15 | 56:15 | 291:25 | 223:14 |
| 236:18 | 89:18 | 57:11,21 | 300:2 | **disputes** |
| 255:7 | 171:22 | 58:17,25 | 302:4,14 | 221:15 |
| 307:16 | 236:23 | 65:4 66:16 | 302:19 | **disrupt** |
| 308:21 | 259:8,11 | 67:5,17 | 303:6,12 | 342:20 |
| 350:15,21 | 261:25 | 75:4 77:3 | 304:8,19 | **disrupting** |

**BRIAN J. SCULLY 1/12/2023**

| | | | | |
|---|---|---|---|---|
| 340:14 | 276:13 | 152:10 | 271:5 | 6:1 7:1,1 |
| **dissemin...** | 277:24 | 166:10,18 | 329:3 | 8:1,1 9:1 |
| 246:23 | 280:5 | 169:22 | **domestic...** | 9:1 10:1,1 |
| **distinction** | 282:2 | 170:19 | 279:10 | 374:2,18 |
| 81:11 | 284:10 | 173:24 | **domestics** | 375:5,10 |
| 148:6,13 | 294:14 | 174:25 | 123:9 | **e-mail** 7:8 |
| 148:16 | 295:18,21 | 181:25 | **Dominion** | 7:10 8:20 |
| 219:9 | 305:15 | 190:12 | 292:23 | 9:18,20 |
| **distribute** | 307:6 | 196:22 | **downranking** | 14:13,16 |
| 115:5 | 320:15 | 197:24 | 288:6 | 14:25 |
| **District** 1:1 | 321:4,12 | 211:8 | **Dr** 72:21 | 66:10,15 |
| 1:2 2:8 | 330:5,7 | 216:13 | **draft** 9:12 | 66:25 |
| 10:10,10 | 331:22 | 222:4 | 321:4,13 | 120:7,11 |
| **dive** 274:14 | 332:16 | 226:24 | 321:17 | 120:13 |
| 274:24 | 344:5 | 231:14 | 352:20 | 129:3,9 |
| **divided** | 346:7 | 241:24 | **drafting** | 131:18 |
| 90:15 | 348:2 | 242:2 | 43:5 | 157:1,3,5 |
| **DIVINE** 3:6 | 354:5 | 252:9 | 189:14 | 157:12 |
| **division** 1:3 | 364:17 | 266:15,21 | **drafts** | 161:4,17 |
| 10:11 33:2 | **documents** | 275:23 | 321:18 | 162:11 |
| 33:3,15 | 6:4,13 | 283:10 | **dramatic** | 175:19,23 |
| 248:20 | 7:12,17 | 289:20 | 301:2 | 177:6 |
| **DM** 281:9 | 9:5 165:17 | 290:16 | **Drazen** | 179:12 |
| **DNI** 334:2 | 176:17 | 303:19 | 186:17,21 | 180:25 |
| **DNI-led** | 294:19 | 305:12 | 187:17 | 193:13 |
| 332:21 | 319:21 | 313:1 | **Dropping** | 198:21 |
| **doc** 294:9 | **doing** 18:24 | 324:12 | 225:20 | 199:7,19 |
| 300:8,12 | 19:1 40:25 | 325:2 | **drops** 254:19 | 201:25 |
| **document** | 41:17 | 333:24 | **due** 264:4,19 | 202:13,20 |
| 15:8 69:18 | 43:21 46:2 | 340:6 | **duly** 11:13 | 202:22 |
| 72:7,11 | 46:4 47:21 | 346:4 | **dump** 236:7 | 203:1,19 |
| 98:19 | 49:14 | 348:12,13 | **duplicate** | 204:4,10 |
| 125:2 | 55:18 | 349:9,12 | 64:23 | 205:6,6 |
| 139:6 | 58:16 | 355:19 | 208:10,15 | 206:13 |
| 156:23 | 68:24 69:2 | 356:11 | 208:24 | 208:13 |
| 190:20 | 74:19,20 | 370:4 | **duplication** | 210:11,16 |
| 191:4 | 87:6,8 | **DOJ** 25:23 | 120:25 | 211:6 |
| 194:8,11 | 90:6 106:6 | 32:16,24 | **duplicative** | 213:25 |
| 194:13 | 108:4 | 33:4,15,19 | 210:21 | 214:1,5,19 |
| 195:10 | 120:16 | 33:25 34:4 | 212:1 | 214:24 |
| 198:10 | 121:15,20 | 117:20 | **duty** 168:23 | 217:15,20 |
| 207:11,12 | 121:24 | 248:19 | **Dynamics** | 217:22 |
| 219:20 | 127:24 | 264:18 | 5:13 | 223:1,12 |
| 244:1,6 | 128:24 | **domestic** | ――――― | 224:1 |
| 249:5 | 131:10 | 26:16,23 | **E** | 225:7 |
| 250:1 | 136:12 | 27:16,20 | **E** 1:23 2:2 | 226:11 |
| 251:15 | 139:14 | 38:4,7,9 | 3:1,1,17 | 227:18 |
| 252:21 | 140:16 | 123:13 | 4:1,1,1,20 | 228:11,15 |
| 271:15 | 149:10 | 270:17,22 | 5:1,6 6:1 | 228:22 |

BRIAN J. SCULLY 1/12/2023

230:7,8,11
230:17,17
230:24
237:23
249:14
252:4,20
253:1,10
253:15
255:19
271:25
277:20
278:19
280:16
281:21
282:3,17
283:8
284:24
285:10
286:3
288:18
291:9,20
294:2
296:8
297:10,24
298:24
299:17,25
301:15,18
301:19,24
307:1,2
313:10
317:21
320:21
334:18
345:14
350:3,3,12
351:18
352:2,4,17
356:18
359:19
360:3,4,23
373:4
**E-mail(s)**
6:20
**e-mailed**
138:18
156:12
157:15
194:20
**e-mailing**

14:5
188:18
294:8
334:25
**e-mails** 67:5
67:7
131:14
156:19
166:24
168:3
170:20
171:4
178:22
179:13,17
179:23
180:13,15
180:20
184:7,11
184:18
189:11,22
192:1
193:7,7,9
193:21
201:3
202:4,4
203:17,23
213:15
215:6
230:7
260:2
276:24
277:7
278:1
288:10
299:19
340:2
345:15
**earlier**
20:12 55:2
56:18,22
63:16
72:13
74:14
91:15
93:10
96:16 98:5
99:11,19
100:16
101:17

102:8
112:23
115:1
118:21,23
119:7
121:11
126:9
131:4,19
140:9
147:22
150:10
156:22
157:5,22
159:1
170:3
171:21
174:14
200:22
203:12
208:16
246:10
255:24
257:1
263:7
264:16
265:12
266:20
272:20
280:5
284:1
294:21
295:24
296:1
301:15
303:24
316:5
320:12
322:15
336:22
337:24
340:2
351:2
353:19
355:17,21
356:3
360:12,24
362:6
364:2
365:4

367:1,5
368:19
370:6
**earliest**
22:20,24
23:8,10
**early** 22:7
22:23,25
49:18
53:14
63:24 64:6
70:9 83:24
88:25
89:25 97:5
173:18
234:8
239:25
240:25,25
241:1
327:2
336:12,13
356:7
362:11,13
367:6
**easier** 14:20
144:9
**Easterly**
22:14 76:5
191:20
304:10,13
305:18
307:3,9
308:5,13
309:14
310:2,4,11
311:23
312:15
313:23
314:11
318:14
335:16
337:24
344:6,13
**Easterly's**
316:12
345:4
367:25
**ecosystem**
357:2,8

**educate** 25:1
239:18
240:12
**educated**
261:5
**education**
16:13
131:5
239:14
**effectively**
329:2
**efficacy**
322:9
**effort** 12:21
13:5,10
203:13
307:17
308:2
320:4
**efforts** 8:17
18:13 96:9
118:3
259:14
302:4,14
302:18
303:1,1,6
303:7,11
320:8
321:25
323:22
336:4,6,20
**EI-ISAC**
60:19
61:10,23
62:1,2,5,7
110:17,21
110:22,23
112:10,13
112:18
147:6,14
147:20,25
148:2,3,12
148:21
149:13,20
199:12
204:8
228:7
**eight** 196:6
196:10,12

**BRIAN J. SCULLY  1/12/2023**

233:22
245:16
250:16
**EIP** 5:9 53:4
54:3 58:14
59:6 62:12
62:24
64:11,13
64:16,24
65:4,10,23
66:2,7,10
66:25 67:4
67:11,16
67:23
68:10,21
73:22 74:1
74:4 75:3
76:12
79:10,24
80:12,15
81:8,11,18
82:13 95:1
97:25 98:3
98:17 99:1
99:12,13
99:13,18
102:7,13
102:15,22
103:9,13
103:21,22
104:2,7,8
105:2,12
105:23
106:5,9,13
106:21
107:2
108:9,12
108:18
109:6,18
109:22
110:2
111:6,7,13
111:14,16
111:18
112:1,5,21
116:1,15
119:2,13
119:14
121:12,15

121:18
122:11
134:11
136:20
147:16
149:5,9
158:10,14
158:18,19
162:22
169:5
171:15
183:21,22
184:23
185:13
198:3
199:11,12
199:13,20
200:2,11
200:19
201:12
202:20
203:9
208:11,17
208:25
209:15,22
210:6,11
210:19,24
211:4,10
211:19
212:7
214:2,6
217:16
228:14
229:22
230:1,12
230:17
277:11
362:15,17
368:14
369:7,13
369:22
371:15,23
**EIP's** 66:14
115:14
**EIP-243**
158:11
**EIP-spec...**
169:14
200:7

**EIP243**
161:15
**EIS** 67:7
**either** 75:17
104:11
137:12
155:14
197:24
215:13,16
216:22
251:11
259:21
353:6
365:24
368:2
**election**
5:10,16
8:9,17
9:22 16:24
23:25 24:1
24:5,21
25:3,6
26:13
27:22
31:21,22
31:24 32:4
32:5 33:5
36:11 38:8
38:25 41:8
47:24 48:6
48:9,25
49:6 50:7
50:10 51:5
51:20 52:1
52:12,23
52:25
54:18,20
54:24
55:23 56:4
56:8 57:4
57:7,13,19
57:25
58:24
59:14 60:1
60:15,23
60:25 61:1
61:5 62:20
63:12,24
64:1 67:10

68:4,14
69:21,22
73:3,8,10
73:16
74:21 75:7
78:16,20
79:4,5,7
79:10,12
79:17 80:1
80:3 83:20
83:23
84:15,24
85:1 87:1
88:6,13,18
90:10,15
90:19
91:17,19
92:3 93:16
94:23 95:7
95:11 96:6
96:7,8,16
97:19
100:18,21
101:11,19
102:10
106:1,4,13
107:18
110:14
113:11
119:23
120:3,5,14
123:2
126:23,25
127:2,7,15
128:11,24
129:15,24
130:23
131:6,23
132:11
134:19
140:3,22
141:2,3
147:5,5,8
147:9
148:6
149:2,16
163:22,24
164:4,20
165:9,10

168:21
169:8
170:7,7
172:19
174:2,18
174:19
175:11,12
179:7,25
180:19
181:11
185:17
187:22
195:18
202:14
204:18
207:7,9
208:23
215:12,24
216:8,21
216:22
217:9
220:7,23
221:4
228:8
230:1
234:6,10
234:13,23
235:12
239:15
240:23,24
241:1
242:8,11
244:14
246:3
251:17
254:12,13
256:15
257:20
258:5,14
260:11,16
260:20,24
261:1,2,14
261:19,22
262:17,18
262:22,24
264:9
265:10,18
265:21
266:1,7,8

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 267:4,12 | 126:4 | **employment** | 305:7 | 204:17 |
| 267:13,21 | 127:8 | 196:24 | 318:12 | 324:3 |
| 268:1,3,5 | 132:14,19 | **enable** 73:9 | 347:1,4,7 | 369:15 |
| 269:25 | 304:19 | **enclosed** | 347:9,13 | **entry** 98:23 |
| 270:5,8,15 | 332:15 | 375:11,13 | 348:1 | 290:9 |
| 280:2 | 355:3 | **Enclosures** | **engagements** | **environment** |
| 282:14,25 | **election...** | 375:25 | 18:7,10 | 48:15 |
| 283:4,16 | 304:5 | **encouraged** | 19:9 44:22 | 152:1 |
| 285:20 | **elections** | 318:5 | 45:4 298:8 | 154:6 |
| 286:21 | 8:4 25:2,8 | **encouraging** | 299:1 | **Erie** 217:10 |
| 297:5,12 | 27:14 | 128:9 | **engages** | **errata** |
| 297:22 | 48:15 | **ended** 49:15 | 171:3 | 373:16 |
| 298:1,10 | 215:10 | 51:16 | **engaging** | 375:14,17 |
| 298:16 | 216:1 | 65:18,25 | 18:10 | 375:19 |
| 300:20,24 | 234:4,5 | 195:14 | 73:17 | 376:1 |
| 301:8 | 239:14,18 | 336:11 | 78:20 79:4 | **erry** 281:16 |
| 302:4,14 | 240:13 | 337:21 | 286:21 | **escalate** |
| 302:18,19 | 263:5 | **ends** 19:17 | 329:14 | 176:3 |
| 303:12,13 | 269:20 | **enemies** | 346:21 | 206:2 |
| 304:16 | 270:11 | 285:22 | **ensure** | 207:25 |
| 305:6,7 | 296:17 | **enforcement** | 253:23 | 208:2,11 |
| 306:15 | 299:2 | 95:13 | **entailed** | 226:15 |
| 307:5,12 | 308:23 | 220:11 | 169:13 | 292:25 |
| 315:15 | 315:16 | 245:25 | **enter** 165:25 | 297:3 |
| 332:24 | 331:17 | 250:5,17 | 166:7 | **escalated** |
| 336:1 | 332:12 | 250:21,22 | **entire** | 200:11 |
| 339:4,6 | 334:4 | 251:2 | 174:19 | **escalating** |
| 340:14,16 | 340:14 | 320:21 | 180:19 | 158:5 |
| 340:18 | 364:8 | 366:6,9,14 | 194:8 | 295:5,20 |
| 344:18 | **Ellis** 1:23 | **enforcing** | 195:23 | **ESI** 276:17 |
| 354:23,24 | 2:2 4:20 | 289:15 | 219:13 | 276:25 |
| 360:10 | 10:15,15 | **engage** 16:18 | 357:7 | **especially** |
| 362:1,8 | 374:2,18 | 184:18 | **entirely** | 95:11 |
| 363:12,14 | **Elvis** 7:6 | 266:1 | 29:8 77:1 | 164:23 |
| 363:19 | 29:22 30:1 | 322:17 | 101:20 | **ESQUIRE** 3:3 |
| 364:20 | 237:10 | 346:12,17 | 188:11,16 | 3:4,5,6,17 |
| 365:1 | 248:13 | 347:24 | 261:17 | 3:18 4:3 |
| 366:1,12 | 249:20 | **engaged** | 295:24 | 4:11 375:5 |
| 366:17 | **emerging** | 44:25 | 363:22 | **essential** |
| 368:9,24 | 109:21 | 73:21 | **entities** | 128:6 |
| 370:14 | **emphasize** | 130:18 | 46:21 48:2 | 267:16 |
| 371:2 | 372:8 | **engagement** | 109:13 | **essentially** |
| 372:1 | **employed** | 18:13,15 | **entitled** | 17:3 18:12 |
| **election...** | 374:10 | 43:19 44:4 | 233:13 | 19:9 28:8 |
| 262:9 | **employee** | 46:7 82:2 | 244:2 | 40:17 |
| 264:22 | 120:2 | 146:1 | 277:4 | 41:11 |
| 265:9 | 278:20 | 172:2,4 | 302:3 | 43:17 |
| **election...** | **employees** | 187:15 | 328:12 | 45:13 47:2 |
| 125:23 | 337:9 | 278:5,11 | **entity** | 54:11,14 |

| | | | | |
|---|---|---|---|---|
| 57:12 | 331:9 | 73:22 | 252:15,18 | 19:21 |
| 59:12 62:9 | **exactly** | 292:21 | 255:15 | 259:3,4 |
| 67:24 85:4 | 15:21 | **exchanges** | 259:24 | **expectation** |
| 86:19 | 68:24 93:5 | 250:3 | 269:4 | 175:4,19 |
| 117:15 | 101:21 | **excluded** | 277:16,19 | 193:16 |
| 154:2,7,12 | 137:15 | 95:13 | 301:20 | 261:9 |
| 155:19 | 152:15,19 | **Exclusive** | 302:1 | **expectat...** |
| 263:2 | 221:9 | 8:8 | 306:18,20 | 247:7 |
| 291:2 | 275:25 | **excuse** 82:14 | 309:20,23 | **expected** |
| 294:2 | 307:21 | 313:17 | 319:15,18 | 246:1,19 |
| 305:4 | 337:12,20 | 350:3 | 328:4,7 | **expecting** |
| 323:17 | **EXAMINATION** | **executed** | 334:19,25 | 179:10 |
| 348:18 | 5:2 11:14 | 249:11 | 335:1,6,12 | **expedited** |
| 358:20 | **examined** | 377:14 | 345:18,20 | 6:24 |
| **establish** | 373:12 | **executive** | 349:15,18 | 372:17 |
| 126:18 | **example** 28:7 | 73:6 89:15 | 349:24 | **experience** |
| **established** | 43:2 44:13 | **exhibit** 5:8 | 350:2 | 318:4 |
| 55:24 | 58:16 66:9 | 5:9,11,14 | 352:13,16 | **expert** |
| 215:24 | 78:6 | 5:18 6:3,4 | 359:13,16 | 108:11 |
| 313:2 | 103:12 | 6:13,20,22 | 363:6,9 | 361:20 |
| 364:5 | 147:3 | 7:3,4,6,8 | 364:11,14 | **expertise** |
| **et** 1:6,10 | 161:12 | 7:10,12,17 | 365:10,13 | 25:6,8 |
| 10:6,7 | 177:2 | 8:3,4,7,11 | 368:3,6 | 343:18 |
| 375:8,8 | 189:10 | 8:14,16,20 | 369:17,20 | **experts** |
| 376:3,3 | 221:14 | 8:22 9:3,4 | 369:23 | 337:25 |
| **evaluate** | 223:3,24 | 9:8,12,15 | **exhibits** | 338:7,10 |
| 23:21 | 240:4 | 9:18,20,22 | 188:19 | 343:14,21 |
| **evening** | 243:8 | 9:24 13:25 | 212:14 | 356:4 |
| 226:7,23 | 263:16 | 14:4,4,6,7 | 237:24 | 361:5,10 |
| 226:24 | 292:4 | 69:7,9 | 252:14,16 | 361:16 |
| 227:4 | 315:18 | 138:17,20 | 277:25 | **Expires** |
| **event** 5:14 | 332:10 | 156:13,14 | 301:25 | 377:24 |
| 5:18 78:3 | 336:21 | 168:4 | 318:18 | **explain** |
| 117:4 | 339:24 | 170:20 | 345:14 | 151:21 |
| 332:3 | 340:3,16 | 173:2 | **exist** 166:5 | 153:14 |
| **events** | 341:23 | 179:13 | **existed** 98:8 | 223:12 |
| 331:21,25 | 342:25 | 190:13,16 | **existing** | 342:3 |
| **everybody** | 357:15 | 194:19,25 | 283:13 | **explained** |
| 65:20 | **examples** | 197:25 | **expand** | 71:3 |
| 211:22,23 | 126:10 | 198:10 | 300:18 | **explanation** |
| 211:24 | 158:11 | 212:25 | 302:18 | 221:19 |
| **evidence** | 265:2 | 213:14 | **expanding** | 229:13,17 |
| 219:2 | **excellence** | 227:9,12 | 151:6,9 | **explicit** |
| **exact** 85:4 | 141:23 | 231:15 | 301:1 | 90:18 91:5 |
| 86:5 | 142:4 | 242:12 | 303:6 | 94:22 95:6 |
| 129:23 | 149:24 | 243:22,25 | 320:10 | **extensive** |
| 134:24 | **Excerpts** 7:6 | 249:15,17 | **expands** 8:17 | 152:3,3 |
| 190:2 | **exchange** | 249:22 | 302:3,14 | **extent** 53:16 |
| 307:24 | 73:10,17 | 252:3,5,12 | **expect** 19:15 | 79:24 92:5 |

BRIAN J. SCULLY 1/12/2023

| | | | | |
|---|---|---|---|---|
| 94:15 | 225:5,11 | 102:9,12 | **false** 207:9 | 216:16 |
| 100:19 | 225:16 | 102:14,18 | 219:11,17 | 244:13 |
| 121:22 | 233:23 | 103:12 | 224:2 | 245:6,18 |
| 124:17 | 241:6 | 104:22 | 283:14 | 248:12,13 |
| 136:21 | 243:9 | 327:12 | 288:3 | 250:17,24 |
| 137:8 | 253:15,23 | **facilita...** | **falsely** | 251:4 |
| 141:5 | 255:20,25 | 111:25 | 280:11 | 264:18 |
| 150:19,22 | 256:2 | **facilities** | 354:24 | 270:17 |
| 153:17,21 | 271:24 | 342:19 | **familiar** | 316:2 |
| 158:20 | 272:24 | **fact** 43:1 | 15:12,13 | 366:18 |
| 184:7 | 275:4 | 55:11 | 69:17 | **FBI's** 271:6 |
| 287:20 | 284:12,25 | 76:13 87:9 | 77:23,24 | **FBI.gov** |
| 364:3,4,6 | 284:25 | 124:16 | 85:19 | 215:2 |
| 365:6 | 286:4 | 154:20 | 107:1 | **FBI/CISA** |
| **external** | 287:4,12 | 197:22 | 123:19,21 | 206:21 |
| 108:15,18 | 287:17 | 207:6 | 131:9 | **February** |
| 109:2,4,11 | 293:15 | 219:1 | 239:15 | 327:25,25 |
| 133:8,11 | 294:7 | 234:3 | 266:11 | 328:2 |
| 329:21,24 | 295:18 | 235:15 | 279:25 | 350:8 |
| 369:8,15 | 296:6 | 238:4 | 328:16,18 | **FEC** 244:2 |
| **extraord...** | 297:6 | 242:7 | 335:2 | **FED** 314:13 |
| 35:7 | 307:2,3,10 | 276:22 | 364:23 | **federal** |
| **extremely** | 307:12,14 | 277:3 | 365:19 | 16:20 21:5 |
| 192:7 | 308:6 | 288:2 | **familiarity** | 25:11 |
| **eyesight** | 309:14 | 291:2,9 | 182:18 | 31:15 37:1 |
| 297:17 | 310:6,21 | 309:15 | **far** 14:14 | 37:12 44:7 |
| | 310:25 | 348:11 | 17:25 | 55:23 56:5 |
| **F** | 311:2 | **factors** | 107:6,8 | 91:16 92:1 |
| **face** 308:25 | 320:18,20 | 339:2 | 112:17 | 92:14,25 |
| **Facebook** | 348:15 | **facts** 344:15 | 125:1 | 93:19,24 |
| 21:7 27:3 | **Facebook...** | 344:17,24 | 138:13 | 94:6,11,17 |
| 36:23,24 | 144:24 | 345:11 | 172:14 | 96:24 |
| 37:4,11 | **Facebook...** | **fair** 13:23 | 182:23 | 128:9 |
| 38:15 65:3 | 159:13 | 13:24 | 234:3 | 136:24 |
| 78:7 117:3 | **Facebook...** | 298:15 | 334:13 | 149:25 |
| 117:10,12 | 320:24 | 329:17 | **fast** 12:22 | 150:4 |
| 117:16,19 | **faced** 83:23 | 345:5 | 275:22 | 178:11 |
| 127:6 | **facilitate** | 369:13 | **FBI** 25:23 | 235:2 |
| 146:6 | 25:16 | **fairly** 36:9 | 29:10,14 | 245:24 |
| 159:7,17 | 59:25 | 57:8 | 29:19 30:6 | 246:12 |
| 159:18,22 | 74:22 | 114:15,16 | 30:15 | 250:4,16 |
| 176:15 | 103:16 | **fall** 51:17 | 117:20 | 250:21,22 |
| 217:24 | 210:21 | 51:19 | 207:1,16 | 258:3,11 |
| 218:2,7,10 | 220:19 | 170:14 | 214:19,20 | 264:5,12 |
| 218:10,12 | 263:4 | 184:4 | 214:20,21 | 267:6,8,19 |
| 218:19,23 | 264:10 | 186:8,10 | 215:1,8,13 | 286:14,20 |
| 219:4,23 | **facilitated** | 187:6 | 215:16,18 | 315:9 |
| 220:9 | 50:10 | 315:18 | 215:22,25 | 317:2,12 |
| 221:16 | 52:10 | 359:10 | 216:4,5,11 | 337:9 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 370:9,12 | 341:11,22 | 202:5 | 67:17 | 308:7 |
| 370:18,25 | 341:25,25 | 213:13 | 180:16 | 352:2 |
| 371:18 | 342:4,11 | 224:1 | 207:21 | **follow-up** |
| **feed** 155:8 | 343:1,4,11 | 228:17 | 291:17,18 | 13:19 |
| **feedback** | 343:13,18 | 233:11,11 | 295:5 | 116:8 |
| 88:14,17 | 343:22,24 | 253:5 | **Fleischman** | **followers** |
| 294:11 | 355:13,16 | 260:3 | 4:11 11:4 | 206:8,17 |
| 361:17 | 355:20,23 | 277:5 | **flexibility** | 207:22 |
| **feel** 167:17 | 356:4,5,13 | 278:2 | 330:15 | **following** |
| **fellow** 89:4 | 374:11 | 299:11,13 | **flip** 117:22 | 65:18 |
| **felt** 16:10 | **find** 62:20 | 299:15,23 | **flipping** | 89:16 |
| 235:4 | 108:25 | 310:5 | 109:10 | 115:6,13 |
| **field** 215:23 | 143:14,17 | 319:9 | **floor** 267:24 | 115:17 |
| 215:25 | 179:23 | 320:2 | **flows** 105:17 | 191:14 |
| 216:5 | 180:7 | 335:23 | 106:19 | 199:12 |
| **fifth** 101:4 | 220:24 | 345:15 | 110:22 | 203:7 |
| 195:9 | 221:13,24 | 354:7 | 357:20,22 | 253:24 |
| **fight** 8:17 | 222:3 | 356:11 | **focus** 13:22 | 290:13 |
| 302:4,14 | 224:11 | 360:4 | 59:1 | 291:1 |
| 302:18 | 315:8 | 370:22 | 330:15 | **follows** |
| 303:6,12 | 329:5 | 371:16,20 | 354:8,20 | 11:13 |
| 303:20 | 375:11 | **five** 38:25 | 355:3 | 299:24 |
| 304:14,18 | **finding** | 180:12 | 357:19,25 | **force** 12:5 |
| **figure** 49:20 | 367:3 | 181:1 | **focuses** | 118:1,7 |
| 86:6 | **findings** | 192:11 | 331:16 | 130:2 |
| 102:19 | 47:6 | 201:1 | **focussed** | 271:6 |
| 221:17 | **finds** 298:24 | 243:2 | 61:1 | 312:3 |
| 275:12 | 350:12 | 276:18 | **foggy** 22:19 | 330:15 |
| **figuring** | **finish** 113:3 | 282:5 | 101:6 | 348:13 |
| 274:4 | **first** 6:24 | 319:3 | **Foley** 71:10 | **foregoing** |
| **file** 116:1 | 12:15,16 | 330:25 | **folks** 29:17 | 373:12 |
| **filed** 190:19 | 12:19 14:7 | **fix** 83:6 | 46:22 52:6 | 374:4,5 |
| 244:1 | 24:12 | **flag** 109:21 | 52:11 | 377:6,13 |
| **filing** | 25:21 | 110:1 | 58:11 70:2 | **foreign** 12:5 |
| 375:21 | 31:14 | 192:2 | 70:3 83:23 | 26:15,21 |
| **fill** 58:1,16 | 55:16 | 251:18,18 | 85:5,20 | 39:21 41:9 |
| 58:22 | 56:25 78:6 | 281:3 | 104:5,23 | 45:2,9,9 |
| 315:22 | 81:25 | 297:3 | 147:20 | 45:14,18 |
| **filling** | 95:14 | 320:17 | 165:18 | 117:25 |
| 58:20 85:1 | 103:2 | 364:20 | 188:25 | 118:7 |
| **filter** 62:4 | 109:11 | 365:1 | 234:18,20 | 122:13 |
| **final** 194:10 | 117:15 | **flagged** | 264:9 | 123:3,9,13 |
| 194:12 | 125:21 | 116:12 | 267:13 | 130:1 |
| 243:13 | 144:11 | 177:9 | 327:15 | 256:20 |
| 299:8 | 153:5 | 206:6 | **follow** | 259:13 |
| **finalized** | 156:25 | 288:12 | 137:21 | 271:6 |
| 321:22 | 157:17,18 | 292:22 | 197:22 | 323:18,22 |
| **financial** | 185:25 | **flagging** | 287:24,25 | 329:3 |
| 340:23 | 187:18 | 21:21 | 289:3 | 330:14 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 348:13 | 159:16,21 | **forwards** | 269:19 | 193:4,6 |
| 364:18 | 168:6,10 | 205:5 | 276:23 | 265:5 |
| **Forensic** | 175:14,18 | 217:22 | **fourth** 44:11 | 270:12 |
| 48:22 | 175:24 | **found** 153:3 | 90:5 | **functioning** |
| **forget** 29:17 | 205:16 | 328:23 | 185:22 | 341:21 |
| 54:7 102:1 | 216:16 | **foundation** | 249:5 | **functions** |
| 116:22,23 | 217:23 | 39:2 80:5 | 251:16 | 304:4 |
| 155:13 | 220:2 | 122:22 | 321:3 | 354:21 |
| 174:4 | 231:1 | 145:11 | 364:16 | 355:10 |
| 186:1 | 259:9 | 149:18 | **frame** 99:17 | **fund** 110:23 |
| 214:4 | 280:25 | 178:15 | 220:5 | **funded** 61:8 |
| 286:16 | 281:23 | 196:1 | **framework** | 89:21 |
| 307:23 | 336:25 | 197:2 | 44:14 | **funding** |
| **forgetting** | **forwarded** | 204:24 | **Frameworks** | 61:10,12 |
| 167:18 | 17:21 24:3 | 214:23 | 47:8 | 61:23 62:1 |
| **forgot** 30:1 | 119:11 | 233:25 | **framing** 42:7 | 149:1,2 |
| **form** 116:17 | 131:14 | 244:21 | **fraud** 341:17 | 303:9 |
| 148:8 | 135:4 | 245:8,12 | **frequency** | 368:21 |
| 228:18 | 137:13 | 304:21 | 31:19 | **funds** 110:18 |
| 347:1,4 | 159:7 | 313:8 | **frequent** | 337:17 |
| 359:5 | 178:4 | 333:19 | 31:20 | **funky** 299:18 |
| 377:7 | 180:20 | 350:24 | **frequently** | **further** |
| **formal** | 184:8 | 353:25 | 39:4 64:4 | 31:20 |
| 234:16 | 189:23 | 354:13 | **Friday** | 102:6 |
| **formalized** | 193:2 | 355:6 | 291:17,20 | 221:17 |
| 142:15 | 200:19,20 | 356:22 | 291:21 | 307:16 |
| 320:16 | 206:16 | 359:23 | 292:1,6 | 318:14 |
| **formally** | 207:24 | 361:14 | 293:17 | 332:9 |
| 276:12 | 218:1,18 | **foundati...** | 304:10 | 347:10 |
| **formation** | 226:7 | 304:3 | **front** 187:2 | **fuse** 5:9 |
| 318:20 | 229:16 | **four** 12:1 | 328:8 | 141:3 |
| **formed** 58:12 | 281:12,15 | 19:8 31:18 | **frozen** 82:24 | **future** |
| 73:9 | 281:22 | 35:24 | 82:25 | 367:15,19 |
| **former** | 366:20 | 48:13,13 | **full** 11:17 | 367:21 |
| 304:15 | **forwarding** | 48:16,17 | 69:4 80:9 | 368:1 |
| **forming** | 23:25 67:8 | 48:24 | 261:8 | **fuzzy** 81:11 |
| 100:8,10 | 67:9 | 89:20 90:1 | 264:3 | **FYI** 199:20 |
| **Fort** 324:2 | 134:25 | 105:12 | 342:20 | **FYSA** 199:11 |
| **forth** 27:4 | 175:6,20 | 110:7 | **full-time** | |
| 127:6 | 179:25 | 111:11 | 170:10 | **G** |
| 144:20 | 183:15 | 112:22 | 330:19,25 | **G** 10:1 |
| 370:19 | 184:11 | 113:24,25 | **fully** 148:16 | **G-e-o-f-f** |
| **forum** 45:2 | 192:1 | 141:16,17 | **fun** 291:21 | 308:18 |
| **forward** 13:3 | 202:24 | 184:22 | **function** | **G7** 44:11 |
| 13:13 17:6 | 205:11 | 185:12 | 25:2 63:17 | 45:12 |
| 63:25 | 217:7 | 192:11,25 | 63:20 | **GAC** 316:5 |
| 106:12 | 242:10 | 214:21 | 161:20 | **Gadde** 360:14 |
| 123:5 | 278:4,6 | 250:8,12 | 163:18 | 360:14 |
| 129:8 | 291:24 | 256:4 | 189:23 | **gaining** |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 229:4 | 108:20 | 231:10,18 | 371:10 | 25:14,15 |
| **gap** 49:21 | 111:8 | 231:21 | 372:7,20 | 27:7,10,17 |
| 52:6 56:24 | 115:9,15 | 242:18,22 | 372:21,23 | 29:20 |
| 57:1,12,17 | 115:20 | 244:20 | 373:2,5 | 33:21 36:6 |
| 57:18 58:2 | 116:17 | 245:7 | 375:5,10 | 37:8,19,21 |
| 58:16,20 | 118:16 | 249:16,19 | **gateway** | 38:10,16 |
| 58:23 | 122:21 | 252:7,11 | 123:19,23 | 38:19 41:4 |
| 74:18 | 125:6,9 | 252:19,24 | 124:23 | 41:21,22 |
| 83:22 84:4 | 126:5 | 253:2,4,7 | 125:18,22 | 44:21 |
| 84:6,8,9 | 130:19 | 253:12 | 126:3 | 52:21 57:5 |
| 84:11 85:2 | 138:22 | 255:16 | **gathered** | 59:1 64:7 |
| 85:5,21 | 139:2 | 258:6 | 107:19 | 65:5 67:20 |
| 86:14,21 | 142:6 | 262:2 | **gathering** | 68:13 74:2 |
| 86:22 87:1 | 145:3,6,10 | 271:10,17 | 107:15 | 79:19 |
| 87:9 91:14 | 146:16 | 273:1 | **GEC** 111:3 | 80:18,19 |
| 91:16,18 | 148:8 | 276:3 | 280:1 | 80:23 |
| 92:1,14,23 | 149:17 | 277:13,21 | **Gegovich** | 83:18 94:4 |
| 93:8,10,15 | 150:18 | 283:21 | 141:13 | 107:5,7 |
| 93:18 94:5 | 152:20 | 294:16,23 | **general** 4:12 | 119:7,13 |
| 94:10,17 | 153:7,17 | 298:11 | 21:2 32:22 | 128:2,7,22 |
| 96:15,23 | 155:25 | 302:6,10 | 39:14 | 143:12 |
| 98:7 99:10 | 156:8 | 304:20 | 49:22 60:3 | 153:14 |
| 111:22 | 161:25 | 306:21 | 62:16 | 163:21 |
| 368:19 | 178:14 | 310:12 | 124:14,16 | 176:23 |
| 370:5,12 | 179:21 | 313:7 | 133:1 | 177:16 |
| **gaps** 57:6 | 181:2,8 | 316:19 | 141:6 | 178:18 |
| 96:23 | 183:3,10 | 318:21 | 145:20 | 193:18,19 |
| 315:22 | 185:7 | 319:8 | 235:7 | 212:11 |
| 372:1 | 190:21,24 | 324:24 | 238:12 | 215:11,22 |
| **Garcia-C...** | 194:14,21 | 333:18 | 240:17 | 220:14 |
| 186:3 | 195:25 | 334:20 | 247:15 | 222:5 |
| **Gardner** 3:17 | 196:4 | 335:1,4,8 | 266:13 | 233:14 |
| 10:24,25 | 197:1 | 339:13,19 | 268:14,22 | 234:2,23 |
| 14:12,19 | 198:5,22 | 341:6 | 328:12 | 235:7 |
| 23:2,5 | 199:3 | 344:7,10 | 330:16 | 239:23 |
| 34:15,18 | 201:4 | 344:25 | 346:19 | 257:6 |
| 35:4 53:1 | 202:15 | 345:6 | 348:19 | 258:21 |
| 69:11 | 204:12,20 | 349:25 | 358:17 | 263:10,12 |
| 71:20 72:3 | 204:23 | 350:23 | 371:19 | 264:25 |
| 77:10,19 | 212:2,17 | 351:15 | **General's** | 278:17 |
| 80:4 87:16 | 212:21,23 | 352:7 | 3:7 10:20 | 288:13 |
| 90:25 92:4 | 213:6 | 353:24 | 10:23 | 293:19,22 |
| 92:17 93:2 | 214:22 | 354:12 | 35:10 | 304:2 |
| 93:22 | 215:3 | 355:5 | **generality** | 309:4 |
| 94:14 | 226:25 | 356:21 | 153:22 | 315:23 |
| 95:20,24 | 227:14,19 | 358:14 | 154:10 | 325:19 |
| 96:25 | 227:22 | 359:5,22 | **generally** | 333:5,6,22 |
| 97:20 | 228:18 | 360:19 | 15:21 16:7 | 340:10 |
| 98:11 | 230:19 | 361:13 | 24:24 25:7 | 343:14 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 349:5 | 13:1 40:3 | 197:25 | 200:13 | 238:18 |
| 357:18,19 | 50:17,19 | 198:9 | 210:1 | 249:14 |
| 359:7,11 | 87:5 | 209:4,6 | 242:21 | 254:4 |
| 366:16 | 136:17 | 210:1 | 254:15 | 259:9,24 |
| 369:8 | 190:1 | 215:21 | 299:6 | 262:4,21 |
| **generate** | 210:8 | 217:2 | 304:12 | 263:5 |
| 159:24 | 214:16 | 218:14,15 | 312:21 | 270:4 |
| **generic** | 282:6 | 221:3,7,23 | 338:15 | 271:11,16 |
| 100:6 | 283:11 | 222:10 | 357:5 | 277:4 |
| **generically** | 284:2,5,6 | 231:22 | 369:1 | 288:16 |
| 155:6 | 339:24 | 241:10 | **going** 14:9 | 290:11 |
| 358:7 | 345:23 | 253:4 | 14:11 15:1 | 296:18 |
| **gentleman** | 346:1 | 256:24 | 20:4 21:16 | 298:20 |
| 310:6 | **given** 12:12 | 257:10 | 27:2 31:12 | 301:24 |
| **Geoff** 22:11 | 373:14 | 266:25 | 32:13 | 302:19 |
| 25:14,25 | **gives** 272:4 | 271:10 | 39:22 | 307:20 |
| 28:4,10 | **giving** 27:6 | 273:8 | 48:14 | 334:9,15 |
| 53:23 54:1 | 55:20 | 274:20 | 50:17,19 | 334:24 |
| 75:25 76:2 | 270:20 | 275:2,22 | 50:24 | 336:15 |
| 130:5,5 | **Gleicher** | 276:11 | 54:16 56:1 | 358:3 |
| 191:21 | 310:17,18 | 277:19 | 77:24 | **good** 29:24 |
| 253:17 | 311:22 | 279:15,16 | 89:14 | 56:14,21 |
| 270:2,3 | 312:16 | 288:5 | 102:20 | 66:20 |
| 308:18,19 | **global** 278:5 | 289:24 | 122:2,5 | 109:1 |
| 309:17 | 278:11 | 294:4 | 125:1 | 134:13 |
| 333:5 | **globally** | 302:10 | 138:16 | 140:11 |
| 350:4 | 236:21 | 315:8 | 140:5,24 | 163:6 |
| 353:20 | 255:8 | 330:4 | 144:6 | 181:4 |
| 360:23 | 273:11 | 332:9 | 156:10 | 247:14 |
| **George** | **go** 12:17 | 333:13 | 162:8,12 | 271:12 |
| 279:20,22 | 13:3 15:1 | 342:14 | 166:20 | 276:3 |
| **Georgetown** | 34:22 | 348:6,17 | 167:11 | 279:6,10 |
| 46:24 | 53:12 | 349:6 | 172:20 | 282:4 |
| **getting** | 61:16 83:2 | 350:2 | 173:9 | 284:23,25 |
| 40:18 | 83:5,5,7 | 362:20 | 179:3 | 286:5 |
| 100:2 | 88:22 | 364:16 | 181:3 | 330:6 |
| 102:18 | 113:3 | 365:16 | 183:24 | 331:12 |
| 109:4 | 120:17 | 370:1 | 184:2 | 341:23 |
| 125:10 | 124:8 | **goal** 54:22 | 193:13 | 346:16 |
| 203:22 | 125:6 | 347:19 | 198:23 | **Google** 38:16 |
| 208:16 | 127:13 | **goes** 13:13 | 208:4 | 144:18 |
| 220:19 | 152:17 | 19:12 62:2 | 209:20 | 233:23 |
| 228:9 | 165:17 | 62:3,3 | 211:10 | 350:5,16 |
| 293:4 | 182:21 | 90:16 | 212:14 | **Google-s...** |
| 299:8 | 183:4 | 94:19 | 218:15 | 161:5 |
| 344:1 | 186:10 | 95:10 | 220:11 | **Gotcha** 79:22 |
| 345:14 | 188:4 | 109:20 | 229:2 | 126:15 |
| **gist** 54:14 | 191:3 | 110:21 | 230:24 | 141:18 |
| **give** 12:24 | 195:4 | 158:9 | 233:7 | 218:11 |

