IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

STATE OF MISSOURI, STATE OF LOUISIANA, *et al.*,

    Plaintiffs,

v.

JOSEPH R. BIDEN, JR.,
in his official capacity as President of the United States, *et al.*,

    Defendants.

No. 3:22-cv-01213-TAD-KDM

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO COMPEL SUPPLEMENTAL DISCLOSURES FROM DEFENDANT CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY**

Defendant Cybersecurity and Infrastructure Agency ("CISA") admits that it did not produce "switchboarding" emails from five key CISA custodians—Chad Josiah, Rob Schaul, Alex Zaheer, John Stafford, and Pierce Lowary. It admits that it never searched these custodians' accounts for responsive documents, though it knew all along that these custodians possess highly relevant and responsive information. The Court should order CISA to supplement its document production to include all responsive documents from those five current and former CISA officials.

    **I.    CISA Concealed the Five Custodians' Involvement in "Switchboarding."**

CISA presents various arguments to suggest that Plaintiffs knew or should have known about the involvement of the five custodians earlier. These arguments are all meritless.

First, citing Mr. Scully's testimony, CISA contends that it has already produced the "vast majority" of the "switchboarding" emails, by producing those from Brian Scully. Doc. 182, at 2, 11. But Scully admitted that he was guessing on this point: "So *I would imagine* the vast majority

1

of them are mine, because for a period of time I was the principal one relaying it." Doc. 179-6 ("Scully Dep."), at 180:18-23 (emphasis added). And, in fact, Scully's math does not add up. *Id.* Scully admitted that there are about 200 switchboarding emails, because CISA maintained (and still possesses) a spreadsheet identifying each "switchboarding" instance. Scully Dep. 180:19-20 ("we forwarded about 200 emails, total"); *id.* 189:21-190:7 (estimating 200 emails "give or take a few," because "we kept a tracking spreadsheet"); *id.* 165:12-176:20 (describing the spreadsheet and identifying Josiah, Schaul, Zaheer, Stafford, and an intern (Lowary) as entering "switchboarding" information into it). Plaintiffs requested that spreadsheet from CISA to cross-check CISA's production, but CISA refused to provide it. Doc. 179-7, at 10. So Plaintiffs' attorneys carefully reviewed CISA's production and, using conservative estimates, identified at most 100 "switchboarding" emails produced from Scully. Thus, far from producing the "vast majority," CISA is still withholding at least half of its "switchboarding" emails—and likely more.

Next, CISA argues that "it was eminently reasonable for CISA to focus its search and production efforts on Mr. Scully rather than on" the other five custodians. Doc. 182, at 11. On the contrary, Mr. Scully admits that he *knew* the other five custodians were engaged in "switchboarding," and Scully was personally involved in identifying the key custodians to search for responsive documents. Scully Dep. 188:20-189:20. Yet, armed with Mr. Scully's direct knowledge that highly relevant, responsive documents were in those five individuals' custody, CISA refused to search their ESI for it. This reflects gamesmanship, not reasonableness.

CISA argues that it effectively disclosed the involvement of Josiah, Schaul, Stafford, and Zaheer in its interrogatory responses and document requests, Doc. 182, at 12—though CISA makes no such argument as to Lowary, *see id.* at 16 n.6 (admitting that "Mr. Lowary's participation … first came up during Mr. Scully's deposition"). This argument is meritless. CISA's discovery

2

responses were artfully crafted to imply that these four individuals had little or no direct involvement in "switchboarding." First, CISA's interrogatory responses—which Scully reviewed and approved, Scully Dep. 189:13-20—identified six *other* custodians as those for whom CISA had made a good-faith determination that they possessed relevant information. Doc. 179-4, at 18. CISA specified that "CISA has identified the following custodians *as having relevant communications*, as produced in response to Requests For Production 2 and 3," and listed those six individuals. *Id.* (emphasis added). CISA then identified Josiah, Schaul, Zaheer, and Stafford "as *appearing* in the communications produced" from the first six custodians, implying that these four individuals were *not* custodians "having relevant communications." *Id.* (emphasis added).

CISA now contends that its document production revealed that those four custodians "had some level of involvement in CISA's switchboarding efforts." Doc. 182, at 12. On the contrary, CISA's documents confirmed the false impression created by CISA's interrogatory responses—*i.e.*, that Scully was the "switchboarder," and that the other four custodians had, at most, limited or tangential involvement. The documents newly filed by the Government, Doc. 182-2, contain only a handful of emails involving each of Josiah, Schaul, and Stafford, all of which copy Scully, and no emails at all from Zaheer or Lowary. Among these, Josiah's emails virtually all relate to reported "phishing" attacks, not misinformation. *See* Doc. 182-2, at 32-43. And Schaul was involved in flagging only one incident for social-media platforms, at the direction of Geoff Hale, in February 2021, well after the 2020 election cycle. *Id.* at 43-49. Further, CISA identifies only *one* email involving Zaheer contained in a Scully email chain, and the Government admits that that email involved Zaheer "flagging *for Mr. Scully* potential misinformation," which Scully forwarded to social-media platforms. Doc. 182, at 12 (emphasis added) (citing Doc. 182-1, at 64). This, of course, implies that Zaheer was *not* involved in "switchboarding" misinformation reports

3

directly to social-media platforms. Thus, CISA's documents fail to show independent involvement in "switchboarding" by any of the five custodians—only Scully's deposition revealed it.

