**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**

|  |  |
|---|---|
| The State of Missouri, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 22-cv-1213 |
| President Joseph R. Biden, Jr., in his official capacity as President of the United States of America, *et al.,* | |
| *Defendants*. | |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT FOR LACK OF SUBJECT-MATTER JURISDICTION AND FAILURE TO STATE A CLAIM

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 3

I.      Settled Pleading Standards Require The Court To Disregard The Complaint's
Legal Conclusions Couched As Factual Allegations. ........................................ 3

II.     The Court Lacks Subject-Matter Jurisdiction ................................................... 5

     A.     Plaintiffs lack standing. ........................................................................ 5

         i.     Injury-In-Fact ........................................................................... 7

              a.     The States do not plausibly allege any direct injury to their
interests as States ........................................................ 7

              b.     The States' Reference To "Special Solicitude" Does Not
Cure The Deficiencies In Their Injury Allegations. ........... 12

              c.     States Cannot Bring Parens Patriae Actions Against the
Federal Government. ................................................... 13

              d.     The Individual Plaintiffs Fail to Allege a Plausible Injury-
in-Fact ....................................................................... 15

              e.     No Plaintiff Has Third-Party Standing. ............................ 17

         ii.     Causation ............................................................................... 19

              a.     No Plaintiff Plausibly Alleges Causation. .......................... 20

              b.     For Additional Reasons, the Individual Plaintiffs Fail to
Plausibly Allege Causation. ........................................... 25

         iii.     Redressability ......................................................................... 27

              a.     No Plaintiff Plausibly Alleges Redressability ..................... 27

              b.     For Additional Reasons, the Individual Plaintiffs Fail to
Plausibly Allege Redressability ....................................... 29

              c.     The Relief Sought Would Violate Article III ....................... 29

     B.     Plaintiffs Fail To Identify an Applicable Waiver Of Sovereign Immunity
That Permits Their Claims Against The Agency Defendants ........................... 32

    i.  Plaintiffs do not raise claims challenging "agency action" to which the APA's waiver of sovereign immunity applies................................. 33

    ii.  Plaintiffs do not identify a "final" agency action within the waiver of sovereign immunity for their APA claims.......................................... 35

    iii.  Plaintiffs fail to identify a waiver of sovereign immunity for their First Amendment or *ultra vires* claims against the Agency Defendants. ......................................................................................... 36

III. Plaintiffs Fail To State A Claim Upon Which Relief May Be Granted......................... 39

  A. Plaintiffs Fail To State A Claim Under The First Amendment.......................... 39

    i.  The Complaint Does Not Plausibly Allege That Defendants Engaged in "Such Significant Encouragement . . . that the choice must in law be deemed to be that of the State.".................................... 41

    ii.  The Coercion Allegations Are Implausible. .......................................... 45

    iii.  Plaintiffs' joint participation allegations are implausible...................... 54

    iv.  The Allegations That § 230(c) Facilitates First Amendment Violations Are Neither Justiciable, Nor Plausible.................................. 56

  B. Plaintiffs Fail to State a Claim Against Numerous Defendants Whose Conduct Is Barely Mentioned In The Complaint................................................ 60

  C. Plaintiffs fail to allege an *ultra vires* claim against any Defendant.................... 61

  D. Plaintiffs' Conclusory Allegations Fail to State APA Claims. ........................... 62

IV. The President Should Be Dismissed As A Party Because Equitable Relief Is Unavailable Against The President................................................................................. 62

CONCLUSION ................................................................................................................................. 64

# TABLE OF AUTHORITIES

## CASES

*Alabama-Coushatta Tribe of Tex. v. United States,*
  757 F.3d 484 (5th Cir. 2014)..................................................................... 32, 33

*Alexander v. Trump,*
  753 F. App'x 201 (5th Cir. 2018) ....................................................................... 32

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
  458 U.S. 592 (1982)................................................................................... *passim*

*Am. Family Ass'n v. City. & Cnty. of San Francisco,*
  277 F.3d 1114 (9th Cir. 2002) ........................................................................... 47

*Am. Mfrs. Mut. Ins. v. Sullivan,*
  526 U.S. 40 (1999).................................................................................... 42, 54

*Amin v. Mayorkas,*
  24 F.4th 383 (5th Cir. 2022)............................................................................... 35

*Apter v. HHS,*
  ---F. Supp. 3d---, 2022 WL 17578869 (S.D. Tex. Dec. 6, 2022), *appeal filed,*
  No. 22-40802 (5th Cir. Dec. 13, 2022)......................................................... 38, 39

*Arch Coal, Inc. v. Acosta,*
  888 F.3d 493 (D.C. Cir. 2018)............................................................................ 33

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022)............................................................................... 12

*Armstrong v. Exceptional Child Center,*
  575 U.S. 320 (2015)........................................................................................... 37

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)....................................................................... 3, 16, 21, 22

*Ass'n of Am. Physicians & Surgeons v. Schiff (AAPS I),*
  518 F. Supp. 3d 505 (D.D.C. 2021), *aff'd,* 23 F.4th 1028 (D.C. Cir. 2022).................... 10, 20

*Ass'n of Am. Physicians & Surgeons v. Schiff (AAPS II),*
  23 F.4th 1028 (D.C. Cir. 2022).................................................... 10, 20, 21, 24

*Atkinson v. Meta Platforms, Inc.,*
  No. 20-17489, 2021 WL 5447022 (9th Cir. Nov. 22, 2021)................................... 59

*Backpage.com, LLC v. Dart,*
  807 F.3d 229 (7th Cir. 2015).................................................... 49, 50, 52, 53

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ............................................................................................... 19, 49, 51

*Barnes v. Lehman*,
  861 F.2d 1383 (5th Cir. 1988) .......................................................................................... 41

*Batterton v. Marshall*,
  648 F.2d 694 (D.C. Cir. 1980) ......................................................................................... 38

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................... *passim*

*Benfield v. Magee*,
  945 F.3d 333 (5th Cir. 2019) ............................................................................................. 3

*Bennett v. Spear*,
  520 U.S. 154 (1997) .................................................................................................. 35, 36

*Berenson v. Twitter*,
  No. C 21-9818, 2022 WL 1289049 (N.D. Cal. Apr. 2022) .................................................. 17

*Blum v. Yaretsky*,
  457 U.S. 991 (1982) .................................................................................................. *passim*

*Brackeen v. Haaland*,
  994 F.3d 249 (5th Cir. 2021), *cert. granted*, 142 S. Ct. 1204 (2022) ..................................... 13

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
  531 U.S. 288 (2001) .......................................................................................................... 39

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) .......................................................................................................... 18

*California v. Texas*,
  141 S. Ct. 2104 (2021) ...................................................................................................... 29

*Changizi v. Dep't of Health & Hum. Servs.*,
  602 F. Supp. 3d 1031 (S.D. Ohio 2022), *appeal filed*,
  No. 22-3573 (6th Cir. June 30, 2022) ........................................................................... *passim*

*City of L.A. v. Lyons*,
  461 U.S. 95 (1983) ..................................................................................................... 6, 9, 16

*City of N.Y. v. U.S. Dep't of Def.*,
  913 F.3d 423 (4th Cir. 2019) ............................................................................................ 62

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .............................................................................................. 6, 7, 9, 16

*Clinton v. City of New York,*
    524 U.S. 417 (1998)............................................................................................ 63

*Cornerstone Christian Schs. v. Univ. Interscholastic League,*
    563 F.3d 127 (5th Cir. 2009)............................................................................ 30

*Cornish v. Corr. Servs. Corp.,*
    402 F.3d 545 (5th Cir. 2005)..................................................................... 40, 54

*Crawford v. Hinds Cnty. Bd. of Supervisors,*
    1 F.4th 371 (5th Cir. 2021)............................................................................... 16

*Dalton v. Specter,*
    511 U.S. 462 (1994)........................................................................................... 38

*Danos v. Jones,*
    652 F.3d 577 (5th Cir. 2011).................................................................32, 37, 38

*Del Castillo v. PMI Holdings N. Am. Inc,*
    No. 14-cv-3435, 2016 WL 3745953 (S.D. Tex. July 13, 2016) ............................ 5

*Divino Grp. LLC v. Google LLC,*
    No. 19-cv-4749, 2021 WL 51715 (N.D. Cal. Jan. 6, 2021) ................................ 58

*Doe v. Google,*
    No. 21-16934, 2022 WL 17077497 (9th Cir. Nov. 18, 2022)............................. 20

*Dorce v. City of New York,*
    2 F.4th 82 (2d Cir. 2021).................................................................................. 16

*El Paso Cnty. v. Trump,*
    982 F.3d 332 (5th Cir. 2020), *cert. denied sub nom.*
    *El Paso Cnty. v Biden*, 141 S. Ct. 2885 (2021) ................................................ 11

*Estiverne v. La. State Bar Ass'n,*
    863 F.2d 371 (5th Cir. 1989)......................................................................... 9, 14

*Evans v. Newton,*
    382 U.S. 296 (1966)........................................................................................... 54

*Ex parte Young,*
    209 U.S. 123 (1908)........................................................................................... 37

*Flagg Bros., Inc. v. Brooks,*
    436 U.S. 149 (1978)........................................................................................... 58

*Flast v. Cohen,*
    392 U.S. 83 (1968).......................................................................................... 7, 25

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ........................................................................... 62, 63

*Frazier v. Bd. of Tr. of Nw. Miss. Reg'l Med. Ctr.*,
  765 F.2d 1278 (5th Cir.), *amended*, 777 F.2d 329 (5th Cir. 1985) ................................. 54, 55

*Freedom From Religion Found., Inc. v. Obama*,
  641 F.3d 803 (7th Cir. 2011) ................................................................ 45

*Geyen v. Marsh*,
  775 F.2d 1303 (5th Cir. 1985) ............................................................... 37

*Ghedi v. Mayorkas*,
  16 F.4th 456 (5th Cir. 2021) ................................................................ 3

*Glenewinkel v. Carvajal*,
  No. 3:20-CV-2256, 2022 WL 179599 (N.D. Tex. Jan. 20, 2022) ........................................ 34

*Gov't of Manitoba v. Bernhardt*,
  923 F.3d 173 (D.C. Cir. 2019) .............................................................. 13

*Hammerhead Enters., Inc. v. Brezenoff*,
  707 F.2d 33 (2d Cir. 1983) ................................................................. 49, 53

*Harrell v. Florida Bar*,
  608 F.3d 1241 (11th Cir. 2010) ............................................................. 27, 28

*Hart v. Facebook Inc.*,
  No. 22-cv-00737, 2022 WL 1427507 (N.D. Cal. May 5, 2022) ........................................... 20

*Hawaii v. Trump*,
  859 F.3d 741 (9th Cir. 2017), *vacated & remanded for dismissal as moot*,
  138 S. Ct. 377 (2017) ...................................................................... 63

*Huber v. Biden*,
  No. 21-cv-06580, 2022 WL 827248 (N.D. Cal. Mar. 18, 2022), *aff'd*,
  2022 WL 17818543 (9th Cir. Dec. 20, 2022) .................................................. 55

*Huber v. Biden*,
  2022 WL 17818543 (9th Cir. Dec. 20, 2022) .................................................. 60

*In re Deepwater Horizon*,
  857 F.3d 246 (5th Cir. 2017) ............................................................... 18

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
  138 S. Ct. 2448 (2018) ..................................................................... 58

*Juliana v. United States*,
     947 F.3d 1159 (9th Cir. 2020), *denying reh'g en banc*,
     986 F.3d 1295 (9th Cir. 2021) ............................................................ 29, 30

*Kentucky v. Biden*,
     23 F.4th 585 (6th Cir. 2022) ................................................................ 13, 14

*Kowalski v. Tesmer*,
     543 U.S. 125 (2004) .................................................................................. 18

*Larson v. Domestic & Foreign Commerce Corp.*,
     337 U.S. 682 (1949) ........................................................................ 36, 37, 38

*Louisiana v. Biden*,
     ---F. Supp. 3d---, 2022 WL 3570933 (W.D. La. Aug. 18, 2022) ............... 12

*Louisiana v. United States*,
     948 F.3d 317 (5th Cir. 2020) ................................................................ 33, 34

*Lugar v. Edmondson Oil Co.*,
     457 U.S. 922 (1982) .................................................................................. 54

*Lujan v. Defs. of Wildlife*,
     504 U.S. 555 (1992) .......................................................................... *passim*

*Lujan v. Nat'l Wildlife Fed'n*,
     497 U.S. 871 (1990) ........................................................................ 34, 35, 62

*Maher v. Roe*,
     432 U.S. 464 (1977) .................................................................................. 42

*Manhattan Cmty. Access Corp. v. Halleck*,
     139 S. Ct. 1921 (2019) .............................................................................. 58

*Manker v. Spencer*,
     No. 3:18-cv-372, 2019 WL 5846828 (D. Conn. Nov. 7, 2019) ................. 35

*Massachusetts v. EPA*,
     549 U.S. 497 (2007) .................................................................................. 12

*Massachusetts v. Mellon*,
     262 U.S. 447 (1923) ........................................................................ 9, 11, 13

*Mathis v. Pacific Gas & Electric Co.*,
     891 F.2d 1429 (9th Cir. 1989) ................................................................... 44

*Michigan v. U.S. EPA*,
     581 F.3d 524 (7th Cir. 2009) ..................................................................... 13

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1866) ................................................................. 62

*Moody v. Farrell*,
  868 F.3d 348 (5th Cir. 2017) ........................................................... 40, 49

*National Treasury Employees Union v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974) ............................................................. 63

*Nat'l Collegiate Athletic Ass'n v. Tarkanian*,
  488 U.S. 179 (1988) .......................................................................... 39, 47

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  49 F.4th 700 (2d Cir. 2022) ............................................................... 46, 53

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) ........................................................... 64

*Newman v. Google LLC*,
  No. 20-cv-4011, 2021 WL 2633423 (N.D. Cal. June 25, 2021) .......... 58

*Norwood v. Harrison*,
  413 U.S. 455 (1973) ............................................................................. 59

*O'Handley v. Padilla*,
  579 F. Supp. 3d 1163 (N.D. Cal. 2022) ............................................... 55

*Ohio v. Thomas*,
  173 U.S. 276 (1899) ............................................................................... 8

*Okwedy v. Molinari*,
  333 F.3d 339 (2d Cir. 2003) ........................................................... 53, 54

*Papasan v. Allain*,
  478 U.S. 265 (1986) ................................................................................ 3

*Paterson v. Texas*,
  308 F.3d 448 (5th Cir. 2002) ................................................................ 17

*Peery v. Chi. Hous. Auth.*,
  791 F.3d 788 (7th Cir. 2015) ....................................................31, 40, 41, 45

*Penthouse Int'l., Ltd. v. McAuliffe*,
  610 F.3d 1353 (5th Cir. 1980) ............................................................. 50

*Penthouse Int'l, Ltd. v. Meese*,
  939 F.2d 1011 (D.C. Cir. 1991) ........................................................... 52

*Peoples Nat'l Bank v. Off. of Comptroller of Currency of U.S.*,
   362 F.3d 333 (5th Cir. 2004)..................................................................35, 36

*R.C. Maxwell Co. v. Borough of New Hope*,
   735 F.2d 85 (3d Cir. 1984).............................................................................59

*Railway Employees' Department v. Hanson*,
   351 U.S. 225 (1956).......................................................................................57

*Raines v. Byrd*,
   521 U.S. 811 (1997).....................................................................................6, 9

*Ramirez v. U.S. Immigr. & Customs Enf't*,
   310 F. Supp. 3d 7 (D.D.C. 2018)..................................................................35

*Rawson v. Recovery Innovations, Inc.*,
   975 F.3d 742 (9th Cir. 2020).........................................................................56

*Rendell-Baker v. Kohn*,
   457 U.S. 830 (1982).........................................................................44, 55, 58

*Robbins v. Oklahoma*,
   519 F.3d 1242 (10th Cir. 2008) ......................................................................5

*Rochester Tel. Corp. v. United States*,
   307 U.S. 125 (1939).......................................................................................36

*Rogalinski v. Meta Platforms, Inc.*,
   No. 22-cv-02482, 2022 WL 3219368 (N.D. Cal. Aug. 9, 2022), *appeal filed*,
   No. 22-16327 (9th Cir. Sept. 1, 2022)...........................................................60

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
   547 U.S. 47 (2006)...........................................................................................5

*Seals v. McBee*,
   898 F.3d 587 (5th Cir. 2018).........................................................................19

*Serv. Emps. Int'l Union, Local 5 v. City of Houston*,
   595 F.3d 588 (5th Cir. 2010).........................................................................27

*Shaw v. Villanueva*,
   918 F.3d 414 (5th Cir. 2019)...........................................................................3

*Sierra Club v. Peterson*,
   228 F.3d 559 (5th Cir. 2000).........................................................................35

*Skinner v. Ry. Labor Execs. Ass'n*,
   489 U.S. 602 (1989).......................................................................................57

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966) ................................................................................. 13

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ........................................................................... 10, 24

*St. Tammany Par., ex rel. Davis v. FEMA*,
  556 F.3d 307 (5th Cir. 2009) ................................................................... 32

*State of Louisiana v. Biden*,
  45 F.4th 841 (5th Cir. 2022) ................................................................... 31

*State of Nev. v. Burford*,
  918 F.2d 854 (9th Cir. 1990) ................................................................... 13

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ................................................................................. 30

