for laboratories out of compliance, and accreditation organization resources. Therefore, we have determined that the requirements of the accreditation program submitted for approval are equal to or more stringent than the requirements of the CLIA regulations.

### B. Subpart H—Participation in Proficiency Testing for Laboratories Performing Nonwaived Testing

We have determined that COLA's requirements are equal to or more stringent than the CLIA requirements at §§ 493.801 through 493.865.

### C. Subpart J—Facility Administration for Nonwaived Testing

We have determined that COLA's requirements for the specialty of Pathology to include Histopathology, Cytology and Oral Pathology are equal to or more stringent than the CLIA requirements at §§ 493.1100 through 493.1105.

### D. Subpart K—Quality System for Nonwaived Testing

We have determined that COLA's requirements for the specialty of Pathology to include Histopathology, Cytology and Oral Pathology are equal to or more stringent than the CLIA requirements at §§ 493.1200 through 493.1299.

### E. Subpart M—Personnel for Nonwaived Testing

We have determined that COLA's requirements for the specialty of Pathology to include Histopathology, Cytology and Oral Pathology are equal to or more stringent than the CLIA requirements at §§ 493.1403 through 493.1495 for laboratories that perform moderate and high complexity testing.

### F. Subpart Q—Inspection

We have determined that COLA's requirements for the specialty of Pathology to include Histopathology, Cytology and Oral Pathology are equal to or more stringent than the CLIA requirements at §§ 493.1771 through 493.1780.

### G. Subpart R—Enforcement Procedures

We have determined that COLA's requirements for the specialty of Pathology to include Histopathology, Cytology and Oral Pathology meet the requirements of subpart R to the extent that it applies to accreditation organizations. COLA policy sets forth the actions the organization takes when laboratories it accredits do not comply with its requirements and standards for accreditation. When appropriate, COLA will deny, suspend, or revoke accreditation in a laboratory accredited by COLA and report that action to us within 30 days. COLA also provides an appeal process for laboratories that have had accreditation denied, suspended, or revoked.

We have determined that COLA's laboratory enforcement and appeal policies are equal to or more stringent than the requirements of part 493 subpart R as they apply to accreditation organizations.

### IV. Federal Validation Inspections and Continuing Oversight

The Federal validation inspections of laboratories accredited by COLA may be conducted on a representative sample basis or in response to substantial allegations of noncompliance (that is, complaint inspections). The outcome of those validation inspections, performed by CMS or our agents, or the State survey agencies, will be our principal means for verifying that the laboratories accredited by COLA remain in compliance with CLIA requirements. This Federal monitoring is an ongoing process.

### V. Removal of Approval as an Accrediting Organization

CLIA regulations at § 493.575 provide that we may rescind the approval of an accreditation organization, such as that of COLA, before the end of the effective date of approval in certain circumstances. For example, If we determine that COLA has failed to adopt, maintain and enforce requirements that are equal to, or more stringent than, the CLIA requirements, or that systemic problems exist in its monitoring, inspection or enforcement processes, we may impose a probationary period, not to exceed 1 year, in which COLA would be allowed to address any identified issues. Should COLA be unable to address the identified issues within that timeframe, CMS may, in accordance with the applicable regulations, revoke COLA's deeming authority under CLIA.

Should circumstances result in our withdrawal of COLA's approval, we will publish a notice in the Federal Register explaining the basis for removing its approval.

### VI. Collection of Information Requirements

This document does not impose information collection requirements, that is, reporting, record keeping or third-party disclosure requirements. Consequently, there is no need for review by the Office of Management and Budget (OMB) under the authority of the Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35). The requirements associated with the accreditation process for clinical laboratories under the CLIA program, codified in 42 CFR part 493 subpart E, are currently approved by OMB under OMB control number 0938–0686.

### VII. Executive Order 12866 Statement

In accordance with the provisions of Executive Order 12866, this notice was not reviewed by the Office of Management and Budget.

The Administrator of the Centers for Medicare & Medicaid Services (CMS), Chiquita Brooks-LaSure, having reviewed and approved this document, authorizes Lynette Wilson, who is the Federal Register Liaison, to electronically sign this document for purposes of publication in the **Federal Register**.

**Lynette Wilson,**
*Federal Register Liaison, Centers for Medicare & Medicaid Services.*

[FR Doc. 2022–04770 Filed 3–4–22; 8:45 am]

**BILLING CODE 4120–01–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID–19 Pandemic Request for Information (RFI)

**AGENCY:** Office of the Surgeon General, Department of Health and Human Services.

**ACTION:** Request for information (RFI).

**SUMMARY:** The Office of the Surgeon General requests input from interested parties on the impact and prevalence of health misinformation in the digital information environment during the COVID–19 pandemic. The purpose of this RFI is to understand the impact of COVID–19 misinformation on healthcare infrastructure and public health more broadly during the pandemic including (but not limited to) quality of care, health decisions and outcomes, direct and indirect costs, trust in the healthcare system and providers, and healthcare worker morale and safety, understand the unique role the information environment played in the societal response to the COVID–19 pandemic and implications for future public health emergencies, understand the impact of exposure to health misinformation and how access to trusted and credible health information, particularly during a public health emergency, impacts lifesaving health decisions such as an individual's

likelihood to vaccinate; and use the information requested to prepare for and respond to future public health crises. HHS will consider the usability, applicability, and rigor of submissions in response to this RFI and share learnings from these responses with the public. Public comments and submissions will also be made available to the public and can be used for research purposes.

