**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

STATE OF LOUISIANA, STATE OF
MISSOURI, *et al*.

         *Plaintiffs*,

   v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States, *et al.*,

         *Defendants*.

Case No. 3:22-cv-01213-TAD

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 3

ARGUMENT ............................................................................................................................ 3

   I.   Plaintiffs Are Likely to Succeed on the Merits. .......................................................... 3

      A. Plaintiffs Are Likely to Succeed on their First Amendment Claim. ......................... 3

         1.  Inducement – Significant Encouragement, Coercion, and Deception. ..................... 4

           a. Significant Encouragement. ................................................................................... 5

           b. Coercion. ............................................................................................................. 14

           c. Deception. ............................................................................................................ 18

         2. Joint Participation – Collusion and Pervasive Entwinement. ................................... 29

           a. Conspiracy and Collusion. ................................................................................... 29

           b. Pervasive Entwinement. ...................................................................................... 41

         3.  Defendants' Censorship Activities Violate the First Amendment. .......................... 51

      B. Plaintiffs Are Likely to Succeed on their APA and *Ultra Vires* Claims. ..................... 53

      C. Plaintiffs Are Likely to Establish Standing. ................................................................ 56

         1. Plaintiffs Are Likely to Prove Injury. ........................................................................ 56

         2. Plaintiffs Are Likely to Prove Traceability. .............................................................. 58

         3. Plaintiffs Are Likely to Prove Redressability. ........................................................... 62

   II.   The Other Three Equitable Factors Strongly Favor a Preliminary Injunction. ................. 65

   III.   The Court Should Grant Classwide Injunctive Relief Under Rule 23(b)(2). ..................... 66

CONCLUSION .......................................................................................................................... 67

CERTIFICATE OF SERVICE .................................................................................................. 70

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Adickes v. S.H. Kress& Co*,
    398 U.S. 144 (1970) ................................................................................................ 5

*Al-Amin v. Smith*,
    511 F.3d 1317 (11th Cir. 2008) ........................................................................ 60

*Alfred L. Snapp & Son v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982) .......................................................................................... 66

*Am. Fed. of Lab. & Cong. of Indus. Orgs. v. N.L.R.B.*,
    57 F.4th 1023 (D.C. Cir. 2023) ........................................................................ 55

*Armstrong v. Ashley*,
    --- F.4th ---, 2023 WL 2005263 (5th Cir. 2023) ................................................ 30

*Backpage.com, LLC v. Dart*,
    807 F.3d 229 (7th Cir. 2015) ............................................................................ 14

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ...................................................................................... 14, 53

*Biden v. Knight First Amendment Inst. at Columbia Univ.*,
    141 S. Ct. 1220 (2021) ................................................................................. 4, 14

*Bland v. Roberts*,
    730 F.3d 368 (4th Cir. 2013) ............................................................................ 36

*Alcarez v. Block*,
    746 F.3d 593 (9th Cir. 1984) ............................................................................ 55

*Blum v. Yaretsky*,
    457 U.S. 991 (1982) .................................................................................... 4, 5, 6

*Brandenburg v. Ohio*,
    395 U.S. 444 (1969) ............................................................................................ 7

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*,
    531 U.S. 288 (2001) ............................................................................... 3, 29, 41

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin., U.S. Dep't of Lab.*,
    17 F.4th 604 (5th Cir. 2021) ............................................................................ 65

*Buckley v. Am. Const. Law Found., Inc.*,
    525 U.S. 182 (1999) .......................................................................................... 51

*Burton v. Wilmington Parking Auth'y,*
   365 U.S. 715 (1961) ................................................................................ 29

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.,*
   827 F.2d 1291 (9th Cir. 1987) ................................................................... 4

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971) ................................................................................ 54

*Citizens United v. F.E.C.,*
   558 U.S. 310 (2010) ................................................................................ 51

*Croft v. Governor of Tex.,*
   562 F.3d 735 (5th Cir. 2009) ................................................................... 57

*Crowe v. Lucas,*
   595 F.2d 985 (5th Cir. 1979) ............................................................. 29, 30

*Danos v. Jones,*
   652 F.3d 577 (2011) ................................................................................ 55

*Davis v. F.E.C.,*
   554 F.3d 724 (2008) ................................................................................ 63

*Davis v. F.E.C.,*
   554 U.S. 724 (2008) ................................................................................ 62

*DeHoyos v. Allstate Corp.,*
   240 F.R.D. 269 (W.D. Tex. 2007) ........................................................... 66

*Dennis v. Sparks,*
   449 U.S. 24 (1980) .................................................................................. 29

*Dossett v. First State Bank,*
   399 F.3d 940 (8th Cir. 2005) ..................................................................... 6

*Duke Power Co. v. Carolina Envt. Study Grp.,*
   438 U.S. 59 (1978) ............................................................................. 58, 60

*Dwares v. City of New York,*
   985 F.2d 94 (2d Cir. 1993) ........................................................................ 7

*Dykes v. Hosemann,*
   743 F.2d 1488 (11th Cir. 1984) ............................................................... 29

*Elrod v. Burns,*
   427 U.S. 347 (1976) ................................................................................ 65

*Fla. Dep't of State v. Treasure Salvors, Inc.*,
   458 U.S. 670 (1982) ........................................................................ 55

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ...................................................... 56

*Frazier v. Bd. of Trs. of Nw. Miss. Reg'l Med. Ctr.*,
   765 F.2d 1278 (5th Cir.) ................................................................. 5

*Fries v. Barnes*,
   618 F.2d 988 (2d Cir. 1980) ........................................................... 5

*Gallagher v. Neil Young Freedom Concert*,
   49 F.3d 1442 (10th Cir. 1995) ...................................................... 42

*George v. Edholm*,
   752 F.3d 1206 (9th Cir. 2014) ....................................... 4, 7, 18, 19

*Hatteras v. Sw. Bell Tel. Co.*,
   774 F.2d 1341 (5th Cir. 1985) ........................................................ 5

*Hemphill v. Schott*,
   141 F.3d 412 (2d Cir. 1998) ........................................................... 7

*Hill v. Colorado*,
   530 U.S. 703 (2000) ...................................................................... 52

*Hobbs v. Hawkins*,
   968 F.2d 471 (5th Cir. 1992) ........................................................ 29

*In re Domestic Airline Travel Antitrust Litig.*,
   221 F. Supp. 3d 46 (D.D.C. 2016) ............................................... 59

*In re TelexFree Sec. Litig.*,
   --- F. Supp. 3d ---, 2022 WL 3915989 (D. Mass. Aug. 31, 2022) ........................................... 59

*Int'l Women's Day March Planning Comm. v. City of San Antonio*,
   619 F.3d 346 (5th Cir. 2010) ........................................................ 52

*Jackson v. Metro. Edison Co.*,
   419 U.S. 345 (1974) ...................................................................... 41

*Jones v. City of Chicago*,
   856 F.2d 985 (7th Cir. 1988) ........................................................ 18

*Knight First Amend. Inst. at Columbia Univ. v. Trump*,
   928 F.3d 226 (2d Cir. 2019) ......................................................... 36

*Ladd v. Livingston*,
    777 F.3d 286 (5th Cir. 2015) ............................................................... 3, 65

*Lujan v. Def. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................. 56

*Lynch v. Leis*,
    382 F.3d 642 (6th Cir. 2004) ................................................................... 63

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019) ............................................................................ 60

*Massachusetts v. E.P.A.*,
    549 U.S. 497 (2007) ................................................................................. 65

*Mastafa v. Australian Wheat Bd. Ltd.*,
    No. 07 Civ. 7955(GEL), 2008 WL 4378443 (S.D.N.Y. Sep. 25, 2008) ................. 59

*Mathis v. Pac. Gas & Elec. Co.*,
    891 F.2d 1429 (9th Cir. 1989) ................................................................... 4

*McIntyre v. Ohio Elec. Comm'n*,
    514 U.S. 334 (1995) ................................................................................. 52

*McNamara v. Moody*,
    606 F.2d 621 (5th Cir. 1979) ................................................................... 57

*Minn. Citizens Concerned for Life, Inc. v. Swanson*,
    692 F.3d 864 (8th Cir. 2012) ................................................................... 65

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins.*,
    463 U.S. 29 (1983) ................................................................................... 54

*Near v. Minnesota ex rel. Olson*,
    283 U.S. 697 (1931) ................................................................................. 53

*Neb. Press Ass'n v. Stuart*,
    427 U.S. 539 (1976) ................................................................................. 53

*Nesmith v. Alford*,
    318 F.2d 110 (5th Cir. 1963) ................................................................... 30

*Norwood v. Harrison*,
    413 U.S. 455 (1973) .......................................................................... 4, 6, 19

*Packingham v. North Carolina*,
    137 S. Ct. 1730 (2017) ............................................................................ 58

*Parsons v. U.S. Dep't of Justice,*
  801 F.3d 701 (6th Cir. 2015) ........................................................................................ 58

*Peterson v. City of Greenville,*
  373 U.S. 244 (1963) ....................................................................................................... 4

*Pfannstiel v. City of Marion,*
  918 F.2d 1178 (5th Cir. 1990) ...................................................................................... 30

*Pinkerton v. United States,*
  328 U.S. 640 (1946) ...................................................................................................... 30

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.,*
  413 U.S. 376 (1973) ...................................................................................................... 66

*Pleasant Grove City v. Summum,*
  555 U.S. 460 (2009) ........................................................................................................ 7

*R.A.V. v. City of St. Paul,*
  505 U.S. 377 (1992) ...................................................................................................... 52

*Rattner v. Netburn,*
  930 F.2d 204 (2d Cir. 1991) .......................................................................................... 14

*Rawson v. Recovery Innovations, Inc.,*
  975 F.3d 742 (9th Cir. 2020) .................................................................................... 41, 42

*Reitman v. Mulkey,*
  387 U.S. 369 (1967) ..................................................................................................... 4, 5

*Rice v. Paladin Enters., Inc.,*
  128 F.3d 233 (4th Cir. 1997) ........................................................................................... 7

*Rivera v. Rhode Island,*
  402 F.3d 27 (1st Cir. 2005) ............................................................................................. 6

*Roberson v. Dakota Boys & Girls Ranch,*
  42 F.4th 924 (8th Cir. 2022) ..................................................................................... 42, 43

*Robinson v. Hunt County,*
  921 F.3d 440 (5th Cir. 2019) ......................................................................................... 36

*Robinson v. Maruffi,*
  895 F.2d 649 (10th Cir. 1990) ....................................................................................... 18

*Rosemond v. United States,*
  572 U.S. 65 (2014) .......................................................................................................... 6

*Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*,
    547 U.S. 47 (2006) .................................................................................. 56

*S. Utah Wilderness All. v. Palma*,
    707 F.3d 1143 (10th Cir. 2013) ............................................................. 63

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) .................................................................................. 59

*Skinner v. Ry. Lab. Execs. Ass'n*,
    489 U.S. 602 (1989) ................................................................................. 5

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020) ................................................................. 56

*Stringer v. Whitley*,
    942 F.3d 715 (5th Cir. 2019) ................................................................. 62

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
    732 F.3d 535 (5th Cir. 2013) ................................................................. 66

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) ................................................................. 55

*Tweed-New Haven Airport Auth. v. Tong*,
    930 F.3d 65 (2d Cir. 2019) .................................................................... 58

*United States v. Baker*,
    923 F.3d 390 (5th Cir. 2019) ................................................................. 30

*United States v. Buttorff*,
    572 F.2d 619 (8th Cir. 1978) ................................................................... 7

*United States v. Curran*,
    20 F.3d 560 (3d Cir. 1994) ..................................................................... 18

*United States v. Mekjian*,
    505 F.2d 1320 (5th Cir. 1975) ................................................................. 6

*United States v. Rahman*,
    189 F.3d 88 (2d Cir. 1999) ...................................................................... 7

*United States v. Rashwan*,
    328 F.3d 160 (4th Cir. 2003) ................................................................. 18

*United States v. Williams*,
    553 U.S. 285 (2008) ................................................................................. 7

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) ...................................................................................... 56

*Warner v. Grand Cnty.*,
  57 F.3d 962 (10th Cir. 1995) ......................................................................... 5

*Webb ex rel. K.S. v. Smith*,
  936 F.3d 808 (8th Cir. 2019) ....................................................................... 58

*West v. Atkins*,
  487 U.S. 42 (1988) ................................................................................. 41, 42

*West Virginia State Board of Education v.Barnette*,
  319 U.S. 624 (1943) ...................................................................................... 52

*Wittner v. Banner Health*,
  720 F.3d 770 (10th Cir. 2013) ..................................................................... 41

**Statutes**

5 U.S.C. § 500 ..................................................................................................... 53

5 U.S.C. § 706(2) ................................................................................................ 54

5 U.S.C. §§ 702 and 704 .............................................................................. 53, 54

18 U.S.C. § 2(b) .................................................................................................. 18

42 U.S.C. § 1983 ........................................................................................... 30, 57

**Rules**

Fed. R. Civ. P. 23(b)(2) ..................................................................................... 66

**Other Authorities**

RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR ECONOMIC HARM § 28 (Am. L. Inst. 2022) ... 58

RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 27 (Am. L. Inst. 2022) ............................................................................. 58, 59

## INTRODUCTION

This case involves some of the most egregious First Amendment violations in American history.  Federal officials from the White House and multiple agencies use pressure, threats, coercion, cajoling, collusion, demands, and trickery and deceit to induce social-media platforms to censor speakers and viewpoints on social media that the federal officials disfavor.  The proof of this sprawling federal "Censorship Enterprise" is voluminous and overwhelming.  Plaintiffs summarize key points of the evidence in 1,442 numbered paragraphs with specific citations of the record for each point.  *See* Plaintiffs' Proposed Findings of Fact, attached as Exhibit 1.  This evidence establishes beyond dispute the following unconscionable federal censorship activities.

White House officials like Rob Flaherty, Andrew Slavitt, and Jennifer Psaki have engaged in a relentless pressure campaign, both in public and in private, to coerce platforms into censoring disfavored viewpoints on social media.  *See infra*, at 8-10; Ex. 1, ¶¶ 31-211.  Surgeon General Vivek Murthy and his staff coordinate closely with the White House in this pressure campaign, causing social-media platforms to scramble and assure federal officials that "we hear your call to do more" to censor disfavored viewpoints.  *See infra*, at 8-13; Ex, 1, ¶¶ 212-425.  The CDC flags specific social-media posts for censorship, organizes "BOLO" ("Be On the Lookout") meetings to tell platforms what should be censored, and serves as the ultimate fact-checker with final authority to dictate what speech will be removed from social media.  *See infra*, at 31-34; Ex. 1, ¶¶ 426-595.

Dr. Fauci orchestrated an elaborate campaign of trickery and deception to induce social-media platforms to censor the lab-leak theory and other viewpoints he disfavors.  *See infra*, at 19-27; Ex. 1, ¶¶ 598-852.  The FBI, likewise, deliberately planted false information about "hack-and-leak" operations to deceive social-media platforms into censoring the Hunter Biden laptop story.  *See infra*, at 27-29; Ex. 1, ¶¶ 880-904.  The FBI, CISA, and the GEC collude with social-media

platforms in hundreds of meetings about misinformation, and those agencies repeatedly flag huge quantities of First Amendment-protected speech to platforms for censorship. *See infra*, at 34-40; Ex. 1, ¶¶ 853-1134. CISA "switchboards" reports of so-called "misinformation" from state and local governments to platforms for censorship. *See infra*, at 37-39; Ex. 1, ¶¶ 972-977.

CISA and the GEC are pervasively intertwined with massive public-private censorship enterprises like the Election Integrity Partnership, a collaboration among government, social-media platforms, and activist nonprofits to monitor, track, and censor enormous volumes of Americans' speech on social media. *See infra*, at 42-48; Ex. 1, ¶¶ 991-1075, 1135-1235. Federal health officials in the Surgeon General's Office, the CDC, and HHS collaborate in a similar censorship enterprise called the Virality Project, which procures the censorship of enormous quantities of First Amendment-protected speech. *See infra*, at 48-51; Ex. ¶¶ 1236-1365. These are just examples of the violations herein.

Altogether, these censorship activities by federal officials and agencies constitute a gargantuan federal "Censorship Enterprise." This enterprise is highly effective—it has stifled debate and criticism of government policy on social media about some of the most pressing issues of our time. And its activities are flagrantly unconstitutional. The Court should enter a preliminary injunction putting a stop to these egregious violations of the First Amendment.

Plaintiffs incorporate by reference their previously filed briefing addressing these issues, including their prior Memorandum in Support of Preliminary Injunction, Doc. 15, and their Response to Defendants' Motion to Dismiss, Doc. 161-1. Plaintiffs also incorporate by reference the documentary discovery, evidence, and deposition transcripts and exhibits filed in the case, including Docs. 10-1 to 10-15, Docs. 71-1 to 71-13, Docs. 86-2 to 86-10, and Docs. 204-210.

## FACTUAL BACKGROUND

Plaintiffs incorporate by reference the facts set forth in their Proposed Findings of Fact, attached as Exhibit 1 hereto.  Plaintiffs also incorporate by reference the facts set forth in the Factual Background section of their prior brief in support of preliminary injunction, Doc. 15, at 8-41.  Key facts relevant to each legal standard are also set forth in the Argument section below.

