# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| STATE OF LOUISIANA, STATE OF MISSOURI, *et al.*,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,<br><br>        *Defendants*. | Case No. 3:22-cv-01213 |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT IN SUPPORT**
**OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

Plaintiffs respectfully submit the following Proposed Findings of Fact as Exhibit 1 to their supplemental brief in support of a preliminary injunction.  Plaintiffs incorporate by reference the evidence, documents, and exhibits previously filed in this case; where cited herein, they are cited by docket number (e.g. "Doc. 174-1, at 31" is page 31 of ECF No. 174-1).  The deposition transcripts and exhibits to depositions are filed separately; they are cited herein as "[Witness Last Name] Dep. Page:Line," *e.g.*, "Fauci Dep. 1:3-5" is lines 3-5 of page 1 of Dr. Fauci's deposition, and "Scully Dep. 10:22-11:5" is page 10, line 22 through page 11, line 5 of Brian Scully's deposition.  Plaintiffs are also filing the video recordings of the depositions with the Court so that the Court may view the testimony of the Government's witnesses and assess the witnesses' credibility for itself.  The Declaration of Jasimiel Jones, submitting supplemental exhibits in addition to the deposition and transcript and attached as Exhibit 2, is cited herein as "Jones Decl. Ex. __, at __" *e.g.*, pages 1-3 of Exhibit A to the Jones Declaration is "Jones Decl. Ex. A, at 1-3." Plaintiffs' previously filed exhibits attached to the Declaration of Tammy Glenn, Doc. 10-1, are cited as "Glenn Decl. Ex. __, at __; Doc. 10-1, at __."  In addition, these Findings regularly refer to the company formerly known as Facebook, now known as Meta, which owns Facebook, Instagram, WhatsApp, and other platforms, as "Facebook," consistent with common usage in documents.

I.     **The Campaign Of Public Threats Against Social-Media Platforms To Pressure Them To Censor More Speech on Social Media.**

1.  Federal officials, including Defendants, have made a long series of public statements since at least 2018 demanding that social-media platforms increase their censorship of speech and speakers disfavored by these officials, and threatening adverse consequences – such as repeal or

reform of Section 230 immunity under the Communications Decency Act, antitrust scrutiny or enforcement, increased regulation, and other measures – if the platforms do not increase censorship. The private communications between government officials and social-media platforms addressing disinformation, misinformation, and censorship set forth herein were made against the backdrop of these public threats.

2. The immunity provided by Section 230 of the Communications Decency Act is extremely valuable for social-media platforms, so threatening to amend or repeal that immunity is highly motivating to them. One commentator has aptly described Section 230 immunity as "a hidden subsidy worth billions of dollars," stating: "Digital platforms enjoy a hidden subsidy worth billions of dollars by being exempted from any liability for most of the speech on their platforms (Section 230)." Glenn Decl. Ex. 11, Doc. 10-1 at 140. Another commentator has observed, "imperiling Section 230 is a fearsome cudgel against ever untouchable companies." Glenn Decl. Ex. 13, Doc. 10-1 at 206.

3. The threat of antitrust scrutiny or enforcement is also a major motivator to social-media platforms. For example, Facebook CEO Mark Zuckerberg has stated that the threat of antitrust enforcement is "an 'existential' threat" to his platform. Glenn Decl. Ex. 12, Doc. 10-1 at 202.

**A. Threats From Federal Elected Officials Pressuring Platforms to Censor Speech.**

4. Then-Speaker of the House Nancy Pelosi stated on April 12, 2019: "I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it. And it is not out of the question that that could be removed." Glenn Decl. Ex. 13, Doc. 10-1, at 205 ("When asked about Section 230, Pelosi referred to the law as a 'gift' to tech companies that have leaned heavily on the law to grow their business…. 'It is a gift to them and I don't think that they are treating it with the respect that they should, and so I think that that could be a question mark and in jeopardy… I

do think that for the privilege of 230, there has to be a bigger sense of responsibility on it.  And it is not out of the question that that could be removed.'").

5.  Senator Richard Blumenthal stated on Nov. 17, 2020: "I have urged, in fact, a breakup of tech giants.  Because they've misused their bigness and power. …  And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court."  Glenn Decl. Ex. 16, at 1; Doc. 10-1, at 225.

6.  Senator Mazie Hirono tweeted on Feb. 5, 2021: "Sec 230 was supposed to incentivize internet platforms to police harmful content by users.  Instead, the law acts as a shield allowing them to turn a blind eye. The SAFE TECH ACT brings 230 into the modern age and makes platforms accountable for the harm they cause."  Glenn Decl. Ex. 55, at 1; Doc. 10-1, at 723.

7.  Defendants' political allies have repeatedly used congressional hearings as forums to advance these threats of adverse legislation if social-media platforms do not increase censorship of speakers, speech, content, and viewpoints they disfavor.  They have repeatedly used such hearings to berate social-media firm leaders, such as Mark Zuckerberg of Facebook, Jack Dorsey of Twitter, and Sundar Pichai of Google and YouTube, and to make threats of adverse legal consequences if censorship is not increased.  Such hearings include, but are not limited to, an antitrust hearing before the House Judiciary Committee on July 29, 2020; a Senate Judiciary Committee hearing on November 17, 2020; and a House Energy and Commerce Hearing on March 25, 2021.

8.  The March 25, 2021 Joint Hearing of the Communications and Technology Subcommittee with the Subcommittee on Consumer Protection and Commerce, the Joint Statement of Democratic Committee Chairs stated: "This hearing will continue the Committee's work of holding online

platforms accountable for the growing rise of misinformation and disinformation. ... For far too long, big tech has failed to acknowledge the role they've played in fomenting and elevating blatantly false information to its online audiences.  Industry self-regulation has failed.  We must begin the work of changing incentives driving social media companies to allow and even promote misinformation and disinformation."  Glenn Decl. Ex. 17, at 1-2; Doc. 10-1, at 228-29.

9.   At the same hearing, entitled "Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation," Representative Schakowsky stated: "[S]elf-regulation has come to the end of its road…. [Congress] is preparing to move forward with regulation and legislation. The regulation we seek … must hold platforms accountable when they are used to … spread misinformation….  All three of the companies that are here today run platforms that are hotbeds of misinformation and disinformation."  Jones Decl., Ex. A, at 1, 5.  She also stated: "Self-regulation has not worked.  They must be held accountable for allowing misinformation and disinformation to spread."  *Id.* at 7.

10. At the same hearing, Representative Doyle stated: "despite repeated promises to tackle this crisis, Facebook, Google, and Twitter instead routinely make minor changes in response to the public relations crisis of the day. … It is now painfully clear that neither the market nor public pressure will force these social media companies to take the aggressive action they need to take to eliminate disinformation and extremism from their platforms.  And therefore, it is time for Congress and this committee to legislate and realign these companies' incentives. … I question whether existing liability protections [*i.e.*, Section 230] should apply … That is why you are here today, Mr. Zuckerberg, Mr. Pichai, and Mr. Dorsey…. Your business model itself has become the problem."  *Id.* at 10-11.

11. At the same hearing, Representative Rush accused the platforms of allowing "[m]isinformation, outlandish conspiracy theories, and incendiary content" to spread, and stated to the three CEOs of Google, Facebook, and Twitter: "There is only one comparison that remotely approaches the avarice and moral discrepancy of your companies, and that is the slavetocracy burden of our Nation's shameful and inhumane and most difficult dark days in the past." *Id.* at 13. He also stated to Jack Dorsey, "I can't wait until we come up with legislation that will deal with you and your cohorts in a very, very effective way." *Id.* at 14.

12. At the same hearing, Representative Upton stated: "we are going to see some changes in Section 230." *Id.* at 15.

13. At the same hearing, Representative Eshoo demanded of Jack Dorsey, "why haven't you banned the 12 accounts that are spewing its deadly COVID misinformation?" *Id.* at 17.

14. At a hearing of the Antitrust subcommittee of the House Judiciary Committee on July 29, 2020, Representative Cicilline said to Mark Zuckerberg: "Mr. Zuckerberg.  When a television station runs a false political advertisement, they're held liable for that.  Why should Facebook or any other platform be different?  … It's hard to understand why Facebook shouldn't be responsible for those business decisions. … Facebook gets away with it because you're the only game in town.  There's no competition forcing you to police your own platform.  Allowing this misinformation to spread can lead to violence.  And frankly, I believe it strikes at the very heart of American democracy. … American democracy has always been at war against monopoly power. … These companies, as exist today, have monopoly power.  Some need to be broken up, all need to be properly regulated and held accountable. … The names have changed, but the story is the same. Today, the men are named Zuckerberg, Pichai, Cook, and Bezos."  Jones Decl., Ex. B, at 9-11.

15. On November 17, 2020, at a hearing of the Senate Judiciary Committee, Senator Blumenthal stated: "Now, Mr. Zuckerberg and Mr. Dorsey, you have built terrifying tools of persuasion and manipulation with power far exceeding the robber barons of the last Gilded Age. You have profited hugely by … promoting hate speech and voter suppression. … The destructive incendiary misinformation is still a scourge on both your platforms and on others. … [W]hat appears on your platform … is voter suppression and incendiary malicious misinformation. … [A] series of hearings on big tech is long overdue on antitrust issues … and Section 230. I have urged, in fact, a breakup of the tech giants because they've misused their bigness and power. Breaking off, for example, WhatsApp and Instagram [both Meta platforms]…. And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad…. [F]oreign disinformation campaigns intended to interfere in our democracy…. What we've seen here are fighting words and hate speech that certainly deserve no free expression protection. … Change is going to come, no question. Change is on the way and I intend to bring aggressive and targeted reform to Section 230." Jones Decl., Ex. C, at 2-3. Soon thereafter, he demanded that Mark Zuckerberg (who was testifying before the committee) "commit to … robust contend modification playbook in this coming election, including fact-checking, labelling, reducting the spread of misinformation" to "tak[e] action against dangerous disinformation" and "malign tactics." *Id.* at 4; *see also, e.g., id.* at 9 (Senator Coons demanding that Jack Dorsey explain why "you don't have a standalone climate change misinformation policy")

16. On March 11, 2022, Representative Ro Khanna, the Chairman of the House Oversight and Reform Committee who is leading "an investigation of oil industry 'misinformation' and held two days of hearings on the oil industry, tweeted: "Facebook is preventing us from taking action on climate change by allowing climate misinformation to spread. Congress must step up and hold

them accountable." Jones Decl., Ex. D. He also tweeted: "Misinformation being spread on social media is undermining our efforts to tackle climate change. As chair of the House Oversight Environment Subcommittee, I will be holding a hearing to hold social media companies accountable." *Id.*

17. On April 20, 2022, twenty-two Democratic members of Congress sent a letter to Mark Zuckerberg of Facebook (n/k/a "Meta Platforms, Inc."), demanding that Facebook increase censorship of "Spanish-language disinformation across its platforms" and threatening Congressional action if Facebook did not do so. The letter claimed that "disinformation" was a threat to democracy, and it made explicit threats of adverse legislative action if Facebook/Meta did not increase censorship: "The spread of these narratives demonstrate that Meta does not see the problem of Spanish-language disinformation in the United States as a critical priority for the health of our democracy. The lack of Meta's action to swiftly address Spanish-language misinformation globally demonstrates the need for Congress to act to ensure Spanish-speaking communities have fair access to trustworthy information." Glenn Decl. Ex. 18; Doc. 10-1, at 244-46.

18. Comments from two Members of the House of Representatives summarize this campaign of pressure and threats: "In April 2019, Louisiana Rep. Cedric Richmond warned Facebook and Google that they had 'better' restrict what he and his colleagues saw as harmful content or face regulation: 'We're going to make it swift, we're going to make it strong, and we're going to hold them very accountable.' New York Rep. Jerrold Nadler added: 'Let's see what happens by just pressuring them.'" Glenn Decl. Ex. 14, at 2-3; Doc. 10-1, at 218-19.

**B. Public Threats from President Biden and His Aides Pressuring Platforms to Censor.**

19. Then-candidate and now-President Biden has led this charge.  He has tripled down on these threats of adverse official action from his colleagues and allies in senior federal-government positions.  His threats of adverse government action have been among the most vociferous, and among the most clearly linked to calls for more aggressive censorship of disfavored speakers and speech by social-media companies.

20. For example, on January 17, 2020, then-candidate Biden stated, in an interview with the New York Times editorial board, that Section 230 of the CDA should be "revoked" because social-media companies like Facebook did not do enough to censor supposedly false information in the form of political ads criticizing him—*i.e.*, core political speech.  He stated: "The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one. For Zuckerberg and other platforms."  He also stated, "And it should be revoked.  It should be revoked because it is not merely an internet company.  It is propagating falsehoods they know to be false.... There is no editorial impact at all on Facebook. None. None whatsoever. It's irresponsible. It's totally irresponsible."  Glenn Decl. Ex. 19, at 27; Doc. 10-1, at 275.

21. Candidate Biden also threatened that Facebook CEO Mark Zuckerberg should be subject to civil liability and even *criminal prosecution* for not censoring such core political speech: "He should be submitted to civil liability and his company to civil liability…. Whether he engaged in something and amounted to collusion that in fact caused harm that would in fact be equal to a criminal offense, that's a different issue. That's possible. That's possible it could happen."  *Id.*  In other words, Biden's message—not long before he became President of the United States—was that if Facebook did not censor political ads against him, Zuckerberg should go to prison.  These two threats echoed the same threats made by numerous political allies of the President since 2019, cited above.

22. During the presidential campaign, now-Vice President Harris made similar threats against social-media firms to pressure them to engage in more aggressive censorship of speakers, content, and viewpoints she disfavors.  For example, in addition to the statements cited above, she stated in 2019: "We will hold social media platforms responsible for the hate infiltrating their platforms, because they have a responsibility to help fight against this threat to our democracy. And if you profit off of hate—if you act as a megaphone for misinformation or cyberwarfare, if you don't police your platforms—we are going to hold you accountable as a community."  Glenn Decl. Ex. 20, at 1; Doc. 10-1, at 284.

23. In or around June 2020, the Biden campaign published an open letter and online petition (ironically, on Facebook) calling for Facebook to engage in more aggressive censorship of core political speech and viewpoints that then-Candidate Biden disfavored.  The open letter complained that Facebook "continues to allow Donald Trump to say anything — and to pay to ensure that his wild claims reach millions of voters.  Super PACs and other dark money groups are following his example.  Trump and his allies have used Facebook to spread fear and misleading information about voting….  We call for Facebook to proactively stem the tide of false information by no longer amplifying untrustworthy content and promptly fact-checking election-related material that goes viral.  We call for Facebook to stop allowing politicians to hide behind paid misinformation in the hope that the truth will catch up only after Election Day.  There should be a two-week pre-election period during which **all** political advertisements must be fact-checked before they are permitted to run on Facebook. … Anything less will render Facebook a tool of misinformation that corrodes our democracy."  Glenn Decl. Ex. 23, at 1; Doc. 10-1, at 299.

24. The online petition demanded that Facebook "[p]romote real news, not fake news," "[q]uickly remove viral misinformation," and "[e]nforce voter suppression rules against

everyone—even the President [Trump]." Glenn Decl. Ex. 24, at 2; Doc. 10-1, at 304. The petition complained that Facebook "continues to amplify misinformation and lets candidates pay to target and confuse voters with lies." *Id.* at 304. It demanded that Facebook "promote authoritative and trustworthy sources of election information, rather than rants of bad actors and conspiracy theorists," "promptly remove false, viral information," and "prevent political candidates and PACs from using paid advertising to spread lies and misinformation – especially within two weeks of election day." *Id.* at 305.

25. On September 28, 2020, the Biden-Harris campaign sent a letter to Facebook accusing it of propagating a "storm of disinformation" by failing to censor the Trump campaign's political speech, including social-media political ads. Glenn Decl. Ex. 25, at 3; Doc. 10-1, at 312. The letter accused Facebook of allowing "hyper-partisan" and "fantastical" speech to reach millions of people, and it demanded "more aggressive" censorship of Trump. *Id.*

26. On December 2, 2020—during the presidential transition—Biden's former chief of staff and top technical advisor, Bruce Reed, publicly stated that "it's long past time to hold the social media companies accountable for what's published on their platforms." Glenn Decl. Ex. 26, at 1; Doc. 10-1, at 314-15. This comment specifically referred to the amendment or repeal of Section 230 of the Communications Decency Act. *See id.* He also wrote: "Washington would be better off throwing out Section 230 and starting over." *Id.*

27. On July 16, 2021, President Biden stated that social-media companies are "killing people" by not censoring enough misinformation. Waldo Ex. 14, at 1.

28. On January 3, 2022, an audio clip of President Biden played on Alyssa Milano's podcast stated: "The unvaccinated are responsible for their own choices, but those choices had been shulled [sic] by dangerous misinformation on cable TV and social media. You know, these companies …

are making money by ped[dling] lies and allowing misinformation that can kill their own customers and their own supporters. It's wrong. It's immoral. I call on the purveyors of these lies and misinformation to stop it. Stop it now."  Waldo Ex. 39, at 5 (Audio Tr. 4).

29. In September of 2022, the White House convened the "United We Stand" summit at which the President put social media companies on notice that Section 230 protections were at risk. "Tech platforms currently have special legal protections under Section 230 of the Communications Decency Act that broadly shield them from liability. This immunity extends beyond what the First Amendment requires and what newspapers and other media receive. It also effectively permits hate-fueled content mobilizing users to violence to be amplified on large tech platforms.  President Biden has long urged fundamental reforms to Section 230, and …he reiterates his call for Congress to fundamentally reform Section 230."  Jones Decl., Ex. E, at 9.

30. President Biden also stated in the same document: "Americans deserve to know how the algorithms that drive large tech platforms may amplify divisions and contribute to hate-fueled violence, among other critical harms.  Consistent with those same principles for accountability, President Biden supports *requiring* platform transparency sufficient to allow the public and researchers to understand how and why such decisions are made, their potential effects on users, and the very real dangers these decisions may pose."  *Id.* (emphasis added).

## II.    The White House's Public and Private Pressure Campaign on Platforms.

31.    Many White House officials are involved in communicating with social-media platforms about misinformation, disinformation, and censorship.  In response to a third-party subpoena, Facebook/Meta identified at least the following White House officials as engaged in such communications: Special Assistant to the President Laura Rosenberger, White House Partnerships Manager Aisha Shah, White House Counsel Dana Remus, and White House officials

Andy Slavitt, Rob Flaherty, and Clarke Humphrey.  Doc. 84, ¶ 379.  Defendants' discovery reveals many others.  *See infra.*

32.    In response to a third-party subpoena, YouTube identified White House officials Benjamin Wakana and Rob Flaherty as engaged in such communications, and Defendants' discovery reveals others.  Doc. 84, ¶ 380.  Defendants' discovery reveals others.  *See infra.*

33.    In response to a third-party subpoena, Twitter has disclosed the following White House officials as engaged in such communications: Deputy Assistant to the President and Director of Digital Strategy Rob Flaherty, White House Senior Advisor Andrew Slavitt, NSC staffer Katy E. Colas, Deputy Assistant to the President Joshua Geltzer, White House Digital Director Clarke Humphrey, Deputy Director of the Office of Digital Strategy Tericka Lambert, Press Secretary for the First Lady Michael LaRosa, NSC Director of Counterterrorism John Picarelli, Chief of Staff for the Office of Digital Strategy Hoor Qureshi, Director of Strategic Communications and Engagement Courtney Rowe, White House Associate Counsel Michael Posada, Associate Director for Communications Marissa Sanchez-Velasco, Deputy Director of Digital Strategy Christian Tom, and Strategic Director of Digital Communications Benjamin Wakana.  Jones Decl., Ex. F, at 1.  Defendants' discovery has revealed others.  *See infra.*

**A. Pressure in Private from Rob Flaherty, Andy Slavitt, and White House Officials.**

34.    The Biden White House's demands for censorship began almost immediately upon taking office.  On January 23, 2021, three days after Inauguration Day, at 1:04 a.m., Clarke Humphrey of the White House emailed Twitter, copying Rob Flaherty, with the subject line: "Flagging Hank Aaron misinfo."  Doc. 174-1, at 1.  The email stated: "Hey folks – Wanted to flag the below tweet and am wondering if we can get moving on the process for having it removed ASAP."  *Id.*  Humphrey then linked to a Tweet by anti-vaccine activist Robert F. Kennedy Jr., who

is also a principal target of the Virality Project and a member of the so-called "Disinformation Dozen." *Id.* Humphrey added: "And then if we can keep an eye out for tweets that fall in this same ~genre that would be great." *Id.*

35.    "Flagging Hank Aaron misinfo" refers to the claim by anti-vaccine speakers that COVID-19 vaccines may have contributed to baseball legend Hank Aaron's death. *See, e.g.,* https://www.usatoday.com/story/news/factcheck/2021/01/26/fact-check-hank-aaron-death-unlikely-result-covid-19-vaccine/6699577002/.

36.    Twitter responded to Humphrey within 4 minutes, at 1:08 a.m. on January 23, 2021, stating: "Thanks.  We recently escalated this."  Doc. 174-1, at 2.

37.    The White House's demands for censorship continued relentlessly, and their tone was arrogant, demanding, and peremptory.  On Saturday night, February 6, 2021, at 9:45 p.m., Rob Flaherty emailed Twitter to demand the immediate removal of a parody or impostor account linked to Finnegan Biden, Hunter Biden's adult daughter.  Doc. 174-1, at 4.  He stated: "Please remove this account immediately."  *Id.*  He also stated: "I have tried using your form three times and it won't work—it is also ridiculous that I need to upload my id to a form [to] prove that I am an authorized representative of Finnegan Biden."  *Id.*

38.    Two minutes later, at 9:47 p.m., Twitter responded, "Thanks for sending this over.  We'll escalate for further review from here."  *Id.*  Flaherty shot back, the same minute, "Cannot stress the degree to which this needs to be resolved immediately."  *Id.*  Forty-five minutes later, at 10:32 p.m., Twitter responded, "Update for you – account is now suspended."  *Id.* at 3-4.

39.    The next day, Sunday, Feb. 7, 2021, Twitter emailed Flaherty and described steps he could take to "streamline the process" for the White House's demands for Twitter censorship. *Id.* at 3.  Twitter offered to enroll White House officials in Twitter's Partner Support Portal for

13

expedited review of flagging content for censorship, recommending that Flaherty "**Designate a list of authorized White House staff for Twitter's Partner Support Portal**." *Id.* (bold in original). Twitter stated: "We sent over instructions about this on January 28th and also discussed this with Christian [Tom] during our call on February 4th. This is the same system we had in place for the previous two administrations for their support issues, *as well as the transition and campaign teams*. Once you assign and we enroll these authorized reporters, whenever they submit a ticket through the Help Center it will be prioritized automatically, without having to contact our team, and you won't need to add your personal information. To enroll your designated reporters to the Partner Support Portal, we simply need the list of @usernames (up to 10) that are registered with a White House email address." *Id.* at 3 (italics added; underlines omitted).

40.    Twitter noted that it had been recently bombarded with such requests for censorship from the White House: "we would prefer to have a streamlined process strictly with your team as the internal liaison. That is the most efficient and effective way to ensure we are prioritizing requests. In a given day last week for example, we had more than four different people within the White House reaching out for issues." *Id.* at 3.

41.    The next day, Monday, February 8, 2021, Facebook emailed Rob Flaherty, Courtney Rowe, and Clarke Humphrey of the White House to explain how it had recently expanded its COVID-19 censorship policies. Doc. 174-1, at 7-8. Facebook stated: "We wanted to make sure you saw our announcements today about running the largest worldwide campaign to promote authoritative COVID-19 vaccine information and expanding our efforts to remove false claims on Facebook and Instagram about COVID-19, COVID-19 vaccines and vaccines in general during the pandemic." *Id.*

42.     Under the heading "**Combating Vaccine Misinformation**," Facebook provided a detailed list of expanded censorship policies: "We are expanding our efforts to remove false claims on Facebook and Instagram about COVID-19, COVID-19 vaccines and vaccines in general during the pandemic. Since December [*i.e.* during the Biden transition], we've removed false claims about COVID-19 vaccines that have been debunked by public health experts. … [W]e are expanding the list of false claims we will remove to include additional debunked claims about the coronavirus and vaccines. … Groups, Pages and accounts on Facebook and Instagram that repeatedly share these debunked claims may be removed altogether. We are also requiring some admins for groups with admins or members who have violated our COVID-19 policies to temporarily approve all posts within their group. …. On Instagram, in addition to surfacing authoritative results in Search, in the coming weeks we're making it harder to find accounts in search that discourage people from getting vaccinated…." *Id.* at 7-8 (bold in original).

43.     This was not nearly enough for the White House.  Within 19 minutes of receiving this email, Flaherty responded, pressing Facebook for more information about how strict the new policies are.  *Id.* at 7.  Quoting Facebook's email in italics, he wrote: "This line, of course, stands out: *that repeatedly share these debunked claims may be removed altogether*. Can you share more about your framework here? May, of course, is very different than 'will.'  Is there a strike policy, ala Youtube? Does the severity of the claims matter?" *Id.* at 7.  He also asked for specific data on the application of the censorship policies: "And as far as your removal of claims, do you have data on the actual number of claims - related posts you've removed?  Do you have a sense of how many are being flagged versus how many are being removed? Are there actions (downranking, etc) that sit before removal? How are you handling things that are dubious, but not provably false?" *Id.*

44.     The next day, February 9, 2021, Flaherty followed up with Facebook with a demand for more information and an accusation (to be repeated) that Facebook's failure to censor speech on its platforms causes "political violence": "All, especially given the Journal's reporting on your internal work on political violence spurred by Facebook groups, I am also curious about the new rules as part of the 'overhaul.'  I am seeing that you will no longer promote civic and health related groups, but I am wondering if the reforms here extend further? Are there other growth vectors you are controlling for?"  *Id.* at 6.  Flaherty suggested an oral meeting to discuss: "Happy to put time on the calendar to discuss further."  *Id.*

45.     Facebook responded on February 9, 2021, with a detailed answer to each of Flaherty's questions about the enforcement of its new policies.  *Id.* at 5-6.  Facebook also noted that "We are happy to discuss these and additional questions as per your recent note."  *Id.* at 5. Among other things, Facebook reported that it would "suspend the entire Page, Group, or account" in case of repeat violations; that it "will begin enforcing this policy immediately," *id.* at 5; that for vaccine-skeptical content that does not violate Facebook's policies, Facebook will "reduce its distribution and add strong warning labels with more context, so fewer people see the post," *id.* at 6; and that Facebook was working to censor content that does not violate its policies in other ways by "prevent[ing] posts discouraging vaccines from going viral on our platforms; address[ing] content that experts believe dissuades people from getting the vaccine, but does not violate our misinformation policies, through the use of information labels; and prevent[ing] recommendations for Groups, Pages, and Instagram accounts that repeatedly push content discouraging vaccines," *id.* at 6.

46.     Facebook advised Flaherty that it was relying on advice of "public health authorities" to determine its censorship policies: "In consultation with leading health

16

organizations, we continuously expand the list of false claims that we remove about COVID-19 and vaccines during the pandemic. We remove claims *public health authorities* tell us have been debunked or are unsupported by evidence." *Id.* at 6 (emphasis added).

47.     Facebook also promised Flaherty that it would aggressively enforce the new censorship policies: "We will begin enforcing this policy immediately, with a particular focus on Pages, Groups and accounts that violate these rules, and we'll continue to expand our enforcement over the coming weeks." *Id.* at 5.

48.     Facebook then followed up to "see when you would like to have a meeting arranged to speak to our misinformation team reps about the latest updates. They also have a more detailed misinformation analysis prepared based on the discussions/questions from the previous meetings during the transition time period." *Id.* at 5.

49.     This email makes clear that Flaherty, as part of the Biden transition team, had already engaged in "previous meetings" and "discussions/questions" with Facebook about censorship of COVID-19 misinformation on its platforms during the Presidential transition period from November 2020 to January 2021. *Id.*

50.     On February 24, 2021, Facebook emailed Rob Flaherty with the subject "Misinfo Themes," stating: "Following up on your request for COVID-19 misinfo themes we are seeing. All the below claims violate our updated Covid and vaccine misinformation policies that we announced earlier this month, and we are removing these claims from our platforms," and she identified "Vaccine Toxicity," "False Claims About Side Effects of Vaccines," "Comparing the Covid Vaccine to the Flu Vaccine," and "Downplaying Severity of COVID-19."  Jones Decl. Ex. G, at 1-2.  Flaherty responded by inquiring for details about Facebook's actual enforcement practices and for a report on misinformation that was not censored: "Can you give us a sense of

volume on these, and some metrics around the scale of removal for each?  Can you also give us a sense of misinformation that might be falling outside your removal policies?  Goes without saying, just because it's on your list for removal hasn't historically meant that it was removed, so I want to get a sense of the state of play here!"  *Id.* at 1.  Facebook promised to discuss this at an upcoming oral meeting: "Hope to cover a lot of that on Monday … Can definitely go into detail on content that doesn't violate like below but could contribute to vaccine hesitancy."  *Id.*

51.     On March 1, 2021, White House officials Rob Flaherty and Clarke Humphrey, along with Joshua Peck of HHS, participated in a meeting with Twitter about misinformation. Jones Decl., Ex. H, at 1.  The same day, after the meeting, Twitter emailed these officials and assured the White House that it would increase censorship of "misleading information" on Twitter: "Thanks again for meeting with us today.  As we discussed, we are building on our continued efforts to remove the most harmful COVID-19 misleading information from the service …. We have also introduced a strike system that determines when further enforcement is necessary. … As we said, we are committed to working with stakeholders in the public, private and non-profit sectors to address the reliability of covid information online and look forward to continued dialogue about joint efforts."  *Id.* at 1.

52.     From at least May 28, 2021 to July 10, 2021, a senior Meta executive repeatedly copied Slavitt on his emails to Surgeon General Murthy in which he assured the Surgeon General and the White House that Meta was engaging in censorship of COVID-19 misinformation according to the White House's demands. Doc. 71-4. Among other things, the Meta executive insisted that "We've expanded penalties for individual Facebook accounts that share misinformation."  *Id.* at 9.

53.     On March 12, 2021, referring to previous oral communications with the White House and HHS, Facebook emailed Flaherty "[f]ollowing up on our commitment to share our survey data on vaccine uptake."  Doc. 174-1, at 9.  Facebook provided the White House with a detailed report and summary on the topic, and noted that the information had evidently been requested by or on behalf of "White House / HHS" officials: "Hopefully, this format works for the various teams and audiences within the White House / HHS that may find this data valuable."  *Id.*

54.     On March 15, 2021, at 3:20 a.m., Flaherty sent an email to Facebook acknowledging, "[g]ood insights here," but then immediately pivoted to demand more and different data, linking a recent Washington Post article accusing Facebook of allowing the spread of information about vaccine hesitancy and QAnon, stating: "I'm more interested in the data that was       outlined       in       the       Washington       Post (https//www.washingtonpost.com/technology/202l/03/l4/facebook-vaccine-hesistancy-qanon) And what interventions you are testing/their effectiveness."  *Id.* at 9.  This would become a standard tactic of the White House – linking to articles critical of Facebook in the press, and then demanding more information or actions based on those articles.

55.     The day before, Sunday, March 14, 2021, at 11:13 p.m., Flaherty had emailed a link to the same article to Facebook ("https://www.washingtonpost.com/technology/2021/03/14/facebook-vaccine-hesistancy-qanon"), copying White House COVID-19 official Andrew Slavitt, with no more text in the email and the subject line: "You are hiding the ball."  *Id.* at 12.

56.     The next morning, Facebook responded by stating, "there is a misunderstanding on what this story is covering with respect to research that's happening – I will call to clear up. Certainly not hiding the ball."  *Id.* at 11-12.

57.     Flaherty responded in accusatory fashion, referring to a series of at least three previous oral conversations in which the White House had demanded more information from Facebook about its censorship policies.  *Id.* at 11.  Flaherty made clear that the White House was seeking more aggressive action on "borderline" content—*i.e.*, content that *does not clearly violate Facebook's own censorship policies* but the White House demands action against anyway. Flaherty wrote: "I don't think this is a misunderstanding … I've been asking you guys pretty directly, over a series of conversations, for a clear accounting of the biggest issues you are seeing on your platform when it comes to vaccine hesitancy, and the degree to which borderline content--as you define it-- is playing a role."  *Id.* at 11. Flaherty also referred to a series of meetings, including one-on-one meetings with Facebook ("1:1"): "I've also been asking for what actions you have been taking to mitigate it as part of your 'lockdown' - which in our first conversation, was said to be in response to concerns over borderline content, in our 1:1 convo you said was not out of any kind of concern over borderline content, and in our third conversation never even came up." *Id.*

58.     Flaherty followed with a series of accusations that Facebook was deceiving and prevaricating with the White House about its "borderline" (*i.e. not* violative) content: "You said you would commit to us that you'd level with us. I am seeing in the press that you have data on the impact of borderline content, and its overlap with various communities. I have asked for this point blank, and got, instead, an overview of how the algorithm works, with a pivot to a conversation about profile frames, and a 45-minute meeting that seemed to provide you with more insights than it provided us."  *Id.*  He accused Facebook of being the "top driver[] of vaccine hesitancy," demanded action against "borderline" content, and stated that the White House wanted to be directly involved in those efforts: "I am not trying to play 'gotcha' with you. We are gravely

concerned that your service is one of the top drivers of vaccine hesitancy- period.  I will also be the first to acknowledge that borderline content offers no easy solutions. But we want to know that you're trying, we want to know how we can help, and we want to know that you're not playing a shell game with us when we ask you what is going on. This would all be a lot easier if you would just be straight with us." *Id.*

59.     Facebook responded on March 15, respectfully disputing the Washington Post's reporting, but then saying to Flaherty: "We obviously have work to do to gain your trust. You mention that you are not trying to play 'gotcha' with us—I appreciate the approach you are taking to continued discussions. We are also working to get you useful information that's on the level. That's my job and I take it seriously--I'll continue to do it to the best of my ability, and I'll expect you to hold me accountable." *Id.* at 10-11.

60.     The same day, March 15, 2021, Andrew Slavitt (who was copied on these exchanges between Facebook and Flaherty) weighed in, once again accusing Facebook of dishonesty in a series of oral meetings: "It would [be] nice to establish trust. I do feel like relative to others, interactions with Facebook are not straightforward and the problems are worse – like you are trying to meet a minimum hurdle instead of trying to solve the problem and we have to ask you precise questions and even then we get highly scrubbed party line answers. We have urgency and don't sense it from you all.  100% of the questions I asked have never been answered and weeks have gone by." *Id.* at 10.

61.     Slavitt then made an ominous statement threatening unspecified Executive action against Facebook in retaliation for Facebook's perceived lack of cooperation with the White House's demands on censorship of "borderline" (*non-violative*) content: "*Internally we have been considering our options on what to do about it.*" *Id.* at 10 (emphasis added).

62.     On March 16, 2021, Facebook responded to Slavitt, again disputing the Washington Post's reporting and respectfully explaining its position, but also promising to share information about vaccine hesitancy in "real time": "We are absolutely invested in getting you the specific information needed to successfully manage the vaccine roll out." *Id.* Facebook promised to increase information-sharing and proposed a detailed oral meeting on the topic: "But I understand your point regarding how we communicate, and that we need to share information with you in a way that prioritizes what we are seeing in as close to real time as possible. I'd like to set up a conversation with our research leads to walk your team through ongoing research we are currently conducting and our approach; and then we can prioritize sharing results as quickly as possible." *Id.* Facebook also offered to speak to Slavitt by phone at any time. *Id.*

63.     On March 19, 2021, Facebook had an oral meeting with White House officials, including Flaherty and Slavitt. Doc. 174-1, at 15. On Sunday, Facebook sent a follow-up summary of the meeting to Andrew Slavitt ("Thanks for taking the time to connect on Friday"), which noted that the White House (1) demanded a "Consistent Product Team [Point of Contact]" at Facebook, (2) demanded "Sharing Additional Data" from Facebook, (3) had asked about "Levers for Tackling Vaccine Hesitancy Content," and (4) asked about censorship policies for the Meta platform WhatsApp. *Id.*.

64.     In the follow-up email, Facebook noted that, in direct response to White House demands, it was censoring, removing, and reducing the spread of content that did not violate its policies: "You also asked us about our levers for reducing virality of vaccine hesitancy content. In addition to policies previously discussed, these include *the additional changes that were approved late last week* and that we'll be implementing over the coming weeks. As you know, in addition to removing vaccine misinformation, we have been focused on reducing the virality of content

22

discouraging vaccines *that does not contain actionable misinformation*. This is *often-true content* … but it can be framed as sensation, alarmist, or shocking. *We'll remove these Groups, Pages, and Accounts when they are disproportionately promoting this sensationalized content*." *Id.* at 15 (emphases added).

65.     Facebook also provided the White House with a detailed report on its censorship policies on WhatsApp: "WhatsApp's approach to misinformation focuses on limiting the virality of messages, preventing coordinated abuse, and empowering users to seek out reliable sources of information both in and out of the product. Our product includes features to limit the spread of viral content, such as forward limits and labels, privacy settings to help users decide who can add them to groups, and simple ways for users to block accounts and make reports to WhatsApp if they encounter problematic messages. Additional limitations we placed in April 2020 on forwarding of messages that have been forwarded many times reduced these kinds of messages by over 70%." *Id.*

66.     On March 22, 2021, Flaherty responded to Facebook, demanding much more detailed information and action about "sensationalized" content on its platforms. *Id.* at 14. Flaherty noted that White House officials were demanding a plan from Facebook to censor non-violative content, *i.e.*, "looking out for your game plan on tackling vaccine hesitancy spread on your platform." *Id.*

67.     In this email, Flaherty badgered Facebook with a series of detailed requests for information about this issue of censoring vaccine-skeptical content that does not violate Facebook's content-moderation policies, such as truthful but "sensational" content: "Again, as I've said, what we are looking for is the universe and scale of the problem. You noted that there is a level below sensational stories that get down-ranked, which took the form of general skepticism.

23

… [T]he problem does not sit in 'microchips'-land, and … it seems plausible that the things that drive the most actual hesitancy sit in 'sensational' and 'skeptical.'"  *Id.*.  Flaherty demanded more information and greater censorship of such non-violative "sensational" and "skeptical" content: "If you're down ranking sensational stuff—great—but I want to know how effective you've seen that be from a market research perspective.  And then, what interventions are being taken on 'skepticism?' … [W]hat are you trying here, and again, how effective have you seen it be. And *critically*, what amount of content is falling into all of these buckets? Is there wider scale of skepticism than sensationalism? I assume given the Carnegie data and the studies I've seen in the press that you have this. … As I've said: this is not to play gotcha. It is to get a sense of what you are doing to manage this." *Id.* (italics in original).

68.    Flaherty also badgered Facebook for more information on Meta's censorship policies on the WhatsApp platform, pushing for greater censorship there: "On whatsapp, which I may seem like I'm playing gotcha, but I guess I'm confused about how you're measuring reduction of harm. If you can't see the message, I'm genuinely curious—how do you know what kinds of messages you've cut down on? Assuming you've got a good mousetrap here, that's the kind of info we're looking for above: what interventions you've taken, and what you've found to work and not work? And how effective are you seeing the good information on Whatapp be? Are you doing cross platform campaign work to try to reduce people's exposure on whatsapp?" *Id.* at 14.

69.    Flaherty concluded with an accusation of past dishonesty against Facebook and proposed frequent oral meetings to address the White House's issues: "You've given us a commitment to honest, transparent conversations about this. We're looking for that, and hoping we can be partners here, even if it hasn't worked so far. I know Andy [Slavitt] is willing to get on

the phone with [a Facebook official] a couple of times per week if its necessary to get all of this." *Id.*

70.     Flaherty's statement that the White House is "hoping we can be partners here, even if it hasn't worked so far," reinforced Slavitt's previous implied threat that the White House would take some unspecified action against Facebook if it did not cooperate with the White House's demands on censorship of vaccine-hesitant content, especially *non-violative* content, on Facebook's platforms.  *Id.*

71.     Facebook then agreed with Flaherty and Slavitt to schedule a meeting that Wednesday at 4:00 pm to discuss these issues.  *Id.* at 13.

72.     On April 9, 2021, Facebook sent Flaherty an email to respond to a long series of detailed questions from Flaherty about how the Meta platform WhatsApp was censoring COVID-19 misinformation.  Doc. 174-1, at 17-21.  All Flaherty's questions were designed to probe and pressure Facebook toward more aggressive censorship.  *See id.*  Facebook began by "noting some of the key differences between a private messaging app like WhatsApp, and social media like Facebook and Instagram. Approximately 90 percent of the messages sent on WhatsApp are one-to-one, and the majority of group chats include fewer than ten people. WhatsApp does not promote content, and users do not build audiences or discover new people as they would on social media."  *Id.* at 18.  Flaherty responded to this: "Very aware. [Smiley face]."  In other words, the White House was demanding information about speech on a *private* messaging app used for one-to-one private communication, and demanding greater censorship of speech on that app—and it was "very aware" that it was doing so.  *Id.*

73.     Facebook noted that "WhatsApp seeks to control the spread of misinformation and inform users through deliberate, content-agnostic product interventions -- things like labeling and

limiting message forwards." *Id.* at 18.  Facebook noted that the message-forwarding limits are "intended" to censor COVID misinformation, and that they actually reduced such speech by 70 percent, and Facebook admitted that these are "somewhat blunt tools" that prevent its users from sending many other forms of speech as well: "The forward limits … are intended to reduce their spread. As mentioned in my earlier note, when WhatsApp rolled out the limitation for highly forwarded messages to one chat at a time in April 2020, this resulted in a 70% reduction of those messages globally.  Of course, not all forwards are misinformation, so these are by nature somewhat blunt tools, but they are important ones -- and ones that many other messaging services don't provide." *Id.*

74.    After presenting Facebook with a series of questions (presented in bold and in red type in the email, *see id.* at 18-20), Flaherty summed up by demanding insight into Facebook's internal information: "I guess I have the same question here as I do on Facebook on Instagram. Do you guys think you have this under control? You're obviously going to say yes to that, so I guess the real question is, as ever: how are you measuring success? Reduction in forwarding? Measured impact across Facebook properties?" *Id.* at 20.

75.    Facebook responded by emphasizing that it was "reducing viral activity on our platform" through message-forward limits and other speech-blocking techniques as well: "On WhatsApp, reduction in forwards is just one of the signals that we use to measure how well we are doing in reducing viral activity on our platform. We also ban accounts that engage in mass marketing or scam behaviors - including those that seek to exploit COVID-19 misinformation. Our efforts in this space are more comprehensive than anything that our peers in private messaging or SMS do, and we are constantly innovating to stay ahead of future challenges." *Id.* at 20.

76.     Facebook also offered to meet with the White House "Monday or anytime next week" to discuss its censorship efforts, to which Flaherty responded, "Hoor should be trying to land a time." *Id.* at 17.

77.     Flaherty responded to Facebook's long, detailed account of its censorship efforts on WhatsApp by expressing dissatisfaction with the response and demanding ever-more detailed information, stating that he "couldn't care less" about Facebook's "product safari": "Will say I'm really mostly interested in what effects the interventions and products you've tested have had on increasing vaccine interest within hesitant communities, and which ones have shown promise. Really couldn't care less about products unless they're having measurable impact. And while the product safari has been interesting, at the end of the day, *I care mostly about what actions and changes you're making to ensure sure you're not making our country's vaccine hesitancy problem worse*. I definitely have what I believe to be a non-comprehensive list of products you're building but I still don't have a good, empirical answer on how effective you've been at reducing the spread of vaccine-skeptical content and misinformation to vaccine fence sitters in the now-folded 'lockdown.'" *Id.* at 17 (emphasis added).

78.     Flaherty then accused Facebook of being responsible for the riot at the Capitol on January 6, 2021, by not censoring enough speech online, and suggested that Facebook would be similarly responsible for COVID-related deaths if it did not engage in more online censorship here: "In the electoral context, you tested and deployed an algorithmic shift that promoted quality news and information about the election. This was reported in the New York Times and also readily apparent to anyone with cursory social listening tools. You only did this, however, after *an election that you helped increase skepticism in, and an insurrection which was plotted, in large part, on*

*your platform*. And then you turned it back off.  *I want some assurances, based in data, that you are not doing the same thing again here*." *Id.* (emphases added).

79.     Facebook responded by promising ever-more-detailed information to the White House's demands: "Understood. I thought we were doing a better job [of] responding to this – and we are working to get the data that will more clearly show the universe of the Covid content that's highest in distribution with a clear picture of what percentage of that content is vax hesitancy content, and how we are addressing it. I know [a Facebook official] told Andy [Slavitt] that would take a bit of time to nail down and we are working on that universe of data. I will make sure we're more clearly responding to your questions below." *Id.* at 17.

80.     The meeting that Facebook offered with the White House on Monday, April 12 or thereafter occurred on Wednesday, April 14, because Flaherty emailed Facebook that day stating: "Since we've been on the phone…" *Id.* at 22.

81.     In this Wednesday, April 14, 2021 email, with the subject line "tucker," Flaherty noted that the White House was tracking COVID-related content in real time, and he demanded the censorship of currently-trending posts of content from two prominent Fox News hosts, Tucker Carlson and Tomi Lahren: "Since we've been on the phone – the top post about vaccines today is tucker Carlson saying they don't work. Yesterday was Tomi Lehren [*sic*] saying she won't take one.  This is exactly why I want to know what 'Reduction' actually looks like – if 'reduction' means 'pumping our most vaccine hesitant audience with tucker Carlson saying it doesn't work' then ... I'm not sure it's reduction!" *Id.* at 22.  Facebook responded: "Thanks—I saw the same thing when we hung up.  Running this down now." *Id.*  In a separate email chain to Flaherty and Courtney Rowe the same day, Facebook also assured the White House, "running down the question on Tucker and working on getting you report by end of week." *Id.* at 23.

28

82.     Tucker Carlson has 1.2 million followers on his personal Facebook account and 3.8 million followers on his show's account, Jones Decl., Ex. I, at 1-2, so censoring Carlson's content would affect the free-speech rights of millions of people in a single stroke.

83.     In the meantime, Facebook was offering to cooperate closely with the White House to "amplify" its preferred messages.  On April 13, 2021, Facebook emailed Andy Slavitt about the temporary halt of the Johnson & Johnson vaccine, stating: "Re the J+J [*i.e.*, Johnson & Johnson] news, we're keen to amplify any messaging you want us to project about what this means for people – it obviously has the risk of exacerbating vaccine hesitancy, so we're keen to get ahead of the knock-on effect.  Don't hesitate to tell me – or via your teams – how we can help to provide clarity/reassurance via Facebook."  Doc. 174-1, at 31-32.  Facebook then forwarded the same offer to Courtney Rowe and Rob Flaherty of the White House digital communications team.  *Id.* at 31.

84.     Flaherty responded the same day, April 13, with a series of detailed requests about how Facebook could amplify the White House's preferred messages, including: "Some kind of thing that puts the news in context if folks have seen it (like your current 'COVID news' panel) that has 3-4 pieces of info (eg: Adverse events are very rare – 6 cases out of nearly 7 million, the FDA and CDC are reviewing so it health care providers know how to treat any of the rare events, this does not affect pfzier or moderna, which vaccinate via a different mechanism)"; "CDC is working through an FAQ that we'd love to have amplified in whatever way possible – maybe through the COVID info panel"; and "[a] commitment from you guys to make sure that a favorable review reaches as many people as the pause, either through hard product interventions or algorithmic amplification."  *Id.* at 30-31.  Flaherty also block-quoted a White-House-approved message on the vaccine pause for Facebook to amplify.  *Id.* at 31.

85.     Flaherty then concluded by demanding that Facebook monitor any "misinformation" relating to the Johnson & Johnson vaccine pause, and asking Facebook to provide a detailed report to the White House within 24 hours of how it was doing so: "More broadly: we share [Facebook's] concern about knock-on effects and are curious to get a read from your CMU data about what you're seeing and with whom. *Moreover, I want to make sure you have eyes on what might be spinning off the back end of this – that the news about J&J doesn't spin off misinformation. Would be great to get a 24 hour report-back on what behavior you're seeing.*" *Id.* at 31 (emphasis added).

86.     The same day, April 13, 2021, Facebook responded with a detailed report on misinformation on its platforms about this issue.  Doc. 174-1, at 24-30.  Facebook noted that there was an oral meeting about misinformation with the White House scheduled the next day: "I'm looking forward to the meeting tomorrow [*i.e.*, Wednesday, April 14] and hoping we can spend some time responding to Rob's feedback from last week as well as further discussing the J&J news and how we can hopefully partner together." *Id.* at 24.

87.     Facebook also noted that it had recently had a telephone call with Courtney Rowe about how it was censoring misinformation, and had agreed to provide a detailed report on its relevant censorship enforcement policies: "Courtney – as we discussed, we also wanted to send over some examples of content we see on our platform that we remove (misinformation & harm) as well as content we take other actions on, but do not remove (vaccine hesitancy). I have included some examples at the bottom of this email and happy to setup time to talk through this more with you as well, if helpful." *Id.* at 24.  Facebook then provided a six-page report on censorship with explanations and screen shots of sample posts of content that it censors and does not censor.  *Id.* at 24-30.

88.     First, Facebook responded to Flaherty's request for government-message-amplification by agreeing to cooperate with the White House on those demands.  *Id.* at 24. Regarding Flaherty's demand that Facebook monitor and report on "misinformation" related to the Johnson & Johnson vaccine pause, Facebook agreed to both monitor and report to the White House: "We will look to get you insights as soon as we have them. We are going to be watching to see how this plays out over the next couple of days. [A Facebook official] is joining [the call] tomorrow and plans to share a couple things we are seeing emerge from the CMU survey and what we are going to be watching over the next few days. Also, we are proactively monitoring and seeing what themes emerge from content on-platform and happy to share out when we have stuff collected." *Id.* at 24-25.

89.     Facebook then provided a detailed report to Courtney Rowe's request for specific examples of posts that are censored on its platforms.  First, as to "VACCINE HESITANCY" content, Facebook explained that this content does not violate Facebook's content-moderation policies, but Facebook assured the White House that Facebook still censors such non-violative content by suppressing it in news feeds and algorithms.  *Id.* at 25.  Facebook admitted that such content is often "true" and sometimes involves core political speech or advocacy (*e.g.*, "discussing choice to vaccinate in terms of personal and civil liberties"): "The following examples of content are those that *do not violate our Misinformation and Harm policy*, but may contribute to vaccine hesitancy or present a barrier to vaccination. This includes, for example, content that contains sensational or alarmist vaccine misrepresentation, disparaging others based on the choice to or to not vaccinate, *true but shocking claims or personal anecdotes*, or *discussing the choice to vaccinate in terms of personal and civil liberties* or concerns related to mistrust in institutions or individuals." *Id.* at 25 (emphases added).

90.     Facebook assured the White House that it censors such true, political, non-violative content through "a spectrum of levers" that includes concealing the content from other users, deboosting the content, and preventing sharing through "friction": "We utilize a spectrum of levers for this kind of content…. Actions may include reducing the posts' distribution, not suggesting the posts to users, limiting their discoverability in Search, and applying Inform Labels and/or reshare friction to the posts." *Id.* Facebook then provided the White House with a series of sample posts, all of which content originated from Children's Health Defense, the anti-vaccine organization headed by Robert F. Kennedy Jr. (who would soon be identified as one of the so-called "Disinformation Dozen"). *Id.* at 25-27.

91.     Next, under the heading "Examples of Content Removed for Violating our Misinformation & Harm Policy," Facebook provided the White House with "examples of posts we have removed for violation of our Misinformation & Harm Policy." *Id.* at 27. Facebook then provided a list of screen shots of posts it had removed from the platform entirely, again all of which originated from Children's Health Defense, Robert F. Kennedy Jr.'s group. *Id.* at 28-30.

92.     As noted below, Facebook's explanation that it was removing violative posts by Children's Health Defense and censoring even its posts that did not violate Facebook's policies turned out to be not nearly enough to satisfy the White House.

93.     Separately from Flaherty's demands about Tucker Carlson, on April 14, 2021, Andy Slavitt also emailed a high-level Facebook executive—Facebook's President of Global Affairs, former Deputy Prime Minister of the United Kingdom Nick Clegg—with a sarcastic message expressing the White House's displeasure both with Facebook's failure to censor Tucker Carlson and with Facebook's perceived failure to allow the White House to micromanage its censorship policies: "Number one of Facebook. Sigh. Big reveal call with FB and WH today. No

progress since we spoke.  Sigh."  Doc. 174-1, at 35.  Clegg promptly responded to Slavitt with an apology and promise to immediately address the censorship of Tucker Carlson: "OK – sorry to hear about call today, will dig in now."  *Id.*  The subject line of Slavitt's email, reproduced in the "Re:" line of later messages, was "Tucker Carlson anti-vax message."  *Id.* at 34.

94.     Late evening of the same day, April 14, 2021, at 10:51 p.m., Nick Clegg provided Slavitt with a detailed report about the Tucker Carlson post, explaining that Tucker Carlson's content did not violate Facebook policies (due to the federal government's own information about its accuracy) but assuring the White House that Facebook would censor it anyway.  *Id.* at 34.  Clegg denied that Carlson's content was the top post on Facebook, but then stated, "Regardless of popularity, the Tucker Carlson video does not qualify for removal under our policies. Following the government's decision yesterday, we are allowing claims that the Johnson and Johnson vaccine causes blood clots…. That said, the video is being labeled with a pointer to authoritative COVID information, it's not being recommended to people, and it is being demoted."  *Id.* at 34.

95.     Clegg also stated that Facebook was "v[ery] keen" to provide a more detailed report on its censorship practices in response to White House demands: "I'm v keen that we follow up as we'd agreed, and I can assure you the teams here are on it."  *Id.*

96.     Brian Rice of Facebook then forwarded the same report on the Tucker Carlson post to Rob Flaherty.  *Id.* ("Making sure you receive--").

97.     Less than twenty minutes later, at 11:29 p.m. on April 14, 2021, Flaherty responded to Rice with a sarcastic response badgering Facebook for a more detailed explanation of why it had not removed Tucker Carlson's content outright, demanding greater censorship, and accusing Facebook of causing an "insurrection" by not censoring enough speech on its platforms: "I guess this is a good example of your rules in practice then – and  a chance to dive in on questions as

they're applied. How was this [*i.e.* Tucker Carlson' post] not violative?  The second half of the segment is raising conspiracy theories about the government hiding that all vaccines aren't effective. It's not about just J&J. What exactly is the rule for removal vs demoting? Moreover: you say reduced and demoted. What does that mean? There's 40,000 shares on the video. Who is seeing it now? How many? How effective is that? And we've gone a million rounds on this in other contexts so pardon what may seem like deja vu – but on what basis is 'visit the covid-19 information center for vaccine resources' the best thing to tag to a video that says the vaccine doesn't work?"  Doc. 174-1, at 33.  Flaherty concluded ominously by reiterating his accusation that Facebook had caused the January 6 riot by not censoring enough speech on its platforms: "Not for nothing but last time we did this dance, it ended in an insurrection."  *Id.* at 34.

98.     Six minutes later, at 11:35 p.m. on April 14, Flaherty followed up with another email accusing Facebook of providing incorrect information through CrowdTangle and demanding an explanation: "And sorry – if this was not one of the most popular posts about the vaccine on Facebook today, then what good is crowdtangle? [A Facebook official] said that Tomis [*i.e.*, Tomi Lahren's] video was the most popular yesterday based on your data, which reflected what CT [*i.e.*, CrowdTangle] was showing. Tuckers video was top on CT today. What is different about this video, then?" *Id.* at 33.

99.     On Friday, April 16, Flaherty then sent an email expressing his displeasure with the timing of Facebook's response and demanding immediate answers, snapping at Rice: "These questions weren't rhetorical."  *Id.* at 33.  Facebook apologized and promised an immediate response: "Hey Rob – understood and sorry for the delay.  The team has been heads-down since our conversation to produce the report we discussed on Wednesday afternoon. We are aiming to

get you something tonight ahead of the weekend." *Id.* Facebook then proposed another oral meeting: "schedule a call to discuss. Would that work?" *Id.*

100. On Tuesday, April 21, 2021, Facebook sent an additional response to the same email chain, indicating that there had been a phone call with Flaherty ("thanks for catching up earlier") and providing another, more detailed report on its censorship of Tucker Carlson in response to each of Flaherty's queries question-by-question. *Id.* at 36. Facebook again reported that Tucker Carlson's content had not violated its policies, stating that "we reviewed this content in detail and it does not violate those policies," but reported that Facebook had been censoring it anyway and would continue to censor it even though no fact-check had reported it false: "The video received 50% demotion for seven days while in the queue to be fact checked, and *will continue to be demoted even though it was not ultimately fact checked*." *Id.* (emphasis added). These circumstances raise a compelling inference that Facebook continued to demote Tucker Carlson' content, in violation of its own policies and practices, due to the White House's pressure.

101. In the same time frame, the White House was exerting similar pressure on other major social-media platforms. It had meetings with YouTube and Twitter about misinformation on April 21, 2021 as well.

102. On April 21, Rob Flaherty, Andy Slavitt, and Kelsey Fitzpatrick of the White House, along with an official at HHS, participated in a meeting with several Twitter officials. Doc. 71-7, at 86. The meeting's subject was "Twitter Vaccine Misinfo Briefing." *Id.* The meeting invite noted: "White House Staff will be briefed by Twitter on vaccine misinfo. Twitter to cover trends seen generally around vaccine misinformation, *the tangible effects seen from recent policy changes*, what interventions are currently being implemented *in addition to previous policy*

*changes*, and ways the White House (and our COVID experts) can *partner* in product work." *Id.* (emphases added).

103.    The next day, April 22, Twitter employees noted in internal communications that the White House officials, during this meeting, had posed "one really tough question about why Alex Berenson hasn't been kicked off the platform." Jones Decl., Ex. J, at 2-3. The Twitter employee noted that the White House's questions were "pointed" and "mercifully we had answers." *Id.* Another internal Twitter communication noted that the White House "really wanted to know about Alex Berenson. Andy Slavitt suggested they had seen data viz that had showed he was the epicenter of disinfo that radiated outwards to the persuadable public." *Id.*

104.    Later, on July 16, 2021, Twitter suspended Alex Berenson for the first time. *Id.* On August 28, 2021, Twitter permanently deplatformed Berenson. *Id.*

105.    On April 21, 2021, Flaherty, Andy Slavitt, Kelsey Fitzpatrick of the White House, and Jessica Scruggs of HHS had a similar meeting with YouTube, to which at least six YouTube officials were invited. Jones Decl., Ex. K, at 1. The calendar invite stated that the purpose of the meeting was: "White House staff to get briefed by YouTube on general trends seen around vaccine misinformation. As well as, the empirical effects of YouTube's efforts to combat misinfo, what interventions YouTube is currently trying, and ways the White House (and or COVID experts) can partner in product work." *Id.*

106.    Just after midnight on April 22, 2021, Rob Flaherty emailed a list of Google officials about YouTube, copying Andy Slavitt, Clarke Humphrey, and Kelsey Fitzpatrick of the White House. Doc. 174-1, at 39. He began by referring to the oral meeting with Google/YouTube officials on April 21: "Thanks again for the conversation today." *Id.* Flaherty also referred to an earlier, "first conversation," indicating that there had been multiple meetings with YouTube. *Id.*

107.    Flaherty then noted that the White House had asked YouTube (like Facebook) to monitor and report on the speech on its platforms, stating that the White House expected a report from them: "We'll look out for the top trends that you've seen in terms of misinformation around the vaccine." *Id.*

108.    Flaherty then provided a "recap" of their oral conversation, stating that concern about misinformation on YouTube was "shared at the highest (and I mean highest) levels of the [White House]": "To recap: … we remain concerned that Youtube is 'funneling' people into hesitance and intensifying people's hesitancy…. we want to be sure that you have a handle on vaccine hesitancy generally and are working toward making the problem better. *This is a concern that is shared at the highest (and I mean highest) levels of the WH*, so we'd like to continue a good-faith dialogue about what is going on under the hood here. I'm the on the hook for reporting out." *Id.* (emphasis added).

109.    Citing an article "highlighting the Youtube misinformation that is spreading through the Vietnamese community," Flaherty stated: "Clearly, more work to be done here. Would love to get some insights from you on how you are tackling this problem across all languages." *Id.*

110.    Flaherty then stated, "A couple of other things it would be good to have from you all," and provided a five-bullet list of detailed demands for YouTube's internal data about the spread of misinformation on its platform, including: "the top trends that you're seeing in terms of misinformation/hesitance inducing content," and "[a] deeper dive on reduction and its effectiveness," among others. *Id.*

111.    Flaherty indicated that the White House was coordinating with the Stanford Internet Observatory, which was then operating the Virality Project, discussed in detail below, noting in

the first bullet point: "Stanford has mentioned that it's recently Vaccine Passports and J&J pause-related stuff, but I'm not sure if that reflects what you're seeing." *Id.* This reference raises the inference that the White House's "COVID experts" ("our COVID experts") mentioned in the calendar invite for the meeting, Jones Decl., Ex. K, at 1, are, in fact, "Stanford" personnel associated with the Virality Project, and that the White House was working with "Stanford" to "partner with" platforms "on product work."

112.   As with Facebook, many of Flaherty's demands related to so-called "borderline" content, *i.e.*, often-truthful content that does not violate platform policies but that the White House disfavors. *See* Doc. 174-1, at 39. Among other things, he praised YouTube for reducing distribution of such content: "I believe you said you reduced watch time by 70% on 'borderline' content, which is impressive." *Id.* But then, again, he followed up with a long series of demands for more information: "How does that track with vaccine-related content specifically…? What has the comparative reduction in watch time on 'borderline' vaccine topics been after your interventions? And what has the increase in watch time been on authoritative information?... Related to the second bullet: to what extent have your ranking interventions been effective there? And, perhaps more critically, to what degree is content from people who have been given a 'strike' still being recommended and shown in prominent search positions? … [H]ow did you arrive on info-panels as the best intervention? And to what extent are people clicking through after exposure to vaccine-hesitant content? … What are the general vectors by which people see the 'borderline' content – or really just vaccine-skeptical content? Is it largely through recommendations? Search?" *Id.* Notably, Flaherty's "most critical[]" question implied that YouTube should be censoring more content from disfavored *speakers*, *i.e.*, those who have been given a "strike" for previous anti-vaccine content. *Id.*

113.    Flaherty emphasized that the White House wanted to make sure YouTube's "work extends to the broader problem" of people viewing vaccine-hesitant content.  *Id.* at 39-40.  And he proposed regular meetings to push YouTube to disclose its "internal data" to the White House: "We've worked with a number of platform partners to track down similar information based on internal data, including partners of similar scale. I am feeling a bit like I don't have a full sense of the picture here. We speak with other platforms on a semi-regular basis. We'd love to get in this habit with you. Perhaps bi-weekly? Looking forward to more conversation."  *Id.* at 40.

114.    On April 23, 2021, Flaherty sent Facebook an email that included a document entitled "Facebook COVID-19 Vaccine Misinformation Brief" prepared by an unidentified third party.  Jones Decl., Ex. L, at 1.  The "Brief" had two major headings with several bullet points under each: "Facebook plays a major role in the spread of COVID vaccine misinformation," and "Facebook's policy and enforcement gaps enable misinformation's spread." *Id.*   The "Brief" recommended much more aggressive censorship of Facebook's platforms, calling for "progressively severe penalties … and comprehensive enforcement for pages, accounts, and groups that repeatedly post COVID vaccine misinformation," and stating that "[b]ans for COVID-19 misinformation should be cross-platform and enforced at the entity-level, not the account level." *Id.*  It called for Facebook to stop distributing even non-violative anti-vaccine content "in News Feed or in group recommendations" to "significantly reduce the reach of low-quality domains," and it stated that "[v]accine misinformation monitoring and enforcement must adjust as disinformers evade enforcement…." *Id.* at 1-2.  And it called for specific censorship of disfavored speakers: "Warning screens before linking to domains known to promote vaccine misinformation would dissuade users from following links to of-platform misinformation and hurt the vaccine-misinformation business model Facebook enables." *Id.* at 2.

115.    Reproducing this pro-censorship "Brief" in the text of his email to Facebook, Flaherty wrote: "Here's the crux of their recs.  Don't read this as White House endorsement of these suggestions (or, also, as the upper bound of what our thoughts may be).  But – spirit of transparency – this is circulating around the building and informing thinking." *Id.* at 1.

116.    On May 1, 2021, Nick Clegg of Facebook sent an email to Andy Slavitt indicating that the White House had recently met with Facebook to "share research work" and make more demands, stating: "Thanks to your team for sharing the research work with us…." *Id.* at 41.  At the beginning of the email, Clegg apologized to the White House for not catching and censoring three pieces of vaccine content that went viral, even though the content did not violate Facebook's policies, and promising to censor such non-violative content more aggressively in the future: "I wanted to send you a quick note on the three pieces of vaccine content that were seen by a high number of people before we demoted them. Although they don't violate our community standards, we should have demoted them before they went viral and this has exposed gaps in our operational and technical process." *Id.* at 42.

117.    Clegg then promised to be more vigilant and censor such non-violative content to prevent it from going viral in the future, and offered to report back to the White House in detail about its efforts to do so: "The teams have spent the last 24 hrs analysing these gaps and are making a number of changes starting next week, including setting up more dedicated monitoring for Covid vaccine content on the cusp of going viral, applying stronger demotions to a broader set of content, and setting up daily review and analysis so that we have a better real-time view of what is being seen by lots of people. I will be checking on this closely to make sure that these additional steps show results - the stronger demotions in particular should deliver real impact.  Please let me know if you'd like to discuss any of this in more detail." *Id.*

40

118.    Clegg then listed in bold the demands that the White House had made in its recent meeting, with a detailed response to each. *Id.* at 42.  First, the White House had demanded that Facebook address "**Non-English mis/disinformation circulating without moderation**," and Facebook promised to take steps to do so. *Id.* (bold in original).

119.    Second, the White House had commanded Facebook: "**Do not distribute or amplify vaccine hesitancy, and Facebook should end group recommendations for groups with a history of COVID-19 or vaccine misinformation**." *Id.* (bold in original).  Facebook assured the White House that it was taking strong steps to censor such content, and promised to increase its efforts to do so in the future: "Much of the research you shared called on us to ensure that our systems don't amplify vaccine hesitancy content and this is top of mind for us. In addition to the changes I mentioned above, we have already removed all health groups from our recommendation feature on Facebook, and on Instagram we filter vaccine-related accounts from our 'accounts you may follow feature'. We also remove accounts that may discourage vaccination from search features. We currently enforce on hash tags we know are shared to promote vaccine hesitancy content and are working to improve our automated systems here." *Id.*

120.    Third, the White House had demanded that Facebook "**Monitor[] events that host anti-vaccine and COVID disinformation**." *Id.* (bold in original).  Facebook promised to monitor social-media "events" on its platforms more closely and take more aggressive action to censor them: "we are working to improve automatic detection for events hosting anti-vaccine and COVID content. Our viral monitoring efforts will also help us detect events that are gaining views on Facebook, and we do remove events coordinating in-person gatherings that involve or encourage people who have COVID-19 to join." *Id.*

121.    Fourth, the White House had demanded censorship of the so-called "Disinformation Dozen" in the private meeting with Facebook, raising the concern that "**12 accounts are responsible for 73% of vaccine misinformation**." *Id.* (bold in original).  Facebook responded that it was scrutinizing those speakers and censoring them whenever it could, but that most if their content did not violate Facebook's policies: "we continue to review accounts associated with the 12 individuals identified in the CCDH 'Disinformation Dozen' report, but many of those either do not violate our policies or have ceased posting violating content.  Our 'Dedicated Vaccine Discouraging Entity' policy is designed to remove groups and pages that are dedicated to sharing vaccine discouraging content and we continue to review and enforce on these where we become aware of them." *Id.*

122.    Clegg then noted that he realized the White House would not be satisfied with these answers and was demanding greater censorship: "I realise that our position on this continues to be a particular concern for you." *Id.*  Clegg then suggested that too much censorship might be counterproductive and might drive vaccine hesitancy: "Among experts we have consulted, there is a general sense that deleting more expressions of vaccine hesitancy might be more counterproductive to the goal of vaccine uptake because it could prevent hesitant people from talking through their concerns and potentially reinforce the notion that there's a cover-up." *Id.* Brian Rice also forwarded Nick Clegg's email to Rob Flaherty. *Id.* at 41.

**B.    Public Pressure and Threats From Press Secretary Jennifer Psaki.**

123.    The White House was evidently quite unhappy with this response and the results of its pressure campaign behind closed doors.  A few days later, the White House took its pressure campaign public.  On May 5, 2021, Jen Psaki publicly reminded Facebook and the other platforms of the threat of legal consequences hanging over its head if it did not censor misinformation more

42

aggressively.  At the May 5, 2021 White House Press Briefing, Jen Psaki stated about social-media censorship: "The President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections. And we've seen that over the past several months, broadly speaking."  Glenn Decl. Ex. 29, at 15, Doc. 10-1, at 353.

124.    Psaki also stated that President Biden "also supports better privacy protections and a robust anti-trust program.  So his view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public."  *Id.*  She thus linked the threat of a "robust anti-trust program" to the White House's demand that "more … needs to be done" by "the major platforms" to prevent "misinformation" and "disinformation" from "going out to the American public," *i.e.*, its demand for censorship.  *Id.*

125.    The next day, May 6, 2021, Flaherty privately responded to Facebook's most recent email, badgering Facebook again for more explanations about why it was not censoring more aggressively.  Regarding Nick Clegg's apology for not catching and censoring three viral posts earlier, Flaherty linked to one and noted: "For one, it's still up and seems to have gotten pretty far. And it's got 365k shares with four comments. We've talked about this in a different context, but how does something like that happen? The top post, the one from the Wisconsin news station, has 2.1 million comments."  Doc. 174-1, at 41.

126.    Flaherty also demanded more information about Facebook's efforts to demote "borderline" content: "Won't come as a shock to you that we're particularly interested in your demotion efforts, which I don't think we have a good handle on (and, based on the below, it doesn't

seem like you do either). Not to sound like a broken record, but how much content is being demoted, and how effective are you at mitigating reach, and how quickly?"  *Id.*

127.    Flaherty then criticized Facebook's censorship efforts for vaccine-related posts in Facebook groups related to other topics: "Also, health groups: sure. But it seems more likely that anti-vax stuff is moving in groups that are not about health but are ... mom centric, or other spaces. Strikes me as the issue here is less from single-use anti-vaccine accounts and more about people who ... do other things and are also vaccine hesitant."  *Id.* (ellipses in original).

128.    Flaherty tied this criticism to his criticism of Facebook's failure to censor the "Disinformation Dozen": "Seems like your 'dedicated vaccine hesitancy' policy isn't stopping the disinfo dozen - they're being deemed as not dedicated – so it feels like that problem likely carries over to groups."  *Id.*

129.    On May 10, 2021, Facebook sent an email to Rob Flaherty and Courtney Rowe of the White House digital team, touting its efforts to promote vaccination on its platforms.  Doc. 174-1, at 46.  Among other things, Facebook reported that "Since January, we've provided more than $30 million in ad credits to help governments, NGOs and other organizations reach people with COVID-19 vaccine information and other important messages."  *Id.*

130.    The next day, May 11, 2021, Flaherty responded with a one-line, snarky email stating: "Hard to take any of this seriously when you're actively promoting anti-vaccine pages in search."  *Id.*  He included a link to a news report about this topic on Twitter.  *Id.*

131.    The next day, May 12, 2021, Facebook responded, assuring Flaherty that it had censored the accounts mentioned in the news reports: "Thanks Rob - both of the accounts featured in the tweet have been removed from Instagram entirely…. We're looking into what happened."  *Id.* at 45.

132.    Facebook then assured Flaherty it was working on processes to suppress disfavored speech from search results on its platforms and remove anti-vaccine accounts: "We are continuing to develop technology to improve the quality of search results at scale across Instagram - this is a continual process built on new technology to address adversarial accounts…. We also remove accounts that may discourage vaccination from search by developing and using this new technology to find accounts on Instagram that discourage vaccines, and remove these accounts from search altogether. We've also removed accounts that primarily discourage vaccination from appearing where we recommend new accounts to follow, such as accounts you may like, and suggested accounts." *Id.*

133.    Facebook acknowledged that its censorship efforts were not enough and promised the White House they would increase them: "We clearly still have work to do [sic], but wanted to ensure you were aware of the authoritative resources we're pointing people to first as we continue investing in removing accounts from search that may discourage vaccination." *Id.*

134.    The same day, May 12, 2021, Flaherty responded sarcastically, indicating that promoting pro-vaccine speech was not enough for the White House, which demanded the removal or deboosting of anti-vaccine speech: "Sure. They're first connected to authoritative information, but then you, as of last night, were presenting an anti-vaccine account with less than 1000 followers alongside, at level, with those pinned accounts!" *Id.* at 45.

135.    Flaherty then accused Facebook of not doing enough to censor anti-vaccine content in search results and dissembling to deceive the White House: "'[R]emoving bad information from search' is one of the easy, low-bar things you guys do to make people like me think you're taking action. If you're not getting *that* right, it raises even more questions about the higher bar stuff." *Id.* at 45. Flaherty continued, accusing Facebook of dishonesty: "You say in your note that you

remove accounts that discourage vaccination from appearing in recommendations (even though you're using 'primarily' to give yourself wiggle room). You also said you don't promote those accounts in search. Not sure what else there is to say." *Id.*

136.    Flaherty then compared Facebook unfavorably to other platforms to pressure them to suppress anti-vaccine content in search results: "Youtube, for their warts, has done pretty well at promoting authoritative info in search results while keeping the bad stuff off of those surfaces. Pinterest doesn't even show you any results other than official information when you search for 'vaccines.' I don't know why you guys can't figure this out." *Id.*

137.    On May 28, 2021, a senior executive of Meta sent an email to Slavitt and Murthy reporting that Facebook had expanded its censorship policies, evidently to satisfy federal officials' demands made at a recent oral meeting.  The email stated that a "key point" was that "We're expanding penalties for individual Facebook accounts that share misinformation."  Doc. 71-4, at 9.

### C. Flaherty's Profane Attack: "Are You Guys F\*\*king Serious?"

138.    At some time prior to July 15, 2021, the White House's Facebook account experienced an issue that slowed its growth in followers.  Doc. 174-1, at 56.  On July 15, 2021, Facebook emailed a White House staffer and reported that "the technical issues that had been affecting follower growth on @potus have been resolved.... you should start to see your numbers trend back upwards.... Thanks for your patience as we investigated this." *Id.*  The White House staffer asked Facebook, "Could you tell me more about the technical issues affecting audience growth?" *Id.* at 55.  Facebook responded, "from what we understand it was an internal technical issue that we can't get into, but it's now resolved and should not happen again." *Id.*  The White House staffer then simply added Rob Flaherty to the email chain without further comment. *Id.*

46

139.    The same minute he was added to the email chain, 3:29 p.m. on July 15, 2021, Flaherty exploded at Facebook: "Are you guys fucking serious? I want an answer on what happened here and I want it today."  *Id.* at 55.

140.    Facebook immediately raced to placate Flaherty, assuring him that the problem was from a "bug in our recommendation surface" that had been resolved two months earlier.  *Id.* at 55. Facebook followed up with a longer explanation stating that the President's account had been affected because Facebook "take[s] aggressive steps to reduce the spread of vaccine hesitancy and vaccine misinformation on our platforms and we deploy technology to do so. As part of our efforts on Instagram, we have measures to help ensure we don't recommend people follow accounts that promote vaccine hesitancy at scale. For two weeks in April (April 14-28) this measure was impacted by over-enforcement on a signal we used …." *Id.* at 54.  In other words, the White House's Instagram account had been inadvertently swept into the net of censorship that it had insisted that Facebook impose on private speakers' accounts.  Evidently the White House is not amused when its own accounts are subject to the same treatment that it demands the platforms impose on thousands of ordinary Americans whose viewpoint the White House disfavors.

## D.    President Biden on Social-Media Platforms: "They're Killing People."

141.    That same day, July 15, 2021, the White House held a joint press conference with Jen Psaki and Surgeon General Murthy.  Dr. Murthy participated in the White House press conference with White House Press Secretary Jennifer Psaki to announce the Surgeon General's Health Advisory on Misinformation.  Waldo Ex. 10.  Psaki announced of Dr. Murthy that "[t]oday, he published an advisory on health misinformation as an urgent public health crisis."  *Id.* at 1.

142.     Among other things, Dr. Murthy stated that "Modern technology companies have enabled misinformation to poison our information environment with little accountability to their users." *Id.* at 2.

143.     Dr. Murthy announced: "we expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms." *Id.* at 3.

144.     At the July 15 press conference, Dr. Murthy also demanded that the platforms do "much, much more" and "take aggressive action" against misinformation.  Waldo Ex. 10, at 5.

145.     Dr. Murthy also stated that platforms "have to do more to reduce the misinformation that's out there …." *Id.* at 6.

146.     At the same press conference on July 15, 2021, Jennifer Psaki stated: "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team."  Waldo Ex. 10, at 10.

147.     Psaki stated: "We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation." *Id.* at 10.

148.     Regarding the Administration's "asks" to social-media platforms, Psaki stated: "There are also proposed changes that we have made to social media platforms, including Facebook, and those specifically are four key steps: One, that they measure and publicly share the impact of misinformation on their platform. Facebook should provide, publicly and transparently, data on the reach of COVID-19 — COVID vaccine misinformation. Not just engagement, but the reach of the misinformation and the audience that it's reaching." *Id.* at 11.

149.    Psaki also stated: "Second, that we have recommended — proposed that they create a robust enforcement strategy that bridges their properties and provides transparency about the rules. So, about — I think this was a question asked before — there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms. All of them remain active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns."  Waldo Ex. 10, at 11.

150.    Psaki stated: "Third, it's important to take faster action against harmful posts. As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly."  *Id.* at 11.

151.    And Psaki stated, publicly criticizing Facebook: "Finally, we have proposed they promote quality information sources in their feed algorithm. Facebook has repeatedly shown that they have the levers to promote quality information. We've seen them effectively do this in their algorithm over low-quality information and they've chosen not to use it in this case. And that's certainly an area that would have an impact."  Waldo Ex. 10, at 11.

152.    Psaki concluded: "So, these are certainly the proposals. We engage with them regularly and they certainly understand what our asks are."  *Id.* at 11.

153.    The next day, July 16, 2021, President Biden stated of Facebook and other platforms that "they're killing people" by failing to censor enough misinformation: "Mr. Biden was asked what his message was to social media platforms when it came to Covid-19 disinformation. 'They're killing people,' he said. 'Look, the only pandemic we have is among the

49

unvaccinated, and that — and they're killing people.'"  Glenn Decl. Ex. 33, at 1; Doc. 10-1, at 436.

154.    President Biden's statement came after "weeks" of pressuring Facebook to give federal officials access to Facebook's internal data: "White House officials … singled out social media companies for allowing false information to proliferate. That came after weeks of failed attempts to get Facebook to turn over information detailing what mechanisms were in place to combat misinformation about the vaccine, according to a person familiar with the matter."  *Id.*

155.    Surgeon General Murthy had been directly involved in those meetings with Facebook, including "tense" meetings and a meeting where he "angrily" demanded that Facebook do more to censor misinformation.  *Id.* at 437.

156.    When the President stated, "They're killing people," Psaki reinforced the same message: "'Our point is that there is information that is leading to people not taking the vaccine, and people are dying as a result,' Jen Psaki, the White House press secretary, said before Mr. Biden made his comments. 'And we have responsibility as a public health matter to raise that issue.'"  *Id.* at 436.

157.    That same day, July 16, 2021, at a White House press conference, Psaki stated that "we're in regular touch with social media platforms … about areas where we have concern. … [W]e are … regularly making sure social media platforms are aware of the latest narratives dangerous to public health that we and many other Americans seeing — are seeing across all of social and traditional media.  And we work to engage with them to better understand the enforcement of social media platform policies."  Glenn Decl. Ex. 34, at 6; Doc. 10-1, at 444.

158.    Psaki then described a "false narrative that remains active  … flowing on the internet quite a bit, in other places as well," and stated, "we want to know that the social media

platforms are taking steps to address it. That is inaccurate, false information… And that is an example of the kind of information that we are flagging or raising." Glenn Decl. Ex. 34, at 7; Doc. 10-1, at 445.

159.    Psaki also demanded additional "steps" "for Facebook or other platforms," including "to measure and publicly share the impact of misinformation on their platform and the audience it's reaching, also with the public." *Id.*

160.    She called on the platforms "to create robust enforcement strategies that bridge their properties and provide transparency about rules." *Id.* She stated that platforms should coordinate on censoring disfavored speakers: "You shouldn't be banned from one platform and not others if you — for providing misinformation out there." *Id.*

161.    Psaki also stated that the platforms should be "[t]aking faster action against harmful posts. As you all know, information travels quite quickly. If it's up there for days and days and days when people see it, you know, there's — it's hard to put that back in a box." Glenn Decl. Ex. 34, at 8; Doc. 10-1, at 446.

162.    Psaki was asked whether the censorship Facebook was already doing, which included "remov[ing] 18 million pieces of COVID misinformation" and "connect[ing] more than 2 billion people to reliable information," was "sufficient," and she responded, "Clearly not, because we're talking about additional steps that should be taken." *Id.*

163.    "[A] few hours after Biden's comment" that social-media platforms are "killing people" by not censoring misinformation, "Twitter suspended [Alex Berenson's] account for the first time." Jones Decl., Ex. J, at 3. Later, on August 28, 2021, Twitter permanently deplatformed Berenson. *Id.*

164.    Four days later, July 20, 2021, the White House explicitly threatened to amend or repeal the liability protections of § 230 of the Communications Decency Act if social-media companies did not increase censorship of disfavored speakers and viewpoints.  Glenn Decl. Ex. 35; Doc. 10-1, at 474-75 -  *'They Should Be Held Accountable': White House Reviews Platforms' Misinformation Liability*, USA TODAY (July 20, 2021), *at* https://www.usatoday.com/story/news/politics/2021/07/20/white-house-reviews-section-230-protections-covid-misinformation/8024210002/.   The White House communications director, Kate Bedingfield, announced that "[t]he White House is assessing whether social media platforms are legally liable for misinformation spread on their platforms."  *Id.*  "We're reviewing that, and certainly, they should be held accountable," she said.  *Id.*

165.    The White House communications director "specified the White House is examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites."  *Id.*

166.    Media reported that, in connection with this threat, "Relations are tense between the Biden administration and social media platforms, specifically Facebook, over the spread of misinformation online."  *Id.*; *see also, e.g.,* Glenn Decl. Ex. 36; Doc. 10-1, at 477-81: *White House says social media networks should be held accountable for spreading misinformation*, CNBC.com (July 20, 2021), *at* https://www.cnbc.com/2021/07/20/white-house-social-networks-should-be-held-accountable-for-spreading-misinfo.html.

167.    When "asked … whether these companies should be held liable for publishing false information that causes people harm, Kate Bedingfield said the administration is reviewing policies. That could include amending the Communications Decency Act, or Section 230 of the

act.  'We're reviewing that and certainly they should be held accountable,' Bedingfield said.  'And I think you heard the president speak very aggressively about this.  He understands that this is an important piece of the ecosystem.'"  *Id.* at 478.

168.    The same day, Tuesday, July 20, 2021, Clarke Humphrey of the White House communications office emailed Facebook asking for the removal of an Instagram account associated with Dr. Fauci, saying it "is not actually one of ours."  Fauci Ex. 57, at 1-2.  Facebook responded one minute later, stating, "Yep, on it!"  Fauci Ex. 57, at 1.  The next day, Facebook responded again, stating, "This account has been removed.  Thank you for flagging!"  *Id.*

**E. The Social-Media Platforms Are Cowed into Collusion on Censorship.**

169.    The threats and public pressure on July 15 and 16—including the President's comment, "they're killing people"—got immediate results, as Facebook scrambled to assuage the White House's wrath and accede to all its censorship demands.

170.    After this series of public statements, responding to "White House pressure," Facebook censored the accounts of the 12 specific disfavored speakers whom Psaki accused of spreading health misinformation.  Glenn Decl. Ex. 37; Doc. 10-1, at 483-85: *Facebook takes action against 'disinformation dozen' after White House pressure*, CNN.com (Aug. 18, 2021), *at* https://www.cnn.com/2021/08/18/tech/facebook-disinformation-dozen/index.html.    Psaki had "hammered the platform in July for allowing the people identified in the report to remain on its platform."  *Id.* at 483.  After they were singled out for censorship by the White House, Facebook "removed over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people, for violating our policies."  *Id.*

171.    Other platforms responded to the pressure as well, as Twitter suspended Alex Berenson within a few hours of President Biden's July 16 comments and deplatformed him Berenson on August 28, 2021.  Jones Decl., Ex. J, at 3.

172.    On July 17, 2021, another Facebook official sent an email to Anita B. Dunn, the political strategist and Senior Advisor to the President in the White House, begging for assistance in getting back into the White House's good graces.  Doc. 174-1, at 49.  The Facebook official, who evidently had a prior relationship with Dunn, wrote: "Would love to connect with you on the President's comments on Covid misinfo and our work there. Really could use your advice and counsel on how we get back to a good place here. … As I hope you know, we've been doing a significant amount of work to … fight the misinfo … Obviously, yesterday things were pretty heated, and I'd love to find a way to get back to pushing together on this - we are 100% on the same team here in fighting this and I could really use your advice."  *Id.*  Dunn looped in Rob Flaherty to schedule a call.  *Id.* at 48.  Facebook then wrote: "Thanks Anita, and thanks Rob. I appreciate the willingness to discuss. We'd love to find a way to get things back to a productive conversation."  *Id.*  Facebook also noted, with a similarly conciliatory tone: "We had a conversation with the Surgeon General's office yesterday to discuss the advisory in more detail and hope to continue to work to address concerns."  *Id.*

173.    The next Monday, July 19, 2021, YouTube emailed Flaherty to announce "a few new ways in which we are making it easier for people to find authoritative information on health topics on YouTube."  *Id.* at 51-2.  On July 20, 2021, Flaherty responded, linking to a Tweet of "borderline" content and stating, "I'm curious: Saw this tweet. [Linking the Tweet].  I think we had a pretty extensive back and forth about the degree to which you all are recommending anti-

54

vaccination content. You were pretty emphatic that you are not. This seems to indicate that you are. What is going on here?" *Id.* at 51.

174.    YouTube responded by assuring Flaherty that it "reduce[s]" the recommendation of anti-vaccine speech even when it does not violate YouTube's policies: "it is important to keep in mind that borderline content accounts for a fraction of 1% of what is watched on YouTube in the United States. We use machine learning to reduce the recommendations of this type of content, including potentially harmful misinformation. In January 2019, we announced changes to our recommendations systems to limit the spread of this type of content which resulted in a 70% drop in watchtime on non-subscribed recommended content in the U.S. and our goal is to have views of nonsubscribed, recommended borderline content below 0.5%." *Id.* at 51.

175.    This was not enough for Flaherty, who demanded more information: "I see that's your goal - what is the actual number right now?" *Id.* at 50.  YouTube responded that it would check for more information, and stated: "Per our COVID-19 medical misinformation policy, we will remove any content that contradicts local health authorities' or the World Health Organization's (WHO) medical information about COVID-19. To date, approximately 89% of videos removed for violations of this policy were removed with 100 views or less. With regards to the specific videos you referenced, the content was not in violation of our community guidelines." *Id.* at 50.

176.    Flaherty responded, expressing surprise that YouTube was not censoring the disfavored content: "So this actually gets at a good question - the content [that the Tweet] points out isn't defined as 'borderline' and therefore isn't subject to recommendation limitations?" *Id.*

177.    YouTube, like Facebook before it, assured Flaherty that it would "limit the visibility" and "reduce the spread" such content, even though it does not violate YouTube's

policies: "the content was not in violation of our policies and therefore not subject to removal. But for all content on YouTube, we apply our 4R framework we have previously described to raise authoritative voices while reducing visibility on borderline content. External evaluators use these guidelines which are then used to inform our machine learning systems that limits the spread of borderline content." *Id.* at 50.

178.    On October 28, 2021, the same day as a Washington Post article about Facebook employee Frances Haugen's allegations about misinformation on Facebook, Rob Flaherty emailed Brian Rice of Facebook a hyperlink to the article. The only text in the email was the subject line, which stated: "not even sure what to say at this point." Waldo Ex. 35, at 1-2; *see also infra.*

179.    On November 4, 2021, Meta reported to Rowe, Flaherty, and other White House officials that "we updated our misinformation policies for COVID-19 vaccines to make clear that they apply to claims about children…." Doc. 71-3, at 15.

180.    On November 30, 2021, Christian Tom of the White House emailed Twitter stating, "Would you mind looking at this video and helping us with next steps to put a label or remove it?" Doc. 174-1, at 65. He included a link to a Tweet of an unflattering, comedic video of First Lady Jill Biden reading to children, which had been clearly edited to make it sound as if she was profanely heckled while reading to them. *Id.* The subject line of the message was "Doctored video on Twitter of the First Lady." *Id.* Twitter responded within six minutes: "Happy to escalate with the team for further review from here." *Id.*

181.    That evening, Twitter emailed back, stating, "Update for you - The team was able to create this event page for more context and details." *Id.* at 64. The "event page" explained the context of the parody video but did not censor it; it alerted users that the video had been edited for "comedic" effect. *See A video of first lady Jill Biden reading to children was manipulated to*

56

*include profanity, according to fact-checkers*, TWITTER (Nov. 30, 2021), https://twitter.com/i/events/1465769009073123330.

182.    Christian Tom promptly emailed back, asking that Twitter actually censor the comedic video, not just provide an event page explaining that it was comedic: "Will you apply the 'Manipulated Media' disclaimer to the video asset itself?"  Doc. 174-1, at 64.

183.    The next morning, December 1, 2021, Tom emailed Twitter again, arguing that Twitter should apply a label to the video under its content-moderation policies: "Just wanted to follow-up here.  It looks like from the rubric that this fits the first two criteria, which means it is 'likely' to be labeled:" and linking Twitter's "manipulated media" policy.  *Id.* at 63-4.

184.    Twitter wrote back the same morning, explaining that the comic, parody video of Jill Biden was not subject to labeling under its policy because it was not likely to cause harm, but noting again that Twitter had created a special page to explain that the video was edited: "After escalating this to our team, the Tweet and video referenced will not be labeled under our synthetic and manipulated media policy. Although it has been significantly altered, the team has not found it to cause harm or impact public safety.  The team was able to create this Twitter Moment (here) and event page for more context and details."  *Id.* at 63.

185.    The same day, Christian Tom emailed back, disputing Twitter's interpretation of its own content-moderation policy and looping in Michael DeRosa, the First Lady's press secretary.  *Id.*  Michael DeRosa then emailed as well, disputing and demanding information about Twitter's application of its own policy.  *Id.* at 62.  Tom and DeRosa continued to press Twitter for further explanation and action on December 9, 13, and 17.  *Id.* at 60-61.  Twitter provided another, more detailed explanation of its decision on December 17.  *Id.* at 59-60.  Tom emailed back the

57

same day, again disputing Twitter's application of its own policy and pressing Twitter again on the issue.  *Id.* at 58-59.  He added Rob Flaherty to the email chain for the first time.  *Id.* at 58.

186.    Nine minutes later, on December 17, 2021, Flaherty wrote to Twitter, angrily accusing Twitter of dishonestly misapplying its own policies: "New to the thread here, but this all reads to me like you all are bending over backwards to say that this isn't causing confusion on public issues.  If the AP deems it confusing enough to write a fact check, and you deem it confusing enough to create an event for it, how on earth is it not confusing enough for it to at least have a label?  Total Calvinball."  *Id.* at 58.  ("Calvinball" refers to a game in the cartoon "Calvin and Hobbes" where the participants make up the rules of the game as they go along.)

187.    A senior-level Twitter executive then emailed Flaherty proposing to resolve the matter by phone.  *Id.*  After that phone conversation, it appears that the Tweet that prompted the exchange is no longer available.  *See id.* at 65 (linking to https://twitter.com/ArtValley818_/status/1465442266810486787?s=20, which is no longer available).

**F.    White House Pressure and Collusion Continue Throughout 2022.**

188.    During January 2022, Facebook reported to Rowe, Manning, Flaherty, and Slavitt that it has "labeled and demoted" "vaccine humor posts whose content could discourage vaccination."  It also reported to the White House that it "labeled and demoted" posts "suggesting natural immunity to COVID-19 infection is superior to immunity by the COVID-19 vaccine."  Doc. 71-3, at 10-11.

189.    Twitter emailed back within an hour and offered to discuss, to which Flaherty responded: "Happy to talk through it but if your product is appending misinformation to our tweets that seems like a pretty fundamental issue."  *Id.*

190.    Separately, Jesse Lee of the White House emailed Twitter in response to the same report, accusing Twitter of "calling the President a liar" and offering to talk by phone to resolve the complaint: "this note is factually inaccurate. This is a very technical question but you don't have it right, and you are in effect calling the President a liar when his tweet is actually accurate. I'm happy to discuss this with whoever is the right person," and providing his cell phone number. *Id.* at 69.  Twitter then reached out by phone to resolve it.  *Id.*

191.    On September 18, 2021, regarding a story in the Wall Street Journal about COVID-19 "misinformation" circulating on Facebook, Flaherty demanded that Meta provide an explanation "as we have long asked for, [of] how big the problem is, what solutions you're implementing, and how effective they've been."  Doc. 71-3, at 24.

192.    On February 1, 2022, Psaki was asked at a White House press conference whether the Administration was satisfied with Spotify's decision to affix advisory warnings to Joe Rogan's immensely popular podcast, which featured speakers that contradicted the Administration's messaging about COVID-19 and vaccines, or whether the government "think[s] that companies like Spotify should go further than just, you know, putting a label on" disfavored viewpoints and speakers.  Psaki responded by demanding that Spotify and other platforms "do[] more" to block disfavored speech: "[O]ur hope is that all major tech platforms … be vigilant to ensure the American people have access to accurate information on something as significant as COVID-19…. So, this disclaimer – it's a positive step.  But we want every platform to continue *doing more* to call out … mis- and disinformation while also uplifting accurate information."  Glenn Decl. Ex. 38, at 15-16; Doc. 10-1, at 501-2 (emphasis added). She stated that Spotify's advisory warnings are "a good step, it's a positive step, but *there's more that can be done*."  *Id.* at 502 (emphasis added).

193.    On April 25, 2022, Psaki was asked at a White House press briefing to respond to the news that Elon Musk would acquire Twitter, and asked "does the White House have any concern that this new agreement might have President Trump back on the platform?"  Glenn Decl. Ex. 40; Doc. 10-1, at 528.

194.    Psaki responded by reiterating the threats of adverse legal consequences to Twitter and other social media platforms, specifically referencing antitrust enforcement and Section 230 repeal: "No matter who owns or runs Twitter, the President has long been concerned about the power of large social media platforms … [and] has long argued that tech platforms must be held accountable for the harms they cause.  He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more.  And he's encouraged that there's bipartisan interest in Congress."  *Id.* at 528-29.

195.    At the same press briefing, Psaki was asked: "Are you concerned about the kind of purveyors of election misinformation, disinformation, health falsehoods, sort of, having more of an opportunity to speak there on Twitter?"  She responded by specifically linking the legal threats to the social-media platforms' failure to more aggressively censor free speech: "I would say our concerns are not new.  We've long talked about and the President has long talked about his concerns about the power of social media platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable."  *Id.* at 534.

196.    Psaki was then asked a question that noted that "the Surgeon General has said that misinformation about COVID amounts to a public health crisis," and then queried, "would the White House be interested in working with Twitter like it has in the past to continue to combat this

kind of misinformation?  Or are we in a different part of the pandemic where that kind of partnership is no longer necessary?"  *Id.* at 549.

197.    Psaki responded by reaffirming that senior officials within the White House and/or the Administration are continuing to coordinate directly with social-media platforms to censor disfavored speakers and content on social media, and directly linking these efforts to the repeated threat of adverse legal action: "we engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue.  But there are also reforms that we think Congress could take and we would support taking, including reforming Section 230, enacting antitrust reforms, requiring more transparency.  And the President is encouraged by the bipartisan support for — or engagement in those efforts."  *Id.*

198.    On June 13, 2022, Flaherty demanded that Meta continue to produce periodic "COVID-19 insights reports" to track so-called "misinformation" regarding COVID-19 on Meta's social-media platforms, expressing the specific concern that COVID vaccines for children under 5 would soon be authorized.  Doc. 71-3, at 6.

199.    Meta got the message.  It agreed to continue sending its censorship-tracking reports, and on June 22, 2022, Meta assured Flaherty that it was expanding its censorship of COVID-19 "misinformation" to ensure that speech critical or skeptical of COVID-19 vaccines for children under 5 years old—a highly controversial topic—would be censored.  Doc. 71-3, at 5.

### G.    Pressure to Expand the Topics of Social-Media Censorship.

200.    Since this lawsuit was filed, Defendants have expanded their social-media censorship activities and pressured social-media platforms for censorship in new areas of online discourse, including areas such as climate change, gender, abortion, and economic policy.

201.    For example, on June 14, 2022, White House National Climate Advisor Gina McCarthy spoke at an Axios event titled "A conversation on battling misinformation." Jones Decl. Ex. M, at 1.

202.    During the event, "McCarthy skewered Big Tech companies for 'allowing' disinformation and cheered Congress for 'taking action' to enact more censorship last Thursday." *Id.* at 2.  "Axios political reporter Alexi McCammond asked McCarthy how so-called 'rampant mis-and-disinformation around climate change online and in other platforms' has 'made your job harder?'"  *Id.*  "McCarthy responded by slamming social media companies: 'We have to get tighter, we have to get better at communicating, and frankly, *the tech companies have to stop allowing specific individuals over and over again to spread disinformation*.'"  *Id.* (emphasis added).  "She suggested further that 'we have to be smarter than that and *we need the tech companies to really jump in*.'"  *Id.* at 3 (emphasis added).  "McCammond responded by asking: 'Isn't misinformation and disinfo around climate a threat to public health itself?'  McCarthy asserted that it 'absolutely' is: 'Oh, absolutely.'"  *Id.*

203.    Like Psaki and others, McCarthy explicitly tied these demands for censorship of climate-change-related speech to threats of adverse legislation: "McCarthy also praised Congress directly for pushing social media companies to censor Americans: 'We do see Congress taking action on these issues, we do see them trying to tackle the misinformation that's out there, trying to hold companies accountable.'"  *Id.* at 4.

204.    On June 16, 2022, the White House announced a new task force to address, among other things, "gendered disinformation" and "disinformation campaigns targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists."  Jones Decl., Ex. N, at 1.

205.    The June 16 Memorandum decries "online harassment and abuse"—vague terms that, on information and belief, are deliberately adopted to sweep in constitutionally protected speech.  *Id.*  In particular, the Memorandum defines "online harassment and abuse" to include "gendered disinformation," a deliberately broad and open-ended term.  *Id.* § 1.  The Memorandum announces plans to target such "gendered disinformation" directed at public officials and public figures, including "women and LGBTQI+ political leaders, public figures, activists, and journalists."  *Id.*  The Memorandum creates a Task Force co-chaired by the Assistant to the President for National Security Affairs, which includes the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security, among others.  *Id.*

206.    The Task Force is charged with "developing programs and policies to address … *disinformation campaigns* targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists in the United States and globally."  *Id.* § 4(a)(iv) (emphasis added).  The Memorandum calls for the Task Force to consult and coordinate with "technology experts" and "industry stakeholders," *i.e.*, social-media firms, to achieve "the objectives of this memorandum," *id.* § 4(b).  Those "objectives," of course, include suppressing so-called "disinformation campaigns" against "public and political figures."  *Id.* § 4(a)(iv).

207.    The Memorandum again threatens social-media platforms with adverse legal consequences if they do not censor aggressively enough to suit federal officials: "the Task Force shall … submit periodic recommendations to the President on *policies, regulatory actions, and legislation on technology sector accountability* to address systemic harms to people affected by online harassment and abuse."  *Id.* § 5(c) (emphasis added).

208.     Relatedly, on May 27, 2022, HHS Assistant Secretary Rachel Levine demanded that social-media platforms censor "misinformation" about "gender-affirming care."  Jones Decl., Ex. O, at 1.  In a public address to health officials, Levine "spoke about the need for government to 'address health information directly' and specified that includes encouraging Big Tech to combat health misinformation 'beyond COVID-19.'"  *Id.*  Levine stated: "So I'd like to just talk briefly about another area of substantial misinformation that is directly impacting health equity in our nation, and that is the health equity of sexual and gender minorities. There is substantial misinformation about gender-affirming care for transgender and gender diverse individuals… The positive value of gender-affirming care for youth and adults is not in scientific or medical dispute … And we need to use our clinicians' voice to collectively advocate for our tech companies to create a healthier, cleaner information environment."  *Id.* at 1-2.

209.     On July 8, 2022, the President signed an Executive Order on protecting access to abortion.  Jones Decl., Ex. P, at 1.

210.     Section 4(b)(iv) of the order states: "The Secretary of Health and Human Services shall, in consultation with the Attorney General and the Chair of the FTC, consider options to address deceptive or fraudulent practices related to reproductive healthcare services, including online, and to protect access to accurate information."  *Id.*  This is a plain reference to the online advertising practices of pro-life pregnancy resources centers, which the President's political allies were then attacking.  Jones Decl., Ex. Q, at 1-2.

211.     On August 11, 2022, Flaherty emailed Twitter to dispute a note added by Twitter to one of President Biden's tweets.  Doc. 174-1, at 68.  The subject line of Flaherty's email was a link to a Tweet criticizing Twitter's note: "Joe Weisenthal on Twitter: 'Wow, this note that twitter added to Biden's tweet is pure gibberish. Imagine adding this, and thinking this is helpful to the

public's understanding in any way.'" *Id.*  Linking to a tweet about gas prices, Flaherty wrote: "Happy to connect you with some economists who can explain the basics to you guys."  *Id.* Flaherty copied Jesse Lee, Senior Advisor to the National Economic Council at the White House, on the email.  *Id.*

## III.    The Pressure Campaign from Surgeon General Murthy and His Office.

212.    Throughout 2021 and 2022, Surgeon General Vivek Murthy and his Office engaged in a pressure campaign in parallel with, and often overlapping with, the White House's pressure campaign on social-media platforms.  Surgeon General Murthy and his staff were often included in the same meetings and communications with White House officials and social-media platforms, and joined White House officials pressuring them to increase censorship in public and in private.

### A.    The Surgeon General: Using the "Bully Pulpit" to Pressure Platforms.

213.    Eric Waldo is the Senior Advisor to the Surgeon General of the United States, Vivek Murthy, and was formerly a Chief Engagement Officer in the Office of the Surgeon General ("OSG").  Waldo Dep. 11:15-12:2.

214.    As "the engagement team leader" for OSG, Waldo was "the one in charge of maintaining the contacts and the relationships with representatives of social media platforms."  *Id.* at 51:11-17.

215.    Dr. Murthy was directly involved in editing and approving the final work product of the Surgeon General's Office, including the Surgeon General's July 15, 2021 health advisory on misinformation and the Surgeon General's March 3, 2022 RFI to social-media platforms.  *Id.* at 14:20-22, 15:16-19, 16:9-10, 17:1-6, 187:24-188:3.

216.    Calling for an "all-of-society approach" to misinformation was a pervasive theme of the Surgeon General's communications, including the health advisory and the RFI.  *Id.* at 19:25,

26:8, 88:9, 89:13, 101:2, 117:13, 122:15, 211:22, 246:25, 251:9, 332:22.  This theme echoes the repeated call for an "all-of-society approach" in the Virality Project's public report.  *See infra.*

217.    Before the Surgeon General's health advisory on misinformation was published on July 15, 2021, OSG and Waldo "did pre-rollout calls with Twitter, Facebook, [and] Google/YouTube."  *Id.* at 20:7-11.

218.    The Surgeon General uses his "bully pulpit" to call for censorship of health misinformation: "Dr. Murthy continued from a communications perspective to talk about health misinformation using his bully pulpit."  *Id.* at 25:23-25.

219.    Waldo admits that the Surgeon General is directly advocating to social-media platforms to take stronger actions against health "misinformation": "[T]he Surgeon General has the ability … to talk to the relevant stakeholders and say we want you to be aware of this issue and that we think you have a role to play to improve the health outcomes, yes."  *Id.* 28:10-14.  As part of this role, the Surgeon General "call[s] out social media platforms in the [health] advisory."  *Id.* at 28:18-19.

220.    The Surgeon General's "bully pulpit," Waldo agrees, involves putting public pressure on social-media platforms: "I think the bully pulpit … is really the fact that he commands attention, including being able to …  speak with the press, speak with the public, and … we think of the Surgeon General as the nation's doctor."  *Id.* at 29:9-15.

221.    A goal of the Surgeon General's use of the "bully pulpit" includes to "reduce the dissemination of health misinformation."  *Id.* at 30:5-10.  This includes making "recommendations of specific steps the social media platforms are … called out to take to reduce the spread of misinformation on the platforms."  *Id.* at 31:3-8.

222.     OSG reinforces its public "message of calling out the social media platforms to take steps to reduce the spread of misinformation on their platforms" through private communications with platforms: "[W]hat we're saying publicly, we're also … said that privately to them as well." *Id.* at 32:5-8, 12-14.  This includes during "rollout calls." *Id.* at 32:19-20.

**B. Surgeon General Works in Tandem with the White House and Virality Project.**

223.     On the day of the health misinformation advisory rollout, July 15, 2021, "Press Secretary … Jen Psaki had already made remarks specifically about Facebook, and then," the next day, "President Biden made his remarks that social media and Facebook were killing people." *Id.* at 33:19-25.  "Facebook … was upset about how the rollout had gone." *Id.* at 33:6-8.  Waldo's initial rollout call with Facebook, as a result, was affected by the Administration's public attacks on Facebook: "I wouldn't call it the most productive call." *Id.* at 34:4-6.

224.     After this public pressure, Facebook's senior executive, Nick Clegg, reached out to request "deescalat[ion]" and "work[ing] together" as a direct result of that public pressure on Facebook: "Then later, with our call, we had a call with Nick Clegg from Facebook, and at his request, and … his intentions were to sort of I think deescalate and just find ways that we could work together, given how Facebook … was treated in that rollout day." *Id.* at 34:7-13.

225.     In the call with Nick Clegg, Surgeon General Murthy reiterated his demand for Facebook to do more to censor "misinformation" on its platforms: "[O] n the call with Nick Clegg, the Surgeon General did … reiterate the idea that, you know, as we described in the advisory, that we think there's more … that Facebook and other social media companies can do, and … we reiterated that." *Id.* at 35:7-12.

226.     Murthy also asked Clegg and Facebook specific questions about requiring Facebook to share data with outside researchers about the scope and reach of misinformation on

its platforms, again echoing the key recommendation of the Virality Project: "[T]he most specific questions were about understanding the data around the spread of misinformation and how we were measuring that, and … how we could have external researchers validate the spread of misinformation and -- and helping us as a field understand the depth of the problem."  *Id.* at 35:20-36:2.

227.   One such "external researcher" that OSG had in mind was "Renee DiResta, from the Stanford Internet Observatory," a leading organization of the Virality Project, which hosted a "rollout event" for the advisory featuring Dr. Murthy on the day the advisory was announced.  *Id.* at 36:19-23.

228.   Waldo admits that there was "coordination" between OSG and Renee DiResta of the Virality Project on the launch of the Surgeon General's health advisory: "I know there was coordination with [DiResta] with respect to the launch … there was a panel, a public sort of virtual town hall that we hosted -- with the Sanford [sic] Internet Observatory that Dr. Murthy spoke at, and that was part of the launch day. So certainly there would have been coordination … with her." *Id.* at 38:1-7.

229.   Kyla Fullenwider is the OSG's key "subject matter expert" who "worked on the advisory" and had significant substantive input on both the Surgeon General's July 15, 2021 health advisory on misinformation, and the Surgeon General's March 3, 2022 RFI to social-media platforms on the spread of misinformation.  *Id.* at 39:1-4, 59:16-23.  Kyla Fullenwider is not a direct employee of the OSG, but works for a non-profit contractor named "US Digital Response," Waldo Dep. 85:13-15.

230.   Kyla Fullenwider "did a follow-up call with Renee DiResta" about the health advisory.  *Id.* at 38:25-39:4.

231.    After the launch of the health advisory, Waldo and Fullenwider "did a call" with Renee DiResta "that was more of a brainstorm around … public-facing events that we could do to talk about this issue" of stopping health misinformation.  *Id.* at 40:13-17.

232.    Fullenwider and DiResta "most likely" discussed misinformation in these calls. *Id.* at 41:4-6.

233.    Waldo and OSG also received a briefing from the Center for Countering Digital Hate about the so-called "Disinformation Dozen."  *Id.* at 43:1-48:1.  CCDH gave "a presentation about the Disinformation Dozen and sort of how they were measuring … that those were the folks primarily responsible for a lot of misinformation online."  *Id.* at 47:2-5.

234.    Rafael Campos of OSG "helped create the event with … the Stanford Internet Observatory for the launch," and likely had communications with Stanford and Professor DiResta in the lead-up to the event.  *Id.* at 48:12-14, 49:1-2.

235.    The OSG anticipated that the social-media platforms would feel pressured by the advisory: "we didn't think they would be happy about this -- you know, the content of the advisory."  *Id.* at 54:24-55:1.

236.    Waldo is aware of "at least one call … that the Surgeon General [Murthy] had with Facebook during the transition," i.e., between President Biden's election and his assuming office. *Id.* at 55:8-10.  The call involved a "Facebook individual": "Dr. Murthy had mentioned that he had been on a call with that person [from Facebook] during the transition."  *Id.* at 79:11-18, 56:5-6. Waldo identified the individual as "a data person from the Facebook team."  *Id.* at 56:10.  The purpose of that call was "again, about that issue of trying to understand the reach of the mis- and disinformation and understanding … how far it was spreading."  *Id.* at 56:15-19.

237.     "Data about misinformation" was "a topic of conversation" in that call, and the participants discussed "Facebook" being "un[]clear" or "unable to present … the depth or reach of the misinformation, that they didn't have that data." *Id.* at 80:1-15.

238.     DJ Patil may have participated in that transitional call.  Patil was the "chief data scientist in the Obama administration, and he was a special government employee at the White House for part of the first year" of the Biden Administration.  *Id.* at 81:6-13.  Patil was also "on the call with Dr. Murthy and [Waldo] and Nick Clegg … in his capacity as a White House official." *Id.* at 81:24-82:3.

239.     Waldo "connected [Patil] to another research data person … a Facebook data person." *Id.* at 82:13-16.

240.     The purpose of this follow-up was to demand more information from Facebook about monitoring the spread of misinformation on its platforms: "[T]he problem was we were still in this piece of not understanding the reach and depth … of the misinformation … on Facebook. And … this person was going to try to explain to [Patil] the data challenges in doing so." *Id.* at 83:4-9.

241.     Kyla Fullenwider is the "main" or key staffer for the OSG on misinformation and disinformation.  *Id.* at 58:21-24. Ann Kim is listed on the OSG's org chart, Waldo Ex. 2, as the person who "[d]irects mis- and dis-information engagement," Waldo Ex. 2, but that is solely "because Kyla Fullenwider reported up to Ann Kim. And since Kyla, I think, was our main subject matter expert or continued to do work on mis- and disinformation, maybe that was why that was put under Anne's list of duties." Waldo Dep. 58:20-24.  Fullenwider, therefore, is the OSG's "main subject matter expert" on "mis- and disinformation," who "directs mis- and dis-information engagement" for the OSG.  *Id.* at 58:13-59:7.

70

242.    Fullenwider works for the nonprofit U.S. Digital Response, and is not directly employed by the OSG, though she was acting in an official capacity on behalf of OSG.  Waldo Ex. 3, at 32; Waldo Dep. 85:10-86:8.

243.    U.S. Digital Response is not a government agency but a non-profit organization: "U.S. Digital Response (USDR) is a nonprofit, nonpartisan organization that helps governments, nonprofits, and public entities respond quickly to critical public needs."  *About U.S. Digital Response*, U.S. Digital Response (last visited Feb. 17, 2023), https://www.usdigitalresponse.org/about.

244.    Ann Kim has no direct involvement in mis- and disinformation.  Waldo Dep. 58:25-59:3.  But Kyla Fullenwider "was definitely working on mis- and disinformation."  *Id.* at 59:6-7.  Fullenwider "was working with Daniel [Tartakovsky] on the design of … the advisory. And then … Kyla was continuing to help us think about were there additional ways we might engage."  *Id.* at 59:12-15.  Further, "Kyla … was the principal designer of options around follow-up with respect to data."  *Id.* at 59:16-18.  And when "the Surgeon General's office put out an RFI around misinformation data" on March 3, 2022, "Kyla worked on that."  *Id.* at 59:18-22.  Kyla "was the subject matter expert who was chiefly creating options for the Surgeon General …  to consider how we would continue to … talk about mis- and disinformation with respect to data."  *Id.* at 60:6-10.

245.    Kyla Fullenwider also participated in the "rollout calls" to the social-media platforms announcing the Surgeon General's health advisory on misinformation.  *Id.* at 62:24-63:4.

246.    Waldo was also "on some e-mails and at least one call with Rob Flaherty" when he "would communicate with Facebook." *Id.* at 64:9-11.  This included a call with Rob Flaherty and

71

the OSG: "[B]efore our call with Nick Clegg, … I had a call with Rob." *Id.* at 65:1-2. By then, Flaherty had been "separately communicating with Facebook," and he was "giving us a heads-up on his experiences … in communicating with … Facebook." *Id.* at 65:4-9.

247.    In August 2021, Waldo joined a call with Rob Flaherty and Brian Rice of Facebook, who was in charge of Facebook's relationship with federal officials. *Id.* at 66:10-14, 124:24-125:2.

248.    In that August 2021 call, "Brian Rice from Facebook had requested a call to give us an update on some sort of internal action they were doing. … Facebook had either found something or removed something and was letting us know about it." *Id.* at 66:16-23.

249.    Andy Slavitt of the White House also communicated with Nick Clegg. *Id.* at 67:14-21. When Andy Slavitt left the White House, he offered Surgeon General Murthy as a direct contact for Nick Clegg. *Id.* at 68:4-7.

250.    In addition, "Dr. Murthy has certainly had conversations with Dr. Fauci." *Id.* at 69:21-22. Waldo claims that he does not know the nature of those conversations. *Id.* at 69:23-25. "Dr. Murthy would have directly communicated with Dr. Fauci, to my knowledge." *Id.* at 70:13-15.

251.    Waldo is "certain that Dr. Murthy has connected" with Dr. Francis Collins. *Id.* at 71:2-9.

252.    Waldo was involved in collecting information to respond to Plaintiffs' interrogatories on behalf of OSG. *Id.* at 73:19-74:11.

**C.    The Surgeon General Pressures Social-Media Platforms in Private.**

253.    The first meeting with social-media platforms relating to misinformation that OSG identified in response to interrogatories was a brief introductory call with Nick Clegg on May 25, 2021: "On May 25, 2021, from 4:30 to 5:00 pm ET, Dr. Vivek Murthy from OSG and Andy Slavitt

from the White House met remotely with Nick Clegg from Facebook. The purpose of the call was to introduce Dr. Murthy to Mr. Clegg." Waldo Ex. 3, at 32; *see also* Waldo Dep. 78:24-79:10. The next meeting disclosed was the first "rollout call" relating to the advisory on July 12, 2021. Waldo Ex. 3, at 32. As noted below, this interrogatory response failed to disclose several previous meetings between Dr. Murthy and Facebook.

254.    OSG had pre-rollout calls with Twitter and YouTube on July 12 and July 14, 2021, and a rollout call with Facebook the day after the rollout on July 16, 2021. *Id.* at 32; Waldo Dep. 85:10-90:5.

255.    Kyla Fullenwider handled the substantive communications with the social-media platforms in the rollout calls; Waldo's role was to "connect them to our subject matter expert." Waldo Dep. 86:24-25.

256.    The July 16 call with Facebook was "the same day" that President Biden stated of Facebook that "They're killing people" by not censoring enough misinformation. *Id.* at 90:24, 93:3-5.

257.    At that July 16 call, Kyla Fullenwider "was able, at a high level, to walk over the … recommendations section for … technology companies," which demand greater censorship of misinformation. *Id.* at 91:14-16.

258.    The Facebook call "was definitely a slightly awkward call" because "President Biden made his comment about social media companies and Facebook killing people … right before, or even potentially during the call," and Waldo observed that "the Facebook team looked a little sad." *Id.* at 92:24-93:6.

259.    On July 23, 2021, Waldo, Dr. Murthy, and DJ Patil of the White House had a call with Nick Clegg and Brian Rice of Facebook. Waldo Ex. 3, at 32-33. Nick Clegg requested the

73

meeting "to deescalate" and "reset the tone" because the "Facebook team were feeling … that they had been uniquely called out."  Waldo Dep. 95:4-13.

260.    After the meeting, Nick Clegg "did share definitely over e-mail more information about what they were doing to reduce mis- and disinformation, COVID mis- and disinformation on the platform."  *Id.* at 96:13-17.

261.    There was also "a follow-up e-mail sometime the next couple of weeks where … Nick or Brian shared … here's additional work we're doing, here's how we're responding to the advisory."  *Id.* at 97:7-11.

262.    This follow-up email provided "a catalog of … both removal of misinformation and other steps to tamp down mis- and disinformation."  *Id.* at 97:16-22.

263.    Waldo believes that these were "new steps that they had taken in the week or so since … they felt uniquely called out on July 15th and 16th."  *Id.* at 97:23-98:3.  The email was in response to a request from OSG "asking for, can you let us know, like, what you're doing in addition" to combat misinformation, "and so this was responding to that."  *Id.* at 98:5-7.

264.    On the July 23 call with Facebook, "Dr. Murthy raised the issue of wanting to have a better understanding of the reach of the mis- and disinformation on … the social media platform."  *Id.* at 98:19-22.

265.    Waldo likens the problem of mis- and disinformation on social media to "eating, like, a piece of uranium," and compares misinformation to "cancer."  *Id.* at 99:1-101:8.

266.    The OSG's health advisory advances the view that the spread of misinformation is "very harmful."  *Id.* at 101:24-102:7.

267.    Waldo agrees that the health advisory "provides specific examples to technology companies what they could do more of to reduce the spread of health mis- and disinformation." *Id.* at 104:16-18.

268.    Waldo uses the word "poison" to describe health misinformation, as did Dr. Murthy in announcing the Health Advisory.  *Id.* at 105:4; Waldo Ex. 10, at 2.

269.    In the July 23, 2021 call with Nick Clegg, Dr. Murthy "didn't retreat … from the message of the advisory, which explicitly calls for social media platforms to do more to control the reach of misinformation on their platforms," and "continued … to discuss that message." Waldo Dep. 107:21-108:5.

270.    In addition, in that call, the OSG asked Facebook to report back on "what they were doing in response to the advisory, if they were taking any actions." *Id.* at 109:2-4.

271.    In addition, Patil was "also asking the data impact questions." *Id.* at 109:24.

272.    OSG perceived that OSG's and the White House's public statements criticizing Facebook put economic pressure on Facebook, and that Facebook was engaging with Dr. Murthy to "keep Dr. Murthy from saying … any other things that might be viewed as bad for their business." *Id.* at 113:13-15.

273.    Waldo agrees that the events of July 15 and July 16 put unique pressure on Facebook: "when you add the press conference remarks plus President Biden's remarks, it made it seem as though … there was more attention on Facebook." *Id.* at 116:2-5.

274.    The OSG's "subject matter experts" – Kyla Fullenwider, Daniel Tartakovsky, and DJ Patil of the White House – believed that misinformation "was a problem across multiple platforms." *Id.* at 116:15-16.

275.     On July 30, 2022, Waldo had a meeting with Google and YouTube representatives, in which the representatives reported to OSG on what actions they were taking that were consistent with or in response to the health advisory: "The topics discussed included YouTube/Google following up on the announcement of the OSG Advisory to share more of the work it was doing around health mis- and disinformation."  Waldo Ex. 3, at 33.

276.     When the OSG's health advisory issued, Twitter's policy handle publicly endorsed the OSG's call for greater censorship of health misinformation: "[T]he Twitter policy handle … either retweeted or quote tweeted and said something like, we agree. … [W]e do need an all-society approach, and here's what we're doing."  Waldo Dep. 122:11-16.

277.     On August 10, 2021, Waldo and Rob Flaherty had a call with Facebook in which Facebook reported back to federal officials on its actions to remove misinformation, including the details of "an operation [Facebook] uncovered that is related to vaccine misinformation."  Waldo Ex. 3, at 33 (alteration in original).  According to Waldo, "Brian Rice had requested a call with me and Rob [Flaherty] and, during the call, flagged that Facebook … had done some sort of internal operation where … they discovered some misinformation pieces happening and had taken some corrective action."  Waldo Dep. 124:13-21.

278.     Brian Rice was Facebook's "main … staff level liaison" with the federal officials. *Id.* at 125:2-3.

279.     Facebook emailed Waldo and Flaherty "a COVID report list that had … some sort of report from Facebook on a biweekly basis."  *Id.* at 126:11-16.

280.     On September 14, 2021, Waldo had another meeting with Google/YouTube representatives, "to discuss a new policy we [YouTube] are working on as well as provide an update on our overall efforts to combat harmful COVID-19 misinformation on the platform."

Waldo Ex. 3, at 33.  This was the "second update by [Google/Youtube] to [OSG] following the health advisory of stuff they're doing to combat harmful COVID-19 misinformation through YouTube."  Waldo Dep. 129:7-12.

281.    On May 28, 2021, a few days after meeting with Andy Slavitt and Dr. Murthy for the first time (and almost two months before OSG issued the Health Advisory and had the related meetings with Waldo and others), Nick Clegg emailed Dr. Murthy and stated that, "[a]s promised," he was sending a report of misinformation on Facebook.  Waldo Ex. 4, at 1.  Clegg also "highlighted a few policy updates we announced yesterday regarding repeat misinformation," including "expand[ing] penalties for individual Facebook accounts that share misinformation," "add[ing] more context about pages that repeatedly share false claims," and "redesign[ing] notifications when they share content that a fact-checker later rates."  *Id.*

282.    These "policy updates" about increasing censorship were announced on May 27, 2021, two days after Nick Clegg's meeting with Dr. Murthy and Andy Slavitt on May 25, 2021.  Waldo Dep. 138:2-7.

283.    Clegg plainly indicated that there had been prior conversations in which Slavitt and Dr. Murthy had demanded "defensive work" to remove misinformation: "We're . . . committed to addressing the defensive work around misinformation that you've called on us to address."  Waldo Ex. 4, at 2.  These prior conversations were not disclosed in OSG's responses to interrogatories, which noted the first meeting with Dr. Murthy was a mere introductory meeting with Clegg on May 25, 2021.  Waldo Ex. 3, at 32.

284.    On June 14, 2021, Nick Clegg emailed Dr. Murthy another ("the latest") "Facebook bi-weekly covid content report," which he indicated was "as promised/discussed," and offered

"[a]s always" to "jump on a call at any point … to delve into any further details as needed."  Waldo Ex. 5, at 1.

285.    The "Facebook bi-weekly covid content report," *id.*, contained a report of "the most engaged posts … with respect to both accurate and inaccurate information."  Waldo Dep. 140:8-10.  Rob Flaherty of the White House also received these reports.  *Id.* at 140:21-24.

286.    Waldo admits that Facebook sending these biweekly reports to Dr. Murthy and Flaherty "had preexisted" and "predates the meeting" on May 25, 2021 – further indicating that OSG failed to disclose key meetings between Dr. Murthy and social media platforms in its interrogatory responses.  *Id.* at 142:10-11.

287.    On July 6, 2021, Waldo emailed contacts at Twitter to set up the "rollout call" before the health advisory and stated: "As you know, one of the issues Dr. Murthy has been thinking about is how to help stop the spread of health misinformation as we continue to tackle COVID19 and beyond.  I know you and your teams are working hard and thinking deeply about this issue.  We'd love to chat over zoom to connect and discuss what's on the horizon for our teams."  Waldo Ex. 6, at 2; Waldo Dep. 145:15-146:22.

288.    On July 6, 2021, Waldo sent an identical email to Facebook.  Waldo Ex. 7, at 3-4. The purpose of these emails was to set up calls to announce the Surgeon General's forthcoming health advisory on misinformation.  Waldo Dep. 149:11-16.  Because of scheduling conflicts, the "rollout call" with Facebook was not scheduled until July 16, the day after the advisory was announced and the same day President Biden stated of Facebook that "they're killing people."  *Id.* at 149:11-17.

289.    On July 6, 2021, Waldo also sent an email to YouTube with a similar statement to set up a rollout call with YouTube.  Waldo Ex. 8, at 3.  Waldo's emails make clear that OSG's message and purpose was to "stop the spread of misinformation" on social-media platforms.  *Id.*

290.    In these calls, "we had Kyla [Fullenwider] on the call and giving them a high-level update that we're going to have this advisory come out and that we want them to take a look at it."  Waldo Dep. 153:23-154:1.

291.    On July 10, 2021, Nick Clegg emailed Dr. Murthy, attaching another bi-weekly Covid content report, and stated, "I understand ... that my team is meeting with yours next week to delve deeper into our [C]ovid misinformation efforts."  Waldo Ex. 9, at 1.  Waldo understands that this refers to the July 16 rollout meeting.  Waldo Dep. 155:12-18.

292.    In the July 16, 2021 meeting with Facebook, Kyla Fullenwider went over the advisory, and then "asked additional questions … related to Facebook's efforts to combat health misinformation," including "some questions about, again, the research side.… [S]ome questions came up about CrowdTangle, if I recall correctly which was a … data port for … some ways to understand the Facebook, again, impact and research of the misinformation."  *Id.* at 157:21-159:9.

**D.    The Surgeon General's Public Pressure Campaign.**

293.    On July 15, 2021, Dr. Murthy participated in a White House press conference with White House Press Secretary Jennifer Psaki to announce the Surgeon General's Health Advisory on Misinformation.  Waldo Ex. 10.  Psaki announced of Dr. Murthy that "[t]oday, he published an advisory on health misinformation as an urgent public health crisis."  *Id.* at 1.

294.    At the press conference, Dr. Murthy described misinformation as "one of the biggest obstacles that's preventing us from ending this pandemic," and stated: "Today, I issued a Surgeon General's Advisory on the dangers of health misinformation.  Surgeon General

Advisories are reserved for urgent public health threats…. [T]oday we live in a world where misinformation poses an imminent and insidious threat to our nation's health." *Id.* at 2.  He stated that "misinformation takes away our freedom to make informed decisions about our health and the health of our loved ones." *Id.* at 2.

295.    Dr. Murthy's definition of "misinformation" incorporates the notion that the definition changes over time: "Health misinformation is false, inaccurate, or misleading information about health, according to the best evidence at the time." *Id.* at 2.  Waldo agrees that this definition "contemplate[s] that what constitutes misinformation might change over time," and that "something that we now think is misinformation may later turn out to be accurate information … [a]nd vice versa."  Waldo Dep. 164:17-165:7.

296.    Dr. Murthy stated that those who question mask mandates and decline vaccination are following misinformation: "During the COVID 19 pandemic, health misinformation has led people to resist wearing masks in high-risk settings. It's led them to turn down proven treatments and to choose not to get vaccinated. This has led to avoidable illnesses and death. Simply put, health [mis]information has cost us lives."  Waldo Ex. 10, at 2.

297.    Dr. Murthy placed specific blame on social-media platforms for the spread of misinformation: "Now, health misinformation didn't start with COVID-19.  What's different now, though, is the speed and scale at which health misinformation is spreading. Modern technology companies have enabled misinformation to poison our information environment with little accountability to their users.  They've allowed people who intentionally spread misinformation — what we call 'disinformation' — to have extraordinary reach." *Id.* at 2.  Dr. Murthy described social-media companies as enabling the spread of "poison" in our "information environment." *Id.*

298.    He blamed the platforms' algorithms and features for the spread as well: "They've designed product features, such as 'Like' buttons, that reward us for sharing emotionally charged content, not accurate content.  And their algorithms tend to give us more of what we click on, pulling us deeper and deeper into a well of misinformation." *Id.*

299.    Echoing the language of the Virality Project, Dr. Murthy stated, "we need an all-of-society approach to fight misinformation." *Id.* at 2.

300.    Dr. Murthy announced: "we're saying we expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms." *Id.* at 3.  Both the call for "transparency and accountability" and the request for increased monitoring and greater censorship of "super-spreaders" mirror the Virality Project report. *See infra.*

301.    Both Dr. Murthy's public statements and his health advisory repeatedly use the word "accountable" and "accountability" to refer to the social-media platforms—again, echoing the Virality Project report. *See id.* at 2, 3, 5; Waldo Ex. 11, at 14, 16.

302.    Waldo agrees that the word "accountable" carries with it the threat of consequences; he concedes that "accountability includes accepting the consequences for when you do something wrong … or inappropriate."  Waldo Dep. 171:4-8.  Thus, the OSG's repeated reference to holding social-media platforms "accountable" entails an implied threat of adverse consequences if the platforms do not censor more health misinformation. *See id.*

303.    The Surgeon General's use of the word "accountable" also echoes the repeated use of the word "accountable" by elected federal officials, including President Biden and his political allies, to threaten adverse legal consequences against social-media platforms if they do not increase

censorship of disfavored speakers, speech, and viewpoints.  *See, e.g.,* Jones Decl., Ex. R (quoting White House Communications Director Kate Bedingfield: "We're reviewing [amending Section 230 of the Communications Decency Act], and certainly [the social media companies] should be held accountable.  I think you've heard the president speak very aggressively about this.").

304.    Waldo agrees that Murthy's comments entail that "there's an obligation … or certainly an imperative to do more.  So … not only stop but reduce or take some sort of mitigating efforts so that the misinformation and disinformation is not leading to poor health results for people."  Waldo Dep. 172:21-173:1.

305.    Dr. Murthy's call for greater "transparency" is a call for platforms to engage in the kind of data-sharing that Dr. Murthy, Rob Flaherty, DJ Patil, and Kyla Fullenwider, among others, demanded in private meetings with Facebook.  *Id.* at 174:15-23.  Again, this echoes the key recommendation of the Virality Project.

306.    Waldo agrees that Dr. Murthy's call for greater "accountability" includes a demand to "take more proactive steps to stop the spread of misinformation."  *Id.* at 176:1-4.

307.    Dr. Murthy also demanded that the platforms do "much, much more" and "take aggressive action" against misinformation: "We know that the dramatic increase in the speed — speed and scale of spreading misinformation has, in part, been enabled by these platforms. So that's why in this advisory today, we are asking them to step up. We know they have taken some steps to address misinformation, but much, much more has to be done. And we can't wait longer for them to take aggressive action because it's costing people their lives."  Waldo Ex. 10, at 5.

308.    Dr. Murthy also stated that platforms "have to do more to reduce the misinformation that's out there so that the true voices of experts can shine through."  *Id.* at 6.

82

309.     After the advisory, OSG asked Facebook, Google/YouTube, and Twitter "as a follow-up what actions they might have taken in response to the advisory."  Waldo Dep. 181:15-21.

310.     At the same press conference on July 15, 2021, Jennifer Psaki stated: "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team."  Waldo Ex. 10, at 10.

311.     Psaki stated: "We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation." *Id.*

312.     "Regarding the Administration's "asks" to social-media platforms, Psaki stated: "There are also proposed changes that we have made to social media platforms, including Facebook, and those specifically are four key steps: One, that they measure and publicly share the impact of misinformation on their platform. Facebook should provide, publicly and transparently, data on the reach of COVID-19 — COVID vaccine misinformation. Not just engagement, but the reach of the misinformation and the audience that it's reaching." *Id.* at 11.  Again, this echoes the key recommendation of the Virality Project report.  It also echoes Dr. Murthy's call for "transparency" and the repeated private demands that Facebook give external researchers like Renee DiResta of the Virality Project access to its internal data.  Waldo Dep. 191:17-21.

313.     Psaki also stated: "Second, that we have recommended — proposed that they create a robust enforcement strategy that bridges their properties and provides transparency about the rules. So, about — I think this was a question asked before — there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms All of them remain

active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns." Waldo Ex. 10, at 11.

314. Psaki stated: "Third, it's important to take faster action against harmful posts. As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly." *Id.*

315. Waldo agrees that the Surgeon General's advisory calls for platforms to "move faster" and take "more aggressive" action against supposed misinformation. Waldo Dep. 194:20-21.

316. And Psaki stated, publicly criticizing Facebook: "Finally, we have proposed they promote quality information sources in their feed algorithm. Facebook has repeatedly shown that they have the levers to promote quality information. We've seen them effectively do this in their algorithm over low-quality information and they've chosen not to use it in this case. And that's certainly an area that would have an impact." Waldo Ex. 10, at 11.

317. Psaki concluded: "So, these are certainly the proposals. We engage with them regularly and they certainly understand what our asks are." *Id.*

318. On the same day, July 15, 2021, Surgeon General Murthy issued his advisory, "Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment." Waldo Ex. 11, at 1 (the "Health Advisory"); Waldo Dep. 196:21-197:1.

319. The Health Advisory describes censorship of health misinformation as a "moral and civic imperative": "Health misinformation is a serious threat to public health. … Limiting the

spread of health misinformation is a moral and civic imperative that will require a whole-of-society effort." Waldo Ex. 11, at 2. The "whole-of-society effort" echoes the language of the Virality Project.

320. The Health Advisory states: "Misinformation has caused confusion and led people to decline COVID-19 vaccines, reject public health measures such as masking and physical distancing, and use unproven treatments." *Id.* at 4.

321. The Health Advisory specifically blames social-media platforms for the spread of misinformation: "In recent years, the rapidly changing information environment has made it easier for misinformation to spread at unprecedented speed and scale, especially on social media and online retail sites, as well as via search engines." *Id.* at 5. According to the Advisory, "misinformation is often framed in a sensational and emotional manner that can connect viscerally, distort memory, align with cognitive biases, and heighten psychological responses such as anxiety. People can feel a sense of urgency to react to and share emotionally charged misinformation with others, enabling it to spread quickly and go 'viral.'" *Id.*

322. In addition, the Advisory blames "product features" of platforms: "[P]roduct features built into technology platforms have contributed to the spread of misinformation. For example, social media platforms incentivize people to share content to get likes, comments, and other positive signals of engagement. These features help connect and inform people but reward engagement rather than accuracy, allowing emotionally charged misinformation to spread more easily than emotionally neutral content." *Id.*

323. The Advisory also faults platforms' "algorithms": "algorithms that determine what users see online often prioritize content based on its popularity or similarity to previously seen

content. As a result, a user exposed to misinformation once could see more and more of it over time, further reinforcing one's misunderstanding." *Id.*

324.     The Health Advisory specifically called for platforms to enact "policy changes" to reduce the spread of misinformation: "**Implement product design and policy changes on technology platforms** to slow the spread of misinformation." *Id.* at 7 (bold in original).

325.     The Health Advisory also explicitly threatened future "legal and regulatory measures" to combat misinformation: "**Convene federal, state, local, territorial, tribal, private, nonprofit, and research partners** to explore the impact of health misinformation, identify best practices  to prevent and address it, issue recommendations, and find common ground on  difficult questions, including *appropriate legal and regulatory measures that address health misinformation* …." *Id.* at 7 (bold in original, italics added).

326.     Under the heading "What Technology Platforms Can Do," the Health Advisory called for platforms to take a series of steps to increase and enable greater social-media censorship of "misinformation," including the following: "[M]ake meaningful long-term investments to address misinformation, including product changes. Redesign recommendation algorithms to avoid amplifying misinformation, build in "frictions" … to reduce the sharing of misinformation, and make it easier for users to report misinformation. Give researchers access to useful data to properly analyze the spread and impact of misinformation. Strengthen the monitoring of misinformation. … [A]ddress misinformation in live streams, which are more difficult to moderate due to their temporary nature and use of audio and video. Prioritize early detection of misinformation 'super-spreaders' and repeat offenders. Impose clear consequences for accounts that repeatedly violate platform policies. Evaluate the effectiveness of internal policies and practices in addressing misinformation and be transparent with findings. Publish standardized

measures of how often users are exposed to misinformation and through what channels, what kinds of misinformation are most prevalent, and what share of misinformation is addressed in a timely manner. Communicate why certain content is flagged, removed, downranked, or left alone." *Id.* at 12.

327.    Waldo agrees that the Advisory calls for platforms to provide "a method for users to flag problematic posts so that they could be reviewed for content modulation, policy violations." Waldo Dep. 200:25-201:5.

328.    Waldo agrees that "clear consequences" for repeat violators include "things like issuing strikes against them, suspensions … and sometimes permanent deplatforming." *Id.* at 205:6-13.

329.    In its conclusion, the Health Advisory states: "We need institutions to recognize that this issue is their moral and civic responsibility, too, and that they are accountable." Waldo Ex. 11, at 16.  Waldo agrees that the word "accountable" is repeated in the Surgeon General's remarks and the Advisory itself.  Waldo Dep. 206:3-11.

**F. The Surgeon General's Collaboration with the Virality Project.**

330.    Also on January 15, 2021, Surgeon General Murthy participated in a separate launch event hosted by Stanford Internet Observatory, which was then operating the Virality Project.  Waldo Ex. 12, at 1; Waldo Dep. 206:12-207:9.

331.    In his public comments with Stanford Internet Observatory, Dr. Murthy stated: "We're asking technology companies to operate with greater transparency and accountability so that misinformation doesn't continue to poison our sharing platforms, and we know the government can play an important role, too."  Waldo Ex. 12, at 8 (Audio Tr. 6).  This reiterates the key words "poison" and "accountability."

332.    Waldo describes government's "important role" as including "bringing stakeholders … together with urgency around a common vision for a healthy information environment … the government can help bring together stakeholders … what I would call the convening power of a bully pulpit." Waldo Dep. 209:15-22.  This would include bringing social-media platforms around to the government's "common vision" for censorship.  *Id.* at 209:24-210:8.

333.    Dr. Murthy was asked, "do you believe a rapid response initiative like the Virality Project could be implemented at the federal level to combat health misinformation on a national scale from the top down?" and he answered that "having a federal organized effort to combat misinformation" is "a really, really interesting idea."  Waldo Ex. 12, at 10 (Audio Tr. 8).

334.    Dr. Murthy stated: "[T]echnology companies have a really important role.  They must step up and play to slow the spread of misinformation on their sites wh[ether] that's by either sharing data with people and researchers about what interventions they're making and the impact that's having or whether it's by changing their algorithms and making other alterations to their platform to identify misinformation early and slow its spread and avoid sending more information of misinformation to people who are consuming it."  *Id.* at 11 (Audio Tr. 9).

335.    Waldo agrees that "the purpose of the data sharing is so that outside people come in and … assess how well they're doing with their own internal policies to combat the spread of misinformation."  Waldo Dep. 211:6-11.

336.    Dr. Murthy expressly stated that he had been coordinating with Renee DiResta and the Virality Project and planned to continue to do so: "Well, thank you, Renee, for those kind words. … I do want to say thank you to you personally because you have been a leader in this effort long before many people recognize[d] what was happening with COVID misinformation. You were there looking at the data, looking at the numbers, speaking out, raising the flags, saying

there's something here we've got to address and do so urgently. I have personally learned a lot from your work and from our conversations together, and so I just want to say thank you to you for everything you've done for being such a great partner for moderating our event today, and just for being a partner in the future, because I know we have lots and lots more that we've got to do together." Waldo Ex. 12, at 12 (Audio Tr. 10).

337.    Dr. Murthy also stated that his team had been "partnered with" the Stanford Internet Observatory over "many months": "myself, my team, we're committed to working with you, Renee, with others … who we've been … partnered with over the last many months…." *Id.* at 13 (Audio Tr. 11).

**G. The Surgeon General's "Angry" and "Tense" Meetings With Platforms.**

338.    On July 16, 2021, the New York Times reported that President Biden publicly stated about Facebook, "They're killing people" by allowing misinformation to spread on its platforms.  Waldo Ex. 14, at 1.

339.    The article reported that "this week, White House officials went further and singled out social media companies for allowing false information to proliferate. That came after weeks of failed attempts to get Facebook to turn over information detailing what mechanisms were in place to combat misinformation about the vaccine, according to a person familiar with the matter." *Id.*

340.    The same article reported that Jennifer Psaki stated, "We raised for them in our direct channels, of which every administration has always had with every social media platform, that we're seeing this trend."  *Id.* at 2.

341.    The article reported that there had been a series of "talks" between Surgeon General Murthy and Facebook "since January" of 2021—none of which were disclosed in OSG's

interrogatory responses: "Since January, senior White House officials, including the surgeon general, Dr. Vivek Murthy, have been in talks with the social media company to stop the spread of false stories about vaccination side effects and other harms."  *Id.* at 2.  In these "talks," federal officials demanded Facebook's internal data on misinformation on its platforms: "Despite repeated requests by the White House, Facebook has not shared even basic data on how much vaccine misinformation exists and if the company's efforts to stop its spread are working, according to the person familiar with the talks."  *Id.* at 2.

342.   "When administration officials presented data from CrowdTangle, a content tracking tool owned by Facebook, that showed vaccine misinformation was soaring, company officials dismissed its accuracy."  *Id.* at 2.

343.   In one meeting, Dr. Murthy "angrily" demanded that Facebook censor misinformation instead of just promoting reliable information: "In another meeting with Dr. Murthy, … Dr. Murthy angrily said that while the company [Facebook] promoted its efforts to encourage vaccination, it did not do enough to defend against bad information."  *Id.* at 2.

344.   In another "tense" meeting in "late spring," Dr. Murthy repeated similar demands: "In one tense meeting in the late spring, according to the person familiar with the matter, a Facebook official responded defensively, 'How do you know if your efforts are working?'"  *Id.* at 2.

345.   Waldo agrees that this news report "does not accurately describe … that introductory call between Nick Clegg, Andy Slavitt, and Dr. Murthy on May 25th of 2021," which is the only meeting involving Dr. Murthy disclosed in OSG's interrogatory responses.  Waldo Dep. 219:17-21; 222:14-23.  In those responses, OSG did not disclose Dr. Murthy's "tense" and "angry" meetings with Facebook during the spring of 2021.

**H.      The Surgeon General Leverages Public Pressure to Increase Censorship.**

346.     On July 21, 2021, five days after the July 16 meeting where "the Facebook folks … had sad faces," *id.* at 226:15-16, Facebook emailed Waldo and Kyla Fullenwider, stating: "We wanted to follow up with you on a few questions you asked in the meeting focused on CrowdTangle, data on the online interventions, and Facebook's borderline content policies," Waldo Ex. 16, at 1.  This referred to the July 16 meeting with Waldo and Fullenwider.  Waldo Dep. 227:3-8.

347.     In the email, Facebook reported back to OSG on "interventions that the team mentioned, some of which specifically create frictions in how people consume information." Waldo Ex. 16, at 1.  These include limiting forwarded WhatsApp messages, placing "warning labels on fact checked content," and creating "friction when someone goes to share these posts on Facebook." *Id.*

348.     Facebook also reported to OSG a series of censorship policies and actions, including the following: "We remove COVID-19 content that contributes to the risk of imminent physical harms, including numerous false claims about the COVID-19 vaccine.  We permanently ban pages, groups, and accounts that repeatedly break our rules on COVID-19 misinformation. We also reduce the reach of posts, pages, groups, and accounts that share other false claims that do not violate our policies but may present misleading or sensationalized information about COVID-19 and vaccines."  *Id.* at 1.  Evidently, OSG's inquiry at the July 16 meeting about "borderline content" related to the censorship of such content.  *See id.*  Waldo agrees that Fullenwider asked Facebook to report back about censorship at the July 16 meeting: "The response indicates that it's about COVID policies including removal, banning and reducing the reach." Waldo Dep. 232:9-11, 233:12-234:1.

349.    On July 16, 2021, Nick Clegg emailed Dr. Murthy and stated, "Dear Vivek, Reaching out after what has transpired over the past few days following the publication of the misinformation advisory and culminating today in the President's remarks about us." Waldo Ex. 17, at 1-2.  He then stated, "I know our teams met today to better understand the scope of *what the White House expects of us on misinformation* going forward." *Id.* at 2 (emphasis added).  Facebook understood the purpose of the meetings was to understand the White House's expectations on misinformation. *See id.*

350.    Clegg indicated that there had been a history of prior discussions with Dr. Murthy and the White House in which federal officials demanded greater censorship—both more stringent policies and greater enforcement—which were not disclosed in OSG's interrogatory responses: "Certainly we understand (and have understood for some time) that there is disagreement on some of the policies governing our approach and how they are being enforced." *Id.* at 2.  Clegg asked for a meeting with Dr. Murthy, who did not immediately respond. *Id.* at 1-2.

351.    On July 18, 2021, having received no response to his email requesting a meeting, Clegg texted Dr. Murthy stating, "I imagine you and your team are feeling a little aggrieved – as is the FB team, it's not great to be accused of killing people – but as I said by email I'm keen to find a way to deescalate and work together collaboratively.  I am available to meet/speak whenever suits." Waldo Ex. 18, at 1.

352.    On July 19, Dr. Murthy responded by email and agreed to a meeting, which was scheduled for July 23, 2021.  Waldo Ex. 17, at 1; Waldo Dep. 241:1-14.

353.    At the July 23, 2021 meeting, "Dr. Murthy asked Mr. Clegg about … the research questions about understanding the reach of the data in terms the impact of the … health

misinformation. And … DJ [Patil] had some questions about also on the data side and Nick [Clegg] offered to connect DJ with a data person from Facebook."  Waldo Dep. 242:8-16.

354.    Later on June 23, 2021, after the meeting between Dr. Murthy and Nick Clegg, Clegg sent a follow-up email to Dr. Murthy stating: "Dear Vivek, if I may, thanks again for taking the time to meet earlier today….. I wanted to make sure you saw the steps we took just this past week to adjust policies on what we are removing with respect to misinformation as well as steps taken to further address the 'disinfo dozen'…." Waldo Ex. 19, at 1.

355.    Clegg's reference to "just this past week" refers to the one-week period between this July 23 email and rollout of the Advisory on July 15 and the President's comment "They're killing people" on July 16. *Id.*; Waldo Dep. 244:14-19.

356.    It is evident that Dr. Murthy and federal officials pressured Facebook for specific censorship actions in the July 23 meeting, because the same day as the meeting, Clegg reported back to them a series of new censorship actions and policies.  First, Clegg reported enforcement actions against the "Disinfo Dozen" whom Jennifer Psaki had publicly demanded censorship: "We removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen (so a total of 39 Profiles, Pages, Groups, and IG accounts deleted thus far, resulting in every member of the disinfo dozen having had at least one such entity removed)."  Waldo Ex. 19, at 1.  Clegg reported that Facebook was secretly censoring accounts associated with the Disinfo Dozen even if they had not violated Facebook's policies: "We are also continuing to make 4 other Pages and Profiles, which have not yet met their removal thresholds, more difficult to find on our platform." *Id.*

357.    Clegg also reported that Facebook had amended its censorship policies to make them more restrictive: "We also expanded the group of false claims that we remove, to keep up with recent trends of misinformation that we are seeing." *Id.*

358.    Clegg also committed to "do more" to censor misinformation in response to federal officials' demands: "We hear your call for us to do more and, as I said on the call, we're committed to working toward our shared goal of helping America get on top of this pandemic." *Id.* Dr. Murthy, evidently, demanded that Facebook "do more" against misinformation on it platforms in the July 23 phone call. *See id.*

359.    Clegg further agreed to accede to federal officials' demands that Facebook make its internal data on misinformation available to federal officials and researchers like Renee DiResta of the Virality Project: "We will reach out directly to DJ to schedule a deeper dive on how to best measure Covid related content and how to proceed with respect to the question around data." *Id.* at 1-2.

360.    Clegg also pledged to report back to Dr. Murthy repeatedly so that federal officials could monitor Facebook's "progress" on censoring misinformation: "We'd also like to begin a regular cadence of meetings with your team so that we can continue to update you on our progress. You have identified 4 specific recommendations for improvement and we want to make sure to keep you informed of our work on each." *Id.* at 2. Clegg also promised to continue sending federal officials regular updated reports on the spread of misinformation on Facebook's platforms. *Id.*

361.    Clegg concluded by promising that Facebook would "strive" to meet federal officials' expectations on censorship: "we will strive to do all we can to meet our shared goals." *Id.*; *see also* Waldo Dep. 245:6-247:4.

362.    Waldo agrees that Clegg's statement "We hear your call for us to do more" in the July 23 email is an accurate understanding of the Surgeon General's message from the July 15 press conference, the Health Advisory, and the July 15 rollout at Stanford Internet Observatory: "Yes. I think, as we've established, the advisory and … the remarks, and the event with the Stanford

Internet Observatory, Dr. Murthy is calling on … social media companies to do more to address the problem of health mis- and disinformation." Waldo Dep. 251:6-12.

363.    After the July 23 email, Waldo connected Brian Rice of Facebook with DJ Patil to discuss data-sharing to monitor social-media misinformation between Facebook and federal officials. *Id.* at 252:9-19.

364.    Additionally, on the July 23 call with Nick Clegg, the OSG specifically asked Facebook to report back on any additional steps they were taking in response to the Health Advisory to increase censorship of misinformation on their platforms. Waldo Ex. 21, at 1. On August 6, 2021, Waldo emailed Brian Rice and Nick Clegg of Facebook and stated, "I know on the call with Dr. Murthy he'd mentioned seeing if you were able to send an update of any new/additional steps you are taking with respect to health misinformation in light of the advisory." *Id.* Waldo noted that "we are asking all platforms for this type of update." *Id.* Waldo asked for a report from Facebook within two weeks: "Would you be able to send something over within two weeks?" *Id.*

365.    In the same email, Waldo connected Facebook with DJ Patil of the White House "on next steps for connecting on data." *Id.*

366.    Facebook responded that it was planning "additional steps" to increase censorship of misinformation, and promised to report back to the Surgeon General in 2 weeks: "Our teams have been working on additional steps—we will have something back to you within two weeks outlining our approach." *Id.* Facebook also followed up with Patil to schedule the meeting about using Facebook's internal data to monitor speech on its platforms. *Id.*

367.    Waldo admits that, during the July 23 call, "we asked for an update," and that it was probably Dr. Murthy who asked for it. Waldo Dep. 256:20-23.

368.     Waldo does not dispute that he asked "all platforms" to provide a similar "update" on new or additional steps to censor misinformation in light of the Advisory, and that "all platforms" means "Facebook, Twitter, Instagram, and YouTube, and Google." *Id.* at 257:10-258:9.

369.     On July 19, 2021, a few days after the President's "They're killing people" comments, Rob Flaherty of the White House emailed Dr. Murthy to put him in touch with an operative for the Democratic National Committee who works on misinformation and disinformation issues. Waldo Ex. 22, at 3.  Flaherty wrote: "Vivek – wanted to link you with Jiore Craig, who's been a critical leader of the DNC's misinfo work for a long time, but also has been helping us think through mis/dis on the COVID side.  I thought it would be great for you both to connect as OSG charts out next steps." *Id.*  Eric Waldo followed up to schedule a Zoom meeting on July 22 between Ms. Craig of the DNC and key members of the OSG's staff. *Id.* at 1.

370.     On August 18, 2021, Facebook again reported back to OSG about additional censorship actions against misinformation "superspreaders." Waldo Ex. 24, at 1.  Facebook stated, "Eric and DJ – flagging this post for you and for Surgeon General Murthy.  This details how we are approaching content from the disinfo dozen." *Id.*  Facebook sent the same update to Rob Flaherty of the White House on the same day. *Id.* at 2.

371.     The post was entitled, "How We're Taking Action Against Vaccine Misinformation Superspreaders." *Id.* at 1.  The post detailed a long list of censorship actions taken against the "Disinfo Dozen," including removing over three dozen pages, groups and accounts linked with them; imposing additional penalties on another two dozen pages, groups, and accounts linked with them; applying penalties to some of their website domains so that third parties posting their content will be deamplified; and removing the remaining violating content. *Id.* at 1.

96

372.     As Waldo acknowledges, this was the "second report that Facebook has sent [OSG] after that July 23rd meeting where they're reporting back about actions taken against the Disinfo Dozen." Waldo Dep. 268:12-16.

373.     On August 20, 2021—two weeks after the August 6 email in which Waldo had requested a report within two weeks on Facebook's new or additional steps to remove misinformation in light of the Health Advisory—Nick Clegg sent a long, detailed email to Dr. Murthy, Waldo, and DJ Patil, detailing Facebook's additional censorship actions taken as a result of the Advisory. Waldo Ex. 25, at 1-3.

374.     In the August 20 email, Clegg noted that Dr. Murthy had "asked for an update on existing and new steps that Facebook is taking." *Id.* at 1. Clegg noted that Facebook was taking new steps in response to the pressure from the White House and Surgeon General since July 15 and 16: "In this update, we describe … further policy work to enable stronger action against persistent distributors of vaccine misinformation." *Id.*

375.     In a lengthy section headed "Limiting Potentially Harmful Misinformation," Clegg provided five bullet points and four sub-bullet points detailing expanded efforts of censorship by Facebook taken in response to the Advisory. *Id.* at 2. These included, among others, " expanding our COVID policies to further reduce the spread of potentially harmful content"; "increasing the strength of our demotions for COVID and vaccine-related content that third-party fact-checkers rate as 'Partly False' or 'Missing Context'"; "making it easier to have Pages/Groups/Accounts demoted for sharing COVID and vaccine-related misinformation"; and "strengthening our existing demotion penalties for websites that are repeatedly fact-checked for COVID or vaccine misinformation content shared on our platform." *Id.* at 2. Clegg also included a report of additional actions taken against the Disinfo Dozen. *Id.* Clegg also reporteded that Facebook

"continue[s] to experiment with signals that we can use … to demote content that we predict will contain low quality information."  *Id.*

376.    In another long section entitled "Increasing Transparency," Clegg detailed a list of actions taken by Facebook to share data about the reach of misinformation on its platforms, per federal demands.  *Id.* at 2-3; *see also* Waldo Dep. 269:20-277:8 (reviewing the content of the August 20 email in detail).

377.    Waldo agrees that this email is "a report back to [OSG's] request for report in two weeks related to actions they took in respect to the advisory."  Waldo Dep. 270:19-23.

378.    Waldo responded to Clegg by stating that "we look forward to continuing to move forward together with urgency and solutions during these extraordinary times."  Waldo Ex. 25, at 1. The phrase "urgency and solutions" was intended to push Facebook to increase its anti-misinformation efforts: "I was hoping that Facebook would continue to move. Urgency means, you know, that they would take this seriously, and solutions means that they would also come with real solutions to the problems and not just pretend to solve problems."  Waldo Dep. 277:23-278:3.

379.    Three days later, on August 23, 2021, Rob Flaherty of the White House emailed Facebook, asking for a report on how they intended "to promote" the FDA's approval of the Pfizer vaccine and noting that the White House "[would] appreciate a push" of the vaccine information using specific "suggested language from [the White House]."  Waldo Ex. 27, at 2.  Facebook responded the same day with an additional report on new steps to remove vaccine misinformation: "We're … updating our misinformation policies to remove the specific claims that 'there are no FDA-approved vaccines' and 'the Pfizer vaccine is not FDA-approved.'  We'll also continue to look for claims that are no longer accurate given the approval today."  *Id.* at 1.  Facebook forwarded

this report on increasing censorship to Waldo at OSG as well.  *Id.*; *see also* Waldo Dep. 280:1-281:24.

380.    On September 18, 2021, Facebook sent Eric Waldo and Rob Flaherty another bi-weekly report, and also noted that "I'm sure you also saw yesterday's story in the WSJ about the spread of COVID-19 misinformation in comments on Facebook," which Facebook disagreed with and offered to discuss.  Waldo Ex. 30, at 1.   Flaherty responded, "Happy to talk about it, Brian. Would be interested to see, as we have long asked for, how big the problem is, what solutions you're implementing, and how effective they've been."  *Id.*  Facebook promised, "we will circle back over the next few days to brief."  *Id.*

381.    On September 29, 2021, Google emailed Eric Waldo to "share an update we recently made to YouTube's policies pertaining to vaccine-related misinformation."   Google reported: "We just announced that we will be introducing a new policy that prohibits content that includes harmful misinformation about the safety, efficacy, or ingredients for currently administered vaccines…"  Waldo Ex. 31, at 1.

382.    On October 19, 2021, Rob Flaherty emailed Facebook, copying several White House officials and Eric Waldo, and asked Facebook to "connect on what the admin's plans are for the 5-11 vaccine rollout."  Waldo Ex. 32, at 1.  The "5-11 vaccine rollout" refers to the approval of vaccines for children ages 5 to 11 years old. Waldo Dep. 298:20-23.

383.    Flaherty requested that Facebook report on its censorship plans for claims on social media about the authorization of vaccines for children ages 5 to 11: "We'd like to talk about what we're seeing as the biggest headwinds we're going to face, and discuss what you all are planning as we move into this next phase.  We remain concerned about mis- and disinformation on feed and

groups, and the wide reach of hesitancy-inducing content across your platform."  Waldo Ex. 32, at 1.

384.    Facebook responded, agreeing to the meeting: "we'd welcome the opportunity. Adding Felicia on our end to help coordinate."  Waldo Ex. 32, at 1.

385.    Waldo states that he does not recall whether this meeting occurred or if he participated, but he agrees that the meeting probably occurred: "Probably.  If they added schedulers, usually those meetings happen."  Waldo Dep. 300:14-23.

**I. The Surgeon General and White House Hammer Facebook.**

386.    On October 28, 2021, the Washington Post ran a story based on information from Frances Haugen reporting that "Facebook researchers had deep knowledge of how coronavirus and vaccine misinformation moved through the company's apps, according to documents disclosed by Facebook whistleblower Frances Haugen."  Waldo Ex. 33, at 1.

387.    In response to the article, on October 29, Surgeon General Murthy issued a series of Tweets from his official Twitter account demanding that Facebook increase censorship and give outside researchers access to its data.  Waldo Ex. 33, at 1.  In the Tweet thread, Dr. Murthy stated: "I was deeply disappointed to read this story. Health misinformation has harmed people's health and cost lives. In the Surgeon General's Advisory on Health Misinformation, I stated clearly that tech platforms have a responsibility to improve our health information ecosystem.  What continues to be lacking from Facebook and other tech companies is transparency and accountability. Only the companies understand the full extent of misinformation's spread and impact – yet they have not yet shared this data with independent researchers and the public. Without this critical data, it is much harder to design the right interventions or hold the platforms accountable. … We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health

misinformation on their platforms. The time for excuses and half measures is long past. We need transparency and accountability now. The health of our country is at stake." *Id.* Dr. Murthy repeated the mantras "transparency" and "accountability," threatening that the federal government would "hold the platforms accountable" for misinformation. *Id.*

388. This Tweet thread reflects Dr. Murthy's own words, as he "made the final and substantial edits" to the Tweets. Waldo Dep. 303:25-304:17.

389. Waldo agrees that the Twitter thread demands "transparency and accountability around health misinformation, especially vis-à-vis the social media organizations," and "demands that Facebook and the other platforms do more" to "stop[] health misinformation." *Id.* at 305:6-22. "Lots of work went into" crafting that message, according to Waldo. *Id.* at 306:7-8.

390. On October 28, 2021, the same day as the Washington Post article, Rob Flaherty emailed Brian Rice of Facebook a hyperlink to the article. The only text in the email was the subject line, which stated: "not even sure what to say at this point." Waldo Ex. 35, at 1-2.

391. Facebook responded to Flaherty by stating, "nothing in the story is inconsistent with what we briefed on," and providing its account of the facts underlying the story. *Id.* at 1. Facebook then forwarded this response to Waldo and the OSG, noting that "I saw the Surgeon General's reaction on Twitter," and asking for "a longer conversation next week" about the issue. *Id.*

392. Waldo describes both the Surgeon General's public Tweet threat, and Rob Flaherty's private email to Facebook, as different ways of "hitting up Facebook" about the Frances Haugen article: "this was one of the most popular articles in all of news that week, so I'm not surprised that people who care a lot about this issue were certainly hitting up Facebook about it." Waldo Dep. 307:13-22.

393.     On October 28, 2021, Nick Clegg also emailed Dr. Murthy and asked for a meeting to discuss the "intense debate that's been prompted by the documents disclosed by a former employee."  Waldo Ex. 36, at 2.  Waldo responded on behalf of the OSG, stating that "we have seen the recent public reports around Facebook and misinformation.  We are certainly concerned about what we are seeing, given our emphasis on health misinformation in our advisory and the ongoing conversations our teams have been having.  As has been the case, you'll continue to see us raising the issue of health misinformation in public and in private as a critical public health issue." *Id.* at 1.

394.     Regarding his reference to "in private," Waldo admits that this refers to "closed-door meetings" with platforms like Facebook: "in the government, you're not always just doing a panel that's open press, you're meeting with stakeholders … in closed-door meetings…."  Waldo Dep. 312:13-16.  The Surgeon General's Office was continuously pushing for action against health misinformation "in public and private" meetings with stakeholders: "talking about health mis- and disinformation was in our talking points of when we talked to stakeholders in public and private." *Id.* at 313:8-11.

395.     The next day, October 29, 2021, Facebook sent a long email to Rob Flaherty, Eric Waldo, and several other White House officials referring back to an October 25 meeting about vaccines for children ages 5-11.  Waldo Ex. 37, at 3-4; Waldo Dep. 315:8-316:15.  The email reported to the White House and OSG a "detailed description of [Facebook's] plans" for the approval of vaccines for children.  *Id.* at 4.  The plans included immediately updating policies to censor claims relating to vaccination of children: "As discussed, soon as the EUA is issued, we will also be able to apply claims from our current misinfo policies for COVID-19 vaccines to include claims about child vaccinations."  *Id.*

396.     Facebook also noted that it was relying directly on the CDC to decide what to censor: "We were able to make this change based on the conversation we had last week with the CDC…. There are several claims we will be able to remove as soon as the CDC debunks them." *Id.*

397.     Facebook then asked federal officials to provide a federal health authority to dictate what content would be censored on Facebook's platforms: "We expect the approval of COVID vaccines for kids aged 5-11 will be another significant peak of new misinformation claims.  Our policy allows us to take action against this content once those claims have been debunked and confirmed harmful by a public health authority.  We're committing to addressing these quickly; to do so effectively, we will need a channel to a health expert with whom we can discuss these claims in real time.  Is this something we could partner on, and if so, would your team be able to connect us with a point person?"  *Id.*

398.     On November 4, 2021, Facebook followed up again to OSG and the White House with additional reports of censoring misinformation: "Last Friday, we updated our misinformation policies for COVID-19 vaccines to make clear they apply to claim about children," identifying a list of specific claims.  *Id.* at 1.

399.     Facebook made clear that the CDC was serving as the "health expert" who was dictating what could be said on Facebook's platforms "in real time": "We're grateful to our partners at the CDC for helping get these debunked in advance of the announcement, and we look forward to staying connected on emerging COVID misinformation trends."  *Id.* at 1, 3.

**J.     The Surgeon General Threatens Regulation to Increase Censorship.**

400.     On December 21, 2021, Dr. Murthy gave a podcast on the Omicron variant in which he again publicly threatened to hold the social-media platforms "accountable" for not censoring

misinformation: "number one, we have to track down where this misinformation is coming from and understand how to hold platforms accountable, new technology platforms that are driving so much of the misinformation spread.… [B]y allowing this misinformation to proliferate on their sites, they're subjecting people in the United States and around the world to extraordinary harm, and they're doing so with little accountability at this moment and really with very little transparency. That can't be allowed to continue because it's putting everyone's health at risk." Waldo Ex. 38, at 4 (Audio Tr. 7).

401.    Dr. Murthy demanded "aggressive action" from the platforms to censor speech: "I do think that part of what they have to do, the platforms is take aggressive action against people who are intentionally spreading misinformation." *Id.*

402.    Waldo agrees that this message is "consistent with his previous statements as well as the content within the advisory itself." Waldo Dep. 321:22-24.

403.    As Waldo concedes, Dr. Murthy's threat to hold platforms "accountable" and his demand for "aggressive action" to censor misinformation "is consistent with the messaging we've reviewed all day today of the advisory, the rollout, the public statements" by OSG. *Id.* at 322:22-24.

404.    On January 3, 2022, Dr. Murthy participated in Alyssa Milano's podcast. Waldo Ex. 39, at 1.   In the podcast, Dr. Murthy stated that the "sophistication with which this misinformation is spreading is truly unprecedented, and a lot of has been enabled by technology platforms in the social media which enable the spread, and … the platforms need to do a lot more is step up, to be accountable for making their spaces safer." *Id.* at 3 (Audio Tr. 2).  He also stated, "finally, I just want to come back to the technology companies for a moment here, because unless those platforms step up and make their spaces safer and reduce the amount of misinformation on

their site, it's going to be pretty tough to get a full handle on this spread of misinformation." *Id.* at 5 (Audio Tr. 4).

405.    Immediately after these comments, the podcast broadcast public comments by President Biden, stating: "Joe Biden: The unvaccinated are responsible for their own choices, but those choices had been shulled [*sic*] by dangerous misinformation on cable TV and social media. You know, these companies … are making money by ped[dling] lies and allowing misinformation that can kill their own customers and their own supporters. It's wrong. It's immoral. I call on the purveyors of these lies and misinformation to stop it. Stop it now." *Id.*

406.    Waldo agrees that this podcast is "aligned with … the advisory and the other public statements we've seen so far."  Waldo Dep. 327:8-10.

407.    Dr. Murthy also called for the platforms to "go after people who are superspreaders of misinformation on these sites," which Waldo agrees is "entirely consistent … with the messages that Dr. Murthy was sharing about health mis- and disinformation." *Id.* at 329:23-330:18.

408.    On February 14, 2021, Dr. Murthy participated in a panel discussion hosted by the Rockefeller Foundation.  Waldo Ex. 41.  Dr. Murthy stated, "what feels different in this moment compared to ten years ago or [twenty] years ago is this speed, scale, and sophistication with which this misinformation is spreading and much of it has been enabled, in fact, by technology platforms, and we talk to people about where they're encountering misinformation. It's off and on social media channels and other tech platforms. … We need certainly technology companies to step up and do more, to help reduce this spread of misinformation, and to be transparent with the public about how much misinformation is being transacted on their sites and whether their methods of addressing it are working or not. We do not have enough transparency on that front and that is hindering us in our response of misinformation." *Id.* a 6-7 (Audio Tr. 9-10).

409.    Waldo agrees that this is "a consistent message with what we've seen in previous public statements, interviews, as well as the advisory itself."  Waldo Dep. 331:23-25.

410.    In the same panel, Dr. Murthy stated that there is a role for government to set "safety standards" when it comes to misinformation, which directly suggests government regulation and foreshadowed the OSG's forthcoming Request for Information (RFI): "And, of course, there's a role for government here as well to set safety standards, to push for transparency and accountability, particularly from platforms."  Waldo Ex. 41, at 8 (Audio Tr. 11).  Dr. Murthy then immediately foreshadowed the OSG's forthcoming Request for Information (RFI) as a step toward government "setting safety standards": "There are steps we are working now that we will be -- you know, have more to say about it in the … coming weeks and months ahead, to try to, in fact, gather even more information about the impact of health misinformation on health professionals of the public and also in the role that technology companies may be playing on that on that front."  *Id.*  Less than a month later, the OSG issued a formal RFI for information about misinformation on social media platforms.

411.    On March 3, 2021, the OSG issued a formal RFI in the Federal Register, seeking information from social-media platforms and others about the spread of misinformation on social media.  Waldo Ex. 42 (87 Fed. Reg. 12712).  The RFI is entitled, "Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID–19 Pandemic Request for Information (RFI)."  *Id.* at 1.

412.    "Kyla [Fullenwider] was the primary driver on the RFI from a content expert perspective."  Waldo Dep. 338:22-23.  Though she was employed at U.S. Digital Response, "she was doing work on behalf of the Surgeon General."  *Id.* at 340:8-9.  Kyla Fullenwider is also

106

responsible for receiving and reviewing the responses to the RFI.  *Id.* at 362:6-10.  "Kyla was the subject matter expert who was guiding this RFI process."  *Id.* at 362:15-17.

413.    The RFI defines "technology platforms" very broadly, indicating that the Surgeon General is expanding its attempts to control the spread of so-called "misinformation": "Technology platforms include the following: General search engines, content sharing platforms, social media platforms, e-commerce platforms, crowd sourced platforms, and instant messaging systems."  Waldo Ex. 42, at 2; *see also* Waldo Dep. 341:14-342:7.

414.    Under the heading "Information About Technology Platforms," the RFI seeks a long series of detailed information about misinformation on such platforms, including "Information about how widespread COVID–19 misinformation is on individual technology platforms," Waldo Ex. 42, at 2; "any aggregate data and analysis on the prevalence of COVID–19 misinformation on individual platforms including exactly how many users saw or may have been exposed to instances of COVID–19 misinformation," *id.* at 2-3; and "[a]ny aggregate data and analysis on how many users were exposed, were potentially exposed, or otherwise engaged with COVID–19 misinformation," *id.* at 3.

415.    The RFI also seeks detailed information about censorship policies and how they are enforced: "Information about COVID–19 misinformation policies on individual technology platforms," and "[a]ny aggregate data and analysis of technology platform COVID–19 misinformation policies including implementation of those policies and evaluations of their effectiveness."  *Id.* at 3.

416.    The RFI also seeks detailed information about disfavored *speakers* on social-media platforms, requesting "[i]nformation about sources of COVID–19 misinformation," including "[i]nformation about the major sources of COVID–19 misinformation associated with exposure."

*Id.* at 3.  The RFI makes clear that "source" refers to *speakers* on platforms: "By source we mean both specific, public actors that are providing misinformation, as well as components of specific platforms that are driving exposure to information."  *Id.* at 3.

417.    Especially in light of Dr. Murthy's prior public statements about the government "setting safety standards" for misinformation, Waldo Ex. 41, at 8 (Audio Tr. 11), the RFI carries a clear implied threat of future regulation against the social-media and other technology platforms.

418.    Contemporaneous media coverage portrayed the RFI as a "demand" for information from platforms.  *See, e.g.,* Waldo Ex. 44, at 1 (Brad Dress, *Surgeon General Demands Data on COVID-19 Misinformation from Major Tech Firms*, The Hill (Mar. 3, 2022, 11:24 am)).

419.    Max Lesko, the Surgeon General's Chief of Staff, also sent the RFI to several major tech platforms with a formal letter requesting that they respond.  Waldo Dep. 348:20-22.  He sent nearly identical letters to Facebook, Google, LinkedIn, Twitter, YouTube, and Microsoft.  Waldo Exs. 46, 47, 48, 49, 50, 51.  Each letter was directed to the CEO of the platform over General Murthy's signature.  *Id.*

420.    Each letter stated, "The proliferation of health misinformation during the pandemic has been both extensive and dangerous. … It is clear that we must do everything we can to address this threat."  *Id.*  Each letter referred to the July 15, 2021 Health Advisory, noting that "a large proportion of health misinformation is spread through technology platforms," and "my Advisory includes a call for technology companies to join this broader effort to create a safer, healthier information environment."  *Id.*  Each letter advised the social-media platforms of the RFI, and formally "request[ed] that your company contribute to the RFI….  Specifically, I am requesting responses from companies about the extent and spread of COVID-19 misinformation on their

technology platforms, policies to address COVID-19 misinformation and their effectiveness, [and] sources of COVID-19 misinformation…." *Id.*

421. On May 3, 2022, Facebook notified the White House and OSG that it had "filed a response to the Surgeon General's rfi on Covid misinformation and would be happy to discuss at the appropriate time." Waldo Ex. 54, at 2. To date, the OSG has never made this or any other the responses to its RFI public.

422. Shortly after the RFI was issued, on March 11, 2022, GQ magazine published an interview with Dr. Murthy. Waldo Ex. 52. In this interview, Dr. Murthy stated, "we all have a responsibility to do everything we can to reduce the spread of misinformation… Whether you have one million followers on social media, or you've got 10 followers, we all have platforms and people in our lives who trust us." *Id.* at 6. He called on platforms like Spotify (which was then being criticized for hosting Joe Rogan's podcast) to censor health misinformation: "If you're running a platform, whether it's a Spotify or another social media platform, you've got to think about, how do I create a healthy information environment here? How do I create rules and a culture that promotes accurate information?" *Id.* He emphasized that "a platform has the ability, the opportunity, and the responsibility to create rules and a culture that supports the dissemination of accurate information and that reduces the spread of misinformation." *Id.* at 7.

423. Echoing his prior comments about "setting safety standards" by government, Dr. Murthy compared censorship "rules" for misinformation to speed limits: "We have speed limits on the road because we know that sometimes if you drive too fast, that can have an impact on somebody else's health and wellbeing. If we're going to live together in a society, we've got to take steps and observe certain rules to help protect other people. That's true here as well. Platforms

have an opportunity to help shape that environment in their own way. We all do. That's our responsibility at a time like this." *Id.*

### K. The White House and Surgeon General Continue Oversight of Censorship.

424.    On June 22, 2022, Facebook again emailed Waldo, Rob Flaherty, and other White House officials with an update on Facebook's increased censorship.  Waldo Ex. 53, at 1.  In the email, Facebook stated that it "[w]anted to ensure that you were aware of our policy updates following the early childhood vaccine approvals.  As of today, all COVID-19 vaccine related misinformation and harm policies on Facebook and Instagram apply to people 6 months or older…." *Id.*  Facebook indicated that it had again relied on the CDC to dictate what claims people can post on Facebook: "We expanded these policies in coordination with the CDC and ensured that we also included false claims that might be connected to children…." *Id.*

425.    Throughout this period, at the federal officials' request, Facebook continued to send bi-weekly "Covid Insights Reports" reporting on COVID-19 related misinformation on its platforms to the White House and OSG.  *See, e.g.,* Waldo Ex. 54, at 2-4.  In the spring of 2022, Facebook repeatedly asked the federal officials if it could discontinue or reduce the frequency of these reports, which it had been sending for over a year.  *Id.* at 2.  Finally, on June 13, 2022, Facebook notified the White House and OSG that "we will plan to discontinue these unless we hear from you that this information continues to be valuable." *Id.* at 1.  Rob Flaherty responded the same day, requesting that Facebook continue to send the reports and further asking Facebook to report on how it would handle misinformation for early-childhood (under age 5) vaccines: "It would be helpful to continue to get these as we start to ramp up under 5 vaccines.  Obviously, that has a potential to be just as charged.  Would love to get a sense of what you all are planning here."

*Id.* Facebook continued to send the reports as requested, including two reports on July 17, 2022, and promised to continue sending them. *Id.*

## IV. The CDC and the Census Bureau: BOLO and Authoritative Fact-Checking.

426.    In addition to the public and private pressure campaigns from the White House and the Surgeon General's Office, the CDC and the Census Bureau have engaged in a long censorship campaign together, enabled by the White House's pressure on platforms to cooperate with the federal government.  Working closely with Census, the CDC flags supposed "misinformation" for censorship on platforms (sometimes using the acronym "BOLO," "Be On the Lookout"), and exercises full authority to dictate what health claims will be censored on social media platforms.

### A.    The CDC's Regular Communication with Social Media Platforms.

427.    Carol Crawford is the division director for the division of Digital Media within the CDC Office of the Associate Director for Communication.  Crawford Depo. 11:7-9.

428.    According to Crawford, her "division provides leadership for CDC's web presence. We provide leadership for CDC's social media presence."  *Id.* 11:14-16.  Crawford is "the director of that work. I determine strategy, objectives, oversee work."  *Id.* 11:21-22.

429.    Before April 2022, Crawford was "the branch chief of the Digital Media Branch within the Division of Public Affairs, and most of the roles that our division currently performs, web and social media, were in that branch." *Id.* 15:3-6.

430.    Crawford is "the main person that was the CDC point of contact to talk to Facebook, Twitter and the platforms since our job was to lead digital media."  *Id.* 249:1-4.

431.    Crawford has regular contact with social-media platforms, especially about COVID-19 issues: "We started regular contact with the [platforms] at the beginning of the COVID

outbreak to exchange information about COVID, and most of the contact since then has been around COVID or other high-priority things, but mostly COVID." *Id.* 16:13-17.

432.   Crawford had only "very occasional" contacts with the platforms before COVID-19, *id.* 17:8-9; but then she and the CDC "started talking to some of them in February and March of 2020," at the beginning of the pandemic. *Id.* 18:5-6.

433.   At this time, CDC leaders were asking Crawford's group if they were in contact with the platforms: "there were a lot of people asking staff, or other staff, are we -- were we in contact with the groups, and do we have any arrangements." *Id.* 18:19-23.

434.   Crawford communicated with platforms by email, phone, and in meetings and calls. *Id.* 20:1-19.  She "had points of contact at several of them, and we would have meetings when we needed to talk.  So we arranged calls." *Id.* 20:17-19.

**B.    CDC's and Census's Pressure and Collusion With Facebook/Meta.**

435.   On February 6, 2020, Facebook emailed State Department officials, noting that "Facebook has taken proactive as well as reactive steps to control information and misinformation related to Corona virus which includes … removal of misinformation."  Crawford Ex. 2, at 4.  The email was forwarded to Crawford, who reforwarded to her contacts at Facebook.  *Id.* at 3. Facebook proposed to Crawford that "Facebook team would create a Coronavirus Page serving up content that exists on other organizations' FB pages including the CDC," and would direct users to "curated content from trusted sources."  *Id.* at 3.

436.   On February 7, 2020, Crawford agreed to the proposals, and she also proposed that "There could be times we might want to address widespread myths like mask use or new issues." *Id.* at 2.  She discussed with Facebook the same day.  *Id.* at 1.

437.    On March 3, 2020, Facebook emailed Crawford and noted that Facebook intended to "support governments … with their response efforts on COVID-19," including the "goal" to "remove misinformation."  Crawford Ex. 3, at 1.

438.    Crawford "talked pretty regularly" with Facebook "around this time," *i.e.*, March 2020.  37:7-9.

439.    Crawford recalls having discussions of misinformation with Facebook "in the fall of 2020."  Crawford Dep. 38:7-8.  These included discussions of how to combat "growing" misinformation about COVID-19: "I can recall us generally saying things to the effect of … misinformation is really growing, or … what do you think we could be doing to address it? That kind of conversation."  *Id.* 38:11-15.

440.    On January 25, 2021, Facebook emailed Crawford the first of an ongoing, biweekly series of CrowdTangle reports, which report on "top engaged COVID and vaccine-related content overall across Pages and Groups."  Crawford Ex. 6, at 2.  The email emphasized in bold the anti-vaccine content listed in the report, including "Reports of healthcare workers refusing the vaccine," "Posts about alleged vaccine-related deaths," and "News and reports of severe vaccine side effects."  *Id.*  Facebook indicated that it was sending this report in response to a prior conversation with Crawford in which such data was requested: "I am following up on our conversation several weeks ago about providing more detailed reporting from our CrowdTangle team."  *Id.*

441.    Crawford responded that the report "looks wonderful and much appreciated."  *Id.* at 1.  She said that she "will be extending our distribution list" for the report.  *Id.* at 1.  She also noted, "One group we'll be adding" to the distribution list for the CrowdTangle reports "is the Census group who hopefully will soon start their project with us."  *Id.*  And she stated, "the wide group of those looking at misinfo will want this."  *Id.*

442.    CrowdTangle is "a social media listening tool for Meta properties … [l]ike Instagram and Facebook." Crawford Dep. 50:3-6. "[S]ocial media listening reports show themes … of discussion on social media channels." *Id.* 52:10-12. The CrowdTangle report is "a search of content on social media, and a summary of the higher volume conversations." *Id.* 53:8-10. It is "a report of the most talked about topics on social media during this time period." *Id.* 54:13-15.

443.    The CrowdTangle reports that Facebook regularly emailed to CDC were only one of two forms of access to CrowdTangle. Since "March or April 2020," Facebook had also allowed CDC to "directly log into CrowdTangle and run our own reports or searches." *Id.* 77:9-13.

444.    According to Crawford, the CrowdTangle reports "would help us understand what was being discussed on social media about COVID, which helps us look for gaps in information, confusion about facts, things that we might need to adjust our communication materials for." *Id.* 57:24-58:3.

445.    Crawford confirms that the CDC had privileged access to CrowdTangle from early 2020, and government officials used the non-public "social media listening tool" to monitor and track private speech about COVID-19 on social media: "we had access to go in directly to CrowdTangle and run in reports … from early 2020. … And I mentioned that our research team … searched in it and looked in it to create their reports, and I believe other teams did too." *Id.* 147:12-18.

446.    The CDC also used other "social media and listening tools" to monitor Americans' speech on social media: "we did searches in CrowdTangle, the same way we do searches in other social media and listening tools that we have to create, to understand what's being discussed in the environment, to update our communication material." *Id.* 148:11-15.

447.    The CDC's "listening tools" included "Meltwater reports," where "Meltwater is sort of like CrowdTangle but for all the platforms." *Id.* 154:13-16.  But CrowdTangle is superior to Meltwater for monitoring Facebook and Instagram because it provides privileged access to some online speech: "CrowdTangle can see more on the Meta properties.  So it's nicer if you're just looking at Meta properties.  Meltwater gives you social media at large." *Id.* 154:24-155:2.

448.    Related to the bolded categories of supposed misinformation in Facebook's CrowdTangle report, Crawford claims that she does not have specific recollection about the issues, but she admits that "I do recall generally discussing misinformation with Facebook around this time." *Id.* 58:11-13.

449.    Crawford added Census Bureau officials to the distribution list for the CrowdTangle reports because "[t]hey were going to start working with the CDC regarding misinformation." *Id.* 58:19-20; *see also id.* 61:11-12 ("At some point I recall adding Census to the distr[ibution]").

450.    From then on, Facebook regularly sent Crawford biweekly "CrowdTangle content insights report[s]." Crawford Ex. 7, at 1-4.  With each report, Facebook would highlight in bold the high-engagement misinformation-related issues for the CDC from the two-week period. *Id.* In each email, Facebook would introduce these misinformation-related posts by noting something like, "However, posts falling into the following themes also garnered high engagement." *Id.*

451.    The CrowdTangle reports survey content that is not publicly available, such as "personal Group posts." *Id.* at 2.

452.    Crawford is "sure that general discussions" with Facebook addressed "that there was a lot of information on vaccines, which is one of the bolded words [in the CrowdTangle Reports], for example. I am sure that did occur." Crawford Dep. 64:19-22.

453.    On January 27, 2021, Facebook sent Crawford a recurring invite to a "Facebook weekly sync with CDC (CDC to invite other agencies as needed)."  Crawford Ex. 36, at 1.  A large number of Facebook and CDC officials were included on the invite, including Liz Lagone, Facebook's content-moderation officer who communicated with the CDC.  *See Id.*  The agenda for the recurring meeting included "Misinfo collab status."  *Id.*  It also included "CDC needs/questions."  *Id.*

454.    Crawford confirms that CDC frequently had weekly meetings with Facebook: "There were definitely times that we were talking weekly."  Crawford Dep. 226:20-21; *see also, e.g.,* Crawford Ex. 39, at 1 (recurring calendar invite for a meeting with the same agenda and participants on May 6, 2021).

455.    On March 10, 2021, Crawford sent Facebook an email seeking information about "Themes that have been removed for misinfo."  Crawford Ex. 44, at 3.  She stated, "We mentioned this on the call last week and you said you'd be sending something as other had asked – is that available yet by chance?"  *Id.* She clarified: "You mentioned that WH and HHS had asked so you'd get it to us," and responded "Yes" to Facebook's question, "Are you looking for types of COVID-19 misinfo we remove?"  *Id.*

456.    Facebook noted, that "[w]e are setting up a meeting with WH/HHS to discuss more likely later this week or early next.  Perhaps a CDC rep could participate…."  Crawford Ex. 44, at 2.  Crawford noted, "They want to see what you guys proactively have removed that might not be in those [CrowdTangle] reports….  My guess is a short meeting with Lis Wilhelm['s] vaccine confidence team is what is needed if FB is willing to do it."  Crawford Ex. 44, at 2.

457.    In this exchange, CDC was "wondering if [Facebook] had info on the types of posts that were removed and the themes because they were worried that we could only see the live posts

and so we wouldn't know if there was also confusion about other areas that had been removed." Crawford Dep. 258:6-11. CDC had "asked on the meeting if they had this data, like, because we wanted it. And I think she said, Oh, we did something like this for the White House or HHS." *Id.* 260:6-9.

458. From this, Crawford understood that HHS and the White House were having similar meetings with Facebook: "I do think that they did have meetings with the agencies." *Id.* 261:10-11.

459. On March 25, 2021, Crawford and other CDC officials met with Facebook. Ex. S, at 1. The day before the meeting, March 24, 2021, Facebook emailed Crawford and noted, "[a]s we discussed last week, we will present on COVID-19 misinformation on this session/meeting and have some of our team that is focused on that workstream provide a briefing on the current policies and approach as well as the current trends we are identifying." *Id.* at 2. The official also noted that Facebook would have a "Misinformation Manager" and Liz Lagone, a content-moderation official for Facebook who "will be leading from our side on misinformation briefing for your team. They all work on our COVID-19 policies." *Id.* at 1. Crawford responded, attaching a Powerpoint slide deck and stating, "This is a deck Census would like to discuss and we'd also like to fit in a discussion of topic types removed from Facebook." *Id.* She also noted that two Census Bureau officials (Zack Schwartz and Jennifer Shopkorn) and two Census Bureau contractors (Sam Huxley and Christopher Lewitzke) would attend the meeting. *Id.*

460. The "deck Census would like to discuss" was attached to the email, *id.* at 3-16, and it contained an overview of "Misinformation Topics" including "concerns about infertility, misinformation about side effects, and claims about vaccines leading to deaths." *Id.* at 4. "These topics were selected due to high volume, continued public discussion, and high-profile coverage,"

according to the slide deck. *Id.* For each topic, the deck included sample slides and a statement from the CDC debunking the supposedly erroneous claim. *Id.* at 6-14. The slides were clearly designed to convince Facebook that such content should be censored. For example, with respect to claims of infertility, the deck provided screen shots of six specific posts on Facebook and Instagram, summarized similar claims, and stated: "According to CDC there is no evidence that fertility problems are a side effect of any vaccine, including COVID-19 vaccines." *Id.* at 6-8. It also noted that "Several of Facebook's fact check partners have covered this claim." *Id.* at 6. The deck provided a similar debunking treatment for claims about other side effects from COVID vaccines, *id.* at 9-11, and claims about vaccines leading to deaths, *id.* at 12-14—in each case, providing six sample posts from real Facebook users as examples of the type of claim, and providing information designed to ensure that the claim would be censored. *Id.*

461.    On March 30, 2021, Facebook sent Crawford an email with the subject line, "This week's meeting." Crawford Ex. 8, at 3. Crawford confirms that she was engaging in weekly meetings with Facebook during this time period, as well as other time periods during the COVID-19 pandemic: "we were meeting weekly during parts, so I imagine we were." Crawford Dep. 68:9-10.

462.    The email indicates that CDC and Facebook were repeatedly discussing misinformation during these weekly meetings, as Facebook stated to Crawford: "I wanted to surface any misinfo questions your team may have for the team that I had briefing last time. They are available to attend again, but also want to make sure we are answering any of your team's questions." Crawford Ex. 8, at 3.

463.    Crawford admits that these weekly meetings involved CDC meeting with Facebook's *content-moderation* teams: "I do recall [Facebook] bringing in people from their Trust

and Safety or Misinformation teams … to talk to us about misinformation at some weekly meetings." Crawford Dep. 68:24-69:3.

464.    Crawford admits that, in these meetings with Facebook content-moderation team, CDC inquired about how Facebook was censoring COVID-19 misinformation: "we had asked questions about what they were seeing in terms of misinformation and inquired about any activities they were undertaking. And I believe this was an offer to sort of get back to us on any of those questions." *Id.* 69:9-13.

465.    In response, Crawford noted that she was also communicating with Facebook through an alternative channel.  Crawford Ex. 8, at 2 ("I added this part in yellow to our chain on turn.io").  She asked Facebook if they "have thoughts on how we can meet regularly with Census? … am I correct that your team is going to consider how you might want to engage with the CDC/Census team routinely and get back to us?" *Id.* at 2-3.  She noted to Facebook: "I know you all have experience with Census already." *Id.* at 3.

466.    At this time, CDC had recently executed an Interagency Agreement with the Census Bureau to assist the CDC in addressing misinformation: "We had entered an IAA with Census to help advise on misinformation." Crawford Dep. 71:3-4.  Pursuant to this agreement, the Census Bureau provided reports to the CDC on misinformation that the Census Bureau tracked on social media: "they provided reports on misinformation that they were seeing to us." *Id.* 71:15-17. "Census did provide [CDC] with the key themes they were seeing around misinformation during the times that they were looking at it." *Id.* 72:16-19.

467.    An IAA is "an agreement between two agencies to conduct some kind of work between them." *Id.* 109:23-24.  Under this IAA, CDC was "only engaging" with Census "on COVID misinformation." *Id.* 110:12-13.  CDC was "learning about how [Census] operated a

general misinformation team." *Id.* 110:13-14.  The IAA "let [CDC] partner with Census to learn how they handled misinformation and help us with the COVID misinformation. … They seemed to have more knowledge than we did." *Id.* 111:3-6.

468.    Facebook replied that "it would be great to have questions that may not have been answered from your team on misinfo.  That team is very busy so it's a good opportunity to di[g] deeper on that topic and especially if there are areas that are still unclear or the teams have concerns about." Crawford Ex. 8, at 2.

469.    Crawford responded that CDC "would like to have more info … about what is being done on the amplification-side," and that CDC "is still interested in more info on how you analyze the data on removals, etc." *Id.* at 2.  She also noted that Census Bureau was "hoping to go over the deck they had and discuss how to engage on a more regular basis." *Id.*

470.    Following up, Crawford noted that Census would like to discuss the following topics: "It looks like the posts from last week's deck about infertility and side effects have all been removed.  Were those re-evaluated by the moderation team or taken down for another reason?" *Id.* at 1.  This remark plainly indicates that, in the last week of March 2021, the Census Bureau was sharing "decks" of posts about COVID-19 misinformation with Facebook, which Facebook then "removed," and CDC was following up to inquire whether the censorship occurred because those posts were "re-evaluated by [Facebook's] moderation team" because of Census's flagging, or for another reason.  Crawford testified that she "cut and pasted" the Census Bureau's inquiries on these points.  Crawford Dep. 76:10.

471.    Crawford also asked Facebook to give the Census Bureau direct access to log in to Facebook's CrowdTangle tool: "Can we add the Census Team to CrowdTangle?"  Crawford Ex. 8, at 1.  As Crawford noted, Facebook had "allowed [CDC] to directly log into CrowdTangle and

run our own reports or searches," and she was asking Facebook to let Census "log in to CrowdTangle" as well.  Crawford Dep. 77:4-14.

472.    In the same email, Crawford inquired of Facebook, "One of the main themes we're seeing and from the CrowdTangle report is local news coverage of deaths after receiving the vaccine.  What's the approach for adding labels to those stories?"  Crawford Ex. 8, at 1.  Thus, the CDC inquired of Facebook what its "approach" was to censoring local news stories about vaccine-related deaths.  *Id.*

473.    Crawford asked Facebook "[h]ow should we best engage regularly going forward on the Census/CDC reports."  Crawford Ex. 8, at 1. Crawford notes that Census had already been working with Facebook to address census-related misinformation: "we generally discussed, you know, how we should talk about misinformation because they had already been working with Census, on their own Census misinformation, and I wanted to know what was best for them for engaging on any topics that we might want to discuss."  Crawford Dep. 77:19-24.

474.    Facebook answered that "[w]e are working on a proposal of how to set up a sharing partnership on the misinform[ation] items."  Crawford Ex. 8, at 1.

475.    Crawford also had three-way meetings with Facebook, CDC, and Census about misinformation: "there were meetings where Census, myself and Facebook were on calls," in which they "had general conversations about what were opportunities to address misinformation."  Crawford Dep. 83:6-12.  In those conversations, specific topics like the removal of specific posts discussed in Exhibit 8 "were probably discussed," but Crawford claims she does not "have specific memory of it."  *Id.* 83:12-14.

476.    On April 13, 2021, Facebook followed up by emailing Crawford and proposing to enroll CDC and Census Bureau officials in a special misinformation reporting channel to

Facebook.  Crawford Ex. 10, at 2.  With a subject line "CV19 misinfo reporting channel," Facebook wrote, "We're working to get our COVID-19 misinfo channel up for CDC and Census colleagues," and asked Crawford to confirm "if the below emails are correct for onboarding to the reporting channel and if there are others you'd like to include."  *Id.*  Facebook provided nine emails, including five CDC officials and four Census officials or contractors, to "onboard" into the COVID-19 "misinfo reporting channel."  *Id.*

477.    The officials who work for Reingold, including Christopher Lewitzke, "were contractors working with Census."  Crawford Dep. 101:10.

478.    Crawford states that this email refers to the fact that Facebook "has a portal or reporting channel where you can report misinformation or threats or things from a specific log-in that I believe they only provide to … federal agencies."  *Id.* 91:23-92:2.  The portal allows federal officials to "log onto Facebook as an administrator, and it's something that they make available to you as a federal agency."  *Id.* 95:17-19.  Crawford understands that this "wasn't something that was generally available" to the public but was only provided to federal officials.  *Id.* 96:15-16.

479.    Crawford recalls that a CDC official logged into this portal and used it to report "two or three posts."  *Id.* 92:17.

480.    On April 23, 2021, Crawford emailed Facebook and stated that the Wyoming Department of Health had "mentioned … that the algorithms that Facebook and other social media networks are apparently using to screen out postings by sources of vaccine misinformation are also apparently screening out valid public health messaging, including WY Health communications."  Crawford Ex. 38, at 2.  When she did not hear back, on April 28, she emailed Facebook again, "Anything you all can do to help on this?"  *Id.*  Facebook then responded and addressed the

problem.  *Id.* at 1-2.  The government is not amused when government-induced censorship sweeps in the government's own speech.

481.    On May 6, 2021, Crawford emailed Facebook a table containing a list of 16 specific postings on Facebook and Instagram, with a link and the text of each post. Crawford Ex. 9, at 1-3. Crawford wrote, "As mentioned, here are two issues that we are seeing a great deal of misinfo on that we wanted to flag for you all … These are just some example posts. … Our census team is copied here, has much more info on it if needed."  Crawford Ex. 9, at 1.  Crawford copied Jennifer Shopkorn of the Census Bureau and Christopher Lewitzke, a Census Bureau contractor, on the email.  *Id.*

482.    Crawford "flag[ged]" these posts for Facebook "[b]ecause we had had conversations with Facebook about ways that we could address misinformation, and … one suggestion … that came up in that conversation was to let them know if we were seeing major themes that CDC had scientific information on, or had web content that would address."  Crawford Dep. 87:15-21.

483.    When Crawford would "flag" such content for Facebook and other platforms, she knew that they would evaluate and possibly censor the content under the content-moderation policies: "I do know that the platforms have a variety of ways to address misinformation. They might tag it as something that people should look more into.  I think … that they have the ability to control how often some of these things show up in peoples' feeds. And I do know that removing them is an option that they could consider."  *Id.* 88:7-14.

484.    CDC's "goal" in flagging misinformation for possible removal from Facebook "is to be sure that people have credible health information so that they can make the correct health decisions…. There were a lot of things circulating that were not accurate information about

COVID. And so we were trying to point out and make the credible information more available to users." *Id.* 88:25-89:6.

485.    CDC and Census used "the social [media] listening tools," such as CrowdTangle, to identify misinformation that was "flagged" to Facebook for possible censorship. *Id.* 90:18-23. Regarding the table of 16 posts she "flagged" in her May 6, 2021 email, she stated, "these probably came from the social listening tools … that can consolidate examples.  And we provided some examples of what we meant." *Id.* 90:18-23.

486.    On May 10, 2021, Crawford emailed Facebook with the subject line, "COVID BOLO Misinformation meetings."  Crawford Ex. 40, at 3.  She wrote: "We would like to establish COVID BOLO meetings on misinformation and invite all platforms to join the meetings.  We are aiming for our first one on Friday at noon. … Are there direct POCs on your end I should include on the invite?  Happy to chat if better.  THANKS!"  *Id.*

487.    On May 18, 2021, Facebook emailed Crawford noting that a Facebook official "has an agenda item" for the "CDC call this week."  Crawford Ex. 11, at 2.  This official, according to Crawford, is a member of Facebook's "Trust and Safety team, or the Misinformation team."  Crawford Dep. 103:9.

488.    The Facebook official noted that Facebook's "Content Policies … determine what we may remove or reduce and inform."  Crawford Ex. 11, at 2.  She noted that "we currently remove false claims about face masks," and wanted to discuss "whether there is still a high risk of harm from mask misinformation," as well as "false claims about the efficacy of social distancing or the existence of COVID-19."  *Id.*

489.    Crawford admits that the CDC provided "scientific information" that Facebook would use to decide whether to "remove" or "reduce and inform," *id.*, content under its policies:

"What we did provide was scientific information that I did assume that they might use to do those things," *i.e.*, "remove or reduce and inform." Crawford Dep. 105:17-19.

490.   The next day, May 19, 2021, Facebook emailed Crawford and noted that, for the weekly call that week, "here are some of the COVID content items that [Facebook's content-moderation official] will be flagging for you/CDC team." Crawford Ex. 11, at 1. She then provided a list of twelve specific claims, including such claims as "COVID-19 has a 99.96% survival rate," "COVID-19 vaccines cause bell's palsy," and "[p]eople who are receiving COVID-19 vaccines are subject to medical experiments." Crawford Ex. 11, at 1-2.

491.   Facebook raised these twelve claims to get CDC's guidance on whether they violated Facebook's policies: "They were wanting our feedback on whether these things were true or false statements that they were seeing. Did the CDC have science around this, did we have content on our website." Crawford Dep. 106:10-13. CDC would respond to debunk such claims if it had information: "[I]f we knew, if we had something or we had science on these items, we would point to it or provide them an answer." *Id.* 106:19-21.

492.   In response, Crawford indicated that "Census team members" would join the call, and that she might not be able to address or debunk all 12 claims on the call, because "[t]here may be some facts we have to get back to the group on after the meeting." Crawford Ex. 11, at 1.

493.   On the call referred to in the email, CDC discussed with Facebook these twelve claims and who at CDC might be able to address their veracity. Crawford Dep. 106:23-107:3.

494.   According to Crawford, "Sometimes in these meetings they would ask do we know if this is true or false, which is what they were doing [in Exhibit 11]. And then if we knew, the communicators knew the answer, we would provide it. If not, I would say, we would say, I'll have to get back to you later, we'll talk to our SMEs," *i.e.* subject-matter experts. *Id.* 116:7-12.

495.     Census Bureau officials would follow up to monitor whether Facebook was actually removing the content that federal officials had flagged as misinformation: "Census was at least periodically checking on things that they had flagged, or they had seen come up." *Id.* 117:19-21.

496.     After the meeting, on May 24, Facebook's content-moderation official emailed Crawford, stating, "Thanks so much again for you and team's help in debunking a few COVID-19 and vaccine misinformation claims for us." Crawford Ex. 15, at 2.  She then provided a list of the twelve claims with CDC's input on each, noting "Debunked" for each claim that the CDC had debunked in the meeting. *Id.* at 2-3.  Among other things, she noted that CDC "[d]ebunked" claims like "Face masks contain … harmful particles," and even plainly evaluative statements like "People who are receiving COVID-19 vaccines are subject to medical experiments." *Id.* at 2-3.

497.     On June 2, 2021, Crawford emailed the Facebook content-moderation official back with further input on the claims from CDC's subject-matter experts.  Crawford Ex. 16, at 2.  She noted several times that CDC's "web content to debunk is in clearance," meaning that CDC was preparing web content that would debunk those claims.  *Id.*

498.     The next day, on June 3, 2021, the Facebook content-moderation official emailed Crawford to clarify that "web content to debunk is in clearance" means that "we should consider these debunked by the CDC now," and Crawford answered that "Yes they are debunked and we will also have content on it soon."  Crawford Ex. 16, at 1.  As Crawford stated, "We reported to Facebook that they were debunked at this time."  Crawford Dep. 135:2-3.

499.     Crawford knew that Facebook would apply its content-moderation policies to claims that the CDC debunked: "I knew that they had options … which is to inform people, to maybe reduce it in the algorithm, or to remove it…. [T]hey probably had other options, but I knew of at least those." *Id.* 138:18-22.

500.   On July 26, 2021, the same Facebook content-moderation official emailed Crawford, asking for CDC to debunk three more COVID-related claims.  The subject line of the email was, "FB Misinformation Claims Help Debuning."  Crawford Ex. 17, at 1.  Crawford understood that "Debuning" was "Debunking" misspelled.  Crawford Dep. 139:1-2.

501.   In this email, Facebook's content moderator wrote to Crawford: "Our Misinformation Policy Team has identified some claims that we were hoping your team could **help us understand if they are false and can lead to harm**?"  Crawford Ex. 17, at 1 (bold in original).

502.   Facebook's content-moderation policy called for it to remove claims that are false and can lead to harm.  *See, e.g.,* Crawford Ex. 26, at 4 (Facebook's content-moderation official, Liz Lagone, noting that "We remove … posts on the grounds that the claim is false and that it is harmful," where "harmful" includes cases where "if people believed it, it might make them less likely to get vaccinated.").  So it was clear that Facebook's "Misinformation Policy Team" was asking CDC to advise whether these claims should be removed under Facebook's content-moderation policy.  Crawford admits that she understood that CDC's guidance would "benefit" Facebook's expansion and application of its censorship "policy" to these claims, acknowledging that Facebook was asking her about these claims "[b]ecause CDC would have credible health information about the claims or scientific information that would benefit their policy making." Crawford Dep. 140:1-3.

503.   The three claims included: "Spike protein in COVID-19 vaccines is dangerous/cytotoxic," "Guillain-Barre Syndrome (GBS) is a possible side effect of the COVID vaccine," and "Heart inflammation is a possible side effect of all COVID-19 vaccines."  Crawford Ex. 17, at 1.

504.    Facebook also asked Crawford if "your team was aware of any global source of truth/database for vaccine adverse effects including possibly vaccine-related deaths."  Crawford Ex. 17, at 1.

505.    Crawford responded, "Got it, let me get back to you shortly and thank you much for asking!"  Crawford Ex. 17, at 1.

506.    Crawford does not recall her specific response to this inquiry, but she admits that "generally" she referred them to the CDC's subject-matter experts and responded to Facebook with the CDC's view on the scientific questions, as she did with similar requests.  Crawford Dep. 140:16-141:4.

507.    On July 20, 2021, Facebook emailed Crawford another biweekly "CrowdTangle content insights report" on COVID-19.  Crawford Ex. 18, at 1.  One of the misinformation-trending topics that Facebook flagged in bold in the email was "**Door-to-Door Vaccines**," which stated that "The highest interaction Page posts for this topic convey concern from political opponents about the Biden Administration's strategy to ramp up vaccination efforts in communities with low vaccination rates by going 'door-to-door' to educate and encourage more Americans to get vaccinated."  *Id.*  The same topic, in the same time frame, was emphasized in the Virality Project report as a prime example of viral vaccine-related "misinformation," when in fact it involved only expressions of political opinion.  Scully Ex. 2, at 39, 54-55.

508.    The same email also noted posts "expressing skepticism about vaccinating children."  Crawford Ex. 18, at 1.  Earlier CrowdTangle reports in the same email chain had flagged for the CDC highly engaged content about "**Vaccine Side Effects** … especially for children and pregnant women," "**Vaccine Refusal**," and "**Vaccination Lawsuits** … lawsuits over compulsory vaccination related to employment."  *Id.* at 2-3 (bold in original).

128

509.   Facebook noted that the CrowdTangle reports were confidential and not to be disclosed further: "As always, please do not share." *Id.* at 1.

510.   Facebook continued to send biweekly CrowdTangle reports, which flagged in bold high-engagement topics such as "**Proof of Vaccination Requirement**," "**COVID-19 and Unvaccinated Individuals**" (addressing "concerns that the recent uptick in hospitalizations and deaths is being driven up by unvaccinated individuals"), and "**COVID-19 Mandates**," as well as "allowing people to return to … religious services."  Crawford Ex. 19, at 1-3 (bolds in original).

511.   On August 19, 2021, Facebook asked Crawford for a "VAERS Policy Consultation" meeting for the CDC to give Facebook guidance on how to address VAERS-related misinformation: "Our Health Policy folks would like to meet with your VAERS experts for a consultation meeting regarding VAERS and misinformation."   Crawford Ex. 20, at 1.  Crawford responded, "I'm sure we can do this, and I'm glad you're asking."  Crawford Ex. 20, at 1.

512.   "VAERS" is the HHS's Vaccine Adverse Event Reporting System, *see* https://vaers.hhs.gov/.   At that time, the CDC was greatly concerned about VAERS-related "misinformation" on social-media, because users cited and discussed VAERS data and reports to raise concerns about the safety of vaccines in ways that the CDC thought misleading, as Crawford recounted: "the topic of VAERS was an area that was widely discussed on social media, and there was a lot of areas of confusion about what VAERS data was.  There was myths about VAERS data, and there was misinformation about VAERS data. So it was always one of the things that rose to the top in terms of volume of discussion of people were very confused about VAERS." Crawford Dep. 150:21-151:3.  So it is not surprising that Crawford was "glad" Facebook was "asking" for a meeting in which the CDC would give Facebook guidance on how to censor "misinformation" about VAERS.  Crawford Ex. 20, at 1.

513.     Crawford also followed up with Facebook by providing written CDC-provided materials for Facebook to use in addressing VAERS-related "misinformation" on its platforms: "If of use, we just published a new video and I've attached some recent talking points that may also inform your efforts."  Crawford Ex. 20, at 1.  Plainly, the "efforts" Crawford wished to "inform" were Facebook's efforts to remove VAERS-related "misinformation" from its platforms.

514.     The CDC also had a meeting with Facebook about VAERS-related misinformation: "We did have a session with the VAERS experts with Facebook."  Crawford Dep. 151:8-9.  In the meeting, the CDC had "two experts for VAERS and a couple of their communication experts on the line with Facebook's team," which consisted of "their misinformation and policy type team" that the content-moderation official "was part of."  *Id.* 151:20-24.  In the meeting, the CDC "offered the [subject-matter expert] just to answer their questions about what VAERS was and what it wasn't.  And my recollection is [Facebook] asked a lot of questions like … who can report something on VAERS and things like that during the session."  *Id.* 152:1-6.

515.     On September 1, 2021, Crawford emailed Facebook and stated: "BOLO for a small but growing area of misinfo.  One of our lab alerts … was misinterpreted and was shared via social media." Crawford Ex. 21, at 1.  ("BOLO" stands for "Be on the lookout."  Crawford Dep. 153:21.).  She explained what the CDC viewed was misinformation, and then stated, "I've attached some example Facebook posts and another document with the facts around the issue."   Crawford Ex. 21, at 1.

516.     Plainly, Crawford was flagging these posts and related posts for possible censorship under Facebook's content-moderation policy.  She admits that the CDC's "BOLO" alerts were provided to "assist" the platforms with their enforcement decisions under their policies: "Similar to all the other BOLOs, we still thought it was good to point out if we had facts around something

that was widely circulating as a cause of misinformation to the platforms to assist them in whatever they were going to do with their policy or not do." Crawford Dep. 153:23-154:3.

517.    When asked what she "expected [Facebook] to do once they were on the lookout" for the supposed misinformation that the CDC had flagged, Crawford responded: "I knew that they had various options. They could have just used it to inform people. They could have considered it in their algorithm, I believe. I did understand that potentially removing posts was something that they might do." Crawford Dep. 155:15-20.  So she provided the information knowing it would happen and wanting it to happen.

518.    On November 2, 2021, Facebook's content-moderation official sent Crawford and other CDC officials an email stating, "thanks so much for confirming the ability for the claims in question last week having the risk of causing vaccine refusals." Crawford Ex. 22, at 1.  Again, that is one of the criteria Facebook used to justify removal of content from its platforms.  Crawford Ex. 26, at 4 ("We remove … posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated.").  The content-moderation official also stated, "thank you all so much for your input over the last week on our many questions about vaccine misinformation relative to the EUA."  Crawford Ex. 22, at 1. ("EUA" refers to the FDA's "emergency use authorization to the Pfizer vaccine for children." *Id.*)

519.    The content-moderation official also stated: "I wanted to share that as a result of our work together, when the FDA gave emergency use authorization to the Pfizer vaccine for children last week, we immediately updated our policies globally to remove additional false claims about the COVID-19 vaccine for children (e.g. 'the COVID vaccine is not safe for kids')." Crawford Ex. 22, at 1.  She also noted, "We also launched a new feature on Instagram, where accounts that repeatedly post content that violates our policies on COVID-19 or vaccine

misinformation may now lose the ability to be tagged or mentioned or may see pop-ups asking if they'd like to delete certain posts that may violate our policies."  Crawford Ex. 22, at 1.  Thus, Facebook noted that, "as a result of our work together" with the CDC, Facebook had updated its content-moderation policies to increase censorship of vaccine-related claims in significant ways. *Id.*

520.    The content-moderation official went on to ask the CDC to debunk additional claims: "**we have identified a number of additional claims we would like to get your team's assessment on … <u>Would it at all be possible to get input by Monday, November 8th?</u>**" Crawford Ex. 22, at 1 (bold and underline in original).  She requested, "For each of the following new claims, which we've recently identified on the platform, **can you please tell us if: 1. The claim is false; and 2. If believed, could this contribute to vaccine refusals?**"  *Id.* (bold in original).  Again, these are the two precise criteria that Facebook relied on to remove content from its platforms.  Crawford Ex. 26, at 4 ("We remove … posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated.").   She then included a new list of ten specific claims about the COVID-19 vaccines for the CDC to debunk.  Crawford Ex. 22, at 1-2.

521.    Crawford understood, again, that this request was made to "inform their policies," *i.e.*, inform Facebook's application of its content-moderation policies to these claims: "It was still my interpretation that she was asking to inform their policies."  Crawford Dep. 159:7-8.

522.    Crawford also admits that she was "happy" when the CDC's information to Facebook caused "less spread of misinformation" on Facebook and other platforms, *i.e.*, that she desired that outcome: "I'm happy that providing the scientific information led to less spread of misinformation."  *Id.* 161:23-25.

523.    Crawford also understood that Facebook was, in fact, removing content from its platforms based on the CDC's information: "I understand that she's removing claims … that are not scientifically accurate." *Id.* 162:21-22.

524.    Crawford responded to Facebook, "Thank you so much for the feedback on what you've been able to do.  This is very good to know."  Crawford Ex. 22, at 1.  She also stated, regarding Facebook's request that the CDC debunk the ten new claims, that "I'm going to work on this one …. I hope we can do it by Monday, I will keep you posted."  *Id.*

525.    The following Monday, November 8, 2021, Crawford followed up with a response from the CDC addressing seven of the ten claims Facebook had asked CDC to evaluate.  Crawford Ex. 23, at 1-2.  The CDC rated six of the seven claims "**False**."  *Id.* (bold in original).  Crawford also noted in the response email, without citing any support, that "It appears that any of these could potentially cause vaccine refusal."  Crawford Ex. 23, at 1. Under Facebook's policies, a claim that is both false and could contribute to vaccine refusal was subject to removal.  Crawford Ex. 26, at 4 ("We remove … posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated.").

526.    On February 3, 2022, Facebook's content-moderation official sent Crawford another email, stating that she "wanted to **share updates we made as a result of our work together**" and "**ask for your assessment on a few things**."  Crawford Ex. 26, at 1 (bold in original). She described the "updates" as follows: "On February 2nd, we launched several updates to our COVID-19 Misinformation and Harm Policy based on your [*i.e.* CDC's] inputs."  *Id.*  These "updates" included "[r]emoving claims that COVID-19 vaccines cause heart attacks," and "[t]aking steps to reduce the distribution of content that our systems predict likely violates our COVID-19 and vaccine misinformation policies, but has not yet been reviewed by a human; if at

any point this content is confirmed to violate the policy then it will be removed from the platform." Crawford Ex. 26, at 1.  Crawford responded, "the update is very helpful, thank you for including that!" *Id.*

527.   Facebook's content-moderation official also included, under the heading "**NEW: For CDC Input**," another request that "For each of the following new claims, **can you please tell us if: 1. The claim is false; and 2. If believed, could this claim contribute to vaccine refusals**?" Crawford Ex. 26, at 1 (bold and underline in original).  She then provided a long, detailed list of claims and sub-claims about COVID-19 for CDC's input.  *Id.* at 2-4.

528.   Among other things, Facebook asked the CDC to pre-refute claims based on events that had not occurred yet.  Facebook asked Crawford to address "How FDA EUA authorization for children under 5 might impact our policies."  Crawford Ex. 26, at 1.  Facebook noted, "We understand that the FDA is considering giving emergency use authorization for the COVID-19 vaccine for children under five in the coming weeks.  We are considering how our existing policies on COVID-19 vaccines … should apply to claims about children 6 months to 4 years once the vaccine is approved for use.  Can you please assess for each claim whether it is false for children in this age range and if believed, likely to contribute to vaccine hesitancy or refusals?  *Please let us know if it is easiest to set up a time to meet and discuss each one.*"  Crawford Ex. 26, at 2 (italics in original).  There followed a long, detailed list of claims about the vaccines, for which Facebook sought CDC's input on their falsity as to children under 5.  *Id.* at 2-3.

529.   For this long list of claims, Crawford understood that Facebook would use the CDC's input to "determine" Facebook's censorship policy for such claims: "I know that they're using our scientific information to determine their policy."  Crawford Dep. 170:19-20.

134

530.    Regarding Facebook's request for CDC's input on these many new claims, Crawford responded, "I will talk to the Vaccine program and see what we can do."  Crawford Ex. 27, at 1.  The next day, February 4, 2022, she followed up, stating, "I'm heading out today but do you have a minute to discuss this by chance?  Call anytime," and provided her phone number. Crawford Ex. 27, at 1.  Crawford also changed the subject line of the email to state, "Have 5 minutes to chat? [re]: Vaccine Misinformation Questions for CDC."  *Id.*

### C.    CDC's and Census's Pressure and Collusion with Google/YouTube.

531.     On March 18, 2021, Crawford emailed contacts at Google, stating: "As I believe we discussed previously, CDC is now working with Census to leverage some of their infrastructure to help identify and address COVID vaccine mis-info."  Crawford Ex. 28, at 1.  She went on, "As I understand it from the Census team … when they were doing this for the Census project last year, they meet regularly with a Google/YouTube Trust team."  *Id.*  A "Trust team" is a content-moderation team.  Crawford then asked, "Is it possible for us to start up regular meetings on this topic or maybe use our existing meeting time."  *Id.*  The subject line of this email was "COVID Misinfo Project."  *Id.*  Google and Crawford then set up a time to talk and discuss the project.  *Id.*

532.    Crawford states that this email refers to "the work of the IAA with Census to help consult and work with us on the COVID misinformation…"  Crawford Dep. 175:6-8.  Her reference to Census's infrastructure referred to "the fact that Christopher [Lewitzke, the Census contractor] ran those reports and looked for misinformation on those areas for us."  *Id.* 175:11-13.

533.    Crawford's reference to Census's previous project referred to their work on combating misinformation about the 2020 Census.  *Id.* 175:18-19.

534.     Crawford does not remember the specific call referenced in this email, but she admits that, "This was in 2021.  So we had been meeting pretty regularly with Google by this time." *Id.* 179:5-6.

535.     On March 23, 2021, Crawford sent a calendar invite for a meeting on March 24 that included herself and five other CDC employees, four Census Bureau employees and contractors (including Zachary Schwartz, Christopher Lewitzke, and Jennifer Shopkorn), and six Google/YouTube officials.  Jones Decl., Ex. T, at 1-2.  The subject of the meeting was "COVID Misinformation: CDC/Census/Google."  *Id.* at 1.  The invite stated: "CDC/Census to meet with Google regarding our misinformation efforts."  *Id.*

536.     At the meeting, CDC and Census presented a slide deck similar to the one that Census prepared for the meeting with Facebook on March 25, 2021, discussed above.  *See id.* 3-16.  The slide deck was entitled, "COVID Vaccine Misinformation: Issue Overview."  *Id.* at 3.  As with the Facebook slide decks, this one stated of "Misinformation Topics" that "[t]hese topics were selected due to high volume, continued public discussion, and high-profile coverage."  *Id.* at 4.  It noted that these topics included "infertility, misinformation about side effects, and claims of vaccines leading to deaths."  *Id.*

537.     For each topic, the slide deck included a description of a common claim, specific examples of videos on YouTube and social-media postings making the disfavored claim, and a putative refutation by the CDC.  *Id.* at 6-14.  For infertility, the slide deck stated that "[c]ommon claims about the COVID vaccine's side effects include that it causes infertility in women and men, miscarriages, and stillbirth," and it provide screen shots of specific videos on YouTube and social-media posts making this claim.  *Id.* at 6-8.  The deck asserted that "[a]ccording to CDC there is no evidence that fertility problems are a side effect of any vaccine, including COVID-19 vaccines."

136

*Id.* at 6.  Regarding supposed misinformation about side effects, the deck stated, "speculation and misinformation about side effects after taking the COVID vaccine have been prevalent on social media since the first vaccines were approved," and it provided screen shots of an example video on YouTube and social-media posts making such claims, along with a putative refutation by the CDC.  *Id.* at 9-11.  Regarding the topic "Death from Vaccines," the slide deck stated that "[v]accine-hesitant groups spreading misinformation and conspiracy theories about alleged vaccine-related deaths erode trust in the COVID-19 vaccine and the public health system," and it provided a sample video on YouTube and social-media posts linking the vaccines to deaths, along with a putative refutation by the CDC: "According to CDC, VAERS has not detected patterns in cause of death that would indicate a safety problem with COVID-19 vaccines."  *Id.* at 12-14.  As with the similar Facebook slide deck, the evident purpose of this presentation was to induce YouTube to censor these claims on its platform.

538.    On March 25, 2021, Kate Galatas of the CDC emailed the group attending the meeting and stated: "Many thanks, again, for the time yesterday.  This is such important shared work we are doing in the mis/dis information space, and we deeply appreciate your contributions.  Please find attached the slide deck referenced during the meeting, and we ask that you treat it close hold and not for further distribution.  We are looking forward to our future collaboration efforts!"  *Id.* at 1.

539.    On March 29, 2021, Crawford followed up with Google, inquiring "Are you all open to using our regular 4pm meetings to go over things with Census or what is preferred?"  Crawford Ex. 29, at 2.  Google responded: "We would like to follow up on our discussion with your colleague, Cynthia, on vaccine information a few months ago.  Specifically, we plan to share a new list of common vaccine misinformation claims and would love it if Cynthia or other vaccine

experts could join." *Id.* He also stated that "we can save a few minutes … to discuss potential next steps regarding the Census…" *Id.* The subject line of this email was "Follow up on mis-info conversation." *Id.*

540. Crawford recalls that Census was asking for regular meetings with platforms specifically focused on misinformation: the statement "is in reference to discussing how to engage on an ongoing basis about misinformation and the Census suggestion that we have regular meetings with them just on that topic." Crawford Dep. 184:14-18. The exchange was "about how to engage more regularly about misinformation, or … whatever Census had done with Google and YouTube, should we have a similar structure with CDC." *Id.* 185:11-14.

541. Regarding the request for input on the "new list of common vaccine misinformation claims," Crawford responded, "I've arranged for a few SMEs [subject-matter experts] to join the call, including Cynthia." Crawford Ex. 29, at 2.

542. A few days later, on April 2, 2021, Google emailed Crawford stating, "Thanks again for your time this week. Attached are some of the claims we discussed for your reference." Crawford Ex. 29, at 1.

543. Crawford's reference to the "4pm meeting" refers to a regular biweekly meeting with Google, which still continues to the present day: "I still have a 4:00 p.m. meeting every other Monday with Google." Crawford Dep. 180:6-7.

544. Crawford also has "similar regular meetings with … Meta and Twitter." *Id.* 180:11-16. She admits that she has ongoing meetings with Google and Facebook/Meta that continue to the present: "we had regular meetings with Google, and we had regular meetings with Meta…. you know, the frequency changed…. I mean, Google we meet every other week. Right now with Meta it's more ad hoc." *Id.* 180:16-21.

545.    Crawford also "had a regular meeting with Pinterest for a short period of time, and we had … just more ad hoc meetings on occasion with Twitter." *Id.* 180:23-181:1.

546.    Crawford states that these meetings "were mostly about things other than misinformation; though misinformation was discussed in the meetings." *Id.* 181:22-24.

547.    On April 12, 2021, Google/YouTube followed up with an email to Crawford, stating, "For tomorrow's call, would it be possible to include Cynthia or other COVID-19 treatment SMEs [subject-matter experts] to follow up on some additional questions?"  Crawford Ex. 30, at 1.  Crawford responded, "Can you give me an idea of what topics we'll be covering? But yes, I'll ask them to attend." *Id.*

548.    Crawford notes that it "wasn't uncommon" for Google/YouTube to ask her to bring subject-matter experts to meetings to go over such topics.  Crawford Dep. 188:19-22.

549.    On May 10, 2021, Crawford emailed her Google contacts and invited them to attend in the BOLO meetings: "We would like to establish COVID BOLO meetings on misinformation and invite all platforms to join the meetings.  We are aiming for our first one on Friday at noon. We have heard through the grapevine that [an official] at YouTube would want to join.  Are there other POCs on your end I should include on the invite?"  Crawford Ex. 40, at 1.  The subject of the email was "COVID BOLO meetings on misinformation." *Id.*

**D.    CDC's and Census's "BOLO Meetings."**

550.    On May 11, 2021, Crawford followed up with an email stating, "We would like to invite digital platforms to attend a short 'Be On The Lookout' meeting on COVID.  Please let us know if you have questions and feel free to forward this message to anyone in your organization that should attend."  Crawford Ex. 40, at 2.  Google responded by asking that Crawford include

139

the YouTube official in the meeting, and Crawford noted that she "was going to ask about" him at the 4:00pm recurring meeting.  *Id.*

551.    Crawford testified that she wanted to include YouTube on the BOLO meetings because they hosted the most content: "people from YouTube would occasionally be on our regular meetings, depending on what we talked about. And because YouTube has the most content, like, hosting, … they were a part of the BOLO meetings…"  Crawford  Dep. 244:21-245:1.

552.    The Census officials "were arranging" the BOLO meetings, and "they drafted the slides" for the meetings.  *Id.* 246:12-20.

553.    Crawford ran the BOLO meetings.  *Id.* 265:13.  She "opened up the meeting, introduced myself, gave context for why we were doing the BOLO meeting in brief. And then I believe that Christopher [Lewitzke] went through the slide decks, and I occasionally piped in on them."  *Id.* 265:15-19.

554.    The "slide decks" shown at the meetings were "similar to the table" of 16 Facebook posts that Crawford previously emailed to Facebook, but "they were more like this is a theme, and then there'd be maybe a little info about what the theme was and then maybe a couple of example posts. And then there would be a slide maybe with CDC links or information related to that theme." *Id.* 266:1-6.

555.    The first BOLO meeting was held on May 14, 2021.  Jones Decl., Ex. U, at 1.  The slide deck for that meeting was entitled "COVID Vaccine Misinformation: Hot Topics."  *Id.* at 2-10.  It contained a list of five "Hot Topics" with an "ADVISORY" in red noting that platforms should "**Be On the Lookout**" for "**Potential Misinformation**" on each topic, and provided specific examples of social-media posts for each topic, "Associated Link(s) and Hashtag(s)" for each topic, and the CDC's position on each topic (listed as "**The Facts**").  *Id.* at 4-8.

556.     Crawford also emailed similar slide decks for BOLO meetings scheduled for May 28 and June 18, 2021, though the latter was canceled due to the new Juneteenth holiday.   Jones Decl., Exs. V and W.  In the cover email to the May 28 slides, Crawford requested secrecy: "Please do not share outside your trust and safety teams."  Jones Decl., Ex. V, at 1.  Just like the May 14 BOLO slides, these slides contained lists of "Hot Topics" with an "ADVISORY" in red noting that platforms should "**Be On the Lookout**" for "**Potential Misinformation**" on each topic, and provided specific examples of social-media posts for each topic, "Associated Link(s) and Hashtag(s)" for each topic, and the CDC's position on each topic (listed as "**The Facts**").  Jones Decl., Ex. V, at 4-6; *id.* Ex. W, at 4-6.

557.     In conducting the BOLO meetings, Crawford described CDC's goal as follows: "our goal is to be sure that credible information about COVID was out there. A lot of people seek information on platforms. We thought that by giving the platform scientific information it might help in our goals to being sure that credible information could be found."  Crawford Dep. 266:16-21.   Of course, the BOLO meetings did not address identifying and promoting "credible information," but flagging information that the CDC thinks is *not* credible for potential removal. Crawford effectively admits this; when asked if CDC's goal includes that "incredible information would not be found," she agreed that "I did want the credible information to be found in advance of the uncredible information."  *Id.* 266:22-267:4.

558.     Crawford believes that the third BOLO meeting was cancelled because Juneteenth was declared a new federal holiday, and "that is why we didn't end up having it and we sent the materials out via email."  *Id.* 248:17-22.

559.     On October 28, 2021, Google emailed Crawford stating, "do you have time to connect early next week on anticipated guidance on vaccines for [children ages] 5-11?  It would

be great to connect as the CDC plans communications on authoritative information for pediatric vaccines." Crawford Ex. 42, at 2.

560.    Crawford responded: "Yes, we can discuss pediatric vaccines early next week but let me give you some general info: ACIP is likely to vote on this on Nov 2.  CDC is likely to start posting final information on Nov 3 (possibly late Nov 2), if that helps to know.  There will be many updates so the changes might span over a few days.  We are also looking ahead and misinformation and hope to have a BOLO type meeting later that week with platforms that are interested."   Crawford Ex. 42, at 1.   ("ACIP" is the "Advisory Council for Immunization Practices."  253:21-22.)

561.    On June 29, 2022, Google/YouTube emailed Crawford and her deputy, stating: "The YouTube Policy team is requesting evidence-based input on the claims below.  In the past, the CDC has reviewed COVID information claims and commented TRUE or FALSE + add any additional context needed."  Crawford Ex. 43, at 1.  YouTube then presented two claims, relating to the safety and effectiveness of administering progesterone to reverse chemical abortion.  *Id.* ("**CLAIM**: High doses of progesterone is a **safe** method of reversing chemical abortion … **CLAIM**: High doses of progesterone is an **effective** method of reversing chemical abortion….") (bold in original).  Crawford responded, "I'll check on this but I think I'll probably end up needing to refer you to another agency.  I'll get back to you."  *Id.*

562.    Regarding this exchange, Crawford notes that the CDC's "focus is not solely on COVID.  We're focusing on other topics.  I think [YouTube] thought that we might be able to help with this topic as well."  Crawford Dep. 256:5-8.  Thus, Crawford admits that the CDC is continuing to engage with social-media platforms to provide information that will lead to the

censorship of health-related claims on social media, and that it is willing to expand its focus to other health topics beyond COVID-19.

### E. CDC's and Census's Pressure and Collusion with Twitter.

563.    On April 8, 2021, Twitter emailed Crawford stating, "I'm looking forward to setting up regular chats; my team has asked for examples of problematic content so we can examine trends.  All examples of misinformation are helpful…."  Crawford Ex. 32, at 1.  The subject line of this email was "Request for problem accounts."  *Id.*  Crawford responded, "Yes, we'll get that to you early next week."  *Id.*

564.    Crawford believes that Twitter sent this email in response to her inquiry, "Is there a good way that we should start engaging on misinformation?"  197:19-20.

565.    Crawford responded on April 14, 2021, "The Census team put this spreadsheet together with four example areas," which included the topics, "Vaccines aren't FDA approved," "Fraudulent cures," "VAERS data taken out of context," and "Infertility."  Crawford Ex. 33, at 1. The attachment was called, "Twitter CDC Examples 4-13-21.xlsx."  *Id.*  The spreadsheet contained a "list [of] things that [Census] saw that were being stated as misinformation."  Crawford Dep. 203:24-204:1.  "Infertility" referred to "people claiming that getting the vaccines led to infertility." *Id.* 204:17-18.

566.    Crawford believes that Twitter "was asking for these examples in this email because he was wondering … what would come up in BOLO meetings, or what we would be discussing."  *Id.* 204:22-24.

567.    On May 10, 2021, Crawford emailed Twitter, stating "We wanted to point out two issues we are seeing a great deal of misinfo about…."  Crawford Ex. 34, at 4.  She then provided

a list of "sample posts" that included 12 Tweets reproduced verbatim.  She stated, "Our census team is copied here, has much more info on it if needed."  *Id.*

568.    In the same email on May 10, 2021, Crawford wrote, "Also, we are standing up a BOLO COVID misinformation meeting and inviting all tech platforms.  We are shooting for 12pm EST on Friday for our first meeting.  I'll include you on the invite…."  Crawford Ex. 34, at 4.

569.    Crawford agrees that she was "sending this to [Twitter] so that he would be on the lookout for those things appearing on Twitter."  Crawford Dep. 208:25-209:3.

570.    Crawford notes that "the BOLO format … was used previously," *id.* 209:12-13, because Census had done "BOLO meetings … for their own work," *id.* 209:23-24.  The platforms had done BOLO meetings for Census "in relation to the 2020 census."  *Id.* 210:5-9.

571.     Regarding the BOLO meetings, Census officials "explained" to Crawford "how they did it."  *Id.* 210: 16.  "In fact, they drafted the slide deck" for the CDC BOLO meetings with social-media platforms.  *Id.* 210:16-17.  Census "drafted it and showed me how they thought that we should do it, and that … we would give examples, we would give the science, and then … people could follow up separately."  *Id.* 210:18-22.

572.    Crawford believes that regular meetings with Twitter were not set up, but that "I know they participated in the BOLO meetings."  *Id.* 198:15-16.

573.    Regarding the BOLO meetings, Crawford remembers that two occurred and a third one was scheduled but cancelled due to a holiday, and "in lieu of a meeting" she sent "a Powerpoint."  *Id.* 198:24-199:1.

574.    Twitter responded to Crawford's May 10, 2021 email flagging 12 specific Twitter posts as examples of trending misinformation, stating: "Thanks for sharing this – agree these are important trends to note; a quick scan shows that at least some of these have been previously

reviewed and actioned." Crawford Ex. 34, at 3.  He then stated: "I will now ask the team to review the others." *Id.*

575.    Crawford understood that "asking the team to review the others" meant referring Crawford's flagged posts and issues to Twitter's content-moderation team for possible censorship: "I interpreted it as Twitter made decisions about the areas of misinformation based on whatever policy they had."  Crawford Dep. 211:17-19.

576.    As with Facebook, Crawford understood that her flagging of posts would result in Twitter censoring at least some of these materials in different ways, including removing posts: "similar to Meta that they probably had multiple options. I am sure some were removed. I am sure some … were flagged. I see flags all the time on the Twitter posts. I am sure some were just maybe … maybe they weren't distributed as much on peoples' feeds."  *Id.* 212:10-16.

577.    In the same email, Twitter offered to enroll CDC officials in its "Partner Support Portal" to provide expedited review of content flagged for censorship: "Carol, remind me: did you have a chance to enroll in our Partner Support Portal?  In the future, that's the best way to get a spreadsheet like this reviewed."  Crawford Ex. 34, at 3.

578.    Crawford understood that Twitter's Partner Support Portal was "similar to what I described for Meta.  It's an offering where you log in and you can report misinformation or threats or problematic posted content in this portal, and it puts it in a system for review."  Crawford Dep. 212:3-7.

579.    On May 10, 2021, Twitter noted to Crawford, "I'd be glad to enroll you in our Partner Support Portal, which allows you a special, expedited reporting flow in the Twitter Help Center.  It worked very well with Census colleagues last year."  Crawford Ex. 34, at 3.

580.   Crawford responded by asking for instructions on how to enroll in the Partner Support Portal, and Twitter offered to enroll any Twitter accounts she identified.   Crawford Ex. 34, at 3.  Crawford provided her personal Twitter account to enroll.  *Id.*

581.   Then, on May 24, Census Bureau contractor Christopher Lewitzke followed on the same email chain with Twitter, asking about "the partner support portal enrollment for CDC." Crawford Ex. 34, at 2.  Lewitzke indicated that they planned to report COVID misinformation to Twitter using existing Census accounts already enrolled in the portal, not CDC accounts, stating: "would there be any issues or complications stemming from flagging COVID misinformation on the portal using the existing census.gov accounts that have access?  We'll want to have at least some CDC accounts whitelisted, but that backup may be helpful short-term."  *Id.*  He then stated: "Let us know any next steps we can take to make sure CDC is all set with the portal."  *Id.*

582.   Crawford confirms that Census had used similar portals to report misinformation to platforms in the past: "I did know from discussions with them that one technique I think that they used was using portals … for their work to report [mis]information."  Crawford Dep. 213:16-19.

583.   Twitter emailed Crawford on May 27, 2021, noting that she should be fully enrolled.  Crawford Ex. 34, at 1.  A screen shot of the portal proclaims, in very large, bolded type, "**Report any issue to get priority service**."  *Id.* (bold in original, font greatly reduced).

584.   Crawford believes that she attempted to use Twitter's Partner Support Portal "every now and then," but that she never solved technical issues that prevented her from reporting anything.  Crawford Dep. 215:9-22.

585.   Christopher Lewitzke is "a Census contractor."  *Id.* 217:5-6.

586.    On September 2, 2021, Crawford emailed Twitter, stating, "A quick BOLO for a small but growing area of misinfo."  Crawford Ex. 35, at 1.  To Twitter, she claimed that "one of our Lab alerts … was misinterpreted and was shared via social media."  Crawford Ex. 35, at 1.  She stated, "I've attached some example Twitter posts and another document with the facts around the issue."  *Id.*  The subject line of the email was "BOLO: CDC lab alert & misinformation."  *Id.*

587.    This report was very similar to the report Crawford provided Facebook the day before, September 1, 2021.  Crawford Ex. 21, at 1.  "The only difference is this email is going to Twitter."  Crawford Dep. 220:7-8.

588.    By sending these emails to Facebook and Twitter flagging what the CDC believed was a misinterpretation of a CDC lab alert on social media, CDC intended to prevent the disfavored message from spreading on social media: "We saw this confusion about this alert brewing and more posts were going up with confusion, and we thought it would be a good idea to provide the platforms with the facts *before it became something bigger*."  *Id.* 220:13-17 (emphasis added).  In other words, CDC wished to cause the disfavored viewpoint to be censored before it could be viewed or repeated by others—a quintessential prior restraint.

589.    CDC specifically flagged this information to the platforms, knowing that they would evaluate it for potential censorship under their content-moderation policies: Crawford "knew their policy teams or their trust teams or misinfo teams … would evaluate it."  *Id.* 220:21-23.  And Crawford "knew that removal was one of the options that they had, yes."  *Id.* 220:25-221:1.

**F.      CDC Endorses the States' Theory of Standing.**

590.     Crawford admits that government communicators have a strong interest in tracking what their constituents are saying on social media: "It's helpful for communicators to know what is being discussed because it helps improve our communication materials." *Id.* 53:10-12.

591.     Crawford emphasized this point multiple times: "as I mentioned before, it does help … for communicators to know what conversations occurs on social media because it helps us identify gaps in knowledge, or confusion, or things that we're not communicating effectively that we need to adjust." *Id.* 54:15-20.

592.     CrowdTangle reports "would help us understand what was being discussed on social media about COVID, which helps us look for gaps in information, confusion about facts, things that we might need to adjust our communication materials for." *Id.* 57:24-58:3.

593.     Crawford specifically expressed the concern that, if content was censored or removed from social-media platforms, government communicators would not know what the citizens' true concerns were: She "was wondering if they delete the info will we know those myths or information so we could update communication activity. So if they were deleting content would we know what the themes were." *Id.* 75:14-18.   Thus, Crawford was concerned that, if the platforms "were deleting content," she might not know "what the themes were" of "myths or [mis]information," which would prevent her from "updat[ing the CDC's] communication activity" to address those myths and misinformation.  *Id.*  Accordingly, Crawford wanted to know, "would [CDC] be able to see in CrowdTangle or other reports … what kind of themes were removed so we would still have the full picture of areas of confusion." *Id.* 75:21-76:1.

594.     Crawford inquired of Facebook "about the data that we could get so we had a full picture on confusion so that we could adjust communication materials, or ways that we were communicating" about COVID-19. *Id.* 81:10-13.  In other words, Crawford wanted to know about

148

speech that was censored, as well as speech that was left up, on social-media platforms so CDC could get "a full picture" and "adjust communication materials" to address people's actual concerns. *Id.*

595.    The CDC "did searches in CrowdTangle, the same way we do searches in other social media and listening tools that we have to create, to understand what's being discussed in the environment, to update our communication material." *Id.* 148:11-15.

## V.    Dr. Fauci's Campaigns to Censor Disfavored Viewpoints on Social Media.

596.    Dr. Fauci, cooperating frequently with NIH Director Dr. Francis Collins, engaged in a series of campaigns to discredit and procure the censorship of viewpoints he disfavored on social media, beginning at least in early 2020.  Once he became Chief Medical Advisor in the Biden Administration in early 2021, his censorship efforts coordinated with and reinforced those of federal officials in the White House, the Office of the Surgeon General, the CDC, and elsewhere.

597.    Until his recent retirement, Dr. Anthony S. Fauci was the director of the National Institute for Allergy and Infectious Diseases at the National Institutes of Health and the Chief Medical Advisor to President Biden.  Fauci Dep. 10:8-16.  At the time of his deposition, Dr. Fauci had been the director of NIAID for over 38 years.  *Id.* at 10:25-11:1.

### A.    Dr. Fauci's Conspiracy and Campaign to Suppress the Lab-Leak Theory.

598.    First, in early months of 2020, Dr. Fauci worked closely with Dr. Francis Collins and Jeremy Farrar to orchestrate a campaign to discredit and suppress the opinion that SARS-CoV-2, the virus that causes COVID-19, leaked from a laboratory at the Wuhan Institute of Virology—an opinion that has recently been confirmed as likely true.  Early in the pandemic, Dr. Fauci was aware that NIAID, under his direction, had funded dangerous gain-of-function research on coronaviruses at that laboratory, and he sought to discredit and suppress the lab-leak theory to

deflect the scandal and blame associated with potential responsibility for the deaths of millions in the ensuing pandemic.  He engaged in a campaign of deception to discredit the theory, and as a result of his efforts, the lab-leak theory was heavily censored on social media.

599.    On December 30, 2011, Dr. Fauci co-authored an op-ed with Dr. Francis S. Collins in the Washington Post entitled *A Flu Virus Risk Worth Taking*.  Fauci Ex. 1, Fauci Dep. 13:13-20.

600.    In this op-ed, Dr. Fauci and Dr. Collins advocated for creating potentially dangerous viruses in laboratories, writing that "important information and insights can come from generating a potentially dangerous virus in a laboratory."  Fauci Ex. 1, at 1.  According to Fauci and Collins, "[u]nderstanding the biology of … virus transmission has implications for outbreak prediction, prevention and treatment," and "[i]dentifying threatening viruses can also facilitate the early stages of manufacturing vaccines that protect against such a virus in advance of an outbreak." *Id.* at 2.  They further argued that "identifying the molecular Achilles heel of these viruses can allow scientists to identify novel antiviral drug targets that could be used to prevent infection … or better treat those who become infected." *Id.*

601.    Dr. Fauci and Dr. Collins acknowledged the significant risks associated with such research, writing that "[s]afeguarding against the potential accidental release or deliberate misuse of laboratory pathogens is imperative." *Id.*  But they believed that those risks were contained, writing that "engineered viruses … are maintained in high-security laboratories." They further state that "scientists, journal editors, and funding agencies involved are working together to ensure that access to specific information that could be used to create dangerous pathogens is limited to those with an established and legitimate need to know." *Id.*

602.     Thus, long before the COVID-19 pandemic, Dr. Fauci and Dr. Collins were highly visible, public advocates for laboratory experiments that involve "generating a potentially dangerous virus in a laboratory." *Id.* at 1.

603.     Such research of "generating a potentially dangerous virus in a laboratory" is commonly called "gain-of-function" research.  Dr. Fauci testified that "[g]ain of function is a very potentially misleading terminology, and that was one of the reasons why several years ago outside groups, not the NIH … did away with the terminology 'gain of function' because it can often be very confusing and misleading."  Fauci Dep. 16:3-10.  But Dr. Fauci confirms that "the NIH" did not "d[o] away" with that terminology, *id.*, and Dr. Fauci's own internal email uses the phrase "SARS Gain of Function" to describe the research on bat coronaviruses that was conducted by Dr. Shi Zhengli and others at the Wuhan Institute of Virology, partly funded by Dr. Fauci's NIAID through the subgrants from the EcoHealth Alliance, discussed below, *see* Fauci Ex. 6, at 8.

604.     On June 1, 2014, Dr. Fauci's NIAID funded a grant to the EcoHealth Alliance for the five-year period June 1, 2014, to May 31, 2019.  Fauci Ex. 2, at 2.  The title of the project was "Understanding the Risk of Bat Coronavirus Emergence."  *Id.* at 1.  The project's Abstract stated, "This project will examine the risk of future coronavirus (CoV) emergence from wildlife using in-depth field investigations across the human-wildlife interface in China, molecular characterization of novel CoVs and host receptor binding domain genes, mathematical models of transmission and evolution, and in vitro and in vivo laboratory studies of host range."  *Id.*

605.     The Abstract noted that one of the project's "three specific aims" would be to "[t]est predictions of CoV inter-species transmission" by engaging in two forms of research to enhance the bat coronaviruses' transmissibility to humans: "reverse genetics," *i.e.*, genetic manipulation of the viruses to render them more transmissible; and "virus infection experiments"

using "humanized mice," *i.e.*, repeatedly infecting humanized mice with bat coronaviruses to provoke mutations that render them more infectious to human cells (a process known as "serial passage," *see* https://en.wikipedia.org/wiki/Serial_passage). *Id.* at 1. Specifically, the Abstract stated: "Predictive models of host range (i.e.[,] emergence potential) will be tested experimentally using *reverse genetics*, pseudovirus and receptor binding assays, and *virus infection experiments across a range of cell cultures* from different species and humanized mice." *Id.* (emphases added).

606. Dr. Fauci attempted to argue that "reverse genetics" is so vague that it might not refer to gain-of-function research. *See* Fauci Dep. 23:18-20 ("I'm not really quite sure what they're referring to. Reverse genetics can mean many things."). But Dr. Fauci admits that "reverse genetics" means "[m]anipulation of a virus, recombination, things like that." *Id.* at 23:19-21. In 2015, in an article reporting on research performed pursuant to this grant, Dr. Ralph Baric and Dr. Shi Zhengli wrote that they used "reverse genetics" to "generate[] and characterize[] a chimeric virus" that was more infectious and more virulent in humans. Fauci Ex. 4, at 1. Dr. Fauci's own internal email describes that article as addressing "SARS Gain of Function." Fauci Ex. 6, at 8.

607. Dr. Fauci admits that "EcoHealth has a subaward from their original grant that goes to Shi Zhengli at the Wuhan Institute of Virology." Fauci Dep. 36:4-6. He agrees that EcoHealth and Shi Zhengli of the Wuhan Institute of Virology "work together on research that's directly funded by NIAID." Fauci Dep. 36:7-13.

608. Dr. Fauci also attests that Dr. Peter Daszak likely has access to the genetic sequences of chimeric viruses that Shi Zhengli created during her research funded by EcoHealth using NIAID funds: "I don't know absolutely for sure, but I would imagine that if Peter Daszak is collaborating scientifically with Shi Zhengli, that it is likely, given the norms of scientific

collaboration, that he would have access to data," and "they are collaborators, since he has a subaward to the Wuhan Institute that I believe goes to Dr. Shi." Fauci Dep. 37:1-13. Daszak, therefore, is likely in possession of genetic evidence demonstrating whether SARS-CoV-2 originated from NIAID-funded research at the Wuhan Institute of Virology.

609.    Dr. Fauci claimed that he had never seen this grant award before his deposition, and that he was only "vaguely" aware of NIAID's funding of EcoHealth Alliance. *Id.* at 18:10-12 ("I'm vaguely familiar with the fact that EcoHealth Alliance has been doing research on trying to understand the bat coronavirus emergence."); *id.* at 19:7-8 ("I have no recollection of the initiation of this grant."). Dr. Fauci admits that "NIAID has funded EcoHealth Alliance," 20:5-6, but he contends that he is completely unfamiliar with this project. *Id.* at 20:8-9 ("[T]his is the first time that I have seen this piece of paper."). But this very grant project was flagged for Dr. Fauci in an email from his subordinate on January 27, 2020, at the beginning of the pandemic. Fauci Ex. 5. Given the public and Congressional scrutiny of this particular project and its relation to the origins of the COVID-19 pandemic, Dr. Fauci's testimony on these points is not credible.

610.    Peter Daszak is listed as the "Contact PI/Project Leader" for the grant award "Understanding the Risk of Bat Coronavirus Emergence." Fauci Ex. 2, at 1. The "Awardee Organization" is the EcoHealth Alliance. *Id.*

611.    Dr. Fauci claims that he is not acquainted with Peter Daszak and does not know how to pronounce Daszak's name, Fauci Dep. 20:13 ("I'm not sure"), and that he "do[es]n't even remember meeting him," *id.* at 21:1-2, but that he has seen a photo of himself with Daszak at a public event as the only evidence that they have met. *Id.* at 21:2-8.

612.    In fact, Dr. Fauci has exchanged cordial emails with Daszak on a first-name basis, and he participated in a podcast with him on February 9, 2020, in which they both sought to

discredit the lab-leak theory of COVID's origins.  Fauci Ex. 15, 16, 30.  Dr. Fauci's attempt to

deny or downplay his acquaintance and familiarity with Daszak is not credible.

613.    On October 17, 2014, the U.S. Government entered a "research funding pause" on

gain-of-function research on coronaviruses, in a document entitled "U.S. Government Gain-of-

Function Deliberative Process and Research Funding Pause on Selected Gain-of-Function

Research Involving Influenza, MERS, and SARS Viruses."  Fauci Ex. 3, at 1 (the "GoF Pause" or

"Pause").

614.    Contrary to Dr. Fauci's testimony that the "pause" was an occasion to jettison the

term "gain-of-function," the Pause provided a simple and clear definition of "gain of function"

research, defining "Gain-of-function studies" as "research that improves the ability of a pathogen

to cause disease."  Fauci Ex. 3, at 2.  The research on bat coronaviruses described in Fauci Ex. 2

meets this simple definition.

615.    The Pause applied to funding for all "research such as this until a new U.S.

Government research policy could be adopted."  Fauci Dep. 27:17-19; Fauci Ex. 3, at 2-3.

616.    The Pause provided an exception in Footnote 1, which stated: "An exception from

the research pause may be obtained if the head of the USG funding agency determines that the

research is urgently necessary to protect the public health or national security."  Fauci Ex. 3, at 2

n.1.

617.    Dr. Fauci testified that he does not recall whether NIAID ever invoked that

exception during the years that the Pause was in place (2014-2017).  Fauci Dep. 28:22-29:3.  He

testified that authorization for funding under the exception would "not usually rise up to the office

of the director, but is handled at the level of staff and deputy."  *Id.* at 29:1-2.  He testified that such

approval for projects "urgently necessary to protect the public health or national security" could

have come from "any of a number of people. It could have been people at the program level. It could have been my deputy. It could have been program managers and division directors." *Id.* at 30:16-19.

618.     This testimony contradicts the plain language of the exception, which states that "*the head of the USG funding agency*" must "determine[] that the research is urgently necessary to protect the public health and national security" to allow continued funding for gain-of-function research on coronaviruses.  Fauci Ex. 3, at 2 n.1.  At all relevant times, Dr. Fauci was the "head of the USG funding agency," *i.e.*, the Director of NIAID, and he was responsible for authorizing funding for gain-of-function research on the ground that it was "urgently necessary to protect the public health or national security."

619.     Dr. Fauci states that he does not recall whether NIAID ever authorized continued funding for Peter Daszak or EcoHealth Alliance pursuant to the exception to the Pause in footnote 1.  Fauci Dep. 30:3-12.

620.     In fact, Dr. Fauci testified that "I don't recall" or "I do not recall" 174 times in his deposition, and testified that he could not recall or remember using variations on that phrase 212 times.  *See* Fauci Dep. 22:21-352:17-18.  This contrasts sharply with his public statements about the very same issues that, during his deposition, he professed near-complete loss of memory.  *See, e.g.,* Jones Decl., Ex. X, at 1 ("I remember it very well").  It also contrasts sharply with his clear, specific recollection of unrelated events from the same time frame.  *See, e.g.,* Fauci Dep. 353:20-354:16.  Dr. Fauci's repeated claims to not remember or not recall key events and people are not credible.

621.     Dr. Fauci's chief deputy is Dr. Hugh Auchincloss, who is the Principal Deputy Director of NIAID.  *Id.* at 30:20-25.

622.     In December 2015, during the research "Pause" on gain-of-function funding, Nature Medicine published an article entitled, "A SARS-like cluster of circulating bat coronaviruses shows potential for human emergence." Fauci Ex. 4, at 1. Dr. Ralph Baric of the University of North Carolina was listed as the corresponding author, and Dr. Shi Zhengli of the Wuhan Institute of Virology was listed as a co-author. *Id.* at 1 & n.8.

623.     The 2015 Nature Medicine article clearly described gain-of-function research on bat coronaviruses. The Abstract states: "Here we examine the disease potential of a SARS-like virus, SHC014-CoV, which is currently circulating in Chinese horseshoe bat populations. Using the SARS-CoV reverse genetics system, we generated and characterized a chimeric virus expressing the spike of bat coronavirus SHC014 in a mouse-adapted SARS-CoV backbone." Fauci Ex. 4, at 1. Notably, the article uses the same phrase as the EcoHealth grant, "reverse genetics," to describe creating "a chimeric virus." *Id.*

624.     The article reports that the "chimeric virus" created from a "SARS-like" bat coronavirus had become highly transmissible in human tissue: it could "replicate efficiently in primary human airway cells and achieve *in vitro* titers equivalent to epidemic strains of SARS-CoV." *Id.* It had also become more virulent: "Additionally, *in vivo* experiments demonstrate replication of the chimeric virus in mouse lung with notable pathogenesis." *Id.* There were no available treatments for this lab-created "chimeric" virus: "Evaluation of available SARS-based immune-therapeutic and prophylactic modalities revealed poor efficacy; both monoclonal antibody and vaccine approaches failed to neutralize and protect from infection with CoVs using the novel spike protein." *Id.*

625.     The article noted that the authors had then "synthetically re-derived an infectious full-length SHC014 recombinant virus and demonstrate robust viral replication both in vitro and

156

in vivo." *Id.* The article concluded that "[o]ur work suggests a potential risk of SARS-CoV re-emergence from viruses currently circulating in bat populations" – and this conclusion was based on creating a more transmissible (to humans) and more virulent (to humans) SARS-like coronavirus in a lab. *Id.*

626.    The article acknowledged that NIAID was the principal funder of this research, and that it had received funding from the EcoHealth Alliance, Daszak's group: "Research in this manuscript was supported by grants from the National Institute of Allergy & Infectious Disease and the National Institute of Aging of the US National Institutes of Health (NIH) … and by USAID-EPT-PREDICT funding from EcoHealth Alliance." *Id.* at 5.

627.    The article also noted that the NIH had reviewed and approved the research under the GoF Pause: "Experiments with the full-length and chimeric SHC014 recombinant viruses were initiated and performed before the GOF research funding pause and have since been reviewed and approved for continued study by the NIH." *Id.* "GOF" is short for "gain-of-function."

628.    Dr. Fauci testified that he first became aware of this Nature Medicine article "likely … several months" after the outbreak of the COVID-19 pandemic, and that "it was brought to my attention in the context of questions that were raised by members of Congress about experiments that were funded by the NIAID." Fauci Dep. 31:17-20, 32:7-9. In fact, Dr. Fauci attached this article to a confidential midnight email to his principal deputy, Hugh Auchincloss, on January 31, 2020, and directed Auchincloss to read it immediately and take unspecified actions on it on a Saturday morning. Fauci Ex. 6, at 8. Dr. Fauci's testimony on this point is not credible.

629.    Dr. Fauci testified that he does not believe he has ever met Dr. Ralph Baric, the corresponding author of the 2015 Nature Medicine article. Fauci Dep. 32:16-19 ("I know who he is, I doubt I've ever met him. I may have met him at one of the meetings where there are thousands

of scientists saying hi to each other…"); *see also id.* at 33:25-34:1.  In fact, Dr. Fauci's official calendar shows a one-on-one meeting with Dr. Ralph Baric on February 11, 2020, during the events described herein.  Fauci Ex. 17, at 1.  A contemporaneous Slack message on February 18, 2020 reports that Dr. Baric "sat in Fauci's office talking about the outbreak and chimeras," *i.e.*, lab-created chimeric viruses.  Jones Decl., Ex. Y, at 1.  And Dr. Fauci testified that Dr. Baric may be the source of the phrase "SARS Gain of Function" in the attachment to his midnight email to Hugh Auchincloss.  Fauci Dep. 57:11-12. Dr. Fauci's testimony on this point is not credible.

630.    Dr. Fauci professed to be ignorant of the identity of Dr. Shi Zhengli, the notorious "Bat Woman" of the Wuhan Institute of Virology.  When asked if he knows who she is, he stated, "I'm not a hundred percent certain. I get sometimes confused with Asian names."  *Id.* at 33:9-10, 18-19.  Yet Dr. Shi Zhengli, the so-called "bat woman," is world-renowned as the researcher who may have caused the COVID-19 pandemic, and has been so since the beginning of the pandemic, *see, e.g.,* Jones Decl., Ex. Z, at 1, and the name "Shi" is included in the title of the article that Dr. Fauci forwarded to Dr. Hugh Auchincloss after midnight on February 1, 2020.  Fauci Ex. 6, at 8. Dr. Fauci's testimony is not credible on this point.

631.    Dr. Fauci testified that he first became aware of the outbreak of COVID-19 either December 31, 2019 or "the first couple days of 2022."  Fauci Dep. 34:8-11.

632.    Dr. Fauci recounts that he first became aware of concerns that the SARS-CoV-2 virus that causes COVID-19 "might have been genetically engineered or originated in a laboratory" when "[t]here was a phone call in late January of 2020, I believe, from Jeremy Farrar. There was one other person on the phone. I believe it was [K]ristian [Andersen], who piped me in on a three-way call, saying that they looked at the virus and there was some concern about the

molecular configuration or makeup of the virus that made them think there was a possibility that there could have been a manipulation of the virus." *Id.* at 34:12-35:1.

633.    Dr. Fauci states that he does not believe that anyone ever raised the concern to him before that late January call, and he specifically attests that he does not recall Dr. Robert Redfield, then-Director of the CDC, raising the concern to him in mid-January 2020.  *Id.* at 35:2-15.  Dr. Fauci's recollection conflicts with that of Dr. Redfield, who specifically recalls raising this issue to Dr. Fauci earlier in January 2020, and having his concerns fall on deaf ears: "Dr. Robert Redfield, a virologist and the director of the Centers for Disease Control and Prevention (CDC), had urged Fauci privately to vigorously investigate both the lab and natural hypotheses.  He was then excluded from the ensuing discussions—learning only later that they'd even occurred. 'Their goal was to have a single narrative,' Redfield [said]."  Jones Decl., Ex. AA, at 7.

634.    "In mid-January of 2020, … Redfield expressed his concerns in separate phone conversations with three scientific leaders: Fauci; Jeremy Farrar, the director of the U.K.'s Wellcome Trust; and Tedros Adhanom Ghebreyesus, director general of the World Health Organization (WHO). Redfield's message, he says, was simple: 'We had to take the lab-leak hypothesis with extreme seriousness.'"  *Id.* at 23.  Dr. Fauci disputes this account and states that this conversation did not happen: "To my recollection, no."  Fauci Dep. 35:9-12.

635.    On January 27, 2020, Dr. Fauci and several other senior NIAID officials received an email from Greg Folkers, who is his "immediate chief of staff in my office group," *id.* at 38:2-4; the email provided "Talking Points for NIAID Director Dr. Fauci."  Fauci Ex. 5.  The email stated that "when talking about CoV … we have on our team (Vincent and folks we fund, Peter Daszak, Ralph Baric, Ian Lipkin, etc.) probably the world's experts on non-human coronaviruses. … EcoHealth group (Peter Daszak et al) has for years been among the biggest players in

coronavirus work, also in collaboration Ralph Baric, Ian Lipkin, and others." *Id.* at 1. It also flagged the ongoing NIAID grant to Daszak and its work with Wuhan Institute of Virology: "NIAID has funded Peter's group for coronavirus work in China for the past five years through R01 1R01AI110964: 'Understanding the Risk of Bat Coronavirus Emergence.' That's now been renewed." *Id.* It noted that "[t]he results of the work to date include … Found SARS-related CoVs that can bind to human cells (published in *Nature*) and that cause SARS-like disease in humanized mouse models"—a clear reference to the 2015 *Nature Medicine* article. *Id.* Three days later, Dr. Fauci would attach that *Nature Medicine* article to a midnight email to Hugh Auchincloss. Fauci Ex. 6, at 8.

636.    Like so many other things, Dr. Fauci testifies that he does not recall receiving this email. Fauci Dep. 40:5-6.

637.    Dr. Fauci states that he first became aware of the concern that the virus might be bioengineered and lab-created in a call with Dr. Kristian Andersen of Scripps and Jeremy Farrar of the Wellcome Trust on January 31, 2020. Fauci Dep. 43:17-25. In that call, according to Dr. Fauci, "Jeremy and [K]ristian said they had looked at -- or at least [K]ristian did, possibly Jeremy -- and maybe one other scientist -- and said that it is possible that there may have been a manipulation because it was an unusual virus." Fauci Dep. 44:3-9. A phone call was arranged for the next day, Saturday, February 1, 2020, to discuss the possibility. *Id.* at 44:15-17.

638.    According to contemporaneous emails, Eddie Holmes and Bob Garry were involved in this call with Dr. Fauci and Kristian Andersen as well. Fauci Ex. 7, at 2. Eddie Holmes, who was then raising serious concerns that the virus had leaked from a lab, would go on to be the lead drafter of a key article discrediting the lab-leak theory.

160

639.     After the January 31 call with Farrar and Andersen, in the evening of the same day, Dr. Fauci forwarded them an article that was skeptical of the lab-leak theory, stating that "it is of interest to the current discussion."  Ex. 6, at 1.  Andersen responded, stating that he was not convinced by the article because "one has to look really closely at all the sequences to see that some of the features look (potentially) engineered," and that "after discussion earlier today, Eddie [Holmes], Bob [Garry], Mike [Laribee], and myself *all find the genome inconsistent with expectations from evolutionary theory*." *Id.* (emphasis added); *see also* Fauci Dep. 51:3-8.

640.     A few hours later, shortly after midnight, at 12:29 a.m. on February 1, 2020, Dr. Fauci sent an email to his principal deputy, Hugh Auchincloss.  Fauci Ex. 6, at 8.  The subject line of the email said "IMPORTANT."  *Id.*  The email stated: "Hugh: It is essential that we speak this AM.  Keep your cell phone on. … Read this paper as well as the e-mail that I will forward to you now.  You will have tasks today that must be done.  Thanks, Tony."  *Id.*

641.     The "this paper" that was attached to the email was the 2015 *Nature Medicine* article entitled "A SARS-like cluster of circulating bat coronaviruses shows potential for human emergence," Fauci Ex. 4, co-authored by Dr. Ralph Baric and Dr. Shi Zhengli and funded by NIAID and the EcoHealth Alliance.  Fauci Ex. 6, at 8; Fauci Dep. 55:23-56:25.  As an attachment to Dr. Fauci's email, this article was called "Baric, Shi et al – Nature Medicine – SARS Gain of Function.pdf."  Fauci Ex. 6, at 8.

642.     Dr. Fauci claims that he can recall virtually nothing about sending this urgent, confidential email to his principal deputy in the middle of the night of the day when he found out that highly qualified researchers were concerned that SARS-CoV-2 might have leaked from a laboratory.  *See* Fauci Dep. 55:15-63:21 ("I don't recall … I don't know for sure … I can't say that I recall that in particular … I don't recall.  I'm not sure exactly why those words got in there

… I don't recall … I don't recall … I don't precisely recall … I don't recall if I did … I might have, but I don't recall. … I don't recall. … I don't recall … I don't recall. … I don't recall … I really don't recall … I actually don't recall why I forwarded it to him … I don't recall why I did that … I don't remember … I don't recall speaking to him."). This contrasts starkly with Dr. Fauci's public claim to "remember … very well" key events of the same day. Jones Decl., Ex. X, at 1. Dr. Fauci's claim to an amazing loss of memory about this urgent clandestine email to his confidential deputy is not credible.

643.    Dr. Fauci admits, however, that he wanted Auchincloss to find out what coronavirus research NIAID was funding in China before his call later that afternoon with scientists about the lab-leak concerns raised by Andersen and Farrar: "And at my recollection, I brought to Hugh's attention, saying, 'We have to speak in the morning, because I want to find out what the scope of what it is that we are funding so I'll know what we're talking about.'" Fauci Dep. 58:1-5. In particular, Dr. Fauci wanted to find out what EcoHealth Alliance was doing: "this was the first that I had heard about specifics of what EcoHealth and what other people were doing, and I wanted my staff to say get me up to date. So that's what I meant by you have work to do." *Id.* at 58:6-12.

644.    Regarding the "tasks that must be done," Dr. Fauci admits that "I wanted to be briefed on the scope of what our collaborations were and the kind of work that we were funding in China. I wanted to know what the nature of that work was." *Id.* at 59:12-15.

645.    The tone of the email and Dr. Fauci's own testimony strongly support the inference that Dr. Fauci sent the email to Auchincloss because he was concerned that NIAID, under his leadership, was funding research in China that might have led to the creation and leak of SARS-CoV-2, and he wanted to know the full extent of NIAID's exposure before his call later that day with scientists and funding authorities. *See also* Fauci Dep. 58:18-25. If it became public that

NIAID had funded the creation of SARS-CoV-2, Dr. Fauci and his agency potentially faced an enormous crisis of public credibility and accountability.

646.     Immediately after sending Auchincloss the 2015 *Nature Medicine* article, Dr. Fauci also forwarded Auchincloss another article about the possibility that SARS-CoV-2 had leaked from a lab—the Jon Cohen article that he had sent to Kristian Andersen and Jeremy Farrar earlier that evening.  Fauci Ex. 6, at 9.  This email confirms that Dr. Fauci was deeply concerned about the prospect that NIAID, under his watch, might have funded the creation of the virus causing the global pandemic.

647.     Dr. Fauci denies that, when he sent this email to Auchincloss, he was then concerned that NIAID might have funded the creation of the virus that caused the COVID-19 pandemic.  When asked, "Were you concerned at that time that the work that you had funded in China might have led to the creation of the coronavirus?"  Dr. Fauci responded: "I wasn't concerned that it might have."  Fauci Dep. 59:16-19.  In light of the tone and content of his emails at the time, and Dr. Fauci's other testimony, this statement is plainly not credible.

648.     According to Dr. Fauci, when he participated in the secret call with the scientists and funding authorities later that afternoon on Saturday, Feb. 1, 2020, he did not share with them that NIAID had been funding "SARS Gain of Function" research in China leading to the outbreak of COVID-19.  Fauci Dep. 63:22 ("I don't believe I did.").

649.     In fact, once again, Dr. Fauci claims that he does not recall what he said on the clandestine February 1, 2020 phone call.  *Id.* at 64:17 ("I don't recall").

650.     At 1:19 p.m. on Saturday, Feb. 1 – about forty minutes before the secret conference call to discuss the lab-leak concern – Dr. Fauci also forwarded the "Baric, Shi et al – Nature Medicine – SARS Gain of Function" article to Lawrence Tabak of the NIH, saying only "Here it

163

is." Fauci Ex. 6, at 15. Lawrence Tabak was then "the deputy director of the National Institutes of Health," the principal deputy to then-NIH Director Dr. Francis Collins. Fauci Dep. 65:8-11.

651.   Dr. Fauci testified that "I don't recall why" he sent the 2015 *Nature Medicine* article to Lawrence Tabak, but he admits that it was likely to get it into the hands of Dr. Francis Collins, who was about to participate in the 2:00 p.m. secret conference call with Dr. Fauci and the other scientists. *Id.* at 66:15-17. Dr. Fauci claims that this was "to make sure *everyone* was aware of what the discussions were," *id.* at 66:13-15, but that is not credible in light of his testimony that he did not alert any of the *other* scientists on the call to the concern that NIAID was funding "SARS Gain of Function" research in China. *Id.* at 63:22.

652.   The more compelling inference is that Dr. Fauci wanted Dr. Collins to know that NIAID and NIH faced enormous exposure if the lab-leak theory turned out to be true or publicly accepted. Dr. Collins, along with Dr. Fauci, had publicly championed gain-of-function research since at least 2011, and NIH had jointly funded Dr. Shi Zhengli's work at the Wuhan Institute of Virology through NIAID and the National Institute of Aging. Fauci Ex. 4, at 5 (referring to "grants from the National Institute of Allergy & Infectious Disease and the National Institute of Aging of the US National Institutes of Health (NIH)").

653.   On Saturday, Feb. 1, 2020, at 11:47 a.m., Hugh Auchincloss emailed Dr. Fauci in response to his 12:29 a.m. email. The subject line stated only "Continued." Auchincloss stated: "The paper you sent me [*i.e.*, the 2015 *Nature Medicine* article on 'SARS Gain of Function'] says the experiments were performed before the gain of function pause but have since been reviewed and approved by NIH. Not sure what this means since Emily is sure that no Coronavirus work has gone through the P3 framework. She will try to determine if we have any distant ties to this work abroad." Fauci Ex. 6, at 16. At 5:51 p.m., Dr. Fauci responded: "OK. Stay tuned." *Id.*

654.     "Emily" in Auchincloss's email "is Emily Erbelding, the Director of the Division of Microbiology and Infectious Diseases at NIAID," who "would have been the one who was closest to the ground in understanding what we were doing in funding China."  Fauci Dep. 70:14-18.  The "P3 framework" refers to the special approval process required for funding of gain-of-function research on coronaviruses that may cause pandemics, as "P3" stands for "potential pandemic pathogens."  *See* National Institutes of Health, Office of Science Policy, *Gain of Function Research*, at https://osp.od.nih.gov/policies/national-science-advisory-board-for-biosecurity-nsabb/gain-of-function-research/ ("Certain gain-of-function studies with the potential to enhance the pathogenicity or transmissibility of potential pandemic pathogens (PPPs) have raised biosafety and biosecurity concerns…").  Thus, Auchincloss and Dr. Fauci had evidently discussed the concern that NIAID had funded the creation of "potential pandemic pathogens" at the Wuhan Institute of Virology, and Dr. Fauci was concerned about NIAID's "ties to this work abroad."  Fauci Ex. 6, at 16.

655.     Dr. Fauci admits that this email confirms that he "wanted to be briefed as to the extent of our involvement with funding in China," Fauci Dep. 71:2-4—in particular, NIAID's funding of the Wuhan Institute of Virology, as a global SARS-like pandemic emerged from Wuhan.

656.     Dr. Fauci also admits that he may have raised the concern with Auchincloss that Dr. Baric's and Dr. Shi Zhengli's research reflected in the 2015 *Nature Medicine* article may have been illegally funded in violation of the GoF Pause in effect from 2014 to 2017.  Fauci Dep. 71:14-20 ("Q: Did you raise a specific concern with Hugh that the research reflected in the Baric, Shi Nature Medicine paper may have been inconsistent with the pause on -- gain-of-function funding research?  A. That is possible.").

657.    On Saturday, Feb. 1, 2020, Jeremy Farrar sent an email organizing a secret conference call at 2:00 pm EST to a group of scientists and science-funding authorities.  Fauci Ex. 6, at 17-18.  The first thing that Farrar noted in the email, in bold, was "**Information and discussion is shared in total confidence and not to be shared until agreement on next steps.**" *Id.* at 17 (bold in original).

658.    Separately, Farrar sent just Dr. Fauci an email on the morning of Feb. 1 to ensure that he could join the call, stating "Could you join?"  Fauci Ex. 7, at 12.  In that email, Farrar listed the participants and stated, "My preference is to keep this a really tight group. … Obviously ask everyone to treat in total confidence." *Id.*  He also stated that the purpose of the call was "To listen to the work of Eddie, Bob and Kristian have done.  Question it.  And think through next steps." *Id.*

659.    Dr. Fauci described the call as an open debate about the lab-leak theory among "a larger group of evolutionary virologists," Fauci Dep. 58:19-20, but in fact the call included a heavy representation of international government and science-funding authorities—including Dr. Fauci, Director of NIAID; Dr. Francis Collins, Director of NIH; Jeremy Farrar, head of the Wellcome Trust, the United Kingdom's "predominant" science-funding authority; Paul Schreier, the Chief Operating Officer of the Wellcome Trust who is responsible for "research funding" there; and Sir Patrick Vallance, the chief medical advisor to the U.K. government.  Fauci Ex. 6, at 18; *see also* Fauci Dep. 75:11-76:15.  All these people had a strong vested interest in avoiding a major scandal about international science-funding practices—such as the concern that Western governments may have funded the creation of a deadly virus that escaped from a lab and infected millions of people. As funding authorities who control the distribution of massive amounts of research funding, they also had powerful influence over the research scientists on the call.

660.    Dr. Fauci took steps to ensure that Dr. Francis Collins would be included on the call "since he's the director of NIH."  Fauci Dep. 75:4-6.  Dr. Fauci evidently spoke with Dr. Collins before the call, as he emailed Farrar before the call stating, "Jeremy: Francis will be on the call.  He is trying to phone you."  Fauci Ex. 7, at 17.  Farrar then emailed Dr. Collins stating, "Francis Call me on [redacted]."  Fauci Ex. 7, at 19.

661.    Like the 12:29 a.m. email to Auchincloss, Dr. Fauci repeatedly claimed that he could not recall virtually any details about the 2:00 p.m. secret conference call with scientists and funding authorities about the lab-leak theory.  Fauci Dep. 63:19-67:11 ("I don't recall bringing this up … I don't recall … I don't recall … I don't recall when it was … I don't recall … I don't believe that Larry was, but he could have been … I don't recall"); Fauci Dep. 73:20-74:14 ("I don't recall a discussion about confidentiality or not … I may have. I don't recall."); Fauci Dep. 77:13-15 ("Do you remember anything that anybody said on the call?  A: No."); Fauci Dep. 78:10-83:10 ("I don't recall whether that was discussed … I don't recall anything from that phone call that said that … I'm not sure if I discussed it … I have a vague recollection that there was a concern … It is certainly possible, but I don't specifically remember … I don't specifically recall.").

662.    This testimony to near-complete lack of memory about the call stands in stark contrast to Dr. Fauci's public statements a year and a half after the call occurred, when FOIA releases of Dr. Fauci's emails finally revealed to the public that this secret call had occurred.  Then, Dr. Fauci stated, "I remember it very well."  Jones Decl., Ex. X, at 1.  Dr. Fauci's testimony about lack of recall is not credible.

663.    Notwithstanding his repeated testimony that he cannot recall specifically what was said on the call, Dr. Fauci provided a self-justifying and innocent account of the call, describing it as a good-faith discussion among scientists trying to get to the truth without any preconceived

167

biases. *See, e.g.,* Fauci Dep. 77:16-18 ("[T]here was what appeared to me to be good faith discussion back and forth between people who knew each other"); Fauci Dep. 79:23-80:1 ("I think the general feeling among the participants on the call is that they wanted to get down to the truth and not wild speculation about things."); Fauci Dep. 80:9-10 ("I don't think there was any other concern than sticking with the truth and sticking with data").

664.   Dr. Fauci thus seeks to have his cake and eat it too—he claims both to remember little or nothing of what was said on the call, and to clearly remember that the entire discussion was done in good faith and without any bias.  In any event, subsequent communications and events make clear that Dr. Fauci's testimony on this point is not credible, as discussed in detail below, as an aggressive plot to discredit the lab-leak theory commenced immediately after the call.

665.   Almost an hour into the 2:00 pm call, at 2:56 p.m., Jeremy Farrar sent a cryptic email to Fauci, Collins, Vallance (all science funders) and Mike Ferguson, stating, "Can I suggest we shut down the call and then redial in?  Just for 5-10 mins?"  Dr. Fauci responded, "Yes."  Fauci Ex. 7, at 26.  Dr. Fauci claims he cannot recall whether this occurred.  Fauci Dep. 92:1-93:6.

666.   Dr. Fauci testified that the call participants concluded that they needed more time to take a much closer look at the biology of the virus and genetic sequences before coming to a conclusion about the virus's origins, and they planned to take more time to continue their inquiry afterward.  *See* Fauci Dep. 78:3-9 ("The ten[or] of it ended that we need more time … they said we need some time to more carefully look at this to see if we can come to a sound conclusion based on further examination of the sequences."); Fauci Dep. 80:24-25 ("The plan was to go and spend more time carefully looking at it.").  In fact, Eddie Holmes and Kristian Andersen began drafting an article concluding that the lab-leak hypothesis was baseless and rooted in animus

immediately after the call ended, and Dr. Fauci received an initial draft of this article by the next Tuesday morning. *See infra*. Dr. Fauci's testimony on this point is not credible.

667.     Dr. Fauci testified that his next interaction with the call's participants was when Kristian Andersen sent him a preprint of that article attacking the lab-leak theory. Fauci Dep. 82:19-83:1. In fact, before the preprint, Holmes and Farrar had sent Dr. Fauci at least *four* drafts of the article to review. *See infra.* Dr. Fauci's testimony is not credible on this point.

668.     Dr. Fauci states that he cannot remember if he had further discussions with Jeremy Farrar, Francis Collins, and Patrick Vallance surrounding this call on Feb. 1, 2020. Fauci Dep. 83:2-10; 85:8-23, 90:25-91:15, 92:1-21. In fact, Dr. Fauci sent Jeremy Farrar a lengthy email that is entirely redacted at 12:38 a.m. on Saturday, Feb. 1, 2020, Fauci Ex. 7, at 1; Farrar emailed Fauci on Jan. 30 stating "Tony Perfect timing – thank you. Great to catch up," and provided Sir Patrick Vallance's phone number, Fauci Ex. 7, at 4; Fauci emailed Farrar and Vallance on Jan. 30, stating "Thanks, Jeremy. Great chatting with you and Patrick. Will stay in close touch," Fauci Ex. 7, at 4; Jeremy Farrar sent Dr. Fauci an email on Friday, Jan. 31, stating "Tony Really would like to speak with you this evening It is 10pm now UK Can you phone me on [redacted]," Fauci Ex. 7, at 3; Farrar and Sir Patrick Vallance had a three-way call with Dr. Fauci on Jan. 30, 2020, Fauci Ex. 7, at 4; Farrar emailed Fauci and Collins after the call referring to "Conversations with you and Tony, and Patrick and others," Fauci Ex. 7, at 34; among others. Dr. Fauci had extensive discussions with Jeremy Farrar, Francis Collins, and Patrick Vallance surrounding the 2:00 p.m. February 1, 2020 secret conference call, and his testimony to the contrary is not credible.

669.     After the call, Francis Collins emailed Farrar and stated, "Hi Jeremy, I can make myself available at any time 24/7 for the call with Tedros. Just let me know. Thanks for your leadership on this critical and sensitive issue." Fauci Ex. 7, at 34. Farrar responded, "We are

169

altogether as you know!"  Fauci then chimed it: "Thanks, Jeremy.  We really appreciate what you are doing here."  Fauci Ex. 7, at 34.  "Tedros" refers to the director of the World Health Organization.  Fauci Dep. 95:6-7.

670.    After the call, Dr. Fauci described the scientists as engaging in a careful investigation of the virus: "[K]ristian and a few of the others carefully got together and looked at it and examined the pros and the cons and the ups and downs, and came to the conclusion that their initial concern about the molecular basis of the concern was unwarranted and that what they saw was quite compatible and, in fact, suggestive of a natural evolution."  Fauci Dep. 81:8-15.  In fact, Eddie Holmes and Kristian Andersen immediately began drafting an article attacking the lab-leak theory with no further investigation, which was sent to Dr. Fauci in less than three days.  *See infra.* Dr. Fauci's testimony on this point is not credible.

671.    Farrar emailed Dr. Tedros of the World Health Organization and two senior WHO officials, along with Dr. Fauci and Dr. Collins, indicating that he had just spoken to the senior WHO officials and "[f]ully agree with your summary."  Fauci Ex. 8, at 1.  Farrar emphasized the "urgency and importance" of the lab-leak question because of the "[g]athering interest evident in the scientific literature and in mainstream and social media to the question of the origin of this virus," and thus it was "[c]ritical" to "get ahead of the science and the narrative of this" instead of "reacting to reports which could be very damaging."  Fauci Ex. 8, at 1.  He also wrote, "I am sure I speak for Francis [Collins] and Tony [Fauci] when I say we are here and ready to play any constructive role in this," as they "[d]o think this is an urgent matter to address."  *Id.*

672.    Thus, Farrar, joined by Fauci and Collins, sent a message to the WHO that they wanted to "get ahead" of potentially damaging "narrative[s]" that might emerge "in mainstream and social media" about the origins of the virus.  *Id.*

673.    Later that day, on Feb. 2, Farrar separately emailed Fauci and Collins, stating "Tedros and Bernhard have apparently gone into conclave…they need to decide today in my view. If they do prevaricate, I would appreciate a call with you later tonight or tomorrow to think how we might take forward."  Fauci. Ex. 8, at 2.  He also stated, "Meanwhile…." and linked to an online article speculating about the lab-leak origins of the virus—again indicating that Fauci, Farrar, and Collins were concerned about controlling online discourse about the lab-leak theory. *Id.*

674.    The day after the conference all, Sunday, Feb. 2, Dr. Fauci, Jeremy Farrar, and Dr. Collins shared a series of emails (1) acknowledging that there were very serious arguments in favor of the lab-leak theory, and (2) repeatedly expressing concern about the lab-leak theory's involvement on "social media."  The group, including Dr. Fauci, repeatedly expressed concern about postings about the lab-leak theory on social media.  *See* Fauci Ex. 8.

675.    First, after the Feb. 1 call, still on Feb. 1, Farrar sent an email to the group expressing concern that "[t]here will be media interest and there is already chat on Twitter/WeChat" about the lab-leak theory, and stating: "In order to stay ahead of the conspiracy theories and social media I do think there is an urgency for a body to convene" to address the lab-leak question.  Fauci Ex. 8, at 9.

676.    The next day, Feb. 2, Farrar then expressed concern that "these questions are being asked by politicians, starting in the scientific literature, [and] certainly on social and main stream media.  If, and I stress if, this does spread further, pressure and tensions will rise.  [I] fear these questions will get louder and more polarised and people will start to look to who to blame. … I am concerned if this is not done quite quickly it will be reacting to what may be lurid claims."  Fauci Ex. 8, at 7.

677.   Another call participant then agreed that "this needs to be discussed urgently," in part "because of the lurid claims on Twitter."  Fauci Ex. 8, at 6.  He also noted that "if the evolutionary origins of the epidemic were to be discussed, I think the only people with sufficient information or access to samples to address it would be the teams working in Wuhan."  *Id.*

678.   The same day, Farrar acknowledged "this is a very complex issue," and again expressed concern about "social and main stream media": "As discussed on the phone this discussion is not limited to those on this email, it is happening wider in the scientific, social and main stream media."  Fauci Ex. 8, at 5.

679.   Dr. Collins then responded to Farrar and Dr. Fauci only, stating that "a confidence-inspiring framework … is needed, or the voices of conspiracy will quickly dominate, doing great potential harm to science and international harmony."  Fauci Ex. 8, at 5.

680.   Farrar then shared notes with Fauci, Collins and Tabak (Collins' deputy) from "Mike Farzan (discoverer of SARS receptor)," which stated that Farzan "is bothered by the furin cleavage site [a virus feature that looks bioengineered] and has a hard time explaining that as an event outside the lab," and that "acquisition of the furin site would be highly compatible with the idea of continued passage of virus in tissue culture," *i.e.*, serial passage.  Fauci Ex. 8, at 4.  Farzan suggested that "a likely explanation" of the virus was serial passage of SARS-like coronaviruses in human cell lines, and he stated that "I am 70:30 or 60:40" in favor of laboratory origins.  Fauci Ex. 8, at 3-4.

681.   Farrar also shared notes from "Bob" [Garry] that he had "aligned" the new virus "with the 96% bat CoV sequenced at WIV [Wuhan Institute of Virology]," and viewed the lab-origin theory as highly likely: "I really can't think of a plausible natural scenario … I just can't

figure out how this gets accomplished in nature.  Do the alignment of the spikes at the amino acid level – it's stunning."  Fauci Ex. 8, at 4.

682.    Having shared these notes, Farrar noted, "On a spectrum if 0 is nature and 100 is release – I am honestly at 50!  My guess is that this will remain grey, unless there is access to the Wuhan lab – and I suspect that is unlikely!"  Fauci Ex. 8, at 3.  Both Farrar and Collins expressed concerns that the WHO might move too slowly for their liking.  *Id.*

683.    Then, still on February 2, 2020, Dr. Fauci wrote to Farrar, Collins, and Lawrence Tabak (Dr. Collins' principal deputy), stating: "Like all of us, I do not know how this evolved, but given the concerns of so many people and *the threat of further distortions on social media*, it is essential that we move quickly.  Hopefully, we can get the WHO to convene."  Fauci Ex. 8, at 2 (emphasis added).

684.    Dr. Fauci claimed that he is completely dissociated from social media, stating: "I don't do social media so I'm not familiar with them," Fauci Dep. 98:15-16; and "You know, I'm so dissociated from social media. I don't have a Twitter account. I don't do Facebook. I don't do any of that, so I'm not familiar with that," Fauci Dep. 99:5-8; *see also, e.g.,* Fauci Dep. 103:12-14; 210:3-8; 213:10-16; 241:6-9; 241:21-242:1; 301:10-11 ("I don't pay attention to things related to social media accounts."); *id.* at 312:7-9 ("I can repeat it for the hundredth time, I really don't get involved in social media issues."); *id.* at 356:15-16 ("I'm not a social media person.").

685.    In fact, Dr. Fauci's daughter was then a software engineer at Twitter, Fauci Dep. 99:23-100:15; Dr. Fauci has done numerous podcasts and interviews on social media, including with Mark Zuckerberg, Fauci Dep. 99:16-19, 101:1-6; Dr. Fauci had specifically expressed concern about "the threat of further distortions on social media" about the lab-leak theory in his contemporaneous email, Fauci Ex. 8, at 2; and Dr. Fauci's communications staff had repeatedly

emailed Twitter to try to remove postings critical of Dr. Fauci, *see infra*.  Dr. Fauci's professed ignorance of social media is not credible.  His communications and conduct make clear that he is keenly aware and deeply concerned about what he believes are "distortions on social media." Fauci Ex. 8, at 2.

686.    Dr. Fauci also testified that "I don't recall anything about social media" in his discussions with Farrar about the origins of the virus. Fauci Dep. 102:17-18.  In light of the contemporaneous emails repeatedly raising concerns about discussions of the lab-leak theory on social media, this claim is not credible.

687.    Dr. Fauci admits that he was "concerned about … there being misinformation or disinformation that would interfere with our trying to save the lives of people throughout the world, which happens when people spread false claims."  Fauci Dep. 103:18-22.  He states that "misinformation and/or disinformation can lead to loss of life … and that troubles me."  Fauci Dep. 104:15-17.  This includes the spread of misinformation and disinformation on social media, because "that's part of the way information is disseminated."  Fauci Dep. 104:22-23.

688.    After Dr. Fauci's email about "the threat of further distortions on social media," Farrar emailed back indicating that the WHO might not move quickly to address the lab-leak theory, and stating to Fauci and Collins: "they need to decide today in my view.  If they do prevaricate, I would appreciate a call with you later tonight or tomorrow to think how we might take forward."  Fauci Ex. 8, at 2.  He also stated: "Meanwhile…." and linked to an online posting expressing concerns about the lab-leak theory – indicating his dominant concern about online speech discussing the lab-leak theory.  *Id.*

689.    Soon thereafter, Farrar emailed Dr. Tedros of the WHO and two senior WHO officials, copying Fauci and Collins.  Fauci Ex. 8, at 1. Farrar urged the WHO to quickly establish

a working group to address the lab-leak theory, and reiterated that they should "[a]ppreciate the urgency and importance of this issue," given the "[g]athering interest evident in the science literature and in mainstream and social media to the question of the origin of this virus," and pressing them to "get ahead of … the narrative of this and not reacting to reports which could be very damaging." Fauci Ex. 8, at 1.

690.    Fauci claims that he does not believe there was any further communication between him and Farrar about this issue, despite Farrar's urgent request for a follow-up call if the WHO did not act immediately. Fauci Ex. 8, at 2; Fauci Dep. 109:22-110:7. In light of their subsequent communications, this testimony is not credible.

691.    By the early morning of February 4, 2020, Eddie Holmes had already sent a draft research paper attacking the lab-leak theory to Jeremy Farrar. Fauci Ex. 9, at 1. Holmes noted to Farrar that, in the draft, he "[d]id not mention [the virus's] other anomalies as this will make us look like loons." Fauci Ex. 9, at 1. To complete the draft between the afternoon of Saturday, Feb. 1, and the early morning of Tuesday, Feb. 4, Holmes must have started working on it almost immediately after the Feb. 1 conference call.

692.    Farrar forwarded this draft to Fauci and Collins at 2:01 a.m. on Tuesday morning, February 4, 2020, in an attachment called "Summary." Fauci Ex. 10, at 3. He noted, "Please treat in confidence – a very rough first draft from Eddie and team – they will send on the edited, cleaner version later." *Id.*; *see also* Fauci Ex. 12, at 1.

693.    Dr. Collins responded: "I note that Eddie is now arguing against the idea that this is the product of intentional human engineering," Fauci Ex. 10, at 3, a dramatic reversal of Holmes's position a few days earlier that Holmes and Andersen "find the genome inconsistent with expectations from evolutionary theory." Fauci Ex. 6, at 1. The paper's conclusion was also

profoundly at odds with Holmes's statement, in the email sending the draft paper itself, that they would "look like loons" if the paper discussed the virus's other "anomalies" that strongly suggested a lab origin.  Fauci Ex. 9, at 1.

694.    Collins also noted that Holmes had not ruled out the possibility of a lab-created virus through serial passage.  Fauci Ex. 10, at 3.  Farrar responded, stating "Eddie would be 60:40 lab side.  I remain 50:50."  *Id.*  Eddie, however, had already drafted a paper that *refuted* the lab-leak theory, even though he evidently still believed was the better explanation.  *See id.*

695.    Regarding the possibility of serial passage, Dr. Fauci noted that "Serial passage in ACE2-transgenic mice" was a possibility for the virus's origin, Fauci Ex. 10, at 2— notably, serial passage in humanized mice as was used in the 2015 *Nature Medicine* study.  (Like so many other things, Dr. Fauci claims he does not recall this statement that he wrote.  Fauci Dep. 115:22-116:12.)  Collins responded, "Surely that wouldn't be done in a BSL-2 lab?" and Farrar answered, "Wild West...."  Fauci Ex. 10, at 2.  This exchange indicates that that Fauci, Farrar, and Collins were concerned that the coronavirus had been created in Wuhan by serial passage through humanized mice in a low-security [BSL-2] lab and then escaped from that low-security lab—*i.e.*, the precise concerns surrounding the NIAID-funded research at WIV.  *Id.*; *see also, e.g.,* Jones Decl., Ex. BB< at 14 ("In the above exchange, the health officials [Fauci, Farrar, and Collins] seem to be contemplating the possibility that the repeated passage of a coronavirus through genetically modified mice in an insufficiently secure lab could have resulted in the accidental emergence and release of SARS-CoV-2.").

696.    Later in the evening of the same day, Tuesday, Feb. 4, Farrar sent Fauci and Collins a second version of draft, entitled "Summary," with the note "Tidied up."  Fauci Ex. 12, at 7.  Dr. Fauci claims he does not remember receiving these drafts.  Fauci Dep. 127:4-10.

697.     The next day, February 5, 2020, Farrar sent Fauci and Collins a third version of the draft, still entitled "Summary," with a note: "Tony and Francis The revised draft from Eddie, copied here."  Fauci Ex. 12, at 8.

698.     Two days later, on February 7, 2020, Farrar sent Fauci and Collins a fourth version of the same draft, entitled "Summary.Feb7.pdf," with the note in the subject line, "Revised draft." Fauci Ex. 11, at 2.  This draft made clear that Holmes and his co-authors planned to aggressively discredit the lab-leak theory.  It stated in bold in the beginning "Overview" section: "**Analysis of the virus genome sequences clearly demonstrates that the virus is not a laboratory construct or experimentally manipulated virus**."  Fauci Ex. 11, at 3 (bold in original).

699.     This was the *fourth* updated draft that Farrar sent to Fauci and Collins of the paper discrediting the lab-leak theory in the first week since the Feb. 1 secret conference call.  The draft advocated that genetic evidence "clearly demonstrates" that the lab-leak theory is false.  *Id.*

700.     Dr. Fauci claims that he did not have any involvement in Farrar's efforts to push the WHO to assemble a working group to address the lab-leak theory.  Fauci Dep. 110:4-7 ("So I really would doubt that there was any further communication between me and the WHO about this. This was fundamentally Jeremy's lane, if you want to call it that."); *id.* at 125:17-19 ("I didn't have any direct involvement with the WHO, not to my recollection."); *id.* at 131:14-15 ("This was mostly a Jeremy-led thing").  But in fact, Dr. Fauci sent multiple emails to Farrar urging for the inclusion of a long list of specific scientists in the WHO's working group.  Fauci Ex. 13, at 1-2, 6.

701.     On Feb. 5, 2020, Farrar emailed Fauci and Collins, stating that he believed that the WHO would assemble a working group to address the lab-leak theory, and urging Fauci and Collins to provide names of scientists to participate in the group.  Fauci Ex. 13, at 7.  Farrar stated that the WHO "have asked for names to sit on that Group – please do send any names."  *Id.*  He

then stated, "We can have a call this week with a core group of that *to frame the work of the Group* including – if you could join?"  *Id.* (emphasis added).  And then he stated, "With names to be put forward into the Group from us and *pressure on this group from your and our teams* next week."  *Id.* (emphasis added).  Plainly, Farrar intended, with Fauci and Collins' assistance, to stack the WHO's group with their hand-picked scientists, have an advance call "to frame the work of the Group," and to put "pressure on this group from [Fauci's and Collins'] and our teams next week," *id.*—to influence and control the outcome of the WHO Group's deliberations.

702.    Fauci and Collins did not dispute this plan.  On the contrary, Fauci responded by providing Farrar with a detailed list of eight scientists to include in the WHO's group "in addition to the individuals who were on the call with us last Saturday."  Fauci Ex. 13, at 2, 6.  Fauci then followed up to his own email with an additional scientist, stating she is "an important name for the coronavirus evolution working group.  Please include her."  *Id.* at 1.  Fauci's attempts to downplay his involvement with the plan to create and control a WHO working group on COVID-19's origins to discredit the lab-leak theory, therefore, are not credible.

703.    Dr. Fauci testified that he, Farrar, and Collins "wanted to get them [the WHO] involved because we wanted to make sure that this was an open and transparent discussion," Fauci Dep. 126:9-12, is not credible in light of the contemporaneous email from Farrar to Fauci and Collins plotting to "frame the work of the Group" and put "pressure on this group from your and our teams next week."  Fauci Ex. 13, at 3.

704.    Dr. Fauci claims he does not recall any discussions about framing the work of the Group, or putting pressure on the Group.  Fauci Dep. 137:1-21.

705.    On February 9, 2020, Dr. Fauci participated in a joint podcast with Dr. Peter Daszak of the EcoHealth Alliance to discuss the outbreak of COVID-19.  Fauci Ex. 15, at 1.

706.     Peter Daszak was then involved in organizing a statement for the Lancet seeking to discredit the lab-leak theory, similar to the article then being drafted by Eddie Holmes, of which Dr. Fauci had received four drafts the previous week.  *See* Jones Decl., Ex. CC, at 1.  Just a few days later, The Lancet would publish a statement of scientists organized and co-signed by Daszak and Jeremy Farrar, which stated: "We stand together to strongly condemn conspiracy theories suggesting that COVID-19 does not have a natural origin."  *Id.*  Thus, at that time, Daszak was working in parallel with Dr. Fauci, and together with Jeremy Farrar, to produce a published article discrediting the lab-leak theory.  *Id.*

707.     During the podcast, both Dr. Fauci and Daszak made comments seeking to discredit the lab-leak theory.  Fauci Ex. 16, at 1.  Fauci, when asked "Do you have any sense of where [the virus] probably came from?" answered, "Well I think ultimately we know that these things come from an animal reservoir.  I heard these conspiracy theories and like all conspiracy theories … they [are] just conspiracy theories….   I think the things you are hearing are still in the realm of conspiracy theories without any scientific basis for it."  *Id.*  Daszak was asked, "Is it your sense that it's almost certain it came from an animal-to-human transmission?" and he responded: "All the evidence says that is what happened. … It looks to me and to most scientists like it's a bat virus that got into people either in the market or in rural China and just unfortunately has the capacity to spread."  *Id.*

708.     On February 11, 2020, Dr. Fauci had a meeting at NIAID with Dr. Ralph Baric, the corresponding author of the 2015 *Nature Medicine* article about NIAID-funded gain-of-function research in Wuhan that Dr. Fauci sent to Hugh Auchincloss after midnight on Feb. 1.  Fauci Ex. 17, at 1 (Dr. Fauci's official calendar, Feb. 11, 2020, at 2:30 p.m. – "Meeting with Dr. Ralph Baric").  Dr. Fauci does not dispute that he met with Dr. Ralph Baric that day, but (like so many

other things) he claims that he does not recall the meeting or what they discussed. Fauci Dep. 149:9-10, 149:21-23.  As noted above, given that Dr. Fauci was deeply concerned about Baric's research at the time, Dr. Fauci's testimony on this point is not credible.

709.    On Feb. 11, 2020, Ian Lipkin wrote an email referring to the draft paper about the origins of COVID-19 stating that, while the paper was "well-reasoned and provides a plausible argument against genetic engineering," it "does not eliminate the possibility of an inadvertent release following adaptation through selection in culture at the institute in Wuhan.  Given the scale of the bat CoV research pursued there and the site emergence of the first human cases we have a nightmare of circumstantial evidence to assess."  Fauci Ex. 18, at 1.  Dr. Fauci states that he does not recall this email but that "it's entirely possible that Ian wrote this to me," because "Ian communicates with me."  Fauci Dep. 153:15-17.

710.    Dr. Fauci testified that it is "molecularly" impossible that SARS-CoV-2 originated from NIAID-funded research: "molecularly, that could not have happened."  *Id.* at 157:21-22.  But separately, he repeatedly testified that molecular virology is not his field, so his certainty on this one key point is not credible.  *Id.* at 64:8-9 ("that's not my field, evolutionary virology"); *id.* at 117:19-20 ("I'm hesitant to go there because that's not my area of expertise"); *id.* at 127:12-13 ("it was an area that was not my area of expertise"); *id.* at 160:7-9 ("Did I fully understand the molecular virology of it?  Unlikely, because I'm not an evolutionary virologist.").

711.    On February 17, 2020, the preprint version of the paper drafted by Eddie Holmes attacking the lab-leak theory was released.  Fauci Ex. 19.  The paper was entitled, "The Proximal Origins of SARS-CoV-2."  *Id.* at 12.  Its listed authors were Kristian Andersen, Andrew Rambaut, Ian Lipkin, Edward Holmes, and Robert Garry.  *Id.*  All these authors, except possibly Ian Lipkin,

had been participants in the secret phone conference at 2:00 p.m. on Saturday, Feb. 1, 2020.  Fauci Dep. 161:7-10.

712.    These authors had a financial interest in supporting NIH's preferred narrative. "Garry and Andersen have both been recipients of large grants from NIH in recent years, as has another 'Proximal Origin' author, W. Ian Lipkin of Columbia University."  Jones Decl., Ex. BB.

713.    These authors were stunningly recent converts to the theory of natural origin.  On February 11, Ian Lipkin had sent an email about the same paper stating that "we have a nightmare of circumstantial evidence to assess."  Fauci Ex. 18, at 1.  On February 4, Holmes had written to Farrar that he avoided discussing the virus's "other anomalies as this will make us look like loons." Fauci Ex. 9, at 1.

714.    On February 2, Bob Garry had written to Farrar, "I really can't think of a plausible natural scenario … I just can't figure out how this gets accomplished in nature.  Do the alignment of the spikes at the amino acid level – it's stunning."  Fauci Ex. 8, at 4.  On January 31, Andersen had written to Dr. Fauci that the virus's "features (potentially) look  engineered," and that "after discussion earlier today, Eddie [Holmes], Bob [Garry], … and myself all find the genome inconsistent with expectations from evolutionary theory."  Fauci Ex. 6, at 1.

715.    The preprint version of "The Proximal Origin of SARS-CoV-2" asserted a very different conclusion.  It stated that "this analysis provides evidence that SARS-CoV-2 is not a laboratory construct nor a purposefully manipulated virus."  Fauci Ex. 19, at 2.  It stated that "genomic evidence does not support the idea that SARS-CoV-2 is a laboratory construct."  *Id.* at 6.

716.    Dr. Fauci does not dispute that this preprint was sent to him.  Fauci Dep. 160:3-4 ("It is likely that this was sent to me").  Dr. Fauci admits that he reviewed the preprint when it was

sent to him.  *Id.* at 160:7 ("Did I look through it?  Yes.").  And Dr. Fauci admits that he was aware of what their conclusion was about the lab-leak theory.  *Id.* at 162:13-15 ("I am certain that having looked at it, I was aware of what their conclusion was.").

717.    This was the *fifth* version of the paper that was sent to Dr. Fauci to review, after four drafts sent to him on Feb. 4, 5, and 7.  *Id.* at 160:13-16.

718.    On March 6, 2020, Kristian Andersen emailed Dr. Fauci, Dr. Collins, and Jeremy Farrar, stating, "Dear Jeremy, Tony, and Francis, Thanks again for your advice and leadership as we have been working through the SARS-CoV-2 'origins' paper.  We are happy to say that the paper was just accepted by Nature Medicine and should be published shortly …. To keep you in the loop, I just wanted to share the accepted version with you, as well as a draft press release. We're still waiting for proofs, so please let me know if you have any comments, suggestions, or questions about the paper or the press release."  Fauci Ex. 22, at 1.  He also wrote: "Tony, thank you for your straight talk on CNN last night – it's being noticed."  *Id.*

719.    Thus, Andersen thanked Dr. Fauci, Collins, and Farrar for their "advice and leadership" about the paper, sent them the final draft, and asked for their input both on the draft and on their public messaging about the draft.  *Id.*

720.    This was the *sixth* version of the paper that was forwarded to Dr. Fauci for review and input.  *Id.*

721.    Dr. Fauci responded: "Kristian: Thanks for your note.  Nice job on the paper. Tony."  *Id.*

722.    Dr. Fauci denies that he provided "advice and leadership" in the preparation of the paper.  Fauci Dep. 171:11-13.  In light of the extensive meetings and correspondence detailed above, that testimony is not credible.

723.    On March 17, 2020, *Nature Medicine* published the online version of *The Proximal Origin of COVID-19*.  Fauci Ex. 24, at 3.  The print version appeared in the April 2020 volume of the journal.  *Id.*

724.    The final, published version of the article makes even stronger claims attacking the lab-leak theory than the preprint version.  In its opening, the article states: "Our analyses *clearly show* that SARS-CoV-2 is not a laboratory construct or a purposefully manipulated virus."  Fauci Ex 24, at 1 (emphasis added).  Similarly strong language, leaving no room for doubt, occurs throughout the article: "the genetic data *irrefutably show* that SARS-CoV-2 is not derived from any previously used viral backbone," *id.* at 1 (emphasis added).  "This *clearly shows* that the SARS-CoV-2 spike protein optimized for binding to human-like ACE2 is the result of natural selection," *id.* at 2 (emphasis added).  "[T]he evidence shows that SARS-CoV-2 is not a purposefully manipulated virus," *id.* at 3.  "[W]e do not believe that any type of laboratory-based scenario is plausible."  *Id.* at 3.  "SARS-CoV-2 originated via natural selection."  *Id.* at 3.

725.    Thus, between the preprint version and final version of the article, the article substantially beefed up its conclusion that the lab-leak theory is implausible and should be discredited.  Dr. Fauci claims he does not "recall specific conversations" about that conclusion with the authors, but he admits that he is "sure" that he discussed that conclusion with them: "we read the preprint and, therefore, we knew what the conclusion was, and I'm sure that that conclusion was discussed. So I would not be surprised at all following the initial preprint that I discussed the conclusion of these authors that this is not a laboratory construct or a purposely manipulated virus."  Fauci Dep. 181:3-10; *see also id.* at 181:18-22.  Based on all these circumstances, it is likely that Dr. Fauci encouraged the authors to express a stronger and more unequivocal conclusion against the lab-leak theory than reflected in the preprint.

726.   Once the article "The Proximal Origin of SARS-CoV-2" was released, both Dr. Fauci and Dr. Collins took steps to push it into prominence.  First, on March 26, 2020, Dr. Collins published a blog post on the article on the "NIH Director's Blog" entitled "Genomic Study Points to Natural Origin of COVID-19."  Fauci Ex. 25, at 1.

727.   Dr. Collins used strong language relying on the study to attack and discredit the lab-leak theory as "outrageous" and "debunk[ed]": "Some folks are even making outrageous claims that the new coronavirus causing the pandemic was engineered in a lab and deliberately released to make people sick.  A new study debunks such claims by providing scientific evidence that this novel coronavirus arose naturally."  Fauci Ex. 25, at 2.  Dr. Collins stated that the study shows that "the coronavirus that causes COVID-19 almost certainly originated in nature," and that "this study leaves little room to refute a natural origin for COVID-19."  Fauci Ex. 25, at 3.

728.   In his blog post, Dr. Collins did not disclose that he and Dr. Fauci had been part of the group that organized the study, nor that he and Dr. Fauci had reviewed six versions of the study before it was published.  Fauci Ex. 25.

729.   As was evidently intended, Dr. Collins's blog post immediately fueled media coverage attacking the lab-leak theory as a "conspiracy theory."  For example, the next day, March 27, 2020, ABC News ran a story entitled, "Sorry, conspiracy theorists.  Study concludes COVID-19 'is not a laboratory construct.'"  Fauci Ex. 26.  The article quoted Bob Garry—who on January 31 had found "the genome inconsistent with the expectations of evolutionary theory," Fauci Ex. 6, at 1, and on February 1 had told Farrar that "I just can't figure out how this gets accomplished in nature … it's stunning," Fauci Ex. 8, at 4—as stating that "[t]his study leaves little room to refute a natural origin for COVID-19."  Fauci Ex. 26, at 3-4.

730.    Dr. Fauci testified that he could not remember any contact from Dr. Collins about "The Proximal Origin of SARS-CoV-2" after Dr. Collins' blog post on March 26, 2020.  Fauci Dep. 186:19-187:6.  In light of their subsequent communications and Dr. Fauci's actions, this testimony is not credible.

731.    In fact, Dr. Collins emailed Dr. Fauci about the article on Thursday, April 16, 2020.  Fauci Ex. 27.  The email linked to a Fox News piece by Bret Baier alleging that sources were "increasingly confident" that SARS-CoV-2 originated in a lab, and it stated: "Wondering if there is something NIH can do to help put down this very destructive conspiracy, with what seems to be growing momentum."  Fauci Ex. 27, at 1.  Dr. Collins stated, "I hoped the Nature Medicine article on the genomic sequence of SARS-CoV-2 [*i.e.*, "The Proximal Origin of COVID-19] would settle this. … Anything more we can do?"  Fauci Ex. 27, at 1.

732.    Dr. Fauci responded to Dr. Collins at 2:45 a.m. the next day, Friday, April 17, stating only: "Francis: I would not do anything about this right now.  It is a shiny object that will go away in times.  Best, Tony."  Fauci Ex. 27, at 2.

733.    Dr. Fauci testified that he did not take "any steps to increase the visibility of the article after this" email exchange with Dr. Collins.  191:21-22; *see also* 195:10-17.  That testimony is incorrect and not credible.

734.    In fact, that same day, Dr. Fauci took matters into his own hands to make the lab-leak theory "go away."  At the joint press conference on April 17, 2020, with President Trump, Vice President Pence, and Dr. Fauci, a reporter asked, "Mr. President, I wanted to ask Dr. Fauci: Could you address the suggestions or concerns that this virus was somehow manmade, possibly came out of a laboratory in China?"  Fauci Ex. 28, at 2.  Dr. Fauci responded: "There was a study recently that we can make available to you, where a group of highly qualified evolutionary

virologists looked at the sequences there and the sequences in bats as they evolve.  And the mutations that it took to get to the point where it is now is [pause for emphasis] *totally consistent* with a jump of a species from an animal to a human."  *Id.*; *see also id.* 199:18-25 (Dr. Fauci conceding that, "when you said that sentence about totally consistent, you pause and use that phrase, 'totally consistent' with emphasis" – "Right."); *see also* Video of April 17, 2020 White House Coronavirus Task Force Briefing, *at* https://www.youtube.com/watch?v=brbArpX8t6I (exchange starting at 1:38:32 of video).

735.    Dr. Fauci then feigned ignorance and unfamiliarity with the authors of the study: "the paper will be available – I don't have the authors right now, but we can make that available to you."  Fauci Ex. 28, at 2.  Presenting himself as unconnected with the paper, Dr. Fauci did not reveal (1) that he was part of a group that had launched the paper in a clandestine phone call on Saturday, Feb. 1; (2) that he had extensively corresponded with Jeremy Farrar about the paper and its conclusions; (3) that the authors of the paper had sent six versions to him, Jeremy Farrar, and Dr. Collins to review; (4) that he had likely urged the authors to beef up their conclusion attacking the lab-leak theory between the preprint and published versions of the paper; (5) that the authors had personally thanked him for his "advice and leadership" in drafting the paper; or (6) that Dr. Collins had emailed him the day before to ask him to push the paper publicly or take other steps to discredit the lab-leak theory.

736.    Dr. Fauci does not dispute that he was referring to "The Proximal Origin of SARS-CoV-2" in his public remarks at the April 17, 2020, White House press briefing.  Fauci Dep. 201:2-6 ("I assume it was the Nature Medicine paper…. I think it was.").

737.    Dr. Fauci testified that he did not make that paper available to any reporters after the press conference.  *Id.* at 201:7-9 ("Not to my knowledge.).  That testimony is not credible.

186

738.    In fact, over the weekend following the press conference, Dr. Fauci personally responded to an inquiry from a reporter specifically asking for the study he had referred to at the April 17, 2020 press conference, and provided a link to "The Proximal Origin of SARS-CoV-2." Fauci Ex. 29, at 1.  On Sunday, April 19, a reporter emailed the White House press office asking, "Dr. Fauci said on Friday he would share a scientific paper with the press on the origin of the coronavirus.  Can you please help me get a copy of that paper?"  *Id.*

739.    Dr. Fauci personally responded to this reporter, stating, "Bill: Here are the links to the scientific papers and a commentary about the scientific basis of the origins of SARS-CoV-2." Fauci Ex. 29, at 1.  He then provided three links.  The first was a link to the online version of "The Proximal Origin of SARS-CoV-2."   The second and third were links to a paper and an online statement by Eddie Holmes, whom Dr. Fauci knew had begun secretly drafting the paper that became "The Proximal Origin of SARS-CoV-2" immediately after the clandestine Feb. 1 conference call with Dr. Fauci, Jeremy Farrar, and others.  Fauci Ex. 29, at 1.  The second link to a paper authored by Holmes was "a commentary on [The Proximal Origin of SARS-CoV-2] in the journal *Cell*."  Fauci Dep. 202:25-203:1; *see also id.* at 203:2-16.

740.    On April 18 and 19, 2020, Dr. Fauci exchange cordial emails with Peter Daszak of the EcoHealth Alliance, who steers NIAID funds to finance bat coronavirus research with Dr. Shi Zhengli at the Wuhan Institute of Virology.   On Saturday, April 18, Daszak emailed Dr. Fauci, calling him "Tony," and stating: "As the PI of the R01 grant publicly targeted by Fox News reporters at the Presidential press briefing last night, I just wanted to say a personal thank you … for standing up and stating that the scientific evidence supports a natural origin for COVID-19 … not a lab release from the Wuhan Institute of Virology."  Fauci Ex. 30, at 1.  Daszak also wrote: "Once this pandemic's over I look forward to thanking you in person and let you know how

important your comments are to us all." *Id.* Dr. Fauci responded on April 19: "Peter: Many thanks for your kind note." *Id.*

741. Dr. Fauci's and Dr. Collins's efforts to orchestrate and publicize "The Proximal Origin of SARS-CoV-2" as a method of discrediting the lab-leak theory were highly effective. "The Proximal Origin of SARS-CoV-2" became one of the most widely read and most publicized scientific papers in history, with pervasive media coverage using it to discredit the lab-leak theory. "The paper has been accessed online more than 5.7 million times and has been cited by more than 2,000 media outlets. … It became one of the best-read papers in the history of science." Jones Decl., Ex. BB, at 3.

742. As a direct result of these efforts, speech and speakers advocating for the lab-leak theory of COVID-19's origins were extensively censored on social media platforms.

743. Twitter took aggressive censorship action against such speech and speakers. For example, on September 16, 2020, Twitter suspended the account of a Chinese virologist who claimed coronavirus was made in a lab. Fauci Ex. 31, at 1. "Twitter has suspended the account of a Chinese scientist who suggested that the novel coronavirus was created in a lab … despite inconclusive evidence." Fauci Ex. 31 at 2.

744. Facebook, likewise, took aggressive steps to censor the lab-leak theory on social media, even going so far as to formalize this policy as part of its official content-moderation policy. Fauci Ex. 32, at 3 (Facebook announcing that "we are expanding the list of false claims we will remove to include additional debunked claims about the coronavirus and vaccines," including "COVID-19 is man-made or manufactured"). Facebook noted that "we already prohibit these claims in ads," and promised "to take aggressive action against misinformation about COVID-19 and vaccines." *Id.* Facebook promised to "begin enforcing this policy immediately, with a

188

particular focus on Pages, groups or accounts that violate these rules …. Groups, Pages, and accounts on Facebook that repeatedly share these debunked claims may be removed altogether." *Id.*

745.    Like Twitter, Facebook censored even high-profile speakers who raised questions about the origins of COVID-19 or advanced the lab-leak hypothesis.  For example, Facebook censored an article by award-winning British journalist Ian Birrell who raised "the question of the origins of the Covid-19 virus within Wuhan" and criticized the natural-origin theory of the virus. Fauci Ex. 33, at 1.

746.    Dr. Fauci claims that he is not aware of any suppression of speech about the lab-leak theory on social media: "I'm not aware of suppression of speech on social media to my knowledge…. I don't recall being aware of suppression of anything."  Fauci Dep. 208:10-14.  He claims that this ignorance is because he does not pay any attention to anything said on social media: "This is not something that would be catching my attention because, you know, the social media and Twitter, I told you, I don't have a Twitter account. I don't tweet. I don't do Facebook. I don't do anything. So social media stuff, I don't really pay that much attention to."  *Id.* at 210:3-8.  As noted above, Dr. Fauci's emails and actions reflect extensive concern about what is said on social media, and his attempt to cast himself as someone with no knowledge of social media is not credible.

747.    Further, Dr. Fauci's emails and interrogatory responses show a close relationship with the CEO and founder of Meta (Facebook/Instagram), Mark Zuckerberg.

748.    On February 27, 2020, Mark Zuckerberg emailed Dr. Fauci directly to inquire about the development of the COVID-19 vaccine and offer the assistance of the Chan-Zuckerberg foundation.  Fauci Ex. 23, 1.  Zuckerberg already had Dr. Fauci's email, called Dr. Fauci by his

189

first name "Tony," and wrote as if he had a preexisting acquaintance with Dr. Fauci.  *Id.*  Dr. Fauci, likewise, responded to Zuckerberg on a first-name basis and with the familiar tone of an acquaintance.  Fauci Ex. 23, at 2.

749.     Dr. Fauci claims that he does not recall whether he had already met Mark Zuckerberg.  Fauci Dep. 173:17-174:5 ("I meet thousands of people.  I'm not sure I ever met him in person."). But in fact, Dr. Fauci still refers to Mark Zuckerberg by his first name.  *Id.* at 289:9-16.

750.     On March 15, 2020, Mark Zuckerberg sent Dr. Fauci a lengthy email to offer close coordination between Dr. Fauci and Facebook on COVID-19 messaging.  In the email, Zuckerberg thanked Dr. Fauci for his leadership, and "share[d] a few ideas of ways to help you get your message out."  Fauci Ex. 23, at 3.  Zuckerberg made three proposals: (1) Facebook was about to launch a "Coronavirus Information Hub" visible at the top of the page to all Facebook users to "get authoritative information from reliable sources," and Zuckerberg offered to include "a video from you" as a "central part of the hub," *id.*; (2) Zuckerberg was "doing a series of livestreamed Q&As from health experts" for his 100 million followers and wanted Dr. Fauci to do one of these videos, *id.*; and (3) Zuckerberg advised Dr. Fauci that Facebook had "allocated technical resources and millions of dollars of ad credits for the US government to use for PSAs to get its message out over the platform," and he wanted Dr. Fauci to recommend "a point person for the government response," *id.*

751.     Dr. Fauci responded the next day, telling "Mark" that "[y]our idea and proposal sound terrific," that he "would be happy to do a video for your hub," and that "your idea about PSAs is very exciting."  Fauci Ex. 23, at 4.  He copied his Special Assistant to put Zuckerberg in

touch with the right point person for the government to arrange specially subsidized government messaging about COVID-19 on Facebook.  *Id.*

752.    Zuckerberg replied the same day, stating "[w]e'd love to move quickly to help the effort and support getting these messages out."  Fauci Ex. 23, at 6.

753.    Dr. Fauci claims that the U.S. Government did not accept Facebook's offer of free ad credits to support the Government's COVID-19 messaging.  Fauci Dep. 177:22-178:4 ("I don't believe that there was any money that was given from the Zuckerberg to the United States government to do PSAs. It's possible, but it certainly didn't happen to my knowledge. I don't recall money being given for PSAs.").  But at the time, Dr. Fauci described the proposal as "very exciting" and immediately followed up on Zuckerberg's offer.  Fauci Ex. 23, at 4.  Separate emails from Facebook to the White House corroborate these ad credits.  *See, e.g.,* Doc. 174-1, at 46.   Dr. Fauci's testimony on this point is not credible.

754.    Dr. Fauci and Zuckerberg have "interacted on Facebook Zoom-type podcasts." Fauci Dep. 175:17-18.  Dr. Fauci did "[t]hree live stream Facebook-type Q and As" about COVID-19 with Zuckerberg.  Fauci Dep. 177:2-4.

755.    Dr. Fauci's interrogatory responses reveal extensive direct communications between Dr. Fauci and Zuckerberg.  *See* Scully Ex. 12, at 33, 53-54 (identifying 13 communications between Dr. Fauci and Zuckerberg, including emails, phone calls, virtual meetings, and live broadcasts, over a nine-month period in 2020).

756.    Reviewing the foregoing facts about Dr. Fauci's communications with Farrar, Eddie Holmes, and others, former Director of the CDC Robert Redfield "had a dawning realization. He concluded there'd been a concerted effort not just to suppress the lab-leak theory but to manufacture the appearance of a scientific consensus in favor of a natural origin. 'They

made a decision, almost a P.R. decision, that they were going to push one point of view only' and suppress rigorous debate, said Redfield. 'They argued they did it in defense of science, but it was antithetical to science.'"  Jones Decl., Ex. AA.

**B.  Dr. Fauci's Efforts to Suppress Speech on Hydroxychloroquine.**

757.  On May 22, 2020, The Lancet published an online article entitled "Hydroxychloroquine or chloroquine with or without a macrolide for treatment of COVID-19: a multinational registry analysis."  Fauci Ex. 35, at 1.  The article purported to analyze 96,032 patients to compare cohorts who did and did not receive hydroxychloroquine or chloroquine to treat COVID-19.  *Id.*  The study concluded that hydroxychloroquine and chloroquine were "associated with decreased in-hospital survival and an increased frequency of ventricular arrhythmias when used for COVID-19."  *Id.*

758.  On May 27, 2020, Dr. Fauci publicly cited this study to claim that hydroxychloroquine is "not effective against coronavirus."  Fauci Ex. 34, at 1.  Dr. Fauci "became the first Trump administration official to say definitively that hydroxychloroquine is not an effective treatment for the coronavirus." *Id.* at 2.  "'The scientific data is really quite evident now about the lack of efficacy,' Fauci … said on CNN." *Id.*

759.  Dr. Fauci's comments were based on the May 22 Lancet study.  *Id.* at 3 ("Fauci's comments come days after the Lancet published a 96,000-patient observational study that concluded that hydroxychloroquine had no effect on Covid-19 and may even have caused some harm.").

760.  The Lancet article was an observational study, not a randomized trial.  At the time, "[t]here [wa]s no data yet from randomized, controlled clinical trials of hydroxychloroquine – the

gold standard for evaluating potential treatments."  Fauci Ex. 34, at 4.  "But Fauci was unequivocal on [May 27, 2022], saying that 'the data are clear right now.'"  *Id.*

761.    Just a few days later, The Lancet retracted the May 22, 2022 study.  Fauci Ex. 35, at 1.  An article reporting on the retraction noted that the study's authors "were unable to confirm that the data set was accurate," that "several concerns were raised with respect to the veracity of the data," the study may have "include[ed] more cases than possible," and that "[a] first-year statistics major could tell you about major flaws in the design of the analysis."  Jones Decl., Ex. DD, at 2-3.

762.    Thus, Dr. Fauci's initial dismissal of hydroxychloroquine was based on a purely *observational* study – not a randomized, controlled trial – and one that was retracted for glaring errors just days later.

763.    Dr. Fauci testified that he did not recall that The Lancet study he cited to discredit the efficacy of hydroxychloroquine had been retracted.  Fauci Dep. 223:7 ("I don't recall it being retracted.").

764.    Dr. Fauci stepped up his public campaign to discredit hydroxychloroquine by insisting that its effectiveness could only be judged by undergoing rigorous, randomized, double-blind, placebo-based studies, notwithstanding his previous reliance on the less-than-rigorous observational study in The Lancet that was subsequently retracted.  On July 31, 2020, Dr. Fauci testified before the House Select Subcommittee on Coronavirus Crisis, during which he stated: "The point that I think is important, because we all want to keep an open mind, any and all of the randomized placebo-controlled trials, which is the gold standard of determining if something is effective, none of them had shown any efficacy by hydroxychloroquine. Having said that, I will state, when I do see a randomized placebo-controlled trial that looks at any aspect of

hydroxychloroquine, either early study, middle study, or late, if that randomized placebo-controlled trial shows efficacy, I would be the first one to admit it and to promote it. But I have not seen yet a randomized placebo-controlled trial that's done that. And in fact, every randomized placebo-controlled trial that has looked at it, has shown no efficacy. So, I just have to go with the data. I don't have any horse in the game one way or the other, I just look at the data." *See* https://www.youtube.com/watch?v=RkNC5OQD2UE.

765.    Despite his insistence before a congressional committee that randomized, placebo-controlled trials were the determining factor for his opinion regarding the effectiveness of hydroxychloroquine in the treatment of COVID-19, Dr. Fauci quietly admitted that such rigorous studies are not actually required to determine the efficacy of a therapeutic drug.  Dr. Fauci was asked, "Do you recall saying in connection with the discussion of hydroxychloroquine that a randomized double blind placebo based study is the gold standard?"  Fauci Dep. 244:8-11.  He replied, "That is the gold standard for everything. *It isn't always needed*, but for the most part, it's the gold standard." *Id.* at 244:12-14 (emphasis added).

766.    Dr. Fauci's sudden reversal concerning the critical standards for scientific studies to determine the effectiveness of hydroxychloroquine demonstrated a lack of candor to the House Select Subcommittee on Coronavirus Crisis.  Indeed, Dr. Fauci misled the Committee when he failed to disclose that randomized, double-blind, placebo-based studies are not always needed and that he previously relied on the *observational,* i.e., non-randomized, non-double-blind, non-placebo-based study in The Lancet to form an opinion about that drug's efficacy in the first place. Dr. Fauci lacks credibility on this point.

767.    Despite mounting evidence against his position, Dr. Fauci testified that his opinion against hydroxychloroquine was based on other studies as well as the retracted article in The

Lancet, but he could not identify any of those studies.  Fauci Dep. 223:12-18 ("I don't recall specifically what those studies are now.").

768.     Dr. Fauci did not retreat from his hard public stance against hydroxychloroquine. On July 26, 2020, a group called "America's Frontline Doctors" held a press conference at the U.S. Capitol criticizing the government's response to the COVID-19 pandemic and touting the benefits of hydroxychloroquine in treating the coronavirus.  Fauci Ex. 38, at 5.

769.     Dr. Fauci responded to this event with highly visible public statements condemning the use of hydroxychloroquine.  For example, he stated on "Good Morning America," that "[t]he overwhelming prevailing clinical trials that have looked at the efficacy of hydroxychloroquine have indicated that it is not effective in coronavirus disease."  Fauci Ex. 36, at 5.  Dr. Fauci made these comments in direct response to the public claims of America's Frontline Doctors.  Fauci Dep. 227:7-228:13.  He also stated on MSNBC's "Andrea Mitchell Reports" that the video of the press conference by America's Frontline Doctors constituted "a video out there from a bunch of people spouting something that isn't true."  Fauci Ex. 37, at 3.

770.     Dr. Fauci also stated that "the cumulative data on trials, clinical trials that were valid, namely clinical trials that were randomized and controlled in a proper way, … showed consistently that Hydroxychloroquine is not effective in the treatment of coronavirus disease or COVID-19."  Fauci Ex. 37, at 3.  But two months earlier, he had said "the data are clear right now" when no such studies existed.  Fauci Ex. 34, at 4.

771.     Social-media platforms reacted by aggressively censoring the video of America's Frontline Doctors.  Facebook removed the video when it was "the top-performing Facebook post in the world," and "had accumulated over 17 million views by the time of its censorship by Facebook."  Fauci Ex. 38, at 3, 4.  Further, "Facebook's decision to censor the livestream was

quickly followed by YouTube, the Google-owned video-sharing platform." *Id.* at 6. "The video had 80,000 views on YouTube prior to its removal." *Id.* "Following Facebook and YouTube's removal of the video, Twitter followed suit…." *Id.*; *see also* Fauci Ex. 36, at 3 (noting that "Twitter … removed the video, saying it was 'in violation of our COVID-19 misinformation policy'").

772.    Dr. Fauci professed to be unaware of whether 17 million views of a video on Facebook are a large number of views: "I don't know what 17 million views means. What's the denominator? Is 17 million a large amount? Is it a small amount? I don't go on social media, so I don't know what 17 million views means." Fauci Dep. 236:7-11.  It is common sense that 17 million views are a large number of views.  Dr. Fauci's testimony on this point is not credible.

773.    Dr. Fauci does not deny that he or his staff at NIAID may have communicated with Facebook regarding the censorship of the America's Frontline Doctors video.  Instead, he claims that he does not recall whether they communicated with Facebook about it, and that it is possible that they did so.  Fauci Dep. 238:2-5 ("I don't recall anybody communicating with them about that. Could have been, but I don't recall anybody -- I don't recall anybody communicating with the social media people."); *see also id.* at 238:6-10.  He also does not deny that other federal officials may do so, but he claims that "I don't recall any of that" and "it just doesn't ring a bell to me right now." *Id.* at 238:21-239:7.  He claims he doesn't "pay attention" to whether his staff or other federal officials communicate with social-media platforms about censorship because "I have a really important day job that I work at." *Id.* at 238:19-20.

774.    Nevertheless, regarding the decision by YouTube and Twitter to follow Facebook in censoring the video, Dr. Fauci admits that "Yes, I knew of that." *Id.* at 239:8-13.

775.     A few days later, on August 1, 2020, the web host provider for America's Frontline Doctors shut down their website.  *Id.* at 242:14-243:8; Fauci Ex. 39.  Dr. Fauci testifies that he does not recall this occurrence.  Fauci Dep. 243:13-18.

776.     On November 18, 2022, a meta-analysis of 449 studies on the efficacy of hydroxychloroquine considered "449 HCQ COVID-19 studies, 351 peer reviewed, 371 comparing treatment and control groups."  Fauci Ex. 40, at 1.  The meta-analysis concluded that "[l]ate treatment and high dosages may be harmful, while early treatment consistently shows positive results."  *Id.*  It also noted that "[n]egative evaluations" of hydroxychloroquine "typically ignore treatment delay."  *Id.*  And it noted that "HCQ/CQ was adopted for early treatment in all or part of 41 countries."  *Id.*

### C.     Dr. Fauci's "Devastating Takedown" of the Great Barrington Declaration.

777.     Dr. Fauci recommended Dr. Clifford Lane of NIAID to participate in a WHO mission to China in February 2020.  Fauci Dep. 139:15.

778.     On April 3, 2020, the NIH Record wrote a report on Lane's trip entitled "NIAID's Lane Discusses WHO COVID-19 Mission to China.  Fauci Ex. 20, at 1.  Lane praised China's response to the pandemic, especially their reliance on lockdowns and "extreme … social distancing": "The Chinese were managing this in a very structured, organized way,' he explained.  'When we got there, the outbreak was already coming under control in China.  The measures they put in place appeared to be working…. It demonstrated their successful response…. From what I saw in China, we may have to go to as extreme a degree of social distancing to help bring our outbreak under control."  *Id.* at 5-6.

779.     Dr. Fauci discussed this conclusion with Lane when he returned from China: "Dr. Lane was very impressed about how from a clinical public health standpoint, the Chinese were

handling the isolation, the contact tracing, the building of facilities to take care of people, and that's what I believed he meant when he said were managing this in a very structured, organized way." Fauci Dep. 165:4-11.

780.   Dr. Fauci admits that Lane "did discuss with me that the Chinese had a very organized way of trying to contain the spread in Wuhan and elsewhere. … he mentioned that they had a very organized, well-regimented way of handling the outbreak." *Id.* at 166:1-7.

781.   Dr. Fauci came to agree with Dr. Lane's rosy assessment of China's draconian response to the outbreak: "Dr. Lane is a very astute clinician, and I have every reason to believe that his evaluation of the situation was accurate and correct." *Id.* at 166:24-167:1.

782.   On Feb. 22, 2020, Dr. Lane sent an email stating, "China has demonstrated that this infection can be controlled, albeit at great cost." Fauci Ex. 21, at 1.

783.   On October 4, 2020, Plaintiffs Dr. Jay Bhattacharya of Stanford and Dr. Martin Kulldorff of Harvard, along with Dr. Sunetra Gupta of Oxford, published online the "Great Barrington Declaration," which was one-page treatise opposing reliance on lockdowns and advocating for an approach to COVID-19 called "focused protection." Fauci Ex. 41.

784.   The Great Barrington Declaration criticized the social-distancing and lockdown approaches to the pandemic endorsed by government experts such as Dr. Fauci and Cliff Lane: "As infectious disease epidemiologists and public health scientists we have grave concerns about the damaging physical and mental health impacts of the prevailing COVID-19 policies, and recommend an approach we call Focused Protection." *Id.*  It was very critical of such government policies: "Current lockdown policies are producing devastating effects on short and long-term public health. The results (to name a few) include lower childhood vaccination rates, worsening cardiovascular disease outcomes, fewer cancer screenings and deteriorating mental health –

198

leading to greater excess mortality in years to come, with the working class and younger members of society carrying the heaviest burden. Keeping students out of school is a grave injustice. Keeping these measures in place until a vaccine is available will cause irreparable damage, with the underprivileged disproportionately harmed." *Id.* It called for an end to lockdowns: "The most compassionate approach that balances the risks and benefits of reaching herd immunity, is to allow those who are at minimal risk of death to live their lives normally to build up immunity to the virus through natural infection, while better protecting those who are at highest risk. We call this Focused Protection." *Id.*

785.    The Declaration called for an end of government-imposed lockdowns and an immediate return to normal life for those who are low-risk: "Those who are not vulnerable should immediately be allowed to resume life as normal. Simple hygiene measures, such as hand washing and staying home when sick should be practiced by everyone to reduce the herd immunity threshold. Schools and universities should be open for in-person teaching. Extracurricular activities, such as sports, should be resumed. Young low-risk adults should work normally, rather than from home. Restaurants and other businesses should open. Arts, music, sport and other cultural activities should resume. People who are more at risk may participate if they wish, while society as a whole enjoys the protection conferred upon the vulnerable by those who have built up herd immunity." *Id.*

786.    The Declaration was thus highly critical of the lockdown policies defended by Dr. Fauci and Dr. Cliff Lane of NIAID since Dr. Lane's trip to China at the beginning of the pandemic. The Declaration was "going against the global political consensus, which holds that lockdowns are key to minimising mortality to Covid-19." Fauci Ex. 48, at 3. After it was posted online, it rapidly gathered signatures from doctors and scientists, as well as members of the public.

787. Four days later, on October 4, 2020, Dr. Francis Collins emailed Dr. Fauci and Cliff Lane, citing the Great Barrington Declaration. Fauci Ex. 42, at 1. Dr. Collins stated: "Hi Tony and Cliff, See https://gbdeclaration.org. This proposal from the three fringe epidemiologists who met with the Secretary seems to be getting a lot of attention – and even a co-signature from Nobel Prize winner Mike Leavitt at Stanford. There needs to be a quick and devastating published take down of its premises. I don't see anything like that on line yet – is it underway? Francis." *Id.*

788. This email seeking Dr. Fauci's assistance in a "quick and devastating ... take down" of the Great Barrington Declaration" is strikingly similar to Dr. Collins' email to Dr. Fauci on April 16, 2020, asking Dr. Fauci's "help [to] put down this very destructive conspiracy," *i.e.*, the lab-leak hypothesis. Fauci Ex. 27, at 1. In both cases, Dr. Collins sought Dr. Fauci's aid in discrediting and silencing an online narrative that federal officials disfavored, and in both cases, Dr. Fauci promptly and effectively complied.

789. Dr. Collins' question to Dr. Fauci in the email, "Is it underway?" implies that Dr. Collins expected Dr. Fauci to be already working on a "quick and devastating ... take down" of the Declaration, or to be aware of others working on one. Fauci Ex. 42, at 1. Dr. Fauci denies that Dr. Collins had any reason to think that Dr. Fauci might be working on a refutation of the Great Barrington Declaration, because "[t]his is not something I would be involved in," because "I have a very important day job that is running a $6.4 billion institute." Fauci Dep. 260:11-20. Given Dr. Fauci's immediately subsequent attempts to refute and discredit the Great Barrington Declaration, this testimony is not credible.

790. The same day as Dr. Collins' email, October 8, 2020, Dr. Fauci wrote back to Dr. Collins, stating "Francis: I am pasting in below a piece from *Wired* that debunks this theory. Best, Tony." Fauci Ex. 43, at 1. Dr. Fauci followed up the same day with an email to Dr. Collins linking

to an article by Gregg Gonsalves which Dr. Fauci called "[a]nother refutation of the herd immunity approach." Fauci Ex. 44, at 1.

791.    Dr. Fauci has known Gregg Gonsalves for decades, since the 1980s.  Fauci Dep. 265:16-19.  Dr. Fauci does not deny that he may have contacted Gregg Gonsalves before Gonsalves wrote this piece attacking the Great Barrington Declaration, but claims he does not recall.  *Id.* at 268:8-19 ("I don't recall.  I might have.").

792.    Dr. Fauci and Dr. Collins followed up with a series of public media statements attacking the Great Barrington Declaration.  On October 14, 2020, the Washington Post ran a story entitled, "Proposal to hasten herd immunity to the coronavirus grabs White House attention but appalls top scientists." Fauci Ex. 45, at 1.  In the article, Dr. Collins described the Great Barrington Declaration and its authors as "fringe" and "dangerous": "This is a fringe component of epidemiology.  This is not mainstream science.  It's dangerous."  *Id.* at 3.

793.    Dr. Fauci consulted with Dr. Collins before he told the Washington Post that the Great Barrington Declaration represented a "fringe" and "dangerous" idea.  Fauci Dep. 272:4-7.

794.    Dr. Fauci endorsed these comments in an email to Dr. Collins on October 13, 2020, stating, "[w]hat you said was entirely correct." Fauci Ex. 46, at 1.

795.    Dr. Fauci admits that Dr. Collins could have been concerned about the spread of the ideas in the Declaration on social media when he called it "fringe" and "dangerous."  Fauci Dep. 274:19-20.

796.    The next day, October 15, 2020, Dr. Fauci echoed Dr. Collins' comments, calling the Declaration "nonsense" and "dangerous." Fauci Ex. 47, at 1.  Describing the proposal as "letting infections rip as it were," Dr. Fauci stated: "Quite frankly that is nonsense, and anybody

who knows anything about epidemiology will tell that that is nonsense and very dangerous."  *Id.* at 3.

797.    Dr. Fauci testified that "it's possible that" he coordinated with Dr. Collins on their public statements attacking the Great Barrington Declaration.  Fauci Dep. 279:23-24.

798.    Dr. Fauci also testified of himself and Dr. Collins that "that's not our style to be coordinating things."  *Id.* at 279:22-23.   In light of the extensive coordination with Dr. Collins about the lab-leak theory, and the coordination about the Great Barrington Declaration, that testimony is not credible.

799.    Shortly after Dr. Collins' email to Dr. Fauci seeking a "quick and devastating … take down" of the Great Barrington Declaration, the Declaration and its authors, Drs. Bhattacharya and Kulldorff, experienced extensive censorship on social media. *See infra.*   In October 2020, Google deboosted the search results for the Declaration, so that "most users in English-speaking countries, when they google 'Great Barrington Declaration,' will not be directed to the declaration itself but to articles that are critical of the declaration."  Fauci Ex. 48, at 4.

800.    In the same time, "[c]ensorship of the declaration … also spread to Reddit. The two most popular subreddits for discussion of the coronavirus – r/COVID-19 and r/coronavirus – have both removed links to the Great Barrington Declaration. The moderators of r/coronavirus, a forum with 2.3million members, have declared it to be 'spam'."  Fauci Ex. 48, at 4-5.

801.    In October 2020, YouTube updated its terms of service regarding medical "misinformation," reporting "COVID-19 medical misinformation policy updated to prohibit content about vaccines contradicting consensus from health authorities."  Fauci Ex. 49, at 3. "Health authorities" include federal officials like Dr. Fauci and Dr. Collins.  *See id.*  This October 2020 update specifically stated that claims which are "not allowed on YouTube" include "[c]laims

that achieving herd immunity through natural infection is safer than vaccinating the population," which is listed on the same footing as "[c]laims that COVID-19 vaccines contain a microchip or tracking device."  Fauci Ex. 50, at 3-4.

802.    Pursuant to this censorship policy of YouTube, the authors of the Great Barrington Declaration had content removed from YouTube, including a video of a roundtable discussion with Governor Ron DeSantis of Florida.  *See infra.*

803.    Facebook, likewise, adopted censorship policies against the Great Barrington Declaration.  Meta's policy on "Misinformation about vaccines" states that: "We remove misinformation primarily about vaccines when *public health authorities* conclude that the information is false and likely to directly contribute to imminent vaccine refusals."  Fauci Ex. 51, at 4 (emphasis added).

804.    Facebook/Meta views Dr. Fauci as a "public health authority" who may dictate what people may post about COVID-19 on its platforms (Facebook and Instagram, among others), because Mark Zuckerberg and Dr. Fauci were collaborating on multiple public appearances and videos for Facebook.  *See supra*; Scully Ex. 12, at 33, 53-54 (identifying 13 communications between Dr. Fauci and Zuckerberg, including emails, phone calls, virtual meetings, and live broadcasts, over a nine-month period in 2020).  Indeed, in his March 15, 2020 email to Dr. Fauci, Mark Zuckerberg described Dr. Fauci as an "expert[]," a "health expert[]" and "reliable source[]" for "authoritative information" about fighting COVID-19.  Fauci Ex. 23, at 3.

805.    Dr. Fauci claims that he would not have paid any attention to the Great Barrington Declaration because he is too busy and important to pay attention to such matters: "this is not something that I would have been paying a lot of attention to.  I was knee deep in trying to do things like develop a vaccine that wound up saving the lives of millions of people. That's what I

was doing at the time." Fauci Dep. 256:13-17.  Given Dr. Fauci's direct involvement in publicly attacking the Great Barrington Declaration and collecting sources for Dr. Collins to "take [it] down," this statement is not credible.  In fact, on November 1, 2020, Greg Folkers, Dr. Fauci's staffer at NIAID, sent Dr. Fauci a list of articles attacking the Great Barrington Declaration— including one co-authored by Gregg Gonsalves—with the statement "As discussed. I have highlighted the three I found the most useful."  Fauci Ex. 52, at 1.  The list of articles were all harshly critical of the Declaration—using phrases like "dangerous," "false promise," "ethical nightmare," and "could kill millions."  *Id.*  Thus, four weeks after the Declaration was published, Dr. Fauci and his staffers were still "discuss[ing]" and looking up articles on ways to attack it.  *Id.*

806.    Dr. Kulldorff points out that, regardless of disagreements over the policy, describing the Declaration as "fringe" and "nonsense" is fundamentally dishonest, as the Declaration reflects principles of pandemic preparedness that were widely accepted before COVID-19: "the Great Barrington Declaration is merely a restatement of the principles of public health. Lockdown … is a 'terrible experiment' that throws those principles 'out of the window' by focusing solely on one disease at the expense of all other health problems. 'Most countries in Europe had a pandemic-preparedness plan that did not recommend lockdowns, but instead proposed a risk-based strategy to protect those at high risk, which is actually the same as the focused protection we put forward in the Great Barrington Declaration. What we are proposing is, therefore, nothing revolutionary', [Kulldorff] said."  Fauci Ex. 48, at 6.

807.    Regarding the censorship of the Great Barrington Declaration on social media, Dr. Fauci repeatedly testified that he was oblivious to it: "I don't pay much attention to what goes on in social media … it is highly unlikely that … I paid any attention to this thing of Google censoring the Great Barrington Declaration … I would not have paid much attention to it."  Fauci Dep.

281:15-282:2, 283:7-10.  In light of his contemporaneous statements and emails, this statement is not credible.

808.    Like so many other topics, Dr. Fauci repeatedly testified that he could not recall virtually anything about his involvement in seeking to squelch the Great Barrington Declaration. He testified at least 33 times that he could not recall his involvement in this matter.  *See* Fauci Dep. 251:11, 252:20, 255:6, 255:9, 256:3, 257:5, 258:12, 263:1, 263:15, 263:21, 264:17, 264:20, 264:22, 265:2, 265:6, 268:10, 268:18, 270:24, 282:19-20, 284:22-23, 290:13, 290:21, 291:13, 291:16, 292:15, 292:24, 293:15, 293:24, 295:9, 295:25, 296:21, 297:2-3, 297:14.  For the reasons discussed above, these claims to almost total loss of memory are not credible.

**D.     NIAID Flags Social-Media Accounts for Censorship Under Dr. Fauci.**

809.    As noted above, Dr. Fauci testified that he is not aware of any NIAID or NIH staff contacting social media platforms to ask them to remove content.  In fact, NIAID and NIH staff—including staffers in Dr. Fauci's senior circle—sent several messages to social-media platforms asking them to remove content lampooning or criticizing Dr. Fauci.  Dr. Fauci's testimony to the contrary is not credible.

810.    On March 14, 2020, a Twitter employee reached out to CDC officials, including Carol Crawford, and asked if a particular account associated with Dr. Fauci is "real or not."  Fauci Ex. 53, at 2.  Scott Prince of NIH responded, "Fake/Impostor handle.  PLEASE REMOVE!!!"  *Id.* Twitter responded that it would take action promptly and "circle back ASAP."  *Id.*  An HHS official then asked if Twitter could pre-block similar parody accounts: "Is there anything else that you can also do to block other variations of [Dr. Fauci's] name from impersonation so we don't have this happen again?"  *Id.* at 1.  Twitter replied: "We'll freeze this @handle and some other variations so no one can hop on them."  *Id.*

811.   Likewise, on April 21, 2020, Judith Lavelle of NIAID emailed Facebook, copying Scott Prince of NIH and Jennifer Routh of Dr. Fauci's communications team, and stated: "We wanted to flag a few more fake Dr. Fauci accounts on FB and IG for you.  I have also reported them from @niaid and my personal FB account."  Fauci Ex. 55, at 3.  She listed eight accounts that she considered fake.  One of these was called "Dr.FauciTheHero," and she stated, "I think this one may be fine as a fan page but could use a reminder to be a bit more clear," *id.* at 4—thus noting that she was seeking the censorship only of speech about Dr. Fauci that the government disfavors, while "a fan page" was fine.

812.   Both Jennifer Routh and Judith Lavelle are members of Dr. Fauci's communications staff.  Fauci Dep. 308:14-21.

813.   The fact that Lavelle stated they were flagging "a few *more*" accounts indicates that NIAID's flagging social-media accounts for censorship was not an isolated incident but an ongoing practice.  Fauci Ex. 55, at 3.

814.   Lavell then followed up flagging yet another account, saying "Apologies one more," and adding Greg Folkers of Dr. Fauci's personal staff to the email chain reporting these accounts to Facebook for censorship.  Fauci Ex. 55, at 3.

815.   The same day, Facebook responded, "Flagged this for the fake accounts team and they have confirmed that all but two accounts were removed for impersonation of Dr. Fauci.  I guess two of the accounts are fan accounts."  Fauci Ex. 55, at 3.

816.   The Facebook employee then added, "Also want to intro you all to [two more Facebook employees] who have been working hard to manage any fake accounts for NIH across the board.  She can work with you directly if anything like this comes up."  Fauci Ex. 55, at 2. Lavelle responded that "our team will be sure to reach out if we identify any more impersonations,"

*id.*, and Facebook answered that Lavelle of NIAID should "feel [free] to flag to us the various imposter accounts," Fauci Ex. 55, at 1. Again, this response indicates an ongoing and widespread practice of NIH reporting supposedly "fake" accounts for censorship. *Id.*

817.    Dr. Fauci testifies that he does not remember for certain, but he "likely" asked his communications staff to do something about these impersonation or parody accounts. Fauci Dep. 302:6-10 ("I vaguely remember somebody mentioning something about an imposter account. … And I likely would have said, 'Well, how can they do that?'"). He also agrees that his communications staff would do so on their own. *Id.* at 301:1-4 ("I have a communication staff that I'm sure, if they found out it was a false and misleading account, that they would want it to be removed."); *see also id.* at 301:23-25; 304:19-21.

818.    Dr. Fauci believes it is "totally appropriate" for his communications staff to contact social-media platforms and seek the removal of such accounts. *Id.* at 312:19-21; *see also id.* at 310:14-16.

819.    He thinks so because "impersonating me is a bad thing." *Id.* at 303:20; *see also id.* at 304:11-13; 309:23-310:1 ("fake accounts are bad things, I believe"); 311:20-21. Dr. Fauci specifically believes that removing accounts associated with him is "a good thing" because "those accounts are bad." *Id.* at 329:12-16.

820.    Dr. Fauci does not know whether some of the so-called "fake accounts," which he calls "bad things," that his staff flagged for censorship may actually be parody accounts. *Id.* at 311:7-9.

821.    Moreover, it was not just NIAID staff, but also White House staff, who flagged content about Dr. Fauci for removal from social-media platforms. As noted above on Tuesday, July 20, 2021, Clarke Humphrey of the White House communications office emailed Facebook

asking for the removal of an Instagram account associated with Dr. Fauci, saying it "is not actually one of ours." Fauci Ex. 57, at 1-2. Facebook responded one minute later, stating, "Yep, on it!" Fauci Ex. 57, at 1. Courtney Billet, Dr. Fauci's communications director at NIAID, then weighed in, asking Facebook to disclose whether "there's a federal email address attached to whomever set this account up," so that she could ascertain whether the account was set up by "some federal employee outside our official comms offices." Fauci Ex. 57, at 1. The next day, Facebook responded, stating, "This account has been removed. Thank you for flagging!" Fauci Ex. 57, at 1.

822.   NIAID's communications with social-media platforms were not limited to flagging impostor or parody accounts. On October 30, 2020, for example, a NIAID staffer wrote an email connecting Google/YouTube with Jennifer Routh of NIAID's "Office of Communications and Government Relations," so that NIAID and the "Google team" could "connect on vaccine communications – specifically misinformation…." Fauci Ex. 56, at 2. Routh then added Courtney Billet ("director of the Office of Communications and Government Relations at NIAID") and two other senior NIAID officials to the communications chain with YouTube. Fauci Ex. 56, at 1.

823.   Likewise, in response to a third-party subpoena, Twitter has disclosed that Dina Perry, a Public Affairs Specialist for NIAID, communicates or has communicated with Twitter about misinformation and censorship. Jones Decl., Ex. F, at 1.

824.   NIAID did not disclose Dina Perry in response to interrogatories seeking the identities of NIAID officials who communicate with social-media platforms about misinformation, disinformation, and censorship. Scully Ex. 12, at 17-18.

825.   Dr. Fauci testified that he has never "contacted a social media company and asked them to remove misinformation from one of their platforms." Fauci Dep. 151:21-24 ("No, I have

not.").  He also testified that no one on his staff at NIAID has "ever reached out to a social media platform to ask them to take content down or to block content in any way.  *Id.* at 152:7-15 ("To my knowledge, no.").  In light of the repeated attempts of Dr. Fauci's staff to have content related to Dr. Fauci removed from social media, Dr. Fauci's testimony on this point is not credible.

### E.    CDC and NIH Procure the Censorship of Speech on Ivermectin.

826.    On September 13, 2021, Facebook emailed Carol Crawford of the CDC to ask the CDC to identify whether the claim that "Ivermectin is effective in treating COVID" is "false, and if believed, could contribute to people refusing the vaccine or self-medicating," which were the qualifications for censoring that claim on Facebook's platforms.  Fauci Ex. 58, at 2.  Facebook noted that it was currently rating this claim as "*not false*," *i.e.*, Facebook was *not* censoring the claim that Ivermectin is effective in treating COVID-19, because there was "no consensus" of its efficacy for treatment.  *Id.* at 3.

827.    The next day, the CDC responded, advising Facebook that the claim that "Ivermectin is effective in treating COVID" is "***NOT ACCURATE***" (bold and italics in original) and thus should be censored on Facebook's platforms.  Fauci Ex. 58, at 1.  To support this claim, the CDC cited NIH's "Ivermectin | COVID-19 Treatment Guidelines."  *Id.*  Thus, the CDC cited the NIH's treatment guidelines for Ivermectin as authority to urge Facebook to censor claims about using Ivermectin to treat COVID-19.  *Id.*  CDC also cited NIH to call for the censorship of two related claims about Ivermectin, and noted that "[t]hese responses are based on the independent advice of … NIH," which had "opined that there are not data that indicate ivermectin is effective in the ways described above."  *Id.*

### F.    Dr. Fauci's Double Standard on Acceptable Speech: Mask Mandates.

828.    "Sylvia Burwell is the former Secretary of the Department of Health and Human Services [under President Obama] and the current president of American University."  Fauci Dep. 313:9-11.  "Sylvia has, over the past couple of years, asked [Dr. Fauci] advice about personal safety during the COVID-19 pandemic."  *Id.* at 313:17-19.

829.    On February 4, 2020, Sylvia Burwell wrote Dr. Fauci an email stating that she was traveling and wondering if she should wear a mask in the airport.  Fauci Dep. 313:21-314:5; *see also* Jones Decl., Ex. EE, at 1.  Dr. Fauci responded, stating: "Masks are really for infected people to prevent them from spreading infection to people who are not infected, rather than protecting uninfected people from acquiring infection.  The typical mask you buy in the drugstore is not really effective in keeping out virus, which is small enough to pass through material. … I do not recommend that you wear a mask…."  Fauci Dep. 314:9-19; *see also* Jones Decl., Ex. EE, at 1.

830.    Dr. Fauci agrees that he "made several statements that are similar to that at that time frame."  Fauci Dep. 315:12-14.

831.    He states that, at that time, there were "no studies" on the efficacy of masking to stop the spread of COVID-19.  *Id.* at 316:8-13.

832.    In fact, on March 31, 2020, Dr. Fauci forwarded studies showing that masking is ineffective.  Fauci Dep. 318:24-319:7.

833.    Dr. Fauci's position on masking dramatically changed by April 3, 2020, when he became an advocate for universal mask mandates.  *Id.* at 317:14-20.

834.    Dr. Fauci states that his position on masking changed in part because "[e]vidence began accumulating that masks actually work in preventing acquisition and transmission."  Fauci Dep. 317:5-6.

835.    Dr. Fauci was asked to identify any studies that were done between February 2020 and April 3, 2020, that supported his change of position on the efficacy of masking, and he could not identify any.  *Id.* at 318:8-10.

836.    Dr. Fauci was asked if there were any "placebo-based, double-blind, randomized studies of the efficacy of masking that were done between February and April 2020," and he could not identify any.  *Id.* at 322:1-5.  In fact, it is obvious that there were none.

837.    Dr. Fauci's position on masking, therefore, directly contradicts his insistence on randomized, double-blind, placebo-based clinical trials for alternative COVID-19 treatments like hydroxychloroquine and ivermectin.  At best, Dr. Fauci's dramatic change in position on masking was based on observational studies—the same kind of studies that he dismissed, in the very same time frame, as inadequate to support the use of hydroxychloroquine to treat COVID-19.  At worst, it was based on no evidence at all—and Dr. Fauci identified none.

838.    Dr. Fauci believes it can be dangerous to give ordinary people access to scientific information: "If information is clearly inadequate and statistically not sound, there can be a danger in people who don't have the ability or the experience of being able to understand that it's a flawed study."  *Id.* at 323:5-9.

839.    Dr. Fauci believes that it is "disturbing" when "unwitting" people believe what he thinks is misinformation: "I think honest debate is important, but when it goes beyond debate and leads people who are unwitting about these things to do things that are clearly detrimental to their life and their safety, I find that disturbing."  *Id.* at 358:13-17.

## G.    Dr. Fauci and the White House Cause the Censorship of Alex Berenson.

840.    Alex Berenson is a former New York Times science reporter and prominent critic of government messaging about COVID-19 vaccines who was deplatformed from Twitter on

August 28, 2021, after months of pressure from White House and federal officials.   Fauci Ex. 59, at 4.

841.    As Berenson notes: "On July 16, 2021, President Biden complained publicly that social media companies were 'killing people' by encouraging vaccine hesitancy.   A few hours after Biden's comment, Twitter suspended by account for the first time."   Fauci Ex. 59, at 4.

842.    Dr. Fauci, who was then Chief Medical Advisor to President Biden, played a key role in procuring the censorship of Alex Berenson.   Shortly before President Biden's comments, Dr. Fauci engaged in public attacks on Alex Berenson in attempt to discredit him and silence his government-skeptical opinions.

843.    On July 11, 2021, appearing on CNN's "State of the Union," Dr. Fauci described Alex Berenson's comments on vaccine skepticism as "horrifying."   Fauci Ex. 60, at 1.  Responding to applause for a speech given by Berenson at a conference, Dr. Fauci stated: "It's horrifying.  I mean, they are cheering about someone saying that it's a good thing for people not to try and save their lives."   *Id.*  In response to Berenson's views, Dr. Fauci stated, "it's almost frightening to say, … we don't want you to do something to save your life."   *Id.*  Dr. Fauci also stated, "I don't think that anybody who is thinking clearly can get that."   *Id.*

844.    Dr. Fauci's public comments as the President's Chief Medical Advisor specifically criticizing Alex Berenson were made at a time when other White House officials like Andrew Slavitt were *privately* pressuring Twitter to deplatform Berenson since April 21, 2020.   *See, e.g.,* Fauci Ex, 58, at 7 (internal Twitter communications on April 22, 2020, indicating that White House officials "had one really tough question about why Alex Berenson hasn't been kicked off from the platform," and "yes, they really wanted to know about Alex Berenson.  Andy Slavitt suggested

they had seen data vis that had showed he was the epicenter of disinfo that radiated outwards to the persuadable public.").

845.    Dr. Fauci does not deny that he may have discussed Alex Berenson with other White House or federal officials, but claims he does not recall whether he did so.   Fauci Dep. 343:16-23.

846.    Dr. Fauci believes that misinformation and disinformation "contribute to the deaths" of people: "misinformation and disinformation, particularly that encourages people to avoid lifesaving interventions, can certainly result in the unnecessary death of people whose lives would have been saved. So when misinformation and disinformation leads people to avoid a lifesaving intervention, that is equivalent to contributing to the death of that person." *Id.* at 345:8-15.  "I do feel strongly that misinformation and disinformation, when it leads to people avoiding lifesaving interventions, can be deadly.  *Id.* at 346:1-3.

847.    Dr. Fauci also believes that misinformation and disinformation on social media are "contrary to public health" and "the enemy of public health": "If social media is propagating disinformation that leads to the death of people by encouraging them to avoid lifesaving interventions, I believe that's contrary to public health." *Id.* at 346:5-7, 346:10-13.

848.    Dr. Fauci admits that it is "certainly possible" that he discussed the view that "disinformation or misinformation on social media platforms are killing people" with others in the federal government, but claims he cannot remember whether he did so.  *Id.* at 345:3-25.

849.    Dr. Fauci testified that the first time he heard of Alex Berenson was when Berenson publicly claimed that the White House demanded that Twitter deplatform him in 2022: "it's the person who says that the White House demanded Twitter ban me months before the company did so. I had never heard of who Alex Berenson was before this … I don't even know who he is." *Id.*

at 335:1-7.  In light of Dr. Fauci's public attacks on Alex Berenson in 2021, this testimony is not credible.

850.    Former FDA Commissioner Scott Gottlieb also emailed Twitter to pressure them to remove Alex Berenson's content, invoking Dr. Fauci in his email.  Sending Twitter a link to a post by Berenson entitled "The Arrogance of Dr. Fauci," Gottlieb wrote: "This is why Tony needs a security detail," Fauci Ex. 62, at 1—thus implying that Berenson's criticism of Dr. Fauci was endangering Dr. Fauci's life.

851.    Dr. Fauci does not deny that he may have discussed this issue with Gottlieb before Gottlieb sent this email to Twitter, but he claims he does not recall whether he did so.  Fauci Dep. 349:7-19, 352:12-18.

852.    After testifying over 200 times during his deposition that he could not remember or could not recall events related to the case, Dr. Fauci was shown an email chain between him and Dr. Ezekial Emanuel from May 2, 2020 that had no direct connection to issues in the case.  Fauci Ex 63.  Unlike his convenient lack of memory as to case-related communications, Dr. Fauci was immediately able to provide a detailed, specific account of the context and communications with Dr. Emanuel relating to that email chain.  Fauci Dep. 353:20-354:16.

## VI.    The FBI's Censorship Campaign of Pressure and Deception.

853.    In parallel with the censorship of health "misinformation" and related issues achieved by the White House, the CDC, Surgeon General Murthy, Dr. Fauci, and others, *see supra* Parts I-V, federal national-security and law-enforcement agencies flex their considerable muscle to pressure and induce social-media platforms to censor disfavored speech and viewpoints about elections and other topics.  The FBI's Foreign Influence Task Force (FITF) and the Cybersecurity and Infrastructure Security Agency's (CISA) "Mis, Dis, and Malinformation Team" play key roles

in this efforts – in cooperation with non-profit agencies working in close collaboration with the government, such as the CISA-funded "Center for Internet Security" and the formidable censorship cartel calling itself the "Election Integrity Partnership" and the "Virality Project."

854.   Elvis Chan is the Assistant Special Agent in Charge of the Cyber Branch for the San Francisco Division of the Federal Bureau of Investigation.  Chan Dep. 8:11-13.

855.   In this role, Chan is "one of the primary people" who communicates with social-media platforms about disinformation on behalf of the FBI.  *Id.* 105:3-4 ("I would say I'm one of the primary people with pass-through information" for platforms).  There are many other points of contact between the FBI and social-media platforms, however.  *Id.* 105:3-7 ("[W]e have agents on the different cyber squads and our private sector engagement squad who also relay information to the companies.").

856.   Chan graduated from the Naval Postgraduate School in 2021 with an M.A. in Homeland Security Studies.  *Id.* 10:16-17.  In connection with his master's degree, Chan authored a publicly available thesis entitled, "Fighting Bears and Trolls: An Analysis of Social Media Companies and U.S. Government Efforts to Combat Russian Influence Campaigns During the 2020 U.S. Elections."  *Id.* 11:3-16; Chan Ex. 1, at 1.  This thesis overtly relied only on publicly available documents, but it also reflected Chan's personal knowledge and experience of working with social-media platforms during the 2020 elections.  *See id.*

857.   Chan's thesis discussed "hack-and-dump activity," also known as "hack-and-leak" operations, as well as "Russian malign influence … on the social media platforms and on fake news websites that the Russians have created."  Chan Dep. 13:7-21.

858.   Chan's thesis relied on research performed by persons and entities comprising the Election Integrity Partnership, including Graphika, *id.* 145:1-6; and Renee DiResta of the Stanford

Internet Observatory, *id.* 51:20-52:7, 85:4-12.  Chan communicated directly with DiResta "about Russian disinformation," and had "[a] lot of conversations about Russian disinformation" with DiResta.  *Id.* 52:5-7, 52:24-25.

859.    Chan also knows Alex Stamos, the head of the Stanford Internet Observatory, from the time when Stamos participated on behalf of Facebook in the USG-Industry meetings.  *Id.* 54:2-19.  Chan and Stamos were involved in meetings about "malign-foreign-influence activities" on Facebook while Stamos was the chief security officer for Facebook.  *Id.*  Chan has also discussed "protecting platforms from hacking" with Stamos.  *Id.* 55:12-13.  And Chan's "colleagues at FBI headquarters regularly meet with researchers much more frequently than I do."  *Id.* 57:15-18.

860.    According to Chan, the FBI engages in "information sharing" with social-media platforms about content posted on their platforms, which includes both "strategic-level information" and "tactical information."  *Id.* 16:16-19.

**A. FBI's and CISA's Regular "USG-Industry" Disinformation Meetings**

861.    The FBI participates in a CISA-organized "industry working group" with Facebook, Twitter, and Google/YouTube, as well other social-media platforms.  *Id.* 18:21-24.  The social-media platforms that participate are Facebook, Microsoft, Google, Twitter, Yahoo! (a.k.a. Verizon Media), Wikimedia Foundation, and Reddit.  *Id.* 23:24-24:3.  On the U.S. Government side, the meetings are attended by representatives of CISA, the Department of Homeland Security's Intelligence & Analysis division ("I&A"), the Office of the Director of National Intelligence (ODNI), the FBI's Foreign Influence Task Force (FITF), and Elvis Chan on behalf of FBI-San Francisco when he is available.  *Id.* 24:9-19; *see also* Chan Ex. 6, at 37.  Chan later confirmed that "DOJ National Security Division" attends these "USG-Industry" meetings as well.  Chan Dep. 171:6-8.

862.    Chan participates in the meetings because most social-media platforms are headquartered in San Francisco, and "FBI field offices are responsible for maintaining day-to-day relationships with the companies that are headquartered in their area of responsibility."  *Id.* 24:21-25:4.  As a result, Chan serves as a frequent conduit for communication between federal officials, especially FBI officials but also others, and social-media platforms.  *See id.*

863.    Matt Masterson attended, and Brian Scully attends, the USG-Industry meetings on behalf of CISA.  They are "regular attendees" and "one of them is usually emceeing the meeting." *Id.* 25:15-18.  "For the 2020 election cycle, Mr. Masterson was … primarily the facilitator.  Ahead of the 2022 midterm elections, Mr. Scully has been the primary facilitator."  *Id.* 26:19-22.

864.    Chan also "participate[s] in the preparation meetings" for the USG-Industry meetings.  *Id.* 27:24-25.

865.    At these CISA-led "USG-Industry" meetings, "the disinformation content was shared by the social media companies.  They would provide a strategic overview of the type of disinformation they were seeing on their respective platforms," and the FBI "provided strategic unclassified overviews of the activities that we saw [Russian actors] doing."  *Id.* 156:9-157:1.

866.    The "USG-Industry" meetings "are continuing" at the time of Chan's deposition on November 23, 2022, and Chan assumes that they will continue through the 2024 election cycle. Chan Dep. 284:23-285:6.  Online "disinformation" continues to be discussed between the federal agencies and the social-media platforms at these meetings.  Chan Dep. 285:7-286:16.

**B. The FBI's Regular Bilateral Meetings with Social-Media Platforms.**

867.    The USG-Industry group meetings are not the only censorship-related meetings between the FBI and social-media platforms.  Chan also "hosted … bilateral meetings between each of the companies I mentioned"—*i.e.,* Meta/Facebook, Twitter, Google/YouTube,

Yahoo!/Verizon Media, Microsoft/LinkedIn, Wikimedia Foundation, and Reddit, *see id.* 23:24-24:3—"and the Foreign Influence Task Force." *Id.* 39:4-8.

868.    During these bilateral meetings, the FBI's FITF would also "bring in field offices that had cyber investigations" of "state-sponsored actors that the FBI was investigating that we believe were capable of hack-and-dump campaigns" during the 2020 election cycle. *Id.* 39:10-16. In other words, in the bilateral meetings, the FBI repeatedly raised the concern about the possibility of "hack and dump" operations during the 2020 election cycle during FITF's bilateral meetings with each of at least seven major social-media platforms. *Id.*

869.    These bilateral meetings between FBI and social-media platforms are continuing—they occurred during the 2020 election cycle, and they continued during the 2022 election cycle. *Id.* 39:18-40:1.  "They occur at roughly a quarterly cadence," but "the cadence increase[s] as elections get close," so that the meetings "become monthly as the election nears and then weekly very close to the elections." *Id.* 40:2-20.  These meetings will continue quarterly, monthly, and then weekly leading up to the 2024 election as well. *Id.* 41:5-15. The meetings also occurred "[o]n a quarterly cadence" during the 2018 election cycle. *Id.* 42:18-24.

870.    The companies with which FITF conducts these regular bilateral meetings include "Facebook, Google, Twitter, Yahoo!, Reddit, and LinkedIn," as well as "Apple and Wikimedia Foundation." *Id.* 41:24-42:7.  Apple was "added because they are a cloud infrastructure company; and we believe that tactical information, specifically indicates that we shared with them related to foreign-state-sponsored actors, might pop up on … any screening they do on iCloud." *Id.* 42:12-17.

871.    In these meetings, FBI officials meet with senior social-media platform officials in the "trust and safety or site integrity" role, *i.e.*, those in charge of enforcing terms of service and

content-moderation policies for the platforms.  *Id.* 43:5-44:1.  In other words, the FBI meets with the officials responsible for censoring speakers and content on the platforms—those "directly involved in the enforcement of terms of service for these various platforms," which "includes … content modulation of content on the platforms."  *Id.* 49:19-50:2.

872.    The FBI's "quarterly meetings" with social media platforms to "probe" questions about censorship of disinformation began as early as "in the 2017 time frame." *Id.* 87:24-88:14, 89:19-20.

873.    A large number of FBI officials attend each regular bilateral meeting about disinformation with each of those seven social-media platforms.  In addition to Chan and Laura Dehmlow, who is the head of FBI's Foreign Influence Task Force (FITF), "between three to ten" FITF officials attend each meeting, as well as "one field office comprised of two representatives" from each of "one to three field offices." *Id.* 109:21-22, 110:7-14.  Frequently the number of FBI agents attending each meeting "could be as high as a dozen." *Id.* 110:17-18.

874.    Likewise, large numbers of officials from the social-media platforms attend these regular bilateral meetings with the FBI about disinformation.  "[A] similar amount" of people attend each meeting from the platforms, and "for the three larger companies – specifically Google/YouTube, Facebook, and Twitter – it would be equal numbers or higher numbers than the FBI." *Id.* 110:21-25.

875.    In addition to all these meetings, on February 4, 2019, there was a meeting between Facebook, Google, Microsoft, and Twitter and the FBI's FITF, ODNI, and CISA to discuss election issues.  Elvis Chan attended, as did Director Krebs, Matt Masterson, and possibly Brian Scully of CISA.  Representatives of the social-media companies at the meeting included those

from the "trust and safety" or content-modulation teams, and "the social media companies were focused on discussing disinformation." *Id.* 151:9-154:6.

876.   Discovery obtained from LinkedIn contains 121 pages of emails between Elvis Chan and other FBI officials and LinkedIn officials setting up numerous meetings to discuss disinformation issues during the 2020 and 2022 election cycles.  Chan Ex. 2.  Chan confirms that he has a similar set of communications setting up a similar series of meetings with each of "six or seven other social-media platforms as well"—he has "similar types of correspondence" with the others, including Facebook, Twitter, Google/YouTube, etc.  Chan. Dep. 288:4-17.

877.   These emails confirm that Chan and the other FBI officials regularly met with senior officials at social-media platforms with responsibility for *content moderation*.  *See* Chan Ex. 2, at 3; Chan Dep. 292:7-293:8. The FBI meets with "director level and … their direct reports" from the "trust and safety and site integrity" teams.  Chan Dep. 293:4-8.

878.   The FBI communicates with social-media platforms using two alternative, encrypted channels—the self-deleting messaging app Signal, and the encrypted messaging service Teleporter.  Chan Dep. 295:7-296:9.

879.   For each election cycle, during the days immediately preceding and through election day, the FBI maintains a command center around the clock to receive and forward reports of "disinformation" and "misinformation," and the FBI requests that the platforms have people available to receive and process those reports at all times: "FBI headquarters, they just ran 24 hours a day for their command post, I believe from Friday to Tuesday.  FBI San Francisco ran from, I believe, 8:00 o'clock in the morning to perhaps 10:00 o'clock at night every day except the election, when we ran until midnight."  Chan Dep. 301:14-20.  In advance of the elections, the FBI "ask[ed]

the companies when they intended to have personnel on what days monitoring their platform for any threats that they saw."  Chan Dep. 301:21-24.

### C.     The FBI's Deceptive Information Censors the Hunter Biden Laptop Story.

880.     Elvis Chan, other FBI officials, and other federal officials repeatedly warned industry participants to be alert for "hack and dump" or "hack and leak" operations prior to the 2020 election, even though they had no investigative basis to issue such warnings.  These warnings provided the justification for the platforms to censor the Hunter Biden laptop story that the New York Post broke on October 14, 2020.  *See id.* at 232:1-234:3. These "hack and leak" or "hack and dump" warnings were issued many times, both in the "USG-Industry" meetings and in the FBI's bilateral meetings with social-media platforms.

881.     Hack and leak operations were discussed at the USG-Industry meetings.  *Id.* 172:3-5.  At the USG-Industry meetings, Elvis Chan and other FBI officials "warned the social media companies about the potential for a 2016-style DNC hack-and-dump operation."  *Id.* 172:23-173:1.

882.     During these meetings, Chan "warned the companies about a potential for hack-and-dump operations from the Russians and the Iranians on more than one occasion."  *Id.* 175:10-13.  Laura Dehmlow, the head of FITF, also "mentioned the possibility of hack-and-dump operations."  *Id.* 175:17-20.

883.     The prospect of hack-and-leak operations was also repeatedly raised "[a]t the FBI-led meetings with FITF and the social-media companies."  *Id.* 177:24-25.  It was also raised at the "CISA-hosted USG-industry" meetings.  *Id.* 178:1-6, 180:24-25.  "[T]he risk of hack-and-leak operations were raised at both sets of meetings, both at CISA-organized USG-industry meetings and the FITF-organized direct meetings between the FBI and social media platforms."  *Id.* 181:6-11.  Chan himself raised the warnings "regularly" at the bilateral FITF-platform meetings.  *Id.*

185:16-18.  Laura Dehmlow raised the warning at the USG-Industry meetings "that the FBI is concerned about the potential for hack-and-leak or hack-and-dump operations from foreign state-sponsored actors." *Id.* 187:1-4.  And Chan himself "recollect[s] mentioning the potential for hack-and-dump operations during the CISA-hosted USG-industry meetings." *Id.* 189:4-7.  Chan confirms that he raised these concerns "to the social media platforms on multiple occasions in two sets of meetings in 2020," including "the USG-industry meetings organized by CISA" and "the FITF organized meetings with the individual social media platforms." *Id.* 204:2-12.

884.    In the same time frame in 2020, as federal officials were repeatedly raising these concerns about hack-and-leak operations, some social media platforms updated their policies to provide that posting hacked materials would violate their policies and could result in censorship: "some social media companies adjusted or updated their terms of service or their community standards to say that they would not post any hacked materials." *Id.* 205:6-9. According to Chan, the "impetus" for these more restrictive censorship policies was the repeated concern raised by Chan, the FBI, and federal national-security officials about the risk of "a 2016-style hack-and-leak operation: "the impetus was in case there was a 2016-style hack-and-leak operation." *Id.* 205:14-21.  The FBI's repeated warnings, therefore, induced social-media platforms to adopt more restrictive censorship policies on hacked materials, *see id.*, which would then be used to censor the Hunter Biden laptop story.

885.    Chan denies that the FBI urged the platforms to change their terms of service to address hacked materials, but he admits that the FBI repeatedly inquired of the social-media platforms *whether* their policies would allow for or require the censorship of hacked materials. The FBI "wanted to know if they had changed their terms of service or modified it, and we wanted to know what they had changed," and thus the platforms "advise[d]" the FBI that "they had

changed" their policies "to reflect the ability to pull down content that results from hack operations." *Id.* 206:5-13.

886.   Again, Chan testified that, in meeting with platforms like Facebook, the FBI "asked, 'If you receive a whole -- if you see a trove of potentially hacked materials, what are you going to do about it?'  Which would be our way of asking them how their terms of service would handle a situation like that." Chan Dep. 247:25-248:4.  The FBI "ask[ed] how they would handle it if potentially hacked materials appeared."  Chan Dep. 248:5-8.  Chan believes they asked that question of Twitter, Facebook, and YouTube, and the social-media platforms responded, as he "remember[s] the social media companies having terms-of-service policies to handle this sort of situation."  Chan Dep. 248:14-16.  Both Facebook and Twitter, for example, "said that they would remove hacked materials if they were able to validate that it was hacked."  Chan Dep. 252:24-253:4.  These conversations happened "ahead of the 2020 elections."  Chan Dep. 253:6-7.

887.   The FBI asked the platforms how their policies would handle a hack-and-leak operation at the same time as repeatedly warning them about such operations—thus effectively inducing them to adopt such policies.  Chan Dep. 248:23-249:2.

888.   The FBI inquired about the platforms' hacked-materials policies because "internally we wanted to know what actions that we would need to take, whether we would need to take a legal remedy such as like a seizure warrant" to remove supposedly hacked materials. Chan Dep. 249:17-20.

889.   Chan was not the only FBI official to ask the platforms about their censorship policies for hacked materials.  Instead, this question was posed repeatedly by multiple FBI officials: "I would say we take turns asking. When I say 'we,' I mean either myself or the members of the Foreign Influence Task Force …. Wherever it seemed like an organic follow-up question,

we would ask 'How would your terms of service apply to this situation or that situation?'"  Chan Dep. 250:14-20.

890.    When asked, "did anyone within the FBI discuss or suggest with you that you should raise the prospect of Russian hack-and-leak operations with social media platforms in 2020?" Chan repeatedly responded with a stock answer, "I do not recollect."  *Id.* 189:14-23; 189:8-191:21, 203:13-15 ("I cannot recollect." … "I do not recollect." … "I do not recollect." … "I don't recollect." … "I don't recollect." … "I do not recollect.").

891.    These responses are not credible because they are stock responses, and it is facially implausible that Chan does not recall whether other federal officials discussed warning platforms about "hack-and-leak" operations during 2020, especially after the fiasco of censorship of the Hunter Biden laptop story.  These "I do not recollect" responses also contradict Chan's testimony later in the deposition that he "regularly" communicated with FITF and FBI's cyber division about the possibility of a hack-and-leak operation: "I believe that we internally discussed the potential for hack-and-leak operations, and so I regularly was in communication with the cyber division of the FBI as well as with the Foreign Influence Task Force to see if they had heard of anything that I had not heard of.  So I would say that the people that I communicate with, everyone was vigilant, but no one -- I believe that in general people at the FBI were concerned about the potential for hack-and-leak operations, but that we had not seen any investigations that led in that direction or that would lead us in that direction."  *Id.* 206:23-207:10.  He specifically admitted that he recalls discussing hack-and-leak operations with FITF officials "Ms. Dehmlow, Mr. Olson, Mr. Cone, and Mr. Giannini."  *Id.* 207:19-23.  It is not credible that the *only* aspect of his internal discussions with the FBI about hack-and-leak operations that he does not recall is whether someone from the FBI suggested or directed him to raise the issue with social-media platforms.

892.    Further, as revealed on the video of Chan's deposition, his demeanor in answering questions on this point changes and becomes evasive.  Chan's demeanor when testifying on this point undermines his credibility.

893.    The FBI and other federal officials had no specific investigative basis for these repeated warnings about possible "hack-and-dump" operations. As Chan admits, "[t]hrough our investigations, we did not see any similar competing intrusions to what had happened in 2016. So although from our standpoint we had not seen anything, we specifically, in an abundance of caution, warned the companies in case they saw something that we did not." *Id.* 174:7-13.  As Chan admits, "we were not aware of any hack-and-leak operations that were forthcoming or impending" when he and other federal officials warned about the "risk of hack-and-leak operations, especially before the general election." *Id.* 192:19-24.

894.    Matt Masterson and Brian Scully of CISA also raised the concern about the threat of hack-and-leak operations in the 2020 election cycle to the social-media platforms during the "USG-Industry" meetings that occurred quarterly, then monthly, then weekly leading up to the 2020 election. *Id.* 212:3-22.

895.    Yoel Roth, then-Head of Site Integrity at Twitter, provided a formal declaration to the Federal Election Commission containing a contemporaneous account of the discussion of the threat of "hack-and-leak operations" at the meetings between the FBI, other federal law-enforcement and national-security agencies, and the social-media platforms.  His declaration states: "Since 2018, I have had regular meetings with the Office of the Director of National Intelligence, the Department of Homeland Security, the FBI, and industry peers regarding election security.  During these weekly meetings, the federal law enforcement agencies communicated that they expected 'hack-and-leak operations' by state actors [*i.e.*, Russians or other foreign

governments] might occur in the period shortly before the 2020 presidential election, likely in October.  I was told in these meetings that the intelligence community expected that individuals associated with political campaigns would be subject to hacking attacks and that material obtained through those hacking attacks would likely be disseminated over social media platforms, including Twitter. These expectations of hack-and-leak operations were discussed throughout 2020. *I also learned in these meetings that there were rumors that a hack-and-leak operation would involve Hunter Biden*."  Chan. Ex. 8, ¶¶ 10-11, at 2-3 (emphasis added).   Yoel Roth executed this declaration on December 17, 2020, shortly after the events described, and submitted it to the Federal Election Commission in a formal enforcement proceeding, so it has the force of a statement under oath.  *Id.* at 4.

896.    Chan's account of these meetings largely matches Roth's account, *see, e.g.,* Chan Dep. 218:5-220:15, but there are two key discrepancies between Roth's and Chan's accounts.  First, Roth recounts that the FBI and national-security officials communicated to Twitter that they "*expected*" that there would be one or more hack-and-leak operations by Russia or other "state actors."   *Id.* at 2.  Chan testified that he believed they used words like "concern" instead of "expected."   Chan. Dep. 220:20-24, 224:5-17, 226:5-12, 227:3-6.   Second, Roth specifically recalls that federal officials told him that "there were rumors that a hack-and-leak operation would involve Hunter Biden."  Chan Ex. 8, ¶ 11, at 3.  Chan testified that "in my recollection, Hunter Biden was not referred to in any of the CISA USG-Industry meetings."  Chan Dep. 213:8-10; *see also id.* 227:24-228:1, 228:21-23, 229:9-11 229:15-20.

897.    On these points, Roth's declaration is more credible than Chan's testimony, for at least four reasons.  First, Roth's declaration was executed much closer in time to the events described—just two months later—while Chan's testimony occurred over two years later.  Indeed,

as noted above, Chan himself admitted that he "could not recollect" key details about the federal officials' course of conduct in warning social-media platforms about a supposed "hack and dump" operation, so there is no reason to think that Chan's recollection is more reliable on these similarly specific details.

898.    Second, Roth had no incentive to color or shade his account of communications from federal officials when he submitted this Declaration to the FEC, while Chan has strong incentives to shade his testimony on these points to deemphasize the FBI's involvement in censoring the Hunter Biden laptop story.  Indeed, if the FBI and other federal officials warned social-media platforms about a hack-and-leak operation *involving Hunter Biden*—when the FBI had received Hunter Biden's laptop from the Delaware repair-shop owner and thus *knew* that it was not hacked, *see* Doc. 106-3, at 5-11 —that raises a compelling inference that the FBI deliberately gave misleading information to social-media platforms to induce them to wrongfully censor the Hunter Biden laptop story.

899.    Third, Chan's testimony on a closely related point—whether Chan was instructed by an FBI official to warn social-media platforms about "hack and leak" operations—is not credible.  Chan's minor disagreements with Roth's account are not credible for similar reasons. For example, Chan claims to have extremely specific recollection of the FBI's word-choice in meetings that occurred over two years earlier—disputing that the FBI used the word "expected," *id.* 220:20-24, 223:12-22, 224:5-17, 226:5-12, 227:3-6, and affirmatively asserting with confidence that "Hunter Biden" was never mentioned, *id.* 213:8-10, 227:24-228:1, 228:21-23, 229:9-11 229:15-20—while at the same time claiming that he could not recollect whether he discussed the same issues with the FBI internally *at all*, *Id.* 189:14-23; 189:8-191:21, 203:13-15.

900.     Fourth, Chan's demeanor while testifying by videotape on this point is evasive and undermines his credibility.

901.     Two additional points support the credibility of Roth's account over Chan's.  First, Brian Scully's testimony, unlike Chan's, did not dispute or quibble with any aspect of Roth's near-contemporaneous account of these conversations—Scully merely contended that he could not remember.  Scully Dep. 247:18-248:2.

902.     Second, Roth's account directly matches the less detailed but even more contemporaneous account provided by Mark Zuckerberg in his testimony before Congress on October 28, 2020.  Zuckerberg's testimony confirms that, as Yoel Roth recounted, the FBI conveyed a strong risk or expectation of a foreign hack-and-leak operation shortly before the 2020 election: "So you had both the public testimony from the FBI and in private meetings alerts that were given to at least our company … that suggested that we be on *high alert and sensitivity* that if a trove of documents appeared that we should view that with suspicion, that it might be part of a foreign manipulation attempt."  Chan Ex. 9, at 56 (emphasis added).  Indeed, Chan did not dispute Zuckerberg's account: "I don't remember the exact framing of our discussions with them [*i.e.*, Facebook]."  Chan Dep. 247:14-15.  And again, Chan did not dispute the fundamental details of Zuckerberg's account; he admitted that he "hosted several private meetings with Facebook where the concern about a hack-and-leak operation was raised" in 2020.  Chan Dep. 246:17-20.  Though Chan did state that "I would not have framed it like Mr. Zuckerberg did," Chan essentially concedes the accuracy of Zuckerberg's account.   Chan Dep. 255:14-15.

903.     After the Hunter Biden story broke on October 14, 2020, Laura Dehmlow of the FBI refused to comment on the status of the Hunter Biden laptop in response to a direct inquiry

from Facebook, even though the FBI had the laptop in its possession since late 2019 and knew that its contents were not hacked.  Chan Dep. 213:11-215:5.

904.    When the Hunter Biden laptop story broke on October 14, 2020, it was widely censored on social media, including by Twitter and Facebook, pursuant to their hacked-materials policies.  For example, Twitter's Site Integrity Team "blocked Twitter users from sharing links over Twitter to the applicable New York Post articles and prevented users who had previously sent Tweets sharing those articles from sending new Tweets until they deleted the Tweets" sharing the Hunter Biden laptop story.  Chan Ex. 8, at 3.  "Facebook, according to its policy communications manager began 'reducing its distribution on the platform,' pending … a third-party fact check. Twitter went beyond that, blocking all users, including the House Judiciary Committee, from sharing the article on feeds and through direct messages.  Twitter even locked the New York Post account entirely, claiming the story included hacked materials and was potentially harmful."  Chan Ex. 9, at 2.

### D.    The FBI Routinely Flags Speakers and Content for Censorship.

905.    According to Chan, during the 2020 election cycle, "the U.S. government and social media companies effectively impeded [foreign] influence campaigns primarily through information sharing and *account takedowns*, respectively."  Chan Ex. 1, at i (emphasis added).

906.    According to Chan, the FBI's "information sharing" includes both "strategic information," which "discusses the tools, tactics or processes" used by foreign-influence campaigns, and "tactical information," which means identifying specific "indicators or selectors," which are both "a term of art" that refers to "IP addresses, email accounts, social media accounts, … website domain names, and … file hash values."  Chan Dep. 29:15-30:7.

907.    In other words, according to Chan, the FBI "shares information" with social-media platforms that includes information about specific IP addresses, email accounts, social-media accounts, and website domain names that the FBI believes should be censored, and this sharing of information leads social-media platforms to engage in "account takedowns" based on the FBI's information.  *See id.*  According to Chan, this combination of "information sharing" and "account takedowns" "effectively impeded [foreign] influence campaigns" during the 2020 election cycle. Chan Ex. 1, at i.

908.    Chan testified that the FBI shares this information with social-media platforms so that they can "protect their platforms"—indeed, "protect their platforms" was a stock phrase in Chan's testimony.   Chan Dep. 32:19, 34:7-12, 35:8-10, 36:25, 87:22-23, 274:14.   As Chan's testimony makes clear, however, the phrase "protecting their platforms" is a euphemism for "censoring speech that federal officials disfavor."   For example, Chan admits that "protect their platforms" means "knocking down accounts or knocking down misinformation content."  Chan Dep. 273:12-17.  Chan's thesis and testimony make clear that the FBI's purpose in "information sharing" with social-media platforms is to induce them to censor speech that the FBI dislikes and wants to see censored.   For example, Chan testified that "my purpose is to share the information with them so they can protect their platforms as they deem appropriate," but he immediately admitted that "one way to protect their platforms is to take down these accounts."  *Id.* 35:9-14. Thus, Chan admits that the FBI's "purpose" in "information-sharing" includes "to take down these accounts" that the FBI believes are Russian-influenced.  *Id.*

909.    Chan admits that the purpose and predictable effect of "tactical" information-sharing—*i.e.*, the FBI flagging specific accounts, websites, URLs, IP addresses, web domain names, etc., to social-media platforms for censorship—is that the platforms will take action against

such specific content and accounts under their content-moderation policies: "from what I have observed and what they have told me when we have provided them with high confidence of Russian selectors, that they have been able to discover fake Russian accounts and take them down." *Id.* 32:20-24.

910.    According to Chan, the social-media platforms "take the information that we share, they validate it through their own means. And then if they determine that these are accounts being operated by Russian state-sponsored actors, then they have taken them down." *Id.* 33: 12-17.

911.    Chan admits that, during the 2020 election cycle, the U.S. Government engaged in "information sharing with the social media companies to expose Russia's different operations and shut down its accounts." Chan Ex. 1, at xvii. In other words, Chan admits that the purpose of federal officials' "information sharing" was to "shut down … accounts" on social media that the Government disfavored. *Id.*; *see also* Chan Dep. 37:17-38:2.

912.    In addition to social-media platforms, Chan and the FBI also "share indicators" with state and local government election officials, such as "county registrars or county clerk's offices"—who are also state actors subject to the First Amendment. Chan "would share indicators with them," and "share the same type of information that I shared with social media companies," including "IP addresses and domain names, so that they could see if they were popping up anywhere on their networks." *Id.* 50:11-51:6. In other words, the FBI feeds information to state and local election officials so that they can make their own reports of supposed "misinformation" and "disinformation" to social-media platforms, creating a First Amendment feedback loop. The FBI seeds concerns with the state and local election officials, who then identify supposed "disinformation" and "misinformation" based on the FBI's information, and then report it to the social-media platforms through CISA and the FBI.

913.    Chan contends that Russian "state-sponsored actors … have created fake social media accounts," which "have either generated disinformation themselves or they have amplified existing content from current users of social media platforms." *Id.* 60:1-7.

914.    These supposedly Russian-controlled accounts "make their own content," such as "mak[ing] their own Facebook postings," and they "try to find what are the hot-button or current issues in the news … and then they will try to either generate content themselves related to that or they will amplify existing content." *Id.* 60:13-22. This is supposedly done with the goal to "sow discord in the American online environment." *Id.* 61:12-13.

915.    Chan agrees that "the goal there is … they post messages that they anticipate will be divisive and try and get Americans to engage with them." *Id.* 61:14-18.

916.    As Chan agrees, "engagement" with a social-media posting includes viewing the content, liking or disliking it, reposting it, commenting on it, and/or reposting it with commentary. *Id.* 61:19-63:13. All of these are First Amendment-protected activities. In this way, according to Chan, "the Russians are trying to get people to engage on their divisive content." *Id.* 63:19-64:1.

917.    According to Chan, over 126 million Americans "engaged" with Russian-originated content on Facebook, and 1.4 million Americans engaged with such content on Twitter, during the 2016 election cycle. *Id.* 66:2-25. All of this was First Amendment-protected activity. Chan credits federal government efforts during the 2020 election cycle with preventing the vast majority of such "engagement" by American citizens with Russian-originate content on social media during the 2020 election cycle. Chan Ex. 1, at v ("This thesis finds that the Russians shifted their tactics from 2016 to 2020. Still, the U.S. government and social media companies effectively impeded their influence campaigns primarily through information sharing and account takedowns,

respectively.").   Thus, the federal officials' "information sharing" activities prevented an enormous amount of First Amendment-protected activity from occurring.

918.    Chan's thesis and testimony provide clear examples of how supposedly Russian-originated "disinformation" on social media becomes intertwined with, and inseparable from, First Amendment-protected forms of expression by American citizens.   Chan identifies a supposedly Russian-originated political ad on Facebook that features a picture of Hillary Clinton with a black X painted over her face, advertising an event called "Down with Hillary!" and stating, "Hillary Clinton is the co-author of Obama's anti-police and anti-Constitutional propaganda."   Chan Ex. 1, at 29.   None of this is "disinformation" in any meaningful sense—it is actually expression of political opinions.   The posting notes that it received 763 reactions and 78 comments on Facebook, which Chan agrees are "engagements by users."   *See id.*; *see also* Chan Dep. 67:1-68:20.   Chan contends that the underlying ad was "Russian-originated content masquerading as something posted by an American," *id.* 67:6-10—*i.e.*, just the sort of content that the FBI would flag for censorship to social-media platforms through "tactical information-sharing."   But once the FBI induces Facebook to pull down the ad from the platform, the First Amendment-protected "engagements" by Americans—likes, dislikes, re-posts, comments, etc.—are all obliterated as well.   This is the collateral damage to *Americans'* freedom of speech in the FBI's war on so-called Russian "disinformation."

919.    Chan's thesis provides similar examples of supposedly Russian-originated content with heavy engagement by Americans.   For example, it reproduces two supposedly Russian-originated political ads containing a secure-borders message ("Secured Borders: Every man should stand for our borders! Join!") and a pro-Second Amendment message ("Defend the 2nd: The community of 2nd Amendment supporters, gun-lovers & patriots").   Chan Ex. 1, at 32.   Again,

these are expressions of political opinion, not "disinformation" in any meaningful sense.  The former posting garnered 134,943 "likes," and the latter posting garnered 96,678 "likes"—each of which is a First Amendment-protected expression of support for the underlying, supposedly Russian-originated, political message.  *See id.*  Another similar ad, targeting black voters, simply stated "Black Matters: Join us because we care. Black matters!" and it drew 223,799 "likes" from ordinary users.  *Id.* at 32; Chan Dep. 80:12-20.  Chan admits that these are "high" levels of "engagement" from ordinary users.  Chan Dep. 83:21.

920.    Chan also reports that "IRA employees used social media bots, i.e., computer programs which control social media accounts, to amplify existing content."  Chan Ex. 1, at 30.  To "amplify existing content" means to do "things like liking it or reposting it."  Chan Dep. 71:20-24.

921.    Based on research, Chan estimates that "over 100,000 real people had their postings amplified by [Russian]-controlled social media bots."  *Id.* 87:2-6.

922.    In addition, the "indicators" that the FBI targeted for censorship included supposedly Russian-aligned websites that hosted First Amendment-protected content posted by Americans.   For example, Chan identified a supposedly Russia-generated website called "PeaceData," which "hire[d] unwitting freelance journalists, including Americans, to write articles for the site."  *Id.* 141:24-142:3.  "[A]t least 20 freelance journalists, which includes Americans, had been duped into writing articles for the site."  *Id.* 142:4-9.  The FBI identified this site as Russia-generated to the social-media platforms, and as a result, the platforms "identified accounts that were foreign-associated … that were directing users to those platforms" and "t[ook] actions against those accounts."  *Id.* 143:10-20.  The speech of the American freelance journalists was thus suppressed due to FBI inducement.

923.    Similarly, Chan identified a website called "NAEBC" as a Russia-generated website. According to Chan, the Russians "used various social media accounts to engage with real users and convince them to post on the NAEBC site, which met with some success." *Id.* 144:13-145:2.  Thus, "the NAEBC site also included content drafted and written by real users that had posted on that site." *Id.* 145:3-6.  "The FBI flagged the NAEBC site to social-media platforms as a … Russian-originated source." *Id.* 146:12-15.  On that basis, "the companies were able to discover Russian-controlled accounts that were used to try to redirect users to those websites," and the platforms "said they had taken down those accounts." *Id.* 146:16-147:7.  The FBI thus induced the platforms to censor the speech of "real users" on a supposedly fake Russian website.

924.    Chan admits that "Russia's influence operations" are deeply intertwined with First-Amendment-protected speech by ordinary social-media users, as he describes: "Many factors are at play when trying to measure the effects of Russia's influence operations. First-order effects include real users interacting with inauthentic content, Russian-bot amplification of divisive organic content, and IRA-controlled accounts communicating directly with real users."  Chan Ex. 1, at 94.

925.    During the days surrounding the 2020 election, the FBI's command post also routed reports of domestic "disinformation" to social-media platforms for censorship to social-media. "During FBI San Francisco's 2020 election command post, which I believe was held from the Friday before the election through election night, that Tuesday at midnight, information would be provided by other field offices and FBI headquarters about disinformation …. These were passed to FBI San Francisco's command post, which I mentioned to you before I was the daytime shift commander, and we would relay this information to the social media platforms where these accounts were detected."  Chan Dep. 162:12-24.

926.   The FBI made no attempt to distinguish whether these reports of "election disinformation" "whether they were American or foreign." *Id.* 163:1-3. "[M]any field offices" of the FBI "relayed this information to us." *Id.* 163:7-11.

927.   "[T]hose reports would come to FBI San Francisco … and then FBI San Francisco would relay them to the various social media platforms where the problematic posts had been made," in order "to alert the social media companies to see if they violated their terms of service…. which may include taking down accounts." *Id.* 165:3-17.

928.   The FBI has about a "50 percent success rate" in getting reported disinformation taken down or censored by the platforms, *i.e.*, "that some action had been taken because it was a terms-of-service violation." *Id.* 167:7-14.

**E.     The FBI Demands Information on Censorship from the Platforms.**

929.   Regarding the algorithms that platforms use to detect inauthentic activity and to censor content, the FBI has "probed them to ask for details" about those algorithms, "so that we could make sure we were sharing the most effective and actionable type of information with them," *id.* 88:5-7, 20-22—in other words, to maximize the chances that disfavored speech would be censored as a result of the FBI's "information sharing."

930.   The FBI "would … ask them what their terms of service or community standards were." *Id.* 90:21-23.  But Chan contends that "we never told the companies to modify their terms of service or community standards." *Id.* 92:5-7.

**F.     The FBI Flags Accounts and URLs for Censorship on a Monthly Basis**

931.   The FBI gives "tactical information" to social-media platforms, where "tactical information includes identifying specific social media accounts and URLs" to be evaluated for censorship.  *Id.* 96:24-97:2.  Chan estimates that this occurs "one to five times per month." *Id.*

97:17-18.  This includes such "tactical" information-sharing at most quarterly meetings.  *Id.* 98:18-19.

932.    To flag such specific accounts, URLs, and content to the platforms, Chan "would typically … send an email to the recipients at the companies" notifying them that he would be using "a secure file transfer application within the FBI that is called Teleporter," and "the Teleporter email contains a link for them to securely download the files from the FBI."  *Id.* 98:20-11.  The Teleporter files contain "different types of indicators," *i.e.*, specific social-media accounts, web sites, URLs, email accounts, etc. that the FBI wants the platforms to evaluate under their content-moderation policies.  *Id.* 99:15.

933.    Each such communication may contain any number of such "indicators," ranging "from one account or one selector to many, like a whole spreadsheet full of them."  *Id.* 100:16-17.

934.    Chan "estimate[s] that during 2020 [he] shared information with the companies between one to five or one to six times per month."  *Id.* 100:21-24.  Each such incident of information-sharing included flagging a number of specific "indicators" that ranged anywhere from one to "hundreds" of specific accounts, web sites, URLs, etc... *Id.* 101:4-7.

935.    During the 2022 election cycle, Chan shared such information with the platforms "one to four times per month."  *Id.* 101:13-14.  Each such incident involved flagging a number of specific "indicators" that ranged anywhere from one to "in the tens, in the dozens" of specific accounts, web sites, URLs, etc.  *Id.* 101:17-19.

936.    "[I]n general" these flagging communications would go to all seven social-media platforms identified above, but sometimes there would be "company-specific information" that would go to a particular company.  *Id.* 102:3-9.  "[M]ost of the time we would share with that list of [seven] companies."  *Id.* 102:14-15.

937.    When it made such communications, the FBI would request that the platforms report back to the FBI their specific actions taken toward the accounts that the FBI specifically flagged for possible censorship. *Id.* 102:18-25. "[A]t every quarterly meeting we try to follow up to ask if information we shared has been relevant if we have not received a response yet." *Id.* 103:5-9. Sometimes, but not always, the platforms report back to the FBI on what accounts they have removed based on the FBI's information, in which case the FBI documents the report to "help[] us fine-tune the information we're sharing." *Id.* 103:14-22.

938.    Including Chan, at least *eight* FBI agents in the San Francisco field office are involved in reporting disinformation to social-media platforms—Chan himself, two GS-14 supervisors who report to Chan, and roughly five FBI field agents in two different squads within the office. *Id.* 105:19-108:18. All these agents share both "strategic" and "tactical" information with social-media platforms about supposed malign-foreign-influence content on platforms, and they are "involved in following up to find out if their tactical information was acted on." *Id.* 108:8-10.

939.    In addition, a significant number of FBI officials from FBI's Foreign Influence Task Force (FITF) also participate in regular meetings with social-media platforms about supposed disinformation. *Id.* 108:19-110:14. These include "three to ten" FITF officials at bilateral meetings with social-media platforms. *Id.* 110:7-8.

940.    The FBI uses both its criminal-investigation authority and its national-security authority to gather information about supposed malign-foreign-influence activities and content on social-media platforms. This specifically includes using "the Foreign Intelligence Surveillance Act … the PATRIOT Act, [and] Executive Order 12333 that allows us to gather national security intelligence" to investigate content on social media. *Id.* 111:13-112:8.

941.    In one case in 2020, for example, a single "Teleporter message was sent" to platform(s) "with a spreadsheet with hundreds of accounts," all of which the FBI was flagging for the platforms as supposed malign-foreign-influence accounts.  *Id.* 112:9-14.

942.    Chan expressed a high degree of confidence that the FBI's identification of "tactical information" (*i.e.*, specific accounts, URLs, sites, etc.) to social-media platforms was always accurate, and that the FBI never misidentified accounts, content, web sites etc. as operated by malign foreign actors when in fact they were operated by American citizens.  He testified that "we only share information that we have a high confidence that is attributed to a foreign-state actor," and that "[i]n my experience, it has always been correct."  *Id.* 112:15-113:16.

943.    But there are substantial reasons to think that Chan is wrong.  For example, Chan reports that the FBI induced Twitter to remove accounts and Tweets related to the #ReleaseTheMemo hashtag in 2019, which supported Congressman Devin Nunes' investigation regarding Russia collusion.  *Id.* 149:13-21; Chan Ex. 1, at 71 (noting that 929,000 Tweets removed by Twitter as supposedly Russian disinformation included thousands of Tweets amplifying the #ReleaseTheMemo hashtag).  In fact, recent reporting indicates that Twitter was aware that the accounts pushing #ReleaseTheMemo were *not* Russian-controlled inauthentic accounts, but core political speech by ordinary American citizens that the FBI conspired to suppress.

944.    The FBI's flagging accounts for censorship often leads to the censorship of additional accounts.  According to Chan, the FBI "may share, for example, one account with them, but then they may find ten connected accounts and take all of them down."  *Id.* 113:23-114:1.

**G.      Pressure from Congress Induces Platforms to Increase Censorship.**

945.    According to Chan, the social-media platforms were far more aggressive in taking down disfavored accounts and content in the 2018 and 2020 election cycles than they were in the 2016 cycle. *Id.* 115:18-116:6.

946.    Based on his personal observation, experience, and research, Chan concludes that "pressure from Congress, specifically HPSCI and SSCI," induced the social-media platforms to adopt more aggressive censorship policies in 2018 and 2020. *Id.* 116:1-3. "HPSCI" stands for the House Permanent Select Committee on Intelligence, and "SSCI" stands for the Senate Select Committee on Intelligence. *Id.* 116:11-14.

947.    This "pressure from Congress" took multiple forms.  First, those Congressional committees called "the CEOs for the companies … to testify in front of their committees," including "Mark Zuckerberg and Jack Dorsey and Sundar Pichai." *Id.* 116:20-117:2.  These CEOs were called to testify about disinformation on their platforms "more than once." *Id.* 117:5-6.  Chan believes that "that kind of scrutiny and public pressure from Congress … motivated them to be more aggressive in the account takedowns."  *Id.* 117:7-14.  Chan believes this based on conversations with social-media platform employees. *Id.* 117:15-118:2.

948.    Chan identifies specific congressional hearings that placed such pressure on social-media platforms to adopt more restrictive censorship policies: "On April 10–11, 2018, the Senate Commerce Committee and Senate Judiciary Committee held hearings on consecutive days with Mark Zuckerberg to discuss Russia's influence campaigns on Facebook and its countermeasures to combat them…. The Senate committees also used this as an opportunity to hold Facebook accountable for its actions and *exert pressure for positive change*."  Chan Ex. 1, at 50 (emphasis added).  "On July 17, 2018, the House Judiciary Committee held a hearing with senior executives from Facebook, Google, and Twitter so they could provide updates on their companies' efforts for

content filtering to stop foreign influence campaigns on their platforms." *Id.* On September 5, 2018, the Senate Intelligence Committee held a hearing with senior executives from Facebook and Twitter to discuss their companies' efforts to stop foreign influence campaigns and illegal transactions on their platforms." *Id.*

949.    Chan links these Congressional hearings to "constructive change," *i.e.*, more aggressive censorship policies by the platforms: "On October 31, 2017, the Senate Judiciary Committee held a hearing with senior executives from Facebook, Google, and Twitter to discuss the extent of the Russian disinformation campaigns on their respective platforms." Chan Ex. 1, at 48. "This public hearing … provided politicians with the occasion to exert pressure on the companies to make constructive changes to their platforms." *Id.* at 48-49. According to Chan, this "constructive change" means the adoption of more restrictive censorship policies. Chan Dep. 133:9-23.

950.    In addition, Congress put pressure on the platforms to adopt and enforce more aggressive censorship policies and practices by sending high-level congressional staff from HPSCI and SSCI to meet with the social-media platforms directly and threaten them with adverse legislation.   According to Chan, "staffers from both of those committees have visited with … those [social-media] companies," and after these meetings with congressional staffers, employees of the social-media platforms "would indicate that they had to prepare very thoroughly for these types of meetings … and they indicated that it felt like a lot of pressure." *Id.* 117:19-119:2.

951.    The Congressional staffers had such meetings with "Facebook, Google, and Twitter."   Employees from those three companies "experienced these visits from congressional staffers as exercising a lot of pressure on them." *Id.* 118:12-16.

952.     In those meetings, the Congressional staffers discussed potential legislation with the social-media platforms, and before or after they met with those three companies, the Congressional staffers "discussed with [Chan] … legislation that they were thinking about doing." *Id.* 118:17-120:3.

953.     It is Chan's opinion that the social-media platforms' "changes in takedown policies" to make them more restrictive "resulted from that kind of pressure from Congress." *Id.* 118:17-20.

954.     Chan's opinion is the result of discussing these meetings with participants on both sides—both the Congressional staffers and employees of Facebook, Twitter, and Google.  Chan "and FBI San Francisco personnel would meet with the congressional staffers, typically before they met or after they met with the social media companies," because "they wanted an FBI opinion about what they had heard from the social media companies." *Id.* 119:23-120:3.

955.     To the best of Chan's recollection, these meetings between Congressional staffers and social-media platforms were an "annual occurrence" that began in 2017 and recurred annually after 2017. *Id.* 120:7-8. "The staffers had separate meetings with each of the companies." *Id.* 121:4-5. "[A]fter those meetings, the staffers would come to [Chan] and ask [his] opinion of potential legislation." *Id.* 121:6-9.

956.     Chan also discussed these meetings with the social-media platform employees who participated, as he "talk[s] with the social media platform personnel regularly," and he understood from them that "the congressional staffers put a lot of pressure on them" in the meetings. *Id.* 122:18-25.  He spoke directly to the personnel who participated in the meetings. *Id.* 123:21-24. Senior officials from the social-media platforms, including Yoel Roth of Twitter, Steven Siegel of

Facebook, and Richard Salgado of Google, participated in the meetings with Congressional staffers. *Id.* 123:25-125:7.

957.   The Congressional staffers involved in the meetings were "senior-level staffers," including "a director-level" staffer, "the committee counsel or a senior counsel for the committee," and "one or two other … line-level staffers." *Id.* 123:6-13.

958.   According to Chan, "intense pressure from U.S. lawmakers and the media … eventually force[d] the social media companies to examine what had taken place on their platforms [in 2016] and strive to ensure that it did not happen in the future." *Id.* 127:3-23; Chan Ex. 1, at 42.

959.   These steps included actions by the social-media platforms to take more aggressive enforcement against violations of their terms of service, but also policy changes to the terms of service themselves to make their policies more restrictive: "the policy changes specifically to their terms of service or community standards." Chan Dep. 129:17-19. These involved "more robust or more aggressive content-modulation policies," that "clarify that certain things actually violate their policies and can be taken down." *Id.* 130:4-18.

960.   Chan notes that "Facebook and Twitter faced more Congressional scrutiny … as their senior executives testified before Congress on three separate occasions before the midterm elections," Chan Ex. 1, at 46, and he concludes that "political pressure from Congress was a contributing factor" leading social-media platforms to adopt more restrictive content-moderation policies.  Chan Dep. 132:7-9.  Chan believes that these more restrictive censorship policies that include "account takedowns" are "constructive change," *id.* 133:2-23.

961.   These policy changes, induced by "political pressure from Congress," resulted in a dramatic increase in censorship on social-media platforms, including for example that "zero [Twitter] accounts were taken down during the 2016 cycle but 3,613 Twitter accounts were taken

down during the 2018 cycle." *Id.* 133:24-134:5.  Likewise, 825 accounts were removed from Facebook and Instagram based on publicly available reports, but according to Chan, the actual number was much higher.  *Id.* 147:8-148:18.  In 2019, Twitter announced the takedown of "422 accounts which made 929,000 tweets." *Id.* 149:9-12.  "[S]ome subset of that amount was due to information [the FBI] provided." *Id.* 150:12-14.

962.    When meeting with social-media platforms, Chan "typically meet[s] with the trust and safety individuals and then their associated attorneys." *Id.* 135:16-18.

963.    Samaruddin K. Stewart ("Sam") of the State Department's Global Engagement Center "would meet with social media companies … primarily with policy individuals." *Id.* 135:2-15.

964.    Sam Stewart would offer "different types of software made by vendors that they would pilot to see if they could detect malign foreign influence on social media platforms." *Id.* 135:25-136:3.  Chan believed that the Global Engagement Center's products "might accidently pick up U.S. people information." *Id.* 138:10-12.

965.    Elvis Chan knows and has worked with Peter Strzok and Lisa Page. *Id.* 234:19-240:5.  He also knows and has worked with James Baker, the former general counsel of the FBI who went on to become deputy general counsel of Twitter and encouraged Twitter to keep censoring the Hunter Biden laptop story. *Id.* 239:13-16.

**H.    The FBI's Censorship Activities Are Ongoing.**

966.    Chan urges the public to report supposed misinformation on social media directly to the platforms, or else report it to the FBI or DOJ so that they can report it to the platforms, and boasts that the platforms are "very aggressive" in taking down misinformation.  As he stated in a public podcast just before the 2020 election: "If you're also seeing something related to the election

on your social media platform, all of them have portals where you can report that sort of information. They're being very aggressive in trying to take down any disinformation or misinformation, and then, lastly, if they see anything on election day or before election day, you can always report it to FBI.gov or justice.gov … We take all of these very seriously." Chan Ex. 13, at 3, 9:9-19. FBI San Francisco, when it receives such reports, "would then relay those to social media platforms," so that "the social media platforms will assess those in connection with their terms of service." Chan Dep. 267:13-23. Chan characterizes the platforms as "very aggressive" in taking down disinformation because they "[adjusted] their policies to be able to handle foreign-malign-influence operations." *Id.* 270:23-25.

967. The FBI continues the same efforts in 2022 and later election cycles that it pursued in 2020. As Chan publicly stated, "post 2020, we've never stopped … as soon as November 3rd happened in 2020, we just pretty much rolled into preparing for 2022." Chan Ex. 15, at 2, 8:2-4. Chan stated: "[W]e are also really engaged with the technology companies that are out here … We're also working with the social media companies to make sure that any foreign disinformation that's coming out … if we can identify them, we can share that information with them so they can knock down accounts, knock down disinformation content," and he noted that they are "having conversations with all of those organizations as they're building up to November of [2022]." Chan Ex. 15, at 2-3, 8:15-9:4.

## VII.   CISA's Censorship: Pressure, "Switchboarding," and Working Through Nonprofits.

968. CISA, the Cybersecurity and Infrastructure Security Agency within the Department of Homeland Security, serves as a "nerve center" for federal censorship efforts. CISA meets routinely with social-media platforms about censorship in at least five different sets of standing meetings, CISA pressures platforms to increase censorship of speech that federal officials disfavor,

and CISA serves as a "switchboard" by "routing disinformation concerns to social-media platforms" for censorship. CISA also seeks to evade the First Amendment by outsourcing many of its censorship activities to nonprofit agencies that it collaborates closely with, including the CISA-funded Center for Internet Security and its "EI-ISAC" ("Election Infrastructure – Information Sharing & Analysis Center") for state officials, and the massive censorship cartel calling itself the "Election Integrity Partnership."

969.    Brian Scully is the chief of the so-called "Mis, Dis, and Malinformation Team" or "MDM Team" within the Cybersecurity and Infrastructure Security Agency (CISA) in the Department of Homeland Security (DHS).   Scully Depo. 15:14-20.   Before the Biden Administration, the MDM Team was known as the "Countering Foreign Influence Task Force," or CFITF.

970.    Lauren Protentis is the "Engagements Lead" for the MDM Team, and she is in charge of "outreach and engagement to key stakeholders, interagency partners, [and] private sector partners," including "social media platforms."  Scully Depo. 18:2-18.  During relevant periods in both 2020 and 2022, however, Protentis was on maternity leave, and during those times, Scully performs her role as chief engagement officer for communicating with other federal agencies, private-sector entities, and social-media platforms about misinformation and disinformation. Scully Depo. 18:19-20:10.

971.    Both Scully and Protentis have done or are doing extended details at the National Security Council where they work on misinformation and disinformation issues.  Protentis began a one-year detail at the NSC in January 2023, as soon as she came back from maternity leave, and she will deal with mis- and disinformation issues for the NSC as part of her detail.  Scully Depo. 19:15:20:5.

## A.    CISA "Switchboards" by Flagging Government-Reported "Misinformation."

972.    Scully admits that, during 2020, the MDM team "did some switchboard work on behalf of election officials."  Scully Depo. 16:23-25.  "Switchboard work" or "switchboarding" is a disinformation-reporting system that CISA provides that allows state and local election officials (who are government officials subject to the First Amendment) "to identify something on social media they deemed to be disinformation aimed at their jurisdiction. They could forward that to CISA and CISA would share that with the appropriate social media companies."  Scully Depo. 17:3-8.

973.    In reporting perceived misinformation to the platforms, CISA and the state and local officials have "an understanding that if the social media platforms were aware of disinformation that they might apply their content moderation policies to it," and "the idea was that they would make decisions on the content that was forwarded to them based on their policies."  Scully Depo. 17:15-21.

974.    CISA's "switchboarding" activity causes social-media speech to be censored that otherwise would not have been censored: Scully agrees that "if it hadn't been brought to their attention then they obviously wouldn't have moderated it."  Scully Depo. 17:22-18:1.

975.    Scully contends that "we didn't do switchboarding in 2022."  Scully Depo. 21:24-25.   But he admits that this decision was made in late April or early May 2022.  Scully Depo. 22:15-23.  This lawsuit was filed, specifically challenging CISA's "switchboarding" activity, on May 5, 2022.  Doc. 1.

976.    Throughout the 2022 election cycle and through the present date, CISA continues to publicly state on its website that the MDM Team "serves as a switchboard for routing disinformation concerns to appropriate social media platforms": "The MDM team serves as a

switchboard for routing disinformation concerns to appropriate social media platforms and law enforcement. This activity began in 2018, supporting state and local election officials to mitigate disinformation about the time, place, and manner of voting. For the 2020 election, CISA expanded the breadth of reporting to include other state and local officials and more social media platforms." Scully Ex. 24, at 3; *see also* Cybersecurity and Infrastructure Security Agency, "Mis, Dis, Malinformation," https://www.cisa.gov/mdm (visited Feb. 4, 2023).

977.    According to Scully, "switchboarding is CISA's role in forwarding reporting received from election officials, state/local election officials, to social media platforms." Scully Depo. 23:24-24:2.

**B.    CISA Organizes the "USG-Industry Meetings" on Misinformation.**

978.    The MDM Team continues to communicate regularly and extensively with social-media platforms about misinformation and disinformation, including during the 2022 election cycle. These communications include at least "two general types of communications, one, we did regular sync meetings between government and industry, so federal partners and different social media platforms." Scully Depo. 21:2-6. This is "a coordinated meeting. Facebook was the industry lead, so [Scully] would have coordination calls with them prior to the meetings, just to set the agenda for meetings…" Scully Depo. 21:6-10. These meetings are described in CISA's interrogatory responses as "USG-Industry" meetings. Scully Ex. 12, at 38-40.

979.    In addition, the MDM Team received regular reports from social-media platforms about any changes to their censorship policies or their enforcement actions on censorship: "if a platform was putting out a … public report on policies or activities" relating to disinformation and censorship, CISA would "get a briefing on that or at least get an awareness that it was going out." Scully Depo. 21:11-16.

980.    The USG-Industry meetings increase in frequency as each election nears.  In 2022, they were "monthly" as the election approached, and then in October, they became "biweekly," so that there were two "biweekly meetings … prior to the [2022] election."  Scully Depo. 24:16-21.

981.    "DOJ, FBI, ODNI, and … DHS" participate in these meetings on the federal government's side.  Scully Depo. 25:23. DHS's participation includes at least two components: CISA, typically represented by Scully and Geoff Hale, Scully's supervisor; and the Office of Intelligence and Analysis ("I&A").  Scully Depo. 25:11-26:13. Scully's role is to "oversee" and "facilitate the meetings."  Scully Depo. 25:14-16.  On behalf of CISA, Kim Wyman, Allison Snell, and Lauren Protentis also participate in the meetings. Scully Depo. 28:4-13.

982.    On behalf of FBI, FITF Chief Laura Dehmlow and Elvis Chan participate in these "USG-Industry" meetings, and "periodically other people would be on from different parts of FBI," while "Laura [Dehmlow] was usually who [CISA] coordinated through."  Scully Depo. 29:14-30:12.

983.    These "USG-Industry" meetings have been occurring "for years," and "the first meeting we had … between federal and … industry was in 2018."  Scully Depo. 31:10-16.

984.    In addition, prior to each "USG-Industry" meeting, CISA hosts at least two planning meetings before the main meeting: a bilateral planning meeting between CISA and Facebook, and an interagency meeting with the federal agencies that participate.  Scully Depo. 36:21-37:13.

985.    Even though the 2022 meetings were still quite recent at the time of his deposition, Scully professed that "I don't recall specifics, so I'll just say that upfront" about the discussions at these meetings.  Scully Depo. 37:19-20; *see also* Scully Depo. 39:23-25.

986.    The social-media platforms attending these meetings include "Facebook, Twitter, Microsoft, Google, Reddit, … [and] LinkedIn," as well as "others."  Scully Depo. 38:15-20.  For example, Wikimedia Foundation participated in "some."  Scully Depo. 39:2-6.

987.    Scully agrees that "concerns about misinformation and disinformation on social media platforms [were] discussed in these meetings in the 2022 timeframe."  Scully Depo. 39:7-11.  This includes federal officials reporting on disinformation concerns that they believe will affect speech on social media; for example, the "intelligence community" would report on "information operations": "the intelligence community, if their reporting included foreign actors who were potentially going to use information operations, they might mention that in their briefings."  Scully Depo. 39:19-23.

988.    The social-media platforms, likewise, would report back to federal officials about disinformation "trends" on their platforms, and provide additional information to the federal government not included in their public reports about such trends: "the platforms, they might share some high-level trend information from public reporting that they put out.  So a lot of the platforms do their own regular reports on what they're seeing on their platforms and … what actions they're taking. And so the platforms, themselves, would share that type of information…. they would share essentially what they were getting ready to make public or what they had already made public… and then potentially provide some additional context around that."  Scully Depo. 40:4-22.  The government would ask for additional information about their observations of disinformation trends on social media, and the platforms would provide it: "they would share that, and if the government had questions or was looking for additional context they would often talk about that, they would generally talk about any new tactics that they were seeing."  Scully Depo. 41:1-5.

989.     Scully admits that the discussion of foreign-originated misinformation is ultimately targeted at preventing domestic actors' from engaging in certain government-disfavored speech. He states that "my recollections for the time period we're talking about here, from September 2022 to the election in 2022, I recall most of it was foreign based.  But … often what you see overseas essentially makes its way to the United States."  Scully Depo. 41:6-12.

990.     At the various meetings, the platforms discuss misinformation and disinformation as "coordinated inauthentic behavior," which is subject to removal under their terms of service, but Scully admits that "coordinated inauthentic behavior" concerns CISA because it "could lead to mis and disinformation, for sure."  Scully Depo. 42:12-14.

## C.     CISA Is Deeply Embedded in the Election Integrity Partnership.

991.     Scully admits that CISA has established relationships with researchers at "Stanford" and the "University of Washington," as well as "Graphika."  Scully Depo. 46:23, 48:1-4.  CISA's coordination with these researchers has continued since before the 2020 election cycle. Scully Depo. 47:22-25.  Detailed additional information about these entities and their collaboration with CISA in the "Election Integrity Partnership" (or "EIP") is provided below.  *See infra*.

992.     Stanford Internet Observatory, University of Washington, the Atlantic Council, and Graphika are all involved in the EIP.  Scully Depo. 48:1-22.

993.     When EIP was starting up, Scully admits that CISA's "involvement" with the EIP included at least the following collaborations: (1) "a couple of our [CISA] interns came up with the idea and … [CISA] had some communications with" the EIP.  Scully Depo. 49:8-10.  (2) CISA "received some briefings on the work that they were doing."  Scully Depo. 49:13-14.  (3)  CISA "had some communications early on in the process, when they were making decisions, when Stanford was trying to figure out what the gap was."  Scully Depo. 49:18-21.  (4) CISA "connected

them [EIP] with the Center For Internet Security," which is a CISA-funded nonprofit that channels reports of disinformation from state and local government officials to social-media platforms. Scully Depo. 50:5-6. (5) CISA also "connected them [EIP] with some of the election official groups," *i.e.*, "the National Association of Secretaries of State [NASS] and the National Association of State Election Directors [NASED]," both of which are groups of state and local government officials. Scully Depo. 50:6-10. (6) And CISA "facilitated some meetings between those three." Scully Depo. 50:10-11.

994.    The CISA interns who originated the idea of the EIP "worked for the Stanford Internet Observatory, as well … which was part of the [Election Integrity] Partnership." Scully Depo. 51:7-8, 22-24.

995.    According to Scully, the "gap" that the EIP was designed to fill, was that state and local election officials lack the resources to monitor and report on disinformation that affects their jurisdictions: "One of the gaps that we identified from 2018 is, as you know, most election officials their offices are fairly low staff, low resourced, and so there was no – they didn't have capabilities to try to identify disinformation targeting their jurisdictions, and so was essentially the gap is that most election offices throughout the country just didn't have that capacity or capability to be monitoring so that they could identify anything that would be potentially target their jurisdictions, so that was the gap." Scully Depo. 57:6-17.

996.    Scully and other CISA officials identified the "gap" as a problem to CISA interns who were simultaneously working for the Stanford Internet Observatory: "So we had a conversation with the interns, and they were asking questions about kind of needs that the election officials have, generally. One of the gaps that we identified from 2018 is, as you know, most

election officials their offices are fairly low staff, low resourced, and so … they didn't have the capabilities to try to identify disinformation targeting their jurisdictions." Scully Depo. 57:2-11.

997.    Thus, Scully and other CISA officials were involved in originating and brainstorming about the creation of the EIP in the first place, as they "had some initial conversation with the interns" about this "gap," and then they also "had a conversation with the Stanford Internet Observatory folks about the gap." Scully Depo. 52:3-6.   Then, CISA "received a briefing from them [EIP], or two, on kind of what they were putting together." Scully Depo. 52:7-9.  Scully and other CISA officials then "facilitated some meetings between Stanford folks, the Center For Internet Security, and election officials, where they had discussions about how they would work together." Scully Depo. 52:10-13.  And CISA's involvement did not end there, as Scully admits that "we had some conversations, kind of throughout, when they were -- particularly when they were putting out public reporting about what they were seeing." Scully Depo. 52:14-17.   In addition, Scully "wouldn't be surprised if there were some other kind of brief conversations in there." Scully Depo. 52:18-20.

998.    The EIP continued to operate during the 2022 election cycle. Scully Depo. 53:4-5. At the beginning of the 2022 election cycle, the EIP "gave us [CISA] a briefing, early on, about what they were thinking about," which occurred in "May/June of 2022." Scully Depo. 53:14-19. Scully and Geoff Hale of CISA received the briefing from Renee DiResta and another EIP official. Scully Depo. 53:22-54:7.  In that briefing, the EIP officials "walked through what their plans were for 2022, [and] some of the lessons learned from 2020." Scully Depo. 54:11-13.  Their plans for 2022 were that "they were going to do something similar to what they did in 2020 in terms of trying to support election officials." Scully Depo. 54:16-18.  They planned to "work with state and local election officials." Scully Depo. 54:22-25.

999.    CISA followed EIP's public reporting during the 2022 election cycle, and in particular, Scully relied on "at least one public report … that I thought was pretty good," which was "about specific disinformation" and "was basically how to think about whether or not a narrative poses risks."  Scully Depo. 56:12-17.

1000.   Scully admits that CISA has "an established relationship" with the EIP and the Stanford Internet Observatory personnel who lead it.  Scully Depo. 55:24-25.

1001.   The Center for Internet Security is a "non-profit that oversees the multi-state ISAC and the election infrastructure subsector information sharing and analysis center, that's what ISAC stands for."  Scully Depo. 59:13-16.  In other words, CIS oversees the "Multi-State Information Sharing and Analysis Center," or "MS-ISAC," and the "Election Infrastructure Information Sharing and Analysis Center," or "EI-ISAC."  Scully Depo. 60:9-20.  Both of these are organizations of state and/or local government officials, organized for information sharing.  Scully Depo. 60:3-11, 60:25-61:6.

1002.   CISA funds the Center for Internet Security in its activity of overseeing the EI-ISAC, which is an organization for information-sharing among state and local government election officials.  Scully Depo. 61:9-10, 62:1 ("CISA provides funding for the EI-ISAC").

1003.   CISA directed election officials to the Center for Internet Security, which CISA funds, as an alternative route for reporting misinformation to social-media platforms, because CISA found the "switchboarding" role to be resource-intensive.  Scully Depo. 62:16-24.

1004.   CISA connected the Center for Internet Security with the EIP because "the EIP was working on the same mission," so "we wanted to make sure that they were all connected."  Scully Depo. 62:24-63:1.  Thus, CISA originated and set up the collaborations between local government officials and the CIS, and between the EIP and the CIS.  *Id.*

1005.   The Center for Internet Security worked closely with CISA in reporting misinformation to social-media platforms, as CISA served as a pass-through for reports from CIS to the platforms: CIS officials "were receiving reporting directly from election officials. In the early part of 2020, they would forward what they were receiving election officials to us at CISA, and then we would push that to the social media platform; as 2021 moved along, CIS more frequently provided that directly to the platforms, themselves.  And so I would say early on in the process, the switchboarding generally came through CISA. Later on in the process, it was more of a mixed bag of how the switchboarding worked." Scully Depo. 63:23-64:10.

1006.   In addition to CIS and CISA, EIP also reported supposed misinformation to social-media platforms.  Scully Depo. 64:13-14.  CISA and CIS coordinated directly with each other on reporting misinformation.  Scully Depo. 64:18-20.

1007.   CISA served a mediating role between CIS and the EIP, and the platforms, to coordinate their efforts in reporting misinformation to the platforms: "There was a point where one of the platforms was concerned about too much kind of duplicate reporting coming in, and so we did have some conversations with EIP and CIS on how to kind of better manage that activity to make sure we weren't overwhelming the platforms." Scully Depo. 64:21-65:1.

1008.   There was also direct email communication between EIP and CISA about misinformation reporting.  Scully Depo. 66:9-12.

1009.   When CISA reported misinformation to platforms, CISA would "generally copy the Center for Internet Security," which was coordinating with EIP.  Scully Depo. 67:20-68:6.

1010.   Alex Stamos and Renee DiResta of the Stanford Internet Observatory briefed Scully about the EIP's report, "The Long Fuse," in "late spring, early summer 2021."  Scully Depo. 70:1-10.  Scully also reviewed portions of the report.  *See id.*; Scully Ex. 1 (EIP Report).

1011.   Dr. Kate Starbird of the University of Washington, who works with the EIP, is also on the MDM Subcommittee for CISA.  Scully Depo. 72:19-73:4.  Kate Starbird of the University of Washington serves on CISA's CSAC MDM Subcommittee, as well as working with the EIP. Scully Ex. 59, at 1.

1012.   Alex Stamos and Renee DiResta, who quarterback the EIP, also have roles in CISA. Renee DiResta of the Stanford Internet Observatory—a key player in the EIP—also serves as a "Subject Matter Expert (SME)" for the CISA's Cybersecurity Advisory Committee's MDM Subcommittee.  *Id.*; Scully Depo. 361:19-362:6.  Alex Stamos, the director of the Stanford Internet Observatory who launched the EIP, serves on the CISA Cybersecurity Advisory Committee, along with Kate Starbird.  Jones Decl., Ex. FF, at 3, 12-13.

1013.   CISA had extensive communications to coordinate with the EIP when it was starting up during the 2020 election cycle: "we had conversations with Stanford about the gap. They gave us some briefings on what they were doing, how they were doing it.  Prior to the election, we had some conversations with them to facilitate and coordinate meetings, as I mentioned. And then when they put public reporting out, if we had questions about it, we would probably have conversations with them around that, as well."  Scully Depo. 74:17-75:1.

1014.   In addition to Scully, Matt Masterson was involved in communicating with the EIP. Scully Depo. 75:6-11.  In addition, Scully "wouldn't be surprised" if Geoff Hale participated in some conversations with EIP.  Scully Depo. 76:1-2.

1015.   The then-Director of CISA, Director Krebs, "had a relationship with Alex Stamos," the head of the Stanford Internet Observatory, while CISA was coordinating with the EIP, and Director Krebs "may have had conversations in that context" about the EIP.  Scully Depo. 76:8-

10.   In fact, when he left CISA in late 2020, Director Krebs "joined Alex Stamos," and "they started a business together," called the "Krebs/Stamos Group."  Scully Depo. 76:5-23.

1016.   Scully believes that "Director Krebs may have participated in a couple of meetings that I'm aware of, that Stamos was also in."  Scully Depo. 77:20-22, 78:3-11.

1017.   According to Scully, "generally speaking, the reporting that CISA received came through the Center for Internet Security."  Scully Depo. 79:19-21.

1018.   Matt Masterson and Scully presented questions to the EIP about their "public reporting," which consisted of "regular blog posts on what they were seeing" about supposed election-related misinformation.  Scully Depo. 81:19-82:16.  Masterson was also involved in at least one of the initial discussions with the Stanford Internet Observatory about starting up the EIP.  Scully Depo. 81:24-82:4.  Masterson spoke to Stanford about "clarifying the gap that election officials faced for the folks at the Stanford Internet Observatory early on in the process."  Scully Depo. 83:22-25.

1019.   The idea of the "gap" came from Scully and CISA, which he "shared with the interns."  Scully Depo. 84:8-22.

1020.   Matt Masterson "was in the meeting where we talked about the gap with [Alex] Stamos, in particular.  And I believe Stamos mentioned that [*i.e.*, the collaboration that became the Election Integrity Partnership] as an option during that call."  Scully Depo. 85:21-24.

1021.   Matt Masterson left CISA in January 2021.  He started at Microsoft in early 2022.  In the intervening year, immediately after leaving CISA, Masterson "was a fellow at the Stanford Internet Observatory."  Scully Depo. 88:21-89:8.  Thus, both the CISA Director (Krebs) and the political appointee directly involved in the establishment of the EIP (Masterson) went to work with Alex Stamos of Stanford Internet Observatory immediately after the 2020 election cycle.

1022.   Alex Stamos consulted with CISA in part because "he knew he would need us helping him connect with election officials." Scully Depo. 100:17-18.

1023.   Scully believes that there was at least "a fifth call" between CISA and Alex Stamos in 2020. Scully Depo. 101:4.

1024.   Scully put Stamos in touch with NASED and NASS, and "facilitated some meetings between … them [EIP] and election officials." Scully Depo. 101:15-102:10.   Scully "facilitated meetings … some meetings between EIP and CIS" because "they didn't have relationship" and "didn't know each other.   So [CISA] just facilitated getting them together to talk and figure out how they were going to work together." Scully Depo. 102:14-20.   The purpose of these meetings was "to set up a direct line of communication between CIS and EIP." Scully Depo. 103:7-10.

1025.   Scully also put EIP in contact and facilitated meetings between EIP (*i.e.*, folks at the Stanford Internet Observatory, which organized EIP) and representatives of NASED and NASS, the organizations of state and local election officials. Scully Depo. 103:11-104:19.   These occurred in July or August 2020. Scully Depo. 104:24-25.

1026.   Scully believes that the Center for Internet Security, which CISA funds, "forward[ed] messages that election officials sent them" reporting misinformation "to EIP." Scully Depo. 106:10-16.

1027.   Scully agrees that "EI-ISAC is a part of CIS and we do fund the EI-ISAC." Scully Depo. 110:20-23.

1028.   Scully agrees that CISA collaborated with the EIP. Scully Depo. 111:15-18.

1029.   CISA probably had "between two and four" conversations with the EIP about its public reports on disinformation trends on social media. Scully Depo. 113:20-24.   "[I]f we had a question about jurisdiction[s] being targeted or a new [disinformation] tactic or things like that,

we would just ask them … questions about that sort of thing."  Scully Depo. 114:17-21.  Scully "was following the public reports" from the EIP during 2020.  Scully Depo. 115:16-17.

1030.   CISA received misinformation reports principally from three sources: first, from the Center for Internet Security; and second, "sometimes election officials would send them in to CISA central, which is CISA's kind of ops center block room type setup.  And then the third way was they would just send direct to a CISA employee, … often Matt Masterson, who had relationships with many of the election officials."  Scully Depo 119:7-11, 119:22-120:5.

1031.   CISA coordinated with the Center for Internet Security on reporting misinformation to platforms: "we would let them know when we reported something to a platform … to avoid duplication," and "most of the reporting that I recall in 2020 came through CIS. And so we just wanted to let them know that we were acting on what they sent us.  For reporting that didn't come through CIS, we would often let them know after we had shared it with the platforms that we had shared something with the platforms for their arrangement."  Scully Depo. 120:23-121:9.

1032.   CIS and EIP also "had a relationship.  They shared information."  Scully Depo. 121:20-21.

1033.   According to Scully, "CISA does not do attribution.  We didn't do analysis of what we received from election officials.  So we would not know what percentage" of misinformation reports "were foreign derived."  Scully Depo. 122:25-123:3.  CISA thus forwards reports of "misinformation" to social-media platforms "without assessing whether they were originated from foreign or domestics sources."  CISA would not "take steps to see whether this came from foreign or domestic sources," but "would just pass it along to the social-media platforms." Scully Depo. 123:4-18.

1034.   Scully was aware that social-media platforms changed their content-moderation policies to be more restrictive of election-related "misinformation" during the 2020 election cycle, because the platforms reported on those changes to federal officials "in our regular sync meetings," *i.e.*, the "USG-Industry" meetings.  Scully Depo. 127:18-19.  In those meetings, "that would be one of their briefing points, that they were making significant changes" to policies for censoring election-related speech.  Scully Depo. 128:4-6.

1035.   During 2020, Matt Masterson was "a senior election security person at CISA," and he was a "political appointee."  Scully Depo. 129:23-130:4.  Masterson was "familiar with the switchboarding work that we were doing."  Scully Depo. 131:8-10.  And "when he would receive emails" reporting misinformation, "he forwarded them to us."  Scully Depo. 131:13-14.

1036.   Scully understands that the Virality Project was "Stanford's attempt to mimic the EIP for COVID."  Scully Depo. 134:10-11.

1037.   The Virality Project "sent [Scully] some of their public reports."  Scully Depo. 134:13-14.

1038.   Scully was aware that Alex Stamos and Renee DiResta of the Stanford Internet Observatory were involved in the Virality Project.  Scully Depo. 134:21-22.

1039.   Scully "did have some conversations where they were … asking me … for any connections I had with HHS or CDC."  Scully Depo. 135:10-12.

1040.   In addition, Scully recalls "some informal … conversations that I may have had with Alex, in particular, and maybe Renée, as well," about the Virality Project. Scully Depo. 136:3-6.

1041.   Alex Stamos gave Scully an "overview what they planned to do in the Virality Project" that "was similar to what they did … with the EIP."  Scully Depo. 136:19-22.

1042.   Scully also had conversations with Renee DiResta about commencing the Virality Project.  Scully Depo. 139:5-14.

1043.   With respect to the EIP, Alex Stamos and Renee DiResta "shared … lessons learned," and "what some of their big takeaways were" with Scully.  Scully Depo. 141:6-8.

1044.   CrowdTangle is a "Facebook-owned social media monitoring service."  Scully Depo. 144:23-24.

1045.   According to the Virality Project report, "as voting-related mis-and disinformation arose in the 2020 presidential election, the Election Infrastructure Information Sharing and Analysis Center (EI-ISAC) served a critical role in sharing information with the Election Integrity Partnership and pushing its rapid response analysis back out to election stakeholders across all states."  Scully Ex. 2, at 150.  Scully understands that this refers to the Center for Internet Security, which operates the EI-ISAC through CISA-provided funding, and that "it was Center for Internet Security" that engaged in direct communications with the EIP and played a critical role in sharing information with the EIP.  Scully Depo. 147:17-25.

1046.   During the summer of 2020, CISA was "piloting a capability that would allow us to monitor narratives online," Scully Depo. 151:13-15—*i.e.*, the work that the EIP eventually did and does.

1047.   In his public statements, Alex Stamos has identified the EIP's "partners in government" as "most particularly those in CISA and DHS, but also in all of the local and state governments with whom we operated with."  Scully Ex. 6, at 4.  Scully agrees that "CISA and DHS were partners of the EIP."  Scully Depo. 369:1-11.

1048.   According to Stamos, "[t]he Election Integrity Partnership started with our team in Stanford sending a group of interns to go work with the cyber security and infrastructure security

agency at the DHS to work election security. And what these interns found is, there's a lot of opportunity for them to contribute to the technical components of election security. They also found that there was a lack of capability around election disinformation. This is not because CISA didn't care about disinformation, but at the time they lacked both kind of the funding and the legal authorizations to go do the kinds of work that would be necessary to truly understand how election disinformation was operated." Scully Ex. 6, at 4.

1049.   Stamos says that the EIP is "a project between four different institutions to try to fill the gap of the things that the government cannot do themselves." Scully Ex. 6, at 4.

1050.   Stamos states that CISA was one of "four major stakeholders" in the EIP: "There are kind of four major stakeholders that we operated with that we worked beside at EIP. Our partners in government, most particularly those in CISA and DHS, but also in all of the local and state governments with whom we operated with." Scully Ex. 6, at 4.

1051.   EIP had access to data for monitoring social-media speech that the federal government does not have:  The EIP "also worked with the major platforms, Facebook, Twitter, YouTube, TikTok, Reddit, NextDoor and the like. … [S]ome of those cases we had agreements for access of data. In other cases, we had to have individual analysts go work with them." Scully Ex. 6, at 5.

1052.   According to Stamos, there was very little foreign disinformation in 2020: "We find very little evidence that there's any foreign involvement at all. In fact, the vast majority of election disinformation in 2020 came from Americans who had verified accounts and very large follower accounts." Scully Ex. 6, at 6.

1053.   According to Stamos, its founder, the EIP targeted "large follower account political partisans who are spreading misinformation intentionally, doing so in a multi-media context. So

they're doing so online, on social media, but they're also doing so on cable news, doing so on the radio, through a variety of different outlets and are able to amplify their message and to motivate their followers to go try find evidence of the incorrect claims that they're making." Scully Ex. 6, at 7.

1054.   According to Renee DiResta, "in August 2020, students from the Stanford Internet Observatory were doing an internship with CISA and they identified a massive gap in the capability of federal, state, and local governments to become aware of, to analyze, and to rapidly respond to mis and disinformation, both foreign and domestic, targeting the 2020 election." Scully Ex. 7, at 4.   The EIP was designed to fill that "gap" in the governments' capability to "rapidly respond to mis- and disinformation … targeting the 2020 election." *Id.*

1055.   As DiResta notes, the EIP was designed to get around "unclear legal authorities, including very real First Amendment questions," that would arise if CISA or other government agencies were to monitor and flag misinformation for censorship on social media.  Scully Ex. 7, at 4.  As she states, "that gap had several components. The federal government wasn't prepared to identify and analyze election mis- and disinfo. …There were unclear legal authorities, including very real First Amendment questions." *Id.*

1056.   DiResta agrees that "the vast majority of voting related misinformation in the 2020 election was domestic." Scully Ex. 7, at 6.

1057. The Virality Project was immediately established on the heels of the EIP: "Following the success of EIP and the certification of the 2020 election, SIO [Stanford Internet Observatory] … almost immediately we recognized the need to ramp back up. This time to support government health officials' efforts to combat misinformation and targeting the COVID-19 vaccines. In February 2021, we formally established the Virality Project drawing on the same

partners from EIP and adding a few more, and much like EIP, it focused on realtime observation, analysis, and understanding of cross platform vaccine-related misinformation."  Scully Ex. 7, at 7.

1058.   The CISA-funded Center for Internet Security coordinated with EIP regarding online misinformation and reported it to CISA.  For example, on October 1, 2020, CIS emailed Scully about alleged misinformation, noting that "the impact seems to be escalating.  Our hope is the platforms can do more to take down the misinformation.  The EIP has been tracking this spread under ticket EIP-243 and has more examples."  Scully Ex. 9, at 1.  Scully forwarded this report to social media platforms.  *Id.*

1059.   EIP had advised Scully that it was using a ticketing system to track misinformation narratives.  Scully Depo. 159:1-5.

1060.   Scully forwarded this report tracked under EIP-243 to Twitter, as well as Facebook and YouTube, because "people generate traffic … by posting it across platforms," and he "would sometimes share across other platforms that we thought there might be … relevant content showing up on their platforms."  Scully Depo. 160:2-5; Scully Ex. 9, at 1, 7, 12.

1061.   Scully asked social-media platforms to report back how they were handling reports of misinformation and disinformation received from CISA.  *See* Scully Ex. 9, at 11 (asking Twitter "to see if there's anything you can share about how you're approaching" misinformation reported by CISA).  According to Scully, "periodically … we would ask if the decision was made and if we can share back."  Scully Depo. 164:15-17.

1062.   CISA maintained a "tracking spreadsheet" of its misinformation reports to social-media platforms during the 2020 election cycle.  Scully Depo. 165:14-166:13.  After Scully's deposition, CISA produced this "tracking spreadsheet" in response to Plaintiffs' Motion to Compel.  Jones Decl., Ex. GG.

1063.   At least six members of the MDM team "took shifts" in reporting supposed misinformation to social-media platforms, including Scully, Chad Josiah, Rob Schaul, Alex Zaheer, John Stafford, and Pierce Lowary.  Scully Depo. 166:9-168:11, 183:14-16.

1064.   At the time, Pierce Lowary and Alex Zaheer were simultaneously serving as interns for CISA and working for the Stanford Internet Observatory, which was then operating the Election Integrity Partnership.  Scully Depo. 168:22-171:16, 183:20-22.  Thus, Zaheer and Lowary were simultaneously engaged in reporting misinformation to social-media platforms on behalf of CISA, and in reporting misinformation to social-media platforms on behalf of the EIP.  *Id.*

1065.   Zaheer and Lowary were also two of the four Stanford interns who originated the idea of the EIP.  Scully Depo. 171:14-16, 184:22-24, 185:12-14.

1066.   Zaheer "was one of the people that were working the ticketing system" for EIP.  Scully Depo. 181:21-23.  Likewise, Lowary "did both SIO and CISA push forwarding" at the same time during the fall of 2020.  Scully Depo. 183:14-16.

1067.   CISA's misinformation reporting to platforms "ramped up as we got closer to the election."  Scully Depo. 174:1-2.  On election night, they "were up until at least midnight," and "if we received anything we would push it forward."  Scully Depo. 175:12-14.  Close to the election, they would "monitor their phones" for disinformation reports even during "off hours."  Scully Depo. 175:16-17.  "[T]he expectation [was] … that they would be responsible for forwarding something" to the platforms. Scully Depo. 175:19-21.

1068.   Alex Zaheer, when switchboarding for CISA, forwarded detailed a report of supposed "misinformation" from the Election Integrity Partnership (EIP) to CISA's reporting system, which called for "swift removal of … posts and continued monitoring of the user's account" because that user had "claimed (1) that mail-in voting is insecure, [and] (2) conspiracy

theories about election fraud are hard to discount."  Scully Ex. 9, at 62.  Scully forwarded this

report to Twitter, which reported back that it had taken action pursuant to its civic integrity policy.

*Id.* at 61; *see also* Scully Depo. 199:6-200:17.

1069.   According to Scully, forwarding such reports of misinformation from the EIP to

social-media platforms "was our standard practice."  Scully Depo. 200:25.  In fact, CISA's

tracking spreadsheet contains at least eleven entries of "switchboarded" reports of misinformation

that CISA received directly from "EIP" and forwarded to social-media platforms for review under

their policies.  Jones Decl., Ex. GG, at 4-5, Column C ("From"), Lines 86-96, 115, 123 (all listing

"EIP").  CISA also used EIP tracking numbers for those reports.  *See id.* Column D.  One of these

notes that content was reported to Twitter for censorship because "EIP … saw article on The

Gateway Pundit."  *Id.* at 4 (Column F, Line 94).

1070.   CIS routinely reported misinformation by sending the notice simultaneously to both

CISA    and    to    the    EIP,    using    the    EIP's    misinformation-reporting    email

"tips@2020partnership.atlassian.net."  Scully Ex. 9, at 33, 52, 58; Scully Ex. 10, at 1.  Scully Ex.

11, at 1-2 (indicating that "tips@2020partnership.atlassian.net" is the reporting email for the EIP);

Scully Depo. 229:18-230:25 (Scully admitting that this email is the EIP reporting email).

1071.   State officials, likewise, simultaneously reported supposed "misinformation" to

CISA, CIS, and the EIP.  *See, e.g.,* Scully Ex. 9, at 59 (Colorado state official reporting

misinformation to "EI-ISAC, CISA and Stanford Partners").

1072.   State officials sometimes indicated that they were reporting misinformation to

platforms for censorship precisely *because* federal officials at FBI and CISA had warned them

about it.  *See, e.g.,* Scully Ex. 9, at 59 (noting that Colorado was reporting two Twitter accounts,

one with 14 followers and one with 2 followers, because "[t]hese are concerning to us here in

Colorado because of recent FBI/CISA warnings about impersonation accounts spreading false information about the election").

1073.   One platform complained to Scully that it was receiving duplicate reports of misinformation from the EIP and Center for Internet Security, and asked if CISA could be designated reporter for the group: "Hey Brian, can we talk about CIS Misinformation reporting duplicate reports to EIP?  Possible to have just you escalate?"  Scully Ex. 9, at 63.  Scully coordinated with CIS and EIP to set forth a coordinated reporting process involving agreed roles for all three of them—CISA, CIS, and EIP.  *Id.*; Scully Depo. 209:14-212:12.  Scully admits that there was "an agreement for EIP and CIS and CISA to coordinate and let each other know what they were reporting to platforms like Twitter."  Scully Depo. 212:7-12.

1074.   State and local officials reported misinformation to the FBI in parallel with their reports to CIS and CISA.  *See, e.g.,* Scully Ex. 10, at 10.  This is because CISA "tell[s] election officials to report what they saw to either DHS or the FBI, and it would end up where it needed to be."  Scully Depo. 215:8-14.

1075.   The Center for Internet Security, likewise, sometimes used EIP ticket numbers on the misinformation reports it sent to CISA for forwarding to platforms. *See, e.g.*, Scully Ex. 10, at 27 (reporting supposed misinformation in Pennsylvania under ticket number "EIP-664"); Scully Depo. 217:16-218:19.  As noted, CISA's "tracking spreadsheet" used similar EIP ticket numbers at least 13 times for misinformation reports sent to platforms.  Jones Decl., Ex. GG, at 4-5.

**D.    CISA Uses Switchboarding to Pressure Platforms to Censor Speech.**

1076.  CISA and Scully did not just forward misinformation reports to platforms; in addition, they also engaged in fact-checking for the platforms.  For example, regarding a report about election security in Pennsylvania, Facebook asked Scully if he could please "confirm" two

factual aspects of the report, and Scully responded with an explanation of why the government believed that the report was misinformation violating Facebook's terms of service. Scully Depo. 218:22-219:24; Scully Ex. 10, at 25-27; Scully Depo. 222:20-224:20; Scully Ex. 10, at 35-37 (Scully engaging in his own research to debunk an election-integrity claim on Twitter and reporting to Twitter, which relied on his research to label the Tweet).

1077.   Scully admits that CISA commonly engaged in such informal fact-checking for the platforms: "if social media platforms needed additional information from an election official we would try to support that. … "[G]enerally speaking, we would do what we did here, which is if the -- if the jurisdiction made a public statement or if there was additional information the jurisdiction could provide, and the platforms asked for it, that we would try to facilitate getting the information they asked for." Scully Depo. 220:6-20. CISA would do its own research as well as relaying statements from public officials to help debunk postings for social-media platforms. Scully Depo. 221:1-4 ("If it was a public statement, I'm sure we pulled it ourselves. If there was not a public statement, I would imagine we would go back to the election official."); Scully Depo. 221:23-222:19.

1078.   In presenting such "debunking" information to platforms to urge them to remove content, CISA always assumed—without any independent research—that the *government* official was a reliable source, and that the social-media user was unreliable, even for first-hand accounts: "if there was a public statement that was put out by the jurisdiction, we would … defer to that." Scully Depo. 221:9-12. CISA would not "take any steps to find out" if the private citizen's account might actually be truthful, and CISA would not "do further research to figure out who was telling the truth," but would simply "relay … the official statement from the jurisdiction" to the platforms for censorship. Scully Depo. 221:13-22.

1079.  CISA's fact-checking activity included both relaying "debunking" information from state and local officials—always assuming without question that the state and local officials were truthful, not the social-media speakers—and performing its own fact-checking when the claim related to federal activities.  For example, "[t]here was also one time when I believe it was Facebook had a question about DHS immigration and customs enforcement having agents going places where we also provided a response back on a specific piece."  Scully Depo. 220:8-13.

1080.  CIS and CISA's "switchboarding" activities reached, not just public postings, but private postings on social-media platforms.  *See, e.g.,* Scully Ex. 10, at 45-46 (reporting a "post on a private FB page," *i.e.*, a "(private) Facebook post that Trump already won AZ").

1081.  Social-media platforms treated CISA as a privileged reporter of misinformation, frequently responding with great promptness to CISA's reports of misinformation, immediately "escalating" the content for moderation, and reporting back the censorship action taken.  For example, on November 10, 2020, at 7:23 pm, Scully reported offending Tweets, and Twitter responded within two minutes, "Thanks Brian.  We will escalate."  Shortly after midnight the same night, at 12:11 a.m., Twitter followed up with a report on censoring the Tweets.  Scully Ex. 10, at 59.  On November 13, 2020, Scully reported an offending tweet at 11:20 pm, and Twitter responded at 11:21 pm, "Thanks Brian.  We will escalate."  Scully Ex. 18, at 26; Scully Depo. 291:15-294:3.

1082.  CISA's censorship partners also originated their own reports for censorship.  CIS and the EIP sometimes reached out to state and local officials to invite them to debunk and report speech that CIS and EIP had observed on social media.  For example, on December 1, 2020, the Center for Internet Security emailed local government officials stating, "The EI-ISAC, and our partners at the Election Integrity Partnership (EIP), are tracking a social-media post that is gaining

traction very quickly." Scully Ex. 11, at 4. The CIS asked the local officials to debunk the post so that "we can work with the social media platforms to have the posts removed as misinformation. Please let us know as soon as possible." *Id.* The local officials responded with information disputing the posts, and CIS promptly forwarded the dispute to CISA and EIP: "Brian [Scully] and EIP, misinformation tweet … a [local official] confirmed the misinformation." *Id.* at 2. Scully then forwarded the report to Twitter, which responded within three hours, "We have labeled the tweet and are taking steps to limit trending on this." *Id.* at 1; Scully Depo. 228:5-231:7.

    **E.    CISA's Many Misinformation Meetings with Platforms.**

    1083.    In its interrogatory responses, CISA disclosed five sets of recurring meetings with social-media platforms that involve discussions of misinformation, disinformation, and/or censorship of speech on social media. Scully Ex. 12, at 38-40.

    1084.    Scully provided the information in the interrogatory responses regarding CISA's meetings with social-media platforms regarding misinformation and censorship. Scully Depo. 232:24-233:3. In doing so, Scully failed to disclose a long series of *bilateral* meetings between CISA and social-media platforms. *See, e.g.,* Scully Depo. 238:11-13 ("we had some Twitter-only calls, as well, that [Yoel Roth] participated in"); Scully Depo. 238:21-22 ("we had some briefings from [Twitter] on some of their public reports" about misinformation); Scully Depo. 239:8-12 (agreeing that there were "briefings in those bilateral meetings with Twitter as relating to misinformation and disinformation on social media"); Scully Depo. 239:20-240:3 (admitting that CISA conducted "bilateral meetings with other social media platforms, like this, where misinformation was discussed"); Scully Depo. 241:4-22 (admitting to a series of bilateral meetings with social-media platforms beginning in 2018 and continuing through 2020); Scully Depo. 241:7-14 (testifying that "in 2018 … in our initial stages of trying to build those relationships, we would

go meet with each platform one-on-one"); Scully Depo. 241:20-22 (admitting that, "prior to starting the switchboarding work, in 2020, we had conversations with each platform individually").

1085.   None of these many bilateral meetings with social-media platforms about misinformation was disclosed in CISA's interrogatory responses.  Scully Ex. 12, at 38-40; Scully Depo. 243:6-21.

1086.   In its interrogatory responses, CISA describes the "USG-Industry" meetings as follows: "A recurring meeting usually entitled USG – Industry meeting, which has generally had a monthly cadence, and is between government agencies and private industry. Government participants have included CISA's Election Security and Resilience subdivision, DHS's Office of Intelligence and Analysis, the FBI's foreign influence task force, the Justice Department's national security division, and the Office of the Director of National Intelligence. Industry participants generally include Google, Facebook, Twitter, Reddit, [and] Microsoft but, have also included Verizon Media, Pinterest, LinkedIn, and the Wikimedia Foundation as well. The topics discussed include, but are not limited to: information sharing around elections risk, briefs from industry, threat updates, and highlights and upcoming watch outs."  Scully Ex. 12, at 38-39.

1087.   In fact, the CISA's description of the "USG-Industry" meeting as having "a monthly cadence" is misleading.  The meetings became biweekly and weekly close to elections, when they were most needed: "from summer of 2018 … to early 2020 they were quarterly. Sometime in 2020 they became monthly and then as we got closer to the election in 2020 they became weekly."  Scully Depo. 234:7-11.

### F.   CISA Worked with FBI to Suppress the Hunter Biden Laptop Story.

1088.   Scully claims that he does not recall whether or not "hack and leak" or "hack and dump" operations were raised at the USG-Industry meetings, but he does not dispute that they may

have been raised: "I don't recall a specific incident of that [*i.e.*, discussions of "hack and dump" or "hack and leak" operations], but it's definitely possible. It's a tactic that had been used in the past." Scully Depo. 236:6-12.  Scully does not dispute that he may have raised it: "Me, personally, I don't recall myself raising that, but it's possible."  Scully Depo. 236:15-16.  He does not dispute that Laura Dehmlow of FBI's FITF may have raised the concern: "Again, I don't know. It was a tactic that had been used globally, previously.  So it wouldn't surprise me if there was some discussion of that somewhere in these meetings."  Scully Depo. 236:20-23.   He does not dispute that Elvis Chan and/or Matt Masterson may have raised the concern.  Scully Depo. 237:10-22.

1089.   Scully also does not dispute Yoel Roth's account of the communications to social-media platforms from federal officials about hack-and-leak operations and the possibility of a hack-and-leak operation involving Hunter Biden in Paragraphs 10-11 of Yoel Roth's Declaration dated December 17, 2020.  Scully Ex. 13, at 2-3; Scully Depo. 245:23-248:11.  Scully does not dispute that federal officials repeatedly raised the concern that they "expected hack and leak operations by state actors" in the USG-Industry meetings, Scully Depo. 245:23-247:17 ("it's certainly possible, because it was a common tactic … I would definitely not be surprised if these were included in the conversations"); and Scully does not dispute Roth's statement that Roth learned in these meetings that "there were rumors that a hack and leak operation would involve Hunter Biden," Scully Depo. 247:18-248:7.

1090.   Contemporaneous emails confirm that CISA officials were warning of "hack and leak" operations during the USG-Industry and other meetings with social-media platforms during 2020.  For example, on September 16, 2020, Facebook employees emailed Scully and other CISA officials a draft of a joint industry statement, which stated: "For several years, tech companies have worked together with … U.S. government agencies … to counter election threats across our

platforms…. At today's meeting, we specifically discussed: … (2) Ways to counter targeted attempts to undermine the election conversation before, during, and after the election. This includes *preparing for so-called 'hack and leak' operations* attempting to use platforms and traditional media for unauthorized information drops." Scully Ex. 16, at 1 (emphasis added). This email confirms that "preparing for so-called 'hack and leak' operations" was discussed at the USG-Industry meeting on Sept. 16, 2020, which included CISA, FBI's FITF, DOJ's National Security Division, ODNI, and Google, Microsoft, Facebook, Twitter, Reddit, Verizon Media, Pinterest, LinkedIn, and Wikimedia Foundation. Scully Ex. 16, at 1; *see also* Scully Depo. 253:14-255:13.

1091. Likewise, the agenda for the July 15, 2020 USG-Industry meeting included, as a "Deep Dive Topic," a 40-minute discussion of "Hack/Leak and USG Attribution Speed/Process." Scully Ex. 17, at 16. According to Scully, "attribution" in this context means identifying the hacker and leaker, and "USG" means "United States Government." Scully Depo. 274:4-275:10.

1092. Like Elvis Chan, Scully was not aware of any "pending investigations, at that time, into possible hack and leak operations." Scully Depo. 255:9-13.

1093. At the USG-Industry meeting, CISA asked platforms to report back on "Themes / narratives / approaches you anticipate for races you think will be targeted." Scully Ex. 15, at 1.

**G.      CISA's Ongoing and Expanding Censorship Efforts.**

1094. In the spring and summer of 2022, Lauren Protentis requested the social-media platforms to prepare "one-pagers" for state and local election officials to address their content moderation rules. *See* Scully Ex. 17, at 1 (including "One-Pager Reminder" on the agenda for the April 2020 USG-Industry meeting); Scully Depo. 260:3-261:11 ("we had asked industry to provide a one-page summary of their content moderation rules that we could share with election officials").

1095.   The purpose of these "one-pagers" was to provide a summary of the platforms' content moderation rules to state and local government officials who would be reporting misinformation to the platforms.  Scully Depo. 260:3-261:11.

1096.   Lauren Protentis of CISA repeatedly lobbied the social-media platforms to include in their "one-pagers" for state and local officials a description of how to report perceived misinformation to the platform for censorship.  *See, e.g.,* Scully Ex. 18, at 41 (Protentis requesting that Facebook update its one-pager to include its "steps for flagging or escalating MDM content" to "make this a comprehensive product on both the critical needs for officials—account security and MDM concerns"); *id.* at 44 (Protentis asking Microsoft to create a one-pager for election officials to "provide steps to … report MDM"); *id.* at 45 (Protentis requesting that Twitter update its one-pager for government officials to include information about "how to report disinformation").  Scully agrees that Protentis was "trying to make sure that election officials have the information they need if they want to report" disinformation.  Scully Depo. 300:23-25.

1097.   CISA also set up an "operation center" on and around Election Day that engaged in "switchboarding" reports of election-day misinformation to platforms: "CISA regularly set up an operation center on election day, around the election. And the platforms and some of the other agencies do the same."  Scully Depo. 262:16-19.  This "operation center" received "switchboard reporting" in 2018 and 2020.  Scully Depo. 263:15-18.  It was also communicating with platforms and other federal agencies, including "connectivity with FBI, DOJ, NEI, I&A."  Scully Depo. 264:18.  When these reports came in, CISA would "perform the same misinformation routing function and pass that along to the platforms."  Scully Depo. 265:1-7.

1098.   The CISA-funded Center for Internet Security continued to report misinformation and disinformation to platforms for censorship in 2022: "CIS was up and running [in 2022]."

Scully Depo. 266:2. Scully understands that "CIS continued to receive disinformation/misinformation reports from state and local election officials during the 2022 election cycle, and relay them directly to social media platforms." Scully Depo. 266:5-13.

1099. Scully also believes that NASS and NASED routed disinformation concerns directly to social-media platforms in 2022. Scully Depo. 268:25-269:3.

1100. Scully agrees that foreign-originated social-media content typically becomes repeated from domestic sources: "We often see what happens overseas send up showing up domestically." Scully Depo. 279:9-11.

1101. CISA has also teamed up directly with the State Department's Global Engagement Center (GEC) to seek removal of social-media content; for example, on one occasion, the GEC enlisted CISA's aid to seek the removal of "a YouTube channel run by Americans falsely claiming" that a certain State Department special envoy was "Patient Zero" for COVID-19. Scully Ex. 18, at 2. Scully forwarded the report to Facebook, which reported within minutes that it had "flagged for our internal teams." Scully Ex. 18, at 1.

1102. CISA flagged obvious parody and joke accounts for censorship, including a Colorado parody account with 56 followers whose handle stated, "dm us your weed store location (hoes be mad, but this is a parody account)," and one with 27 followers whose handle stated, "Smoke weed erry day." Scully Ex. 18, at 11-12. The government official who reported these stated that "these are concerning to us … because of recent FBI/CISA warnings about impersonation accounts spreading false information about the election." Scully Ex. 18, at 11. In other words, the government official sought to censor these accounts *before* they posted any election-related speech, because (according to "FBI/CISA"), they *might* engage in misleading

election-related speech.  *See id.*  Scully forwarded these reports to Twitter for censorship.  Scully Ex. 18, at 10.

1103.   Platforms report to CISA when they update their content-moderation policies to make them more restrictive.  On September 10, 2020, for example, Twitter reported to Masterson and Scully that it was "updating our Civic Integrity Policy" to "label or remove false or misleading information intended to undermine public confidence in an election or other civic process."  Scully Ex. 18, at 9.  This includes censorship of "Disputed claims that could undermine faith in the process itself, e.g. unverified information about election rigging, ballot tampering, vote tallying, or certification of election results."  Scully Ex. 18, at 9.  The EIP had successfully lobbied platforms to adopt such changes ahead of the 2020 election.  *See infra.*

1104.   CISA pushed for the censorship of content that CISA's Director particularly disfavored, including supposed disinformation about CISA itself, and about the so-called "Hammer and Scorecard" narrative that attributed election interference to federal intelligence agencies.  For example, Scully requested censorship of a "disinfo report about CISA and Director Krebs."  Scully Ex. 18, at 19.  And on November 10, 2022, Scully reported to platforms that "Director Krebs is particularly concerned about the hammer and scorecard narrative that is making the rounds," and asked for information about their tracking and "amplification" of the narrative.  Scully Ex. 18, at 22, 24.  Twitter and Facebook promptly reported back on their efforts to censor the narrative.   Scully Ex. 18, at 21 (Facebook reporting that "our teams are labelling and downranking the content as identified"); *id.* at 24 (Yoel Roth of Twitter explaining Twitter's attempts to censor the narrative, and asking CISA "Let us know if there are especially high-profile examples of tweets sharing the conspiracy that *haven't* been labeled" so Twitter can censor them).  *See also* Scully Depo. 286:3-289:25.

1105.   CISA also purposely debunks online narratives, knowing that the social-media platforms will use its debunks as censorship.  For example, Yoel Roth emailed CISA about the Hammer and Scorecard narrative stating: "We've tracking the Hammer/Scorecard issue closely, particularly since Director Krebs' tweet on the subject (which was pretty unambiguous as far as debunks go)."  Scully Ex. 18, at 24.  Scully admits that CISA was aware that "social-media platforms were following the rumor page posted by CISA and using that as a debunking method for content on their platforms."  Scully Depo. 290:13-17 ("We had a sense they were doing that, yeah.").

1106.   CISA publicly states that it is expanding its efforts to fight disinformation heading into the 2024 election cycle.  Scully Ex. 27, at 1.  On August 12, 2022, Director Easterly was reported to be "beef[ing] up [CISA's] efforts to fight falsehoods," and "has taken several specific steps to fight the problem."  *Id.*

1107.   In January 2022, Director Easterly asked Facebook for a "briefing from us on 2022 election approach."  Scully Ex. 28, at 2.  Easterly responded to an email by Facebook and directed her staff to set up the meeting.  *Id.*  Scully does not know what was discussed at the meeting. Scully Depo. 309:12-19.

1108.   Director Easterly also exchanged text messages with Matt Masterson on February 26, 2022, when he was recently employed by Microsoft.  Scully Ex. 29, at 2-3.  In those texts, referring to a previous unidentified group call, Easterly told Masterson that she is "Just trying to get us in a place where Fed can work with platforms to better understand the mis/dis trends so relevant agencies can try to prebunk/debunk as useful."  Scully Ex. 29, at 2.  She stated that CISA is "looking to play a coord role so not every D/A [*i.e.*, department and agency] is independently reaching out to platforms which could cause a lot of chaos."  Scully Ex. 29, at 2.  Masterson

responded, agreeing with Easterly, and stating, "Platforms have got to get comfortable with gov't. It's really interesting how hesitant they remain." Scully Ex. 29, at 3. (Scully notes that "D/A" is "one of our common abbreviations for department and agency." Scully Depo. 316:23-24.)

1109.   Scully agrees with Director Easterly that, when multiple federal agencies contact platforms independently, "it does create challenges and provides the platforms opportunities to play departments off each other." Scully Depo. 317:6-9.  For CISA to play a "coordinating" role among the agencies, therefore, allows federal officials to keep better influence and control over the platforms.

1110.   According to a September 2022 leaked draft copy of DHS's "Quadrennial Homeland Security Review, DHS's capstone report outlining the department's strategy and priorities in the coming years, the department plans to target 'inaccurate information' on a wide range of topics, including "the origins of the COVID-19 pandemic and the efficacy of COVID-19 vaccines, racial justice, U.S. withdrawal from Afghanistan, and the nature of U.S. support to Ukraine." Scully Ex. 30, at 4.

1111.   Scully agrees that DHS has discussions about targeting misinformation regarding the efficacy of COVID-19 vaccines, Scully Depo. 322:9-21 ("our building critical infrastructure help in public health is one of the sectors of critical infrastructure, so we engage with CDC and HHS to help them"); about the origins of the COVID-19 pandemic, Scully Depo. 323:16-17 ("We did some work on the … bio-lab narratives"); and regarding Ukraine, Scully Depo. 324:5-10 ("We saw this with COVID. … We saw this around Ukraine.  And so, again, just helping people understand … these disinformation narratives….").  In particular, CISA participated in a "Unified Coordination Group" regarding Russia's invasion of Ukraine, which addressed misinformation: "there was a … Unified Coordination Group, when Russia invaded Ukraine, to coordinate DHS

activities related to the crisis.  As a part of that there was an MDM component, and a member of the MDM team was detailed to lead the MDM component of the Russian/Ukraine work."  Scully Depo. 325:5-12.  Scully believes that this group communicated with social-media platforms as well (again, not disclosed in CISA's interrogatory responses).  Scully Depo. 327:1-18.

1112.  As of August 12, 2022, DHS's Office of Inspector General continued to call for a more aggressive, not less aggressive, approach to combating disinformation.  Scully Ex. 31, at 1 (OIG calling for DHS to adopt a "Unified Strategy to Counter Disinformation Campaigns").

1113.  DHS's OIG reports that CISA is expanding, not contracting, its efforts to fight disinformation.  OIG reports that CISA's "MDM team focuses on disinformation activities targeting elections and critical infrastructure. According to a CISA official, the MDM team counters all types of disinformation, to be responsive to current events."  Scully Ex. 31, at 9.  "An official from the MDM team stated that, through this work, CISA is building national resilience to MDM, such as COVID-19 vaccine hesitancy and foreign influence activities."  *Id.* at 10.  OIG further reports that, "[a]ccording to selected Intelligence Community officials, the Office of the Director of National Intelligence and the U.S. Department of Justice worked with CISA and I&A to counter disinformation related to the November 2020 elections. For example, according to an Office of the Director of National Intelligence official, prior to the November 2020 elections, CISA and I&A joined in weekly teleconferences to coordinate Intelligence Community activities to counter election-related disinformation. The Office of the Director of National Intelligence official stated the teleconferences continued to occur every 2 weeks after the 2020 elections and were still taking place as of the time of this audit."  *Id.* at 11.  Further, OIG reports that "CISA and I&A also work with the U.S. Department of State's (State Department) Global Engagement Center on countering disinformation."  *Id.* at 11.

1114.   On November 21, 2021, Director Easterly reported that CISA is "beefing up its misinformation and disinformation team in the wake of a divisive presidential election that saw a proliferation of misleading information online."  Scully Ex. 23, at 1.  "I am actually going to grow and strengthen my misinformation and disinformation team," Easterly stated publicly.  *Id.*  She stated that she "had a meeting with 'six of the nation's experts' in the misinformation and disinformation space."  *Id.*  And she "stressed her concerns around this being a top threat for CISA … to confront."  *Id.*   "One could argue that we're in the business of protecting critical infrastructure, and the most critical infrastructure is our cognitive infrastructure," Easterly said.  *Id.*  "We now live in a world where people talk about alternative facts, post-truth, which I think is really, really dangerous if people get to pick their own facts," Easterly said.  *Id.* at 2.  Evidently, Easterly thinks that *government officials* should help Americans "pick their own facts" for them. *Id.*

1115.   According to Scully, CISA has an expansive mandate to address all kinds of misinformation that may affect "critical infrastructure" indirectly: "mis, mal-information threatens critical infrastructure in a number of ways, it could be operational impact, so in the case of the elections, disrupting election operations …. So a multitude of ways that disinformation could impact critical infrastructure, like I said … there's financial, there's reputational, there's just a multitude of ways that this disinformation could affect critical infrastructure."  Scully Depo. 340:10-341:1.  This could include, for example, "misinformation" that undermines confidence in any kind of national institution, including banks and financial services industry: "from mis, dis and mal-information, a reputational risk could come about if the integrity or the public confidence in a particular sector was critical to that sector's functioning.  So I think the financial services would probably be a good example. So if there's a loss of confidence by the American public in

financial services, financial systems of the United States, that could create national security concerns." Scully Depo. 341:17-342:2. This is a breathtakingly broad—even limitless— interpretation of CISA's mandate to protect "critical infrastructure," which would allow CISA to target virtually any kind of core political speech as "mis, dis and mal-information" that "create national security concerns" by undermining "public confidence in a particular sector." *Id.*

1116.  In fact, CISA is "working with Treasury to develop a product to help the financial services sector understand MDM risks to the sector." Scully Depo. 355:22-24.

1117.  Scully has publicly stated that CISA is "trying to reduce the amount that Americans engage with disinformation," where "engaging with disinformation" means "amplifying it, re-tweeting it, resending it, things like that." Scully Depo. 346:7-24; Scully Ex. 49.

1118.  On June 22, 2022, CISA's Cybersecurity Advisory Committee issued a "Draft Report to the Director" calling for an extremely broad view of CISA's mandate. The report states that "[t]he spread of false and misleading information poses a significant risk to critical functions like elections, public health, financial services, and emergency response." Scully Ex. 46, at 1. "Pervasive MDM diminishes trust in information, in government, and in democratic processes more generally." *Id.* The report states that "CISA should consider MD across the information ecosystem," including "social media platforms of all sizes, mainstream media, cable news, hyper partisan media, talk radio, and other online resources." *Id.* at 2. Scully agrees with this report that CISA is trying to make its "resilience activity … as broad as possible so it's applicable anywhere that someone may come across MDM." Scully Depo. 358:7-11.

1119.  In September 2022, the Center for Internet Security is still working on a "portal" for government officials to report election-related misinformation to social-media platforms. Scully Ex. 19, 21. "[W]ork on the online 'portal' for election officials to flag misinformation to

social-media platforms … continues today." Scully Ex. 21, at 4. Scully states that "my understanding is that [CIS] did do something along those lines, I just don't know the extent of it." Scully Depo. 365: 3-6.

1120. As of January 2023 and today, CISA's website continues to proclaim, "[t]he MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms and law enforcement. This activity began in 2018, supporting state and local election officials to mitigate disinformation about the time, place, and manner of voting. For the 2020 election, CISA expanded the breadth of reporting to include other state and local officials and more social media platforms. This activity leverages the rapport the MDM team has with the social media platforms to enable shared situational awareness." Scully Ex. 24, at 3; *see also* www.cisa.gov/mdm (visited Feb. 10, 2023). CISA thus proclaims that it is "expand[ing] the breadth of reporting," not retreating from it. *Id.*

1121. Regarding misinformation reports, CISA "would generally share whatever we received from the election officials with the FBI, in case there was an ongoing investigation related to whatever it was that we forwarded to them." Scully Depo. 366:17-20.

1122. CISA engaged in switchboarding and colluding with social-media platforms to promote censorship in other ways as well.

**VIII.   The State Department's Global Engagement Center's Censorship Efforts.**

1123. The State Department's Global Engagement Center ("GEC") also conducts numerous meetings with social-media platforms about disinformation.

1124. The GEC's "front office and senior leadership engage with social media companies." Kimmage Dep. 29:12-13. These senior leadership meet with social-media platforms "[e]very few months, can be quarterly, but sometimes less than quarterly." *Id.* at 32:9-10.

According to Daniel Kimmage, Principal Deputy Coordinator of the GEC, these meetings focus on the "tools and techniques" of spreading disinformation on social media, and it "would be rare" for them to discuss specific "content that's posted on social media that might be of concern to the GEC." *Id.* at 30:9-31:3.

1125.   In addition, the GEC's "Technology Engagement Team does engage with social media companies" as well. *Id.* at 29:11-12.  The Technology Engagement Team meets with social media companies "[m]ore frequently" than the senior leadership, which meets with them "every few months." *Id.* at 37:9-15.

1126.   Kimmage recalls at least two meetings with Twitter. *Id.* at 129:22-25.  At such meetings, the GEC would bring "between five and ten" people, including "the acting coordinator, me, in that capacity, then one or more of the deputy coordinators, team chiefs from the Global Engagement Center, and working-level staff with relevant subject matter expertise." *Id.* 130:24-131:13.  These GEC staff meet with the platforms' content-moderation teams, *i.e.*, the people responsible for censorship on the platforms. *Id.* at 133:1-20, 135:1-11.

1127.   In such a meeting, "the GEC would provide an overview of what it was seeing in terms of foreign propaganda and disinformation. And Twitter would, to the extent that they felt comfortable sharing information, would discuss similar topics." 136:8-13.

1128.   In addition to meeting with Twitter, the GEC's senior leadership had similar meetings with Facebook and Google as well during the same time frames. *Id.* at 139:22-140:6. These meetings were also with Facebook and Google's content-moderation or trust and safety teams, *i.e.*, the people responsible for censoring content on their platforms. *Id.* at 141:17-143:3.

1129.   The GEC brought similar numbers of people to the meetings with Facebook and Google. *Id.* at 143:16-17 ("I believe the lineup would have been similar.").

1130.   In addition to the senior-leadership and TET meetings, the GEC also maintained a Senior Advisor as a permanent liaison in Silicon Valley, Samaruddin K. Stewart, for the purpose of meeting with social-media platforms about disinformation.  *Id.* at 159:24-160:13; Kimmage Ex. 9, at 2.  Stewart set up a series of meetings with LinkedIn to discuss "countering disinformation" and to "explore shared interests and alignment of mutual goals regarding the challenge."  Kimmage Ex. 9, at 2.  Like the senior-leadership meetings, Stewart scheduled these meetings with the head of the trust and safety team, *i.e.*, the person responsible for censorship on the platform.  *See id.* at 7 (meeting with the "Head of Threat Prevention, Trust & Safety" at LinkedIn).  Kimmage confirms that Stewart set up similar meetings with other social-media platforms.  Kimmage Dep. 160:12-13.

1131.   On March 25, 2021, the GEC set an email to Rob Schaul of CISA flagging "a disinfo campaign on YouTube targeting a [diplomatic security] officer" on a "Youtube channel run by Americans."  Kimmage Ex. 11, at 2.  Brian Scully of CISA forwarded the disinformation report to Twitter, Facebook, and YouTube.  *Id.* at 1, 3, 7.  Facebook responded, "Thank you so much for this!  Have flagged for our internal teams."  *Id.* at 1.

1132.   The GEC also coordinated with the Election Integrity Partnership.  George Beebe of the GEC was in contact with the EIP.  Kimmage Dep. 202:10-24.  Kimmage admits that the GEC had "a general engagement with the EIP. … the GEC was engaging with the partnership."  *Id.* at 214:11-19.  In addition to Mr. Beebe, Adele Ruppe, who "liaised on election-related issues," may have engaged with the EIP.  *Id.* 214:23-215:5.

1133.   Kimmage states that the GEC's work against disinformation "equips … technology companies to better understand" disinformation "so that they can take whatever actions they would take to stop the spread."  *Id.* 280:24-281:3.

284

1134.   On October 17, 2022, at an event at Stanford University, Secretary of State Blinken was asked, "Stanford is one of the leading institutions to combat misinformation research and pointing out propaganda narratives and how they spread. How do you envision the cooperation between the State Department and institutions like Stanford in combatting the spread of propaganda?"  Kimmage Ex. 16, at 5.  Secretary Blinken responded, mentioning the GEC and noting that State is engaging in "collaborations" and "build[ing] out … partnerships" with Stanford: "Stanford is doing remarkable work on that, and it's one of the things that we want to make sure that we're benefitting from, because this is a day-in, day-out battle for us, combating misinformation and disinformation around the world. We have at the State Department itself a big focus on this. We have something called the Global Engagement Center that's working on this every single day. But that work is both inspired by work that's being done in academia, including here at Stanford, as well as where appropriate collaborations. …So we're trying to build out these kinds of partnerships to make sure that we're looking at every place that is actually developing answers, including Stanford, and then integrating that into what we do."  *Id.*

## IX.   The Election Integrity Partnership and Virality Project – Federal Collaborators.

1135.   Federal officials also work through nonprofit organizations to achieve their censorship goals.  Most notably, federal officials at CISA and the GEC, and state officials through the CISA-funded EI-ISAC, work in close collaboration with the Stanford Internet Observatory and other nonprofit organizations to achieve censorship and attempt to evade the First Amendment. Moreover, the Surgeon General's Office and other federal officials collaborate closely with the Stanford Internet Observatory and the same entities under the aegis of the "Virality Project."

### A.   The Election Integrity Project Is a Formidable Censorship Cartel.

1136.   According to its website, "[t]he Election Integrity Partnership (EIP) was formed in July 2020 as a coalition of research entities focused on supporting real-time information exchange between the research community, election officials, *government agencies*, civil society organizations, and *social media platforms*."   *The 2020 Election Integrity Partnership*, Election Integrity Partnership (last visited Feb. 22, 2023) (emphasis added), https://www.eipartnership.net/2020.  The EIP's "objective was to detect and *mitigate the impact* of attempts to prevent or deter people from voting or to delegitimize election results." *Id.* (emphasis added).  As discussed further herein, "mitigate[ing] the impact" means pushing social-media platforms to censor supposed "misinformation."

1137.   "In March 2021 [the EIP] published [its] final report. This page displays an archive of the work carried out by the EIP and its partners during the 2020 U.S. election." *Id.*  The EIP report is publicly available, it provides a detailed account of the EIP's activities in the 2020 election, and it is Exhibit 1 to the deposition of Brian Scully.  Scully Ex. 1 (containing Stanford Internet Observatory et al., Election Integrity P'Ship, *The Long Fuse: Misinformation and the 2020 Election* (v1.3.0 2021), https://www.eipartnership.net/report [https://purl.stanford.edu/tr171zs0069]).

1138.   The EIP was created "in consultation with CISA [the Cybersecurity and Infrastructure Security Agency at the Department of Homeland Security] and other stakeholders." *Id.* at 20 (2).[1]  After "consultation with CISA," the EIP "assembled" a "coalition … with like-minded partner institutions." *Id.*

1139.   CISA interns originated the EIP: "The initial idea for the Partnership came from four students that the Stanford Internet Observatory (SIO) funded to complete volunteer

---

[1] Citations of this exhibit are formatted "Scully Ex. 1, at [page of exhibit] ([page of report])."

internships at the Cybersecurity and Infrastructure Security Agency (CISA) at the Department of Homeland Security." *Id.*

1140.   The EIP agrees with Scully that the EIP was formed to fill in a perceived "gap" in the ability of the government to "monitor and correct" misinformation: "Responsibility for election information security is divided across government offices: CISA has authority to coordinate on cybersecurity issues related to the election, the FBI to investigate cyber incidents and enforce election laws, and intelligence agencies to monitor for foreign interference. Yet, no government agency in the United States has the explicit mandate to monitor and correct election mis- and disinformation." *Id.*

1141.   The EIP acknowledges that the federal government directly targeting misinformation posted Americans would "likely" violate the First Amendment and exceed agencies' lawful authority: "This is especially true for election disinformation that originates from within the United States, which would likely be excluded from law enforcement action under the First Amendment and not appropriate for study by intelligence agencies restricted from operating inside the United States." *Id.*  As noted below, the EIP's founders publicly admit that virtually all the misinformation targeted by the EIP was domestic in origin, not foreign, and thus subject to the First Amendment.

1142.   The EIP specifically notes CISA and the FBI in discussing the need to fill this "gap" in their ability to police "election misinformation originating from domestic sources": "none of these federal agencies has a focus on, or authority regarding, election misinformation originating from domestic sources within the United States. This limited federal role reveals a critical gap for non-governmental entities to fill. Increasingly pervasive mis- and disinformation, both foreign and

domestic, creates an urgent need for collaboration across government, civil society, media, and social media platforms." *Id.* at 9 (v).

1143.   "As a result" of the First Amendment and lack of legal authority, according to the EIP, "during the 2020 election, local and state election officials, who had a strong partner on election-system and overall cybersecurity efforts in CISA, were without a clearinghouse for assessing mis- and disinformation targeting their voting operations." *Id.* at 20 (2).  The EIP was deliberately formed to fill this "gap."

1144.   The EIP "was formed between four of the nation's leading institutions focused on understanding misinformation and disinformation in the social media landscape: the Stanford Internet Observatory, the University of Washington's Center for an Informed Public, Graphika, and the Atlantic Council's Digital Forensic Research Lab." *Id.*

1145.   The EIP makes clear that its "aim" was not just to observe but to "defend[]" the public from misinformation: "With the narrow aim of defending the 2020 election against voting-related mis- and disinformation, it bridged the gap between government and civil society, helped to strengthen platform standards for combating election-related misinformation, and shared its findings with its stakeholders, media, and the American public." *Id.* at 9 (v).

1146.   The EIP's statement that it "helped to strengthen platform standards for combating election-related misinformation" refers to the fact that the EIP successfully pushed virtually all major social-media platforms to adopt or increase censorship policies targeted at election-related "misinformation" during the 2020 election cycle.  *See id.*

1147.  The EIP notes that its efforts to push social-media platforms to adopt more restrictive censorship policies were highly effective, both in procuring changes in policies and censoring speech: "Many platforms expanded their election-related policies during the 2020

election cycle. … Platforms took action against policy violations by suspending users or removing content, downranking or preventing content sharing, and applying informational labels." *Id.* at 12 (viii).

1148.   Alex Stamos, the director of the Stanford Internet Observatory who founded the EIP, has publicly stated that the EIP successfully pushed social-media platforms to adopt more restrictive policies about election-related speech in 2020: "My suggestion, if people want to get the platforms to do stuff is, first, you've got to push for written policies that are specific and that give you predictability; right? And so this is something we started in the summer, in August, is as Kate [Starbird] talked about Carly Miller led a team from all four institutions to look at the detailed policies of the big platforms and to measure them against situations that we expected to happen. Now we're not going to take credit for all of the changes they made, but there -- we had to update this thing, like, eight or nine times; right? And so like putting these people in a grid to say, you're not handling this, you're not handling this, you're not handling this, creates a lot of pressure inside of the companies and forces them to kind of grapple with these issues, because you want specific policies that you can hold them accountable for."  Scully Ex. 4, at 7 (Audio Tr. 4).

1149.   Alex Stamos notes that the EIP then pressured the platforms to aggressively enforce the new policies that the EIP had pushed them to adopt: "The second is, when you report stuff to them, report how it's violating those written policies; right? So there's two steps here. Get good policies, and then say, this is how it's violated it."  *Id.*

1150.   Other EIP participants have also publicly stated that the EIP induced social-media platforms to adopt much more aggressive censorship policies on election-related speech.  On March 3, 2021, at an EIP-hosted conference on the release of the EIP report, Emerson Brooking of the Atlantic Council's DRFLab, an EIP participant, stated: "I think the EIP really helped push

the envelope with things like just the notion that … this delegitimization of electoral processes that we were seeing in the summer and early fall that this should be against content moderation policies on these platforms, and begin to take proactive steps there…." Scully Ex. 5, at 6 (Audio Tr. 2). He also stated, "after November 3rd, we saw that market shift where content moderation actions that … we could hardly contemplate a few weeks before began to be taken. There was a much stronger emphasis on cracking down on the sort of content we've been tracking from the beginning." *Id.*

1151.  The EIP treats "Government" and Social-Media "Platforms" as two of its "Four Major Stakeholders," providing input to the EIP and receiving feedback from the EIP. Scully Ex. 1, at 26 (8) & fig.1.2 (graphic showing "Government" as the EIP's first "Major Stakeholder," submitting information to EIP's "Intake Queue" and receiving feedback on the EIP's "Mitigation"—*i.e.*, censorship—efforts).

1152.  The EIP organizes its misinformation reports under groups called "tickets," and it notes that "[t]ickets were submitted by … trusted external stakeholders…" *Id.* at 26 (8). "Trusted external stakeholders" include "government": "External stakeholders included government, civil society, social media companies, and news media entities." *Id.* at 30 (12). Thus, it is clear that "government" submitted "tickets," *i.e.*, reports of misinformation to be processed for censorship on social media, to the EIP. *See id.* at 26, 30 (8, 12).

1153.  And it is clear that the "government" partners who submit tips to the EIP are CISA, the State Department's Global Engagement Center (GEC), and the Elections Infrastructure Information Sharing & Analysis Center (EI-ISAC), an organization of state and local government officials coordinated by the Center for Internet Security (CIS) pursuant to funding from CISA, *see EI-SAC*, Center for Internet Security (last visited Feb. 22, 2023)

("The EI-ISAC is federally funded by CISA."), https://www.cisecurity.org/ei-isac.   Specifically, the "Government" "stakeholders" listed under the EIP's "Four Major Stakeholder Groups" are CISA, GEC, and the EI-ISAC. Scully Ex. 1, at 30 (12).

1154.   These "Government" stakeholders report misinformation to the EIP: "Government and civil society partners could create tickets or send notes to EIP analysts, and they used these procedures to flag incidents or emerging narratives to be assessed by EIP analysts."  *Id.*

1155.   The CISA-funded EI-ISAC and CISA itself worked in collaboration with the EIP to report misinformation to social-media platforms: "[T]he EI-ISAC served as a singular conduit for election officials to report false or misleading information to platforms. By serving as a one-stop reporting interface, the EI-ISAC allowed election officials to focus on detecting and countering election misinformation while CIS and its partners reported content to the proper social media platforms. Additionally, the Countering Foreign Influence Task Force (CFITF), a subcomponent of CISA, aided in the reporting process and in implementing resilience efforts to counter election misinformation."  *Id.* at 31 (13).

1156.   The EIP report mentions *The Gateway Pundit*, the website operated by Plaintiff Jim Hoft, 47 times.  *See id.* at 51, 74, 76, 101, 103, 110, 112, 145, 150-51, 153, 155-56, 172, 175, 183, 194-95, 206-09, 211-12, 214-16, 226-27.[2]

1157.   The EIP boasts that it "used an innovative internal research structure that leveraged the capabilities of the partner organizations through a tiered analysis model based on 'tickets' collected internally and from our external stakeholders. Of the tickets we processed, 72% were related to delegitimization of the election," *i.e.*, core political speech.  *Id.* at 10 (vi).

---

[2] Report pages 33, 56, 58, 83, 85, 92, 94, 127, 132-33, 135, 137-38, 154, 157, 165, 176-77, 188-91, 193-94, 196-98, 208-09.

1158.   The EIP admits that the speech it targets for censorship is domestic, grassroots speech by American citizens: "The production and spread of misinformation was multidirectional and participatory. Individuals participated in the creation and spread of narratives. Bottom-up false and misleading narratives started with individuals identifying real-world or one-off incidents and posting them to social media. Influencers and hyperpartisan media leveraged this grassroots content, assembling it into overarching narratives about fraud, and disseminating it across platforms to their large audiences. Mass media often picked up these stories after they had reached a critical mass of engagement. Top-down mis- and disinformation moved in the opposite direction, with claims first made by prominent political operatives and influencers, often on mass media, which were then discussed and shared by people across social media properties." *Id.* at 11 (vii). In other words, virtually everything it targets is quintessential First Amendment-protected political speech.

1159.   This included censorship of highly visible political figures: "The primary repeat spreaders of false and misleading narratives were verified, blue-check accounts belonging to partisan media outlets, social media influencers, and political figures, including President Trump and his family." *Id.* at 12 (viii).

1160.   One key point that the EIP emphasizes is that it wants greater "access" to platforms' internal data to achieve greater monitoring of Americans' speech on social media.  The EIP complains that "***Lack of transparency and access to platform APIs hindered external research into the effectiveness of platform policies and interventions***." *Id.* (emphasis added).  "API" stands for "Application Programming Interface," so the EIP wants greater direct access to platforms' internal data about so-called "misinformation" on their platforms.  *See id.*  This directly echoes the repeated demands from the White House and the Surgeon General that social-media platforms

provide access to their internal data about misinformation on their platforms, both to government and "researchers." The relevant "researchers" include Stanford Internet Observatory and the other constituents of the EIP and the Virality Project, who are working hand-in-glove with federal officials.

1161.   The EIP contends that not enough censorship was achieved during 2020 as a result of their lack of direct access to platforms' APIs: "Many platforms expanded their election-related policies during the 2020 election cycle. However, application of moderation policies was inconsistent or unclear." *Id.*

1162.   The EIP recommends that platforms increase enforcement of censorship policies: "Impose clear consequences for accounts that repeatedly violate platform policies. These accounts could be placed on explicit probationary status, facing a mixture of monitoring and sanctions." *Id.* at 14 (x).

1163.   The EIP report acknowledges the contributions of Alex Stamos, Renee DiResta, Kate Starbird, Matt Masterson, Pierce Lowary, and Alex Zaheer. *Id.* at 16 (xii).  All of these individuals have or had formal roles in CISA.

1164.   The EIP is partially funded by the federal government: "Researchers who contributed to the EIP … receive partial support from the U.S. National Science Foundation (grants 1749815 and 1616720)." *Id.* at 17 (xiii).

1165.   In addition, the Atlantic Council, one of the four nonprofit organizations in the EIP, is partially government-funded.  Kimmage Dep. 294:8-18.

1166.   "The initial idea for the Partnership came from four students that the Stanford Internet Observatory (SIO) funded to complete volunteer internships at the Cybersecurity and

Infrastructure Security Agency (CISA) at the Department of Homeland Security." Scully Ex. 1, at 20 (2).

1167.  "The students approached SIO leadership in the early summer, and, in consultation with CISA and other stakeholders, a coalition was assembled with like-minded partner institutions." *Id.*

1168.  "The Election Integrity Partnership (EIP) was officially formed on July 26, 2020—100 days before the November election—as a coalition of research entities who would focus on supporting real-time information exchange between the research community, election officials, government agencies, civil society organizations, and social media platforms." *Id.*

1169.  As a key point in its "Operational Timeline," the EIP lists a July 9, 2020, "Meeting with CISA to present EIP concept." *Id.* at 21 (3). In other words, the Stanford Internet Observatory "present[ed]" the "EIP concept" to CISA two weeks before the EIP was formed. *Id.*

1170.  The SIO's EIP team was "led by … Research Manager Renee DiResta … and Director Alex Stamos." *Id.* at 22 (4). The University of Washington's "contributing team" was "led by … Kate Starbird." *Id.*

*1171.*  Alex Stamos and Kate Starbird are members of CISA's Cybersecurity Advisory Committee. *See CISA Cybersecurity Advisory Committee*, Cybersecurity & Infrastructure Security Agency (last visited Feb. 24, 2023), https://www.cisa.gov/resources-tools/groups/cisa-cybersecurity-advisory-committee. Starbird chairs CISA's Subcommittee on "Protecting Critical Infrastructure from Misinformation and Disinformation." *See* CISA Cybersecurity Advisory Committee, Subcommittee Factsheet 1 (April 13, 2022), https://www.cisa.gov/sites/default/files/publications/CSAC%20Subcommittee%20Factsheet_April%2013%202022.pdf. Renee DiResta gives lectures on behalf of CISA. *See* CISA, *Cybersecurity*

*Summit 2021: Responding to Mis, Dis, and Malinformation*, YouTube (Oct. 27, 2021), https://www.youtube.com/watch?v=yNe4MJ351wU.

1172.   One of the EIP's goals was to "flag policy violations to platforms."  Scully Ex. 1, at 24 (6).

1173.   As noted above, the EIP describes "Government" as one of "four major stakeholders," who both provided input into the "intake queue" for "tickets" (*i.e.*, reporting misinformation) and received feedback on "mitigation" (*i.e.*, censorship).  *Id.* at 26 (8).

1174.   The EIP tracked misinformation using "tickets," which tracked "informational event[s]" that could encompass many social-media postings: "The EIP tracked its analysis topics and engaged with outside stakeholder organizations using an internal ticketing workflow management system. Each identified informational event was filed as a unique ticket in the system."  *Id.*

1175.   "Tickets were submitted by both trusted external stakeholders (detailed in Section 1.4 on page 11) and internal EIP analysts."  *Id.*  "Section 1.4" on pages 11-12 of the report identifies government as a trusted external stakeholder: "Trusted external stakeholders" include "government, civil society, social media companies, and news media entities."  *Id.* at 29-30 (11-12).  Page 12 specifically identifies CISA, the EI-ISAC, and the State Department's GEC as the EIP's "Government" stakeholders.  *Id.* at 30 (12) fig.1.3.

1176.   A "ticket" could encompass many individual postings: "A single ticket could map to one piece of content, an idea or narrative, or hundreds of URLs pulled in a data dump."  *Id.* at 27 (9).

1177.   The EIP's managers both report misinformation to platforms and communicate with government partners about their misinformation reports: "The manager had the ability to tag

platform partners on a ticket for action. They also communicated with the EIP's partners in government, and could request further information from election officials if necessary," thus serving as a conduit for a back-and-forth about misinformation reports between government officials and platforms. *Id.* at 27-28 (9-10).

1178. The scope of the EIP's monitoring of Americans' speech on social media is enormous: "Team members from each of these tiers were divided into on-call shifts. Each shift was four hours long and led by one on-call manager. It was staffed by a mix of Tier 1 and Tier 2 analysts in a 3:1 ratio, ranging from five to 20 people. Analysts were expected to complete between two to five shifts per week. The scheduled shifts ran from 8:00 am to 8:00 pm PT for most of the nine weeks of the partnership, ramping up only in the last week before the election from 12-hour to 16- to 20-hour days with all 120 analysts on deck." *Id.* at 28 (10).

1179. The "Government" stakeholders flag misinformation to the EIP for censorship: "Government and civil society partners could create tickets or send notes to EIP analysts, and they used these procedures to flag incidents or emerging narratives to be assessed by EIP analysts." *Id.* at 30 (12).

1180. Of the "Four Major Stakeholder Groups" who participated in the EIP, the first listed is "Government," which includes three government entities: the Elections Infrastructure ISAC, CISA, and the State Department's GEC. *Id.*

1181. The EIP reports that CISA, CIS, and the EI-ISAC collaborated with the EIP in reporting misinformation: "In this election cycle, the EI-ISAC served as a singular conduit for election officials to report false or misleading information to platforms. By serving as a one-stop reporting interface, the EI-ISAC allowed election officials to focus on detecting and countering election misinformation while CIS and its partners reported content to the proper social media

platforms. Additionally, the Countering Foreign Influence Task Force (CFITF), a subcomponent of CISA, aided in the reporting process and in implementing resilience efforts to counter election misinformation." *Id.* at 31 (13).

1182.   The EI-ISAC jointly reports misinformation flagged by state and local election officials to CISA and to the EIP: "Content reported by election officials to the EI-ISAC was also routed to the EIP ticketing system. This allowed analysts to find similar content, ascribe individual content pieces to broader narratives, and determine virality and cross-platform spread if applicable. This analysis was then passed back to election officials via the EI-ISAC for their situational awareness, as well as to inform potential counter-narratives. Additionally, if an internally generated EIP ticket targeted a particular region, analysts sent a short write-up to the EI-ISAC to share with the relevant election official. This allowed the state or local official to verify or refute the claim, and enabled analysts to properly assess whether or not the content violated a platform's civic integrity policies. In this way, the EIP demonstrated the upside of using the EI-ISAC coordinating body to connect platforms with authoritative voices to determine truth on the ground and help election officials effectively counter viral falsehoods about election infrastructure." *Id.*

1183.   The EIP created established channels for reporting misinformation to platforms for censorship: "The EIP established relationships with social media platforms to facilitate flagging of incidents for evaluation when content or behavior appeared to violate platform policies." *Id.* at 35 (17).

1184.   The EIP receives real-time reports on censorship actions from the platforms, who communicate directly with EIP managers about censorship through the EIP's system: "Analysts conducted their initial assessment on all tickets, and, if content in a ticket appeared to be a violation of a platform's published content policies, an analyst or manager added the platform representative

to the ticket. If questions arose, a manager communicated with the platform representative in the ticket comments. Analysts put the ticket back in the queue and updated the ticket to note if the content in question received a moderation action." *Id.*

1185.   Virtually all major social-media platforms participate directly in the EIP: "The EIP onboarded the following social media companies: Facebook and Instagram, Google and YouTube, Twitter, TikTok, Reddit, Nextdoor, Discord, and Pinterest." *Id.*

1186.   In the 2020 election cycle, the EIP "processed 639 in-scope tickets. 72% of these tickets were related to delegitimizing the election results." *Id.* at 45 (27).

1187.   The EIP had a high level of success in pushing the platforms to censor speech: "35% of the URLs we shared with Facebook, Instagram, Twitter, TikTok, and YouTube were either labeled, removed, or soft blocked." *Id.*  "In total, we believe the four major platforms we worked with all had high response rates to our tickets." *Id.* at 55 (37).  "We find, overall, that platforms took action on 35% of URLs that we reported to them." *Id.* at 58 (40).

1188.   The Center for Internet Security, which runs the EI-ISAC using funding from CISA, is a major reporter of misinformation to the EIP: "16% of tickets were filed by the Center for Internet Security (CIS), an election official community partner, in the form of tips." *Id.* at 46 (28); *see also* Center for Internet Security, *EI-ISAC* (last visited Feb. 24, 2023), https://www.cisecurity.org/ei-isac.

1189.   The EIP "prioritize[es] … swing states over non-swing states." Scully Ex. 1, at 46 (28).

1190.   The EIP's "dataset included 639 distinct, in-scope tickets." *Id.*  A "ticket" could be extremely broad, "map[ping] to" and entire "idea or narrative." *Id.* at 27 (9).  For example, the "SHARPIEGATE" ticket was submitted on November 4, 2020, to "try and consolidate all the

content" regarding the Sharpiegate story from "a variety of different states across Twitter, FB, TikTok, and Youtube." *Id.* at 47 (29) fig.2.1.

1191.   The EIP includes extensive collaboration with a "government partner" in its Sharpiegate ticket. *Id.* at 48 (30).  Its internal ticket-management software ("Jira") simultaneously allowed the "government partner" to communicate directly with the "platform partner" to debunk the online claim. *Id.* at 48 (30) fig.2.2.

1192.   The EIP reports that it repeatedly flagged *The Gateway Pundit*, Plaintiff Jim Hoft's website, as a purveyor of social-media misinformation: "The top misinformation-spreading websites in our dataset were … thegatewaypundit[.]com, a far-right news website.  65% of these tickets involved an exaggeration of the impact of an issue within the election process." *Id.* at 51 (33) (alteration in original).

1193.   The EIP does not claim that most of *The Gateway Pundit*'s content was false, only that it involved the "exaggeration of the impact of an issue within the election process." *Id.*

1194.   As noted above, the EIP Report cites *The Gateway Pundit* 47 times.  *See supra* paragraph 1156 and accompanying citation.

1195.   The EIP "coded tickets based on whether they … had an element of foreign interference. Interestingly … less than 1% related to foreign interference."  Scully Ex. 1, at 53 (35).  Thus, virtually all the speech targeted for censorship comes from American speakers.

1196.   The EIP targeted speech for censorship or debunking in most tickets: "Of our 639 tickets, 363 tickets tagged an external partner organization to either report the content, provide situational awareness, or suggest a possible need for fact-checking or a counter-narrative." *Id.* at 55 (37).

1197.   "[G]roups that reported tickets include the State Department's Global Engagement Center…" *Id.* at 60 (42).  Daniel Kimmage testified that George Beebe of the GEC was in contact with the EIP.  Kimmage Dep. 202:10-24.  Kimmage attests that the GEC had "a general engagement with the EIP. … the GEC was engaging with the partnership."  *Id.* at 214:11-19.  In addition to Mr. Beebe, Adele Ruppe, who "liaised on election-related issues," may have engaged with the EIP.  *Id.* 214:23-215:5.

1198.   In addition, left-wing advocacy groups like "MITRE, Common Cause, the DNC, the Defending Digital Democracy Project, and the NAACP" submitted tickets to the EIP.  Scully Ex. 1, at 60 (42).

1199.   The EIP indicates that the "misinformation" it targeted during the 2020 election cycle was core political speech of American citizens protected by the First Amendment: "Our analysis demonstrates that the production and spread of misinformation and disinformation about Election 2020 … was participatory. In other words, these dynamics were not simply top-down from elites to their audiences, but were bottom-up as well, with members of the 'crowd' contributing in diverse ways—from posting raw content, to providing frames for that content, to amplifying aligned messages from both everyday members of the crowd and media (including social media) elites. Repeatedly, our data reveal politically motivated people sincerely introducing content they mistakenly believed demonstrated real issues with election integrity…"  *Id.* at 181 (163).  "Well-meaning, though often politically motivated, individuals repeatedly introduced this content into the broader information sphere, often via social media…"  *Id.* at 182 (164).

1200.   EIP analysts collected data from Twitter "contemporaneously," and they also have access to "CrowdTangle and Facebook search functionality."  *Id.* at 199-200 (181-82).

1201.   The EIP's tickets encompassed almost 5,000 URLs: "Through our live ticketing process, analysts identified social media posts and other web-based content related to each ticket, capturing original URLs (as well as screenshots and URLs to archived content). In total, the EIP processed 639 unique tickets and recorded 4,784 unique original URLs." *Id.* at 200 (182).

1202.   These tickets and URLs encompass millions of social media posts, including almost 22 million posts on Twitter alone: "In total, our incident-related tweet data included 5,888,771 tweets and retweets from ticket status IDs directly, 1,094,115 tweets and retweets collected first from ticket URLs, and 14,914,478 from keyword searches, for a total of 21,897,364 tweets." *Id.* at 201 (183).

1203.   The EIP "collected data from Twitter in real time from August 15 through December 12, 2020," and did so "[u]sing the Twitter Streaming API" to "track[] a variety of election-related terms …. The collection resulted in 859 million total tweets." *Id.* at 200-01 (182-83).  Thus, the EIP had privileged access to Twitter's internal data about speech on its own platform.

1204.   The EIP did not have privileged access to Facebook's internal data, however: "To understand how the information ecosystem looks from the perspective of Facebook and Instagram, we collected public posts through the CrowdTangle API from Facebook Groups, Facebook Pages, Facebook verified profiles and public Instagram accounts." *Id.* at 201 (183).  This explains the White House's and Surgeon General's insistence in 2021 that Facebook grant "researchers" such as Renee Diresta access to Facebook's internal data.

1205.   The EIP treats as "misinformation" truthful reports that the EIP believes "lack[] broader context." *Id.* at 203 (185).

1206.   The EIP admits that it focuses on speech from the "political right" because it believes that the right spreads misinformation: "Influential accounts on the political right … were responsible for the most widely spread of false or misleading information in our dataset. Right-leaning accounts also more frequently augmented their misinformation posts with narrative-related hashtags … which persisted across multiple incidents and were shared millions of times in our dataset." *Id.* at 204-05 (186-87).

**B.      The EIP Targets Plaintiff Jim Hoft and *The Gateway Pundit*.**

1207.   According to the EIP, "[t]he 21 most prominent repeat spreaders on Twitter … include political figures and organizations, partisan media outlets, and social media all-stars. … [A]ll 21 of the repeat spreaders were associated with conservative or right-wing political views and support of President Trump." *Id.* at 205 (187).

1208.   The EIP lists *The Gateway Pundit* as the second-ranked "Repeat Spreader[] of Election Misinformation" on Twitter, ranking it above Donald Trump, Eric Trump, Breitbart News, and Sean Hannity.  *Id.* at 206 (188) tbl.5.2.  In the 2020 election cycle, the EIP flagged *The Gateway Pundit*'s speech in 25 incidents with over 200,000 retweets.  *Id.*

1209.   The EIP claims that "[f]ar-right hyperpartisan media outlets also participated in a wide range of [Twitter] incidents, including The Gateway Pundit, which ranked #2 in the dataset." *Id.* at 206 (188).

1210.   In addition, the EIP lists *The Gateway Pundit*'s website as the domain cited in the most "incidents"—its website content was tweeted by others in 29,207 original tweets and 840,740 retweets.  *Id.* at 207 (189) tbl.5.3.  *The Gateway Pundit* ranks above Fox News, the New York Post, the New York Times, and the Washington Post on this list.  *Id.*

1211.   In fact, the EIP dedicates an entire subsection of its report to *The Gateway Pundit*. *Id.* at 214-16 (196-98).  The EIP reports that "The Gateway Pundit was among the most active spreaders of election-related misinformation in our analyses. … It appeared as a top repeat spreader through its website, its Twitter account, its YouTube channel, and its Instagram account."  *Id.* at 214 (196).

1212.   The EIP report notes that "Twitter suspended [*The Gateway Pundit*'s] account on February 6, 2021," indicating that *The Gateway Pundit*'s deplatforming on Twitter was the result of the EIP's efforts.  *Id.*

1213.   The EIP states that "The Gateway Pundit was highly active throughout the election lifecycle, including during the weeks leading up to the election, when it repeatedly spread content—in distinct information incidents—that sought to undermine trust in mail-in voting specifically and the eventual election results more generally."  *Id.*

1214.   According to the EIP, "[o]n Twitter, The Gateway Pundit's account was highly retweeted across 26 different incidents (#2 among repeat spreaders). Evidence from our data suggest that its prominence was due both to production of its own material and to amplification (via original and quote tweets) of other partisan content."  *Id.* at 215 (197).

1215.   According to the EIP, "[o]f all the domains linked to in our Twitter data, The Gateway Pundit's website was connected to the largest number of incidents (46) while also garnering the most related original tweets (29,207) and retweets (840,750). Their YouTube channel appeared in five incidents, and their 13 incident-related videos had more than 4 million views on YouTube."  *Id.* at 215-16 (197-98).

1216.   According to the EIP, "[t]he Gateway Pundit['s] … Instagram account was tied for #2 among repeat spreaders, appearing in 10 incidents for 20 posts that received more than 132,000 engagements." *Id.* at 216 (198).

**C.    The EIP Induces Major Changes in Platform Censorship Policies.**

1217.   The EIP notes that "during the 2020 election, all of the major platforms made significant changes to election integrity policies, both as the campaigns kicked off and through the weeks after Election Day—policies that attempted to slow the spread of specific narratives and tactics that could potentially mislead or deceive the public…." *Id.* at 229 (211).

1218.   The EIP notes that "[m]ajor social media platforms such as Facebook, Twitter, YouTube, Pinterest, and TikTok introduced changes to their community standards in the months leading up to the election and in the aftermath." *Id.* at 230 (212).

1219.   In particular, starting just over a month after the EIP launched, in "September 2020," "[a] number of platforms announced the first updates to election-specific policies: making large additions; adding more clarity and specificity; or stating clearly that they will label or remove content that delegitimizes the integrity of the election." *Id.*

1220.   The policy changes reflected that the EIP and the platforms anticipated that they would have to target speech by *domestic* speakers, not supposed "foreign disinformation," during the 2020 election: "[M]uch of the misinformation in the 2020 election was pushed by authentic, domestic actors, and platforms shifted their focus to address downstream harms related to the content itself. As a result, most subsequent updates introduced policies related to specific content categories." *Id.* at 231 (213).

1221.   The EIP lobbies platforms to "remove" so-called "repeat spreaders" like *The Gateway Pundit*, and complains that they are not removed often enough: "Despite what appeared

to be clear policy to penalize or remove repeat spreaders and high-profile disinformation actors, platforms appeared to shy away from using this particular intervention. In some cases, this was a result of a variety of 'newsworthiness' exceptions, which allowed some high-profile repeat spreaders, including politicians, to evade bans. Yet many of the repeat spreaders we saw were not politicians"—including *The Gateway Pundit*, among many others. *Id.* at 233 (215).

1222.   The EIP indicates that it will continue its censorship activities in future elections: "The next election will have its own unique set of misinformation narratives, yet many of the tactics, dynamics, and basic structures of these narratives will likely remain the same." *Id.* at 243-44 (225-26).

1223.   The EIP reinforces this intention by calling for even more aggressive, more expansive censorship of social-media speech, including into other areas such as "public health": "Doing nothing is not an option. … Not pursuing structural policy change will accelerate our country's slide toward extremism, erode our shared national and inclusive identity, and propel yet more individuals toward radicalization via mis- and disinformation. The problem is larger than elections: it spans politics, self-governance, and critical policy areas, including public health." *Id.* at 251 (233). The EIP acted on this statement promptly by forming the "Virality Project" in 2021. *See infra*.

1224.   The EIP proclaims that the "EIP's novel structure, enabling rapid-response analysis and a multistakeholder reporting infrastructure, could prove effective to many information spaces blighted by pervasive misinformation," in addition to election-related speech. *Id.* at 259 (241).

1225.   The EIP calls for more aggressive penalties to enforce censorship on social media, in language that was copied and parroted by the demands of Jen Psaki and the Surgeon General: "Establish clear consequences for accounts that repeatedly violate platform policies." *Id.* at 256

(238).  "Prioritize quicker action on verified or influential accounts if they have already violated platform policies in the past."  *Id.* at 257 (239).

1226.   The EIP even advocates for an express system of pre-publication approval for disfavored speakers—the ultimate prior restraint: "Consider implementing holding areas for content from high-visibility repeat spreaders, where content can be evaluated against policy before posting."  *Id.*

1227.   The EIP proclaims that it offers "a whole-of-society response," in words parroted by the Surgeon General's Health Advisory.  *Id.* at 259 (241).

1228.   The EIP boasts that "[t]he EIP, in its structure and its operations … *united government, academia, civil society, and industry*, analyzing across platforms, to address misinformation in real time."  *Id.* (emphasis added).

1229.   The EIP states that "[t]he lessons from EIP should be both learned and applied. The fight against misinformation is only beginning. The collective effort must continue."  *Id.* at 259-60 (241-42).

1230.   The EIP specifically advocates for a broader role for CISA in federal efforts to combat election-related "misinformation."  *Id.* at 252-53 (234-35).

1231.   Alex Stamos, the director of the Stanford Internet Observatory who launched the EIP, publicly states that virtually all the speech targeted by the EIP is by domestic speakers engaging in core political speech.  He has publicly stated: "almost all of this is domestic: right? … It is all domestic, and the second point on the domestic, a huge part of the problem is well-known influencers …. you have … a relatively small number of people with very large followings who have the ability to go and find a narrative somewhere, pick it out of obscurity and … harden it into these narratives."  Scully Ex. 4, at 5 (Audio Tr. 2).

1232.   Likewise, on October 3, 2020, at a CISA-hosted cybersecurity conference, Clint Watts of the EIP stated that election misinformation "is overwhelmingly more domestic than foreign this time around in 2020."  Scully Ex. 3, at 4 (Audio Tr. 2).

1233.   At the same conference, Alex Stamos stated: "The bigger issue in 2020, is going to be domestic … we have set up this thing called the [E]lection [I]ntegrity [P]artnership, so we went and hired a bunch of students. We're working with the University of Washington, Graphika, and DFRLab, and the vast, vast majority of the contact we see we believe is domestic. You know, some of it you can't tell, but a lot of it is coming from domestic blue checkmark verified elites; right? And so I think a much bigger issue for the platforms is elite disinformation. The stuff that is being driven by people who are verified that are Americans who are using their real identities."  *Id.* at 5 (Audio Tr. 3).  He also stated, "the truth is, that the vast majority of these problems or the kind of problems in the information environment are domestic problems."  *Id.* at 6 (Audio Tr. 4).

1234.   Alex Stamos has noted that the fear of government regulation pushes the platforms to respond to government pressure and increase censorship. On November 10, 2020, at a conference hosted by the Atlantic Council, Alex Stamos stated: "So, you know, on effectively pushing the platforms to do stuff … they will always be more responsive in the places that are both economically highly important and that have *huge potential regulatory impact*, most notably right now that would be the United States and Europe."  Scully Ex. 4, at 6 (Audio Tr. 3) (emphasis added).

1235.   On November 17, 2021, at a conference hosted by the Digital Publics Symposium, Kate Starbird of CISA's Subcommittee and the University of Washington's Center for an Informed Public, an EIP participant, stated: "Now fast forward to 2020, we saw a very different story around disinformation in the U.S. election. It was largely domestic coming from inside the United States.

… Most of the accounts perpetrating this … they're authentic accounts. They were often blue check and verified accounts. They were pundits on cable television shows that were who they said they were … a lot of the major spreaders were blue check accounts, and it wasn't entirely coordinated, but instead, it was largely sort of cultivated and even organic in places with everyday people creating and spreading disinformation about the election." Scully Ex. 8, at 4 (Audio Tr. 2). She also stated: "So we see this – the disinformation campaign was top down … but this campaign was also bottom up with everyday people sharing their own experiences, their own misperceptions of being disenfranchised or finding what they thought to be evidence of voter fraud." *Id.* at 5 (Audio Tr. 3). These are the voices that the EIP silenced.

> **D.    The Virality Project Expands EIP's Censorship Work with Federal Officials.**

1236.    Soon after the 2020 election cycle, beginning in early 2021, the same four entities that launched the Election Integrity Partnership established a similar program to address COVID-19-vaccine-related "misinformation" on social media, which they called the "Virality Project." *See* Scully Ex. 2 (containing Stanford Internet Observatory, et al., The Virality Project, *Memes, Magnets, and Microchips: Narrative Dynamics Around COVID-19 Vaccines* (v.1.0.1 2022), https://purl.stanford.edu/mx395xj8490).

1237.    The Virality Project's final report, dated April 26, 2022, lists Renee DiResta as the principal Executive Editor, and lists Renee DiResta, Kate Starbird, and Matt Masterson as contributors.  Scully Ex. 2, at 4 (i).[3]  Current and former CISA interns Jack Cable, Isabella Garcia-Camargo, Pierce Lowary, and Alex Zaheer are listed as "researchers and analysts" who participated in social-media "monitoring" for the project.  *Id.*

---

[3] Citations of this exhibit are formatted "Scully Ex. 2, at [page of exhibit] ([page of report]).

1238.   The same four entities that operated the EIP launched the Virality Project ("VP")
in 2021: Stanford Internet Observatory, University of Washington's Center for an Informed Public,
Graphika, and the Atlantic Council's Digital Forensics Research lab.  *Id.* at 8-9 (1-2).  Three new
nonprofit entities were added as well.  *Id.*

1239.   According to its report, "[t]he VP team developed technology to identify emerging
narratives, to understand what communities they appeared within, and to gauge their scope, speed,
and spread.  In addition, the analysts assessed social media platforms' published policies to
understand how (if at all) platforms might limit or action the spread of misleading vaccine-related
content."  *Id.* at 9 (2).  As discussed below, like the EIP, the VP took action to push "platforms [to]
limit or action the spread of misleading vaccine-related content."  *Id.*

1240.   According to the VP, "[v]accine mis- and disinformation was largely driven by a
cast of recurring actors," including "long-standing anti-vaccine influencers and activists, wellness
and lifestyle influencers, pseudomedical influencers, conspiracy theory influencers, right-leaning
political influencers, and medical freedom influencers."  *Id.*

1241.   Like the EIP, the VP admits that the speech it targets is heavily speech by "domestic
actors," *i.e.*, American citizens: "Foreign … actors' reach appeared to be far less than that of
domestic actors."  *Id.*

1242.   Like the EIP, the VP indicates that it pushes platforms to adopt more aggressive
censorship policies on COVID vaccine-related content: "While online platforms have made
progress in creating and enforcing vaccine related policies, gaps still exist."  *Id.* at 10 (3).

1243.   Like the EIP, the VP notes that it did not only observe and report on misinformation
but took action to stop the spread of misinformation: "Detection, however, was only part of the

work. The Virality Project also sought to relate its findings to the public and to stakeholders in public health, government, and civil society." *Id.*

1244.   The VP indicates that it should increase the efficiency of having "government partners" share "tips" of misinformation with entities like the VP, stating that "[r]esearch institutions" should "[s]treamline a tip line process to make it easy for civil society and government partners to share observations.  Establish a feedback loop to discuss what types of analysis or tips are most relevant." *Id.*

1245.   The VP strives to "[d]evelop and maintain clear channels of communication that enable federal, state, and local agencies to understand and learn from what might be happening in other regions. Federal Information Sharing and Analysis Centers (ISAC) are one path forward." *Id.* at 11 (4).

1246.   The VP recommends that the federal government "[i]mplement a Misinformation and Disinformation Center of Excellence housed within the Cybersecurity and Infrastructure Security Agency." *Id.*

1247.   The VP states that social-media "[p]latforms owe the public *transparency and accountability* as they face the challenges of deciding what to surface, what to curate, and how to minimize the virality of harmful false claims. Tech platform policies against public health misinformation should be clear and precise, and their enforcement should be consistently applied." *Id.* (emphasis added).   The Surgeon General copied this messaging verbatim in his Health Advisory, which he launched at the VP.

1248.   The VP calls for more aggressive censorship of COVID-19 "misinformation," stating: "To these ends, platforms should: Consistently enforce policies, particularly against recurring actors," and "Continue to improve data sharing relationships with researchers." *Id.*  The

emphasis on "data sharing relationships" is directly echoed in the White House's and the Surgeon General's demands that platforms share their internal data with researchers.

1249.   The VP boasts that the "Office of the Surgeon General incorporated VP's research and perspectives into its own vaccine misinformation strategy," and specifically cites the Surgeon General's Health Advisory on this point. *Id.* at 11 (4) & 13 (6) n.5 (citing Off. U.S. Surgeon Gen., *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment* (July 15, 2021), https://hhs.gov.sites.default.files.surgeon.general-misinformation-advisory.pdf).

1250.   "Over the course of its seven months of work, the Virality Project observed narratives that questioned the safety, distribution, and effectiveness of the vaccines." *Id.* at 11 (4).

1251.   Like the EIP, the VP states that "[t]he enormity of the challenge demands a *whole-of-society response*," *id.* at 12 (5) (emphasis added), and calls for more federal agencies to be involved through "cross-agency collaboration," *id.* The Surgeon General adopted and echoed the VP's call for a "whole-of-society" response.

1252.   The VP admits that "it was not always clear what *was* misinformation; in the case of the novel coronavirus, it was often simply not yet clear what was true or where scientific consensus lay," *id.* at 14 (7), and that "[g]round truth about COVID-19 was rapidly evolving, and even institutional experts were not always aligned on the facts," *id.* at 15 (8).

1253.   According to the VP, "[v]iral posts that claimed to have the answers to the public's most pressing questions appeared online; fact-checkers struggled to evaluate them, and platforms wrestled with whether to leave them up or take them down. Social media influencers of varying backgrounds debated the merits and efficacy of masking, providing detailed breakdowns of their analyses in public posts." *Id.*

1254.   The VP attributes opposition to mask mandates and lockdowns to right-wing political ideology: "In the months before vaccines or treatments emerged, governments worldwide turned to preventative measures such as masking requirements and lockdowns. In the US, these measures were quickly framed as affronts to liberty by facets of the US right-wing political spectrum, turning individual responses to the virus into a function of political identity." *Id.*

1255.   The VP suggests that it flagged for censorship COVID-related posts with enormous engagement on social media, reporting for example that "[b]efore the major social media platforms began to take down [one] video—which was in violation of their COVID-19 misinformation policies—[it] amassed tens of millions of views and was shared into a wide variety of communities." *Id.* at 16 (9).

1256.   The speech that the VP decries is all quintessential First Amendment–protected speech.  *See, e.g., id.* ("Several prominent anti-vaccine activists began to post regularly about COVID-19; their followings began to increase, despite prior platform efforts to reduce the spread of false and misleading claims from anti-vaccine figures. As the possibility of a vaccine became more of a reality as 2020 progressed, anti-vaccine activists focused on preemptively undermining uptake.  Several of the vaccines in development used relatively novel mRNA technology, which afforded an opportunity to present them as untested, unsafe, rushed, or risky, even to audiences who had taken all previously recommended vaccines.").

1257.   "It was against this backdrop" of widespread First Amendment–protected speech on social media "that the Virality Project (VP) came together. A collection of research institutions had previously collaborated through the Election Integrity Partnership (EIP) to identify and understand the spread of election mis- and disinformation in the US during the 2020 presidential campaign. In December 2020, these partners jointly observed that the same tactics used to great

effect during the 2020 election were already in use to expand the spread of COVID-19 vaccine mis- and disinformation." *Id.*.  The VP used the same tactics as the EIP to engage in "rapid response" to misinformation: "The Project's broad array of institutions enabled information sharing and *rapid response* when false and misleading information percolated across social platforms." *Id.* (emphasis added).

1258.   The VP was overtly biased against "anti-vaccine" viewpoints from the beginning: "The Project's original framing document articulated the threat: **A surge of anti-vaccine disinformation will pose significant challenges to the rollout and public adoption of COVID-19 vaccines in the United States**." *Id.*  (bold in original).

1259.   Just like the EIP, the VP boasts that it is a "multistakeholder collaboration" that includes "government entities" among its key stakeholders: "The Virality Project adopted *a multistakeholder collaboration with civil society organizations, social media platforms, and government entities* to respond to misand disinformation around the novel vaccines."  *Id.* at 17 (10) (emphasis added).

1260.   "The research institutions that comprised the Election Integrity Partnership—the Stanford Internet Observatory, the University of Washington's Center for an Informed Public, the Atlantic Council's Digital Forensic Research Lab, and Graphika—along with new partners the National Conference on Citizenship (NCoC)'s Algorithmic Transparency Institute and New York University's Center for Social Media and Politics and Tandon School of Engineering—all elected to participate in this new initiative: the Virality Project." *Id.*

1261.   The VP report complains that "the internet has no editorial gatekeepers." *Id.* at 18 (11).

1262.   The VP decries the influence of "social media influencers" such as "Doctors" and "Mommy Bloggers." *Id.* at 19 (12).

1263.   According to the VP, "[t]hese influencers have adopted the best practices of communication in the internet age, and their effectiveness in drawing in online users is made evident by the mass followings they have acquired across social media sites: platforms as varied as Pinterest, Instagram, and YouTube…" *Id.*

1264.   The VP targets misinformation "tactics" that involve speech that the VP does not contend is false or even falsifiable.  It states that speakers "use tactics that have persisted over time, many of which have been used in service of spreading mis- and disinformation in contexts beyond the vaccine conversation; for example, the Election Integrity Partnership observed several of these tactics during the lead-up to the 2020 US election." *Id.*

1265.   These "tactics" include such things as "**Hard-to-Verify Content:** Using content that is difficult to fact-check or verify, such as personal anecdotes"; "**Alleged Authoritative Sources:** Using or pointing to information from an alleged public health official, doctor, or other authoritative source"; "**Organized Outrage:** Creating events or in-person gatherings, or using or co-opting hashtags"; and "**Sensationalized/Misleading Headlines:** Using exaggerated, attention-grabbing, or emotionally charged headlines or click-bait." *Id.* (bold in original). Notably, none of these "tactics" involves false speech, and all are protected by the First Amendment.

### E.     The Virality Project Targets Plaintiff Jill Hines and Health-Freedom Groups.

1266.   According to the VP report's taxonomy, Plaintiff Jill Hines, the founder of Health Freedom Louisiana, constitutes a "medical freedom influencer[]" who engages in the "tactic" of "**Organized Outrage**" simply because she "create[ed] events or in-person gatherings" to oppose

mask and vaccine mandates in Louisiana.  *See id.* at 9, 19 (2, 12) (bold in original). But this "tactic" is First Amendment–protected activity.

1267.   Another "tactic" decried by the VP is "**Group super-spreader:** An individual account sharing posts into multiple online groups."  Id. at 20 (13) (bold in original).  This is also quintessential First Amendment expression.

1268.   The VP report repeatedly emphasizes the problem of "health freedom" or "medical freedom influencers" like Plaintiff Jill Hines.  It identifies "Liberty" as a "trope" of social-media disinformation: "*Liberty*: Individuals have the right to '**health freedom**'; no government or employer should be able to tell people what to put in their bodies."  *Id.* (italics in original) (bold added).

1269.   The VP also identifies political and religious opinions—including well-established and widespread views—as "themes" and "tropes" of anti-vaccine "misinformation," such as: "*Distrust of industry*: Vaccines are produced by profit-motivated pharmaceutical companies that have repeatedly concealed harm in pursuit of profit"; "*Religiosity*: Vaccines contain materials that are objectionable on religious grounds"; and "*Conspiracy*: … Governments have covered up information proving vaccines are dangerous, [and] Doctors and politicians who advocate for vaccines have been bought off by 'Big Pharma.'"  *Id.*

1270.   Like the EIP, the VP agrees that government pressure pushes social-media platforms to adopt more aggressive censorship policies: "Platforms had started adapting their policies to address vaccine misinformation in early 2019, spurred by public outcry, negative press coverage, and *government inquiries*…"  *Id.* at 21 (14) (emphasis added).

1271.   The VP boasts that its "analysts had to develop a nuanced and nimble understanding of what content constituted policy violations"—evidently because it was flagging content to platforms for censorship in real time.  *Id.* at 21-22 (14-15).

1272.   The VP extensively monitored and tracked Americans' speech about COVID-19 and vaccines on social media: "To surface in-scope content, VP's team of analysts were divided into topical detection teams, referred to as pods…. These pods … enabled analysts to develop and ensure sustained familiarity with how the COVID-19 vaccine conversation was evolving within particular communities on public platforms."  *Id.* at 22 (15).

1273.   This monitoring involved VP analysts reading and searching Americans' social-media accounts in real time: "Analysts in each pod assessed emerging narratives that were within scope … , surfacing content both via qualitative observation of the pages and accounts, and by using lists of common terms associated with vaccine hesitancy and long-standing anti-vaccine rhetoric."  *Id.*

1274.   The VP states that "Anti-vaccine activists and influencers, including those discussed in the Center for Countering Digital Hate's 'Disinformation Dozen' Report … surfaced the greatest amount of content …"  *Id.* at 23 (16).

1275.   This covert monitoring of Americans' online speech about vaccine was extensive, sophisticated, and adaptive: "At the beginning of the project, analysts used broad search terms ("vaccine," "jab") to surface relevant content and incidents (specific events or stories), but gradually began to incorporate a combination of machine learning and hand coding to identify additional recurring narratives relevant to the four in-scope categories. This included terms related to medical freedom under "Vaccine Distribution," or severe adverse effects and death under

"Vaccine Safety," among others. As narratives and new keywords emerged throughout the analysis period, analysts continually refined their searches." *Id.*

1276.   This mass-social-media-surveillance project included federal agencies as key "stakeholders": "The Virality Project established a nonpartisan, multi-stakeholder model consisting of health sector leaders, federal health agencies, state and local public health officials, social media platforms, and civil society organizations. These stakeholders provided tips, feedback, and requests to assess specific incidents and narratives, and each entity type brought specific expertise to bear on understanding COVID-19 vaccine hesitancy." *Id.* at 24 (17).

1277.   Thus, the VP's "multi-stakeholder model" included government agencies and officials, including "federal health agencies" and "state and local public health officials," working alongside "social media platforms" to combat vaccine-related "misinformation." *Id.*

1278.   The government "stakeholders" such as "federal health agencies" and "state and local public health officials" were among those who "provided tips" and "requests to assess specific incidents and narratives," *i.e.*, flagging content for social-media censorship. *Id.*

1279.   The VP emphasizes the role of "Federal government agencies" in the VP, including the CDC and the Office of Surgeon General: "**Federal government agencies** served as coordinators for national efforts. The Virality Project built strong ties with several federal government agencies, most notably the Office of the Surgeon General (OSG) and the CDC, to facilitate bidirectional situational awareness around emerging narratives. The CDC's biweekly "COVID-19 State of Vaccine Confidence Insights" reports provided visibility into widespread anti-vaccine and vaccine hesitancy narratives observed by other research efforts." *Id.* (bold in original).

1280.   Social media platforms served as stakeholders alongside federal and state officials: "**Platforms** were the final stakeholders in the VP effort. Six social media platforms engaged with VP tickets—Facebook (including Instagram), Twitter, Google (including YouTube), TikTok, Medium, and Pinterest—*acknowledging content flagged for review and acting on it in accordance with their policies*. On occasion, platforms also provided information on the reach of *narratives previously flagged by VP*, which provided a feedback loop leveraged to inform the Project's understanding of policies and ongoing research." *Id.* at 25 (18) (bold in original) (italics added).

1281.   Thus, the VP openly proclaims that it "flagged" "content … for review" to platforms to "act[] on it in accordance with their policies." *Id.* Government officials provided "tips" to the VP about misinformation on social media, and the VP flagged it for platforms for censorship.

1282.   The VP emphasizes the importance of federal officials and social-media platforms in its collaboration on censorship: "As the effort progressed, *input from these partners was crucial* in defining the VP's output formats and in surfacing where the impacts of vaccine mis- and disinformation were being felt offline." *Id.*

1283.   The VP engaged in continuous, ongoing communication with federal officials, platforms, and other stakeholders: "The Virality Project delivered 31 weekly briefings focused on increasing situational awareness and enabling the stakeholders working on countering vaccine mis- and disinformation to develop the most effective possible response." *Id.*

1284.   The VP boasts that it "provided strategic insights" to federal officials in combating misinformation: "Briefings directly informed counter-messaging efforts by public health stakeholders … and public health officials (for example, the CDPH), and *provided strategic*

*insights to government entities such as the OSG, CDC, and the Department of Health and Human Services.*" *Id.* (emphasis added).

1285.   Further, the "Stanford Internet Observatory and the Virality Project also hosted Surgeon General Vivek Murthy for a seminar on vaccine mis- and disinformation, including the rollout of the Surgeon General's advisory on health misinformation." *Id.* at 27 (20).

1286.   Like the EIP, the VP used "tickets" to track social-media narratives, where each "ticket" could encompass many postings: "As part of the Virality Project, analysts created tickets documenting URLs of in-scope content. In total, 911 tickets were created, tracking both specific pieces of misinformation and broader narratives. At the end of the monitoring period, analysts had created 845 tickets tracking specific vaccine misinformation incidents (events or pieces of content) and 66 tickets tracking broad narratives." *Id.* at 34 (27).

1287.   The VP aimed, not just to track, but to "respond to" misinformation: "The Virality Project operated with a team of analysts drawn from across the partner organizations. Workflows were designed to detect, analyze, and *respond to* incidents of COVID-19 vaccine-related disinformation in online ecosystems." *Id.* (emphasis added).

1288.   "From February to August 2021, VP analysts *systematically monitored activity across social media platforms* to document emerging narratives and trends in public discourse while also tracking the popularity and spread of older content." *Id.* (emphasis added).

1289.   "The [VP] used the Jira Service Desk software to log mis- and disinformation incidents that were determined to be in scope for specific areas of the public COVID-19-related conversation. For each single incident of anti-vaccine mis- or disinformation surfaced during monitoring, an analyst filed a ticket that provided a brief description of the incident, including

engagement numbers at the time of creation and links to relevant social media posts." *Id*. at 35 (28).

1290.   The VP boasts that it targeted online speech for censorship before it could go viral, thus imposing massive prior restraints on the amplification of targeted content: "Tickets also enabled analysts to quickly tag platform or health sector partners to ensure their situational awareness of high-engagement material that appeared to be going viral, so that *these partners could determine whether something might merit a rapid public or on-platform response* (such as a label)." *Id.* at 37 (30) (emphasis added).

1291.  The VP reported the content in 174 "tickets" to social-media platforms for censorship: "Managers gave all incident analyses a final review for quality-control purposes, to determine appropriate next steps and to make a final decision about whether tickets should be shared with external stakeholders. *Of the 911 incidents monitored, 174 were referred to platforms for potential action*." *Id.* (emphasis added).

1292.   Like the EIP, the VP appears to have had direct access to Twitter's and YouTube's internal data about speech spreading on its platform, but not Facebook's: "The engagement data or video view data for links associated with each ticket was collected differently depending on the social media platform in question: Facebook and Instagram: CrowdTangle API; Twitter: Twitter API…" *Id.* at 38 (31).

1293.  Like the Surgeon General and the White House, the VP complains that the platforms must make their internal data more available to VP: "Due to limited transparency from social media platforms, engagement is the closest proxy researchers can use to understand what content users are seeing on social media platforms. Metrics such as impression counts are generally unavailable to outside researchers." *Id.*

1294.   The VP's monitoring tracked content with about 6.7 million engagements on social media per week, or over 200 million over the seven months of the reported project: "Average weekly engagement with content tracked across all Virality Project tickets was 6.7 million." *Id.* at 39 (32).

1295.   The vast majority of speech flagged and tracked by the VP was not false or incorrect speech: "The most commonly employed tactics were Hard-to-Verify Content and Alleged Authoritative Source." *Id.* at 41 (34); *see also id.* at 42 (35) fig.2.6 (showing predominance of these two "tactics").

1296.   According to the VP, "[o]f the engagement captured by tickets, more than a third came from content primarily spread by accounts that demonstrated recurring success making content go viral; we refer to them here as 'recurring actors.'" *Id.* at 41 (34).

1297.   The VP boasts that it induced "platform action" against such "recurring actors" in 2021: "Recurring actors drove a majority of engagement in the first half of the study period, but fell off in importance after that, most likely due to platform action against certain users beginning in the late spring of 2021." *Id.* at 43 (36).

1298.   Like Jennifer Psaki at the White House, the VP repeatedly cites the Center for Countering Digital Hate's report on the "Disinformation Dozen." *Id.* at 23 & 32 n.43, 43 & 48 n.7, 111 & 129 n.179.[4]

1299.   "Four distinct weeks during the monitoring period had incidents observed by Virality Project analysts that generated more than 10 million engagements." *Id.* at 43 (36).

1300.   One of these "Viral Incidents" tracked by the VP was: "In July, posts went viral expressing outrage at attempts by the Biden administration to engage in vaccine outreach." *Id.* at

---

[4] Report pages 16 & 25 n.43, 36 & 41 n.7, 104 & 122 n.179.

45 (38).  This incident did not involve any vaccine-related misinformation at all, but core political speech: "the Biden administration used the phrase 'door-to-door' to describe a push for on-the-ground community-led efforts to persuade more Americans to get vaccinated. Prominent Republican politicians miscast this as a forced vaccination campaign by 'Needle Nazis' and a prelude to the government knocking on the door to take away guns."  *Id.* at 46 (39).

1301.   The VP boasts that censorship enforcement was effective, especially in "deplatforming" key actors: "The decline of content from recurring actors midway through the monitoring period potentially reflects a policy impact, as deplatforming these actors led to an apparent reduction in false or misleading content."  *Id.* at 47 (40).

1302.   The VP tracked and flagged "Claims that [supposedly] misrepresent … vaccine mandates," not just misinformation about the vaccines.  *Id.* at 50 (43).

1303.   According to the VP, "content" that "leveraged decontextualized statistics from the US Department of Health and Human Services' Vaccine Adverse Event Reporting System (VAERS) database" is misinformation.  *Id.* at 51 (44).

1304.   According to VP, it was also misinformation when true adverse health events from vaccines were "shared absent context": "Rare incidents documenting verified adverse health events, including blood clotting and heart inflammation, were shared absent context, often in an effort to present them as common and significant risks."  *Id.*

1305.   According to the VP, discussing "breakthrough" cases and "natural immunity" was also misinformation: "False and misleading narratives related to efficacy sought to undermine the perceived benefits of vaccines. These narratives included stories of people diagnosed with COVID-19 after being vaccinated—"breakthrough" cases, particularly in the time of the Delta variant—to promote the idea that the vaccines aren't effective. Later, the idea that natural

immunity from infection is superior to immunity from vaccination became a political talking point raised repeatedly by right-leaning political influencers, despite inconclusive scientific evidence." *Id.*

1306.   According to VP, misinformation also included "discussions of vaccine passports and mandates (including months before any state or federal officials began advocating for them)." *Id.*

1307.   The VP also counts as misinformation "claims that the government was headed toward mandating an unsafe vaccine." *Id.* The government did, of course, eventually mandate the vaccines for most Americans.

1308.   The VP also treated Americans' "long-standing mistrust of pharmaceutical companies' profit motives" as part of anti-vaccine misinformation. *Id.*

1309.   "Conspiracy Theories" that "assign blame to … government" are also misinformation to be tracked and censored, according to VP. *Id.*

1310.   According to VP, "personal anecdotes" about "vaccine injuries and severe side effects—ranging from rashes, to blood clots, to death" are also misinformation." *Id.* at 52 (45).

1311.   "Personal anecdotes often made their way into mainstream media coverage after gaining traction online. Distortions of official government statistics—most often from VAERS, described in more depth later in this section—were used both to reinforce the personal anecdotes and for focused misinformation solely discussing the statistics." *Id.*

1312.   According to VP, "stripp[ing] both individual stories and official statistics of important context" is misinformation. *Id.*

1313.   According to VP, "adverse event stories" were objectionable because they were "employed to push back against vaccine mandates." *Id.* at 52-53 (45-46).

1314.   Like the White House and Dr. Fauci, the VP treats Alex Berenson as a major malefactor in spreading COVID-19 vaccine "misinformation."  *See id.* at 54, 57 (47, 50).

1315.   Like the White House and Rob Flaherty, the VP flagged and tracked Fox News host Tucker Carlson as a spreader of vaccine misinformation: "*In May 2021, Tucker Carlson misrepresented VAERS data on his talk show*, decontextualizing it while claiming that 3,362 Americans had died following COVID-19 vaccinations between December 2020 and April 2021, equating to roughly 30 people every day."  *Id.* at 57 (50) (emphasis added).

1316.   Health Freedom groups, like Plaintiff Jill Hines's group Health Freedom Louisiana, are particular targets of the VP's tracking and censorship activities.

1317.   The VP report includes an entire section on such groups: "Section 3.2.2 – Government Overreach and Medical Freedom Narratives."  *Id.* at 59 (52).

1318.   According to the VP, "[o]ne of the primary long-standing themes of anti-vaccine distribution narratives is that mass vaccine distribution constitutes a government overreach. The movement sees vaccine mandates, including, historically, school vaccine requirements, as an assault on 'health freedom' or 'medical freedom.'"  *Id.*

1319.   According to the VP, "[i]n 2020, following the emergence of COVID-19, these same health freedom groups expanded their vaccine protests to social distancing, masks, and other prevention measures."  *Id.*  This includes Plaintiff Jill Hines.

1320.   The VP describes the role of Facebook groups—also employed by Jill Hines—in organizing health freedom groups to oppose vaccine mandates: "groups emerged on platforms such as Facebook during the pandemic, with names specifically related to COVID-19 or mRNA vaccines, to assist in discoverability; some grew their numbers into the tens of thousands."  *Id.*

1321.  The VP focused, not just on misinformation about vaccines, but political speech and political organizing against "vaccine passports and vaccine mandates": "During the VP's period of analysis, narratives about government overreach and medical freedom focused on two areas of controversy: vaccine passports and vaccine mandates." *Id.*

1322.  The VP treats as misinformation political speech and political opinions on these topics: "This amplification hinged upon misleading framing that suggested the implementation of any form of vaccine passport would be compulsory.  In reality, the plans for many programs were entirely optional. Other framing from domestic right-leaning political actors created a portrait of governments as prying or snooping into citizens' private matters." *Id.* at (60) 53.

1323.  The VP views virtually all conservative speech opposing government-imposed COVID mandates as misinformation: "Activists pushed the idea that through a passport system, governments and 'Big Tech' were limiting the public's freedoms—situating the conversation within a larger set of narratives surrounding pandemic public health regulations like mask mandates, lockdowns, and social distancing." *Id.*

1324.  Like the EIP, the VP specifically flagged Jim Hoft's *The Gateway Pundit* as a purveyor of misinformation and COVID "conspiracy theories: "Headlines sometimes hawked conspiracy theories: one Gateway Pundit headline, "The Great Reset: Big Tech and Big Pharma Join Forces to Build Digital COVID Vaccination Passport," was a nod to groups such as QAnon…. The article alleged collusion between Big Tech and Big Pharma that would threaten 'individual rights.'" *Id.* at 60-61 (53-54) & 68 (75) n.49 (citing Joe Hoft, *The Great Reset: Big Tech and Big Pharma Join Forces to Build Digital COVID Vaccination Passport*, Gateway Pundit (January 17, 2021), https://thegatewaypundit.com/great-reset-big-tech-big-pharma-joining-forces-build-digital-covid-vaccination-passport).

1325.   Other right-leaning speakers flagged by the VP include One America News Network, Breitbart News, and others.  *Id.* at 60 (53).

1326.   The VP attributes political successes such as state-level bans on vaccine passports to such supposed misinformation.  *Id.* at 61 (54).

1327.   The VP attributes opposition to vaccine mandates by employers to such supposed misinformation: "The backlash to COVID-19 vaccine requirements for employment and other activities parallels the conversation about vaccine passports. It, too, relies on and attempts to exacerbate distrust in public health officials and government institutions."  *Id.*

1328.   According to VP, even truthful information about vaccine effects on health that are still being studied constitutes misinformation: "In early 2021, users on Twitter, Facebook, and Reddit reported unverified reproductive side effects, ranging from abnormal menstrual cycles to miscarriages and infertility. … At the time there was no medical consensus on the vaccine's effect on reproductive health, yet anti-vaccine activists presented the theory as fact and evidence of harm. Research is ongoing…."  *Id.* at 66-67 (59-60).

1329.   According to VP, even "videos that appeared to be created satirically" are misinformation when they "were taken seriously."  *Id.* at 68 (61).

1330.   Alex Berenson is mentioned 49 times in the Virality Project report.  *Id.* at 54, 57, 71, 73, 96-97, 122-23, 188-90, 195, 207-08.[5]

1331.   "Health freedom" or "medical freedom" groups are discussed dozens of times in the VP report.  The word "freedom" occurs 100 times, almost always in direct connection with a discussion of "health freedom" or "medical freedom" groups, influencers, or content.  *See id.* at 6,

---

[5] Report pages 47, 50, 64, 66, 89-90, 115-16, 181-83, 188, 200-01.

9, 20, 23, 59-62, 66, 70, 74, 77, 82, 84-86, 93-96, 105, 117-18, 121-22, 130-31, 137-38, 141, 143, 187, 197-98, 201, 204, 210, 220-22.[6]

1332.   The VP defines "Medical freedom influencers" as actors who "are averse to government interference in individuals' personal lives. While they explicitly advocate for "health freedom" or "vaccine choice," these actors often propagate vaccine doubt by contextualizing the choice with misleading claims of vaccines' adverse medical consequences." *Id.* at 82 (75).

1333.   Fox News host Tucker Carlson, who has wide audiences in Missouri and Louisiana, is cited 42 times in the Virality Project report. *See id.* at 57, 73, 87, 91-92, 98, 115, 119-20, 122-23, 193, 201, 208, 215-16, 218.[7]

1334.   In fact, the VP report cites the entire Fox News channel as a source of vaccine misinformation: "Fox News has played a particularly pivotal role in spreading vaccine misinformation and anti-vaccine beliefs during the COVID-19 pandemic.... [B]etween June 28 and July 11, 2021, Fox News ran 129 segments about the COVID-19 vaccine on its cable broadcast; more than half of those segments included unverified claims that undermined vaccination efforts." *Id.* at 91 (84).

1335.   According to VP, "Fox News television host Tucker Carlson has been one of the most prominent and sensationalist spreaders of false or misleading information about vaccines throughout the COVID-19 pandemic." *Id.*; *see also id.* at 91 (describing "Right-wing media personality Tucker Carlson" as part of a "cast of recurring characters" that influenced vaccine hesitancy in Spanish- and Chinese-speaking communities).

---

[6] Report pages iii, 2, 13, 16, 52-55, 59, 63, 67, 70, 75, 77-79, 86-89, 98, 110-11, 114-115, 123-24, 130-31, 134, 136, 180, 190-91, 194, 197, 203, 213-15.

[7] Report pages 50, 66, 80, 84-85, 91, 108, 112-13, 115-16, 186, 194, 201, 208-09, 211.

1336.   The VP also cites Candace Owens and The Daily Wire as purveyors of vaccine misinformation. *See, e.g., id.* at 86, 92 (79, 85).

1337.   The VP cites Robert F. Kennedy, Jr., a well-known anti-vaccine activist with wide followings in Missouri and Louisiana, as one of the most influential purveyors of vaccine misinformation.  *Id.* at 83 (76).  The VP describes Kennedy as "especially pernicious" because he has a large audience: "RFK Jr.'s activism is especially pernicious because, like other long-standing influencers, he has a large and committed following and has become somewhat of a household name in the US."  *Id.*

1338.   The VP also cites America's Frontline Doctors and its founder, Dr. Simone Gold, as a source of vaccine misinformation.  *Id.* at 87-88 (80-81).

1339.   The VP notes that "Simone Gold, a licensed emergency room physician, was the second most prominent PMI across Virality Project's tickets.  Gold is the leader of America's Frontline Doctors….   Gold has been influential since the summer of 2020, when the White Coat Summit, an event broadcast online in which members of America's Frontline Doctors spoke on the steps of the Supreme Court. The White Coat Summit promoted hydroxychloroquine both as a preventative measure and as a cure for COVID-19."  *Id.*

1340.   The VP treats Dr. Joseph Mercola, another anti-vaccine speaker with wide audiences in Missouri and Louisiana, as a purveyor of vaccine misinformation.  *Id.* at 87 (80).  Again, the VP criticizes Mercola precisely because his speech reaches wide audiences.  *Id.*

1341.   The VP asserts that Gold's "false and misleading claims about the COVID-19 vaccine" include core political speech like "encouraging her followers to boycott companies for their vaccine protocols" and "organizing a cross-country tour to fight back against 'censorship, chaos, and the undeniable slide towards communism that lurks beneath the tyrannical lockdowns

328

for governmental 'public health' policy'." *Id.* at 88 (81).  To the VP, political "organizing" to oppose vaccine mandates and lockdowns constitutes a "false and misleading claim[]." *Id.*

1342.   The VP asserts that "the right-leaning media ecosystem differs from the rest of the media environment in ways that make it especially vulnerable to the spread of mis- and disinformation." *Id.* at 91 (84).

1343.   The VP states that "[t]he newest iteration of medical freedom, adapted for COVID-19, challenges the legitimacy of government or corporate vaccine mandates and public health interventions specific to COVID-19, including vaccine passport systems and masking requirements." *Id.* at 93 (86).

1344.   The VP states that "medical freedom" groups spread misinformation "across all 50 states": "Medical freedom influencers (MFIs) active in the anti-COVID-19-vaccine movement were fairly distinct from other categories of influencer in that rather than hinging on a handful of key (and often celebrity-status) individuals, they spread their narratives via a franchise model *across all 50 states*." *Id.* (emphasis added).

1345.   The VP indicates that it tracked and flagged "medical freedom" groups "at a messaging and organizing level," *i.e.*, the level where Jill Hines was targeted: "As medical freedom activists have fought requirements imposed by states, cities, or private employers, they have learned from each others' successes and failures—at a messaging and an organizing level—and have brought those lessons to their local communities. What one state does, another state will often echo." *Id.* at 94 (87).

1346.   Like Andrew Slavitt, the VP treats Alex Berenson as one of the "most significant influencer[s]" who opposes vaccines: "Alex Berenson is perhaps the most significant influencer who defies categorization. A former New York Times reporter and a bestselling novelist with no

specific anti-vaccine background …, Berenson … over time evolved into a key player in repeatedly spreading false and misleading information about the COVID-19 pandemic and vaccines. He underplayed the danger of the virus and challenged the efficacy of vaccines and masks, even as evidence supported their value as life-saving public health measures." *Id.* at 96 (89) (providing an image of Berenson's tweets).

1347. The VP disfavors Berenson because he reaches wide audiences and criticizes the government: "Berenson's popular posts on Twitter notably claimed to be "digging up" or "uncovering" information that was hidden from the public about vaccine safety or effectiveness. In one incident in July 2021, Berenson amplified a conspiracy theory from a statement filed with a lawsuit from America's Frontline Doctors stating that the government was covering up more than 45,000 vaccine-related deaths. Berenson's 17-tweet thread, which received over 16,000 interactions on July 21, 2021, claimed that the CDC had "quietly more than DOUBLED" the number of deaths reported in VAERS, suggesting the CDC had misled the public." *Id.* at 96-97 (89-90).

1348. The VP notes that Berenson had wide audiences nationwide when he was censored: "Twitter permanently deplatformed Berenson in August 2021 for repeated violations of Twitter's COVID-19 falsehoods policy. At the time he lost his account, he had more than 200,000 followers." *Id.* at 97 (90).

1349. The VP states that the government pushed for "accountability" from platforms in successfully pressuring them to adopt vaccine-related censorship policies in the years leading up to COVID-19: "During and after the [2018-19 measles] outbreaks, scientists and congressional leaders sought accountability from the platforms, inquiring about the extent to which vaccine

hesitancy among impacted communities had been exacerbated by misinformation on their products." *Id.* at 131 (124).

1350.   The VP provides a timeline of policy changes becoming more restrictive of vaccine-related misinformation that shows repeated tightening of policies by Facebook, Twitter, and YouTube once President Biden had been elected. *Id.* at 133 (126) fig.5.1.

1351.   The VP calls for more aggressive censorship policies to target speech that is not false or incorrect and that constitutes core political speech: "While progress has been made since platforms first developed vaccine-related policies in 2019, clear gaps in platform policy exist with respect to moderating vaccine-related content, including posts that employ personalized stories, medical freedom claims, and misleading headlines and statistics." *Id.* at 143 (136).

1352.   The VP also calls for more aggressive action to "suppress content" and "deplatform accounts": "In addition, policies about the actions platforms can take to suppress content, promote trusted voices, and deplatform accounts vary widely from platform to platform and are still not enforced consistently, both within and across platforms." *Id.*

1353.   Just like the Surgeon General, the VP demands "more transparency" for "external researchers" (like those at the VP, working closely with government) to oversee the platforms' censorship efforts: "It should be noted that understanding the impact of platform policy is limited by what information is publicly available. It is crucial that platforms provide more transparency on each moderation approach and allow external researchers the ability to independently verify the success and impacts of these interventions." *Id.*

1354.   Like the Surgeon General, the VP argues that "a whole-of-society effort is needed" to stop the spread of so-called misinformation: "[A] whole-of-society effort is needed in which

stakeholders build robust and persistent partnerships to ensure that significant high-harm claims can be addressed as they arise." *Id.* 147 (140).

1355.   This "whole-of-society" effort includes an active role for the government in censoring disfavored speech: "The Virality Project sought to do just that by bringing together four types of stakeholders: (1) research institutions, (2) public health partners, (3) government partners, and (4) platforms. Our recommendations recognize the collective responsibility that all stakeholders have in mitigating the spread of mis- and disinformation…" *Id.*

1356.   According to the VP, "The Virality Project offers an early template for structuring interaction between research institutions and nonacademic stakeholders (including government entities, health practitioners, and private companies)." *Id.*

1357.   According to the VP, it used "ingenuity" to facilitate "the *intake* of tips from … government partners": "An area that required ingenuity was creating a framework for facilitating the *intake* of tips from civil society and government partners…. However, their tips are often highly valuable, so overcoming this challenge is a priority for future efforts." *Id.* at 148 (141) (emphasis added).

1358.   The VP recommends an even more "streamlined" process for "government partners" to provide "tips" of misinformation to be reported for censorship, and it notes that it received tips through "informal exchanges, such as Zoom meetings or calls with our partners": "Streamline tip line processes for civil society and government partners. Set up an efficient channel for intaking external tips…. The Virality Project often had to leverage informal exchanges, such as Zoom meetings or calls with our partners, to receive the tips verbally or encourage additional reporting. In future projects, external reporting channels should be strengthened via an easier

means of reporting and increased access to the reporting channels, especially for partners on the ground (such as health practitioners or government health officials)." *Id.*

1359.   The VP repeatedly cites the work of Surgeon General Murthy, noting that "[d]uring a July 15, 2021, panel with the Virality Project, US Surgeon General Vivek Murthy discussed the importance of vaccination by sharing his own story about COVID-19 … alongside data around the effectiveness of the vaccines." *Id.* at 149 (142). "In the context of vaccine misinformation specifically, some examples of engagement best practices can be found in the Virality Project's July 15, 2021, hosted discussion with Surgeon General Vivek Murthy…" *Id.* at 150 (143).

1360.   According to VP, "While the federal government (through DHHS, the CDC, and the Surgeon General) has ramped up its engagement and communications, more can be done moving forward. There are several areas where government officials can focus to improve their ongoing response to mis- and disinformation surrounding the COVID-19 vaccines." Id. at 149-50 (142-43).

1361.   These include "real-time response" to misinformation on the model provided by CIS and the EI-ISAC for election speech: "Federal, state, and local government officials should coordinate real-time response to emerging mis- and disinformation. … For example, as voting-related mis- and disinformation arose in the 2020 presidential election, the Election Infrastructure Information Sharing and Analysis Center (EI-ISAC) served a critical role in sharing information with the Election Integrity Partnership and pushing its rapid response analysis back out to election stakeholders across all states… Moving forward, the government should support the establishment of such an information-sharing mechanism." *Id.* at 150 (143).

1362.   The VP recommends that the federal government "[i]mplement a Misinformation and Disinformation Center of Excellence (CoE) housed within the federal government," which

"would centralize expertise on mis- and disinformation within the federal government at the Cybersecurity & Infrastructure Security Agency (CISA) with its existing mis- and disinformation team," *i.e.*, Brian Scully's group.  *Id.*

1363.   The VP's "Recommendations to Platforms" reflect near-verbatim language used by the Surgeon General's Health Advisory: "Consistently enforce policies against recurrent actors. … While many platforms have improved transparency around content moderation, there is still inconsistent enforcement of policies, notably in the case of recurring actors. More consistency and transparency is needed around enforcement practices, particularly when prominent or verified accounts are involved.  While past policy environments have been slower to enforce policies against prominent accounts, these are the accounts with the greatest potential for impact. If anything, they may merit closer scrutiny."  *Id.* at 152 (145).

1364.   Likewise, the VP recommends that platforms "[c]ontinue to prioritize and improve data sharing. The Virality Project's research would not have been possible without access to public platform data. For privacy reasons, some data understandably may be limited, but in general, establishing standardized guidelines about how platforms can share data with research institutions is needed." *Id.* at 153 (146).

1365.   "Notably, engagement numbers are the closest proxy that researchers have to understand what content users see on social media platforms. However, engagement is not the same thing as impressions, or user views—how many times a piece of content is seen by users. Ideally, access to user impression data would be available, allowing researchers to directly measure when and how content is surfaced to users by social media platforms. Unfortunately, social media platforms often do not make impression data available to researchers; as a result of this chronic

gap, assessing impact and reach, or the dynamics of platform curation, remains a significant challenge." *Id.*

## X.   Federal Censorship Inflicts Grave, Imminent, and Ongoing Injuries on Plaintiffs.

1366.   The foregoing conduct has inflicted and continues to inflict ongoing and imminent injuries on both the private Plaintiffs and the States of Louisiana and Missouri.

### A.   Defendants Gravely Injure the Individual Plaintiffs.

1367.   The individual Plaintiffs provide undisputed evidence of how they have suffered from federally-induced censorship.  Docs. 10-3 (Declaration of Dr. Jayanta Bhattacharya), 10-4 (Declaration of Dr. Martin Kulldorff), 10-5 (Declaration of Jim Hoft), 10-7 (Declaration of Dr. Aaron Kheriaty), 10-12 (Declaration of Jill Hines).   The Government does not dispute this evidence.

1368.   Dr. Bhattacharya attests that, "Because of my views on COVID-19 restrictions, I have been specifically targeted for censorship by federal government officials."  Doc. 10-3, ¶ 5. He notes that "[t]he Great Barrington Declaration received an immediate backlash from senior government officials who were the architects of the lockdown policies, such as Dr. Anthony Fauci…"  *Id.* ¶ 13.  "Because it contradicted the government's preferred response to COVID-19, the Great Barrington Declaration was immediately targeted for suppression by federal officials." *Id.* ¶ 14. "Instead, what followed was a relentless *covert* campaign of social-media censorship of our dissenting view from the government's preferred message."  *Id.* ¶ 15.

1369.   As a result of this "covert campaign," Dr. Bhattacharya experiences ongoing injuries, including the de-boosting of search results in Google, *id.* ¶16; the removal of links to the Great Barrington Declaration in Reddit discussions, *id.*; the ongoing removal of a YouTube video discussing the Great Barrington Declaration and related issues with Governor DeSantis, *id.* ¶¶ 17-

18; the removal of personal Tweets, *id.* ¶¶ 25-26; the removal of LinkedIn posts, *id.* ¶¶ 28-29; and account termination by LinkedIn, *id.* ¶ 30.

1370.   Dr. Bhattacharya observes that he lacks access to his colleagues' speech and viewpoints as well, because "social-media censorship has not focused solely on the co-authors of the Great Barrington Declaration, but has swept in many other scientists as well: Twitter, LinkedIn, YouTube, Facebook, they have permanently suspended many accounts—including scientists." *Id.* ¶ 31.

*1371.*   As Dr. Bhattacharya observers, "[t]hese censorship policies have driven scientists and others to self-censorship, as scientists … restrict what they say on social-media platforms to avoid suspension and other penalties.*" Id.* ¶ *31.*

*1372.*   Dr. Bhattacharya attests based on personal experience: "Having observed and lived through the government-driven censorship of the Great Barrington Declaration and its co-authors, it is clear to me that these attacks were politically driven by government actors. … One of the motivations for that was a motivation to create … an illusion of consensus within the public that there was no scientific dissent against lockdowns. [T]he Great Barrington Declaration … posed a political problem for them because they wanted to tell the public that there was no dissent. And so, they had to destroy us. They had to do a devastating takedown.*" Id.* ¶ 32.

*1373.*   Dr. Kulldorff likewise attests that there is "an organized campaign against the Great Barrington Declaration," Doc. 10-4, ¶ 14.  He notes that the GBD "was censored on social media in an apparent attempt to prevent it from … 'getting a lot of attention,'" *id.* ¶ 15; including Google debooosting search results, *id.*, and Facebook removing content related to it, *id.* ¶ *16.*

1374.   Dr. Kulldorff also identifies an ongoing campaign of censorship against his personal social-media accounts, including censored personal Tweets on Twitter*, id.* ¶¶ *17-18;*

censored posts criticizing mask mandates, *id.* ¶ *19;* ongoing self-censorship to avoid further censorship penalties, *id.* ¶¶ 20, 27; removal of YouTube content, *id.* ¶ 21; removal of LinkedIn posts, *id.* ¶¶ 22-25; and the ongoing permanent suspension of his LinkedIn account, *id.* ¶ 26.

1375.   Dr. Kulldorff has experienced direct censorship of his social-media speech in addition to the Great Barrington Declaration.  For example, his Tweets questioning the efficacy of masking and criticizing government mask mandates have been censored and caused him to be suspended from Twitter.  *Id.* ¶¶ 18-19.

1376.   Dr. Kulldorff has also engaged in self-censorship to avoid being suspended or removed from social media: "Twitter is an important venue for communicating accurate public health information to the public. Because of the censoring, and the suspension of other scientists, I have had to self-censor myself on the platform."  *Id.* ¶ 20.

1377.   Dr. Bhattacharya and Dr. Kulldorff's roundtable discussion with Governor Ron DeSantis—which featured all three co-authors of the Great Barrington Declaration—was removed from YouTube.  The roundtable discussion addressed the Great Barrington Declaration and its premises in detail.  As Dr. Kulldorff recounts, "On March 18, 2021, I participated in a two-hour roundtable discussion with Governor Ron DeSantis in Florida, along with Dr. Sunetra Gupta at Oxford, Dr. Jay Bhattacharya at Stanford and Dr. Scott Atlas at Stanford. In this discussion, we made remarks critical of COVID-19 restrictions, including mask mandates on children. I stated that 'children should not wear face masks, no. They don't need it for their own protection, and they don't need it for protecting other people either.' … Dr. Gupta stated that "to force [children] to wear masks and distance socially, all of that to me is in direct violation of our social contract.' In the same roundtable, we also argued against vaccine passports. 'Let's try to argue against that

from the very beginning before it sort of takes off.' Unfortunately, the video of the roundtable was removed by YouTube, which is owned by Google." *Id.* ¶ 21.

1378.   Dr. Kulldorff also experiences ongoing censorship on "LinkedIn, which is a popular communications platform among scientists and other professionals." *Id.* ¶ 22-26.   LinkedIn has blocked and removed his posts opposing vaccine mandates and promoting the benefits of natural immunity. *Id.*   These included posts in which he and Dr. Bhattacharya "criticized the official Covid-19 response as formulated by Dr. Anthony Fauci." *Id.* ¶ 25.

1379.   Dr. Kulldorff states that he and other scientists engage in self-censorship to avoid being terminated from social-media platforms: "Twitter and LinkedIn are important venues for communicating accurate public health information to other scientists and to the public. Because of the censoring, and the suspension of other scientists, I have had to self-censor myself on both platforms.  Sometimes by not posting important public health information." *Id.* ¶ 27.

1380.   Dr. Kulldorff notes that social-media censorship directly affects him as a *reader* of other scientists' speech on social media, on an ongoing basis, by reducing his access to the thoughts and views of scientists who dissent from the government-mandated orthodoxy: "Social-media censorship has not focused solely on the co-authors of the Great Barrington Declaration but has swept in many other scientists as well. These censorship policies have driven scientists and others to self-censor, as scientists like me restrict what we say on social-media platforms to avoid suspension and other penalties. In fact, the most devastating consequence of censoring is not the actual posts or accounts that are censored or suspended, but the reluctance of scientists to openly express and debate scientific questions using their varied scientific expertise. Without scientific debate, science cannot survive." *Id.* ¶ 28.

1381.  Dr. Kheriaty, also, describes ongoing injuries from social-media censorship of views dissenting from the government-preferred narratives about COVID-19.  He experiences an ongoing pattern of censorship and removals lasting over years: "I have always shared peer-reviewed research findings as well as my own opinions and perspectives on Twitter and LinkedIn. It was not until I began posting information about covid and our covid response policies, however, that I encountered censorship on the Twitter platform. This began in 2020 when I published an article on the adverse mental health consequences of lockdowns. The problem became more pronounced in 2021 when I shared my Wall Street Journal article and other information on ethical issues related to vaccine mandates."  Doc. 10-7, ¶ 11.

1382.  As Dr. Kheriaty notes, "[t]he Twitter censorship took several forms."  *Id.*  He describes suffering artificial limitations on the number of followers on his social-media accounts, *id.* ¶¶ 12-13; "shadow banning" of social-media posts that "challenge[] the federal government's preferred covid policies," *id.* ¶¶ 14-15; self-censorship to avoid further adverse consequences or permanent bans, *id.* ¶ 16; and removal of content from YouTube, *id.* ¶ 17.  Dr. Kheriaty specifically notes that the problem of "shadow banning" his social-media posts is ongoing and increasing, as it "intensified in 2022."  *Id.* ¶ 15.  Further, he notes that "[t]he pattern of content censored on these social media platforms mirrors closely the CDC and Biden administration policies."  *Id.* ¶ 18.

1383.  Dr. Kheriaty describes the ongoing experience of shadow-banning: "I encountered evidence of this shadow-banning in 2021 before I was let go from the University after I started posting on covid topics, and the problem intensified in 2022 following my dismissal, as I continued to post frequently on the ethics of vaccine mandates for competent adults."  *Id.* ¶ 15.

1384.  Dr. Kheriaty also experiences ongoing injury as a *reader* of other speakers' content on social media, as government policies cause censorship and self-censorship of their content as

well: "I have several of my friends and colleagues—including Dr. Peter McCollough and Dr. Robert Malone—who were temporarily (McCollough) or permanently (Malone) banned from Twitter for posing peer-reviewed scientific findings regarding the covid vaccines." *Id.* ¶ 16.

1385.   Dr. Kheriaty also engages in self-censorship to avoid more severe penalties from the platforms: "Even though the ethics of vaccine mandates is among my areas of expertise, and an area that has impacted me personally and professionally, I am extremely careful when posting any information on Twitter related to the vaccines, to avoid getting banned. This self-censorship has limited what I can say publicly on topics where I have specific scientific and ethical expertise and professional experience." *Id.* ¶ 16.

1386.   Dr. Kheriaty observes a close link between this ongoing pattern of social-media censorship and speech that criticizes government policies: "The pattern of content censored on these social media platforms mirrors closely the CDC and Biden administration policies. In my experience using these platforms to discuss covid topics, any content that challenges those federal policies is subject to severe censorship, without explanation, on Twitter and YouTube—even when the information shared is taken straight from peer-reviewed scientific literature." *Id.* ¶ 18.

1387.   Plaintiff Jim Hoft attests both ongoing injuries and the imminent expectation of future injuries. Doc. 10-5. Hoft is the "founder, owner, and operator of the popular news website The Gateway Pundit ('GP'), gatewaypundit.com. … Since its founding in 2004, the Gateway Pundit has grown from a one-man blog to one of the internet's largest destinations for conservative news and commentary. In 2021, The Gateway Pundit was ranked fourth on a list of top ten conservative news websites, ranked by monthly web searches, with over 2 million searches per month." *Id.* ¶ 2.  The Gateway Pundit has large social-media followings on multiple platforms: "In particular, GP's Twitter account had over 400,000 followers before it was suspended.  GP's

Facebook account has over 650,000 followers. GP's Instagram account has over 205,000 followers. GP's YouTube account has over 98,000 followers." *Id.* ¶ 3.

1388.   Hoft notes that The Gateway Pundit's "social media accounts have experienced censorship on all major social-media platforms," which "has followed and reflected the calls for censorship from federal government officials, including in the Biden Administration." *Id.* ¶ 4. These acts of censorship include suspensions from his Twitter account and another personal Twitter account, *id.* ¶¶ 6-7, 10; a permanent ban from his Twitter account, *id.* ¶ 8; labels applied to Twitter posts on personal accounts, *id.* ¶ 9; warning labels imposed on Facebook posts and other restrictions on his Facebook account, *id.* ¶ 12; permanent removal of content posted on Facebook, *id.* ¶ 13; prevention of sharing of Facebook-posted content, *id.*; removal of content from YouTube, *id.* ¶ 14; imposition of sanctions on Mr. Hoft's followers for re-posting or amplifying his speech, *id.* ¶ 15; engaging in self-censorship to avoid permanent bans or other more serious sanctions from the social-media platforms, *id.* ¶ 16; and demonetization by Google, *id.* ¶ 19; *see also id.* ¶¶ 18-20.

1389.   Hoft observers that "GP's social media accounts have experienced censorship on all major social-media platforms, including its speech regarding COVID-19 issues and election security. In many instances, we have noticed that this censorship has followed and reflected the calls for censorship from federal government officials, including in the Biden Administration." *Id.* ¶ 4. "For example, the current Administration has repeatedly called for censorship of social media speech regarding election integrity and so-called 'COVID-19 misinformation.' GP has experienced significant social-media censorship regarding its speech on both of those issues, including on Twitter, Facebook, and YouTube." *Id.* ¶ 5.

1390.   Hoft has experienced censorship for COVID speech that is now widely acknowledged to be true, such as a suspension from Twitter for claiming that the vaccines do not prevent infection, and the claim that COVID deaths are overcounted by including deaths from other causes: "On or about January 2, 2021, Twitter suspended GP's Twitter account (@gatewaypundit) after it posted a tweet that stated, "Then It's Not a Vaccine: Crazy Dr. Fauci Says Early COVID Vaccines Will Only Prevent Symptoms and NOT Block the Infection …What?"  *Id.* ¶ 6; *see also id.* ¶ 9.

1391.   The Gateway Pundit also experienced censorship under Twitter's "hacked materials" policy by retweeting the contents of Hunter Biden's laptop.  After a GP blogger "tweeted content related to Hunter Biden's laptop," "Twitter suspended the account on the ground that he 'Violat[ed] our rules against posting or sharing privately produced/ distributed intimate media of someone without their express consent.'"  *Id.* ¶ 10.

1392.   Hoft also experiences a long list of acts of censorship from Facebook: "Facebook frequently imposed warning labels and other restrictions on our content, particularly content related to election integrity and COVID-19. Facebook's censorship was so aggressive that I was forced to hire an assistant to monitor and address censorship on Facebook."  *Id.* ¶ 11; *see also id.* ¶ 12.  Facebook imposes labels on Hoft's content that require the reader, before viewing Hoft's content, to click-through a Facebook-imposed screen that states: "The Gateway Pundit is an American far-right news and opinion website.  The website is known for publishing falsehoods, hoaxes, and conspiracy theories."  *Id.* at 12.  It also labels Hoft's postings as "Missing Context" even when their truth is undisputed.  *Id.* at 20-23.  And it labels expressions of core political opinion as "Partly False."  *Id.* at 28; *see also id.* 29-58 (many other examples of such labeling and blocking from reposting on Facebook and Twitter).

342

1393.   As Hoft notes, Facebook also prevents Hoft's audiences from reposting or amplifying his content: "Facebook also [dis]courages (or otherwise outright prohibits) the public from sharing our content with their social networks."  *Id.* ¶ 13.  Hoft describes this second-order censorship in detail: "The social-media platforms have extended their censorship policies to our followers as well. We have received numerous reports from followers that they have received temporary suspensions or other adverse actions from social-media platforms (such as seven-day suspensions of their Facebook accounts) for re-posting or amplifying our content. This chills our followers from re-posting, re-tweeting, or otherwise amplifying our content. The risk of being locked out of Facebook for seven days, or suffering other forms of censorship, deters our followers from amplifying our content on social media platforms, which reduces the reach of our message." *Id.* ¶ 15.

1394.   Hoft also describes ongoing self-censorship to avoid more severe penalties on social media: "These social-media censorship policies chill GP's freedom of expression on social media platforms as well. To avoid suspension and other forms of censorship, we frequently avoid posting content that we would otherwise post on social-media platforms, and we frequently alter content to make it less likely to trigger censorship policies."  *Id.* ¶ 16.

1395.   Hoft observes that the censorship of his content on social media closely tracks the censorship preferences of federal officials: "Based on my close observation of the patterns of censorship of GP's social-media accounts and related accounts in recent years, I have strong reason to infer that federal government officials are directly involved in the censorship of our speech and content." *Id.* ¶ 17.  Hoft's posts that have faced censorship include posts criticizing the FBI, *id.* at 9; and criticizing the administration of the 2020 election, *id.* at 11;

1396.   Hoft continues to experience censorship, including up to the date he executed his declaration.  For example, he received a strike on YouTube on May 14, 2022, and YouTube removed the video he had posted, for speech regarding election integrity that discussed the problem of election fraud and raised questions about the outcome of the 2020 Presidential election, including money Idaho illegally received from Mark Zuckerberg and other problems relating to voter fraud.  *Id.* ¶ 14.

1397.   Plaintiff Jill Hines is the "Co-Director of Health Freedom Louisiana, a consumer and human rights advocacy organization." Doc. 10-12, ¶ 2.  Hines's "organization engages in public advocacy on behalf of Louisiana citizens on issues of health freedom and fundamental human rights. [Hines] ha[s] testified before the Louisiana legislature approximately 20 times on such issues." *Id.* ¶ 3.  Hines attests that, "Because our organization recognizes the need to educate and inform the public of their rights regarding state and federal laws concerning vaccinations, we have experienced social media censorship of our speech regarding vaccine information." *Id.* ¶ 2. Hines has "approximately 13,000 followers each on Health Freedom Louisiana and Reopen Louisiana." *Id.* ¶ 2.  Among other things, Hines' organization "advocate[s] against the imposition of mask mandates on children, especially during prolonged periods, as in schools." *Id.* ¶ 4.  Hines also "launched a grassroots effort called Reopen Louisiana on April 16, 2020 to help expand our reach on social media and take on the issues surrounding the continued government shutdown." *Id.* ¶ 6.

1398.   Hines describes continuous and ongoing censorship on social media from pressure wielded by federal officials: "In the last two years, any information that was not positive in nature or conveyed adverse events associated with shutdown or mitigation efforts was deemed 'misinformation.'  Dr. Anthony Fauci has used the term repeatedly and it has been adopted by the

press and media." *Id.* ¶ 5.  Hines continues to suffer ongoing social-media censorship, and the acts of censorship include application of warnings on Facebook content, *id.* ¶ 8; the reduction of her reach to audiences on Facebook, *id.*; removal of content and sanctions, including 30-day suspensions, from Facebook, *id.* ¶ 9; 24-hour suspensions that prevented her from organizing people to advocate to the Louisiana legislature, *id.* ¶ 10; shadow-banning and dramatically restricting the reach of her speech to its audiences, id. ¶ 10; and the complete de-platforming of Facebook groups intended to organize Louisianans to petition their government, id. ¶¶ 13-14.  Ms. Hines states that "[r]emoving our closed group at such a crucial time effectively stopped our ability to communicate with our representatives in the state legislature."  Id. ¶ 14.  "To say the cards are stacked against me is an understatement."  Id. ¶ 16.

1399.  Hines attests that the censorship campaign against her social-media speech is ongoing, noting that "[p]osts pointing to lack of safety of masking were and are targeted, as well as articles that mention adverse events of vaccinations, including VAERS data."  Id. ¶ 9.  She continues to suffer specific, new acts of censorship, including right up to the time when she executed her Declaration on June 9, 2022: "The most recent restriction [was] in late May 2022." *Id.*  Ms. Hines notes that "[m]y personal Facebook page, and the Facebook pages of both Health Freedom Louisiana and Reopen Louisiana, are all under constant threat of being completely deplatformed.  My personal account is currently restricted for 90 days."  Id. ¶ 12.

1400.  Hines reports that acts of censorship of her COVID-19-related speech have occurred continuously up to the present: "Over the last year and a half since we noticed social-media censorship beginning in October 2020, my pages have been hit with numerous 'fact checks' and 'community standards' violations."  *Id.* ¶ 11.

1401.   Hines has observed a link between the censorship that her groups have experienced and the public demands for censorship from federal officials: "Many similar threats from federal officials followed … especially as covid became a public concern. In the last two years, any information that was not positive in nature or conveyed adverse events associated with shutdown or mitigation efforts was deemed 'misinformation.' Dr. Anthony Fauci has used the term repeatedly and it has been adopted by the press and media." *Id.* ¶ 5.

1402.   Social-media censorship dramatically reduces the reach of Hines's speech: "our analytics showed that we were reaching approximately 1.4 million people in a month's time on one of our Facebook pages, but after sharing photos of the mouths of children suffering from impetigo from long-term mask use, our page received a warning and our reach was reduced to thousands." *Id.* ¶ 8.

1403.   Hines experiences an ongoing campaign of social-media censorship that extends to the present, the date she executed her declaration: "This began a long series of attempts to censor our posts on Facebook and other social-media platforms. Posts pointing to lack of safety of masking were and are targeted, as well as articles that mention adverse events of vaccinations, including VAERS data. I was completely restricted from Facebook for 30 days starting in January 2022 for sharing the image of a display board used in a legislative hearing that had Pfizer's preclinical trial data on it. The most recent restriction, in late May 2022, was for re-posting an Epoch Times article that discussed a pre-print study detailing increased emergency calls for teens with myocarditis following covid vaccination." *Id.* ¶ 9.

1404.   Censorship of Hines's social-media speech directly impairs her efforts to engage in political organization to petition her government to change its policies: "One post in particular that was hit with a 'community standards' warning on October 6, 2020, was a 'call to action' asking

people to contact their legislators to end the governor's mask mandate. On the same day, we were asking people to testify during the Legislature's Second Extraordinary Session regarding a bill … that would prohibit a covid vaccine employee mandate. I was prohibited from posting for 24 hours on all pages, including my own. When I was finally able to post again, our reach was significantly diminished, compared with our 1.4 million per month rate beforehand. Our page engagement was almost non-existent for months. It felt like I was posting in a black hole. Each time you build viewership up, it is knocked back down with each violation. Our current analytics show Reopen Louisiana is reaching around 98,000 in the last month and Health Freedom Louisiana is only reaching 19,000. There are warnings when you search for Health Freedom Louisiana. People that regularly interacted with our page were never heard from again. Some people who did find the page later on, asked us where we went." *Id.* ¶ 10.

1405.  Hines suffers repeated censorship on individual posts as well, including undisputedly truthful information: "Over the last year and a half since we noticed social-media censorship beginning in October 2020, my pages have been hit with numerous 'fact checks' and 'community standards' violations. Articles with health concerns related to mask wearing have been targeted … as well as articles relating to pregnant women being vaccinated. … Data taken directly from VAERS was flagged as misinformation and we received 'fact checks' for that as well, even if it contained a disclaimer about causation." *Id.* ¶ 11.

1406.  Hines attests that she is under current and constant threat of more severe censorship penalties, including deplatforming: "My personal Facebook page, and the Facebook pages of both Health Freedom Louisiana and Reopen Louisiana, are all under constant threat of being completely deplatformed. My personal account is currently restricted for 90 days." *Id.* ¶12.

1407.  Hines engages in self-censorship to avoid more severe penalties: "On many occasions, I have altered the spelling of words, used emoji's, or placed links in comments to avoid censorship." *Id.* ¶ 12.

1408.  Hines's health-freedom groups were completely deplatformed, inflicting a severe and direct injury on her ability to engage in political organization to amplify her message and petition the government: "two of our Facebook groups were completely deplatformed, effectively disbanding a group of more than two thousand people who were organized to engage in direct advocacy to our state legislature, on two separate occasions. There were two groups that were deplatformed: HFL Group and North Shore HFL. … HFL Group had almost 2,000 people, and North Shore HFL had less than 500 before it was taken down." *Id.* ¶ 13.

1409.  This censorship directly interfered with the core political speech and advocacy of Hines and thousands of Louisianans: "The last post I made in our HFL Group on July 13, 2021, was a 'call to action' for the upcoming Veto Session, asking people to contact legislators regarding health freedom legislation. During the regular legislative session, we had two bills that were passed successfully, but both were vetoed by the governor, including a hugely popular bill that prohibited the addition of vaccine information on a state issued driver's license. The other bill provided immunity from liability for businesses that did not impose a covid vaccine mandate. Removing our closed group at such a crucial time effectively stopped our ability to communicate with our representatives in the state legislature." *Id.* ¶ 14.

1410.  To this day, Hines's political message, and those of thousands of Louisianans, is greatly diminished from this censorship: "After North Shore was deplatformed, we looked for alternatives for daily communication. We were to the point of speaking in code on Facebook, so

moving away from traditional social media was the only option. We currently have 80 members in a chat app called GroupMe. We have no statewide reach with that tool." *Id.* ¶ 15.

1411.   Censorship undercuts Hines's ability to "effectively communicate with people," including Louisiana state officials, about her political views: "It has been incredibly frustrating knowing that the government's narrative is going unchallenged and that we have not been able to effectively communicate with people. Knowing that government agencies colluded with Facebook to suppress the messaging of groups like mine while paying exorbitant amounts to promote vaccinations and covid policies has been especially disheartening. To say the cards are stacked against me is an understatement." *Id.*¶ 16.

## B.    Defendants Gravely Injure Similarly Situated Speakers and Listeners.

1412.   Plaintiffs' unrebutted evidence demonstrates that other similarly situated speakers have suffered and are suffering similar, ongoing, and imminent injuries from government-induced censorship on social media.

1413.   For example, Michael Senger had over 112,000 followers on Twitter, including in Missouri and Louisiana; he attests that he was twice suspended from Twitter and then permanently banned for posting Tweets critical of government policies for responding to COVID-19.  Doc. 10-2, ¶¶ 4-8.  He was temporarily suspended twice for tweets criticizing the FDA's emergency approval of COVID vaccines and for posting a video document public officials' statements on vaccine effectiveness. *Id.*¶ 4-6.  On March 8, 2022, he was permanently suspended from Twitter for posting a statement of core political opinion criticizing government policy, stating that "every COVID policy—from the lockdowns and masks to the tests, death coding, and vaccine passes— has been one, giant fraud." *Id.*¶ 7-8.  This permanent suspension was inconsistent with Twitter's own policies. *Id.*¶ 10.  Senger attests that the censorship inflicts ongoing harm on him, both

"personally and professionally": "I discovered a gift that I had for writing and developed a network of thousands of intelligent people from all over the world with whom I had a close relationship discussing these and other issues. Now I have been silenced and cut off from all of them, with no viable way of getting that network back or promoting my work, seemingly for the sole crime of being too articulate in vocalizing my beliefs."  *Id.* ¶ 13.

1414.   Jeff Allen is the proprietor of "NewsTalkSTL, a popular news talk radio station in the St. Louis, Missouri region," which "enjoys a substantial Missouri audience."  Doc. 10-8, ¶¶ 2-3.  His station posts content on YouTube, and he describes how the station "has been targeted by YouTube from the moment of its launch in July 2021" through the present, including flagging the station's first promotional video, and issuing "strikes" for "COVID-related and election-related 'misinformation.'"  *Id.* ¶¶ 4-6.  These include removing a video of a show that "featured discussion of timely COVID issues, including testing and vaccines and treatments," and issuing a strike for that posting.  *Id.* ¶¶ 9-10.  His station "continued to receive strikes" from YouTube "in the first week of January and into February, 2022" for COVID-related content, *id.* ¶ 12.  On March 14, 2022, Allen's station aired a show on "election integrity" that did not claim any election was stolen, but discussed polling data indicating that many Americans have grave concerns about election integrity.  *Id.* ¶¶ 13-14.  On March 21, 2022, YouTube permanently removed the station's channel as a result of that posting.  *Id.* ¶ 15.  "In so doing, YouTube deleted all of our content and prevented any more posts, silencing our voice and our expression from the platform entirely."  *Id.* ¶ 16.

1415.   Allen has also experienced significant and ongoing censorship from Facebook: "Facebook has also targeted our content, pulling advertisements and issuing temporary suspensions, also for COVID and election-related 'misinformation.'"  *Id.* ¶ 18.

1416.   Mark Changizi is a commentator on Twitter with 37,000 followers, including many in Missouri and Louisiana.  Doc. 10-9, ¶ 7, 38.  Changizi experiences longstanding and ongoing censorship on Twitter, including a first suspension on April 20, 2021 "for linking to an article on the safety and efficacy of face masks," *id.* ¶ 18; additional suspension on June 25, 2021, *id.*¶ 19; having his account secretly "heavily censored and deboosted," meaning that "the user's tweets are de-platformed—they appear in Twitter feeds much less frequently and replies to other posts may be hidden," *id.* ¶ 20; covert loss of followers, much like Dr. Kheriaty, ¶ 21; and a permanent Twitter suspension on December 18, 2021, for tweets comparing the danger of COVID-19 to the flu and promoting the benefits of natural immunity, *id.* ¶ 23.  He experiences similar shadow-banning by YouTube, as his "follower-ships at YouTube also plateaued and reversed despite the fact that [he] was very active," *id.* ¶ 31.  He observes that Twitter is also censoring his *private* direct messages to other Twitter users, *id.* ¶¶ 32-35.  And two of his YouTube videos are also censored with their content removed from YouTube.  *Id.* ¶ 36.

1417.   Changizi engages in self-censorship on social media to avoid more severe penalties, *id.* ¶¶ 39-42, and he has "become very careful about what I say on Twitter and YouTube (and Facebook and Instagram) to avoid suspension."  *Id.* ¶ 39.

1418.   Changizi perceives a link between the censorship he experiences and pressure from federal officials, *id.*¶¶ 43-47.  He observes: "Twitter notoriously suspends only those who question the wisdom and efficacy of government restrictions, or who cast doubt on the safety or efficacy of the vaccines."  *Id.*¶ 50.  He also observes the pro-government bias in social-media censorship decisions: "there are no examples of Twitter suspending individuals who have spread misinformation from the other side—by, for example, exaggerating the efficacy of masks or the threat the virus poses to children."  *Id.*¶ 51.

1419.   Daniel Kotzin observes that his censorship at Twitter began in September 2021, after which he was suspended by Twitter four times, including a 24-hour suspension, two seven-day suspensions, and a permanent ban.  Doc. 10-10, ¶¶ 11-12.  He received these penalties for tweets questioning whether COVID vaccines reduce infection and transmission, referring to natural immunity, and criticizing government policies on lockdowns and mask mandates.  *Id.* ¶¶ 13, 15, 17.  He was permanently suspended on April 29, 2022, for a truthful tweet stating: "Myocarditis, pericarditis, blood clots, and strokes are known potential side effects of covid vaccination.  That is not my idea of safe."  *Id.* ¶ 19.

1420.   Kotzin attests that "[p]ermanent expulsion from Twitter has been devastating for me.  I had spent 2 years building my Twitter following. Two years ago, I had fewer than 100 followers, and at the time of my permanent suspension I had nearly 32,000.  When my account is suspended, I am unable to communicate with my followers."  *Id.* ¶¶ 21-23.

1421.   Kotzin observes an increase in censorship on Twitter after the Surgeon General's Request for Information issued on March 3, 2022.  "Based on my observations and extensive Twitter use, many more accounts than usual have been suspended since the Surgeon General's RFI on March 3."  *Id.* ¶ 25.  This increase in censorship affected Kotzin directly: "Since the Surgeon General's Request for "health misinformation" in March [2022] I have been suspended four times by Twitter, and have now been permanently banned."  *Id.* ¶ 35.

1422.   Kotzin notes that suspension results in loss of one's own prior expression: "When an account is permanently suspended, everything the person ever wrote is erased and cannot be accessed by anyone."  *Id.* ¶ 27.

1423.  Kotzin describes that he "methodically self-censored" to avoid permanent suspension: "Since the [Surgeon General's] RFI, many of us who are critical of government covid

policies have been regulating our speech more carefully than ever, because we have noticed that more of us are getting suspended than ever before, and we don't want to risk losing our audience. I considered the possibility of 'permanent suspension' to be such a devastating prospect that I methodically self-censored." *Id.* ¶¶ 28-29; *see also id.* ¶¶ 31-32.

1424.   Kotzin observes a close link between social-media censorship and the federal government's policies and preferred narratives: "Twitter suspends only those who question the wisdom and efficacy of government restrictions, or those who cast doubt on the necessity, safety or efficacy of the vaccines.  If all or almost all suspensions are targeted at critics of the government and government policies, and no or almost no suspensions are targeted at purveyors of factually incorrect information, then it is not 'misinformation' that is being censored, but criticism of the government." *Id.* ¶¶ 34-35.

1425.   Joshua McCollum is a concerned parent in a school district in Missouri.  Doc. 10-14, ¶¶ 1-4.  Like Hines, he has experienced censorship that directly interferes with his ability to organize, associate with like-minded people, and petition his local government: "On or about July 28, 2021, in the midst of discussing with others a recent school board meeting related to masks, and whether FHSD would keep its policy of optional masking versus change their policy to mandatory masking, [McCollum] decided to launch an online petition to encourage the board members to keep their optional masking policy and *not* change to mandatory masking." *Id.* ¶ 9. Through his account on Nextdoor (a Meta/Facebook platform), he posted this petition on change.org, and "[t]he posting of this petition on change.org was the beginning of the shadow-banning and blocking of my Nextdoor account." *Id.* ¶ 11.  Comments were blocked from his Nextdoor account, and then his Nextdoor account was suspended for one month for "spreading misinformation." *Id.*¶¶ 12-14.  This censorship prevented him from organizing, associating with

others, and petitioning his local government, when those on the other side of the issue were allowed to do so: "Subsequently, on August 12, 2021, FHSD decided to reinstate their mandatory masking policy, shortly after the voice of myself and the 280 fellow petition signers was suppressed.  There were petitions encouraging reinstatement of mandatory masking, but our contrary petition was suppressed by Nextdoor.  I am a parent simply trying to have a voice in my local school district and its policies regarding my own children, but social media has stooped down to censor even my voice within my local community."  *Id.*¶¶ 15-17.

1426.   Jessica Marie Gulmire is a freelance journalist for the Epoch Times who resides in Missouri, and has readership in Missouri and Louisiana.  Doc. 10-15, ¶¶ 1-3.  Gulmire has "been censored numerous times by Facebook and Twitter even before I joined The Epoch Times in the summer of 2021," as her "personal posts regarding excessive COVID-19 measures and regarding the election were repeatedly flagged and taken down by Facebook and Twitter."  *Id.* ¶¶ 7-8.  Her journalism for the Epoch Times has also been censored by Facebook, including an article questioning the evidence for vaccinating pregnant women with COVID-19 vaccines that was later validated by Pfizer documents, *id.* ¶¶ 10-13; and an article in March 2022 for The Federalist about the People's Convoy of truckers in the United States supporting their Canadian counterparts, *id.* 18-19.  She has also had eleven articles about "mask mandates, vaccines, lockdowns and mental health" censored on Pinterest, *id.* ¶ 17.

**C.   Defendants Gravely Injure the State Plaintiffs, Louisiana and Missouri.**

**1.   Fundamental policies favoring freedom of speech for their citizens.**

1427.   Both Louisiana and Missouri have adopted fundamental policies favoring freedom of speech, without government-induced censorship, for their citizens.  La. Const. art. I, § 7; Mo. Const. art. I, § 8.

### 2.      Direct censorship of the States and their political subdivisions.

1428.   Both Louisiana and Missouri, and their political subdivisions, have experienced direct social-media censorship on COVID and related issues.   For example, Louisiana's Department of Justice—the office of its Attorney General—was directly censored on YouTube for posting video footage of Louisianans criticizing mask mandates and COVID-19 lockdown measures on August 18, 2021—on August 18, 2021, just after the federal Defendants' most vociferous calls for censorship of COVID "misinformation."  Bosch Decl., Doc. 10-13, ¶ 7.

1429.   In addition, a Louisiana state legislator was censored by Facebook when he posted content addressing vaccinating children against COVID-19.  Bosch Decl., Doc. 10-13, ¶ 9.

1430.   St. Louis County, a political subdivision of Missouri, conducted public meetings regarding proposed county-wide mask mandates, at which some citizens made public comments opposing mask mandates. Flesh Decl., Doc. 10-6, ¶ 7.  Missouri's open-meetings law required St. Louis County to post publicly the videos of those meetings, but YouTube censored the entire videos of four public meetings, removing the content, because some citizens publicly expressed views that masks are ineffective.  *Id.*

### 3. The States' interest in following the uncensored discourse of their citizens.

1431. Patrick Flesch, Director of Constituent Services for the Missouri Attorney General's Office, explains that he is "personally involved in, receiving, reviewing, and responding to thousands of communications from Missouri constituents per year."  Doc. 10-6, ¶ 3.  He explains that being able to follow Missourians' uncensored speech on social media is essential for him to do his job effectively, as understanding Missourians' true thoughts and concerns on policy matters like election integrity and COVID-19 is necessary to craft policies and messages that are responsive to constituents' actual concerns.  Doc. 10-6, ¶ 3-4.  This "includes monitoring activity

and mentions on multiple social media platforms, including Facebook, Twitter, and YouTube." *Id.* "I monitor these sorts of trends *on a daily or even hourly basis* when needed on behalf of the Office." *Id.* (emphasis added).  For example, regarding the censorship of St. Louis County's video of its public meeting where citizens opposed mask mandates, Flesch notes: "This video is just the sort of information that is important for me to review, and yet it was unavailable for a critical period of time due to online censorship of speech questioning the efficacy of mask mandates." *Id.*¶ 7.  Likewise, regarding YouTube censoring Jeff Allen's radio station NewsTalkSTL, and Nextdoor censoring Joshua McCollum's online petition, Flesch observes: "These examples are just the sort of online speech by Missourians that it is important for me and the Missouri Attorney General's Office to be aware of."  *Id.* ¶¶ 9.

1432.   As Flesch attests, "The kinds of speech discussed above and in the Complaint in this case—such as speech about the efficacy of COVID-19 restrictions, and speech about issues of election security and election integrity—are matters of core interest and high importance to me in my work on behalf of the AGO. When such speech is censored on social media, it makes it much harder for me to do my job and to understand what Missourians really are concerned about."  *Id.*¶ 10.

1433.   As Mr. Flesch explains in detail: "Issues regarding COVID-19 responses (such as mask mandates imposed by municipalities and school districts on schoolchildren) and election security and integrity have been of critical importance to Missourians in recent months and years. …  It is very important for me to have access to free public discourse on social media on these issues so I can understand what Missourians are actually thinking, feeling, and expressing about such issues, and so I can communicate effectively with them."  *Id.* ¶ 5.  "[O]nline censorship of

356

free public discourse on social-media companies has hampered my ability to follow Missourians' speech on these issues." *Id.* ¶ 6.

1434.   Ashley Bosch, Communications Officer for the Louisiana Department of Justice, attests on behalf of the State of Louisiana: "Part of my job is to gather and synthesize topical subject matters that are important to Louisiana citizens, on behalf of the Department."  Doc. 10-13, ¶ 4.  "Understanding what subject matters and issues are important to Louisianans is critical for the Department to formulate policies and messaging that will address the concerns expressed by our constituents."  *Id.*  This "includes monitoring activity and mentions on social media platforms, including Facebook, Instagram, Twitter, and YouTube."  *Id.*  Doc. 10-13, ¶ 4.  "It is very important for me to have access to free public discourse on social media on these issues so I can understand what our constituents are actually thinking, feeling, and expressing about such issues, and so I can communicate properly with them."  *Id.* ¶ 5.  "Online censorship of Louisiana citizens by social media companies interferes with my ability to follow Louisianans' speech on these issues."  *Id.* ¶ 6.  Bosch notes that it is particularly important for her to follow Louisianan's speech on topics of federally-induced censorship: "For example, mask and vaccine mandates for students have been a very important source of concern and public discussion by Louisiana citizens over the last year."  Doc. 10-13, ¶ 5.  "Louisianans' speech about the efficacy of COVID-19 restrictions, and speech about issues of election security and election integrity are matters of great interest and importance to me in my work on behalf of the Louisiana Department of Justice." Doc. 10-13, ¶ 10.

1435.   As noted above, Defendants' witness from the CDC, Carol Crawford, attests to exactly the same government interest in being able to read and follow the true, uncensored opinions of the government's constituents.

1436. Crawford admits that government communicators have a strong interest in tracking what their constituents are saying on social media: "It's helpful for communicators to know what is being discussed because it helps improve our communication materials." Crawford Dep. 53:10-12. Crawford emphasized this point multiple times: "as I mentioned before, it does help … for communicators to know what conversations occurs on social media because it helps us identify gaps in knowledge, or confusion, or things that we're not communicating effectively that we need to adjust." *Id.* 54:15-20.

1437. Crawford said that CrowdTangle reports "would help us understand what was being discussed on social media about COVID, which helps us look for gaps in information, confusion about facts, things that we might need to adjust our communication materials for." *Id.* 57:24-58:3. Crawford specifically expressed the concern that, if content was censored or removed from social-media platforms, government communicators would not know what the citizens' true concerns were: She "was wondering if they delete the info will we know those myths or information so we could update communication activity. So if they were deleting content would we know what the themes were." *Id.* 75:14-18. Accordingly, Crawford wanted to know, "would [CDC] be able to see in CrowdTangle or other reports … what kind of themes were removed so we would still have the full picture of areas of confusion." *Id.* 75:23-76:1.

### 4. States' interest in fair, unbiased, open processes to petition state government.

1438. Social-media censorship directly interferes with the States' interest maintaining fair, even-handed, and open processes for petitioning their own governments and political subdivisions. When one side of a debate can organize on Facebook or Nextdoor and petition the government, and the other side cannot because of social-media censorship, that means that state officials never receive a fair, unbiased presentation of their constituents' views.

*1439.*  As noted above, social-media censorship has perverted state and local political processes by artificially restricting access to the channels of advocacy to one side of various issues. For example, social-media censorship prevented Louisiana advocacy groups from organizing effectively to advocate in favor of legislative action on issues of great public import.  Hines Decl., Doc. 10-12, ¶¶ 13-14.   Likewise, social-media censorship prevented a Missouri parent from circulating an online petition to advocate against mandatory masking at his local school district, a political subdivision of the State.  McCollum Decl., Doc. 10-14, ¶¶ 9-17; *see also* Doc. 10-12, ¶¶ 13-14; Doc. 10-14, ¶¶ 9-17; Doc. 10-15, ¶¶ 11-16, 18-19.

*1440.*  Plaintiff Jill Hines explains that "two of our Facebook groups were completely deplatformed, effectively disbanding a group of more than two thousand people who were organized to engage in direct advocacy to our state legislature, on two separate occasions."  Doc. 10-12, ¶ 13.  She attests that "[t]he last post I made in our HFL Group on July 13, 2021, was a 'call to action' for the upcoming Veto Session, asking people to contact legislators regarding health freedom legislation.."  *Id.* ¶ 14.  Suppressing these Facebook groups directly interfered with state officials' ability to receive free and fair communications of their constituents' concerns: "Removing our closed group at such crucial time effectively stopped our ability to communicate with our representatives in the state legislature."  *Id.*

**5. State quasi-sovereign interests.**

*1441.*   The States also assert quasi-sovereign interests in protecting the freedom of speech of a substantial segment of their population—*i.e.*, their citizens who are both speakers and audiences of speech on social media; and in ensuring that their citizens receive the full benefit of participation in the federal system—which includes, among other benefits, the full protection of the First Amendment.

1442.   Based on the foregoing evidence, social-media censorship afflicts a substantial segment of the populations of both Missouri and Louisiana.

Dated: March 6, 2023

Respectfully submitted,

**ANDREW BAILEY**
**Attorney General of Missouri**

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

*/s/ Charles F. Capps*
Joshua M. Divine, Mo. Bar No. 69875*
 *Solicitor General*
Charles F. Capps, Mo. Bar No. 72734*
 *Deputy Solicitor General*
Todd A. Scott, Mo. Bar No. 56614*
 *Senior Counsel*
Kenneth C. Capps, Mo. Bar No. 70908*
 *Assistant Attorney General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
charles.capps@ago.mo.gov
*Counsel for State of Missouri*

*/s/ D. John Sauer*
Elizabeth B. Murrill (La #20685)
 *Solicitor General*
Tracy Short (La #23940)
 *Assistant Attorney General*
D. John Sauer, Mo. Bar No. 58721*
 *Special Assistant Attorney General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

*/s/ Jenin Younes*
Jenin Younes *
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta*
*Bhattacharya, Dr. Martin Kulldorff, Dr.*
*Aaron Kheriaty, and Jill Hines*

*/s/ John C. Burns*
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

\* admitted *pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 6, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

<u>*/s/ D. John Sauer*</u>