UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

STATE OF MISSOURI, ET AL.          CASE NO.  3:22-CV-01213

VERSUS                             JUDGE TERRY A. DOUGHTY

JOSEPH R. BIDEN JR., ET AL.        MAG. JUDGE KAYLA D. MCCLUSKY

<u>**MEMORANDUM RULING**</u>

Pending before the Court is a Motion to Dismiss [Doc. No. 128] filed by Defendants,[1]

seeking dismissal of all claims filed against them by Plaintiffs pursuant to Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6). Plaintiffs filed an opposition [Doc. No. 165], and Defendants

filed a reply [Doc. No. 199]. For the following reasons, the Motion is **GRANTED IN PART** and

**DENIED IN PART**.

I.      BACKGROUND

On May 5, 2022, the State of Louisiana and the State of Missouri (collectively "the States"),

each by and through its own Attorney General, together with Aaron Kheriaty, Martin Kulldorff,

Jim Hoft, Jayanta Bhattacharya, and Jill Hines (collectively "the Private Plaintiffs," and together

with the States, "Plaintiffs") filed suit in this Court against various named defendants for violations

---

[1] The Amended Complaint [Doc. No. 84] names sixty-seven defendants, who are hereinafter collectively referred to as "Defendants": Wally Adeyemo, Xavier Becerra, Joseph R. Biden, Jr., Leah Bray, Yolanda Byrd, U.S. Census Bureau, Elvis M Chan, Subhan Cheema, Christy Choi, U.S. Dept of Commerce, Carol Crawford, Cybersecurity & Infrastructure Security Agency, Laura Dehmlow, Jay Dempsey, Centers for Disease Control & Prevention, Jen Easterly, U.S. Election Assistance Commission, Anthony Fauci, Federal Bureau of Investigation, Rob Flaherty, U.S. Food & Drug Administration, Alexis Frisbie, Kate Galatas, Kristin Galemore, Geoffrey Hale, Dept of Health & Human Services, Dept of Homeland Security, Mina Hsiang, Clarke Humphrey, Nina Jankowicz, Karine Jean-Pierre, Erica Jefferson, U.S. Dept of Justice, Brad Kimberly, Daniel Kimmage, Tericka Lambert, Timothy W Manning, Matthew Masterson, Alejandro Mayorkas, Gina McCarthy, Lorena Molina-Irizarry, Janell Muhammed, Michael Murray, Vivek H Murthy, Kristen Muthig, National Institute of Allergy & Infectious Diseases, Joshua Peck, Lauren Protentis, Jennifer Rene Psaki, Dana Remus, Mark A Robbins, Laura Rosenberger, Courtney Rowe, Dori Salcido, Zachary Henry Schwartz, Brian Scully, Aisha Shah, Jennifer Shopkorn, Robert Silvers, Andrew Slavitt, Allison Snell, U.S. Dept of State, Samaruddin K Stewart, U.S. Dept of Treasury, Samantha Vinograd, Benjamin Wakana, Eric Waldo, Kim Wyman.

of the First Amendment, actions in excess of statutory authority, and violations of the Administrative Procedure Act ("APA"). In their Complaint, the States assert that the Defendants are liable for their conduct relating to the alleged suppression of certain ideas and viewpoints on social-media platforms.[2] On November 11, 2022, the Defendants filed a Motion to Dismiss the States' Second Amended Complaint[3] for lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted.[4]

This suit arises out of the alleged coercion by the Biden Administration and various government agencies and officials of social-media companies, urging those companies "to censor viewpoints and speakers disfavored by the Left."[5] The social-media companies involved in this alleged suppression include Facebook (now owned by Meta, Inc.), Twitter, LinkedIn, and YouTube, among others, who, according to the Plaintiffs, moderated the content on their platforms to prevent the spread of "disinformation," "misinformation," and "malinformation."[6] The Plaintiffs allege that this censorship was encouraged—perhaps even mandated—by the Biden Administration and several key governmental departments, including the Department of Health and Human Services ("HHS"), the Center for Disease Control and Prevention ("CDC"), the United States Census Bureau, and many others.[7]

### A.  Alleged Use of Governmental Authority to Encourage Censorship

According to Plaintiffs, beginning around the time of the COVID-19 outbreak and ensuing pandemic, if not earlier, "an unprecedented rise of censorship and suppression of free speech— including core political speech—on social-media platforms" occurred, causing harm to the States

---

[2] [Doc. No. 1].
[3] [Doc. No. 84]
[4] [Doc. No. 128].
[5] [Doc. No. 84 at ¶3].
[6] [Id.].
[7] [Id.].

and their citizens, as well as the generalized public.[8] The Department of Homeland Security created a "Disinformation Governance Board," apparently intended to prevent the spread of "disinformation" about issues such as the lab-leak of COVID-19,[9] the efficacy of mask mandates and COVID-19 lockdowns,[10] the Hunter Biden laptop story,[11] and election integrity and the security of voting by mail.[12] According to the Plaintiffs, each of these topics has been heavily censored by various social-media platforms, resulting in the suppression of speech in violation of the First Amendment.[13]

The Plaintiffs focus on Section 230 of the Communications Decency Act ("CDA") as a key tool used by the government that "artificially empowered and subsidized the growth of social-media companies and their censorship policies by effectively immunizing much censorship on social media from liability."[14] The CDA, enacted in 1996, provides protection "for private blocking and screening of offensive material" by a "provider or user of an interactive computer service" in order "to promise the continued development of the Internet and other interactive computer services and other interactive media." 47 U.S.C. § 230. Section 230(c)(2) specifically states that: "No provider or user of an interactive computer service shall be held liable on account of (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." 47 U.S.C. § 230(c)(2)(A). The States allege that, through subsequent court interpretations of this

---

[8] [Id. at ¶7].
[9] [Id. at ¶138].
[10] [Id. at ¶148].
[11] [Id. at ¶133].
[12] [Id. at ¶160].
[13] [Id. at ¶131].
[14] [Id. at ¶171].

section and others like it, social-media companies have been granted broad immunity for censorship of disfavored viewpoints.[15]

The Plaintiffs further allege that, aware of the importance of this immunity to social-media companies, the Biden Administration and his political allies "have a long history of threatening to use official government authority to impose adverse legal consequences against social-media companies if such companies do not increase censorship of speakers and messages disfavored by Biden and his political allies."[16] According to the Plaintiffs, threats by the government to repeal or amend Section 230 of the CDA—if social-media companies failed to target and censor certain viewpoints—acted as a catalyst in kickstarting more aggressive censorship on social media.[17] Examples given by the Plaintiffs of these alleged threats include:

> Speaker Nancy Pelosi (D-CA 11th District), April 12, 2019: "I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it. And it is not out of the question that that could be removed."[18]
>
> …
>
> Then-Senator Kamala Harris (D-CA), Sept. 30, 2019: "Look, let's be honest, Donald Trump's Twitter account should be suspended."[19]
>
> …
>
> Senator Richard Blumenthal (D-CT), Nov. 17, 2020: "I have urged, in fact, a breakup of tech giants. Because they've misused their bigness and power. … And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their

---

[15] [Id. at ¶177].
[16] [Id. at ¶183].
[17] [Id.].
[18] [Id. (*citing Nancy Pelosi warns tech companies that Section 230 is 'in jeopardy'*, TECH CRUCH (April 12, 2019), at https://techcrunch.com/2019/04/12/nancy-pelosi-section-230/.)].
[19] [Id. (*citing Kamala Harris says Trump's Twitter account should be suspended,* CNN.com (Sept. 30, 2019), at https://www.cnn.com/2019/09/30/politics/kamala-harris-trump-twitter-cnntv/index.html; *see also* https://twitter.com/kamalaharris/status/1179810620952207362.)].

immunity is way too broad and victims of their harms deserve a day in court."[20]

Senator Mazie Hirono (D-HI), Feb. 5, 2021: "Sec 230 was supposed to incentivize internet platforms to police harmful content by users. Instead, the law acts as a shield allowing them to turn a blind eye. The SAFE TECH ACT brings 230 into the modern age and makes platforms accountable for the harm they cause."[21]

…

On April 20, 2022, twenty-two Democratic members of Congress sent a letter to Mark Zuckerberg of Facebook (n/k/a "Meta Platforms, Inc."), demanding that Facebook increase censorship of "Spanish-language disinformation across its platforms."[22]

The Plaintiffs allege that these statements and many others demonstrate coercion by the government and various officials to prevent the spread of disfavored ideas.[23] As the Plaintiffs put it in their Complaint, "The flip side of such threats, of course, is the implied 'carrot' of retaining Section 230 immunity and avoiding antitrust scrutiny, allowing the major social-media platforms to retain their legally privileged status that is worth billions of dollars of market share."[24]

Thus, the Plaintiffs allege that, driven by then-candidate and now-President Biden, the Defendants have coerced social-media companies into suppressing an unprecedented number of speakers on vital issues of public concern.[25] Specifically, Plaintiffs allege:

For example, on January 17, 2020, then-candidate Biden stated, in an interview with the New York Times editorial board, that Section 230 of the CDA should be "revoked" because social-media companies like Facebook did not do enough to censor supposedly false information in the form of political ads criticizing him—*i.e.*, core political speech. He stated: "The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one. For Zuckerberg and other platforms." He also

---

[20] [Id. (*citing Breaking the News: Censorship, Suppression, and the 2020 Election Before the S. Comm. on Judiciary*, 116th Cong. at 36:10–15 (2020) (statement of Sen. Richard Blumenthal))].

[21] [Id. (*citing* https://twitter.com/maziehirono/status/1357790558606024705?lang=bg)].

[22] [Id. at ¶185].

[23] [Id.].

[24] [Id. at ¶188].

[25] [Id. at ¶190].

> stated, "It should be revoked because it is not merely an internet company. It is propagating falsehoods they know to be false.... There is no editorial impact at all on Facebook. None. None whatsoever. It's irresponsible. It's totally irresponsible."[26]

The Plaintiffs' Second Amended Complaint goes into great detail as to each of these threats and the alleged effects they had on social-media companies' implementation of their censorship policies.[27] Ultimately, Plaintiffs allege that the result of these statements, together with the looming threat to Section 230 of the CDA, were the catalysts for widespread collusion between government officials and social-media companies.[28]

As a direct result of the above alleged coercion and collusion, the Plaintiffs assert that the Defendants have successfully censored and limited core political speech.[29] The Plaintiffs cite to a plethora of evidence, including a review by the Media Research Center, which "identified 646 instances over the last two years where social-media firms censored public criticism of then-Candidate and now-President Biden."[30] *See* Joseph Vasquez and Gabriela Pariseau, *Protecting the President: Big Tech Censors Biden Criticism 646 Times Over Two Years* (April 21, 2022), https://censortrack.org/protecting-president-big-tech-censors-biden-criticism-646-times-over-two-years. "The Media Research Center found more than 640 examples of bans, deleted content and other speech restrictions placed on those who criticized Biden on social media over the past two years." *Id.* "The list of censorship targets included an array of prominent influencers on social media: Trump; lawmakers like Sen. Ted Cruz (R-TX) and House Minority Leader Kevin McCarthy (R-CA); news outlets like the New York Post, The Washington Free Beacon and The

---

[26] [Id. at ¶169–202 (*citing* N.Y. Times Editorial Board, *Joe Biden* (Jan. 17, 2020), at
https://www.nytimes.com/interactive/2020/01/17/opinion/joe-biden-nytimes-interview.html)].
[27] *See generally* [Id. at ¶190].
[28]*See generally* [Id. at ¶¶203–316].
[29] [Id. at ¶317].
[30] [Id. at ¶318].

Federalist; satire site The Babylon Bee"; and others. *Id.* The Plaintiffs allege that censorship of criticism of a sitting President is just one example of a core concern that the First Amendment sought to address.[31] However, these facts provide a clear violation of that concern.

### B.  Alleged Injury to the States and the Private Plaintiffs

Because of the alleged coercion and collusion by the Defendants to suppress speech, the States assert "at least eight forms of imminent, continuing, irreparable injury."[32] The States list these eight alleged injuries as follows: (1) "The federal censorship program directly undermines Missouri's and Louisiana's fundamental policies favoring the freedom of speech, and thus it inflicts a clear and direct injury on the States' sovereignty";[33] (2) "the States and their agencies and political subdivisions have suffered government-induced online censorship directly";[34] (3) "State agencies—such as the Offices of the States' Attorneys General— closely track and rely on free speech on social media to understand their citizens' true thoughts and concerns," and "[c]ensorship of social-media speech directly interferes with this critical state interest, because it 'directly interferes with [our] ability to follow, measure, and understand the nature and degree of [constituents'] concerns'";[35] (4) "social-media censorship thwarts the States' ability to provide free, fair, and open political processes that allow citizens to petition their government and advocate for policy changes";[36] (5) "federally induced social-media censorship directly affects Missouri, because it has resulted in the extensive censorship of Plaintiff Dr. Bhattacharya";[37] (6) "Missouri and Louisiana have a quasi-sovereign interest in protecting the free-speech rights of "a sufficiently

---

[31] [Id. at ¶327].
[32] [Id. at ¶459].
[33] [Id. at ¶460].
[34] [Id. at ¶461].
[35] [Id. at ¶462].
[36] [Id. at ¶463].
[37] [Id. at ¶464].

substantial segment of its population," and "preventing ultra vires actions against those rights";[38] (7) "Missouri and Louisiana 'ha[ve] an interest in securing observance of the terms under which [they] participate[] in the federal system'";[39] and (8) "Missouri and Louisiana have a unique interest in advancing, protecting, and vindicating the rights of their citizens who are listeners, readers, and audiences of social-media speech."[40]

The Private Plaintiffs, primarily through the use of individual Declarations, allege their own ongoing injuries as a result of the alleged government action described above.[41] The Private Plaintiffs state that the alleged censorship "is achieved through a wide variety of methods, ranging from complete bans, temporary bans, insidious 'shadow bans' (where neither the user nor his audience is notified of the suppression), deboosting, de-platforming, de-monetizing, restricting access to content, imposing warning labels that require click-through to access content, and many other ways."[42] Additionally, the Private Plaintiffs list suppression via "temporary and permanent suspensions," "deboosting search results to bury the most relevant results," "imposing advisory labels and 'sensitive content' labels, making it more difficult to access specific content," and "artificially limiting the number of followers of a disfavored account."[43]

For example, Jay Bhattacharya ("Bhattacharya"), one of the Private Plaintiffs, stated in his declaration, "Because of my views on COVID-19 restrictions, I have been specifically targeted for censorship by federal government officials."[44] Bhattacharya, the Professor of Health Policy at Stanford University School of Medicine, specifically alleges that a publication entitled the "Great Barrington Declaration," which Bhattacharya co-authored, was subject to "immediate backlash

---

[38] [Id. at ¶465]; *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982).
[39] [Doc. No. 84 at ¶466]; *Snapp*, 458 U.S. at 607–08.
[40] [Doc. No. 84 at ¶467].
[41] [Id. at ¶469].
[42] [Id. at ¶473].
[43] [Id.].
[44] [Doc. No. 45-3 at ¶5].

from senior government officials who were the architects of the lockdown policies" for COVID-19.[45] The Great Barrington Declaration "called for an end to economic lockdowns, school shutdowns, and similar restrictive policies on the ground that they disproportionately harm the young and economically disadvantaged while conferring limited benefits."[46] Bhattacharya stated that, because the Great Barrington Declaration "contradicted the government's preferred response to COVID-19," its content was suppressed in various ways.[47] Specifically, Bhattacharya alleges that "Google deboosted search results for the Declaration, pointing users to media hit pieces critical of it, and placing the link to the actual Declaration lower on this list of results."[48] Further, a "roundtable" discussion between Bhattacharya and others, posted via video to YouTube, was removed from the social-media platform, with YouTube claiming that the video "contradicts the consensus of local and global health authorities regarding the efficacy of masks to prevent the spread of COVID-19."[49] Additionally, Bhattacharya alleges that he and his co-authors of the Great Barrington Declaration were personally censored on social media, primarily on Twitter and LinkedIn.[50]

Martin Kulldorff ("Kulldorff"), another of the Private Plaintiffs, made similar allegations in his declaration.[51] Along with Bhattacharya, Kulldorff co-authored the Great Barrington Declaration and allegedly "experienced censorship on social media platforms due to [his] views on the appropriate strategy for handling the COVID-19 pandemic."[52] In addition to the alleged suppression of the Great Barrington Declaration itself on platforms such as Google and

---

[45] [Id. at ¶13].
[46] [Id. at ¶8].
[47] [Id. at ¶14].
[48] [Id. at ¶16].
[49] [Id. at ¶18].
[50] [Id. at ¶¶26, 28].
[51] [Doc. No. 45-4].
[52] [Id. at ¶8].

