**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

|  |  |
|---|---|
| STATE OF MISSOURI ex rel. ANDREW BAILEY, Attorney General, | |
| STATE OF LOUISIANA ex rel. JEFFREY M. LANDRY, Attorney General, | No. 3:22-cv-01213-TAD-KDM |
| DR. JAYANTA BHATTACHARYA, | |
| JILL HINES, | |
| JIM HOFT, | |
| DR. AARON KHERIATY, and | |
| DR. MARTIN KULLDORFF, | |
| *Plaintiffs*, | |
| v. | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; | |
| KARINE JEAN-PIERRE, in her official capacity as White House Press Secretary; | |
| VIVEK H. MURTHY, in his official capacity of Surgeon General of the United States; | |
| XAVIER BECERRA, in his official capacity as Secretary of the Department of Health and Human Services; | |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES; | |
| DR. ANTHONY FAUCI, in his official capacity as Director of the National Institute of Allergy and Infectious Diseases and as Chief Medical Advisor to the President; | |

1

NATIONAL INSTITUTE OF ALLERGY
AND INFECTIOUS DISEASES;

DR. HUGH AUCHINCLOSS, in his
official capacity as Acting Director of the
National Institute of Allergy and Infectious
Diseases;

CENTERS FOR DISEASE CONTROL
AND PREVENTION;

CAROL Y. CRAWFORD, in her official
capacity as Chief of the Digital Media
Branch of the Division of Public Affairs
within the Centers for Disease Control and
Prevention;

UNITED STATES CENSUS BUREAU,
a.k.a. BUREAU OF THE CENSUS;

JENNIFER SHOPKORN, in her official
capacity as Senior Advisor for
Communications with the U.S. Census
Bureau;

DEPARTMENT OF COMMERCE;

ALEJANDRO MAYORKAS, in his official
capacity as Secretary of the Department of
Homeland Security;

ROBERT SILVERS, in his official capacity
as Under Secretary of the Office of
Strategy, Policy, and Plans, within DHS;

SAMANTHA VINOGRAD, in her official
capacity as Senior Counselor for National
Security in the Office of the Secretary for
DHS;

DEPARTMENT OF HOMELAND
SECURITY;

JEN EASTERLY, in her official capacity as
Director of the Cybersecurity and
Infrastructure Security Agency;

CYBERSECURITY AND
INFRASTRUCTURE SECURITY
AGENCY;

GINA McCARTHY, in her official capacity
as White House National Climate Advisor,

NINA JANKOWICZ, in her official
capacity as director of the so-called
"Disinformation Governance Board" within
the Department of Homeland Security,

ANDREW SLAVITT, in his official
capacity as White House Senior COVID-10
Advisor,

ROB FLAHERTY, in his official capacity
as Deputy Assistant to the President and
Director of Digital Strategy at the White
House,

COURTNEY ROWE, in her official
capacity as White House Covid-19 Director
of Strategic Communications and
Engagement,

CLARKE HUMPHREY, in her official
capacity as White House Digital Director
for the Covid-19 Response Team,

BENJAMIN WAKANA, in his official
capacity as the Deputy Director of Strategic
Communications and Engagement at the
White House COVID-19 Response Team,

SUBHAN CHEEMA, in his official
capacity as Deputy Director for Strategic
Communications and External Engagement
for the White House Covid-19 Response
Team,

DORI SALCIDO, in her official capacity as
White House Covid-19 Director of Strategic
Communications and Engagement,

TIMOTHY W. MANNING, in his official capacity as White House Covid-19 Supply Coordinator,

DANA REMUS, in her official capacity as Counsel to the President,

AISHA SHAH, in her official capacity as White House Partnerships Manager,

LAURA ROSENBERGER, in her official capacity as Special Assistant to the President,

MINA HSIANG, in her official capacity as Administrator of the U.S. Digital Service within the Office of Management and Budget in the Executive Office of the President,

U.S. DEPARTMENT OF JUSTICE,

FEDERAL BUREAU OF INVESTIGATION,

LAURA DEHMLOW, in her official capacity as Section Chief for the FBI's Foreign Influence Task Force,

ELVIS M. CHAN, in his official capacity as Supervisory Special Agent of Squad CY-1 in the San Francisco Division of the Federal Bureau of Investigation,

JAY DEMPSEY, in his official capacity as Social Media Team Lead, Digital Media Branch, Division of Public Affairs at the CDC,

KATE GALATAS, in her official capacity as Deputy Communications Director at the CDC,

ERIC WALDO, in his official capacity as Chief Engagement Officer for the Surgeon General,

YOLANDA BYRD, in her official capacity
as a member of the Digital Engagement
Team at HHS,

CHRISTY CHOI, in her official capacity as
Deputy Director, Office of
Communications, HRSA within HHS,

TERICKA LAMBERT, in her official
capacity as Director of Digital Engagement
at HHS and Deputy Director of the Office
of Digital Strategy at the White House,

JOSHUA PECK, in his official capacity as
Deputy Assistant Secretary for Public
Engagement at HHS,

JANELL MUHAMMED, in her official
capacity as Deputy Digital Director at HHS,

MATTHEW MASTERSON, in his official
capacity as Senior Cybersecurity Advisory
within CISA in the Department of
Homeland Security,

LAUREN PROTENTIS, in her official
capacity as an official of CISA,

GEOFFREY HALE, in his official capacity
as an official of CISA,

ALLISON SNELL, in her official capacity
as an official of CISA,

KIM WYMAN, in her official capacity as
CISA's Senior Election Security Lead,

BRIAN SCULLY, in his official capacity as
an official of DHS and CISA,

ZACHARY HENRY SCHWARTZ, in his
official capacity as Division Chief for the
Communications Directorate at the U.S.
Census Bureau,

LORENA MOLINA-IRIZARRY, in her official capacity as an official of the Census Bureau,

KRISTIN GALEMORE, in her official capacity as Deputy Director of the Office of Faith Based and Neighborhood Partnerships at the Census Bureau,

U.S. FOOD AND DRUG ADMINISTRATION,

ERICA JEFFERSON, in her official capacity as Associate Commissioner for External Affairs within the Office of the Commissioner at the U.S. Food and Drug Administration,

MICHAEL MURRAY, in his official capacity as Acquisition Strategy Program Manager for the Office of Health Communications and Education at the FDA,

BRAD KIMBERLY, in his official capacity as Director of Social Media at the FDA,

U.S. DEPARTMENT OF STATE,

LEAH BRAY, in her official capacity as Acting Coordinator of the State Department's Global Engagement Center,

SAMARUDDIN K. STEWART, in his official capacity as Senior Technical Advisor and/or Senior Advisor for the Global Engagement Center of the State Department,

DANIEL KIMMAGE, in his official capacity as Acting Coordinator for the Global Engagement Center at the State Department,

ALEXIS FRISBIE, in her official capacity as a member of the Technology Engagement Team at the Global

Engagement Center at the State Department,

U.S. DEPARTMENT OF TREASURY,

WALLY ADEYEMO, in his official capacity as Deputy Secretary of the Treasury,

U.S. ELECTION ASSISTANCE COMMISSION,

MARK A. ROBBINS, in his official capacity as Interim Executive Director of the EAC, and

KRISTEN MUTHIG, in her official capacity as Director of Communications for the EAC,

*Defendants*.

## THIRD AMENDED COMPLAINT

### NATURE OF THE ACTION

1.   In 1783, George Washington warned that if "the Freedom of Speech may be taken away," then "dumb and silent we may be led, like sheep, to the Slaughter."  George Washington, *Address to the Officers of the Army* (March 15, 1783).  The freedom of speech in the United States now faces one of its greatest assaults by federal government officials in the Nation's history.

2.   A private entity violates the First Amendment "if the government coerces or induces it to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint."  *Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring).  "The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly."  *Id.*

3.   That is exactly what has occurred over the past several years, beginning with express and implied threats from government officials and culminating in the Biden Administration's open and explicit censorship programs.  Having threatened and cajoled social-media platforms for years to censor viewpoints and speakers disfavored by the Left, senior government officials in the Executive Branch have moved into a phase of open collusion with social-media companies to suppress disfavored speakers, viewpoints, and content on social-media platforms under the Orwellian guise of halting so-called "disinformation," "misinformation," and "malinformation."

4.   The aggressive censorship that Defendants have procured constitutes government action for at least five reasons: (1) absent federal intervention, common-law and statutory doctrines, as well as voluntary conduct and natural free-market forces, would have restrained the emergence of censorship and suppression of speech of disfavored speakers, content, and viewpoint on social media; and yet (2) through Section 230 of the Communications Decency Act (CDA) and other actions, the federal government subsidized, fostered, encouraged, and empowered the creation of a small number of massive social-media companies with disproportionate ability to censor and suppress speech on the basis of speaker, content, and viewpoint; (3) such inducements as Section 230 and other legal benefits (such as the absence of antitrust enforcement) constitute an immensely valuable benefit to social-media platforms and incentive to do the bidding of federal officials; (4) federal officials—including, most notably, certain Defendants herein—have repeatedly and aggressively threatened to remove these legal benefits and impose other adverse consequences on social-media platforms if they do not aggressively censor and suppress disfavored speakers, content, and viewpoints on their platforms; and (5) Defendants herein, colluding and coordinating with each other, have also directly coordinated and colluded with social-media platforms to identify disfavored speakers, viewpoints, and content and thus have procured the actual censorship

8

and suppression of the freedom of speech.  These factors are both individually and collectively sufficient to establish government action in the censorship and suppression of social-media speech, *especially* given the inherent power imbalance: not only do the government actors here have the power to penalize noncompliant companies, but they have threatened to exercise that authority.

5.   Defendants' campaign of censorship includes the recent announcement of the creation of a "Disinformation Governance Board" within the Department of Homeland Security.   "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth."  *United States v. Alvarez*, 567 U.S. 709, 728 (2012) (plurality op.).  Likewise, our constitutional tradition stands against the idea that we need a "Disinformation Governance Board" within our federal domestic-security apparatus.

6.   Email correspondence between the CDC, the Census Bureau, and major social-media platforms including Twitter, Facebook, and YouTube was released that reveals yet more evidence that Defendants are directing social media censorship.

7.   As a direct result of these actions, there has been an unprecedented rise of censorship and suppression of free speech—including core political speech—on social-media platforms. Many viewpoints and speakers have been unlawfully and unconstitutionally silenced in the modern public square.  These actions gravely threaten the fundamental right of free speech and free discourse for virtually all citizens in Missouri, Louisiana, and America, both on social media and elsewhere.   And they have directly impacted individual Plaintiffs in this case, all of whom have been censored and/or shadowbanned as a result of Defendants' actions.

8.   Under the First Amendment, the federal Government should play no role in policing private speech or picking winners and losers in the marketplace of ideas.  But that is what federal officials are doing, on a massive scale – the full scope and impact of which yet to be determined.

9.   Secretary Mayorkas of DHS commented that the federal Government's efforts to police private speech on social media are occurring "across the federal enterprise."  It turns out that this statement is quite literally true.  This case involves a massive, sprawling federal "Censorship Enterprise," which includes dozens of federal officials across at least eleven federal agencies and components, who communicate with social-media platforms about misinformation, disinformation, and the suppression of private speech on social media—all with the intent and effect of pressuring social-media platforms to censor and suppress private speech that federal officials disfavor.

10. This Censorship Enterprise is extremely broad, including officials in the White House, HHS, DHS, CISA, the CDC, NIAID, and the Office of the Surgeon General; as well as the Census Bureau, the FDA, the FBI, the State Department, the Treasury Department, and the U.S. Election Assistance Commission, among others.  And this effort rises to the highest levels of the U.S. Government, including numerous White House officials overseeing the Censorship Enterprise.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction because the federal claims arise under the Constitution and laws of the United States.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

A.      **Plaintiffs.**

13. Plaintiff State of Missouri is a sovereign State of the United States of America.  Missouri sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

14. Andrew Bailey is the Attorney General of Missouri.  Under Missouri law, he has authority to bring suit on behalf of the State of Missouri to vindicate the State's sovereign, quasi-sovereign, and proprietary interests, and to protect the constitutional rights of its citizens.  *See, e.g.*, Mo. Rev. Stat. § 27.060.

15. Plaintiff State of Louisiana is a sovereign State of the United States of America.  Louisiana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

16. Jeffrey M. Landry is the duly elected Attorney General of Louisiana.  Under Louisiana law, he has authority to bring suit on behalf of the State of Louisiana to vindicate the State's sovereign, quasi-sovereign, and proprietary interests, and to protect the constitutional rights of its citizens.

17. Missouri and Louisiana, and their agencies and officials, have a sovereign and proprietary interest in receiving free flow of information in public discourse on social-media platforms.  This includes an interest in preventing the States, their agencies, and their political subdivisions from suffering direct censorship on social-media platforms when they post their own content.  In addition, Missouri and Louisiana, and their agencies and officials, are constantly engaged in the work of formulating, enacting, advancing and enforcing public policies, and formulating messages and communications related to such policies, and they frequently and necessarily rely on the flow of speech and information on social media to inform public-policy decisions.  Further, information and ideas shared on social media frequently are repeated in, and impact and influence, public discourse outside of social media, which Missouri and Louisiana, and their agencies and officials, also rely upon.

18. Missouri and Louisiana further have a sovereign interest in ensuring that the fundamental values reflected in their own Constitutions and laws, and the fundamental rights guaranteed to their

citizens, are not subverted by the unconstitutional actions of federal officials and those acting in concert with them.  Missouri's Constitution provides the highest level of protection for the freedom of speech, protecting it in even more expansive language than that in the First Amendment, and Louisiana's Constitution provides similar protection for free-speech rights.  Defendants' unlawful subversion of Missourians' and Louisianans' fundamental rights and liberties under state law violates both the state and federal Constitutions, and it injures Missouri's and Louisiana's sovereign interests in advancing their own fundamental laws and fundamental policies favoring the freedom of speech.

19. In addition, Missouri and Louisiana have a quasi-sovereign interest in protecting the free-speech rights of the vast majority of their citizens, who constitute "a sufficiently substantial segment of its population."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982).  This falls within Missouri's and Louisiana's "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general."  *Id.*  This injury "suffices to give the State standing to sue as *parens patriae*" because "the injury" to Missourians' and Louisianans' free-speech and free-expression rights "is one that the State … would likely attempt to address"—indeed, Missouri and Louisiana have addressed, *see, e.g.,* MO. CONST., art. I, § 8; LA. CONST., art. I, § 7—"through [their] sovereign lawmaking powers."  *Alfred L. Snapp*, 458 U.S. at 607.

20. Further, Missouri and Louisiana "ha[ve] an interest in securing observance of the terms under which [they] participate[] in the federal system."  *Alfred L. Snapp*, 458 U.S. at 607–08.  This means bringing suit to "ensur[e] that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system."  *Id.* at 608.  The rights secured by the First Amendment, and analogous state constitutional provisions, are foremost among the "benefits

that are to flow from participation in the federal system." *Id.* Missouri and Louisiana "have an interest, independent of the benefits that might accrue to any particular individual, in assuring that the benefits of the federal system are not denied to its general population." *Id.* Missouri and Louisiana sue to vindicate all these interests here.

21. Plaintiff Dr. Jayanta Bhattacharya is a former Professor of Medicine and current Professor of Health Policy at Stanford University School of Medicine and a research associate at the National Bureau of Economic Research. He is also Director of Stanford's Center for Demography and Economics of Health and Aging. He holds an M.D. and Ph.D. from Stanford University. He has published 161 scholarly articles in peer-reviewed journals in the fields of medicine, economics, health policy, epidemiology, statistics, law, and public health, among others. His research has been cited in the peer-reviewed scientific literature more than 13,000 times. He was one of the co-authors of the Great Barrington Declaration, a statement criticizing government-mandated COVID restrictions, which was co-signed by over 930,000 people, including over 62,000 scientists and healthcare professionals. Dr. Bhattacharya and his audiences have experienced significant censorship and suppression of his speech on social-media caused by Defendants, as detailed in his previously filed Declaration, ECF No. 10-3, which is attached as Exhibit C and incorporated by reference herein.

22. Plaintiff Dr. Martin Kulldorff is an epidemiologist, a biostatistician and a former Professor of Medicine at Harvard University and Brigham and Women's Hospital, from 2015 to November 2021. Before that, he was Professor of Population Medicine at Harvard University from 2011 to 2015. He holds a Ph.D. from Cornell University. He has published over 200 scholarly articles in peer-reviewed journals in the fields of public health, epidemiology, biostatistics and medicine, among others. His research has been cited in the peer-reviewed scientific literature more than

25,000 times.  He was one of the co-authors of the Great Barrington Declaration, a statement criticizing government-mandated COVID restrictions, which was co-signed by over 930,000 people, including over 62,000 scientists and healthcare professionals.  Dr. Kulldorff and his audiences have experienced significant censorship and suppression of his speech on social-media caused by Defendants, as detailed in his previously filed Declaration, ECF No. 10-4, which is attached as Exhibit D and incorporated by reference herein.

23. Plaintiff Dr. Aaron Kheriaty earned his M.D. from Georgetown University, and completed residency training in psychiatry at the University of California Irvine.  For many years, he was a Professor of Psychiatry at UCI School of Medicine and the Director of the Medical Ethics Program at UCI Health, where he chaired the ethics committee.  He also chaired the ethics committee at the California Department of State Hospitals for several years.  He is now a Fellow at the Ethics & Public Policy Center in Washington, DC, where he directs the program on Bioethics and American Democracy.  He has authored numerous books and articles for professional and lay audiences on bioethics, social science, psychiatry, religion, and culture.  His work has been published in the Wall Street Journal, the Washington Post, Arc Digital, The New Atlantis, Public Discourse, City Journal, and First Things.  He has conducted print, radio, and television interviews on bioethics topics with The New York Times, the Los Angeles Times, CNN, Fox News, and NPR.  He maintains social-media accounts, including the Twitter account @akheriaty, which has over 158,000 followers.  Dr. Kheriaty and his audiences have experienced significant censorship and suppression of his speech on social-media caused by Defendants, as detailed in his previously filed Declaration, ECF No. 10-7, which is attached as Exhibit G incorporated by reference herein.

24. Plaintiff Jim Hoft is the founder, owner, and operator of the popular news website The Gateway Pundit.  He resides in St. Louis, Missouri.  The Gateway Pundit is one of the most popular

conservative news sites in the country, with over 2.5 million web searches per day. Mr. Hoft maintains and operates The Gateway Pundit's social-media accounts, including a Facebook account with over 650,000 followers, an Instagram account with over 205,000 followers, and (until its recent permanent suspension) a Twitter account with over 400,000 followers. Mr. Hoft and his audiences have experienced extensive government-induced censorship on social-media platforms, including of his speech on COVID-19 issues and election security issues, as set forth in his Declaration, ECF No. 10-5, which is attached as Exhibit E and incorporated by reference herein.

25. Plaintiff Jill Hines is a resident of Louisiana. She is the Co-Director of Health Freedom Louisiana, a consumer and human rights advocacy organization. She also launched, in 2020, a grassroots effort called Reopen Louisiana. She maintains social-media accounts for both Health Freedom Louisiana and Reopen Louisiana with approximately 13,000 followers. Ms. Hines and her audiences have experienced extensive government-induced censorship of her speech on social media, including her speech related to COVID-19 restrictions, as set forth in her Declaration, ECF No. 10-12, which is attached as Exhibit L and incorporated by reference herein.

**B.    Defendants.**

26. Defendant Joseph R. Biden, Jr., is President of the United States. He is sued in his official capacity.

27. Defendant Karine Jean-Pierre is White House Press Secretary. She is sued in her official capacity. She is substituted for her predecessor, former White House Press Secretary Jennifer Rene Psaki.

28. Defendant Vivek H. Murthy is Surgeon General of the United States. He is sued in his official capacity.

29. Defendant Xavier Becerra is Secretary of the Department of Health and Human Services. He is sued in his official capacity.

30. Defendant Department of Health and Human Services (HHS) is a Cabinet-level agency within the Government of the United States.

31. Defendant Anthony Fauci is the former Director of the National Institute of Allergy and Infectious Diseases (NIAID) and Chief Medical Advisor to the President.  He is sued in his official capacity.

32. Defendant National Institute of Allergy and Infectious Diseases (NIAID) is a federal agency under the Department of Health and Senior Services.

33. Dr. Hugh Auchincloss is the Acting Director of NIAID, and became Acting Director on or about January 1, 2023.  He is sued in his official capacity.

34. Defendant Centers for Disease Control and Prevention (CDC) is a federal agency under the Department of Health and Human Services.

35. Defendant Carol Y. Crawford is Chief of the Digital Media Branch of the Division of Public Affairs within the Centers for Disease Control and Prevention.  She is sued in her official capacity.

36. Defendant United States Census Bureau, a.k.a. Bureau of the Census ("Census Bureau"), is an agency of the federal government within the Department of Commerce.

37. Defendant Jennifer Shopkorn is Senior Advisor for Communications with the U.S. Census Bureau.  She is sued in her official capacity.

38. Defendant U.S. Department of Commerce is a Cabinet-level agency within the Government of the United States.

39. Defendant Alejandro Mayorkas is Secretary of the Department of Homeland Security.  He is sued in his official capacity.

40. Defendant Robert Silvers is Under Secretary of the Office of Strategy, Policy, and Plans, within the Department of Homeland Security.  He is sued in his official capacity.

41. Defendant Samantha Vinograd is the Senior Counselor for National Security within the Office of the Secretary of DHS.  She is sued in her official capacity.

42. Defendant Department of Homeland Security (DHS) is a Cabinet-level agency within the Government of the United States.

43. Defendant Jen Easterly is the Director of the Cybersecurity and Infrastructure Security Agency within the Department of Homeland Security.  She is sued in her official capacity.

44. Defendant Cybersecurity and Infrastructure Security Agency (CISA) is an agency within the Department of Homeland Security that is charged with protecting the United States' cybersecurity and physical infrastructure.

45. Defendant Gina McCarthy is the White House National Climate Advisor.  She is sued in her official capacity.

46. Defendant Nina Jankowicz is the director of the newly constituted "Disinformation Governance Board" within the Department of Homeland Security.  She is sued in her official capacity.

47. At times relevant to this Complaint, Defendant Andrew Slavitt is or was the White House Senior COVID-19 Advisor.  He is sued in his official capacity.

48. Defendant Rob Flaherty is Deputy Assistant to the President and Director of Digital Strategy at the White House.  He is sued in his official capacity.

49. At times relevant to this Complaint, Defendant Courtney Rowe is or was the White House Covid-19 Director of Strategic Communications and Engagement.  She is sued in her official capacity.

50. Defendant Clarke Humphrey is the White House Digital Director for the Covid-19 Response Team.  She is sued in her official capacity.

51. At times relevant to this Complaint, Defendant Benjamin Wakana is or was the Deputy Director of Strategic Communications and Engagement at the White House COVID-19 Response Team.  He is sued in his official capacity.

52. Defendant Subhan Cheema is Deputy Director for Strategic Communications and External Engagement for the White House Covid-19 Response Team.  He is sued in his official capacity.

53. Defendant Dori Salcido is, on information and belief, the White House Covid-19 Director of Strategic Communications and Engagement.  She is sued in her official capacity.

54. At times relevant to this Complaint, Defendant Timothy W. Manning is or was the White House Covid-19 Supply Coordinator.  He is sued in his official capacity.

55. Defendant Dana Remus was, at times relevant to this Complaint, Counsel to the President, a.k.a. White House Counsel.  She is sued in her official capacity.

56. Defendant Aisha Shah is White House Partnerships Manager.  She is sued in her official capacity.

57. Defendant Laura Rosenberger serves as Special Assistant to the President at the White House.  She has extensive experience in service at the State Department.  She is sued in her official capacity.

58. Defendant Mina Hsiang is Administrator of the U.S. Digital Service within the Office of Management and Budget in the Executive Office of the President.  She is sued in her official capacity.

59. Defendant U.S. Department of Justice ("DOJ") is a Cabinet-level agency within the Government of the United States.

60. Defendant Federal Bureau of Investigation ("FBI") is an investigative agency of the federal Government within the U.S. Department of Justice.  The Foreign Influence Task Force ("FITF") is a task force within the FBI that purportedly investigates and/or addresses foreign influences within the United States.   The FTIF's website states: "The FBI is the lead federal agency responsible for investigating foreign influence operations. In the fall of 2017, Director Christopher Wray established the Foreign Influence Task Force (FITF) to identify and counteract malign foreign influence operations targeting the United States." https://www.fbi.gov/investigate/counterintelligence/foreign-influence.

61. Defendant Laura Dehmlow is the Section Chief for the FBI's Foreign Influence Task Force.  She is sued in her official capacity.

62. Defendant Elvis M. Chan is Supervisory Special Agent of Squad CY-1 in the San Francisco Division of the FBI.  On information and belief, he has authority over cybersecurity issues for FBI in that geographical region, which includes the headquarters of major social-media platforms, and he plays a critical role for FBI and FITF in coordinating with social-media platforms relating to censorship and suppression of speech on their platforms.

63. Defendant Jay Dempsey is Social Media Team Lead, Digital Media Branch, Division of Public Affairs at the CDC.  He is sued in his official capacity.

64. Defendant Kate Galatas is Deputy Communications Director at the CDC. She is sued in her official capacity.

65. Defendant Eric Waldo is Chief Engagement Officer for the Surgeon General. He is sued in his official capacity.

66. Defendant Yolanda Byrd is a member of the Digital Engagement Team at HHS. She is sued in her official capacity.

67. Defendant Christy Choi is Deputy Director, Office of Communications, HRSA within HHS. She is sued in her official capacity.

68. Defendant Tericka Lambert served Director of Digital Engagement at HHS and now serves as Deputy Director of the Office of Digital Strategy at the White House. She is sued in her official capacity.

69. Defendant Joshua Peck is Deputy Assistant Secretary for Public Engagement at HHS. He is sued in his official capacity.

70. At times relevant to this Complaint, Defendant Janell Muhammad is or was Deputy Digital Director at HHS. She is sued in her official capacity.

71. At times relevant to this Complaint, Defendant Matthew Masterson is or was Senior Cybersecurity Advisory within CISA in the Department of Homeland Security. He is sued in his official capacity.

72. Defendant Lauren Protentis is a member of the "Mis, Dis, and Mal-information (MDM) Team" within CISA at DHS. She is sued in her official capacity.

73. Defendant Geoffery Hale is a member of the Mis, Dis, and Mal-information (MDM) Team within CISA at DHS. He is sued in his official capacity.

74. Defendant Allison Snell is a member of the Mis, Dis, and Mal-information (MDM) Team within CISA at DHS.  She is sued in her official capacity.

75. Defendant Kim Wyman is CISA's Senior Election Security Lead.  She is sued in her official capacity.

76. Defendant Brian Scully is a member of DHS's Countering Foreign Influence Task Force, National Risk Management Center, and the Chief of the Mis-, Dis-, Malinformation Team at CISA. He is sued in his official capacity.

77. Defendant Zachary ("Zack") Henry Schwartz is the Division Chief for the Communications Directorate at the U.S. Census Bureau.  He is sued in his official capacity.

78. Defendant Lorena Molina-Irizarry served at times relevant to this Complaint as Director of Operations at Census Open Innovation Labs at the Census Bureau and Senior Advisor on the American Rescue Plan Team at the White House.  She is sued in her official capacity.

79. Defendant Kristin Galemore is Deputy Director of the Office of Faith Based and Neighborhood Partnerships at the Census Bureau.  She is sued in her official capacity.

80. Defendant U.S. Food and Drug Administration ("FDA") is a federal agency within the U.S. Department of Health and Human Services.

81. Defendant Erica Jefferson is the Associate Commissioner for External Affairs within the Office of the Commissioner at the U.S. Food and Drug Administration.  She is sued in her official capacity.

82. Defendant Michael Murray is the Acquisition Strategy Program Manager for the Office of Health Communications and Education at the FDA.  He is sued in his official capacity.

83. Defendant Brad Kimberly is the Director of Social Media at the FDA.  He is sued in his official capacity.

84. Defendant U.S. Department of State ("State Department") is a Cabinet-level agency within the Government of the United States.

85. Defendant Leah Bray is the Acting Coordinator of the State Department's Global Engagement Center.  She is sued in her official capacity.

86. Defendant Samaruddin K. Stewart is a Senior Technical Advisor and/or Senior Advisor for the Global Engagement Center of the State Department.  He is sued in his official capacity.

87. At times relevant to this Complaint, Defendant Daniel Kimmage is or was the Acting Coordinator for the Global Engagement Center at the State Department.  He is sued in his official capacity.

88. Defendant Alexis Frisbie is a member of the Technology Engagement Team at the Global Engagement Center at the State Department.  She is sued in her official capacity.

89. The State Department operates a "Global Engagement Center" within the State Department that conducts counter-"disinformation" activities.  According to the State Department's website, the Global Engagement Center's mission is "[t]o direct, lead, synchronize, integrate, and coordinate efforts of the Federal Government to recognize, understand, expose, and counter foreign state and non-state propaganda and disinformation efforts aimed at undermining or influencing the policies, security, or stability of the United States, its allies, and partner nations." As alleged further herein, the Global Engagement Center is involved in procuring the censorship of private speech on social media, including of U.S. citizens.  The State Department also maintains an Office of Cyber Coordinator, a.k.a. Office of the Coordinator for Cyber Issues, that has, on information and belief, also been involved in federal social-media censorship activities.

90. Defendant U.S. Department of the Treasury ("Treasury") is a Cabinet-level agency within the Government of the United States.

91. Defendant Wally Adeyemo is the Deputy Secretary of the Treasury.  He is sued in his official capacity.

92. Defendant U.S. Election Assistance Commission ("EAC") is an independent agency within the Government of the United States.  According to its website, the EAC "was established by the Help America Vote Act of 2002 (HAVA).  The EAC is an independent, bipartisan commission charged with developing guidance to meet HAVA requirements, adopting voluntary voting system guidelines, and serving as a national clearinghouse of information on election administration."

93. Defendant Mark A. Robbins is the Interim Executive Director of the EAC.  He is sued in his official capacity.

94. Defendant Kristen Muthig is the Director of Communications for the EAC.  According to the EAC's website, Muthig "manages media relations, communications strategy and supports the commissioners and EAC leadership."  She is sued in her official capacity.

## GENERAL ALLEGATIONS

**A. Freedom of Speech Is the Bedrock of American Liberty.**

95. The First Amendment of the U.S. Constitution states that "Congress shall make no law … abridging the freedom of speech, or of the press…"  U.S. CONST. amend. I.

96. Article I, § 8 of the Missouri Constitution provides "[t]hat no law shall be passed impairing the freedom of speech, no matter by what means communicated: that every person shall be free to say, write or publish, or otherwise communicate whatever he will on any subject, being responsible for all abuses of that liberty…."  MO. CONST. art. I, § 8.  Article I, § 7 of the Louisiana Constitution provides that "[n]o law shall curtail or restrain the freedom of speech or of the press.  Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that

freedom." L~A~. C~ONST~. art. I, § 7.  All other State Constitutions likewise protect the freedom of speech as a fundamental right of the first order.

