# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

ROBERT F. KENNEDY, JR.,
CHILDREN'S HEALTH DEFENSE,
& CONNIE SAMPOGNARO, individually
and on behalf of all others similarly situated,

No. _____

*Plaintiffs*,

v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States;

JURY TRIAL DEMANDED

KARINE JEAN-PIERRE, in her official
capacity as White House Press Secretary;

VIVEK H. MURTHY, in his official
Capacity as Surgeon General of the
United States;

CLASS ACTION

XAVIER BECERRA, in his official
capacity as Secretary of the Department of
Health and Human Services;

DR. ANTHONY FAUCI, in his official
capacity as Director of the National Institute
of Allergy and Infectious Diseases and as
Chief Medical Advisor to the President;

NATIONAL INSTITUTE OF ALLERGY
AND INFECTIOUS DISEASES;

CENTERS FOR DISEASE CONTROL
AND PREVENTION;

CAROL Y. CRAWFORD, in her official
capacity as Chief of the Digital Media

Branch of the Division of Public Affairs
within the Centers for Disease Control and
Prevention;

UNITED STATES CENSUS BUREAU,
a.k.a. BUREAU OF THE CENSUS;

JENNIFER SHOPKORN, in her official
capacity as Senior Advisor for
Communications in the U.S. Census Bureau;

DEPARTMENT OF COMMERCE;

ALEJANDRO MAYORKAS, in his official
capacity as Secretary of the Department of
Homeland Security;

ROBERT SILVERS, in his official capacity
as Under Secretary of the Office of Strategy,
Policy, and Plans within DHS

SAMANTHA VINOGRAD, in her official
capacity as Senior Counselor for National
Security in the Office of the Secretary
for DHS;

DEPARTMENT OF HOMELAND
SECURITY;

JEN EASTERLY, in her official capacity
as Director of the Cybersecurity and
Infrastructure Security Agency;

CYBERSECURITY AND
INFRASTRUCTURE SECURITY
AGENCY;

GINA McCARTHY, in her official capacity
as White House National Climate Advisor;

NINA JANKOWICZ, in her official capacity as director of the so-called "Disinformation Governance Board" within DHS;

ANDREW SLAVITT, in his official capacity as White House Senior COVID-10 Advisor;

ROB FLAHERTY, in his official capacity as Deputy Assistant to the President and Director of Digital Strategy at the White House;

COURTNEY ROWE, in her official capacity as White House Covid-19 Director of Strategic Communications and Engagement;

CLARKE HUMPHREY, in her official capacity as White House Digital Director for the Covid-19 Response Team;

BENJAMIN WAKANA, in his official capacity as the Deputy Director of Strategic Communications and Engagement at the White House COVID-19 Response Team;

DANA REMUS, in her official capacity as Counsel to the President;

AISHA SHAH, in her official capacity as White House Partnerships Manager,

LAURA ROSENBERGER, in her official capacity as Special Assistant to the President,

MINA HSIANG, in her official capacity as Administrator of the U.S. Digital Service within the Office of Management and Budget in the Executive Office of the President,

U.S. DEPARTMENT OF JUSTICE,

FEDERAL BUREAU OF
INVESTIGATION,

LAURA DEHMLOW, in her official capacity
as Section Chief for the FBI's Foreign
Influence Task Force,

ELVIS M. CHAN, in his official capacity as
Supervisory Special Agent of Squad CY- 1 in
the San Francisco Division of the Federal
Bureau of Investigation,

JAY DEMPSEY, in his official capacity as
Social Media Team Lead, Digital Media
Branch, Division of Public Affairs at the
CDC,

ERIC WALDO, in his official capacity as
Chief Engagement Officer for the Surgeon
General,

YOLANDA BYRD, in her official capacity as
a member of the Digital Engagement Team at
HHS,

CHRISTY CHOI, in her official capacity as
Deputy Director, Office of Communications,
HRSA within HHS;

TERICKA LAMBERT, in her official
capacity as Director of Digital Engagement at
HHS and Deputy Director of the Office of
Digital Strategy at the White House,

JOSHUA PECK, in his official capacity as
Deputy Assistant Secretary for Public
Engagement at HHS,

JANELL MUHAMMED, in her official
capacity as Deputy Digital Director at HHS,

MATTHEW MASTERSON, in his official
capacity as Senior Cybersecurity Advisory
within CISA in the Department of Homeland
Security,

LAUREN PROTENTIS, in her official
capacity as an official of CISA,

GEOFFREY HALE, in his official capacity
as an official of CISA,

ALLISON SNELL, in her official capacity as
an official of CISA,

BRIAN SCULLY, in his official capacity as
an official of DHS and CISA,

ZACHARY HENRY SCHWARTZ, in his
official capacity as Division Chief for the
Communications Directorate at the U.S.
Census Bureau,

LORENA MOLINA-IRIZARRY, in her
official capacity as an official of the Census
Bureau,

KRISTIN GALEMORE, in her official
capacity as Deputy Director of the Office of
Faith Based and Neighborhood Partnerships
at the Census Bureau,

ERICA JEFFERSON, in her official capacity
as Associate Commissioner for External
Affairs within the Office of the Commissioner
at the U.S. Food and Drug Administration,

MICHAEL MURRAY, in his official
capacity as Acquisition Strategy Program
Manager for the Office of Health
Communications and Education at the FDA,

BRAD KIMBERLY, in his official capacity
as Director of Social Media at the FDA,

U.S. DEPARTMENT OF STATE,

SAMARUDDIN K. STEWART, in his
official capacity as Senior Technical Advisor
and/or Senior Advisor for the Global
Engagement Center of the State Department,

DANIEL KIMMAGE, in his official capacity
as Acting Coordinator for the Global
Engagement Center at the State Department,

ALEXIS FRISBIE, in her official capacity as
a member of the Technology Engagement
Team at the Global Engagement Center at the
State Department,

U.S. DEPARTMENT OF TREASURY,

U.S. ELECTION ASSISTANCE
COMMISSION,

MARK A. ROBBINS, in his official capacity
as Interim Executive Director of the EAC,
and

KRISTEN MUTHIG, in her official capacity
as Director of Communications for the EAC,

*Defendants*.

## **COMPLAINT**

By and for their complaint herein, on personal knowledge with respect to themselves and on information and belief with respect to all other allegations, Plaintiffs allege as follows.

### **INTRODUCTION**

1.     A half century ago, in *Norwood v. Harrison*, 413 U.S. 455, 465 (1973), the Supreme Court reaffirmed what the Justices called an "axiomatic" principle of constitutional law.

2.     The Court set forth this principle categorically, without qualification or dissent.

3.     The principle was this: government "***may not induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish***." *Id.* (citation omitted) (emphasis added).

4.     The *Norwood* principle is "axiomatic" because, without it, government actors could evade nearly every prohibition in the Bill of Rights through the simple expedient of inducing private parties to do what the Constitution bars the government from doing directly. "Constitutional limitations on governmental action would be severely undercut if the government were allowed to actively encourage conduct by 'private' persons or entities that is prohibited to the government itself." *United States v. Davis*, 482 F.2d 893, 904 (9th Cir. 1973) (federal government may not constitutionally seek to induce private airlines to conduct searches that would violate the Fourth Amendment if engaged in by state actors).

5.     The *Norwood* principle fully applies to the First Amendment.  As Justice Thomas recently put it, the government acts unconstitutionally if it "induces [a private entity] to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint." *Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring).

6.    Today, fifty years after *Norwood*, the federal government has apparently forgotten this axiomatic principle—or else has decided it isn't bound by a clear holding of the United States Supreme Court.

7.    Beginning in early 2020 and continuing to the present day, the federal government has waged a systematic, concerted campaign, astonishing in its breadth and effectiveness, to "induce, encourage, [and] promote" the nation's three largest social-media platforms "to accomplish what [the government] is constitutionally forbidden to accomplish"—namely, the censorship of constitutionally protected speech.

8.    Those three social-media companies—Facebook,[1] Google,[2] and Twitter[3]—wield a power over the content of American public discourse far greater than any entity, private or public, has ever wielded before.  *See Knight First Amendment Institute*, 141 S. Ct. at 1221 (Thomas, J., concurring) ("Today's digital platforms provide avenues for historically unprecedented amounts of speech. . . Also unprecedented, however, is the concentrated control of so much speech in the hands of a few private parties.").

9.    Since 2020, an ever-growing army of federal officers, at every level of the government—from the White House itself to the FBI, the CIA, the Department of Homeland Security, the CDC, the Office of the Surgeon General, and numerous less-well-known federal entities—has been engaged in the effort to induce those companies to censor constitutionally protected speech.

10.    Through this censorship campaign, federal agents and agencies have encouraged, promoted, and induced those companies to stifle viewpoints that the government disfavors, to

---

[1] "Facebook" is used throughout this Complaint to refer to the company now calling itself "Meta" that (among other things) owns a variety of social media platforms such as Facebook and Instagram.
[2] "Google" refers to Google LLC, which owns (among other things) the Google search engine and the video-based social-media platform YouTube.
[3] "Twitter" refers to Twitter, Inc., which owns and operates the microblogging social-media platform Twitter.

suppress facts that the government does not want the public to hear, and to silence specific speakers—in every case critics of federal policy—whom the government has targeted by name.

11.    Because of the historically unprecedented power wielded by a handful of behemoth social-media companies over the content of American public discourse, the federal government's systematic campaign to induce these companies to censor speech is among the gravest threats to free speech this country has ever faced.

12.    With virtually every passing week come fresh disclosures of secret communications between federal officials and social-media platforms working together to suppress constitutionally protected speech—in the words of one eminent constitutional scholar, "the most massive system of censorship in the nation's history."  Phillip Hamburger, *Is Social-Media Censorship a Crime?*, Wall St. J. (Dec. 14, 2022), https://www.wsj.com/articles/is-social-media-censorship-a-crime-section-241-us-code-government-private-conspiracy-civil-rights-speech-11670934266.

13.    This censorship campaign has involved repeated threats made by powerful members of the federal government, including the President himself, to visit catastrophic consequences on social-media companies (for example, breaking them up under the antitrust laws) if they fail to censor more aggressively speech that federal actors disfavor.

14.    In addition, federal agents and agencies have repeatedly entered into collusive partnerships with social-media companies, working closely and jointly with those companies to decide what speech and what speakers to censor.

15.    It is well established that the government violates the Constitution if it uses coercive threats to induce private parties to censor protected speech or if it engages in collusive joint action with private parties to violate the First Amendment.  *See, e.g.*, *Bantam Books v. Sullivan*, 372 U.S. 58 (1963) (threats); *Brentwood Academy v. Tennessee Secondary School Athletic Assn.*, 531

U.S. 288, 296 (2001) (joint activity).

16.    Moreover, the government's censorship campaign has been relentlessly content-based and viewpoint-discriminatory.

17.    It is "a core postulate of free speech law" that "government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019). *See Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (citation omitted) ("the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content").

18.    Yet the federal government's censorship campaign has repeatedly, systematically, and very successfully targeted constitutionally protected speech on the basis of its content and viewpoint.

19.    To give just three out of countless examples, this censorship campaign:

 A.    was responsible, just before the presidential election of 2020, for the online suppression of reporting about a laptop owned by President Biden's son Hunter Biden—reporting now known to be accurate—an act of censorship that deprived Americans of information of the highest public interest and may even have swung the outcome of that election;

 B.    was responsible throughout much of 2020 and 2021 for the online suppression of any reporting, any information, or any expressions of opinion suggesting that COVID-19 may have originated in a Chinese government laboratory in Wuhan, again depriving Americans of information and legitimate opinion of the highest public importance at a critical period of time; and

C. is responsible even now for the online suppression of facts and opinions about the COVID vaccines that might lead people to become "hesitant" about COVID vaccine mandates, again depriving Americans of information and opinion on matters of the highest public importance.

20. This is a class action for declaratory and injunctive relief (no damages are sought) brought on behalf of consumers of news on social-media platforms against the federal agencies and officers participating in this censorship campaign.

21. Over 80% of Americans now access the news from digital devices, and some 80% of online news traffic is accessed through news aggregators and social-media companies, principally Facebook, Google (which owns YouTube), and Twitter. As the Supreme Court has put it, social-media platforms are "the modern public square," *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017), and every American who consumes news online has a First Amendment right against government censorship of protected speech in that public square.

22. Consumers of online news have standing to bring this suit for the same reason consumers of prescription medicines had standing in *Virginia State Board of Pharmacy*: because the First Amendment protects not only the right to speak, but also the "right to 'receive information and ideas.'" *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council* 425 U.S. 748, 756 (1976) (citation omitted) (striking down ban on advertising drug prices). *See also, e.g.*, *Davis v. East Baton Rouge Parish School Bd.*, 78 F.3d 920, 926 (5th Cir. 1996) ("[T]he First Amendment protects the . . . right to receive protected speech."); *Kass v. City of New York*, 864 F.3d 200, 207 (2d Cir. 2017) (First Amendment "extends not only to the right to speak, but also to the right to listen and receive information").

23. Moreover, consumers of online news are the most appropriate parties to challenge the

federal government's online censorship campaign.  For in a case like this, "it is the right of the viewers and listeners . . . which is paramount," since it "is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail."  *CBS v. FCC*, 453 U.S. 367, 395 (1981) (emphasis added) (citation omitted).

24.    Indeed, a nationwide class of online news consumers is the only fully appropriate party to seek the remedy necessary and warranted here—i.e., a nationwide injunction.

25.    Only a nationwide injunction can effectively redress the federal government's nationwide effort to censor constitutionally protected online speech, and the most appropriate party to seek that remedy is not an individual who has been censored, nor even a state Attorney General, but rather a nationwide class of online news consumers.

26.    Apart from the Judiciary, no branch of our Government, and no other institution, can stop the current Administration's systematic efforts to suppress speech through the conduit of social-media companies.  Congress can't, the Executive won't, and States lack the power to do so.  The fate of American free speech, as it has so often before, lies once again in the hands of the courts.

## JURISDICTION AND VENUE

27.    This Court has subject-matter jurisdiction because the claims herein arise under the Constitution of the United States.

28.    As to the Defendant federal agencies, subject-matter jurisdiction lies because sovereign immunity has been expressly waived by the Administrative Procedure Act.  *See, e.g.*, *Bolger v. District of Columbia*, 510 F. Supp. 2d 86, 91 (D.D.C. 2007) ("Federal courts have subject-matter jurisdiction over [constitutional] suits seeking declaratory and injunctive relief because the APA waives [a] federal agency's sovereign immunity even when the claim is one directly under the

Constitution and not under the APA.").

29. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because substantial events giving rise to the claim occurred in this District, because named Plaintiffs have significant connections to Louisiana, because numerous Members of the proposed class reside here, and because a closely related case is already pending here.

## PARTIES

**A.** **Plaintiffs.**

30. PLAINTIFF ROBERT F. KENNEDY, Jr., a natural person and citizen of New York, is a world-renowned attorney and author. Over decades of legal service, he has repeatedly fought and won major battles against governments and large corporations on behalf of the poor, children, minorities, and the environment. In 2018, the National Trial Lawyers Association named Kennedy and his legal team Trial Team of the Year for their work winning a $289 million jury verdict against Monsanto for selling carcinogenic weed-killer products.

31. Kennedy is also the founder of Plaintiff Children's Health Defense (CHD).

32. Information, ideas, and analysis published online concerning U.S. elections and COVID-19 are critically important to Kennedy for his own personal knowledge, for his role as a citizen, and for the many activities he is engaged in to shed light on and fight against governmental policies he believes to be inimical to the health and well-being of individuals and this country.

33. Kennedy is also an online news publisher, with hundreds of thousands of followers and audience members. In producing his news reports, Kennedy draws on information, analysis, and ideas he gathers from, among other sources, Facebook, Twitter, and YouTube. When content is censored on those sites, it is often difficult or impossible for Kennedy to find it elsewhere and to relay it to his readers.

34. Both as a news consumer and news publisher, Kennedy has a protected legal interest in his ability to gain online access to accurate, complete, uncensored information and opinion from willing speakers about COVID-19 and U.S. politics.

35. PLAINTIFF CHILDREN'S HEALTH DEFENSE ("CHD") is a nonprofit organization incorporated in Georgia and headquartered in New Jersey dedicated to informing the public of, and fighting against, various threats to children's health.

36. CHD has over seventy thousand members, including numerous members who reside in Louisiana and in this District.

37. CHD's members tend to be avid consumers of news concerning COVID-19 and governmental health policies. To find such news, they often rely—as do countless other Americans—on what is reported on Facebook, Twitter, and YouTube. They also tend to be highly active in local politics on matters related to COVID and other health issues.

38. Information, ideas, and analysis published online and related to COVID-19 and governmental health policies are critically important to CHD's members for their own personal knowledge, for their role as citizens, and for the many activities they are engaged in to change governmental policies to which they object.

39. CHD is also an online publisher of news viewed by thousands of people. In producing such news, CHD draws on information, analysis, and ideas it gathers from, among other sources, Facebook, Twitter, and YouTube. When content is censored on those sites, it is often difficult or impossible for CHD and CHD's members to find it elsewhere.

40. CHD's members and CHD itself have a protected legal interest in their ability to gain online access to accurate, complete, uncensored information and opinion from willing speakers about COVID-19 and U.S. politics.

41.   PLAINTIFF CONNIE SAMPOGNARO is a natural person, a citizen of Louisiana, and a resident of this District.

42.   Sampognaro holds a Master's Degree in Healthcare Management and has worked as a health care professional.

43.   She is keenly interested in issues of public health care policy and has been since the beginning of the pandemic a frequent consumer of online news related to COVID-19.

44.   Information, ideas, and analysis published online related to COVID-19 are important to Sampognaro for her own personal health, for role as a citizen, and for her role as a health care policy advocate in her community.

45.   Sampognaro has a protected legal interest in her ability to gain online access to accurate, complete, and uncensored information and opinions from willing speakers about COVID-19 and U.S. politics.  When viewpoints, information, and ideas related to these matters are censored on the country's major social-media sites, it is often difficult or impossible for Sampognaro to find it elsewhere.

**B.      Defendants.**

46.   DEFENDANT JOSEPH R. BIDEN, JR., is President of the United States.  He is sued in his official capacity.

47.   DEFENDANT KARINE JEAN-PIERRE is White House Press Secretary.  She is sued in her official capacity; her predecessor in office was former White House Press Secretary Jennifer Rene Psaki.

48.   DEFENDANT VIVEK H. MURTHY is Surgeon General of the United States.  He is sued in his official capacity.

49.     DEFENDANT XAVIER BECERRA is Secretary of the Department of Health and Human Services.  He is sued in his official capacity.

50.     DEFENDANT DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS) is a Cabinet-level agency within the Government of the United States.

51.     DEFENDANT ANTHONY FAUCI was the Director of the National Institute of Allergy and Infectious Diseases (NIAID) and Chief Medical Advisor to the President and on information and belief continues to advise the Administration on health matters.   He is sued in his official capacity.

52.     DEFENDANT NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES (NIAID) is a federal agency under the Department of Health and Senior Services.

53.     DEFENDANT CENTERS FOR DISEASE CONTROL AND PREVENTION (CDC) is a federal agency under the Department of Health and Human Services.

54.     DEFENDANT CAROL Y. CRAWFORD is Chief of the Digital Media Branch of the Division of Public Affairs within the Centers for Disease Control and Prevention.   She is sued in her official capacity.

55.     DEFENDANT UNITED STATES CENSUS BUREAU, a.k.a. Bureau of the Census ("Census Bureau"), is an agency of the federal government within the Department of Commerce.

56.     DEFENDANT JENNIFER SHOPKORN is Senior Advisor for Communications with the U.S. Census Bureau.   She is sued in her official capacity.

57.     DEFENDANT U.S. DEPARTMENT OF COMMERCE is a Cabinet-level agency within the Government of the United States.

58.     DEFENDANT ALEJANDRO MAYORKAS is Secretary of the Department of Homeland Security.   He is sued in his official capacity.

59.     DEFENDANT ROBERT SILVERS is Under Secretary of the Office of Strategy,

Policy, and Plans, within the Department of Homeland Security. He is sued in his official capacity.

60. DEFENDANT SAMANTHA VINOGRAD is the Senior Counselor for National Security within the Office of the Secretary of DHS. She is sued in her official capacity.

61. DEFENDANT DEPARTMENT OF HOMELAND SECURITY (DHS) is a Cabinet-level agency within the Government of the United States.

62. DEFENDANT JEN EASTERLY is the Director of the Cybersecurity and Infrastructure Security Agency within the Department of Homeland Security. She is sued in her official capacity.

63. DEFENDANT CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (CISA) is an agency within the Department of Homeland Security that is charged with protecting the United States' cybersecurity and physical infrastructure.

64. DEFENDANT GINA MCCARTHY is the White House National Climate Advisor. She is sued in her official capacity.

65. At times relevant to this Complaint, DEFENDANT NINA JANKOWICZ was the director or intended director of the "Disinformation Governance Board" (for the entirety of its existence from April 27-August 24, 2022) within the Department of Homeland Security. She is sued in her official capacity.

66. At times relevant to this Complaint, DEFENDANT ANDREW SLAVITT is or was the White House Senior COVID-19 Advisor. He is sued in his official capacity.

67. DEFENDANT ROB FLAHERTY is Deputy Assistant to the President and Director of Digital Strategy at the White House. He is sued in his official capacity.

68. At times relevant to this Complaint, DEFENDANT COURTNEY ROWE is or was the

White House COVID-19 Director of Strategic Communications and Engagement. She is sued in her official capacity.

69. DEFENDANT CLARKE HUMPHREY is the White House Digital Director for the COVID-19 Response Team. She is sued in her official capacity.

70. At times relevant to this Complaint, DEFENDANT BENJAMIN WAKANA is or was the Deputy Director of Strategic Communications and Engagement at the White House COVID-19 Response Team. He is sued in his official capacity.

71. DEFENDANT DANA REMUS was, at times relevant to this Complaint, Counsel to the President, a.k.a. White House Counsel. She is sued in her official capacity.

72. DEFENDANT AISHA SHAH is White House Partnerships Manager. She is sued in her official capacity.

73. DEFENDANT LAURA ROSENBERGER serves as Special Assistant to the President at the White House. She has extensive experience in service at the State Department. She is sued in her official capacity.

74. DEFENDANT MINA HSIANG is Administrator of the U.S. Digital Service within the Office of Management and Budget in the Executive Office of the President. She is sued in her official capacity.

75. DEFENDANT U.S. DEPARTMENT OF JUSTICE ("DOJ") is a Cabinet-level agency within the Government of the United States.

76. DEFENDANT FEDERAL BUREAU OF INVESTIGATION ("FBI") is an investigative agency of the federal Government within the U.S. Department of Justice. The Foreign Influence Task Force ("FITF") is a task force within the FBI that purportedly investigates and/or addresses foreign influences within the United States. The FITF's website states: "The FBI is the lead

federal agency responsible for investigating foreign influence operations. In the fall of 2017, Director Christopher Wray established the Foreign Influence Task Force (FITF) to identify and counteract malign foreign influence operations targeting the United States." https://www.fbi.gov/ investigate/counterintelligence/foreign-influence.

