## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| **The State of Missouri,**<br>        *et al.,*<br><br>    *Plaintiffs*,<br><br>        v.<br><br>**President Joseph R. Biden, Jr., in his official capacity as President of the United States of America,**<br>        *et al.,*<br><br>    *Defendants*. | Civil Action No. 22-cv-1213 |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION AND FOR LEAVE TO
FILE THIRD AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND................................................................................................................. 4

ARGUMENT ..................................................................................................................... 6

I.      Plaintiffs' proposed classes do not satisfy the applicable Rule 23 requirements. .............. 6

      A.      Plaintiffs' proposed class definitions are insufficiently precise. ........................... 7

      B.      Plaintiffs have failed to establish a single adequate, common question of fact or law applicable to each member of either putative class. ........................... 9

      C.      Plaintiffs' putative classes do not satisfy the Rule 23(b)(2) requirements because each class member would not be entitled to the same injunction. .......... 21

      D.      Plaintiffs' general policy arguments do not justify class certification................. 23

II.     Plaintiffs have failed to show that a belated Third Amended Complaint is justified. ........................................................................................................... 24

CONCLUSION.................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*A. A. by & through P.A. v. Phillips*, No.,
  21-30580, 2023 WL 334010 (5th Cir. Jan. 20, 2023)....................................................... 7

*Bass v. Parkwood Hosp.*,
  180 F.3d 234 (5th Cir. 1999) ........................................................................................... 14

*Blum v. Yaretsky*,
  457 U.S. 991 (1982)........................................................................................... 14, 16, 18

*Bustos v. Lennon*,
  538 F. App'x 565 (5th Cir. 2013) .................................................................................... 25

*Changizi v. Dep't of Health & Hum. Servs.*,
  No. 2:22-CV-1776, 2022 WL 1423176 (S.D. Ohio May 5, 2022)................................... 24

*Flecha v. Medicredit, Inc.*,
  946 F.3d 762 (5th Cir. 2020) .............................................................................. 6, 21, 24

*Frazier v. Bd. of Trustees of Nw. Mississippi Reg'l Med. Ctr.*,
  765 F.2d 1278 (5th Cir.) .................................................................................................. 16

*Hart v. Facebook Inc.*,
  No. 22-CV-00737-CRB, 2022 WL 1427507 (N.D. Cal. May 5, 2022).................................. 24

*John v. Nat'l Sec. Fire & Cas. Co.*,
  501 F.3d 443 (5th Cir. 2007) ................................................................................. 6, 7, 9

*Lewis v. Casey*,
  518 U.S. 343 (1996)......................................................................................................... 21

*Louisiana Div. Sons of Confederate Veterans v. City of Natchitoches*,
  821 F. App'x 317 (5th Cir. 2020) ........................................................................... 16, 18

*M.D. ex rel. Stukenberg v. Perry*,
  675 F.3d 832 (5th Cir. 2012) ....................................................................... 6, 10, 19, 20

*Maldonado v. Ochsner Clinic Found.*,
  493 F.3d 521 (5th Cir. 2007) .......................................................................................... 21

*O'Handley v. Weber*,
  No. 22-15071, 2023 WL 2443073 (9th Cir. Mar. 10, 2023).................................... 16

*Schlesinger v. Reservists Comm. to Stop the War*,
  418 U.S. 208 (1974)......................................................................................................... 21

*Sims v. Jefferson Downs, Inc.*,
   611 F.2d 609 (5th Cir. 1980) ................................................................ 14

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................... *passim*

*Warth v. Seldin*,
   422 U.S. 490 (1975) ......................................................................... 22

**Rules**

Fed. R. Civ. P. 23 ...................................................................... *passim*

**Other Authorities**

Twitter, Updates to Our Work on Covid-19 Vaccine Information,
   https://perma.cc/R4MY-K5KY (Mar. 21, 2023) ................................... 19

## INTRODUCTION

Plaintiffs move for class certification in a case in which they allege that different people were affected on different social media platforms in different ways due to various actions from different government actors—precisely the type of case that is ill-suited for class treatment. The Court should deny Plaintiffs' motion for class certification and for leave to file an amended complaint containing class allegations.

Plaintiffs claim that, at various points since 2019, sixty-seven different government agencies and officials have communicated with social media companies about the content on those companies' platforms. Plaintiffs allege that those communications took many different forms, and led various social media companies to take different actions against various posts on their platforms. Plaintiffs assert that those content moderation decisions amount to "state action" that violates the First Amendment, and they now move to certify two broad, vague classes pursuant to Rule 23(b)(2). The first proposed class includes people impacted, directly or indirectly, by content moderation decisions that were made after the speech at issue was "flagged" by a Defendant "for suppression." The second proposed class includes people impacted, directly or indirectly, by content moderation decisions that were made pursuant to a social media policy that was "induced" by a Defendant. Neither proposed class satisfies the applicable requirements.

*First*, the proposed classes are impermissibly vague. A class may be certified only if it is given a precise definition. Here, both proposed classes are littered with ambiguous terms. For example, the first proposed class refers to content moderation decisions made after the speech at issue was "flagged" by a Defendant "for suppression." Plaintiffs, however, do not define either of the quoted terms. It is unclear whether this language means that a Defendant must have "flagged" the *particular* social media post at issue, or whether it is sufficient if the Defendant "flagged"

general content (*e.g.*, vaccine misinformation) that is found in multiple posts. It is equally unclear what it means to flag speech "for suppression." Plaintiffs do not specify whether this speaks only to a Defendant's subjective motivation, or whether it means that a Defendant must have verbally requested "suppression." And if it is the latter, it is unclear whether a Defendant must have explicitly asked the social media company to take action against a post, or whether it is sufficient that a Defendant generally stated that the post was concerning.

