IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

STATE OF LOUISIANA, STATE OF MIS-
SOURI, *et al.*,

*Plaintiffs,*

*v.*

JOSEPH R. BIDEN, JR., in his official ca-
pacity as the President of the United
States, *et al.*,

*Defendants.*

Case No: 3:22-cv-01213-TAD

THE HONORABLE
TERRY A. DOUGHTY

BRIEF OF AMICUS CURIAE ALLIANCE DEFENDING FREEDOM
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

INTERESTS OF *AMICUS CURIAE* ........................................................................ 1

INTRODUCTION ...................................................................................................... 2

ARGUMENT .............................................................................................................. 3

    I.    The government should be held responsible when it uses a private party, like social media companies, to censor speech it dislikes. .......................... 3

        A.  The government cannot induce—much less compel—private parties to take actions that violate citizens' constitutional freedoms. .............. 3

        B.  In an expanding number of contexts, government officials cooperate with private parties to silence speech. ..................................................... 4

              1.  Government officials frequently effectuate the heckler's vetoes of upset third parties. ............................................................................ 4

              2.  Government officials frequently silence speech citing nothing more than complaints from private parties. ...................................... 8

              3.  Government officials have bragged openly about inducing social media companies to suppress pro-life speech. ................................ 12

              4.  Government officials have condoned the violence and vandalism carried out by private parties to intimidate others. ........................ 13

        C.  Social media companies are eager to silence viewpoints they dislike, providing the government a ready source of accomplices. .................... 13

              1.  Many social media companies have policies replete with speech-threatening terms, setting the stage for unlawful censorship. ....... 14

              2.  Social media companies have repeatedly demonstrated their willingness to censor the speech of Americans. ............................... 18

              3.  The government teaming up with "big tech" to censor speech poses severe and pervasive threats to the free exchange of ideas. . 20

    II.    The government has no business determining which views are right or wrong, let alone which should be silenced. ................................................. 21

CONCLUSION ......................................................................................................... 25

CERTIFICATE OF SERVICE ................................................................................. 27

## TABLE OF AUTHORITIES

**Cases**

*Abrams v. United States,*
    250 U.S. 616 (1919) ................................................................................ 21, 22

*Adams v. Trustees of the University of North Carolina-Wilmington,*
    640 F.3d 550 (4th Cir. 2011) ................................................................. 1

*Americans for Prosperity Foundation v. Bonta,*
    141 S. Ct. 2373 (2021) ............................................................................ 1

*Arizona Christian School Tuition Organization v. Winn,*
    563 U.S. 125 (2011) ................................................................................. 1

*Bair v. Shippensburg University,*
    280 F. Supp. 2d 357 (M.D. Pa. 2003) ................................................. 16

*Biden v. Knight First Amendment Institute at Columbia University,*
    141 S. Ct. 1220 (2021) ............................................................................ 14

*Blum v. Yaretsky,*
    457 U.S. 991 (1982) ................................................................................. 3

*Brentwood Academy v. Tennessee Secondary School Athletic Association,*
    531 U.S. 288 (2001) ................................................................................. 3

*Brown v. Board of Education of Topeka,*
    374 U.S. 483 (1954) ................................................................................. 22

*Brown v. City of Pittsburgh,*
    586 F.3d 263 (3d Cir. 2009) .................................................................. 1

*Brown v. Entertainment Merchants Association,*
    564 U.S. 786 (2011) ................................................................................. 17

*Bruni v. City of Pittsburgh,*
    941 F.3d 73 (3rd Cir. 2019) ................................................................... 1

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014) ................................................................................. 1

*City of Lakewood v. Plain Dealer Publishing Co.,*
    486 U.S. 750 (1988) ................................................................................. 17

*Dambrot v. Central Michigan University,*
    55 F.3d 1177 (6th Cir. 1995) ................................................................. 16

*Davis v. Monroe County Board of Education,*
    526 U.S. 629 (1999) ................................................................................. 16

*DeJohn v. Temple University,*
    537 F.3d 301 (3d Cir. 2008) .................................................................. 1

*Dobbs v. Jackson Women's Health Organization,*
　142 S. Ct. 2228 (2022) ..................................................................................... 12

*Doe v. University of Michigan,*
　721 F. Supp. 852 (E.D. Mich. 1989) ............................................................... 16

*Keyishian v. Board of Regents of the University of the State of New York,*
　385 U.S. 589 (1967) .................................................................................... 24, 25

*Korematsu v. United States,*
　323 U.S. 214 (1944) ......................................................................................... 22

*March for Life Education & Defense Fund v. California,*
　141 S. Ct. 192 (2020) ......................................................................................... 1

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
　138 S. Ct. 1719 (2018) ....................................................................................... 1

*Meriwether v. Hartop,*
　992 F.3d 492 (6th Cir. 2021) ............................................................................. 1

*Missouri v. Biden,*
　__ F. Supp. 3d __, 2023 WL 2578260 (W.D. La. Mar. 20, 203) ........................ 3

*National Institute of Family & Life Advocates v. Becerra,*
　138 S. Ct. 2361 (2018) ....................................................................................... 1

*Norwood v. Harrison,*
　413 U.S. 455 (1973) ........................................................................................... 3

*Nuxoll ex rel. Nuxoll v. Indian Prairie School District #204,*
　523 F.3d 668 (7th Cir. 2008) ........................................................................... 16

*Obergefell v. Hodges,*
　576 U.S. 644 (2015) ......................................................................................... 10

*OSU Student Alliance v. Ray,*
　699 F.3d 1053 (9th Cir. 2012) ........................................................................... 1

*Packingham v. North Carolina,*
　582 U.S. 98 (2017) ..................................................................................... 13, 18

*Plessy v. Ferguson,*
　163 U.S. 537 (1896) ......................................................................................... 22

*R.A.V. v. City of St. Paul,*
　505 U.S. 377 (1992) ......................................................................................... 15

*Reed v. Town of Gilbert,*
　135 S. Ct. 2218 (2015) ....................................................................................... 1

*Roberts v. Haragan,*
　346 F. Supp. 2d 853 (N.D. Tex. 2004) ............................................................ 16

iv

*Roe v. Wade,*
    410 U.S. 113 (1973) ........................................................................ 12

*Saxe v. State College Area School District,*
    240 F.3d 200 (3d Cir. 2001) ...................................................... 15, 16

*Terminiello v. City of Chicago,*
    337 U.S. 1 (1949) .......................................................................... 24

*Thompson v. Hebdon,*
    140 S. Ct. 348 (2019) ...................................................................... 1

*Tinker v. Des Moines Independent Community School District,*
    393 U.S. 503 (1969) ...................................................................... 24

*Town of Greece v. Galloway,*
    572 U.S. 565 (2014) ........................................................................ 1

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    137 S. Ct. 2012 (2017) .................................................................... 1

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) .................................................................. 22

*United States v. Alvarez,*
    567 U.S. 709 (2012) ...................................................................... 23

*United States v. Stevens,*
    559 U.S. 460 (2010) ...................................................................... 17

*Uzuegbunam v. Preczewski,*
    141 S. Ct. 792 (2021) ............................................................... 1, 8, 9

*Watts v. Northside Independent School District,*
    37 F.4th 1094 (5th Cir. 2022) ........................................................ 3

*West Virginia State Board of Education v. Barnette,*
    319 U.S. 624 (1943) ...................................................................... 24

*Zubik v. Burwell,*
    136 S. Ct. 1557 (2016) .................................................................... 1

## Historical Documents

THE DECLARATION OF INDEPENDENCE (U.S. 1776) ...................................... 2

THE FEDERALIST NO. 51 (James Madison)
    (George W. Carey & James McClelland ed., 2001) ............................ 2

## Journal Articles

Eugene Volokh, *Treating Social Media Platforms Like Common Carriers?,*
    1 J. FREE SPEECH L. 377, 395–400 (2021) ...................................... 18

**Litigation Documents**

Amended Verified Complaint, *Perlot* v. *Green*,
No. 3:22-cv-00183-DCN (D. Idaho May 17, 2022), ECF No. 17,
https://bit.ly/43saop7 ............................................................................... 10

Complaint, *Young America's Foundation v. Stenger*,
No. 3:20-cv-00822 (N.D.N.Y. Jul. 22, 2020), https://bit.ly/3mxpc5q ................ 5

Complaint, *Young America's Foundation. v. Covino*,
No. 2:16-cv-03474 (C.D. Cal. May 19, 2016), ECF No. 1,
https://bit.ly/3Utz1he .............................................................................. 4

Complaint, *DeJong* v. *Pembrook*,
No. 3:22-cv-01124 (S.D. Ill. May 31, 2022), ECF No. 1,
https://bit.ly/3KX28pW ............................................................................. 9

Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Injunction,
ECF No. 212-2 ....................................................................................... 23

**Other Authorities**

@MarkWarner, TWITTER (Aug. 25, 2022, 1:23 PM), https://bit.ly/3GFK8hp ............. 12

@MarkWarner, TWITTER (Aug. 25, 2022, 1:23 PM), https://bit.ly/3zZo2m9 ............. 12

@TheDailyCitizen, TWITTER (May 18, 2021), https://bit.ly/3UvZOti ......................... 19

Aaron Sibarium, *"Dogs-t': Federal Judge Decries Disruption of His Remarks by Stanford Law Students and Calls for Termination of the Stanford Dean Who Joined the Mob*, WASH. FREE BEACON (Mar. 10, 2023),
https://bit.ly/3KAogVJ ............................................................................... 8

Aaron Sibarium, *Hundreds of Yale Law Student Disrupt Bipartisan Free Speech Event*, WASH. FREE BEACON (Mar. 16, 2022), https://bit.ly/3xRf89n ................ 8

Adam Feldman, *Supreme Court All-Stars 2013–2017*, EMPIRICAL SCOTUS (Sept. 13, 2018), https://bit.ly/2pm2NXn ................................................................. 1

Alliance Defending Freedom, *ADF, YAF, Ben Shapiro File Free Speech Suit against CSULA*, https://bit.ly/3Af0ASh .......................................................... 5

Alyssa Guzman, *Far-Left Students Scream "F\*\*k Pro-Lifers" after Hijacking Anti-Abortion Event at Virginia University, as Protestors Throw "Punches," Injuring Chapter President*, DAILY MAIL (Mar. 30, 2023),
https://bit.ly/4181XOa ............................................................................... 7

Ashley Carnahan, *COVID Lab Leak Theory Appears Vindicated after Energy Department Report: "They Censored Us, Trashed Us,"* FOX NEWS (Feb. 27, 2023), https://fxn.ws/418h6iu ............................................................................ 23

Catherine Rampel, *A Chilling Study Shows How Hostile* College *Students Are Towards Free Speech*, WASH. POST (Sept. 18, 2017),
https://wapo.st/3tp1IQd ............................................................................. 7

Clair Duffy & Brian Fung, *Lawmakers Urge Google to Remove Misleading Results in Searches for Abortion Clinics*, CNN (Jun. 17, 2022), https://cnn.it/3L2xJqv .......................................................................... 12

David Lat, *Is Free Speech in American Law Schools a Lost Cause?*, ORIGINAL JURIS. (Mar. 17, 2022), https://bit.ly/3m2FhiQ ................................... 8

David Sacks, *Get Ready for the 'No-Buy' List*, COMMON SENSE WITH BARI WEISS (July 30, 2021), https://bit.ly/3o6on3L......................................................... 20, 21

Dennis Shaul, *There's No Downplaying the Impact of Operation Choke Point*, AM. BANKER (Nov. 28, 2018), https://bit.ly/2TYnIxH............................................. 21

Emily Jashinsky, *Exclusive: Man Tried to Share His Regrets About Transgender Life. YouTube Censored It*, THE FEDERALIST (Jun. 19, 2020), https://bit.ly/43w6XxJ .......................................................................... 19

Emma Colton, *Violence Follows after Suspected Antifa Members Disrupt Pro-Life Campus Event: "Fascists,"* FOX NEWS (Mar. 30, 2023), https://fxn.ws/414YUX9 .........................................................................7

Ethan Siegel, *The Wuhan Lab Leak Hypothesis Is a Conspiracy Theory, Not Science*, FORBES (Jun. 3, 2021), https://bit.ly/3GJ34vI .................................... 23

Gabe Kaminsky, *Twitter Locked Focus on the Family's Account Because the Christian Group Said Boys and Girls Are Different*, THE FEDERALIST (Feb. 22, 2021), https://bit.ly/417qkvB.................................................................. 18, 19

Hannah Mackay, *Police Seek Information on Anti-Abortion Pregnancy Center Vandalism*, THE DETROIT NEWS (Sept. 23, 2022), https://bit.ly/3L3ToNR...... 13

Harriet Alexander, *Blood-Boiling Moment Woke Stanford Law School Students Taunt Conservative Judge Invited to Speak There—Before Dean of "Equity" Ambushes Him with Pious Speech Accusing Him of "Harm,"* DAILY MAIL (Mar. 11, 2023), https://bit.ly/3Kyc488...........................................8

Jennifer Korn, *Yelp to Begin Prominently Labeling Crisis Pregnancy Centers to Avoid Confusion*, CNN BUSINESS (Aug. 23, 2022), https://cnn.it/40bDuq7 .... 13

Jeremy Herb & Natasha Bertrand, *US Energy Department Assesses Covid-19 Likely Resulted from Lab Leak, Furthering US Intel Divide over Virus Origin*, CNN (Feb. 27, 2023), https://cnn.it/3KI9dJU...................................... 23

Jeremy Tedesco, *Cancel Culture Targets Charity*, WALL ST. J. (Jan. 18, 2022), https://on.wsj.com/3MFnbyu.............................................................. 21

Jessica Chasmar, *Google to Crack Down on Search Results for Crisis Pregnancy Centers after Dem Pressure*, FOX BUSINESS (Aug. 25, 2022), https://fxn.ws/41tmLj3 .......................................................................... 12

Joseph A. Wulfsohn, *What Elon Musk's Twitter Files Have Uncovered About the Tech Giant So Far*, FOX NEWS (Jan. 22, 2023), https://fxn.ws/41jtsEs ........... 20

Karl, *Top 10 Social Networking Sites by Market Share Statistics [2023]*, DreamGrow (Mar. 12, 2023), https://bit.ly/41p3KhG ................................... 14

Kristen Waggoner & Monica Miller, *The Anti-Free Speech Sickness Plaguing America Has Infected Our Future Lawyers*, DAILY MAIL (Mar. 23, 2022), https://bit.ly/3ZeQKtL ............................................................................... 8

Lindsey Grewe, *Fire at Colorado Pregnancy Center Being Investigated as Arson in Wake of Roe v. Wade Reversal*, KKTV (Jun. 27, 2022), https://bit.ly/40i5J6E ................................................................................ 13

Lisa Gutierrez, *Online Search for Abortion Can Take You to Anti-Abortion Center. Websites Take Action*, KANSAS CITY STAR (Sept. 1, 2022), https://bit.ly/40pGb7H .............................................................................. 12

Luis Fieldman, *Graffiti Reportedly Defaces Bethlehem House in Easthampton, Labeled by Some as "Crisis Pregnancy Center,"* MASS LIVE (Aug. 19, 2022), https://bit.ly/3KJpjD1 ............................................................................... 13

Mason Walker & Katerina Eva Matsa, *News Consumption Across Social Media in 2021*, PEW RESEARCH CTR. (Sept. 20, 2021), https://pewrsr.ch/3MN0rwL . 14

Max Thornsberry, *Kamala Harris Praises Dem AGs for 'Taking on' Crisis Pregnancy Centers Rocked by Violence*, FOX NEWS (Sept. 22, 2022), https://fxn.ws/3A5mlnj .............................................................................. 13

Meta, *Hate Speech*, https://bit.ly/3GJ2L3X............................................................ 15

Richard Allan, *Hard Questions: Who Should Decide What Is Hate Speech in an Online Global Community?*, META (Jun. 27, 2017), https://bit.ly/3odlw9q..... 17

Riley Gaines, *I Was Hit in the Face by a Man Dressed as a Woman and Threatened by a Racist Mob for Daring to Speak Out against an Extreme Trans Movement Erasing Female Athletes Like Me. . . But I Refuse to be Silenced!*, DAILY MAIL (Apr. 7, 2023), https://bit.ly/4145MnN ........................ 7

Robby Soave, *U.S. State Department Funds a Disinformation Index That Warns Advertisers to Avoid Reason*, REASON (Feb. 14, 2023), https://bit.ly/3o9Y8cL ............................................................................... 20

Rod Dreher, *The Tyranny of Tech and Trans*, THE AM. CONSERVATIVE (Jan. 27, 2021), https://bit.ly/3zYhynM .................................................................. 19, 20

Rohan Gupta, *Terrified Swimming Champion Riley Gaines Is Ambushed by Screaming Trans Activists and "Hit Twice by Guy in a Dress" after Saving Women's Sports Speech at San Francisco State University—as Cops Say There Were NO Arrests*, DAILY MAIL (Apr. 7, 2023), https://bit.ly/41onpyj ....... 7

