# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

STATE OF LOUISIANA, STATE OF MISSOURI, *et al.*,

    Plaintiffs,

v.

JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,

    Defendants.

No. 3:22-cv-01213-TAD-KDM

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND FOR LEAVE TO AMEND THE COMPLAINT TO ADD CLASS ALLEGATIONS**

Defendants contend that their federal censorship activities are so widespread, diffuse, and disconnected that this case can only be litigated through thousands of individual lawsuits against dozens upon dozens of separate Defendants. Doc. 244, at 9-11. The evidence—which Defendants studiously ignore—tells a different story. It demonstrates a heavily interconnected web of federal censorship activities—a federal "Censorship Enterprise"—that affects all class members. Rule 23(b)(2) is tailor-made to address such situations of massive, widespread civil-rights violations.

**ARGUMENT**

I.   **The Proposed Classes Are Ascertainable and Precisely Defined.**

Defendants argue that the class definitions are "insufficiently precise." Doc. 244, at 7. This is incorrect. "[A]scertainability requires only that the court be able to identify class members at some stage of the proceeding." *Vita Nuova, Inc. v. Azar*, No. 4:19-CV-00532-O, 2020 WL 8271942, at *3 (N.D. Tex. Dec. 2, 2020) (quoting *Frey v. First Nat'l Bank Sw.*, 602 F. App'x 164, 168 (5th Cir. 2015) (citations omitted)). A class definition "is not overly vague" when it is "easily defined under the plain meaning of its composite terms." *Id.* Both classes are precisely defined.

First, Defendants argue that the word "after" in the definition of Class 1 is vague. *Id.* Not so. "After" means "following in time." *After*, Merriam-Webster Online, *at* https://www.merriam-webster.com/dictionary/after. Defendants argue that "after" is "vague" because it is supposedly "unclear whether the act of flagging the speech must *cause* the moderation decision." Doc. 244, at 7. But "after" means "following in time," not "caused by," so that vagueness does not exist.

Next, Defendants argue that the word "flag" is too vague to understand. The dictionary disagrees. To "flag" means "to mark or identify with or as with a flag." *Flag*, Merriam-Webster Online, *at* https://www.merriam-webster.com/dictionary/flag. In fact, Defendants themselves

1

repeatedly use the word "flag" to describe calling platforms' attention to content for censorship.[1] Defendants also argue that it is unclear whether "flagging" includes only "particular social media posts" or "general content." Doc. 244, at 7. This argument is meritless. Both individual posts and broader issues or narratives can be "flagged," as Defendants' own usage shows. *Compare* Doc. 214-1, ¶ 34, ¶ 147; *with id.* ¶ 481, ¶ 1179. Next, Defendants argue that it is unclear whether "flagging" must occur in a "*bilateral communication*." Doc. 244, at 7. But nothing in the above-quoted definition of "flag" limits "flagging" to bilateral communications only; content is "flagged" if is "mark[ed] or identif[ied] … as with a flag." That is the term's plain meaning.

Next, Defendants argue that the phrase "for suppression" is vague. "Suppression" is clearly defined in the proposed Third Amended Complaint and prior Complaints. *See* Doc. 84, ¶ 132; Doc. 227-10, ¶ 131. "For" is "used as a function word to indicate purpose," "used as a function word to indicate an intended goal," and "used as a function word to indicate the object or recipient of a[n] … activity." *For*, Merriam-Webster Online Dictionary, *at* https://www.merriam-webster.com/dictionary/for. Thus, content is flagged "for suppression" whenever the objective content and context of the communication indicates that that content is to be considered for censorship or suppression by the platforms. *See id.* Plaintiffs' evidence abounds with such communications flagging speech "for suppression." *See, e.g.,* Doc. 214-1, ¶¶ 34, 36, 38, 168, 481, 1081. Contrary to Defendants' suggestion, the class definition does not require probing into "a Defendants' subjective intention in flagging a post," nor does it require "that the Defendant

