**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| STATE OF MISSOURI, ex rel. ANDREW BAILEY, Attorney General, et al. | ) ) ) ) | CASE NO: 3:22-cv-1213 |
| Plaintiffs, | ) ) | JUDGE DOUGHTY |
| vs. | ) ) | MAGISTRATE JUDGE MCCLUSKY |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States | ) ) ) | |
| Defendants. | ) ) ) | |

_____

**BRIEF OF AMICUS CURIAE THE BUCKEYE INSTITUTE**
**IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

_____

Ben E. Clayton, LSBA No. 17512
Joshua P. Clayton, LSBA No.34488
ben@claytonlawfirmllc.com
josh@claytonlawfirmllc.com
Suite No. 101
893 Brownswitch Road
Slidell, Louisiana  70458
(985) 863-3065 voice
(985) 863-7707 facsimile

Jay R. Carson (0068526) (Pro hac admission pending)
David C. Tryon (0028954)
The Buckeye Institute
88 East Broad Street, Ste. 1300
Columbus, Ohio 43215
(614) 224-4422
j.carson@buckeyeinstitute.org
d.tryon@buckeyeinstitute.org

*Attorneys for Amicus Curiae The Buckeye Institute*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................... ii

**INTEREST OF AMICUS CURIAE** ...................................................................... 1

**INTRODUCTION** .................................................................................................. 1

**ARGUMENT** ......................................................................................................... 2

    **A.**  **Will No one Rid Me of These Turbulent Tweets?** ............................... 2

    **B.**  **Academic Views of Jawboning** ............................................................ 4

    **C.**  **Jawboning's Unhappy Bipartisan History** .......................................... 9

    **D.**  **Jawboning's Allure and Dangers** ....................................................... 12

**CONCLUSION**..................................................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Biden v. Knight First Amendment Inst. at Columbia Univ*., 141 S. Ct. 1220, 1226 (2021) .......... 4

*First Unitarian Church of Los Angeles v. Cnty. of Los Angeles*, 357 U.S. 513, 532, 2 L.Ed.2d
    1460, 78 S.Ct. 1352, 1354 (1958) ................................................................................ 6, 14

*Norwood v. Harrison*, 413 U.S. 455, 465 (1973) ......................................................................... 4

**Other Authorities**

Bambauer, Derek E. *Against Jawboning*, 100 Minn. L. Rev. 51 (2015) ...................... 2, 7, 8, 9, 12

Bambauer, Derek E. *Orwell's Armchair*, 79 U. Chi. L. Rev. 863, 898–99 (2012) ...................... 13

Brito, Jerry,  *"Agency Threats" & the Rule of Law: An Offer You Can't Refuse,* 37 Harv. J.L. &
    Pub. Pol'y 553 (2014) ............................................................................................................ 7

Dodsley, Robert*The Chronicle of the Kings of England, from William the Norman to the Death
    of George III* (1821), J. Fairburn. P. 27, https://archive.org/details/chroniclekingse00saddgoog
    .............................................................................................................................................. 3

Foran, Clare The Atlantic, *Why Hillary Clinton Thinks She Lost the Election*
    https://www.theatlantic.com/politics/archive/2017/05/hillary-clinton-election-trump-fbi-russia-
    hacking/525183/ ................................................................................................................... 9

Judges 15:15-16 (King James) ...................................................................................................... 1

Kreimer, *Censorship by Proxy: The First Amendment, Internet Intermediaries, & the Problem of
    the Weakest Link*, 155 U. Pa. L. Rev. 11, 27 (2006) ............................................................ 11

*To Secure These Rights: The Report of the President's Committee on Civil Rights*, No. 47 (1947),
    https://www.trumanlibrary.gov/library/to-secure-these-rights#47 ........................................... 15

Wasserman, *Symbolic Counter-Speech*, 12 Wm. & Mary Bill Rts. J. 367, 402 (2004) .............. 13

Tim Wu, *Agency Threats*, 60 Duke L. J. 1841 (2011) ............................................................. 4, 6

