**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**

STATE OF LOUISIANA, *et al.*,

    *Plaintiffs*,

          v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States of
America, *et al.,*

    *Defendants*.

Civil Action No. 22-cv-1213

## <u>DEFENDANTS' OPPOSITION TO PLAINTIFFS'<br>MOTION FOR PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................1

BACKGROUND AND PROPOSED FINDINGS OF FACT......................................5

I.     For years, in response to public sentiment, social media companies have sought to identify and contain misinformation on their platforms. ....................................................5

       A.     Since their emergence, social media companies have been economically incentivized to moderate content on their platforms................................................5

       B.     After the 2016 U.S. presidential election, social media companies took significant steps to combat election-related influence campaigns and misinformation on their platforms. ........................................................................9

       C.     As the COVID-19 pandemic emerged, social media companies sought to address health misinformation on their platforms. ................................................13

       D.     Social media companies have long taken actions short of removal against "borderline content" that is not expressly prohibited by their content moderation removal policies. ...............................................................................15

       E.     Bipartisan calls to revise or revoke Section 230 have repeatedly arisen over the years..............................................................................................................19

II.    Since 2017, Executive Branch agencies and officials have promoted authoritative information or expressed concerns with the spread of misinformation............................22

       A.     The White House ...............................................................................................23

              1.     White House Public Statements................................................................25

                     a.     White House Press Briefings (Jennifer Psaki)..............................25

                     b.     President Biden's Comments ........................................................28

                     c.     White House Communications Director Kate Bedingfield's Comments......................................................................................29

              2.     White House Private Statements...............................................................30

                     a.     White House Requests for More Data about Misinformation on Facebook ........................................................31

                     b.     No White House Demands for Changes to the Companies' Content Moderation Policies or Practices Regarding COVID-19 .....................................................................................36

       c.     White House Requests for Action on Fake and Doctored Posts and Accounts ....................................................37

B.    The Surgeon General ...........................................................40

    1.    The Advisory, the RFI, and Other Public Statements .............42

    2.    Direct Communications with Social Media Companies.........................45

    3.    The Virality Project ...........................................................49

C.    The Centers for Disease Control and Prevention (CDC) ....................................51

    1.    CDC's Pandemic-Era Meetings with Social Media Companies..............53

    2.    CDC's Responses to Social Media Companies' Requests for Scientific Information Relating to Claims About COVID-19 or Vaccines ..........................................................................56

    3.    CDC Emails Alerting Social Media Companies to Misinformation Themes Observed on Platforms and Providing Relevant Scientific Information .......................................................................59

    4.    CDC's Two "Be on the Lookout Meetings" in May 2021 ......................60

    5.    A CDC Official's One-Time Use of a Facebook Reporting Channel in 2021 ....................................................................62

    6.    CDC's Receipt of Bi-weekly Facebook COVID-19 Content Reports in 2021 .....................................................................62

D.    The Census Bureau ..............................................................63

E.    Dr. Fauci, Former Director of the National Institute of Allergy and Infectious Diseases (NIAID) .......................................................64

F.    The Cybersecurity and Infrastructure Security Agency (CISA) ..........................69

    1.    CISA's Mission and General Overview .................................................69

    2.    The Election Infrastructure Subsector ....................................................70

    3.    The Center for Internet Security....................................................72

    4.    CISA's Efforts to Build Resilience to Misinformation ...........................74

        a.     CISA's Mis-, Dis-, and Malinformation ("MDM") Team...........74

|   |   | b. | CISA's Switchboarding Work During the 2020 Election Cycle | 74 |
|   |   | c. | CISA's Meetings with Social Media Companies | 80 |
|   |   | d. | CISA's Limited Involvement with the Election Integrity Partnership | 84 |
|   | G. | | The State Department's Global Engagement Center (GEC) | 86 |
|   | H. | | The Federal Bureau of Investigation | 91 |
|   |   | 1. | FBI Efforts as to Foreign Influence and Election Misinformation | 91 |
|   |   | 2. | The "Hunter Biden Laptop Story" | 97 |

LEGAL STANDARD .......................................................................................101

ARGUMENT ................................................................................................102

I. Plaintiffs fail to satisfy their burden of demonstrating that irreparable harm would result in the absence of a preliminary injunction. ..........................................104

   A. Plaintiffs cannot establish imminent, irreparable harm based on social media companies' past content moderation decisions. ......................................106

      1. The Individual Plaintiffs' alleged harms stem from long-past content moderation decisions. ............................................................107

      2. Plaintiff States' alleged harms likewise stem from long-past content moderation decisions. ............................................................112

   B. Plaintiffs cannot establish imminent, irreparable harm based on alleged past actions of federal officials. .........................................................113

      1. Plaintiffs have not made the requisite showing of ongoing or imminent irreparable harm as to the White House Defendants. .............115

      2. Plaintiffs have not made the requisite showing of ongoing or imminent irreparable harm as to CISA Defendants. .............................116

      3. Plaintiffs have not made the requisite showing of ongoing or imminent irreparable harm as to the CDC Defendants. .........................118

      4. Plaintiffs have not made the requisite showing of ongoing or imminent irreparable harm as to the Census Defendants. .....................120

5.      Plaintiffs have not made the requisite showing of ongoing or imminent irreparable harm as to Dr. Fauci, in his former capacity as NIAID Director. ...............................................................121

6.      Plaintiffs have not made the requisite showing of ongoing or imminent irreparable harm as to the GEC Defendants. ..........................121

C.    Plaintiffs' delay in seeking relief shows there is no immediate need for an injunction. .........................................................................................126

II.    Plaintiffs fail to show a likelihood of success on the merits. ............................................128

A.    Plaintiffs lack Article III standing to bring any of their claims. .........................128

1.      Plaintiffs fail to establish any injury-in-fact. ..........................................130

2.      Plaintiffs fail to establish traceability and redressability. .......................131

B.    Plaintiffs are not likely to prevail on their First Amendment claims. .................136

1.      Plaintiffs are not likely to prevail on their theory that any Defendant provided "such significant encouragement" as to convert private conduct into government conduct. ...............................141

a.      Plaintiffs' "significant encouragement" theory rests on a misunderstanding of Blum and its progeny. ...............................141

b.      Plaintiffs fail to show that the White House has provided "such significant encouragement" as to render the White House legally responsible for social media companies' independent decisions. .............................................148

c.      Plaintiffs fail to show that OSG has provided "such significant encouragement" as to render OSG legally responsible for social media companies' independent decisions. ................................................................160

i.      Surgeon General's Public Statements ...........................165

ii.     OSG's Private Communications ....................................167

iii.    The RFI...........................................................168

2.      Plaintiffs fail to show "coercion" under Bantam Books. .......................169

a.      Plaintiffs fail to connect purported coercion to specific acts harming them.........................................................................170

b.      Defendants made no threats and instead sought to persuade. .....171

iv

c.      Defendants consistently recognized social media
        companies' authority over their platforms and no evidence
        shows they engaged in improper "pressure." ...........................180

        i.      White House Press Secretary .........................................181

        ii.     White House Digital Director ........................................182

        iii.    The Surgeon General ....................................................183

d.      Officials' remarks about potential § 230 amendments and
        antitrust enforcement raised legitimate policy questions and
        had no coercive effect. ............................................................185

        i.      Legislative Remarks and Hearings ................................186

        ii.     Executive Branch Remarks and Actions ........................190

3.  Deception is not a freestanding basis for state action and is lacking
    here. .................................................................................................193

    a.  There is no "deception" test for state action..............................194

    b.  The record contradicts Plaintiffs' allegations of deceit and
        trickery. .................................................................................195

        i.      FBI...............................................................................196

        ii.     Dr. Fauci, in his prior role as the Director of NIAID ......200

4.  Plaintiffs fail to show that any Defendant jointly participated in
    any particular content moderation decision. ..........................................213

    a.  Plaintiffs fail to show that, by sharing information about
        COVID-19, CDC or the Census Bureau jointly participated
        in any content moderation decision. ..........................................216

    b.  The FBI did not participate in "censorship" by sharing
        information about foreign malign influence efforts or
        potential election-related misinformation. ................................224

    c.  Plaintiffs fail to establish that CISA worked jointly with
        social media companies to violate the First Amendment............228

    d.  Plaintiffs fail to identify joint action by the Global
        Engagement Center and social media companies to remove
        any social media content. ........................................................237

e.  No "joint action" transformed the private conduct of the Election Integrity Partnership or the Virality Project into state action attributable to Defendants. .......................................239

    i.  EIP ..............................................................................240

    ii.  The Virality Project ......................................................244

f.  Social media companies' voluntary consultation with agencies for scientific and medical information about COVID-19 does not support a state action finding relating to "other agencies." ..................................................248

5.  Even if Plaintiffs could show that any social media content moderation actions amount to state action, the Court cannot necessarily conclude that all of those content moderation actions violate the First Amendment ..............................................250

C.  Plaintiffs are not likely to prevail on their APA and Ultra Vires claims. ...........253

III.  Plaintiffs fail to satisfy the remaining preliminary injunction requirements. ................257

IV.  Plaintiffs' proposed injunction is improper. .................................................261

A.  Plaintiffs' proposed injunction lacks the specificity required by Federal Rule of Civil Procedure 65. ..................................................262

B.  Plaintiffs' proposed injunction is impermissibly overbroad. ............................264

CONCLUSION..............................................................................................275

## TABLE OF AUTHORITIES

### CASES

*Abu-Jamal v. Nat'l Pub. Radio,*
  No. 96-cv-0594, 1997 WL 527349 (D.D.C. Aug. 21, 1997), *aff'd,*
  159 F.3d 635 (D.C. Cir. 1998) ....................................................................... 187

*Adickes v. S.H. Kress & Co.,*
  398 U.S. 144 (1970) ........................................................................................ 146

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.,*
  140 S. Ct. 2082 (2020) ................................................................................... 253

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.,*
  878 F.2d 806 (5th Cir. 1989) ......................................................................... 101

*Alvarez v. O'Brien,*
  No. 8:21-cv-303, 2022 WL 5209377 (D. Neb. Oct. 5, 2022) ..................... 274, 275

*Am. Civil Liberties Union v. Clapper,*
  785 F.3d 787 (2d Cir. 2015) .......................................................................... 258

*Am. Family Ass'n v. City. & Cnty. of S.F.,*
  277 F.3d 1114 (9th Cir. 2002) ................................................................. 174, 176

*Am. Mfrs. Ins. Co. v. Sullivan,*
  526 U.S. 40 (1999) ................................................................................. *passim*

*Anderson v. Jackson,*
  556 F.3d 351 (5th Cir. 2009) ......................................................................... 101

*Anderson v. United States,*
  417 U.S. 211 (1974) ....................................................................................... 227

*Appellant's Reply Brief to Cal. Sec'y of State Shirley Weber,*
  --- F.4th ---, 2022 WL 4389216 (9th Cir. Sept. 14, 2022) .......................... 145

*Ark. Project v. Shaw,*
  775 F.3d 641 (5th Cir. 2014) ......................................................................... 104

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton,*
  997 F.2d 898 (D.C. Cir. 1993) ....................................................................... 255

*Atiyeh v. Capps,*
  449 U.S. 1312 (1981) ..................................................................................... 262

*Backpage.com, LLC v. Dart,*
  807 F.3d 229 (7th Cir. 2015) .................................................... 146, 170, 175, 176

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) ........................................................................170, 171, 172, 173

*Barber v. Bryant,*
  860 F.3d 345 (5th Cir. 2017) ...................................................................*passim*

*Bass v. Parkwood Hosp.,*
  180 F.3d 234 (5th Cir. 1999) ................................................... 194, 195, 214

*Bates v. State Bar of Ariz.,*
  433 U.S. 350 (1977) ...........................................................................................249

*Batterton v. Marshall,*
  648 F.2d 694 (D.C. Cir. 1980) .......................................................................253

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth,*
  529 U.S. 217 (2000) ...........................................................................................102

*Benisek v. Lamone,*
  138 S. Ct. 1942 (2018) ......................................................................................126

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................... 113, 255

*Beverly v. United States,*
  468 F.2d 732 (5th Cir. 1972) ..........................................................................258

*Block v. Meese,*
  793 F.2d 1303 (D.C. Cir. 1986) .....................................................................176

*Bluefield Water Ass'n v. City of Starkville,*
  577 F.3d 250 (5th Cir. 2009) ..........................................................................104

*Blum v. Yaretsky,*
  457 U.S. 991 (1982) ...................................................................................*passim*

*Boire v. Pilot Freight Carriers, Inc.,*
  515 F.2d 1185 (5th Cir. 1975) ........................................................................127

*Bowen v. Georgetown Univ. Hosp.,*
  488 U.S. 204 (1988) ...........................................................................................253

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,*
  531 U.S. 288 (2001) ............................................................................... 137, 246

*Buckley v. Valeo,*
  424 U.S. 1 (1976) ................................................................................................191

*Buentello v. Boebert*,
   545 F. Supp. 3d 912 (D. Colo. 2021) ....................................................................187

*Burson v. Freeman*,
   504 U.S. 191 (1992) ...........................................................................................252

*Burton v. City of Belle Glade*,
   178 F.3d 1175 (11th Cir. 1999) ........................................................................264

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ...........................................................................................264

*California v. Texas*,
   141 S. Ct. 2104 (2021) .......................................................................................261

*Campbell v. PMI Food Equip. Grp., Inc.*,
   509 F.3d 776 (6th Cir. 2007) ............................................................................144

*Chambless Enter., LLC v. Redfield*,
   508 F. Supp. 3d 101 (W.D. La. 2020) ...............................................................260

*Changizi v. HHS*,
   602 F. Supp. 3d 1031 (S.D. Ohio 2022), *appeal filed*,
   No. 22-3573 (6th Cir. June 6, 2022) .........................................162, 166, 169, 253

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
   370 F.3d 151 (1st Cir. 2004)..............................................................................126

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979) ...........................................................................................253

*Citibank, N.A. v. Citytrust*,
   756 F.2d 273 (2d Cir. 1985) .......................................................................126, 127

*Commodity Trend Service, Inc. v. CFTC*,
   233 F.3d 981 (7th Cir. 2000) ............................................................................252

*Common Cause v. Nuclear Regul. Comm'n*,
   674 F.2d 921 (D.C. Cir. 1982) ..........................................................................262

*Cornish v. Corr. Servs. Corp.*,
   402 F.3d 545 (5th Cir. 2005) .....................................................................149, 214

*Dalton v. Specter*,
   511 U.S. 462 (1994) ...........................................................................................255

*Daniels v. Alphabet, Inc.*,
   No. 20-cv-04687, 2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) .....................186

*Danos v. Jones*,
　652 F.3d 577 (5th Cir. 2011) ................................................................ 255

*Davis v. Pension Benefit Guar. Corp.*,
　571 F.3d 1288 (D.C. Cir. 2009) ............................................................ 257

*Def. Distrib. v. U.S. Dep't of State*,
　838 F.3d 451 (5th Cir. 2016) ................................................................ 258

*Dep't of the Navy v. Egan*,
　484 U.S. 518 (1988) ............................................................................. 252

*Doe v. Google*,
　No. 20-cv-07502-BLF, 2021 WL 4864418 (N.D. Cal. Oct. 19, 2021), *aff'd*,
　2022 WL 17077497 (9th Cir. Nov. 18, 2022) ............................... 215, 217

*Doe v. Google LLC*,
　No. 21-16934, 2022 WL 17077497 (9th Cir. Nov. 18, 2022) ........................ *passim*

*Donald J. Trump for President, Inc. v. Way*,
　492 F. Supp. 3d 354 (D.N.J. 2020) ....................................................... 258

*El Paso Cnty. v. Trump*,
　982 F.3d 332 (5th Cir. 2020) ................................................................ 129

*Elrod v. Burns*,
　427 U.S. 347 (1976) ............................................................................. 104

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
　762 F.2d 464 (5th Cir. 1985) ................................................................ 102

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
　521 F.3d 1157 (9th Cir. 2008) ................................................................ 20

*Fairley v. PM Mgmt.-San Antonio AL, LLC*,
　724 F. App'x. 343 (5th Cir. 2018) ........................................................ 239

*Flagg Bros. v. Brooks*,
　436 U.S. 149 (1978) ............................................................................. 221

*Flight Training Int'l, Inc. v. Fed. Aviation Admin.*,
　58 F.4th 234 (5th Cir. 2023) ......................................................... 256, 257

*Ford v. NYLCare Health Plans of Gulf Coast, Inc.*,
　301 F.3d 329 (5th Cir. 2002) ................................................................ 131

*Frazier v. Bd. of Trs. of Nw. Miss. Reg'l Med. Ctr.*,
　765 F.2d 1278 (5th Cir.), *amended*, 777 F.2d 329 (5th Cir. 1985) .......... 214, 216, 217, 218

*Freedom From Religion Found., Inc. v. Obama*,
   641 F.3d 803 (7th Cir. 2011) ............................................................... 147, 269, 270

*FTC v. Facebook, Inc.*,
   581 F. Supp. 3d 34 (D.D.C. 2022) ....................................................................192

*Gallagher v. Neil Young Freedom Concert*,
   49 F.3d 1442 (10th Cir. 1995) ..........................................................................144

*Garzes v. Lopez*,
   281 F. App'x 323 (5th Cir. 2008) .....................................................................133

*George v. Edholm*,
   752 F.3d 1206 (9th Cir. 2014) ................................................................. 194, 195

*Giboney v. Empire Storage & Ice Co.*,
   336 U.S. 490 (1949) ..........................................................................................251

*Google, Inc. v. Hood*,
   822 F.3d 212 (5th Cir. 2016) ............................................................................104

*Guillot v. Garrett*,
   970 F.2d 1320 (4th Cir. 1992) ..........................................................................252

*H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs. LLC*,
   No. 3:09-CV-00393, 2009 WL 1766095 (N.D. Tex. June 23, 2009) ........... 126, 127

*Haig v. Agee*,
   453 U.S. 280 (1981) ..........................................................................................252

*Hammerhead Enters., Inc. v. Brezenoff*,
   707 F.2d 33 (2d Cir. 1983) .....................................................174, 178, 180, 185

*Harmon v. Dallas Cnty.*,
   927 F.3d 884 (5th Cir. 2019) ............................................................................273

*Hart v. Facebook, Inc.*,
   No. 22-cv-737, 2022 WL 1427507 (N.D. Cal. May 5, 2022) ...................... 161, 162

*Henson v. Santander Consumer USA Inc.*,
   582 U.S. 79 (2017) ............................................................................................188

*Holder v. Humanitarian L. Project*,
   561 U.S. 1 (2010) ..............................................................................................252

*Holmberg v. Armbrecht*,
   327 U.S. 392 (1946) ..........................................................................................126

*Howard Gault Co. v. Tex. Rural Legal Aid, Inc.*,
848 F.2d 544 (5th Cir. 1988) ...................................................................................*passim*

*Huber v. Biden*,
No. 21-CV-06580-EMC, 2022 WL 827248 (N.D. Cal. Mar. 18, 2022), *aff'd*,
2023 WL 17818543 (9th Cir. Dec. 20, 2022)....................................................................215

*Humana, Inc. v. Jackson*,
804 F.2d 1390 (5th Cir. 1986) ..........................................................................................104

*Illinois v. Telemarketing Assocs., Inc.*,
538 U.S. 600 (2003) ..........................................................................................................251

*Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*,
946 F.3d 649 (5th Cir. 2019) ............................................................................................131

*Informed Consent Action Network v. YouTube LLC*,
582 F. Supp. 3d 712 (N.D. Cal. 2022)...............................................................................186

*INS v. Chadha*,
462 U.S. 919 (1983)...........................................................................................................186

*INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Labor*,
510 U.S. 1301 (1993) .........................................................................................................265

*Jackson v. Metro. Edison Co.*,
419 U.S. 345 (1974) ................................................................................................ 137, 214, 221

*Juliana v. United States*,
947 F.3d 1159 (9th Cir. 2020), *denying reh'g en banc*, 986 F.3d 1295 (9th Cir. 2021).........261

*Jungels v. Pierce*,
825 F.2d 1127 (7th Cir. 1987) ..........................................................................................274

*Justin Indus., Inc. v. Choctaw Secs., L.P.*,
920 F.2d 262 (5th Cir. 1990) ............................................................................................104

*Keller v. State Bar of Cal.*,
496 U.S. 1 (1990)...............................................................................................................261

*Kentucky v. Biden*,
23 F.4th 585 (6th Cir. 2022) .............................................................................................113

*La. Div. Sons of Confederate Veterans v. City of Natchitoches*,
821 F. App'x 317 (5th Cir. 2020) ...............................................................................*passim*

*Laird v. Tatum*,
408 U.S. 1 (1972)...............................................................................................................179

*Leach v. Carlile*,
   258 U.S. 138 (1922) ................................................................................................252

*Louisiana v. Biden*,
   45 F.4th 841 (5th Cir. 2022) ....................................................................................263

*Lugar v. Edmondson Oil Co.*,
   457 U.S. 922 (1982) ................................................................................................214

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .........................................................................................129, 133

*M.D. ex rel. Stukenberg v. Abbott*,
   907 F.3d 237 (5th Cir. 2018) ....................................................................................263

*Maher v. Roe*,
   432 U.S. 464 (1977) .........................................................................................147, 153

*Manhattan Cmty. Access Corp. v. Halleck*,
   139 S. Ct. 1921 (2019) .....................................................................................137, 214

*Martinez v. Mathews*,
   544 F.2d 1233 (5th Cir. 1976) ..........................................................................101, 102

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ................................................................................................113

*Matal v. Tam*,
   582 U.S. 218 (2017) ..................................................................................125, 147, 153

*Mayo Found. for Med. Educ. & Rsch. v. BP Am. Prod. Co.*,
   447 F. Supp. 3d 522 (N.D. Tex. 2020) ......................................................................257

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ................................................................................................101

*McSurely v. McClellan*,
   553 F.2d 1277 (D.C. Cir. 1976) ...............................................................................187

*Meyer v. Brown & Root Constr. Co.*,
   661 F.2d 369 (5th Cir. 1981) ....................................................................................264

*Minnesota Voters Alliance v. Mansky*,
   138 S. Ct. 1876 (2018) ............................................................................................266

*Montient Corp. v. Dondero*,
   529 F.3d 532 (5th Cir. 2008) ....................................................................................103

*Moody v. Farrell*,
    868 F.3d 348 (5th Cir. 2017) ............................................................*passim*

*Mountain Med. Equip., Inc. v. Healthdyne, Inc.*,
    582 F. Supp. 846 (D. Colo. 1984) ...................................................106

*Multimedia Holdings Corp. v. Cir. Ct. of Fla., St. Johns Cnty.*,
    544 U.S. 1301 (2005) ............................................................ 173, 179

*Nat'l Collegiate Athletic Ass'n v. Tarkanian*,
    488 U.S. 179 (1988) ...................................................................138

*National Rifle Ass'n of America v. Cuomo*,
    350 F. Supp. 3d 94 (N.D.N.Y. 2018) ...............................................179

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ...................................................................102

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    49 F.4th 700 (2d Cir. 2022), *petition for cert. filed*,
    No. 22-842 (U.S. Mar. 6, 2023) ...............................177, 178, 179, 185

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021), *aff'd sub nom.*,
    *New York v. Meta Platforms, Inc.*,
    --- F.4th ---, 2023 WL 3102921 (D.C. Cir. Apr. 27, 2023) ...................192

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................257

*Norwood v. Harrison*,
    413 U.S. 455 (1973) ...................................................................193

*O'Handley v. Padilla*,
    579 F Supp. 3d 1163 (N.D. Cal. 2022), *aff'd sub nom.*, *O'Handley v. Weber*,
    62 F.4th 1145 (9th Cir. 2023) .......................................................215

*O'Handley v. Weber*,
    62 F.4th 1145 (9th Cir. 2023) ..................................................*passim*

*Okwedy v. Molinari*,
    333 F.3d 339 (2d Cir. 2003) ............................................ 170, 171, 178

*Paez v. Wal-Mart Stores, Tex., LLC*,
    No. EP-20-CV-00321-DCG, 2022 WL 3216343 (W.D. Tex. Aug. 9, 2022)..........223

*Payne v. Travenol Lab., Inc.*,
    565 F.2d 895 (5th Cir. 1978) .........................................................264

*Peery v. Chi. Hous. Auth.*,
    791 F.3d 788 (7th Cir. 2015) ............................................................ 147, 269, 270

*Penthouse Int'l, Ltd. v Meese*,
    939 F.2d 1011 (D.C. Cir. 1991) ..................................................................*passim*

*Penthouse Int'l, Ltd. v. McAuliffe*,
    610 F.2d 1353 (5th Cir. 1980) ......................................................................172

*Peterson v. City of Greenville*,
    373 U.S. 244 (1963) ..................................................................................179

*Pham v. Univ. of La. at Monroe*,
    194 F. Supp. 3d 534 (W.D. La. 2016) ................................................... 106, 108

*Pikaluk v. Horseshow Ent., L.P.*,
    810 F. App'x 243 (5th Cir. 2020) ...............................................................246

*Playboy Enters., Inc. v. Meese*,
    639 F. Supp. 581 (D.D.C. 1986) .................................................................175

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009) ..................................................................................*passim*

*R.C. Maxwell Co. v. Borough of New Hope*,
    735 F.2d 85 (3d Cir. 1984) ..................................................174, 179, 185, 190

*Rattner v. Netburn*,
    930 F.2d 204 (2d Cir. 1991) ......................................................................177

*Reilly v. Pinkus*,
    338 U.S. 269 (1949) ..................................................................................252

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ..................................................................................102

*Roviaro v. United States*,
    353 U.S. 53 (1957) ....................................................................................259

*S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*,
    499 F.3d 553 (6th Cir. 2007) .....................................................................144

*Schilling v. Speaker of U.S. House of Representatives*,
    --- F. Supp. 3d ---, 2022 WL 4745988 (D.D.C. Oct. 3, 2002), *appeal filed*,
    No. 22-5290 (D.C. Cir. Nov. 4, 2022)..........................................................187

*Schmidt v. Lessard*,
    414 U.S. 473 (1974) ..................................................................................262

*Scott v. Schedler*,
   826 F.3d 207 (5th Cir. 2016) ............................................................... 263, 264

*Seals v. McBee*,
   898 F.3d 587 (5th Cir. 2018), *as revised* (Aug. 9, 2018) ............................. 133, 265

*SEC v. First Fin. Group of Tex.*,
   645 F.2d 429 (5th Cir. Unit A 1981).................................................................... 105

*SEC v. Life Partners Holding, Inc.*,
   854 F.3d 765 (5th Cir. 2017) ............................................................................ 264

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
   140 S. Ct. 2183 (2020) ..................................................................................... 269

*Shenzhen Tange Li'An E-Com., Co. v. Drone Whirl LLC*,
   No. 1:20-CV-738, 2020 WL 5237267 (W.D. Tex. Sept. 2, 2020)........................ 126

*Sierra Club v. Peterson*,
   228 F.3d 559 (5th Cir. 2000) ............................................................................ 256

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976)........................................................................................... 132

*Skinner v. Ry. Labor Execs. Ass'n*,
   489 U.S. 602 (1989) ................................................................................. 141, 142

*Smith v. Town of Lake Providence*,
   No. 3:22-CV-01319, 2022 WL 16626762 (W.D. La. Oct. 17, 2022)................... 273

*Spiegel v. City of Houston*,
   636 F.2d 997 (5th Cir. Unit A 1981).................................................................. 258

*Star Sys. Int'l Ltd. v. Neology, Inc.*,
   No. 4:18-CV-00574, 2019 WL 679138 (E.D. Tex. Feb. 19, 2019)...................... 211

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
   No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)............................ 20

*Stringer v. Whitley*,
   942 F.3d 715 (5th Cir. 2019) ............................................................................ 107

*Tara Enters., Inc. v. Humble*,
   622 F.2d 400 (8th Cir. 1980) ............................................................................ 274

*Texas v. Rettig*,
   987 F.3d 518 (5th Cir. 2021), *cert. denied sub nom.*,
   *Texas v. Comm'r of Internal Revenue*, 142 S. Ct. 1308 (2022) ........................... 256

*Town of Chester v. Laroe Ests., Inc.*,
   581 U.S. 433 (2017) ...................................................................................134

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) .............................................................................114

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) .............................................................................191

*Trump v. Mazars USA, LLP*,
   140 S. Ct. 2019 (2020) .............................................................................187

*Trump v. Twitter, Inc.*,
   602 F. Supp. 3d 1213 (N.D. Cal. 2022), *appeal filed*,
   No. 22-15961 (9th Cir. June 28, 2022)........................................... 187, 188

*Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*,
   229 F.3d 478 (5th Cir. 2000) ....................................................................273

*Ty, Inc. v. Jones Group, Inc.*,
   237 F.3d 891 (7th Cir. 2001) ....................................................................126

*United States v. Mackey*,
   No. 21-CR-80, 2023 WL 363595 (E.D.N.Y. Jan. 23, 2023)..............265, 266

*United States v. Phillip Morris USA Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009) ................................................................263

*United States v. Reddick*,
   900 F.3d 636 (5th Cir. 2018) ....................................................................225

*United States v. Scroggins*,
   599 F.3d 433 (5th Cir. 2010) ....................................................................223

*United States v. Stevens*,
   559 U.S. 460 (2010) ..........................................................................251, 252

*United States v. Tobin*,
   No. 04-cr-216-01-sm, 2005 WL 3199672 (D.N.H. Nov. 30, 2005) ....................227

*VDARE Found. v. City of Colo. Springs*,
   11 F.4th 1151 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1208 (2022).............................*passim*

*Vote.Org v. Callanen*,
   39 F.4th 297 (5th Cir. 2022) ....................................................................135

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
   576 U.S. 200 (2015) ............................................................102, 138, 176, 250

*Walmart Inc. v. U.S. Dep't of Just.*,
   21 F.4th 300 (5th Cir. 2021) ...................................................................253

*Washington v. Trump*,
   858 F.3d 1168 (9th Cir. 2017) ...............................................................191

*Watts v. Northside Indep. Sch. Dist.*,
   37 F.4th 1094 (5th Cir. 2022) ................................................................193

*White v. Commc'ns Workers of Am., AFL-CIO, Loc. 1300*,
   370 F.3d 346 (3d Cir. 2004) ...........................................................143, 144

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ...............................................................................130

*Williams-Yulee v. Fla. Bar*,
   575 U.S. 433 (2015) ...............................................................................252

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...........................................................101, 110, 257, 258

*X-Men Sec., Inc. v. Pataki*,
   196 F.3d 56 (2d Cir. 1999) .....................................................................176

*Young v. Motion Picture Ass'n of Am., Inc.*,
   299 F.2d 119 (D.C. Cir. 1962) ...............................................................126

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ...............................................................................191

*Zamecnik v. Indian Prairie Sch. Dist.*,
   619 F. Supp. 2d 517 (N.D. Ill. 2007) .....................................................264

*Zieper v. Metzinger*,
   474 F.3d 60 (2d Cir. 2007) .............................................................177, 188

*Zimmerman v. City of Austin*,
   881 F.3d 378 (5th Cir. 2018) ..................................................................109

**STATUTES**

5 U.S.C. § 551.................................................................................255, 256

5 U.S.C. § 553.........................................................................................256

5 U.S.C. § 702.........................................................................................255

5 U.S.C. § 704.........................................................................................255

5 U.S.C. § 706.................................................................................................255

6 U.S.C. § 652..........................................................................................69, 254

18 U.S.C. § 241.....................................................................................227, 265

18 U.S.C. § 912.................................................................... 38, 68, 157, 249

18 U.S.C. § 1343...........................................................................................252

18 U.S.C. §§ 2251 *et seq.*...........................................................................265

22 U.S.C. § 2656 note..............................................................................87, 254

28 U.S.C. § 533.............................................................................................254

42 U.S.C. § 284.....................................................................................202, 254

42 U.S.C. § 285f.....................................................................................65, 202

42 U.S.C. § 300u..........................................................................................254

47 U.S.C. § 230.............................................................................. 19, 20, 28

50 U.S.C. §§ 1701 *et seq.*............................................................................92

Telecommunications Act of 1996,
    Pub. L. No. 104-104, 110 Stat. 56 (codified at 47 U.S.C. § 230)..........................19

National Defense Authorization Act for Fiscal Year 2021,
    Pub. L. No. 116-283, 134 Stat. 3388...........................................................81

Joint Resolution of Apr. 10, 2023,
    Pub. L. No. 118-3, 137 Stat. 6 ...........................................................39, 115

**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 6.................................................................................188

U.S. Const. art. II, § 3 .............................................................................191

**RULES**

Fed. R. Civ. P. 25.......................................................................................275

Fed. R. Civ. P. 65............................................................................. 5, 262, 263

## REGULATIONS

Reorganization Plan No. 3 of 1966,
    31 Fed. Reg. 8855 (June 25, 2016) ................................................................ 40, 184

Office of the Assistant Secretary for Health; Statement of Organization, Functions and
    Delegations of Authority,
    52 Fed. Reg. 11,754 (Apr. 10, 1987) ..................................................................... 40

Exec. Order No. 13,848,
    83 Fed. Reg. 46,843 (Sept. 12, 2018) ............................................................. 93, 197

Continuation of the National Emergency With Respect to Foreign Interference in or
    Undermining Public Confidence in United States Elections,
    84 Fed. Reg. 48,039 (Sept. 10, 2019) ............................................................. 93, 197

Exec. Order No. 13,925, Preventing Online Censorship,
    85 Fed. Reg. 34,079 (May 28, 2020), rescinded by
    Exec. Order No. 14,029, Revocation of Certain Presidential Actions and Technical
    Amendment, 86 Fed. Reg. 27,025 (May 14, 2021) .................................................. 21

Declaring a National Emergency Concerning the Novel Coronavirus (COVID-19)
    Outbreak, Proclamation No. 9994,
    85 Fed. Reg. 15,337 (Mar. 13, 2020) ............................................................. 13, 116

Continuation of the National Emergency With Respect to Foreign Interference in or
    Undermining Public Confidence in the United States Elections,
    85 Fed. Reg. 56,469 (Sept. 10, 2020) ............................................................. 93, 197

Exec. Order No. 13,987,
    86 Fed. Reg. 7019 (Jan. 20, 2021) ....................................................................... 40

Impact of Health Misinformation in the Digital Information Environment in the
    United States Throughout the COVID-19 Pandemic Request for Information (RFI),
    87 Fed. Reg. 12,712 (May 7, 2022) ...................................................... 44, 169, 184

## OTHER AUTHORITIES

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and
    Procedure* § 2948.1 (3d ed. 2013) ...................................................................... 104

## INTRODUCTION

The record in this case shows that the Federal Government promoted necessary and responsible actions to protect public health, safety, and security when confronted by a deadly pandemic and hostile foreign assaults on critical election infrastructure. Among those efforts, various agencies and officials spoke publicly and privately with social media companies to promote the Government's message on issues of public health and safety, identify potential threats to election integrity and security on social media, and call the companies' attention to misinformation spreading on their platforms.

Plaintiffs condemn these efforts as a wide-ranging "Censorship Enterprise" constituting "some of the most egregious First Amendment violations in American history." Pls.' Supp. Prelim. Inj. Br. at 1 (Dkt. 214) ("PI Supp."). To do so, Plaintiffs press a far-ranging conspiracy theory in which dozens of federal agencies and officials, across multiple administrations, have allegedly coerced or colluded with every large-scale social media company to suppress speech and speakers expressing views on COVID-19 and election integrity that are "disfavored" by the current Administration. But Plaintiffs' repetition of the word "censorship" and its equivalents does not cure the significant factual deficiencies in their theory—including that much of the challenged conduct occurred in the previous Administration—or transform sheer speculation into concrete proof. Indeed, despite receiving thousands of pages of documents and deposing multiple federal officials over an eight-month period, Plaintiffs fail to cite any evidence of past or (critically) imminent violations of their First Amendment rights to support their request for extraordinary preliminary relief. And when confronted with evidence that *undermines* their arguments, Plaintiffs urge the Court to simply disregard the facts and adopt Plaintiffs' conclusory allegations and speculations instead. Although the Court accepted Plaintiffs' factual allegations in ruling on

Defendants' motion to dismiss, allegations alone are not enough to justify preliminary injunctive relief. Plaintiffs must now back up their allegations with evidence. Their failure to do so necessarily means that they cannot meet any of the preliminary injunction requirements.

*First*, and most starkly, Plaintiffs cannot establish that they will suffer any ongoing or imminent irreparable harm in the absence of a preliminary injunction. In their more than 500 pages of briefing, Plaintiffs devote just *two sentences* to this dispositive factor. And the only argument Plaintiffs advance is that because they have alleged a First Amendment violation, irreparable harm must be assumed. But even when a First Amendment violation is alleged, a plaintiff still must establish that the allegedly ongoing or imminent harm is *real*. Plaintiffs' stale, nearly year-old declarations pointing to even older content moderation decisions fail to make that showing.

*Second*, Plaintiffs cannot establish a likelihood of success on the merits. To start, Plaintiffs lack Article III standing. They submit no evidence of an impending harm to a legally cognizable interest. Nor do they submit evidence supporting their far-fetched assertion that impending harms—whatever they may be—will result from the Government's alleged coercion of social media companies, rather than the companies' own economic interest in maximizing advertising revenues (the lifeblood of their businesses) and societal influences that inform the companies' content moderation decisions. Absent this type of evidence, Plaintiffs have no basis for concluding that social media companies, which have regulated content on their platforms since the industry's earliest days and which are not parties to this case, will spontaneously cease their content moderation efforts if the Court enjoins the Government from speaking.

Plaintiffs' claims fare no better on the merits. To succeed on their First Amendment claims, Plaintiffs must first make the difficult showing that a particular content moderation decision that harmed them is attributable to a particular Defendant. The Supreme Court has repeatedly held that

the government may be deemed responsible for private conduct only if (1) the government coerced, or significantly encouraged to the point of compelling, the private party into engaging in that conduct, or (2) the government jointly participated in that conduct to such an extent that the private party operated as a government actor. The record here contains no evidence satisfying these demanding standards. Rather, it shows that government officials expressed positions on matters of significant public concern—precisely what the Government is entitled to do, and indeed what the public expects. The Constitution preserves the Government's right to encourage specific private behavior, such as joining a war effort, stopping the sale of cigarettes to children, and—in this case—reducing the spread of misinformation that undermines election security or the nation's efforts to protect the public from the spread of a deadly disease. A social media company's independent decision to follow the Government's urgings does not transform the company's conduct into government action.

Nor does the statutory environment alter the analysis. Plaintiffs make much of the fact that federal officials, including members of a separate branch of government, have advocated for reform to § 230 of the Communications Decency Act. Those calls for reform have come from Members of Congress from both major political parties, federal officials from multiple administrations, and Defendants and non-Defendants alike. That social media companies—like many other important companies—face the potential for legislative reform does not transform each and every suggestion or encouragement from a federal official into a potential constitutional problem. Yet adopting Plaintiffs' legal theory would have precisely that result, thrusting courts into the role of policing every communication from any federal official to or about a social media company, and disabling federal officials from freely advocating in the public interest as to some

of the most critical actors in our society. Neither the state action doctrine nor the First Amendment warrants that result.

In tacit acknowledgement that they cannot satisfy the actual state action standard, Plaintiffs repeatedly urge the Court to water that standard down, or even to adopt Plaintiffs' newly created state action theories (such as "deception" or "collusion") instead. Plaintiffs then repeatedly mischaracterize the evidence to fit those newly fabricated theories. But no matter how Plaintiffs spin the law or the evidence, they fail to satisfy their burden of showing that any single Defendant is *responsible* for any particular content moderation decision under settled state action principles. And in the absence of any such evidence, Plaintiffs' claims do not vindicate any free speech interest. Rather, they simply seek to portray government speech on a range of topics with which Plaintiffs disagree as "censorship" and to invoke the authority of the Court to silence that speech. The First Amendment lends no support to that effort.

Plaintiffs face no greater likelihood of success on their ultra vires and Administrative Procedure Act (APA) claims. Those claims run up against several jurisdictional hurdles. And on the merits, Plaintiffs merely rehash their failed First Amendment claims and advance a claim of procedurally improper rulemaking that is specious on its face.

*Third*, the balance of harms tips sharply in favor of Defendants. Plaintiffs' interests in preventing interference with their First Amendment freedoms may be substantial in the abstract, but on this record, they are entirely speculative, and they are far outweighed by the Government's interest in speaking and taking action to promote the public interest. Plaintiffs' sweeping and vague proposed injunction would effectively muzzle the White House and multiple federal agencies, with dire consequences for law enforcement, national security, and public health interests that Defendants have the power and duty to protect. In particular, as explained in five agency

declarations filed with this brief, Plaintiffs' proposed injunction could prevent the dissemination of vital public health information, communications with social media companies about criminal activity in process on their platforms, and efforts to act on national security threats relating to international terrorism and election security. The resulting harm inflicted on society as a whole is reason enough to deny Plaintiffs' requested preliminary injunction.

Moreover, even if Plaintiffs could satisfy each of the requirements for a preliminary injunction, their proposed injunction should be denied because it fails to satisfy the specificity requirement of Federal Rule of Civil Procedure 65(d). The proposed injunction's numerous vague and undefined terms fail to put Defendants on reasonable notice as to what conduct is enjoined. The injunction is also overbroad, as it would sweep in a host of government conduct that does not implicate any protected First Amendment interest, while obstructing legitimate efforts by the Federal Government to fulfill its critical law enforcement, national security, and public health missions.

The Court should deny Plaintiffs' motion for a preliminary injunction.

## BACKGROUND AND PROPOSED FINDINGS OF FACT

I.  **For years, in response to public sentiment, social media companies have sought to identify and contain misinformation on their platforms.**

A. **Since their emergence, social media companies have been economically incentivized to moderate content on their platforms.**

1.      Social media companies, such as Facebook, Twitter, and YouTube, are for-profit companies that allow users and advertisers to post content on their platforms subject to their terms of service. Since the emergence of the first social media companies in the early 2000s, these companies have moderated content uploaded to their platforms. *See, e.g.*, *Making the Internet Safe for Kids: The Role of ISP's and Social Networking Sites: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Com.*, 109th Cong. 214-16 (2006)

(statement of Chris Kelly, Chief Privacy Officer, Facebook.com, Inc.); *see also id.* at 219

(statement of Michael Agnus, Executive Vice President & General Counsel, MySpace).[1] For

example, as early as 2003, the earliest social media platforms (*e.g.*, Friendster) had terms of service

that included content moderation provisions that barred, among other things, false and misleading

information. Declaration of Dr. Stuart Gurrea (Gurrea Decl.) ¶¶ 12, 68 (Ex. 1). Over the years as

social media companies grew and developed, including periods well before 2020, content

moderation by the companies "has responded to evolving concerns, including terrorism, election

interference, and public health concerns." *Id.* Today, each major company requires users and

advertisers to agree to extensive conditions—including conditions related to content moderation—

in exchange for authorization to use its platforms.[2]

2.     As Defendants' expert economist Dr. Stuart Gurrea has explained, social media

platforms are intrinsically economically incentivized to moderate content on their platforms

because moderation contributes to retaining users and increasing their engagement. Gurrea Decl.

¶¶ 12, 44-46. (Ex. 1).[3] Increased user numbers and engagement, in turn, increases the number of

---

[1] *See* Gurrea Decl. ¶¶ 12-13 (Ex. 1) (explaining that social media companies have moderated content since their emergence).

[2] *See* Gurrea Decl. ¶ 12 (Ex. 1).

[3] Social media platforms are a type of two- (or multi-) sided market where, on one side of the platform, users interact with each other or access content and, on the other side, advertisers target consumers through the platform. Gurrea Decl. ¶ 33 (Ex. 1). Typically, social media platforms attract and maintain a large user base and collect user data—and users derive more value from the platforms as the number of users increase. *Id.* ¶ 34. On the other side of the platform, advertisers target users with specific demographic characteristics or interests, and social media platforms facilitate this targeted advertising by relying on user data. *Id.* ¶ 35. Advertisers on social media platforms want their products displayed on their platform in a manner that enhances the brand reputation of the product, as brand reputation affects consumer decisions. *Id.* ¶ 36. And because social media platforms primarily generate revenue through advertising, it is in their economic interest to attract a large user base and increase user engagement. *Id.* ¶ 39. Consequently, "social media platforms are incentivized economically to moderate content on their platforms because content moderation is a quality-control decision that impacts user engagement and advertising revenue." *Id.* ¶ 42.

people viewing advertisements, thus resulting in an increase in both advertising revenues and platforms' profits. *Id.* ¶¶ 11, 41. In addition, content moderation that preserves or enhances the reputation and value of an advertiser's product directly makes the platform more valuable to the advertiser, and therefore increases advertising revenues and the platform's profits. *Id.* ¶¶ 12, 38, 48. Conversely, inadequate content moderation that is detrimental to user engagement likely will reduce advertising revenue because the value of a platform to advertisers depends on the level of user engagement and the quality of the user experience. *Id.* ¶¶ 12, 38, 45, 54, 62. This is particularly true for Twitter, Facebook, and YouTube, among others, as they operate under "particularly strong economic incentives to moderate content," because they rely on a large user base to attract advertisers and thus focus on retaining the large group of users who may be alienated by more extreme views. *Id.* ¶ 44.

3.      Consistent with Dr. Gurrea's analysis, the social media companies themselves have commented publicly that they adopt and apply their content moderation policies based on customer and advertiser demands. For example, a former representative from Twitter recently explained in congressional testimony that the company has long seen the "lawful but awful . . . speech of a small number of abusive users drive away countless others." *See* Ex. 2 at 6 (*Protecting Speech from Government Interference and Social Media Bias, Part 1: Twitter's Role in Suppressing the Biden Laptop Story: Hearing Before the H. Comm on Oversight & Accountability*, 118th Cong. (2023)); *see also id.* at 5 (emphasizing the importance of "the health of the conversation"). Twitter's decision to adopt and apply content moderation policies "was based on customer research, advertiser feedback, Twitter's declining revenue, user growth, and stock price." *Id.*

4.      Other social media platforms similarly have attested to the user and advertiser preferences that have long impelled platform content moderation policies and measures. For

example, a YouTube representative has explained that "advertisers typically do not want to be associated with controversial or sensitive content on YouTube," and so the company allows content creators "the privilege of earning advertiser revenue," or "monetization," of the videos they post, only if those content creators "meet more restrictive criteria, including" certain "Advertiser-friendly Content Guidelines." Declaration of Alexandra N. Veitch ¶¶ 17, 50, *Netchoice, LLC v. Paxton*, No. 21-cv-840 (W.D. Tx. Sept. 30, 2021), ECF No. 8-5 (Ex. 3). And similarly, "advertisers will not advertise on Facebook if they believe it is not effective at removing harmful content or content that violates [its] community standards. Indeed, people and advertisers have stopped using Facebook due to these concerns." Declaration of Neil Potts ¶ 8, *Netchoice, LLC v. Paxton*, No. 21-cv-840 (W.D. Tx. Sept. 30, 2021), ECF No. 8-6 (Ex. 4); *cf. NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022) (vacating preliminary injunction and remanding), *pet'n for cert. filed*, No. 22-555 (U.S. Dec. 15, 2022).

5.    Platform responses to advertiser concerns stem from real world experience. In 2017, for example, a wave of companies pulled their advertisements from YouTube for fear of association with "offensive or extremist videos," before YouTube bolstered its policies and enforcement. *See* Ex. 84 at 2 (Brett Molina, *Many YouTube creators frustrated by changes in policies, practices*, USA TODAY (Apr. 5, 2018)) ("Major advertisers including AT&T and Verizon started pulling their business from YouTube in March 2017 after discovering their ads were appearing on offensive or extremist videos. YouTube parent company Google said it would start an 'extensive review' of its ad policies."). In 2020, Facebook similarly was forced to address advertiser concerns when "[m]ore than 750 companies including Coca-Cola, Hershey and Unilever . . . temporarily paused their advertising on Facebook and its subsidiary Instagram" upon being "unimpressed with promises to better police hate speech." Ex. 150 (Elizabeth Dwoskin &

Taylor Telford, *Facebook is working to persuade advertisers to abandon their boycott. So far, they aren't impressed.*, Wash. Post (Jul. 3, 2020)).[4]

**B.   After the 2016 U.S. presidential election, social media companies took significant steps to combat election-related influence campaigns and misinformation on their platforms.**

6.    Although social media companies have long moderated content on their platforms, *see* Gurrea Decl. ¶¶ 66-78 (Ex. 1), the 2016 U.S. presidential election marked a turning point for the companies. The U.S. intelligence community,[5] a Department of Justice-appointed special counsel,[6] and bipartisan majorities of the intelligence committees for both houses of Congress all concluded that Russian agents had interfered with the 2016 election, including by conducting an influence campaign on social media. *See, e.g.*, Ex. 7 at 14 (H. Permanent Select Comm. on Intell., Report on Russian Active Measures, H.R. Rep. No. 115-1110 (2018)) (finding that "Russian intelligence leveraged social media in an attempt to sow social discord and to undermine the U.S. electoral process").[7]   Among its many findings, the House Permanent Select Committee on

---

[4] Recent events, too, confirm that market forces demand that social media companies adopt and apply content moderation policies. For example, when Elon Musk in 2022 acquired control of Twitter and substantially relaxed its content moderation policies, Twitter lost half of its top advertisers, according to a report by Media Matters for America. *See* Ex. 5 at 2 (Halisia Hubbard, *Twitter has lost 50 of its top 100 advertisers since Elon Musk took over, report says*, Nat'l Public Radio (Nov. 25, 2022)). Twitter also is estimated to lose 32 million users over the next two years, including based on concerns about the proliferation of hate speech because of Mr. Musk's relaxation of Twitter's content moderation policies, according to a forecast by Insider Intelligence. *See* Ex. 6 at 2 (Mark Sweney, *Twitter 'to lose 32m users in two years after Elon Musk Takeover,'* The Guardian (Dec. 13, 2022)).

[5] *See* Ex. 8 (Office of the Director of National Intelligence, Background to "Assessing Russian Activities and Intentions in Recent U.S. Elections": The Analytic Process and Cyber Incident Attribution (2017)).

[6] *See* Special Counsel Robert S. Mueller, III, U.S. Dep't of Justice, Report on the Investigation into Russian Interference in the 2016 Presidential Election (2019) (Redacted version released Apr. 18, 2019).

[7] "Russia's targeting of the 2016 U.S. presidential election was part of a broader, sophisticated, and ongoing information warfare campaign designed to sow discord in American politics and

Intelligence ("Committee") concluded that "[h]acked material," including material from the Democratic National Committee ("DNC"), "was disseminated through [a] myriad network of actors with the objective of undermining the effectiveness of the future administration." Ex. 7 at 12. "This dissemination worked in conjunction with derisive messages posted on social media to undermine confidence in the election and sow fear and division in American society." *Id.* The Committee opined further that, "[a]s a country, it is time for us to reflect, understand what happened, fix the discovered problems, and unify around the common purpose of countering any future influence campaigns by Russia or any other nation." *Id.* at 10.

7.      Demands for action from Congress and the public had a profound impact on the behavior of social media companies. *See* Gurrea Decl. ¶ 73 (Ex. 1) ("[t]rust and safety in the realm of political speech" became a "bigger concern" in the context of the 2016 U.S. presidential election). Congressional committees, for example, repeatedly called social media executives to testify in public hearings about what had gone wrong on their platforms in 2016, and how the companies would adjust their policies.[8]

8.      Twitter understood that it was being "told in no uncertain terms, by the public and by Congress, that [it] had a responsibility to do a better job protecting future elections." Ex. 10 at

---

society." Ex. 9 at 75 (S. Select Comm. on Intelligence, Report, Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume II: Russia's Use of Social Media, S. Rep. No. 116-290 (2020)).

[8] *See, e.g.*, *Extremist Content and Russian Disinformation Online: Working with Tech to Find Solutions: Hearing Before the Subcomm. on Crime & Terrorism of the S. Comm. on the Judiciary*, 115th Cong. (2017); *Russia Investigative Task Force Hearing with Social Media Companies: Hearing before the H. Comm. on Intell.*, 115th Cong. (2017); *Social Media Influence in the 2016 U.S. Election: Hearing Before the S. Comm. on Intell.*, 115th Cong. (2017); *Foreign Influence Operations' Use of Social Media Platforms (Company Witnesses), Hearing Before the S. Comm. on Intell.*, 115th Cong. (2018); *Securing U.S. Election Infrastructure and Protecting Political Discourse: Hearing Before the Subcomm. on Nat'l Sec. of the H. Comm. on Oversight & Reform*, 115th Cong. (2019).

3 (*Protecting Speech from Government Interference and Social Media Bias, Part 1: Twitter's Role in Suppressing the Biden Laptop Story: Hearing Before the H. Comm on Oversight & Accountability*, 118th Cong. (2023) (opening statement of Yoel Roth, Former Head of Trust & Safety, Twitter, Inc.). Moreover, Twitter was "economically incentivized to moderate low-quality content in the sphere of politics because it recognized that user engagement drove the majority of its revenues through advertising." Gurrea Decl. ¶ 74 (Ex. 1). As Twitter explained in its Form 10-K annual report in December 2016, "[i]f people do not perceive our products and services to be useful, reliable and *trustworthy*, we may not be able to attract users or increase the frequency of their engagement with our platform and the ads that we display." *Id.* (emphasis added) (quoting Twitter, Inc., Annual Report (Form 10-K) (Feb. 27, 2017)). To that end, in 2018, Twitter adopted a policy to prevent hacked materials from being placed on its platform, *id.*, and it removed at least 70 million bot (fake) accounts relating to political issues, Gurrea Decl. ¶ 74 (Ex. 1). And before the 2020 election, Twitter "updated [its] civic integrity policy to address misleading or disputed information that undermines confidence in the election, causes voter intimidation or suppression or confusion about how to vote or misrepresents affiliation or election outcomes." Ex. 14 at 4 (*Censorship and the 2020 Election: Hearing Before the S. Comm. on the Judiciary*, 116th Cong. (2020)) (statement of Jack Dorsey, CEO, Twitter, Inc.). In response to calls from the public "to offer additional context to help make potentially misleading information more apparent," Twitter applied labels to over 300,000 tweets concerning the 2020 election between October 27, 2020, and November 11, 2020. *Id.*

9.      Facebook responded to the public's calls as well. On November 18, 2016, Facebook CEO Mark Zuckerberg published an "update" on Facebook in response to "[a] lot" of Facebook users' questions about "what we're doing about misinformation" relating to elections. Ex. 11

(Mark Zuckerberg, Facebook (Nov. 18, 2016)). Mr. Zuckerberg assured the public that Facebook "take[s] misinformation seriously" and would be implementing a host of new measures to crack down on misinformation on the platform. *Id.* On January 4, 2018, Mr. Zuckerberg published a post on Facebook where he recognized that "Facebook has a lot of work to do—whether it's protecting our community from abuse and hate, defending against interference by nation states, or making sure that time spent on Facebook is time well spent." *See* Ex. 12 (Mark Zuckerberg, Facebook (Jan. 4, 2018)). Accordingly, Mr. Zuckerberg explained that his "personal challenge for 2018 is to focus on fixing these important issues" and that "[t]his will be a serious year of self-improvement[.]" *Id.* In October 2019, as the 2020 presidential election approached, Facebook redoubled its efforts, announcing that it was taking "several new measures to help protect the democratic process" in advance of the 2020 elections, including attempts to "[p]revent[] the spread of misinformation" through "clearer fact-checking label*s*[.]" Ex. 13 (Guy Rosen, et al., *Helping to Protect the 2020 US Elections*, Meta (Oct. 21, 2019)). Among other things, Facebook "built sophisticated systems to protect against election interference that combined artificial intelligence, significant human review and partnerships with the intelligence community, law enforcement and other tech platforms." *See* Ex. 14 at 4 (statement of Mark Zuckerberg, CEO, Facebook). Further, Facebook "locked down new political ads in the week before the [2020] election to prevent misleading claims from spreading" and "strengthened [its] enforcement against malicious and conspiracy networks like Qanon"—all with the explanation that "[t]his is what people expect of [Facebook]." *Id.* Put simply, Facebook "heard resoundingly from [its] community that people do not want to see [election-related] misinformation and believe it is a problem." *Id.* at 10.

**C.  As the COVID-19 pandemic emerged, social media companies sought to address health misinformation on their platforms.**

10.     The COVID-19 pandemic marked another turning point for social media companies. In early 2020, the emergence of the pandemic precipitated a public health crisis, loss of life, fear, and economic disruption across the country and the world. To date, more than 103 million Americans have reportedly contracted the virus, resulting in more than 6 million hospitalizations and 1.12 million deaths. Ex. 15 (*COVID Data Tracker*, Ctrs. for Disease Control & Prevention (last updated Apr. 25, 2023)). In January 2020, the Secretary of Health and Human Services ("HHS") declared COVID-19 a public health emergency; in March 2020, then-President Trump declared a national emergency. *See* Declaring a National Emergency Concerning the Novel Coronavirus (COVID-19) Outbreak, Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020).

11.     In this pandemic environment, it became immediately apparent to global health authorities that COVID-19 misinformation, especially when it circulated on social media, could lead to death and intensify suffering worldwide. As the United Nations Secretary-General explained in a public statement, "[a]s soon as the virus spread across the globe, inaccurate and even dangerous messages proliferated wildly over social media, leaving people confused, misled, and ill-advised." Ex. 16 (*COVID-19 pandemic: countries urged to take stronger action to stop spread of harmful information*, World Health Org. (Sept. 23, 2020)). The World Health Organization ("WHO"), together with the United Nations and other partners, called upon countries to "take stronger action to stop [the] spread of harmful information" relating to the pandemic. *Id.* In May 2020, WHO member states (including the United States) adopted a resolution recognizing that managing the "infodemic" of COVID-19 misinformation is "a critical part of controlling the COVID-19 pandemic[.]" *Id.* In June 2020, 132 countries (including the United States) signed onto a "cross-regional statement on 'infodemic' in the context of COVID-19" stating, among other

things, that "social media platforms" have "a clear role and responsibility in helping people to deal with the 'infodemic.'" Ex. 17 at 2 (*Cross-Regional Statement on 'Infodemic' in the Context of COVID-19*, U.S. Mission to the United Nations (June 12, 2020)).

12.     Well before these 132 countries called on them to act, social media companies had already begun adopting measures to curb the spread of COVID-19-related misinformation on their platforms. For some companies, including YouTube, Facebook, and Pinterest, this was not their first foray into curbing the spread of public health misinformation. *See* Gurrea Decl. ¶¶ 76-77 (Ex. 1). In a March 2020 blog post, Facebook explained that removing health misinformation from its platform was nothing new: "We've removed harmful [health-related] misinformation since 2018, including false information about the measles in Samoa where it could have furthered an outbreak and rumors about the polio vaccine in Pakistan where it risked harm to health and aid workers." Ex. 18 at 3 (Nick Clegg, *Combating COVID-19 Misinformation Across Our Apps*, Meta (Mar. 25, 2020)). Beginning in January 2020, Facebook "applied this policy to misinformation about COVID-19 to remove posts that make false claims about cures, treatments, the availability of essential services or the location and severity of the outbreak." *Id.* Twitter likewise introduced policies to "address content that goes directly against guidance from authoritative sources of global and local public health information." Ex. 19 at 4 (Vijaya Gadde & Matt Derella, *An update on our continuity strategy during COVID-19*, Twitter Blog (Mar. 16, 2020; updated Apr. 1, 2020)).

13.     These policies resulted in widespread content moderation by social media platforms in early 2020. Twitter reported that, during a two-week period in March 2020 alone, it had "removed more than 1,100 tweets containing misleading and potentially harmful content" and "challenged more than 1.5 million accounts which were targeting discussions around COVID-19 with spammy or manipulative behaviors." *Id.* And Facebook reported in April 2020 that, "during

the month of March [2020], [it] displayed warnings on about 40 million posts related to COVID-19," and had "removed hundreds of thousands of pieces of misinformation that could lead to imminent physical harm," including "theories like physical distancing is ineffective in preventing the disease from spreading." Ex. 20 at 5 (Guy Rosen, *An Update on Our Work to Keep People Informed and Limit Misinformation About COVID-19*, Meta (Apr. 16, 2020)).

14.    As the nation's pandemic response progressed, the companies consulted "guidance from the WHO and other health authorities" when updating their policies. *See* Ex. 18 at 3. For instance, in February 2021, following "consultations with leading health organizations[] including the [WHO]," Facebook expanded "the list of false claims [it would] remove to include additional debunked claims about the coronavirus and vaccines." *See* Ex. 20 at 1-2. And in March 2021, Facebook consulted the "High Level Panel on Vaccine Confidence & Misinformation" (a coalition organized by the London School of Hygiene and Tropical Medicine and others) and the Vaccine Confidence Project (an international research group) about its approach to moderating vaccine-hesitant content. *See* Pls.' Suppl. Br. Ex. A, at 42 (Dkt. 174-1) (email from Facebook executive). In September 2021, Google announced that YouTube would remove content containing false claims about COVID-19 vaccines—a decision that was reached in consultation with "local and international health organizations and experts," including the WHO. Ex. 153 at 1 (YouTube Team, *Managing harmful vaccine content on YouTube*, YouTube Official Blog (Sept. 29, 2021)).

**D.  Social media companies have long taken actions short of removal against "borderline content" that is not expressly prohibited by their content moderation removal policies.**

15.    The companies' efforts to limit the spread of misinformation on their platforms have been multifaceted. As one Twitter representative recently testified, "[c]ompanies like Twitter—teams like mine—have to exercise judgment about where to draw the line on [problematic] content and implement that judgment consistently at the scale of hundreds of millions of unique posts per

day." *See* Ex. 10 at 4. One way in which the companies tackle this difficult task is by taking actions short of removal—including downgrading and labeling posts—against "borderline content," or "content that [is] not prohibited" outright by a company's community standards but that "come[s] close to the lines drawn by those policies." Ex. 22 at 21 (Transparency Center, *Content Borderline to Community Standards*, Meta (Sept. 23, 2021)). Since 2018, Facebook, Twitter, and YouTube have each taken steps to discourage and demote borderline content.[9]

16.    In a blog post, Facebook CEO Mark Zuckerberg explained the "basic incentive problem" that prompted the company to moderate borderline content. Ex. 23 at 7. According to Mr. Zuckerberg, "[o]ne of the biggest issues social networks face is that, when left unchecked, people will engage disproportionately with more sensationalist and provocative content." *Id.* Even though users were more likely to engage with borderline content, they consistently reported to Facebook that such content "degrade[s] the quality of [Facebook's] services." *Id.* at 6. As. Dr. Gurrea notes, these reports about "quality" are highly concerning to large platforms like Facebook because "low-quality content" drives advertisers and users away from the platform, *see* Gurrea Decl. ¶¶ 59-64 (Ex. 1)—even if, as Facebook acknowledges, people "engage with [it]," *see* Ex. 23 at 8 ("People consistently tell us these types of content make our services worse—even though they engage with them."). But simply adjusting Facebook's community standards categorically to require removal of more types of low-quality content would not solve the problem, because "no matter where [Facebook] draw[s] the lines for what is allowed, as a piece of content gets close to

---

[9] *See* Ex. 23 at 6-9 (Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, Facebook (Nov. 15, 2018), https://perma.cc/ZK5C-ZTSX); Ex. 24 at 2 (YouTube Team, *Continuing our work to improve recommendations on YouTube*, YouTube Official Blog (Jan. 25, 2019), https://perma.cc/FH3M-KL6U); Ex. 25 (Alex Kantrowitz, *Twitter is Going to Limit the Visibility of Tweets from People Behaving Badly*, BuzzFeed News (May 15, 2018), https://perma.cc/RRU8-X4R3) (quoting a statement from Twitter's CEO).

that line, people will engage with it more on average—even when they tell us afterwards they don't like the content." *Id.* at 7. At the time of Mr. Zuckerberg's post in 2018, the most concerning forms of borderline content were "click-bait and misinformation." *Id.* at 8.

17. To address this problem, Mr. Zuckerberg announced that Facebook would address "borderline content so it gets less distribution and engagement." *Id.* The announcement included the following graph:



*Id.* at 7. "By making the distribution curve look like the graph [above] where distribution declines as content gets more sensational," Mr. Zuckerberg explained, "people are disincentivized from creating provocative content that is as close to the line as possible." *Id.* Facebook's goal was to "create a healthier, less polarized discourse where more people feel safe participating." *Id.* at 9. And reducing the distribution of such content would address the consistent concern that Facebook heard from users that "these types of content make [its] services worse." *Id.* at 8.

18. YouTube made a similar announcement in January 2019. *See* Ex. 24. YouTube announced that it was "taking a closer look at how [it could] reduce the spread of content that comes close to—but doesn't quite cross the line of—violating [its] Community Guidelines." *Id.* at 2. And "[t]o that end," YouTube would begin "reducing recommendations of borderline content

17

and content that could misinform users in harmful ways." *Id.* Specific examples included "videos promoting a phony miracle cure for a serious illness." *Id.*

19.   The companies' approaches to borderline content have been extensively scrutinized—and, at times, criticized—by scholars and observers, in part because of a lack of transparency. As one commentator noted, reducing the visibility of content amorphously described as "approaching the line" means "not having to articulate an explicit policy; this gives platforms the flexibility to intervene around quickly emerging phenomena, go after content designed to elude prohibitions, and curtail content they 'know' is bad but have a hard time articulating why." Ex. 26 at 12 (Tarleton Gillespie, *Reduction/Borderline content/Shadowbanning*, Yale-Wikimedia Initiative on Intermediaries & Info. (July 20, 2022)). These policies thus "avoid[] accountability, . . . and are not—yet—reported as part of the platform[s'] transparency obligations." *Id.*; *see also* Evelyn Douek, *Facebook's "Oversight Board:" Move Fast with Stable Infrastructure and Humility*, 21 N.C. J. L. & Tech. 1, 42-43 (2019) (highlighting ways in which borderline content policies lack transparency).

20.   The companies have moderated COVID-19 content under their borderline content policies, although they have not publicly provided extensive details as to how those policies are applied. In July 2021, Facebook announced that "[s]ince the beginning of the pandemic," it had "labeled and reduced the visibility of more than 167 million pieces of COVID-19 content debunked by our network of fact-checking partners." Ex. 27 at 3 (Guy Rosen, *Moving Past the Finger Pointing*, Meta (July 17, 2021)). And since September 2021, Facebook's borderline content policy page has listed—among other kinds of borderline content—"[c]ontent that does not violate our COVID-19 or vaccine policies, but which shares misleading or sensationalized information about vaccines in a way that would be likely to discourage vaccinations." Ex. 22 at 2. YouTube,

too, has noted that its work to "reduc[e] recommendations of borderline content" has been "foundational [to] ensuring that we limit the spread of COVID-19 related borderline content on our site." Ex. 28 at 2 (*How has YouTube responded to the global COVID-19 crisis?*, YouTube, https://perma.cc/3CCA-SNLE) YouTube. Beyond highlighting their efforts generally, the companies have not catalogued the content that has been removed under their borderline content policies.

### E. Bipartisan calls to revise or revoke Section 230 have repeatedly arisen over the years.

21.    Enacted in 1996, § 509 of the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, 138-39 (codified at 47 U.S.C. § 230), commonly known as § 230, has been interpreted to immunize social media companies from liability for their content moderation decisions. In particular, paragraph (c)(1) states: "No provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Paragraph (c)(2) further provides:

> No provider or user of an interactive computer service shall be held liable on account of —
>
> (A)    any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
>
> (B)    any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph [A].

47 U.S.C. § 230(c)(2). The statute also provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3).

22.    The problem Congress sought to solve in § 230(c) arose from a New York state trial court's ruling that an internet service provider that had voluntarily deleted some messages from an

online message board was then "legally responsible for the content of defamatory messages that it failed to delete." *See Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (discussing *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)). Congress responded to that ruling by "immuniz[ing] the removal of user-generated content" through § 230. *Id*. That is, § 230 "provides 'Good Samaritan' protections from civil liability for providers . . . of an interactive computer service for actions to restrict . . . access to objectionable online material." H.R. Rep. No. 104-458, at 194 (1996) (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. 10. In enacting § 230(c), Congress made findings describing online platforms as offering "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. § 230(a)(3). Accordingly, it is established that "the policy of the United States" is "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation[.]" *Id.* § 230(b).

23.    Bipartisan concerns about § 230 have been expressed for years, and efforts to reform or revoke § 230 have been made for nearly as long. For example, congressional inquiries, including in 2016 and in 2019, explored the concerns of some legislators about allegations of politically biased content moderation by online platforms that have asserted that § 230(c) immunizes them from liability for their content moderation decisions—concerns that then-President Trump echoed in 2019 and 2020.[10] Then-President Trump tweeted: "REVOKE 230!" Ex. 31 at 1 (Donald J. Trump (@realDonaldJTrump), Twitter (May 29, 2020, 11:15 AM)). In October 2021, then-

---

[10] *See*, *e.g.*, Ex. 29 (Letter from Senator John Thune to Mark Zuckerberg, Chairman and Chief Executive Officer, Facebook, Inc. (May 10, 2016)); Ex. 30 (*Stifling Free Speech: Technological Censorship and the Public Discourse: Hearing Before the Subcomm. on the Const. of the S. Comm. on the Judiciary*, 116th Cong. (2019)); Remarks by President Trump at the Presidential Social Media Summit, 2019 WL 3072280, at \*15 (July 11, 2019).

Missouri Attorney General Eric Schmitt similarly tweeted: "Get rid of section 230 protections, treat them like common carriers, bust up #BigTech." Ex. 32 at 1 (Eric Schmitt (@Eric_Schmitt) (Oct. 12, 2021, 3:06 PM)). Then-Attorney General William P. Barr observed in February 2020 that "[t]echnology has changed in ways that no one, including the drafters of [§] 230, could have imagined." Ex. 33 at 2 (William P. Barr, Att'y Gen., Opening Remarks at the DOJ Workshop on Section 230: Nurturing Innovation or Fostering Unaccountability? (Feb. 19, 2020)). Four months later, then-Attorney General Barr issued several proposed recommendations to reform § 230 so as to "provide stronger incentives for online platforms to address illicit material on their services while continuing to foster innovation and free speech." Ex. 34 at 1 (Press Release, U.S. Dep't of Just., Justice Department Issues Recommendations for Section 230 Reform (June 17, 2020), https://perma.cc/9S5E-JXLX). Noting that the Department of Justice was "[r]esponding to bipartisan concerns about the scope of 230 immunity," the recommendations "identified a set of concrete reform proposals to provide stronger incentives for online platforms to address illicit material[s] on their services while continuing to foster innovation and free speech." *Id.* Among the recommendations was "to make clear that federal antitrust claims are not, and were never intended to be, covered by Section 230 immunity." *Id.* at 2. In May 2020, former President Trump issued an Executive Order, entitled "Preventing Online Censorship," in which he directed the Federal Government to narrowly construe protections against liability for social media companies in § 230 in light of the purported decisions of those companies to provide "warning label[s]" on the speech of some individuals but not others.[11] For his part, President Biden has also participated in the

---

[11] Exec. Order No. 13,925, Preventing Online Censorship, § 1, 85 Fed. Reg. 34,079, 34,079 (May 28, 2020), rescinded by Exec. Order No. 14,029, Revocation of Certain Presidential Actions and Technical Amendment, § 1, 86 Fed. Reg. 27,025 (May 14, 2021). Similarly, proposed legislation both before and after then-President Trump's issuance of Executive Order 13925 sought to narrow § 230 and explored concerns by Republican legislators about online platforms' "selective

public debate over § 230. *See* Mem. in Supp. of Defs.' MTD at 12 (Dkt. 128-1) ("Defs.' MTD") (quoting 2d. Am. Compl. ¶ 313 (Dkt. 84)).

## II.    Since 2017, Executive Branch agencies and officials have promoted authoritative information or expressed concerns with the spread of misinformation.

24.    Beginning with the Trump Administration and continuing into the Biden Administration, the White House and Executive Branch agencies have responded in myriad ways to societal concerns over misinformation, particularly on social media platforms, that could endanger public health or threaten the integrity of our electoral processes. For instance, since at least 2017, in the face of revelations about foreign influence targeting the Nation's election infrastructure, agencies such as the Department of Homeland Security ("DHS"), the Federal Bureau of Investigation ("FBI"), and the predecessor agency to Cybersecurity and Infrastructure Security Agency ("CISA") worked with various segments of society—including state and local election officials and technology companies—to share information that could be used to identify and prevent the dissemination of election-related misinformation circulated by foreign adversaries and others. Beginning in 2020, in response to the deadly COVID-19 pandemic, public health authorities such as Centers for Disease Control and Prevention ("CDC") provided science-based, data-driven health information to protect the public against the virus's spread and helped social media companies identify misinformation about COVID-19 circulating on their platforms. The Surgeon General and the White House later used their bully pulpits to call on social media companies to take more aggressive action, consistent with their own corporate policies, against health misinformation on their platforms.

---

censorship" and lack of transparency in moderating content. *Compare* Ending Support for Internet Censorship Act, S. 1914, 116th Cong. (2019), *with* Limiting Section 230 Immunity to Good Samaritans Act, S. 3983, 116th Cong. (2020); Stopping Big Tech's Censorship Act, S. 4062, 116th Cong. (2020); Platform Accountability & Consumer Transparency Act, S. 4066, 116th Cong. (2020).

25.    In this action, Plaintiffs sue a total of 67 Federal agencies and official-capacity Defendants, in a sprawling Complaint that takes aim at numerous public statements and private communications by Executive Branch officials touching on matters of election security and the COVID-19 pandemic. Plaintiffs seek to treat this array of Executive Branch agencies and officials as a monolith, characterizing the disparate and independent actions of 67 different Defendants over multiple administrations as a single "Censorship Enterprise." PI Supp. 1. Plaintiffs provide no factual or legal basis for treating these various actions collectively as part of a single "enterprise," and the Court must consider whether preliminary injunctive relief is appropriate based on each Defendant's alleged conduct. Below, Defendants describe the relevant actions that the White House and each of the federal agency and official-capacity Defendants have or have not taken over the last two administrations, which apparently form the basis of (but do not support) Plaintiffs' request for sweeping and indiscriminate injunctive relief. *See also* Defs.' Resp. to Pls.' Proposed Findings of Fact in Supp. of Mot. for Prelim. Inj. ¶¶ 19-211 ("Defs.' Resp. PFOF") (filed concurrently with this brief).

**A.  The White House**

26.    By early 2021, hundreds of thousands of Americans had lost their lives to COVID-19, and the pandemic was still rampant. Indeed, 23,629 COVID-related U.S. deaths were reported during the week of January 6-13, 2021, which still remains the single highest weekly total of reported COVID-19 deaths in the United States.[12]

27.    The Administration viewed social media as a powerful tool for promoting accurate, authoritative COVID-19 information, such as CDC guidance on vaccines, *see* Ex. 37 at 2 (*Press*

---

[12] Ex. 38 (*COVID Data Tracker: Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory*, Ctrs. for Disease Control & Prevention (last updated Apr. 28, 2023)).

*Briefing by Press Secretary Jen Psaki*, The White House (July 16, 2021)) (discussing White House efforts to "meet people where they are" on social media), but was also concerned that misinformation relating to COVID-19 vaccines posed a critical threat to public health and contributed to preventable hospitalizations and deaths, *see* Ex. 36 at 19 (Defs.' Supp. Rog. Resp. Related to Robert Flaherty). Accordingly, during the first several months of the Biden Administration, White House officials began speaking with social media companies about promoting more accurate COVID-19 information and to better understand what actions the companies were taking to curb the spread of COVID-19 misinformation. These officials included Andy Slavitt, former Senior Advisor for the COVID-19 Response,[13] and Rob Flaherty, Director of Digital Strategy. Mr. Flaherty was responsible for overseeing the President's engagements on social media and outreach to digital creators, among other things. *See* Ex. 36 at 19.

28.    White House spokespeople—mainly former Press Secretary Jennifer Psaki—have spoken publicly about the President's view that social media companies ought to curb the spread of misinformation related to COVID-19 on their platforms. Other White House officials—mainly Mr. Flaherty—have also had numerous private communications with social media companies on a wide range of topics, including COVID-19 misinformation. The record does not show a single instance in which these individuals threatened legal or regulatory action against companies that chose not to heed the Administration's calls to address the COVID-19 misinformation circulating on their platforms. Nor does the record show that White House officials demanded that the companies change their content moderation policies or take action (regardless of existing policies) to address particular content that they view as potentially harmful COVID-19 misinformation. To

---

[13] Mr. Slavitt served for four months before stepping down in June 2021. Ex. 39 (Maeve Sheehey, *Andy Slavitt stepping down from White House Covid-19 response role*, Politico (June 9, 2021)).

the contrary, although the Administration has long urged the companies to combat misinformation on their platforms and has provided general recommendations to that effect, it has made "crystal clear" its view that "[a]ny decision about platform usage and who should be on the platform is orchestrated and determined by private-sector companies," and "not the federal government." Ex. 37 at 31 (Ms. Psaki July 16, 2021, press briefing statement).

### 1. White House Public Statements

29.    President Biden and his spokespeople have repeatedly expressed concerns about the spread of potentially harmful misinformation on social media, especially related to COVID-19. In these public statements, Ms. Psaki and others have emphasized that, as private entities, *platforms* bear the responsibility for setting and enforcing their own policies concerning misinformation— policies with which the Government, like members of the public, may or may not agree.

### a.   *White House Press Briefings (Jennifer Psaki)*

30.    In 2021 and 2022, Ms. Psaki was regularly asked during White House press briefings for the President's views on social media companies' content moderation policies, particularly as they related to COVID-19 misinformation and whether the platforms should take action against former President Trump's accounts. Ms. Psaki repeatedly emphasized that, as private actors, social media companies make their own decisions about whether and how to moderate content on their platforms. *See, e.g.*, Ex. 147 at 15 (*Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack*, The White House (May 5, 2021)) (noting that the President "believe[s] in First Amendment rights" and that "social media platforms need to make" "the decisions" regarding "how they address the disinformation [and] "misinformation [that] . . . continue to proliferate on their platforms"); *Press Briefing by Press Secretary Jen Psaki and Director of the National Economic Council Brian Deese*, 2021 WL 2310371, at *9 (June 4, 2021) ("[A]s always,

[whether to moderate content is] a decision for the company to make and any platform to make."); *id.* at *10 ("This is a decision by a private-sector company.").

31.    The topic of COVID-19 misinformation was the focus of a July 15, 2021, joint press briefing with Surgeon General Vivek Murthy. Ex. 40 (*Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy*, The White House (July 15, 2021)). In that briefing, Ms. Psaki explained that the White House had been "in regular touch" with the platforms and "flagging . . . for Facebook" "problematic posts . . . that spread disinformation." *Id.* at 10. In the following day's briefing, she clarified that her reference to "flagging . . . problematic posts" was meant simply to reflect the Government's practice of "regularly making sure social media platforms are aware of the latest narratives dangerous to public health" and of "engag[ing] with [platforms] to better understand the enforcement of social media platform policies." Ex. 37 at 6. She emphasized that the Government does not "take anything down" or "block anything" and that platforms themselves, as "private-sector compan[ies]," "make[] decisions about what information should be on their platform[s]." *Id.* at 12. She reiterated this point three days later, on July 19: "It's up to social media platforms to determine what their application is of their own rules and regulations." *Press Briefing by Press Secretary Jen Psaki*, 2021 WL 3030746, at *16 (July 19, 2021).

32.    In the July 15, 2021, Press Briefing, Ms. Psaki also mentioned four "proposed changes" concerning misinformation that the White House had "recommended" to social media companies. Ex. 40 at 10-11. Those recommendations were that (i) the platforms should "measure and publicly share the impact of misinformation on their platform[s]"; (ii) the platforms should "create a robust enforcement strategy that bridges their properties and provides transparency about the rules"; (iii) the platforms should "take faster action" against "harmful, violative posts"—that is, "posts that will be within their policies for removal [but] often remain up for days"; and (iv) the

platforms should "promote quality information sources in their feed algorithm." *Id.* With respect to "creat[ing] a robust enforcement strategy," Ms. Psaki noted that there are "about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms," and "[a]ll of them remain active on Facebook" despite being "banned" on other platforms "that Facebook owns." *Id.* at 10. She did not recommend removing content relating to these twelve people's accounts; instead, she made a factual statement about those accounts in support of her recommendation that platforms have strategies for "bridg[ing] their properties"—*i.e.*, applying consistent rules across multiple platforms owned by the same entity—and "provid[ing] transparency about the rules." *Id.* These recommendations thus highlighted the need for transparency, consistency, and efficiency in the companies' enforcement of their existing policies. And, mindful that the companies were responsible for decision-making regarding misinformation on their platforms, Ms. Psaki repeatedly noted that these proposals were not demands—they were "proposed" and "recommended" by the White House. *Id.*

33.     The subject of content moderation on social media platforms continued to come up periodically during White House press briefings throughout 2021 and 2022, and Ms. Psaki continued to emphasize that content moderation decisions were the companies' to make. *See, e.g.*, 2021 WL 3030746, at *16 ("It's up to social media platforms to determine what their application is of their own rules and regulations."); *Press Briefing by Press Secretary Jen Psaki*, 2022 WL 1468470, at *9 (May 10, 2022) ("[I]t's the decision by a private sector company to make on who will or will not be allowed on their platforms."). When Ms. Psaki was asked whether the Administration was "considering any regulatory or legal moves to possibly address disinformation on social media," she responded: "That's up to Congress to determine how they want to proceed moving forward." 2021 WL 3030746, at *2. In October 2021, Ms. Psaki was asked again about

whether the White House supported policy reforms—specifically, reforms to § 230. *See Press Briefing by Press Secretary Jen Psaki*, 2021 WL 4587211, at *9 (Oct. 6, 2021). She reaffirmed the President's view that "tech platforms must be held accountable for the harms that they cause" and expressed that the President "has been a strong supporter of fundamental reforms to achieve that goal, . . . includ[ing] Section 230 reforms [and] privacy and antitrust reforms as well as more transparency." *Id.* Reiterating the White House's view that Congress should lead any effort to propose policy reforms relating to misinformation, Ms. Psaki concluded, "[the President] looks forward to working with Congress on these bipartisan issues." *Id.*

34.    At a White House press briefing on April 25, 2022, Ms. Psaki was asked whether the White House was concerned about Twitter's purchase by Elon Musk. Ms. Psaki stated:

> No matter who owns or runs Twitter, the President has long been concerned about the power of large social media platforms, . . . [and] the power they have over our everyday lives; has long argued that tech platforms must be held accountable for the harms they cause. He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230 [47 U.S.C. § 230], enacting antitrust reforms, requiring more transparency, and more. And he's encouraged that there's bipartisan interest in Congress.

Ex. 42 at 3 (*Press Briefing by Press Secretary Jen Psaki*, The White House (Apr. 25, 2022)). Notably, Ms. Psaki spoke on this occasion about the myriad policy issues raised by the dominance of social media companies; she did not mention COVID-19 or misinformation in particular, nor was she asked about it. *See also* Defs.' Resp. PFOF ¶¶ 123-130, 146-152, 155-162, 310-314.

### b.   *President Biden's Comments*

35.    On July 16, 2021, while President Biden was preparing to board Marine One, a reporter asked the President what his "message" was for "platforms like Facebook." Ex. 45 at 2 (Question from Reporter to President Joseph R. Biden, Jr., in Washington, D.C. 2 (July 16, 2021)). The President responded: "They're killing people. Look, the only pandemic we have is among the unvaccinated and they're killing people." *Id.* Three days later, President Biden was asked about

his earlier comment. He explained that he had just read that twelve individuals were responsible for sixty percent of the misinformation regarding COVID 19 circulating on social media—a statistic reported by the non-profit Center for Countering Digital Hate[14]—and clarified that "Facebook isn't killing people. These 12 people are out there giving misinformation. Anyone listening to it is getting hurt by it. It's killing people . . . the outrageous misinformation about the vaccine. That's what I meant." Ex. 43 at 2-3 (Question from Reporter to President Joseph R. Biden, Jr., in Washington, D.C. (July 19, 2021)). He further said, "[m]y hope is that Facebook, instead of taking [the comment] personally, . . . would do something about the misinformation," thus repeating his policy view that social media companies—like every other sector in society—ought to do more to curb the harmful spread of COVID-19 misinformation on their platforms. *Id.* In that same interview, President Biden was asked whether he would "hold [social media companies] accountable if they don't do more to stop the spread." Ex. 43 at 3. He responded: "When you say hold accountable, I just want to – I'm not trying to hold people accountable. I'm trying to make people look at themselves, look in the mirror, think about that misinformation going to your son, your daughter, your relatives, someone you love. That's all I'm asking." *Id.* President Biden did not threaten any legal or regulatory action or make any demands. *See also* Defs.' Resp. PFOF ¶¶ 153-154, 162-163.

       c.  *White House Communications Director Kate Bedingfield's Comments*

36.  On July 20, 2021, White House Communications Director Kate Bedingfield appeared on the television news program Morning Joe. Ms. Bedingfield was asked what the Biden Administration plans to do about COVID-19 misinformation on social media. Ms. Bedingfield explained that the "most important" thing was for people to obtain information from trusted

---

[14] *See generally* Ex. 44 (Ctr. For Countering Digital Hate, *The Disinformation Dozen, Why Platforms Must Act on Twelve Leading Online Anti-Vaxxers* (Mar. 24, 2021)).

sources like their doctors, but with respect to social media platforms, "we all have a responsibility here," including platforms and "news outlets." Ex. 46 at 4 (Interview by Mika Brzezinski with Kate Bedingfield, Comm'c'ns Dir., White House, in Washington, D.C. (July 20, 2021)). The interviewer followed up by asking Ms. Bedingfield whether President Biden would support amending § 230 so that the platforms could no longer rely on its legal protection. *Id.* at 5. Ms. Bedingfield demurred by responding, "[w]ell, we're reviewing that," *id.*, before noting that the President had emphasized that "the people creating the content" are responsible for it, *id.* at 6. As Ms. Bedingfield explained, "it is a big and complicated ecosystem, and everybody bears responsibility to ensure that we are not providing people with bad information about a vaccine that will save their lives." *Id.* Ms. Bedingfield did not threaten any legal or regulatory action against, or make any demands of, social media platforms during this interview.

### 2.   White House Private Statements

37.    White House aides—mainly, Mr. Flaherty—have had numerous conversations with representatives from Meta, Google, and Twitter about COVID-19 misinformation.[15] In those conversations, Mr. Flaherty sought to better understand (i) the companies' existing policies addressing the spread of misinformation or disinformation on their platforms, (ii) the actions those companies were taking to enforce those policies, and (iii) what the Government could do to assist social media companies in their efforts to address the spread of misinformation on their platforms.

---

[15] Many of Mr. Flaherty's communications with these companies did not concern mis- and disinformation. For example, the Administration has routinely partnered with the companies to promote the President's messages on policy matters, such as when the White House and Instagram arranged for Olivia Rodrigo to visit the White House to encourage young people to get vaccinated against COVID-19, *see* Ex. 47 (MOLA_DEFSPROD_00016809), and when the President hosted a town hall meeting with "creators" on YouTube, *see* Ex. 48 (MOLA_DEFSPROD_00017159). In other communications, White House officials have reported accounts impersonating federal officials—in violation of federal law—and the President's relatives—in violation of social media companies' terms of service. *See infra*.

*See* Ex. 36 at 20. Mr. Flaherty "also encouraged social media companies to be transparent and share data concerning the prevalence of misinformation and disinformation on their platforms." *Id.* At times, he "expressed frustration when he perceived platforms to be applying their policies inconsistently or to not be forthcoming in their assessment of the problems with misinformation and disinformation on their platforms." *Id.*

38.    The record is replete with examples of Mr. Flaherty asking the companies for information about the nature and extent of the COVID-19 misinformation they were seeing on their platforms. *See infra* Defs.' Proposed Findings of Fact ("PFOF") § II.A.2.a. As described further below, when specific proposals for policy changes by social media platforms were raised, Mr. Flaherty explicitly disclaimed that the White House supported them or was asking the companies to adopt them. *See infra* Defs.' PFOF § II.A.2.b. White House officials did flag some content—mainly, imposter accounts—for the social media companies. *See infra* Defs.' PFOF § II.A.2.c. When they did so, the companies reviewed the requests under their existing policies, and the White House neither threatened the companies nor demanded that they override their policies to accommodate the White House's concerns. *See id.*; Defs.' Resp. PFOF ¶¶ 34-122.

a.    *White House Requests for More Data about Misinformation on Facebook*

39.    An illustrative example of the White House's focus on understanding misinformation trends on the platforms is an April 14, 2021, exchange during which Mr. Flaherty and Mr. Slavitt asked their respective contacts at Facebook to explain why a post by then-Fox News anchor Tucker Carlson—in which he discouraged Americans from getting vaccinated against COVID-19—was the most viewed post that day on Facebook.

40.    By April 2021, the White House had already requested information several times from Facebook about the prevalent COVID-19 misinformation themes on its platform. *See, e.g.*, Dkt. 174-1 at 7 (February 8, 2021 email to Facebook: "do you have data on the actual number of

31

claims-related posts you've removed?"); Pls.' Jones Decl., Ex. G at 1 (Dkt. 214-9) (February 24, 2021 email to Facebook: "Can you give us a sense of volume on these [themes], and some metrics around [t]he scale of removal for each?"); *see also* Ex. 49 (MOLA_DEFSPROD_00017759) (email from Facebook representative to Mr. Flaherty noting that he might not be able to answer Mr. Flaherty's "questions on the data" in an upcoming meeting). For its part, Facebook would occasionally send the White House information from its public announcements about its misinformation policies, sometimes copied and pasted directly from an announcement's text. *See, e.g.*, Dkt. 174-1 at 5-6 (response that included text copied from Facebook's blog); *id.* at 8 (email from Facebook sharing publicly announced policy changes); *id.* at 9 (email from Facebook sharing "survey data on vaccine uptake" that it had published online).

41.     On March 14, 2021, the *Washington Post* published a story about misinformation on Facebook that Mr. Flaherty perceived to be inconsistent with what Facebook had told White House officials previously, which frustrated Mr. Flaherty. According to the *Post*, Facebook was "conducting a vast behind-the-scenes study of doubts expressed by U.S. users about vaccines," which had revealed that "[j]ust 10 out of the 638 population segments [studied] contained 50 percent of all vaccine hesitancy content on the platform."[16] Mr. Flaherty emailed the story to his contact at Facebook and wrote in the subject line: "You are hiding the ball[.]" Dkt. 174-1 at 12. By this he meant, as he later explained in another email, that he felt the *Post* had revealed that Facebook had access to "data on the impact of borderline content"—that is, content that does not violate Facebook's policies for removal, but which Facebook nonetheless moderates[17]—"and its

---

[16] Ex. 50 at 2 (Elizabeth Dwoskin, *Massive Facebook study on users' doubt in vaccines finds a small group appears to play a big role in pushing the skepticism*, Wash. Post (Mar. 14, 2021)).

[17] As Facebook has explained, "Some types of content, although they do not violate the letter of our Community Standards, are sensationalist or provocative and can bring down the overall quality

overlap with various communities," which data Mr. Flaherty had previously asked for and which Facebook had not provided. Dkt. 174-1 at 11.

42.    Mr. Flaherty explained that he was "not trying to play 'gotcha' with [Facebook]," but that the White House was "gravely concerned" about misinformation on Facebook and wanted to better understand how the Administration could be helpful in resolving the problem. *Id.* ("[W]e want to know that you're trying, we want to know how we can help, and we want to know that you're not playing a shell game with us when we ask you what is going on."). In light of the *Post* story, Mr. Flaherty stated that he felt Facebook had not been forthcoming with him in their prior interactions. *Id.* Mr. Slavitt responded to the email thread and echoed Mr. Flaherty's concerns, stating that "100% of the questions I asked have never been answered and weeks have gone by." *Id.* at 10. He added: "Internally we have been considering our options on what to do about it," evidently meaning Facebook's lack of transparency about the trends it was seeing on its platform. *Id.*; *see also* Ex. 40 at 10 (Ms. Psaki calling for companies to "measure and publicly share the impact of misinformation on their platform"). There is no evidence that Mr. Slavitt was referring to (or that the White House actually took) retributive action of any kind, and no evidence that Facebook took action in response to Mr. Slavitt's email.

43.    Facebook responded to these emails on March 16, 2021, by committing to "getting [the White House] the specific information needed to successfully manage" the "rollout" of the new COVID-19 vaccine. Dkt. 174-1 at 10. Facebook explained that the information in the *Post* story was not "vetted internally" and offered to walk the White House through data that Facebook

---

of discourse on our platform, especially because people have frequently told us that they do not like encountering these forms of content." Ex. 22 at 2.

had previously shared with the White House—data that had been published in a public report. *Id.*; *see also id.* at 9 (email attaching the data referenced in Facebook's email about the *Post* story).

44.    One month later, on April 14, 2021, Mr. Slavitt and Mr. Flaherty had an email exchange with Facebook regarding Tucker Carlson's post asserting that vaccines are ineffective. Upon learning (likely through CrowdTangle)[18] that Mr. Carlson's post was the most viewed vaccine-related post on Facebook that day, Mr. Slavitt and Mr. Flaherty reached out to their respective contacts at Facebook. Mr. Slavitt wrote: "Number one on Facebook [today]. Sigh." Dkt. 174-1 at 35. Mr. Flaherty wrote: "[T]he top post about vaccines today is [T]ucker Carlson saying they don't work." *Id.* at 22. He added: "Yesterday was Tomi Lehren [sic] saying she won't take one. This is exactly why I want to know what 'Reduction' actually looks like—if 'reduction' means 'pumping our most vaccine hesitant audience with [T]ucker Carlson saying it doesn't 'work' then . . . I'm not sure it's reduction!"[19] In its response to both White House officials, Facebook explained that Mr. Carlson's post was "not the most popular post about vaccines on Facebook [that day]," noting also that "[r]egardless of popularity, the Tucker Carlson video does not qualify for removal under [its] policies." *Id.* at 34.

45.    Mr. Flaherty responded by asking Facebook to help the White House understand how it was applying its content moderation policies: "I guess this is a good example of your rules in practice then—and a chance to dive in on questions as [to how] they're applied," wrote Mr.

---

[18] CrowdTangle is a Facebook tool that allows users to "[m]onitor public information" about the reach of Facebook posts. Ex. 51 (*CrowdTangle*, Meta, https://perma.cc/L7N2-CSK5). "FEMA has been a user of CrowdTangle since 2015, and has used it to create real-time displays for their various regional teams to support their social media situational awareness efforts and help direct needs or information clarification." Ex. 52 at 3 (MOLA_DEFSPROD_00018060).

[19] "Reduction" is likely a reference to Facebook's borderline content policy, under which Facebook has pledged since 2018 to combat misinformation by "reducing its distribution and virality." Ex. 23 at 8.

Flaherty. *Id.* at 33. He went on to ask, among other things: "How was this [the Tucker Carlson video] not violative? . . . What exactly is the rule for removal vs demoting? Moreover: you say reduced and demoted. What does that mean?" *Id.* Mr. Flaherty ended his email by remarking: "[n]ot for nothing but last time we did this dance, it ended in an insurrection." *Id.* at 34. Later that day, Mr. Flaherty followed up with another question: "And sorry—if this was not one of the most popular posts about the vaccine on Facebook today, then what good is [C]rowd[T]angle?" *Id.* at 33. When after two days Facebook still had not responded, Mr. Flaherty followed up (in frustration): "These questions weren't rhetorical[.]" *Id.* Facebook thereafter responded with answers to Mr. Flaherty's questions, including that Mr. Carlson's post was not violative because "while [Facebook] remove[d] content that explicitly directs people not to get the vaccine, . . . [Facebook] reviewed this content in detail and it does not violate those policies." *Id.* at 36.

46.     The aforementioned exchanges demonstrates that, even in a moment of apparent (and atypical) frustration with Facebook, White House officials remained focused on obtaining information from social media companies to better understand the important problem of misinformation, as was true throughout their interactions with Facebook and other platforms. In the exchange, White House officials sought an explanation as to why a post by an influential figure that discouraged vaccination was surging in popularity given the company's content moderation policies (hence Mr. Flaherty's reference to "Reduction"). When Facebook responded that the post did not violate its community standards, White House officials did not demand (or even request) that Facebook remove the post or change its policies so that the post would be considered violative. Instead, the White House officials sought to learn more about how Facebook applied its policies— such as its little-understood "demoti[on]" policy for borderline content, *see supra* Defs.' PFOF § I.D—and how the White House could use Facebook's public-data resource (CrowdTangle) to

understand what Americans were seeing on the platform. Although Mr. Flaherty used strong language at times, this language reflected his frustration over not receiving answers to his repeated requests for information and the urgency of the public health crisis that the Administration was working to tackle—not threats or demands that Facebook change its content moderation policies or how they were enforced. Nor is there any evidence that Facebook subsequently changed its approach to applying its established policies, or took any action against the Tucker Carlson post, or any other post, as a result of the White House's contacts. Defs.' Resp. PFOF ¶¶ 81-82, 93-97.

   b.   *No White House Demands for Changes to the Companies' Content Moderation Policies or Practices Regarding COVID-19*

47.   Indeed, the record contains no evidence that White House officials demanded that social media companies adopt particular changes to their content moderation policies or the manner of their enforcement, or that action be taken against specific posts concerning COVID-19. Mr. Flaherty disclaimed the notion that he (or anyone at the White House) knew how best to combat misinformation on social media. *See, e.g.*, Dkt. 174-1 at 11 ("I will . . . be the first to acknowledge that borderline content offers no easy solutions."). Moreover, on one occasion when Mr. Flaherty shared specific proposals with Facebook—proposals that were developed by third-party researchers—Mr. Flaherty emphasized that the White House was *not* asking Facebook to adopt those recommendations. *See generally* Defs.' Resp. PFOF ¶¶ 34-211.

48.   Specifically, on April 23, 2021, Mr. Flaherty sent Facebook's representative an email with the subject "Research Suggestions." Pls.' Jones Decl., Ex. L at 1 (Dkt. 214-14). An outside group had recently "[b]rief[ed]" the White House on COVID-19 vaccine misinformation on Facebook. *Id.* Mr. Flaherty sent Facebook the outside group's findings, which included specific recommendations, including that "Facebook should direct resources to equal policy enforcement around violative content and networks in non-English languages." *Id.* at 2. In his cover email, Mr.

36

Flaherty explicitly noted that Facebook should not "read this as White House endorsement of these suggestions (or, also, as the upper bound of what our thoughts on this might be)." *Id.* at 1. He noted that he was sending the recommendations only in the "spirit of transparency" because the findings were "circulating around the building[.]" *Id.* On May 1, Facebook wrote to Mr. Slavitt, thanking "the [White House] team for sharing the research work" and providing "some details on where we're developing work in this space (and where we aren't)." Dkt. 174-1 at 41-42. The White House did not respond to this note with threats or demands to implement the outside group's suggestions. *Id.* at 41. Instead, Mr. Flaherty repeated his typical questions about what Facebook was seeing on its platform. *Id.* ("Not to sound like a broken record, but how much content is being demoted, and how effective are you at mitigating reach, and how quickly?").

       c.  *White House Requests for Action on Fake and Doctored Posts and Accounts*

49.    At times, White House officials requested that social media companies remove fake accounts from their platforms—such as imposter accounts purporting to belong to members of the President's family, or Dr. Fauci. *See* Ex. 53 at 1 (MOLA_DEFSPROD_00016598) (the President's daughter-in-law); Dkt. 174-1 at 4 (the President's grandchild); Ex. 54 at 1 (MOLA_DEFSPROD_00016939) (Dr. Fauci); Ex. 55 at 1-2 (MOLA_DEFSPROD_00017968) (a "fan account" for the President's son). White House officials also flagged a doctored video of the First Lady. Dkt. 174-1 at 65.

50.    It is not unusual for members of the public, or the victims themselves, to report imposter accounts or doctored content to social media platforms. Twitter, Facebook, and YouTube each prohibit imposter accounts and provide mechanisms for the public to report violations of their

imposter rules.[20] Indeed, in one instance when the White House flagged a fake account of one of the President's family members, Twitter merely directed the White House to fill out its publicly available imposter form. Ex. 53 at 1. Understandably, however, some companies have a mechanism for the White House to submit expedited requests for removal of such information, since willfully impersonating a federal official is a federal crime, *see* 18 U.S.C. § 912, and could have dangerous consequences for public safety and national security. Those mechanisms, moreover, have been utilized by at least the prior two administrations. *See* Dkt. 174-1 at 3 (noting that Twitter offered the Biden Administration "the same system we had in place for the previous two administrations").

51.    The record demonstrates that the White House requested that the platforms review the above-mentioned incidents, s*ee* Ex. 54 at 2 ("Hi there –any way we can get this pulled down?"); Ex. 53 at 1 ("[This account] is an impersonation – and [the victim] has requested it be taken down."); Dkt. 174-1 at 4 ("Please remove this account immediately"); *id.* at 65 ("[w]ould you mind looking at this video and helping us with next steps to put a label or remove it?"), and that the platforms accordingly evaluated the White House's requests under their existing policies. When the platforms determined that the content was violative, it was removed. *See, e.g.*, Dkt. 174-1 at 4. When the content was not violative—as was the case with a doctored video of the First Lady circulating on Twitter—the platform declined to remove it. *Id.* at 63 ("After escalating this to our team, the [t]weet and video referenced will not be labeled under our synthetic and manipulated media policy."). In the latter instance, the White House did not seek to compel Twitter to change its decision; it asked for "any other info" about why the content did not qualify for labeling, "in

---

[20] *See* Ex. 56 (*Account Integrity & Authentic Identity*, Meta, https://perma.cc/DCR9-9FBY); Ex. 57 (*Authenticity on Twitter*, Twitter Help Ctr., https://perma.cc/6NVT-PS59); Ex. 58 (*Impersonation policy*, YouTube Help, https://perma.cc/R5BD-X6JB).

order to help us understand the Twitter processes best." *Id.* at 61. A White House official also requested the removal of a tweet by Robert F. Kennedy, Jr., regarding COVID-19 vaccines. As discussed further below, *see infra* Defs.' Arg. § II.B.1, the record shows that the tweet had already been escalated for review by Twitter's independent trust and safety team, which—applying its independent judgment—did not remove the tweet.

52.    To be sure, White House officials sometimes used language reflecting urgency or exasperation when engaging with the social media companies about imposter accounts and doctored content. *See, e.g.*, Dkt. 174-1 at 58 (Mr. Flaherty observing that Twitter's explanation was "Total Calvinball"). This language merely reflects the same frustration that Mr. Flaherty expressed when he perceived the platforms to be "applying their policies inconsistently or to not be forthcoming in their assessment of the problems with misinformation and disinformation on their platforms." *See* Ex. 36 at 20. It does not reflect demands or threats of legal or regulatory retaliation.

53.    Since the start of 2023, the landscape of White House COVID-19 efforts has changed dramatically. On April 10, 2023, the President signed into law a resolution terminating the national emergency related to the COVID-19 pandemic. *See* Joint Resolution of Apr. 10, 2023, Pub. L. No. 118-3, 137 Stat. 6. And HHS's public health emergency is likewise due to end on May 11, 2023, in part because, "thanks to the [A]dministration's whole-of-government approach to combating the virus, we are in a better place in our response than we were three years ago, and we can transition away from the emergency phase." Ex. 67 at 1 (*COVID-19 Public Health Emergency (PHE)*, Dep't of Health & Hum. Servs., https://perma.cc/3HZ4-QM3G). Moreover, recognizing that "transitioning out of the emergency phase is the natural evolution of the COVID response," the White House plans to wind down its COVID-19 Response Team later this month. *See* Ex. 59

(Dan Diamond & Taylor Pager, *White House Disbanding its Covid-19 Team in May*, Wash. Post (Mar. 22, 2023)). The COVID-19 Response Team was charged, among other things, with "[o]rganizing the White House to combat COVID-19," Exec. Order No. 13,987, 86 Fed. Reg. 7019, § 2 (Jan. 20, 2021), and included several White House staffers who communicated with social media companies about the spread of COVID-19 misinformation on their platforms, including Mr. Slavitt and other Defendants. *See* Ex. 60 at 1 (MOLA_DEFSPROD_00018067). Winding down the team and ending COVID-19 emergency declarations reflect that the Administration is reaching a new phase of its response to the virus. *See also* Defs.' Resp. PFOF ¶¶ 188-211.

### B.  The Surgeon General

54.    The U.S. Surgeon General is commonly referred to as the "Nation's Doctor."[21] The Office of the Surgeon General ("OSG") is housed within HHS, and the Surgeon General reports to the Assistant Secretary for Health.[22] The Surgeon General does not have independent regulatory authority. *See, e.g.*, Reorganization Plan No. 3 of 1966, 31 Fed. Reg. 8855 (June 25, 1966) (transferring the Surgeon General's powers to what is now HHS); Declaration of Max Lesko, Chief of Staff, Off. of the Surgeon Gen. ¶ 3 ("Lesko Decl.") (Ex. 63). Rather, the Surgeon General's role is primarily to draw attention to public health matters affecting the nation.[23] For example, Surgeons General have traditionally issued reports and calls to action on public health issues ranging from

---

[21] *See* Ex. 61 at 1 (*About the Office of the Surgeon General*, U.S. Dep't of Health & Hum. Servs., https://perma.cc/AHX2-KGED).

[22] *See* Office of the Assistant Secretary for Health; Statement of Organization, Functions and Delegations of Authority, 52 Fed. Reg. 11,754, 11,754-55 (Apr. 10, 1987); *see also* Ex. 62 at 1 (*Office of the Assistant Secretary for Health Organizational Chart*, U.S. Dep't of Health & Hum. Servs., https://perma.cc/R5JF-URY9).

[23] *See* Ex. 64 at 1 (*Mission of the Office of the Surgeon General*, U.S. Dep't of Health & Hum. Servs., https://perma.cc/87KA-DMD9); *see also* Waldo Dep. 26:1-11.

health literacy[24] to opioid addiction,[25] to—perhaps most famously—the health risks of smoking cigarettes.[26]

55.     The current Surgeon General, Dr. Vivek Murthy, took two such official actions relating to health misinformation in 2021 and 2022. In July 2021, Dr. Murthy issued a Surgeon General's Advisory ("Advisory") that called attention to the harms caused by the spread of misinformation and offered "recommendations" for various sectors of society, including social media platforms, to address such harms. And in March 2022, Dr. Murthy issued a Request for Information ("RFI"), published in the Federal Register, seeking comments from interested members of the public about health misinformation on social media. In addition to the Advisory and the RFI, Dr. Murthy made public statements reiterating the Advisory's themes at a White House press briefing, at public events, and in interviews. In private, OSG held courtesy meetings with Facebook, Google, and Twitter to inform them of the Advisory's release and its themes, and the Surgeon General held an additional meeting with Facebook on July 23, 2021 (at Facebook's request) at which the Advisory's themes were discussed. OSG has not flagged specific posts for social media companies or demanded particular actions from the companies (let alone any specific company), nor has it worked with the companies to moderate content on their platforms. Lesko Decl. ¶ 8 (Ex. 63). Moreover, OSG was not—and is not—involved in a coalition of researchers known as the "Virality Project." Indeed, following the issuance of the Advisory and the RFI, the

---

[24] *See generally* U.S. Dep't of Health & Hum. Servs., *Proceedings of the Surgeon General's Workshop on Improving Health Literacy* (2006), https://perma.cc/25F7-ABJ2.

[25] *See* Ex. 66 (*U.S. Surgeon General's Advisory on Naloxone and Opioid Overdose*, U.S. Dep't of Health & Hum. Servs., https://perma.cc/W9KJ-QPAW).

[26] *See generally* U.S. Dep't of Health, Education, & Welfare, *Smoking and Health: Report of the Advisory Committee to the Surgeon General of the Public Health Service* (1964), https://perma.cc/Z2WJ-UWEN.

Surgeon General's office has pivoted to "core issues" other than COVID-19-related misinformation. Waldo Dep. 114:6-115:5 (Dkt. 210-1).

### 1. The Advisory, the RFI, and Other Public Statements

56.     Dr. Murthy was confirmed by the Senate on March 23, 2021, *see* 167 Cong. Rec. S1721 (daily ed. Mar. 23, 2021), and sworn into office on March 25. On July 15, 2021, Dr. Murthy published a Surgeon General's Advisory related to COVID-19 misinformation. *See generally* Waldo Ex. 11 (Dkt. 210-12) ("Advisory"). A Surgeon General's Advisory is a "public statement that calls the American people's attention to a public health issue" and provides "recommendations" as to "how that issue should be addressed." *Id.* at 3. A Surgeon General's Advisory does not impose any obligations on private parties.

57.     The July 2021 Advisory states that health misinformation has "sowed confusion, reduced trust in public health measures, and hindered efforts to get Americans vaccinated." *Id.* at 16. The Advisory calls for a "whole-of-society effort" to "curb the spread of harmful misinformation," *id.* at 6-7, and it offers recommendations as to how various sectors can tackle the issue, *id.* at 8-15. For "technology platforms," the Advisory identifies eight recommendations, including "[a]ssess[ing] the benefits and harms of products and platforms and tak[ing] responsibility for addressing the harms," "[g]iv[ing] researchers access to useful data to properly analyze the spread and impact of misinformation," and "[p]rioriti[zing] the early detection of misinformation 'super-spreaders' and repeat offenders." *Id.* at 12. The Advisory does not mention any particular social media post—or any individual responsible for such a post—that the Surgeon General would consider to be harmful misinformation. Nor does the Advisory demand any specific action of social media companies. To the contrary, the Advisory recognizes that "[d]efining 'misinformation' is a challenging task," *id.* at 17, and it encourages platforms to consider how to

"safeguard[] user privacy and free expression" while addressing the spread of health misinformation, *id.* at 6-7. *See also* Defs.' Resp. PFOF ¶¶ 318-329.

58.     On the date of the Advisory's release, July 15, 2021, Dr. Murthy spoke at a virtual event hosted by the Stanford Internet Observatory and a joint press briefing with White House Press Secretary Jennifer Psaki. During the Stanford event, Dr. Murthy advised that "[i]f we want to fight health misinformation, we'll need all parts of society to pull together," which is "why this surgeon general advisory has recommendations for everyone." Waldo Ex. 12 at 7-8 (Dkt. 210-13). He also described the Advisory's recommendations at a high level. *Id.* At the White House briefing later that day, Dr. Murthy reiterated the same points, explaining that "we need an all-of-society approach to fight misinformation" and that the Advisory "has recommendations for everyone." *See* Ex. 40 at 2. In response to journalists' questions, he noted that the Advisory "ask[ed] [social media platforms] to step up" to address misinformation, but made no demands that they take action of any kind, or suggest that the Government would retaliate against them if they did not. *Id.*

59.     After the Advisory's release, Dr. Murthy spoke publicly about the importance of addressing health misinformation—as described in the Advisory—and the need for a "healthy information environment." *See* Ex. 68 (Clay Skipper, *Surgeon General Dr. Vivek Murthy Sees Polarization as a Public Health Issue*, GQ (Mar. 11, 2022)); *see also* Ex. 69 (Rockefeller Foundation, *Building Public Health's Defense Against Disinformation*, https://perma.cc/M5EG-YJKG) (announcing a February 14, 2022, virtual event on misinformation featuring Dr. Murthy). In these remarks, Dr. Murthy did not make demands or threaten legal action, nor did he call out specific social media companies or their users.

60.     In March 2022, OSG published in the Federal Register an RFI seeking "input from interested parties on the impact and prevalence of health misinformation in the digital information

environment during the COVID-19 pandemic." Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID-19 Pandemic Request for Information (RFI), 87 Fed. Reg. 12,712, 12,712 (Mar. 7, 2022). The RFI requested any comments by May 2, 2022. It sought information on a broad range of topics, including "[i]nformation about sources of COVID-19 misinformation" on social media and elsewhere, such as "specific, public actors that are providing misinformation" and "components of specific platforms that are driving exposure to information." *Id.* at 12,714. The RFI emphasized, however, that "[a]ll information should be provided at a level of granularity that preserves the privacy of users." *Id.* at 12,713. Like the Surgeon General's Advisory, the RFI imposed no obligations; responses were purely voluntary. *See id.* at 12,712 ("You may respond to some or all of the topic areas covered in the RFI."); *see also* Defs.' Resp. PFOF ¶¶ 411-423.

61.    On April 7, 2023, OSG published the comments it received in response to the RFI. Several social media companies submitted responses, including Twitter, Google, and Meta (Facebook). *See* Ex. 70 (RFI Responses Compiled, Dep't of Health & Hum. Servs (Apr. 7, 2023)).[27] None of these companies' responses indicates that they changed their content moderation policies, or moderated the content of any users, in response to the RFI (or any other action taken by OSG). *See id.* at 1-6 (Twitter); *id.* at 7-14 (Google); *id.* 15-24 (Meta). Twitter's five-page response, for example, simply discusses the content moderation policies that Twitter was at that point applying and includes statistics concerning their enforcement. *Id.* at 1-6. Meta's eight-page submission similarly discusses Facebook's polices that were in place at the time, noting that the

---

[27] In response to the RFI, OSG received more than 7,500 pages of comments from various sectors of society, including from researchers, private firms, public health departments, and many individuals. Those comments are publicly available at https://www.regulations.gov/comment/HHS-OASH-2022-0006-0002. For convenience and feasibility, Defendants' exhibit contains only the responses submitted by Twitter, Google, and Meta (Facebook). *See* Ex. 70.

document offers a "high-level" description of those policies and directing readers to view Meta's website for "[m]ore details around our approach to misinformation." *Id.* at 18. Google's submission takes the same approach; it provides an overview of Google's "efforts in addressing COVID-19 health misinformation and disinformation," including Google's efforts to "provid[e] authoritative content." *Id.* at 13. OSG does not intend to take any formal action with respect to the RFI responses it received. *See* Lesko Decl. ¶ 10 (Ex. 63).

### 2.  Direct Communications with Social Media Companies

62.    On May 25, 2021, Dr. Murthy participated in an introductory call with Nick Clegg, President of Global Affairs at Facebook, and Mr. Slavitt. *See* Ex. 187 at 5 (Defs.' Fourth Am. Combined Objections & Resp. to Pl. First Set of Prelim. Inj.-Related Interrogatories. On May 28, Mr. Clegg followed up by sending Dr. Murthy and Mr. Slavitt a biweekly "COVID insights report"—which described Facebook's "most engaged or the most viewed posts," Waldo Dep. 140:15-16—for May 3-15, 2021, Waldo Ex. 4 at 1 (Dkt. 210-5). Mr. Clegg also "highlight[ed] a few policy updates" that Facebook had announced publicly on May 27, and he shared "data [he] mentioned on [the] call" that "point to the positive (if not as publicly discussed) influence [Facebook was] having on attitudes towards vaccines[.]" *Id.*; *see also* Defs.' Resp. PFOF ¶¶ 252, 282-286.

63.    Before the Advisory's July 15, 2021 release, Eric Waldo, then-Chief Engagement Officer for OSG,[28] arranged high-level "stakeholder calls with relevant parties," also known as "rollout calls." Waldo Dep. 18:20-21. The goal of the rollout calls was for OSG to "give [stakeholders] a heads-up that the advisory was going to come out" and to encourage them to

---

[28] Mr. Waldo no longer works at OSG. Katharine Dealy, OSG's Director of Engagement, is his successor. Defs.' Notice Regarding Substitution of Official-Capacity Defendants at 2 ("Defs.' Notice of Substitution") (Dkt. 263).

review the document when it became public. *Id.* at 18:20-21; 87:2-6. Mr. Waldo held rollout calls on July 12 and July 14 with representatives from Twitter and Google/YouTube, respectively. Ex. 187 at 35-36. These were cordial meetings. *See* Waldo Dep. 87:2-6. Indeed, representatives from Google/YouTube expressed agreement as to the importance of combating health misinformation and said they were "excited" to review the Advisory. *Id.* at 89:25-90:2. Due to scheduling conflicts, a rollout call with Facebook did not occur until the day after the Advisory was released, or July 16, 2021. *Id.* at 90:15-19. That meeting occurred on the same day that the President told reporters that persons spreading COVID-19 misinformation on Facebook were "killing people"—a comment that he clarified two days later, *see supra* at 28-29—which made the meeting "slightly awkward." *Id.* at 92:25. Facebook and OSG did not discuss the President's comments or Facebook's sentiment towards it, however. *Id.* at 94:7-10; *see also* Defs.' Resp. PFOF ¶¶ 153, 157, 217, 222, 223, 227, 254-258, 273, 287-292, 348-349.

64.   On July 16, 2021—the same day that OSG and Facebook met to discuss the Advisory—Mr. Clegg reached out to Dr. Murthy to request a call regarding "how we can continue to work toward . . . shared goals" despite "disagreement on some of the policies governing [Facebook's] approach[.]" Waldo Ex. 17 at 2 (Dkt. 210-16); *see also* Waldo Ex. 18 at 1 (Dkt. 210-17) (text message from Mr. Clegg to Dr. Murthy). Mr. Clegg noted that Facebook staff were feeling "a little aggrieved" by the President's comments. Waldo Ex. 18 at 1 (Dkt. 210-17). In his email, Mr. Clegg mentioned that OSG and Facebook had met that day to discuss "the scope of what the White House expect[ed] from" Facebook. Waldo Ex. 17 at 2 (Dkt. 210-16). Mr. Waldo testified, however, that Mr. Clegg misunderstood the nature of OSG's meeting with Facebook, which Mr. Waldo had attended (and Mr. Clegg had not). Waldo Dep. 236:21-25. At the July 16 meeting, OSG

had simply "walk[ed] over the . . . recommendations section" of the Advisory "at a high level." *Id.* 91:7-16.

65.     In addition, on July 17, 2021, Facebook published a document describing actions it was "already tak[ing] . . . on the eight recommendations from the Surgeon General" in the form of measures that Facebook had had in place since April 2020, more than a year prior to the Advisory. *See* Ex. 71 (*Taking action to combat COVID-19 vaccine misinformation*, Facebook (July 17, 2021), https://perma.cc/6R6J-ANNF). The four-page document does not mention a single *new* action that Facebook would begin to take in light of the Surgeon General's Advisory; rather, it describes ways in which Facebook was *already* addressing the Advisory's recommendations. *Id.*

66.     In response to Mr. Clegg's meeting request, Dr. Murthy met virtually with Mr. Clegg on July 23, 2021. Dr. Murthy tried to set a "cordial" tone at the meeting and raised the issue of "wanting to have a better understanding of the reach of the mis- and disinformation" on Facebook. Waldo Dep. 107:1-2, 98:18-22. The "most specific questions were about understanding the data around the spread of misinformation and how we [are] measuring that," *Id.* at 35:20-23, meaning "how we're measuring the harm and the impact," *Id.* at 36:14. He also reiterated that OSG is "asking everyone to do more." *Id.* at 107:13-14. According to Mr. Waldo, someone from OSG's staff (Mr. Waldo could not recall whom) made a request of Facebook to explain "if they would share" what they were doing in response to the Advisory, "if anything." *Id.* at 109:5-17. And an offer was made (again, Mr. Waldo could not recall by whom) to connect DJ Patil, the White House's "data person," with Facebook personnel, so that Dr. Patil could better understand Facebook's data about the spread of misinformation. *Id.* at 112:1-10. Dr. Murthy did not demand specific actions or threaten legal consequences against Facebook if they were not taken. *See id.* at 35:20. *See also* Defs.' Resp. PFOF ¶¶ 259-271, 352-368.

67.   After the July 23, 2021 call, Dr. Murthy did not have further meetings about misinformation with Facebook. *See* Lesko Decl. ¶ 12 (Ex. 63). Nor did OSG request meetings on misinformation with other social media companies.[29] OSG concluded that such meetings "would [not] be a good use of Dr. Murthy's time." Waldo Dep. 115:1, 113:3-15. Mr. Waldo explained why OSG decided to deprioritize these meetings:

> [OSG had] done the work that we intended vis-a-vis the advisory, which is the Surgeon General's role, to raise up the issue, bring attention to it, and then . . . we wanted to move on to other priorities and that, you know, our part of the relay race was over. We had -- we had raised up the flagpole that this is an issue of public importance and that hopefully researchers, nonprofits, citizens, whomever, relative stakeholders would take actions. But we weren't – we're not a regulatory agency. We don't have oversight authority, et cetera. So it wasn't our job then to sort of show up with a clipboard, but rather we were trying to encourage the field to move forward and give permission structure where others might recognize that this is important and want to study it more, want to do more work in this area. But . . . Dr. Murthy wanted to focus on other core issues . . . .

*Id.* at 114:6-115:5.

68.   For its part, Facebook followed up with OSG in several ways. First, Mr. Clegg thanked Dr. Murthy for his time on July 23, 2021, and expressed wanting to "make sure [he] saw the steps [Facebook] took just this past week"—or, since July 16—"to adjust policies on what we are removing with respect to misinformation." Waldo Ex. 19 at 1 (Dkt. 210-18).[30] In that message, Mr. Clegg also expressed interest in "a regular cadence of meetings," which never materialized because OSG "didn't think [such meetings] would be worth [its] time given [OSG's] competing

---

[29] Mr. Waldo participated in three meetings—two with Google in July and September 2021 and one with Facebook in August 10—at the companies' request. Ex. 187 at 35-36. These were courtesy meetings that the companies requested to give OSG advance notice of announcements and work that they were doing on misinformation. *See* Waldo Dep. 66:16-23, 129:1-23.

[30] The record does not indicate clearly what these "steps" were. And, as discussed *infra*, Facebook's announcement with respect to the Surgeon General's Advisory did not describe any *new* action that Facebook would take. *See* Ex. 71. The document highlights ways in which Facebook was *already* following the recommendations laid out in the Advisory.

priorities." Waldo Dep. 254:7-12. Second, Facebook occasionally sent OSG updates on its activities. For example, on August 23, 2021, shortly after the Food and Drug Administration (FDA) approved the Pfizer COVID-19 vaccine, a Facebook representative forwarded Mr. Waldo an email informing the White House that Facebook planned to update its misinformation policies to remove claims that there were no FDA-approved vaccines. Waldo Ex. 27 at 1 (Dkt. 210-23). Third, Facebook continued to send OSG—mainly, Mr. Waldo—its bi-weekly COVID insight reports. *See* Waldo Ex. 54 at 1 (Dkt. 210-46) (Facebook sending Mr. Waldo "the most recent two reports" from June 24 to July 8, 2022). Mr. Waldo did not "spend a lot of time looking at [the] reports," Waldo Dep. 140:14-20, and he was not aware of any action taken by federal officials in response to the reports, *id.* at 141:14-16. As of December 2022, Mr. Waldo did not believe that he was still receiving those reports. *Id.* at 294:1-2. Mr. Waldo no longer works at OSG. *See* Defs.' Notice Regarding Substitution of Official-Capacity Defendants at 2 ("Defs.' Notice of Substitution") (Dkt. 263).

### 3. The Virality Project

69.    One of the Advisory's recommendations for governments is to "[i]nvest in fact-checking and rumor control mechanisms where appropriate." Advisory at 15. In support, the Advisory cites an online article written by individuals at the Stanford Internet Observatory and posted on a website for the "Virality Project." *See id.* at 22 n.62 (citing M. Masterson, A. Zaheer, *et al.*, *Rumor control: A framework for countering vaccine misinformation*, Virality Project Policy Analysis (May 4, 2021) (Ex. 72)). The Virality Project is a "coalition of research entities focused on supporting real-time information exchange" about COVID-19 misinformation "between the disinformation research community, public health officials, civil society organizations, government agencies, and social media platforms." Ex. 73 (*Announcing the Virality Project*,

49

Virality Project (Feb. 11, 2021), https://perma.cc/9T3J-F2HG). One of the lead entities responsible for the Virality Project is the Stanford Internet Observatory. *See id.*

70.    The Virality Project issued a "final report" on February 24, 2022, which was later revised on April 26, 2022. Waldo Ex. 28 at 2 (Dkt. 210-24) ("Virality Project Report"). Among other things, the report describes a process by which Virality Project analysts "created tickets documenting URLs" of "both specific pieces of misinformation and broader narratives." Virality Project Report at 27. According to the report, 174 "incidents" of misinformation were "referred to platforms for potential action." *Id.* at 30. The Virality Project provided information to social media platforms, but had no control over content moderation, censorship, or labeling posts. *See* Ex. 74 (*Background on the SIO's Projects on Social Media*, Stanford Internet Observatory (Mar. 17, 2023)) ("SIO Statement"). Rather, social media companies examined any reports sent to them by the Virality Project to determine if the content violated their policies and did not take action in cases where companies felt their existing policies were not violated. *Id.* Decisions to remove or flag tweets were made by the social media companies. *Id.*

71.    The report also notes that the Virality Project "built strong ties" with OSG, Virality Project Report at 17, and that it "hosted [a] discussion with [Dr.] Murthy" on July 15, 2021, the day of the Advisory's launch and Dr. Murthy's virtual appearance at the event hosted by the Stanford Internet Observatory, *id.* at 143. But according to OSG's Chief of Staff, Max Lesko, OSG "never provided any tip, flag, ticket, report, or other form of notification or input to the Virality Project concerning posts or accounts on social media." *See* Lesko Decl. ¶ 16 (Ex. 63). Moreover, OSG did not understand the Stanford event on July 15, 2021, to be a Virality Project event, and it was not advertised as such. *Id.* ¶ 15; *see also* Waldo Ex. 12 at 1 (Dkt. 210-13) (advertising the July 15, 2021, event as being hosted by the Stanford Internet Observatory). Mr. Waldo, who led OSG's

rollout of the Advisory, testified that he had never heard of the Virality Project. Waldo Dep. 207:10-14. Nor was he aware of any OSG involvement in the Virality Project. *Id.* at 207:18-21. He was not familiar with anyone at OSG or in the Federal Government reporting specific instances of misinformation on social media—referred to in the Virality Project report as "tickets"—to the Virality Project, either. *Id.* at 285:4-10.

72.     The Virality Project has not been active since 2022. Its February 2022 report is self-described as a "final" report. *See* Virality Project Report. The project's most recent "weekly briefing," "policy analysis," and "rapid response" posts—the only three categories of posts available on the Virality Project's website—all occurred in August 2021.[31] The final "weekly briefing" post from August 3, 2021, notes that it will be the project's "last official briefing." *See* Ex. 75 (*Virality Project Weekly Briefing # 32*, Virality Project (Aug. 3, 2021)). And the Virality Project's Twitter account has made no posts since announcing the final report on February 24, 2022. *See* Ex. 76 (Virality Project, Twitter (Feb. 24, 2022, 2:08 PM), https://perma.cc/6ADR-YCW7). To the best of OSG's knowledge, the Virality Project is no longer currently active, and OSG does not currently have any contact with it. Lesko Decl. ¶ 14 (Ex. 63). *See also* Defs.' Resp. PFOF ¶¶ 1236-1265.

## C.  The Centers for Disease Control and Prevention (CDC)

73.     CDC, a component of HHS, is a "science-based, data-driven, service organization that," "[f]or more than 70 years," has worked to "protect[] the public's health." Ex. 77 (*CDC 24/7: Saving Lives, Protecting People*, Ctrs. for Disease Control & Prevention, https://perma.cc/Z53S-9J8S (last updated Aug. 31, 2022)). Its mission is to "work[] 24/7 to protect America from health,

---

[31] *See* Ex. 81 (*Weekly Briefings,* Virality Project, https://perma.cc/W64T-2CXX); Ex. 82 (*Rapid Response*, Virality Project, https://perma.cc/9Z2L-KE5F); Ex. 83 (*Policy Analysis*, Virality Project, https://perma.cc/CZS2-KKSB).

safety and security threats, both foreign and in the U.S." Ex. 78 (*Mission, Role and Pledge*, Ctrs. for Disease Control & Prevention, https://perma.cc/SU2B-Z6TR (last updated Apr. 29, 2022)). To accomplish its mission, CDC "conducts critical science and provides health information" to prevent "expensive and dangerous health threats, and respond[] when [such threats] arise." *Id.* CDC's Office of Communications supports the agency's mission by "[e]nsur[ing] CDC's work is accessible, understandable, and actionable," and by "[m]aximiz[ing] public trust in and credibility of CDC's science, programs, and recommendations." Ex. 79 (*Office of Communications (OC)*, Ctrs. for Disease Control & Prevention, https://perma.cc/885U-GHJ8 (last updated Apr. 3, 2023)).

74.    Carol Crawford works for the CDC Office of Communications as the head of its Division of Digital Media. Crawford Dep. 11:7-12 (Dkt. 205-1). In that role, Ms. Crawford provides leadership for CDC's website and social media accounts. *Id.* at 11:14-19; Declaration of Carol Crawford, Director of CDC's Division of Digital Media ¶ 3 ("Crawford Decl.") (Ex. 80); *see also* Ex. 79. That includes convening personnel from across the agency to manage the CDC website and maintain social media accounts, coordinating CDC's web content management system, and drafting policies and guidelines in that space. Crawford Decl. ¶ 3 (Ex. 80). Ms. Crawford has worked for CDC in various capacities for 34 years. *Id.* ¶ 1.

75.    At various times during 2020-2022, CDC communicated regularly with several social media companies (such as Facebook) and sporadically with others (such as Twitter), primarily about promoting COVID-19 health information from CDC and also about COVID-19 misinformation on the companies' platforms. When communicating with social media companies, CDC was either (1) responding to Facebook's requests for science-based public health information; (2) proactively alerting Facebook, Twitter, and YouTube about false COVID-19 claims the agency observed on the platforms that could adversely affect public health; or

(3) advising the companies where to find accurate information about such claims on CDC's webpage. CDC also received bi-weekly summaries (in what were called "CrowdTangle reports") from Facebook about high-volume COVID-19 content circulating on its platform. CDC did not direct or encourage the development or enforcement of the companies' misinformation policies and did not direct or encourage them to take any particular actions with respect to any particular speakers[32] or claims circulating on their platforms.

### 1. CDC's Pandemic-Era Meetings with Social Media Companies

76.     Even before the COVID-19 pandemic, Ms. Crawford had occasional contacts with social media companies, primarily for the purpose of managing CDC's own social media accounts. At times, social media companies would reach out to CDC to partner with the agency on special projects such as promoting information about flu vaccines or addressing prescription drug overdoses. *Id.*

77.     Early in the COVID-19 pandemic, Ms. Crawford and others from her office began to communicate regularly with representatives from certain social media companies about COVID-19. Those communications were largely prompted by the companies' efforts to "get[] [CDC's] credible information out to [their] audiences[.]" Crawford Dep. 181:25–182:1. Social media companies began regularly reaching out to CDC to ensure that the information they chose to promote on their platforms remained consistent with the latest CDC guidance on issues such as masking protocols or vaccine recommendations. Crawford Decl. ¶ 5 (Ex. 80). Google, for instance,

---

[32] That includes the Individual Plaintiffs in this case. Crawford Dep. 264:2-18 ("Q: At any of your – in flagging any material for any of the social media issues, themes, facts, whatever you flag, can you say whether or not you flagged any information from the Great Barrington Declaration? A: I don't know what that is. Q: Okay. How about Jay Bhattacharya? Anything from him? A: I don't know who that is. Q: Marty Kulldorff. Anything from him? A: I don't know who that is. Q: Aaron Kheriaty. Anything from him? A: I don't know who that is. Q: Jim Hoft, or Gateway Pundit? A: I don't know who that is. Q: All right. And Jill Hines? A: I don't know who she is.").

would reach out to verify that the CDC web links appearing in its search results were accurate and up-to-date. *Id.* And Facebook reached out for help identifying CDC content that the company wanted to promote in its platform "group" pages. *Id.*

78.     An email from Facebook to Ms. Crawford in early February 2020 illustrates the types of communications the platforms had with CDC. At that time, a representative from Facebook informed Ms. Crawford that the company had "been working to identify how [it] can support efforts to provide users with accurate and timely information about [the] coronavirus," Crawford Ex. 2 at 2 (Dkt. 205-3), and was considering initiatives to "mak[e] it easier" for users to find "CDC-credible information," Crawford Dep. 18:9-15. The same Facebook representative informed CDC that the company was already taking "steps to control information and misinformation related to [COVID-19]," including by "remov[ing] [] misinformation" on its platform and by directing users to the WHO's webpage. Crawford Ex. 2 at 3-4 (Dkt. 205-3). What Facebook was looking to do in February 2020—and the reason it was reaching out to CDC then—was to "get CDC's feedback on a few key initiatives that" the company was "considering launching in the coming days/weeks" to *promote* CDC information. *Id.* at 2. Facebook proposed three initiatives: (1) "proactive messages," called "'Quick Promotions,'" "at the top of the News Feed to users in various countries about how to protect [themselves] from coronavirus," which would point users to "credible websites including the WHO internationally, and the CDC in the US"; (2) a "Coronavirus Page serving up content that exists on other organizations' [Facebook] pages including the CDC," which users could find when they "search for information on coronavirus" on the platform; and (3) "a coronavirus 'hub' which would contain various modules including pages to follow, fundraisers that are happening on the platform related to coronavirus, and potentially a common set of FAQs." *Id.* at 3. The email from Facebook included "design mocks" and asked for CDC's "feedback" on various questions,

including whether CDC thought it "would be beneficial to launch" the "Quick Promotions" "in the US at this time[.]" *Id.*

79.    Ms. Crawford responded that the agency believed there would be "great value" in adding "Quick Promotions" to Facebook's newsfeed and suggested that "if we can rotate messages, there could be times [CDC] might want to address widespread myths like mask use or new issues." *Id.* at 2. She also stated that CDC thought the two other promotions were "great" and would "love to be a part of [them]." *Id.* She noted that "[U.S.] users will need information directly from CDC and other federal/local organizations rather than international organizations," and asked Facebook to "[l]et us know what you need." *Id.*

80.    Soon, officials from CDC and Facebook began meeting weekly "to exchange information about COVID." Crawford Dep. 16:13-15. Later in the pandemic, CDC began meeting regularly with Google. *Id.* at 180:16-17. For a "short period of time," CDC met regularly with Pinterest as well, *id.* at 180:23-24; and "on occasion," CDC met with Twitter, *id.* at 180:24-25–181:1. While "misinformation was discussed" in those meetings, the meetings were "by and large . . . about things other than misinformation,"—in particular, about promoting CDC information relating to COVID on the social media companies' platforms. *Id.* at 181:22-25. These regular meetings facilitated conversations about the latest COVID-19 information in the midst of a pandemic environment where CDC's knowledge and understanding of the novel virus were evolving. Crawford Decl. ¶ 6 (Ex. 80).

81.    CDC no longer has regular meetings with any social media company except for Google, and it has no regular or direct communications with any social media company about misinformation. *Id.* ¶¶ 6-12. The last regular meeting with Facebook personnel took place in the summer of 2021. *Id.* ¶ 8. It has been well over a year since CDC had a meeting with Twitter or

Pinterest that touched on misinformation. *Id.* ¶¶ 9-10. And while CDC currently meets regularly with Google, there is no evidence that those meetings have related in any way to misinformation since March 2022. *Id.* ¶ 11. Instead, the bi-weekly meetings with Google focus on topics such as the impact of the redesign of the CDC.gov website on search engine results. *Id.*

82.     Moreover, even outside of meetings, CDC does not regularly, or directly, communicate with social media or technology companies about misinformation; nor does it have plans to do so. *Id.* ¶¶ 6-7. However, CDC has some occasional, indirect contact with personnel from social media or technology companies that may relate to misinformation. *Id.* For example, CDC personnel develop periodic "State of Vaccine Confidence Insight" reports, which are publicly available on its website, and which CDC periodically distributes to a wide list of email recipients that may include personnel from social media companies. *Id.* ¶ 7. CDC also funds and attends conferences that discuss misinformation and infodemic management, and personnel from social media companies may attend or speak at those conferences. *Id.* These occasional, indirect interactions concerning misinformation do not involve any requests or demands by CDC for a social media company to moderate any particular content on its platform. *See also* Defs.' Resp. PFOF ¶¶ 434-530 (Facebook), 531-560 (Google), 561-589 (Twitter).

### 2. CDC's Responses to Social Media Companies' Requests for Scientific Information Relating to Claims About COVID-19 or Vaccines

83.     On occasion, some social media companies reached out to Ms. Crawford via email to ask for information responsive to certain claims about COVID-19 or vaccines circulating on their platforms, and Ms. Crawford would respond on CDC's behalf.

84.     For example, at various times in 2021, Facebook emailed Ms. Crawford a list of claims (untethered to any particular post) and asked CDC to indicate whether they had been "debunked," *see* Crawford Ex. 16 at 1 (Dkt. 205-17)—in other words, whether they were "false

and can lead to harm," Crawford Ex. 17 (Dkt. 205-18), or "contribute to vaccine hesitancy or refusals," Crawford Ex. 26 at 2 (Dkt. 206-26). After checking with the relevant subject-matter experts as necessary, Ms. Crawford would respond by indicating whether the claims were false and harmful, and sometimes directing the company to information available on CDC's website that directly responded to the false claim. Crawford Dep. 129:11-22; Crawford Ex. 15 at 2 (Dkt. 205-16) (directing Facebook to CDC's "facts and misses" page for more information in response to one of the false claims); Crawford Ex. 23 (Dkt. 205-24) (sending links to CDC webpages addressing the claims raised by Facebook). Nevertheless, CDC could not always provide conclusive answers to the claims Facebook sent the agency. And where scientific evidence was unavailable at the time, CDC would respond to Facebook's inquiries with "[i]nconclusive." *See, e.g.*, Crawford Ex. 16 at 1 (Dkt. 205-17).

85.    When responding to Facebook, CDC did not instruct the company to remove or take any other action against posts or users promoting claims that CDC concluded were false and hazardous to public health. Crawford Dep. at 138:12-14. Indeed, Ms. Crawford understood that the scientific information CDC provided in its responses might inform Facebook's own "policy making" and content moderation decisions, *id.* at 139:23-25-140:1-4, but that "CDC's role" was never "to determine what" Facebook should or should not "do with the scientific information that [CDC] provided," *id.* at 161:20-23. Nor do any communications between Facebook and Ms. Crawford indicate that she or anyone else from CDC ever told Facebook how to handle misinformation. Instead, Facebook made clear that it was "seeking [the agency's] advice" on various issues to "help [*it*] determine the appropriate action to take on [certain] content[.]" *See* Crawford Ex. 26 at 4 (emphasis added) (Dkt. 205-26). At times, Facebook informed CDC about updates to its policies as a result of information it learned from CDC. *See id.* (noting actions the

company took against certain claims under its "current policy"); *id.* at 1 (informing CDC of "several updates" Facebook had made to its "COVID-19 Misinformation and Harm policy based on [CDC] inputs"). But the record contains no evidence that CDC ever demanded (or even asked) that Facebook implement any specific policy changes or even that Facebook report any such changes to the agency. *See also* Defs.' Resp. PFOF ¶¶ 434-530.

86.    Google (which owns YouTube) likewise requested CDC's input on claims about COVID-19 vaccines circulating on YouTube's platform. For instance, in March 2021, Google reached out to CDC to ask if a "vaccine expert[]" from CDC could join a call where Google "plan[ned] to share a new list of . . . vaccine misinformation claims" that the company had compiled. Crawford Ex. 29 at 2 (Dkt. 205-29). Ms. Crawford agreed to "arrange[] for a few [subject matter experts] to join the call[.]" *Id.* And in April of that year, Google again asked CDC if a vaccine expert could join a call "to follow up on some additional questions" from the company. Crawford Ex. 30 at 1 (Dkt. 205-30). Google also reached out with more technical questions, too. As vaccines were becoming available in 2021, Google notified CDC of updates the company planned to implement to its "vaccine general availability banner" as COVID-19 vaccines became available to new groups of people or CDC issued new guidance. *See* Crawford Ex. 42 at 3 (Dkt. 205-42) (Google asking CDC to verify whether Google's "one liner on the latest booster shot guidance from the CDC/Vaccines.gov" was accurate and CDC confirming that it was). As with Facebook, CDC did not demand (or even ask) that Google take any action with respect to content on YouTube or information appearing in Google's own banners. *See also* Defs.' Resp. PFOF ¶¶ 531-549.

87.    Most recently, in June 2022, Google requested CDC's "evidence-based input" on health-related claims unrelated to COVID-19 or vaccines. Crawford Ex. 43 (Dkt. 205-43). CDC

did not substantively respond to that request because it concerned information that fell outside CDC's scope. Crawford Dep. 256:9-16. When asked in her deposition why she thought Google sent CDC this request, Ms. Crawford testified that she believed it was because CDC's "focus is not solely on COVID," and so Google likely "thought that [CDC] might be able to help" by providing input on "this [other] topic as well." *Id.* at 256:4-8. Contrary to Plaintiffs' assertion, *see* PI Supp. 33, this email exchange does not show that CDC is communicating with platforms about misinformation on other topics as well.

### 3. CDC Emails Alerting Social Media Companies to Misinformation Themes Observed on Platforms and Providing Relevant Scientific Information

88.     At the same time, CDC occasionally pointed out to, or "flagged" for, Facebook or Twitter "issues" or "themes" about COVID-19 that the agency noticed had been circulating widely on the companies' platforms and referred the companies to information on CDC's website that addressed the claims. Crawford Ex. 9 at 1 (Dkt. 205-10); Crawford Dep. 87:13-25–88:1-2 (explaining that "flagging" meant simply "pointing out"). On occasion, CDC included specific social media posts as examples, to provide context or to clarify what the claims were. *Id.* at 90:14-23 (saying CDC "provided some examples of what we meant"). On May 6, 2021, for instance, Ms. Crawford emailed Facebook to point out "two issues [that] we are seeing a great deal of misinfo" about—"vaccine shedding and microchips"—and provided "some example posts." Crawford Ex. 9 at 1 (Dkt. 205-10). On May 10, 2021, Ms. Crawford sent the same email to Twitter, with example posts from its platforms. Crawford Ex. 34 at 4 (Dkt. 205-34). Ms. Crawford noted in her emails that CDC "plan[ned] to post something shortly to address vaccine shedding and" that she could "send that link soon." Crawford Ex. 9 at 1 (Dkt. 205-10); Crawford Ex. 34 at 4 (Dkt. 205-34). Ms. Crawford testified that, through these alerts, CDC was "trying to point out" to the social media companies the "[in]accurate information" circulating about COVID-19 "and [to] make the credible

59

information more available to users." Crawford Dep. 88:25-89:6. The "goal," in other words, was "to be sure that people ha[d] credible health information so that they [could] make the correct health decisions for themselves." *Id.*

89.    Ms. Crawford did not "know exactly what [the companies] might do with" the claims and posts flagged by CDC, nor did she ask the companies to take any particular action with respect to the claims or posts. *Id.* at 88:15-18; *see also id.* at 75:19-21. Neither she nor "anyone at CDC" advised a "social media company on how [it] should apply [its] policies to . . . a particular post[.]" *Id.* at 104:22-105:6. And the social media companies did not face any "consequence[s]" if they declined to "do anything with" the items "flagged" or pointed out by CDC. *Id.* at 88:19-22. Ms. Crawford simply believed "it was worth pointing out that" CDC was "going to have" responsive "information up soon" on its website, *id.*, which could assist the social media companies' application of their own policies with respect to claims "widely circulating" on their platforms. *Id.* at 153:23-154:3. Ultimately, the social media companies themselves "made decisions about" how to handle the misinformation circulating on their platforms, "based on whatever policy they had." *Id.* at 211:18-19; *id.* at 103:13-16 (discussing Facebook's options). Ms. Crawford has "never seen [those] policies," *id.*, or had input into their development or enforcement, *id.* at 105:12-19.

### 4.  CDC's Two "Be on the Lookout Meetings" in May 2021

90.    In May 2021, CDC held two meetings—called "Be On the Lookout" or "BOLO" meetings—to discuss misinformation with social media platforms. Crawford Dep. 198:21-24; *id.* at 244:19-245:2; *see also* Crawford Decl. ¶¶ 14-16 (Ex. 80). Facebook, Twitter, and YouTube were invited to participate, Crawford Ex. 34 at 4 (Dkt. 205-34) (Twitter invite); Crawford Ex. 40 at 1 (Dkt. 205-40) (YouTube invite); *id.* at 3 (Facebook invite), and officials from the Census Bureau ("Census") also participated in the meetings, *infra* Defs.' PFOF § II.D.

60

91.     The BOLO meetings emerged from an Interagency Agreement that CDC entered into with Census in January 2021. Crawford Decl. ¶¶ 13-14 (Ex. 80). The agreement allowed CDC to consult with Census "to learn how th[at agency] handled [online] misinformation" during the 2020 Census, to inform CDC's response to COVID-19 misinformation circulating online. Crawford Dep. 111:1-6, 175:14-19. CDC sought Census' assistance on this issue because CDC was "shorthanded" at the time, and Census "seemed to have more knowledge than [CDC] did." *Id.* at 111:5-6. Census introduced CDC to the idea of BOLO meetings, which would provide a forum for CDC to "give examples" to social media companies of false health information circulating on their platforms and to point the companies to responsive scientific information available from CDC. Crawford Dep. 210:20-22. Participants from social media companies "could [then] follow up separately" with CDC to discuss any of the issues further. *Id.* Ms. Crawford "ran the BOLO meetings," with the help of a Census contractor. *Id.* at 265:11-19. Census "drafted the slide deck," which CDC edited, *id.* at 210:15-25; and Census explained how it "thought [CDC] should" present the information, based on how Census "had done it in the past." *Id.* The PowerPoint slide decks presented COVID-19 misinformation narratives and contained example social media posts as illustrations. Crawford Decl. ¶ 14 (Ex. 80). During these presentations, CDC did not ask, let alone demand, that a company take a particular action with respect to the themes and example posts that were discussed at the BOLO meetings. *See* Defs.' Resp. PFOF ¶¶ 550-562.

92.     Two additional BOLO meetings were scheduled for the summer of 2021 but never occurred. Crawford Decl. ¶ 15 (Ex. 80). The first was cancelled due to a holiday; CDC emailed PowerPoint slides to the companies instead. *Id.*; Crawford Dep. 248:15-22. The second was cancelled because CDC had no information to share. Crawford Decl. ¶ 15 (Ex. 80). There have

been no BOLO meetings of this type since May 28, 2021, and no further meetings are anticipated. *Id.*

### 5. A CDC Official's One-Time Use of a Facebook Reporting Channel in 2021

93.   In the spring of 2021, Facebook and Twitter each separately suggested that CDC register to use the companies' respective "reporting channel" or "portal" set up by the company for entities such as CDC to report "misinformation or threats" that they observed on the platforms. Crawford Dep. 91:9-10; *id.* at 211:24-212:7. Ms. Crawford did not use Twitter's portal and does not recall anyone else from CDC ever being given access to the portal. *Id.* at 213:5-8. Ms. Crawford also did not use the Facebook reporting channel, but one other CDC official used it in the summer of 2021 to report a handful of "posts or threats" in a single submission. *Id.* at 92:3-5, 92:13-18; Crawford Decl. ¶ 18 (Ex. 80). CDC did not demand that Facebook take any particular action with respect to the few posts flagged through the reporting channel in the summer of 2021; and Facebook did not report back to CDC whether it took any action on those posts. Crawford Decl. ¶ 18. Ms. Crawford testified that she is unaware of any CDC official using a reporting channel since the summer of 2021. *Id.*; *see also* Defs.' Resp. PFOF ¶¶ 476-478.

### 6. CDC's Receipt of Bi-weekly Facebook COVID-19 Content Reports in 2021

94.   Additionally, from January to December 2021, Facebook sent CDC bi-weekly reports, called "CrowdTangle COVID content report[s]," Crawford Ex. 6 at 2 (Dkt. 205-7) which provided a "summary of the higher volume conversations" about COVID-19 on the platform, Crawford Dep. 53:7-12, and included "pictures of [] posts" "as examples" of the conversations, *id.* at 149:6-7. These reports could be used by CDC to better "understand what[] [was] being discussed" on social media so that the agency could "update [CDC] communication material" in response. *Id.* at 148:11-15. Facebook personnel included a summary of "[h]ighly engaged . . . content," which was not limited to content considered "misinformation," in the cover

62

emails to which the reports were attached. *See, e.g.*, Crawford Ex. 7 at 1 (Dkt. 205-8) (including in the summary of highly engaged content "posts . . . about celebrating health care workers" and posts "shar[ing] news that kids over 12 can be vaccinated," with "posts includ[ing] varied stances on support/opposition to the idea"). Ms. Crawford did not "personally do anything . . . with the CrowdTangle reports" aside from passing them along to others. Crawford Dep. 59:14-19; 52:6-10. CDC did not direct Facebook to take any action with respect to any information or example posts contained in the reports. The last CrowdTangle report CDC received from Facebook was in December 2021.[33]

95.     Before it began sending these summary CrowdTangle reports to CDC, Facebook had also allowed CDC, since March or April 2020, to "log into CrowdTangle and run [its] own reports or searches." Crawford Dep. 77:9-13, 147:12-14. Ms. Crawford did not use CrowdTangle to run searches, but other teams from CDC may have done so. *Id.* at 148:11-15. In any event, to the extent anyone did run searches in CrowdTangle, that would not indicate any effort to influence Facebook's applications of its content moderation policies. *See also* Defs.' Resp. PFOF ¶¶ 440-452, 456, 471, 472, 507-10.

**D.  The Census Bureau**

96.     Although the Census Bureau worked with CDC on COVID-19 misinformation in the past, CDC has not "work[ed] with Census in quite some time." Crawford Dep. 111:9-10. In particular, pursuant to a now-expired Interagency Agreement, *supra* Defs.' PFOF § II.C.4, Census helped CDC organize the two BOLO meetings CDC hosted in May 2021. Crawford Dep. 210:10-

---

[33] Crawford Ex. 6 at 1-2 (Dkt. 205-7) (first report sent in January 2021); Dkt. 71-2 at 1 (email from Facebook attaching the "last insights report for this series" (emphasis removed)); *id.* 71-2 at 1 (email from Facebook attaching the "last insights report for this series" (emphasis omitted)); *id.* at 2 (email from Facebook noting that the "reports will be discontinued in Jan 2022" (emphasis omitted)); *id.* (Crawford thanking Facebook for sending the reports and stating that she "understand[s] the[y're] ending").

25. To Ms. Crawford's knowledge, CDC's last meetings and communications with Census personnel about misinformation took place in the summer of 2021. Crawford Decl. ¶ 13 (Ex. 80).

97.    Also in 2021, Facebook added Census to the distribution list for its CrowdTangle reports. Crawford Dep. 58:17-20; *id.* Crawford Ex. 6 at 1 (Dkt. 205-7). On one occasion, Ms. Crawford sent Facebook a few questions from Census seeking greater understanding about how the company applied its content moderation policies to certain types of misinformation. In particular, Census wanted to know Facebook's "approach" to "adding labels to" certain stories posted on its platform and why Facebook decided to remove certain posts that had been identified as containing misinformation. Crawford Dep. 76:2-77:1; Crawford Ex. 8 at 2 (Dkt. 205-9). Ms. Crawford testified that she "th[ought] that Census was at least periodically checking on things they had flagged," *id.* at 117:19-21, but there is no evidence that in "periodically checking on things" Census ever demanded or even asked a social media company to take specific action with respect to a particular post.

### E. Dr. Fauci, Former Director of the National Institute of Allergy and Infectious Diseases (NIAID)

98.    The National Institute of Allergy and Infectious Diseases ("NIAID") is an agency within the National Institutes of Health ("NIH"), which in turn is a component of HHS. *See* Ex. 85 (*List of Institutes and Centers*, Nat'l Insts. of Health, https://perma.cc/YR83-TJMY); Ex. 86 (*About NIH*, Nat'l Insts. of Health, https://perma.cc/55BG-UDQU). NIAID conducts and supports research to better understand, treat, and prevent infectious, immunologic, and allergic diseases and is responsible for "respond[ing] to emerging public health threats." Ex. 87 (*NIAID Mission*, Nat'l Insts. of Health, https://perma.cc/8GVS-XSWM). To that end, NIAID manages a diverse research portfolio concerning "many of the world's most intractable and widespread diseases," including

"tuberculosis and influenza, HIV/AIDS, biodefense," COVID-19, and others. *Id.*; *see also* 42 U.S.C. § 285f.

99.    From 1984 to 2022, Dr. Fauci was the Director of NIAID, serving under seven Republican and Democratic Presidents in that role. Ex. 88 (*Anthony S. Fauci, M.D., Former NIAID Director*, Nat'l Insts. of Health, https://perma.cc/CSF2-XYNH). During that time, he led the agency in tackling "newly emerging and re-emerging infectious disease threats including HIV/AIDS, West Nile virus, the anthrax attacks, pandemic influenza, various bird influenza threats, Ebola and Zika, among others, and, of course, most recently the COVID-19 pandemic." Ex. 89 (*Statement by Anthony S. Fauci, M.D.*, Nat'l Insts. of Health (Aug. 22, 2022), https://perma.cc/RH8Z-P3X5). In 2008, he was awarded the presidential medal of freedom—the highest honor available to federal civil servants—by President George W. Bush for his work on HIV/AIDS. Ex. 90 (*President Bush Honors Presidential Medal of Freedom Recipients*, The White House (June 19, 2008), https://perma.cc/KE8X-4SPS).

100.   In January 2020, President Trump announced the formation of a Coronavirus Task Force, and named as its members Dr. Fauci and eleven other federal officials (including then-Secretary of Health and Human Services Alex Azar and then-Assistant to the President and Senior Advisor to the Chief of Staff Rob Blair). Ex. 91 (*Statement from the Press Secretary Regarding the President's Coronavirus Task Force*, The White House (Jan. 29, 2020), https://perma.cc/5VFS-LRZC). The task force was "charged . . . with leading the United States Government response to the novel 2019 coronavirus and with keeping [the President] apprised of developments." *Id.* In January 2021, after the change in administrations, Dr. Fauci was named President Biden's Chief Medical Advisor, Fauci Dep. 10:17-22 (Dkt. 206-1), to advise the President on handling the COVID-19 pandemic, Ex. 92 (*Statement from President Joe Biden on*

*the announcement of Dr. Anthony Fauci's Departure from NIAID*, The White House (Aug. 22, 2022), https://perma.cc/4KMA-PWH2). After 50 years as a civil servant (and 38 of those years as Director of NIAID), Dr. Fauci recently retired from government service. Ex. 93 (*Dr. Anthony Fauci to Leave NIAID at the End of December*, Nat'l Insts. of Health (Dec. 7, 2022), https://perma.cc/NLZ6-NY85).[34]

101.   As the nation's leading infectious disease expert, Dr. Fauci assumed a critical role in the pandemic response during the last two presidential administrations, answering difficult questions about unsettled scientific matters in White House press briefings, congressional hearings, cable news programs, and other public platforms. Until his retirement at 82 years old, he worked tirelessly—maintaining 18-hour workdays[35]—at the height of the pandemic. He has garnered numerous awards for leading the nation through an unprecedented public health crisis.[36]

102. Dr. Fauci had only limited interactions with Facebook during 2020, and no involvement with other social media platforms. In March 2020, Facebook CEO Mark Zuckerberg sent Dr. Fauci an email invitation to participate in a "Facebook Live" event, in which Dr. Fauci answered Mr. Zuckerberg's questions about COVID-19 in a live broadcast on the Facebook platform. *See* Ex. 187 at 58-60; *see also* Fauci Ex. 23 at 2 (Dkt. 206-24). Mr. Zuckerberg began his invitation with a "note of thanks for [Dr. Fauci's] leadership and everything [he was] doing to make our country's response to this outbreak as effective as possible." Fauci Ex. 23 at 3 (Dkt. 206-

---

[34] Dr. Hugh Auchincloss succeeded Dr. Fauci as the Acting Director of NIAID. *See* Defs.' Notice of Substitution at 2.

[35] Ex. 94 (Azmi Haroun, *Dr. Anthony Fauci, the US's top infectious-disease expert, shared a day in his life, and it's exhausting just reading it*, Insider (Dec. 4, 2020), https://perma.cc/ML8H-HSB5).

[36] *See, e.g.*, Ex. 95 (*2021 National Academy of Sciences Public Welfare Medal*, National Academy of Sciences, https://perma.cc/B8CV-T76C); Ex. 96 (*Anthony Fauci Named Recipient of AHA Award of Honor*, American Hospital Association (Apr. 21, 2022), https://perma.cc/M2BL-EGJR).

24). Mr. Zuckerberg continued by explaining that he "wanted to share a few ideas of ways [Facebook] could help . . . get [Dr. Fauci's] message out." *Id.* One idea was connected to Facebook's forthcoming "Coronavirus Information Hub," which would appear "at the top of Facebook for everyone" to help users "get authoritative information from reliable sources and . . . encourage people to practice social distanc[ing.]" *Id.* Mr. Zuckerberg thought that "it would be useful to include a video from [Dr. Fauci]" on this hub, "because people trust and want to hear from experts[.]" *Id.* Another idea was that Dr. Fauci participate in other "livestreamed Q&As" as part of a "series" that Mr. Zuckerberg was creating "with health experts to try to use [his] large following on the platform . . . to get authoritative information out as well." *Id.* Dr. Fauci responded that Mr. Zuckerberg's "idea and proposal sound terrific" and that he "would be happy to do a video for [the] hub." *Id.* at 4. During the video, Dr. Fauci answered "important questions" from Mr. Zuckerberg about COVID-19 "public health measures." Fauci Dep. at 177:2-8. Dr. Fauci has also participated in a small number of other livestreamed discussions with Mr. Zuckerberg to discuss COVID-19. *See* Ex. 187 at 58-60.

103.   Otherwise, Dr. Fauci has had no interactions with any social media company about COVID-19 or misinformation related to COVID-19. Dr. Fauci has never asked a social media company "to remove misinformation from" its platform. Fauci Dep. at 152:21-24. Dr. Fauci does not "pay attention to what social media organizations like Google and YouTube and Twitter . . . do[.]" *Id.* at 239:21-24; *id.* at 241:6-13 ("I do not get involved in any way with social media. I don't have an account, I don't tweet, I don't Facebook, and I don't pay attention to that. . . . I don't pay attention to what gets put up and put down on social media."). He is unfamiliar with the companies' policies. *See id.* at 241:14-25. And he has not been involved in any social media company's decision whether, or how, to moderate particular content. *Id.* at 280:3-7; *id.* at

281:24-282:2. Indeed, Dr. Fauci has testified that rather than "interfering with other people's ability to say what they want to say," his method of "countering false information . . . is to try to [] flood the system with the correct information[.]" *Id.* at 357:8-13. *See also* Defs.' Resp. PFOF ¶¶ 598-808, 840-852.

104.  In April 2020, Dr. Fauci's communications staff alerted Facebook of "fake Dr. Fauci accounts on [Facebook] and [Instagram],"—a federal crime, *see* 18 U.S.C. § 912—including one "particularly troubling" account that was also "selling masks[.]" Fauci Ex. 55 at 3-4 (Dkt. 207-19). "[A]ll but two" of the "accounts were removed for the impersonation of Dr. Fauci." *Id.* at 3. The two that were not removed were apparently "fan accounts[.]" *Id.* Dr. Fauci was not involved in the communications with Facebook about the impersonating accounts and was not aware that the accounts existed.

105.  Plaintiffs misconstrue the record when they assert that Dr. Fauci "approves of the removal of these accounts from social media because he thinks they are 'a bad thing,' even though they may include parody accounts." PI Supp. 40. Links to the accounts to which Plaintiffs refer were included in an email chain that did not include Dr. Fauci, *see* Fauci Ex. 55 (Dkt. 207-19),[37] and Dr. Fauci was shown that email for the first time during his deposition. When asked about the accounts linked in the email, Dr. Fauci stated, "I don't know what these are. I just got a bunch of links to them. I'm not sure what they are." Fauci Dep. 311:7-9. Dr. Fauci speculated that, based on the email, it looked like his communications staff was "trying to get rid of fake accounts" on Facebook "because fake accounts are bad things, I believe." *Id.* at 309:24-310:1. He went on to say: "I'm reading here that there are people that are using my name falsely and creating fake

---

[37] Although Plaintiffs repeatedly suggest the possibility that some accounts were parody accounts, they have introduced no such evidence, and the communications from NIAID staff clearly show that NIAID staff were only seeking the removal of accounts impersonating Dr. Fauci.

accounts which people in the communications staff [are] saying . . . is troubling because they're doing things like selling masks and doing things like that. So I think that it would be kind of appropriate for my communications staff to be concerned when people are falsely impersonating me." *Id.* at 310:8-16. When asked whether he was saying that "bad things," such as impersonating accounts, "should be removed from social media," Dr. Fauci responded, "No. I mean, I think when someone says they're me and they're not me, I think someone should take a close look at that." *Id.* at 311:22-312:1. And when asked whether "someone" should "take a close look at other false statements on social media," Dr. Fauci testified, "That's not my lane. I don't – I never get involved in that, nor do I concentrate on that, so I don't have an opinion on that. Like I've told you . . . now . . . I can repeat it for the hundredth time, I really don't get involved in social media issues." *Id.* at 312:2-9. *See also* Defs.' Resp. PFOF ¶¶ 809-825.

### F. The Cybersecurity and Infrastructure Security Agency (CISA)

#### 1. CISA's Mission and General Overview

106.   The Cybersecurity and Infrastructure Security Agency ("CISA"), a component of DHS, has a broad statutory mandate to "coordinate with" Federal and non-Federal entities (including international entities) "to carry out the cybersecurity and critical infrastructure activities of the Agency, as appropriate[.]" 6 U.S.C. § 652(c)(2). To accomplish its mission and manage risks to the nation's election infrastructure, CISA works collaboratively with state and local governments, election officials, federal partners, and private sector partners. Declaration of Geoff Hale, Lead for Election Security and Resilience, Nat'l Risk Mgmt. Ctr., CISA ¶ 6 ("Hale Decl.") (Ex. 97). This includes working in a nonpartisan manner with state and local election officials— among others, officials from Missouri and Louisiana, as discussed below—as the trusted and

expert voices within their communities to equip the American public with accurate information about the conduct and security of elections. *Id.*[38]

### 2. The Election Infrastructure Subsector

107.   In January 2017, based on the vital role that elections play in the United States, DHS officially designated election infrastructure as a critical infrastructure subsector. Hale Decl. ¶ 4 (Ex. 97). This designation recognizes that the disruption of U.S. election infrastructure would have a devastating impact on the country. *Id.* "Election infrastructure" refers to an assembly of systems and networks, including, among other things, voter registration databases and associated IT systems, IT infrastructure and systems used to manage elections, voting systems and associated infrastructure, storage facilities for election and voting system infrastructure, and polling places. *Id.* ¶ 5. CISA reduces the risk to U.S. critical infrastructure by, among other things, building resilience to disinformation. *Id.* ¶ 9.

108.   The official designation of election infrastructure as "critical infrastructure" also resulted in the creation of the "Election Infrastructure Subsector," which builds election infrastructure resilience by focusing on a wide range of election-related systems and assets, such as storage facilities, polling places, centralized vote tabulation locations used to support the election process, and related information and communications technologies. *Id.* ¶ 23. Like all critical infrastructure sectors, the Election Infrastructure Subsector is supported by two councils:

---

[38] In furtherance of its mission, CISA provides publicly available resources on election security for both the general public and election officials at all levels. Hale Decl. ¶ 7 (Ex. 97). Examples of these resources include an Election Infrastructure Insider Threat Mitigation Guide, CISA's partnership with the FBI to publish election-security-related public service announcements, and the compilation of a toolkit of free services and tools intended to help state and local government officials, election officials, and vendors enhance the cybersecurity and cyber resilience of U.S. election infrastructure. *Id.* In addition, CISA provides numerous voluntary and no-cost election security services, such as cybersecurity assessments, cyber threat hunting, cyber incident response, and training and exercises to state and local government officials and private sector election infrastructure partners. *Id.* ¶ 8.

a government coordinating council ("GCC") and a sector coordinating council ("SCC"). *Id.* ¶¶ 24, 27.

109.   The Election Infrastructure Subsector GCC ("EIS-GCC") is comprised of state, local, and Federal Government departments and agencies, which share information and collaborate on best practices to mitigate and counter threats to election infrastructure. *Id.* ¶ 29. The EIS-GCC Executive Committee is chaired by CISA, and its members include the U.S. Election Assistance Commission Chairperson, the National Association of Secretaries of State ("NASS") President, the National Association of State Election Directors ("NASED") President, and a local government election official. *Id.* ¶ 30. Notably, Louisiana is a member of NASS, and both Louisiana and Missouri are members of NASED. *Id.* ¶ 33. The Louisiana Secretary of State has been a member of the EIS-GCC since May 2018. *Id.* ¶ 31. He served as an EIS-GCC Executive Committee member from the summer of 2021 to the summer of 2022, while he was the NASS President. *Id.* The Missouri Secretary of State served as an alternate member of the EIS-GCC from 2018-2019. *Id.* ¶ 32.

110.   The Election Infrastructure Subsector SCC ("EI-SCC") comprises owners or operators with significant business or operating interests in U.S. election infrastructure systems or services. Its mission is "to advance the physical security, cyber security, and emergency preparedness of the nation's election infrastructure," and it accomplishes this mission through the voluntary actions of the infrastructure owners and operators represented in the EI-SCC. *Id.* ¶ 34. The EI-SCC is governed by a five-member Executive Committee. *Id.* ¶ 35. Although CISA is not a member of the EI-SCC, it serves as the secretariat and provides various administrative functions. *Id.* ¶ 36.

71

111.  After the 2020 election, the EI-SCC and EIS-GCC launched a Joint Managing Mis/Disinformation Working Group to coordinate infrastructure security efforts across the subsector. *Id.* ¶ 38. The Working Group provides a forum through which the Election Infrastructure Subsector can identify challenges in mitigating the risks posed by disinformation impacting election infrastructure and produce resources for addressing these risks. *Id.* ¶ 39. To date, the Joint Managing Mis/Disinformation Working Group has published two guides to assist state and local election officials and industry providers with preparing for and responding to risks associated with disinformation: (1) the Rumor Control Page Start-Up Guide, which is designed for use by state, local, tribal and territorial government officials and private partners seeking to dispel inaccurate election security-related information by sharing accurate information; and (2) the MDM Planning and Incident Response Guide for Election Officials, which is designed for SLTT election officials and to help them understand, prepare for, and respond to disinformation that may impact the ability to securely conduct elections. *Id.* ¶ 40.

112.  CISA supports the Joint Managing Mis/Disinformation Working Group by providing administrative and substantive support, such as facilitating working group meetings and helping to draft working group products. *Id.* ¶ 41. The Working Group does not engage with social media companies, and it does not flag or report potential disinformation to social media or technology companies. *Id.* ¶ 43.

### 3.   The Center for Internet Security

113.  The Center for Internet Security ("CIS") is a non-profit organization that exists to "make the connected world a safer place by developing, validating, and promoting timely best practice solutions that help people, businesses, and governments protect themselves against pervasive cyber threats." *Id.* ¶ 44; Ex. 98 (*About Us*, Ctr. For Internet Sec., https://perma.cc/456L-TUHD). It is home to the Multi-State Information Sharing and Analysis Center ("MS-ISAC") and

the Elections Infrastructure Information Sharing and Analysis Center ("EI-ISAC"). Hale Decl. ¶ 44 (Ex. 97).

114.   The MS-ISAC serves as a central cybersecurity resource for state, local, tribal and territorial government entities. *Id.* ¶ 45. It is a membership-based organization that includes more than 14,000 organizations and all fifty states, including Plaintiffs Missouri and Louisiana. *Id.* ¶ 46. The MS-ISAC members receive direct access to a suite of cybersecurity services and cybersecurity informational products including, but not limited to, cybersecurity advisories and alerts, vulnerability assessments, incident response support, secure information sharing, tabletop exercises, and malicious domains/internet protocol reports. *Id.* ¶ 47.

115.   The EI-ISAC, which was founded in 2018, is an organization managed by CIS with membership open to all state, local, tribal and territorial organizations that support election officials. *Id.* ¶ 48. Membership in the EI-ISAC is voluntary and free for participants. *Id.* ¶ 49. The EI-ISAC supports the rapidly changing cyber and critical infrastructure security needs of U.S. elections offices and offers a suite of election-focused cyber defense tools, including threat intelligence products, incident response and forensics, threat and vulnerability monitoring, cybersecurity awareness, and training products. *Id.* ¶ 48.

116.   DHS has provided financial assistance to CIS through a series of cooperative agreement awards, managed by CISA, to provide specified cybersecurity services to state, local, tribal, and territorial government organizations through the MS- and EI-ISACs. *Id.* ¶ 50. DHS has limited the use of funds to cybersecurity services intended to detect, prevent, respond to, mitigate, and recover from cyber threats, vulnerabilities and risk. *Id.* DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election-related disinformation to social media platforms. *Id.* ¶ 51.

73

### 4. CISA's Efforts to Build Resilience to Misinformation

#### a. *CISA's Mis-, Dis-, and Malinformation ("MDM") Team*

117. CISA's Mis-, Dis-, and Malinformation ("MDM") Team leads CISA's efforts to build resilience to disinformation targeting critical infrastructure. Scully Dep. 16:4-6 (Dkt. 209-1) The MDM Team, which was formerly known as the Countering Foreign Influence Task Force, was established in 2018 in CISA's predecessor agency. *See* Ex. 187 at 77. CISA builds this resilience through public awareness and engagement and seeks to reduce the impact of disinformation targeting election infrastructure. Scully Dep. 346:15-348:1. In general, CISA develops publications for public awareness and education, as well as publications for key stakeholders to help them understand how disinformation works and the steps they can take to mitigate risks. *Id.* at 16:7-15; Hale Decl. ¶ 14 (Ex. 97) (describing creation of graphic novels focusing on disinformation tactics through fictional stories and development of infographic explaining foreign influence campaigns). CISA also conducts analysis of open-source reporting. Scully Dep. 16:16-25. In addition, CISA engages or has engaged with different stakeholders, including civil society groups, federal partners, and private sector organizations, such as social media and technology companies. *Id.* at 16:16-22; Ex. 187 at 77.

#### b. *CISA's Switchboarding Work During the 2020 Election Cycle*

118. "Switchboarding" refers to a process by which CISA forwarded to social media companies election-related information that state and local election officials (or other stakeholders, such as NASS and NASED) had identified as misinformation. Scully Dep. 17:1-14, 23:19-24:2, 303:11-304:5. Those companies then decided how to handle the forwarded content based on their own policies. *Id.* at 17:15-21. During the 2020 election cycle, CISA provided switchboarding services primarily for state and local election officials, but also for other election infrastructure stakeholders. *Id.* at 16:16-25.

119. For the 2020 election cycle, much of the potential election security-related disinformation CISA received from state and local election officials was shared by those officials through CIS. Hale Decl. ¶ 71 (Ex. 97); Scully Dep. 59:9-60:17, 119:5-120:5.[39] When that happened, election officials would email the potential disinformation to CIS, which would then forward the information to CISA and others, including the Election Integrity Partnership ("EIP"), discussed below. Scully Dep. 16:16-25.[40] CISA did not fund CIS or the MS- or EI-ISAC for any of the work they provided in relation to the reporting of potential election security-related disinformation to social media or technology companies during the 2020 election cycle. Hale Decl. ¶ 77 (Ex. 97). In addition, officials in Plaintiff States Louisiana and Missouri were among those who shared potential misinformation with CISA or CIS for purposes of it being sent to social media companies. *Id.* ¶ 70; Ex. 100 (MOLA_DEFSPROD_00007488); Ex. 101 (MOLA_DEFSPROD_00007646); Ex. 102 (MOLA_DEFSPROD_00010719); Ex. 103 (MOLA_DEFSPROD_00008681); Ex. 104 (MOLA_DEFSPROD_00010774); and Ex. 105 (MOLA-DEFSPROD_00008610).

120. Before establishing its switchboarding operation, CISA met with social media companies and reaffirmed its "position" to "never ask [the companies] to take any specific

---

[39] CISA also received potential disinformation in two other ways. Scully Dep. 119:5-120:5. The first was that election and other officials would send information to CISA Central, which is CISA's operations center. *Id.* at 119:5-120:5. The second was that election and other officials would directly contact CISA employees. *Id.* at 119:5-120:5.

[40] In addition, CISA understands that CIS would share reports of potential election security-related disinformation with other organizations with which it had its own independent relationships, such as with the EIP for further analysis and with NASS and NASED for situational awareness. Hale Decl. ¶ 74 (Ex. 97). At a certain point in the 2020 election cycle, CIS began forwarding the potential election security-related disinformation received from state and local election officials directly to the relevant social media or technology companies and would include CISA on the email for situational awareness, as well as others, including the EIP. *Id.* ¶ 75. CISA took no action on these emails sent by CIS, other than frequently recording them in an internal spreadsheet that CISA had created. *Id.*

actions," and to leave it to the companies to "make decisions based on their terms of service." Scully Dep. 241:23-242:5. Consistent with that position, when CISA transmitted to social media companies potential misinformation identified by local and state officials, CISA's protocol was to include the following notice stating that it was not requesting that the social media companies take any particular action:

> The Cybersecurity and Infrastructure Security Agency (CISA) of the U.S. Department of Homeland Security (DHS) is not the originator of this information. CISA is forwarding this information, unedited, from its originating source – this information has not been originated or generated by CISA. This information may also be shared with law enforcement or intelligence agencies.

> CISA affirms that it neither has nor seeks the ability to remove or edit what information is made available on social media platforms. CISA makes no recommendations about how the information it is sharing should be handled or used by social media companies. Additionally, CISA will not take any action, favorable or unfavorable, toward social media companies based on decisions about how or whether to use this information.

> In the event that CISA follows up to request further information, such a request is not a requirement or demand. Responding to this request is voluntary and CISA will not take any action, favorable or unfavorable, based on decisions about whether or not to respond to this follow-up request for information.

*See, e.g.*, Ex. 106 at 1 (MOLA_DEFSPROD_00008499); Hale Decl. ¶ 72 (Ex. 97).

121.   Normally, CISA would receive a note from a social media company acknowledging that it had received CISA's email, but CISA often did not receive a similar note reporting what action was ultimately taken. Scully Dep. 177:7-178:8. If a social media company needed additional information from an election or other official, CISA tried to facilitate the information sharing. *Id.* at 219:25-220:13.

122.   Consistent with the fact that social media companies independently evaluated whether certain information violated their terms of service, they from time to time concluded that forwarded posts did not violate their content moderation policies and therefore took no action. *See,*

*e.g.*, Ex. 105 at 1 (MOLA_DEFSPROD_00008610) (email from Twitter stating that the "[t]weet was not determined to be a violation of our rule"); Ex. 107 at 1 (MOLA_DEFSPROD_00008640) (email from Twitter concluding that certain tweets violated its terms of service while others did not): Ex. 108 at 1 (MOLA_DEFSPROD_00009505) (email from Twitter stating "[t]weet was not in violation of our Civic Integrity Policy"); Ex. 109 at 1 (MOLA_DEFSPROD_00010711) (email from Twitter stating that the tweets were not in violation of their policies and would not be actioned); Ex. 110 at 1 (MOLA_DEFSPROD_00010794) (email from Twitter stating "internal review of account data indicates [the account] is not suspicious"); Ex. 111 at 1 (MOLA_DEFSPROD_00010376) (email from Twitter stating the tweet did not violate its civic integrity policy).

123.   On occasion at the request of election officials, CISA would ask social media companies to report back on how, if at all, they had addressed misinformation CISA had flagged on behalf of those officials. Scully Dep. 163:17-164:17. Over time, however, the companies began reporting directly to the election officials what actions, if any, they took concerning potential misinformation. *Id.* at 164:8-25. *See also* Defs.' Resp. PFOF ¶¶ 972-977, 1076-1082.

124.   CISA discontinued its switchboarding work after the 2020 election cycle and has no intention to engage in switchboarding for the next election. Scully Dep. 21:19-25; 265:13-19; Hale Decl. ¶ 78 (Ex. 97). In April or May 2022, CISA leadership decided that CISA would no longer play a switchboarding role, in part because it was resource intensive. Scully Dep. at 22:1-23; 62:15-22. Although CIS had requested that DHS provide funding for CIS's 2022 switchboarding efforts, DHS declined. Hale Decl. ¶ 79 (Ex. 97). It is CISA's understanding that during the 2022 election, social media companies engaged directly with CIS and election officials with any misinformation concerns. Scully Dep. 265:20-266:13. Although CISA was copied on CIS's communications with

social media companies in 2020, it was not copied on any such communications in 2022. *Id.* at 266:14-16.

125.   Plaintiffs contend, based on a November 10, 2021, "Cyberscoop" article, that CISA intended to expand its disinformation efforts, PI Supp. 58; *see also* Pls.' Proposed Finding of Fact ¶ 1106, ("Pls.' PFOF") (Dkt. 214-1) (referring to "Cyberscoop" article and claiming that "CISA publicly states that it is expanding its efforts to fight disinformation heading into the 2024 election cycle"); Pls.' PFOF ¶ 1114 (citing same November 2021 article where CISA Director Easterly is quoted as saying that CISA is "beefing up its misinformation and disinformation team"). While CISA anticipated and publicly stated that its MDM Team would grow, the size of the team has remained constant and the scope of CISA's disinformation mission has not expanded. Hale Decl. ¶¶ 12-13 (Ex. 97); *see also* Defs.' Resp. PFOF ¶¶ 1094-1122.

126.   Regarding CISA's 2022 election-related work, CISA endeavored to mitigate the risks posed by disinformation by providing updates to CISA's Election Security Rumor vs. Reality webpage, discussed *infra* at 79, and the "Tactics of Disinformation" resilience guide, which highlighted examples of the tactics used by disinformation actors and outlining proactive measures to mitigate the effectiveness of such tactics. Hale Decl. ¶¶ 64, 66 (Ex. 97). CISA also partnered with the FBI to publish a public service announcement on information manipulation tactics related to the 2022 midterm elections. *Id.* ¶ 67; Scully Dep. 303:11-304:5. And CISA sought to amplify the voices of state and local election officials through its social media platforms and other public forums. Hale Decl. ¶ 64 (Ex. 97).[41]

---

[41] Over the past several years, CISA has done a limited amount of disinformation-related work concerning other critical infrastructure sectors, but none of that work has concerned communications with social media companies concerning content on their platforms. Hale Decl. ¶ 16 (Ex. 97). For example, during the COVID-19 pandemic, and in relation to the Healthcare and Public Health Sector, CISA provided support to the sector and produced two public guidance

127. The "Election Security Rumor vs. Reality" webpage was "designed to address common disinformation narratives by providing accurate information related to elections." *See* Ex. 112 (*Election Security Rumor vs. Reality*, CISA (Nov. 4, 2022), https://perma.cc/VV2B-57BT); Hale Decl. ¶ 15 (Ex. 97). CISA developed this website to provide accurate information about false election rumors spreading in the public domain. Scully Dep. 290:18-23. The page was designed to "inform voters and help them build resilience against foreign influence operations and disinformation narratives about election infrastructure." *See* Ex. 112. Although the page was designed for voters, social media companies also have used the rumors page as a source to debunk content on their platforms. Scully Dep. 290:12-17. Notably, both Louisiana and Missouri have similar websites that seek to promote accurate information concerning elections and COVID-19.[42] In fact, the Missouri Secretary of State's election misinformation page expressly links to CISA's resources concerning election misinformation.[43]

---

documents. *Id.* ¶ 17. In addition, in support of the President's Unified Coordination Group for domestic preparedness and response regarding any potential impacts of Russia's invasion of Ukraine on the United States, a group that was in operation from January 2022 to April 2022, CISA personnel provided situational awareness reports based on publicly available third-party reporting and also provided support to build resilience to disinformation related to the crisis for the purpose of being prepared should foreign influence operations increase their targeting of U.S. critical infrastructure. *Id.* ¶ 18. And in relation to the Financial Services Sector, CISA has been working with the Treasury Department on a public guide to help the sector understand disinformation and the risks it poses. *Id.* ¶ 19. That guide is still in development, and work currently is on pause because other, urgent tasks have taken priority. *Id.*

[42] *See* Ex. 113 at 3-8 (*Social Media Resources*, Mo. Dep't of Health & Senior Servs., https://perma.cc/6U4G-Y44L) (providing "rumor control" resources regarding COVID-19); Ex. 114 at 1 (*Election Security*, Mo. Sec'y of State, https://perma.cc/LW4Y-9TLJ); Ex. 115 at 1-2 (*COVID-19 Stay at Home Order*, Off. of the Governor, https://perma.cc/2HMS-RBBU) (providing accurate information concerning Louisiana's COVID-19 stay at home order); Ex. 116 (*Get Election Information: Frequently Asked Questions*, La. Dep't of State, https://perma.cc/F72W-4VMB).

[43] *See* Ex. 114 at 3 (linking to CISA, The War on Pineapple: Understanding Foreign Intelligence in 5 Steps (2019) (Ex. 117)); *id.* (linking to Dep't of Homeland Sec., Social Media Bots Overview (2018) (Ex. 118)).

c.   *CISA's Meetings with Social Media Companies*

128.  In furtherance of its mission to improve the security and resiliency of critical infrastructure, CISA participated in meetings with social media companies and others concerning misinformation, including (1) recurring U.S. Government ("USG")-Industry meetings (and preparatory meetings in advance of these meetings); (2) CISA Cybersecurity Advisory Committee ("CSAC") quarterly meetings; (3) CISA CSAC, Protecting Critical Infrastructure from Misinformation and Disinformation subcommittee meetings; and (4) meetings convened by the EIS-GCC and the EI-SCC Joint Managing Mis/Disinformation Working Group. *See* Ex. 187 at 42-44. Contrary to Plaintiffs' insinuation that these meetings "provide[d] avenues for government officials to push for censorship of disfavored viewpoints and speakers online," Pls.' Mem. in Supp. of Mot. for Prelim. Inj. 27, ("PI Br.") (Dkt. 11-1), Plaintiffs have failed to adduce any evidence that any such alleged "push" for censorship occurred during these meetings.

129.  *USG-Industry meetings.* For example, the USG-Industry meetings, which began in 2018 and continued through 2022, included federal agency participants from CISA, DHS, the FBI, the Department of Justice ("DOJ"), and the Office of the Director of National Intelligence ("ODNI"), as well as social media company participants from Google, Facebook, Twitter, Reddit and Microsoft, and on occasion Verizon Media, Pinterest, LinkedIn, and the Wikimedia Foundation. *See* Ex. 187 at 42-43; Scully Dep. 31:10-16. The topics discussed generally included information sharing around election risks, briefs from the industry, threat updates, and highlights and upcoming "watch outs." *Id.* at 43. CISA's role at these meetings generally involved educating social media platforms on how elections function and are administered, as well as potential threats to election security. Scully Dep. 224:22-25:9. Much of the discussion at these meetings involved cybersecurity issues, as well as discussions about then-ongoing physical threats to poll workers. *Id.* at 235:11-22. CISA has not participated in the USG-Industry meetings since the 2022 general

election, *see* Hale Decl. ¶ 69 (Ex. 97), and currently, there is no plan to resume participation in these meetings. Scully Dep. 32:9-11.

130.   Although concerns about misinformation and disinformation were also discussed during these agency-industry meetings, they did not involve "pushes" to censor misinformation or disinformation. *Id.* at 39:12-25. For example, CISA discussed the development of informational products it had created to promote resilience to disinformation, such as a general disinformation resilience guide highlighting examples of the tactics use by foreign disinformation actors and outlining proactive measures to mitigate the effectiveness of such tactics entitled the Tactics of Disinformation. *Id.* at 39:12-18: Hale Decl. ¶ 66 (Ex. 97). Other agencies, including DOJ, FBI, ODNI, and DHS, would participate and provide unclassified, high-level reviews or strategic intelligence briefings on these topics. Scully Dep. 25:10-23. The social media companies would share high-level trend information from public reporting they had released. *Id.* at 40:2-41:15. For example, members of the intelligence community discussed malign foreign actors who potentially were going to launch disinformation operations. *Id.* at 39:19-25; *see also* Defs.' Resp. PFOF ¶¶ 861-866, 978-990.

131.   *CISA CSAC meetings.* Established under the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388 (NDAA), the CISA CSAC operates as a federal advisory committee, governed by the Federal Advisory Committee Act, to provide recommendations to CISA on topics related to its cybersecurity mission. *See* Ex. 119 (*CISA Cybersecurity Advisory Committee*, CISA, https://perma.cc/G6BW-LKDR); Ex. 120 (*CISA Cybersecurity Advisory Committee (CSAC) Charter*, CISA, https://perma.cc/QU5C-ZT5F). CSAC includes experts on cybersecurity, technology, risk management, privacy and resilience, and members employed or previously employed by, among others, social media and technology

companies. Ex. 120 at 2-3. The CSAC quarterly meeting agenda and summaries are available online, Ex. 121 (*CISA Cybersecurity Advisory Committee (CSAC) Meeting Resources*, CISA, https://perma.cc/F6N9-2DF2), and contrary to Plaintiffs' contention, a review of those materials fails to reflect any coercion or attempted censorship by the Federal Government of social media companies. Instead, these materials reflect the creation of a new, congressionally-mandated advisory committee, discussions about how CISA can better accomplish its mission of promoting the security and resilience of critical infrastructure such as by refining the national effort to identify and prioritize the most critical entities and infrastructure, improving efforts to strengthen the nation's cyber workforce, and enhancing public-private communication and collaboration in preventing and responding to cybersecurity incidents. *Id.*

132.   *CISA CSAC, Protecting Critical Infrastructure from Misinformation and Disinformation Subcommittee (MDM Subcommittee) meetings*. In addition, the CSAC MDM Subcommittee, which was directed to stand down in December 2022 because it had completed the tasks for which it was created and provided its recommendations to CISA, had nothing to do with attempted censorship of content on social media platforms. *See* Ex. 187 at 43. The MDM Subcommittee did not discuss whether or how social media platforms should moderate content, either in specific cases or more generally. Ex. 122 at 9 (*Addressing false claims and misperceptions of the UW Center for an Informed Public's research*, Univ. of Wash. (Mar. 16, 2023)). Rather, the CSAC established the MDM Subcommittee for the purpose of evaluating and providing recommendations on potentially effective MDM resiliency efforts that fit within CISA's unique capabilities and mission. Ex. 123 (CISA Cybersecurity Advisory Committee, Subcommittee Factsheet and 2022 Cybersecurity Advisory Committee (CSAC) Reports and Recommendations (2023)). Like the CSAC Committee, the MDM Subcommittee operated transparently and details

82

about the MDM Subcommittee, its membership, reports, and recommendations, are posted on CISA's website. *Id.* Specifically, the MDM Subcommittee recommended that CISA take actions such as "shar[ing] up to date 'best practices' around how to proactively address and counter MDM based on the most recent research[,]" "[s]har[ing] information with state and local election officials[,]" and "[p]rotect[ing] the courts" from becoming the "target of an intensified campaign to undermine public trust in the legitimacy of their processes." Ex. 124 at 1-2 (CISA Cybersecurity Advisory Committee, Report to the Director: Protecting Critical Infrastructure from Misinformation & Disinformation Information Sharing Around Foreign Adversary Threats to Elections (2022)). Nothing in these materials reflects an attempt by CISA to "push" social media companies to censor mis- or disinformation.

133. *EIS-GCC and EI-SCC Joint Managing Mis/Disinformation Working Group meetings.* Finally, as explained above, *see supra* Defs.' PFOF ¶ 111, the EIS-GCC and EI-SCC Joint Mis/Disinformation Working Group, which was launched after the 2020 election, provides a forum through which the Election Infrastructure Subsector can identify challenges in building resilience against disinformation and produce resources to work towards this goal. *See* Ex. 187 at 44. Notably, the Secretary of State Office for Plaintiff Louisiana has been a member of the EIS-GCC since May 2018, and while serving as the NASS President from the summer of 2021 to 2022, the Louisiana Secretary of State served as an EIS-GCC Executive Committee member. Hale Decl. ¶ 31 (Ex. 97). In this capacity, Louisiana received regular briefings (usually every two weeks) on CISA's election security efforts—including briefings on CISA's disinformation resilience work— engaged in security planning activities for the Election Infrastructure Subsector and oversaw the management and activity of EIS-GCC working groups. *Id.* This included the oversight and management of the EI-SCC and EIS-GCC Joint Managing Mis/Disinformation Working Group.

*Id.* The Missouri Secretary of State Office was an alternate member of the EIS-GCC from 2018-19. *Id.* ¶ 32. In this capacity, the Missouri Secretary of State Office attended the EIS-GCC biannual meetings and activity participated in briefings on the Election Infrastructure Subsector's security and resilience efforts. *Id.*

        d.   *CISA's Limited Involvement with the Election Integrity Partnership*

134.   The Election Integrity Partnership ("EIP") was a private partnership formed in 2020 that included the Stanford Internet Observatory ("SIO"), the University of Washington, Graphika, and the Atlantic Council's Digital Forensic Research Lab, and whose mission was to better understand the information environment around elections. *See* Scully Ex. 1 at vi (Dkt. 209-2) (The Long Fuse: Misinformation and the 2020 Election). The EIP's "primary goals were to: (1) identify mis- and disinformation before they went viral and during viral outbreaks[;] (2) share clear and accurate counter-messaging[;] and (3) document the specific misinformation actors, transmission pathways, narrative evolutions, and information infrastructures that enabled these narratives to propagate." *Id.* Among other actions, the EIP developed a ticketing system where trusted external stakeholders and internal EIP analysts could flag misinformation that EIP would then analyze and, depending on the nature of the information, could flag for social media companies for their awareness. *Id.* at 8-10; 18-19.

135.   The EIP provided public factual findings to social media platforms, but had no control over content moderation, censorship, or labeling posts. Ex. 74 at 2. Rather, social media platforms examined any reports sent to them by the EIP to determine if the content violated their policies and whether and how to moderate the content. *Id.*; *see* Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"); Ex. 125 at 3 (*A Statement from the Election Integrity Partnership*, Election Integrity Partnership (Oct. 5, 2022),

https://perma.cc/LV9L-CNCR) ("Each [social media] company made their own determinations on how to treat our reports."). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2.

136.   CISA involvement with the EIP was limited, and it did not found, fund, or have any role in the management or operation of the EIP. Hale Decl. ¶ 52 (Ex. 97); Ex. 122 at 7. During 2020, several Stanford University students interned at CISA on election security matters. Hale Decl. ¶ 53 (Ex. 97).[44] During their internships, CISA personnel and the interns discussed the challenges facing and the needs of election officials. *Id.*; Scully Ex. 1 at 2 (Dkt. 209-2). Based on lessons learned from the 2018 election, CISA employee Brian Scully shared with the interns his view that State and local election officials' resources were insufficient to allow them to identify misinformation that targeted their jurisdictions. Scully Dep. 84:10-22. The interns then presented the lack of resources and challenges facing election officials to officials at the SIO. Hale Decl. ¶ 54 (Ex. 97). CISA personnel subsequently had a conversation with Alex Stamos, who worked for the SIO, and confirmed his understanding that the States were lacking in such resources. Scully Dep. 86:22-87:9; Hale Decl. ¶ 54 (Ex. 97).

137.   In July 2020, the EIP was formed. Scully Ex. 1 at 21(3) (Dkt. 207-2). As the EIP was being stood up, and given its relationships with the election community, CISA connected the EIP with election stakeholders at NASS, NASED, and CIS, which, as discussed earlier, manages the MS-ISAC and the EI-SAC. Hale Decl. ¶ 58 (Ex. 97). And as it would with other nongovernmental organizations in the election community, CISA received a briefing from EIP in May or June 2022,

---

[44] Students who interned at CISA should only have performed CISA work during their internships with the agency, and they should not have performed any CISA work outside of their CISA internship, including while interning at SIO or supporting the EIP. Hale Decl. ¶ 61 (Ex. 97).

during which the EIP shared its plans for the 2022 midterms and lessons learned from the 2020 election. Scully Dep. 54:10-14; Hale Decl. ¶ 60 (Ex. 97).

138.   CISA did not launch the EIP, and the EIP is not a government organization. Hale Decl. ¶ 56 (Ex. 97). CISA does not fund and has never funded the EIP. *Id.* ¶ 57. CISA generally did not share information with the EIP. Scully Dep. 73:25-74:2; 106:3-9. It did not submit tickets flagging potential misinformation to the EIP. Ex. 125 at 2 ("CISA did not send any examples of potential misinformation to EIP" and "EIP did not send any reports of false rumors or disinformation to social media companies on behalf of [DHS] or [CISA]."); Ex. 74 at 3 (stating that the EIP did not receive requests from CISA to eliminate or censor tweets); Ex. 122 at 7 (stating that CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA). CISA is not aware of any communications with the EIP about specific disinformation concerns. Scully Dep. 75:2-5. Presently, CISA is not doing any work with the EIP. Hale Decl. ¶ 63 (Ex. 97). *See also* Defs.' Resp. PFOF ¶¶ 991-1075.

### G.  The State Department's Global Engagement Center (GEC)

139.   Disinformation from foreign state and foreign non-state actors is of critical concern to the United States. *See* Declaration of Leah Bray, Deputy Coordinator, Glob. Engagement Ctr., U.S. Dep't of State ¶ 5 (Bray Decl.) (Ex. 142).[45] Indeed, Congress and the Executive Branch recognized before 2020 that private platforms' enforcement of their own terms of service can be important in opposing activities of foreign adversaries, such as the ISIS terrorist organization, that

---

[45] For example, disinformation is one of Russia's most important and far-reaching tools in support of its invasion of Ukraine. Bray Decl. ¶ 5 (Ex 142). Russia has operationalized the concept of perpetual adversarial competition in the information environment by encouraging the development of a disinformation and propaganda ecosystem. *Id.* This ecosystem creates and spreads false narratives to strategically advance Russia's policy goals. *Id.* Russia's intelligence services operate, task, and influence websites that present themselves as news outlets to spread lies and sow discord. *Id.* ¶ 6.

have sought to use social media platforms to disseminate anti-American propaganda.[46] Congress also explicitly recognized the need for government action to counter such dissemination when it mandated that the Department of State's Global Engagement Center (GEC) counter foreign propaganda and disinformation. Kimmage Dep. 26:5-12 (Dkt. 208-1). The GEC's mission is "to direct, lead, synchronize, integrate, and coordinate efforts of the Federal Government to recognize, understand, expose, and counter foreign state and foreign non-state propaganda and disinformation efforts aimed at undermining or influencing the policies, security, or stability of the United States[, its] allies[,] and partner nations." *See* 22 U.S.C. § 2656 note (Global Engagement Center).

140.   The GEC plays a key role in coordinating U.S. government efforts and helping to lead a global response to such foreign malign influence. *See* Bray Decl. ¶ 7 (Ex. 142). A central part of this effort is exposing foreign state and non-state actors' disinformation tactics so that allied governments and partners abroad, including civil society organizations, academia, the press, and the international public, can conduct further analysis of their own and thereby increase collective resilience to disinformation and propaganda. *Id.*

141.   The GEC carries out its statutory mission to counter propaganda and disinformation from foreign state and non-state actors along five lines of effort: (1) analytics and research,

---

[46] *See* Ex. 163 at 13 (*Global Efforts to Defeat ISIS: Hearing Before the S. Comm. on Foreign Rels.*, 114th Cong. (2016) (statement of Brett H. McGurk, Special Presidential Envoy)) (Twitter, Facebook, and YouTube "are . . . removing ISIL-related content from their platforms . . . . [W]e have widely publicized how anyone can report ISIL content on-line, so that platforms can remove it if the content violates a platform's terms of service, which it often does."); Ex. 164 at 3 (*Countering Terrorist Internet Recruitment: Hearing Before the Subcomm. on Investigations of the S. Comm. on Homeland Sec. and Governmental Affs.*, 114th Cong. (2016) (statement of Sen. Rob Portman)) ("[S]ocial media firms including Facebook and Twitter have stepped up their voluntary efforts to police their own terms of service, which prohibit incitements to terrorism. Twitter has closed more than 100,000 ISIS-linked accounts, and Facebook has actively worked to remove offending users while working in various ways to promote content to counter jihadist propaganda. Those actions have helped to degrade ISIS's social media megaphone. . . but its online presence remains strong.").

(2) international partnerships, (3) programs and campaigns, (4) exposure, and (5) technology assessment and engagement. *Id.* ¶ 4; *see also* Kimmage Dep. 26:24-27:19. GEC's Russia, People's Republic of China, Iran, and Counterterrorism teams seek to build societal and institutional resilience against foreign propaganda and disinformation abroad. Bray Decl. ¶ 4 (Ex. 142); Kimmage Dep. 28:5-10. The GEC plays a coordination role in the interagency's public exposure of foreign information influence operations, including the use of proxy sites and social media networks overseas. Ex. 126 (GEC, *About Us*, U.S. Dep't of State, https://perma.cc/6U48-PE8Y). The GEC hosts private sector technology demonstrations, assesses counter-disinformation technologies against specific challenges, and identifies technological solutions through overseas technology challenge programs. Bray Decl. ¶ 4 (Ex. 142). The GEC also has a resources team, an interagency coordination team, a Technology Engagement Team (TET), and a front office. Kimmage Dep. 28:5-19.

142.   The GEC's TET holds meetings with social media companies and exchanges information concerning the propaganda and disinformation tools and techniques used by the United States' adversaries. Kimmage Dep. 29:14-30:14. These meetings rarely include discussions about specific content posted on social media because the meetings are at a higher, more conceptual level about what foreign actors are doing, rather than specific content. *Id.* at 30:20-31:3. The TET team also ran the disinfo-cloud, an information sharing platform that contained tools to counter propaganda and misinformation. *Id.* at 169:19-173:17. These tools could identify coordinated inauthentic activity on a social media platform by a foreign disinformation actor. *Id.* at 170:11-18.[47]

---

[47] For a time, the TET had a location in Silicon Valley where one individual, Sam Stewart (named as Defendant Samaruddin K Stewart), was stationed. Kimmage Dep. 153:7-154:21. The purpose of the Silicon Valley location was to facilitate public/private coordination and broker constructive

143.   The GEC front office engages with social media companies, primarily to build relationships with those companies to facilitate better communications at the working level. *Id.* at 31:12-20. The primary topics discussed at these meetings are the tools and techniques used by America's adversaries, including the campaigns being conducted by foreign propaganda actors like Russia, China, Iran, and terrorist organizations, as well as the narratives they are promoting. *Id.* at 32:11-19. The GEC also is in listening mode during these meetings for anything the social media companies want to share, although they typically have little to share. Kimmage Dep. 32:11-33:1. The social media companies have shared high-level information like a foreign disinformation campaign with a narrative, rather than specific content that would be part of that campaign. *Id.* at 33:14-34:2.

144.   The GEC did not flag specific content for social media companies during the meetings between the GEC front office and social media companies and did not give the companies any directives. *Id.* at 34:13-36:5. The GEC's purpose in advising social media companies about disinformation campaigns was not to influence companies' internal decisions regarding content, but to deepen their understanding of the actions of malign actors seeking to undermine U.S. national security, in line with the GEC's congressional mandate. *Id.* at 36:6-37:7. In addition, the purpose of the GEC's liaisons with social media companies is not to stop the spread of online disinformation; rather, the GEC simply shares lessons learned, information about propaganda and disinformation techniques, and the campaigns and narratives of foreign propaganda and

---

engagements between the government and the tech sector, including social media companies, and academia and research. Kimmage Dep. 155:5-21. Mr. Stewart had conversations with social media companies in which the GEC shared information related to its mission to counter foreign propaganda and disinformation. *Id.* at 155:22-156:11. The social media companies also educated the GEC based on what sorts of propaganda and disinformation they were seeing. *Id.* at 157:11-23. Mr. Stewart no longer works for the GEC, and no one from the TET is currently working from the Silicon Valley location. *Id.* at 154:14-21, 272:17-25.

disinformation actors. *Id.* at 273:12-24. Sharing information can help social media companies to identify coordinated inauthentic activity or to understand what these actors are trying to achieve, as well as to understand the types of narratives they are promoting. *Id.* at 279:17-280:4. Providing this information to social media companies is the first step in social media companies' ability to address foreign propaganda on their sites, as "[s]olving a problem has to start with understanding the problem[.]" *Id.* at 280:9-281:3.

145.   However, the GEC does not engage in any activities where the intention is to propose to social media companies that certain content should not be posted on their platforms. Kimmage Dep. 37:16-25. Indeed, "[t]he Global Engagement Center does not tee up actions for social media companies to take," and it "does not seek to influence the decisions of the social media companies." *Id.* at 38:2-3, 283:9-22; Bray Decl. ¶ 16 (Ex. 142) (explaining that the GEC's practice is not to request social media companies take any specific actions when sharing information with them).[48] Nor does the GEC seek to provide information that might inform social media companies' decisions concerning content moderation, or brief social media companies on their content

---

[48] In rare instances the GEC has flagged a specific post for a social media company when the circumstances involved potential threats to the safety of State Department personnel. Bray Decl. ¶ 17 (Ex. 142). In 2018, a colleague informed Mr. Kimmage, who was then acting Coordinator of the GEC, of a security situation in a Middle Eastern country where protestors were using a social media platform to communicate in ways that raised urgent security concerns, and the State Department was concerned for the safety of its personnel. *Id.*; Kimmage Dep. 38:12-39:25. Mr. Kimmage communicated directly with a social media platform and informed it of the State Department's concern. *Id.* Mr. Kimmage was "very specific" in his interaction with the social media company that this was a real time situation in which the State Department believed its personnel were at risk and asked the company to review the activity on these accounts to decide whether the content in question, which had been posted by foreign actors, violated its terms of service. *Id.* at 38:12-39:25, 40:1-3. Mr. Kimmage did not ask for anything to be removed from the site, but he did express concerns about the personal safety of State Department personnel. *Id.* at 38:12-39:25. Mr. Kimmage is unaware of what action, if any, the platform took in response to his identification of this issue, because it did not report back to him. *Id.* at 40:4-7.

moderation policies. Kimmage Dep. 38:4-11, 285:19-286:1.[49] Rather, whatever actions social media companies may take after receiving information from the GEC is left completely up to those companies. *Id.* at 273:12-274:8; *see also* Defs.' Resp. PFOF ¶¶ 1123-1134.

### H.  The Federal Bureau of Investigation

#### 1.  FBI Efforts as to Foreign Influence and Election Misinformation

146.   "Foreign influence operations," as then-Deputy Assistant Attorney General Adam S. Hickey of the DOJ National Security Division explained in 2018 to the Senate Judiciary Committee, "include covert actions by foreign governments intended to affect U.S. political sentiment and public discourse, sow divisions in our society, or undermine confidence in our democratic institutions to achieve strategic geopolitical objectives." Ex. 127 at 1 (*Election Interference: Ensuring Law Enforcement is Equipped to Target Those Seeking to Do Harm: Hearing Before the S. Comm. on the Judiciary*, 115th Cong. (2018) (statement of Adam Hickey, Deputy Assistant Att'y Gen., Dep't of Just.), 2018 WL 2933298). A prominent example is found in the 2018 federal indictment "of 13 Russian individuals and three entities, including the Internet Research Agency (or IRA), for federal crimes in connection with an effort to interfere in the 2016 Presidential election. The defendants allegedly conducted what they called 'information warfare against the United States,' with the stated goal of 'spread[ing] distrust towards the candidates and the political system in general.'" Ex. 128 at 1 (Adam. S. Hickey, Deputy Assistant Att'y Gen.,

---

[49] When asked at his deposition about any efforts by the GEC to influence social media companies' content moderation decisions, Mr. Kimmage, the acting GEC Coordinator and Principal Deputy Coordinator from 2017 until June 2021, stated that he never had a conversation with social media companies during which he encouraged them to speed up the removal of posts. Kimmage Dep. 42:12-20, 47:16-20. Mr. Kimmage further testified that he is unaware of instances in which other GEC personnel expressed concern about specific content on a platform to a third party on the understanding that the party would convey that concern to the social media company. *Id.* at 55:20-56:8.

Remarks at Misinfo Con (Aug. 6, 2018), 2018 WL 3727551); *see also* Ex. 129 (Press Release, Dep't of Just., Grand Jury Indicts Thirteen Russian Individuals and Three Russian Companies for Scheme to Interfere in the United States Political System (Feb. 16, 2018), 2018 WL 920088) (DOJ news release describing indictment). It was to address such "information warfare" that the FBI in the fall of 2017 established the Foreign Influence Task Force ("FITF"). *See* Ex. 130 at 7 (*Oversight of the Federal Bureau of Investigation: the January 6 Insurrection, Domestic Terrorism, and Other Threats: Hearing Before the S. Comm. on the Judiciary*, 117th Cong. 1 (2021), 2021 WL 808994 (statement of Christopher Wray, Dir., FBI)).

147.   Among the categories of activity by foreign governments that the FITF investigates and seeks to disrupt are "attempts by adversaries—hoping to reach a wide swath of Americans covertly from outside the United States—to use false personas and fabricated stories on social media platforms to discredit U.S. individuals and institutions"; "[t]argeting U.S. officials and other U.S. persons through traditional intelligence tradecraft"; "[c]riminal efforts to suppress voting and provide illegal campaign financing"; and "[c]yber attacks against voting infrastructure, along with computer intrusions targeting elected officials and others." Ex. 131 at 1 (*Combating Foreign Influence*, Fed. Bureau of Investigation, https://perma.cc/M4P7-6KFF); *see* Declaration of Larissa L. Knapp, Exec. Assistant Dir., Nat'l Sec. Branch, FBI ("Knapp Decl.") ¶¶ 10-20 (Ex. 157).

148.   Government concern about foreign influence efforts directed to United States elections has continued beyond the 2016 election into the 2020 election season and beyond, including under the Trump Administration. The International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.*, grants the President broad authority to impose economic sanctions on foreign governments that threaten the security of the United States. Invoking that authority, President Trump in 2018 declared an emergency to deal with the unusual and extraordinary threat

presented by "the ability of persons located . . . outside the United States to interfere in or undermine public confidence in United States elections, including through the unauthorized accessing of election and campaign infrastructure *or the covert distribution of propaganda and disinformation*." Exec. Order No. 13,848, 83 Fed. Reg. 46,843, 46,843 (Sept. 12, 2018) (emphasis added). Noting that "foreign powers have historically sought to exploit America's free and open political system," President Trump found that "the proliferation of digital devices and internet-based communications has created significant vulnerabilities and magnified the scope and intensity of the threat of foreign interference." *Id.* The order required, *inter alia*, various national security officials, not later than 45 days after an election, to assess "any information indicating that a foreign government, or any person acting as an agent of or on behalf of a foreign government, has acted with the intent or purpose of interfering in that election." *Id.* at 46,843-44. President Trump continued that emergency finding for the following two years. 84 Fed. Reg. 48,039 (Sept. 10, 2019); *see also* 85 Fed. Reg. 56,469 (Sept. 10, 2020) (President Biden continued that finding for two successive years).

149.   Also, on March 2, 2020, the eve of "Super Tuesday" (when multiple states held primary contests), then-Attorney General Barr joined numerous other officials in a joint statement advising: "We continue to work with all 50 states, U.S. territories, local officials, political parties, and private sector partners to keep elections free from foreign interference." Ex. 132 at 1 (Press Release, Fed. Bureau of Investigation, Joint Statement from DOS, DOJ, DOD, DHS, ODNI, FBI, NSA, and CISA on Preparations for Super Tuesday (Mar. 2, 2020), 2020 WL 996966). "Americans must also remain aware," the joint statement continued, "that foreign actors continue to try to influence public sentiment and shape voter perceptions. They spread false information and propaganda about political processes and candidates on social media in hopes to cause confusion

and create doubt in our system. We remain alert and ready to respond to any efforts to disrupt the 2020 elections." *Id.* Closer to Election Day, FBI and CISA, on September 22, 2020, issued an "announcement to raise awareness of the potential threat posed by attempts to spread disinformation regarding the results of the 2020 elections." Ex. 133 at 1 (Press Release, Fed. Bureau of Investigation, Foreign Actors and Cybercriminals Likely to Spread Disinformation Regarding 2020 Election Results (Sept. 22, 2020)*,* 2020 WL 5644950). "Foreign actors and cybercriminals," the announcement continued, "could create new websites, change existing websites, and create or share corresponding social media content to spread false information in an attempt to discredit the electoral process and undermine confidence in U.S. democratic institutions." *Id.* For example, an Iranian hacking group obtained unauthorized access to one local government's computers and, before that intrusion was thwarted, could have displayed false results for the 2020 election on that government's public-facing website. Ex. 134 at 1 (Joseph Menn, *Iran gained access to election results website in 2020, military reveals*, Wash. Post (Apr. 24, 2023)).

150.  Elvis Chan, the Assistant Special Agent in Charge ("ASAC") of the Cyber Branch for the FBI in San Francisco, assisted with FITF efforts by sharing with social media companies information the FBI developed in the course of malign-influence investigations. As a supervisor over FBI San Francisco cyber investigations, he has also shared information with social media companies about cyber investigations, which are different from malign-influence investigations. Chan Dep. 8:11-13, 100:11-12, 105:13-18 (Dkt. 204-1). The companies ASAC Chan met with most frequently were Facebook, Google, Twitter, and Microsoft. *Id.* at 210:19-25.

151.  The USG-industry meetings ASAC Chan regularly attended included discussion of "hack-and-dump" (a.k.a. "hack-and-leak") operations. *Id.* at 170:12-15, 171:9-11, 172:3-5.[50] Multiple FBI agents attended the USG-industry meetings, at which, before the 2020 election, the FBI warned social media companies about the potential for 2016-style Russian hack-and-dump operations. *Id.* at 172:17-173:13, 177:7-10. The FBI's warnings, though not based on observed computer intrusions similar to those that occurred in 2016, followed from the assessment that because such a hack-and-dump operation had been deployed before (in 2016), it could be deployed again, given, for example, the skills of the Russian hackers shown in 2016. *Id.* at 173:18-174:13, 208:7-12. The FBI also voiced warnings at FITF-organized bilateral meetings with individual platforms. *Id.* at 181:6-11, 185:19-25, 189:24-190:13; *see also* Defs.' Resp. PFOF ¶¶ 865-879.

152.  In general, ASAC Chan met with the platforms' trust and safety personnel monthly in connection with cyber or FITF investigations, although the frequency became weekly as the 2020 election approached. Chan Dep. 40:2-11, 40:44-50. On FITF matters, the FBI shared information with the platforms that was (1) *strategic* (concerning general foreign malign techniques or processes), or (2) *tactical* (describing attributes, or indicators, of particular social media accounts indicating they were being operated by foreign malign actors). FITF shared information about a foreign malign actor's social media activity not based on the content or viewpoint expressed in a post, but rather on the determination that the account is part of a covert

---

[50] The paradigmatic or "best" example of a hack-and-dump or hack-and-leak operation was the one undertaken by members of Russia's GRU military unit when they unlawfully intruded ("hacked") into the computer networks of the Democratic Congressional Campaign Committee, the Democratic National Committee, and the presidential campaign of Hillary Clinton, and thereafter released ("dumped" or "leaked") information stolen from those networks on the internet. Chan Dep. 13:7-15; *see, e.g.*, Ex. 135 at 1 (Press Release, Dep't of Just., Grand Jury Indicts 12 Russian Intelligence Officers for Hacking Offenses Related to the 2016 Election (July 13, 2018), 2018 WL 3425704 (DOJ news release describing indictment charging 12 "Russian nationals for committing federal crimes . . . intended to interfere with the 2016 U.S. presidential election")).

effort by a foreign malign actor. *See* Knapp Decl. ¶¶ 16-20 (Ex. 157). Platforms would use their own means to validate the FBI's views on whether particular accounts were being operated by Russian state-sponsored actors and whether to take them down. Chan Dep. at 29:14-30:10, 32:8-33:17. The FBI only shared information concerning accounts it attributed with *high confidence* to a foreign-state actor, and to date the FBI's attributions have always proven correct. *Id.* at 112:21-113:6. As Yoel Roth, former head of content moderation at Twitter, further explained in 2023 testimony before the House Oversight and Accountability Committee: "The FBI was quite careful and quite consistent to request review of the accounts, but not to cross the line into advocating for Twitter to take any particular action." Ex. 2 at 16. During 2020, ASAC Chan estimated that he shared tactical information with platforms "between one to five or one to six times per month." *Id.* at 100:21-24; *see also* Defs.' Resp. PFOF ¶¶ 905-924, 929-930.

153.   The Russians' 2016 hack-and-leak operation provided an impetus for some platforms to change their service terms to state, among other things, that they would not allow posts of hacked materials because of concerns about the hacking victim's privacy. Chan Dep. 205:4-17, 248:10-16. Although ASAC Chan inquired whether platforms had made changes to their terms of service and what the changes were, he never suggested that any platform change a service term. *Id.* at 206:3-17, 250:17-21, 253:21-254:1. The platforms themselves "were actively looking for hack-and-leak operations" using detection methods that would identify hacked materials "put or uploaded onto their platforms." *Id.* at 204:18-24.

154.   Also as part of its election integrity efforts, the FBI in San Francisco operated a 2020 election command post, starting on the Friday before the election and continuing through election night. The San Francisco Field Office was responsible for relaying to the platforms election-related time, place, or manner disinformation or malign-foreign-influence information on their platforms

as reported by other field offices and after agency review. Chan Dep. 162:10-163:20, 164:23-165:2, 168:10-20. The FBI operated on the ground that it is a potential crime to post false information about the time, place, or manner of an election. *Id.* at 270:2-13; *see* Knapp Decl. ¶¶ 21-24 (Ex. 157). During the 2022 midterm elections the FBI in San Francisco staffed the command post on Election Day only, based on its experience during the 2018 midterm elections, when the "volume of information . . . to be coordinated" was "very low." Chan Dep. at 167:20-168: 9.

155.   The FBI would convey such posts to platforms "to alert" them "to see if" the posts violated the platforms' terms of service, and if the posts did so, the platforms "would follow their own policies, which may [have] include[d] taking down accounts." *Id.* at 165:9-22; *see* Knapp Decl. ¶¶ 21-24 (Ex. 157). Platforms would sometimes reply that they had taken down the posts, while in other cases they would state that the flagged post did not violate platform terms of service. *Id.* at 165:23-167:3-14; *see also* Defs.' Resp. PFOF ¶¶ 878-879, 925-928, 966-967.

## 2.   The "Hunter Biden Laptop Story"

156.   Plaintiffs allege that the FBI is responsible for "censorship" of the *New York Post*'s October 14, 2020, story concerning alleged contents of Hunter Biden's laptop computer. PI Br. 23-24; *see* PI Supp. 27-29.

157.   The evidence reflects that it was Twitter and Facebook, acting on their own initiative, that unilaterally determined what limits to impose on the dissemination of posts involving that story. Following the *New York Post*'s publication on October 14, 2020, Senator Hawley asserted that, "Twitter is blocking all tweets and direct messages that contain the URL for the Post article," while "Facebook has stated that it is 'reducing [the story's] distribution on our platform,' though the specifics of how Facebook will implement this remain opaque." Ex. 136 at 1 (Press Release, Sen. Josh Hawley, Hawley Calls for FEC Investigation of Potential In-Kind Contributions from Twitter and Facebook to Biden Campaign (Oct. 14, 2020), https://perma.cc/A7ST-3KQK) (news

release reprinting Sen. Hawley letter to FEC). Twitter's then-chief executive, Jack Dorsey, later represented to Congress in 2020 that, after the *New York Post*'s release of its article, the platform enforced its 2018 Hacked Materials Policy, which prevented sharing certain links from that newspaper's Twitter account, "publicly or privately," but "[r]eferences to the contents of the materials or discussion about the materials were not restricted under the policy." Ex. 137 at 6 (*Censorship and the 2020 Election: Hearing Before the S. Comm. on the Judiciary*, 116th Cong. (2020), 2020 WL 13568471 (opening statement of Jack Dorsey, CEO, Twitter)). Application of the 2018 policy "prevent[ed] Twitter from being used to spread hacked materials." *Id.* at 5. As a former attorney for Twitter, Vijaya Gadde, represented to Congress in 2023, Twitter initially decided the *New York Post*'s tweets about the story fell within that policy because the tweets contained "embedded images that looked like they may have been obtained through hacking," and the result of Twitter's initial decision was to "block[]" tweets and linked-to articles "embedding those source materials"—which did not prevent other "tweeting [about], reporting, discussing, or describing the contents of" the laptop. Ex. 2 at 5.

158.   But "Twitter then "changed its policy within 24 hours and admitted its initial action was wrong. This policy revision immediately allowed people to tweet the original articles with the embedded source materials." *Id*. Or, as Mr. Dorsey put it, Twitter changed course, and it "quickly updated" its "policy to limit its scope to only cover the removal of materials shared by hackers directly," and subsequently restored the *New York Post*'s account. Ex. 137 at 6. Mr. Dorsey further explained: "We made a quick interpretation, using no other evidence, that the materials in the article were obtained through hacking, and according to our policy we blocked them from being spread." Ex. 14 at 3. And Mr. Dorsey noted that Twitter "admitted this action was wrong and corrected it within 24 hours." *Id.*

159.   As Mr. Roth further testified in 2023 about Russian interference in the 2016 election: "Twitter and the entire social media industry were frankly caught with their pants down in 2016 and missed an opportunity to do the critical work of protecting election security." Ex. 2 at 11. Mr. Roth testified that academics and researchers had reached this judgment after long study of Russian "active measures," and that the most influential part of Russia's campaign was the hack and leak in 2016 targeting John Podesta, Chairman of Hillary Clinton's 2016 presidential campaign. *Id.* The incident involving Mr. Podesta served as "one of the animating concerns" for Twitter's initial decision to limit the distribution of posts about the *New York Post*'s Hunter Biden story. *Id.* That decision was not motivated by coercion or pressure from the Federal Government. *Id.* No one from the Federal Government, the Biden campaign or the DNC directed asked Twitter to remove or take action against content concerning the New York Post story. *Id.* at 11, 25.

160.   Plaintiffs contend that Mr. Roth previously acknowledged in a December 2020 declaration submitted in a Federal Elections Commission ("FEC") proceeding that the Federal Government had informed Twitter of a potential hack and leak operation concerning Hunter Biden. PI Supp. 28. Yet Mr. Roth stated only that, in "regular meetings" he attended with the FBI, other Federal agencies, "and industry peers regarding election security," he had "learned" that "there were rumors that a hack-and-leak operation would involve Hunter Biden." Chan Ex. 8 (Roth Decl.) ¶¶ 10-11 (Dkt. 204-5). But Mr. Roth did not say in his 2020 declaration from whom he heard those rumors, or attribute them to Government personnel. Mr. Roth later clarified, in sworn congressional testimony in February 2023, that he intended to indicate in his FEC declaration that another social media company, not the Federal Government, had raised the possibility of a hack-and-leak operation concerning Hunter Biden. Ex. 2 at 11. Mr. Roth explained that the Federal Government did not share that perspective or provide information to Twitter concerning this issue.

*Id.*; *see id.* at 37 ("My recollection is that a representative of another tech company may have mentioned [the Hunter Biden hack-and-leak operation], but those meetings were several years ago. I truly don't recall."); *id.* at 43 ("I want to be clear that my statement to the FEC does not suggest that the FBI told me it would involve Hunter Biden. That's a popular reading of the declaration but it was not my intent."); *id.* at 46 ("My recollection is it was mentioned by another technology company in one of our joint meetings, but I don't remember who."). Documents that ASAC Chan sent to Twitter the "night before" the *New York Post* story broke "did not relate to Hunter Biden." *Id.* at 12; *see also* Defs.' Resp. PFOF ¶¶ 880-904.

161.   ASAC Chan testified that no one brought anything to do with Hunter Biden's laptop to his attention before the *New York Post*'s publication on October 14, 2020. Chan Dep. 229:21-230:19. At one bilateral meeting between the FBI FITF and Facebook after October 14, 2020, one of Facebook's analysts asked if FBI had any information to share about the Hunter Biden investigation or case, and FBI personnel answered that the FBI had no comment. *Id.* at 213:11-19, 308:14-309:12. Other than the Facebook analyst's inquiry and the FBI's no-comment response, ASAC Chan was not aware of any communications related to the Hunter Biden laptop story between the FBI and Facebook, Chan Dep. 233:22-234:3, Twitter, *id.* at 233:8-21, Apple, Microsoft, *id.* at 234:6-7, or any other platform, *id.* at 234:4-5; *see also id.* at 227:24-228:1, 21-23, 229:6-14 (testifying that he did not recall any Federal Government personnel mentioning Hunter Biden's name during meeting with Twitter). (The FBI is not commenting on the relevant investigation, which is ongoing.) Ex. 138 at 36-37 (*Annual World Wide Threats Hearing with Heads of the Intelligence Committee: Hearing Before H. Select Comm. on Intell.*, 118th Cong. (2023)).

162.   ASAC Chan was not aware (until asked about the Roth Declaration at his deposition) of actions Twitter initially took to limit circulation of certain posts (containing "embedded source materials") about the Post's Hunter Biden laptop story. *Id.* at 232:18-21. As Mr. Roth explained, his "interactions with [ASAC] Chan and with the FBI almost entirely focused on what the FBI called malign[ ] foreign interference, things like Russian troll farms and Iranian involvement in the elections, not on any type of domestic" inquiry. Ex. 2 at 12.

163.   As to Meta, in the October 25, 2022 letter by that company's counsel to this Court, the platform stated that ASAC Chan "at no point in time advised Meta 'to suppress the Hunter Biden laptop story.' Nor did any of his colleagues." Ex. A, Dkt. 96 at 2-3.[51]

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) ("Injunctive relief is an extraordinary and drastic remedy[] and should only be granted when the movant has clearly carried the burden of persuasion."). Plaintiffs must "by a clear showing" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Failure to satisfy any one of these requirements precludes injunctive relief, *see Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989), and Plaintiffs bear a heavy burden

---

[51] Mr. Zuckerberg's October 2020 congressional testimony that the FBI put the company on "alert" about a potential hack-and-dump operation does not show that ASAC Chan or the FBI advised Facebook regarding the "Hunter Biden Laptop Story." PI Supp. 28; Pls.' PFOF ¶ 902. ASAC Chan testified that what the FBI would have done was to ask the platform "how their terms of service would handle a situation" involving materials released from such an operation. Chan Dep. 247:22-248:1-4, 250:14-21. Twitter and Facebook said they would remove hacked materials if the platforms *themselves* were able to validate such materials were hacked. *Id.* at 252:24-253:4.

of persuading the district court that all four elements are satisfied, *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985). A plaintiff's burden is even higher where, as here, it seeks a preliminary injunction that would alter the status quo. *See, e.g.*, *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). Preliminary injunctions that go "well beyond simply maintaining the status quo" are "particularly disfavored[] and should not be issued unless the facts and law clearly favor the moving party." *Id.*

## ARGUMENT

Contrary to Plaintiffs' hyperbole and speculation, the record confirms only that devoted civil servants did what government officials are expected to do: promote government policies, including through discussions with private parties, to help protect the public. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015) ("[A]s a general matter, when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position," otherwise "it is not easy to imagine how government would function"); *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000) ("the government" has the right to "speak[] . . . to promote its own policies or to advance a particular idea," and to the extent "the citizenry objects, newly elected officials later could espouse some different or contrary position"); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J. concurring) (it is "the very business of government to favor and disfavor points of view on . . . innumerable subjects"); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) ("when the government" seeks to "promote a particular policy of its own it is entitled to say what it wishes").

The evidence demonstrates that during a pandemic that cost over a million Americans their lives, officials from the White House and OSG promoted an "all of society" effort to overcome this challenge, the likes of which our nation had not experienced in over a century. *See supra* Defs.' PFOF § II.A.-B. Public health officials at CDC and NIAID communicated with social media

companies to help promote accurate health information and address the spread of misinformation that could threaten additional lives. *See supra* Defs.' PFOF § II.C.-E. FBI officials likewise communicated with social media platforms to help identify malign foreign actors seeking to exploit social media to further their objectives and undermine our national security. *See supra* Defs.' PFOF § II.H. Similarly, officials at CISA sought to protect our democratic processes by sharing, with social media companies, reports received from persons of all political stripes, including from Plaintiffs Louisiana and Missouri, regarding election-related misinformation. *See supra* Defs.' PFOF § II.F. None of the evidence demonstrates that any government official coerced or effectively compelled any social media company to take any action regarding content on its platforms. Rather, Defendants, like officials in prior administrations, used the bully pulpit, and other means of communication, to promote public health and safety—again, precisely what government officials are supposed to do. Ultimately, the social media companies—large, independent corporations—decided for themselves what would be carried on their platforms.

These types of government communications with social media companies are not unlawful, and indeed, are beneficial. Although Plaintiffs purport to argue otherwise, they point to no evidence demonstrating the type of coercion that the Supreme Court has held necessary to transform private decisions into state action. Instead, Plaintiffs ask this Court to recognize new legal theories of state action to justify a sweeping injunction that would hamstring, if not cripple, the Government's ability to express its views on matters of critical public concern.

Plaintiffs' motion should therefore be denied on the merits. But even if the Court believes Plaintiffs' legal theories have merit, Plaintiffs cannot establish any irreparable harm to justify a preliminary injunction that would impair the Federal Government's ability to communicate with private companies to promote national security and public safety.

I.     **Plaintiffs fail to satisfy their burden of demonstrating that irreparable harm would result in the absence of a preliminary injunction.**

Plaintiffs have not "clearly carried the burden of persuasion" to show imminent irreparable harm, *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009) (citation omitted), as "is *required* for injunctive relief." *Montient Corp. v. Dondero*, 529 F.3d 532, 538 (5th Cir. 2008) (emphasis added); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (3d ed. 2013) ("Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."). To show irreparable harm, Plaintiffs must demonstrate "a *significant threat* of injury from the impending action, that the injury is *imminent*, and that money damages would not fully repair the harm." *Humana, Inc. v. Jackson*, 804 F.2d 1390, 1394 (5th Cir. 1986) (emphases added).

Plaintiffs devote a mere two sentences of their 68-page supplemental brief to this indispensable factor. And they argue only that a preliminary injunction is warranted because they bring a First Amendment claim. PI Supp. 65. But merely asserting a First Amendment violation does not suffice. A First Amendment injury, like any other, must be imminent and non-speculative to satisfy the irreparable injury requirement. *See Google, Inc. v. Hood*, 822 F.3d 212, 227-28 (5th Cir. 2016) ("[I]nvocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury."); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (finding a preliminary injunction appropriate when it was "clear . . . that First Amendment interests were either *threatened or in fact being impaired* at the time relief was sought" (emphasis added)); *Ark. Project v. Shaw*, 775 F.3d 641, 663-64 (5th Cir. 2014) ("Federal courts are not obligated to grant an injunction for every violation of law," and that the "court's

104

power to order injunctive relief depends" on "whether plaintiffs have established . . . a reasonably certain threat of imminent harm." (citation omitted)).

To demonstrate irreparable harm at the preliminary injunction stage, Plaintiffs must adduce evidence showing that the irreparable injury is likely to occur "*during the pendency of the litigation*." *Justin Indus., Inc. v. Choctaw Secs., L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990) (emphasis added). After all, the very purpose of a preliminary injunction is "simply [to] preserve[] the status quo pending final determination of the action after a full hearing." *SEC v. First Fin. Group of Tex.*, 645 F.2d 429, 435 n.8 (5th Cir. Unit A 1981). Plaintiffs make no effort to meet their heavy burden as to this critical element of the preliminary injunction requirements. In their two-sentence argument, they point to no evidence at all substantiating their irreparable harm claim. *See* PI Supp. 65. And although they allege, elsewhere in their brief, *see id.* at 56-57, vaguely defined harms to their interests as speakers or listeners for standing purposes, those purported harms fall far short of satisfying Article III's requirements of "concrete and particularized" and "actual or imminent" injury. *Infra* Arg. § II.A.1.; *see also* Defs.' MTD 18-31; Defs.' Reply in Supp. of MTD 7-19 ("Defs.' Reply") (Dkt. 199). Much less do they show any *irreparable* injury likely to arise during the pendency of this suit on the merits.

For several reasons, the record undermines Plaintiffs' claimed need for immediate relief. First, Plaintiffs rely on harms arising from social media companies' *past* content moderation decisions, which provide no basis for *forward-looking* injunctive relief, preliminary or otherwise. Plaintiffs' assertion that those past harms are "ongoing" or "imminent" are contradicted by the evidence: Plaintiffs' previously banned accounts have been restored and Plaintiffs point to no recent social-media content that others posted (or wished to post) to which Plaintiffs have been denied access because of a company's content moderation decision. Second, as the Government's

response to the pandemic and attacks on election infrastructure have evolved to meet new challenges and changed circumstances, much of Defendants' conduct that Plaintiffs challenge is no longer occurring, and Plaintiffs have no entitlement to relief, especially preliminary injunctive relief, from conduct that has ceased. Moreover, Plaintiffs' assertion that Defendants are "expanding censorship efforts," PI Supp. 57, is speculative and unfounded. To support that assertion, Plaintiffs point to various policy statements and initiatives on issues relating to climate change, cyber bullying, and other topics unrelated to COVID-19 and election security—matters of public concern on which the Government is entitled to promote awareness as well as its own views on how they should be met. But Plaintiffs offer no evidence that any Defendant has spoken with a social media company about content moderation relating to such topics, or that any social media company moderates content relating to those topics (let alone that it does so at the demand of any Defendant).

Finally, even if Plaintiffs could otherwise show any ongoing or imminent harm, Plaintiffs' delay in seeking relief undermines any conclusion that such harm is irreparable and warrants emergency injunctive relief. The conduct of which Plaintiffs complain began years ago (by their own admission), and yet Plaintiffs waited until last May to bring suit, after which they then sought discovery, which has consequently delayed any relief they could obtain from their preliminary-injunction motion by nearly a year. That delay alone proves the absence of irreparable harm.

### A. Plaintiffs cannot establish imminent, irreparable harm based on social media companies' past content moderation decisions.

To start, Plaintiffs cannot show imminent, irreparable harm based on the alleged past content moderation decisions of social media companies: "[h]arm that has *already* occurred," of course, "cannot be remedied by an injunction." *Pham v. Univ. of La. at Monroe*, 194 F. Supp. 3d 534, 548 (W.D. La. 2016) (quoting *Mountain Med. Equip., Inc. v. Healthdyne, Inc.*, 582 F. Supp.

846, 848 (D. Colo. 1984)) (emphasis added). Plaintiffs acknowledge that "past injury is not redressable by injunctive or declaratory relief." PI Supp. 62 (citing *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019)). Yet they rely almost exclusively on content moderation decisions occurring long ago. The declarations supporting their request for emergency relief are nearly *one year old*—all of them executed in May or June 2022, before the Plaintiff States' initial request for preliminary injunctive relief. Even those declarations point to actions taken by social media companies as long ago February 2021. *Infra* Arg. § I.A.1. Despite nearly one year's time and access to voluminous discovery materials with which to update their declarations, Plaintiffs have adduced no evidence of recent content moderation decisions affecting their speech, or the speech of others with which they seek to engage. In the meantime, the social media accounts of the Individual Plaintiffs who were allegedly "permanently deplatformed" have apparently been restored. As explained further below, the outdated declarations and changed factual circumstances contradict Plaintiffs' conclusory assertions that they are "experienc[ing] ongoing injury from censorship and face the imminent prospect of further censorship." PI Supp. 57.

### 1. The Individual Plaintiffs' alleged harms stem from long-past content moderation decisions.

The Individuals Plaintiffs' declarations allege harms arising from past content moderation decisions affecting posts of their own or of other users they claim to follow. But those decisions primarily occurred between two and three years ago—in *2020* and *2021*. *See* Bhattacharya Decl. ¶¶ 16-18 (Dkt. 10-3) (Google, Redditt, YouTube actions in February and March 2021); Kulldorff Decl. ¶¶ 9-15 (Dkt. 10-4) (Google, Redditt, YouTube actions in February and March 2021); *id.* ¶¶ 17-18 (Twitter and LinkedIn actions in 2021); Hoft Decl. ¶¶ 3, 6-8 (Dkt. 10-5) (Twitter action in January and February 2021); Kheriaty Decl. ¶ 11 (Dkt. 10-7) (Twitter action in 2020-2021); Hines Decl. ¶¶ 7-8 (Dkt. 10-12) (Facebook action in 2020). Even the most recent alleged content

moderation actions occurred, at the latest, in May 2022—roughly *one year* ago. Kulldorff Decl.
¶ 26 (LinkedIn action in January 2022); Hoft Decl. ¶ 14 (YouTube action in May 2022); Kheriaty
Decl. ¶ 15 (Twitter action in 2021 and 2022); Hines Decl. ¶ 9 (Facebook action in January and
May 2022).[52] These actions, all of which had already occurred by "the time [Plaintiffs] brought
this suit," *Pham*, 194 F. Supp.3d at 548, cannot be remedied by any prospective injunctive relief,
*infra* Arg. § II.A., and certainly not by *immediate* injunctive relief.[53] *See generally* Defs.' Resp.
PFOF ¶¶ 1367-1411.

Nor do past content moderation decisions show any "ongoing" or "imminent" harm,
despite Plaintiffs' conclusory assertions. The Individual Plaintiffs attempt to show an ongoing or
imminent injury affecting their own speech on social media in two ways. First, three of the
Individual Plaintiffs (Kulldorff, Hines, and Hoft), *see* Pls.' Mem. Opp'n to Defs.' MTD at 9 ("Pls.'
Opp'n to MTD") (Dkt. 165) suggest that they are experiencing ongoing injury because one of their
social media accounts had been "permanently suspended" or "banned." *See* Hoft Decl. ¶ 8; Pls.'
PFOF ¶ 1369 (referencing the Bhattacharya Declaration's reliance on the alleged termination of
Dr. Kulldorff's LinkedIn account, *see* Bhattacharya Decl. ¶ 30); Pls.' PFOF ¶ 1388 (referencing
the Hoft Declaration's allegation that the Gateway Pundit has been permanently banned from
Twitter, *see* Hoft Decl. ¶ 8); Pls.' PFOF ¶ 1399 (referencing the Hines Declaration's allegation

---

[52] Plaintiffs also reference content moderation decisions occurring at unspecified points in time.
*See, e.g.*, Bhattacharya Decl. ¶¶ 25-26 (asserting that Twitter "censored his tweet" and temporarily
"locked [him] out of" his account "for three weeks" without specifying a date for either action),
*id.* ¶¶ 28-29 (referencing conduct by Twitter at an unspecified past date). Their failure to identify
when those decisions occurred necessarily means that they cannot show ongoing or imminent
irreparable harm stemming from those decisions.

[53] The non-party declarations attached to the Complaint suffer the same flaw. Changizi Decl. ¶ 18
(Dkt. 10-9) (April 2021 Twitter conduct); *id.* ¶ 19 (June 2021 Twitter conduct); *id.* ¶¶ 20, 23
(December 2021 Twitter conduct); Senger Decl. ¶¶ 4-7 (Dkt. 10-2) (October 2021 and March 2022
Twitter conduct); Kotzin Decl. ¶ 13 (Dkt. 10-10) (September 2021 Twitter conduct); Kitchen Decl.
¶¶ 18, 32 (Dkt. 10-11) (September 2021 Medium conduct).

that Hines' personal account was "restricted for 90 days," *see* Hines Decl. ¶ 12[54]). But as of today, all three individuals' accounts appear active: Kulldorff has an active LinkedIn page, *see* Declaration of Jasmine Robinson ¶ 2 (Ex. 139) ("Robinson Decl."), Hines has an active Facebook page, *id.* ¶ 3, and the Gateway Pundit has an active Twitter account, *id.* ¶ 4.[55] *See also* Defs.' Resp. PFOF ¶¶ 1369, 1388, 1399.

Second, the Individual Plaintiffs contend that they are experiencing an ongoing injury because of their choice to "self-censor[] to avoid more severe penalties from the platforms." Pls.' PFOF ¶ 1385; *see also id.* ¶ 1371 (Dr. Bhattacharya asserting that the companies' "policies have driven scientists and others to self-censorship," although not stating that he engages in "self-censorship" of his own speech), *id.* ¶ 1379 ("Dr. Kulldorff states that he and other scientists engage in self-censorship"), *id.* ¶ 1385 ("Dr. Kheriaty also engages in self-censorship"), *id.* ¶ 1394 ("Hoft . . . describes ongoing self-censorship"), *id.* ¶ 1407 ("Hines engages in self-censorship"). Yet Plaintiffs' own decision to limit what they say on social media or how they say it, based on a generalized fear of how any company might choose to apply its own policy, is a "self-inflicted injury" that does not confer standing, *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018), and thus does not suffice to show irreparable harm warranting immediate injunctive relief. Plaintiffs nowhere specify what content they seek to post online that a social media company might decide to moderate. Even if they had so specified, "the risk that" any content they post

---

[54] Hines also states that Facebook pages for two of her organizations, Health Freedom Louisiana and Reopen Louisiana, are "under constant threat of being completely deplatformed," Hines Decl. ¶ 12, but she offers no evidence to substantiate that claim, and she does not allege that they ever have been "deplatformed."

[55] The same is true of non-party declarants Daniel Kotzin and Amanda J. Kitchen. Kotzin alleged that his Twitter account was permanently suspended, *see* Kotzin Decl. ¶¶ 12, 19, but he now appears to have an active account, Robinson Decl. ¶ 5 (Ex. 139). Kitchen alleged that her Twitter account was "shadowbanned," *see* Kitchen Decl. ¶ 34, but she, too, appears to have an active and publicly viewable account, Robinson Decl. ¶ 6 (Ex. 139).

subsequently will be moderated by a social media company "is speculative and depends . . . on the actions of [those] third-party" companies. *Id.* at 390. That risk is particularly speculative here, where no Plaintiff identifies any content moderation measures applied to any of their posts in the last year. *See, e.g.*, Defs.' Resp. to Pls.' PFOF ¶ 1396 (responding to Hoft's claim to have "experience[d] censorship" up to the date he executed his declaration the year prior, "on May 14, 2022"). Plaintiffs' conclusory and speculative assertions to the contrary do not justify preliminary relief. *Winter*, 555 U.S. at 22 (plaintiffs must show that irreparable harm is "*likely*," not just "possib[le]" "in the absence of an injunction").

Moreover, to the extent the Individual Plaintiffs allege an interest in listening to, reading, or interacting with speech on social media, they fail to establish any ongoing or imminent irreparable harm to that interest either. The Individual Plaintiffs assert their own interest in receiving speech on social media for the first time in their supplemental brief, but they do so in conclusory fashion, citing no evidence that they have been precluded from receiving any particular speech because of a social media company's particular content moderation decision. *See* PI Supp. 56 (arguing that "[t]he individual Plaintiffs assert violation of their First Amendment right to speak and listen freely without government interference," but without specifying how such interests have been harmed). Indeed, the declarations they submitted nearly one year ago make no mention of any harm to their interests as "listeners"[56] as opposed to their interests as speakers. Instead, the Individual Plaintiffs assert an "interest in being able to read and follow the speech and writings that others post on social media" for the first time in their declarations supporting the motion to

---

[56] The declarations generally assert harm to *other* users' right to engage with certain content because of content moderation decisions affecting the *declarants'* own speech. *See, e.g.*, Kheriaty Decl. ¶¶ 9-10, 12, 14 (discussing his number of followers and ways in which they have allegedly been restricted from viewing Kheriaty's posts). But they do not allege any harm to the declarants' own interest in receiving any other users' speech.

amend the complaint and for class certification. *See* 2d Bhattacharya Decl. ¶ 4 (Dkt. 227-5). Even if the Court were to consider those declarations, their contents would not move the Individual Plaintiffs any closer to showing imminent, irreparable harm based on this newly asserted interest.

Like Plaintiffs' allegations of harm to their interest as speakers, the allegations relating to their interest as listeners are entirely conclusory, speculative, and vague. For instance, Dr. Bhattacharya declares that he is "aware of others [he] follow[s] on social media engaging in self-censorship," 2d Bhattacharya Decl. ¶ 6, but he provides no factual details (including any timeframe) supporting that claim. He also asserts that he "frequently read[s] and listen[s] to the speech and writings on social media of other speakers and writers whom federal officials *may* have explicitly targeted for censorship," and lists various names, *id.* ¶ 5 (emphasis added), but he nowhere elaborates how, when, or by whom those speakers may have been "targeted for censorship" and how or when he has actually been prevented from receiving any speech from them on social media.[57] The remaining declarations are similarly vague and conclusory. *See* 2d Kulldorff Decl. ¶ 5 (Dkt. 227-6) (alleging that he "read[s] the writings and/or listen[s] to the speech of others who have been targeted for censorship on social media," without specifying how, when, or by whom those individuals have been "targeted for censorship"); 2d Kheriaty Decl. ¶¶ 5-6 (Dkt. 227-7) (same); 2d Hoft Decl. ¶¶ 6-7 (Dkt. 227-8) (same); 2d Hines Decl. ¶¶ 5-6 (Dkt. 227-9) (same). These assertions, devoid of any factual support, are woefully inadequate to show a likelihood of ongoing or imminent, irreparable harm to the Individual Plaintiffs' interest in receiving speech on social media that can be attributed to any of the Defendants, much less all of them.

---

[57] Other allegations are completely unconnected to the actions of a social media company and are thus irrelevant to the First Amendment claim in this case. *See, e.g.*, 2d Bhattacharya Decl. ¶ 6 (alleging that he has "heard from prominent signatories of the Great Barrington Declaration . . . [that] they have experienced" "retaliation" "*at work* for signing the document[]" (emphasis added)).

In short, none of the Individual Plaintiffs shows irreparable harm stemming from the content moderation decisions of social media companies.

### 2. Plaintiff States' alleged harms likewise stem from long-past content moderation decisions.

Nor do the Plaintiff States show any imminent, irreparable harm based on social media companies' content moderation decisions. Again, for the reasons explained in Defendants' motion to dismiss, none of the States' alleged harms constitutes a cognizable injury-in-fact for Article III standing. *See* Defs.' MTD 18-31. Even assuming they did, they still do not support Plaintiffs' request for preliminary injunctive relief, as they hinge on long-past conduct and thus fall far short of showing any likelihood of imminent, irreparable harm.

First, the Plaintiff States allege two instances of content moderation affecting their interest in speaking on social media. *See* 2d. Am. Compl. ¶ 461; Pls.' Opp'n to MTD 15-16. Those events, however occurred *in 2021*. Pls.' Opp'n to MTD 15-16. The States point to no interference with their own speech for nearly two years, much less interference for which Defendants could be deemed responsible.

Second, the States purport to identify six other "forms of imminent, continuing, irreparable injury." 2d. Am. Compl. ¶ 459.[58] Each of those alleged injuries, however, is derivative of their citizens' interests in speaking or engaging on social media. *See id.* ¶ 460 (alleging an interest in enforcing the free speech rights of their citizens); *id.* ¶ 462 (alleging an interest in receiving their residents' speech); *id.* ¶ 463 (alleging an interest in their residents' ability to use social media to petition the States); *id.* ¶ 464 (alleging an interest in Dr. Bhattacharya having a greater "impact"

---

[58] The Complaint alleges eight total interests, but Plaintiffs States have since abandoned their alleged interest in Dr. Bhattacharya's speech having a greater "impact" on social media, 2d. Am. Compl. ¶ 464. *See* Defs.' Reply 11 n.4; PI Supp. 57 (now asserting "seven specific" injuries, not including injury to Dr. Bhattacharya's speech).

on social media); *id.* ¶¶ 465-66 (alleging quasi-sovereign interests in vindicating the free speech

rights of their residents); *id.* ¶ 467 (alleging an interest in vindicating the speech of all "listeners,

readers, and audiences of social-media speech"). But even assuming States could establish

standing based on asserted injuries to their residents, *contra, e.g.*, *Kentucky v. Biden*, 23 F.4th 585,

596 (6th Cir. 2022) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 486-86 (1923)), the States point

to no recent content moderation decision affecting any of these asserted interests. Again, none of

the Individual Plaintiffs' (or the non-party social-media users') declarations point to content

moderation decisions occurring after May 2022. *See* Pls.' PFOF ¶ 1431-42. The States present

declarations from two employees who purport that the performance of their official duties has been

impeded because of their inability to "follow" or "monitor" speech on social media, but those

declarations likewise point to long-past conduct. Flesch Decl. ¶¶ 7-9 (Dkt. 10-6) (alleging impact

from content moderation occurring, at the latest, in March 2022); Bosch Decl. ¶¶ 8-9 (Dkt. 10-13)

(not including any details about the timing or circumstances of impact of alleged instances of

moderated content).

Just like the Individual Plaintiffs' injuries, the States' alleged injuries based on long-past

conduct fall far short of showing any imminent, irreparable harm warranting immediate injunctive

relief. *See also* Defs.' Resp. PFOF ¶¶ 1427-1442.

**B. Plaintiffs cannot establish imminent, irreparable harm based on alleged past actions of federal officials.**

Nor can Plaintiffs show imminent, irreparable harm based on the past actions of Defendants

that they allege caused social media companies to moderate content on their platforms. Plaintiffs,

of course, are harmed by *Defendants* only to the extent that *Defendants'* conduct can be said to

have compelled social media companies to act with respect to particular content on their platforms

that Plaintiffs wished to disseminate or receive. *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (alleged

injuries cannot be "th[e] result [of] the *independent* action of some third party not before the court[]"). Thus, even assuming Plaintiffs could point to any current or imminent harm from a prior or future content moderation decision, they would still need to tie that harm to some ongoing or future conduct of a Defendant.

That means that the prior conduct of Defendants is irrelevant and cannot be the basis of emergency injunctive relief absent any indication that it is likely to recur (and imminently so). For instance, CISA discontinued its switchboarding activities after the 2020 election as non-governmental organizations stepped in to perform that important function, and focused its resources on other initiatives aimed at promoting election integrity. Switchboarding efforts that ceased over two years ago could not compel any social media platform's current or future content moderation decisions concerning election content on their platforms, and thus do not show ongoing or imminent irreparable harm. Yet the majority of the conduct Plaintiffs seek to enjoin is exactly this type of past, completed conduct by Defendants having no ongoing or future effect. A preliminary injunction against that conduct is not only unnecessary, but improper: it would also constitute an improper "advisory opinion" having no real-world effect on Plaintiffs' First Amendment rights. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) ("Under Article III, federal courts do not adjudicate hypothetical or abstract disputes."). When assessing Plaintiffs' need for preliminary injunctive relief, then, the Court must disregard Defendants' past conduct that Plaintiffs have not shown is likely to recur during the pendency of this lawsuit.

The record does not show that the challenged actions of Defendants are occurring or are likely to recur during the pendency of this lawsuit.

**1. Plaintiffs have not made the requisite showing of ongoing or imminent irreparable harm as to the White House Defendants.**

Plaintiffs' claims against White House officials are based almost exclusively on public and private statements that occurred in 2021 at the height of a global pandemic that took more than a million U.S. lives. *See supra* Defs.' PFOF § II.A. The vast majority of White House officials' statements cited by Plaintiffs concerned the critical public health threat posed by mis- and disinformation about COVID-19 vaccines, and vaccine hesitancy more specifically, *see id.*, especially during the initial rollout of the first COVID-19 vaccine. *See, e.g.*, Ex. 140 at 1 (MOLA_DEFSPROD_00018153). The White House shared these concerns with global institutions like the World Health Organization and the United Nations—as well as nearly every country around the world—that acknowledged the "infodemic" of COVID-19 misinformation that was spreading on social media. *See* Ex. 17; *supra* Defs.' PFOF § I.C. To be clear, none of the White House officials' statements about COVID-19 misinformation was unlawful or made the White House responsible for any independent decisions by the social media companies. Urging all sectors of society, including social media companies, to accept their role in the Nation's collective effort to combat the coronavirus was (and remains) an essential element of the Government's duty and responsibility to lead that effort. But even setting the merits question aside, Plaintiffs have set forth no evidence demonstrating that the White House is now so engaged with social media companies about COVID-19 misinformation as to raise even the specter, much less the probability, of imminent irreparable harm.

To the contrary, the record shows that the White House's approach to the COVID-19 pandemic has markedly changed since 2021. In April 2023, President Biden signed a joint resolution into law that terminated the national emergency related to COVID-19, which had been in place since March 2020. *See* 137 Stat. 6. The declaration of national emergency did not merely

serve a signaling purpose, but rather reflected the Administration's view of the pandemic and enabled the Administration to exercise certain statutory authorities necessary to respond to the crisis. *See* 85 Fed. Reg. 15,337. HHS's public health emergency is likewise due to end on May 11, 2023. *See* Ex. 67 at 1 ("[T]hanks to the administration's whole-of-government approach to combatting the virus, we are in a better place in our response than we were three years ago, and we can transition away from the emergency phase."). And later this month, the White House will wind down its COVID-19 Response Team, which was the primary coordinator of the Administration's response to the pandemic and which included several White House officials who are Defendants in this action and whose communications Plaintiffs cite in support of their motion. There is, accordingly, no evidence in the record of any current White House engagement with social media companies concerning COVID-19 misinformation that would support a claim that injunctive relief against the White House is needed. *See also* Defs.' Resp. PFOF ¶¶ 188-211.

**2. Plaintiffs have not made the requisite showing of ongoing or imminent irreparable harm as to CISA Defendants.**

Plaintiffs' arguments regarding CISA's alleged violation of the First Amendment focus primarily on its switchboarding activities during the 2020 election cycle. PI Supp. 37-39. As noted above, CISA has re-focused its important election-security efforts elsewhere. Thus, CISA decided in April or May 2022 not to provide switchboarding services for the 2022 election cycle and has no intention of engaging in switchboarding for the next election. Scully Dep. 21:19-22:1-23; Hale Decl. ¶ 78 (Ex. 97). Indeed, the record shows that in 2022 CISA fulfilled its role of promoting election integrity through support for the development of two EI-SCC and EIS-GCC Joint Managing Mis/Disinformation Working Group guides to build resilience to misinformation; updates to the Rumor vs. Reality webpage; the development of the "Tactics of Disinformation" guide; Halloween-themed messages on social media to build awareness of the risks posed by

disinformation; a CISA-FBI public service announcement on information manipulation tactics concerning the 2022 midterm elections; and participation in the USG-Industry meetings, *see* Scully Dep. 303:10-304:5; Hale Decl. ¶¶ 64-69 (Ex. 97), but not through switchboarding.

Nonetheless, Plaintiffs insist that CISA continues to engage in switchboarding activities "through the present day," pointing to an outdated statement that previously appeared on CISA's website. PI Supp. 37; Pls.' PFOF ¶¶ 976, 1120. But Mr. Scully explained during his deposition that this statement was inaccurate and should be changed to indicate that CISA's switchboarding efforts are no longer occurring, in addition to stating that CISA did not engage in switchboarding activities in 2022. Scully Dep. 21:19-22:23, 366:21-367; Hale Decl. ¶ 78 (Ex. 97) (explaining that CISA did not engage in switchboarding for the 2022 election cycle and has no intention to engage in switchboarding for the next election). CISA's website subsequently has been updated. *See* Ex. 141 (*Foreign Influence Operations and Disinformation*, CISA, https://perma.cc/F46N-KZDU).

Plaintiffs also point to CISA's alleged "collaboration" with the EIP. PI Supp. 45-47. But CISA's involvement with the EIP was generally limited to connecting it with election stakeholders in advance of the 2020 election, receiving a briefing from EIP in May or June 2022 during which EIP shared its lessons learned from the 2020 election and plans for the 2022 election (which was to work with state and local election officials), and attending public briefings provided by the EIP. Scully Dep. 54:10-25; Hale Decl. ¶¶ 58, 60, 62 (Ex. 97). CISA is not presently conducting any work with the EIP, *see* Hale Decl. ¶ 63 (Ex. 97), and Plaintiffs thus cannot establish any imminent, irreparable harm on this basis.

Finally, even if Plaintiffs contended that CISA's meetings with social media companies in which misinformation generally was discussed violate the First Amendment (and they make no such argument), those meetings have largely ended as well. For example, CISA has not

participated in the USG-Industry meetings since the 2022 general election. Hale Decl. ¶ 69 (Ex. 97).[59] Similarly, the CSAC Protecting Critical Infrastructure from Misinformation and Disinformation Subcommittee was directed to stand down in December 2022 because it had completed its tasking and provided its recommendations to CISA. *See* Ex. 187 at 43. And although the EI-SCC and EIS-GCC Joint Managing Mis/Disinformation Working Group (Working Group) is still ongoing, its relevant work has consisted of the publication of two guides to help state and local election officials and industry providers prepare for and respond to risks of disinformation. Hale Decl. ¶ 40 (Ex. 97) (And, in any event, the Working Group does not engage with social media companies and does not flag or report potential disinformation to those companies, *id.* ¶ 43).

Plaintiffs cannot show any current or "certainly impending" irreparable harm from CISA's past switchboarding activities, any involvement by CISA with the EIP, or CISA's meetings with social media companies, as Plaintiffs have not shown that such activities are occurring or likely to recur during the pendency of this suit. *See also* Defs.' Resp. PFOF ¶¶ 1094-1122.

### 3. Plaintiffs have not made the requisite showing of ongoing or imminent irreparable harm as to the CDC Defendants.

As to CDC as well, Plaintiffs' challenge looks to past actions. First, Plaintiffs point to BOLO meetings involving CDC and social media companies, PI Supp. 32, but the record plainly shows that only two BOLO meetings ever took place, in May 2021, and there is no plan to restart those meetings now, two years later. Crawford Decl. ¶¶ 14-15 (Ex. 80). Second, Plaintiffs complain about "Facebook provid[ing] the CDC with regular biweekly 'CrowdTangle' reports," PI Supp. 31, but Facebook stopped sending those reports to CDC in December 2021, *supra* Defs.' PFOF § II.C.6., and Plaintiffs reference no record evidence showing any intent by Facebook to

---

[59] Plaintiffs' factually unsupported claim that "[t]he MDM Team continues to communicate regularly and extensively with social-media platforms about misinformation and disinformation," Pls.' PFOF ¶ 978, is therefore incorrect. *See* Defs.' Resp. to PFOF ¶ 978.

send them in the future. Third, Plaintiffs refer to questions Facebook posed to CDC about whether certain claims about COVID-19 and vaccines are false and can lead to vaccine hesitancy, because, in response to CDC's responses, Facebook may have chosen to remove certain claims. PI Supp. 32-33. They also point to similar requests from Google and Twitter. *Id.* But the last request about which Plaintiffs complain was made in the summer of 2022. Crawford Decl. ¶ 19 (Ex. 80). In any event, even if any of the above conduct were presently occurring, it would not constitute evidence of irreparable harm to Plaintiffs. None of the above provides evidence that any company is taking or will take action against particular speech (including speech by a Plaintiff) on its platform because it was coerced or effectively compelled by, or acting jointly with, the CDC Defendants.

Additionally, Plaintiffs assert that CDC "has regular meetings with social-media platforms about misinformation." PI Supp. 31. As a threshold matter, although CDC had "regular meetings" with certain platforms for a period of time, misinformation was only occasionally, and not regularly, discussed at those meetings. In any event, with the exception of Google, CDC has not had "regular meetings" with a social media company, about any matter, since 2021, *see* PI Supp. 31 (referencing PFOF paragraphs that cite emails documenting meetings during 2020 and 2021); rather, any meetings now are "more ad hoc." Crawford Dep. 180:16-21; *see also* Crawford Decl. ¶¶ 6-12 (Ex. 80). And even as to CDC's ongoing meetings with Google, there is no evidence that any such meeting has touched on anything relating to misinformation since March 2022, more than one year ago. Crawford Decl. ¶ 11 (Ex. 80).

Finally, as explained, *supra* Arg. § II.C.2., Plaintiffs misstate the record when they argue that CDC is "focusing on other topics" relating to misinformation "and communicating with platforms about" those topics as well. *See* PI Supp. 33. The testimony Plaintiffs cite for this assertion shows the opposite: In June 2022, Google asked for CDC's input on the veracity of health

claims unrelated to COVID-19 and vaccines, but CDC did not substantively answer the inquiry because it concerned a topic that CDC had not "dealt with." Crawford Dep. 256:11-16. Thus, Plaintiffs' counterfactual allegation that CDC is expanding the breadth of topics discussed with social media companies shows no irreparable harm. Regardless, even if CDC were communicating with a social media company about any topic relating to misinformation, that would not be enough on its own to show irreparable harm; again, Plaintiffs cite no evidence that a company is taking or will take action against speech (including speech by a Plaintiff) on its platform because of coercion or effective compulsion by, or joint participation with, the CDC.

In short, Plaintiffs cannot show any current or certainly impending irreparable harm from CDC's past BOLO meetings, CDC's receipt of CrowdTangle reports, actions taken by social media companies in response to CDC's provision of scientific conclusions, or any "regular meetings" between CDC and "social-media platforms about misinformation." While CDC remains committed, in the event of a future public-health emergency such as COVID-19, to promote public understanding of the disease, its dangers, prevention, and treatment, Plaintiffs point to no conduct in which CDC is now engaged, or soon likely to engage, as evidence of ongoing or imminent irreparable harm. The motion for preliminary injunction against CDC should be denied.

### 4. Plaintiffs have not made the requisite showing of ongoing or imminent irreparable harm as to the Census Defendants.

Plaintiffs include Census in their request for preliminary relief for one reason: Census advised and assisted CDC in 2021, pursuant to an Interagency Agreement, in connection with CDC's efforts to address COVID-19 misinformation on social media. PI Supp. 31-32. Specifically, Census helped CDC host the two May 2021 BOLO meetings and worked with CDC to identify examples of misinformation circulating on the platforms. *Supra* Defs.' PFOF § II.D. But Census' past involvement with CDC—nearly two years ago—plainly provides no basis for preliminary

injunctive relief, and Plaintiffs offer no evidence that such involvement is likely to recur during the pendency of this suit. The motion for preliminary injunction against Census should be denied.

**5. Plaintiffs have not made the requisite showing of ongoing or imminent irreparable harm as to Dr. Fauci, in his former capacity as NIAID Director.**

Plaintiffs' requested injunction against NIAID is based solely on alleged past conduct by Dr. Fauci while he was the agency's Director. Dr. Fauci was a leading figure in the Nation's struggle against the coronavirus, and as such frequently used the bully pulpit to educate the American people about the virus and appropriate measures to protect themselves against it. But Dr. Fauci has retired from NIAID. Dr. Fauci cannot engage in any future government conduct on which Plaintiffs may stake their claimed need for preliminary injunctive relief (or any injunctive relief at all). Indeed, Plaintiffs do not even argue that they will likely be subject to imminent irreparable harm absent a preliminary injunction against NIAID. *See* PI Supp. 63-64 (arguing only that CDC, CISA, and White House officials are engaged in present-day conduct that is likely to cause "ongoing" or "imminent" injury). The motion for preliminary injunction against NIAID should be denied.[60]

**6. Plaintiffs have not made the requisite showing of ongoing or imminent irreparable harm as to the GEC Defendants.**

Although their filings are not entirely clear on this point, Plaintiffs appear to allege that the GEC's reporting of misinformation to the EIP during the 2020 election cycle violates the First Amendment. PI Supp. 48. But Plaintiffs fail to explain how they are suffering any imminent, ongoing harm based on conduct that happened more than two years ago.

During the 2020 election cycle, the GEC discovered certain posts and narratives on social

---

[60] Additionally, because Plaintiffs do not allege any conduct by NIAID whatsoever that is independent of Dr. Fauci's conduct while he was the Institute's Director before retiring, it is unclear on what basis NIAID remains a Defendant in this case at all.

media and digital media that originated from, were amplified by, or likely to be amplified by foreign malign influence actors—like Russia, the People's Republic of China, Iran, and their proxies—that sought to spread propaganda or disinformation about the 2020 election. *See* Bray Decl. ¶ 18 (Ex. 142). The GEC flagged these posts and narratives for the EIP on approximately 21 occasions. *Id.* Presently, the GEC is not doing any work with the EIP, *id.* ¶ 19, and there is no evidence that the GEC will do so in the future. Accordingly, Plaintiffs cannot establish any imminent, irreparable harm based on the GEC's submission of a limited number of tickets regarding foreign malign influence to the EIP during the 2020 election cycle.

*   *   *

Perhaps acknowledging the absence of imminent, irreparable injury based on the allegations raised in their Complaint and their preliminary-injunction motion, Plaintiffs assert a new form of imminent harm in their supplemental brief—one stemming from what they describe as an alleged "expan[sion]" by Defendants of "their censorship efforts." PI Supp. 57-58. In support of this conclusory argument, Plaintiffs cite public policy statements or initiatives by various Federal officials (some of whom are no longer in government[61]). *Id.* (alleging that the White House, CDC, CISA, DHS, and the EIP are "expanding" their efforts to "censor[]" speech on social media). But Plaintiffs fail to connect the alleged policy statements or initiatives in any way to any content moderation policies or actions of any social media company. *See id.* (citing various statements by Defendants without pointing to any resulting content moderation decision by a social

---

[61] For instance, Plaintiffs spend several paragraphs in their PFOFs on reported statements by former White House National Climate Advisor Gina McCarthy in June 2022. *See* Pls.' PFOF ¶¶ 201-03. Ms. McCarthy is no longer the White House National Climate Advisor, *see* Defs.' Notice of Substitution at 2, and in any event, these statements were made nearly one year ago and thus show no imminent future harm. Nor do Plaintiffs allege that any social media company has taken action against any particular content as a result of Ms. McCarthy's comments on this single occasion in June 2022.

media company). For that reason alone, Plaintiffs' speculative "expansion" theory should be disregarded. The Government's conduct, of course, can only cause injury to the Plaintiffs and is only relevant to Plaintiffs' First Amendment claims to the extent Plaintiffs allege and prove that it has actually *compelled* a particular content moderation decision *by a social media company*. In other words, mere policy statements or government initiatives do not constitute the First Amendment violation alleged here: the suppression of online content. But choices made by social media companies to moderate content on their platforms become *state* action attributable to Defendants only if Defendants' policy statements, initiatives, or other communications actually *coerce or effectively compel* a social media company into taking such actions. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Plaintiffs' failure to connect the dots between the alleged "expan[ded]" government conduct and the actions of any social media company means they necessarily lack standing, or any First Amendment claim, relating to this conduct, and is *a fortiori* reason enough to dismiss these allegations as not probative of any irreparable harm.

By way of example, Plaintiffs point to the "Memorandum on the Establishment of the White House Task Force to Address Online Harassment and Abuse," issued by the President in June 2022. *See* PI Supp. 57 (citing Pls.' PFOF ¶ 204, in turn citing Pls.' Jones Decl., Ex. N. (Dkt. 214-16) ("Memorandum")). The Memorandum reflects a legitimate exercise of the President's inherent constitutional duty and authority to study matters adversely affecting the public welfare and to recommend appropriate solutions. It establishes a Task Force charged with "lead[ing] an interagency effort to address online harassment and abuse, specifically focused on technology-facilitated gender-based violence, and . . . develop[ing] concrete recommendations to improve prevention, response, and protection efforts through programs and policies in the United States and globally." Memorandum § 1.

Plaintiffs do not articulate what imminent, irreparable harm they face as a result of the Task Force or this nearly year-old Presidential Memorandum. Importantly, they do not assert that a social media company has taken, or plans to take, action against any content on its platform—much less action that would affect *Plaintiffs'* First Amendment interests—because it felt compelled to do so by any directive in the Presidential Memorandum. They do not even point to any language in the Memorandum itself that purports to require social media companies to take any particular action concerning content on their platforms.[62] Plaintiffs reference the Memorandum's directive that the Task Force "submit periodic recommendations to the President on policies, regulatory actions, and legislation on technology sector accountability," *id.* § 5(c), but a general instruction to provide *recommendations* for *potential* regulation, which is undefined and may never be adopted, does not amount to a threat to social media companies to take any specific action. Plaintiffs also fault the Memorandum's use of the phrase "gendered disinformation," but they do not contend that any social media company will imminently moderate content that it deems to be "gendered disinformation." The same is true of Plaintiffs' remaining assertions of imminent harm based on Defendants' alleged "expanding . . . censorship efforts," which take scattershot aim

---

[62] Moreover, Plaintiffs omit from their narrative that the Task Force carrying out the Memorandum's directives issued an initial "blueprint" for implementing the Memorandum, which further undermines Plaintiffs' speculations that they face imminent, irreparable harm. *See* Ex. 143 at 1 (*EXECUTIVE SUMMARY: Initial Blueprint for the White House Task Force to Address Online Harassment and Abuse*, The White House (Mar. 3, 2023)). The blueprint, which was summarized online by the White House on March 3, 2023, does not purport to direct social media companies to remove any category of speech from their platforms. *See id.* Rather, it recommends actions such as "strengthening coordination among Federal, state, Tribal, territorial and local law enforcement agencies to investigate and prosecute cyberstalking, image-based abuse, sextortion, and child sexual exploitation online," among other things. *Id.* There is no obvious connection between Plaintiffs' purported interest in speech on social media and the work initiated by the Memorandum and summarized in the blueprint, and Plaintiffs make no effort to draw such a connection.

at various policies without articulating any connection to the conduct of a social media company. *See* PI Supp. 57-58; Pls.' PFOF ¶¶ 998, 188-211, 1106-16.[63]

Plaintiffs' failure to even attempt to draw such a connection illustrates that what Plaintiffs ultimately seek to enjoin is not the Defendants' purported coercion of social media companies, but instead the Executive's use of its inherent authority to resort to all available channels of communication, including but not limited to the "bully pulpit," to educate the public on the challenges we confront as a Nation and the measures that can and should be taken to overcome them. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009). But the First Amendment is not a tool for States, or individuals, to seek to muzzle the President or other Federal officials from generally expressing particular policy views or taking particular actions with which they disagree. The Government is free to "express[] a viewpoint," and "the First Amendment d[oes] not demand that the Government balance [its] message" to "maintain viewpoint neutrality." *Matal v. Tam*, 582 U.S. 218, 234-35 (2017). "When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others." *Id.* at 234. Plaintiffs cannot show any Article III injury, much less an irreparable one, stemming from government statements and policy initiatives simply because they disagree with them. As none of the "expanded" conduct that Plaintiffs now seek to challenge is alleged to have coerced or otherwise induced any social media company into taking any particular action, much less action that injures any of the Plaintiffs, it cannot be the basis for awarding any injunctive relief.

---

[63] Plaintiffs argue that CDC is also expanding into "other topics," but, as explained, the evidence contradicts Plaintiffs' allegations. *Infra* Defs.' PFOF § II.C.2. Ms. Crawford simply testified that CDC provides public health information on "other topics" beyond COVID-19; however, Plaintiffs cite no evidence showing that CDC has substantively responded to a social media company's request for health information on any "other topics." *See id.*

**C. Plaintiffs' delay in seeking relief shows there is no immediate need for an injunction.**

Even if Plaintiffs could show any ongoing or imminent harm arising from actions occurring as far back as 2020, their substantial delay in seeking relief decisively undermines any assertion that such harms are irreparable. In First Amendment cases, as in any other, the "party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946)); *id.* at 1945 (finding that, in a First Amendment political retaliation case, the "plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request"). "Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs. LLC*, No. 3:09-CV-00393, 2009 WL 1766095, at *4 (N.D. Tex. June 23, 2009); *see also Shenzhen Tange Li'An E-Com., Co. v. Drone Whirl LLC*, No. 1:20-CV-738, 2020 WL 5237267, at *4 (W.D. Tex. Sept. 2, 2020) ("Plaintiffs' delay in seeking injunctive relief suggests a lack of urgency[.]"); *Citibank, N.A, v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("Delay in seeking enforcement of [the asserted] rights . . . tends to indicate at least a reduced need for . . . drastic, speedy action."); *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) ("[D]elay between the institution of an action and the filing of a motion for preliminary injunction, not attributable to intervening events, detracts from the movant's claim of irreparable harm."); *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered."); *Young v. Motion Picture Ass'n of Am., Inc.*, 299 F.2d 119, 121 (D.C. Cir. 1962) ("The delay in filing this action negatives any finding of urgency necessary to justify the interlocutory relief sought.").

Courts have found that even a delay of "five months" or less "is sufficient to rebut a presumption of irreparable harm." *H.D. Vest, Inc.*, 2009 WL 1766095, at *4; *see also Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (finding that a delay of three months cut against granting immediate relief). Even a delay of *ten weeks* may be enough to show an absence of "urgent need for speedy action to protect [a] plaintiffs' rights" through the issuance of a preliminary injunction. *Citibank*, 756 F.2d at 276.

Here, Plaintiffs have not waited mere months before seeking relief—they have waited *years*. Their Complaint alleges that Defendants or their "political allies" have been making threats against social media platforms "since *at least 2018*," *see, e.g.*, Pls.' PFOF ¶ 1 (emphasis added), and that they "expanded" their alleged "efforts" to coerce or collude with social media companies as soon as the Biden Administration took office in January 2021, *see, e.g.*, 2d. Am. Compl. ¶ 203. The Complaint further alleges that social media platforms began "respond[ing] to" such alleged "threats" "[s]tarting in or around *2020, if not before.*" *Id.* ¶ 189 (emphasis added). And this past conduct was not newly discovered at the time Plaintiffs filed their Complaint—the vast majority of statements and other conduct at issue (*e.g.*, White House press conferences and Facebook Live events with Dr. Fauci, among other things) was public at the time they occurred. Indeed, since early 2020, Facebook has touted the efforts it has taken to promote accurate content about COVID-19 from global and local health experts, including the WHO and CDC. *See* Ex. 144 at 19-20, 50-49 (Kang-Xing Jin, *Keeping People Safe & Informed About the Coronavirus*, Meta (Dec. 18, 2020), https://perma.cc/2VJL-N2L5) (February 26, 2020 update explaining that Facebook "direct[s] people to information from" CDC and the WHO; April 7, 2020 update discussing work with CDC). Yet Plaintiffs waited until May 2022 to bring this suit, *see* Compl. (Dkt. 1) (filed on May 5, 2022), and then waited another 40 days to move for preliminary relief, *see* PI Mot. (Dkt.

10) (filed on June 14, 2022). The preliminary-injunction motion has now been pending for nearly a year while Plaintiffs have sought voluminous discovery. Plaintiffs' nearly one-year-old request for relief from conduct that has been occurring since at least 2018 is anything but urgent.

Nor have Plaintiffs uncovered any new conduct during the pendency of this suit that arguably could justify their belated request for injunctive relief. Despite receiving thousands of pages of documents and dozens of interrogatory responses and taking the depositions of multiple federal officials, the allegations on which Plaintiffs rest their purported need for preliminary injunctive relief are largely the same as those asserted in their initial Complaint in May 2022 or in their Second Amended Complaint in October 2022. And as to Plaintiffs' conclusory assertion that "Defendants have expanded their social-media censorship activities" "[s]ince this lawsuit was filed," Pls.' PFOF ¶ 200 (*but see supra* Arg. § I.B.), Plaintiffs cite public statements or reports by various officials between June and August 2022, many months in the past.

Even if all of the conduct Plaintiffs challenge remained ongoing, Plaintiffs' failure to seek relief for such a substantial period of time undermines any urgency to grant that relief now, before the case is resolved on the merits. Because Plaintiffs fail to carry their heavy burden of showing irreparable harm—the most important factor for any request for preliminary injunctive relief— their motion for preliminary injunction should be denied.

## II.     Plaintiffs fail to show a likelihood of success on the merits.

### A.  Plaintiffs lack Article III standing to bring any of their claims.

For the reasons explained in Defendants' memorandum in support of their motion to dismiss, Defs.' MTD 16-43, Plaintiffs lack Article III standing to bring any of their claims. Although the Court held, in ruling on that motion, that Plaintiff States and the Individual Plaintiffs plausibly alleged Article III standing, *see* MTD Order 18-48 (Dkt. 224), Defendants respectfully disagree with the Court's analysis for the reasons stated in support of their motion to dismiss, and

hereby incorporate by reference and reassert those arguments in opposition to Plaintiffs' request for preliminary relief.

But even assuming Plaintiffs had alleged standing with sufficient plausibility to withstand a motion to dismiss, they fail to provide the evidence necessary to maintain standing for purposes of obtaining preliminary relief. As the parties invoking this Court's jurisdiction, Plaintiffs "bear the burden of establishing" the elements of Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Since these elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported [] with the manner and degree of evidence required at the successive stages of the litigation." *El Paso Cnty. v. Trump*, 982 F.3d 332, 337–38 (5th Cir. 2020) (quoting *Lujan*, 504 U.S. at 561). And "[b]ecause a preliminary injunction 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief,' the plaintiffs must make a 'clear showing' that they have standing to maintain the preliminary injunction." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (citing cases). At this stage, then, Plaintiffs may not rest on "general allegations," *Lujan*, 504 U.S. at 561, but must allege specific facts clearly showing that they likely meet each Article III standing element to sustain their claims on the merits, *Barber*, 860 F.3d at 352.

Plaintiffs fail to make a clear showing that they have Article III standing for purposes of obtaining preliminary relief. They attempt to support their factual allegations with nearly year-old declarations, which make conclusory assertions contradicted by the record. Instead of presenting specific evidence of a current or imminent injury-in-fact fairly traceable to Defendants and likely to be remedied by injunctive relief, Plaintiffs' supplemental brief posits new legal theories in attempts to evade well-established standing requirements. These efforts fail.

### 1.   Plaintiffs fail to establish any injury-in-fact.

Plaintiffs raise two new arguments that they have suffered an injury-in-fact. Both lack merit. First, Plaintiffs contend that the deposition testimony by CDC's Director of Digital Media somehow constitutes an endorsement of the Plaintiff States' purported "interest in being able to read and follow the uncensored speech and opinions of their constituents on social media." PI Supp. 57. But even assuming the witness had testified about her views of the States' alleged injuries—and she did not[64]—her personal views would have no bearing on the legal question whether the States have asserted a cognizable injury to a sovereign or quasi-sovereign interest that they may vindicate in litigation against the Federal Government. They have not. As explained in Defendants' motion to dismiss, among the various reasons the States' all-encompassing right-to-receive-speech theory of standing fails, it is an overly broad and generalized grievance—an interest that the Supreme Court has consistently rejected as a basis for constitutional standing. *See* Defs.' MTD 24 (citing, *e.g.*, *Whitmore v. Arkansas*, 495 U.S. 149, 160 (1990)). Second, Plaintiffs assert that they "face the imminent prospect of further" injury because of Defendants' purported "expanding . . . censorship efforts." PI Supp. 57. That argument fails for the reasons stated above. *Supra* Arg. § I.B.

Moreover, these arguments do not shore up the factual deficiencies in Plaintiffs' allegations. As explained, Plaintiffs' allegations of injury rest on dated declarations that focus on long-past conduct of Defendants and social media companies and shows that Plaintiffs' purported fears of imminent injury stemming from a company's content moderation decision are entirely speculative. *Supra* Arg. § I.A-B; *see also* Defs.' Resp. PFOF ¶¶ 1367-1411, 1427-1442. And even if Plaintiffs had submitted any evidence of imminent harm from a social media company's content

---

[64] Rather, the testimony related to CDC's use of Facebook's CrowdTangle tool. *See* Crawford Dep. 53:4-54:20, 57:22-58:3, 75:10-76:1, 81:10-14.

moderation decision, their conclusory assertions fall far short of making the "clear showing," *Barber*, 860 F.3d at 352, required to attribute those decisions to the conduct of any *Defendant*, *infra* Arg. § II.A.2.—particularly when much of Defendants' challenged conduct occurred in the past and is unlikely to recur during the pendency of this litigation, *supra* Arg. § I.B. In short, Plaintiffs' failure to submit any evidence of actual or imminent harm is fatal to their efforts to show injury-in-fact, even assuming the alleged injuries are legally cognizable.

### 2.   Plaintiffs fail to establish traceability and redressability.

Plaintiffs also cannot satisfy the causation and redressability requirements. To establish causation, they must show, with evidence, that any content moderation actions that social media companies are taking, or will imminently, take against them will occur as a "consequence of" or "as a result of" the challenged communications by Defendants. *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 333 (5th Cir. 2002). To satisfy this standard, Plaintiffs must show that those content moderation actions would not occur "in the absence of" those communications. *Id.* "Causation" is not established if their alleged "injuries" are "the result of the independent action[s] of . . . third party" social media companies that are "not before the court." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). Plaintiffs thus cannot establish the requisite causal link if the content moderation actions at issue may just as well have occurred "as a result of" factors "unrelated to" Defendants' communications, such as the social media companies' independent judgment that content moderation is inherently valuable and/or economically advantageous. *Ford*, 301 F.3d at 333; *see also generally* Gurrea Decl. (Ex. 1).

Nor can Plaintiffs establish redressability based on mere speculation that an injunction against the challenged conduct would influence platforms' regulation of Plaintiffs' speech. "To satisfy redressability, a plaintiff must show that 'it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Inclusive Cmtys.*, 946 F.3d at 655. If an

injunction against government conduct could "just as easily have no" effect on the content moderation actions social media companies may take against Plaintiffs, *id.* at 660, then Plaintiffs do not have standing.

Plaintiffs raise three new arguments in favor of the Article III causation and redressability requirements. Each is meritless. First, relying on tort and antitrust cases, Plaintiffs contend that they are likely to establish traceability on "aiding and abetting" and "conspiracy" theories. PI Supp. 59. They further contend that, because Defendants have engaged in "aiding and abetting" and "conspiracy," the Court need not concern itself with the maxim that "Article III . . . requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976). Plaintiffs cannot sidestep applicable Article III requirements merely by invoking concepts of "aiding and abetting" and "conspiracy" and arguing for their application here in novel and abstract ways. The cases on which Plaintiffs rely do not involve requests for injunctive relief, but rather requests for damages, where a monetary recovery from any defendant would redress the plaintiff's injuries, thus largely reducing the standing issue to questions of substantive aiding-and-abetting and conspiracy law.

Second, Plaintiffs argue that "even assuming" that the connection between Defendants' conduct and Plaintiffs' "other injuries" is "too attenuated," "the injuries to the individual Plaintiffs' First Amendment rights and to [the] Plaintiff States' quasi-sovereign interests would still be fairly traceable to Defendants' conduct." PI Supp. 60. Plaintiffs' argument in support of this contention is not a model of clarity. But to the extent Plaintiffs mean to argue that the traceability requirement is *easier* to meet in connection with the asserted First Amendment interests of the individual Plaintiffs and the States' citizens, *see id.,* they are mistaken. Traceability, like injury-in-fact and

redressability, is an essential element of the "'irreducible constitutional minimum of standing,'" which plaintiffs in federal court "always have the burden to establish," *Barber*, 860 F.3d at 352 (quoting *Lujan*, 504 U.S. at 560), even where free-speech interests are at stake. *see, e.g.*, *Garzes v. Lopez*, 281 F. App'x 323, 325-26 (5th Cir. 2008). Indeed, traceability is "substantially *more* difficult to establish" in cases such as this one, where plaintiffs challenge the government's conduct towards third parties. *Defs. of Wildlife*, 504 U.S. at 562 (emphasis added) (citation omitted). Plaintiffs must show, as a factual matter, that any actions taken against them by social media companies are attributable to the allegedly unconstitutional government coercion of those private actors. And to obtain prospective relief in particular, they must show a non-speculative likelihood that future government actions will affect platforms' conduct toward them—a showing they cannot come close to making. Plaintiffs' contention that the traceability requirement is necessarily met here misses the mark.[65]

Finally, Plaintiffs assert that there is "overwhelming evidence" that Defendants' actions are the "direct and but-for cause" of their injuries and that those injuries would be redressed by their proposed injunction, PI Supp. 60, and they purport to provide several supporting "examples." The evidence shows, however, that social media companies took independent action to moderate content on their platforms. *See, e.g.*, *infra* Defs.' Arg. § II.B.1.[66] Plaintiffs fail to point to any

---

[65] Plaintiffs are also wrong to suggest that they are relieved of any Article III standing requirement simply because they assert a First Amendment claim. *See Seals v. McBee*, 898 F.3d 587, 591 (5th Cir. 2018), *as revised* (Aug. 9, 2018) (in the Fifth Circuit, "requirements of standing are relaxed in the First Amendment context . . . but only as relating to the various court-imposed prudential requirements of standing;" plaintiffs "still must show that they satisfy the core Article III requirements of injury, causation, and redressability").

[66] Here, as elsewhere, Plaintiffs emphasize that the White House allegedly "press[ed] for censorship of so-called 'borderline' content that *does not violate platform policies*, and thus would not be censored but for federal pressure." PI Supp. 60. This contention betrays a fundamental misunderstanding of the platforms' policies. The platforms have policies for moderating

evidence that the companies would change their approaches to content moderation in the absence of the Government's conduct. And it is not sufficient for Plaintiffs to point to "examples" of past conduct that allegedly supports standing. "[S]tanding is not dispensed in gross." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (citation omitted). The relevant question is whether Plaintiffs have established a likelihood that they will suffer injury in the absence of an injunction and that an injunction would redress that injury. As Defendants have made clear throughout this litigation, Plaintiffs cannot lump together the conduct of sixty-seven actors, gesture vaguely at untold numbers of unspecified content moderation decisions made by social media companies over several years spanning multiple Administrations, and ipso facto establish a connection between them and a likelihood of redressability by citing a handful of "examples." Plaintiffs must establish that they will suffer cognizable injuries, that each of those injuries is fairly traceable to specific Defendants, and that a Court order is likely to redress those injuries.

Furthermore, on the present record, Plaintiffs' theory of causation cannot succeed in light of Defendants' evidence. In their complaint, Plaintiffs contended that "in the absence of Defendants' campaign for social-media censorship, market forces and other incentives would have restrained and did restrain social-media platforms from engaging in the social-media censorship alleged herein." 2d. Am. Compl. ¶ 478. In denying Defendants' motion to dismiss, the Court relied on this allegation to conclude that Plaintiffs had established that their alleged injuries were traceable to Defendants' claimed conduct. MTD Order 41-42. But even if that conclusion were correct as a matter of pleading, it cannot support Plaintiffs' standing at this stage; plaintiffs cannot obtain a preliminary injunction without supporting their allegations with evidence. *See Barber*,

---

"borderline" content; the reason it is referred to as "borderline" is that it does not violate the platforms' policies for *removal*, but the content does violate the platforms' policies for reduced distribution. *See supra* Defs.' PFOF § I.D.

860 F.3d at 352; *Vote.Org v. Callanen*, 39 F.4th 297, 303-04 (5th Cir. 2022) (holding that plaintiffs could not establish a likelihood of success on the merits for preliminary injunctive relief in the absence of evidence of standing). They have failed to do so.

Contrary to Plaintiffs' factually unsupported conclusion, there is no basis to conclude that platforms made the content moderation decisions in question as a result of government pressure, as opposed to other factors. For example, social media platforms have their own economic reasons for engaging in content moderation actions. Defendants have presented the expert opinions of Dr. Stuart Gurrea, an economist who specializes in industrial organization, economics, and finance. Gurrea Decl. ¶ 7 (Ex. 1). Dr. Gurrea conducted an economic analysis of Plaintiffs' claim that previously market forces "would have and did restrain social-media platforms" from moderating content, and concluded, based on analysis of the platforms' business model and the economic incentives under which they operate, that the claim lacked economic validity. *Id.* ¶¶ 10-13. He observed that platforms have moderated content since the earliest days of social media, and that while the scope of moderation has grown with the platforms' growth, the moderation of content related to both political matters and health matters, including vaccinations, dates back as far as 2016. *Id.* This analysis is supported by the undisputed evidence that nonparties—mainly the public, Congress, and (with respect to COVID-19) the global health community and 132 sovereign governments—asked that social media companies do more to combat the spread of election and COVID-19 misinformation on their platforms. *See supra* Defs.' PFOF § I. The companies even acknowledged that they were responding to that public sentiment. *See, e.g.*, Ex. 10 at 3 ("We were told in no uncertain terms, by the public and by Congress, that we had a responsibility to do a better job protecting future elections."). And as noted throughout this litigation, the particular types of content moderation to which Plaintiffs object preceded much of the Defendants' conduct on

135

which they premise their claims, underscoring the implausibility of their assertion that the platforms were acting in response to government conduct rather than for other reasons.

And as Dr. Gurrea observed, platforms have a strong incentive to moderate content because doing so is in their economic interests. Gurrea Decl. ¶¶ 43-58 (Ex. 1). Social media companies moderate content because it contributes to establishing, maintaining, and increasing the size and engagement of their user bases. *Id.* ¶ 44. The absence of content moderation can result in a decline of both. *Id.* ¶¶ 45, 48. An increase in user numbers and engagement typically results in an increase in advertising revenue, which in turn increases the platforms' profits. *Id.* ¶¶ 11, 30-42. In addition, content moderation that preserves or even enhances the reputation and value of an advertiser's brand or product directly makes the platform more valuable to the advertiser, and thereby also increases advertising revenues and the platform's profits. *Id.* ¶¶ 38, 61.

Accordingly, Plaintiffs have failed to identify evidence that would support their claim that any content moderation decisions that injured them were traceable to Defendants' conduct, rather than to the companies' independent business decisions driven by their economic interests, strong public sentiment, the opinions of the global health community, or some combination of all three factors (or any other factor not identified in this litigation). And even if they could make that showing regarding some past actions, their claim would still fail because they likewise cannot establish that an injunction would redress any injuries that they have suffered or have a non-speculative likelihood of suffering in the future. At this stage Plaintiffs carry the burden of establishing standing with evidence, and they have failed to do so.

**B.  Plaintiffs are not likely to prevail on their First Amendment claims.**

Plaintiffs' First Amendment claims take aim at numerous independent and (most critically) unspecified content moderation decisions that multiple social media companies have made, over a course of years and across Administrations, to prevent the spread of content that the companies

deem to violate their policies concerning COVID-19 and election misinformation. Of course, as Plaintiffs acknowledge, "the Free Speech Clause prohibits only *governmental* abridgment of speech"; it "does not prohibit *private* abridgment of speech." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019). Thus, in *Halleck*, the Supreme Court recently explained: "[W]hen a private entity provides a forum for speech, the private entity is not ordinarily constrained by the First Amendment because the private entity is not a state actor. The private entity may thus exercise editorial discretion over the speech and speakers in the forum." *Id.* at 1930. After all, the Court commented, "Benjamin Franklin did not have to operate his newspaper as 'a stagecoach, with seats for everyone.'" *Id.* at 1931 (quoting F. Mott, *American Journalism* 55 (3d ed. 1962)).

Private action may be attributable to the Government, and subject to constitutional restraints, "only when [the government] has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004. And a determination of state action must begin "by identifying 'the specific conduct of which the plaintiff complains'"—here, a specific content moderation decision—and tying it to a specific action by a particular government official. *Am. Mfrs. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) (quoting *Blum*, 457 U.S. at 1004).

This is a high bar. Courts seldom attribute private conduct to the Government, and vice versa, out of respect for the "'essential dichotomy' . . . between public and private acts that [the Supreme Court] ha[s] consistently recognized." *Id.* at 53 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349 (1974)). Indeed, the Supreme Court has stressed that courts have an "*obligation*" to "'preserv[e] an area of individual freedom by limiting the reach of federal law' and avoi[d] the imposition of responsibility on [the Government] for conduct it could not control." *Brentwood*

*Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (emphasis added) (quoting *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988)).

Plaintiffs here fall far short of satisfying the demanding standard that must be met before the Government may be held responsible for private conduct. They cannot demonstrate that any particular content moderation decision that allegedly harmed them "must in law be deemed to be that of" any particular government official, *Blum*, 457 U.S. at 1004, much less demonstrate that any such decision was attributable to the wide swath of government conduct that they challenge. To the contrary, this case demonstrates precisely why the standard for attributing private conduct to the Government is so high. Distilled to its essence, Plaintiffs' argument is that social media companies may have been influenced by government officials expressing positions on matters of significant public concern, or law-enforcement agencies acting in furtherance of the Executive Branch's national security responsibilities, or public health officials promoting science-based information to protect the public welfare as contemplated by federal statutes. The Constitution does not prohibit the government from engaging in such conduct, but rather contemplates that the Executive Branch will take care that the laws are faithfully executed and that, in doing so, the Government, through its officials, "has the right to speak for itself," *Summum*, 555 U.S. at 467 (citation omitted), and the "freedom to select the messages it wishes to convey," *Walker*, 576 U.S. at 207-08.

Plaintiffs cannot transform government officials' efforts to carry out their responsibilities into impermissible coercion of (mostly unspecified) private content moderation by simply affixing conclusory (and inapt) labels to Defendants' alleged conduct, *see, e.g.*, PI Supp. 1 ("pressure, threats, coercion, cajoling, collusion, demands, and trickery and deceit"); *id.* at 4 ("coercion, significant encouragement, and deception"); 2d. Am. Compl. ¶ 498 ("conspiring and colluding"),

or by inventing new state-action tests unsupported by precedent, such as making inapposite analogies to criminal law, *see, e.g.*, PI Supp. 6-7 (analogizing state action to accomplice liability).

Nor can Plaintiffs meet the demanding state-action standard by simply alleging the existence of an alleged "Censorship Enterprise." In addition to using pejorative language to attempt to transform innocuous public statements into First Amendment violations, this formulation endeavors to treat 67 different federal agencies and officials as a single edifice. Plaintiffs' "Censorship Enterprise" theory relies on two erroneous arguments. First, Plaintiffs contend that Defendants' conduct "occurs against the backdrop of . . . public threats from senior federal officials who demand greater censorship from social-media platforms and threaten adverse legal consequences—such as repeal or reform of § 230's liability shield, and antitrust enforcement—against the platforms if they do not increase censorship of disfavored viewpoints.'" PI Supp. 15. Plaintiffs further contend that "President Biden and his aides lead this charge." *Id.* As discussed above, much of the conduct that Plaintiffs challenge consists of policy recommendations by government officials or other public comments that the government is entitled to make. In particular, Plaintiffs' challenge to the President's exercise of his bully pulpit betrays a fundamental misunderstanding of constitutional law and threatens to trample on the President's prerogatives. At the same time, Plaintiffs fail to identify any demands by any Defendants that social media companies take specific actions under the threat of specific consequences.

This first argument—that the challenged conduct by Defendants occurs "against the backdrop" of various statements by federal officials—also suffers from a fatal chronological contradiction. Many of the actions by Defendants challenged in this lawsuit occurred in 2020 (or earlier), during the previous Administration. This includes (1) nearly all of Plaintiffs' challenges to the actions of Dr. Fauci and NIAID concerning COVID-19; (2) the FBI's alleged involvement

in "censoring" the Hunter Biden laptop story, prior to the 2020 election; (3) the FBI's referral of potential misinformation related to the 2020 election; (4) CISA's "switchboarding" activities in advance of the 2020 election; and (5) the Election Integrity Partnership's "ticketing" of potential misinformation for social media companies in advance of the 2020 election. Plaintiffs fail to explain how conduct that occurred before President Biden took office could be part and parcel of a "Censorship Enterprise" operated by the Biden Administration.

Second, Plaintiffs contend that there is "extensive evidence of the interconnected nature of the federal censorship activities," and claim that "[t]he White House's campaign of public threats against platforms demanding greater censorship, reinforced by its political allies in Congress and other senior federal officials, grants coercive force to *all* the censorship efforts of *all* the federal agencies involved." Pls.' Reply in Supp. of Mot. for Class Cert. & Leave to Amend Compl. at 7-8 (Dkt. 250). But they have failed to provide any evidence to support this assertion. Plaintiffs point to circumstances where, for example, the White House and OSG allegedly "collaborated" by participating in a joint press briefing, or where CDC "collaborated" with Census to host a couple of meetings with the social media companies. It is unremarkable for different components of the Executive Branch to work together at times, and certainly not indicative of coordination throughout the Federal Government on a common "censorship" objective. Nor does this mean that the statements or actions of one Defendant have any bearing on the nature of the statements or actions made by the sixty-plus other Defendants in this case.

In short, the Court must separately analyze the challenged actions of each individual Defendant to ascertain which, if any of them, is responsible for the alleged violations of Plaintiffs' rights, and which, if any of them, may properly be enjoined going forward even assuming that they violated Plaintiffs' rights at some point in the past. And, as discussed below, when the proper

analysis is conducted, it is clear that no Defendant has violated Plaintiffs' First Amendment rights, no Defendant is currently violating or about to violate Plaintiffs' First Amendment rights, and no Defendant, therefore, may be subject to an injunction.

> **1.  Plaintiffs are not likely to prevail on their theory that any Defendant provided "such significant encouragement" as to convert private conduct into government conduct.**

Plaintiffs first argue that the White House and OSG are responsible for the social media companies' content moderation decisions under a watered-down version of the state action test, which Plaintiffs refer to as a "significant encouragement" test. PI Supp. 5-15. In doing so, Plaintiffs ignore the state action requirement established by *Blum* and its progeny, and they further err by misconstruing the record. Neither the White House nor OSG is responsible for any social media company's decisions to take against any particular posts or individuals.

> a.  *Plaintiffs' "significant encouragement" theory rests on a misunderstanding of* Blum *and its progeny.*

Plaintiffs' "significant encouragement" theory purports to originate in *Blum's* pronouncement that the Government "can be held responsible for a private decision only when it has exercised coercive power or has provided *such significant encouragement*, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004 (emphasis added). Contrary to Plaintiffs' assertion, *Blum*'s reference to "such significant encouragement" as an alternative to coercion does not mean that the Government is responsible for private conduct "whenever 'the Government d[oes] more than adopt a passive position'" toward it. PI Supp. 5 (quoting *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 615 (1989)).[67]

---

[67] Plaintiffs err in contending *Skinner* means that "'[a] private party should be deemed an agent or instrument of the Government' whenever 'the Government did more than adopt a passive position toward the underlying private conduct.'" PI Supp. 5. Rather, *Skinner* teaches that "[w]hether a private party should be deemed an agent or instrument of the Government . . . necessarily turns *on*

141

Rather, the "dispositive question is always 'whether the State has exercised coercive power or has provided *such* significant encouragement . . . that the choice must *in law be deemed to be that of the State.*'" *VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1161 (10th Cir. 2021) (quoting *Sullivan*, 526 U.S. at 52), *cert. denied*, 142 S. Ct. 1208 (2022).

*Blum* illustrates how high the bar is for "significant encouragement" to convert private conduct into state action. There, the plaintiffs—a class of Medicaid patients—contended that nursing homes violated the Due Process Clause by "discharg[ing] or transfer[ring] patients without notice or an opportunity for a hearing," and the question was "whether the State [could] be held responsible for those decisions." *Blum*, 457 U.S. at 993. The State "extensively" regulated the nursing homes in question, *id.* at 1004, including in ways that bore on the nursing homes' transfer and discharge decisions. For example, State regulations required nursing homes "to make all efforts possible to transfer patients to the appropriate level of care or [to] home as indicated by the patient's medical condition or needs," and "impose[d] a range of penalties on nursing homes that fail[ed] to discharge or transfer patients whose continued stay [was] inappropriate." *Id.* at 1008-09 (citation omitted). The State also had to "approve or disapprove continued payment of Medicaid benefits after a change in the patient's need for services." *Id.* at 1010. In short, the State placed various forms of regulatory pressure on nursing homes to discharge patients or transfer them to

---

*the degree* of the Government's participation in the private party's activities." 489 U.S. at 614 (emphasis added) (citations omitted). It did not hold that state action is present "whenever" the Government participates to *any* degree in private-party conduct, and Plaintiffs tellingly cite no case supporting that interpretation. Also, *Skinner* found a sufficient degree of Government "participation" because the challenged regulations, which authorized employee drug and alcohol testing by private railroads, "removed all legal barriers" to testing by pre-empting contrary state law and collective bargaining agreements, and otherwise "made plain" the Government's "strong preference for testing." *Id.* at 615-16. In sharp contrast, this case involves no law or regulation that similarly requires or encourages particular content moderation decisions by social media companies.

lower levels of care, which "made possible and encouraged" the challenged private conduct. *Id.* at

1008 n.19. Yet the Court held that the plaintiffs had failed to establish state action, because the

nursing homes' "decision[s] to discharge or transfer particular patients . . . ultimately turn[ed] on

medical judgments made by private parties." *Id.* at 1008.

Similarly, in *American Manufacturers Mutual Insurance Co. v. Sullivan*, the Supreme

Court reinforced the teaching that government encouragement of private acts must be "so

significant[]. . . as to make the State responsible for it" to satisfy the state action requirement. 526

U.S. at 53. That case concerned the constitutionality of a Pennsylvania workers' compensation

statute that authorized (but did not require) insurers to withhold payments for the treatment of

work-related injuries pending independent "utilization" review of whether the treatment was

"reasonable" and "necessary." *Id.* at 44-47. The Supreme Court held that a private insurer's

decision to withhold payment for a disputed medical treatment pending review did not constitute

state action. *See id.* at 49-58. The challengers' main argument was that, by amending the statute to

grant insurers the "utilization review"—an "option they previously did not have"—"the State

purposely 'encouraged' insurers to withhold payments for disputed medical treatment." *Id.* at 53.

The Court rejected that argument: "[T]his kind of subtle encouragement is no more significant

than that which inheres in the State's creation or modification of any legal remedy. We have never

held that the mere availability of a remedy for wrongful conduct, even when the private use of that

remedy serves important public interests, so significantly encourages the private activity as to

make the State responsible for it." *Id.* "The most that can be said of the statutory scheme," the

Court went on to observe, "is that whereas it previously prohibited insurers from withholding

payment for disputed medical services, it no longer does so. Such *permission of a private choice*

cannot support a finding of state action." *Id.* at 54 (emphasis added); *see also White v. Commc'ns*

143

*Workers of Am., AFL-CIO, Loc. 1300*, 370 F.3d 346, 354 (3d Cir. 2004) (Alito, J.) (*Sullivan* rejected "the notion that the express legislative authorization of an act makes that act state action").

Given these principles, the Fifth Circuit recently held that "[r]esponding agreeably to a request" is not evidence of "sufficiently strong 'encouragement'" under *Blum. La. Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 320 (5th Cir. 2020). The plaintiff, the Sons of Confederate Veterans, applied to march in a city parade coordinated by a private business association. *Id.* at 318-19. In a letter, the Mayor asked the association to "prohibit the display of the Confederate battle flag in that year's parade," and two days later, the association denied the plaintiff's request to march in the parade. *Id.* at 319. The plaintiff argued that the association's decision amounted to "state action," and was thus subject to a First Amendment claim. The Fifth Circuit disagreed, noting that the "Mayor's letter" contained only "a request," and that "the decision to deny the [plaintiff's] parade application rested with the [association], not the City." *Id.* at 320.

The Ninth Circuit, in a case similar to this one, recently joined the chorus of courts that have rejected an overly broad conception of "significant encouragement."[68] In *O'Handley v. Weber*, the plaintiff-appellant argued that a California agency was responsible for Twitter's moderation of his content because the agency's mission included "prioritiz[ing] 'working closely

---

[68] *See also VDARE*, 11 F.4th at 1162 (city's decision not to provide "support or resources" to plaintiff's event was not "such significant encouragement" as to transform a private venue's decision to cancel the event into state action); *S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499 F.3d 553, 565 (6th Cir. 2007) (government officials' requests were "not the type of significant encouragement" that would render agreeing to those requests to be state action); *cf. Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 784 (6th Cir. 2007) (no state action where "government entities . . . did nothing more than authorize and approve a contract that provided tax benefits" or "incentives" "conditioned on [company] opening" local plant); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir. 1995) ("Payments under government contracts and the receipt of government grants and tax benefits are insufficient to establish a symbiotic relationship between the government and a private entity.").

with social media companies to be proactive'" about misinformation, and because it had flagged one of his posts for Twitter as "disinformation." 62 F.4th 1145, 1154 (9th Cir. 2023). Given the state agency's relationship with the companies and its flagging of his post, the plaintiff-appellant argued that the agency had "provided significant encouragement, through its public statements and otherwise, to Twitter" to "suppress speech."[69] In rejecting this argument, the Ninth Circuit explained that the "critical question" when evaluating whether state action exists under a "significant encouragement" theory is "whether the government's encouragement is so significant that we should attribute the private party's choice to the State, out of recognition that there are instances in which the State's use of positive incentives can overwhelm the private party and essentially compel the party to act in a certain way." *Id.*

Applying that standard to the facts before it, the *O'Handley* court held that the state agency had not "essentially compel[led]" Twitter to take any action against the plaintiff-appellant. *Id.* The panel noted that "[t]he [agency] offered Twitter no incentive for taking down the post that it flagged." *Id.* Because the state agency "did nothing more than make a request with no strings attached," and Twitter, in turn, "complied with the request under the terms of its own content moderation policy and using its own independent judgment," appellant's "significant encouragement" argument failed. *Id.*[70]

*Blum*, *Louisiana Division Sons of Confederate Veterans*, *Sullivan*, and *O'Handley* make it clear that "significant encouragement" may only support a finding of state action if the Government's conduct is "so significant" that the State has "essentially compel[ed] the [private]

---

[69] Appellant's Reply Brief to Cal. Sec'y of State Shirley Weber at 13, *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) (No. 22-15071), 2022 WL 4389216.

[70] The court's rejection of the Free Speech Clause claim based on lack of state action made it unnecessary to address whether a social media company's decision to remove a post is a "constitutionally protected exercise[] of editorial judgment." *O'Handley*, 42 F.4th at 1156 n.1.

party to act in a certain way." *O'Handley*, 62 F.4th at 1158. The Government can be liable for choices made by private actors only if its conduct shows that the private actors' choices "must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004. Such governmental conduct can take the form of "coercion"—that is, "actual or threatened imposition of government power or sanction," *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015)—or "significant encouragement"—that is, the provision of "positive incentives," *O'Handley*, 62 F.4th at 1158. *Blum* thus accounts for the possibility that the Government can be legally responsible for private choices through positive inducements (encouragement) in addition to negative ones (coercion by threats of sanction). But in any scenario, the private conduct must be "essentially compel[led]" by the Government. *Id.* at 1158. If any less of a showing were enough to satisfy the state action requirement under a "significant encouragement" theory, then no plaintiff would ever need to demonstrate coercion—the threshold for significant encouragement would be lower and easier to satisfy. That reading of *Blum* makes little sense and is unsupported by precedent—it does not appear that another party has ever prevailed on a theory like the one Plaintiffs assert. *See* Defs.' Reply 42 (refuting Plaintiffs' reliance on inapposite cases). Indeed, despite multiple bites at the apple, Plaintiffs are unable to cite a single factually analogous case supporting their position.[71]

---

[71] Plaintiffs' reliance on *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970), is procedurally and substantively inapt. Contrary to Plaintiffs' characterization, *Adickes* did not hold that the store's denial of service to the black plaintiff "was government action if a police officer in the restaurant 'communicated his disapproval'" to a restaurant employee. PI Supp. 5 (quoting *Adickes*, 398 U.S. at 158). Rather, the Court held that evidence of a policeman's presence in the restaurant would "[leave] open to a jury . . . to infer from the circumstances that the policeman and a [defendant] employee had a 'meeting of the minds' before the store refused to serve her, and the policeman took the further step of arresting her. *Adickes*, 398 U.S. at 156-58. For that reason, the Court concluded that a genuine issue of material fact existed and reversed a grant of summary judgment in the defendant's favor. Here, Plaintiffs must establish that they are likely to *prevail* on the merits, not just defeat a motion for summary judgment, and—at least as to "significant encouragement"— they advance a legally unprecedented theory of state action.

Moreover, the stringent standard articulated in *Blum, Sullivan*, and *O'Handley* reflects the law's respect for the "essential dichotomy" between public and private action. *Sullivan*, 526 U.S. at 53. The Government should be entitled to zealously encourage private parties to act on a wide range of matters affecting the public interest without fear of penalty. *See Maher v. Roe*, 432 U.S. 464, 475-76 (1977) ("Constitutional concerns are greatest when the State attempts to impose its will by force of law; the State's power to encourage actions deemed to be in the public interest is necessarily far broader."). Indeed, the government-speech doctrine shields the Government against "paralyzing" restrictions on its ability to "urg[e]" private actors to take actions that it supports. *Matal*, 582 U.S. at 235.[72] For example, "[d]uring the Second World War," the Federal Government "produced and distributed millions of posters . . . urging enlistment, the purchase of war bonds, and the conservation of scarce resources." *Id.* at 234-35. It would be "absurd" to claim that federal encouragement to join the war effort—even significant encouragement—"is the equivalent of forcing people to serve." *Peery v. Chi. Hous. Auth.*, 791 F.3d 788, 790 (7th Cir. 2015). Of course, it remains true today that "[a] President frequently calls on citizens to do things that they prefer not to do—to which, indeed, they may be strongly opposed on political or religious grounds." *Freedom From Religion Found., Inc. v. Obama*, 641 F.3d 803, 806 (7th Cir. 2011). It makes ample sense, then, that courts require more than a generalized showing of "significant encouragement" before government officials may be held liable for the decisions of private parties.

---

[72] In its memorandum opinion denying Defendants' motion to dismiss, the Court quoted *Matal* for the proposition that "[i]f private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." MTD Order 63 (quoting *Matal*, 582 U.S. at 235). That proposition has no bearing on this case. Unlike in *Matal*, which raised the question whether privately held trademarks are "government speech" simply because they are registered by an arm of the Federal Government, it is beyond dispute here that the Federal Defendants' speech is government speech.

Plaintiffs contend that the White House and OSG have provided "such significant encouragement" to social media companies that they are responsible for those companies' content moderation decisions. For the following reasons, Plaintiffs' arguments should be rejected.

> b. *Plaintiffs fail to show that the White House has provided "such significant encouragement" as to render the White House legally responsible for social media companies' independent decisions.*

Plaintiffs fail to show that White House officials provided "such significant encouragement" as to "essentially compel[]" any social media company to take any particular action. *O'Handley*, 62 F.4th at 1158.

As a threshold matter, Plaintiffs have not shown that the White House offered social media companies *any* "positive incentives" to remove or otherwise moderate users' content on their platforms. *Id.* Plaintiffs' only evidence of "encouragement" from the White House is an email in which Mr. Flaherty told YouTube that its reduction of "watch time" of "borderline content" by 70% was "impressive." PI Supp. 9 (citation omitted). It is not plausible that Mr. Flaherty's comment had any effect on YouTube or transformed the company's conduct into government conduct. Otherwise, Plaintiffs' "significant encouragement" theory relies exclusively on evidence of an alleged "pressure campaign" orchestrated by the White House, which is to say it is nothing more than their "coercion" theory under a different name. *Compare id.* at 8-10 (citing evidence of the White House's "significant encouragement"), *with id.* at 14 (arguing that the White House's "pressure campaign . . . discussed above" "constitutes coercion"). Again, to the extent that *Blum* offers "coerc[ion]" and "such significant encouragement" as distinct ways in which the Government can become "responsible" for private conduct, 457 U.S. at 1004, the latter does not simply encompass efforts to prod that fall short of compulsion, *see* PI Supp. 8 (arguing that Defendants' conduct "rises to the level of coercion, as well as significant encouragement"). Because Plaintiffs have hardly pointed to any evidence of "encouragement"—let alone "such

148

significant encouragement" that White House officials "essentially compelled" any decisions by the social media companies—the "such significant encouragement" standard is inapplicable here.

It also bears emphasis that "[d]eciding whether a [alleged suppression of speech] is fairly attributable to the [Government] begins by identifying the *specific conduct* of which the plaintiff complains." *Moody v. Farrell*, 868 F.3d 348, 352 (5th Cir. 2017) (emphasis added) (quoting *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 550 (5th Cir. 2005)). This "specific conduct" requirement ensures that plaintiffs specify the *particular private action* that they wish to challenge as fairly attributable to the Government. *See Blum*, 457 U.S. at 1004 (the critical question is whether a private "choice" must "in law be deemed to be that of the State"); *Cornish*, 402 F.3d at 550 (explaining that the "specific conduct" at issue was a private employer's termination of the plaintiff). Plaintiffs fail to address this critical step in the state action analysis. They highlight specific examples of White House "pressure," PI Supp. 8, but with few exceptions—namely, Twitter's suspension of Alex Berenson and removal of an imposter account—Plaintiffs make no attempt to connect the White House Defendants' conduct to the specific conduct of any social media company. Simply alleging that the White House engaged in a "pressure campaign" (which it did not) is not enough to establish that the White House is responsible for any private choices; the Plaintiffs must identify which of the social media companies' "choice[s]" the White House is responsible for, and they must explain *how* the White House is responsible for those choices. *Blum*, 457 U.S. at 1004. Those choices, moreover, must have a connection to Plaintiffs' asserted harms.[73]

---

[73] Plaintiffs overlook the fact that some White House communications in evidence have nothing to do with the claims asserted in this case. They make much, for example, of an email in which Flaherty said to Facebook, "Are you guys f**king serious?" *See* PI Supp. 9; Pls.' PFOF ¶ 46 (Heading C., "Flaherty's Profane Attack: "Are You Guys F**king Serious?"). That comment arose in the context of White House officials asking why the White House's own Instagram account was experiencing a decrease in follower growth. Dkt. 174-1 at 55-56. It was not made in connection with any discussions of misinformation on social media. This comment does not make the White

Identifying the "specific conduct" at issue is especially important here, where Plaintiffs argue that numerous content moderation decisions made from 2020 to the present are "fairly attributable" to White House officials who did not take office until 2021. It is beyond dispute that the platforms have been moderating COVID-19 content pursuant to their terms of service, for reasons that include their own economic self-interest and public sentiment, since at least January 2020, well before any of the White House Defendants took office. *See supra* Defs.' PFOF § I.C. And it is also undisputed that some content moderation that occurred in 2021 and 2022 resulted from the enforcement of company policies that predated the Biden Administration. Plaintiffs offer no explanation of which particular actions are attributable to Biden White House officials, as opposed to preexisting content moderation policies—or, for that matter, the other Defendants in this case, whom Plaintiffs separately accuse of influencing the social media companies' decisions.

Even setting these fatal threshold deficiencies aside, Plaintiffs fail to establish that the White House is responsible for any social media company's conduct. Plaintiffs seek to hold White House officials accountable for social media platforms' content moderation decisions by citing public and private statements from these officials that, based on Plaintiffs' allegations, may be divided into three categories: (1) requests for "more detailed information" about the companies' content moderation practices, PI Supp. 8; (2) alleged "very specific demands" about how the platforms should change their policies to "increase censorship of disfavored speech," *id.*; and (3) alleged "demand[s] [for] the removal of specific posts and accounts of disfavored speakers," *id.* at 9. None of this alleged conduct makes the White House legally responsible for any social media company's independent decision-making.

---

House responsible for *any* private conduct that forms the basis of the First Amendment challenges at issue. *See also* Defs.' Resp. PFOF ¶¶ 138-140.

First, Plaintiffs erroneously contend that requests by White House officials—and Mr. Flaherty in particular—for "more detailed information" about COVID-19 misinformation make the White House responsible for companies' content moderation decisions. PI Supp. 8. Plaintiffs rely on requests that Mr. Flaherty made of social media companies for information related to COVID-19 misinformation trends on their platforms and how the companies were enforcing their policies. *See, e.g.*, Dkt. 174-1 at 7 ("Can you share more about your framework here?"); *id.* at 14 ("Again, as I've said, what we are looking for is the universe and scale of the problem."); Dkt. 71-3 at 24 (asking Meta for an explanation, "as we have long asked for, [of] how big the problem is, what solutions you're implementing, and how effective they've been"); *see also* Pls.' PFOF ¶¶ 43-44, 54, 57, 67-68, 112, 126, 175 (mischaracterizing Mr. Flaherty as "demand[ing]" "more information"). But Plaintiffs never demonstrate as a matter of fact, or explain as a matter of simple logic, how those *requests* for *information* from the companies could have so encouraged them to make *decisions* about content on their platforms as to render Mr. Flaherty (or any White House official) responsible for those decisions. Indeed, the Supreme Court has repeatedly rejected the notion that regulations requiring private actors to submit information to the Government are sufficient to render the Government responsible for private decisions. *See Blum*, 457 U.S. at 1006-07 ("We cannot say that the State, by requiring completion of a form, is responsible for the physician's decision."); *Sullivan*, 526 U.S. at 54-55 (same). That principle applies with even greater force here, where White House officials merely *requested* information from social media companies about misinformation on their platforms. *See La. Div. Sons of Confederate Veterans*, 821 F. App'x at 320 ("Responding agreeably to a request and being all but forced by the coercive power of a governmental official are different categories of responses.").

In any event, it is inexplicable how Mr. Flaherty's efforts to obtain information about the companies' actions could have "essentially compel[led]" any specific content moderation decisions by the companies, *O'Handley*, 62 F.4th at 1158, and Plaintiffs offer no explanation in support of their position other than their *ipse dixit* characterizations of the facts. The purpose of Mr. Flaherty's requests was to better understand the companies' policies, how they were being enforced, and what the Administration could do to address key issues like vaccine hesitancy. *See* Ex. 36 at 20. The record of requests reflects these objectives; as Mr. Flaherty told YouTube in April 2021, he wanted to continue a dialogue about "what is going on under the hood" because he was "on the hook for reporting out" to others in the White House. Dkt. 174-1 at 39. Absent from the record are requests by Mr. Flaherty that the companies enforce or adjust their policies in specific ways to require "greater" moderation of COVID-19 misinformation, or that they remove or otherwise restrict access to specific posts, or the posts of specific groups or individuals regarding COVID-19 misinformation. *See also* Defs.' Resp. PFOF ¶¶ 34-122.

Second, Plaintiffs contend that White House officials made "very specific demands about how to increase censorship of disfavored speech." PI Supp. 8. They cite no evidence to support this assertion, apart from a single two-page email chain from April 22, 2021 to May 6, 2021, among a Facebook employee, Mr. Slavitt, and Mr. Flaherty (hereinafter "April 2021 email chain"). *Id.* (citing Pls.' PFOF ¶¶ 118-121, which cite Dkt. 174-1 at 41-42). Plaintiffs characterize this chain as evidence of the White House "demanding that Facebook monitor private events and deplatform the 'Disinformation Dozen,'" *id.*, but it does not support their argument. As discussed above, *see supra* Defs.' PFOF § II.A, on April 23, 2021, Mr. Flaherty sent Facebook "research work" about misinformation on social media that had been conducted by an outside group, with the subject line "Research *Suggestions*" and an explicit disclaimer that Facebook should not "read this as White

House endorsement of these suggestions." Pls.' Jones Decl., Ex. L at 1 (Dkt. 214-14) (emphasis added). On May 1, 2021, the Facebook representative provided reactions to the group's findings, noting that it understood the "suggestions" had not come from within the White House. Dkt. 174-1 at 41; *see also* Defs.' Resp. PFOF ¶¶ 118-121.

It bears repeating that the Executive Branch has broad "power" to "encourage" "actions deemed to be in the public interest." *Maher*, 432 U.S. at 475-76; *see also Matal*, 582 U.S. at 235. The spread of COVID-19 related misinformation on social media was a matter of significant public concern—as reflected by the global effort to combat the COVID-19 "infodemic," *see supra* Defs.' PFOF § I.C., and the social media companies' own misinformation polices. Just as the Government has a legitimate public-health interest in mounting an all-of-society effort to combat the spread of COVID-19, it has an interest in urging social media companies to help in that effort by curbing the spread of potentially harmful misinformation on their platforms. The companies, moreover, recognized that they had a role to play in combating the virus long before Mr. Flaherty (or any current Government official) entered office, *see id.*, and they made their own judgments as to how to meet the moment, *id.* Accordingly, even if Mr. Flaherty had sent the aforementioned "Research Suggestions" to Facebook with a note indicating the White House's endorsement of those suggestions, no First Amendment issue would arise, because mere efforts to persuade private actors are "permissible government speech." *O'Handley*, 62 F.4th at 1163.

Furthermore, the April 2021 email chain does not show that the White House was responsible for any action on Facebook's part. Mr. Flaherty made clear that the "suggestions" from the outside group that briefed the White House were not urged—or even *endorsed*—by the White House. *Id.* Moreover, there is no evidence that Facebook engaged in any "specific conduct" as a result of these emails. *Moody*, 868 F.3d at 352. To the extent Plaintiffs argue that the April 2021

153

email chain renders the White House responsible for actions taken by Facebook against the Disinformation Dozen, that argument is belied by the record. For example, in response to the outside group's view that "12 accounts are responsible for 73% of vaccine misinformation," Facebook's representative explained that Facebook "continue[s] to review accounts associated with the [Disinformation Dozen], but many of those either do not violate our policies or have ceased posting violative content." Dkt. 174-1 at 42. He further noted that Facebook's preexisting "'Dedicated Vaccine Discouraging Entity' policy is designed to remove groups and pages that are dedicated to sharing vaccine discouraging content[,] and we continue to review and enforce" the policy against violative accounts "when we become aware of them." *Id.* Accordingly, not only did the White House *not* express the view that action should be taken against the Disinformation Dozen, but the evidence shows that Facebook continued to exercise its own independent judgment by declining to take any action against those accounts in response to the outside group's "suggestions." PI Supp. 8.

Third, Plaintiffs contend that White House officials "demand[ed] the removal of specific posts and accounts of disfavored speakers." *Id.* at 9. In support, Plaintiffs cite the following as examples: (1) Robert F. Kennedy Jr.; (2) Tucker Carlson and Tomi Lahren; (3) Alex Berenson; (4) the "Disinformation Dozen;" (5) "trending posts on Facebook;" (6) an imposter account of Dr. Fauci; and (7) a doctored video of First Lady Jill Biden. *Id.* It is not disputed that the White House requested the removal of some social media posts and accounts—mainly, imposter accounts. But none was a post made by or account belonging to any of the *Plaintiffs*. And none of these requests is sufficient to make White House officials legally responsible for any company's decision concerning the posts or accounts cited. The social media companies allow any citizen that encounters objectionable conduct to flag that content for the company and urge that it be removed

or otherwise addressed under the platforms' own policies.[74] It would be remarkable if the Government were powerless to do the same, even when posts implicate governmental interests or when the government has unique information that would be helpful to the platforms in applying their policies. And as discussed immediately below, the record demonstrates that some of these requests did not even include requests for the removal of posts. Where the White House did request removal of a post, each request was submitted for the company's consideration "with no strings attached;" and, in each instance that involved a request from the White House, the relevant social media company considered the request "under the terms of its own content-moderation policy and using its own independent judgment." *O'Handley*, 62 F.4th at 1158.

Several of Plaintiffs' purported examples contain no requests—let alone "demand[s]"—for the removal of content. For example, the White House's emails to Facebook about Tucker Carlson's Facebook Video (which included a reference to Lahren's post) did not contain requests to remove posts.[75] *See supra* Defs.' PFOF § II.A. And Plaintiffs' example of "trending posts on Facebook" is a reference to the April 2021 email chain, in which Mr. Flaherty again did not request the removal of any particular posts. In both instances, Mr. Flaherty simply asked for more information—albeit in some instances conveying frustration about the lack thereof—as to why trending posts did not violate Facebook's policies. *See* Dkt. 174-1 at 22 (Carlson) ("What exactly

---

[74] *See, e.g.*, Ex. 21 (*How do I mark a Facebook post as false news?*, Facebook Help Ctr., https://perma.cc/N8HZ-P7R4); Ex. 35 (*Report Violations*, Twitter Help Ctr., https://perma.cc/5MXZ-TAAM); Ex. 41 (*Report inappropriate videos, channels, and other content on YouTube*, YouTube Help, https://perma.cc/34HB-9CHL).

[75] Flaherty instead explained that the Carlson and Lahren examples were "exactly why I want to know what 'reduction' means." Dkt. 174-1 at 22. As noted above, "[r]eduction" is likely a reference to Facebook's borderline content policy, adopted in 2018 to "reduc[e] the distribution and virality" of misinformation. Ex. 23 at 8 (Facebook's 2018 post about borderline content). Flaherty understandably wanted to know more about it because, as noted above, Facebook's borderline content policy enforcement is not transparent. *See supra* Defs.' PFOF § I.D.

is the rule for removal vs. demoting?"); *id.* at 41 ("trends") ("[H]ow does something like this happen? . . . What is going on here?").

The record does not support Plaintiffs' argument that any action taken against the "Disinformation Dozen" must "in law be deemed to be that of" the White House. *Blum*, 457 U.S. at 1004. Plaintiffs again cite to the April 2021 email chain, PI Supp. 9, but as discussed above, that chain contains no indication that the White House endorsed the outside group's research findings on those accounts. And in its response, Facebook explained that it had exercised its independent judgment to determine that the twelve accounts at issue were not violating its policies, and so it would not take any action against them. *See* Defs.' Resp. PFOF ¶¶ 114-122. Plaintiffs also cite Ms. Psaki's statement at the July 15, 2021, White House press briefing, but Ms. Psaki did not urge action against the Disinformation Dozen from the podium. *See* Defs. PFOF § II.A. The record shows, moreover, that Facebook not only took action regarding posts by the Disinformation Dozen in July 2021, but it did so again nearly a month later because it "violat[ed] [Facebook's] policies." Ex. 145 at 2 (Monika Bickert, *How We're Taking Action Against Vaccine Misinformation Superspreaders,* Meta (Aug. 18, 2021), https://perma.cc/27UC-N6QV). As Facebook repeatedly noted at that time, when content posted by these twelve individuals did not violate the company's policies—as determined by Facebook alone—it was not removed. *See id.* ("The remaining accounts associated with these individuals are not posting content that breaks our rules."); *see also* Defs.' Resp. PFOF ¶ 170.

Plaintiffs' examples also underscore that, in *every* case of a White House request for action, the White House did so with no "strings attached" (*i.e.,* any form of actual encouragement or threat of sanction) and social media companies simply "complied with the request"—in the limited cases where they did, in fact, comply—"under the terms of [their] own content-moderation policy and

using [their] own independent judgment." *O'Handley*, 62 F.4th at 1158; *see also La. Div. Sons of Confederate Veterans*, 821 F. App'x at 320 ("Responding agreeably to a request and being all but forced by the coercive power of a governmental official are different categories of responses . . . ."). For example, when the White House asked Twitter to remove or label a doctored video of the First Lady, *see supra* Defs.' PFOF § II.A, Twitter declined to do so because the video did not violate Twitter's policies.[76] Dkt. 174-1 at 65. The White House did not seek to compel Twitter to reach a different conclusion; it instead asked for "any other info" about why the content did not qualify for labeling, "in order to help us understand the Twitter processes best." *Id. See also* Defs.' Resp. PFOF ¶¶ 180-187. By contrast, when the White House emailed Facebook in reference to an imposter account for Dr. Fauci—aptly named "AnthonyFauciOfficial"—and asked if there was "any way" to have it removed, Fauci Ex. 57 at 1-2 (Dkt. 207-21), Facebook independently determined that the account violated its existing policies and removed the account accordingly. Indeed, Facebook's community guidelines at the time—which Instagram had incorporated by reference—stated that Facebook "do[es] not allow the use of our services and will disable accounts if you . . . [i]mpersonate others by . . . [c]reating an account assuming to be or speak for another person or entity."[77] And it is against federal law to impersonate a federal official. *See* 18 U.S.C. § 912. This example falls well short of demonstrating that the decision to remove the Dr. Fauci imposter account "must in law be deemed to be that of the [White House]." *Blum*, 457 U.S. at 1004. *See also* Defs.' Resp. PFOF ¶¶ 809-820. And again, it would be surprising if the First

---

[76] For this reason, there is no "specific conduct" to complain of with respect to this social media post—no action was taken, and so there is no "choice" that can be "deemed to be that of" the White House. *Blum*, 457 U.S. at 1004. And in any event, Plaintiffs cannot possibly show a cognizable injury to their First Amendment rights under these circumstances.

[77] Ex. 56 (choose "show older" in dropdown; then choose "Dec. 17. 2020").

Amendment prohibited federal officials from notifying social media platforms about the existence of fraudulent accounts that violate their terms of service, while any private citizen is free to do so.

That leaves two examples involving posts by Robert F. Kennedy Jr. and Alex Berenson on Twitter. In both examples, the White House interacted with Twitter's government affairs staff. *See* Dkt. 174-1 at 2 (Kennedy), *id.* at Dkt. 71-7 at 86. It is not disputed that these employees "did not have any kind of decision-making authority over policy enforcement," Ex. 10 at 5, making the causal link between the government's action and the platforms' content moderation decisions even more attenuated.

With respect to Mr. Kennedy, on January 23, 2021, a White House official emailed Twitter to "flag" a tweet by Mr. Kennedy about the "wave of suspicious deaths among elderly" following their receipt of the COVID-19 vaccine, and to ask if it could be removed. Dkt. 174-1 at 2.[78] Several minutes later, Twitter's government affairs representative responded: "Thanks. We recently escalated this." *Id.* The record does not indicate whether any action was taken against the tweet. In fact, the tweet is currently available for viewing, which strongly suggests that Twitter declined to remove it. *See* Ex. 146. There is, accordingly, no indication of "specific conduct" by Twitter that the White House could be held responsible for in this case. *Blum*, 457 U.S. at 1004. And even if Twitter had taken action against the tweet, Twitter's response to the White House's email request indicates that, before the White House reached out, it had already "escalated" the tweet, meaning (almost certainly) that it had "escalated" the tweet for internal review according to Twitter's

---

[78] The tweet stated: "#HankAaron's tragic death is part of a wave of suspicious deaths among elderly closely following administration of #COVID #vaccines. He received the #Moderna vaccine on Jan. 5 to inspire other Black Americans to get the vaccine. #TheDefender." *See* Ex. 146 at 1 (Robert F. Kennedy Jr. (@RobertKennedyJr), Twitter (Jan. 22, 2021, 5:41 PM), https://perma.cc/8QXJ-H78L).

community standards. This reflects that Twitter made its decision "under the terms of its own content-moderation policy and using its own independent judgment." *O'Handley*, 62 F.4th at 1158.

Plaintiffs fare no better with respect to Mr. Berenson. They cite an April 22, 2021, meeting between White House officials and Twitter representatives as evidence that the White House is responsible for Twitter "suspending Alex Berenson for the first time," notwithstanding that the suspension did not occur until three months later, on July 16, 2021. PI Supp. 9 (citing Pls.' PFOF ¶¶ 102-04, in turn citing Dkt. 71-7 at 86 and Pls.' Jones Decl., Ex. J at 2-3 (Dkt. 214-12)). More specifically, Plaintiffs cite screenshots from an internal Twitter discussion about the meeting, in which Twitter employees allegedly noted that White House officials "had one really tough question about why Alex Berenson hasn't been kicked off the platform." *Id.* at 3. Another Twitter employee allegedly noted in the internal conversation, "I've taken a pretty close look at [Mr. Berenson's] account and I don't think any of it's violative." *Id.*

In his sworn interrogatory responses—which Plaintiffs fail even to acknowledge in their motion or proposed findings of fact—Mr. Flaherty described the April 22 meeting in detail:

> Mr. Flaherty recalls participating in a meeting with Twitter employees on Zoom, in or around the Spring of 2021, at which Alex Berenson was mentioned. Mr. Flaherty recalls Andrew Slavitt also attending that meeting and he believes, but is not sure, that Lauren Culbertson from Twitter attended the meeting. Mr. Flaherty further recalls the meeting was about vaccine hesitancy and Twitter's efforts to combat disinformation and misinformation on the platform. As the meeting was ending, Mr. Flaherty recalls Mr. Slavitt expressing his view that Twitter was not enforcing its content guidelines with respect to Alex Berenson's tweets, and that employees from Twitter disagreed with that view. Mr. Flaherty also recalls that Mr. Slavitt suggested at the end of the meeting that Mr. Flaherty would follow up with Twitter employees about that subject. Mr. Flaherty does not recall following up with Twitter on the subject of Mr. Berenson, but he does recall being later called within probably a week or two by a Twitter employee, who Mr. Flaherty thinks was Todd O'Boyle, who indicated that Twitter would not be removing Mr. Berenson because Mr. Berenson had not violated Twitter policies at that time. That is the last time that Mr. Flaherty recalls discussing Mr. Berenson with employees from Twitter.

Ex. 36 at 57.

This evidence shows that White House officials inquired about Twitter's enforcement of its policies without coercing or "essentially compel[ing]" any action. *O'Handley*, 62 F.4th at 1158. Indeed, it is not disputed that at the time of the April 22, 2021, meeting Twitter believed—and so told the White House—that Mr. Berenson was not violating Twitter's policies. *See* Ex. 36 at 57. That belief provided the sole basis for Twitter's decision not to deplatform Mr. Berenson in April 2021. *Id.* Accordingly, there is no evidence that the White House was responsible for any action by Twitter arising out of the April 2021 meeting, nor is there any evidence supporting Plaintiffs' suggestion that the April 2021 meeting resulted in Twitter's action against Mr. Berenson three months later. *See also* Defs.' Resp. PFOF ¶¶ 102-04.

In short, Plaintiffs have adduced no evidence to support their claim, and therefore have no likelihood of succeeding on their claim, that the White House "so significant[ly] encourage[d]" any social media companies to take action against any posts or accounts (much less *Plaintiffs'* posts or accounts) that the actions taken by those companies "must in law be deemed to be [those] of the [Government]." *Blum*, 457 U.S. at 1004.

      c.   *Plaintiffs fail to show that OSG has provided "such significant encouragement" as to render OSG legally responsible for social media companies' independent decisions.*

Plaintiffs are also unlikely to prevail on their claim that the Surgeon General engaged in "such significant encouragement" that any of their alleged injuries were "essentially compel[led]" by OSG. *O'Handley*, 62 F.4th at 1158. The Surgeon General's mission is to "protect, promote, and advance the health and safety of the United States" by, among other things, "raising awareness about health threats" and "stimulating action nationwide on public health issues." Lesko Decl. ¶ 3 (Ex. 63). The Surgeon General relies on his "bully pulpit"—that is, his "visibility as the Nation's

Doctor"—to carry out that mission. *Id.* OSG possesses no enforcement or regulatory authority over private parties, including social media companies. *Id.*

Plaintiffs' characterizations of OSG's conduct as constituting "demands," "pressure," and "threat[s]" are illustrative of the fundamental flaws in their case. *See* PI Supp. 10-13. Consider, for example, Plaintiffs' assertion that the Surgeon General's Health Misinformation Advisory "explicitly demands greater censorship from social-media platforms." PI Supp. 11. The Advisory itself overwhelmingly refutes that assertion.

The Advisory states in clear terms that it is a "public statement that *calls the American people's attention* to a public health issue and provides *recommendations* for how that issue should be addressed." Advisory at 3 (emphasis added). Its recommendations are framed exclusively in precatory language, rather than mandatory language. It explains what various sectors of society "can" do to address health misinformation, including eight recommendations for "what technology platforms *can* do." *Id.* at 12 (emphasis added). Among the things that the Advisory says "governments can do" is:

> Convene federal, state, local, territorial, tribal, private, nonprofit, and research partners to explore the impact of health misinformation, identify best practices to prevent and address it, issue recommendations, and find common ground on difficult questions, including appropriate legal and regulatory measures that address health misinformation while *protecting user privacy and freedom of expression.*

*Id.* at 7 (emphasis added). In short, the Advisory indicates that it is nonbinding, uses only precatory language, and recommends that stakeholders (including private parties) "[c]onvene" to "find common ground" while accounting for "freedom of expression." And of course, the Advisory is an *advisory*, not an order. *See Hart v. Facebook, Inc.*, No. 22-cv-737, 2022 WL 1427507, at *7 (N.D. Cal. May 5, 2022) ("Surgeon General Murthy's '22-page advisory' document is, well, advisory."). *See also* Defs.' Resp. PFOF ¶¶ 318-329.

It is therefore not true that the Advisory "explicitly demands greater censorship from social-media platforms." PI Supp. 11. Indeed, it is difficult to imagine how OSG could have been clearer about the nonbinding, non-rights-infringing nature of the Advisory. Plaintiffs, for their part, make no effort to grapple with the language in the Advisory that contravenes their argument. Nor do they grapple with the fact that adopting their reading of the Advisory would have the effect of transforming private action into government action whenever a private party decides it will answer the Government's precatory call to action. As one district court explained in this exact context, "vague government advisory documents . . . are issued annually by the thousands and do not secretly transform large swathes of the private sector into state actors." *Hart*, 2022 WL 1427507, at *7. And Plaintiffs fail to cite any analogous cases supporting their argument that the Advisory "provide[s] such significant encouragement" to social media companies that any of their decisions "must in law be deemed to be that of [OSG]." *Blum*, 457 U.S. at 1004. At least two courts have rejected that very argument. *See Hart*, 2022 WL 1427507, at *7 (holding that the Surgeon General's Advisory "do[es] not secretly transform large swathes of the private sector into state actors"); *Changizi v. HHS*, 602 F. Supp. 3d 1031, 1056 (S.D. Ohio 2022) ("[T]o the extent the RFI and July Advisory affect Plaintiffs at all, those effects stem from Twitter's 'independent actions.'" (citation omitted)), *appeal filed*, No. 22-3573 (6th Cir. June 6, 2022). This Court should do the same.

Moreover, as with their arguments about the White House Defendants, Plaintiffs fail again to identify any "specific conduct" that OSG "essentially compel[ed]." *O'Handley*, 62 F.4th at 1158.[79] The only suggestion of specific conduct is Plaintiffs' contention that, "[i]n response to the

---

[79] Plaintiffs contend that Facebook "agreed to additional data-sharing demanded by the Surgeon General." PI Supp. 11. Setting aside the fact that there is no evidence to support the contention that Dr. Murthy "demanded" anything from Facebook, "additional data-sharing" is not complained of

Advisory, Facebook reported a series of more aggressive steps against misinformation, including deplatforming the Disinformation Dozen and adopting more restrictive policies." PI Supp. 12. That argument is facially deficient; "[r]esponding agreeably to a request" is not evidence of government responsibility for private conduct. *La. Div. Sons of Confederate Veterans*, 821 F. App'x at 320. Were it otherwise, the Government would be severely restricted from expressing its views on matters of public concern. *See Summum*, 555 U.S. at 467-68.

Even assuming, however, that Facebook's "response" to the Advisory could somehow satisfy the standard articulated in *Blum*, the evidence here falls short. Plaintiffs cite emails from Facebook to OSG on July 21 and July 23, 2021. *See* Waldo Exs. 16, 19. In the first email, Facebook thanked OSG for "providing more context to the ongoing discussion around the Surgeon General's recent announcement" and followed up about "questions [OSG] asked in the meeting focused on CrowdTangle, data on online interventions, and Facebook's borderline content policies." Waldo Ex. 16 at 1 (Dkt. 210-15). Nothing in this email indicates that Facebook took *any* action in response to the Advisory; Facebook instead followed up with *information* about its *existing* policies. *Id.* at 1-2. In the second email, sent on July 23, a Facebook employee summarizes his understanding of a meeting with Dr. Murthy earlier that day, including that he "wanted to make sure [Dr. Murthy] saw the steps [Facebook] took this past week to adjust policies on what we are removing with respect to misinformation, as well as steps taken to further address the 'disinfo dozen.'" Waldo Ex. 19 at 1 (Dkt. 210-18). Again, nothing in this email indicates that Facebook took any action *in response* to the Advisory, Facebook's meetings with OSG, or any other conduct by OSG. And it bears repeating that even if OSG had requested that Facebook make the changes mentioned in that

_____

in this action—it has no conceivable relationship with the content moderation that Plaintiffs accuse Defendants of conducting. The same is true of Facebook's provision of "biweekly reports on misinformation" to OSG. *Id.* at 12. In any event, those reports were provided voluntarily.

email (which it did not), nothing in the record indicates that Facebook did anything other than "comply with the request" using "its own independent judgment," *O'Handley*, 62 F.4th at 1158, for reasons related to its own economic interest, *see* Gurrea Decl. ¶¶ 10-81 (Ex. 1); *see also* Defs.' Resp. PFOF ¶¶ 259-261, 346-348.

Any doubt about Facebook's "response" to OSG's private (and public) communications can be put firmly to rest by Facebook's contemporaneous public statements about the Advisory and the Disinformation Dozen. On July 17, 2021—two days after the Advisory was released—Facebook announced that it had "already taken action on all eight of the Surgeon General's recommendations," and it published a four-page document describing policies that Facebook *already had in place* well before the Advisory issued. Ex. 27 (publishing Facebook's response to the Advisory); *see also* Ex. 71 at 1 (Facebook's response to the Advisory). The four-page document does not describe any new actions that Facebook was taking in response to the Advisory; rather, it discusses steps that Facebook had been taking since as far back as April 2020. *See* Ex. 71. Likewise, in August 2021, Facebook posted an update explaining actions taken against the Disinformation Dozen. Ex. 145. The post describes a "debate" among "people" about the Disinformation Dozen, which stemmed from a third-party "report" on the Disinformation Dozen by the Center for Countering Digital Hate, which found that "12 people are responsible for 73% of online vaccine misinformation on Facebook." *Id.* Facebook vigorously disputes that claim, observing that it is "baseless" and that the center relied on an overly narrow sample size. *Id.* The post goes on to note that Facebook has removed misinformation that "violates [its] policies," but "the remaining accounts associated with these individuals are not posting content that breaks our rules . . . or are simply inactive," and so Facebook has not taken action against them. *Id.* These posts underscore that Facebook acted independently in its approach to misinformation, including

its analysis of the third-party "report" about the Disinformation Dozen and the "debate" surrounding that report.

Plaintiffs' erroneous treatment of the Advisory typifies their mischaracterization of other evidence of OSG's conduct in 2021 and 2022. They erroneously represent at least eight times that OSG has "demanded" actions by the social media companies. PI Supp. 10-13. More specifically, in addition to the Advisory, Plaintiffs seek to hold OSG accountable for content moderation by citing OSG's public and private statements and documents, which may be divided into three categories: (1) the Surgeon General's public statements; (2) OSG's private communications with social media companies; and (3) the March 2022 RFI. Like the Advisory, none of this conduct "provide[s] such significant encouragement" to social media companies that any of their decisions "must in law be deemed to be that of [OSG]." *Blum*, 457 U.S. at 1004.

      i.    <u>Surgeon General's Public Statements</u>

First, the Surgeon General's public statements fall far short of rendering OSG responsible for any private conduct. To start, Plaintiffs have failed again to identify which "specific conduct" by any social-media company that has injured them could plausibly be attributed to any of the Surgeon General's public statements. *Moody*, 868 F.3d at 352. As discussed above with respect to Plaintiffs' claims against the White House, it is not enough for Plaintiffs to point to disparate statements by the Surgeon General, label them a "pressure campaign," PI Supp. 10, and impliedly assert that years of private conduct must "be deemed to be that of" OSG as a result of that campaign, *Blum*, 457 U.S. at 1004. For the Court (and Defendants) to assess the validity of Plaintiffs' arguments, Plaintiffs must identify which *specific* conduct was "essentially compel[ed]" by OSG. *O'Handley*, 62 F.4th at 1158. They have failed to do so.

Even more fundamentally, the Surgeon General's public statements about health misinformation are paradigmatic examples of government speech on public policy, which does not transform private conduct into state action. "Broad stances like those embraced by the Surgeon General embody" the Government's "right to 'speak for itself[,] . . . say what it wishes,' and to select the views that it wants to express." *Changizi*, 602 F. Supp. 3d at 1054 (quoting *Summum*, 555 U.S. at 467-68). At no point in his public statements has the Surgeon General "demanded" that social media companies do anything—let alone that any specific company take action against any specific content or accounts. Nor has the Surgeon General "offered . . . incentive[s] for taking down [content]" or made "request[s] with . . . strings attached." *O'Handley*, 62 F.4th at 1158. In his role of calling attention to important public health issues, the Surgeon General has chosen to highlight health misinformation as an issue that "we" the public ought to "demand" that everyone—including social media companies—"take responsibility for" resolving. Waldo Ex. 33 at 1 (Dkt. 210-4). If private conduct were transformed into state action whenever the Government urged private action in this way, then the Government would be severely restricted in its ability to comment on public policy matters. *See Summum*, 555 U.S. at 467-68 ("[I]t is not easy to imagine how government could function if it lacked [the] freedom" to "select the views that it wants to express").

Plaintiffs fail to address the government-speech doctrine in the context of the OSG's public statements. Their only comment on the applicability of the government-speech doctrine in this case is to distinguish "opining in the abstract about disputed policy questions," which in their view is protected speech, from "contacting social-media companies through backchannels and demanding . . . specific changes to their content-moderation policies and . . . concrete censorship action on particular items of speech." PI Supp. 7. Assuming for the sake of argument that the line

Plaintiffs have drawn is appropriate, the Surgeon General's public comments on health misinformation fall comfortably on the protected side.

ii.   <u>OSG's Private Communications</u>

Plaintiffs' reliance on OSG's private communications with social media companies suffers from the same flaws. As with the Advisory, Plaintiffs mischaracterize OSG's comments in these meetings as "demands" with no evidentiary support. PI Supp. 11 ("In private meetings, Dr. Murthy demands that the platforms perform 'defensive work' to remove misinformation."). The bulk of OSG's communications with the social media companies, however, involved discussing the Surgeon General's Advisory at a "high level." *See supra* Defs.' PFOF § II.B. OSG staff would tell the companies that they "hope[d]" they would review the Advisory and "would love to hear from [them] after it comes out, if you think there's ways we can collaborate." Waldo Dep. 89:16-19; *see also id.* at 109:1-4 (OSG asked Facebook "whether or not they would share what they were doing in response to the [A]dvisory, if they were taking any actions"). There is nothing about these communications that suggests that OSG is responsible for any social media company's decisions, or that OSG somehow interfered with any company's independent judgment regarding specific content moderation decisions or policies.

Plaintiffs fail to offer any evidence that OSG significantly encouraged any action during its private meeting with Facebook on July 23, 2021, or that Facebook took any action in response. At Facebook's request, Dr. Murthy and OSG staff met with Facebook on July 23. *Id.* at 96:2-8. Dr. Murthy created a "cordial atmosphere," *Id.* at 107:1-2, and "want[ed] to have a better understanding of the reach of the mis- and disinformation" on Facebook, *Id.* at 98:18-22. Mr. Waldo did not recall OSG making any specific asks of Facebook, except that "specific questions were [asked] about understanding the data around the spread of misinformation and how we were

167

measuring that." *Id.* at 35:20-23. And an offer was made to connect DJ Patil, the White House's "data person," to a person at Facebook, so that Dr. Patil could better understand Facebook's data about the spread of misinformation. *Id.* at 112:1-10. It is inexplicable how this conversation could have rendered OSG responsible for any choices made by Facebook after the meeting.

Throughout this litigation, Plaintiffs have cited a *New York Times* article for the proposition that Dr. Murthy had "a series of 'angry' and 'tense' meetings with platforms to demand that they remove misinformation." PI Supp. 11 (citing Pls.' PFOF ¶¶ 341-344, which in turn cite Zolan Kanno-Youngs & Cecilia Kang, *'They're Killing People': Biden Denounces Social Media for Virus Disinformation*, N.Y. Times (July 16, 2021)). Plaintiffs cited that article as justification for obtaining expedited discovery in support of the instant motion. *See, e.g.*, Pls.' Supp. Br. Addressing Fifth Circuit's Deposition Order at 22 (Dkt. 137). Having now obtained written and deposition discovery from OSG, Plaintiffs can point to *no* evidence that Dr. Murthy ever had an "angry" or "tense" meeting with social media companies. The record demonstrates just the opposite: Mr. Waldo testified that he was "skeptical" of the *Times*'s reporting. *See also* Lesko ¶ 13 (Ex. 63) (stating that there was no meeting where Dr. Murthy "angrily" said anything to Facebook, and "[t]o the extend the article can be read to suggest otherwise, it is wrong"). Unsurprisingly, Plaintiffs fail even to acknowledge this contrary evidence and continue to cite the *Times* article. PI Supp. 11. In this respect, as with every other claim against OSG, Plaintiffs have failed to carry their burden of showing that they are likely to succeed on the merits of their First Amendment claim. *See also* Defs.' Resp. PFOF ¶¶ 253-92.

iii.    The RFI

Plaintiffs argue that the Surgeon General's March 2022 RFI "demand[ed] information from platforms about the spread of, and how to track, misinformation on their platforms." PI Supp. 13.

The RFI did no such thing. The RFI states in clear terms: "The Office of the Surgeon General *requests* input from interested parties on the impact and prevalence of health misinformation in the digital information environment during the COVID-19 Pandemic . . . . Please feel free to respond to as many topics as you choose." 87 Fed. Reg. at 12,712-13 (emphasis added)**.** It also instructs that respondents should not submit their users' "personally identifiable information." *Id.* at 12,713; *see also id.* ("All information should be provided at a level of granularity that preserves the privacy of users."). "Plaintiffs, in other words, have not plausibly established that the RFI is anything other than what it purports to be: a request." *Changizi*, 602 F. Supp. 3d at 1055. *See also* Defs.' Resp. PFOF ¶¶ 411-421.

Moreover, Plaintiffs have not pointed to any specific conduct that has harmed them as a result of the RFI, or is imminently likely to do so. On April 7, 2023, OSG published the responses to the RFI. *See* Ex. 70 (excerpt of RFI responses). Those responses give no indication that the companies took action against any users in response to the RFI. The companies submitted information about the policies they already had in place—policies that were independently devised by the companies—and "metrics" about the enforcement of those policies. Twitter, for example, submitted a five-page document that provides a high-level overview of its actions related to COVID-19, including a description of Twitter's policies since March 2020. Ex. 70 at 1-6. According to Twitter, since 2020, its "enforcement teams . . . challenged 11.7 million accounts, suspended 6,599 accounts and removed over 77,287 pieces of content worldwide." *Id.* at 3. Twitter's submission does not say anything about taking new action, let alone in response to the RFI or OSG's conduct more generally.

### 2.  Plaintiffs fail to show "coercion" under *Bantam Books*.

Plaintiffs also contend that the White House and the Surgeon General engaged in "pressure campaigns" against the social media companies that constituted "coercion," and further assert that

"the other agencies discussed herein, such as CISA, the FBI, CDC, NIAID, and the GEC," also engaged in "coercion" akin to that in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), "because of the background threats from senior federal officials, including both Defendants and their political allies," either to repeal or reform § 230, or to escalate antitrust enforcement. PI Supp. 14-15. Here, too, they have shown no likelihood of success on the merits of their contention that the content moderation decisions made by social media companies resulted from "exercise[s] [of] coercive power" by Defendants, *Blum*, 457 U.S. at 1004, whether through their public remarks or in private discussions with the companies. Even if certain Defendants asked or urged the companies to do more to address misinformation on their platforms, the record reflects that any ensuing content moderation decisions they made ultimately "rested with" those companies. *See La. Div. Sons of Confederate Veterans*, 821 F. App'x at 320.

a.    *Plaintiffs fail to connect purported coercion to specific acts harming them.*

Plaintiffs' coercion theory stumbles out of the gate because it improperly attempts to characterize as state action broad swathes of platform conduct covering entire categories of misinformation, instead of concrete applications of platforms' policies to particular social media posts or accounts. But to give rise to state action not only must any purported government "pressure" be sufficiently coercive to render a third party's actions attributable to the government, but such purported "pressure" must also be targeted at the *specific* actions that harmed the plaintiff. *See Bantam Books,* 372 U.S. at 61-62 (Free Speech Clause violation arose from state agency's threats of prosecution if distributor did not remove "*certain designated books or magazines distributed by him* [that] had been reviewed by the [agency] and . . . declared … to be objectionable" (emphasis added)); *Backpage.com*, 807 F.3d at 230, 232 (sheriff's letter demanded that two credit card issuers "prohibit the use of their credit cards to purchase any ads on" a particular website containing advertisements for adult services); *Okwedy v. Molinari*, 333 F.3d

339, 341-42 (2d Cir. 2003) (per curiam) (municipal official allegedly pressured billboard company to take down particular series of signs he found offensive). In all those cases—as in *Bantam Books*, and unlike in *Blum*—government officials had pressured the private entities in question to engage in (or refrain from) "the specific conduct of which the plaintiff complain[ed]." *Blum*, 457 U.S. at 1004.

In any event, Plaintiffs' coercion theory is properly rejected, even assuming they could meet the specific conduct requirement—which they cannot.

b. *Defendants made no threats and instead sought to persuade.*

Plaintiffs mischaracterize Defendants' statements and communications as coercive, and their argument hinges on a fundamentally mistaken comparison between this case and *Bantam Books*, 372 U.S. 58. Plaintiffs contend that Defendants made "on-the-ground threat[s]" akin to those in *Bantam Books*, and that therefore the Defendants' remarks cannot be characterized as "advice." PI Supp. 14 (quoting *Bantam Books*, 372 U.S. at 68). That comparison is flawed, because it ignores the close connection between the state agency's demands for the removal of particular publications and the threats of actual criminal enforcement at issue in *Bantam Books.* That connection is entirely absent here, where (other than Plaintiffs' conjecture), there is no evidence that any Defendant asserted that the content moderation choices of social media companies would result in criminal (or civil) proceedings, or retaliatory government action of any kind. Plaintiffs therefore fail to recognize that under *Bantam Books* and the cases applying it, neither official reproach of private conduct nor calls for it to cease will give rise to state action so long as government officials do not pair their criticism—even of private speech—with threats of punishment.

*Bantam Books* involved Rhode Island's Commission to Encourage Morality in Youth, empowered by law "to investigate and recommend the prosecution of all violations" of a Rhode

Island indecency law, including by deeming non-obscene publications objectionable for "sale, distribution or display" to persons below age 18. *See Bantam Books*, 372 U.S. at 60-62 & n.1. After deeming a publication "objectionable," the Commission routinely notified the publication's distributor not to carry it, threatening prosecution under the state obscenity law for failure to comply. *Id.* at 61-62. Moreover, the Commission's notices warned recipients that the state attorney general "will act for" the agency "in case of non-compliance." *See id.* at 62 n.5. Following the Commission's notices local police officers conducted inspections to inquire whether the distributor had removed the books and magazines in question from circulation. *Id.* at 63. Typically, distributors would return the materials to the publisher rather than face court action. *See id.*

The Supreme Court held that, although the Commission's notices were not themselves enforceable, compliance was nevertheless effectively compulsory because "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around[.]" *Id.* at 68. As the Court observed, the Commission's "notices, phrased virtually as orders, reasonably understood to be such by the distributor, invariably followed up by police visitations, in fact stopped the circulation of the listed publications *ex proprio vigore*." *Id.* (emphasis added). Thus, in *Bantam Books*, the Court determined "that even though the distributors would violate no law if they refused to cooperate with" the state agency, "compliance with the directives was [n]ot voluntary." *Penthouse Int'l, Ltd. v. McAuliffe*, 610 F.2d 1353, 1355-56, 1360 (5th Cir. 1980) (injunction warranted under *Bantam Books* where county attorney used "calculated scheme that included public announcements in the local newspapers, systematic visits to retailers of the magazines in question, and a program of carefully timed warrantless arrests" under state obscenity statute to effectively terminate sale of plaintiffs' magazines within county).

172

But here, Plaintiffs' bid to extend *Bantam Books* fails, because the record shows Defendants did not "phrase" their statements "virtually as orders," the companies' reactions to Defendants' statements did not show that the companies "reasonably understood" those statements "as orders" ("virtually," or otherwise), and by no means were the statements "followed up" by law enforcement "visitations." The record does not show any Defendant conveyed to any social media company that any exercise of criminal, civil, or regulatory authority against it would result from "non-compliance" with a Defendant's preferences regarding content moderation. There simply is no showing of "threats to institute criminal proceedings," or threats of any kind, akin to those in *Bantam Books*. *Cf. Multimedia Holdings Corp. v. Cir. Ct. of Fla., St. Johns Cnty.*, 544 U.S. 1301, 1305 (2005) (Kennedy, J., in chambers) ("[a]lthough it is true that '[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings,' *Bantam Books*, [372 U.S. at 68]," relief was unwarranted from allegedly coercive state court orders purportedly presaging prosecution where, *inter alia*, "there [was] no suggestion that the judge who entered the orders . . . could institute such a proceeding").

Even where officials raise the prospect of government sanctions for disfavored conduct—evidence of which has not been shown here—any such "threats" must be more than fanciful to amount to coercion of a private entity such that private conduct becomes state action constrained by the Free Speech Clause. As the Ninth Circuit noted in rejecting a characterization of YouTube's content moderation decisions as "state action," remarks by government officials that "lack force of law" are "incapable" of sustaining a coercion theory. *Doe v. Google LLC*, No. 21-16934, 2022 WL 17077497, at *2 (9th Cir. Nov. 18, 2022) (unpublished). That is, public officials must remain free in the public interest to criticize the conduct, including the speech, of private parties without

173

fear of begetting "state action," so long, as here, their remarks are "devoid" of "any enforceable threats." *See VDARE*, 11 F.4th at 1163 (citation omitted).

Although the Fifth Circuit has not had occasion to examine the limits of *Bantam Books* for state action purposes, other circuits have repeatedly rejected efforts to expand its holding. For example, the Tenth Circuit in *VDARE* rejected a state action claim where a mayor had publicly encouraged a resort to "be attentive to the types of events they accept," and the resort then cancelled its contract to host the organizational plaintiff's conference. 11 F.4th at 1156-57, 1163-68, 1171-72 (citation omitted). The Third Circuit in *R.C. Maxwell Co. v. Borough of New Hope*, similarly rejected a claim of state action where a letter from the Borough Council caused a bank to remove the plaintiff's billboards from the bank's property, because in comparison to the threats of criminal prosecution in *Bantam Books*, the Council "could brandish nothing more serious than civil or administrative proceedings under a zoning ordinance *not yet drafted*." 735 F.2d 85, 86 n.2, 88 (3d Cir. 1984) (emphasis added). And the Second Circuit in *Hammerhead Enters., Inc. v. Brezenoff*, similarly rejected an attempted *Bantam Books* analogy, where a municipal official sent letters urging department stores not to sell a disfavored board game, because the official's agency lacked "administrative power" over New York department stores, and "no credible evidence suggest[ed] that any store decided not to carry the board game as a result of [the] letter." 707 F.2d 33, 36-37 & n.2 (2d Cir. 1983). Such decisions show that "*Bantam Books* and its progeny draw a line between coercion and persuasion: The former is unconstitutional intimidation while the latter is permissible government speech." *O'Handley*, 62 F.4th at 1163 (citing *Am. Family Ass'n v. City. & Cnty. of S.F.*, 277 F.3d 1114, 1125 (9th Cir. 2002)). "This line holds even when government officials ask an intermediary not to carry content they find disagreeable." *Id.*

The D.C. Circuit's analysis in *Penthouse International* is also instructive. There, the U.S. Attorney General's Commission on Pornography sent retailers a letter suggesting that if they continued to sell adult magazines, then they would be named in the Commission's public report, and thus associated with promoting child abuse. As a result, one retailer that received the letter stopped selling adult magazines. *Playboy Enters., Inc. v. Meese*, 639 F. Supp. 581, 583-85 (D.D.C. 1986). In litigation brought by publishers of the magazines, the D.C. Circuit concluded that the letter "contained no threat to prosecute, nor intimation of intent to proscribe the distribution of the publications," and therefore did not violate the First Amendment. *Penthouse Int'l, Ltd. v Meese*, 939 F.2d 1011, 1015 (D.C. Cir. 1991). The adult magazine plaintiff's "threat" allegation "*with the rhetoric drawn out* says nothing more than that the Commission threatened to embarrass the [magazine's] distributors publicly," which was insufficient. *Id.* at 1016 (emphasis added). The D.C. Circuit did "not see why government officials may not vigorously criticize a publication for any reason they wish." *Id.* at 1015. Indeed, "[a]s part of the duties of their office, these officials surely must be expected to be free to speak out to criticize practices, *even in a condemnatory fashion*, that they might not have the statutory or even constitutional authority to regulate." *Id.* (emphasis added). Thus, the D.C. Circuit explained, "[a]t least when the government threatens no sanction—criminal or otherwise—we very much doubt that the government's criticism or effort to embarrass the distributor threatens anyone's First Amendment rights." *Id.* at 1016. [80]

---

[80] Plaintiffs err in comparing this case to *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015). In *Backpage.com*, the county sheriff sent letters to Visa and MasterCard asking that they "immediately cease and desist from allowing [their] credit cards to be used to place ads on websites like Backpage.com," which had an "adult" section on its classified advertisements forum. *Id.* at 230-31. The letters asserted that Visa and MasterCard had "the legal duty to file 'Suspicious Activity Reports' to authorities in cases of human trafficking and sexual exploitation of minors," and cited the federal money-laundering statute, intimating that the "companies could be prosecuted for processing payments made by purchasers of the ads on Backpage that promote unlawful sexual activity, such as prostitution." *Id.* at 232. The day after the sheriff sent the letters, his spokesperson

In agreement, other courts of appeals have held that "public officials may criticize practices that they would have no constitutional ability to regulate, so long as there is no actual or threatened imposition of government power or sanction." *See, e.g.*, *Am. Family Ass'n*, 277 F.3d at 1120, 1125 (no Free Speech Clause violation where municipal resolution urged "local television stations not to broadcast advertising campaigns aimed at 'converting' homosexuals"); *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 68 (2d Cir. 1999) (rejecting Free Speech Clause claim where legislators were alleged to have "made accusations against [a private security company], asked government agencies to conduct investigations into its operations, questioned [the company's] eligibility for an award of a contract supported by public funds, and advocated that [the company] not be retained," and noting that court was "aware of no constitutional right on the part of the plaintiffs to require legislators to refrain from such speech or advocacy"); *see also Walker*, 576 U.S. at 208 ("[W]hen the government speaks[,] it is entitled to promote a program, to espouse a policy, or to take a position. In doing so, it represents its citizens[,] and it carries out its duties on their behalf."); *Block v. Meese*, 793 F.2d 1303, 1314 (D.C. Cir. 1986) (Scalia, J.) ("[C]ontrol of government expression (which would *always* seem to fall in the category of political expression, the most protected form of speech) is no more practicable, and no more appealing, than control of political expression by anyone else.").

---

informed Visa and MasterCard that if they did not "sever ties with Backpage and its imitators," the sheriff would highlight their "*ties to sex trafficking*" at a press conference. *Id.* at 233. The sheriff also "contacted the Inspector General of the United States Postal Service and the FBI, urging them to investigate the lawfulness of alternative payment methods for Backpage's sex ads." *Id.* at 237. Visa and MasterCard thereafter stopped allowing use of their cards to purchase ads on the website. *Id.* at 232. The Seventh Circuit therefore concluded that the sheriff's credible threats and actions had violated the free speech rights of Backpage. *Id.* at 231. In this case, by contrast, there is no evidence that a Defendant "intimat[ed]" to any particular company that criminal proceedings could ensue from its specific content moderation decisions, or even that any Defendant vowed to "urg[e]" law enforcement agencies "to investigate the lawfulness" of such decisions. *Id.* at 232, 237.

Plaintiffs fail to address the circuit decisions that have declined to extend *Bantam Books*. They instead rely (PI Supp. 14) on *Rattner v. Netburn*, 930 F.2d 204, 209-10 (2d Cir. 1991), a decision that also fails to support Plaintiffs. *Rattner* held that a letter from a village official to the local Chamber of Commerce could "*reasonably* be viewed as an *implicit* threat" to boycott local businesses or otherwise retaliate if the Chamber continued to carry statements by the plaintiff in its local newspaper. *Id.* at 210 (emphasis added); *see Zieper v. Metzinger*, 474 F.3d 60, 69 (2d Cir. 2007) (applying *Rattner*). But "consider[ing] the entirety of the defendants' words and actions," *id.* at 66, the evidence in *Rattner* showed that such a boycott "threat was perceived and its impact was demonstrable." 930 F.2d at 210. Here, in contrast, no record evidence shows that social media companies "perceived" remarks by or communications from Defendants as "threats"—let alone that such a perception was objectively "reasonable," or that it had any "impact" on the companies' decisions. In addition, the threat of a commercial boycott in *Rattner* (omitted from Plaintiffs' description of the case) "constituted a more direct economic sanction," *Zieper*, 474 F.3d at 69, than anything like the backdrop of unspecified policy changes to § 230, and antitrust enforcement, that Plaintiffs rely on here. Indeed, none of the factors that the Second Circuit considers when evaluating claims of coercion-based state action—"(1) [officials'] word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, perhaps most importantly, (4) whether the speech refers to adverse consequences"—supports finding state action in this case. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700, 707, 715 (2d Cir. 2022), *petition for cert. filed*, No. 22-842 (U.S. Mar. 6, 2023).

To the contrary, when Defendants' private communications and public statements are viewed in "the[ir] entirety," *Zieper*, 474 F.3d at 66, they manifest Defendants' consistent acknowledgment that social media companies exercise sole control over content moderation on

their own platforms, and cannot be viewed as having "crossed the line between attempts to convince and attempts to coerce." *Vullo*, 49 F.4th at 707 (quoting *Zieper*, 474 F.3d at 66); *see also id.* at 716-19 (rejecting claim of coercion where, *inter alia*, official's request "did not refer to any pending investigations or possible regulatory action" and "did not 'intimat[e] that some form of punishment or adverse regulatory action [would] follow the failure to accede to [it]'") (quoting *Hammerhead*, 707 F.2d at 39). [81]

In denying Defendants' motion to dismiss, this Court remarked that a threat need not "be *enforceable* in order to constitute coercive state action," and that "the government actor making the threat need not possess the *direct* power or decisionmaking authority to enforce [it]." MTD Order 62 & n.206 (emphases added). Although some courts have concluded that the directness of authority is 'not necessarily dispositive," *Okwedy*, 333 F.3d at 343-44, it "is certainly relevant," *id.* at 343. Indeed, it is highly probative of whether a threat is objectively realistic, and not fanciful, and therefore may constitute coercion. And the stringent requirements for state action foreclose the notion that an official's remarks become "coercive" where, as here, they are "'devoid'" of any

---

[81] This case differs from *Okwedy*, even assuming that opinion reflects the Second Circuit's current view of the law. *Cf. Vullo*, 49 F.4th at 716-18. In *Okwedy*, a minister contracted with a billboard company to display two billboards condemning homosexuality. 333 F.3d at 340. The borough president wrote a letter to the company criticizing the billboards and remarking that the company "derive[d] substantial economic benefits" from a "number of billboards" it owned in the borough. *Id.* at 342 (citation omitted). He also directed the company to contact his legal counsel to discuss the issues raised in his letter. *Id.* The company took the signs down that same day. *Id.* at 340. The Second Circuit concluded that between the borough president's references to the "substantial economic benefits" the company received from its business within the borough, and his directive to contact the borough's legal counsel, the company could reasonably fear that the president "intended to use his official power to retaliate against it if it did not respond positively to his entreaties." *Id.* at 344. Here again, although some officials obviously expressed frustration over and dissatisfaction with overall trends in platform content moderation choices, that falls well short of showing that each Defendant manifested an "inten[t] to use his official power to retaliate against," *id.*, any social media company if the company did not engage in any particular act (or acts) of content moderation.

threats even indirectly enforceable. *See VDARE*, 11 F.4th at 1163 (quoting *R.C. Maxwell*, 735 F.2d at 88-89); *Vullo*, 49 F.4th at 716-19; *see also Penthouse Int'l*, 939 F.2d at 1015 (no coercion where "the Advisory Commission had no . . . tie to prosecutorial power" "equivalent" to *Bantam Books*, "nor authority to censor publications," but where instead it leveled "no threat to prosecute, nor intimation of intent to proscribe the distribution of the publications"); *cf. Multimedia Holdings*, 544 U.S. at 1305 (Kennedy, J., in chambers) (rejecting *Bantam Books*-based coercion claim where, *inter alia*, "there is no suggestion that the judge who entered the orders . . . could institute" allegedly feared "prosecution by virtue of the orders"). *VDARE*, *R.C. Maxwell*, *Penthouse International*, and *Vullo*, are the weight of authority on this point. As described above, each of those decisions rejected efforts akin to Plaintiffs' here to expand *Bantam Books* because there was no "actual or threatened imposition of governmental power or sanction . . . 'regulatory, proscriptive, or compulsory in nature.'" *Penthouse Int'l*, 939 F.2d at 1015 (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)).[82]

In painting Defendants as making coercive "threats," Plaintiffs also impermissibly ignore evidence reflecting Defendants' recognition (and the companies' too) that the companies remained firmly in "control" of their platforms, including how to handle specific content. *See O'Handley*, 62 F.4th at 1156-57. Government officials are free to "vigorously criticize" private actions "for any reason they wish." *Penthouse Int'l*, 939 F.2d at 1015. And here, Defendants' remarks, even

---

[82] The other two cases cited in the Court's Rule 12(b) ruling also do not support analogy to *Bantam Books*. *Peterson v. City of Greenville*, 373 U.S. 244 (1963), held that the management of a restaurant engaged in state action when it excluded African-American patrons because municipal law *required* the exclusion. *Id.* at 248. No such enactment purports *to require* the content moderation choices challenged here. In *National Rifle Ass'n of America v. Cuomo*, 350 F. Supp. 3d 94 (N.D.N.Y. 2018), although the District Court denied dismissal because it deemed the coercion allegations facially plausible, at a later stage of that action, the Second Circuit in *Vullo* essentially rejected the District Court's reasoning.

those that ranked at most as "vigorous[] critici[sm]," consistently recognized their own ultimately advisory character: The officials clearly understood that what they said was advisory and "lack[ed] force of law." *See Doe*, 2022 WL 17077497, at *2 ("acts . . . specifically directed at YouTube" that "lack force of law" are "incapable of coercing YouTube to do much of anything"). Thus, none of Defendants' remarks on which Plaintiffs rely attempted to divest or succeeded in divesting any company of its autonomy and discretion to determine for itself which posts contained "misinformation," and, if so, what to do about them.

      c.  *Defendants consistently recognized social media companies' authority over their platforms and no evidence shows they engaged in improper "pressure."*

Defendants address below the particular statements of the White House Press Secretary, the White House Digital Director, and the Surgeon General relied on by Plaintiffs, and then turn to Plaintiffs' contention that "background threats" turned the remaining Defendants' statements and actions into "coercion." As we show, Plaintiffs' attempt to depict remarks by various government personnel as a "pressure campaign" (PI Supp. 14, 18) is predicated on cherry-picking certain statements without regard to the context. That context shows that Defendants repeatedly acknowledged the social media companies' independence and ultimate authority to make decisions regarding their terms of service and their application to particular content and accounts. Moreover, none of the challenged statements and communications threatened, overtly or otherwise, that "some form of punishment or adverse regulatory action [would] follow the failure to accede to" any of the government requests concerning misinformation on the companies' platforms, let alone any specific requests (of which there were none) concerning Plaintiffs or their posts. *Hammerhead*, 707 F.2d at 39. The challenged remarks therefore were not "coercive" for state action purposes.

i.       White House Press Secretary

During Press Secretary Psaki's May 5, 2021, press briefing, she expressed the President's view regarding social media platforms' "responsibility" to "stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections." Ex. 147. Yet she also emphasized that the President "believe[s] in First Amendment rights" and that "social media platforms need to make" "the decisions" regarding "how they address the disinformation" and "misinformation" that "continue to proliferate on their platforms." Ex. 147; *see also supra* Defs.' PFOF § II.A.1; Defs.' Resp. PFOF ¶¶ 123-124.

Likewise, during the July 15, 2021 press briefing with the Surgeon General, Ms. Psaki remarked that the Government was "flagging . . . for Facebook" "problematic posts . . . that spread disinformation." Ex. 40. But at the next day's briefing she added that the Government does not "take anything down" or "block anything" and that social media platforms themselves, as "private-sector compan[ies]," "make[] decisions about what information should be on their platform[s]," Ex. 37. Ms. Psaki also reiterated that although government officials urged social media companies to address misinformation, the companies ultimately had to decide which strategies (if any) to adopt. "Any decision about platform usage and who should be on the platform," she explained, "is orchestrated and determined by private-sector companies. Facebook is one of them . . . [a]nd there are a range of media who are—also have their own criteria and rules in place, and they implement them. And that's their decision to do. That is not the federal government doing that." Ex. 37. And when the news media later asked whether the Administration was "considering any regulatory or legal moves to possibly address disinformation on social media," Ms. Psaki responded that it was "up to Congress to determine how they want to proceed moving forward." *Press Briefing by Press Secretary Jen Psaki*, 2021 WL 3030746, at *2; *see also* Defs.' Resp. PFOF ¶¶ 123-124, 141-162.

ii.   White House Digital Director

In a similar vein, Mr. Flaherty's email correspondence with social media companies repeatedly manifests a shared understanding that Facebook and other companies remained fully in command of their content moderation decisions. Thus, when Facebook advised Mr. Flaherty that Tucker Carlson's video discouraging COVID-19 vaccination did not violate its standards, Mr. Flaherty *did not* demand that Facebook nevertheless remove the video, or insist that the company change a policy, or threaten retaliation if Facebook failed to comply. Instead, he sought to better *understand* Facebook's policies, how Facebook applied them, and how the White House could use the company's public-data resource, CrowdTangle, to understand what content Americans were being exposed to on the platform. *See supra* Defs.' PFOF § II.A.2.

Although Mr. Flaherty used strong language at times, such language does not show coercion because it lacked any accompanying assertion that adverse consequences would follow if Facebook did not change its content moderation decisions. And when Mr. Flaherty shared with Facebook specific proposals concerning misinformation developed by third-party researchers, he emphasized that the White House *was not* insisting that Facebook adopt those proposals. *Supra* Defs.' PFOF § II.A.2. The record fails to show that Mr. Flaherty threatened, or even alluded to, adverse consequences if the social media companies did not answer his questions, or if they declined to take action against particular posts or accounts. *See, e.g.*, Dkt. 174-1 at 33 (asking Facebook, without mentioning any possible sanction, "[h]ow" a Tucker Carlson video was "not violative" of Facebook policies, and asking "[w]hat exactly is the rule for removal vs demoting? Moreover: you say reduced and demoted. What does that mean?"). Tellingly, the companies did not respond to Mr. Flaherty's requests in a way indicating that they perceived Mr. Flaherty's questions about COVID-19 misinformation trends on their platforms, and how the companies were

enforcing their policies, to be "threats." *See, e.g.*, Dkt. 174-1 at 42 (Facebook employee indicated understanding that the outside researchers' "recommendations/observations" conveyed by Mr. Flaherty on April 23, 2021, had not come from within the White House). And far from instantly removing the "Disinformation Dozen" in the spring of 2021 after receiving the outside research "suggestions," Facebook indicated that it would not do so because those 12 individuals "either d[id] not violate [its] policies or have ceased posting violative content," and said so without any apparent concern that it would suffer any consequences at the Government's hands for failing to remove them. Dkt. 174-1 at 42; *see also* Ex. 145 ("The remaining accounts associated with these individuals are not posting content that breaks our rules."); Defs.' Resp. PFOF ¶¶ 81, 82, 93-100, 116-122.

### iii.   The Surgeon General

The Office of the Surgeon General likewise manifested respect for social media companies' control over their own platforms. The Surgeon General's Advisory, for example, proposed a range of potential content moderation measures—including labeling posts that contain misinformation—and cautions that *companies* should assess for themselves whether any measure might have "unintended consequences" or unjustifiably impede "free expression." The Advisory did not purport to make that assessment for the companies, and certainly did not expressly or implicitly threaten the companies with adverse legal consequences if the recommendations were not accepted—indeed, the Surgeon General would lack authority to impose legal consequences. *See* Lesko Decl. ¶ 3 (Ex. 63); *see also* Advisory at 12 (proposing that social media companies might address misinformation by, among other things, "[p]rovid[ing] information from trusted and credible sources"). To the contrary, the Advisory expressly recognized that "[d]efining misinformation is a challenging task, and any definition has limitations." *Id.* at 17. The Surgeon

General thus expressly urged social media companies to exercise *their* discretion in a way that "avoid[s] conflating controversial or unorthodox claims with misinformation." *Id. See also* Defs.' Resp. PFOF ¶¶ 318-329.

Nor can the Surgeon General's March 2022 RFI reasonably be characterized as coercive. The RFI merely sought information, including "[i]nformation about sources of COVID-19 misinformation" on social media and elsewhere. 87 Fed. Reg. at 12,713-14. Like the Surgeon General's Advisory, the RFI imposed no obligations; responses were purely voluntary. *See* Lesko Decl. ¶ 6 (Ex. 63). This Court, in ruling on Defendants' motion to dismiss, accepted as valid Plaintiffs' characterization of the RFI as implicitly threatening to impose regulation. MTD Order 61. Whether or not that characterization was facially plausible under Rule 12(b)(6), Plaintiffs have not adduced any evidence that the RFI threatened any regulatory consequence or that such a consequence could have followed. On its face, the RFI states that "HHS will consider the usability, applicability, and rigor of submissions in response to this RFI and share learnings from these responses with the public," and that the "inputs from stakeholders will help inform future pandemic response in the context of an evolving digital information environment." *See* 87 Fed. Reg. at 12,713. Nothing in this RFI either expressly or implicitly threatened future regulation if social media companies failed to adopt content moderation policies and practices preferred by the Government. Indeed, as discussed above, the Surgeon General does not have independent regulatory authority, *see, e.g.*, 31 Fed. Reg. 8855 (transferring the Surgeon General's powers to what is now HHS), and thus cannot issue or enforce binding regulations. The RFI has not resulted in any proposed regulation. For their part, Plaintiffs cite no authority for the extraordinary notion that an agency's publication of a request for information is coercive. Accordingly, Plaintiffs cannot

make a case of government coercion based on the Surgeon General's RFI. *See also* Defs.' Resp. PFOF ¶¶ 411-421.

        d.   *Officials' remarks about potential § 230 amendments and antitrust enforcement raised legitimate policy questions and had no coercive effect.*

Plaintiffs seek to overcome the fatal deficiencies in their coercion theory by contending that the Defendants' statements become coercive when viewed "against the backdrop" of alleged "threats" in Congress and from the Executive Branch to repeal or reform § 230, and to intensify antitrust enforcement against the companies. PI Supp. 15 (citing Pls.' PFOF ¶¶ 1-30). That contention is mistaken in several respects.

It bears emphasis from the outset that the record as a whole offers no evidence that certain legislators or Biden Administration officials have said they would refrain from advocating changes to § 230, or pursuing potential remedies under the antitrust laws, if social media companies intensified their content moderation measures as to any individual Plaintiff or particular residents of the Plaintiff States. Nor is there record evidence that a social media company has said that it took a particular content moderation measure because it inferred (let alone reasonably) the existence of a "threat" from any of the statements by Defendants. *See Hammerhead*, 707 F.2d at 37 (no coercion where official's remarks cannot "reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request"); *accord VDARE*, 11 F.4th at 1163-65; *R.C. Maxwell*, 735 F.2d at 88-89; *Penthouse Int'l*, 939 F.2d at 1014-16.

But even considering on their own terms, as we do below, the smattering of legislative and Executive Branch remarks on which Plaintiffs rely, they fail to show that Defendants "coerced" social media companies to do anything (let alone to do anything that violated Plaintiffs' Free

Speech Clause rights). All that occurred was part of a legitimate debate about § 230 and antitrust questions stemming from the economic ascendance of social media companies.

i.     <u>Legislative Remarks and Hearings</u>

To start with Congress: The purported "backdrop" consists of several statements by individual *nondefendant* Representatives and Senators, but whether Defendants "threatened" or "coerced" entities in an unconstitutional sense "are conclusions and characterizations that must be supported" by evidence as to what Defendants, not nonparties "said and did." *Vullo*, 49 F.4th at 716. Assigning "coercive" effect to legislator remarks would be especially improper because only collective action by Congress, not the views of individual legislators, may alter federal laws. *Cf. INS v. Chadha*, 462 U.S. 919, 951-52 (1983). The Ninth Circuit thus rejected individual legislators' remarks as ground for characterizing YouTube's content moderation as state action. *Doe*, 2022 WL 17077497, at *2-3. The court concluded that (1) "statements by House Speaker Nancy Pelosi on possibly removing the protection provided to social media platforms under" § 230, (2) a "letter by Representative Adam Schiff" "encouraging the curbing of COVID-related misinformation on social media platforms," and (3) "a statement by Speaker Pelosi" at an academic "forum on COVID calling for greater accountability for 'the division and the disinformation proliferating online,'" were insufficient to constitute coercion as a matter of law—including because individual legislators' remarks "lack[ed] force of law, rendering them incapable of coercing YouTube to do much of anything." *See id.* at *2.[83]

---

[83] The Ninth Circuit's rejection of individual legislator remarks as legally sufficient for coercion was presaged by several prior district court decisions. *See Informed Consent Action Network v. YouTube LLC*, 582 F. Supp. 3d 712, 723 (N.D. Cal. 2022) ("publicly expressed views of individual members of Congress—regardless of how influential—do not constitute action on the part of the federal government" (quoting *Daniels v. Alphabet, Inc.*, No. 20-cv-04687, 2021 WL 1222166, at *6 (N.D. Cal. Mar. 31, 2021))); *accord Trump v. Twitter, Inc.*, 602 F. Supp. 3d 1213, 1224 (N.D. Cal. 2022) (rejecting as insufficient to plausibly allege state action "ambiguous and open-ended

Plaintiffs fare no better in attempting to rely on various congressional hearings that the legislators purportedly "used . . . as forums to advance . . . threats of adverse legislation if social-medial platforms do not increase censorship." Pls.' PFOF ¶¶ 4-7 (citing hearings on July 29, 2020; November 17, 2020; and March 25, 2021—the first two of which occurred before the Biden Administration took office). Plaintiffs' characterization of the hearings as "coercive" "overlook[s] Congress's role as an investigatory body," which includes legislative "studies of proposed laws, and 'surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." *Trump v. Twitter*, 602 F. Supp. 3d at 1224 (quoting *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020)). The statements Plaintiffs selectively quote fall "within the normal boundaries of a congressional investigation, as opposed to threats of punitive state action," *id.* at 1224, given the unarguable legitimacy of Congress "conducting investigative hearings on potential legislation," *see Schilling v. Speaker of U.S. House of Representatives*, --- F. Supp. 3d ---, 2022 WL 4745988, at *8 (D.D.C. Oct. 3, 2002) (citing, *inter alia*, *McSurely v. McClellan*, 553 F.2d 1277, 1286 (D.C. Cir. 1976)), *appeal filed*, No. 22-5290 (D.C. Cir. Nov. 4, 2022). The absence of Supreme Court decisions classifying legislative hearings as "coercing" private entities into becoming state actors is unsurprising given the leeway afforded to

---

statements to the effect that 'we may legislate' something unfavorable to Twitter or the social media sector"), *appeal filed*, No. 22-15961 (9th Cir June 28, 2022); *Abu-Jamal v. Nat'l Pub. Radio*, No. 96-cv-0594, 1997 WL 527349, at *6 (D.D.C. Aug. 21, 1997) (radio network's broadcasting decision was not state action where even if "individual members of Congress did call" network "in attempts to pressure it not to air" specified program, "not one of these people has any legal control over [network]'s actions"), *aff'd*, 159 F.3d 635 (D.C. Cir. 1998); *see also Buentello v. Boebert*, 545 F. Supp. 3d 912, 918 (D. Colo. 2021) (rejecting contention that state action doctrine applied to decision by an individual Member of Congress to block a follower of her personal Twitter account, noting that "member of Congress" holds "almost no power to act on behalf of the United States government").

legislators—including via the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1—to explore

problems and potentially responsive enactments.

Nor could the legislators' remarks and their comments at hearings reasonably have been

understood by social media companies as "threats," when "consider[ing] the entirety of" their

"words and actions." *Zieper*, 474 F.3d at 66. The companies understand, as do the courts, that

"enacting a bill is rarely fast or easy." *Trump v. Twitter*, 602 F. Supp. 3d at 1224. And although

legislators of both political parties have proposed amendments to § 230 as the economic power

and influence of social media companies has grown sharply in the last decade, no such change has

actually been enacted. *Supra* Defs.' PFOF § I.E.

The statute could perhaps one day be amended in a manner that would "alter the

judgments" Congress "made in the past," to account for "evolution" of social media companies

since the statute became law in 1996. *Cf. Henson v. Santander Consumer USA Inc.*, 582 U.S. 79,

90 (2017) (Court did not "[d]oubt that the evolution of the debt collection business might invite

reasonable disagreements on whether Congress should reenter the field and alter the judgments it

made in the past"). But if the mere possibility of some (vague and unspecified) § 230 amendment

were enough to constitute "coercion" triggering the state action doctrine here, then state action

would be present *everywhere*. That is not the law.

Plaintiffs also err in relying (PI Supp. 16-17) on personal views expressed by FBI Assistant

Special Agent in Charge (ASAC) Elvis Chan in his master's thesis, and his testimony, that certain

social media company employees he talked with felt what he called "pressure" from inquiries made

during congressional hearings, and platform meetings with congressional staff, "after 2016." *See*

Chan Dep. 123:1-3 ("I don't recollect any of them using the specific word 'pressure,' but that was

how I interpreted our conversations."); *id.* at 125:22. No Members of Congress or legislative staff

are defendants here, so even if Plaintiffs' characterization of ASAC Chan's testimony were correct, that would not show that *Defendants* "essentially compel[led]" platform decisions. *O'Handley*, 62 F.4th at 1158. Rather, as discussed above, the Constitution does not prohibit government officials from speaking their mind on matters of public concern, or of expressing their concerns in informal conversations. Rather, government officials may permissibly make public statements and advocate for change: "[O]fficials surely must be expected to be free to speak out to criticize practices, even in a condemnatory fashion," but "[a]t least when the government threatens no sanction," any such "effort to embarrass" a private entity is not an impermissible threat. *See Penthouse Int'l*, 939 F.2d at 1015-16.

Moreover, Plaintiffs offer no evidence that the "pressure" ASAC Chan described came from legislators and staff Plaintiffs characterize as Defendants' "political allies" (PI Supp. 15).[84] And ASAC Chan did not assert that what he called "pressure" was of such moment as to amount to "coercion" under the state action doctrine—that is a fanciful legal characterization Plaintiffs attach to ASAC Chan's testimony. *Cf. Doe*, 2022 WL 17077497, at *2-3 (House Speaker comments "on possibly removing the protection provided to social media platforms" under § 230 among events found insufficient to show "state action" under compulsion or nexus theories).

Also missing is evidence that the so-called "pressure" sought to compel action against specific posts or accounts, or that it was understood by (or acted on) by any company as such. To the contrary: Asked whether social media companies "changed their practices and became more

---

[84] For example, Plaintiffs emphasize (PI Supp. 16) a statement in ASAC Chan's master's thesis (which reflected only his academic views, not the FBI's views) that an October 31, 2017 Senate Judiciary Committee hearing "provided politicians with the occasion to exert pressure on the companies to make constructive changes to their platforms" (Chan Ex. 1 at 48-49 (Dkt. 204-2)), while entirely ignoring that the pertinent Senate committee hearing was chaired by a Republican Senator, because Republicans then held the Senate majority.

189

active in account takedowns" after the meetings with congressional staffers, ASAC Chan answered: "No. I would not connect those two events." Chan Dep. 125:15-21. The "pressure" ASAC Chan testified about therefore did not have the effect on particular content moderation choices Plaintiffs contend it had. *See also* Defs.' Resp. PFOF ¶¶ 945-961.

        ii.    Executive Branch Remarks and Actions

Also misconceived is Plaintiffs' contention that remarks from President Biden or his Administration concerning potential amendments to § 230, or raising the prospect that the growing economic power of social media companies may implicate the antitrust laws, contributed to "coercion." The Defendants here are within the Executive Branch, and could not unilaterally amend § 230, as that of course would require action by both houses of Congress and the President.

Moreover, the remarks Plaintiffs strain to depict as "coercive" did not telegraph that Defendants would press Congress to enact any particular legislation if social media companies did not intensify their content moderation. For example, Ms. Psaki said at an April 2022 news conference that "there are . . . *reforms that we think* Congress *could* take and [that] we would support taking, including *reforming* [§] 230, enacting antitrust reforms, requiring more transparency." Ex. 42 (emphasis added); Pls.' PFOF ¶ 197. But neither Ms. Psaki nor any other Defendant announced actual proposed language for any such amendment. The possibility of § 230 "reform" thus resembles the "zoning ordinance not yet drafted" that the Third Circuit in *R.C. Maxwell* ruled insufficient to support an analogy to the "criminal prosecution under existing statutes" threatened in *Bantam Books*: The mere prospect of "civil or administrative proceedings" under that undrafted ordinance, the court of appeals ruled, was an insufficient "quantum of governmental authority" to constitute "coercion." *R.C. Maxwell*, 735 F.2d at 88. Indeed, the Supreme Court has never held that government officials' references to (unspecified) statutory

190

"reform" (or even actual proposed legislation sent to Congress for consideration) could be
"coercive." Notably, then-Missouri Attorney General tweeted himself: "Get rid of section 230
protections, treat them like common carriers, bust up #BigTech." Ex. 32. That shows Plaintiffs
themselves did not behave as though government official calls for statutory reform (or even
revocation) were inherently "coercive," but rather were part of a legitimate debate.

It would in any event be extraordinary to prohibit the Executive Branch from identifying
concerns about the conduct of businesses within the United States and asserting that a statutory
amendment might be appropriate to address those concerns, merely because such statements on
matters of public concern might influence the conduct of private actors in a way that affects speech.
*Cf.* U.S. Const. art. II, § 3 (the President "shall" recommend to Congress "such Measures as he
shall judge necessary and expedient"); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S.
579, 587 (1952) (Recommendations Clause assigns President "function[]" of "recommending . . .
laws he thinks wise").[85]

---

[85] The "coercion" claim cannot be sustained by extrinsic statements of Mr. Biden before taking
office. This Court's ruling on the motion to dismiss accepted as plausible Plaintiffs' allegations
that comments candidate Biden made in January 2020 (about potential criminal or civil liability
for Facebook and its executives due to misinformation on that platform) were "coercive." *Compare*
MTD Order 62 & n.203 (attributing comments to "President Biden"), *with* 2d. Am. Compl. ¶¶ 191-
92 (discussing comments of "candidate" Biden) *and* Pls.' PFOF ¶¶ 20-21 (same). But precedent
does not support assigning coercive effect to such candidate comments. The candidate remarks at
issue here are no more consequential than those in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018). In
assessing an unconstitutional discrimination claim there, the Court considered but ultimately
rejected "extrinsic statements—many of which were made before the President took the oath of
office," where the statements did not overcome the facial neutrality of the President's rationale for
his action when he was in office. *Id.* at 2418-19. Leeway for candidate rhetoric is guaranteed by
the Free Speech Clause, which "has its fullest and most urgent application precisely to the conduct
of campaigns for political office," *Buckley v. Valeo*, 424 U.S. 1, 15 (1976) (citation omitted). *Cf.*
*Washington v. Trump*, 858 F.3d 1168, 1173-74 (9th Cir. 2017) (Kozinski, J., dissenting) (opining
that "[n]o Supreme Court case—indeed no case anywhere that I am aware of—sweeps so widely
in probing politicians for unconstitutional motives[,]" and given that "[c]andidates say many things
on the campaign trail" that "are often contradictory or inflammatory," reliance on candidate's
campaign statements is "unworkable").

191

Plaintiffs' effort to depict as coercion limitations that could be placed on social media companies under the antitrust laws is similarly incomplete and incorrect. Plaintiffs have failed to show that any decision under the antitrust statutes bears a concrete nexus to Defendants' efforts to address misinformation on social media. Tellingly, Plaintiffs omit evidence of antitrust enforcement measures proposed or taken against social media companies that well predated the tenure of many Defendants and that also predated the misinformation-focused remarks Plaintiffs paint as coercive. For example, during the Trump Administration, then-Attorney General Barr explained in a speech in December 2019: "Concerns about online platforms have come from a wide variety of stakeholders, across the political spectrum. Indeed, almost every State AG is now participating in publicly announced antitrust investigations of Google and Facebook . . . . [W]e have a good cooperative relationship in these efforts." Ex. 148 at 2 (William P. Barr, Att'y Gen., Remarks at the National Association of Attorneys General 2019 Capital Forum (Dec. 10, 2019), 2019 WL 6715208). One example of such parallel federal and state allegations of antitrust violations by an online platform is found in *Federal Trade Commission v. Facebook, Inc.*, No. 20-cv-3590 (D.D.C.) (public redacted version of under-seal complaint filed Jan. 13, 2021, before President Biden entered office). There, the FTC alleged that conduct by Facebook, including acquisition of Instagram and WhatsApp, was harmful to competition. *See FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34 (D.D.C. 2022) (denying motion to dismiss amended complaint). Notably, attorneys general for multiple states, *including the two State Plaintiffs here*, brought their own action predicated on similar antitrust allegations. *See New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 13 (D.D.C. 2021) (dismissing States' action), *aff'd sub nom. New York v. Meta Platforms, Inc.*, --- F.4th ---, 2023 WL 3102921 (D.C. Cir. Apr. 27, 2023). The commencement of the FTC's suit prior to the Biden Administration, and the two Plaintiff States' participation in a multi-state

antitrust action raising similar allegations, undermines Plaintiffs' contention that proposals for antitrust enforcement against platforms are inherently coercive "threats" (whether aimed at platform content moderation choices or anything else).

Additionally, Plaintiffs' mischaracterization of § 230 as an unconstitutional subsidy akin to the one invalidated in *Norwood v. Harrison*, 413 U.S. 455 (1973), PI Supp. 50, rips that case from its context. There is of course no basis for interpreting *Norwood* as somehow dispensing with Plaintiffs' obligation to satisfy the established state action requirements under cases such as *Blum* before the acts of private social media companies can legally be attributed to Defendants. *Cf. Watts v. Northside Indep. Sch. Dist.*, 37 F.4th 1094, 1097-98 (5th Cir. 2022) (citing *Norwood* in the course of applying *Blum* and other state action precedents). The question presented in *Norwood* was not, as here, whether the State could be held responsible for the conduct of private parties. Rather, the question was whether the State's own conduct—furnishing free textbooks to segregated private schools—was itself constitutional. The Court held no, explaining "the Constitution does not permit the State to aid [racial] discrimination even when there is no precise causal relationship between state financial aid to a private school and the continued wellbeing of that school." *Norwood*, 413 U.S. at 465-66. "[T]he constitutional infirmity of the Mississippi textbook program," therefore, was "that it significantly aid[ed] the organization and continuation of a separate system of private schools which . . . may discriminate if they so desire." *Id.* at 467. Here, Defendants do not "operat[e]" or provide "significant[] aid" to private social media platforms in the first place, much less do so contrary to the affirmative constitutional obligation to refrain from racial discrimination. *See id.* at 465. Plaintiffs' reliance on *Norwood* is therefore misplaced.

### 3.  Deception is not a freestanding basis for state action and is lacking here.

Next, Plaintiffs advance a newfound "deception" theory that relates only to two distinct allegations: (1) that the FBI is responsible for suppression of the Hunter-Biden laptop story; and

(2) that Dr. Fauci is responsible for suppression of a wide array of content relating to COVID-19. PI Supp. 18-29. These arguments lack merit. At the start, "deception" is not an independent legal basis for attributing a private entity's acts to the Government under the state action doctrine. Instead, it is an invention of Plaintiffs' own making, cut out of whole cloth to fit their allegations of First Amendment violations against the FBI and Dr. Fauci, which are plainly deficient under well-settled state-action doctrine. In any event, Plaintiffs' new deception theory, even if it were legally tenable, is unsupported by the record. On the contrary, the record here squarely *rebuts* Plaintiffs' allegations that the FBI or Dr. Fauci deceived (or attempted to deceive) anyone. Thus, neither the law nor the facts support Plaintiffs' First Amendment claims based on a "deception" state-action theory.

a.   *There is no "deception" test for state action.*

Neither the Supreme Court nor the Fifth Circuit has ever recognized "deception" as an independent test for "state action." *See, e.g.*, *Bass v. Parkwood Hosp.*, 180 F.3d 234, 241-42 (5th Cir. 1999) (listing "public function," "compulsion (or coercion)," and "nexus or joint action" tests, without identifying "deception" as an independent state action test). Plaintiffs' contention that "deception" is a distinct test for state action hinges on a mischaracterization of the Ninth Circuit's decision in *George v. Edholm*, 752 F.3d 1206 (9th Cir. 2014).

In *George*, the Ninth Circuit denied summary judgment on the "state action" issue based on evidence that two policemen misrepresented the plaintiff's medical condition to a (private) doctor "with the intent of inducing" the doctor to perform an allegedly illegal cavity search of the plaintiff resulting in the discovery of a plastic baggie containing cocaine. *Id.* at 1215. Critically, "there [was] evidence . . . that [two officers] . . . physically assisted [the private party] by turning [the plaintiff] on the table and holding his legs, and that [one officer] emphasized . . . the necessity for prompt action in removing the cocaine." *Id.* at 1216. Thus, the issue for trial was whether the

194

policemen "provided 'significant encouragement, either overt or covert,' to [the doctor]," and "'induce[d], encourage[d] or promote[d]'" the doctor "to do what he would not otherwise have done," "such that" the doctor's "actions" were "attributable to the state," without suggesting that "deception" was a distinct basis for such a finding. *Id*. Far from analyzing the purported misrepresentations as an adequate or independent test for state action, the Ninth Circuit considered those misrepresentations in applying the same state action tests the Fifth Circuit has identified. *Compare id.* at 1215, *with Bass*, 180 F.3d at 241-42. Indeed, the Ninth Circuit only concluded that the private doctor's conduct "could be attributed to the state" because "a reasonable jury could conclude that [the officers] provided false information, encouragement, *and active physical assistance* to" the doctor. *George*, 752 F.3d at 1216 (emphasis added).

Neither *George* nor any of the other cases Plaintiffs cite suggests that evidence of misrepresentations independently suffices to show state action. To show that any social media content moderation action is attributable to some Defendant, Plaintiffs thus must satisfy one of the tests the Supreme Court *has* recognized, such as the coercion test.

> b. *The record contradicts Plaintiffs' allegations of deceit and trickery.*

In any event, the record rebuts Plaintiffs' assertions that the FBI or Dr. Fauci, on behalf of NIAID, engaged in "deception." Rather than evincing any deceptive conduct, the record shows that dedicated public servants used their knowledge and skill to provide information or other resources to the public as a whole, and private companies in particular, which social media companies may (or may not) have considered when determining whether and how to moderate certain categories of content on their platforms. Plaintiffs' characterization of the government officials' conduct as "deceitful" is, ironically, based on gross mischaracterizations of the evidence.

i.   FBI

Plaintiffs contend that the FBI "engaged in a campaign of deception to induce social-media platforms to censor the Hunter Biden laptop story," a contention built on two mistaken premises— that (1) the FBI "had no investigative basis" for warning platforms about hack-and-leak or hack-and-dump operations by Russian state-sponsored actors ahead of the 2020 election, and (2) platforms took content moderation measures against the "Hunter Biden laptop story" because FBI statements "left" them "with the clear impression that the Hunter Biden laptop materials were, in fact, hacked materials." PI Supp. 27-29.

First, the snippet from ASAC Chan's testimony that Plaintiffs cite, in which he stated that the FBI was "not aware of" hack-and-leak "operations that were forthcoming or impending," when viewed in proper context, neither stated nor implied that the FBI lacked an "investigative basis" for its warnings, as Plaintiffs contend. *Id.* at 27-28 (quoting Pls.' PFOF ¶ 893); *see* Chan Dep. 192:19-24. ASAC Chan testified: "[W]hat we mentioned was that there was the general risk of hack-and-leak operations, especially before the election. However, we were not aware of any hack-and-leak operations that were forthcoming or impending." Chan Dep. 192:19-24. Plaintiffs lack any ground for arguing that the "general risk" ASAC Chan described was an inadequate basis for FBI's general warnings to social media companies about the potential risk of hack-and-leak operations. Nor is there evidence the FBI misstated the basis for its warnings.

"Investigative basis" is an amorphous term Plaintiffs do not attempt to define, but in any event, the FBI did have a factual basis for the 2020 warnings. Start with the indictment the Government obtained in 2018 against 12 members of the GRU, a Russian Federation intelligence agency within the Main Intelligence Directorate of the Russian military, for committing federal crimes intended to interfere with the 2016 U.S. presidential election: Those GRU members

196

engaged in a well-documented effort to hack into the computer networks of the Democratic Congressional Campaign Committee, the Democratic National Committee, and the presidential campaign of Hillary Clinton, and then released that information on the internet. *See, e.g.*, Ex. 135. Because Russia had pursued a hack-and-dump effort in 2016, the FBI viewed it as "possible" Russia would do so again in 2020. Chan Dep. 221:3. The FBI's warnings reflected an abundance of caution given the skills of the Russian hackers shown in 2016. *Supra* Defs.' PFOF § II.H.1; Chan Dep. 173:18-174:13, 203:16-204:1, 208:7-12. The record does not support Plaintiffs' apparent assumption that the FBI's 2020 warnings were improper because the risk of a repetition was zero or negligible. And Plaintiffs do not even attempt to justify their further assumption that such warnings would *only* have been appropriate if the risk of recurrence of hack-and-dump efforts was so high as to be "*impending*." PI Supp. 37 (emphasis added); *see also* Defs.' Resp. PFOF ¶¶ 880, 893.

Plaintiffs also fail to address (let alone explain), statements during the Trump Administration that place the allegedly improper warnings Chan described in proper context. President Trump in 2018 declared an emergency to deal with the unusual and extraordinary threat presented by "the ability of persons located . . . outside the United States to interfere in or undermine public confidence in United States elections, including through the unauthorized accessing of election and campaign infrastructure *or the covert distribution of propaganda and disinformation*." 83 Fed. Reg. at 46,843 (emphasis added). He repeated that finding twice, including on the eve of the 2020 election. 84 Fed. Reg. 48,039; 85 Fed. Reg. 56,469. "The Russian effort to influence the 2016 presidential election," then Deputy Attorney General Rod J. Rosenstein noted in a July 2018 speech, "is just one tree in a growing forest. Focusing merely on a single election misses the point. As [Director of National Intelligence Dan Coats] made clear, 'these

actions are persistent, they are pervasive, and they are meant to undermine America's democracy on a daily basis, regardless of whether it is election time or not.'" Ex. 149 at 2 (Rod J. Rosenstein, Deputy Att'y Gen., Remarks at the Aspen Security Form (July 19, 2018), 2018 WL 3471764). Multiple Cabinet agencies went on to explicitly state in March 2020 that "foreign actors continue to try to influence public sentiment and shape voter perceptions," and that "[t]hey spread false information and propaganda about political processes and candidates on social media in hopes to cause confusion and create doubt in our system." Ex. 132 (joint statement of Mar. 2, 2020). Another announcement in September 2020 sought to "raise awareness of the potential threat posed by attempts to spread disinformation regarding the results of the 2020 elections." That statement noted that "[f]oreign actors and cybercriminals could create new websites, change existing websites, and create or share corresponding social media content to spread false information in an attempt to discredit the electoral process and undermine confidence in U.S. democratic institutions." Ex. 133 (FBI and CISA announcement of Sept. 22, 2020).

Although those statements did not use the hack-and-dump jargon, they show that FBI and other agencies raised serious concerns about foreign influence operations ahead of and close in time to the 2020 election, further undermining Plaintiffs' notion that the FBI's more particularized warnings to platforms about potential hack-and-dump operations before the 2020 election were somehow improper.

Second, the record shows the FBI did not raise the "Hunter Biden Laptop Story" in its warnings before October 14, 2020, when the *New York Post* "broke" that story. Rather, the record establishes that Twitter made the independent and temporary decision to limit circulation of the *New York Post* story on its platform, and that the decision did not involve the FBI in any way. *Supra* Defs.' PFOF § II.H.2. Other than one inquiry by a Facebook analyst about what the FBI

could "share" about the Hunter Biden investigation after the *New York Post* published its story, and the FBI's "no comment" response, ASAC Chan was not aware of any communications related to the Hunter Biden Laptop Story between the FBI and Facebook, Chan Dep. 233:22-234:3, Twitter, *id.* at 233:8-21, Apple or Microsoft, *id.* at 234:6-7, or any other platform, *id.* at 234:4-5.

Plaintiffs heavily rely on statements made in a declaration that Yoel Roth, Twitter's former Senior Director for Trust and Safety, submitted to the Federal Elections Commission (FEC) in 2020. Plaintiffs emphasize (PI Supp. 38) Mr. Roth stated in that 2020 declaration that, in "regular meetings" he attended with the FBI and other agencies "and industry peers regarding election security," he had "learned" that "there were rumors that a hack-and-leak operation would involve Hunter Biden." Chan Ex. 8 (Roth Decl.) ¶¶ 10-11 (Dkt. 204-5). But Mr. Roth did not say in his 2020 declaration from whom he heard those rumors; much less did he attribute them to Government personnel. And Mr. Roth has clarified, in sworn congressional testimony in 2023, that he intended the declaration to state that another social media company, rather than the Federal Government, mentioned at a meeting that there was the possibility of a hack and leak operation concerning Hunter Biden. Mr. Roth explained that the Federal Government did not share that perspective or provide information to Twitter concerning this issue, emphasizing that his 2020 declaration "does not suggest that the FBI told [him] it would involve Hunter Biden." Ex. 2 at 43; *see also id.* at 37, 46. Similarly, ASAC Chan's testimony that he did not discuss the Hunter Biden Laptop Story with Facebook before October 14, 2020 reinforces the statement in the October 25, 2022 letter by Meta's counsel to this Court that "ASAC Chan at no point in time advised Meta 'to suppress the Hunter Biden laptop story.' Nor did any of his colleagues." Dkt. 96 at 2 (Ex. A).

The recent congressional testimony also refutes Plaintiffs' assertion that the FBI in 2020 "induced" revisions to platform hacked materials policies or the application of those policies to

the "Hunter Biden Laptop Story." PI Supp. 27. Twitter grounded its decisions concerning the *New York Post* story on a 2018 policy that "prevent[ed] Twitter from being used to spread hacked materials," but decided within 24 hours that its initial decision was wrong and removed the restrictions. Ex. 137 at 5-6; Ex. 2 at 5; *see also* Defs.' Resp. PFOF ¶¶ 880-904, 1083-1087.

        ii.    <u>Dr. Fauci, in his prior role as the Director of NIAID</u>

As with the FBI, Plaintiffs' arguments regarding Dr. Fauci, in his prior role as Director of NIAID, are legally and factually meritless. Again, "deception" is not a cognizable basis for finding state action. The record is also utterly lacking factual support for Plaintiffs' "deception" theory involving Dr. Fauci.

Plaintiffs assert that Dr. Fauci worked with former NIH Director Dr. Francis Collins or other Biden Administration officials to "orchestrate[] a series of campaigns of deceit to procure the censorship of viewpoints he disfavored on social media." PI Supp. 19. Ultimately, Plaintiffs' allegations amount to nothing more than a disagreement with the correctness of Dr. Fauci's or other scientific experts' conclusions about the origin, treatment, or prevention of COVID-19. They have nothing at all to do with content moderation on social media platforms, let alone violations of the First Amendment.

Indeed, Plaintiffs spend *seven pages* on arguments about (1) Dr. Fauci's involvement in internal discussions among an international group of virologists about the origins of COVID-19, (2) whether Dr. Fauci correctly concluded that hydroxychloroquine is not an effective treatment for COVID-19, (3) Dr. Fauci's views on the efficacy of face masks, (4) Dr. Fauci's criticism of the "focused protection" strategy espoused by the Great Barrington Declaration, and (5) Dr. Fauci's public expression of "horror" at people cheering over refusing a life-saving vaccine. PI Supp. 19-27. Strikingly absent from these discussions is any allegation that Dr. Fauci ever publicly

or privately spoke to any social media company about his views on the above issues—let alone

that he did so in a manner that could be considered threatening or coercive (or "deceptive"). In

fact, Dr. Fauci testified time and time again that he has never asked a social media company "to

remove misinformation from one of [its] platforms," Fauci Dep. 152:21-24, and indeed does not

"pay attention to what social media organizations like Google and YouTube and Twitter . . . do,"

*id.* at 239:21-24.[86] And despite Plaintiffs' voluminous filings, they have provided no evidence to

rebut this testimony.

So what is the resulting state action, and First Amendment violation, arising from Dr.

Fauci's internal discussions and public comments about COVID-19? According to Plaintiffs:

"*[s]ocial media platforms . . . follow[ing]* Dr. Fauci's lead," "accepting [Dr. Fauci's]

proclamation[s]" as to the "scientific consensus," and choosing to "censor[]" content on their

platforms that ran counter to that consensus. PI Supp. 25 (emphasis added). But the social media

companies' decisions to consider the conclusions of Dr. Fauci and other scientific experts when

---

[86] *See also* Fauci Dep. 99:5-9 ("You know, I'm so dissociated from social media. I don't have a Twitter account. I don't do Facebook. I don't do any of that, so I'm not familiar with that. I've never gotten involved in any of that."); *id.* at 210:3-8 ("So social media stuff, I don't really pay that much attention to."); *id.* at 213:13-16 ("Like I said, my association with social media is almost zero. I don't have an account. I don't tweet. I don't pay attention to social media. I wouldn't know how to access a tweet if you paid me."); *id.* at 235:21-22 ("I don't get involved in social media stuff."); *id.* at 241:6-13 ("I do not get involved in any way with social media. I don't have an account, I don't tweet, I don't Facebook, and I don't pay attention to that. . . . I don't pay attention to what gets put up and put down on social media."); *id.* at 241:23-242:1 ("I don't pay attention to social media issues. That's something I don't do. I don't follow it. I don't have an account. I don't follow it."); *id.* at 280:3-7 ("I'm not aware of anything being censored. Like I said multiple times—and I'll repeat it again—I don't follow what goes on social media, censoring or otherwise. That's not something that I pay attention to."); *id.* at 281:24-282:2 ("I don't pay attention to that whole culture of social media censoring or not censoring. I've said that maybe 50 times today. That's not what I do."); *id.* at 312:8-9 ("I really don't get involved in social media issues."); *id.* at 357:8-13 ("My way of countering false information, and I've been on the record multiple times as saying that, is that my approach is to try to [] flood the system with the correct information as opposed to interfering with other people's ability to say what they want to say.").

determining what content to allow on their platforms does not make Dr. Fauci (or any other scientist) legally *responsible* for those decisions, *Blum*, 457 U.S. at 1004, and certainly does not amount to a First Amendment violation. A contrary conclusion would have far-reaching, and dangerous, ramifications. Accepting this theory of state action in the First Amendment context would mean that any time a government official expresses views or gives scientific advice, the official could be in danger of violating the First Amendment if a social media company simply considers those views or advice in its own decision-making process. Yet neither NIAID nor any other agency may presume to control whether or how a social media company, or any other third party, uses the health information that it makes public. To avoid running afoul of the First Amendment, then, NIAID—which is tasked with "advanc[ing] the understanding, diagnosis, and treatment of many of the world's most intractable and widespread diseases," including "tuberculosis and influenza, HIV/AIDS," and COVID-19, *see* Ex. 86—would have to refrain from promoting critical health information that can save lives. It would be precluded from carrying out its statutory purpose to "conduct and support . . . research, training, *health information dissemination*, and" participate in "other programs with respect to" such diseases. 42 U.S.C. § 285f (emphasis added); *see also id.* § 284(b)(1)(F) (granting NIAID authority to "develop, conduct, and support public and professional education and information programs"). Plaintiffs' proposed "deception" theory of state action must be rejected for this reason alone. *See Summum*, 555 U.S. at 467 (a government entity "is entitled to say what it wishes" (citation omitted)).

Indeed, it is worth noting that Plaintiffs seem to have constructed their amorphous deception theory—articulated for the very first time in their supplemental brief, despite Dr. Fauci being named in the original complaint in May 2022—to account for the complete absence of any evidence of communications between Dr. Fauci and social media companies about

misinformation. Earlier in this case, in justifying the deposition of Dr. Fauci, Plaintiffs claimed that "Dr. Fauci is *directly involved* in multiple, far-reaching social-media censorship campaigns against so-called COVID-19 'misinformation.'" Joint Stmt. Regarding Witness Depositions at 5 (Dkt. 86) (emphasis added). In seeking Dr. Fauci's deposition, Plaintiffs expressed skepticism about the accuracy of NIAID's interrogatory responses indicating that Dr. Fauci did not have any direct communications with social-media platforms about "censorship"; Plaintiffs insisted that, contrary to those responses, Dr. Fauci "acted on behalf of others" in procuring" "social media censorship." *Id.* at 10. Now, tacitly acknowledging that Dr. Fauci's deposition testimony failed to substantiate those assertions, Plaintiffs abandon them for an invented theory that turns not on Dr. Fauci's interactions with social media companies (or any other relevant facts) but instead on unfounded speculation that Dr. Fauci sought to deceive the public about COVID-19. Yet the very notion that Dr. Fauci, together with highly respected scientists from around the world, orchestrated a "campaign to deceive" anyone—including social media companies—is built on distortions of the evidence and baseless attacks on Dr. Fauci's credibility stemming from his testimony on matters irrelevant to Plaintiffs' First Amendment claim.

§    *The Origins of COVID-19.* Plaintiffs' primary "deception" theory is that Dr. Fauci worked with former NIH Director Dr. Francis Collins[87] and an official from a British research organization (Dr. Jeremy Farrar[88]) to "discredit and suppress the opinion that SARS-CoV-2, the virus that causes COVID-19, leaked from a laboratory at the Wuhan Institute of Virology[.]" PI Supp. 19. According to Plaintiffs, the alleged conspiracy formed during a purportedly "clandestine . . . call" on February 1, 2020, during which the participants allegedly entered into a plan to

---

[87] Dr. Collins stepped down as Director of NIH in December 2021. Ex. 151 at 1 (*A Farewell to Dr. Francis Collins*, Nat'l Insts. of Health (Dec. 16, 2021), https://perma.cc/5Q48-NJAD).

[88] Dr. Farrar does not work for the United States Government and is not a Defendant in this case.

"manufacture the appearance of scientific consensus against the lab-leak theory," *id.* at 21, which culminated in the publication of a research article by non-federal officials refuting that theory—all for the "purpose of . . . suppress[ing] the lab leak theory in both 'main stream and social media,'" *id.* at 24 (citation omitted). Plaintiffs contend that the "conspiracy succeeded" when social media platforms decided to "aggressively censor[] the lab-leak theory well into 2021." *Id.*[89]

To support this accusation, Plaintiffs misconstrue internal discussions documented in email exchanges between Dr. Fauci and other scientists in early 2020. That correspondence flatly contradicts Plaintiffs' deception theory. The record shows that, on February 1, 2020, Dr. Jeremy Farrar invited a group of international scientists (including Dr. Fauci and Dr. Collins) to participate in a call later that day. *See* Fauci Ex. 8 at 9-10 (Dkt. 206-9). The invitation stated that the "[i]nformation and discussion" was to be "shared in total confidence and not to be shared until agreement on next steps." *Id.* at 10. Contrary to Plaintiffs' characterization of this instruction, it plainly does not suggest that the call was meant to be "clandestine." PI Supp. 21. On the contrary, the point was to allow for an initial convening of an "ad hoc group" to "air some thoughts" about the participants' "current understanding" of the scientific data—while also identifying "the many gaps in [their] knowledge"—with the aim of obtaining a "broader range of input" going forward.

---

[89] Plaintiffs' use of the phrase "lab-leak theory" implies that there is only one theory concerning how SARS-CoV-2, the virus that causes COVID-19, may have emerged from a laboratory in Wuhan, China. In fact, multiple diverging "lab-leak" theories have emerged. One theory is that SARS-CoV-2 was intentionally engineered in a laboratory and deliberately or accidentally released. Another is that SARS-CoV-2 was inadvertently created in a lab during serial passage experiments and accidently spread beyond the lab. Yet another is that SARS-CoV-2 naturally occurred in the wild, was being studied in a lab, and was accidentally spread beyond the lab by infected researchers. *See* Pls.' Jones Decl. Ex. AA at 6 ("Those suspecting a lab-related incident point to an array of possible scenarios, from inadvertent exposure of a scientist during field research to the accidental release of a natural or manipulated strain during laboratory work."); Ex. 99 (Joel Achenbach, *What we know about covid-19's origins, and what is still a mystery*, Wash. Post (Mar. 1, 2023)) (discussing "versions of the lab leak theory").

Fauci Ex. 8 at 9 (Dkt. 206-9). Thus, the group's next step after the call, according to Dr. Farrar, was to encourage "a body like the WHO . . . to ask or commission a group of scientists from around the world to ask [a] neutral question[:] 'To understand the evolutionary origins of 2019-nCoV[.]" *Id.* at 5. "In other words," the goal was to develop "a completely open minded and neutral question" relating to the origins of COVID-19 and commission "the best minds" to consider it, "under the umbrella of a respected international agency." *Id.* at 10. Doing so was "important for this epidemic and for future risk assessment and understanding of animal/human coronaviruses." *Id.* at 5.

Most participants on the call also believed that a broader group should convene immediately, before the question of COVID-19's origins became "polari[z]ed" and "people . . . start[ed] to look to who to blame"—which could "increase tension and reduce cooperation" necessary for objective inquiry. Fauci Ex. 8 at 7 (Dkt. 206-9). That would undermine the group's shared goal of "really continu[ing] to pursue what actually happened in order to prepare for and prevent similar things from happening in the future." Fauci Dep. 102:13-103:7.[90] For instance, Dr. Farrar noted that, already, "questions [we]re being asked by politicians, . . . in the scientific literature, [and] certainly on social and main stream media." Fauci Ex. 8 at 7 (Dkt. 206-9). Thus, he found it imperative for a group to convene without delay "to consider the evolutionary origins of [the virus], with an open mind, neutral, and in a transparent way[.]" *Id.* In his view, immediate objective analysis might "prevent wild claims being made." *Id.* That was so even if the issue "remain[ed] grey" after a group convened. *Id.* at 3. Dr. Farrar believed that even "grey, from a respected group, under the umbrella of let us say WHO, would in itself help!" *id.*

---

[90] Others identified another reason for urgency in addition to discovering the source of the virus: if the virus did come from a "non-human host, pre-adapted, it [could] threaten control efforts through new zoonotic jumps." Fauci Ex. 8 at 6 (Dkt. 206-9).

After the call, the group continued internal discussions about various theories surrounding COVID-19's origins. Their email exchanges reflect a shared desire for "open minded and neutral" scientific inquiry, *id.* at 10, as several virologists voiced competing initial views on the theories surrounding the origins of the COVID-19 virus. Some opined that "a non-natural origin of 2019-nCoV is highly unlikely at present," *id.* at 7; others stated that they favored the view that the virus originated through events a laboratory, *id.* at 3-4; and others responded that their view "[wa]s completely neutral," *id.* at 7. Dr. Collins, for his part, conveyed that he "hadn't given much consideration to the idea of lab-based evolution by tissue-culture passage" that one scientist presented, and he agreed that the idea "[wa]s worth including on the list of options" to be examined. *Id.* at 3. And as Dr. Kristian Andersen expressed in another email to Dr. Fauci and Dr. Farrar, while "some of the features" of the virus "(potentially) look[ed] engineered" on an initial review of the data, he believed it was important to "look very critically at" the issue and "there [we]re still further analyses" to be done, so "opinions could still change." Fauci Ex. 6 at 1 (Dkt. 206-7). Amidst the uncertainty, what was clear to the participants was that the issue was "very complex," Fauci Ex. 8 at 5 (Dkt. 206-9), that they alone did not have all the answers, *id.* at 9, and that opinions could evolve as new information was considered, *id.*

Dr. Fauci's participation in these discussions was limited. He apparently did not respond at all to the email exchanges involving the entire group on the call or share his thoughts on the origins of COVID-19. Instead, he emailed Dr. Farrar separately on the afternoon of February 2, 2020, to apologize for taking "so long to weigh in on [Dr. Farrar's] e-mails," and to convey only that he agreed with the urgency of convening a broader group. *Id.* at 2 (including Dr. Collins and another NIH employee on the email). "Like all of us," Dr. Fauci wrote, "I do not know how this evolved, but given the concerns of so many people and the threat of further distortions on social

media, it is essential that we move quickly. Hopefully, we can get WHO to convene." *Id.*; *see also* Fauci Dep. 126:13-18 ("[T]he theme of everything that was going on at the time" was to "get WHO moving on getting the convening . . . so that evidence and data could be openly discussed."). That Dr. Fauci did not weigh in on the substantive question of the virus's origin is entirely consistent with his deposition testimony. He testified that, because he is "not an evolutionary virologist," he is "not qualified . . . to make any kind of definitive determination about whether a genome could or could not be a laboratory construct or experimentally manipulative." *Id.* at 121:22-122:2. Accordingly, he "relied, as anyone would, [on] highly qualified, respected evolutionary virologists" to examine the evidence. *Id.* at 122:3-5.

Separately, and around the same time as the February 1, 2020 call, Dr. Andersen and four other expert virologists (two of whom may have been included on Dr. Farrar's invitation to the February 1 call[91]) were looking into the issue further and developing a research paper with their analysis.[92] Their paper, titled "The Proximal Origin of SARS-CoV-2," was eventually published in Nature Medicine, a scientific journal,[93] on March 17, 2020. Fauci Ex. 24 at 3 (Dkt. 206-25) (with link to online publication). The paper stated that "[o]ur analyses clearly show that SARS-CoV-2 is not a laboratory construct or a purposefully manipulated virus." *Id.* at 1.

---

[91] Co-authors Dr. Andrew Rambaut (located in Edinburgh, UK) and Dr. Edward Holmes (in Sydney, Australia) are on the email chain following the February 1 call. Fauci Ex. 6 at 9 (Dkt. 206-7).

[92] Plaintiffs allege that these virologists only began drafting their paper after the February 1 call, PI Supp. 21, but there is no evidence in the record indicating when the authors began their research. The evidence actually suggests that Dr. Andersen and Dr. Holmes were considering the issue and examining the data before the February 1 call. *See* Fauci Ex. 6 at 1 (Dkt. 206-7) (January 31, 2020 email from Dr. Andersen informing Dr. Fauci of his initial impressions in advance of the call, referring to an article that quotes him and Dr. Holmes).

[93] "*Nature Medicine* is a monthly journal publishing original peer-reviewed research in all areas of medicine on the basis of its originality, timeliness, interdisciplinary interest and impact on improving human health. . . . All editorial decisions are made by a team of full-time professional editors." Ex. 152 at 1 (*Journal Information*, Nature Medicine, https://perma.cc/2MD3-H6SV).

Before the article's publication, Dr. Farrar had forwarded several drafts of the paper, which Dr. Holmes had sent to him, to Dr. Fauci and Dr. Collins. As with the email discussions after the February 1 phone call, Dr. Fauci testified that he had "very little input into" those drafts. Fauci Dep. 196:1-8. As Dr. Fauci explained, he would not have had much input because they "involve[d]" issues of "very complicated evolutionary virology of which [he is] not an expert." *Id.* at 124:9-14.[94] Indeed, the record contains no evidence that Dr. Fauci ever responded to Dr. Farrar's emails with any substantive input on the drafts.[95]

These are the facts on which Plaintiffs attempt to build their claim against Dr. Fauci. But the facts contradict Plaintiffs' assertion that there was a "clandestine" call whose participants formed a conspiracy with the "stated purpose" of "suppress[ing] the lab-leak theory" on "social media." PI Supp. 24. On the contrary, the facts show that a group of international virologists sought to urgently and openly investigate "what actually happened" to cause the COVID-19 virus, before politics or the spread of unfounded theories in mainstream media and social media interfered with the objective inquiry needed to properly combat the virus and defend against the risk of future

---

[94] *See also* Fauci Dep. 114:4-15 ("I remember getting a paper and looking at it. I don't believe I had any substantive comments on it, just by reading it. Because that's not my lane, evolutionary virology."); *id.* at 120:10-20 ("My recollection is I really didn't have any meaningful comments on [the draft] because it . . . would be involved in a lot of complicated evolutionary virology that is not my lane."); *id.* at 124:21-24 ("I might have looked at [the draft], but I certainly didn't make any meaningful comments since this is outside of my lane of expertise."); *id.* at 127:10-13 ("Again, I had very little input or even interpretation of the . . . information because it was in an area that is not my area of expertise.").

[95] Plaintiffs assert that Dr. Andersen thanked Dr. Fauci for his "advice and leadership" in an email and suggest that provides evidence that Dr. Fauci played a significant role in the drafting of the paper. PI Supp. 23. But the cited email shows nothing of the sort. The cited email is from Dr. Andersen to Drs. Farrar, Fauci, and Collins. In it, Dr. Andersen thanks all of them for their "advice and leadership as we have been working through the SARS-CoV-2 'origins' paper," and informs them "that the paper was just accepted by Nature Medicine and should be published shortly (not quite sure when)." Fauci Ex. 22 at 1 (Dkt. 206-23). Dr. Andersen also shares "the accepted version" of the paper in order to "keep [them] in the loop[.]" *Id.*

outbreaks. Fauci Dep. 102:22. The facts show no agreement to attempt to "suppress" speech on any medium that promoted any particular theory of the virus's origins.

Importantly, Plaintiffs reference not a single public or private communication by Dr. Fauci or anyone else about the "lab-leak" theory that was directed, publicly or privately, at a social media company. Instead, Plaintiffs pin the culmination of the alleged conspiracy to deceive on the following public and private statements: *First*, roughly one week after the article's publication, Dr. Collins wrote on the "NIH Director's Blog" online that the article refuted "outrageous claims that the new coronavirus causing the pandemic was engineered in a lab and deliberately released to make people sick." *See* Fauci Ex. 25 at 1 (Dkt. 206-26). *Second*, in April 2020, Dr. Fauci responded to an email from Dr. Collins expressing concern about the "growing momentum" of the theory that COVID-19 started in a lab, Fauci Ex. 27 at 1-2 (Dkt. 206-28), with, "I would not do anything about this right now. It is a shiny object that will go away in times." *Id.* at 2. *Third*, and also in April 2020, Dr. Fauci was asked at a White House press conference to address "concerns that th[e] virus was somehow manmade, [and] possibly came out of a laboratory in China," Fauci Ex. 28 at 2 (Dkt. 206-29); he responded by explaining that a recent study by "highly qualified evolutionary virologists" found that the data were "totally consistent with a jump of a species from an animal to a human." *Id.*[96] After the press conference, one member of the press reached out to Dr. Fauci's office to obtain a copy of the study Dr. Fauci was referring to, and Dr. Fauci passed along three "links to the scientific papers and a commentary about the scientific basis of the origins of SARS-CoV-2," including a link to "The Proximal Origin of SARS-CoV-2." Fauci Ex. 29 (Dkt. 206-30).

---

[96] At the press conference, then-President Trump followed up after a brief line of questioning directed at Dr. Fauci by saying that he was "very satisfied with the decision [the Administration] made" to "listen[] to experts" and "many others." Fauci Ex. 28 at 3 (Dkt. 206-29). Had the Administration not done so, the President said, "we could have lost more than 2 million people. I really believe that." *Id.*

These statements, most of which simply promote information, and none of which was directed at a social media company, hardly show any effort to "suppress" the "lab-leak theory" on social media.

This evidence contradicts every premise on which Plaintiffs construct their novel and legally unsupported "conspiracy to deceive" narrative. That narrative is built on fiction, not fact. *See also* Defs.' Resp. PFOF ¶¶ 598-756. Plaintiffs resort to baseless and irrelevant attacks on Dr. Fauci's credibility. Woven throughout their elaborate reconstruction of the events is a request for the to Court disregard Dr. Fauci's testimony as "not credible," and, presumably, to accept Plaintiffs' factually unsupported retelling of the events instead. *See* PI Supp. 20. Plaintiffs' sole argument against Dr. Fauci's credibility—that he, like any other deponent, responded with some variation of "I do not recall" in his deposition when he did not recall the answer to a question, *id.*—is spurious. Plaintiffs obscure the details that Dr. Fauci could not recall by referring, without elaboration, to a long string cite to paragraphs of their proposed findings of fact. *Id.*[97] Following the trail from that string cite to the deposition transcript reveals that the details Dr. Fauci could not recall were irrelevant and trivial matters such as: when and where he met a scientist years ago, Fauci Dep. 32:32-33:3; when he became aware of a particular article in 2020, *id.* at 31:21-32:3; who was copied on an email sent three years ago, *id.* at 55:5-8; whether he recalled, from eight years ago, the initiation of a grant he was not responsible for approving, *id.* at 21:21-22:23; what he remembered saying in a televised interview in July 2021, *id.* at 340:25, 342:13-18; and whether he was aware of communications between social media companies and other federal officials in which Dr. Fauci was not personally involved, *id.* at 328:20-329:7, among other immaterial matters.

---

[97] Elsewhere, Plaintiffs make the same accusation by simply citing nearly *the entire deposition transcript*. PI Supp. 20 (citing Pls.' PFOF ¶ 620, in turn citing Fauci Dep. 22:21-352:18).

That Dr. Fauci—then responsible for running NIAID, with an annual budget of more than $6 billion, 2,000 employees, and 1,300 funded principal investigators—could not remember these irrelevant and trivial details is unremarkable.[98] In any litigation, even as to relevant information, witness "memories fade" "with the passage of time." *Star Sys. Int'l Ltd. v. Neology, Inc.*, No. 4:18-CV-00574, 2019 WL 679138, at *2 (E.D. Tex. Feb. 19, 2019) (citation omitted).

Plaintiffs do not explain how Dr. Fauci's failure to remember such minutiae from between two and eight years ago "contradicts the documentary evidence" or otherwise undermines his credibility. Plaintiffs fail to substantiate their very serious suggestion that Dr. Fauci—who was testifying under oath—was deliberately withholding information. An unadorned string cite to their brief does not suffice. Nor does their submission of a cut and spliced audio-recording of Dr. Fauci's deposition, which removes all context in which to assess his testimony and Plaintiffs' serious accusations against him. If the Court chooses to watch the audiovisual-recording of Dr. Fauci's deposition, Defendants urge the Court to watch the *full* recording—which shows Dr. Fauci making a concerted effort to answer each question as thoroughly as possible, and provide as many details as possible, even where his memory is hazy (despite being repeatedly cut off or instructed to provide *less* information by opposing counsel, *see* Fauci Dep. 47:5-21 ("paus[ing]" Dr. Fauci's answer regarding details of the February 1, 2020 call and asking him "not to go off on . . . a tangent"); *id.* at 127:13-128:8 (interrupting Dr. Fauci's response to counsel's questions relating to the receipt of a draft research paper); *id.* at 134:6-135:12 (interrupting Dr. Fauci's answer "provid[ing] context" about an email he sent to Dr. Farrar).

---

[98] *See also* Defs.' Resp. PFOF ¶¶ 609, 612, 620, 628-630, 636, 642, 647, 651, 662-664, 666-668, 670, 685, 686, 690, 7702, 703, 708, 710, 722, 730, 733, 737, 746, 750, 753, 766, 772, 789, 798, 805, 807-809, 825, 849, 890-892.

In any event, Plaintiffs' baseless attacks on Dr. Fauci's credibility do not fill the gaping holes in their legally unsupported deception theory, which the evidence contradicts.

§ *Other COVID-19-related topics.* The remaining narratives supporting Plaintiffs' deception theory are likewise built on a contortion of the record and have nothing to do with content on social media platforms—and everything to do with Plaintiffs' substantive disagreement with the conclusions and recommendations of Dr. Fauci and other scientific experts, which is irrelevant to their First Amendment claim. Plaintiffs allege that, "[h]aving succeeded so dramatically in suppressing the lab-leak theory through deception, Dr. Fauci," in coordination with others, "continued . . . the same tactic of deceptively creating a false appearance of scientific consensus to procure the censorship of disfavored viewpoints on social media." PI Supp. 24. In support, Plaintiffs lodge a series of complaints about Dr. Fauci's views on issues such as the effectiveness of facemasks or particular treatments for COVID-19, among other things.

But none of Dr. Fauci's publicly or privately expressed views has any connection to speech on social media. Plaintiffs do not allege that Dr. Fauci discussed any of his views with a social media company, or that he demanded any company moderate content opposed to his views. Nor do Plaintiffs allege that a social media company made any particular content moderation decision because of any such demand. Instead, they assert that social media companies' content moderation decisions were consistent with (or "followed") Dr. Fauci's publicly expressed views on various matters. PI Supp. 24-25. Yet the mere fact that social media companies may have considered the public statements of Dr. Fauci (or any other civil servant) in making their own decisions about what content to allow on their platforms does not suggest that Dr. Fauci intended to *deceive* any company into moderating content on its platform in a manner consistent with his views. *See* Defs.' Resp. PFOF ¶¶ 757-776 (regarding efficacy of hydroxychloroquine), 777-808 (regarding the Great

Barrington Declaration), 828-39 (masking), 840-852 (Alex Berenson). That is particularly so considering Dr. Fauci's repeated testimony that he does not "pay attention to social media" Fauci Dep. 213:13-16. Rather, as Dr. Fauci testified, his "approach" to "countering false information," "is to try to [] flood the system with the correct information as opposed to interfering with other people's ability to say what they want to say." *Id.* at 357:8-13. And he is entitled to take that approach. As the former Director of NIAID and Chief Medical Advisor to the President, Dr. Fauci was "entitled to say what [he] wishes . . . and to select the views that [he] want[ed] to express[.]" *Summum*, 555 U.S. at 467-68 (citations omitted). Finding that Dr. Fauci's publicly (or privately) expressed views render him "*responsible* for," *Blum*, 457 U.S. at 1004, the decision of a social media company and thus violates the First Amendment would, ironically, transform the First Amendment into a tool for muzzling routine government speech.

*   *   *

In short, Plaintiffs' attempt to impugn the character of these public servants is built on a distortion of the factual record that, ultimately, is irrelevant to their First Amendment claims. Plaintiffs fail to show any likelihood of success on the merits of their newly constructed "deception" state-action theory, which lacks any factual or legal basis. A preliminary injunction against the FBI or NIAID on this basis is unwarranted.

### 4.  Plaintiffs fail to show that any Defendant jointly participated in any particular content moderation decision.

Additionally, Plaintiffs contend that various Defendants acted as "joint participants" with, and both "conspired" and "colluded" with, social media companies, and so those companies content moderation decisions amount to state action. PI Supp. 29. As discussed below, Plaintiffs' supporting facts are unsupported by the record and otherwise do not establish the type of joint action necessary to hold the Government responsible for private conduct.

213

To meet the state action requirement via the joint action test, a plaintiff must show that "the government act[ed] jointly with the private entity." *Manhattan Cmty. Access Corp.*, 139 S. Ct. at 1928 (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941-42 (1982)). As with every other formulation of the state-action tests, the joint action inquiry "begins by identifying the specific conduct of which the plaintiff complains." *Moody*, 868 F.3d at 352 (quoting *Cornish*, 402 F.3d at 550); *Cornish*, 402 F.3d at 550 (requiring the plaintiff to "establish 'a sufficiently close nexus between the State and *the challenged action*,'"—there, the termination of the plaintiff's employment—"of the regulated entity" (quoting *Blum*, 457 U.S. at 1004)). The plaintiff must then show that, as to that particular private action, the Government "so far insinuated itself into a position of interdependence with the [private actor] that it was a joint participant in the enterprise." *Bass*, 180 F.3d at 242 (quoting *Jackson*, 419 U.S. at 357); *see also Howard Gault Co. v. Tex. Rural Legal Aid, Inc.*, 848 F.2d 544, 555 (5th Cir. 1988) (state action found where there was "heavy participation" by the government in private decisions such that the "activities of the State" and the private parties were "interlocking"). In other words, the Government must have played an "indispensab[le]" and "meaningful role in the mechanism leading to the disputed act." *Frazier v. Bd. of Trs. of Nw. Miss. Reg'l Med. Ctr.*, 765 F.2d 1278, 1287-88 (5th Cir.), *amended*, 777 F.2d 329 (5th Cir. 1985). This standard cannot be not satisfied based only on the private party's "generalized relation with the state." *Id.* at 1287. Instead, "the state" must have played an "affirmative role[] in the particular conduct underlying" the plaintiff's "grievance." *Id.* at 1286.

In addition, the plaintiff must show that the joint action flowed from an agreement between a private party and government official to achieve the "specific conduct of which the plaintiff complains." *Moody*, 868 F.3d at 352-54 ("conspiracy or joint action" tests failed where those circumstances were lacking) (citation omitted). Applying that standard here, there is no meeting

of the minds, and thus no state action, where a social media company independently applies its terms of service to moderate content on its platform. *See O'Handley*, 62 F.4th at 1156 (holding that because "Twitter acted in accordance with its own content-moderation policy when it limited other users' access to [plaintiff's] posts and ultimately suspended his account[]," Twitter "did not operate as a state actor"); *Huber v. Biden*, No. 21-CV-06580-EMC, 2022 WL 827248, at *5 (N.D. Cal. Mar. 18, 2022) (dismissing conspiracy claim between the President and Twitter where Twitter suspended plaintiff's account for violating company's terms of service), *aff'd*, 2023 WL 17818543 (9th Cir. Dec. 20, 2022); *Doe v. Google*, No. 20-cv-07502-BLF, 2021 WL 4864418, at *5 (N.D. Cal. Oct. 19, 2021) (rejecting state action claim under joint action theory because there were "no allegations that Defendants invoked state or federal procedure to bring about the suspension of Plaintiffs' accounts"), *aff'd*, 2022 WL 17077497 (9th Cir. Nov. 18, 2022). Plaintiffs cannot satisfy this "meeting of the minds" requirement by referring only to "generalized statements about working together to counteract the dissemination of election misinformation." *O'Handley v. Padilla*, 579 F Supp. 3d 1163, 1184 (N.D. Cal. 2022), *aff'd sub nom.*, *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023).

The Fifth Circuit has emphasized that the joint participation standard is not easily met. In *Howard Gault Co. v. Texas Rural Legal Aid, Inc.*, the Fifth Circuit held that a group of onion growers were functionally state actors when they pursued a lawsuit and a temporary restraining order to stop a labor strike. 848 F.2d at 555. The court found dispositive that the growers, seizing upon "deep-seated community hostility toward the strike," hired attorneys who were at the same time "criminal district attorneys" and who repeatedly acted in their official capacity to collaborate in the lawsuit with "the Attorney General of the State of Texas" and the County sheriff. *Id.* As the court explained, "[t]he interlocking activities of the State . . . and the growers constituted a joint

effort" such that the growers' conduct, "while not compelled by the state, was so 'significantly encouraged, both overtly and covertly, that the choice must in law be deemed to be that of the state." *Id.* (alterations omitted) (quoting *Blum*, 457 U.S. at 1004). The court was careful to "emphasize that the growers cannot be considered state actors merely because they invoked a state statute[;]" rather, "[i]t was the *heavy participation* of [the] state and state officials" in the growers' lawsuit that satisfied the state action requirement. *Id.* (emphasis added).

In addition, the fact that social media companies may act on a large number of posts identified by a government agency does not demonstrate that the social media companies acted "jointly" with the Government:

> That Twitter and Facebook allegedly removed 98 percent of the posts flagged by [the state] does not suggest that the companies ceded control over their content-moderation decisions to the State and thereby became the government's private enforcers. It merely shows that these private and state actors were generally aligned in their missions to limit the spread of misleading election information. Such alignment does not transform private conduct into state action.

*O'Handley*, 62 F.4th at 1156-57.

Here, as a general matter, Plaintiffs' "joint participation" theory fails because regardless of what Defendants allegedly communicated, the social media companies "retained ultimate control" over the content allowed on their platforms. *Frazier*, 765 F.2d at 1287-88. Defendants are not "indispensab[le]" to any "particular" content moderation actions, nor do they have access to the "mechanism" by which those moderation actions occur (the private platforms' internal technical systems), much less play a "meaningful role" in that mechanism. *Id.* As explained below, Plaintiffs' allegations with respect with specific Defendants fail for a number of other reasons.

    a. *Plaintiffs fail to show that, by sharing information about COVID-19, CDC or the Census Bureau jointly participated in any content moderation decision.*

Plaintiffs' allegations against CDC and the Census Bureau do not demonstrate joint participation between those agencies on the one hand, and social media companies on the other, in

the companies' content moderation decisions. *See* PI Supp. 31-33. The claims against these agencies falter at the outset because Plaintiffs fail to "identif[y] [any] *specific*" content moderation decision by a social media company in which CDC and Census were purportedly heavily involved. *Moody*, 868 F.3d at 352 (emphasis added). Rather, Plaintiffs simply recite a grab bag of past communications between various employees of social media companies and CDC (and, occasionally, employees of Census). PI Supp. 31-33 (referencing various emails and meetings between the agencies and social media company employees). But mere communications between a private company and the Government do not transform the private company into a state actor. Such a theory of state action would yield untenable results—it "would effectively cause companies to cease communicating with" government officials, including "their elected representatives[,] for fear of liability." *Doe*, 2021 WL 4864418, at *4-5 (finding that a "Twitter exchange between Rep. Schiff and YouTube CEO Susan Woj[c]icki" did not support a finding of state action). As with Plaintiffs' other overly broad conceptions of state action, this one, too, must be rejected.

Relying solely on an assortment of communications between social media companies and CDC (and sometimes Census), Plaintiffs ask the Court to infer, without evidence, that social media companies ceded "authority" to CDC and Census "to dictate what may and may not be posted on their platforms." PI Supp. 32. Yet not a single one of the challenged communications comes close to evincing that CDC (or Census) had significant involvement with—much less ultimate authority over—social media companies' content moderation decisions. Rather, the record shows that the companies "retained ultimate control" over content allowed on their platforms. *Frazier*, 765 F.2d at 287-88.

To start, contrary to Plaintiffs' assertions, the mere existence of "regular meetings" with certain social media platforms, *see* PI Supp. 31, does not suffice to show that CDC was

"indispensab[le]" to the companies' content moderation decisions, *Frazier*, 765 F.2d at 1287-88. Initially, although Plaintiffs characterize past meetings as being "about misinformation," PI Supp. 31, the record shows otherwise. As Ms. Crawford testified, regular meetings with select social media platforms for a short time in 2021 were initiated for the purpose of *promoting* CDC's understanding of information about COVID-19. Crawford Dep. 27:13-23, 181:19-182:2. Only occasionally did those meetings involve any discussions about misinformation. *Id.*; Crawford Decl. ¶¶ 5-6 (Ex. 80). And to the extent the meetings did touch on misinformation, the focus was on narratives that the companies or CDC observed circulating on platforms and the information available from CDC that would respond to those narratives. Crawford Decl. ¶ 6 (Ex. 80). But regardless of whether and to what extent meetings with social media companies involved discussions about misinformation narratives, that would not show that CDC had become so "heavily involved" in a company's decision to moderate any particular content so as to attribute that content moderation decision to CDC. *Howard Gault*, 848 F.2d at 555. At most, it shows a "generalized relation" between the companies and CDC, which falls far short of demonstrate state action. *Frazier*, 765 F.2d at 1286. *See also* Defs.' Resp. PFOF ¶¶ 435-589.

Nor does CDC's mere receipt of Facebook's CrowdTangle reports, *see* PI Supp. 31-32, show joint participation in any decision to moderate particular speech. As explained, the CrowdTangle reports provided summaries of high-engagement COVID-19 content on Facebook's platform, regardless of whether that content was considered "misinformation." *Supra* Defs.' PFOF § II.C.6.; *see also* Crawford Dep. 53:8-10 ("[CrowdTangle is] a search of content on social media, and a summary of the higher volume conversations."); Crawford Ex. 18 (Dkt. 205-19) (summary of COVID insight report that listed "news of shifting public health policies allowing people to return to work, school, and religious services" as among the most "highly engaging content").

CDC did not use the reports to "monitor" speech for the purpose of removing particular posts, contrary to Plaintiffs' unsupported assertions, *see* PI Supp. 31-32. As Ms. Crawford testified, CDC used the reports to understand the public's concerns about COVID-19 and vaccines as expressed on social media and to "improve [its own] communication materials." Crawford Dep. 53:7-12.[99] CrowdTangle is no evidence of joint participation in any particular content moderation decision. *See also* Defs.' Resp. PFOF ¶¶ 440-452, 456, 471, 472, 485, 507-510.

Further, certain social media companies' requests that CDC provide input on the science behind general claims about COVID-19 and vaccines shows no state action. According to Plaintiffs, CDC was doing more than providing input—it was "dictat[ing]" what companies could allow on their platforms. PI Supp. 32. Yet Plaintiffs cite no evidence whatsoever backing up that extravagant claim. The cited emails do not contain any discussions about specific posts and whether such posts should be permitted on the platforms. Rather, they show that Facebook asked CDC whether certain claims in the abstract (for instance that "vaccines caus[e] magnetism," Crawford Ex. 16 at 2 (Dkt. 205-17) had been "debunked" by scientific sources or were "false and can lead to harm," Crawford Ex. 17 (Dkt. 205-18)—or, as put elsewhere, were false and could lead to vaccine hesitancy, Crawford Ex. 26, at 4 (Dkt. 205-26). In response to these requests, CDC did not ask the platform to take any particular action against any particular content. Instead, CDC provided factual information, sometimes stating the claim had been "debunked," other times stating the evidence was "inconclusive," and often times pointing directly to publicly available

---

[99] Plaintiffs' contention that CDC had "privileged access to use CrowdTangle," *see* PI Supp. 32, likely refers to Facebook offering CDC the opportunity to log into the CrowdTangle platform to run its own reports about general categories of content circulating on the platform. *See* Crawford Dep. 77:9-14. Ms. Crawford did not use CrowdTangle for this purpose, but others at CDC may have. *See id.* at 50:1-4. Regardless, there is no evidence that anyone at CDC used CrowdTangle reports to collude with Facebook to remove or otherwise suppress particular posts or accounts.

and responsive information on the agency's website. *See, e.g.*, *id.* at 1; *supra* Arg. § II.C.2. Plaintiffs cite a handful of similar exchanges that CDC had with Google and Twitter. *See* PI Supp. 33. These communications reflect social media companies' independent interest in CDC's understanding of the facts, as opposed to any effort by CDC to "dictate" to the companies what content they should allow on their platforms. *See also* Defs.' Resp. PFOF ¶¶ 435-589.

Plaintiffs find evidence of joint action from the fact that Facebook occasionally informed CDC that it had "updated its policies . . . based on the CDC's input" on the above requests. PI Supp. 33. But Plaintiffs offer no evidence that CDC was given advance notice of or in any way weighed in on Facebook's decisions about whether and how to update its misinformation policies. Those decisions rested entirely with Facebook. Plaintiffs also allege that CDC was aware that, in applying its policies, Facebook may have removed posts from its platform that made "debunked" claims. Pls.' PFOF ¶¶ 523, 525. But CDC's mere awareness that, applying its own policies, Facebook might remove hypothetical posts making claims that contradict CDC's science-based information about COVID-19 and vaccines, does not show that CDC "dictated" Facebook's decision to remove such posts, or that CDC otherwise entered into an agreement with Facebook to remove those posts. Again, as Ms. Crawford testified, it was not "CDC's role . . . to determine what" companies should "do with the scientific information that [CDC] provided." Crawford Dep. 161:20-23. And Plaintiffs cite no authority in support of the surprising proposition that a government entity cannot provide information to a social media platform upon request, regardless of whether the platform might use the information to inform its content moderation decisions.

At most, the evidence shows mere "acquiescence" by CDC in the company's independent decisions to moderate content—including potentially removing content—in reliance on CDC's science-based information. The Supreme Court "has never held that [the government's] mere

acquiescence in a private action converts that action into that of the [government]." *Flagg Bros. v. Brooks*, 436 U.S. 149, 164 (1978). Making that finding here would have especially problematic implications for the functioning of government and for private conduct. It would imply that social media companies are *precluded* by the First Amendment from choosing to rely on certain types of information—solely because it comes from the Federal Government—when determining how to implement their own terms of service. In other words, finding state action based on this conduct would restrict the decisionmaking of social media companies, not subject to constitutional constraints and endowed with First Amendment rights of their own, about the content of the speech that may be carried on their platforms. By the same token, holding CDC responsible for a social media company's independent decision to rely on CDC's information would subject the agency to constitutional liability in a host of unknown circumstances outside of its control. CDC cannot predict whether and how a social media company (or any other private company) may choose to use its information (much of it publicly available on its website) in carrying out the company's own business policies. These are among the reasons that the Supreme Court has cautioned that state-action principles be construed so as to preserve the "'essential dichotomy' [] between public and private acts." *Sullivan*, 526 U.S. at 53 (quoting *Jackson*, 419 U.S. at 349).

Similarly, the two BOLO meetings held in May 2021—in which CDC (with the help of Census) discussed misinformation narratives circulating online and where to find scientific information from CDC, *supra* Defs.' PFOF § II.C.4, shows no joint participation in the companies' content moderation decisions. Plaintiffs misconstrue the record when they assert that CDC and Census provided "lists and screenshots of specific posts that [the agencies'] believe[d] should be censored." PI Supp. 32. In fact, the materials presented focused on misinformation "narratives," Crawford Decl. ¶ 14 (Ex. 80); and while some slides included social media posts as clarifying

"examples," neither CDC nor Census pressed the social media companies to "censor[]," or take any action relating to, those posts or any others. *Id.*; *see also* Defs.' Resp. PFOF ¶¶ 550-562.

Next, Plaintiffs' claim that CDC "asks platforms to provide reports about censorship," PI Supp. 31, is evidentiarily unsupported and, in any event, shows no joint participation in any content moderation decision. Plaintiffs base their allegation on a March 2021 email exchange in which Ms. Crawford asked Facebook whether it could provide more information on the "*themes*" or "*types* of COVID-19 misinfo[rmation]" that Facebook had already removed. Crawford Ex. 44 at 3 (Dkt. 205-44) (emphases added); *see also* Defs.' Resp. PFOF ¶¶ 455-458. Ms. Crawford testified that the reason for this request was to understand whether Facebook's past, independent decisions to remove certain content from its platforms would affect what CDC viewed in the CrowdTangle reports. As she explained, the CDC team responsible for creating reports on "vaccine confidence" was concerned that if only "live posts" on Facebook were reflected in CrowdTangle reports, CDC might be unaware of other areas of confusion about COVID-19 vaccines reflected in removed posts. Crawford Dep. 258:1-11. Thus, CDC's request was aimed at trying to understand the effects of Facebook's decisions, not attempting to compel Facebook to take any particular action with respect to any particular post.

Relatedly, the record lends no support to Plaintiffs' assertion that CDC inquires whether "specific content flagged by CDC and the Census Bureau has been removed," or that Census "follows up to monitor whether platforms are removing" such content. PI Supp. 31. On the contrary, the evidence shows that CDC simply sought to understand *why* Facebook had taken down certain posts. *See* Crawford Ex. 8 at 1 (Dkt. 205-9) (email from CDC asking: "Were those [posts] re-evaluated by the [Facebook] moderation team or taken down for another reason?"). Indeed, Plaintiffs' assertion that Census occasionally "check[ed]" to see whether things they might have

flagged or otherwise observed on Facebook had been removed, Crawford Dep. 117:19-21, confirms that Census did not know what action the company would take with respect to any specific content and was not "heavily involved" in the company's content moderation decisions, *Howard Gault*, 848 F.2d at 555.

Finally, Plaintiffs state that "CDC's and Census Bureau's actions constitute significant encouragement[ and] coercion," in addition to "conspiracy or collusion." PI Supp. 31. Yet Plaintiffs do not "discuss[]" any state-action theories relating to CDC conduct aside from their theory of "conspiracy or collusion." It is Plaintiffs' "obligation . . . to develop [those] arguments." *Paez v. Wal-Mart Stores, Tex., LLC*, No. EP-20-CV-00321-DCG, 2022 WL 3216343, at *2 (W.D. Tex. Aug. 9, 2022). Having failed to do so, they have waived them. *See United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010) (argument not adequately briefed is waived). In any event, there is no evidence that CDC or Census threatened adverse consequences if a social media company failed to take action concerning any particular post or account, or offered them significant incentives of encouragement to do so, as *Blum* requires. *Supra* Arg. § II.B.1-2. To the contrary, CDC never "instruct[ed]" a social media company "to do anything" with the information that was "debunked." Crawford Dep. 138:12-14. CDC never "advise[d] or help[ed]" a social media company on the "enforce[ment] or appl[ication] of [its] policies to any particular social media post." *Id.* at 105:1-19. CDC never required a social media company to take any particular action with any content the agency flagged as reflecting a misinformation theme that CDC's scientific information could address. *Id.* at 87:13-88:18. The "consequence" to any social media company for failing to take action with respect to any particular content on its platform was "[n]othing." *Id.* at 88:19-22.

In sum, none of the challenged conduct amounts to state action under any theory. Instead, the record confirms that social media platforms have exercised independent decision-making authority about whether and how to moderate content on their platforms, including content about COVID-19. Accordingly, there is no basis for attributing any decision of any social media company to CDC or Census. *See Blum*, 457 U.S. at 993. For all of these reasons, Plaintiffs are unlikely to succeed on the merits of their claims against CDC and Census.

> b. *The FBI did not participate in "censorship" by sharing information about foreign malign influence efforts or potential election-related misinformation.*

The FBI shared information with platforms regarding particular accounts or websites that FBI had with high likelihood determined to be covertly operated by hostile foreign actors, Knapp Decl. ¶¶ 10-20 (Ex. 157), and, on or near the day of an election, posts (even by domestic sources) that the agency preliminarily had found to contain falsehoods regarding the time, place, and manner of voting in the impending election, *id.* ¶¶ 21-24. When the FBI did so, contrary to Plaintiffs' contention (PI Supp. 34-36), each platform retained sole discretion over all content moderation decisions regarding the account or website at issue. The FBI shared information with "*no strings attached*," such "that the social media companies c[ould] protect their platforms *as they deem[ed] appropriate*." Chan Dep. 32:16-20 (emphasis added). The FBI "d[id] not control what" platforms would "do" with the shared information. *Id.* at 33:2. Because the private platforms never "ceded control" over those decisions to the FBI, Plaintiffs' conspiracy theory of state action as to FBI has no likelihood of success. *O'Handley*, 62 F.4th at 1156. And Plaintiffs also disregard the narrow scope and the serious import to national security and to law enforcement of the information FBI shares with platforms.

In particular, the FBI's Foreign Influence Task Force (FITF) shared information with the platforms that was (1) strategic (concerning techniques or processes through which foreign malign

actors operated), Chan Dep. 29:17-23, or (2) tactical (describing attributes, or "selectors," including IP addresses and "hash values," associated with particular social media accounts indicating their operators were foreign, such as the Russians), *id.* at 29:24-30:7, 30:10; *see* Knapp Decl. ¶¶ 10-20 (Ex. 157); *cf. United States v. Reddick*, 900 F.3d 636, 639 (5th Cir. 2018) ("hash value comparison allows law enforcement to identify" contraband "with almost absolute certainty, since hash values are specific to the makeup of a particular image's data"). Platforms would "take the information that [FBI] share[d]," and then "validate" it "*through their own means. And then if they determine[d]* that these [were] accounts being operated by Russian state-sponsored actors, then they [would] take[ ] them down." Chan Dep. 33:13-17 (emphasis added). Or, as Yoel Roth, formerly head of Twitter's content moderation personnel, testified to Congress in 2023, the "FBI was quite careful and quite consistent to request review of the accounts, but not to cross the line into advocating for Twitter to take any particular action." Ex. 10 at 16.

FITF shared information about a foreign malign actor's social media activity *not* based on the content or viewpoint expressed in a post, but rather on the determination that the account is part of a covert effort by a foreign malign actor. *See* Knapp Decl. ¶¶ 16-20. That is, FITF would "only share information" about a particular social media account when the FBI had "high confidence" that the account "is attributed to a foreign-state actor." Chan Dep. at 112:21-113:6. Put another way, FITF would only provide account-specific information after "gathering" appropriate "intelligence" and completing the declassification review. *Id.* at 111:13-112:8. Thus, when FITF "provided" platforms "with high confidence" information that particular accounts bore indications of foreign malign activity, the platforms then were "able to discover fake . . . accounts and take them down." *Id.* at 32:21-24. Hostile foreign entities often exploit such fake online personas on social media sites created via false representations of the identity or other

characteristics of the account holder, including whether the holder is a person at all rather than a "bot" or automation.[100]

In some instances, the platform's own analytical work would lead the platform to find ten accounts connected to the one account about which FITF shared information, and the platform would then "take all of them down." Platforms would only "sometimes" inform FITF "how many accounts were taken down" following FITF's sharing of information. And when FITF "ask[s] for specifics," platforms "don't necessarily tell" FITF "all the time." Chan Dep. 113:23-114:7; *see also* Defs.' Resp. PFOF ¶¶ 860, 861, 867, 873, 889, 906-909, 918, 931, 938, 939, 942.

Similarly, as part of the FBI's election integrity efforts FBI personnel, on or near the day of an election, would call platforms' attention to accounts posting disinformation about the time, place, or manner of elections in various states. *Id.* at 162:10-163:3; *see* Knapp Decl. ¶¶ 21-24 (Ex. 157). A "hypothetical example" of such a post, which "would probably be flagged," is one that asserted that "Political Party A" would "vote on Tuesday," while "Political party B" would "vote

---

[100] As then-Deputy Attorney General Rod J. Rosenstein explained: "Together, bots and networks of paid trolls operating multiple accounts allow foreign agents to quickly spread disinformation and create the false impression that it is widely accepted." Ex. 149 (Deputy Attorney General remarks of July 19, 2018); *see also* Kimmage Dep. 170:11-18, 279:17-280:4; Ex. 9 at 80 ("The spread of intentionally false information on social media is often exacerbated by automated, or 'bot' accounts."); Ex. 154 at 2 (Press Release, Fed. Bureau of Investigation, 40 Officers of China's National Police Charged in Transnational Repression Schemes Targeting U.S. Residents, (Apr. 17, 2023), 2023 WL 2968014) (describing *United States v. Yunpeng Bai, et al.* (E.D.N.Y. unsealed Apr. 17, 2023), which alleges that Chinese agents "created thousands of fake online personas on social media sites, including Twitter, to target Chinese dissidents through online harassment and threats," and "disseminated . . . government propaganda and narratives to counter the pro-democracy speech of the Chinese dissidents . . . . [Agents] created and maintained the fake social media accounts through temporary email addresses, posted official PRC government content, and interacted with other online users to avoid the appearance that [their] accounts were 'flooding' a given social media platform."); Ex. 155 at 4 (Craig Timberg, *Secret trove offers rare look into Russian cyberwar ambitions*, Wash. Post (Mar. 30, 2023)) (describing documents of Russian defense contractor about "tactics for automating the creation of massive numbers of fake social media accounts for disinformation campaigns.").

on Wednesday." Chan Dep. 265:6-10. In the election security context, the FBI operated on the understanding that it is a potential election crime for a person in the United States (not simply a foreign person) to post deliberately misleading information about the time, place, or manner of casting a ballot. *Id.* at 270:2-13; *see, e.g.*, *Anderson v. United States*, 417 U.S. 211, 225-26 (1974) (upholding 18 U.S.C. § 241 conviction for deceiving voters regarding which candidate was selected on their ballot where accused's casting of fictitious ballots "injure[d] the right of all voters in a federal election to express their choice of a candidate and to have their expressions of choice given full value and effect"); *see also United States v. Mackey*, No. 21-cr-80, Dkt. 115 (E.D.N.Y. Mar. 31, 2023) (conviction for using Twitter to assert, among other things, that supporters of particular Presidential candidate could and should vote by posting specific hashtag on Twitter or Facebook, or by texting candidate's first name to specific telephone text code); *United States v. Tobin*, No. 04-cr-216-01-sm, 2005 WL 3199672 (D.N.H. Nov. 30, 2005) (conviction for disruption of phone lines on election day).

In that regard, in 2020, the FBI San Francisco Field Office at which ASAC Chan works was responsible for relaying time/place/manner disinformation or malign-foreign-influence information to platforms. Chan Dep. 168:10-20. The FBI would convey such posts to platforms "to alert" them "to see if" the posts "violated" the platforms' "terms of service," and if the posts did so, the platforms "would *follow their own policies*, which may include taking down accounts." *Id.* at 165:9-22 (emphasis added). Platforms would sometimes inform the FBI that they had taken down the posts, while in other instances they would state that a post at issue "did not violate" platform "terms of service." *Id.* at 166:2-7; *see also* Defs.' Resp. PFOF ¶¶ 879, 925-928, 966.

In the aftermath of Russian active interference in the 2016 Presidential Election, including via social media, the Senate Select Committee on Intelligence concluded: "Information sharing

between the social media companies and law enforcement must improve, and in both directions." Consistent with that conclusion, the record shows that the FBI shared information with social media companies to counteract foreign malign influence efforts, and to raise platform awareness about posts with deliberately misleading information about the time, place, or manner of voting. But there is no evidence the FBI sought control over platform content moderation decisions, and no evidence the platforms ever ceded such control to the FBI. Plaintiffs' "joint participation" theory thus fails against the FBI.

> c. *Plaintiffs fail to establish that CISA worked jointly with social media companies to violate the First Amendment.*

Plaintiffs next contend that CISA "engages in extensive collusion with platforms on censorship" based primarily on the following activities: (1) "continuous meetings and coordination" between social media companies and CISA; and (2) CISA's "flagging [of] content for censorship," providing additional evidence of misinformation to social-media platforms, and platforms' treatment of CISA as a "privileged reporter of misinformation." PI Supp. 36-39. As discussed below, these activities neither individually nor collectively reflect any joint action depriving Plaintiffs of their constitutional rights.

▪ <u>CISA's Meetings with Social Media Companies</u>. Plaintiffs first contend that CISA's meetings with social media companies regarding general discussions of misinformation concerns support their claim of collusion. PI Supp. 37. Plaintiffs cite no authority to support the conclusion that meetings in which misinformation concerns generally were discussed—as an element of broader election-related security discussions—are sufficient to establish the requisite joint participation necessary for the Government to be responsible for private decisions, and indeed, the law is to the contrary. *See supra* at pp. 213-16.

In furtherance of its mission, CISA participated in regular meetings with social media companies about misinformation, including recurring USG-Industry meetings (and preparatory meetings in advance of these meetings); CISA Cybersecurity Advisory Committee (CSAC) quarterly meetings; CISA CSAC, Protecting Critical Infrastructure from Misinformation and Disinformation subcommittee meetings; and meetings convened by the EIS-GCC and the EI-SCC Joint Managing Mis/Disinformation Working Group. *See* Ex. 187 at 42-44. Contrary to Plaintiffs' factually unsupported claim that these meetings "provide avenues for government officials to push for censorship of disfavored viewpoints and speakers online," PI Supp. 27, Plaintiffs have failed to adduce any evidence that such alleged "push[es]" for censorship actually occurred during these meetings.

For example, the USG-Industry meetings, which began in 2018 (during the Trump Administration) and ended in 2022, included federal agency participants from CISA, DHS, the FBI, DOJ, ODNI, as well as technology company participants from Google, Facebook, Twitter, Reddit and Microsoft, and on occasion Verizon Media, Pinterest, LinkedIn, and the Wikimedia Foundation. Ex. 187 at 42-43; Scully Dep. 31:10-16.[101] CISA never flagged or reported potential disinformation for social media or technology companies during or in connection with the USG-Industry meetings. Hale Decl. ¶ 68 (Ex. 97). Rather, the topics discussed generally included information sharing around election risk, briefs from the industry, threat updates, and highlights and upcoming watch outs. Ex. 187 at 43. For example, these meetings generally involved CISA educating social media platforms on how elections function and are administered, as well as potential threats to elections. Scully Dep. 224:22-25:9. Much of the discussions at these meetings

---

[101] Plaintiffs claim that the USG-Industry meetings "have been ongoing for years and are continuing." PI Supp. 37. CISA has not participated in the USG-Industry meetings since the 2022 general election. Hale Dec. ¶ 69 (Ex. 97).

involved cyber security issues, as well as discussions about recurrent physical threats to poll workers. *Id.* at 235:11-22.

Although general concerns about misinformation and disinformation were discussed during these USG-industry meetings, they did not involve "pushes" to censor misinformation or disinformation, either in general or regarding specific individuals, posts, or accounts. *Id.* at 39:12-25. For example, CISA often reported on election infrastructure security, key election timelines, and publications designed to promote resilience to disinformation, such as a general disinformation resilience guide highlighting examples of the tactics use by foreign disinformation actors and outlining proactive measures to mitigate the effectiveness of such tactics entitled the Tactics of Disinformation. *Id.* at 39:12-18; Hale Decl. ¶ 68 (Ex. 97). Other agencies, including DOJ, FBI, ODNI, and DHS, would participate and provide unclassified, high-level reviews or strategic intelligence briefings. Scully Dep. 25:10-23. Members of the intelligence community discussed malign foreign actors who potentially were going to launch disinformation operations. *Id.* at 39:19-25. Industry participants would share high-level trend information from public reporting they had released. *Id.* at 40:2-41:15. In short, Plaintiffs have failed to provide any evidence that CISA or other federal agencies colluded with social media platforms during these meetings to deprive anyone of their constitutional rights, much less the rights of Plaintiffs. *See also* Defs.' Resp. PFOF ¶¶ 861, 866, 978-990.

Similarly, the CISA CSCAC Committee quarterly meeting agenda and summaries, as well as participants, are all available on-line, Ex. 121, and contrary to Plaintiffs' contention, a review of those materials fails to reflect any collusion between CISA and social media companies to deprive Plaintiffs (or anyone) of their constitutional rights through the removal of or other action against specific social media content. Instead, these materials reflect discussions concerning the

creation of a new, congressionally-mandated advisory committee; how CISA can better accomplish its mission of promoting the security and resilience of critical infrastructure such as by refining the national effort to identify and prioritize the most critical entities and infrastructure; improving efforts to strengthen the nation's cyber workforce; and enhancing public-private communication and collaboration in preventing and responding to cybersecurity incidents. *Id.*

In addition, the CSAC Protecting Critical Infrastructure from Misinformation and Disinformation Subcommittee (Subcommittee), which was directed to stand down in December 2022 because it had completed its taskings and provided its recommendations to CISA, did not involve any joint action by CISA and social media companies to remove or take any action concerning any social media content. *See* Ex. 187 at 43; Ex. 122 at 9 (stating that the MDM Subcommittee did not participate in, or recommend for others to participate in, any activities related to social media platform moderation or other activities that could be construed, even broadly, as "censorship"). Rather, CISA had established the Subcommittee for the purpose of evaluating and providing recommendations on potentially effective critical infrastructure-related counter-MDM efforts that fit within CISA's unique capabilities and mission. Ex. 123 at 1. Like the CSAC Committee, the Subcommittee operated transparently, and further details about the Subcommittee, its membership, and reports and recommendations, are posted on CISA's website, *Id.*; and Ex. 119. Specifically, the Subcommittee recommended that CISA take actions such as "shar[ing] up to date 'best practices' around how to proactively address and counter MDM based on the most recent research[,]" "[s]har[ing] information with state and local election officials[,]" and "[p]rotect[ing] the courts" from being the target of "an intensified campaign to undermine public trust in the legitimacy of their processes." Ex. 124 at 1-3. Nothing in these materials reflects an attempt by CISA to "push" social media companies to censor mis- or disinformation or reflects

a conspiracy or collusion to deprive Plaintiffs—or anyone, for that matter—of their constitutional rights.

Finally, the EIS-GCC EI-SCC Joint MDM Working Group (Working Group), which was launched after the 2020 election, provides a forum through which the Election Infrastructure subsector could identify challenges in countering MDM and produce resources for addressing these challenges. *See* Ex. 187 at 44. CISA supports the Working Group by providing administrative and substantive support, such as facilitating meetings and helping to draft working group products. Hale Decl. ¶ 41 (Ex. 97). As noted above, the Louisiana Secretary of State oversaw the management and activity of the Working Group from the summer of 2021 to the summer of 2022. *Id.* ¶ 31.[102] To date, the Working Group has published two guides to help state and local election officials and industry providers prepare for and respond to risks of disinformation. *Id.* ¶ 40.[103] The Working Group does not engage with social media companies, and it does not flag or report potential disinformation to social media or technology companies. *Id.* ¶ 43. Again, Plaintiffs have failed to adduce any evidence that these meetings involved federal agencies attempting to conspire or collude with social media companies to act on misinformation on their platforms, let alone a

[102] The Louisiana Secretary of State has been a member of the EIS-GCC since May 2019, and while serving as the NASS President from the summer of 2021 to 2022 served as an EIS-GCC Executive Committee member. Hale Decl. ¶ 31 (Ex. 97). In this capacity, Louisiana received regular briefings (usually every two weeks) on CISA's election security efforts, including briefings on CISA's disinformation resilience work, and engaged in security planning activities for the Election Infrastructure Subsector. *Id.* In addition, the Missouri Secretary of State served as an alternative member of the EIS-GCC from 2018-2019 and attended the EIS-GCC biannual meetings and actively participated in briefings on the Election Infrastructure Subsector's security and resilience efforts. *Id.* at ¶ 32.

[103] These publications include (1) the Rumor Control Page Start-Up Guide, which is designed for use by state, local, tribal and territorial government officials and private sector partners seeking to dispel inaccurate election security-related information by sharing accurate information; and (2) the MDM Planning and Incident Response Guide for Election Officials, which is designed for SLTT election officials and to help them understand, prepare for, and respond to disinformation that may impact the ability to securely conduct elections. Hale Decl. ¶ 40 (Ex. 97).

conspiracy to deprive Plaintiffs of their constitutional rights. *See also* Defs.' Resp. PFOF ¶¶ 1011, 1235.

In short, like the allegations rejected by the Ninth Circuit in *O'Handley*, Plaintiffs' "allegations establish, at most, a meeting of the minds to promptly address election misinformation, not a meeting of the minds to violate constitutional rights." 62 F.4th at 1159.

▪ CISA's Switchboarding Activities During the 2020 Election Cycle. Plaintiffs next claim that CISA's conveyance of potential misinformation identified by state and local election officials—including officials from Plaintiffs Missouri and Louisiana, and membership associations in which officials from Missouri and Louisiana are members[104]—to social media companies during the 2020 election cycle evinces a conspiracy to deprive Plaintiffs of their constitutional rights. PI Supp. 37-38. But this also fails to show that CISA was a joint participant in any content moderation action.

As discussed above, during the 2020 election cycle, CISA performed "switchboarding" work on behalf of state and local election officials. Scully Dep. 16:16-25. Switchboarding involved state and local election officials identifying for CISA information on social media that they believed constituted election-related misinformation, and CISA forwarding that information to social media companies for their informational awareness. *Id.* at 17:1-14; 23:19-24:2. Social media companies would then make independent decisions on the content that CISA forwarded to them based on the companies' policies. *Id.* at 17:15-21.

---

[104] *See, e.g.*, Ex. 100; Ex. 101; Ex. 102; Ex. 103; Ex. 104; Ex. 105 and Hale Decl. ¶¶ 33, 70 (Ex. 97) (explaining that officials in Plaintiff States Missouri and Louisiana were among those who transmitted election security-related disinformation to CISA or CIS for the purpose of it being shared with the social media companies, that Louisiana is a member of NASS, and both Louisiana and Missouri are members of NASED).

When CISA set up its switchboarding function it met with social media companies and reaffirmed its "position that [CISA] would never ask them to take any specific actions, [and] that they should make decisions based on their terms of service." *Id.* at 241:23-242:5. Accordingly, when CISA transmitted potential misinformation identified by state and local election officials to social media companies, CISA's protocol was to include a notice stating that it was not requesting that the company take any particular action. *See, e.g.,* Ex. 106; Hale Decl. ¶ 72 (Ex. 97).

On occasion, at the request of election officials, CISA would ask social media companies to report back on how, if at all, they had addressed misinformation CISA flagged for the companies. Scully Dep. 163:17-164:17. Over time, however, the companies would report directly to the election officials about what actions, if any, they took concerning potential misinformation. *Id.* at 164:8-25.

Normally, CISA would receive a note from a social media company acknowledging that they received CISA's email, but CISA often did not receive any kind of notification from a social media company regarding what decision it made concerning potential misinformation. *Id.* at 177:7-178:8. If a social media company needed additional information from an election official in order to make a decision about whether content violated its terms of service, CISA would try to support that effort. *Id.* at 219:25-220:13. For example, if state or local officials had made a public statement about potential misinformation, or could provide additional information about it, and a social media company asked for it, CISA would try to obtain that information for the company. *Id.* at 219:25-220:20.

The record in this case makes clear that social media companies made independent judgments in applying their content moderation polices to information that CISA "switchboarded" to them, and Plaintiffs concede as much. *See* Pls.' PFOF ¶ 973 (quoting Brian Scully's deposition

testimony that "the idea was that [the social media companies] would make decisions on the content that was forwarded to them based on their policies."). For example, when CISA passed along information for social media companies' awareness, the companies at times concluded that certain posts did not violate their content moderation policies and therefore determined that no action would be taken. *See, e.g.,* Ex. 105 at 1 (email from Twitter concluding that "Tweet was not determined to be a violation of our rule"); Ex. 107 at 1 (email from Twitter concluding that certain tweets violated its terms of service while others did not); Ex. 108 at 1 (email from Twitter stating "[t]weet was not in violation of our Civic Integrity Policy"); Ex. 109 at 1 (email from Twitter stating that the "Tweets to not be in violation of our policies" and that Twitter would "not take action on these Tweets"); Ex. 110 at 1 (email from Twitter stating "internal review of account data indicates [the account] is not suspicious"); Ex. 111 at 1 (email from Twitter stating "this tweet was not determined to violate our civic integrity policy"). *See also* Defs.' Resp. PFOF ¶¶ 1076-1082.

Despite Plaintiffs' voluminous preliminary injunction filings, nowhere do they identify facts supporting the notion that the social media companies failed to exercise their independent judgment in applying their content moderation policies. This is fatal to their claim of conspiracy. *See O'Handley*, 62 F.4th at 1158 ("The First Amendment does not interfere with this communication [between the Government and social media companies] so long as the intermediary is free to disagree with the government and to make its own independent judgment about whether to comply with the government's request.").

Furthermore, Plaintiffs fail to explain why CISA's willingness to provide social media companies with additional context about misinformation identified by state and local governments reflects a "meeting of the minds" to deprive Plaintiffs of their constitutional rights. PI Supp. 39. Nothing about these activities negates the fact that social media companies independently applied

their content moderation policies in determining what action, if any, to take regarding potential misinformation.[105]

    d.   *Plaintiffs fail to identify joint action by the Global Engagement Center and social media companies to remove any social media content.*

Plaintiffs also devote a paragraph of their brief to their claim that the State Department's Global Engagement Center (GEC) "colludes with social-media platforms on censorship," solely because it meets with social media companies about disinformation, including with the platforms' content moderation officials. PI Supp. 39-40.

But this too does not establish the type of "joint action" necessary to attribute private conduct to the Government. For example, the GEC's Technology Engagement Team (TET) meets with social media companies and exchanges information concerning the propaganda and disinformation tools and techniques used by the United States' adversaries. Kimmage Dep. 29:14-30:14. These meetings rarely include discussions about specific content posted on social media because the meetings are at a higher, more conceptual level about what foreign actors are doing, rather than specific content. *Id.* at 30:20-31:3.[106]

---

[105] In a last-ditch effort to establish a conspiracy between CISA and social media companies Plaintiffs make two final arguments. First, they note that early in the 2022 election cycle a CISA employee asked social media companies to develop a one-page document that state and local election officials could use to help explain the social media companies' content moderation policies and how to report misinformation to the companies. PI Supp. 39. Second, Plaintiffs note that CISA runs an "operation center" on election day that engages in reporting misinformation to social media platforms. *Id.* Once again, Plaintiffs fail to explain how these activities reflect a deprivation of Plaintiffs' constitutional rights. In addition, nothing about these activities undermines the fact that social media companies independently apply their content moderation policies when potential misinformation was brought to their attention.

[106] Plaintiffs also claim that the fact that the GEC briefly had a liaison in Silicon Valley to connect with social media platforms is evidence of collusion. PI Supp. 39. Not so. For a time, the GEC had a location in Silicon Valley where one individual, Defendant Sam Stewart, was stationed. Kimmage Dep. 153:7-154:21. The purpose of the Silicon Valley location was to facilitate public/private coordination and broker constructive engagements between the Government and the technology sector, including social media companies, academia and research. *Id.* at 155:5-21. Mr.

Similarly, the GEC front office also engages with social media companies, primarily to build relationships with those companies to facilitate better communications at the working level. *Id.* at 31:12-20. The GEC did not flag specific content for social media companies during these meetings and did not give the companies any directives. *Id.* at 34:13-36:5. The GEC's purpose in advising social media companies about disinformation campaigns was not to influence social media companies' internal decisions regarding content, but to deepen their understanding of the actions of malign actors seeking to harm the national security, in line with the GEC's congressional mandate. *Id.* at 36:6-37:7. The GEC simply shared lessons learned, information about propaganda and disinformation techniques, and the campaigns and narratives of foreign propaganda and disinformation actors. *Id.* at 273:12-24. Sharing information can help social media companies identify coordinated inauthentic activity or to understand what these actors are trying to achieve, as well as to understand the types of narratives they are promoting. *Id.* at 279:17-280:4. Providing this information to social media companies is the first step in social media companies' ability to address foreign propaganda on their sites, as "[s]olving a problem has to start with understanding the problem." *Id.* at 280:9-281:3.

However, the GEC does not engage in any activities with the intention of proposing to social media companies that certain content should not be posted on their platforms. *Id.* at 37:16-25. Indeed, "[t]he Global Engagement Center does not tee up actions for social media companies

---

Stewart had conversations with social media companies in which the GEC shared information related to its mission to counter foreign propaganda and disinformation. *Id.* at 155:22-156:11. The social media companies also educated the GEC based on what sorts of propaganda and disinformation they were observing on their platforms. *Id.* at 157:11-23. Mr. Stewart no longer works for the GEC, and no one from the GEC is currently working from the Silicon Valley location. *Id.* at 154:14-21, 272:17-25. Plaintiffs have failed to identify anything collusive about these meetings.

to take," and it "does not seek to influence the decisions of the social media companies."[107] *Id.* at 38:2-3, 283:9-22. Nor does the GEC seek to provide information that might inform or influence social media companies' decisions concerning the moderation of specific content. Kimmage Dep. 38:1-11; Bray Decl. ¶ 16 (Ex. 142) (stating that the GEC's practice is not to request social media companies take any specific actions when sharing information with them).[108] Rather, whatever actions social media companies may take after receiving information from the GEC is left completely up to those companies. Kimmage Dep. at 273:12-274:8. *See also* Defs.' Resp. PFOF ¶¶ 1123-1134.

In short, as with CISA, at most Plaintiffs have established that the GEC and social media companies were "generally aligned in their mission to limit the spread of misleading election

---

[107] In 2018, the GEC flagged a specific post for social media companies, and this involved the safety of State Department personnel. In this incident, a colleague of Mr. Kimmage, who was the then-Acting Coordinator of the GEC, informed him about a security situation in a Middle Eastern country where protestors were using a social media platform to communicate in ways that raised urgent security concerns, and the State Department was concerned for the safety of its personnel. Kimmage Dep. 38:12-39:25; Bray Decl. ¶ 17 (Ex. 142). Mr. Kimmage communicated directly with the social media platform and informed it that this was an ongoing concern. Kimmage Dep. 38:12-39:25. Mr. Kimmage was "very specific" in his interaction with the social media company that this was a real time situation where the State Department believed its personnel were at risk and asked the company to review the activity on these accounts to decide whether this content violated its terms of service. *Id.* at 38:12-39:25. Mr. Kimmage did not ask for anything to be removed from the sites, but he did express security concerns about the safety of State Department personnel. *Id.* at 38:12-39:25. These posts were from foreign actors. *Id.* at 40:1-3. Mr. Kimmage is unaware of what action, if any, social media companies took in response to his identification of this issue, because they did not report back to him. *Id.* at 40:4-7.

[108] When asked at his deposition about any efforts by the GEC to influence social media companies' content moderation decisions, Daniel Kimmage, the acting GEC coordinator and principal deputy coordinator from 2017 until June 2021, stated that he never had a conversation with social media companies where he encouraged them to speed up the removal of posts. Kimmage Dep. 42:12-20, 47:16-20. Mr. Kimmage further testified that he is unaware of instances where someone at the GEC may have gone through a third party on the understanding that the party would convey a concern about content on a social media platform with a social media company. *Id.* at 55:20-56:8. Plaintiffs have failed to identify any evidence to the contrary.

238

information." *O'Handley*, 62 F.4th at 1157. But such alignment falls far short of establishing that the GEC acted jointly with social media companies in acting against any particular content.

      e. *No "joint action" transformed the private conduct of the Election Integrity Partnership or the Virality Project into state action attributable to Defendants.*

Plaintiffs next contend that "social-media companies work hand-in-glove with Defendants and their partners in state and local government, the Election Integrity Partnership, and the Virality Project to censor speech expressing viewpoints that Defendants disfavor." PI Supp. 42. More specifically, Plaintiffs allege that certain Defendants are responsible for certain (unspecified) content moderation decisions made by social media companies due to two separate layers of alleged "joint participation": (1) those Defendants allegedly worked jointly with the Election Integrity Partnership (EIP) and the Virality Project (VP) such that the EIP and the VP are state actors; and (2) the EIP and VP in turn worked jointly with social media companies to supposedly target certain content such that the social media companies are state actors.[109] *Id.* Plaintiffs are

---

[109] Plaintiffs contend that the EIP and VP acted as arms of the Federal Government due to the alleged level of involvement in the activities of those private organizations by CISA, the GEC, and the EI-ISAC. Plaintiffs claim that the EI-ISAC is a "government agency," apparently because it receives funding from CISA. PI Supp. 42 (referring to the "CISA-funded EI-ISAC" as a "government agency"). Plaintiffs provide no legal or factual basis for its claim that the EI-ISAC is a government agency. As noted *supra*, at 73, the EI-ISAC is a voluntary organization managed by CIS with membership open to all state, local, tribal, and territorial organizations that support election officials. Hale Decl. ¶ 48 (Ex. 97). Plaintiffs cite no legal support for the proposition that the receipt of federal funding converts a private entity into an arm of the Federal Government. Indeed, Fifth Circuit precedent is to the contrary. *Fairley v. PM Mgmt.-San Antonio AL, LLC*, 724 F. App'x. 343, 344 (5th Cir. 2018) (affirming dismissal of section 1983 claim where plaintiff contended that nursing home's receipt of federal funds converted the nursing home into a state actor). Moreover, the EI-ISAC is overseen by CIS, a non-profit organization, rather than the Federal Government. Scully Dep. 59:9-60-17; Hale Decl. ¶ 44 (Ex. 97). CISA did not fund CIS or the EI-ISAC for any of the work they provided in relation to the reporting of potential election security-related disinformation to social media or technology companies during the 2020 election cycle. *Id.* ¶¶ 50-51. Accordingly, any suggestion that the EI-ISAC is a Federal Government agency, or that its work can be imputed to CISA, lacks merit.

incorrect both as a matter of fact and as a matter of law, and they fail to establish a likelihood of success based on this state-action theory.

        i.      <u>EIP</u>

Plaintiffs contend that the EIP is pervasively entwined with CISA and the GEC such that the EIP is a state actor. PI Supp. 45. Plaintiffs are incorrect. To start, Plaintiffs mischaracterize the EIP. The EIP is a private partnership formed in 2020 that included the Stanford Internet Observatory, the University of Washington, Graphika, and the Atlantic Council's Digital Forensic Research Lab to better understand the information environment around elections. *See* Scully Ex. 1 at vi (Dkt. 209-2). The EIP's "primary goals were to: (1) identify mis- and disinformation before they went viral and during viral outbreaks; (2) share clear and accurate counter-messaging; and (3) document the specific misinformation actors, transmission pathways, narrative evolutions, and information infrastructures that enabled these narratives to propagate." *Id*. Among other actions, the EIP developed a "ticketing" system by which trusted external stakeholders and internal EIP analysts could flag misinformation that EIP would then analyze and, depending on the nature of the information, could flag for social media companies for their awareness. *Id.* at 8-10; 18-19.

The record reflects that several Stanford University students who interned at CISA and worked on election security matters came up with the idea for the EIP. *Id.* at 2; Hale Decl. ¶ 53 (Ex. 97). Based on lessons learned from the 2018 election, CISA personnel discussed with the interns a gap that existed in the resources of state and local election officials to identify misinformation that targeted their jurisdictions. Scully Dep. 84:10-22; Hale Decl. ¶ 53 (Ex. 97). Some of the Stanford students who interned at CISA independently made a presentation about this lack of resources to the Stanford Internet Observatory. Hale Decl. ¶ 54 (Ex. 97). Subsequently, CISA personnel had a conversation with Alex Stamos, who worked for the Stanford Internet

Observatory, one of the four organizations that comprised the EIP, and confirmed the existence of the gap in state and local resources. Scully Dep. 86:22-87:9; Hale Decl. ¶ 54 (Ex. 97). The Stanford Internet Observatory thereafter launched the EIP. Hale Decl. ¶ 55 (Ex. 97). CISA personnel's provision of feedback to interns about a gap in state and local election official resources and confirmation of that feedback to Mr. Stamos does not render the EIP a government body.

Furthermore, Plaintiffs do not provide any evidence that CISA or the GEC were entwined in the management or control of the EIP. Rather, Plaintiffs claim only that (1) CISA and the GEC were "major stakeholders" of the EIP; (2) CISA and the GEC provided information into EIP's "Intake Queue"; (3) the EIP receives some funding from a grant from the National Science Foundation and from Federal funding for the Atlantic Council (rather than from CISA or the GEC); and (4) "numerous current and former CISA personnel also have or had roles in the EIP." PI Supp. 42, 44.

Even assuming Plaintiffs were factually correct about each of these activities, which they are not, they have identified no legal authority to support the proposition that this minimal level of involvement rises to the level of management or control of the EIP. As an initial matter, CISA did not found, fund, or otherwise have any role in the management or operation of the EIP. Hale Decl. ¶¶ 52, 56-57 (Ex. 97); Ex. 122 at 7 ("CISA did not found, fund, or otherwise control the EIP."). Moreover, Plaintiffs overstate—and in some cases misstate—the evidence. For example, Plaintiffs contend that CISA and the GEC provided information to the EIP's "Intake Queue" for flagging misinformation for social media companies. But as Mr. Scully explained during his deposition, CISA generally did not share information with EIP, and CISA did not provide tickets flagging potential misinformation for the EIP. Scully Dep. 73:25-74:2; 106:3-9; *see* Scully Ex. 1 at 38 (Dkt. 209-2) (reflecting organizations that tagged alleged misinformation and not including CISA); Ex.

125 at 2 ("CISA did not send any examples of potential misinformation to EIP" and "EIP did not send any reports of false rumors or disinformation to social media companies on behalf of [DHS] or [CISA]."); Ex. 122 (stating that CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA); Ex. 74 (stating that EIP did not receive requests from CISA to eliminate or censor tweets).

And with respect to the GEC, during the 2020 election cycle, the GEC discovered certain posts and narratives on social media and digital media that originated from, were amplified by, or likely to be amplified by foreign malign influence actors—like Russia, the People's Republic of China, Iran, and their proxies—that sought to spread propaganda or disinformation about the 2020 election. *See* Bray Decl. ¶ 18 (Ex. 142). The GEC flagged these posts and narratives for the EIP on approximately 21 occasions. *Id.* Plaintiffs fail to explain how the GEC's limited submission of tickets to the EIP concerning foreign malign influence actors transforms the EIP into a state actor.

Furthermore, Plaintiffs fail to explain how funding by entities other than CISA or the GEC, such as a grant from the National Science Foundation and some Federal funding received through the Atlantic Council, reflects substantial entwinement in the EIP by CISA or the GEC. Many entities, such as universities, receive Federal funding and also engage in content moderation (for example, of student and faculty publications), and there is no basis for suggesting that the Federal government somehow becomes responsible for that content moderation under the First Amendment.

Finally, Plaintiffs substantially overstate the extent and relevance of the "roles" that certain CISA personnel have played at the EIP, and vice versa. Plaintiffs contend that "[n]umerous current and former CISA personnel also have or had roles in the EIP," and that "key EIP personnel such as Alex Stamos, Renee DiResta, and Kate Starbird also have formal roles in CISA." PI Supp. 44.

That is an overstatement, at best. First, Plaintiffs rely upon the EIP report's acknowledgement of contributions to the report by Alex Stamos, Renee DiResta, Kate Starbird, Pierce Lowary, Alex Zaheer, and Matthew Masterson, in claiming that CISA was "pervasively entwined" with the EIP. *See* Pls.' PFOF ¶ 1163. As explained in Defendants' response to Plaintiffs' proposed findings of fact, Messrs. Lowary and Zaheer's contributions to the EIP report were in their roles at the Stanford Internet Observatory, and Mr. Masterson, a former CISA employee, was simply thanked by the EIP for his "additional feedback." *See* Defs.' Resp. to Pls.' PFOF ¶ 1163 (citing Scully Ex. 1 at 16 (xii) (Dkt. 209-2)).[110] Second, the "formal roles" Mr. Stamos and Ms. Starbird supposedly had at CISA were as members of CISA's Cybersecurity Advisory Committee, an "independent advisory body" established in June 2021—after the 2020 election—that provides advice, consultation and recommendations to CISA on "the development, refinement, and implementation of policies, programs, and training pertaining to CISA's cybersecurity mission." *See* Ex. 119, at 1. And Plaintiffs identify no involvement of Ms. DiResta with CISA apart from a lecture she gave during a 2021 conference hosted by CISA. *See* Pls.' PFOF ¶ 1171 (citing Cybersecurity Summit 2021: Responding to Mis, Dis, and Malinformation, YouTube (Oct. 27, 2021)). In short, Plaintiffs have failed to establish that CISA or the GEC were entwined in the management or control of the EIP.

At bottom, Plaintiffs have failed to identify any factual or legal basis to establish that CISA or the GEC's involvement with the EIP transformed the EIP into a state actor for purposes of the First Amendment. Plaintiffs accordingly cannot establish a substantial likelihood of success on this First Amendment theory. *See also* Defs.' Resp. PFOF ¶¶ 1136-1235.

---

[110] In addition, Mr. Stamos, Ms. DiRestra, Mr. Lowary, and Mr. Zaheer contributed to the EIP report in their capacity as "students, staff, and researchers" for the Stanford Internet Observatory, and Ms. Starbird contributed to the report in her capacity as an employee of the University of Washington Center for an Informed Public. Defs.' Resp. to Pls.' PFOF ¶ 1163.

ii.   The Virality Project

Plaintiffs next claim that "[f]ederal officials are pervasively entwined with the Virality Project." PI Supp. 50. Plaintiffs argue that this entwinement between the Virality Project and OSG is established by the following six facts: (1) OSG "pushes platforms to share information with the Virality Project"; (2) OSG coordinated with the Virality Project on the Surgeon General's Health Advisory; (3) the Surgeon General "repeatedly echoes the key messaging from the Virality Project"; (4) the Surgeon General launched his Health Advisory on Misinformation at an event hosted by the Stanford Internet Observatory, which is one of the groups that leads the Virality Project; (5) the Virality Project had "strong ties with several federal government agencies," including OSG, and was involved in "flagging vaccine-related content on social media"; and (6) OSG "incorporated [the Virality Project's] research and perspectives into its own vaccine misinformation strategy." *Id.* None of these actions, either individual or collectively, establishes sufficient entwinement between OSG and the Virality Project to convert the private conduct of the Virality Project into state action. And as discussed *infra*, Plaintiffs have failed to establish certain of these alleged "entwinements" to begin with.

First, Plaintiffs have provided no evidence that OSG "pushes platforms to share information with the Virality Project." PI Supp. 50. In support of this claim, Plaintiffs cite a portion of the deposition of Eric Waldo, a former senior advisor to the Surgeon General, where he discussed a conversation the Surgeon General had with an employee of Facebook. During this conversation, the Surgeon General raised the possibility of having external researchers validate the extent to which misinformation spreads on social media platforms. *Id.* at 50 (citing Waldo Dep. 35:20-26:2). But nowhere in this discussion does Mr. Waldo suggest that the Surgeon General asked Facebook to share information with the Virality Project (or any specific individual or entity),

244

much less that he "pushed" Facebook to do so. There is no evidence that the Virality Project was even mentioned in that conversation; Mr. Waldo, in fact, testified that he had never heard of the Virality Project. Waldo Dep. 207:10-21. (Plaintiffs also fail to explain what a request for Facebook to share information with the Virality Project would have had to do with "censoring" speech on Facebook.)

Second, Plaintiffs' claim that the Surgeon General "coordinated" with the Virality Project on his Health Advisory also is unsupported by the record. For example, Mr. Waldo stated that he did not know who was consulted in the development of the Surgeon General's Health Advisory because that work predated his time in the office. Waldo Dep. 37:13-22. Mr. Waldo explained that OSG coordinated the launch of the Health Advisory with Renee DiResta, who worked for the Stanford Internet Observatory. *Id.* at 37:23-38:8. And while the Stanford Internet Observatory was one of the founders of the Virality Project, Plaintiffs put forward no evidence that Ms. DiResta participated in the rollout of the Health Advisory as part of her work for the Virality Project rather than the Stanford Internet Observatory. *See* Waldo Dep. 283:2-18 (stating he was unaware of any involvement by OSG with the Virality Project but was aware that it had involvement with the Stanford Internet Observatory concerning the announcement of the Health Advisory); Lesko Decl. ¶ 15 (Ex. 63) (stating that OSG did not understand the launch of the Health Advisory to be a Virality Project event).

Third, there is no evidence that OSG "echo[ed] the key messaging from the Virality Project." PI Supp. 50. The Virality Project's final report (released in February 2022) postdated many—if not most—of the Surgeon General's public and private statements on health misinformation that are included in the record, including the Health Misinformation Advisory (released in July 2021). There is no evidence that the Surgeon General was even aware of the

Virality Project's "key messaging." The fact that OSG and the Virality Project shared a view that misinformation related to COVID-19 could potentially be harmful—a view that is widely held, including by 132 countries' governments, *see supra* at 13-14—is not evidence of entwinement of any kind.

Fourth, Plaintiffs have failed to produce any evidence that OSG "flagg[ed] vaccine-related content on social media" to the Virality Project. *See* PI Supp. 50. The only support Plaintiffs identify for this claim is a sentence in a Virality Project report that states: "The Virality Project built strong ties with several federal government agencies, most notably [OSG] and the CDC, to facilitate bidirectional situational awareness around emerging narratives." *See* Scully Ex. 2 at 17 (Dkt. 209-3) (Virality Project Report). Plaintiffs provide no basis to equate facilitation of "bidirectional situational awareness around emerging narratives" with "flagging" "vaccine-related content on social media." To the contrary, the record shows that OSG never provided any "tips, flags, tickets, reports, or other form of notification or input to the Virality Project concerning posts or accounts on social media." Lesko Decl. ¶ 16 (Ex. 63).

More fundamentally, even if Plaintiffs could establish each of these facts, which they cannot, Plaintiffs have identified no evidence that OSG exercised any management or control of the Virality Project, so as to convert its activities into state action. *See Brentwood Acad.*, 531 U.S. at 295. Finally, Plaintiffs do not even attempt to argue that the Virality Project failed to utilize its own independent judgment in conducting its work, or that social media companies that received information from the Virality Project failed to do the same. *See Pikaluk v. Horseshow Ent., L.P.*, 810 F. App'x 243, 247 (5th Cir. 2020).

Accordingly, Plaintiffs have failed to establish a likelihood of success in establishing that the activities of the Virality Project constitute state action attributable to Defendants. *See also* Defs.' Resp. PFOF ¶¶ 1236-1365.

\* \* \* \*

Neither the EIP nor the Virality Project is a state actor, and even if Plaintiffs could establish that they are, Plaintiffs have not shown that their actions, in turn, converted the content moderation decisions of any social media company into state action. That is to say, Plaintiffs do not provide any evidence that either of these organizations threatened or pressured any social media company to take action of any kind against particular content, or speakers, when flagging potential misinformation for the companies to independently evaluate under their terms of service.[111] Nor is there any evidence that any social media company regarded (or acted on) communications from the EIP, or the Virality Project, as threats or pressure to "censor" speech. Rather, the evidence is clear that both the EIP and the Virality Project simply flagged information for social media companies so that those companies could apply their independent judgment to determine whether the information violated their terms of service—terms to which all users agree. *See* Waldo Ex. 28 at 17 (Dkt. 210-3) ("Six social media platforms engaged with [Virality Project] tickets— acknowledging content flagged for review and acting on it in accordance with their policies"); Ex. 74 (noting that Twitter "examined any reports sent to it by the Virality Project to determine if the content was violating of its policies and did not take action in cases where Twitter felt its existing policies were not violated"); Scully Ex. 1 at 17 (Dkt. 209-2) ("The EIP established relationships with social media platforms to facilitate flagging of incidents for evaluation when content or

---

[111] Indeed, Plaintiffs' misguided coercion theory is particularly inapt with respect to the EIP, as its activities began before the current Administration.

behavior appeared to violate platform policies[].”); Ex. 125 at 3 (“Social-media platforms, not EIP,

decided which action to take.”); Ex. 74 (stating that the EIP provided public factual findings to

social media platforms, but had no control over content moderation, censorship, or labeling posts);

Ex. 122 (stating that EIP’s “researchers made independent decisions about what to pass on to

platforms, just as the platforms made their own decisions about what to do with our tips”).

       Reflective of the fact that social media companies independently applied their terms of

service when they received tips about potential misinformation from these organizations, the EIP

reported that only 35% of the time potential misinformation was shared with companies was the

misinformation “labeled, removed, or soft blocked.” Scully Ex. 1 at 27, 40 (Dkt. 209-2) (“No

action was taken on 65%.”).

       Here, Plaintiffs’ claims of state action are even weaker than the ones rejected in *O’Handley*,

discussed *supra* at 214-16. Neither the EIP nor the Virality Project possesses any regulatory

authority—indeed, they are private actors. There is no evidence that either the EIP or the Virality

Project threatened or pressured social media companies when identifying potential misinformation

for their consideration. Rather, the evidence reflects that the EIP and the Virality Project simply

flagged misinformation for social media companies, and those companies then independently

applied their terms of service. Plaintiffs cannot establish state action implicating the First

Amendment under these circumstances.

      f.  *Social media companies’ voluntary consultation with agencies for scientific
and medical information about COVID-19 does not support a state action
finding relating to “other agencies.”*

       Finally, Plaintiffs attempt to bring “other agencies” within the reach of their capacious

joint-action theory through a series of meritless arguments that turn on mischaracterizations of the

evidence. *See* PI Supp. 40-41. First, Plaintiffs posit that social media companies “routinely treat

certain federal agencies, and “CDC in particular,” as fact-checkers having “authority to dictate”

what appears on their platforms. *Id.* at 40. As explained above, Arg. § II.B.4.a., that extravagant assertion lacks any evidentiary basis. As support, Plaintiffs point to Facebook's requests for views about COVID-19 and vaccines from various agencies, including CDC and NIAID, when Facebook was assessing the validity of factual claims circulating on its platform. PI Br. at 40. But Plaintiffs point to no precedent teaching that Facebook's (or any other company's) voluntary choice to seek advice regarding available scientific and medical information about the virus and the vaccines can support a state action finding. And the cited correspondence does not indicate that, in voluntarily electing to treat the agencies as reliable sources of scientific information—even as "privileged" sources, as Plaintiffs put it—any company somehow surrendered its "plenary power to reexamine" agencies' views, and "to reject them" when determining whether certain claims constituted "misinformation." *Cf. Nat'l Collegiate Athletic Ass'n*, 488 U.S. at 194-95 (distinguishing *Bates v. State Bar of Ariz.*, 433 U.S. 350, 360 n.12, 362 (1977), in holding that a private association was not a state actor where public university "retained the authority to withdraw from the [private association] and establish its own standards"). There is no evidence that any agency demanded or implored that companies accord any deference to its views, dispositive or otherwise, or that companies take any particular action concerning any particular post.

Plaintiffs also point to a handful of instances in which NIAID communications staff notified a social media company of posts impersonating Dr. Fauci and asked for their removal; and they say that other officials made similar requests. PI Supp. 40. As noted, impersonating a federal official may violate both federal law, 18 U.S.C. § 912, and the social media companies' own content moderation policies, *supra* at 157 (noting Facebook and Twitter mechanisms for the

public to report imposter accounts).[112] But as with the communications over the scientific validity

of certain claims, these communications lack any support for Plaintiffs' extraordinary assertion

that social media companies have ceded "ultimate authority," PI Supp. 40, to the Government to

"dictate" was appears on their platforms.

Next, Plaintiffs assert that social media companies' efforts to amplify the Federal

Government's perspectives on the health benefits of COVID-19 vaccines, among other topics,

constitutes "collusi[ve]" state action. PI Supp. 41. That argument is also mistaken. The

Constitution preserves the Government's leeway to craft and to put forward government views on

matters of public import. *See Walker*, 576 U.S. at 207-08. The Government's willingness to have

its views about vaccines promoted on social media reflects a commonsense interest in sharing what

the Government viewed as important public health information on platforms capable of reaching

a large share of the population in the middle of a deadly pandemic. Such a willingness does not

reflect "collusion" between the Government and the social media companies to suppress Plaintiffs'

preferred views of controversial issues that arose during the pandemic. Plaintiffs thus cannot show

any likelihood of success on the merits of their claims against some category of "other agencies"

that have supposedly "colluded" with social media companies to violate any Plaintiffs' First

Amendment rights.

> **5.  Even if Plaintiffs could show that any social media content moderation actions
> amount to state action, the Court cannot necessarily conclude that all of those
> content moderation actions violate the First Amendment.**

In addition to suffering from numerous defects on its own terms, the sprawling and

imprecise nature of Plaintiffs' legal theory also makes it impossible for them to pinpoint which

content moderation decisions are attributable to Defendants, thus precluding the Court from

---

[112] Dr. Fauci was not involved in these requests and did not testify to his views on the removal of
"parody" accounts, despite Plaintiffs' contrary assertions, *see* PI Supp. 40. *Supra* PFOF § II.E.

conducting the relevant First Amendment analysis. Plaintiffs presume, incorrectly, that each relevant content moderation decision would be subject to, and would fail, strict scrutiny. But content moderation actions may apply to different forms of speech, some of which merit less protection than others, or even none. And moderation actions against certain content may have critical national security justifications and would survive the highest level of scrutiny. The Court thus cannot assume that all relevant content moderation decisions necessarily violate the First Amendment.

Critically, Plaintiffs do not, and likely cannot, catalogue the types of speech that, allegedly, either currently is or will be subject to social media companies' moderation actions that are attributable to the Government. They identify examples of speech previously subject to moderation actions, but they seek injunctive relief relating to ongoing and future unspecified moderation actions. Given Plaintiffs' failure to submit evidence on the specific speech that is currently or will soon be subject to relevant moderation actions, the Court cannot conduct the analysis necessary to conclude that the moderation actions violate the First Amendment.

To begin with, some categories of speech—even if deemed "core political speech" as Plaintiffs label them—fall outside the protections of the Free Speech Clause. Thus, moderation actions against that speech would not necessarily violate the First Amendment, even if such actions are attributed to the Government (which they are not).

For example, the First Amendment permits "restrictions upon the content of speech in a few limited areas" without triggering scrutiny at all, including the areas of solicitation, aiding and abetting, fraud, conspiracy, and incitement. *United States v. Stevens*, 559 U.S. 460, 468 (2010) (citation omitted); *see, e.g.*, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). To take one of those areas: The Free Speech Clause "does not shield fraud." *Illinois v. Telemarketing*

*Assocs., Inc.*, 538 U.S. 600, 612 (2003); *see, e.g.*, *Stevens*, 559 U.S. at 468; *Commodity Trend Service, Inc. v. CFTC*, 233 F.3d 981, 993 (7th Cir. 2000). And a "difference of opinion as to whether a product had any value at all d[oes] not bar a fraud order based on claims of far greater curative powers than the product could actually have." *Reilly v. Pinkus*, 338 U.S. 269, 273 (1949) (discussing *Leach v. Carlile*, 258 U.S. 138, 139 (1922)). So, for example, if a user made a social media post intended to promote potential commercial uses of a drug as a remedy for COVID-19 via a fraudulent statement within the scope of the wire-fraud statute, 18 U.S.C. § 1343, the First Amendment would not protect that post, just as the First Amendment would not bar the Government from prosecuting the fraud.

In any event, even if strict scrutiny were to apply to some of the content moderation episodes, certain, relevant moderation actions may satisfy it. The Supreme Court has observed that although strict scrutiny sets a high bar, cases in which it is met "do arise." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015) (quoting *Burson v. Freeman*, 504 U.S. 191, 211 (1992) (plurality opinion)). As explained below, Arg. §§ III, IV-B, *infra*, certain moderation actions taken by social media platforms concern malign foreign actors, and if Plaintiffs argue that those moderation actions are attributable to the Defendants, the Court would have to weigh whether those actions, with the ensuing national security benefits, satisfy strict scrutiny.

For example, when the speech in question implicates the Government's foreign affairs and national security responsibilities, a Free Speech Clause claim does not automatically triumph over the exercise of those powers. *See Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988) (the Government's interest in national security is "compelling"); *Guillot v. Garrett*, 970 F.2d 1320, 1324 (4th Cir. 1992) (Luttig, J.) ("[F]oreign policy [is] the province and responsibility of the Executive." (quoting *Egan*, 484 U.S. at 529; *Haig v. Agee*, 453 U.S. 280, 293-94 (1981))); *Holder*

*v. Humanitarian L. Project*, 561 U.S. 1, 33-34 (2010). Some of the communications with social media companies that Plaintiffs challenge involved agencies, such as the FBI and the State Department, that are statutorily authorized, at a minimum, to address malign foreign-origin misinformation. At least as to the activities of such agencies concerning posts from hostile foreign governments or foreign non-governmental organizations (such as al-Qaida)—entities unable to seek shelter under the Free Speech Clause, *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082 (2020)—Plaintiffs have not demonstrated a likelihood of succeeding on their claim under the First Amendment.

### C.  Plaintiffs are not likely to prevail on their APA and Ultra Vires claims.

Plaintiffs argue that the various alleged communications by Defendants—none of which has imposed any legal obligations on any party—are ultra vires because they were not expressly authorized by statute. PI Supp. 53-55. Government officials, however, need no express statutory authorization to simply engage in basic speech.

Although "an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (emphasis added), "an agency without legislative rulemaking authority may" still "issue . . . non-binding statements," *Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980). A "legislative-type rule," or "substantive rule," is one that is "binding" or has the "force of law," and "affect[s] individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979); *see also Walmart Inc. v. U.S. Dep't of Just.*, 21 F.4th 300, 308 (5th Cir. 2021) ("Non-substantive rules" include "non-binding agency policy statements"); *Changizi*, 602 F. Supp. 3d at 1057 ("[A]gencies may issue 'non-binding [policy] statements' on various topics even if they lack 'legislative rulemaking authority' in relation thereto") (citation omitted).

Here, none of the alleged communications at issue is a "legislative" or "substantive" rule that requires Congressional authorization. They are non-binding communications that impose no obligations, and confer no rights, on any person. No person or organization—including any social media platform or social media user—is required to take any action as a result of those communications. And none of those communications imposes any penalty on any party that declines to take any particular action. Those communications amount to routine government speech conveying a policy view, akin to public remarks made by any other government official. Indeed, government officials across multiple administrations have engaged in televised interviews or have held press conferences, and Plaintiffs never suggest all of those activities were expressly authorized by some statute.

Accordingly, Defendants did not require any Congressional authorization before expressing their views on social media practices.[113] In any event, a government official has a right to engage in non-binding speech on matters the official finds important.[114] *See Summum*, 555 U.S.

---

[113] In ruling on Defendants' motion to dismiss, the Court noted that, in its view, Plaintiffs had properly alleged that Defendants imposed a "prior restraint" on social media users, and thus their conduct required statutory authorization. *See* MTD Order 72. But Plaintiffs refer to no statement or action by any Defendant that legally restrained any communications by social media users. Any social media account restrictions are imposed by the platforms themselves, not by any Defendant.

[114] Moreover, many of the Defendant agencies have been given broad, express statutory authority to carry out their respective missions, which would encompass relevant communications with social media companies. *See, e.g.*, 6 U.S.C. § 652 (CISA is charged with leading the national effort to understand, manage, and reduce risk to the nation's cyber and physical infrastructure); 28 U.S.C. § 533, (the Attorney General may appoint officials to, inter alia, detect crimes against the United States and to conduct such other investigations regarding official matters under the control of the Department of Justice); 22 U.S.C. § 2656 note (GEC is formed "[t]o direct, lead, synchronize, integrate and coordinate efforts of the Federal Government to recognize, understand, expose, and counter foreign state and foreign non-state propaganda and disinformation efforts aimed at undermining or influencing the policies, security, or stability of the United States and United States allies and partner nations."); 42 U.S.C. § 300u (HHS is authorized to "formulate national goals, and a strategy to achieve such goals, with respect to health information and health promotion . . . and education in the appropriate use of health care"); 42 U.S.C. § 284(b)(1)(F) (NIAID has the

at 467–68 ("A government entity has the right to 'speak for itself'" and it "is entitled to say what it wishes . . . and to select the views that it wants to express," otherwise "it is not easy to imagine how government could function") (citations omitted). Thus, Plaintiffs cannot make a showing of ultra vires conduct based on nothing more than Government speech about, and with, social media companies. An ultra vires claim is valid only if a plaintiff can show that an official acted "without any authority whatever," or without any "colorable basis for the exercise of authority." *See Danos v. Jones*, 652 F.3d 577, 583 (5th Cir. 2011). Finally, Defendants incorporate by reference their argument that Plaintiffs have failed to identify a sovereign immunity waiver for their ultra vires claim. *See* Defs.' Reply 36-39. Plaintiffs' ultra vires claim thus fails.

For similar reasons, Plaintiffs' APA claims fail as well. The APA provides a right to judicial review to persons suffering legal wrong because of, or adversely affected or aggrieved by, "agency action," 5 U.S.C. § 702; *see id.* § 706(2), that is "final," *id.* § 704, *see also Bennett*, 520 U.S. at 175. As shown by Defendants in support of their motion dismiss, Plaintiff have failed to allege—and now to establish—that they are challenging any conduct by Defendants that amounts to "agency action." Defs.' MTD 45-48. [115]

Nor have Plaintiffs met the finality requirement. To constitute "final agency action," the action must be "identifiable" and "specific," and must determine "rights or obligations" from

---

authority to "develop, conduct, and support public and professional education and information programs").

[115] The APA defines "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see also id.* § 551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction," and "relief"). Note that the President is not subject to the APA at all. *See Dalton v. Specter*, 511 U.S. 462, 470 (1994) ("The actions of the President . . . are not reviewable under the APA because . . . the President is not an 'agency'") (citation omitted). The President's advisers are not considered agencies either. *Cf. Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 905 (D.C. Cir. 1993).

"which legal consequences will flow." *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) (citation omitted). Additionally, the plaintiff "must show some *direct*, final agency action involving the particular plaintiff." *Texas v. Rettig*, 987 F.3d 518, 529 (5th Cir. 2021) (emphasis added), *cert. denied sub nom. Texas v. Comm'r of Internal Revenue*, 142 S. Ct. 1308 (2022). Here, none of the alleged communications by Defendants constitutes "final agency action." As explained above, those communications impose no requirement on any party, and so they do not determine any "rights or obligations." *Peterson*, 228 F.3d at 565 (citation omitted). Nor do any of those communications "direct[ly]" affect any "particular plaintiff." *Rettig*, 987 F.3d at 529 (citation omitted). To the extent they affect Plaintiffs at all, those effects would stem from the independent decisions of private social media companies, each of which is free to ignore Defendants. Thus, Defendants' alleged communications do not constitute "final agency action," and Plaintiffs' APA claims fail for that reason alone.

Additionally, Plaintiffs' APA claims also fail on the merits. Their contentions that Defendants have acted in "arbitrary [and] capricious" fashion and "contrary to constitutional right" all hinge on the flawed assertion underlying their First Amendment claim: that Defendants have imposed some legal restriction on speech. *See* PI Supp. 54. Their argument that Defendants have failed to observe the APA's requirements for notice-and-comment rulemaking, *id.* at 55; *see* 5 U.S.C. § 553(b), is specious. Those requirements apply only to an agency's promulgation of "final, legislative rules." *See Flight Training Int'l, Inc. v. Fed. Aviation Admin.*, 58 F.4th 234, 240 (5th Cir. 2023). Defendants' meetings and e-mails with social media companies, and their public remarks at press briefings, do not constitute APA "rule[s]" to begin with. 5 U.S.C. § 551(4) (defining a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy"). Nor

are they "legislative" rules, that is, "rules having the force and effect of law . . . because they are promulgated pursuant to legislative authority delegated to the agency by Congress," and that "modif[y] or add[ ] to a legal norm." *Flight Training Int'l, Inc.*, 58 F.4th at 241 (citations omitted). Defendants' actions meet none of these criteria. Finally, Defendants incorporate by reference the argument that Plaintiffs have also failed to establish that they are challenging any conduct that amounts to discrete "agency action," and therefore that they have not established any waiver of sovereign immunity as to this claim. *See* Defs.' MTD 45-48. Plaintiffs' APA claims thus fail. Plaintiffs' APA claims thus fail.

### III.   Plaintiffs fail to satisfy the remaining preliminary injunction requirements.

An injunction also is not appropriate because the balance of the equities and the public interest tip sharply in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that "[t]hese factors merge when the Government is the opposing party"). As an initial matter, given that Plaintiffs cannot establish the first two factors necessary to obtain an injunction, "it is clear they cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009); *Mayo Found. for Med. Educ. & Rsch. v. BP Am. Prod. Co.*, 447 F. Supp. 3d 522, 535 (N.D. Tex. 2020) (declining to address the final two *Winter* factors because plaintiff could not establish the first two factors).

But even if Plaintiffs could satisfy one or both of those factors, the remaining *Winter* factors tip decisively in Defendants' favor. Although there is no dispute that protecting First Amendment rights when they are genuinely at risk is in the public interest, the speculative risk of harm to Plaintiffs' asserted interests must be weighed against the substantial, widespread obstruction of legitimate government functions that would result if the Court entered Plaintiffs' proposed injunction—functions that are critical to the public welfare and the integrity of our democratic

processes. *See Winter*, 555 U.S. at 24 ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") (citations omitted).

First, as also shown in the discussion of the proposed injunction's overbreadth, *infra*, Arg. § IV.B, Plaintiffs' proposed injunction would significantly hinder the Federal Government's ability to combat foreign malign influence campaigns, prosecute crimes, protect the national security, and provide accurate information to the public on matters of grave public concern such as health care and election integrity. *See* Knapp Decl. ¶¶ 5-50 (Ex. 157); Declaration of Brandon Wales, Exec. Dir., CISA ("Wales Decl.") ¶¶ 27-30 (Ex. 167); Crawford Decl. ¶¶ 20-23 (Ex. 80); Lesko Decl. ¶¶ 18-19 (Ex. 63); Bray Decl. ¶¶ 12-15 (Ex. 142). These government activities are essential to the nation's welfare and safety, and outweigh the speculative First Amendment interests Plaintiffs assert here. *Def. Distrib. v. U.S. Dep't of State*, 838 F.3d 451, 459 (5th Cir. 2016) (holding that any First Amendment interest by plaintiffs was outweighed by stronger interest of Federal Government in national security); *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 826 (2d Cir. 2015) (recognizing maintenance of national security as "public interest of the highest order"); *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 375 (D.N.J. 2020) (recognizing "that the public interest favors preserving the integrity of the election process"); *Beverly v. United States*, 468 F.2d 732, 741 n.13 (5th Cir. 1972) (in assessing request for stay pending appeal, court was "particularly mindful that the grant of a stay would be contrary to the public interest in the orderly investigation of criminal activities by a federal grand jury"); *cf. Spiegel v. City of Houston*, 636 F.2d 997, 1002 (5th Cir. Unit A 1981) (reversing preliminary injunction that "by its terms . . . in its overbreadth forbids good faith as well as bad faith law

enforcement activities"); *Roviaro v. United States*, 353 U.S. 53, 59 (1957) (recognizing "the public interest in effective law enforcement").

The FBI, for example, routinely shares intelligence with private sector entities, including social media platforms, so that those entities can use that information to help protect the public. Knapp Decl. ¶ 15 (Ex. 157). Foreign malign actors (like Russia, the People's Republic of China, and Iran) attempt to use social media to sway U.S. voters' preferences and perspectives, shift U.S. policies, increase discord in the United States, and undermine the American people's confidence in democratic institutions and processes. *Id.* ¶¶ 10-12. Across Administrations, the Executive Branch has recognized such operations as a profound threat to national security. *Id.* ¶ 11. Yet the proposed injunction could be understood to prevent the FBI from sharing, with social media platforms, intelligence about which accounts appear to be tools of foreign malign actors— preventing the platforms from taking appropriate action pursuant to their own terms of service.

The injunction also could be understood to prevent the FBI and the GEC from calling platforms' attention to accounts used by foreign terrorist organizations, such as the Islamic State of Iraq and ash-Sham (ISIS) and al Qaeda, to recruit supporters and propagate their ideologies. *Id.* ¶¶ 25-31; Bray Decl. ¶ 14 (Ex. 142). Whereas the promotion of terrorist activities is typically a violation of a social media platform's terms of service, platforms may not be able to identify terrorist content without access to FBI intelligence. Knapp Decl. ¶ 30 (Ex. 157). For example, the FBI is uniquely positioned to identify and share intelligence about code words and symbols being used by terrorist groups. *Id.* ¶ 48. Similarly, the GEC would be unable to flag for social media companies the kinds of propaganda and disinformation spread by foreign terrorist groups or state actors aimed at harming U.S. interests. Bray Decl. ¶ 14 (Ex. 142). As the FBI has explained:

> [T]he Russian, Chinese, and Iranian governments, other foreign malign actors individuals or groups intent on preventing qualified voters from

259

> voting, terrorists, cyber criminals, individuals or groups involved in crimes against children, and a wide variety of other criminals would benefit, and the American public and victims of crime would be harmed, if the court were to issue the proposed PI and if it were interpreted to prevent the FBI from communicating with social media platforms about criminal conduct, national security threats, and other threats on their platforms.

Knapp Decl. ¶ 5 (Ex. 157).

As this Court previously has recognized, "[i]n balancing the equities and considering the public interest, courts properly decline to second-guess the judgments of public health officials." *Chambless Enter., LLC v. Redfield*, 508 F. Supp. 3d 101, 123 (W.D. La. 2020) (Doughty, J.). But that is precisely what the proposed injunction would do. As CDC has explained, the proposed injunction "could inhibit CDC from performing its essential education function, to the detriment of those whose health and well-being (and perhaps their lives) depend on the availability of accurate information about disease prevention and treatment," Crawford Decl. ¶ 21 (Ex. 80), a function the agency has been faithfully carrying out for nearly 75 years.

Second, the proposed injunction, if granted, could be read to prevent the Government from speaking on issues of significant public concern. Popular rhetoric is a core aspect of the modern presidency. Yet Plaintiffs seek to enjoin Executive Branch officials from using the bully pulpit to express the President's views. For example, Plaintiffs seek to prohibit, as "censorship," public statements made by the White House Press Secretary during press briefings, outreach by the Surgeon General, and even off-the-cuff remarks made by the President to reporters. *See* PI Supp. 10 ("The White House makes detailed public demands for greater censorship, including at the White House press conferences on May 5, 2021 and July 15, 2021."); *id.* (challenging President's public statement that social media companies are "killing people"); *id.* at 11 ("The Surgeon General uses his 'bully pulpit' to pressure social-media platforms to censor disfavored viewpoints."). As the Supreme Court has observed, "If every citizen were to have a right to insist

that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed." *Summum*, 555 U.S. at 468 (quoting *Keller v. State Bar of Cal.,* 496 U.S. 1, 12–13 (1990)). Plaintiffs' proposed injunction, if granted, would significantly impair the public interest by curtailing the Federal Government's ability to publicly express its views on matters affecting the public welfare and ensure an informed citizenry.

Together, these interests far outweigh Plaintiffs' speculative fears that social media companies, whether under threat by or otherwise compelled by Defendants, will remove or otherwise restrict access to speech that Plaintiffs wish to engage in or with. Moreover, Plaintiffs' overbroad injunction, which would significantly interfere with core Executive Branch functions as explained below, raises serious separation-of-powers concerns. The Supreme Court has repeatedly emphasized that Article III does not "grant unelected judges a general authority to conduct oversight of decisions of the elected branches of Government." *California v. Texas*, 141 S. Ct. 2104, 2116 (2021); *cf. Juliana v. United States*, 947 F.3d 1159, 1171 (9th Cir. 2020) (affirming the dismissal of constitutional claims on redressability grounds because "it is beyond the power of an Article III court to order, design, supervise, or implement the plaintiffs' requested remedial plan"), *denying reh'g en banc*, 986 F.3d 1295 (9th Cir. 2021). It is difficult to imagine a more overly expansive remedy than the broad injunction Plaintiffs propose, the enforcement of which would threaten to encroach on the Executive Branch's prerogatives to speak on matters of public concern. Accordingly, if the Court reaches the balance of the equities and the public interest, it should conclude that those factors weigh heavily against granting the relief Plaintiffs seek.

## IV.    Plaintiffs' proposed injunction is improper.

Plaintiffs' proposed injunction is not only contrary to the public interest but also improper for several reasons. First, the proposed injunction lacks the specificity required by Federal Rule of

Civil Procedure 65(d)(1). Second, the proposed injunction is substantially overbroad because it would needlessly interfere with the performance of lawful Executive Branch activities that protect the public welfare. And it would also needlessly enjoin former and current federal employees sued in their official capacities when Plaintiffs also seek to enjoin the federal agencies where they are or were employed. Accordingly, the Court should reject Plaintiffs' proposed injunction, as further discussed below.

### A. Plaintiffs' proposed injunction lacks the specificity required by Federal Rule of Civil Procedure 65.

Plaintiffs' proposed injunction is insufficiently precise. Rule 65(d)(1) requires that "[e]very order granting an injunction" must "state its terms specifically," and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." As the Supreme Court has explained:

> The specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood. . . . Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.

*Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (citations omitted); *Atiyeh v. Capps*, 449 U.S. 1312, 1316-17 (1981) (Rehnquist, J., in chambers) (holding that an injunction requiring prison officials to accomplish a further reduction of the inmate population at three facilities by "at least 250" individuals by a date certain "falls short of [Rule 65's] specificity requirement"); *Common Cause v. Nuclear Regul. Comm'n*, 674 F.2d 921, 926-27 (D.C. Cir. 1982) (holding that an injunction barring the NRC from closing to the public future meetings similar in nature to the meeting that gave rise to the action lacked the requisite specificity under Rule 65). As the Fifth Circuit has explained, an "injunction should not contain broad generalities," but "must describe in reasonable

detail the acts restrained or required" and identify what specific policies are enjoined. *Scott v. Schedler*, 826 F.3d 207, 213-14 (5th Cir. 2016).

Plaintiffs' requested injunction falls far short of the specificity requirement of Rule 65(d). Plaintiffs' proposed, ambiguous injunction seeks to enjoin certain Defendants from "taking any steps" to "demand, urge, encourage, pressure, coerce, deceive, collude with, or otherwise induce any social-media company or platform for online speech" to "censor, suppress, remove, de-platform, suspend, shadow-ban, de-boost, deamplify, issue strikes against, restrict access to, demonetize," or take "any similar adverse action" against "any speaker, content, or viewpoint expressed on social media." PI Supp. 67-68. If Defendants are to understand these undefined terms by reference to the immense swath of conduct that, to Plaintiffs, amounts to coercion, encouragement, or joint participation, those terms could encompass any form of expression, public or private. The line between permissible and impermissible expression would be anyone's guess.

Nor do Plaintiffs define the terms "censor," "suppress," "remove," "de-platform," "suspend," "shadow-ban," "de-boost," "deamplify," "issue strikes against," "restrict access to," or "demonetize," many of which are conclusory labels ("censor," "suppress") or terms of art within the social media industry that the proposed injunction does not define ("shadow-ban," "de-boost," "deamplify"). Compounding those ambiguities is the proposed injunction's attempt to prohibit Defendants from "otherwise induc[ing]" these actions or "any similar adverse action[s]." *See Scott*, 826 F.3d at 207; *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 272 (5th Cir. 2018); *Louisiana v. Biden*, 45 F.4th 841, 845-46 (5th Cir. 2022); *United States v. Phillip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009). In addition, the proposed injunction fails to specify the covered "social media compan[ies]" and "platform[s] for online speech," or, if these terms are meant instead to refer to entire categories including companies not yet in existence, then the injunction

263

does not give them a precise definition. These vague, undefined concepts fail to put the Defendants on reasonable notice of what conduct is proscribed and improperly place Defendants at risk of contempt.[116]

### B.  Plaintiffs' proposed injunction is impermissibly overbroad.

Even if Plaintiffs' proposed injunction were sufficiently precise, it is radically overbroad. The proposed injunction would threaten to prevent Executive Branch agencies from performing functions essential to public safety and national security—functions that pose no threat to the First Amendment. Thus, the injunction would defy established principles barring equitable relief that is "more burdensome to the defendant[s] than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Scott*, 826 F.3d at 211 (an injunction must be "narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order as determined

---

[116] These defects would not be cured by the proposal by amicus Children's Health Defense, which would limit the proposed injunction to a prohibition against federal officials' privately communicating with social media companies for the purpose of inducing them to censor constitutionally protected speech, as such an injunction would still lack the specificity required by Rule 65(d). *See* Br. *Amicus Curiae* of Children's Health Def. 3-6 (Dkt. 262). For example, it is unclear what conduct would amount to "inducement" or what specific speech would be subject to constitutional protection and, therefore, subject to the injunction. *See Zamecnik v. Indian Prairie Sch. Dist.*, 619 F. Supp. 2d 517, 523 (N.D. Ill. 2007) (holding that a request for a preliminary injunction must "establish[] the speech at issue with sufficient specificity"); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1200 (11th Cir. 1999) (holding that an injunction that ordered a City "not to discriminate" in the future lacked sufficient specificity). And an injunction that prevented Defendants from inducing the censorship of "constitutionally protected speech" would also constitute an impermissible "obey-the-law" injunction. *See SEC v. Life Partners Holding, Inc.*, 854 F.3d 765, 784 (5th Cir. 2017) ("Rule 65(d) therefore prohibits 'general injunction[s] which in essence order[] a defendant to obey the law." (quoting *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 373 (5th Cir. 1981))); *Payne v. Travenol Lab., Inc.*, 565 F.2d 895 (5th Cir. 1978) (holding that "[t]he word 'discriminating,' like the word 'monopolizing' . . . is too general" and that "[s]uch 'obey the law' injunctions cannot be sustained" (citations omitted)). In addition, such an injunction would be improper because by focusing on the "purpose" of the communication (*i.e.*, "the purpose of inducing"), compliance with the injunction would turn on the intent behind each Defendants' communication with a social media company—an unworkable standard that would simply result in endless hearings to determine whether Defendants had the requisite intent to violate the injunction in communicating with social media companies.

by the substantive law at issue"); *cf. INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Labor*, 510 U.S. 1301, 1305-1306 (1993) (O'Connor, J., in chambers) (emphasizing harm from "improper intrusion by a federal court into the workings of a coordinate branch of the Government").

1.      For example, the proposed injunction could be taken to apply to "a range of situations—some of which are completely unrelated to the allegations against the FBI and FBI officials in this lawsuit—in which it would be in the public interest and consistent with the FBI's law enforcement and national security missions for the FBI to notify a social media platform of criminal conduct, national security threats or other threats on its platform." Knapp Decl. ¶ 5 (Ex. 157). Yet the proposed injunction could be read to preclude Defendants from sharing intelligence on the use of online platforms to commit crimes ranging from fraud to the sexual exploitation of children,[117] conduct that is not subject to First Amendment protection. *Id.* ¶¶ 5-50. *See, e.g., Seals*, 898 F.3d at 597 (holding that statute that regulated true threats and extortion did not implicate the First Amendment).

*United States v. Mackey*, No. 21-CR-80, 2023 WL 363595 (E.D.N.Y. Jan. 23, 2023), illustrates the overbreadth of Plaintiffs' requested injunction. In *Mackey*, the United States charged the defendant with a violation of 18 U.S.C. § 241 based on his alleged participation in an online conspiracy to disenfranchise certain Twitter users by, *inter alia*, conducting a coordinated campaign to spread disinformation about voting procedures during the 2016 Presidential election.

---

[117] The proposed injunction could potentially prevent the Government from alerting a social media provider that child sexual abuse material exists on its platform, thus triggering the provider's statutory duties under 18 U.S.C. §§ 2251 *et seq*., including the removal and reporting of such content. Knapp Decl. ¶ 43 (Ex. 157). Furthermore, the proposed injunction's prohibition on 'acting in concert with others' could potentially prevent the National Center for Missing and Exploited Children ("NCMEC") from working with government agencies and providers to keep child pornography off the internet. *Id.* ¶¶ 43-44.

*Id.* at *1. The district court rejected the defendant's argument that the indictment violated his First Amendment rights, holding that "[t]his case is about conspiracy and injury, not speech." *Id.* at *19. In so concluding the court observed that "[f]alse speech . . . may fall into categories historically exempted from First Amendment protection[,]" *id.*, and took particular note of the Supreme Court's observation in *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1899 n.4 (2018), that the government "may prohibit messages intended to mislead voters about voting requirements and procedures." *Mackey*, 2023 WL 363595, at *22.[118] Yet Plaintiffs' proposed injunction would appear to bar federal law enforcement from alerting social media companies to the presence of such illegal activity on their platforms. Other examples of the proposed injunction's gratuitous intrusions on the FBI's law-enforcement activities are discussed in the declaration of Larissa L. Knapp, *see* Knapp Decl. ¶¶ 10-49 (Ex. 157).

2.    The proposed injunction could similarly interfere with key functions statutorily assigned to CISA, such as the ability to share with platforms information that allows them to detect, prevent, and mitigate malicious cyber activity. Wales Decl. ¶ 26 (Ex. 167). For example, CISA's declaration explains that in March 2023, a cybercriminal compromised a Voice over Internet Protocol (VoIP) company, causing the company unwittingly to distribute an altered version of its software to hundreds of thousands of customers. *Id.* ¶ 28.c. The altered software would initiate a connection to GitHub—a site that allows individual users to develop, host, and

---

[118] The court further explained that "statutes that prohibit falsities in order to 'protect the integrity of government processes' (*e.g.*, perjury statues, laws barring lying to government officials, and those 'prohibit[ing] falsely representing that one is speaking on behalf of the Government') are properly within the government's regulatory authority." *Mackey*, 2023 WL 363595, at *21 (citation omitted). Accordingly, the district court rejected the defendant's First Amendment challenge that characterized his deceptive tweets as "political speech" and concluded that his tweets are "most accurately characterized as a vehicle or means for illegal conduct." *Id.* at *22.

download software and to comment on or contribute to one another's work—to download a file containing Internet addresses that the user's computer would then use to download malware. *Id.* To mitigate the harm caused by this crime, CISA contacted GitHub to learn whether the malicious file remained accessible. *Id.* If that conduct were regarded as encouraging GitHub to remove the file, as plaintiffs' theory would appear to suggest, the proposed injunction would hamper such efforts in the future. *Id.* Other potential harms to CISA should Plaintiffs' broad injunction issue are discussed in the declaration of Brandon Wales. *See* Wales Decl. ¶¶ 28-30 (Ex. 167).

3.      In addition, the proposed injunction could be understood to interfere with important public-health functions. Because so many Americans use social media, the Surgeon General, in exercising his responsibility to promote healthy behavior, would typically ask social media platforms to take steps that help Americans make choices that improve their health. Lesko Decl. ¶ 19 (Ex. 63). The Surgeon General could, for example, ask platforms to take steps to prevent online bullying of children and teenagers, or to limit advertisements for tobacco, alcohol, or dangerous weight-loss products that could be seen by children or teenagers. *Id.* ¶ 20. But the proposed injunction could be understood to forbid that sort of advocacy if it is deemed to "encourage" platforms to take action against the content in question. *Id.*

Notably, Plaintiffs engage in the same type of advocacy with social media companies that their proposed injunction could be construed to prohibit. For example, in October 2019, Louisiana Attorney General Jeff Landry, on behalf of the National Association of Attorneys General, wrote a letter to Facebook, Craigslist and eBay "call[ing] upon you to join us in this shared responsibility to protect our youth, the Constitution and the integrity of the digital marketplace" by, among other things, "review[ing] the current content posted to [your] companies' websites and remove illegal postings for the sales and/or transfer of alcohol products." Ex. 158 at 1 (Press Release, La. Dep't

of Just., Online Alcohol Sales Concern of Republican and Democrat Attorney Generals (Oct. 22, 2019), https://perma.cc/4ZFX-TEP5); Ex. 159 at 1 (Letter from Jeff Landry, La. Att'y Gen., et al., to Scott Schenkel, Interim Chief Exec. Officer, eBay (Oct. 22, 2019)). The letter also invited the companies to help "establish a work[ing] group with stakeholders from industry and government" to "discuss and establish realistic and effective protocols for internet platforms and content providers related to illegal and unlicensed alcohol sales via digital platforms." Ex. 159 at 2.

Similarly, on behalf of 33 other state attorneys general, Attorney General Landry sent a letter to Facebook, eBay, Craigslist, Walmart and Amazon urging them "to more rigorously monitor price gouging practices by online sellers using their services" concerning COVID-19, including a request that the companies "[s]et policies and enforce restrictions on unconscionable price gouging during emergencies" and "[t]rigger price gouging protections prior to an emergency declaration." Ex. 160 at 1 (Press Release, La. Dep't of Just., 33 State Attorneys General Warn Amazon, Facebook, Ebay, Craigslist, Walmart: Online Marketplaces Are Not Exempt from Price Gouging Laws (Mar. 25, 2020), https://perma.cc/X2BY-FHF5). And in April 2021, Attorney General Landry joined a bipartisan letter to Twitter, among others, noting that the platforms were "being used to market and sell blank or fraudulently completed COVID vaccine cards bearing the [CDC] logo," and stating expressing "deep[] concern[] about this use of [their] platforms to spread false and misleading information regarding COVID vaccines." Ex. 161 at 1 (Letter from Nat'l Ass'n of Att'ys Gen., et al., to Jack Dorsey, CEO, Twitter, Inc., et al. (Apr. 1, 2021)). The letter requested that the platforms "take immediate action to prevent [their] platforms from being used as a vehicle to commit these fraudulent and deceptive acts that harm our communities." *Id.* at 2. Among other requests, the letter indicated that platforms should "promptly tak[e] down ads or links identified through that monitoring." *Id.* Plaintiffs' position that they can combat potential

violations of state law on social media platforms through direct communications with those platforms, but that the Federal Government must be enjoined from taking similar action to curtail violations of federal law, highlights why their proposed injunction should be rejected.[119]

4.      Relatedly, Plaintiffs' proposed injunction would preclude the White House and federal agencies from legitimately using the bully pulpit to advance their views on matters of public concern, raising serious separation-of-powers concerns. "A President frequently calls on citizens to do things that they prefer not to do—to which, indeed, they may be strongly opposed on political or religious grounds." *Freedom From Religion Found.*, 641 F.3d at 806. Indeed, popular rhetoric is a core aspect of the modern presidency—a tool that presidents have used to galvanize private actors for more than a century. *See* Jeffrey K. Tulis & Russell Muirhead, *The Rhetorical Presidency* 4 (2017 ed.). But a presidential request is not compulsion where "people are free to ignore the President's call." *Peery*, 791 F.3d at 791.

The same holds true for other Executive Branch officials. Because it would be impossible for the President to administer the entire Executive Branch alone, "the Constitution assumes that lesser executive officers will assist the supreme Magistrate in discharging the duties of his trust." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2197 (2020) (citation omitted). Limitations on the speech of other senior government officials, including White House staff and Cabinet members, therefore also threaten the President's constitutional prerogatives in administering the Executive Branch and articulating the administration's policy views. The

---

[119] Plaintiffs' proposed inunction also could bar components of the Department of Justice or other agencies from working with social media companies to address dangerous TikTok "challenges," such as the one that recently resulted in the death of a 13-year-old who overdosed on Benadryl. Ex. 162 (Michelle Watson, Carma Hassan, *Benadryl TikTok 'challenge': A 13-year old died in Ohio after participating*, CNN (Apr. 18, 2023)).

Seventh Circuit has thus recognized that it is appropriate for federal officials and agencies generally to use the bully pulpit:

> Government officials and agencies spend a great deal of time urging private persons and firms and other institutions to change their behavior (for example, to adopt healthier diets or use public transit more) without backing up their urging with coercion or the threat of it. Physically fit young men and women are encouraged to enlist in the armed forces, but there is no longer a draft, and so there is no coercion to enlist and it would be absurd to claim that encouraging enlistment is the equivalent of forcing people to serve.

*Peery*, 791 F.3d at 790-91.

Here, Plaintiffs' proposed injunction could be read to preclude the Defendants from "urging" or "encouraging" social media companies to act consistent with an Administration's views of the public interest. Indeed, Plaintiffs' proposed injunction is so broad that it could be read to not only cover direct communications between Defendants and social media companies but could preclude federal officials from giving public speeches or press conferences by government officials where they "encouraged" social media companies to take certain actions, including actions against malign foreign influence actors, people who disseminate child sexual abuse materials, or people who improperly disclose classified documents. *See, e.g.*, Ex. 166 (Brett Samuels, *White House says social media companies have responsibility to manage platforms amid leaked document fallout*, The Hill (Apr. 13, 2023)). Indeed, under Plaintiffs' theory, an Administration's public statement recommending reforms to § 230 could be swept into the proposed injunction if it were deemed to be a veiled threat to social media companies. Plaintiffs have no First Amendment right that entitles them to muzzle such plainly legitimate Government speech. *See Summum*, 555 U.S. at 468 (citizens have no right to prohibit government speech with which they disagree); *Freedom From Religion Found.*, 641 F.3d at 806 ("Those who do not agree

with a President's statement may speak in opposition to it; they are not entitled to silence the speech of which they disapprove.").

5. Furthermore, Plaintiffs' proposed injunction could conceivably be construed to preclude agencies from publishing election- and health-related information on their websites if a social media company were to rely upon that information in deciding whether information on its platform violated its terms of service. Under Plaintiffs' proposed injunction, such proposed publication on websites could be perceived as "encouraging" platforms to consider this information in applying their terms of service. Indeed, far from being speculative, Plaintiffs improperly challenge this precise conduct. *See, e.g.*, Pls.' PFOF ¶ 729 ("As was evidently intended, Dr. Collins's blog post immediately fueled media coverage attacking the lab-leak theory as a 'conspiracy theory.'"); *id.* ¶ 1105 ("Scully admits that CISA was aware that 'social media platforms were following the rumor page posted by CISA and using that as a debunking method for content on their platforms.").

Putting to one side that such publication via websites is classic government speech, an injunction that could be read to preclude Defendant agencies from publishing information on their websites on which social media companies might rely for purposes of applying their own content moderation policies would substantially obstruct Defendants' performance of their missions. *See* Crawford Decl. ¶ 21 (Ex. 80); Bray Decl. ¶ 14 (Ex. 142); Wales Decl. ¶ 28.a. (Ex. 167). It would leave Defendants in an impossible position where each agency post would risk drawing accusations of contempt depending on the unpredictable choices of social media companies concerning whether and how to act on that information.

For example, CISA developed a Rumors vs. Reality page on its website to provide accurate information about election rumors. Ex. 112; Scully Dep. 290:18-23. The page was "designed to

address common disinformation narratives by providing accurate information related to elections."

Ex. 112. The page "seeks to inform voters and help them build resilience against foreign influence

operations and disinformation narratives about election infrastructure." *Id.* Tellingly, despite their

apparent objection to CISA's maintenance of this website, Plaintiffs Louisiana and Missouri have

similar websites that seek to debunk rumor and misinformation concerning both elections and

COVID-19. *See* Ex. 113; Ex. 114; Ex. 115; Ex. 116. In fact, contrary to its position in this litigation,

the Missouri Secretary of State's election misinformation page expressly links to CISA's resources

concerning election misinformation. Ex. 114 (linking to CISA's "The War on Pineapple:

Understanding Foreign Intelligence in 5 Steps"; and "Social Media Bots Overview").

Similarly, a "core part of CDC's mission is to promulgate science-based, data-driven

information about public health matters." Crawford Decl. ¶ 21 (Ex. 80). Like CISA, social media

companies may choose to rely on CDC-published information when determining whether certain

posts violate their terms of service. *Id.* Yet, under Plaintiffs' proposed injunction, this could be

construed as a "step" to "encourage" a social media company to "suppress" or take "similar

adverse action" against information that is counter to CDC-provided information. This is yet

another example of the staggering overbreadth of Plaintiffs' proposed injunction.

6.     Plaintiffs' proposed injunction is also overbroad because it seeks to preclude

Defendants from "acting in concert" with "any such others who are engaged in the aforementioned

conduct." PI Supp. 68. Although it is unclear what conduct Plaintiffs seek to cover with this

provision, as written the language could be read to mean that even if a Defendant is unaware that

another entity has "engaged in the aforementioned conduct," that Defendant could not "act[] in

concert" with that entity for any purpose—even if that interaction has nothing to do with content

moderation. This is an absurd and unworkable result, and the Court should reject such an

amorphous injunction that would cause significant harm to Defendants' operational interests. *See, e.g.*, Wales Decl. ¶ 29a-e (Ex. 167); Crawford Decl. ¶ 22 (Ex. 80).[120]

7. Finally, Plaintiffs' proposed injunction is overbroad because it would not just apply to the Office of the White House Press Secretary and numerous agencies but also would extend to dozens of current and former federal employees sued in their official capacity. *See* PI Supp. 67-68).[121] As the Fifth Circuit has recognized, an official capacity claim is essentially a claim against the agency and the official capacity claims therefore merge with those against the agencies. *Harmon v. Dallas Cnty.*, 927 F.3d 884, 891 (5th Cir. 2019) (citing *Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 485 (5th Cir. 2000)) (observing that when "a defendant government official is sued in his individual and official capacity, and the city or state is also sued" the "official-capacity claims and the claims against the governmental entity essentially merge"); *Smith v. Town of Lake Providence*, No. 3:22-CV-01319, 2022 WL 16626762, at *7 (W.D. La. Oct. 17, 2022) (holding that official capacity claims brought against officers merged with claims against

---

[120] For example, Plaintiffs' overbroad proposed injunction could throw CDC's funding of research and other public health programs into jeopardy, thereby inhibiting CDC from carrying out core elements of its vital public health mission. Crawford Decl. ¶¶ 22-23 (Ex. 80). If a CDC-funded entity publicizes research that runs contrary to a narrative circulating on social media, and a social media company then takes steps consistent with its terms of service to limit that narrative, it is unclear whether CDC would be deemed to be "acting in concert" with "others" "engaged" in the "conduct" of "inducing" a social-media company to "suppress" or take "similar adverse action" against certain content, speakers or viewpoints. *Id.*

[121] As another example of the overbreadth of the proposed injunction, Plaintiffs seek to enjoin DOJ and the State Department in addition to the component offices under their authority. *See* PI Supp. 68. But despite Plaintiffs' voluminous filings, they do not appear to have identified any evidence that these parent agencies have violated the First Amendment. For example, Plaintiffs identify DOJ only twice in their supplemental brief, and in both instances, it is in the context of meetings it attended with other federal departments and agencies, and in which misinformation generally was discussed. *Id.* at 34, 37. And Plaintiffs do not identify *any* conduct of the Department of State, which is only referenced twice in their brief, and, in both circumstances, it is simply to note that State is the parent agency of the GEC. *Id.* at 39, 44. Accordingly, any injunction in this case should not run against these agencies.

town). Indeed, "nothing [is] added by suing the [government official] in his official capacity." *See Jungels v. Pierce*, 825 F.2d 1127, 1129 (7th Cir. 1987).

Plaintiffs fail to explain why an injunction against federal employees sued in their official capacity is necessary when they also seek to enjoin the agencies where these individuals are now or previously were employed. There is nothing added by seeking to enjoin individuals sued in their official capacity where the agencies also would be subject to the proposed injunction. Instead, enjoining those individuals would result in substantial confusion. For example, if the proposed injunction were to extend to individuals sued in their official capacity, when an official capacity Defendant leaves the Government, a successor would need to be identified. But identifying a successor is not always easy or obvious, as employee job descriptions and responsibilities change over time. Sometimes, there may not be a successor given changed agency priorities and organizational structures. Accordingly, given the potential confusion resulting from applying an injunction against a host of individuals and because the official capacity claims merge with the claims against the agencies and the Office of the White House Press Secretary, any injunction in this case should apply only to those agency Defendants.

In addition, Plaintiffs improperly seek to apply the injunction against former Federal Government employees sued in their official capacity and for whom no successor has been named, including: Andrew Slavitt; Clarke Humphrey; and Benjamin Wakana. PI Supp. 68; *see also* Defs.' Notice of Substitution at 4. Any prospective injunctive relief against these former government employees sued in their official capacity is no longer available against them because they have no authority to act. *See Alvarez v. O'Brien*, No. 8:21-cv-303, 2022 WL 5209377, at *2 (D. Neb. Oct. 5, 2022) (citing *Tara Enters., Inc. v. Humble*, 622 F.2d 400, 401 (8th Cir. 1980) (holding that "because monetary damages are not sought nor any other relief which would be operative against

these defendants who no longer possess any official power, the action against them is, of course, moot").'" Nor are successors automatically substituted for these Defendants pursuant to Fed. R. Civ. P. 25(d), because these Defendants "did not hold an office for which a particular successor can be identified." *Alvarez*, 2022 WL 5209377, at *2 (citations omitted). Accordingly, injunctive relief against former government employees for whom there are no successors is improper.

* * * *

Thus, even if the Court were to conclude that Plaintiffs are likely to prevail on the merits, that Plaintiffs have shown that they would suffer concrete and imminent irreparable harm in the absence of an injunction, and that Plaintiffs' harm outweighs the detriment to the public interest of awarding them a properly drawn injunction, it would be profoundly and unnecessarily harmful to the public interest, and therefore unjustifiable, to impose the overbroad and vague injunction that Plaintiffs have proposed. If any injunction could be appropriate upon a finding that Plaintiffs are likely to prevail and face irreparable harm, it would need to be far more narrowly tailored to prevent the purportedly unlawful conduct that would cause Plaintiffs' asserted injuries.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied. If nevertheless the Court were to enter an injunction, Defendants respectfully request that the injunction be administratively stayed for seven days, to allow Defendants time to consider moving for a stay pending appeal.

Dated:  May 2, 2023                    Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       Principal Deputy Assistant Attorney General

                                       JAMES J. GILLIGAN
                                       Special Litigation Counsel, Federal Programs Branch

                                       JOSHUA E. GARDNER (FL Bar No. 0302820)
                                       Special Counsel, Federal Programs Branch

                                       */s/ Kyla M. Snow*
                                       KYLA M. SNOW (OH Bar No. 96662)
                                       INDRANEEL SUR (D.C. Bar No. 978017)
                                       AMANDA K. CHUZI (D.C. Bar No. 1738545)
                                       KUNTAL CHOLERA (D.C. Bar No. 1031523)
                                       Trial Attorneys
                                       U.S. Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street, NW
                                       Washington D.C. 20005
                                       Tel: (202) 514-3259
                                       kyla.snow@usdoj.gov

                                       *Attorneys for Defendants*