BRIAN J. SCULLY  1/12/2023

gov@twit...
 300:5
governance
 312:22
government
 9:16 21:4
 24:14 28:1
 38:6 40:4
 40:13 41:2
 44:7 45:14
 45:14
 55:23 61:3
 73:10,16
 73:20 75:3
 78:6 90:16
 90:17 91:4
 91:16 92:2
 92:25
 93:20,24
 94:21 95:5
 105:13,16
 105:17,21
 106:20
 109:12,16
 110:5
 117:14
 127:23,24
 128:9
 132:5
 135:4
 137:13
 140:14
 142:3
 146:24
 149:25
 150:4
 153:2
 156:20
 179:10
 221:19
 236:25
 244:18
 257:7,17
 257:22,23
 258:1
 275:8,12
 286:20
 314:2,10
 317:24

318:6
320:17,20
320:25
348:22,23
348:25
369:2
370:13
371:1,18
372:7
governme...
 94:6,11,17
 109:25
 178:23
 194:5
 257:25
 339:7
governments
 45:9
 105:22
 323:18
 369:4
graduated
 172:14
 182:25
grant 61:14
grants 61:12
graphic 43:2
 105:12
 107:13
 108:8
 110:8
 330:9
Graphika
 47:13 48:3
 48:19
grateful
 294:10
gray 310:5
great 295:3
ground 12:18
grounds
 152:21
 155:25
group 47:14
 76:23 89:6
 111:7
 197:12
 233:8
 325:7,14

325:16
326:3,6,13
326:16,17
359:19
368:15
groups 16:19
 38:12 46:8
 47:10,13
 50:7 110:8
 111:12
 349:7
grow 336:15
 336:20
guess 19:8
 66:1 76:6
 104:25
 111:17
 203:5
 227:4
 269:3
 290:10
 307:11
 348:12
guidance
 22:14
 216:21
 358:18
guy 263:16
guys 63:9
 173:23
 179:16
 185:7
 216:13
 226:23
 249:21
 264:24
 265:4
 303:19
 344:8
 366:8
Gwinnet
 228:6
Gwinnett
 228:24
 229:12

———————
       H
———————
H 5:6  6:1
 7:1  8:1

9:1
H-i-c-k-e-y
 33:17
hack 236:6,7
 236:14,18
 237:4,14
 246:1,13
 247:7,21
 250:18,24
 251:12,22
 254:17,22
 255:2,11
 255:11
 274:9
 275:6,13
 275:15,19
hack/leak
 272:10,17
 274:24
hacker
 274:11
hacking
 246:21,22
Hale 22:12
 25:14,25
 28:4 53:23
 54:1 75:25
 191:21
 253:17
 270:2
 308:19
 309:17
 350:5
 353:20
 360:23
half 271:23
 273:15
hammer 286:6
 286:11
 288:2,21
 340:3,7
hammer/s...
 289:21
 291:10
Hampshire
 299:12,22
hand 374:14
handing
 174:5

312:4
handle 215:5
 265:1
 281:8
handling
 31:5 312:5
happen 62:15
 219:25
 241:15
 256:15
 315:21
 351:4
happened
 100:25
 101:7
 106:22
 139:23
 168:17
 210:10
 229:8
 246:15
 265:8
 268:11,17
 293:19
 301:14
 337:20
 351:8
happening
 117:1
 253:9
 268:22
happens
 36:22
 176:13
 264:21
 279:9
 323:18
 347:17
happy 14:24
 307:14
 312:16
harassment
 8:9 50:24
hard 27:7
 86:6
 177:11
 178:7
 180:2
 293:18

BRIAN J. SCULLY 1/12/2023

305:16
337:6,11
359:25
**harder**
340:18
**harms** 342:12
342:13,15
**Harvard**
46:22
**Hawaii** 2:3
**head** 12:25
13:3 130:1
241:20
**headed**
117:14
**header**
199:24
205:18
226:11
282:23
297:23
**header's**
297:16
**heading**
122:10
**headline**
302:13
319:25
**heads** 210:8
284:3,5,6
311:15
**health**
136:24
322:16
355:13
**hear** 257:24
327:8
334:21
344:8
349:6,8
**heard** 22:11
134:6
145:15,17
263:8
277:5
**hearing** 65:3
124:6,11
290:23
**heavy** 367:12

**height** 331:6
331:10,12
**heightened**
126:22
**held** 2:1
10:12
**help** 16:14
44:14,17
100:20
131:6
210:4
216:8
220:4
260:19
261:22
307:17
316:8
322:16,18
323:5
324:10
343:5
355:23
356:6
358:18
**helpful**
155:21,24
162:12
299:3
300:9,12
**helpfully**
220:24
**helping**
58:22,23
100:17
187:12
324:7
358:2
**helps** 43:18
43:18
44:11
90:24
263:20
317:23
**hereunto**
374:13
**hesitant**
317:25
**hey** 14:12
27:2 86:25

139:13
179:2
208:9
224:6
226:19
257:17
259:2
**HHS** 135:12
140:12
322:18
323:10
**Hi** 161:4
228:7
283:10
350:11
**Hickey** 33:12
**high** 3:9
153:22
154:9
337:3
**high-level**
25:18
27:11 40:5
257:3
**higher** 37:22
130:12
296:5
**highlight**
305:16
346:9
**highlighted**
150:5
**highligh...**
98:25
**Hill** 8:11
335:17
**historic...**
259:8
**hoax** 219:13
**hoes** 281:10
**hold** 138:22
139:2,3,3
185:7
186:18
190:22,24
212:24
231:18,21
242:18,19
242:22

253:9
277:21
302:8,8
344:7
**holiday**
373:6
**Homeland**
4:13 11:5
11:23
244:13
245:3,17
320:3
321:5,13
321:15
**hone** 359:8
359:11
**honest** 65:17
91:21
113:20
135:2
148:15
177:24
216:14
259:19
261:16
322:25
**honestly**
22:17 29:6
54:7
124:20
176:18
303:18
**hope** 158:5
283:10
291:22
298:23
350:11
**hosted** 117:5
**hosting**
160:18
**hour** 319:7
**hours** 175:16
177:9
181:3
271:11
349:23
**House** 140:4
140:19
**housed**

141:23
142:4
149:24
150:3
**HSH** 322:23
**human** 28:21
34:9
340:15
**hundred**
26:18
137:17
169:16
**Hunter**
247:21,24
248:14
**hyper** 357:10
358:12
359:3
**hypothet...**
339:14,21
343:25
**hypothet...**
339:16
344:2

---
**I**

**I-S-A-C**
59:21
**I&A** 26:8
27:8 28:14
28:22
264:18
332:12,18
**I&P** 56:25
**IA** 26:4
**idea** 17:19
47:17 49:9
50:14
51:11
57:25 58:2
58:12 84:3
84:10,13
84:24
89:19 90:8
108:3
109:1
132:16
171:15
184:23

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 185:5,13 | 59:3 60:13 | 141:22 | 301:5 | 196:12 |
| 185:21 | 87:3 89:24 | 149:23 | 308:22 | 375:16 |
| 192:23 | 233:4 | 364:7 | 327:18 | **indicates** |
| 215:23 | 314:21 | **implemented** | 332:7 | 192:22,23 |
| 257:1 | 361:15 | 363:19 | 339:3 | 253:19 |
| 261:13,13 | 370:10,13 | **implemen...** | **included** | 278:3 |
| 346:19 | **identifying** | 118:2 | 39:21 | 280:9 |
| 371:23 | 191:11 | **implies** | 99:16 | 291:9 |
| **identifi...** | 210:21 | 222:4 | 111:21,25 | **indication** |
| 14:1 69:8 | 232:24 | **implying** | 112:4,5 | 153:2 |
| 138:21 | 370:5 | 339:10 | 225:5 | **indicator** |
| 156:15 | **IG** 285:7,8 | **imposter** | 235:14 | 42:19 |
| 190:14 | **Illinois** | 205:23 | 247:17 | **individual** |
| 195:1 | 299:12,22 | 206:7 | 276:18 | 134:24 |
| 213:1 | **image** 154:13 | **in-authe...** | 301:10,16 | 193:15 |
| 227:10 | 154:14 | 239:5 | 309:13 | 258:23 |
| 243:23 | **images** | **in-person** | **includes** | **individu...** |
| 249:23 | 330:10 | 295:15 | 45:3 48:2 | 241:22 |
| 252:6 | **imagine** | **inaccurate** | 61:4 72:16 | **individuals** |
| 277:17 | 180:21 | 321:9 | 254:16 | 35:15 |
| 301:21 | 208:18 | **inauthentic** | 293:23 | 38:12 |
| 306:19 | 209:23 | 41:23 42:3 | 357:8 | 179:24 |
| 309:21 | 221:3 | 42:10,15 | **including** | 180:12 |
| 319:16 | 268:9 | 115:1 | 67:15 | 246:19 |
| 328:5 | 274:19 | **inbox** 194:23 | 206:7 | **Indraneel** |
| 335:13 | **immediate** | 212:20 | 246:24 | 3:18 11:5 |
| 345:21 | 176:14 | 227:13 | 277:8 | **Indranee...** |
| 349:16 | 314:7 | 302:2 | 304:14 | 3:24 |
| 352:14 | **immediately** | 319:18 | 312:13 | **industry** |
| 359:14 | 110:4 | **inboxes** | 321:24 | 21:4,7 |
| 363:7 | 195:17 | 189:11 | 354:22 | 31:15 78:7 |
| 364:12 | 205:10,17 | 192:21 | 359:2 | 117:14 |
| 365:11 | 293:16 | **incident** | 370:22 | 132:5 |
| 368:4 | **immigration** | 144:19 | 371:16 | 179:2 |
| 369:18 | 220:10 | 218:19 | **incorrect** | 233:13,17 |
| **identified** | **impact** 152:8 | 221:19 | 119:15 | 233:19 |
| 57:6 85:4 | 154:4 | 236:10 | **increase** | 237:2 |
| 191:14 | 158:4 | 264:11 | 336:24 | 243:18 |
| 192:9 | 313:1 | **incidents** | **increasing** | 244:13 |
| 193:22,24 | 332:3 | 109:21 | 150:15 | 245:15 |
| 233:10 | 340:13,16 | 110:1 | 154:4 | 253:20,21 |
| 276:24 | 340:21 | 268:8 | **incredibly** | 254:2,15 |
| 288:7 | 343:7 | **include** | 304:9 | 254:21 |
| 361:4 | **imperson...** | 18:16 | **independ...** | 255:21 |
| **identify** | 206:22 | 50:25 | 60:7 | 256:1,8,13 |
| 17:4 27:20 | 207:8 | 109:12 | 316:14 | 257:5,7,8 |
| 37:25 38:7 | **impetus** | 232:9 | 317:3 | 257:17,22 |
| 38:9 44:9 | 356:11 | 295:19 | **indicate** | 257:24 |
| 57:10,15 | **implement** | 300:1,19 | 54:19 | 260:8 |

BRIAN J. SCULLY  1/12/2023

262:9
297:25
343:1
**industry...**
216:18
**inference**
245:22
**influence**
12:5 26:15
117:25
118:7
130:1
271:6
309:1,8
330:14
348:13
350:15,22
351:14
356:20
364:18
**informal**
136:4
**information**
35:7 39:22
40:5,11
45:24,25
48:15
59:15 60:4
60:6,16,22
73:9,17,21
74:1,4,6,7
74:9 78:21
79:5 82:16
87:5 90:15
94:7
105:23
115:7
121:21
137:21
140:20
147:6,7,16
148:5
150:20,23
151:25
152:22
153:18
154:6
165:2,8
166:8

179:25
193:10
207:9
220:3,7,17
220:20,22
220:22
222:19
223:5,14
224:11
225:19
226:8
254:19
258:11
263:4
264:10
278:23
279:11,14
280:8
283:15,25
287:20,21
289:3
290:22
291:5
300:25
301:5
315:13,16
315:22
321:9
323:4,9,15
326:12
336:2
339:9
357:2,7
359:2
**informat...**
17:11
270:9
**informed**
72:20
143:21
**infrastr...**
4:6 12:10
15:24 16:6
16:9 59:15
60:15 61:1
110:14
137:24
141:24
147:5

154:1,5
265:25
269:20,25
270:5,8,9
270:15
309:6,7
322:15,17
322:20
323:6
327:3,13
327:13,16
331:18
332:2,4,6
332:7
338:17,18
338:19,23
339:1,3,5
339:6,12
340:9,12
340:22
341:1,2,4
341:13
**infrequent**
32:1
**initial** 52:4
58:14
86:10
89:19
117:13
223:5
241:9
**initially**
101:15
**initiative**
9:22 90:11
316:5
**Injunction**
6:25
**inoffensive**
311:5,6,10
**inputs** 109:8
**inquiry**
208:8
**Inspector**
328:12
**Instagram**
146:7
217:11
285:10

320:18
**instances**
200:18
**institut...**
97:8 100:3
355:11
**instruct**
35:5
150:21
152:23
153:20
156:1
**instruction**
51:2
167:14
339:17
**instruct...**
156:9
**intake**
105:17,23
107:14
**integrity**
5:16 48:7
48:10,25
49:7 51:5
51:20 52:1
52:23
57:25 68:5
69:21 73:3
73:8 75:7
78:16 79:6
79:7 80:3
83:20
84:25 88:6
88:13,18
97:19
107:19
126:25
127:7
128:11
132:11
134:19
141:3
147:8
168:21
181:11,15
200:16
202:14
228:8

230:1
280:2
283:12
341:19
360:11
362:2,9
368:9
**intel** 259:12
332:25
333:9,11
333:22
334:15
**intellec...**
286:21
**intellig...**
25:18 26:2
34:9 36:7
36:8 39:20
95:15
235:4
244:12
246:19
257:2
258:17,18
258:20
332:14,22
**intended**
283:15
**intending**
252:8
**intensive**
62:19 63:8
166:11
173:23
**interact**
278:24
279:2
310:20
**interacting**
314:20
**interaction**
75:10
**interact...**
24:10
51:25 75:7
117:10
121:16
**interagency**
18:11

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 36:25 37:1 | 196:14 | 153:16 | 170:6 | 263:3 |
| **Intercept** | 200:1 | 169:12,15 | 187:8 | **involve** |
| 9:4 319:20 | **intern's** | 169:20 | 370:5 | 60:22 |
| **interest** | 182:20 | 170:1,16 | **internships** | 245:15 |
| 9:25 44:10 | **internal** | 172:8,11 | 51:13 | 247:21 |
| 47:4 | 108:12 | 172:11 | 89:22 90:7 | **involved** |
| 159:14 | 120:13 | 182:14 | **interpret** | 16:8 21:19 |
| 161:6 | 133:7 | 185:17 | 275:6 | 21:21 |
| 341:3,5 | 155:20 | 186:11,14 | 371:7,8 | 25:12 26:1 |
| 374:11 | 165:17,21 | 186:23 | **interpre...** | 48:6,20,22 |
| **interested** | 329:20,23 | 188:5 | 239:4 | 51:5 56:4 |
| 27:13 | **internally** | 195:11 | 257:21 | 61:5 73:2 |
| 56:19 | 58:21 | 196:18 | **interpreted** | 75:6 78:2 |
| 143:13 | **internat...** | 201:25 | 257:14 | 80:14,16 |
| **interesting** | 44:4,20,22 | 361:22 | **interrog...** | 80:16 |
| 116:3 | 44:24 | 362:3 | 6:25 192:3 | 81:24 82:3 |
| 192:7,17 | 338:25 | 363:12 | **interrog...** | 82:6,7 |
| 192:18 | **internet** | **interning** | 189:14 | 88:10 |
| 317:25 | 50:6 51:8 | 196:19 | 190:18 | 97:24 |
| **interest...** | 51:10,23 | **interns** 49:9 | 231:16 | 100:3 |
| 122:11 | 52:5,11 | 49:15 | 242:15 | 101:22 |
| 355:17 | 58:9,11 | 50:13,16 | 243:7 | 102:5,9 |
| **interfer...** | 59:7,9 | 50:18,25 | 353:2 | 104:15 |
| 45:2 83:2 | 61:7 62:24 | 51:4,12,13 | **interrupt** | 113:6 |
| 83:3 | 63:19 | 51:14,16 | 13:6 178:1 | 114:9 |
| 122:14 | 64:19 | 51:16,18 | **intersti...** | 117:20 |
| 286:22 | 67:14,21 | 51:19 52:4 | 228:5 | 134:18,19 |
| **interloc...** | 70:15,21 | 57:3 58:4 | **interval** | 134:21,22 |
| 310:5 | 72:16 | 58:20 75:9 | 125:19 | 153:15 |
| **intermit...** | 76:15 78:5 | 84:2,3,11 | **intervening** | 168:3 |
| 31:13 | 78:9 79:14 | 84:20,22 | 89:2 | 169:18 |
| **intern** | 79:17,21 | 84:23 86:7 | **interview** | 170:19 |
| 166:19 | 79:25 80:2 | 86:7,14,20 | 345:23 | 172:10,17 |
| 167:9,10 | 80:17,21 | 86:25 87:4 | 346:1,3,5 | 180:12,14 |
| 167:12 | 80:24 81:6 | 94:25 98:6 | **introduce** | 184:10 |
| 168:22 | 81:13,17 | 170:5,9,10 | 10:18 | 188:20,21 |
| 169:3,4,7 | 82:2 83:24 | 170:12,18 | **introduc...** | 189:13 |
| 169:21,23 | 85:6 89:4 | 171:15 | 126:16 | 192:1 |
| 170:24 | 89:7,11,20 | 184:23 | **invaded** | 207:7 |
| 171:2,7,8 | 101:14,21 | 185:13,20 | 325:7 | 211:18 |
| 172:16 | 101:25 | 187:5,22 | **investig...** | 215:9 |
| 179:19 | 104:18,22 | 197:23 | 366:19 | 232:24 |
| 182:11,13 | 110:18 | 198:2 | **investig...** | 245:13 |
| 182:21 | 112:6,11 | 368:15 | 255:10 | 256:4 |
| 183:14,20 | 117:6 | 371:23 | **invitation** | 280:1 |
| 185:22,25 | 119:9,20 | **interns'** | 153:8 | 312:8,11 |
| 186:5 | 129:11 | 57:25 | **invite** 55:12 | 318:19 |
| 187:11,13 | 142:25 | 58:14 | 55:17 | 327:16 |
| 188:2,8 | 147:18,21 | **internship** | **invites** | 334:17 |

| | | | | |
|---|---|---|---|---|
| 360:10,24 | 269:19 | **job** 1:21 | 332:12 | 262:13 |
| 361:25 | 270:16 | 11:20,25 | **joint** 207:16 | **jumping** 73:5 |
| 362:4,11 | 272:9 | 12:8  15:19 | 233:8 | 203:25 |
| 362:19 | 290:7 | 18:10 | 253:21 | 204:5 |
| 366:13 | **items** 30:18 | 115:24 | 254:2 | 261:24 |
| **involvement** | 30:22,23 | 116:1 | 307:22 | 269:4 |
| 49:6,8 | 34:5 | 314:7 | **Joseph** 1:9 | **June** 5:17 |
| 192:19 | 268:15 | 342:23,24 | 4:20  10:7 | 55:4  86:10 |
| 371:18 | 272:21 | 347:16 | 11:18 | 86:17 |
| **involves** | _____ | **jobs** 340:19 | 375:8 | 195:14,19 |
| 59:21 | **J** | **John** 3:3 | 376:3 | 196:13 |
| 81:12 | **J** 1:14  2:1 | 10:19 | **Josh** 3:6 | 345:24 |
| **involving** | 5:2,8  6:3 | 14:12 | 10:24 | 352:21 |
| 156:20 | 7:3  8:3 | 34:18  54:7 | **JOSHUA** 3:17 | **June/July** |
| 278:1 | 9:3  11:12 | 82:23 | 375:5,10 | 86:12 |
| **Iowa** 214:13 | 375:12 | 125:10 | **Joshua.e...** | **junior** 10:7 |
| 214:17 | 376:2 | 138:23 | 3:23 | 43:16 |
| **Iranian-...** | 377:5,20 | 139:2,3 | **Josiah** 42:22 | **jurisdic...** |
| 285:22 | **Jack** 9:24 | 145:7 | 166:18,24 | 17:6 |
| **Isabella** | 188:7 | 167:19 | 179:18 | 114:18 |
| 185:25 | 195:3,5 | 179:19 | 184:14 | 220:16,17 |
| 186:3 | 196:17,20 | 184:14 | 191:24 | 221:11,22 |
| **ISAC** 59:14 | 197:18 | 185:10 | 192:12 | 222:1,5,13 |
| 59:16,21 | 198:1 | 191:25 | 276:20 | **jurisdic...** |
| 60:14,15 | **January** 1:15 | 192:12 | **journalist** | 57:11,17 |
| 60:16 | 10:3  12:2 | 194:21 | 280:10 | 57:22  87:4 |
| 110:15 | 19:20 | 198:12,22 | **JR** 1:9  375:8 | **justice** 3:19 |
| **issue** 208:15 | 71:16 | 212:17,17 | 376:3 | 11:1,6 |
| 289:2,22 | 88:24 | 213:7 | **July** 86:17 | 322:1 |
| 324:13 | 195:19 | 227:19 | 98:25 | 324:11,13 |
| **issued** 222:1 | 196:13 | 231:19 | 104:25 | 324:15 |
| 310:9 | 307:11 | 232:1 | 269:6 | 375:5 |
| **issues** 21:22 | 330:13 | 242:19,24 | 271:24 | |
| 34:21  71:4 | 374:14 | 249:16 | 272:6 | _____ |
| 130:24 | 375:3,12 | 252:7 | 274:18 | **K** |
| 163:8 | 376:4 | 253:7 | **jump** 89:14 | **K-theore...** |
| 234:24 | **JCDC** 307:17 | 271:10 | 122:2 | 240:5 |
| 235:24 | 307:19 | 276:20 | 125:1 | **Kaitlin** |
| 237:14 | 309:9 | 302:7 | 126:11 | 141:13 |
| 239:1 | **Jefferson** | 318:21 | 144:6 | **Kansas** |
| 310:21 | 3:11 | 334:20 | 146:20 | 375:21 |
| 315:14 | **Jen** 191:19 | 371:11 | 162:5 | **Kate** 72:21 |
| 317:14 | 304:9 | **John.sau...** | 173:2,8 | 87:25 |
| 318:6,15 | 307:2 | 3:13 | 271:9 | 360:4 |
| 324:9 | 311:23 | **join** 38:18 | 288:15 | **keep** 180:18 |
| 342:8 | **Jessica** 4:3 | **joined** 10:21 | 293:14 | 185:8 |
| 349:12 | 11:3 | 35:11 | 297:7 | 271:15 |
| **item** 247:13 | **Jessica....** | 36:15 | **jumped** 33:12 | 290:3 |
| 258:24 | 4:9 | 76:14,15 | 160:13 | **Kent** 3:5 |
| | | | | 35:9 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| **kept** 165:15 | 99:19,24 | 242:1 | 42:6 43:1 | 104:20,21 |
| 190:6 | 100:8,10 | 246:6 | 46:13 47:7 | 104:22,24 |
| **key** 16:13 | 104:8 | 255:25 | 47:10,10 | 105:5,20 |
| 18:11,15 | 105:2,12 | 256:2,25 | 47:16 49:2 | 105:21,24 |
| 189:9 | 112:9 | 257:3 | 53:6 55:22 | 106:2,9,10 |
| 263:3 | 114:13,20 | 258:8 | 55:24 56:6 | 106:15 |
| 276:15,25 | 114:23 | 260:21 | 56:10 57:7 | 107:6,18 |
| 355:11 | 115:3 | 263:14 | 58:23 | 107:21 |
| **kicked** 127:1 | 116:22 | 266:3 | 59:11,18 | 108:5,6,14 |
| **Kim** 28:6 | 119:24 | 267:16 | 59:18 | 108:17,23 |
| 304:14,18 | 120:6,7 | 270:10,14 | 61:11 62:1 | 109:25 |
| 305:2,4 | 121:21,22 | 270:14 | 65:20,22 | 110:20,21 |
| 353:18 | 124:14 | 271:5 | 65:23 | 111:5,10 |
| 360:22 | 128:9 | 289:18 | 66:20,21 | 111:20 |
| **kind** 13:7 | 132:13 | 290:18 | 68:16 69:1 | 113:10,15 |
| 14:14 16:7 | 133:14 | 293:4 | 69:3,4 | 113:21 |
| 18:5 20:7 | 136:4,17 | 315:23 | 70:19 | 114:4 |
| 24:25 25:8 | 136:24,24 | 317:22 | 71:12,24 | 115:7,22 |
| 26:14,16 | 138:10 | 318:5,9 | 72:6 73:20 | 116:24 |
| 27:2,5 | 141:6,6,7 | 323:16 | 73:23 | 117:8 |
| 29:2 30:14 | 141:9 | 324:2 | 74:13 | 118:13,18 |
| 31:18 | 145:1,5 | 337:3 | 75:15 | 119:14 |
| 37:22 | 147:21,22 | 344:21 | 76:19,21 | 120:24 |
| 39:25 | 148:3,17 | 347:11 | 76:24 77:4 | 121:1,3,6 |
| 40:20 | 149:13 | 356:6,8 | 77:15 79:6 | 121:14,16 |
| 41:12,25 | 150:15 | 357:20,24 | 79:9 80:1 | 121:21,24 |
| 42:2,11 | 152:1,5,13 | 358:18 | 80:7,12 | 121:25 |
| 43:21 | 153:13 | **kinds** 24:9 | 81:4,5,15 | 122:24 |
| 44:11,17 | 154:9 | 49:11 | 81:15,16 | 123:2,6,22 |
| 45:1 46:3 | 157:1 | 215:19 | 81:25 82:3 | 123:25 |
| 47:4,15,20 | 161:18 | 368:22 | 82:18 | 124:17,19 |
| 47:22 52:8 | 164:24 | **Klein** 345:24 | 83:18 | 124:21,21 |
| 52:15,19 | 174:12 | **knew** 100:17 | 84:16 85:3 | 127:11,11 |
| 52:25 | 175:16 | 117:2,6,9 | 85:16,24 | 127:16 |
| 55:16 56:3 | 178:5,7 | 176:24 | 85:25 86:5 | 128:3,19 |
| 57:4 58:1 | 182:4 | 192:18 | 86:11 88:3 | 128:21 |
| 58:22 | 187:2,13 | 295:22 | 88:5,10,17 | 129:6,10 |
| 60:10 62:8 | 187:25 | 313:19 | 89:1,12,25 | 129:14,22 |
| 63:14 | 207:4 | **know** 13:2 | 90:2,3,4 | 132:13 |
| 64:22,25 | 211:11,18 | 16:23 22:8 | 91:21 | 133:9 |
| 65:25 66:2 | 217:3 | 22:21 25:5 | 94:11,16 | 134:12,22 |
| 66:4 67:12 | 225:13 | 27:4,9 | 95:5 98:13 | 137:5,8 |
| 68:17 71:2 | 234:15,25 | 28:18 29:1 | 98:15 99:4 | 140:19 |
| 71:3 77:16 | 235:3 | 29:6 30:19 | 99:6,17,23 | 142:11,14 |
| 80:1 81:4 | 237:6 | 31:1,23 | 100:17 | 142:20,22 |
| 81:10,22 | 239:3,13 | 32:12,12 | 101:5 | 142:22 |
| 82:1,13 | 240:1,2,15 | 32:25 34:5 | 102:17 | 143:9,11 |
| 84:13 88:9 | 240:17 | 39:3,4,24 | 103:17 | 144:1,1,2 |
| 94:12 98:3 | 241:12 | 41:10 42:4 | 104:8,10 | 145:12,12 |