## II. CISA's "Switchboarding" Is Not "Defunct" But Highly Relevant.

CISA argues that "any information concerning switchboarding is not relevant in the first place to Plaintiffs' motion for a preliminary injunction," because CISA supposedly "has not performed the switchboarding function since the 2020 election." Doc. 182, at 14. This argument is meritless for several reasons. First, the purpose of expedited discovery is to test the plausibility of such self-serving claims. Plaintiffs are not required to accept CISA's say-so on this disputed point, and the emails of five custodians whom CISA has now identified as directly involved in "switchboarding" are obviously relevant on this point. Indeed, CISA's website, to this very day, boasts that CISA's "MDM team" actively engages in "switchboarding":

> The MDM team *serves as a switchboard for routing disinformation concerns to appropriate social media platforms and law enforcement*. This activity began in 2018, supporting state and local election officials to mitigate disinformation about the time, place, and manner of voting. For the 2020 election, CISA *expanded the breadth of reporting to include other state and local officials and more social media platforms*. This activity *leverages the rapport the MDM team has with the social media platforms* to enable shared situational awareness.

CISA, *Mis, Dis, Malinformation*, www.cisa.gov/mdm (visited Jan. 24, 2023) (emphases added). CISA's public statement, therefore, indicates that "switchboarding" is an *ongoing* activity since the 2018 election cycle, and that—far from discontinuing it—CISA most recently "expanded the breadth of reporting" to include "more social media platforms." *Id.* Further, other public disclosures indicate that CISA is "beefing up" its anti-disinformation activities, not dialing them back. *See, e.g., See Truth Cops: Leaked Documents Outline DHS's Plan to Police Disinformation*, THE INTERCEPT (Oct. 31, 2022), https://theintercept.com/2022/10/31/social-media-disinformation-dhs/ (reporting that DHS's "priorities in the coming years" included "target[ing]

4

'inaccurate information' on a wide range of topics, including 'the origins of the COVID-19 pandemic and the efficacy of COVID-19 vaccines, racial justice, U.S. withdrawal from Afghanistan, and the nature of U.S. support to Ukraine'"); *Cyber Agency Beefing up Disinformation, Misinformation Team*, THE HILL (November 10, 2021) (quoting Easterly as stating her intention "to grow and strengthen my misinformation and disinformation team" in coordination "with our partners in the private sector").

Second, even if CISA discontinued (or quietly re-directed, *see infra*) its "switchboarding" efforts during the 2022 election cycle, CISA evidently did so in response to *this lawsuit*. As the original Complaint alleged, CISA boasts that its "MDM team *serves as a switchboard* for routing disinformation concerns to appropriate social media platforms and law enforcement." Doc. 1, ¶ 220. As the Complaint further notes, CISA published or re-posted this statement as recently as April 12, 2022. Doc. 1, ¶¶ 219, 220. Thus, as recently as mid-April 2022, CISA was publicly touting the MDM team's work in serving as a "switchboard." *Id.* Just weeks later, on May 5, 2022, Plaintiffs filed their initial Complaint against CISA and other Defendants. *See* Doc. 1. That Complaint raised specific allegations challenging CISA's "switchboarding" function. Doc. 1, ¶¶ 219-220. Then, according to Scully, CISA abruptly decided *not* to engage in "switchboarding" for the 2022 election cycle in late April or early May of 2022—even though CISA was still boasting about this function just before it was sued. Scully Dep., Doc. 179-6, at 366:21–367:7 (testifying that the decision to stop switchboarding "was made in late April 2022 or early May 2022"). These facts raise the compelling inference that CISA stopped "switchboarding" in response to this lawsuit.