*Stringer v. Whitley*,
  942 F.3d 715 (5th Cir. 2019) ................................................................... 16

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ................................................................. 63

*Texas v. Equal Emp. Opportunity Comm'n*,
  933 F.3d 433 (5th Cir. 2019) ........................................................... 12, 35

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) *as revised* (Nov. 25, 2015) ......................... 8

*Texas v. United States*,
  328 F. Supp. 662 (S.D. Tex. 2018) ........................................................ 12

*Town of Chester v. Laroe Ests., Inc.*,
  581 U.S. 433 (2017) ................................................................................. 6

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ................................................................. 6, 8, 25

*Trump v. Twitter*,
  602 F. Supp. 3d 1213 (N.D. Cal.), *appeal filed*, No. 22-15961 (9th Cir. June 28, 2022) .. 51, 52

*Unimex, Inc. v. U.S. Dep't of Hous. & Urban Dev.*,
  594 F.2d 1060 (5th Cir. 1979) ................................................................. 37

*United States v. Scroggins*,
  599 F.3d 433 (5th Cir. 2010) ................................................................... 11

*Va. ex rel. Cuccinelli v. Sebelius*,
    656 F.3d 253 (4th Cir. 2011) ............................................................... 8, 9

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) .............................................................7, 8, 25

*VDARE Found. v. City. of Colo. Springs*,
    11 F.4th 1151 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1208 (2022) .......................42, 45, 50

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
    714 F.3d 186 (4th Cir. 2013) ............................................................... 33

*Vote.Org v. Callanen*,
    39 F.4th 297 (5th Cir. 2022) ............................................................... 18

*Washington v. Trump*,
    858 F.3d 1168 (9th Cir. 2017) ............................................................. 17

*Weiland v. Palm Beach Cnty. Sheriff's Office*,
    792 F.3d 1313 (11th Cir. 2015) ............................................................. 4

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ....................................................................... 16

*Wyoming ex rel. Sullivan v. Lujan*,
    969 F.2d 877 (10th Cir. 1992) ............................................................. 13

**STATUTES**

5 U.S.C. § 551 ............................................................................ 32, 33

5 U.S.C. § 702 ............................................................................ 32, 62

5 U.S.C. § 704 ............................................................................... 32

5 U.S.C. § 706 ............................................................................... 62

47 U.S.C. § 230 .........................................................................20, 21, 49

Communications Decency Act of 1996,
    Pub. L. No. 104-104, 110 Stat. 56 *codified at* 47 U.S.C. § 230 ............................ 20

**OTHER AUTHORITIES**

33 Fed. Prac. & Proc. Judicial Review § 8322 (2d ed.) ........................................ 34

Press Briefing by Press Sec'y Jen Psaki and Sec'y of Agric. Tom Vilsack (May 5, 2021),
    https://perma.cc/4ZGE-N9QL ............................................................. 48, 49

Press Briefing by Press Sec'y Jen Psaki (July 16, 2021),
    https://perma.cc/HE54-LB2R ............................................................................................... 49

## INTRODUCTION

The First Amendment prohibits the Federal Government from "abridging the freedom of speech." But it does not regulate the conduct of private enterprises. Nor does the First Amendment prohibit government officials from sharing facts or opinions with private companies concerning the impact their conduct may have on the public welfare.

To successfully challenge actions taken by a private party as conduct forbidden by the First Amendment, a plaintiff must surmount a particularly high obstacle—the plaintiff must demonstrate that the private actor is itself engaged in state action, having been "coerced" by or "colluded" with the Government to suppress speech. That is the theory of Plaintiffs' Complaint. But Plaintiffs cannot satisfy their heavy burden to attribute private action to the Government by relying on speculative and conclusory allegations, talismanically repeating the word "censor" and its cognates, or ignoring well-established doctrine. Yet Plaintiffs' response to Defendants' motion to dismiss commits all three errors. Their response only confirms that Plaintiffs have failed to carry their burden of alleging jurisdiction or an entitlement to relief on the merits.

With respect to Article III standing, Plaintiffs propose, among other things, that the Court ignore the prohibition on State *parens patriae* actions against the Federal Government and authorize two States (and a handful of individuals) to bring claims on behalf of any and all "audiences and potential audiences" of "social-media speech" nationwide. Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss the Second Am. Compl. 30, ECF No. 165 ("Opp."). They press an inverted chain of causation, asserting that their alleged injuries—which first occurred in 2020–are fairly traceable to statements that certain Defendants made in 2021 and 2022. And they urge the Court to disregard Article III's requirement that any relief granted be likely to redress their injuries, even while acknowledging that some of the conduct they challenge (*e.g.*, public statements by the White House Press Secretary and the Surgeon General), may not ultimately need to be enjoined to redress

1

their injuries if they prevail on the merits. *See id.* at 47 (stating that it is "not yet determined" whether such statements need be enjoined). In short, Plaintiffs' theories of standing hinge on implausible allegations and contradict settled doctrine. None of Plaintiffs' allegations satisfies the elements of Article III and the case should be dismissed for lack of standing.

Relatedly, the Court should dismiss the claims against the Agency Defendants for the additional jurisdictional reason that the statements Plaintiffs cite in support of their case— statements made over years by disparate Government officials at press conferences, in written advisories, in emails, and in meetings—do not constitute agency action, or final agency action, as necessary to invoke the Administrative Procedure Act's (APA) waiver of sovereign immunity.

On the merits, Plaintiffs' claims fare no better. Plaintiffs again urge the Court to ignore settled doctrine strictly limiting the circumstances in which private conduct may be attributed to the Government. Plaintiffs take scattershot aim at statements of certain Defendants and even *non-parties*—including many Members of Congress—and contend that, taken together, these remarks amount to "coercion" of, or "collusion" with, private social media companies to censor speech. In effect, Plaintiffs ask this Court to hold every Executive Branch official who has ever communicated with social media companies about misinformation responsible for every company's content-moderation decision, from 2020 into the future.

The Court should reject these novel arguments out of hand. Not only are they meritless but accepting them would open the courts to innumerable suits against the Government based on the conduct of private parties. And ultimately, Plaintiffs' Complaint rests on conclusory allegations that do not plausibly raise claims of Government censorship. Accordingly, for the reasons stated in Defendants' opening brief, *see* Defs.' Mem. in Support of Motion to Dismiss, ECF No. 128-1 ("Mem."), and those stated herein, the Complaint must be dismissed.

## ARGUMENT

### I.   Settled Pleading Standards Require The Court To Disregard The Complaint's Legal Conclusions Couched As Factual Allegations.

It bears emphasis at the outset that Plaintiffs' opposition is predicated on a mistaken legal standard under which they contend that their Complaint's bald legal conclusions must be accepted as true. But "[t]he Supreme Court is no-nonsense about pleading specificity requirements," *Shaw v. Villanueva*, 918 F.3d 414, 415 (5th Cir. 2019), which apply equally in the Rule 12(b)(1) and 12(b)(6) contexts, *Ghedi v. Mayorkas*, 16 F.4th 456, 464 (5th Cir. 2021). The Supreme Court has stressed that, in considering a motion to dismiss, courts must ignore a complaint's "legal conclusions, conclusory statements, [and] 'naked assertion[s]' devoid of 'further factual enhancement.'" *Benfield v. Magee*, 945 F.3d 333, 336-37 (5th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Instead, courts must "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. Plaintiffs' Complaint is replete with threadbare allegations that must be disregarded.

Consider, for example, the Complaint's treatment of Dr. Anthony Fauci. The Complaint alleges that, "[o]n information and belief, . . . Dr. Anthony Fauci coordinated with social-media firms to police and suppress speech regarding COVID-19 on social media." Second Am. Compl. ¶ 204, ECF No. 84 ("SAC"). That charge of speech suppression is a "legal conclusion couched as a factual allegation," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)), which cannot be credited without the support of well-pleaded factual allegations, *Iqbal*, 556 U.S. at 680. Yet the Complaint contains no such well-pleaded factual allegations. To the contrary, it goes on merely to allege that Dr. Fauci "discredit[ed]" the "lab-leak theory" on a conference call with scientists and accepted an e-mail invitation from Mark Zuckerberg in March 2020 to "make public statements to be posted [on] Facebook [ ] regarding

3

COVID-19." SAC ¶¶ 206-07. Around the same time, Facebook allegedly began removing content about the lab-leak theory. *Id.* Based on those bare assertions, Plaintiffs allege that Dr. Fauci successfully "orchestrated" a plan to "suppress" the lab-leak theory on social media. *Id.* ¶ 212. Those allegations do not plausibly support that conclusion. "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice" to allege unlawful conduct. *Twombly*, 550 U.S. at 557.

Defendants' motion to dismiss points to many (but not all, due to page constraints) other examples of conclusory allegations in the Complaint that are properly disregarded at the Rule 12(b) stage. It is not enough, for instance, for the Individual Plaintiffs to satisfy the Article III requirement that their injuries be "certainly impending" by alleging that "private plaintiffs . . . are suffering grave and ongoing injuries," SAC ¶ 469, without describing what those injuries are. And no matter how many times the Complaint uses the word "censor" and its cognates, *see* Opp. 53 (pointing out that the term appears 441 times), allegations of government censorship cannot be credited without nonconclusory factual allegations that actually raise a plausible inference that the Government is pressuring social media platforms to take down particular posts or accounts, or working hand-in-hand with them to do so.

Also improper is Plaintiffs' effort to satisfy the facial plausibility requirement as to each Defendant by ascribing to all of them the allegedly improper statements or conduct of some of them. *See Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1323 & n. 14 (11th Cir. 2015) (describing "shotgun pleading" as improperly "asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions"). For example, the facial plausibility of the claim against one agency must rest on the alleged statements or conduct of that agency, not of other agencies whose statements or conduct

that agency cannot control. *Cf. Del Castillo v. PMI Holdings N. Am. Inc*, No. 14-cv-3435, 2016 WL 3745953, at *17 (S.D. Tex. July 13, 2016) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008)).

Plaintiffs thus cannot avoid Rule 12(b) dismissal through their repeated insistence that their Complaint is "detailed" and contains what they consider to be magic words. *See, e.g.*, Opp. 7, 18, 53. The Complaint must stand on its substance, not its length. Considering only the Complaint's factual assertions and setting aside its legal conclusions, the Complaint fails to allege subject-matter jurisdiction or entitlement to relief on the merits.

## II.    The Court Lacks Subject-Matter Jurisdiction.

The Court lacks subject-matter jurisdiction over this action. Mem. 16-49. None of the Plaintiffs—the individuals or the States—has carried the burden of plausibly alleging Article III standing, and their resort to prudential theories of *parens patriae* and novel conceptions of third-party standing lacks merit. And as to the claims against the Agency Defendants,[1] the Complaint fails to identify an "agency action"—let alone a "final agency action"—required to trigger the APA's waiver of sovereign immunity. Plaintiffs' response only underscores these deficiencies.

### A.    Plaintiffs lack standing.

At the start, Plaintiffs contend that "[t]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." Opp. 5 (quoting *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)). While that principle may apply when several plaintiffs seek to challenge the same alleged conduct, it does not permit a single plaintiff who possesses standing to litigate the claims of others who do not, or to seek relief on behalf of

---

[1] "Agency Defendants" includes the agencies and their officials specifically identified in Counts Three through Seven of the Complaint, and not the President, the White House Press Secretary's Office, or any other White House official. *See* SAC ¶¶ 515-70; Mem. 14.

others that is unrelated to the redress of that plaintiff's injury. "[S]tanding is not dispensed in gross." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (citation omitted). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* (citation omitted); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff." (citation omitted)). It is well established, moreover, that States cannot bring claims implicating purely individual rights, acting only as "nominal part[ies]." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600 (1982). Accordingly, to obtain relief, the States must show that they satisfy each element of Article III standing, independent of injury to any individual Plaintiff. The same is true for the Individual Plaintiffs—they must independently plead standing without resting on the States' allegations (even if those allegations were sufficient to show standing for the States). And as shown below, no plaintiff here has adequately alleged standing.

Several principles that underlie a court's consideration of standing compel that conclusion. First, where, as here, "reaching the merits of [a] dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," the standing inquiry is "especially rigorous." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)). Second, where, as here, a plaintiff alleges that his injuries result from independent actions of third parties, standing is "substantially more difficult to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (citation omitted). Third, where, as here, a plaintiff claims standing based on *future* injury, speculation about future unlawful conduct will not suffice. *City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983). Consideration of Plaintiffs' allegations in light of these principles underscores their many deficiencies and the reasons why this case must be dismissed.

i.        <u>Injury-In-Fact</u>

None of the Plaintiffs alleges a "concrete, particularized, and actual or imminent" injury. *Clapper*, 568 U.S. at 409 (citation omitted). The Court should reject the States' novel effort to assert the interests of citizens as *parens patriae* and all Plaintiffs' effort to assert claims on behalf of non-party speakers and "audiences" not before this Court.

       *a.   The States do not plausibly allege any direct injury to their interests as States.*
None of the novel and boundless "sovereign" interests that the States contend are infringed upon by content moderation suffices to establish a cognizable injury in fact.

   ▪ *Alleged Interference with States' "Fundamental Policies."* First, the States double down on their contention that Defendants' alleged conduct interferes with their "fundamental" constitutional policies "favoring the freedom of speech[.]" Opp. 14 (citing SAC ¶ 460). But the States do not dispute that, reduced to its essence, their theory of injury is merely that the Federal Government's alleged actions are contrary to the Free Speech Clause of the First Amendment and, in turn, the States' parallel constitutional provisions. *See* Mem. 24-25. That is a paradigmatic "generalized grievance[] about the conduct of government," *Flast v. Cohen*, 392 U.S. 83, 106 (1968)—an "'abstract injury in nonobservance of the Constitution'" that fails to satisfy the "requirements of standing," *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 482 (1982). Indeed, the States admit that their purported interest in their free-speech policies does not differentiate them from the rest of the 50 states. *See* SAC ¶ 95 ("All other State Constitutions likewise protect the freedom of speech as a fundamental right of the first order."). Accepting that expansive view of injury-in-fact would transform courts into "publicly funded forums for the ventilation of public grievances[,]" *Valley Forge*, 454 U.S. at

473—precisely what Article III's separation-of-powers foundation is designed to prevent, *see TransUnion*, 141 S. Ct. at 2203.

The States cite the Fifth Circuit's recognition that states have a sovereign interest in their "power to create and enforce a legal code." Opp. 14 (citing *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015), *as revised* (Nov. 25, 2015)). Yet that type of interest is infringed only when an actual conflict arises between state and federal exercise of "sovereign power over individuals and entities within the relevant [state] jurisdiction," *Snapp*, 458 U.S. at 601, such as when a federal regulatory scheme preempts a similar state program, *see Texas*, 809 F.3d at 154 (citing *Va. ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011), for the proposition that the conflicting laws at issue must actually "regulate[] behavior or provide[] for the administration of a state program"). But here the States point to no regulatory or administrative programs of theirs with which Defendants' alleged actions interfere; instead, they reference the free-speech provisions of their own constitutions that restrain rather than authorize exercises of the States' police power over their citizens. Hence, they have shown no "genuine conflict" between state and federal law that might be "capable of producing injury-in-fact." *Cuccinelli*, 656 F.3d at 270.

Moreover, the States' constitutional provisions vest the States' citizens with rights enforceable *by those citizens* against the *States' officials*—not rights enforceable by the States themselves against the Federal Government. *See* Mem. 24. The States' attempt to turn these provisions into regulatory swords against the Federal Government not only distorts their state constitutions but also defies the fundamental principle that the States lack "power to enforce [state law] against the federal government." *Cuccinelli*, 656 F.3d at 270 (citing *Ohio v. Thomas*, 173 U.S. 276, 283 (1899)). And because the States' constitutions are "not even hypothetically enforceable against the federal government," the States' theory of injury "raises only 'abstract

questions of political power, of sovereignty, of government.'" *Id.* at 271 (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 485 (1923)).

▪ *Alleged Injuries to the States' Speech.* Next, the States assert injuries based on alleged content moderation of videos that State agencies or subdivisions posted on social media platforms. Opp. 15; SAC ¶ 461. But "the first amendment does not protect government speech." *Estiverne v. La. State Bar Ass'n*, 863 F.2d 371, 379 (5th Cir. 1989). And even if these allegations stated "an invasion of a legally protected interest," *Raines*, 521 U.S. at 819 (citation omitted), they show no "certainly impending" harm, as Article III demands when a plaintiff seeks prospective relief, *Clapper*, 568 U.S. at 414 & n.5. The content-moderation measures on which the States rely were taken by YouTube in *2021*. SAC ¶ 461. The Complaint does not allege that YouTube or any other social media company imminently intends to remove or moderate videos the States have posted or intend to post. Indeed, the alleged content-moderation decisions involved constituents' videos about "COVID-19 lockdown measures" or "mask mandates," SAC ¶ 461,[2] yet the Complaint alleges no "concrete plans" by the States, *Defs. of Wildlife*, 504 U.S. at 564, to discuss these subjects online. The States' purported fear of interference with their own social media speech is thus too vague and speculative to establish imminent injury-in-fact. *See Lyons*, 461 U.S. at 102, 105 (allegations of injury arising from a traffic stop five months prior did not show "real and immediate" threat of future injury from future traffic stop).