**DATES:** To be assured consideration, comments must be received via the methods provided below, no later than midnight Eastern Time (ET) on May 2, 2022. Submissions received after the deadline will not be reviewed.

**ADDRESSES:** You may send comments, identified by [Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID–19 Pandemic Request for Information (RFI)], by any of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for sending comments.

• *Form:* [*https://forms.office.com/g/kPPYHM15Uc*].

• *Email:* ▓▓▓▓▓▓▓▓▓▓. Include [Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID–19 Pandemic Request for Information (RFI)] in the subject line of the message.

You may respond to some or all of the topic areas covered in the RFI. You may also include links to online material or interactive presentations.

For information on public comments, see the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:** Max Lesko at ▓▓▓▓▓▓▓▓▓▓ or at ▓▓▓▓▓▓▓▓▓▓.

**SUPPLEMENTARY INFORMATION:** Please feel free to respond to as many topics as you choose. Responses should include the name of the person (s) or organization (s) filing the comment, as well as the respondent type (*e.g.,* academic institution, advocacy group, professional society, community-based organization, industry, member of the public, government, and governmental entities such as libraries and public health departments. Respondent's role in the organization, as applicable, may also be provided (*e.g.,* researcher, administrator, student, product manager, journalist) on a voluntary basis. Comments containing references, studies, research, and other empirical data that are not widely published should include electronic links to the referenced materials or be attached to the email. No proprietary business information, copyrighted information, or personally identifiable information should be submitted in response to this RFI. Listening sessions will be hosted to allow oral comments and submissions. Please be aware that all submissions will be reviewed and relevant comments submitted in direct response to the information requested in this RFI may be posted or otherwise released publicly.

**I. Background**

1. Health misinformation—health information that is false, inaccurate, or misleading according to the best available evidence at the time—has been a challenge during public health emergencies before, including persistent rumors about HIV/AIDS that have undermined efforts to reduce infection rates in the U.S. and during the Ebola epidemic. But the speed, scale, and sophistication with which misinformation has been spread during the COVID–19 pandemic has been unprecedented. Recent research shows that most Americans believe or are unsure of at least one COVID–19 vaccine falsehood. The digital information environment is a phenomenon that requires further research and study to better prepare for future public health emergencies. This RFI seeks to understand both the impact of health misinformation during the COVID–19 pandemic and the unique role that technology and social media platforms play in the dissemination of critical health information during a public health emergency. The inputs from stakeholders will help inform future pandemic response in the context of an evolving digital information environment.

**II. Scope and Assumptions**

• The definition of health misinformation for the purposes of this RFI is health information that is false, inaccurate, or misleading according to the best available evidence at the time.

• Exposure is defined as seeing content in newsfeeds, in search results, or algorithmically nominated content.

• Potential exposure is the exposure users would have had if they could see all the content that is eligible to appear in their newsfeeds.

• Engagement includes the clicking or viewing of content, as well as reacting.

• Sharing is the act of sharing a piece of pre-existing content within social media.

• Technology platforms include the following: General search engines, content sharing platforms, social media platforms, e-commerce platforms, crowd sourced platforms, and instant messaging systems.

• Relevant dates for responses include January 2020–Present.

• Research, case studies, data sets, images, data visualizations, interviews, and personal testimonies may be submitted.

• All information should be provided at a level of granularity that preserves the privacy of users.

• If including data sets, please make the data available in a downloadable, machine-readable format with accompanying metadata.

**III. Information Requested/Key Questions**

Please respond to specific topics where you have both expertise and sufficient evidence to support your comments. Respondents are requested to share objective results of an evaluation for each topic when possible. A response to every item is not required.

*Information About Impact on Healthcare*

1. Information about how COVID–19 misinformation has affected quality of patient care during the pandemic.

a. Information about how important a role COVID–19 misinformation played in patient decisions not to vaccinate, including the types of misinformation that influenced decisions.

b. Information about the media sources from which patients are receiving misinformation and if such information has negatively influenced their healthcare decisions or resulted in patient harm.

2. Information about how COVID–19 misinformation has impacted healthcare systems and infrastructure.

a. Information about time and resources spent addressing COVID–19 misinformation.

b. Information about how COVID–19 misinformation has impacted healthcare worker morale and safety in the workplace, including instances of online harassment or harm.