## ARGUMENT

"To be entitled to a preliminary injunction, a movant must establish (1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest."  *Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015).  All four of these factors favor an injunction here.

## I.      Plaintiffs Are Likely to Succeed on the Merits.

First, Plaintiffs are likely to succeed on the merits of their First Amendment claim (Count One) and their APA and *ultra vires* claims (Counts Two to Seven).  *See* Doc. 84, at 145-161.

### A.      Plaintiffs Are Likely to Succeed on their First Amendment Claim.

"[T]here is no single test to identify state actions and state actors," and the Supreme Court's "cases have identified a host of facts that can bear on the fairness of such an attribution" of state action.  *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 294, 296 (2001).  The question of state action is a "necessarily fact-bound inquiry," and "the criteria lack rigid simplicity."  *Id.* at 295, 298.  When the government induces or jointly participates in conduct that the Constitution prohibits the government from performing, the government is liable as if it had performed the conduct itself.  Courts have articulated multiple, overlapping tests for when the government induces or jointly participates in private conduct.  Under these tests, Defendants are

liable for viewpoint-based censorship by social-media companies for at least five independent reasons: Defendants are *inducing* the censorship by means of (1) significant encouragement, (2) coercion, and/or (3) deception; and Defendants are *jointly participating* in the censorship through (4) conspiracy or collusion, and/or (5) pervasive entwinement in the censorship process.   The evidence in this case satisfies all five of these standards.

### 1.    Inducement – Significant Encouragement, Coercion, and Deception.

As to inducement, it is "axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973); *see also Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J. concurring) ("The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly.").  As relevant here, such inducement can take the form of coercion (both implied and express), *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); "significant encouragement," *id.*; or deception, *George v. Edholm*, 752 F.3d 1206, 1215 (9th Cir. 2014).  A government official who induces private conduct by any of these means is liable as if he had performed the conduct himself.  *See Blum*, 457 U.S. at 1004; *George*, 752 F.3d at 1215.

Moreover, under this standard, it is not required for the government's unlawful conduct to be the but-for cause of the censorship.  The Constitution forbids governmental coercion, significant encouragement, and deception—even when the private parties do not resist.  *Reitman v. Mulkey*, 387 U.S. 369, 380–81 (1967); *Peterson v. City of Greenville*, 373 U.S. 244, 248 (1963); *Mathis v. Pac. Gas & Elec. Co.*, 891 F.2d 1429, 1434 (9th Cir. 1989); *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1295 (9th Cir. 1987).

4

### a. Significant Encouragement.

The Constitution prohibits the government from "significant[ly] encourag[ing]" private conduct that the government itself could not constitutionally undertake. *Blum*, 457 U.S. at 1004. Although outright commands are the most obvious form of government inducement, the government acts unconstitutionally even when it "can be charged with only encouraging, rather than commanding" improper conduct. *Reitman*, 387 U.S. at 375 (quotation marks omitted); *accord Frazier v. Bd. of Trs. of Nw. Miss. Reg'l Med. Ctr.*, 765 F.2d 1278, 1286 (5th Cir.) (government is responsible for private conduct that it "had some affirmative role, albeit one of encouragement short of compulsion," in promoting), *amended on other grounds*, 777 F.2d 329 (5th Cir. 1985) (Mem.).

Significant encouragement takes many forms. Explicit requests are most obvious. *E.g.*, *Hatteras v. Sw. Bell Tel. Co.*, 774 F.2d 1341, 1343 n.4 (5th Cir. 1985) (telephone disconnection at government's request); *Warner v. Grand Cnty.*, 57 F.3d 962, 964 (10th Cir. 1995) (search at government's request); *Fries v. Barnes*, 618 F.2d 988, 990–91 (2d Cir. 1980) (seizure of property at government's request). But subtler, more "covert" forms of encouragement also are significant when designed to induce specific action. *See Skinner v. Ry. Lab. Execs. Ass'n*, 489 U.S. 602, 615 (1989) ("[A] private party should be deemed an agent or instrument of the Government" whenever "the Government did more than adopt a passive position toward the underlying private conduct.").

For example, in *Adickes v. S.H. Kress & Co.*, a restaurant refused to serve a plaintiff "because she was a white person in the company of Negroes." 398 U.S. 144, 152 (1970). The Supreme Court held that the denial of service was government action if a police officer in the restaurant "communicated his disapproval to a [restaurant] employee, thereby influencing the decision not to serve [the plaintiff]." *Id.* at 158. Similarly, in *Dossett v. First State Bank*, public-

school officials contacted the plaintiff's employer, a private bank where the school had an account, to report their displeasure at the plaintiff's remarks during a recent school-board meeting.  399 F.3d 940, 944 (8th Cir. 2005).  The bank's president fired the plaintiff, citing the plaintiff's "negative [comments] about our local school board and superintendent."  *Id.* at 944-45. Although the president "denied that any of the school board members or the superintendent threatened to remove funds from the Bank or demanded that [the plaintiff] be fired," the court held that the termination constituted government action if the bank and school officials nonetheless "reach[ed] a mutual understanding" that the plaintiff's speech deserved retaliation.  *Id.* at 944, 949–50.

The Fifth Circuit has held that even the silent presence of government officials sometimes can transform otherwise private conduct into government action.  *See United States v. Mekjian*, 505 F.2d 1320, 1327 (5th Cir. 1975) (stating that a search performed by private parties is attributable to the government if federal officials are "stand[ing] by watching with approval as the search continues").  To be sure, presence alone, without other factors, "is not sufficient." *Blum*, 457 U.S. at 1004–05.  But if the facts show that the officials' approving presence "induce[s], encourage[s] or promote[s]" the private parties to act, *Norwood*, 413 U.S. at 465, then that presence amounts to unconstitutional "significant encouragement," *Blum*, 457 U.S. at 1004; *cf. Rivera v. Rhode Island*, 402 F.3d 27, 34 (1st Cir. 2005) (recognizing that a government official's assurance that he will not intervene can make the official responsible for private acts of violence).

Attributing responsibility to the government for "significantly encouraging" private acts makes sense because a party who has lent any "assistance rendered by words, acts, encouragement, support, or presence" is legally an accomplice.  *Rosemond v. United States*, 572 U.S. 65, 73 (2014). Although that term applies most often in the criminal context, courts routinely find that the government is an accomplice to private civil misconduct when the government significantly

6

encourages that conduct. *E.g.*, *George*, 752 F.3d at 1215 ("Police officers may be liable for a private party's search when the police ordered or were complicit in the search."); *Hemphill v. Schott*, 141 F.3d 412, 419 (2d Cir. 1998) (identifying a "Fourteenth Amendment right not to be subjected to the excessive force of a third party who is aided and abetted by a state actor"); *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993) ("[A] state actor may be subject to liability for an action physically undertaken by private actors in violation of the plaintiff's liberty or property rights if the state actor directed or aided and abetted the violation.").

Moreover, Defendants cannot evade responsibility for their actions by appealing to the government-speech doctrine. That doctrine permits the government to express its own opinion without violating the First Amendment. *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009). But Defendants are not merely opining in the abstract about disputed policy questions. Instead, they are contacting social-media companies through backchannels and demanding that those companies make specific changes to their content-moderation policies and take concrete censorship action on particular items of speech.

Courts regularly apply the same distinction to private speech. The First Amendment protects advocating criminal conduct in the abstract, *Brandenburg v. Ohio*, 395 U.S. 444, 448–49 (1969), but not "encourag[ing]" a particular person to take a specific criminal action, *e.g.*, *United States v. Rahman*, 189 F.3d 88, 115 (2d Cir. 1999); *Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 243–47 (4th Cir. 1997); *United States v. Buttorff*, 572 F.2d 619, 623–24 (8th Cir. 1978). Thus, the First Amendment protects "abstract advocacy" like "'I believe that child pornography should be legal' or even 'I encourage you to obtain child pornography,'" but it does not protect "the recommendation of a particular piece of purported child pornography." *United States v. Williams*, 553 U.S. 285, 299–300 (2008). So too, even assuming the First Amendment permits the

7

government to advocate in the abstract for actions that the Constitution bars the government itself from taking, it does not permit the government to engage in specific, significant encouragement of such actions.

Here, there is overwhelming evidence the Defendants significantly encourage social-media censorship, especially the White House and Surgeon General's Office, and others as well.

**The White House, Rob Flaherty, and Jennifer Psaki.**  Beginning in early 2021, and continuing through the present, White House officials such as Rob Flaherty, Andy Slavitt, and Jennifer Psaki, working with others such as Clarke Humphrey, Courtney Rowe, Christian Tom, and Benjamin Wakana, have conducted and continue to conduct an intense pressure campaign against social-media platforms in public and in private to demand greater censorship.  Plaintiffs' Proposed Findings of Fact, Ex. 1, ¶¶ 31-211.

Rob Flaherty spearheads this campaign with a relentless chain of emails, meetings, and communications pressuring the platforms to engage in greater censorship of COVID-related speech.  *Id.*  Flaherty continuously badgers platforms for more detailed information about their censorship practices.  *See, e.g., id.* ¶¶ 43-45, 50, 54, 66-68, 74, 84-85, 112-113, 175.  White House officials ask platforms for reports on specific censorship issues.  *See, e.g., id.* ¶¶ 85-86 (asking for and receiving "a 24 hour report-back" on misinformation about the Johnson & Johnson vaccine); 87, 107 (Flaherty to YouTube, "We'll look out for the top trends that you've seen in terms of misinformation around the vaccine.").  White House officials make very specific demands about how to increase censorship of disfavored speech.  *Id.* ¶¶ 118-121 (demanding that Facebook monitor private events and deplatform the "Disinformation Dozen").

The White House pressures the platforms with accusations and belligerent language.  *See id.* ¶ 55 ("You are hiding the ball."); ¶ 58 ("This would all be a lot easier if you would just be

straight with us."); ¶¶ 69-70, 77 ("Really couldn't care less about … the product safari"); ¶ 99 (snapping, after not receiving a response on the censorship of Tucker Carlson quickly enough for his liking, "[t]hese questions weren't rhetorical."); 126 ("Not to sound like a broken record…."); ¶ 130 ("Hard to take any of this seriously…."); ¶¶ 134-136 ("I don't know why you guys can't figure this out"); ¶ 173 (Flaherty accusing YouTube of providing misleading information); ¶ 178 ("not even sure what to say at this point"); ¶ 186 ("Total Calvinball.").   This includes one particularly profane attack by Rob Flaherty against Facebook: "Are you guys f**king serious? I want an answer on what happened here and I want it today." *Id.* ¶ 139.  Indeed, Flaherty accuses Facebook of fomenting the January 6, 2021 riot by not censoring enough speech. *Id.* ¶ 78 ("an insurrection which was plotted, in large part, on your platform….  I want some assurances, based in data, that you are not doing the same thing again here."); ¶ 97 ("Not for nothing but last time we did this dance, it ended in an insurrection.").

The encouragement takes other forms as well.  White House officials praise the platforms for censoring content that does not violate their policies.  *Id.*   ¶ 112 (Flaherty praising YouTube for censoring non-violative content: "I believe you said you reduced watch time by 70% on 'borderline' content, which is impressive."); ¶ 174 (YouTube assuring Flaherty that it censors non-violative content).  And White House officials demand the removal of *specific* posts and accounts of disfavored speakers, and social-media platforms routinely comply.  *Id.* ¶¶ 34-36 (Robert F. Kennedy Jr.); ¶¶ 81-82, 93-94 (Tucker Carlson and Tomi Lahren of Fox News); ¶ 103-104 (demanding and receiving the deplatforming of Alex Berenson); ¶¶ 121, 128 (the "Disinformation Dozen"); ¶ 149 (Psaki calling for the deplatforming of the "Disinformation Dozen"); ¶ 125 (trending posts on Facebook); ¶ 168 (parody or fake account of Dr. Fauci); 1¶¶ 80-187 (a comedic video of Jill Biden).

When aggressive demands do not get quick enough results, the White House resorts to overt and implied threats. *See, e.g., id.* ¶ 61 ("Internally we have been considering our options on what to do about it."); ¶ 108 (Flaherty telling YouTube, "This is a concern that is shared at the highest (and I mean highest) levels of the WH"); ¶¶ 114-115 (referring to a list of policy recommendations and stating, "spirit of transparency – this is circulating around the building and informing thinking.").

In addition to private demands, public pressure is a key part of this campaign. The White House makes detailed public demands for greater censorship, including at the White House press conferences on May 5, 2021 and July 15, 2021. *Id.* ¶¶ 123-124 (Jennifer Psaki demanding greater censorship and calling for "a robust anti-trust program"); ¶¶ 146-152 (Jennifer Psaki at the July 15, 2021 press conference making four public demands on platforms, including data-sharing, creating "a robust enforcement strategy," to "take faster action against harmful posts," and adjusting their algorithms); ¶¶ 164-165 (White House communications director threatening repeal of Section 230 if platforms do not censor more speech). President Biden accuses the platforms of "killing people" by not censoring enough misinformation. *Id.* ¶ 153.

Social-media platforms promptly respond to this pressure campaign by repeatedly reporting to the White House that they will stiffen their policies and/or take enforcement actions against disfavored speech. *Id.* ¶¶ 41-42, 45, 64, 75, 131, 177, 187. And platforms dutifully report to the White House in detail about their censorship practices. *Id.* ¶¶ 86-87, 132-133, 174.

**The Surgeon General and His Office.** Throughout 2021 and 2022, Surgeon General Vivek Murthy and his Office have and are engaged in a pressure campaign in parallel with, and often overlapping with, the White House's pressure campaign on social-media platforms. Surgeon General Murthy and his staff are often included in the same meetings and communications with

White House officials and social-media platforms, and join White House officials pressuring them to increase censorship in public and in private.  *See id.* ¶¶ 212-425.

The Surgeon General uses his "bully pulpit" to pressure social-media platforms to censor disfavored viewpoints.  *Id.* ¶¶ 218-222.  This pressure occurs in public and in private, *id.* ¶¶ 222, 225, 269, including in "closed-door meetings" with platforms, *id.* ¶ 394.  The Surgeon General pressures platforms to share data about misinformation and censorship on their platforms to allow the government to monitor disfavored viewpoints on their platforms.  *Id.* ¶¶ 236-240, 353.  After intense pressure, Facebook ultimately agreed to additional data-sharing demanded by the Surgeon General.  *Id.* ¶¶ 359, 363.  In private meetings, Dr. Murthy demands that the platforms perform "defensive work" to remove misinformation.  *Id.* ¶ 283.  In early 2021, Dr. Murthy had a series of "angry" and "tense" meetings with platforms to demand that they remove misinformation.  *Id.* ¶¶ 341-344.

Dr. Murthy places great public pressure on the platforms to censor.  At his July 15, 2021 press conference with Jennifer Psaki, Dr. Murthy announced a Health Advisory that explicitly demands greater censorship from social-media platforms.  *Id.* ¶¶ 293-309.  He demanded that platforms do "much, much more" to "address misinformation."  *Id.* ¶ 307.  His Health Advisory demands that platforms take specific steps to censor disfavored viewpoints on health and share data with government and its partners so they can monitor the spread of disfavored speech on their platforms.  *Id.* ¶¶ 324-329.  He explicitly calls for prior restraints, *e.g.*, "prioritize the early detection of misinformation 'super-spreaders' and repeat offenders.  Impose clear consequences for accounts that repeatedly violate platform policies."  *Id.* ¶ 326-329.

This White House-Surgeon General pressure campaign gets results.  After the public pressure of July 15 and 16, Facebook provided "a catalog of … both removal of misinformation

11

and other steps to tamp down mis- and disinformation." *Id.* ¶ 262.  In fact, the Surgeon General's Office asked all platforms to report back on what additional censorship they were imposing as a result of the Surgeon General's Health Advisory.  *Id.* ¶¶ 270, 309, 364, 368.  Platforms reported back with new steps taken to increase censorship of disfavored viewpoints.  *Id.* ¶¶ 370-377, 395. In response to the Advisory, Facebook reported a series of more aggressive steps against misinformation, including deplatforming the Disinformation Dozen and adopting more restrictive policies.  *Id.* ¶ 348, 354-358.  Facebook told the White House and Surgeon General, "we hear your call to do more." *Id.* ¶ 358.  Facebook sought to understand "what the White House expects of us on misinformation going forward."  *Id.* ¶ 349.  It asked to "find a way to deescalate and work together collaboratively" on censoring misinformation.  *Id.* ¶ 351.  Facebook assured the White House and Surgeon General that it would censor disfavored speech about vaccines for children ages 5-11.  *Id.* ¶ 395. The Surgeon General's pressure campaign places both economic and public pressure on platforms.  *Id.* ¶¶ 272-273.

Facebook provides biweekly reports on misinformation on its platforms to the Surgeon General and the White House.  *Id.* ¶¶ 279, 284-286, 291.  Platforms provide detailed reports on their censorship activities to the Surgeon General and his staff, especially announcing increased censorship policies and enforcement.  *See, e.g., id.* ¶¶ 281, 395-398.