Facebook,[53] Kulldorff asserts that his individual opinions were censored on his private social-media accounts.[54] As just one example, Kulldorff alleged that Twitter censored the following tweet in March of 2021: "Thinking that everyone must be vaccinated is as scientifically flawed as thinking that nobody should. COVID vaccines are important for older, higher risk people and their caretakers. Those with prior natural infection do not need it. Nor children."[55] Kulldorff echoed Bhattacharya's belief that the censorship of COVID-19-related opinions on social media was driven by government officials.[56]

Private Plaintiff Jim Hoft ("Hoft"), founder, owner, and operator of the news website "The Gateway Pundit," also alleged significant censorship of his viewpoints on social media.[57] Specifically, Hoft asserts that The Gateway Pundit's social-media accounts have been heavily censored, and its Twitter account has been permanently suspended.[58] Hoft stated in his declaration that The Gateway Pundit addressed hot-button topics such as COVID-19 response and election security, which ultimately led to censorship allegedly coerced by the government.[59] For example, Hoft alleges that Twitter suspended The Gateway Pundit's account after posting a tweet in January of 2021 that said "Five Days After Biden Inauguration, Judge Rules Late Changes To VA Election Law That Allowed Late Mail-In Ballots Without Postmark To Be Counted is ILLEGAL @100percFEDUP via @gatewaypundit."[60] Hoft lists many other tweets, as well as posts on other social-media platforms like Facebook and YouTube, that he alleges were censored because of specific viewpoints relating to COVID-19 and election integrity.[61] Even further, Hoft alleges that

---

[53] [Id. at ¶¶15, 16].
[54] [Id. at ¶17].
[55] [Id.].
[56] [Id. at ¶30].
[57] [Doc. No. 45-5].
[58] [Id. at ¶3].
[59] [Id. at ¶4].
[60] [Id. at ¶7].
[61] [Id.].

The Gateway Pundit has "received numerous reports from followers that they have received temporary suspensions or other adverse actions from social-media platforms (such as seven-day suspensions of their Facebook accounts) for re-posting or amplifying" Gateway Pundit content.[62] Hoft alleges that he has a "strong reason to infer that federal government officials are directly involved in the censorship of [his] speech and content," based on the timeline of the exponential increase in censorship he allegedly experienced.[63]

Private Plaintiff Jill Hines ("Hines"), the co-director of Health Freedom Louisiana, alleged similar censorship by social-media platforms in her declaration.[64] Hines stated that, during the COVID-19 pandemic, her group "advocated against the imposition of mask mandates on children, especially during prolonged periods, as in schools."[65] Additionally, on April 16, 2020, Hines launched "a grassroots effort called Reopen Louisiana," which was used to expand social-media outreach on "issues surrounding the continued government shutdown."[66] Hines alleges that by October of 2020, her social-media pages began to receive "significant hits from 'fact checkers' and 'warnings' from Facebook," as millions of people began to interact with her content.[67] Hines cited one post in particular that was "hit with a 'community standards' warning" on Facebook for calling her followers to action by "asking people to contact their legislators to end the governor's mask mandate."[68] As a result of her posts, Hines alleges that she was censored in various ways, including being prohibited from posting for twenty-four hours at a time on all pages,[69] being threatened with getting completely "deplatformed,"[70] and actually being deplatformed on two

---

[62] [Id. at ¶15].
[63] [Id. at ¶17].
[64] [Doc. No. 45-12].
[65] [Id. at ¶4].
[66] [Id. at ¶6].
[67] [Id. at ¶8].
[68] [Id. at ¶10].
[69] [Id.].
[70] [Id. at ¶12].

separate Facebook groups.[71] Hines asserts that, because of widespread censorship, her group has been forced to use other platforms such as GroupMe, which does not allow for "statewide outreach."[72]

The last of the Private Plaintiffs, Aaron Kheriaty ("Kheriaty"), alleged similar experiences in his declaration, which details the supposed censorship Kheriaty was subjected to for his views on the COVID-19 pandemic.[73] Specifically, Kheriaty's most controversial opinions related to "an employee vaccine mandate for COVID-19 that made no exceptions for those with infection-induced (or 'natural') immunity."[74] Kheriaty alleges that his employment with the University of California was terminated due to his opposition to the vaccine mandate, and his story ultimately received widespread attention, particularly on Twitter and LinkedIn.[75] Kheriaty asserts that, as his following on these social-media platforms grew, he and his followers began to have issues, such as being automatically "unfollowed" or dropping followers randomly.[76] Kheriaty also alleges that he experienced "shadowbanning" on Twitter, whereby his tweets would not appear in his followers' feeds, such that his followers "commented that they had not seen anything from [Kheriaty] for months, even though [he posted] frequently."[77] Further, Kheriaty alleges that a video he posted of an interview with journalist Alyson Morrow on the ethics of vaccine mandates was temporarily removed from YouTube and was only reposted when others "drew attention" to the censorship.[78]

---

[71] [Id. at ¶13].
[72] [Id. at ¶15].
[73] [Doc. No. 45-7].
[74] [Id. at ¶6].
[75] [Id. at ¶8].
[76] [Id. at ¶12].
[77] [Id. at ¶14].
[78] [Id. at ¶17].

Plaintiffs assert that, based on the above-mentioned examples and the many others laid out in their respective declarations, they have experienced "government-induced social-media censorship," in violation of their First Amendment rights.[79]

### C.  Procedural Background and the Motion to Dismiss

The Plaintiffs filed suit in May of 2022 to challenge the aforementioned actions by the government and the alleged suppression of free speech.[80] The Plaintiffs plead seven counts against the Defendants as follows: (1) Violation of the First Amendment, against all Defendants;[81] (2) Action in Excess of Statutory Authority, against all Defendants;[82] (3) Violation of the APA, against the HHS Defendants;[83] (4) Violation of the APA, against the DHS Defendants;[84] (5) Violation of the APA, against the Census Defendants;[85] (6) Violation of the APA, against the FBI Defendants;[86] and (7) Violation of the APA, against the State Department Defendants.[87] In terms of relief, the Plaintiffs ask this Court to declare that Defendants' conduct constitutes a First Amendment violation of the U.S. Constitution and analogous provisions of the States' Constitutions, declare that Defendants' conduct exceeds their statutory authority, declare that Defendants' conduct violates the APA, and to preliminarily and permanently enjoin Defendants from continuing to engage in unlawful conduct and the above-described acts of suppression.[88]

In the instant Motion to Dismiss, the Defendants seek dismissal of all claims filed by Plaintiffs against them pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), for lack

---

[79] [Doc. No. 165 at p.6].
[80] [Doc. No. 1].
[81] [Doc. No. 84 at ¶¶488–507].
[82] [Id. at ¶¶508–515].
[83] [Id. at ¶¶516–526].
[84] [Id. at ¶¶527–537].
[85] [Id. at ¶¶538–548].
[86] [Id. at ¶¶549–559].
[87] [Id. at ¶¶560–570].
[88] [Id. at p.161].

of subject-matter jurisdiction and failure to state a claim upon which relief can be granted.[89] Specifically, as it relates to Rule 12(b)(1), the Defendants assert that the Plaintiffs lack Article III standing to bring any of their claims, and there has been no waiver of sovereign immunity for any of the claims against the Agency Defendants.[90] Further, pursuant to Rule 12(b)(6), the Defendants argue that the Plaintiffs fail to state a plausible First Amendment claim against any Defendant, fail to state plausible *ultra vires* claims, and fail to state APA claims against the Agency Defendants.[91] Finally, Defendants argue that, under the separation of powers doctrine, Plaintiffs cannot recover equitable or declaratory relief against President Biden through the judicial system.[92]

In their opposition, the Plaintiffs argue that the Complaint alleges each element of standing so as to give this Court subject-matter jurisdiction over every claim brought against the Defendants.[93] Notably, the Plaintiffs point out that this Court has already found standing to exist in a previous ruling in this matter, and thus, the Court should come to the same conclusion here.[94] Further, the Plaintiffs argue that sovereign immunity does not bar any of their claims, and each claim states a plausible claim for relief.[95] Lastly, Plaintiffs assert that, while relief against a president is "extraordinary," it is not impossible, and the claims should survive here.[96]

The issues are briefed, and the Court is prepared to issue a ruling.

---

[89] [Doc. No. 128 at p.1].
[90] [Id.].
[91] [Id.].
[92] [Id. at p.74].
[93] [Doc. No. 165].
[94] [Id.]; *see* [Doc. No. 34].
[95] [Doc. No. 165].
[96] [Id. at p.82].

## II.     LAW AND ANALYSIS

### A.  Legal Standards

Defendants move to dismiss this action for lack of subject-matter jurisdiction and for failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), respectively. With respect to Rule 12(b)(1), Defendants argue this Court lacks subject-matter jurisdiction because Plaintiffs lack Article III standing or, in the alternative, because Defendants have not waived sovereign immunity. With respect to Rule 12(b)(6), Defendants argue that Plaintiffs' allegations in the Complaint are insufficient to plausibly state the claims therein.

### 1.  Subject-Matter Jurisdiction: Rule 12(b)(1) Standard

A defect in the court's Article III or constitutional standing implicates the court's subject-matter jurisdiction and, therefore, is properly raised by a party via Rule 12(b)(1). *See Cadle Co. v. Neubauer*, 562 F.3d 369, 374 (5th Cir. 2009) (citation omitted); *Moore v. Bryant*, 853 F.3d 245, 248 n.2 (5th Cir. 2017) ("Dismissals for lack of Constitutional standing are granted pursuant to Rule 12(b)(1)."). Further, "[w]hen a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (*quoting Nowak v. Ironworkers Loc. 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)). The party seeking to invoke jurisdiction bears the burden of demonstrating its existence. *See Ramming*, *supra*; *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). "[T]here is a presumption against subject matter jurisdiction that must be rebutted by the party bringing an action to federal court." *Coury v. Prot*, 85 F.3d 244, 248 (5th Cir. 1996) (citation omitted). Moreover, because this action is at the motion to dismiss

stage, plaintiff must "clearly . . . allege facts demonstrating" each element of Article III standing. *Spokeo, Inc. v. Robins*, 578, U.S. 330, 338 (2016) (citation omitted); *see also NOLA Health Sols., LLC v. New Orleans Reg'l Physician Hosp. Org., Inc.*, No. CV 18-7007, 2019 WL 112031, at *5 (E.D. La. Jan. 4, 2019).

"A court can find that subject matter jurisdiction is lacking based on (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Enable Mississippi River Transmission, L.L.C. v. Nadel & Gussman, L.L.C.*, 844 F.3d 495, 497 (5th Cir. 2016) (citations and internal quotation marks omitted). When deciding a motion to dismiss for want of standing, the trial court must "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 495 (1975).

### 2.   Failure to State a Claim: Rule 12(b)(6) Standard

The Federal Rules of Civil Procedure sanction dismissal where the plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A pleading states a claim for relief, *inter alia*, when it contains a "short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). A claim is facially plausible when it contains sufficient factual content for the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility does not equate to possibility or probability; it lies somewhere in between. *See Iqbal*, 556 U.S. at 663. Plausibility simply calls for enough factual allegations to raise a reasonable expectation that discovery will reveal evidence to

support the elements of the claim. *See Twombly*, 550 U.S. at 556. Although the court must accept as true all factual allegations set forth in the complaint, the same presumption does not extend to legal conclusions. *Iqbal*, 556 U.S. at 663. A pleading comprised of "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" does not satisfy Rule 8. *Id.* "[P]laintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim." *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152–53 (5th Cir. 2010).

"The notice pleading requirements of Federal Rule of Civil Procedure 8 and case law do not require an inordinate amount of detail or precision." *Gilbert v. Outback Steakhouse of Fla. Inc.*, 295 F. App'x 710, 713 (5th Cir. 2008) (citations and internal quotation marks omitted). Further, "a complaint need not pin plaintiff's claim for relief to a precise legal theory. Rule 8(a)(2) of the Federal Rules of Civil Procedure generally requires only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of [her] legal argument." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). Indeed, "[c]ourts must focus on the substance of the relief sought and the allegations pleaded, not on the label used." *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013) (citations omitted). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555).

Assessing whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663. A well-pleaded complaint may proceed even if it strikes the court that actual proof of the asserted facts is improbable and that recovery is unlikely. *Twombly*, 550 U.S. at 556. Nevertheless, a court is compelled to dismiss an otherwise well-pleaded claim if it is premised upon an invalid legal theory. *Neitzke v. Williams*, 490 U.S. 319, 320 (1989).

When considering a motion to dismiss, courts generally are limited to the complaint and its proper attachments. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citation omitted). However, courts may rely upon "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"—including public records. *Dorsey*, 540 F.3d at 338; *Norris v. Hearst Tr.*, 500 F.3d 454, 461 (5th Cir. 2007) (holding that it is proper to take judicial notice of matters of public record).

### B.  Analysis

As noted above, in their Motion to Dismiss, Defendants challenge Plaintiffs' claims under Rules 12(b)(1) and (b)(6). Defendants first assert that both the States and Private Plaintiffs lack Article III standing to bring their claims against Defendants. Next, Defendants argue that, without express waiver, sovereign immunity bars Plaintiffs' claims. Even if Plaintiffs can establish both standing and a waiver of sovereign immunity, Defendants argue that Plaintiffs' claims fail on the merits under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Finally, Defendants argue that the separation of powers doctrine independently requires dismissal of the claims against President Joseph Biden ("President Biden"). Each argument will be addressed in turn below.

### 1.  Article III Standing

The United States Constitution, via Article III, limits federal courts' jurisdiction to "cases" and "controversies." *Sample v. Morrison*, 406 F.3d 310, 312 (5th Cir. 2005) (*citing* U.S. Const. art. III, § 2). The "law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 435 (2017) (citation omitted).

Thus, "the standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction and to

justify exercise of the court's remedial powers on his behalf." *Warth*, 422 U.S. at 498–99 (citation and internal quotation marks omitted). The Article III standing requirements apply to claims for injunctive and declaratory relief. *See Seals v. McBee*, 898 F.3d 587, 591 (5th Cir. 2018), *as revised* (Aug. 9, 2018); *Lawson v. Callahan*, 111 F.3d 403, 405 (5th Cir. 1997).

Article III standing is comprised of three essential elements. *Spokeo*, 578 U.S. at 338 (citation omitted). "The plaintiff must have (1) suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* (internal citations omitted). Furthermore, "[a] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y.*, 581 U.S. at 439 (citations omitted). However, the presence of one party with standing "is sufficient to satisfy Article III's case-or-controversy requirement." *Texas*, 809 F.3d 134 (citing *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)).

Defendants raise challenges to each essential element of standing for both the Private Plaintiffs and the States. Each argument will be addressed in turn below. For the reasons stated herein, the Court finds that the Plaintiffs have satisfied Article III's standing requirements.

### a. Plaintiffs adequately allege injury-in-fact for purposes of Article III standing.

Plaintiffs seeking to establish injury-in-fact must show that they suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (citations and internal quotation marks omitted). For an injury to be "particularized," it must "affect the plaintiff in a personal and individual way." *Id.* (citations and internal quotation marks omitted).

19

Defendants argue that the Private Plaintiffs fail to offer "nonconclusory allegations" of "certainly impending injuries sufficient to support the *prospective* relief sought."[97] As to the States, Defendants argue that *parens patriae* standing is unavailable against the Federal Government and that the States fail to allege any direct injury to their interest as States.[98] In response, Plaintiffs argue that each of the Private Plaintiffs allege "imminent, ongoing injuries from government-induced social-media censorship."[99] Plaintiffs argue further that *parens patriae* standing is available to the States and that the Complaint adequately alleges injuries to the States' individual, sovereign, and quasi-sovereign (*parens patriae*) interests.[100] Finally, Plaintiffs argue that the States and Private Plaintiffs have third-party standing.