97. The freedom of speech and expression guaranteed by the First Amendment is one of the greatest bulwarks of liberty.  These rights are fundamental and must be protected against government interference.

**1.  Government officials lack authority to censor disfavored speakers and viewpoints.**

98. If the President or Congress enacted a law or issued an order requiring the suppression of certain disfavored viewpoints or speakers on social media, or directing social media to demonetize, shadow-ban, or expel certain disfavored speakers, such a law or order would be manifestly unconstitutional under the First Amendment.

99. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

100.       "[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (quotations omitted).

101.       "In light of the substantial and expansive threats to free expression posed by content-based restrictions," the Supreme "Court has rejected as 'startling and dangerous' a 'free-floating test for First Amendment coverage ... [based on] an *ad hoc* balancing of relative social costs and benefits.'"  *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality op.) (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)).

**2.  Merely labeling speech "misinformation" or "disinformation" does not strip away First Amendment protections.**

102.     Labeling disfavored speech "misinformation" or "disinformation" does not strip it of First Amendment protection.  "Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements.  This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee."  *Id.* at 718.

103.      The Supreme Court has thus rejected the argument "that false statements, as a general rule, are beyond constitutional protection."  *Id.*

104.     "Permitting the government to decree this speech to be a criminal offense, whether shouted from the rooftops or made in a barely audible whisper, would endorse government authority to compile a list of subjects about which false statements are punishable.  That governmental power has no clear limiting principle.  Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth."  *Id.* at 723 (citing G. ORWELL, NINETEEN EIGHTY–FOUR (1949) (Centennial ed. 2003)).

105.     "Were the Court to hold that the interest in truthful discourse alone is sufficient to sustain a ban on speech … it would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition.  The mere potential for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom."  *Id.* at 723.

**3.   Counterspeech, not censorship, is the proper response to supposed "misinformation."**

106.     When the Government believes that speech is false and harmful, "counterspeech," not censorship, must "suffice to achieve its interest."  *Id.* at 726.  The First Amendment presumes that "the dynamics of free speech, of counterspeech, of refutation, can overcome the lie."  *Id.*

107.     "The remedy for speech that is false is speech that is true.  This is the ordinary course in a free society.  The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth."  *Id.* at 727.

108.     "The theory of our Constitution is 'that the best test of truth is the power of the thought to get itself accepted in the competition of the market.'"  *Id.* at 728 (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).

109.     "The First Amendment itself ensures the right to respond to speech we do not like, and for good reason.  Freedom of speech and thought flows not from the beneficence of the state but from the inalienable rights of the person.  And suppression of speech by the government can make exposure of falsity more difficult, not less so.  Society has the right and civic duty to engage in open, dynamic, rational discourse.  These ends are not well served when the government seeks to orchestrate public discussion through content-based mandates."  *Id.* at 728.

**4.  Americans have a First Amendment right to be exposed to a free flow of speech, viewpoints, and content, free from censorship by government officials.**

110.     The First Amendment also protects the right to receive others' thoughts, messages, and viewpoints freely, in a free flow of public discourse.   "[W]here a speaker exists …, the protection afforded is to the communication, to its source and to its recipients both."  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976).

111.     The right to receive information is "an inherent corollary of the rights to free speech and press that are explicitly, guaranteed by the Constitution," because "the right to receive ideas follows ineluctably from the sender's First Amendment right to send them."  *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). "The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them.

It would be a barren marketplace of ideas that had only sellers and no buyers." *Lamont v. Postmaster Gen.*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring).

112.    "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

113.    "[A]ssuring that the public has access to a multiplicity of information sources is a governmental purpose of the highest order, for it promotes values central to the First Amendment." *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 663 (1994). Indeed, "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *United States v. Midwest Video Corp.*, 406 U.S. 649, 668 n.27 (1972) (plurality op.) (quotations omitted).

**5. Government officials may not circumvent the First Amendment by inducing, threatening, and/or colluding with private entities to suppress protected speech.**

114.    It is "axiomatic" that the government may not "induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (quotations omitted).

115.    A private entity violates the First Amendment "if the government coerces or induces it to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint." *Knight First Amendment Institute*, 141 S. Ct. at 1226 (Thomas, J., concurring). "The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly." *Id.*

116.    Threats of adverse regulatory or legislative action, to induce private actors to censor third parties' speech, violate the First Amendment. *See Hammerhead Enters. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983) ("Where comments of a government official can reasonably be

interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid claim can be stated."); *see also Bantam Books v. Sullivan*, 372 U.S. 58, 68 (1963) (holding that a veiled threat of prosecution to pressure a private bookseller to stop selling disfavored books could violate the First Amendment).

117.    The unprecedented control over private speech exercised by social-media companies gives government officials an unprecedented opportunity to circumvent the First Amendment and achieve indirect censorship of private speech.  "By virtue of its ownership of the essential pathway," a social media platform "can . . . silence the voice of competing speakers with a mere flick of the switch." *Turner*, 512 U.S. at 656*; see also Knight First Amendment Inst*., 141 S. Ct. at 1224 (Thomas, J., concurring). "The potential for abuse of this private power over a central avenue of communication cannot be overlooked." *Turner*, 512 U.S. at 656.

**B.    The Dominance of Social Media as a Forum for Public Information and Discourse.**

118.    Social media has become, in many ways, "the modern public square." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).  Social media platforms provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard."  *Id.*

119.    "Today's digital platforms provide avenues for historically unprecedented amounts of speech, including speech by government actors. Also unprecedented, however, is the concentrated control of so much speech in the hands of a few private parties."  *Knight First Amendment Institute*, 141 S. Ct. at 1221.

120.    The "concentration" of power in social media companies "gives some digital platforms enormous control over speech." *Id.* at 1224.  Defendants have not hesitated to exploit this power.

28

121.     For example, on information and belief, Facebook has close to 3 billion registered users worldwide and over 124 million users in the United States, including millions of Missourians and millions of citizens of other States.

122.     On information and belief, Twitter has more than 340 million users worldwide, including approximately 70 million users in the United States.  Approximately 500 million tweets are posted on Twitter every day, and they are accessible to non-Twitter users on the internet. Moreover, Twitter users include large numbers of politicians, journalists, public figures, and others with a disproportionately large impact on public discourse in other forums, so Twitter's impact on public discourse is even larger than its numbers alone reflect.

123.     On information and belief, YouTube has more than 4 billion hours of video views every month.  Videos on YouTube channels are visible to both YouTube users and to the general public on the internet.  An estimated 500 hours of video content are uploaded to YouTube every minute.

124.     YouTube is extremely popular among politicians and public figures in reaching their audiences.  On information and belief, in 2020, approximately 92 percent of U.S. Senators and 86 percent of U.S. Representatives uploaded content on YouTube.

125.     According to a recent Pew Research study, 66 percent of U.S. adults use Facebook, and 31 percent of U.S. adults say they get news regularly on Facebook.  Walker et al., *News Consumption Across Social Media in 2021*, PEW RESEARCH CENTER (Sept. 20, 2021), *at* https://www.pewresearch.org/journalism/2021/09/20/news-consumption-across-social-media-in-2021/.

126.     According to the same study, 72 percent of U.S. adults say that they use YouTube, and 22 percent of U.S. adults say that they regularly get news on YouTube.  *Id.*

127.    According to the same study, 23 percent of U.S. adults say that they use Twitter, and 13 percent of U.S. adults say they regularly get news on Twitter.  *Id.*  This comprises 55 percent of Twitter users.  *Id.*

128.    According to the same study, 41 percent of U.S. adults say that they use Instagram, and 11 percent of U.S. adults say they regularly get news on Instagram.  *Id.*

129.    The free flow of information and expression on social media directly affects non-users of social media as well.  Social-media users who are exposed to information, ideas, and expression through social media communicate the same information, ideas, and expression with non-social-media users.  News, information, messages, narratives, and storylines that originate on social media are frequently replicated in other forums, such as television, print media, and private discourse.  Further, much content posted on social-media is directly available to non-social-media users.  For example, posts on Twitter are directly accessible on the internet to non-Twitter-users, and content on YouTube is available to the general public on the internet as well.

130.    In the aggregate, these numbers of Americans who (1) use social-media platforms, and (2) regularly use social-media platforms to obtain news and information about matters of public interest, comprise hundreds of millions of Americans, including millions of Missourians and Louisianans, and very substantial segments of the populations of Missouri, Louisiana, and every other State.

131.    There are also many ways for social-media companies to censor or suppress speech on social-media platforms.  Some of these methods are immediately known to the speaker and/or his or her audience, and some are not visible to them.  Censorship, therefore, can occur without the knowledge of the speaker and/or his or her audience.  These methods include, but are not limited to, terminating speakers' accounts, suspending accounts, imposing warnings or strikes

30

against accounts to chill future disfavored speech, "shadow banning" speakers, demonetizing content, adjusting algorithms to suppress or de-emphasize speakers or messages, promoting or demoting content, placing warning labels on content, suppressing content in other users' feeds, promoting negative comments on disfavored content, and requiring additional click-through(s) to access content, among many others.  Many methods, moreover, have a chilling effect on social-media speech, as the threat of censorship (such as suspension, demonetization, or banning) drives speakers to self-censor to avoid making statements that might be deemed to violate the social-media companies' vague, ever-changing, often-hidden, and inconsistently enforced standards for censoring and suppressing speech.  Collectively herein, all these methods of suppressing and/or censoring speech on social media are called "censorship" and/or "suppression" of social-media speech.

132.    The censorship and suppression of free speech on social media functions in most cases as a prior restraint on speech, both through its direct effect and its chilling effects.  A prior restraint is the most severe form of restriction on freedom of expression.

**C.    Public and Private Attempts to Police "Misinformation" or "Disinformation" on Social Media Have Proven Embarrassingly Inaccurate.**

133.    Yesterday's "misinformation" often becomes today's viable theory and tomorrow's established fact.  "Even where there is a wide scholarly consensus concerning a particular matter, the truth is served by allowing that consensus to be challenged without fear of reprisal.  Today's accepted wisdom sometimes turns out to be mistaken."  *Alvarez*, at 752 (Alito, J., dissenting) (emphasis added).  This prediction has proven true, again and again, when it comes to suppressing "misinformation" and "disinformation" on social media.

**1.    The Hunter Biden laptop story.**

134.     Perhaps most notoriously, social-media platforms aggressively censored an October 14, 2020 New York Post exposé about the contents of the laptop of (then-Candidate Biden's son) Hunter Biden, which had been abandoned in a Delaware repair shop and contained compromising photos and email communications about corrupt foreign business deals.  As the New York Post reported at the time, "[b]oth Twitter and Facebook took extraordinary censorship measures against The Post on Wednesday over its exposés about Hunter Biden's emails … The Post's primary Twitter account was locked as of 2:20 p.m. Wednesday because its articles about the messages obtained from Biden's laptop broke the social network's rules against 'distribution of hacked material,' according to an email The Post received from Twitter," even though there were "zero claims that [Hunter Biden's] computer had been hacked."  *Twitter, Facebook censor Post over Hunter Biden exposé*, N.Y. POST (Oct. 14, 2020), *at* https://nypost.com/2020/10/14/facebook-twitter-block-the-post-from-posting/.   "Twitter also blocked users from sharing the link to The Post article indicating that Hunter Biden introduced Joe Biden to the Ukrainian businessman, calling the link 'potentially harmful.'"  *Id.*

135.     As the Wall Street Journal Editorial Board reported, "nearly all of the media at the time ignored the story or 'fact-checked' it as false.  This … was all the more egregious given other evidence supporting the Post's scoop.  Neither Hunter Biden nor the Biden campaign denied that the laptop was Hunter's.  And Hunter's former business partner, Tony Bobulinski, went public with documents backing up some of the laptop's contents."  Editorial Board, *Hunter Biden's Laptop Is Finally News Fit to Print*, WALL ST. J. (March 18, 2022).

136.     Biden, his allies, and those acting in concert with them falsely attacked the Hunter Biden laptop story as "disinformation."  *Id.*   Fifty "intelligence officials—headlined by former Obama spooks James Clapper and John Brennan—circulated a statement peddling the Russian

'disinformation' line—even as they admitted they had no evidence.  Th[e] result was a blackout of the Hunter news, except in a few places…." *Id.*  Parroting the Biden campaign's false line, both social media platforms and major news organizations treated the story as "disinformation" and aggressively censored it.

137.     In early 2022—over a year and a half later—major news organizations finally admitted that the Hunter Biden laptop story was truthful and rested on reliable sourcing and information. *Id.*  The Washington Post and the New York Times quietly acknowledged the truth and reliability of the story "17 months" later, in mid-March 2022. *Id.*

138.     Free-speech advocate Glenn Reynolds aptly described this embarrassing episode as one that permanently damaged the credibility and reputation for fairness of social-media platforms and major media outlets:  "Twitter and other tech giants banned The Post's reporting, since admitted to be accurate, on Hunter Biden's laptop and the damaging information it contained. Many social-media giants banned any links to the story, and Twitter even went so far as to stop its users from sharing the story one-on-one through direct messages. (CEO Jack Dorsey later admitted that was a 'total mistake.')  Their purpose was to affect the election's outcome in favor of the Democrats, and they probably did."  Glenn H. Reynolds, '*Censorship is free speech' is the establishment's Orwellian line on Elon Musk's Twitter crusade*, N.Y. POST (Apr. 15, 2022), https://nypost.com/2022/04/14/the-establishments-orwellian-line-on-elon-musks-twitter-crusade/.

### 2.     Speech about the lab-leak theory of COVID-19's origins.

139.     Likewise, beginning in February 2020, social-media platforms censored speech advocating for the lab-leak theory of the origins of SARS-CoV-2, the virus that causes COVID-19.  The lab-leak theory postulates that the virus did not originate naturally in bats or other animals,

33

but leaked from a biotech laboratory in Wuhan, China, operated by the Wuhan Institute of Virology.

140.    On information and belief, Defendant Dr. Anthony Fauci, a senior federal government official, coordinating with others, orchestrated a campaign to discredit the lab-leak hypothesis in early 2020.  As director of NIAID, Dr. Fauci had funded risky "gain-of-function" research at the Wuhan Institute of Virology through intermediaries such as EcoHealth Alliance, headed by Dr. Peter Daszak.  Thus, if the lab-leak theory were established, Dr. Fauci and Dr. Daszak could be potentially implicated in funding the research on viruses that caused the COVID-19 pandemic and killed millions of people worldwide.

141.    During the same time frame as he was orchestrating a campaign to falsely discredit the lab-leak theory, Dr. Fauci was exchanging emails with Mark Zuckerberg, the CEO of Facebook, regarding public messaging and the dissemination of COVID-19 information on social-media.  On information and belief, Dr. Fauci coordinated directly with Facebook and/or other social-media firms to suppress disfavored speakers and content of speech on social media.

142.    Not surprisingly, social-media platforms like Facebook promptly accepted Dr. Fauci's initiative to discredit the lab-leak theory, and they engaged in an aggressive campaign to censor speech advocating for the lab-leak theory on social media on the ground that it was supposedly disinformation.  Facebook "expand[ed] its content moderation on Covid-19 to include 'false' and 'debunked' claims such as that 'COVID-19 is man-made or manufactured.'"  Editorial Board, *Facebook's Lab-Leak About-Face*, WALL ST. J. (May 27, 2021), https://www.wsj.com/articles/facebooks-lab-leak-about-face-11622154198.    This included suppressing speech by highly credentialed and well-respected writers, such as "science journalist

34

Nicholas Wade," *id.*, and scientist Alina Chan.  Other social-media platforms likewise censored speech advocating for the lab-leak hypothesis.

143.     By 2021, however, "the circumstantial evidence" favoring the lab-leak theory "finally permeated the insular world of progressive public health," *id.*, and Fauci and other Biden Administration officials were forced to admit the theory's inherent plausibility.  After a long period of censorship, in May 2021, Facebook and other platforms announced that they would no longer censor social-media speech advocating for the lab-leak theory.

144.     The Wall Street Journal noted the close link between government and social-media platforms in censoring this speech: "Facebook acted in lockstep with the government," indicating that "[w]hile a political or scientific claim is disfavored by government authorities, Facebook will limit its reach.  When government reduces its hostility toward an idea, so will Facebook." *Id.* "Free speech protects the right to challenge government.  But instead of acting as private actors with their own speech rights, the companies are mandating conformity with existing government views." *Id.*

145.     There had long been credible—even compelling—evidence of the plausibility of the lab-leak theory, long before social-media companies stopped censoring it.  *See, e.g.,* House Foreign Affairs Committee Minority Staff Report, *The Origins of COVID-19: An Investigation of the Wuhan Institute of Virology* (Aug. 2021), https://gop-foreignaffairs.house.gov/wp-content/uploads/2021/08/ORIGINS-OF-COVID-19-REPORT.pdf (detailing evidence available long before censorship lifted); Nicholas Wade, *The origin of COVID: Did people or nature open Pandora's box at Wuhan?*, BULL. ATOMIC SCIENTISTS (May 5, 2021), https://thebulletin.org/2021/05/the-origin-of-covid-did-people-or-nature-open-pandoras-box-at-wuhan/; ALINA CHAN, VIRAL: THE SEARCH FOR THE ORIGIN OF COVID-19 (Sept. 3, 2021).

146.     Facebook's decision to stop censoring the lab-leak theory did not come until "after almost every major media outlet, and … even the British and American security services, finally confirmed that it is a feasible possibility."  Freddie Sayers, *How Facebook censored the lab leak theory*, UNHERD (May 31, 2021), https://unherd.com/2021/05/how-facebook-censored-the-lab-leak-theory/.  Facebook admitted that its decision to end censorship was made "in consultation with" government officials, *i.e.*, "public health experts."  *Id.*

147.     The reach of Facebook's censorship alone (to say nothing of other platforms that censored the lab-leak theory) was enormous.  Facebook "displayed 'warnings'" on such supposed COVID-19-related misinformation, and claimed that "[w]hen people saw those warning labels, 95% of the time they did not go on to view the original content."  *Id.*  "Moreover, if an article is rated 'false' by their 'fact checkers', the network will 'reduce its distribution'.  This means that, while an author or poster is not aware that censorship is taking place, the network could be hiding their content so it is not widely disseminated."  *Id.*

148.     Ironically, while admitting that it had erroneously censored speech on the lab-leak theory for over a year, Facebook announced that it was "now extending its policy of 'shadow-banning' accounts that promote misinformation.  'Starting today, we will reduce the distribution of all posts in News Feed from an individual's Facebook account if they repeatedly share content that has been rated by one of our fact-checking partners.'  So now, if you share something deemed to contain misinformation multiple times, your account could be silenced; you won't be informed, you won't know to what degree your content will be hidden and you won't know how long it will last—all thanks to group of 'fact-checkers' whose authority cannot be questioned."  *Id.*  It is astonishing that "this announcement was made on the very same day as Facebook's admission of error" on the lab-leak theory.  *Id.*

### 3.      Speech about the efficacy of mask mandates and COVID-19 lockdowns.

149.      Social-media platforms also aggressively censored speech questioning the efficacy of masks and lockdowns as COVID-19 mitigation measures.  Yet evidence revealed that concerns about the efficacy of these measures were well-founded.

150.      For example, on information and belief, Twitter's "COVID-19 misleading information policy," as of December 2021, noted that Twitter will censor (label or remove) speech claiming that "face masks … do not work to reduce transmission or to protect against COVID-19," among many other restrictions.  *See* Twitter, *Covid-19 misleading information policy*, https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy.   On information and belief, both Twitter and other social-media platforms have imposed similar policies, imposing censorship on speech questioning the efficacy of masks and the efficacy of lockdowns as COVID-19 mitigation measures.

151.      On April 8, 2021, YouTube "deleted a video in which Florida Gov. Ron DeSantis and a handful of medical experts," including Plaintiffs Bhattacharya and Kulldorff, "questioned the effectiveness of having children wear masks to stop the spread of COVID-19."  *YouTube Purges Ron DeSantis Video Over Claims Children Don't Need to Wear Masks*, THE WRAP (Apr. 8, 2021), https://www.thewrap.com/youtube-purges-florida-governor-video-over-claims-children-dont-need-to-wear-masks/.

152.      On August 10, 2021, "YouTube barred Sen. Rand Paul (R-Ky.) from uploading new videos to the site for seven days, after the ophthalmologist posted a video last week arguing that most masks 'don't work' against the coronavirus."  *Rand Paul Suspended from YouTube Over Covid Claims*, FORBES (Aug. 10, 2021), https://www.forbes.com/sites/joewalsh/2021/08/10/rand-paul-suspended-from-youtube-over-covid-claims/?sh=31f1d4e01971.

153.     "When Scott Atlas, a member of the Trump White House's coronavirus task force, questioned the efficacy of masks last year, Twitter removed his tweet.  When eminent scientists from Stanford and Harvard recently told Florida Gov. Ron DeSantis that children should not be forced to wear masks, YouTube removed their video discussion from its platform." *How Facebook uses 'fact-checking' to suppress scientific truth*, N.Y. POST (May 18, 2021), https://nypost.com/2021/05/18/how-facebook-uses-fact-checking-to-suppress-scientific-truth/.

154.     In the same vein, Facebook suppressed a scientist for citing a peer-reviewed study "by a team of researchers in Germany who established an online registry for thousands of parents to report on the impact of masks on their children.  More than half of those who responded said that masks were giving their children headaches and making it difficult for them to concentrate. More than a third cited other problems, including malaise, impaired learning, drowsiness and fatigue." *Id.*

155.      On November 21, 2020, "[t]wo leading Oxford University academics … accused Facebook of 'censorship' after it claimed an article they wrote on face masks amounted to 'false information'." *Two top Oxford academics accuse Facebook of censorship for branding their article on whether masks work 'false information'*, DAILY MAIL (Nov. 21, 2020) https://www.dailymail.co.uk/news/article-8973631/Two-Oxford-academics-accuse-Facebook-censorship-article-warning.html.

156.     No convincing evidence supported the efficacy of mask mandates, while compelling evidence contradicted it, both before and after their implementation.  Tracking the aggregate case numbers in States with and without mask mandates over the course of the COVID-19 pandemic, in a "natural experiment," demonstrates that mask mandates made "zero difference." John Tierney, *The Failed COVID Policy of Mask Mandates*, CITY J. (April 19, 2022),

https://www.city-journal.org/the-failed-covid-policy-of-mask-mandates.   Both case rates and mortality rates were "virtually identical." *Id.*  Indeed, "mask mandates were implemented without scientific justification," and "they failed around the world." *Id.*  "In their pre-Covid planning strategies for a pandemic, neither the Centers for Disease Control nor the World Health Organization had recommended masking the public—for good reason.  Randomized clinical trials involving flu viruses had shown, contrary to popular wisdom in Japan and other Asian countries, that there was 'no evidence that face masks are effective in reducing transmission,' as the WHO summarized the scientific literature." *Id.*  "Anthony Fauci acknowledged this evidence early in the pandemic, both in his public comments ('There's no reason to be walking around with masks,' he told 60 Minutes) and in his private emails ('I do not recommend you wear a mask,' he told a colleague, explaining that masks were too porous to block the small Covid virus)." *Id.*  "Instead of carefully analyzing the effects of masks, the CDC repeatedly tried to justify them by misrepresenting short-term trends and hyping badly flawed research, like studies in Arizona and Kansas purporting to show that infections had been dramatically reduced by the mask mandates imposed in some counties.  But in each state, … infection rates remained lower in the counties that did not mandate masks." *Id.*; *see also, e.g.,* IAN MILLER, UNMASKED: THE GLOBAL FAILURE OF COVID MASK MANDATES (Jan. 20, 2022).

157.    Ironically, Plaintiff Kulldorff was suspended on Twitter for several weeks for posting that masks endow vulnerable individuals with a false sense of security, because they actually do not work well to protect against viral infection.  This exemplifies the danger of government involvement in social media censorship: preventing a world-renowned epidemiologist from conveying to the public that vulnerable people should not rely on masks for protection could indirectly cause great harm.

158.     Likewise, no convincing evidence supported the efficacy of lockdowns.  Quite the

contrary.  In January 2022, a Johns Hopkins meta-analysis reviewed the efficacy of lockdowns as

a COVID-19 mitigation measure and found that they had minimal impact, if any, on COVID-19

mortality rates.  The study reached "the conclusion that lockdowns have had little to no effect on

COVID-19 mortality… [L]ockdowns in Europe and the United States only reduced COVID-19

mortality by 0.2% on average…. While this meta-analysis concludes that lockdowns have had

little to no public health effects, they have imposed enormous economic and social costs where

they have been adopted.  In consequence, lockdown policies are ill-founded and should be rejected

as a pandemic policy instrument."  Herby et al., *A Literature Review and Meta-Analysis of the*

*Effects of Lockdowns on COVID-19 Mortality*, STUDIES IN APPLIED ECONOMICS (Jan. 2022),

*available      at*      https://sites.krieger.jhu.edu/iae/files/2022/01/A-Literature-Review-and-Meta-

Analysis-of-the-Effects-of-Lockdowns-on-COVID-19-Mortality.pdf.

159.     On December 21, 2021, Dr. Leana Wen, a CNN medical commentator and strong

advocate for COVID-19 restrictions, tweeted that "cloth masks are little more than facial

decorations."  *CNN's Leana Wen: 'Cloth Masks Are Little More Than Facial Decorations'*,

REASON,  *at*  https://reason.com/2021/12/21/leana-wen-cloth-mask-facial-decorations-covid-cdc-

guidance/.  Twitter did not censor this tweet, even though it undermined the efficacy of mask

mandates that permitted the use of cloth masks (*i.e.*, virtually all of them)—undoubtedly because

it was advocating for *more* aggressive mitigation measures (*i.e.*, higher-quality masks than cloth

masks), not less.

160.     "On September 26, 2021, CDC Director Walensky cited an Arizona study to claim

that schools without mask mandates were 3.5 times more likely to experience COVID-19

outbreaks.  However, the study is so flawed that experts have said it 'should not have entered into

the public discourse' and that you 'can't learn anything' about mask rules from the study."  March 11, 2022 Letter of U.S. Rep. Cathy McMorris Rodgers, et al., to Surgeon General Murthy, *at* https://republicans-energycommerce.house.gov/wp-content/uploads/2022/03/3.11.22-Letter-to-Surgeon-General-Murthy-Final.pdf.   Yet Director Walensky's statement circulated widely on social media without being censored.

**4.      Speech about election integrity and the security of voting by mail.**

161.      In or around 2020, social-media platforms began aggressively censoring speech that raised concerns about the security of voting by mail, a major election-security issue. Notoriously, social-media platforms aggressively censored core political speech by then-President Trump and the Trump campaign raising concerns about the security of voting by mail in the run-up to the November 2020 presidential election.

162.      This censorship is ironic because, for many years before 2020, it was a common left-wing talking point to claim that fraud occurred in voting by mail.  In opposing photo-ID requirements for in-person voting, Democrats and their allies frequently claimed that photo IDs for in-person voting were pointless because voting by mail, not in-person voting, presented the real opportunities for fraud.

163.      These Democratic claims of fraud in voting by mail were widely parroted in mainstream media for many years.  For example, in 2012, the New York Times wrote that "votes cast by mail are less likely to be counted, more likely to be compromised and more likely to be contested than those cast in a voting booth, statistics show," in an article headlined "Error and Fraud at Issue as Absentee Voting Rises."   https://www.nytimes.com/2012/10/07/us/politics/as-more-vote-by-mail-faulty-ballots-could-impact-elections.html.   In 2012, The Washington Post published an articles stating that "[i]t may still be possible to steal an American election, if you

know the right way to go about it," citing a case in which "[c]onspirators allegedly bought off absentee voters" and "faked absentee ballots." https://www.washingtonpost.com/politics/decision2012/selling-votes-is-common-type-of-election-fraud/2012/10/01/f8f5045a-071d-11e2-81ba-ffe35a7b6542_story.html. In 2014, MSNBC claimed: "Indeed, election experts say absentee ballot fraud is the most common form of organized voter fraud, since, because of the secret ballot, there's no way to ensure that an in-person voter is voting for the candidate he promised to." https://www.msnbc.com/msnbc/greg-abbott-bogus-voter-fraud-crusade-msna291356. In 2016, Slate claimed, in a piece titled, "Voter Fraud Exists. Republican Restrictions Won't Stop It," that "[t]he vast majority of voter fraud prosecutions touted by conservative groups like the Heritage Foundation involve absentee ballots that were illegally cast. And the only voting fraud schemes with the potential to actually swing elections involved mail-in ballots." https://slate.com/news-and-politics/2016/09/voter-fraud-exists-through-absentee-ballots-but-republicans-wont-stop-it.html.

164.    Many other authorities confirm the reasonableness of concerns about security of voting by mail. For example, in *Crawford v. Marion County Election Board*, the U.S. Supreme Court held that fraudulent voting "perpetrated using absentee ballots" demonstrates "that not only is the risk of voter fraud real but that it could affect the outcome of a close election." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 195–96 (2008) (opinion of Stevens, J.) (emphasis added).

165.    The bipartisan Carter-Baker Commission on Federal Election Reform—co-chaired by former President Jimmy Carter and former Secretary of State James A. Baker—determined that "[a]bsentee ballots remain the largest source of potential voter fraud." BUILDING CONFIDENCE IN U.S. ELECTIONS: REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM, at 46 (Sept. 2005),

at https://www.legislationline.org/download/id/1472/file/3b50795b2d0374cbef5c29766256.pdf. According to the Carter-Baker Commission, "[a]bsentee balloting is vulnerable to abuse in several ways." *Id.* "Blank ballots mailed to the wrong address or to large residential buildings might be intercepted." *Id.* "Citizens who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation." *Id.* "Vote buying schemes are far more difficult to detect when citizens vote by mail." *Id.* Thus, the Commission noted that "absentee balloting in other states has been a major source of fraud." *Id.* at 35. It emphasized that voting by mail "increases the risk of fraud." *Id.* And the Commission recommended that "States … need to do more to prevent … absentee ballot fraud." *Id.* at v.

166.     The U.S. Department of Justice's 2017 Manual on Federal Prosecution of Election Offenses, published by its Public Integrity Section, states: "Absentee ballots are particularly susceptible to fraudulent abuse because, by definition, they are marked and cast outside the presence of election officials and the structured environment of a polling place." U.S. Dep't of Justice, *Federal Prosecution of Election Offenses* 28 (8th ed. Dec. 2017), at https://www.justice.gov/criminal/file/1029066/download. This Manual reports that "the more common ways" that election-fraud "crimes are committed include … [o]btaining and marking absentee ballots without the active input of the voters involved." *Id.* at 28. And the Manual notes that "[a]bsentee ballot frauds" committed both with and without the voter's participation are "common" forms of election fraud. *Id.* at 29.