77. DEFENDANT LAURA DEHMLOW is the Section Chief for the FBI's Foreign Influence Task Force. She is sued in her official capacity.

78. DEFENDANT ELVIS M. CHAN is Supervisory Special Agent of Squad CY-1 in the San Francisco Division of the FBI. On information and belief, he has authority over cybersecurity issues for FBI in that geographical region, which includes the headquarters of major social-media platforms, and he plays a critical role for FBI and FITF in coordinating with social-media platforms relating to censorship and suppression of speech on their platforms. He is sued in his official capacity.

79. DEFENDANT JAY DEMPSEY is Social Media Team Lead, Digital Media Branch, Division of Public Affairs at the CDC. He is sued in his official capacity.

80. DEFENDANT ERIC WALDO is Chief Engagement Officer for the Surgeon General. He is sued in his official capacity.

81. DEFENDANT YOLANDA BYRD is a member of the Digital Engagement Team at HHS. She is sued in her official capacity.

82. DEFENDANT CHRISTY CHOI is Deputy Director, Office of Communications, HRSA within HHS. She is sued in her official capacity.

83. DEFENDANT TERICKA LAMBERT served Director of Digital Engagement at HHS and now serves as Deputy Director of the Office of Digital Strategy at the White House. She is sued in her official capacity.

84. DEFENDANT JOSHUA PECK is Deputy Assistant Secretary for Public Engagement at HHS. He is sued in his official capacity.

85. At times relevant to this Complaint, DEFENDANT JANELL MUHAMMAD is or was Deputy Digital Director at HHS. She is sued in her official capacity.

86. At times relevant to this Complaint, DEFENDANT MATTHEW MASTERSON is or was Senior Cybersecurity Advisory within CISA in the Department of Homeland Security. He is sued in his official capacity.

87. DEFENDANT LAUREN PROTENTIS is a member of the "Mis, Dis, and Mal-information (MDM) Team" within CISA at DHS. She is sued in her official capacity.

88. DEFENDANT GEOFFERY HALE is a member of the Mis, Dis, and Mal-information (MDM) Team within CISA at DHS. He is sued in his official capacity.

89. DEFENDANT ALLISON SNELL is a member of the Mis, Dis, and Mal-information (MDM) Team within CISA at DHS. She is sued in her official capacity.

90. DEFENDANT BRIAN SCULLY is a member of DHS's Countering Foreign Influence Task Force, National Risk Management Center, and the Chief of the Mis-, Dis-, Malinformation Team at CISA. He is sued in his official capacity.

91. DEFENDANT ZACHARY ("ZACK") HENRY SCHWARTZ is the Division Chief for the Communications Directorate at the U.S. Census Bureau. He is sued in his official capacity.

92. DEFENDANT LORENA MOLINA-IRIZARRY served at times relevant to this Complaint as Director of Operations at Census Open Innovation Labs at the Census Bureau and Senior Advisor on the American Rescue Plan Team at the White House. She is sued in her official capacity.

93. DEFENDANT KRISTIN GALEMORE is Deputy Director of the Office of Faith Based

and Neighborhood Partnerships at the Census Bureau.   She is sued in her official capacity.

94.   DEFENDANT U.S. FOOD AND DRUG ADMINISTRATION ("FDA") is a federal agency within the U.S. Department of Health and Human Services.

95.   DEFENDANT ERICA JEFFERSON is the Associate Commissioner for External Affairs within the Office of the Commissioner at the U.S. Food and Drug Administration.   She is sued in her official capacity.

96.   DEFENDANT MICHAEL MURRAY is the Acquisition Strategy Program Manager for the Office of Health Communications and Education at the FDA.   He is sued in his official capacity.

97.   DEFENDANT BRAD KIMBERLY is the Director of Social Media at the FDA.   He is sued in his official capacity.

98.   DEFENDANT U.S. DEPARTMENT OF STATE ("State Department") is a Cabinet-level agency within the Government of the United States.

99.   DEFENDANT SAMARUDDIN K. STEWART is a Senior Technical Advisor and/or Senior Advisor for the Global Engagement Center of the State Department.   He is sued in his official capacity.

100.  At times relevant to this Complaint, DEFENDANT DANIEL KIMMAGE is or was the Acting Coordinator for the Global Engagement Center at the State Department.   He is sued in his official capacity.

101.  DEFENDANT ALEXIS FRISBIE is a member of the Technology Engagement Team at the Global Engagement Center at the State Department.   She is sued in her official capacity.

102.  The State Department operates a "GLOBAL ENGAGEMENT CENTER" within the State Department that conducts counter-"disinformation" activities.   According to the State

Department's website, the Global Engagement Center's mission is "[t]o direct, lead, synchronize, integrate, and coordinate efforts of the Federal Government to recognize, understand, expose, and counter foreign state and non-state propaganda and disinformation efforts aimed at undermining or influencing the policies, security, or stability of the United States, its allies, and partner nations." As alleged further herein, the Global Engagement Center is involved in procuring the censorship of private speech on social media, including of U.S. citizens. The State Department also maintains an Office of Cyber Coordinator, a.k.a. Office of the Coordinator for Cyber Issues, that has, on information and belief, also been involved in federal social-media censorship activities.

103. DEFENDANT U.S. DEPARTMENT OF THE TREASURY ("Treasury") is a Cabinet-level agency within the Government of the United States.

104. DEFENDANT U.S. ELECTION ASSISTANCE COMMISSION ("EAC") is an independent agency within the Government of the United States. According to its website, the EAC "was established by the Help America Vote Act of 2002 (HAVA). The EAC is an independent, bipartisan commission charged with developing guidance to meet HAVA requirements, adopting voluntary voting system guidelines, and serving as a national clearinghouse of information on election administration."

105. DEFENDANT MARK A. ROBBINS is the Interim Executive Director of the EAC. He is sued in his official capacity.

106. DEFENDANT KRISTEN MUTHIG is the Director of Communications for the EAC. According to the EAC's website, Muthig "manages media relations, communications strategy and supports the commissioners and EAC leadership." She is sued in her official capacity.

## ALLEGATIONS

### OVERVIEW

107. Sustained, successful efforts by federal officers to induce social-media platforms to censor speech appear to have begun in 2020.

108. Throughout that year, officers from a variety of federal agencies worked closely, although often clandestinely, with Facebook, Google, and Twitter in an effort to induce, encourage and promote censorship of constitutionally protected speech on those platforms.

109. Because the two most prominent censorship "achievements" of that year—the suppression of the lab-leak theory of COVID's origins and of reporting about Hunter Biden's laptop—appear to conflict with the interests of and positions taken by then-President Donald Trump, it is doubtful that the White House was organizing or spearheading these federal censorship efforts.

110. That changed with the election of President Joe Biden.

111. Immediately after (or perhaps even before) the January 2021 Inauguration, according to senior White House officials, members of the Biden team initiated "direct engagement" with the nation's major social-media companies in an effort to have them "clamp down" on speech the White House disfavored. Nandita Bose, *Exclusive: White House working with Facebook and Twitter to tackle anti-vaxxers*, Reuters (Feb. 20, 2021), https://www.reuters.com/article/health-coronavirus-white-house-exclusive-idINKBN2AK0HP.

112. The White House called this disfavored speech "misinformation," *id.*, but in reality, as later revelations would prove, the Administration was asking social-media companies to suppress not only putatively false speech, but also wholly accurate speech as well as expressions of opinion.

113.  For their part, the social-media platforms tended to be willing participants in this "direct engagement" censorship campaign.  Facebook, for example, stated in early 2020 that it had agreed to supply the White House with "any assistance we can provide" in achieving the Administration's objectives.  *Id.*

114.  Over the ensuing years, the Administration's "direct engagement" efforts with social-media companies spread from the White House throughout the Executive Branch, metastasizing into a government-wide campaign to achieve through the intermediation of social-media companies exactly the kind of content-based and viewpoint-based censorship of dissident political speech that the First Amendment prohibits.

115.  Details of this massive federal censorship campaign have been alleged by the Attorneys General of Missouri and Louisiana as well as other plaintiffs in a case currently pending before this Court.  *See Missouri v. Biden*, No. 3:22-cv-01213-TAD-KDM (W.D. La.), ECF No. 84.  Many of the factual details alleged in their complaint are realleged below.  Many of the below allegations, however, do not appear in their complaint.

### Federal Inducement of Social Media Censorship of the Lab-Leak Theory of COVID's Origins.

116.  The lab-leak theory of COVID's origin postulates that the virus did not originate naturally in animals, but rather escaped from the Wuhan Institute of Virology, a Chinese government biotech laboratory located in Wuhan, China.

117.  The true origins of the virus are not known at this time, but there can be no doubt that the lab-leak theory was, from the beginning of the pandemic, and still is today not only plausible, but supported by significant evidence, and in any event well within the ambit of legitimate debate and opinion.

118.  Substantial evidence now indicates that, in early 2020, Defendant Dr. Anthony Fauci, a senior federal government official, coordinated with others in orchestrating an effort to falsely discredit the lab-leak hypothesis.

119.  As director of NIAID, Dr. Fauci had funded risky and possibly unlawful "gain-of-function" research at the Wuhan Institute of Virology through intermediaries such as EcoHealth Alliance, headed by Dr. Peter Daszak.  The lab-leak theory, therefore, had the potential to implicate Dr. Fauci (and Dr. Daszak) in the creation of the COVID-19 virus and, indirectly, in the pandemic that killed millions of people worldwide.

120.  In late January and early February 2020, Dr. Fauci received information from colleagues suggesting that COVID-19 originated in the Wuhan laboratory.  Soon thereafter, however, Dr. Fauci participated in a conference call with scientists and science-funding authorities with the purpose of discrediting and suppressing the lab-leak theory.  After the conference call, influential individuals signed public statements that were placed in science journals in an attempt to discredit the lab-leak theory.

121.  In the same time frame, Dr. Fauci communicated with Facebook CEO Mark Zuckerberg directly regarding public messaging and the flow of information on social media about the government's COVID-19 response.  For example, in a series of emails produced in response to FOIA requests dated from March 15 to 17, 2020, Zuckerberg invited Fauci to make public statements to be posted for viewing by all Facebook users regarding COVID-19, and also made another proposal that is redacted in FOIA-produced versions but was treated as a high priority by Fauci and National Institutes of Health (NIH) staff.

122. In an email on March 15, 2020, Zuckerberg proposed coordinating with Fauci on COVID-19 messaging to "make sure people can get authoritative information from reliable

sources," and suggested including a video message from Fauci because "people trust and want to hear from experts." Zuckerberg proposed including this content in a "hub" that "we're going to put at the top of Facebook" to reach "200+ million Americans, 2.5 billion people worldwide."

123. In the same email, Zuckerberg made a three-line proposal to Fauci that was redacted by the federal government before the email was produced in a FOIA request.

124. The next day, NIH's communications director emailed Fauci and strongly recommended that he do the videos for Facebook. Regarding the redacted proposal from Zuckerberg, she stated: "But an even bigger deal is his offer [REDACTED]. The sooner we get that offer up the food-chain the better." She also stated that her staff was "standing by to discuss this with HHS and WH comms," and requested authority to "determine who the best point of contact would be so the Administration can take advantage of this officer, soonest." Fauci responded that "I will write or call Mark and tell him that I am interested in doing this. I will then tell him that you will get for him the name of the USG [on information and belief, shorthand for U.S. Government] point of contact."

125. Fauci responded by email to Zuckerberg on March 17, 2020, agreeing to the collaboration that Zuckerberg proposed and describing his redacted proposal as "very exciting."

126. Around the same time frame as the Zuckerberg-Fauci emails, Facebook and other social-media companies adopted policies of disallowing on their platforms any claims that COVID-19 might have originated in the Wuhan lab. This included suppressing speech by highly credentialed and well-respected writers, such as science journalist Nicholas Wade and scientist Alina Chan.

127. Such claims were declared by Facebook and other social-media companies to be "false" and "debunked," despite the fact that such claims had not been "debunked" or proven false, and notwithstanding strong circumstantial evidence favoring the lab-leak theory.

128. There had long been substantial and obvious evidence of the plausibility of the lab-leak theory, including the location of the Wuhan laboratory, the fact that this laboratory was engaging in gain-of-function bat coronavirus experiments at the time of the outbreak, the disturbing fact that the Chinese government immediately took steps to silence employees of the laboratory and conceal the details of the work being performed there, and numerous genetic clues suggesting a laboratory rather than natural origin. *See, e.g.*, Nicholas Wade, *The origin of COVID: Did people or nature open Pandora's box at Wuhan?*, Bull. Atomic Scientists (May 5, 2021), https://thebulletin.org/2021/05/the-origin-of-covid-did-people-or-nature-open-pandoras-box-at-wuhan/; Alina Chan, *Viral: The Search for the Origin of COVID-19* (2021); House Foreign Affairs Committee Minority Staff Report, *The Origins of COVID-19: An Investigation of the Wuhan Institute of Virology* (Aug. 2021), https://foreignaffairs.house.gov/wp-content/uploads/2021/08/ORIGINS-OF-COVID-19-REPORT.pdf.

129. Indeed the circumstantial evidence of the lab-leak theory was and is so strong on its face as to call into question the objectivity and disinterestedness of those who, like Fauci, sought to paint the lab-leak theory as a "debunked" or deranged "conspiracy theory." Comedian John Stewart made this point memorably in 2021: "Oh my God, there's been an outbreak of chocolatey goodness near Hershey, Pennsylvania. What do you think happened? Like, 'Oh I don't know, maybe a steam shovel mated with a cocoa bean?' Or it's the f***ing chocolate factory." The Late Show with Stephen Colbert, *Jon Stewart On Vaccine Science And The Wuhan Lab Theory*, YouTube (June 15, 2021), https://www.youtube.com/watch?v=sSfejgwbDQ8.

130. In any event, the fact that the lab-leak theory was at the very least plausible is evidence that social-media censorship of that theory was not based on an independent judgment arrived at by Facebook, Twitter, or Google, but was rather undertaken by those companies in reliance on

federal health officials implementing the plan, orchestrated by Fauci and others in early 2020, to discredit and suppress the lab-leak theory.

131. This conclusion is further supported by Facebook's admission that its censorship of COVID-related speech (on supposed grounds of falsity) is based on what "*public health experts have advised us*." Facebook, *COVID-19 and Vaccine Policy Updates & Protections*, https://www.facebook.com/help/230764881494641 (emphasis added). On information and belief, Fauci and CDC officials are included among those "public health experts" who have "advised" Facebook on what to censor.

132. As Fauci's role in the funding of the Wuhan laboratory's gain-of-function experiments began coming to light, Fauci and other Administration officials were forced to backtrack, and after a long period of censorship, in May 2021, Facebook and other platforms announced that they would no longer censor speech making or reporting claims that COVID had originated in the Wuhan virology lab.

133. As numerous commentators noted at the time, the close temporal connection between the government's backtracking on the lab-leak theory and social media companies' sudden about-face in their censorship of that theory is further evidence of coordination. *See, e.g.*, Editorial Board, *Facebook's Lab-Leak About-Face*, Wall St. J. (May 27, 2021), https://www.wsj.com/articles/facebooks-lab-leak-about-face-11622154198.

### Federal Inducement of Censorship
### of the Hunter Biden Laptop Story

134. On August 26, 2022, Mark Zuckerberg appeared on "The Joe Rogan Experience" podcast and, when asked about Facebook's censorship of the Hunter Biden laptop story, revealed that Facebook had acted as a result of communications from the FBI.

135. Zuckerberg stated: "The FBI came to us" and told Facebook to be "on high alert," asserting to Facebook that there had been "a lot of Russian propaganda" in the 2016 presidential election, and warning Facebook that "there's about to be some kind of dump that's similar to that, so just be vigilant." BBC, *Zuckerberg tells Rogan FBI warning prompted Biden laptop story censorship* (Aug. 26, 2022), https://www.bbc.com/news/world-us-canada-62688532.

136. On information and belief, the FBI's reference to a "dump" of information was intended to be a reference to the contents of Hunter Biden's laptop, which was already in the FBI's possession and which the FBI knew would soon be the subject of a story being published in the New York Post.

137. Zuckerberg's admission that the FBI induced Facebook's censorship of the Hunter Biden laptop story was widely recognized as a bombshell revelation of federal law-enforcement influence on social-media censorship.

138. Facebook has identified the FBI's FITF, as supervised by Laura Dehmlow, and FBI San Francisco Special Agent Elvis Chan as involved in the communications between the FBI and Facebook that led to Facebook's suppression of the Hunter Biden laptop story.

139. Dehmlow evidently works with CISA on social-media censorship issues. On March 1, 2022, Dehmlow gave a presentation to CISA's Protecting Critical Infrastructure from Misinformation & Disinformation Subcommittee in which Dehmlow indicated that the FBI's FITF "engages . . . with appropriate partners for information exchange." On information and belief, this "information exchange" includes communications with social-media platforms about censorship and/or suppression of social-media speech.

140. On information and belief, because major social-media platforms are headquartered in the geographical area of FBI's San Francisco Division, and Special Agent Chan is in charge of

cyber-related issues for that division, Chan has performed a critical role in communicating with social-media platforms on behalf of the FBI relating to censorship and suppression of speech on social media.

141. Chan has openly boasted about his official role on behalf of FBI in coordinating with social-media companies. In a recent podcast, he stated, "Our field office, FBI San Francisco, was very involved in helping to protect the US elections in 2020. . . Even though foreign actors were trying to interfere in our elections, the FBI, the US government working in conjunction with *the private sector*, as well as with election officials from every single state and protectorate, we were really able to do it. . . But completely different from 2016 where we did not. *See* Get It Started Podcast, *Ep 4—Den Jones speaks with Elvis Chan, FBI*, Banyan Security, https://www.banyansecurity.io/resource/get-it-started-get-it-done/ (emphasis added).

142. Chan's subsequent comments make clear that "government working in conjunction with the private sector" includes the FBI working with social-media companies on censorship and suppression of private speech. Chan indicated that he works closely with Defendant Jen Easterly, who, as alleged herein, quarterbacks CISA's extensive federal government-induced social-media censorship activities.

143. Chan admits to regular, routine coordination about censorship with social-media platforms, stating of the 2020 election cycle in particular: "we talked with all of these entities I mentioned regularly, at least on a monthly basis. And right before the election, probably on a weekly basis. If they were seeing anything unusual, if we were seeing anything unusual, sharing intelligence with technology companies, *with social-media companies*, so that they could protect their own platforms. That's where the FBI and the US government can actually help companies."

*Id.* (emphasis added).  On information and belief, "social-media companies" "protect[ing] their own platforms" includes censorship and suppression of speech at the FBI's behest.

144.  Documents produced by LinkedIn show Chan repeatedly organizing meetings with representatives of LinkedIn from 2020 through the present.  Based on the limited agendas provided, it appears that these meetings included discussions of election-related content and suppression of election-related speech on social media.  On information and belief, Chan organized similar meetings with other major social-media platforms, as in one instance, he notified LinkedIn about a particular proposed time slot for a meeting that another company had already taken that time slot.  Dehmlow was routinely included in these meetings as well.

145.  Chan bemoaned the fact that there was not a similar level of coordination about censorship between the federal government and social-media companies during the 2016 election cycle: "It seems obvious, but I'm not going to lie, in 2016, there was not that same level of communications between the US government and the private sector."  *Id.*  Chan called on social-media platforms to be "more mindful" of federal government warnings on such issues: "But where we in the government are saying, if you are in one of the 17 designated critical infrastructure sectors, of which information technology is one of them, then you need to be more mindful."  *Id.*

146.  The recently published (and ongoing) "Twitter Files" indicate that private FBI communications were similarly responsible for Twitter's decision to censor the Hunter Biden laptop story.

147.  According to journalist Michael Shellenberger, internal Twitter documents reveal "evidence pointing to an organized effort by representatives of the intelligence community (IC), aimed at senior executives at news and social-media companies, to discredit leaked information

about Hunter Biden before and after it was published." https://twitter.com/ShellenbergerMD/status/1604871630613753856.

148. Throughout 2020, when Hunter Biden's laptop was in the possession of the FBI but was still being kept secret from the public, FBI San Francisco Special Agent Chan and other federal officers repeatedly "primed" Twitter executives in emails and at regular meetings to expect "Russian hack-and-leak" operations in the run-up to the 2020 presidential election. *Id*.

149. "On August 11, 2020, the FBI's Chan share[d] information with Twitter's [then-Head of Site Integrity Yoel] Roth relating to the Russian hacking organization, APT28, through the FBI's secure, one-way communications channel, Teleporter." *Id*.

150. Roth was instrumental in Twitter's decision to censor the Hunter Biden laptop story.

151. At some point in the 2020 meetings with government agents, Roth was told "that there were rumors that a hack-and-leak operation would involve Hunter Biden." *FBI warned Twitter during 'weekly' meetings of Hunter Biden 'hack-and-leak operation' before censoring The Post*, New York Post (Dec. 4, 2022), https://nypost.com/2022/12/04/fbi-warned-twitter-of-hunter-biden-hack-before-censoring-the-post.

152. At approximately 7:00 pm on October 13, 2020, the Post informed Hunter Biden and a Biden attorney that the Post was planning to publish a report the next day on the explosive and incriminating content found on Biden's laptop.

153. Later that evening, Biden's attorney began reaching out to third parties concerning the Post's forthcoming story.

154. On information and belief, the FBI knew on the evening of October 13th of the Post's plan to publish the story the following day.

155.  At 9:22 pm on October 13, FBI Special Agent Chan sent 10 confidential documents to Roth through Teleporter.

156.  The next morning, October 14, the Post published its explosive story on Hunter Biden's laptop.

157.  The facts reported in that story were true.

158.  "And yet," as Shellenberger reports, "within hours, Twitter and other social-media companies censor[ed] the NY Post article, preventing it from spreading and, more importantly, undermining its credibility in the minds of many Americans."  https://twitter.com/ShellenbergerMD/status/1604871630613753856.

159.  This censorship required deliberate, aggressive action by social-media firms.

160.  "Facebook moderators had to manually intervene to suppress a controversial New York Post story about Hunter Biden, according to leaked moderation guidelines seen by the Guardian." Alex Hern, *Facebook leak reveals policies on restricting New York Post's Biden story*, The Guardian (Oct. 30, 2020), https://www.theguardian.com/technology/2020/oct/30/facebook-leak-reveals-policies-restricting-new-york-post-biden-story.