Similarly, the second proposed class refers to content moderation decisions made pursuant to social media policies or practices that were "induced" by Defendants. Plaintiffs, however, make no attempt to explain what it means to "induce" a policy or practice. It is unclear whether this refers to any action by a Defendant that *caused* a social media company to adopt the policy or practice at issue, regardless of what the Defendant intended, or whether the Defendant must have requested that the company adopt that particular policy or practice. These are only a few examples of the many vague terms in both proposed classes.

The proposed class definitions are thus insufficiently precise. But even if Plaintiffs could overcome this hurdle, the Court could not ascertain the members of each class, which would prevent the Court from providing relief for the class members. Courts can only issue relief for *established* injuries. Thus, the Court could only issue relief to class members who are identified and who submit evidence demonstrating injuries caused by a Defendant. But Plaintiffs offer no feasible method for identifying persons who were impacted because some Defendant allegedly "flagged" a social media post "for suppression" or "induced" some policy. Thus, certifying either proposed class would likely have no practical effect on the relief the Court could issue.

*Second*, Plaintiffs cannot satisfy the commonality requirement for either proposed class. A class may be certified only if there is a common question of fact or law, central to the claim of

2

each class member, to which the Court can provide a single, class-wide answer. A question is not common to the class if its answer could vary among class members based on their unique circumstances. Here, there is no common question of fact or law sufficient to certify either proposed class. For each proposed class, different putative members have allegedly been affected in different ways by different Defendants, thus precluding any common question of fact that would be central to the claims of *all* members.

Relatedly, these factual distinctions among putative class members also preclude any sufficient, common question of law for either proposed class. The government may be responsible for a content moderation action taken by a social media company only if the government coerced the company into taking that precise action, or provided such significant encouragement that the decision to take that action was effectively made by the government. To determine whether this standard is met with respect to any particular content moderation decision, the Court must conduct a fact-intensive analysis of the circumstances surrounding that decision. Thus, the Court cannot determine, in one fell swoop, whether any or all Defendants are responsible for *all* alleged content moderation decisions encompassed by either broad, proposed class. Both proposed classes therefore fail to satisfy the commonality requirement.

*Third*, Plaintiffs cannot satisfy the Rule 23(b)(2) requirement that every class member be entitled to the same injunction. Given that different members of each proposed class will allegedly be harmed in different ways by different Defendants, each member would (at most) be entitled to a different injunction targeting different Defendants. Indeed, that is precisely why Plaintiffs are moving for class certification: to secure broader relief by aggregating the various injunctions to which different class members would allegedly be entitled. That is an improper use of Rule 23(b)(2).

*Finally*, the Court should deny Plaintiffs' belated motion for leave to amend their Complaint for a third time. For one, the proposed amended complaint would be futile because it seeks only to add class allegations, but as noted above, neither of Plaintiffs' proposed classes meets the applicable requirements. Additionally, Plaintiffs were dilatory in seeking to amend their Complaint and add class allegations. They have alleged from the beginning that, in their view, Defendants have caused social media companies to take action against social media posts of people around the country. Plaintiffs' attempt to justify their delay in seeking class certification based on their claim that they only recently discovered the magnitude of those alleged efforts by Defendants lacks merit. Thus, if Plaintiffs wanted to move for class certification, they should have included class allegations in their original Complaint or one of their two Amended Complaints.

Accordingly, the Court should deny Plaintiffs' motion for class certification and for leave to file a Third Amended Complaint.

<u>**BACKGROUND**</u>

1.      In May 2022, Plaintiffs brought this suit against five federal agencies and eight federal officials, claiming that these Defendants are legally responsible for certain content moderation decisions made by several private social media companies. *See* ECF No. 1. Plaintiffs have since amended their Complaint twice and added more Defendants, for a total of thirteen federal agency Defendants and fifty-four federal official Defendants. *See* ECF Nos. 45, 84.

Plaintiffs allege that, at various points since 2019, Defendants communicated with various social media companies about the content on their platforms, and that these communications occurred through different mediums and took different forms. *See*, *e.g.*, 2d Am. Compl. ¶¶ 396, 451. Plaintiffs allege, for example, that these communications by different federal agencies allegedly occurred in person, over the phone, over e-mail, and even through public statements and

documents that did not mention specific social media companies by name. *See id.* ¶¶ 206-07, 218, 222, 256, 310. Plaintiffs further allege that these communications often included general statements about the harms of misinformation and the need for social media companies to address it, and at times also included references to particular social media posts. *See id.* ¶¶ 222, 225-26, 248. Plaintiffs allege that the communications amount to a "Censorship Enterprise" that "is extremely broad." *See id*. ¶ 10. Plaintiffs do not allege, however, that each Defendant engaged in all of the types of communications just described, nor do they allege that all Defendants communicated with social media companies with the same frequency.

Plaintiffs claim that these alleged communications and actions caused social media companies to take certain content moderation actions, and that those actions thus constitute "state action" that violates the First Amendment. *See id.* at 145-50. Plaintiffs also bring claims under the Administrative Procedure Act against five distinct agencies. *See id.* at 152-61.

2.      Plaintiffs now move to certify two nationwide classes, each of which is defined to include any person who satisfies a number of broad conditions:

> The class of social-media users who have engaged or will engage in, or who follow, subscribe to, are friends with, or are otherwise connected to the accounts of users who have engaged or will engage in, speech on any social-media company's platform(s) that has been or will be removed; labelled; used as a basis for suspending, deplatforming, issuing strike(s) against, demonetizing, or taking other adverse action against the speaker; downranked; deboosted; concealed; or otherwise suppressed by the platform after Defendants and/or those acting in concert with them flag or flagged the speech to the platform(s) for suppression.