*Social Media Use in 2021*, PEW RESEARCH CTR. (Apr. 7, 2021), https://pewrsr.ch/3zZLtvL................................................................................ 14

Stephen M. LePore, *"I Was Assaulted": Incredulous Riley Gaines Slams Statement from SF State PRAISING Students for "Peaceful" Protests after She Was "Attacked" and Forced to High Inside Room when Trans-Rights*

*Protestors Stormed Her Speech about Women's Sport*, DAILY MAIL (Apr. 9, 2023), https://bit.ly/3GHweeq ................................................................ 7

Stuart Kyle Duncan, *My Struggle Session at Stanford Law School*, WALL ST. J (Mar. 17, 2023), https://on.wsj.com/41lg7ey ...................................... 8

*The Cover Up: Big Tech, the Swamp, and Mainstream Media Coordinated to Censor American's Free Speech*, U.S. HOUSE COMM. ON OVERSIGHT & ACCOUNTABILITY (Feb. 8, 2023), https://bit.ly/3MFJqV6 ................................ 20

Twitter, *Hateful Conduct*, https://bit.ly/3o5m29b .................................... 15

Tyler O'Neil, *Washington Pregnancy Center Vandalized; "If Abortion Isn't Safe, You Aren't Either,"* FOX NEWS (May 27, 2022), https://fxn.ws/3ME7esy ........ 13

Viewpoint Diversity Score, *2022 Business Index* (May 2022), *available at* https://bit.ly/3MDe2qb ............................................................................ 14, 15

Viewpoint Diversity Score, *About Us*, https://bit.ly/40jg3LH ................................ 1, 14

Viewpoint Diversity Score, *FAQs*, https://bit.ly/3UtxUy1 ............................................. 2

Viewpoint Diversity Score, *Statement on Debanking and Free Speech*, (Nov. 10, 2022), https://bit.ly/3L0whoA .......................................................... 21

WCCO Staff, *Vandals Target Minneapolis Pregnancy Center*, CBS NEWS (Mar. 4, 2023), https://cbsn.ws/40amd0x ...................................................... 13

YouTube, *How Does You Tube Protect the Community from Hate and Harassment?*, https://bit.ly/3zZYSE5 .............................................. 15

Zachary Mettler, *Biden to Nominate Controversial Transgender Doctor for Assistant Health and Human Services Secretary*, DAILY CITIZEN (Jan. 19, 2021), https://bit.ly/417rEP5 ........................................................... 19

### INTERESTS OF *AMICUS CURIAE*

Alliance Defending Freedom is the world's largest non-profit, public-interest legal organization committed to protecting religious freedom, free speech, and the sanctity of life. ADF has contributed to 72 Supreme Court victories. Since 2011, it has represented parties in 14 Supreme Court victories.[1] In 2018, *Empirical SCOTUS* ranked it first among "the top performing firms" litigating First Amendment cases.[2]

ADF represents a wide variety of clients who seek to exercise their free speech rights and to challenge government policies that seek to curtail this freedom. For example, ADF represents students, student organizations, and faculty silenced on campus. *See, e.g.*, *DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008); *Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550 (4th Cir. 2011); *OSU Student All. v. Ray*, 699 F.3d 1053 (9th Cir. 2012); *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021). It also represents pro-life advocates who face punishments for seeking to protect unborn life. *See, e.g.*, *Brown v. City of Pittsburgh*, 586 F.3d 263 (3d Cir. 2009); *Bruni v. City of Pittsburgh*, 941 F.3d 73 (3rd Cir. 2019).

But threats to free speech extend into the private sector. Thus, ADF seeks "to encourage businesses to respect customers and external stakeholders who hold diverse viewpoints, [to] promote freedom of thought in their workplaces, and [to] support a public culture of trust and tolerance in their giving and political activities."[3] In this arena, ADF urges companies to resist "demands that they cancel, deplatform, or deny service to individuals or groups because of their religious or ideological beliefs" and to foster "workplace environments where team members can be honest about

---

[1]   *See, e.g.*, *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021); *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021); *March for Life Educ. & Def. Fund v. California*, 141 S. Ct. 192 (2020); *Thompson v. Hebdon*, 140 S. Ct. 348 (2019); *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018); *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719 (2018); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017); *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (victories for S. Nazarene Univ. and Geneva Coll.); *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014); *Town of Greece v. Galloway*, 572 U.S. 565 (2014); *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125 (2011).

[2]   Adam Feldman, *Supreme Court All-Stars 2013–2017*, EMPIRICAL SCOTUS (Sept. 13, 2018), https://bit.ly/2pm2NXn. (All links provided in this brief were last visited on April 17, 2023).

[3]   Viewpoint Diversity Score, *About Us*, https://bit.ly/40jg3LH.

their views and learn from each other's differences."[4]

The prospect of government officials and private businesses cooperating to silence the free speech of American citizens is alarming. When government officials enlist the aid of private actors in this censorship, those officials should be held accountable. The government should not be able to mask its censorship behind the guise of private action.

## INTRODUCTION

This nation has long prided herself on her system of limited government, where the people delegate only certain powers to their leaders, and where checks and balances prevents those powers from being abused. As our Founders noted, this is because government is "but the greatest of all reflections on human nature." THE FEDERALIST NO. 51 at 269 (James Madison) (George W. Carey & James McClelland ed., 2001). Because men are not angels, government is necessary. But as our leaders are also not angels, both external and internal controls on government are essential. *Id.*

Our Founders quickly saw that we needed the First Amendment's affirmative protections to prevent the government from controlling public opinion. To them, a "dependence on the people is, no doubt, the primary control on the government." *Id.* They knew from experience that government officials were far from infallible, something our history since has oft confirmed. Hence, if the government could control or manipulate public opinion, the "consent of the governed"—the only source of government's "just powers"—would be a farce that exists only in theory and our liberties would be jeopardized. THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776).

Nevertheless, the urge to censor disfavored ideas remains, especially among government officials who fancy themselves on the "right side of history" or the living embodiment of "science." These officials often chafe at the First Amendment's restrictions and look for ways to sidestep them, only to find willing partners in the

---

4   Viewpoint Diversity Score, *FAQs*, https://bit.ly/3UtxUy1.

2

private sector. These big tech companies, especially social media companies, seemingly share the censorious inclinations of many government officials. So for government officials, this provides an alluring temptation: the ability to censor speech they dislike while potentially evading the First Amendment's protections. If our liberties are to remain secure, and if debate on public issues is to remain free and unfettered, courts cannot tolerate or turn a blind eye to this end-run around the Constitution. And thus, this Court should grant Plaintiffs' motion for preliminary injunction.

ARGUMENT

I.  **The government should be held responsible when it uses a private party, like social media companies, to censor speech it dislikes.**

   A. **The government cannot induce—much less compel—private parties to take actions that violate citizens' constitutional freedoms.**

As this Court has already recognized, the Supreme Court has repeatedly ruled that the government may not use private parties as proxies to violate Americans' constitutional rights. *Missouri v. Biden*, __ F. Supp. 3d __, 2023 WL 2578260, *28 (W.D. La. Mar. 20, 203). Indeed, "[i]t is also axiomatic that a state may not induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (citations omitted). When the government "has provided such significant encouragement, *either overt or covert*, [the private party's] choice must in law be deemed to be that of the [government]." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (emphasis added); *accord Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001); *Watts v. Northside Indep. Sch. Dist.*, 37 F.4th 1094 (5th Cir. 2022) (holding coach can be held liable for players' attack on referee that coach ordered because "any reasonable football coach would have known he was engaged in state action when instructing his players that Friday night"). Thus, even when government uses covert inducement to silence speech, it has crossed the line to conduct forbidden by the First Amendment.

### B. In an expanding number of contexts, government officials cooperate with private parties to silence speech.

Sadly, the government often ignores this fundamental principle, cooperating with private parties to silence disfavored speech. Sometimes, these situations involve the facts present here: government officials prompting private parties to silence speech. Other times, they involve the inverse: government officials silencing speech at the behest of private parties. Either way, the end result of this cooperation is the same, as many ADF clients can attest: free speech gets censored.

### 1. Government officials frequently effectuate the heckler's vetoes of upset third parties.

One very common scenario is that government officials enforce the heckler's veto of a hostile mob. For example, in 2016, Young Americans for Freedom, a student group at California State University-Los Angeles, invited conservative commentator Ben Shapiro to give a lecture entitled *When Diversity Becomes a Problem. See* Compl., *Young Am.'s Found. v. Covino*, No. 2:16-cv-03474 (C.D. Cal. May 19, 2016), ECF No. 1, https://bit.ly/3Utz1he. As soon as the group started promoting the event on Facebook, it began receiving angry and threatening comments from students and faculty alike. Because of this reaction, University officials declared Mr. Shapiro's views "controversial" and tried to impose additional security fees. Next, the University president tried to cancel the event because of this backlash. Both attempts failed, the first because the fees were unconstitutional, and the latter because the group and Mr. Shapiro refused to be silenced.