---

[1] *See, e.g.,* Doc. 214-1, ¶ 34 (Clarke Humphrey: "Flagging Hank Aaron misinfo"); ¶ 43 (Rob Flaherty: "Do you have a sense of how many are being flagged…"); ¶ 147 (Psaki: "We're flagging problematic posts for Facebook…"); ¶ 158 (Psaki); ¶ 326 (Surgeon General Murthy); ¶ 481 (Carol Crawford: "here are two issues that we are seeing a great deal of misinfo on that we wanted to flag for you all"); ¶¶ 490, 495 (Crawford); ¶ 811 (NIAID); ¶ 923 (Elvis Chan: "The FBI flagged the NAEBC site…."); ¶ 1096 (Lauren Protentis: "steps for flagging … MDM content").

verbally request the post's 'suppression.'" Doc. 244, at 7. All that is required is that the objective content and context of the communication indicate that the content is being flagged for possible censorship by the platform—*i.e.*, "for suppression." *See* Doc. 227-10, ¶ 131.

As to the definition of Class 2, Defendants argue that the term "induced" is vague. Doc. 244, at 8. Again, this is meritless. To "induce" is "to move by persuasion or influence," or to "bring about by influence or stimulation." *Induce*, Merriam-Webster Online Dictionary, *at* https://www.merriam-webster.com/dictionary/induce. Defendants argue that this term is unclear because it does not clarify whether it includes only those changes that were specifically requested. Doc. 244, at 8. Not so. All changes that are "induced," *i.e.*, brought about by Defendants' actions, are included within the meaning of that word. "[S]pecifically request[ing]" a change is not the only way of "inducing" it, and nothing in the definition suggests this artificial limitation.

Next, Defendants argue that the phrase "enforcement practice" is vague because it might include either "a discrete period of time," or "a longer period of time." Doc. 244, at 8. Again, this is incorrect. A "practice" is a "repeated or customary action," or a "usual way of doing something." *Practice*, Merriam-Webster Online Dictionary, *at* https://www.merriam-webster.com/dictionary/practice. The definition does not require a "practice" to be of a particular length. Both short-lived and longstanding "practices" fall within the definition, so long as they are "repeated," "customary," or "usual" while occurring. *See id.*

Next, Defendants argue that the phrase "or will" is ambiguous. Doc. 244, at 8. "Or" is "a function word to indicate an alternative," and "will" is an "auxiliary verb … used to express futurity." *Or, Will*, Merriam-Webster Online Dictionary, *at* https://www.merriam-webster.com/dictionary/or, /will. The classes thus include members who are not yet, but will become, victims of Defendants' censorship in the future. *See id.* Rule 23(b)(2) classes are often

3

defined to include such future members. *See, e.g., Jack v. Am. Linen Supply Co.*, 498 F.2d 122, 124 (5th Cir. 1974); *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000).

Finally, Defendants argue that the terms "friends with" and "otherwise connected to" might refer to "just standard friendships." Doc. 244, at 9. Not so. The definition includes "social-media users who … *follow, subscribe to, are friends with, or are otherwise connected to the accounts of users*" who are victims of censorship. Doc. 227-1, at 5 (emphasis added). In this context, both "friends with" and "otherwise connected to" plainly refer to *social-media* connections. "[O]therwise connected to the *accounts* of users," *id.* (emphasis added), refers to connections with social-media accounts, not "standard friendships." Likewise, "friends with … users" plainly refers to *social-media* connections, like every other item on the same list. *See* ANTONIN SCALIA AND BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 31, at 195 (2012) ("[W]ords grouped in a list should be given related meanings.") (the "associated-words canon").

## II. The Proposed Class Definitions Satisfy Commonality.

Next, Defendants argue that the proposed classes fail to satisfy commonality. *See* Doc. 244, at 9-20. This is incorrect. For commonality to be satisfied, the class members' "claims must depend upon a common contention" that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Commonality is satisfied where there is "some glue holding the alleged reasons for all those decisions together," such that "examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id.* at 352. Notably, for Rule 23(b)(2) classes, only *one* such common question is required. *Id.* at 359.