**Regulations**

I.R.C. section 501(c)(3) ................................................................................................................ 1

## INTEREST OF AMICUS CURIAE

Amicus Curiae The Buckeye Institute respectfully submits its brief in support of the Plaintiffs' Motion for Preliminary Injunction. The Buckeye Institute was founded in 1989 as an independent research and educational institution—a think tank—whose mission is to advance free-market public policy in the states. The staff at The Buckeye Institute accomplishes the organization's mission by performing timely and reliable research on key issues, compiling and synthesizing data, formulating free-market policy solutions, and marketing them for implementation in Ohio and replication nationwide. The Buckeye Institute is a nonpartisan, non-profit, tax-exempt organization as defined by I.R.C. § 501(c)(3). The Buckeye Institute's Legal Center files and joins amicus briefs that are consistent with its mission and goals. The Buckeye Institute frequently litigates to support the First Amendment rights of individuals and a free press. In this case, the allegations of the Plaintiffs' Complaint and Preliminary Injunction Motion, and the substantial evidence adduced to support them, raise significant concerns that the Executive Branch has engaged in and unless enjoined, will continue to engage in censorship in violation of the First Amendment. A Preliminary Injunction is therefore appropriate.

## INTRODUCTION

And he found a new jawbone of an ass, and put forth his hand, and took it, and slew a thousand men therewith.

And Samson said, With the jawbone of an ass, heaps upon heaps, with the jaw of an ass have I slain a thousand men.

*Judges* 15:15-16 (King James).

The biblical story of Samson slaying a thousand men with the jawbone of an ass is meant to convey his divinely endowed strength. He could eviscerate an army singlehandedly, wielding only a happenstance and improbable weapon. In the early 1960s, the term "jawboning" entered

1

the political lexicon to describe a President's ability to accomplish similar a feat of political strength—commanding regulatory policy—through the seemingly innocuous tool of public and private statements. Derek E. Bambauer, *Against Jawboning*, 100 Minn. L. Rev. 51, 57 (2015) (defining jawboning and noting the term's biblical origin).  While Samson's prowess on the battlefield of Lehi was considerable and supernatural,  the modern regulatory state's power to smite speech, stories and ideas seeks to mimic and usurp a role that does not legitimately belong to the State, that being the role of a "Philistine slayer."   The legitimate role of the State is not to decide who is or is not a Philistine to be struck with the jawbone. Recall that Samson was ordained by God to  "…begin to deliver Israel out of the hand of the Philistines." *Judges* 13:5 (King James). It is not a legitimate role of the State to appoint itself  to be the supposed deliverer of society from what the State feels  is objectionable speech.

While Samson's prowess on the battlefield of Lehi was considerable, his supernatural strength pales in comparison to the modern regulatory state's power to smite the speech, stories, and ideas of political philistines with whom it disagrees.

 As the Second Amended Complaint, the Preliminary Injunction Motion, and the evidence attached to it demonstrate, by jawboning—that is wheedling, cajoling, and in some cases, threatening regulated entities—the Executive Branch can get private actors to censor speech on the government's behalf.  This brief emphasizes the legal and cultural hazards of executive governance by jawboning, reflects on some dark chapters of American history occasioned by it, and argues that Executive jawboning is inconsistent with the First Amendments' protections, the constitutionally mandated separation of powers.

**ARGUMENT**

**A.  Will No one Rid Me of These Turbulent Tweets?**

Had Twitter been available to Thomas à Becket—Archbishop of Canterbury and Lord Chancellor to King Henry II in the 1160s— the separation of church and state that would become a cornerstone of liberal democracies might have emerged centuries earlier. Still, limited to quill and scroll and horseback delivery, Becket and his defense of church independence against royal prerogative achieved the medieval equivalent of going viral. The King was enraged by, among things, Becket's insistence that church authorities, rather than the Crown, had exclusive jurisdiction to try criminal cases against clergy.  And although the King theoretically enjoyed absolute power, because Becket was a papal legate, the King was nevertheless politically constrained in what direct action he could take against Becket. So, like a White House staffer frustrated by a stream of vaccine hesitant tweets,[1] Henry reportedly complained to four of his knights —"will no one deliver me this turbulent priest?" *See* Robert Dodsley, *The Chronicle of the Kings of England, from William the Norman to the Death of George III* 27 (1821), https://archive.org/details/chroniclekingse00saddgoog.