| | | | | |
|---|---|---|---|---|
| 145:19,21 | 203:8 | 273:12,16 | 327:1,5,19 | 76:23 77:8 |
| 146:9,14 | 204:14 | 274:13,17 | 327:23 | 77:8,9,17 |
| 146:18 | 205:2,3 | 274:20,21 | 328:20 | 77:17,20 |
| 148:16,20 | 207:22 | 274:22,23 | 330:1 | 78:4,9 |
| 148:22 | 208:22 | 275:1,16 | 332:3 | 191:20 |
| 149:19 | 209:20 | 275:25 | 333:12,15 | 284:14 |
| 152:17 | 210:7,18 | 278:14,16 | 334:10,13 | 285:2,13 |
| 154:16 | 210:25 | 279:20,22 | 336:19,25 | 285:18 |
| 158:1,3,22 | 211:2,2,11 | 280:1,4,6 | 337:5,9,18 | 286:5 |
| 159:3 | 211:13 | 280:22 | 337:21 | 288:20 |
| 162:11 | 212:9 | 282:7,11 | 338:4,6,10 | 290:1,6 |
| 163:6,25 | 213:14 | 283:2,19 | 339:10 | 291:11 |
| 164:9,9 | 215:20 | 283:23 | 340:22 | 340:5 |
| 165:25 | 216:7,11 | 285:2,8 | 342:8,9 | **Krebs'** 290:4 |
| 168:5,18 | 216:14 | 286:10 | 343:12 | **Krebs's** |
| 168:25,25 | 220:3 | 287:12 | 350:19,25 | 77:24 |
| 169:13,18 | 221:6 | 291:7 | 351:12,14 | 289:23 |
| 169:21 | 224:13,14 | 293:19,21 | 351:17 | **Krebs-St...** |
| 172:13 | 225:12,14 | 293:21 | 352:5,9,10 | 197:12 |
| 173:24 | 225:18 | 294:1,13 | 352:12 | **Krebs/St...** |
| 174:19 | 228:23 | 294:18 | 353:17 | 76:23 |
| 176:8,16 | 231:9,12 | 295:1,22 | 354:1,1,18 | **Kris** 308:6 |
| 176:18 | 234:24 | 296:24 | 356:2,5,10 | 308:10,11 |
| 177:8,13 | 235:6 | 298:14 | 356:14,23 | **Kristi** 228:7 |
| 177:15,16 | 236:20 | 301:1 | 356:23 | |
| 177:22 | 237:10,20 | 307:21 | 358:13,16 | **L** |
| 178:13,17 | 238:1,2,3 | 308:10 | 359:1,21 | **L** 3:20 375:6 |
| 179:3,8 | 238:5,18 | 309:1,3,12 | 359:24 | **L-i-m-b-i-k** |
| 180:3 | 238:18,20 | 309:15,17 | 360:7,15 | 155:4 |
| 181:19 | 239:2,17 | 310:10,11 | 360:16,18 | **L-o-w-a-r-y** |
| 182:3,4,23 | 240:5,10 | 310:14,15 | 360:21 | 183:18 |
| 182:23,24 | 240:19 | 310:17,18 | 362:10,12 | **Lab** 47:9 |
| 183:24 | 241:13 | 310:24 | 362:12 | 48:22 |
| 185:22 | 244:24 | 311:6,12 | 363:18,21 | **label** 200:15 |
| 187:7,12 | 248:3 | 311:16 | 363:22,23 | 224:17 |
| 187:19,25 | 252:16 | 312:18 | 363:25 | 283:14 |
| 188:6,6,9 | 256:20 | 313:6,13 | 364:3,6 | **labeled** |
| 188:14 | 258:3 | 313:18,19 | 365:5,7,24 | 226:19 |
| 190:2,3,23 | 259:3,4,16 | 314:6,8 | 367:8,15 | 231:5 |
| 192:16 | 260:7 | 315:12 | 367:20,24 | 292:9,14 |
| 193:6,14 | 261:21 | 316:1,22 | 368:1 | 292:16 |
| 193:25 | 262:10,13 | 317:1,6 | 369:10 | **labeling** |
| 194:8,17 | 263:19,20 | 318:8,13 | **knowledge** | 288:6 |
| 194:18 | 264:7,9 | 318:16,19 | 56:7 61:9 | **lack** 80:4 |
| 197:18 | 269:2 | 321:15,16 | 146:19 | 122:21 |
| 198:7,8,11 | 270:24 | 321:23 | 172:12 | 145:11 |
| 198:14 | 271:8 | 324:19 | 324:14 | 149:17 |
| 201:3,6 | 272:14,24 | 326:19,20 | **known** 274:10 | 178:15 |
| 202:12,17 | 273:4,5,9 | 326:23 | **Krebs** 76:7,8 | 195:25 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 197:1 | 297:24 | 274:9 | 84:14 | 5:15 |
| 214:22,23 | 298:23 | 275:7,13 | 141:7 | **like-minded** |
| 244:20 | 299:16,21 | 275:16,20 | **let's** 34:22 | 97:8 |
| 245:7 | 300:11 | **Leaked** 9:5 | 69:9 83:7 | **liking** |
| 304:21 | 350:4 | 319:21 | 146:20 | 346:25 |
| 313:7 | 351:12 | **leaker** | 151:3 | **Limbik** 155:2 |
| 333:19 | **law** 95:13 | 274:11 | 172:23 | 155:10 |
| 350:23 | 245:24 | **learn** 46:3 | 173:2,3,8 | **limit** 127:7 |
| 353:24 | 250:4,16 | 47:20 | 183:4 | 231:6,9 |
| 354:13 | 250:21,22 | **learned** | 197:25 | **limited** |
| 355:5 | 251:2 | 54:13 71:3 | 198:9 | 36:10 |
| 356:22 | 320:21 | 84:14 | 217:2 | 232:10 |
| 359:22 | 366:5,8,14 | 141:7 | 231:15 | **line** 85:14 |
| 361:13 | **lawyer** 92:9 | 144:10 | 243:25 | 103:8 |
| 368:20,21 | **lead** 16:2 | 247:19 | 271:9,19 | 148:22 |
| **lacks** 204:24 | 18:7,10 | **learning** | 276:1 | 202:5,7 |
| 329:11 | 19:9 21:7 | 143:18 | 277:19 | 250:8,12 |
| **landed** 164:7 | 28:17 29:2 | **leave** 18:23 | 285:15 | 250:16,22 |
| **large** 305:20 | 36:1 42:12 | 19:17 | 288:15 | 255:22 |
| 305:24 | 42:23 | 28:12 65:6 | 289:6 | 273:15 |
| **larger** 14:19 | 43:24 54:5 | 88:21 | 291:15 | 285:7 |
| 181:15 | 78:7 | 299:3 | 294:4 | 299:15 |
| **lasted** | 117:16 | 331:1 | 301:23 | 376:5,9,13 |
| 325:12 | 118:8 | 336:12 | 309:23 | 376:17,21 |
| **late** 22:7,16 | 325:11 | **led** 326:21 | 330:4 | **lines** 43:17 |
| 22:25 70:9 | 332:25 | **left** 43:24 | 362:20 | 58:8 86:25 |
| 104:25 | 342:15 | 76:13 | **letter** 167:5 | 133:12 |
| 292:5 | 370:9,18 | 88:23 | **letting** | 207:11 |
| 293:5 | **lead-up** 38:8 | 167:23 | 294:1 | 216:24 |
| 367:5 | 298:2 | 197:19 | **level** 37:22 | 235:2 |
| **lateral** | **leader** | 319:7 | 45:1 56:5 | 286:15,18 |
| 144:17,17 | 118:10 | **legal** 4:20 | 153:22 | 327:6 |
| **Laura** 29:16 | **leadership** | 10:15,16 | 154:10 | 333:25 |
| 30:6,10,10 | 97:5 | 92:5,9,12 | 182:16 | 340:15 |
| 236:17 | 317:23 | 92:18,20 | 258:23 | 365:5 |
| 248:13 | 326:12 | 93:11 | 259:17 | **link** 285:9 |
| 270:20 | 371:1 | 94:15 | 318:12 | 320:23 |
| **Lauren** 18:6 | **leading** 33:4 | 95:21 96:3 | 333:8,13 | **LinkedIn** |
| 28:12 | **leads** 43:20 | 368:22 | **levels** | 9:24 38:17 |
| 75:18 | 44:4 311:9 | 370:22 | 146:23 | 195:6 |
| 191:21 | **leak** 236:7 | 371:16 | **Lexitas** | 196:3,5,9 |
| 255:19 | 236:14,19 | 375:1,24 | 10:16 | 196:11 |
| 260:4 | 237:4,14 | **lengthy** | 375:1,24 | 233:25 |
| 269:13 | 246:1,13 | 139:13 | **liaisons** | **links** 96:23 |
| 294:8 | 247:7,21 | 343:24 | 264:16 | 146:1 |
| 295:2,7,17 | 250:18,24 | **lesson** | 267:18 | **list** 72:11 |
| 296:6,15 | 251:13,22 | 144:10 | **lie** 348:7 | 87:25 |
| 296:22 | 254:17,23 | **lessons** | 349:2 | 165:19 |
| 297:1,10 | 255:2,11 | 54:13 | **Lightning** | 232:11 |

| | | | | |
|---|---|---|---|---|
| 233:8,21 | 265:25 | 87:10 | 168:3 | 279:4 |
| 243:2 | 282:2 | 141:2 | 170:20 | 304:3 |
| 264:3 | 292:22 | 177:2 | 175:23 | 316:15 |
| 276:17 | 299:17 | 187:25 | 179:13 | 322:24 |
| 285:22 | 316:2 | 276:4 | 180:13 | 324:8 |
| 338:9 | 317:6 | 314:8 | 212:21 | 340:17 |
| 339:3 | 337:19 | 319:4 | 213:13 | 342:21 |
| 342:14 | 341:8 | 349:20 | 224:10 | 348:21 |
| 354:2 | **live** 198:23 | 372:4 | 232:18,23 | 349:6 |
| 361:3,4,9 | 344:14 | **longer** 18:20 | 291:4 | **lots** 342:6 |
| 361:16,20 | **loading** | 167:22 | 316:13 | 349:12 |
| **listed** 43:23 | 345:17 | **look** 14:7 | **looks** 82:24 | **Louisiana** |
| 110:11,24 | **local** 24:5 | 58:9 69:9 | 161:12,17 | 1:2 10:11 |
| 111:2,5,6 | 54:20,23 | 88:1 90:13 | 162:8 | **love** 307:16 |
| 112:22 | 57:18 | 90:22 | 173:18 | **low** 57:8,9 |
| 180:12 | 58:23 60:1 | 122:9 | 175:25 | **Lowary** |
| 191:19 | 60:23 61:3 | 156:17,25 | 176:5 | 183:16 |
| 192:14 | 79:3 85:1 | 157:1,16 | 195:10,18 | 184:10,22 |
| 233:6 | 91:19 | 162:19 | 197:11 | 185:15 |
| 274:14 | 93:16 96:6 | 173:12 | 198:19 | 192:1 |
| 280:5 | 96:16 | 175:22 | 199:22 | 193:1,22 |
| **listen** 13:10 | 101:10 | 186:2 | 214:17 | 196:25 |
| **listen-only** | 106:11 | 190:22 | 218:22 | 197:7 |
| 28:6,7,11 | 148:5 | 206:14 | 223:2 | 276:21 |
| **lists** 15:16 | 149:16 | 215:1 | 269:16 | **lower** 292:22 |
| 105:12 | 150:20 | 217:3 | 280:19 | 361:3 |
| 192:11 | 164:9,14 | 219:20 | 282:10,13 | **Luke** 28:16 |
| 280:8 | 204:17 | 222:8 | 283:24 | 28:22 29:1 |
| **literally** | 207:7 | 253:24 | 294:7 | |
| 160:13 | 215:10 | 273:23 | 295:3 | **M** |
| **Litigation** | 222:1 | 274:20 | 297:18 | **ma'am** 372:23 |
| 4:5 | 265:20 | 276:15 | **loom** 8:10 | 373:2 |
| **little** 14:11 | 266:7 | 278:2 | **loop** 107:9 | **machines** |
| 14:15 | 296:17 | 281:4 | **looping** | 292:23 |
| 22:19 | 298:9 | 296:5 | 203:9 | **mad** 281:10 |
| 26:22 73:7 | 299:12,21 | 309:23 | 308:6 | **Magnets** 5:12 |
| 83:1 101:6 | 300:20 | 312:22 | **loose** 293:20 | **main** 21:17 |
| 102:12 | 369:3 | 335:2 | **loss** 341:24 | 236:5,5 |
| 130:20 | **location** | 338:24 | 342:4,9 | 279:18 |
| 143:4 | 263:23 | 339:2 | **lot** 40:6 | 306:17 |
| 146:18 | 281:9 | 340:1 | 45:4 125:7 | **mainstream** |
| 172:25 | **Locust** | 359:20 | 159:23 | 357:9,16 |
| 181:7 | 375:21 | **looked** | 162:12 | 359:3 |
| 182:18 | **logged** 190:7 | 314:20 | 177:21 | **maintain** |
| 197:10 | **logistics** | 340:2 | 235:16 | 146:22 |
| 220:5 | 30:17 | **looking** 15:7 | 239:14 | 170:6 |
| 235:17 | **long** 5:9 | 41:2 59:2 | 257:2 | **maintained** |
| 240:14 | 11:19,24 | 141:14 | 260:15 | 120:9 |
| 263:11 | 27:17 46:3 | 162:14 | 261:19 | **major** 105:13 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 110:7 | 26:10 | 98:9 113:9 | 313:11,13 | 300:19 |
| 111:6,12 | 90:18 91:6 | 117:4 | 314:12 | 301:6,9 |
| 126:24 | 94:22 95:6 | 120:2,18 | 317:20 | 303:20,20 |
| **majority** | 278:22 | 129:17 | **Matt's** 85:20 | 305:9,13 |
| 18:12 | **mandates** | 130:23 | **matter** 10:6 | 312:23 |
| 131:3 | 47:16 | 142:24 | 92:23 | 313:5 |
| 180:21 | **manner** 318:9 | 191:20 | 361:5,16 | 316:9 |
| 254:6 | **March** 71:16 | 217:23 | **matters** 4:5 | 318:10 |
| **making** 49:19 | 336:12 | 218:3,5,19 | 344:18 | 320:10 |
| 56:1 85:7 | **marked** 13:25 | 219:5 | 350:15,22 | 323:7 |
| 92:21 | 69:7 | 237:19 | 351:14 | 325:9,10 |
| 122:18 | 138:20 | 251:7,12 | 356:20 | 325:11 |
| 128:5 | 156:14 | 253:16 | **Matthew** 4:11 | 326:2,5 |
| 144:9 | 190:13 | 271:25 | 283:10 | 330:16,21 |
| 173:16 | 194:25 | 283:9 | **matthew....** | 331:5,16 |
| 176:24 | 212:25 | 284:5 | 4:15 | 331:19,23 |
| 178:8,21 | 227:9 | 305:5 | **mature** 46:2 | 337:4,15 |
| 211:21 | 243:22 | 313:11,13 | **May/June** | 338:22 |
| 238:18 | 249:22 | 314:12 | 53:19 | 342:23 |
| 269:10 | 252:6,21 | 317:21 | **MD** 20:17,21 | 343:19,19 |
| 286:7,25 | 277:16 | 318:13 | 354:8,15 | 343:22 |
| 301:2 | 301:20 | **Masterson's** | 354:20,22 | 344:22 |
| 340:18 | 306:18 | 129:19 | 355:10,19 | 346:16 |
| **mal-info...** | 309:20 | **material** | 357:2,7 | 347:23 |
| 5:20 8:15 | 319:15 | 246:22 | **MDM** 11:21 | 348:12 |
| 15:17,23 | 328:4 | **maternity** | 16:5,14 | 353:3,7,10 |
| 20:1,14 | 335:12 | 18:23 | 19:10 | 353:12,13 |
| 143:15,19 | 345:20 | 19:17 | 20:12 | 355:24 |
| 145:20 | 349:15 | 331:1 | 39:15 42:9 | 356:12 |
| 340:11 | 352:13 | **Matt** 11:4 | 44:9,16 | 357:20,21 |
| 341:18 | 359:13 | 75:10,17 | 45:6 56:20 | 357:25 |
| 343:6,10 | 363:6 | 80:13 | 72:24 | 358:6,11 |
| **manage** 16:1 | 364:11 | 81:17 | 75:20 | 358:24 |
| 16:2 43:4 | 365:10 | 82:18 | 118:8 | 359:1 |
| 64:25 | 368:3 | 83:16 | 143:21 | 366:3,23 |
| **managed** | 369:17 | 88:14,23 | 153:25 | 367:12 |
| 18:13 | **Marybeth** | 98:14 | 154:4 | 371:20 |
| 364:7 | 71:10 | 120:2,12 | 166:9,12 | **MDM-related** |
| **management** | **Masterson** | 130:3,7,22 | 171:18,20 | 329:15 |
| 11:22 | 75:11 | 142:24 | 188:11 | **MDM-spec...** |
| 308:25 | 80:13,23 | 191:20 | 189:7 | 113:12 |
| 309:7 | 81:17 | 217:23,25 | 233:8,8 | **mean** 17:2 |
| 327:15 | 82:19 | 218:3,5,19 | 274:2 | 34:2 48:11 |
| 343:17 | 83:16 84:4 | 219:5 | 278:25 | 49:3 55:13 |
| **manages** | 85:17 | 237:19 | 285:24 | 62:8 66:13 |
| 42:25 | 86:13 | 271:25,25 | 295:5,11 | 69:3 71:25 |
| **managing** | 87:22 | 283:9 | 295:20 | 74:5,15 |
| 262:21 | 88:14,18 | 284:5 | 297:3,5 | 82:12 |
| **mandate** | 88:21 89:9 | 305:5 | 298:4 | 103:20 |

BRIAN J. SCULLY 1/12/2023

| | | | | |
|---|---|---|---|---|
| 105:4,25 | **meaning** | 94:13 | 241:6 | 358:12 |
| 108:4 | 287:3 | 105:14 | 242:16 | 359:3,4 |
| 114:2 | 298:9 | 107:20 | 244:18 | 363:16 |
| 115:11,21 | 313:1 | 108:2 | 245:4,16 | 364:21 |
| 121:19 | **means** 118:13 | 109:13,13 | 246:23 | 365:2 |
| 131:17 | 273:17 | 114:24 | 247:25 | 366:2,5,25 |
| 133:17,18 | 275:14,25 | 118:25 | 254:18 | **medium** 359:9 |
| 135:24 | 285:8 | 120:22 | 256:14 | **meet** 133:2 |
| 143:12 | 289:14 | 122:18 | 257:17 | 239:25 |
| 148:15 | 298:14 | 123:5,17 | 258:2,5,12 | 241:10 |
| 149:8 | 309:2 | 126:19 | 258:14 | **meeting** 21:6 |
| 151:21 | 350:14 | 127:5,20 | 259:4 | 24:13 |
| 152:16 | 351:14,17 | 129:12 | 261:4 | 30:17 |
| 160:17 | **meant** 133:4 | 131:20 | 263:24 | 31:14 |
| 165:6 | 142:10,11 | 132:2,12 | 265:17,22 | 36:21,22 |
| 169:4 | 218:9 | 132:17 | 266:9 | 37:2,4 |
| 174:8 | 223:22 | 134:4 | 268:23 | 38:23 |
| 175:2,9 | 232:16 | 138:11 | 269:1 | 47:20 |
| 176:8,16 | 241:1 | 144:4,24 | 274:5,8 | 75:16 |
| 182:2 | 257:15 | 146:3 | 277:9 | 78:10 |
| 183:3 | 334:24 | 151:8 | 278:7,13 | 85:21 86:2 |
| 189:5 | 351:13 | 152:18 | 286:20,24 | 86:13,17 |
| 193:24 | 354:19 | 153:15 | 286:24 | 86:23 |
| 197:17 | 358:16 | 157:10 | 290:13,25 | 87:10 99:1 |
| 204:14 | **measures** | 163:19 | 291:25 | 99:4,7,12 |
| 207:3 | 355:13 | 164:11,13 | 293:5,6 | 99:17 |
| 211:7 | **mechanism** | 165:4 | 296:16 | 100:22 |
| 227:4,23 | 61:16 | 168:7 | 300:18 | 103:8 |
| 227:24 | **meddling** | 172:5,18 | 305:18 | 117:15,17 |
| 231:8 | 175:1 | 180:16 | 314:19,21 | 140:1 |
| 236:4 | **media** 17:4,8 | 189:25 | 317:13 | 233:7,12 |
| 248:6 | 17:10,13 | 192:2 | 318:4 | 233:13,17 |
| 257:5 | 17:16 | 193:3,9 | 326:14,24 | 243:15,18 |
| 270:8 | 18:16,21 | 200:21 | 327:3,9,18 | 248:25 |
| 273:7,22 | 20:8 21:1 | 208:23 | 333:16 | 253:25 |
| 274:7 | 21:5,23 | 210:12 | 339:10,23 | 254:7 |
| 275:1 | 23:21 24:2 | 214:3 | 340:4,6,8 | 256:3 |
| 280:22 | 24:5,10,13 | 220:4,6,25 | 341:14,16 | 259:20 |
| 281:17 | 27:1,23 | 221:20 | 347:1 | 262:9 |
| 287:8 | 38:13 39:2 | 222:17 | 350:15,21 | 269:14,17 |
| 293:18 | 39:8 57:21 | 223:20 | 350:21 | 269:18 |
| 298:13 | 58:17 59:3 | 228:9 | 351:3,7,13 | 270:1,3,21 |
| 309:3 | 64:2 66:5 | 229:4,8 | 351:24 | 270:25 |
| 316:17 | 66:17 67:1 | 232:8,25 | 352:11 | 272:5 |
| 326:16 | 67:18 68:8 | 233:18,22 | 356:19,19 | 274:18 |
| 338:9 | 73:12,12 | 233:24,25 | 357:8,9,10 | 275:3 |
| 341:12 | 73:18 | 235:13 | 357:15,16 | 309:13,16 |
| 358:7,13 | 78:21 79:6 | 237:3 | 357:20,21 | 337:25 |
| 366:21 | 93:21 94:7 | 239:11,21 | 357:23 | **meetings** |

BRIAN J. SCULLY 1/12/2023

| | | | | |
|---|---|---|---|---|
| 21:4,9,10 | 241:4,5,15 | **memory's** | 257:1 | 322:19 |
| 24:19,23 | 241:18 | 22:19 | 268:21 | 336:13 |
| 25:7,12,15 | 242:16 | 101:6 | 282:14 | **mid-October** |
| 25:16 26:8 | 243:8,18 | **mention** | 283:25 | 174:21 |
| 28:1,15,23 | 243:21 | 20:11 | 303:21,23 | **middle** 110:8 |
| 29:11,15 | 244:11,17 | 38:11 | 314:23 | 157:17 |
| 29:23 | 245:3,14 | 39:23,25 | 316:3,4 | 162:20 |
| 30:15 31:6 | 245:14,19 | 103:11 | 320:12 | 208:7 |
| 31:10 | 245:24 | 110:5 | 322:14 | 278:3 |
| 32:10,13 | 246:8,14 | 131:25 | 336:22 | **midnight** |
| 32:16 33:4 | 246:18 | 159:4 | 349:10 | 175:13 |
| 33:8,20,24 | 247:2,11 | 247:24 | 353:18 | 226:18 |
| 34:6,10 | 247:20,25 | 263:9 | 355:21 | 292:1 |
| 35:16 36:3 | 248:15,24 | **mentioned** | 356:3 | 293:16 |
| 36:12,18 | 249:11 | 24:12 | 362:16 | **midterms** |
| 36:19,20 | 251:13,23 | 29:10 39:1 | 367:10 | 8:10 298:2 |
| 37:7,15 | 254:4,24 | 40:23 46:9 | **merely** | **mimic** 134:11 |
| 38:7,14 | 255:3 | 48:1,18 | 220:21 | **mind** 99:8 |
| 39:9 45:21 | 256:2 | 56:18 59:5 | **merging** | 180:19 |
| 45:23 | 258:2,10 | 59:6 60:11 | 110:2 | 346:15 |
| 50:11 | 260:5 | 63:7,16 | **messages** | 357:8 |
| 52:10 | 269:6 | 72:15 | 8:22 | 359:2 |
| 74:23 | 272:19,21 | 74:23 | 106:12 | **mine** 71:9 |
| 77:21 78:1 | 306:2,9 | 80:13 | 120:15 | 83:22 |
| 78:10,16 | 310:23 | 85:13,23 | 178:4 | 180:22 |
| 102:9,12 | 317:16 | 99:19 | 309:25 | **minority** |
| 102:14,15 | 323:2 | 100:5 | **met** 141:6 | 122:19 |
| 102:22 | 353:23 | 101:17 | 238:4 | **minute** 99:9 |
| 103:12 | 361:6,11 | 102:8 | 239:25 | 99:15 |
| 112:1 | **member** | 111:20 | 338:4,10 | 107:13 |
| 117:14,19 | 183:22 | 112:16,23 | **META** 297:25 | 156:17 |
| 127:19,22 | 325:10 | 117:4 | **method** | 292:24 |
| 128:14,20 | **members** 49:2 | 131:4,19 | 290:15 | 345:17 |
| 128:22 | 97:25 | 139:5,6 | **methodology** | **minutes** |
| 132:4,6,21 | 166:12 | 140:5,23 | 154:18,20 | 87:13 |
| 132:23 | 180:7 | 153:24 | **meting** | 175:25 |
| 133:7,8,12 | 263:9 | 157:4 | 295:15 | 206:2 |
| 178:25 | 264:24 | 159:1 | **Michigan** | 224:16 |
| 216:18 | 279:16 | 170:3 | 46:25 47:1 | 226:15,18 |
| 232:8,25 | 326:7 | 183:11 | **Microchips** | 271:16 |
| 233:4,6 | 359:20,25 | 184:5 | 5:12 | 274:14 |
| 234:21 | **Memes** 5:11 | 187:14 | **Microsoft** | 276:3 |
| 236:3,8,23 | **memories** | 189:21 | 38:16,18 | 282:5 |
| 237:15 | 247:13 | 190:5 | 38:19 | 292:4 |
| 238:5,6,7 | **memory** | 193:14 | 88:22,25 | 318:25 |
| 238:10,13 | 230:22,23 | 198:3 | 233:24 | 319:6,7 |
| 238:15 | 247:14 | 240:13 | 297:11,25 | 349:23 |
| 239:9,20 | 255:1 | 251:3 | **mid** 22:20 | **mis** 5:20 |
| 240:6,9 | 258:24 | 252:2 | 23:9,10 | 8:14 15:17 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 19:25 | 127:8 | 293:5 | **mix** 333:5 | **MOLA_DEF...** |
| 20:14,18 | 130:17,24 | 310:21 | **mixed** 64:9 | 8:6 |
| 40:13 | 132:14,19 | 311:3 | **Mm-hmm** 23:18 | **MOLA_DEF...** |
| 42:11,12 | 137:21 | 317:14 | 110:13 | 7:11 |
| 42:14,16 | 138:6,11 | 318:6 | 139:15 | **MOLA_DEF...** |
| 57:20 | 141:22 | 322:6 | 163:1,12 | 7:13 |
| 58:24 | 142:3,15 | 323:11 | 166:25 | **MOLA_DEF...** |
| 90:19 | 144:3 | 324:12 | 274:16 | 7:9 |
| 91:17  92:3 | 149:15,23 | 335:20,25 | 300:16 | **MOLA_DEF...** |
| 92:15  93:1 | 150:17 | 336:5,16 | 308:24 | 9:14 |
| 93:20 | 151:7 | 338:1,8 | 330:17 | **MOLA_DEF...** |
| 94:12,23 | 157:3,6,9 | 357:14 | 350:7 | 9:19 |
| 95:7  96:10 | 158:6,14 | 363:13,20 | 365:15 | **MOLA_DEF...** |
| 96:18 | 160:7 | 364:8,21 | 370:7 | 8:23 |
| 126:22 | 161:9,21 | 365:2,16 | **Mm-mmm** 111:1 | **moment** |
| 127:12 | 164:10 | **misleading** | **MO** 375:21 | 352:18 |
| 143:14,18 | 165:3 | 283:15 | **mode** 28:6,7 | **Monday** 373:4 |
| 145:20 | 169:19 | 336:2 | 28:11 | **money** 61:16 |
| 147:3 | 173:13,24 | **misreading** | 263:21 | 62:3,3 |
| 151:23 | 178:23 | 160:14 | **model** 154:12 | 110:20,22 |
| 314:14 | 179:4,15 | **missed** 233:9 | **modeling** | 342:18 |
| 315:3 | 198:20 | **missing** | 155:9 | **monitor** |
| 340:11 | 200:3 | 282:19 | **moderated** | 57:20  59:3 |
| 341:17 | 201:2,23 | **mission** | 17:24 | 90:18  91:6 |
| 343:6,9 | 208:10 | 26:19  29:7 | **moderation** | 91:17  92:2 |
| 347:21 | 210:25 | 62:25  63:2 | 17:18 | 92:15  93:1 |
| 348:20 | 213:17 | 153:25 | 40:15 | 94:23  95:6 |
| 354:9,15 | 215:9 | 309:5 | 123:7 | 151:14 |
| 363:15 | 216:12 | 316:12 | 128:10,16 | 174:10 |
| 370:14 | 217:9 | 338:23 | 260:10,13 | 175:17 |
| 371:2 | 225:1,17 | 343:2 | 260:23 | 325:20 |
| **mischara...** | 226:8 | **Missouri** 1:5 | 284:7 | **monitored** |
| 23:6  97:21 | 228:17 | 3:7,11 | 289:15 | 108:2 |
| 345:7 | 229:10 | 10:6,20,23 | 296:3 | **monitoring** |
| **misinfor...** | 232:9 | 35:10 | **modulation** | 57:15 |
| 5:10  8:4 | 233:1 | 375:8 | 23:22,22 | 144:24 |
| 8:13  21:22 | 235:12,13 | 376:3 | 289:9 | 150:16 |
| 39:7  41:18 | 235:25 | **mistake** | **MOLA_DEF...** | 176:6,9 |
| 41:20  42:1 | 238:8 | 232:4 | 7:18 | 178:22 |
| 42:8  43:10 | 239:1,10 | **mistaken** | **MOLA_DEF...** | 201:2 |
| 45:17  77:3 | 239:22 | 232:16 | 6:5 | 225:15 |
| 91:6 | 243:10 | **misunder...** | **MOLA_DEF...** | 287:19 |
| 106:23 | 260:24 | 229:5 | 6:21 | 326:8 |
| 114:24 | 261:5 | **mitigate** | **MOLA_DEF...** | 348:5 |
| 118:3 | 264:23 | 16:15 | 6:14 | **Monkey** 324:6 |
| 120:8,10 | 265:5,16 | 343:20 | **MOLA_DEF...** | **Monroe** 1:3 |
| 124:24 | 268:4 | 358:3,23 | 9:21 | 10:11 |
| 125:23 | 278:12 | **Mitigation** | **MOLA_DEF...** | **month** 31:24 |
| 126:4 | 287:21 | 106:19 | 8:21 | 248:24 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| monthly | multitude | 259:5 | 33:3,14 | 264:19 |
| 24:17 | 340:20,24 | 286:7,11 | 34:9 35:6 | 300:25 |
| 31:21 32:3 | mystery | 286:17,19 | 50:8,9 | 319:9 |
| 233:14 | 337:19 | 287:4,9,13 | 71:8,9,15 | 348:7 |
| 234:3,5,9 | | 288:3,21 | 71:17,18 | 349:2 |
| 234:16 | **N** | 291:11 | 101:16,17 | 372:15 |
| 255:21 | N 3:1 4:1,1 | 323:23 | 101:19 | needed |
| 256:3 | 4:1 5:1,1 | 340:8 | 103:13 | 127:12 |
| 310:23 | 6:1,1 7:1 | narratives | 135:25 | 174:10 |
| months 19:8 | 7:1 8:1,1 | 109:22 | 136:8,14 | 215:14 |
| 24:11 | 9:1,1 10:1 | 110:2 | 178:11 | 216:9 |
| 196:6,10 | NAFTA 263:7 | 144:3 | 244:12 | 220:6 |
| 196:13 | name 10:14 | 151:14 | 248:19 | needle 81:5 |
| 248:24 | 10:15 | 152:1,8 | 332:8 | 81:10 |
| 325:12 | 11:17 | 155:7 | 336:7 | needs 9:8 |
| morning | 32:20 | 256:8,14 | 342:1,5 | 57:4 |
| 173:18 | 35:20 36:1 | 256:21 | NATO 44:25 | 295:10 |
| 175:5 | 54:6,7 | 257:18 | 45:12 | 328:12,24 |
| 176:1 | 76:22 | 258:4,13 | nature 69:4 | 329:23 |
| 282:4 | 103:2,3 | 259:2 | 113:18 | nefarious |
| 286:5 | 166:20 | 323:17 | 139:9 | 229:6 |
| mouth 69:6 | 167:5,6,10 | 324:8 | 145:13 | NEI 264:18 |
| move 179:5 | 167:11 | NASED 103:13 | 169:17 | neither |
| 291:15 | 171:7,10 | 103:23 | 203:23 | 374:9 |
| 301:23 | 172:16,19 | 104:2,23 | 262:23 | Nelson 4:3 |
| moved 64:3 | 172:21 | 107:25 | 322:2 | 11:3 |
| 336:25 | 186:1 | 112:1 | 325:3 | network |
| moving | 187:18 | 263:23 | 327:5 | 220:4 |
| 172:25 | 194:4 | 264:6,22 | 371:25 | never 27:18 |
| 208:3 | 279:25 | 267:6 | NAV 263:7 | 133:4 |
| 282:1 | 376:2,3 | 268:25 | near 292:1 | 240:7 |
| 308:15 | 377:11 | NASOS 103:23 | 293:16 | 242:3 |
| MS-ISAC | named 179:20 | NASS 103:25 | necessarily | new 41:5 |
| 60:19 | 182:12 | 104:3,23 | 36:18 58:5 | 44:9 |
| multi-state | 285:21 | 107:25 | 62:18 | 114:19 |
| 59:14 | names 29:3 | 112:1 | 65:13 | 142:14 |
| multilat... | 30:9 50:17 | 263:24 | 76:11 | 188:19 |
| 45:1,12 | 50:20 | 264:6,22 | 100:7 | 286:15 |
| multiple | 100:5 | 267:6 | 149:11 | 290:7,8 |
| 59:22 | 167:18 | 268:25 | 151:24 | 299:12,22 |
| 201:10 | 188:24 | Nathaniel | 348:25 | 301:24 |
| 230:20 | 189:2,4,6 | 310:18 | necessary | 305:4 |
| 245:14 | 189:9 | 312:6 | 258:22 | 312:22 |
| 247:10 | 192:6 | nation's | 368:23 | 313:5 |
| 359:10 | 276:18,23 | 337:25 | 377:9 | 336:21 |
| 363:16 | narrative | 338:7 | need 34:19 | news 109:13 |
| multistate | 5:12 56:16 | national | 100:17 | 124:16 |
| 60:14 61:2 | 154:4 | 11:22 16:5 | 199:21 | 302:3 |
| 61:6 | 219:10,16 | 20:5 33:1 | 227:22 | 334:12 |