CISA's behavior both pre- and post-lawsuit strongly confirms this inference. Immediately *before* being sued, CISA was eager to continue—and expand—its switchboarding activity through

5

2022 and beyond. *See* Ex. A, at 1-3 (internal CISA document used in April 29, 2022 meeting stating that "CISA has a burgeoning MDM effort" whose "actions include directly engaging with social-media companies to flag MDM," and discussing plans for the 2022 and 2024 election cycles); *id.* at 3 (April 25, 2022 email suggesting that "CISA can be a poc [i.e., point of contact] . . . between MDM targets and SM/media companies"); Doc. 71-5, at 3–4 (Easterly stating on February 26, 2022 that CISA "was looking to play a coord role so not every [department and agency] is independently reaching out to platforms" about misinformation). Then, immediately *after* being sued, CISA's documents reflect a strategic effort to downplay and conceal its involvement in activities like "switchboarding." Shortly after this suit was filed on May 5, 2022, CISA's MDM Subcommittee meeting featured discussions about the need for the "government," and especially CISA Director Easterly, to tread with "caution" in charting a "path forward to strategically approach MDM . . . during the current discourse" and "given this fraught time, *especially in advance of the election season.*" Doc. 86-7, at 3 (emphasis added).

All this raises a compelling inference that CISA supposedly discontinued its "switchboarding" activities for the 2022 election cycle in response to this lawsuit. This Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)). And because the facts indicate that CISA paused its "switchboarding" activities in response to being sued, Plaintiffs' claims for injunctive relief are unaffected. As the Fifth Circuit recently explained,

> a defendant cannot automatically moot a case simply by ending its allegedly unlawful conduct once sued. If that is all it took to moot a case, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends. As a result, the burden rests with the defendant to demonstrate that it is

> absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.

*Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022) (cleaned up) (concluding that the defendant's voluntary cessation did not moot the plaintiff's request for a permanent injunction); *see also Speech First, Inc. v. Fenves*, 979 F.3d 319, 327–29 (5th Cir. 2020) (applying the same doctrine to conclude that the defendant's voluntary cessation did not moot the plaintiff's request for a preliminary injunction). CISA cannot plausibly contend that "it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," *Franciscan*, 47 F.4th at 376, when CISA was eager to continue "switchboarding" right up to the moment before it was sued. And Scully never suggested that CISA would not resume the practice. On the contrary, when asked whether he "anticipate[d] serving [as] a switchboard in the future," Scully replied: "That's not my decision to make, so—so I don't want to speak on behalf of the director or future directors." Doc. 179-6, at 367:14–16. Scully explicitly denied "know[ing] what . . . Director Easterly's position is" on the matter. *Id.* at 367:20–25. Meanwhile, CISA's own website continues, as of today, to announce that its "MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms and law enforcement." CISA, *Mis, Dis, Malinformation*, https://www.cisa.gov/mdm (visited Jan. 24, 2023).

Further, there is strong evidence that CISA did not actually discontinue its "switchboarding" activities even during the 2022 election cycle, but instead quietly redirected them through other channels. Scully admits that CISA continued to engage in a long series of oral meetings with social-media platforms about misinformation and disinformation during the 2022 election cycle. *See, e.g.,* Scully Dep. 21:2-18, 24:9-42:19. Furthermore, in the same timeframe that CISA was supposedly discontinuing its "switchboarding" activities, Lauren Protentis repeatedly lobbied social-media platforms to set up and identify alternative channels for state and

local officials (who are subject to the First Amendment, just like CISA) to report so-called "misinformation" to social-media platforms. *See* Ex. B (Scully Dep. Ex. 18), at 48 (Protentis requesting Twitter prepare a "one-pager for election officials" on "MDM reporting"); *id.* at 45 (Protentis urging Twitter to include "how to report disinformation" in its "one-pager" for government officials); *id.* at 44 (Protentis asking Microsoft to prepare a "one-pager" for government officials on how "to report MDM"); *id.* at 41 (Protentis urging Facebook to add "any steps for flagging or escalating MDM content" to its "one-pager" for government officials, and describing "MDM concerns" as one of "the critical needs of officials"). Further, Scully testified that the Center for Internet Security, whose "switchboarding" activities are *funded by CISA*, continued to "switchboard" in 2022. Scully Dep. 265:23-266:4 ("I also believe that CIS was up and running…"). In other words, far from making it "defunct," CISA actually took careful steps to ensure that "switchboarding" would continue during 2022, through different channels.

CISA also contends that, because it has produced a self-curated selection of CISA's switchboarding emails, "Plaintiffs already have the precise information they claimed they needed." Doc. 182, at 13. The Court should be inherently skeptical of Defendants' claim that Plaintiffs have received "enough" discovery—especially when it involves *Defendant* CISA carefully selecting what discovery Plaintiffs receive on this critical point. The Court authorized Plaintiffs to obtain discovery of "the identity of federal officials" who communicate with social-media platforms about misinformation and censorship, and "the nature and content of those communications." Doc. 34, at 13. To this end, Plaintiffs clearly and explicitly requested *all* of CISA's "switchboarding" emails in discovery, multiple times. Notwithstanding the obvious relevance of this information, CISA obfuscated the identities of Josiah, Schaul, Zaheer, Stafford, and Lowary as CISA officials

8

who communicate with social-media platforms about censorship, and it continues to withhold their communications to this day.