---

[2] Missouri does not allege that the videos at issue were "posted" by St. Louis County or Missouri itself, as opposed to a nonparty. Mem. 25. The footnote in the declaration that the State contends "makes clear that St. Louis County itself posted the videos," Opp. 16, includes only a citation to a website that requires a subscription to view, *id.* (citing ECF No. 45-6, at 3 n.1). The footnote thus does not suffice to show injury to St. Louis County. Louisiana claims injury based on alleged "censor[ship]" of a single Louisiana legislator's tweet on an unknown date, Opp. 15; SAC ¶ 461, but does not contend that the legislator was speaking in an official capacity or explain how one legislator's speech could constitute speech by the State itself, *see* Mem. 25 n.7.

▪ *Alleged Injuries to a Purported Right to Receive all Speech on Social Media*. The States also allege injury to a purported interest in following the "free discourse of their citizens" on social media platforms to craft responsive public messaging and policies, Opp. 16-19; SAC ¶ 462, but they do not articulate any concrete harm to such interests stemming from moderation of certain content on social media platforms, *see* Mem. 26-27. The allegations instead rest on the assumption that platforms' moderation of speech is so widespread and related to "important" topics that it "would directly affect [the States'] ability to craft policies and messages" responsive to residents' concerns. Opp. 17-18. The States do not explain what those policies and messages would be or how content moderation would make crafting them more difficult. Such conclusory speculation does not satisfy Article III. *See Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505, 513 (D.D.C. 2021) ("*AAPS I*") (rejecting allegations by user of Facebook and Pinterest that the companies' policies prevented her from "conveniently access[ing] information about vaccination[s]" when she did not specify "how accessing [such] materials ha[d] been made more difficult for her") (citations omitted), *aff'd* 23 F.4th 1028 (D.C. Cir. 2022) ("*AAPS II*"). The States also err in contending that their allegations suffice because "[i]ntangible" injuries are cognizable. Opp. 18. Intangible injuries are not exempt from Article III's requirements of concreteness and particularization. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016).

▪ *Alleged Injuries to the States' "Political Process."* Additionally, the States posit that their "political processes" have been "distort[ed]" by moderation of content on social media platforms. Opp. 20 (citing SAC ¶ 463). As with the rest of their asserted injuries, however, the States pinpoint no actual interference with their activities as *States*. Instead, they rely on alleged injuries to *residents* based on: an advocacy group's use of Facebook, *see* Decl. of Jill Hines ¶¶ 13-14, ECF No. 45-12 ("Hines Decl."); a Missouri parent's use of Nextdoor, Decl. of Joshua McCollum ¶¶ 9-

17, ECF No. 45-14; and another individual whose "friends and family" were apparently unable to post an article on Facebook, Decl. of Jessica Marie Gulmire ¶¶ 18-19, ECF No. 45-15. *See* Opp. 20 (citing declarations). It matters not, as the States emphasize, that the declarants' descriptions of those past instances are "specific" and "detail[ed]." Opp. 20. At the end of the day, the declarations speak only to injuries allegedly suffered by *individuals* and say nothing of consequence for the alleged injury-in-fact of the *States*.[3] Ultimately, the States' assumption that its "political processes" are "distort[ed]" by actions taken with respect to these three individuals is speculative and conjectural. Opp. 20.

Moreover, these allegations resemble the "incidental" theory of trickle-down adverse effects that the Fifth Circuit has rejected in the taxpayer standing context. *See El Paso Cnty. v. Trump*, 982 F.3d 332, 339-40 (5th Cir. 2020) (rejecting county's standing theory based on "incidental economic impact" of government funding decisions because "'virtually all federal policies' will have 'unavoidable economic repercussions.'" (citation omitted)), *cert. denied sub nom.*, *El Paso Cnty. v Biden*, 141 S. Ct. 2885 (2021). A more "direct" link is "necessary to demonstrate standing," in part because founding an injury-in-fact on an "incidental" harm "might spark a [wave] of unwarranted litigation against the federal government." *Id.* at 340 (citation omitted). Such a "direct" link is especially necessary where, as here, the States' general interest in a certain "political process" raises only an "abstract question[] of political power" that *Mellon* stressed courts are "without authority" to adjudicate. 262 U.S. at 485.[4]

---

[3] Moreover, the conduct alleged occurred long ago—in *2021*, according to the declarants, *see, e.g.*, Hines Decl. ¶¶ 13-14—and thus does not show any plausible threat of ongoing or imminent harm.

[4] Furthermore, the States abandon their claims of injury based on purported past "censorship" of Dr. Bhattacharya, *see* SAC ¶ 464, by failing to respond to Defendants' showing that moderation of Dr. Bhattacharya's speech does not cause them injury, Mem. 28-29. *See United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010) (argument not adequately briefed is waived).

>   b. *The States' Reference To "Special Solicitude" Does Not Cure The*
>      *Deficiencies In Their Injury Allegations.*

Plaintiffs' cursory invocation of the "special solicitude" owed to States in standing analysis, *see* Opp. 28-29 (citing *Massachusetts v. EPA*, 549 U.S. 497 (2007)), is unavailing, as the States do not satisfy the requirements for special solicitude.[5] In the Fifth Circuit, a state may receive special solicitude *only* if it shows that: (1) it possesses "a congressionally accorded procedural right"; and (2) the challenged conduct "affects the state's '*quasi-sovereign*' interests in, for instance, its physical territory or lawmaking function." *Louisiana v. Biden*, ---F. Supp. 3d---, 2022 WL 3570933, at *8 (W.D. La. Aug. 18, 2022) (Doughty, J.) (citation omitted); *see also Texas*, 809 F.3d at 152. These requirements are "seldom" met. *Id.* at 162. Neither is met here.

As to the first, Plaintiffs wrongly argue that the APA affords them a procedural right. *See* Opp. 28-29. In the Fifth Circuit, to assert a procedural right under the APA, a plaintiff must challenge a "final agency action," which is a jurisdictional requirement. *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 441 (5th Cir. 2019). As explained below, *see infra* Part II.B (discussing sovereign immunity), Plaintiffs fail to identify a final agency action. Plaintiffs therefore lack any "congressionally accorded procedural right" that satisfies the first requirement for special solicitude. Mem. 30.

Plaintiffs fail to satisfy the second requirement, too. As explained below, the States do not assert any quasi-sovereign interest but instead rely on the interests of "Louisianans and

---

[5] As other courts have explained, *Massachusetts v. EPA*'s reference to "special solicitude" did not purport to relax any standing requirements for States, but only indicated that States may assert certain *types* of injuries that private parties may not. *See Arizona v. Biden*, 40 F.4th 375, 385 (6th Cir. 2022); *see also* Mem. 29-30. Even courts that have suggested that special solicitude relaxes the causation and redressability requirements in certain contexts (in apparent contradiction of the Supreme Court's cases following *Massachusetts v. EPA*, *id.*) have held states to the same exacting Article III standards for showing injury-in-fact. *See Texas v. United States*, 328 F. Supp. 662, 691 (S.D. Tex. 2018).

Missourians" in individual free-speech rights. Opp. 29. Accordingly, the States are not entitled to any "special solicitude" in the standing analysis.

      *c.   States Cannot Bring* Parens Patriae *Actions Against the Federal Government.*

      The States' continued appeal to *parens patriae* standing should be rejected out of hand. The Supreme Court has long held that States do not have standing as *parens patriae* to sue the Federal Government. *Snapp*, 458 U.S. at 610 n.16 ("A State does not have standing as *parens patriae* to bring an action against the Federal Government." (citing *Massachusetts*, 262 U.S. at 485-86), *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966)). Courts have consistently held that this so-called *Mellon* bar precludes any *parens patriae* actions by states against the Federal Government.[6]

      The States wrongly assert that their action may proceed in *parens patriae* under the Sixth Circuit's decision in *Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022). *See* Opp. 22-25. In *Kentucky*, the Sixth Circuit recognized two types of actions by states against the Federal Government, one "forbidden" and one "permissible." *Id.* at 596-97. The first, "forbidden" action is the traditional notion of *parens patriae* rejected in *Mellon*, in which a state seeks "to sue the United States *on behalf of state citizens* allegedly harmed by the federal government." *Id.* at 596 (emphasis added). In *Mellon*, for instance, Massachusetts was barred from "su[ing] on behalf of its own citizens to vindicate their putative interests against being governed by an allegedly unconstitutional federal statute." *Id.* at 596-97 (citing *Mellon*, 262 U.S. at 485-86). By contrast, the second, "permissible"

---

[6] *Wyoming ex rel. Sullivan v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992); *Michigan v. U.S. EPA*, 581 F.3d 524, 529 (7th Cir. 2009); *State of Nev. v. Burford*, 918 F.2d 854, 858 (9th Cir. 1990); *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179-80 (D.C. Cir. 2019); *see also Brackeen v. Haaland*, 994 F.3d 249, 292 (5th Cir. 2021) (en banc) (opinion of Dennis, J.) (rejecting the notion that States "have standing to bring an equal protection challenge in *parens patriae* on behalf of citizens[.]"), *cert. granted*, 142 S. Ct. 1204 (2022).

action arises when a state asserts injury to "its *own* sovereign [or] quasi-sovereign interests." *Id.* at 596. In such cases, although "states sometimes purport to sue in a '*parens patriae*' capacity, . . . what they are really doing is asserting some injury . . . *separate and apart from* their citizens' interest." *Id.* (emphasis added). The "classic" example, the court elaborated, would be a "public nuisance[]" suit, "in which a state sues to prevent pollution," which "invades the state's prerogative to superintend the public health," and "safeguard its domain[.]" *Id.* (internal quotation marks and citation omitted).

It is not clear which of those two types of *parens patriae* theories the States are relying on, but their Complaint fails either way. If the States are suing, as they say, to vindicate "the free-speech rights" of their residents, or to ensure that their residents "are not excluded from" the "[f]ree-speech" "benefits" guaranteed by "the federal system," Opp. 21, then they are simply bringing a suit "on behalf of state citizens allegedly harmed by the federal government"—the very type of *parens patriae* action that *Kentucky v. Biden* concludes is "forbidden," *Kentucky*, 23 F.4th at 596. If on the other hand they are attempting to invoke their own sovereign or quasi-sovereign interests, then their suit would still fail because the States have not plausibly alleged any interest existing apart from their citizens' interests. As explained above, the States do not plausibly allege any direct injury to their sovereign interests. And the States' suggestion that they may have a quasi-sovereign interest in being included in the "benefits" guaranteed by "the federal system," Opp. 21, goes nowhere, because the First Amendment affords protections to individuals, not the States. *Estiverne*, 863 F.2d at 379. Ultimately, then, the States are acting as nothing more than "nominal part[ies]," and their action is barred. *Kentucky*, 23 F.4th at 599 (citing *Snapp*, 458 U.S. at 607).

Indeed, the States' own arguments foreclose their resort to *parens patriae*: they acknowledge that *parens patriae* suits are precluded if brought "on behalf of individuals []able to

represent themselves." Opp. 22. The reality that several individuals whose speech has allegedly been censored have joined the States *in this action*—and that still other individuals have sued elsewhere (albeit without success)—illustrates that individual platform users are fully "able to represent themselves." *Id.*; *see* Mem. 21. The States offer no explanation for that glaring flaw in their *parens patriae* theory of standing. Moreover, to the extent the States seek to represent recipients of speech, as opposed to speakers, they rely entirely on third-party standing, Opp. 29-31—the very category of *parens patriae* standing that they admit "a State lacks standing to bring . . . against the federal government," *id.* at 22 (citing *Snapp*, 458 U.S. at 600).

All that being so, the States novelly propose that *Snapp* supports *parens patriae* standing to "vindicate" their "interests rooted in *state* law"—that is, the free-speech provisions of the States' constitutions. Opp. 25-26 (emphasis added). But *Snapp* provides no support for that theory. *Snapp* held that Puerto Rico had quasi-sovereign interests in protecting its citizens from discriminatory treatment resulting from violations by "numerous individuals and companies engaged in the apple industry in Virginia" of "two federal statutes," *Snapp*, 458 U.S. at 594-97—a far cry from the States' purported interest in enforcing state constitutions against the Federal Government. And in any event, as explained, *supra* Part II.A.i.a, the Federal Constitution withholds from states the power to enforce state law against the Federal Government.

### d. The Individual Plaintiffs Fail to Allege a Plausible Injury-in-Fact.

Plaintiffs contend that the Individual Plaintiffs are suffering two kinds of cognizable harm: (1) "the expectation of imminent, future *new* injuries"; and (2) "*ongoing* censorship injuries" stemming from past content moderation. Opp. 7. The Court should reject both arguments.

The Complaint and the Individual Plaintiffs' declarations fail to allege that the Individual Plaintiffs have "concrete plans," *Defs. of Wildlife*, 504 U.S. at 564, to post content that would likely be removed in the future. It is not disputed that each of the Individual Plaintiffs plausibly

alleges that he or she suffered content moderation in the past. *See* ECF No. 10-3 (Decl. of Dr. Jayanta Bhattacharya ¶ 16 & n.4 ("Bhattacharya Decl.")); ECF No. 10-4 (Decl. of Dr. Martin Kulldorff ¶¶ 15-16 ("Kulldorff Decl.")); ECF No. 10-5 (Decl. of Jim Hoft ¶¶ 11-12 ("Hoft Decl.")) ECF No. 10-7 (Decl. of Aaron Kheriaty ¶ 11 ("Kheriaty Decl.")); Hines Decl. ¶¶ 8, 10-11. But where a plaintiff seeks injunctive relief, "[p]ast wrongs . . . do not in themselves amount to [the] real and immediate threat of injury necessary to make out a case or controversy." *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 375 (5th Cir. 2021) (quoting *Lyons*, 461 U.S. at 102). Future injuries must be "*certainly impending* to constitute injury in fact." *Clapper*, 568 U.S. at 410 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). The Complaint and declarations consist only of conclusory allusions to unspecified future injuries that must be disregarded. *See, e.g.*, SAC ¶ 475 ("[T]hese injuries to the private Plaintiffs and their audiences are imminent and ongoing.").

The Complaint and declarations also fail plausibly to allege "ongoing" injuries that are sufficient to establish Article III standing. Again, conclusory allegations cannot meet this burden. *See Iqbal*, 556 U.S. at 678. Accordingly, and contrary to Plaintiffs' assertion, the Complaint's repeated but factually unsupported allegations that Plaintiffs "are suffering grave and ongoing injuries," Opp. 7 (quoting SAC ¶ 469), must be disregarded. Moreover, the Individual Plaintiffs' allusions to potentially ongoing harm, such as permanent suspensions on Facebook, "implicate the intersection of the redressability and injury-in-fact requirements." *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019). Plaintiffs seek relief from past content-moderation decisions, but the remedy they propose would not undo those decisions or even bind the decisionmakers themselves. Their injuries are therefore not redressable. *Cf. Dorce v. City of New York*, 2 F.4th 82, 95-96 (2d

Cir. 2021) ("[A]n injunction against future actions by a defendant does not remedy the harm done by that defendant's past acts.").

>    e.   *No Plaintiff Has Third-Party Standing.*

Additionally, Plaintiffs assert a theory of third-party standing that is as ill-defined and far-reaching as the rest of their standing arguments. Although the Complaint purports to allege only that Missouri and Louisiana have third-party standing, SAC ¶ 467, Plaintiffs now assert that both the States and the Individual Plaintiffs may "assert the injuries" of third parties—namely, "the *audiences* of social-media speech," which number in the "millions" and include not only Missouri and Louisiana residents but also all "Americans who are deprived access to speech that is censored on social-media." Opp. 30. Even "*potential* audiences" fit within Plaintiffs' amorphous and ever-expanding third-party standing theory. *Id.* (emphasis added). This novel theory of third-party standing is meritless.[7]

First, as to the States: Plaintiffs themselves emphasize that "*[e]veryone agrees* that a State lacks standing to bring a third-party *parens patriae* lawsuit against the federal government." Opp. 22 (emphasis added). Allowing the States to bring claims on behalf of social media "audiences" in their territory and nationwide would "render[]" that undisputed bar against third-party *parens patriae* standing "meaningless." *Washington v. Trump*, 858 F.3d 1168, 1188 (9th Cir. 2017) (Bea, J., dissenting from the denial of rehearing en banc); *cf. Paterson v. Texas*, 308 F.3d 448, 451 (5th Cir. 2002) ("As for the State's argument that it represents the interests of Texas class members, we know of no authority that would give it standing in a representative capacity."); *see also* Mem.

---

[7] The Court should disregard Plaintiffs' repeated invocation of Alex Berenson as an example of Government "censorship" that confers Article III standing. Opp. 30, 34, 38-40, 79. Berenson is not a plaintiff in this case; he has the capacity to bring suit to vindicate his own interests, and indeed, he has done so. *See Berenson v. Twitter*, No. C 21-9818, 2022 WL 1289049 (N.D. Cal. Apr. 2022). The same is true of the unidentified "Disinformation Dozen." Opp. 30, 34, 79.

21. Plaintiffs identify no contrary precedent validating a theory of State third-party standing apart from the *parens patriae* doctrine.