*2. Information About Technology Platforms*

3. Information about how widespread COVID–19 misinformation is on individual technology platforms including: General search engines, content sharing platforms, social media platforms, e-commerce platforms, crowd sourced platforms, and instant messaging systems.

a. Starting with, but not limited to, *these common examples* of COVID–19 vaccine misinformation documented by the Centers for Disease Control and Prevention (CDC), any aggregate data

and analysis on the prevalence of COVID–19 misinformation on individual platforms including exactly how many users saw or may have been exposed to instances of COVID–19 misinformation.

b. Any aggregate data and analysis on how many users were exposed, were potentially exposed, or otherwise engaged with COVID–19 misinformation.

i. Exposure is defined as seeing content in newsfeeds, in search results, or algorithmically nominated content.

ii. Potential exposure is the exposure users would have had if they could see all the content that is eligible to appear within their newsfeeds.

iii. Engagement includes the clicking or viewing of content, as well as reacting. Sharing is the act of sharing a piece of pre-existing content within social media.

c. Any aggregate data broken down by demographics on groups or populations who may have been differentially exposed to or impacted by COVID–19 misinformation.

4. Information about COVID–19 misinformation policies on individual technology platforms.

a. Any aggregate data and analysis of technology platform COVID–19 misinformation policies including implementation of those policies and evaluations of their effectiveness.

5. Information about sources of COVID–19 misinformation.

a. Information about the major sources of COVID–19 misinformation associated with exposure.

i. By source we mean both specific, public actors that are providing misinformation, as well as components of specific platforms that are driving exposure to information.

6. Information about COVID–19 misinformation from sources engaged in the sale of unproven COVID–19 products or services (*e.g.,* prescriptions for unapproved or unauthorized drugs, sales of alternative cures, or sales of other unapproved or unauthorized COVID–19 medical products), or other money-making models.

*Information About Impacted Communities*

7. Information about how COVID–19 misinformation has impacted individuals and communities.

a. Information about how COVID–19 misinformation has impacted organizations that serve communities directly through service (*e.g.,* libraries and food banks), and community-based organizations that are faith-based or provide affinity to communities (*e.g.,* clubs and sororities or fraternities).

b. Information about how COVID–19 misinformation has impacted community members: Individuals and families.

### IV. How To Submit Your Response

To facilitate review of your responses, please reference the subject of the RFI in your response. You may respond to some or all of the topic areas covered in the RFI, and you can suggest other factors or relevant questions. You may also include links to online material or interactive presentations. If including data sets, please make the data available in a downloadable, machine-readable format with accompanying metadata.

Please note that this is a request for information (RFI) only. In accordance with the implementing regulations of the Paperwork Reduction Act of 1995 (PRA), specifically 5 CFR 1320.3(h)(4), this general solicitation is exempt from the PRA. Facts or opinions submitted in response to general solicitations of comments from the public, published in the **Federal Register** or other publications, regardless of the form or format thereof, provided that no person is required to supply specific information pertaining to the commenter, other than that necessary for self-identification, as a condition of the agency's full consideration, are not generally considered information collections and therefore not subject to the PRA.

This RFI is issued solely for information and planning purposes; it does not constitute a Request for Proposal (RFP), applications, proposal abstracts, or quotations. This RFI does not commit the U.S. Government to contract for any supplies or services or make a grant award. Further, we are not seeking proposals through this RFI and will not accept unsolicited proposals. We note that not responding to this RFI does not preclude participation in any future procurement, if conducted. It is the responsibility of the potential responders to monitor this RFI announcement for additional information pertaining to this request.

HHS may or may not choose to contact individual responders. Such communications would be for the sole purpose of clarifying statements in written responses. Contractor support personnel may be used to review responses to this RFI. Responses to this notice are not offers and cannot be accepted by the Government to form a binding contract or issue a grant. Information obtained as a result of this RFI may be used by the Government for program planning on a non-attribution basis. This RFI should not be construed as a commitment or authorization to incur cost for which reimbursement would be required or sought. All submissions become U.S. Government property; they will not be returned, and we may publish some of their content.

Dated: March 2, 2022.

**Max Lesko,**
*Chief of Staff, Office of the Surgeon General.*

[FR Doc. 2022–04777 Filed 3–4–22; 8:45 am]

**BILLING CODE 4150–28–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### National Institutes of Health

### Center for Scientific Review; Notice of Closed Meetings

Pursuant to section 10(d) of the Federal Advisory Committee Act, as amended, notice is hereby given of the following meetings.

The meetings will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* Center for Scientific Review Special Emphasis Panel; PAR Panel: Understanding Alzheimer's Disease-2.

*Date:* March 29, 2022.
*Time:* 8:30 a.m. to 7:00 p.m.
*Agenda:* To review and evaluate grant applications.
*Place:* National Institutes of Health, Rockledge II, ▬▬▬▬▬▬ (Virtual Meeting).
*Contact Person:* Samuel C. Edwards, Ph.D., Chief, BDCN IRG, Center for Scientific Review, National Institutes of Health, ▬▬▬▬▬▬

*Name of Committee:* Center for Scientific Review Special Emphasis Panel; Topics in Child and Adolescent Biobehavioral Development, Psychopathology, Sleep, and Cognitive Function.

*Date:* March 30, 2022.
*Time:* 10:00 a.m. to 8:00 p.m.
*Agenda:* To review and evaluate grant applications.
*Place:* National Institutes of Health, Rockledge II, ▬▬▬▬▬▬ (Virtual Meeting).
*Contact Person:* Benjamin G. Shapero, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, ▬▬▬▬▬▬