In October 2021, the Surgeon General publicly hammered Facebook after a Washington Post report about disinformation on its platforms, pressuring all platforms to increase censorship. *Id.* ¶¶ 386-387.  He stated: "We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health misinformation on their platforms.  The time for excuses and half measures is long past. We need transparency and accountability now."  *Id.* ¶ 387.  The Surgeon General's Office agrees that the Surgeon General was "hitting up Facebook" on the spread

of misinformation on its platforms. *Id.* ¶ 392. Dr. Murthy followed up with a series of public statements demanding that the platforms increase censorship of disfavored viewpoints, including "aggressive action" against "superspreaders" and disfavored speakers. *Id.* ¶¶ 400-409.

The Surgeon General threatens regulation of platforms if they do not increase censorship. The Surgeon General's Health Advisory impliedly threatens regulation by calling for "appropriate legal and regulatory measures that address health misinformation." *Id.* ¶ 325. Dr. Murthy himself, and the Surgeon General's documents, threaten adverse consequences on the platforms by threatening to hold them "accountable." *See, e.g.,* ¶¶ 301-303, 329, 387, 403. Shortly before issuing a formal Request for Information (RFI) in the Federal Register, Dr. Murthy called for the government to set "safety standards" for misinformation on platforms. *Id.* ¶ 410. Then, on March 3, 2022, the Surgeon General issued the formal RFI to demand information from platforms about the spread of, and how to track, misinformation on their platforms. *Id.* ¶ 411-416. The RFI requests information about specific disfavored speakers and viewpoints on social media. *Id.* ¶ 416. The RFI carries an implied threat of regulation against social-media platforms if they do not stop the spread of misinformation. *Id.* ¶¶ 410-416. Shortly after the RFI, Dr. Murthy called for the equivalent of "speed limits"—*i.e.*, government-imposed safety standards—for misinformation on platforms. *Id.* ¶ 423.

These pressure campaigns amount to not only unlawful significant encouragement, but also coercion and conspiracy/collusion, as discussed further below. Moreover, the activities of other agencies such as CISA, the FBI, the CDC, the GEC, and NIAID, discussed in other subsections below, also constitute significant encouragement.

### b. Coercion.

Defendants' conduct also constitutes outright coercion.  Coercion includes "actual or threatened imposition of government power or sanction," "even if it turns out to be empty." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230–31 (7th Cir. 2015); *see also Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Mem.) (Thomas, J. concurring) ("The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly."). Threats include any "intimati[on]," however "veiled" or "implicit," "that some form of punishment or adverse regulatory action" may follow unless the private actor complies with the government's demands.  *Rattner v. Netburn*, 930 F.2d 204, 209–10 (2d Cir. 1991).

*Rattner* is instructive.  There, a local chamber of commerce published speech that criticized the local government.  *Id.* at 205.  A local official wrote to the chamber purportedly on behalf of himself "and [his] neighbors to express [their] concern" that the article was "misleading."  *Id.* at 205–06.  The official said that the article "raise[d] significant questions and concerns about the objectivity and trust which we are looking for from our business friends" and asked which of the Chamber's members supported the article's publication.  *Id.* at 206.  The Second Circuit concluded that the letter "may reasonably be viewed as an implicit threat."  *Id.* at 210.  Further, no amount of verbal disclaimer can eliminate an actual on-the-ground threat.  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963).  "It would be naive to credit the [government's] assertion that [its demands for stricter censorship] are in the nature of mere . . . advice."  *Bantam Books*, 372 U.S. at 68.

Defendants' conduct described herein constitutes coercion.  This is true of the White House's and Surgeon General's pressure campaigns—interspersed with veiled threats—discussed above.  It is also true of the demands of the other agencies discussed herein, such as CISA, the

14

FBI, the CDC, NIAID, and the GEC, because of the background threats from senior federal officials, including both Defendants and their political allies.

As noted, Defendants' conduct occurs against the backdrop of a steady and ongoing drumbeat of public threats from senior federal officials who demand greater censorship from social-media platforms and threaten adverse legal consequences—such as repeal or reform of Section 230's liability shield, and antitrust enforcement—against the platforms if they do not increase censorship of disfavored viewpoints. Plaintiffs' Proposed Findings of Fact, Ex. 1, ¶¶ 1-30. The threat of Section 230 repeal or reform is a "fearsome cudgel" to platforms because the liability shield is "a hidden subsidy worth billions of dollars," *id.* ¶ 2; and antitrust enforcement is "an existential threat" to the companies, *id.* ¶ 3. These threats include public statements and congressional hearings where social-media CEOs such as Mark Zuckerberg of Facebook, Jack Dorsey of Twitter, and Sundar Pichai of Google are repeatedly raked over the coals, compared to a "slavetocracy," accused of running "hotbeds of misinformation and disinformation," hounded to take "aggressive action … to eliminate misinformation and disinformation," and told that "aggressive and targeted reform" of Section 230 is coming, among others. *Id.* ¶¶ 4-18.

President Biden and his aides lead this charge, making the most vociferous and aggressive threats against platforms to demand greater censorship of disfavored viewpoints. *Id.* ¶¶ 19-30. Among other things, Biden has called for Mark Zuckerberg to face civil liability and even criminal prosecution for not censoring enough speech he disfavors, *id.* ¶¶ 20-21, and publicly stated that social-media platforms are "killing people" by not censoring enough misinformation, *id.* ¶ 27. Likewise, White House Press Secretary Jennifer Psaki and White House Communications Director Kate Bedingfield, among others, have repeatedly threatened Section 230 repeal and antitrust scrutiny against the platforms while demanding more censorship. *Id.* ¶¶ 123-124, 146-152, 156-

162, 164-165, 192-197.  And once President Biden was elected with both Houses of Congress under control of his political allies, these threats became all the more menacing.

The Government's own witnesses attest to the coercive power of such pressure from Congress, which was exerted in private meetings as well.   FBI agent Elvis Chan observes the platforms became far more aggressive in removing misinformation during the 2020 election cycle than in previous election cycles, and they have remained so.  *Id.* ¶ 945.  Based on direct observation and experience, Chan attributes this increase in censorship to pressure from Congress.  *Id.* ¶¶ 946-961.  He observes that "pressure from Congress, specifically HPSCI and SSCI"—the House Permanent Select Committee on Intelligence, and the Senate Select Committee on Intelligence— pushed the platforms to adopt more aggressive censorship policies and enforcement.  *Id.* ¶ 946.

This pressure takes two forms.  First, Congressional committees force the CEOs of social-media platforms to appear and testify, including "Mark Zuckerberg and Jack Dorsey and Sundar Pichai."  *Id.* ¶ 947.  Based on discussions with platform employees, Chan concludes that "that kind of scrutiny and public pressure from Congress … motivated them to be more aggressive in the account takedowns."  *Id.* ¶ 947.  Chan identifies specific hearings that placed public pressure on the platforms and pushed them to increase censorship.  *Id.* ¶¶ 948-949.

Second, those Congressional committees sent high-level staffers to Silicon Valley to meet directly with senior officials from the platforms, including Facebook, Google, and Twitter, in non-public meetings.  *Id.* ¶¶ 950, 956-957.  In these private meetings, employees of the platforms experience the visits from Congressional staffers as exercising a lot of pressure on them.  *Id.* ¶ 951. The staffers have presented potential legislation to the platforms in these meetings, effectively threatening them with adverse legal consequences if they did not increase censorship.  *Id.* ¶ 952. This pressure from Congress made the platforms more cooperative with the FBI when it seeks

account "takedowns."  *Id.* ¶ 953.  Chan discussed these meetings both with the staffers and the platform employees who attend them.  *Id.* ¶¶ 955-956.

As Chan attests, these tactics place "intense pressure from U.S. lawmakers" on the platforms and cause them to change their policies to be more restrictive, and to adopt more aggressive enforcement of their policies.  *Id.* ¶¶ 958-959.  This Congressional pressure on platforms is ongoing, as Chan acknowledges there were multiple such hearings during the 2022 election cycle to pressure the platforms to increase censorship.  *Id.* ¶ 960.  Chan attributes the dramatic increases in censorship on social-media platforms in recent years to such Congressional pressure.  *Id.* ¶¶ 961.

Likewise, Alex Stamos of the Election Integrity Partnership agrees with Elvis Chan that "pushing the platforms to do stuff" is easier when they face "huge potential regulatory impact," as in the United States.  *Id.* ¶ 1234.  And the Virality Project report agrees that government pressure pushes social-media platforms to adopt more aggressive censorship policies, and that "government inquiries" resulted in more restrictive vaccine-related policies.  *Id.* ¶ 1270, *see also id.* ¶ 1349.

Especially against the backdrop of these public and private threats of adverse legal consequences – closely linked to demands for greater censorship – the Defendants' conduct rises to the level of coercion, as well as significant encouragement.  For example, the White House's pressure campaign detailed above, combined with these threats, is extremely coercive.  Indeed, White House officials have resorted to public and private threats to increase the pressure of their "encouragement."  So, too, is the Surgeon General's pressure campaign, conducted in close coordination with the White House.  Among other things, the Surgeon General has impliedly threatened adverse regulation through his Health Advisory and RFI, along with his public statements.   The CDC's close collaboration with the social-media platforms on health-

misinformation censorship, likewise, is enabled by the coercive pressure campaign from the White House and allied federal officials.  The same conclusion applies to the censorship activities of the FBI, CISA, NIAID, and the GEC, all discussed further below.

### c.  Deception.

Government is also responsible for private conduct that it induces by deception. For example, when government officials "gave false information about [a suspect's] medical condition" to a doctor "with the intent of inducing [the doctor] to perform" a search, the court held the government officials responsible for that search. *George*, 752 F.3d at 1215.  So also, when government officials give false information to social-media platforms with the intent of inducing them to censor disfavored viewpoints, the government officials are responsible for that censorship. *See id.*; *see also Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) ("[Government officials] cannot hide behind [those] whom they have defrauded.").

As above, holding government officials responsible for private action that they induce by deception is consistent with other areas of law, including federal complicity law.  A defendant who uses deception to induce an innocent person into committing "an act . . . which if directly performed by [the defendant] would be an offense" is liable as if he had committed the act himself. 18 U.S.C. § 2(b); *see, e.g.*, *United States v. Curran*, 20 F.3d 560, 567 (3d Cir. 1994).  Thus, a defendant "cannot insulate himself from punishment by manipulating innocent third parties to perform acts on his behalf that would be illegal if he performed them himself." *United States v. Rashwan*, 328 F.3d 160, 165 (4th Cir. 2003). So too, government officials cannot "avoid responsibility for an unconstitutional [act] by using deception to induce a private party to perform" the act on their behalf. *George*, 752 F.3d at 1220; *cf. Robinson v. Maruffi*, 895 F.2d 649, 656 (10th Cir. 1990) ("[A] police officer who deliberately supplied misleading information that influenced

the decision [to prosecute] . . . cannot escape liability" for malicious prosecution even though it was the prosecutor, not the officer, who filed charges.).  "[I]t is axiomatic that a state may not induce … private persons to accomplish what it is constitutionally forbidden to accomplish," Norwood, 413 U.S. at 465—including by tricking or deceiving them into doing it.

Here, the evidence shows Defendants Dr. Fauci, NIAID, NIH, and the FBI engaging in egregious campaigns of deception "with the intent of inducing" platforms to censor speech. *George*, 752 F.3d at 1215.  These actions violate the First Amendment.

**Dr. Fauci, Dr. Collins, NIAID, and NIH.**  Dr. Fauci, collaborating frequently with NIH Director Dr. Francis Collins, orchestrated a series of campaigns of deceit to procure the censorship of viewpoints he disfavored on social media, beginning at latest in early 2020.  Once he became Chief Medical Advisor in the Biden Administration in early 2021, his censorship efforts coordinated with and reinforced those of federal officials in the White House, the Office of the Surgeon General, and the CDC.

*Lab-Leak Theory.* In early months of 2020, Dr. Fauci worked closely with Dr. Collins and Jeremy Farrar of the Wellcome Trust, a predominant British science-funding organization, to orchestrate a deceptive campaign to discredit and suppress the opinion that SARS-CoV-2, the virus that causes COVID-19, leaked from a laboratory at the Wuhan Institute of Virology—an opinion that has recently been confirmed as likely true.  *See* Michael R. Gordon, et al., *Lab Leak Most Likely Origin of Covid-19 Pandemic, Energy Department Now Says*, WALL STREET JOURNAL (Feb. 26, 2023), *at* https://www.wsj.com/articles/covid-origin-china-lab-leak-807b7b0a.

Dr. Fauci had powerful motives to suppress the lab-leak theory: he is a longstanding public advocate for gain-of-function research, which makes viruses more virulent and transmissible; and his agency, NIAID, funded dangerous gain-of-function experiments on bat coronaviruses at the

Wuhan Institute of Virology, the prime suspect for a lab leak.  Plaintiffs' Proposed Findings of Fact, Ex. 1, ¶¶ 598-630.  If the lab-leak theory were established or widely believed, Dr. Fauci and his agency could face responsibility for the deaths of millions in a global pandemic, and a crisis of confidence in the public science-funding enterprise they run.  *Id.*; *see also id.* ¶ 652.

In a call in the evening of Friday, January 31, 2020, Dr. Fauci became aware from Jeremy Farrar that Dr. Kristian Andersen of Scripps and other virologists had grave concerns that SARS-CoV-2, the virus that causes COVID-19, "look(s) … engineered."  *Id.* ¶¶ 637, 639.  Shortly before this call, Dr. Fauci had received a briefing from his staff about NIAID's funding of research on bat coronaviruses in Wuhan.  *Id.* ¶ 635.

After midnight after the call with Farrar and Andersen, Dr. Fauci sent an urgent, cryptic email to his confidential deputy, Dr. Hugh Auchincloss, attaching a paper about the "SARS Gain of Function" research that NIAID had funded in Wuhan, and telling him to "[k]eep your cell phone on … you will have tasks today that must be done."  *Id.* ¶¶ 640; *see also id.* ¶ 640-647, 653-656.  Dr. Fauci later testified eighteen times that he could not remember anything about this urgent, cryptic email exchange with his principal deputy.  *Id.* ¶ 642.

In fact, Dr. Fauci's testimony on this email and other points is not credible, and it contradicts the documentary evidence, including his own contemporaneous emails, on approximately 37 points.  *Id.* ¶¶ 609, 612, 620, 628, 629, 630, 642, 647, 651, 662, 664, 666, 667, 668, 670, 685, 686, 690, 702, 703, 708, 710, 722, 730, 733, 737, 746, 753, 772, 789, 798, 805, 807, 808, 809, 825, 849.  Further, Dr. Fauci testified that "I do not recall" or similar 174 times in his deposition, and counting variations on "I don't remember," at least 212 times.  *Id.* ¶ 620.  This contrasts with his public claims, on some of the very same events that he was asked to testify, that "I remember it very well."  *Id.*  It also contrasts with his clear, specific recollection of

contemporaneous events that are not directly related to the case. *Id.* ¶¶ 620, 852. Plaintiffs are filing with the Court a video compilation of Dr. Fauci's response stating "I do not recall" so that the Court may assess his credibility by viewing his demeanor. *See* Jones Decl., Ex. 2, ¶ 35.

On February 1, 2020, Dr. Fauci participated in a clandestine conference call with a group of science funders and influential science-funding authorities to discuss the lab-leak possibility. *Id.* ¶¶ 648, 657-666. Farrar insisted that the call was to be "in total confidence." *Id.* ¶ 657. Influential figures with a strong vested interest in avoiding a major scandal about science-funding practices were heavily represented on the call. *Id.* ¶ 659. As science-funding authorities, they also had powerful influence over the scientists on the call. *Id.* Dr. Fauci testified sixteen times that he could not remember details about the call, *id.* ¶ 661, though to the national media, he has proclaimed of the very same call, "I remember it very well," *id.* ¶ 662.

Contemporaneous emails show that the participants on the call—including Dr. Fauci, Dr. Collins, and Farrar himself—were keenly aware that there were powerful arguments in favor of the lab-leak theory of COVID's origins. *Id.* ¶ 680 ("hard time explaining that as an event outside the lab"); *id.* ("70:30 or 60:40" in favor of laboratory origins); *id.* ¶ 681 ("I really can't think of a plausible natural scenario … I just can't figure out how this gets accomplished in nature…. it's stunning."); *id.* ¶ 682 (Farrar: "On a spectrum if 0 is nature and 100 is release – I am honestly at 50!"); *id.* ¶ 694 ("Eddie [Holmes] would be 60:40 lab side. I remain 50:50"); *id.* ¶ 709 ("we have a nightmare of circumstantial evidence to assess").

Immediately after the call, the participants launched a deceitful effort to manufacture the appearance of scientific consensus against the lab-leak theory. Two scientists on the call, Eddie Holmes and Kristian Andersen, began drafting a scientific paper for publication to decisively

refute the lab-leak theory, even though their contemporaneous emails indicated that they were both inclined to believe the lab-leak theory. *Id.* ¶¶ 691-692.

Following the call, Dr. Fauci, Farrar, and Dr. Collins communicated extensively about the plan to discredit the theory. Among other things, they plotted to prod the WHO to establish a panel on the lab-leak theory that they would stack with a "core group" of their own contacts, then "frame the work of the group" and put "pressure on this group from our and your teams" to push it to their preferred result—discrediting the lab-leak theory. *Id.* ¶¶ 701-702.