### i.  The States allege an injury-in-fact.

Defendants argue that *parens patriae* standing is unavailable against the federal government, that the alleged distinct injuries to the States overlap in substantial part, and that none of the alleged distinct injuries support an injury-in-fact that satisfies Article III.[101] Plaintiffs argue in response that the Complaint sufficiently alleges injuries to the States' individual, sovereign, and quasi-sovereign (*parens patriae*) interests; the alleged injuries are particularized, concrete, imminent, and ongoing; and that the States are entitled to "special solicitude" in the standing analysis.[102]

Specifically, Plaintiffs contend that Defendants' actions undermine the States' fundamental policies favoring free speech; that the States experience direct, ongoing censorship injuries; that the States themselves have an interest in following the free discourse of their citizens; that federal

---

[97] [Doc. No. 128-1 at p.45] (emphasis in original).
[98] [Id. at pp.32, 36].
[99] [Doc. No. 165 at p.16].
[100] [Id. at p.24].
[101] [Doc. No. 128-1 at pp.32–44].
[102] [Doc. No. 165 at pp.24-39].

officials are interfering with and distorting the States' process to petition the government; and that *parens patriae* standing is available because the States have quasi-sovereign interests in protecting the free-speech rights of a substantial segment of each State's population, as well as an interest in securing observance of the terms under which they participate in the federal system.[103] Plaintiffs also assert that the States are entitled to "special solicitude" in the standing analysis.[104]

For the reasons explained herein, the Court finds that the Complaint alleges an injury-in-fact to the States sufficient to satisfy Article III standing under either a direct injury or *parens patriae* theory of standing and that the States are entitled to "special solicitude" in the standing analysis.

### 1. The States are entitled to "special solicitude" in the standing analysis.

Defendants argue that the States are not afforded "special solicitude" in the standing analysis under the United States Court of Appeals for the Fifth Circuit's ("Fifth Circuit") understanding of *Massachusetts v. EPA*. Plaintiffs respond that the States are entitled to special solicitude under Fifth Circuit precedent. This Court has already held that the States "have proven standing through the normal inquiry" and that "they also can establish standing as a result of special solicitude."[105] The Court finds no reason to reconsider its ruling.

States are not normal litigants for the purposes of invoking federal jurisdiction. *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007). The Supreme Court of the United States has made clear that when it comes to states, they are granted "special solicitude" in the analysis of standing when challenging action or inaction by the federal government. *See id.* at 520 (where the Court noted that given Massachusetts' stake in "protecting its quasi-sovereign interests, the

---

[103] [Id. at pp.24–38].
[104] [Id. at p.38].
[105] [Doc. No. 34 at p.6].

Commonwealth is entitled to special solicitude in our standing analysis"); *see also Texas*, 809 F.3d at 162 ("Without 'special solicitude,' it would be difficult for a state to establish standing, a heavy burden in many of the government's hypotheticals."). The Fifth Circuit employs a two-pronged test in determining whether to afford a state special solicitude. A state must allege the violation of (1) "a congressionally accorded procedural right" that (2) affects their "quasi-sovereign interests in, for instance, [their] physical territory or lawmaking function." *Louisiana v. Biden*, No. 2:21-CV-00778, 2022 WL 3570933, at *8 (W.D. La. Aug. 18, 2022) (Doughty, J.) (citing *Massachusetts*, 549 U.S. at 520–21); *see also Texas*, 809 F.3d at 151–55.

Here, both criteria are satisfied. Both *Texas* and *Massachusetts* involved APA claims. In the Complaint, the States assert both First Amendment and APA claims.[106] These assertions raise questions "eminently suitable to resolution in the federal court." *Texas*, 809 F.3d at 151 (*quoting Massachusetts*, 549 U.S. at 516–17). As explained in further detail below, the States also assert a "quasi-sovereign" interest in protecting the welfare of a substantial segment of their population.[107] Although the States have satisfied standing through the normal inquiry, they can also establish standing through the doctrine of special solicitude.

> **2.  The States have *parens patriae* standing because the Complaint alleges injuries to their quasi-sovereign interests.**

*Parens patriae*, literally "parent of the country," refers traditionally to the role of the state as sovereign and guardian of persons under legal disability. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600 n.8 (1982) (quoting Black's Law Dictionary 1003 (5th ed. 1979)). The legal term "*parens patriae* lawsuit" has two meanings. *See id.* at 600–01. The term can refer to either a lawsuit that the State maintains on behalf of individuals unable to represent

---

[106] [Doc. No. 84 at ¶¶506–570].
[107] *See infra* p.22–28.

themselves, or it can refer to a lawsuit the State brings to vindicate its "quasi-sovereign" interests. *See id.* at 600; *see also Kentucky v. Biden*, 23 F.4th 585, 596–98 (6th Cir. 2022); *Chapman v. Tristar Prod., Inc.*, 940 F.3d 299, 305 (6th Cir. 2019).

A suit predicated on the former meaning of *parens patriae* is a "third-party" *parens patriae* lawsuit. It is well settled that States may not bring third-party *parens patriae* suits against the federal government. *See Kentucky*, 23 F.4th at 596. Courts are seemingly split, however, as to whether States may sue the federal government under a quasi-sovereign theory of *parens patriae* standing. *Compare Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 181–83 (D.C. Cir. 2019) ("[A] State in general lacks *parens patriae* standing to sue the federal government."), *with Kentucky*, 23 F.4th at 596–98 (holding that although "states may not invoke th[e] third-party-standing conception of *parens patriae* to sue the United States, . . . the second, more modern conception of *parens patriae* generally is permissible").

In *Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447 (1923), the United States Supreme Court held that states generally lack *parens patriae* standing to bring federal-constitutional challenges to federal statutes. This principle became known as the "*Mellon* bar." The *Mellon* bar stands for the proposition that it is "the United States, and not the state[s], which represents [its citizens] as *parens patriae*." *Id.* at 486. The distinction between third-party and quasi-sovereign *parens patriae* standing had not yet crystalized when *Mellon* was decided. *See Snapp*, 458 U.S. at 600–08 (tracing the origin of the theory of quasi-sovereign *parens patriae* standing to the first half of the twentieth century in *State of Louisiana v. State of Texas*, 176 U.S. 1 (1900) and *State of Missouri v. State of Illinois*, 180 U.S. 208 (1901)).

In *Snapp*, the United States Supreme Court held that Puerto Rico had *parens patriae* standing to sue the federal government to protect its quasi-sovereign interests. *Id.* at 608. The Court

identified at least two kinds of injuries to a state's quasi-sovereign interests. One kind of injury to a state's quasi-sovereign interest is an "injury to a sufficiently substantial segment of [the State's] population." *Id.* at 607. The Court did not draw any definitive limits on the proportion of the population that must be adversely affected, but it explained that one helpful indication is "whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Id.* A second kind of quasi-sovereign injury is the exclusion of the State and its residents "from the benefits that are to flow from participation in the federal system." *Id.* at 608. Ultimately, the Court in *Snapp* found that Puerto Rico had sufficiently alleged injuries to its quasi-sovereign interests and that it had *parens patriae* standing to sue the federal government. *Id.* at 609–10.

In *Massachusetts v. E.P.A.*, 549 U.S. 497 (2007), the United States Supreme Court further clarified the scope of the *Mellon* bar. In *Massachusetts*, Justice Stevens, writing for the majority, held that Massachusetts had standing to sue the EPA to protect its quasi-sovereign interests. *Massachusetts*, 549 U.S. at 518–21 & n.17. The Court also specifically noted there is "a critical difference between allowing a State to protect her citizens from the operation of federal statutes (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." *Id.* at 520 n.17 (internal quotation marks and citations omitted). Because Massachusetts was not disputing the application of a federal statute to its citizens, but instead seeking to assert its rights under a federal statute, the Court found that it had *parens patriae* standing to sue the EPA.

More recently, the United States Court of Appeals for the District of Columbia and the United States Court of Appeals for the Sixth Circuit reached opposite results in determining whether a State had *parens patriae* standing to sue the federal government. *See Bernhardt*, 923

24

F.3d at 181–83; *Kentucky*, 23 F.4th 585. In *Bernhardt*, the court held that Missouri did not have *parens patriae* standing to sue the federal government. 923 F.3d 173. The court also noted that *Massachusetts* did not create an exception to the *Mellon* bar, but rather noted a distinction "between a *parens patriae* lawsuit (what *Mellon* prohibits) and a state suing based on its rights under federal law (not a *parens patriae* lawsuit at all)." *Id.* (citations and internal quotation marks omitted).

In contrast, in *Kentucky*, the court held that three plaintiff states had *parens patriae* standing to sue the federal government. 23 F.4th 585. Kentucky, Ohio, and Tennessee sued relevant federal officials seeking an injunction on a contractor mandate on the grounds that it, as a federal regulation, preempted state law and the States' quasi-sovereign interest in the health and economic well-being of their populaces. *Id.* at 598–99. The court noted that states have a sovereign interest to sue the United States when a federal regulation purports to preempt state law. *Id.* at 598 (citations omitted). The court also noted that states have a "recognized quasi-sovereign interest in the health and economic well-being of their populaces." *Id.* (internal citation and quotation marks omitted).

Unlike the court in *Bernhardt*, the court in *Kentucky* recognized the distinction between third-party and quasi-sovereign *parens patriae* standing. *Id.* at 596. In rejecting *Bernhardt*, the court stated:

> We reject the D.C. Circuit's analysis [in *Bernhardt*] for two reasons. First, it mistakenly conflates quasi-sovereign-interest suits with third-party *parens patriae* suits to suggest that *Mellon* categorically bars both. Yet as we have shown, *Mellon* does not. That case invalidates the traditional third-party standing conception of *parens patriae*, but it does not invalidate (or even address) the quasi-sovereign-interest theory. And second, the D.C. Circuit's putative "*Bernhardt* bar" conflicts with Supreme Court precedent. As the Court recognized in *Massachusetts v. EPA*, post-*Mellon* precedent endorses the view that a state has "standing to bring a cross-claim

> against the United States to vindicate its 'quasi-sovereign' interests which are 'independent of and behind the titles of its citizens.'"

*Id.* at 598 (internal citations omitted). The court ultimately concluded that the plaintiff states had plausibly shown standing by asserting injuries to their sovereign and quasi-sovereign interests. *Id.* at 601.

Here, the States assert two quasi-sovereign interests: the "quasi-sovereign interest in protecting the free-speech rights of 'a sufficiently substantial segment of [each State's] population'";[108] and the "interest in securing observance of the terms under which [they] participate[] in the federal system," including the interest in ensuring "that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system."[109] Defendants argue that these assertions fail to plausibly allege any direct injury to the States' sovereign or quasi-sovereign interests.[110] The Court does not find Defendants' argument persuasive.

First, Plaintiffs have plausibly alleged extensive federal censorship limiting the free flow of information on social-media platforms used by "millions of Missourians and Louisianians, and very substantial segments of the populations of Missouri, Louisiana, and every other State."[111] The Complaint goes into great detail as to how the alleged federal censorship harms "enormous segments of [the States'] populations."[112] Further, the Complaint alleges that the suppression of the Private Plaintiffs' speech is "only a representative slice of the enormous suppressions inflicted by Defendants' conduct on countless similarly situated speakers and audiences, including in

---

[108] [Doc. No. 84 at ¶465].
[109] [Id. at ¶466 (*quoting Snapp*, 458 U.S. at 607–08)].
[110] [Doc. No. 128].
[111] [Doc. No. 84 at ¶¶9, 129].
[112] [Id. at ¶470].

Missouri and Louisiana."[113] These allegations are more than, as Defendants argue, "generalized grievances about the conduct of the government" and are certainly more than allegations of an "abstract injury in nonobservance of the Constitution."[114] The allegations in the Complaint detail an alleged federal regime of mass censorship; give specific examples as to how said censorship has injured the States' quasi-sovereign interests in protecting the freedom of expression of their residents;[115] and plausibly state injuries to a sufficiently substantial segment of the States' populations.

Further, the Complaint alleges that the States and a substantial segment of their population are being "excluded from the benefits that are to flow from participation in the federal system."[116] Like the Missouri and Louisiana Constitutions, the U.S. Constitution guarantees the right of freedom of expression, understood to encompass both the right to speak and the right to listen. *See* U.S. Const. amend. I; *see also Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976) (upholding the "First Amendment right to receive information and ideas" as well as to speak them). The United States Supreme Court has recognized the freedom of expression as one of the most important benefits bestowed by the federal Constitution. *See e.g.*, *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.") The Complaint plausibly alleges that federal agencies, actors, and officials—in their official

---

[113] [Id. at ¶471].

[114] [Doc. No. 199 at p.20 (*citing Flast v. Cohen*, 392 U.S. 83, 106 (1968); *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 482 (1982))].

[115] *See e.g.* [Doc. No. 84 at ¶¶461–63 (where the Complaint alleges that "Louisiana's department of Justice – the office of its Attorney General – was directly censored on YouTube… just after the federal Defendants' most vociferous calls for censorship of Covid 'misinformation,'" as well as other instances of State officials and agencies being censored online)].

[116] [Id. at ¶466].

capacity as such—are excluding the States and their residents from an important benefit meant "to flow from participation in the federal system." *Snapp*, 458 U.S. at 608.

Accordingly, the Court finds that the States have *parens patriae* standing because the Complaint has adequately alleged injuries to the States' quasi-sovereign interests in protecting the constitutionally bestowed rights of their citizens.

> **3.  The Complaint alleges an injury to the States' sovereign interest in the power to create and enforce a legal code, as well as a direct injury in the federal government censoring their posts on social media.**

In *Texas*, the Fifth Circuit held that several states had standing to sue the federal government where twenty-six states challenged the implementation of the Deferred Action for Parents of Americans and Lawful Permanent Residents Program ("DAPA"). 809 F.3d 134, 149 (5th Cir. 2015). The court noted that a state's sovereign interests may provide standing to sue the federal government, stating:

> [S]tates have a sovereign interest in 'the power to create and enforce a legal code. Pursuant to that interest, states may have standing based on (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law[.]

*Id.* at 153 (internal citations and quotation marks omitted). The court also noted that the states had to show an injury that is "concrete, particularized, and actual or imminent." *Id.* at 150 (citation omitted). The State of Texas argued that it would suffer a financial injury because DAPA would allow otherwise ineligible aliens to become eligible for state-subsidized driver's licenses. *Id.* at 149. The government argued that the costs would be offset by employment authorization increasing tax revenue and decreasing reliance on social services. *Id.* at 155. The Fifth Circuit rejected the government's argument, stating:

> Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the

28

> relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury.

*Id.* at 155–56. The court held that Texas' allegations satisfied Article III's injury-in-fact requirement.

Here, the Complaint alleges injuries to the States' sovereign interest in the power to create and enforce a legal code. Defendants' alleged censorship program would be a federal assertion of authority to regulate matters that the States seek to control. Defendants argue that the Complaint points to no federal law that interferes with the States' ability to regulate behavior or provide for the administration of a state program.[117] However, both Louisiana and Missouri have adopted fundamental policies favoring the freedom of speech. *See* Mo. Const. art. I, § 8 *and* La. Const. Ann. art. I, § 7. The Complaint alleges extra-legal, unauthorized action by Defendants. *Texas* and *Massachusetts* should not be read as requiring government action to stem solely from a federal law; thus, it is irrelevant in this Court's view that the alleged censorship did not stem from a federal statute or regulation. The allegations in the Complaint, if true, detail a scheme of censorship that directly conflicts, and effectively preempts, Missouri and Louisiana's free speech policies. This Court has already held that the States have an interest in regulating the enforcement of their constitutions which guarantee free speech to residents of Louisiana and Missouri, and it finds no reason to reconsider its holding.[118]

Defendants' argument that the alleged conduct does not threaten "any interest in the States' sovereign territory or any other proprietary interest" is equally unpersuasive.[119] For example, in *Castillo v. Cameron Cnty., Tex.*, 238 F.3d 339 (5th Cir. 2001), the Fifth Circuit held that Texas'

---

[117] [Doc. No. 128-1 at p.23].
[118] [Doc. No. 34].
[119] [Doc. No. 128-1 at p.23].

sovereign interests were implicated even though a challenged action did not require Texas "to perform or refrain from performing any particular acts." There, the state of Texas challenged an injunction that allowed a sheriff, in violation of state law, to refuse to incarcerate certain state parole violators. *Id.* Citing *Snapp*, the court held that, because Texas "has a sovereign interest in enforcing its laws, it has a personal stake in appealing the [injunction] that gives the County discretion to violate those laws." *Id. Castillo*, therefore, demonstrates that courts have recognized sovereign interests aside from a state's interest in "sovereign territory or any other proprietary interest."