167.     Thus, social-media censorship that has occurred since 2020 to suppress speech raising concerns about the security of voting by mail would, if applied even-handedly, suppress statements about the risks of fraud in mail-in voting by the United States Supreme Court, the Carter-Baker Commission co-chaired by President Jimmy Carter, and the U.S. Department of

Justice's prosecution manual for election-integrity crimes. One would not be able to quote Justice Stevens' opinion for the Supreme Court in *Crawford* on social media if it followed its own rules. Raising concerns about election integrity, and questioning the security of voting by mail, became unspeakable on social media only after it became expedient for the Democratic Party and the political Left to suppress these ideas, viewpoints, and concerns.

168.     This censorship of speech, speakers, and viewpoints on such topics and concerns continues to this day, at Defendants' instigation, as alleged further herein.

169.     There is a common theme to all these examples of wrong-headed censorship: Each involved censoring truthful or reliable information that contradicted left-wing political narratives. What led to the censorship was not the fact that the speech was supposedly false, but that the message was politically inconvenient for Democratic officials and government-preferred narratives. As a result, the ability of politicians and social-media platforms to reliably identify actual "misinformation" and "disinformation" has been proven false, again and again.

**D.     Defendants, Using Their Official Authority, Have Threatened, Cajoled, and Colluded With Social-Media Companies to Silence Disfavored Speakers and Viewpoints.**

170.     On information and belief, the individual Defendants and those acting in concert with them have conspired and colluded to suppress Americans' First Amendment and analogous state-law rights to freedom of expression on social-media platforms, and to be exposed to free expression on such platforms, and they have taken many overt actions to achieve this goal.

**1.   Section 230 of the CDA subsidized, protected, and fostered the creation of speech-censorship policies in a small, concentrated group of social-media firms.**

171.     First, the Defendants did not act in a vacuum. For decades, the federal government has artificially encouraged, protected, fostered, and subsidized the aggregation of control over

speech, including the specific power of censorship, by a small group of powerful social-media firms.

172.     In particular, Section 230 of the Communications Decency Act (CDA) artificially empowered and subsidized the growth of social-media companies and their censorship policies by effectively immunizing much censorship on social media from liability.  Section 230's unique liability shield fostered the aggregation of power in the field into a concentrated cluster of powerful social-media firms, and it directly fostered, protected, and encouraged the development of speech-censorship policies.  This process was greatly accelerated and enhanced by the social-media platforms' success in convincing courts to adopt ever-broadening interpretations of Section 230 immunity, which stray beyond the statutes' text.

173.     "Historically, at least two legal doctrines limited a company's right to exclude." *Knight First Amendment Institute*, 141 S. Ct. at 1222 (Thomas, J., concurring).  "First, our legal system and its British predecessor have long subjected certain businesses, known as common carriers, to special regulations, including a general requirement to serve all comers."  *Id.*  "Second, governments have limited a company's right to exclude when that company is a public accommodation.  This concept—related to common-carrier law—applies to companies that hold themselves out to the public but do not 'carry' freight, passengers, or communications."  *Id.* Absent the artificial immunity created by the overly expansive interpretations of Section 230 immunity, these legal doctrines, and free-market forces, would impose a powerful check on content- and viewpoint-based censorship by social-media platforms.  *See id.*

174.     The CDA was enacted in 1996 for the purpose of promoting the growth of internet commerce and protecting against the transmission of obscene materials to children over the

internet.  It was intended to "offer a forum for a true diversity of political discourse," 47 U.S.C. § 230(a)(3), but in recent years Defendants have exploited it to produce the opposite effect.

175.     Section 230 of the CDA, 47 U.S.C. § 230, provides unique liability protections for internet publishers of information, such as social-media companies, which are not available to other publishers, such as those of printed media.  Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  In other words, social-media firms are generally protected from liability for what their users post.

176.     Section 230(c)(2), however, also provides that: "No provider or user of an interactive computer service shall be held liable on account of (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or *otherwise objectionable, whether or not such material is constitutionally protected*."  47 U.S.C. § 230(c)(2)(A) (emphasis added).  Courts have interpreted Section 230 broadly—beyond its plain textual import—to shield social-media platforms from liability for censoring anything they deem "objectionable," even if it is constitutionally protected speech.

177.     This reading is unreasonable and exceeds what Congress authorized.  Viewpoint and content-based discrimination—now widely practiced by social-media platforms—are the antithesis of "good faith." *Id.*  Moreover, Congress intended the "otherwise objectionable" material in § 230(c)(2)(A) to refer only to content similar to "obscene, lewd, lascivious, filthy, excessively violent, [and] harassing" content referred to in the same list.  *Id.*  But social-media companies have interpreted this liability shield unreasonably broadly, and have convinced courts to adopt overbroad interpretations of Section 230 immunity.  *See, e.g., Malwarebytes, Inc. v. Enigma*

46

*Software Grp. USA, LLC*, 141 S. Ct. 13, 15 (2020) (statement of Thomas, J., respecting the denial of certiorari) ("[C]ourts have extended the immunity in § 230 far beyond anything that plausibly could have been intended by Congress."); *id.* at 15-18 (discussing and criticizing the overbroad reading of § 230 liability that has shielded social-media firms).

178.    These platforms, therefore, have the best of both worlds: They claim that they are exempt from liability if they leave even atrocious content posted, but they are *also* exempt from liability if they censor anything they deem "objectionable, whether or not such material is constitutionally protected."  47 U.S.C. § 230(c)(2)(A).

179.    Further, Section 230 of the CDA purportedly shields such platforms from liability for colluding with other social-media platforms on how to censor speech: "No provider or user of an interactive computer service shall be held liable on account of … (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1)."  47 U.S.C. § 230(c)(2)(B).  On information and belief, social-media platforms do, in fact, extensively coordinate with one another in censoring social-media speech.

180.    Section 230 also purports to preempt any state law to the contrary: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).

181.    On information and belief, the immunity provided by Section 230 of the CDA directly contributed to the rise of a small number of extremely powerful social-media platforms, who have now turned into a "censorship cartel."  The liability shield provided by the federal government artificially subsidized, fostered, and encouraged the viewpoint and content-based censorship policies that those platforms have adopted at Defendants' urging.

182.     On information and belief, social-media firms greatly value the immunity provided by § 230 of the CDA, which continues to provide them with artificial liability protections, and credible threats to amend or repeal that immunity are powerful motivators to those platforms. Defendants are aware of this.

183.     On information and belief, the largest and most powerful social-media firms are also greatly concerned about antitrust liability and enforcement, given their dominance in the social-media market(s), and credible threats to impose antitrust liability and/or enforcement are powerful motivators to those platforms as well.  Defendants are aware of this too.

**2.  The campaign of threats against social-media companies to demand censorship.**

184.     Defendant Biden, his political allies, and those acting in concert with him have a long history of threatening to use official government authority to impose adverse legal consequences against social-media companies if such companies do not increase censorship of speakers and messages disfavored by Biden and his political allies.  Common threats of adverse legal and/or regulatory consequences include the threat of antitrust enforcement or legislation, and the threat of amending or repealing the liability protections of Section 230 of the Communications Decency Act (CDA), among others, if social-media companies fail to engage in more aggressive censorship of viewpoints, content, and speakers disfavored by Defendants.  These threats are effective because they address legal matters of critical concern to dominant social-media firms.

185.     Defendants have leveraged these threats to secure such increased censorship of speakers, content, and viewpoints that they disfavor on social-media platforms; and they have now moved into a phase of open collusion with the threatened companies, cooperating with them directly to censor speech, speakers, and viewpoints that Defendants disfavor.

186.     Threats from Biden, senior government officials in the Biden administration, and those acting in concert with them come in the context of a history of such threats from senior federal officials politically allied with them.  These threats have routinely linked (1) the prospect of official government action in the form of adverse legislation, regulation, or agency action—especially threats of antitrust legislation and/or enforcement and calls to amend or repeal Section 230 of the CDA, among others—with (2) calls for more aggressive censorship and suppression of speakers, viewpoints, and messages that these officials disfavor.  Recent examples include, but are by no means limited to, the following:

- Speaker Nancy Pelosi, April 12, 2019: "I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it.  And it is not out of the question that that could be removed." *Nancy Pelosi warns tech companies that Section 230 is 'in jeopardy'*, TECH CRUCH (April 12, 2019), at https://techcrunch.com/2019/04/12/nancy-pelosi-section-230/. ("When asked about Section 230, Pelosi referred to the law as a 'gift' to tech companies that have leaned heavily on the law to grow their business…. 'It is a gift to them and I don't think that they are treating it with the respect that they should, and so I think that that could be a question mark and in jeopardy… I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it.  And it is not out of the question that that could be removed.'").

- Senator Mark Warner, Oct. 28, 2020: "It saddens me that some of my colleagues have joined in the Trump Administration's cynical and concerted effort to bully platforms into allowing dark money groups, right-wing militias and even the President himself to continue to exploit social media platforms to sow disinformation, engage in targeted harassment, and suppress voter participation.  We can and should have a conversation about Section

230—and the ways in which it has enabled platforms to turn a blind eye as their platforms are used to facilitate discrimination and civil rights violations, enable domestic terrorist groups to organize violence in plain sight, assist in stalking and networked harassment campaigns, and enable online frauds targeted at vulnerable users…."  Statement of U.S. Sen. Mark R. Warner on Section 230 Hearing (Oct. 28, 2020), *at* https://www.warner.senate.gov/public/index.cfm/2020/10/statement-of-sen-mark-r-warner-on-facebook-s-decision-to-finally-ban-qanon-from-its-platforms.

- Then-Senator Kamala Harris, Sept. 30, 2019: "Look, let's be honest, Donald Trump's Twitter account should be suspended."  *Kamala Harris says Trump's Twitter account should be suspended*, CNN.com (Sept. 30, 2019), *at* https://www.cnn.com/2019/09/30/politics/kamala-harris-trump-twitter-cnntv/index.html; *see also* https://twitter.com/kamalaharris/status/1179810620952207362.

- Then-Senator Kamala Harris, Oct. 2, 2019: "Hey @jack [*i.e.*, Twitter CEO Jack Dorsey]. Time to do something about this," providing picture of a tweet from President Trump. https://twitter.com/kamalaharris/status/1179193225325826050.

- Senator Richard Blumenthal, Nov. 17, 2020: "I have urged, in fact, a breakup of tech giants. Because they've misused their bigness and power. …  And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court."  *Breaking the News: Censorship, Suppression, and the 2020 Election Before the S. Comm. on Judiciary*, 116th Cong. at 36:10–15 (2020) (statement of Sen. Richard Blumenthal).

- Senator Mazie Hirono, Feb. 5, 2021: "Sec 230 was supposed to incentivize internet platforms to police harmful content by users.  Instead, the law acts as a shield allowing

them to turn a blind eye. The SAFE TECH ACT brings 230 into the modern age and makes platforms accountable for the harm they cause." https://twitter.com/maziehirono/status/1357790558606024705?lang=bg.

- March 2021 Joint Hearing of the Communications and Technology Subcommittee, Joint Statement of Democratic Committee Chairs: "This hearing will continue the Committee's work of holding online platforms accountable for the growing rise of misinformation and disinformation. ... For far too long, big tech has failed to acknowledge the role they've played in fomenting and elevating blatantly false information to its online audiences. Industry self-regulation has failed. We must begin the work of changing incentives driving social media companies to allow and even promote misinformation and disinformation." *See* Yaël Eisenstat & Justin Hendrix, *A Dozen Experts with Questions Congress Should Ask the Tech CEOs—On Disinformation and Extremism*, JUST SECURITY (Mar. 25, 2021), https://www.justsecurity.org/75439/questions-congress-should-ask-the-tech-ceos-on-disinformation-and-extremism/.

- On April 20, 2022, twenty-two Democratic members of Congress sent a letter to Mark Zuckerberg of Facebook (n/k/a "Meta Platforms, Inc."), demanding that Facebook increase censorship of "Spanish-language disinformation across its platforms." The letter claimed that "disinformation" was a threat to democracy, and it made explicit threats of adverse legislative action if Facebook/Meta did not increase censorship: "The spread of these narratives demonstrate that Meta does not see the problem of Spanish-language disinformation in the United States as a critical priority for the health of our democracy. The lack of Meta's action to swiftly address Spanish-language misinformation globally demonstrates the need for Congress to act to ensure Spanish-speaking communities have fair access to trustworthy information." The letter demanded

information about Facebook's censorship policies on election-related speech for the upcoming elections: "How is Meta preparing to proactively detect and address foreign disinformation operations targeted at Spanish-speaking communities for future elections within the United States, including the 2022 primaries and general election? … [W]hat new steps has Meta taken to ensure the effectiveness of its algorithmic content detection policies to address disinformation and hate-speech across different languages?"  April 20, 2022 Letter of Rep. Tony Cardenas, et al., at https://cardenas.house.gov/imo/media/doc/Meta%20RT%20and%20Spanish%20Language%20Disinformation%20Congressional%20Letter%20Final.pdf.

187.    Comments from two House Members summarize this campaign of pressure and threats: "In April 2019, Louisiana Rep. Cedric Richmond warned Facebook and Google that they had 'better' restrict what he and his colleagues saw as harmful content or face regulation: 'We're going to make it swift, we're going to make it strong, and we're going to hold them very accountable.' New York Rep. Jerrold Nadler added: 'Let's see what happens by just pressuring them.'"  Vivek Ramaswamy and Jed Rubenfeld, Editorial, *Save the Constitution from Big Tech: Congressional threats and inducements make Twitter and Facebook censorship a free-speech violation*, WALL ST. J. (Jan. 11, 2021), https://www.wsj.com/articles/save-the-constitution-from-big-tech-11610387105.

188.    Defendants' political allies have repeatedly used congressional hearings as forums to advance these threats of adverse legislation if social-media platforms do not increase censorship of speakers, speech, content, and viewpoints they disfavor.  They have repeatedly used such hearings to berate social-media firm leaders, such as Mark Zuckerberg of Facebook, Jack Dorsey of Twitter, and Sundar Pichai of Google and YouTube, and to make threats of adverse legal consequences if censorship is not increased.  Such hearings include, but are not limited to, those

cited above, as well as an antitrust hearing before the House Judiciary Committee on July 29, 2020;

a Senate Judiciary Committee hearing on November 17, 2020; and a House Energy and Commerce

Hearing on March 25, 2021.

189.     The flip side of such threats, of course, is the implied "carrot" of retaining Section

230 immunity and avoiding antitrust scrutiny, allowing the major social-media platforms to retain

their legally privileged status that is worth billions of dollars of market share.

190.     Starting in or around 2020, if not before, social-media firms have responded to these

threats by engaging in increasingly more aggressive censorship of speakers, messages, and

viewpoints disfavored by Defendants, senior government officials, and the political left.  "With all

the attention paid to online misinformation, it's easy to forget that the big [social-media] platforms

generally refused to remove false content purely because it was false until 2020."  Gilead Edelman,

*Beware the Never-Ending Disinformation Emergency*, THE WIRED (March 11, 2022), *at*

https://www.wired.com/story/youtube-rigged-election-donald-trump-moderation-

misinformation/.  On information and belief, it was in response to such threats of adverse legal

consequences that social-media companies ramped up censorship in 2020, disproportionately

targeting speakers and viewpoints on the political right.  On information and belief, the examples

of censorship of truthful and reliable speech in 2020, cited above, were motivated in whole or in

part by such threats.

191.     Then-candidate and now-President Biden has led this charge.  He has tripled down

on these threats of adverse official action from his colleagues and allies in senior federal-

government positions.  His threats of adverse government action have been among the most

vociferous, and among the most clearly linked to calls for more aggressive censorship of

disfavored speakers and speech by social-media companies.

192.    For example, on January 17, 2020, then-candidate Biden stated, in an interview with the New York Times editorial board, that Section 230 of the CDA should be "revoked" because social-media companies like Facebook did not do enough to censor supposedly false information in the form of political ads criticizing him—*i.e.*, core political speech.  He stated: "The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one. For Zuckerberg and other platforms."  He also stated, "It should be revoked because it is not merely an internet company.  It is propagating falsehoods they know to be false.... There is no editorial impact at all on Facebook. None. None whatsoever. It's irresponsible. It's totally irresponsible."   N.Y. Times Editorial Board, *Joe Biden* (Jan. 17, 2020), *at* https://www.nytimes.com/interactive/2020/01/17/opinion/joe-biden-nytimes-interview.html. These claims were specifically linked to Facebook's alleged failure to censor *core political speech*—*i.e.*, political ads on Facebook criticizing candidate Biden.  *Id.*

193.    Candidate Biden also threatened that Facebook CEO Mark Zuckerberg should be subject to civil liability and even *criminal prosecution* for not censoring such core political speech: "He should be submitted to civil liability and his company to civil liability…. Whether he engaged in something and amounted to collusion that in fact caused harm that would in fact be equal to a criminal offense, that's a different issue. That's possible. That's possible it could happen."  *Id.*  In other words, Biden's message—not long before he became President of the United States—was that if Facebook did not censor political ads against him, Zuckerberg should go to prison.  These two threats echoed the same threats made by numerous political allies of the President since 2019, cited above.

194.    During the presidential campaign, now-Vice President Harris made similar threats against social-media firms to pressure them to engage in more aggressive censorship of speakers,

content, and viewpoints she disfavors.  For example, in addition to the statements cited above, she stated in 2019: "We will hold social media platforms responsible for the hate infiltrating their platforms, because they have a responsibility to help fight against this threat to our democracy. And if you profit off of hate—if you act as a megaphone for misinformation or cyberwarfare, if you don't police your platforms—we are going to hold you accountable as a community." *Kamala Harris Wants to Be Your Online Censor-in-Chief*, REASON.COM (May 7, 2019), *at* https://reason.com/2019/05/07/kamala-harris-promises-to-pursue-online-censorship-as-president/.

195.    In or around June 2020, the Biden campaign published an open letter and online petition (ironically, on Facebook) calling for Facebook to engage in more aggressive censorship of core political speech and viewpoints that then-Candidate Biden disfavored.  The open letter complained that Facebook "continues to allow Donald Trump to say anything — and to pay to ensure that his wild claims reach millions of voters.  Super PACs and other dark money groups are following his example.  Trump and his allies have used Facebook to spread fear and misleading information about voting…. We call for Facebook to proactively stem the tide of false information by no longer amplifying untrustworthy content and promptly fact-checking election-related material that goes viral.  We call for Facebook to stop allowing politicians to hide behind paid misinformation in the hope that the truth will catch up only after Election Day.  There should be a two-week pre-election period during which **all** political advertisements must be fact-checked before they are permitted to run on Facebook. … Anything less will render Facebook a tool of misinformation that corrodes our democracy."  Biden-Harris, *Our Open Letter to Facebook* (last visited May 5, 2022), https://joebiden.com/2961-2/.

196.     The online petition demanded that Facebook "[p]romote real news, not fake news," "[q]uickly remove viral misinformation," and "[e]nforce voter suppression rules against everyone—even the President [Trump]."  The petition complained that Facebook "continues to amplify misinformation and lets candidates pay to target and confuse voters with lies."  It demanded that Facebook "promote authoritative and trustworthy sources of election information, rather than rants of bad actors and conspiracy theorists," "promptly remove false, viral information," and "prevent political candidates and PACs from using paid advertising to spread lies and misinformation – especially within two weeks of election day."  Biden-Harris, *#Movefastfixit* (last visited May 5, 2022), https://joebiden.com/facebook/.

197.     On September 28, 2020, the Biden-Harris campaign sent a letter to Facebook accusing it of propagating a "storm of disinformation" by failing to censor the Trump campaign's political speech, including social-media political ads.  Sept. 28, 2020 Biden-Harris Letter, *at* https://www.documentcloud.org/documents/7219497-Facebook-Letter-9-28.html.   The letter accused Facebook of allowing "hyper-partisan" and "fantastical" speech to reach millions of people, and it demanded "more aggressive" censorship of Trump.  *Id.*

198.     A federal lawsuit filed in 2021 alleged that "before and after the November, 2020 election," California government officials "contracted with partisan Biden campaign operatives to police speech online.  The secretary of state of California then sent these flagged tweets to Twitter, Instagram, YouTube and other platforms for their removal."  *Harmeet Dhillon: Biden White House 'flags' Big Tech – here's why digital policing is so dangerous*, FOX NEWS (July 16, 2021), *at* https://www.foxnews.com/opinion/biden-white-house-flags-big-tech-digital-policing-harmeet-dhillon. Once in power, Biden and those acting in concert with him would continue this same course of conduct of "flagging" content for censorship by private social-media firms, now using

the authority of the *federal* government to "flag" specific speech and speakers for censorship and suppression.

199.     On December 2, 2020—during the presidential transition—Biden's former chief of staff and top technical advisor, Bruce Reed, publicly stated that "it's long past time to hold the social media companies accountable for what's published on their platforms." *Biden Tech Advisor: Hold Social Media Companies Accountable for What Their Users Post*, CNBC.com (Dec. 2, 2020), *at* https://www.cnbc.com/2020/12/02/biden-advisor-bruce-reed-hints-that-section-230-needs-reform.html.  This comment specifically referred to the amendment or repeal of Section 230 of the Communications Decency Act.  *See id.*  Thus, the threat of adverse legal consequences for social-media companies that did not censor opposing political viewpoints was at the forefront of the incoming Biden Administration's public messaging.

200.     Coming into the new Administration, with now-President Biden's political allies in control of both Houses of Congress, social-media companies were on clear notice that the federal 5government's involvement in social-media censorship was likely to escalate, and their threats of adverse legislation, regulation, and legal action became more ominous.  On information and belief, this caused a chilling effect on speech by prompting social-media companies to ramp up their own censorship programs against disfavored speech and speakers, to preempt the risk of adverse action against them by the Government.

201.     Once in control of the Executive Branch, Defendants promptly capitalized on these threats by pressuring, cajoling, and openly colluding with social-media companies to actively suppress particular disfavored speakers and viewpoints on social media.

202.     Defendants, those acting in concert with them, and those allied with them routinely seek to justify overt censorship of disfavored speakers and viewpoints by wrapping it in the

monikers "misinformation," "disinformation," and/or "malinformation." Their standard tactic is to label speech that contradicts their preferred political narratives "misinformation," "disinformation," and "malinformation" to justify suppressing it. Other common buzzwords include calls for a "healthy information ecosystem," "healthy information environment," or "healthy news environment," among others. This is the Orwellian vocabulary of censorship. It is deployed aggressively to undermine fundamental First Amendment rights.

203. As noted above, these labels have proven extremely unreliable. Defendants' and the political Left's ability to accurately identify "misinformation" and "disinformation" is unreliable because they apply such labels, not based on actual truth or falsity, but based on their current preferred political narrative. This has resulted, again and again, in the suppression of truthful information under the name of "disinformation" and "misinformation."

**3. White House and HHS officials collude with social-media firms to suppress speech.**

204. Before the Biden Administration took office, on information and belief, coordination and collusion between senior HHS officials and social-media companies to censor viewpoints and speakers was already underway. Once in office, senior officials in the Biden Administration—in the White House, in HHS, and elsewhere—capitalized and greatly expanded on these efforts.

205. On information and belief, beginning on or around January or February 2020, if not before, Defendant Dr. Anthony Fauci, a senior federal government official, coordinated with social-media firms to police and suppress speech regarding COVID-19 on social media.

206. Prior to 2020, as head of NIAID, Dr. Fauci had overseen funding of risky gain-of-function research on viruses, including research at the Wuhan Institute of Virology. This included

research funded through intermediaries such as Dr. Peter Daszak and the EcoHealth Alliance, among others.

207.     In late January and early February 2020, Dr. Fauci received information from colleagues that suggested that the COVID-19 virus may have originated in a laboratory in Wuhan, China.  This revelation threatened to implicate Dr. Fauci in the virus's origins, as he had funded the risky research that, under this theory, led to the virus's origin.  Soon thereafter, Dr. Fauci participated in a conference call with scientists and science-funding authorities intended to discredit and suppress this lab-leak theory.  After the conference call, influential individuals signed public statements that were placed in science journals in attempt to discredit the lab-leak theory.

208.     In the same time frame, Dr. Fauci communicated with Facebook CEO Mark Zuckerberg directly regarding public messaging and the flow of information on social media about the government's COVID-19 response.  For example, in a series of emails produced in response to FOIA requests dated from March 15 to 17, 2020, Zuckerberg invited Fauci to make public statements to be posted for viewing by all Facebook users regarding COVID-19, and also made another proposal that is redacted in FOIA-produced versions but was treated as a high priority by Fauci and NIH staff.

209.     In an email on March 15, 2020, Zuckerberg proposed coordinating with Fauci on COVID-19 messaging to "make sure people can get authoritative information from reliable sources," and suggested including a video message from Fauci because "people trust and want to hear from experts."  Zuckerberg proposed including this content in a "hub" that "we're going to put at the top of Facebook" to reach "200+ million Americans, 2.5 billion people worldwide."

210.     In the same email, Zuckerberg made a three-line proposal to Fauci that was redacted by the federal government before the email was produced in a FOIA request.

211.     The next day, NIH's communications director emailed Fauci and strongly recommended that he do the videos for Facebook.  Regarding the redacted proposal from Zuckerberg, she stated: "But an even bigger deal is his offer [REDACTED].  The sooner we get that offer up the food-chain the better."  She also stated that her staff was "standing by to discuss this with HHS and WH comms," and requested authority to "determine who the best point of contact would be so the Administration can take advantage of this officer, soonest."  Fauci responded that "I will write or call Mark and tell him that I am interested in doing this.  I will then tell him that you will get for him the name of the USG [on information and belief, shorthand for "U.S. Government"] point of contact."

212.     Fauci responded by email to Zuckerberg on March 17, 2020, agreeing to the collaboration that Zuckerberg proposed and describing his redacted proposal as "very exciting."

213.     As alleged above, around the same time frame as the Zuckerberg-Fauci emails, Facebook and other social-media companies censored and suppressed speakers and speech advocating for the lab-leak theory of COVID-19's origins, despite the overwhelming circumstantial evidence favoring that theory.  This censorship directly implemented the plan, orchestrated by Fauci and others in early 2020, to discredit and suppress the lab-leak theory.

214.     In the same timeframe, Facebook and other social-media companies began an ever-increasing campaign of monitoring, censorship, and suppression of speech and speakers about COVID-19 and issues related to COVID-19.  This campaign would dramatically escalate with the advent of the Biden Administration.

215.     On information and belief, those firms coordinated directly with Fauci, CDC, and other government officials regarding censorship and suppression of disfavored speech and speakers.

216.     For example, Facebook's "COVID and Vaccine Policy" states that Facebook "does not allow false claims about the vaccines or vaccination programs which *public health experts have advised us* could lead to COVID-19 vaccine rejection."  Facebook, *COVID-19 and Vaccine Policy Updates & Protections*, https://www.facebook.com/help/230764881494641 (emphasis added).  On information and belief, Fauci and CDC officials are included among those "public health experts" who "advise[]" Facebook on what to censor.  Facebook also censors COVID-19 information as "false," not based on actual truth or falsity, but based on whether the claim contradicts or challenges the pronouncements of Fauci and the CDC.  *Id.*  This includes strongly supported claims such as "[c]laims that wearing a face mask properly does not help prevent the spread of COVID-19," along with an elaborate list of additional disfavored content and viewpoints subject to censorship.  *Id.*

217.     On information and belief, other social-media firms have similar policies and similar practices of coordinating with Fauci and the CDC and with each other, directly or indirectly, on the suppression of disfavored speakers and speech.

218.     Such collusion between HHS officials and social-media companies on the censorship of disfavored speakers and speech accelerated once the Biden Administration took office.

219.     On May 5, 2021, Defendant Psaki gave a White House press conference at which she stated that "[t]he President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections.  And we've seen that over the past several months, broadly speaking…. we've seen it from a number of sources."  White House, *Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom*

*Vilsack, May 5, 2021, at* https://www.whitehouse.gov/briefing-room/press-briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-tom-vilsack-may-5-2021/.

220.    Echoing Biden's past threats to social-media firms, Psaki immediately went on to state that President Biden "supports better privacy protections and *a robust anti-trust program*." *Id.* (emphasis added).  She linked the threat of anti-trust enforcement to the demand for more aggressive censorship by social-media platforms, stating that the President's "view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public." *Id.*

221.    At a White House press briefing with Psaki on July 15, 2021, Surgeon General Vivek Murthy announced that "health misinformation" constitutes an "urgent public health threat," stating that he had "issued a Surgeon General's Advisory on the dangers of health misinformation. Surgeon General Advisories are reserved for urgent public health threats. And while those threats have often been related to what we eat, drink, and smoke, today we live in a world where misinformation poses an imminent and insidious threat to our nation's health."  The White House, *Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy, July 15, 2021*, at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/.

222.    Surgeon General Murthy stated that "[m]odern technology companies have enabled misinformation to poison our information environment with little accountability to their users. They've allowed people who intentionally spread misinformation — what we call 'disinformation' — to have extraordinary reach." *Id.*  He accused their algorithms of "pulling us deeper and deeper into a well of misinformation." *Id.*

223.     Surgeon General Murthy explicitly called for more aggressive censorship of social-media speech, stating that "we're saying we expect more from our technology companies. …. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms." *Id.* "

224.     He also stated that "technology companies have a particularly important role" to play in combating "misinformation." He stated: "We know that the dramatic increase in the speed — speed and scale of spreading misinformation has, in part, been enabled by these platforms. So that's why in this advisory today, we are asking them to step up. We know they have taken some steps to address misinformation, but much, much more has to be done. And we can't wait longer for them to take aggressive action because it's costing people their lives." *Id.*

225.     He also stated: "we are asking technology companies to help lift up the voices of credible health authorities…. [T]hey have to do more to reduce the misinformation that's out there so that the true voices of experts can shine through." *Id.*

226.     At the same press briefing, after the Surgeon General spoke, Defendant Psaki stated: "[W]e are in regular touch with these social media platforms, and those engagements *typically happen through members of our senior staff*, but also members of our COVID-19 team, given, as Dr. Murthy conveyed, this is a big issue of misinformation, specifically on the pandemic." *Id.* (emphasis added). She added, "*We're flagging problematic posts for Facebook that spread disinformation*." *Id.* (emphasis added). She stated, "we have recommended—proposed that they create a robust enforcement strategy," *i.e.*, a more aggressive censorship program. *Id.*

227.     Psaki called on social-media companies to censor particular disfavored speakers, stating: "[T]here's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms. All of them remain active on Facebook, despite some even being

63

banned on other platforms, including Facebook — ones that Facebook owns." *Id.*  And she called on Facebook and other social-media companies to censor disfavored content and disfavored viewpoints: "[I]t's important to take faster action against harmful posts. As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days.  That's too long. The information spreads too quickly." *Id.*

228.     She stated that "[w]e engage with them [*i.e.*, social-media companies] regularly and *they certainly understand what our asks are*." *Id.* (emphasis added).  She stated that, "we've made a calculation to push back on misinformation," and that "we are working to combat misinformation that's traveling online." *Id.*

229.     The same day, the Surgeon General released his advisory regarding "health misinformation."  It defined "health misinformation" as "information that is false, inaccurate, or misleading according to the best available evidence at the time.  Misinformation has caused confusion and led people to decline COVID-19 vaccines, reject public health measures such as masking and physical distancing, and use unproven treatments."  *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment*, at 4 (July 15, 2021), *at* https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf.