161.  At the time, Facebook claimed that the censorship of the Hunter Biden laptop story was "part of our standard process to reduce the spread of misinformation.  We temporarily reduce distribution pending factchecker review."  *Id.* But this was not true.  In fact, Facebook imposed "special treatment" on the New York Post to suppress the story, which included "manually overrid[ing]" Facebook's own guidelines for suppressing so-called "misinformation."  *Id.*

162.  According to journalist Matt Taibbi, Twitter too "took extraordinary steps to suppress the story, removing links and posting warnings that it may be 'unsafe.' They even blocked its transmission via direct message, a tool hitherto reserved for extreme cases, e.g., child pornography.

White House spokeswoman Kaleigh McEnany was locked out of her account for tweeting about the story, prompting a furious letter from Trump campaign staffer Mike Hahn, who seethed: 'At least pretend to care for the next 20 days.'"  https://twitter.com/mtaibbi/status/1598834882414727168.

163.  Twitter's publicly announced basis for censoring the Post's story was quickly recognized within the company to be without basis under Twitter's own policies.

164. On information and belief, communications between Chan and Roth, potentially including on the night of October 13, convinced Roth that the Post's story should be suppressed.

165.  Roth has subsequently stated that the FBI's communications about Russian hacking operations, together with the FBI's warnings to expect Russian disinformation in the run-up to the presidential election, led him to believe that Russia was somehow behind the Post's Hunter Biden laptop.

166.  According to one survey, sixteen percent of Biden voters polled stated that they would have changed their votes if they had known about the Hunter Biden laptop story before the election, potentially changing the outcome of the election.

### Other 2020 Viewpoint-Discriminatory
### Efforts by Federal Actors to Induce Social Media Censorship

167.  Throughout 2020, in addition to their role in inducing censorship of the Hunter Biden laptop story and the lab-leak theory of COVID's origins, federal actors met and worked with social-media companies, often behind closed doors, in an effort to induce those companies to censor other categories of constitutionally protected speech, especially speech related to the presidential election and speech related to COVID.

168. In addition, government agents began partnering with third-party entities to send Facebook, Twitter, and Google yet more censorship requests.

169. As with the suppression of the lab-leak theory of COVID's origins and facts related to Hunter Biden's laptop, these efforts were in some cases blatantly viewpoint-discriminatory, seeking censorship specifically of then-President Trump and his supporters.

170. Starting in January 2020, according to Taibbi, who reviewed voluminous internal Twitter documents, "Twitter's contact with the FBI was constant and pervasive, as if it were a subsidiary. . . Between January 2020 and November 2022, there were over 150 emails between the FBI and former Twitter Trust and Safety chief Yoel Roth." *Id.*

171. In a "surprisingly high number" of these emails, the FBI asked Twitter to censor election-related posts or accounts. *Id.*

172. "The FBI's social media-focused task force, known as FTIF [*sic*], created in the wake of the 2016 election, swelled to 80 agents and corresponded with Twitter." *Id.*

173. Meetings between social-media companies and government agents were also regularized in this period and became more frequent in the run-up to the election. Internal Twitter messaging shows that these meetings between Twitter and government partners were happening "weekly." https://twitter.com/mtaibbi/status/1601364807831425025.

174. In addition to demanding censorship of particular content, federal agents at these meetings and in these communications were also seeking information form social media companies about their users.

175. One Twitter executive spoke to concerns about governmental pressure applied to Twitter during this time, writing in a January 2020 email, "We have seen a sustained (if uncoordinated) effort by the IC [on information and belief, a reference to Intelligence Community] to push us to share more information and change our API policies. They are probing and pushing everywhere they can (including by whispering to congressional staff)." https://twitter.com/ShellenbergerMD/

status/1604888429816209409?s=20&t=lYJtarkLVFhr0TuuscvZMg.  On information and belief, "whispering to congressional staff" refers to threats by government officials in the executive and legislative branches regarding adverse action that could be taken against social-media companies that did not censor speech the government wished to censor.  These threats will be addressed further below.

176. In July 2020, FBI's FITF sent a questionnaire to Yoel Roth asking Twitter for clarification regarding their "[indication that they] had not observed much recent activity from official propaganda actors on [their] platform."  https://twitter.com/mtaibbi/status/1604613308778266627.  Roth circulated the questions with other Twitter executives, including commentary of his concern about the governmental pressure: "I'm not particularly comfortable with the Bureau (and by extension the IC) demanding written answers here."  *Id.*

177. In August 2020, social-media firms "met with federal government officials to discuss how to handle misinformation during this month's political conventions and election results this fall."  David Ingram & Kevin Collier, *Big Tech met with govt to discuss how to handle election results*, NBC News (Aug. 20, 2022), https://www.nbcnews.com/tech/tech-news/big-tech-met-gov-t- discuss-how-handle-election-results-n1236555.

178. This meeting was described as "the latest in a series" of meetings between major social-media companies and government officials about the suppression of election-related "misinformation": "'We held the latest in a series of meetings with government partners today where we each provided updates on what we're seeing on our respective platforms and what we expect to see in the coming months,' companies including Google, Facebook, Twitter and Reddit said in a joint statement after the meeting."  *Id.* "The statement also included Microsoft, Verizon

Media, Pinterest, LinkedIn and the Wikimedia Foundation, which operates Wikipedia and other sites." *Id.*

179. The discussion was reported as "one in a series of monthly meetings between the government and tech companies" and involved "back-and-forth conversation on a variety of topics." *Id.* Neither the "topics" of the "conversation" nor the particular participants on behalf of the government were disclosed. *Id.* "According to the industry statement, participants in Wednesday's meeting also included representatives from the FBI's foreign influence task force, the Justice Department's national security division, the Office of the Director of National Intelligence and the Cybersecurity and Infrastructure Security Agency." *Id.* "The companies said they would continue to meet regularly before the November election." *Id.*

180. One email from a Twitter employee documented an ongoing series of payments from the FBI to Twitter for their compliance with certain FBI requests. https://twitter.com/ ShellenbergerMD/status/1604908670063906817. Twitter collected $3,415,323 from the FBI from October 2019 through February 2021. *Id.* Included in the underlying actions justifying these payments is Twitter's handling of FBI Emergency Disclosure Requests (EDRs). https://help.twitter.com/en/rules-and-policies/twitter-law-enforcement-support. A Twitter executive explained in a 2022 email regarding a phone call with the FBI about an upcoming meeting that the FBI's intention for the meeting was "to convince us to produce on more FBI EDRs" and that "[the FBI] repeatedly emphasized Twitter's lower level of compliance in comparison with other platforms." https://twitter.com/ShellenbergerMD/status/ 1604909613568049152. The FBI's use of EDRs to elicit and pay for user information from Twitter and other social media companies (information that could then function as a basis for the FBI's demanding censorship of certain users or posts) created a symbiotic relationship of close

and complex interactions in which the federal government essentially paid social-media companies to work with the FBI in censoring protected speech.

181. The existence of regular censorship meetings in 2020 between federal agents and social-media companies is confirmed in the Twitter Files by journalist Taibbi, who reports that these meetings established a system through which agents "from every corner of government" could seek to induce those companies to censor content they disfavored. https://twitter.com/mtaibbi/status/1633830077170618376?s=20.

182. Taibbi explains, "Twitter had so much contact with so many agencies that executives lost track." https://twitter.com/mtaibbi/status/1606701408967090177.

183. Taibbi further reports: "With other tech firms [Twitter] held a regular 'industry meeting' with FBI and DHS, and developed a formal system for receiving thousands of content reports from every corner of government," such as "HHS, Treasury, [and the] NSA." https://twitter.com/mtaibbi/status/1633830077170618376?s=20.

184. "Emails from the FBI, DHS and other agencies often came with spreadsheets of hundreds or thousands of account names for review. Often, these would be deleted soon after." *Id.*

185. According to Taibbi, many of these putative "disinfo" reports sought censorship of content that was not in fact false, but was rather expressive of facts or opinions the government sought to stifle, such as "anti-Ukraine narratives." *Id.*

186. This behavior was occurring across the Intelligence Community. The State Department reports that "[i]n December 2019, GEC/TET [i.e., State's Global Engagement Center's Technology Engagement Team] established a Silicon Valley location to facilitate public-private coordination and broker constructive engagements between the U.S. government and the tech sector, academia, and research. The goal is to increase collaboration that results in identifying,

exposing, and defending against foreign adversarial propaganda and disinformation." On information and belief, "collaboration that results in . . . defending against . . . disinformation," *id.*, includes censorship of protected social-media speech.

187. The GEC publishes "Counter Disinformation Dispatches," of which the State Department states: "The Global Engagement Center's Counter Disinformation Dispatches summarize lessons learned about disinformation and how to counter it based on the experiences of frontline counter-disinformation practitioners, for the benefit of those newly engaged in this issue."

188. The GEC provides, as an online "counter-disinfo resource," a link to CISA's website, stating: "An agency of the Department of Homeland Security, the Cybersecurity and Infrastructure Security Agency 'is responsible for protecting the [United States'] critical infrastructure from physical and cyber threats,' including election security."

189. The State Department—through the GEC—has worked directly with CISA and the FBI to procure the censorship of specific content on social media. For example, on March 25, 2020, Alex Dempsey of the State Department forwarded to an FBI agent a report about a video on social media making ostensibly false allegations about a State Department officer. Brian Scully of CISA forwarded the report to Facebook personnel, stating, "[S]ee the below reporting from our State Department Global Engagement Center colleagues about disinformation . . . targeting a Diplomatic Security Officer." Facebook responded, "Have flagged for our internal teams. As always, we really appreciate the outreach and sharing of this information." Scully also forwarded the State Department's report to Twitter and Google/YouTube. In flagging the content for Google, Scully commented, "It does appear the FBI has been notified, so you may have already heard from them."

190. CISA also works closely with the Center for Internet Security (CIS), an outside third-party group, to flag content for censorship on social media, including election-related speech. *See*

Joint Statement on Discovery Disputes Ex. 8, *Missouri v. Biden*, No. 3:22-cv-01213-TAD-KDM (W.D. La.), ECF No. 71-8. On information and belief, CIS is or was funded by CISA and works as a joint participant with CISA on federal social-media censorship activities.  As early as June 2020, the CIS, working with CISA, was planning a "Reporting Portal" for government officials seeking to suppress election misinformation that would allow "social-media companies" to "process reports and provide timely responses, to include the removal of reported misinformation from the platform where possible." *Id.* at 90.  CIS and CISA work closely to remove so-called "misinformation" by flagging content for removal by social-media companies.

191.  Documents reveal that CISA's authority as a national-security agency within DHS led to prompt responses and swift censorship actions in response to CISA's actions of "flagging" posts for censorship. *See Id.* This included many posts on election integrity issues where CISA acted as *de facto* judge of the truthfulness and value of social-media speech.

192.  CISA also flagged specific individuals' and entities' speech for censorship.  For example, in a "disinformation" conference regarding the 2020 election hosted by CISA, one presenter identified the Gateway Pundit, a popular conservative-leaning news website, as a "repeat spreader" of "false or misleading content about the 2020 election."  The presenter stated that the Gateway Pundit is the second most frequent spreader of election-related disinformation, just above President Trump and his two sons, Donald Jr. and Eric Trump, who were also described as "prolific spreaders of disinformation."  Other supposed "repeat spreaders" of disinformation identified at the CISA-hosted conference included Sean Hannity, Breitbart, James O'Keefe, and Mark Levin.  The presenter emphasized that every account identified as a spreader of disinformation was "ideologically pro-Trump" in its political orientation. *See* Mike Benz, Foundation for Freedom Online, *DHS Encouraged Children to Report Family to Facebook for Challenging US Government*

40

*Covid Claims*, https://report.foundationforfreedomonline.com/8-29-22.html. "In the same training session for state and local election officials, DHS's formal partner group then encouraged the mass reporting of US social media posts for censorship…." *Id.*

193. In the Twitter Files, journalist Taibbi further reports that government agents partnered with government-funded NGOs to bombard social-media companies with huge numbers of censorship requests, often demonstrating a clear viewpoint-discriminatory bias against then-President Trump or his political positions.

194. Taibbi found detailed evidence of collaborations between governmental agents and third-party entities, particularly a consortium called the "Election Integrity Partnership," as vehicles for inducing social-media companies to censor constitutionally protected speech. "Perhaps the ultimate example of the absolute fusion of state, corporate, and civil society organizations is the Stanford Internet Observatory (SIO), whose 'Election Integrity Partnership' is among the most voluminous 'flaggers' in the #TwitterFiles." https://twitter.com/mtaibbi/status/ 1633830077170618376?s=20.

195. The so-called "Election Integrity Partnership" (EIP) is or was a consortium of four private groups working with numerous federal entities, including DHS and State, to monitor online election-related speech and induce social-media companies to censor the speech the EIP and its governmental partners disfavor. Recent, heavily documented reports indicate that both the State Department and CISA teamed up with this consortium in a close collaboration to achieve social-media censorship of election-related speech beginning in 2020, and that this collaboration is continuing to this day.

196. "EIP research manager Renee DiResta boasted that . . . the EIP succeeded in getting 'tech partners' Google, TikTok, Facebook and Twitter to take action on '35% of the URLS flagged' under 'remove, reduce, or inform' policies." *Id.*

197. "According to the EIP's own data, it succeeded in getting nearly 22 million tweets labeled [i.e., marked to indicate supposed falseness or unreliability] in the runup to the 2020 vote." *Id.*

198. "It's crucial to reiterate," reports Taibbi, that "EIP was partnered with state entities like CISA and GEC while seeking elimination of millions of tweets. In the #TwitterFiles, Twitter execs did not distinguish between [EIP and governmental] organizations, using phrases like 'According to CIS[A], escalated via EIP.'" *Id.*

199. Pursuant to third-party subpoena, Twitter has identified personnel associated with the State Department's GEC, including Alexis Frisbie and Daniel Kimmage, as likely involved in communications with Twitter about censorship and/or content modulation on issues such as election integrity, vaccine/COVID misinformation, and related subjects.

200. According to public reports, the EIP is comprised of four member organizations: Stanford Internet Observatory (SIO), the University of Washington's Center for an Informed Public, the Atlantic Council's Digital Forensic Research Lab, and social media analytics firm Graphika." Greg Piper & John Solomon, *Outsourced censorship: Feds used private entity to target millions of social posts in 2020*, Just the News (Sept. 30, 2022), https://justthenews.com/government/ federal-agencies/biden-administration-rewarded-private-entities-got-2020-election.

201. The EIP "worked with the departments of Homeland Security (DHS) and State to censor massive numbers of social media posts they considered misinformation during the 2020 election, and its members then got rewarded with millions of federal dollars from the Biden administration afterwards, according to interviews and documents obtained by [reporters]." *Id.*

202. The EIP's censorship operations, still working hand in hand with federal agencies, continued after the 2020 election and continue to this day, although the EIP has changed its name (as detailed below).

203. The EIP "set up a concierge-like service in 2020 that allowed federal agencies like Homeland's Cybersecurity Infrastructure Security Agency (CISA) and State's Global Engagement Center to file 'tickets' requesting that online story links and social media posts be censored or flagged by Big Tech." *Id.*

204. "Three liberal groups — the Democratic National Committee, Common Cause and the NAACP — were also empowered like the federal agencies to file tickets seeking censorship of content. A Homeland [i.e., DHS]-funded collaboration, the Elections Infrastructure Information Sharing and Analysis Center, also had access." *Id.*

205. "In its own after-action report on the 2020 election, the consortium boasted it flagged more than 4,800 URLs — shared nearly 22 million times on Twitter alone — for social-media platforms. Their staff worked 12-20 hour shifts from September through mid-November 2020, with 'monitoring intensifying significantly' the week before and after Election Day." *Id.* (alterations omitted).

206. Backed by the authority of the federal government, including DHS, CISA, the State Department, and State's Global Engagement Center, the EIP successfully sought and procured extensive censorship of core political speech by private citizens: "The tickets sought removal, throttling and labeling of content that raised questions about mail-in ballot integrity . . . and other election integrity issues of concern to conservatives." *Id.*

207. "The consortium achieved a success rate in 2020 that would be enviable for baseball batters: Platforms took action on 35% of flagged URLs, with 21% labeled, 13% removed and 1% soft-blocked, meaning users had to reject a warning to see them." *Id.*

208. The consortium's "[p]articipants were acutely aware that federal agencies' role in the effort" raised First Amendment concerns. "For instance, SIO's Renee DiResta said in a CISA Cybersecurity Summit video in 2021 that the operation faced 'unclear legal authorities' and 'very real First Amendment questions.'" *Id.*

209. One free-speech advocate described the consortium as "the largest federally- sanctioned censorship operation he had ever seen, a precursor to the now-scrapped Disinformation Governance Board and one that is likely to grow in future elections." *Id.* "'If you trace the chronology, you find that there was actually 18 months' worth of institutional work to create this very apparatus that we now know played a significant role in the censorship of millions of posts for the 2020 election and has ambitious sights for 2022 and 2024,' he said." *Id.*

210. A member of Congress "called the[se] revelations 'stunning' and said the 2020 operation amounted to the federal government sanctioning and outsourcing censorship." *Id.*

211. "It wasn't just blogs and individual social media users whose content was targeted for removal and throttling as 'repeat spreaders' of misinformation. News and opinion organizations, including the New York Post, Fox News, Just the News and SeanHannity.com were also targeted." *Id.*

212. "The partnership's members published the 292-page public report in March 2021, though the most recent version is dated June 15, 2021. The launch webinar featured former CISA Director Christopher Krebs, 'who led the effort to secure electoral infrastructure and the response to mis- and disinformation during the election period.'" *Id.*

213.  "'I think we were pretty effective in getting platforms to act on things they haven't acted on before,' both by *pressuring them to adopt specific censorship policies* and then *reporting violations*, SIO founder and former Facebook Chief Security Officer Alex Stamos told the launch webinar." *Id.* (emphasis added).  "'Platform interventions' [i.e., censorship of specific posts or content] in response to 'delegitimization of election results,' for example, went from uniformly 'non-comprehensive' in August 2020 to 'comprehensive' by Election Day, the report says." *Id.*

214.  "SIO officially launched the partnership 100 days before the election, 'in consultation with CISA and other stakeholders,' the partnership report says.  It attributes the idea to SIO-funded interns at CISA, noting that censorship by that agency and domestic social media monitoring by intelligence agencies would likely be illegal." *Id.* (citing Center for an Informed Public, Digital Forensic Research Lab, Graphika, & Stanford Internet Observatory, *The Long Fuse: Misinformation and the 2020 Election*, Stanford Digital Repository: Election Integrity Partnership V1.3.0 (Mar. 3, 2021) [hereinafter EIP Report], https://purl.stanford.edu/tr171zs0069).

215.  The EIP Report's executive summary states: "Increasingly pervasive mis- and disinformation, both foreign and domestic, creates an urgent need for collaboration across government, civil society, media, and social-media platforms." *Id.*

216.  The consortium was openly biased based on political viewpoint, calling President Trump "the social media Death Star."  "During the launch webinar, the Atlantic Council's Emerson Brooking said they wanted to stop the 'amplification and legitimation' of 'far-right influencers [who] would be doing all they could to try to catch the eye of a Fox News producer,' making it likely that President Trump, 'the social media Death Star,' would see their content." *Id.*

217.  The consortium's work included the direct involvement of government officials in censorship decisions.  "Government entities were involved in real-time chats with the partnership

and social-media platforms over specific content under review." *Id.* For example, "[a] chat screenshot in the report shows an unidentified government partner rejecting the Sharpiegate claim that 'sharpies aren't read at all' by ballot-counting machines, and a platform provider responding that it was now reviewing those claims." *Id.*

218. Notably, consistent with its carrot-and-stick approach to private entities on social-media censorship, the Biden Administration—including the State Department—has richly rewarded the private-sector partners in this censorship consortium, lavishing federal largesse upon them. "The [consortium's] partners all received federal grants from the Biden administration in the next two years." *Id.* "The National Science Foundation awarded the Stanford and UW projects $3 million in August 2021 'to study ways to apply collaborative, rapid-response research to mitigate online disinformation.'" *Id.* "UW's press release about the award noted their earlier work on the partnership and praise for the report from ex-CISA director Krebs, who called it 'the seminal report on what happened in 2020, not just the election but also through January 6.'" *Id.* "Graphika, also known as Octant Data, received its first listed federal grant several weeks after the 2020 election: nearly $3 million from the Department of Defense for unspecified 'research on cross-platform detection to counter malign influence.' Nearly $2 million more followed in fall 2021 for 'research on co-citation network mapping,' which tracks sources that are cited together." *Id.* "The Atlantic Council … has received $4.7 million in grants since 2021, all but one from the State Department. That far exceeds the think tank's federal haul in previous years, which hadn't approached $1 million in a single year since 2011." *Id.*

219. The EIP Report, discussed above, identifies the Election Assistance Commission as a federal agency working on social-media content issues alongside CISA, identified as "the lead on domestic vulnerabilities and coordination with state and local election officials." The same

paragraph states: "The Election Assistance Commission should remain in an amplifying role, pushing best practices and critical information out broadly to the election community." EIP Report, at 235. On information and belief, the EAC's "critical information" that is "push[ed] … out broadly" includes federally induced censorship and/or suppression of social-media speech on the basis of content and viewpoint.

220. "UW's project, SIO and Graphika also collaborated on the Virality Project, which tracks and analyzes purported 'COVID-19 vaccine misinformation and social media narratives related to vaccine hesitancy.'" Piper & Solomon, *Outsourced censorship: Feds used private entity to target millions of social posts in 2020*, Just the News (Sept. 30, 2022), https://justthenews.com/government/federal-agencies/biden-administration-rewarded-private-entities-got-2020-election.

221. Taibbi explains that the Virality Project is simply the "renamed" version of the EIP after the 2020 election, having since been "on-boarded to Twitter's JIRA ticketing system." https://twitter.com/mtaibbi/status/1633830104144183298.

222. One Virality Project email included guidance to "take action even against 'stories of true vaccine side effects' and 'true posts which could fuel hesitancy.'" https://twitter.com/mtaibbi/status/1633830108321677315.

223. The collaboration with CISA on the EIP is not the State Department's only involvement in federal social-media censorship activities.

224. For example, on February 4, 2020, Samaruddin K. Stewart, then a "Senior Advisor for the Global Engagement Center of the State Department" reached out to LinkedIn and stated that he was "tasked with building relationships with technology companies . . . in [Silicon Valley] with

interests in countering disinformation," and asked for a meeting. As the email indicates, Stewart intended to reach out to other social-media platforms as well.

225. On March 9, 2020, Stewart reached out to LinkedIn again, referring back to their earlier oral meeting, and stated, "I'll send information [to LinkedIn representatives] about gaining access to Disinfo Cloud – which is a GEC [i.e., State Department's Global Engagement Center] funded platform that offers stakeholders an opportunity to discovery companies, technology, and tools that can assist with identifying, understanding, and addressing disinformation." On information and belief, "addressing disinformation" includes the censorship and suppression of private speech. On information and belief, Stewart engaged in similar meetings and coordination efforts with other social-media platforms as well.