> The class of social-media users who have engaged in or will engage in, or who follow, subscribe to, are friends with, or are otherwise connected to the accounts of users who have engaged in or will engage in, speech on any social-media company's platform(s) that has been or will be removed; labelled; used as a basis for suspending, deplatforming, issuing strike(s) against, demonetizing, or taking other adverse action against the speaker; downranked; deboosted; concealed; or otherwise suppressed by the company pursuant to any change to the company's policies or enforcement practices that Defendants and/or those acting in concert with them have induced or will induce the company to make.

Class Cert. Mot. at 5. Plaintiffs also seek leave to amend their complaint, for a third time, to add new allegations in support of their class certification motion. *See* ECF No. 227.

**A<small>RGUMENT</small>**

**I.**      **Plaintiffs' proposed classes do not satisfy the applicable Rule 23 requirements.**

"To obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012).[1] "The requirements of Rule 23(a)" include that "there are questions of law or fact common to the class" (commonality) and that "the claims or defenses of the representative parties are typical of the claims or defenses of the class" (typicality). *Id.* Further, "[t]he existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23." *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007). Plaintiffs seek class certification under Rule 23(b)(2), which requires Plaintiffs "to [also] establish that" Defendants have "acted . . . on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *Perry*, 675 F.3d at 837.

"Plaintiffs, as the parties seeking certification, bear the burden of proof to establish that the proposed class satisfies the requirements of Rule 23." *Id.* The Court "must conduct a rigorous analysis of the [R]ule 23 prerequisites before certifying a class," and this "require[s] [it] to . . . look beyond the pleadings to understand the claims, . . . relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Id.* The Court can only "certify class actions based on proof, not presumptions." *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 768 (5th Cir. 2020).

---

[1] Internal citations and quotation marks are omitted throughout this brief unless otherwise stated.

### A.   *Plaintiffs' proposed class definitions are insufficiently precise.*

"It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 n.3 (5th Cir. 2007). "There can be no class action if the proposed class is amorphous or imprecise." *Id.* "The order defining the class should avoid subjective standards . . . or terms that depend on resolution of the merits." *A. A. by & through P.A. v. Phillips*, No. 21-30580, 2023 WL 334010, at *2 (5th Cir. Jan. 20, 2023).

Here, neither of Plaintiffs' proposed classes is sufficiently precise. To start, the first proposed class definition applies to certain content moderation decisions taken "after" Defendants "flag . . . the speech to the platform(s) for suppression." This language is vague for several reasons. First, in stating that the moderation decision must come "after" the speech was flagged, it is unclear whether the act of flagging the speech must *cause* the moderation decision, or whether it must simply temporally precede the moderation decision. Second, it is also unclear what it means to "flag . . . speech." Plaintiffs do not specify whether it means to flag particular social media posts, or whether it can also mean to flag general content (*e.g.*, vaccine misinformation) which may be found in multiple posts. Third, it is unclear what it means to "flag" the speech "to the platform(s)." Plaintiffs do not specify whether this refers only to the act of flagging a post in a *bilateral communication* with a social media company, or whether it can refer to the act of flagging a post in a public speech or document that social media companies can access. Fourth, Plaintiffs do not specify what it means to flag speech "for suppression." It is unclear whether this speaks to a Defendant's subjective intention in flagging a post, or whether it requires that the Defendant verbally request the post's "suppression." If it is the latter, Plaintiffs do not clarify whether a

Defendant would have to request that the platform take action against the relevant speech, or whether it is sufficient if a Defendant generally states that the speech is concerning.

The second proposed class definition contains other vague terms. This class definition applies to certain content moderation decisions taken "pursuant to any change" in a social media company "polic[y] or enforcement practice[]" that Defendants "induced." The term "induced," however, is vague for multiple reasons. First, Plaintiffs fail to specify whether the "inducement" must take place in a bilateral communication, or whether it can occur through a public statement or document. Second, it is unclear what it means to "induce" a change in policy or practice. Plaintiffs do not specify whether it refers to *any* action or statement by any Defendant that simply *results* in a change to a social media policy or practice, or whether it refers only to situations where a Defendant specifically requests (or at least intends for) the particular change in policy or practice.

Additionally, Plaintiffs also do not define what an "enforcement practice" is. It is unclear whether this can include a handful of discrete enforcement actions taken during a discrete period of time, or whether it refers to a series of enforcement actions taken over a longer period of time. And if it is the latter, Plaintiffs do not clarify how many enforcement actions must take place (and for how long) before those actions constitute an "enforcement practice."

Furthermore, both proposed classes contain other ambiguous terms. For example, both include people who have "engaged *or will engage in*" speech that "has been *or will be*" subject to certain content moderation actions. It is unclear whether this language means that people who have been affected by no relevant content moderation action thus far, but who will be so affected in the future, would be class members (i) right away, or (ii) only *if and when* they are affected by a relevant content moderation action. If it is the former—if those people would be class members

right away—Plaintiffs fail to explain how the Court can determine *ex ante* who will be affected by a relevant content moderation action in the future.

In addition, both proposed classes refer to people who are "friends with" or are "otherwise connected to" users subject to the specified content moderation decisions. But Plaintiffs do not define either term. They do not specify whether the term "friends with" refers to formal social media connections (whereby social media "friends" can access each other's profiles) or just standard friendships. And if it is the latter, Plaintiffs do not identify the criteria for determining a user's "friends." Additionally, the term "otherwise connected to" has no precise meaning at all. Plaintiffs suggest only that it will cover "connections" that are of the same kind as other relationships specified in the class definition (*e.g.*, "follow[ers]" and "subscribe[rs]"). Class Cert. Mot. at 21. But this adds no further clarity to what "otherwise connected to" means, and Plaintiffs fail to give a single example of what it would include, and what it would exclude, to help delineate its boundaries.