When these attempts failed, the mob stepped in—with the University's tacit blessing. The night before the lecture, protestors with sleeping bags camped out in front of the doors of the Student Union, where the lecture would occur. Already, these groups had blanketed the campus with flyers urging students to participate in rallies to stop Mr. Shapiro from delivering his speech. About four hours before the lecture, large numbers of protestors assembled inside and outside the Student Union, filling

its lobby within the next two hours. Then they linked arms and physically blocked access to the doors of the lecture hall, preventing anyone from entering. University police did nothing to stop this blockade or to help people enter the lecture hall.

Young Americans for Freedom tried to circumvent this blockade by discreetly escorting people into the lecture hall through a back door. But the mob quickly formed another human wall to block it. Again, University police did nothing.[5]

Why did the police stand by? Because the University president and vice president of student life ordered them to effectuate this heckler's veto. As a result, the lecture hall was only half full when Mr. Shapiro spoke, and more than 100 people who wanted to hear him were stranded outside. In short, free speech was stymied because government officials allowed a hostile mob to do what the officials wanted to do all along: silence Mr. Shapiro and the students who invited him.

Similarly, in 2019, College Republican at Binghamton University invited renowned economist and presidential advisor Dr. Arthur Laffer to deliver a lecture entitled *Trump, Tariffs, and Trade Wars*. *See* Compl., *Young Am.'s Found. v. Stenger*, No. 3:20-cv-00822 (N.D.N.Y. Jul. 22, 2020), https://bit.ly/3mxpc5q. When the group tried to table to advertise the event, a mob of over 200 students attacked. It confiscated and destroyed College Republicans' flyers and posters, broke down and carried away its table, hurled insults and obscenities, and physically assaulted one member. When the police arrived, they demanded that College Republicans leave, enforcing the mob's chant: "Pack it up." The University president and vice president for student affairs then issued false statements, blaming College Republicans for the incident.

Emboldened by their success at using government officials to censor College Republicans, a group called College Progressives and its off-campus allies posted fliers on social media, urging students and others to disrupt Dr. Laffer's lecture, or in

---

[5]   Video footage of these disruptions is available. *See* Alliance Defending Freedom, *ADF, YAF, Ben Shapiro File Free Speech Suit against CSULA*, https://bit.ly/3Af0ASh.

their words "put an end to this clownery." Aware of this agitation, University police blamed College Republicans. So University officials moved the lecture and gave College Progressives the adjacent lecture hall to use in planning their disruptions. College Republicans objected to no avail. The group then asked officials to clarify that protestors had to let Dr. Laffer speak, but the University refused. It asked for assurances that police would remove disruptors rather than silencing Dr. Laffer, only to get the same refusal.

When Dr. Laffer arrived at the airport, University police intercepted him, trying to convince him to cancel the lecture and leave immediately—all based on the social media agitation. Dr. Laffer refused.

Meanwhile, College Progressive and its off-campus allies lined up outside the lecture hall and in the adjacent space University officials provided them. When the doors opened, they flooded in and blocked access to the seats, preventing attendees from taking the open seats. Many were wearing masks to conceal their identities (as this was pre-Covid). Police made a token attempt to ask everyone to sit, but when College Progressives and its allies refused, the police did nothing, though 43 officers were present. As a result, many invited guests could not attend.

Seconds after Dr. Laffer began speaking, the disruptors began shouting, accusing Dr. Laffer of advancing "racial oppression" and "modern-day slavery." Still, the police did nothing. A disruptor pulled out a bullhorn, yelling through it for two minutes. When police began to take action, the protestors formed a protective human wall around him. So the police then ordered Dr. Laffer to leave. Eventually, police removed the disruptor, but only after he handed off his megaphone for others to continue the disruption. In all, College Progressives and its allies occupied the lecture hall for more than an hour, preventing the lecture from taking place. And once again the vice president for student affairs blamed College Republicans for this and endorsed the shout-down and disruption from College Progressives. In the days that

followed, he and the president worked to suspend College Republicans for violating a policy applied to no one else.

At both campuses, officials chose to bow to a hostile mob. Rather than respecting the constitutional liberties of Young Americans for Freedom or College Republicans, these officials silenced speech, both by standing down while the mob accomplished what they had failed to do and by affirmatively enforcing the mob's wishes.

Sadly, these shout-downs—where government officials carry out the heckler's veto of irate private parties—are far from an isolated occurrence. Studies from over five years ago reveal that 51% of university students thought shouting down a speaker is an appropriate response to ideas one does not like, and almost 20% thought violence is.[6] It is no wonder then that these incidents are multiplying. Just recently, Kristan Hawkins of Students for Life of America faced a similar experience at Virginia Commonwealth University.[7] Riley Gaines, a female athlete speaking at San Francisco State University on who should compete in women's sports, had to barricade herself in a room for almost three hours to avoid a violent mob.[8] And as has happened at so many other campuses, the University president defended the mob, blessing this censorship.[9] ADF's CEO, Kristen Waggoner, faced a similar experience when over 100 students at Yale Law School tried to shout her down—at an event

---

[6]    Catherine Rampel, *A Chilling Study Shows How Hostile* College *Students Are Towards Free Speech*, WASH. POST (Sept. 18, 2017), https://wapo.st/3tp1IQd.

[7]    Emma Colton, *Violence Follows after Suspected Antifa Members Disrupt Pro-Life Campus Event: "Fascists,"* FOX NEWS (Mar. 30, 2023), https://fxn.ws/414YUX9; Alyssa Guzman, *Far-Left Students Scream "F\*\*k Pro-Lifers" after Hijacking Anti-Abortion Event at Virginia University, as Protestors Throw "Punches," Injuring Chapter President*, DAILY MAIL (Mar. 30, 2023), https://bit.ly/4181XOa.

[8]    Rohan Gupta, *Terrified Swimming Champion Riley Gaines Is Ambushed by Screaming Trans Activists and "Hit Twice by Guy in a Dress" after Saving Women's Sports Speech at San Francisco State University—as Cops Say There Were NO Arrests*, DAILY MAIL (Apr. 7, 2023), https://bit.ly/41onpyj; Riley Gaines, *I Was Hit in the Face by a Man Dressed as a Woman and Threatened by a Racist Mob for Daring to Speak Out against an Extreme Trans Movement Erasing Female Athletes Like Me. . . But I Refuse to be Silenced!*, DAILY MAIL (Apr. 7, 2023), https://bit.ly/4145MnN.

[9]    Stephen M. LePore, *"I Was Assaulted": Incredulous Riley Gaines Slams Statement from SF State PRAISING Students for "Peaceful" Protests after She Was "Attacked" and Forced to High Inside Room when Trans-Rights Protestors Stormed Her Speech about Women's Sport*, DAILY MAIL (Apr. 9, 2023), https://bit.ly/3GHweeq.

designed to show how the right and left works together to protect civil rights.[10] Judge Duncan from the Fifth Circuit was shouted down by obscenity-yelling students at Stanford Law School, with officials intervening only to chide him and seemingly approve the disruption.[11]

### 2. Government officials frequently silence speech citing nothing more than complaints from private parties.

Another increasingly common scenario is that government officials silence speech, not in response to a hostile mob, but in response to third-party complaints. For example, in 2016, Chike Uzuegbunam tried to share his religious beliefs with his fellow Georgia Gwinnett College students in an outdoor plaza "where students often gather." *Uzuegbunam*, 141 S. Ct. at 796. But officials stopped him, explaining that he "could speak about his religion or distribute materials only in two" speech zones, "which together make up just 0.0015 percent of campus." *Id.* at 796–97.

So Chike reserved a speech zone, and on the appointed day, he began sharing how Jesus Christ died on the cross and rose from the dead to provide salvation and eternal life to all. After about 20 minutes, "a campus police officer again told him to stop, this time saying that people had complained about his speech." *Id.* at 794. According to the officer, Chike's speech violated a policy "because it had led to complaints." *Id.* This is because the College's speech code prohibited students from saying "anything that 'disturbs the peace and/or comfort of person(s).'" *Id.* So officers threatened Chike with punishment if he continued speaking in the speech zone.