Here, there are not just one, but many such common questions. First and foremost, all Defendants' federal censorship activities "occur[] against the backdrop of a steady and ongoing drumbeat of public threats from senior federal officials who demand greater censorship from social-media platforms and threaten adverse legal consequences … against the platforms if they do not increase censorship of disfavored viewpoints." Doc. 214, at 15; *see also* Doc. 214-1, ¶¶ 1–30. Plaintiffs contend that this constant backdrop of public threats—including threats from Executive Branch officials such as President Biden, Jennifer Psaki, and Kate Bedingfield, Doc. 214-1, ¶¶ 19-30—renders coercive Defendants' various actions of demanding, pressuring, cajoling, and colluding with social-media platforms to suppress speech. Doc. 214, at 17. This issue raises common factual questions—such as whether this campaign of threats occurred, and whether it had a coercive effect on the social-media platforms. *See* Doc. 214-1, ¶¶ 945-961 (Elvis Chan attesting that such pressure has a coercive effect on platforms); ¶ 1234 (Alex Stamos making similar statements). It raises a common legal question – whether such threats render Defendants' conduct unlawfully coercive. *See* Doc. 214, at 17-18. This issue alone satisfies commonality.

There are many similar common factual and legal questions. The White House engaged in an egregious public and private pressure campaign to procure the censorship of disfavored viewpoints. Doc. 214, at 8-10; Doc. 214-1, ¶¶ 31-211. The Surgeon General and his staff conducted a similar pressure campaign in coordination with the White House. Doc. 214, at 10-13; Doc. 214-1, ¶¶ 212-425. Dr. Fauci and the FBI engaged in elaborate campaigns of deception to induce social-media platforms to censor disfavored content and viewpoints, such as the lab-leak theory and the Hunter Biden laptop story. *See* Doc. 214, at 19-27; Doc. 214-1, ¶¶ 596-808, 840-852 (Dr. Fauci); Doc. 214, at 27-29; Doc. 214-1, ¶¶ 868-904 (FBI). All these campaigns raise common factual questions, such as whether and how such campaigns occurred; and common legal

questions, such as whether such conduct was unlawful. Likewise, the CDC's collusion with platforms to censor disfavored viewpoints, Doc. 214, at 31-33, and the FBI's and CISA's longstanding collusion with platforms on censorship, *id.*, at 34-39, raise common questions of fact about the occurrence of such conspiracy and collusion, and common questions of law regarding whether these agencies' collusion violates the First Amendment, *see* Doc. 214, at 29-31. CISA's, the GEC's, and other federal officials' involvement with the Election Integrity Partnership and the Virality Project, *id.* at 42-51, raises common questions of fact about the nature of federal-official involvement in such joint public-private censorship enterprises, and common questions of law about whether these arrangements violate the First Amendment. *See id.* at 41-42. And so forth.

This case, therefore, is the antithesis of *Wal-Mart v. Dukes*, on which Defendants heavily rely. In *Wal-Mart*, the Supreme Court engaged in an extensive, careful *factual* analysis to conclude that Wal-Mart's putative liability for discrimination against each class member would turn, almost entirely, on *individualized* questions that were not common to the class. *Wal-Mart*, at 564 U.S. at 351-58. Here, the opposite is true. Most critical questions associated with liability turn on facts and legal questions that are *not* dependent on an individualized, member-specific determination, but are the same for every class member. *See supra*. In fact, the first 334 pages and 1,365 paragraphs of Plaintiffs' Proposed Findings of Fact raise common factual questions whose resolution does not vary by class member. *See* Doc. 214-1, at 1-334, ¶¶ 1–1,365. And Plaintiffs' legal arguments raise at least five common legal questions about federal officials' responsibility for social-media censorship, among many others. Doc. 214, at 4-8, 14, 18-19, 29-31, 41-42.

In arguing to the contrary, Defendants contend that each Defendant's conduct must be viewed in isolation, so that a class member affected by (for example) the White House's censorship would not share common issues with a member affected by CISA's censorship, etc. Doc. 244, at

6

9-11. This argument fails for three reasons. First, even if it were true, the "backdrop" of public threats rendering *all* Defendants' conduct unlawfully coercive raises questions of fact and law common to every class member, as discussed above. *See* Doc. 214, at 15, Doc. 214-1, ¶¶ 1-30.