The knights, eager to earn favor or avoid reprobation from their King—a man with significant power to influence their lives and fortunes—stepped in to solve Henry's problem by murdering Becket in Canterbury Cathedral. *Id*.; Lloyd de Beer & Naomi Speakman, *Who killed Thomas Becket?*, The British Museum (Apr. 22, 2021), https://www.britishmuseum.org/blog/who-killed-thomas-becket.

Even beyond the obvious First Amendment legal constraints on a President's ability to censor speech, modern executives face political constraints just as Henry II did in dealing with Becket.  Indeed, while the First Amendment allows certain limited types of censorship, for example the prevention of publication of national security secrets, politicians who are seen as using

---

[1] See, e.g. Plaintiffs' Supplemental Memorandum in support of Motion for Preliminary Injunction, ECF 214, PageID # 16374-76.

the power of the State to silence political opponents tend to activate the American public's political antibodies against express government censorship. Based on the facts pled in the Second Amended Complaint and the evidence adduced thus far, faced with social media posts questioning its policies, the current administration landed upon King Henry's solution. This brief argues that this administration was not the first to do so, nor given the dynamics of executive power and human nature will it be the last. While it would be plainly unconstitutional for the President or any other government entity to formally order social media posts to be removed, their distribution throttled back, or the offending posters be de-platformed, the President might feel empowered to "encourage" social media platforms to do his or her bidding under the guise of "responsible content moderation."

Of course, as the Plaintiffs make clear, the government cannot engage in censorship by proxy by inducing, encouraging, or pressuring "private persons to accomplish what it is constitutionally forbidden from accomplishing." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973); *see also Biden v. Knight First Amendment Inst. at Columbia Univ*., 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring) ("The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly.").   A preliminary injunction is therefore appropriate.

**B.  Academic Views of Jawboning**

Three law review articles—all written before the pandemic and the concerns raised in this action—have ably presented the arguments for and against executive jawboning and merit consideration in evaluating the need for a preliminary injunction here. The consensus of these articles is that even if the use of the executive branch's threats might sometimes be appropriate—

or at least constitutionally tolerable—in pursuit of legitimate regulatory goals, jawboning third parties to engage in extra-constitutional action is not.

First, in 2015, Tim Wu, a senior advisor to the Federal Trade Commission and Columbia Law Professor—with a political cynicism that would make Machiavelli blush—wrote an article extolling the supposed virtues of governance though executive jawboning aptly titled *Agency Threats*. Tim Wu, *Agency Threats*, 60 Duke L. J. 1841 (2011). Professor Wu posits that "[t]he use of threats instead of law can be a useful choice—not simply a procedural end run." *Id.* at 1842. "Threat regimes," he suggests, "are important and are best justified when the industry is undergoing rapid change—under conditions of 'high uncertainty.' Highly informal regimes are most useful, that is, when the agency faces a problem in an environment in which facts are highly unclear and evolving." *Id.* "Conditions of high uncertainty" understates the information management challenges of social media platforms during the *annus horribilis* that was 2020 and the two years that have followed it, so the period in which the actions described in the Second Amended Complaint occur provides an ideal testing ground for his thesis.