BRIAN J. SCULLY 1/12/2023

| | | | | |
|---|---|---|---|---|
| 357:10 | noticed | 272:9 | 153:6 | 6:23 156:8 |
| 358:6 | 228:16 | 331:9 | 161:25 | 215:3 |
| 359:3 | notifica... | 340:12 | 178:14,15 | Observatory |
| night 175:1 | 178:5 | numbers | 179:21 | 51:8,10,23 |
| 175:8,10 | notified | 162:11 | 194:14 | 52:6 58:9 |
| 175:12 | 165:13 | 211:1,5,11 | 195:25 | 58:12 |
| 179:7 | notifies | numeral | 196:4 | 70:15,21 |
| 291:20,21 | 177:3 | 141:16 | 197:1 | 72:16 |
| 292:6 | notify 67:16 | numerical | 198:5 | 76:15 78:5 |
| 293:6 | 68:7 129:4 | 14:5 | 201:4 | 78:9 80:18 |
| nights | 140:18 | | 202:15 | 80:21,24 |
| 173:25 | 160:8 | ——— O ——— | 204:12,20 | 81:7,13,18 |
| No's 252:5 | notifying | O 4:1 5:1 | 204:23 | 82:2 83:24 |
| nod 12:24 | 179:24 | 6:1 7:1 | 212:2 | 85:6 89:4 |
| non-profit | notion 94:20 | 8:1 9:1 | 214:22 | 89:7,11,21 |
| 47:7 59:13 | 216:15 | 10:1 | 226:25 | 102:1 |
| 148:3 | novels 43:3 | Oberes | 228:18 | 104:18,23 |
| nongover... | 330:10 | 157:18,25 | 230:19 | 117:6 |
| 267:11 | November | object | 231:10 | 142:25 |
| nongover... | 213:15,17 | 152:20 | 244:20 | 169:12,16 |
| 45:9,13 | 214:13 | 155:25 | 245:7 | 169:20 |
| normal 26:10 | 217:8 | objection | 258:6 | 170:1,16 |
| 130:6 | 223:4 | 23:2,5 | 273:1 | 172:8,12 |
| 201:7 | 226:6 | 53:1 71:20 | 283:21 | 182:14 |
| 306:9,10 | 284:24 | 72:3 77:10 | 294:16,23 | 185:17 |
| normally | 286:4 | 77:19 80:4 | 294:24 | 186:11,14 |
| 41:25 | 291:18 | 87:16 92:4 | 298:11 | 186:24 |
| 165:18 | 332:12 | 92:17 93:2 | 304:20,21 | 188:5 |
| 178:3 | 334:11 | 93:22 | 310:12,13 | 195:11 |
| 270:2 | 335:15 | 94:14 | 313:7 | 196:18 |
| 333:8 | 336:5 | 95:20,24 | 316:19 | 361:23 |
| Northwest | 337:5 | 96:25 | 324:24 | 362:4 |
| 3:20 375:6 | NRMC 9:22 | 97:20 | 333:18 | observer |
| notarized | NSA 286:13 | 98:11 | 339:13,19 | 332:24 |
| 375:19 | 286:16 | 108:20 | 341:6 | obtain 323:9 |
| notary 2:8 | NSD 33:7 | 111:8 | 344:25 | obtained |
| 374:21 | number 10:8 | 115:9,15 | 345:6 | 246:22 |
| 375:18 | 113:22 | 115:20 | 350:23 | obviously |
| 377:23 | 160:22 | 116:17 | 351:15 | 12:19 16:1 |
| notation | 162:5,22 | 118:16 | 352:7 | 16:19,23 |
| 165:14 | 171:3,7,8 | 122:21 | 353:24 | 17:23 |
| note 178:3 | 172:16 | 126:5 | 354:12 | 28:11 |
| 201:14 | 190:2 | 130:19 | 355:5 | 38:15 42:6 |
| 287:22 | 201:16 | 142:6 | 356:21 | 51:12 |
| noted 337:24 | 210:20 | 145:3,6,10 | 358:14 | 77:24 87:7 |
| notes 109:18 | 214:20,20 | 146:16 | 359:5,22 | 87:21 88:9 |
| notice | 214:21 | 148:8 | 360:19 | 107:24 |
| 202:24 | 217:16 | 149:17 | 361:13 | 120:12 |
| 203:4 | 256:10 | 150:18 | objections | 175:11 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 182:17 | 245:6,16 | 332:11 | 261:1,3,14 | 15:18 19:7 |
| 184:7 | 248:17 | 334:2 | 261:19,23 | 23:13 |
| 194:10 | 251:18,21 | 360:17 | 265:21 | 34:12 |
| 210:15 | 332:11,19 | 366:12 | 266:1,7 | 44:19 |
| 244:25 | **office** 3:7 | **officially** | 295:11,20 | 61:11 |
| 245:12 | 4:12 10:20 | 89:12 | 297:2,5,12 | 87:23 |
| 264:4 | 10:23 11:6 | 336:11 | 297:23 | 88:12 |
| 275:16 | 12:10 26:2 | **officials** | 298:2,9,10 | 89:24 91:2 |
| 282:17 | 34:8 35:11 | 8:9 16:25 | 298:14,17 | 97:4 |
| 298:13 | 44:24 | 24:1,1,5 | 299:2,12 | 100:19 |
| 324:19 | 204:7 | 45:15 | 299:22 | 103:20 |
| 351:1 | 205:12 | 52:12 | 300:20,24 | 104:1,6 |
| 359:10 | 206:6,15 | 54:18,21 | 301:8 | 109:10 |
| 367:25 | 206:19 | 54:24 57:4 | 305:8 | 114:7 |
| **occur** 24:16 | 214:13,18 | 57:8,19 | 306:15 | 115:18 |
| 53:18 55:3 | 215:25 | 58:24 60:1 | 320:17 | 119:5 |
| 70:6,8 | 216:1 | 60:23 61:2 | 321:1 | 125:15,16 |
| 86:3 87:10 | 225:2 | 61:5 62:20 | 340:18 | 125:17 |
| 246:2 | 244:11 | 63:12,24 | 363:14 | 126:13 |
| 268:18 | 311:15,19 | 64:1 73:10 | 364:20 | 130:15 |
| 334:3 | 312:10 | 73:16 75:3 | 365:1 | 131:1,25 |
| **occurred** | 328:11 | 78:20 79:4 | 366:17 | 135:6 |
| 78:4 | 333:9,11 | 79:10,12 | 372:2 | 141:20,20 |
| 104:11 | 334:1 | 80:2 83:23 | **oh** 19:21 | 144:14 |
| 138:14 | 375:20 | 87:1 96:7 | 29:24 89:1 | 145:23 |
| 200:19 | **officer** | 96:17 | 89:5 | 146:12,21 |
| 246:8 | 280:12 | 100:18,21 | 131:19,25 | 146:22 |
| 264:11 | 289:9 | 101:11 | 161:14 | 150:14 |
| 309:16 | 374:3 | 102:10 | 162:17 | 151:11 |
| 327:23 | **officers** | 106:1,4,11 | 163:15 | 158:2,17 |
| **occurring** | 216:5,5 | 106:13 | 167:19 | 160:21 |
| 235:18 | **offices** 57:8 | 110:5 | 183:4 | 162:10 |
| 246:7 | 57:13 | 119:23 | 192:8 | 167:8,16 |
| 279:7 | 90:16 | 120:4,5,15 | 225:25 | 167:24 |
| **October** 5:21 | 215:23 | 123:2 | 227:21 | 170:13,23 |
| 24:18 | **official** | 131:7,24 | 232:3,16 | 171:2 |
| 156:19 | 17:4 49:1 | 148:6 | 241:3 | 173:7,11 |
| 157:2 | 50:7 67:10 | 149:16 | 249:7 | 173:12 |
| 168:4 | 68:14 | 164:5,21 | 253:4 | 183:3 |
| 173:14 | 163:22,24 | 204:18 | 271:2 | 184:25 |
| 198:19 | 164:9,14 | 207:8 | 282:22 | 186:5 |
| 199:6 | 165:9,11 | 215:10,12 | 297:16 | 189:13 |
| 208:21 | 180:1 | 215:24 | 302:7 | 190:17 |
| 246:4 | 220:7,23 | 216:4,8,21 | 318:24 | 191:1,6 |
| **odd** 29:8 | 221:4,18 | 216:22 | 363:5 | 194:24,24 |
| **ODNI** 25:23 | 221:21,24 | 223:5 | **OIG** 9:8 | 198:15 |
| 34:8 35:15 | 251:17 | 242:11 | 328:16 | 205:15 |
| 36:2 37:14 | 281:17 | 260:11,16 | **okay** 13:9 | 206:4 |
| 117:20 | 331:19 | 260:20 | 14:24 15:7 | 207:20 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 208:6,20 | 299:20,23 | 300:19 | 148:23 | 159:18 |
| 209:14 | 302:11 | 301:16 | 318:8 | 304:5 |
| 210:19 | 306:23 | **one-pagers** | **operated** | **ops** 119:24 |
| 211:9 | 308:5 | 295:23 | 53:6 | 267:10,15 |
| 212:23 | 309:24 | 296:2,20 | 155:16 | 267:21,24 |
| 214:7,11 | 320:1 | 298:1 | 368:24 | **option** 85:23 |
| 215:7 | 328:10 | **ones** 38:20 | **operating** | **options** |
| 216:11 | 329:5 | 114:2,3 | 56:11 | 216:10 |
| 217:2 | 330:8 | 121:17 | 95:16 | **oral** 135:7 |
| 219:25 | 332:9 | 168:3 | 148:20 | **order** 14:5 |
| 223:17 | 335:4,8 | 185:3 | **operation** | **ordinary** |
| 224:5 | 344:11 | 189:17,20 | 247:21 | 178:12 |
| 225:14 | 345:18 | 228:16 | 262:17,24 | **Oregon** |
| 226:3,5 | 348:11 | 233:9 | 264:22 | 201:23 |
| 227:16 | 349:24 | 234:16 | 265:9,10 | **org** 15:8,12 |
| 231:25 | 354:6 | 268:17 | 267:5 | 18:2 22:12 |
| 232:17,21 | 355:9 | 279:19 | **operational** | 42:21 |
| 232:22 | 356:25 | 306:17 | 98:20,24 | 130:8,13 |
| 243:4 | 359:17 | 348:22 | 155:18 | 166:17 |
| 244:4 | 368:7 | **ongoing** | 340:13 | 167:4 |
| 245:23 | 369:12 | 364:24 | 342:13,16 | 171:21 |
| 246:17 | 373:3 | 366:18 | **operations** | **organiza...** |
| 247:18 | **omitted** | **online** 94:8 | 39:22 | 49:24 62:2 |
| 248:8 | 215:5 | 114:23 | 96:11,19 | 147:23 |
| 250:2,14 | **On-call** | 150:16 | 179:8 | 148:19 |
| 251:10 | 107:14 | 151:15,23 | 236:7,7,14 | 369:9 |
| 253:7 | **once** 81:22 | 155:8 | 236:19 | **organiza...** |
| 255:17 | 203:16 | 158:14 | 237:4 | 9:23 130:4 |
| 256:7,12 | 204:1 | 195:6 | 246:1,13 | **organiza...** |
| 259:25 | 213:20 | 228:17 | 247:7 | 16:21 |
| 262:16 | 299:10 | 305:24 | 250:18,24 | 45:10,12 |
| 265:8 | 333:7 | 336:2 | 251:13,22 | 47:14,16 |
| 269:11,18 | **one's** 35:20 | 354:3 | 254:17,23 | 48:5,13,17 |
| 271:22 | 35:20,21 | 357:11 | 255:2,12 | 50:2 73:11 |
| 275:21 | **one-on-one** | 359:4 | 264:15 | 148:19 |
| 280:7,16 | 241:11 | 364:19 | 278:23 | 262:21 |
| 281:14 | **one-page** | 365:1 | 279:15 | 323:5,6 |
| 283:2 | 253:10 | **oops** 346:8 | 309:1,8 | **original** |
| 284:22 | 260:9,13 | **open** 16:22 | 312:5 | 375:13 |
| 285:25 | 260:21,22 | 164:2 | 340:14 | **originated** |
| 286:2,2 | **one-pager** | 281:9 | 342:20 | 90:8 94:25 |
| 287:2,17 | 260:6 | 325:21 | **opportun...** | 123:8 |
| 290:24 | 294:21 | 326:8,9 | 317:8 | 171:15 |
| 294:6 | 296:8,11 | **opening** | **opportunity** | 184:23 |
| 295:2,17 | 296:15 | 345:18 | 13:19 | 185:13,21 |
| 296:14 | 297:1,12 | **operate** | 234:18 | 198:2 |
| 297:19,22 | 297:22 | 52:25 53:4 | **opposed** | 228:14 |
| 297:23 | 298:16 | 61:23 62:7 | 91:18 | 371:23 |
| 298:21 | 299:2,7,21 | 110:19 | 92:24 | **originates** |

BRIAN J. SCULLY 1/12/2023

| | | | | |
|---|---|---|---|---|
| 95:12 | **P** | 173:3,4,5 | 285:25 | 322:7 |
| 329:3 | **P** 3:1,1  4:1 | 173:9,10 | 288:16,17 | **panels** |
| **originating** | 4:1  10:1 | 173:11,20 | 289:19 | 187:14 |
| 83:19 | 11:21 | 191:3,6,8 | 290:6,8,13 | **paragraph** |
| **originator** | **P-a-t-t-o-n** | 195:9 | 290:19,21 | 110:4 |
| 201:13 | 32:21 | 197:11 | 291:1,8,12 | 147:2 |
| **origins** | **p.m** 157:2 | 198:9,11 | 291:15,16 | 150:2 |
| 321:24 | 173:19 | 198:16 | 293:8 | 192:6,8 |
| 322:7 | 175:25 | 199:16 | 294:4 | 244:8,9 |
| **outcome** | 177:3 | 201:17,22 | 295:2 | 245:23 |
| 374:12 | 183:9 | 203:14,15 | 296:6 | 304:7 |
| **outcomes** | 209:9,12 | 204:1,1,5 | 297:8,9 | 305:15,16 |
| 27:22 | 276:7 | 204:7 | 298:19 | 330:10 |
| 354:25 | 291:20 | 205:8,10 | 299:14,15 | 332:10 |
| **Outline** 9:5 | 292:5,23 | 206:9 | 305:15 | 335:23 |
| 319:21 | 292:24 | 208:3,4 | 307:6 | 336:15 |
| **outlining** | 362:23 | 213:14 | 310:6 | 337:23 |
| 321:6 | 363:1 | 214:7,9 | 313:10 | 348:3 |
| **outputs** | 372:12 | 216:25 | 315:17 | 361:15 |
| 109:8 | 373:9 | 222:20 | 320:2,15 | **parentheses** |
| **outreach** | **P.O** 3:10 | 224:21,22 | 321:3,3 | 281:10 |
| 18:13,15 | **PA** 217:10 | 225:5,11 | 330:2,4,5 | **parody** |
| 272:1 | **page** 5:2,8 | 225:16,20 | 332:10 | 205:24 |
| **outside** | 6:3  7:3 | 225:25 | 346:7 | 206:6 |
| 134:3 | 8:3  9:3 | 226:2,4 | 348:2 | 281:10 |
| 151:6 | 15:16 | 227:17 | 354:4 | **part** 11:22 |
| 353:22 | 72:11  73:7 | 228:2 | 356:25 | 20:2  51:23 |
| **overall** 96:8 | 87:23 | 231:22,25 | 364:16 | 61:8  63:25 |
| **overlapped** | 89:14,16 | 232:3,13 | 365:17 | 75:16,20 |
| 195:22 | 90:21 | 242:20,25 | 366:1 | 78:23 |
| **overseas** | 98:19 | 247:19 | 368:11,12 | 104:7 |
| 41:11 | 105:8,11 | 249:5,25 | 370:1,2 | 106:7 |
| 278:20,23 | 108:12,24 | 251:15,15 | 375:14,18 | 110:22 |
| 279:5,8,9 | 109:2,11 | 251:16 | 375:20 | 115:25 |
| 280:19 | 110:9 | 260:3 | 376:5,9,13 | 128:7,21 |
| **oversee** | 117:22 | 261:25 | 376:17,21 | 147:22 |
| 25:15 | 122:2,5,10 | 262:4 | **pages** 1:22 | 149:10 |
| **overseeing** | 125:2,5,14 | 269:4,5,9 | 160:22 | 169:4,5,7 |
| 59:21 | 126:11,12 | 271:9,20 | 206:5 | 169:24 |
| **oversees** | 141:15 | 271:21,24 | 208:4 | 181:14 |
| 59:13 | 144:6,7 | 278:2 | 269:11 | 189:7 |
| **overtaxing** | 145:23 | 280:7,14 | 276:15 | 192:3 |
| 211:15 | 146:20 | 280:15 | 285:15 | 193:3,5 |
| **overview** | 149:22 | 281:2,4,6 | 291:16 | 201:7 |
| 136:17 | 156:25 | 281:15 | 332:9 | 203:12 |
| **overwhelmed** | 157:17 | 282:3 | **paid** 203:2 | 264:21 |
| 342:17,18 | 160:22,25 | 283:7,7 | **pandemic** | 281:20 |
| **overwhel...** | 162:7,9,11 | 284:9,19 | 264:20 | 290:5 |
| 65:1 | 162:16,20 | 284:21 | 321:25 | 311:1 |

BRIAN J. SCULLY 1/12/2023

| | | | | |
|---|---|---|---|---|
| 322:24 | 181:19,21 | 369:10,13 | 364:18 | 291:17 |
| 323:21 | 334:13 | **partners** | **pass** 106:5 | 294:5 |
| 325:9 | **particip...** | 16:20 | 123:16 | 297:8 |
| 338:23 | 126:18 | 18:11,12 | 163:8 | 298:20 |
| 342:23 | 354:23 | 21:5 37:1 | 265:5 | 299:16 |
| 347:15 | **particular** | 44:5,20,22 | **passed** 56:23 | 330:5,6,8 |
| 362:1 | 11:25 | 46:11 | 162:24 | 370:2 |
| **part-** 330:19 | 23:20 | 109:17 | **passing** | **peers** 244:13 |
| **part-time** | 30:18,22 | 110:1 | 141:10 | **penalty** |
| 170:6,12 | 31:9 42:17 | 204:9 | **patient** | 377:12 |
| 184:3 | 65:8 74:10 | 224:2 | 280:12 | **pending** |
| **participant** | 85:22 | 228:8 | **Patton** 32:17 | 255:9 |
| 354:2 | 112:15 | 235:2 | 32:17 | **Pennsylv...** |
| **particip...** | 136:5 | 264:6,12 | **pay** 196:21 | 218:18 |
| 72:11,12 | 152:7 | 267:11 | 197:20 | 219:19,22 |
| 128:23 | 154:14 | 298:1 | **PDF** 89:16,17 | 223:4,13 |
| **participate** | 159:24 | 369:2,6 | 122:6 | 223:21,25 |
| 55:12,16 | 179:11 | **partnership** | 125:5,12 | **people** 18:4 |
| 131:11 | 209:1 | 5:16 48:7 | 125:14 | 29:19 30:5 |
| 132:7 | 211:16 | 48:10,25 | 126:12 | 36:2 46:24 |
| 323:1 | 258:14,16 | 49:2,7 | 144:8 | 54:8 56:4 |
| 333:5,6,13 | 287:9 | 51:6,20,24 | 160:25 | 103:4 |
| 353:5,10 | 341:20 | 52:2,24 | 162:7,9,11 | 112:10,13 |
| **particip...** | 346:8,9,11 | 58:1,6 | 173:6,10 | 112:14 |
| 25:22 26:3 | 359:9,12 | 68:5 69:21 | 198:11,16 | 114:1,5 |
| 28:2,23 | **particul...** | 73:3,8 | 201:18 | 115:6,12 |
| 29:14 33:7 | 33:23 | 75:8 78:16 | 203:14 | 134:18,19 |
| 34:10 | 52:16 | 79:8 80:3 | 204:8 | 140:18 |
| 35:15 | 56:19 82:6 | 83:20 | 205:10 | 152:18 |
| 38:14,17 | 174:17 | 84:25 85:8 | 206:10,11 | 154:23 |
| 38:23 39:3 | 239:24 | 88:6,13,19 | 208:5 | 159:23 |
| 55:14 71:5 | 256:19 | 89:19 | 214:10 | 168:2 |
| 77:21 | 266:11 | 97:19 | 217:1 | 174:8,22 |
| 78:10 | 279:5 | 99:21,24 | 222:21 | 175:16 |
| 132:3 | 286:5 | 100:9,11 | 224:22 | 176:5 |
| 238:12 | 289:22 | 107:19 | 225:25 | 178:12 |
| 274:17 | 299:3 | 132:11 | 226:4 | 179:3 |
| 309:18 | 344:17 | 134:20 | 227:17 | 181:22 |
| 326:4 | 366:10 | 141:4 | 228:3 | 189:7 |
| 333:2 | 369:2 | 147:8 | 251:16 | 191:11,24 |
| 353:21 | **parties** | 168:21 | 261:25 | 192:9,11 |
| **particip...** | 10:18 | 181:12,15 | 269:5,9 | 192:19 |
| 28:2 | 374:10 | 202:14 | 271:21 | 193:1,18 |
| 310:22 | **partisan** | 228:8 | 280:15 | 193:19,21 |
| 353:9,14 | 357:10 | 230:2 | 281:4,6 | 201:1 |
| 353:16,23 | 358:12 | 280:2 | 283:8 | 255:20 |
| **particip...** | 359:3 | 360:11 | 284:19,21 | 259:3 |
| 33:4 39:5 | **partner** 96:7 | 362:2,9 | 286:1 | 263:25 |
| 76:4 | 97:8 | **parts** 30:5 | 288:16 | 285:22 |

BRIAN J. SCULLY 1/12/2023

| | | | | |
|---|---|---|---|---|
| 291:2 | 152:2 | 344:16,23 | 10:21 | 17:16 |
| 297:11 | **person** 20:7 | **picked** 372:2 | 35:11 | 18:17,21 |
| 316:8 | 53:25 | **piece** 220:13 | **plan** 8:8 9:6 | 20:8 21:1 |
| 324:7 | 117:18 | **Pierce** | 32:9 | 21:6,23 |
| 331:4 | 129:24 | 183:15 | 269:23 | 23:21 24:2 |
| 336:21 | 171:3 | 184:10,20 | **planned** | 24:6,11,14 |
| 337:4,15 | 219:11 | 184:22 | 136:17 | 25:1,9 |
| 342:17,19 | 264:3 | 191:25 | 307:12 | 27:1 38:13 |
| 344:14 | **person's** | 193:1,22 | **planning** | 39:8 40:2 |
| 347:20 | 36:1 103:1 | 196:25 | 295:19 | 40:4,7,8 |
| 348:4,21 | **personally** | 197:7 | **plans** 54:12 | 40:10,15 |
| 349:4,8 | 236:15 | 276:21 | 54:15 | 40:24 |
| 358:2,18 | 238:3 | **pilighting** | 319:22 | 41:19,21 |
| 358:21 | 245:13 | 151:21,22 | 321:8 | 42:6 58:18 |
| 360:2 | **perspective** | **pilot** 151:18 | 367:21 | 59:4 64:5 |
| 364:23 | 24:25 | 152:15,19 | **platform** | 64:14,22 |
| **perceive** | 39:15 | 153:14 | 21:11 64:3 | 65:1,12 |
| 96:23 | 42:10 | 154:7 | 65:16 | 66:5 67:1 |
| **percent** | 45:25 46:7 | 155:6,11 | 66:17 | 67:7 73:12 |
| 26:18,24 | 47:13 | 155:17 | 67:10,18 | 73:18 |
| 61:15 | 234:22 | **piloted** | 68:9 | 78:22 79:7 |
| 122:12,13 | 257:25 | 151:16 | 120:25 | 94:8 |
| 137:18 | 315:12,15 | **piloting** | 126:17 | 105:14 |
| 149:12 | 323:2 | 151:13,22 | 133:2,9 | 106:8 |
| 169:16 | 325:25 | 152:2,5 | 134:4 | 107:2,10 |
| **percentage** | 326:1 | **pilots** | 146:4 | 119:1,11 |
| 123:3 | 367:12 | 155:14 | 160:9 | 120:22 |
| **perform** | **pertained** | **pinging** | 161:11,22 | 121:7,8 |
| 265:4 | 30:15 | 176:20 | 163:2 | 122:18 |
| **performed** | **phone** 99:9 | **Pinterest** | 164:2,7,12 | 123:6,17 |
| 63:16 | 99:12,15 | 233:24 | 165:4,7,16 | 126:24 |
| **performing** | 227:5 | **place** 56:25 | 168:7,16 | 127:5 |
| 161:19 | 293:12 | 135:25 | 179:14 | 128:2,25 |
| **performs** | **phones** | 232:8 | 180:8,9 | 129:12 |
| 63:20 | 174:10 | 291:5 | 200:21 | 131:21 |
| **period** 20:24 | 175:17 | 314:12 | 208:24 | 132:2,12 |
| 21:20 | 176:6 | 325:17 | 220:25 | 132:17 |
| 28:23 | **phonetic** | 334:4 | 222:17 | 133:5,16 |
| 31:11 41:7 | 47:14 | 351:24 | 223:21 | 138:12 |
| 162:3 | 71:10 | 356:12 | 241:11,22 | 158:5 |
| 180:22 | 141:13 | 363:15 | 278:7 | 160:1,3,5 |
| 246:2 | **phrase** 56:22 | **placed** | 287:14 | 160:8,10 |
| **periodic...** | **physical** | 128:13,15 | 300:18 | 160:14,17 |
| 30:4 162:4 | 235:18,23 | **places** | 306:14 | 161:10,23 |
| 164:15 | 263:23 | 220:11 | 352:11 | 163:19 |
| 165:20 | 270:12 | **plaintiff** | 357:20 | 164:19 |
| **perjury** | 342:12 | 3:2 10:7 | **platform's** | 168:11 |
| 377:12 | **pick** 32:4 | **plaintiffs** | 261:6 | 172:5,18 |
| **perking** | 174:6 | 1:7 6:23 | **platforms** | 178:21,21 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 179:7,10 | 315:2 | **plus** 193:1 | 284:7 | 62:16 |
| 179:14,24 | 316:14 | 331:1,11 | 289:15 | 153:8 |
| 180:16 | 317:4,7,13 | **POCs** 350:14 | 296:3 | 242:2 |
| 184:9,11 | 317:23 | **point** 34:1 | **policy** 12:9 | 367:25 |
| 189:25 | 318:4,11 | 58:4 64:21 | 126:13 | 368:1 |
| 192:2 | 326:14,24 | 101:9,23 | 129:4,12 | **positions** |
| 193:3,10 | 327:9,18 | 102:4 | 133:2 | 337:8 |
| 203:13 | 340:6 | 103:3 | 134:1,4 | **possibility** |
| 210:13 | 348:5,6,8 | 174:7 | 200:16 | 99:20 |
| 212:9 | 348:24 | 233:12 | 209:21 | **possible** |
| 214:3 | 349:2 | 234:21 | 261:6 | 22:18 39:6 |
| 220:6,18 | 350:21 | 255:25 | 283:12,13 | 75:14 95:9 |
| 221:20 | 351:25 | 262:8 | 311:16 | 98:10 |
| 229:9 | 356:19 | 275:18 | 312:4,9,11 | 129:6 |
| 232:9,25 | 357:9 | 290:18,19 | 312:12 | 133:18 |
| 233:18,22 | 363:17 | 290:21 | 332:8 | 147:19 |
| 235:6,9,13 | 364:21 | 291:19 | 338:25 | 190:12 |
| 237:3 | 365:2 | 323:20 | **political** | 193:20 |
| 239:21 | 366:5,25 | 326:11 | 130:4,7,12 | 198:1 |
| 240:1,7 | **play** 59:1 | 327:2 | 246:20 | 200:22 |
| 241:8 | 62:18,22 | 337:3 | 313:14,17 | 208:11 |
| 242:16 | 64:11 | 354:7 | 364:15 | 210:18 |
| 244:19 | 100:13 | 355:9 | **Politics** 8:7 | 216:10,20 |
| 245:4,16 | 152:13 | 358:1 | **poll** 217:10 | 224:14 |
| 246:24 | 168:9 | **points** 128:5 | 219:1,11 | 236:11,16 |
| 248:1 | 316:13 | 135:19 | 235:20 | 237:8,17 |
| 254:18 | 317:8,10 | 234:14 | 339:11 | 237:21 |
| 256:4 | 317:18 | 243:3 | **popped** | 246:10 |
| 257:18 | **played** | 272:22 | 234:15 | 248:10 |
| 258:2,12 | 149:20 | 350:14 | **popping** 27:3 | 254:16 |
| 260:17,19 | 182:5 | 351:2 | 302:2 | 255:10,11 |
| 261:11,21 | 345:10 | **police** 9:6 | **portal** 8:5 | 256:18 |
| 262:18 | **playing** 19:4 | 305:17 | 320:20 | 257:24 |
| 263:24 | 63:6 | 319:22 | 363:13,20 | 290:5 |
| 265:2,6,17 | 311:24 | **policies** | 364:8,20 | 294:20 |
| 265:22,24 | **please** 10:17 | 17:18,21 | 365:1 | 295:5 |
| 266:9 | 11:9,16 | 21:13 | **portfolio** | 358:10 |
| 268:19,24 | 130:21 | 23:22 | 20:3 | **possibly** |
| 269:1 | 145:7 | 121:23 | **portion** | 22:25 |
| 277:9 | 167:10 | 123:7 | 129:1 | 23:13 |
| 290:13,15 | 185:9 | 126:17,25 | 257:23 | 231:14 |
| 290:25 | 205:22 | 127:7,11 | 270:5 | **post** 198:23 |
| 291:3,4,7 | 218:23 | 127:14,25 | **portions** | 225:4 |
| 292:1 | 308:7 | 128:10,17 | 70:1 | 227:20 |
| 293:6,15 | 339:18,22 | 132:13,18 | **portrayed** | 228:9 |
| 296:16 | 361:16 | 133:5,10 | 229:6 | 229:4,9,13 |
| 305:19,24 | 375:11,15 | 133:17 | **poses** 56:16 | 339:25 |
| 306:4,6 | 375:19 | 177:5 | **position** | 344:15 |
| 314:13,21 | **plura** 250:5 | 260:23 | 35:21,21 | 345:11 |