Moreover, CISA's argument that these "switchboarding" emails will be simply cumulative of Mr. Scully's "switchboarding" emails is unconvincing. The Second Amended Complaint contains extensive allegations challenging CISA's involvement in coordinating with the Stanford Internet Observatory to create, launch, and operate the so-called "Election Integrity Partnership," a joint censorship operation between government agencies like CISA and the State Department's Global Engagement Center and private entities led by Stanford Internet Observatory. *See* Doc. 84, ¶¶ 401-420. In his deposition, Mr. Scully attempted to downplay CISA's involvement in the Election Integrity Partnership, but he was forced to admit that CISA was extensively involved in the EIP. *See, e.g.,* Scully Dep. 52:3-22, 57:2-17, 101:1-102:20; 209:14-212:12. Critically, among other admissions, Mr. Scully admitted that Zaheer and Lowary were *simultaneously working for CISA and the Stanford Internet Observatory* during the fall of 2020. Scully Dep. 51:11-24, 168:22-172:21. He also admitted that at least one intern—Alex Zaheer—was directly involved in processing "tickets" (*i.e.*, reports of supposed misinformation on social media to be flagged for censorship) for the Election Integrity Partnership *at the same time* that he was "switchboarding" similar misinformation reports to platforms on behalf of CISA. *Id.* 170:13-171:16, 181:18-182:5. The limited discovery of Zaheer's "switchboarding" activities reflects *crossover* between his efforts as an EIP "ticketer" and as a CISA "switchboarder." *See* Doc. 182-1, at 64 (Alex Zaheer sending an *EIP-originated* misinformation report to CISA's CFITF email address, which Scully then forwarded to Twitter); Scully Dep. 199:6-200:25. There is every reason to expect that the additional "switchboarding" emails of Zaheer and Lowary will involve similar "crossover" and entanglement between the misinformation-reporting operations of CISA and the Election Integrity

9

Partnership, *see id.* 200:25—further supporting a finding of government action through "joint participation" between CISA and the private entities of the EIP. *See, e.g., Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 753 (9th Cir. 2020). On this point, the "switchboarding" emails of Zaheer and Lowary are likely to be uniquely relevant and probative.

### III. CISA's Other Arguments Lack Merit.

CISA argues that it has no duty to supplement under Rule 26(e) because it knew all along that its discovery responses were incomplete. Doc. 18, at 15-16. This argument has no merit. The duty to supplement extends to correcting deliberate and unjustified omissions, as well as inadvertent omissions. *See, e.g., Visual Interactive Phone Concepts, Inc. v. Virgin Mobile USA*, No. 05–2661 (MLC), 2008 WL 4192065, at *6–7 & n.5 (D.N.J. Sept. 8, 2008).

CISA asks for 21 days to respond in the event that the Court orders additional discovery. Doc. 182, at 16-17. The Court should reject this request, which appears calculated to render CISA's supplemental disclosures difficult or impossible for Plaintiffs to use in their preliminary-injunction brief, which is due on Monday, February 27, 2023. CISA knowingly and deliberately withheld this extremely relevant, responsive information, and it has been under a duty to supplement its document production on this point since August. Further, Plaintiffs demanded this information on the record during Scully's deposition on January 12, 2023. CISA should be required to remediate its omission within seven days of this Court's ruling.

### CONCLUSION

For the reasons stated, the Court should order Defendant CISA to supplement its document production by producing any and all documents responsive to Plaintiffs' discovery requests from CISA custodians Chad Josiah, Rob Schaul, Alex Zaheer, John Stafford, and Pierce Lowary, including but not limited to any email account(s) used by those officials.

Dated: January 24, 2023

**ANDREW BAILEY**
**Attorney General of Missouri**

<u>/s/ D. John Sauer</u>
D. John Sauer, Mo. Bar No. 58721*
  *Deputy Attorney General*
Joshua M. Divine, Mo. Bar No. 69875*
  *Solicitor General*
Charles F. Capps, Mo. Bar No. 72734*
  *Deputy Solicitor General*
Todd A. Scott, Mo. Bar No. 56614*
  *Senior Counsel*
Kenneth C. Capps, Mo. Bar No. 70908*
  *Assistant Attorney General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
John.Sauer@ago.mo.gov
*Counsel for State of Missouri*

\* admitted *pro hac vice*

<u>/s/ Jenin Younes</u>
Jenin Younes *
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines*

<u>/s/ John C. Burns</u>
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

Respectfully submitted,

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

<u>/s/ Elizabeth B. Murrill</u>
Elizabeth B. Murrill (La #20685)
  *Solicitor General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

11

## CERTIFICATE OF SERVICE

I hereby certify that, on January 24, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*