Second, neither the States nor the Individual Plaintiffs meet the requirements for asserting third-party standing. In addition to meeting the "irreducible constitutional minim[a]" of Article III, *Defs. of Wildlife*, 504 U.S. at 560, a litigant seeking to assert a third party's right must show that (1) it "has a 'close' relationship with the person who possesses the right," and (2) "there is a 'hindrance' to the possessor's ability to protect his own interests," *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (citation omitted). Plaintiffs do not even acknowledge these requirements—tacitly conceding (and soundly so) that they do not meet them. Plaintiffs unquestionably lack a close relationship with "millions" of unknown audience and potential audience members nationwide whose purported right to receive "social-media speech" they seek to assert, Opp. 30. *See Vote.Org v. Callanen*, 39 F.4th 297, 304 (5th Cir. 2022) (organizations' relationship to "some unknown subset of Texas voters that may in the future submit their voter registration applications via fax using [the organizations'] web application" was "insufficiently close to support third-party standing"). Nor does Plaintiffs' blanket and unsupported assertion that audience members lack "incentive" to assert a purported right to listen to social media speech, Opp. 30, plausibly show any actual "genuine obstacle" that would preclude an individual from asserting any such right, *In re Deepwater Horizon*, 857 F.3d 246, 253 (5th Cir. 2017) (citation omitted).

Plaintiffs attempt to bypass these requirements by positing a blanket First Amendment "'exception' to the ordinary third-party standing doctrine," Opp. 30-31 (citation omitted), suggesting that third-party rights may always be invoked in any First Amendment case. Plaintiffs ignore that the "exception" they cite is limited to overbreadth challenges to statutes, *see e.g.*, *Broadrick v. Oklahoma*, 413 U.S. 601, 611-12 (1973) (cited at Opp. 31)—and even in that context

18

is "employed . . . sparingly and only as a last resort," *id.* at 613. Any exception applicable in overbreadth cases is inapposite here. Furthermore, even in overbreadth cases, plaintiffs "still must show that they satisfy the core Article III requirements of injury, causation, and redressability." *Seals v. McBee*, 898 F.3d 587, 591 (5th Cir. 2018).[8]

    ii.   <u>Causation</u>

Even if any Plaintiff could establish an imminently threatened injury—or one suffered in the past—none of them plausibly alleges that their claimed injuries are attributable to Defendants. That is true for at least three reasons. First, the Complaint contains only conclusory, factually unsupported assertions about unidentified "market forces" and "incentives" that Plaintiffs say would preclude social media companies from combatting misinformation in the absence of "threats," *see* SAC ¶¶ 478-84, while ignoring the obvious reality that the companies have for their own reasons moderated content on their platforms concerning COVID-19, election integrity, and other matters of public concern. Second, the Complaint alleges that the companies reacted to "threats" made by people who are *not Defendants* in this case, which defeats causation. *E.g.*, SAC ¶ 189. Third, and relatedly, many (if not most) of Plaintiffs' alleged injuries predate Defendants' allegedly coercive conduct. Plaintiffs' effort to cast as wide a net as possible—attributing all content moderation occurring from early 2020 onward to statements made by all sixty-seven official-capacity Defendants, regardless of when they were made—creates an insurmountable

---

[8] Plaintiffs' reliance on *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), is equally meritless. *See* Opp. 30. There the Court determined that four book publishers had standing in part because they were asserting their *own* right to "publication" of books guaranteed by the "freedom of the press"—they were "not," the Court stressed, acting as "mere proxies arguing *another's* constitutional rights." *Bantam Books*, 372 U.S. at 58 n.6 (emphasis added). Other "pragmatic considerations"—such as the publisher's "greater economic stake" in the case as compared to potential distributers—also informed the Court's conclusion that the publishers were the proper party to bring the case, but did not support a finding of third-party standing. *Id.*

chronological problem for establishing causation. Any doubt as to whether these defects preclude standing are put to rest by the series of cases that have rejected similar claims on causation grounds.[9] These defects defeat every Plaintiff's standing allegation, and the Individual Plaintiffs' allegations suffer from additional problems, discussed separately below.

### a.   No Plaintiff Plausibly Alleges Causation.

First, Plaintiffs fail to rebut that their theory of causation is based on conclusory, speculative allegations about social media companies' business judgments. The linchpin of Plaintiffs' argument is that these companies would not moderate misinformation on their platforms "in the absence of Defendants' [conduct]." SAC ¶ 478. That contention rests on Plaintiffs' dubious hypothesis that, although "market forces and other incentives" would ordinarily preclude social media companies from combatting misinformation, *id.*, the social media companies are acting against their own interests in response to "threats of adverse legal consequences"—specifically, antitrust enforcement and changes to Section 230(c) of the Communications Decency Act of 1996 ("CDA"), Pub. L. No. 104-104, § 509, 110 Stat. 56, codified at 47 U.S.C. § 230 ("§ 230")—made by "Defendants and their allies," SAC ¶ 479. Further still, under Plaintiffs' theory, these "threats" became "even more motivating" when President Biden took office in 2021. *Id.*

Plaintiffs' theory is unfounded and predicated on conclusory allegations that cannot give rise to a plausible finding of causation. *See* Mem. 34-35. Despite Plaintiffs' access to discovery prior to amending their Complaint and their reliance on public sources, the Complaint does not describe what the relevant "market forces" or "incentives" are, or offer any statements by social

---

[9] *See, e.g., Changizi v. Dep't of Health & Hum. Servs.*, 602 F. Supp. 3d 1031, 1046-49 (S.D. Ohio 2022), *appeal filed*, No. 22-3573 (6th Cir. June 30, 2022); *Hart v. Facebook Inc.*, No. 22-cv-00737, 2022 WL 1427507 (N.D. Cal. May 5, 2022); *AAPS I*, 518 F. Supp. 3d 505 (D.D.C. 2021), *aff'd*, 23 F.4th 1028 (D.C. Cir. 2022) ("*AAPS II*"); *cf. Doe v. Google*, No. 21-16934, 2022 WL 17077497 (9th Cir. Nov. 18, 2022)

media company employees (or other nonconclusory allegations) showing that the companies would feel compelled by these "forces" to refrain from content-moderation efforts in the absence of Defendants' actions. *Id.* at 33. Instead, the Complaint merely offers bald, sweeping statements— *e.g.*, "[o]n information and belief, . . . credible threats to amend or repeal [§ 230] are powerful motivators to those platforms." SAC ¶ 181. More is needed to satisfy the plausibility standard of pleading. *See Twombly*, 550 U.S. at 555.

Plaintiffs' unsupported theory also fails in light of the "obvious" alternative explanations for the companies' conduct, which render plaintiffs' theory implausible. *See Iqbal*, 556 U.S. at 681-82. Social media companies have historically taken steps to combat misinformation in response to significant societal concerns. In advance of the 2020 election, before President Biden took office, the companies took steps to combat election interference. *See* SAC ¶ 387; Mem. 5-6. In 2020, with the emergence of an unprecedented global pandemic that threatened, and took, the lives of millions of people, the companies—like many other large corporations—sought to play their part in combatting the spread of the disease by revising their terms of service to address COVID misinformation. *Id.* These "undeniable 'widespread societal concerns about online misinformation' offer a 'far [more] plausible' explanation for social media platforms' longstanding efforts to combat misinformation" than Plaintiffs' unsupported theory about repeal or amendment of § 230 and threats of antitrust enforcement. Mem. 38 (quoting *AAPS II*, 23 F.4th at 1034-35); *see also Changizi*, 602 F. Supp. 3d at 1048 (holding that the plaintiffs did not "account for the

21

'innumerable other potential causes' that may have driven, or currently drive, Twitter's behavior, including 'widespread societal concerns about online misinformation'" (citation omitted)).[10]

Plaintiffs offer little in response. They do not dispute that their allegations regarding "market forces" and "incentives" are conclusory and unsupported. Instead, they simply insist that the Complaint "repeatedly alleges that the social-media platforms would *not* have engaged in the complained-of censorship without the pressure from federal officials." Opp. 37. It is irrelevant how frequently that conclusion is repeated, however—at no point is it plausibly supported by non-conclusory allegations of fact. *See Iqbal*, 556 U.S. at 680-81 ("[B]are assertions" that amount to conclusory allegations are "not entitled to be assumed true"). Nor do Plaintiffs substantively address the "more likely explanations" that defeat the plausibility of their claims. *Id.* at 681. They contend that "only the most obtuse or biased of observers could believe that social-media platforms are oblivious to federal pressure and simply engage in 'independent judgment based on their own policies.'" Opp. 40 (quoting Mem. 35). Plaintiffs, however, fail to meet their obligation to plead facts sufficient to show standing. That burden cannot be met through *ad hominems*.

Second, even if Plaintiffs were correct that the social media companies began moderating content in 2020 despite (rather than because of) "market forces," the Complaint does not attribute

---

[10] The Complaint itself supports these common-sense alternative explanations. Central to Plaintiffs' claims is the allegation that leading social media platforms "generally refused to remove false content purely because it was false until 2020." SAC ¶ 478; *see also* Opp. 33. That allegation is sourced to a news article, Gilead Edelman, *Beware the Never-Ending Disinformation Emergency*, The Wired (Mar. 11, 2022), https://www.wired.com/story/youtube-rigged-election-donald-trump-moderation-misinformation/. But the article's very next line explains that "[i]t was *Covid-19*, and then the *election*, that got [the companies] past their squeamishness about weighing in on factual disputes." *Id.* (emphases added). Platforms combatted health misinformation because of their "well-intentioned desire to keep people safe during a public health crisis." *Id.* As Plaintiffs' own source indicates, the obvious alternative reasons for the companies' actions are based in societal concerns about a global pandemic and election integrity, not "threats" from non-party legislators.

22

the companies' actions to any Defendant to this suit. Instead, it spends five pages listing examples of ways in which President Biden's "allies" in Congress—who are not Defendants—have allegedly threatened social media companies with "legal consequences" unless they combat misinformation on their platforms. SAC ¶¶ 183-88. Immediately following that list of examples, Plaintiffs allege that, "[s]tarting in or around 2020, if not before, social-media firms [ ] responded to *these threats* by engaging in increasingly more aggressive censorship." *Id.* ¶ 189 (emphasis added). The Complaint also attributes Plaintiffs' injuries to numerous other nonparties. According to the Complaint: (1) social media companies "aggressively censored" the Hunter Biden laptop story in 2020 after 51 then-*former* intelligence officials (who are not Defendants) labeled it "Russian disinformation," *Id.* ¶ 135; (2) those companies "censored" content about the COVID lab-leak theory in 2020 after "influential individuals" (who are not Defendants) "signed public statements that were placed in science journals," *id.* ¶¶ 206, 212; and (3) those companies currently moderate content based on consultations with "NGOs," "the World Health Organization[]," and "researchers," none of whom are Defendants, *id.* ¶ 482. At the same time, and despite the Complaint's length, Plaintiffs fail to allege that any *Defendant* has made any threat of "legal consequences." *See infra* Part III.A.ii.[11] Thus, even accepting the Complaint's allegations as true, the Complaint fails to establish that social media companies' ramping up of anti-misinformation efforts in 2020 is fairly traceable to any Defendant.

---

[11] In addition to five pages of statements made by Members of Congress, the Complaint cites a handful of statements made in 2020 by then-candidates Biden and Harris. *See* SAC ¶¶ 191-96. But—with the exception of a single comment made by President Biden in July 2021, SAC ¶ 232—it alleges no such statements by them in the two years since they took office. This smattering of long-ago remarks does not plausibly establish causation, especially when viewed in comparison to the numerous *other* statements made by non-parties, which Plaintiffs allege formed the basis for the social media companies' actions.

Seeking to cure this deficiency, Plaintiffs contend that Defendants caused their injuries by making "demands" of social media platforms "against the backdrop" of prior "public threats of adverse legal consequences from Defendants such as President Biden, Jen Psaki, and their political allies in Congress." Opp. 38-39. It bears repeating that the Complaint contains no alleged "threats of adverse legal consequences" from the official-capacity Defendants, including President Biden and White House Press Secretary Jennifer Psaki. *See infra* Part III.A.ii. And in any event, Plaintiffs' attempt to blame their injuries on statements Defendants allegedly made in 2021 cannot be squared with their theory that social media companies began "censoring" content *in 2020*—and in response to threats from Congress, not Defendants. SAC ¶¶ 183-88.

Plaintiffs do not dispute that the social media companies developed and enforced their content-moderation policies long before the Biden Administration engaged in any communication with them. *See* Mem. 38. This is significant because, as other courts have found, allegations that the companies have generally removed content due to pressure from the Biden Administration (as opposed to their own independent judgments) cannot be squared with the timing of the companies' actions. *See, e.g.*, *AAPS II*, 23 F.4th at 1034; *Changizi*, 602 F. Supp. 3d at 1046-47. Plaintiffs nonetheless contend that there is no "chronological problem" because the Complaint alleges that the Government's allegedly unlawful conduct began in early 2020. Opp. 42 (quoting SAC ¶ 189). But as discussed, the Complaint alleges that social media companies were responding to *non-parties*' "threats" in early 2020. Plaintiffs further contend that the "threats" that occurred in 2020 came from "Dr. Fauci, [who was an Executive Branch employee in 2020], among others." Opp. 42-43. But the Complaint is devoid of any well-pleaded facts regarding threats from Dr. Fauci, *see infra* Part I.A; and the "others" are non-parties, *see* SAC ¶¶ 183-88.

24

One last point bears mention. In a typical case, a plaintiff pleads that a particular person or entity has caused (or will cause) a specific harm that is redressable through court-ordered relief. The causation analysis under Article III is thus straightforward in the mine-run of cases; all that the court must determine is whether the specified injury is "fairly traceable" to the defendant's conduct. *See Spokeo*, 578 U.S. at 338. Here, by contrast, Plaintiffs allege that sixty-seven government officials are collectively responsible for every content-moderation decision made by every social media platform from 2020 onward, and for every allegedly resulting harm to the Individual Plaintiffs, their "audience," and the States. With limited exceptions, Plaintiffs make no effort to connect specific actions by identified government officials to distinct actions taken by particular companies that injured individual Plaintiffs in concretely described ways. *See* Mem. 33-34. Their failure to do so, combined with the sheer breadth of their claims, necessarily defeats Plaintiffs' claims that their injuries are fairly *traceable* to Defendants' conduct, and threatens to draw the Court into a role of "general legal oversight of the Legislative and Executive Branches," which Article III prohibits. *TransUnion*, 141 S. Ct. at 2203; *see also Valley Forge*, 454 U.S. at 472 (standing "limit[s] the federal judicial power 'to those disputes which confine federal courts to a role consistent with a system of separated powers'" (quoting *Flast v. Cohen*, 392 U.S. at 97)). The Court should, accordingly, reject Plaintiffs' effort to draw a tenuous connection between their sweeping allegations of government conduct and untold numbers of decisions made by some of the world's largest media companies—none of which is before the Court.

### b. For Additional Reasons, the Individual Plaintiffs Fail to Plausibly Allege Causation.

For the reasons outlined above, the Individual Plaintiffs also cannot establish causation. Indeed, each of the Individual Plaintiffs admits that his or her content was first moderated by social media companies in 2020, long before President Biden took office and certain Defendants made

the allegedly coercive statements described in the Complaint. *See* Bhattacharya Decl. ¶ 16 & n.4; Kulldorff Decl. ¶¶ 15-16; Hoft Decl. ¶¶ 11-12; Kheriaty Decl. ¶ 11; Hines Decl. ¶¶ 8, 10-11. The Complaint does not explain why those decisions are fairly traceable to the official-capacity Defendants, or why the social media companies will not take those same actions in the future for reasons unrelated to Defendants' actions.

Jim Hoft is the only Individual Plaintiff for whom Plaintiffs attempt to establish causation in their response brief. *See* Opp. 37-38. Mr. Hoft is the lone Individual Plaintiff whose content was allegedly "flagged . . . for censorship" by Defendants, supposedly at a March 3, 2021, "training session for state and local elected officials" that Plaintiffs allege was "hosted by CISA." SAC ¶ 432.[12] But he, too, falls short of establishing causation. Mr. Hoft alleges that he experienced "repeated" content moderation by Facebook, Twitter, and YouTube in "2020 and 2021," including a permanent ban of his website's Twitter account on February 6, 2021. *See* Hoft Decl. ¶¶ 11-12. The timing of these injuries does not align with the averment that CISA "flagged" Mr. Hoft's posts at a CISA presentation in March 2021, *after* his content was repeatedly moderated by the platforms. The Complaint contains no allegations connecting any of Defendants' conduct to Mr. Hoft in 2020 or January or February 2021. Notably, though, the Complaint *also* alleges that Mr. Hoft was "targeted" by *non-parties*—specifically, a 501(c)(3) group known as the Center for Countering Digital Hate and Senator Amy Klobuchar. Hoft Decl. ¶ 19. Mr. Hoft even alleges that the Center, which is not a party to this case, "boast[ed] that it had succeeded in demonetizing [Mr. Hoft's website] on Google." *Id.* Accordingly, Plaintiffs have failed to explain how any content-

---

[12] *See* SAC ¶ 432 (referring to Atlantic Council, *The long fuse: Misinformation and the 2020 election*, YouTube (Mar. 4, 2021) (37:34-39:13), https://www.youtube.com/watch?v=acCETiXCdWM. An edited version of this video appears in a *Foundation for Freedom Online* article that the Complaint incorporates by reference. *See* SAC ¶ 432. The article includes a link to the full video, which indicates that the event took place on March 3, 2021.

moderation measures taken against Mr. Hoft can be attributed to Defendants, rather than by the independent judgment of social media companies or by other influences, including actions by non-parties, to which social media companies responded.

    iii.    <u>Redressability</u>

Plaintiffs also fail to establish that their alleged injuries are redressable by the relief sought. Although the Court previously reasoned in its discovery order that "[s]topping of the alleged suppression of supposed disfavored speakers, viewpoints, and content would address Plaintiff States' alleged injuries," ECF 34 at 6, more is required to establish redressability here, where the key question is whether an injunction that binds only the Defendants would have the likely effect of "[s]topping the alleged suppression" carried out by independent social media companies. *Id.* The Supreme Court has cautioned that the redressability requirement is "substantially more difficult" to satisfy where, as here, a plaintiff challenges the Government's conduct towards third parties. *Defs. of Wildlife*, 504 U.S. at 562. The Complaint fails to clear this high hurdle for any Plaintiff. Furthermore, granting the relief Plaintiffs seek would draw the Court well beyond the limits of its Article III powers.