There is no doubt about the purpose of this conspiracy. Dr. Fauci's, Farrar's, and Dr. Collins's communications at the time repeatedly express concern about preventing the spread of the lab-leak theory on social media. *Id.* ¶¶ 671, 673, 675, 676, 677, 678, 683. Dr. Fauci, in particular, expressed concerns about "the threat of further distortions on social media." *Id.* ¶ 683.

By February 4, 2020—three days after the clandestine conference call—Eddie Holmes sent a draft scientific paper attacking the lab-leak theory to Farrar, who forwarded it to Dr. Fauci. *Id.* ¶ 691. Though the draft purported to refute the lab-leak theory, Holmes noted that he did not "mention" the virus's "other anomalies" that make it look bioengineered "as this will make us look like loons." *Id.* ¶ 691. Dr. Fauci's and Dr. Collins's own emails make clear that they were keenly aware that the virus may have been created through serial passage through tissue of humanized mice in the Wuhan laboratory whose work NIAID was funding. *Id.* ¶ 695.

Farrar sent Dr. Fauci four drafts of the scientific paper to review in the week following the conference call. *Id.* ¶¶ 696-699. These drafts claimed that science "clearly demonstrates" a natural origin for SARS-CoV-2. *Id.* ¶ 698. By February 17, 2020, the scientific paper discrediting the lab-leak theory was accepted in a prestigious journal and was in preprint form, which was forwarded to Dr. Fauci for review (the fifth such draft he received). *Id.* ¶ 711, 716. The papers'

five listed authors were participants in the clandestine February 1, 2020 conference call, and they all privately acknowledged the plausibility of the lab-leak theory in emails that were shared with Dr. Fauci. *Id.* ¶¶ 711-715. Yet the paper claimed that "SARS-CoV-2 is not a laboratory construct nor a purposefully manipulated virus." *Id.* ¶ 715. Dr. Andersen, the lead author, thanked Dr. Fauci for his "advice and leadership" in preparing the paper, and sent him a sixth draft to review, seeking further input from Dr. Fauci. *Id.* ¶ 718. The paper was then published in Nature Medicine on March 17, 2020, as "The Proximal Origin of SARS-CoV-2." *Id.* ¶ 723. The final version attacked the lab-leak theory in unequivocal terms. *Id.* ¶ 724 ("clearly show … irrefutably show … clearly shows … we do not believe that any type of laboratory-based scenario is plausible").

Dr. Fauci and Dr. Collins then collaborated on a deceitful campaign to push the article into prominence, treating it as a scientific consensus created through independent scientific inquiry, rather than the product of a secret cabal of science-funders bent on suppressing the lab-leak theory to protect their own reputations. *Id.* ¶¶ 726-741. Dr. Collins featured it on NIH's official blog, citing "The Proximal Origin of SARS-CoV-2" to describe the lab-leak theory as "outrageous" and "debunk[ed]," leading national media to proclaim, "Sorry, Conspiracy Theorists." *Id.* ¶¶ 727-729. When Fox News host Bret Baier still discussed the lab-leak theory, Dr. Collins emailed Dr. Fauci, noting that he had hoped that "the Nature Medicine article" had "settled" "this very destructive conspiracy," and asking if there was "[a]nything more we can do?" to discredit the theory. *Id.* ¶ 731. Dr. Fauci described the lab-leak theory as a "shiny object that will go away in times," and the same day, during a White House Coronavirus Task Force briefing, deceptively cited this paper to proclaim an independent scientific consensus against the lab-leak theory. *Id.* ¶¶ 732-739. In doing so, he pretended to be unfamiliar with the paper's authors, when in fact they had sent him seven drafts to review and thanked him for his "advice and leadership" in preparing the paper. *Id.*

23

Dr. Fauci, Dr. Collins, and Jeremy Farrar, and those acting in concert with them, thus engaged in a deliberately deceptive conspiracy to manufacture the appearance of a scientific consensus refuting the lab-leak theory when none existed, and when the very scientists involved were actively doubting the virus's natural origins. *Id.* ¶¶ 598-740. The stated purpose of this conspiracy was to suppress the lab-leak theory in both "main stream and social media," *id.* ¶¶ 671, 673, 675, 676, 677, 678, 683—or, as Dr. Fauci himself put it at the time, to suppress "the threat of further distortions on social media." *Id.* ¶ 683.

The conspiracy succeeded in its object. "The Proximal Origins of SARS-CoV-2" became "one of the best-read papers in the history of science." *Id.* ¶ 741. It was trumpeted in national media as refuting the lab-leak theory as a racist "conspiracy theory." Social-media platforms followed Dr. Fauci's lead in lockstep and aggressively censored the lab-leak theory well into 2021, and the censorship cabal effectively deflected responsibility for the SARS-CoV-2 for years to come. *Id.* ¶¶ 743-756.

Having succeeded so dramatically in suppressing the lab-leak theory through deception, Dr. Fauci—cooperating often with Dr. Collins, and later with Biden White House officials—continued to the same tactic of deceptively creating a false appearance of scientific consensus to procure the censorship of disfavored viewpoints on social media.

*Hydroxychloroquine.* Soon thereafter, Dr. Fauci engaged in a well-known public campaign against the drug hydroxychloroquine as an effective early treatment for coronavirus. *Id.* ¶¶ 757-776. He publicly declared that the drug was plainly ineffective based on an observational study in The Lancet, which was swiftly retracted for glaring errors. *Id.* ¶¶ 757-76. He proclaimed, based on that flawed observational study, that the evidence was "unequivocal," "that the data are clear right now," and that "[t]he scientific data is really quite evident now about the lack of efficacy."

*Id.* ¶¶ 758, 760.  Then, as observational data *supporting* the drug's usage emerged, he dismissed such data because it was not from *randomized* studies (the "gold standard" for scientific evidence)—even though his own proclamation against the drug had itself been based on a (flawed and later retracted) *observational* study.  *Id.* ¶¶ 761-766, 770.  When dissenting doctors advocated for the drug's usage, he attacked them on national media as "a bunch of people spouting something that isn't true."  *Id.* ¶ 769; *see also id.* ¶¶ 768-770.

Social-media platforms, predictably, followed Dr. Fauci's lead and aggressively censored social-media speech advocating for the use of hydroxychloroquine, acting in lockstep with Dr. Fauci and accepting his proclamation of a clear scientific consensus against the drug's usage.  *Id.* ¶¶ 771-775.  In fact, Dr. Fauci's deceptively manufactured scientific consensus did not exist and never existed – hundreds of studies suggest that the drug is effective for early treatment of COVID-19, and the drug is approved for usage to treat COVID-19 in 41 countries.  *Id.* ¶ 776.

*Mask Efficacy.*  The same deceptiveness and double standard afflicted Dr. Fauci's positions on mask mandates, which also resulted in widespread social-media censorship.  *Id.* ¶¶ 828-839.  In private communications in February 2020, Dr. Fauci stated that masks are generally ineffective to prevent the spread of coronavirus: "The typical mask you buy in the drugstore is not really effective in keeping out virus, which is small enough to pass through material. … I do not recommend that you wear a mask…"  *Id.* ¶ 829.  By early April 2020, however, Dr. Fauci unequivocally endorsed universal masking, launching nationwide mask mandates that would last for years.  *Id.* ¶ 833.  Dr. Fauci's dizzying change in position could not be justified by "randomized" studies that he insisted were necessary to justify using hydroxychloroquine.  *Id.* ¶¶ 836-837.

*The Great Barrington Declaration.*  Dr. Fauci and Dr. Collins collaborated to inflict a deceptive "quick and devastating … take down" of the Great Barrington Declaration, co-authored

by Plaintiffs Dr. Bhattacharya and Dr. Kulldorff.  *Id.* ¶¶ 777-808.  Consistent with principles of pandemic response that were nearly universally accepted before the COVID-19 pandemic, the Great Barrington Declaration called for focused protection of high-risk individuals while reopening society for others, and it was sharply critical of prevailing government policies favoring lockdowns, school shutdowns, and similar restrictions.  *Id.* ¶¶ 783-786.  Among other things, it described "keeping students out of school" as "a grave injustice."  *Id.* ¶ 784.

Since Dr. Cliff Lane's trip to China at Dr. Fauci's direction in February 2020, Dr. Fauci and the government establishment favored the Chinese government's novel tactic of aggressive lockdowns to control the virus's spread, so the Great Barrington Declaration was a grave threat to the credibility of lockdown policies.  *Id.* ¶¶ 777-782.

Dr. Fauci and Dr. Collins responded swiftly to the Great Barrington Declaration, following the same tactic of manufacturing the appearance of a false scientific consensus against it to procure its suppression on social media.  *Id.* ¶¶ 787-808.  Four days after it was published, Dr. Collins emailed Dr. Fauci, asking if a "swift and devastating published take down" of the Declaration was "underway."  *Id.* ¶ 787.  The two then collaborated in a public campaign to attack the Declaration and proclaim it to be "appall[ing]," "nonsense," "very dangerous," "letting infections rip," "fringe," and "not mainstream science."  *Id.* ¶¶ 789-798.  The claim that it was "fringe" and "not mainstream science" was deceptive, as focused protection had been scientific orthodoxy for pandemic responses prior to the COVID-19 pandemic.  *Id.* ¶ 806.  The campaign succeeded once again, as social-media platforms promptly and aggressively censored the Great Barrington Declaration and its authors, acting in lockstep with Dr. Fauci's proclamations.  *Id.* ¶¶ 799-805.

*Alex Berenson.*  Dr. Fauci also collaborated with the White House to procure the censorship of vaccine critic Alex Berenson.  *Id.* ¶¶ 840-851.  As part of the White House's ongoing pressure

campaign against Twitter to deplatform Berenson, *see supra*, Dr. Fauci publicly attacked Berenson's positions as "horrifying," "frightening," and not "want[ing] to do something to save your life." *Id.* ¶ 843.  These comments were timed just a few days before the White House's public pressure campaign on July 15 and 16, 2021, which led to Berenson's immediate suspension and later permanent deplatforming.  *See supra*.

**The FBI and the Hunter Biden Laptop Story**.  Similar to Dr. Fauci's campaign of deception to suppress the lab-leak theory, the FBI engaged in a campaign of deception to induce social-media platforms to censor the Hunter Biden laptop story that the New York Post broke on October 14, 2020.  Even though the FBI was in possession of Hunter Biden's laptop and knew it was not hacked, the FBI—anticipating the news story—told platforms to expect a hack-and-leak operation possibly involving Hunter Biden, and the FBI pushed the platforms to adopt policies censoring "hacked materials."  This deception induced the platforms to censor the story.

In 2020, in its routine bilateral meetings with seven major social-media platforms, the FBI repeatedly raised the concern that a "hack-and-dump" or "hack-and-leak" operation might be forthcoming shortly before the 2020 general election.  Plaintiffs' Proposed Findings of Fact, Ex. 1, ¶¶ 868, 883.  Both the FBI and CISA repeatedly raised the concern about such "hack-and-dump" operations during the mass "USG-Industry" meetings during 2020 as well.  *Id.* ¶¶ 881-882.  In addition to the FBI's Elvis Chan and Laura Dehmlow, senior CISA officials Matt Masterson and Brian Scully repeatedly raised the warning about "hack-and-dump" operations during the 2020 USG-Industry meetings.  *Id.* ¶¶ 894.

In fact, the FBI had no investigative basis to believe that any hack-and-leak or hack-and-dump operation was underway.  *Id.* ¶ 893.  Chan admits that "we did not see any similar competing intrusions to what had happened in 2016. …. [F]rom our standpoint we had not seen anything. …

[W]e were not aware of any hack-and-leak operations that were forthcoming or impending," *id.*—yet the FBI repeatedly hammered home the warning about an impending hack-and-leak operation.

Responding to these repeated concerns raised by the FBI and CISA, social-media platforms updated their content-moderation policies in 2020 to provide that they would remove hacked materials from their platforms. *Id.* ¶ 884. The FBI encouraged these changes by repeatedly warning about the expectation of hack-and-leak operations and inquiring of the platforms whether they would censor hacked materials. *Id.* ¶¶ 885-888. Multiple FBI officials raised this same inquiry to the platforms in this time frame. *Id.* ¶ 889.

A formal declaration by Twitter's then-Head of Site Integrity, Yoel Roth—executed in December 2020, close in time to the relevant events—recounts that the FBI and other federal officials repeatedly warned platforms that they "expected" hack-and-leak operations during the 2020 election cycle. *Id.* ¶ 895. Roth also learned in these meetings with federal officials that "there were rumors that a hack-and-leak operation would involve Hunter Biden." *Id.*

Corroborating Roth's account, Mark Zuckerberg testified before Congress in October 2020 that the FBI had warned platforms to be on "high alert and sensitivity" for a hack-and-dump operation shortly before the 2020 election. *Id.* ¶ 902. Likewise, Brian Scully of CISA does not dispute that FBI and CISA raised the concern about hack-and-leak operations to platforms in the USG-Industry meetings during 2020, and he does not dispute Yoel Roth's account of the communications about hack-and-leak operations in his December 2020 declaration. *Id.* ¶¶ 1088-1089. CISA's emails with platforms reflect that the 2020 meetings included discussions of such topics as "preparing for so-called 'hack and leak' operations" and "Deep Dive Topic … Hack/Leak and USG Attribution Speed/Process." *Id.* ¶¶ 1090-1091. Like Chan, Scully was not aware of any pending investigations of hack and leak operations at the time. *Id.* ¶ 1092.

After the Hunter Biden laptop story broke on October 14, 2020, platforms privately asked the FBI to confirm whether the story was credible so they could decide whether it should be censored, but the FBI refused to confirm it. *Id.* ¶ 903. Accordingly, based on the FBI's deceitful information, platforms were left with the clear impression that the Hunter Biden laptop materials were, in fact, hacked materials. After the Hunter Biden story broke, it was widely censored on social media—Twitter even suspended the New York Post's Twitter account for two weeks— pursuant to the very "hacked materials" policies that the FBI had induced platforms to adopt in the preceding months of 2020. *Id.* ¶ 904.

### 2.    Joint Participation – Collusion and Pervasive Entwinement.

Government is responsible not only for private conduct it induces by significant encouragement, deception, or threats but also for private conduct in which it acts as a "joint participant." *Burton v. Wilmington Parking Auth'y*, 365 U.S. 715, 725 (1961). Most often, this occurs through a conspiracy or collusive behavior. *E.g.*, *Dennis v. Sparks*, 449 U.S. 24, 28–29 (1980); *Hobbs v. Hawkins*, 968 F.2d 471, 480 (5th Cir. 1992). But even without a conspiracy, government is responsible for private action arising out of "pervasive entwinement of public institutions and public officials in [the private entity's] composition and workings." *Brentwood Acad.*, 531 U.S. at 298.

### a.  Conspiracy and Collusion.

Government is liable when it "reach[es] an understanding" with private parties to violate a victim's rights. *Dykes v. Hosemann*, 743 F.2d 1488, 1498 (11th Cir. 1984). As the Fifth Circuit has held, this requirement usually is "met by circumstantial evidence" because "conspirators rarely formulate their plans in ways susceptible of proof by direct evidence." *Crowe v. Lucas*, 595 F.2d

985, 993 (5th Cir. 1979).[1]  Plaintiffs need not prove, however, that Defendants "reached an understanding" to censor each particular item of speech—only that Defendants reached an understanding with social media companies to censor in general.  When a plaintiff establishes "the existence of a conspiracy involving state action," the government becomes responsible for *all* constitutional violations committed "in furtherance of the conspiracy by a party to the conspiracy." *Armstrong v. Ashley*, --- F.4th ---, 2023 WL 2005263, at *12 (5th Cir. 2023).  That is because conspiracy can "be charged as the legal mechanism through which to impose liability on each and all of the Defendants *without regard* to the person doing the particular act" that deprives the plaintiff of federal rights.  *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990) (emphasis added) (cited in *Armstrong*, 2023 WL 2005263, at *12).

Likewise, courts hold government responsible for the acts of coconspirators in civil law because the same attribution of responsibility occurs in criminal law.  Liability under § 1983 is based on "more or less traditional principles of agency, partnership, joint venture, and the like." *Nesmith v. Alford*, 318 F.2d 110, 126 (5th Cir. 1963).  And under the traditional principles of partnership in criminal law, "conspirators are criminally liable for substantive crimes committed by other conspirators in furtherance of the conspiracy." *United States v. Baker*, 923 F.3d 390, 406 (5th Cir. 2019) (citing *Pinkerton v. United States*, 328 U.S. 640 (1946)).

Here, there is overwhelming evidence of collusion and conspiracy between Defendants and social-media platforms to censor speech—including the CDC, the FBI, CISA, and the GEC.  This

---

[1] In *Crowe*, the plaintiff sued state officials under 42 U.S.C. § 1983, alleging that they had arranged for his arrest in furtherance of a conspiracy to deprive him of "his rights to freedom of speech and assembly" after he questioned the integrity of an election. *Id.* at 988–92. Although there was no direct evidence of an agreement among the defendants, "[t]he evidence showed that the defendants had participated in private meetings at which Crowe was discussed." *Id.* at 993. "From this evidence and the testimony regarding the defendants' course of conduct toward Crowe," the Fifth Circuit concluded, "the jury could reasonably have inferred that a conspiracy existed." *Id.*

evidence also amounts to joint participation and coercion, as discussed above, and pervasive entwinement, discussed below.