The Complaint also alleges direct censorship injuries that qualify as injuries-in-fact under Article III. The Complaint alleges, for example, that "Louisiana's Department of Justice—the office of its Attorney General—was directly censored on YouTube for posting video footage of Louisianans criticizing mask mandates and COVID-19 lockdown measures on August 18, 2021— just after the federal Defendants' most vociferous calls for censorship of COVID 'misinformation.'"[120]  In addition, "[a] Louisiana state legislator was censored by Facebook when he posted content addressing vaccinating children against COVID-19."[121] Likewise, "St. Louis County, a political subdivision of Missouri, conducted public meetings regarding proposed county-wide mask mandates, at which some citizens made public comments opposing mask mandates," and "YouTube censored the entire videos of four public meetings, removing the content, because some citizens publicly expressed views that masks are ineffective."[122]

---

[120] [Doc. No. 84 at ¶461 (citations omitted)].
[121] [Id. (citations omitted)].
[122] [Id. (citations omitted)].

Defendants argue that the First Amendment does not protect government speech.[123] Plaintiffs correctly respond that the question here is whether the States have suffered an injury-in-fact under Article III, not whether they have suffered a violation of the First Amendment.[124] While government speech has traditionally been bifurcated from private speech for purposes of First Amendment scrutiny, the analysis has typically applied to a government agency or actor censoring speech related to that agency or actor's own forum or employee. For example, in *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 465–80 (2009), the United States Supreme Court held that the placement of a permanent monument in a public park was a form of government speech and is therefore not subject to scrutiny under the Free Speech Clause. In *Summum*, a city rejected a religious organization's request to erect a religious monument. *Id.* After determining that the request qualified as government speech,[125] the Court explained the Free Speech Clause and its relation to government speech, stating:

> The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech. See *Johanns v. Livestock Marketing Assn.,* 544 U.S. 550, 553 2005) ("[T]he Government's own speech ... is exempt from First Amendment scrutiny"); *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 139, n. 7 (1973) (Stewart, J., concurring) ("Government is not restrained by the First Amendment from controlling its own expression"). A government entity has the right to "speak for itself." *Board of Regents of Univ. of Wis. System v. Southworth,* 529 U.S. 217, 229 (2000). "[I]t is entitled to say what it wishes," *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 833, and to select the views that it wants to express, see *Rust v. Sullivan,* 500 U.S. 173, 194 (1991); *National Endowment for Arts v. Finley,* 524 U.S. 569, 598 (1998) (SCALIA, J., concurring in

---

[123] [Doc. No. 128-1 at pp.39, 199, 22 (*quoting Estiverne v. Louisiana State Bar Ass'n*, 863 F.2d 371, 379 (5th Cir. 1989))].

[124] [Doc. No. 168 at p.25].

[125] The traditional test used to differentiate government speech from private speech discusses three relevant factors: (1) whether the medium at issue has historically been used to communicate messages from the government; (2) whether the public reasonably interprets the government to be the speaker; and (3) whether the government maintains editorial control over the speech. *See Summum*, 555 U.S. at 470–72; *see also Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209–13 (2015).

> judgment) ("It is the very business of government to favor and
> disfavor points of view").

*Id.* at 467–68. The Court clarified that there are some restraints on government speech, stating:

"For example, government speech must comport with the Establishment Clause. The involvement

of public officials in advocacy may be limited by law, regulation, or practice." *Id.* at 468–69

(internal citations and quotation marks omitted).

The facts here are also distinguishable from *Estiverne v. Louisiana State Bar Ass'n*, 863

F.2d 371, 379 (5th Cir. 1989)), the case upon which Defendants rely. In *Estiverne*, an attorney

sued the Louisiana State Bar Association after a report on disciplinary proceedings against him

was published in the state bar journal. *Id.* at 373. The Court noted the following with respect to the

First Amendment and government speech:

> [H]ere, the state actor was *itself* engaged in expressive activity
> similar to that engaged in by the private press. While the first
> amendment does not protect government speech, it does not prohibit
> the government, itself, from speaking, nor require the government
> to speak. Similarly, the First Amendment does not preclude the
> government from exercising editorial control over its own medium
> of expression.

*Id.* at 379 (internal citations and quotation marks omitted) (emphasis in original). *Estiverne* is

distinguishable from the instant facts.

Here, there are allegations that the federal government has censored the States in forums

not traditionally associated with the federal government. While the States' censored speech likely

qualifies as government speech under *Summum* and *Walker*, the party censoring the government

speech, the federal government, is a separate part of the government, and the forum in which the

speech was censored, social media, is not a forum over which the federal government traditionally

exercises "editorial control." This unique, cross-system relationship of government "censor-er"

and government "censor-ee" raises an issue distinguishable from the issues raised in *Summum* and *Estiverne*.

In *Summum* and *Estiverne*, the government actors censored speech related to forums that those government actors controlled. They did not, as is alleged here, censor government speech from a separate part of the government in a forum controlled by neither the States nor the federal government. This distinction is significant. "States are not mere political subdivisions of the United States." *New York v. United States*, 505 U.S. 144, 188 (1992). The States "are neither regional offices nor administrative agencies of the Federal Government," and the Constitution "leaves to the several States a residuary and inviolable sovereignty." *Id.* (citation omitted). Thus, the States have adequately alleged an injury to their sovereign interests.

Additionally, courts have found standing in First Amendment cases even though the speech was ultimately deemed to be government speech. *See e.g.*, *Pulphus v. Ayers*, 249 F. Supp. 3d 238 (D.D.C. 2017) (where the court held that an artist and his congressional representative had standing to sue the Architect of the Capital for refusing to display artwork deemed "anti-police," despite ultimately concluding that the artwork constituted government speech). Accordingly, this Court finds that, for purposes of standing, the States' allegation of direct federal censorship of the States' speech on social media platforms qualifies as an injury-in-fact under Article III.

Because the Court finds that the States have adequately alleged injury-in-fact under a theory of *parens patriae* standing, a theory of injury to sovereign interests, and a theory of direct injury, the Court will not address the States' arguments as to their interest in following the free discourse of their citizens or in the interest in fair processes to petition the government.

ii.   **The Private Plaintiffs allege an injury-in-fact.**

Defendants next argue that the Private Plaintiffs fail to sufficiently allege Article III injuries-in-fact. Specifically, Defendants argue that the Private Plaintiffs cannot establish an injury-in-fact because the complained-of injuries involve "social media content moderation *in the past*," and the Private Plaintiffs fail to offer "nonconclusory allegations of certainly impending injuries" to support the prospective relief sought.[126] Defendants argue further that the Private Plaintiffs' declarations are unhelpful because "[p]ast wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy with respect to potential future similar wrongs."[127] In response, Plaintiffs argue that each Private Plaintiff alleges imminent, ongoing injuries from government-induced social-media censorship.[128] Plaintiffs cite to the sworn declarations incorporated by reference in the Complaint in support of their allegations.[129]

For the reasons explained herein, the Court finds that the Complaint alleges an injury-in-fact to each of the Private Plaintiffs sufficient to satisfy Article III standing.

1.   **The Private Plaintiffs allege a substantial risk of future censorship injuries.**

In *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("*SBA List*"), the Supreme Court held that, for purposes of an Article III injury-in-fact, an allegation of future injury may suffice if there is "a 'substantial risk' that the harm will occur." (*quoting Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)). In *SBA List*, a petitioner challenged a statute that prohibited making certain false statements during the course of a political campaign. *Id.* at 151–52. In deciding whether the pre-enforcement challenge was justiciable—and in particular, whether it

---

[126] [Doc. No. 128-1 at p.45 (emphasis in original)].

[127] [Id. (*quoting Dorce v. City of New York*, 2 F.4th 82, 95–96 (2d Cir. 2021) (*quoting City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)), *remanded*, 2022 WL 2286381 (S.D.N.Y. June 24, 2022) (internal quotation marks omitted))].

[128] [Doc. No. 165 at p.15].

[129] [Id. at ¶338 (incorporating the fifteen declarations by reference)].

alleged a sufficiently imminent injury for purposes of Article III—the Court noted that pre-enforcement review is warranted under circumstances that render the threatened enforcement "sufficiently imminent." *Id.* at 159. Specifically, the Court noted that past enforcement is "good evidence that the threat of enforcement is not 'chimerical.'" *Id.* at 164 (*quoting Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).

Similarly, in *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979), the Supreme Court held that a complaint alleges an Article III injury-in-fact where fear of future injury is not "imaginary or wholly speculative." In *Babbitt*, the Supreme Court considered a pre-enforcement challenge to a statute that made it an unfair labor practice to encourage consumers to boycott using "dishonest, untruthful, and deceptive publicity." *Id.* at 301. Because the plaintiffs had engaged in consumer publicity campaigns in the past and alleged an intention to continue those campaigns in the future, the Court held that their challenge to the consumer publicity provision presented an Article III case or controversy. *Id.* at 302 (*see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 386, *certified question answered sub nom. Commonwealth v. Am. Booksellers Ass'n, Inc.*, 236 Va. 168 (1988) (where the Supreme Court held that booksellers could seek pre-enforcement review of a law making it a crime to "knowingly display for commercial purpose" material that is "harmful to juveniles," as defined by the statute).

Defendants cite *Dorce v. City of New York*, 2 F.4th 82, 95–96 (2d Cir. 2021), to support their argument that the Private Plaintiffs do not satisfy Article III's injury-in-fact requirement, but the allegations in *Dorce* are distinguishable from the allegations made here. In *Dorce*, the plaintiffs sought an injunction and complained of "continuing pain and suffering from a defendant's past" actions. *Id.* at 96. The Second Circuit correctly noted that "an injunction against future actions by a defendant does not remedy the harm done by that defendant's past acts." *Id.* The court in *Dorce*

also noted that "[p]ast wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy' with respect to potential future similar wrongs." *Id.* at 95–96 (*quoting Lyons*, 461 U.S. at 103). Here, as discussed in further detail below, Plaintiffs seek relief from ongoing and future wrongs. Unlike the plaintiffs in *Dorce*, the Plaintiffs here do not merely seek relief from present harm due to past wrongs. Accordingly, the Court does not find *Dorce* persuasive. *See also O'Handley v. Weber*, No. 22-15071, 2023 WL 2443073, at *9 (9th Cir. Mar. 10, 2023) ("It is clear that [plaintiff] suffered a concrete injury when Twitter limited other users' ability to access his posts and then later suspended his account.").

Here, the Private Plaintiffs each allege that they have suffered past *and* ongoing censorship. For example, Bhattacharya alleges an ongoing "campaign" of social-media censorship.[130] His allegations identify ongoing harms from past censorship and raise an inference that he is imminently likely to experience future acts of censorship. Likewise, Kulldorff attests that there is an organized campaign of federal censorship against the Great Barrington Declaration, which entails the likelihood of future acts of censorship against it.[131] Kulldorff's allegations of an ongoing campaign of censorship[132] against his personal social-media accounts attest to ongoing injuries and support an expectation of imminent future injuries. Kheriaty also attests to ongoing and

---

[130] [Doc. No. 45-3 at ¶¶15–33 (where Bhattacharya alleges numerous acts of censorship that continue to inflict harm to this day, including: the de-boosting of search results in Google; the removal of links to the Great Barrington Declaration in Reddit discussions; the ongoing removal of a YouTube video discussing the Declaration with Governor DeSantis; the removal of personal Tweets; the removal of LinkedIn posts; and account termination by LinkedIn)].

[131] [Doc. No. 45-4 at ¶¶14–16 (where Kulldorff notes that the Great Barrington Declaration "was censored on social media in an apparent attempt to prevent it from … 'getting a lot of attention,'" including Google deboosting search results and Facebook removing content related to it)].

[132] *See* [Id. at ¶¶17–26 (where Kulldorff alleges that Defendants' actions led to: the censoring of personal Tweets on Twitter; posts criticizing mask mandates; ongoing self-censorship to avoid further censorship penalties; removal of YouTube content; removal of LinkedIn posts; and ongoing permanent suspension of his LinkedIn account)].

expected future injuries.[133] He even notes that the problem of "shadow banning" his social-media posts is ongoing and increasing, as it "intensified in 2022."[134]

Hoft and Hines attest to similar past, ongoing, and expected future censorship injuries.[135] The Complaint even alleges that Defendants are currently engaged in an ongoing project that continues to encourage and engage in censorship activities specifically targeting Hoft's website.[136] Hines also alleges past and ongoing censorship injuries. She attests that "[t]he most recent restriction [was] in late May 2022" and notes that "[her] personal Facebook page, and the Facebook pages of both Health Freedom Louisiana and Reopen Louisiana, are all under constant threat of being completely deplatformed."[137] According to Hines, when she gave her declaration, her personal Facebook account was under an ongoing ninety-day restriction.[138] Hines also alleges that these restrictions are all directly traceable to federal officials.[139]

Each of the Private Plaintiffs allege past, ongoing, and expected future censorship injuries. Their allegations are more than complaints of past wrongs. Further, Plaintiffs easily satisfy the substantial risk standard. The threat of future censorship is substantial, and the history of past censorship is strong evidence that the threat of further censorship is not illusory or merely speculative. Plaintiffs' request for an injunction does not merely seek to redress the initial imposition of their censorship penalties, but rather their continued maintenance and enforcement. Accordingly, the Court finds that the Private Plaintiffs have satisfied Article III's injury-in-fact requirement.

---

[133] [Doc. No. 45-7 at ¶¶12–18].
[134] [Id. at ¶15].
[135] *See* [Doc. Nos. 45-5 at ¶¶3–17; 45-12 at ¶¶4–15].
[136] [Doc. No. 84 at ¶¶401–420].
[137] [Doc. No. 45-12 at ¶12].
[138] [Id.].
[139] [Id. at ¶4].

For the reasons stated above, the Court finds that both the States and Private Plaintiffs have satisfied Article III's injury-in-fact requirement. Because Plaintiffs have sufficiently alleged an injury-in-fact under the normal inquiry, the Court will not address Plaintiffs' argument that there is third-party standing to sue on behalf of the States' citizens and the Private Plaintiffs' social-media audiences.

### b. Plaintiffs adequately allege traceability for purposes of Article III standing

After establishing that both the States and the Private Plaintiffs allege injuries-in-fact sufficient for Article III standing, the Court turns to the second element of the standing analysis: traceability. *See Spokeo*, 578 U.S. at 338. For the reasons explained herein, the Court finds that Plaintiffs have adequately alleged traceability to satisfy Article III standing.

In their Motion to Dismiss, Defendants argue that any content moderation by social-media companies is not attributable to Defendants but is instead "independent action" of third parties.[140] Defendants assert that the "coercive status quo" that Plaintiffs allege caused their injury is insufficient to establish standing to sue the named Defendants, rather than the social-media companies themselves.[141] In essence, Defendants argue that no "non-speculative" allegation shows that social-media companies were actually responding to Defendants' threats, and therefore, there is no direct causal link between the censorship by private companies and the statements and actions of Defendants.[142] Further, Defendants assert that the timing of the alleged threats and censorship alone is insufficient to establish traceability.[143] Finally, Defendants point to several recent

---

[140] [Doc. No. 128-1 at p.32–33 (*citing Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards*, 128 F.3d 910, 916 (5th Cir. 1997))].
[141] [Id. at p.34].
[142] [Id.].
[143] [Id.].

decisions by other courts across the country where similar allegations were made, yet those courts dismissed the claims for lack of standing.[144]

Defendants point to two main issues with the Amended Complaint that demonstrate a lack of traceability. First, Defendants argue that Plaintiffs ignore "obvious alternative explanation[s]" for the rise in censorship by social-media companies, which would diminish the influence of Defendants on those companies.[145] These "alternative explanations" include revenue loss, market incentives, the natural prioritization of censorship amid the COVID-19 crisis, and other social cues.[146] Second, Defendants argue that the Amended Complaint suffers from "chronological problems," in that the censorship has occurred for years, long before President Biden even took office.[147] Defendants assert that the alleged "ramping up" of censorship by social-media companies due to Defendants' actions is purely speculative and cannot satisfy the traceability element.[148]

In response, Plaintiffs point out that this Court has already found that Plaintiffs' injuries are "fairly traceable" to the Defendants' conduct, and nothing in Defendants' Motion "provides any convincing reason for this Court to revisit these holdings."[149] Further, Plaintiffs assert that they have adequately alleged direct injury due to "acts of censorship that the social-media companies, but for Defendants' unlawful conduct, *otherwise would not have imposed*."[150] Plaintiffs then refer to seven sources of evidence that they assert demonstrate clearly and plausibly how Defendants' words and actions are fairly traceable to Plaintiffs' injuries.[151]

---

[144] [Id. at p.35].
[145] [Id. at p.38 (*citing Twombly*, 550 U.S. at 567)].
[146] [Id.].
[147] [Id.].
[148] [Id. at p.39].
[149] [Doc. No. 165 at p.32 (*citing* Doc. No. 34 at p.4 (*in turn citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)))].
[150] [Id. at p.33 (*quoting* Doc. No. 84 at ¶476)] (emphasis in original).
[151] [Id.].