230.     The Surgeon General's advisory called for social-medial companies to "make meaningful long-term investments to address misinformation, including product changes," to "[r]edesign recommendation algorithms to avoid amplifying misinformation," to "build in 'frictions'— such as suggestions and warnings—to reduce the sharing of misinformation," and to

"make it easier for users to report misinformation." *Id.* at 12.  It called on social-media companies to "[s]trengthen the monitoring of misinformation," and to censor disfavored speakers swiftly and aggressively: "Prioritize early detection of misinformation 'super-spreaders' and repeat offenders. Impose clear consequences for accounts that repeatedly violate platform policies." *Id.*

231.     Facebook responded by stating that it was, in fact, aggressively censoring "health misinformation," and *coordinating with the Government to do so*.  "A Facebook spokesperson said the company has *partnered with government experts*, health authorities and researchers to take 'aggressive action against misinformation about COVID-19 and vaccines to protect public health.'" *White House Slams Facebook as Conduit for COVID-19 Misinformation*, REUTERS (July 15, 2021), at https://www.reuters.com/world/us/us-surgeon-general-warns-over-covid-19-misinformation-2021-07-15/ (emphasis added). "'So far we've removed more than 18 million pieces of COVID misinformation, [and] removed accounts that repeatedly break these rules…,' the spokesperson added." *Id.*

232.     Facebook stated that it "has introduced rules against making certain false claims about COVID-19 and its vaccines." *Id.*

233.     The next day, July 16, 2021, a reporter asked President Biden what he thought of COVID misinformation on social media, and he responded, referring to platforms like Facebook, by stating: "They're killing people." *They're Killing People: Biden Denounces Social Media for Virus Disinformation*, N.Y. TIMES (July 16, 2021), *at* https://www.nytimes.com/2021/07/16/us/politics/biden-facebook-social-media-covid.html.  The New York Times reported that "this week, White House officials went further and singled out social media companies for allowing false information to proliferate. That came after weeks of

failed attempts to get Facebook to turn over information detailing what mechanisms were in place to combat misinformation about the vaccine, according to a person familiar with the matter." *Id.*

234.     The same day, July 16, 2021, Psaki explicitly called for social-media companies to coordinate with *each other* in censoring disfavored speakers, to ensure that such speakers are completely muzzled.  "You shouldn't be banned from one platform and not others … for providing misinformation out there."  White House, Press Briefing by Press Secretary Jen Psaki, July 16, 2021, *at*  https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/.  On information and belief, social-media companies have heeded this demand, and they do, in fact, coordinate extensively with each other in censorship of disfavored speakers, speech, and viewpoints on social media.

235.     Psaki also demanded that social-media companies "create robust enforcement strategies," "tak[e] faster action against harmful posts," and "promot[e] quality information algorithms"—which is a euphemism for algorithms that suppress disfavored messages.  *Id.*  When asked whether Facebook's already-aggressive censorship—it claimed to have suppressed 18 million pieces of COVID-19-related "misinformation"—was "sufficient," she responded, "Clearly not, because we're talking about additional steps that should be taken."  *Id.*

236.     Four days later, July 20, 2021, the White House explicitly threatened to amend or repeal the liability protections of § 230 of the Communications Decency Act if social-media companies did not increase censorship of disfavored speakers and viewpoints.  *'They Should Be Held Accountable': White House Reviews Platforms' Misinformation Liability*, USA TODAY (July 20, 2021), *at* https://www.usatoday.com/story/news/politics/2021/07/20/white-house-reviews-section-230-protections-covid-misinformation/8024210002/.  The White House communications director announced that "[t]he White House is assessing whether social media platforms are legally

liable for misinformation spread on their platforms." *Id.* "We're reviewing that, and certainly, they should be held accountable," she said. *Id.*

237.     She "specified the White House is examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites." *Id.* Media reported that, in connection with this threat, "Relations are tense between the Biden administration and social media platforms, specifically Facebook, over the spread of misinformation online." *Id.*; *see also, e.g., White House says social media networks should be held accountable for spreading misinformation*, CNBC.com (July 20, 2021), *at* https://www.cnbc.com/2021/07/20/white-house-social-networks-should-be-held-accountable-for-spreading-misinfo.html. When asked whether the President is "open to amending 230 when Facebook and Twitter and other social media outlets spread false information that cause Americans harm, shouldn't they be held accountable in a real way?" White House Communications Director Bedingfield responded, "We're reviewing that and certainly they should be held accountable. And I think you heard the president speak very aggressively about this. He understands that this is an important piece of the ecosystem." *Id.*

238.     After this series of public statements, responding to "White House pressure," Facebook censored the accounts of the 12 specific disfavored speakers whom Psaki accused of spreading health misinformation. *Facebook takes action against 'disinformation dozen' after White House pressure*, CNN.com (Aug. 18, 2021), *at* https://www.cnn.com/2021/08/18/tech/facebook-disinformation-dozen/index.html. Psaki had "hammered the platform in July for allowing the people identified in the report to remain on its platform." *Id.* After they were singled out for censorship by the White House, Facebook "removed

over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people, for violating our policies." *Id.*

239.    In the same time frame, Twitter permanently suspended the account of prominent lockdown critic Alex Berenson, despite repeated reassurances from high-level Twitter executives that his account was safe, just days after Dr. Fauci singled him out as a danger for suggesting young people might reasonably decline the vaccine.

240.    On October 29, 2021, the Surgeon General tweeted from his *official* account (as opposed to his personal account, which remains active), in a thread: "We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health misinformation on their platforms.  The time for excuses and half measures is long past.  We need transparency and accountability now.   The health of our country is at stake."   *See* https://twitter.com/Surgeon_General/status/1454181191494606854.

241.    Defendants' response to this censorship was to demand still more censorship by social-media platforms, including but not limited to Facebook.  "[A]fter Facebook's action against the 'disinformation dozen,' a White House spokesperson continued to strongly criticize the company." *Id.*  "'In the middle of a pandemic, being honest and transparent about the work that needs to be done to protect public health is absolutely vital, but Facebook still refuses to be straightforward about how much misinformation is circulating—and being actively promoted— on their platform,' a White House spokesperson told CNN Business.  'It's on everyone to get this right so we can make sure the American people are getting accurate information to protect the health of themselves and their loved ones -- which is why the Administration will continue to push leaders, media outlets, and leading sources of information like Facebook to meet those basic expectations,' the spokesperson added." *Id.*

242.     On February 1, 2022, Psaki was asked at a White House press conference whether the Administration was satisfied with Spotify's decision to affix advisory warnings to Joe Rogan's immensely popular podcast, which featured speakers that contradicted the Administration's messaging about COVID-19 and vaccines, or whether the government "think[s] that companies like Spotify should go further than just, you know, putting a label on" disfavored viewpoints and speakers.  Psaki responded by demanding that Spotify and other platforms "do[] more" to block disfavored speech: "[O]ur hope is that all major tech platforms … be vigilant to ensure the American people have access to accurate information on something as significant as COVID-19.  So, this disclaimer – it's a positive step.  But we want every platform to continue *doing more* to call out … mis- and disinformation while also uplifting accurate information."  She stated that Spotify's advisory warnings are "a good step, it's a positive step, but *there's more that can be done*."  White House, *Press Briefing by Press Secretary Jen Psaki, February 1, 2022* (emphases added), *at* https://www.whitehouse.gov/briefing-room/press-briefings/2022/02/01/press-briefing-by-press-secretary-jen-psaki-february-1-2022/.

243.     On March 3, 2022, the Surgeon General issued a formal "Request for Information" on the "Impact of Health Misinformation" on social media.  HHS, *Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID-19 Pandemic Request for Information* (RFI), 87 Fed. Reg. 12,712-12,714 (March 2, 2022).

244.     In the RFI, "[t]he Office of the Surgeon General requests input from interested parties on the impact and prevalence of health misinformation in the digital information environment during the COVID–19 pandemic."  *Id.* at 12,712.  The RFI states that "the speed, scale, and sophistication with which misinformation has been spread during the COVID-19 pandemic has been unprecedented," and it implies that social-media companies are to blame,

carrying a clear threat of future regulation: "This RFI seeks to understand both the impact of health misinformation during the COVID–19 pandemic and the unique role that technology and social media platforms play in the dissemination of critical health information during a public health emergency." *Id.* at 12,713.

245.    The RFI seeks specific information about health "misinformation" on such social-media platforms: "Information about how widespread COVID–19 misinformation is on individual technology platforms including: General search engines, content sharing platforms, social media platforms, e-commerce platforms, crowd sourced platforms, and instant messaging systems." *Id.*

246.    The RFI seeks: "Any aggregate data and analysis on how many users were exposed, were potentially exposed, or otherwise engaged with COVID–19 misinformation," where "[e]xposure is defined as seeing content in newsfeeds, in search results, or algorithmically nominated content," and "[p]otential exposure is the exposure users would have had if they could see all the content that is eligible to appear within their newsfeeds." *Id.* at 12,714.  It also seeks "[i]nformation about COVID–19 misinformation policies on individual technology platforms," including "[a]ny aggregate data and analysis of technology platform COVID–19 misinformation policies including implementation of those policies and evaluations of their effectiveness." *Id.*

247.    Media reports aptly described Murthy as "demand[ing]" information about the major sources of COVID-19 misinformation by May 2, 2022.  Brad Dress, *Surgeon General Demands Data on COVID-19 Misinformation from Major Tech Firms*, THE HILL (March 3, 2022), *at*    https://thehill.com/policy/healthcare/596709-surgeon-general-demands-data-on-covid-19-misinformation-from-major-tech/.  "In a formal notice, Murthy requested major tech platforms submit information about the prevalence and scale of COVID-19 misinformation on their sites, from social networks, search engines, crowdsourced platforms, e-commerce platforms and instant

messaging systems." *Id.* "In his notice to major tech platforms, Murthy is requesting specific information on demographics affected by misinformation as well as sources of misinformation and 'exactly how many users saw or may have been exposed to instances of Covid-19 misinformation.'" *Id.*

248.    On or around July 27, 2022, a limited number of emails between CDC officials and representatives of social-media platforms from late 2020 and early months of 2021 became publicly available, over a year after they had been requested under FOIA. These newly revealed emails—which are attached as Exhibit A, and incorporated by reference herein—confirm the allegations of collusion between HHS officials and social-media platforms to censor disfavored speech, speakers, and viewpoints, as alleged herein.

249.    These emails indicate that Defendant Carol Y. Crawford of CDC and other CDC officials frequently communicated and coordinated with social-media platforms, including Facebook/Meta, Twitter, Google/YouTube, and Instagram, regarding the censorship of speech on social-media platforms, including flagging specific content for censorship.   During 2021, Crawford organized "Be On the Lookout" or "BOLO" meetings on "misinformation" with representatives of social-media platforms—including Twitter, Facebook/Meta, and Google/YouTube—in which she and other federal officials colluded and/or collude with those platforms about speech to target for suppression.   These meetings include Crawford and other federal officials flagging specific social-media posts for censorship and providing examples of the types of posts to censor.   Crawford emailed "slides" from the "BOLO" meetings to participants afterwards.   These slides included repeated examples of specific posts on social-media platforms flagged for censorship.   The slides called for "all" social-media platforms to "Be On the Lookout"

for such posts.  Crawford cautioned the meeting participants, with respect to these slides, "[p]lease do not share outside your trust and safety teams."

250.     Officials of the Census Bureau participated and/or participate in these BOLO meetings, including Defendant Jennifer Shopkorn and Christopher Lewitzke, who is a Senior Digital Marketing Associate with Reingold, a communications firm that was, on information and belief, acting on behalf of the Census Bureau.  Crawford's emails indicate that the Census Bureau and its officials and agents, such as Lewitzke and Shopkorn, play an important, active, and ongoing role in colluding with social-media platforms to censor disfavored speech.  On March 18, 2021, Crawford emailed Twitter officials and stated that "[w]e are working on a project with Census to leverage their infrastructure to identify and monitor social media for vaccine misinformation," and stated that "[w]e would like the opportunity to work with your trust team on a regular basis to discuss what we are seeing."  She also noted that "I understand that you did this with Census last year as well."  Twitter responded by stating, "With our CEO testifying before Congress this week is tricky," but otherwise agreed to the collusive arrangement.  Likewise, in subsequent emails to Twitter (on May 6) and Facebook (on May 10), Crawford noted to the social-media platform officials that "[o]ur census team," *i.e.*, Lewitzke and Shopkorn, who were cc'ed on the emails, "has much more info on it if needed" regarding "some example posts" of "misinfo" that she flagged for censorship.

251.     Defendants Crawford and others, including the Census officials and agents Lewitzke and Shopkorn, took other steps to procure the censorship of disfavored speech on social media.  For example, on May 10, 2021, Crawford emailed Twitter officials to flag "two issues that we are seeing a great deal of misinfo about," noting that Lewitzke and Shopkorn "ha[ve] much more info on it if needed."  The same email included 13 specific Twitter posts as examples of the

72

sort of posts to be censored.  On May 6, 2021, Crawford sent a similar email to Meta/Facebook officials, also copying Lewitzke and Shophorn and stating that they have "much more info" about the issue; this email included 16 specific posts from Facebook and Instagram as examples of posts to be targeted for censorship.   On May 12, 2021, Crawford emailed Facebook officials to flag "some new info on myths your misinfo folks might be interested in," with links to specific issues of "misinformation" for Facebook to censor.  On April 9, 2021, Crawford agreed with a Twitter official that CDC would provide "examples of problematic content" posted on Twitter, and the Twitter official noted that "all examples of misinformation are helpful."  Calendar invites from early 2021 indicate that Crawford, Jay Dempsey, and other CDC officials participated in Facebook's "weekly sync with CDC," with "CDC to invite other agencies as needed."

252.     In another exchange of emails, Crawford agreed with Facebook officials that CDC would participate in a COVID-19 "misinfo reporting channel," and arranged for CDC officials to have training on the use of Facebook's "misinfo reporting channel."   On information belief, Crawford's "team" at CDC, as well as Shopkorn and Lewitzke from Census, were "onboarded" onto Facebook's "misinfo reporting channel."  A calendar invite in May 2021 included Crawford, Lewitzke, Shopkorn, other CDC officials, and other Reingold employees who were, on information and belief, acting on behalf of the Census Bureau, to participate in the "onboarding" onto Facebook's "misinfo reporting channel."

253.     Crawford's communications with Facebook indicate that CDC, the Census Bureau, and other government agencies collaborate with Facebook to flag speech regarding both COVID-19 and elections for censorship using "CrowdTangle," which Facebook describes as "a Facebook tool that tracks how content spreads online."  An email from a Facebook official to Crawford stated that, using CrowdTangle, "[w]hen health departments flag potential vaccine misinformation on

Facebook and Instagram, we review and remove the content if it violates our policies…  This is similar to how governments and fact-checkers use CrowdTangle ahead of *elections*…." (Emphasis added.)

254.      Additional communications between CDC and social-media platforms reflect an ongoing, close, and continuing collaboration, effectively amounting to a joint enterprise, on censorship of COVID-19 "misinformation" and related issues.  *See* Ex. A.  For example, the communications reflect close coordination on creating and publishing content on behalf of CDC on social-media platforms, and artificially "amplifying" government messaging on social-media to the suppression of private messaging, including a gift of $15 million in Facebook ad credits from Facebook to CDC.  They also reflect close coordination on amplifying CDC's content and other related issues.

**4.  White House and DHS officials collude with social-media firms to suppress speech.**

255.      On information and belief, senior officials in the Biden Administration and the Department of Homeland Security are also colluding with social-media companies to suppress disfavored speakers and viewpoints.  These efforts include censorship of disfavored content and viewpoints about election integrity and COVID-19, among other topics, under the guise of suppressing "misinformation" and "domestic terrorism."   These efforts culminated with the Orwellian announcement of the creation of a "Disinformation Governance Board" within DHS.

256.      A direct forum for government officials to call for social-media censorship of election-related "misinformation" was already in place during the general election cycle of 2020.

257.      In August 2020, social-media firms "met with federal government officials to discuss how to handle misinformation during this month's political conventions and election results this fall."  Ingram et al., *Big Tech met with govt to discuss how to handle election results*,

NBC News (Aug. 20, 2022), *at* https://www.nbcnews.com/tech/tech-news/big-tech-met-gov-t-discuss-how-handle-election-results-n1236555.

258.     This was one of a "series" of meetings between major social-media companies and government officials about the suppression of election-related "misinformation": "'We held the latest in a series of meetings with government partners today where we each provided updates on what we're seeing on our respective platforms and what we expect to see in the coming months,' companies including Google, Facebook, Twitter and Reddit said in a joint statement after the meeting." *Id.* "The statement also included Microsoft, Verizon Media, Pinterest, LinkedIn and the Wikimedia Foundation, which operates Wikipedia and other sites." *Id.*

259.     The discussion was reported as "one in a series of monthly meetings between the government and tech companies" and involved "back-and-forth conversation on a variety of topics." *Id.* Neither the "topics" of the "conversation" nor the particular participants on behalf of the government were disclosed. *Id.* "According to the industry statement, participants in Wednesday's meeting also included representatives from the FBI's foreign influence task force, the Justice Department's national security division, the Office of the Director of National Intelligence and the Cybersecurity and Infrastructure Security Agency." *Id.* "The companies said they would continue to meet regularly before the November election." *Id.*

260.     On September 28, 2020, the Biden-Harris campaign sent a letter to Facebook demanding that Facebook take "more aggressive" action to censor statements by President Trump and the Trump campaign that raised concerns about election security and the security of voting by mail.  Sept. 28, 2020 Biden-Harris Letter, https://www.documentcloud.org/documents/7219497-Facebook-Letter-9-28.html.     The letter accused Facebook of being a "propagator of disinformation" for refusing to censor the rival campaign's core political speech, thus promoting

"distrust in our democracy" and threatening to "undermine democracy." *Id.* The Biden-Harris campaign described the Trump campaign's political speech as "dangerous claptrap" and argued that "[r]emoving this video should have been the easiest of calls." *Id.* The letter demanded that Facebook "remove Mr. Trump's posts, which violate your policies." *Id.* (underline in original).

261.    The same letter complained that Facebook's "algorithm" permitted Trump's political speech to reach millions of people. It complained about the successful reach on Facebook of political speech that it opposed, bemoaning the fact that "a hyperpartisan propaganda organ like the *Daily Wire* is Facebook's top web publisher." *Id.* The Biden-Harris campaign accused Facebook of allowing speech that it favored "to be drowned out by a storm of disinformation." *Id.* And it concluded, "We will be calling out those failures [to censor Trump's political speech] as they occur over the coming 36 days," *i.e.*, until the November 2020 general election. *Id.*

262.    On information and belief, responding to prior threats from Defendants and those acting in concert with them, Facebook complied with this demand and did engage in "more aggressive" censorship of the Trump campaign's core political speech from then on, resulting in an aggressive campaign to suppress President Trump and his campaign's political speech, especially on issues related to election security. In the wake of the Biden-Harris letter, Facebook declared that it "won't allow ads with content that seeks to delegitimize the outcome of an election," and it ramped up censorship of Trump's political speech thereafter.

263.    As one commentator noted, "It's no surprise that Facebook's policy change happened the same week that the Biden campaign demanded Trump's Facebook posts be censored." Alexander Hall, *Liberal Media Used to Warn Against Mailing Votes; Now Big Tech, Left Are Protecting It* (Oct. 30, 2020), *at* https://www.newsbusters.org/blogs/free-speech/alexander-hall/2020/10/30/liberal-media-used-warn-against-mailing-votes-now-big.

264.     At the same time, "Twitter also modified its rules, stating: 'we may label and reduce the visibility of Tweets containing false or misleading information about civic processes in order to provide additional context' in its Civic integrity policy." *Id.*

265.     Both platforms ramped up censorship of core political speech of President Trump and his campaign, as well as core political speech by others favoring their messages and campaigns, in the critical final month before the 2020 general election, resulting in egregious acts of censorship.  These acts of censorship included suppression of expressions of concern about election security as a result of the massive increase in voting by mail during the 2020 general election.

266.     In perhaps the most notorious example, as noted above, Twitter, Facebook, and other social-media companies censored the New York Post's entirely truthful and carefully sourced article about Hunter Biden's laptop on October 14, 2020, as discussed further above.  This censorship included locking the New York Post's social-media accounts for weeks until after the election.

267.     According to one survey, sixteen percent of Biden voters polled stated that they would have changed their votes if they had known about the Hunter Biden laptop story before the election, which could have changed the outcome of the election.

268.     This censorship required deliberate, aggressive action by social-media firms. "Facebook moderators had to manually intervene to suppress a controversial New York Post story about Hunter Biden, according to leaked moderation guidelines seen by the Guardian." *Facebook leak reveals policies on restricting New York Post's Biden story*, THE GUARDIAN (Oct. 30, 2020), *at* https://www.theguardian.com/technology/2020/oct/30/facebook-leak-reveals-policies-restricting-new-york-post-biden-story.

269.    At the time, Facebook claimed that the censorship of the Hunter Biden laptop story was "part of our standard process to reduce the spread of misinformation.  We temporarily reduce distribution pending factchecker review."  *Id.*  But this was not true.  In fact, Facebook imposed "special treatment" on the New York Post to suppress the story, which included "manually overrid[ing]" Facebook's own guidelines for suppressing so-called "misinformation."  *Id.*

270.    On December 10, 2020, nine Democratic House Members in the so-called "Congressional Task Force on Digital Citizenship" (a group of exclusively Democratic members of Congress) sent a letter to President-elect Biden, calling for the incoming Administration to create task forces that would increase censorship of "disinformation and misinformation" on social media.    Dec.    10,    2020    Letter    of    Rep.    Wexton,    et    al.,    *at* https://wexton.house.gov/uploadedfiles/12.10.20_house_democrats_disinformation_roadmap_to _president-elect_biden.pdf.

271.    The letter decried the rise of "news environments online, which report vastly different information and do not offer the same editorial standards to protect against disinformation and misinformation that traditional news media do."  *Id.*  It criticized social-media platforms for failing to censor "disinformation" more aggressively: "As social media platforms post record revenues from engagement, they seldom act as responsible information gatekeepers and, in fact, have financial incentives to direct users to posts that are false, misleading, or emotionally manipulative."  *Id.*

272.    The letter called on President-elect Biden to "[s]upport collaboration between government and civic organizations to combat dangerous propaganda."  *Id.*  The letter acknowledged that "social media platforms have taken some steps to limit the spread of harmful disinformation and misinformation over the past year," but urged that these steps were not nearly

enough, arguing that "we can still see how easily this content is posted and amplified by bad actors and unknowing citizens," that "platforms have financial incentives for engaging posts to reach larger audiences, regardless of the content," and that "computer algorithms still make up a majority of content moderation, and platforms have at times refused to take action against accounts and groups promoting violence and hate speech." *Id.*

273.     The letter called for President-elect Biden to deploy the U.S. Department of Justice and the Department of Homeland Security to combat "disinformation," and it called for more direct government involvement in policing the content of political speech on social media platforms, in order to "build citizen resilience to disinformation and support a healthy information ecosystem"— which is Newspeak for viewpoint- and content-based censorship.

274.     In announcing the letter, its lead signer, Rep. Wexton, openly stated that Americans lack the sophistication to make their own judgments about truth and falsity of online speech, and that government-approved "gatekeepers" of information should be imposed:  "In the letter, the Members recognize that, while a growing number of people in the U.S. are getting their news from social media platforms, many Americans are ill-equipped to recognize and sift through false, misleading, or emotionally manipulative posts. Additionally, there exists a lack of effective information gatekeepers to protect against disinformation threats online."  *See* Dec. 10, 2020 News Release, https://wexton.house.gov/news/documentsingle.aspx?DocumentID=431.

275.     Consistent with this letter, the Biden Administration launched several initiatives designed to inject the power and authority of federal agencies like DHS into policing "disinformation" and "misinformation" online—which, all too often, means censoring core political speech disfavored by government officials.

276.     On information and belief, DHS and its officials are actively engaged in this project of procuring the censorship of disfavored speakers, content, and viewpoints in speech about election integrity.

277.     On May 3, 2021, it was reported that DHS intended to "partner with private firms," *i.e.*, social-media companies, to monitor disfavored speech online.  *Biden team may partner with private firms to monitor extremist chatter online*, CNN.com (May 3, 2021), *at* https://www.cnn.com/2021/05/03/politics/dhs-partner-private-firms-surveil-suspected-domestic-terrorists/index.html.  The purpose of these "partnerships" was to evade legal, constitutional, and ethical problems with DHS's direct surveillance of online speech: "The Department of Homeland Security is limited in how it can monitor citizens online without justification and is banned from activities like assuming false identities to gain access to private messaging apps." *Id.* "Instead, federal authorities can only browse through unprotected information on social media sites like Twitter and Facebook and other open online platforms." *Id.* "The plan being discussed inside DHS, according to multiple sources, would, in effect, allow the department to circumvent those limits." *Id.* "Outsourcing some information gathering to outside firms would give DHS the benefit of tactics that it isn't legally able to do in-house, such as using false personas to gain access to private groups used by suspected extremists, sources say." *Id.*

278.     As noted above, on May 5, 2021, Defendant Psaki stated at a White House press conference that "[t]he President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and *elections*."  White House, Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack, May 5, 2021 (emphasis added), *at* https://www.whitehouse.gov/briefing-room/press-

briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-tom-vilsack-may-5-2021/.  Psaki immediately went on to state that President Biden "supports better privacy protections and *a robust anti-trust program*."  *Id.* (emphasis added).  And she stated that the President's "view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public."  *Id.*

279.     In the same press conference, Psaki notoriously went on to state, "We're flagging problematic posts for Facebook that spread disinformation."  *Id.*  On information and belief, especially in light of Psaki's earlier reference to speech about "elections," this statement about "flagging problematic posts" referred not just to social-media speech about COVID-19, but also social-media speech about election integrity.  *See, e.g., White House says social media platforms should not amplify 'untrustworthy' content*, REUTERS (May 5, 2021), *at* https://www.reuters.com/article/ctech-us-trump-facebook-biden-idCAKBN2CM1XU-OCATC.

280.     In June 2021, the National Security Council released its "National Strategy for Countering Domestic Terrorism."  *See* The White House, *National Strategy for Countering Domestic Terrorism* (June 2021), *at* https://www.whitehouse.gov/wp-content/uploads/2021/06/National-Strategy-for-Countering-Domestic-Terrorism.pdf.  The "National Strategy" repeatedly claimed that "disinformation and misinformation" are important elements of "domestic terrorism."  *Id.* at 9.  It claimed that the "ideologies" of domestic terrorists "connect and intersect with conspiracy theories and *other forms of disinformation and misinformation*."  *Id.* (emphasis added).  It stated that such "elements" of domestic terrorism "can combine and amplify threats to public safety," "*[e]specially on Internet-based communications platforms such as social-media*."  *Id.* (emphasis added).  It stated that DHS and others "are

81

currently funding and implementing or planning" programs to "strengthen[] user resilience to disinformation and misinformation online for domestic audiences." *Id.* at 20. The Strategy memo identified, as its "broader priority," the task of "enhancing faith in government and addressing the extreme polarization, *fueled by a crisis of disinformation and misinformation often channeled through social media platforms*, which can tear Americans apart…." *Id.* at 29 (emphasis added). And it called for DHS and others to "accelerat[e] work to contend with an information environment that challenges healthy democratic discourse," and to "find[] ways to counter the influence and impact" of online disinformation. *Id.*

281. On July 26, 2021, the Global Internet Forum to Counter Terrorism (GIFCT), an "organization formed by some of the biggest U.S. tech companies including Facebook and Microsoft," which includes DHS on its board of advisors, announced that it is "significantly expanding the types of extremist content shared between firms in a key database," to move from images and videos to content-based speech tracking. *Facebook and tech giants to target attacker manifestos, far-right militias in database*, REUTERS (July 26, 2021), *at* https://www.reuters.com/technology/exclusive-facebook-tech-giants-target-manifestos-militias-database-2021-07-26/.

282. "GIFCT … was created in 2017 under pressure from U.S. and European governments," and "its database mostly contains digital fingerprints of videos and images related to groups on the U.N. Security Council's consolidated sanctions list and a few specific live-streamed attacks." *Id.* "Until now, the Global Internet Forum to Counter Terrorism's (GIFCT) database has focused on videos and images from terrorist groups on a United Nations list," but now the group announced that it would move into content-based speech tracking. *Id.* On

information and belief, DHS officials including Defendants have access to such database(s) as tools to advance censorship of online speech.

283.    Shortly thereafter, on August 2, 2021, DHS Secretary Mayorkas announced that DHS was working directly with social-media companies to censor disfavored speech on social-media platforms.  "On [a] broadcast of MSNBC's 'Andrea Mitchell Reports,' DHS Secretary Alejandro Mayorkas stated that the department is working with tech companies 'that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring.'"  *Mayorkas: We're Working with Platforms on 'How They Can Better Use' Their Terms to 'Prevent Harm' from Misinformation*, BREITBART NEWS (Aug. 2, 2021),  *at*  https://www.breitbart.com/clips/2021/08/02/mayorkas-were-workgin-with-platforms-on-how-they-can-better-use-their-terms-to-prevent-harm-from-misinformation/.

284.    Echoing Psaki's comments at the July 15, 2021 news conference with Surgeon General Murthy, Mayorkas stated: "So, we're working together with them. We're working with the tech companies that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring."  *Id.*  On information and belief, the reference to "us[ing] their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harms from occurring" refers to government-induced censorship of disfavored viewpoints, speakers, and content.

285.    Mayorkas added that there was a federal-government-wide effort to police speech on social media, stating: "[T]he connectivity between speech and violence, the connectivity between active harm and speech is something that we're very focused on, and it's a difficult

challenge. But we're working on it and meeting that challenge, again, because of the great personnel of the Department of Homeland Security and *across the federal enterprise*." *Id.* (emphasis added).

286.     Soon after Mayorkas's August 2, 2021 comments, DHS officials began plotting to create a "Disinformation Governance Board" within DHS. *See* ECF No. 10-1, at 19-23 (Glenn Decl. Ex. 1, at 6-10).  On September 13, 2021, senior DHS officials Robert Silvers and Samantha Vinograd sent a memorandum to Secretary Mayorkas recommending the creation of the Disinformation Governance Board.  The opening sentence of the Memorandum noted that the Board's purpose would be to combat "[t]he spread of disinformation" regarding "[c]onspiracy theories about the validity and security of elections," including "disinformation surrounding the validity of the 2020 election," and "[d]isinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks," which "undercut[] public health efforts to combat the pandemic." *Id.* at 19.

287.     The same Memorandum noted that CISA was involved in flagging content for censorship on social-media platforms: "Leading up to the 2020 election, CISA relayed reports of election disinformation from election officials to social media platform operators." *Id.* at 20.  The Memorandum called for the Board to perform "partner engagement" with "private sector entities [and] tech platforms." *Id.* at 22.