226. All of these 2020 viewpoint-discriminatory efforts by federal agents and federally-partnered entities to induce social-media censorship took place against a backdrop of repeated demands by powerful Democratic politicians for online censorship coupled with repeated threats that the government would take adverse action against social-media companies—potentially catastrophic action, including antitrust break-up and/or repeal of Section 230, the federal statute immunizing such companies from liability for the third-party content they carry—unless those companies agreed to censor more aggressively the viewpoints, content, and speakers that these politicians disfavored.

227. Examples of such demands and threats include, but are by no means limited to, the following.

228. In April, 2019, House Speaker Nancy Pelosi said, "I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it. And it is not out of the question that that could be removed." Taylor Hatmaker, *Nancy Pelosi warns tech companies that Section 230 is 'in*

*jeopardy'*, Tech Crunch (Apr. 12, 2019), https://techcrunch.com/2019/04/12/nancy-pelosi-section-230/.

229. "When asked about Section 230, Pelosi referred to the law as a 'gift' to tech companies that have leaned heavily on the law to grow their business…. 'It is a gift to them and I don't think that they are treating it with the respect that they should, and so I think that that could be a question mark and in jeopardy." *Id.*

230. Also in April 2019, "Louisiana Rep. Cedric Richmond warned Facebook and Google that they had 'better' restrict what he and his colleagues saw as harmful content or be held "accountable" through governmental action: 'We're going to make it swift, we're going to make it strong, and we're going to hold them very accountable.' New York Rep. Jerrold Nadler added: 'Let's see what happens by just pressuring them.'" Vivek Ramaswamy & Jed Rubenfeld, *Save the Constitution from Big Tech: Congressional threats and inducements make Twitter and Facebook censorship a free-speech violation*, Wall St. J. (Jan. 11, 2021), https://www.wsj.com/articles/save-the-constitution-from-big-tech-11610387105.

231. Throughout 2019 and 2020 (and continuing thereafter), Democratic Congressmen repeatedly used congressional hearings as forums to demand more aggressive censorship form social-media companies and to threaten them with adverse legislative or regulatory consequences if they did not do so.

232. At one such hearing, in October 2020, Senator Mark Warner said, "It saddens me that some of my colleagues have joined in the Trump Administration's cynical and concerted effort to bully platforms into allowing dark money groups, right-wing militias and even the President himself to continue to exploit social-media platforms to sow disinformation, engage in targeted harassment, and suppress voter participation. We can and should have a conversation about

Section 230—and the ways in which it has enabled platforms to turn a blind eye as their platforms are used to facilitate discrimination and civil rights violations, enable domestic terrorist groups to organize violence in plain sight, assist in stalking and networked harassment campaigns, and enable online frauds targeted at vulnerable users…." Statement of U.S. Sen. Mark R. Warner on Section 230 Hearing (Oct. 28, 2020), https://www.warner.senate.gov/public/index.cfm/ 2020/10/statement-of-sen-mark-r-warner-on-facebook-s-decision-to-finally-ban-qanon-from-its-platforms.

233.  At another such hearing in November 2020, Senator Richard Blumenthal said: "I have urged, in fact, a breakup of tech giants.  Because they've misused their bigness and power. . . . And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court." *Breaking the News: Censorship, Suppression, and the 2020 Election Before the S. Comm. on Judiciary*, 116th Cong. at 36:10–15 (2020) (statement of Sen. Richard Blumenthal).

234.  Prior to being elected President, then-candidate Joe Biden also threatened social-media companies with adverse government action if they did not censor more aggressively.  Indeed his demands for censorship were among the most vociferous, and among the most clearly linked to threats to remove those companies' Section 230 immunities.

235.  For example, on January 17, 2020, then-candidate Biden stated, in an interview with the New York Times editorial board, that Section 230 of the CDA should be "revoked" because social-media companies like Facebook did not do enough to censor supposedly false information.  He stated: "The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one.  For Zuckerberg and other platforms."  He also stated, "It should be revoked because it is not merely an internet company.  It is propagating falsehoods they know

to be false.... There is no editorial impact at all on Facebook. None. None whatsoever. It's irresponsible. It's totally irresponsible." Interview by N.Y. Times Editorial Board of Joe Biden, N.Y. Times, (Jan. 17, 2020), https://www.nytimes.com/interactive/2020/01/17/opinion/joe-biden-nytimes-interview.html. These claims were specifically linked to Facebook's alleged failure to censor political ads on Facebook criticizing candidate Biden—i.e., core political speech.

236. Candidate Biden also threatened that Facebook CEO Mark Zuckerberg should be subject to civil liability and even criminal prosecution for not censoring such core political speech: "He should be submitted to civil liability and his company to civil liability. . . . Whether he engaged in something and amounted to collusion that in fact caused harm that would in fact be equal to a criminal offense, that's a different issue. That's possible. That's possible it could happen." *Id*. In other words, Biden's message—not long before he became President of the United States—was that if Facebook did not censor political ads against him, Zuckerberg should be held personally liable and perhaps jailed.

237. During the presidential campaign, now-Vice President Harris made similar threats against social-media firms to pressure them to engage in more aggressive censorship of speakers, content, and viewpoints she disfavors. For example, she stated in 2019: "We will hold social-media platforms responsible for the hate infiltrating their platforms, because they have a responsibility to help fight against this threat to our democracy. And if you profit off of hate—if you act as a megaphone for misinformation or cyberwarfare, if you don't police your platforms— we are going to hold you accountable as a community." Scott Shackford, *Kamala Harris Wants to Be Your Online Censor-in-Chief*, Reason (May 7, 2019), https://reason.com/2019/05/07/kamala-harris-promises-to-pursue-online-censorship-as-president/.

238. Backed up by these threats, the voluminous efforts by federal agents and federally partnered entities to induce viewpoint-based social-media censorship in the run-up to the presidential election of 2020 would reasonably have been perceived by social-media companies as demands that had to be substantially complied with on pain of potentially catastrophic consequences such as the loss of Section 230 immunity or an antitrust break-up.

239. The government's censorship campaign proved highly effective.

240. For example, the censorship achieved through these efforts included suppression of President Trump's own speech as well as many expressions of concern by Republicans about election security as a result of the massive increase in voting by mail during the 2020 general election.

241. Such censorship by social-media companies was a marked change from the policies generally followed by those companies prior to 2020. "With all the attention paid to online misinformation, it's easy to forget that the big [social-media] platforms generally refused to remove false content purely because it was false until 2020." Gilead Edelman, *Beware the Never-Ending Disinformation Emergency*, Wired (March 11, 2022), https://www.wired.com/story/youtube-rigged-election-donald-trump-moderation-misinformation/.

### 2020 Census Bureau Efforts to Induce Online Censorship

242. Census Bureau officials have openly stated that they too work with social-media companies to suppress so-called misinformation and disinformation.

243. For example, in 2020, the Census Bureau boasted that Census "has established the government's first ever Trust & Safety Team" in order to "prevent the spread of fake, false and inaccurate information that can negatively influence 2020 Census participation and response." Zack Schwartz, *Census Partners with Social-Media Platforms, Community Organizations, the*

*Public to Stop Spread of False Information*, U.S. Census Bureau (Feb. 10, 2020), https://www.census.gov/library/stories/2020/02/putting-2020-census-rumors-to-rest.html.

244.  Census further stated that it is "[w]orking with social-media platforms such as Facebook, Microsoft, Nextdoor, Google, and Pinterest to update their policies and terms of service to include census-specific activities," and "[c]oordinating with YouTube and Twitter to create processes enabling us to quickly identify and respond to misinformation and disinformation." *Id.* On information and belief, these activities included government-induced censorship of social-media speech.  Census stated: "These partnerships will help the Census Bureau counter false information that can lead to an undercount by quickly identifying phony information and respond with factual content." *Id.*

245.  In addition, Census invites private citizens to report suspected false information to the Census Bureau so that Census can arrange for it to be censored.  Census directs the public to: "Report inaccurate, suspicious or fraudulent information to the Census Bureau.  If you see or hear something, tell us: Report suspicious information and tips to rumors@census.gov.  Reach out to us on our verified social media accounts (@USCensusBureau) to ask questions and flag suspicious information.  Call the Census Bureau Customer Service Hotline at 1-800-923-8282 to report suspicious activity." *Id.*

246.  Census responds to such reports by seeking to induce social-media companies to censor speech and content that Census disfavors.  For example, YouTube has disclosed that Census officials have been granted "trusted flagger" status to flag content for censorship on social media and receive privileged, expedited treatment for such reports.

247. Defendant Schwartz was the "operations manager for the Trust & Safety Team and deputy division chief for the Center for New Media and Promotion at the Census Bureau" who authored this report instructing the public to flag disinformation directly to Census.

248. "Trust & Safety Team" is a euphemism for the individuals working at social-media platforms charged with monitoring, suppressing, and censoring disfavored speech, speakers, and content. Census's creation of a like-named "Trust & Safety Team" amounted to the creation of a federal censorship agency within Census.

249. On its website, Census boasts that "the U.S. Census Bureau's Trust & Safety Team protected the 2020 Census from misinformation and disinformation." Census Bureau, Trust & Safety Team, https://www.census.gov/about/trust-and-safety.html.

250. This page also notes that the "Trust & Safety Team's" censorship work continues today across expanded fronts: "We continue to watch for misinformation being shared online, and we work to share facts instead to help support communications around the Census Bureau's commitment to data quality and transparency around these efforts. The team's role has expanded to also support the American Community Survey (ACS), the Economic Census, and other Census Bureau programs and data products." *Id.*

251. The same page continues to instruct the public to report so-called "misinformation" to Census for censorship: "Help the Census Bureau's Trust & Safety team by reporting inaccurate, suspicious, or fraudulent information you read, hear, or spot online, including: A rumor in a message board or group claiming the information you provided to the Census Bureau will be publicly disclosed. . . . An advertisement on social media sharing fake 2020 Census websites and inaccurate information. No matter what you find, let the Census Bureau know by contacting rumors@census.gov." *Id.*

252.  The Trust & Safety Team openly states that it coordinates with social-media platforms to censor speech: "Trust & Safety Team coordinates and integrates our efforts with external technology and social-media platforms, partner and stakeholder organizations, and cybersecurity officials. . . . Leveraging best practices from the public and private sectors, the Trust & Safety Team monitors all available channels and open platforms for misinformation and disinformation about the census.  Monitoring allows us to respond quickly to combat potential threats to achieving an accurate count in traditional media, social media and other stakeholder communications.  As we discover misinformation and disinformation, the team *will coordinate the responses with partners and stakeholders*."  Ron S. Jarmin, *Why the Census Bureau is Establishing a "Trust & Safety" Team*, U.S. Census Bureau (Dec. 17, 2019), https://www.census.gov/newsroom/blogs/random-samplings/2019/12/why_the_census_burea.html.  "Coordinating the responses with partners and stakeholders," evidently, means working with social-media platforms to censor speech.

253.  In other Census publications, Schwartz and other officials claim that "harnessing the capabilities of social-media platforms such as Facebook, Twitter, YouTube and Instagram … enables the Census Bureau to identify and respond to misinformation swiftly before it spreads." Zack Schwartz, *Census Bureau Teams Up With Tech Giants to Connect With Millennials and Other Hard-to-Count Population*, U.S. Census Bureau (Jul. 16, 2019), https://www.census.gov/library/stories/2019/07/hey-siri-why-is-2020-census-important.html.  "The U.S. Census Bureau is partnering with tech giants to … respond to disinformation before it spreads." *Census Spotlights: Tech Companies*, U.S. Census Bureau (2020), https://www.census.gov/library/spotlights/2020/tech.html.

254. Census also states that it has "partner[ed] with search engines" such as Google to de-boost government-disfavored private content and promote Census-favored content instead. *Census Spotlights: Nextdoor*, U.S. Census Bureau (2020), https://www.census.gov/library/spotlights/2020/nextdoor.html.

255. Public reports indicate that Census teamed up with "Data & Society's Disinformation Action Lab" at the "Center for an Informed Public" at the University of Washington in a "behind-the-scenes networked response to mis- and disinformation about the 2020 U.S. Census, an effort that provides a model for future multi-stakeholder collaborations to mitigate the impacts of communication harms." *CIP honors Data & Society's Disinformation Action Lab for collaboration to protect the 2020 U.S. Census from mis- and disinformation*, U. Wash. Center for an Informed Public (May 31, 2022), https://www.cip.uw.edu/2022/05/31/disinformation-action-lab-data-society-census-misinformation.

256. The director of the Center for an Informed Public (CIP) is Kate Starbird, who also serves on CISA's advisory committee that advises CISA's social-media censorship activities. According to the CIP, "Beyond the Census Counts Campaign, DAL [i.e., the Disinformation Action Lab] supported other national civil rights groups, local civil society groups, state and city government officials, and worked with *social-media companies*, journalists, and *the Census Bureau itself* — all to protect a complete and fair count from mis- and disinformation." *Id.* (emphasis added).

257. As alleged further herein, Census officials also participate in censorship activities relating to so-called COVID-19 misinformation.

258. On information and belief, as further alleged herein, all Defendants have been and are engaged in federally-induced censorship of private speech on social media, in a manner that directly interferes with and injures the free-speech rights of Plaintiffs and other Class Members.

### Biden Administration's Expansion of Executive Department's
### Efforts to Induce Social Media Companies to Censor Speech

259. After the 2020 presidential election, the Biden Administration expanded enormously the Executive Department's efforts to induce social-media companies to block or demote speech, turning those efforts into a hydra-headed, government-wide censorship campaign.

260. On December 2, 2020, Bruce Reed, Biden's former chief of staff and top technical advisor, publicly stated that "it's long past time to hold the social-media companies accountable for what's published on their platforms." Lauren Feiner, *Biden Tech Advisor: Hold Social Media Companies Accountable for What Their Users Post*, CNBC (Dec. 2, 2020), https://www.cnbc.com/2020/12/02/biden-advisor-bruce-reed-hints-that-section-230-needs-reform.html.

261. This comment, made during the transition, specifically referred to the amendment or repeal of Section 230 of the Communications Decency Act. *See id.* Thus, the threat of adverse legal consequences for social-media companies that did not censor speech the White House disfavored was at the forefront of the incoming Biden Administration's public messaging.

262. As stated earlier, immediately after Inauguration, the White House initiated "direct engagement" with social-media companies to induce them to "clamp down" on speech the new Administration disfavored.

263. The individually named White House Defendants and other Defendants were directly involved in this "direct engagement" with social-media platforms about censorship and suppression of speech on social-media.

264. For example, on or around March 1, 2021, Flaherty, Wakana, Humphrey, and Rowe participated in a "Twitter // COVID Misinfo" meeting with Twitter.

265. On March 2, 2021, Facebook sent an email assuring Slavitt, Flaherty, and Humphrey that the company is "[c]ombating vaccine misinformation and de-amplifying content that could

contribute to vaccine hesitancy" by "improving the effectiveness of our existing enforcement systems (particularly focusing on entities that repeatedly post vaccine misinformation), mitigating viral content that could lead to vaccine hesitancy."

266.  A senior Facebook executive repeatedly emailed to Surgeon General Murthy, copying Slavitt, assuring the Surgeon General and the White House that Facebook was censoring COVID-19 content in accordance with the White House's demands.  On May 28, 2021, one of these emails to Slavitt and Murthy reported that Facebook had expanded its censorship policies, evidently to satisfy federal officials' demands made at a recent oral meeting.  The email stated that a "key point" was that "We're expanding penalties for individual Facebook accounts that share misinformation."

267.  Among other things, the Facebook executive insisted that "[w]e've expanded penalties for individual Facebook accounts that share misinformation."

268.  On September 18, 2021, regarding a story in the Wall Street Journal about COVID-19 "misinformation" circulating on Facebook, Flaherty demanded that Facebook provide an explanation "as we have long asked for, [of] how big the problem is, what solutions you're implementing, and how effective they've been."  Needless to say, the "solutions" evidently referred to policies to censor and suppress more private speech on Facebook's platforms, and Facebook promised to "brief" the White House on those.

269.  The campaign included public pronouncements by the President, spokespersons for the President, and a Cabinet Secretary demanding that social-media companies censor COVID-related speech much more aggressively.

270.  They also included the initiation and proliferation of ever-expanding, intensive networks of regular meetings and secret communications between numerous federal agencies and the major

social-media companies, with the goal of inducing those companies to censor constitutionally protected speech.

271. On March 1, 2021, a Twitter employee wrote to Defendants Slavitt, Flaherty, Peck and Humphrey after a meeting that the company was escalating efforts to remove harmful content about COVID and introducing a strike system—apparently the outcome of the discussion that had just occurred. This was following an email exchange in February of 2021 in which the same employee had sought to update the four about "additional measure[s] Twitter taking regarding covid [*sic*]."

272. In response to a third-party subpoena, Twitter has identified Crawford, Flaherty, Frisbie, Kimmage, Lambert, Murthy, Shopkorn, Slavitt, and Waldo as federal officials "with whom [Twitter] has had meetings or discussions between January 20, 2021 and August 4, 2022 about election integrity, vaccine/Covid misinformation, violent extremism, and similar content moderation issues."

273. Similar communications were occurring regularly between Facebook and government officials. On February 19, 2021, Defendant Flaherty, on an email between him, Humphrey, Defendant Courtney Rowe, and Defendant Joshua Peck, and several Facebook employees as well, asked to hear from the company about "mis and dis" and later stated that one of his questions was about "algorithmic productions." Flaherty also asked if "plans are in the works . . . to replicate the strategy you deployed around lockdowns – the 'stay at home' stickers/promoted Instagram story." A meeting was apparently held pursuant to Flaherty's request shortly thereafter on March 1, with the subject being "Misinfo & Disinfo." On February 24, 2021, a Facebook employee wrote to Defendant Flaherty "Following upon your request for COVID-19 misinfo themes we are seeing," "we are removing these claims from our platforms[.]" Those themes were Vaccine Toxicity,"

"False Claims About Side Effects of Vaccine," "Comparing the Covid Vaccine to the Flu Vaccine," and "Downplaying Severity of Covid-19." Flaherty responded later that day, asking for a "sense of volume on these, and some metrics around the scale of removal for each[]," as well as "misinformation that might be falling outside of your removal policies." The Facebook employee replied that she could "go into detail on content that doesn't violate like below but could contribute to vaccine hesitancy." A different Facebook employee wrote to Defendants Slavitt, Flaherty, Peck, and Humphrey on March 2, 2021, updating the White House on "vaccine intent" and "shar[ing] survey based data on intent to vaccinate," and relaying the ways that the company was combatting "misinformation." These methods included "improving the effectiveness of our existing enforcement systems (particularly focusing on entities that repeatedly post vaccine misinformation)" and "mitigating viral content that could lead to vaccine hesitancy" while "promoting the vaccine and providing authoritative information." Upon information and belief, that means ensuring that posts departing from the government's messaging on vaccines are censored and de-amplified through the Facebook algorithm, while those conveying the government's message are amplified.

274. In response to a third-party subpoena, Facebook has identified Special Assistant to the President Laura Rosenberger, White House Partnerships Manager Aisha Shah, White House Counsel Dana Remus, and White House officials Slavitt, Flaherty, and Humphrey; HHS officials Waldo, Byrd, Choi, Lambert, Peck, and Muhammed; EAC officials Muthig and Robbins; CDC officials Crawford and Dempsey; DHS officials Masterson, Protentis, Hale, and Snell; and FDA officials Thorpe, Jefferson, Murray, and Kimberly, among others, as federal officials who may have "communicated with Facebook regarding content moderation between January 1, 2020 and July 19, 2022 as it relates to: (i) COVID-19 misinformation; (ii) the Department of Homeland

Security's proposed Disinformation Governance Board; (iii) the New York Post story from October 14, 2020 about Hunter Biden's laptop computer; and/or (iv) election security, integrity, outcomes, and/or public confidence in election outcomes (not to include issues of foreign interference or related issues)." On information and belief, the FDA has participated in federally-induced censorship of private speech on social media about questions of vaccine safety and efficacy, among other subjects.

275. These communications were not just limited to Facebook and Twitter. On May 20, 2021, Mina Hsiang of the Office of Management and Budget wrote to a Google employee, apparently following up on a conversation from the previous day that was "critically helpful for the nationwide vaccination effort." Hsiang suggested a change to results yielded by a search for "who can get vaccinated now." The parties continued to collaborate on the subject, and eventually arranged a meeting that was apparently held on May 27, 2021 and scheduled by Defendant Joshua Peck. Defendant Andy Slavitt asked Peck and Hsiang to take his place on the call because he was "slammed." Sheila Walsh of HHS exchanged emails with employees at YouTube about combating vaccine "misinformation" and arranged a meeting as well.

276. In response to a third-party subpoena, YouTube has identified Schwartz, Faught, Molina-Irizarry, Galemore, Wakana, Flaherty, and Waldo, among others, as federal officials likely to have "communicated with the YouTube custodians about misinformation about COVID, the census, or elections."

277. The State Department's Global Engagement Center, including Stewart and other State employees, were also involved in organizing a "misinformation and disinformation" workshop for African governments in May 2021. Lauren Protentis of CISA and Joe Parentis, Deputy Coordinator for the State Department's Global Engagement Center, were speakers at the event.

The event was moderated by Elizabeth Vish of the State Department's Office of Cyber Coordinator. The agenda for the event included a presentation by Facebook on "How does Facebook work with governments to address misinformation and disinformation?" This included "Fact checking techniques, how to identify disinformation and misinformation" and "Proven techniques to take down these articles." Also included were such topics: "The effectiveness of fake news checkers," "Steps for stopping already-circulating misinformation," and "International takedown requests." On information and belief, these statements reflected the collective experience of CISA and the State Department in working to achieve social-media censorship of domestic speech in America.

278. CISA officials—including Defendants Easterly, Masterson, Protentis, Hale, Scully, and Snell, among others—have aggressively embraced the role of mediators of federally induced censorship.

279. CISA states that its mission includes "directly engaging with social-media companies to flag MDM" and that it is "working with federal partners to mature a whole-of-government approach to mitigating risks of MDM," which includes "framing which … interventions are appropriate to the threats impacting the information environment." CISA repeatedly and frequently flags posts for censorship on social-media platforms, and continues to do so on an ongoing basis.

280. CISA officials have flagged for censorship even obvious parody accounts, such as accounts parodying the Colorado government that stated in their mock Twitter handles, "[Direct message] us your weed store location (hoes be mad, but this is a parody account)" and "Smoke weed erry day." To such reports, Twitter responded, "We will escalate. Thank you," and "We have actioned these account [*sic*] under our civic integrity policy."

281.  On May 5, 2021, Defendant Psaki gave a White House press conference at which she stated that "[t]he President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections.  And we've seen that over the past several months, broadly speaking….  we've seen it from a number of sources."  The White House, *Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack, May 5, 2021*, https://www.whitehouse.gov/briefing-room/press-briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-tom-vilsack-may-5-2021.