Accordingly, neither proposed class definition is "adequately defined and clearly ascertainable." *John*, 501 F.3d at 445 n.3. The Court should decline to certify either class on this ground alone.[2]

### B. Plaintiffs have failed to establish a single adequate, common question of fact or law applicable to each member of either putative class.

To satisfy the commonality requirement, all putative class members' "claims must depend upon a common contention . . . that is capable of classwide resolution." *Wal-Mart Stores, Inc. v.*

---

[2] Plaintiffs argue that, for a Rule 23(b)(2) class, plaintiffs do not have to show that the class's members can be "eas[ily] identif[ied]." Class Cert. Mot. at 19. Defendants dispute this, but need not engage with the issue here. Plaintiffs admit that "Plaintiffs must" still "show . . . that the classes are defined in terms that are clear and precise," *id.* at 21, and, as explained, the proposed classes are neither clear nor precise.

*Dukes*, 564 U.S. 338, 350 (2011). "What matters to class certification" is "not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id*. (emphasis in original). Critically, it is not enough for a well "crafted class complaint" to "literally raise[]" a number of "common questions" that may be somewhat relevant to the class members' claims. *Id.* at 349. The "commonality test is" not "met when the proposed class merely establishes that there is at least one issue whose resolution will affect all or a significant number of the putative class members." *Perry*, 675 F.3d at 840. "Rather, Rule 23(a)(2) requires that all of the class members' claims depend on a common issue of law or fact whose resolution will resolve an issue that is *central to the validity* of each one of the [class members'] claims in one stroke."[3] *Id.* (emphasis added).

Plaintiffs have failed to show that there is a common question of fact or law that is "central to the validity of each" class member's claim for which the Court may provide a "common answer[]" in "one stroke." *Wal-Mart*, 564 U.S. at 350.

1.      Plaintiffs do not demonstrate that there is a common question of fact that is both susceptible to a common answer and central to the claim of each member of either putative class. Each of Plaintiffs' proposed classes is defined to include different people affected by different actions taken by different social media companies allegedly due to different government actors. Thus, the claim of each member of either putative class will not turn on the same set of facts. To the contrary, within each class, different sets of members will rely on different sets of facts, and Plaintiffs have not shown that there is a single specific factual allegation—*e.g.*, a particular policy

---

[3] Plaintiffs assert that, "[f]or Rule 23(b)(2) classes . . . commonality is a low hurdle." Class Cert. Mot. at 9. This is incorrect. In *Perry*, the Fifth Circuit noted that the Supreme Court's "*Wal-Mart* decision has heightened the standards for establishing commonality," and it applied the heightened standard in that case, which involved only a Rule 23(b)(2) class. *Perry*, 675 F.3d at 839.

or communication involving a particular Defendant—that will be central to *all* claims of either proposed class.

For example, consider the first proposed class, which includes people affected by certain social media moderation actions that occurred after a government official "flagged" the content at issue. Plaintiffs note that this class would include Tucker Carlson and his followers, and that those class members' claims would be based on the allegation that "Facebook suppressed a . . . video by Tucker Carlson" in "response to" a "demand" by a specific White House official. Class Cert. Mot. at 7. Plaintiffs also note that this class would include people whose "posts [were allegedly] flagged by CISA during the 2020 election cycle," and the claim for each of those members would thus rely on the alleged CISA communication that affected her or him. *Id.* The operative Complaint contains allegations concerning other government officials who supposedly "flagged" content, including other White House officials and certain officials from the Centers for Disease Control and Prevention ("CDC") and the Census Bureau, and alleges these communications involved different social media companies and occurred through different means—public statements, interviews, direct conversations, and through third parties, just to name a few. 2d. Am. Compl. ¶¶ 248, 278, 365. To the extent Plaintiffs argue that other persons will become class members by virtue of those allegations, those members' claims would likewise rely on those specific allegations. To resolve the claims of each of these groups of putative class members, a factfinder would have to resolve a distinct set of factual questions; *e.g.*, for each group, the factfinder would have to decide whether the specific government official at issue "flagged the speech" at issue, that the official did so "for suppression," and that the speech was "flagged" before the relevant social media company took action against that speech. Plaintiffs thus do not, and cannot, show that there is a single specific factual allegation that is central to the claims of *all* members of the first proposed class.

The same reasoning applies to the second proposed class, which includes people affected by certain moderation actions taken pursuant to a new policy or enforcement practice that a Defendant supposedly "induced." Plaintiffs argue that this class would include people affected by Facebook's October 2021 decision to clarify that its misinformation policy would "include" false "claims about child vaccines," and that these members' claims would be based on a specific, alleged conversation Facebook had with the CDC. Class Cert. Mot. at 8. Plaintiffs also argue that this class would include people affected by various unidentified social media policy changes allegedly spurred by certain comments by the Surgeon General. *See id.* Again, the claims of each of these groups of class members would arise from a different set of facts. Each will have been affected by particular moderation actions that occurred under particular, new policies or practices allegedly induced by the particular actions of a particular Defendant. Accordingly, the "[d]issimilarities within [each] proposed class" would "impede the generation of [a] common answer[]" to any common question that is central to each member's claim, and so Plaintiffs cannot satisfy the commonality requirement. *Wal-Mart*, 564 U.S. at 350.