---

[10]   Aaron Sibarium, *Hundreds of Yale Law Student Disrupt Bipartisan Free Speech Event*, WASH. FREE BEACON (Mar. 16, 2022), https://bit.ly/3xRf89n; David Lat, *Is Free Speech in American Law Schools a Lost Cause?*, ORIGINAL JURIS. (Mar. 17, 2022), https://bit.ly/3m2FhiQ; Kristen Waggoner & Monica Miller, *The Anti-Free Speech Sickness Plaguing America Has Infected Our Future Lawyers*, DAILY MAIL (Mar. 23, 2022), https://bit.ly/3ZeQKtL.

[11]   Stuart Kyle Duncan, *My Struggle Session at Stanford Law School*, WALL ST. J (Mar. 17, 2023), https://on.wsj.com/41lg7ey; Aaron Sibarium, *"Dogs-t': Federal Judge Decries Disruption of His Remarks by Stanford Law Students and Calls for Termination of the Stanford Dean Who Joined the Mob*, WASH. FREE BEACON (Mar. 10, 2023), https://bit.ly/3KAogVJ; Harriet Alexander, *Blood-Boiling Moment Woke Stanford Law School Students Taunt Conservative Judge Invited to Speak There—Before Dean of "Equity" Ambushes Him with Pious Speech Accusing Him of "Harm,"* DAILY MAIL (Mar. 11, 2023), https://bit.ly/3Kyc488.

To defend this unconstitutional policy, the College tried to hide behind the "fighting words" doctrine, citing these alleged complaints from third parties. Thus, to these officials—and to the Office of the Attorney General of Georgia—Chike's presentation of the Christian Gospel "arguably rose to the level of 'fighting words,'" all because some private individuals complained. *Id*. at 797.

The situation escalated even faster for Maggie DeJong, a master's degree student from Southern Illinois University, Edwardsville. *See* Compl., *DeJong* v. *Pembrook*, No. 3:22-cv-01124 (S.D. Ill. May 31, 2022), ECF No. 1, https://bit.ly/3KX28pW. While counting down the weeks to graduation, she was shocked when she suddenly received not one, not two, but three no-contact orders. These orders banned her from having "any contact" or "indirect communication" with three students, two from her graduating class of ten and one from another. If she violated these orders, officials threatened her with "disciplinary consequences," and they copied a University police officer on each order to drive that threat home.

Before issuing these orders, no official had even informed Maggie that she was under investigation. Nor did anyone give her a chance to tell her side of the story. No one even told Maggie what she had supposedly done to merit this punishment.

One month later, after Maggie was forced to retain legal counsel, the picture became clearer. Three students complained because Maggie expressed her Christian and conservative views on current events. These students found her views offensive, as was their right, but they also claimed that her speech itself had threatened them.

On social media, Maggie frequently expressed her religious beliefs. To one student, this content "directly attacks and belittles my own religious beliefs." This student also said that Maggie "claims to have 'objective truth.'" Of course, the student failed to mention that this conversation occurred over a year before and that the two were joking with each other at the time. Instead, the student told officials that she felt "unable to speak about my own belief system" in Maggie's presence, and that

9

Maggie's mere words represented discrimination, harassment, or retaliation.

To another student, Maggie explained why she "refuse[d] to succumb to critical race theory": she considered it "divisive and racist in its essence." That student's report also omitted how this exchange occurred ten months earlier and how Maggie followed up by saying "how much I value you" and how she saw in this student "a beautiful heart," a "compassion for children," and a "strong warrior." All the student told officials was that she "perceived" this spoken message "as threatening."

Based on these incomplete complaints about speech, University officials issued the three no-contact orders, and they accused Maggie of committing "oppressive acts" and "misconduct." This led to her being accused of "creat[ing] a toxic and harmful learning environment" and of making "threats . . . against members of our community." All this because three private parties cloaked their disagreement and subjective offense in the language of discrimination, harassment, and threats.

Peter Perlot, Mark Miller, Ryan Alexander, and Richard Seamon—three law students and a law professor at the University of Idaho—can feel Maggie's pain. They, too, received no-contact orders without warning, jeopardizing their careers, all because students complained about their speech. See Am. V. Compl., *Perlot* v. *Green*, No. 3:22-cv-00183-DCN (D. Idaho May 17, 2022), ECF No. 17, https://bit.ly/43saop7.

In response to an anti-LGBT slur from an unknown individual, the University held a "moment of community." Peter, Mark, and Professor Seamon—all Christians involved with Christian Legal Society—attended this event to denounce the slur and marginalization of any members of the community. They and other Christian Legal Society members prayed together at the event. While they did, a student, Ms. Doe, accosted them about why Christian Legal Society believes that marriage is between one man and one woman. Mark and Professor Seamon explained that this is what the Bible teaches—a view that the Supreme Court has described as "decent and honorable." *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015). The conversation ended with Ms.

Doe and Mark civilly disagreeing with each other. Later, Peter left a note at her desk, inviting her to Christian Legal Society meetings if she wanted to discuss the issue or the group in more detail.

Three days later, Ryan and Peter attended a meeting with an American Bar Association accreditation panel. Ms. Doe and others complained about Christian Legal Society's religious views. Ryan offered a different perspective, highlighting how Ms. Doe had approached the group. He also expressed concern about religious freedom on campus, noting that Christian Legal Society's recognition had recently been delayed because of objections to its beliefs about marriage.

Three days after the panel, Peter, Mark, and Ryan all received no-contact orders, prohibiting them from contacting Ms. Doe in any way on or off campus, ordering them to sit on the opposite side of the classroom if she were present, and threatening further discipline or expulsion if they violated this order.

Meanwhile, Professor Seamon emailed Ms. Doe, offering to meet with her if she wanted to discuss everything further and making it clear that there was no problem if she didn't. Ms. Doe thanked him for "reaching out" and expressed a desire to meet with him. Days later, she changed her tune and copied the dean and associate dean on an email accusing Professor Seamon of "caus[ing] me to fear for my life at the [U]niversity of Idaho." She continued: "I fear you. I fear CLS. My life, my grades, my law school career are not safe with a professor that is actively working towards taking away my human rights." What led to this? She explained: "The group you are the admin for, subjected me and others to violent verbal abuse, in which you took the lead on and agreed with." And she threatened to seek "a restraining order from the police" if he contacted her again.

The associate dean reviewed Professor Seamon's emails with Ms. Doe, declaring them all innocent. No matter. Within weeks—and after Peter, Mark, and Ryan filed suit—Professor Seamon also received a no-contact order. Like Peter, Mark, and Ryan,

11

he was barred from contacting Ms. Doe in any way—though she was in his class—beyond what is "required for classroom assignments, discussion, and attendance."

In short, law school officials, who should know the First Amendment's protections for religious speech, used one private individual's ideological disagreement and subjective offense as an excuse to slap four people with no-contact orders.

### 3. Government officials have bragged openly about inducing social media companies to suppress pro-life speech.

As this case illustrates, government officials often urge private sector actors to silence views they dislike, and they even brag openly about it. For example, after a draft of *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), foreshadowed the demise of *Roe v. Wade*, 410 U.S. 113 (1973), more than 20 members of Congress urged Google to limit the ways internet users might find pregnancy centers that do not perform or refer for abortions.[12] U.S. Senator Mark Warner publicly boasted that he and U.S. Representative Elissa Slotkin persuaded Google to alter search results to minimize the likelihood that queries would return results listing these centers:[13]

> Back in June @RepSlotkin and I wrote to @Google urging them to improve their search results and prevent users that search for abortion clinics and services from being misled. Today I received a response from Google and am happy to report that they're taking action.[14]

He went onto say that as a result of Google's responses to his requests, users "will only see facilities that have been verified to provide abortions in the local search box on Google."[15] After these two legislators' requests, Google also announced it would begin flagging pregnancy centers with a "might not provide abortions" label.[16] Around the same time, tech company Yelp announced it would also act against these

---

[12]   Clair Duffy & Brian Fung, *Lawmakers Urge Google to Remove Misleading Results in Searches for Abortion Clinics*, CNN (Jun. 17, 2022), https://cnn.it/3L2xJqv.

[13]   Jessica Chasmar, *Google to Crack Down on Search Results for Crisis Pregnancy Centers after Dem Pressure*, FOX BUSINESS (Aug. 25, 2022), https://fxn.ws/41tmLj3.

[14]   @MarkWarner, TWITTER (Aug. 25, 2022, 1:23 PM), https://bit.ly/3zZo2m9.

[15]   @MarkWarner, TWITTER (Aug. 25, 2022, 1:23 PM), https://bit.ly/3GFK8hp.