Second, both classes are defined to include *audience members* of social-media speech, not just speakers. Each class representative has a strong interest in following uncensored discourse on social media, free from federal censorship, regardless of which federal Defendant or topic of discourse is involved. *See* Doc. 227-5, ¶¶ 3-5 (Bhattacharya); Doc. 227-6, ¶¶ 3-5 (Kulldorff); Doc. 227-7, ¶¶ 3-6 (Kheriaty); Doc. 227-8, ¶¶ 4-7 (Hoft); Doc. 227-9, ¶¶ 3-6 (Hines). Through them, class members assert an interest in being able to read and follow social-media speech affected by the censorship activities of *all* Defendants, not just the specific Defendants who have induced platforms to censor their particular speech. Thus, the common factual and legal questions surrounding the censorship campaigns of each federal Defendant are common to both classes, because both classes are defined as classes of potential *audiences*, as well as speakers.

Third, by treating each Defendants' censorship conduct as occurring in isolation from each other, Defendants overlook extensive evidence of the interconnected nature of the federal censorship activities. For example, the White House's pressure campaign is closely integrated with the Office of Surgeon General, as the OSG participates in the very same pressure campaign as the White House, Doc. 214-1, ¶ 212. Likewise, the censorship campaign of the CDC and the Census Bureau draws directly from White House pressure. *Id.* ¶ 426. NIAID and NIH censorship efforts are intertwined and reinforced by CDC. *Id.* ¶ 827. CISA, FBI, DOJ, ODNI, and other federal agencies are jointly involved in pressuring and colluding with platforms, even participating in the same meetings, the same collusive activities, and the same campaigns of pressure and deception. *Id.* ¶¶ 861-866. CISA, the FBI, and other federal law-enforcement and national-

security agencies colluded on the suppression of the Hunter Biden laptop story. *Id.* ¶¶ 880-894. NIAID and NIH, through their directors Dr. Fauci and Dr. Francis Collins, conspired together on a series of censorship campaigns, including relating to the lab-leak theory and the Great Barrington Declaration. *Id.* ¶¶ 596, 598-756, 777-808. NIAID is embedded in the White House's censorship activities, and Dr. Fauci reinforced the White House's covert and overt attempts to deplatform Alex Berenson. *Id.* ¶¶ 596, 840-852. CISA and the GEC effectively coordinate both with each other and with private entities in a massive surveillance and censorship project through the Election Integrity Partnership. *Id.* ¶¶ 1132, 1135, 1153-54, 1175, 1197. OSG, the CDC, and other federal officials coordinate with each other and with the same private entities as CISA and the GEC through the Virality Project. *Id.* ¶¶ 1279, 1284. High-level congressional staffers coordinate with the FBI on pressuring platforms to increase censorship in secret meetings conducted in Silicon Valley. *Id.* ¶¶ 950-958. The White House's campaign of public threats against platforms demanding greater censorship, reinforced by its political allies in Congress and other senior federal officials, grants coercive force to *all* the censorship efforts of *all* the federal agencies involved. *Id.* ¶ 1-30. And so forth. The evidence demonstrates an extensively integrated and interrelated scheme of censorship by all Defendants "across the federal enterprise." Doc. 227-10, ¶ 285.

### III. All Class Members Will Benefit From a Single Injunction.

Rule 23(b)(2) provides that a "class action may be maintained if … the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Defendants argue that "different sets of members will allegedly be affected by different Defendants in different ways, and so each would be 'entitled to a different injunction.'" Doc. 244, at 21 (citing *Wal-Mart*, 564 U.S. at 360). This is incorrect for multiple reasons.