Wu goes on to state the obvious; "[t]he greatest advantage of a threat regime is its speed and flexibility." *Id.* at 1851. Regulation by threat is expedient because "a threat is extant the moment it is made—its final shape, so to speak, is immediately apparent." *Id.* He downplays the obvious due process concerns, ensuring readers that "the argument that rule by threat is a means of avoiding judicial review may be overstated." *Id*. at 1843. In his view, "[t]hreats are, by their nature, just that: threats to enforce or enact a rule, not binding actions in the usual sense of that word. Regulated entities that are unhappy with a de facto regime can and do test the threats, forcing the agency to use its more formal powers and therefore invoke judicial review." *Id.*

Wu's assurance that if a regulated entity is unhappy it will sue, however, overlooks the fundamental power dynamic that makes jawboning effective: most regulated entities either cannot afford to sue or prefer to avoid conflict with the regulator.  And that is the whole point of jawboning. Wu also fails to suggest how to remedy the harm done to customers of the regulated entity.  They bear the cost and other harms caused by the regulation but have little direct legal recourse against the government.  Further, they are hard-pressed to get information regarding the communications between the government and the regulated entity that could show the governmental disregard for the impact on the consumers. Indeed, the government's resistance to discovery and its motion to dismiss in this action demonstrate the opacity of this process to the detriment of the consumers—and in this case, social media users.

Jawboning social media companies and the resulting social media – government collusion raises even more complications.  The "customers" purchase advertising from social media. They have different interests than the end-users who use the social media product to communicate. Most advertisers would likely have no qualms with social media companies removing posts with which the majority of social media users might disagree.  A "stultifying conformity" of thought may be "destructive to a free society" and to the social media users with a minority view, but it is not necessarily bad for advertisers. *See First Unitarian Church of Los Angeles v. Cnty. of Los Angeles*, 357 U.S. 513, 532 (1958) (Black, J., concurring) (discussing impact of unconstitutional loyalty oaths on free expression and civil discourse).

Professor Wu closes his defense of agency threats by noting the sound governance practices of Vito Corleone in "The Godfather," who used threats accented by the occasional enforcement action to achieve his aims. Wu, *supra*, at 1847.  While the comparison is tongue-in-cheek, it is nevertheless apt. In fairness to Professor Wu, his article focuses on encouraging private actors to

6

accept or self-impose regulatory burdens that do not, on their face, offend the Constitution. Professor Wu assumes, perhaps naively, that regulatory threats would be used only to accomplish other legitimate regulatory goals. In other words, Congress or a regulatory agency would likely have the authority to enact or promulgate the type of jawboned policies he suggests, but the processes of enacting legislation or working under the Administrative Procedure Act's rubric are inconvenient and inefficient. Professor Wu acknowledges that the Executive branch would abuse its power if an agency used "threats to take actions that Congress has specifically barred, or to accomplish objectives for which it would otherwise lack delegated authority." *Id*. at 1854. The jawboning in the instant case presents that exact scenario. The President's jawboning involves restrictions on speech that would be entirely impermissible if the government acted directly.  The facts pled in the Second Amended Complaint call to mind not Vito Corleone—but his son Michael—who begins with noble intentions but once in power succumbs to the temptation to abuse it.

Jerry Brito, a lawyer and Senior Research Fellow at George Mason University's Mercatus Institute published a response to Professor Wu's article arguing forcefully that jawboning third parties into submission by threats of new or greater regulation replaces the rule of law with the rule of men. Jerry Brito, *"Agency Threats" & the Rule of Law: An Offer You Can't Refuse,* 37 Harv. J.L. & Pub. Pol'y 553 (2014). The fatal flaw of governance by jawboning threats is human nature:

> [H]aving ejected the rule of law in an attempt to secure "speed and flexibility," [Wu] is forced to recreate a stand-in of that very same rule of law through "guidelines" and "lists" made to prevent the predictable consequences of the rule of men. As much as one would like to have omniscient, benevolent angels for regulators, unfortunately only "fallible men" are available.

*Id.* at 568.