BRIAN J. SCULLY  1/12/2023

post-ele... 227:6
posted 82:19
116:9
280:20
290:14
posting
159:25
274:6,8
291:3
340:7
postings
259:4
341:14,16
posts 82:14
82:14,18
114:17
115:7
116:13
225:15
339:9,23
340:1,3
potential
17:13 25:3
27:15 38:2
155:7
312:22
313:4,5
342:15,21
361:4
potentially
19:18
39:21
40:21
57:16 87:6
100:2
140:5
277:11
315:18
343:20
357:21
361:5
Pox 324:6
practical
92:23
93:11
practice
62:6 65:19
66:13,18

161:19
162:3
200:25
209:21
210:14
pre-marked
14:6
pre-mate...
28:12
prebunk
315:3,9
prebunk/...
314:15
Prebunking
315:20
preceden...
336:1
predated
364:22
predict
152:8
154:3
predictive
152:10
154:12
155:9
Prelimin...
6:24
prep 255:21
269:16,18
preparation
233:7
243:15,17
preparatory
37:6 256:1
prepared
194:3
254:22
361:17
370:10,13
preparing
188:21
190:9
254:16
present 4:19
10:17
20:24
28:25 99:1
99:13,13

99:18
presiden...
147:4
246:3
press 129:6
presumably
204:11
298:9
presume
308:19
pretty 56:14
56:21
180:5
256:23
289:23
293:19,20
356:7
prevent
344:22
previous
23:6 97:21
117:2
251:24
313:16,22
314:3,7,10
345:7
previously
190:5
205:24
236:21
primaries
28:5
primarily
46:7 54:1
174:3
primary
75:10
83:21
308:22
principal
29:2 103:5
120:4
167:19
180:23
principally
16:11
38:25
49:16,16
63:9

prior 21:8
24:21
36:12,17
36:19
74:21
117:8
241:20
314:3
332:11
priorities
321:7
priority
16:3
privacy
152:4,12
155:18
165:18
private
16:20
18:11 44:7
47:12
221:15
225:4,10
225:16
308:3
314:7
327:14
privilege
34:16,21
150:21,24
152:23
153:1,19
156:1
Pro-Trump
217:12
218:25
proactive
20:21
proactively
228:24
probably
19:19
22:20
23:12 50:4
74:16,25
80:18,25
86:8,9,11
86:12
113:9,12

113:23
124:5,15
124:17
174:20
180:25
181:4
211:8
230:25
235:7
241:17,18
243:19
271:12
316:4
323:25
327:24
331:8,12
331:14
337:10
341:23
346:2
369:10
372:2
problem
65:25
304:9,14
359:1
problems
234:25
357:7
procedure
297:2
procedures
109:21
121:23
354:25
proceed
11:11 35:8
proceedings
374:4,6,7
process 43:4
43:5,5
49:19 64:7
64:8 65:12
65:14
67:12
83:25 85:4
85:7 106:7
118:2,15
150:20

BRIAN J. SCULLY 1/12/2023

| | | | | |
|---|---|---|---|---|
| 152:22 | 16:12,13 | 366:11 | 24:25 25:8 | 53:9 56:12 |
| 153:1,19 | 16:17 | **promoting** | 25:17 | 56:13 |
| 156:1 | 39:16,18 | 77:5 | 40:21 | 72:20 |
| 164:23 | 43:1,4,7,9 | **prompt** | 61:23 62:1 | 74:24 81:2 |
| 201:7 | 44:12 | 293:23 | 94:7 98:20 | 81:20 |
| 211:17 | 56:21 | 294:1 | 135:13,19 | 82:10,11 |
| 239:25 | 131:5 | **promptly** | 220:3,18 | 82:22 |
| 240:11,18 | 207:16 | 176:7,21 | 222:13 | 112:25 |
| 240:19 | 298:8 | **prompts** | 234:23 | 113:1,7,18 |
| 241:1,2 | 303:15,23 | 256:8 | 257:3 | 114:8 |
| 274:25 | 303:24 | 257:5 | 258:11 | 115:14,17 |
| 282:7 | 316:2,3 | **proposal** | 260:9 | 127:20 |
| 283:4,17 | 333:23 | 363:11,18 | 261:10 | 131:5,6 |
| 297:5 | 343:5 | 363:23 | 290:22 | 134:14 |
| 300:19 | Professi... | 364:7,19 | 296:7,16 | 137:11,14 |
| 320:16 | 2:6 374:3 | 364:22 | 298:3 | 138:3,19 |
| 337:19 | **professor** | **proposed** | 315:13,16 | 138:25 |
| 356:8 | 360:8 | 272:4 | 323:14 | 145:1,1 |
| **processes** | **profile** 9:24 | 275:4 | 325:24 | 220:16 |
| 177:21 | 195:6 | 336:24 | 326:1 | 221:1,3,10 |
| 203:6 | 196:3,5,9 | **proposes** | 361:10,17 | 221:14 |
| 240:23,24 | 196:11 | 272:5 | **provided** | 222:14 |
| **produce** | **program** | **protect** 8:8 | 61:12,13 | 238:22,25 |
| 295:18 | 148:4 | 339:2 | 64:4 88:18 | 254:22 |
| **produced** | 152:17 | **protected** | 109:8 | 283:16,25 |
| 156:20 | 279:12 | 35:7 | 188:24 | 305:10 |
| 191:16 | **programming** | **protecting** | 189:2,6,9 | 306:3,10 |
| 192:10 | 155:15 | 338:22 | 209:17 | 322:16 |
| 277:11 | **project** 5:11 | **Protection** | 220:12 | 323:5,5 |
| 310:1 | 51:10 | 12:11 | 223:5,20 | 335:16 |
| **product** | 134:7,9,15 | **Protentis** | 299:20 | 341:19,24 |
| 28:18 | 135:8,22 | 18:7 19:15 | 323:12 | 347:25 |
| 43:12 | 136:10,18 | 31:5 36:13 | 325:20 | 348:1 |
| 131:6 | 137:4,17 | 42:22 | **provides** | 355:13 |
| 137:24 | 139:8 | 75:18 | 61:10 | 368:8 |
| 143:24 | 141:3,14 | 191:21 | 317:7 | 369:21 |
| 154:24 | 144:2 | 255:20 | 320:23 | 374:21 |
| 155:10 | 153:14 | 260:4 | **providing** | 375:18 |
| 172:2 | 368:10 | 269:13 | 128:23 | 377:23 |
| 187:11,15 | **Project's** | 294:8 | **public** 2:8 | **publicly** |
| 243:13 | 138:19,25 | 295:2 | 9:25 16:12 | 43:8 47:19 |
| 295:10 | **projects** | 297:10 | 21:12,12 | 82:15 |
| 322:19,25 | 187:13 | 298:23 | 21:13 40:6 | 145:13 |
| 355:23 | 188:16 | 350:4 | 40:18,19 | 190:19 |
| 356:11 | **prolifer...** | 351:12 | 40:21,24 | 195:5 |
| **production** | 336:1 | 352:3 | 41:14 | 284:2 |
| 42:25 | **promote** | **Protentis's** | 46:15,15 | 354:3 |
| 276:14 | 330:15 | 21:1 | 50:24 | **published** |
| **products** | **promoted** | **provide** | 52:17 53:8 | 26:12 |

BRIAN J. SCULLY 1/12/2023

| | | | | |
|---|---|---|---|---|
| **pull** 14:9,16 | 46:14 | 156:18 | 339:18 | **quietly** |
| 138:16 | 47:18 53:8 | 242:12 | 345:9 | 320:3 |
| 154:14 | 59:6 62:11 | 284:1 | 348:4 | **quote** 338:15 |
| 212:15 | 62:12 69:5 | 306:10 | 349:11 | 338:20 |
| 222:6 | 74:24 | 328:7 | 354:10 | 344:5,13 |
| 252:20 | 82:10,13 | 335:10 | 361:18 | 344:20 |
| 253:5 | 101:13,15 | | 364:4 | 348:10,18 |
| **pulled** 221:2 | 101:23,24 | **Q** | 371:11 | 349:11 |
| **pulling** | 101:25 | **quadrennial** | **questioning** | 364:20 |
| 242:19 | 102:4,24 | 321:5,13 | 276:12 | **quotes** 322:3 |
| 302:1 | 103:16,19 | 321:15 | **questions** | 370:3 |
| 352:16 | 103:21 | **qualifies** | 13:2,19,21 | **quoting** |
| 359:16 | 104:2,4 | 351:11 | 13:22 41:2 | 368:13 |
| **pulls** 44:8 | 112:12,13 | **quarterly** | 46:14 57:3 | |
| **pundit** | 112:24 | 32:1,13 | 74:25 81:2 | **R** |
| 123:20,23 | 120:14 | 234:4,9 | 81:20 | **R** 1:9 3:1 |
| 124:23 | 129:7 | **question** | 112:25 | 4:1 10:1,7 |
| 125:18,22 | 165:14 | 13:10,11 | 114:10,20 | 375:8 |
| 126:3 | 207:15,15 | 34:13,14 | 116:7,8 | 376:3 |
| **purchasing** | 221:10 | 34:19 35:5 | 122:1 | **race** 258:23 |
| 372:22,24 | 222:6 | 51:2 66:21 | 127:23 | **races** 256:9 |
| **purpose** 16:4 | 231:15 | 94:5 | 181:7 | 256:15 |
| 17:9 24:20 | 260:21 | 114:18 | 234:19 | 258:5,14 |
| 24:22 27:6 | 272:18,25 | 116:18 | 251:25 | 258:14,16 |
| 45:16,20 | 273:13 | 119:15 | 257:7,16 | **racial** 322:1 |
| 45:22,23 | 290:7 | 134:13 | 257:22,25 | 324:11,13 |
| 103:7 | 301:11,17 | 146:4,12 | 260:16 | 324:15 |
| 260:12 | 303:14,22 | 151:1 | 261:20 | **radar** 124:3 |
| 296:25 | 303:24 | 153:11,22 | 271:15 | 124:10 |
| **purposes** | 319:19 | 167:14 | 298:25 | **radio** 357:10 |
| 17:12 | 322:18 | 179:23 | 339:22 | 359:4 |
| 155:18 | 325:23 | 180:10,24 | 356:9 | **raise** 30:19 |
| **pursuant** 2:2 | 345:19 | 181:6 | 370:23 | 30:22,24 |
| 200:16 | 351:6,24 | 185:9 | 371:17 | 37:17 |
| **push** 64:2 | 363:9 | 186:19,20 | 372:6,8 | 99:20 |
| 164:4 | 368:10 | 197:6 | 373:4 | 128:25 |
| 165:7,10 | 369:20 | 213:8 | **queue** 105:18 | 236:18 |
| 175:11,14 | **puts** 47:3 | 218:24 | 105:23 | **raised** 31:2 |
| 175:18 | **putting** | 220:10 | **quick** 34:13 | 247:10 |
| 183:15 | 21:12 | 223:18,19 | 36:9 125:3 | 255:2 |
| 293:13 | 30:20 34:5 | 243:5 | 282:5,6 | 355:17 |
| **pushed** | 43:1 52:9 | 250:12,15 | **quickly** | **raising** |
| 300:18 | 52:16 | 258:8 | 34:20 | 124:23 |
| 318:5 | 56:24 | 275:21 | 47:10 | 126:2 |
| **pushing** | 84:24 | 278:22 | 176:10 | 236:13,16 |
| 147:8 | 85:11 | 291:14 | 177:18,20 | 251:22 |
| **put** 26:9 | 97:18 | 299:25 | 179:5 | 261:21 |
| 40:6,24 | 100:14 | 330:6 | 228:10 | 352:5 |
| 41:15 | 112:5,10 | 331:12 | 229:5 | **Ramaswami** |

| | | | | |
|---|---|---|---|---|
| 187:20 | 371:9,9 | 292:4 | 113:5,13 | 251:25 |
| ramped 174:1 | 372:9 | 374:20 | 113:16,19 | 259:15 |
| ramping | 373:12 | reason 56:11 | 113:20 | 265:19 |
| 105:2,5 | 375:15 | 68:12 | 114:3 | 268:13 |
| random 333:4 | 376:6,10 | 266:22 | 116:19 | 270:20,23 |
| 333:5 | 376:14,18 | 273:13 | 117:14 | 272:14 |
| range 46:20 | 376:22 | 314:25 | 119:12 | 284:8,17 |
| 171:25 | 377:6 | 376:7,11 | 120:15 | 285:6,21 |
| 231:13 | reading 91:1 | 376:15,19 | 121:1 | 285:23 |
| 321:9 | 95:25 | 376:23 | 124:9,15 | 287:1 |
| 342:21 | 124:19 | reasonable | 126:2,8,10 | 289:11 |
| rapid 147:9 | 150:6 | 230:25 | 127:14 | 290:1,4 |
| rationale | 159:20 | reasons | 128:1,13 | 301:18 |
| 68:18 | 160:12 | 130:5 | 128:18 | 303:17 |
| re-ask | 161:16 | recall 21:24 | 129:5,8 | 321:20 |
| 185:10 | 211:20 | 22:9,17 | 132:20 | 334:15 |
| 371:11 | 275:17 | 24:8 26:20 | 133:6,13 | 345:25 |
| re-tweeting | 347:3,6 | 27:9,18,24 | 133:20,23 | 346:4 |
| 346:23 | reads 207:5 | 29:3,16 | 134:2,23 | 351:9 |
| reach 116:7 | 228:11 | 31:7,8 | 135:18 | 356:16 |
| 221:25 | 361:15 | 32:19 | 137:5,15 | 362:17 |
| 222:12 | ready 40:18 | 33:22 34:3 | 139:20 | 371:24 |
| 340:5 | reaffirm | 37:18,20 | 140:16,23 | recalling |
| 351:5 | 242:2 | 38:5,12,20 | 141:8 | 52:20 |
| reached 65:8 | real 78:12 | 39:5 41:9 | 142:17,19 | 268:8 |
| 116:16 | 371:16 | 54:2,9 | 143:6,7 | receive |
| 228:23 | reality | 55:19 | 151:5 | 71:11 |
| 307:10 | 290:6,7,9 | 56:13 | 168:15 | 79:25 |
| 350:20 | 291:8 | 65:18,24 | 179:6 | 106:4 |
| 351:1 | 315:17 | 66:6 67:14 | 182:2,15 | 119:7,8 |
| 356:15 | realize | 67:20 | 189:15 | 123:4 |
| reaching | 199:1 | 75:14 76:3 | 190:11,12 | 131:13 |
| 224:2 | really 30:7 | 76:3 78:2 | 194:6 | 174:3,23 |
| 316:14 | 30:8 77:11 | 78:3 80:25 | 200:23 | 178:5 |
| 317:3 | 104:10 | 82:20 | 203:11,21 | 252:19 |
| 351:23 | 188:1,16 | 86:15,17 | 209:25 | 260:15 |
| read 11:2 | 196:21 | 87:20 | 210:14 | 262:25 |
| 69:24 70:1 | 197:20,22 | 90:12 95:2 | 211:12,14 | 264:23 |
| 90:23 91:8 | 203:25 | 95:9 97:13 | 214:4 | 266:6 |
| 96:20 | 253:3 | 97:15,17 | 216:19,23 | received |
| 143:2,4,5 | 297:17 | 97:23 | 218:13 | 22:13 |
| 143:6,7,9 | 317:23,25 | 99:16 | 235:9 | 23:25 |
| 143:11,12 | 327:5 | 100:4,5 | 236:5,9,15 | 49:13 52:7 |
| 219:21 | 344:16,16 | 101:3,20 | 237:21 | 67:9 68:14 |
| 275:18 | 372:1 | 102:23 | 238:11,22 | 71:7 79:20 |
| 287:15 | realtime 2:7 | 103:1,18 | 239:6 | 109:8 |
| 299:18 | 2:7 73:9 | 103:18 | 246:6,9 | 120:5 |
| 355:7 | 73:17,21 | 106:6,24 | 247:1,10 | 123:1 |
| 361:12 | 78:21 79:4 | 112:12,21 | 247:24 | 137:10 |

BRIAN J. SCULLY 1/12/2023

157:13
159:6
165:8
168:9
175:13
176:24
177:1,24
178:3
180:4,9
193:12
200:3,10
231:2
252:23
294:1
306:12
366:17
**receives**
149:14
**receiving**
63:23 64:1
107:24
166:10
182:8
215:9,18
307:4
**recess** 34:20
35:1 83:11
183:7
209:10
276:8
319:12
362:24
**recipients**
214:20
299:13,23
**recognize**
15:8
**Recognizing**
126:21
**recollec...**
38:11
67:12
101:9
103:15
128:25
133:3
136:25
147:18
150:9

184:21
237:6,17
333:20
367:7
**recollec...**
41:7 55:6
255:5
**recommend**
295:4
**recommen...**
141:21
150:12
329:20
330:3
355:18
358:25
**recommen...**
141:19
149:23
330:3
354:6
**recommen...**
328:23
355:3
357:1
**recommends**
142:2
150:3
**record** 10:3
11:17
34:23,25
35:3,9
83:2,6,8
83:10,13
183:4,6,9
183:11
209:5,7,9
209:12
276:5,7,10
276:13
319:4,9,11
319:14
349:21
362:21,23
363:1,3
372:13
374:6
**recorded**
10:5

**records**
188:25
**recurring**
233:5,12
**recycled**
324:9
**red** 106:17
**redacted**
214:20
**Reddit** 38:16
233:23
**reduce** 309:5
316:10
332:2
346:11,17
347:16,23
**reduced**
374:8
**refer** 20:18
182:6
233:16
270:9
354:15
366:8
**reference**
73:15
105:25
144:13,15
145:24,25
149:22
370:25
**referenced**
201:13
**referencing**
91:22
118:19,20
**referred**
60:18 98:5
201:10
**referring**
20:14 43:7
57:1 73:23
78:24
79:11,13
79:15 84:5
99:5,7,23
105:20
158:3
185:23

214:25
240:19,23
250:10,11
269:23
272:13
275:17
285:10
286:25
295:25
316:25
**refers** 20:17
23:19
146:14
250:4
255:21
291:12
**reflect**
259:5
**reflected**
201:9
**reflects**
47:4
**refresh**
230:22
255:1
**refreshes**
230:23
**refusing**
167:13
**regarding**
244:14
278:19
**regardless**
296:25
358:9
**Registered**
2:6 374:2
**regular** 21:3
40:7,24
82:13,14
127:19
128:3
141:17
238:9
244:11
245:3,19
310:23
**regularly**
116:1

262:16
**reiterate**
240:9
**rejects** 8:8
**relate** 19:24
41:17
156:21
159:17
240:5
**related** 6:25
26:12 77:2
81:18
122:12,13
122:19
127:15
130:17,24
133:14,15
137:3,25
138:5,15
143:14
150:23
159:19
161:10
235:12,25
238:7,25
263:6
273:20
285:24
312:12
323:1
324:15
325:8
342:8
362:8
366:19
371:15
374:10
**relates**
157:9
162:19
279:5
317:15
**relating**
97:13
98:16
113:18
128:24
135:21
137:22

| | | | | |
|---|---|---|---|---|
| 143:16,18 | 266:8 | 150:11 | 142:13 | 145:23 |
| 232:9 | **relayed** | 151:12 | 361:20 | 157:9,13 |
| 233:1 | 251:6 | 171:23 | 362:13 | 157:16 |
| 239:10 | **relaying** | 176:20 | 368:8 | 159:6 |
| 243:9 | 180:23 | 194:3 | 369:21 | 161:9,21 |
| 285:13 | 251:12 | 207:14,17 | 370:3 | 162:21 |
| 326:15 | **release** | 208:20,23 | 371:7 | 163:19 |
| 371:15 | 253:24 | 209:1 | **repeat** 19:3 | 164:12,22 |
| **relation** | **released** | 210:16 | 139:17 | 168:13,18 |
| 76:12 | 39:17 | 211:9 | 151:1 | 173:16 |
| 97:16 | 70:12 | 236:13,24 | 186:19 | 198:20 |
| 104:9 | **releases** | 237:7,13 | 197:5 | 200:3,7,10 |
| **relation...** | 129:7 | 246:12 | 223:17 | 200:19 |
| 47:18 | **relevant** | 247:3 | 249:2 | 201:13,23 |
| 55:25 | 135:19 | 248:12 | 291:13 | 203:16 |
| 65:23 | 160:4 | 250:23 | **repeatedly** | 204:6 |
| 67:25 68:3 | 189:10 | 251:11,21 | 245:11 | 205:11 |
| 76:9 79:9 | 191:12,15 | 259:1 | 247:11 | 209:16 |
| 80:9 | 192:20 | 272:17,21 | **rephrase** | 210:11 |
| 102:16 | 235:5 | 283:3 | 257:11 | 213:17 |
| 121:13,20 | 314:14 | 284:12 | **reply** 282:18 | 214:12 |
| 148:21 | 315:2,14 | 285:11,12 | **replying** | 215:12,15 |
| 149:8,10 | **reliable** | 285:18 | 296:6 | 216:2,9 |
| 187:8 | 319:8 | 286:12 | **report** 9:8 | 217:8,17 |
| 240:3 | **rely** 13:2 | 351:21 | 9:12 21:13 | 225:1,10 |
| 310:16 | **remain** 51:15 | 356:1 | 40:12 47:3 | 226:8 |
| 313:18 | 317:25 | 372:3 | 56:13 | 228:3,6 |
| 369:9,15 | 364:19 | **remembering** | 64:13 | 229:18,19 |
| **relation...** | **remained** | 241:19 | 68:18 | 231:2 |
| 238:17,20 | 51:13 | 306:16 | 69:20 | 256:13 |
| 239:24 | **remarks** | **remembers** | 70:12 | 264:24 |
| 240:16 | 337:2 | 248:4 | 71:18 72:2 | 280:8 |
| 241:14 | **remember** | **reminder** | 94:21 | 283:20 |
| **relation...** | 28:21 30:2 | 29:24 | 96:23 | 284:13 |
| 44:5 46:13 | 30:8,8 | 60:16 | 105:12 | 285:1,8 |
| 46:19,20 | 33:11,25 | 260:7 | 106:4 | 288:5,10 |
| 120:3 | 34:4 35:19 | **remove** | 117:23 | 289:19 |
| 131:20,23 | 35:20,25 | 283:14 | 118:13 | 297:5 |
| 215:25 | 36:1 37:15 | **removed** | 122:3 | 298:4 |
| 241:8,10 | 39:24 55:2 | 229:9 | 123:11 | 300:2,25 |
| 304:1 | 62:13 | **render** 377:9 | 127:17 | 301:6 |
| **relatively** | 70:24 | **Renée** 54:5 | 129:25 | 302:3 |
| 176:10 | 71:13 | 70:5,20 | 138:25 | 304:12 |
| 177:18,19 | 86:23 | 72:17 | 140:3,3 | 321:6 |
| **relay** 164:13 | 87:19 95:3 | 116:22,25 | 141:1,3,15 | 328:11,17 |
| 220:21 | 98:2 | 117:6 | 141:15 | 328:20,22 |
| 221:18,21 | 104:14 | 134:22 | 142:18,23 | 329:22 |
| 222:16 | 116:11 | 136:6,9 | 143:2,21 | 335:15 |
| 265:14,21 | 124:6,11 | 139:7,9,23 | 144:7,11 | 352:20 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 364:15,17 | 79:17,20 | 40:21 | 178:10 | 209:18 |
| **reported** | 79:25 81:2 | 46:15 | 267:9 | 221:17 |
| 1:23 68:11 | 81:3,20 | 56:12 | 305:9 | 326:10 |
| 68:22 | 82:10,11 | 106:23 | **represen...** | **researchers** |
| 119:2 | 82:22 | 107:2,24 | 29:11 | 143:14,17 |
| 120:24 | 106:21 | 112:25 | 111:16 | 145:22 |
| 130:5,6,9 | 114:8 | 113:1,7,18 | 112:21 | 325:23 |
| 160:9,19 | 116:1 | 115:14,17 | 181:1 | **researching** |
| 163:20,25 | 118:2,15 | 122:17 | 267:7 | 325:21 |
| 164:10 | 119:8,12 | 123:4 | **reputati...** | **resending** |
| 165:2 | 120:5,8,21 | 134:14,25 | 340:23 | 346:24 |
| 199:11 | 121:1,5 | 137:10,11 | 341:3,5,11 | **reserve** 11:2 |
| 366:14 | 159:13 | 137:14 | 341:12,18 | **resilience** |
| **reporter** 2:3 | 161:5 | 149:14 | 342:15,25 | 16:5,8 |
| 2:4,5,6,7 | 163:9 | 157:3,6 | **request** 45:7 | 42:23 |
| 11:9 12:21 | 173:13 | 165:23 | 277:2,14 | 45:25 |
| 47:9 | 193:10 | 166:1 | 320:18 | 118:2 |
| 138:19 | 198:21 | 173:24 | 337:17 | 131:4 |
| 168:14 | 201:2,25 | 176:7,22 | 372:18 | 303:22 |
| 196:7 | 202:13,19 | 177:10 | **requested** | 315:24 |
| 209:4 | 204:8,18 | 178:12,23 | 247:14 | 324:10 |
| 223:22 | 205:6,22 | 179:4 | 303:9 | 332:1 |
| 372:14,21 | 206:24 | 182:8 | **requesting** | 343:3,21 |
| 372:25 | 207:2 | 193:2 | 276:12 | 347:20 |
| 373:3 | 208:10,15 | 199:13 | **requests** | 358:2,5,8 |
| 374:1,3 | 210:2,7,12 | 202:25 | 191:13,16 | **resilience-** |
| **reporter's** | 210:25 | 203:9 | 192:21 | 315:11 |
| 10:14 | 212:9 | 208:10,16 | 233:2 | **resilien...** |
| **reporting** | 228:14 | 208:25 | 337:22 | 316:3 |
| 8:5 16:22 | 235:4 | 210:21 | **requirement** | **resilien...** |
| 23:25 | 238:25 | 212:1 | 115:24 | 240:14 |
| 26:10,11 | 243:10 | 214:2 | 227:8 | 323:21 |
| 26:14,16 | 257:4 | 215:9,19 | **requirem...** | 346:20 |
| 27:8 36:8 | 259:13 | 216:12 | 155:19 | 359:7 |
| 39:20 40:6 | 263:8,15 | 223:11 | **requires** | **resource** |
| 40:24 | 278:3 | 231:4 | 320:20 | 62:19 63:8 |
| 41:14 44:9 | 279:4 | 238:22 | **research** | 166:11 |
| 46:14 | 282:7,14 | 242:8,11 | 44:6,9 | 173:23 |
| 47:19 | 282:25 | 262:25 | 46:11,16 | **resourced** |
| 50:24 | 283:4 | 264:23 | 46:17 47:3 | 57:9 |
| 52:17 53:9 | 293:5 | 266:6,14 | 47:6,9,19 | **resources** |
| 63:23 | 300:19 | 311:20 | 48:22 | 87:2,8 |
| 64:23 66:3 | 306:3,10 | 325:23 | 49:23 50:1 | 357:11 |
| 66:16 68:8 | 320:25 | 326:11 | 73:12 | 359:4 |
| 68:14 | 326:10 | **repost** | 144:17 | 367:13 |
| 71:25 | 363:13,15 | 347:11 | 145:20 | **respect** |
| 74:24 | 363:20 | **represent** | 187:13,16 | 40:16 |
| 79:11,13 | 364:8 | 10:18 11:7 | 195:10 | 93:15,19 |
| | **reports** 40:7 | **represen...** | 196:14 | 142:15 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| respond | responses | 261:17 | 101:11 | 212:11 |
| 13:11,23 | 6:23 | returns | 102:14 | 214:19 |
| 93:20 | 176:14 | 18:24 | 105:14 | 217:5,9 |
| 176:6 | 188:22 | 176:19 | 109:18 | 218:13 |
| 199:22 | 189:14 | review 43:5 | 110:5,7,9 | 219:6 |
| 223:10 | 190:19 | 165:19 | 110:12,15 | 223:14 |
| 293:16,21 | 193:23 | 174:22 | 110:19 | 226:2,15 |
| 371:2 | 194:5 | 189:17 | 111:3,23 | 226:20 |
| responded | 226:12 | 201:3 | 112:16 | 227:15 |
| 176:10 | 231:17 | 321:6,14 | 116:4 | 228:6,10 |
| 180:3 | 242:15 | 321:16 | 118:8 | 228:17,25 |
| 199:15 | 293:24 | reviewed | 120:19 | 229:19,24 |
| 200:9 | 353:2 | 189:15,20 | 122:4,7 | 230:2,9,14 |
| 209:15 | responsi... | 194:2,7,12 | 123:18 | 230:18 |
| 219:8 | 90:14 | 207:10,13 | 125:10 | 231:2,6 |
| 292:24 | 289:17 | reviewing | 137:15 | 232:5,11 |
| responding | 353:20 | 207:14 | 140:10 | 233:14,20 |
| 5:19 | responsi... | reviews | 141:4,4 | 234:1,6 |
| 179:15 | 239:17 | 25:18 | 146:7 | 237:11 |
| 190:10 | responsible | rhetoric | 147:10 | 241:7,25 |
| 233:1 | 60:10 | 126:22 | 148:18 | 244:14 |
| 292:3,5 | 63:10,12 | Richard | 157:17 | 248:25 |
| responds | 115:25 | 161:4 | 159:14,15 | 250:13,24 |
| 176:2 | 169:22 | 350:11 | 161:2,11 | 251:4,9 |
| 206:1 | 175:20 | right 11:2 | 162:10,19 | 252:10 |
| 224:17 | 343:17 | 14:6 15:15 | 162:25 | 253:20,22 |
| 226:14,17 | responsive | 18:6 19:13 | 163:3,11 | 253:25 |
| 232:7 | 176:21,23 | 20:15,19 | 164:14 | 254:4,8,13 |
| 287:17 | 178:10 | 29:12 | 167:18 | 256:5,10 |
| 308:6 | 293:20,23 | 31:13,24 | 170:21 | 259:22 |
| 317:21 | 331:20,25 | 43:11 | 173:11,17 | 261:7 |
| response | rest 134:23 | 44:13 48:7 | 176:7 | 262:14 |
| 9:16 43:24 | 186:1 | 50:14 | 177:5 | 263:2,21 |
| 107:15 | 282:17 | 51:21 | 179:20 | 264:24 |
| 133:7 | 349:10 | 57:22 59:7 | 181:6 | 272:2 |
| 147:9 | restrict | 59:22 60:2 | 183:23 | 273:10,16 |
| 165:7 | 132:13 | 60:19,24 | 189:12,25 | 274:15 |
| 177:23 | restricted | 61:24 | 190:25,25 | 275:8,13 |
| 191:12,16 | 95:16 | 63:10,15 | 191:6,22 | 275:23 |
| 192:21 | restrict... | 63:17,21 | 192:13 | 280:25 |
| 205:19 | 264:5 | 68:5 70:15 | 193:4 | 281:19 |
| 219:14 | restrictive | 70:22 | 196:11 | 283:17 |
| 220:12 | 132:18 | 78:24 | 198:17,18 | 287:6 |
| 233:23 | result 96:6 | 81:14 82:8 | 199:23 | 288:3,18 |
| 243:7 | results 13:6 | 85:2 88:9 | 200:4 | 289:3,5,9 |
| 247:12 | return 19:16 | 89:22 | 202:5 | 289:15 |
| 250:25 | 375:19 | 91:15,18 | 207:2 | 290:19,20 |
| 251:5 | returned | 91:20 93:8 | 208:1 | 291:22 |
| 282:24 | 165:16 | 96:19,24 | 211:1,23 | 292:19 |