    *a.  No Plaintiff Plausibly Alleges Redressability.*

At the outset, the Court should have little difficulty rejecting Plaintiffs' contention that because this is a First Amendment case, they are "not required to prove that the censorship would cease absent government involvement." Opp. 47. "First Amendment challenges do not eliminate the need for a party to demonstrate it has constitutional standing," *Serv. Emps. Int'l Union, Local 5 v. City of Houston*, 595 F.3d 588, 597 (5th Cir. 2010), and it is axiomatic that when a plaintiff's asserted injury arises from the Government's "unlawful regulation . . . of *someone else*," causation and redressability "hinge on the response of the regulated (or regulable) third party to the government action," *Defs. of Wildlife*, 504 U.S. at 562. Unsurprisingly, Plaintiffs cite no authority

that contravenes these settled principles. The case they cite, *Harrell v. Florida Bar*, involved a plaintiff who claimed that state bar rules that applied directly to him were void for vagueness. 608 F.3d 1241, 1257 (11th Cir. 2010). *Harrell* stands for the unremarkable proposition that, in cases where a plaintiff alleges that his own speech will be chilled by the Government's regulation of his conduct, striking down the regulation will redress his injury. *Id.* ("As for the redressability prong, if the challenged rules are stricken as unconstitutional, Harrell simply need not contend with them any longer."). That logic is inapplicable here.

Plaintiffs' injuries are not redressable because it is "merely speculative" that an injunction against Defendants will cause social media companies to undo the actions that Plaintiffs insist were "induced" by Defendants. Opp. at 33. Again, the Complaint demonstrates that those companies modified and enforced their misinformation policies—including against the individual Plaintiffs— well before the current Administration took office. *See* SAC ¶ 189. The Complaint also alleges that those companies were and are responding to the expressed views of Members of Congress, former government officials, NGOs, and others who are not Defendants to this suit and who would not be bound by an injunction. *See, e.g., id.* ¶ 482. As with their argument in support of causation, Plaintiffs repeat their unsubstantiated allegation that "in the absence of Defendants'" conduct, "market forces and other incentives" would "restrain" the platforms from engaging in content moderation. Opp. 46-47 (quoting SAC ¶ 478). That allegation is insufficient to meet the "substantially more difficult" redressability requirement that applies here, because it is not only speculative and unsupported by non-conclusory allegations of fact, but it is also contradicted by the more specific allegations in the Complaint regarding non-parties. *See Changizi*, 602 F. Supp. 3d at 1050 (holding that the plaintiff failed to plead redressability because he failed to account for Twitter's activity that predated the Biden Administration or to "substantiate anywhere . . . that

Twitter *believes* its enforcement of its COVID-19 policy comes to the overall detriment of its financial health"). It is also contradicted by the far more plausible theory that the companies will continue to moderate misinformation because it is in their own interest to do so. *Supra* pp. 20-21.

b. *For Additional Reasons, the Individual Plaintiffs Fail to Plausibly Allege Redressability.*

For the reasons outlined above, the Individual Plaintiffs also cannot establish redressability. But the Individual Plaintiffs fail to plead redressability for an additional reason: the Complaint does not include substantiated allegations that social media companies would reconsider any ongoing suspensions and bans if Plaintiffs obtain the relief they seek. In other words, even assuming that an order enjoining Defendants would lead to less content-moderation in the future—an assumption the Complaint fails to show is facially plausible—the Complaint lacks any indication that the social media companies would *also* revisit actions taken in the past. This matters because the Individual Plaintiffs rely heavily on allegations of "ongoing" injuries due to content-moderation decisions made in the past, *see* Opp. 6-14, and they suggest (without factual support) that the companies would "predictabl[y]" respond to an injunction by undoing their past actions, *see* Opp. at 46-47. The chain of inferences required to credit Plaintiffs' argument that Defendants would likely lead the social media companies to undo their past acts is too speculative to satisfy the redressability requirement under Article III.

c. *The Relief Sought Would Violate Article III.*

Moreover, Plaintiffs' injuries are not redressable because their proposed injunction far exceeds the authority conferred by Article III. *See* Mem. 41. This is not an academic concern; the Supreme Court has repeatedly emphasized that Article III guards against "grant[ing] unelected judges a general authority to conduct oversight of decisions of the elected branches of Government." *California v. Texas*, 141 S. Ct. 2104, 2116 (2021); *cf. Juliana v. United States*, 947

F.3d 1159, 1171 (9th Cir. 2020) (affirming the dismissal of constitutional claims on redressability grounds because "it is beyond the power of an Article III court to order, design, supervise, or implement the plaintiffs' requested remedial plan"), *denying reh'g en banc*, 986 F.3d 1295 (9th Cir. 2021). The Complaint seeks an order "enjoin[ing] Defendants, their officers, officials, agents, servants, employees, attorneys, and all other persons acting in concert or participation with them, from continuing to engage in [the alleged] unlawful conduct." SAC, Prayer for Relief ¶ D. On Plaintiffs' theory of what constitutes unlawful conduct, it is difficult to imagine a more broadly applicable remedy, the enforcement of which would threaten to encroach significantly on the Executive Branch's prerogatives to speak on matters of public concern. Plaintiffs' contrary contentions are incorrect.

First, Plaintiffs err in contending that Defendants' arguments are "premature and speculative" because Plaintiffs are still in the process of determining the scope of relief that they seek. Opp. 47. Whether the Court has jurisdiction over this case is a "first and fundamental" question that must be resolved before the case may "proceed at all." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (citations omitted). The standing inquiry thus cannot be put on hold while Plaintiffs attempt to fashion a remedy that satisfies the redressability requirement. Furthermore, it is *Plaintiffs* who bear the burden of establishing standing, and "on a motion to dismiss," the Court must determine whether the Complaint "allege[s] facts that give rise to a plausible claim of [Plaintiffs'] standing." *Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 133-34 (5th Cir. 2009) (citing *Defs. of Wildlife*, 504 U.S. at 561). Here, accepting the Complaint's allegations as true, Plaintiffs seek a sweeping remedy to redress their extraordinarily broad claims, which would require for its enforcement that this Court effectively become a permanent monitor of government speech at the highest levels. Mem. 41.

Even if the Court were to consider the relief requested in Plaintiffs' preliminary injunction motion instead of the Complaint, as Plaintiffs suggest, *see* Opp. 45, that request for relief is just as problematic.[13] Such a broadly and ambiguously worded injunction, turning on subjective terminology such as "urge," "encourage," and "induce" (*see* SAC, Prayer for Relief), would subject numerous Executive Branch officials, including (in Plaintiffs' view) the President,[14] to the threat of penalties for merely expressing their views on public policy issues; it would also undoubtedly chill the Executive Branch's lawful speech. As the Fifth Circuit very recently explained, it is reversible error for an injunction to "lack precision" such that an "ordinary person" cannot "ascertain . . . exactly what conduct is proscribed." *State of Louisiana v. Biden*, 45 F.4th 841, 846 (5th Cir. 2022). Contrary to Plaintiffs' assertion, moreover, nothing in the terms of their proposed injunction indicates that it is limited to "direct communications" between Government officials and social media companies. *See* Opp. 45. But even if it were so limited, such an injunction would draw the Court beyond the bounds of Article III. "Government officials and agencies spend a great deal of time urging private persons and firms and other institutions to change their behavior," *Peery v. Chi. Hous. Auth.*, 791 F.3d 788, 790 (7th Cir. 2015), and this Court cannot police the bounds between permissible "urg[ing]" and prohibited "coercion" without impermissibly entangling itself with and impeding the performance of critical Executive Branch functions that regularly require Executive Branch officials to engage in government speech, *id.*

---

[13] Plaintiffs seek the following: "[an injunction] preventing Defendants, and their agents, officers, employees, contractors and all those acting in concert with them, from taking any steps to demand, urge, encourage, pressure, or otherwise induce any company or platform for online speech, or any employee, officer, or agent of any such online company or platform, to censor, suppress, remove, de-platform, suspend, shadow-ban, de-boost, or take any other adverse action against any speaker, content, or viewpoint expressed on social-media." ECF 15 at 57.

[14] As explained below, the Court cannot enter declaratory or injunctive relief as to the President, and for that reason the claims against the President should be dismissed. *Infra* Part IV.

Plaintiffs also object to Defendants' understanding of the breadth of their proposed injunction on the ground that "it is not yet determined whether an injunction against 'press statements' and 'advisories against misinformation' will be sought or necessary." Opp. 47-48 (citation omitted). That objection is astonishing, given that Plaintiffs have repeatedly argued—in their Complaint, their Fifth Circuit briefs, and even their opposition to the instant motion—that the Surgeon General's health misinformation advisory and the White House Press Secretary's press statements violate the First Amendment, *see, e.g.*, Opp. 59-60, and have sought extensive discovery from both officials. If Plaintiffs intend to seek no relief for these putative violations, then by definition they have no standing to litigate these claims.

### B. Plaintiffs Fail To Identify An Applicable Waiver Of Sovereign Immunity That Permits Their Claims Against The Agency Defendants.

Plaintiffs bear the burden of showing that the Government has consented to suit through an "unequivocal waiver of sovereign immunity." *St. Tammany Par., ex rel. Davis v. FEMA*, 556 F.3d 307, 315 (5th Cir. 2009). The APA, 5 U.S.C. § 702 ("Section 702"), "waives the United States' sovereign immunity in suits against federal agencies requesting nonmonetary relief." *Alexander v. Trump*, 753 F. App'x 201, 205 (5th Cir. 2018) (citing *Danos v. Jones*, 652 F.3d 577, 581 (5th Cir. 2011)). Under Fifth Circuit precedent, however, Section 702 applies only if certain requisites are met. Relevant here, for statutory or non-statutory claims asserted "completely apart from the general provisions of the APA" (Counts One and Two here), the plaintiff must challenge "agency action," as that term is defined by the APA, 5 U.S.C. § 551(13). *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 489 (5th Cir. 2014). For claims arising under the "general provisions of the APA" (Counts Three through Seven), not only must the claim contest "agency action," but that action must also be "final" within the meaning of 5 U.S.C. § 704. *Id.* Plaintiffs do not satisfy these separate requirements as to any of their claims against the Agency Defendants.

32

i.      Plaintiffs do not raise claims challenging "agency action" to which the APA's waiver of sovereign immunity applies.

Plaintiffs do not dispute that Section 702's waiver of sovereign immunity is triggered only if they challenge an "agency action." *See* Opp. 51-52. "[A]gency action" is defined by the APA as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Alabama-Coushatta*, 757 F.3d at 489 (quoting 5 U.S.C. § 551(13)). "[T]he agency action being challenged," moreover, "must be 'circumscribed [and] discrete.'" *Louisiana v. United States*, 948 F.3d 317, 321 (5th Cir. 2020) (quoting *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 194 (4th Cir. 2013)). Plaintiffs' response only underscores their failure to identify any circumscribed and discrete "agency action" they seek to challenge under the APA.

To begin, Plaintiffs do not identify a "rule, order, license, sanction, relief, or the equivalent"—as required by the statute. *Alabama-Coushatta*, 757 F.3d at 489. Instead, they declare that by repeating the word "[c]ensor" or "its cognates" no less than "441 times in the Complaint," they have alleged "First Amendment violations." Opp. 53. Whether Plaintiffs allege "censorship" or "First Amendment violations"—each of which is a legal conclusion rather than a well-pleaded factual allegation—says nothing of whether the underlying conduct said to have violated the First Amendment is an "agency action" as defined by the APA. Plaintiffs suggest that statements at a press conference constitute "agency action." *See id.* (arguing that Dr. Murthy's statements at a press conference violated the First Amendment). But merely "asking [social media companies] to consistently take action against misinformation super-spreaders on their platforms," *id.* (quoting SAC ¶ 222), is not the equivalent of a "rule, order, license, sanction, [or] relief," 5 U.S.C. § 551(13). *See Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 501 (D.C. Cir. 2018) ("press releases,

33

advisories, warnings, or manuals that do not have the force of law" are "not subject to judicial review"); *see also* Mem. 46 (citing cases).

Unable to point to any "agency action" by any Agency Defendant, Plaintiffs assert that the "action" they challenge is in reality a joint "collaborat[ion]" of all Agency Defendants "with social-media companies to censor speech[.]" Opp. 51-52; *see also* SAC ¶ 9 (describing Defendants' conduct as a "sprawling federal 'Censorship Enterprise'"); *id.* ¶ 521 (calling the Agency Defendants' "conduct" a "campaign"). Simply aggregating the statements of multiple Agency Defendants and labeling it all a collaborative enterprise, however, moves Plaintiffs no closer to identifying an "agency action." *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990) ("The term 'land withdrawal review program' . . . is simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the [agency]" and is not "an identifiable 'agency action.'"). As the Fifth Circuit holds, the APA's waiver of sovereign immunity is triggered only by challenges to "circumscribed" and "discrete" agency action, *Louisiana*, 948 F.3d at 321—that is, a "particular and identifiable action taken" by an agency, *Glenewinkel v. Carvajal*, No. 3:20-CV-2256, 2022 WL 179599, at *4-5 (N.D. Tex. Jan. 20, 2022), and not the whole-of-government challenge Plaintiffs purport to bring here, *see* 33 Fed. Prac. & Proc. Judicial Review § 8322 (2d ed.) ("The APA authorizes challenges to specific actions—such as a particular rule or order. It does not authorize plaintiffs to pile together a mish-mash of discrete actions into a 'program' and then sue an agency to force broad policy changes to this 'program.'" (citing *Lujan*, 497 U.S. at 891)).[15]

---

[15] The out-of-circuit class-action cases on which Plaintiffs rely for their broad conception of "agency action" are irrelevant to the types of claims asserted here. In those cases, the plaintiffs sought to *compel* agencies to take "discrete and concrete action" allegedly required by statute with

ii.      <u>Plaintiffs do not identify a "final" agency action within the waiver of sovereign immunity for their APA claims.</u>

Plaintiffs also do not identify a "final agency action" to trigger the waiver of sovereign immunity for their APA claims. At the outset, Plaintiffs dispute that the final agency action requirement goes to the Court's jurisdiction, but the Fifth Circuit has repeatedly made clear that "[i]n this circuit, whether an agency action is final is a jurisdictional issue, not a merits question." *Texas*, 933 F.3d at 441 (citing *Peoples Nat'l Bank v. Off. of Comptroller of Currency of U.S.*, 362 F.3d 333, 336 (5th Cir. 2004)). The case Plaintiffs cite, *Amin v. Mayorkas*, 24 F.4th 383 (5th Cir. 2022), is not to the contrary. *See* Opp. 55. Although *Amin* expressed doubt on whether treating the APA's finality requirement as jurisdictional was in "step with recent Supreme Court precedent," it nonetheless followed the established Fifth Circuit rule that finality is a jurisdictional requirement. 24 F.4th at 389-91 & n.2.[16]

Agency action is "final" if it meets two conditions: (1) it "mark[s] the consummation of the agency's decisionmaking process," and (2) it is "[an action] by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted). "[A] final action must be an 'identifiable action or event.'" *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) (quoting *Lujan*, 497 U.S. at 899).

---

respect to particular plaintiffs. *See Manker v. Spencer*, No. 3:18-cv-372, 2019 WL 5846828, at *13 (D. Conn. Nov. 7, 2019) (seeking an injunction compelling the agency to "consider specified factors in determining" a Navy and Marine Corps veteran's discharge upgrade application); *see also Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 20-21 (D.D.C. 2018) (seeking to compel the agency to apply specific statutory factors to its decisions about where to detain plaintiffs). Here, Plaintiffs are not seeking to *compel* action directed at them, but to *restrain* a broad range of speech directed at third parties, and therefore *Manker* and *Ramirez* are inapposite.

[16] In any event, whether the Court treats the "final agency action" requirement as jurisdictional or instead as a predicate to a cause of action as Plaintiffs urge, *see* Opp. 55, the outcome is the same, as § 704's "final agency action" requirements must be met regardless.

Plaintiffs fail to show that either element is satisfied here. As to the first, Plaintiffs declare that "Defendants . . . have affirmatively decided and begun to" "use social-media companies as instrumentalities by which to censor speech[.]" Opp. 56. Yet Plaintiffs cite no factual allegation in the Complaint to support that conclusory and speculative assertion—and indeed there is none. The Complaint instead references various statements by government officials in various forums (*e.g.*, emails and meetings). It is *those statements* Plaintiffs challenge, and seek to enjoin, as unlawful "agency action." But Plaintiffs do not allege—nor could they—that such statements alone culminate a "decisionmaking process."