**The CDC and Census Bureau.**  In addition to the public and private pressure campaigns from the White House and the Surgeon General's Office, the CDC and the Census Bureau are engaged in a long censorship campaign together, enabled by the White House's pressure on platforms to cooperate with the federal government.  Working closely with Census, the CDC flags supposed "misinformation" for censorship on platforms (sometimes using the acronym "BOLO," *i.e.*, "Be On the Lookout"), and exercises full authority to dictate what health claims will be censored on social media platforms.  As discussed herein, the CDC's and Census Bureau's actions constitute significant encouragement, coercion, and conspiracy or collusion.

The CDC has regular meetings with social-media platforms about misinformation, including often weekly meetings.  Plaintiffs' Proposed Findings of Fact, Ex. 1, ¶¶ 431, 434, 438-439, 453-454, 461, 473, 475, 531, 539-540, 544-545, 563.  These meetings routinely include the platforms' content-moderation officers.  *Id.* ¶¶ 453, 459, 463, 487, 531.

The CDC asks platforms to provide reports about censorship on their platforms.  *Id.* ¶¶ 455-457, 463, 472.  These requests include inquiries about whether specific content flagged by the CDC and the Census Bureau has been removed.  *Id.* ¶¶ 470, 475.  The Census Bureau follows up to monitor whether platforms are removing the content that the CDC and Census flag.  *Id.* ¶ 495.

Facebook provides the CDC with regular biweekly "CrowdTangle" reports about misinformation on its platforms.  *Id.* ¶¶ 440-442, 450.  The CDC uses CrowdTangle and other "social media listening tools" to monitor disfavored speech on platforms.  *Id.* ¶ 442-447.  These "listening tools" allow the CDC to "flag" misinformation for censorship.  *Id.* ¶ 485.  Facebook also

gives the CDC privileged access to use CrowdTangle to monitor speech on Facebook's platforms, including in private speech like personal group posts.  *Id.* ¶¶ 443, 451. 471.

The CDC works closely with the Census Bureau on censorship on social media pursuant to an Interagency Agreement (IAA), because the Census Bureau engaged in an earlier social-media censorship campaign with platforms during the 2020 census.  *Id.* ¶¶ 449, 466-467, 532-533. Census and the CDC, working together, present social-media platforms with series of tables and decks that warn about misinformation themes and provide lists and screenshots of specific posts that they believe should be censored.  *Id.* ¶ 460, 481.  These include slide decks, *id.* ¶¶ 460, 536-538; tables of dozens of posts, *id.* ¶¶ 481, 567; spreadsheets of "example areas," *id.* ¶ 565; and "BOLO" slides, *id.* ¶¶ 554-556.  They also include "BOLO" flags for supposed "misinformation" about the CDC's own content.  *Id.* ¶¶ 515, 586-589.  The CDC admits that it flags posts for censorship on the platforms, knowing that the platforms may take action to censor those posts and intending that the censorship occur—censorship is the desired result of the flagging.  *Id.* ¶¶ 483-484, 521-523, 575-576.  Platforms also offer the CDC privileged channels for federal officials to report misinformation on their platforms.  *Id.* ¶¶ 476-479 (Facebook's "misinfo reporting channel"); *id.* ¶¶ 577-584 (Twitter's "Partner Support Portal").

The CDC hosted a series of "BOLO" meetings to flag disfavored speech and viewpoints for censorship, where "BOLO" stands for "Be On the Lookout."  *Id.* ¶¶ 486, 549.  At the BOLO meetings, the CDC and Census presented the platforms with slide decks identifying specific claims they wished to have censored, along with screenshots of specific posts as examples of the types of content to censor, and the CDC's justification for censoring that content.  *Id.* ¶¶ 550-558.

Social-media platforms routinely treat the CDC as a privileged fact-checker with authority to dictate what may and may not be posted on their platforms.  Facebook does so continuously.

32

*Id.* ¶¶ 488-499 (asking the CDC to "debunk" specific claims); *id.* ¶¶ 500-506 (asking the CDC to debunk additional specific claims); *id.* ¶¶ 511-514 (asking the CDC for guidance on how to censor speech about VAERS); *id.* ¶¶ 518-519 (content on vaccine refusals and childhood vaccines); *id.* ¶¶ 520-525 (asking for the CDC's position on ten specific claims); *id.* ¶¶ 527-530 (asking the CDC to refute and confirm harmfulness of a long series of medical claims, including relating to vaccines for children under age 5).  The CDC regularly provides its definitive determination on such issues.  *See id.*  The CDC admits that it "know[s] that they're using our scientific information to determine their policy." *Id.* ¶ 529.  YouTube also seeks the CDC's determinative guidance on how to enforce its policies, including on health issues other than COVID-19.  *Id.* ¶ 541 (requesting input on a "list of common vaccine misinformation claims"); *id.* ¶¶ 547-548 (it "wasn't uncommon" for Google/YouTube to seek input on specific claims); *id.* ¶¶ 559-560 (YouTube seeking the CDC's guidance on claims about childhood vaccines); *id.* ¶¶ 561-562 ("The YouTube Policy team is requesting evidence-based input on the claims below.  In the past, the CDC has reviewed COVID information claims and commented TRUE or FALSE + add any additional context needed.").  Twitter, too, treats the CDC as an authoritative fact-checker.  *Id.* ¶ 563.

Facebook confirms that it updated its censorship policies to address claims on childhood vaccines as a direct result of the CDC's input.  *Id.* ¶ 518.  It also updated its policies on other topics to render them more restrictive, based on the CDC's input.  *Id.* ¶ 526.  Facebook routinely asks the CDC to confirm whether particular claims "are false and can lead to harm"; if the CDC so confirms, Facebook censors those claims.  *Id.* ¶¶ 501-502, 520-521.

When it comes to misinformation, the CDC's "focus is not solely on COVID.  We're focusing on other topics," and communicating with platforms about them, as well.  *Id.* ¶ 562.

**The FBI's Collusion.**  FBI agent Elvis Chan and many other FBI agents, especially from the FBI's Foreign Influence Task Force ("FITF"), routinely meet with social media platforms about disinformation, misinformation, and censorship.  Plaintiffs' Proposed Findings of Fact, Ex. 1 ¶¶ 855, 860.  These include regular, CISA-organized mass meetings of federal national-security and law-enforcement agencies (CISA, other DHS components, the FBI, the ODNI, and DOJ's national security division) with at least eight major social-media platforms ("USG-Industry meetings"), at which misinformation is extensively discussed.  *Id.* ¶¶ 861-866.

The FBI also has regular bilateral meetings with at least seven social-media platforms, plus Apple, to discuss disinformation concerns, and these bilateral meetings also continue through the present day.  *Id.* ¶¶ 867-877.  In these meetings, the FBI meets with the platforms' content-moderation officers in particular.  *Id.* ¶¶ 871, 877, 962.  Three to ten agents from FBI's FITF task force participate in these bilateral meetings along with Elvis Chan.  *Id.* ¶ 939.

The FBI also communicates with platforms—including flagging content, accounts, and URLs for censorship—through alternative channels, including the self-deleting app Signal and the encrypted Teleporter service.  *Id.* ¶¶ 878.

Elvis Chan confirms that the FBI cooperates with social-media platforms through "information sharing and *account takedowns*."  Plaintiffs' Proposed Findings of Fact, Ex. 1 ¶ 905 (emphasis added).  In addition to sharing "strategic information" about themes and tactics of putative disinformation, the FBI routinely flags specific content, posts, accounts, and URLs to the platforms for censorship—*i.e.*, "IP addresses, email accounts, social media accounts, … website domain names, and … file hash values." *Id.* ¶ 906.

The intended purpose and predictable effect in flagging specific speakers, content, and accounts to platforms is to induce the platforms to censor those speakers, content, and accounts.

*Id.* ¶¶ 908-911. The purpose of the FBI's "information sharing" with platforms is to "shut down … accounts." *Id.* ¶ 911. And it succeeds on a grand scale.

The FBI also flags specific content, speakers, and accounts to state and local government officials to encourage them to report them to social-media platforms (or to report them to the FBI and CISA, who then flag them to platforms). *Id.* ¶ 912.

Chan estimates that the FBI sends lists of accounts, content, websites, and URLs to social-media platforms for censorship about "one to five times per month." *Id.* ¶ 931. Each time, the FBI sends the platforms an encrypted Teleporter message with a list of "indicators," *i.e.*, specific social-media accounts, web sites, URLs, email accounts, etc., that the FBI wants the platforms to evaluate under their content-moderation policies. *Id.* ¶ 932. The size of each list ranges from a single account to "a whole spreadsheet full of them," sometimes including "hundreds" of specific accounts, websites, URLs, etc. *Id.* ¶ 934. In one occasion in 2020, the FBI sent "a spreadsheet with hundreds of accounts" via Teleporter to the platforms. *Id.* ¶ 941. Such mass-flagging messages were sent during the 2020 and 2022 election cycles with similar frequency. *Id.* ¶¶ 934-935. In general, these mass-flagging messages go to all seven major social-media platforms, but sometimes there are platform-specific mass-flagging messages. *Id.* ¶ 936. At least eight FBI agents in the San Francisco field office participate in flagging content for censorship to the social-media platforms. *Id.* ¶ 938.

The FBI's social-media flagging of supposed "foreign influence" accounts sweeps in massive amounts of domestic, First Amendment-protected speech by ordinary Americans. *Id.* ¶¶ 913-924. For example, the FBI flags supposedly foreign posts (including core political speech) that hundreds of thousands of American have engaged by liking, commenting on, and reposting—

all First Amendment-protected activities.[2]  *Id.* ¶¶ 916-919.  The FBI thus obliterates massive amounts of American speech when it induces platforms to censor such supposedly "foreign" speech.  The FBI also flags for censorship foreign-hosted websites on which American journalists and American speakers post content.  *Id.* ¶¶ 922-923.

In addition, the FBI runs "command centers" around every election that, among other things, flag reported "misinformation" for censorship to social-media platforms.  *Id.* ¶ 879, 925-927.  In doing such flagging, the FBI does not attempt to distinguish whether the speaker is American or foreign; it flags the disfavored content to the platforms for censorship regardless of whether it is foreign or domestic.  *Id.* ¶ 926.

The FBI also probes platforms for details about how they detect supposedly "inauthentic content" and how they enforce their censorship policies.  ¶¶ 929-930.  And the FBI also asks the platforms to report back to it on whether it censors the content it flags.  *Id.* ¶ 937.

The FBI boasts a "50 percent success rate" in getting platforms to censor content that it flags as misinformation.  *Id.* ¶ 928.  Given the sheer volume of the FBI's reports, this comprises the censorship of massive amounts of disfavored speakers and viewpoints.

**CISA Collusion.**   CISA, likewise, engages in extensive collusion with platforms on censorship.

---

[2] *See, e.g., Robinson v. Hunt County*, 921 F.3d 440, 447 (5th Cir. 2019) (commenting on a Facebook page is First Amendment-protected activity); *Bland v. Roberts*, 730 F.3d 368, 386 (4th Cir. 2013) ("liking" a web page is First Amendment-protected speech); *see also Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019), *cert. granted, judgment vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021) (Mem.) ("Replying, retweeting, and liking are all expressive conduct that blocking inhibits.  Replying and retweeting are messages that a user broadcasts, and, as such, undeniably are speech.").

*Continuous meetings and coordination.*  CISA communicates regularly with social-media platforms about misinformation through multiple series of standing meetings.  Plaintiffs' Proposed Findings of Fact, Ex. 1, ¶¶ 978-990, 1083-1087.  CISA has at least five sets of recurring meetings with social-media platforms about misinformation and disinformation.  *Id.* ¶ 1078. CISA also has many bilateral meetings with individual platforms.  *Id.* ¶ 1084.

CISA hosts the "USG-Industry" meetings attended by the FBI, CISA, ODNI, DOJ, DHS's I&A, and at least seven or eight major social-media platforms.  *Id.* ¶¶ 978, 981, 986, 1086.  These "USG-Industry" meetings increase in frequency as each election nears, becoming monthly and then weekly shortly before an election.  *Id.* ¶¶ 980, 1087.  These meetings have been ongoing for years and are continuing.  *Id.* ¶¶ 983, 985.  "Concerns about misinformation and disinformation on social media platforms" are discussed at the USG-Industry meetings.  *Id.* ¶ 987.  Federal officials and platforms report to each other on the trends and topics of misinformation that they perceive on social media.  *Id.* ¶¶ 987-988.  CISA also has bilateral planning meetings with Facebook before every USG-Industry meeting.  *Id.* ¶ 984.

In addition, CISA receives regular reports from social-media platforms about any changes to their content-moderation policies.  *Id.* ¶ 979.  Platforms report to CISA when they make their policies more restrictive.  *Id.* ¶ 1103.  CISA also asks platforms to report back on how they acted on reports of misinformation received from CISA, and whether they censored the flagged content. *Id.* ¶ 1061.  In the USG-Industry meetings, the platforms report on changes to their content-moderation policies to the federal officials.  *Id.* ¶ 1024.

*Flagging content for censorship.*  CISA's website proclaims that it "serves as a switchboard for routing disinformation concerns to appropriate social media platforms," and that it has "expanded the breadth of reporting" under this program.  *Id.* ¶ 976.  CISA "switchboards" reports

of misinformation to social-media platforms for censorship by receiving the reports from state and local government officials and others, and forwarding them to platforms such as Facebook, Twitter, and YouTube to be evaluated for censorship under their content-moderation policies. *Id.* ¶¶ 972, 977. The "idea" of such "switchboarding" is to get the platforms to apply their content-moderation policies to the disfavored content, *i.e.*, to censor them. *Id.* ¶ 973.

CISA receives reports of misinformation both from the nonprofit organization Center for Internet Security (CIS) and directly from state and local government officials. *Id.* ¶ 1030. CISA also directs election officials to the Center for Internet Security, whose EI-ISAC program CISA funds, as an alternative route for reporting misinformation to platforms. *Id.* ¶ 1002. The CISA-funded EI-ISAC, operated by CIS, is a clearinghouse for state and local government officials to report misinformation for censorship. CISA coordinates with the CIS on reporting misinformation to the platforms. *Id.* ¶ 1031. The Center for Internet Security works closely with CISA in reporting misinformation to social-media platforms, and CISA serves as a pass-through for reports from CIS to the platforms. *Id.* ¶ 1005. CISA reports misinformation to the platforms without making any assessment of whether it involves foreign or domestic speakers. *Id.* ¶ 1033.

During the 2020 election cycle, CISA maintained a "tracking spreadsheet" with 146 entries of its "switchboarding" activities. *Id.* ¶ 1062. At least six members of CISA "took shifts" in "switchboarding" misinformation reports to platforms during 2020 election cycle. *Id.* ¶ 1063. Two of these CISA staffers were interns simultaneously working for Stanford Internet Observatory and flagging misinformation to platforms on behalf of the Election Integrity Partnership (discussed below). *Id.* ¶ 1064. These shifts would last until late in the evening as election day approached. *Id.* ¶ 1067. State officials sometimes flagged misinformation for censorship because CISA and the FBI had warned them to be on the lookout for such content. *Id.* ¶ 1072. CIS and EIP also

flagged social-media content to local election officials and invited them to review and report it as misinformation.  *Id.* ¶ 1082.

In addition to flagging misinformation to platforms, CISA frequently fact-checks such reports for the platforms.  *Id.* ¶¶ 1076-1080.  CISA also publishes debunks of social-media narratives, knowing that the platforms will use this information to censor those narratives.  *Id.* ¶ 1105.  CISA pushed especially hard for the censorship of content that CISA's Director disfavored, including the "Hammer and Scorecard" narrative in 2020.  *Id.* ¶ 1105.  CISA flags even obvious parody and joke accounts to the platforms for censorship, such as account handles saying "Smoke weed erry day" and "hoes be mad, but this is a parody account."  *Id.* ¶ 1102.

Platforms treat CISA as a privileged reporter of misinformation, often responding with great alacrity to reports, even late in the evening, and reporting back when speech reported by CISA has been censored.  *Id.* ¶ 1081.

Early in the 2022 election cycle, Lauren Protentis of CISA repeatedly urged the platforms to prepare "one pagers" for state and local government officials that would explain to them how to report misinformation directly to the platforms.  *Id.* ¶¶ 1094-1096.  The Center for Internet Security, whose EI-ISAC is funded by CISA, continued to flag misinformation to the platforms during the 2022 election cycle.  *Id.* ¶ 1098.  Like the FBI, CISA runs an "operation center" on election day that engages in reporting misinformation to social-media platforms.  *Id.* ¶ 1097.