As noted above, this Court has already found the traceability element to be satisfied here.[152] This Court quoted the Supreme Court's decision in *Bennett v. Spear*, 520 U.S. 154, 169–70 (1997), for the proposition that a plaintiff "need not demonstrate that the defendant's actions are 'the very last step in the chain of causation.'"[153] Rather, the causation required for standing purposes can be established with "no more than de facto causality." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2556, 204 L. Ed. 2d 978 (2019). The Court sees no reason to depart from its previous holding on this issue and finds that Plaintiffs have adequately alleged the traceability element.

To establish traceability (also called "causation" in this context), a plaintiff must show a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). Thus, under this element of standing, courts must analyze the remoteness, if any, between the injury to the plaintiff and the action by the defendant. *See generally id.* "In other words, a plaintiff must establish that it is 'substantially probable that the challenged acts of the defendant, not of some absent third party' caused or will cause the injury alleged." *Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505, 513 (D.D.C. 2021), *aff'd sub nom. Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff*, 23 F.4th 1028 (D.C. Cir. 2022) ("*AAPS II*") (*quoting Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996)).

To the extent Defendants challenge Plaintiffs' allegation that Defendants coerced the social-media companies to more aggressively censor certain viewpoints, this will be discussed in further detail below. Under the traceability element, it is not necessary that collusion between the named Defendants and the third-party social-media companies be definitive. Instead, Plaintiffs must only allege facts demonstrating that Defendants' own statements and actions caused Plaintiffs' injuries.

---

[152] [Doc. No. 34 at p.5].
[153] [Id.].

Defendants cite to *AAPS I* to assert that the traceability element cannot be met where the defendant is a federal actor who attempted to use Section 230 to threaten social-media companies, who in turn took action against the plaintiffs. *See AAPS I*, 518 F. Supp. 3d at 515. In *AAPS I*, the plaintiffs sued Congressman Adam Schiff for violations of free speech and press, after the congressman made various statements concerning the spread of misinformation. *See generally id.* The district court held that the plaintiffs could not establish causation for purposes of Article III standing because "all the alleged harms stem from the actions of parties not before the Court, not from Congressman Schiff." *Id.* Thus, the court granted the defendant's motion to dismiss, and the circuit court affirmed.

While neither *AAPS I* nor *AAPS II* constitutes controlling authority on this Court, it is worth noting that the fact patterns between those cases and the one before the Court are similar. However, there are also clear differences. For example, in *AAPS I*, the court found that Congressman Schiff's statements lacked any "threatening language," and he did not address the plaintiffs directly in any statement he made. *See id.* The *AAPS I* court also found that plaintiffs failed to address "the innumerable other potential causes for the actions taken by the technology companies," other than the influence of Congressman Schiff. *Id.* at 516. Thus, the court found that Congressman Schiff's statements were not fairly traceable to the plaintiffs' injuries.

In contrast, here, Plaintiffs explicitly alleged that "in the absence of Defendants' campaign for social-media censorship, market forces and other incentives would have and did restrain social-media platforms from engaging in the social-media censorship alleged herein."[154] Thus, rather than ignoring the exterior considerations that the *AAPS I* court was concerned with, Plaintiffs addressed them head on, and they even provided alternate explanations and arguments as to their potential

---

[154] [Doc. No. 84 at ¶478].

effect. Further, the Plaintiffs, as reproduced in part on page four of this ruling above, alleged various statements from many individuals that contained concrete threats both toward the general viewpoints espoused by Plaintiffs, as well as the specific content of the Private Plaintiffs themselves.[155] Thus, rather than a few sporadic statements by a single congressman, Plaintiffs here have alleged a full scheme of coordination among Defendants that resulted in direct injury to the Plaintiffs.

The other cases cited by Defendants are also not controlling on this Court and are similarly unpersuasive. In *Changizi v. Dep't of Health & Hum. Servs.*, the Southern District of Ohio, citing to *AAPS I*, found that plaintiffs failed to satisfy the traceability element where they "failed to 'establish a chronological chain of causation between' HHS' actions and Twitter's disciplinary measures." 602 F. Supp. 3d 1031, 1048 (S.D. Ohio May 5, 2022), *appeal filed*, No. 22-3573 (6th Cir. June 30, 2022) (*quoting AAPS I*, 518 F. Supp. 3d at 505). Much like in *AAPS I*, the *Changizi* court found the plaintiffs' timing argument unpersuasive—in other words, the court held that the mere temporal closeness of the HHS statements and the Twitter censorship could not establish causation for Article III standing purposes. *See id.* Importantly, however, the *Changizi* court took issue with the plaintiffs' failure to name "the entire [Biden] administration" in the complaint, where plaintiffs alleged that the censorship increased "after the Biden Administration began to broadly ask social media companies to 'do more' to combat COVID-19 'misinformation.'" *Id.* at 1046.

Here, however, Plaintiffs have alleged the full picture: a cohesive and coercive campaign by the Biden Administration and all of the Agency Defendants to threaten and persuade social-

---

[155] [Id. at ¶480 (alleging, for example, "the censorship of the Great Barrington Declaration and Plaintiffs Bhattacharya and Kulldorff just after a senior HHS official called for a 'quick and devastating … take-down' of the Declaration")].

media companies to more avidly censor so-called "misinformation." Thus, while the *Changizi* plaintiffs may have left gaps in their pleadings, Plaintiffs in the current case have not. Plaintiffs have alleged, as described in detail above, a "ramping up" in censorship that directly coincides with the deboosting, shadow-banning, and account suspensions that are the subject of the Amended Complaint.[156] And these are not mere generalizations: Plaintiffs made specific allegations showing a link between Defendants' statements and the social-media companies' censorship activities.[157] While Plaintiffs acknowledge that some censorship existed before Defendants made the statements that are the subject of this case, they also allege in detail an increase in censorship, which is tied temporally to the Defendants' actions. Thus, Plaintiffs here provide the allegations that may have been missing in the *Changizi* complaint.

Further, the Defendants' reliance on *Hart v. Facebook Inc.*, No. 22-CV-00737-CRB, 2022 WL 1427507 (N.D. Cal. May 5, 2022), is also misplaced. As in the above cases, the plaintiffs in *Hart* sought redress for censorship of their viewpoints on social-media platforms like Twitter and Facebook. However, the *Hart* court found that the plaintiff's allegations were simply too "vague" and "implausible" to fairly connect the government officials to the actions of the social-media companies. *Id.* at 5. But as this Court has repeatedly noted, Plaintiffs' Amended Complaint simply cannot be characterized as "vague." Instead, Plaintiffs have carefully laid out the alleged scheme of censorship and how Defendants are specifically connected to and involved with it.[158]

---

[156] *See* [Doc. No. 165 at p.34 (referencing the Amended Complaint, which alleges "there are many examples of censorship crack-downs by social-media platforms that immediately followed demands for censorship from federal officials, including Defendants")].

[157] [Id. (referencing the Amended Complaint, which alleges various examples of direct correlation, including "the *en masse* deplatforming of the 'Disinformation Dozen' after Jen Psaki publicly demanded it," "the censorship of the Great Barrington Declaration and Plaintiffs Bhattacharya and Kulldorff just after a senior HHS official called for a 'quick and devastating … take-down' of the Declaration," and "Twitter's deplatforming of Alex Berenson just after the President stated, 'They're killing people' and Dr. Fauci publicly singled out Berenson; among many others")].

[158] [Id. (referencing the Amended Complaint, which alleged direct collusion between Defendants and the social-media companies, including: "Defendants have openly admitted that they and other federal officials are directly

Rather than ignoring potential flaws in their arguments, Plaintiffs have addressed them head on, and the Amended Complaint suffers from none of the defects as those found by the courts above. Despite the detailed pleadings, Defendants continue to couch Plaintiffs' allegations as "unfounded" and "conclusory," and they argue that this is not the "typical case" for Article III standing.[159] However, "typicality" is not a requirement for traceability. "Because Article III 'requires no more than *de facto* causality,'" the Court finds that all Plaintiffs have adequately alleged the traceability element for Article III standing purposes. *See Dep't of Com.*, 139 S. Ct. at 2566 (*quoting Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986)).

### c. Plaintiffs adequately allege redressability for purposes of Article III standing.

Turning to the final element of the Article III standing analysis, the Court finds that both the States and the Private Plaintiffs have shown that their alleged injuries-in-fact are redressable by the Court. *See Spokeo*, 578 U.S. at 338. The redressability element of the standing analysis requires that the alleged injury is "likely to be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61. "To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 141 S. Ct. 2104, 2115, 210 L. Ed. 2d 230 (2021) (*quoting Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984), *abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)).

In their Motion to Dismiss, Defendants argue that "the expansive injunction" Plaintiffs request would not redress their alleged injuries.[160] Enjoining Defendants from "continuing to

---

involved in specific censorship decisions by social-media platforms"; "'Jen Psaki publicly admits that 'we're flagging problematic posts for Facebook' and that 'they certainly understand what our asks are'"; "'Secretary Mayorkas states that 'we're working together … with the tech companies that are the platform for much of the disinformation that reaches the American public"; and "'CISA openly states that its 'MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms.'")].

[159] [Doc. No. 199 at pp.20, 25].
[160] [Doc. No. 128-1 at p.39].

engage in unlawful conduct as alleged" would not remedy Plaintiffs' injuries because continued censorship, Defendants argue, relies on the "unfettered choices made by independent actors not before the court."[161] Because the injury could continue based on the actions of third-parties, Defendants assert that this Court cannot issue an order that would redress Plaintiffs' injuries.[162]

Further, Defendants find it unlikely that an injunction against Defendants would cause the social-media companies to change their misinformation censorship policies.[163] Defendants point to the fact that most of the companies' censorship policies existed long before the COVID-19 pandemic and related issues, and therefore, nothing could be changed by an injunction from this Court.[164] Defendants urge this Court to dismiss Plaintiffs' claim so as to avoid becoming "a permanent monitor of government speech at the highest levels" and stepping "far beyond the limits of Article III."[165] If the Court were to issue an injunction against Defendants, such an order would "have to include far-reaching bans on government speech" and would affect more than just the Plaintiffs in this case, according to Defendants.[166] Finally, Defendants argue that an injunction from this Court would also impinge on "the implementation of foreign policy and the protection of national security," due to the potential effects on federal investigations and communications with social-media companies.[167]

In response, Plaintiffs again point to this Court's previous order finding that Plaintiffs have met the redressability element and, with respect to the States specifically, that they are entitled to "special solicitude" in each step of the standing analysis.[168] Plaintiffs argue that nothing in

---

[161] [Id. at p.40 (*quoting Lujan*, 504 U.S. at 562)].
[162] [Id.].
[163] [Id.].
[164] [Id. at p.41].
[165] [Id.].
[166] [Id. at p.42].
[167] [Id. at p.43].
[168] [Doc. No. 165 at p.43]; [Doc. No. 34 at p.4].

Defendants' Motion raises any reason for the Court to reconsider its previous finding that "stopping the alleged suppression of supposed disfavored speakers, viewpoints, and content would address Plaintiff States' alleged injuries."[169]

Plaintiffs further assert that Defendants' arguments regarding the scope of the injunctive relief are premature, primarily because Plaintiffs are currently engaged in discovery that would aid in defining the scope of an injunction.[170] While Defendants have resisted such discovery, Plaintiffs argue it "is essential to crafting specific, appropriately tailored injunctive relief to remedy Plaintiffs' injuries."[171] Even without this discovery, however, Plaintiffs argue that their Amended Complaint and their Motion for Preliminary Injunction state with specificity the scope of injunctive relief that they allege will redress their injuries.[172] Further, Plaintiffs argue that Defendants overstate the issue: it is not necessary that an injunction *fully* redress every harm alleged, but rather "the substantial likelihood that judicial relief would *partially* redress Plaintiffs' injuries satisfies Article III."[173]

The Court agrees with Plaintiffs that, rather than seeking "sweeping" and "expansive" relief that goes beyond the scope of these Plaintiffs and these claims, the requested injunctive relief would directly redress Plaintiffs' alleged injuries. Defendants misunderstand Plaintiffs' requested relief: Plaintiffs do not seek to "rescind or modify" social-media companies' censorship policies, nor do they seek to bind those companies to this Court's order.[174] Rather, Plaintiffs seek an injunction against Defendants based on their own specific conduct (such as direct communications to the social-media platforms), as detailed in the Amended Complaint. The Court finds it "likely,

---

[169] [Doc. No. 165 at p.44 (*quoting* Doc. No. 34 at p.6)].
[170] [Id.].
[171] [Id.].
[172] [Id. at p.45]; [Doc. No. 10 (seeking to enjoin Defendants from "taking any steps to demand, urge, encourage, pressure, or otherwise induce any social-media company or platform for online speech," among other things)].
[173] [Doc. No. 165 at p.48] (emphasis in original).
[174] *See* [Doc. No. 128-1 at p.40].

as opposed to merely speculative," that this requested relief would redress Plaintiffs' alleged injuries. *See Lujan*, 504 U.S. at 561.

Despite Defendants' arguments that an order from this Court would not affect the decisions of third-party social-media companies, and thus would fail to redress Plaintiffs' injuries, the Court finds that Plaintiffs have "met their burden of showing that third parties will likely react in predictable ways." *Dep't of Com.*, 139 S. Ct. at 2566. As discussed above, Plaintiffs have detailed the temporal and logical connection between Defendants' statements and the social-media companies' increased censorship—these allegations explain how stopping Defendants' statements will likely stop the increased censorship. Plaintiffs' "theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Id.* at 2566 (*citing Bennett*, 520 U.S. at 169–170). Thus, Plaintiffs have overcome the hurdle Defendants raised in their Motion concerning the "unfettered choices made by independent actors not before the court."[175]

Plaintiffs also point to case law suggesting that, in the First Amendment context, the "determinative or coercive effect" of government actors "upon the action of someone else" can satisfy the redressability element of Article III standing. *Bennett*, 520 U.S. at 169. As discussed in more detail below, the Court finds that Plaintiffs have adequately alleged a scheme of coercion by Defendants to encourage violations of Plaintiffs' First Amendment rights. Thus, "an order enjoining [Defendants] from further interference with [Plaintiffs'] First Amendment rights" would likely redress Plaintiffs' alleged injuries. *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 361 (D.D.C. 2020).

---

[175] [Id. at p.40 (*quoting Lujan*, 504 U.S. at 562)].

Additionally, courts typically find that where an injury is traceable to a defendant's conduct, it is usually redressable as well. *See, e.g.*, *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 54 (D.C. Cir. 2016) ("[C]ausation and redressability are closely related, and can be viewed as two facets of a single requirement."); *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009) ("Redressability . . . is closely related to traceability, and the two prongs often overlap."); *El Paso Cnty. v. Trump*, 408 F. Supp. 3d 840, 852 (W.D. Tex. 2019). In alleging direct causation between Defendants' actions and social-media companies' responses, Plaintiffs have adequately plead the traceability element, as discussed above, and, therefore, this Court is further persuaded that the redressability element is met as well.

For the above reasons, because Plaintiffs have adequately alleged injury-in-fact, traceability, and redressability, Defendants' Motion to Dismiss is **DENIED** on the grounds of Article III standing.