288.     In a subsequent Memorandum dated January 31, 2022, DHS officials indicated that the Board's activities would oversee extensive *pre-existing* social-media censorship activities by other federal officials and agencies: "The Board will also support and coordinate … MDM work with other departments and agencies, the private sector, and non-government actors." *Id.* at 24. This Memorandum attached the Board's Charter, which stated that its mission was to "guide and

84

support the Department's efforts to address mis-, dis-, and mal-information." *Id.* at 27. It also stated that the Board would "harmonize and support coordination with … the private sector." *Id.* The Charter called for the Board to "coordinate, deconflict, and harmonize departmental efforts to address MDM," including between "DHS Components" and "interagency partners," and "serving as the Department's internal and external point of contact for coordination with … the private sector … regarding MDM." *Id.* at 28-29.

289.     Under continuous pressure from federal officials, including Defendants herein, social-media firms have imposed increasingly draconian censorship on core political speech about election integrity. For example, in March 2022, YouTube imposed a one-week suspension on The Hill, a well-known political publication covering Congress, for posts that included clips of former President Trump's speech at the CPAC conference and interview on Fox News, which included claims that fraud changed the outcome of the 2020 presidential election. Gilead Edelman*, Beware the Never-Ending Disinformation Emergency*, THE WIRED (March 11, 2022), *at* https://www.wired.com/story/youtube-rigged-election-donald-trump-moderation-misinformation/. YouTube relied on its "Elections misinformation policy," under which it censors "Content that advances false claims that widespread fraud, errors, or glitches changed the outcome of *select past national elections*, after final election results are officially certified." YouTube, *Elections Misinformation Policy*, https://support.google.com/youtube/answer/10835034?hl=en.

290.     This policy is openly content- and viewpoint-based—it applies only to "select" past national elections, and "[u]nder the policy, you can only include those claims if you explicitly debunk or condemn them." Edelman, *supra*. On information and belief, this policy is also selective in application, as it is not applied to censor widespread, false Democratic claims that supposed "collusion" between the Trump campaign and Russia changed the outcome of the 2016

presidential election.  And "by asking news hosts to explicitly denounce any mention of election fraud, YouTube isn't just making its own content decisions; it's injecting itself into the editorial processes of actual media outlets."  *Id.*

291.     On November 10, 2021, the Cybersecurity and Infrastructure Security Agency (CISA), an agency within DHS, announced that it was "beefing up its disinformation and misinformation team in the wake of a divisive presidential election that saw a proliferation of misleading information online."  *Cyber agency beefing up disinformation, misinformation team*, THE HILL (Nov. 10, 2021), *at* https://thehill.com/policy/cybersecurity/580990-cyber-agency-beefing-up-disinformation-misinformation-team/.  "'I am actually going to grow and strengthen my misinformation and disinformation team,' CISA Director Jen Easterly said."  *Id.*  Defendant Easterly said that so-called "disinformation" and "misinformation" pose "a top threat for CISA, which is charged with securing critical infrastructure, to confront."  *Id.*

292.     Indulging in a bit of Newspeak of her own, Easterly claimed that social-media speech is a form of "infrastructure," and that policing speech online by the federal government falls within her agency's mission to protect "infrastructure," stating that CISA is "in the business of critical infrastructure, and the most critical infrastructure is our cognitive infrastructure, so building that resilience to misinformation and disinformation, I think, is incredibly important."  *Id.*

293.     Easterly announced that CISA was working directly with unnamed "partners in the private sector" and other government agencies to police online speech: "We are going to work with our partners in the private sector and throughout the rest of the government and at the department to continue to ensure that the American people have the facts that they need to help protect our critical infrastructure."  *Id.*

294.     With specific reference to hotly disputed election-integrity issues, which comprise core political speech, Easterly stated that Americans should not be allowed to "pick [their] own facts" and make their own decisions about what is true, especially regarding election security: "We now live in a world where people talk about alternative facts, post-truth, which I think is really, really dangerous if you get to pick your own facts, and it's particularly corrosive when you talk about matters of election security." *Id.* Instead, she indicated, federal officials like herself should intervene to help Americans "pick" the right "facts." *Id.*

295.     CISA appears to be the focus of many of DHS's attempts to police the content of speech and viewpoints on social media. On information and belief, CISA maintains a number of task forces, working groups, and similar organizations as joint government-private enterprises, which provide avenues for government officials to push for censorship of disfavored viewpoints and speakers online.

296.     In a 2020 document entitled "2020 Election Infrastructure Subsector-Specific Plan," *at* https://www.cisa.gov/sites/default/files/publications/election_infrastructure_subsector_specific_plan.pdf, CISA stated that it had partnered to "promote" interaction between election officials and the Center for Technology and Civic Life, the now-notorious nonprofit funded by Mark Zuckerberg that engaged in egregious election interference by injecting hundreds of millions of private dollars and personnel into local election offices in heavily Democratic-favoring areas.

297.     CISA routinely expands the definitions of "misinformation" and "disinformation" to include "malinformation," *i.e. truthful* information that the government believes is presented out of context to contradict left-wing political narratives. CISA defines "malinformation" as information that is "based on fact, but used out of context to mislead, harm, or manipulate." *See,*

87

*e.g.,* CISA, *We're in This Together.  Disinformation Stops with You.* (last visited May 5, 2022),

https://www.cisa.gov/sites/default/files/publications/SLTTCOVIDToolkit_FINAL_508.pdf.

298.     CISA's same publication decries the spreading of "false treatment and prevention

measures [for COVID-19], *unsubstantiated rumors regarding the origin of the virus*, and more."

*Id.* (emphasis added).  On information and belief, "unsubstantiated rumors regarding the origin of

the [COVID-19] virus" refers to the lab-leak theory of COVID-19's origins, which (as noted

above) is supported by compelling circumstantial evidence, both scientific and historical.

299.     CISA's "Mis-, Dis-, and Malinformation [MDM] Planning and Incident Response

Guide  for  Election  Officials," *at* https://www.cisa.gov/sites/default/files/publications/mdm-

incident-response-guide_508.pdf, calls for constant policing of speech regarding election integrity,

stating that "election infrastructure related MDM occurs year-round," and "[f]alse narratives erode

trust and pose a threat to democratic transitions, especially, but not limited to, narratives around

election processes and the validity of election outcomes."  *Id.*  The Guide defines MDM to include

"[n]arratives or content that delegitimizes election results or sows distrust in the integrity of the

process based on false or misleading claims."  *Id.*

300.     On February 7, 2022, DHS issued a National Terrorism Advisory Bulletin,

available     at     https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-system-bulletin-

february-07-2022.   It begins by stating: "The United States remains in a heightened threat

environment fueled by several factors, including an online environment filled with false or

misleading narratives and conspiracy theories, and other forms of mis- dis- and mal-information

(MDM)."  *Id.*  The first critical "factor" contributing to a "heightened threat environment,"

according to the Bulletin, is "(1) the proliferation of false or misleading narratives, which sow

discord or undermine public trust in U.S. government institutions."  *Id.*  Again, the first "[k]ey

factor contributing to the current heightened threat environment" identified in the Bulletin is "[t]he proliferation of false or misleading narratives, which sow discord or undermine public trust in U.S. government institutions: For example, there is widespread online proliferation of false or *misleading narratives regarding unsubstantiated widespread election fraud and COVID-19.* Grievances associated with these themes inspired violent extremist attacks during 2021." *Id.* (emphasis added). The Bulletin stated that DHS is directly coordinating with social-media platforms to address so-called "MDM": "DHS is working with public and private sector partners, as well as foreign counterparts, to identify and evaluate MDM, including false or misleading narratives and conspiracy theories spread on social media and other online platforms that endorse or could inspire violence." *Id.* And it specifically stated that CISA likewise "works with public and private sector partners … [to] increase nationwide cybersecurity resilience." *Id.*

301.     This February 7, 2022 Bulletin echoed statements from prior bulletins indicating that so-called COVID-19 "misinformation" and election-related "misinformation" are domestic terror threats. For example, DHS's January 27, 2021 National Terrorism Advisory System Bulletin, available at https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-system-bulletin-january-27-2021, stated that "Domestic Violent Extremists" are "motivated by a range of issues, including anger over COVID-19 restrictions [and] the 2020 election results…." *Id.* Similarly, DHS's August 13, 2021 National Terrorism Advisory System Bulletin, available at https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-system-bulletin-august-13-2021, stated that "violent extremists … may seek to exploit the emergence of COVID-19 variants by viewing the potential re-establishment of public health restrictions across the United States as a rationale to conduct attacks." *Id.* It stated that "domestic threat actors … continue to introduce, amplify, and disseminate narratives online that promote violence," and included therein

"conspiracy theories on perceived election fraud … and responses to anticipated restrictions relating to the increasing COVID cases." *Id.*

302.     On April 12, 2022, CISA published another bulletin announcing that it was coordinating directly with social-media platforms to police "Mis, Dis, Malinformation" (which it calls "MDM"). CISA, *Mis, Dis, Malinformation*, *at* https://www.cisa.gov/mdm. The bulletin states that, "False or misleading information can evoke a strong emotional reaction that leads people to share it without first looking into the facts for themselves, polluting healthy conversations about the issues and increasing societal divisions." *Id.* CISA reported that its Countering Foreign Influence Task Force's "mission evolved" during the Biden Administration to address the new "information environment," which (on information and belief) is codespeak for ramping up online censorship: "In 2021, the CFITF officially transitioned into CISA's MDM team, and the mission evolved to reflect the changing information environment." *Id.* CISA stated that it coordinates directly with social media firms to address "MDM": "The MDM team continues to work in close coordination with interagency and private sector partners, *social media companies*, academia, and international partners on a variety of projects to build resilience against malicious information activities." *Id.* (emphasis added).

303.     On information and belief, the April 12, 2022, CISA bulletin indicates that CISA works directly with social-media companies to flag content for censorship: "The MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms…." *Id.* CISA boasts that it has "expanded the breadth of reporting [MDM] to include … more social media platforms," and that "[t]his activity leverages the rapport the MDM team has with the social media platforms to enable shared situational awareness." *Id.* On information and belief, these statements reflect and express on ongoing practice by government officials of directly

colluding with social-media platforms to suppress disfavored speech, viewpoints, content, and speakers on social media.   Again, these statements echo Psaki's statement that the Biden Administration is "flagging problematic posts for Facebook," and Mayorkas's statement that DHS is "working with the tech companies that are the platform for much of the disinformation that reaches the American public" to address so-called misinformation and disinformation.

304.    The same bulletin suggests that CISA is directly involved in such "flagging" related to COVID-19 "misinformation."   It states that "COVID-19-related MDM activities seek to undermine public confidence and sow confusion," and claims that "the rapid evolution of accurate information makes older, dated information a potential catalyst of confusion and distrust as well." *Id.*   Thus, it claims, "[t]he MDM team supports the interagency and *private sector partners'* COVID-19 response efforts via regular reporting and analysis of key pandemic-related MDM trends." *Id.*   On information and belief, these "private sector partners" include social-media firms, and the "reporting and analysis" includes flagging disfavored content for censorship.

305.    On April 27, 2022, Mayorkas announced that DHS was creating a "Disinformation Governance Board" within DHS to combat so-called "misinformation" and "disinformation." *Biden Administration creates 'Disinformation Governance Board' under DHS to fight 'misinformation,'* THE POST MILLENNIAL (April 27, 2022), *at* https://thepostmillennial.com/breaking-biden-administration-creates-disinformation-governance-board-under-dhs-to-fight-misinformation.  "The Department of Homeland Security is setting up a new board designed to counter misinformation related to homeland security, with a focus specifically on Russia and irregular migration. The board will be called the 'Disinformation Governance Board,' and will be headed by executive director Nina Jankowicz." *Id.*  During congressional testimony, Mayorkas described the endeavor as a "just recently constituted

Misinformation/Disinformation Governance Board." *Id.* (video link at 1:40).  He stated: "The goal is to bring the resources of the Department together to address this threat."  *Id.*

306.     Jankowicz has called for more aggressive censorship of election-related speech by social-media platforms, and has implied that social-media censorship of election-related speech should never relent or be reduced, stating on Twitter: "Considering the long-term damage these lies do to our democracy, I'm dismayed about this decision [not to censor election-related speech more aggressively].  I say this about foreign disinformation and it applies to domestic disinfo too: Elections aren't an end point.  They're an inflection point.  Policies need to reflect that."  *Id.*

307.     On information and belief, DHS's new "Disinformation Governance Board" is intended to be used, and will be used, to increase DHS's efforts to induce and procure the censorship of disfavored content, viewpoints, and speakers on social-media platforms.

308.     From its inception, the DGB was envisioned as an agency for suppressing core political speech about election security and COVID-19 restrictions.  In the internal memo to Secretary Mayorkas advocating for the DGB's creation, the very first two topics of "disinformation" to be targeted were "conspiracies about the validity and security of elections," and "disinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks."

309.     Internal documents of DHS, provided by whistleblowers to U.S. Senators, indicate that the "Disinformation Governance Board" was formulated to create a stronger bureaucratic structure to federal social-media censorship policies and activities that were already in full force, both within DHS and across other federal agencies.  The whistleblower documents make clear that the DGB's task was not to *establish* a censorship program, but to *oversee* the massive censorship

program against free speech on these topics that already exists—both within DHS, and across the
federal government.

310.    On information and belief, Defendants Robert Silvers and Samantha Vinograd
played and play a central role in DHS's censorship activities, including but not limited to the
formulation and creation of the "Disinformation Governance Board."   The whistleblower
documents cited above strongly support this conclusion.   Silvers and Vinograd co-signed the
September 13, 2021 "Memorandum for the Secretary" re "Organizing DHS Efforts to Counter
Disinformation" that provided an overview of DHS's disinformation activity and recommended
the creation of the DGB.   As noted above, the opening lines of this memo state that "[t]he spread
of disinformation presents serious homeland security risks," especially "[c]onspiracy theories
about the validity and security of elections" and "[d]isinformation related to the origins and effects
of COVID-19 vaccines or the efficacy of masks."   The memo reflects detailed knowledge and
active oversight of DHS's "misinformation" and "disinformation" activities.   Further, Defendant
Silvers authored the January 31, 2022 memo to the Secretary seeking his "approval of the charter
for the Disinformation Governance Board," and he authored a separate memorandum to DHS's
general counsel seeking the same approval.   Silvers also is listed as a participant in the April 28,
2022 meeting with Twitter executives Nick Pickles and Yoel Roth organized by Nina Jankowicz,
discussed below.

311.    On April 28, 2022, Jankowicz arranged for a meeting between Secretary Mayorkas
and/or other senior DHS officials, including Undersecretary Robert Silvers, and "Twitter
executives Nick Pickles, Head of Policy, and Yoel Roth, Head of Site Integrity," to discuss
"public-private partnerships, MDM, and countering DVE.  The meeting is off the record and closed
press."  ECF No. 10-1, at 31 (Glenn Decl. Ex. 1, at 18).  This was to be a cozy meeting: Jankowicz,

who drafted the meeting brief, noted that "Nick and Yoel both know DGB Executive Director Nina Jankowicz." *Id.* The meeting was to be "an opportunity to discuss operationalizing public-private partnerships between DHS and Twitter." *Id.* In the meeting, DHS was to "Propose that Twitter become involved in Disinformation Governance Board Analytic Exchanges on Domestic Violent Extremism (DVE) and Irregular Migration," and to "Thank Twitter for its continued participation in the CISA Analytic Exchange on Election Security." *Id.* DHS was also to "Ask what types of data or information would be useful for Twitter to receive in Analytic Exchanges or other ways the Department could be helpful to Twitter's counter-MDM efforts." *Id.*

**5.   Defendants reinforce their threats and admit further colluding to censor free speech.**

312.   On or around April 25, 2022—two days before DHS announced the creation of its "Disinformation Governance Board"—it was reported that free-speech advocate Elon Musk would acquire Twitter and make it a privately held company.  Left-wing commentators widely decried this news on the ground that free speech on Twitter would allow the spread of so-called "misinformation" and "disinformation."

313.   On April 25, 2022, Psaki was asked at a White House press briefing to respond to the news that Elon Musk would acquire Twitter, and asked "does the White House have any concern that this new agreement might have President Trump back on the platform?"  White House, *Press Briefing by Press Secretary Jen Psaki, April 25, 2022*, at https://www.whitehouse.gov/briefing-room/press-briefings/2022/04/25/press-briefing-by-press-secretary-jen-psaki-april-25-2022/.

314.   Psaki responded by reiterating the threats of adverse legal consequences to Twitter and other social media platforms, specifically referencing antitrust enforcement and Section 230 repeal: "No matter who owns or runs Twitter, the President has long been concerned about the

power of large social media platforms … [and] has long argued that tech platforms must be held accountable for the harms they cause.  He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more.  And he's encouraged that there's bipartisan interest in Congress."  *Id.*

315.     At the same press briefing, Psaki was asked: "Are you concerned about the kind of purveyors of election misinformation, disinformation, health falsehoods, sort of, having more of an opportunity to speak there on Twitter?"  She responded by specifically linking the legal threats to the social-media platforms' failure to more aggressively censor free speech: "We've long talked about and the President has long talked about his concerns about the power of social media platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable."

316.     Psaki was then asked a question that noted that "the Surgeon General has said that misinformation about COVID amounts to a public health crisis," and then queried, "would the White House be interested in working with Twitter like it has in the past to continue to combat this kind of misinformation?  Or are we in a different part of the pandemic where that kind of partnership is no longer necessary?"  *Id.*

317.     Psaki responded by reaffirming that senior officials within the White House and/or the Administration are continuing to coordinate directly with social-media platforms to censor disfavored speakers and content on social media, and directly linking these efforts to the repeated threat of adverse legal action: "we engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue.  But there are also reforms that we think Congress could take and we would support taking, including reforming Section 230,

enacting antitrust reforms, requiring more transparency.  And the President is encouraged by the bipartisan support for — or engagement in those efforts."  *Id.*

**6. Defendants have successfully procured the censorship of core political speech.**

318.     As a direct result of the conduct alleged herein, Defendants have achieved a great deal of success in procuring the censorship of disfavored speakers, viewpoints, and content on social media, as alleged further herein—including core political speech.

319.     Among other things, they have achieved astonishing success in muzzling public criticism of President Biden.  A recent review by the Media Research Center identified 646 instances over the last two years where social-media firms censored public criticism of then-Candidate and now-President Biden.  *See* Joseph Vasquez and Gabriela Pariseau, *Protecting the President: Big Tech Censors Biden Criticism 646 Times Over Two Years* (April 21, 2022), *at* https://censortrack.org/protecting-president-big-tech-censors-biden-criticism-646-times-over-two-years.

320.     "The Media Research Center found more than 640 examples of bans, deleted content and other speech restrictions placed on those who criticized Biden on social media over the past two years."  *Id.*  "MRC Free Speech America tallied 646 cases in its CensorTrack database of pro-Biden censorship between March 10, 2020, and March 10, 2022. The tally included cases from Biden's presidential candidacy to the present day."  *Id.*

321.     "The worst cases of censorship involved platforms targeting anyone who dared to speak about any subject related to the *New York Post* bombshell Hunter Biden story. … Big Tech's cancellation of that story helped shift the 2020 election in Biden's favor.  Twitter locked the Post's account for 17 days.  In addition, Twitter slapped a 'warning label' on the GOP House Judiciary Committee's website for linking to the Post story."  *Id.*  "CensorTrack logged 140 instances of

users—including lawmakers, organizations, news outlets and media personalities—censored for sharing anything related to the bombshell Hunter Biden laptop story." *Id.*

322.       "Twitter was the most aggressive censor when it came to the Biden laptop story. CensorTrack entries show that users could not tweet the story or pictures of the Post story."

323.       "Big Tech even axed those who blamed the current inflation crisis on Biden.  For example, Facebook censored Heritage Action, the advocacy arm of the conservative Heritage Foundation, on March 15, simply for posting a video quoting Biden's embarrassing statements on energy policy.  Facebook placed an interstitial, or filter, over Heritage Action's video, suppressing the post's reach.  The video showed Biden and officials in his administration explaining how his policies would cause gas prices to rise." *Id.*

324.       "[T]he largest category by far included users who dared to call out Biden's notoriously creepy, touchy-feely behavior around women and children.  The 232 cases of comedic memes, videos, or generic posts about Biden's conduct composed more than one-third of CensorTrack's total instances of users censored for criticizing the president." *Id.*

325.       "Big Tech even went after posts that quoted Biden's own words and made him look awful in retrospect." *Id.*

326.       "The list of censorship targets included an array of prominent influencers on social media: Trump; lawmakers like Sen. Ted Cruz (R-TX) and House Minority Leader Kevin McCarthy (R-CA); news outlets like the New York Post, The Washington Free Beacon and The Federalist; satire site The Babylon Bee; celebrities like Donald Trump Jr. and James Woods, and media personalities like Daily Wire host Candace Owens, Salem radio host Sebastian Gorka and radio host Dana Loesch." *Id.*

327.     Most recently, social-media platforms are beginning to censor criticisms of the Biden Administration's attempt to redefine the word "recession" in light of recent news that the U.S. economy has suffered two consecutive quarters of reduction in GDP. *See, e.g., Economist slams Facebook for 'absolutely Orwellian' fact-check upholding Biden's recession denial*, Fox News (Aug. 1, 2022), at https://www.foxnews.com/media/economist-slams-facebook-absolutely-orwellian-fact-check-upholding-bidens-recession-denial.

328.     Thus, Defendants' conduct alleged herein has created, with extraordinary efficacy, a situation where Americans seeking to exercise their core free-speech right to criticize the President of the United States are subject to aggressive prior restraint by private companies acting at the bidding of government officials.  This situation is intolerable under the First Amendment.

**7.   Federal officials open new fronts in their war for censorship of disfavored speech.**

329.     Since this lawsuit was filed, federal officials, including Defendants herein, have expanded their social-media censorship activities and opened new fronts in their war against the freedom of speech on social media.  The frontiers of government-induced censorship are thus expanding rapidly.

330.     For example, on June 14, 2022, White House National Climate Advisor Gina McCarthy spoke at an Axios event titled "A conversation on battling misinformation."  *See* Alexander Hall, *Biden climate advisor demands tech companies censor 'disinformation' to promote 'benefits of clean energy'*, Fox News (June 14, 2022), *at* https://www.foxnews.com/media/biden-climate-advisor-tech-companies-censor-disinformation-promote-benefits-clean-energy (video of her comments embedded in link).  McCarthy publicly demanded that social-media platforms engage in censorship and suppression of speech that contradicts federal officials' preferred narratives on climate change.

331.     During the event, "McCarthy skewered Big Tech companies for 'allowing' disinformation and cheered Congress for 'taking action' to enact more censorship last Thursday." *Id.*  "Axios political reporter Alexi McCammond asked McCarthy how so-called 'rampant mis-and-disinformation around climate change online and in other platforms' has 'made your job harder?'"  *Id.*  "McCarthy responded by slamming social media companies: 'We have to get tighter, we have to get better at communicating, and frankly, *the tech companies have to stop allowing specific individuals over and over again to spread disinformation*.'"  *Id.* (emphasis added).  "She suggested further that 'we have to be smarter than that and *we need the tech companies to really jump in*.'"  *Id.* (emphasis added).  "McCammond responded by asking: 'Isn't misinformation and disinfo around climate a threat to public health itself?'  McCarthy asserted that it 'absolutely' is:  'Oh, absolutely.'"  *Id.*

332.     Following the Administration's now-familiar playbook, McCarthy explicitly tied these demands for censorship of climate-change-related speech to threats of adverse legislation: "McCarthy also praised Congress directly for pushing social media companies to censor Americans: 'We do see Congress taking action on these issues, we do see them trying to tackle the misinformation that's out there, trying to hold companies accountable.'"  *Id.*

333.     Two days later, the White House announced a new task force to address, among other things, "gendered disinformation" and "disinformation campaigns targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists."  White House, *Memorandum on the Establishment of the White House Task Force to Address Online Harassment and Abuse* (June 16, 2022), *at* https://www.whitehouse.gov/briefing-room/presidential-actions/2022/06/16/memorandum-on-the-establishment-of-the-white-house-task-force-to-address-online-harassment-and-abuse/.

334.     The June 16 Memorandum decries "online harassment and abuse"—vague terms that, on information and belief, are deliberately adopted to sweep in constitutionally protected speech.   In particular, the Memorandum defines "online harassment and abuse" to include "gendered disinformation," a deliberately broad and open-ended term.  *Id.* § 1.  The Memorandum announces plans to target such "gendered disinformation" directed at public officials and public figures, including "women and LGBTQI+ political leaders, public figures, activists, and journalists."  *Id.*  The Memorandum creates a Task Force co-chaired by the Assistant to the President for National Security Affairs, which includes the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security, among others.  *Id.*

335.     The Task Force is charged with "developing programs and policies to address … *disinformation campaigns* targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists in the United States and globally."  *Id.* § 4(a)(iv) (emphasis added).  The Memorandum calls for the Task Force to consult and coordinate with "technology experts" and "industry stakeholders," *i.e.*, social-media firms, to achieve "the objectives of this memorandum," *id.* § 4(b).  Those "objectives," of course, include suppressing so-called "disinformation campaigns" against "public and political figures."  *Id.* § 4(a)(iv).

336.     The Memorandum again threatens social-media platforms with adverse legal consequences if they do not censor aggressively enough to suit federal officials: "the Task Force shall … submit periodic recommendations to the President on *policies, regulatory actions, and legislation on technology sector accountability* to address systemic harms to people affected by online harassment and abuse."  *Id.* § 5(c) (emphasis added).

337.     On June 17, 2022, twenty-one Democratic U.S. Senators and Representatives sent a letter to Sundar Pichai, the CEO of Alphabet Inc., which owns Google, demanding that Google censor, suppress, and de-boost search results and Google Maps results for pro-life pregnancy resource centers.    June 17, 2022 Letter of Sen. Mark Warner, et al., available at https://reason.com/wp-content/uploads/2022/06/26F26BB28841042A7931EEC58AC80E08.anti-abortion-letter-to-google-final.pdf.   The letter's co-signers included many of the Members of Congress who have previously made threats of adverse legal consequences if social-media platforms do not increase censorship—such as Senators Mark Warner, Amy Klobuchar, and Richard Blumenthal.  *Id.*  The letter cited "research by the Center for Countering Digital Hate (CCDH)," *id.*—the same organization that Jen Psaki and the White House coordinated with to demand the censorship of the so-called "Disinformation Dozen," and that coordinated the demonetization of Plaintiff Hoft from Google.  The letter describes pro-life pregnancy resource centers as "fake clinics," and demands that Google proactively censor search results, mapping results, and advertisements relating to such clinics.  *Id.*  The letter demands that Google "limit the appearance of anti-abortion fake clinics or so-called 'crisis pregnancy centers' in Google search results, Google Ads, and on Google Maps"; that Google "add user-friendly disclaimers that clearly indicate whether or not a search result does or does not provide abortions"; and that Google take "additional steps to ensure that users are receiving accurate information when they search for health care services like abortion on Google Search and Google Maps."  *Id.*

338.     Defendants swiftly doubled down on this demand for social-media censorship of pro-life pregnancy resource centers.  On July 8, 2022, the President signed an Executive Order "aimed at protecting abortion rights."  Sandhya Raman, *Biden issues executive order responding to abortion ruling*, Roll Call (July 8, 2022), at  https://rollcall.com/2022/07/08/biden-issues-

executive-order-responding-to-abortion-ruling/.   The order directs HHS, DOJ, and the FTC "to examine ways to … curb the spread of misinformation related to abortion." *Id.*   The order is entitled "Executive Order on Protecting Access to Reproductive Healthcare Services," available at https://www.whitehouse.gov/briefing-room/presidential-actions/2022/07/08/executive-order-on-protecting-access-to-reproductive-healthcare-services/.   Section 4(b)(iv) of the order states: "The Secretary of Health and Human Services shall, in consultation with the Attorney General and the Chair of the FTC, consider options to address deceptive or fraudulent practices related to reproductive healthcare services, including online, and to protect access to accurate information." *Id.*

### 8. Discovery reveals a massive federal Censorship Enterprise including all Defendants.

339.     Plaintiffs reassert and incorporate by reference the Exhibits A-O to the First Amended Complaint, Docs. 45-1 to 45-15, and the Exhibits to their Joint Statement on Discovery Disputes, Docs. 71-1 to 71-13, as if set forth fully herein.   For ease of reference, this Second Amended Complaint refers to the exhibits to the First Amended Complaint by the same Exhibit numbers, Exhibits A-O.   Likewise, Docs. 71-1 to 71-13 are incorporated by reference and referred to by their docket number.   In addition, two additional Exhibits, labeled "Exhibit P" and "Exhibit Q," comprising additional documents produced by Defendants in discovery, are attached hereto and incorporated fully by reference herein.

340.     Based on documents produced by Defendants in discovery and other recent public disclosures, senior federal officials have placed intensive oversight and pressure to censor private speech on social-media platforms.   All Defendants have been involved in the actions of this "Censorship Enterprise" in various ways, and these censorship activities continue to the present and continue to directly cause Plaintiffs irreparable harm.   Representative examples of such federal

censorship activities are set forth herein, but these do not identify all the federally induced acts of censorship by any means.

341.     After President Biden publicly stated (about Facebook) on July 16, 2021, that "They're killing people," a very senior executive at Meta (Facebook and Instagram) reached out to Surgeon General Murthy to engage in damage control and appease the President's wrath.  Soon thereafter, the same Meta executive sent a text message to Surgeon General Murthy, noting that "it's not great to be accused of killing people," and expressing that he was "keen to find a way to deescalate and work together collaboratively."

342.     Such "deescalation" and "working together collaboratively," naturally, involved increasing censorship on Meta's platforms.  One week after President Biden's public accusation, on July 23, 2021, that senior Meta executive sent an email to Surgeon General Murthy stating, "I wanted to make sure you saw the steps we took *just this past week* to adjust policies on what we are removing with respect to misinformation, as well as steps taken to further address the 'disinfo dozen': we removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen...."

343.     Again, on August 20, 2021, the same Meta executive emailed Murthy to assure him that Facebook "will shortly be expanding our COVID policies to further reduce the spread of potentially harmful content on our platform.  These changes will apply across Facebook and Instagram," and they included "increasing the strength of our demotions for COVID and vaccine-related content," and "making it easier to have Pages/Groups/Accounts demoted for sharing COVID and vaccine-related misinformation."

344.     In addition, that senior Meta executive sent a "Facebook bi-weekly covid content report" to Surgeon General Murthy and to White House official Andrew Slavitt, evidently to

reassure these federal officials that Facebook's suppression of COVID-19 "misinformation" was aggressive enough for their preferences.