282.  Psaki immediately went on to state that President Biden "supports . . . *a robust anti-trust program*," *id.* (emphasis added), thereby implicitly linking a threat of antitrust enforcement actions against social-media companies to the demand for more aggressive censorship, stating that the President's "view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public."  *Id.*

283.  At a White House press briefing with Psaki on July 15, 2021, Surgeon General Vivek Murthy announced that "health misinformation" constitutes an "urgent public health threat," stating that he had "issued a Surgeon General's Advisory on the dangers of health misinformation. Surgeon General Advisories are reserved for urgent public health threats.  And while those threats have often been related to what we eat, drink, and smoke, today we live in a world where misinformation poses an imminent and insidious threat to our nation's health."  The White House, *Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy, July 15,*

*2021*, https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing- by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/.

284. Surgeon General Murthy stated that "[m]odern technology companies have enabled misinformation to poison our information environment with little accountability to their users. They've allowed people who intentionally spread misinformation — what we call 'disinformation' to have extraordinary reach." *Id.* He accused their algorithms of "pulling us deeper and deeper into a well of misinformation." *Id.*

285. Surgeon General Murthy explicitly called for more aggressive censorship of social-media speech, stating that "we're saying we expect more from our technology companies. . . . We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms." *Id.* He also stated that "technology companies have a particularly important role" to play in combating "misinformation." He stated: "We know that the dramatic increase in the speed and scale of spreading misinformation has, in part, been enabled by these platforms. So that's why in this advisory today, we are asking them to step up. We know they have taken some steps to address misinformation, but much, much more has to be done. And we can't wait longer for them to take aggressive action because it's costing people their lives." *Id.*

286. He also stated: "we are asking technology companies to help lift up the voices of credible health authorities. . . . [T]hey have to do more to reduce the misinformation that's out there so that the true voices of experts can shine through." *Id.*

287. At the same press briefing, after the Surgeon General spoke, Defendant Psaki stated: "[W]e are in *regular touch with these social-media platforms*, and those engagements *typically happen through members of our senior staff*, but also members of our COVID-19 team, given, as

Dr. Murthy conveyed, this is a big issue of misinformation, specifically on the pandemic." *Id.* (emphasis added). She added, "*We're flagging problematic posts for Facebook that spread disinformation*." *Id.* (emphasis added). She stated, "we have recommended—proposed that they create a robust enforcement strategy," i.e., a more aggressive censorship program. *Id.*

288. Psaki called on social-media companies to censor particular disfavored speakers, stating: "[T]here's about 12 people who are producing 65 percent of anti-vaccine misinformation on social-media platforms. All of them remain active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns." *Id.*

289. The claim that "12 people" "are producing 65 percent of anti-vaccine misinformation on social-media platforms," which has been repeated innumerable times in the media, has no basis in fact. It was first published by U.K. resident Imran Ahmed in a report that named the specific "12 people" at issue, and Psaki's reference to "12 people" was intended to, and would have been understood to, refer to those specific individuals, all of whom were well known to be harsh critics of the government's COVID policies.

290. In other words, the Administration was calling on the major social-media companies to censor and silence specific individual dissidents.

291. Facebook itself has stated that the infamous "disinformation dozen" claim has no factual support.

292. One of the "12 people" whom Psaki (falsely and defamatorily) accused of "producing 65% of anti-vaccine misinformation on social-media platforms" is Plaintiff Robert F. Kennedy Jr.

293. Psaki further called on Facebook and other social-media companies to censor disfavored content and disfavored viewpoints: "[I]t's important to take faster action against harmful posts. As you all know, information travels quite quickly on social-media platforms; sometimes it's not

accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly." *Id.*

294. She stated that "[w]e engage with them [i.e., social-media companies] regularly and *they certainly understand what our asks are*." *Id.* (emphasis added). She stated that, "we've made a calculation to push back on misinformation," and that "we are working to combat misinformation that's traveling online." *Id.*

295. The same day, the Surgeon General released his advisory regarding "health misinformation." It defined "health misinformation" as "information that is false, inaccurate, or misleading according to the best available evidence at the time. Misinformation has caused confusion and led people to decline COVID-19 vaccines, reject public health measures such as masking and physical distancing, and use unproven treatments." *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment*, (July 15, 2021), https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf.

296. The Surgeon General's advisory called for social-medial companies to "make meaningful long-term investments to address misinformation, including product changes," to "[r]edesign recommendation algorithms to avoid amplifying misinformation," to "build in 'frictions'— such as suggestions and warnings—to reduce the sharing of misinformation," and to "make it easier for users to report misinformation." *Id.* It called on social-media companies to "[s]trengthen the monitoring of misinformation," and to censor disfavored speakers swiftly and aggressively: "Prioritize early detection of misinformation 'super-spreaders' and repeat offenders. Impose clear consequences for accounts that repeatedly violate platform policies." *Id.*

66

297. Facebook responded by stating that it was, in fact, aggressively censoring "health misinformation," and *coordinating with the Government to do so*. "A Facebook spokesperson said the company has *partnered with government experts*, health authorities and researchers to take 'aggressive action against misinformation about COVID-19 and vaccines to protect public health.'" *White House Slams Facebook as Conduit for COVID-19 Misinformation*, Reuters (July 15, 2021) (emphasis added), https://www.reuters.com/world/us/us-surgeon-general-warns-over-covid-19- misinformation-2021-07-15/. "'So far we've removed more than 18 million pieces of COVID misinformation, [and] removed accounts that repeatedly break these rules…,' the spokesperson added." *Id*.

298. Facebook stated that it "has introduced rules against making certain false claims about COVID-19 and its vaccines." *Id*.

299. The next day, July 16, 2021, a reporter asked President Biden what he thought of COVID misinformation on social media, and he responded, referring to platforms like Facebook, by stating: "They're killing people." Zolan Kanno-Youngs & Cecilia Kang, *They're Killing People: Biden Denounces Social Media for Virus Disinformation*, N.Y. Times (July 16, 2021), https://www.nytimes.com/2021/07/16/us/politics/biden-facebook-social-media-covid.html. The New York Times reported that "this week, White House officials went further and singled out social-media companies for allowing false information to proliferate. That came after weeks of failed attempts to get Facebook to turn over information detailing what mechanisms were in place to combat misinformation about the vaccine, according to a person familiar with the matter." *Id*.

300. After these comments from President Biden, a very senior executive at Facebook reached out to Surgeon General Murthy to engage in damage control and appease the President's wrath. Soon thereafter, the same Facebook executive sent a text message to Surgeon General Murthy,

noting that "it's not great to be accused of killing people" and expressing that he was "keen to find a way to deescalate and work together collaboratively."

301.  The same day, July 16, 2021, Psaki explicitly called for social-media companies to coordinate with *each other* in censoring disfavored speakers, to ensure that such speakers are completely muzzled.  "You shouldn't be banned from one platform and not others … for providing misinformation out there."  The White House*, Press Briefing by Press Secretary Jen Psaki, July 16, 2021*, https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/.  On information and belief, social-media companies have heeded this demand, and they do, in fact, coordinate extensively with each other in censorship of disfavored speakers, speech, and viewpoints on social media.

302.  Psaki also demanded that social-media companies "create robust enforcement strategies," "tak[e] faster action against harmful posts," and "promot[e] quality information algorithms"—which is a euphemism for algorithms that suppress disfavored messages.  *Id.* When asked whether Facebook's already-aggressive censorship—it claimed to have suppressed 18 million pieces of COVID-19-related "misinformation"—was "sufficient," she responded, "Clearly not, because we're talking about additional steps that should be taken."  *Id.*

303.  Four days later, July 20, 2021, the White House explicitly threatened to amend or repeal the liability protections of § 230 of the Communications Decency Act if social-media companies did not increase censorship of disfavored speakers and viewpoints.  Matthew Brown, *'They Should Be Held Accountable': White House Reviews Platforms' Misinformation Liability*, USA Today (July 20, 2021), https://www.usatoday.com/story/news/politics/2021/07/20/white-house-reviews-section-230-protections-covid-misinformation/8024210002/.  The White House communications director announced that "[t]he White House is assessing whether social-media platforms are

legally liable for misinformation spread on their platforms." *Id.* "We're reviewing that, and certainly, they should be held accountable," she said. *Id.*

304.  She "specified the White House is examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites." *Id.* Media reported that, in connection with this threat, "Relations are tense between the Biden administration and social-media platforms, specifically Facebook, over the spread of misinformation online." Brown, *'They Should Be Held Accountable,'* USA Today (July 20, 2021); *see also, e.g.*, Jessica Bursztynsky, *White House says social media networks should be held accountable for spreading misinformation*, CNBC (July 20, 2021), https://www.cnbc.com/2021/07/20/white-house-social-networks-should-be-held-accountable-for-spreading-misinfo.html.    When asked whether the President is "open to amending 230 when Facebook and Twitter and other social media outlets spread false information that cause Americans harm, shouldn't they be held accountable in a real way?"  White House Communications Director Bedingfield responded, "We're reviewing that and certainly they should be held accountable.  And I think you heard the president speak very aggressively about this.  He understands that this is an important piece of the ecosystem." *Id.*

305.  After this series of public statements, responding to "White House pressure," Facebook censored the accounts of the 12 specific disfavored speakers (including Plaintiff Kennedy) whom Psaki accused of spreading health misinformation.  Oliver Darcy, *Facebook takes action against 'disinformation dozen' after White House pressure*, CNN (Aug. 18, 2021), https://www.cnn.com/2021/08/18/tech/facebook-disinformation-dozen/index.html.    Psaki had "hammered the platform in July for allowing the people identified in the report to remain on its platform." *Id.* After they were singled out for censorship by the White House, Facebook "removed

over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people, for violating our policies." *Id.*

306. On the same day, July 20, 2021, Humphrey emailed Facebook asking for the takedown of an Instagram account parodying Fauci. In less than two minutes, Facebook replied, "Yep, on it!" Soon thereafter, Facebook reported that the account had been censored.

307. On July 23, 2021, the aforementioned senior Facebook executive sent an email to Surgeon General Murthy stating, "I wanted to make sure you saw the steps we took just this past week to adjust policies on what we are removing with respect to misinformation, as well as steps taken to further address the 'disinfo dozen': we removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen." Again, on August 20, 2021, the same Facebook executive emailed Murthy to assure him that Facebook "will shortly be expanding our COVID policies to further reduce the spread of potentially harmful content on our platform. These changes will apply across Facebook and Instagram," and they included "increasing the strength of our demotions for COVID and vaccine- related content" and "making it easier to have Pages/Groups/Accounts demoted for sharing COVID and vaccine-related misinformation." In addition, that senior Facebook executive sent a "Facebook bi-weekly covid content report" to Surgeon General Murthy and to White House official Andrew Slavitt, evidently to reassure these federal officials that Facebook's suppression of COVID-19 "misinformation" was aggressive enough for their preferences.

308. In the same time frame, Twitter permanently suspended the account of prominent lockdown critic Alex Berenson, despite repeated reassurances from high-level Twitter executives that his account was safe, just days after Dr. Fauci singled him out as a danger for suggesting young people might reasonably decline the vaccine.

309. Berenson disclosed internal Twitter communications revealing that senior "WH" officials including Andrew Slavitt specifically pressured Twitter to deplatform Berenson, an influential vaccine critic—which Twitter did. This pressure to deplatform Berenson evidently occurred on April 21, 2021, when four Twitter employees participated in a Zoom meeting with at least three White House officials and one HHS official, intending to allow the White House to "partner" with Twitter in censoring COVID-related "misinfo."  The meeting invitation stated: "White House Staff will be briefed by Twitter on vaccine misinfo.  Twitter to cover trends seen generally around vaccine misinformation, *the tangible effects seen from recent policy changes*, what interventions are currently being implemented in addition to previous policy changes, and ways the White House (and our COVID experts) can *partner* in product work."  (Emphasis added).

310. The next day, April 22, Twitter employees noted in internal communications that the White House officials had posed "tough" questions during this meeting, including "one really tough question about why Alex Berenson hasn't been kicked off the platform."  *See* Alex Berenson, *The White House privately demanded Twitter ban me months before the company did so*, Unreported Truths (Aug. 12, 2022), https://alexberenson.substack.com/p/the-white-house-privately-demanded.  On July 11, 2021, Dr. Fauci publicly described Berenson's public statements on vaccines as "horrifying."  Soon thereafter, after President Biden's subsequent statement that "They're killing people" by not censoring vaccine "misinformation," Twitter caved to federal pressure and permanently suspended Berenson.

311. On October 29, 2021, the Surgeon General tweeted from his *official* account (as opposed to his personal account, which remains active), in a thread: "We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health misinformation on their platforms.  The time for excuses and half measures is long past.  We need transparency and

accountability now. The health of our country is at stake." *See* https://twitter.com/ Surgeon_General/status/1454181191494606854.

312. In another concerning exchange on October 31, 2021, Deputy Assistant to the President Rob Flaherty emailed a contact at Facebook with a link to a Washington Post article complaining about the spread of COVID "misinformation" on Facebook. The email contained only the link to that story with the subject line, "not even sure what to say at this point." The Facebook official defended Facebook's practices, and assured Mr. Flaherty that Facebook's internal studies were intended to "improve our defenses against harmful vaccine misinformation," and that Facebook had, in fact, "improved our policies," i.e., increased censorship of online speech.

313. Defendants' response to this censorship was to demand still more censorship by social-media platforms, including but not limited to Facebook. "[A]fter Facebook's action against the 'disinformation dozen,' a White House spokesperson continued to strongly criticize the company." Darcy, *Facebook takes action against 'disinformation dozen' after White House pressure*, CNN (Aug. 18, 2021). "'In the middle of a pandemic, being honest and transparent about the work that needs to be done to protect public health is absolutely vital, but Facebook still refuses to be straightforward about how much misinformation is circulating—and being actively promoted— on their platform,' a White House spokesperson told CNN Business. 'It's on everyone to get this right so we can make sure the American people are getting accurate information to protect the health of themselves and their loved ones—which is why the Administration will continue to push leaders, media outlets, and leading sources of information like Facebook to meet those basic expectations,' the spokesperson added." *Id.*

314. On information and belief, active coordination between Facebook and the FBI on censorship and suppression of speech on social media continues to this day. For example,

Facebook "now appears to be monitoring *private* messages and suppressing material related to the whistleblower complaint of … FBI special agent Steve Friend." Miranda Devine, *Facebook 'silencing' activity related to FBI whistleblower Steve Friend*, N.Y. Post (Sept. 25, 2022), https://nypost.com/2022/09/25/facebook-silencing-activity-related-to-fbi-whistleblower-steve-friend/.

315. After Friend made public allegations critical of political bias at the FBI, the whistleblower's "wife's Facebook account was suspended after she responded to an offer of support from a local chapter" of a supportive "conservative group that advocates for parental rights." *Id.* The wife responded to the group with a private message from her Facebook account, stating that "her husband was in the process of obtaining permission from the FBI to speak publicly and asked them to encourage their members to share his whistleblower story on their personal social media accounts." *Id.* "About 30 minutes later, Mrs. Friend received a notification from Facebook that her account had been suspended because the 'account, or activity on it, doesn't follow our Community Standards.'" *Id.* At the receiving end, "Mrs. Friend's Facebook message disappeared. In its place was a notification saying, 'Message unavailable.'" *Id.* Thus, it now appears that Facebook is policing private messages sent on Facebook to censor and suppress any communications that might be critical of the FBI.

316. The State Department has inserted itself in efforts to combat so-called Covid-19 "disinformation." State provides an online briefing dated January 21, 2022, entitled "COVID-19 Fact Checking: What Journalists Need to Know," which "provides information about fact-checking resources available to journalists to counter COVID-19 and vaccine misinformation, and an overview of counter-misinformation efforts around the world."

317. Facebook reported to Rowe, Flaherty, and Slavitt that it has "labeled and demoted"

"vaccine humor posts whose content could discourage vaccination" during January 2022. It also reported to the White House that it "labeled and demoted" posts "suggesting natural immunity to COVID-19 infection is superior to immunity by the COVID-19 vaccine." Likewise, on November 4, 2021, Facebook reported to Rowe, Flaherty, and other White House officials that "we updated our misinformation policies for COVID-19 vaccines to make clear that they apply to claims about children…."

318. On February 1, 2022, Psaki was asked at a White House press conference whether the Administration was satisfied with Spotify's decision to affix advisory warnings to Joe Rogan's immensely popular podcast, which featured speakers that contradicted the Administration's messaging about COVID-19 and vaccines, or whether the government "think[s] that companies like Spotify should go further than just, you know, putting a label on" disfavored viewpoints and speakers. Psaki responded by demanding that Spotify and other platforms "do[] more" to block disfavored speech: "[O]ur hope is that all major tech platforms … be vigilant to ensure the American people have access to accurate information on something as significant as COVID-19. So, this disclaimer – it's a positive step. But we want every platform to continue *doing more* to call out … mis- and disinformation while also uplifting accurate information." She stated that Spotify's advisory warnings are "a good step, it's a positive step, but *there's more that can be done*." The White House, *Press Briefing by Press Secretary Jen Psaki, February 1, 2022* (emphases added), https://www.whitehouse.gov/briefing-room/press-briefings/2022/02/01/press-briefing- by-press-secretary-jen-psaki-february-1-2022/.

319. On February 17, 2022, Lauren Protentis of CISA emailed contacts at Microsoft and stated: "The Department of Treasury has asked our team for appropriate POCs [i.e., points of contact] to discuss social media and influence matters. We'd like to make a connection to

Microsoft if you're amenable?  This is somewhat time-sensitive, so thanks in advance to your attention to this matter."  The email was forwarded to recent CISA alumnus, now Microsoft employee, Matthew Masterson, who exchanged the text messages with Jen Easterly quoted above. Masterson responded, "Send em to me.  I will make sure [the other Microsoft contact] is looped in."  Separately, Masterson's colleague at Microsoft responded that "Matt [Masterson] and I can be the primary POCs for the introduction."  Protentis responded, "We're going to pass your info to Treasury.  They will reach-out directly and provide more information about the nature of this request."

320.  On February 17, 2022, Protentis sent a similar email to Yoel Roth of Twitter (Nina Jankowicz's contact who was scheduled to attend the April 2022 meeting with Robert Silvers and senior DHS officials), asking for a Twitter point of contact for Treasury to "discuss social media and influence matters."  After Roth responded, Protentis stated that "Treasury . . . will reach-out directly to begin the dialogue and provide more information about the nature of this request."

321.  On February 17, 2022, Protentis reached out to a contact at Google, asking that "[t]he Department of Treasury has asked our team for appropriate POCs to discuss social media and influence matters.  We'd like to make the connection to Google if you're amenable?"  Protentis followed up just over an hour later, stating, "Apologies for the second email, this is somewhat time-sensitive, so thank you for your prompt attention to this request!"  When the Google contact responded, Protentis replied, "We're going to pass your info to Treasury.  They will reach-out directly and provide more information about the nature of this request."

322.  On February 17, 2022, Protentis reached out to contacts at Facebook and stated, "The Deputy Secretary at Treasury [Wally Adeyemo] would like to be connected to industry partners to discuss potential influence operations on social media.  We'd like to make the connection to

Facebook if you're amenable?" On information and belief, the nearly identically-phrased inquiries to Twitter and Microsoft that Protentis sent on the same day were also sent at Adeyemo's request.

323. On information and belief, these messages reflect the participation of Treasury and Adeyemo in federal censorship activities.

324. On March 3, 2022, the Surgeon General issued a formal "Request for Information" (RFI) on the "Impact of Health Misinformation" on social media. HHS, *Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID-19 Pandemic Request for Information*, 87 Fed. Reg. 12,712-12,714 (Mar. 2, 2022).

325. In the RFI, "[t]he Office of the Surgeon General requests input from interested parties on the impact and prevalence of health misinformation in the digital information environment during the COVID–19 pandemic." *Id.* at 12,712. The RFI states that "the speed, scale, and sophistication with which misinformation has been spread during the COVID-19 pandemic has been unprecedented," and it implies that social-media companies are to blame, carrying a clear threat of future regulation: "This RFI seeks to understand both the impact of health misinformation during the COVID–19 pandemic and the unique role that technology and social-media platforms play in the dissemination of critical health information during a public health emergency." *Id.* at 12,713.

326. The RFI seeks specific information about health "misinformation" on such social- media platforms: "Information about how widespread COVID–19 misinformation is on individual technology platforms including: General search engines, content sharing platforms, social-media platforms, e-commerce platforms, crowd sourced platforms, and instant messaging systems." *Id.*

327. The RFI seeks: "Any aggregate data and analysis on how many users were exposed, were potentially exposed, or otherwise engaged with COVID–19 misinformation," where "[e]xposure is defined as seeing content in newsfeeds, in search results, or algorithmically nominated content,"

and "[p]otential exposure is the exposure users would have had if they could see all the content that is eligible to appear within their newsfeeds." *Id.* at 12,714. It also seeks "[i]nformation about COVID–19 misinformation policies on individual technology platforms," including "[a]ny aggregate data and analysis of technology platform COVID–19 misinformation policies including implementation of those policies and evaluations of their effectiveness." *Id.*

328. Media reports aptly described Murthy as "demand[ing]" information about the major sources of COVID-19 misinformation by May 2, 2022. Brad Dress, *Surgeon General Demands Data on COVID-19 Misinformation from Major Tech Firms*, The Hill (March 3, 2022), https://thehill.com/policy/healthcare/596709-surgeon-general-demands-data-on-covid-19-misinformation-from-major-tech/. "In a formal notice, Murthy requested major tech platforms submit information about the prevalence and scale of COVID-19 misinformation on their sites, from social networks, search engines, crowdsourced platforms, e-commerce platforms and instant messaging systems." *Id.* "In his notice to major tech platforms, Murthy is requesting specific information on demographics affected by misinformation as well as sources of misinformation and 'exactly how many users saw or may have been exposed to instances of Covid-19 misinformation.'" *Id.*

### CDC and Census Bureau Collusion in and Inducement of Social Media Censorship of COVID-Related Speech

329. On or around July 27, 2022, a limited number of emails between CDC officials and representatives of social-media platforms from late 2020 and early months of 2021 became publicly available, over a year after they had been requested under FOIA. These emails—which are attached as Exhibit A to First Am. Compl., Missouri v. Biden, No. 3:22-cv-01213-TAD-KDM (W.D. La.), ECF No. 45-1 [hereinafter CDC Emails]—confirm the allegations of collusion between HHS officials and social-media platforms to censor disfavored speech, speakers, and

viewpoints, as alleged herein.

330.  These emails indicate that Defendant Carol Y. Crawford of CDC and other CDC officials frequently communicated and coordinated with social-media platforms, including Facebook, Twitter, Google/YouTube, and Instagram, regarding the censorship of speech on social-media platforms, including flagging specific content for censorship.   During 2021, Crawford organized "Be On the Lookout" or "BOLO" meetings on "misinformation" with representatives of social-media platforms—including Twitter, Facebook, and Google/YouTube—in which she and other federal officials colluded and/or collude with those platforms about speech to target for suppression.   These meetings include Crawford and other federal officials flagging specific social-media posts for censorship and providing examples of the types of posts to censor.    Crawford emailed "slides" from the "BOLO" meetings to participants afterwards.    These slides included repeated examples of specific posts on social-media platforms flagged for censorship.    The slides called for "all" social-media platforms to "Be On the Lookout" for such posts.   Crawford cautioned the meeting participants, with respect to these slides, "[p]lease do not share outside your trust and safety teams."