*Wal-Mart* is instructive. There, the plaintiffs asserted a Title VII sex discrimination claim, and moved to certify a class consisting of all women working in Wal-Mart stores nationwide who had been (or could be) subject to discriminatory pay and promotion decisions by their respective supervisors. *Id.* at 342, 346. The Court concluded that the plaintiffs failed to satisfy the commonality requirement because the putative class members would be challenging different employment decisions made by different supervisors at different locations. *See id.* at 343, 352. Thus, although each putative member's claim would involve the same general question ("why was I disfavored?"), that question would not "produce a common answer" for all class members "in one stroke" because it would require a separate "inquiry" into each "employment decision." *Id.* at

12

350-53. Here, likewise, Plaintiffs cannot satisfy the commonality requirement because the putative members of each proposed class would include people affected by different content moderation decisions allegedly caused by different Defendants. *See supra* at 11-12. Thus, even if all members of either proposed class seek to answer the same general question (*e.g.*, "was I affected by a content moderation decision after a Defendant flagged the relevant post?"), that question cannot "produce a common answer" for the whole class "in one stroke" since the factfinder would have to "inquir[e]" into each, "particular" fact pattern and determine whether its distinct allegations are true. *See supra* at 11-12.

Accordingly, for each class, Plaintiffs have failed to show that there is a common factual question, central to each member's claim, that can yield a single, class-wide answer. Notably, Plaintiffs make little effort to establish a common question of fact applicable to the claims of all members in either proposed class.

2.    Plaintiffs likewise fail to show that there is a single common question of law that is sufficient for certification of either proposed class. Plaintiffs assert that, for each proposed class, there is one common question of law: whether the government conduct described therein renders "the government . . . responsible for" the specified social media content moderation decisions. Class Cert. Mot. at 9. This question, however, cannot be answered on a class-wide basis, "in one stroke." *Wal-Mart*, 564 U.S. at 350. The relevant state-action inquiry is highly fact-intensive, and thus given that each proposed class will include a litany of different fact patterns, *see supra* at 4-5, the Court must conduct a separate analysis for each fact pattern to determine whether any particular Defendant is indeed responsible for the content moderation decision at issue.

Under the state-action doctrine, the government is "responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement . . . that the

choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). To satisfy this standard, the plaintiff must show that the government called on the private party to take the precise action at issue—*i.e.*, by "dictat[ing] the decision" made "in [that] particular case." *Id.* at 1010. "Under any formula," however, "the inquiry into whether private conduct is fairly attributable to the state must be determined based on the circumstances of each case." *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir. 1999). The Fifth Circuit has thus cautioned that "[t]he determination of whether" private conduct is attributable to the state "must be made by sifting facts and weighing circumstances case by case." *Sims v. Jefferson Downs, Inc.*, 611 F.2d 609, 611 (5th Cir. 1980). Here, both proposed classes are defined so broadly that, contrary to the Plaintiffs' assertion, the Court cannot reach a single conclusion as to whether all of the content moderation decisions listed in each proposed class (including those that have yet to occur) are (or will be) attributable to Defendants. Indeed, Plaintiffs fail to cite a single analogous case where a broad, sprawling set of allegations justified class certification under Rule 23.

Again, consider the first proposed class, which includes individuals who have been affected by a social media moderation decision after "Defendants . . . flagged the speech . . . for suppression." People may be members of this class based on many diverse fact patterns, including those where a social media company voluntarily makes a content moderation decision after: (1) a law enforcement agency contacts the company and expresses concern about posts on the company's platform that encourage international terrorism, (2) a law enforcement agency publishes a study that describes, with example posts, how certain social media users prey on children, and notes that social media companies should address this, (3) a civil servant, on a single occasion, notifies the company that a user is impersonating a government official, and asks the company to prevent this, and (4) a government health care official, during a televised interview,

notes that certain users are materially misrepresenting Medicare eligibility criteria on various social media platforms, to the detriment of the elderly. Furthermore, this proposed class would also include a hypothetical fact pattern where a social media company removes a post after a government official, with the authority to impose sanctions, threatens to impose a sanction on the company unless it removed that post.

The Court, of course, could not provide a single decision, based on a single legal analysis, on whether the government is responsible for all of content moderation decisions found in the aforementioned fact patterns. Those fact patterns have meaningful distinctions. For example, in the first four fact patterns described above, the government officials did not coerce or effectively coerce the social media company. By contrast, the final fact pattern includes the threat of a sanction. Further, some of these fact patterns involved only public statements, and in some of them, the government officials did not expressly call on social media companies to take any action. Even if Plaintiffs would argue that the government is responsible for the moderation decision in each scenario, the point is that the Court could not resolve that dispute without looking at the specific facts, and conducting a separate legal analysis, for each scenario. Furthermore, these fact patterns are only a sliver of the many (and varied) scenarios encompassed by the first proposed class.

To show otherwise, Plaintiffs suggest that, for the first proposed class, the Court need only determine whether government officials are liable for content moderation decisions anytime they "flag" the relevant content "for suppression." Class Cert. Mot. at 9. As an initial matter, as discussed above, it is unclear what it means to "flag" content "for suppression." However, if it includes any situation where the government simply references harmful content, and welcomes its removal, then Plaintiffs are wrong. Again, the Supreme Court has made clear that the government may be "responsible for a private decision *only* when it has . . . coerc[ed]" or effectively coerced

the private party into making that decision.[4] *Blum*, 457 U.S. at 1004. The Fifth Circuit has thus found that, absent coercion (or effective coercion), the government is not liable for a private decision to disallow particular content even when a government official has specifically flagged that content as problematic. *See*, *e.g.*, *Louisiana Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 319-20 (5th Cir. 2020) (private committee's decision to prohibit Confederate flags during a parade was not "state action" even though the committee had adopted that policy at "the Mayor's request" because "[r]esponding agreeably to a request" is not the same as "being all but forced by the coercive power of a governmental official"); *accord O'Handley v. Weber*, No. 22-15071, 2023 WL 2443073, *4 (9th Cir. Mar. 10, 2023) (finding no coercion when the California Secretary of State "flagged" a tweet for Twitter's review and Twitter later suspended the user's tweet for violating the company's content-moderation policy). Tellingly, Plaintiffs cite to no binding precedent indicating that the mere act of identifying content that the government finds concerning is inherently unlawful.