[16]   Lisa Gutierrez, *Online Search for Abortion Can Take You to Anti-Abortion Center. Websites Take Action*, KANSAS CITY STAR (Sept. 1, 2022), https://bit.ly/40pGb7H.

pregnancy centers, singling them out with a negative label stating that they "provide limited medical services and may not have licensed medical professionals onsite."[17]

In sum, legislators spoke, and social media jumped, censoring pro-life centers in ways the government never could.

### 4. Government officials have condoned the violence and vandalism carried out by private parties to intimidate others.

To top it off, some of the most high-ranking government officials have cheered on the violence and vandalism private individuals have directed towards peaceful, law-abiding Americans due to the views they express. After a draft of the *Dobbs* decision was leaked in May 2022, vandals and arsonists began targeting pregnancy centers across the country, damaging or destroying their facilities and defacing them with messages threatening their employees and volunteers.[18] Rather than denouncing unlawful destruction and intimidation, in a speech to the Democratic Attorneys General Association, Vice President Kamala Harris commended the attorneys general for "taking on" pregnancy care centers, and engaging in public information campaigns designed to refute what she called their "predatory practice[s]."[19]

### C. Social media companies are eager to silence viewpoints they dislike, providing the government a ready source of accomplices.

Social media is the "modern public square." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). A recent study observed that 81% of Americans use YouTube,

---

[17]   Jennifer Korn, *Yelp to Begin Prominently Labeling Crisis Pregnancy Centers to Avoid Confusion*, CNN Business (Aug. 23, 2022), https://cnn.it/40bDuq7.

[18]   Tyler O'Neil, *Washington Pregnancy Center Vandalized; "If Abortion Isn't Safe, You Aren't Either"*, Fox News (May 27, 2022), https://fxn.ws/3ME7esy; *see also* Lindsey Grewe, *Fire at Colorado Pregnancy Center Being Investigated as Arson in Wake of Roe v. Wade Reversal*, KKTV (Jun. 27, 2022), https://bit.ly/40i5J6E (including the message, "If abortions aren't safe, neither are you"); Luis Fieldman, *Graffiti Reportedly Defaces Bethlehem House in Easthampton, Labeled by Some as "Crisis Pregnancy Center."* Mass Live (Aug. 19, 2022), https://bit.ly/3KJpjD1 (including the message "If abortions aren't safe, neither are you!"); Hannah Mackay, *Police Seek Information on Anti-Abortion Pregnancy Center Vandalism*, The Detroit News (Sept. 23, 2022), https://bit.ly/3L3ToNR (including the message, "if abortion isn't safe neither are you"); WCCO Staff, *Vandals Target Minneapolis Pregnancy Center*, CBS News (Mar. 4, 2023), https://cbsn.ws/40amd0x (including the message, "If abortions aren't safe, neither are you").

[19]   Max Thornsberry, *Kamala Harris Praises Dem AGs for 'Taking on' Crisis Pregnancy Centers Rocked by Violence*, Fox News (Sept. 22, 2022), https://fxn.ws/3A5mlnj.

69% use Facebook, and almost half get their news from social media.[20] These companies have become highly centralized,[21] which is unsurprising since they "derive much of their value from network size." *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring). This places vast control over large amounts of speech in the hands of a small number of private corporations.

But these companies do not respect free speech. Instead, they restrict speech using ill-defined and subjective terms like "hate speech," which allows them to censor disfavored content or viewpoints. Courts have repeatedly struck down these policies when used by the government, but these companies generally are not subject to the First Amendment. And they have repeatedly shown that they will enforce these policies against disfavored views.

Their policies are rife for abuse—by the companies themselves, by activists, and by government officials seeking an end-run around the First Amendment. This presents an existential threat to free speech, and courts should provide the most stringent review for any government influence in social media censorship.

1. **Many social media companies have policies replete with speech-threatening terms, setting the stage for unlawful censorship.**

According to the Viewpoint Diversity Score Business Index,[22] most of the largest social media companies have unclear or imprecise restrictions on speech that allow for invidious and veiled forms of viewpoint- and content-discrimination. These companies purport to prohibit "hateful," "intolerant," or "offensive" speech, and "harassment."[23] These policies typically mirror discrimination or harassment policies that

---

[20]  *Social Media Use in 2021*, PEW RESEARCH CTR. (Apr. 7, 2021), https://pewrsr.ch/3zZLtvL; Mason Walker & Katerina Eva Matsa, *News Consumption Across Social Media in 2021*, PEW RESEARCH CTR. (Sept. 20, 2021), https://pewrsr.ch/3MN0rwL.

[21]  Facebook and YouTube alone receive over 50% of all social media site visits, and the top 10 social media companies, 3 of which are owned by Meta, receive over 85%. Karl, *Top 10 Social Networking Sites by Market Share Statistics [2023]*, DreamGrow (Mar. 12, 2023), https://bit.ly/41p3KhG.

[22]  The Index is the first comprehensive benchmark designed to measure corporate respect for religious and ideological diversity in the market, workplace, and public square. Viewpoint Diversity Score, *About Us*, https://bit.ly/40jg3LH.

[23]  Viewpoint Diversity Score, *2022 Business Index* 10–11 (May 2022), *available at*

would violate the First Amendment if enforced by the government.

For example, the City of St. Paul once passed an anti-bias ordinance barring speech that would "arouse[] anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 380 (1992). This ordinance prohibited a person from making the forbidden statements about race, religion, gender, and color, but it would allow them to make similar statements about other ideas, like political affiliation or union membership. It only applied if the speech was "addressed to one of the specified disfavored topics." *Id.* at 391. Thus, the ordinance imposed "special prohibitions on those speakers who express views on disfavored subjects," the very essence of content-based discrimination. *Id.*

Yet social media companies restrict speech using virtually identical terms. For example, YouTube prohibits "hate speech," which it defines as speech that "incites hatred . . . against groups based on protected attributes such as age, gender, race, caste, religion, sexual orientation, or veteran status."[24] Meta (*a.k.a.*, Facebook) uses virtually identical terms,[25] as does Twitter.[26]

If government officials enforced such policies, they would violate the First Amendment. For example, the Third Circuit struck down a harassment policy that applied to any speech that "offends, denigrates, or belittles an individual" based on their religious traditions, racial customs, sexual orientation, and other personal characteristics. *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 218–19 (3d Cir. 2001). The policy was unconstitutionally overbroad because it "could conceivably be applied to cover any speech about some enumerated personal characteristics the content of

---

https://bit.ly/3MDe2qb.

[24] YouTube, *How Does You Tube Protect the Community from Hate and Harassment?*, https://bit.ly/3zZYSE5.

[25] Meta, *Hate Speech*, https://bit.ly/3GJ2L3X ("We define hate speech as a direct attack against people . . . on the basis of what we call protected characteristics: race, ethnicity, national origin, disability, religious affiliation, caste, sexual orientation, sex, gender identity and serious disease").

[26] Twitter, *Hateful Conduct*, https://bit.ly/3o5m29b ("You may not directly attack other people on the basis of race, ethnicity, national origin, caste, sexual orientation, gender, gender identity, religious affiliation, age, disability, or serious disease.").

which offends someone." *Id.* at 217. And "[t]he Supreme Court has held time and again . . . that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it." *Id.* at 215. Similarly, the Sixth Circuit invalidated a discriminatory harassment policy prohibiting "any intentional, unintentional, physical, verbal, or nonverbal behavior that subjects an individual to an intimidating, hostile or offensive educational, employment, or living environment." *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995). It could not pass constitutional muster because its application depended on enforcement officials' subjective judgment about what qualifies as "negative" or "offensive" speech. *Id.* at 1184.

Nevertheless, social media companies' policies are replete with restrictions that would violate the First Amendment if enforced by government officials. They even use the same terms courts have repeatedly struck down as unconstitutional:

| Terms of Social Media Speech Restrictions[27] | Terms of Unconstitutional Speech Restrictions |
|---|---|
| • "targets, insults and abuses"<br>• "incites hatred"<br>• "promote hostility and malice" | • "threats, insults, epithets, ridicule, or personal attacks"[28]<br>• "stigmatize or victimize"[29]<br>• "derogatory comments"[30]<br>• "offends, denigrates or belittles"[31]<br>• "acts of intolerance which demonstrate malicious intent toward others"[32] |

There is simply no meaningful distinction between the two lists. Social media companies' policies are littered with vague, subjective terms that decades of First Amendment case law say pose real and substantial threats to the freedom of speech. Nor do those policies even remotely resemble the constitutionally permissible definition of harassment or any other category of speech outside the First Amendment's protection. *See, e.g.*, *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999) (defining

---

[27] All terms are drawn from the YouTube, Meta, and Twitter policies cited in footnotes 24–26.