8

First, when contending that each class member would be entitled to a "*different* injunction," *Wal-Mart*, 564 U.S. at 360, Defendants ignore the injunction that Plaintiffs are actually requesting. *See* Doc. 214, at 67-68.  Plaintiffs seek an injunction that would prevent Defendants and those acting in concert with them "from taking any steps to demand, urge, encourage, pressure, coerce, deceive, collude with, or otherwise induce any social-media company or platform for online speech … to censor, suppress, remove, de-platform, suspend, shadow-ban, de-boost, deamplify, issue strikes against, restrict access to, demonetize, or take any similar adverse action against any speaker, content, or viewpoint expressed on social media." Doc. 214, at 67-68.  This single injunction will redress, at least in part, the censorship injuries of all class members of both classes, including both speakers and audience members.  Defendants never contend otherwise, or even address Plaintiffs' proposed injunction.  *See* Doc. 244, at 21-23.  The omission is glaring.

Moreover, Plaintiffs' proposed injunction undermines Defendants' arguments.  First, Defendants argue that "different sets of members will allegedly be affected by different Defendants in different ways." Doc. 244, at 21.  Defendants overlook extensive evidence to the contrary, demonstrating an interconnected federal censorship enterprise, as discussed above.  *See supra*. Moreover, the injunction sought demonstrates that there is a fundamental commonality among all the plaintiffs' injuries, such that a single injunction will address and protect all of them—*i.e.*, an injunction prohibiting Defendants from communicating with social-media platforms to pressure, coerce, collude with, or deceive them into censoring or suppressing speech on social media.  *See* Doc. 214, a 67-68.  Defendants contend that a class member injured by the CDC's colluding with platforms would not be entitled to an injunction against the other Defendants, Doc. 244, at 21-22, but this argument overlooks both the breadth of the First Amendment interests at stake and all class members' interests as potential *audiences* of free speech on social media.  As noted above,

9

the CDC's censorship activities are closely intertwined with the those of the other Defendants; and the class members' interests as potential *audiences* of free speech on social media are broader than the speech targeted by any individual agency.

Next, Defendants object that Plaintiffs seek "a broader injunction on behalf of many class members who may *oppose* Plaintiffs' lawsuit and requested relief, but who cannot opt out." Doc. 244, at 22. This concern is meritless. As the D.C. Circuit has noted, "[w]hen a challenged policy is generally applicable to the class for purposes of Rule 23(b)(2), the history of the Rule confirms the propriety of certifying the class *even if some members may be uninterested in pressing the claims*. The Advisory Committee explained that a challenged action 'is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class.'" *J.D. v. Azar*, 925 F.3d 1291, 1315 (D.C. Cir. 2019) (emphasis added).

### IV.   Plaintiffs' Request for Amendment and Class Certification Is Timely.

Finally, Defendants argue that Plaintiffs were supposedly "dilatory" in seeking to add class allegations. Doc. 244, at 25. Not so. Plaintiffs moved for leave to amend and class certification at the conclusion of preliminary-injunction related discovery, *i.e.*, as soon as the relevant proof was available through expedited discovery. This is the most natural and appropriate juncture to seek class certification, and it compares favorably to the timing of many other requests for certification that were granted. *See* Doc. 227-1, at 23-24. Defendants make no plausible claim of prejudice from the supposed delay; nor could they, as merits discovery has not even commenced.

### CONCLUSION

The Court should grant Plaintiffs' Motion for Class Certification and for Leave to File a Third Amended Complaint for the Limited Purpose of Adding Class Allegations, Doc. 227.

Dated: April 18, 2023

**ANDREW BAILEY**
**Attorney General of Missouri**

*/s/ Kenneth C. Capps*
Joshua M. Divine, Mo. Bar No. 69875*
  *Solicitor General*
Todd A. Scott, Mo. Bar No. 56614*
  *Senior Counsel*
Kenneth C. Capps, Mo. Bar No. 70908*
  *Assistant Attorney General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
kenneth.capps@ago.mo.gov
*Counsel for State of Missouri*


*/s/ John J. Vecchione*
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: john.vecchione@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines*


  *  admitted *pro hac vice*

Respectfully submitted,

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

*/s/ D. John Sauer*
Elizabeth B. Murrill (La #20685)
  *Solicitor General*
Tracy Short (La #23940)
  *Assistant Attorney General*
D. John Sauer (Mo #58721)*
  *Special Assistant Attorney General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*


*/s/ John C. Burns*
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

11

## CERTIFICATE OF SERVICE

I hereby certify that, on April 18, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*