Brito offers a realistic view of how regulatory threats have operated to expand executive power beyond what it could legally enforce, using as an example a speech by former FCC Chairman Michael Powell's to internet service providers:

> Much like a mobster's threat, Chairman Powell's speech was a mere suggestion to the industry. After all, the FCC had no legal way to enforce his edict. Powell was just saying, "Boy, it would sure be nice if the industry started behaving this way." Then the FCC's Enforcement Bureau opened an investigation into a small carrier; a simple letter of inquiry, not a formal enforcement action predicated on any agency rulemaking. In less than a month, however, the carrier had signed a consent decree pledging to adhere to the suggestions in Powell's speech and coughing up a $15,000 contribution to the U.S. Treasury. The rest of the industry got the message loud and clear.

*Id.* at 565–66.  Thus, while the FCC's letter of inquiry carried little legal weight, the potential of a formal investigation and all of the risks, costs and negative publicity that would accompany it were enough to get the carrier to agree to plainly extra-legal terms and to send a message to the rest of the industry.   Even if Powell's motives were pure, even if the industry reforms were salutary, there is more than a whiff of extortion in the air.

In *Against Jawboning*, Professor Derek Bambauer directly addresses the constitutional hazards of jawboning in relation to speech regulation on internet platforms. Derek E. Bambauer, *Against Jawboning*, 100 Minn. L. Rev. 51 (2015).  Using the example of a state attorney general subpoena to Google meant to lend aid to the motion picture industry's crackdown on video piracy, Professor Bambauer notes that what Professor Wu saw as the exception in executive jawboning efforts—seeking to enforce results that lie beyond an executive's legal capacity—is, in reality, the norm.  The state attorneys general involved "sought to coerce the company based on threatened action at the edges of or wholly outside their legal authority." *Id.* at 55.  The constitutional concern "is not simply the motivation; state officials advocate for interest groups constantly," but that the attorney general "threatened Google despite lacking authority over the subject matter of his investigation." *Id.* at 55.  Why would any company accede to threats or—euphemistically,

"suggestions"— from the government if it knows that the government lacks any legal authority to enforce them?  "Cost and uncertainty," Professor Bambauer answers:

> As to cost, even a subpoena that was ultra vires -- beyond the official's power -- would cause Google to incur potentially significant expense. Lawyers at WilmerHale -- Google's outside counsel -- do not come cheap, and if Hood defeated the motion for the temporary restraining order, Google would have had to comply with burdensome discovery. And the potential costs were more than pecuniary -- the MPAA planned to allocate budget to media outreach efforts designed to harm Google's reputation. Even false accusations can wound.

*Id.* at 56.  According to Professor Bambauer, "The cost-benefit calculus is clear: it makes sense to censor anything questionable. *Id.* at 86.

### C.  Jawboning's Unhappy Bipartisan History

Although the Second Amended Complaint in this case alleges a Democratic presidential administration exerting influence on social media platforms to ban or limit speech by individuals and organizations perceived to be on the right, history teaches that jawboning at the expense of constitutional rights is a bipartisan activity that spans the ideological spectrum.  The temptation to abuse executive power is perennial and ecumenical.   Professor Bambauer offers numerous examples where the executive branch, at the state, local, and federal levels, has used jawboning to undermine constitutional rights. Notably, President George W. Bush authorized the National Security Agency to conduct surveillance on Americans' international telephone calls and e-mail traffic without obtaining either a Title III warrant or an order under the Foreign Intelligence Surveillance Act. Bambauer, *supra*, at 91. The telecom providers agreed to provide the information at the administration's request.  Because jawboning—by design—provides little transparency into the decision-making process, it is impossible to know to what extent the telecom providers' acquiescence was motivated by fear of regulatory retaliation, a sense of patriotism in the wake of the 9/11 attacks, the wish to be "part of the solution," or a mosaic of motives. What is clear is that

these third parties engaged in investigative steps that it would have been illegal for the administration to take directly.