| | | | | |
|---|---|---|---|---|
| 293:25 | 327:15 | 100:14 | 23:19 | 167:2 |
| 294:11 | 341:18 | 129:20 | 58:17 | **safety** |
| 295:6,15 | 343:17 | 147:7,15 | 118:24 | 289:10,13 |
| 296:4,8 | **risks** 16:15 | 149:20 | 138:10 | 289:13,14 |
| 298:10 | 56:17 | 150:15 | 172:17 | **Salahuddin** |
| 299:8,13 | 154:5 | 151:7,9,9 | 189:24 | 218:2 |
| 300:6,13 | 269:20,25 | 167:21,24 | 265:5 | **Saleela** |
| 300:15 | 270:8 | 168:10 | 291:24 | 218:2 |
| 301:12,15 | 309:5 | 171:17 | 348:14 | **sat** 133:21 |
| 305:21 | 316:10 | 182:4,20 | 366:4,24 | **Saturday** |
| 306:21 | 323:7 | 239:17 | 367:22 | 173:17,18 |
| 308:19,23 | 332:2 | 240:2 | **RPR** 1:23 | 173:19 |
| 311:25 | 342:21,25 | 278:10 | 374:18 | 176:1,1,11 |
| 312:5,16 | 343:20 | 303:22 | **rules** 12:18 | **Sauer** 3:3 |
| 313:2,11 | 354:21 | 305:17 | 126:18 | 5:3 10:19 |
| 316:15 | 355:24,25 | 311:24 | 152:4,13 | 10:19 |
| 328:25,25 | 356:2,7 | 313:21 | 155:16 | 11:15 14:2 |
| 330:16,25 | 358:4,23 | 316:13 | 260:10,14 | 14:17,23 |
| 331:21 | **Rob** 43:20,23 | 317:11,18 | **rumor** 290:13 | 23:19 34:22 |
| 339:5 | 166:17,18 | 345:10 | 290:19 | 35:8,13 |
| 342:16 | 167:1 | 371:1 | 291:12 | 53:2 69:9 |
| 344:19 | 179:18 | **roll** 142:15 | **rumors** | 69:13 |
| 346:2,13 | 184:14 | **Roman** 73:7 | 247:20 | 71:22 80:6 |
| 347:17 | 191:25 | 141:16 | 290:22 | 83:1,7,14 |
| 348:8,25 | 276:20 | **room** 10:22 | **run** 62:8 | 87:18 91:3 |
| 353:3 | 311:11,12 | 119:25 | 279:13 | 92:6 93:3 |
| 355:4,14 | 311:14,24 | 263:17,18 | 280:11,23 | 95:22 |
| 357:3 | 312:8,21 | 263:22,25 | 342:10,11 | 108:22 |
| 359:20 | 326:5,20 | 264:1,14 | **running** | 122:23 |
| 360:5,12 | 350:5 | 267:7,22 | 60:10 | 125:13 |
| 361:1,20 | **Robert** | 267:23,25 | 81:23 | 126:7 |
| 361:23 | 192:12 | 268:3 | 266:2 | 138:16,24 |
| 362:2,9 | **robust** | **Rose** 308:10 | 312:21 | 139:4 |
| 368:15 | 265:25 | 308:11 | **runs** 148:4 | 145:4,9 |
| 370:5,23 | **Robyn** 10:15 | **Roth** 7:4 | 267:17 | 148:9 |
| **rigorous** | **Rodney** 32:17 | 238:1,2 | 342:6 | 151:3,4 |
| 222:4 | 33:9 | 244:3,9 | 356:1 | 152:25 |
| **ring** 126:1 | **role** 18:25 | 246:17 | **Russia** 325:7 | 153:9 |
| 197:16 | 19:4 23:24 | 247:6 | **Russian/...** | 156:3,5,12 |
| 213:24 | 25:7,10,13 | 248:4 | 325:11 | 156:16 |
| 247:9 | 25:14 | 289:5 | **Russians** | 172:22,24 |
| 284:14 | 42:24 | **roughly** | 324:1 | 181:5,9 |
| 294:22 | 55:18,22 | 148:17 | ———— | 183:1,17 |
| **risk** 11:22 | 59:2 62:17 | **rounds** 286:7 | **S** | 185:8,11 |
| 44:14,16 | 62:18,21 | 287:1 | **S** 3:1 4:1 | 190:15 |
| 56:20 | 62:22 63:3 | **route** 268:25 | 5:1,6 6:1 | 191:2 |
| 236:6 | 63:7,13 | **routed** | 7:1 8:1 | 194:16,19 |
| 308:25 | 64:12 | 268:18 | 9:1 10:1 | 194:22 |
| 309:6 | 83:19,21 | **routing** | **S-c-h-a-u-l** | 195:2 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 196:2 | 344:12 | 338:16 | 225:4,8 | 331:16,22 |
| 197:3 | 345:13,22 | 341:15,17 | 229:20 | 332:10,16 |
| 198:25 | 349:17,20 | 348:19,21 | 230:4 | 334:1 |
| 199:5 | 349:24 | 352:3 | 231:5 | 335:19,23 |
| 204:21 | 350:1 | 368:13 | 232:7,7 | 336:3,14 |
| 205:1 | 352:15 | 371:7 | 244:9,10 | 337:23 |
| 209:6,13 | 354:14 | **says** 73:8 | 246:18 | 338:14,20 |
| 212:3,13 | 359:15 | 88:12 | 247:6 | 344:5,6 |
| 212:19,22 | 362:20 | 89:19 91:4 | 250:20 | 350:8,11 |
| 213:2,9 | 363:2,5,8 | 91:11,12 | 251:20 | 354:8,20 |
| 215:4 | 364:13 | 94:21 | 253:23 | 355:9,15 |
| 227:1,11 | 365:12 | 95:18 96:5 | 254:6,7,10 | 357:6 |
| 227:21,24 | 368:5 | 96:13 97:4 | 256:7 | 364:17 |
| 228:1,19 | 369:19 | 97:12 | 260:6 | 366:1,3 |
| 230:21 | 371:12 | 98:25 | 269:20 | 368:21,25 |
| 231:20,22 | 372:5,14 | 107:14 | 270:16 | 369:5 |
| 231:24 | 372:16 | 108:10 | 272:9,15 | 370:12,15 |
| 232:2 | **sausage** 85:7 | 109:6,16 | 275:24 | 370:17,21 |
| 242:20,25 | **saw** 12:24 | 109:19,24 | 280:17 | 370:24 |
| 243:1,24 | 116:2 | 110:7 | 281:8,16 | **SCHAU** 4:3 |
| 244:22 | 215:12 | 111:11 | 282:21,25 | **Schaul** 43:20 |
| 249:14,17 | 293:12 | 117:24 | 283:10,13 | 43:23 |
| 249:21,24 | 319:25 | 118:14 | 284:23 | 46:10 |
| 252:3,9,13 | 324:5,5,6 | 122:11 | 285:7 | 166:18 |
| 252:22,25 | 336:1 | 125:21,25 | 287:3 | 167:2 |
| 253:3,6,10 | 356:18 | 126:17,21 | 289:1,21 | 179:18 |
| 253:13 | **saying** 27:1 | 142:8 | 292:8 | 184:14 |
| 255:18 | 27:2 34:1 | 144:16 | 295:14 | 191:25 |
| 258:9 | 91:16 | 145:25 | 297:24 | 192:12 |
| 262:6 | 152:18 | 146:13 | 299:6,11 | 276:20 |
| 271:14,18 | 199:20,22 | 147:2,2,11 | 299:16 | 326:5,20 |
| 273:3 | 203:10 | 150:8 | 300:4,11 | 350:5 |
| 276:1,4,11 | 223:13 | 158:8 | 300:15 | **schedule** |
| 277:15,18 | 248:13 | 175:24 | 304:6,7,17 | 174:8 |
| 277:23 | 254:22 | 176:2 | 305:17,22 | **scorecard** |
| 301:22 | 282:4 | 177:6 | 307:14 | 286:6,11 |
| 302:9,12 | 284:25 | 191:9 | 308:14,18 | 288:3,21 |
| 304:23 | 286:4 | 192:8 | 311:22 | 340:4,8 |
| 306:20,24 | 287:18,24 | 195:13,16 | 312:1,15 | **Scott** 3:4 |
| 309:22 | 292:25 | 195:21 | 312:25 | 10:22 |
| 316:21 | 294:8 | 196:5 | 314:11 | 82:23 |
| 318:24 | 296:6 | 197:17 | 316:12 | 319:5 |
| 319:2,17 | 299:25 | 199:11 | 317:22 | 349:22 |
| 328:6 | 303:4 | 204:10,11 | 320:2,15 | **screen** 14:10 |
| 334:23 | 307:3 | 206:20,23 | 321:4,15 | 14:10,18 |
| 335:2,7,10 | 308:6 | 208:9,13 | 321:24 | 15:3,4 |
| 335:14 | 309:4 | 210:6,19 | 328:21,25 | 42:21 |
| 341:9 | 315:6 | 217:10 | 330:2,13 | 69:14 72:8 |
| 344:8,11 | 324:2 | 223:4 | 330:17 | 78:19 88:1 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 90:22 | 72:10 | 155:11 | 327:14,14 | 136:8,14 |
| 105:8,9 | 160:21 | 186:18 | 341:20 | 141:24,24 |
| 107:11,12 | 198:13 | 188:18 | 343:4,7,17 | 147:19,21 |
| 117:23 | 203:15 | 202:7 | 343:18 | 178:11 |
| 124:4 | 205:4 | 214:16 | 355:23,24 | 187:22 |
| 138:17 | 207:20 | 231:19,21 | 356:1,6 | 195:18 |
| 156:18 | 214:15 | 254:10 | **sector's** | 201:25 |
| 191:4 | 222:23 | 273:15 | 341:21 | 235:15,17 |
| 198:24 | 223:10,15 | 277:22 | **sectors** 60:5 | 235:24 |
| 199:2 | 244:5 | 280:7,15 | 60:8 | 244:13,14 |
| 206:14,16 | 249:4 | 285:5,7 | 322:16 | 245:3,17 |
| 209:3 | 281:2 | 300:17 | 338:25 | 248:19 |
| 212:15 | 296:10 | 304:7 | 355:12 | 264:9 |
| 213:4,10 | 299:11 | 305:15 | **secure** 298:3 | 267:13 |
| 215:2 | 320:1,14 | 307:6 | 298:4 | 270:12 |
| 222:21 | 344:4 | 345:16 | **Securing** | 294:9,13 |
| 225:5 | **Scully** 1:14 | 346:10 | 47:8 | 295:11 |
| 227:20 | 2:1 5:2,8 | 352:3,17 | **security** 4:7 | 296:21 |
| 252:8 | 6:3 7:3 | 354:4 | 4:13 5:19 | 305:6 |
| 281:7 | 8:3 9:3,16 | 355:9 | 9:22 11:5 | 320:3 |
| 306:25 | 10:5 11:12 | 357:5 | 11:23 | 321:5,14 |
| 319:19,25 | 11:16,18 | **Secretaries** | 15:24,24 | 321:16 |
| 328:8 | 83:15 | 50:8 | 20:5 25:6 | 327:16 |
| 335:11 | 188:21 | 103:14 | 26:13 33:1 | 332:25 |
| 345:19 | 191:21 | **secretary** | 33:3,15 | 336:7 |
| 363:9 | 209:14 | 204:6 | 35:6 50:6 | 342:2,5 |
| 364:14 | 219:4 | 205:12 | 52:12 | 344:19 |
| 368:10 | 251:7 | 206:5,15 | 55:23 56:5 | 352:24 |
| 369:20 | 253:14 | 206:19 | 59:7,10 | 353:6 |
| **screwy** 209:3 | 269:21 | 207:4 | 61:7 62:24 | 359:18 |
| **scroll** 87:23 | 372:12 | 214:13,18 | 63:20 | 360:3,25 |
| 105:7 | 373:8,11 | 225:1,18 | 64:20 | 363:12 |
| 108:24 | 375:12 | 304:15 | 67:14,21 | **security...** |
| 125:10 | 376:2 | 311:17,17 | 71:8,9,15 | 234:24 |
| 157:11 | 377:5,20 | 311:21 | 71:17,19 | **see** 14:10,15 |
| 192:5 | **search** | **secretary's** | 76:25 | 14:17,21 |
| 195:9 | 192:20 | 101:18 | 79:14,17 | 14:22 15:4 |
| 197:10 | 222:4 | 311:19 | 79:21 80:1 | 15:16 18:6 |
| 201:17 | **searched** | **section** | 80:2 90:10 | 27:2 30:21 |
| 206:4 | 188:25 | 108:11 | 90:15 96:8 | 41:11 62:9 |
| 214:7 | 276:18 | 109:2 | 101:14,21 | 69:14 72:7 |
| 216:25 | 277:1 | 125:18 | 110:18 | 73:7,14 |
| 224:6,21 | **searches** | 193:25 | 112:6,11 | 78:22 83:1 |
| 244:8 | 144:18 | 281:5 | 113:12 | 87:25 88:1 |
| 245:23 | **sec** 190:24 | **sector** 16:20 | 119:10,21 | 88:8,15 |
| 282:16 | **second** 35:21 | 18:12 44:8 | 127:15 | 91:10,12 |
| 285:15,25 | 82:23 | 47:12 60:4 | 128:24 | 97:8 98:20 |
| 302:23 | 98:23 | 60:5 308:3 | 129:11,24 | 99:2,3 |
| **scrolling** | 138:22 | 314:8 | 135:25 | 105:7,11 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 105:15 | 246:4,24 | 27:15 40:8 | 199:6 | **sentence** |
| 106:17 | 247:22 | 40:14,20 | 205:14,14 | 73:14 |
| 107:15 | 249:8 | 41:5,13 | 271:24 | 78:24 |
| 109:3 | 250:6,6,14 | 47:21 | 299:10 | 95:18,19 |
| 117:23 | 250:18 | 52:17 | **senior** 4:4 | 96:1,5,12 |
| 118:3 | 253:8,14 | 82:15 83:4 | 22:12 | 96:20 97:4 |
| 122:14 | 259:9 | 114:12 | 129:22,23 | 109:11 |
| 123:12 | 261:3 | 194:4 | 251:17 | 118:4 |
| 125:3,17 | 269:7 | 235:8 | 305:5 | 122:10 |
| 125:20 | 270:18 | 258:13 | 360:17 | 125:21 |
| 141:25 | 271:23 | 279:4 | **sense** 49:8 | 142:8 |
| 144:20 | 272:11 | 291:6 | 56:3 63:23 | 147:1,11 |
| 146:4,8,24 | 278:7 | 371:4 | 74:9 | 150:7 |
| 150:4 | 279:9 | **seen** 20:20 | 120:23 | 207:5 |
| 152:5 | 286:3,7 | 50:23 | 136:11 | 246:17 |
| 154:19 | 287:3 | 124:18 | 152:12 | 247:6,19 |
| 156:23 | 289:7 | 244:5 | 268:14 | 250:5 |
| 157:6 | 296:9,12 | 259:8 | 290:16 | 280:9 |
| 163:10 | 297:12 | 321:16,18 | 369:12 | 287:2 |
| 165:19 | 298:4,22 | 363:22,23 | **sensitive** | 334:1 |
| 166:21,23 | 298:25 | **semester** | 352:4,5 | 355:8 |
| 170:4 | 300:2 | 170:15 | **sent** 66:5,25 | 371:5 |
| 173:20 | 302:5,13 | **senate** | 67:7 69:10 | **sentences** |
| 176:3 | 302:15 | 197:16 | 106:13 | 90:14,25 |
| 191:9,17 | 304:10 | **send** 106:8,9 | 121:4 | **separate** |
| 192:6 | 307:5,17 | 107:2 | 134:13,17 | 37:3 155:5 |
| 194:10 | 308:7 | 109:17 | 135:3 | 180:13 |
| 195:6 | 310:3,6 | 119:23 | 168:16 | 267:23 |
| 198:18 | 319:23 | 120:1,15 | 180:8 | **separately** |
| 199:1,16 | 320:5,6,21 | 131:15,17 | 190:6 | 129:3 |
| 201:22,25 | 320:22 | 210:2 | 193:6,9,12 | **separation** |
| 202:8 | 321:10,11 | 212:13,18 | 193:15 | 108:21 |
| 203:19 | 322:3 | 318:17 | 199:19 | **September** |
| 204:7 | 328:14 | **sending** | 201:24 | 18:23 |
| 205:22 | 330:11 | 66:25 | 202:3,7 | 19:13 |
| 206:5,11 | 334:5 | 134:24 | 203:17 | 20:24 |
| 206:15 | 335:17 | 157:3 | 212:22 | 21:20 |
| 208:7 | 336:17 | 180:14 | 214:14,18 | 24:11 |
| 213:3,10 | 338:2 | 193:21 | 217:19 | 28:24 |
| 213:16,21 | 340:6,16 | 211:21,24 | 226:13 | 31:12 |
| 214:12,14 | 346:10 | 211:25 | 230:5,11 | 36:10,13 |
| 214:24 | 350:6,9,17 | 242:7 | 265:3 | 38:24 39:5 |
| 215:1 | 354:8 | 252:3 | 284:24 | 41:8 282:3 |
| 222:1,21 | 357:11 | 295:3 | 286:3 | 283:9 |
| 223:8 | 360:22 | 307:2 | 288:17 | 364:15,25 |
| 225:2 | 361:6 | 345:13 | 294:2 | **sequential** |
| 228:2 | 368:16 | 368:14 | 351:19 | 170:5 |
| 232:6 | 369:22 | **sends** 176:19 | 352:17 | **series** |
| 244:1,23 | **seeing** 27:12 | 198:19 | 366:12 | 309:25 |

BRIAN J. SCULLY 1/12/2023

| | | | | |
|---|---|---|---|---|
| 310:10 | **seven** 233:21 | 328:8 | **shifted** | 372:9 |
| **serve** 60:7 | 245:15 | 329:10 | 113:15 | 375:17 |
| 70:17 | **shaking** 13:3 | 335:11 | **shifts** 166:9 | **signature** |
| 109:6 | **share** 14:10 | 345:19 | 166:13,14 | 373:7,19 |
| 189:23 | 14:10,18 | 363:10 | 174:13,21 | 375:14,17 |
| **served** 19:8 | 15:3,4 | 364:15 | 174:25 | 375:20 |
| 147:7 | 17:7 25:19 | 366:16 | 193:9,11 | 376:25 |
| 367:3 | 36:9 40:5 | 368:10 | **short** 104:17 | **signed** |
| **serves** 366:3 | 40:10,17 | 369:20 | 151:18 | 157:18 |
| 366:23 | 40:20 41:1 | **shared** 74:8 | 310:15 | 373:16 |
| **service** | 41:12 | 74:9 80:11 | **shorthand** | **significant** |
| 144:24 | 45:24,25 | 84:11,19 | 2:3,5 | 126:24 |
| 242:5 | 59:3 69:15 | 84:21 | 20:12 | 128:6 |
| 260:18 | 72:8 74:1 | 121:7,8,21 | 374:1 | 153:4 |
| **services** | 74:4,6 | 141:6 | **shortly** | **signoff** |
| 341:22,25 | 78:19 88:1 | 161:11 | 246:2 | 299:8 |
| 343:1,4,11 | 90:22 | 205:24 | **shot** 206:16 | **Silver** 312:8 |
| 343:14,18 | 105:8,9 | 213:6 | 225:6 | **Silvers** |
| 343:22,24 | 107:12 | 258:19 | 281:7 | 311:11,12 |
| 355:23 | 117:23 | **shares** | **show** 176:17 | 311:14,24 |
| 356:4,5,13 | 138:17 | 196:23 | 190:16 | **similar** |
| **serving** 20:6 | 156:18 | **sharing** 17:9 | 242:14 | 52:24 |
| 63:13 | 160:3,15 | 59:15,25 | 243:6 | 54:17 |
| 147:15 | 160:16,17 | 60:4,6,17 | **showed** 280:4 | 93:18 |
| 163:18 | 163:11 | 60:22 | **showing** 14:3 | 100:3 |
| 367:14,22 | 164:17 | 78:21 79:5 | 160:5 | 134:23 |
| **set** 6:24 | 191:5 | 80:10 | 227:12 | 136:19 |
| 16:3 21:9 | 199:2 | 121:24 | 252:15,18 | 139:12 |
| 47:20 58:1 | 206:14 | 147:6,7,15 | 255:14 | 140:6,25 |
| 61:4 63:14 | 211:11 | 147:15 | 279:10 | 238:16 |
| 68:16 88:9 | 212:15 | 148:5 | 342:17,19 | 243:20 |
| 103:8 | 213:4,11 | 164:3 | **shown** 229:7 | 296:23 |
| 165:17 | 215:2 | 235:6 | **shows** 157:2 | 314:19 |
| 179:7,17 | 222:22 | 260:4 | 205:11 | **simultan...** |
| 181:7 | 234:18,20 | 263:4 | 269:11 | 196:23 |
| 253:8 | 235:5,12 | 264:11 | **shredded** | **simultan...** |
| 256:3 | 252:8 | 284:12 | 339:11 | 169:24 |
| 262:16 | 258:1,20 | 288:24 | **side** 15:15 | 183:21 |
| 312:3 | 259:14,24 | 298:7 | 28:1 38:7 | 185:16 |
| 364:25 | 260:10,25 | **sheet** 43:2 | 40:4 43:24 | 195:23 |
| 374:13 | 285:1 | 373:16 | 44:18 54:4 | 197:8 |
| **sets** 39:18 | 287:5 | 376:1 | 127:23 | 200:2 |
| 303:14,23 | 288:23 | **sheets** | 236:25 | **Sincerely** |
| **setting** | 294:9 | 375:14,17 | 237:2 | 375:22 |
| 65:20 | 296:8,11 | 375:19 | 310:4 | **single** |
| 99:20 | 299:3 | **shift** 174:15 | 315:19 | 363:15,19 |
| 159:2 | 306:25 | 175:3 | **sides** 40:3 | **SIO** 97:5 |
| **settle** 62:23 | 311:24 | 180:15 | 238:20 | 104:4,12 |
| **setup** 119:25 | 319:19,25 | 193:15,20 | **sign** 11:2 | 104:15,17 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 181:14,17 | 253:16 | 168:7 | 317:13 | **sorry** 16:9 |
| 182:19 | 350:4 | 172:5,18 | 318:4 | 19:2 23:5 |
| 183:15,22 | **so-called** | 180:15 | 326:14,24 | 29:9 30:9 |
| 183:23 | 126:4 | 189:24 | 327:3,9,18 | 31:9 37:10 |
| 187:2,3,3 | 254:17 | 192:2 | 333:16 | 40:2 47:9 |
| 187:4,6 | **social** 17:4 | 193:3,9 | 339:10,23 | 55:1 60:12 |
| 195:15,24 | 17:8,10,12 | 200:20 | 340:4,5,8 | 66:14,23 |
| 196:24 | 17:16 | 208:23 | 341:13,16 | 67:3 70:7 |
| 197:8 | 18:16,21 | 210:12 | 346:25 | 76:20 84:5 |
| **sir** 15:5 | 20:8 21:1 | 214:3 | 350:15,21 | 86:6,7 |
| 153:11 | 21:5,23 | 220:4,6,25 | 350:21 | 90:21 91:8 |
| **sit** 130:8 | 23:20 24:2 | 221:20 | 351:2,6,13 | 95:25 |
| **sitting** | 24:5,10,13 | 222:16 | 351:24 | 100:15 |
| 263:17 | 27:1,22 | 223:20 | 352:11 | 104:1 |
| **situation** | 38:13 39:8 | 228:9 | 356:19,19 | 113:3 |
| 161:8 | 57:21 | 229:4,8 | 357:8,15 | 114:16 |
| 223:2 | 58:17 59:3 | 232:8,25 | 357:19,21 | 122:7 |
| 228:13 | 64:2 66:5 | 233:18,22 | 363:16 | 125:8,12 |
| 344:23 | 66:16,25 | 235:13 | 364:21 | 125:15 |
| **situational** | 67:17 68:8 | 237:3 | 365:2 | 138:2 |
| 155:7 | 73:11,18 | 239:11,21 | 366:2,5,25 | 139:17 |
| 267:17,24 | 78:21 79:6 | 241:6 | **society** | 143:16 |
| 268:2 | 93:21 94:7 | 242:16 | 16:19 | 145:6,7,10 |
| 325:24 | 94:13 | 244:18 | 73:11 | 147:2 |
| 326:1 | 107:20 | 245:4,16 | 105:13 | 150:25 |
| **six** 73:7,7 | 108:2 | 246:23 | 109:12,17 | 151:22 |
| 126:14 | 109:13 | 247:25 | 354:22 | 155:3 |
| 270:16 | 114:24 | 256:14 | **solving** | 163:13,15 |
| 331:1 | 118:25 | 257:17 | 65:25 | 164:13 |
| 337:25 | 120:22 | 258:2,5,12 | **somebody** | 166:17 |
| 338:6 | 122:18 | 258:13 | 62:22 | 167:20 |
| 349:23 | 123:5,17 | 259:4 | 102:2 | 168:4 |
| **size** 105:9 | 126:18 | 261:3 | 133:19 | 171:23 |
| **sizes** 357:9 | 127:5 | 263:24 | 135:4 | 173:8 |
| **skip** 334:24 | 129:12 | 265:17,22 | 168:6 | 178:1 |
| **skipping** | 131:20 | 266:9 | 174:12 | 186:2,18 |
| 141:15 | 132:1,12 | 268:23 | 224:14 | 195:4 |
| 298:19 | 132:17 | 269:1 | 227:5 | 196:8 |
| **slash** 28:9 | 134:4 | 274:5,8 | 263:13 | 197:5 |
| **slightly** | 138:11 | 277:9 | 333:8,10 | 198:22,25 |
| 91:14 | 144:4,24 | 278:7,13 | 358:11 | 214:9,15 |
| **slowly** | 146:3 | 286:19,23 | **somewhat** | 218:4,9,14 |
| 345:18 | 151:8 | 290:12,25 | 15:13 | 221:8 |
| **small** 122:19 | 152:18 | 291:25 | 105:10 | 222:11 |
| 193:25 | 153:15 | 293:5,6 | 352:4 | 223:15,17 |
| **Smoke** 281:16 | 157:9 | 296:16 | **Sonoma** 163:9 | 225:22,23 |
| **smoothly** | 163:19 | 300:18 | **soon** 14:15 | 225:25 |
| 15:2 | 164:11,13 | 305:18 | 198:14 | 226:1,1,4 |
| **Snell** 28:8 | 165:3 | 314:21 | 335:9 | 227:19 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 232:3,14 | 100:9 | 279:15 | **specific** | 133:22 |
| 232:23 | 102:11 | 338:1 | 27:19,20 | 135:9 |
| 233:18 | 114:21 | **speak** 14:20 | 37:17,25 | 149:9 |
| 241:3 | 115:7 | 27:8 36:2 | 38:11 | 150:3 |
| 243:4 | 123:24 | 42:5 56:2 | 39:24 | 207:17 |
| 249:1,21 | 130:16,16 | 58:3 61:21 | 56:15,24 | 235:9 |
| 252:13 | 131:1,7 | 64:16 | 74:6,14,16 | 237:1,7 |
| 253:9 | 151:20 | 67:13 | 75:3 90:12 | 242:6 |
| 257:11 | 152:4 | 87:22 | 116:12 | 245:17 |
| 262:3 | 179:12 | 115:16 | 120:10 | 246:9 |
| 268:12 | 206:25 | 131:16 | 129:9 | 254:8 |
| 269:10 | 220:22 | 149:11 | 133:21 | 256:17 |
| 273:9 | 234:20 | 161:24 | 143:24 | 259:15 |
| 274:22 | 286:21 | 177:20 | 216:23 | 275:17 |
| 279:22 | 329:14 | 207:3 | 220:12 | 276:24 |
| 280:14 | 345:12 | 243:12 | 236:10 | 282:11 |
| 281:6 | 368:18 | 367:18 | 237:16,21 | 283:24 |
| 282:1 | **sorts** 20:25 | **speaking** | 240:8 | 284:17 |
| 284:9 | 25:21 | 15:22 16:7 | 241:19 | 297:1 |
| 291:13 | 26:25 | 24:24 27:7 | 242:3 | 301:6 |
| 292:12 | 27:16 | 27:10,17 | 247:13 | 341:16 |
| 293:11 | 40:13 | 33:21 36:6 | 255:4 | **specificity** |
| 297:17,17 | 129:1 | 37:19,21 | 258:24 | 211:13 |
| 297:20 | 147:24 | 65:5 74:2 | 268:8,14 | **specifics** |
| 299:23 | 304:4 | 79:19 | 272:22 | 37:20 |
| 302:6 | 342:8,12 | 83:18 94:4 | 273:12,24 | 39:24 |
| 303:3 | 343:9 | 107:5 | 278:14 | 80:10 |
| 305:15 | 356:9 | 119:14 | 282:13 | 107:21 |
| 307:23 | **sound** 279:25 | 128:2,7 | 285:12,12 | 141:9 |
| 311:1 | 334:21 | 143:13 | 285:24 | 181:20 |
| 314:1 | **sounded** | 177:17 | 290:5,9 | 247:4 |
| 318:21,22 | 54:16 | 215:11,22 | 294:18 | 251:25 |
| 320:1 | **sounds** 96:14 | 220:14 | 303:7 | 286:17 |
| 325:15 | 160:13 | 235:1 | 304:13,25 | **specify** |
| 327:8 | 207:18 | 257:6 | 305:20 | 115:11 |
| 330:21 | 308:21 | 258:21 | 336:6 | 200:13 |
| 334:23 | 364:1 | 263:10,12 | 341:8 | **speculate** |
| 344:7 | **source** 16:22 | 264:25 | 345:25 | 91:23 97:2 |
| 347:12 | 42:16 | 304:2 | **specific...** | 216:6 |
| 351:23 | 123:14 | 305:10 | 37:16 | 231:14 |
| 361:17 | 274:5 | 309:4 | 65:24 74:3 | 272:15 |
| 363:5 | 279:6,11 | 325:20 | 84:6 99:6 | **speculating** |
| 368:13 | 325:21 | 340:10 | 103:20 | 68:23 |
| 369:23 | 326:8,9 | 357:18 | 105:24 | 266:10 |
| 371:10 | **sources** 24:4 | 358:7 | 113:10,14 | **speculation** |
| **sort** 18:3 | 123:9 | **special** 4:4 | 113:21 | 71:21 72:4 |
| 30:23 | 329:4 | 320:19 | 118:19 | 87:17 97:1 |
| 47:15 | 357:22 | **Specialist** | 121:19 | 98:12 |
| 99:20 | **space** 25:6 | 4:20 | 124:9 | 111:9 |