As to the second element of finality, the challenged statements did not determine the "rights or obligations" of, or result in "legal consequences" for, any Plaintiff. *Bennett*, 520 U.S. at 178. Here, Plaintiffs challenge the statements of various personnel only because they allegedly have induced *third-party social media companies* to decide to take specific actions concerning certain content on their platforms. But agency action is not "final" if it "does not of itself adversely affect [the] complainant but only affects his rights adversely on the contingency of future administrative action." *See Peoples Nat'l Bank*, 362 F.3d at 337 (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)). Thus, the statements challenged here do not themselves constitute "final" action, as any alleged adverse effect on Plaintiffs' rights depends on the *future* decisions and consequent actions of third-party social media platforms.

Because Plaintiffs fail to identify a final agency action, the Court must dismiss their APA claims (Counts Three through Seven) for lack of subject-matter jurisdiction.

iii.     Plaintiffs fail to identify a waiver of sovereign immunity for their First Amendment or *ultra vires* claims against the Agency Defendants.

Plaintiffs assert that, even without a waiver of sovereign immunity, their First Amendment claim may proceed under the principles articulated by *Larson v. Domestic & Foreign Commerce*

*Corp.*, 337 U.S. 682 (1949), *see* Opp. 49-50, but Fifth Circuit caselaw dispels that notion. In *Danos*, the Fifth Circuit explained that, under *Larson*, sovereign immunity does not bar a specific type of constitutional claim to proceed against government officials: one "in which a 'statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional.'" 652 F.3d at 581-82 (quoting *Larson*, 337 U.S. at 689-90).[17] Plaintiffs do not allege that any official here acted pursuant to an unconstitutional "statute or order," and therefore *Larson* does not apply. *Cf. Unimex, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 594 F.2d 1060, 1062 (5th Cir. 1979) ("No contention is made that the basis for either official's authority to act on the mortgage application is unconstitutional." (citing *Ex parte Young*, 209 U.S. 123 (1908))). Moreover, Plaintiffs' reliance on *Armstrong v. Exceptional Child Center*, 575 U.S. 320 (2015), does not support their argument, as *Armstrong* did not address sovereign immunity but only the existence of a cause of action for equitable relief. *See id.* at 324-27.

Plaintiffs also contend that the doctrine of sovereign immunity does not apply to their *ultra vires* claim. Opp. 50-51. Even assuming that the *ultra vires* exception to sovereign immunity remains after the 1976 amendments to Section 702, *but see Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985),[18] Plaintiffs cannot take advantage of any such waiver here. As Plaintiffs

---

[17] *Larson* also described the exception as permitting claims to enjoin official conduct if the officer has exercised powers conferred by statute in a manner that is "constitutionally void," 337 U.S. at 702, but Plaintiffs here have identified no such statute pursuant to which Defendants have acted.

[18] In *Geyen*, the Fifth Circuit expressed doubt about the viability of the *ultra vires* exception to sovereign immunity following Congress's 1976 addition of the waiver now codified in Section 702. *See Geyen*, 775 F.2d at 1307 ("The principal purpose of this amendment was to do away with the *ultra vires* doctrine and other fictions surrounding sovereign immunity."). Plaintiffs assert that the Fifth Circuit has more recently "treated the *ultra vires* exception as good law," Opp. 50, but they cite only *Danos*, where the court merely "*assume[d] for the sake of analysis* that the *Larson* exception to sovereign immunity may still apply in certain cases after the 1976 amendments to the [APA]," 652 F.3d at 583 (emphasis added). Additionally, the Supreme Court's discussion of *ultra*

acknowledge, Opp. 50, to press an *ultra vires* claim, they must "do more than simply allege that the actions of the officer are illegal or unauthorized," *Danos*, 652 F.3d at 583. They must allege that the official acted "without any authority whatever," or without any "colorable basis for the exercise of authority." *Id*. Or as otherwise stated, plaintiffs must point to "(1) an officer, (2) whose powers are limited by statute, who (3) acted outside of those limitations." *Apter v. HHS*, ---F. Supp. 3d---, 2022 WL 17578869, at \*4–5 (S.D. Tex. Dec. 6, 2022) (citing *Larson*, 337 U.S. at 689), *appeal filed*, No. 22-40802 (5th Cir. Dec. 13, 2022).

In Plaintiffs' view, they state an *ultra vires* claim merely by asserting the legal conclusion that "Defendants are engaged in *de facto* prior restraints" in violation of the First Amendment, and that no statute authorizes Defendants to violate the First Amendment. Opp. 50-51. Taken to its logical conclusion, Plaintiffs' argument is that any constitutional claim against a federal official necessarily states an *ultra vires* claim, too. Plaintiffs cite no precedent endorsing that theory of overlapping constitutional and *ultra vires* claims. The Supreme Court has consistently "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Dalton*, 511 U.S. at 472.

Setting aside Plaintiffs' legal conclusions, the Complaint is devoid of any factual allegations supporting an *ultra vires* claim. The "conduct" Plaintiffs allege is *ultra vires* is various forms of speech by federal agencies and their officials—speech made at press conferences, in guidance documents, on calls, and in emails. But agencies and their officials need no statutory authority to make such "non-binding" statements that do not "carry the force of law." *Batterton v. Marshall*, 648 F.2d 694, 701-02 (D.C. Cir. 1980). Nor do Plaintiffs point to any statute limiting

---

*vires* claims in *Dalton v. Specter*, 511 U.S. 462, 471-72 (1994), which concerned a claim against the President rather than an agency, *see id.*, did not opine on the applicability of the *ultra vires* doctrine in claims against an agency, where § 702 is the source of the sovereign immunity waiver.

any particular agency or official from making the statements referenced in the Complaint. Plaintiffs therefore fail to state an *ultra vires* claim against any Defendant. *See Apter*, 2022 WL 17578869, at *4-5 (finding that the plaintiffs failed to allege an *ultra vires* act when they did not point to any statute limiting the Food and Drug Administration's authority "to make public statements in-line" with the purposes of the statute it was implementing).

## III. Plaintiffs Fail To State A Claim Upon Which Relief May Be Granted.

Even if Plaintiffs could establish subject-matter jurisdiction, their claims would still be subject to dismissal under Rule 12(b)(6) for failure to state a claim.

### A. Plaintiffs Fail To State A Claim Under The First Amendment.

The First Amendment proscribes only governmental conduct. But in limited circumstances, "seemingly private behavior 'may be fairly treated as that of the [government] itself.'" *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (citation omitted). Those circumstances are seldom present: the Supreme Court has cautioned that courts should "avoid[] the imposition of responsibility on [the Government] for" private "conduct it could not control" and preserve private companies' "freedom" to make decisions without fear of potential liability. *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988). Accordingly, the Government "normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). While courts have applied various overlapping tests to determine whether private behavior should be treated as state action, a coherent principle has emerged: "constitutional standards are invoked only when it can be said that the [government] is *responsible* for the specific conduct of which the plaintiff complains." *Blum*, 457 U.S. at 1004. Consistent with that principle, courts

rarely attribute private action to the Government (or vice versa) in the absence of "coercion or the threat of it." *Peery*, 791 F.3d at 790-91.

Moreover, "[d]eciding whether a deprivation of a protected right is fairly attributable to the State 'begins by identifying the specific conduct of which the plaintiff complains.'" *Moody v. Farrell*, 868 F.3d 348, 352 (5th Cir. 2017) (quoting *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 550 (5th Cir. 2005)). It is not enough for a plaintiff to allege that government officials have pressured private action in some generalized sense. *See Blum*, 457 U.S. at 1004 ("extensive[] regulat[ion]" of private parties by the government "does not by itself convert [private] action into that of the [government]"). The alleged coercion must have compelled the particular action that harmed the plaintiff. *See id.* at 1008 (considering whether specific "decision[s] to discharge or transfer particular patients" from nursing homes "turn[ed] on medical judgments made by private parties" or were the "responsib[ility]" of the State).

The Complaint here does not come close to pleading the type of governmental conduct that could transform platform content-moderation decisions into the responsibility of the Government. Indeed, this case demonstrates precisely why the Supreme Court has cautioned against generously attributing private conduct to the Government. Plaintiffs allege that Government speech at the highest levels—from a single comment by President Biden to reporters, to the Surgeon General's nonbinding advisory—is unconstitutional because it occurred "against the backdrop" of alleged "threats" by other government *and non-government* actors over the course of multiple years and across two presidential administrations. Relying on that theory of aggregate speech, Plaintiffs seek to hold virtually any current Executive Branch official who has ever communicated with a social media company responsible for the content-moderation decisions of an unknown number of social media companies against an unknown number of private individuals. That theory represents an

unprecedented expansion of the state-action doctrine. It also contains no limiting principle: if Plaintiffs prevail on their First Amendment claim, then the President and the Executive Branch would be severely limited in exercising their fundamental role of advocating for the public interest. But "it is certainly permissible for the . . . government that is responsible for" public welfare to "urge private measures" to achieve its policy objectives. *Peery*, 791 F.3d at 791.

Plaintiffs offer little legal analysis to the contrary. They rest on the mistaken assumption that alleging state action is easily done when one of five "factors"—abstract formulations of the Supreme Court's state-action test that are divorced from the context of the cases in which they appear—is "present." *See* Opp. 57-58. They then assert, in conclusory fashion, that each of those five "factors" is present here. *Id.* 58-69. But Plaintiffs misconstrue the state action analysis and obscure the ultimate inquiry: as the Fifth Circuit has explained, "[w]hether the various approaches to detecting state action are different in operation or just different in characterization," the Court's task must be to determine whether "challenge[d] conduct [is] fairly attributable to [the Government]." *Barnes v. Lehman*, 861 F.2d 1383, 1386 (5th Cir. 1988). As explained below, no matter how Plaintiffs attempt to formulate their claim, the Complaint fails plausibly to allege that Defendants are responsible for the social media companies' alleged "censorship." Accordingly, the Complaint must be dismissed.

      i.      <u>The Complaint Does Not Plausibly Allege That Defendants Engaged in "Such Significant Encouragement . . . that the choice must in law be deemed to be that of the State."</u>

Plaintiffs first attempt to water down the state action requirement by arguing that "significant encouragement" from the Government necessarily transforms private conduct into Government action. Opp. 58-60 (quoting *Blum*, 457 U.S. at 1004). In doing so, Plaintiffs misunderstand *Blum* and disregard the Supreme Court's reluctance to curb the Government's authority to encourage private behavior. Even the Government's "approval [of] or acquiescence"

41

in private action does not convert that private action into Government action. *Am. Mfrs. Mut. Ins. v. Sullivan*, 526 U.S. 40, 52 (1999). While "[c]onstitutional concerns are greatest when the State attempts to impose its will by force of law ,the [Government's] power to encourage actions deemed to be in the public interest is necessarily far broader." *Maher v. Roe*, 432 U.S. 464, 475-76 (1977).

As the Tenth Circuit recently explained in rejecting a version of Plaintiffs' argument, the "dispositive question is always 'whether the State has exercised coercive power or has provided *such* significant encouragement, either overt or covert, that the choice must *in law be deemed to be that of the State*.'" *VDARE Found. v. City. of Colo. Springs*, 11 F.4th 1151, 1161 (10th Cir. 2021) (quoting *Sullivan*, 526 U.S. at 52), *cert. denied*, 142 S. Ct. 1208 (2022). Put differently, the "such significant encouragement" language from *Blum* stands only for the unremarkable proposition that state action may be present even in the absence of the "exercise[] [of] coercive power," so long as "it can be said that the government is *responsible* for the specific conduct of which the plaintiff complains." *Blum*, 457 U.S. at 1004 (emphasis added). Moreover, as *Blum* indicates by referring to "specific conduct," there must be a sufficiently close nexus between the Government's conduct and the challenged action. *See id.* at 1003 ("Faithful adherence to the 'state action' requirement . . . requires careful attention to the gravamen of the plaintiff's complaint.").

*Blum* illustrates how high the bar is for "significant encouragement" to constitute state action. There, the plaintiffs—a class of Medicaid patients—contended that nursing homes violated the Due Process Clause by "discharg[ing] or transfer[ring] patients without notice or an opportunity for a hearing," and the question was "whether the State [could] be held responsible for those decisions." *Id.* at 993. The state "extensively" regulated the nursing homes in question, *id.* at 1004, including in ways that bore on the nursing homes' transfer and discharge decisions. For example, state regulations required nursing homes "'to make all efforts possible to transfer patients

42

to the appropriate level of care or [to] home as indicated by the patient's medical condition or needs,'" and "impose[d] a range of penalties on nursing homes that fail[ed] to discharge or transfer patients whose continued stay [was] inappropriate." *Id.* at 1008-09. The state also had to "approve or disapprove continued payment of Medicaid benefits after a change in the patient's need for services." *Id.* at 1010. In short, the state placed various forms of pressure on nursing homes to discharge patients or transfer them to lower levels of care, which "made possible and encouraged" the challenged private conduct. *Id.* at 1008 n.19. Yet the Court held that the plaintiffs had failed to establish state action, because the nursing homes' "decision[s] to discharge or transfer particular patients . . . ultimately turn[ed] on medical judgments made by private parties." *Id.* at 1008.

Plaintiffs have failed plausibly to allege facts that satisfy this high standard. And indeed, Plaintiffs make no effort to explain how their allegations satisfy that standard or identify which private decisions should be "deemed to be that of [Defendants]"—they merely contend, in conclusory fashion, that the Complaint is sufficient and append a string citation. Opp. 58. The string citation refers to allegations regarding former White House Press Secretary Psaki's statements from the podium (SAC ¶¶ 226-27, 233-34, 241); the Surgeon General's voluntary health misinformation advisory and Request for Information ("RFI")[19] (SAC ¶¶ 228-29, 242-46); meetings where social media companies "provided updates on what [they were] seeing" on their platforms as to election-related misinformation (SAC ¶ 257); DHS Secretary Mayorkas' statement that the agency is "working with" social media companies (SAC ¶¶ 282-84); DHS bulletins that expressed the agency's views that misinformation can be peddled by "domestic threat actors" (SAC ¶ 300); and 100 paragraphs relating to communications between social media companies

---

[19] An RFI solicits voluntary responses and "does not carry a penalty" for noncompliance. *Changizi*, 602 F. Supp. 3d at 1044.

and the Government on various topics (SAC ¶¶ 338-457). The implication of Plaintiffs' argument is that each of these government efforts to express views on misinformation—regardless of their form or substance or the extent to which they encourage "specific conduct," *Blum*, 457 U.S. at 1004—transforms every content-moderation decision made by every social media company into a government decision. That argument cannot possibly withstand a motion to dismiss.

Plaintiffs have not identified one factually analogous case where state action was found based on the presence of "significant encouragement." Their reliance on the Ninth Circuit's decision in *Mathis v. Pacific Gas & Electric Co.*, 891 F.2d 1429, 1431 (9th Cir. 1989), is misplaced. Plaintiffs contend that *Mathis* held that "[w]here the government had a 'policy . . . to encourage and pressure' private actors into adopting the government's preferred policy, there is 'significant encouragement' constituting government action." Opp. 59 (quoting *Mathis*, 891 F.2d at 1431). In fact, *Mathis* expressly rejected that proposition, which the plaintiffs had urged the court to adopt, as the remainder of the paragraph that Plaintiffs quote makes clear. *See Mathis*, 891 F.2d at 1431.[20] Relying on *Blum*, the Court held that "there is no state, or federal, action unless the [private decision] is 'made on the basis of some rule of decision for which the State is responsible.'" *Id.* at 1432 (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 843 (1982) (White, J., concurring)). As Defendants explained in their opening brief—and as Plaintiffs do not dispute—

---

[20] The full quote is: "Plaintiffs contend, however, that the policy of NRC was to encourage and pressure licensees into adopting the proposed procedures. These urgings, according to plaintiffs, constitute 'such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.' We accept for purposes of decision the contention of plaintiffs that they have adequately alleged that the NRC rule was actually applied to PG&E despite its lack of formal adoption. We conclude, however, that even this assumption fails to supply the necessary nexus between the actions of the NRC and PG & E's decision to deny access to plaintiffs Hassard and Schofield because of their psychological test results." *Mathis*, 891 F.2d at 1431 (quoting *Blum*, 457 U.S. at 1004).

the Government has not forced a "rule of decision" on social media companies that they must follow. Mem. 52; Opp. 72. *Mathis* is thus inapposite.

The stringent application of the state action requirement in *Blum* and *Mathis* makes sense in the broader context of the Supreme Court's reluctance to make governments responsible for private conduct, and vice versa. The Government should be (and is) entitled to strongly encourage private parties to take action on a wide range of matters affecting the public interest without fear of penalty. For example, "[p]hysically fit young men and women are encouraged to enlist in the armed forces, but there is no longer a draft, and so there is no coercion to enlist[—]and it would be absurd to claim that encouraging enlistment is the equivalent of forcing people to serve." *Peery*, 791 F.3d at 790. The government equities are especially pronounced here, where Plaintiffs seek to curb the President's ability to speak in a variety of ways, including through his Press Secretary. *See Freedom From Religion Found., Inc. v. Obama*, 641 F.3d 803, 806 (7th Cir. 2011) ("A President frequently calls on citizens to do things that they prefer not to do—to which, indeed, they may be strongly opposed on political or religious grounds."). It makes ample sense, then, that courts require more than a generalized showing of "significant encouragement" before government officials may be held liable for the specific decisions of private parties. The question must be whether the Government has provided "*such* significant encouragement, either overt or covert," that the specific choice made by the private actor "must *in law be deemed to be that of the [State]*." *Blum*, 457 U.S. at 1004 (emphases added).

ii.   The Coercion Allegations Are Implausible.