**Global Engagement Center Collusion.**   Likewise, the State Department's Global Engagement Center (GEC) colludes with social-media platforms on censorship.  GEC conducts numerous meetings with social-media platforms about disinformation.  *Id.* ¶ 1123.  These include quarterly meetings involving the GEC's senior leadership and more frequent meetings involving its Technology Engagement Team.  *Id.* ¶ 1124-1125.  As with the other agencies, the GEC meets

with the platforms' content-moderation officials, *i.e.*, those charged with enforcing censorship policies. *Id.* ¶ 1126-1127.  The GEC also maintains at times a permanent liaison in Silicon Valley to connect with social-media platforms, who also meets with the platforms' content-moderation teams. *Id.* ¶ 1130.

**Other Agencies' Collusion.**  This collusion extends to other agencies as well.   In particular, platforms routinely treat certain federal agencies as privileged fact-checkers with authority to dictate what will and will not be removed.  Plaintiffs' Proposed Findings of Fact, Ex. 1 ¶ 46, ¶ 396 (Facebook to White House: "There are several claims we will be able to remove as soon as the CDC debunks them."); *id.* ¶ 397 (asking the Surgeon General to provide a health expert to dictate what claims about child vaccines would be censored on Facebook).  As discussed above, platforms treat the CDC, in particular, as a final censorship authority with ultimate authority to dictate what health-related claims will be censored on their platforms.

Other agencies share this privileged-fact-checker role.  Under Dr. Fauci's leadership, NIAID staff, working with HHS, NIH, and White House officials, repeatedly flagged posts, content, and accounts for censorship to social-media platforms, including impersonation and/or parody accounts (and even fan pages) of Dr. Fauci himself.  *Id.* ¶¶ 809-825.  These flaggings include requests such as "PLEASE REMOVE!!!" and "Is there anything else that you can also do to block other variations … so we don't have this happen again?"  *Id.* ¶ 810.  Dr. Fauci approves of the removal of these accounts from social media because he thinks they are "a bad thing," even though they may include parody accounts.  *Id.* ¶¶ 818-820.

NIH, likewise, serves as an authority dictating what speech will be censored on social media.  *Id.* ¶¶ 826-827.  NIH provided the authority, for example, for the CDC to rate claims about

the efficacy of Ivermectin to treat COVID-19 as "*NOT ACCURATE*" to platforms to procure their censorship on social media.  *Id.*

Platforms also coordinate closely with federal officials in controlling messaging on their platforms, including amplifying and subsidizing the government's message to the exclusion of private speakers.  *Id.* ¶¶ 83-84 (Facebook collaborating with the White House to amplify government messaging); *id.* ¶ 129 (Facebook noting that it has "provided more than $30 million in ad credits to help governments … reach people"); *id.* ¶ 379 (White House telling Facebook it would "appreciate a push" to promote the FDA approval of the Pfizer vaccine).

### b.  Pervasive Entwinement.

In addition to conspiracy and collusion, joint activity occurs whenever the government has "so far insinuated itself" into private affairs as to blur the line between public and private action. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974).  This manifests itself in "pervasive entwinement of public institutions and public officials in [the private entity's] composition and workings."  *Brentwood Acad.*, 531 U.S. at 298; *see also Wittner v. Banner Health*, 720 F.3d 770, 777–78 (10th Cir. 2013).  To become pervasively entwined in a private entity's workings, government need only "significantly involve[] itself in the private [entity's] actions and decisionmaking"; it is not necessary to establish that "state actors . . . literally 'override' [the private entity's] independent judgment."  *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 751, 753 (9th Cir. 2020).

Pervasive entwinement exists even if the private party is exercising independent judgment. The Supreme Court has explicitly rejected "the proposition that no person acts under color of state law where he is exercising independent professional judgment."  *West v. Atkins*, 487 U.S. 42, 52 n.10 (1988).  "A finding that individual state actors . . . literally 'override' a nominally private

[actor's] independent judgment might very well provide relevant information.  But it is a mistake to focus too narrowly on this question." *Rawson*, 975 F.3d at 751; *accord West*, 487 U.S. at 52 n.10 ("The exercise of independent professional judgment is not . . . the primary test." (cleaned up)).  "[S]ustained and routine cooperation between" government officials and private actors can constitute joint participation even if the private actors exercise independent judgment, especially if the purpose of the cooperation is "to further [the government's] interest." *Rawson*, 975 F.3d at 750, 754; *see also Roberson v. Dakota Boys & Girls Ranch*, 42 F.4th 924, 935 (8th Cir. 2022) ("In *West*, the doctor's use of professional . . . judgment did not preclude him from being a state actor. Rather, the salient fact was that his relationship with [government officials] was *cooperative*." (internal citation and quotation marks omitted)); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1454 (10th Cir. 1995) (indicating that a "substantial degree of cooperative action" can constitute "joint action").

Here, social-media companies work hand-in-glove with Defendants and their partners in state and local government, the Election Integrity Partnership, and the Virality Project to censor speech expressing viewpoints that Defendants disfavor.  This conduct constitutes significant encouragement, coercion, and conspiracy and collusion as well.

**The Election Integrity Partnership.**  The Election Integrity Partnership is a collaboration among four anti-disinformation nonprofits—Stanford Internet Observatory, the University of Washington's Center for an Informed Public, Graphika, and the Atlantic Council's Digital Forensic Lab—with government and social-media platforms.  *Id.* ¶ 1144.

The EIP lists three government agencies—CISA, the CISA-funded EI-ISAC, and the GEC—as "major stakeholders." *Id.* ¶ 1153, 1180.  The EIP lists them as providing information into the EIP's "Intake Queue," *i.e.*, reporting misinformation for censorship.  *Id.* ¶ 1151.  These

government agencies, as "trusted external stakeholders," submit "tickets" to the EIP to flag content and themes on social media for censorship. *Id.* ¶¶ 1152, 1153, 1175.

The EIP was created "in consultation with" CISA. ¶ *Id.* 1138. CISA interns originated the idea of the EIP, *id.* ¶ 1139, and then CISA officials helped create it. The EIP's "Operational Timeline" includes a July 9, 2020, "Meeting with CISA to present EIP concept." *Id.* ¶ 1169.

The EIP successfully lobbied social-media platforms to adopt more restrictive policies about election-related speech during the late summer and early fall of 2020. *Id.* ¶¶ 1148-1150, 1149, 1217-1220. The EIP then aggressively reported misinformation to the platforms to be censored under those new policies that it pushed them to adopt. *Id.* ¶¶ 1148-1150.

Through its "ticketing" system, the EIP flagged, not just posts, but entire themes and narratives on social media to platforms for censorship, encompassing potentially millions of posts in 2020 alone. *Id.* ¶¶ 1157, 1174-1176. The EIP used teams of researchers working long days to monitor Americans' speech on social-media platforms and report disfavored speech to platforms for censorship. *Id.* ¶ 1178. The EIP created "established relationships with social media platforms to facilitate flagging of incidents for evaluation" under their content-moderation policies. *Id.* ¶ 1182. The EIP coordinated closely with virtually all major platforms, as well as government agencies, in reporting misinformation. *Id.* ¶ 1183-1185.

The EIP boasts that its flagging for censorship had a high success rate: "35% of the URLs we shared with Facebook, Instagram, Twitter, TikTok, and YouTube were either labeled, removed, or soft blocked. … the four major platforms we worked with all had high response rates to our tickets." *Id.* ¶ 1187.

The CISA-funded Center for Internet Security was a major source for EIP tickets.  *Id.* ¶ 1188.  The GEC also reported misinformation to the EIP.  *Id.* ¶ 1197 ("Groups that reported tickets include the State Department's Global Engagement Center…").

The EIP admits that the speech it targets for censorship is not foreign but domestic, grassroots speech by American citizens.  *Id.* ¶ 1158, 1195, 1199.  This includes the speech of highly visible figures with hundreds of thousands or millions of social-media followers, such as Plaintiff Jim Hoft, President Trump, Fox News host Sean Hannity, and Breitbart News.  *Id.* ¶ 1159, 1208.

The EIP is partly funded by the federal government, both through a grant from the U.S. National Science Foundation and from federal funding for the Atlantic Council.  *Id.* ¶¶ 1164-1165.

Numerous current and former CISA personnel also have or had roles in the EIP.  *Id.* ¶ 1163.  Likewise, key EIP personnel such as Alex Stamos, Renee DiResta, and Kate Starbird also have formal roles in CISA.  *See id.* ¶¶ 1179-1171.

The EIP "flag[s] policy violations for platforms."  *Id.* ¶ 1172; *see also id.* ¶ 1177.  The reach of the EIP's monitoring and reporting is enormous; its "tickets" encompassed almost 22 million posts on Twitter alone.  *Id.* ¶ 1202; *see also id.* ¶ 1201.  These disfavored tweets were identified by monitoring 859 million tweets over three months.  *Id.* ¶ 1203.

The EIP was given privileged access to the internal data of some platforms to monitor Americans' social-media speech, *id.* ¶ 1203, but it expressed frustration about not having access to better internal data from Facebook, *id.* ¶ 1204.

The EIP targets truthful speech and core political speech that expresses viewpoints disfavored by the government and the EIP.  *Id.* ¶ 1205-1206.  The EIP's public report indicates that it flagged Plaintiff Jim Hoft's content for censorship repeatedly; the report mentions Hoft's

website 47 times, identifies him as the #2 "superspreader" of election-related misinformation on Twitter, and devotes an entire subsection of the report to his website and social-media accounts. *Id.* ¶¶ 1156, 1192-1194, 1207-1216.  The EIP indicates that it monitored and targeted Hoft's content in 29,207 original tweets and over 840,000 retweets.  *Id.* ¶ 1210.

The EIP indicates that it plans to remain active in the future.  *Id.* ¶ 1222-1224.  In fact, the EIP reformed itself as the "Virality Project" during 2021.  *Id.* ¶ 1223.

**The EIP's Pervasive Entwinement with CISA and the GEC.**  CISA has established relationships with researchers at the Stanford Internet Observatory, the University of Washington, and Graphika—three of the four entities comprising the "Election Integrity Partnership" ("EIP"). *Id.* ¶ 991-992.  Brian Scully admits that CISA has an "established relationship" with the EIP and the Stanford Internet Observatory personnel involved.  *Id.* ¶ 1000.  He also admits that CISA collaborated with the EIP.  *Id.* ¶ 1028.

As noted, CISA interns originated the idea of the EIP.  *Id.* ¶ 993.  The EIP is designed to address a CISA-perceived problem of a "gap" that Brian Scully communicated to the CISA interns. *Id.* ¶¶ 995-996.  The "gap" is the lack of resources that prevents state and local officials from identifying and flagging social-media misinformation that affects their jurisdictions.  *Id.* ¶ 995. The EIP is designed to fill that "gap," *i.e.*, to do the work of monitoring and censoring speech that government lacks the resources to do effectively.

CISA received briefings from the EIP on its work.  *Id.* ¶ 993.  These "conversations" happened "throughout" the EIP's work during the 2020 election cycle.  *Id.* ¶ 997.  CISA also reviewed and relied on the EIP's public reports on social-media misinformation.  *Id.* ¶ 999.

CISA had communications with the EIP's founders, including Alex Stamos and Renee DiResta of the Stanford Internet Observatory, as the EIP was starting up and they were "trying to

45

figure out what the gap was." *Id.* ¶ 993.  CISA briefed the EIP's founders on what the "gap" is that needed to be filled.  *Id.* ¶ 997.  CISA "had conversations with Stanford about the gap" as the EIP was being launched.  *Id.* ¶¶ 1013, 1019.  The EIP's leaders, Alex Stamos and Renee DiResta, also briefed CISA on the EIP in spring or summer 2021.  *Id.* ¶ 1010.

CISA connected the EIP to the Center for Internet Security (CIS), a nonprofit the runs the CISA-funded "EI-ISAC," a clearinghouse through which state and local government officials report misinformation to CIS and CISA to be flagged to the platforms.  *Id.* ¶¶ 993, 997, 1001-1002, 1027.  CISA connected the EIP to the CIS so that they could coordinate directly on flagging misinformation.  *Id.* ¶ 1024.  As a result of CISA's connection, the CIS and the EIP had a relationship and shared information.  *Id.* ¶ 1032.  CISA also connected the EIP to organizations of state and local officials who report misinformation, including the National Association of Secretaries of State (NASS) and the National Association of State Election Directors (NASED). *Id.* ¶¶ 993, 1024-1025.

CISA connected the Center for Internet Security with the EIP because "the EIP was working on the same mission," so "we wanted to make sure that they were all connected." *Id.* ¶ 1004.  Thus, CISA originated and set up the collaborations between local government officials and the CIS, and between the EIP and the CIS.  *Id.*

Two of the interns who originated the idea of the EIP worked simultaneously for CISA and for Stanford Internet Observatory during the 2020 election cycle, and they flagged misinformation to the platforms on behalf of both CISA and the EIP during the same time.  *Id.* ¶¶ 994, 1064-1066.

CISA served a mediating role between the CIS, the EIP, and the platforms, to coordinate their efforts in reporting misinformation to the platforms.  *Id.* ¶ 1007, 1073.  CISA also had direct email communications with the EIP about misinformation reporting.  *Id.* ¶ 1008.

As noted above, CISA coordinated closely with the Center for Internet Security on misinformation reports, and CIS coordinated closely with the EIP, creating a triangle of collaboration.  *Id.* ¶ 1006, 1009.

There is substantial overlap of personnel between CISA and the EIP.  As noted above, two interns worked simultaneously for CISA and EIP in flagging misinformation to platforms on behalf of both entities.  *Id.* ¶¶ 994, 1064-1066.  Alex Stamos, Renee DiResta, and Kate Starbird of the University of Washington—all key players in the EIP—also have formal roles in CISA.  *Id.* ¶¶ 1011-1012.  CISA Director Krebs went into business with Alex Stamos after he left government, and Matt Masterson became a fellow at the Stanford Internet Observatory when he left; both participated in meetings with the EIP while they were at CISA.  *Id.* ¶¶ 1014-1016, 1018, 1021.  Masterson spoke to Stanford about "clarifying the gap" when they were originating the EIP.  *Id.* ¶ 1018.  Masterson was at the meeting with Alex Stamos where the idea of the EIP was first discussed.  *Id.* ¶ 1020.

The EIP was formulated as a means to accomplish what the government is forbidden to do under the First Amendment.  Alex Stamos has publicly stated that the EIP was formed in part because of the government "lacked … legal authorizations" to engage in the EIP's work.  *Id.* ¶ 1048.  The EIP tries to "to fill the gap of the things that the government cannot do themselves." *Id.* ¶¶ 1049, 1054.  Renee DiResta also admits that the EIP was designed to get around the problem of "very real First Amendment questions" that would arise if federal officials did the EIP's monitoring and censorship work directly.  *Id.* ¶ 1055.

The EIP and CIS coordinated directly on specific misinformation reports to platforms, including instances where CIS reported misinformation under EIP tracking numbers.  *Id.* ¶ 1058. CISA then forwarded EIP-ticketed reports received from CIS to the platforms.  *Id.* ¶ 1060.

Forwarding misinformation reports received from the EIP to platforms was CISA's "standard practice." *Id.* ¶ 1069. CISA's "tracking spreadsheet" of "switchboarding" communications contains at least 13 entries that originated from the EIP, including one flagging Plaintiff Jim Hoft's content. *Id.* ¶¶ 1069, 1075. CIS simultaneously forwarded reports of misinformation to both CISA and the EIP. *Id.* ¶ 1070. State and local officials simultaneously forwarded reports of misinformation to CIS, CISA, and the EIP. *Id.* ¶ 1071.

The GEC, likewise, coordinated directly with the EIP by "engaging with the [Election Integrity] partnership." *Id.* ¶ 1132. As noted above, the GEC reported misinformation to the EIP.

**The Virality Project.** After the 2020 election cycle, the EIP continued and expanded the same work under the moniker "Virality Project" (VP), continuing to collaborate closely with federal officials and turning its attention to so-called "misinformation" about COVID-19 vaccines. *Id.* ¶¶ 1236, 1257, 1260. The same four entities were involved in the Virality Project, including Stanford Internet Observatory and many former CISA officials; new nonprofits were added as well. *Id.* ¶¶ 1237-1238.

Like the EIP, the VP targets First Amendment-protected domestic speech by American citizens. *Id.* ¶¶ 1241, 1256. Like the EIP, the VP seeks the censorship of speech that is truthful but does not support the government's preferred narratives on COVID vaccines, including religious claims and core political speech like "*Liberty*: … no government or employer should be able to tell people what to put in their bodies." *Id.* ¶¶ 1264-1265, 1268, 1269.

The VP specifically targets speech by "health freedom" groups, such as Plaintiff Jill Hines' group "Health Freedom Louisiana." *Id.* ¶¶ 1266-1268, 1316-1323, 1331. The VP devotes an entire section of its report to such groups, noting that it targets their speech nationwide. *Id.* ¶ 1317. It discusses such groups almost 100 times. *Id.* ¶ 1331. In targeting such groups, the VP focuses

not only on misinformation about vaccines, but political speech and political organizing against vaccine passports and vaccine mandates—areas where Hines experienced particularly invidious censorship. *Id.* ¶ 1321. The VP targets such groups "across all 50 states" including "at a messaging and *organizing* level." *Id.* ¶¶ 1343-1345 (emphasis added). Like the EIP, the VP also specifically flags Plaintiff Jim Hoft's content as misinformation. *Id.* ¶ 1324.