## 2. Sovereign Immunity

As an alternative ground to dismiss the action, Defendants next assert that, even if Plaintiffs have Article III standing, all of Plaintiffs claims against the Agency Defendants must be dismissed because Plaintiffs have not identified a waiver of sovereign immunity.[176] Defendants state that claims against governmental agencies and their officials are claims against the United States, yet the United States cannot be sued without its consent.[177] *See Lewis v. Clarke*, 581 U.S. 155 (2017); *United States v. Mitchell*, 463 U.S. 206, 212 (1983). Defendants assert that neither 28 U.S.C. § 1331, which grants jurisdiction over federal causes of action, nor 5 U.S.C. § 702, which provides

---

[176] [Id. at p.43].
[177] [Id. at pp.43–44].

a limited waiver of sovereign immunity, can provide Plaintiffs with a way to sue the Agency Defendants.[178]

Specifically, Defendants argue that, because Plaintiffs cannot satisfy the requirements of Section 702—namely, that a particular agency action affected Plaintiffs and the action was "final"—all of Plaintiffs' claims are barred under the sovereign immunity doctrine.[179] Defendants point to the APA itself, which creates a cause of action for persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" to judicial review thereof. 5 U.S.C. § 702. Under the APA, "agency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* at § 551(13). Defendants argue that a "wholesale attack" or "blanket challenge" on agency action is not authorized under the limited terms of the APA.[180] Thus, Defendants argue that "speech by government officials expressing views on policy matters," "issuing advisories, guides, or other publications," "responding to inquiries for scientific information," and other alleged activities in the Complaint are not the type of circumscribed and discrete agency action that can lead to a waiver of sovereign immunity under Section 702.[181]

In response, Plaintiffs assert that sovereign immunity does not act as a bar to any of their claims.[182] This Court agrees and finds Plaintiffs have carried their burden of demonstrating that sovereign immunity does not bar their claims, as explained more fully below.

---

[178] [Id. at p.44].
[179] [Id. at p.44].
[180] [Id. at p.45].
[181] [Id. at p.46].
[182] [Doc. No. 165 at p.49].

### a. Sovereign Immunity does not bar Plaintiffs' First Amendment claims

Plaintiffs assert that, as for their First Amendment claims, Defendants' sovereign immunity argument is a "nonstarter." Citing to *United States v. Lee*, 106 U.S. 196 (1882), Plaintiffs argue that a constitutional exception exists to the sovereign immunity doctrine, whereby the ordinary bar does not exist for court orders enjoining federal officials from violating the Constitution. See also *Ex parte Young*, 209 U.S. 123, 159–60 (1908) (holding that sovereign immunity does not bar suits against state officials in their official capacity for an injunction barring them from violating the Constitution); *Philadelphia Co. v. Stimson*, 223 U.S. 605, 618–21 (1912) (holding that *Ex parte Young* similarly applies to federal officials); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690–98 (1949) (limiting *Lee*'s application to constitutional claims and refusing to extend to common-law tort claims); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (recognizing "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers"). Even further, Plaintiffs characterize the rampant censorship as a de facto prior restraint, often described as "the most serious and least tolerable infringement on First Amendment rights." The constitutional exception to sovereign immunity must apply to such restraints, which limit speech before it occurs, in order to maintain any effectiveness in the protection of First Amendment rights, according to Plaintiffs.

The Court agrees with Plaintiffs that Defendants have ignored the basic principle that parties may seek to enjoin federal officials from violating the Constitution. Here, many of Plaintiffs' central claims seek to enjoin just that—a violation of the First Amendment by Defendants, oftentimes before speech has even occurred (*i.e.*, a prior restraint). Defendants' argument that Plaintiffs have not sufficiently plead such a constitutional violation is more suited

to discussion under the Rule 12(b)(6) standard, not sovereign immunity. Thus, the Court finds that these claims are not barred by the doctrine of sovereign immunity.

### b.  Sovereign Immunity does not bar Plaintiffs' *ultra vires* claims.

Like the above-described constitutional claims, Plaintiffs argue that sovereign immunity does not bar their *ultra vires* claims against Agency Defendants because, simply put, parties are entitled to sue for injunctive relief against federal officials in their official capacity for actions beyond their statutory authority.[183] In *Larson*, 337 U.S. 682, the Supreme Court described two types of cases where plaintiffs can avoid the sovereign immunity bar. One type is when a "statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional." *Id.* at 689–90. The second type of cases are "those in which the officer's action is *ultra vires* his or her authority." *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011). In other words, under the second category, where a federal officer's actions are alleged to be outside the scope of their authority, "the *Larson* exception to sovereign immunity may still apply." *Id.* Both the United States Supreme Court and the Fifth Circuit have applied this *ultra vires* exception to the sovereign immunity bar, as recently as 2011. *See Dalton v. Specter*, 511 U.S. 462, 472 (1994); *Danos*, 652 F.3d at 583. Where the exception applies, a plaintiff need not demonstrate a waiver of sovereign immunity. *See Danos*, 652 F.3d at 581.

As Defendants point out, for the *ultra vires* exception to apply, Plaintiffs must have alleged "facts sufficient to establish that the officer was acting without any authority whatsoever, or without any colorable basis for the exercise of authority," not just "that the actions of the officer are illegal or unauthorized." *Id.* at 583. However, the Court finds that the Complaint meets this requirement. Specifically, the Plaintiffs allege "that Defendants are engaged in *de facto* prior

---

[183] [Id. at p.50].

restraints"**;** that this regime "falls upon the communication of news and commentary on current events"**;** and that the regime "is 'massive' in scale, encompassing 'dozens of federal officials across at least eleven federal agencies and components.'"[184] Plaintiffs' detailed allegations are sufficient to make a colorable claim for the *ultra vires* exception. And any arguments as to the merits of these pleadings—and the sufficiency of the allegations—are better addressed under Rule 12(b)(6), below. Thus, sovereign immunity does not bar Plaintiffs' *ultra vires* claims.

### c. Sovereign Immunity does not bar Plaintiffs' APA claims.

Defendants also assert that Plaintiffs have failed to identify a "final agency action" that would satisfy the requirements for an APA claim, and therefore, Plaintiffs' claims are barred by sovereign immunity.[185] Defendants point to the Fifth Circuit's decision in *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 487 (5th Cir. 2014), to assert that identification of a "final" action is a necessary prerequisite to proceed on a claim under the APA, specifically as in Counts Three through Seven of the Complaint.[186] Under the test laid out in *Bennett v. Spear*, *supra*, Defendants assert that Plaintiffs cannot meet either of the required two prongs of "finality": (1) "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." 520 U.S. at 178.

In response, Plaintiffs argue that Section 702's waiver of sovereign immunity expressly covers their APA claims because such claims are "requests for equitable relief based on legal wrongs inflicted by agency action."[187] Plaintiffs assert that Defendants' "directing and collaborating with social-media companies to censor speech based on its content" qualifies as

---

[184] [Id. at p.51].
[185] [Doc. No. 128-1 at p.48].
[186] [Id.].
[187] [Doc. No. 165 at p.51].

"discrete" agency action under Section 702.[188] While Defendants assert that merely asking social-media companies to take action against information is not agency action itself,[189] Plaintiffs here have the better argument: Plaintiffs are not challenging "the whole of government," but rather are challenging distinct statements and actions constituting coercion and collusion in the context of social media.

In *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004), the United States Supreme Court clarified that the "discrete" requirement for agency action means that a court cannot order "compliance with broad [legal] mandates," but rather must manage agencies at a narrower level. Here, Plaintiffs allege violations by Defendants at that narrower level. Specifically, Plaintiffs allege a constitutional violation of "colluding with social-media platforms to censor disfavored speakers and viewpoints."[190] Instead of arguing against Defendants' general views on policy matters, Plaintiffs have requested relief from censorship that is neither "vague" nor "undefined." *See Vill. of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186, 194 (4th Cir. 2013). Plaintiffs have put forth allegations that Defendants targeted specific people through their statements—in fact, the declarations of the Private Plaintiffs contain numerous detailed allegations of this exact claim. Defendants' alleged targeting of these individuals and their social-media profiles is "discrete action," easily distinguishable from "broad policies and practices" affecting the general public as a whole.

Further, contrary to Defendants' assertion that many instances of agency action in the aggregate cannot be challenged under the APA, similar yet discrete injuries that occur frequently can be challenged without constituting "a broad programmatic attack." *Ramirez v. U.S. Immigr. &*

---

[188] [Id. at pp.51–52].
[189] [Doc. No. 199 at p.33].
[190] [Doc. No. 165 at p.52]; [Doc. No. 84 at ¶497].

*Customs Enf't*, 310 F. Supp. 3d 7, 21 (D.D.C. 2018). Unlike in the case of *Alabama-Coushatta*, *supra*, here Plaintiffs seek redress not from the "broad policies and practices" of each agency, but rather from their alleged aggressive censorship on specific occasions. *See* 757 F.3d at 491. Because Plaintiffs are attempting to correct discrete agency action, and not an agency's policy as a whole, Defendants' arguments here are without merit.

Finally, in response to Defendants' argument concerning the "finality" of agency action, Plaintiffs correctly assert that the "finality" requirement does not appear in Section 702—the waiver of sovereign immunity section—itself, but rather in Section 704.[191] Plaintiffs cite to various opinions in which courts have held the "finality" requirement not to apply to the waiver analysis, and this Court finds those decisions persuasive here. *See, e.g.*, *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1168–72 (9th Cir. 2017); *Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 494 n.4 (6th Cir. 2014); *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 187 (D.C. Cir. 2006). Despite the murkiness of the Fifth Circuit's own view on the "finality" requirement, recent case law indicates that the Fifth Circuit has doubted the application of the requirement to Section 702. *See Amin v. Mayorkas*, 24 F.4th 383, 389 n.2 (5th Cir. 2022). Thus, the Court agrees with Plaintiffs that they need not demonstrate the "finality" of the agency actions described above in order to assert a waiver of sovereign immunity under Section 702. Because Plaintiffs have alleged discrete agency action in the form of targeted censorship, the APA claims are not barred by sovereign immunity.

For all of the above reasons, Defendants' Motion to Dismiss is **DENIED** on sovereign immunity grounds.

---

[191] [Doc. No. 165 at p.54].

### 3. Merits of Plaintiffs' Claims

Defendants next argue that Plaintiffs' First Amendment, *ultra vires*, and APA claims should be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The arguments as to Plaintiffs' First Amendment claims are largely united by the theory that Plaintiffs have not plausibly alleged "state action." Under this theory, Plaintiffs' claims fail as a matter of law because the First Amendment imposes limitation only on state action, not action by private parties. As to Plaintiffs' *ultra vires* claims, Defendants argue that Plaintiffs have failed to allege facts showing that Defendant federal officials acted "without any authority whatever."[192] Finally, Defendants argue that Plaintiffs' APA claims fail because their allegations are insufficient to support the conclusion that Defendants' actions were "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law."[193]

With respect to their First Amendment claims, Plaintiffs argue that the Complaint alleges facts demonstrating government action because it alleges that federal officials engaged in significant encouragement, coercion, and/or joint participation. Plaintiffs also argue that the federal government has "effectively subsidized, authorized, and encouraged the practices of online censorship by granting them legal immunity in Section 230 of the CDA."[194] As to the *ultra vires* claims, Plaintiffs reassert the arguments raised concerning the waiver of sovereign immunity, *i.e.*, that the Complaint alleges a *de facto* prior restraint, which can be described as "the most serious and least tolerable infringement on First Amendment rights."[195] Finally, as to the APA counts,

---

[192] [Doc. No. 128-1 at p.86 (*quoting Danos v. Jones*, 652 F.3d 577, 583 (5th Cir. 2011))].
[193] [Id. at 73–74 (*citing* 5 U.S.C. § 706(2)].
[194] [Doc. No. 165 at pp.77–78].
[195] [Id. at p.61 (*quoting Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976))].

Plaintiffs argue that their allegations are more than sufficient to support the conclusion that Defendants acted "not in accordance with law," "contrary to constitutional right," and "in excess of statutory . . . authority."[196]

Each argument will be addressed in turn below. For the reasons stated herein, the Court finds that Plaintiffs have stated plausible claims on the merits in all counts of the Complaint.

### a. Plaintiffs' First Amendment Claim states a valid claim for relief under Rule 12(b)(6).

The Free Speech Clause of the First Amendment states that Congress shall make no law abridging the freedom of speech, or of the press. U.S. Const. amend. I. The constitutional right of free expression is "intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us." *Leathers v. Medlock*, 499 U.S. 439, 448–449 (1991) (*quoting Cohen v. California*, 403 U.S. 15, 24 (1971)). "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994).

Traditionally, the First Amendment imposes limitations only on "state action, not action by private parties." *Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551, 567 (1972). However, plaintiffs "may establish a First Amendment claim based on private conduct if that conduct 'can fairly be seen as state action.'" *Id.* (*quoting Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)). There is no single test to identify state action and state actors, but the Supreme Court has "identified a host of facts that can bear on the fairness of such an attribution" of state action. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 294, 296 (2001). Government action can exist in at least five circumstances: (1) action that results from the State's exercise of "coercive

---

[196] [Id. at p.92 (*quoting* 5 U.S.C. § 706(2)(A)-(C))].

power," *id.* at 295, 298 (*quoting Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)); (2) action that results from the state providing "significant encouragement, either overt or covert," to a private action, *id.* (*quoting Blum*, 457 U.S. at 1004); (3) action that results from a private actor operating as a willful participant in joint activity with the State or its agents, *id.* (*quoting Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982)); (4) action that is entwined with governmental policies, or when the government is entwined in the management or control of the private action, *id.* (*quoting Evans v. Newton*, 382 U.S. 296, 299 (1966)); and (5) action with specific features that combines to create a compelling case for state action, especially where a federal statute has immunized private conduct. *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 615 (1989).

### i. Plaintiffs allege that Defendants provided significant encouragement and/or coercion by threatening adverse consequences if social media companies did not comply with their demands.

In *Norwood v. Harrison*, 413 U.S. 455 (1973), the Supreme Court demonstrated how actions by a private actor can qualify as unconstitutional state action. There, parents of Mississippi schoolchildren challenged the validity of a statutory program under which the State purchased textbooks and lent them to students in private and public schools. *Id.* at 456. The complaint alleged that certain private schools participating in the program excluded students on the basis of race, and that, by supplying textbooks to these discriminatory schools, the State provided direct aid to racially segregated education. *Id.* Because the State bore a necessary and inescapable cost of education on behalf of discriminatory schools, the State gave support to such discrimination. *Id.* at 265. After noting that racial discrimination in a state-operated school is barred by the Constitution, the Court instructed that "[i]t is axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Id.* (*quoting Lee v. Macon Cnty. Bd. of Ed.*, 267 F. Supp. 458, 475–476 (M.D. Ala.), *aff'd sub nom.*

*Wallace v. U S*, 389 U.S. 215 (1967)). Later, in *Blum* v. *Yaretsky*, the Court clarified the "significant encouragement" doctrine, stating that a state or the federal government "normally can be held responsible for a private decision" when it "has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government]." 457 U.S. at 1004.

The Supreme Court in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963), stated that coercion includes "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation." At issue in *Bantam* was whether a legislatively-created commission, by notifying publishing distributors, on official commission stationary, that certain designated books or magazines had been declared objectionable for sale or distribution, amounted to a scheme of governmental censorship. *Id.* at 65. In answering the question affirmatively, the Court stated:

> People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around, and [the distributor's] reaction, according to uncontroverted testimony, was no exception to this general rule. The Commission's notices, phrased virtually as orders, reasonably understood to be such by the distributor, invariably followed up by police visitations, in fact stopped the circulation of the listed publications *ex proprio vigore*. It would be naive to credit the State's assertion that these blacklists are in the nature of mere legal advice, when they plainly serve as instruments of regulation[.]

*Id.* at 68–69. The Court held that, even though the distributors were "'free' to ignore the [] notices, in the sense that [] refusal to 'cooperate' would have violated no law," the conduct "was in fact a scheme of state censorship." *Id.* at 68–69, 72.

In *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1295 (9th Cir. 1987), the United States Court of Appeals for the Ninth Circuit found state action where a government official threatened adverse action to coerce a private party into performing a particular act. There, a deputy county attorney threatened to prosecute a regional telephone company if it

continued to carry a third-party's "dial-a-message" service. *Id.* The court noted that when the government official threatened prosecution, the state "exercised coercive power" over the telephone company and "thereby converted its otherwise private conduct into state action." *Id.* (*quoting Blum*, 457 U.S. at 1004).