345.     In another, similar exchange, on October 31, 2021, Deputy Assistant to the President Rob Flaherty emailed a contact at Meta with a link to a Washington Post article complaining about the spread of COVID "misinformation" on Facebook.  The email contained only the link to that story with the subject line, "not even sure what to say at this point."  The Facebook official defended Facebook's practices, and assured Mr. Flaherty that Facebook's internal studies were intended to "improve our defenses against harmful vaccine misinformation," and that Facebook had, in fact, "improved our policies," *i.e.*, increased censorship of online speech. *Id.*

346.     Likewise, Alex Berenson disclosed internal Twitter communications revealing that senior "WH" officials including Andrew Slavitt specifically pressured Twitter to deplatform Berenson, an influential vaccine critic—which Twitter did.  This pressure to deplatform Berenson evidently occurred on April 21, 2021, when four Twitter employees participated in a Zoom meeting with at least three White House officials and one HHS official intended to allow the White House to "partner" with Twitter in censoring COVID-related "misinfo."  The meeting invitation stated: "White House Staff will be briefed by Twitter on vaccine misinfo.  Twitter to cover trends seen generally around vaccine misinformation, *the tangible effects seen from recent policy changes*, what interventions are currently being implemented in addition to previous policy changes, and ways the White House (and our COVID experts) can *partner* in product work." (Emphasis added).

347.     The next day, April 22, Twitter employees noted in internal communications that the White House officials had posed "tough" questions during this meeting, including "one really

tough question about why Alex Berenson hasn't been kicked off the platform." *See* https://alexberenson.substack.com/p/the-white-house-privately-demanded.

348.　　On July 11, 2021, Dr. Fauci publicly described Berenson's public statements on vaccines as "horrifying."　Soon thereafter, after President Biden's subsequent statement that "They're killing people" by not censoring vaccine "misinformation," Twitter caved to federal pressure and permanently suspended Berenson.

349.　　Such communications from the White House impose maximal pressure on social-media companies, which clearly yields the sought-after results.　And federal officials are fully aware that such pressure is necessary to induce social-media platforms to increase censorship of views that diverge from the government's.　CISA Director Jen Easterly, for example, texted with Matthew Masterson about "trying to get us in a place where Fed can work with platforms to better understand the mis/dis trends *so relevant agencies can try to prebunk/debunk as useful*," and complained about the Government's need to overcome the social-media platforms' "hesitation" to working with the government: "Platforms have got to get more comfortable with gov't.　It's really interesting how hesitant they remain."

350.　　In fact, such pressure from government officials on social-media companies, along with the many public statements alleged in the Complaint, have succeeded on a grand scale.　A veritable army of federal bureaucrats are involved in censorship activities "across the federal enterprise."　There are so many, in fact, that CISA Director Easterly and Matthew Masterson complained in text messages that "chaos" would result if all federal officials were "independently" contacting social-media platforms about so-called misinformation: "Not our mission but was looking to play a coord role so not every D/A is independently reaching out to platforms which could cause a lot of chaos."　On information and belief, as alleged above, the "Disinformation

Governance Board" was created to impose a bureaucratic structure on the enormous censorship activities already occurring involving dozens of federal officials and many federal agencies.

351.    These federal bureaucrats have leveraged their clout and pressure on social-media platforms to become deeply embedded in a joint enterprise with social-media companies to procure the censorship of private citizens' speech on social media.  Officials at HHS, including Defendants herein, routinely flag content for censorship, for example, by organizing weekly "Be On The Lookout" meetings to flag disfavored content; sending lengthy lists of examples of disfavored posts to be censored; serving as privileged "fact checkers" whom social-media platforms consult about censoring private speech; and receiving detailed reports from social-media companies about so-called "misinformation" and "disinformation" activities online; among others.

352.    These efforts go back as far as very early 2020, and they continue through the present day, as evidenced by Facebook employees writing to high-level officials in HHS and the State Department informing them of new attempts to "control information and misinformation related to Corona virus [*sic*] which includes links to WHO page as well as removal of misinformation."

353.    A Facebook employee wrote to Defendants Slavitt, Flaherty, Peck, and Humphrey on March 2, 2021, updating the White House on "vaccine intent" and "shar[ing] survey based data on intent to vaccinate," and relaying the ways that the company was combatting "misinformation." These methods included "improving the effectiveness of our existing enforcement systems (particularly focusing on entities that repeatedly post vaccine misinformation)" and "mitigating viral content that could lead to vaccine hesitancy" while "promoting the vaccine and providing authoritative information."

354.      Upon information and belief, that means ensuring that posts departing from the government's messaging on vaccines are censored and de-amplified through the Facebook algorithm, while those conveying the government's message are amplified.

355.      On March 1, 2021, a Twitter employee wrote to Defendants Slavitt, Flaherty, Peck and Humphrey after a meeting that the company was escalating efforts to remove harmful content about Covid and introducing a strike system—apparently the outcome of the discussion that had just occurred.  This was following an email exchange in February of 2021 in which the same employee had sought to update the four about "additional measure[s] Twitter taking regarding covid [*sic*]."

356.      Likewise, on April 26, 2020, Muhammed wrote to Facebook employees and asked them to take down Facebook pages, and deactivate associated accounts, misrepresenting themselves as Administration for Children and Families Program (ACF).  One of those employees responded, "Absolutely."  *Id.*

357.      Shortly after the inauguration of President Biden, an individual who worked in private sector engagement connected a Facebook employee with Defendants Courtney Rowe and Joshua Peck, and saying that Defendants Flaherty and Humphrey would want to be in touch about misinformation and disinformation.

358.      On February 24, 2021, a different Facebook employee wrote to Defendant Flaherty "Following upon your request for COVID-19 misinfo themes we are seeing," "we are removing these claims from our platforms[.]"  Those themes were Vaccine Toxicity," "False Claims About Side Effects of Vaccine" (including that the vaccines may cause infertility), "Comparing the Covid Vaccine to the Flu Vaccine," and "Downplaying Severity of Covid-19."

359.     Flaherty responded later that day, asking for a "sense of volume on these, and some metrics around the scale of removal for each[]," as well as "misinformation that might be falling outside of your removal policies."  The Facebook employee replied that she could "go into detail on content that doesn't violate like below but could contribute to vaccine hesitancy."

360.     Similarly, on February 19, 2021, Defendant Flaherty, on an email between him, Humphrey, Defendant Courtney Rowe, and Defendant Joshua Peck, and several Facebook employees as well, asked to hear from the company about "mis and dis" and later stated that one of his questions was about "algorithmic productions."  Flaherty also asked if "plans are in the works . . . to replicate the strategy you deployed around lockdowns – the 'stay at home' stickers/promoted Instagram story."  A meeting was apparently held pursuant to Flaherty's request shortly thereafter on March 1, with the subject being "Misinfo & Disinfo."

361.     On May 20, 2021, Mina Hsiang of the Office of Management and Budget wrote to a Google employee, apparently following up on a conversation from the previous day that was "critically helpful for the nationwide vaccination effort."  Hsiang suggested a change to results yielded by a search for "who can get vaccinated now."

362.     The parties continued to collaborate on the subject, and eventually arranged a meeting that was apparently held on May 27, 2021 and scheduled by Defendant Joshua Peck. Defendant Andy Slavitt asked Peck and Hsiang to take his place on the call because he was "slammed."

363.     Sheila Walsh of HHS exchanged emails with employees at YouTube about combating vaccine "misinformation," and arranged a meeting as well.

364.     Defendant Christy Choi, Deputy Director in the Office of Communications within HHS had exchanges with Facebook asking it to change the name of a Facebook page providing

"misleading information about vaccine" "[g]iven the administration's focus on getting more Americans vaccinated."

365.     CISA, likewise, has aggressively embraced its "evolved mission" of screening complaints of social-media disinformation and then "routing disinformation concerns" to social-media platforms.  CISA routinely receives reports of perceived "disinformation," often from state and local government officials, and forwards them to social-media companies for censorship, placing the considerable weight of its authority as a federal national-security agency behind its demands for suppression of private speech.  CISA, therefore, serves as a government clearinghouse for expedited censorship of social-media speech disfavored by government officials.

366.     Moreover, many of these substantive communications from federal officials flagging specific posts and content for censorship also appear to occur through alternative channels of communication.  For example, Facebook trained CDC and Census Bureau officials on how to use a "Facebook misinfo reporting channel."  Twitter offered federal officials a privileged channel for flagging misinformation through a "Partner Support Portal."  YouTube has disclosed that it granted "trusted flagger" status to Census Bureau officials, which allows privileged and expedited consideration of their claims that content should be censored.

367.     As alleged further herein, federal censorship efforts escalated after President Biden assumed office in January 2021.

368.     The individually named White House Defendants and other Defendants were directly involved in communications with social-media platforms about censorship and suppression of speech on social-media.

369.     For example, Humphrey requested that a Meta employee censor an Instagram parody account of Dr. Fauci, and Meta replied, "Yep, on it!"  Soon thereafter, Meta reported that the account had been censored.

370.     As another example, on May 28, 2021, a senior executive of Meta sent an email to Slavitt and Murthy reporting that Facebook had expanded its censorship policies, evidently to satisfy federal officials' demands made at a recent oral meeting.  The email stated that a "key point" was that "We're expanding penalties for individual Facebook accounts that share misinformation."

371.     As recently as June 13, 2022, Flaherty demanded that Meta continue to produce periodic "COVID-19 insights reports" to track so-called "misinformation" regarding COVID-19 on Meta's social-media platforms, expressing the specific concern that COVID vaccines for children under 5 would soon be authorized.

372.     Meta got the message.  It agreed to continue sending its censorship-tracking reports, and on June 23, 2022, Meta assured Flaherty that it was expanding its censorship of COVID-19 "misinformation" to ensure that speech critical or skeptical of COVID-19 vaccines for children under 5 years old—a highly controversial topic—would be censored.  Notably, Pfizer's own data established that the vaccine does not stop infection or transmission in this age group, demonstrating the political nature of this censorship.  *See* https://www.nytimes.com/2022/02/28/health/pfizer-vaccine-kids.html.

373.     The White House Defendants were involved in many other communications regarding censorship as well.  For example, in June and July of 2022, Flaherty, Manning, Salcido, and Cheema were included in the email chain with Meta in which Flaherty demanded that Meta continue providing biweekly "COVID-19 Insights" reports to ensure adequate censorship of

110

speech on Facebook and Instagram "as we start to ramp up under 5 vaccines"—*i.e.*, as vaccination of children under 5 for COVID-19 began.  Wakana and Rowe were also involved in similar communications overseeing Meta's misinformation practices.

374.     Again, for example, Flaherty, Wakana, Humphrey, and Rowe participated in a "Twitter // COVID Misinfo" meeting with Twitter on or around March 1, 2021.  And on April 21, 2021, Flaherty and Slavitt, along with White House Confidential Assistant Kelsey V. Fitzpatrick, participated in a meeting with Twitter at which those White House officials demanded greater censorship on Twitter and specifically demanded the de-platforming of Alex Berenson.  The meeting invite for that meeting stated that "White House Staff will be briefed by Twitter on vaccine misinfo.  Twitter to cover trends seen generally around vaccine misinformation, the tangible effects seen from recent policy changes, … and ways the White House (and our COVID experts) can partner in product work."

375.     A senior Meta executive repeatedly copied Slavitt on his emails to Surgeon General Murthy in which he assured the Surgeon General and the White House that Meta was engaging in censorship of COVID-19 misinformation according to the White House's demands.  Among other things, the Meta executive insisted that "We've expanded penalties for individual Facebook accounts that share misinformation."

376.     Likewise, on March 2, 2021, Meta sent an email assuring Slavitt, Flaherty, and Humphrey that the company is "[c]ombating vaccine misinformation and de-amplifying content that could contribute to vaccine hesitancy" by "improving the effectiveness of our existing enforcement systems (particularly focusing on entities that repeatedly post vaccine misinformation), mitigating viral content that could lead to vaccine hesitancy…."

377.     Among many other reports, Meta reported to Rowe, Manning, Flaherty, and Slavitt that it has "labeled and demoted" "vaccine humor posts whose content could discourage vaccination" during January 2022.  It also reported to the White House that it "labeled and demoted" posts "suggesting natural immunity to COVID-19 infection is superior to immunity by the COVID-19 vaccine."

378.     Likewise, on November 4, 2021, Meta reported to Rowe, Flaherty, and other White House officials that "we updated our misinformation policies for COVID-19 vaccines to make clear that they apply to claims about children…."

379.     On September 18, 2021, regarding a story in the Wall Street Journal about COVID-19 "misinformation" circulating on Facebook, Flaherty demanded that Meta provide an explanation "as we have long asked for, [of] how big the problem is, what solutions you're implementing, and how effective they've been."  Needless to say, the "solutions" evidently referred to policies to censor and suppress more private speech on Meta's platforms, and Meta promised to "brief" the White House on those.

380.     In response to a third-party subpoena, Meta has identified Special Assistant to the President Laura Rosenberger, White House Partnerships Manager Aisha Shah, White House Counsel Dana Remus, and White House officials Slavitt, Flaherty, and Humphrey; HHS officials Waldo, Byrd, Choi, Lambert, Peck, and Muhammed; EAC officials Muthig and Robbins; CDC officials Crawford and Dempsey; DHS officials Masterson, Protentis, Hale, and Snell; and FDA officials Thorpe, Jefferson, Murray, and Kimberly, among others, as federal officials who may have "communicated with Meta regarding content moderation between January 1, 2020 and July 19, 2022 as it relates to: (i) COVID-19 misinformation; (ii) the Department of Homeland Security's proposed Disinformation Governance Board; (iii) the New York Post story from

October 14, 2020 about Hunter Biden's laptop computer; and/or (iv) election security, integrity, outcomes, and/or public confidence in election outcomes (not to include issues of foreign interference or related issues)."

381.     In response to a third-party subpoena, YouTube has identified Schwartz, Faught, Molina-Irizarry, Galemore, Wakana, Flaherty, and Waldo, among others, as federal officials likely to have "communicated with the YouTube custodians about misinformation about COVID, the census, or elections."

382.     In response to a third-party subpoena, Twitter has identified Crawford, Flaherty, Frisbie, Kimmage, Lambert, Murthy, Shopkorn, Slavitt, and Waldo as federal officials "with whom [Twitter] has had meetings or discussions between January 20, 2021 and August 4, 2022 about election integrity, vaccine/Covid misinformation, violent extremism, and similar content moderation issues."

383.     On August 26, 2022, Mark Zuckerberg appeared on Joe Rogan's podcast and revealed that Facebook's censorship of the Hunter Biden laptop story had occurred as a result of communications from the FBI.  Zuckerberg stated: "The FBI basically came to us" and told Facebook to be "on high alert" relating to "a lot of Russian propaganda," that the FBI was "on notice" that "there's about to be some kind of dump … that's similar to that, so just be vigilant." Zuckerberg stated: "If the FBI … if they come to us and tell us we need to be on guard about something, then I want to take that seriously."  On information and belief, the FBI's reference to a "dump" of information was a specific reference to the contents of Hunter Biden's laptop, which was already in the FBI's possession.

384.      Joe Rogan asked Zuckerberg if the FBI has flagged the Hunter Biden laptop story as Russian disinformation specifically, and Zuckerberg stated: "I don't remember if it was that

specifically, but [the story] basically fit the pattern" that the FBI had identified.  *See* https://www.wptv.com/news/national/fbi-responds-to-mark-zuckerberg-claims-on-joe-rogan-show-about-hunter-bidens-laptop (video commencing around 7:30).  This revelation that the FBI had induced Facebook's censorship of the Hunter Biden laptop story was widely recognized as a bombshell revelation of federal law-enforcement influence on social-media censorship.

385.    Pursuant to the third-party subpoena, Meta has identified the FBI's FITF, as supervised by Laura Dehmlow, and Elvis Chan as involved in the communications between the FBI and Meta that led to Facebook's suppression of the Hunter Biden laptop story.

386.    Dehmlow evidently works with CISA on social-media censorship issues.  On March 1, 2022, Dehmlow gave a presentation to CISA's Protecting Critical Infrastructure from Misinformation & Disinformation Subcommittee in which Dehmlow indicated that the FBI's FITF "engages … with appropriate partners for information exchange."  On information and belief, this "information exchange" includes communications with social-media platforms about censorship and/or suppression of social-media speech.

387.    On information and belief, because major social-media platforms are headquartered in the geographical area of FBI's San Francisco Division, and Elvis Chan is in charge of cyber-related issues for that division, Chan has performed a critical role in communicating with social-media platforms on behalf of the FBI relating to censorship and suppression of speech on social media.

388.    Chan has openly boasted about his official role on behalf of FBI in coordinating with social-media companies.  In a recent podcast, he stated, "Our field office, FBI San Francisco, was very involved in helping to protect the US elections in 2020. … [T]he FBI, the US government working in conjunction with *the private sector*, as well as with election officials from every single

114

state and protectorate, we were really able to do it. … But completely different from 2016 where we did not.  Even though foreign actors were trying to interfere in our elections, the FBI, the US government working in conjunction with the private sector, as well as with election officials from every single state and protectorate, we were really able to do it." *See* https://www.banyansecurity.io/resource/get-it-started-get-it-done/ (emphasis added).

389.     Chan's subsequent comments make clear that "government working in conjunction with the private sector" includes the FBI working with social-media companies on censorship and suppression of private speech.  Chan indicated that he works closely with Defendant Jen Easterly, stating, "So Jen Easterly, she's the current director for CISA, she's the one who coined that term shields up. She's a Star Trek fan. She's a Trekkie, I am myself." *Id.*  Easterly, as alleged herein, quarterbacks CISA's extensive federal government-induced social-media censorship activities.

390.     Chan admits to regular, routine coordination about censorship with social-media platforms, stating of the 2020 election cycle in particular: "we talked with all of these entities I mentioned regularly, at least on a monthly basis. And right before the election, probably on a weekly basis. If they were seeing anything unusual, if we were seeing anything unusual, sharing intelligence with technology companies, *with social media companies*, so that they could protect their own platforms.  That's where the FBI and the US government can actually help companies." *Id.*  On information and belief, "social media companies" "protect[ing] their own platforms" includes censorship and suppression of speech at the FBI's behest.

391.     Chan bemoaned the fact that there was not a similar level of coordination about censorship between the federal government and social-media companies during the 2016 election cycle: "It seems obvious, but I'm not going to lie, in 2016, there was not that same level of communications between the US government and the private sector." *Id.*  Chan called on social-

media platforms to be "more mindful" of federal government warnings on such issues: "But where we in the government are saying, if you are in one of the 17 designated critical infrastructure sectors, of which information technology is one of them, then you need to be more mindful." *Id.*

392.     In a public interview dated October 28, 2020, Chan explicitly encouraged citizens to report "misinformation" or "disinformation" to social-media companies and to the federal government so that such speech could be censored and/or suppressed, stating: "If you are seeing something related to election on your social-media platform, all of them have portals where you can report that sort of information, and *they are being very aggressive in trying to take down any misinformation or disinformation* … [i]f you see anything on election day or before election day, you can always report it to FBI.gov or Justice.gov … *we take all of these very seriously*." *See* https://www.govinfosecurity.com/fbi-on-election-theres-going-to-be-lot-noise-a-15257 (quotes at 7:45-8:48 of video) (emphasis added).  Based on these comments, this includes the FBI "tak[ing] … very seriously" reports of "misinformation" and "disinformation" and inducing social-media companies to censor them.

393.     Documents produced by LinkedIn show Chan repeatedly organizing meetings with representatives of LinkedIn from 2020 through 2022 (the present).  Based on the limited agendas provided, it appears that these meetings included discussions of election-related content and suppression of election-related speech on social media.  On information and belief, Chan organized similar meetings with other major social-media platforms, as in one instance, he notified LinkedIn about a particular proposed time slot for a meeting that another company had already taken that time slot.  Dehmlow was routinely included in these meetings as well.

394.     On information and belief, active coordination between Meta and the FBI on censorship and suppression of speech on social media continues to this day.  For example,

Facebook "now appears to be monitoring *private* messages and suppressing material related to the whistleblower complaint of … FBI special agent Steve Friend."  Miranda Devine, *Facebook 'silencing' activity related to FBI whistleblower Steve Friend*, N.Y. Post (Sept. 25, 2022), at https://nypost.com/2022/09/25/facebook-silencing-activity-related-to-fbi-whistleblower-steve-friend/.

395.     After an FBI whistleblower made public allegations critical of political bias at the FBI, the whistleblower's "wife's Facebook account was suspended after she responded to an offer of support from a local chapter" of a supportive "conservative group that advocates for parental rights." *Id.*  The wife responded to the group with a private message from her Facebook account, stating that "her husband was in the process of obtaining permission from the FBI to speak publicly and asked them to encourage their members to share his whistleblower story on their personal social media accounts." *Id.*  "About 30 minutes later, Mrs. Friend received a notification from Facebook that her account had been suspended because the 'account, or activity on it, doesn't follow our Community Standards.'" *Id.*  At the receiving end, "Mrs. Friend's Facebook message disappeared. In its place was a notification saying, 'Message unavailable.'" *Id.*  Thus, it now appears that Meta/Facebook is policing *private* messages sent on Facebook to censor and suppress any communications that might be critical of the FBI.

396.     Recent, heavily documented reports indicate that both the State Department and CISA have teamed up with a consortium of four private groups in a close collaboration to achieve social-media censorship of election-related speech beginning in 2020, and that this collaboration is continuing to this day.

397.     Pursuant to third-party subpoena, Twitter has identified personnel associated with the State Department's Global Engagement Center, including Alexis Frisbie and Daniel Kimmage,

as likely involved in communications with Twitter about censorship and/or content modulation on issues such as election integrity, vaccine/COVID misinformation, and related subjects.

398.     The State Department reports that "[i]n December 2019, GEC/TET [*i.e.*, State's Global Engagement Center's Technology Engagement Team] established a Silicon Valley location to facilitate public-private coordination and broker constructive engagements between the U.S. government and the tech sector, academia, and research.  The goal is to increase collaboration that results in identifying, exposing, and defending against foreign adversarial propaganda and disinformation."  On information and belief, "collaboration that results in … defending against … disinformation," *id.*, includes censorship of social-media speech.

399.     The Global Engagement Center publishes "Counter Disinformation Dispatches," of which the State Department states: "The Global Engagement Center's Counter Disinformation Dispatches summarize lessons learned about disinformation and how to counter it based on the experiences of frontline counter-disinformation practitioners, for the benefit of those newly engaged in this issue."

400.     The Global Engagement Center provides, as an online "counter-disinfo resource," as link to CISA's website, stating: "An agency of the Department of Homeland Security, the Cybersecurity and Infrastructure Security Agency 'is responsible for protecting the [United States'] critical infrastructure from physical and cyber threats,' including election security."

401.     The State Department has inserted itself in efforts to combat so-called Covid-19 "disinformation."  State provides an online briefing dated January 21, 2022, entitled "COVID-19 Fact Checking: What Journalists Need to Know," which "provides information about fact-checking resources available to journalists to counter COVID-19 and vaccine misinformation, and an overview of counter-misinformation efforts around the world."

402.     According to public reports, "[a]consortium of four private groups worked with the departments of Homeland Security (DHS) and State to censor massive numbers of social media posts they considered misinformation during the 2020 election, and its members then got rewarded with millions of federal dollars from the Biden administration afterwards, according to interviews and documents obtained by [reporters]." *Outsourced censorship: Feds used private entity to target millions of social posts in 2020*, JUST THE NEWS (Sept. 30, 2022), *at* https://justthenews.com/government/federal-agencies/biden-administration-rewarded-private-entities-got-2020-election.

403.     On information and belief, the purpose and effect of this consortium of private non-profit groups is to allow federal officials at CISA and State to evade First Amendment and other legal restrictions while still operating unlawfully to censor the private election-related speech on Americans on social-media.  Its censorship operations continue to this day.  *See id.*

404.     This consortium of private entities, closely collaborating with CISA and the State Department, calls itself "The Election Integrity Partnership."  This collaborative federal-private censorship project "is back in action again for the 2022 midterm elections, raising concerns among civil libertarians that a chilling new form of public-private partnership to evade the First Amendment's prohibition of government censorship may be expanding." *Id.*

405.     "The consortium is comprised of four member organizations: Stanford Internet Observatory (SIO), the University of Washington's Center for an Informed Public, the Atlantic Council's Digital Forensic Research Lab, and social media analytics firm Graphika." *Id.*  The consortium "set up a concierge-like service in 2020 that allowed federal agencies like Homeland's Cybersecurity Infrastructure Security Agency (CISA) and State's Global Engagement Center to

file 'tickets' requesting that online story links and social media posts be censored or flagged by
Big Tech." *Id.*

406.     "Three liberal groups — the Democratic National Committee, Common Cause and
the NAACP — were also empowered like the federal agencies to file tickets seeking censorship
of content.  A Homeland [*i.e.* DHS]-funded collaboration, the Elections Infrastructure Information
Sharing and Analysis Center, also had access." *Id.*

407.     "In its own after-action report on the 2020 election, the consortium boasted it
flagged more than 4,800 URLs — shared nearly 22 million times on Twitter alone — for social
media platforms. Their staff worked 12-20 hour shifts from September through mid-November
2020, with 'monitoring intensifying significantly' the week before and after Election Day." *Id.*
(alterations omitted).

408.     Backed by the authority of the federal government, including DHS, CISA, the State
Department, and State's Global Engagement Center, the consortium successfully sought and
procured extensive censorship of core political speech by private citizens: "The tickets sought
removal, throttling and labeling of content that raised questions about mail-in ballot integrity …
and other election integrity issues of concern to conservatives." *Id.*

409.     "The consortium achieved a success rate in 2020 that would be enviable for baseball
batters: Platforms took action on 35% of flagged URLs, with 21% labeled, 13% removed and 1%
soft-blocked, meaning users had to reject a warning to see them." *Id.*

410.     The consortium's "[p]articipants were acutely aware that federal agencies' role in
the effort" raised First Amendment concerns.  "For instance, SIO's Renee DiResta said in a CISA
Cybersecurity Summit video in 2021 that the operation faced 'unclear legal authorities' and 'very
real First Amendment questions.'" *Id.*

411.     One free-speech advocate described the consortium as "the largest federally-sanctioned censorship operation he had ever seen, a precursor to the now-scrapped Disinformation Governance Board and one that is likely to grow in future elections." *Id.* "'If you trace the chronology, you find that there was actually 18 months' worth of institutional work to create this very apparatus that we now know played a significant role in the censorship of millions of posts for the 2020 election and has ambitious sights for 2022 and 2024,' he said." *Id.*

412.     A member of Congress "called the revelations 'stunning' and said the 2020 operation amounted to the federal government sanctioning and outsourcing censorship." *Id.*

413.     "It wasn't just blogs and individual social media users whose content was targeted for removal and throttling as 'repeat spreaders' of misinformation. News and opinion organizations, including the New York Post, Fox News, Just the News and SeanHannity.com were also targeted." *Id.*

414.     "The partnership's members published the 292-page public report in March 2021, though the most recent version is dated June 15, 2021.  The launch webinar featured former CISA Director Christopher Krebs, 'who led the effort to secure electoral infrastructure and the response to mis- and disinformation during the election period.'" *Id.*

415.     "'I think we were pretty effective in getting platforms to act on things they haven't acted on before,' both by *pressuring them to adopt specific censorship policies* and then *reporting violations*, SIO founder and former Facebook Chief Security Officer Alex Stamos told the launch webinar." *Id.* (emphasis added).  "'Platform interventions' [*i.e.*, censorship of specific posts or content] in response to 'delegitimization of election results,' for example, went from uniformly 'non-comprehensive' in August 2020 to 'comprehensive' by Election Day, the report says." *Id.*

416.     "SIO officially launched the partnership 100 days before the election, 'in consultation with CISA and other stakeholders,' the partnership report says.  It attributes the idea to SIO-funded interns at CISA, noting that censorship by that agency and domestic social media monitoring by intelligence agencies would likely be illegal."  *Id.* (citing Center for an Informed Public, Digital Forensic Research Lab, Graphika, & Stanford Internet Observatory (2021), *The Long Fuse: Misinformation and the 2020 Election*. Stanford Digital Repository: Election Integrity Partnership. v1.3.0, *at* https://purl.stanford.edu/tr171zs0069 ("EIP Report")).

417.     The EIP Report's executive summary states: "Increasingly pervasive mis- and disinformation, both foreign and domestic, creates an urgent need for collaboration across government, civil society, media, and social media platforms."  *Id.*

418.     The consortium was openly biased based on political viewpoint, calling President Trump "the social media Death Star."  "During the launch webinar, the Atlantic Council's Emerson Brooking said they wanted to stop the 'amplification and legitimation' of 'far-right influencers [who] would be doing all they could to try to catch the eye of a Fox News producer,' making it likely that President Trump, 'the social media Death Star,' would see their content."  *Id.*

419.     The consortium's work included the direct involvement of government officials in censorship decisions.  "Government entities were involved in real-time chats with the partnership and social media platforms over specific content under review."  *Id.*  For example, "[a] chat screenshot in the report shows an unidentified government partner rejecting the Sharpiegate claim that 'sharpies aren't read at all' by ballot-counting machines, and a platform provider responding that it was now reviewing those claims."  *Id.*

420.     Notably, consistent with its carrot-stick approach to private entities on social-media censorship, the incoming Biden Administration—including the State Department—richly

rewarded the private-sector partners in this consortium of censorship, lavishing federal largesse upon them. "The [consortium's] partners all received federal grants from the Biden administration in the next two years." *Id.* "The National Science Foundation awarded the Stanford and UW projects $3 million in August 2021 'to study ways to apply collaborative, rapid-response research to mitigate online disinformation.'" *Id.* "UW's press release about the award noted their earlier work on the partnership and praise for the report from ex-CISA director Krebs, who called it 'the seminal report on what happened in 2020, not just the election but also through January 6.'" *Id.* "Graphika, also known as Octant Data, received its first listed federal grant several weeks after the 2020 election: nearly $3 million from the Department of Defense for unspecified 'research on cross-platform detection to counter malign influence.' Nearly $2 million more followed in fall 2021 for 'research on co-citation network mapping,' which tracks sources that are cited together." *Id.* "The Atlantic Council … has received $4.7 million in grants since 2021, all but one from the State Department. That far exceeds the think tank's federal haul in previous years, which hadn't approached $1 million in a single year since 2011." *Id.*

421.   "UW's project, SIO and Graphika also collaborated on the Virality Project, which tracks and analyzes purported 'COVID-19 vaccine misinformation and social media narratives related to vaccine hesitancy.'" *Id.*

422.   The collaboration with CISA on the Election Integrity Project is not the State Department's only involvement in federal social-media censorship activities. Documents produced so far in discovery from Defendants provide glimpses into the State Department's involvement on many fronts.

423.   For example, on February 4, 2020, Samaruddin K. Stewart, then a "Senior Advisor for the Global Engagement Center of the State Department" reached out to LinkedIn and stated

that he was "tasked with building relationships with technology companies … in [Silicon Valley] with interests in countering disinformation," and asked for a meeting.  As the email indicates, Stewart intended to reach out to other social-media platforms as well.