331.  These efforts go back as far as very early 2020, and they continue through the present day, as evidenced by Facebook employees writing to high-level officials in HHS and the State Department informing them of new attempts to "control information and misinformation related to Corona virus [*sic*] which includes links to WHO page as well as removal of misinformation."

332.  On April 26, 2020, Defendant Muhammed wrote to Facebook employees and asked them to take down Facebook pages, and deactivate associated accounts, misrepresenting themselves as Administration for Children and Families Program (ACF).    One of those employees responded, "Absolutely."  Defendant Christy Choi, Deputy Director in the Office of Communications within

HHS had exchanges with Facebook asking it to change the name of a Facebook page providing "misleading information about vaccine" "[g]iven the administration's focus on getting more Americans vaccinated."

333. Officials of the Census Bureau participated and/or participate in these BOLO meetings, including Defendant Jennifer Shopkorn and Christopher Lewitzke, who is a Senior Digital Marketing Associate with Reingold, a communications firm that was, on information and belief, acting on behalf of the Census Bureau. Crawford's emails indicate that the Census Bureau and its officials and agents, such as Lewitzke and Shopkorn, play an important, active, and ongoing role in colluding with social-media platforms to censor disfavored speech. On March 18, 2021, Crawford emailed Twitter officials and stated that "[w]e are working on a project with Census to leverage their infrastructure to identify and monitor social media for vaccine misinformation." She added, "We would like the opportunity to work with your trust team on a regular basis to discuss what we are seeing." She also noted that "I understand that you did this with Census last year as well." Twitter responded by stating, "With our CEO testifying before Congress this week is tricky," but otherwise agreed to the collusive arrangement. Likewise, in subsequent emails to Twitter (on May 6) and Facebook (on May 10), Crawford noted to the social-media platform officials that "[o]ur census team," i.e., Lewitzke and Shopkorn, who were cc'ed on the emails, "has much more info on it if needed" regarding "some example posts" of "misinfo" that she flagged for censorship.

334. Defendants Crawford and others, including the Census officials and agents Lewitzke and Shopkorn, took other steps to procure the censorship of disfavored speech on social media. For example, on May 10, 2021, Crawford emailed Twitter officials to flag "two issues that we are seeing a great deal of misinfo about," noting that Lewitzke and Shopkorn "ha[ve] much more info on it if needed." The same email included 13 specific Twitter posts as examples of the sort

of posts to be censored.   On May 6, 2021, Crawford sent a similar email to Facebook officials, also copying Lewitzke and Shophorn and stating that they have "much more info" about the issue; this email included 16 specific posts from Facebook and Instagram as examples of posts to be targeted for censorship.   On May 12, 2021, Crawford emailed Facebook officials to flag "some new info on myths your misinfo folks might be interested in," with links to specific issues of "misinformation" for Facebook to censor.   On April 9, 2021, Crawford agreed with a Twitter official that CDC would provide "examples of problematic content" posted on Twitter, and the Twitter official noted that "all examples of misinformation are helpful."   Calendar invites from early 2021 indicate that Crawford, Jay Dempsey, and other CDC officials participated in Facebook's "weekly sync with CDC," with "CDC to invite other agencies as needed."

335.   Moreover, many of these substantive communications from federal officials flagging specific posts and content for censorship also appear to occur through alternative channels of communication.  For example, Facebook trained CDC and Census Bureau officials on how to use a "Facebook misinfo reporting channel."  Twitter offered federal officials a privileged channel for flagging misinformation through a "Partner Support Portal."  YouTube has disclosed that it granted "trusted flagger" status to Census Bureau officials, which allows privileged and expedited consideration of their claims that content should be censored.

336.  In another exchange of emails, Crawford agreed with Facebook officials that CDC would participate in a COVID-19 "misinfo reporting channel," and arranged for CDC officials to have training on the use of Facebook's "misinfo reporting channel."  On information and belief, Crawford's "team" at CDC, as well as Shopkorn and Lewitzke from Census, were "onboarded" onto Facebook's "misinfo reporting channel."  A calendar invite in May 2021 included Crawford, Lewitzke, Shopkorn, other CDC officials, and other Reingold employees who were, on

information and belief, acting on behalf of the Census Bureau, to participate in the "onboarding" onto Facebook's "misinfo reporting channel."

337.  Crawford's communications with Facebook indicate that CDC, the Census Bureau, and other government agencies collaborate with Facebook to flag speech regarding both COVID- 19 and elections for censorship using "CrowdTangle," which Facebook describes as "a Facebook tool that tracks how content spreads online."  An email from a Facebook official to Crawford stated that, using CrowdTangle, "[w]hen health departments flag potential vaccine misinformation on Facebook and Instagram, we review and remove the content if it violates our policies… This is similar to how governments and fact-checkers use CrowdTangle ahead of *elections*…." (Emphasis added.)

338.  Additional communications between CDC and social-media platforms reflect an ongoing, close, and continuing collaboration, effectively amounting to a joint enterprise, on censorship of COVID-19 "misinformation" and related issues.  *See* CDC Emails.  For example, the communications reflect close coordination on creating and publishing content on behalf of CDC on social-media platforms, and artificially "amplifying" government messaging on social-media to the suppression of private messaging, including a gift of $15 million in Facebook ad credits from Facebook to CDC.  They also reflect close coordination on amplifying CDC's content and other related issues.

### DHS Collusion in and Inducement of Censorship of
### Election-Related and Other Constitutionally Protected Speech

339.  DHS and its officials are actively engaged in the campaign to procure the censorship of disfavored speakers, content, and viewpoints, particular with respect to speech concerning so-called "election integrity."

340.  On May 3, 2021, it was reported that DHS intended to "partner with private firms," i.e.,

social-media companies, to monitor disfavored speech online. Zachary Cohen & Katie Bo Williams, *Biden team may partner with private firms to monitor extremist chatter online*, CNN (May 3, 2021), https://www.cnn.com/2021/05/03/politics/dhs-partner-private-firms-surveil-suspected-domestic-terrorists/index.html.

341. The purpose of these "partnerships" was to evade legal, constitutional, and ethical problems with DHS's direct surveillance of online speech: "The Department of Homeland Security is limited in how it can monitor citizens online without justification and is banned from activities like assuming false identities to gain access to private messaging apps." *Id.* "Instead, federal authorities can only browse through unprotected information on social media sites like Twitter and Facebook and other open online platforms." *Id.* "The plan being discussed inside DHS, according to multiple sources, would, in effect, allow the department to circumvent those limits." *Id.* "Outsourcing some information gathering to outside firms would give DHS the benefit of tactics that it isn't legally able to do in-house, such as using false personas to gain access to private groups used by suspected extremists, sources say." *Id.*

342. As noted above, on May 5, 2021, Defendant Psaki stated at a White House press conference that "[t]he President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and *elections*." The White House, *Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack, May 5, 2021* (emphasis added), https://www.whitehouse.gov/briefing-room/press-briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-tom-vilsack-may-5-2021. Psaki immediately went on to state that President Biden "supports better privacy protections and *a robust anti-trust program*." *Id.* (emphasis added). And she stated that the

President's "view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public." *Id.*

343. In the same press conference, Psaki notoriously went on to state, "We're flagging problematic posts for Facebook that spread disinformation." *Id.* On information and belief, especially in light of Psaki's earlier reference to speech about "elections," this statement about "flagging problematic posts" referred not just to social-media speech about COVID-19, but also social-media speech about election integrity. *See, e.g.*, Reuters Staff, *White House says social-media platforms should not amplify 'untrustworthy' content*, Reuters (May 5, 2021), https://www.reuters.com/article/ctech-us-trump-facebook-biden-idCAKBN2CM1XU-OCATC

344. In June 2021, the National Security Council released its "National Strategy for Countering Domestic Terrorism." *See* The White House, *National Strategy for Countering Domestic Terrorism* (June 2021), https://www.whitehouse.gov/wp-content/uploads/2021/06/National-Strategy-for-Countering-Domestic-Terrorism.pdf.

345. The "National Strategy" repeatedly claimed that "disinformation and misinformation" are important elements of "domestic terrorism." *Id.* at 9. It claimed that the "ideologies" of domestic terrorists "connect and intersect with conspiracy theories and *other forms of disinformation and misinformation*." *Id.* (emphasis added). It stated that such "elements" of domestic terrorism "can combine and amplify threats to public safety," "*[e]specially on Internet-based communications platforms such as social-media*." *Id.* (emphasis added). It stated that DHS and others "are currently funding and implementing or planning" programs to "strengthen[] user resilience to disinformation and misinformation online for domestic audiences." *Id.* at 20. The Strategy memo identified, as its "broader priority," the task of "enhancing faith in government

and addressing the extreme polarization, *fueled by a crisis of disinformation and misinformation often channeled through social-media platforms*, which can tear Americans apart…." *Id.* at 29 (emphasis added). And it called for DHS and others to "accelerat[e] work to contend with an information environment that challenges healthy democratic discourse," and to "find[] ways to counter the influence and impact" of online disinformation. *Id.*

346. On July 26, 2021, the Global Internet Forum to Counter Terrorism (GIFCT), an "organization formed by some of the biggest U.S. tech companies including Facebook and Microsoft," which includes DHS on its board of advisors, announced that it is "significantly expanding the types of extremist content shared between firms in a key database," to move from images and videos to content-based speech tracking. Reuters, *Facebook and tech giants to target attacker manifestos, far-right militias in database*, https://www.reuters.com/technology/exclusive-facebook-tech-giants-target-manifestos-militias- database-2021-07-26/.

347. "GIFCT … was created in 2017 under pressure from U.S. and European governments," and "its database mostly contains digital fingerprints of videos and images related to groups on the U.N. Security Council's consolidated sanctions list and a few specific live- streamed attacks." *Id.* "Until now, the Global Internet Forum to Counter Terrorism's (GIFCT) database has focused on videos and images from terrorist groups on a United Nations list," but now the group announced that it would move into content-based speech tracking. *Id.* On information and belief, DHS officials, including Defendants, have access to such database(s) as tools to advance censorship of online speech.

348. Shortly thereafter, on August 2, 2021, DHS Secretary Mayorkas announced that DHS was working directly with social-media companies to censor disfavored speech on social- media platforms. "On [a] broadcast of MSNBC's 'Andrea Mitchell Reports,' DHS Secretary Alejandro

Mayorkas stated that the department is working with tech companies 'that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring.'" Ian Hanchett, *Mayorkas: We're Working with Platforms on 'How They Can Better Use' Their Terms to 'Prevent Harm' from Misinformation*, Breitbart News (Aug. 2, 2021), https://www.breitbart.com/clips/2021/08/02/mayorkas-were-workgin-with-platforms-on-how-they-can-better-use-their-terms-to-prevent-harm-from-misinformation/.

349. Echoing Psaki's comments at the July 15, 2021, news conference with Surgeon General Murthy, Mayorkas stated: "So, we're working together with them. We're working with the tech companies that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring." *Id.* On information and belief, the reference to "us[ing] their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harms from occurring" refers to government-induced censorship of disfavored viewpoints, speakers, and content.

350. Mayorkas added that there was a federal-government-wide effort to police speech on social media, stating: "[T]he connectivity between speech and violence, the connectivity between active harm and speech is something that we're very focused on, and it's a difficult challenge. But we're working on it and meeting that challenge, again, because of the great personnel of the Department of Homeland Security and *across the federal enterprise*." *Id.* (emphasis added).

351. Soon after Mayorkas's August 2, 2021 comments, DHS officials began plotting to create a "Disinformation Governance Board" within DHS. *See Missouri v. Biden*, No. 3:22-cv-01213-TAD-KDM (W.D. La.), ECF No. 10-1, at 19-23 (Glenn Decl. Ex. 1, at 6-10). On September 13,

2021, senior DHS officials Robert Silvers and Samantha Vinograd sent a memorandum to Secretary Mayorkas recommending the creation of the Disinformation Governance Board. The opening sentence of the Memorandum noted that the Board's purpose would be to combat "[t]he spread of disinformation" regarding "[c]onspiracy theories about the validity and security of elections," including "disinformation surrounding the validity of the 2020 election," and "[d]isinformation related to the origins and effects of COVID- 19 vaccines or the efficacy of masks," which "undercut[] public health efforts to combat the pandemic." *Id.* at 19.

352. The same Memorandum noted that CISA was involved in flagging content for censorship on social-media platforms: "Leading up to the 2020 election, CISA relayed reports of election disinformation from election officials to social media platform operators." *Id.* at 20. The Memorandum called for the Board to perform "partner engagement" with "private sector entities [and] tech platforms." *Id.* at 22.

353. In a subsequent Memorandum dated January 31, 2022, DHS officials indicated that the Board's activities would oversee extensive *pre-existing* social-media censorship activities by other federal officials and agencies: "The Board will also support and coordinate … MDM work with other departments and agencies, the private sector, and non-government actors." *Id.* at 24. This Memorandum attached the Board's Charter, which stated that its mission was to "guide and support the Department's efforts to address mis-, dis-, and mal-information." *Id.* at 27. It also stated that the Board would "harmonize and support coordination with … the private sector." *Id.* The Charter called for the Board to "coordinate, deconflict, and harmonize departmental efforts to address MDM," including between "DHS Components" and "interagency partners," and "serving as the Department's internal and external point of contact for coordination with … the private sector … regarding MDM." *Id.* at 28-29.

354.  Under continuous pressure from federal officials, including Defendants herein, social-media firms have imposed increasingly draconian censorship on core political speech about election integrity.  For example, in March 2022, YouTube imposed a one-week suspension on The Hill, a well-known political publication covering Congress, for posts that included clips of former President Trump's speech at the CPAC conference and interview on Fox News, which included claims that fraud changed the outcome of the 2020 presidential election.  Gilead Edelman*, Beware the Never-Ending Disinformation Emergency*, The Wired (Mar. 11, 2022), https://www.wired.com/story/youtube-rigged-election-donald-trump-moderation-misinformation/.

355.  YouTube relied on its "Elections misinformation policy," under which it censors "Content that advances false claims that widespread fraud, errors, or glitches changed the outcome of *select past national elections*, after final election results are officially certified."  YouTube, *Elections Misinformation Policy* (emphasis added), https://support.google.com/youtube/answer/10835034?hl=en.

356.  This policy is openly content- and viewpoint-based—it applies only to "select" past national elections, and "[u]nder the policy, you can only include those claims if you explicitly debunk or condemn them."  Edelman, *supra*.   On information and belief, this policy is also selective in application, as it is not applied to censor widespread, false Democratic claims that supposed "collusion" between the Trump campaign and Russia changed the outcome of the 2016 presidential election.   And "by asking news hosts to explicitly denounce any mention of election fraud, YouTube isn't just making its own content decisions; it's injecting itself into the editorial processes of actual media outlets." *Id.*

357.  On November 10, 2021, the Cybersecurity and Infrastructure Security Agency (CISA), an agency within DHS, announced that it was "beefing up its disinformation and misinformation

team in the wake of a divisive presidential election that saw a proliferation of misleading information online." Maggie Miller, *Cyber agency beefing up disinformation, misinformation team*, The Hill (Nov. 10, 2021), https://thehill.com/policy/cybersecurity/580990-cyber-agency-beefing-up-disinformation-misinformation-team/. "'I am actually going to grow and strengthen my misinformation and disinformation team,' CISA Director Jen Easterly said." *Id.* Defendant Easterly said that so-called "disinformation" and "misinformation" pose "a top threat for CISA, which is charged with securing critical infrastructure, to confront." *Id.*

358. Easterly claimed that social-media speech is a form of "infrastructure," and that policing speech online by the federal government falls within her agency's mission to protect "infrastructure," stating that CISA is "in the business of critical infrastructure, and the most critical infrastructure is our cognitive infrastructure, so building that resilience to misinformation and disinformation, I think, is incredibly important." *Id.*

359. Easterly announced that CISA was working directly with unnamed "partners in the private sector" and other government agencies to police online speech: "We are going to work with our partners in the private sector and throughout the rest of the government and at the department to continue to ensure that the American people have the facts that they need to help protect our critical infrastructure." *Id.*

360. Easterly texted with Matthew Masterson about "trying to get us in a place where Fed can work with platforms to better understand the mis/dis trends so relevant agencies can try to prebunk/debunk as useful," and complained about the Government's need to overcome the social-media platforms' "hesitation" to working with the government: "Platforms have got to get more comfortable with gov't. It's really interesting how hesitant they remain."

361. With specific reference to hotly disputed election-integrity issues, Easterly stated that

Americans should not be allowed to "pick [their] own facts" and make their own decisions about what is true, especially regarding election security: "We now live in a world where people talk about alternative facts, post-truth, which I think is really, really dangerous if you get to pick your own facts, and it's particularly corrosive when you talk about matters of election security." *Id.* Instead, she indicated, federal officials like herself should intervene to help Americans "pick" the right "facts." *Id.*

362. CISA appears to be the focus of many of DHS's attempts to police the content of speech and viewpoints on social media. On information and belief, CISA maintains a number of task forces, working groups, and similar organizations as joint government-private enterprises, which provide avenues for government officials to push for censorship of disfavored viewpoints and speakers online. CISA has aggressively embraced its "evolved mission" of screening complaints of social-media disinformation and then "routing disinformation concerns" to social-media platforms. CISA routinely receives reports of perceived "disinformation," often from state and local government officials, and forwards them to social-media companies for censorship, placing the considerable weight of its authority as a federal national-security agency behind its demands for suppression of private speech. CISA, therefore, serves as a government clearinghouse for expedited censorship of social-media speech disfavored by government officials.

363. In a 2020 document entitled "2020 Election Infrastructure Subsector-Specific Plan," https://www.cisa.gov/sites/default/files/publications/election_infrastructure_subsector_ specific_plan.pdf, CISA stated that it had partnered to "promote" interaction between election officials and the Center for Technology and Civic Life, the now-notorious nonprofit funded by Mark Zuckerberg that engaged in egregious election interference by injecting hundreds of millions of private dollars and personnel into local election offices in heavily Democratic-favoring areas.

364. CISA routinely expands the definitions of "misinformation" and "disinformation" to include "malinformation," i.e., *truthful* information that the government believes is presented out of context to contradict left-wing political narratives. CISA defines "malinformation" as information that is "based on fact, but used out of context to mislead, harm, or manipulate." *See, e.g.*, CISA, *We're in This Together. Disinformation Stops with You.* (last visited May 5, 2022), https://www.cisa.gov/sites/default/files/publications/SLTTCOVIDToolkit_FINAL_508.pdf.

365. CISA's same publication decries the spreading of "false treatment and prevention measures [for COVID-19], *unsubstantiated rumors regarding the origin of the virus*, and more." *Id.* (emphasis added). On information and belief, "unsubstantiated rumors regarding the origin of the [COVID-19] virus" refers to the lab-leak theory of COVID-19's origins, which (as noted above) is supported by compelling circumstantial evidence, both scientific and historical.

366. CISA's "Mis-, Dis-, and Malinformation [MDM] Planning and Incident Response Guide for Election Officials," https://www.cisa.gov/sites/default/files/publications/mdm-incident-response-guide_508.pdf, calls for constant policing of speech regarding election integrity, stating that "election infrastructure related MDM occurs year-round," and "[f]alse narratives erode trust and pose a threat to democratic transitions, especially, but not limited to, narratives around election processes and the validity of election outcomes." *Id.* The Guide defines MDM to include "[n]arratives or content that delegitimizes election results or sows distrust in the integrity of the process based on false or misleading claims." *Id.*

367. On February 7, 2022, DHS issued a National Terrorism Advisory Bulletin, https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-system-bulletin-february-07-2022. It begins by stating: "The United States remains in a heightened threat environment fueled by several factors, including an online environment filled with false or misleading narratives and

conspiracy theories, and other forms of mis- dis- and mal-information (MDM)." *Id.* The first critical "factor" contributing to a "heightened threat environment," according to the Bulletin, is "(1) the proliferation of false or misleading narratives, which sow discord or undermine public trust in U.S. government institutions." *Id.* Again, the first "[k]ey factor contributing to the current heightened threat environment" identified in the Bulletin is "[t]he proliferation of false or misleading narratives, which sow discord or undermine public trust in U.S. government institutions: For example, there is widespread online proliferation of false or *misleading narratives regarding unsubstantiated widespread election fraud and COVID-19*. Grievances associated with these themes inspired violent extremist attacks during 2021." *Id.* (emphasis added). The Bulletin stated that DHS is directly coordinating with social-media platforms to address so-called "MDM": "DHS is working with public and private sector partners, as well as foreign counterparts, to identify and evaluate MDM, including false or misleading narratives and conspiracy theories spread on social media and other online platforms that endorse or could inspire violence." *Id.* And it specifically stated that CISA likewise "works with public and private sector partners … [to] increase nationwide cybersecurity resilience." *Id.*

368.  This February 7, 2022 Bulletin echoed statements from prior bulletins indicating that so-called COVID-19 "misinformation" and election-related "misinformation" are domestic terror threats. For example, DHS's January 27, 2021 National Terrorism Advisory System Bulletin, https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-system-bulletin-january-27-2021, stated that "Domestic Violent Extremists" are "motivated by a range of issues, including anger over COVID-19 restrictions [and] the 2020 election results…." *Id.* Similarly, DHS's August 13, 2021 National Terrorism Advisory System Bulletin, https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-system-bulletin-august-13-2021,

stated that "violent extremists … may seek to exploit the emergence of COVID-19 variants by viewing the potential re-establishment of public health restrictions across the United States as a rationale to conduct attacks." *Id.* It stated that "domestic threat actors … continue to introduce, amplify, and disseminate narratives online that promote violence," and included therein "conspiracy theories on perceived election fraud … and responses to anticipated restrictions relating to the increasing COVID cases." *Id.*

369.  On April 12, 2022, CISA published another bulletin announcing that it was coordinating directly with social-media platforms to police "Mis, Dis, Malinformation" (which it calls "MDM"). CISA, *Mis, Dis, Malinformation*, https://www.cisa.gov/mdm.   The bulletin states that MDM—which, again, includes factually accurate information—"can evoke a strong emotional reaction that leads people to share it without first looking into the facts for themselves, polluting healthy conversations about the issues and increasing societal divisions." *Id.* CISA reported that its Countering Foreign Influence Task Force's "mission evolved" during the Biden Administration to address the new "information environment," which (on information and belief) is codespeak for ramping up online censorship: "In 2021, the CFITF officially transitioned into CISA's MDM team, and the mission evolved to reflect the changing information environment." *Id.* CISA stated that it coordinates directly with social-media firms to address MDM: "The MDM team continues to work in close coordination with interagency and private sector partners, *social-media companies*, academia, and international partners on a variety of projects to build resilience against malicious information activities." *Id.* (emphasis added).