Regardless, even if "flagging" content "for suppression" (whatever that means) were sufficient to render the government responsible for a content moderation decision, that general legal conclusion would not be "apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at

---

[4] The government could also be responsible for a private act if the government jointly participated in that act. Under this test, the government is a joint participant only when it has played an "indispensab[le]" and "meaningful role in the mechanism leading to the disputed act." *Frazier v. Bd. of Trustees of Nw. Mississippi Reg'l Med. Ctr.*, 765 F.2d 1278, 1287–88 (5th Cir.), *amended*, 777 F.2d 329 (5th Cir. 1985). This standard cannot be satisfied based only on the private party's "generalized relation with the state. " *Id.* Instead, "the state" must have played an "affirmative role, in the particular conduct underlying" the plaintiff's "grievance." *Id.* Here, regardless of what Defendants allegedly communicated, the social media companies "retained ultimate control" over the content allowed on their platforms. *Id.* Defendants are not "indispensab[le]" to any "particular" content moderation actions, nor do they have access to the "mechanism" by which those moderation actions occur (the private platforms' internal technical systems), much less play a "meaningful role" in that mechanism. *Id.*

350. The Court would still have to make a *specific* legal decision, for *each* class member's claim, as to whether the government was responsible for the content moderation action challenged by that member—and that would require the Court to sift through the facts of each member's claim to determine whether the government did in fact "flag" the relevant content for "suppression." Indeed, if a general legal conclusion were sufficient to certify a class, the *Wal-Mart* plaintiffs could have certified a class based on the general question "is sex discrimination in a pay or promotion decision unlawful?" The Supreme Court, however, emphasized that the "crux of the inquiry" for each class member's Title VII claim would be the "particular employment decision" that affected her. *Wal-Mart*, 564 U.S. at 352. The same reasoning applies here: the "crux of the inquiry" for each member of the putative classes here would be the particular actions of the Defendant that allegedly affected her. Accordingly, Plaintiffs fail to show that there is a common legal question, central to the claim of each member of the first proposed class, that the Court could resolve "in one stroke."

Plaintiffs' second proposed class likewise covers several potential, distinct fact patterns, and the Court would have to conduct a separate legal analysis for each one to determine whether Defendants are responsible for the content moderation action at issue. This proposed class includes those affected by certain content moderation decisions made "pursuant to any change" to a social media policy or enforcement practice that "Defendants . . . induced." Depending upon how the term "induce" is construed, *see supra* at 8, this class could include parties whose content was removed pursuant to a social media policy that was inspired by: (1) a public speech by a government official on the harms of misinformation, (2) a law enforcement publication explaining how terrorists utilize social media platforms, (3) an interview in which a government official described adolescent cyber-bullying on social media platforms, and (4) an e-mail to the social

17

media company in which a government official explains how the company's platform is used for illicit drug sales. Moreover, this class would also include a party whose content was removed pursuant to a policy change that a social media company was compelled to make under the threat of sanctions by a government official with authority to impose those sanctions.

Once more, the Court could not conduct a single legal analysis to determine whether the government is responsible for all of the content moderation decisions made by different Defendants in these fact patterns. The first three involve standard government speech expressing a viewpoint on a policy issue, and the final fact pattern contains an actual threat, rendering it meaningfully different. Again, even if Plaintiffs argue that the government would be responsible for the moderation decision in each fact pattern, the Court would have to consider the facts of each scenario to determine who is correct.

Plaintiffs argue that, for the second proposed class, the Court need only answer the general question of whether "the government is responsible for" a moderation action taken "pursuant to a policy that the government induced" a social media company to adopt. Class Cert. Mot. at 9. But assuming that to "induce" a policy means simply to "cause" a company to adopt that policy, Plaintiffs are again wrong. Once more, the government may be "responsible for a private decision *only* when it has . . . coerc[ed]" or effectively coerced the private party into making that decision. *Blum*, 457 U.S. at 1004 (emphasis added). The Fifth Circuit has thus found that a private decision is not "state action," even if it was caused by the government. *See*, *e.g.*, *Sons of Confederate Veterans*, 821 F. App'x at 319-20 (private committee's decision to prohibit Confederate flags at a parade was not state action even though it would not have been made "without the Mayor's letter" requesting that prohibition). And Plaintiffs cite no binding precedent indicating that the government is responsible for any private decision caused by some government statement.