[28] *Roberts v. Haragan*, 346 F. Supp. 2d 853, 872 (N.D. Tex. 2004).

[29] *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 853 (E.D. Mich. 1989).

[30] *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. #204*, 523 F.3d 668, 670 (7th Cir. 2008).

[31] *Saxe*, 240 F.3d at 215.

[32] *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 370 (M.D. Pa. 2003) (cleaned up).

"harassment" as conduct that is "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities"); *United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (listing the "well-defined and narrowly limited classes of speech" beyond the First Amendment's protection); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790–91 (2011) (same).

Meta has even candidly admitted that "there is no universally accepted answer for when something crosses the [hate speech] line" and that people have "very different levels of tolerance for speech about protected characteristics."[33] This concession confirms a disturbing truth—our freedom to express our views is subject to the caprice, whim, and subjective judgments of social media employees and algorithms. This admission is also symptomatic of the larger problem: "hate speech" is not a workable standard. It is vague, subjective, and invites the censorship of views that either the company or some disgruntled user may find offensive. Such arbitrary censorship is precisely what the First Amendment was designed to address.

What's worse, social media companies do not have to be transparent about their decision-making process. This causes users to self-censor and allows the companies to discriminate covertly and without accountability. The absence of clear standards is troubling because "[s]tandards provide the guideposts that . . . allow courts quickly and easily to determine whether the [censoring party] is discriminating against disfavored speech. Without these guideposts, *post hoc* rationalizations . . . and the use of shifting or illegitimate criteria are far too easy[.]" *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988).

But since social media companies are not subject to these standards, content-based and viewpoint-based discrimination can fester under their ill-defined

---

[33]  Richard Allan, *Hard Questions: Who Should Decide What Is Hate Speech in an Online Global Community?*, META (Jun. 27, 2017), https://bit.ly/3odlw9q.

censorship policies. This makes them enticing targets for activists and government actors who want to circumvent the First Amendment, creating the opportunity for what Professor Eugene Volokh calls "censorship creep." Eugene Volokh, *Treating Social Media Platforms Like Common Carriers?*, 1 J. FREE SPEECH L. 377, 395–400 (2021). He observed that not only will the social media companies be increasingly inclined to exercise more censorial power over time, but also third parties will subject them to ever increasing public pressure "to suppress . . . supposedly dangerous speech." *Id.* at 399. That is, "People will demand: If you blocked *A*, why aren't you blocking *B*? Aren't you being hypocritical or discriminatory?" *Id.* And since the social media companies are working with vague and subjective standards, "there is little reason to think that the platforms will enforce the rules in any generally politically neutral way." *Id.* at 400. As this happens, the "modern public square" will cease to ensure, protect, or respect genuine free speech. *Packingham*, 582 U.S. at 107.

### 2. Social media companies have repeatedly demonstrated their willingness to censor the speech of Americans.

Social media companies have shown a willingness to shut down broad swaths of speech coming from those on the political right. This is perhaps most vividly illustrated in the way they have silenced speech questioning gender identity ideology.

In January 2021, Twitter locked Focus on the Family out of the Twitter account of its news platform (*The Daily Citizen*) for stating that one of President Biden's nominees is a man who identifies as a woman.[34] The full tweet said:

> On Tuesday, President-elect Joe Biden announced that he had chosen Dr. Rachel Levine to serve as Assistant Secretary for Health at the Department of HHS. Dr. Levine is a transgender woman, that is, a man who believes he is a woman.[35]

The tweet linked to an article on *The Daily Citizen's* website and repeated the first

---

[34]   Gabe Kaminsky, *Twitter Locked Focus on the Family's Account Because the Christian Group Said Boys and Girls Are Different*, THE FEDERALIST (Feb. 22, 2021), https://bit.ly/417qkvB.
[35]   *Id.*

two sentences of that article.[36] Twitter told Focus on the Family that the post violated its "rules against hateful conduct" and "promoted violence, threatened, or harassed" Dr. Levine.[37] So according to Twitter, describing what the term "transgender woman" means using basic biological terms is "hateful," "harassing," and even violent. Twitter denied Focus on the Family's appeal and lifted the ban only after four long months.[38]

The Heritage Foundation, a conservative think tank and public policy organization, also had its content on gender identity censored. YouTube removed a Heritage video featuring Walt Heyer, a male who once identified as female. Heyer stated that individuals are "not born transgender," that gender dysphoria "is a childhood developmental disorder," and that "our schools are complicit" in encouraging children experiencing gender dysphoria to present as the opposite sex.[39] YouTube removed the video, claiming Heyer's remarks violated its "hate speech" policy,[40] and it denied Heritage's appeal.[41] Emilie Kao, former director of Heritage's DeVos Center for Religion and Society, noted that "YouTube . . . decided, under the guise of 'hate speech,' to censor the viewpoint that it doesn't like. This won't help children and families struggling with [gender dysphoria] who want information from both sides of the debate."[42]

Facebook similarly banned Robert Gagnon, Professor of New Testament Theology at Houston Baptist University and renowned expert on what the Bible teaches on sexuality, for 24 hours after he criticized the Biden Administration's gender identity executive order for, among other things, violating female military personnel's dignity and privacy by forcing them to shower with men who identify as women.[43] To

---

[36]   Zachary Mettler, *Biden to Nominate Controversial Transgender Doctor for Assistant Health and Human Services Secretary*, DAILY CITIZEN (Jan. 19, 2021), https://bit.ly/417rEP5.

[37]   Kaminsky, *supra* note 34.

[38]   @TheDailyCitizen, TWITTER (May 18, 2021), https://bit.ly/3UvZOti.

[39]   Emily Jashinsky, *Exclusive: Man Tried to Share His Regrets About Transgender Life. YouTube Censored It*, THE FEDERALIST (Jun. 19, 2020), https://bit.ly/43w6XxJ.

[40]   *Id.*

[41]   *Id.*

[42]   *Id.*

[43]   Rod Dreher, *The Tyranny of Tech and Trans*, THE AM. CONSERVATIVE (Jan. 27, 2021),

Facebook, this somehow violated its policy against "violence and incitement."[44]

In each situation, social media companies picked which ideological views they prefer and silenced those with differing opinions. These companies have regrettably opted for suppression and censorship over dialog and debate.

### 3. The government teaming up with "big tech" to censor speech poses severe and pervasive threats to the free exchange of ideas.

Because social media is the modern public square and is concentrated in a few big tech companies, it is concerning that these companies censor mainstream political and religious views. That concern grows exponentially when the government enlists these companies as censors of disfavored views. Permitting this to happen would allow the government to circumvent the First Amendment.

All signs point to a growing government influence over social media. The Biden Administration admitted as early as 2021 that it was flagging and reporting posts on Facebook, YouTube, and other platforms as Covid-19-related "misinformation."[45] A recent report found that the U.S. State Department sent $330 million to The Global Disinformation Index, a British organization that is attempting to discredit and blacklist many conservative news outlets for peddling "disinformation."[46] And as the Twitter Files have made clear, Twitter worked with various federal agencies, including the FBI, over several years to target Republican leaders, conservative activists, and certain media outlets.[47]

The danger of big tech social media companies and the government teaming up to censor the speech of everyday Americans presents an existential threat to free

---

https://bit.ly/3zYhynM.

[44]   *Id.*

[45]   David Sacks, *Get Ready for the 'No-Buy' List*, COMMON SENSE WITH BARI WEISS (July 30, 2021), https://bit.ly/3o6on3L.

[46]   Robby Soave, *U.S. State Department Funds a Disinformation Index That Warns Advertisers to Avoid Reason*, REASON (Feb. 14, 2023), https://bit.ly/3o9Y8cL.

[47]   *The Cover Up: Big Tech, the Swamp, and Mainstream Media Coordinated to Censor American's Free Speech*, U.S. HOUSE COMM. ON OVERSIGHT & ACCOUNTABILITY (Feb. 8, 2023), https://bit.ly/3MFJqV6; Joseph A. Wulfsohn, *What Elon Musk's Twitter Files Have Uncovered About the Tech Giant So Far*, FOX NEWS (Jan. 22, 2023), https://fxn.ws/41jtsEs.

speech and our ability to have reasoned, unmanipulated discourse. The First Amendment should provide the strongest possible protection against it.