This is not a new phenomenon. Years ago, executive-branch jawboning helped initiate industry blacklisting—most notably in Hollywood—of persons suspected of harboring communist sympathies. To be sure, legislative jawboning by members of the House Un-American Activities Committee and Senator Joseph McCarthy played significant role in feeding anticommunist paranoia. But the movements roots stem from an executive pronouncement. With the Soviet Union's assertion of dominance over Eastern Europe and communism on the march worldwide, American policy makers became increasingly concerned over Soviet attempts to influence and subvert what they saw as American values through subtle propaganda and the infiltration of American government and private institutions.[2] In December 1947—more than two years before Senator Joseph McCarthy made his first public allegations of widespread communist infiltration of the federal government-- the U.S. Attorney General published the "Attorney General's List of Subversive Organizations" (AGLOSO). *See* Robert Justin Goldstein, *Prelude to McCarthyism: The Making of a Blacklist*, Prologue Magazine, (Fall 2006), https://www.archives.gov/publications/prologue/2006/fall/agloso.html. The list imposed no direct sanctions on any of the organizations named. But "as various scholars wrote contemporaneously and subsequently, AGLOSO, which was massively publicized in the media, became what amounted to "an official blacklist." In the public mind it came to have "authority as *the* definitive

---

[2] While history didn't exactly repeat itself, it certainly rhymed when fears of Russian influence in the 2016 came to the fore and served as a topic for politicians to jawbone. *See, e.g.*, Clare Foran, *Why Hillary Clinton Thinks She Lost the Election*, The Atlantic (May 2, 2017), https://www.theatlantic.com/politics/archive/2017/05/hillary-clinton-election-trump-fbi-russia-hacking/525183/. While the actual evidence of Russian "bots" influencing the election was slim. *See* Patrick Ruffini, *Why Russia's Facebook ad campaign wasn't such a success*, The Washington Post, November 3, 2017, https://www.washingtonpost.com/outlook/why-russias-facebook-ad-campaign-wasnt-such-a-success/2017/11/03/b8efacca-bffa-11e7-8444-a0d4f04b89eb_story.html. Yet social media companies anxious to stave off the new Russian subversion and reassure users and regulators that social media undertook a voluntary purge of suspected 'bot' accounts.

report on subversive organizations," understood as a "proscription of the treasonable activity of the listed organizations" and the "litmus test for distinguishing between loyalty and disloyal organizations and individuals."  *Id*. Notably, the list was never accompanied by any proof that any of the organizations on it had engaged in any criminal activity or sought to "subvert" the American government.

It was instead, a list of the usual suspects. The list served its purpose of dissuading citizens from joining or associating with the groups on it.  Many of the organizations folded.

That same year, the House Unamerican Activities Committee ("HUAC"), which had formed in 1938, began investigating communist subversion in the motion picture industry. Like King Henry's knights, Hollywood took the hint.  The studio heads agreed among themselves not to hire actors and screenwriters who exercised their constitutional rights to decline to cooperate with HUAC as well as anyone with alleged ties to "subversive organizations."  Because the studios were acting as private entities, simply trying to act "responsibly" and enforcing their private preference to hire only patriotic Americans, there was no need for actual evidence of any ties to subversive groups like the one named on the AGLSO.  Rumor and hearsay were sufficient.  By 1956, even McCarthyism began to wane, *Elks Magazine* "carried an article entitled "What the Attorney General's List Means," which began by accurately noting that "there are few Americans who have not heard of 'the Attorney General's subversive list'" and concluded by declaring, "There is no excuse for any American citizen becoming affiliated with a group on the Attorney General's list today." Goldstein, *supra*.

The Red Scare purge of the 1950s highlights the insidious nature of government censorship by proxy. Blacklisting—like the de-platforming and shadow banning at issue here—operates in the dark. Individuals may never be aware that they have been blacklisted or their tweets shadow

banned.  Blacklisted screenwriters did not receive notice that they had been blacklisted or the opportunity to contest that designation in any type of hearing.  They simply saw opportunities disappear. Private entities like the Hollywood studios of the 1950s and social media companies of today have no duty to explain their actions. This lack of transparency allows the censors, both government and the private parties to engage in gaslighting—they simply deny that there are any restrictions in place or any communications between the executive branch and the private party which might disclose governmental pressure or even collusion.  *See, e.g.*, *Changizi v. Department of Health and Human Services*, 602 F. Supp.3d 1031, 1046 (2022) ("HHS contends that Plaintiffs' complaint is 'bereft of factual support for the conclusory allegation that any remedial actions that Twitter has taken (or may again take) against Plaintiffs were (or will be) attributable to Defendants, rather than the 'independent' and 'legitimate discretion' of Twitter.'").