| | | | | |
|---|---|---|---|---|
| 115:10 | **spoke** 78:4 | 276:20 | 89:6 | 100:7 |
| 118:17 | 334:21 | **stage** 47:7 | **Stamped** 6:5 | 101:25 |
| 122:22 | **spoken** 307:3 | 174:2 | 6:14,21 | 104:18,22 |
| 142:7 | **spot** 284:10 | **stages** 241:9 | 7:9,10,13 | 117:5 |
| 149:18 | 348:25 | **stakeholder** | 7:18 8:5 | 142:2,25 |
| 178:16 | **spread** 32:6 | 108:19 | 8:21,22 | 147:20 |
| 194:15 | 144:19 | 110:8 | 9:14,19,20 | 169:7,12 |
| 198:6 | 158:10 | 111:7,12 | **stand** 270:14 | 169:15,20 |
| 201:5 | **spreader** | **stakehol...** | 307:19 | 169:25 |
| 202:16 | 126:3 | 16:13,19 | 308:15 | 170:11,14 |
| 204:13,24 | **spreaders** | 18:11,16 | **standard** | 170:15 |
| 231:11 | 125:23 | 20:9 44:15 | 66:18 | 172:8,11 |
| 244:21 | **spreading** | 97:7 | 180:5 | 172:11 |
| 273:2 | 114:23 | 105:13,22 | 187:13 | 182:7,13 |
| 283:22 | 124:24 | 108:11,15 | 200:25 | 182:24 |
| 294:17,24 | 160:8 | 108:25 | 372:18 | 185:16 |
| 298:12 | 207:8 | 109:3,5,7 | **standing** | 186:11,11 |
| 304:22 | 323:4 | 109:12 | 179:3 | 186:13,23 |
| 310:13 | **spreads** | 137:25 | **standpoint** | 188:2,5,8 |
| 316:20 | 323:11 | 147:10 | 46:22 | 195:11 |
| 324:25 | **spreadsheet** | 152:9 | 143:25 | 196:15,18 |
| 333:19 | 165:15,22 | 263:3 | 154:21 | 204:9,11 |
| 351:16 | 166:2,5,8 | 264:2 | 239:24 | 204:15,16 |
| 352:8 | 190:6,9 | 303:25 | 332:24 | 204:17 |
| 354:13 | 193:14 | 322:20 | 359:7 | 361:22 |
| 356:22 | 201:10,14 | 366:2 | **stands** 59:16 | 362:3 |
| 358:15 | **spring** 70:9 | **stalled** | 146:10 | 368:14 |
| 359:23 | 89:10 | 364:19 | 307:22 | 370:4 |
| 360:20 | **stability** | **Stamos** 70:5 | **Stanford** | **Stanford's** |
| 361:14 | 339:7 | 70:14 | 46:23 48:2 | 134:10 |
| **speech** 320:4 | **staff** 16:2 | 72:17 76:9 | 48:18 | **Starbird** |
| 348:5 | 28:9 53:25 | 76:14,15 | 49:20 | 72:21 |
| **speed** 275:22 | 54:6 57:8 | 77:8,17,22 | 50:22,22 | 87:25 |
| **speed/pr...** | 113:10,12 | 77:25 78:7 | 51:8,10,15 | 360:5 |
| 272:10 | 113:13 | 85:22,23 | 51:22 52:5 | **start** 14:3 |
| 273:16 | 148:25,25 | 86:3,11,16 | 52:11 58:9 | 212:6 |
| 275:23 | 149:1 | 87:15 88:8 | 58:11 | 233:11 |
| **spell** 32:20 | 171:8 | 98:7 99:10 | 70:14,21 | 244:8 |
| 155:3 | 330:19,22 | 99:16 | 70:21 | **started** 12:2 |
| 167:5 | 331:1,11 | 101:2 | 72:16 | 24:17 32:2 |
| 279:23 | 333:8,13 | 111:22 | 74:18 | 76:17 |
| **spelling** | **staffing** | 116:20,24 | 76:14 78:4 | 88:24 |
| 373:4 | 173:23 | 117:2,5 | 78:5,8 | 89:13 |
| **spend** 87:7 | **Stafford** | 136:9 | 80:17,21 | 117:1 |
| **spent** 314:9 | 167:19 | 139:7 | 80:23 81:6 | 174:4,5,20 |
| **spilling** | 179:19 | 142:12 | 81:12,17 | 174:21 |
| 247:19 | 184:14 | 362:12 | 82:2 83:24 | 336:12 |
| 297:9,15 | 191:25 | 368:13,21 | 85:6 89:4 | 368:14 |
| **split** 107:11 | 192:13 | **Stamos's** | 89:6,11,20 | **starting** |

| | | | | |
|---|---|---|---|---|
| 12:5 18:6 | 377:1 | **stead** 21:1 | 338:12 | **subdivision** |
| 98:3 | **state's** | **stenogra...** | **string** 7:8 | 15:9 |
| 241:20 | 204:6 | 374:7 | 9:18 | 307:25 |
| 283:14 | 205:12 | **step** 80:19 | **strong** 96:7 | **subject** |
| 297:8 | 206:6,15 | 106:25 | 317:6 | 150:20 |
| 307:1 | 206:19 | 263:2 | **structure** | 152:22 |
| 323:24 | 214:13,18 | 347:10 | 339:8 | 153:19 |
| **starts** 324:4 | **state/local** | **steps** 16:14 | **stuck** 188:1 | 217:15 |
| **state** 1:5 | 24:1 | 123:12 | **student** | 246:21 |
| 10:6 11:16 | **stated** | 171:25 | 169:7 | 255:22 |
| 24:4 38:2 | 148:18 | 221:13 | **students** | 282:13 |
| 44:23 50:9 | 334:2 | 231:6,8 | 50:22,23 | 289:23 |
| 50:9 54:20 | **statement** | 295:4,19 | 51:15 | 297:11 |
| 54:23 | 21:12,13 | 298:3 | 89:20 90:1 | 361:5,16 |
| 57:18 | 218:18 | 302:17 | 97:5 370:4 | **submitted** |
| 58:23 60:1 | 219:21 | 304:13 | **studies** | 108:9,10 |
| 60:23 61:3 | 220:16 | 316:9 | 170:11 | 189:18 |
| 79:3 85:1 | 221:1,3,10 | 357:13 | **study** 95:15 | 199:21 |
| 91:19 | 221:15,22 | **stood** 60:7 | **stuff** 15:3 | 200:4 |
| 93:15 96:6 | 221:24 | 80:20 | 53:17 | 243:13 |
| 96:16 | 222:2,6 | 104:9 | 64:13 96:3 | **submitting** |
| 101:10,18 | 253:20,21 | 325:5 | 115:3 | 105:22 |
| 101:19 | 253:24 | 362:12 | 116:3,8 | **subscribe** |
| 103:14 | 254:3,7,15 | 364:4 | 121:24 | 145:2 |
| 106:11 | 254:22 | **stop** 266:19 | 166:13 | 377:11 |
| 148:5 | 314:19 | **store** 281:9 | 169:15 | **subsector** |
| 149:15 | **statements** | **stories** | 177:21 | 59:15 |
| 164:8,14 | 127:21 | 124:19 | 184:4 | 60:15 |
| 204:17 | 219:18 | **straight** | 187:11 | 339:7 |
| 207:4,7 | 222:14 | 120:18 | 188:11 | **subsidiary** |
| 215:10 | 225:10 | **strategic** | 189:11 | 38:18 |
| 221:25 | **states** 1:1 | 25:18 36:7 | 227:6 | **substance** |
| 223:4 | 10:9,25 | 36:8 37:22 | 234:20 | 377:8 |
| 225:2,19 | 41:12 | 235:3 | 238:17 | **substantial** |
| 246:1 | 45:19 | **strategi...** | 240:16 | 50:23 |
| 265:20 | 59:22 | 27:11 | 241:14 | 135:23 |
| 266:7 | 90:18 91:5 | **strategy** 9:9 | 289:13 | 153:4 |
| 278:4,11 | 94:22 95:6 | 12:10 | 366:8 | 264:4 |
| 278:19 | 95:12,16 | 321:7 | 368:18 | 317:18 |
| 281:18 | 147:10 | 328:13,24 | **sub-bullet** | **substant...** |
| 296:17 | 223:25 | 329:2,8,11 | 354:22 | 136:1 |
| 297:2 | 275:7 | **streamlined** | 357:6 | **suffice** |
| 298:9 | 342:1 | 65:11,14 | **subcommi...** | 301:4 |
| 299:11,21 | **stating** | **Street** 3:9 | 72:24,25 | **suggested** |
| 300:20 | 329:23 | 3:20 375:6 | 353:3,7 | 312:3 |
| 304:15 | **statutory** | 375:21 | **subcommi...** | **suggesting** |
| 369:3 | 61:20 | **strengthen** | 70:18 | 95:4 |
| 375:8 | **stay** 107:12 | 336:16,20 | **subcompo...** | 286:20 |
| 376:3 | 173:3 | **stressed** | 118:1 | **summarized** |

| | | | | |
|---|---|---|---|---|
| 74:13 | **suppose** | 187:2,4 | 362:19 | 170:19 |
| **summary** 36:9 | 17:25 | 188:11,16 | **surprised** | 171:1,4 |
| 73:7 74:15 | 45:11 | 197:23 | 52:18 76:1 | 173:25 |
| 89:15 | 219:12 | 198:4 | 237:9 | 184:6,18 |
| 260:9,13 | 221:14 | 201:8 | 247:16 | 189:23 |
| 260:21,22 | 340:3 | 203:2 | 272:23 | 193:4,6 |
| 346:16 | **supposedly** | 207:10,12 | 296:23 | 213:15 |
| **summer** 36:16 | 218:25 | 211:15,21 | 334:14 | 216:13 |
| 36:17 70:9 | **suppressed** | 218:7 | **surprising** | 241:21,24 |
| 86:4 97:6 | 320:19 | 219:9 | 273:10 | 265:11,14 |
| 117:1 | **suppresses** | 221:2 | **suspect** | 266:21 |
| 151:18 | 354:23 | 223:16,19 | 103:3 | **switched** |
| 170:9,10 | **Supreme** 3:8 | 237:18,25 | 108:24 | 252:14 |
| 186:7,14 | **Sur** 3:18 | 238:18 | 163:7 | **sworn** 11:10 |
| 187:8,24 | 11:5 | 239:13 | 261:18 | 11:13 |
| 188:10 | **sure** 11:18 | 240:6 | 289:16 | **sync** 21:4 |
| 234:7 | 15:1 16:10 | 241:11 | 290:3 | 24:13 |
| **Summit** 5:19 | 17:12 | 243:16 | 326:21 | 36:20 78:7 |
| **super** 239:15 | 20:20 | 249:2 | 331:6 | 127:19,22 |
| 325:18 | 26:22 29:8 | 256:16 | 333:10 | 128:14 |
| **supervision** | 34:2 42:13 | 257:13,15 | **swear** 11:9 | 132:4 |
| 374:9 | 52:14 | 259:20,23 | **switchboard** | 233:17 |
| **supervisor** | 54:24 56:1 | 261:8 | 16:24 17:1 | 238:9 |
| 22:13 | 57:2 60:14 | 265:2 | 168:10 | 244:17 |
| 140:22 | 61:4 62:5 | 267:2 | 263:15 | 245:14 |
| 141:11 | 63:1 65:1 | 269:10 | 366:3,23 | 246:7 |
| **suppleme...** | 65:15 | 271:17 | 367:15,22 | 247:2,11 |
| 276:13 | 66:12 67:3 | 273:19 | **switchbo...** | 255:3 |
| 277:2 | 68:25 | 286:25 | 131:16 | 260:5 |
| **supply** | 74:12 77:1 | 295:24 | 179:16 | 269:6,14 |
| 220:24 | 79:11,14 | 296:19 | **switchbo...** | 269:25 |
| **support** | 80:8 84:12 | 299:19 | 64:16 | 272:2 |
| 54:18 | 85:13 93:6 | 300:22,24 | **switchbo...** | 306:2,9 |
| 184:4 | 102:15 | 301:1 | 21:25 22:2 | 317:16 |
| 220:8 | 124:18 | 302:24 | 23:17,19 | **synch** 178:25 |
| 301:9 | 132:9 | 303:10,25 | 23:24 | 238:6 |
| 307:17 | 135:2 | 305:11 | 62:17 63:3 | **syncs** 132:5 |
| 322:2 | 140:21 | 306:15 | 63:7,17,20 | **system** 96:8 |
| 325:3 | 149:7,12 | 316:25 | 64:7,9,12 | 158:20,24 |
| 331:3,14 | 151:1 | 331:8 | 118:21,22 | 159:4 |
| 337:11 | 152:2,9 | 337:6,7,20 | 118:24 | 181:23,25 |
| **supported** | 161:1 | 363:22 | 131:9,12 | 182:1,3,7 |
| 90:10 | 162:13 | 365:22 | 138:4,5,8 | 182:7 |
| 149:2 | 166:4 | **surprise** | 149:3,5,20 | 267:13 |
| **supporting** | 176:17,24 | 80:11 | 156:21 | 342:4 |
| 187:11 | 178:21 | 236:22 | 161:20 | 355:13,17 |
| 331:3 | 181:8,13 | 247:4 | 163:18 | 355:20 |
| **supports** | 184:7 | 252:1 | 166:1 | **systems** 2:7 |
| 43:17,20 | 185:23 | 255:6 | 169:1 | 270:12 |

| | | | | |
|---|---|---|---|---|
| 288:6 | 137:20 | 116:15 | 245:20 | 370:3 |
| 341:25 | 140:8 | 127:18 | 250:17 | **talks** 44:19 |
| 342:11 | 141:2 | 128:3 | 259:13 | 78:20 |
| 374:20 | 142:14 | 133:21 | 263:7,21 | 90:14 |
| | 147:13 | 172:4,23 | 264:15 | 108:9 |
| **T** | 157:8 | 208:9 | 306:2 | 146:6 |
| **T** 4:1  5:1,1 | 158:6 | 209:21,24 | 310:23 | 254:3 |
| 5:6  6:1,1 | 170:13 | 240:1,13 | 312:19 | 363:13 |
| 7:1,1  8:1 | 179:16 | 241:12,23 | 335:3 | 368:12,18 |
| 8:1  9:1,1 | 183:1 | 258:3 | 351:13 | 370:8 |
| **table** 73:6 | 190:1,21 | 296:2 | 355:16 | **tally** 349:23 |
| 232:17,18 | 219:20 | 306:14,14 | 360:11 | **tangential** |
| 232:18,19 | 221:13,23 | 311:7 | 362:5 | 13:13 |
| **tactic** | 231:8 | 325:22 | 368:19 | **Tangle** |
| 114:19 | 242:3 | 344:14,18 | **talking** | 144:18,22 |
| 236:11,21 | 261:2,12 | 349:6 | 28:24  31:2 | 144:23 |
| 246:11 | 275:5,11 | 356:18 | 31:11,17 | 145:2,13 |
| 255:7 | 276:1 | 357:10 | 41:7  45:14 | 146:7 |
| 273:11 | 277:14 | 359:4 | 47:10 | **target** 57:16 |
| **tactics** 41:5 | 313:14 | **talked** 26:20 | 56:24 | 321:8 |
| 41:13 | 316:9 | 26:21,22 | 83:15 | **targeted** |
| 114:11,22 | 318:22 | 46:22,24 | 91:14 | 114:19 |
| 114:23 | 328:22 | 58:10  63:3 | 96:15 | 254:11 |
| 116:12 | 342:18 | 65:10,11 | 114:25 | 256:10,19 |
| 279:6 | 345:17 | 72:13  82:1 | 145:19 | 278:20 |
| 316:6 | 348:7 | 85:5,21 | 163:5 | **targeting** |
| 323:4 | 349:3 | 91:15 | 185:8 | 16:5  57:11 |
| 359:10 | 358:24 | 93:14 | 206:12,13 | 87:3  96:10 |
| **take** 16:15 | 361:9 | 96:15 | 208:14,21 | 96:18 |
| 31:10,19 | 367:4 | 99:11 | 210:24 | 154:1 |
| 43:8  50:13 | **takeaways** | 100:16 | 217:12 | 331:17 |
| 57:24 | 141:8 | 121:17 | 237:14 | **targets** |
| 60:21  63:2 | 143:20 | 132:4 | 239:13 | 258:19 |
| 63:6  65:10 | **taken** 177:13 | 140:21 | 240:21 | **task** 12:5 |
| 80:19  81:9 | 178:6 | 142:21 | 242:6 | 118:1,7 |
| 81:10  85:9 | 288:11 | 147:22 | 243:10 | 130:2 |
| 89:10 | 304:13 | 157:22 | 244:25 | 271:6 |
| 94:12 | 374:4,7 | 161:13 | 245:1,21 | 312:2 |
| 96:22 | 375:12 | 171:21 | 246:13 | 330:15 |
| 103:7 | 376:4 | 173:22 | 256:12,17 | 348:13 |
| 106:25 | **talk** 5:15 | 179:1 | 259:3 | **tasked** |
| 111:21 | 12:21 | 181:18 | 260:7 | 174:13,14 |
| 112:4,9 | 26:11  41:3 | 208:15 | 263:25 | **tasks** 90:12 |
| 116:2 | 41:4  45:5 | 213:25 | 274:7,9 | **team** 8:13,15 |
| 118:6,23 | 47:13  84:4 | 216:18,20 | 294:3,14 | 15:17,23 |
| 120:20 | 99:25 | 233:6,7 | 294:19,21 | 16:2,2,4 |
| 121:10 | 100:10 | 235:10 | 296:15,20 | 18:4,8 |
| 123:12 | 102:19 | 238:10 | 333:22 | 19:10 |
| 133:6 | 111:22 | 244:17 | 335:5 | 36:14 |

| | | | | |
|---|---|---|---|---|
| 39:15 | 348:12,13 | 221:17 | 317:17 | 114:21 |
| 42:24 | 350:13 | 348:15 | 336:23 | 143:6,8 |
| 44:10 | 353:10,12 | **tells** 280:10 | 345:8 | 210:17 |
| 75:20 | 353:13 | 340:5 | 373:13,14 | 219:13 |
| 102:3 | 358:24 | **tended** 216:5 | **text** 8:22 | 280:19 |
| 113:13 | 366:3,23 | **tenth** 283:7 | 217:4 | 295:4 |
| 115:19,25 | 367:12 | **term** 138:9,9 | 309:25 | 301:14 |
| 117:12 | 368:14 | 242:5 | 310:3 | 309:9 |
| 118:8,10 | **team's** | 293:20 | 312:1 | 345:12 |
| 118:15 | 342:23 | **terminology** | 316:11,12 | **things** 16:3 |
| 131:18 | **teammates** | 127:13 | 317:21 | 25:4 26:25 |
| 143:22 | 308:7 | **terms** 31:18 | **texting** | 27:11,17 |
| 159:14 | **teams** 42:9 | 54:18 | 310:11 | 41:17 43:5 |
| 161:6 | 287:18 | 83:22 | **texts** 310:10 | 44:3,18 |
| 166:9,12 | 288:1 | 154:4 | **thank** 29:24 | 46:16 |
| 171:18,20 | 311:9 | 155:21 | 87:24 | 55:10 69:4 |
| 174:5 | **tech** 279:12 | 166:10 | 88:14 | 71:4 |
| 180:7 | 279:14 | 184:6 | 183:10 | 113:16 |
| 188:25 | **technical** | 260:18 | 199:4 | 114:11,19 |
| 189:4,7 | 83:17,17 | 288:23 | 206:2 | 115:2 |
| 263:13,14 | 146:19 | 317:18 | 224:17 | 124:19 |
| 263:19 | 195:18 | **terrorism** | 227:21 | 129:1 |
| 278:25 | **technically** | 26:23 | 272:1 | 131:7 |
| 279:16 | 130:9 | 27:16 | 300:12 | 144:9 |
| 289:10 | 175:2 | **test** 152:11 | 308:14 | 159:3 |
| 299:1 | **technique** | 154:7,10 | 367:3 | 168:14 |
| 303:20 | 115:4 | 154:17 | **thanked** 89:9 | 174:9 |
| 305:18 | **Technolo...** | **testified** | **thanks** 176:2 | 207:1 |
| 307:15 | 9:25 | 11:13 | 199:16 | 216:16 |
| 311:9 | **technology** | 150:10 | 200:10 | 235:11 |
| 312:2,3 | 286:16 | 156:22 | 277:15 | 238:23 |
| 318:11 | **teleconf...** | 192:25 | 292:25 | 254:8 |
| 320:11 | 332:13 | 193:8 | 295:3 | 256:8 |
| 325:10 | 334:2 | 245:11 | 299:21 | 258:19 |
| 326:5,7,21 | **tell** 111:19 | 255:24 | **theft** 76:25 | 260:6 |
| 326:23 | 118:22 | 276:19 | **theirs** 67:15 | 264:18 |
| 330:21 | 158:13 | 309:10 | 301:11 | 268:25 |
| 331:5,6,10 | 198:14 | 360:24 | **theme** 259:5 | 270:13,14 |
| 331:13,16 | 211:23 | 365:3 | 349:8 | 279:7 |
| 331:19,23 | 214:5 | 367:4 | **themes** 256:8 | 284:2 |
| 335:20,25 | 215:11 | **testify** | 256:14,21 | 290:20 |
| 336:5,17 | 244:25 | 251:16 | 257:18 | 291:2,6 |
| 336:21 | 257:18 | **testimony** | 258:4,12 | 292:8 |
| 337:4,15 | 266:17,23 | 23:7 89:25 | 259:1 | 304:4 |
| 338:22 | 287:12 | 97:22 | **theory** 154:8 | 306:13 |
| 343:19 | 334:16 | 118:23 | 154:10 | 316:7 |
| 344:22 | 349:1 | 119:6 | **thereon** | 325:23 |
| 346:16 | **telling** | 202:18 | 377:10 | 326:11 |
| 347:23 | 35:18 | 276:16 | **thing** 88:9 | 333:24 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 334:16 | 125:6 | 255:24 | 371:25 | **threats** 25:3 |
| 340:15 | 128:1,21 | 256:9,22 | 372:5,18 | 26:16,21 |
| 342:12 | 131:22 | 256:25 | **thinking** | 26:23 |
| 345:11 | 134:21 | 257:12 | 37:23 | 27:16 |
| 346:24 | 135:24 | 258:15,16 | 53:15  58:5 | 235:18,24 |
| 348:1,22 | 136:13 | 258:22 | 85:15  87:6 | 340:17 |
| 348:24 | 137:7,8,16 | 259:6,21 | 99:22 | 366:15 |
| 349:13 | 139:20 | 261:9 | 100:2 | **three** 19:8 |
| 358:23 | 140:2,4,17 | 262:5,19 | **third** 72:10 | 35:17,23 |
| **think** 15:1 | 142:17 | 263:17,21 | 90:4 | 43:17,22 |
| 19:12 | 143:4,5,23 | 265:24 | 119:25 | 44:8  48:18 |
| 20:17 | 144:10 | 267:8 | 249:25 | 50:11 |
| 24:18 | 149:4 | 268:7,9,15 | 320:15 | 110:11 |
| 26:23 | 150:10 | 268:20,21 | 346:7 | 119:8,17 |
| 38:25  47:3 | 156:21 | 270:25 | 361:19 | 187:14 |
| 48:1,17 | 157:4 | 271:2,12 | 364:16 | 191:17 |
| 49:1  50:3 | 158:16 | 276:22 | 365:17 | 214:19,21 |
| 53:23,24 | 162:16,18 | 279:18,19 | 366:1 | 215:5 |
| 54:22  55:1 | 165:14 | 281:17 | 368:11 | 254:8 |
| 55:7,22,25 | 166:20,22 | 286:23 | **third-party** | 308:22 |
| 56:11,16 | 167:1 | 288:14 | 288:1 | 331:3 |
| 58:4,7,10 | 169:2 | 290:24 | 325:22 | 345:15 |
| 58:13  59:5 | 173:5 | 295:8,9 | 326:10 | **throttled** |
| 60:18 | 174:2,13 | 296:1 | **thought** | 320:19 |
| 65:13,17 | 175:10 | 298:14 | 56:14,20 | **throw** 217:11 |
| 65:19,22 | 177:17 | 300:23 | 58:14 | **Thursday** |
| 66:7  71:1 | 180:4,20 | 301:3 | 100:1 | 1:15  157:2 |
| 72:15 | 181:3,18 | 305:8 | 116:3 | **ticket** |
| 74:15 | 182:16 | 306:1,8,12 | 145:7 | 144:16 |
| 80:14 | 187:3,3 | 306:12,17 | 159:13 | 146:2 |
| 81:19  82:5 | 192:5 | 307:22 | 160:4 | 158:10,18 |
| 82:8  83:15 | 194:7 | 311:4 | 161:5 | 161:15 |
| 84:14 | 197:14 | 314:6 | 227:25 | 162:19,22 |
| 87:11 | 198:16 | 315:5 | 232:14 | 199:13 |
| 88:24 | 204:16 | 317:5 | 252:17,17 | **ticketing** |
| 90:11 | 212:11 | 318:7 | 260:18 | 158:20,23 |
| 91:25  92:7 | 215:20 | 328:1 | **thread** 81:5 | 159:4 |
| 92:12,13 | 220:5 | 329:11,13 | 81:10 | 181:22,25 |
| 93:18,24 | 222:3 | 329:17 | **threat** 37:17 | 182:1,3,6 |
| 94:2  100:6 | 227:14 | 333:4,7,11 | 37:23  38:1 | **tickets** |
| 100:7,17 | 232:12 | 337:8 | 338:13 | 108:9,10 |
| 101:4,15 | 233:9,21 | 341:22 | 339:12 | 109:17 |
| 106:1,15 | 236:4 | 344:15 | 341:13 | 110:1 |
| 112:15 | 239:4 | 345:4 | **threaten** | 122:12 |
| 113:4,4 | 240:23 | 351:10 | 340:8 | **tier** 106:18 |
| 117:7 | 245:22 | 353:19 | **threatening** | 107:14 |
| 119:15 | 250:20 | 357:24 | 235:20 | **tiered** |
| 124:14,15 | 251:7 | 365:3,21 | **threatens** | 144:15 |
| 124:16 | 252:13,15 | 369:10 | 340:11 | **time** 10:4 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 22:15,18 | 351:4,4,11 | 214:5 | 303:18 | 169:19 |
| 22:22 | 351:11 | **tips@202...** | **tonight** | 190:6,8 |
| 28:24 | 352:4,5 | 203:1 | 292:9,11 | 228:9 |
| 30:17,25 | 360:18 | 230:17 | 292:14,15 | 229:3 |
| 34:24 35:2 | 362:22,25 | **tips@202...** | 292:17,18 | 287:4 |
| 41:7 46:3 | 372:12 | 202:8 | **tool** 145:21 | 288:22 |
| 55:16 | **timeframe** | 204:2 | **tools** 108:6 | 289:2,21 |
| 70:12 78:8 | 31:1 36:10 | 205:13 | 155:21 | **traction** |
| 83:9,12 | 39:10,18 | 213:21 | 231:13 | 228:10 |
| 87:7 90:7 | 55:6 71:15 | 230:9,14 | **top** 15:7 | 229:4 |
| 100:25 | 85:10 86:8 | **tips@202...** | 83:4 | **traditional** |
| 105:2,6 | 86:18 | 203:18 | 157:16 | 254:18 |
| 127:16 | 87:15,21 | **tips2202...** | 163:6 | **traffic** |
| 139:10,24 | 104:20 | 205:5 | 201:22 | 159:24 |
| 141:12 | 122:19 | **title** 11:20 | 241:19 | **transcribed** |
| 142:23 | 129:20 | 15:19 29:5 | 289:19 | 12:20 |
| 158:17 | 170:24 | 29:9 32:24 | 299:14 | **transcript** |
| 164:25 | 177:7 | 32:25 | 338:13 | 5:7 6:2 |
| 169:4,5,8 | 227:2 | 129:19,23 | **topic** 13:13 | 7:2 8:2 |
| 169:24 | 285:19 | 289:11 | 181:6 | 9:2 13:7 |
| 180:22 | 293:7 | 311:16 | 312:12 | 368:12 |
| 181:4 | 327:25 | 335:19 | **topics** 236:5 | 370:2 |
| 183:5,8 | 337:14 | **today** 11:3 | 248:9 | 372:15 |
| 186:24 | **timeline** | 13:3 14:8 | 274:15 | 374:5 |
| 209:8,11 | 55:6,8 | 20:13 | 308:22 | 375:16 |
| 218:1 | 98:20,24 | 240:21 | 315:14 | **transcri...** |
| 220:1,1,9 | 178:8,18 | 244:17 | 321:10 | 5:14,18 |
| 249:11 | 179:11 | 245:11 | **total** 180:20 | 373:14 |
| 255:10 | **timelines** | 276:16,19 | **touch** 59:6 | **transiti...** |
| 265:17 | 101:6 | 282:6 | 62:12,12 | 330:14 |
| 271:12 | 176:19 | 283:11 | 101:13,16 | **transpar...** |
| 276:6,9 | **times** 38:22 | 299:7 | 101:24 | 261:10 |
| 277:5 | 174:15,15 | 334:9 | 102:1,5,25 | **transparent** |
| 287:19 | 174:16 | 364:22 | 112:6,10 | 260:19 |
| 297:10 | 177:22 | 366:22 | 112:13 | **Treasury** |
| 300:17 | 201:10 | **today's** 10:3 | 234:14,21 | 343:16 |
| 302:21 | 230:20 | 253:20,25 | 351:6 | 350:13,19 |
| 303:1,3 | 238:5 | 254:7 | **track** 45:17 | 350:25 |
| 306:5 | 247:10 | **Todd** 3:4 | 151:23,24 | 351:22 |
| 314:9 | 255:6 | 10:22 | 152:17 | 352:5,10 |
| 315:21 | 273:10 | **Todd.sco...** | 153:15 | 355:22 |
| 319:10,13 | 351:9 | 3:14 | 165:22 | 356:15 |
| 323:23 | **timestamps** | **told** 86:25 | **tracked** | **trend** 40:5 |
| 324:9 | 293:2 | 215:15 | 144:2 | 315:8 |
| 327:25 | **timing** | 246:18 | 161:15 | **trending** |
| 331:4 | 177:20 | 267:3 | **tracking** | 231:6,9 |
| 333:14 | **tiny** 73:5 | **tomorrow** | 150:16 | **trends** 41:13 |
| 334:5 | **tips** 66:14 | 277:3,12 | 158:10,14 | 235:8 |
| 336:8 | 202:14 | **ton** 238:23 | 165:15,19 | 305:20,24 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 306:7 | 347:16 | 290:10 | 283:8 | 223:11 |
| 314:14,18 | 357:25 | 291:11,19 | 288:18 | 226:14,19 |
| 314:21,23 | 358:5,9,17 | **tweets** | 289:9 | 230:7,12 |
| 315:1 | 359:8,11 | 159:17 | 291:1,19 | 248:24 |
| 323:3 | **trying** 49:20 | 177:4 | 291:20 | 256:10 |
| **triage** | 54:18 91:8 | 226:19 | 293:15 | 259:6 |
| 107:15 | 91:23 93:7 | 292:9,14 | 298:23 | 268:9 |
| **Trick** 213:8 | 94:4 97:3 | 292:16 | 299:6,20 | 271:11 |
| **tried** 239:18 | 131:5 | 305:20 | 300:4,15 | 272:9 |
| **tries** 344:22 | 135:23 | **twice** 333:8 | 301:5,10 | 279:18 |
| 346:16 | 152:7 | **Twitter** 27:3 | 360:18 | 281:22 |
| **trouble** | 154:2,7,17 | 38:15 65:2 | **Twitter's** | 290:5 |
| 98:24 | 154:19 | 65:8 127:5 | 282:24 | 291:21 |
| **true** 17:25 | 216:7 | 146:13,13 | 289:20 | 296:20 |
| 95:11 | 219:9 | 159:18,19 | 292:5 | 303:23 |
| 211:3 | 229:1 | 159:25 | **Twitter-...** | 306:8,16 |
| 281:1 | 241:9 | 162:25 | 238:11,15 | 325:12 |
| 330:19,22 | 256:18 | 163:5 | **two** 21:2,2 | 331:2,2 |
| 331:23 | 261:22 | 173:14 | 21:11,17 | 332:9 |
| 366:21,22 | 279:19 | 176:2,6,15 | 24:9,19 | 334:3,9 |
| 373:13 | 299:18 | 199:12,21 | 29:21 | 345:14 |
| 374:5 | 300:23 | 199:23 | 30:18 | 356:24 |
| 377:9,13 | 305:1 | 200:4,9 | 35:17 37:6 | 360:23 |
| **truly** 368:23 | 306:11 | 205:17,19 | 38:23 | 372:17,18 |
| **trust** 289:10 | 314:12 | 206:1,16 | 39:18 44:5 | **two-fifths** |
| 289:12,14 | 315:20 | 207:25,25 | 51:16,18 | 119:10 |
| **trusted** | 323:3,22 | 208:8 | 52:8 54:8 | **two-fold** |
| 108:10,14 | 329:5 | 209:1,16 | 59:19,20 | 265:24 |
| 108:18 | 342:17 | 210:2 | 60:10,12 | **tying** 90:11 |
| **truth** 9:4 | 346:11 | 211:16 | 67:25 75:9 | **type** 27:16 |
| 221:18 | 347:22 | 212:1,10 | 86:11 90:3 | 40:10 |
| 319:21 | 349:14 | 221:16 | 90:14 | 44:12 74:7 |
| 344:15 | 364:2 | 223:2 | 101:17 | 119:25 |
| **truths** | **Tuesday** | 224:6,7,16 | 113:24,25 | 240:16 |
| 345:11 | 226:6 | 226:9,12 | 117:7 | **types** 21:3 |
| **try** 13:1 | 373:6 | 226:14,17 | 119:16,21 | 21:17 |
| 25:1 27:21 | **turn** 139:5 | 226:22 | 119:22 | 243:21 |
| 46:3 47:5 | **turning** | 227:3 | 125:11 | 316:7 |
| 47:5 57:10 | 20:23 24:9 | 229:16,19 | 170:3,5 | 331:19,24 |
| 62:20 83:6 | 37:14 | 231:4,12 | 171:3,7,8 | **typewriting** |
| 220:8,19 | 42:20 | 233:23 | 181:3 | 374:8 |
| 229:9 | 78:19 | 239:6,6,9 | 184:25 | **typical** |
| 261:9 | 177:8 | 241:5 | 185:20 | 177:7,14 |
| 314:15 | 267:4 | 243:9 | 188:19 | 178:8 |
| 315:3,8,12 | 354:4 | 246:24 | 191:16 | 187:11 |
| 315:15,25 | **tweet** 224:18 | 281:8,13 | 193:18,19 | **typically** |
| 317:10 | 231:5 | 281:16,18 | 193:21 | 42:11 |
| 319:3 | 289:23 | 281:23,23 | 207:22 | |
| 332:1 | 290:2,5,8 | 282:4 | 214:20 | **U** |