The Complaint does not plausibly allege governmental pressure that rises to the level of "coercion." *See* Mem. 51-62. Plaintiffs allege that the President, "his political allies, and those acting in concert with him" have engaged in coercion by making "credible threats" to "repeal or amend" § 230 immunity and to "impose antitrust liability and/or enforcement" on social media

companies. SAC ¶ 185; Opp. 61-62. According to Plaintiffs, Defendants have "linked" these threats with "calls for more aggressive censorship and suppression of speakers, viewpoints, and messages that these officials disfavor." SAC ¶¶ 185-86.

The fatal problem with Plaintiffs' coercion theory is that the Complaint contains no plausible allegation that *Defendants* have made any explicit or implied threats of adverse legal consequences to social media companies. Whether Defendants "threatened" or "coerced" entities in an unconstitutional sense "are conclusions and characterizations that must be supported by factual allegations as to what [they] said and did." *Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700, 716 (2d Cir. 2022). In support of their contention that "[t]he Complaint alleges numerous threats and pressure, both public and private, against social-media platforms," Plaintiffs cite two kinds of statements. First, Plaintiffs cite statements by non-parties. Opp. 62. Second, Plaintiffs cite statements by certain Defendants that cannot plausibly be construed as "threats." Neither kind of statement is sufficient to plead state action in the form of coercion.

Plaintiffs first contend that the Complaint contains a "long, continu[ed] campaign of threats" and a "long list of threats from senior federal officials" that establish coercion. Opp. 62 (citing SAC ¶¶ 183-202); *id.* at 63 (citing SAC ¶¶ 259-61, 269-73, 288). The citations obscure the sources of the "threats." Even a cursory examination of the Complaint reveals that none of them is an official-capacity Defendant in this case. The individuals listed in the Complaint are: Rep. Nancy Pelosi, Sen. Mark Warner, then-*Senator* Kamala Harris, Sen. Richard Blumenthal, Sen. Mazie Hirono, "twenty-two Democratic members of Congress," Rep. Cedric Richmond, and Rep. Jerrold Nadler (SAC ¶ 185); then-*candidate* Biden, who said more than one year before he was sworn in as President that civil or criminal liability could be "possible" (SAC ¶¶ 191-92); the Biden campaign (SAC ¶¶ 193-202, 259-61); and "Democratic House Members" (SAC ¶¶ 269-73).

Putting to one side that these statements contained no actual "threats" of adverse legal action if social media companies did not comply with the speaker's wishes, it is beyond dispute that none of these statements was made by a Defendant in this case.

Perhaps recognizing that these "threats" were not made by Defendants, Plaintiffs seek a dramatic expansion of the state-action doctrine to accommodate their claims: they argue that Defendants' public and private statements were coercive because they were made "against the *backdrop*" of the non-party "threats" discussed above. Opp. 37, 38, 60, 74 (emphasis added). Put simply, Plaintiffs ask this Court to find that Defendants' conduct—that is, statements and communications from certain officials in the Executive Branch that made *no* express or implied references to adverse legal consequences—are coercive because, at some earlier point, non-party lawmakers and candidates who were not part of the Executive Branch but who were members of the President's political party expressed interest in § 230 reform or antitrust enforcement. There is no precedent for this expansive state-action theory, which defies the teaching that state action is to be found only in limited circumstances. *See Tarkanian*, 488 U.S. at 191.

The second kind of statement that Plaintiffs cite as "threats and pressure" fares no better. Although at least attributable to certain Defendants, these statements cannot plausibly be construed as coercive. *See* Opp. 63 (citing SAC ¶¶ 218-23, 277-78, 313-14, 316, 232, 235-36, 242-46, 331, 335). The vast majority of the cited statements fail to mention § 230 reform, antitrust enforcement, or anything that could be construed as an "actual or threatened imposition of government power or sanction," as required to establish coercion. *Am. Family Ass'n v. City. & Cnty. of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002). Those statements are: White House Press Secretary Psaki's statements from the podium urging social media companies to combat misinformation (SAC ¶¶ 218, 277-78, 314); Surgeon General Murthy's statements from the podium about

misinformation's threat to public health (SAC ¶¶ 220-23); President Biden's statement to a reporter that Facebook is "killing people" (SAC ¶ 232); the Surgeon General's RFI on health misinformation (SAC ¶¶ 242-46); White House Climate Adviser McCarthy's statements on misinformation (SAC ¶ 331); and a White House memorandum establishing a task force on, *inter alia*, "gendered disinformation" (SAC ¶ 335).

Plaintiffs cite three instances in which officials from the White House Press Office mentioned § 230 or antitrust policy reforms. During a May 5, 2021, press briefing, former Press Secretary Psaki was asked about content moderation. She said,

> The President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation . . . He also supports better privacy and a robust anti-trust program. So his view is that there's more that needs to be done to ensure that this type of [content] is not going out to the American public.

Press Briefing by Press Sec'y Jen Psaki and Sec'y of Agriculture Tom Vilsack (May 5, 2021), https://perma.cc/4ZGE-N9QL ("Psaki May 2021 Briefing") (cited at SAC ¶ 219). During an April 25, 2022, briefing, Ms. Psaki said that the President

> has long argued that tech platforms must be held accountable for the harms they cause. He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to § 230, enacting antitrust reforms, requiring more transparency, and more.

SAC ¶ 313. She also said, "there are . . . reforms that we think Congress could take and [that] we would support taking, including reforming [§] 230, enacting antitrust reforms, requiring more transparency." *Id.* ¶ 316. On July 20, 2021, USAToday reported that then-White House Communications Director Kate Bedingfield said on MSNBC's "Morning Joe" that the White House is "examining how misinformation fits into the liability protections granted by Section 230." *Id.* ¶¶ 235-36. She also said that social media companies "should be held accountable." *Id.*

Even assuming that those three statements by White House press officials were made before the content moderation measures taken against Plaintiffs, it is not plausible to characterize those statements as intimidating or coercing social media companies into taking any actions on their platforms, and Plaintiffs plead no non-conclusory allegations to support this claim. These public statements were made to journalists, not social media companies. They did not contain specific requests. *See Moody*, 868 F.3d at 352 ("Deciding whether a deprivation of a protected right is fairly attributable to the State begins by identifying the *specific conduct* of which the plaintiff complains." (emphasis added and citation omitted)). Nor did they say—either explicitly or implicitly—that "some form of punishment or adverse regulatory action [would] follow the failure to accede to" any Government requests. *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983). To the contrary, the White House has frequently noted that platforms are independent decisionmakers with ultimate authority over their terms of service. The Press Secretary's May 2021 statement, for example, emphasized that the President "believe[s] in First Amendment rights" and that "social media platforms need to make" "the decisions" regarding "how they address the disinformation" and "misinformation" that "continue to proliferate on their platforms." *See* Psaki May 2021 Briefing (cited at SAC ¶ 218). Likewise, in a July 2021 press briefing, Ms. Psaki said that the Government does not "take anything down" or "block anything" and that social media platforms themselves, as "private-sector compan[ies]," "make[] decisions about what information should be on their platform[s]." Press Briefing by Press Sec'y Jen Psaki (July 16, 2021), https://perma.cc/HE54-LB2R (cited at SAC ¶¶ 232-34).

In addition, "[e]nacting antitrust reforms" and "reforms to § 230," are not the kinds of "adverse legal actions" that have been recognized as coercive in Supreme Court precedent, *see Bantam Books v. Sullivan*, 372 U.S. 58, 62-63 (1963) (threat of prosecution); *Backpage.com, LLC*

*v. Dart*, 807 F.3d 229, 230-31 (7th Cir. 2015) (threat of criminal referral and investigation); *cf.
Penthouse Int'l., Ltd. v. McAuliffe*, 610 F.3d 1353, 1360 (5th Cir. 1980) (a "program of carefully
timed warrantless arrests"), let alone *enforceable* threats that the speakers could have acted on if
they intended to, *see VDARE*, 11 F.4th at 1163-64; Mem. 59-60. Rather, they are *policy* initiatives
that government officials are entitled to support and advocate for publicly without fear of penalty.
That is especially true here, where no Defendant has suggested that the President's support for
such policy initiatives is contingent on any specific action that he believes the social media
companies should take against any individuals. Rather, and as Ms. Psaki's statements indicate, the
President's support for antitrust and § 230 reform—which have apparently earned "bipartisan
interest in Congress," SAC ¶ 313—stems from his general concerns about misinformation on
social media. Adopting Plaintiffs' theory of coercion based on these statements would require that
any statement made by the President's spokespeople—in which they say that the President or his
administration is supportive of policy measures to resolve a problem that the President believes is
caused, in part, by a particular business sector at large—rises to the level of coercion. The law does
not support such a rule.[21]

Plaintiffs' allegations stand in stark contrast with the facts of the cases on which they rely
in their response brief. Indeed, it is telling that although Plaintiffs contend that the allegations in
the Complaint are "far more coercive than in these other cases where government action was

---

[21] Of course, each action would require congressional approval. Plaintiffs make much of the fact
that "Defendants controlled the Presidency and both houses of Congress, and had authority to carry
out the threats." Opp. 63. Assuming for present purposes that control of Congress is relevant (it is
not) and that "Defendants" can control the legislative branch (they cannot), Plaintiffs' claims for
*forward-looking* relief are undermined by the fact that the majority in the House of Representatives
recently changed political parties.

found," Opp. 61, they do not even attempt to describe the facts of those cases or analogize them to the pending matter. As explained below, those cases are nothing like this one.

This case bears no resemblance to *Bantam Books*, 372 U.S. 58, which involved overt threats of criminal prosecution for distribution of disfavored publications, combined with site inspections by law-enforcement officials. As explained (Mem. 59-60), in *Bantam Books*, the Rhode Island Commission to Encourage Morality in Youth routinely sent notices to a book distributor informing him that "certain designated books or magazines" had been declared objectionable for sale or display to minors and threatening criminal prosecution for failure to remove them. 372 U.S. at 61-62. Following each notice, a local police officer would then visit the distributor to see what action it had taken to comply. *Id.* at 63.

Plaintiffs' factual allegations here are far afield from the Commission's notices that functioned as regulatory "instruments" there. The distributor in *Bantam Books* had reason to fear because the dozens of notices he received from the Commission expressly threatened prosecution and presaged visits from the police, effectively compelling the removal of publications from distribution. 372 U.S. at 61-64. But the federal officials' statements in this case that Plaintiffs have strained to characterize as "threats" did not carry any such teeth: They neither threatened to dispatch law-enforcement officials to investigate the content-moderation practices of specific social media platforms, nor sent them correspondence directly threatening prosecution for failure to comply with official demands—whether by stating that the Attorney General "will act . . . in case of non-compliance" or by other means. *Id.* at 62 n.3. Allusions to antitrust and § 230 reform, which were made in public remarks to journalists in the context of discussing the desirability of possible legal or policy reforms to address the general practices of an entire industry, are thus "a world away" from the Commission's conduct in *Bantam* Books. *Trump v. Twitter*, 602 F. Supp.

51

3d 1213, 1224 (N.D. Cal.) (rejecting similar bid to extend *Bantam Books*), *appeal filed*, No. 22-15961 (9th Cir. June 28, 2022); *see also Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1015-16 (D.C. Cir. 1991) (rejecting bid to "extend *Bantam Books*" where retailers were allegedly pressured to remove adult magazines from their shelves or be named in report of U.S. Attorney General's Commission on Pornography and effectively be accused of contributing to child abuse); Mem. 60 (listing cases that rejected comparisons to *Bantam Books*).

Nor is this case analogous to *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), which, again, involved a county sheriff's credible threats of criminal prosecution made directly to companies. In *Backpage.com*, the county sheriff sent letters to Visa and MasterCard asking that they "immediately cease and desist from allowing [their] credit cards to be used to place ads on websites like Backpage.com," which had an "adult" section on its classified advertisements forum. *Id.* at 230-31. The letters asserted that Visa and MasterCard had "the legal duty to file 'Suspicious Activity Reports' to authorities in cases of human trafficking and sexual exploitation of minors," and cited the federal money-laundering statute, intimating that the "companies could be prosecuted for processing payments made by purchasers of the ads on Backpage that promote unlawful sexual activity, such as prostitution." *Id.* at 232. The day after the sheriff sent the letters, his spokesperson informed Visa and MasterCard that if they did not "sever ties with Backpage and its imitators," the sheriff would highlight their "ties to sex trafficking" at a press conference. *Id.* at 233. The sheriff also "contacted the Inspector General of the United States Postal Service and the FBI, urging them to investigate the lawfulness of alternative payment methods for Backpage's sex ads." *Id.* at 237. Visa and MasterCard thereafter stopped allowing use of their cards to purchase ads on the website. *Id.* at 232. The Seventh Circuit therefore concluded that the sheriff had violated the free speech rights of Backpage. *Id.* at 231.

The Complaint lacks any similar allegation that, for example, Defendants "intimat[ed]" to any particular platform that criminal proceedings would result from specific content-moderation decisions, or even that any official vowed to "urg[e]" law enforcement agencies "to investigate the lawfulness" of such decisions. *Id.* at 237. In other words, the Complaint lacks plausible allegations that any Defendant "crossed the line 'between attempts to convince and attempts to coerce.'" *Vullo*, 49 F.4th at 707 (quoting *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003); *see id.* at 716-19 (rejecting facial plausibility of claim that former state insurance regulator "'threatened' or 'coerced' entities in an unconstitutional sense" where, *inter alia*, they "did not refer to any pending investigations or possible regulatory action" and "did not 'intimat[e] that some form of punishment or adverse regulatory action [would] follow the failure to accede to the [ ] request'") (quoting *Hammerhead*, 707 F.2d at 39).

Finally, this case also differs from *Okwedy*, even assuming that opinion reflects the Second Circuit's current view of the law.[22] There, a minister contracted with a billboard company to display two billboards condemning homosexuality. 333 F.3d at 340. The borough president wrote a letter to the company criticizing the billboards and remarking that the company "derive[d] substantial economic benefits" from a "number of billboards" it owned in the borough. *Id.* at 342 (citation omitted). He also directed the company to contact his legal counsel to discuss the issues raised in his letter. *Id.* The company took the signs down that same day. *Id.* at 340. The Second Circuit concluded that between the borough president's references to the "substantial economic benefit[s]" the company received from its business within the borough, and his directive to contact

_____

[22] In a more recent Second Circuit case, the court held that guidance letters and press statements were not unconstitutionally coercive, even though the speaker "plainly. . . sought to convince" private parties to "sever business relationships with gun promotion groups" and "ha[d] regulatory authority over the target audience," and some of her remarks may have been "perceived . . . as threatening." *Vullo*, 49 F.4th at 716-18.

the borough's legal counsel, the company could reasonably fear that the president "intended to use his official power to retaliate against it if it did not respond positively to his entreaties." *Id.* at 344. Here again, although the Complaint contains colorful allegations about some officials' expression of dissatisfaction with overall trends in platform content-moderation choices, it lacks nonconclusory allegations that any Defendant manifested an "inten[t] to use his official power to retaliate against," *id.*, any social media company if the company did not engage in any particular act (or acts) of content moderation.

iii.     Plaintiffs' joint participation allegations are implausible.

Plaintiffs' reliance on the "joint participation" theory articulated in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982), fares no better. *See* Opp. 64-65. "Under the theory of joint participation or 'symbiotic relationship,' '[c]onduct that is formally private may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action.'" *Frazier v. Bd. of Tr. of Nw. Miss. Reg'l Med. Ctr.*, 765 F.2d 1278, 1285 (5th Cir.) (quoting *Evans v. Newton*, 382 U.S. 296, 299 (1966)), *amended,* 777 F.2d 329 (5th Cir. 1985). This inquiry, too, is particularized to the "specific conduct of which the plaintiff[s] complain[]." *Cornish*, 402 F.3d at 550 (considering whether a company's decision to terminate the plaintiff was fairly attributable to the state) (quoting *Sullivan*, 526 U.S. at 51); *see also Lugar*, 457 U.S. at 941 (under a joint-action theory, the "[p]rivate persons" must be "jointly engaged with state officials *in the prohibited action.*" (emphasis added)).

Here, to state a joint-participation claim, Plaintiffs would have to plausibly allege that a social media company's particular content-moderation decision affecting a Plaintiff's own post was made in such close coordination with a Defendant that both—and not the company alone— are ultimately responsible for that decision. They do not. To the contrary: Plaintiffs' allegations

*confirm* that the ultimate decision whether to take any content-moderation action against a particular user or post—and if so, what type—is solely up to the social media platforms themselves. Although Plaintiffs assert that various government officials have generally discussed the issue of misinformation with certain platforms, *see* Opp. 65-67, have "flagg[ed] problematic posts," *id.* at 65-66 (quoting SAC ¶ 225), or have served as "public health experts" for certain social media companies, *id.* at 65 (citing SAC ¶¶ 215-16), among other things, they do not allege that any Defendant was personally involved in the actual decision-making concerning moderation of any of Plaintiffs' content, *Frazier*, 765 F.2d at 1285–86. At most, these allegations illustrate "a *generalized relation* with the [Government]," and not that any Defendant "has had some affirmative role . . . in the particular conduct" allegedly injuring Plaintiffs. *Id.* at 1286 (emphasis added). That is insufficient to show joint participation under any formulation of the test. *See id.*; *cf. Rendell-Baker*, 457 U.S. at 843 ("Here the school's fiscal relationship with the State is not different from that of many contractors performing services for the government.").