Like the EIP, the VP pushes platforms to adopt more restrictive content-moderation policies and to engage in more aggressive enforcement of such policies. *Id.* ¶¶ 1242, 1248, 1270. Like the EIP, the VP allows "government partners" to share "tips," *i.e.*, to flag so-called "misinformation" for censorship. *Id.* ¶¶ 1244, 1276. The VP's "stakeholders provided tips … and requests to assess specific incidents and narratives." *Id.* ¶ 1276. These "stakeholders" include "federal health agencies" and "state and local public health officials." *Id.* ¶ 1277.

Six major social-media platforms (Facebook/Instagram, Twitter, Google/YouTube, TikTok, Medium, and Pinterest) cooperated in the VP, "acknowledging content flagged for review and acting on it in accordance with their policies" and providing feedback on "the reach of narratives previously flagged by VP." *Id.* ¶ 1280.

Like the EIP, the VP targets speech by influential speakers with large audiences, affecting audiences of millions of people. *Id.* ¶¶ 1255 (video censored after "tens of millions of views"); *id.* ¶ 1297 (targeting "recurring actors" that create "viral" incidents); *id.* ¶¶ 1313-1314, 1344-1348 (Alex Berenson and Tucker Carlson); *id.* ¶ 1325 (Breitbart News and One America News Network); *id.* ¶¶ 1334-1341 (Fox News, The Daily Wire, Candace Owens, Robert F. Kennedy Jr. (considered "especially pernicious" because of his large audience), America's Frontline Doctors, Simone Gold, Dr. Joseph Mercola, and others).

Like the EIP, the VP engages in monitoring of Americans' speech on social media on a massive scale. *Id.* ¶¶ 1272-1276. The VP "systematically monitored activity across social media platforms" for seven months. *Id.* ¶ 1288. The VP monitored about 6.7 million social-media "engagements" per week, over 200 million over seven months. *Id.* ¶ 1294. The VP reported 174 "tickets" tracking vaccine-related narratives and themes to platforms for censorship. *Id.* ¶ 1291. The vast majority of speech flagged and tracked by the VP was not false or incorrect speech. *Id.* ¶¶ 1295, 1303-1313.

Federal officials are pervasively entwined with the Virality Project. The Surgeon General pushes platforms to share information with the Virality Project. *Id.* ¶¶ 226-227. His Office coordinated with the Virality Project on the Surgeon General's Health Advisory and "brainstorm[ed]" with the Virality Project. *Id.* ¶ 228, 231. The Surgeon General repeatedly echoes the key messaging of the Virality Project. *Id.* ¶ 319. The Surgeon General launched his Health Advisory on Misinformation in an event hosted by Stanford Internet Observatory, which leada the Virality Project. *Id.* ¶¶ 330-337. Dr. Murthy admitted that his Office had been "partnered with" SIO for "many months." *Id.* ¶ 337.

The VP notes its coordination with "federal government agencies," touting its "strong ties with several federal government agencies, most notably the Office of the Surgeon General (OSG) and the CDC," which involved flagging vaccine-related content on social media ("situational awareness around emerging narratives"). *Id.* ¶ 1279. The VP and the Surgeon General's office collaborated closely, as the VP boasts that "the Office of the Surgeon General incorporated VP's research and perspectives into its own vaccine misinformation strategy," including its Health Advisory on Misinformation. *Id.* ¶ 1249. The VP repeatedly cites the work of Surgeon General Murthy. *Id.* ¶ 1359.

The VP "directly informed counter-messaging efforts by … public health officials," and "provided strategic insights to government entities such as the OSG, CDC, and the Department of Health and Human Services." *Id.* ¶ 1284. As noted, the VP even hosted Surgeon General Murthy for an event announcing his Health Advisory. *Id.* ¶ 1285.

The VP matches the Surgeon General's messaging on social-media misinformation verbatim, calling for "transparency," "accountability" and a "whole-of-society" effort to address misinformation. *Id.* ¶¶ 1247, 1251, 1353-1355. This includes demanding data-sharing from the platforms, a key demand of the White House and Surgeon General directly echoed by the VP. *Id.* ¶ 1293. It also includes the "recommendations" for platforms to increase censorship in the VP's report and the Surgeon General's Health Advisory, including demands for data-sharing. *Id.* ¶¶ 1363-1364.

For all these reasons, Plaintiffs are likely to establish that Defendants' conduct involves government action—it involves significant encouragement, coercion, deception, conspiracy/collusion, and pervasive entwinement. Most of the conduct of the federal agencies and officials discussed herein, moreover, falls into multiple such categories.

### 3.    Defendants' Censorship Activities Violate the First Amendment.

Given a finding of government action for all these activities, Defendants' social-media censorship activities violate the First Amendment. In fact, the censorship here is particularly egregious because it unites three forms of government action considered most offensive to the First Amendment: viewpoint discrimination, targeting core political speech, and prior restraints.

First, the Court has held that First Amendment protection is "at its zenith" when the government attempts to restrict "core political speech." *Buckley v. Am. Const. Law Found., Inc*., 525 U.S. 182, 186–87 (1999); *see also Citizens United v. F.E.C.*, 558 U.S. 310, 485 (2010)

(Thomas, J., concurring in part and dissenting in part) (describing "core political speech" as the "primary object of First Amendment protection").  Although it includes speech about elections, "core political speech need not center on a candidate for office" but encompasses any "advocacy of a politically controversial viewpoint."  *McIntyre v. Ohio Elec. Comm'n*, 514 U.S. 334, 347 (1995). "No form of speech is entitled to greater constitutional protection than" core political speech.  *Id.*  Here, virtually all the election-related speech targeted by CISA, the GEC, the FBI, and the Election Integrity Partnership is core political speech.  So too is the great majority of the health-related speech, as it focuses on politically sensitive topics like the safety and efficacy of COVID vaccines, mask mandates, and similar topics.  Each of these topics is highly "politically controversial."  *Id.*

Second, "viewpoint-based" regulation is especially "obnoxious" to the First Amendment. *Hill v. Colorado*, 530 U.S. 703, 723 (2000). Indeed, the "rationale of the general prohibition" against *content*-based regulation "is that content discrimination raises the specter that the Government may effectively drive certain ideas or *viewpoints* from the marketplace." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992) (emphasis added and quotation marks omitted). Accordingly, courts are even more skeptical of viewpoint-based restrictions on speech than they are of content-based restrictions. *See, e.g.*, *Int'l Women's Day March Planning Comm. v. City of San Antonio*, 619 F.3d 346, 359 (5th Cir. 2010) ("[C]ontent-based burdens on speech in a public forum are subject to strict scrutiny, while viewpoint-based burdens are [absolutely] unconstitutional."). As the Supreme Court famously wrote in *West Virginia State Board of Education v. Barnette*, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."  319 U.S.

624, 642 (1943).  Here, virtually all of Defendants' requests for censorship is viewpoint-based.  Defendants have not procured the censorship of *all* speech about elections and COVID-19 vaccines; they have only sought to censor the *views* about such topics that contradict the government's preferred narratives.  This is quintessential viewpoint discrimination.

Third, prior restraints are "the most serious and least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).  Although the quintessential prior restraint is a law requiring government approval prior to publication, *see* 4 WILLIAM BLACKSTONE, COMMENTARIES *152, the Supreme Court treats as a *de facto* prior restraint any government restriction on speech whose "object . . . is not punishment but suppression."  *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 703, 711–12 (1931) (treating a statute as an unconstitutional prior restraint even though it was enforced against the defendants only after they had circulated the offending publication); *see also Bantam Books*, 372 U.S. at 60–70 (treating agency pressure to stop the circulation of "books which have for sometime been widely distributed" as a *de facto* regime of prior restraint).  Here, Defendants' censorship seeks not to impose consequences on disfavored viewpoints, but to silence disfavored viewpoints on social media.  This is a massive system of *de facto* prior restraints.

Because Defendants' conduct violates three of the most fundamental precepts of the First Amendment, it is egregiously unconstitutional.  Plaintiffs are likely to succeed on their First Amendment claim.

### B.   Plaintiffs Are Likely to Succeed on their APA and *Ultra Vires* Claims.

Plaintiffs are also likely to succeed on the merits of their claims under the Administrative Procedure Act (APA), 5 U.S.C. § 500 et seq, as well as their statutory *ultra vires* claim.  Plaintiffs explained in their Response to Defendants' Motion to Dismiss why 5 U.S.C. §§ 702 and 704

provide a cause of action and a waiver of sovereign immunity for their APA claims.  Doc. 161-1, at 51–56.  Plaintiffs also explained why they do not need a waiver of sovereign immunity for their *ultra vires* claim and why, even if they did, 5 U.S.C. § 702 provides one.  *Id.* at 50–51.  Plaintiffs incorporate by reference those explanations here.

The APA directs a reviewing court to "hold unlawful and set aside agency action" that the court concludes is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law."  5 U.S.C. § 706(2).  Agency Defendants' censorship program meets each of these conditions.

To decide whether agency action was "arbitrary, capricious, [or] an abuse of discretion," § 706(2)(A), "the court the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). If the agency "relied on factors which Congress has not intended it to consider" or "entirely failed to consider an important aspect of the problem," then its action was arbitrary and capricious.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983).  Here, Agency Defendants entirely failed to consider many important facts about their censorship program, including (1) that it targets core political speech for suppression, (2) that it is viewpoint discriminatory, and (3) that it subjects speech to *de facto* prior restraint. And Defendants' decision to proceed with the program despite its manifest unconstitutionality was "a clear error of judgment."  *Overton Park*, 401 U.S. at 416.

Plaintiffs have already explained why Agency Defendants' censorship program is "contrary to constitutional right" and "in excess of statutory . . . authority." § 706(2)(B)–(C).

Finally, Agency Defendants launched their censorship program "without observance of procedure required by law," § 706(2)(D), because they failed to provide the public with notice and an opportunity to comment.  The APA exempts "interpretative rules," "general statements of policy," and "rules of agency organization, procedure, or practice" from notice and comment. § 553(b)(A).  But these exceptions "must be narrowly construed," *Texas v. United States*, 40 F.4th 205, 228 (5th Cir. 2022).  And even broadly construed, they would not encompass Defendants' censorship program.  Because the program does more than "clarify or explain existing law or regulations," it is no mere "interpretative rule[]." *Alcarez v. Block*, 746 F.3d 593, 613 (9th Cir. 1984).  Because the program does not "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power," it is no mere "general statement of policy." *Texas*, 40 F.4th at 228 (alteration omitted).  And because the program "encodes . . . substantive value judgment[s]" and "trenches on substantial private rights or interests," it is no mere "rule[] of agency organization, procedure, or practice." *Am. Fed. of Lab. & Cong. of Indus. Orgs. v. N.L.R.B.*, 57 F.4th 1023, 1034–35 (D.C. Cir. 2023) (cleaned up) (limiting this exception to "internal house-keeping measures").

In addition, Plaintiffs are likely to prevail on the merits of their *ultra vires* claim because no statute provides "any colorable basis" on which Defendants could claim the authority to implement their censorship program.  *Danos v. Jones*, 652 F.3d 577, 583 (2011) (quotation mark omitted).  Defendants have failed to identify a single statute that they are prepared to argue gives them the authority for their mass-censorship program.  Nor could they: the censorship program is "plainly invalid," *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 716 (1982) (White, J., concurring in the judgment in part and dissenting in part).

### C.   Plaintiffs Are Likely to Establish Standing.

In the context of a preliminary injunction, "the 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). To have standing, a plaintiff must face or have suffered an injury traceable to the challenged conduct of the defendant and likely to be redressed by a favorable decision. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992). At the preliminary-injunction stage, a movant need only show that he likely to prove that he has standing. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020). Because Plaintiff States and the individual Plaintiffs seek the same relief, Plaintiffs need only show that they are likely to prove that at least one Plaintiff has standing. *See Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). In fact, all Plaintiffs have standing. Plaintiffs incorporate by reference their prior briefing on standing in response to Defendants' motion to dismiss. Doc. 161-1, at 5-49.

### 1.   Plaintiffs Are Likely to Prove Injury.

Plaintiffs' Proposed Findings of Fact set forth the facts underlying the imminent, ongoing injuries to both the individual Plaintiffs, Ex. 1, ¶¶ 1367-1411, and to the State Plaintiffs, *id.* ¶¶ 1427-1442. They also describe the injuries to other, similarly situated speakers and listeners of social-media speech. *Id.* ¶¶ 1412-1426.

The individual Plaintiffs assert violations of their First Amendment right to speak and listen freely without government interference. *See Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (holding that government "censorship equally infringe[s]" the speaker's rights and "the rights of [the audience] to whom the [speech] was addressed"). A personal loss of First Amendment rights is "unquestionably" an injury that supports standing.

*Croft v. Governor of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009); *see also McNamara v. Moody*, 606 F.2d 621 (5th Cir. 1979) (affirming a nominal-damages award under 42 U.S.C. § 1983 for a First Amendment free-speech violation absent any other injury).

The State Plaintiffs, moreover, assert seven specific imminent, ongoing injuries. *See* Doc. 161-1, at 14-29. Among other things, Defendants' own witness, Carol Crawford of the CDC, attests to the significance of the States' injury to their interest in being able to read and follow the uncensored speech and opinions of their constituents on social media. Plaintiffs' Proposed Findings of Fact, Ex. 1, ¶¶ 1435-1437. The CDC agrees with the States that government agencies have a strong interest in reading and following the *uncensored* speech and opinions of their constituents. *Id.* ¶¶ 590-595. The CDC admits that "it does help … for communicators to know what conversations occurs on social media because it helps us identify gaps in knowledge, or confusion, or things that we're not communicating effectively that we need to adjust." *Id.* ¶ 591. Having a "full picture" of what people are saying on social media allows the government agency to "adjust communication materials" to address their actual thoughts and concerns. *Id.* ¶ 594.

The evidence also demonstrates the imminent and ongoing nature of Plaintiffs' injuries. Plaintiffs both experience ongoing injury from censorship and face the imminent prospect of further censorship in the future, as all Defendants are continuing and expanding their censorship efforts. For example, the White House continues its censorship campaign throughout 2022 without relenting. *Id.* ¶¶ 188-199. The White House also continues to expand the topics of its social-media censorship campaign, to include new topics such as "climate disinformation," abortion-related speech, "gendered disinformation," and economic policy. *Id.* ¶¶ 200-211. Likewise, when it comes to misinformation, the CDC's "focus is not solely on COVID. We're focusing on other topics" as well, and the CDC colludes with social-media platforms about emerging topics like

medication abortion. *Id.* ¶ 562.  CISA and its Director Jen Easterly have made a series of public statement indicating that they intend to expand their anti-disinformation efforts in the future. *Id.* ¶¶ 1106, 1112-1114, 1118.  Recent DHS document indicate that DHS intends to target misinformation on new topics like "the origins of the COVID-19 pandemic," "the U.S. withdrawal from Afghanistan," "racial justice," and "the nature of U.S. support for Ukraine." *Id.* ¶ 1110. CISA has already been involved in an initiative against so-called misinformation about the U.S.'s involvement in Ukraine. *Id.* ¶ 1111.  CISA is also working with Treasury on an initiative to address "misinformation" about the financial-services industry. *Id.* ¶¶ 1115-1116.  The EIP continues to operate through the 2022 election cycle. *Id.* ¶ 998.  At every turn, Defendants' censorship enterprise is expanding its efforts to dictate and control what Americans may say on social media, the "modern public square." *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017).

## 2.  Plaintiffs Are Likely to Prove Traceability.

Plaintiffs are likely to prove that their injuries are fairly traceable to Defendants' actions of inducing and jointly participating in social-media companies' viewpoint-based censorship.  But-for causation is sufficient for traceability. *Duke Power Co. v. Carolina Envt. Study Grp.*, 438 U.S. 59, 74–75 (1978).  But it is not necessary. *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019); *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 714 (6th Cir. 2015).  On the contrary, "the fairly-traceable inquiry is much more forgiving than the . . . tort-causation inquiry," *Webb ex rel. K.S. v. Smith*, 936 F.3d 808, 814 (8th Cir. 2019), and even the tort-causation inquiry does not require but-for causation, RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 27 (Am. L. Inst. 2022).  For example, a defendant who aided and abetted a tort is liable for it, RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR ECONOMIC HARM § 28 (Am. L. Inst. 2022), even if his act of aiding and abetting was not a but-for cause of the tort, *id.* cmt. e.

Likewise, a party to a conspiracy is liable for torts committed in furtherance of the conspiracy by his coconspirators, *id.* § 27, even if his own conduct was not a but-for cause of the torts, *id.* rptr. note c. *A fortiori*, "injuries resulting from [a third party's acts] are . . . 'fairly traceable' to" the defendant if the defendant "aided or abetted their commission," *Mastafa v. Australian Wheat Bd. Ltd.*, No. 07 Civ. 7955(GEL), 2008 WL 4378443, at *2 (S.D.N.Y. Sep. 25, 2008), or the third party committed the acts in furtherance of a conspiracy to which the defendant was a party, *see In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 55 (D.D.C. 2016).