Similarly, in *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015), the United States Court of Appeals for the Seventh Circuit held that "a public official who tries to shut down an avenue of expression of ideas and opinions through 'actual or threatened imposition of government power or sanction' is violating the First Amendment." (*quoting Am. Fam. Ass'n, Inc. v. City & Cnty. of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002)). There, a plaintiff sought a preliminary injunction to stop a sheriff's campaign of pressuring credit card companies to cut ties with its website. *Id.* The court noted the distinction between government expression, which is permitted by the First Amendment, and government intimidation, which is not permitted, stating:

> [T]he fact that a public-official defendant lacks direct regulatory or decisionmaking authority over a plaintiff, or a third party that is publishing or otherwise disseminating the plaintiff's message, is not necessarily dispositive.... What matters is the distinction between attempts to convince and attempts to coerce. A public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form.

*Id.* (*quoting Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003)). The court noted that an injunction can be issued even if the threatened action turns out to be empty or ignored by the victim. *Id.*; *see also Peterson v. City of Greenville*, 373 U.S. 244 (1963) (finding state action "even assuming, as respondent contends, that the manager would have acted as he did independently of the existence of the ordinance"); *Okwedy*, 333 F.3d at 340–41 ("[A] public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First

Amendment rights even if the public-official defendant lacks direct regulatory or decisionmaking authority over the plaintiff or a third party that facilitates the plaintiff's speech."); *Nat'l Rifle Ass'n of Am. v. Cuomo*, 350 F. Supp. 3d 94, 106, 111 (N.D.N.Y. 2018) ("Further, the government actor need not have direct power to take adverse action over a targeted entity for comments to constitute a threat….").

More recently, in *O'Handley v. Weber*, No. 22-15071, 2023 WL 2443073 (9th Cir. Mar. 10, 2023), the United States Court of Appeals for the Ninth Circuit clarified the distinction between government expression and government intimidation. There, the California Office of Elections Cybersecurity ("OEC"), headed by the California Secretary of State's office, flagged posts on Facebook and Twitter as erroneous or misleading social media posts. *Id.* at 3. The companies removed most of the flagged posts, leading the plaintiff to file suit alleging, among other things, violation of the First Amendment. *Id.* at 2. Noting the distinction between attempts to convince and attempts to coerce, the court stated that "government officials do not violate the First Amendment when they request that a private intermediary not carry a third party's speech so long as the officials do not threaten adverse consequences if the intermediary refuses to comply." *Id.* at 6 (citations omitted). Because the plaintiff failed to allege any threat or attempt at coercion aside from the takedown request,[197] the court held that the plaintiff failed to allege state action through significant encouragement or coercion.

Here, Plaintiffs have clearly alleged that Defendants attempted to convince social-media companies to censor certain viewpoints. For example, Plaintiffs allege that Psaki demanded the censorship of the "Disinformation Dozen" and publicly demanded faster censorship of "harmful

---

[197] The takedown request made by the OEC stated: "Hi, We wanted to flag this Twitter post: https://twitter.com/DC_Draino/status/1237073866578096129 From user @DC_Draino. In this post user claims California of being a culprit of voter fraud, and ignores the fact that we do audit votes. This is a blatant disregard to how our voting process works and creates disinformation and distrust among the general public." *Id.* at 3.

posts" on Facebook.[198] Further, the Complaint alleges threats, some thinly veiled and some blatant, made by Defendants in an attempt to effectuate its censorship program. One such alleged threat is that the Surgeon General issued a formal "Request for Information" to social-media platforms as an implied threat of future regulation to pressure them to increase censorship.[199] Another alleged threat is the DHS's publishing of repeated terrorism advisory bulletins indicating that "misinformation" and "disinformation" on social-media platforms are "domestic terror threats."[200] While not a direct threat, equating failure to comply with censorship demands as enabling acts of domestic terrorism through repeated official advisory bulletins is certainly an action social-media companies would not lightly disregard. Moreover, the Complaint contains over 100 paragraphs of allegations detailing "significant encouragement" in private (*i.e.*, "covert") communications between Defendants and social-media platforms.[201]

The Complaint further alleges threats that far exceed, in both number and coercive power, the threats at issue in the above-mentioned cases. Specifically, Plaintiffs allege and link threats of official government action in the form of threats of antitrust legislation and/or enforcement and calls to amend or repeal Section 230 of the CDA with calls for more aggressive censorship and

---

[198] [Doc. No. 84 at ¶226; *see also* id. at ¶227 (alleging that Psaki stated that "we engage with them regularly and they certainly understand what our asks are," and that these "asks" include demands for increased censorship); id. at ¶¶228–229 (detailed allegations about the Surgeon General's health advisory calling for greater censorship of social-media "misinformation"); id. at ¶233 (alleging that Jen Psaki demanded that social-media platforms coordinate with each other to censor disfavored speech); id. at ¶234 (alleging that Psaki demanded more "robust enforcement strategies" from platforms to "take faster action" against supposedly harmful speech); id. at ¶239 (alleging that Surgeon General Murthy publicly stated, "We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health misinformation on their platforms. The time for excuses and half measures is long past. We need transparency and accountability now."); id. at ¶241 (alleging that Jen Psaki demanded that social-media platforms "do more" to increase censorship, in addition to Spotify's restrictions on Joe Rogan's podcast)].

[199] [Id. at ¶¶242–246].

[200] [Id. at ¶300; *see also* id. at ¶¶ 242–246 (alleging that the Surgeon General issued a formal "Request for Information" to social-media platforms as an implied threat of future regulation to pressure them to increase censorship); id. at ¶¶242–246 (alleging that the Surgeon General issued a formal "Request for Information" to social-media platforms as an implied threat of future regulation to pressure them to increase censorship); id. at ¶¶183–202 (containing detailed allegations of a long, continuing campaign of threats against social-media platforms to pressure them to censor)].

[201] [Id. at ¶¶338–457].

suppression of speakers and viewpoints that government officials disfavor.[202] The Complaint even alleges, almost directly on point with the threats in *Carlin* and *Backpage*, that President Biden threatened civil liability and criminal prosecution against Mark Zuckerburg if Facebook did not increase censorship of political speech.[203] The Court finds that the Complaint alleges significant encouragement and coercion that converts the otherwise private conduct of censorship on social-media platforms into state action, and is unpersuaded by Defendants' arguments to the contrary.

Defendants argue that Plaintiffs allege only "isolated episodes in which federal officials engaged in rhetoric about misinformation on social media platforms" and that the Complaint is "devoid" of any "enforceable threat" to "prosecute."[204] Further, they argue that it "is unclear how the alleged comments about amending [Section 230 of the CDA] or bringing antitrust suits could be viewed as 'threats' given that no Defendant could unilaterally take such actions."[205] The Court is unpersuaded by these arguments for several reasons. First, as explained above, any suggestion that a threat must be enforceable in order to constitute coercive state action is clearly contradicted by the overwhelming weight of authority.[206] Moreover, the Complaint alleges that the threats became more forceful once the Biden Administrative took office and gained control of both Houses of Congress, indicating that the Defendants could take such actions with the help of political allies in Congress. Additionally, the Attorney General, a position appointed by and removable by the President, could, through the DOJ, unilaterally institute antitrust actions against social-media companies.

---

[202] [Id. at ¶¶185–186].

[203] [Id. at ¶¶191–192].

[204] [Doc. No. 128-1 at p.74 (*quoting VDARE Found. v. City of Colorado Springs*, 11 F.4th 1151, 1162–63 (10th Cir. 2021), *cert. denied*, 212 L. Ed. 2d 216 (Feb. 28, 2022))].

[205] [Id.].

[206] [*See supra*, pp.59–60 (explaining that in *Backpage.com, LLC*, 807 F.3d at 230, *Peterson*, 373 U.S. 244, *Okwedy*, 333 F.3d 339, and *National Rifle Association of America*, 350 F. Supp. 3d 94, the courts all noted that the threat need not be the cause-in-fact for the challenged action, and that the government actor making the threat need not possess the direct power or decisionmaking authority to enforce the threat in order for the threat to constitute coercive action)].

Further, while the Government may certainly select the messages it wishes to convey, this freedom is limited by the more fundamental principle that a government entity may not employ threats to limit the free speech of private citizens. *See Backpage.com, LLC*, 807 F.3d at 235. Plaintiffs are not, as Defendants argue, seeking a "judicial gag order to prevent the Executive Branch from expressing its views on important matters of public concern."[207] As the Supreme Court explained: "[W]hile the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to dangerous misuse.  If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Matal v. Tam*, 582 U.S. 218, 235 (2017). The Complaint alleges more than the exercise of permissible government speech. It alleges extensive and highly effective efforts by government officials to "silence or muffle the expression of disfavored viewpoints." *Id.*

Accordingly, the Court finds that Plaintiffs have plausibly alleged state action under the theory of significant encouragement and/or coercion.

### ii.  Plaintiffs allege that Defendants' conduct amounts to joint participation and/or entwinement.

"[A] private entity can qualify as a state actor … when the government acts jointly with the private entity." *Manhattan Cmty. Access Corp. v. Halleck*, 204 L. Ed. 2d 405 (June 17, 2019). Further, "[p]rivate persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law…It is enough that [the private actor] is a willful participant in joint activity with the State or its agents." *Lugar*, 457 U.S. at 941 (*quoting United States v. Price*, 383 U.S. 787, 794 (1966)). Government action also occurs when there is "a symbiotic relationship between the [government] and the [private party]," *Brentwood Academy*, 531 U.S. at 294; when the private

---

[207] [Doc. No. 128-1 at p.15].

entity is "entwined with governmental policies," *id.* at 296; where the government has "specifically authorized or approved the private parties' actions;" when the private action "received clear state imprimatur;" and/or when the government "affirmatively command[s]" the private action. *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 754–55 (9th Cir. 2020).

In *Skinner*, 489 U.S. at 606–612, 615, the Supreme Court held that railroads' drug testing of employees constituted government action because features of the regulation combined to "convince [the Court] that the Government did more than adopt a passive position toward the underlying private conduct." There, the regulation specifically authorized railroads to adopt a policy of drug testing and shielded the railroads from state laws which restricted such testing, effectively preempting state law. *Id.* In finding state action, the Court reasoned that the regulations preempted state laws by "covering the same subject matter"; that "[t]he Government ha[d] removed all legal barriers to the testing authorized by [the regulation]"; and that the regulation "made plain not only [the government's] strong preference for testing, but also its desire to share the fruits of such intrusions." *Id.*

Similarly, in *Ry. Emp. Dep't v. Hanson*, 351 U.S. 225, 231–32 (1956), the Supreme Court found government action where a federal statute authorized close-shop agreements, preempting the laws of seventeen states. The Court stated that "[i]f private rights are being invaded, it is by force of an agreement made pursuant to federal law which expressly declares that state law is superseded. In other words, the federal statute is the source of the power and authority by which any private rights are lost or sacrificed." *Id.*; *see also Norwood*, 413 U.S. at 466 (where the Supreme Court emphasized that "[a] State may not grant the type of tangible financial aid here involved if that aid has a significant tendency to facilitate, reinforce, and support private discrimination").

64

Recently, in *O'Handley*, the United States Court of Appeals for the Ninth Circuit found no joint action where government officials flagged certain tweets as misinformation. There, the plaintiff alleged the "conspiracy approach" to joint action which requires "the plaintiff to show a 'meeting of the minds' between the government and the private party to 'violate constitutional rights.'" 2023 WL 2443073, at *7 (*quoting Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983)). The court noted that, because the "only alleged interactions are communications between the OEC and Twitter[208] in which the OEC flagged for Twitter's review posts that potentially violated the company's content-moderation policy," the plaintiff "allege[d] no facts plausibly suggesting either that the OEC interjected itself into the company's internal decisions to limit access to his tweets and suspend his account or that the State played any role in drafting Twitter's Civic Integrity Policy." *Id.* at *8. The court described the relationship between the state officials and Twitter as a permissible "arms-length" relationship. *Id.* at *8 (*citing Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498 (9th Cir. 1996)). For the reasons explained below, the allegations here are distinguishable from those in *O'Handley*.

Here, Plaintiffs have plausibly alleged joint action, entwinement, and/or that specific features of Defendants' actions combined to create state action. For example, the Complaint alleges that "[o]nce in control of the Executive Branch, Defendants promptly capitalized on these threats by pressuring, cajoling, and openly colluding with social-media companies to actively suppress particular disfavored speakers and viewpoints on social media."[209] Specifically, Plaintiffs allege that Dr. Fauci, other CDC officials, officials of the Census Bureau, CISA, officials at HHS, the state department, and members of the FBI actively and directly coordinated with social-media

---

[208] *See infra* note 197 for communication between the OEC and Twitter.
[209] [Doc. No. 84 at ¶200].

companies to push, flag, and encourage censorship of posts the Government deemed "Mis, Dis, or Malinformation."[210]

These allegations, unlike those in *O'Handley*, demonstrate more than an "arms-length" relationship. Plaintiffs allege a formal government-created system for federal officials to influence social-media censorship decisions. For example, the Complaint alleges that federal officials set up a long series of formal meetings to discuss censorship, setting up privileged reporting channels to demand censorship, and funding and establishing federal-private partnership to procure censorship of disfavored viewpoints.[211] The Complaint clearly alleges that Defendants specifically authorized and approved the actions of the social-media companies and gives dozens of examples where Defendants dictated specific censorship decisions to social-media platforms. These allegations are a far cry from the complained-of action in *O'Handley*: a single message from an unidentified member of a state agency to Twitter.

Further, similarly to *Skinner* and *Hanson*, several specific factors combine to create state action. Section 230 of the CDA purports to preempt state laws to the contrary, thus removing all legal barriers to the censorship immunized by Section 230.  Federal officials have also made plain

---

[210] [Id. at ¶¶207–214 (alleging coordination between Dr. Fauci and social-media platforms to procure censorship of viewpoints disfavored by Dr. Fauci); ¶¶215–216 (alleging that Dr. Fauci and CDC officials serve as "public health experts" who advise social-media platforms on what to censor); ¶225 (alleging that Jen Psaki stated that "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff" and that "we're flagging problematic posts for Facebook"); ¶248 (alleging that "Crawford of CDC and other CDC officials frequently communicated and coordinated with social-media platforms, including Facebook/Meta, Twitter, Google/YouTube, and Instagram, regarding the censorship of speech on social-media platforms, including flagging specific content for censorship," and providing details); ¶249 ("Officials of the Census Bureau … play an important, active, and ongoing role in colluding with social-media platforms to censor disfavored speech."); ¶¶250–253 (additional specific allegations of coordination between CDC and Census officials and social-media platforms to censor specific content); ¶¶282–283 ("DHS Secretary Alejandro Mayorkas stated that the department is working with tech companies … to … prevent harm from occurring."); ¶286 ("Leading up to the 2020 election, CISA relayed reports of election disinformation from election officials to social media platform operators."); ¶¶292–293 (alleging that CISA is working with "partners in the private sector … to continue to ensure that the American people have the facts that they need" and that this would ensure that Americans do not get to "pick their own facts"); ¶301 (alleging that "CISA published another bulletin announcing that it was coordinating directly with social-media platforms to police 'Mis, Dis, Malinformation,'" stating that CISA works "continues to work in close coordination with … social media companies" on this issue)].
[211] [Id. at ¶9].

a strong preference and desire to "share the fruits of such intrusions," showing "clear indices of the Government's encouragement, endorsement, and participation" in censorship, which "suffice to implicate the [First] Amendment." *Skinner*, 489 U.S. at 615–16.

The Complaint further explicitly alleges subsidization, authorization, and preemption through Section 230, stating: "[T]hrough Section 230 of the Communications Decency Act (CDA) and other actions, the federal government subsidized, fostered, encouraged, and empowered the creation of a small number of massive social-media companies with disproportionate ability to censor and suppress speech on the basis of speaker, content, and viewpoint."[212] Section 230 immunity constitutes the type of "tangible financial aid," here worth billions of dollars per year, that the Supreme Court identified in *Norwood*, 413 U.S. at 466. This immunity also "has a significant tendency to facilitate, reinforce, and support private" censorship. *Id.* Combined with other factors such as the coercive statements and significant entwinement of federal officials and censorship decisions on social-media platforms, as in *Skinner*, this serves as another basis for finding government action.