424.     On March 9, 2020, Stewart reached out to LinkedIn again, referring back to their earlier oral meeting, and stated, "I'll send information [to LinkedIn representatives] about gaining access to Disinfo Cloud – which is a GEC [*i.e.* State Department's Global Engagement Center] funded platform that offers stakeholders an opportunity to discovery companies, technology, and tools that can assist with identifying, understanding, and addressing disinformation."  On information and belief, "addressing disinformation" includes the censorship and suppression of private speech.

425.     On July 19, 2021, Stewart organized another meeting with LinkedIn and several State Department colleagues on the topic "countering disinformation."  On information and belief, Stewart engaged in similar meetings and coordination efforts with other social-media platforms as well.

426.     The State Department's Global Engagement Center has worked directly with CISA and FBI to procure the censorship of specific content on social media.  For example, on March 25, 2020, Alex Dempsey of the State Department forwarded to an FBI agent a report about a video on social media making ostensibly false allegations about a State Department officer.  Brian Scully of CISA forwarded the report to Facebook personnel, stating "see the below reporting from our State Department Global Engagement Center colleagues about disinformation … targeting a Diplomatic Security Officer."  Facebook responded, "Have flagged for our internal teams.  As always, we really appreciate the outreach and sharing of this information."  Scully also forwarded the State Department's report to Twitter and Google/YouTube.  In flagging the content for Google,

Scully commented, "It does appear the FBI has been notified, so you may have already heard from them."

427.     The State Department's Global Engagement Center, including Stewart and other State employees, were also involved in organizing a "misinformation and disinformation" workshop for African governments in May 2021.  Lauren Protentis of CISA and Joe Parentis, Deputy Coordinator for the State Department's Global Engagement Center, were speakers at the event.  The event was moderated by Elizabeth Vish of the State Department's Office of Cyber Coordinator.  The agenda for the event included a presentation by Facebook on "How does Facebook work with governments to address misinformation and disinformation?"  This included "Fact checking techniques, how to identify disinformation and misinformation," and "Proven techniques to take down these articles.  The effectiveness of fake news checkers," "Steps for stopping already-circulating misinformation," and "International takedown requests."   On information and belief, these statements reflected the collective experience of CISA and the State Department in working to achieve social-media censorship of domestic speech in America.

428.     CISA officials—including Defendants Easterly, Masterson, Protentis, Hale, Scully, and Snell, among others, have aggressively embraced the role of mediators of federally-induced censorship.

429.     As noted above, CISA states that its mission includes "directly engaging with social media companies to flag MDM," and that it is "working with federal partners to mature a whole-of-government approach to mitigating risks of MDM," which includes "framing which … interventions are appropriate to the threats impacting the information environment."   CISA repeatedly and frequently flags posts for censorship on social-media platforms, and continues to do so on an ongoing basis.

430.     CISA officials have flagged for censorship even obvious parody accounts, such as accounts parodying the Colorado government that stated in their mock Twitter handles "dm us your weed store location (hoes be mad, but this is a parody account)," and "Smoke weed erry day." To such reports, Twitter responded, "We will escalate.  Thank you," and "We have actioned these account under our civic integrity policy."

431.     CISA also works closely with the Center for Internet Security ("CIS"), an outside third-party group, to flag content for censorship on social media, including election-related speech. *See* Doc. 71-8.  On information and belief, CIS is or was funded by CISA and works as a joint participant with CISA on federal social-media censorship activities.   As early as June 2020, the Center for Internet Security, working with CISA, was planning a "Reporting Portal" for government officials seeking to suppress election misinformation that would allow "social media companies" to "process reports and provide timely responses, to include the removal of reported misinformation from the platform where possible."  Doc. 71-8, at 90.  CIS and CISA work closely to remove so-called "misinformation" by flagging content for removal by social-media companies.

432.     Documents reveal that CISA's authority as a national-security agency within DHS led to prompt responses and swift censorship actions in response to CISA's actions of "flagging" posts for censorship.  *See* Doc. 71-8.  This included many posts on election integrity issues where CISA acted as *de facto* judge of the truthfulness and value of social-media speech.

433.     CISA has also flagged named Plaintiffs' speech for censorship.  For example, in a "disinformation" conference regarding the 2020 election hosted by CISA, one presenter identified the Gateway Pundit, the website hosted by Plaintiff Jim Hoft, as a "repeat spreader" of "false or misleading content about the 2020 election."  The presenter stated that the Gateway Pundit is the second most frequent spreader of election-related disinformation, just above President Trump and

126

his two sons, Donald Jr. and Eric Trump, who were also described as "prolific spreaders of disinformation."  Other supposed "repeat spreaders" of disinformation identified at the CISA-hosted conference included Sean Hannity, Breitbart, James O'Keefe, and Mark Levin.  Gateway Pundit was called "one of the most prolific spreaders of misinformation across the entire [2020] election."  The presenter emphasized that every account identified as a spreader of disinformation was "ideologically pro-Trump" in its political orientation.  *See* Mike Benz, Foundation for Freedom Online, *DHS Encouraged Children to Report Family to Facebook for Challenging US Government Covid Claims*, at foundationforfreedomonline.com.  "In the same training session for state and local election officials, DHS's formal partner group then encouraged the mass reporting of US social media posts for censorship…." *Id.*

434.    CISA's "Protecting Critical Infrastructure from Misinformation & Disinformation Subcommittee Meeting" on March 29, 2022, included the following discussion flagging online speech by Jim Hoft's Gateway Pundit as misinformation warranting censorship: "Misinformation: A news release by Gateway Pundit provided factually inaccurate reporting announcing that Maricopa County elections officials held an unannounced meeting at the election and tabulation center," while election officials contended that "[t]his meeting was, in fact, a publicly announced tour with members of the public and legislators from both parties."

435.    On February 17, 2022, Lauren Protentis of CISA emailed contacts at Microsoft and stated: "The Department of Treasury has asked our team for appropriate POCs [*i.e.*, points of contact] to discuss social media and influence matters.  We'd like to make a connection to Microsoft if you're amenable?  This is somewhat time-sensitive, so thanks in advance to your attention to this matter."  The email was forwarded to recent CISA alumnus, now Microsoft employee, Matthew Masterson, who exchanged the text messages with Jen Easterly quoted above.

Masterson responded, "Send em to me.  I will make sure [the other Microsoft contact] is looped in."  Separately, Masterson's colleague at Microsoft responded that "Matt [Masterson] and I can be the primary POCs for the introduction."  Protentis responded, "We're going to pass your info to Treasury.  They will reach-out directly and provide more information about the nature of this request."

436.    On February 17, 2022, Protentis sent a similar email to Yoel Roth of Twitter (Nina Jankowicz's contact who was scheduled to attend the April 2022 meeting with Robert Silvers and senior DHS officials), asking for a Twitter point of contact for Treasury to "discuss social media and influence matters."  After Roth responded, Protentis stated that "Treasury … will reach-out directly to begin the dialogue and provide more information about the nature of this request."

437.    On February 17, 2022, Protentis reached out to a contact at Google, asking that "[t]he Department of Treasury has asked our team for appropriate POCs to discuss social media and influence matters.  We'd like to make the connection to Google if you're amenable?"  Protentis followed up just over an hour later, stating, "Apologies for the second email, this is somewhat time-sensitive, so thank you for your prompt attention to this request!"  When the Google contact responded, Protentis replied, "We're going to pass your info to Treasury.  They will reach-out directly and provide more information about the nature of this request."

438.    On February 17, 2022, Protentis reached out to contacts at Meta/Facebook and stated, "The Deputy Secretary at Treasury [*i.e.*, Defendant Wally Adeyemo] would like to be connected to industry partners to discuss potential influence operations on social media.  We'd like to make the connection to Meta if you're amenable?"  On information and belief, the nearly identically-phrased inquiries to Twitter and Microsoft that Protentis sent on the same day were also sent at Adeyemo's request.

439.     On information and belief, these messages reflect the participation of Treasury and Adeyemo in federal censorship activities.

440.     In response to a third-party subpoena, counsel for Meta identified the EAC's Executive Director Mark Robbins and the EAC's Communications Director Kristen Muthig as officials who may "have communicated with Meta regarding content moderation between January 1, 2020 and July 19, 2022 as it relates to: (i) COVID-19 misinformation; (ii) the Department of Homeland Security's proposed Disinformation Governance Board; (iii) the New York Post story from October 14, 2020 about Hunter Biden's laptop computer; and/or (iv) election security, integrity, outcomes, and/or public confidence in election outcomes (not to include issues of foreign interference or related issues)."

441.     The EIP Report, discussed above, identifies the Election Assistance Commission as a federal agency working on social-media content issues alongside CISA, identified as "the lead on domestic vulnerabilities and coordination with state and local election officials."  The same paragraph states: "The Election Assistance Commission should remain in an amplifying role, pushing best practices and critical information out broadly to the election community."   EIP Report, at 235.  On information and belief, the EAC's "critical information" that is "push[ed] … out broadly" includes federally induced censorship and/or suppression of social-media speech on the basis of content and viewpoint.

442.     In response to a third-party subpoena, Meta has identified Public Affairs Specialist Valerie Thorpe of the FDA; Michael Murray, who is the Acquisition Strategy for the Office of Health Communications and Education at the FDA; Brad Kimberly, who is the Director, Social Media at the FDA; and Erica Jefferson, Associate Commissioner for External Affairs at the FDA, as officials who may "have communicated with Meta regarding content moderation between

January 1, 2020 and July 19, 2022 as it relates to: (i) COVID-19 misinformation; (ii) the Department of Homeland Security's proposed Disinformation Governance Board; (iii) the New York Post story from October 14, 2020 about Hunter Biden's laptop computer; and/or (iv) election security, integrity, outcomes, and/or public confidence in election outcomes (not to include issues of foreign interference or related issues)."

443.     On information and belief, the FDA has participated in federally-induced censorship of private speech on social media about questions of vaccine safety and efficacy, among other subjects.

444.     Pursuant to third-party subpoena, YouTube has identified Census officials Schwartz, Molina-Irizarry, Galemore—as well as Deloitte employees/Census contractors Michael Jaret Saewitz and Caroline Faught—as involved in communications with YouTube about misinformation and content modulation of speech on YouTube.

445.     Census Bureau officials have openly stated that they are working with social-media companies to suppress so-called misinformation and disinformation.  For example, in 2020, Census boasted that Census "has established the government's first ever Trust & Safety Team" in order to "prevent the spread of fake, false and inaccurate information that can negatively influence 2020 Census participation and response."  *Census Partners with Social-Media Platforms, Community Organizations, the Public to Stop Spread of False Information*, at https://www.census.gov/library/stories/2020/02/putting-2020-census-rumors-to-rest.html    (Feb. 10, 2020).  "Trust & Safety Team" is what social-media platforms like Twitter call their censorship teams.

446.     Evidently, "preventing the spread of fake, false and inaccurate information" includes federally-induced censorship of free speech on social media.  Census states that it is

"[w]orking with social media platforms such as Facebook, Microsoft, Nextdoor, Google, and Pinterest to update their policies and terms of service to include census-specific activities," and "[c]oordinating with YouTube and Twitter to create processes enabling us to quickly identify and respond to misinformation and disinformation." *Id.* On information and belief, these activities include government-induced censorship of social-media speech. Census states: "These partnerships will help the Census Bureau counter false information that can lead to an undercount by quickly identifying phony information and respond with factual content."

447. In addition, Census invites private citizens to report suspected false information to the Census Bureau so that Census can arrange for it to be censored. Census directs the public to: "Report inaccurate, suspicious or fraudulent information to the Census Bureau. If you see or hear something, tell us: Report suspicious information and tips to rumors@census.gov. Reach out to us on our verified social media accounts (@USCensusBureau) to ask questions and flag suspicious information. Call the Census Bureau Customer Service Hotline at 1-800-923-8282 to report suspicious activity." *Id.*

448. As noted above, it is evident that Census responds to such reports by seeking to censor speech and content that it disfavors. Among other things, YouTube has disclosed that Census officials have been granted "trusted flagger" status to flag content for censorship on social media and receive privileged, expedited treatment for such reports.

449. Defendant Schwartz was the "operations manager for the Trust & Safety Team and deputy division chief for the Center for New Media and Promotion at the Census Bureau," who authored this report instructing the public to flag disinformation directly to Census.

450. "Trust & Safety Team" is a euphemism for the authorities within social-media platforms who are in charge of censoring and suppressing disfavored speech, speakers, and

content.  Census's creation of a like-named "Trust & Safety Team" was the creation of a federal censorship agency within Census.

451.     On its website, Census boasts that "the U.S. Census Bureau's Trust & Safety Team protected the 2020 Census from misinformation and disinformation."  Census Bureau, Trust & Safety Team, *at* https://www.census.gov/about/trust-and-safety.html.  This page notes that the "Trust & Safety Team's" censorship work continues today across expanded fronts: "We continue to watch for misinformation being shared online, and we work to share facts instead to help support communications around the Census Bureau's commitment to data quality and transparency around these efforts. The team's role has expanded to also support the American Community Survey (ACS), the Economic Census, and other Census Bureau programs and data products."  *Id.*  The same page continues to instruct the public to report so-called "misinformation" to Census for censorship: "Help the Census Bureau's Trust & Safety team by reporting inaccurate, suspicious, or fraudulent information you read, hear, or spot online, including: A rumor in a message board or group claiming the information you provided to the Census Bureau will be publicly disclosed…. An advertisement on social media sharing fake 2020 Census websites and inaccurate information. No matter what you find, let the Census Bureau know by contacting rumors@census.gov."  *Id.*

452.     The Trust & Safety Team openly states that it coordinates with social-media platforms to censor speech: "Trust & Safety Team coordinates and integrates our efforts with external technology and social media platforms, partner and stakeholder organizations, and cybersecurity officials…. Leveraging best practices from the public and private sectors, the Trust & Safety Team monitors all available channels and open platforms for misinformation and disinformation about the census.  Monitoring allows us to respond quickly to combat potential threats to achieving an accurate count in traditional media, social media and other stakeholder

communications.  As we discover misinformation and disinformation, the team *will coordinate the responses with partners and stakeholders*."  https://www.census.gov/newsroom/blogs/random-samplings/2019/12/why_the_census_burea.html.  "Coordinating the responses with partners and stakeholders," evidently, means working with social-media platforms to censor speech.

453.    In other Census publications, Schwartz and other Census officials claim that they are "harnessing the capabilities of social media platforms such as Facebook, Twitter, YouTube and Instagram … enables the Census Bureau to identify and respond to misinformation swiftly before it spreads."  https://www.census.gov/library/stories/2019/07/hey-siri-why-is-2020-census-important.html.  "The U.S. Census Bureau is partnering with tech giants to … respond to disinformation before it spreads."  https://www.census.gov/library/spotlights/2020/tech.html.

454.    Census also states that it has "partner[ed] with search engines" such as Google to de-boost disfavored content and promote Census-favored content above government-disfavored private content.  https://www.census.gov/library/spotlights/2020/nextdoor.html.

455.    Public reports indicate that Census teamed up with "Data & Society's Disinformation Action Lab" at the "Center for an Informed Public" at the University of Washington in a "behind-the-scenes networked response to mis- and disinformation about the 2020 U.S. Census, an effort that provides a model for future multi-stakeholder collaborations to mitigate          the          impacts          of          communication          harms." https://www.cip.uw.edu/2022/05/31/disinformation-action-lab-data-society-census-misinformation/.

456.    Center for an Informed Public's director is Kate Starbird, who also serves on CISA's advisory committee that advises CISA's social-media censorship activities.  According to CIP, "Beyond the Census Counts Campaign, DAL supported other national civil rights groups,

local civil society groups, state and city government officials, and worked with *social media companies*, journalists, and *the Census Bureau itself* — all to protect a complete and fair count from mis- and disinformation." *Id.* (emphasis added).

457.     As alleged further herein, Census officials also participate in censorship activities relating to so-called COVID-19 misinformation

458.     On information and belief, as further alleged herein, all Defendants have been and are engaged in federally-induced censorship of private speech on social media, in a manner that directly interferes with and injures the free-speech rights of Plaintiffs and their citizens.

**E.  Defendants' Conduct Has Inflicted and Continues to Inflict Grave Injuries on Plaintiffs, Missourians, Louisianans, and all Americans.**

459.     Defendants' conduct, as alleged herein, has inflicted and continues to inflict grave, ongoing injuries on Plaintiffs, Missourians and Louisianans, and all Americans.  Many of these injuries are detailed in the previously filed Declarations submitted in support of the States' Motion for Preliminary Injunction, ECF Nos. 10-2 to 10-15, which are attached to the First Amended Complaint as Exhibits B to O, and incorporated by reference herein.

**1.     Ongoing injuries inflicted on Plaintiff States.**

460.     First, the Defendants' conduct has inflicted and continues to inflict at least eight forms of imminent, continuing, irreparable injury on the Plaintiff States, Missouri and Louisiana.

461.     *First*, both Missouri and Louisiana have adopted fundamental policies favoring the freedom of speech, including on social media.  Missouri's Constitution provides: "[N]o law shall be passed impairing the freedom of speech, no matter by what means communicated… [E]very person shall be free to say, write or publish, or otherwise communicate whatever he will on any subject…." MO. CONST. art. I, § 8.  Louisiana's Constitution provides: "No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his

sentiments on any subject, but is responsible for abuse of that freedom." LA. CONST. art. I, § 7. The federal censorship program directly undermines Missouri's and Louisiana's fundamental policies favoring the freedom of speech, and thus it inflicts a clear and direct injury on the States' sovereignty. *See Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015).

462.     *Second*, the States and their agencies and political subdivisions have suffered government-induced online censorship directly.   For example, Louisiana's Department of Justice—the office of its Attorney General—was directly censored on YouTube for posting video footage of Louisianans criticizing mask mandates and COVID-19 lockdown measures on August 18, 2021—just after the federal Defendants' most vociferous calls for censorship of COVID "misinformation."  Bosch Decl. ¶ 7.  A Louisiana state legislator was censored by Facebook when he posted content addressing vaccinating children against COVID-19.  Bosch Decl. ¶ 9.  St. Louis County, a political subdivision of Missouri, conducted public meetings regarding proposed county-wide mask mandates, at which some citizens made public comments opposing mask mandates.  Flesh Decl. ¶ 7.  YouTube censored the entire videos of four public meetings, removing the content, because some citizens publicly expressed views that masks are ineffective.  *Id.*

463.     *Third*, State agencies—such as the Offices of the States' Attorneys General—closely track and rely on free speech on social media to understand their citizens' true thoughts and concerns.  *See, e.g.,* Flesch Decl. ¶ 4 ("I monitor these trends on a daily or even hourly basis…"); Bosch Decl. ¶ 6.  This allows them to craft messages and public policies that are actually responsive to their citizens' concerns.  Flesch Decl. ¶ 5; Bosch Decl. ¶¶ 4-6.  Censorship of social-media speech directly interferes with this critical state interest, because it "directly interferes with [our] ability to follow, measure, and understand the nature and degree of [constituents'] concerns." Flesh Decl. ¶ 6.

135

464.     *Fourth*, social-media censorship thwarts the States' ability to provide free, fair, and open political processes that allow citizens to petition their government and advocate for policy changes.  Social-media censorship has perverted state and local political processes by artificially restricting access to the channels of advocacy to one side of various issues.  For example, social-media censorship prevented Louisiana advocacy groups from organizing effectively to advocate in favor of legislative action on issues of great public import.  Hines Decl. ¶¶ 13-14.  Likewise, social-media censorship prevented a Missouri parent from circulating an online petition to advocate against mandatory masking at his local school district, a political subdivision of the State. McCollum Decl. ¶¶ 9-17; Gulmire Decl. ¶¶ 11-16, 18-19.  Such censorship—which directly interferes with citizens' ability to petition their government—thwarts the States' interest in providing fair and open processes to petition state officials.

465.     *Fifth*, federally induced social-media censorship directly affects Missouri, because it has resulted in the extensive censorship of Plaintiff Dr. Bhattacharya, who serves as an expert witness for Missouri in a series of lawsuits challenging mask and vaccine mandates.  *See* Bhattacharya Decl. ¶ 4.  Censorship of Dr. Bhattacharya reduces the message and impact of Missouri's own retained expert witness.  *See id.* ¶¶ 17-32.  Likewise, the Missouri Attorney General's Office relied heavily on the high-quality German survey study of 26,000 schoolchildren, finding that 68 percent reported harms from masking in school, in its lawsuits challenging school mask mandates.  That study was censored on social media as a result of Defendants' campaign, and Missouri was lucky to find it because it is in German and not cited on social media.  "Because online censorship acts as a prior restraint on speech," Missouri "will never know exactly how much speech … on social media never reaches [our] eyes because it is censored in advance, or as soon as it is posted."  Flesch Decl. ¶ 11.

466.     *Sixth*, Missouri and Louisiana have a quasi-sovereign interest in protecting the free-speech rights of "a sufficiently substantial segment of its population," and preventing *ultra vires* actions against those rights. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). This falls within Missouri's and Louisiana's "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Id.* This injury "suffices to give the State standing to sue as *parens patriae*" because "the injury" to Missourians' and Louisianans' free-speech and free-expression rights "is one that the State[s] … would likely attempt to address through [their] sovereign lawmaking powers." *Id.* at 607. Indeed, they have done so. *See, e.g.,* MO. CONST., art. I, § 8; LA. CONST., art. I, § 7.

467.     *Seventh*, Missouri and Louisiana "ha[ve] an interest in securing observance of the terms under which [they] participate[] in the federal system." *Alfred L. Snapp*, 458 U.S. at 607–08. This means bringing suit to "ensur[e] that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system." *Id.* at 608. Free-speech rights, and protection from *ultra vires* actions destroying them, are foremost among the "benefits that are to flow from participation in the federal system." *Id.* Missouri and Louisiana "have an interest, independent of the benefits that might accrue to any particular individual, in assuring that the benefits of the federal system are not denied to its general population." *Id.*

468.     *Eighth*, Missouri and Louisiana have a unique interest in advancing, protecting, and vindicating the rights of their citizens who are listeners, readers, and audiences of social-media speech. As noted above, the First Amendment protects the rights of the speakers' audiences, such as listeners and readers, to have access to protected speech. *See, e.g., Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). As a result of Defendants' censorship, the States' many citizens, as readers and followers of social-media speech, suffer an

injury that is individually too diffuse to warrant filing their own lawsuits, yet the injury is all the greater because it is spread among millions of readers. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963) (holding that, where one plaintiff "is not likely to sustain sufficient … injury to induce him to seek judicial vindication of his [First Amendment] rights," a plaintiff with a greater stake may assert them, lest "infringements of freedom of the press may too often go unremedied"). The States have a "close relationship" with their citizens, as readers and listeners of social-media speech, because they are specifically authorized by state law to vindicate those rights. And there is a "hindrance" to their citizens' asserting their own rights, because each individual injury is too diffuse to warrant litigation. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); *Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956-57 (1984).

469.     All these injuries to the State Plaintiffs and their citizens are continuing and ongoing, and they constitute irreparable harm.

**2.  Ongoing injuries inflicted on the private Plaintiffs and their social-media followings.**

470.     The private Plaintiffs Bhattacharya, Hines, Hoft, Kheriaty, and Kulldorff, and their social-media audiences and/or potential social-media audiences (*i.e.*, the larger audiences who would hear them if they were not censored)—who include thousands or millions of Missourians and Louisianans—have suffered and are suffering grave and ongoing injuries as well. Identical injuries afflict many similarly situated speakers and audiences who have been affected by the government-induced censorship procured by Defendants as well.

471.     Government-induced online censorship affects the private Plaintiffs and enormous segments of Missouri's and Louisiana's populations. The censorship affects speakers with all sizes of audiences—from small groups of concerned parents seeking to share concerns on neighborhood networking sites, Flesch Decl. ¶ 9; to social-media titans, such as Plaintiff Jim Hoft, who is one of

the most influential online voices in the country, with over a million social-media followers, Hoft Decl. ¶¶ 2-3.  Censorship affects some of the most highly credentialed physicians in the world, speaking on matters of core competence, such as Plaintiffs Bhattacharya, Kulldroff, and Kheriaty, scientists and medical professors at Stanford, Harvard, and the University of California.  *See* Bhattacharya Decl. ¶¶ 2-5; Kulldorff Decl. ¶¶ 2-6; Kheriaty Decl. ¶¶ 2-5.

472.     This censorship encompasses social-media accounts with hundreds of thousands of followers, including the private Plaintiffs' accounts, which include many thousands of followers in Missouri and Louisiana.  *See* Hoft Decl. ¶ 3 (Missouri-based speaker with 400,000 Twitter followers, 650,000 Facebook followers, 98,000 YouTube subscribers, 205,000 Instagram followers); Kulldorff Decl. ¶ 7 ("250,800 followers on Twitter and 13,400 contacts and followers on LinkedIn"); Kheriaty Decl. ¶ 3 (158,000 Twitter followers, even though artificially capped by Twitter); Allen Decl. ¶ 15 (the entire YouTube channel of a conservative talk-radio station based in Missouri); Changizi Decl. ¶ 7 (37,000 Twitter followers); Senger Decl. ¶ 3 (112,000 Twitter followers); Kotzin Decl. ¶¶ 3-4 (31,900 followers); Kitchen Decl. ¶ 32 (over 44,000 Twitter followers).  These declarants provide only a representative slice of the enormous suppressions inflicted by Defendants' conduct on countless similarly situated speakers and audiences, including in Missouri and Louisiana. *See, e.g.,* Bhattacharya Decl. ¶ 31.

473.     Defendants' censorship squelches Plaintiffs' core political speech on matters of great public concern.  This includes speech relating to COVID-19 policies—especially speech criticizing the government's response to COVID-19.  *See, e.g.,* Hoft Decl. ¶¶ 6, 12; Bhattacharya Decl. ¶¶ 15-31; Kulldorff Decl. ¶¶ 14-30; Kheriaty Decl. ¶¶ 16-17; Hines Decl. ¶¶ 7-14.  It also extends to speech about election security and integrity, including core political speech. *See, e.g.*,

Hoft Decl. ¶¶ 7-8, 14; Allen Decl. ¶ 14-15; Flesh Decl. ¶ 8.  And the censorship targets speech simply because it is critical of the President of the United States.  *See, e.g.,* Hoft Decl. ¶ 10.

474.      Government-induced censorship of Plaintiffs' and others' speech is achieved through a wide variety of methods, ranging from complete bans, temporary bans, insidious "shadow bans" (where neither the user nor his audience is notified of the suppression), deboosting, de-platforming, de-monetizing, restricting access to content, imposing warning labels that require click-through to access content, and many other ways.  These include temporary and permanent suspensions of many speakers.  *See, e.g.,* Hoft Decl. ¶¶ 6-8; Kheriaty Decl. ¶ 16; Bhattacharya Decl. ¶ 16; Changizi Decl. ¶¶ 18-23; Allen Decl. ¶ 15; *see also* Bhattacharya Decl. ¶ 31 ("Twitter, LinkedIn, YouTube, Facebook, they have permanently suspended many accounts—including scientists.").  It includes suppressing specific content, such as removing or blocking social-media posts and videos.  *See, e.g.,* Hoft Decl. ¶ 14; Bhattacharya Decl. ¶¶ 17-18; Changizi Decl. ¶ 36.  It includes demonetization by technology firms, *see* Hoft Decl. ¶ 19, and deboosting search results to bury the most relevant results, Bhattacharya Decl. ¶ 16.  It includes suppressing posts in news feeds, and imposing advisory labels and "sensitive content" labels, making it more difficult to access specific content.  *See, e.g.,* Hoft Decl. ¶ 13; Changizi Decl. ¶ 27-28.  It includes insidious methods of censorship like surreptitious de-boosting and "shadow-banning," where the censor does not notify the speaker or the audience of the censorship.  Many speakers discover through circumstantial methods that they have been shadow-banned.  *See, e.g.,* Kheriaty Decl. ¶¶ 14-15.  It includes indirect methods of shadow-banning such as artificially limiting the number of followers of a disfavored account.  Kheriaty Decl. ¶¶ 12-13; Changizi Decl. ¶ 31.  All these forms of censorship directly impact Plaintiffs and their social-media audiences, and they continue to do so.

475.     Such censorship has compounded effects on the freedom of expression, creating massive distortions in the free marketplace of ideas.  As noted above, much speech is suppressed in secret, so the speakers and audience never know whether or how much speech was silenced. *See, e.g.,* Kheriaty Decl. ¶¶ 14-15.  Censorship of the principal speaker, moreover, deters other speakers from re-tweeting, re-posting, or "amplifying" the content, which suppresses even more speech and further artificially reduces the speakers' audience.  *See* Hoft Decl. ¶ 15.  And, perniciously, censorship commonly leads to self-censorship, as online speakers carefully restrict what they say to avoid the (often financially catastrophic) consequences of a suspension or ban. *See, e.g.,* Hoft Decl. ¶ 16; Bhattacharya Decl. ¶ 31; Kheriaty Decl. ¶ 16.

476.     Like the injuries to the State Plaintiffs and their citizens, these injuries to the private Plaintiffs and their audiences are imminent and ongoing, and they constitute irreparable harm.

**3.     Defendants' conduct has directly caused Plaintiffs' injuries.**

477.     For the reasons alleged in greater detail herein, Defendants' conduct has directly caused and continues to directly cause Plaintiffs' injuries.  By their campaign of threats, coordination, and collusion, Defendants have successfully induced social-media platforms to impose acts of censorship that have directly injured all Plaintiffs and their audiences.  These are acts of censorship that the social-media companies, but for Defendants' unlawful conduct, otherwise would not have imposed.

478.     Overwhelming evidence supports the conclusion that Defendants have caused Plaintiffs' injuries, alleged above, by inducing social-media platforms to engage in increased censorship.  As the allegations herein emphasize, there is powerful support for the conclusion of direct causation between Defendants' conduct and Plaintiffs' free-speech injuries.  This evidence includes, but is not limited to, the following:

479.      *First*, as alleged above, in the absence of Defendants' campaign for social-media censorship, market forces and other incentives would have and did restrain social-media platforms from engaging in the social-media censorship alleged herein.  Notably, as noted above, prior to Defendants' campaign of threats and pressure, social-media platforms generally declined to engage in the acts of censorship alleged herein.

480.      *Second*, as alleged above, the campaign of threats of adverse legal consequences from Defendants and their political allies—directly linked to demands for greater censorship—are *highly motivating* to social-media platforms, because they address matters of great import and potential legal vulnerability, such as Section 230 immunity and the prospect of antitrust enforcement.  These threats became even more motivating at the beginning of 2021, when Defendants and their allies took control of the Executive Branch, with all its powerful agencies, and both Houses of Congress, indicating that they had the ability to carry out their threats.  By responding to these threats, social-media platforms are merely "reacting in predictable ways," and their greatly increased censorship is merely "the predictable effect of Government action on the decisions of third parties."  *Department of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).