370.  The April 12, 2022 CISA bulletin indicates that CISA works directly with social-media companies to flag content for censorship: "The MDM team serves as a switchboard for routing disinformation concerns to appropriate social-media platforms…." *Id.* CISA boasts that it has

"expanded the breadth of reporting [MDM] to include … more social-media platforms," and that "[t]his activity leverages the rapport the MDM team has with the social-media platforms to enable shared situational awareness." *Id.* On information and belief, these statements reflect and express on ongoing practice by government officials of directly colluding with social-media platforms to suppress disfavored speech, viewpoints, content, and speakers on social media. Again, these statements echo Psaki's statement that the Biden Administration is "flagging problematic posts for Facebook," and Mayorkas's statement that DHS is "working with the tech companies that are the platform for much of the disinformation that reaches the American public" to address so-called misinformation and disinformation.

371. The same bulletin suggests that CISA is directly involved in such "flagging" related to COVID-19 "misinformation." It states that "COVID-19-related MDM activities seek to undermine public confidence and sow confusion," and claims that "the rapid evolution of accurate information makes older, dated information a potential catalyst of confusion and distrust as well." *Id.* Thus, it claims, "[t]he MDM team supports the interagency and *private sector partners'* COVID-19 response efforts via regular reporting and analysis of key pandemic-related MDM trends." *Id.* (emphasis added). On information and belief, these "private sector partners" include social-media firms, and the "reporting and analysis" includes flagging disfavored content for censorship.

372. On April 27, 2022, Mayorkas announced that DHS was creating a "Disinformation Governance Board." Hannah Nightingale, *Biden Administration creates 'Disinformation Governance Board' under DHS to fight 'misinformation,'* The Post Millenial (Apr. 27, 2022), https://thepostmillennial.com/breaking-biden-administration-creates-disinformation-governance-board-under-dhs-to-fight-misinformation. "The Department of Homeland Security

is setting up a new board designed to counter misinformation related to homeland security, with a focus specifically on Russia and irregular migration. The board will be called the 'Disinformation Governance Board,' and will be headed by executive director Nina Jankowicz." *Id.* During congressional testimony, Mayorkas described the endeavor as a "just recently constituted Misinformation/Disinformation Governance Board." *Id.* (video link at 1:40). He stated: "The goal is to bring the resources of the Department together to address this threat." *Id.*

373. Jankowicz called for more aggressive censorship of election-related speech: "Considering the long-term damage these lies do to our democracy, I'm dismayed about this decision [not to censor election-related speech more aggressively]. I say this about foreign disinformation and it applies to domestic disinfo too: Elections aren't an end point. They're an inflection point. Policies need to reflect that." *Id.*

374. On information and belief, DHS's new "Disinformation Governance Board" was intended to be used to increase DHS's efforts to induce and procure the censorship of disfavored content, viewpoints, and speakers on social-media platforms.

375. From its inception, the DGB was envisioned as an agency for suppressing core political speech about election security and COVID-19 restrictions. In the internal memo to Secretary Mayorkas advocating for the DGB's creation, the very first two topics of "disinformation" to be targeted were "conspiracies about the validity and security of elections," and "disinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks."

376. Internal documents of DHS, provided by whistleblowers to U.S. Senators, indicate that the "Disinformation Governance Board" was formulated to create a stronger bureaucratic structure to federal social-media censorship policies and activities that were already in full force, both within DHS and across other federal agencies. The whistleblower documents make clear

that the DGB's task was not to *establish* a censorship program, but to *oversee* the massive censorship program against free speech on these topics that already exists—both within DHS, and across the federal government.

377. On information and belief, Defendants Robert Silvers and Samantha Vinograd played and play a central role in DHS's censorship activities, including but not limited to the formulation and creation of the "Disinformation Governance Board." The whistleblower documents cited above strongly support this conclusion. Silvers and Vinograd co-signed the September 13, 2021 "Memorandum for the Secretary" regarding "Organizing DHS Efforts to Counter Disinformation" that provided an overview of DHS's disinformation activity and recommended the creation of the DGB. As noted above, the opening lines of this memo state that "[t]he spread of disinformation presents serious homeland security risks," especially "[c]onspiracy theories about the validity and security of elections" and "[d]isinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks." The memo reflects detailed knowledge and active oversight of DHS's "misinformation" and "disinformation" activities. Further, Defendant Silvers authored the January 31, 2022 memo to the Secretary seeking his "approval of the charter for the Disinformation Governance Board," and he authored a separate memorandum to DHS's general counsel seeking the same approval. Silvers also is listed as a participant in the April 28, 2022 meeting with Twitter executives Nick Pickles and Yoel Roth organized by Nina Jankowicz, discussed immediately below.

378. On April 28, 2022, Jankowicz arranged for a meeting between Secretary Mayorkas and/or other senior DHS officials, including Undersecretary Robert Silvers, and "Twitter executives Nick Pickles, Head of Policy, and Yoel Roth, Head of Site Integrity," to discuss "public-private partnerships, MDM, and countering DVE. The meeting is off the record and closed

press." *Missouri v. Biden*, No. 3:22-cv-01213-TAD-KDM (W.D. La.), ECF No. 10-1, at 31 (Glenn Decl. Ex. 1, at 18). This was to be a cozy meeting: Jankowicz, who drafted the meeting brief, noted that "Nick and Yoel both know DGB Executive Director Nina Jankowicz." *Id.* The meeting was to be "an opportunity to discuss operationalizing public-private partnerships between DHS and Twitter." *Id.* In the meeting, DHS was to "[p]ropose that Twitter become involved in Disinformation Governance Board Analytic Exchanges on Domestic Violent Extremism (DVE) and Irregular Migration," and to "[t]hank Twitter for its continued participation in the CISA Analytic Exchange on Election Security." *Id.* DHS was also to "[a]sk what types of data or information would be useful for Twitter to receive in Analytic Exchanges or other ways the Department could be helpful to Twitter's counter-MDM efforts." *Id.*

## White House Threats Following News of Elon Musk's Acquisition of Twitter

379. On or around April 25, 2022—two days before DHS announced the creation of its "Disinformation Governance Board"—it was reported that free-speech advocate Elon Musk would acquire Twitter and make it a privately held company dedicated to free speech principles. Left-wing commentators widely decried this news on the ground that it would ground that free speech on Twitter would allow the spread of so-called "misinformation" and "disinformation."

380. On April 25, 2022, Psaki was asked at a White House press briefing to respond to the news that Elon Musk would acquire Twitter, and asked "does the White House have any concern that this new agreement might have President Trump back on the platform?" The White House, *Press Briefing by Press Secretary Jen Psaki, April 25, 2022*, https://www.whitehouse.gov/briefing-room/press-briefings/2022/04/25/press-briefing-by-press-secretary-jen-psaki-april-25-2022/.

381. Psaki responded by reiterating the threats of adverse legal consequences to Twitter and

other social-media platforms, specifically referencing antitrust enforcement and Section 230 repeal: "No matter who owns or runs Twitter, the President has long been concerned about the power of large social-media platforms … [and] has long argued that tech platforms must be held accountable for the harms they cause.   He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more.   And he's encouraged that there's bipartisan interest in Congress." *Id.*

382.  At the same press briefing, Psaki was asked: "Are you concerned about the kind of purveyors of election misinformation, disinformation, health falsehoods, sort of, having more of an opportunity to speak there on Twitter?"   *Id.*  She responded by specifically linking the legal threats to the social-media platforms' failure to more aggressively censor free speech: "We've long talked about and the President has long talked about his concerns about the power of social-media platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable." *Id.*

383.  Psaki was then asked a question that noted that "the Surgeon General has said that misinformation about COVID amounts to a public health crisis," and then queried, "would the White House be interested in working with Twitter like it has in the past to continue to combat this kind of misinformation?   Or are we in a different part of the pandemic where that kind of partnership is no longer necessary?"   *Id.*

384.  Psaki responded by reaffirming that senior officials within the White House and/or the Administration are continuing to coordinate directly with social-media platforms to censor disfavored speakers and content on social media, and directly linking these efforts to the repeated threat of adverse legal action: "we engage regularly with all social-media platforms about steps that can be taken that has continued, and I'm sure it will continue.   But there are also reforms

that we think Congress could take and we would support taking, including reforming Section 230, enacting antitrust reforms, requiring more transparency.  And the President is encouraged by the bipartisan support for — or engagement in those efforts." *Id.*

### Continuing Federal Collusion in and
### Inducement of Social Media Censorship

385.  Since mid-2022, federal officials, including Defendants herein, have expanded their social-media censorship activities still further and opened new fronts in their campaign against the freedom of speech on social media.

386.  On June 13, 2022, Flaherty demanded that Facebook continue to produce periodic "COVID-19 insights reports" to track so-called "misinformation" regarding COVID-19 on Facebook's social-media platforms, expressing the specific concern that COVID vaccines for children under 5 would soon be authorized.  Facebook agreed to continue sending its censorship-tracking report.

387.  On June 23, 2022, Facebook assured Flaherty that it was expanding its censorship of COVID-19 "misinformation" to ensure that speech critical or skeptical of COVID-19 vaccines for children under 5-years old—a highly controversial topic—would be censored.  Such censorship is particularly egregious given that Pfizer's own data established that the vaccine does not stop infection or transmission in this age group. *See* Apoorva Mandavilli & Noah Weiland, *Pfizer Shot Is Far Less Effective in 5- to 11-Year-Olds Than in Older Kids, New Data Show*, N.Y. Times (Feb. 28, 2022), https://www.nytimes.com/2022/02/28/health/pfizer-vaccine-kids.html.

388.  The White House Defendants were involved in many other communications regarding censorship as well.   For example, in June and July of 2022, Flaherty was included in the email chain with Facebook in which he demanded that Facebook continue providing biweekly "COVID-19 Insights" reports to ensure adequate censorship of speech on Facebook and

Instagram "as we start to ramp up under 5 vaccines"—i.e., as vaccination of children under 5 for COVID-19 began. Wakana and Rowe were also involved in similar communications overseeing Facebook's misinformation practices.

389. On June 14, 2022, White House National Climate Advisor Gina McCarthy spoke at an Axios event titled "A conversation on battling misinformation." *See* Alexander Hall, *Biden climate advisor demands tech companies censor 'disinformation' to promote 'benefits of clean energy'*, Fox News (June 14, 2022), https://www.foxnews.com/media/biden-climate-advisor-tech-companies-censor-disinformation-promote-benefits-clean-energy (video of her comments embedded in link). McCarthy publicly demanded that social-media platforms engage in censorship and suppression of speech that contradicts federal officials' preferred narratives on climate change.

390. During the event, "McCarthy skewered Big Tech companies for 'allowing' disinformation and cheered Congress for 'taking action' to enact more censorship last Thursday." *Id.* "Axios political reporter Alexi McCammond asked McCarthy how so-called 'rampant mis-and-disinformation around climate change online and in other platforms' has 'made your job harder?'" *Id.* "McCarthy responded by slamming social-media companies: 'We have to get tighter, we have to get better at communicating, and frankly, *the tech companies have to stop allowing specific individuals over and over again to spread disinformation*.'" *Id.* (emphasis added). "She suggested further that 'we have to be smarter than that and *we need the tech companies to really jump in*.'" *Id.* (emphasis added). "McCammond responded by asking: 'Isn't misinformation and disinfo around climate a threat to public health itself?' McCarthy asserted that it 'absolutely' is: 'Oh, absolutely.'" *Id.*

391. Following the Administration's now-familiar playbook, McCarthy explicitly tied these

99

demands for censorship of climate-change-related speech to threats of adverse legislation: "McCarthy also praised Congress directly for pushing social-media companies to censor Americans: 'We do see Congress taking action on these issues, we do see them trying to tackle the misinformation that's out there, trying to hold companies accountable.'" *Id.*

392.  Two days later, the White House announced a new task force to address, among other things, "gendered disinformation" and "disinformation campaigns targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists." The White House, *Memorandum on the Establishment of the White House Task Force to Address Online Harassment and Abuse* (June 16, 2022), https://www.whitehouse.gov/briefing-room/presidential-actions/2022/06/16/memorandum-on-the-establishment-of-the-white-house-task-force-to-address-online-harassment-and-abuse/.

393.  The June 16 Memorandum decries "online harassment and abuse"—vague terms that, on information and belief, are deliberately adopted to sweep in constitutionally protected speech. In particular, the Memorandum defines "online harassment and abuse" to include "gendered disinformation," a deliberately broad and open-ended term.  *Id.* § 1.  The Memorandum announces plans to target such "gendered disinformation" directed at public officials and public figures, including "women and LGBTQI+ political leaders, public figures, activists, and journalists." *Id.* The Memorandum creates a Task Force co-chaired by the Assistant to the President for National Security Affairs, which includes the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security, among others.  *Id.*

394.  The Task Force is charged with "developing programs and policies to address … *disinformation campaigns* targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists in the United States and

globally." *Id.* § 4(a)(iv) (emphasis added). The Memorandum calls for the Task Force to consult and coordinate with "technology experts" and "industry stakeholders," *i.e.*, social-media firms, to achieve "the objectives of this memorandum," *id.* § 4(b). Those "objectives" include suppressing so-called "disinformation campaigns" against "public and political figures." *Id.* § 4(a)(iv).

395. The Memorandum again threatens social-media platforms with adverse legal consequences if they do not censor aggressively enough to suit federal officials: "the Task Force shall … submit periodic recommendations to the President on *policies, regulatory actions, and legislation on technology sector accountability* to address systemic harms to people affected by online harassment and abuse." *Id.* § 5(c) (emphasis added).

396. On June 17, 2022, twenty-one Democratic U.S. Senators and Representatives sent a letter to Sundar Pichai, the CEO of Alphabet Inc., which owns Google, demanding that Google censor, suppress, and de-boost search results and Google Maps results for pro-life pregnancy resource centers. Letter of Sen. Mark Warner, et al. (June 17, 2022), https://reason.com/wp-content/uploads/2022/06/26F26BB28841042A7931EEC58AC80E08.anti-abortion-letter-to-google-final.pdf. The letter's co-signers included many of the Members of Congress who have previously made threats of adverse legal consequences if social-media platforms do not increase censorship—such as Senators Mark Warner, Amy Klobuchar, and Richard Blumenthal. *Id.* The letter cited "research by the Center for Countering Digital Hate (CCDH)," *id.*—the same organization that Jen Psaki and the White House coordinated with to demand the censorship of the so-called "Disinformation Dozen." The letter describes pro-life pregnancy resource centers as "fake clinics," and demands that Google proactively censor search results, mapping results, and advertisements relating to such clinics. *Id.* The letter demands that Google "limit the

appearance of anti-abortion fake clinics or so-called 'crisis pregnancy centers' in Google search results, Google Ads, and on Google Maps"; that Google "add user-friendly disclaimers that clearly indicate whether or not a search result does or does not provide abortions"; and that Google take "additional steps to ensure that users are receiving accurate information when they search for health care services like abortion on Google Search and Google Maps." *Id.*

397. Defendants swiftly doubled down on this demand for social-media censorship of pro-life pregnancy resource centers. On July 8, 2022, the President signed an Executive Order "aimed at protecting abortion rights." Sandhya Raman, *Biden issues executive order responding to abortion ruling*, Roll Call (July 8, 2022), https://rollcall.com/2022/07/08/biden-issues-executive-order-responding-to-abortion-ruling/. The order directs HHS, DOJ, and the FTC "to examine ways to … curb the spread of misinformation related to abortion." *Id.* The order is entitled "Executive Order on Protecting Access to Reproductive Healthcare Services," available at https://www.whitehouse.gov/briefing-room/presidential-actions/2022/07/08/executive-order-on-protecting-access-to-reproductive-healthcare-services/. Section 4(b)(iv) of the order states: "The Secretary of Health and Human Services shall, in consultation with the Attorney General and the Chair of the FTC, consider options to address deceptive or fraudulent practices related to reproductive healthcare services, including online, and to protect access to accurate information." *Id.*

398. Today, a veritable army of federal bureaucrats is involved in censorship activities "across the federal enterprise." There are so many, in fact, that CISA Director Easterly and Matthew Masterson complained in text messages that "chaos" would result if all federal officials were "independently" contacting social-media platforms about so-called misinformation: "Not our mission but was looking to play a coord role so not every D/A is independently reaching out

to platforms which could cause a lot of chaos."

## CLASS ACTION ALLEGATIONS

399. Plaintiffs re-allege and incorporate by reference all the allegations contained above.

400. Pursuant to Federal Rule of Civil Procedure 23(b)(2), Plaintiffs assert claims on behalf of the following Class: All persons in the United States who have consumed news related to COVID-19 or U.S. elections on Facebook, Twitter, or YouTube at any time from January 2020 to the present.

401. Plaintiffs reserve the right to amend this Class definition if discovery and/or further investigation reveal that the Classes should be expanded, divided into subclasses, or modified in any other way.

402. This Rule 23(b)(2) injunctive and declaratory class action is properly maintainable because it satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a) and the injunctive remedy requirement of Rule 23(b)(2).

403. Although the precise number of Class members is unknown, the proposed Class numbers at least in the tens of millions and is therefore so numerous that joinder of all members would be impracticable.

404. The claims of every Member of the proposed Class are united by a common, dispositive issue of law: whether the federal government's systematic, concerted campaign to induce social-media companies to censor constitutionally protected violates the First Amendment and should be enjoined.

405. The named Plaintiffs are members of the putative Class, and their claims are typical of the Class: (A) because, like other Class Members, they have been denied the right to receive uncensored ideas and information on the social-media platforms that comprise what the Supreme

Court calls the "modern public square"; and (B) because all Class Members' claims arise from the same course of conduct by the Defendants.

406.  Plaintiffs will fairly and adequately represent and protect the interests of the Class, because they are passionately dedicated to the freedom of all persons in this country to make health care and citizenship decisions on the basis of full, accurate information uncensored by the government.  In addition, Plaintiff CHD will zealously represent the interests of the Class because of its institutional interests in protecting its own members, who are also Class Members.  And Plaintiff Kennedy will be a zealous Class representative because he has himself been the victim of the Defendants' massive, unconstitutional censorship campaign.

407.  Plaintiffs have retained counsel competent and experienced in both constitutional law and class action litigation.

408.  Certification of the Class is appropriate pursuant to Fed. R.C.P. 23(b)(2) because Defendants have acted in ways that apply generally to the Class, so that final injunctive relief and corresponding declaratory relief are appropriate respecting the Class as a whole.  The Class Members' interests in this case are indivisible and cohesive in that an injunction will at once redress the violation of every Class Member's First Amendment rights, apply to all Members identically, and give to each Class Member (as well as the public more generally) the access to robust, uncensored expression of facts and opinions in the "modern public square" to which the Constitution entitles them.

409.  No ascertainability requirement applies to this Rule 23(b)(2) class action.  *See Neese v. Becerra*, 342 F.R.D. 399, 411 (N.D. Tex. 2022); *O'Donnell v. Harris Cnty.*, No. H-16-1414, 2017 U.S. Dist. LEXIS 65444, at *11 (S.D. Tex. Apr. 28, 2017); *cf. In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir. 2004).

## INJURY

410.  Defendants' conduct has violated, is violating, and unless enjoined will continue to violate the named Plaintiffs' and other Class Members' right to receive ideas and information from willing speakers.

411.  Because of their dominance in the social-media market and the gatekeeping power that this dominance gives them, the major social-media platforms exercise a historically unprecedented power over public discourse in America—a power to control what hundreds of millions of people in this country can say, see, and hear.

412.  When speech is censored on the major social-media platforms, it is very difficult if not impossible for most people to find it.  Indeed most people who consume news on the major social-media platforms will not even know that such information and ideas have been suppressed (or "de-boosted," "shadow-banned," etc.).

413.  When individual speakers are censored on the major social-media platforms, it is very difficult if not impossible for most people to gain access to their voices.  Indeed most people who consume news on the major social-media platforms will not even know that these voices have been silenced (or "de-boosted," "shadow-banned," etc.).

414.  Defendants' conduct has badly distorted online public discourse, stifled dissent, and blocked or restricted access to vast quantities of information and ideas that would otherwise have been easily accessible online, posted by willing speakers.

415.  For example, as a direct result of the conduct alleged herein, Defendants have achieved astonishing success in muzzling public criticism of President Biden.

416.  A recent review by the Media Research Center identified 646 instances over the last two years where social-media firms censored public criticism of then-candidate and now-President Biden.  *See* Joseph Vasquez & Gabriela Pariseau, *Protecting the President: Big Tech*

*Censors Biden Criticism 646 Times Over Two Years* (Apr. 21, 2022), https://censortrack.org/protecting-president-big-tech-censors-biden-criticism-646-times-over-two-years.

417. "The Media Research Center found more than 640 examples of bans, deleted content and other speech restrictions placed on those who criticized Biden on social media over the past two years." *Id.* "MRC Free Speech America tallied 646 cases in its CensorTrack database of pro-Biden censorship between March 10, 2020, and March 10, 2022. The tally included cases from Biden's presidential candidacy to the present day." *Id.*

418. "The worst cases of censorship involved platforms targeting anyone who dared to speak about any subject related to the *New York Post* bombshell Hunter Biden story. . . . Big Tech's cancellation of that story helped shift the 2020 election in Biden's favor. Twitter locked the Post's account for 17 days. In addition, Twitter slapped a 'warning label' on the GOP House Judiciary Committee's website for linking to the Post story." *Id.* "CensorTrack logged 140 instances of users—including lawmakers, organizations, news outlets and media personalities—censored for sharing anything related to the bombshell Hunter Biden laptop story." *Id.*

419. "Twitter was the most aggressive censor when it came to the Biden laptop story. CensorTrack entries show that users could not tweet the story or pictures of the Post story."

420. "Big Tech even axed those who blamed the current inflation crisis on Biden. For example, Facebook censored Heritage Action, the advocacy arm of the conservative Heritage Foundation, on March 15, simply for posting a video quoting Biden's embarrassing statements on energy policy. Facebook placed an interstitial, or filter, over Heritage Action's video, suppressing the post's reach. The video showed Biden and officials in his administration explaining how his policies would cause gas prices to rise." *Id.*

421. "[T]he largest category by far included users who dared to call out Biden's notoriously

creepy, touchy-feely behavior around women and children. The 232 cases of comedic memes, videos, or generic posts about Biden's conduct composed more than one-third of CensorTrack's total instances of users censored for criticizing the president." *Id.*

422. "Big Tech even went after posts that quoted Biden's own words and made him look awful in retrospect." *Id.*

423. "The list of censorship targets included an array of prominent influencers on social media: Trump; lawmakers like Sen. Ted Cruz (R-TX) and House Minority Leader Kevin McCarthy (R-CA); news outlets like the New York Post, The Washington Free Beacon and The Federalist; satire site The Babylon Bee; celebrities like Donald Trump Jr. and James Woods, and media personalities like Daily Wire host Candace Owens, Salem radio host Sebastian Gorka and radio host Dana Loesch." *Id.*

424. Social media platforms have also censored criticisms of the Biden Administration's 2022 attempt to redefine the word "recession" in light of news that the U.S. economy had suffered two consecutive quarters of reduction in GDP. *See, e.g.*, Taylor Penley, *Economist slams Facebook for 'absolutely Orwellian' fact-check upholding Biden's recession denial*, Fox News (Aug. 1, 2022), https://www.foxnews.com/media/economist-slams-facebook-absolutely-orwellian-fact-check-upholding-bidens-recession-denial.