In any event, even assuming the government could be responsible for a policy change simply by "inducing" it, that general legal conclusion would not be "apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350. The Court would still have to reach a *specific* legal conclusion, for each class member's claim, over whether the government is responsible for the content moderation action at issue; this would require a fact-intensive analysis over whether a Defendant did in fact "induce" the relevant policy change. Thus, to determine whether each member of the second proposed class has a valid claim, the Court would have to conduct an individualized analysis; there is no legal question it can resolve, "in one stroke," that would materially help resolve the claims of all class members. Accordingly, there is no adequate, common question of law for either proposed class.[5]

*Perry* is informative. There, the plaintiffs—several children in Texas's long-term foster care system (the "FCS")—brought suit against Texas for "various systemic failures" in the FCS, and claimed, among other things, that Texas "violated" their "substantive due process rights to be free from harm while in state custody." *Perry*, 675 F.3d at 835. Plaintiffs moved to certify a class consisting of "all children who are now and all those who will be in the [FCS]." *Id.* at 835-36. The district court certified the class, concluding, in part, that all class members "share[d] the common legal claim that [the FCS's] systematic deficiencies resulted in widespread violations of their . . . constitutional rights." *Id.* at 842; *see also id.* at 839. The Fifth Circuit vacated that order, noting that even if all class members were "within the same system," each "class member experienced

---

[5] For each class, Defendants may also have mootness arguments that apply to some members, but not others. At least one major social media company has relaxed its content moderation policies. *See* Twitter, Updates to Our Work on Covid-19 Vaccine Information, https://perma.cc/R4MY-K5KY (Mar. 21, 2023) ("Effective November 23, 2022, Twitter is no longer enforcing the COVID-19 misleading information policy."). Other platforms may follow suit. Thus, class members who claim they will be harmed on those platforms may not have a live claim.

[its] shortcoming in a different way," which would impact the applicable legal analysis for each claim, including the substantive due process claim. *Id.* at 838-39. The Court thus found that the district court improperly ignored Texas's argument that the claims of each class member would require an "individualized inquiry regarding the harm or risk of harm experienced by [that] class member from the State's practices," which "would appear to prevent the class claims from asserting a common question of law that" could be resolved on a class-wide basis "in one stroke." *Id.* at 843. The Fifth Circuit concluded by noting that the "deficiencies" in the "proposed class" arose from its improper "attempt[] to aggregate a plethora of discrete claims . . . into one 'super-claim.'" *Id.* at 848.

Here, similarly, the members of each proposed class allegedly were (or will be) affected in "different way[s]" (and by different Defendants), and so the Court would have to conduct a number of "individualized inquir[ies]" to determine whether each of their First Amendment claims has merit, thus defeating the commonality requirement. *Id.* at 843. And like the *Perry* plaintiffs, Plaintiffs here also improperly try to certify each of its classes based on a "super-claim" consisting of "discrete claims" against particular Defendants based on particular communications they allegedly had (or will have) with particular social media companies.

Accordingly, the Court cannot reach a single, across-the-board legal decision on whether Defendants are responsible for all content moderation decisions encompassed by either proposed class. Plaintiffs thus fail to satisfy the Rule 23(a) commonality requirement.[6]

---

[6] For the same reasons, Plaintiffs cannot satisfy the "typicality" requirement. *See Wal-Mart*, 564 U.S. at 349 n.5 ("[T]he commonality and typicality requirements of Rule 23(a) tend to merge."); *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 768 (5th Cir. 2020) (the "failure to prove commonality also establishes" the "failure to prove . . . typicality"). Given the diversity in the putative class members' respective fact patterns, Plaintiffs cannot show that their circumstances are necessarily "typical" of those applicable to each class member.

### C. Plaintiffs' putative classes do not satisfy the Rule 23(b)(2) requirements because each class member would not be entitled to the same injunction.

Even if Plaintiffs could satisfy the requirements of Rule 23(a), Plaintiffs fall far short of establishing that a class is appropriate under Rule 23(b)(2). "To qualify for class-wide injunctive relief, class members must have been harmed in essentially the same way" and must therefore be entitled to the same relief. *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007). Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a *different* injunction . . . against the defendant." *Wal-Mart*, 564 U.S. at 360 (emphasis in original).

Here, for each proposed class, different sets of members will allegedly be affected by different Defendants in different ways, *see supra* at 11-12, and so each would be "entitled to a different injunction." *Id.* A party can only secure an injunction that remedies her particular injury. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 222 (1974) (When "the relief sought produces a confrontation with one of the coordinate branches of the Government," the "framing of relief" may be "no broader than required by" the "the discrete factual context within which the concrete injury occurred or is threatened."); *Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party . . ."). Thus, within each proposed class, each member would only be entitled to an injunction targeting the particular conduct of the particular Defendant responsible for her current or impending injury. If a member of the first proposed class claims that she will be harmed by, say, the CDC based on certain health misinformation content that it "flagged," she would at most be entitled to an injunction against that CDC-related speech; she would not be entitled to an injunction against any

21

other Defendant. The same is true of the class representatives, whose claimed injuries vary widely and allegedly arise from different conduct by different government officials at different times.

Plaintiffs therefore cannot show that all members of either class would be entitled to an injunction of the same scope. To the contrary, it appears that they seek class certification precisely because different class members would be "entitled to . . . different injunction[s]," *Wal-Mart*, 564 U.S. at 360, in hopes of aggregating those injunctions to maximize the scope of relief. That, however, is an improper use of Rule 23(b)(2). *See supra* at 21.

Enforcing this Rule 23(b)(2) requirement is especially important here because, unlike a typical class action, members of a Rule 23(b)(2) class generally cannot opt-out. *Wal-Mart*, 564 U.S. at 363 ("(b)(2) does not require that class members be given notice and opt out rights"). Thus, if the Court certifies either or both of the proposed classes, Plaintiffs would be seeking a broader injunction on behalf of many class members who may *oppose* Plaintiffs' lawsuit and requested relief, but who cannot opt out and prevent Plaintiffs from securing that relief. For example, some people may be class members because they "listen" to, but disagree with, those who were subject to content moderation actions for spreading misinformation, and those class members may support those moderation actions. Similarly, some may be class members because they were subject to content moderation actions after inadvertently spreading misinformation, and they may be satisfied that the misinformation was contained. Plaintiffs cannot presume that all class members would support the functional gag order that Plaintiffs seek against many federal agencies and officials.