It's not just the social media companies and the government that are creating this existential threat to the free speech. The financial sector is also getting in on the action. One of PayPal's founders warned of this when he highlighted how "the ever-increasing list of suspects" whose speech is censored "has grown from unquestionable hate groups, like neo-nazis and the KKK, to organizations who espouse socially conservative views, like the Family Research Council, religious liberty advocates, and even groups concerned with election integrity."[48] Activists are calling on the financial industry to stop donations to these so-called "hate groups,"[49] and many financial institutions have shown a troubling trend of de-banking conservative and religious groups.[50] Worse yet, they have often been prodded to do so by the government. Perhaps most famously, the government illegally pressured financial institutions to deny services to political opponents as part of Operation Chokepoint.[51]

## II. The government has no business determining which views are right or wrong, let alone which should be silenced.

For far too many these days—from the heads of government bureaucracies, to scions of business, to agitators in a mob—"[p]ersecution for the expression of opinions seems . . . perfectly logical." *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). They "have no doubt of [their] premises or [their] power and want a certain result with all [their] heart." *Id*. So they seek to "express [their] wishes in law and sweep away all opposition." *Id*.

There is only one problem. This approach is unconstitutional. Under the

---

[48] Sacks, *supra* note 45.

[49] Jeremy Tedesco, *Cancel Culture Targets Charity*, WALL ST. J. (Jan. 18, 2022), https://on.wsj.com/3MFnbyu.

[50] Viewpoint Diversity Score, *Statement on Debanking and Free Speech*, (Nov. 10, 2022), https://bit.ly/3L0whoA.

[51] Dennis Shaul, *There's No Downplaying the Impact of Operation Choke Point*, AM. BANKER (Nov. 28, 2018), https://bit.ly/2TYnIxH.

Constitution, the government has no role deciding which views are right or wrong, let alone which can be expressed. For as Justice Holmes observed over a century ago:

> But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out. That at any rate is the theory of our Constitution.

*Id*. Both history and precedent confirm the wisdom of his observation.

Our history is full of examples of once-dominant opinions being challenged and later even discarded thanks to vigorous societal debate. Slavery once held such sway that Congress imposed a gag-order on the subject. The government declared that debate over and the issue settled, until John Quincy Adams defied the gag order, much to our nation's credit and benefit. At one time Congress created a statutory basis for internment camps, President Roosevelt consigned Japanese-Americans to them, and the Supreme Court affirmed these actions. *See Korematsu v. United States*, 323 U.S. 214 (1944). In other words, all three branches of the federal government declared the issue settled. Of course, the "court of history"—thanks to the benefit of unfettered debate in a free society—had a very different verdict. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) (noting *Korematsu* "was gravely wrong the day it was decided, has been overruled in the court of history, and . . . has no place in law under the Constitution" (cleaned up)). Racial segregation also once held such societal sway that the Supreme Court affirmed it. *See Plessy v. Ferguson*, 163 U.S. 537 (1896). Yet again, the unfettered debate that is the hallmark of our nation led to this odious notion rightfully being discarded. *See Brown v. Bd. of Educ. of Topeka*, 374 U.S. 483 (1954).

While this history provides a helpful frame of reference, the very facts of this case illustrate the same reality. Just three short years ago, the government—including many Defendants—declared the idea that Covid-19 leaked from a lab in Wuhan to be dangerous misinformation and a conspiracy theory that needed to be

suppressed.[52] Dr. Collins declared this theory "outrageous," "debunk[ed]," and a "very destructive conspiracy." Pl.'s Suppl. Br. in Supp. of Mot. for Prelim. Inj. at 23, ECF No. 212-2, PageID.15596. Dr. Fauci dubbed it a "shiny object that will go away in time." *Id.* Both took steps to suppress it in both "main stream and social media," with Dr. Fauci describing these efforts as suppressing "the threat of further distortions on social media." *Id.* at 24, PageID.15597. The government declared the debate over and the science settled. But it wasn't. The U.S. Department of Energy has now concluded that the lab-leak theory is the most likely explanation for the pandemic.[53]

*Amicus* takes no position on the accuracy of the lab-leak theory. The point is this: something that a few government officials declared outlandish a few years ago has now been determined credible by another government agency. This is an important and vivid reminder of why this nation has wisely refused to give government officials the power to end debate by silencing views it deems misguided.

On top of experience, decades of First Amendment precedent confirm that the government simply does not have the power to declare certain views "right" by silencing others. Our "constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *United States v. Alvarez*, 567 U.S. 709, 723 (2012). Rather, the "remedy for speech that is false is speech that is true. . . . The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth." *Id.* at 727. This "is the ordinary course in a free society" that recognizes that "[f]reedom of speech and thought flows not from the beneficence of the state but from the inalienable rights of the person." *Id.* at 727–28. Because this is true when someone falsely claims to have received the Medal of Honor, which is what

---

[52] *See, e.g.*, Ethan Siegel, *The Wuhan Lab Leak Hypothesis Is a Conspiracy Theory, Not Science*, FORBES (Jun. 3, 2021), https://bit.ly/3GJ34vI.

[53] *See, e.g.*, Jeremy Herb & Natasha Bertrand, *US Energy Department Assesses Covid-19 Likely Resulted from Lab Leak, Furthering US Intel Divide over Virus Origin*, CNN (Feb. 27, 2023), https://cnn.it/3KI9dJU; Ashley Carnahan, *COVID Lab Leak Theory Appears Vindicated after Energy Department Report: "They Censored Us, Trashed Us,"* FOX NEWS (Feb. 27, 2023), https://fxn.ws/418h6iu.

happened in *Alvarez*, it is all the more true for far more significant public debates, like debates over pandemics and public health measures.

Nor is this a new concept. Even in the throes of World War II, the need for national unity bowed to the "fixed star in our constitutional constellation"—that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 640–42 (1943). Why? Because we "set up government by the consent of the governed, and the Bill of Rights denies those in power any legal opportunity to coerce that consent. Authority here is to be controlled by public opinion, not public opinion by authority." *Id.* at 641. And the freedoms our Constitution protects extend to the "right to differ as to things that touch the heart of the existing order." *Id.* at 642.

Even after World War II ended, we recognized that the "vitality of civil and political institutions in our society depends on free discussion," that this was the only way to ensure that "government remains responsive to the will of the people" and open to "peaceful change," and that the "right to speak freely . . . is . . . one of the chief distinctions that sets us apart from totalitarian regimes." *Terminiello v. City of Chi.*, 337 U.S. 1, 4 (1949). Thus, there is "no room under our Constitution" for anything that "lead[s] to standardization of ideas either by legislatures, courts, . . . dominant political or community groups," or the government acting via private parties. *Id.* at 4–5.

Indeed, even in K–12 schools, "students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate" or of only "those sentiments that are officially approved." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). This is all the more true at the university level. *See Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967) (noting First Amendment prohibits casting a "pall of orthodoxy over the classroom"). We recognize that "[n]o field of education is so thoroughly comprehended by man that new discoveries

24

cannot yet be made." *Id.* Thus, "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id.*

What is true of our teachers and students is also true for the rest of us. We must "remain free to inquire, to study and to evaluate, to gain new maturity and understanding," especially on issues of national and even international import. *Id.* And the government has no business casting "a pall of orthodoxy" over those debates, *id.*, including by enlisting the aid of large social media companies.

CONCLUSION

Throughout our history, we have recognized that government leaders—whether hereditary like King George III, elected like presidents and congressmen, or appointed like judges and heads of bureaucracies—are fallible. Hence, we have not given them the power to declare which views are true or false, which are right or wrong, and which should be voiced or silenced. Government officials should not be allowed to sidestep these protections, which are essential for us to remain a free society in which the "consent of the governed" has real meaning, by enlisting the aid of social media companies who have eagerly picked sides and enthusiastically muzzled their opponents. Thus, this Court should grant Plaintiffs' motion.

Respectfully submitted this 18th day of April, 2023.

*/s/ Brian W. Arabie*

BRIAN W. ARABIE
Louisiana Bar No. 27359
**SIGLER ARABIE & CANNON, LLC**
630 Kirby Street (70601)
P.O. Box 1550 (70602)
Lake Charles, Louisiana
Telephone: (337) 439–2033
Facsimile: (337) 439–7837
brian@siglerlaw.com

TRAVIS C. BARHAM*
Arizona Bar No. 024867
Georgia Bar No. 753251
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Rd. NE, Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Facsimile: (770) 339–6744
tbarham@ADFlegal.org

TYSON C. LANGHOFER*
Arizona Bar No. 032589
**ALLIANCE DEFENDING FREEDOM**
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707–4655
Facsimile: (571) 707–4656
tlanghofer@ADFlegal.org

* Motion for admission *pro hac vice* filed simultaneously.

*Attorneys for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of April, 2023, I filed a true and accurate copy of the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sends an electronic notification to all attorneys of record:

Respectfully submitted on this the 18th day of April, 2023.

*/s/ Brian W. Arabie*
BRIAN W. ARABIE
*Attorney for Amicus Curiae*