### D.  Jawboning's Allure and Dangers

Jawboning on internet speech issues by "recruiting proxy censors" is particularly effective—and thus particularly dangerous—because it targets the "weakest link in the chain of communication."   Seth F. Kreimer, *Censorship by Proxy: The First Amendment, Internet Intermediaries, & the Problem of the Weakest Link*, 155 U. Pa. L. Rev. 11, 27 (2006).  Targeting social media platforms works because "[i]t provides a mechanism for the exercise of authority over otherwise ungovernable conduct. * * *[The practical] cost of monitoring and sanctioning disfavored communications is largely externalized onto the intermediaries who are the subjects of direct regulation." *Id.* As Professor Bambauer explains, "[I]t is far easier and more effective to impose controls upon an intermediary than upon a host of dispersed speakers who may be difficult to identify, located outside the regulators' jurisdiction, or judgment-proof." Bambauer, *supra* at 85-86.

12

Jawboning targeting intermediaries is especially pernicious here because "platforms such as Google, Twitter, Facebook, and Instagram are the new gatekeepers for online content." *Id*. Because those entities serve both as gatekeepers and repositories of online activity, they can consign unwanted information or unfavored options to the Orwellian "memory hole." For all practical purposes, "[m]aterial de-listed from Google's search results or deleted from a Twitter feed simply disappears . . .." *Id.* at 60.

Jawboning for "moderation" of internet speech, when coupled with human nature and the natural incentives of power, creates a perilously slippery slope. Plainly, the executive branch is tasked with protecting the nation's security and by extension its health. An administration may see an urgent need to act and engage in some benign jawboning to get assistance from social media platforms. The executive branch may grow to see its policies relating to the crisis at as not only correct, but essential. Thus, in addition to getting the administration's arguments out, social media ought to moderate those arguments made against that policy. Proceeding from the messianic notion that its policies are the only hope for the nation, the executive may come to its re-election as similarly crucial.

Jawboning is also insidious because the more it is practiced, the easier it becomes. Psychology (as well as common sense and experience) teaches that once a person has crossed ethical line, it becomes progressively easier to cross that line again. Thus, like a paperclip that is repeatedly bent, gaining the acquiescence of the regulated parties becomes easier and easier until no resistance is offered. Indeed, the frequent meetings and familiarity evident in the email exchanges documented by the Plaintiffs points to a kind of regulatory Stockholm Syndrome. The social media platforms *want* to cooperate.

13

From the government's viewpoint, third parties' willingness to assist provides political cover. Even in the 1950s an act of Congress or Executive Order banning potential communist subversives from working in certain private industries where they could implant Marxist or other "unamerican" ideas in the national psyche would have faced legal challenges and been seen as politically heavy-handedness. But if government simply provided information, industry leaders who wished to appear responsible or patriotic might act on their own initiative.  Simply put, "When the government can indirectly threaten or compel private actors to fall in line with its preferences, there is a threat to the constitutionally protected liberty to exchange information that is checked poorly, if at all, by standard First Amendment doctrine." Derek E. Bambauer, *Orwell's Armchair*, 79 U. Chi. L. Rev. 863, 898–99 (2012).