BRIAN J. SCULLY 1/12/2023

U 4:1 6:1
  7:1 8:1
  9:1
U.S 4:13
uh-huh 13:2
uhn-uhn 13:3
Ukraine
  322:3
  324:6
  325:4,7
  326:15
ultimate
  347:19
umbrella
  148:18
unable 92:15
unambiguous
  289:24
unauthor...
  254:19
unavailable
  270:4
unclassi...
  25:20 26:9
  36:7 235:3
  257:4
  258:18
unclear
  370:21
  371:15
undermine
  27:21
  254:11
  283:15
  343:10
  356:13
undermines
  354:24
  355:10,19
undermining
  27:13
  354:21
underneath
  28:10
  148:19
  330:9
underpin...
  223:7
understand

13:15,17
16:14
44:15 47:6
48:14
56:23
59:13
79:24 93:7
94:5
143:17
151:2,25
152:19
153:7
154:3,16
219:9
223:13,16
241:12
249:3
256:18
277:13
297:21
304:3
305:20
312:2
314:14
315:1,20
316:9
323:3,7,22
324:7
327:11
343:6
345:9
355:24
358:3,19
358:22
368:23
understa...
  17:15
  56:19
  59:17
  61:19,25
  67:22 68:3
  68:9,20
  73:4 78:13
  89:8
  107:23
  108:1
  121:11
  122:17
  123:23

134:10
143:13
147:17
148:2,17
148:24
154:6
169:6,11
170:17
179:22
182:20
261:10
265:23
266:13
267:18
270:11
279:6
308:12,17
311:8
312:8
325:19
327:17
333:20
336:23
337:16
343:19
365:4
understood
  149:8
  158:19
  240:7
undertake
  240:8
  303:12
unfortun...
  14:14
  237:5
unified 9:9
  325:6,14
  326:2,6,16
  328:13,24
  329:1,7
United 1:1
  10:9,25
  41:12
  45:19
  90:17 91:5
  94:22 95:5
  95:12,16
  275:7

342:1
universe
  290:6,7,8
  291:8
  315:17
  359:2
University
  46:23,25
  46:25 47:1
  48:3,18
  72:19
  360:8
unofficial
  281:18
  349:22
unoffici...
  281:8
unpack
  102:11
unrelated
  356:17
unsure 90:4
unusual
  225:9
upcoming
  257:19
  299:1
update 129:4
  270:13,17
  282:6
  283:11
updates
  128:23
  234:23
updating
  283:12
upfront
  37:20
use 20:13,20
  39:22 94:1
  94:3
  109:20
  126:22
  138:9
  145:22
  210:20
  231:13
  254:18
  320:21

useful
  140:15
  156:7
  261:12
  314:15
  358:8
usefully
  144:7
uses 217:16
USG 179:1
  216:17
  233:13
  243:18
  245:15
  255:21
  260:5
  262:8
  272:10
  273:15
  274:24
  275:7,7,12
  275:19,22
  287:20
usual 289:1
usually 30:6
  233:12
  324:1

V

v 1:8 375:8
  376:3
V-i-r-a-...
  139:1
vaccine
  323:10
vaccines
  5:13 144:3
  322:1,10
vague 53:1
  77:10,11
  77:14
  87:16 93:2
  93:23
  130:19
  341:6
  344:25
validate
  224:3
variance

| | | | | |
|---|---|---|---|---|
| 153:25 | 347:12 | **waived** 373:7 | 164:9 | 261:14 |
| **varies** 44:21 | 349:3 | **wake** 335:25 | 178:2 | 327:4,21 |
| **various** 66:3 | 369:7 | **walk** 18:3 | 183:12 | 327:21 |
| 298:8 | **viewed** 71:4 | **walked** 54:11 | 216:2 | 334:21 |
| 351:2 | **Vijaya** | 71:1 | 218:7 | 341:15 |
| **vast** 180:21 | 360:14 | **Walter** | 240:6 | 370:9,13 |
| **vehicle** | **violates** | 157:18,24 | 253:23 | **watch** 264:14 |
| 61:16 | 261:6 | **want** 14:20 | 285:1 | 279:16 |
| 149:14 | **violations** | 14:25 | 287:3,11 | **watching** |
| **vendors** | 153:5 | 15:14  27:4 | 287:25 | 179:4 |
| 264:9 | 177:4 | 34:19  42:5 | 294:9 | **way** 41:11 |
| 267:12,13 | **violence** | 45:5  56:2 | 298:24 | 62:21 |
| **venues** | 340:17 | 58:3  61:21 | 343:4 | 67:18 |
| 357:15 | 366:11,15 | 63:11  69:5 | 356:18 | 81:18 |
| **verbal** 13:1 | **VIPs** 80:20 | 77:15  87:7 | **wanting** | 84:25  85:8 |
| **verifica...** | **Virality** | 91:22  92:9 | 351:23 | 101:15 |
| 288:2 | 5:11  134:6 | 93:6  96:3 | **wants** 13:18 | 108:2 |
| **verifying** | 134:9,15 | 97:2 | 315:1 | 119:25 |
| 98:7 | 135:8,21 | 113:22 | **warned** 207:1 | 125:3 |
| **Verizon** | 136:10,18 | 117:22 | **warning** | 133:19 |
| 233:24 | 137:3,17 | 127:13 | 207:7 | 148:23 |
| **versus** 10:7 | 138:18,24 | 133:24 | **warnings** | 164:11,20 |
| **video** 4:20 | 138:25 | 149:11 | 206:22 | 196:16 |
| 10:4  82:24 | 139:8 | 154:15 | **warrant** | 216:22 |
| 145:24 | 141:14 | 207:3 | 207:2 | 239:22 |
| 146:1 | 144:2 | 216:6 | **Warren** 43:18 | 260:18 |
| 223:6 | **visible** | 221:8 | 257:15 | 261:22 |
| 224:7 | 105:9 | 227:20,23 | **Washington** | 273:23 |
| **videogra...** | **voluntary** | 243:12 | 2:4  3:21 | 274:13 |
| 10:2,16 | 318:9,9 | 249:2 | 46:23  48:3 | 280:3 |
| 11:8,11 | **volunteer** | 252:20 | 48:19 | 281:3 |
| 34:24  35:2 | 89:21 | 253:5 | 72:20 | 286:22 |
| 83:9,12 | **vote** 8:19 | 283:11 | 304:15 | 300:1,4 |
| 183:5,8 | 302:5,15 | 300:25 | 360:9 | 324:10 |
| 209:8,11 | **votes** 217:12 | 308:21 | 375:6 | 327:11 |
| 276:6,9 | 286:14 | 318:12 | **wasn't** 62:17 | 337:21 |
| 319:10,13 | **voting** 96:11 | 358:21 | 63:8  67:12 | 347:19 |
| 362:22,25 | 96:19 | 367:18 | 75:20  76:6 | **ways** 108:4 |
| 363:4 | **voting-r...** | 372:25 | 87:8  106:7 | 119:8,16 |
| 372:10 | 147:3 | **wanted** 30:19 | 128:6 | 119:17,22 |
| **videos** 224:1 | ——————— | 30:22 | 139:12 | 120:4 |
| **Videotaped** | **W** | 62:18,25 | 151:24 | 159:23 |
| 1:14 | **W** 3:9 | 63:9  65:14 | 170:5 | 254:11 |
| **view** 58:22 | **wait** 14:24 | 68:15  72:6 | 175:4 | 279:3 |
| 146:1 | **waiting** | 86:19 | 199:1 | 283:24 |
| 239:8 | 174:9 | 121:2 | 201:7 | 340:12,20 |
| 261:4 | 212:16 | 152:6,11 | 203:5,6 | 340:24 |
| 329:10 | 252:11 | 152:12 | 227:8 | 342:6 |
| 338:22 | 302:7 | 163:8,25 | 238:23 | **we'll** 14:16 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 34:19 45:6 | 240:20 | 170:10,14 | 213:8 | 135:24 |
| 108:25 | 243:10 | 185:15 | 231:23,25 | 136:4 |
| 207:25 | 271:11 | 197:11,15 | 255:17 | 137:6 |
| 277:14 | 276:16 | 197:19 | 258:7 | 143:21 |
| 279:15 | 277:5 | 207:11,13 | 262:3 | 149:3 |
| 298:7 | 282:20 | 210:15 | 276:19 | 152:4,6 |
| 317:22 | 289:21 | 303:10 | 302:11 | 159:3 |
| 372:23 | 292:13 | **weren't** 59:2 | 306:23 | 169:12,13 |
| **we're** 28:24 | 294:10 | 65:1 152:9 | 318:22,25 | 169:22 |
| 31:1,17,17 | 322:18 | 211:15 | 341:7 | 172:1,3,7 |
| 34:25 35:3 | 355:21 | 239:15 | 372:9 | 181:14,17 |
| 41:7 44:13 | **Web** 8:7,11 | 334:13 | 374:13 | 182:13,17 |
| 45:13 | **website** | **Western** 1:2 | 375:15 | 184:5 |
| 125:10 | 43:13 | 10:10 | 376:2,25 | 185:16 |
| 139:13 | 123:24 | **WHEREOF** | **witness's** | 186:10,13 |
| 168:3 | 138:3 | 374:13 | 23:6 97:21 | 186:23 |
| 170:20 | 365:14,22 | **White** 140:4 | 345:7 | 187:5,13 |
| 173:5 | 365:23 | 140:18 | **wondering** | 188:1,4,11 |
| 175:23 | 366:22 | **whoa** 242:22 | 288:22 | 196:20 |
| 179:3,13 | **weed** 281:9 | 242:23,23 | **word** 82:9 | 197:12,15 |
| 180:13 | 281:16 | 242:23 | 93:8,11 | 197:21 |
| 183:6 | **week** 86:11 | **wide** 321:9 | 168:5 | 229:8 |
| 204:7 | 208:22 | **Wiki** 39:2 | 341:10 | 239:14 |
| 206:24 | 283:14 | 233:25 | 370:6 | 240:15 |
| 208:21 | 337:24 | **Wilson** | **words** 65:2 | 241:21 |
| 209:9 | **weekend** | 157:19 | 68:2 69:6 | 279:14 |
| 224:2 | 174:16 | 217:4 | 69:20 | 296:7 |
| 229:3 | **weekends** | 227:18 | 123:11 | 304:3,16 |
| 235:1 | 173:25 | **withdraw** | 149:4 | 305:7,11 |
| 242:18,19 | 174:4,6 | 153:6 | 160:6 | 314:13 |
| 252:11 | **weekly** 31:23 | **withdrawal** | 170:4 | 315:8 |
| 283:12 | 234:6,11 | 322:1 | 180:11 | 323:16 |
| 294:10 | 234:12,21 | 324:20 | 257:16 | 324:21 |
| 302:7 | 245:24 | **witness** | 287:11 | 325:12 |
| 307:14 | 332:13 | 10:22 11:2 | 317:11 | 343:3,4,8 |
| 323:3,22 | **weeks** 19:18 | 11:9,10 | **work** 16:24 | 356:6,6 |
| 338:16 | 127:1 | 14:21,22 | 17:1 25:9 | 362:17 |
| 343:13 | 295:15 | 34:17 35:5 | 43:3,9,18 | 364:19,24 |
| 346:11 | 334:3,9 | 83:3 91:2 | 43:19,20 | 368:15,22 |
| 348:8 | **weird** 130:7 | 125:8,11 | 46:5 47:4 | 370:18 |
| 355:22 | 269:11 | 150:21,25 | 47:15 | **worked** 38:19 |
| 356:4,7,8 | **welcome** | 152:23 | 49:14 | 51:7,19,22 |
| 358:20 | 287:22 | 153:20 | 52:13 | 64:10 66:8 |
| 363:1 | **went** 51:14 | 156:2,10 | 54:23 89:5 | 89:3 |
| **we've** 31:10 | 58:10 78:8 | 183:12,14 | 102:20 | 104:12 |
| 43:3 46:22 | 85:5,16 | 190:23 | 112:18 | 112:18 |
| 69:11 | 89:5 117:4 | 191:1 | 130:22 | 149:12 |
| 181:2 | 135:3 | 194:24 | 131:1,3,9 | 152:11 |
| 192:9 | 164:25 | 196:8 | 131:12 | 154:20 |

**BRIAN J. SCULLY  1/12/2023**

168:22
169:3,7
170:15
183:20
187:4
196:5,9
197:8
239:16
240:24
266:4
316:1,4,5
369:4
**worker**
217:10
218:24
219:1,11
**workers**
235:20
339:11
**working** 31:1
44:14
49:15  51:9
51:16
62:20,25
142:24
168:24
169:4,5,9
169:24,25
172:10
181:22,24
186:15,24
187:6
190:9
195:23
196:18
200:2
226:22
227:3
233:8
263:14
294:10
296:22
297:25
331:5
355:22
356:8
**works** 16:14
46:4  62:5
72:21

171:20
182:3
315:24
316:9
323:8
358:22
**world** 344:14
**worried**
356:12
**wouldn't**
17:23
41:25
52:18
55:14,15
75:15  76:1
80:11
107:6
162:2
169:2
174:18
177:16
193:14
194:6
198:7,7
220:1
230:23
235:16
236:22
237:8
243:19
252:1
267:23
296:22,23
334:14
339:2
341:15
343:21
347:18
362:18
368:1
**woven** 60:3
**writing**
124:12
298:23
**written** 43:8
43:9  124:1
188:22
190:10
299:5

303:2
329:8
**wrong** 61:20
284:9
**wrongdoing**
153:2
**wrote** 209:19
211:8
229:11
287:23
288:25
289:25
292:20
295:13
312:6,24
313:3
314:17
316:16
318:2
**Wyman** 28:6
304:14,18
305:2,4
353:18
360:22

_____
**X**
**x** 1:4,12  5:6
6:1  7:1
8:1  9:1
**XII** 87:23

_____
**Y**
**yeah** 14:22
15:21
17:25
18:18  20:3
20:22  23:8
23:15
30:16  31:7
31:9,14,17
33:16,22
34:17,18
38:2  42:13
42:18
45:11
47:25  48:9
48:21
49:22
50:19  54:9

60:3  62:9
62:10  63:6
63:22  65:5
66:6  67:2
67:3,24
68:1  69:11
70:1,13
71:24  72:5
72:14,15
73:1,4,14
74:15
77:11
78:23  79:1
79:2,19
80:8  84:7
84:8  86:5
86:7,24
88:3,4
91:12  92:8
92:19  93:5
93:17
94:16  96:2
96:12,21
96:22  97:2
97:23
98:13
101:12
102:8
103:15
104:1
105:4
106:14
108:3
110:24
111:10
115:11,21
116:5,10
118:9,18
123:21
124:15
125:5,9
126:14
130:14,20
131:17
136:25
137:15
138:13
139:2,25
140:11

141:5
143:1
144:12
145:9
146:8,18
147:12
148:13
149:19
150:1,6,7
150:8
151:10
152:25
153:24
154:9
156:10
157:13,20
158:25
159:21
160:12,15
161:14
162:18,23
164:15,24
166:3
168:8
169:14
174:17
175:9
176:25
178:2,17
180:9,18
183:19
188:3
189:19
190:1,25
192:7
194:18
195:16
198:7
199:3,24
200:5,15
200:17
201:6,11
202:17,21
203:5,19
204:14
208:13,19
209:6
212:5,12
212:19,21

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 217:14 | 287:16 | 351:17 | 244:15 | **Z** |
| 218:6 | 288:13,25 | 354:7,11 | 245:5 | **Z-a-h-e-e-r** |
| 219:8,14 | 289:6,25 | 356:23 | 249:9 | 167:7 |
| 222:3,18 | 290:17 | 359:24 | 251:5,10 | **Zaheer** 43:14 |
| 222:24 | 291:4,23 | 360:6,13 | 253:12 | 166:19 |
| 226:10 | 292:7 | 361:21 | 268:3 | 167:3 |
| 227:14 | 293:10,11 | 364:9 | 269:12,22 | 171:13,14 |
| 228:4,12 | 294:18,25 | 369:11,24 | 272:3,12 | 179:19 |
| 228:22 | 295:7,13 | 371:8 | 283:18 | 181:11 |
| 229:1,2,3 | 297:6,15 | **year** 19:22 | 286:9 | 184:14 |
| 229:11,21 | 298:13 | 47:23 89:2 | 287:7,23 | 185:3,12 |
| 231:12,18 | 299:17 | 195:23 | 288:19 | 191:25 |
| 231:20,24 | 301:13 | 260:4 | 289:7 | 192:12 |
| 232:13,20 | 302:6,9 | 282:7 | 293:2 | 196:25 |
| 237:5 | 304:25 | **years** 12:1 | 294:12 | 197:7 |
| 239:2,12 | 305:22 | 31:13,18 | 295:16 | 198:19 |
| 239:23 | 306:1,12 | 101:5 | 300:3,3,7 | 199:6 |
| 241:3 | 308:20 | 261:20 | 300:14 | 276:20 |
| 242:1,10 | 309:11 | 321:8 | 304:17 | **zero** 280:12 |
| 242:11,22 | 310:8,14 | **yep** 12:23 | 312:1,17 | **zoom** 10:13 |
| 242:23 | 310:18,19 | 48:8 72:9 | 313:12 | 14:11,18 |
| 244:24 | 311:21 | 99:3 | 316:16 | 90:23 |
| 249:17,19 | 312:6,24 | 105:15,19 | 320:6 | |
| 249:21 | 313:17 | 109:5,9 | 330:12 | **0** |
| 250:9,11 | 314:5,17 | 110:6,10 | 331:22 | **01/28/2022** |
| 250:14 | 315:5,24 | 111:24 | 338:14,20 | 8:20 |
| 252:9,14 | 317:5 | 119:19 | 347:2 | **02/11/2022** |
| 252:22,24 | 319:24 | 125:16 | 348:1,10 | 9:20 |
| 253:2,6,9 | 320:22 | 126:9 | 352:25 | **02/17/2022** |
| 253:12 | 321:11 | 177:6 | 355:15 | 9:18 |
| 256:6,22 | 323:13 | 191:23 | 357:4 | **04/14/2022** |
| 258:7 | 325:1 | 195:13 | 361:2 | 7:8 |
| 260:8,25 | 328:18 | 196:16 | 366:7 | **06/18/2020** |
| 262:12,15 | 329:6,8,17 | 199:8 | 368:17,25 | 9:17 |
| 262:16 | 329:25 | 200:8 | 369:25 | **06/22/2022** |
| 264:1 | 332:21 | 201:19,21 | 370:16 | 9:13 |
| 265:7,23 | 333:9 | 202:6 | **Yoel** 7:4 | **08/10/2022** |
| 266:10,20 | 334:8,12 | 204:10 | 238:1,2 | 9:11 |
| 269:9,11 | 334:23 | 206:23 | 244:2 | **08/12/2022** |
| 270:2 | 336:3 | 210:5,9,23 | 245:20 | 8:19 |
| 275:9 | 339:15,20 | 211:7 | 289:2,5 | **09/16/2020** |
| 276:4 | 341:7 | 222:25 | **YouTube** | 7:10 |
| 277:21 | 342:9,22 | 225:8 | 127:6 | |
| 278:10,18 | 344:10,20 | 226:16 | 146:13 | **1** |
| 280:24 | 345:9 | 229:25 | 159:20,24 | **1** 1:22 5:9 |
| 281:7,20 | 346:20 | 230:3,10 | 278:6 | 69:7,10 |
| 281:25 | 347:25 | 230:15 | 280:10,23 | **1.4** 108:11 |
| 283:1,23 | 348:9 | 231:3 | 301:15 | 109:2 |
| 284:21 | 349:5 | 233:15 | | **1:41** 183:9 |

BRIAN J. SCULLY 1/12/2023

**10** 6:13
87:12  99:9
99:15
212:14,15
212:25
214:10
244:9
276:3
319:7
**10/18/2022**
8:14
**10/31/2022**
9:7
**10:27** 83:10
**10:40** 83:13
**100** 26:24
61:15
149:12
**101** 45:6
**10298-300**
7:19
**10389-391**
7:21
**10390** 288:15
**10392-394**
7:21
**10394** 285:16
**10410-412**
7:22
**10420-422**
6:16
**10449-453**
6:15
**10492-494**
6:12
**10512** 208:3
**10512-516**
6:11
**10523-526**
6:11
**10538-541**
6:10
**10539** 204:1
**10564-565**
7:20
**10603** 173:9
**10603-605**
6:7
**10679-682**

6:6
**10718** 7:19
281:2
**10th** 173:14
226:7
286:4
328:21
**11** 5:3  6:20
108:12,25
109:2,4
173:5
212:14
227:9,12
244:8
245:23
281:6
298:22
**11/29/2022**
7:6
**11:00** 175:7
175:10
**11:20** 292:23
**11:21** 292:24
**11:26** 291:20
**11:33** 292:4
**1100** 3:20
375:6
**11th** 281:4
**12** 1:15  6:22
109:11
110:9
162:9
190:13,16
231:15,19
242:12,19
269:5,9
375:12
376:4
**12/01/2020**
6:20
**12/17/2020**
7:5
**12:00** 175:7
175:10
**12:11** 226:18
**12:34** 183:6
**12:52** 173:19
175:24
**12076-079**

7:15
**12223** 297:7
**12223-22...**
7:23
**12th** 10:3
302:22
**13** 7:4  9:22
243:22,25
**13599** 7:16
**13603** 214:8
214:10
**13603-609**
6:15
**13661-66...**
6:7
**13696-701**
7:16
**13729-734**
6:8
**138** 5:11
**13804** 61:21
**13th** 291:18
**14** 7:6  206:7
206:17
249:15,16
249:17,22
**143** 146:20
**14448** 2:6
**14526-529**
7:14
**14545** 7:13
269:5,8
**14545-547**
7:15
**14552-553**
7:14
**15** 7:8  87:12
99:9,15
206:1
250:22
252:4,5,16
252:17,18
253:1,8
255:15
330:18,21
331:4,8
337:4,8
**156** 6:4
**15741-743**

7:14
**15743** 261:24
**15th** 272:6
274:18
294:15
**16** 7:10
252:5,16
252:17,18
252:18,21
253:1,5
271:21
338:25
**1608** 375:20
**17** 7:12
224:16
252:5,16
253:1
259:24
269:4
375:3
**17th** 248:22
249:6
350:9
374:14
**18** 7:17
173:10,11
277:16,19
**18th** 345:24
**19** 8:4  191:3
191:6,7,8
284:20,21
363:6,9
**190** 6:22
**194** 9:24
**196** 125:2,15
**19th** 284:19
**1st** 157:2
271:24

**2**
**2** 5:11  89:14
138:17,20
368:12
370:1
**2:11** 209:9
**2:13** 209:12
**20** 117:1
175:25
377:15

**200** 180:20
189:22
190:2
**2018** 12:6
31:16,25
32:7  57:7
84:14
117:16
234:7
241:7
244:10
245:2
263:16
**2019** 12:2
31:25  32:7
195:12
**202** 3:22  4:8
4:14
**2020** 5:10
16:23  32:2
32:8  33:5
33:23
35:22
47:24
48:12
51:19
54:13,17
55:14
62:13  63:7
63:15,18
63:25
69:22  72:2
75:21  86:4
86:18  96:6
98:25
107:20
118:11
121:2
126:23
127:9,14
129:15,21
130:18,24
132:21
133:14,25
134:4
147:4,16
149:2,6
151:18,19
153:15

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 156:19 | **2021** 5:17,19 | 303:18,24 | **252** 7:8,10 | **35** 122:2,4,8 |
| 161:21 | 5:21  64:3 | 307:4,11 | 7:12 | 222:20 |
| 169:24 | 69:22 | 308:22 | **25th** 282:3 | **352** 9:12 |
| 170:8 | 70:10 | 328:2,21 | **27** 5:21  8:16 | **359** 9:20 |
| 172:18 | 71:16 | 334:5,12 | 216:25 | **363** 8:4 |
| 184:17 | 88:24 | 350:9 | 291:16 | **364** 8:7 |
| 185:17 | 89:10 | 352:21 | 301:20 | **365** 8:14 |
| 186:7 | 142:24 | 362:17 | 302:1,8 | **368** 5:14 |
| 187:23,24 | 167:23 | 364:16,25 | 334:19 | **369** 5:18 |
| 189:25 | 195:12,14 | 367:2,6 | 335:1,2,5 | **376** 1:22 |
| 195:19 | 195:19 | **2023** 1:15 | **277** 7:17 | **38** 231:22,23 |
| 196:13 | 196:13 | 10:3  32:10 | **27th** 208:21 | 232:1,6,12 |
| 202:14 | 330:13 | 32:14 | **28** 8:20 | 232:13 |
| 204:22 | 331:14 | 374:14 | 232:3,12 | 242:20,24 |
| 207:15 | 335:15 | 375:3,12 | 232:14 | 242:25 |
| 208:22 | 337:5 | 376:4 | 306:18,20 | **39** 242:20 |
| 213:16,18 | **2022** 9:23 | **2024** 8:19 | **29** 8:22 | **3rd** 217:8 |
| 214:6 | 15:9  19:13 | 19:20 | 309:20,23 | ——— **4** ——— |
| 234:6,8,8 | 20:24 | 302:5,15 | **2nd** 213:17 | **4** 141:15,16 |
| 234:9,11 | 21:20,25 | 302:20 | 214:14 | 141:16 |
| 237:15 | 22:2,6 | **20530** 3:21 | ——— **3** ——— | 370:2 |
| 241:16,18 | 24:12 | 375:6 | **3** 106:18 | **4:23** 157:2 |
| 241:21 | 28:16,24 | **20th** 89:16 | 247:19 | **4:40** 319:6 |
| 246:3,8 | 33:22 | **21** 8:7  336:5 | **3:00** 175:5 | **4:42** 319:11 |
| 247:8 | 34:11 | 364:11,14 | **3:22-cv-**... | **4:53** 319:14 |
| 248:22 | 35:16  36:3 | **211** 126:11 | 1:8  10:9 | **40** 242:21 |
| 249:6 | 36:13 | 126:13 | **3:34** 276:7 | 274:14 |
| 255:3 | 37:15  38:8 | **212** 6:13 | **3:50** 276:10 | **42** 294:4,6 |
| 262:8,13 | 38:24  39:9 | **213** 125:5 | 319:5 | **43** 297:17,20 |
| 263:11,17 | 41:8,9 | **214** 125:14 | **30** 9:4  144:6 | **45** 298:19 |
| 264:1,13 | 52:25  53:7 | **22053** 298:19 | 144:7 | 299:15 |
| 264:19 | 53:19 | **221** 3:9 | 319:15,18 | **46** 9:12 |
| 266:12,15 | 54:12,15 | **222** 251:16 | 375:20 | 224:23,24 |
| 271:24 | 55:4  56:8 | **227** 6:20 | **301** 8:16 | 298:20 |
| 272:6 | 71:16 | **229** 126:12 | **306** 8:20 | 352:13,16 |
| 274:18 | 88:25 | **22nd** 285:25 | **309** 8:22 | **475** 2:3 |
| 282:4 | 260:4 | 352:21 | **30th** 198:19 | **48** 297:14,15 |
| 283:9 | 262:13 | **23** 8:11 | 199:6 | 297:16 |
| 284:24 | 265:8,11 | 334:25 | **31** 9:8  328:4 | **48th** 297:8 |
| 285:20 | 265:11,14 | 335:7,12 | 328:7 | **49** 9:15 |
| 286:4 | 265:18 | **23rd** 19:18 | **319** 9:4 | 297:15 |
| 291:18 | 266:8,21 | **24** 5:17  8:14 | **32** 349:23 | 345:19,20 |
| 322:19 | 267:4,21 | 288:16 | **328** 9:8 | **49th** 297:9 |
| 331:14 | 268:3,6 | 293:9 | **33** 201:17 | ——— **5** ——— |
| 332:12 | 269:7 | 365:10,13 | **335** 8:11 | |
| 334:3 | 294:15 | **24/7** 174:9 | **345** 9:15 | **5:46** 362:23 |
| 345:24 | 298:22 | 267:17 | **3484** 2:4 | **5:53** 363:1 |
| 348:14 | 302:22 | **243** 7:4 | **349** 9:18 | **50** 319:6 |
| 362:18 | 303:3,5,13 | **249** 7:6 | | |

**BRIAN J. SCULLY  1/12/2023**

| | | | |
|---|---|---|---|
| **51** 203:14 | **74** 84-487 | **86** 25-627 | 173:2 |
| **514-325** 9 | 7:20 | 7:21 | 179:13 |
| 3:22 | **751-887** 0 | **86** 28-630 | 197:25 |
| **52** 9:18 | 3:12 | 6:19 | 198:10 |
| 203:15 | **755** 2-554 | **86** 31-632 | 330:6,8 |
| 349:15,18 | 7:20 | 6:19 | 332:10 |
| 349:19 | **756** 4-566 | **8634** 6:18 | **9:06** 1:16 |
| 350:2 | 6:10 | **86** 36-639 | 10:4 |
| **53** 122:5 | **7565** 204:5 | 6:18 | **9:32** 34:25 |
| **54** 225:24,25 | **7574-576** 6:9 | **864** 225:20 | **9:34** 35:3 |
| **55** 204:1 | **7583-587** 6:9 | **86** 40-643 | **954** 225:21 |
| **56** 162:16 | **759** 8-600 | 6:19 | **9603-605** 6:9 |
| **573** 3:12 | 7:15 | **86** 49-650 | **9676** 160:22 |
| **58** 205:10 | **7599** 271:9 | 6:18 | 160:24 |
| **59** 9:20 | 271:19 | **86** 60-662 | **9676-680...** |
| 204:7 | **7633-634** 6:8 | 6:17 | 6:6 |
| 206:10,11 | **765** 4-659 | **8663** 222:21 | **9703** 7:19 |
| 226:4,5 | 7:15 | 222:23 | 283:7 |
| 359:13,16 | **7th** 261:25 | **86** 63-667 | **9th** 98:25 |
| **5th** 284:24 | --- | 6:17 | 282:3 |
| --- | **8** | **86** 68-669 | |
| **6** | **8** 105:8,11 | 6:18 | |
| **6** 5:14  368:3 | 297:18 | **8669** 224:21 | |
| 368:6 | **80s** 323:25 | **8679** 6:17 | |
| **6:04** 372:12 | 323:25 | **8689** 6:17 | |
| 373:9 | **81** 88-189 | **86** 93-694 | |
| **6:30** 177:3 | 7:19 | 6:16 | |
| **61** 9:22 | **8238** 48 2:6 | **8695** 6:17 | |
| 13:25  14:7 | **8349** 201:20 | **86** 96-700 | |
| **62** 9:24 | 201:21 | 6:15 | |
| 194:19,21 | **8349-352** 6:8 | **870-3578** 4:8 | |
| 194:22,25 | **8356** 162:6 | **87** 10-711 | |
| 198:16 | **8357** 162:14 | 6:16 | |
| **63** 208:4 | **84** 96-498 | **87** 39-741 | |
| **64108** 375:21 | 6:11 | 6:15 | |
| **65101** 3:11 | **8519** 7:20 | **87** 56-758 | |
| **69** 5:9 | 284:9 | 6:12 | |
| **6th** 223:4 | **85** 21-522 | **87** 68-769 | |
| --- | 6:16 | 6:10 | |
| **7** | **85** 54-557 | **8769** 198:9 | |
| **7** 5:18 | 7:23 | **87** 78-780 | |
| 160:25 | **8557** 294:4 | 6:12 | |
| 292:4 | **85** 86-587 | **899** 3:10 | |
| 330:4,5,5 | 7:22 | --- | |
| 369:17,21 | **8595** 7:22 | **9** | |
| 369:23 | **86-3** 190:20 | **9** 6:4  156:13 | |
| **7:23** 226:7,9 | **86** 23-627 | 156:14 | |
| **746-841** 4 | 7:22 | 168:4,4 | |
| 4:14 | **8625** 291:16 | 170:20 | |