Plaintiffs do not satisfy the joint-participation test merely by labeling the conduct alleged "coordination" or "collusion," *see* Opp. 65-66, or conclusorily asserting that Defendants and social media companies entered into a "preconceived plan" with any Defendant, "to implement federal-private censorship enterprises," *id.* at 80-81. Such labels and conclusions must be set aside in the Rule 12(b)(6) analysis. *Twombly*, 550 U.S. at 555. And regardless, these allegations fail to show any "meeting of the minds to violate" any Plaintiff's "constitutional rights." *Huber v. Biden*, No. 21-cv-06580, 2022 WL 827248, at *5 (N.D. Cal. Mar. 18, 2022) (quoting *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1184 (N.D. Cal. 2022)), *aff'd*, 2022 WL 17818543 (9th Cir. Dec. 20, 2022). (internal quotation marks and citation omitted). Indeed, to the extent Plaintiffs allege that "White House officials" asked Twitter a "tough question about why Alex Berenson hasn't been kicked off

the platform," [23] SAC ¶ 346, the Complaint shows the opposite of any "meeting of the minds," or "joint action," concerning the company's content-moderation decisions. Finally, Plaintiffs' claims are not saved by their mere recitation of the various formulations of the joint-participation test set forth in one Ninth Circuit case, *see* Opp. 64-65, which concerned actions far afield from those alleged here in any event, *see Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 754 (9th Cir. 2020) (joint action when county prosecutor "was heavily involved in" the statutorily prescribed "decisionmaking process[es]" of the private psychiatric treatment facility's "detention, diagnosis, and treatment" of a criminal suspect).

   iv.      The Allegations That § 230(c) Facilitates First Amendment Violations Are Neither Justiciable, Nor Plausible.

Plaintiffs' final theory of state action is essentially that all content-moderation measures by social media companies *necessarily* constitute state action because the "federal government" has allegedly "subsidized, authorized, and encouraged . . . online censorship by granting" social media companies "legal immunity in Section 230." Opp. 67-68. At the outset, this theory is at loggerheads with Plaintiffs' central allegations of coercion, which hinge on some Defendants' public endorsements of congressional efforts to reform § 230. That is, Plaintiffs essentially allege that some Defendants support amending or repealing the very same statute on which they also allegedly depend to facilitate coercion of social media companies to doing their bidding. The inherent inconsistency on which this state-action theory rests is reason enough to reject it as wholly implausible.

More fundamentally, however, crediting Plaintiffs' theory that *§ 230* transforms social media companies' content moderation measures into Government action would require dismissal

---

[23] Again, Berenson is not a Plaintiff here, and allegations as to him are therefore irrelevant.

of Plaintiffs' claims for lack of standing. Plaintiffs do not challenge § 230 as unconstitutional, and the injunction they request would have no effect on § 230's continued operation. Accordingly, if it is true—as Plaintiffs urge—that § 230's grant of legal immunity "encourage[s]" "censorship," then no injunction short of striking down the statute would redress Plaintiffs' injuries, and their claims must be dismissed for lack of standing on redressability grounds. Indeed, Plaintiffs' reliance on *Skinner* only underscores this point. In that case, the plaintiffs sought to enjoin *federal regulations* that allegedly violated the Fourth Amendment because they either "required" or endorsed specific drug and alcohol testing practices and procedures by private railroad companies. *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 606-15 (1989).

Even setting aside this core Article III defect, neither *Skinner* nor *Railway Employees' Department v. Hanson*, 351 U.S. 225 (1956), supports Plaintiffs' § 230 state-action theory. Unlike the federal laws at issue in those cases, § 230 does not require, encourage, or authorize any specific private conduct that could plausibly be attributed to the Federal Government. In *Skinner*, for instance, the challenged federal regulations either "required," "encourage[d], [or] endorse[d]" — through detailed provisions—specific drug and alcohol testing practices and procedures that were carried out by the railroad companies. 489 U.S. at 614-16. And in *Hanson*, a federal statute was "the source of the power and authority by which" railroad companies adopted labor agreements that state law otherwise proscribed. 351 U.S. at 232.[24]

---

[24] Moreover, *Hanson* was decided well before the development of contemporary state action doctrine. Under contemporary state action doctrine, the Supreme Court "has never held that" the Government's "mere acquiescence in a private action converts that action into that of the State." *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 164 (1978). The reasoning in *Hanson* is thus, at a minimum, in tension with the contemporary doctrine. Indeed, the Supreme Court recently characterized *Hanson*'s notion that a federal law that is permissive but not mandatory is sufficient to establish governmental action as "even more questionable today" than when Hanson was decided. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2479 n.24 (2018). *Hanson* should not be extended here.

Section 230, on the other hand, neither requires nor encourages companies to take any specific content moderation actions nor grants the companies authority to take such actions that they would otherwise lack. As other courts have explained, "[u]nlike the regulations in *Skinner*," § 230 "does not require private entities to do anything, nor does it give the government a right to supervise or obtain information about private activity." *Divino Grp. LLC v. Google LLC*, No. 19-cv-4749, 2021 WL 51715, at *6 (N.D. Cal. Jan. 6, 2021). Quite the opposite: § 230(c) "reflects a deliberate *absence* of government involvement in regulating online speech," *id.*—that is, § 230 "is designed to keep the federal government removed from the editorial decision-making process of internet companies like YouTube and Google." *Newman v. Google LLC*, No. 20-cv-4011, 2021 WL 2633423, at *10 (N.D. Cal. June 25, 2021). The statute therefore "lacks the necessary coercive features that the United States Supreme Court has identified as the hallmark of coerced private state action." *Id.* "[N]othing about" § 230(c) "is coercive" at all. *Divino*, 2021 WL 51715, at *6.

Finally, Plaintiffs' strained comparison of § 230 to federal aid statutes goes nowhere. *See* Opp. 69. Even assuming § 230 provided "tangible financial aid" to social media companies (and it does not), that would not be enough to impute companies' every content-moderation decision to the Federal Government: the mere fact that "the government funds or subsidizes a private entity" "does not convert the private entity into a state actor." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1931-32 (2019); *see also Rendell-Baker*, 457 U.S. at 840 ("[T]he school's receipt of public funds does not make the [school's] discharge decisions acts of the State."). [25] That

---

[25] *Norwood v. Harrison*, 413 U.S. 455 (1973) (cited at Opp. 69), is also inapposite. *Norwood* held that a State that was under a federal desegregation order, and that therefore had an affirmative constitutional duty to dismantle its segregated system of education, could not provide aid to all-white private schools founded to avoid public-school desegregation. 413 U.S. at 457-60, 467-68. "[T]he constitutional infirmity of the Mississippi textbook program," the Court explained, "is that

principle also forecloses Plaintiffs' assertion (Opp. 80) that the conduct of nongovernmental organizations such as the Election Integrity Partnership regarding misinformation on platforms is properly attributed to Defendants based on federal grants those organizations allegedly received.

\* \* \*

In examining Plaintiffs' allegations, it is worth repeating that they fail to address the "obvious alternative explanation," *Twombly*, 550 U.S. at 568, for the content-moderation policies the companies adopted and for the ensuing moderation measures they allegedly applied against Plaintiffs. Businesses are "naturally sensitive" to public sentiment because it drives business, *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85, 89 (3d Cir. 1984), and as the Complaint shows, social media companies have a strong interest of their own in combating misinformation on their platforms, *see supra* Part II.A.ii. Each platform decision to formulate and enforce content-moderation policies consistent with terms of service to which users have agreed remains a "self-interested business decision" that cannot be attributed to government. *See Atkinson v. Meta Platforms, Inc.*, No. 20-17489, 2021 WL 5447022, at \*1 (9th Cir. Nov. 22, 2021); *see also R.C. Maxwell Co.*, 735 F.2d at 89 ("If we were to apply constitutional standards to every private action intended to conform to civic sentiment, we would erode the ambit of private action greatly."); *Twombly*, 550 U.S. at 567. In other words, the "allegations do not 'tend to exclude the possibility' of the alternative explanation" that the social media companies, in moderating content that they deemed misinformation, were "independently enforcing [their] Terms of Service." *Huber*, 2022

---

it significantly aids the organization and continuation of a separate system of private schools which . . . may discriminate if they so desire." *Id.* at 467. Mississippi's "constitutional obligation require[d] it to steer clear, not only of operating the old dual system of racially segregated schools, but also of giving significant aid to institutions that" further such segregation. *Id.* Here, Defendants do not "operat[e]" the private social media platforms in the first place, and even if the platforms' conduct toward Plaintiffs were properly characterized as discriminatory, that conduct results from private corporate choices, not from "significant aid" from Defendants.

WL 17818543, at *1; *accord Rogalinski v. Meta Platforms, Inc.*, No. 22-cv-02482, 2022 WL 3219368, at *5 (N.D. Cal. Aug. 9, 2022) (platform user's claim not plausible where he "has not rebutted the eminently plausible conclusion that [platform] acted alone"), *appeal filed*, No. 22-16327 (9th Cir. Sept. 1, 2022). This case thus resembles *Twombly*, where the Supreme Court held that allegations of parallel business conduct and "bare assertion[s]" of conspiracy were insufficient to state a claim for antitrust conspiracy. 550 U.S. at 556-66.

### B. Plaintiffs Fail to State a Claim Against Numerous Defendants Whose Conduct Is Barely Mentioned In The Complaint.

The Complaint barely mentions many of the named Defendants, and they should thus be dismissed from this case. As the motion to dismiss explains, Mem. 71, such Defendants include—but are not limited to—the Department of Treasury and its Deputy Secretary, Wally Adeyemo, and Mina Hsiang, Administrator of the U.S. Digital Service at the Office of Management and Budget. As to Treasury and Adeyemo, Plaintiffs acknowledge that the Complaint alleges only that Adeyemo requested to be put in touch with social media companies to discuss "social media and influence matters." Opp. 81. And as to Hsiang, Plaintiffs allege only that she "suggested a change to results yielded by" a Google search in an email with a Google employee. SAC ¶ 360. Yet Plaintiffs insist that "[t]hese represent highly relevant First Amendment violations" in light of the "extensive allegations about other federal officials." Opp. 81-82. That argument cannot possibly withstand scrutiny under *Twombly* and its progeny. If the pleading standard is to have any meaning, it must preclude Plaintiffs from stating First Amendment claims against these Defendants based only on the limited allegations the Complaint makes against them. Accordingly, the Court should dismiss the Department of Treasury, Wally Adeyemo, and Mina Hsiang.

The same is true for at least two other Agency Defendants and their officials, and several White House employees, as to whom no allegations are made *at all*, other than that they were

identified in a list by a social media company as potentially having discussed misinformation with that company: (1) the Election Assistance Commission (EAC) and the EAC officials sued in their official capacity,[26] (2) the Food and Drug Administration (FDA) and the FDA officials sued in their official capacity; [27] (3) Aisha Shah, in her official capacity as White House Partnerships Manager; (4) Laura Rosenberger, in her official capacity as Special Assistant to the President; (5) Tericka Lambert, in her official capacity as Director of Digital Engagement at HHS and Deputy Director of the Office of Digital Strategy at the White House; and (6) Stuart Delery, who is substituted for Dana Remus, in his official capacity as White House Counsel. *See* SAC ¶¶ 379-80, 441, 443 (listing these officials as being named by social media companies, in response to third-party subpoenas, because they may have communicated with social media companies about topics including misinformation, but not including any other factual allegations regarding these officials). At the very least, these Defendants should be dismissed.[28]

### C.  Plaintiffs fail to allege an *ultra vires* claim against any Defendant.

For the reasons stated above, *supra* Part II.B.iii, Plaintiffs fail to state a claim for relief under the *ultra vires* doctrine, and Count Two should therefore be dismissed from the Complaint.

---

[26] Mark A. Robbins, EAC Interim Executive Director; and Kristen Muthig, EAC Director of Communication.

[27] Erica Jefferson, FDA Associate Commissioner for External Affairs within the Office of the Commissioner; Michael Murray, FDA Acquisition Strategy Program Manager for the Office of Health and Communications and Education; and Brad Kimberly, FDA Director of Social Media.

[28] No doubt, plaintiffs' specification of the exact relief they're seeking in their forthcoming supplement to their preliminary-injunction motion will highlight additional defendants against whom no injunction would be appropriate or available. Moreover, pursuant to Federal Rule of Civil Procedure 25(d), named Defendants who have ceased to hold their official positions should not be subject to an injunction because they are no longer parties to this suit; their "successor[s] [are] automatically substituted as a party." Fed. R. Civ. P. 25(d).

### D.  Plaintiffs' Conclusory Allegations Fail to State APA Claims.

For multiple reasons, Plaintiffs fail to allege any plausible APA claim. *See* Mem. 73-74. As explained above, *supra* Part II.B.iii, Plaintiffs do not challenge "agency action" as required to invoke the APA's waiver of sovereign immunity and to state a cause of action under the statute, *see* 5 U.S.C. § 702. For the same reason, Plaintiffs' claims fall outside the scope of review authorized by 5 U.S.C. § 706(a), which allows reviewing courts to "hold unlawful and set aside *agency action*, findings, and conclusions" (emphasis added). *See Lujan*, 497 U.S. at 879, 882-83. Plaintiffs have identified no "agency action" that the Court may "hold unlawful and set aside" but instead invite the Court to enter an improper "'obey the law' injunction" "foreclosed by the APA." *City of N.Y. v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (citation omitted).

These claims warrant dismissal for still other reasons. The APA claims rest entirely on "labels and conclusions[] and a formulaic recitation of the elements of a cause of action" under the APA, which are insufficient to state a claim for relief. *Twombly*, 550 U.S. at 555. Additionally, if Plaintiffs contend that the Agency Defendants have violated the APA because they have acted "contrary to constitutional right," 5 U.S.C. § 706(2)(B), their claim duplicates their First Amendment claim and fails for the same reasons outlined above, *supra* Part III. The Court should dismiss Counts Three through Seven.

### IV.  The President Should Be Dismissed As A Party Because Equitable Relief Is Unavailable Against The President.

The Court must dismiss the President from this case to avoid the unnecessary separation-of-powers conflict that would arise if the Court issued injunctive or declaratory relief against the President. Mem. 74-75. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866), recognized more than 150 years ago that federal courts lack jurisdiction to "enjoin the President in the performance of his official duties," as *Franklin v. Massachusetts*, 505 U.S. 788 (1992), more

62

recently reaffirmed. *See also id.* at 827 (Scalia, J., concurring in part and concurring in the judgment). Plaintiffs provide no basis for this Court for ignoring those decisions.

Plaintiffs err in relying on *National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974) ("*NTEU*"), to keep the President in this case. To begin with, because *NTEU* pre-dates *Franklin*, "[i]t is not entirely clear, of course, whether, and to what extent," it "remain[s] good law[.]" *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). In any event, *NTEU* is inapposite. *First*, *NTEU* did not involve a constitutional claim for prospective relief directly against the President; instead, it concerned a Presidential action that allegedly was "ministerial" and not discretionary. 492 F.2d at 607; *see also Mississippi*, 71 U.S. at 498 (ministerial duty is "a simple, definite duty" that is "imposed by law" where "nothing is left to discretion"). There can be no question here that the President's alleged actions—principally, the remarks he made about misinformation on social media companies' platforms—do not concern any ministerial duty. *Second*, unlike in *NTEU*, Plaintiffs do not contend (nor could they) that "the sole defendant they can appropriately name in asserting their claims is the President of the United States." 492 F.2d at 614. Plaintiffs sue many Executive Branch officials subordinate to the President, and any prospective injunction (even assuming one were appropriate) may be issued against those subordinate Executive Branch officials. *See id.* at 613; *see also Franklin*, 505 U.S. at 803 (concluding that the "injury alleged is likely to be redressed by declaratory relief against the Secretary [of Commerce] alone"); *Swan*, 100 F.3d at 979-80 (injunctive relief against subordinate officials could substantially redress plaintiff's injury); *see also Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017), *vacated & remanded for dismissal as moot*, 138 S. Ct. 377 (2017) (availability of injunctive relief against officials other than the President obviated need for injunction against him).

Plaintiffs are also wrong to rely on *Clinton v. City of New York*, 524 U.S. 417 (1998). *See*

Opp. 83. That case involved a "challenge to the constitutionality of" a statute and sought a "declaratory judgment" to strike "down that statute and [thereby] nullif[y] the statutory power of the President." *Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010). But here Plaintiffs seek a declaration against the President's own alleged conduct, not a declaration that any statute is unconstitutional. That is an entirely different kind of remedy. *See id.* Following *Newdow* and *Mississippi*, this Court should reject the claims for declaratory and injunctive relief against the President.

## CONCLUSION

For the reasons stated above and in the opening memorandum, the Court should dismiss the Complaint under Rule 12(b)(1) for lack of subject-matter jurisdiction or under Rule 12(b)(6) for failure to state a claim.

Dated:  February 8, 2023          Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAMES J. GILLIGAN
Special Litigation Counsel, Federal Programs Branch

JOSHUA E. GARDNER
Special Counsel Federal Programs Branch

*/s/ Kyla M. Snow*
KYLA M. SNOW (OH Bar No. 96662)
INDRANEEL SUR (D.C. Bar No. 978017)
AMANDA K. CHUZI (D.C. Bar No. 1738545)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
Tel: (202) 514-3259
kyla.snow@usdoj.gov

*Attorneys for Defendants*