Under these principles, Plaintiffs are likely to prove that the injuries they assert are fairly traceable to the challenged actions of Defendants. Plaintiffs are likely to prove that Defendants' acts of inducing and jointly participating in social-media companies' viewpoint-based censorship are but-for causes of that censorship, including censorship that has affected the individual Plaintiffs and Plaintiff States' citizens as speakers or audience members. Plaintiffs are also likely to prove that Defendants aided and abetted the censorship and that the social-media companies committed the censorship in furtherance of a conspiracy with Defendants to suppress speech. Each of these grounds—but-for causation, aiding and abetting, and conspiracy—is individually sufficient to establish that the injuries to Plaintiffs' and Plaintiff States' citizens' ability to speak and listen are fairly traceable to the challenged actions of Defendants.

To be sure, "injury that results from the independent action of some third party not before the court" is not fairly traceable to the defendant. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976). But acts of a third party "are not 'independent' of steps taken to aid and abet those acts." *Mustafa*, 2008 WL 4378443, at *2; *accord In re TelexFree Sec. Litig.*, --- F. Supp. 3d ---, 2022 WL 3915989, at *13 (D. Mass. Aug. 31, 2022). Nor are acts in furtherance of a conspiracy to which the defendant is a party. *See Domestic Airline Travel Antitrust Litig.*, 221 F.

Supp. 3d at 55, 57 (drawing a contrast between "independent decision[s]" and a coconspirator's acts in furtherance of the conspiracy).  Here, Defendants conduct falls into the latter categories.

Moreover, even assuming the connection between Defendants' conduct and Plaintiffs' other injuries were too attenuated to support standing (which it is not), the injuries to the individual Plaintiffs' First Amendment rights and to Plaintiff States' quasi-sovereign interests would still be fairly traceable to Defendants' conduct.  All Plaintiffs are suffering censorship, which is an injury no matter who is responsible for it.  But for both the individual Plaintiffs and Plaintiff States' citizens, censorship *at the hands of the government* is a distinct injury insofar as it is an invasion of their constitutional rights.  *See Al-Amin v. Smith*, 511 F.3d 1317, 1333–35 (11th Cir. 2008) (holding that like being deprived of due process, being deprived of First Amendment rights is *per se* a cognizable injury, independently of "any actual injury" that it entails). Without Defendants' involvement, social-media censorship by private companies would not violate constitutional rights. *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019).  Therefore, the violation of the individual Plaintiffs' and Plaintiff States' citizens' constitutional rights is traceable to Defendants even assuming (contrary to fact) that the other injuries Plaintiffs assert are not.  *See Duke Power*, 438 U.S. at 74-75 (recognizing that but-for causation is sufficient for traceability).

In any event, here, as discussed further above, there is overwhelming evidence that Defendants' actions are the direct and but-for cause of the censorship that injures Plaintiffs.  For example, White House officials repeatedly and successfully press for censorship of so-called "borderline" content that *does not violate platform policies*, and thus would not be censored but for federal pressure.  *See, e.g.,* Plaintiffs' Proposed Findings of Fact, Ex. 1, ¶¶ 57, 64 (promising the White House that Facebook would censor "often-true" but "sensationalized" content); ¶ 73

(imposing forward limits on non-violative speech on WhatsApp); ¶¶ 89-92 (assuring the White House that Facebook will use a "spectrum of levers" to censor content that "do[es] not violate our Misinformation and Harm policy, including "true but shocking claims or personal anecdotes, or discussing the choice to vaccinate in terms of personal and civil liberties"); ¶¶ 93-100 (agreeing to censor Tucker Carlson's content at the White House's behest, even though it did not violate platform policies), ¶¶ 103-104 (Twitter deplatforming Alex Berenson at White House pressure); ¶ 171 (Facebook deplatformed the Disinformation Dozen immediately after these comments). Facebook officials scrambled to get back into the White House's good graces. *Id.* ¶¶ 172, 224 (pleading for "de-escalation" and "working together").

The facts demonstrate a clear pattern of platforms responding to White House pressure by agreeing to greater and greater censorship, including of non-violative speech. This is strikingly clear in the platforms' response to the one-two punch of Jennifer Psaki's and Surgeon General Murthy's public comments on July 15, 2021, followed by President Biden's accusation that the platforms are "killing people" on July 16. *Id.* ¶¶ 141-162. Twitter suspended Alex Berenson within hours of the President's statement, and later deplatformed him. *Id.* ¶ 163. Facebook took prompt action against the Disinformation Dozen. *Id.* ¶ 170. YouTube immediately assured the White House that it was aggressively censoring non-violative content. *Id.* ¶ 174.

As another example, virtually all the "flagging" activity—by the White House, the CDC, NIAID, CISA, the FBI, the GEC, the EIP, and the Virality Project—obviously results in censorship that the platforms would not impose *but for* Defendants' actions. The whole point of "flagging" content for censorship is to *call the platforms' attention to content that they have not censored*, in order to get them to censor it. The fact that content is flagged means that the platforms have not censored it, and federal officials think that they should. "Flagging" would make no sense if it were

61

not the but-for cause of censorship. The Government's witnesses effectively admit this. For example, Brian Scully acknowledges that CISA's "switchboarding" activity causes speech to be censored that otherwise would not have been censored, because Scully agrees that "if it hadn't been brought to their attention [by CISA's flagging] then they obviously wouldn't have moderated it." *Id.* ¶ 974.

In addition, the social-media censorship traceable to Defendants' conduct includes many specific examples of Defendants' inducing the censorship of Plaintiffs' social-media content in particular. Both CISA and the Election Integrity Project repeatedly flagged Plaintiff Jim Hoft's content for censorship, the latter on a massive scale. The Virality Project, working in collaboration with the Surgeon General's Office, particularly targeted "health freedom" groups like Plaintiff Jill Hines's "Health Freedom Louisiana." The Great Barrington Declaration was censored immediately after Dr. Fauci's campaign to suppress it. The YouTube video of Dr. Bhattacharya and Dr. Kulldorff's roundtable with Governor DeSantis was censored pursuant to a policy change that YouTube adopted at Dr. Fauci's instigation. And so forth. All Plaintiffs' censored content falls within the scope of Defendants' censorship campaign. Plaintiffs are likely to prove traceability.

### 3. Plaintiffs Are Likely to Prove Redressability.

Finally, Plaintiffs are likely to prove that a favorable decision would redress their injuries. Because past injury is not redressable by injunctive or declaratory relief, *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019), Plaintiffs must prove that, at least as of when they filed suit, their injuries were ongoing, or new injuries were imminent, but would likely be stopped by injunctive or declaratory relief against Defendants, *see Davis v. F.E.C.*, 554 U.S. 724, 734 (2008) ("While

. . . the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed.").

A plaintiff's standing is assessed as of the filing of the first complaint that the plaintiff joined. *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004); *see also Davis v. F.E.C.*, 554 F.3d 724, 734 (2008) ("While . . . the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."); *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013) ("[S]tanding . . . is assessed at the time of the original complaint, even if the complaint is later amended.").  The State Plaintiffs filed suit on May 5, 2022, *see* Doc. 1, and the individual Plaintiffs joined on August 2, 2022, *see* Doc. 45.

The State Plaintiffs already have more than enough evidence to prove that their injuries were ongoing as of May 5, 2022. For example, preliminary discovery has revealed that Defendant CDC was working with Facebook in June 2022 to expand Facebook's censorship policies to encompass skepticism about COVID-19 vaccines for children.  On June 7, Facebook notified CDC officials that Facebook's censorship policies for claims about childhood COVID-19 vaccines would wait for government approval.  Doc. 71-7, at 6 ("We'll hold on our policy changes until we get the final word from you.").  On June 22, the new and expanded policy that Facebook adopted under Defendants' supervision took effect.  Doc. 71-3, at 5 ("As of today[, June 22, 2022], all COVID-19 vaccine related misinformation and harm policies on Facebook and Instagram apply to people 6 months or older . . . . We expanded these policies in coordination with the CDC and ensured that we also included false claims that might be connected to children . . . .").  Defendant Robert Flaherty was involved in the effort too.  *See id.* (email about the new policy addressed to "Rob and Team").  On June 13, Flaherty denied Facebook's request for permission to stop

submitting its biweekly "Covid Insights Report" to the White House, because he wanted to monitor Facebook's suppression of COVID-19 misinformation "as we start to ramp up under 5 vaccines." Doc. 71-3, at 6.   Facebook had previously informed Defendants Flaherty, Courtney Rowe, and Eric Waldo that it "expect[ed] the approval of COVID vaccines for kids ages 5-11 w[ould] be another significant peak in new misinformation claims."   Doc. 86-5, at 4.   The rollout of vaccines for children under age five undoubtedly prompted another "peak" in content to be censored.   *Id.*

Similarly, the individual Plaintiffs are likely to show that their injuries were both imminent and ongoing as of August 2, 2022.   The documents Plaintiffs obtained indicate that Defendants are planning to continue their censorship activities into the future, well beyond August 2.   For example, preliminary discovery revealed that Defendant CISA "has a burgeoning MDM [Mis-, Dis-, and Mal-Information] effort" that includes "directly engaging with social media companies to flag MDM," with focus in calendar year 2022 on the midterm elections in November.   Doc. 71-8, at 2. Spearheading this effort is an "MDM Subcommittee," which was working under Defendant Jennifer Easterly's direction to "continu[e]/refin[e] the mission of Rumor Control" for the 2022 midterm elections.   Doc. 86-7, at 14.   CISA "wants to insure that it is set up to extract lessons learned from 2022 and apply them to the agency's work in 2024."   Doc. 71-8, at 2.   Accordingly, the "MDM Subcommittee" is working under Easterly's direction to perfect its "mission of Rumor Control" in time for the 2024 elections.   Doc. 86-7, at 14.   All of this indicates that Plaintiffs are likely to show that each Plaintiff has been affected by *new* incidents of censorship occurring at Defendants' behest after that Plaintiff filed or joined this lawsuit.   And *past* decisions to suppress speech expressed by or addressed to Plaintiffs or Plaintiff States' citizens also impose ongoing injury on Plaintiffs insofar as the speech remains suppressed.   Furthermore, the censorship that the individual Plaintiffs have experienced in the past continues to chill their speech in the present.

This chilling effect also violates the rights of the individual Plaintiffs' audience members, including many in Plaintiff States.

For similar reasons, Plaintiffs have standing to assert their procedural APA claim.  *See Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007) ("When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.").  Here, there is at least "some possibility" that calling the agencies' attention to the grave constitutional problems with their censorship activities will prompt them to reconsider this censorship enterprise.

## II.     The Other Three Equitable Factors Strongly Favor a Preliminary Injunction.

In addition to showing a likelihood of success on the merits, Plaintiffs must show that "a substantial threat of irreparable injury" exists, "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and "that the grant of an injunction will not disserve the public interest."  *Ladd*, 777 F.3d at 288.

Where, as here, "a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied."  *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc).  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Defendants have no cognizable interest in maintaining an unconstitutional program of *de facto* prior restraint, *see BST Holdings, L.L.C. v. Occupational Safety & Health Admin., U.S. Dep't of Lab.*, 17 F.4th 604, 618 (5th Cir. 2021) ("Any interest [an agency] may claim in enforcing an unlawful (and likely unconstitutional) [regulation] is illegitimate."); whereas Plaintiffs have an overriding interest in protecting the First Amendment freedoms of individual Plaintiffs, the

millions of similarly situated speakers and listeners, and the millions of citizens Plaintiff States represent as *parentes patriae*, *see Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 381 (1973) ("[T]he freedoms of speech and of the press rank among our most cherished liberties."). "Injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013).

### III.    The Court Should Grant Classwide Injunctive Relief Under Rule 23(b)(2).

To make preliminary injunctive relief as fully effective as possible, the Court should grant classwide preliminary injunctive relief under Rule 23(b)(2).  To that end, Plaintiffs will shortly file a motion for leave to amend the Complaint to include class allegations and a motion for certification of an injunctive class under Rule 23(b)(2) at the conclusion of expedited preliminary-injunction-related discovery.  The Court should grant class certification and grant classwide preliminary injunctive relief.  Rule 23(b)(2) was designed precisely for cases like this, where a plaintiff alleges large-scale civil-rights violations targeting entire classes of people.  *See, e.g.*, *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 284 (W.D. Tex. 2007) ("Rule 23(b)(2) was promulgated essentially as a tool for facilitating civil rights class actions." (cleaned up)).  Because Defendants are acting "on grounds that apply generally to the class" by targeting everyone who expresses the views they disfavor, "injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

Classwide injunctive relief is particularly appropriate here, because a classwide injunction is required to protect Plaintiff States' quasi-sovereign interest in the ability of their citizens to engage in free exchange of ideas on social media.  This is an interest that each Plaintiff "State has in the well-being of its populace" as a whole, not merely an interest in the well-being of handful of individual residents.  *Alfred L. Snapp & Son v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 602–

07 (1982).  Each Plaintiff State has millions of citizens who use social media and have a right to hear and listen to other users, both inside and outside of Plaintiff States.  Only an injunction that protects the entire forum of social media from Defendants' censorship is sufficient to redress the injuries to Plaintiff States' populace as a whole.

Furthermore, classwide injunctive relief is necessary to provide adequate redress for the injuries that the individual Plaintiffs and the Plaintiff States are suffering directly.  One of the ways Defendants are injuring Plaintiff States directly is by compromising their "ability to follow, measure, and understand the nature and degree of" their citizens' views and concerns on matters of public importance.  Doc. 10-6, ¶ 6; Doc. 10-13, ¶ 6.  Classwide relief that protects the rights of social-media users as a whole is necessary to remediate this injury.  Likewise, the individual Plaintiffs closely follow the accounts of other social-media users, many of whom are experiencing or are at risk of experiencing censorship by social-media companies with the encouragement or joint participation of Defendants.  An injunction that protects only their rights as speakers, but not the rights of other speakers, would not remediate the injuries they experience daily as *audience* members participating in ongoing dialog on social media.

## CONCLUSION

For the reasons stated, the Court should enter the preliminary injunction requested in Plaintiffs' Motion for Preliminary Injunction, Doc. 10, at 1, with the following modifications in light of the evidence.  The Court should enter a preliminary injunction preventing Defendants, and their agents, officers, employees, contractors and all those acting in concert with them, from taking any steps to demand, urge, encourage, pressure, coerce, deceive, collude with, or otherwise induce any social-media company or platform for online speech, or any employee, officer, or agent of any such company or platform, to censor, suppress, remove, de-platform, suspend, shadow-ban, de-

boost, deamplify, issue strikes against, restrict access to, demonetize, or take any similar adverse action against any speaker, content, or viewpoint expressed on social media. The Court should also preliminarily enjoin Defendants from acting in concert with any others, including but not limited to persons and entities associated with the Center for Internet Security, the Election Integrity Partnership, and the Virality Project, to engage in the aforementioned conduct, and from acting in concert with any such others who are engaged in any of the aforementioned conduct.

The injunction should extend to the White House Defendants (White House Press Secretary, Rob Flaherty, Andrew Slavitt, Clarke Humphrey, Courtney Rowe, Benjamin Wakana, Gina McCarthy, and their official successors and those acting in concert with them); the Surgeon General Defendants (Dr. Vivek H. Murthy, HHS, Eric Waldo, and their official successors and those acting in concert with them); the CDC Defendants (Centers for Disease Control, HHS, Carol Crawford, Kate Galatas, Jay Dempsey, and their official successors and those acting in concert with them); the Census Defendants (U.S. Census Bureau, Jennifer Shopkorn, Zachary Henry Schwartz, and their official successors and those acting in concert with them); the NIAID Defendants (NIAID, HHS, Dr. Anthony Fauci, and his official successor and those acting in concert with them); the FBI Defendants (FBI, DOJ, Laura Dehmlow, Elvis Chan, and their official successors and those acting in concert with them); the CISA Defendants (Cybersecurity and Infrastructure Security Agency, DHS, Director Jen Easterly, Brian Scully, Matthew Masterson, Lauren Protentis, Geoffrey Hale, Allison Snell, Kim Wyman, and their official successors and those acting in concert with them); and the GEC Defendants (State Department, Leah Bray, Daniel Kimmage, Samaruddin K. Stewart, Alexis Frisbie, and their official successors and those acting in concert with them).

Dated: March 6, 2023

**ANDREW BAILEY**
**Attorney General of Missouri**

*/s/ Charles F. Capps*
Joshua M. Divine, Mo. Bar No. 69875*
 *Solicitor General*
Charles F. Capps, Mo. Bar No. 72734*
 *Deputy Solicitor General*
Todd A. Scott, Mo. Bar No. 56614*
 *Senior Counsel*
Kenneth C. Capps, Mo. Bar No. 70908*
 *Assistant Attorney General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
charles.capps@ago.mo.gov
*Counsel for State of Missouri*


*/s/ Jenin Younes*
Jenin Younes *
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta*
*Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty,*
*and Jill Hines*


Respectfully submitted,

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

*/s/ D. John Sauer*
Elizabeth B. Murrill (La #20685)
 *Solicitor General*
Tracy Short (La #23940)
 *Assistant Attorney General*
D. John Sauer (Mo #58721)*
 *Special Assistant Attorney General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*


*/s/ John C. Burns*
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*


\*  admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 6, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*