Defendants argue that this final theory of state action, if accepted, requires dismissal of Plaintiffs' claims for lack of standing because Plaintiffs do not challenge Section 230 as unconstitutional, and the requested injunction would have no effect on Section 230's continued operation. According to Defendants, if it is true that Section 230 encourages censorship, then "no injunction short of striking down the statute would redress Plaintiffs' injuries, and their claims must be dismissed for lack of standing on redressability grounds."[213] This argument misses the mark.

---

[212] [Id. at ¶4].
[213] [Doc. No. 199 at pp.56–57].

First, Plaintiffs do not argue, as Defendants contend, that Section 230's immunity alone "transforms social media companies' content moderation measures into Government action."[214] Rather, Plaintiffs argue that the monetary value of Section 230 immunity "combined with other factors" rises to the level of government action.[215] Stated differently, Plaintiffs injuries could be redressed without declaring Section 230 unconstitutional. The Defendants' alleged use of Section 230's immunity—and its obvious financial incentives for social-media companies—as a metaphorical carrot-and-stick *combined* with the alleged back-room meetings, hands-on approach to online censorship, and other factors discussed above transforms Defendants' actions into state action. As Defendants note, Section 230 was designed to "reflect a deliberate absence of government involvement in regulating online speech," but has instead, according to Plaintiffs' allegations, become a tool for coercion used to encourage significant joint action between federal agencies and social-media companies. Plaintiffs' injuries could be redressed by enjoining Defendants from engaging in the above-discussed "other factors" that have twisted Section 230 into a catalyst for government-sponsored censorship.

Accordingly, the Court finds that Plaintiffs have plausibly alleged state action under the theories of joint participation, entwinement, and the combining of factors such as subsidization, authorization, and encouragement.

### iii. Because the Complaint alleges state action, Plaintiffs plausibly state a claim for violation of the First Amendment via government-induced censorship.

Having found the above-mentioned tests for government action satisfied, the Court now turns to whether the alleged government action—government induced censorship on social-media platforms—adequately states a violation of the First Amendment. For the reasons explained below,

---

[214] [Id. at p.56].
[215] [Doc. No. 128-1 at p.67].

68

the Court finds that Plaintiffs have plausibly alleged prior restraints and viewpoint discrimination, which are clear violations of the First Amendment.

If there is a bedrock principal underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable. *Matal*, 582 U.S. at 243. First Amendment standards must be given the benefit of any doubt to protect rather than stifle speech. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010). The First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals. *Turner Broadcasting System, Inc.*, 512 U.S. at 641.

Government action, aimed at the suppression of particular views on a subject which discriminates on the basis of viewpoint, is presumptively unconstitutional. The First Amendment guards against government action "targeted at specific subject matter." *National Rifle Association of America*, 350 F. Supp. 3d at 112. Viewpoint discrimination is an egregious form of content discrimination. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). The government must abstain from regulating speech when the specific motivating ideology or the perspective of the speaker is the rationale for the restriction. *Id.* Moreover, "[t]hreatening penalties for future speech goes by the name of 'prior restraint,' and a prior restraint is the quintessential first-amendment violation." *Backpage.com, LLC*, 807 F.3d at 230.

The U.S. Supreme Court in *Turner Broadcasting System, Inc.* noted that, because "a cable operator, unlike speakers in other media," can "silence the voice of competing speakers with a mere flick of the switch," the "potential for abuse" of private power over "a central avenue of

communication cannot be overlooked." 512 U.S. at 656–657. Moreover, even if a speaker has exceeded the limits of the First Amendment, "courts are extremely reluctant to permit the state to close down his communication forum altogether." *Carlin Communications, Inc.*, 827 F.2d at 1296. Online platforms such as those found on social-media fit into this category of "communication forums" subject to potential abuse via "a mere flick of the switch." *See generally Turner Broadcasting System, Inc.*, 512 U.S. at 656–657. Further, online censorship can function as a prior restraint by preventing a user of the social-media platform from voicing their opinion at all.

Here, Plaintiffs have clearly and plausibly alleged that Defendants engaged in viewpoint discrimination and prior restraints. As discussed in great detail above, Plaintiffs allege a regime of censorship that targets specific viewpoints deemed mis-, dis-, or malinformation by federal officials. Because Plaintiffs allege that Defendants are targeting particular views taken by speakers on a specific subject, they have alleged a clear violation of the First Amendment, *i.e.*, viewpoint discrimination. Moreover, Plaintiffs allege that Defendants, by placing bans, shadow-bans, and other forms of restrictions on Plaintiffs' social-media accounts, are engaged in *de facto* prior restraints, another clear violation of the First Amendment. Thus, the Court finds that Plaintiffs have plausibly alleged their First Amendment claims.

### b. Plaintiffs' *ultra vires* and APA claims plausibly state claims for relief under Rule 12(b)(6).

Defendants next challenge both the *ultra vires* and APA claims brought by Plaintiffs. Defendants argue that Plaintiffs have failed to state a plausible *ultra vires* exception to sovereign immunity because the Complaint fails to allege that Defendants acted without any authority whatsoever. According to Defendants, the Complaint alleges only "the kind of speech government officials engage in when they participate in news media interviews or speak from the lectern."[216]

---

[216] [Doc. No. 128-1].

As to the APA claims, Defendants argue that, "to the extent Plaintiffs contend that the Agency Defendants have acted 'contrary to constitutional right,'" Plaintiffs' APA claims "simply duplicate their First Amendment claim."[217] Further, Defendants contend that, while the Complaint "invokes 5 U.S.C. § 706(2)(A) or (2)(D), it merely offers 'labels and conclusions,' and 'formulaic recitation[s] of the elements of a cause of action,' without 'further factual enhancement.'"[218]

Plaintiffs respond that the *ultra vires* claim plausibly alleges that Defendants are engaged in *de facto* prior restraints.[219] As to the APA claims, Plaintiffs respond that their allegations are "more than sufficient to support the conclusion that Defendants' actions were 'not in accordance with law,' 'contrary to constitutional right,' and 'in excess of statutory . . . authority.'"[220] Moreover, Plaintiffs contend that the Complaint "adequately allege[s] that Defendants failed to observe 'procedure required by law,' [] because 'they never engaged in any notice-and-comment process' even though their actions affected First Amendment legal rights."[221]

As explained above, in examining both Plaintiffs' First Amendment claims and whether sovereign immunity bars the *ultra vires* claims, Plaintiffs have plausibly alleged *de facto* prior restraints, which the Supreme Court has described as "the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n*, 427 U.S. at 559. Further, the Complaint alleges that Defendants' regime of prior restraints "falls upon the communication of news and commentary on current events," making the damage to First Amendment rights "particularly great."[222] *Id.* The Complaint also alleges that Defendants' regime of prior restraint is "massive" in scale, encompassing "dozens of federal officials across at least eleven federal

---

[217] [Id. at p.87 (internal citations omitted)].
[218] [Id. (*quoting Iqbal*, 556 U.S. at 678)].
[219] [Doc. No. 165 at p.61 (*quoting* 5 U.S.C. § 702)].
[220] [Id. at p.92 (*quoting* 5 U.S.C. § 706(2)(A)-(C)].
[221] [Id. (*quoting* 5 U.S.C. § 706(2)(A)-(C); Doc. No. 85 at ¶¶525, 536, 547, 558, 569) (*referencing Amin v. Mayorkas*, 24 F.4th 383, 392 (5th Cir. 2022))].
[222] *See, e.g.*, [Doc. No. 84 at ¶24].

agencies and components."[223] Further, Defendants have not presented a statute that purports to provide any "colorable basis" for these prior restraints. Accordingly, the Court finds that Plaintiffs' *ultra vires* claim plausibly states a claim for relief under Rule 12(b)(6).

Finally, as explained above,[224] Plaintiffs allege many instances of discrete agency action and need not demonstrate the "finality" of those agency actions. Further, the detailed allegations of the Complaint are more than sufficient to support the conclusion that Defendants acted "not in accordance with law," "contrary to constitutional right," and "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A)-(C). The allegations are not, as Defendants argue, a "formulaic recitation of the elements of a cause of action."[225] Plaintiffs have provided ample factual support to support their APA claims.

For the above reasons, because Plaintiffs have adequately alleged each claim in the Complaint, Defendants' Motion to Dismiss is **DENIED** on Rule 12(b)(6) grounds.

### 4. Plaintiffs' Claims Against President Biden

In Defendants' final argument, they move that this Court dismiss all of Plaintiffs' claims against President Biden under the separation of powers doctrine.[226] According to Defendants, Plaintiffs' requested relief is "categorically unavailable against" President Biden.[227] Defendants assert that "in general," courts lack the jurisdiction to enjoin the President because such relief is "extraordinary."[228] *See Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992). Further, Defendants point out that courts are hesitant to "second-guess the legality of the President's discretionary decisions" via declaratory or injunctive relief.[229]

---

[223] [Id. at ¶9].
[224] *See infra* at p.54.
[225] [Doc. No. 199 at p.75 (*quoting Twombly*, 550 U.S. at 555)].
[226] [Doc. No. 128-1 at p.74].
[227] [Id.].
[228] [Id. at p.75].
[229] [Id.].

In response, Plaintiffs assert that, while injunctive relief against the President is "extraordinary," it is not "categorically barred."[230] Plaintiffs argue that courts "may enjoin the President if the plaintiffs' injuries cannot be redressed by enjoining other officials."[231] Further, Plaintiffs assert that, regardless of the injunctive relief sought, courts do have the authority to grant declaratory relief against the President.[232] Thus, Plaintiffs maintain that they may proceed with their claims against President Biden.

In their reply, Defendants focus on the "unnecessary separation-of-powers conflict that would arise if the Court issued injunctive or declaratory relief against the President."[233] Defendants re-emphasize the Supreme Court's holdings in *State of Mississippi v. Johnson*, 71 U.S. 475, 501 (1866), and *Franklin*, *supra*, which Defendants say stand for the proposition that Plaintiffs cannot "enjoin the President in the performance of his official duties."[234] *State of Mississippi*, 71 U.S. at 501. Further, Defendants directly contest Plaintiffs' argument that President Biden is the "sole defendant they can appropriately name" in their various claims; Defendants assert that Plaintiffs have in fact named many subordinate executive officials in their suit, thus defeating Plaintiffs' justification for adding the President as a party.[235]

In *State of Mississippi v. Johnson*, the Supreme Court stated that, even if it granted the plaintiff's requested injunction against President Johnson, it would be unable to enforce its own order should the President choose to refuse to comply: "But we are fully satisfied that this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties; and

---

[230] [Doc. No. 165 at p.83].
[231] [Id. (*citing Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017), *vacated and remanded,* 199 L. Ed. 2d 275 (Oct. 24, 2017)].
[232] [Id.].
[233] [Doc. No. 199 at p.62].
[234] [Id.].
[235] [Id. at p.63].

that no such bill ought to be received by us." *Id.* at 501. Thus, injunctions against the President have generally been disfavored (and may even be impossible).

In *Franklin v. Massachusetts*, the Supreme Court, while jointly analyzing the redressability element of standing and the separation-of-powers issue, noted that "the District Court's grant of injunctive relief against the President himself is extraordinary and should have raised judicial eyebrows." 505 U.S. at 802. The general principle upon which the Supreme Court relied is that courts lack the jurisdiction to enjoin the President as it relates to his official duties. *Id. (citing State of Mississippi*, 71 U.S. at 501). However, the Court noted that it had previously "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." *Id.* Notably, the Court also distinguished its analysis of the presidential claims from those against other federal officials, and it found the redressability element of standing was satisfied for the declaratory relief sought against the federal officials. *Id.* at 803.

Defendants also direct this Court's attention to *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974) ("*NTEU*"). In *NTEU*, the district court dismissed a complaint seeking an injunction against President Nixon for lack of jurisdiction. *Id.* Upon review, the appellate court noted that federal officials can be subject to mandamus by the courts with respect to their official duties. *Id.* at 602. The court held that the presidential duty at issue in *NTEU* came directly from a statute; this statute prescribed certain actions by the President, and therefore, any violation of the statutory duty was subject to mandamus by the courts. *Id.* The court further held that the controversy was not a political question; thus, the court was not deprived of jurisdiction on those grounds either. *Id.* at 604. Ultimately, the court found that it had jurisdiction and could direct the President to act if the court chose to do so, based on temporal and other considerations. *Id.* at 616.

74

Defendants argue that in the present case, none of the considerations justifying the *NTEU* court's exercise of jurisdiction are present. Most notably, President Biden has not acted, nor has he been alleged to have acted, based on a specific statute. The only statute that Plaintiffs devote significant attention to is the CDA, 47 U.S.C. § 230, which does not entail presidential duties. The Court tends to agree with Defendants that, in the absence of a statutory tether, Plaintiffs' requested injunctive relief against President Biden is inappropriate. Defendants also argue, and this Court agrees, that Plaintiffs' reliance on *Clinton v. City of New York*, 524 U.S. 417 (1998), is misplaced. *Clinton* dealt with the Line Item Veto Act and whether the President had the authority to act under it. *Id.* The plaintiff in *Clinton* sought declaratory relief, not injunctive relief, based on pure statutory authority. *Id.* This case is thus easily distinguishable.

While the parties do not devote much of their arguments to this issue, the Court agrees with Defendants that injunctive relief against President Biden is not proper here. Importantly, the Plaintiffs already seek relief against several subordinate federal officials, who are more properly subject to this Court's jurisdiction. The case law suggests that where relief against other federal officials would redress the Plaintiffs' alleged injuries, the claims against the President should not proceed and are not necessary. Further, there is no statute underlying President Biden's actions that the Court could point to in forcing the President into some action. Most of the case law on this issue discusses a specific statute that a President failed to comply with, a fact that is clearly lacking here. Thus, the Court finds that Plaintiff's claims for injunctive relief against President Biden should be dismissed.

In contrast to the case law concerning injunctive relief against the president, the Court notes the lack of clear authority on the availability of declaratory relief against a sitting president. For example, in *Stone v. Trump*, 400 F. Supp. 3d 317, 359 (D. Md. 2019), the United States District

Court for the District of Maryland noted that the only real support for dismissing a claim for declaratory relief against then-President Trump was Justice Scalia's concurring opinion in *Franklin*. There, Justice Scalia stated: "I think we cannot issue a declaratory judgment against the President. It is incompatible with his constitutional position that he be compelled personally to defend his executive actions before a court." *Franklin*, 505 U.S. at 827 (Scalia, J., concurring). However, the *Stone* court pointed out that "[s]ix years after Justice Scalia's statement in *Franklin*, in *Clinton v. New York*, the Supreme Court expressly stated that a declaratory judgment against the President could redress the plaintiff's injuries." *Stone*, 400 F. Supp. 3d at 359 (*quoting D.C. v. Trump*, 291 F. Supp. 3d 725, 751–52 (D. Md. 2018). Thus, the *Stone* court ultimately decided to deny without prejudice the defendants' motion to dismiss the claims for declaratory relief against President Trump, determining that the case law was too unclear on the issue to completely dismiss the president from the suit at that time. *Id.* at 360. This Court agrees with the *Stone* court's view and declines to dismiss the claims for declaratory relief against President Biden at this time.

For these reasons, the Court finds Defendants' arguments persuasive as to the requested injunctive relief, and the Motion to Dismiss is **GRANTED** as to Plaintiffs' claims for an injunction against President Biden. Such claims are **DISMISSED WITH PREJUDICE**. However, because the case law is unclear as to the availability of declaratory relief against a sitting president, the Motion to Dismiss is **DENIED WITHOUT PREJUDICE** as to Plaintiffs' claims for declaratory relief against President Biden.

## III.    CONCLUSION

For the foregoing reasons, the Motion to Dismiss [Doc. No. 128] filed by Defendants is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion is **GRANTED** as to Plaintiffs' claims for injunctive relief against President Biden, and those claims are **DISMISSED**

**WITH PREJUDICE**. Defendants' Motion is **DENIED WITHOUT PREJUDICE** as to Plaintiffs' claims for declaratory relief against President Biden. Defendants' Motion is **DENIED WITH PREJUDICE** in all other respects.

MONROE, LOUISIANA, this 20th day of March, 2023.

Terry A. Doughty
United States District Judge