481.      *Third*, the *timing* of many censorship decisions—coming immediately after Defendants' demands for increased censorship—strongly supports the conclusion that Defendants' conduct has *caused* the censorship of free speech on social media.  As alleged further herein, there are many examples of censorship crack-downs by social-media platforms that immediately followed demands for censorship from federal officials, including Defendants.  These include, but are not limited to, (1) the *en masse* deplatforming of the "Disinformation Dozen" after Jen Psaki publicly demanded it; (2) the censorship of the Great Barrington Declaration and Plaintiffs Bhattacharya and Kulldorff just after a senior HHS official called for a "quick and devastating …

take-down" of the Declaration, Bhattacharya Decl. ¶¶ 6, 14; *id.* ¶¶ 15-31; and (3) Twitter's deplatforming of Alex Berenson just after the President stated, "They're killing people" and Dr. Fauci publicly singled out Berenson; among many others.

482.     *Fourth*, Defendants have openly admitted that they and other federal officials are directly involved in specific censorship decisions by social-media platforms.  Among other examples, Jen Psaki publicly admits that "we're flagging problematic posts for Facebook" and that "they certainly understand what our asks are."  Secretary Mayorkas states that "we're working together … with the tech companies that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring," and that this collaboration is happening "across the federal enterprise."  Easterly states that she works directly "with our partners in the private sector and throughout the rest of the government and at the department to continue to ensure that the American people have the facts that they need to help protect our critical infrastructure."  CISA openly states that its "MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms."  And so forth.

483.     *Fifth*, social-media platforms openly admit that they consult with and rely on government officials to identify what content to censor.  For example, Facebook's "COVID and Vaccine Policy Updates and Protections" states that Facebook does "not allow false claims about the vaccines or vaccination programs which *public health experts have advised us* could lead to COVID-19 vaccine rejection."  (emphasis added).  As noted above, "[a] Facebook spokesperson said the company has *partnered with government experts*, health authorities and researchers to take 'aggressive action against misinformation about COVID-19 and vaccines to protect public health.'"  Twitter, likewise, admits that it coordinates with government officials in identifying what

to censor. For example, its "Civic integrity policy" states that Twitter "will label or remove false or misleading information intended to undermine public confidence in an election or other civic process" and that it "work[s] with select government and civil society partners in these countries to provide additional channels for reporting and expedited review" of so-called "misinformation." Twitter's "COVID-19 misleading information policy" states that it "primarily enforce[s] this policy in close coordination with trusted partners, including public health authorities, NGOs and *governments*, and continue[s] to use and consult with information from those sources when reviewing content." Similarly, YouTube's "COVID-19 medical misinformation policy" states that "YouTube doesn't allow content that spreads medical misinformation that contradicts local health authorities' or the World Health Organization's medical information about COVID-19. … YouTube's policies on COVID-19 are subject to change in response to changes to global or local health authorities' guidance on the virus."

484. *Sixth*, the *content* of the censorship decisions evidences Defendants' direct influence on censorship, because those decisions focus on the areas of concern for Defendants and uniformly favor Defendants' preferred narratives. For example, Dr. Kheriaty notes that "[t]he pattern of content censored on these social media platforms mirrors closely the CDC and Biden administration policies…. [A]ny content that challenges those federal policies is subject to severe censorship, without explanation, on Twitter and YouTube—even when the information shared is taken straight from peer-reviewed scientific literature." Kheriaty Decl. ¶ 18. Regarding shadow-banning in particular, he observes that "[t]he posts most subject to this were those that challenged the federal government's preferred covid policies." Kheriaty Decl. ¶ 15. Likewise, the censorship of social-media speech about COVID-19 and election security directly reflects the calls for censorship from federal officials. Hoft Decl. ¶¶ 4, 16. Censorship of Hoft's speech has focused

on topics specifically targeted for censorship by DHS as "domestic terrorism," including in its National Terrorism Advisory System Bulletin from February 7, 2022.  Hoft Decl. ¶ 20; *id.* Ex. 7, at 1.  Further, this censorship is heavily *one-sided* in the government's favor—"Twitter notoriously suspends only those who question the wisdom and efficacy of government restrictions, or who cast doubt on the safety or efficacy of the vaccines," but "there are no examples of Twitter suspending individuals who have spread misinformation from the other side—by, for example, exaggerating the efficacy of masks or the threat the virus poses to children."  Changizi Decl. ¶¶ 50-51; *see also* Kotzin Decl. ¶ 33.   As Dr. Bhattacharya notes, "Having observed and lived through the government-driven censorship of the Great Barrington Declaration and its co-authors, it is clear to me that these attacks were politically driven by government actors."  Bhattacharya Decl. ¶ 32.

485.      *Seventh*, the revelation of recent internal documents—such as the DGB whistleblower documents, and the CDC emails released last week—demonstrate beyond any possible doubt that Defendants are *directly involved* in and are *directing* social-media censorship decisions, both by identifying high-level topics of censorship and by identifying specific posts and types of postings for censorship.  CDC and Census Bureau officials demonstrate that this direct, collusive involvement of federal officials in specific and general censorship decisions happens on a wide scale, and the DGB documents quoted above indicate that such "MDM"-censorship activities are occurring "across the federal enterprise."  The documents revealed in discovery and filed with the Court reflect the same practices among all other Defendants, as alleged further herein.

486.      For all these reasons, among others, it is perfectly clear that Defendants' conduct has *caused* the general and specific censorship policies and decisions alleged herein.

487.     For similar reasons, an order and judgment from this Court preventing the continuation of Defendants' conduct will redress Plaintiffs' ongoing injuries.  Defendants' conduct has caused social-media platforms to engage in the censorship decisions that have injured Plaintiffs, and an order ceasing Defendants' conduct will alleviate those injuries.

488.     Defendants are continuing, and are likely to continue, to engage in the unlawful conduct alleged herein.

## CLASS ALLEGATIONS

489.     Pursuant Federal Rule of Civil Procedure 23(a) and 23(b)(2), Plaintiffs Bhattacharya, Hines, Hoft, Kheriaty, and Kulldorff bring this action on behalf of themselves and two classes of other persons similarly situated to them.

490.     Plaintiffs propose to define the first class ("Class 1") as follows: The class of social-media users who have engaged or will engage in, or who follow, subscribe to, are friends with, or are otherwise connected to the accounts of users who have engaged or will engage in, speech on any social-media company's platform(s) that has been or will be removed; labelled; used as a basis for suspending, deplatforming, issuing strike(s) against, demonetizing, or taking other adverse action against the speaker; downranked; deboosted; concealed; or otherwise suppressed by the platform after Defendants and/or those acting in concert with them flag or flagged the speech to the platform(s) for suppression.

491.     Plaintiffs propose to define the second class ("Class 2") as follows: The class of social-media users who have engaged in or will engage in, or who follow, subscribe to, are friends with, or are otherwise connected to the accounts of users who have engaged in or will engage in, speech on any social-media company's platform(s) that has been or will be removed; labelled; used as a basis for suspending, deplatforming, issuing strike(s) against, demonetizing, or taking

other adverse action against the speaker; downranked; deboosted; concealed; or otherwise suppressed by the company pursuant to any change to the company's policies or enforcement practices that Defendants and/or those acting in concert with them have induced or will induce the company to make.

492.     Class 1 is sufficiently numerous that joinder of all members is impracticable. Defendants' conduct, as alleged further herein, involves flagging for suppression the social-media content of hundreds of users with, collectively, hundreds of thousands or millions of followers.

493.     Class 2 is sufficiently numerous that joinder of all members is impracticable.  As alleged further herein, Defendants' conduct has resulted policy and enforcement-practice changes at social-media platforms that have caused censorship affecting thousands if not millions of social-media users as speakers and/or audience members.

494.      Class 1 members' claims share questions of law or fact in common, including the question whether the government is responsible for a social-media company's suppression of content that the government flags to the company for suppression.

495.     Class 2 members' claims share questions of law or fact in common, including the question whether the government is responsible for a social-media company's suppression of content pursuant to a policy or enforcement practice that the government induced the company to adopt or enforce.

496.     The individual Plaintiffs' claims are typical of those of Class 1 members. The claims of the individual Plaintiffs and Class 1 members all arise from the same course of conduct by Defendants, namely, their practice of particular flagging content to social-media companies for suppression, and they are all based on the same legal theory, namely, the theory that such conduct

violates the First Amendment. The individual Plaintiffs are not subject to any affirmative defenses that are inapplicable to the rest of the class and likely to become a major focus of the case.

497.     The individual Plaintiffs' claims are typical of those of Class 2 members. The claims of the individual Plaintiffs and Class 2 members all arise from the same course of conduct by Defendants, namely, their practice of inducing social-media companies to adopt stricter content-moderation policies and enforcement practices, and are all based on the same legal theory, namely, the theory that such conduct violates the First Amendment. The individual Plaintiffs are not subject to any affirmative defenses that are inapplicable to the rest of the class and likely to become a major focus of the case.

498.     The individual Plaintiffs are willing and able to take an active role in the case, control the course of litigation, and protect the interests of absentees in both classes. No conflicts of interest currently exist or are likely to develop between Private Plaintiffs and absentees in either class.

499.     The proposed class counsel are two of the individual Plaintiffs' counsel, John J. Vecchione and John C. Burns. Mr. Vecchione and Mr. Burns have extensive experience litigating class actions and/or First Amendment and other civil-rights cases. Mr. Vecchione and Mr. Burns have the zeal and competence required to provide adequate representation for both classes.

500.     The proposed classes are defined in terms that are objective and precise.

501.     Defendants have acted on grounds that apply generally to both classes in that Defendants have targeted speech expressed by or addressed to members of both classes on the ground that the speech expresses a viewpoint Defendants disfavor. Consequently, injunctive relief and corresponding declaratory relief is appropriate respecting each class as a whole.

## CLAIMS FOR RELIEF

## COUNT ONE – VIOLATION OF THE FIRST AMENDMENT
### Against All Defendants

502.     All foregoing Paragraphs are incorporated as if set forth fully herein.

503.     The First Amendment prohibits Congress from making laws "abridging the freedom of speech." U.S. CONST. amend. I.  This prohibition applies to restrictions on speech by all branches of the federal government. *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017).

504.     The Constitutions of Missouri, Louisiana, and every other State provide similar or more robust protection for free-speech rights.

505.     An enormous amount of speech and expression occurs of social media.  Social-media platforms have become, in many ways, "the modern public square." *Packingham*, 137 S. Ct. at 1737.  Social media platforms provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id.*  They also permit private citizens to interact directly with public and elected officials.

506.     Social-media platforms are akin to common carriers and/or public accommodations that, under longstanding statutory and common-law doctrines, should be subject to non-discrimination rules in accessing their platforms, which discrimination on the basis of content and viewpoint would violate.

507.     "Historically, at least two legal doctrines limited a company's right to exclude." *Knight First Amendment Institute*, 141 S. Ct. at 1222 (Thomas, J., concurring).  "First, our legal system and its British predecessor have long subjected certain businesses, known as common carriers, to special regulations, including a general requirement to serve all comers." *Id.*  "Second, governments have limited a company's right to exclude when that company is a public accommodation. This concept—related to common-carrier law—applies to companies that hold themselves out to the public but do not 'carry' freight, passengers, or communications." *Id.*

149

Absent the artificial immunity created by the overbroad interpretations of Section 230 immunity, these legal doctrines—along with private and free-market forces—would impose a powerful check on content- and viewpoint-based discrimination by social-media platforms.  *See id.*

508.　　　As alleged further herein, through Section 230 immunity and other actions, the federal government has abrogated these legal restraints on social-media censorship; it has artificially subsidized, encouraged, and enabled the emergence of a small group of immensely powerful social-media companies; and it has conferred on that cartel powerful legal shields protecting its ability to censor and suppress speech on social media based on content and viewpoint with impunity.

509.　　　As alleged further herein, Defendants have coerced, threatened, and pressured social-media platforms to censor disfavored speakers and viewpoints by using threats of adverse government action, including threats of increased regulation, antitrust enforcement or legislation, and repeal or amendment of Section 230 CDA immunity, among others.

510.　　　As alleged further herein, Defendants also hold out the "carrot" of continued protection under Section 230 and antitrust law, and thus preserving the legally favored status of social-media platforms.  Commentators have aptly summarized this carrot-stick dynamic: "Section 230 is the carrot, and there's also a stick: Congressional Democrats have repeatedly made explicit threats to social-media giants if they failed to censor speech those lawmakers disfavored."  Vivek Ramaswamy and Jed Rubenfeld, *Save the Constitution from Big Tech: Congressional threats and inducements make Twitter and Facebook censorship a free-speech violation*, WALL STREET JOURNAL (Jan. 11, 2021).  "Facebook and Twitter probably wouldn't have become behemoths without Section 230."  *Id.*  "Either Section 230 or congressional pressure alone might be sufficient to create state action. The combination surely is."  *Id.*

511.     As alleged further herein, as a result of such threats and inducements, Defendants are now directly colluding with social-media platforms to censor disfavored speakers and viewpoints, including by pressuring them to censor certain content and speakers, and "flagging" disfavored content and speakers for censorship.  Defendants have thus engaged in joint action with private parties and acted in concert with private parties to deprive Plaintiffs, Missourians, Louisianans, and Americans of their constitutional rights under the First Amendment and related state-law rights.

512.     Defendants' actions constitute government action for at least five independently sufficient reasons: (1) absent federal intervention, common-law and statutory doctrines, as well as voluntary conduct and natural free-market forces, would have restrained the emergence of censorship and suppression of speech of disfavored speakers, content, and viewpoint on social media; and yet (2) through Section 230 of the CDA and other actions, the federal government subsidized, fostered, encouraged, and empowered the creation of a small number of massive social-media companies with disproportionate ability to censor and suppress speech on the basis of speaker, content, and viewpoint; (3) such inducements as Section 230 and other legal benefits (such as the absence of antitrust enforcement) constitute an immensely valuable benefit to social-media platforms to do the bidding of federal government officials; (4) federal officials—including, most notably, Defendants herein—have repeatedly and aggressively threatened to remove these legal benefits and impose other adverse consequences on social-media platforms if they do not increase censorship and suppression of disfavored speakers, content, and viewpoints; and (5) Defendants herein, conspiring and colluding both with each other and social-media firms, have directly coordinated with social-media platforms to identify disfavored speakers, viewpoints, and content and have procured the actual censorship and suppression of them on social media.  These

factors, considered either individually or collectively, establish that the social-media censorship alleged herein constitutes government action.  These actions have dramatically impacted the fundamental right of free speech in Missouri, Louisiana, and America, both on social media and elsewhere.

513.     As alleged herein, Defendants have acted in concert both with each other, and with others, to violate the First Amendment and state-level free speech rights.

514.     Defendants' actions violate the First Amendment and analogous state constitutional protections.  The First Amendment is violated where, as here, "if the government coerces or induces it to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint." *Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring).  "The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly." *Id.*

515.     The censorship and suppression of speech that Defendants have induced social-media platforms to impose on disfavored speakers, content, and viewpoints constitute forms of prior restraints on speech, which are the most severe restrictions and the most difficult to justify under the First Amendment.  "One obvious implication of" the First Amendment's text "is that the government usually may not impose prior restraints on speech."  *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022).

516.     These actions have injured and continue to injure Plaintiffs, as well as Missouri's, Louisiana's, and other States' citizens, both speakers and users of social media, and they have injured Missourians, Louisianans, and Americans who do not use social media by their predictable

effect on the availability of information through social-media users, who often repeat or communicate information presented on social media to non-users.

517.    These actions have also injured and continue to injure Plaintiffs, as well as Missouri's, Louisiana's, and other States' citizens, by broadly chilling the exercise of free-speech rights on social-media platforms.  This injures the First Amendment and state-level rights of all citizens, both users and non-users of social media, by reducing the availability of free speech in a free marketplace of ideas.  Much social-media speech is available to non-users of social media on the internet, and social-media users convey speech and information learned on social media platforms to non-users of social media through many other means.  Suppressing speech on social media, therefore, directly impacts the First Amendment rights of non-social media users, as well as users.

518.    Defendants' interference with First Amendment and state free-speech rights of Plaintiffs and virtually all Missourians, Louisianans, and Americans is *per se* unconstitutional, and even if not, it cannot be justified under any level of constitutional scrutiny.

519.    Defendants' interference with First Amendment rights of Plaintiffs and virtually all Missourians and Louisianans also interferes with rights that the States guaranteed to them under their respective state constitutions.  Defendants' interference thus undermines the system of rights the States provided to their citizens, effectively limiting the reach of each State's fundamental law and thwarting the fundamental policies of each sovereign State.

520.    Defendants' conduct inflicts imminent, ongoing, and continuing irreparable injury on Plaintiffs, as alleged further herein.

521.    Subject to the limitation that the Court may grant only declaratory and not injunctive relief against the President in his official capacity, the Court has inherent authority to

declare, enjoin, restrain, enter judgment, and impose penalties on Defendants and other federal

actors, and those acting in concert with them, to prevent and restrain violations of federal law,

including the First Amendment.  "The ability to sue to enjoin unconstitutional actions by state and

federal officers is the creation of courts of equity, and reflects a long history of judicial review of

illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Center, Inc.*,

575 U.S. 320, 327 (2015).

### COUNT TWO – ACTION IN EXCESS OF STATUTORY AUTHORITY
### Against All Defendants

522.    All foregoing Paragraphs are incorporated as if set forth fully herein.

523.    No federal statute authorizes the Defendants' conduct in engaging in censorship,

and conspiracy to censor, in violation of Plaintiffs', Missourians', Louisianans', and Americans'

free-speech rights.

524.    "An agency's power is no greater than that delegated to it by Congress."  *Lyng v.

Payne*, 476 U.S. 926, 937 (1986).  Agency actions that exceed the agency's statutory authority are

*ultra vires* and must be invalidated.

525.    No statute authorizes any Defendants—including but not limited to White House

officials, HHS officials, DHS officials, and any other federal officials or agencies—to engage in

the course of conduct regarding the censorship and suppression of speech on social media as

alleged herein.

526.    No statute authorizes Defendants—including but not limited to White House

officials, HHS officials, DHS officials, and any other federal officials or agencies—to identify

what constitutes "misinformation," "disinformation," and/or "malinformation" in public discourse

on social-media platforms; to direct, pressure, coerce, and encourage social-media companies to

censor and suppress such speech; and/or to demand that private companies turn over information

about speech and speakers on their platforms in the interest of investigating "misinformation," "disinformation," and/or "malinformation."

527.    Further, the interpretation of any statute to authorize these actions would violate the non-delegation doctrine, the canon of constitutional avoidance, the major-questions doctrine, the Supreme Court's clear-statement rules, and other applicable principles of interpretation.  No statute may be properly construed to do so.

528.    Defendants and the federal officials acting in concert with them, by adopting the censorship policies and conduct identified herein, have acted and are acting without any lawful authority whatsoever, and without any colorable basis for the exercise of authority.  No federal statute, regulation, constitutional provision, or other legal authority authorizes their social-media-censorship program, and it is wholly *ultra vires*.

529.    Defendants' *ultra vires* actions inflict ongoing irreparable harm on Plaintiffs, as alleged herein.

### COUNT THREE – VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
### Against the HHS Defendants

530.    All foregoing Paragraphs are incorporated as if set forth fully herein.

531.    Defendants HHS, NIAID, CDC, FDA, Becerra, Murthy, Crawford, Fauci, Galatas, Waldo, Byrd, Choi, Lambert, Peck, Dempsey, Muhammed, Jefferson, Murray, and Kimberly are referred to collectively herein as the "HHS Defendants."

532.    As set forth herein, the HHS Defendants' conduct is unlawful, arbitrary and capricious, an in excess of statutory authority under the Administrative Procedure Act.

533.    The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law…."  5 U.S.C. § 706(2)(A)-(D).  The HHS Defendants' conduct violates all of these prohibitions.

534.     Defendants HHS, CDC, and NIAID are "agencies" within the meaning of the APA. Defendants Becerra, Fauci, and Murthy, in their official capacities, are the heads of federal agencies.

535.     The HHS Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action from by which "rights or obligations have been determined," and "from which legal consequences will flow."  *Id.* Defendants' campaign of pressuring, threatening, and colluding with social-media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort.  Such actions reflect the completion of a decisionmaking process with a result that will directly affect Plaintiffs, Missourians, Louisianans, and Americans.  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).  The actions of Defendants alleged herein, on information and belief, reflect and result from a specific, discrete, and identifiable decision of Defendants to adopt an unlawful social-media censorship program.

536.     The HHS Defendants' conduct is arbitrary, capricious, and an abuse of discretion because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem, disregards settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the unlawful nature of the HHS Defendants' conduct, among other reasons.  5 U.S.C. § 706(2)(A).

537.     The HHS Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment rights of Plaintiffs and virtually all

Missourians and Louisianans for the reasons discussed herein and in Count One, *supra*.  5 U.S.C. § 706(2)(B).

538.     The HHS Defendants conduct is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because no statute authorizes any of the conduct alleged herein, as discussed in Count Two, *supra*.  5 U.S.C. § 706(2)(C).

539.     The HHS Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to obtain input from the public, before engaging in these unlawful agency policies.  5 U.S.C. § 706(2)(D).

540.     The HHS Defendants' conduct is unlawful under the APA and should be set aside.

### COUNT FOUR – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Against the DHS Defendants

541.     All foregoing Paragraphs are incorporated as if set forth fully herein.

542.     Defendants DHS, CISA, Mayorkas, Easterly, Silvers, Vinograd, Jankowicz, Masterson, Protentis, Hale, Snell, Wyman, and Scully, are referred to collectively herein as the "DHS Defendants."

543.     As set forth herein, the DHS Defendants' conduct is unlawful, arbitrary and capricious, an in excess of statutory authority under the Administrative Procedure Act.

544.     The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance

of procedure required by law….″  5 U.S.C. § 706(2)(A)-(D).  The DHS Defendants' conduct violates all of these prohibitions.

545.       Defendants DHS and CISA are "agencies" within the meaning of the APA. Defendants Mayorkas and Easterly, in their official capacities, are the heads of federal agencies.

546.       The DHS Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action from by which "rights or obligations have been determined," and "from which legal consequences will flow."  *Id.* Defendants' campaign of pressuring, threatening, and colluding with social-media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort.  Such actions reflect the completion of a decisionmaking process with a result that will directly affect Plaintiffs, Missourians, Louisianans, and Americans.  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).  The actions of Defendants alleged herein, on information and belief, reflect and result from a specific, discrete, and identifiable decision of Defendants to adopt an unlawful social-media censorship program.

547.       The DHS Defendants' conduct is arbitrary, capricious, and an abuse of discretion because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem, disregards settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the unlawful nature of the DHS Defendants' conduct, among other reasons.  5 U.S.C. § 706(2)(A).

548.       The DHS Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment and state free-speech rights of Plaintiffs and virtually all Missourians, Louisianans, and Americans for the reasons discussed herein and in Count One*, supra*.  5 U.S.C. § 706(2)(B).

549.     The DHS Defendants conduct is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because no statute authorizes any of the conduct alleged herein, as discussed in Count Two, *supra*.  5 U.S.C. § 706(2)(C).

550.     The DHS Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to obtain input from the public, before engaging in these unlawful agency policies.  5 U.S.C. § 706(2)(D).

551.     The DHS Defendants' conduct is unlawful under the APA and should be set aside.

## COUNT FIVE – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Against the Census Defendants

552.     All foregoing Paragraphs are incorporated as if set forth fully herein.

553.     Defendants Department of Commerce, Census Bureau, Shopkorn, Schwartz, Molina-Irizarry, and Galemore are referred to collectively herein as the "Census Defendants."

554.     As set forth herein, the Census Defendants' conduct is unlawful, arbitrary and capricious, and in excess of statutory authority under the Administrative Procedure Act.

555.     The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law…."  5 U.S.C. § 706(2)(A)-(D).  The Census Defendants' conduct violates all of these prohibitions.

556.     Defendants Department of Commerce and Census Bureau are "agencies" within the meaning of the APA.

557.     The Census Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action by which "rights or obligations have been determined," and "from which legal consequences will flow."  *Id.* Defendants' campaign of pressuring, threatening, and colluding with social-media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort.  Such actions reflect the completion of a decisionmaking process with a result that will directly affect Plaintiffs, Missourians, Louisianans, and Americans.  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).  The actions of Defendants alleged herein, on information and belief, reflect and result from a specific, discrete, and identifiable decision of Defendants to adopt an unlawful social-media censorship program.

558.     The Census Defendants' conduct is arbitrary, capricious, and an abuse of discretion because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem, disregards settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the unlawful nature of the Census Defendants' conduct, among other reasons.  5 U.S.C. § 706(2)(A).

559.     The Census Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment and state free-speech rights of Plaintiffs and virtually all Missourians, Louisianans, and Americans for the reasons discussed herein and in Count One*, supra*.  5 U.S.C. § 706(2)(B).

560.     The Census Defendants conduct is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because no statute authorizes any of the conduct alleged herein, as discussed in Count Two, *supra*.  5 U.S.C. § 706(2)(C).

561.     The Census Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to obtain input from the public, before engaging in these unlawful agency policies.  5 U.S.C. § 706(2)(D).

562.     The Census Defendants' conduct is unlawful under the APA and should be set aside.

### COUNT SIX – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Against the FBI Defendants

563.     All foregoing Paragraphs are incorporated as if set forth fully herein.

564.     Defendants U.S. Department of Justice, FBI, Dehmlow, and Chan referred to collectively herein as the "FBI Defendants."

565.     As set forth herein, the FBI Defendants' conduct is unlawful, arbitrary and capricious, and in excess of statutory authority under the Administrative Procedure Act.

566.     The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law…."  5 U.S.C. § 706(2)(A)-(D).  The FBI Defendants' conduct violates all of these prohibitions.

567.     Defendants DOJ and FBI are "agencies" within the meaning of the APA.

568.     The FBI Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action by which "rights or

161

obligations have been determined," and "from which legal consequences will flow." *Id.* Defendants' campaign of pressuring, threatening, and colluding with social-media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort. Such actions reflect the completion of a decisionmaking process with a result that will directly affect Plaintiffs, Missourians, Louisianans, and Americans. *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). The actions of Defendants alleged herein, on information and belief, reflect and result from a specific, discrete, and identifiable decision of Defendants to adopt an unlawful social-media censorship program.

569.    The FBI Defendants' conduct is arbitrary, capricious, and an abuse of discretion because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem, disregards settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the unlawful nature of the FBI Defendants' conduct, among other reasons. 5 U.S.C. § 706(2)(A).

570.    The FBI Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment and state free-speech rights of Plaintiffs and virtually all Missourians, Louisianans, and Americans for the reasons discussed herein and in Count One*, supra*. 5 U.S.C. § 706(2)(B).

571.    The FBI Defendants' conduct is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because no statute authorizes any of the conduct alleged herein, as discussed in Count Two, *supra*. 5 U.S.C. § 706(2)(C).

572.    The FBI Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to

obtain input from the public, before engaging in these unlawful agency policies.   5 U.S.C. § 706(2)(D).

573.      The FBI Defendants' conduct is unlawful under the APA and should be set aside.

## COUNT SEVEN – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Against the State Department Defendants

574.      All foregoing Paragraphs are incorporated as if set forth fully herein.

575.      Defendants Department of State, Bray, Stewart, Kimmage, and Frisbie are referred to collectively herein as the "State Department Defendants."

576.      As set forth herein, the State Department Defendants' conduct is unlawful, arbitrary and capricious, and in excess of statutory authority under the Administrative Procedure Act.

577.      The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law…."  5 U.S.C. § 706(2)(A)-(D).  The State Department Defendants' conduct violates all of these prohibitions.

578.      Defendant U.S State Department is an "agency" within the meaning of the APA.

579.      The State Department Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action by which "rights or obligations have been determined," and "from which legal consequences will flow."  *Id.* Defendants' campaign of pressuring, threatening, and colluding with social-media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort.  Such actions reflect the completion of a decisionmaking process with a result that will directly affect

163

Plaintiffs, Missourians, Louisianans, and Americans. *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). The actions of Defendants alleged herein, on information and belief, reflect and result from a specific, discrete, and identifiable decision of Defendants to adopt an unlawful social-media censorship program.

580. The State Department Defendants' conduct is arbitrary, capricious, and an abuse of discretion because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem, disregards settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the unlawful nature of the State Department Defendants' conduct, among other reasons. 5 U.S.C. § 706(2)(A).

581. The State Department Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment and state free-speech rights of Plaintiffs and virtually all Missourians, Louisianans, and Americans for the reasons discussed herein and in Count One, *supra*. 5 U.S.C. § 706(2)(B).

582. The State Department Defendants' conduct is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because no statute authorizes any of the conduct alleged herein, as discussed in Count Two, *supra*. 5 U.S.C. § 706(2)(C).

583. The State Department Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to obtain input from the public, before engaging in these unlawful agency policies. 5 U.S.C. § 706(2)(D).

584. The State Department Defendants' conduct is unlawful under the APA and should be set aside.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

A.       Certify this case as a class action under Federal Rule of Civil Procedure 23(b)(2), as proposed herein; appoint Plaintiffs Bhattacharya, Hines, Hoft, Kheriaty, and Kulldorff as class representatives; and appoint John J. Vecchione and John C. Burns as class counsel;

B.       Declare that Defendants' conduct violates the First Amendment of the U.S. Constitution and analogous provisions of Missouri's, Louisiana's, and other States' Constitutions;

C.       Declare that Defendants' conduct is *ultra vires* and exceeds their statutory authority;

D.       Declare that Defendants' conduct violates the Administrative Procedure Act and is unlawful, and vacate and set aside such conduct;

E.       Preliminarily and permanently enjoin Defendants (except for President Biden), their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from continuing to engage in unlawful conduct as alleged herein;

F.       Preliminarily and permanently enjoin Defendants (except for President Biden), their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from taking any steps to demand, urge, pressure, or otherwise induce any social-media platform to censor, suppress, de-platform, suspend, shadow-ban, de-boost, restrict access to content, or take any other adverse action against any speaker, content or viewpoint expressed on social media; and

G.       Grant such other and further relief as the Court may deem just and proper.

Dated: March 20, 2023

Respectfully submitted,

**ANDREW BAILEY**
**Attorney General of Missouri**

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

*/s/ Charles F. Capps*
Joshua M. Divine, Mo. Bar No. 69875*
  *Solicitor General*
Charles F. Capps, Mo. Bar No. 72734*
  *Deputy Solicitor General*
Todd A. Scott, Mo. Bar No. 56614*
  *Senior Counsel*
Kenneth C. Capps, Mo. Bar No. 70908*
  *Assistant Attorney General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
charles.capps@ago.mo.gov
*Counsel for State of Missouri*

*/s/ D. John Sauer*
Elizabeth B. Murrill (La #20685)
  *Solicitor General*
Tracy Short (La #23940)
  *Assistant Attorney General*
D. John Sauer, Mo. Bar No. 58721*
  *Special Assistant Attorney General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

*/s/ Jenin Younes*
Jenin Younes*
John J. Vecchione*
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta*
*Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty,*
*and Jill Hines*

*/s/ John C. Burns*
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

* admitted *pro hac vice*

166

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 20, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ Charles F. Capps*