425. Defendants also achieved enormous success in stifling and distorting public discourse surrounding COVID-19.

426. For example, as detailed above, they stifled information and ideas about the lab-leak theory of COVID's origins.

427. They also suppressed vast amounts of speech containing information and ideas about the inefficacy and dangers of the COVID vaccines.

428. They also suppressed information and ideas concerning the safety and possible efficacy of certain medicines—such as Hydroxychloroquine and Ivermectin—believed by many physicians and scientists all over the world to be potential treatment alternatives.

429. Indeed, Defendants succeeded in inducing major social-media platforms to censor all of the following COVID-related claims as "misinformation" when in fact these claims were either entirely accurate or at a minimum well within the ambit of legitimate opinion, speculation, and reporting:

A. Claims that COVID-19 was manmade;[4]

B. Claims that COVID-19 was manufactured or bioengineered;[5]

C. Claims that COVID-19 was created by a government or country;[6]

D. Claims that "contradict" WHO or U.S. health officials' guidance on the treatment, prevention, or transmission of COVID-19;[7]

---

[4] *But see, e.g.,* British Med. J., *The COVID-19 lab leak hypothesis: did the media fall victim to a misinformation campaign?*, July 8, 2021, https://www.bmj.com/content/374/bmj.n1656 (Lab-leak theory of COVID's origin was and is supported by substantial evidence "deserv[ing] serious investigation").

[5] *But see, e.g.*, *id*. (Substantial evidence supports claim that COVID was manufactured or bioengineered through laboratory gain-of-function experiments).

[6] *But see, e.g.*, Proceedings of the Nat'l Acad. of Science, *A call for an independent inquiry into the origin of the SARS-CoV-2 virus*, May 19, 2022, https://www.pnas.org/doi/10.1073/pnas.2202769119 (substantial evidence supports claim that COVID-19 was created at a Chinese government-controlled virology laboratory in Wuhan, China, with the possible assistance of U.S. governmental funding).

[7] Governmental guidance and policy on COVID-19 has repeatedly been in error. *See, e.g.*, Scientific American, *How the U.S. Pandemic Response Went Wrong—and What Went Right—during a Year of COVID*, Mar. 11, 2021, https://www.scientificamerican.com/article/how-the-u-s-pandemic-response-went-wrong-and-what-went-right-during-a-year-of-covid/; New York Times, *The C.D.C. Waited 'Its Entire Existence for This Moment.' What Went Wrong?*, Aug. 14, 2020, https://www.nytimes.com/2020/06/03/us/cdc-coronavirus.html.

E. Claims about the COVID vaccines that contradict "expert consensus" from U.S. health authorities or the WHO;[8]

F. Claims that Hydroxychloroquine ("HCQ") is an effective treatment for COVID;[9]

G. Claims that Ivermectin ("IVM") is an effective treatment for COVID;[10]

H. Claims that HCQ or IVM is safe to use as a treatment for COVID;[11]

I. Recommendations of the use of HCQ or IVM against COVID;[12]

J. Claims that COVID is no more dangerous to some populations than the seasonal flu.[13]

---

[8] The "expert consensus" on COVID has repeatedly been in error. *See, e.g.*, Washington Post, *Beware of 'expert' consensus. The covid-19 lab leak theory shows why*, May 30, 2021, https://www.washingtonpost.com/opinions/2021/05/30/beware-expert-consensus-covid-19-lab-leak-theory-shows-why/.

[9] But see this peer-reviewed, published 2021 study reporting that in a trial involving over 10,000 ambulatory patients in France, those treated with HCQ suffered a stunningly low .06% mortality rate, whereas in the control group (no HCQ), the fatality rate was *almost nine times higher*.

[10] But see this peer-reviewed, published meta-analysis of IVM clinical studies finding that IVM reduced mortality for COVID patients by roughly half or more.

[11] Both HCQ and IVM are well known to be extremely safe for human use at well-established dosages, both have been safely used for decades, and both have been approved for human use by the FDA. *See* Opinion of the Attorney General of Nebraska, *Prescription of Ivermectin or Hydroxychloroquine as Off-Label Medicines for the Treatment or Prevention of COVID-19*, Oct. 14, 2021 at 17, 38, https://ago.nebraska.gov/sites/ago.nebraska.gov/files/docs/opinions/21-017_0.pdf.

[12] Hundreds of US doctors prescribe and many foreign health authorities have recommended IVM and/or HCQ for the treatment or prevention of COVID. *See id*. at 29-30, 47.

[13] *But see, e.g.*, NATIONAL PUBLIC RADIO, *In Kids, The Risk of COVID-19 and the Flu Are Similar, But the Risk Perception Isn't*, May 21, 2021, https://www.npr.org/2021/05/21/999241558/in-kids-the-risk-of-covid-19-and-the-flu-are-similar-but-the-risk-perception-isn.

K.  Claims that the mortality rate of COVID is for some populations the same or lower than that of the seasonal flu.[14]

L.  Claims suggesting that the number of deaths caused by COVID is lower than official figures assert.[15]

M.  Claims that face masks or mask mandates do not prevent the spread of COVID.[16]

N.  Claims that wearing a face mask can make the wearer sick.[17]

O.  Claims that COVID vaccines have not been approved.[18]

---

[14] In fact, for children and indeed all individuals under the age of 45, studies have shown that the infection mortality rate ("IFR") of COVID-19 is lower than the widely-reported IFR of the seasonal flu. *See, e.g.*, A. Levin *et al.*, *Assessing the age specificity of infection fatality rates for COVID-19: systematic review, meta-analysis, and public policy implications*, Dec. 8, 2020, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7721859/ (reporting a COVID IFR of .004% for children and .068% for adults under 45, as compared to the widely-reported IFR of .1% for the seasonal flu).

[15] In fact, official COVID mortality figures frequently failed to distinguish between individuals who died *because* of COVID-19 and individuals who died *with* COVID-19, resulting in significant overstatements of COVID deaths. *See* American Association of Medical Colleges, *how are COVID-19 deaths counted? It's complicated*, Feb. 18, 2021, https://www.aamc.org/news-insights/how-are-covid-19-deaths-counted-it-s-complicated.

[16] Numerous studies show that face mask mandates were not effective in preventing the spread of COVID-19. *See* New York Times, *Why Masks Work, but Mandates Haven't*, May 31, 2022, https://www.nytimes.com/2022/05/31/briefing/masks-mandates-us-covid.html.

[17] *But see, e.g.*, Cleveland Clinic, *Do Masks Make You Sick?*, Oct. 25, 2021, https://health.clevelandclinic.org/can-wearing-a-mask-make-you-sick (mask-wearing can cause sore throats, bacterial skin infections, and anxiety).

[18] The COVID-19 vaccines issued under an Emergency Use Authorization were not in fact approved by the FDA. *See* FDA, *What Is an emergency Use Authorization and How Is It Being Used To Respond to COVID-19*, https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/covid-19-frequently-asked-questions ("Under an EUA, the FDA may allow the use of *unapproved* medical products, or *unapproved* uses of approved medical products in an emergency to diagnose, treat, or prevent serious or life-threatening diseases or conditions") (emphasis added).

P.  Claims that social distancing does not help prevent the spread of COVID.[19]

Q.  Claims that COVID-19 vaccines can kill or seriously harm people.[20]

R.  Claims that the immunity from getting COVID is more effective than vaccination.[21]

S.  Claims that the COVID vaccines are not effective in preventing infection;[22]

T.  Claims that people who have been vaccinated against COVID can still spread the disease to others;[23]

U.  Claims that the COVID vaccines are toxic or harmful or contain toxic or harmful ingredients;[24] and

---

[19] *But see, e.g.*, Studies in Applied Economics, *A Literature Review and Meta-Analysis of the Effects of Lockdowns on Covid-19 Mortality*, Jan. 2022, https://sites.krieger.jhu.edu/iae/files/2022/01/A-Literature-Review-and-Meta-Analysis-of-the-Effects-of-Lockdowns-on-COVID-19-Mortality.pdf (lockdowns and social distancing mandates were ineffective against mortality).

[20] In fact, the COVID-19 vaccines can cause myocarditis, a heart condition capable of leading to serious harm or death. *See, e.g.*, CDC, *Clinical Considerations: Myocarditis and Pericarditis after Receipt of mRNA COVID-19 Vaccines Among Adolescents and Young Adults*, https://www.cdc.gov/vaccines/covid-19/clinical-considerations/myocarditis.html#:~:text=In%20April%202021%2C%20increased%20cases,of%20mRNA%20COVID%2D19%20vaccines. In addition, the COVID vaccines have been found to increase the risk of serious neurological disorders and hemorrhagic stroke. *See, e.g.*, Nature, *Neurological complications after first dose of COVID-19 vaccines and SARS-CoV-2 infection*, Oct. 25, 2021, https://www.nature.com/articles/s41591-021-01556-7); Univ. Coll. London, *Rise in Guillain-Barré syndrome following AstraZeneca vaccine*, May 30, 2022, https://www.ucl.ac.uk/news/2022/may/rise-guillain-barre-syndrome-following-astrazeneca-vaccine.

[21] In fact, natural immunity from being infected with COVID-19 was and is "much greater" than the immunity conferred by vaccination. *See, e.g.*, Science, *Having SARS-CoV-2 once confers much greater immunity than a vaccine—but vaccination remains vital*, Aug. 26, 2021, https://www.science.org/content/article/having-sars-cov-2-once-confers-much-greater-immunity-vaccine-vaccination-remains-vital.

[22] The COVID vaccines did not and do not prevent infection. *See, e.g.*, British Med. J., *What do we know about COVID vaccines and preventing transmission?*, Feb. 4, 2022, https://www.bmj.com/content/376/bmj.o298.

[23] In fact, vaccinated people can and do spread the disease to others. *Id.*

[24] Many physicians are concerned about the toxicity of the mRNA ingredient of the Pfizer and

V. Claims that fetal cells were used in the manufacture or production of any of the COVID vaccines.[25]

430.  In addition, Defendants successfully induced the major social media platforms to censor accounts, regardless of truth or falsity, of individuals who had suffered, or believed they had suffered, significant injuries from COVID vaccinations, including both first-hand accounts of such vaccine injuries and news reports of such injuries.

431.  The asserted basis for censoring such accounts was that, even if true, or perhaps especially if true, they could have the effect of increasing "vaccine hesitancy"—i.e., leading people to question whether the COVID vaccines were safe.

432.  The suppression of all the above information and opinion caused legally cognizable harm to the named Plaintiffs and other Members of the proposed Class.

433.  To begin with, all three named Plaintiffs and all other Class Members were thereby deprived of information and ideas in violation of their First Amendment rights, which itself is a legally cognizable injury.

434.  Moreover, named Plaintiff Robert F. Kennedy, Jr., was harmed in his ability to gather news concerning U.S. elections and COVID—including facts about COVID mortality, facts about the COVID vaccines, and facts and opinions about alternative COVID treatments—and

---

Moderna vaccines because it is designed to stimulate production of the COVID virus's "spike protein," the full dangers of which are not yet known.  *See, e.g.*, Molecular Biology, *Could SARS-CoV-2 Spike Protein Be Responsible for Long-COVID Syndrome?*, Jan. 13, 2022, https://link.springer.com/article/10.1007/s12035-021-02696-0 ("[T]here is urgent need to better understand the neurotoxic effects of the spike protein" that is "expressed in response to mRNA vaccines").

[25] In fact, fetal cell lines were and are used in the manufacture and production of the Johnson and Johnson COVID vaccine.  Science, *Abortion opponents protest COVID-19 vaccines' use of fetal cells*, Jun. 5, 2020, https://www.science.org/content/article/abortion-opponents-protest-covid-19-vaccines-use-fetal-cells.

report such news to his hundreds of thousands of followers.  To take just one of numerous examples, the above censorship prevented Kennedy from knowing the number and seriousness of first-hand accounts of vaccine injuries and reporting that information to his followers.

435.  In addition, as a result of Defendants' censorship campaign, Kennedy has also been directly censored on social media and de-platformed entirely from major platforms.  Just recently, in March 2023, an important public political speech given by Kennedy in New Hampshire was blocked by YouTube and therefore could not be viewed by most online news consumers.

436.  Named Plaintiff Children's Health Defense suffered a similar injury to its ability to gather news.

437.  Moreover, CHD's many members were deprived of information and ideas concerning the safety and efficacy of alternative COVID treatments—information and ideas of the greatest potential importance to them individually.  To take just one example, many of CHD's members justifiably believe that they or their friends or family members suffered or may have suffered vaccine injuries.  Because of the above-described censorship, such individuals were prevented from learning of and communicating with other individuals so situated, forming bonds or communities with them, and exchanging information with them—a loss that both harmed them psychologically and deprived them of information that could have helped in obtaining proper medical treatment.

438.  Named Plaintiff Connie Sampognaro was harmed as a citizen and health care policy advocate by the government's censorship campaign, which deprived her of COVID-related information and ideas of the highest public importance.

439.  In addition, Sompognaro is potentially immunocompromised and has therefore been since the beginning of the pandemic acutely in need, for her own health, of complete, accurate

information about COVID and the possible treatments therefor; the censorship described above made it difficult if not impossible for her to find such information.

440. In addition, Defendants' inducement, encouragement, and promotion of social media censorship distorted public discourse about COVID, preventing the named Plaintiffs and other Class Members from knowing the actual state of public opinion on issues related to the COVID lockdowns and COVID vaccines, diminishing their ability to fight against governmental policies they disagreed with and in favor policies they believed in.

441. Defendants have not acknowledged any fault or wrongdoing concerning their efforts to induce social-media censorship of constitutionally protected speech.

442. On the contrary, government agencies and agents have repeatedly defended the government's censorship campaign and denied that it implicates any First Amendment concerns.

443. For example, Defendant Mayorkas has defended the DHS's censorship efforts, including an endorsement of the Department's plan to institute a Disinformation Governance Board. *See* Kelly Hooper, *Mayorkas cites misinformation about Homeland Security's disinformation board*, Politico (Aug. 5, 2022), https://www.politico.com/news/2022/05/01/mayorkas-defends-dhs-disinformation-board-00029182. He said, "The fact is that disinformation that creates a threat to the security of the homeland is our responsibility to address. And this department has been addressing it for years, throughout the years of the prior administration in an ongoing basis." *Id.*

444. In a public statement provided to Fox News in advance of a December 2022 article, the FBI defended its actions in communicating with social-media companies, saying, "The correspondence between the FBI and Twitter show nothing more than examples of our traditional, longstanding and ongoing federal government and private sector engagements, which involve

numerous companies over multiple sectors and industries. As evidenced in the correspondence, the FBI provides critical information to the private sector in an effort to allow them to protect themselves and their customers." Jake Gibson & Adam Sabes, *FBI responds to Twitter Files disclosures, says it didn't request 'any action' on specific tweets*, FOX News (Dec. 21, 2022), https://www.foxnews.com/politics/fbi-responds-twitter-files-disclosures-says-didnt-request-any-action-specific-tweets.

445. In answering a question about governmental involvement with the suppression of the Hunter Biden laptop story, Defendant Jean-Pierre characterized the reporting as a "distraction that is so full of old news." The White House, *Press Briefing by Press Secretary Karine Jean-Pierre*, Dec. 5, 2022, https://www.whitehouse.gov/briefing-room/press-briefings/2022/12/05/press-briefing-by-press-secretary-karine-jean-pierre-december-5-2022/.

446. In March 2023, it was revealed that in mid-December 2022, after publication of the initial installment of the Twitter Files, instead of investigating possible violations of the First Amendment by government actors seeking to induce, encourage, and promote social media censorship, the Administration commenced *an investigation of Twitter and the Twitter Files journalists*. On December 13, 2022, the Federal Trade Commission sent private communications to Twitter demanding that Twitter disclose its interactions with Twitter Files journalists "Bari Weiss, Matt Taibbi, [and] Michael Shellenberger" and "[i]dentify all journalists and other members of the media" with whom Twitter had shared internal documents. U.S. House of Representatives, Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government, *The Weaponization of the Federal Trade Commission: An Agency's Overreach To Harass Elon Musk's Twitter*, at pp. 5, 7, Mar. 7, 2023, https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/Weaponization_

Select_Subcommittee_Report_on_FTC_Harrassment_of_Twitter_3.7.2023.pdf.

447. Because Defendants have not only refused to acknowledge any wrongdoing in the federal government's social media censorship efforts, but have defended those efforts, and painted them as mere continuations of longstanding agency behavior, it is virtually certain that the Administration will continue these efforts.

## CLAIM FOR RELIEF

### VIOLATION OF THE FIRST AMENDMENT
### Against All Defendants

448. All foregoing Paragraphs are incorporated as if set forth fully herein.

449. It is a violation of the First Amendment for government agents to use coercive threats against private actors to bring about censorship of others' constitutionally protected speech. *See, e.g.*, *Bantam Books v. Sullivan*, 372 U.S. 58 (1963).

450. As detailed above, since early 2020 Defendants have systematically and repeatedly used destructive, coercive threats against social-media companies—for example, threats to repeal their Section 230 immunity or to bring antitrust actions against them—in order to cause those companies to censor others' protected speech.

451. It is a violation of the First Amendment for government actors to enter into collusive partnerships with social-media companies working jointly with them to censor protected speech; such collusion turns the social-media companies' censorship into unconstitutional state action. *See, e.g.*, *Brentwood Academy v. Tennessee Secondary School Athletic Assn.*, 531 U.S. 288, 296 (2001) (state action exists when "a private actor operates as a 'willful participant in joint activity with the State or its agents'") (citation omitted).

452. As detailed above, since early 2020 Defendants have systematically and repeatedly

entered into collusive partnerships with social-media companies working jointly with them to censor protected speech.

453. Defendants' campaign to induce social-media censorship of protected speech has repeatedly involved not only coercive threats and collusive joint action, but entwinement, symbiotic relationships, statutory immunity under Section 230, mutual payments of money and other valuables, and other conduct more than sufficient to turn social-media company censorship into state action.

454. Because of such conduct, the COVID-related permissible-speech policies adopted at major social-media platforms (*i.*e., their policies concerting what speech is to be blocked on grounds of supposed falsity and what speech, even if true, will still be censored) became instances of state action, so that every application of those policies to censor protected speech was and is unconstitutional state action.

455. Governmental conduct sufficient to turn social media censorship into unconstitutional state action is unquestionably unlawful and enjoinable.

456. But the *Norwood* principle goes further.

457. Under *Norwood*, it is also—independently—unconstitutional for government agents deliberately "to encourage or promote private persons to accomplish what [the government] is constitutionally forbidden to accomplish." *Norwood*, 413 U.S. at 465.

458. The *Norwood* test is not the same as the test for determining whether governmental conduct has turned a private party's conduct into state action.

459. Under *Norwood*, concerted governmental efforts to induce social media companies to censor protected speech are unconstitutional whether or not they produce state action by those companies.

460. Indeed, government efforts to induce social-media companies to censor protected speech are unconstitutional and enjoinable even when they fail to achieve their goal. *See, e.g.*, *Backpage.com v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) (Posner, J.) (attempt by government officials to pressure private companies to shut down constitutionally protected speech "is ***actionable and thus can be enjoined even if it turns out to be empty***—the victim ignores it, and the threatener folds his tent") (emphasis added).

461. *Norwood* is violated even when the government has not, for example, used threats or engaged in collusive partnerships.

462. Governmental agents who, through whatever means, "induce, encourage, or promote" social-media companies to censor constitutionally protected speech are plainly seeking to have those companies "accomplish what [the government] is constitutionally forbidden to accomplish," and are therefore acting in violation of *Norwood* and hence in violation of the First Amendment.

463. As described in detail above, since 2020 Defendants have systematically, repeatedly, and highly successfully been doing exactly that—inducing, encouraging, and promoting social-media companies to censor protected speech.

464. Thus Defendants' censorship campaign is unlawful and enjoinable regardless of whether the governmental conduct involved would or would not have been sufficient to turn the social media companies into state actors.

465. In addition, Defendants' campaign to induce social-media censorship of protected speech conduct also violates the First Amendment for yet another, independent reason.

466. It is "a core postulate of free speech law" that "government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299

(2019).

467. As detailed above, Defendants have since early 2020 systematically and repeatedly been discriminating against and targeting online speech "based on the ideas or opinions it conveys."

468. Thus Defendants' efforts to induce social media companies to censor protected speech violate the First Amendment because they are blatantly viewpoint-discriminatory and are enjoinable for that reason alone, *even when those efforts do not involve coercive threats or collusion, and even when those efforts fail*.

469. Through their conduct, as detailed above, Defendants have injured the named Plaintiffs and other Class Members in violation of the First Amendment by denying them their right receive ideas and information from willing speakers, by inhibiting them from gathering news, and by preventing them from having access to uncensored public discourse in the "modern public square."

470. As detailed above, Defendants' censorship campaign is ongoing, and, because Defendants refuse to acknowledge any constitutional wrongdoing, virtually certain to continue if not enjoined by this Court.

## PRAYER FOR RELIEF

Therefore Plaintiffs respectfully request that the Court certify the proposed Class, enter judgment in their favor, and grant the following relief:

A. Declare that Defendants' conduct violates the First Amendment;

B. Preliminarily and permanently enjoin Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from taking any steps to demand, urge, pressure, or otherwise induce any social-media platform to censor, suppress, de-platform, suspend, shadow-ban, de-boost, restrict access to constitutionally protected speech,

or take any other adverse action against any speaker, protected content or viewpoint expressed on social media; and

    C.  Grant such other and further relief as the Court may deem just and proper.

              Respectfully submitted,

              */s/ G. Shelly Maturin, II*

              _____
              G. SHELLY MATURIN, II
              (La. Bar # 26994)
              Law Office of G. Shelly Maturin, II, L.L.C.
              322 Heymann Blvd., Suite 1
              Lafayette, LA 70503
              Telephone: (337) 362-3514
              E-mail: shelly@maturinlaw.com

              _____-s-_____
              JED RUBENFELD
              (NY Bar # 2214104)
              (*pro hac vice* forthcoming)
              1031 Forest Rd.
              New Haven, CT 06515
              Telephone: (203) 432-7631
              E-mail: jed.rubenfeld@yale.edu