In response, Plaintiffs argue that they satisfy the Rule 23(b)(2) requirements because they seek a broad injunction that would provide relief to each member of each proposed class. *See* Class Cert. Mot. at 18-19. But the question is not whether an omnibus injunction can provide some relief to each class member; any injunction can include multiple provisions to try and ensure that each

class member will benefit somehow. The question is whether each member is entitled to the *same injunction*. *See supra* at 21. Plaintiffs cannot show that the injunction that each member of each class would be entitled to would be identical; *e.g.*, they cannot show that each and every class member would be entitled to an injunction against *all* Defendants.

Plaintiffs also argue that Defendants' alleged communications "harm[] both speakers and their audiences," and so all members of each proposed class are being harmed by all Defendants. Class Cert. Mot. at 17. Plaintiffs, however, are assuming, with no evidence, that each member of each proposed class will either be a "speaker[]" or an "audience[]" member of speech that is allegedly being affected by each Defendant. As they are defined, however, each proposed class may include a person whose speech was allegedly affected by one Defendant, but who neither engages in nor listens to any speech allegedly affected by any other Defendant.

Accordingly, Plaintiffs fail to satisfy the requisite Rule 23(b)(2) requirements, and the Court should thus deny their class certification motion.

### D. *Plaintiffs' general policy arguments do not justify class certification.*

Plaintiffs make two general arguments as to why the Court should certify their proposed classes. Neither has merit. First, Plaintiffs argue that they have a First Amendment right to listen to other persons whose speech is allegedly being suppressed, and that class certification is necessary to secure relief for those persons. *See* Class Cert. Mot. at 1-2, 4, 22-23. But if Plaintiffs establish that the alleged suppression of other peoples' speech violates *Plaintiffs'* First Amendment right to listen, then it is unclear why Plaintiffs cannot seek relief for that speech in their own names.

Second, Plaintiffs argue that class certification is necessary for the Court to issue relief to other parties whose rights are allegedly being infringed by Defendants. *See* Class Cert. Mot. at 21-22. But class certification, in itself, will not enable the Court to issue broader relief. Again, courts

can only issue relief to redress injuries that parties *establish*. *See supra* at 21. Thus, even if the Court certifies the classes, it can only provide relief for class members that have established, with evidence, injuries that flow from some Defendant. To secure broader relief for class members, Plaintiffs would thus have to identify those members, and submit evidence both demonstrating their injuries and connecting those injuries to a Defendant. But Plaintiffs refer to no feasible method for identifying many, much less all, of those members. Plaintiffs do not suggest that there is any database listing all people who have been subject to content moderation actions after a Defendant "flagged" the speech at issue or due to a policy "induced" by a Defendant. Thus, even with class certification, the Court likely could not issue broader relief to cover all class members.

Furthermore, class certification is not necessary to protect other people whose First Amendments rights are allegedly being infringed by Defendants. Those parties may bring their own lawsuits, and several already have. *See*, *e.g.*, *Hart v. Facebook Inc.*, No. 22-CV-00737-CRB, 2022 WL 1427507 (N.D. Cal. May 5, 2022); *Changizi v. Dep't of Health & Hum. Servs.*, No. 2:22-CV-1776, 2022 WL 1423176 (S.D. Ohio May 5, 2022). Regardless, "the Supreme Court has made clear that fear of underenforcement" of some right "is no justification for class certification." *Flecha*, 946 F.3d at 769. Plaintiffs must satisfy the applicable class action requirements. *See id.* As explained, Plaintiffs cannot satisfy the requirements of Rule 23(a) and 23(b)(2), and the variety of unique fact patterns that each proposed class would contain make a class proceeding especially impractical and inefficient here.

## II.   **Plaintiffs have failed to show that a belated Third Amended Complaint is justified.**

"A district court . . . may consider factors, such as undue delay, . . . dilatory motive, and futility of the amendment, when deciding whether to grant leave to amend." *Bustos v. Lennon*, 538 F. App'x 565, 569 (5th Cir. 2013). The Court should deny Plaintiffs' request for leave to file yet

another amended Complaint. First, the proposed, Third Amended Complaint would be futile. That proposed Complaint simply adds cursory class allegations that mimic the arguments in Plaintiffs' class certification motion. *See* Class Mot. at 22. But as explained above, Plaintiffs' two proposed classes fail to meet a number of requirements, and Plaintiffs' arguments do not show otherwise.

Second, Plaintiffs were dilatory in seeking to add class allegations. Plaintiffs could have included these allegations in the original Complaint they filed almost a year ago, or at least in one of their two Amended Complaints. Indeed, in their original Complaint, Plaintiffs noted that, in their view, Defendants were "threaten[ing] the . . . right of free speech . . . for virtually all citizens in . . . America." Compl. ¶ 6. If they believed, from the start, that Defendants' alleged conduct was impacting non-parties, they could have sought class certification from the start. The Court should not allow Plaintiffs to amend their Complaint again based solely on their belated strategic decision.

## CONCLUSION

The Court should deny Plaintiffs' Motion for Class Certification and for Leave to File a Third Amended Complaint.


Dated:  April 11, 2023            Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JOSHUA GARDNER
Special Counsel, Federal Programs Branch

*/s/ Kuntal Cholera*
KUNTAL CHOLERA
KYLA SNOW
INDRANEEL SUR
AMANDA CHUZI
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005

25

Kuntal.Cholera@usdoj.gov
Kyla.Snow@usdoj.gov
Indraneel.Sur@usdoj.gov
Amanda.K.Chuzi@usdoj.gov

*Attorneys for Defendants*