But the danger of jawboning social media companies is not merely that it violates the First Amendment, but that it degrades the free speech and expression as a value worth protecting.  A Knight Foundation survey on attitudes towards free speech and expression showed Americans are increasingly willing to value protection from misinformation and freedom from insult above free expression. Free Expression in America Post-2020, The Knight Foundation (Jan. 6, 2022); https://knightfoundation.org/reports/free-expression-in-america-post-2020/.  Historian Vincent Blasi suggests a type of national "pathology" regarding freedom of expression, defined by a "shift in basic attitudes, among certain influential actors if not the public at large, concerning the desirability of the central norms of the first amendment."  Harold M. Wasserman, *Symbolic Counter-Speech*, 12 Wm. & Mary Bill Rts. J. 367, 402 (2004)(internal citation omitted). He posits ""historical periods when intolerance of unorthodox ideas is most prevalent and when governments are most able and most likely to stifle dissent systematically." *Id.*  A government that emphasizes moderation over open debate erodes public confidence in the value of free speech and

threatens to usher in such an unwelcome age. At the same time, government intervention in the nation's dialogue—even when done by proxy—also decreases trust in government institutions. The government that cries wolf too often, or is perceived as having rigged the argument is less likely to believed when the wolves inevitably arrive.

## CONCLUSION

Writing in 1958—one year after Joseph McCarthy's death—Justice Black reflected on the anti-communist hysteria, with its blacklists, loyalty oaths, and demands for intellectual conformity with words that resonate today: "The course which we have been following the last decade is not the course of a strong, free, secure people, but that of the frightened, the insecure, the intolerant." *First Unitarian Church,* 357 U.S. at 532 (Black, J., concurring).

In a pluralistic constitutional republic, societal values exist in constant tension. Freedom is balanced against safety. Democracy and the will of the majority is balanced against individual liberties and minority rights. This often requires citizens, institutions, and even Presidential administrations to hold competing ideas in their heads simultaneously. Thus, in the same year that the Truman administration published its list of subversive organizations, the President's Committee on Civil Rights, convened by President Truman in 1946, published its report. Discussing the primacy of free speech and the right to dissent, the Committee, like Justice Black, saw free expression as the hallmark of a strong nation, confidant in the capacity of free people to reason together:

> This right is an expression of confidence in the ability of freemen to learn the truth through the unhampered interplay of competing ideas. Where the right is generally exercised, the public benefits from the selective process of winnowing truth from falsehood, desirable ideas from evil ones. If the people are to govern themselves their only hope of doing so wisely lies in the collective wisdom derived from the fullest possible information, and in the fair presentation of differing opinions.

President's Committee on Civil Rights, *To Secure These Rights: The Report of the President's Committee on Civil Rights* 47 (1947), https://www.trumanlibrary.gov/library/to-secure-these-rights#47.

The executive branch has no more business moderating tweets or Facebook posts than it does deciding who ought to write screenplays. The jawboning of social media companies into censoring posts disfavored by the government causes immediate irreparable harm as a violation of the First Amendment and may lead to longer lasting irreparable harm through the continued erosion of nation's commitment to the First Amendment's principles.  For all the foregoing reasons, amicus curiae The Buckeye Institute urges the Court to grant the Plaintiffs' Preliminary Injunction Motion.

Respectfully submitted,

*/s/ Ben E. Clayton*
Ben E. Clayton, LSBA No. 17512
ben@claytonlawfirmllc.com
Joshua P. Clayton, LSBA No. 34488
josh@claytonlawfirmllc.com
Attorneys for Amicus Curiae The Buckeye Institute
Suite No. 101
893 Brownswitch Road
Slidell, Louisiana  70458
(985) 863-3065 voice
(985) 863-7707 facsimile

*/s/ Jay R. Carson*
Jay R. Carson (0068526) (pro hac admission pending)
David C. Tryon (0028954)
The Buckeye Institute
88 East Broad Street, Ste. 1300
Columbus, Ohio 43215
(614) 224-4422

16

j.carson@buckeyeinstitute.org
d.tryon@buckeyeinstitute.org

*Attorneys for Amicus Curiae The Buckeye Institute*

## CERTIFICATE OF SERVICE

The foregoing Brief was served on all counsel of record via the Court's electronic filing system this 18th day of April, 2023.

*/s/ Ben E. Clayton*
*Counsel for Amicus Curiae The Buckeye Institute*

17