# DEFENDANTS' EXHIBIT 1:

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

| | |
|---|---|
| STATE OF LOUSIANA, STATE OF MISSOURI, *et al.* **)** | |
| **)** | |
| **Plaintiffs,** **)** | |
| **)** | |
| **v.** **)** | No. 3:22-cv-01213-TAD-KDM |
| **)** | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.* **)** | |
| **)** | |
| **Defendants.** **)** | |

**EXPERT WITNESS DECLARATION**

**OF**

**STUART GURREA, PH.D.**

**April 25, 2023**

## TABLE OF CONTENTS

I.  ASSIGNMENT ................................................................................................................1

II.  QUALIFICATIONS.......................................................................................................2

III. SUMMARY OF OPINIONS ........................................................................................3

IV. BACKGROUND .............................................................................................................5

V.  SOCIAL MEDIA AND THE SOCIAL MEDIA LANDSCAPE ....................................6

VI. THE BUSINESS MODEL OF SOCIAL MEDIA PLATFORMS ................................12

     A.  Two-sided Markets ...........................................................................................12

     B.  Social Media Are Two- (Multi-) Sided Platforms..........................................16

VII.  SOCIAL MEDIA PLATFORMS HAVE STRONG MARKET-BASED ECONOMIC INCENTIVES TO MODERATE CONTENT ..................................................20

     A.  Social Media Platforms Have Market-Based Economic Incentives to Moderate Content ...............................................................................................................21

     B.  The Economic Tradeoffs of Content Moderation .......................................25

     C.  Competition Disciplines the Level of Content Moderation.......................26

VIII. GOVERNMENT INTERVENTION IS NOT NECESSARY FOR SOCIAL MEDIA PLATFORMS TO MODERATE LOW-QUALITY CONTENT..........................28

IX. MODERATION OF LOW-QUALITY CONTENT PREDATES DEFENDANTS' ALLEGED ACTIONS .......................................................................................................32

X.  CONCLUSION.............................................................................................................38

## EXHIBITS

**Exhibit 1**    Curriculum Vitae of Stuart D. Gurrea

**Exhibit 2**    Documents and Data Reviewed and Considered

## I.    ASSIGNMENT

1.     My name is Stuart Gurrea and I am an economist.  The State of Louisiana and others
       ("Plaintiffs") sued the President of the United States and other U.S. Government
       officials and agencies ("Defendants") for allegedly coercing social media platforms to
       "censor" certain content in alleged violation of the Free Speech Clause of the First
       Amendment of the U.S. Constitution.[1]  The U.S. Department of Justice has asked
       me to assess, for purposes of Plaintiffs' motion for a preliminary injunction, the role
       of market-based economic incentives as drivers of content moderation by social
       media platforms, regardless of any government influence.

2.     According to Plaintiffs, Defendants have induced major social media platforms,
       including Facebook, Twitter, and YouTube, to "suppress" certain information.
       Plaintiffs claim that government action has led to an increase in censorship and
       suppression of certain speech that would not have occurred as a result of natural
       free-market forces.[2]

3.     My assignment consists of assessing the role of market-based economic incentives as
       an explanation for content moderation by social media platforms.  Content
       moderation refers to monitoring and vetting content to meet compliance and
       acceptability standards on a social media platform.  To complete my assignment, I
       rely on generally accepted principles in microeconomics and financial economics
       regarding economic incentives.  Informed by these principles, by economic theory,
       by empirical evidence, and by social media platforms' specific economic
       circumstances, I assess the role of market-based economic incentives as an
       explanation for the observed moderation of content by social media platforms after
       2020.

4.     Secretariat Economists ("SE") is being compensated for my work in this matter at an
       hourly rate of $725.  My hourly rate applies to my work preparing this report and to

---

[1] Complaint, *State of Missouri ex rel. Eric S. Schmitt, Attorney General, et al. v. Joseph R. Biden, Jr. in his official capacity as President of the United States et al.,* No. 3:22-cv-01213-TAD-KDM, October 6, 2022 ("Complaint").

[2] Complaint, ¶ 4.

any testimony I am asked to provide at deposition or trial.  SE's compensation is independent of all opinions I render in this case and the outcome of this matter.


**II.    QUALIFICATIONS**

5.    I am a Managing Director at Secretariat Economists ("SE"), an economics consultancy that provides applied economic analysis to clients.  I have attached as Exhibit 1 to this report my curriculum vitae, which lists my academic background, publications, and prior professional experience, including a list of cases in which I have offered expert testimony at deposition or trial.

6.    I graduated from the University of Seville, Spain, with a Bachelor's degree in Economics; I received a Master's degree in Economics from Northwestern University; and, I received my Ph.D. in Economics from Northwestern University.  My fields of specialization include industrial organization, econometrics, and finance.  Industrial organization is the field of economics concerned with the structure and operation of markets and industries.  Econometrics is the application of mathematical and statistical models to the analysis of economic data.  A significant part of my training as an economist consists of the analysis of economic incentives and how they shape the decision making and conduct of consumers and businesses.

7.    I joined Economists Incorporated ("EI") in September of 2001.  EI was acquired by SE in July 2021.  I have been affiliated with EI or SE since 2001 and my current title is Managing Director.  During my tenure at EI and SE, I have applied my experience and expertise in economics in general, and in industrial organization and econometrics in particular, to address a broad range of economic issues, including predicting the outcomes of markets, understanding financial incentives and transactions, pricing, asset valuation, and quantifying economic harm related to contract disputes.  I have conducted these economic analyses for businesses, individuals, non-profit organizations, governments, and industry associations.

8.    In the course of my professional career, I have addressed economic questions in a broad range of industries, including the technology sector.  Many of my assignments

have involved analyzing economic incentives and the operation of industries and markets through the development of theoretical models and by implementing a variety of empirical methods.  On many occasions, I have applied these analyses to assess economic incentives and explain firm behavior and market outcomes.  To this end, I have relied on principles of economics and financial economics, and the use of a variety of quantitative methods.

9.      In the context of litigation, I have conducted economic analyses in an advisory role for both plaintiffs and defendants, and I have testified about economic issues by declaration, at deposition, in arbitration proceedings, and in state and Federal court. I have been qualified as an expert in economics and economic modeling in Federal court.

## III.    SUMMARY OF OPINIONS

10.     From an economics perspective, social media platforms can be understood as two- or multi-sided platforms on which users, content providers, and advertisers participate and interact.  As a result, the value of a social media platform depends on participation on all sides of the platform.  Social media platforms also are characterized by the interdependence between the value participants on one side of the platform derive from their participation and the level of participation on the other side(s) of the platform.  (See § VI.)

11.     The primary source of revenue of large social media platforms is advertising. Consequently, social media platforms strive to increase user engagement on the platform because they recognize not only that an increase in user participation increases the value of participation on the platform to other users, but also that it increases the value of participation to advertisers – their main source of revenue. (See § VI.)

12.     Social media platforms have strong market-based economic incentives to moderate the content on their platforms.  It is in a platform's financial interest to do so because content moderation contributes to retaining and increasing user engagement.

Increasing user engagement typically results in an increase in advertising revenues and the platform's profits because the value of the platform to advertisers as a vehicle to reach consumers increases.  Also, content moderation that preserves or enhances the reputation and value of an advertiser's brand (*i.e.*, product) directly makes the platform more valuable to the brand and increases the platform's advertising revenues and profits.  (See § VII.)

13.  Government intervention is not necessary to incentivize social media platforms to moderate low-quality content (including misinformation, disinformation or malinformation).[3]  Market-based economic incentives are sufficient to promote content moderation of low-quality content.  Consistent with these incentives, social media platforms explicitly tie the moderation of low-quality content to market-based economic incentives and regularly take actions to moderate content and address misinformation or misleading content.  (See § VIII.)

14.  Moderation of low-quality content by social media platforms pre-dates Defendants' alleged conduct.  In response to their economic incentives, social media platforms have moderated content since their inception.  The focus of content moderation pre-2020 evolved with societal concerns and cultural norms, and has addressed concerns about teenager safety, terrorism, election security, and public health.  Notably, moderation of low-quality content before 2020 responded to economic incentives and extended to politics and vaccination policy.  (See § IX.)

15.  My opinions are limited to assessing the economic evidence related to content moderation, and I express no opinion on legal issues such as whether Defendants' actions amounted to pressure, coercion or encouragement.

16.  To form the opinions summarized above, I relied on the documents, materials and data I list in Exhibit 2 to this report.  These include documents produced in the

---

[3] Complaint, ¶¶ 2 and 3.  "Misinformation is false, but not created or shared with the intention of causing harm.  Disinformation is deliberately created to mislead, harm, or manipulate a person, social group, organization, or country.  Malinformation is based on fact, but used out of context to mislead, harm, or manipulate."  (https://www.cisa.gov/topics/election-security/foreign-influence-operations-and-disinformation#:~:text=Misinformation%20is%20false%2C%20but%20not,mislead%2C%20harm%2C%20or%20manipulate.)

course of this litigation and other sources I relied on to inform my opinions.  If additional documents, materials, or data are produced or filed, I reserve the right to modify, qualify, or supplement the opinions I express herein.

## IV.   BACKGROUND

17.   Plaintiffs allege that Defendants have engaged in unilateral and concerted actions with social media companies that have resulted in the censorship and suppression of low-quality content on the companies' platforms.

18.   Among the methods social media platforms can implement to "censor" content, Plaintiffs list:

> terminating speakers' accounts, suspending accounts, imposing warnings or strikes against accounts to chill future disfavored speech, "shadow banning" speakers, demonetizing content, adjusting algorithms to suppress or de-emphasize speakers or messages, promoting or demoting content, placing warning labels on content, suppressing content in other users' feeds, promoting negative comments on disfavored content, and requiring additional click-through(s) to access content […].[4]

19.   According to Plaintiffs, this type of "censorship" could not occur without Defendants' alleged actions because "natural free-market forces, would have restrained the emergence of censorship and suppression of speech of disfavored speakers, content, and viewpoint on social media."[5]

20.   According to Plaintiffs, before the alleged actions, "social media platforms generally declined to engage in acts of censorship" alleged in the Complaint.[6]  Plaintiffs assert that social media companies ramped up censorship in 2020.  For example, Plaintiffs dedicate significant attention to two events related to COVID-19 and two events related to the 2020 election that were purportedly subject to censorship and, supposedly, were legitimate stories in hindsight: "[s]peech about the lab-leak theory

---

[4] Complaint, ¶ 130.

[5] Complaint, ¶ 4.

[6] Complaint, ¶ 478.

of COVID-19's origins," "[s]peech about the efficacy of mask mandates and COVID-19 lockdowns," "[t]he Hunter Biden laptop story," and "[s]peech about election integrity and the security of voting by mail."[7]

21.    In support of Plaintiffs' claim, Dr. Jayanta Bhattacharya, Ms. Jill Hanes, Mr. Jim Hoft, Dr. Aaron Kheriaty, and Dr. Martin Kulldorff submitted declarations describing the content they allegedly posted and that they assert was moderated or removed because of the Defendants' actions.[8]  Drs. Bhattacharya, Kheriaty and Kulldorff allege censorship on social media following publication in 2020 of their critical views regarding the federal response to COVID-19.[9]  Ms. Hines alleges censorship following her use in 2020 of social media platforms to organize against COVID-19 response policies.[10]  Mr. Hoft alleges censorship in 2021 of the social media accounts of a news website he maintains and operates following publication of issues related to COVID-19 and election security.[11]

## V.    SOCIAL MEDIA AND THE SOCIAL MEDIA LANDSCAPE

22.    Social media companies own and operate online platforms that facilitate the creation and sharing of content by users and enable users to engage in social interactions.  An online platform can be defined as "a digital service that facilitates interactions between two or more distinct but interdependent sets of users (whether firms or individuals) who interact through the service via the Internet."[12]

---

[7] Complaint, pp. 31, 33 and 36.

[8] Declaration of Dr. Jayanta Bhattacharya, June 14, 2022 ("Bhattacharya Declaration"); Declaration of Jill Hines, June 14, 2022 ("Hines Declaration"); Declaration of Jim Hoft, June 14, 2022 ("Hoft Declaration"); Declaration of Dr. Martin Kulldorff, June 14, 2022 ("Kulldorff Declaration"); and, Declaration of Aaron Kheriaty, June 14, 2022 ("Kheriaty Declaration").  All declarations in *State of Missouri ex rel. Eric S. Schmitt, Attorney General, et al. v. Joseph R. Biden, Jr. in his official capacity as President of the United States et al.,* No. 3:22-cv-01213.

[9] Bhattacharya Declaration, ¶¶ 10, 12 and 15; Kulldorff Declaration, ¶¶ 7 and 15; and, Kheriaty Declaration, ¶ 11.

[10] Hines Declaration, ¶¶ 7-9.

[11] Hines Declaration, ¶¶ 7-9; and, Hoft Declaration, ¶¶ 4-8.

[12]  OECD, "What is an 'online platform'?", in *An Introduction to Online Platforms and Their Role in the Digital Transformation,* 2019, OECD Publishing, Paris, p. 21.

23.    The earliest social media companies began operating in 1997 and, since then, more popular social media platforms have continued to emerge over time.  Figure 1 below identifies some major events in the history of social media.[13]


**Figure 1: Social Media Timeline**



24.    As social media platforms have proliferated and matured, the number of social media users has continued to grow significantly over the past decade.  Figure 2 below shows the number of social media users at the beginning of each year from 2012 through 2022.  As of January 2022, there were 4.62 billion social media users, accounting for 93.4 percent of all internet users and 58.4 percent of the world's total population.[14]

---

[13] "History of Social Media (It's Younger Than You Think)," https://www.broadbandsearch.net/blog/complete-history-social-media.

[14] Hootsuite's Digital 2022 Global Overview Report, January 2022, pp. 87-88, https://datareportal.com/reports/digital-2022-global-overview-report.

**Figure 2.**
**Number of Social Media Users Over Time**



Source: Hootsuite's Digital 2022 Global Overview Report, January 2022

25.     The history of social media shows that it is a dynamic industry.  The rapid growth in users depicted above in turn enabled rapid growth of certain platforms within a short period of time.  For example, Facebook was founded in 2004 and became the most visited social media website in the world by 2008.[15]  TikTok was founded in 2016, and in 2017 it acquired Musical.ly, which was launched in 2014, and has become a top social media platform today.[16]  Such a dynamic market also led previously successful platforms to fail very quickly as well.  For example, MySpace was launched in 2003 and became the most popular social media site in the world in 2007.[17]  After Facebook took the title from MySpace in 2008 as the world's largest social network, the number of MySpace users declined quickly and it is practically irrelevant today.[18]

---

[15] https://www.britannica.com/topic/Facebook.

[16] https://www.britannica.com/topic/TikTok.

[17] Erick Schonfeld, "Social Site Rankings 2007," TechCrunch, October 24, 2007, https://techcrunch.com/2007/10/24/social-site-rankings-september-2007/.

[18] "What Happened to Myspace (and Is It Even Still Around)?" https://www.purewow.com/entertainment/what-happened-to-

Other well-known failures include the demise of Six Degrees – the first social media platform – and Friendster in the early years of social media.[19]  More recent high-profile failures include Google+.[20]

26.     These large and rapid fluctuations in the social media landscape can be explained by what is described as the "fickle" social media environment.[21]  Social media managers are confronted with constantly changing demographics, consumer preferences, societal concerns, and industry trends that may result in sudden success and equally rapid failure of a social media platform.

27.     The social media industry not only is dynamic, but also is characterized by a large number of participants vying for consumer attention.  In addition to Facebook, YouTube, and Twitter, current industry participants include TikTok, Instagram, Pinterest, and Reddit, among others.  Figure 3 below shows the number of active users of selected social media platforms.  Facebook is the leading social media platform in terms of global active users, with more than 2.9 billion in 2022.

---

myspace#:~:text=Myspace%20peaked%20around%202008%E2%80%94but,the%20episode%20below)%20for%20more.

[19] "The First Social Media Platform: The History Of Social Media," https://publer.io/blog/the-first-social-media-platform/.

[20] "Google begins shutting down its failed Google+ social network," April 2, 2019, https://www.theverge.com/2019/4/2/18290637/google-plus-shutdown-consumer-personal-account-delete.

[21] "Every year, the whims of a fickle public, the introduction of new players, and shifting global trends trigger a shuffle in social media's most important leaderboard."  Dreamgrow, "The 15 Biggest Social Media Sites and Apps [2023]," March 12,2023.  (https://www.dreamgrow.com/top-15-most-popular-social-networking-sites/.)

**Figure 3.**
**Selected Social Media Platforms by Global Active User Figures (Millions)**



Source: Hootsuite's Digital 2022 Global Overview Report, January 2022

28.     The competitiveness of social media is reflected in changes in user choices over time. In August 2012, approximately nine percent of U.S. adults stated they had used Instagram; by February 2021, it reached 40 percent.[22]  The percentage of adults who declared to have used Twitter almost doubled from 13 to 23 percent over the same period.[23]  The percentage of adults who had ever used Facebook, however, remained relatively constant from 2016 to 2021.  Social media platform users also have different preferences across platforms depending on their age.  Facebook ranks in first or second place as the favorite social media platform among users aged 35

---

[22] Pew Research Center, Social Media Fact Sheet, April 2021. Available at: https://www.pewresearch.org/internet/fact-sheet/social-media/.

[23] Pew Research Center, Social Media Fact Sheet, April 2021. Available at: https://www.pewresearch.org/internet/fact-sheet/social-media/.

through 64.  Among younger users ages 16 through 24, however, Instagram is the preferred platform.[24]

29.     Social media platforms typically offer a free service to their users.  Platforms are able to do so because their services to users are subsidized by advertising sales revenues.  In 2022, social media advertising totaled $226 billion worldwide, accounting for 33.9 percent of all digital advertising revenue.[25]  (In addition to social media advertising, digital advertising includes banner advertising, video advertising, search advertising, and classifieds.[26])  Notably, spending in digital advertising surged over the last five years.  Figure 4 below shows the total annual digital advertising revenue from 2017 through 2022.  Digital advertising revenue increased from $254 billion in 2017 to $667 billion in 2022, a 162 percent increase.  During that period, social media advertising revenue increased more than revenue from the other components of digital advertising.  In 2017, advertising on social media platforms accounted for 20.2 percent of all digital advertising revenue.  By the end of 2022, advertising on social media platforms accounted for 33.9 percent.

---

[24] Hootsuite's Digital 2022 Global Overview Report, January 2022, p. 104. https://datareportal.com/reports/digital-2022-global-overview-report.

[25] Hootsuite's Digital 2023 Global Overview Report, January 2023, pp. 416 and 432, https://datareportal.com/reports/digital-2023-global-overview-report.

[26] Statista's Digital Market Insights, https://www.statista.com/outlook/digital-markets?utm_source=DataReportal&utm_medium=Data_Citation&utm_campaign=Statista_Partner&utm_content=DataReportal_Data_Citation#overview.

**Figure 4.**
**Digital and Social Media Advertising Revenues, 2017-2022**



Source: Hootsuite's Digital 2023 Global Overview Report, January 2023

## VI.    THE BUSINESS MODEL OF SOCIAL MEDIA PLATFORMS

30.    To understand the behavior of social media platforms, it is necessary to understand their business model, *i.e.*, "the logic of the firm, the way it operates and how it creates value for its stakeholders."[27]   Social media companies operate like two- (or multi-) sided markets, where economic incentives and externalities are important determinants of each platform's conduct.

### A.    Two-sided Markets

31.    A two-sided market is a market in which "1) two sets of agents interact through an intermediary or platform, and 2) the decisions of each set of agents affects the outcomes of the other set of agents, typically through an externality."[28]   For a

---

[27] Casadesus-Masanell, Ramon, and Joan Enric Ricart, "From Strategy to Business Models and onto Tactics," Special Issue on Business Models, *Long Range Planning*, vol. 43(2), April 2010, p. 196.

[28] Marc Rysman, "The Economics of Two-Sided Markets," *Journal of Economic Perspectives*, vol. 23(3), Summer 2009, p. 125.

platform to succeed, both sides of the market must get on board or participate.[29] And, for agents to get on board, agents on the other side of the platform must participate.[30]

32.     A "network effect" is the change in the value derived from participation on a platform that occurs when the number of users increases.[31]  Users on one side of the platform enjoy *direct* network effects, typically an increase in value from participation, as the number of users on their side of the platform increases.[32]  Importantly, in two-sided markets, increased user participation on one side of the platform also creates an externality for participants on the other side of the platform in the form of *indirect* network effects – increased participation on the platform also changes (typically increases) the value associated with participation to users on the other side of the platform.[33]  The feedback effects when there are positive externalities on both sides of the market are illustrated in Figure 5 below.

---

[29] For example, "a successful pay card requires both consumer usage and merchant acceptance."  (Marc Rysman, "The Economics of Two-Sided Markets," *Journal of Economic Perspectives*, vol. 23(3), Summer 2009, p. 125.)  More generally, a market can be multisided if more than two sides are involved.  For example, an operating system acts as a three-sided platform that connects consumers, software developers, and hardware manufacturers.  (Marc Rysman, "The Economics of Two-Sided Markets," *Journal of Economic Perspectives*, vol. 23(3), Summer 2009, p. 125.)

[30] For example, in relation to the video game platform PlayStation, "[n]either consumers nor game developers will be interested in the PlayStation if the other party is not."  (Marc Rysman, "The Economics of Two-Sided Markets," *Journal of Economic Perspectives*, vol. 23(3), Summer 2009, p. 125.)

[31] "Network externalities are a special kind of externalities in which one person's utility for a good depends on the number of other people who consume this good."  Hal R. Varian, Intermediate Microeconomics, 8th Edition, W.W. Norton & Company, 2010, p. 678.

[32] Tim Stobierski, "What Are Network Effects," Harvard Business School Online, November 12, 2020. (https://online.hbs.edu/blog/post/what-are-network-effects#:~:text=Direct%20network%20effects%20occur%20when,result%20of%20attracting%20more%20users.)

[33] Hal R. Varian, Intermediate Microeconomics, 8th Edition, W.W. Norton & Company, 2010, p. 686.

**Figure 5: Indirect Network Effects in Two-Sided Markets**

Indirect Network Effect A to B

Increase in Participation

Enhanced Value

Side A

Platform

Side B

Enhanced Value

Increase in Participation

Indirect Network Effect B to A

33.     Numerous industries, such as media, payment cards, online video games, and operating systems, fit this paradigm.[34]  For example, newspapers offer a platform that attracts readership by offering content such as news, commentaries, and other information desired by readers.[35]  Advertisers participate in the platform to reach readers, who are potential customers.[36]  Readership may increase with advertising if readers benefit from useful information provided in the advertisements, such as the availability of desirable goods and services at lower prices.[37]  Readership also may increase with advertising if it enables readers to access information at subsidized lower prices.  This may be the case if a newspaper can rely more heavily on advertising revenues as opposed to newspaper or subscription sales revenues to sustain its operations.  Conversely, advertising may increase with a growth in readership as the opportunity to reach a broader audience of potential customers grows.  The indirect positive network externalities between consumers (readers,

---

[34] Marc Rysman, "The Economics of Two-Sided Markets," *Journal of Economic Perspectives*, vol. 23(3), Summer 2009, p. 125.

[35] Marc Rysman, "The Economics of Two-Sided Markets," *Journal of Economic Perspectives*, vol. 23(3), Summer 2009, p. 125.

[36] Marc Rysman, "The Economics of Two-Sided Markets," *Journal of Economic Perspectives*, vol. 23(3), Summer 2009, p. 128.

[37] See, U. Kaiser and M. Song, "Do media consumers really dislike advertising? An empirical assessment of the role of advertising in print media markets," *International Journal of Industrial Organization*, vol. 27(2), pp. 292-301. Readers may also assign negative value to advertising.  (Marc Rysman, "The Economics of Two-Sided Markets," *Journal of Economic Perspectives*, vol. 23(3), Summer 2009, p. 125.)

viewers, or listeners) and advertisers in the media industry are illustrated in Figure 6 below.

**Figure 6: Indirect Network Effects in Media**



34.     The value of a media platform depends on the number of users and advertisers, and these depend on the network effects between the two sides of the platform. Therefore, to increase the value of a media platform, managers of a media platform must adopt strategies, including strategies concerning quality, that take into account the network externalities between both sides of the market.[38]  In particular, platform managers must adopt strategies that contribute to the proper alignment of incentives to participate on the platform between both sides of the market.[39]  If actions on one side of the market have a negative effect on the other side's incentives to participate on the platform, the value of the platform may diminish.[40]  In the newspaper example described above, excessive or uninformative advertising may have a negative effect on readership.

---

[38] Marc Rysman, "The Economics of Two-Sided Markets," *Journal of Economic Perspectives*, vol. 23(3), Summer 2009, p. 128.

[39] See Leonardo Madio and Martin Quinn, "Content moderation and advertising in social media platforms," March 7, 2023, p. 23.  (Available at SSRN: https://ssrn.com/abstract=3551103 or http://dx.doi.org/10.2139/ssrn.3551103.)

[40] "The Tumblr case provides suggestive evidence about the divergence of preferences across sides of the market and how failing to account for them can lead to the destruction of the user base."  See Leonardo Madio and Martin Quinn, "Content moderation and advertising in social media platforms," March 7, 2023, p. 23. (Available at SSRN: https://ssrn.com/abstract=3551103 or http://dx.doi.org/10.2139/ssrn.3551103.)

### B.      Social Media Are Two- (Multi-) Sided Platforms

35.     Social media platforms, like newspapers, fit the two- (multi-) sided market
paradigm.[41]  On one side of the platform, users interact with each other or access
content and, on the other side, advertisers target consumers through the platform.
Moreover, participation on each side of the market has an economic effect on the
other side(s) of the market.  Platforms such as Twitter and Facebook may be
described as two-sided platforms because content is primarily generated by users
themselves.  YouTube and Instagram, in contrast, can be regarded as three-sided
platforms with two sets of users – content providers and viewers.[42]

36.     Typically, social media platforms attract and maintain a large user base and collect
user data.[43]  Users of social media platforms derive more value from the platform as
the number of users increases (a direct network externality).[44]  To create, maintain,
and grow their user bases, social media platforms often attract users by offering a
free service that allows people to connect and share content with friends, family, and
the broader community.[45]  When users sign up, they provide personal information
such as their name, age, location, and interests.[46]  The platform collects additional
data on user behavior, such as the content they generate, the pages they visit, the
posts they like, and the people they interact with. [47]

---

[41] Yassine Lefouili and Leonardo Madio, "The Economics of Platform Liability," *European Journal of Law and Economics*, vol. 53, 2022, p. 321.

[42] H. Shelanski, S. Knox and A. Dhilla, "Network Effects and Efficiencies in Multisided Markets," hearing on re-thinking the use of traditional antitrust enforcement tools in multi-sided markets, Directorate for Financial and Enterprise Affairs Competition Committee, November 15, 2017, OECD, pp. 2 and 3.

[43] "YouTube is a three-sided on-line video market connecting three distinct groups: (i) users (*i.e.*, subscribers or end-user consumers), (ii) content/service providers, and (iii) advertisers." (H. Shelanski, S. Knox and A. Dhilla, "Network Effects and Efficiencies in Multisided Markets," hearing on re-thinking the use of traditional antitrust enforcement tools in multi-sided markets, Directorate for Financial and Enterprise Affairs Competition Committee, November 15, 2017, OECD, pp. 2 and 3.)

[44] Yassine Lefouili and Leonardo Madio, "The Economics of Platform Liability," *European Journal of Law and Economics*, vol. 53, 2022, p. 326.

[45] H. Shelanski, S. Knox and A. Dhilla, "Network Effects and Efficiencies in Multisided Markets," hearing on re-thinking the use of traditional antitrust enforcement tools in multi-sided markets, Directorate for Financial and Enterprise Affairs Competition Committee, November 15, 2017, OECD, p. 4.

[46] See, *e.g.*, https://twitter.com/i/flow/signup and https://www.facebook.com/signup.

[47] For example, see, Twitter, Inc., Form 10-K for the fiscal year ended December 31, 2021, p. 6.

37.     On the other side of the platform, advertisers target users with specific demographic characteristics or interests.  Social media platforms enable such targeted advertising by relying on user data.[48]  For example, Twitter collects data on individual user activity on the platform that "enable[s] advertisers to target an audience based on a variety of factors, including who an account follows and actions taken on [its] platform, such as Tweets created and engagement with Tweets."[49]  Social media platforms often display advertisements alongside user-generated content in the form of sponsored posts, videos, and other ad formats.[50]

38.     Consequently, advertisers on social media platforms want their products displayed on the platform (*i.e.*, associated with content and other products) in a manner that enhances the brand reputation of their products.[51]  Brand reputation is important because it affects consumer decisions.  For example, a recent research study conducted during the COVID-19 pandemic found that 77 percent of Twitter users feel more positive about brands that are community and society focused.[52]

39.     As described above, a defining feature of two (multi) -sided platforms is the presence of "indirect network effects," which occur when the value on one side of the platform varies with the number of customers or users, or number or quality of advertisers, on the other side.  Advertisers enjoy an indirect positive network effect

---

[48] Social media platforms also generate revenue from other sources.  Some social media platforms offer premium services for a fee, such as analytics tools for businesses, enhanced profile features, avoidance of advertisements, or access to exclusive content.  For example, YouTube offers YouTube Premium as an ad-free service for a monthly fee.  (https://www.youtube.com/premium.)  Social media platforms also may extend their revenue streams to business activities such as e-commerce, live events, and subscription services.  For example, Twitter offers Twitter Blue – a "paid subscription that adds a blue checkmark to your account and offers early access to select features, like Edit Tweet."  (https://help.twitter.com/en/using-twitter/twitter-blue.)

[49] Twitter further explains that "[w]e believe this data produces a clear and real-time signal of what is relevant to that account, greatly enhancing the performance of the ads we can serve on behalf of advertisers."  Twitter, Inc., Form 10-K for the fiscal year ended December 31, 2021, p. 6.

[50] Alphabet, YouTube's parent company, refers to this type of advertising as "brand advertising."

[51] Empirical research finds that advertisers are willing to bid more if they know the information context in which their ads will appear.  (See, Sila Ada, Nadia Abou Nabout, and Ela McDonnell Feit, "Context information can increase revenue in online display advertising auctions: Evidence from a policy change," *Journal of Marketing Research*, vol. 59(5), 2022, pp. 1040-1058.)

[52] "Beyond business as usual: Brand reactions to COVID-19," Twitter Marketing UK, https://marketing.twitter.com/en_gb/insights/beyond-business-as-normal--brand-reactions-to-covid-19.

as the value of their participation on the platform increases with the number of users.[53]  Users, in turn, also enjoy an indirect positive network effect from advertisers as their participation enables consumers to participate on the platform at lower or no cost.  Indeed, platforms like Facebook, Twitter, and YouTube subsidize consumer access to the platform through revenue they generate from advertisers.[54]  Another indirect network effect from advertisers to users is the opportunity to shop for products and services they desire.[55]  Figure 7 below provides a stylized depiction of two-sided social media platforms and indirect positive network effects.[56]

### Figure 7: Indirect Network Effects in Social Media



---

[53] Alphabet identifies as a specific source of value to advertisers an increased number of users or customers: "[t]hese partners [advertisers] may not continue to do business with us if we do not create more value (such as increased numbers of users or customers, new sales leads, increased brand awareness, or more effective monetization) than their available alternatives."  Alphabet Inc., Form 10-K for the fiscal year ended December 31, 2019, p. 5.

[54] H. Shelanski, S. Knox and A. Dhilla, "Network Effects and Efficiencies in Multisided Markets," hearing on re-thinking the use of traditional antitrust enforcement tools in multi-sided markets, Directorate for Financial and Enterprise Affairs Competition Committee, November 15, 2017, OECD, p. 4.

[55] According to a digital industry report, social media platforms rank first among platforms that internet users between 16 and 64 years old rely on for brand and product search.  (Hootsuite's Digital 2022 Global Overview Report, p. 106, https://www.hootsuite.com/resources/digital-trends.)

[56] The relative importance of the externalities becomes imbalanced as users do not benefit from more advertisers, but advertisers benefit more with user growth.  (H. Shelanski, S. Knox and A. Dhilla, "Network Effects and Efficiencies in Multisided Markets," hearing on re-thinking the use of traditional antitrust enforcement tools in multi-sided markets, Directorate for Financial and Enterprise Affairs Competition Committee, November 15, 2017, OECD, p. 5.)

40.     For example, on the professional social media network LinkedIn, professionals (users) value positively the opportunity to create more business connections as the number of professionals registered on the platform increases.[57]  A higher number of registered professionals gives recruiters on LinkedIn access to more professionals thereby increasing the value of their advertising spending.[58]

41.     Social media platforms primarily generate revenue through advertising.[59]  Given the economic relationship between users and advertisers, it is in the economic interest of social media platforms to attract a large user base and increase user engagement.[60] To this end, social media platform offerings (*i.e.,* platform features) aim to facilitate and expand the user base (number of established users) and increase user engagement (the response of the user to the platform offering).  For example, Facebook's product development sought to "increase engagement and provide the most compelling user experience."[61]  Consistent with the importance of user engagement, social media platforms identify reductions in user engagement as a material risk factor for companies' performance.  For example, Facebook identifies in its financial statements as a risk factor the company faces its "ability to add and retain users and maintain levels of user engagement with our products."[62]  A decrease in user engagement could lead to a decrease in advertising revenue.[63]  For advertisers, user engagement is indicative of meaningful connections with current and future

---

[57] "The Success of LinkedIn Using Network Effect," Course blog for INFO 2040/CS 2850/Econ 2040/SOC 2090, Cornell University.  (https://blogs.cornell.edu/info2040/2015/11/22/the-success-of-linkedin-using-network-effect/.)

[58] "The Success of LinkedIn Using Network Effect," Course blog for INFO 2040/CS 2850/Econ 2040/SOC 2090, Cornell University.  (https://blogs.cornell.edu/info2040/2015/11/22/the-success-of-linkedin-using-network-effect/.)

[59] *E.g.,* according to YouTube's parent company, "[w]e [Alphabet] generate revenues primarily by delivering both performance advertising and brand advertising."  (Alphabet, Inc., Form 10-K for fiscal year ended December 31, 2019, p. 2.)

[60] David S. Evans, "The Consensus Among Economists on Multisided Platforms and the Implications for Excluding Evidence That Ignore It," *CPI Antitrust Chronicle,* June 2013 (1).

[61] Facebook Inc., Form 10-K for fiscal year ended December 31, 2012, p. 9.

[62] Facebook Inc., Form 10-K for fiscal year ended December 31, 2021, p. 12.

[63] For example, according to Facebook, bad publicity that reduces user engagement could result in decreased revenue.  Facebook Inc., Form 10-K for fiscal year ended December 31, 2022, pp. 26 and 28.

customers.[64]  High levels of user engagement showing a positive attitude towards a brand improves the brand's image and helps the platform attract and retain other advertisers, which leads to more advertising revenue for the platform.

42.     Consequently, social media companies measure the performance and profitability of their platforms in terms of user base size and user engagement level.  For example, for purposes of disclosing its financial performance in reports filed with the U.S. Securities and Exchange Commission, Twitter's key performance metric is "Monetizable Daily Active Usage or Users" ("mDAU").[65]  This metric measures the number of users active on Twitter on any given day.  According to Twitter, mDAU "is the best way to measure our success against our objectives and to show the size of our audience and engagement."[66]  Similarly, Facebook's performance is measured by its user-base metrics – "daily active users" and "monthly active users."[67]

## VII.   SOCIAL MEDIA PLATFORMS HAVE STRONG MARKET-BASED ECONOMIC INCENTIVES TO MODERATE CONTENT

43.     Content moderation consists of controlling user-generated content published on a social media platform.  Content moderation can be defined as:

> monitoring and vetting user-generated content for social media platforms of all types, in order to ensure that the content complies with legal and regulatory exigencies, site/community guidelines, user agreements, and falls within norms of taste and acceptability for that site and its cultural context.[68]

---

[64] P. M. Di Gangi and M. M. Wasko, "Social Media Engagement Theory: Exploring the  Influence of User Engagement on Social Media Usage," *Journal of Organizational and End User  Computing* (JOEUC), vol. 28(2), 2016, pp. 53-73, https://www.researchgate.net/profile/Paul-Di-Gangi-2/publication/299357565_Social_Media_Engagement_Theory/links/5702df4808aea09bb1a305ab/Social-Media-Engagement-Theory.pdf; Stacey McLachlan, "How to Increase Social Media Engagement: A Guide for Marketers," August 13, 2020, https://blog.hootsuite.com/social-media-engagement/.

[65] Twitter Inc., Form 10-K for fiscal year ended December 31, 2020, p. 5.

[66] Twitter Inc., Form 10-K for fiscal year ended December 31, 2020, p. 5.

[67] Facebook Inc., Form 10-K for fiscal year ended December 31, 2021, p. 5.

[68] R. E. Moran, I. Grasso, and K. Koltai, "Folk Theories of Avoiding Content Moderation: How Vaccine-Opposed Influencers Amplify Vaccine Opposition on Instagram," *Social Media + Society*, vol. 8(4), 2022, https://doi.org/10.1177/20563051221144252.

44. Social media platforms have market-based incentives to moderate content on their platforms because content moderation is a quality-control decision that impacts user engagement and advertising revenue.[69] A platform's choice of content moderation must recognize and balance the potentially conflicting effects of content moderation on platform participants. Optimal content moderation from a platform's perspective also must recognize the availability of alternative social media platforms and the potential for substitution away from a platform that fails to moderate content in the interest of platform participants.

### A. Social Media Platforms Have Market-Based Economic Incentives to Moderate Content

45. Social media platforms are for-profit businesses and content moderation is an essential practice they engage in to increase user engagement, maintain and attract advertisers, and maximize the value of the platform.[70] Therefore, managers of social media platforms are economically incentivized to develop content moderation policies, and make content moderation decisions in individual cases, because it affects their financial performance.[71] Inadequate content moderation that is detrimental to user engagement is likely to reduce advertising revenues because the value of a platform to advertisers depends on the level of user engagement. Also, advertisers that do not want their brands associated with certain content may abandon the platform altogether.

46. These incentives are intrinsic to social media platforms that operate an advertising-based model. Twitter, Facebook, and YouTube, among others, follow primarily an

---

[69] Rafael Jimenez-Duran, "The Economics of Content Moderation: Theory and Experimental Evidence from Hate Speech on Twitter," p. 2, https://www.chicagobooth.edu/-/media/research/stigler/pdfs/workingpapers/324jmpjimenezduran003.pdf.

[70] "The moderation policy is a quality decision that maximizes the users' willingness to engage with ads. [...] it makes sense for profit maximizing platforms to restrict the content of some of their users if this increases the overall engagement with ads." Rafael Jimenez-Duran, "The Economics of Content Moderation: Theory and Experimental Evidence from Hate Speech on Twitter," pp. 2 and 3, https://www.chicagobooth.edu/-/media/research/stigler/pdfs/workingpapers/324jmpjimenezduran003.pdf.

[71] I understand that social media platforms' ability to moderate content is predicated on users agreeing to content moderation by agreeing to terms of service. For example, Twitter's 2012 Terms of Service explicitly states that "[w]e [Twitter] reserve the right at all times (...) to remove or refuse to distribute any Content on the Services, to suspend or terminate users." (Twitter, Terms of Use version 7, 2012, https://twitter.com/en/tos/previous/version_7.)

advertising-based model.  As a result, they operate under particularly strong economic incentives to moderate content.[72]  An advertising-based model relies on a large user base to attract advertisers and thus focuses on retaining the largest group of users who may be alienated by more extreme views.[73]  A subscription-based model, in contrast, tends to use the subscription fee as a filter to attract those who are willing to pay to join to share or access content that does not need to satisfy the preferences of a larger user base or advertisers.  As a result, an advertising-based model leads to more moderation by the platform than a subscription-based model.[74]

47.     A recent experimental study found empirical support for the importance of economic incentives as an explanation for content moderation.  In particular, the study found empirical support for the thesis that "[i]n an advertising-driven business model, platforms remove content only if this increases the time that some users spend consuming content, and hence interacting with ads."[75]  The field experiment used Twitter data to examine Twitter's reaction to reported hateful content and to assess how Twitter's enforcement actions impacted activity of users targeted by hateful content on the platform.[76]  The experiment found that reporting hateful content, and Twitter's content moderation in response, resulted in an increase in activity of the targeted users, which is profitable in an advertiser-driven business model.[77]

---

[72] A platform may operate both revenue models.  For example, YouTube is free to users who do not mind watching some ads while watching the videos, but it also offers premium accounts with a fee that allow users to skip the ads.  (https://www.youtube.com/premium.)

[73] Yi Liu, Pinar Yildirim, and Z. John Zhang, "Implications of Revenue Models and Technology for Content Moderation Strategies," *Marketing Science*, vol. 41(4), March 22, 2022, p. 831.

[74] Yi Liu, Pinar Yildirim, and Z. John Zhang, "Implications of Revenue Models and Technology for Content Moderation Strategies," *Marketing Science*, vol. 41(4), p. 831.

[75] Rafael Jimenez-Duran, "The Economics of Content Moderation: Theory and Experimental Evidence from Hate Speech on Twitter," p. 44, https://www.chicagobooth.edu/-/media/research/stigler/pdfs/workingpapers/324jmpjimenezduran003.pdf.

[76] Rafael Jimenez-Duran, "The Economics of Content Moderation: Theory and Experimental Evidence from Hate Speech on Twitter," p. 40, https://www.chicagobooth.edu/-/media/research/stigler/pdfs/workingpapers/324jmpjimenezduran003.pdf.

[77] Rafael Jimenez-Duran, "The Economics of Content Moderation: Theory and Experimental Evidence from Hate Speech on Twitter," p. 1, https://www.chicagobooth.edu/-/media/research/stigler/pdfs/workingpapers/324jmpjimenezduran003.pdf.

48.     The incentives that market forces create for a platform to engage in content moderation are equally illustrated by the consequences of failing to implement content moderation.  For example, Myspace was the most popular social media site from 2005 through 2008 but was surpassed by Facebook in 2009. [78]  The reasons cited for its decline include lack of content moderation, in particular the absence of regulations or systems to deal with violations on the site and the site's poor reputation due to the presence of age-inappropriate content exposed to minors.[79]  As explained above, consequences such as these flowing from a lack of adequate content moderation can deter participation of both users and advertisers.

49.     Elon Musk's takeover of Twitter in 2022 constitutes a natural experiment about the relationship between content moderation and advertising revenue.[80]  Mr. Musk's acquisition of Twitter was expected to result in a reduction in content moderation.[81]  Consistent with these expectations, Twitter reportedly reduced its content moderation staff,[82] limited access among its staff to content moderation tools,[83] and dissolved its advisory Trust and Safety Council.[84]  The world's largest media buying

---

[78] "What Happened to Myspace (and Is It Even Still Around)?" https://www.purewow.com/entertainment/what-happened-to-myspace#:~:text=Myspace%20peaked%20around%202008%E2%80%94but,the%20episode%20below)%20for%20more.

[79] https://buildd.co/startup/failure-stories/what-happened-to-myspace.

[80] The closing of Mr. Musk's purchase of Twitter was confirmed by his tweet announcing "the bird is freed" on October 27, 2022.  (https://twitter.com/elonmusk/status/1585841080431321088?lang=en.)

[81] Kat Tenbarge, David Ingram and Ben Goggin, "Under Musk, some fear Twitter's moderation progress could unravel," NBC News, April 26, 2022.

[82] "Yesterday's reduction in force affected approximately 15% of our Trust & Safety organization (as opposed to approximately 50% cuts company-wide), with our front-line moderation staff experiencing the least impact." (Yoel Roth – former Head of Trust & Safety at Twitter, Tweet, November 4, 2022, https://twitter.com/yoyoel/status/1588657229628321792?cxt=HHwWgMDRnarVhYwsAAAA.)

[83] Siladitya Ray, "Twitter Safety Head Admits 'Surge In Hateful Conduct' As Firm Reportedly Limits Access To Moderation Tools," Forbes, November 1, 2022.

[84] "Twitter today dispersed the Trust & Safety Council, which was an advisory group consisting of roughly 100 independent researchers and human rights activists. The group, formed in 2016, gave the social network input on different content and human rights-related issues such as the removal of Child Sexual Abuse Material (CSAM), suicide prevention and online safety."  (Ivan Mehta, "Twitter disperses the Trust & Safety Council after key members resigned," *TechCrunch,* December 12, 2022.)

agency designated Twitter as a "high risk" media buy.[85]  Reportedly, Twitter lost half of its top 100 advertisers within less than a month of Musk's takeover of Twitter, accounting "for nearly $2 billion in spending on the platform since 2020, and over $750 million in advertising in 2022 alone."[86]  Mr. Musk acknowledged the "drop in revenue" and attributed the reduction in advertising revenue to pressure by activist groups on advertisers associated with concerns about content moderation.[87]

50.     Economic incentives to moderate content are not unique to social media platforms. Traditional advertising-supported media such as magazines, newspapers, television, and radio are also two-sided platforms.  These platforms either create content themselves or buy content from third parties, which is then used to attract readers and audiences.  Readership and audiences are then used to attract advertisers. Advertisers value media platforms that have more viewers and media platforms value advertisers as a source of revenue.[88]  Consistent with these well-understood externalities and economic incentives, traditional media companies moderate the content available on their platforms accordingly: "the cultural content offered to media consumers is shaped by the desire to offer advertisers a vehicle that reaches as many prospective consumers as possible."[89]

---

[85] "GroupM, the world's largest media buying agency, is telling clients that Twitter is now a "high risk" media buy following a barrage of controversies, U-turns and confusion that capped off Elon Musk's second week as the owner of the social network."  (Ivy Liu, "Internal Twitter documents show scope of advertisers' questions about Elon Musk's policies." *Grid.news*, November 15, 2022, https://digiday.com/marketing/never-been-critical-twitters-ad-boycott-is-starting-to-look-like-a-long-goodbye/.)

[86] "In less than a month, Elon Musk has driven away half of Twitter's top 100 advertisers."  (Media Matters for America, November 22, 2022, https://www.mediamatters.org/elon-musk/less-month-elon-musk-has-driven-away-half-twitters-top-100-advertisers.)  Also see, *e.g.*, "Volkswagen tells brands to pause paid advertising on Twitter," Reuters, November 4, 2022 (https://www.reuters.com/technology/volkswagen-tells-brands-pause-paid-activities-twitter-2022-11-04/#:~:text=HAMBURG%2C%20Nov%204%20(Reuters),of%20the%20social%20media%20platform.)

[87] https://twitter.com/elonmusk/status/1588538640401018880.

[88] David S. Evans and Richard Schmalensee, "The Industrial Organization of Markets with Two-Sided Platforms," *Competition Policy International*, vol. 3(1), 2007, p. 155.

[89] Simon P. Anderson and Jean J. Gabzewicz, "The media and advertising: a tale of two-sided markets," prepared for Handbook of Cultural Economics, Victor Ginsburgh and David Thorsby, Eds., Elsevier Science, 2005, p. 2.  One major functional difference between social media platforms and traditional media is that content moderation in traditional media can be implemented during content generation (or selection), before it is made available to consumers.  Content generation on social media platforms, in contrast, is generally not controlled by the platforms and content moderation must be applied to the generated content after it appears

51.     In sum, the advertising-driven business model of social media platforms creates strong market-based economic incentives for the platforms to moderate content to maintain and grow revenues and profits.  These incentives are intrinsic to this type of two- (multi-) sided platforms, where the value of the platform is dependent on the participation of both users and advertisers, and their participation is dependent on the content displayed on the platform.

### B.     The Economic Tradeoffs of Content Moderation

52.     Moderating content has effects on all platform participants – users, content providers, advertisers – and the platforms themselves.  Therefore, to maximize its value, a platform must moderate content such that it balances potentially conflicting effects on platform participants.[90]  As a Congressional Research Service report states, "[e]ach social media operator balances incentives to moderate and prioritize content to increase user engagement and its revenue."[91]

53.     One trade-off that managers may encounter concerns veracity and openness.  As explained above, failure to adequately moderate content is detrimental to social media platforms as it may have a negative effect on user engagement, advertising revenue, and profits.  Excessive content moderation, however, also can harm a platform's reputation and have similar negative effects.  An article published by the consulting firm PricewaterhouseCoopers International summarizes the so-called "moderator's dilemma":

> These [content] platform companies, which must deal with a growing deluge of user-generated content, have to make Solomon-like decisions about the veracity of this information. If they publish

---

on the platform.  Also, content generated by users on social media platforms spreads and multiplies quickly by means of other users' "likes" and reposts.  This means that the amount of content generated on social media platforms is exponentially larger, and neither the content itself nor its timing is controlled by the platforms.

[90] Content moderation is resource intensive and the cost to the platform of having technical means or personnel to carry out content moderation is a factor a social media company also must address.  For example, "Facebook Inc. said it has spent more than $13 billion on safety and security efforts since the 2016 U.S. election, and now has 40,000 employees working on those issues."  (Kurt Wagner and Bloomberg, "Facebook says it has spent $13 billion on safety and security efforts since 2016," *Fortune,* September 21, 2021, https://fortune.com/2021/09/21/facebook-says-it-has-spent-13-billion-on-safety-and-security-efforts-since-2016/.)

[91] Congressional Research Service, "Social Media: Misinformation and Content Moderation Issues for Congress," January 27, 2021, p. 9, https://crsreports.congress.gov/product/pdf/R/R46662.

content that is clearly untrue, consumer backlash would likely be swift, threatening revenue and reputation. On the other hand, if platforms refuse to publish certain content, they may be accused of censorship, bias or having a political agenda.  Adding to the problem are algorithms, which can produce filter bubbles that reinforce users' existing beliefs, rather than showing them a variety of viewpoints.[92]

54.    A second trade-off social media platforms may encounter is the one between the preferences of users and advertisers if these are not aligned.  As noted in paragraph 38, above, advertisers want their products displayed on social media platforms with content and other products that enhance the brand reputation of their products. They prefer content moderation that does not harm their brand image and reputation.  If users, on the other hand, prefer content that is detrimental from the advertiser's perspective, optimal content moderation will have to balance the preferences of users and advertisers based on their economic impact on the value of the platform.[93]  Generally, from an economics perspective, social media platform managers must assess whether users' and advertisers' perception of content is aligned and, if they are not aligned, assess the sensitivity of advertising revenues to alternative levels of content moderation.[94]

## C.    Competition Disciplines the Level of Content Moderation

55.    The availability of alternative social media platforms, and the potential for substitution away from a platform that fails to moderate content in the interest of its

---

[92] "The quest for truth: Content moderation in action," https://www.pwc.com/us/en/industries/tmt/library/content-moderation-quest-for-truth-and-trust.html. Along these lines, Twitter's former Chief Legal Officer Vijaya Gadde recently testified that "[d]efending free expression and maintaining the health of the platform require difficult judgment calls."  (House Oversight and Accountability Committee hearing on Twitter, February 9, 2023, p. 12.)

[93] Leonardo Madio and Martin Quinn describe the example of a platform losing users by moderating content in favor of brand safety: "in 2019, the micro-blogging platform Tumblr lost nearly 30% traffic after banning" adult content "in late 2018 and almost 99% of its market value. Such a ban was designed to keep 'content that is not brand-safe away from ads'." (See Leonardo Madio and Martin Quinn Content moderation and advertising in social media platforms," March 7, 2023. Available at SSRN: https://ssrn.com/abstract=3551103 or http://dx.doi.org/10.2139/ssrn.3551103.)

[94] See Leonardo Madio and Martin Quinn, "Content moderation and advertising in social media platforms," March 7, 2023.  (Available at SSRN: https://ssrn.com/abstract=3551103 or http://dx.doi.org/10.2139/ssrn.3551103.)

participants, also influences the level of content moderation a social media platform can implement profitably.

56.    Social media platforms face competition and this competition impacts content moderation.  Facebook explains that "we [Facebook] compete to attract, engage, and retain people who use our products, to attract and retain businesses that use our free or paid business and advertising services […]."[95]  In the presence of social media alternatives, users who consider the level of content moderation on a platform inadequate can choose to engage less frequently or intently on that platform or leave for a new platform.  Similarly, advertisers that consider the level of content moderation to be inadequate for the image or reputation of their brand can migrate to other social media platforms.

57.    A key feature of the competitive environment among multi-sided platforms is the extent to which users and advertisers engage in what is called "single-homing" or "multi-homing."[96]  A platform user single-homes if she uses only one platform in a particular industry and multi-homes if she uses several.[97]  When it comes to social media consumption, users tend to multi-home much more extensively than in the world of traditional print media.[98]  Also, the switching cost in monetary terms is significantly lower and often zero when subscription fees are not involved.  The non-monetary cost of switching, for example losing contact with friends and connections, is also low when most friends share multiple platforms, which is most likely when the presence of multi-homing is extensive.

58.    Multi-homing is common, and even top platforms are far less essential to their users than suggested by the relatively large size of their respective user bases.  According to a 2022 industry report, users are active on 7.5 social platforms each month on

---

[95] Meta Platforms, Inc., Form 10-K for the fiscal year ending December 31, 2021, p. 8.

[96] Jean-Charles Rochet and Jean Tirole, "Platform Competition in Two-Sided Markets," *Journal of the European Economic Association*, vol. 1(4), 2003, pp. 990-1029.

[97] Jean-Charles Rochet and Jean Tirole, "Platform Competition in Two-Sided Markets," *Journal of the European Economic Association*, vol. 1(4), 2003, pp. 990-1029.

[98] Susan Athey, Emilio Calvano, Joshua S. Gans, "The Impact of Consumer Multi-homing on Advertising Markets and Media Competition," *Management Science*, vol. 64(4), pp. 1574-1590.

average.[99]  Among the top social media platforms, no more than 1.5 percent of any company's user base engages exclusively with that one platform.  For example, 0.7 percent of Facebook's users engage exclusively with Facebook.  For Twitter, the proportion is 0.2 percent.[100]  Thus, most users can easily shift engagement from a platform with unsatisfactory levels of content moderation to others on which they are already active.

## VIII.   GOVERNMENT INTERVENTION IS NOT NECESSARY FOR SOCIAL MEDIA PLATFORMS TO MODERATE LOW-QUALITY CONTENT

59.    According to Plaintiffs, "absent federal intervention, common-law and statutory doctrines, as well as voluntary conduct and natural free-market forces, would have restrained the emergence of censorship and suppression of speech of disfavored speakers, content, and viewpoints on social media."[101]  This statement lacks economic validity and government intervention is not necessary to incentivize social media platforms to moderate low-quality content.

60.    The market-based economic incentives to moderate content described above indicate that Federal intervention is unnecessary for the moderation of low-quality content (including misinformation, disinformation or malinformation).  Large social media platforms have strong market-based economic incentives to moderate low-quality content regardless of "federal intervention" because this type of content is financially detrimental to them.[102]

61.    Low-quality content is deemed financially detrimental by social media platforms because it has a negative effect on advertising revenues.[103]  Advertising revenues

---

[99] Hootsuite's Digital 2022 Global Overview Report, p. 87, https://www.hootsuite.com/resources/digital-trends.

[100] Hootsuite's Digital 2022 Global Overview Report, p. 102, https://www.hootsuite.com/resources/digital-trends.

[101] Complaint, ¶ 4.

[102] See § VII.

[103] Social media platforms' economic incentives to moderate content that can be detrimental to their business imply that they also are economically incentivized to change moderation of specific content in response to

decrease as advertisers abandon the platform for fear that their brand will be impacted negatively by their association with this type of content.[104]  Advertising revenues also may decrease because the value of advertising on the platform diminishes if users reduce their engagement as a result of concerns about the utility and trustworthiness of information on the platform.[105]

62.    Large social media platforms recognize the market-based economic incentives to moderate low-quality content.  The content that social media platforms identify explicitly as detrimental includes false, misleading or undesirable content, and the spreading of misinformation or disinformation.  For example, Twitter acknowledges that dissemination of information perceived to be "misleading or manipulative" could adversely affect its reputation and could decrease revenues.[106]  Facebook identifies "use of our products or services to disseminate information that is deemed to be misleading (or intended to manipulate opinions)" as actions that could negatively impact its brands.[107]  Similarly, YouTube's parent company, Alphabet, recognizes that violations of its guidelines such as the display of "false, misleading or undesirable content" and the "spreading of misinformation or disinformation" could harm the reputation of its brands (*e.g.*, YouTube), reduce use of its platforms, and have a negative impact on its financial condition.[108]

63.    In response to these economic incentives, social media platforms regularly take actions to moderate content and address misinformation or misleading content.  For example, Twitter has numerous rules that prohibit certain content, such as

---

changes in cultural norms and users' and advertisers' perceptions of what constitutes low-quality content such as spam, misinformation, disinformation, and false or misleading information.

[104] See, for example, James Hale, "Brands Look at Instagram's Content Moderation After Ads Run Alongside Posts About Self-Harm, Suicide," *Tubefiler*, January 29, 2019. (https://www.tubefilter.com/2019/01/29/instagram-youtube-adpocalypse-content-moderation/.)

[105] For example, Alphabet identifies as a specific source of value to advertisers an increased number of users or customers: "[t]hese partners [advertisers] may not continue to do business with us if we do not create more value (such as increased numbers of users or customers, new sales leads, increased brand awareness, or more effective monetization) than their available alternatives."  Alphabet Inc., Form 10-K for the fiscal year ended December 31, 2019, p.5.

[106] Twitter, Inc., Form 10-K, for the fiscal year ended December 31, 2021, p. 17.

[107] Meta Platforms, Inc., Form 10-K for the fiscal year ended December 31, 2022, p. 22.

[108] Alphabet Inc., Form 10-K for the fiscal year ended December 31, 2022, p. 16.

misleading information regarding elections and other civic processes.[109]  Twitter's rules are enforced through a variety of actions, including requiring removal of all tweets that violate the rules and permanently suspending accounts that have either repeatedly violated the rules or violated the rules in a particularly egregious way.[110] Similarly, the Facebook Community Standards prohibit content such as harmful health misinformation, and misinformation likely to interfere with people's ability to participate in voter and census processes, and manipulated media.[111]  Facebook enforces these standards by removing violative content, disabling accounts with repeated violations, and other methods.[112]  YouTube also enforces its policies on prohibited content, including manipulated content and content that contradicts the guidance of health authorities on some safe medical practices, by removing channels and videos that violate its Community Guidelines.[113]

64.     In response to economic incentives, the amount and type of content ultimately moderated will depend on the amount and type of low-quality content shared on social media platforms.  For example, recent studies suggests that content polarization, which has increased steadily in the U.S. over the past 40 years,[114] explains sharing of low-quality political content on social media platforms and

---

[109] https://help.twitter.com/en/rules-and-policies/twitter-rules.

[110] https://help.twitter.com/en/rules-and-policies/enforcement-options.  In 2021, Twitter removed 8.7 million Tweets that violated the Twitter Rules and suspended 2.5 million accounts for violating the Twitter Rules. (Twitter Transparency Report, January – June 2021, https://transparency.twitter.com/en/reports/rules-enforcement.html#2021-jan-jun. Twitter Transparency Report, July – December 2021, https://transparency.twitter.com/en/reports/rules-enforcement.html#2021-jul-dec.)

[111] https://transparency.fb.com/policies/community-standards/; https://transparency.fb.com/policies/community-standards/misinformation/.

[112] https://transparency.fb.com/policies/community-standards/; https://transparency.fb.com/enforcement/taking-action/taking-down-violating-content/; https://transparency.fb.com/enforcement/taking-action/disabling-accounts/.  In 2022, the number of pieces of content (such as posts, photos, videos or comments) and accounts Facebook took action on totaled over 12 billion.  (Facebook Community Standards Enforcement Report, Q4 2022, https://transparency.fb.com/data/community-standards-enforcement/; https://transparency.fb.com/policies/improving/content-actioned-metric/.)

[113] https://support.google.com/youtube/answer/9288567. https://transparencyreport.google.com/youtube-policy/removals?hl=en.  In 2021, YouTube removed 25.8 million videos and 15 million channels for violating its Community Guidelines.  (https://transparencyreport.google.com/youtube-policy/removals?hl=en.)

[114] Levi Boxell, Matthew Gentzkow and Jesse M. Shapiro, "Cross-Country Trends in Affective Polarization," National Bureau of Economic Research, Working Paper 26669. (http://www.nber.org/papers/w26669.)

concludes that "individuals who report hating their political opponents are the most likely to share political fake news and selectively share content that is useful for derogating these opponents."[115]  Consistent with this finding, survey research has found that individuals holding more extreme political views are more active on social media.[116]

65.     Twitter's ban of former President Trump provides quasi-experimental evidence of the beneficial effect of moderation of content deemed by a social media company to be detrimental to user engagement.[117]  On January 8, 2021, Twitter banned former President Trump from the platform.[118]  Edison Research's study "The Social Habit" compared Twitter usage before and after the ban.  The study reveals that the proportion of U.S. social media users age 18 and older who said they used Twitter increased from 43 percent prior to the ban to 52 percent after the ban – a 21 percent increase.  Daily Twitter usage also increased from 24 percent of social media users age 18 and older pre-ban to 29 percent post-ban – also a 21 percent increase.  Such an increase of daily Twitter usage was observed among both politically liberal and conservative social media users.[119]  This evidence showing a user increase in response to content moderation suggests that the action was beneficial to Twitter

---

[115] Mathias Osmundsen, Alexander Bor, Peter Vahlstrup, Anja Bechmann, and Michael Petersen, "Partisan Polarization Is the Primary Psychological Motivation behind Political Fake News Sharing on Twitter," *American Political Science Review*, 115(3), 2021, pp. 999-1015.

[116] Pew Research Center, "Americans at the ends of the ideological spectrum are the most active in national politics," January 5, 2022.

[117] In economics, this type of observational evidence is called a natural experiment.  An event, such as a policy change, allows researchers to assess the impact of an intervention of interest. See, for example, A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, vol. 35(1), pp. 13-39, 1997; Joshua D. Angrist and Jörn-Steffen Pischke, "The Credibility Revolution in Empirical Economics: How Better Research Design Is Taking the Con out of Econometrics," *Journal of Economic Perspectives*, 24 (2), pp. 3-30, 2010.  Quasi-experimental evidence assesses the causal effects of an intervention without units being randomly assigned to treatment or control groups.

[118] Twitter, "Permanent suspension of @realDonaldTrump," January 8, 2021, https://blog.twitter.com/en_us/topics/company/2020/suspension. Elon Musk subsequently announced Twitter would lift the ban on former President Trump on November 18, 2022.  (Elon Musk Tweet, November 18, 2022, https://twitter.com/elonmusk/status/1594131768298315777?lang=en.)

[119] Edison Research, "Twitter before and after Trump," February 17, 2021, https://www.edisonresearch.com/twitter-before-and-after-trump/.

from an economic perspective since higher user engagement brings more advertisers to the platform and thus more advertising revenue.[120]

## IX.   MODERATION OF LOW-QUALITY CONTENT PREDATES DEFENDANTS' ALLEGED ACTIONS

66.     In support of their theory that content moderation observed on social media platforms after 2020 is attributable to Defendants' alleged actions, Plaintiffs allege that "prior to Defendants' campaign of threats and pressure, social-media platforms generally declined to engage in the acts of censorship alleged herein."[121]  Contrary to this claim, and consistent with the economic incentives promoting content moderation described above, social media platforms had implemented broad content moderation prior to 2020 in line with contemporaneous societal concerns, including moderation of low-quality content in the spheres of politics and public health.

67.     As a preliminary matter, while certain aspects of social media platforms' business models have evolved over time, the economic incentives driving content moderation described in § VII above have been present since social media platforms first appeared, including the economic benefits associated with balancing openness and veracity, and the economic benefits associated with responding to users' and advertisers' preferences.  Thus, it is reasonable from an economics perspective to find, as illustrated below, that content moderation would be significant prior to 2020.

68.     Moderation of low-quality content, in particular, has played an important role since the inception of social media platforms.  Early social media platform Friendster launched in 2002.  Friendster's Terms of Service included content-moderation

---

[120] There is evidence that daily new users on Gab – a conservative platform – increased dramatically immediately following the Trump-ban, suggesting that the ban might have stimulated interest in competing social media platforms as well.  See Rafael Jimenez-Duran, "The Economics of Content Moderation on Social Media," https://www.promarket.org/2022/11/10/the-economics-of-content-moderation-on-social-media/.

[121] Complaint, ¶ 478.

provisions that shaped content on the platform and not only forbade promoting hatred but also misleading or false information as early as 2003.[122]

69.    Facebook also adopted guidelines and mechanisms early on to moderate content and make their platform more attractive to users and advertisers.  One example of early content moderation promoting user safety prior to 2020 is the 2012 introduction of safety measures seeking to protect teenagers.[123]  Those measures were "coupled with educational resources and partnerships with online safety experts to offer protections for all users, particularly teenagers."[124]  Teenagers were a key user population Facebook wanted to attract and maintain, and therefore protect.[125]

70.    Content moderation aimed at providing a safer platform was an important business consideration for Twitter well before 2020.  In its 2015 financial report, Twitter identified user safety as a factor that could diminish growth in its user base and user engagement.[126]  As I explain above, user base and user engagement on a social media platform are directly related to business success.  Ms. Vijaya Gadde, Twitter's former Chief Legal Officer, testified that "[a]fter Jack Dorsey returned as CEO in 2015, one of his top priorities became what we call the health of the public conversation."[127]  As to the drivers behind this content moderation-related goal, Ms. Gadde explained that "[t]his was based on customer research, advertiser feedback, Twitter's declining revenue, user growth, and stock price.  Teams across Twitter were focused on

---

[122] "Friendster may review and delete any content, messages, photos or profiles (collectively, 'Content') that in the sole judgment of Friendster violate this Agreement or which might be offensive, illegal, or that might violate the rights, harm, or threaten the safety of Members," including content that "promotes information that you *know is false, misleading* or promotes illegal activities or conduct that is abusive, threatening, obscene, defamatory or libelous."  (Emphasis added.)  Friendster Terms of Service Agreement, archived on April 1, 2003, https://web.archive.org/web/20030401235809/http://www.friendster.com/info/tos.jsp.

[123] Facebook Inc., Form 10-K for fiscal year ended December 31, 2012, p. 11.

[124] Facebook Inc., Form 10-K for fiscal year ended December 31, 2012, p. 11.

[125] Facebook was the most popular social media platform among teenagers.  "Twitter is still not in the same league as Facebook, which attracts 77% of online teens."  Pew Research Center, "Teens, Social Media and Privacy," May 21, 2013, https://www.pewresearch.org/internet/2013/05/21/part-1-teens-and-social-media-use/.

[126] Twitter Inc., Form 10-K for fiscal year ended December 31, 2015, p. 11.

[127] House Oversight and Accountability Committee hearing on Twitter, Written Statement of Vijaya Gadde, February 8, 2023, p. 1.

making the platform safer, better, and more profitable."[128]  Thus, Twitter expressly linked user safety to its goal of increased profitability.

71.  Over the history of social media, content moderation pre-2020 has responded to evolving social concerns, including terrorism, election interference, and public health concerns.  Recognizing the impact of these issues on consumers' and advertisers' decisions to participate on a platform, social media platforms have been incentivized to moderate content accordingly before 2020.

72.  For example, in response to a large increase in violent terror-related content in 2014, social media platforms implemented more stringent rules against violent content. Among other measures, Facebook, Twitter, YouTube, and Microsoft created a database of terrorist images.[129]  Content moderation of violent content was promoted by economic incentives.  For example, in 2017, Google reportedly ran advertisements purchased on its network alongside extremist content on YouTube.[130] As a result, Marks & Spencer, Audi, L'Oreal and the UK Government ended their advertising spending on the Google network in 2017.  In response, Mr. Matthew Brittin, Google's European Chief, apologized and said the company would improve the company's content moderation actions and would give more control to advertisers over the placement of the advertisements.[131]  Also, in December 2017, YouTube CEO Susan Wojcicki highlighted an increase in "sharing extremist content and disseminating *misinformation*" (emphasis added), and explained that these actions hurt revenue.[132]  Ms. Wojcicki explained how YouTube "tightened

---

[128] House Oversight and Accountability Committee hearing on Twitter, *Written Statement of Vijaya Gadde*, February 8, 2023, p. 1.

[129] James Titcomb, "Facebook, Twitter and YouTube Create Database of Terrorist Images to Fight Online Extremism," *Telegraph*, December 5, 2016 (https://perma.cc/QP8K-UQN9).

[130] "YouTube faces an advertiser exodus over extremist materials," March 21, 2017, https://www.theneweconomy.com/strategy/youtube-faces-an-advertiser-exodus-over-extremist-materials.

[131] "YouTube faces an advertiser exodus over extremist materials," March 21, 2017, https://www.theneweconomy.com/strategy/youtube-faces-an-advertiser-exodus-over-extremist-materials.

[132] Susan Wojcicki, "Protecting Our Community" *Inside YouTube*, December 4, 2017 (https://blog.youtube/inside-youtube/protecting-our-community/).

policies on what content can appear on [its] platform" by "increas[ing] [its] enforcement teams."[133]

73.   Trust and safety in the realm of political speech became a bigger concern in 2016. Facebook launched a fact-checking program in 2016 in response to information manipulation campaigns conducted during the ongoing U.S. presidential election campaign.  Facebook recognized that dissemination of information "deemed to be misleading (or intended to manipulate opinions)" may be financially detrimental to it.[134]  Facebook's stated goal as early as 2016 was to "address the issue of fake news and hoaxes."[135]  Among other measures, Facebook demoted disputed stories in its News Feed.[136]  To implement this content moderation policy, Facebook relied on outside sources, including both its users and third-party fact checking organizations, to identify non-compliant posts.[137]

74.   Responding to similar concerns regarding the role of misinformation on democratic processes like Brexit and the 2016 election, Twitter removed at least 70 million bot (*i.e.,* automated) accounts in 2018.[138]  Reportedly, Del Harvey, Twitter's head of trust and safety, stated that Twitter "was now erring more on the side of 'preserving safety' rather than supporting free speech at all costs."[139]  Twitter stated that their efforts were guided by an effort to "ensure that people have access to credible, relevant, and high-quality information on Twitter."[140]  Twitter was economically incentivized to moderate low-quality content in the sphere of politics because it

---

[133] Susan Wojcicki, "Expanding our work against abuse of our platform" *Inside YouTube*, December 5, 2017 (https://blog.youtube/news-and-events/expanding-our-work-against-abuse-of-our/).

[134] Facebook, Inc, Form 10-K for fiscal year ended December 31, 2016, p. 12.

[135] Adam Mosseri, "Addressing Hoaxes and Fake News," Facebook, December 15, 2016.

[136] Adam Mosseri, "Addressing Hoaxes and Fake News," Facebook, December 15, 2016.

[137] Adam Mosseri, "Addressing Hoaxes and Fake News," Facebook, December 15, 2016.

[138] Twitter Shuts down millions of fake accounts," BBC News, July 9, 2018, https://www.bbc.com/news/technology-44682354.

[139] Twitter Shuts down millions of fake accounts," BBC News, July 9, 2018, https://www.bbc.com/news/technology-44682354.

[140] Yoel Roth and Del Harvey, "How Twitter Is Fighting Spam And Malicious Automation," Twitter, June 26, 2018. (https://blog.twitter.com/official/en_us/topics/company/2018/how-twitter-is-fighting-spam-and-malicious-automation.html.)

recognized that user engagement drove the majority of its revenues through advertising and "[i]f people do not perceive our products and services to be useful, reliable and *trustworthy*, we may not be able to attract users or increase the frequency of their engagement with our platform and the ads that we display."[141] (Emphasis added.)

75.     Twitter's 2018 concerns and actions in the spheres of politics and public emergencies predated Twitter's post-2020 content moderation in relation to the 2020 election and the COVID-19 pandemic.[142]   Indeed, in 2018 Twitter expressed its concern broadly in relation to issues "from elections to emergency events and high-profile public conversations."[143]

76.     Other social media platforms also began moderating content in relation to public health before 2020 for economic reasons.   YouTube reportedly began promoting more authoritative content related to vaccinations through its algorithms in 2017.[144] In 2017, Alphabet recognized that YouTube and its other "brands may also be negatively affected by the use of our products or services to disseminate information that is deemed to be misleading."[145]   In 2019, YouTube announced that it would "demonetize" channels that promote anti-vaccination.[146]   (Demonetization of a

---

[141] Twitter, Inc., Annual Report, Form 10-K for the fiscal year ending December 31, 2016, p. 11.

[142] Yoel Roth and Del Harvey, "How Twitter Is Fighting Spam And Malicious Automation," Twitter, June 26, 2018. (https://blog.twitter.com/official/en_us/topics/company/2018/how-twitter-is-fighting-spam-and-malicious-automation.html.)

[143] Yoel Roth and Del Harvey, "How Twitter Is Fighting Spam And Malicious Automation," Twitter, June 26, 2018. (https://blog.twitter.com/official/en_us/topics/company/2018/how-twitter-is-fighting-spam-and-malicious-automation.html.)

[144] Christina Caron, "Pinterest Restricts Vaccine Search Results to Curb Spread of Misinformation," *The New York Times,* February 23, 2019. (https://www.nytimes.com/2019/02/23/health/pinterest-vaccination-searches.html.)

[145] Alphabet Inc., Annual Report, Form 10-K for the fiscal year ended December 31, 2017, p. 13.

[146] Catherine Shu, "YouTube demonetizes anti-vaccination videos," *TechCrunch,* February 22, 2019. (https://techcrunch.com/2019/02/22/youtube-demonetizes-anti-vaccination-videos/).

channel on YouTube means that ads cannot be shown on some or all of the videos on the channel, which implies a loss of revenue for the creator of the videos.)[147]

77.     Pinterest began taking action to prevent the spread of harmful health misinformation as early as 2017, when the platform updated its community guidelines to prohibit anti-vaccination advice and other health misinformation.[148]  The platform took further action in 2018 by not showing results for vaccine-related searches, and again in 2019 by redirecting vaccine-related searches to "reliable results about immunizations from leading public health organizations," such as the World Health Organization and the Centers for Disease Control and Prevention.[149]  Pinterest responded to economic incentives as it viewed the dissemination of information deemed to be misleading as potentially harmful to its brand reputation.[150]

78.     Also related to public health, Instagram responded to advertisers' demands in 2019 for content moderation related to the need to eliminate content promoting self-harm or suicide.[151]  Instagram reportedly took actions to remove certain content and "to make sure that" Instagram was "living up to the responsibilities that [advertisers] have of us, and I think we can always improve."[152]  Exemplifying the role that market-based incentives play in the moderation of health-related content, one of the

---

[147] Kajabi.com, "YouTube demonetization: The essential guide for content creators." (https://kajabi.com/blog/youtube-demonetization#:~:text=YouTube%20demonetization%20is%20when%20a,of%20revenue%20for%20the%20creator.)

[148] Ifeoma Ozoma, "Bringing authoritative vaccine results to Pinterest search," Pinterest Newsroom, August 28, 2019. (https://newsroom.pinterest.com/en/post/bringing-authoritative-vaccine-results-to-pinterest-search).

[149] Ifeoma Ozoma, "Bringing authoritative vaccine results to Pinterest search," Pinterest Newsroom, August 28, 2019. (https://newsroom.pinterest.com/en/post/bringing-authoritative-vaccine-results-to-pinterest-search).

[150] Pinterest, Form 10-K for the fiscal year ended December 31, 2019.  "The pre-COVID-19 vaccine-related policies developed by the platforms focused primarily on reducing the discoverability of anti-vaccine content and providing links to authoritative sources." (The Virality Project, "Memes, Magnets, and Microchips, Narrative Dynamics around COVID-19 Vaccines," 2022, p. 124.)

[151] James Hale, "Brands Look at Instagram's Content Moderation After Ads Run Alongside Posts About Self-Harm, Suicide," *Tubefiler*, January 29, 2019.  (https://www.tubefilter.com/2019/01/29/instagram-youtube-adpocalypse-content-moderation/.)

[152] James Hale, "Brands Look at Instagram's Content Moderation After Ads Run Alongside Posts About Self-Harm, Suicide," *Tubefiler*, January 29, 2019.  (https://www.tubefilter.com/2019/01/29/instagram-youtube-adpocalypse-content-moderation/.)

impacted advertisers, Marks & Spencer, reportedly sought explicitly "'additional assurances from Instagram' that content is being properly moderated."[153]  Also, in 2019, Facebook aimed to "minimize low-quality health-related content" based on its understanding of the importance of information quality for users: "[w]e know that people don't like posts that are sensational or spammy, and misleading health content is particularly bad for our community."[154]  As explained above, promoting information quality in alignment with user preferences responds to economic incentives.

## X.    CONCLUSION

79.    Plaintiffs allege that Defendants coerced social media platforms to "censor" certain content.  Plaintiffs assert that without the alleged government intervention, market-based incentives would not result in the observed levels of moderation of low-quality content.  Plaintiffs' assertions are contradicted by the market-based incentives to moderate content on social media platforms and empirical evidence provided by the operation of social media platforms over more than twenty years.

80.    Large social media platforms such as Facebook, Twitter, and YouTube are for-profit business on which users, content providers, and advertisers participate and interact. The main source of revenues of these platforms is advertising, and the value of a platform to advertisers is tied to the content on the site.  Given the numerous alternative social media platforms readily available to users and advertisers, failure to moderate content satisfactorily for users and advertisers is likely to be financially detrimental to platforms.  Therefore, social media platforms have strong market-based economic incentives to moderate content on their platforms, including low-quality content.

---

[153] James Hale, "Brands Look at Instagram's Content Moderation After Ads Run Alongside Posts About Self-Harm, Suicide," *Tubefiler*, January 29, 2019.  (https://www.tubefilter.com/2019/01/29/instagram-youtube-adpocalypse-content-moderation/.)

[154] Facebook, "Addressing Sensational Health Claims," July 2, 2019, https://about.fb.com/news/2019/07/addressing-sensational-health-claims/.

81.     These market-based economic incentives are independent of any alleged government intervention.  These incentives are intrinsic to the economic operation of social media platforms that depend on advertising revenue.  Therefore, there is no economic basis to support the assertion that market-based incentives would not have resulted in the same moderation of low-quality content regardless of any alleged intervention.  In fact, social media platforms have acknowledged specifically the relationship between moderation of low-quality content and market-based incentives to satisfy users and advertisers and increase their revenues.  Further contradicting Plaintiffs' claims, content moderation of low-quality content, including content related to public health and elections, predated Defendant's alleged actions.

I declare that the foregoing report is true and correct.

Executed on April 25, 2023.

_____

Stuart D. Gurrea

# Exhibit 1

# Curriculum Vitae of
# Stuart D. Gurrea, Ph.D.



# Stuart D. Gurrea, Ph.D.
## Managing Director

**Current Position**

Dr. Gurrea is a Managing Director at Secretariat Economists.

**Professional Experience**

Dr. Gurrea has more than 20 years of experience in economic consulting. He earned his Ph.D. in economics from Northwestern University and specializes in industrial organization, financial economics, and econometrics. Dr. Gurrea has conducted economic analyses in the context of legal disputes, policy making, and business strategy, and has served as both a consulting and testifying expert in state and federal courts.

Dr. Gurrea's work combines theoretical modeling with the application of quantitative techniques to address economic questions, including those that arise in the context of breach of contract, asset valuation, securities fraud, labor market discrimination, antitrust, and intellectual property. Many of his assignments involve identifying and quantifying economic damages on an individual or class-wide basis, and evaluating damages claims in light of the principles of economics and finance. Dr. Gurrea has addressed economic issues in a variety of industries, including financial services, energy, airlines, telecommunications, and pharmaceuticals.

While attending Northwestern University, Dr. Gurrea worked as an investment research analyst. He also collaborated in numerous research projects involving the construction of data sets and the estimation of econometric models.

**Contact Details**

Direct:     +1 415.975.3225
Email:      sgurrea@secretariat-intl.com

**Professional History**

- Secretariat Economists
- Dept. of Economics and Kellogg Graduate School of Business, Northwestern University
- Dept. of Economics, Northwestern University
- Zacks Investment Research, Inc.
- Official Chamber of Commerce, Seville, Spain

**Education**

- Ph.D., Economics, Northwestern University
- M.A., Economics, Northwestern University
- B.A., Economics, University of Seville, Spain

**Accreditations**

- American Economic Association
- American Finance Association
- American Bar Association, Antitrust Section



Secretariat Economists was formed in July 2021 with Secretariat's acquisition of Economists Incorporated.

Stuart D. Gurrea, Ph.D.

**Testimony**

- *Connecticut Yankee Atomic Power Company, Maine Yankee Atomic Power Company and Yankee Atomic Electric Company vs. United States of America* ((Fed. Cl. Nos. 21-1116 C, 21-1118 C, & 21-1119 C (Consolidated) ) – For Defendants, analysis of Plaintiffs' cost recovery expectations through litigation and effect on economic incentives to minimize costs. Submitted expert report, February 2023.  Testified at deposition, April 2023

- *Nicole Tokarski v. Med-Data, Inc.,* (No. 2:21-CV-00631-TL, United States District Court, Western District of Washington at Seattle) – For Defendant, in response to plaintiff's motion for class certification, assessed proposed methodology for calculating damages on a class-wide basis in relation to alleged exposure of personal health records. Filed expert report, March 2023

- *Matthew K. Black and Charrisa Raynor v. United States of America* (Fed. Cl., No. 22-10 C) – For Defendants, economic analysis of the determination of the appropriate prejudgment interest rate in lawsuit related to alleged takings of property. Submitted expert report, November 2022.  Testified at deposition November 2022

- *Walter Michael Ennis and Judith Hobson Ennis et al. v. United States of America* (Fed. Cl., No. 21-87 L) – For Defendants, economic analysis of the determination of the appropriate prejudgment interest rate in lawsuit related to alleged takings of property. Submitted expert report, November 2022. Testified at deposition November 2022

-  *Irving Park Shops, LLC, et al. v. United States of America* (Fed. Cl., 21-546) – For Defendants, economic analysis of the determination of the appropriate prejudgment interest rate in lawsuit related to alleged takings of property. Submitted expert report, November 2022.  Testified at deposition November 2022

- *Helen C. Wood, LLC, et al. v. United States of America* (Fed. Cl., No. 21-2143 L) – For Defendants, economic analysis of the determination of the appropriate prejudgment interest rate in lawsuit related to alleged takings of property. Submitted expert report, November 2022.  Testified at deposition November 2022

- *Southern California Edison Company vs. The United States of America* (Fed. Cl., No. 19-1792 C) – For the U.S. Department of Energy, assessed reliability of claimant's expert's predictions regarding a market for exchanges of spent nuclear fuel acceptance rights and schedule of removal of spent nuclear fuel from the San Onofre nuclear plant. Submitted expert report, August 2022. Testified at deposition October 2022

- *Jai Kumar v. Jade Global, Inc.* (No. 01-20-0016-0647) – For Plaintiff, conducted assessment of valuation of vested shares and estimated fair market value of common stock in technology services company in relation to a stock purchase agreement. Submitted expert report and rebuttal expert report, American Arbitration Association, June 15, 2022 and June 30, 2022. Testified at deposition and arbitration, July 2022 and August 2022



Stuart D. Gurrea, Ph.D.

- *Eugenio and Rosa Contreras et al. v. Nationstar Mortgage LLC et al.* (No. 2:16-cv-00302-MCE-EFB) – For defendant, in response to plaintiffs' motion for class certification, assessed plaintiffs' proposed methodology for calculating damages on a class-wide basis in relation to alleged improper property inspection fees and convenience fees charged to mortgage borrowers. Filed expert report, United States District Court, Eastern District of California, Sacramento Division, October 2021

- *Charles McNamee et al. v. Nationstar Mortgage LLC* (No. 14-1948) – For Defendant, assessed reliability of Plaintiff's expert's survey in relation to alleged violations of the Fair Debt Collection Practices Act. Filed expert reports, United States District Court, Southern District of Ohio, Eastern Division, July 2021 and October 2021

- *Duke Energy Progress and Duke Energy Florida LLC. vs. The United States of America* (Fed. Cl., No. 18-891C) – For the U.S. Department of Energy, assessed reliability of claimant's expert's predictions regarding a market for exchanges of spent nuclear fuel acceptance rights and schedule of removal of spent nuclear fuel from the Crystal River Nuclear Plant. Submitted expert report, June 2021. Testified at deposition August 2021

- *Paulette Johansen v. PHH Mortgage Corporation and Wells Fargo Bank, N.A.* (No. BC608637) – For defendant, analysis of economic damages related to alleged breach of settlement agreement in residential mortgage dispute. Superior Court of the State of California, County of Los Angeles, Central District. Testified at deposition, April 2021

- *NorthStar Vermont Yankee, LLC. vs. The United States of America* (Fed. Cl., No. 18-1209C) – For the U.S. Department of Energy, assessed reliability of claimant's expert's predictions regarding a market for exchanges of spent nuclear fuel acceptance rights and schedule of removal of spent nuclear fuel from the Vermont Yankee Nuclear Power Station. Submitted expert report, February 2021. Testified at deposition, March 2021. Testified in the United States Court of Federal Claims, November 2022

- *Dominion Energy Kewaunee Inc. vs. The United States of America* (Fed. Cl., No. 18-808C) – For the U.S. Department of Energy, assessed reliability of claimant's expert's predictions regarding a market for exchanges of spent nuclear fuel acceptance rights and schedule of removal of spent nuclear fuel from the Kewaunee Power Station. Submitted expert report, January 2021. Testified at deposition, March 2021

- *Exelon Generation Company LLC. et al. v. The United States of America* – For the U.S. Department of Energy, assessed reliability of claimant's experts' predictions regarding a market for exchanges of spent nuclear fuel acceptance rights and removal from Oyster Creek Nuclear Generating Station and Three Mile Island Nuclear Generating Station. Related to cost recovery claim pursuant to settlement agreement, Exelon Generation Company LLC. et al. v. The United States of America, Fed. Cl., Nos. 98-521C, 04-102C, 04-103C and 04- 104C, August 5, 2004. Submitted expert report, November 2020, and rebuttal expert report, June 2021



Stuart D. Gurrea, Ph.D.

- *NextEra v. The United States of America* – For the U.S. Department of Energy, assessed reliability of claimant's expert's predictions regarding a market for exchanges of spent nuclear fuel acceptance rights and removal from NextEra nuclear plants (Duane Arnold, Point Beach, St. Lucie, Seabrook, and Turkey Point). Related to cost recovery claim pursuant to settlement agreement for *Florida Power & Light Company v. United States, Fed. Cl. No. 98-483C, Interstate Power and Light Company v. United States, Fed. Cl. No. 04-0067C,* and *FPL Energy Seabrook, LLC v. United States, Fed. Cl. No. 04-0088C,* March 30, 2009. Submitted expert reports, August 2020 and December 2020, and rebuttal expert report, October 2022

- *Omaha Public Power District v. The United States of America* – For the U.S. Department of Energy, assessed reliability of claimant's expert's predictions regarding a market for exchanges of spent nuclear fuel acceptance rights and removal from Fort Calhoun Nuclear Plant.  Related to cost recovery claim pursuant to settlement agreement, Omaha Public Power District v. United States, Fed. Cl., No. 01-115C, June 5, 2006.  Submitted expert report, August 2020 and rebuttal expert report, August 2021

- *Glendale Hoggard and Linda Patton v. Nationstar Mortgage LLC d/b/a Champion Mortgage Company* (No. 1:17-cv-00099-TK) – For Defendant, assessed reliability of Plaintiffs' expert's proposed methods to identify class members and calculate individual damages on a class-wide basis. Plaintiffs' complaint concerned fees charged related to servicing reverse mortgage loans. Filed expert report and testified at deposition, United States District Court for the District of Columbia, June and August 2019

- *Demetrius Robinson et al. v. Nationstar Mortgage LLC* (No. 8:14-cv-03667-TDC) – For Defendant, assessed reliability of Plaintiffs' expert's proposed methods to identify alleged violations of loan modification notification requirements on a class-wide basis.  Filed expert report and declaration, United States District Court for the District of Maryland, Greenbelt Division, December 2018 and February 2019. Testified at Deposition, December 2018

- *State of California v. Wilbur L. Ross, Jr. et al.* (No. 3:18-cv-01865), and *City of San Jose et al. v. Wilbur L. Ross Jr. et al.* (No. 5.18-cv-02279) – For Defendants, conducted analysis of survey and evaluation of the impact of population undercounts associated with the inclusion of a citizenship question in the 2020 Census on congressional apportionment and the distribution of federal funds. Filed expert report and testified at deposition and trial, United States District Court for the Northern District of California, San Francisco Division, October 2018 and January 2019

- *Robyn Kravitz et al. v. U.S. Department of Commerce et al.* (No. 5:18-cv-01041-GJH), and *La Unión Del Pueblo Entero et al. v. Wilbur L. Ross Jr. et al.* (No. 8:18-cv-01570-GJH) – For Defendants, conducted analysis of survey and evaluation of the impact of population undercounts associated with the inclusion of a citizenship question in the 2020 Census on congressional apportionment and the distribution of federal funds. Filed expert report and testified at deposition and trial, United States States District Court for the District of Maryland, Greenbelt Division, October 2018 and January 2019



Stuart D. Gurrea, Ph.D.

- *William A. Leonard, Jr. Chapter 7 Trustee for the Estate of Paul Anthony Morabito v. Paul Anthony Morabito et al.* (No. BK-13-51237-GWZ, Chapter 7) – For Plaintiff, conducted valuation review and offered valuation opinion of spectrum-related lines of business. Filed expert report, United States Bankruptcy Court, District of Nevada, October 2016. Testified at deposition, May 2017

- *Fridman v. Wells Fargo Bank, N.A.* (No. BC478019) – For defendant, analysis of economic damages related to dispute over mortgage payments and mortgage records.  Testified at deposition and trial, Superior Court of the State of California, County of Los Angeles, Central District, April 2015 and July 2015

- *LaDon Powell and Margeret Dennis vs. Ocwen Loan Servicing* (No. 14-cv-00113-SWS) – For defendant, economic analysis of late payment fees in response to breach of contract claims related to reinstatement agreement. Filed expert report, United States District Court for the District of Wyoming, May 2015

**Representative Engagements**

- *Basil Agapion, et al. v. United States and Chapman Spring/Garden, LLC, et al. v. United States (Fed. Cl.)* – For Defendant, economic analysis of the determination of the appropriate pre-judgment interest rate to be applied in lawsuits related to alleged takings of property

- *Melissa Robinson-Agles v. Wells Fargo & Company; Experian Information and Transunion, LLC* – For defendant Wells Fargo, assessed the reliability of Plaintiff's quantification of alleged punitive damages and hedonic damages, including the value of losses of enjoyment of life and loss of ability to borrow

- *Michael C. Cornell et al. v. Kramer Levin Natfalis & Frankel, LLP* – For plaintiff, economic analysis of damages in relation to legal malpractice claim.  Analysis included valuation of business interest absent alleged misconduct

- *Farjad Fani et al. vs. Shartis Friese LLP et al.* – for Defendant, conducted valuation analysis of online fax business in response to legal malpractice lawsuit.  Plaintiffs alleged fire sale of e-fax business as a result of Defendants' conduct

- *North American Soccer League, LLC v. United States Soccer Federation, Inc. and Major League Soccer, LLC* – For Defendant, counterfactual market analysis related to assessment of antitrust liability

- *Back Pay Estimation* – For Defendant, quantification of back pay damages on a class-wide basis for a class of employees in racial discrimination suit

- *For Barbados Federal Trade Commission* – Assessment of Barbados Power and Light Company Ltd.'s depreciation rate study and application, and preparation of recommendations

- *E & J Gallo Winery v. Strategic Materials, Inc.* – Economic analysis of contract damages related to glass manufacturing on behalf of defendant and counterclaim plaintiff



Stuart D. Gurrea, Ph.D.

- *In re Deutsche Bank AG Securities Litigation* – For plaintiff class, analysis of structured finance instruments and Deutsche Bank's subprime exposure, risk management practices and actual credit risk exposure

- *Loreley Financing (Jersey) NO. 28, Limited vs. Merrill Lynch, Pierce, Fenner & Smith Incorporated et al.* – For Plaintiff, analysis of causation and damages in relation to alleged misrepresentations and omissions in the marketing and sale of notes of a collateralized debt obligation

- *Loreley Financing (Jersey) NO. 3, Limited et al. vs. Wells Fargo Securities, LLC, et al.* – For Plaintiff, analysis of causation and damages in relation to alleged misrepresentations and omissions in the marketing and sale of notes of collateralized debt obligations

- *BNSF Railway Company and Norfolk Southern Railway Company vs. First Energy Generation LLC* – For Defendant, valuation of liquidated damages claim related to dispute over rail transportation agreement

- *Wye Oak Technology Inc. v. The Republic of Iraq, et al.* – For Plaintiff, estimation of damages related to breach of contract, including estimation of expected future profits under the contract

- *Gloria J. Jackson et al. v. The United States of America* – For Defendants, economic analysis of the determination of the appropriate prejudgment interest rate in class action lawsuit related to alleged takings of residential property

- *For U.S. Department of Justice and FDIC* – Economic analysis of trading behavior in spot and options foreign exchange markets in relation to criminal investigation of front running allegations against investment bank

- *FirstEnergy Generation, LLC v. BNSF Railway Company and CSX Transportation, Inc.* – For Plaintiff, determination of appropriate discount rate to bring to the present a stream of future liquidated damages payments

- *For Intuit/QuickBooks* – analysis of financial disclosures and determination of the consistency of certain financial calculations with The Truth in Lending Act as implemented by the Board of Governors of the Federal Reserve System's Regulation Z

- *For U.S. Department of Justice and U.S. Customs and Border Protection* – Construction of database and estimation of value of vehicles imported to the U.S. by foreign car manufacturer in relation to violations of customs regulations and the Clean Air Act

- *Federal Deposit Insurance Corporation v. PricewaterhouseCoopers LLP and Crowe Horwath LLP* – For plaintiff, quantification of economic harm in banking fraud case resulting from alleged failure to detect fraud

- *China Development Industrial Bank v. Morgan Stanley & Co. et al.* – For plaintiff, economic analysis of mortgage securitization, structured finance, and conflicts of interest in relation to the marketing and sale of a mortgage-backed collateralized debt obligation and alleged misrepresentations



Stuart D. Gurrea, Ph.D.

- *Navajo Health Foundation – Sage Memorial Hospital, Inc. v. Silvia Mathews Burwell, et al.* – For defendant, The United States of America, analysis of damages claims related to alleged breach of contract related to the provision of hospital services in Navajo hospital

- *Always at Market, Inc. v. United States* – For defendant, conducted analysis of plaintiff's econometric model of new registrations on on-line auction site and responded to damages claims based on this model

- *Entergy Nuclear Vermont Yankee, LLC, v. The United States of America* – For defendant, economic assessment of the development of a market and subsequent trading of allocation rights for pickup of spent nuclear fuel

- *Southern California Edison Company v. The United States of America* – For defendant, economic assessment of the development of a market and subsequent trading of allocation rights for pickup of spent nuclear fuel

- *Gilberte Jill Kelley, and Scott Kelley, M.D. v. The Federal Bureau of Investigation et al.* – For defendant, economic analysis of lost earnings claim related to alleged violation of the Privacy Act and the General Petreaus scandal

- *The West Virginia Investment Management Board and The West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company* – For defendant, analysis of alleged damages to retirement fund resulting from receiving fragmented distribution of investment funds rather than lump sum payment

- *In re Goldman Sachs Group, Inc. Securities Litigation* – For plaintiff class, economic analysis of mortgage securitization, structured finance, and conflicts of interest in relation to the creation of four mortgage-backed collateralized debt obligations

- *Clear-View Technologies v. John H. Rasnick et al.* – For plaintiff, estimated damages related to interference in funding of startup business. Computation required conducting business valuation

- *Matthew Burnett et al. v. Robert Bosch LLC, USA* – For defendant, conducted statistical analysis to assess impact on sparkplug prices of alleged false marketing practices to evaluate the economic basis for class certification

- *Valuation of Mitchell Woods Pharmaceuticals LLC* – Conducted economic valuation of early stage pharmaceutical company developing drug to combat various types of cancer

- *Starr International Company Inc. v. The United States of America* – For defendants, economic analysis of the determination of the appropriate prejudgment interest rate in class action lawsuit related to alleged takings of AIG stock during the 2008-2009 financial crisis

- *For Millicom International Services, LLC.* – Co-authored the study "Assessing the Competitiveness of the Mobile Telephone Industry in Paraguay"

- *Scott J. Bloch v. U.S. Office of Personnel Management* – For defendants, economic assessment of lost income and lost reputation monetary claims



Stuart D. Gurrea, Ph.D.

- *Weili Dai, Sehat Sutardja, and Sutardja Family Partners v. Goldman Sachs & Co., Bradley Defoor, and Graham Brandt* – For claimants in FINRA arbitration, quantification of economic damages related to margin calls in the midst of the 2007-2008 financial crisis

- *The Economic Impact of the SEC's Proposed Rule on Required Pay Ratio Disclosure* – For the Center On Executive Compensation, study of the economic effects of mandatory compensation disclosures pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act

- *In re Text Messaging Antitrust Litigation* – For plaintiffs, economic analysis of liability and damages related to alleged collusion among wireless SMS text messaging service providers in the U.S.

- *Rothschild Capital Partners, LP, et al., v. Gorfine, Schiller & Gardyn, P.A., et al.* – For defendants, economic analysis of damages claim related to lost business opportunities

- *Meda AB v. 3M Company, 3M Innovative Properties Company, and Riker Laboratories, Inc.* – For plaintiffs, quantification of damages associated with the withholding of material information during the purchase of 3M's European pharmaceutical business

- *Securities and Exchange Commission v. Brian H. Stoker* – For plaintiff, analysis of adverse selection in creation of a synthetic collateralized debt obligation squared

- *Entergy Gulf States, Inc. and Entergy Louisiana, LLC v. The United States of America* – For defendant, economic analysis of plaintiffs claim for interest on damages

- *Portland General Electric Company et al. v. The United States of America* – For defendant, economic assessment of the development of a market and subsequent trading of allocation rights for pickup of spent nuclear fuel

- *Sacramento Municipal Utility District. v. The United States of America* – For defendant, economic assessment of the development of a market and subsequent trading of allocation rights for pickup of spent nuclear fuel

- *Kenneth D. Klaas et al., v. Vestin Mortgage Inc., et al.* – For defendants, economic analysis of contract damages claims in hard money lending industry

- *Entergy Corporation and Affiliated Subsidiary Companies vs. Commission of Internal Revenue* – For defendants, analysis of plaintiffs' evaluation of decommissioning funds transferred as part of the nuclear plant acquisition

- *Novartis Pharmaceuticals Corporation v. Mylan Pharmaceuticals Inc. and Mylan Inc.* – For defendants, evaluation of competitive effects of foreclosure of generic fluvastatin drug

- *Tyr Sport, Inc. v. Warnaco Swimwear, Inc. United States Swimming, Inc. et al.* – Analysis on behalf of defendants in response to antitrust liability claims

- *In re Korean Airlines Co., Ltd. Antitrust Litigation* – For plaintiffs, economic analysis of alleged agreement between Korean Air Lines Co., Ltd. and Asiana Airlines, Inc. to raise prices and the effects of that agreement on purchasers of airline services in class action suit



Stuart D. Gurrea, Ph.D.

- *Kansas Gas And Electric v. The United States of America* – For defendant, economic assessment of the development of a market and subsequent trading of allocation rights for pick-up of spent nuclear fuel

- *Burlington Northern Santa Fe Railway* – Study estimating the cost of capital

- *Pacific Gas And Electric Company v. The United States of America* – For defendant, economic assessment of the development of a market and subsequent trading of allocation rights for pick-up of spent nuclear fuel in remanded case

- *Yankee Atomic, Connecticut Yankee Atomic Power Company, Maine Yankee Atomic Power Company v. United States* – For defendant, economic assessment of the development of a market and subsequent trading of allocation rights for pick-up of spent nuclear fuel in remanded case

- *United States of America v. Ralph Cioffi and Matthew Tannin* – Economic analysis of hedge fund operations

- *Charles Felton et al., v. Vestin Realty Mortgage II, et al.* – For defendants, economic analysis of contract damages claims in hard money lending industry

- *National Fire Insurance Co. of Pittsburgh, PA vs. Puget Plastics Corporation et al.* – Economic analysis of lost profits and diminution in business value

- *Consolidated Edison Company of New York And Entergy Nuclear Generation Company v. The United States of America* – For defendant, economic analysis of alleged diminution in proceeds from sale of nuclear assets because of partial breach of contract

- *Arizona Public Service Company v. The United States of America* – For defendant, analysis of damages in connection with partial breach of the contract for disposal of spent nuclear fuel between plaintiff and the Department of Energy ("DOE")

- *Deutscher Tennis Bund, et al., v. ATP Tour Inc.* – Analysis of antitrust liability on behalf of ATP in response to claims of monopolization

- *Southern California Company v. The United States of America* – For defendant, analysis of damages in connection with partial breach of the contract for disposal of spent nuclear fuel between plaintiff and the Department of Energy ("DOE")

- *Dominion Resources, Inc. v. The United States of America* – For defendant, analysis of damages in connection with partial breach of the contract for disposal of spent nuclear fuel between plaintiff and the Department of Energy ("DOE")

- *MGP Ingredients, Inc. v. Mars, Inc. and S&M NuTec, LLC* – Analysis of damages for defendant in patent infringement and misappropriation of trade secrets suit in the pet food industry

- *Dairyland Power Cooperative v. The United States of America* – Economic assessment of the development of a market and subsequent trading of allocation rights for pick-up of spent nuclear fuel



Stuart D. Gurrea, Ph.D.

- *Boston Edison Company And Entergy Nuclear Generation Company v. The United States of America* – For defendant, economic analysis of alleged diminution in proceeds from sale of nuclear assets because of partial breach of contract

- *Clinton Reilly v. Medianews Group et al.* – Analysis of the effects of the acquisition of several newspapers in the San Francisco Bay Area in response to antitrust suit

- *Republica Oriental del Uruguay v. Chemical Overseas Holdings, Inc. et al.* – For plaintiff, calculation of economic injury in the midst of the Argentine financial crisis in fraud suit

- *Pacific Gas And Electric Company v. The United States of America* – Economic assessment of the development of a market and subsequent trading of allocation rights for pick-up of spent nuclear fuel

- *Northern States Power Company v. The United States of America* – For defendant, analysis of damages in connection with partial breach of the contract for disposal of spent nuclear fuel between plaintiff and the Department of Energy ("DOE")

- *Hawaii Renewable Portfolio Standards* – For The Public Utilities Commission of the state of Hawaii, optimal policy design to implement renewable portfolio standards

- *An Economic Analysis of the Competitive Effects of the SBC/AT&T and Verizon/MCI Mergers on the Internet Backbone Market* – Paper submitted before the Infocomm Development Authority of Singapore (IDA) and to the U.S. Federal Communications Commission

- *British Telecommunications Analysis* – Analysis of competitive effects in the market for special local access, provision of enterprise telecommunications services and Internet backbone following the proposed mergers between SBC and AT&T, and Verizon and MCI

- *Southern Nuclear Operating Company v. The United States of America* – For defendant, analysis of damages in connection with partial breach of the contract for disposal of spent nuclear fuel between plaintiff and the Department of Energy

- *DRAMS* – On behalf of Respondent Hynix Semiconductors, paper submitted before the Japanese Ministry of Finance and Ministry of Economy, Technology and Industry in response to econometric analysis evaluating the price effects of alleged subsidies in the market for DRAMs

- *Video Rental Industry Competition Analysis* – Statistical analysis for delineating relevant markets and estimating unilateral effects in relation to the acquisition of Hollywood Entertainment. Analysis in the context of Hart-Scott-Rodino review by the Department of Justice

- *Dr. Steven Nadler v. Aspen Valley Hospital, Inc. et al.* – For defendant, analysis of monopolization and exclusionary conduct allegations in emergency professional orthopedic services

- *Martin Leach v. Ford Motor Company* – For defendant, economic analysis of the reasonableness of a non-compete clause and event study analysis to evaluate the impact of direct competition from former executives



Stuart D. Gurrea, Ph.D.

- *Advertising Effectiveness* – Statistical analysis of survey data to determine effectiveness of alternative advertising campaigns in influencing teenager's attitudes, beliefs and intentions toward smoking and tobacco

- *Canadian Lumber International Trade Study* – Study of the effect of the U.S.-Canada Softwood Lumber Agreement ("SLA"), a tariff- rate quota, on the volume and price of Canadian lumber imports. Presented before the U.S. International Trade Commission

- *Westways World Travel, et al. v. AMR Corp.* – For defendant, economic analysis of damages claims in class action suit related to American Airlines' ticketing

- *Consumer Product Merger* – Demand estimation using scanner sales data for delineating relevant markets and estimating unilateral effects of the merger

- *Barron Aircraft, L.L.C. v. Dassault Falcon Jet Corp.* – For plaintiff, design, implementation and statistical analysis of survey of business-jet aircraft professionals

- *Tobacco Merger* – Demand estimation using scanner sales data for delineating relevant markets and estimating unilateral effects of the merger

- *EchoStar Satellite L.L.C. vs. Viacom Inc., et al.* – For defendants, economic analysis of EchoStar's allegation that Viacom illegally tied the sale of some of its cable programs to its CBS broadcast retransmission rights

- *Federal Communications Commission Inquiries into Broadcast Television* – Econometric analyses regarding media ownership rules prepared on behalf of Fox, NBC, and Viacom/CBS for FCC filings

- *Daisy L. Holoman et al. v. Pfizer Inc. and Warner Lambert Corporation* – For defendants, quantification of damages in class action suit related to a diabetes prescription medication

- *Indiana Michigan Power Company v. The United States of America* – For defendant, analysis of damages in connection with partial breach of the contract for disposal of spent nuclear fuel between plaintiff and the Department of Energy

- *Diane L. Walter-Brock v. Ford Motor Company et al.* – For defendants, analysis of the economics of punitive damages in a product liability suit

- *Julia Tennin and Patricia Alexander v. Ford Motor Company* – For defendants, analysis of the economics of punitive damages in a product liability suit

- For defendant (an internet service provider marketing cell phone service) analyzed plaintiff's damages claims for compensation in a cell phone service false advertising class action suit

- *R. Straman Co. and Newport Convertible Engineering, Inc. v. Volkswagen of America, et al.* – For defendants, analysis concerning antitrust liability and antitrust injury in monopolization claim

- *Bureau of Public Enterprises, Federal Republic of Nigeria* – Report and recommendations for competition policy and anti-trust reform in Nigeria



Stuart D. Gurrea, Ph.D.

- *Newhall Land and Farming Co. v. Kerr McGee Operating Corporation, et al.* – For defendant, analysis concerning the economics of punitive damages

- *Thayer/Patricof Education Funding L.L.C. v. Fred Pryor et al.* – For Plaintiff, analysis of damages related to an acquisition in an accounting fraud suit

- *Marzia Spielholz, et al. v. Los Angeles Telephone Company, et al.* – For defendant, analyzed plaintiff's damages claims for compensation in a cell phone service false advertising class action suit

- *Cardiac Institute General Partnership v. Banner Health System et al.* – Competition analysis for defendant in monopolization claim

- *Braintree Laboratories, Inc. v. Schwarz Pharma, Inc.* – For defendant (and counter-claim plaintiff), demand estimation for delineation of relevant antitrust product market and analysis of market power in pharmaceuticals patent infringement and monopolization suit

- *William H. McKee and Paul R. Estrada v. Heller, Ehrman, White & McAuliffe et al.* – For defendants, business valuation of Monsterbook.com in a negligent misrepresentation and fraud suit

- *Exxon Chemical Plant Fire* – For defendant, analysis concerning the economics of punitive damages

- *Karlsson et al. v. Ford Motor Company et al.* – Analysis for defendants of liability in a product liability suit and the economics of punitive damages

- *Michael Meitus, et al. v. Dain Rauscher Wessels, Dain Rauscher Corporation and Dain Rauscher Inc.* – Competitive analysis of the brokerage industry and valuation of acquired investment bank

- *American Institute of CPAs* – Study of the provision of non-audit services by auditors evaluating efficiency effects and impact on audit quality

- *Competition for Video Programming* – Analysis of the effects of exclusive distribution contracts and the FCC's restrictions affecting cable operators

- *New Skies Satellites Position Paper* – Analysis of the adverse competitive impact of Export-Import Bank financing of iPSTAR satellite on the Asian satellite services market

- *ID Security Systems Canada v. Checkpoint Systems, Inc.* – Analysis for defendant of restraint of trade and tying claims in security tag systems

## Presentations and Publications

- "The Impact of Zero-Sum Games on Class Certification," *Economists Ink*, Secretariat 2Q 2022

- "The Use of Survey Evidence in Class Actions," *Economists Ink*, Secretariat 1Q 2022

- "The Assessment of Survey Evidence in the Epic v. Apple Litigation," *Economics Committee Newsletter*, Winter 2021, Volume 22 (2), Economics Committee, American Bar Association (with Stephanie M. Mirrow)



Stuart D. Gurrea, Ph.D.

- "Data Science in Litigation," presented to the United States Department of Justice Civil Division, Federal Programs Branch, November 3, 2021

- "Data Science in Litigation," California approved CLE webinar for CA attorneys, presented to Severson and Werson, San Francisco, September 13, 2021

- "The Transition Away from LIBOR to SOFR," *Economists Ink* (with Jonathan A. Neuberger), Spring 2021

- "COVID-19 and Natural Experiments to Quantify Economic Harm," *Economists Ink*, Fall 2020

- "Measuring the Impact of Sensitive Questions on Survey Response Rates," *Economists Ink* (with Jonathan A. Neuberger), Fall 2019

- "Financial Markets Reform and Alleged Dealer-Bank Collusion," *Economists Ink* (with Jonathan A. Neuberger), Winter 2018

- "Has Collusion Hindered Financial Market Reform?" (with Jonathan A. Neuberger), *The Exchange*, Insurance and Financial Services Committee, American Bar Association, Section of Antitrust Law, Spring 2018

- "Chapter 8: Overcharges," (with Henry McFarland, Kelsey Shannon and Clarissa Yeap) in <u>Proving Antitrust Damages</u>, American Bar Association, Section of Antitrust Law, 3d ed., 2017

- "Financial Derivatives," presented at The U.S. Department of Justice, Washington D.C., October 11, 2017

- "Goldman Sachs Settles Allegations of Derivatives Benchmark Rate Manipulation," *Economists Ink* (with Jonathan Neuberger), Spring 2017

- "Different Competitive Effects in Financial Rate-Setting Cases," *Economists Ink* (with Jonathan Neuberger), Summer 2016

- "Perspectives On Four Years Of The CFPB's Consumer Complaints Database," (with Jonathan A. Neuberger), *The Exchange*, Insurance and Financial Services Committee, American Bar Association, Section of Antitrust Law, Spring 2016

- "Foreign Exchange Manipulation and Economic Harm," *Economists Ink* (with Jonathan Neuberger), Summer 2015

- "Foreign Exchange Manipulation and Economic Harm," (with Jonathan A. Neuberger), *The Exchange*, Insurance and Financial Services Committee, American Bar Association, Section of Antitrust Law, Spring 2015

- "Rate Manipulation and Antitrust Liability," *Economists Ink* (with Jonathan Neuberger), Summer 2014



Stuart D. Gurrea, Ph.D.

- "Economic Harm and LIBOR Manipulation," *The Exchange*, Section of Antitrust Law, Insurance and Financial Services Committee, The American Bar Association (with Jonathan Neuberger), Spring 2013

- "Economic Harm and the LIBOR Scandal," *Economists Ink* (with Jonathan Neuberger), Winter 2012

- "The (Mis)Use of Screens in Economic Analysis," *Economists Ink* (with Jonathan Neuberger), Spring 2012

- Market Power Handbook: Competition Law & Economic Foundations (2d ed.) American Bar Association, Section of Antitrust Law, (contributor), March 2012

- "The Economics of Google's Acquisition of ITA Software," *Icarus, The Newsletter of the Communications & Digital Technology Industries Committee* (with Gloria Hurdle), ABA Section of Antitrust Law, Spring 2011

- "Remedies in Google's Acquisition of ITA Software," *Economists Ink* (with Gloria Hurdle), Spring 2011

- "Sensitivity Analysis in Economic Modeling," *Economists Ink* (with Jonathan A. Neuberger), Winter 2010

- "The Two Faces of Credit Default Swaps: Risk Management Versus Speculation," *Economists Ink* (with Jonathan A. Neuberger), Summer 2010

- "Financial Innovation, Banking and The Subprime Financial Crisis," presented at The U.S. Department of Justice, Washington D.C., May 13 and 14, 2010

- "The Determinants of Broadband Adoption: The Chinese and Indian Experience," *Icarus, The Newsletter of the Communications & Digital Technology Industries Committee*, ABA Section of Antitrust Law, Fall 2009

- "Comparing China's New Antimonopoly Law and India's Amended Competition Act," *Economists Ink* (with Su Sun), Spring 2009

- "China's New Antimonopoly Law and India's Amended Competition Act: How New Antitrust Regimes in These Important Emerging Markets May Impact High Tech Companies," *Icarus, The Computer & Internet Committee Newsletter* (with Su Sun), ABA Section of Antitrust Law, November 2008

- "Price Squeezes – Are They Detrimental to Consumer Welfare?" *Communications Industry Committee Newsletter*, American Bar Association, Section of Antitrust Law, Fall 2008

- "Imperfect Information, Entry, and the Merger Guidelines,"(with Barry C. Harris and Allison M. Ivory) in Issues in Competition Law and Policy, Volume 2, pp. 1589-1611, American Bar Association, Section of Antitrust Law, 2008



Stuart D. Gurrea, Ph.D.

- "Strategic Departure-time Differentiation And Low Cost Carrier Competition," presented at the panel on airline economics, Annual Meeting of The Southern Economic Association, Charleston, SC, November 18, 2006

- Discussant of "An Empirical Investigation into The Causes of Flight Delays" by Nicolas Rupp, and chaired panel on airline economics at The Annual Meeting of The Southern Economic Association, Charleston, SC, November 18, 2006

- "Imperfect Information, Entry and The Merger Guidelines," *Economists Ink* (with Barry C. Harris and Allison M. Ivory), Summer 2006

- "International Airline Code Sharing and Entry," in Darin Lee, ed., <u>Advances in Airline Economics</u>, Chapter 5, Vol. 1, Elsevier, 2006

- "The Antitrust Economics of Intellectual Property," (with Phil B. Nelson and Robert D. Stoner), in <u>Antitrust and Intellectual Property: A Guide for Practitioners, American Bar Association</u>, Section of Antitrust Law, 2006

- "Economic Tools in Antitrust Analysis. The Use of Econometric Tools in Antitrust," presented at the Second Coloquio Foro Competencia, October 21, 2005, Buenos Aires, Argentina

- "Using Simulation And Econometric Models to Estimate The Effects of a Trade Restraint," *Economists Ink* (with Henry B. McFarland and Robert D. Stoner), Spring 2005

- "The Economic Effects of the Filed Rate Doctrine on Wholesale Electricity Markets," *The Energy Antitrust News*, (with Manny A. Macatangay), Spring 2005

- "Economic Analysis and Sampling of Populations," *Economists Ink*, Winter 2004

- "Event Study Methodology in Securities Litigation," *Economists Ink*, Winter 2004

- "Low Cost Carrier Competition And Flight Departure-Time Differentiation," presented at the Third Conference of the Japan Economic Policy Association, Meiji University, Tokyo, Japan, November 13, 2004

- "EU Guidelines on Competition and Technology Transfer Agreements," *Economists Ink*, Spring 2004

- "Coordinated Interaction and Clayton §7 Enforcement," *George Mason Law Review*, Volume 12, number 1, pp. 89-118, Fall 2003, (with Bruce M. Owen)

- "Coordinated Effects and Merger Policy Enforcement," *Economists Ink*, (with Bruce M. Owen), Fall 2003

- <u>The Economics of Innovation: A Survey, American Bar Association</u>, Section of Antitrust Law, (contributor), July 2002

- "The Intersection of Antitrust and Intellectual Property Law," *Economists Ink* (with Tessie Su), Spring/Summer 2001



Stuart D. Gurrea, Ph.D.

- "Measuring the Competitive Effects of International Airline Code Sharing," *Economists Ink*, Fall 2001

- "Airline Code Sharing and Entry Deterrence." Paper delivered at the 7th Conference of Industrial Organization, Universitat Pompeu Fabra, Barcelona, September 2001

- "Cooperation Among Competitors: Evidence from Airline Alliances." Paper delivered at Northwestern University's Transportation Center, Fall 2000



## EXHIBIT 2

### Documents and Data Reviewed and Considered

1. A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, vol. 35(1), 1997.

2. Adam Mosseri, "Addressing Hoaxes and Fake News," Facebook, December 15, 2016.

3. Adi Robertson, "Google begins shutting down its failed Google+ social network," *The Verge*, April 2, 2019, https://www.theverge.com/2019/4/2/18290637/google-plus-shutdown-consumer-personal-account-delete.

4. Alphabet Inc., Form 10-K, December 31, 2017.

5. Alphabet Inc., Form 10-K, December 31, 2019.

6. Alphabet Inc., Form 10-K, December 31, 2022.

7. Amanda Laine, "The First Social Media Platform: The History Of Social Media," *Publer,* Agust 4, 2022, https://publer.io/blog/the-first-social-media-platform/.

8. BBC News, "Twitter Shuts down millions of fake accounts," July 9, 2018, https://www.bbc.com/news/technology-44682354.

9. Broadband Search, "History of Social Media (It's Younger Than You Think)," https://www.broadbandsearch.net/blog/complete-history-social-media.

10. Callum Glennen, "YouTube faces an advertiser exodus over extremist materials," *The New Economy,* March 21, 2017, https://www.theneweconomy.com/strategy/youtube-faces-an-advertiser-exodus-over-extremist-materials.

11. Casadesus-Masanell, Ramon, and Joan Enric Ricart, "From Strategy to Business Models and onto Tactics," Special Issue on Business Models, *Long Range Planning*, vol. 43(2), April 2010.

12. Catherine Shu, "YouTube demonetizes anti-vaccination videos," *TechCrunch*, February 22, 2019, https://techcrunch.com/2019/02/22/youtube-demonetizes-anti-vaccination-videos/.

13. Christina Caron, "Pinterest Restricts Vaccine Search Results to Curb Spread of Misinformation," *The New York Times*, February 23, 2019, https://www.nytimes.com/2019/02/23/health/pinterest-vaccination-searches.html.

14. Complaint, *State of Missouri ex rel. Eric S. Schmitt, Attorney General, et al. v. Joseph R. Biden, Jr. in his official capacity as President of the United States et al.*, No. 3:22-cv-01213-TAD-KDM, October 6, 2022.

15. Congressional Research Service, "Social Media: Misinformation and Content Moderation Issues for Congress," January 27, 2021, p. 9, https://crsreports.congress.gov/product/pdf/R/R46662.

16. Cornell University, "The Success of LinkedIn Using Network Effect," Course blog for INFO 2040/CS 2850/Econ 2040/SOC 2090, Cornell University. https://blogs.cornell.edu/info2040/2015/11/22/the-success-of-linkedin-using-network-effect/.

17. David S. Evans and Richard Schmalensee, "The Industrial Organization of Markets with Two-Sided Platforms," *Competition Policy International*, vol. 3(1), 2007.

18. David S. Evans, "The Consensus Among Economists on Multisided Platforms and the Implications for Excluding Evidence That Ignore It," *CPI Antitrust Chronicle*, June 2013.

19. Declaration of Aaron Kheriaty in *State of Missouri ex rel. Eric S. Schmitt, Attorney General, et al. v. Joseph R. Biden, Jr. in his official capacity as President of the United States et al.*, No. 3:22-cv-01213, June 14, 2022.

20. Declaration of Dr. Jayanta Bhattacharya in *State of Missouri ex rel. Eric S. Schmitt, Attorney General, et al. v. Joseph R. Biden, Jr. in his official capacity as President of the United States et al.*, No. 3:22-cv-01213, June 14, 2022.

21. Declaration of Dr. Martin Kulldorff in *State of Missouri ex rel. Eric S. Schmitt, Attorney General, et al. v. Joseph R. Biden, Jr. in his official capacity as President of the United States et al.*, No. 3:22-cv-01213, June 14, 2022.

22. Declaration of Jill Hines in *State of Missouri ex rel. Eric S. Schmitt, Attorney General, et al. v. Joseph R. Biden, Jr. in his official capacity as President of the United States et al.*, No. 3:22-cv-01213, June 14, 2022.

23. Declaration of Jim Hoft in *State of Missouri ex rel. Eric S. Schmitt, Attorney General, et al. v. Joseph R. Biden, Jr. in his official capacity as President of the United States et al.*, No. 3:22-cv-01213, June 14, 2022.

24. Dreamgrow, "The 15 Biggest Social Media Sites and Apps [2023]," March 12, 2023, https://www.dreamgrow.com/top-15-most-popular-social-networking-sites/.

25. Edison Research, "Twitter before and after Trump," February 17, 2021, https://www.edisonresearch.com/twitter-before-and-after-trump/.

26. Elon Musk Tweet, November 18, 2022, https://twitter.com/elonmusk/status/1594131768298315777?lang=en.

27. Emily Brozina, "What Happened to Myspace (and Is It Even Still Around)?" *PureWow,* August 24, 2022, https://www.purewow.com/entertainment/what-happened-to-myspace#:~:text=Myspace%20peaked%20around%202008%E2%80%94but,the%20episode%20below)%20for%20more.

28. Erick Schonfeld, "Social Site Rankings 2007," TechCrunch, October 24, 2007, https://techcrunch.com/2007/10/24/social-site-rankings-september-2007/.

29. Facebook Community Standards Enforcement Report, Q4 2022, https://transparency.fb.com/data/community-standards-enforcement/.

30. Facebook Inc., Form 10-K, December 31, 2012.

31. Facebook Inc., Form 10-K, December 31, 2016.

32. Facebook Inc., Form 10-K, December 31, 2021.

33. Facebook Inc., Form 10-K, December 31, 2022.

34. Facebook, "Addressing Sensational Health Claims," July 2, 2019, https://about.fb.com/news/2019/07/addressing-sensational-health-claims/.

35. Friendster Terms of Service Agreement, archived on April 1, 2003, https://web.archive.org/web/20030401235809/http:/www.friendster.com/info/tos.jsp.

36. H. Shelanski, S. Knox and A. Dhilla, "Network Effects and Efficiencies in Multisided Markets," Directorate for Financial and Enterprise Affairs Competition Committee, November 15, 2017, OECD.

37. Hal R. Varian, <u>Intermediate Microeconomics</u>, 8th Edition, W.W. Norton & Company, 2010.

38. Hootsuite's Digital 2022 Global Overview Report, January 2022, https://datareportal.com/reports/digital-2022-global-overview-report.

39. Hootsuite's Digital 2023 Global Overview Report, January 2023, https://datareportal.com/reports/digital-2023-global-overview-report.

40. House Oversight and Accountability Committee hearing on Twitter, Written Statement of Vijaya Gadde, February 8, 2023.

41. House Oversight and Accountability Committee hearing on Twitter, February 9, 2023.

42. https://buildd.co/startup/failure-stories/what-happened-to-myspace.

43. https://help.twitter.com/en/rules-and-policies/enforcement-options.

44. https://help.twitter.com/en/rules-and-policies/twitter-rules.

45. https://help.twitter.com/en/using-twitter/twitter-blue.

46. https://support.google.com/youtube/answer/9288567.

47. https://transparency.fb.com/enforcement/taking-action/disabling-accounts/.

48. https://transparency.fb.com/enforcement/taking-action/taking-down-violating-content/.

49. https://transparency.fb.com/policies/community-standards/.

50. https://transparency.fb.com/policies/community-standards/misinformation/.

51. https://transparency.fb.com/policies/improving/content-actioned-metric/.

52. https://transparencyreport.google.com/youtube-policy/removals?hl=en.

53. https://twitter.com/elonmusk/status/1585841080431321088?lang=en.

54. https://twitter.com/elonmusk/status/1588538640401018880?lang=en.

55. https://twitter.com/i/flow/signup and https://www.facebook.com/signup.

56. https://www.britannica.com/topic/Facebook.

57. https://www.britannica.com/topic/TikTok.

58. https://www.cisa.gov/topics/election-security/foreign-influence-operations-and-disinformation#:~:text=Misinformation%20is%20false%2C%20but%20not,mislead%2C%20harm%2C%20or%20manipulate.

59. https://www.youtube.com/premium.

60. Ifeoma Ozoma, "Bringing authoritative vaccine results to Pinterest search," Pinterest Newsroom, August 28, 2019, https://newsroom.pinterest.com/en/post/bringing-authoritative-vaccine-results-to-pinterest-search.

61. Ivan Mehta, "Twitter disperses the Trust & Safety Council after key members resigned," *TechCrunch*, December 12, 2022, https://techcrunch.com/2022/12/12/twitter-disperses-the-trust-safety-council-after-key-members-resigned/.

62. Ivy Liu, "Internal Twitter documents show scope of advertisers' questions about Elon Musk's policies." *Grid.news*, November 15, 2022, https://digiday.com/marketing/never-been-critical-twitters-ad-boycott-is-starting-to-look-like-a-long-goodbye/.

63. James Hale, "Brands Look at Instagram's Content Moderation After Ads Run Alongside Posts About Self-Harm, Suicide," *Tubefiler*, January 29, 2019, https://www.tubefilter.com/2019/01/29/instagram-youtube-adpocalypse-content-moderation/.

64. James Titcomb, "Facebook, Twitter and YouTube Create Database of Terrorist Images to Fight Online Extremism," *Telegraph*, December 5, 2016, https://perma.cc/QP8K-UQN9.

65. Jean-Charles Rochet and Jean Tirole, "Platform Competition in Two-Sided Markets," *Journal of the European Economic Association*, vol. 1(4), 2003.

66. Joshua D. Angrist and Jörn-Steffen Pischke, "The Credibility Revolution in Empirical Economics: How Better Research Design Is Taking the Con out of Econometrics," *Journal of Economic Perspectives*, 24 (2), 2010.

67. Kajabi.com, "YouTube demonetization: The essential guide for content creators," https://kajabi.com/blog/youtube-demonetization#:~:text=YouTube%20demonetization%20is%20when%20a,of%20revenue%20for%20the%20creator.

68. Kat Tenbarge, David Ingram and Ben Goggin, "Under Musk, some fear Twitter's moderation progress could unravel," *NBC News*, April 26, 2022, https://www.nbcnews.com/tech/internet/elon-musk-fear-twitters-moderation-progress-unravel-rcna25932.

69. Kurt Wagner and Bloomberg, "Facebook says it has spent $13 billion on safety and security efforts since 2016," *Fortune*, September 21, 2021, https://fortune.com/2021/09/21/facebook-says-it-has-spent-13-billion-on-safety-and-security-efforts-since-2016/.

70. Leonardo Madio and Martin Quinn, "Content moderation and advertising in social media platforms," March 7, 2023, https://ssrn.com/abstract=3551103 or http://dx.doi.org/10.2139/ssrn.3551103.

71. Levi Boxell, Matthew Gentzkow and Jesse M. Shapiro, "Cross-Country Trends in Affective Polarization," National Bureau of Economic Research, Working Paper 26669, http://www.nber.org/papers/w26669.

72. Marc Rysman, "The Economics of Two-Sided Markets," *Journal of Economic Perspectives,* vol. 23(3), Summer 2009.

73. Mary Madden, Amanda Lenhart, Sandra Cortesi, Urs Gasser, Maeve Duggan, Aaron Smith, and Meredith Beaton, "Teens, Social Media and Privacy," Pew Research Center, May 21, 2013, https://www.pewresearch.org/internet/2013/05/21/part-1-teens-and-social-media-use/.

74. Mathias Osmundsen, Alexander Bor, Peter Vahlstrup, Anja Bechmann, and Michael Petersen, "Partisan Polarization Is the Primary Psychological Motivation behind Political Fake News Sharing on Twitter," *American Political Science Review*, 115(3), 2021.

75. Media Matters for America, November 22, 2022, https://www.mediamatters.org/elon-musk/less-month-elon-musk-has-driven-away-half-twitters-top-100-advertisers.

76. Meta Platforms, Inc., Form 10-K, December 31, 2021.

77. Meta Platforms, Inc., Form 10-K, December 31, 2022.

78. OECD, "What is an 'online platform?", An Introduction to Online Platforms and Their Role in the Digital Transformation, OECD Publishing, Paris, 2019.

79. P. M. Di Gangi and M. M. Wasko, "Social Media Engagement Theory: Exploring the Influence of User Engagement on Social Media Usage," *Journal of Organizational and End User Computing* (JOEUC), vol. 28(2), 2016, https://www.researchgate.net/profile/Paul-Di-Gangi-2/publication/299357565_Social_Media_Engagement_Theory/links/5702df4808aea09bb1a305ab/Social-Media-Engagement-Theory.pdf.

80. Pew Research Center, Social Media Fact Sheet, April 7, 2021, https://www.pewresearch.org/internet/fact-sheet/social-media/.

81. Pinterest, Form 10-K, December 31, 2019.

82. PricewaterhouseCoopers, "The quest for truth: Content moderation in action," https://www.pwc.com/us/en/industries/tmt/library/content-moderation-quest-for-truth-and-trust.html.

83. R. E. Moran, I. Grasso, and K. Koltai, "Folk Theories of Avoiding Content Moderation: How Vaccine-Opposed Influencers Amplify Vaccine Opposition on Instagram", Social Media + Society, vol. 8(4), 2022, https://doi.org/10.1177/20563051221144252.

84. Rafael Jimenez-Duran, "The Economics of Content Moderation on Social Media," November 10, 2022, https://www.promarket.org/2022/11/10/the-economics-of-content-moderation-on-social-media/.

85. Rafael Jimenez-Duran, "The Economics of Content Moderation: Theory and Experimental Evidence from Hate Speech on Twitter," 2002, https://www.chicagobooth.edu/-/media/research/stigler/pdfs/workingpapers/324jmpjimenezduran003.pdf.

86. "Volkswagen tells brands to pause paid advertising on Twitter," Reuters, November 4, 2022, https://www.reuters.com/technology/volkswagen-tells-brands-pause-paid-activities-twitter-2022-11-

04/#:~:text=HAMBURG%2C%20Nov%204%20(Reuters),of%20the%20social%20media%20platform.

87. Sila Ada, Nadia Abou Nabout, and Ela McDonnell Feit, "Context information can increase revenue in online display advertising auctions: Evidence from a policy change," *Journal of Marketing Research*, vol. 59(5), 2022.

88. Siladitya Ray, "Twitter Safety Head Admits 'Surge In Hateful Conduct' As Firm Reportedly Limits Access To Moderation Tools," *Forbes*, November 1, 2022.

89. Simon P. Anderson and Jean J. Gabzewicz, "The media and advertising: a tale of two-sided markets," *Handbook of Cultural Economics*, Victor Ginsburgh and David Thorsby, Eds., Elsevier Science, 2005.

90. Stacey McLachlan, "How to Increase Social Media Engagement: A Guide for Marketers," August 13, 2020, https://blog.hootsuite.com/social-media-engagement/.

91. Complaint, *State of Missouri ex rel. Eric S. Schmitt, Attorney General, et al. v. Joseph R. Biden, Jr. in his official capacity as President of the United States et al.*, No. 3:22-cv-01213-TAD-KDM, October 6, 2022.

92. Statista's Digital Market Insights, https://www.statista.com/outlook/digital-markets?utm_source=DataReportal&utm_medium=Data_Citation&utm_campaign=Statista_Partner&utm_content=DataReportal_Data_Citation#overview.

93. Susan Athey, Emilio Calvano, Joshua S. Gans, "The Impact of Consumer Multi-homing on Advertising Markets and Media Competition," *Management Science*, vol. 64(4).

94. Susan Wojcicki, "Expanding our work against abuse of our platform," Inside YouTube, December 5, 2017, https://blog.youtube/news-and-events/expanding-our-work-against-abuse-of-our/.

95. Susan Wojcicki, "Protecting Our Community," Inside YouTube, December 4, 2017, https://blog.youtube/inside-youtube/protecting-our-community/.

96. The Virality Project, "Memes, Magnets, and Microchips, Narrative Dynamics around COVID-19 Vaccines," 2022.

97. Tim Stobierski, "What Are Network Effects," Harvard Business School Online, November 12, 2020, https://online.hbs.edu/blog/post/what-are-network-effects#:~:text=Direct%20network%20effects%20occur%20when,result%20of%20attracting%20more%20users.

98. Twitter Inc., Form 10-K, December 31, 2015.

99.  Twitter Inc., Form 10-K, December 31, 2016.

100.      Twitter Inc., Form 10-K, December 31, 2020.

101.      Twitter Inc., Form 10-K, December 31, 2021.

102.      Twitter Marketing UK, "Beyond business as usual: Brand reactions to COVID-19," https://marketing.twitter.com/en_gb/insights/beyond-business-as-normal--brand-reactions-to-covid-19.

103.      Twitter Transparency Report, January – June 2021, https://transparency.twitter.com/en/reports/rules-enforcement.html#2021-jan-jun.

104.      Twitter Transparency Report, July – December 2021, https://transparency.twitter.com/en/reports/rules-enforcement.html#2021-jul-dec.

105.      Twitter, "Permanent suspension of @realDonaldTrump," January 8, 2021, https://blog.twitter.com/en_us/topics/company/2020/suspension.

106.      Twitter, Terms of Use version 7, 2012, https://twitter.com/en/tos/previous/version_7.

107.      U. Kaiser and M. Song, "Do media consumers really dislike advertising? An empirical assessment of the role of advertising in print media markets," *International Journal of Industrial Organization*, vol. 27(2), 292-301.

108.      Yassine Lefouili and Leonardo Madio, "The Economics of Platform Liability," *European Journal of Law and Economics*, vol. 53, 2022.

109.      Yi Liu, Pinar Yildirim, and Z. John Zhang, "Implications of Revenue Models and Technology for Content Moderation Strategies," *Marketing Science*, vol. 41(4), March 22, 2022.

110.      Yoel Roth and Del Harvey, "How Twitter Is Fighting Spam And Malicious Automation," Twitter, June 26, 2018,

https://blog.twitter.com/official/en_us/topics/company/2018/how-twitter-is-fighting-spam-and-malicious-automation.html.

111.      Yoel Roth Tweet, November 4, 2022,

https://twitter.com/yoyoel/status/1588657229628321792?cxt=HHwWgMDRnarVhYwsAA AA.

# DEFENDANTS' EXHIBIT 2:

Hearing - Hearing Transcripts

Back to Document View Page

## Title Info

| | |
|---|---|
| **Title:** | House Oversight and Accountability Committee Holds Hearing on Twitter, Part 1 |
| **Date:** | February 08, 2023 |
| **Committee:** | Oversight and Accountability;HouseCommittee on Oversight and Accountability. House |
| **Source:** | Transcript |
| **Permalink:** | https://congressional.proquest.com/congressional/docview/t39.d40.tr02080123.o06?accountid=14740 |

## Body

House Oversight and Accountability: Protecting Speech from Government Interference and Social Media Bias, Part 1: Twitter's Role in Suppressing the Biden Laptop Story

FEBRUARY 08, 2023 10:00 A.M.

SPEAKERS:

REP. JAMES COMER (R-KY.), CHAIRMAN

REP. JIM JORDAN (R-OHIO)

REP. MICHAEL TURNER (R-OHIO)

REP. PAUL GOSAR (R-ARIZ.)

REP. VIRGINIA FOXX (R-N.C.)

REP. GLENN GROTHMAN (R-WIS.)

REP. GARY PALMER (R-ALA.)

REP. CLAY HIGGINS (R-LA.)

REP. PETE SESSIONS (R-TEXAS)

REP. ANDY BIGGS (R-ARIZ.)

REP. NANCY MACE (R-S.C.)

REP. JACOB LATURNER (R-KAN.)

REP. PATRICK FALLON (R-TEXAS)

REP. BYRON DONALDS (R-FLA.)

REP. KELLY ARMSTRONG (R-N.D.)

REP. SCOTT PERRY (R-PA.)

REP. WILLIAM TIMMONS (R-S.C.)

REP. TIM BURCHETT (R-TENN.)

REP. MARJORIE TAYLOR GREENE (R-GA.)

REP. LISA MCCLAIN (R-MICH.)

REP. LAUREN BOEBERT (R-COLO.)

REP. RUSSELL FRY (R-S.C.)

REP. ANNA PAULINA LUNA (R-FLA.)

REP. CHUCK EDWARDS (R-N.C)

REP. NICK LANGWORTHY (R-N.Y.)

REP. ERIC BURLISON (R-MO.)

REP. JAMIE RASKIN (D-MD.), RANKING MEMBER

DEL. ELEANOR HOLMES NORTON (D-D.C.)

REP. STEPHEN LYNCH (D-MASS.)

REP. GERRY CONNOLLY (D-VA.)

REP. RAJA KRISHNAMOORTHI (D-ILL.)

REP. RO KHANNA (D-CALIF.)

REP. KWEISI MFUME (D-MD.)

REP. ALEXANDRIA OCASIO-CORTEZ (D-N.Y.)

REP. KATIE PORTER (D-CALIF.)

REP. CORI BUSH (D-MO.)

REP. JIMMY GOMEZ (D-CALIF.)

REP. SHONTEL BROWN (D-OHIO)

REP. MELANIE STANSBURY (D-N.M.)

REP. ROBERT GARCIA (D-CALIF.)

REP. MAXWELL ALEJANDRO FROST (D-FLA.)

REP. BECCA BALINT (D-VT.)

REP. SUMMER LEE (D-PA.)

REP. GREG CASAR (D-TEXAS)

REP. JASMINE CROCKETT (D-TEXAS)

REP. DAN GOLDMAN (D-N.Y.)

REP. JARED MOSKOWITZ (D-FLA.)

FORMER TWITTER DEPUTY GENERAL COUNSEL JAMES BAKER

FORMER TWITTER CHIEF LEGAL OFFICER VIJAYA GADDE

FORMER TWITTER GLOBAL HEAD YOEL ROTH

FORMER TWITTER EMPLOYEE ANNIKA COLLIER NAVAROLI

[*]JAMES COMER: The Committee on Oversight and Accountability will come to order. I want to welcome everyone. Without objection, the chair may declare a recess at any time. I recognize myself for the purpose of making an opening statement. Today's hearing is the House Oversight and Accountability Committee's first step in examining the coordination between the federal government and big tech to restrict protected speech and interfere in the democratic process.

Social media platforms are increasingly the place Americans go to express their views, debate issues and gather news and information. These platforms are the virtual town square. However, many social media platforms are under the control of people who are hostile to the fundamental American principles of free speech and expression protected in the US Constitution.

We've witnessed big tech autocrats wield their unchecked power to suppress the speech of Americans to promote their preferred political opinions. Twitter was once one of these platforms until Elon Musk purchased the company a few months ago. Mr. Musk has pledged to end censorship that goes beyond the law.

He has pledged to allow Americans' voices be heard not quashed. In this hearing, we will examine the actions taken by Twitter prior to Mr. Musk's ownership. Many of these actions were carried out by the witnesses before us today. Prior to Mr. Musk's takeover of the company, Twitter aggressively suppressed conservative elected officials, journalists and activists.

This includes shadow banning, locking accounts and banning accounts altogether. In fact, Twitter's previous management team deplatformed and suppressed not just conservative voices, but anyone whose opinions strayed from what they deemed acceptable, opinions such as that students could and should attend school in person to curb learning loss.

In the past, Twitter's leadership included previous CEO Jack Dorsey claim the company did not limit the visibility of certain accounts and tweets known as shadow banning. He said this in front of Congress in 2018, but we now know they did, even placing such accounts on search and trend blacklists. Twitter's employees made censorship decisions on the fly, often not following the company's own publicly stated policies.

It worked hand in hand with the FBI to monitor the protected speech of Americans, receiving millions of tax dollars to do so. Twitter, under the leadership of our witnesses today, was a private company. The federal government used to accomplish what it constitutionally cannot, limit the free exercise of speech.

We now know all this thanks to Elon Musk and the independent journalists who have contributed to what are known as the Twitter Files. That brings us to the specific topic of today's hearing, Twitter's censorship of a news article that shed light on Joe Biden's involvement in his family's suspicious business deals.

In the months leading up to the laptop story, the FBI advised senior Twitter executives to question the validity of any Hunter Biden's story. We also know that one of the witnesses before us today participated in an Aspen Institute exercise in September 2020 on a potential hacking dump operation related to Hunter Biden.

Other big tech companies and reporters attended as well. This exercise prepared them for their future collusion to suppress and de-legitimize information contained in Hunter Biden's laptop about the Biden's family business schemes. On October 14, 2020, the New York Post published its first story based on information contained in Hunter Biden's laptop.

The Post provided proof of the laptop's legitimacy by releasing a computer repair store-signed receipt for the laptop and the federal subpoena used by the FBI to retrieve it in 2019. The article revealed that a top executive at Burisma, who was paying Hunter Biden $50,000 a month, had spent time with then-Vice President Biden in Washington, DC. Throughout his Presidential campaign, Joe Biden assured the American people that he had never spoken to his son about his overseas business dealings.

However, the details exposed in the Post article indicate that Joe Biden lied to the American people. Immediately following the story's publication, America witnessed a coordinated campaign by social media companies, mainstream news and the intelligence community to suppress and delegitimize the existence of Hunter Biden's laptop and its contents.

That morning, Twitter and other social media companies took extraordinary steps to suppress that story. Twitter immediately removed the story and banned the New York Post account. Twitter also banned accounts who shared the story, including White House press secretary, Kayleigh McEnany and blocked its transmission via direct message.

This episode marked the first time Twitter directly limited the spread of information from a mainstream news organization. And the York Post would not get its account back for two weeks. Twitter would finally admit it's mistake, but the damage had already been done. On October 19, 51 former intelligence officials published a letter that Hunter Biden's laptop was Russian disinformation, which Joe Biden used as a talking point at a Presidential debate on October 22. But we all know now this was not Russian disinformation.

It wasn't disinformation. I want to make sure the American people truly understand the timeline here because it's very important. The Hunter Biden laptop story was published on Wednesday. Twitter did not acknowledge the mistake for at least 24 hours. Then on Monday morning, 51 former intelligence officials published their letter.

That letter was then wholeheartedly accepted by mainstream news as proof that the laptop was fake. Joe Biden used that letter to brush aside the few questions he received about the story. During that time, the mainstream media was more concerned about what flavor of ice cream Joe Biden had ordered on a particular day.

All this happened two weeks before the 2020 election, two weeks. One survey found that 70 percent of Biden voters would not have voted for the Biden-Harris ticket if they had known about the Biden laptop, but many Americans did not know about it because of a coordinated cover-up by big tech, the swamp and mainstream news.

Now mainstream media outlets have verified the laptop, but the damage has been done. Today we are joined by three former high ranking employees at Twitter, Vijaya Gadde, Twitter's former top lawyer, James Baker, Twitter's former deputy general counsel, and Yoel Roth, Twitter's former head of trust and safety.

We're also joined by Anika Collier Navaroli, Twitter's former head of trust and safety, a former Twitter member of US safety policy team, let me get that right. I would like to thank you all for your participation in today's hearing. We owe it to the American people to provide answers about this collusion to censor information about Joe Biden's involvement in his family's business schemes.

With that, I yield to the ranking member for his opening statement.

JAMIE RASKIN: Thank you kindly Mr. Chairman. Last night in his State of the Union address over all the heckling, President Biden reviewed significant achievements his administration and Congressional Democrats are delivering for the American people, the lowest unemployment rate in over 50 years, a manufacturing boom in clean energy, semiconductors and infrastructure, expanding health care for veterans, and lowering prescription drug costs for seniors and people with diabetes, beating the opioid epidemic and addressing our national mental health crisis, historic action on climate change.

But this morning, we return not to focus on advancing this robust agenda of progress, but instead to take up an authentically trivial pursuit, all based on the obsessive victimology of right-wing politics in America. The Majority has called a hearing to revisit a two-year-old story about a private editorial decision by Twitter not to allow links to a single New York Post article made for a two-day period that had no discernable influence on anyone or anything.

The New York Post published the article on its own pages and it was carried by lots of other media outlets. It was widely discussed, including on Twitter itself, even during the brief moment in time when links weren't provided, and it was a fixture in right-wing media for the next three weeks before the election.

I think even the chairman and other members of this committee were out on TV and social media talking about it. But instead of letting this trivial pursuit go, my colleagues have tried to whip up a faux scandal about this two-day lapse in their ability to spread Hunter Biden propaganda on a private media platform.

Silly does not even begin to capture this obsession. What's more, Twitter's editorial decision has been analyzed and debated ad nauseum. Some people think it was the right decision. Some people think it was the wrong decision. But the key point here is that it was Twitter's decision. Twitter is a private media company.

In America, private media companies can decide what to publish or how to curate content however they want. If Twitter wants to have nothing but tweets commenting on New York Post articles run all day, it can do that. If it makes such tweets that mention the New York Post never see the light of day, they could do that too.

That's what the First Amendment means. Twitter can ban Donald Trump for inciting violent insurrection against the union as he was impeached by the House of Representatives and its 57 of 100 Senators found he did, and he can also try to resurrect his political career. Elon Musk just purchased Twitter and therefore controls its editorial content.

And among the first things he did was to fire some people, hire some people, denounce some prior decisions and reinstate an unrepentant and still clearly lying Donald Trump to the platform. Those decisions, however heroic or imbecilic you think they might be, are protected by the First Amendment in the United States of America.

Officially, Twitter happens to think they got it wrong about that day or two period. In hindsight, Twitter's former CEO Jack Dorsey called it a mistake. This apology might be a statement of regret about the company being overly cautious about the risks of publishing contents of potentially hacked or stolen materials, or it may reflect craven surrender to a right-wing pressure campaign.

But however you interpret it, the apology just makes the premise of this hearing all the more absurd. The professional conspiracy theorists who are heckling and haranguing this private company have already gotten exactly what they want, an apology. What more do they want? And why does the US Congress have to be involved in this nonsense when we have serious work to do for the American people?

But what makes this hearing tragic is that if our colleagues really wanted to examine a serious problem involving American democracy and social media, my friends, it is staring us in the face right now. Twitter and other social media companies acted as central organizing and staging grounds for the January 6, violent insurrection against Congress and against Vice President Pence.

Twitter became the national and global platform for incitement to seditious violence against our government, and a forum on the day of attack for coordinating logistical movements and tactical maneuvers in the mob violence against our police officers. In the lead up to January 6, Twitter decided to allow Donald Trump and countless MAGA extremists to use the platform to spread Trump's ridiculous big lie and disinformation about the election.

And soon the internet was replete with incitement for civil war, race war, insurrection, revolution and mob violence. Twitter did so despite increasingly desperate appeals from its own employees to act in the interests of public safety approaching January 6. The First Amendment is robust and expansive, but it stops at this point.

It does not protect anyone's right to engage in incitement to imminent lawless action and violent action against the government or against other people. This is the Brandenburg principle. There's no carve-out to free speech for speech relating to the New York Post or Hunter Biden or laptops, but there is a significant carve-out when the speech is deliberately calculated to produce imminent violence and chaos against the government.

That's why Twitter's deliberate indifference to Trump's big lies and incitement, its decision to ignore the pleas of its own employees to deal with the impending explosion against our police and against Congress on January 6, are matters that require real investigation and reflection. Rather than conspiring to suppress right-wing MAGA speeches, my colleagues astonishingly claim Twitter and other media companies knowingly facilitated Trump's spread of disinformation or what his own sycophantic Attorney General William Barr would come to call bullshit, and gave voice to his followers' glorification of violence and calls for civil war.

Today, we will hear from Annika Collier Navaroli, a former Twitter employee turned corporate whistleblower and patriotic hero, who raised the alarm inside Twitter about numerous accelerating warning signs that she saw leading up to the violent and catastrophic attack on the Capitol on January 6, 2021. Ms. Navaroli's here today to publicly testify about how senior officials at Twitter resisted her efforts to put policies in place or to enforce existing policies to promote public safety and to defend our national security.

Twitter management, however, did not want to cross Donald Trump. I don't know precisely how we will solve the problem of private social media platforms being used for the organization of coups and incitement of violent insurrections against the United States or Brazil or any other country, but this is a grave problem confronting democracy, not just in America but all over the world.

It is not a silly concocted partisan issue. We must analyze it carefully and legislate effectively to address it, and we must never forget that the enemies of democracy led by autocrat and war criminal Vladimir Putin are spending hundreds of millions of dollars on social media propaganda and disinformation to destabilize democracy all over the world, even as they wage their genocidal illegal aggressive war against the people of Ukraine.

How are we going to prevent the liberal democracies from being overrun by propaganda, disinformation and violent incitement? Well listen to Annika Collier Navaroli because she has something important to say. She poses a problem that would be worthy of a serious Congressional hearing and we should have one.

Thank you, Mr. Chairman. I yield back.

JAMES COMER: Chairman yields back. I want to thank again the witnesses for appearing here today. Today's witnesses are former Twitter employees, Vijaya Gadde, Twitter's former general counsel, James Baker, Twitter's former deputy general counsel, Yoel Roth, Twitter's former head of trust and safety, and Anika Collier Navaroli, a former member of Twitter's US safety policy team.

I want to remind everyone, you all are appearing under subpoena by your own request. Pursuant to Committee Rule 9(g), the witnesses will please stand and raise their right hands. Do you solemnly swear or affirm that the testimony you are about to give is the truth, the whole truth and nothing but the truth so help you God? Let the record show that the witnesses all answered in the affirmative.

We will begin the five minute question portion of our hearing today. The chair recognizes -- I apologize. Ready to get to the questions. We'll start with the opening statements, then we'll go to the questions, so each witness will get five minute opening statements, and we'll begin with you Mr. Baker.

JAMES BAKER: Thank you, Mr. Chairman. Mr. Chairman, Ranking Member Raskin and members of the committee, thank you for the opportunity to appear before you today. I hope that we will have a useful conversation about matters that are of great importance to the nation and the world. My main goals for this statement are simply to attempt to set the record straight with respect to certain false assertions that have been made about me in the public arena and to offer a suggestion with respect to potential legislation in the area of social media regulation.

As the committee is aware, however, based on the advice of counsel, I believe in good faith that I'm constrained today by my legal and ethical obligations as a former lawyer for Twitter, as well as by certain non-disclosure agreements. Within those constraints however, I will endeavor to respond to the committee's questions as fully as I possibly can, and I believe I can make the following statements.

First, I was not aware of and certainly did not engage in any conspiracy or other effort to do anything unethical, improper or unlawful while I was at Twitter, period. I did not act unlawfully or otherwise inappropriately in any manner with respect to Hunter Biden's laptop. Indeed, documents that Twitter has disclosed publicly reflect that I urged caution with respect to the matter, and noted that we needed more information to fully assess what was going on and to decide what to do, hardly a surprising piece of advice from a corporate lawyer.

Moreover, I'm aware of no unlawful collusion with or direction from any government agency or political campaign on how Twitter should have handled the Hunter Biden laptop situation. Even though many disagree with how Twitter handled the Hunter Biden matter, I believe that the public record reveals that my client acted in a manner that was fully consistent with the First Amendment.

I think that the best reading of the law is that as a private entity, the First Amendment protects Twitter and its content moderation decisions. And I do not believe that the facts in the public record indicate that Twitter became a state actor as that concept is defined under existing precedent such that the First Amendment would have constrained it. Second, I believe that at all times I executed my duties and responsibilities to my client, Twitter, lawfully and ethically.

At no time was I an agent or operative of the government or any political actor when I worked at Twitter. To the contrary, I believe that I worked zealously and diligently within the bounds of the law in pursuit of my client's best interests. Third, I did not destroy or improperly suppress any documents at Twitter regarding information important to the public dialog.

At all times I sought to help my client understand and comply with its legal obligations. It is worth noting that the public record indicates that after I left the company, attorneys or other unidentified third parties collected and or reviewed the contents of at least some of the Twitter Files prior to their release.

Fourth, Twitter disclosed publicly emails between me and Yoel Roth regarding one of Donald Trump's tweets about COVID. I do not have access to my Twitter emails, so I do not know if or how I responded to Mr. Roth. To the best of my recollection, I do not recall directing or urging him to take action with respect to Mr. Trump's tweet.

Instead, what I recall is that I asked him a question so that I could better understand how he and others were implementing Twitter's COVID misinformation policy. Asking questions and learning more about what a client's activities are is what I think good lawyers should do, and again, hardly surprising. Fifth, the Twitter Files referenced prior investigations of me. It is true that the Department of Justice investigated certain aspects of my conduct while I was employed by the FBI related to the handling of certain information.

Because I believe in the accountability for government officials, I cooperated with the department, including sitting for lengthy interviews. Eventually, the department closed the matter. No adverse action was taken with respect to me, and my security clearances while a government employee were never restricted because of the matter.

In closing, Mr. Chairman, I want to return briefly to the general topic of government interaction with social media companies. The law permits the government to have complex, multifaceted and long-term relationships with the private sector. Law enforcement agencies and companies can engage with each other regarding for example, compulsory legal process served on companies, criminal activity that companies, the government or the public identify, such as crimes against children, cybersecurity threats and terrorism, and instances where companies themselves are victims of crime.

When done properly, these interactions can be beneficial to both sides and in the interest of the public. As you Mr. Chairman, Mr. Jordan and others have proposed, a potential workable way to legislate in this area may be to focus on the actions of federal government agencies and officials with respect to their engagement with the private sector.

Congress may be able to limit the nature and scope of those interactions in certain ways, require enhanced transparency and reporting by the executive branch about its engagements, and require higher level approvals within the executive branch prior to such engagements on certain topics so that you can hold Senate confirmed officials, for example, accountable for those decisions.

In any event, if you want to legislate, my recommendation is to focus first on reasonable and effective limitations on government actors. Thank you, Mr. Chairman.

JAMES COMER: Thank you, Mr. Baker. Ms. Gadde.

VIJAYA GADDE: Chairman Comer, Ranking Member Raskin and members of the committee, thank you for this opportunity to provide this opening statement. After a decade as a corporate lawyer, I joined Twitter in 2011 as the first member of the corporate legal team. In 2013, I was promoted to general counsel. In 2018, I became the chief legal officer and continued in that role until October, 2022. During my time at Twitter, I had many distinct teams reporting to me, including legal, trust and safety, public policy, corporate security and compliance.

I was drawn to work at Twitter because I was inspired by how people were able to use the platform and awed by its potential. Twitter enabled anyone to hear directly from any individual instantly. People from around the world were coming together on Twitter for an open and free exchange of ideas. The work was challenging and fulfilling.

After Jack Dorsey returned as CEO in 2015, one of his top priorities became what we called the health of the public conversation. This was based on customer research, advertiser feedback, Twitter's declining revenue, user growth and stock price. Teams across Twitter were focused on making the platform safer, better and more profitable.

As an executive of the company, I also was responsible for helping to achieve the corporate goals set by Mr. Dorsey, and I was accountable to him, the board of directors and ultimately, Twitter's public stockholders. As we prioritize the health of the public conversation, we did not lose sight of what Twitter was for most people, a place to talk about their favorite things.

Topics that animated the platform range from K-Pop, to the World Cup, to video games and movies. We needed to ensure that differences of opinion would not cross the line, for example, into sending death threats to soccer players who miss important goals, distributing non-consensual intimate photos or cyberbullying so vicious that it could compromise a teenager's mental health.

Twitter's platform rules covered a wide range of conduct and changed over time, based on new behaviors and harms on the platform, and feedback from customers, regulators, governments, advertisers, researchers and others. This feedback led to a principles-based approach which we applied to an array of difficult yet equally complicated situations around the world.

These rules were also benchmarked against industry standards. We all knew how difficult it would be to design, much less apply, one set of global rules for hundreds of millions of accounts that shared billions of tweets a week. While I was at Twitter, the company never lost sight of its deep commitment to promoting and defending free expression around the world.

For example, to protect human rights defenders, we fought for the right of people to use pseudonyms on the platform. We litigated in courts around the world to protect the rights of people to express their opinions, often defending them against their own governments who were acting unlawfully or violating international human rights.

And we took extra precautions to ensure we scrutinized or challenged, and never just acquiesced to government legal demands. Defending free expression and maintaining the health of the platform required difficult judgment calls. Most applications of Twitter's rules were fact intensive, subject to internal debate and needed to be made very quickly.

We recognize that after applying our rules, we might learn that some of them did not work as we imagined, and that we would need to update them. We always remained open to new information from our customers and critics regarding our policies and enforcement. At times, we also reversed course. For example, on October 14, 2020, the New York Post tweeted articles about Hunter Biden's laptop, with embedded images that look like they may have been obtained through hacking.

In 2018, we had developed a policy intended to prevent Twitter from becoming a dumping ground for hacked materials. We applied this policy to the New York Post tweets and blocked links to the articles embedding those source materials. At no point did Twitter otherwise prevent tweeting, reporting, discussing or describing the contents of Mr. Biden's laptop.

People could and did talk about the contents of the laptop on Twitter or anywhere else, including other much larger platforms, but they were prevented from sharing the primary documents on Twitter. Still, over the course of that day, it became clear that Twitter had not fully appreciated the impact of that policy on free press and others.

As Mr. Dorsey testified before Congress on multiple occasions, Twitter changed its policy within 24 hours and admitted its initial action was wrong. This policy revision immediately allowed people to tweet the original articles with the embedded source materials, relying on its long-standing practice not to retroactively apply new policies, Twitter informed the New York Post that it could immediately begin tweeting when it deleted the original tweets, which would have freed them to retweet the same content again.

The New York Post chose not to delete its original tweets, so Twitter made an exception after two weeks to retroactively apply the new policy to the Post's tweets. In hindsight, Twitter should have reinstated the post account immediately. There is no easy way to run a global communications platform that satisfies business and revenue goals, individual customer expectations, local laws and cultural norms and get it right every time.

Still, while I was at Twitter, we worked hard every day to make Twitter a healthy platform and ultimately a healthy business. Thank you for your attention. I look forward to your questions.

JAMES COMER: Thank you very much. Mr. Roth.

YOEL ROTH: Thank you, Chairman Comer, Ranking Member Raskin and members of the Committee for the opportunity to speak with you here today. In nearly eight years at Twitter, I worked in and led a division called Trust and Safety. Trust and Safety's core duty is content moderation, removing tweets that violate Twitter's terms of service and suspending users who repeatedly break the rules.

This work is sometimes dismissed merely as censorship, but it represents a key way that Twitter and other companies live up to their responsibility to keep the users of their products safe. Much of this work is uncontroversial. For example, taking down accounts that engage in child sexual exploitation or promote terrorism.

The gray area of this work though, is when trust and safety teams have to make decisions about so-called lawful but awful material, content that may be legal in many jurisdictions, but isn't something most people would want to experience. Think of things like posting someone else's home address without their permission, or bullying somebody for a disability or for how they look.

A free speech absolutist might say yes, that kind of content is unpleasant, but it's not against the law. What right do you have to remove it? The answer is the need to make Twitter an appealing product for millions of people. Consistently in its own research, Twitter found that users were unhappy with the company's approach to content moderation, and that this dissatisfaction drove people away from the service.

This has consequences for what we mean by free speech on social media. Again and again, we saw the speech of a small number of abusive users drive away countless others. Unrestricted free speech paradoxically results in less speech, not more. It is our job in trust and safety to try to strike an appropriate balance.

But the importance of this work goes far beyond Twitter's business prospects and into the realm of national security. In 2017, I led the team at Twitter that uncovered significant interference in an American election by agents of the Russian government. Their mission was to stoke culture war issues on social media to try to further divide Americans.

My team and I exposed hundreds of thousands of these accounts from Russia, but also from Iran, China and beyond. It's a concern with these foreign interference campaigns that informed Twitter's approach to the Hunter Biden laptop story. In 2020, Twitter noticed activity related to the laptop that at first glance, bore a lot of similarities to the 2016 Russian hack and leak operation targeting the DNC. And we had to decide what to do, and in that moment with limited information, Twitter made a mistake.

Under the Distribution of Hacked Material Policy, the company decided to prevent links to the New York Post stories about the laptop from being shared across the service. I've been clear that in my judgment at the time, Twitter should not have taken action to block the New York Post's reporting. And just 24 hours after doing so, the company acknowledged its error.

But the decisions here aren't straightforward, and hindsight is twenty-twenty. It isn't obvious what the right response is to a suspected but not confirmed cyberattack by another government on a Presidential election. I believe Twitter erred in this case because we wanted to avoid repeating the mistakes of 2016. And so the basic job of trust and safety is to try to strike this balance between the harms of restricting too much speech and the dangers of doing too little.

I'll be the first to admit that we didn't always get it right. Even rare mistakes add up when you're carrying out content moderation at the scale of hundreds of millions of unique posts per day. While I was head of Trust and Safety at Twitter, I strove to do this work with impartiality and with a commitment to the fair enforcement of Twitter's written rules.

But whether it's me or Elon Musk or someone else in the future, someone will have to make choices about the governance of online spaces. Those decisions should not be made behind closed doors or based on personal whims. I hope that we can work together to find ways to bring greater trust and transparency to social media.

And I look forward to answering the committee's questions about any of these topics to the best of my ability.

JAMES COMER: Thank you. Ms. Navaroli.

ANNIKA COLLIER NAVAROLI: Good morning, Chairman Comer, Ranking Member Raskin and members of the committee. Thank you so much for the opportunity to speak with you all today. I'm here because there is an urgent need for us to understand the impact that social media companies are having on our democracy. I will be very clear. I was not involved in the decision around Hunter Biden's laptop, but I was involved in decisions that were made leading up to, during and after the January 6th attack on the Capitol.

If we are going to talk about social media and the government, we need to talk about Twitter's failure to act before January 6. I am here to tell you that doing nothing is not an option. If we continue to do nothing, violence is going to happen again. My background is as a trained lawyer and journalist, and my expertise over the past decade has been in the areas of media, technology, law and policy, with a particular focus on social media and free expression.

I joined Twitter in 2019, and by 2020 I was the most senior expert on Twitter's US Safety Policy team. My team's mission was to protect free speech and public safety by writing and enforcing content moderation policies around the world. These policies included things like abuse, harassment, hate speech, violence and privacy.

So if no other algorithm or no other human could decide if a tweet violated my team's policies, the Safety team policy acted as the final moderators. If a high profile individual like any member of this committee or President Trump tweeted something controversial, it was sent to my team's desk. Every day, we had to decide whether a particular piece of content equated to yelling fire in a crowded theater.

My work at Twitter and subsequently at Twitch put me in the middle of key events in history. What I've learned from them is that social media played and continues to play a role in these events. And two years after January 6, we still need to better understand the role that Twitter played in order to prevent it from happening again.

So what do we need to understand? First, Twitter's leadership bent and broke their own rules in order to protect some of the most dangerous speech on the platform. I'm going to talk a little bit about what happened in the months leading up to January 6. During this time, my team worked to try to minimize the threat of violence that we saw coming.

After President Trump instructed the Proud Boys to stand back and stand by in a debate, we considered the danger that that statement would have if it was tweeted. So we crafted what we called a Coded Incitement to Violence policy to address dog whistles like this. Instead of approving it, management bent over backwards to find ways to not approve it. On January 5, the policy was still not approved, and led a meeting where one of my colleagues asked management whether someone was going to have to get shot before we were allowed to take down tweets.

Another colleague looked up live tweets and read them to management to try to convince them of the seriousness of the issue. Still no action was taken. On the morning of January 6, I sent Twitter lawyers a message warning them that our team was hamstrung by leadership. Two days later, when it looked like it was going to happen all over again, I asked the management whether they wanted more blood on their hands.

Only then did they act. The second problem is that there is way too much power concentrated in the hands of too few. With January 6, and many other decisions, content moderators like me did the very best that we could. But far too often, there are far too few of us and we are being asked to do the impossible.

For example, in January 2020, after the US assassinated an Iranian general and the US President decided to justify it on Twitter, management literally instructed me and my team to make sure that World War Three did not start on the platform. No person, people or company should have that kind of unchecked power or that kind of responsibility.

The modern day public conversation should not be susceptible to the whims of any one individual or any one company. Fixing the systemic issues that lead to bad decisions is not going to be easy, but people like me who have been in the trenches can help lead the way. But I must say coming forward and offering this information is risky and it is difficult.

Doxxing and harassment are real, and people are afraid to tell what they know. So we need to make sure that there are protections for those who speak the truth. We need to create space to hear from people on the front lines. We need to give them protection so they can share their experiences. Only then can we begin to understand the full scope of the problem and to find solutions.

There is far too much at stake for us to do nothing. Thank you.

JAMES COMER: Thank you all. Excellent opening statements. Now we'll begin with the question portion. We'll begin by recognizing Mr. Biggs for five minutes.

ANDY BIGGS: Thank you, Mr. Chairman. Mr. Roth, within of just mere minutes or hours after the New York Post published its story on the Hunter Biden laptop at 8:51 am, you sent a message to a team. Part of your team I assume, and you said, it isn't clearly violative of our hacked materials policy, referring to this story, nor is it clearly in violation of anything else.

Do you remember sending that message?

YOEL ROTH: Thank you for the question, Congressman. I don't recall that message specifically, but that does sound like my judgment on that day, yes.

ANDY BIGGS: So that was early on in the day, and yet shortly thereafter, Kayleigh McEnany, White House press secretary, her account was locked. So an inquiry was made the next day by a person named Carolyn Strum. You know Carolyn Strum?

YOEL ROTH: Yes, sir, I do.

ANDY BIGGS: Yeah, and Carolyn Strum asked what's going on here? And somebody named Elaine Aung Soto said, the user was bounced by site integrity for violating our hacked materials policy. Do you remember that incident?

YOEL ROTH: Yes, sir, I do.

ANDY BIGGS: And somebody named Trenton Kennedy said, I'm struggling to understand the policy basis for marking this as unsafe, and I think the best explainability argument, now that may be a technical term for you, but for me, it looks like we're trying to create a narrative here to cover up, but the best explainability argument for this externally will be that we're waiting to understand that this story is the result of hacked materials.

Do you remember Mr. Kennedy's communication?

YOEL ROTH: Yes, I do.

ANDY BIGGS: Yeah. And so then we get into a whole series of things written by Mr. Baker going back and forth. And he says on that same day now at 9:26, which is about a half an hour after your statement that you don't think that anything's been violated here, he says I've seen some reliable cybersecurity folks question the authenticity of the emails in another way.

And then you seem to later - But by the way, that's almost inconceivable. I mean it just seems inconceivable that that would have happened so quickly that he would have that. And then you sent out something right after that that said, "The key factor in forming our approach is consensus from experts monitoring election security and disinformation that this looks a lot like a hack and leak that learned from the 2016 WikiLeaks approach." I'm wondering if you can name for me today any of the experts that seem to have a consensus at 10:12 am on the morning of October 14, that you put out saying that we're going to rely on some group of experts.

Who were they?

YOEL ROTH: Thank you for the question. Twitter did not give me access to any of my documents or emails to prepare for this hearing, and so unfortunately, I can't give you a direct answer.

ANDY BIGGS: Mr. Roth, were there experts? Were there people that you consulted that were cybersecurity experts between 9 am and 10:15 am on that day?

YOEL ROTH: My recollection is that we were following discussions about this incident as they unfolded on Twitter. So cybersecurity experts were tweeting about this incident and sharing their perspectives, and that informed some of Twitter's judgment here. But I want to emphasize, as I said in my statement, I didn't think that the evidence or those perspectives warranted removal and I advocated against taking that action.

ANDY BIGGS: I understand. Let's look at one other document. Our teams made the determination that the materials fall under our hacked materials policy. It's my understanding from reports and internal sources that normally a hacked material policy would require a government official or law enforcement determination that there had actually been a hacked account before that hacked policy were to be in post.

Is that accurate?

YOEL ROTH: No, sir, it's not.

ANDY BIGGS: OK. So the policy did not require that there be any kind of official finding by a government source?

YOEL ROTH: No, there were a number of different types of evidence that we considered under the policy. Certainly government attribution would be a powerful one, but we also look ...

ANDY BIGGS: So that wasn't determinative, is what we're saying?

YOEL ROTH: In that instance, we did not have any specific information from any government source, no.

ANDY BIGGS: I'm going to read something that applies to this and several other things from the Twitter stack that you guys had. This might be an unpopular opinion, but one-off ad hoc decisions like this that don't appear rooted in policy are in my humble opinion, a slippery slope and reflect an alternatively equally dictatorial problem.

Quite frankly, that's what the essence of all four of your testimony, I realize you're trying to fight against it, but you exercised, you exercised an amazing amount of clout and power over the entire American electorate by even holding him hostage for 24 hours, reversing your policy, and then they're like, well, we want to go back to the originals.

That's 24 hours or two weeks that you imposed your will on the American electorate. I'll yield back, Mr. Chairman.

JAMES COMER: Gentleman's time expired. He went 30 seconds over. I'll give the ranking member an extra 30 seconds.

JAMIE RASKIN: You're very fair minded, Mr. Chairman. Mr. Roth, let me start with you. Did I hear you correctly to say that there were thousands or even hundreds of thousands of counterfeit Twitter accounts set up by Russian propaganda and disinformation for Vladimir Putin to pump his poison into the bloodstream of American social media?

Is that right?

YOEL ROTH: That's right, sir. And that's not just past tense. Those accounts are active on social media today. This is an ongoing campaign.

JAMIE RASKIN: Well we should be having a hearing about that. I appreciate your alerting to us what's taking place. Ms. Navaroli, so you've testified that in the months leading up to the November 2020 election, and then in the weeks before January 6, you were growing increasingly anxious about the violent rhetoric and incitement that you saw posted on Twitter.

Can you describe specifically what made you so concerned during that period? And did you raise your concerns with people at Twitter?

ANNIKA COLLIER NAVAROLI: Thank you for that question. As I said in my opening statement, after former President Trump in his debate said the statement, stand back, stand by to the Proud Boys, I am in discussion with other teams at Twitter realized that we had a gap in our policies and that that could not be said on the platform because it would have gone too far.

What we did see continue to happen was those statements in addition to other coded incitement to violence or dog whistles began to spring up on the platform. And so what was once fringe ideology or fringe statements that were calling for the overthrow of the government became a loud roar. And so we heard individuals beginning to say that they were locked and loaded, that they were ready for Civil War Part 2, that they were ready for another revolution, that they were ready for the day of the rope in very clear English on Twitter.

JAMIE RASKIN: And on the January 6th Committee, we have tens of thousands of statements like that being made on Twitter and other parts of social media. So we got a little taste of what you were experiencing on a daily basis. Now there was this meeting on January 5, at Twitter. I don't think it was called specifically to look at what was going to happen the next day, that just happened to be a regular meeting, but at that meeting you and other employees raised urgently the problem of what you saw coming on January 6. How did Twitter management respond to the concerns that you raised?

ANNIKA COLLIER NAVAROLI: That's a great question, and yes, that meeting was a regularly scheduled meeting. Within the meeting, I believe I referred to it in my testimony to the January 6th Committee as I was at my wit's end. I had argued, I had asked questions, I had asked for clarification. We had found dangerous tweets within the meeting, and yet the individual who is the most senior leader within the team in that meeting told us that we were not allowed to take that content down and that we were not allowed to use the coded incitement to violence policy.

The reason that she gave us mirrored what we had been told by the former head of Trust and Safety, Del Harvey that individuals might be saying things like locked and loaded or stand back and stand by in ways of self-protection. That was not what we were seeing on the platform.

JAMIE RASKIN: So when you were seeing things like locked and loaded and Civil War part two and race war and so on, were you warning your superiors at Twitter that you thought there was going to be real violence, that this was not hyperbole that was being spoken at that point?

ANNIKA COLLIER NAVAROLI: Absolutely. I specifically told Del Harvey herself that someone was going to get shot as I testified to the January 6th Committee.

JAMIE RASKIN: You stated that Donald Trump described his own tweets as little missiles. Why did that stick in your mind?

ANNIKA COLLIER NAVAROLI: Yes, the quote that you're referring to, I mean I don't remember exactly what news article that it was in, but it was a news article that I had read in which the former President said that he likes to send out his tweets like little missiles. To me that sounded exactly like weaponization of a platform in his own words, and yet Twitter was not concerned.

JAMIE RASKIN: Alright. Well, again, this bears a complete hearing on its own. This is a real issue unlike something that happened a couple of years ago for 24 hours that has already disappeared in the sands of time. But this is facing us today. As you say, those right-wing, violent forces are still out there and the social media can still be used as a channel for incitement to violent action against state legislatures, school boards, the Capitol of the United States, Congress and so on. How do we prevent this from happening in the future?

And do you think that Twitter is dealing with this problem effectively now?

ANNIKA COLLIER NAVAROLI: As I said in my opening statement, we have to do something. There is too much at stake for us to continue to do nothing. And this question of how do we prevent it is a big one. Unfortunately, I do not believe that we are at a place that we can come to solutions, because we do not know how these companies work.

We must continue to hear from individuals like myself. We must have a seat at the table to be able to share our experiences, because our experiences and the ways that we have succeeded, the ways that we have failed hold the key to our futures and the key to our democracies.

JAMIE RASKIN: Alright, thank you. Mr. Chairman, I would just say I was skeptical about revisiting the whole New York Post thing, where there have already been Congressional hearings and they've already apologized for their little lapse, but this is a serious issue. And so I'm glad, we at least have the opportunity to begin to talk about it in public.

And I yield back to you. Thank you.

JAMES COMER: Gentleman yields back. I'll recognize myself now for questioning. The Biden family investigation begins with the story of how big tech, the media, former intelligence agents and the Bidens themselves suppressed the story of Hunter Biden's laptop weeks before the 2020 election. Today, we're hearing from Twitter executives who buried the New York Post laptop story, claiming it violated the platform's hacked materials policy.

In reality, the Twitter executives were hostile towards conservatives and biased towards anyone who opposed their points of view. For example, Mr. Roth, did you write this tweet?

YOEL ROTH: I regret the language that I used in some of my former tweets, but yes, I did post that.

JAMES COMER: And I'll read the tweet so it's in the record. "Yes, that person in the pink hat is clearly a bigger threat to your brand of feminism than actual Nazis in the White House." Mr. Ross, do you think all conservatives are Nazis?

YOEL ROTH: Certainly not sir.

JAMES COMER: What about the hundreds of people who worked in the Trump administration?

YOEL ROTH: Certainly not.

JAMES COMER: Did Ms. Gadde or any other lawyer at Twitter ever tell you to take down that tweet?

YOEL ROTH: No, Twitter did not have a practice of restricting employees sharing their personal viewpoints on the service.

JAMES COMER: Turning back to the laptop, Ms. Gadde, are you aware that Hunter Biden's lawyers as recently as last week wrote the Department of Justice about Hunter Biden's laptop?

VIJAYA GADDE: I've seen some articles about that.

JAMES COMER: Yes, they did, and it appears that Hunter Biden's attorney is admitting that the laptop and e-mails on it are authentic. So Ms. Gadde, on October 14, 2020, did Hunter Biden report to Twitter that he was the victim of a hack?

VIJAYA GADDE: No, I don't believe he did.

JAMES COMER: Ms. Gadde, when the New York Post initially broke the story about the laptop, did you call Hunter Biden's lawyer to ask if it was authentic?

VIJAYA GADDE: No, I did not.

JAMES COMER: Isn't it correct that the Biden campaign had contact with Twitter in the run-up to the 2020 election?

VIJAYA GADDE: Not to my knowledge.

JAMES COMER: And you're telling this committee that you didn't ask any Biden representative if the laptop was real or for Hunter Biden's attorney's phone number to confirm its authenticity?

VIJAYA GADDE: We did not speak to anybody related to that.

JAMES COMER: Mr. Baker, are you aware that the FBI had Hunter Biden's laptop since December of 2019?

JAMES BAKER: I'm sorry, am I aware of that now?

JAMES COMER: Well, were you aware then?

JAMES BAKER: Then no, I don't believe sir, that to the best of my recollection, I don't think I [inaudible].

JAMES COMER: But you're aware now.

JAMES BAKER: I've heard that now, yes.

JAMES COMER: Mr. Baker, did you call any of your contacts at the FBI to ask whether or not they knew if the material had been hacked?

JAMES BAKER: I don't recall contacting them about that on that day.

JAMES COMER: Mr. Roth, Ms. Gadde and Mr. Baker, it appears to me that you failed at your jobs. You were entrusted with the highest level of power at Twitter. But when you were faced with the New York Post story, instead of allowing people to judge the information for themselves, you rushed to find a reason why the American people shouldn't see it. In a matter of hours, you were deciding on the truth of a story that spans years and dozens of complex international transactions.

You did this because you were terrified of Joe Biden not winning the election in 2020. That's what it appeared. I can assure you this committee will succeed in holding the Bidens accountable. So much of the evidence of wrongdoing from this family is located in that hard drive that you all led the American people to believe was Russian disinformation, when in fact it was not.

Now I agree with Mr. Baker's opening statement. The concern for me is the level of involvement the FBI had with not just Twitter, but all of our social media platform companies. And I think it kind of goes in the opposite direction where my friend the Ranking Member was trying to take this in his opening statement.

This is something this committee should be concerned about. The government doesn't have any role in suppressing speech, and that's something the media should be very concerned about. What if there's a conservative President that somehow cleans out our FBI and they put in conservatives to suppress liberal speech.

That's something that should never happen. So I look forward to more questions, and at this time I will yield to the gentleman from ...

JIM JORDAN: I thank the chair for yielding. Mr. Baker, you said you didn't talk with the FBI that day. Did you talk to the FBI about the Hunter Biden laptop story prior to then or after that day?

JAMES BAKER: I'm trying to make sure I can answer this question consistent with the restrictions that I talked about in my opening statement.

JIM JORDAN: Simple question. Did you talk the FBI about the Hunter Biden story?

JAMES BAKER: To the best of my recollection, I did not talk to the FBI about the Hunter Biden story before that day.

JIM JORDAN: Did talk to them after it? You said ...

JAMES BAKER: I don't recall.

JIM JORDAN: Your response is real specific to the chairman. You said I did not talk to the FBI about the Hunter Biden laptop story that day. I assume that day is October 14. I want to know if you talk to them on the 13th or before, or if you talked to them on the 15th and after.

JAMES BAKER: I don't recall speaking to the FBI. Sitting here today, I don't recall speaking to the FBI at all about the Hunter Biden laptop.

JIM JORDAN: But then why did you answer it the way you did?

JAMES BAKER: I beg your pardon?

JIM JORDAN: I yield back.

JAMES COMER: Chair recognizes Ms. Norton for five minutes.

ELEANOR HOLMES NORTON: Thank you, Mr. Chairman. Like Benghazi before, Republicans are on a taxpayer-funded expedition to attack their political rivals and they are feeding the flames of conspiracy in the process. With the release of the so-called Twitter Files, Donald Trump has seized the moment to further his own conspiracies about the 2020 election.

Writing in December and I quote, "Do you throw the Presidential election results of 2020 out and declare the rightful winner or do you have a new election. A massive fraud of this type and magnitude allows for the termination of all rules, regulations and articles, and even those found in the Constitution," end quote.

Now it bears repeating that this is the same man who inciting an insurrection On January 6, and just last week reposted a message on Truth Social that suggested his supporters will quote, and I'm quoting him now, "Physically fight for him this time," and added, "they got my six and we are loaded, and I mean loaded." This is a question for Ms. Navaroli.

What did the phrase, locked and loaded mean to you while you were at Twitter prior to January 6?

ANNIKA COLLIER NAVAROLI: Yes, thank you for that question. The way that I read locked and loaded to be interpreted by the tweets that I saw coming on Twitter prior to January 6, was that individuals were armed, and that they were ready to commit violence.

ELEANOR HOLMES NORTON: Are you concerned that the use of this language will continue to incite and legitimize political violence leading to the next election?

ANNIKA COLLIER NAVAROLI: Absolutely. We are sitting exactly one month in which the exact same playbook was played in Brazil when we saw almost deja vu happening again. As I said in my opening statement, unless we do something, this will continue to happen again.

ELEANOR HOLMES NORTON: Thank you, Ms. Navaroli. Mr. Roth, you are no stranger to conspiracies and their real-world consequences. If you don't mind, can you please describe for the committee how the release of the so-called Twitter Files has affected your personal safety?

YOEL ROTH: Thank you for the question, Congresswoman. The Twitter Files, I would note first and foremost, didn't just affect me, but affected much more junior employees at Twitter. Employees as far away as Manila and the Philippines were doxed, had their families threatened and experienced harm equal to or greater than what I've experienced.

But concurrent with the Twitter Files, Elon Musk also made the decision to share a defamatory allegation that I support or condone pedophilia. And this lie led directly to a wave of homophobic and anti-Semitic threats and harassment against me, of which Twitter has removed vanishingly little. And following the Daily Mail's decision to publish where I live, ultimately I had to leave my home and sell it. Those are the consequences for this type of online harassment and speech.

ELEANOR HOLMES NORTON: Well, I must say those are very real consequences. By legitimizing unsubstantiated conspiracy theories about the deep state big tech and government censorship for political gain, committee Republicans are holding a match to a powder keg. We all saw the consequences of this kind of rhetoric on January 6, and we continue to see it play out as political violence and hate crimes grip communities around the country.

And I yield back, Mr. Chairman.

JAMES COMER: Gentlelady yields back. Chair recognizes Ms. Mace for five minutes.

NANCY MACE: Thank you, Mr. Chairman. The Twitter Files were not just about Hunter Biden's laptop. Twitter Files make it apparent Twitter worked overtime to suppress accurate COVID information. Dr. Jay Bhattacharya is a professor of medicine at Stanford, who once tweeted an article he wrote about natural immunity. Thanks to Elon Musk's release of the Twitter Files, we learned some of his tweets were tagged with the label of Trends Blacklist.

Apparently the views of a Stanford doctor are disinformation to you people. I along with many Americans have long-term effects from COVID. Not only was I a long hauler, but I have effects from the vaccine. It wasn't the first shot, but it was a second shot that I now developed asthma that has never gone away since I had the second shot.

I have tremors in my left hand and I have the occasional heart pain that no doctor can explain, and I've had a battery of tests. I find it extremely alarming Twitter's unfettered censorship spread into medical fields and affected millions of Americans by suppressing expert opinions from doctors and censoring those who disagree with the CDC. I have great regrets about getting the shot because of the health issues that I now have that I don't think are ever going to go away.

And I know that I'm not the only American who has those kinds of concerns. Another example of what Twitter has done to censor folks is from Dr. Martin Kulldorff, a Harvard educated epidemiologist who once tweeted, "COVID vaccines are important for high risk people and their caretakers. Those with prior natural infection do not need it nor children." The Twitter Files reveal this tweet was deemed false information because it ran contrary to the CDC. So my first question this morning of Ms. Gadde.

May I ask of you, where did you go to medical school?

VIJAYA GADDE: I did not go to medical school.

NANCY MACE: I'm sorry.

VIJAYA GADDE: I did not go to medical school.

NANCY MACE: That's what I thought. Why do you think you or anyone else at Twitter had the medical expertise to censor a doctor's expert opinion?

VIJAYA GADDE: Our policies regarding COVID were designed to protect individuals. We were seeing ...

NANCY MACE: You guys censored Harvard educated doctor, Stanford educated doctors, doctors that are educated in the best places in the world, and you silenced those voices. I have another chart I want to show you Ms. Gadde. I have another tweet by someone with a following of a full 18,000 followers. This person put a chart from the CDC on Twitter, is the CDC's own data, so it's accurate by your standards.

And you all labeled this as misleading. You're not a doctor right, Ms. Gadde?

VIJAYA GADDE: No, I'm not.

NANCY MACE: OK. What makes you think you or anyone else at Twitter have the medical expertise to censor actual accurate CDC data?

VIJAYA GADDE: I'm not familiar with this particular situation.

NANCY MACE: I'm sure you're not. But this is what Twitter did. They labeled this as inaccurate. It is the government's own data. It's ridiculous that we're even having to have this conversation today. It's not just about the laptop. This is about medical advice that expert doctors were trying to give Americans because social media companies like Twitter were silencing their voices.

I have another question, my last one for you, Ms. Gadde. Did the US government ever contact you or anyone at Twitter to pressure Twitter to moderate or censor certain tweets? Yes or no.

VIJAYA GADDE: We have a program.

NANCY MACE: Did the US government ever contact you or anyone at Twitter to censor or moderate certain tweets? Yes or no.

VIJAYA GADDE: We receive legal demands to remove content from the platform from the US government and governments all around the world. Those are published on a third party website and anyone can read them.

NANCY MACE: Thank God for Matt Taibbi. Thank God for Elon Musk for allowing to show us in the world that Twitter was basically a subsidiary of the FBI, censoring real medical voices with real expertise that put real Americans' lives in danger because they didn't have that information. I also want to thank one of my colleagues, Ro Khanna because it as it turns out, censorship isn't just an important issue to conservatives.

Some of my colleagues on the other side of the aisle like Ro found this censorship very concerning, and even wrote to you and the folks at Twitter that he was concerned about the First Amendment being censored. So I want to thank him for speaking up and speaking out about this issue, because this should not be a partisan issue.

This should be an issue that's an American issue. Mr. Chairman, I would like to enter into the record, I ask unanimous consent to enter into the record a Wall Street Journal article from December 9, 2022 by Justin Hart entitled, The Twitter Blacklisting of Jay Bhattacharya, into the record please Mr. Chairman.

JAMES COMER: Without objection, so ordered.

NANCY MACE: Thank you and I yield back.

JAMES COMER: Chair recognizes Mr. Lynch for five minutes.

STEPHEN LYNCH: Thank you, Mr. Chairman. I just want to go over the chronology here. Mr. Roth, back in 2016, Russia and Vladimir Putin engaged in what bipartisan Senate Intelligence Committee investigators called a and I quote, "aggressive multifaceted effort to influence the outcome of that year's Presidential election." The campaign included hacking of the systems of a major political party and leaking illegally obtained information, scanning US election systems for vulnerabilities and exploiting the weaknesses of social media platforms to spread disinformation to the American people.

Again in a 2017 declassified report, the US intelligence community assessed that Russia's 2016 election operations signaled a quote, "new normal" in Russian influence efforts, and that the Kremlin would quote, "apply lessons learned going forward against the US and its allies." Mr. Roth, in a December interview with journalist Kara Swisher, you state that this declassified assessment was quote and I'm quoting you, "a watershed moment in the history of content moderation and the Internet," close quote.

You also stated in that interview that Twitter discussed potential threats to the integrity of the 2020 elections. And it was quote and I'm quoting you again, "Obvious to think about the most influential thing that impacted the 2016 election, which was the hack and leak campaign organized by the Russian government." And that quote, "We would have been stupid not to think about that risk." Mr. Roth, why would Twitter have been stupid to ignore that risk?

YOEL ROTH: Thank you for the question, Congressman. I think Twitter and the entire social media industry were frankly caught with their pants down in 2016, and missed an opportunity to do the critical work of protecting election security. This isn't my judgment. This is the judgment of academics and researchers who have spent years studying Russian active measures, and most of their conclusions suggest that the number one most influential part of the Russian Active Measures campaign in 2016 was the hack and leak targeting John Podesta.

It would have been foolish not to consider the possibility that they would run that play again.

STEPHEN LYNCH: Right, and so let me ask, was that top of mind for Twitter? You're trying to measure the credibility of incoming intelligence. Was that top of mind in regard to your decision, the company's decision to temporarily limit the distribution of the October 14 New York Post story that was delivered by Mayor Giuliani?

YOEL ROTH: Yes, that was one of the animating concerns for us. For nearly two years, we had engaged in scenario planning exercises for potential risks tied to the elections, and one of them appeared to be happening that day. Now again, I think the facts were complicated and I do believe Twitter made a mistake then.

But our judgment was colored by the experience of 2016, and by the very real Russian activities that we saw play out that year.

STEPHEN LYNCH: Mr. Roth, in a December 2020 sworn declaration to the FEC, you said that starting in 2018 you had quote, "regular meetings with the Office of the Director of National Intelligence, the Department of Homeland Security, the FBI and industry peers regarding election security." Is that correct?

YOEL ROTH: Yes, sir, it is.

STEPHEN LYNCH: You stated that during these meetings quote, "federal law enforcement agencies communicated that they expected hack and leak operations by state actors that might occur in the period shortly before the 2020 Presidential election, likely in October," and that there were quote, "rumors that a hack and leak operation would involve Hunter Biden," close quote.

Is that your recollection today?

YOEL ROTH: It is, but I want to clarify that sentence slightly. I think it actually should have been two separate sentences. It is true that in meetings between industry and law enforcement, law enforcement discussed the possibility of a hack and leak campaign in the lead-up to the election. And in one of those meetings, it was discussed, I believe by another company, that there was a possibility that that hack and leak could relate to Hunter Biden and Burisma.

I don't believe that perspective was shared by law enforcement. They didn't endorse it. They didn't provide that information in that.

STEPHEN LYNCH: OK. Just to fast forward here, and in fact in March 2021, four months after the election, the US intelligence community assessed that Russian President Putin authorized a range of government organizations conducted influence operations aimed at denigrated President Biden's candidacy and the Democratic Party, supporting Former President Trump and undermining public confidence in the electoral process, and exacerbating socio-political divisions in the US that obviously reared their head on January 6. Mr. Chairman, my time is expired and I yield back.

JAMES COMER: Gentleman yields back. Chair recognizes Mr. Jordan for five minutes.

JIM JORDAN: Thank you, Mr. Chairman. Mr. Roth, did the government tell you that the Biden laptop story was fake?

YOEL ROTH: No, sir, they did not.

JIM JORDAN: Did they tell you it was hacked?

YOEL ROTH: No, sir, they did not.

JIM JORDAN: On October 14, 2020, Twitter blocks the New York Post story on Hunter Biden and suspends their account. The night before, FBI Special Agent Elvis Chan sends you an email. The email says this, "Heads up. I will be sending a teleporter link for you to download ten documents. It's not spam. Please confirm receipt when you get it." Two minutes later, 6:24 pm you respond back, "Received and downloaded. Thanks." What were those ten documents?

YOEL ROTH: Twitter didn't give me access to my laptop, but Special Agent Chan has said publicly and the FBI has confirmed that those documents did not relate to Hunter Biden. And that's my recollection of them as well.

JIM JORDAN: What did they relate to?

YOEL ROTH: My interactions with Agent Chan and with the FBI almost entirely focused on what the FBI called malign foreign interference, things like Russian troll farms and Iranian involvement in the elections, not on any type of domestic activity.

JIM JORDAN: Any of the information on there classified?

YOEL ROTH: No, sir, I do not hold a security clearance and so I would not have received any classified information.

JIM JORDAN: Who does hold a security clearance? I just got a second email here. I'm just curious about this. "What I propose is that 30 days out from the election," this Is this another email to you from Mr. Chan, "we get temporary clearances. You pick who they are." Who were the people at Twitter who had a security clearance?

YOEL ROTH: To be honest, sir, I'm not sure. And we never ultimately followed through on this plan to get temporary clearances.

JIM JORDAN: Did anyone at Twitter have a security clearance?

YOEL ROTH: It's my understanding that at least some current or former employees did hold clearances, but I wasn't certain about that.

JIM JORDAN: Ms. Gadde, do you know if anyone took up Mr. Chan's offer to hand out security clearances 30 days before the 2020 election?

VIJAYA GADDE: Not that I'm aware.

JIM JORDAN: So we don't know how many people had security clearances at Twitter. Do we know? Mr. Baker, Ms. Gadde, anyone know how many people on Twitter had a security clearance in the 30 days prior to the election?

JAMES BAKER: I don't know the answer to that question sir.

JIM JORDAN: Ms. Gadde.

VIJAYA GADDE: I do not know.

JIM JORDAN: Mr. Roth, you don't know?

YOEL ROTH: No sir.

JIM JORDAN: How about the last one? Ms. Navaroli, do you know?

ANNIKA COLLIER NAVAROLI: No.

JIM JORDAN: I mean, it seemed like the offer was to sort of just hand them out like candy. I just wonder who had them? No one knows? OK. So the FBI didn't tell you that it was fake, didn't tell you that it was hacked, and Mr. Roth, did the story violate your policies?

YOEL ROTH: In my judgment at the time, no, it did not.

JIM JORDAN: Yeah, that's what you said. As you said, it isn't clearly a violation of our hacked materials policy nor is it clearly a violation of anything else. So I think what a lot of people are wondering is, if it didn't violate your policies and they didn't tell you it was fake, didn't tell you was hacked, why did you take it down?

YOEL ROTH: The company made a decision that found that it did violate the policy. It wasn't my personal judgment at the time that it did, but the decision was communicated to me by my direct supervisor, and ultimately I didn't disagree with it enough to object.

JIM JORDAN: You know what I think happened, Mr. Roth? I think you guys got played. I think you guys wanted it to be taken down. We saw what the chairman put up where you said, everyone in the White House is a fascist. I think you guys wanted it to be taken down. I think you meet with these guys every week. We know that's been established in the Twitter Files.

You had weekly meetings with Mr. Chan in the run-up to the election. They send you all kinds of emails. They send you documents on the super-secret James Bond teleporter. You get information on that. I think you guys wanted to take it down. I think you guys got played by the FBI. And that's the scary part, because we had 50, I mean this to me is the real takeaway, 51 former intelligence officials five days after you guys take down the Hunter Biden story and block the New York Post account, five days later 51 former intel officials send a letter and they say, the Hunter Biden story has all the classic earmarks of a Russian information operation.

The information operation was run on you guys, and then by extension run on the American people. And that's the concern. And to Mr. Raskin's point that you guys aren't bound by the First Amendment because you're a private company. OK, maybe so, and your terms of service don't have to comply with the First Amendment.

Would that be right, Mr. Roth? They don't have to. You've said as much in your testimony.

YOEL ROTH: My understanding of the First Amendment is that it protects people and businesses from government, not forms how the ...

JIM JORDAN: I understand, and your term of service. So here's what I want to know. Here's what I want to know. Is this a violation of the First Amendment when the government, Mr. Chan again, sending you an email saying, we think these accounts need to be looked at because they violate your terms of service. That's a different standard.

So you've got the government saying your terms of service which don't have to comply with the First Amendment, but the Government's saying we don't think these accounts comply with your terms of service. Please take them down. You see a problem there, Mr. Roth?

YOEL ROTH: Mr. Chairman, I'm seeing a flashing red light. I'm happy to answer the question. Do I think that that's a valuable use of the FBI's time? No, but I don't see in a request for review a problem under the First Amendment, no.

JIM JORDAN: I sure do. I thank the gentleman. I yield back.

JAMES COMER: Chair recognizes Mr. Connolly for five minutes.

GERRY CONNOLLY: Thank you. Mr. Chairman. My, my, my, what happens when you hold a hearing and you can't prove your point. We heard from the chairman in his opening statement that it's wrong for government to call Twitter and say take down a tweet. Did I hear that correct Mr. Roth?

YOEL ROTH: That was my understanding, yes.

GERRY CONNOLLY: Yeah. So on May 27, 2020, President Donald J. Trump tweeted and I quote, "Republicans feel that social media platforms totally silence conservatives." By the way that's nothing would come as news to you apparently Mr. Roth, because you're still the subject of conservative harassment, "We will strongly regulate," he went on to say, or close them down before we ever allow this to happen," unquote Ms. Navaroli, doesn't that sound eerily like a government official telling Twitter that there's a threat we'll shut you down if we don't like the content?

ANNIKA COLLIER NAVAROLI: I am not familiar with the tweet that you have referenced.

GERRY CONNOLLY: Well, but if I just told you that quote without telling you who said it, might it have some ominous overtones from your point of view, if you're still at Twitter? We'll shut you down, we'll regulate you, we will never allow this to happen? Those are pretty strong words.

ANNIKA COLLIER NAVAROLI: They are.

GERRY CONNOLLY: Yeah. OK. On September 8, 2019 at 11:11 pm Donald Trump heckled two celebrities on Twitter, John Legend and his wife, Chrissy Teigen, and referred to them as, "the musician John Legend and his filthy mouthed wife," unquote. Ms. Teigen responded to that email at 12:17 am and according to notes from a conversation with you, Ms. Navaroli as counsel, you're counsel, the White House almost immediately thereafter contacted Twitter to demand the tweet be taken down.

Is that accurate?

ANNIKA COLLIER NAVAROLI: Thank you for the question. In my role, I was not responsible for receiving any sort of request from the government. However, what I was privy was my supervisors letting us know that we had received something along those lines or something of a request. And in that particular instance, I do remember hearing that we had received a request from the White House to make sure that we evaluated this tweet, and that they wanted it to come down because it was a derogatory statement directly towards the President.

GERRY CONNOLLY: They wanted it to come down. They made that request.

ANNIKA COLLIER NAVAROLI: To my recollection yes.

GERRY CONNOLLY: I thought that was an inappropriate action by a government official, let alone the White House. But it wasn't Joe Biden about his son's laptop. It was Donald Trump because he didn't like what Chrissy Teigen had to say about him. Is that correct?

ANNIKA COLLIER NAVAROLI: Yes, that is correct.

GERRY CONNOLLY: My, my, my. You ever think it's appropriate for the President of the United States to direct or otherwise influence a social media company to take down its content?

ANNIKA COLLIER NAVAROLI: I think it's a very slippery slope.

GERRY CONNOLLY: Mr. Roth, Ms. Gadde, Mr. Baker, any evidence that Joe Biden's ever done that?

YOEL ROTH: Certainly none that I'm aware of, no.

VIJAYA GADDE: I don't recall anything like that.

JAMES BAKER: I'm sorry that President Biden did what sir?

GERRY CONNOLLY: Has Joe Biden ever called Twitter to your knowledge or his White House at his behest to take down content or urge you to take down content?

JAMES BAKER: I don't know the answer to that question, sir.

GERRY CONNOLLY: Well, I'm going to have to conclude at least from three of the four, you don't know. There's no evidence he's ever done that, but there's plenty of evidence Donald J. Trump tried to do that. And if we're going to have a hearing about the misuse of social media and the intrusion of government in the content on social media, we've got an environment-rich target, but it's not Joe Biden, it's Donald J. Trump, and of course we don't want to talk about that.

We don't want to talk about Russian bots and Russian fabrications using fake accounts on Twitter to a political purpose, and it's not to help elect Democrats. And we don't want to talk about four years of Donald Trump manipulating the truth, and trying to manipulate social media and threaten it or directly to try to shape it by taking down content because it was critical of him personally.

And that's what we ought to be talking about as we move forward, not the subject of today's hearing. I yield back.

JAMES COMER: Gentleman yields back. Chair recognizes Mr. Donalds for five minutes.

BYRON DONALDS: Thank you, Mr. Chairman. Real quick, Mr. Roth, you've stated already that what happened with the New York Post story was similar to the hack and leak scenarios from 2016. You also said that you actually were opposed to deleting the New York Post story. Who advocated for the removal of the New York Post story?

YOEL ROTH: The company's decision to treat it as a violation ...

BYRON DONALDS: Mr. Roth, who at the company actually went over your recommendation, because you're pretty high up, who overrode you?

YOEL ROTH: The decision was communicated to me by my direct supervisor.

BYRON DONALDS: Who was that person?

YOEL ROTH: Her name was Dell Harvey. She was the vice president of Trust and Safety at the time.

BYRON DONALDS: Alright, thank you so much. Ms. Gadde real quick. You said to the chairman earlier and I want to paraphrase what I heard earlier, is that Twitter had no contact with anybody from the Biden team. Is that correct to your knowledge?

VIJAYA GADDE: Not to my knowledge.

BYRON DONALDS: Put that up for me. OK, over my right shoulder, we have an email reference, this is Saturday, October 24, 5:39 pm referencing five different tweets with a Twitter email chain. Under the line it's more to review from the Biden team. Does anybody have a comment on how much interaction was happening with the Biden team at Twitter with respect to tweets that they wanted Twitter to review?

Ms. Gadde, Mr. Roth?

VIJAYA GADDE: I'm not familiar with this email.

BYRON DONALDS: So you're not familiar with this email. Mr. Roth, are you familiar with this email?

YOEL ROTH: Only from what's been reported in the Twitter Files.

BYRON DONALDS: Did you ever have contact with anybody from the Biden team?

YOEL ROTH: No, sir, I did not. We explicitly separated the teams that would interact with campaigns from teams like mine that were responsible for content moderation.

BYRON DONALDS: How big was the organization in Twitter that was actually working with campaigns?

YOEL ROTH: I couldn't say for sure.

BYRON DONALDS: Did you ever have any contact with the DNC?

YOEL ROTH: Directly? No, I did not.

BYRON DONALDS: Did anybody on Twitter have any contact with anybody at the DNC?

YOEL ROTH: I think it's likely that somebody at Twitter did, yes.

BYRON DONALDS: In these emails this list that these are tweets that need to be fired from the Biden team. That's what's in the files. You have no idea how many people actually engaged with the Twitter team or how frequently that engagement happened?

YOEL ROTH: No, and again that was by design. We kept those functions separate from content moderation so that we could impartially assess reports like this.

BYRON DONALDS: Do you know how many tweets were actually flagged and taken down at the behest of the Biden team?

YOEL ROTH: I wouldn't agree with the characterization of it as being at the behest of them. These tweets were reported and Twitter independently evaluated them under its rules.

BYRON DONALDS: But the email is very clear. More to review from Biden's team. The response 3 hours later at the bottom, hold this up real quick so we could see, the request at the bottom it says, handled these. What does handled these mean?

YOEL ROTH: My understanding is that these tweets contained non-consensual nude photos of Hunter Biden and they were removed by the company under [inaudible].

BYRON DONALDS: Real quick, Mr. Roth, how could you know so much about the content of these tweets? I mean as far as I'm concerned, these are just Web addresses. I don't know what's in these tweets. You have these things committed to memory that you know the content, but you don't know who you got to talk to at the Biden team?

YOEL ROTH: Sir, I didn't meet with the Biden team, but there was extensive public reporting about these tweets specifically that uncovered what they were.

BYRON DONALDS: You know the contents of the tweets. It was obviously at Twitter, but you have no idea how often people who worked in your organization had with the Biden team during the end of the 2020 Presidential elections.

YOEL ROTH: I would emphasize that the people who interfaced with the campaigns were not part of my team or organization. I would know what the interactions were if they were on my team. It was a different part of the organization, not mine.

BYRON DONALDS: Let me ask a separate question and I'll ask it of you too Mr. Baker. Have you guys been able to quantify the amount of in-kind contributions associated with taking down the New York Post story? Because New York Post story was down for two weeks, give or take. Do you have any understanding of how much that story was limited by Twitter and also by other social media companies, what the impact of an in-kind contribution that would be to the Joe Biden Presidential election in 2020?

JAMES BAKER: No I don't know the answer to that question sir.

BYRON DONALDS: Do you think it's big?

JAMES BAKER: I don't know the answer.

BYRON DONALDS: Do you think it's more than a maximum contribution to a campaign?

JAMES BAKER: I wouldn't want to speculate.

BYRON DONALDS: Would you call it $25,000?

JAMES BAKER: I don't know the answer to that question sir.

BYRON DONALDS: $100,000?

JAMES BAKER: Sir, I don't know the answer to question.

BYRON DONALDS: A million?

JAMES BAKER: I don't know the answer to the question.

BYRON DONALDS: Do you think Twitter would be in violation of federal election laws with the size of an in-kind contribution to take down a story, which is true by the way, because you guys thought you knew something with limited information?

JAMES BAKER: I'm not going To speculate on that sitting here today, sir, or try to give a try to propound a legal analysis of election laws.

BYRON DONALDS: I yield back.

JAMES COMER: Gentleman yields back. Chair recognizes Ms. Ocasio-Cortez. It's your turn. You want to go? We won't start the clock 'til you get there.

ALEXANDRIA OCASIO-CORTEZ: Appreciate also your generosity. I just want to start off right here at the top here. This isn't even my line of questioning, but I'd like to submit to the record a Washington Post article now warning about Hunter Biden laptop disinformation, the guy who leaked it. Here's the deal. Before you even get into my questions, I think that the story here with the Washington Post reporting, is that, they're saying right here when the New York Post first reported in October 2020 that it had obtained contents of a laptop computer allegedly owned by Joe Biden's son Hunter, there was an immediate roadblock faced by other news outlets that hoped to corroborate reporting as many did.

The newspaper wasn't sharing what it obtained. New York Post had this alleged information and was trying to publish it without any corroboration, without any backup information. They were trying to publish it to Twitter. Twitter did not let them, and now they were upset. I believe that political operatives who sought to inject explosive disinformation with the Washington Post couldn't get away with it, and now they're livid and they want the ability to do it again.

They want the ability to inject this again. So they've dragged a social media platform here in Congress. They're weaponizing the use of this committee so that they can do it again. A whole hearing about a 24-hour hiccup in a right-wing political operation. That is why we are here right now, And it's just an abuse of public resources, an abuse of public time.

We could be talking about health care. We could be talking about bringing down the cost of prescription drugs. We could be talking about abortion rights, civil rights, voting rights, but instead we're talking about Hunter Biden's half fake laptop story. I mean, this is an embarrassment. But I'll go into it. Ms. Navaroli, let's talk about something real.

I'd like to show you a tweet posted by former President Trump about my colleagues and I on July 14, 2019. It says in part quote, "Why don't they go back and help fix the totally broken and crime infested places from which they came, then come back and show us how it's done. "These places need your help badly.

You can't leave fast enough. I'm sure that Nancy Pelosi would be very happy as quickly to work out free travel arrangements." Aa day or two after that, Donald Trump publicly incited violence at a rally targeting four Congresswoman, including myself, saying go back to where you came from. Ms. Navaroli, as I understand it, you were the most senior member of Twitter's content moderation team or a senior member of Twitter's content moderation team when this was posted.

As part of your responsibilities, did you review this tweet?

ANNIKA COLLIER NAVAROLI: Yes, it was my team's responsibility to review these tweets.

ALEXANDRIA OCASIO-CORTEZ: And what did you conclude?

ANNIKA COLLIER NAVAROLI: My team made the recommendation that for the first time we find Donald Trump in violation of Twitter's policies and use the public interest interstitial.

ALEXANDRIA OCASIO-CORTEZ: For the first time.

ANNIKA COLLIER NAVAROLI: Yes.

ALEXANDRIA OCASIO-CORTEZ: And at the time, Twitter's policy included a specific example when it came to banned abuse against immigrants, they specifically included the phrase, go back to your country or go or go back to where you came from, correct?

ANNIKA COLLIER NAVAROLI: Yes, that was specifically included in the content moderation guidance as an example.

ALEXANDRIA OCASIO-CORTEZ: You brought this up to the vice president of Trust and Safety Del Harvey correct?

ANNIKA COLLIER NAVAROLI: I did, yes.

ALEXANDRIA OCASIO-CORTEZ: And she overrode your assessment, didn't she?

ANNIKA COLLIER NAVAROLI: Yes, she did.

ALEXANDRIA OCASIO-CORTEZ: And something interesting happened after she overrode your assessment. A day or two later, Twitter seemed to have changed their policies, didn't they?

ANNIKA COLLIER NAVAROLI: Yes, that trope go back to where you came from was removed from the content moderation guidance as an example.

ALEXANDRIA OCASIO-CORTEZ: So, Twitter changed their own policy after the President violated it in order to potentially accommodate his tweet?

ANNIKA COLLIER NAVAROLI: Yes.

ALEXANDRIA OCASIO-CORTEZ: Thank you. So much for bias against right wing on Twitter. Additionally, Ms. Navaroli, are you familiar with the account Libs of TikTok?

ANNIKA COLLIER NAVAROLI: I have heard of it from the news, yes.

ALEXANDRIA OCASIO-CORTEZ: Mr. Roth, are you familiar with this account?

YOEL ROTH: Yes, ma'am, I am.

ALEXANDRIA OCASIO-CORTEZ: Are you aware that from August 11 to August 16, that account posted false information about Boston Children's Hospital, claiming that they were providing hysterectomies to children?

YOEL ROTH: Yes, I am aware of that and other claims from the account.

ALEXANDRIA OCASIO-CORTEZ: And are you aware that this lie was then circulated by other prominent far-right influencers?

YOEL ROTH: Yes.

ALEXANDRIA OCASIO-CORTEZ: And are you aware that all these claims, which I have reiterated, were false, culminated in a real-life harassment and ultimately a bomb threat to the Boston Children's Hospital?

YOEL ROTH: Yes, I am aware.

ALEXANDRIA OCASIO-CORTEZ: And this account is still on that platform today, isn't it?

YOEL ROTH: Regrettably, yes, it is.

ALEXANDRIA OCASIO-CORTEZ: Despite inspiring a bomb threat due to the right-wing incitement of violence against trans-Americans in this country, because they cannot let go of this obsession with fixating violence and inciting violence against trans and LGBT people, in addition to immigrants, in addition to women of color. This is the party that cannot pick on anyone their own size.

And they are trying to co-opt an entire social media platform and use the power of this committee and of Congress in order to pursue a political agenda. I yield back.

JAMES COMER: Lady yields back. Chair recognizes Mr. Fry for five minutes.

RUSSELL FRY: Thank you, Mr. Chairman. This hearing shows who really has been in control of what is said to be the one of the world's most widely used websites, Twitter. The American people probably didn't know how these witnesses were today, but these witnesses were powerful enough to silence an American President with just a few clicks from their California office.

We're also learning that some of those in Washington DC have forgotten their role and exercised their power to achieve ends antithetical to American principles of free speech and expression. The FBI is the lead federal agency responsible for investigating foreign influence operations. However, in recent years, the FBI has devoted countless amounts of time, taxpayer money and manpower to combating Russian foreign influence on social media.

The FBI, as one reporter noted acted as a quote, "doorman to the vast program of social media surveillance and censorship, encompassing agencies across the federal government, from the State Department to the Pentagon to the CIA," end quote. Reports suggest that thousands of reports from the FBI and the foreign influence task force were sent to Twitter.

This isn't what the American people are paying for. This isn't what we trust the FBI to do. FBI agents shouldn't be sitting at a desk in Washington DC scrolling through Twitter and emailing with social media companies. An email from one Twitter employee to another reads, quote. "The FBI San Francisco Emergency Operations Center sent us the attached report of 207 tweets they believed may be in violation of our policies," end quote.

Another email revealed that there are quote, "some folks in the Baltimore field office and at headquarters that are just doing keyboard searches for violations. Mr. Roth, Twitter usually found little evidence that the accounts the FBI flagged had ties to foreign influence. Is that correct?

YOEL ROTH: In part, but we received many reports from the FBI, particularly related to malign foreign interference that were highly credible and were constructive. So I would say it was a bit of a mixed bag.

RUSSELL FRY: And you pushed back to the FBI when they would send you a list of American-based accounts, is that correct?

YOEL ROTH: Politely, but yes.

RUSSELL FRY: Mr. Roth, it appears that Twitter employees were under pressure by the FBI and other government agencies to validate these theories of foreign influence. Would you agree with that?

YOEL ROTH: No, I wouldn't agree with the word pressure. The FBI was quite careful and quite consistent to request review of the accounts, but not to cross the line into advocating for Twitter to take any particular action.

RUSSELL FRY: So flagging American accounts in your view is not foreign or theories of foreign influence, there's not pressure there just by flagging it to you? Domestic accounts.

YOEL ROTH: I don't think it's a great use of the bureau's time, but I wouldn't characterize how they communicated with us as pressure.

RUSSELL FRY: Mr. Roth, you enjoy these meetings with the FBI it seems based on the tweets behind me or the communications behind me. In internal communications at Twitter, you said, definitely not meeting with the FBI, I swear. Is that correct?

YOEL ROTH: I believe I was joking with a colleague at the time, but yes.

RUSSELL FRY: But I can assume that you were meeting with the FBI when you were communicating with your colleague, is that correct?

YOEL ROTH: Yes, one of my job responsibilities was meeting with law enforcement about election security.

RUSSELL FRY: And just so I'm clear, the person you're communicating with here says, "very boring business meeting that is definitely not about Trump." I assume that's also sarcasm?

YOEL ROTH: Yes, that's my assumption.

RUSSELL FRY: And we can assume that Twitter was having these meetings with the FBI about President Trump, correct?

YOEL ROTH: No, sir. The meetings that I was a part of with the FBI were almost entirely and exclusively focused on malign foreign interference, so accounts being operated outside of the United States by other governments, not on the accounts of Americans.

RUSSELL FRY: So what is the basis of this communication then where you talk about not meeting with Trump or not meeting about Trump?

YOEL ROTH: Again, I think those comments are sarcasm, but the context for this interaction was the need to mark my calendar private after another Twitter employee joined one of those meetings with the FBI unexpectedly. And so I had to implement additional security measures around my calendar. This was a fairly banal interaction with a colleague.

RUSSELL FRY: Mr. Chairman, I yield the rest of my time to Mr. Jordan.

JAMES COMER: Mr. Jordan.

JIM JORDAN: I thank the gentleman for yielding. Mr. Roth, was there ever any visibility filtering that was hard coded by Twitter employees into accounts of specific users?

YOEL ROTH: Twitter employees were responsible for building the systems that performed visibility filtering, and then that filtering would have been applied either automatically.

JIM JORDAN: I'm asking a very specific question. I'm asking was the code written in a way that for certain accounts, those accounts are unique in and of themselves, would be visibility filtering, to use your term, so that they wouldn't have as much reach or as much influence?

YOEL ROTH: The term hard coding suggests that it was permanent and immutable, and I wouldn't agree with that no.

JIM JORDAN: But it did happen what you're saying there was hard coded into some of these accounts of specific users by Twitter employees, This ability to filter and limit the reach of that particular post or that particular tweet, I should say.

YOEL ROTH: Again, I wouldn't say that they were hard coded.

JIM JORDAN: Thank you.

JAMES COMER: Chair recognizes Ms. Brown for five minutes.

SHONTEL BROWN: Thank you, Chairman Comer and Ranking Member Raskin for holding this hearing today. Social media has been a revolutionary gift of the 21st century, from helping people across the world build meaningful connections, to learning a new skill set, these platforms have played a significant role in creating an interconnected global world.

When handled responsibly, social media serves as a useful resource with many positive outcomes. However, social media is not without its flaws, and the challenges are much larger than any specific incident or decision by one private company. Recently, social media has contributed to the rise and amplification of domestic extremist content and organizing.

This is extremely concerning and contributing to the division of our society. According to an Anti-Defamation League survey, 66 percent of the LGBTQ+ respondents, that's a full two thirds, experienced harassment online. 37 percent of Jewish respondents and 34 percent of African American respondents said the same.

This is truly disturbing. The power that social media has to inspire real world action both good and bad is well known to all of us. And sadly, the hate online does not stay online. Social media has the power to influence not just here at home, but those who are watching us abroad. For example, an online disinformation campaign by a hostile foreign power can have the power to sway a close election.

So Mr. Roth, in a recent interview you stated and I quote, "Beginning in 2017, every platform, Twitter included, started to invest really heavily in building out an election integrity function." So I ask, were those investments driven in part by bipartisan concerns raised by Congress and the US government after the Russian influence operation in the 2016 Presidential election?

YOEL ROTH: Thank you for the question. Yes, those concerns were fundamentally bipartisan. The Senate's investigation of Russian active measures was a bipartisan effort. The report was bipartisan. And I think we all share concerns with what Russia is doing to meddle in our elections.

SHONTEL BROWN: Thank you so much. Did those investments include better information sharing mechanisms with the federal government?

YOEL ROTH: Yes. I think one of the key failures that we identified after 2016 was that there was very little information coming from the government and from intelligence services to the private sector. The private sector had the power to remove bots and to take down foreign disinformation campaigns, but we didn't always know where to look without leads supplied by the intelligence community.

That was one of the failures highlighted in the Senate Intelligence Committee's report and in the Mueller investigation, and that was one of the things we set out to fix in 2017.

SHONTEL BROWN: Thank you for that. And Mr. Roth, were those communication channels useful to Twitter as it worked to combat foreign influence operations?

YOEL ROTH: Absolutely. I would say they were one of the most essential pieces of how Twitter prepared for future elections.

SHONTEL BROWN: Thank you so much. So clearly we must come together as a committee to stand up and protect our country from foreign election interference and disinformation. I sincerely look forward to spending more time with this committee working to understand how to fight back against our adversaries and strengthen our democracy.

And with that, Mr. Chairman, I yield back.

JAMES COMER: Thank you very much. Chair recognizes Ms. Greene for five minutes.

MARJORIE TAYLOR GREENE: Thank you, Mr. Chairman. Mr. Baker, Ms. Gadde, Mr. Roth and Ms. Navaroli, you can consider your speech canceled during my time because you canceled mine. You see, you permanently banned my personal Twitter account, and it was my campaign account also. So let's talk about election interference shall we. January 2, 2002, you permanently banned my Twitter account.

This was the account that I would put my campaign ads on, raise money on, fight back when attacked with lies, and be able to talk to my voters in my district. But you banned it. And then let me explain, my account was not reinstated until November 21, 2022. That was after my election on November 8. You know, at your company or your former company where you worked, Twitter employees, over 98 percent of them donate to Democrats.

So while you coordinated with DHS, the FBI, the CIA, our government and outside groups to permanently ban, shadow ban conservative Americans and candidates like me and the former President of the United States, President Donald J. Trump, you were censoring and wrongfully violating our First Amendment free speech rights.

Guess what. None of you hold security clearances. None of you are elected. And none of you represent 750,000 people like I do. Let's explain, 52 United States Law 10101, no person shall intimidate, threaten, coerce or attempt to stop any other person for the purpose of interfering with their rights to vote or to vote as he may choose.

You didn't shadow ban or permanently ban my Democrat opponent. No, you did that to me, and that was wrong and it was against the law. You see, not only was it me that you violated my First Amendment rights, you violated countless conservative Americans. These were doctors that were trying to tell the truth about COVID, doctors that were having success treating people with Ivermectin that you all would not allow to be talked about on your platform.

These were parents complaining about their school boards, teaching gender ideas in their schools, biological males entering their daughters' bathrooms and sports. These were also people questioning the 2020 election, and guess what, that's Americans First Amendment right. These were people talking about voting machines.

You know what? Democrats did that in 2019 before the 2020 election. On Twitter, people could question elections such as 2016 saying Hillary won. But in 2020, no one could question elections saying Trump won. You abuse the power of a large corporation, big tech to censor Americans. And you want to know something?

Guess what. I'm so glad that you're censored now and I'm so glad you've lost your jobs. Thank God Elon Musk bought Twitter. And you know what, let's talk about something a little bit further. It's amazing to me, Mr. Roth, as the head of Trust of Safety at Twitter, your ability or should I say inability to remove child porn.

Now here's something that disgusts me about you. In your doctoral dissertation entitled Gay Data, you argued that minors should have access to Grindr, an adult male gay hookup app. Minors? Really? You know, Elon Musk took over Twitter and he banned 44,000 accounts that were promoting child porn. You permanently banned my Twitter account, but you allowed child porn all over Twitter.

Twitter had become a platform you said, connecting queer young adults. You also wrote on Twitter in 2010, can high school students ever meaningfully consent to sex with their teachers? In 2021, while you were the director of Trust and Safety on Twitter, an underage boy and his mother announced a lawsuit against Twitter because Twitter was benefiting from and refused to remove a lewd video featuring this boy and another minor.

That is repulsive. But you violated me. What were my tweets? OK, let's talk about them. I was talking about the deaths being reported on VAERS. By the way, that's on the CDC website. I was also saying that I didn't think any entity should enforce a non-FDA approved vaccine or mask. Guess what. A lot of people agreed with me. But you call that COVID misinformation By the way, I'm a member of Congress and you're not.

I also said the controversial COVID-19 vaccines should not be forced on our military. You want to know something? Republicans stopped that in the NDAA?

JAMES COMER: Ladies time has expired.

MARJORIE TAYLOR GREENE: And your time has expired. I yield back. Thank you, Mr. Chairman.

JAMES COMER: Chair recognizes Mr. Gomez.

JIMMY GOMEZ: Thank you, Mr. Chairman. Mr. Roth, please explain to us why Ms. Marjorie Taylor Greene or the Representative from Georgia was removed from Twitter.

YOEL ROTH: Thank you for the question, Congressman. My recollection is that her personal account was banned from Twitter after repeated written notices due to repeated violations of the Twitter rules.

JIMMY GOMEZ: Can you add a little specificity to the violation of the Twitter rules?

YOEL ROTH: Yes. Again, I didn't have access to my Twitter email documents, anything that would have led me prepared to answer that in more detail, but my recollection is that the Congresswoman repeatedly violated Twitter's policies about sharing misinformation about COVID-19. She received multiple written warnings about that conduct.

She received multiple timeouts related to that conduct. And then ultimately, consistent with the written and published policy, those repeated violations resulted in her account being permanently suspended.

MARJORIE TAYLOR GREENE: Mr. Chairman.

JIMMY GOMEZ: In essence ...

MARJORIE TAYLOR GREENE: I'd like to make a point of personal privilege.

JIMMY GOMEZ: It's still my time.

JAMES COMER: We'll stop the clock.

JIMMY GOMEZ: It's still my time.

JAMIE RASKIN: Point of order, Mr. Chairman.

JAMES COMER: Mr. Raskin, sir.

JAMIE RASKIN: I don't believe that members of this committee have the right to interrupt someone's testimony because their name was mentioned.

MARJORIE TAYLOR GREENE: Point of personal privilege. You were mentioning my name, Mr. Raskin.

JAMIE RASKIN: No I understand, but that's not the rule, Ms. Greene. I don't think a member ...

MARJORIE TAYLOR GREENE: That is the ruling in Congress ...

JAMIE RASKIN: Well, then I'd like to ...

MARJORIE TAYLOR GREENE: Make a point of personal privilege.

JAMIE RASKIN: I'd like the parliamentarian to rule on whether any member of this committee has the right to interrupt a witness's testimony because they mentioned the name of a member of Congress.

MARJORIE TAYLOR GREENE: You mentioned my name, Mr. Raskin.

JAMIE RASKIN: Yeah, I'm not testifying.

JAMES COMER: Chair recognizes Ms. Greene.

MARJORIE TAYLOR GREENE: Thank you Mr. Chairman.

JAMES COMER: For your point of privilege, very briefly.

MARJORIE TAYLOR GREENE: Thank you. For Mr. Roth, who made you in charge of what is it true and what is not?

JAMIE RASKIN: Does she get to reopen her questions?

JAMES COMER: We'll go back to Mr. Gomez, and Mr. Gomez, please remember the decorum of the committee. The clock, we'll restart the clock. You didn't lose any time. Chair recognizes Mr. Gomez.

JIMMY GOMEZ: Thank you so much. The gentlelady from Georgia was suspended from Twitter for knowingly and consistently spreading conspiracy theories about COVID-19 vaccine right, which is shameful, shameful, especially in a pandemic where a million people have lost their lives. With that, I yield my rest of my time to the gentleman from New York, Mr. Goldman.

DANIEL GOLDMAN: Thank you, Mr. Gomez. Let's talk about the so-called Twitter Files, which my Republican colleagues seem to think are God's gift to journalism. In one about the Hunter Biden laptop, the author says that every single fact in the New York Post story was accurate. And Chairman Comer, I notice you blew up the cover of that New York Post story, which I appreciate you doing that because I'd like to dig into this article.

The very first paragraph says, Hunter Biden introduced his father to a top executive at a Ukrainian energy firm less than a year before the elder Biden pressured government officials in Ukraine into firing a prosecutor who was investigating the company. That is false, 100 percent false.

JIM JORDAN: Is the gentleman sure about that?

DANIEL GOLDMAN: Yes, in fact I am sure about that, and as the lead counsel in the first impeachment investigation, we proved that he was actually fired because he was not prosecuting corruption, not that he was fired because he was prosecuting corruption.

JIM JORDAN: Corruption that the President son's company. Will the gentleman yield? Corruption of the President's son's company.

DANIEL GOLDMAN: I'd like to reclaim my time.

JAMES COMER: Gentleman's recognized.

DANIEL GOLDMAN: The fact that Joe Biden fired, consistent with US policy in every single European country, the prosecutor general in Ukraine because he did not prosecute corruption, including at companies like Burisma, has been proven over and over and over. And if you want to know who actually prosecuted Burisma, Chairman Comer, you should talk to the British authorities, because they were the ones who were prosecuting Burisma and they couldn't get any cooperation from the Ukrainian prosecutor general.

So that's why he was fired. So right off the top, the very first paragraph of this so-called bombshell story is completely false. Now what is the allegation that we are hearing from our Republican colleagues about the connection to Joe Biden and Burisma? It is an email from a Burisma employee thanking Hunter Biden for organizing a meeting with the Vice President Biden.

We know nothing about the substance of that meeting. We know nothing about how long they met. It was not on Vice President Biden's schedule. And in fact, I would ask my Republican colleagues, do you meet with foreign businessmen? Do you meet with foreign diplomats? If we were to say to you every single time you met with somebody that you've discussed something that you're voting on, how would you react?

It's preposterous. And Chairman Comer, you have said in your opening statement that Joe Biden lied to the American people. That is a bold, bold accusation. And so far, we've seen no actual evidence of any lies or any support for Joe Biden being involved in anything having to do with Ukraine other than promoting US former policy.

And I hope that you are not abusing the power as chairman of this committee, and that you are not wasting taxpayer dollars on a fishing expedition into a civilian child of a president for political purposes. I yield back.

JAMES COMER: Will the gentleman yield to a quick question. You don't have to, it's your choice. Will you yield?

DANIEL GOLDMAN: Yes, please. I would love to discuss this.

JAMES COMER: Are you admitting that Joe Biden did get the prosecutor in Ukraine fired?

DANIEL GOLDMAN: I think it's very clear that Vice President Biden, along with all of our allies in Europe pressured Ukraine to fire a corrupt prosecutor general who was not charging corruption cases that would have included potentially Burisma.

JAMES COMER: Corruption with his son's company?

DANIEL GOLDMAN: Yes. In fact, what he wanted was the prosecutor general to prosecute corruption, and the allegations that you are making and that the Russians are making, because this is all part of Russian propaganda, is that Burisma was corrupt and Joe Biden was trying to stop an investigation into Burisma. That is categorically false and there is no evidence of it.

UNKNOWN: Mr. Chairman.

JAMES COMER: We're going to recognize one more speaker. We've been requested by the presenters for a brief bathroom break. If you'll allow us, we have one more questioner and then we'll take that break. Chair recognizes Mr. Timmons for five minutes, and then we'll have a five to ten minute break. Mr. Timmons,

WILLIAM TIMMONS: Thank you, Mr. Chairman. We have a big picture problem right now and we're talking about Twitter specifically and Hunter Biden's laptop, but it's not just that. It's the general trend of the media, social media, the FBI, DOJ doing one side's bidding. That's the issue. There's mistakes that have been made and we keep looking back at these mistakes to say, oh, that shouldn't have happened that way.

We are going to have a new policy to avoid that from happening again. But every mistake benefits one side. Every mistake benefits one side. Let's go back to 2016. The Democrat National Committee and the Clinton campaign paid Fusion GPS to create, to fabricate not create, to fabricate the Steele dossier, which was the basis of this entire Russia collusion investigation.

Special counsel, we spent $40 million pursuing it. There was no evidence of the Trump campaign colluding with Russia. There was none. It was actually fabricated by the Democrats and the Clinton campaign to create a narrative to damage President Trump. So that was a mistake. We all know that now. That was the conclusion of that investigation.

And as a side note, that's why Adam Schiff is no longer on Intel, because he lied about that investigation. He said, as the chair of Intel, I have all this information. He abused his position and that's why he was removed from Intel. So next we go to 2020. Another mistake. We have something that is real labeled as something that is fake.

We tell the American people that we're going to have an honest open conversation about issues, about challenges that our country faces, and everybody has their own facts. Congressman from New York is mentioning his facts. It's just very bizarre that Hunter Biden making tens of thousands of dollars a month with no credentials from a business in Ukraine, whether they're being investigated, who knows?

I mean, these are all speculation, and it's something the American people can't really digest because we don't know the answers to it. And when we're told the answers by our government, by big corporations, by big tech, and they're repeatedly wrong, it creates a trust issue. It creates a trust issue. So the American people do not trust, do not trust what they're being told.

They do not trust what they're being told. We're going to dig into the Hunter Biden laptop briefly. Jack Dorsey has said that he did not make that decision. Ms. Gadde, did you make the decision to censor the Biden laptop story?

VIJAYA GADDE: Yes, I was involved in that decision.

WILLIAM TIMMONS: Who was the final arbiter? Because Mr. Roth has said that he disagreed with that decision. Who was the final person that said we're going to do this?

VIJAYA GADDE: I ultimately approved that decision.

WILLIAM TIMMONS: OK thank you. Mr. Roth, you have said previously that you did not believe that the New York Post story violated any policy. You've said that multiple times today. How many times, other than this one, did something get banned or flagged that you disagreed with? Is this the only one?

YOEL ROTH: No, sir, not at all. These are challenging ...

WILLIAM TIMMONS: OK, so you repeatedly, Twitter repeatedly banned and censored material that you thought shouldn't be censored. Is that fair?

YOEL ROTH: These are challenging judgment calls, and I think reasonable minds can differ about whether a given piece of content ...

WILLIAM TIMMONS: OK, but on this one, you did disagree. I just want to say, the American people need to have valid information to process decisions. I would argue that denying the American people the substance of Hunter Biden's laptop story, Hunter Biden's laptop was wrong. You got photos and text messages of Hunter Biden committing multiple felonies, which was never actually criminal, there were no criminal charges.

Must be nice. Hunter Biden and James Biden were negotiating deals with Chinese Communist Party agents, one of whom Hunter Biden classified as the spy chief of China. We have evidence at least one of Hunter's deals with Chinese Communist Party-linked entities, Joe Biden was given a 10 percent equity stake in the joint venture.

We have evidence that the Bidens were trying to sell America's natural resources to the Chinese, and this is my personal favorite, evidence that the Bidens and a Chinese energy company, owned by the Chinese Communist Party, had leased office space no further than three miles from where we're sitting right now.

And the man running for President had his own office in that office space, his own personal office. You think the American people deserve to know that? I do. I think that there's a lot of smoke surrounding the Biden's relationship with the Chinese Communist Party. There's a lot of smoke surrounding the Biden's relationship with Ukraine.

And they deserve to have the facts to make a decision for themselves. You all got it wrong in 2016 with Russian collusion. You got it wrong with Hunter Biden's laptop in 2020. You got it wrong regarding COVID at every turn. The American people deserve better.

JIM JORDAN: Will the gentleman yield for a question?

JAMIE RASKIN: Will the gentleman yield for a question?

JIM JORDAN: Will the gentleman yield?

WILLIAM TIMMONS: Yes.

JAMES COMER: Mr. Raskin.

JIM JORDAN: Mr. Baker, did you talk to any of the 51 former intel officials who sent the now famous letter on October 19, 2020, saying that the Russian of the story in the New York Post had all the classic earmarks of a Russian information operation? Have you talked to any of those 51 prior to that letter being sent on the 19 or after?

JAMES BAKER: Sir, I can't remember who's on that group, but ...

JIM JORDAN: Clapper, Brennan, Morell.

JAMES BAKER: I've talked to those people during the course of my career, yes.

JIM JORDAN: Have you talked to them in your time at Twitter?

JAMES BAKER: I can't remember who's on that list, so I'm afraid ...

JIM JORDAN: How about the three I just mentioned, Clapper and Brennan?

JAMES COMER: OK. Alright.

JAMIE RASKIN: Mr. Chairman, regular order. Regular order.

JAMES COMER: Last question, feel free to answer it then we'll recognize Mr. Raskin.

JAMIE RASKIN: Well, I was going to ask the gentleman before he left, whether he's denying the Russian disinformation propaganda campaign that we've heard about from witnesses or he's just denying Russian collusion, which was something that Mr. Mueller specifically did not address in his final report. He said collusion is not a legal concept.

He was looking just a conspiracy, and he said there wasn't substantial enough evidence to charge conspiracy, but there were dozens of contacts between Donald Trump and the Russians that were documented in that report. That's all I wanted to say.

JAMES COMER: The chair recognizes Mr. Jordan, then we'll recess for just ...

JIM JORDAN: To restate the question that's on the table to Mr. Baker, did he talk with Mr. Clapper, Mr. Brennan or anyone else that he knows of who signed that letter.

JAMIE RASKIN: Point of order, Mr. Chairman whose time is this? What is going on?

JIM JORDAN: The chairman's time.

JAMES COMER: Remaining three seconds of ...

JAMIE RASKIN: He doesn't have remaining time. He's gone over by a minute. We're over.

JAMES COMER: Mr. Baker, feel free to answer the question if you want and then we'll take a recess.

JAMES BAKER: Mr. Jordan, I don't recall discussing that publication that they did about the Hunter Biden laptop with any of those people.

JAMES COMER: We will stand in recess for five minutes. When we return, Mr. Garcia will begin our questioning. We're in recess for five to ten minutes. [In recess] Again, I want to thank the witnesses for your indulgence and know it's a long day. You're doing great. We really appreciate it. Now we'll resume questioning and Chair recognizes Mr. Garcia for five minutes.

ROBERT GARCIA: Thank you, Mr. Chairman. Thank you, Mr. Chairman. I want to thank our witnesses and I just want to just start off also by just apologizing to our witnesses, in particular Mr. Roth for just the homophobic rant and comments that were recently just made from the gentlelady from Georgia. That was really shameful.

And I know that we're here to talk about serious issues, and we're having conversations about Grindr and other issues, which is not really what this hearing is about. So I apologize to all of our witnesses. I want to note that I am someone that you would probably call a Twitter super user. I use a social platform constantly.

I communicate regularly. That's how I get my news, that's how I find out what's happening in popular culture, and I admire what Jack Dorsey, Evan Williams and Christopher Stone actually tried to build as a company. I wish I could say the same for what the platform is today. I think to me and to many other users, we've seen the site currently degraded.

We've seen Mr. Musk more interested in attacking journalists and uplifting conspiracy theories than actually running a company. And I think we can all agree that just overall, the service has substantially degraded. I think just an example is the forced For You page mess that I personally don't like and I think most folks don't as well.

But I want to know more seriously that Mr. Musk and the current team has also done damage as far as trust and safety on the platform. He's gutted the trust and safety teams have been described, has eliminated content management systems and the human rights team, which as we know has ceased to operate. I do want to just take a minute to thank Mr. Roth, and particularly Ms. Navaroli and your teams.

I know that you were trying your best. I want to thank all of the folks that worked at Twitter because they believed in its mission, a mission I'm not sure holds true today completely, but it's one that I know a lot of folks worked on, and so I just thank you for that work. And mistakes were made, and clearly you have actually lived up to those mistakes and the issues that have existed.

But I especially want to thank you for your work around the pandemic. The pandemic took over a million American lives, 1,300 in my own city back home, and your decisions and content moderation actually saved countless lives in this country. Including the work you did by moderating or banning members even of this committee who peddled in lies and were actively causing death and harm to others.

And so for that work on content moderation, I want to thank you. And I want to go back to something that Mr. Roth said briefly. You had mentioned early on in this hearing that you thought that currently there is still systemic election interference and interference happening. How serious do you think the current threat from Russia and other countries is to current election interference?

YOEL ROTH: I think we can look to the evidence from the midterms to know that these campaigns are ongoing and they are serious. And it's not just Russia, Iran and China, though they are the big players. There's now a playbook for how election interference works, and it's unfortunately all too cheap and all too easy for countries to try to carry this out.

ROBERT GARCIA: Thank you. I think it's pretty clear what we've've learned today, one thing we've learned, which hasn't been much by the way, is that there's currently election interference happening today by Russia and other actors. And so that is something that's serious. That's which the focus of this hearing should actually be about versus all of this kind of nonsense and lies and conspiracy theories that this committee is actually focused on today.

I want to take the remaining balance of my time and yield to Ms. Ocasio-Cortez.

ALEXANDRIA OCASIO-CORTEZ: I thank the gentleman from California. I'd like to raise and follow up on a point that the opposition and the other side of the aisle is making, which is trying to insinuate that there is something scandalous or unusual about federal agency outreach to social media platforms and other organizations such as Twitter.

The insinuation here is that, in the FBI and other agencies reaching out to Twitter, that there's something nefarious about this, that this was some sort of partisan weaponization or attempt to intimidate. But we actually have quite a documented history of Representatives from the Trump administration hailing the progress that the government had made in working with companies like Twitter to counter foreign influence operations and other areas of concern.

In early March 2020, right before the Super Tuesday primary election, several Trump administration officials, including Mike Pompeo, Bill Barr, Chad Wolf and acting Director of National Intelligence, Richard Grenell, issued a statement praising the government's cooperation with the private sector to fend off foreign interference and said that relationship was quote, "stronger than it's ever been." This was around this whole time where there's this grievance around this.

And listen to what DHS secretary, Chad Wolf, had to say just weeks before the 2020 Presidential election. We now have direct lines of communication with tech and social media companies and election officials so that both parties can seamlessly take action against false information spreading online. I would argue that this information from the Trump administration would say that they would support your decision in suspending, temporarily suspending this disinformation that seemed to be coming out from the New York Post.

So with that I yield back to the chair.

JAMES COMER: Gentlelady yields back. Chair recognize Mr. Burchett for five minutes.

TIM BURCHETT: Thank you, Mr. Chairman. Ms. Gadde, Charlie Kirk and Dan Bongino are conservative commentators. Is that a fair characteristic? Just yes or no will be fine.

VIJAYA GADDE: I believe so, but I'm not familiar with them.

TIM BURCHETT: OK. The posters behind me show the side of Twitter that is not available to users. Is that correct?

VIJAYA GADDE: This appears to be a view of some of our agent tooling, but I do not have access to that, so I'm not very familiar with that.

TIM BURCHETT: OK, well, Ms. Gadde, the labels identify status that have been assigned these accounts. Is that correct?

VIJAYA GADDE: I don't know.

TIM BURCHETT: Ma'am, these are your internal things. You're telling me you don't receive these, you don't know what they mean?

VIJAYA GADDE: Representative, I did not have access to these tools and so I don't know. They look familiar to me but I don't know.

TIM BURCHETT: As an executive, You did not have access to inside information at Twitter. OK, Ms. Gadde, Mr. Bongino's account and there's a few words under there, verified and active. Can you read the first two labels under verified and active? They're the yellow ones.

VIJAYA GADDE: Notification spikes. Search blacklist.

TIM BURCHETT: Alright, thank you. Ma'am. Mr. Bongino has more than 3.5 million Twitter followers, is that correct would you say?

VIJAYA GADDE: I'm sorry, I don't know the answer to that question.

TIM BURCHETT: OK, well, that is correct. Let's look at Mr. Kirk's account. Ms. Gadde, can I get you to read the yellow labels on Mr. Kirk's account? Can you see those?

VIJAYA GADDE: I'm sorry, I can't see them from right here.

TIM BURCHETT: Alright. Do you know that Mr. Kirk has almost 2 million followers?

VIJAYA GADDE: I was not aware of that.

TIM BURCHETT: OK. Let me ask you what is a search blacklist?

VIJAYA GADDE: I do not know specifically what that is, but I could make a guess if that would be helpful.

TIM BURCHETT: Why don't you make a guess for me, please?

VIJAYA GADDE: When I was at Twitter, there was an ability to prevent something from appearing in one of the tabs of search results.

TIM BURCHETT: OK, thank you. What does do not amplify mean?

VIJAYA GADDE: To the best of my recollection when I was at Twitter, it would mean that we would not recommend or amplify that content in the parts of Twitter where Twitter was making recommendation.

TIM BURCHETT: Thank you, ma'am. In 2018 you said that Twitter does not shadow ban. Twitter did however engage in what is called visibility filtering. One Twitter employee described visibility filtering as a way for us to suppress what people see to different levels. Do you agree with that characterization?

VIJAYA GADDE: I'm sorry, can you please repeat the question?

TIM BURCHETT: I've said Twitter, OK, whey engage in what is called visibility filtering. One Twitter employee described visibility filtering as a way for us to suppress what people see to different levels. Do you agree with that characterization?

VIJAYA GADDE: I agree that visibility filtering does give an ability to change how [inaudible].

TIM BURCHETT: OK. Shadow banning ma'am is understood that the practice is limiting the visibility of a user's post without their knowledge. How is visibility filtering any different?

VIJAYA GADDE: Representative, I believe there are different definitions of shadow banning.

TIM BURCHETT: OK, but you said that that Twitter in 2018 does not shadow ban. Was that a truthful statement, ma'am? Was that a lie?

VIJAYA GADDE: At that time, I'd specifically define shadow banning to mean something different than visibility filtering.

TIM BURCHETT: OK. But you also said that Twitter does not shadow ban based on political viewpoints or ideology. Do you stand by those comments?

VIJAYA GADDE: While I was at Twitter, to the best of my knowledge, we did not do that.

TIM BURCHETT: OK. Mr. Roth, on January 22, 2017, you tweeted that there were actual Nazis living in the White House. Do you still stand by that comment? Yes or no.

YOEL ROTH: Sir, I regret the language I used. No, I do not.

TIM BURCHETT: OK. Mr. Roth, earlier in your testimony you said you regretted tweeting that quote, "Actual Nazis are living in the White House." However, Iran's ayatollah sent anti-Semitic tweets, one stating quote, "Israel is a malignant cancerous tumor that has to be removed and eradicated." Yes or no, did Twitter ever ban the ayatollah or remove this hateful anti-Semitic tweet?

Yes or no.

YOEL ROTH: To the best of my knowledge, Twitter did not remove that tweet, no.

TIM BURCHETT: That answer's no. Mr. Chairman, it's clear that conservative voices are being silenced on social media in the mainstream. I appreciate this hearing. I might also suggest we look into holding one on Direct TV, Newsmax and OAN. I give the rest of my time to Mr. Jordan.

JIM JORDAN: I thank the gentleman for yielding and for his good questions. So the user knows when their accounts been suspended or blocked, but they don't know when they have some of these gold terms that were under Mr. Bongino and Mr. Kirk. Is that right Mr. Roth?

YOEL ROTH: As of the time that I worked at Twitter, yes, that's correct.

JIM JORDAN: So they don't know if they're on the don't search, on the search blacklist, they don't know if they're on the do not amplify. They don't know that.

YOEL ROTH: That's correct. Twitter did not disclose that.

JIM JORDAN: You did that to these two accounts. What I want to know, did you know Mr. Roth, if that was at the prompting of anyone from the government?

JAMES COMER: Gentleman's time has expired, But please answer the question.

YOEL ROTH: No, sir, I'm not aware of any requests or orders or demands or anything from the government requesting that visibility filtering be applied to those accounts or any others.

JAMES COMER: Chair recognizes Mr. Frost for five minutes.

MAXWELL FROST: Thank you, Mr. Chairman. Look, I mean, I've been sitting here for over two hours and I'm still not really seeing the point of this hearing. Is it to solve the problems of the American people, what people are struggling with? No. We get it. My Republican colleagues wish that the Hunter Biden story would have helped them win the 2020 election and that didn't happen.

And so they're angry about it and that's the point of this hearing. You know, it was actually the foundation of the chairman's opening statement. It's why he brought up that poll on the 2020 election. That's what this is all about. And so I want to say to my colleagues, don't worry, there's still many platforms you can spread disinformation on, Parler, Truth Social that have questionable editorial policies but aren't here today.

There was no collusion as the witnesses have said under oath. There was no pressuring from the United States government as we have heard under oath. We're wasting our time here bullying former Twitter employees, so that way it's calling the refs, so that way in the future when they want disinformation to be put on the internet, social platforms will be scared to call them out down the road.

It's called calling the ref. But let's talk about the root of this hearing. My Republican colleagues would have folks believe that Democrats are preparing for some sort of major culture war, and there's a difference between a culture war and how culture naturally changes, culture change. Some on this committee are very resistant to culture change.

I mean just yesterday we heard a member equate immigration negatively to changing our culture, black and brown folks coming into our country. The reality is that culture changes and adopts, it welcomes more people, it becomes more understanding and it also decides to reassess what's acceptable behavior and rhetoric.

It could be different now than it was in say the 1950s. In this supposed culture war, they often conflate the right to free speech with the non-existent right to not be criticized or held accountable for what you say on the Internet or even in real life. And just because it's legal to say something and the government won't throw you in jail for it, doesn't mean the rest of the world and sometimes even your own family have to associate themselves with you or your comments.

Mr. Roth, you helped set up content moderation policy at Twitter. What type of user tweets were more likely to get limited? Did it have to do with racism, sexism, homophobia violence or were you all looking for people who were supporting Donald Trump, President Trump and limiting those?

YOEL ROTH: Our policies were built fundamentally to be viewpoint neutral. They were focused on harm reduction, looking to things like the Universal Declaration of Human Rights with a focus on protecting people's safety, people's right to free and fair elections, people's rights to free speech, and we built concern with those rights into our policies.

MAXWELL FROST: So being a decent human being.

YOEL ROTH: That's certainly what we tried to do, yes.

MAXWELL FROST: Gotcha. Ms. Navaroli, earlier you testified about a 2019 tweet that was about President Trump, and I think it's from Ms. Teigen. What was the tweet about?

ANNIKA COLLIER NAVAROLI: Would you like me to give the direct quote?

MAXWELL FROST: Yeah.

ANNIKA COLLIER NAVAROLI: Please excuse my language. This is a direct quote, but Chrissy Teigen referred to Donald Trump as a pussy ass bitch.

MAXWELL FROST: OK. Free speech. And what happened after Miss Teigen posted her tweet? What did the White House do? What did the Trump White House do?

ANNIKA COLLIER NAVAROLI: From my understanding, the White House reached out to ask that this tweet be removed. It was my team's job. This fell underneath the policy for abusive behaviors and we evaluate it underneath our insults policy. At that time up to three insults were allowed, and so it was our job to determine how many insults were included within that phrase.

MAXWELL FROST: So the Trump White House reached out, not an agency, but the White House reached out and request that you remove the tweet.

ANNIKA COLLIER NAVAROLI: From my understanding, yes.

MAXWELL FROST: OK. Mr. Roth, you mentioned a serious problem of foreign interference in our elections. Did you see that mass interference work more in support of right-wing candidates like President Trump in 2016 or President Biden in 2020?

YOEL ROTH: Thank you for the question. It's an important one, and I don't think there's a clear or easy answer to this. We saw Russian operatives playing both sides and often playing them against each other. One of the most enraging interactions that my team saw were accounts operated out of the same Russian troll farm arguing with each other.

And they were manufacturing drama both on Democratic side and on the Republic side.

MAXWELL FROST: It's still a huge issue?

YOEL ROTH: Absolutely.

MAXWELL FROST: 100 percent. Well there you have it. There's issues of big tech, there are serious issues. We need to litigate. Hunter Biden's laptop is not one of them. And like many of my colleagues have said, we need to talk about these issues, how January 6, maybe could have been prevented if Twitter had taken action due to the hateful speech, and how we have foreign interference in our elections.

Why are folks on this committee so obsessed with Twitter's editorial decision on Hunter Biden's laptop? Would they hold the same hearings of the editorial decisions of Fox News and Newsmax. Free speech is about the government limiting speech about the public. My governor, Ron DeSantis, is doing that right now.

I have a venue in my district that he's revoking the liquor license of, trying to close because they had a drag show. We have teachers who are not able to teach the curriculum that they want because they disagree with Ron DeSantis and his view of the world. That is limiting free speech, and I'd love to see this committee bring in some of these governors who are abusing their power like Governor DeSantis in my state of Florida to limit the free speech of people.

I yield back.

JAMES COMER: Gentleman yields back. Chair now recognizes Mr. Gosar for five minutes.

PAUL GOSAR: Thank you, Mr. Chairman, for this important hearing and thank you for our witnesses for appearing as well. I want to be clear, despite claims in witness testimonies, government cannot deputize the private sector for actions that would otherwise be restricted by the Constitution, in this case, the censorship of lawful speech.

Now I want to direct you to a tweet over my shoulder sent by President Trump on October 5, 2020 before Twitter banned him from the platform. This was after President Trump had become infected with COVID and received treatment at Walter Reed Medical Center. It says in part, "Don't be afraid of COVID. Don't let it dominate your life," end of quote.

Do you see that Mr. Roth?

YOEL ROTH: Yes, sir, I do.

PAUL GOSAR: Less than an hour later, you received an email from James Baker at Twitter, reproduced behind me as well, saying, quote, "Why isn't this POTUS tweet a violation of our COVID-19 policy, especially the, Don't be Afraid COVID statement," end of quote. Isn't that correct, Mr. Roth?

YOEL ROTH: Yes, I believe that's the email displayed.

PAUL GOSAR: Now Mr. Baker, was it your understanding that the Twitter COVID-19 policy was people should be afraid of COVID?

JAMES BAKER: Sir, my recollection ...

PAUL GOSAR: Yes or no.

JAMES BAKER: Could you repeat the question, sir?

PAUL GOSAR: Was it your understanding that Twitter's COVID-19 policy was quote, "People should be afraid of COVID?"

JAMES BAKER: At that point in time, I did not fully understand what Twitter's COVID misinformation policy was, and so I was trying to understand ...

PAUL GOSAR: I'm recapturing my time. So maybe you thought the Twitter's policy was that it should dominate people's lives. Is that what you thought?

JAMES BAKER: I'm sorry, I'm having a hard time hearing you, sir.

PAUL GOSAR: So is it the fact that Twitter, don't let it dominate people's lives? Is that the problem with the tweet?

JAMES BAKER: I didn't, at that point in time, I did not understand fully. I was relatively new at Twitter and I was trying to understand what the policy was and there ...

PAUL GOSAR: OK, recapturing my time. Recapturing my time. I just have to ask you what the other two were asked, where did you go to medical school?

JAMES BAKER: I beg your pardon?

PAUL GOSAR: Where did you go to medical school?

JAMES BAKER: I did not go to medical school.

PAUL GOSAR: Exactly. Now I'd like to have a yes or no from each of the witnesses on these following questions. Did you or others at Twitter communicate with government officials by means of disappearing messaging systems like Signal, Snapchat or Wickr. Mr. Baker, yes or no.

JAMES BAKER: Have I ever communicated with a government official using those?

PAUL GOSAR: Yes or no.

JAMES BAKER: I don't recall.

PAUL GOSAR: Ms. Gadde.

VIJAYA GADDE: Not to the best of my recollection.

PAUL GOSAR: Mr. Roth.

YOEL ROTH: Yes.

PAUL GOSAR: Ms. Navaroli.

ANNIKA COLLIER NAVAROLI: Not to my recollection, no.

PAUL GOSAR: Once again, did you or others at Twitter receive requests from federal law enforcement to allow criminal activity or content whose distribution is criminal to proceed on Twitter? Mr. Baker.

JAMES BAKER: I'm sorry, I don't understand the question, sir.

PAUL GOSAR: Ms. Gadde.

VIJAYA GADDE: Can you please repeat the question, sir?

PAUL GOSAR: Mr. Roth.

YOEL ROTH: If I understood the question correctly, was whether we received requests to allow unlawful activity, the answer is no.

PAUL GOSAR: Yes. Ms. Navaroli.

ANNIKA COLLIER NAVAROLI: Not to my knowledge, no.

PAUL GOSAR: Now I'd like to submit for the record an article by the New York Post titled quote, "Twitter refused to remove child porn because it didn't violate policies." Ms. Gadde, who was involved in this determination?

VIJAYA GADDE: I'm not familiar with the situation.

PAUL GOSAR: Mr. Roth, are you familiar with it?

YOEL ROTH: No, sir, I'm not.

PAUL GOSAR: Once again, I'd like a yes or no from each of the witnesses. Did you apply labels to users with an administrative tool to down rank them? Mr. Baker.

JAMES BAKER: I'm sorry, sir. I'm having a very hard time hearing your questions.

PAUL GOSAR: Ms. Gadde.

VIJAYA GADDE: I'm having the same problem, sir. Can you please repeat the question?

PAUL GOSAR: Mr. Roth.

YOEL ROTH: I'm not sure I understood the question, sir.

PAUL GOSAR: Well, I'm asking you did anybody use an administrative tool to down rank users?

YOEL ROTH: Yes, sir. That's a part of Twitter's content moderation capabilities.

PAUL GOSAR: Mr. Baker.

JAMES BAKER: Well, I'll rely on Mr. Roth.

PAUL GOSAR: Ms. Gadde.

VIJAYA GADDE: Yes. We're very public about our recommendation systems and how they work.

PAUL GOSAR: Thank you. Mr. Chairman, today's witnesses played a central, powerful and disturbing role in limiting not only free speech, but even people's good faith inquiries and research regarding their own health. The Internet is increasingly where my constituents go to engage in civic discourse. Our liberties as Americans will be diminished if we do not recognize our speech is increasingly virtual, and right now, subject to hostility and threatened through bans and de-platforming.

The suggestions by witnesses that all of the removal of quote, "lawful but awful speech," quote was done in favor of users is bunk. They could just as easily provided content filter options to allow lawful speech, letting users decide what lawful materials they do or don't want to engage with, but you didn't. You censored and manipulated millions of people.

Do not allow people like this sitting in front of us today to be the arbiters of truth. I urge my colleagues to support my section 230 Reform, Stop the Censorship Act, which empowers users with the editorial contract. Private businesses, you always have a contract with your customers. Allow them to pick.

I yield back my time.

JAMES COMER: Gentleman yields back. Chair recognizes Ms. Balint.

BECCA BALINT: Thank you, Mr. Chairman, and I want to say as a former history teacher, I care a lot about the facts and the details, so let's dive in. On December 4, then Ranking member Comer appeared on Fox News and alleged that what Elon Musk's Twitter file showed was quote, "evidence that the Biden campaign colluded with big tech to suppress a story that we now know is 100 percent true," unquote.

That is simply not true. It is not true based on what we knew then. It is not true based on what we know now. Mr. Roth, in a declaration to the FEC in December 2020, you stated quote, "I did not receive any communications from or have had any communications with representatives of Biden for President, the Democratic National Committee or any of their agents regarding the New York Post articles before Twitter implemented the enforcement actions on October 14, 2020," unquote.

Mr. Roth, do you stand by that statement?

YOEL ROTH: Yes, absolutely.

BECCA BALINT: It's also worth noting that your colleague, I believe Lauren Culbertson, told the FEC the same thing. Ms. Gadde, did anyone from the Biden campaign or the Democratic National Committee direct Twitter to remove or take action against the New York Post story?

VIJAYA GADDE: No.

BECCA BALINT: Mr. Baker, same question to you please.

JAMES BAKER: Not to my knowledge, no.

BECCA BALINT: So, the evidence is clear, neither the Biden campaign nor the DNC had anything to do with Twitter's decision-making about the New York Post story. My Republican colleagues are using what are otherwise innocuous emails to suggest that there was somehow collusion between Twitter and the Biden campaign. For example, in one email, and this is the same one mentioned in Mr. Donald's questioning earlier, in one email selectively used by Elon Musk, one Twitter executive sends another a series of hyperlinks on October 24, 2020 with the comment quote, "More to review from the Biden team." For the record, this is tweet number eight in the first installment of the so-called Twitter Files.

So, Ms. Gadde, are you familiar with this email?

VIJAYA GADDE: No, I'm not.

BECCA BALINT: OK. So just to be clear, this email has nothing to do with the New York Post story. It is dated October 24, 2020 after Twitter had both made and reversed its decisions about the New York Post story. Mr. Baker, do I have that right?

JAMES BAKER: Based on I think the exhibit that was shown earlier, that sounds correct, yes.

BECCA BALINT: So Ms. Gadde, can you clarify for the record if you're able to what's happening here?

VIJAYA GADDE: Can you please be more specific about ...

BECCA BALINT: With this email?

VIJAYA GADDE: I don't believe I was a recipient of that email or reviewed it during my time at Twitter. So I'm sorry, I don't have familiarity with that.

BECCA BALINT: That's OK. Mr. Baker.

JAMES BAKER: To the best of my understanding, these were tweets that the campaign had concerns about. I don't know the details of those, and they were referred to Twitter, well I'm not sure exactly why, but I can't get inside their heads, but they were referred to Twitter, and Twitter reviewed them and someone again going off the exhibit familiar said they were handled.

I don't know what that means in terms of whether they took any action or didn't take any action, but at least they addressed the matter. So that's what I construe from that email.

BECCA BALINT: Appreciate that. So from my understanding of everything that we've heard today, it's really not uncommon for outside entities, including as we've heard Mr. Trump's campaign, to request that Twitter remove content that violates the company's terms of service. Is that correct Ms. Gadde?

VIJAYA GADDE: That is very common globally.

BECCA BALINT: Thank you. So to the best of your ability to answer Ms. Gadde, were any decisions approved or acted upon based on the political party making the request?

VIJAYA GADDE: No. Our teams were trained to enforce our rules consistently and fairly without regard to any sort of political ideology.

BECCA BALINT: Thank you. So I believe that what's happening here is my Republican colleagues know that the premise of this whole hearing is misleading. There is no evidence that the Biden campaign had anything to do with the Hunter Biden, New York Post story. And the evidence we do have simply shows that the Biden campaign did what the Trump campaign and millions of Twitter users do routinely, flag content and ask Twitter to conduct its own review to determine whether it violates Twitter's own rules and policies.

I yield back.

JAMES COMER: Gentlelady yields. Chair recognizes Mr. Palmer for five minutes.

GARY PALMER: Thank you, Mr. Chairman. I'd like to submit a June 22 study conducted by Princeton University called Powered by Twitter, The Taliban's Takeover of Afghanistan.

JAMES COMER: Without objection, so ordered.

GARY PALMER: This study covers the timeframe of April to September, 2021, which is four to five month period between President Biden's official announcement of America's intentions to withdraw and the chaotic end of the American troop presence in Afghanistan. The study found that the Taliban weaponized Twitter, and that Twitter's moderation policies failed.

There were more than 126,000 accounts in the Taliban support network, and 83 percent of these Taliban-associated accounts were created before 2021, well before Twitter could claim that these accounts represented a government. These accounts shared graphic images and videos depicting dead and decomposing bodies, and rampantly spread disinformation about the facts on the ground in direct violation of Twitter's public policies.

Taliban tweets were shared millions of times in the summer of 2020. The study also found that three quarters of Taliban content was produced by only 20 accounts, which suggestively straightforward. By the way, the US government classifies the Taliban as an insurgent group, in case some of my colleagues don't understand what real insurgencies are.

Mr. Roth, why wasn't Twitter more effective at curtailing the clearcut content of violations by Taliban Twitter accounts?

YOEL ROTH: Thank you for the question, sir. At the time that you referenced, I wasn't responsible for Twitter's work on counterterror.

GARY PALMER: Do you have any idea of why Twitter would allow clearcut violations by an insurgent group? And by the way, they carried out multiple suicide attacks during the timeframe they were sending out these tweets, killing dozens and injuring hundreds.

YOEL ROTH: It's my understanding that Twitter's policies at the time distinguish between some of the more violent portions of the Taliban and some of the more political portions of it. I'm not rendering judgment on that.

GARY PALMER: That stuff's still up on Twitter, and I just wonder how many content moderators were assigned, if any, to check on these accounts. Additionally, it appears that Twitter was profiting from Taliban's presence on the platform in the lead-up to the overthrow of the Afghan government. Twitter placed ads from US companies including Amazon, Disney, McDonald's on the Twitter accounts of the Taliban news organization and their spokespersons and their senior leaders.

Ms. Gadde, did Twitter make money off placed ads on Taliban Twitter accounts on August 26, 2021 when 13 US men and women died in a suicide bombing?

VIJAYA GADDE: I have no knowledge of this matter.

GARY PALMER: You don't have any knowledge about whether or not these ads were up?

VIJAYA GADDE: I do not.

GARY PALMER: According to Twitter, the decision to ban President Trump was after a close review of his tweets and the context around them, specifically how they were being received and interpreted on and off Twitter. On June 3, 2018, the Iranian Ayatollah Khamenei ...

UNKNOWN: Did Twitter do that?

GARY PALMER: It sounds like the Green New Deal to me. [In recess]

JAMES COMER: We'll call the meeting back to order. And I apologize, we've never had this happen with the electricity story went out, but the computer is flickering, but the C-SPAN is working, so we're being recorded again according to the rules. Where we left off, Mr. Palmer had three minutes remaining. So now I now yield three minutes to Mr. Palmer.

GARY PALMER: Thank you, Mr. Chairman. Let's try this again. According to Twitter, the decision to ban President Trump was after a close review of his tweets and the context around them, specifically how they are being received and interpreted on and off Twitter. On June 3, 2018, the Iranian Ayatollah Khamenei tweeted, "Israel is a malignant cancerous tumor in the West Asian region and has to be removed and eradicated.

It is possible and it will happen." This tweet remains on Twitter to this day. Mr. Roth, how do you believe this tweet from the leader of Iran calling for the eradication of Israel was received and interpreted on and off Twitter?

YOEL ROTH: I couldn't say for sure how that tweet was interpreted.

GARY PALMER: You would have a pretty good idea though of how many retweets and the amount of traffic it got.

YOEL ROTH: Only from what I can see in that illustration.

GARY PALMER: Why does the Iranian leader, who has explicitly pledged to eradicate the Jewish state of Israel, get to remain on Twitter? Mr. Roth.

YOEL ROTH: Like all of Twitter's users, the Ayatollah is subject to the same set of rules. And while I can't speak for Twitter's decisions today, I can say that Twitter took a number of enforcement actions against the Ayatollah's account, the same way that we would against [inaudible].

GARY PALMER: That's still us. You understand how hypocritical this is right. You banned a sitting US President and a sitting member of Congress Marjorie Taylor Greene, while a man who has pledged death to America and can openly call for the death of millions of Jewish people, and yet not be removed from Twitter. You understand how that looks, how hypocritical that is? I'm asking, Mr. Baker, Ms. Gadde, Mr. Roth, Ms. Navaroli.

That's amazing, but it shows hypocrisy at Twitter. I want to pivot here Mr. Chairman. Mr. Goldman made a very troubling statement claiming that as Vice President, Joe Biden fired the attorney general of Ukraine since he had knowledge of this prior to becoming a member of Congress, Mr. Goldman should provide to the committee documentation about this action.

We should know who authorized Vice President Biden to take this action against the Ukrainian attorney general. We need to know was there an investigation to justify the firing of the Ukrainian attorney general? And if yes, who conducted it? He needs to provide all details involving this action, including Vice President Biden's threat to withhold $1 billion of US funding if the Ukrainian AG was not fired.

And who authorized Vice President Biden to make that threat. I would request that the committee look into this and I yield back.

JAMES COMER: Gentleman yields back. Chair now recognizes Ms. Lee for five minutes.

SUMMER LEE: Thank you, Mr. Chair. This has been an incredibly electric hearing. It'd be funny if it weren't real life. I understand my colleagues on the other side of the aisle want to be victims so very badly. But Ms. Navaroli, if I understand you correctly, public criticism and allegations of anti-conservative bias are actually making Twitter and other social media companies less willing to enforce their own policies against political conservatives, correct?

ANNIKA COLLIER NAVAROLI: Yes, that was my understanding based on research that was done in Twitter.

SUMMER LEE: Meaning the same Republicans insisting on making themselves a victim is working?

ANNIKA COLLIER NAVAROLI: Please repeat the question.

SUMMER LEE: The same Republicans, folks on this panel who are insisting on making themselves victims in this conversation about Twitter censorship and other accusations they made, is this working because of the conservative bias and the implications of it or the allegations of conservative bias? In other words, are the allegations of conservative bias making it harder for those in Twitter or those who are working there to enforce these policies against folks who incite hate speech or make ...

ANNIKA COLLIER NAVAROLI: Thank you for rephrasing that question, and thank you for asking it. Yes, these allegations are very much having an impact on the leadership within every social media company as they hope to not receive allegations of being biased or in any way being politically leaning.

SUMMER LEE: Thank you. I'm not the only lawyer in the room, so you all know that while the Constitution does provide us the right to free speech, there are of course limitations. As Ms. Navaroli pointed out, we cannot yell fire in a crowded theater. Compromising freedom of speech may seem dangerous until we weigh that compromise against the men and women massacred in Buffalo, for instance, or the many other places where radicalized violent extremists found their motivation to kill on social media.

This isn't about oppression, it's about public safety. This isn't about censorship, it's about protecting our democracy from misinformation. Ms. Navaroli, it was your job to decide whether someone was yelling fire in the theater. Could you describe the coded incitement to violence policy Twitter did not implement?

ANNIKA COLLIER NAVAROLI: Yes, thank you for that question. The coded incitement to violence policy was an incredibly nuanced policy that was created in order to fill the gaps that were existing in the already existing policies around violence. The policies around violence were explicit. So these were calls that said, I'm going to, I want to you, I plan to, I wish to you.

Those sorts of incitements would have come down. Things like stand back, stand by, things like I am locked and loaded and ready for a civil war, or dog whistles that were not covered underneath the policy.

SUMMER LEE: Thank you. Could it have saved lives if it were implemented on January 5, 2021 or possibly in November, 2020?

ANNIKA COLLIER NAVAROLI: I can't speculate as to what might have happened and I do wish we would have acted.

SUMMER LEE: Thank you. Ms. Gadde, the very same words that were plastered across Twitter were shouted at the January 6, insurrection. What threats do Americans face now that Elon Musk has removed all guard rails and welcomed back Donald Trump to the platform?

VIJAYA GADDE: Thank you for the question. I'm actually not really familiar with what the content moderation policies of Twitter are today.

SUMMER LEE: Thank you. Social media platforms like Twitter must own up to their responsibility in spreading violence and chaos. I'd argue so too do members of this panel and institution. Thank you. I yield the balance of my time to Mr. Raskin.

JAMIE RASKIN: Thank you very much. Mr. Roth, I want to go back to the whole question of your finding hundreds of thousands of fake accounts set up by Vladimir Putin and the Russian Internet Research Agency I think they called it, which was the propaganda arm in 2016 and I suppose to this day. Some have been suggesting on the other side of the aisle that it's illegitimate for the FBI or any representative of the federal government, presumably even Donald Trump who did a lot of this, to contact private media entities in order to apprize them of anything, whether it might be the penetration of organized crime or child pornography or foreign malign influence.

And I'm just wondering if you would give us a sense of how much work is actually being done, and I was going to check with you and Mr. Baker about that, how much work does Twitter and other social media entities do that relies on the FBI and other national security agencies?

YOEL ROTH: Thank you for the question. There is a considerable amount of work to address foreign disinformation at Twitter and also at other companies. And this work was reliant in part on intelligence shared with companies by law enforcement and by the intelligence community. I would regard that work as essential.

At Twitter, we had dozens of people working just on these questions of election interference. Those teams no longer exist under Mr. Musk.

JAMIE RASKIN: And Mr. Baker, if you could?

JAMES BAKER: Thank you, sir. Just generally, I mean it's a matter of public record that the FBI has worked with the public, including private entities for decades. Indeed they've had for some number of years now an office of, I think it is called Office of Public Sector Engagement. This is part of what they do in order to fulfill their responsibilities and to do their jobs to protect the country.

JAMIE RASKIN: I yield back.

JAMES COMER: Chair recognizes Mr. Armstrong for five minutes.

KELLY ARMSTRONG: Thank you. Mr. Roth, I'm going to continue down that line of questioning. So when you testified, you were just talking about working very hard to keep foreign troll firms from using Twitter and to engage in malign foreign interference. This sounds like a fairly robust undertaking. You said between 2016 and 2020, you had different teams stood up to do this.

Constant vigilance?

YOEL ROTH: Yes, sir, that was the phrase that we used.

KELLY ARMSTRONG: Yeah, And these types of attempts are constantly evolving. They're trying to find new ways to penetrate your system, so you have to be engaging with it and being willing to adapt on a constant basis.

YOEL ROTH: Yes, sir, that's right.

KELLY ARMSTRONG: And now we forward to 2020, and earlier you testified that you were having regular interactions with national intelligence, Homeland Security and the FBI.

YOEL ROTH: Yes, I did.

KELLY ARMSTRONG: And primarily to deal with foreign interference?

YOEL ROTH: Primarily, but I would say almost exclusively.

KELLY ARMSTRONG: And disinformation and all of that. But you had said earlier, like your contact with Agent Chan was primarily with foreign interference?

YOEL ROTH: Yes, that's right.

KELLY ARMSTRONG: And these were emails. Were there meetings?

YOEL ROTH: Yes, Twitter met quarterly with the FBI Foreign Interference task force, and we had those meetings running for a number of years to share information about malign foreign interference.

KELLY ARMSTRONG: Agents from homeland security or intelligence or just primarily the FBI?

YOEL ROTH: Our primary contacts were with the FBI, and in those quarterly meetings, they were, I believe, exclusively with FBI personnel.

KELLY ARMSTRONG: And you had multiple former FBI agents on the payroll. I mean Mr. Baker, you had ten years' experience with FBI, DOJ?

JAMES BAKER: I was, with DOJ it's two decades roughly, but just for the record, I was never an FBI agent, yeah.

KELLY ARMSTRONG: OK. And Twitter has such a close relationship with at least one FBI agent. That agent could start emails with, Hey, Twitter folks, and could actually advise your company about violations of your own terms of service. Mr. Roth, I think it's safe to say that you had a consistent dialog with the FBI for the weeks and months prior to the New York Post.

Is that fair?

YOEL ROTH: I had ongoing conversations with the FBI for years, I would say, about election security.

KELLY ARMSTRONG: And in response to Mr. Fry earlier, you said you would not categorize the FBI communications as pressure.

YOEL ROTH: No, I would not.

KELLY ARMSTRONG: However, Twitter's director of policy wrote to you in 2020 that Twitter has seen a sustained effort by the intelligence community to push Twitter, and that Twitter should keep a solid front against these efforts. He specifically cited Elvis Chan, an FBI agent in San Francisco. Now on August 11, 2020, Agent Chan sent you three documents in prep for a meeting and said the documents pertain to APT 28, a hacking unit connected with Russian military intelligence.

Agent Chan arranged for having security clearance for Mr. Baker and facilitated encrypted networks for the FBI to share information with Twitter employees. And on October 14, 2020, you stated that this feels a lot like somewhat of a subtle leak operation. Earlier today you testified that you were following national experts on Twitter, national security experts on Twitter as a reason to take down the New York Post story on Hunter Biden's laptop.

YOEL ROTH: Yes, sir, I did.

KELLY ARMSTRONG: So after 2016, you set up all these teams to deal with Russian interference, foreign interference, you're having regular meetings with the FBI, you have connections with all of these different government agencies and you didn't reach out to them once?

YOEL ROTH: Is that question in reference to the day of the New York Post article? That's right. We generally did not reach out to the FBI to consult on content moderation decisions, especially where they related to domestic activity. It's not that we wouldn't have liked that information, we certainly would have. It's that I don't believe it would have been appropriate for us to consult with the FBI.

KELLY ARMSTRONG: So in December of 2020, you did a declaration to the Federal Election Commission that the intelligence community expected a leak and a hack operation involving Hunter Biden. Recently, Mark Zuckerberg confirmed that the FBI warned META that there was a high effort of Russian propaganda, including language specific enough to fit the Hunter laptop Biden security story.

You're talking to these people for weeks and months, years prior to this leaking. They have specifically told you in October that there is going to be a leak potentially involving Hunter Biden's laptop. They legitimately and literally prophesied what happened, and you didn't contact any of them?

YOEL ROTH: No, sir, I did not.

KELLY ARMSTRONG: Did they reach out to you?

YOEL ROTH: On and around that day to the best of my recollection, no, they did not.

KELLY ARMSTRONG: After the story was taken down and you guys did it and you personally disagreed with it. Ms. Gadde, you said you did, did you contact them and say, hey, is this what you were talking about?

YOEL ROTH: If that question was directed to me, no, I did not [inaudible].

KELLY ARMSTRONG: Ms. Gadde, did you talk to anybody from the FBI?

VIJAYA GADDE: Not to the best of my recollection.

KELLY ARMSTRONG: So I guess my question is, what is the point of this program? You have constant communication. They're setup for foreign interference. They've legitimately warned you about this very specific thing, and then all of a sudden everybody just walks away? Like this is what you planned for. This is what you prepared for.

This is the information. They told you exactly what was going to happen, and then you want, I don't care if the members of Congress, you legitimately want the American people to believe we just completely cut off contact with all of the people who we were supposed to defend against? I don't think it passes the smell test and neither do the American people.

I yield back.

JAMES COMER: Chair recognizes Mr. Casar for five minutes.

GREG CASAR: I'm honored to be a new member of Congress where our purpose is to listen to the people and represent their voices and lift up our communities. After talking to thousands of people across Texas asking them, what do you want me to work on for you as a new member of Congress, not a single person told me they were concerned about a New York Post story on Twitter about Hunter Biden.

Is that really what we're dedicating this committee's time to? Is that really what we're going to dedicate the next two years to? Our constituents of all political backgrounds are worried they're getting pushed out of their neighborhoods by spiking housing costs. They see their public schools suffering because we aren't supporting our teachers.

In my state, our rural hospitals are closing. We have more uninsured people than anywhere in the country. We have the highest number of food insecure kids, and reproductive rights have been stripped away. We're talking about none of that. It seems to me that we're having these hearings so that people can beat their chest about Hunter Biden, maybe do some fundraising, get some headlines and ironically post those on Twitter.

If that's what House Republicans want to spend their time on, then that's their prerogative. But to me, it's a damn shame. We're here for a bigger purpose than that. Under the leadership of the legendary chairman Jack Brooks from Texas, this committee implemented the Great Society through the creation of Head Start and the creation of Medicare.

They investigated Watergate. They built the US space program. Anything is possible if we all come together to work on what our constituents demand, if we make sure that we say to our constituents that your voice matters here. We could be ensuring that the historic investments in infrastructure and domestic manufacturing create good union jobs where we need them the most.

We could take on free speech and civil liberties issues at home and across the world. We could be investigating and taking a look at these real threats of domestic terrorism and civil unrest. We could be making sure that our constituents' lives are better, but instead we're focusing today on Twitter. The American people deserve better.

I yield back my time to Mr. Raskin.

JAMIE RASKIN: Thank you very much. Mr. Casar. Let's go back to this point about the Russian disinformation campaign. Just to refresh everybody's recollection, Mr. Roth, you learned, was it before 2016 or after 2016, that Vladimir Putin had commanded an entire campaign to try to invade the American election with social media messages on Twitter, Facebook and so on. Was that before the election you learned or after?

YOEL ROTH: While there was some public discussion of it before the election, most of the confirmed information was only declassified after Election Day.

JAMIE RASKIN: OK. So there was this powerful massive campaign unleashed by a malign foreign actor interested in undermining American democracy with a specific electoral objective, right? Did you find that? Was he just trying to create chaos or did he want to put the thumb on the scale with his intervention for either Hillary Clinton or Donald Trump?

YOEL ROTH: A bit of both, honestly. I think there was a significant amount of the troll activity on social media in particular that wasn't tilted one way or the other. It played both sides and it played them off of each other. And I think that's bad for America and it's bad for democracy. I think the hack and leak campaign was a bit more skewed because that focused very specifically on the DNC and on John Podesta.

JAMIE RASKIN: OK. And so the hack and leak campaign against the DNC and Hillary Clinton was one meant to damage Hillary Clinton's campaign. Is that right?

YOEL ROTH: That's what most research concludes was the objective, yes.

JAMIE RASKIN: Alright. So some people are suggesting that if the US government finds out about a malign foreign influence, disinformation or propaganda campaign in our elections at any level, the government shouldn't say anything to the public or the news media about it. What do you think about that proposition?

YOEL ROTH: I believe that would be a profound failure. I think there's a collective responsibility across the private sector and the public sector to address our shared threats, and Russian interference in American democracy is one of those shared threats.

JAMIE RASKIN: OK. Ms. Gadde, do you agree with that?

VIJAYA GADDE: Yes, I do.

JAMIE RASKIN: OK. And just back to you, Ms. Navaroli for a moment, did you follow the attempt to overthrow the official election result in Brazil?

ANNIKA COLLIER NAVAROLI: I was not working at Twitter at the time, but I paid attention to the news, yes.

JAMIE RASKIN: OK, and were you struck by any of the resemblances between what happened in Brazil and what happened here on January 6?

ANNIKA COLLIER NAVAROLI: Yes, it was the exact same playbook that was played on January 6, in which a ruling party claims that an election was stolen, and that misinformation continued to spread and lead to political violence.

JAMIE RASKIN: Thank you. I yield back Mr. Chairman.

JAMES COMER: Chair recognizes Mr. Fallon for five minutes.

PATRICK FALLON: Thank you, Mr. Chairman. If there was ever a time where our government becomes the sole arbiter of truth, then we've lost the United States. Twitter has become the virtual town square. It now has the power to transform public opinion like no other medium in history with their algorithms shaping and molding the public mind to their own ends.

Mr. Roth, to the best of your knowledge, what percentage of your colleagues when you worked at Twitter donated to Democratic causes or candidates in 2020?

YOEL ROTH: I don't know, sir.

PATRICK FALLON: We have it here. It was 98.4 percent of Twitter employees gave to Democratic candidates or causes in the 2020 election cycle. And believe it or not, those numbers actually went up in the 2022 cycle to 99.7 percent of Twitter employees donating to Democratic candidates and causes. So clearly, Twitter as a whole had a political bias.

Mr. Roth, do you personally think that you have a political bias, and did you have one when you worked at Twitter, a personal political bias?

YOEL ROTH: No sir.

PATRICK FALLON: You didn't. That's remarkable because it's pretty obvious you did have strong bias when you compared, ironically using Twitter, people that worked in the Trump White House to Nazis. They were good folks that you simply disagreed with politically in our representative republic, and you compared them to the most evil people on the planet that murdered 16 million people or at least were responsible for those deaths.

You think that was a little bit hyperbolic?

YOEL ROTH: Yes, I do. As I said, I regret the language.

PATRICK FALLON: I agree with you, it was. And so your political opinion spilled over into censorship work at Twitter. I think your biases had consequences, which you intentionally expressed through your propaganda and censorship role at Twitter. Additionally, you may have collaborated with the US intelligence community regarding stories that you all just didn't want the public to see.

So namely what we refer to as the Hunter Biden laptop story that ran in the New York Post. So I'll ask you Mr. Roth, did you receive ten confidential documents from a special agent of the FBI Elvis Chan the night before the Hunter Biden laptop story ran?

YOEL ROTH: Yes.

PATRICK FALLON: You did. See, because it's interesting the immediacy with which you all acted to censor the New York Post Hunter Biden laptop story, seems to be very indicative of foreknowledge, and the story was seismic and it was rushed to be suppressed knowing full well it was not Russian disinformation as some here said.

It was truth that was denied the American voter, and the Media Research Center polled Democratic voters in 2020 swing states and found that 17 percent would have changed their vote if they had known the contents and evidence of the New York Post story. President Trump lost key states, Georgia, Pennsylvania, Arizona and Wisconsin by collectively just over 100,000 votes.

And if this is accurate, this poll, 3.2 million votes could have swung and he only needed a tiny fraction of those 3.2 million. That decision almost certainly changed the result of the 2020 Presidential election. Did you have any idea the contents of the New York Post story? Mr. Roth.

YOEL ROTH: Only what I read in the New York Post that day.

PATRICK FALLON: And then it was killed by Twitter and the mainstream media followed. So I found this interesting. In 2019, candidate for President Joe Biden said and I quote, "I have never spoken to my son about his overseas business dealings." And yet the evidence in that story and on that laptop revealed that two of Hunter's Mexican business associates, Miguel Magnani and Miguel Velasco visited the White House in February 2014 and he was later photographed, Joe Biden was photographed with them in the White House.

Also in October 2015, Hunter arranged a video conference with his dad, Joe Biden, the sitting Vice President, and Carlos Slim, the Mexican billionaire. And then unbelievably in 2015, Hunter introduced his father, then Vice President, to Vadym Pozharskyi, an executive at the now infamous Burisma Holdings Company where Hunter would later magically make millions as a board member despite having no experience whatsoever in the energy sector.

Joe Biden lied. He created the firewall and then he was exposed because of this story and other information. He lied to the American people. And Mr. Roth, you withheld information on the eve of a Presidential election and you protected that lie. And I hope for the sake of the country that men like you that do those things, men and women, never get to put in such positions of power again.

And Mr. Chairman, I'd also like to see if, I'd like to ask you unanimous consent to enter into the record a tweet from Ranking Member Raskin. The tweet reads, "It's horrifying to see images of Border Patrol agents whipping Haitian refugees at the Texas border." Not exactly the feeling I get ...

JAMES COMER: Without objection, so ordered.

PATRICK FALLON: Thank you. I yield back.

JIM JORDAN: Will the gentleman yield?

PATRICK FALLON: Oh, well, I just think that's misinformation or at least it was a mistake, and Twitter left it up for a week, not a week, a year, a full year.

JIM JORDAN: Gentleman yield.

PATRICK FALLON: I yield.

JIM JORDAN: Mr. Baker, in top of page two, in your written testimony, you said I did not destroy or improperly suppress ...

JAMIE RASKIN: Whose time is it?

JIM JORDAN: Any documents at Twitter regarding information important to the public dialog. The way you worded that it sounds that there is something ...

JAMIE RASKIN: Mr. Chairman, how much extra time is you're going to get during this hearing?

JAMES COMER: He had time. Let him repeat the question and then his time will be expired and please answer.

JAMIE RASKIN: It was expired before he started.

MARJORIE TAYLOR GREENE: Clearly, it's up to the chairman so why don't you let him answer?

JIM JORDAN: Mr. Baker on top of page two of your written testimony, you said I did not destroy or improperly suppress any documents at Twitter regarding information important to the public dialog. The use of the term improperly suppress suggests there was some kind of suppression done in a proper way. I just want to know what that was, and is this referring to your work at Twitter when the Twitter Files were first released just a few months ago?

JAMES BAKER: Unfortunately, sir, I think I'm constrained from answering that question any more fully than in my testimony because of attorney client privilege. So unfortunately, I'm just going to have to leave it at that.

JIM JORDAN: I thought that's been waived.

JAMES BAKER: Not the privilege. Not the privilege. The non-disclosure agreement, my understanding has been waived, but not the attorney client privilege.

JAMES COMER: Gentleman's time's expired.

JAMES BAKER: I do not have anything in writing to indicate that Twitter has waived privilege with respect to that matter.

JAMES COMER: Chair recognizes Ms. Crockett.

JASMINE CROCKETT: Thank you, Mr. Chair. MAGA Republicans can't let go. That should be the name of this hearing. I'm glad that seemingly we have now accepted that President Joe Biden won the election, even though now we are blaming President Trump's loss on Twitter. Can we finally let it go? This is why Democrats are reinforcing that in, this hearing, we should be talking about the threats to our democracy.

That's the real threat, not an old article that seemingly couldn't reach the viewership it sought through its own platform to disparage and attempt to skew the election in favor of a twice-impeached former President who lost a secure and fair election. As a Texan who served in the House and fled the state as MAGA Republicans there pushed an agenda just as insidious as the foreign interference we experienced in the 2016 election, we should be talking about what they don't want to talk about as they continue to cut you off as you try to talk about things such as interfering with our democracy, and how there has been an inciting of political violence against individuals as well as our democracy as a whole.

We are supposed to live in the land of the free, and when some people are afraid of losing power, they engage in conspiracy theories and distractions, such as the Joe Biden, a candidate at the time, not government actor at the time, colluded with social media to win. So let me say thank you for showing up for this political theater.

Unfortunately, the American people deserve better of its leaders. They deserve a robust conversation around the very real and very present threats to our democracy, the greatest democracy in this world. So with that being said, let me be clear. I believe that there has been testimony previously by Ms. Navaroli, I hope I'm not just killing your name right now.

At some point you stated if January 6, and anything like it, that language, if we would have seen that happen in any other country with any other leader, Twitter would have acted completely differently. It is my understanding from this statement, and correct me if I'm wrong, that you almost felt as if Trump was treated differently, in fact that you may have been of the impression that he was treated with more deference than other world leaders.

Is that true?

ANNIKA COLLIER NAVAROLI: Yes. As I testified earlier today, Twitter bent and broke its own rules in order to protect dangerous speech like the tweets that were directed towards Representative Ocasio-Cortez.

JASMINE CROCKETT: And when we talk about bending, it's my understanding from another deposition that there were actual alarms that would go off if someone would access Trump's Twitter account other than I believe the CEO.

ANNIKA COLLIER NAVAROLI: It was my understanding that alarms would ring within Twitter if the account was accessed outside of a select group of individuals who had access to that account.

JASMINE CROCKETT: Are you aware of this being an ongoing practice for other individuals' Twitter accounts?

ANNIKA COLLIER NAVAROLI: At my time at Twitter, the former President Donald Trump's account was the only account that I did not have access to.

JASMINE CROCKETT: OK, so we know that there weren't individual actors running around Twitter setting off alarms every other day, is that correct?

ANNIKA COLLIER NAVAROLI: Not to my knowledge, no.

JASMINE CROCKETT: OK. Now as we talk about January 6, because I think that's the only thing we should be talking about, what I want to talk about is what, and anyone can answer this question, did you see a correlation between a rise in homegrown domestic white supremacy online as it correlates to leading up to January 6?

ANNIKA COLLIER NAVAROLI: I can answer that. So some of the things that we were seeing specifically on Twitter related to white supremacy fan fiction, I mentioned earlier in my testimony that we saw things like people wishing that the day of the rope would occur. That comes from things like The Turner Diaries which are again white supremacy fan fiction.

JASMINE CROCKETT: You would also agree with me that it was clear the white extremists were seemingly triggered and activated to take action against our very democracy here at home by some of the activity that was going on on Twitter, correct?

ANNIKA COLLIER NAVAROLI: Yes, I believe so.

JASMINE CROCKETT: Now just to make sure that we can summarize what we allegedly are here to talk about, you all would agree with me when I say that there was no physical damage or destruction to structures, limb or life as it relates to this article, yet we do know that there was actual harm, physical harm as well as destruction that occurred as a result of January 6, Correct?

ANNIKA COLLIER NAVAROLI: Yes, people died on January 6.

JASMINE CROCKETT: Thank you. With that, I'll yield the remainder of my time to Ranking Leader Raskin.

JAMIE RASKIN: Thank you. Mr. Chairman, I would just use the second to ask unanimous consent to submit for the record an extraordinary article just published called Twitter kept entire database of Republican requests to censor posts published on February 8 that was just published by Rolling Stone. So for everybody's reading enjoyment, if people think it was biased against conservatives, this would lead us to believe it was definitely biased against liberals and progressives.

JAMES COMER: Didn't have you pegged for a Rolling Stone reader, but without objection, so ordered. Chair recognizes Mr. Grothman.

GLENN GROTHMAN: First of all, just a comment. When we talk about the Pledge of Allegiance, one of the lines in there is to the Republic for which we stand. Ben Franklin, when he was asked about our Constitution, he said we give you a Republic if you can keep it. Just two lines that maybe some people around here haven't heard.

Now this is kind of a little story for the three of you on the left here. In January, 2021, the Christian magazine called The Daily Citizen tweeted about President-elect Joe Biden's announcement that Dr. Rachel Levine was the nominee for assistant Secretary of health. They commented that Dr. Levine is a transgender woman.

This was banned from Twitter. Are you any of you familiar with this story?

JAMES BAKER: I'm not familiar with it, sir.

GLENN GROTHMAN: Any reason why it would have been banned? OK. There are local talk radio hosts in my area, well-known media hosts out of the Madison, Milwaukee, Green Bay media market widely listened to. They were a shadow band on Twitter. There are some very prominent doctors in the area that didn't agree perhaps with everything CDC or NIH said that were banned on Twitter.

I'd like you to comment on that, because normally I think when people make a major health decision, they always like to get two separate opinions, and some of these doctors who are widely well respected, probably two of the most prominent doctors in Wisconsin, fell outside the mainstream I think for thinking outside the mainstream They were taken off your platform.

Could you comment on why you would take somebody off a platform, or why a distinguished actor would be considered something that the public as a whole couldn't hear their version of events? No? You're not aware that ever anybody, any doctors who commented outside the mainstream version of what was going on with COVID, going on with the vaccine, going on with treatments that there were people who disagreed with the NIH recommendations and you took them off of Twitter?

You're not familiar with that? None of you are familiar with that. OK. I'll yield some time to Jim Jordan then.

JIM JORDAN: I thank the gentleman for yielding. Mr. Baker, Mr. Roth earlier said, he thought it was a waste of time for the FBI to be sending you accounts that they thought violated Twitter's terms of services and Twitter's policy. I was just curious, did you ever tell Twitter executives or FBI acquaintances that the FBI had no legitimate interest in enforcement of Twitter's policy?

JAMES BAKER: Sir, again I'm going to give you the same answer I gave before. I think the advice that I was giving internally to folks would be covered by the attorney client privilege, and as ...

JAMES COMER: Let me. Mr. Baker, although your testified today by subpoena, you nonetheless have raised the attorney client privilege to avoid answering these questions. Congress does not recognize the common law attorney client privilege. With that, I'm going to allow Mr. Jordan to ask the question again.

JIM JORDAN: Well, there's been two questions I've asked that he's refused to answer. So let me if I could, Mr. Chairman, I'll ask both again. I'll go back to the one I asked a couple of minutes ago. Top of page two of your testimony, you said quote, "I did not destroy or improperly suppress any documents at Twitter regarding information important to the public dialog." I would like to know what you're referring to that you in your mind properly suppressed, and when that took place, specifically if it took place during the time that the Twitter Files were first being released just a few months ago?

JAMES BAKER: Again, sir, as I think we've notified the committee and we've had these conversations with Twitter as well to try to resolve this issue prior to coming up here today, I don't have anything in writing that clears me in my ethical responsibilities to my former client with respect to answering questions that I think fall squarely within the attorney client privilege.

So unfortunately, I don't think I can go beyond what I've said there already, sir.

JAMES COMER: Unfortunately, Mr. Baker, your assertion that the attorney client privilege, it's overruled as to this particular question and answer. So will you please answer the question by Mr. Jordan?

JAMIE RASKIN: Point of order, Mr. Chairman.

JAMES COMER: State your point.

JAMIE RASKIN: Well as I understand it, because we just went through this in the January 6th Committee where multiple witnesses asserted attorney client privilege, including people who weren't covered by it at all, ultimately that's for a court to decide, so I don't think there's anything we can do within the committee at this point unless I'm missing something.

JAMES COMER: We'll give you one more chance to answer the question. If you don't answer it, then we'll have to deal with it after the committee hearing. Mr. Baker, could you answer the question please?

JAMES BAKER: I apologize, but I believe I have ethical responsibilities to my former client and I don't think I can go beyond what I've said already unfortunately.

JIM JORDAN: Mr. Baker, you did suppress documents then that in your language was important to the public dialog?

JAMES COMER: I'm going to give you an extra minute, Mr. Goldman. Oh, you're very next.

DANIEL GOLDMAN: Thank you very much.

JAMES BAKER: I'm sorry, sir, could you repeat the question?

JIM JORDAN: Again, going on your written testimony, so you did suppress documents at Twitter regarding information that was important to the public dialog. That's a yes or no.

JAMES BAKER: I'm going to answer the question with the following sentence, which is right after that. At all times I sought to help my client understand and comply with its legal obligations.

JIM JORDAN: OK.

JAMES COMER: Gentleman's time's expired. I recognize Mr. Goldman for six minutes.

DANIEL GOLDMAN: Thank you, Mr. Chairman. I understand that Mr. Palmer was asking some questions about some of my assertions about the removal of the Ukrainian Prosecutor General. First, let's be clear, I did not say that Vice President Biden fired Mr. Shokin. It was official US and European policy to encourage Ukraine to fire him which they did.

But he is right about one thing. What I say is not evidence and neither is what any of our Republican colleagues say on the other side of the aisle. They may not like what these witnesses say, but the testimony of the witnesses is the evidence not baseless statements without firsthand knowledge. But I urge Mr. Palmer, if he wants to understand what actually happened, to read the 300 page report that we published on the first impeachment investigation.

There's a lot in there about Mr. Shokin. Luckily though, he doesn't even have to do that. You can just read the New York Post story itself, because in that story, Shokin admitted that he never opened an investigation into Burisma. He claims to have had quote, "specific plans to do so." Yeah, sure. For two years, Rudy Giuliani had been peddling Viktor Shokin's bogus story including with agents of Russian intelligence.

And Chairman Comer, if you question that, I urge you to look up Andre Derkach. So who was the sole source of the hard drive to the New York Post? Rudy Giuliani. And for these reasons, many journalists were highly skeptical. One reporter at the New York Post itself refused to put his name on the story. Fox News's Bret Baier said quote, "The whole thing is sketchy," unquote.

And both Giuliani and the Post refused to give the laptop to other journalists to verify and analyze it. In fact, Giuliani told the New York Times that he hoped that it would be published before it could be verified. So, what is the so-called authentication for this laptop? Well, Chairman Comer said in his opening statement that it's a subpoena to the computer repair shop owner, which happened about a year before the New York Post story.

But that is not the same hard drive that Rudy Giuliani received months later from that repair shop owner and passed along to the New York Post after he was in possession of it for several months. Now Mr. Baker, based on your understanding of Russian malign influence campaigns, does Russian intelligence have the capacity to manipulate a hard drive?

JAMES BAKER: Yes.

DANIEL GOLDMAN: So it is possible that some of the materials on a hard drive could be authentic and some could be altered, manipulated or even added to the hard drive. Is that right?

JAMES BAKER: I believe so, yes.

DANIEL GOLDMAN: Mr. Roth, you have testified today that Twitter was keenly aware of the hacking efforts by Russia in connection with the 2016 election. Is that right?

YOEL ROTH: Yes, sir.

DANIEL GOLDMAN: And those efforts I believe you said, and correct me if I'm wrong, by Russian intelligence to interfere in our electoral process continued up and through and including the 2020 election, is that right?

YOEL ROTH: Russian efforts certainly continued through the 2020 election and even through the midterms. I couldn't say specifically if it was military intelligence as was the case in 2016, but certainly the Russian government was involved.

DANIEL GOLDMAN: So let's run down what Twitter knew about this hard drive in this story when it was published. First, the sole source of the hard drive was Rudy Giuliani, who had been working closely with Russian intelligence agents throughout 2020. Second, Russian intelligence interfered in the 2016 election and was actively trying to do it again.

And third, numerous journalists, including at the New York Post and Fox News, raised suspicions about the hard drive and they refused to allow an independent analysis and verification of it. Now Mr. Baker, based on your experience in law enforcement, wouldn't this give anyone concerned about Russian interference in our election serious pause?

JAMES BAKER: Well, I think as reflected in the public record, at the time, I thought there were great concerns on that side of the equation, because in part with respect to all the things that had happened in 2016 with respect to the hack and leak, or hack and dump issues, there were facts that indicated that the computer might have been abandoned and so on, but which made it a very difficult case, which is why we're sitting here today talking about it.

DANIEL GOLDMAN: Right, and there was a 24-hour delay in continuing to spread the publication of it, isn't that right?

JAMES BAKER: Yes.

DANIEL GOLDMAN: OK. You know, that is exactly what 51 former intelligence officials, many from Republican administrations, even the Trump administration, said in that letter that is being distorted by Mr. Jordan and others at this hearing. Let me quote one paragraph of what they say. "We want to emphasize that we do not know if the emails provided to the New York Post by President Trump's personal attorney, Rudy Giuliani, are genuine or not and that we do not have evidence of Russian involvement." Just that our experience makes us deeply suspicious that the Russian government played a significant role in this case.

And unless Twitter, like Special Counsel Mueller concluded about the Trump campaign in 2016, wanted to welcome Russian interference in an election, all of you sitting here today were entirely correct to be highly concerned about the legitimacy of this story. I yield back.

JAMES COMER: Chair recognizes Mr. Higgins for five minutes.

CLAY HIGGINS: Thank you, Mr. Chairman. I'm going to be yielding some time to my colleague, Mr. Jordan here momentarily, but for the record Mr. Baker, Ms. Gadde, Mr. Roth, Ms. Navaroli, are you here on the advice of counsel and do you have counsel present?

JAMES BAKER: Yes, sir.

CLAY HIGGINS: That was a yes.

JAMES BAKER: Yes, sir.

VIJAYA GADDE: Yes, sir.

YOEL ROTH: Yes, I do.

ANNIKA COLLIER NAVAROLI: Yes, I was subpoenaed.

CLAY HIGGINS: That's good to know. I'm glad you all have counsel present. Mr. Chairman for submission for the record, I would like consent to submit to Twitter Files dated December 8 posted about a New York Post regarding a suppression of conservative commentators. I would like that submitted.

JAMES COMER: Without objection, so ordered.

CLAY HIGGINS: Mr. Chairman, thank you. I'd like to also submit for the record a timeline of events which cited sources outlining strong evidence of the Biden family organized criminal actions would certainly indicate that we've crossed that threshold of reasonable suspicion. I'd like this timeline submitted for the record.

JAMIE RASKIN: Excuse me, Mr. Chairman. Where is that from, that timeline?

CLAY HIGGINS: Timeline in my hand Boss Up. I'll get it to you shortly. Bottom line is that the FBI had a Biden crime family laptop for a year. They knew it was leaking. They knew it would hurt the Biden campaign, so the FBI used its relationship with Twitter to suppress criminal evidence being revealed about Joe Biden one month before the 2020 election.

You ladies and gentlemen interfered with the United States of America 2020 Presidential election knowingly and willingly. That's the bad news. It's going to get worse because this is the investigation part. Later comes the arrest part. Your attorneys are familiar with that. Mr. Chairman, I'd like to spend five hours with these ladies and gentlemen doing depositions surely yet to come.

But for right now, I'll yield the balance of my time to my colleague, Mr. Jordan.

JIM JORDAN: I thank the gentleman for yielding. I think you made the right point, and I would just respond to our colleague from New York. You know who knew the laptop was real was the FBI, they had it for, or maybe they had it for a year and just said, you know what we're going to put on the shelf, we're not going to look at it. But if anyone knows real it's them.

That's why I ask the question, again back to my colleague from New York what he was talking about, that's why I asked the question earlier, I said did anyone at the FBI, Mr. Baker would know, Mr. Baker talk to any of those 51 former intel officials who sent the letter saying this has all the classic earmarks of a Russian misinformation operation?

Maybe they could have checked with the FBI because the FBI had the actual laptop in their possession. So I appreciate the gentleman from Louisiana. I think it's a great point that he made. Mr. Roth, I'm going to come back to you and something we were at a few hours ago, and we're talking about this visibility filtering, which in my mind I understand to be something short of suspending and blocking the account which the user then knows has happened because there's a notification in a public way like you did to Miss Greene when you suspended her account.

But there's other things, this search blacklist, this do not amplify that are some kind of filtering that account that the user doesn't know about. And I asked the question earlier, was there any bit of this visibility filtering that was hard coded by Twitter employees into the account of specific users?

And you said, you hesitated for a while and you said, well you wouldn't use the term hard coded, but it seemed to me like something like that went on. Can you elaborate?

YOEL ROTH: Thank you for the question. Twitter's visibility filtering system as has been reported in the Twitter Files, is based on applying labels to user accounts. And so in that sense, if the application of a label is what you meant by hard coded, yes, Twitter's systems did apply those designations to those accounts.

But it was seldom the case that Twitter staff would manually individually go in and apply those labels directly.

JIM JORDAN: Were any government officials, were those labels and therefore that filtering done to any government officials, any elected officials where the user wouldn't know about?

YOEL ROTH: I don't know, sir. I didn't have access to my Twitter computer or to any Twitter systems to prepare me to answer that question.

JIM JORDAN: I'm just talking your time there, in your experience there. Do you know if that happened?

YOEL ROTH: It would not surprise me to know that visibility filtering labels had been applied to the accounts of elected officials.

JIM JORDAN: So visibility filter labels applied to the accounts, but the user doesn't know.

YOEL ROTH: Yes. It was not Twitter's practice to notify users if that [inaudible].

JIM JORDAN: But you think that happened to elected officials and government officials?

YOEL ROTH: Again, I couldn't say for sure.

JIM JORDAN: I appreciate. I yield back.

JAMES COMER: Chair recognizes Mr. Mfume for five minutes.

KWEISI MFUME: Well, Mr. Chairman, it's been a long morning and afternoon, and at this point in time, there's an adage that says, everything that can be said has been said, except that not everyone has said it. So if you will indulge me for a few minutes, I'd just like to reflect on some observations having sat here and gone through this.

And I'm hoping and praying that this is not a problem in search of a solution, because we're dedicating an awful amount of time here and I don't want a few things to escape us. But having said that, I want to first associate myself with the remarks of Mr. Raskin, the ranking chair, his opening remarks succinctly, I think encapsulated and put in place what many of us on this side of the aisle are feeling.

And I also, as a point of personal privilege, would like to just express how many of us share the concern of the gentlewoman from South Carolina, who indicated her ongoing medical condition, which she said she might have to live with the rest of her life that just got me for a moment and I wanted to make sure that that's on the record.

Now I would disassociate myself with her remarks when she said, as did the gentlewoman from Georgia, God bless Elon Musk. For me it's God bless my country, God bless my family, God bless my friends. Mr. Musk can take care of himself. I would also caution if I might all of us, but particularly the gentleman from South Carolina who said earlier that there is proof that Hunter Biden committed multiple felonies.

The gentleman said that without offering anything for the record, and I know we're all covered by Congressional immunity in terms of when we're on the floor and when we're in these committees, but sometimes we probably don't want to feed into hot rhetoric. I mean, we campaign in that kind of poetry, but we are elected to govern in prose.

And when you do that, there's a different sense of responsibility that goes with all of us. Mr. Roth, I listen to you and I feel bad that you were attacked and you had to sell your home, you had to move your family. And I just want to remind you and remind myself that there are members of this committee who are also always under attack because of their race, or because of their surname, or because of their political affiliation.

That kind of reckless incitement I think is best dealt with when you have content moderation. Otherwise, we gin up the rhetoric. The people who can't control themselves oftentimes don't, and then we see violence occurring against whether it's members of Congress through threats or persons like yourself in the private sector.

Ms. Navaroli, you in your testimony, stated that on the morning of January 6, that you sent lawyers a message warning them that your team was hamstrung by leadership. And two days later, when it looked like that might happen again, you asked the management whether or not they wanted more blood on their hands.

What was their response and what did they do?

ANNIKA COLLIER NAVAROLI: Yes, thank you for that question On the morning of January 6, I did send that message to a Twitter lawyer, specifically because I believe that Twitter was going to be facing liability for what was going to occur that day. I do not remember their exact response, but I do remember there coming in a response of confirming that the information had been received.

Would you repeat the second question that you asked?

KWEISI MFUME: I wanted to know what was their response? What did they do?

ANNIKA COLLIER NAVAROLI: Nothing.

KWEISI MFUME: OK. You went on to say that in January 2020, after the United States assassinated an Iranian general, that the President, at that time Mr. Trump, decided to justify it on Twitter, and management literally instructed you to make sure that we were not about to start World War Three on that platform? Is that correct?

ANNIKA COLLIER NAVAROLI: Yes, that did occur.

KWEISI MFUME: And what happened after that?

ANNIKA COLLIER NAVAROLI: It was up to me and my team to create what we called enforcement guidance. So we document that explained how we would apply our policies specifically related to content moderation in that specific instance. I believe the document was relating to foreign policy discourse.

KWEISI MFUME: So, my point here about content moderation on the front end prevents some of the crazy things we see on the back end. Mr. Chairman, I have from the Anti-Defamation League, their latest report on murder and extremism in the United States, oftentimes fueled by the lack of content moderation, and I would ask unanimous consent it be entered into the record.

And I also have the National Threat Assessment done by the Secret Service of our country. This was just released, and it talks about how 25 percent of all of these acts are being conducted by people who are not moderated, but who in fact end up breaking the law and threatening the lives of people. And I would ask unanimous consent that also be ...

JAMES COMER: Without objection, so ordered.

KWEISI MFUME: Thank you, sir.

JAMES COMER: Chair recognizes Mr. Sessions for five minutes.

PETE SESSIONS: Mr. Chairman, thank you very much. So I will say, God bless Elon Musk, because I think I feel that way. It was Elon Musk that revealed data that uncovered a disturbing cabal. Let's be clear, we're here today because Twitter got caught, not because people want to admit mistakes got made or perhaps because they got bought.

If not for the Twitter Files released by Mr. Elon Musk, this activity we're discussing today would still be going on. It's no secret that the political bias of Twitter and their previous leadership bled into politics and merged that with practices of the company and that is a big concern. But a bigger concern is where our government on a political basis by law enforcement becomes engaged in things that a timeline would show were not truthful.

That's the concern. The fact that Twitter was working hand in glove with the Federal Bureau of Investigation and the intelligence community to suppress free speech and things that were not true is disturbing. That is why we are here today. So Mr. Roth, I would engage you if I could for a minute. By the way, I want to compliment all four of you.

You've been here all day. This is hard to do. You've kept your cool. To the best of your ability you're expressing honesty. I admire that. Mr. Roth, can you please tell me about the meetings with the FBI. How many, where did they take place? How do they accomplish what they wanted?

YOEL ROTH: Thank you for the question.

PETE SESSIONS: Yes, sir.

YOEL ROTH: Twitter met with the FBI, I would estimate several dozen times over the course of multiple years. These meetings happened in person in the Twitter office, in the offices of other technology companies, and at times they happened virtually. We issued press releases about these meetings. They were not happening in secret.

They were not anything that the public sector or the private sector strove to hide from anybody. But in these meetings, we used it as an opportunity to discuss the shared threats of foreign malign interference, to discuss the preparations that the public and private sector were implementing, and to use that as an opportunity to make sure that we were having open channels of communication about those malign interference threats.

PETE SESSIONS: Mr. Roth, do you at any time believe that the bureau might not be honest about the things they knew and the information that they shared and passed to you?

YOEL ROTH: I would say I have a personal healthy skepticism about any type of law enforcement. But no, it was never my experience that representatives of the FBI were anything but forthright in those discussions.

PETE SESSIONS: Do you believe that they, today in looking back, misled you?

YOEL ROTH: I don't believe so, no.

PETE SESSIONS: So you believe that the things which they told you in looking back are truthful even today?

YOEL ROTH: To the best of my recollection, yes.

PETE SESSIONS: So the chance for FBI numerous times, dozens of times to meet with you, did you put out information of the substance when you said you provided the public with information? Did you discuss what those meetings were about?

YOEL ROTH: I believe the public statements were fairly high level and talked about preparations for upcoming elections in the United States. Any internal records or meeting minutes would be on my Twitter computer, which I don't have access to.

PETE SESSIONS: And does that reside to the best of your knowledge currently at Twitter?

YOEL ROTH: Yes, sir, I've returned all Twitter property to the company when I chose to leave.

PETE SESSIONS: Yes, and that would be a requirement generally speaking.

YOEL ROTH: Yes.

PETE SESSIONS: So you believe that the bureau met with you, they did not mislead you, that you were as forthright as you could be to the public, and that you were playing the role that you felt like was responsible. Is that your testimony today?

YOEL ROTH: Yes, sir, it is.

PETE SESSIONS: Thank you very much. Mr. Chairman, I yield back.

JAMES COMER: Gentleman yields back. Oh yes, I'm sorry.

JARED MOSKOWITZ: Thank you, Mr. Chairman. You know I'm beginning to, I'm beginning to feel like a little bad for the Majority, like I just feel guilty, because you guys have come today to try to prove that the Biden administration, in coordination with Twitter, is impeaching, impugning free speech. And the problem is that Donald Trump, he is just this thing that hangs around your neck, because at every turn he undermines whatever credibility you want to have on this subject.

I mean, Donald Trump and his administration, it's been proven, reached out to Twitter to take down tweets that got under his skin. The tough guy, Donald Trump, right. He got called the B-word. Let's reach out Twitter. Let's get the tweet taken down. You guys have no credibility, You have none. Your own guy taking free speech off of Twitter.

You know, I also don't understand this bipolar thing that you're doing with Joe Biden. So every day you guys tweet out, Joe Biden is boring, he's sleepy. Every day you say it on TV. Now you want to tell the American people, Joe Biden is an international super mastermind along with his son Hunter. I mean it's just bananas.

The Trump family is getting billions of dollars of loans from foreign governments by using their White House relationships. Any questions? Any questions on that? No, I didn't think so. You want to know if the Trump family made any money selling PPE during the pandemic out of the West Wing? Any questions about that?

No, I didn't think so. But let's move on to Hunter Biden's laptop. Your leaker, I always love this by the way, you guys are against leakers unless they're leaking things you like, your leaker, Mac Isaac, and I love, you know, have you seen this guy? I mean he's like a RadioShack Dot Matrix guy who copied files off a private citizen's hard drive, OK. That's your entire theory is based off of. But I want to use his words.

This is his own words. Your guy, your leaker, the guy who gave you the information. "There have been several attempts by several individuals to modify and insert fake data. I do know there has been multiple attempts over the past year and a half to insert questionable material into the laptop to pass off information or disinformation as coming from the laptop." He continued.

"This is a major concern of mine, because I fought tooth and nail to protect the integrity of the drive and to jeopardize that is going to mean everything I sacrificed will be for nothing." Your guy, your leaker questioning the integrity of the information you guys are peddling. By the way, why isn't he here?

Bring him here. Let's ask him questions. And why haven't we seen the hard drive? You guys aren't shy. Why won't you show it to the American people? Let's talk about Twitter. Let's talk about God bless Elon Musk. See these? God bless the guy who is allowing Nazis and anti-Semitism to perpetrate Twitter. Been a 66 percent increase of anti-Semitism on Twitter since Elon Musk set it free.

Mr. Chairman, I agree with you. It's not fair to say all conservatives are Nazis. That's preposterous. That's not true, but your lord and savior Donald Trump is having tea and dinner with them at Mar-a-Lago. Nick Fuentes right here, who has a picture that is tweeted at me all the time saying, Jews are a virus in response to my tweets.

Donald Trump's having dinner with him. Nazis at Mar-a-Lago. And so no, not all Republicans are Nazis. But I got to tell you, Nazis seem really comfortable with Donald Trump. So I have questions about that, Mr. Chairman. Why is that? Why do I get these tweets? Let's talk about Kanye West, right. The chairman of the Judiciary Committee for three months praising Kanye West.

We love Kanye right? A Nazi, clearly now. It took months for that tweet to come down. How come? I mean, these are things I'd love to know. Is it because maybe they're your voters? I mean, they certainly aren't voting for me. I yield back.

JAMES COMER: Chair recognizes Mr. Langworthy for five minutes.

NICHOLAS LANGWORTHY: The Twitter Files reveal the unrestricted power and censorship regularly exercised by the three witnesses in front of us today, Mr. Roth, Ms. Gadde and Mr. Baker. Now Ms. Navaroli, in your opening you stated that too few people in companies have too much power. Well, I think you're right. The witnesses here today, they had too much power at Twitter and they tried to play the role of God as they interfered with the natural right of the people to a free and fair election.

Twitter knowingly suspended the New York Post's account, one of the most reliable conservative voices in the country, in fear that an honest story would swing the most divisive election in American history into the hands of their enemy, former President Donald Trump. Now, Mr. Roth, you are part of the secretive CPS censorship team at Twitter, correct?

YOEL ROTH: No, sir, I'm not sure what that refers to.

NICHOLAS LANGWORTHY: Mr. Roth, the Twitter Files reveal that you rarely adhere to company policy in making your censorship decisions. One reporter from the Twitter Files called your group a quote, "high speed Supreme Court of moderation issuing content rulings on the fly, often in minutes based on guesses, gut calls and even Google searches in cases even involving the President." Do you recall making decisions in this manner?

YOEL ROTH: No, I do not.

NICHOLAS LANGWORTHY: Can you explain the process for these quick decisions?

YOEL ROTH: Thank you for the question. I think the core of content moderation, whether it's fast or slow, begins with a written set of rules and policies, and that was the primary responsibility of my group at Twitter. It wasn't about making a one-off decision in the moment. It was about having a written and codified set of laws for the platform that we followed in each instance.

In the vast majority of cases, content moderation decisions were not made by me or by another executive or even by a member of my direct team. They were made by hundreds of content moderators enforcing those rules again and again and again. The situations in which decisions would be escalated to senior executives were few and far between, and largely related to the really hard gray area calls.

NICHOLAS LANGWORTHY: So Mr. Roth, as part of the quote Supreme Court of moderation in Twitter, did you have the final call over political censorship decisions?

YOEL ROTH: No, sir, I did not.

NICHOLAS LANGWORTHY: Then who had the final call in these decisions?

YOEL ROTH: There is a team of people, some of whom are represented on this panel today, others not, who were involved in trying to make these decisions, but a portrayal that any one person held sort of supreme or ultimate authority over these decisions would misrepresent what the process was.

NICHOLAS LANGWORTHY: So your team labeled high profile accounts as VITs standing for very important tweeters. What was the threshold for being labeled as a VIT?

YOEL ROTH: That's an excellent question for which there is not a consistent answer. I don't think Twitter was particularly well put together on that definition.

NICHOLAS LANGWORTHY: So was the New York Post labeled a VIT?

YOEL ROTH: I believe the New York Post's account is verified, and verification conferred some of that status of being a VIT, but again the definitions here are a little squishy.

NICHOLAS LANGWORTHY: Now is it true that the Twitter comms director, Trenton Kennedy said in regard to the Post story, I'm struggling to understand the policy basis for marking this unsafe?

YOEL ROTH: Yes, It's my understanding that Mr. Kennedy said that.

NICHOLAS LANGWORTHY: Was the New York Post story regarding Hunter Biden's laptop marked unsafe regardless of uncertainty?

YOEL ROTH: It is true that Twitter marked links to that story as unsafe in a number of our systems which resulted in restricting people's ability to tweet it. That was the decision that Twitter reversed 24 hours later.

NICHOLAS LANGWORTHY: Well, it's clear from this panel that too few people had too much power. The New York Post Twitter account was suspended in an attempt by Democrats and big tech to go ahead and play God and interfere in a natural free and fair election and the free flow of information in this country, the censorship is unbounded.

The New York Post has been a reliable source for decades, including their coverage of the nursing home scandals in New York during the pandemic. Now that you and many others are gone from the company, there is hope that this platform will once again be a place where voices can be heard and respected, and it can return to be a town hall for all points of view no matter if you agree with them or not, sir, and that our elections will never again be controlled by big tech.

I yield back.

JAMES COMER: Will the gentleman yield to Jordan? Mr. Jordan.

JIM JORDAN: OK, thank you. Mr. Roth, in Missouri v. Biden, your declaration to the FEC you said, I also learned in these meetings with the government that a hack and leak operation would involve Hunter Biden. Mr. Chan has testified in his deposition in that same case. In my estimation, we never discussed Hunter Biden specifically with Twitter.

Who told you about Hunter Biden in these meetings?

JAMES COMER: Gentleman time's expired but answer the question.

YOEL ROTH: My recollection is that a representative of another tech company may have mentioned it, but those meetings were several years ago. I truly don't recall.

JIM JORDAN: OK.

JAMES COMER: Chair recognizes Ms. Stansbury for five minutes.

MELANIE STANSBURY: Thank you, Mr. Chairman. And I want to just start this afternoon by thanking our panelists who have been sitting here all afternoon and many of the members of the public who are with us. I see a lot of tired faces out there, and I want to thank you all for spending your day with us. But I also want to start out by asking what are we doing here in this committee today?

Why are we here? Why is this committee devoting a day-long hearing to a political conspiracy theory that was planted in the media by Rudy Giuliani to support Donald Trump's reelection campaign? Of all the topics we could be focused on in this committee to support the American people, how people are going to put food on their table at the end of the day, how we're going to address the economy, how we're going to address critical issues that are on people's minds every day, we are devoting an entire day to this conspiracy theory involving Twitter.

Now the mission of this committee is to root out waste, fraud and abuse and to conduct oversight on behalf of the American people. And if you need any evidence of waste, fraud and abuse, how about the use of this committee's precious time, space and resources to commit to this hearing? You know, I don't even understand why we're here right now, but I do want to clarify some key facts about what we've heard today.

So, I'm going to get into it for just a few moments. Ms. Gadde, thank you for being here today, Mr. Baker. You have already stated publicly that Twitter's handling of this issue was a mistake. Is that correct? Yes or no, is fine.

VIJAYA GADDE: Yes, that's correct.

JAMES BAKER: I don't think I have stated that publicly yet, but that is what the CEO of the company said.

MELANIE STANSBURY: Yes, and at the time only weeks before, one of the most consequential elections of our lifetime in 2020, Twitter made a decision based on policies put into place to protect the public from political disinformation and from foreign interference. Is that correct, Mr. Roth?

YOEL ROTH: Yes.

MELANIE STANSBURY: In fact, the failure of Twitter and other social media companies to moderate political disinformation not only fueled its use in election tampering in 2018, but it allowed for election denialism to run rampant in 2020, and that is exactly what led to the insurrection here on January 6, in the Capitol. So Ms. Navaroli, I want to ask you, thank you for sitting here all day answering these questions, do you believe that Twitter has put into place policies that would adequately protect free speech, but also protect the American people from another violent insurrection and the kind of hate speech that we are seeing run rampant right now on the platform?

ANNIKA COLLIER NAVAROLI: Thank you for that question. I cannot speak to Twitter's current policies because I have not worked there in quite some time. But I can say that my job at Twitter was to balance free expression and safety. And one of the things that I constantly pushed for was for us to include more analysis within that simple balancing act.

And instead of asking just free expression versus safety to say, free expression for whom and safety for whom. So whose free expression are we protecting at the expense of whose safety, and whose safety are we willing to allow to go to the wind so that people can speak freely?

MELANIE STANSBURY: Exactly, right? Because Twitter refused to sanction Donald Trump's account long before it was actually banned, when violent rhetoric and other rhetoric was already being used on the platform. And in fact, since the latest acquisition of Twitter by Elon Musk, the company's Trust and Safety counsel is represented here today, has been dissolved and the accounts of individuals like Donald Trump, who incited violence in the Capitol, have been restored.

And we are seeing anti-Semitism, hate speech, dangerous rhetoric, violence being put on Twitter every single day. Election tampering, disinformation, violence, the attack on our capital. Mr. Chairman, that is what we should be holding oversight hearings on in this committee. I have traveled to every corner of my district, and New Mexicans are depending on us to defend our democracy and to ensure that we are holding, not only those who are committing waste, fraud and abuse accountable, but ourselves.

So let's not waste the precious taxpayer's time and dollars holding hearings about four seasons landscaping-style conspiracy theories and actually get to work for the American people.

JAMES COMER: Would the gentlelady yield to the question?

MELANIE STANSBURY: Mr. Chairman, I yield back.

JAMES COMER: Chair recognizes Ms. Boebert for five minutes.

LAUREN BOEBERT: Thank you, Mr. Chairman. Mr. Matt Taibbi, a respected reporter who published much of the Twitter File said quote," Twitter's contact with the FBI was constant and pervasive as if it were a subsidiary." Now I want to better understand why he would suggest that. Mr. Roth, while at Twitter, how many meetings did you have with the FBI?

YOEL ROTH: I couldn't say for sure, but I would say ...

LAUREN BOEBERT: More than ten.

YOEL ROTH: That's a reasonable estimate.

LAUREN BOEBERT: More than 20.

YOEL ROTH: I couldn't say for sure.

LAUREN BOEBERT: More than 50.

YOEL ROTH: That seems a bit high.

LAUREN BOEBERT: Many meetings with the FBI. Well, how many FBI agents worked at Twitter while you were there?

YOEL ROTH: I don't believe any active FBI agent.

LAUREN BOEBERT: Former FBI agents, how many worked there while you were there?

YOEL ROTH: I'm aware of perhaps two.

LAUREN BOEBERT: Well, we know of at least nine, because they started the BU group chat, BU for bureau. Now Mr. Roth, did the FBI ever ask you to share information like users' communication data without going through proper legal channels?

YOEL ROTH: No, they did not, and I would have refused if they had.

LAUREN BOEBERT: That's correct. I see that you denied Agent Chan's request for access to Twitter's data feed. What's sick isn't that you would deny it, it's that the FBI would even ask you for the private data of American citizens without going through legal channels of the law. Now I want to remind you, Mr. Roth, that you are under oath.

Did the FBI ever ask you to do anything that was illegal or questionably legal?

YOEL ROTH: I'm not a lawyer, but certainly not to the best of my recollection or knowledge.

LAUREN BOEBERT: Now from the hearing that I've been a part of today, it's almost impossible to tell where the FBI ends and where Twitter begins. We have Mr. Baker here, a former FBI agent, and there seems to be a revolving door between the FBI and Twitter itself. Even Mr. Baker said that there was no collusion with the federal government and Twitter.

But Mr. Baker, that's you. You are the collusion between the federal government and the FBI. And now this is such a problem because we're seeing censorship all over. Mr. Roth, Ms. Gadde, did either of you approve the shadow banning of my account at Lauren Boebert? Yes or no.

YOEL ROTH: No, I did not.

VIJAYA GADDE: Not to the best of my recollection,

LAUREN BOEBERT: Well, let me refresh your memory because on March 12, 2021, and Mr. Roth, I know you looked at it because fascist Twitter 1.0 had a public interest exceptions policy, which means for members of Congress to be shadow banned, it had to go before you, Mr. Roth. So I'll ask again, did you shadow ban my account?

Yes or no?

YOEL ROTH: Again, not to the best of my recollection.

LAUREN BOEBERT: So the answer is Mr. Roth, yes, you did. I found out last night from Twitter staff that you suppressed my account for this tweet, "It's a freaking joke about Hillary Clinton being angry that she couldn't rig her election. It's a joke." But in response, being the sinister overlords that you all are, you placed a 90 day account filter so I could not be found.

And now we see here that Twitter staff said the visibility filter on my account excluded me from top searches, prevented notifications for non-followers and much more. This is considered an aggressive visibility filter. You silenced members of Congress from communicating with their constituents. You silenced me from communicating with the American people over a fricking joke.

Now who the hell do you think that you are? Election interference? Yeah, I would say that that was taking place because of you four sitting here. The Hunter Biden laptop story was suppressed. A sitting member of Congress was suppressed. A sitting President was banned from Twitter. You know, I bet that Putin is sitting in the Kremlin wishing he had as much election interference as you four here today.

We've heard about threats to democracy. Well, what about shutting down a duly-elected member of Congress? This is fundamental to our nation's governance, and you all attacked that very foundation. 230 protections. Well, those are for publishers not for editors, and it's clear you were not acting as publishers, you were acting as editors.

And Mr. Chairman, I think it's far past time that we remove 230 protections for big tech platforms who are abusing this protection. And let me just say, I'm not angry for myself. I'm not angry because I was silenced. I can reach out to Elon and to his staff, and I can see what's happened, and I can sit here today and hold you all in account.

I am angry for the millions of Americans who were silenced because of your decisions, because of your actions, because of your collusion with the federal government. They can't reach out to Elon. They can't sit here today and hold you into account. We don't know where the FBI ends and Twitter begins.

JAMIE RASKIN: Mr. Chairman, we're over 17 seconds here.

LAUREN BOEBERT: But I do want to thank Elon Musk for firing you four and saving free speech and even Twitter. Mr. Chairman, I yield.

JAMES COMER: The lady yields. Went over 24 seconds. Now I'll give Ms. Porter 24 extra seconds.

KATIE PORTER: Well, I appreciate your indulgence, Chairman Comer, but I won't need it. So today's hearing gaveled in at 10 am for nearly six hours, we have been going back and forth about this supposed suppression of a single news story from a single outlet for a single day. This hearing has been in its length nearly one quarter of the amount of time that Twitter users could not share the link.

We are spending almost as much time screaming about this as we are this was ever a problem. Look, criminal activity is always a concern, but if, if there is criminal wrongdoing on Hunter Biden's laptop, that is a matter for the FBI and our law enforcement agencies. Today's hearing is merely an exercise in misinformation and disinformation, a free-for-all hellscape.

That's what now CEO Elon Musk said Twitter would become if the platform became a place where anyone could say anything with no consequences. It is unbelievable to me that I am quoting Elon Musk, but that is how ridiculous this hearing has become. The Oversight Committee, like Twitter or any other social media company for that matter, cannot become a free-for-all hellscape where anything goes.

With that Mr. Chairman, I yield back.

JAMES COMER: The lady yields back. Thank you.

LAUREN BOEBERT: Mr. Chairman?

JAMES COMER: Ms. Boebert?

LAUREN BOEBERT: I ask unanimous consent to submit two documents into the record, both from Twitter.

JAMES COMER  Without objection  so ordered

LAUREN BOEBERT: Thank you.

JAMES COMER: Chair recognizes Ms. Luna for five minutes.

ANNA LUNA: Thank you, Chairman. Mr. Roth, have you communicated with government officials ever on a platform called JIRA? Yes or no. Real quick answer. we're on the clock.

YOEL ROTH: Not to the best of my recollection.

ANNA LUNA: Not to your recollection, great. If you did in the event communicate who would have had access to this platform?

YOEL ROTH: That's the nature of my confusion. JIRA ...

ANNA LUNA: OK. Did you ever speak to government officials on JIRA regarding taking down social media posts?

YOEL ROTH: Again, not to the best of my recollection.

ANNA LUNA: Can you explain to me why the federal government would ever have interest in communicating through JIRA, mind you a private cloud server with social media companies without oversight to censor American voices? I want to let you know that this is a violation of the First Amendment and the federal government is colluding with social media companies to censor Americans.

Mr. Chairman, I ask for unanimous consent to submit these graphics into record, and Mr. Roth, I'm going to refresh your memory for you. This flowchart behind me ...

JAMES COMER: Without objection, so ordered.

ANNA LUNA: Thank you, Chair. This flowchart shows the following federal agencies, social media companies, Twitter, leftists, non-profits and organizations communicating regarding their version of misinformation using JIRA, a private cloud server. On this chart, I want to annotate that the Department of Homeland Security, which has the following branches, Cybersecurity and Infrastructure Security Agency, also known as CISA, Countering Foreign Intelligence Task Force, now known as you Misinfo, Disinfo and Mal Information, MDM. This was again used against the American people, the Election Partnership Institute or Election Integrity Partnership EIP, which includes the following, Stanford Internet Observatory, University of Washington Center for Informed Public, Graphika and Atlantic Council's Digital Forensic Research Lab, and potentially according to what we found on the final report by EIP, the DNC. The Center for Internet Security CIS, a non-profit funded by DHS, the National Association of Secretaries of State also known as NASS, and the National Association of State Election Directors, NASED, and in this case, because there are other social media companies involved, Twitter.

What do all these groups though, have in common? And I'm going to again refresh your memory. They were all communicating on a private cloud server known as JIRA. Now the screenshot behind me, which is an example of one of thousands, shows on November 3, 2020 that you, Mr. Roth, a Twitter employee, were exchanging communications on JIRA, a private cloud server with CISA, NASS, NASED and Alex Stamos who now works at Stanford and is a former security officer at Facebook to remove a posting.

Do you now remember communicating on a private cloud server to remove a posting? Yes or no?

YOEL ROTH: I wouldn't agree with the characterization that this ...

ANNA LUNA: I don't care if you do. This is your stuff. Yes or no, did you communicate with a private entity, the government agency on a private cloud server, yes or no?

YOEL ROTH: The question was if I communicated ...

ANNA LUNA: Yes or no. I'm on time, yes or no.

YOEL ROTH: Ma'am, I don't believe I can give you a yes or no.

ANNA LUNA: Well, I'm going to tell you right now that you did and we have proof of it. This, ladies and gentlemen, is joint action between the federal government and a private company to censor and violate the First Amendment. This is also known, and I'm so glad that there's many attorneys on this panel, joint state actors.

It's highly illegal. You were all engaged in this action, and I want you to know that you will be all held accountable. Ms. Gadde, are you still on CISA's Cybersecurity Advisory Council? Yes or no.

VIJAYA GADDE: Yes, I am.

ANNA LUNA: OK. For those who have said that this is a pointless hearing, and I just want to let you guys all know, we found that Twitter was indeed communicating with the federal government to censor Americans. I'd like to remind you that this was all in place before January 6, so to say that these mechanisms weren't in place and to make it about January 6, I want to let you know that you guys were actually in control of all the content, and clearly we have proof of that.

Now if you don't think that this is important to your constituents and the American people from those saying that this was a pointless hearing, I suggest you find other jobs. Chairman, I yield my time.

KWEISI MFUME: Mr. Chairman, point of order.

JAMES COMER: Sure.

KWEISI MFUME: Yeah, I just want to call to the attention of the chair and members.

JAMES COMER: Yes, Mr. Mfume, you're recognized.

KWEISI MFUME: This is getting awfully close to witness intimidation and I would ask the chair to intervene.

JAMES COMER: I'm sorry, I didn't hear what you said, Mr. Mfume.

KWEISI MFUME: I said I would caution all members that we were getting very close to witness intimidation, right on the verge of it, and I would ask that the chair and the ranking member agree how we will proceed from this point on. It was the threats that were just made.

JAMES COMER: Ms. Ocasio-Cortez.

ALEXANDRIA OCASIO-CORTEZ: Thank you, Mr. Chairman. In follow up to that, I am curious about the committee's role or the committee's disposition. Accusing witnesses of a crime, discussing arrest, discussing these, making these allusions and threats, I want to clarify for the record, what is the committee's policy around threatening a witness?

JAMES COMER: We have the member decorum.

ALEXANDRIA OCASIO-CORTEZ: And around the rules of decorum, can we agree that threatening a witness comes close to broaching general decorum? It does broach general decorum of the committee.

JAMES COMER: With all due respect, Ms. Ocasio-Cortez, we don't agree that there were any witness threatening.

ALEXANDRIA OCASIO-CORTEZ: In threatening, when we discuss arrest, when we discuss a potential arrest of a witness, and alluding to a witness or a suggestion of a witness committing a crime, without evidence and without documents being supported to the record.

JAMES COMER: Can you be more specific?

ALEXANDRIA OCASIO-CORTEZ: When we talk about arresting a witness or when we talk about a witness, insinuating that a witness is lying without documentation, I fear that this constitutes threatening a witness, and then that will broach the rules of decorum of this committee. And I'd like to ask that we request witnesses be treated with respect.

Thank you.

JAMES COMER: Appreciate that and I will remind everyone of the member decorum and witness decorum to treat everyone with respect. I thank you Ms. Ocasio-Cortez. Do you have anything to add?

JAMIE RASKIN: No, I thank you and I agree with you, Mr. Chairman. I have a separate point of order I just wanted to raise which is it seems as if several members now seem to have access to some information from Twitter that people on our side don't have. And I would just hope that anybody who's communicated directly with Twitter or received any information relating to the witnesses who has that, who plans to use it, distribute to the committee in advance if that's OK.

JAMES COMER: I think a lot of the quotes and emails are on the laptop.

JAMIE RASKIN: Well I think that at least one member ...

JAMES COMER: And the Twitter Files, Twitter Files that Elon must has ...

JAMIE RASKIN: But one Member had indicated that she had received information directly from Twitter.

JAMES COMER: OK. Chair recognizes Mr. Edwards for five minutes.

CHUCK EDWARDS: Thank you, Mr. Chair and to our witnesses. Thank you for being with us today. I know it has been a long one. Just so that we're clear and to stage my next line of questioning, in December 2019, we've established that the FBI subpoenaed Hunter Biden's laptop from a computer store owner, and then we've established that nearly a year later, in October 2020, the Hunter Biden laptop story is published by the New York Post.

Within hours, Twitter and other social media companies began limiting the distribution of the Hunter Biden story. My question is for Mr. Roth. In September 2020, a few weeks before the New York Post published the first story on the Hunter Biden trading on his name, you participated in an exercise hosted by the Aspen Institute with other media outlets, social media companies and national security reporters.

Isn't that correct?

YOEL ROTH: Yes, I did.

CHUCK EDWARDS: And Mr. Roth, that event was hosted specifically by the Aspen Digital Hack and Dump Working Group. Is that correct?

YOEL ROTH: I know it was hosted by the Aspen Institute. I couldn't say who specifically within that.

CHUCK EDWARDS: Mr. Roth, this event was before the release of the Hunter Biden laptop story, correct?

YOEL ROTH: That's my recollection, yes.

CHUCK EDWARDS: And during that of a scenario that was discussed was a hypothetical October 2020 release of records related to Hunter Biden. Is that correct?

YOEL ROTH: Again, that's my recollection of the event, yes.

CHUCK EDWARDS: And Mr. Roth, did you participate in the design of this hypothetical scenario?

YOEL ROTH: Not to the best of my recollection, no.

CHUCK EDWARDS: Are you telling me that you never had any conversation with anyone regarding the contents of this scenario?

YOEL ROTH: No, sir, I didn't say that. I met with the Aspen Institute on a number of occasions. I wouldn't say that I was involved in the development of the scenario in a specific way, no.

CHUCK EDWARDS: So you're telling me that I will find no witnesses that would testify they had conversation with you regarding the development of this scenario?

YOEL ROTH: I genuinely could not say what other witnesses might or might not say.

CHUCK EDWARDS: Why was Hunter Biden chosen as the subject of this scenario just weeks before the October 14, 2020 publication of the first Hunter Biden story?

YOEL ROTH: I don't know.

CHUCK EDWARDS: But you participated in the conversation.

YOEL ROTH: I was invited to and joined an event hosted by the Aspen Institute, yes.

CHUCK EDWARDS: So surely there had to be some level of conversation as to why Hunter Biden was the topic in that scenario.

YOEL ROTH: Not that I can specifically recall.

CHUCK EDWARDS: Mr. Roth, representatives from Facebook attended this event also, correct?

YOEL ROTH: To the best of my recollection, yes.

CHUCK EDWARDS: And Mr. Roth, the FBI had Hunter Biden's laptop nearly a year before it was uncovered by the New York Post and before the Aspen Institute event. Did members of the US intelligence community participate in the September 2020 Hunter Biden Hack and Dump exercise?

YOEL ROTH: I don't recall.

CHUCK EDWARDS: Mr. Roth, I'd like to point you to a sworn statement that you previously made. I believe this was to the FEC. You've given a sworn declaration stating that federal law enforcement agencies communicated that they expected hack and leak operations by state actors might occur in the period shortly before the 2020 Presidential election, likely in October.

Is this your statement?

YOEL ROTH: Yes, it was.

CHUCK EDWARDS: And Mr. Roth, you said since 2018, you had been meeting with the office of the Director of National Intelligence, the Department of Homeland Security, the FBI and industry peers regarding election security, correct?

YOEL ROTH: Yes, sir.

CHUCK EDWARDS: And Mr. Roth, you were told there would likely be a hack and leak operation occurring in October. Is that correct?

YOEL ROTH: I believe the FBI has objected to the word likely or expected, but we certainly discussed that possibility with them.

CHUCK EDWARDS: Alright. Thank you. Mr. Chair, I yield back.

JAMES COMER: Gentleman yields back. Chair recognizes Ms. Bush for five minutes.

CORI BUSH: Saint Louis and I are here today to talk about the crisis posed by the power of private companies that operate social media platforms. Republicans are holding this hearing because of their ridiculous politically motivated obsession with Hunter Biden. This is a distraction from their inability again to govern.

And it hides the shared concerns raised by Republicans and Democrats alike about the vast power, impunity and lack of accountability of social media platforms. There are so many examples of these companies responding inadequately or inappropriately in crisis, that we have come to understand misconduct as the norm for social media giants and not an aberration.

Social media played a key role in fanning the flames of violence on January 6 in that attack on our US Capitol. The impact has spread all over the world. Last fall, after Reuters reported that disinformation about Chile's proposed constitutional referendum was traveling three times faster on social media platforms than facts, several members of this committee wrote to META, Twitter and TikTok demanding further action to reduce the dissemination, reduce the lies, reduce the hate.

They did nothing. Ms. Gadde, you were at Twitter on January 6, and asked repeatedly for a retrospective meeting to discuss what happened in the lead-up to that day. Management told you quote, "It wasn't a priority for the company." Why was it not a priority for Twitter to learn lessons from January 6?

VIJAYA GADDE: I don't believe you're referring to me. Apologies. I'm the chief legal officer. I did not make that statement.

CORI BUSH: Ms. Navaroli.

ANNIKA COLLIER NAVAROLI: Would you mind repeating the question?

CORI BUSH: Sure. On January 6, you were at Twitter and asked repeatedly for a retrospective meeting to discuss what happened in the lead-up to that day. Management told you quote, "It wasn't a priority for that company." Why was it not a priority for Twitter to learn the lessons from January 6?

ANNIKA COLLIER NAVAROLI: I can't speak to leadership's motivations or why it would not have been a priority for them. What I can say is myself and individual members of my team repeatedly asked that we do a retrospective to understand not just what happened on January 6, but leading into January 8, and the permanent suspension of the President.

CORI BUSH: And what can you say is Twitter's top priority?

ANNIKA COLLIER NAVAROLI: I can't speak to Twitter's top priority at this moment. I can say that again, my team's responsibility was to balance free expression and safety, and to ensure the safety and lack of harm for people on the ground.

CORI BUSH: Thank you. Twitter's top priority seems to be to maximize its profit. The people on this panel were among the top experts moderating content for equity and safety at Twitter, and your concerns were consistently steamrolled by executives pursuing profit. We know this situation must change, but I would argue that the structure of these corporations ensures this malpractice will continue.

These social media companies have shown themselves unfit to maintain a digital public square with almost universal usage and vast power. Their purpose is not to facilitate healthy fact-based discourse. It is to aggressively pursue profit for their billionaire executives and shareholders. Even when they make a good decision about removing a post or a user, it is only to make a profit.

This existential problem will not be solved by asking these for-profit corporations to tweak their approach around the edges. We need to re-envision what the Internet can be. Digital platforms, including social media are here to stay, but we need to make sure that they operate for the public good and not the private interests.

We need to invest in better alternatives to big tech, and we need to establish public ownership and control to ensure these platforms serve everyone fairly. Thank you, and I yield back.

JAMES COMER: Chair recognize Mr. Perry for five minutes.

SCOTT PERRY: Thank the chairman. I thank the witnesses. It's been a long day. Mr. Roth, going back to your statement Mr. Edwards talked about, I want to just kind of revisit that a little bit where it was communicated to you, at least through your statement by the FBI that there was expected hack and dump or hack and leak operations.

And that they would occur before the election, and that these at the bottom here, the meetings that were rumored and those meetings were rumored that the hack and leak operation would involve Hunter Biden. Subsequent to that. Well, first of all, who told you that? Did you get that, can you tell us where you got that information if you know?

YOEL ROTH: The subject of possible hack and leak was raised by a number of representatives of the FBI.

SCOTT PERRY: Was one of them Mr. Chan?

YOEL ROTH: Yes, Mr. Chan was a part of it.

SCOTT PERRY: OK. So are you familiar with the fact that in his testimony and in November 2022, that he says we did not see any similar competing intrusions to what happened in 2016? And of course you would have been talking to intelligence agencies and law enforcement agencies for some time, and they were referring to the 2016 hack and dump operation.

Are you familiar that he said that subsequent to you saying this, that they didn't have any evidence?

YOEL ROTH: I was not aware of Mr. Chan's deposition, no.

SCOTT PERRY: OK, that's fair. That's fair. Did they ever give you any evidence of the hack and dump operation that happened in 2016? And what I think I'm referring to is the allegation that the Clinton campaign, the DNC server was hacked and that that information was spread about through WikiLeaks or other information channels.

Did they ever give you any evidence of that occurrence during these discussions?

YOEL ROTH: That information was made public by the intelligence community in the Mueller report and by the Senate Intelligence Committee.

SCOTT PERRY: Yeah, evidence. Did they ever give you evidence, because as far as we know, CrowdStrike looked at the servers. Did the FBI ever look at the servers at the DNC to your knowledge?

YOEL ROTH: I think that would be a question better directed at the FBI.

SCOTT PERRY: Fair enough. But the point is you never saw any evidence, right? You're just taking it on, and I'm not blaming you because a lot of people want to believe the FBI. I've always wanted to believe the FBI. The question is, did they ever give you any evidence to believe that, because they're making the case, they're making the case that there's a hack and leak operation coming and it's going to be about Hunter Biden right before the election.

Did they ever give you any evidence?

YOEL ROTH: It didn't come up.

SCOTT PERRY: Yeah, I didn't figure it did. And then you all set up a secret channel between Twitter and the FBI. Who did that from the FBI? Was that Elvis?

YOEL ROTH: Mr. Chan was a part of that work, yes.

SCOTT PERRY: Yes, he was part of that. And so you set up and you actually set up a war room as well, right?

YOEL ROTH: I believe the FBI operated a war room.

SCOTT PERRY: OK, fair enough. And you participated in that.

YOEL ROTH: No sir, I did not.

SCOTT PERRY: You did not. Did Twitter participate in it?

YOEL ROTH: I believe Twitter may have sent a representative.

SCOTT PERRY: OK, fair enough. And then you did this tabletop exercise about Hunter Biden and about a leak about Hunter Biden that would come out right before the election, essentially ten days and that happened in September right before the election and you participated in that right?

YOEL ROTH: Yes, I did.

SCOTT PERRY: Who facilitated that exercise? I know the Aspen Institute, but who facilitated the exercise proper? Was anybody from a government agency facilitating any part of that? Were they involved in the discussions during the exercise?

YOEL ROTH: No, I don't believe so, no.

SCOTT PERRY: So they were just spectators.

YOEL ROTH: I wasn't aware that they were spectators either, but I don't recall exactly who was there.

SCOTT PERRY: I know you don't recall who was there. Then who facilitated? Do you recall that?

YOEL ROTH: My recollection is that the event was facilitated by Garrett Graff, who was a member of the Aspen Institute and Aspen Digital.

SCOTT PERRY: Alright. Do you find it odd now, after the fact and I know you've already testified here that you don't see, to Mr. Sessions, that you didn't see that you were misled or potentially duped. It sure seems highly coincidental. Would you agree, it at least seems highly coincidental knowing that the FBI had the laptop, that the FBI set up the war room and the channel and told you per your statement, that this was going to happen, do you find it highly coincidental that it actually happened and it was Hunter Biden at all?

YOEL ROTH: I want to be clear that my statement to the FEC does not suggest that the FBI told me it would involve Hunter Biden. That's a popular reading of that declaration, but it was not my intent. I think there is a coincidence there and I really can't speak as to how that came about.

SCOTT PERRY: Yeah, it's really coincidental. One last question. Did the CIA or the other governmental agency ever ask Twitter to look at something that violated Twitter's policy?

YOEL ROTH: I don't recall specific outreach by the CIA specifically.

SCOTT PERRY: Other government agencies what it was called in the Twitter Files.

YOEL ROTH: Yes, Twitter regularly received reports from government requesting review under our rules.

SCOTT PERRY: So the other government agency, that one, did they ever request information regarding violations of Twitter's policies? The CIA.

JAMES COMER: Gentleman's time's expired, but please answer the question.

SCOTT PERRY: I thank the chair.

YOEL ROTH:

Again, I don't recall specific contact from the CIA, no.

JAMES COMER: Chair recognizes Mr. Burlison for five minutes.

ERIC BURLISON: Thank you, Mr. Chairman. I've sat here listening. I'm glad to be last in rank. I get to listen to all the testimony, and what's become clear to me, there are a few things and that is that the censorship efforts of the big tech, the intelligence community and the media were all working in concert to affect the 2020 election.

I find it unbelievably ironic, and I hope others do too see the irony that people who were so concerned and hell bent and worried about the interference of outside groups on the 2016 elect election became willing participants to interfere in the following Presidential election. These three groups work together and it's clear, worked hand in hand to hide the truth for them from the American people.

The fact that the FBI had the Hunter Biden laptop, heck, it was in their possession for a year before the election is appalling. But that didn't stop them from spreading a lie and a bogus claim about it being Russian interference again. And you know, it's clear to Me why they reached out to you because they knew you would buy the lie.

They knew that an organization with 99 percent of its employees donating to Democratic candidates and efforts would absolutely not look at any information with a jaundiced eye. You would take it as the gospel truth. And so they knew that because it was clear from your tweets before that you have an opinion about the President.

You have an opinion about the Republican Party. And so when all of that leading up to the October 14, 2020, when the New York Post published its story, everything was already in place. So Mr. Roth, my question to you is, when 51 intelligence officials told us that Hunter Biden laptop was Russian disinformation, the Democrats, the mainstream media, the President all repeated this lie.

Now that you know what you know years later, do you still believe that the Hunter Biden laptop is not real or do you believe that it's real?

YOEL ROTH: Sir, I never held that belief.

ERIC BURLISON: Do you believe that the story is Russian disinformation?

YOEL ROTH: No sir. I didn't then and I don't now.

ERIC BURLISON: OK. I have a question for Mr. Baker. You started your role as Twitter's deputy general counsel in June 2020, correct?

JAMES BAKER: Yes, sir.

ERIC BURLISON: Who hired you for that role?

JAMES BAKER: Who specifically hired me? My boss was a person named Sean Edgett, who was the general counsel.

ERIC BURLISON: Sean Edgen?

JAMES BAKER: Edgett, E D G E T T.

ERIC BURLISON: Edgett And that's who you interviewed with?

JAMES BAKER: I interviewed with numerous people, but Sean was my boss.

ERIC BURLISON: Anyone that comes to mind outside of Sean?

JAMES BAKER: Ms. Gadde I interviewed with. Other, you're saying other people that I interviewed with at Twitter?

ERIC BURLISON: But ultimately the hiring agent was Sean Edgett.

JAMES BAKER: I'm not sure exactly who made the decision to be frank with you, but Sean was my boss.

ERIC BURLISON: OK. My next question is, when you were fired from Twitter in December 2022, after the release of the first installment of the Twitter Files, did you destroy any internal communications related to that first batch of the Twitter Files?

JAMES BAKER: As I said in my testimony, I didn't destroy any documents, period.

ERIC BURLISON: What reason were you fired?

JAMES BAKER: You'll have to ask Mr. Musk about that.

ERIC BURLISON: That was not given, you're not given any information?

JAMES BAKER: He made a public statement about it in a tweet, but I think you would have to ask him for the precise reason.

ERIC BURLISON: OK. Thank you. Back to Mr. Roth. Is it true that Twitter whitelisted accounts for the Department of Defense to spread propaganda about its efforts in the Middle East? Did they give you a list of accounts that were fake accounts and asked you to whitelist those accounts?

YOEL ROTH: That request was made of Twitter. To be clear, when I found out about that activity, I was appalled by it. I undid the action and my team exposed activity originating from the Department of Defense's campaign publicly. We've shared that data with the world and research about it has been published.

ERIC BURLISON: Was that only in efforts against foreign entities or were there any efforts against citizens of the United States?

YOEL ROTH: I think the nature of public social media activity means that anybody might have seen it, but my understanding was the activity was predominantly focused outside of the United States.

ERIC BURLISON: Thank you, Mr. Chairman. I want to just say thank you for this hearing. I would hope that we would be asking for documents and communications, whether it's on personal devices or private devices, between these individuals and government officials.

JAMES COMER: Very good. Thank you. Chair recognizes Ms. McClain for five minutes.

LISA MCCLAIN: Thank you, Mr. Chairman and thank you all for being here today. It is a long day. I'm going to try and make this quick and easy. Mr. Roth, part of your job at Twitter dealt with assessing dis- and misinformation, correct?

YOEL ROTH: Yes.

LISA MCCLAIN: Wonderful. How did you determine what disinformation and misinformation was? What's your criteria for making that decision?

YOEL ROTH: Twitter had established policies covering each of those areas and I'll take them in turn. We use the term, we actually generally didn't use the term disinformation, but we focused on platform manipulation. So behaviors like running inauthentic accounts out of a Russian troll farm, we would address as the behaviors that they are.

And we would look for technical signs of that type of manipulation and we would remove those accounts.

LISA MCCLAIN: So technical, it was all technical?

YOEL ROTH: On that side of things, yes.

LISA MCCLAIN: OK.

YOEL ROTH: When it comes to misinformation, which broadly is a question of the content of tweets, Twitter would establish written policies.

LISA MCCLAIN: Which was?

YOEL ROTH: I'm sorry.

LISA MCCLAIN: Which was?

YOEL ROTH: Which policies did Twitter maintain?

LISA MCCLAIN: Yeah, I mean, I think what the problem with America is we have one set of rules for this team and another set of rules for this team. So we're trying to look at what is the equal playing field. I'm under the assumption that when we use disinformation and we use criteria, the criteria is the same for both sides.

So I'm trying to figure out what is the criteria that you had in place to determine which information was misinformation and did you apply that equally, equitably, inclusively, so to speak to all sides? So what is the criteria?

YOEL ROTH: Thank you for the question. We used a three part test across all of our misinformation policies. The first is whether the tweet advances a claim of fact stated definitively, not an opinion, not a viewpoint, but a claim of fact stated definitively.

LISA MCCLAIN: OK.

YOEL ROTH: The second part of that test is whether the claim of fact is provably false. Not iffy, not maybe, not gray area, definitely provably by multiple expert sources false. And then finally, and this is a really important part, we looked for evidence that those claims of fact could cause harm. So if a tweet met all three parts of that test, that it's a claim of fact, that it's provably false, and that it's dangerous, Twitter might intervene under its policies.

No part of that test is viewpoint based.

LISA MCCLAIN: And in your opinion, was that applied to all tweets?

YOEL ROTH: No.

LISA MCCLAIN: Thank you. Mr. Roth, you're familiar with reports that the Biden administration was considering establishing a disinformation governance board under the Department of Homeland Security.

YOEL ROTH: I am aware of public reporting about that, yes.

LISA MCCLAIN: Thank you. And that board was never established, correct?

YOEL ROTH: That's my understanding.

LISA MCCLAIN: That is correct. It seems to me that the federal government had far more powerful disinformation governance board in its relationship with Twitter. Again, Mr. Roth, question. How often were you meeting with people from the federal government while you were at Twitter? Weekly, daily, monthly?

YOEL ROTH: I would estimate somewhere between weekly and monthly.

LISA MCCLAIN: OK. And were you aware that Mr. Baker was also taking these meetings with the federal government as well?

YOEL ROTH: I was not aware of Mr. Baker's calendar, no.

LISA MCCLAIN: So you had no idea that he was meeting, there was no inner, you just worked in silos?

YOEL ROTH: Mr. Baker and I were in some of the same meetings together, but no, I did not know the ins and outs of what he was doing.

LISA MCCLAIN: OK. What did you understand Mr. Baker's role to be at Twitter besides offering general legal advice?

YOEL ROTH: Mr. Baker supervised the primary legal team that advised the trust and safety team. He was the supervisor of the supervisor of the attorneys who advised my team.

LISA MCCLAIN: OK. And how about Ms. Gadde's role at Twitter besides offering general legal advice?

YOEL ROTH: For the final, I believe year and a half of my tenure at Twitter, Ms. Gadde was my direct supervisor.

LISA MCCLAIN: What was her role? Just to supervise you to make sure you follow those three claims?

YOEL ROTH: Ms. Gadde supervised what my team's goals and objectives were. She made sure I was doing my job. She made sure that if there was conflict in the workplace, she guided me on how to address that. She did the job of a manager.

LISA MCCLAIN: OK. And she oversaw you and the trust to make sure that your three claims of fact, provable, false and would cause harm, she oversaw that?

YOEL ROTH: Yes, Ms. Gadde ultimately oversaw Twitter's policies and enforcement decisions.

LISA MCCLAIN: Thank you, Mr. Roth, in Ms. Navaroli's testimony, she states that her expertise is in media technology, law and policy. How often per week did you meet with Ms. Navaroli to discuss these areas while you were both at Twitter?

YOEL ROTH: We did not.

LISA MCCLAIN: You did not. OK. Thank you so much.

JAMES COMER: Gentlelady's time has expired.

LISA MCCLAIN: Thank you.

JAMES COMER: Chair recognizes Mr. LaTurner for five minutes.

JACOB LATURNER: Thank you, Mr. Chairman. Based on everything I have seen regarding this issue, it is clear to me that government officials colluded with Twitter employees to censor the New York Post's legitimate reporting of the Hunter Biden laptop story. Democrats on this committee have so far characterized this hearing as unnecessary and a waste of time.

I'd invite any of my colleagues across the aisle to talk to folks in Kansas, because I can promise you they do not feel that way. In fact, my constituents are very concerned, and rightfully so, that a social media company collaborated with a government entity and a political party to suppress certain social media accounts and filter news ahead of an election cycle.

Americans deserve answers on this outright attack on our First Amendment rights and I look forward to gaining clarity from our witnesses. Mr. Baker, your testimony focuses heavily on the fact that Twitter acted lawfully in its reaction to the Hunter Biden laptop story, but this isn't a criminal trial, it's a Congressional hearing.

I'm here because my constituents are genuinely concerned that they will be kicked off these platforms for any statement that managers at those companies disagree with. They feel that social media companies like Twitter are forcing them to play a game that they don't know the rules to. I want to know your opinion on if you think it is appropriate for people in positions of power to determine what information gets shared.

If not, what criteria is acceptable for making those determinations?

JAMES BAKER: Excuse me, sir, That's a very broad question on people in power. I'm not sure I can answer that effectively and address your ...

JACOB LATURNER: Could you try?

JAMES BAKER: Well, I mean the Congress is in power. Congress is restricted by the Constitution of the United States. Congress passes laws. Those laws impact how, for example, private sector actors exercise their power or spend their money, that type of thing. Government agencies have to act in accordance with the Constitution, the laws you pass, internal regulations, executive orders.

There's a whole panoply of ways that people in power writ large are held accountable and have to comply with rules and regulations and laws and the Constitution.

JACOB LATURNER: Mr. Chairman, I would like to yield the rest of my time to Mr. Jordan.

JAMES COMER: Mr. Jordan.

JIM JORDAN: I thank the gentleman. Mr. Roth, I want to go back to your statement in your declaration to the FEC. I learned that a hack and leak operation would involve Hunter Biden. Who did you learn that from?

YOEL ROTH: My recollection is it was mentioned by another technology company in one of our joint meetings, but I don't recall specifically whom.

JIM JORDAN: You don't know the person's name?

YOEL ROTH: I don't even recall what company they worked at. No, this was a long time ago.

JIM JORDAN: And you're confident that it was from a tech company, not from someone from the government?

YOEL ROTH: To the best of my recollection, yes.

JIM JORDAN: Did anyone from the government in these periodic meetings you have, did they ever tell you that a hack and leak operation involving Hunter Biden was coming?

YOEL ROTH: No, not ...

JIM JORDAN: Did Hunter Biden's name come up at all in these meetings?

YOEL ROTH: Yes, his name was raised in those meetings, but not by the government to the best of my recollection.

JIM JORDAN: OK. Mr. Baker, I'm going to go back to the question we had a few hours ago, but I want to frame in a way I think you can answer. Did you ever tell the FBI that they had no legitimate interest in enforcement of Twitter's policies?

JAMES BAKER: I think I understand the question. I don't recall ever having such a conversation with the FBI.

JIM JORDAN: OK. Did you think there was a problem with the FBI sending you a list of names and accounts and saying, hey, these violate your policies? Did you see that as some kind of potential concern?

JAMES BAKER: I was always concerned that the FBI adhere to the Constitution and laws of the United States, period.

JIM JORDAN: And you didn't think that crossed the line?

JAMES BAKER: What crossed the line, sir?

JIM JORDAN: What I just asked you, that the idea that they're sending you list of accounts that they want, they say these violate your terms of service.

JAMES BAKER: Again, I'm making sure that I can answer the question. Had I thought that they were doing something unlawful, I would have taken appropriate steps to address it.

JIM JORDAN: OK. Mr. Roth, why were you reluctant, based on what I read in the Twitter Files, why were you reluctant to work with the GEC?

YOEL ROTH: It was my understanding that the GEC or the Global Engagement Center of the State Department had previously engaged in at least what some would consider offensive influence operations. Not that they were offensive as in bad but offensive as in they targeted entities outside of the United States. And on that basis, I felt that it would be inappropriate for Twitter to engage with a part of the State Department that was engaged in active statecraft.

We were dedicated to rooting out malign foreign interference no matter who it came from. And if we found that the American government was engaged in malign foreign interference, we'd be addressing that as well.

JAMES COMER: Gentleman's time's expired. In closing, I want to again thank our panelists for being here. I know it's been a long day. We apologize for the electricity going out That's never happened in my six years in Congress. But before we close, the ranking member and I are going to have very brief closing statements.

I yield to the ranking member.

JAMIE RASKIN: Well, thank you kindly Mr. Chairman. Thank you to the witnesses for your endurance and patience today. I hope you don't feel as bad about the day as you seem to look right now, but it's going to be over soon. I want to start with a simple point that I hope will be sympathetic to you, and I began the long day with this.

It's even more important now that we have members who are actually threatening witnesses with arrest and prosecution for clearly imaginary offenses, or at least offenses that might make sense in their minds, but I don't quite know what they would be. But Twitter is a private First Amendment protected media entity and you make your own decisions like Fox News makes its decisions.

And I might get kicked off of Fox News or they might not cover me, or Wall Street Journal or MSNBC. I've got no constitutional right to go there. So I think there's just a fundamental legal fallacy and logical fallacy that pervades most of the questioning today. And my friend the chairman and my friend Mr. Jordan certainly know that under our First Amendment there's a state action requirement.

There is no state action here. Now there's an attempt to perhaps jerry rig some state action by claiming, well, it was really the FBI that committed whatever offense was there. But what do we have in terms of what we found today? Well, today's witnesses, each and every one testified that no US government official directed any of them to censor,, remove or take down the New York Post story.

That was their mistake. Two, today's witnesses all testified that the Biden campaign did not direct Twitter to take action against the New York Post story, and three, the whole hearing was predicated on the idea that the FBI directed Twitter to take down the New York Post story to protect Biden, but once again not a single witness testified that the FBI even communicated with Twitter about the New York Post story.

So to me, this has been a wild cyber goose chase all day. It has turned up absolutely nothing. But there was one serious point made by our witness, Ms. Navaroli, who said that the violence and the chaos that was wreaked upon this institution, not far from where we sit today on January 6, the attempt to topple a Presidential election and install someone who had not been elected as President was facilitated by Twitter and other social media entities.

And at Twitter at least, the brass there specifically rejected the pleas of employees to take seriously all of the signs and clues of coming violence in the insurrectionary action that took place. That's a serious problem that we're going to have to deal with at some point at a serious hearing. Mr. Chairman, I yield back to you.

JAMES COMER: Gentleman yield back. I will conclude by reminding my friend the ranking member that you've gone through quite the transition. At the beginning of the hearing you as well as many of your colleagues said this was a conspiracy theory. After listening to the witnesses, now you say it's a simple mistake they made in suppressing the laptop story.

Twitter is a private company, but they enjoy special liability protection Section 230. They also, according to the Twitter Files, receive millions of dollars from the FBI, which is tax dollars I would assume. And that makes it a concern of the Oversight Committee. The reason that we've had this hearing is because the laptop has been mislabeled by many in the mainstream media as being Russian disinformation, and that started with Twitter, as well as being tampered with, and you had several people including Mr. Goldman that implied that it had been tampered with, even though CBS News and other credible media outlets.

JAMIE RASKIN: You mean mainstream media outlets?

JAMES COMER: CBS. You don't think CBS is credible?

JAMIE RASKIN: No, I thought you were just calling them mainstream media.

JAMES COMER: CBS News. CBS News has done a forensic audit that shows that the hard drive's legitimate and it was not tampered with. So these are misconceptions that are out there, and they started because of the suppression of the laptop story. The reason the laptop's important is because there's evidence on there that should concern every American about potential corruption, as well as evidence that would suggest that there's a possibility that this administration could be compromised because of the millions and millions of dollars that they've received from our adversaries around the world.

We believe that's worth investigating. We believe national security is important. We had a hearing yesterday on our border. We believe there's a crisis at the border and it threatens our national security. We had a hearing today. We believe that we need to make sure that this administration is not compromised because of the millions of dollars that they've received from adversaries around the world, that much of that evidence is contained in the laptop.

So I think this was a very successful hearing. I appreciate the witnesses' time. I know it was a very long day, and again we've never had the electricity go out before. But again, we appreciate your sincere testimony. And with that and without objection all members will have five legislative days.

UNKNOWN: Mr. Chair, I apologize. It's come to my attention that I have to seek your unanimous request in order to submit some additional documents.

JAMES COMER: Without objection so ordered.

UNKNOWN: Thank you. Apologies.

JAMES COMER: With that and without objection, all members will have five legislative days within which to submit materials and to submit additional written questions for the witnesses which will be forwarded to the witnesses for their response. If there's no further business, without objection, the committee stands adjourned.

## Copyright

Copyright 2023 CQ-Roll Call, Inc. All Rights Reserved.

# DEFENDANTS' EXHIBIT 3:

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br>a 501(c)(6) District of Columbia organization,<br><br>and<br><br>COMPUTER & COMMUNICATIONS<br>INDUSTRY ASSOCIATION d/b/a CCIA, a<br>501(c)(6) non-stock Virginia Corporation,<br><br>*Plaintiffs*,<br><br>v.<br><br>KEN PAXTON, in his official capacity as<br>Attorney General of Texas<br><br>*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:21-cv-00840-RP |

# Exhibit C – YouTube's Declaration

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

NETCHOICE, LLC, d/b/a NETCHOICE, a
501(c)(6) District of Columbia organization;
and COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION d/b/a CCIA, a
501(c)(6) non stock Virginia corporation,

     *Plaintiffs*,

     v

KEN PAXTON, in his official capacity as
Attorney General of Texas,

     *Defendant*.

Civ. Action No. 21-cv-840

**DECLARATION OF YOUTUBE IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

I, Alexandra N. Veitch, declare as follows:

1.     I am the Director of Public Policy for the Americas at YouTube. As part of my role, I lead a team that advises the company on public policy issues around online, user-generated content. My team advises on YouTube's content moderation policies and practices, identifies when changes to our policies or their application are required in response to new challenges, and assesses policy proposals and legislation, such as Texas's H.B. 20, that would affect YouTube's ability to moderate content

2.     The statements contained in this declaration are made upon my personal knowledge I am over the age of 18 and am competent to make the statements herein I make this Declaration in Support of Plaintiffs' Motion for Preliminary Injunction in the above-captioned matter If called as a witness, I could and would testify under oath as follows

3.      YouTube is an online platform that allows users to create, upload, and share videos with others around the world. YouTube strives to be a community that fosters self-expression on an array of topics as diverse as its user base, and to nurture a thriving creative and informational ecosystem, as well as an engine of economic opportunity. Over two billion logged-in users worldwide visit each month, and over 500 hours of content are uploaded every minute by an extraordinarily diverse community of creators, who span over 100 countries and 80 languages. On a daily basis, users watch over a billion hours of video on YouTube.

4.      YouTube is a part of Google LLC, a member of NetChoice and CCIA. YouTube does business in Texas and many of its users are located in Texas. Texas users have access generally to all content on YouTube that is available in the United States and worldwide.

### *Responsibility at YouTube*

5.      YouTube believes that the Internet is a force for creativity, learning, and access to information. Supporting the free flow of ideas is at the heart of YouTube's mission. We believe that the world is a better place when we listen, share, and build community through our stories. We strive to make YouTube as open as possible: to empower users to access, create, and share information. We believe that openness brings opportunity, community, and learning, and enables diverse and authentic voices to break through.

6.      Yet an open platform means challenges, and it demands accountability to connect people with quality information. When you create a place designed to welcome many different voices, some will inevitably cross the line. Bad actors will try to exploit platforms for their own personal gain, even as we invest in the systems to stop and deter them. Harmful content on our platform makes YouTube less open, not more, by creating a space where creators and users may

not feel safe to share. We believe that, in order to have and protect openness, you must have responsibility. A commitment to openness is not easy. It sometimes means leaving up content that is outside the mainstream, controversial, or even offensive. But YouTube believes that hearing a broad range of perspectives ultimately makes us a stronger and more informed society, even if we disagree with some of those views. YouTube seeks to strike the right balance between fostering freedom of expression and decreasing the likelihood that users will encounter harmful content on our platform.

7.      These beliefs and values drive the decisions we've made in building YouTube, and the editorial judgements we've made in crafting the content moderation tools and policies that protect our platform. We want YouTube to live up to the ideals of these values–despite challenges, complexities, and emerging threats. We work to maintain our community as a positive, open, and useful space on the Internet. Our balanced approach to content moderation, described below, represents these values. While important work remains to be done, this approach also represents years of ongoing conversations amongst YouTube and its users, creators, and advertisers, of the right balance for our products and businesses.

8.      Responsibility is YouTube's number one priority.  Indeed, our unique business model only works when our viewers, creators, and advertisers all have confidence that we are living up to our responsibility as a business. That responsibility has been critical to YouTube's success and essential to our continued growth, so we've invested heavily in hiring people and developing products, technology, and systems to apply our editorial discretion at scale.

***YouTube's Approach to Responsibility and Content Moderation***

3

9.     YouTube takes a multi-faceted and nuanced approach to exercising its discretion in setting its content-moderation policies, working to distinguish those posts that are truly problematic, those that are borderline, and those that contribute positively to the YouTube community. To that end, we have a diverse set of tools to help us enforce our content-moderation policies, including:   age-gating, removing videos and comments, appending warnings, and suspending and/or terminating accounts. We also have other tools to help us provide authoritative information on our platform - such as the use of information panels. And we further limit when YouTube makes recommendations of borderline content to users. Because removing content is only part of the discussion, YouTube has chosen to develop and invest in this diverse set of tools that are essential in balancing free expression and responsibility on our platform. Simply put, these tools give us broader options than simply removing (or not removing) content from our platform.

10.     Yet H.B. 20 would eliminate much of our ability to make these kinds of choices in setting our policies and would subject YouTube and its community to serious harm by frustrating our ongoing efforts to make YouTube a far more accessible and welcoming place.

11.     YouTube has always had policies that govern how people may use the service, including restrictions on the types of content that they may post. These policies are designed and regularly updated to make YouTube a safer and more enjoyable place for users and creators, and reflect years of experience, investment, and an ongoing conversation between YouTube and its users. YouTube's approach has four pillars, set forth below.

4

12.     **First, we remove content** that violates our **Community Guidelines**, a series of clear, publicly-facing policies governing what is allowed and not allowed on our platform.[1] We work closely with outside experts to help us craft these policies (and their enforcement), primarily focused on preventing real-world harms. The Community Guidelines prohibit a variety of harmful, offensive, and unlawful material, such as hate speech, pornography, terrorist incitement, false propaganda spread by hostile foreign governments, promotion of fraudulent schemes, spam, egregious violations of personal privacy like revenge pornography, violations of intellectual property rights, bullying and harassment, conspiracy theories, and dangerous computer viruses. A full list of YouTube's Community Guidelines is available at: https://bit.ly/3CbToFY.

13.     We employ an array of remedial actions when enforcing our policies, ranging from demonetization (i.e., removing a creator's ability to earn advertising revenue) and warnings, to service-usage penalties such as temporary suspensions of uploading rights and permanent termination of accounts. When an account uploads content that violates the Community Guidelines, the content is removed and the account generally receives a warning. Subsequent violative content can result in a "strike," which temporarily suspends the account's ability to upload content. Generally, three strikes within 90 days leads to the account's termination and deletion of all content uploaded from the account. In the case of severe abuse (such as predatory behavior, spam, or pornography), YouTube will immediately terminate accounts to protect the YouTube community.

---

[1] We communicate our practices to all users through YouTube's Community Guidelines, which are incorporated into our Terms of Service. A user must agree to both the Terms and the Community Guidelines in order to create an account and upload materials to YouTube.

14. **Second, we reduce the spread of harmful misinformation and content that brushes up against our policy lines**. We refer to content that comes close to violating our Community Guidelines (but does not) as "borderline content". Borderline content is just a fraction of 1% of what is watched on YouTube in the United States, and examples include videos promoting a phony miracle cure for a serious illness or conspiracy theory videos (e.g., "the moon landing was faked").

15. Rather than remove such content outright, we've chosen to take steps to reduce the spread of such content using a variety of methods. Because such borderline content may be disturbing or otherwise inappropriate for some viewers, YouTube has chosen to take action (using algorithms) to reduce its availability, including updating YouTube's recommendations system, and disabling features like sharing, commenting, and liking for the borderline content. We set a high bar for what videos we display prominently in our recommendations on the YouTube homepage or through the "Up next" panel.

16. **Third, we raise authoritative and trusted content.** For subjects such as news, science, and historical events, we believe that accuracy and authoritativeness are key and the quality of information and context matter most (as compared to other topics such as music or entertainment, where we look to relevance, newness, and popularity) Here, content moderation can include affirmatively providing users with information to help them make choices about whether or not to interact with certain kinds of content It is sometimes helpful to provide viewers with additional context about the content they are watching.

- **Information Panels.** We display a variety of information panels that provide users with context on content relating to topics and news prone to misinformation, as well as context

about who submitted the content. One example is an information panel displayed on videos from a channel owned by a news publisher that is funded by a government.[2] Another example is National Suicide Prevention Hotline information that we display in response to search queries for terms related to suicide. Information panels, across all types, have been collectively shown billions of times. The COVID-19 information panels alone have been shown over 400 billion times.

- **Breaking News.** Similarly, after a breaking news event, it takes time to verify, produce, and publish high-quality videos. Journalists often write articles first to break the news rather than produce videos. So YouTube has chosen to prioritize these articles and provides a short preview of news articles in search results on YouTube that link to the full article during the initial hours of a major news event.

17. **Fourth, we reward trusted, eligible creators by setting a higher bar for ads/monetization**. Users must meet additional eligibility requirements[3] for the privilege of earning advertising revenue ("monetization") on videos they upload. They must be eligible for, and join, the YouTube Partner Program ("YTPP") and follow YTPP guidelines.[4] Just over 2 million users worldwide, out of the 2 billion monthly users generally, are part of the YTPP and monetize their videos. Such users and their monetized videos also must meet more restrictive criteria, including the Ad-friendly Content Guidelines, because advertisers typically do not want to be associated with controversial or sensitive content on YouTube.[5] Violations of the guidelines may result in a range of actions, such as (1) ads being disabled on a particular video, (2)

---

[2] https://bit.ly/3fpnHzu.
[3] https://www.youtub_com/howyoutub_works/polici_s/mon_tization_polici_s/
[4] https_//support__oo_l_com/youtub_/answ_r/7_85_?hl__n&r_f_topic_9_538_6
[5] https://bit.ly/3ojt7B9.

suspending or permanently disabling a user's eligibility to monetize ads, (3) or, in exceptional circumstances, suspending or disabling a user's account altogether to protect the integrity of the platform or protect our users from harm.

18.     **Scale.** In Q2 2021 alone, YouTube removed over 4 million channels (or accounts), over 6 million videos, and over 1 billion comments, for violations of YouTube's Community Guidelines alone.[6] In Q2 2021, 29.9% of the videos removed were due to child safety issues. 55% of removed comments were due to spam.[7] Further statistics (including others discussed in this declaration) may be found in the YouTube Community Guidelines enforcement report, updated quarterly.[8]

19.     H.B. 20 significantly limits these ongoing efforts to prevent harm to our users and to make YouTube an accessible and welcoming place.

### The Evolution of YouTube's Content Moderation

20.     YouTube has always had rules of what speech we permit on the platform, and we have never claimed that YouTube would host all user-generated content. YouTube has never allowed pornography, incitement to violence, or content that would harm children, for example.

21.     The harms of user-generated content are ever-evolving and often unpredictable, and YouTube's content moderation policies have necessarily had to evolve to address them. Each of our policies is carefully thought through (so they are consistent, well-informed, and can be applied to content from around the world), and often developed in partnership with a wide range

---

[6] Of those videos, more than 30,000 contained misinformation about the COVID-19 vaccine. This was part of YouTube's larger effort to remove medical misinformation about the virus, which resulted in the removal of over 1,000,000 videos related to dangerous or misleading COVID 19 information since February 2020

[7] YouTube uses automated systems to identify comments that are likely spam.

[8] https://bit.ly/2VhAsVG.

of external industry and policy experts. We revise them regularly to account for new and different content or behavior that YouTube deems unacceptable, unsafe, or unwelcome on its service. YouTube has also invested significantly in being able to detect and respond quickly to emerging harms. YouTube's Intelligence Desk, an internal team, monitors news, social media, and user reports to detect these new trends—such as the unpredictable viral 'dares' that risk significant physical harm by, for instance, encouraging viewers to ingest Tide Pods—so as to address them before they become a larger issue. YouTube has over 100 people working to develop new content-moderation policies and improve existing ones.

22.     This approach and investment has given YouTube flexibility to build and maintain responsible practices to handle legal but potentially harmful speech. In 2020, for instance, YouTube updated its policies related to medical misinformation alone more than ten times, which is in line with historical trends. In 2019, YouTube made over 30 updates to its content moderation policies generally—on average, once every 12 days. We saw a similar pace in 2018. And when necessary, YouTube is able to react quickly to promote the safety of its users in changing and emerging contexts. For example, when mobile phone towers in the U.K. were set on fire after a conspiracy theory video blamed COVID-19 on 5G wireless networks, we updated our Community Guidelines in a single day to ban and remove that harmful content.

23.     YouTube's judgments evolve over time as social and cultural conditions change or unforeseen threats and challenges arise. For instance, after a recent violent military coup in Myanmar, YouTube took action against five existing YouTube channels run by the Myanmar military, terminating the channels to prevent the military from promoting political propaganda.[9]

---

[9] https://nyti.ms/3xoq0IW.

*Algorithms and Machine Learning*

24.     YouTube's engineers have designed and built sophisticated software systems using machine learning—a type of algorithm—to moderate content in two key ways: 1) to proactively identify and flag potentially harmful content uploaded to the site, and 2) to automatically remove content that is identical or substantially similar to violative content that was previously removed. Machine learning is the product of human decision-making and is used to implement the standards set in our Community Guidelines, thereby reflecting YouTube's editorial judgments. Our engineers design these systems to identify certain types of content. We then use data inputs (reflecting the judgment of human reviewers) to train these machine learning systems to identify patterns in content—both the rich media content in videos, as well as textual content like metadata and comments—so that our systems can make predictions and find new examples to match the identified types of content. Machine learning is well-suited to detecting patterns, which helps us to identify new content similar to that we have already removed, even before it is ever viewed. We also use hashes (or "digital fingerprints") to automatically identify copies of known violative content before they are ever made available for viewing.[10] These systems automatically remove content only where there is high confidence of a policy violation—*e.g.*, spam—and flag the rest for human review. Algorithmic detection identifies the vast majority of content deemed to violate the Community Guidelines.

25.     Machine learning is critical to implementing all aspects of YouTube's approach to content moderation and keeping our users safe. YouTube relies heavily on technology and algorithms to moderate content and cannot feasibly do otherwise, since over 500 hours of video

_____

[10] In Q1 2021, 27.8% of removed videos were taken down before a single view. A further 39% of removed videos had between 1 and 10 views. https://bit.ly/3fpoLmY

are uploaded to YouTube every single minute of every day. At this massive scale, it would be virtually impossible to remove content that violates our Community Guidelines without the use of algorithmic tools, even with tens of thousands of reviewers watching newly uploaded videos 24 hours a day, 7 days a week. Due to large multi-year investments in machine learning algorithms, since 2017 we have seen a 70% drop in the quarterly estimate of the number of views for video deemed violate to our policies (known as the violative view rate, "VVR").[11]

26.     The vast majority of Community Guidelines violations were flagged by algorithms. In Q2 2021, YouTube removed 6,278,771 videos that violated the Community Guidelines. The vast majority—5,927,201, or 94% of the total removals—were automatically flagged for moderation by YouTube's algorithms. About 5%—351,570 videos—were removed based on initial flags by a user or other human. This removal system is highly efficient: the majority of removed videos were removed before accumulating more than 10 views. Similarly in Q2 2021, YouTube also removed over 1 billion comments, 99.5% of which were flagged for moderation by YouTube's automated systems.

27.     Our machine learning and human reviewers work hand in hand: machine learning is effective for scale and volume, whereas human reviewers can evaluate context for more nuanced enforcement of our policies. Once our machine learning systems flag a potentially violative video without high confidence of a policy violation, human reviewers assess whether the content does indeed violate our policies, and remove those that do. In making those judgment calls, the reviewers seek to protect content that has an educational, documentary, scientific, or artistic purpose, keeping such videos on the platform. These human decisions and judgments are

---

[11] *See* https://bit.ly/38noixm.

in turn used as data inputs to improve the accuracy of our automated detection systems so that we are constantly updating and improving the system's ability to identify potentially violative content. Using that human review, our machine learning systems can automatically remove re-uploads of content that has already been reviewed and determined to violate our policies. In addition, when we introduce a new policy or alter an existing one, it takes our systems time to improve detection rates and begin accurately detecting violative content at scale. Our enforcement of new policies improves over time.

**Further Examples of Our Values Embodied in YouTube's Content Moderation Processes.**

28.     During summer 2020, YouTube faced a dilemma when confronting the tension that arises between 1) accuracy when enforcing content policies and 2) the need to limit potentially harmful content accessible on the site. In response to COVID-19 lockdowns worldwide, YouTube took steps to protect the health and safety of our extended workforce and reduced in-office staffing. As a result of reduced human review capacity, YouTube had to choose between limiting enforcement while maintaining a high degree of accuracy, or relying on automated systems and algorithms to cast a wider net to remove potentially harmful content quickly but with less accuracy. Because of YouTube's belief that responsibility is critical, YouTube chose the latter, despite the risks that automation would lead to over-enforcement—in other words, removing more content that may not violate our policies for the sake of removing more violative content overall.

29.     For certain sensitive high-risk policy areas, such as violent extremism and child safety, YouTube chooses to accept a lower level of accuracy to remove as many pieces of violative content as possible (again, to protect the health and safety of our extended workforce

12

and reduced in-office staffing). This also means that, in these areas specifically, a higher amount of non-violative content was removed. YouTube's decision to over-enforce in these policy areas—out of an abundance of caution—has led to a more than 3x increase in removals of content that our systems suspected was tied to violent extremism or potentially harmful to children. These include dares, challenges, or other posted content that may endanger minors. Moreover, YouTube will immediately suspend users for egregious violations (rather than allowing a user multiple 'strikes').

30. **EDSA.** Because YouTube values creativity and learning, our content policies have an exception for videos that would otherwise be in violation if there is a compelling educational, documentary, scientific, or artistic reason that is apparent in the content or context of the video. YouTube refers to this exception as "EDSA," which is a critical way to make sure that important speech remains on YouTube, while simultaneously protecting the wider YouTube ecosystem from harmful content.[12] These decisions depend on a variety of factors that depend on context and require nuanced judgments, and the bar varies by video and policy category. For example, hate speech and encouragement of violence violate our policies but a documentary about WWII that features speeches from Nazi leaders may be allowed if the documentary provides historical context and does not aim to support the despicable views promoted by the Nazis. There are also certain types of content where we don't allow an EDSA exception under any circumstances because of the sensitivity and egregiously harmful nature of the content, or when it violates the law. For example, content that endangers children or any content with footage of deadly violence filmed by the perpetrator is not allowed on YouTube regardless of the context.

---

[12] https://bit.ly/2VhM7DW

### *Transparency*

31.     Given YouTube's scale, we sometimes make mistakes, which is why creators can appeal video removal decisions. YouTube generally notifies creators when their video is removed, and we provide a link with instructions on how to appeal the removal decision. If a creator chooses to submit an appeal, the video goes to human review, and the decision is upheld, reversed, or modified (modification leads to reinstatement of the video but with restricted access). We provide transparency about our appeals process. As reported in our most recent Transparency Report, in Q2 2021, creators appealed approximately 217,446 videos, or 3.5% of all videos removed. Of those, more than 52,696 were reinstated.

### *The Burdens Posed by H.B. 20*

32.     I understand that on September 9, 2021, the State of Texas enacted H.B. 20, which will go into effect on December 2, 2021.

33.     The restrictions of H.B. 20 would fundamentally burden and undermine YouTube's ability to operate responsibly and enforce the content-moderation policies described above. The statute has a broad definition of "censorship" ("to block, ban, remove, deplatform, demonetize, de-boost, restrict, deny equal access or visibility to, or otherwise discriminate against expression.") that covers YouTube's broad portfolio of content-moderation tools (reflecting our judgment and discretion) across a broad variety of topics.

34.     "Expression" is defined broadly by H.B. 20, and would include any and all user-generated content on YouTube.

35.     For instance, YouTube simply "blocks" or "removes" certain speech like hate speech that violates our Community Guidelines' policy on hate speech. But because hate speech

14

expresses "viewpoints"—as abhorrent as those viewpoints are—H.B. 20 would bar YouTube from taking any content moderation action against such content, such as removing it, age-restricting it, or demonetizing it.

36.     H.B. 20's "censorship" prohibition will directly prevent YouTube from enforcing critical standards designed to prevent the degradation of our users' experiences on the platform and to ensure their safety, including for children. YouTube needs discretion and flexibility when designing, building, and maintaining our content-moderation policies because it encounters such a broad range of content, and at such high volumes. As described above, YouTube's Terms of Service, Community Guidelines, and other content-moderation rules include flexible terms that allow YouTube to exercise its judgment about specific uses or pieces of content in order to provide a better and safer user experience.

37.     While H.B. 20 contains certain content exceptions chosen by the Texas Legislature under Section 143A.006, the state's narrow choices mean that the broad restrictions on content moderation would still eliminate wholesale many of the categories of content (in both our Community Guidelines and Advertising policies) that YouTube has chosen to moderate.

38.     YouTube currently has numerous viewpoint-based policies against many kinds of harmful content, for which H.B. 20 has no applicable exception. For example, YouTube's Community Guidelines has a Violent Criminal Organizations policy[13] under which YouTube currently removes content produced by violent criminal or terrorist organizations ("VCTOs"), content praising or justifying violent acts carried out by VCTOs, content aimed at recruiting members for VCTOs, or hostage videos. In order to comply with H.B. 20, YouTube would have

---

[13] bit.ly/3m0tMVo.

to stop removing such violent extremist content. Similarly, paragraphs 41-45 below discuss examples of additional categories ranging from dangerous pranks risking imminent harm, drug use, suicide/self harm, animal abuse, and medical misinformation.

39.     H.B. 20 seems to allow moderation of content that "directly incites criminal activity or consists of specific threats of violence targeted against a person or group." But this limited exception actually excludes many categories found in YouTube's Community Guidelines hate speech policy.[14] 143A.006(3). For example, YouTube removes content "promoting violence or hatred against individuals or groups based on," among other things, veterans status or sexual orientation. H.B. 20 would stop YouTube from taking action against, for example, content promoting violence or hatred against veterans. Even in the categories that H.B. 20 enumerates, H.B. 20 would still bar YouTube from taking action against content "promoting violence or hatred" without a specific threat of violence.

40.     Reflecting our view of the nuance involved in balancing freedom of expression and responsibility, YouTube has chosen to build systems and processes that apply different standards for different content-moderation actions. For example, we apply the Community Guidelines for removals, and the Ad-friendly Content Guidelines for demonetization. We also age-restrict, reduce availability or functionality, or restrict other borderline content (which otherwise remains available on our platform). By treating all these actions as prohibited "censorship," H.B. 20 will eliminate YouTube's discretion to find the right balance between free expression on YouTube and responsibility for fostering a safe community for its users. The

---

[14] https://support.google.com/youtube/answer/2801939?hl=en&ref_topic=9282436

following are examples showing the nuance and complexity of YouTube's content moderation policies applied in contexts where H.B. 20 would prohibit YouTube from taking action.

41.    Dangerous Pranks. Under our Community Guidelines we remove videos depicting extremely dangerous challenges that pose an imminent risk of physical injury, such as the well-known "Tide Pod" challenge. Another example is the "No Lackin'" challenge, where people post videos of themselves pointing guns at others.[15] Because YouTube is concerned that minors could easily imitate such challenges, we may allow, but age-restrict, content that explains these challenges in an educational or documentary way. However, YouTube may allow, without restriction, a video warning minors against performing such challenges. H.B. 20 would require YouTube to treat each of these examples of dangerous prank-related content equally and leave all of them up on our platform.

42.    Drug Use. Under our Community Guidelines, we remove videos with depictions of the use of hard drugs (like intravenous heroin injection), and depictions of minors using *any* alcohol or drugs (using vaporizers, e-cigarettes, tobacco, or marijuana). Still, we may allow videos that discuss the scientific effects of drug use, content that does not promote or glorify drug usage (e.g., a personal story about the opioids crisis), or news reports about drug busts (with no visible consumption or distribution). Such content, especially if it shows the injection of drugs, may still be age-restricted. H.B. 20 would require YouTube to treat each of these different examples of drug use-related content equally and leave all of them up on our platform.

43.    Suicide. Our Community Guidelines prohibit (1) videos promoting or glorifying suicide, (2) providing instructions on how to self-harm or die by suicide, and (3) graphic images

---

[15] News articles report that this challenge was involved in one 2019 death in the Houston area. https://abc13.com/no-lackin-challenge-teen-shooting-killed-playing-with-guns/5009272/

of self-harm posted to shock or disgust viewers. Still, we may permit, without advertising, videos with first-person accounts (e.g., a biography or detailed interview on survivors and their pasts) and detailed descriptions of suicide. Further, for searches for terms related to suicide, YouTube shows authoritative content helping users connect with the National Suicide Prevention Hotline. H.B. 20 would require YouTube to treat each of these different examples of suicide-related content equally and leave all of them up on our platform.

44. <u>Animals</u>. Under our current Community Guidelines, we remove depiction of content that includes a human maliciously causing an animal to experience suffering, or where animals are encouraged or coerced to fight by humans. Under our Ad-Friendly Content Guidelines, we demonetize, but allow, videos with graphic depictions of skinning or slaughtering animals. We permit advertising on videos portraying animal preparation for eating by professionals focusing on the trade and act of cutting animals, or the preparation of meat or fish (such as BBQ cooking techniques). H.B. 20 would require YouTube to treat each of these different examples of animal-related content equally and leave all of them up on our platform.

45. <u>Medical Misinformation</u>. YouTube does not allow certain types of misleading or deceptive content with serious risk of egregious harm, like medical misinformation (such as content claiming that harmful substances or treatments can have health benefits). This includes content about COVID-19 that poses a serious risk of egregious harm, such as treatment misinformation. One example is content that promotes drinking "mineral miracle solution (MMS)" as a treatment for COVID-19. The FDA has warned that "MMS Consumers Are Drinking Bleach" since "when mixed according to package directions, [MMS products] become

a strong chemical that is used as bleach."[16] H.B. 20 would bar YouTube from taking any content moderation action against content expressing these viewpoints.

46.      More generally, much of what YouTube does is to vary "access or visibility" to certain pieces of content—or certain classes of content—according to subjective judgments about the viewpoint expressed in the speech in accordance with its policies and what YouTube believes will be most relevant to individual users.

47.      Because H.B. 20's definition of "censor" includes "restrict" and "deboost," H.B. 20 would prohibit YouTube's approach to borderline content—content that, in our judgement, comes close to violating our Community Guidelines. Rather than remove this content entirely, YouTube currently takes steps to reduce the spread and restrict its availability (rather than remove the content outright). In 2019, we changed our recommendation system to reduce suggesting such borderline content to users.

48.      YouTube has designed our search ranking systems and algorithms to prioritize different factors depending on the search term requested. In areas such as music or entertainment, we often use relevance, freshness, or popularity to rank search results. In other areas where veracity and credibility are key, including news, politics, and medical or scientific information, our search systems prioritize surfacing authoritative content from trusted sources. For example, when you proactively search for news-related topics, a Top News section will appear near the top of search results, which raises relevant results from authoritative voices including news sources like CNN and Fox News.

---

[16] https://bit.ly/3kNf8BF.

49.     So H.B. 20 will forbid YouTube from making both *individualized decisions* that perhaps one user will prefer certain content relative to other content because of the "viewpoints" expressed in that content; and *broad decisions* that certain content should be emphasized or deemphasized across all users.

50.     H.B. 20's definition of censorship includes action to "demonetize" based on viewpoint. Currently, YouTube requires that users wishing to monetize their content comply with Community Guidelines, but also an additional set of viewpoint-based guidelines, the Advertiser-friendly Content Guidelines. H.B. 20 would bar YouTube from enforcing these guidelines, and prevent YouTube from demonetizing harmful/offensive content. YouTube would be forced to continue to let a harmful content creator earn advertising revenue off YouTube's platform and thus encourage that creator to upload as much harmful and offensive content as quickly as possible.

51.     Finally, H.B. 20 prohibits YouTube from engaging in its *own speech* because it prohibits YouTube from "otherwise discriminat[ing]" against user-submitted expression. This provision—as vague and broad as it is—encompasses situations in which YouTube appends its own expression to user-submitted content, whether to express disagreement with or disapproval of that expression, or to add context YouTube believes is necessary for certain topics prone to misinformation. For certain content (e.g., potential hate speech) that is both close to the Community Guidelines line for removal and is offensive to viewers, YouTube adds a warning message before viewers can watch the video. Because YouTube will only append its own expression based on the "viewpoint" expressed in the content, that would constitute censorship under H.B. 20. Similarly, YouTube displays a variety of information panels that provide users

with context on content relating to topics and news prone to misinformation, as well as context about the publishers of the content.

52.     Therefore, YouTube will face an impossible choice between (1) risking liability by moderating content identified to violate its standards or (2) subjecting YouTube's community to harm by allowing violative content to remain on the site.

**Other Impact**

53.     **Age Gating, Restricted Mode, and YouTube Kids.** YouTube provides features, tools, and age-gated offerings to sensitive users and organizations (such as libraries and families with young children). These features are a way for YouTube to balance free expression with responsibility. For example, YouTube uses age-gating, a process whereby certain content—such as material featuring sexual situations, heavy profanity, or graphic depictions of violence—is made inaccessible to users under age 18. In order to view this content, users coming to YouTube must be signed-in and the age associated with their account must be 18 or older in order to view the video. YouTube also has a feature called Restricted Mode, an optional setting that sensitive users can choose to use to limit the content they see on YouTube. It is also used by libraries, schools, and public institutions. Videos containing potentially adult content like drugs or alcohol use, sexual situations, or violence are not shown to users in Restricted Mode.[17] YouTube also produces an app called YouTube Kids, which includes only videos that are determined to be suitable for children through a combination of human and algorithmic review, and which blocks access to comments more suitable for adults. For example, YouTube Kids does not show videos

---

[17] https://bit.ly/3jiTWl1.

with paid product placements or endorsements, nor overly commercial or promotional videos. Over 35 million weekly viewers in more than 100 countries use YouTube Kids.

54.     H.B. 20's prohibition on "censorship" includes "restricting" content. Complying with that requirement would force Restricted Mode and YouTube Kids to display all content, even if that content would otherwise be violative of YouTube's policies, or is content that YouTube (and a reasonable user would) believe in its judgment to be inappropriate for those audiences. Similarly, YouTube would have to stop age-gating such content. These changes would contradict the purpose of these features and products to give parents options for increased safety, forcing YouTube to make age-inappropriate content available to minors generally, and to other users choosing to use Restricted Mode.

55.     **Disclosure and Notice Requirements.** The "disclosure" and operational restrictions will likewise burden YouTube's discretion in designing its content-moderation systems and processes. While YouTube endeavors to be transparent with its users and creators, this law would impose ambiguous and wide-ranging transparency requirements on all of YouTube's decisions to remove content of any kind. For example, these transparency requirements would apply to all types of content–not just videos–on YouTube. When removing videos under the Community Guidelines, YouTube generally provides users with notice, a complaint system, and an ability to appeal–but it does not currently provide any of this when removing comments.

56.     To comply with H.B. 20, YouTube would have to expand these systems' capacity by over 100X–from a volume handling millions of removals to that of over a billion removals: during the last quarter (Q2 2021), YouTube removed 9.5 million videos and well over 1.16

billion comments. YouTube would have to provide notice of each of these 1.16 billion decisions to remove a comment. When any users receiving notice complain about, or appeal, those 1.16 billion removal decisions, YouTube will have to handle those requests within an accelerated response period.

57.     Though YouTube endeavors to be transparent about its Terms of Service, Community Guidelines, and other content moderation practices generally, H.B. 20 does not explain the level of "specific information" required by the public disclosures section. For example, it seeks public disclosure of "search, ranking, or other algorithms or procedures." Public disclosure of that aspect (and others) of YouTube's content moderation would risk revealing its trade secrets and other confidential intellectual property to our competitors, since YouTube relies on sophisticated proprietary software systems, including machine learning algorithms, in which YouTube has invested significant resources to build and develop. Moreover, detailed disclosure of technical details of our enforcement methods would risk empowering the unscrupulous users seeking gaps and weaknesses in our systems for exploitation and to evolve their tactics to evade our efforts. For these reasons, YouTube does not publicly disclose these kinds of technical details.

58.     H.B. 20 requires a biannual transparency report calling for expansive though ambiguous disclosure including, for example, whenever YouTube took action including "any other action taken in accordance with the platform's acceptable use policy," including detailed breakdowns by rule violated and source of alert. At the immense scale that YouTube operates, this level of granular reporting of every content-moderation decision would be extremely burdensome.

59.     The specter of liability from countless private lawsuits (only for the anti-editorial-discretion provisions) and Attorney General enforcement (for all of the provisions) will substantially chill YouTube's use of editorial discretion to moderate content.

60.     **User Scope.** H.B. 20 prohibits "censoring" a Texas "user's ability to receive the expression of another person," and that "person" need not be in Texas. YouTube has no way to comply without altering its editorial policies platform-wide, because YouTube's Community Guidelines are enforced consistently across the globe, regardless of where the content is uploaded. When content is removed for violating YouTube's Community Guidelines, it is removed globally.

61.     **Harm to YouTube.** To comply with this law, YouTube would have to eliminate many, if not most, of our content-moderation standards that currently apply to any video and comment posted platform-wide. Users will leave YouTube for platforms that are able to responsibly moderate their platforms. Controversial content generally does not perform well with users on YouTube (compared to other categories like music or comedy). Advertisers do not want their brands associated with problematic content and actors. We've seen first-hand that when advertisers lack trust in our systems, they scale back their spend on YouTube. In response to several prior incidents involving extremist, child exploitation, and other harmful content, advertisers (who do not want their advertisements next to objectionable content) have stopped advertising on YouTube. Loss of advertiser trust negatively impacts creator earnings (since that revenue is dependent upon the willingness of advertisers to associate their brands with YouTube content), causing creators, too, to seek alternative platforms. The cost of not taking sufficient action over the long term results in lack of trust from our users, advertisers, and creators. Past

egregious actions of just a handful of creators have harmed the reputation of YouTube and the creator community among advertisers, the media industry and most importantly, the general public. When just one creator does something particularly blatant—like conducts a heinous prank where people are traumatized, promotes violence or hate toward a group, demonstrates cruelty, or sensationalizes the pain of others in an attempt to gain views or subscribers—we have seen how it can cause lasting damage to the community, including viewers, creators and the outside world.

62.     This harm is why responsibility is critical to YouTube's success, and is our number one priority. YouTube has responded to these past incidents by updating the way we moderate content with stricter policies, better controls, and greater transparency. We've made much progress to earn trust, recognizing more can and should be done. Yet H.B. 20 would unilaterally replace much of this entire framework to content moderation and runs contrary to user safety and enjoyment of the user experience.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing to be true and correct to the best of my knowledge. Executed on this September 30, 2021 in Washington, DC.

_____

Alexandra N. Veitch

# DEFENDANTS' EXHIBIT 4:

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br>a 501(c)(6) District of Columbia organization,<br><br>and<br><br>COMPUTER & COMMUNICATIONS<br>INDUSTRY ASSOCIATION d/b/a CCIA, a<br>501(c)(6) non-stock Virginia Corporation,<br><br>    *Plaintiffs*,<br><br>v.<br><br>KEN PAXTON, in his official capacity as<br>Attorney General of Texas<br><br>    *Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:21-cv-00840-RP |

# Exhibit D – Facebook's Declaration

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| NETCHOICE, LLC, d/b/a NETCHOICE, a 501(c)(6) District of Columbia organization; and COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia corporation, <br><br> *Plaintiffs*, <br><br> v. <br><br> KEN PAXTON, in his official capacity as Attorney General of Texas, <br><br> *Defendant*. | Civ. Action No. 1:21-cv-00840-RP |

## DECLARATION OF FACEBOOK IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Neil Potts, declare as follows:

1.      I am currently a Vice President, Trust & Safety Policy, at Facebook, Inc. ("Facebook"), and have been employed there since April 2016. The statements contained in this declaration are made upon my personal knowledge. I am over the age of 18 and am competent to make the statements herein. I make this Declaration in Support of Plaintiffs' Motion for Preliminary Injunction in the above-captioned matter. If called as a witness, I could and would testify under oath as follows.

### Background

2.      Facebook was founded in 2004. Its products enable more than 3 billion people around the world to share ideas, offer support, and discuss important issues, including politics, public health, and social issues. Users of Facebook's products share over a billion stories and over 100 billion messages, every day.

3.     On Facebook, people can share status updates, photos, videos, and links (among other types of content) with family and friends. People can also follow Pages managed by businesses, organizations, and public figures (such as politicians or celebrities) that share content, as well as join Groups or attend Events that relate to topics of interest to them. These are some of the many ways in which people can share and interact with others on Facebook.

4.     The average person could be flooded with millions of posts each day from people all over the world, but most people do not have time (or interest) to look at all of their available content. As a result, Facebook has invested significant resources to develop systems to "rank" content that users are most likely to find relevant and meaningful. The rankings are unique to each user and are informed by their individual choices and actions (both historical and real-time).

5.     Facebook displays ranked content in a curated News Feed, a feature Facebook launched in 2006. News Feed uses algorithms to show a constantly updated and personalized list of stories—for example, vacation pictures from friends, videos from family gatherings, articles from local or national news outlets, and much more.

6.     Millions of Facebook users reside in Texas and have access to and engage with content posted by users across the United States and throughout the world.

## Content Moderation

7.     Facebook's mission is to give people the power to build community and bring the world closer together.

8.     Facebook has invested substantial resources to foster and maintain a safe experience for its community.  People will not use Facebook if they do not feel safe.  Similarly, advertisers will not advertise on Facebook if they believe it is not effective at removing harmful

content or content that violates our community standards. Indeed, people and advertisers have stopped using Facebook due to these concerns.

9. Facebook has long recognized the importance of giving its users a voice and allowing debate on topics about which people may disagree. But content that harasses, threatens, seeks to defraud, or violates the rights of other users makes the community less safe and/or puts people at risk of harm.

10. Facebook has over many years developed robust policies and practices relating to content permitted on its service. Facebook continues to refine these policies and practices based on its experience, evolving societal norms, extraordinary current events, and input from external stakeholders and experts (among others). Moderating speech often involves difficult judgment calls—a task further complicated by the sheer volume of content appearing online, the global reach of Facebook's products, and the absence of vital context typically accompanying speech in the offline world.

11. Facebook's publicly available Terms of Service (to which people must agree to use the service) and Community Standards (which people agree not to violate) describe what content is acceptable. Facebook has had terms and policies like these in place for many years, though the specific requirements have evolved.

12. The Terms of Service prohibit users from, among other things, doing or sharing anything that is "unlawful, misleading, discriminatory or fraudulent" or that "infringes or violates someone else's rights, including their intellectual property rights."[1]

---

[1] *Terms of Service*, Facebook, https://www.facebook.com/terms.php (last visited Sept. 29, 2021).

13.     The Community Standards provide details about what content is not allowed on Facebook.[2] The Community Standards are organized into five categories: (i) violence and criminal behavior, (ii) safety, (iii) objectionable content, (iv) integrity and authenticity, and (v) respecting intellectual property. Within each of those five categories, the Community Standards identify additional subcategories, such as "adult nudity and sexual activity" or "hate speech." Users can see Facebook's policy rationale for prohibiting each category of content and examples. For example, the Community Standards explain that "hate speech" is not allowed on Facebook. Facebook, however, recognizes that people sometimes share content that includes someone else's hate speech to condemn it or raise awareness.[3] In other cases, user expression, including speech, that might otherwise violate our standards can be used self-referentially or in an empowering way. Facebook's policies are designed to allow room for these types of expression. The Community Standards also include information about when content may be accompanied by a sensitivity warning.

14.     Facebook relies on both automated and human review to enforce its terms and policies at scale across its global service.  For many categories, Facebook's artificial intelligence systems find more than 90% of the content they remove before anyone reports it. Facebook also has over 35,000 people working on safety and security. Teams across the company work together to, for example, prevent millions of attempts to create fake Facebook accounts and remove million of pieces of content containing adult nudity, sexual activity, bullying and harassment, child nudity and sexual exploitation of children, and hate speech, content shared by terrorist and organized hate

---

[2] *Community Standards*, Facebook, https://www.facebook.com/communitystandards/ (last visited Sept. 29, 2021) (*Facebook Community Standards*).
[3] *Facebook Community Standards*.

groups, and content that violates intellectual property rights. Facebook publicly shares information about its enforcement efforts in its Transparency Center.[4]

15.     Facebook regularly publishes updates about its efforts to remove harmful content and protect its community. For example, in September 2018, Facebook published an article on how it uses artificial intelligence on Facebook to help suicide prevention efforts. In October 2019, Facebook published an article about the substantial efforts it had undertaken to protect against efforts to interfere with the 2020 U.S. election. In June 2020, Facebook published an article related to labels it would add to content and ads from entities believed to be state-controlled media; in February 2021, Facebook announced it would add informational labels to some posts related to climate change. In May 2021, Facebook published a threat report on efforts it is taking to protect against influence operations aimed at manipulating or corrupting public debate on Facebook by governments, commercial entities, politicians, and conspiracy and fringe political groups.

16.     Facebook has had to implement changes to its policies and practices in response to extraordinary situations. For example, following Myanmar's military coup in February 2021, Facebook reduced the distribution of misinformation shared by the Myanmar military but also protected content, including political speech, that allowed "the people of Myanmar to express themselves." Facebook also revised its policies as information emerged during the COVID-19 pandemic.

17.     Facebook has an appeals process for users to request review of most of its enforcement decisions. If Facebook determines it should not have removed the content under its policies, it will restore the content. In May 2020, Facebook established an external Oversight

---

[4] *Transparency Center*, Facebook, https://transparency.fb.com/ (last visited Sept. 29, 2021) (*Facebook Transparency Center*).

Board to review some of the most difficult enforcement decisions; the Oversight Board's decisions are binding on Facebook. Facebook also relies on independent, third-party fact-checkers to help identify and review certain types of content.  If a fact-checker determines a particular post contains false information, Facebook will label the content and reduce its distribution.

18.     Facebook also has tools that enable users to further curate their own News Feeds— for example, choosing a list of "Favorite" friends and pages to feature, blocking content from certain users or Pages, and reporting content they believe is inappropriate. Facebook has rolled out other features in response to feedback, such as the ability to turn off a counter displaying how many people have "liked" a post or photo.

19.     Facebook has implemented a number of changes over the years to the way it ranks and displays content in News Feed. For example, in January 2018, Facebook announced changes to prioritize content from friends, family, and Groups in News Feed. Facebook recognized this change would likely decrease the amount of time users spent on Facebook, which it did, but believed it would be good for the community and its business over the long term. Facebook also announced recently that users were requesting to see less political content in their News Feeds and so it was studying ways to reduce the prominence of such posts.

### House Bill 20's Impact on Facebook

20.     I understand that on or around September 9, 2021, the State of Texas enacted House Bill 20 (the "Bill"), which is set to go into effect on December 2, 2021. I also understand that Facebook will be subject to the law.

21.     The Bill will significantly undermine, if not outright prevent, Facebook from enforcing its content policies and will require substantial and burdensome changes to the design and operation of its products. I will describe some examples below.

DocuSign Envelope ID: 5CE475DC-B445-4C05-B5C4-528FA4383B5B

22.     I understand that the Bill will force Facebook to display and prioritize content it would otherwise remove, restrict, or arrange differently. For example, the Bill prohibits "censorship" of any content based on the "viewpoint" of the expression or the speaker. "Censorship" includes decisions "to block, ban, remove, deplatform, demonetize, de-boost, restrict, deny equal access or visibility to, or otherwise discriminate against expression."

23.     This definition is broad enough to prevent Facebook from enforcing its terms and policies and even "ranking" the content that users are eligible to see in their News Feeds.

24.     The definition of "viewpoint" is broad enough to include virtually any type of user expression, including hate speech and other objectionable content like white supremacist content, anti-Semitic conspiracy theories, and other racist content.

25.     Similarly, the vague prohibition against "deny[ing] equal access or visibility to" content would appear to strike directly at Facebook's ability to rank and prioritize content to show people what they individually would deem most meaningful and valuable.

26.     Further, because the Bill prohibits Facebook from "censoring" a Texas "user's ability to receive the expression of another person," the Bill effectively will require Facebook to alter its policies globally as Texans can access and engage with billions of pieces of content shared by billions of people across the world and every statement arguably expresses some viewpoint. The required changes will be extraordinarily burdensome to implement and will adversely impact Facebook's community.

27.     Finally, the Bill appears to prohibit Facebook from engaging in its *own speech* because it vaguely prohibits Facebook from "otherwise discriminat[ing]" against user-submitted expression—which encompasses situations where Facebook appends a warning label (or other statement) to certain user-submitted content. So, for example, Facebook effectively will be

precluded from warning users, including teens, before viewing graphically-violent content or about content independent fact-checkers have determined is false.

28.     I also understand that the Bill will impose a number of "disclosure", administrative, and operational requirements on Facebook.   These requirements are also extraordinarily burdensome.

29.     I understand that the Bill requires Facebook to "publicly disclose accurate information" regarding its content moderation practices, "including specific information regarding how the social media platform: (i) curates and targets content to users; (ii) places and promotes content, services, and products, including its own content, services, and products; (iii) moderates content; (iv) uses search, ranking, or other algorithms or procedures that determine results on the platform; and (v) provides users' performance data on the use of the platform and its products and services."

30.     Though Facebook publishes its terms of service and community standards, the Bill does not explain what it means that Facebook's editorial policies must be "sufficient to enable users to make an informed choice regarding the purchase of or use of access to or services from the platform."

31.     Moreover, although Facebook's detailed policies are publicly available, the Bill purports to demand even more without any guidance, making it impossible to publish policies that will account for each and every decision Facebook makes regarding the billions of pieces of content users can access on its services every day.  All such decisions are unique and context-specific, and involve some measure of  judgment.

32.     The Bill also requires Facebook to disclose highly confidential, competitively sensitive business information, such as the "algorithms or procedures that determine results on the

platform." The underlying technology and processes that personalize users' News Feeds are highly proprietary and critical to Facebook's success. The public disclosure of this kind of information will result in competitive harm to Facebook and also expose Facebook and its community to harm by bad actors who will exploit such information.

33. I also understand that the Bill imposes a wide range of administrative and operational requirements that will be extraordinarily burdensome and require a substantial investment of time and resources to comply—for example:

- If Facebook removes content based on a violation of its "acceptable use policy," it must notify the user who provided the content of the removal and explain why the content was removed.

- Facebook must publish a "biannual transparency report" "outlining actions taken to enforce the policy," such as, for example, the number of instances the platform "was alerted to" and "took action with respect to illegal content, illegal activity, or potentially policy-violating content," including things like "content removal," "content demonetization," "content deprioritization" (which happens every time a user loads her or his News Feed since our product experiences are personalized), "account suspension," and "account removal," among others. The report must also include information on other matters, such as the "number of coordinated campaigns," the number of appeals by users, the percentage of successful appeals, and more.

- Facebook must implement a user complaint system that requires Facebook, within 14 days (excluding weekends), to review the content that is the subject of the complaint, determine whether the content adheres to Facebook's "acceptable use

DocuSign Envelope ID: 5CF175DC-B44E-4C05-BF64-E88F4A383BFB

policy," "take appropriate steps based on the determination," and then notify the user "regarding the determination made" and "steps taken." Facebook also must implement a specific appeals process that allows the user to appeal the decision to remove content from the platform, and provides written notice to the user of the determination of the appeal.

34.    Given the extraordinary scale of Facebook's systems and enforcement efforts, as described above and in Facebook's transparency reports, these disclosure, administrative, and operational requirements would impose an enormous burden on Facebook, to the extent compliance is even feasible.

35.    In short, if the Bill's restrictions go into effect, it will, among other things, force Facebook to display, arrange, and prioritize content it would otherwise remove, restrict, or arrange differently; it will chill Facebook's own speech; it will lead some users and advertisers to use Facebook less or stop use entirely; it will force Facebook to substantially modify the design and operation of its products; it will force Facebook to disclose highly sensitive, confidential business information; and it will impose highly onerous administrative and operational burdens on Facebook.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing to be true and correct to the best of my knowledge. Executed on September 30, 2021 in Washington, D.C..

DocuSigned by:

381E463703AB46C...

Neil Potts

10

# DEFENDANTS' EXHIBIT 5:





HOURLY NEWS

WAMU 88 5

On Air Now

PLAYLIST

n p r    **WAMU** 88.5    ○                                    DONATE

---

BUSINESS

# Twitter has lost 50 of its top 100 advertisers since Elon Musk took over, report says

November 25, 2022 · 7:37 AM ET

HALISIA HUBBARD



Half of Twitter's top 100 advertisers appear to no longer be advertising on the website.

*Constanza Hevia/AFP via Getty Images*

Half of Twitter's top 100 advertisers appear to no longer be advertising on the website. A report from Media Matters for America states that these 50 advertisers have spent almost $2 billion on Twitter ads since 2020 and more than $750 million just in 2022.

Seven additional advertisers have slowed their advertising to almost nothing, according to the report, which was published on Tuesday. These companies have paid Twitter more than $255 million since 2020.



**TECHNOLOGY**

Elon Musk's backers cheer him on, even if they aren't sure what he's doing to Twitter

Chevrolet, Chipotle Mexican Grill, Inc., Ford, Jeep, Kyndryl, Merck & Co. and Novartis AG all issued statements about halting Twitter ads or were reported and confirmed as doing so. The others ceased advertising on the platform for a "significant period of time following direct outreach, controversies, and warnings from media buyers."

The report wrote that even with these hits to advertising revenue, Twitter CEO Elon Musk has "continued his rash of brand unsafe actions — including amplifying conspiracy theories, unilaterally reinstating banned accounts such as that of former President Donald Trump, courting and engaging with far-right accounts, and instituting a haphazard verification scheme that allowed extremists and scammers to purchase a blue check."

**Sponsor Message**

**TECHNOLOGY**

Twitter recalls subscription-based service Twitter Blue just days after its launch

Twitter users like author Stephen King have criticized the new blue checkmark system. The symbol used to verify the identity of Twitter accounts, so it was easy to confirm a tweet's source.

Eli Lilly and Co. stopped showing ads on Twitter the day after an account impersonating the pharmaceutical company — complete with a purchased blue check mark — posted, "We are excited to announce insulin is free now."

Eli Lilly asked Twitter to take it down, but the tweet remained up for hours, because the platform's staff was stretched thin due to recent layoffs and resignations. The tweet garnered hundreds of retweets and thousands of likes, and Eli Lilly's stock soon took a dive.



**TECHNOLOGY**

Looking to leave Twitter? Here are the social networks seeing new users now

Endpoints News reported that 12 pharmaceutical giants soon stopped buying Twitter ads, citing Pathmatics, which collects data on corporate advertising and digital marketing trends.

King quipped on Twitter, "Pretty soon the only advertiser left on Twitter will be My Pillow." The pillow-manufacturing company is run by pro-Trump conspiracy theorist Mike Lindell.

Twitter did not immediately respond to NPR's request for comment.

elo  m  k   twitte

# DEFENDANTS' EXHIBIT 6:



**Twitter**

● Thi  article i  more than **2 months old**

## Twitter 'to lose 32m users in two years after Elon Musk takeover'

**Forecast predicts people will leave platform over technical problems and spread of hate speech**

**Mark Sweney**
▼ @marksweney
Tue 13 Dec 2022 06.00 EST

More than 30 million users are expected to leave Twitter over the next two years as concerns mount over technical issues and the proliferation of offen ive content after Elon Mu  k'  $44bn takeover, according to a foreca t.

The number of global monthly u er i  predicted to fall by nearly 4% next year and 5% in 2024   more than 32 million in total   in the first annual declines forecast by the market research agency Insider Intelligence since it began tracking the social media platform in 2008.

"There won't be one cata trophic event that end  Twitter," a principal analy t at In ider Intelligence, Ja mine Enberg,  aid "In tead, u er  will  tart to leave the platform next year a  they grow fru trated with technical i  ue and the proliferation of hateful or other unsavoury content.

"Twitter's skeleton staff, working around the clock, won't be able to counteract the platform's infrastructure and content moderation problem  "

It  report anticipates that Twitter will lo e more u er  in the US, it  bigge t market, than any other country, with number  declining 8.2 million over the next two years. By the end of 2024, US user numbers are forecast to fall to 50.5 million, the lowest level since 2014, as the Twitter becomes "more unstable, and less pleasant".

In the UK, Twitter will lo e about 1 6 million u er  over the next two year , to a ba e of 12 6 million, In ider Intelligence  aid

It predict  that while di illu ioned u er  leaving the platform will occur acro   all age demographic , the bigge t concentration of departers will come from the under-25 and over-45 age groups, which "aren't as loyal and are less willing to tolerate a degrading experience".

2/19/23, 9:11 AM
Case 3:22-cv-01213-TAD-KDM    Document 264-3    Filed 05/03/23    Page 165 of 419    PageID #: 18733
Twitter to lose 32 m users over 2 years, while Musk's takeover fuels hate speech | Twitter | The Guardian

In ider Intelligence ha al o la hed it foreca t for ad revenue growth for Twitter from 22% in 2023 and 16% in 2024 to "es entially flat", a adverti er pull back, pau e or top adverti ing over growing brand afety concern on the platform

In November, the research company cut its outlook for Twitter's ad revenue growth by 40% this year.

**Sign up to Business Today**

📧 **Free daily newsletter**

Get set for the working day – we'll point you to all the business news and analysis you need every morning

**Enter your email address**

[ _____ ]    Sign up

Privacy Notice  Newsletters may contain info about charities, online ads, and content funded by outside parties  For more information see our Privacy Policy  We use Google reCaptcha to protect our website and the Google Privacy Policy and Terms of Service apply.

"Musk's primary focus in 2023 will be kickstarting Twitter's revenue engine, after losing many of its biggest advertisers and a long tail of other advertisers who have been quietly quitting the platform," it said.

On Monday, Twitter abruptly di olved it tru t and afety council, an advi ory group of nearly 100 independent civil, human right and other organi ation that the company formed in 2016 to addres hate peech, child exploitation, uicide, elf harm and other problems on the platform, moments before a meeting scheduled with the company.

The unpopularity of the takeover by Musk, who has fired thousands of employees and told those remaining they had to work long hour at high inten ity, wa ummed up when the world' riche t man received a 10 minute choru of booing from a crowd of 18,000 when he joined the comedian Dave Chappelle on tage in San Franci co on Sunday night



I hope you appreciated this article. Before you move on, I was hoping you would consider taking the step of supporting the Guardian's journalism.

From Elon Musk to Rupert Murdoch, a small number of billionaire owners have a powerful hold on so much of the information that reaches the public about what's happening in the world. The Guardian is different. We have no billionaire owner or shareholders to consider. Our journalism is produced to serve the public interest - not profit motives.

And we avoid the trap that befalls much US media – the tendency, born of a desire to please all sides, to engage in false equivalence in the name of neutrality. While fairness guides everything we do, we know there is a right and a wrong position in the fight against racism and for reproductive justice. When we report on issues like the climate crisis, we're not afraid to name who is responsible. And as a global news organization, we're able to provide a fresh, outsider perspective on US politics - one so often missing from the insular American media bubble.

Around the world, readers can access the Guardian's paywall-free journalism because of our unique reader-supported model. That's because of people like you. Our readers keep us independent, beholden to no outside influence and accessible to everyone - whether they can afford to pay for news, or not.

**If you can, please consider supporting the Guardian today. Thank you.**

**Betsy Reed**
*Editor, Guardian US*

| Single | Monthly | Annual |

| $7 per month | $13 per month | Other |

Continue →    Remind me in March    VISA  mastercard  AMERICAN EXPRESS  P PayPal

# DEFENDANTS' EXHIBIT 7:

~~TOP SECRET//~~ ███████████ ~~//NOFORN~~ ███



## House Permanent Select Committee on Intelligence

# Report on Russian Active Measures

**March 22, 2018**

~~Classified by: 5000041~~
~~Derived from: Multiple Sources~~
~~Declassify on  20431231~~

~~TOP SECRET//~~ ███████████ ~~//NOFORN~~ ███

TOP SECRET// NOFORN

# Table of Contents

(U) Abbreviations — ii

(U) Referenced Persons — iii

(U) Preface — viii

(U) Introduction and Overview — 1

(U) Summary Table of Findings — 4

(U) Summary Table of Recommendations — 8

(U) Chapter 1 – Russian Influence Campaigns in Europe — 11

(U) Chapter 2 – Russia Attacks the United States — 22

(U) Chapter 3 – America Reacts — 38

(U) Chapter 4 – Campaign Links to Russia — 60

(U) Chapter 5 – Intelligence Community Assessment Leaks — 99

(U) Chapter 6 – Summary of Related Committee Oversight Efforts — 111

(U) Chapter 7 – Conclusions and Recommendations — 114

(U) Appendices — 131

(U) Appendix A: Scope and Methodology

(U) Appendix B: Russia Investigation Parameters

(U) Appendix C: Russia's Media Propaganda Apparatus

(U) Appendix D: Intelligence Community Policy Guidance 107.1

(U) Appendix E: HPSCI Majority Memo About FISA Abuses

(U) Appendix F: HPSCI Minority Memo About FISA Abuses

(U) Appendix G: Senate Judiciary Memo About Christopher Steele Referral

(U) Appendix H: Committee Correspondence with DOJ and FBI

TOP SECRET// NOFORN

## Abbreviations

| | | | |
|---|---|---|---|
| AP | Associated Press | NASS | National Association of Secretaries of State |
| APT | Advanced Persistent Threat | NATO | North Atlantic Treaty Organization |
| CIA | Central Intelligence Agency | NCCIC | National Cybersecurity and Communications Integration Center |
| CSP | Counterintelligence Scope Polygraph | | |
| DAG | Deputy Attorney General | NGO | Non-governmental Organization |
| DCCC | Democratic Congressional Campaign Committee | NIST | National Institute for Standards and Technology |
| DHS | Department of Homeland Security | | |
| DIA | Defense Intelligence Agency | NSA | National Security Agency |
| DNC | Democratic National Committee | NSAC | Candidate Trump's National Security Advisory Committee |
| DNI | Director of National Intelligence | | |
| DOJ | Department of Justice | NSC | National Security Council |
| EAC | U.S. Election Assistance Commission | ODNI | Office of the Director of National Intelligence |
| EU | European Union | | |
| FARA | Foreign Agents Registration Act | PTT | Presidential Transition Team |
| FBI | Federal Bureau of Investigation | RNC | Republican National Committee |
| FEC | Federal Election Commission | RT | Formerly known as Russia Today |
| FISA | Foreign Intelligence Surveillance Act | SCI | Sensitive Compartmented Information |
| FISC | Foreign Intelligence Surveillance Court | | |
| | | SIGINT | Signals Intelligence |
| FSB | Russian Federal Security Bureau | SIS | Moldovan Intelligence Service |
| FY | Fiscal Year | SSA | Supervisory Special Agent |
| GRU | Russian General Staff Main Intelligence Directorate | SVR | Russian Foreign Intelligence Service |
| | | UK | United Kingdom |
| HPSCI | House Permanent Select Committee on Intelligence (the Committee) | VOIP | Voice Over Internet Protocol |
| | | VPN | Virtual Private Network |
| HUMINT | Human Intelligence | | |
| IAA | Intelligence Authorization Act | | |
| IC | Intelligence Community | | |
| ICA | Intelligence Community Assessment | | |
| ICD | Intelligence Community Directive | | |
| ICPG | Intelligence Community Policy Guidance | | |
| IRA | Internet Research Agency | | |

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

~~TOP SECRET//~~ **NOFORN**

## (U) Referenced Persons

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| Assange | Julian | Founder of WikiLeaks |
| Bannon | Steve | Former Senior Counselor to the President and White House Chief Strategist (January-August 2017); former Chief Executive Officer of Donald Trump's 2016 presidential campaign; former Executive Chairman of Breitbart News |
| | | |
| | | |
| Brennan | John | Former Director of the Central Intelligence Agency (2013-2017) |
| Cameron | David | Former Prime Minister of the United Kingdom (2010-2016) |
| Chaika | Yuri | Prosecutor General of the Russian Federation (2006-present) |
| Clapper | James | Former Director of National Intelligence (2010-2017) |
| Clinton | Hillary | Nominated as the Democratic candidate for President in 2016; former Secretary of State (2009-2013); former First Lady of the United States |
| Clovis | Sam | Senior White House Advisor to the United States Department of Agriculture (2017-present); National Co-chair of Donald Trump's 2016 presidential campaign |
| Cohen | Michael | Executive Vice President of the Trump Organization and Special Counsel to Donald Trump |
| Comey | James | Former Director of the Federal Bureau of Investigation (2013-2017) |
| Conway | Kellyanne | Counselor to the President (2017-present); Campaign Manager of Donald Trump's 2016 presidential campaign (August 17, 2016-November 8, 2016) |
| Dearborn | Rick | White House Deputy Chief of Staff for Legislative, Intergovernmental Affairs (2017-present); Executive Director of the 2016 Presidential Transition Team |
| | | |
| Diveykin | Igor | Deputy Chief for Internal Policy of the Russian Federation |
| Djukanovic | Milo | Former President of Montenegro from 1998-2002; former Prime Minister from 2003-2006, 2008-2010, and 2012-2016 |
| Dmitriev | Kirill | Chief Executive Officer of the Russian Direct Investment Fund |
| Downer | Alexander | Australian High Commissioner to the United Kingdom |
| Dvorkovich | Arkady | Chairman of the Board of Directors of Russian Railways |
| | | |
| Fatah el-Sisi | Abdel | President of Egypt (2014-present) |

TOP SECRET// NOFORN

## (U) Referenced Persons (cont)

| Flynn | Michael | National Security Advisor (January 2017-February 2017) |
|---|---|---|
| Gates | Rick | Deputy to Paul Manafort (June-August 2016) |
| Gordon | J.D. | Director of National Security of Donald Trump's 2016 presidential campaign |
| Graham | Lindsay | United States Senator from South Carolina (2003-present); former member of the United States House of Representatives from South Carolina (1993-2003) |
| Grassley | Chuck | United States Senator from Iowa (1981-present); former member of the United States House of Representatives from Iowa (1973-1981) |
| Hicks | Hope | White House Director of Communications (2017-present); former White House Director of Strategic Communications (January 2017-September 2017); National Press Secretary of the Presidential Transition Team; Communications Director of Donald Trump's 2016 presidential campaign; former employee of the Trump Organization |
| Johnson | Jeh | Former Secretary of Homeland Security (2013-2017) |
| Kellogg | Keith | Executive Secretary and Chief of Staff of the National Security Council (February 2017-present); Acting National Security Advisor (February 2017); foreign policy advisor of Donald Trump's 2016 presidential campaign |
| Kemp | Brian | Secretary of State of the State of Georgia (2010-present) |
| Kushner | Jared | Senior Advisor to the President; son-in-law of the President (married Ivanka Trump in 2009); real-estate developer |
| Lavrov | Sergey | Minister of Foreign Affairs of the Russian Federation (2004-present) |
| Lynch | Loretta | Former Attorney General of the United States (2015-2017) |
| Macron | Emmanuel | President of France (2017-present) |
| Manafort | Paul | Chairman of Donald Trump's 2016 presidential campaign (June-August 2016) |
| Mashburn | John | Co-led, with Senator Sessions, the foreign policy advisory panel of Donald Trump's 2016 presidential campaign |
| McCabe | Andrew | Former Deputy Director of the Federal Bureau of Investigation (2016-2018) |

TOP SECRET// NOFORN

TOP SECRET/ NOFORN

# (U) Referenced Persons (cont)

| McConnell | Mitch | Senate Majority Leader (2015-present); United States Senator from Kentucky (1985-present) |
|---|---|---|
| McCord | Mary | Former Acting Assistant Attorney General of the United States (2016-2017); former Principal Deputy Assistant Attorney General for National Security (2014-2016) |
| McGahn | Don | White House Counsel (January 2017-present); General Counsel of the Presidential Transition Team (November 2016-January 2017); Counsel to the Trump campaign during Donald Trump's 2016 presidential campaign |
| Merkel | Angela | Chancellor of Germany (2005-present) |
|  |  |  |
| Mueller | Robert | Special Counsel for the United States Department of Justice (May 2017-present); former Director of the Federal Bureau of Investigation (2001-2013) |
| Obama | Barack | Former President of the United States (2009-2017) |
|  |  |  |
| Papadopoulos | George | Former member of the foreign policy advisory panel to Donald Trump's 2016 presidential campaign |
|  |  |  |
| Pelosi | Nancy | Minority Leader of the United States House of Representatives (2011-present); former Speaker of the United States House of Representatives (2007-2011); member of the United States House of Representatives from California (1987-present) |
| Pence | Mike | Vice President of the United States (2017-present); former Governor of Indiana (2013-2017); former member of the United States House of Representatives from Indiana (2001-2013) |
|  |  |  |
|  |  |  |
| Podesta | John | Chairman of Hillary Clinton's 2016 presidential campaign; former White House Chief of Staff; former Counselor to the President |
|  |  |  |
| Pompeo | Mike | Secretary of State nominee (March 2018); Director of the Central Intelligence Agency (January 2017-present); former member of the United States House of Representatives from Kansas (2011-2017) |

TOP SECRET/ NOFORN

## (U) Referenced Persons (cont)

| Putin | Vladimir | President of the Russian Federation (2012-present) |
|---|---|---|
| Reid | Harry | Former Minority Leader of the United States Senate (2015-2017); former United States Senator from Nevada (1987-2017) |
| Rice | Susan | Former National Security Advisor (2013-2017); former United States Ambassador to the United Nations (2009-2013) |
| Romney | Mitt | Former Republican nominee for President (2012); former Governor of Massachusetts (2003-2007) |
| Ryan | Paul | Speaker of the United States House of Representatives (2015-present); member of the United States House of Representatives from Wisconsin (1999-present) |
|  |  |  |
|  |  |  |
| Schiller | Keith | Former Deputy Assistant to the President and Director of Oval Office Operations (January 2017-September 2017); former Director of Security for the Trump Organization (2004-2017) |
| Schmitz | Joe | Former foreign policy advisor to Donald Trump; former Inspector General of the United States Department of Defense (2002-2005) |
|  |  |  |
| Sessions | Jeff | Attorney General of the United States (2017-present); member of the 2016 Presidential Transition Team and Donald Trump's 2016 presidential campaign; former United States Senator from Alabama (1997-2017) |
|  |  |  |
|  |  |  |
| Steele | Christopher | Founder of British research firm Orbis Business Intelligence; former British intelligence professional |
| Stone | Roger | Former advisor of Donald Trump's 2016 presidential campaign |
| Sullivan | Jake | Senior Policy Advisor of Hillary Clinton's 2016 presidential campaign; former National Security Advisor to the Vice President (2013-2014) |
|  |  |  |
|  |  |  |
| Trump | Donald J. | President of the United States (2017-present); career real estate developer and television host and producer |
| Trump, Jr. | Donald | President Trump's son; Trump Organization executive |

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



TOP SECRET//███████████████████//NOFORN██████

## (U) Referenced Persons (cont)

| | | |
|---|---|---|
| Yanukovich | Viktor | Former President of Ukraine (2010-2014) |
| Yates | Sally | Former Acting Attorney General of the United States (Jan 2017); former Deputy Attorney General of the United States (2015-2017) |

# (U) Preface

(U) In 2015, Russia began engaging in a covert influence campaign aimed at the U.S. presidential election. The Russian government, at the direction of President Vladimir Putin, sought to sow discord in American society and undermine our faith in the democratic process. Now, more than a year after the election, the American people rightfully want to know what the Russians did; how they did it; with whose support, if anyone's; and what can be done to counter any election tampering by foreign adversaries in the future.

(U) With this charge, the House Permanent Select Committee on Intelligence (the Committee) initiated an investigation in January 2017 with the mandate to examine (1) what Russian cyber activity and other active measures (covert influence activities run by the Russian intelligence services) were directed against the United States and its allies; (2) whether the Russian active measures include links between Russia and individuals associated with presidential campaigns; (3) what was the U.S. government response to these Russian active measures and what do we need to do to protect ourselves and our allies in the future; and (4) what possible leaks of classified information took place related to the Intelligence Community's assessment of these matters. Our goal was to provide, to the greatest extent practicable, a full accounting of what happened, how it happened, and recommendations for protecting

our democratic processes and institutions in the future.

(U) From the investigation's inception, we were determined to follow the facts wherever they might lead within the agreed-upon scope and refer any criminality (if found) to the appropriate authorities. During the investigation we identified numerous shortcomings, including counterintelligence concerns, classified leaks, puzzling legal processes, and inappropriate or questionable behavior. All of these are enumerated in this report through findings, recommendations, and conclusions.

(U) We reviewed every piece of relevant evidence provided to us and interviewed every witness we assessed would substantively contribute to the agreed-upon bipartisan scope of the investigation. We acknowledge that investigations by other committees, the Special Counsel, the media, or interest groups will continue and may find facts that were not readily accessible to the Committee or outside the scope of our investigation. We will ensure any new discoveries are considered in the due course of the Committee's continuing oversight responsibilities.

(U) We would like to recognize the tireless work of the Committee's staff, which remained professional and dedicated throughout this inquiry. They deserve our nation's gratitude. We would also like to thank the thousands of men and women who serve in the IC. They will wake up to-

morrow and continue their watch to protect the American people against further threats from Russia and other adversaries.

(U) Nevertheless, the Committee remains concerned that Russia will continue to undermine western democracies by stoking social strife, political unrest, and division. As a country, it is time for us to reflect, understand what happened, fix the discovered problems, and unify around the common purpose of countering any future influence campaigns by Russia or any other nation.

## (U) Introduction and Overview

(U) Russia's interference in the 2016 U.S. presidential election was nothing novel for the Kremlin. The Kremlin aspires to sow chaos and discord and advance its agenda in targeted nations, particularly in Europe and former Soviet republics such as the Baltics and Ukraine. To do this, Russia effectively combines decades of experience in propaganda and psychological warfare techniques with its vast media apparatus, a strata of well-educated and proficient technicians, and a robust intelligence and security corps.

(U) In the United States, Russian cyberattacks related to the 2016 elections starkly highlighted technical vulnerabilities in U.S. digital infrastructure and bureaucratic shortcomings that were exploited by the Kremlin. Russia's active measures campaign achieved its primary goal of inciting division and discord among Americans. For more than a year, U.S. politics have been consumed by bitter recriminations, charges, and counter-charges about the attacks. The reliability of the democratic vote—the bedrock of the U.S. republic—was widely and repeatedly questioned.

(U) At the time of the 2016 U.S. presidential election cycle, the Committee was already concerned with Russian malfeasance and aggression in levels that had not been seen since the Cold War. In fact, the IAA for fiscal years 2016 and 2017 included multiple provisions to improve the United States' ability to counter Russian aggression. However, the Kremlin's malicious activities

during the 2016 U.S. presidential election triggered the Committee to announce a specific inquiry into Russia's campaign (see Appendix B). The bipartisan parameters focused the investigation and this report—this Committee examined: (1) Russian cyber activity and other active measures that were directed against the United States and its allies; (2) whether the Russian active measures include links between Russia and individuals associated with presidential campaigns; (3) the U.S. government response to these Russian active measures and what we need to do to protect ourselves and our allies in the future; and (4) what possible leaks of classified information took place related to the Intelligence Community's assessment of these matters.[1] The Committee interviewed 73 witnesses, conducted 9 hearings and briefings, reviewed approximately 307,900 documents, and issued 20 subpoenas. This allowed the Committee to find answers crucial for identifying and addressing institutional weaknesses to assist the United States with identifying and responding to inevitable hostile acts in the future.

(U) While the 2016 U.S. presidential election helped focus American attention on Russian cyber and information operations, the Russian government has conducted active measure campaigns in Europe for years. Believing it is engaged in an information war with the West, Russia's influence activities employ an array of tactics—usually tailored

to the target country's population and environment—in an effort to accomplish the Kremlin's goals. These goals generally include influencing an opponent's leadership and population, advancing a narrative, or inducing a behavior change. The factors that make these campaigns successful also make them hard to counter. However, governments, non-governmental organizations, and media organizations in Europe have begun taking actions to address and mitigate the threat that Russian influence campaigns pose.

(U) The Russian active measures campaign against the United States was multifaceted. It leveraged cyberattacks, covert platforms, social media, third-party intermediaries, and state-run media. Hacked material was disseminated through this myriad network of actors with the objective of undermining the effectiveness of the future administration. This dissemination worked in conjunction with derisive messages posted on social media to undermine confidence in the election and sow fear and division in American society.

(U) The U.S. government's subsequent response to the Russian active measures campaign during the 2016 election was slow and inconsistent. ▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬ As that picture evolved, the FBI's notification to victims and oversight committees was inconsistent in timeliness and quality, which contributed to the victims' failure to both recognize the

threat and defend their systems. State and local governments were slow to grasp the seriousness of the threat and when notified of breaches continued to resist any action that implied federal direction or control. Some states opted not to cooperate with important defensive measures offered by the DHS. While no tabulation systems, or systems that count votes, were impacted, the overall security posture of the U.S. federal, state, and local governments was demonstrated to be inadequate and vulnerable.

(U) The Committee's investigation also reviewed the opening, in summer 2016, of a FBI enterprise counterintelligence investigation into ▬▬ Trump campaign associates: ▬▬▬▬▬▬ Carter Page, ▬▬▬▬▬▬▬▬▬▬▬▬
▬▬ Because of "the sensitivity of the matter," the FBI did not notify congressional leadership about this investigation during the FBI's regular counterintelligence briefings.[2] Three of ▬▬▬ original subjects of the FBI investigation have been charged with crimes and the Committee's review of these cases covers the period prior to the appointment of Special Counsel in May 2017.

(U) While the Committee found no evidence that the Trump campaign colluded, coordinated, or conspired with the Russian government, the investigation did find poor judgment and ill-considered actions by the Trump and Clinton campaigns. For example, the June 2016 meeting at Trump Tower between members of the Trump campaign

TOP SECRET// ███████████████ /NOFORN████

and a Russian lawyer who falsely purported to have damaging information on the Clinton campaign demonstrated poor judgement. The Committee also found the Trump campaign's periodic praise for and communications with Wikileaks—a hostile foreign organization—to be highly objectionable and inconsistent with U.S. national security interests. The Committee also found that the Clinton campaign and the DNC, using a series of cutouts and intermediaries to obscure their roles, paid for opposition research on Trump obtained from Russian sources, including a litany of claims by high-ranking current and former Russian government officials. Some of this opposition research was used to produce sixteen memos, which comprise what has become known as the Steele dossier.

(U) The effectiveness and relatively low cost of information operations, such as the dissemination of propaganda, make it an attractive tool for foreign adversaries. Unless the cost-benefit equation of such operations changes significantly, the Putin regime and other hostile governments will continue to pursue these attacks against the United States and its allies. Based on the investigation, the Committee recommends several solutions to help safeguard U.S. and allies' political processes from nefarious actors, such as the Russians.

---

1. HPSCI Press Release, *Intelligence Committee Chairman, Ranking Member Establish Parameters for Russia Investigation*, Mar. 1, 2017.

2. HPSCI, "Russian Active Measures Investigation Open Hearing," Mar. 20, 2017.

TOP SECRET// ███████████████ /NOFORN████

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// █████████ //NOFORN

## (U) Summary Table of Findings

### CHAPTER 1: RUSSIAN CAMPAIGNS IN EUROPE

(U) Finding #1: The Kremlin exploits free or independent media spaces and open democracies to conduct active measures in Europe.

(U) Finding #2: Russia supports fringe political parties and non-governmental organizations in Europe to further the Kremlin's agenda while also disparaging or discrediting politicians and groups seen as hostile to Moscow.

(U) Finding #3: Russia conducts increasingly aggressive cyber operations against European governments; a tactic that will continue to present a profound threat.

(U) Finding #4: Russia targets disaffected European populations and exploits social, political, and racial divisions in an effort to sow discord, encourage unrest, and incite protests.

(U) Finding #5: Russia leverages business and economic ties in Europe to achieve the Kremlin's goals, message displeasure, or inflict punishment.

(U) Finding #6: European governments and media outlets are conducting a variety of activities to combat Russian influence campaigns.

### CHAPTER 2: RUSSIA ATTACKS THE UNITED STATES

(U) Finding #7: Russia conducted cyberattacks on U.S. political institutions in 2015-2016.

(U) Finding #8: Russian-state actors and third-party intermediaries were responsible for the dissemination of documents and communications stolen from U.S. political organizations.

(U) Finding #9: The Russian government used RT to advance its malign influence campaign during the 2016 U.S. presidential election.

(U) Finding #10: Russian intelligence leveraged social media in an attempt to sow social discord and to undermine the U.S. electoral process.

### CHAPTER 3: AMERICA REACTS

(U) Finding #11: The Federal Bureau of Investigation's notification to numerous Russian hacking victims was largely inadequate.

(U) Finding #12: Communication between the Department of Homeland Security and state election officials was impeded by state officials' mistrust of federal government overreach coupled with a unprecedented level of Russian cyber intrusions.

TOP SECRET// █████████ //NOFORN

TOP SECRET/ ███ NOFORN ███

## (U) Summary Table of Findings (cont)

| CHAPTER 3: AMERICA REACTS (CONT) |
| --- |
| (U) Finding #13: The joint Office of the Director of National Intelligence and Department of Homeland Security public statement attributing election interference to Russia was ineffective. |
| (U) Finding #14: The Executive Branch's post-election response was insufficient. |
| (U) Finding #15: The majority of the Intelligence Community Assessment judgments on Russia's election activities employed proper analytic tradecraft. |
| (U) Finding #16: The Intelligence Community Assessment judgments on Putin's strategic intentions did not employ proper analytic tradecraft. |
| (U) Finding #17: The Federal Bureau of Investigation opened an enterprise counterintelligence investigation into the Trump campaign after receiving information related to Trump campaign foreign policy advisor George Papadopoulos. |
| (U) Finding #18: As part of the enterprise counterintelligence investigation into the Trump campaign, the Federal Bureau of Investigation opened an individual counterintelligence investigation into Carter Page. |
| (U) Finding #19: The dossier compiled by Christopher Steele formed an essential part of an application to the Foreign Intelligence Surveillance Court to obtain electronic surveillance on Carter Page. |
| (U) Finding #20: Special Counsel Robert Mueller indicted Paul Manafort on several charges, none of which relate to allegations of collusion, coordination, or conspiracy between the Trump campaign and the Russian government. |
| ████████████████████████████████████ |
| (U) Finding #22: General Flynn pleaded guilty to making a false statement to the Federal Bureau of Investigation regarding his December 2016 conversations with Ambassador Kislyak, even though the Federal Bureau of Investigation agents did not detect any deception during Flynn's interview. |
| (U) Finding #23: Executive Branch officials did not notify the Trump campaign that members of the campaign were assessed to be potential counterintelligence concerns. |
| (U) Finding #24: The February 2018 indictment of the Internet Research Agency and Russian nationals exposes Russian actors and their intent to spread distrust towards the candidates and the political system in general. |

TOP SECRET ███ NOFORN ███

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET/ NOFORN

## (U) Summary Table of Findings (cont.)

### CHAPTER 4: CAMPAIGN LINKS WITH RUSSIA

(U) Finding #25: When asked directly, none of the interviewed witnesses provided evidence of collusion, coordination, or conspiracy between the Trump campaign and the Russian government.

(U) Finding #26: The Committee found no evidence that President Trump's pre-campaign business dealings formed the basis for collusion during the campaign.

(U) Finding #27: The Republican national security establishment's opposition to candidate Trump created opportunities for two less-experienced individuals with pro-Russia views to serve as campaign advisors: George Papadopoulos and Carter Page.

(U) Finding #28: The change in the Republican Party platform regarding Ukraine resulted in a stronger position against Russia, not a weaker one, and there is no evidence that Paul Manafort was involved.

(U) Finding #29: There is no evidence that Trump associates were involved in the theft or publication of Clinton campaign-related emails, although Trump associates had numerous ill-advised contacts with WikiLeaks.

(U) Finding #30: Carter Page did not travel to Moscow in July 2016 on behalf of the Trump campaign, but the Committee is concerned about his seemingly incomplete accounts of his activity in Moscow.

(U) Finding #31: George Papadopoulos' attempts to leverage his Russian contacts to facilitate meetings between the Trump campaign and Russians was unsuccessful.

(U) Finding #32: Donald Trump Jr., Jared Kushner, and Paul Manafort attended a June 9, 2016, meeting at Trump Tower where they expected to receive—but did not ultimately obtain—derogatory information on candidate Clinton from Russian sources.

(U) Finding #33: Donald Trump Jr. briefly met with a Russian government official at the 2016 National Rifle Association annual meeting, but the Committee found no evidence that the two discussed the U.S. presidential election.

(U) Finding #34: The Committee found no evidence that meetings between Trump associates—including Jeff Sessions—and official representatives of the Russian government—including Ambassador Kislyak—reflected collusion, coordination, or conspiracy with the Russian government.

TOP SECRET/ NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



## (U) Summary Table of Findings (cont.)

### CHAPTER 4: CAMPAIGN LINKS WITH RUSSIA (CONT.)

(U) Finding #35: Possible Russian efforts to set up a "back channel" with Trump associates after the election suggest the absence of collusion during the campaign, since the communication associated with collusion would have rendered such a "back channel" unnecessary.

(U) Finding #36: Prior to conducting opposition research targeting candidate Trump's business dealings, Fusion GPS conducted research benefitting Russian interests.

(U) Finding #37: The law firm Perkins Coie hired Fusion GPS on behalf of the Clinton campaign and the Democratic National Committee to research candidate Trump's Russia ties.

(U) Finding #38: Christopher Steele claims to have obtained his dossier information second- and third-hand from purported high-placed Russian sources, such as government officials with links to the Kremlin and intelligence services.

(U) Finding #39: Christopher Steele's information from Russian sources was provided directly to Fusion GPS and Perkins Coie and indirectly to the Clinton campaign.

### CHAPTER 5: INTELLIGENCE COMMUNITY ASSESSMENT LEAKS

(U) Finding #40: Leaks of classified information regarding Russian intentions to sow discord in the U.S. presidential election began prior to the election day—November 8, 2016.

(U) Finding #41: Leaks of classified information alleging Russian intentions to help elect candidate Trump increased dramatically after the election day—November 8, 2016.

(U) Finding #42: The leaks prior to the classified Intelligence Community Assessment's publication, particularly leaks occurring after the U.S. presidential election, correlate to specific language found in the Intelligence Community Assessment.

(U) Finding #43: Continued leaks of classified information have damaged national security and potentially endangered lives.

(U) Finding #44: Former Director of National Intelligence James Clapper, now a CNN national security analyst, provided inconsistent testimony to the Committee about his contacts with the media, including CNN.



## (U) Summary Table of Recommendations

### CHAPTER 1: RUSSIAN CAMPAIGNS IN EUROPE

(U) Recommendation #1: European governments, non-governmental organizations, businesses, think tanks, and academia should strengthen legal and regulatory environments, promote media pluralism, build professional media associations, and improve the financial sustainability of legitimate news outlets.

(U) Recommendation #2: European governments, non-governmental organizations, businesses, think tanks, and academia should implement and encourage multi-pronged, country-wide efforts by both public and private entities to combat Russian propaganda, technical, and cyber operations.

(U) Recommendation #3: European governments, non-governmental organizations, businesses, think tanks, and academia should implement more stringent cyber security practices, such as multifactor authentication and encryption of sensitive data, as well as educating workforces on basic cyber security topics and best practices.

(U) Recommendation #4: European governments should look to long-term solutions to lessen economic dependence on Russia.

### CHAPTER 2 & 3: RUSSIA ATTACKS THE UNITED STATES AND AMERICA REACTS

(U) Recommendation #5: Congress should identify options available to the private sector and federal government that would address the social media vulnerabilities exploited by the Russian government.

(U) Recommendation #6: Congress should consider updating the Foreign Intelligence Surveillance Act to cover malicious international cyber actors.

(U) Recommendation #7: The Federal Bureau of Investigation should improve cyberattack victim notification.

(U) Recommendation #8: Threats identified by the Intelligence Community to state and local elections infrastructure should be immediately briefed to appropriate state and local officials. When threats are identified, the federal government should conduct an expedited declassification review to ensure that the threat information can reach all necessary state and local officials in a timely manner.

(U) Recommendation #9: The Secretary of Homeland Security should provide certain designated state and local election officials appropriate security clearances to enable those officials to respond to election-related threats.



TOP SECRET//NOFORN

# (U) Summary Table of Recommendations (cont.)

## CHAPTER 2 & 3: RUSSIA ATTACKS THE UNITED STATES AND AMERICA REACTS (CONT.)

(U) Recommendation #10: Significant threats to U.S. elections identified by the Intelligence Community, including cyberattacks directed at political organizations, should be immediately reported to the Congressional intelligence committees.

(U) Recommendation #11: Congress should encourage the adoption of National Institute of Standards and Technology cyber security standards, such as those adopted by the Elections Assistance Commission, by providing federal resources to state and local governments to facilitate such adoption. Funds should be tied to the adoption and certification of elections systems to appropriate standards.

(U) Recommendation #12: Congress should consider additional funding for the National Institute of Standards and Technology to enable better outreach to state and local governments.

(U) Recommendation #13: Congress should consider a one-time grant to state and local election agencies to conduct a risk assessment of those agencies' computer systems.

(U) Recommendation #14: Congress should consider strengthening the Help America Vote Act of 2002 to ensure that both statewide voter registration and tabulation systems are better protected from foreign cyber threats.

(U) Recommendation #15: The Department of Homeland Security should provide the owner or operator of any electronic election infrastructure affected by any significant foreign cyber intrusion with a briefing and include steps that may be taken to mitigate such intrusions.

(U) Recommendation #16: State and local governments should be encouraged to establish redundancies that are not dependent on current elections infrastructure, such as a mechanism that retains individual vote records, ensuring the integrity of the vote in the event of a compromise of voting infrastructure due to a foreign cyberattack. An example of such a redundancy is a contemporaneously created paper record reflecting the voter's selections.

(U) Recommendation #17: While it is important to implement lessons learned from the Executive Branch's response, Congress should not hamper the Executive Branch's ability to use discretion in responding to a particular foreign threat.

(U) Recommendation #18: Congress should consider repealing the Logan Act.

TOP SECRET//NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

## (U) Summary Table of Recommendations (cont.)

### CHAPTER 2 & 3: RUSSIA ATTACKS THE UNITED STATES AND AMERICA REACTS (CONT.)

(U) Recommendation #19: All U.S. presidential campaigns should receive unclassified counterintelligence briefings at an appropriate time prior to a nomination convention.

(U) Recommendation #20: When consistent with national security, the Intelligence Community should immediately inform U.S. presidential candidates when it discovers a legitimate counterintelligence threat to the campaign, and promptly notify Congress.

(U) Recommendation #21: Both houses of Congress should consider requiring all staff to receive an annual counterintelligence awareness briefing.

### CHAPTER 4: CAMPAIGN LINKS TO RUSSIA

(U) Recommendation #22: Political campaigns and law enforcement should ensure that their counterintelligence defenses appropriately account for the role of cut-outs and intermediaries.

(U) Recommendation #23: Congress should consider amending current campaign finance laws to further increase transparency regarding services provided by foreign persons or entities.

### CHAPTER 5: INTELLIGENCE COMMUNITY ASSESSMENT LEAKS

(U) Recommendation #24: Each component of the Intelligence Community should update its guidance regarding media contacts to ensure the guidance applies to every employee, including senior officials.

(U) Recommendation #25: Congress should consider legislation to increase the penalties for unauthorized disclosures of classified information.

(U) Recommendation #26: The Executive Branch should consider instituting mandatory polygraphs for all non-confirmed political appointees that have top secret clearances.



## (U) Chapter 1—Russian Influence Campaigns in Europe

*Key Question #1: What Russian cyber activity and other active measures were directed against the United States and its allies?*

(U) While Americans became acutely aware of Russian cyber and information operations after the 2016 U.S. presidential election, these activities were not new to Europe.

**UNCLASSIFIED**
**SOVIET PROPAGANDA TARGETING THE WEST AFTER WORLD WAR II**



Americani Aborigine Ahorazu Ahora
Source: Marshall Plan Foundation

**UNCLASSIFIED**



(U) Russia conducts information warfare in an effort to manipulate the populace and leadership of the nations it targets. To these ends, Russia employs an array of tactics for its influence activities in an effort to advance the Russian government's interests. When successful, these activities can influence an opponent's leadership and population to advance a narrative and induce a behavior change, concurrently serving multiple Russian objectives.

(U) Russia's goals for these campaigns include: to advance the Kremlin's interests; discredit the West; confuse or distort events that threaten Russia's image; break Western political cohesion; and defend Russia's role as a vital global power. More specific and country-tailored goals also include to: weaken, divide, and halt further expansion of consensus-driven institutions like NATO and the EU; sow confusion and amplify divisions among segments of Western populations; challenge establishment politics; damage U.S. foreign policy goals; advance Russia's version of world events; distract from controversial Russian policies and activities; reverse perceived anti-Russian policies; improve bilateral relations; and strengthen economic ties.

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

~~TOP SECRET/~~ ~~//OFORN~~

(U) Aiding in Russia's influence activitives, the modern world's widespread use of the internet and social media for news and communications has allowed Russia to: quickly and easily weaponize data stolen in cyber breaches; disseminate propaganda, misinformation, and disinformation; and aggravate social, racial, and political divisions.



(U) Finding #1: The Kremlin exploits free or independent media spaces and open democracies to conduct active measures in Europe.



(U) Russia also exploits free media

spaces and open democracies through a network of Russian state-owned news outlets and media platforms, such as Sputnik and RT, which promote Russia's image abroad and show foreigners world events from a Russian perspective (see Appendix C).

(U) The Kremlin's active measures, or information warfare, strategy includes several tactics:



- (U) After alleged Russian interference in the Brexit vote, in October 2013, the U.K. Electoral Commission announced a probe into this activity. According to open source reporting, Russian-based Twitter accounts posted more than 45,000 messages about Brexit in 48 hours during the 2016 referendum vote.[7]

- (U)

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



to Moscow.

**UNCLASSIFIED
HEADQUARTERS OF RUSSIA'S
INTERNET RESEARCH AGENCY**

Source: Independent

**UNCLASSIFIED**

(U) *Plant and propagate false news sto-ries*: Russia uses "troll" armies to set up fake social media accounts and blogs, including through an organization known as the Inter-net Research Agency (IRA).[11] A study by the European Endowment for Democracy de-scribed large numbers of paid Russian "trolls" on social media.[12]

(U) **Finding #2**: Russia supports fringe po-litical parties and non-governmental organ-izations in Europe to further the Kremlin's agenda while also disparaging or discred-iting politicians and groups seen as hostile

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

13



pugn the target's character or reputation.

**UNCLASSIFIED**

**ANTI-MERKEL PROTESTS FOLLOWING A RUSSIAN INFLUENCE CAMPAIGN**

Source: The Guardian

**UNCLASSIFIED**

(U) In another example during the recent French Presidential elections, Russian-controlled media highlighted defamatory stories about the private life and campaign funding of the more Russia-skeptic candidate Emmanuel Macron. Two days before the final presidential election, data hacked from Macron's En Marche party was posted on a data sharing website. Cybersecurity researchers attributed the hack to the same GRU group that hacked the DNC.[21]

(U) **Finding #3: Russia conducts increasingly aggressive cyber operations against European governments; a tactic that will continue to present a profound threat.**

(U) In a tactic dating back to the Soviet era, Moscow also denigrates and discredits people and groups seen as hostile to its interests

(U) Kremlin-linked journalists and media outlets also will engage in misinformation: weaving truth and falsehoods together to create misleading reports intended to im-

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



(U) Finding #4:  Russia targets disaffected European populations and exploits social, political, and racial divisions in an effort to sow discord, encourage unrest, and incite protests.



**(U) Finding #5:  Russia leverages business and economic ties in Europe to achieve the Kremlin's goals, message displeasure, or inflict punishment.**

(U) Russia is adept at utilizing economic ties to its advantage.  Moscow aims to deepen business ties with individuals that

TOP SECRET/ NOFORN

can be used as agents of influence, and countries whose dependence on trade with Russia create vulnerabilities to Russian influence. Economic vulnerability—such as reliance on Russia for trade or energy—can be leveraged to change behavior, message displeasure, or inflict punishment. For example, Germany imports about 40 percent of its natural gas from Russia. Because of this, many business leaders are lobbying for the removal of sanctions against Russia.[37]



(U) Finding #6: European governments and media outlets are conducting a variety of activities to combat Russian influence campaigns.

(U) According to a 2016 study by the RAND Corporation, Russia's various tactics for conducting information operations, combined with its lack of a consistent, ideological goal, make countering these activities difficult. This study found that the factors that make Russian disinformation effective—the high volume of stories, its rapid, continuous nature, and lack of consistency—are the same factors that make it difficult to counter.[38]

## UNCLASSIFIED
### 2017 EUROPEAN SEMINAR ON BOLSTERING RESILIENCE TO ACTIVE MEASURES CAMPAIGNS



Source: Public Use

### UNCLASSIFIED

(U) Many European governments are taking proactive steps to counter Russian propaganda and disinformation efforts. NATO has prioritized efforts to counter "hybrid threats" by developing a strategy that includes strengthened coordination with the European Union, as well as training and exercises through its new Intelligence Division. The Strategic Communications Center of Excellence in Riga, Latvia and the Cooperative Cyber Defense Center of Excellence in Tallinn, Estonia also contribute to these efforts. In addition, several NATO al-

TOP SECRET/ NOFORN



lies and European Union members signed a Memorandum of Understanding to establish a European Center of Excellence for Countering Hybrid Threats in April 2017.[43]

**(U)** In 2017, Ukraine banned Russian social media platforms, as well as RT and Sputnik—though the latter two can still be accessed online. Additionally, media platforms such as StopFake are used to identify false news stories.[50]

**(U)** In November 2016, the European Parliament adopted a resolution to counteract anti-EU propaganda by third parties.[51]

**(U)** In France, the French newspaper *Le Monde* launched a web platform to allow readers to check the reliability of French and international websites with an Internet browser extension that will alert readers when they come across false or unverified stories.[46]

█████████████████████████
█████████████████████████
█████████████████████████
█████████████████████████
█████████████████████████
█████████████████████████
█████████████████████████
█████████████████████████
█████████████████████████
█████████████████████████
█████████████████████████

(U) Russia's active measures campaign in Europe is nothing new, but the growing frequency and intensity of Russian influence efforts pose an increasingly significant threat to the United States and its allies. The Committee has taken significant measures to highlight this growing threat to the American people since at least 2015. Specifically, the Intelligence Authorization Act (IAA) for fiscal years 2016 and 2017 included multiple provisions to improve the United States' ability to counter Russian aggression:

- (U) FY 2016 IAA, Section 502. Assessment on funding of political parties and nongovernmental organizations by the Russian Federation.

- (U) FY 2016 IAA, Section 503. Assessment on the use of political assassinations as a form of statecraft by the Russian Federation.

- (U) FY 2017 IAA, Section 501. Committee to Counter Active Measures by the Russian Federation to Exert Covert Influence Over Peoples and Governments.

- (U) FY 2017 IAA, Section 502. Travel of Accredited Diplomatic and Consular Personnel of the Russian Federation in the United States.

- (U) FY 2017 IAA, Section 503. Study and Report on Enhanced Intelligence and Information Sharing with Open Skies Treaty Member States.



(U) Additionally, in 2016 the Committee held two hearings and seven briefings for Committee Members on Russia and related issues, and the Chairman and Members of the Committee sent six letters to the Administration urging stronger action against Russia. For example, Committee Members urged the Obama administration to hold Russia accountable for multiple violations of the Intermediate-Range Nuclear Forces Treaty, and expressed concern over likely Russian attempts to utilize the Open Skies Treaty for intelligence collection purposes. Additionally, in spring 2016, Chairman Nunes declared the inability to predict the plans and intentions of the Putin regime "the biggest intelligence failure since



9/11."[56]

1.
2.
3.
4.
5.
6.
7. Alexi Mostrous, Mark Bridge, Katie Gibbons, "Russia Used Twitter Bots and Trolls "To Disrupt" Brexit Vote," *The Times UK*, Nov. 15, 2017.
8.
9.
10.
11. Sonam Sheth, *"Our Task Was to Set Americans Against Their Own Government": New Details Emerge About Russia's Trolling Operation*, Business Insider, Oct. 17, 2017.
12. European Endowment for Democracy, *Bringing Plurality and Balance to the Russian Language Media Space*, June 25, 2015.
13.
14. HPSCI, HPSCI Staff Delegation to Tallinn, Estonia, Sept. 15, 2017.
15. HPSCI, HPSCI Staff Delegation to Tallinn, Estonia, Sept. 15, 2017; XE Currency Converter, *EUR to USD*, www.xe.com/currencyconverter/convert/?Amount=1&From=EUR&To=USD.
16. HPSCI, HPSCI Staff Delegation to Berlin, Germany, Sept. 16, 2017.
17.
18.
19.
20.
21.
22. TrendMicro, "From Espionage to Cyber Propaganda: Pawn Storm's Activities over the Past Two Years," Apr. 25, 2017.
23.
24.
25.
26.
27. HPSCI, HPSCI Staff Delegation to Berlin, Germany, Sept. 16, 2017; LexisNexis, Discovery Services Fact Sheet: "How Many Pages in a Gigabyte?," Dec. 23, 2017.
28.
29.
30.
31.
32.
33.
34. HPSCI, HPSCI Staff Delegation to Chisinau, Moldova, Sept. 19, 2017.
35.
36.
37. HPSCI, HPSCI Staff Delegation to Berlin, Germany, Sept. 16, 2017.
38.
39.
40.





41. ██████████████████████████████████████ .
42. ██████████████████████████████████████████████████████████

43. NATO, "NATO Welcomes Opening of European Centre for Countering Hybrid Threats," Apr. 11, 2017.
44. ████████████████████████████████████████████████
45. ████████████████████████████████████████████████
46. ████████████████████████████████████████████████
47. ████████████████████████████████
48. ████████████████████████████████████ .
49. HPSCI, HPSCI Staff Delegation to Tallinn, Estonia, Sept. 15, 2017.
50. HPSCI, HPSCI Staff Delegation to Kiev, Ukraine, Sept. 21, 2017.
51. European Parliament, "European Parliament resolution of 23 November 2016 on EU strategic communications to counteract propaganda against it by third parties," Nov. 23, 2016.
52. ████████████████████████████████████████████████
53. ████████████████████████████████████████████████
54. GAO, *Russia: U.S. Government Takes a Country-Specific Approach to Addressing Disinformation Overseas*, May 2017.
55. ████████████████████████
56. Bridget Johnson, "Chairman: Biggest Post 9/11 Intelligence Failure was Misreading Putin," *PJ Media*, Apr. 13, 2016; Saagar Enjeti, "US Response to Rusian Spying is 'Biggest Intelligence Failure Since 9/11," Sept. 15, 2016; Susan Jones, "Rep. Devin Nunes: We've Been Warning Administration About Russian Hacking 'And They Did Nothing,'" CNS News, Jan. 9, 2017.

# (U) Chapter 2 - Russia Attacks the United States

*Key Question #1: What Russian cyber activity and other active measures were directed against the United States and its allies?*

(U) The Russian government's multifaceted malign influence campaign was the subject of extensive public reporting in the months before the January 5, 2017, publication of the classified ICA titled *Assessing Russian Activities and Intentions in Recent US Elections.* While many of the facts concerning the attack have been widely disseminated, there are important elements of the Russian campaign that remain classified.

(U) The purpose of the Committee's review of the Russian information operations was to establish the facts, as well as the federal government's understanding of those facts. This chapter specifically examines (1) the cyberattacks that targeted U.S. political organizations (including the method of the attack and its attribution); (2) the dissemination of hacked material; and (3) the role of Russian state media and social media in Russia's malign influence campaign.

(U) **Finding #7: Russia conducted cyberattacks on U.S. political institutions in 2015-2016.**

(U) The Committee agrees with this statement and finds the ICA assessment of

Russian responsibility to be based on compelling facts and well-reasoned analysis.



**UNCLASSIFIED**

**SPEAR PHISHING** is a cyberattack that uses email to lure a victim into opening attachments, following links or disclosing their credentials. These messages are highly specific and seem authentic to the recipient.

**CREDENTIAL HARVESTING** is the process of identifying the usernames, passwords, and hashes of targets which can then be used to gain unauthorized access to a user's system.

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

25



(U) Attribution is a Bear





PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//                                                              NOFORN/

lective dissemination of information from hacked U.S. political systems. This represents a "significant escalation in directness, level of activity, and scope of effort" in Russia's "longstanding desire to undermine the US-led liberal democratic order." It is therefore likely that high-level Russian government approval was required in both planning and execution of the operation.[16]

(U) Russian-state Actors

(U) Guccifer 2.0 and DC Leaks



**UNCLASSIFIED**
**GUCCIFER 2.0 TAKES CREDIT FOR**
**DNC HACK ON WORDPRESS.COM**



Source: Wordpress.com (guccifer2.wordpress.com)
**UNCLASSIFIED**

(U) While the intelligence case for attribution to Russia is significant, alternative scenarios have been examined to include an insider threat or another cyber actor. No credible evidence was found supporting either alternative, including a review of information contained in classified intelligence reports.

(U) Finding #8: Russian-state actors and third-party intermediaries were responsible for the dissemination of documents and communications stolen from U.S. political organizations.

(U) Russian-state actors and third party intermediaries were responsible for the se-

TOP SECRET//                                                              NOFORN/

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ████████████ //NOFORN ████



(U) From their first appearances, both Guccifer 2.0 and DC Leaks sought to conceal their identities. During a media interview on June 21, 2017, Guccifer 2.0 identified himself as a Romanian "hacker, manager, philosopher, women lover," and a "freedom fighter." He further explained in broken English his desire to follow in Marcel Lazar's (the original Guccifer) footsteps to "fight for freedom of minds and for a world without illuminati."[19]

(U) Meanwhile, DC Leaks identified itself as a group of American hacktivists engaged in "a new level project aimed to analyze and publish a large amount of emails from top-ranking officials and their influence agents all over the world." The self-described premise of the DC Leaks effort was that "politicians have forgotten that in a democracy the people are the highest form of political authority."[20]

- (U) Both Guccifer 2.0 and DC Leaks worked to conceal their true identities, physical locations, and motivations;



- •
- •

- (U) Guccifer 2.0's first appearance online and claim of responsibility for the DNC hack occurred within 24 hours of the public announcement by ████████ that the DNC had been hacked by actors affiliated with the Russian government;[22]



- •

TOP SECRET// ████████████ //NOFORN ████

- (U) Multiple cybersecurity firms have evaluated Guccifer 2.0's activity and have published evidence that the online persona used a Russian-based VPN service to transmit files and communicate. Additionally, posted documents were processed on a computer using Russian language settings;[24]

- (U) During interactions with the media, Guccifer 2.0 denied any relationship with the Russian government and claimed to be Romanian. However, when pressed to explain how he hacked into the DNC in his native Romanian language, he failed to demonstrate fluency. Guccifer 2.0 terminated the interview when challenged on this point;[25]

- (U)

{U) WikiLeaks

{U) WikiLeaks played a key role in Russia's malign influence campaign and served as a third party intermediary for Russian intelligence during the period leading up to the 2016 U.S. presidential election.

(U) The global reach of WikiLeaks and its established ties to the media makes it an attractive outlet for the dissemination of stolen documents intended to undermine the United States and its electoral process. In addition, WikiLeaks' historic actions, which have undermined U.S. interests and been beneficial to Russia, make the organization an ideal intermediary for Russian intelligence.[27]

## UNCLASSIFIED
## GUCCIFER 2.0 & WIKILEAKS



Source: Twitter
## UNCLASSIFIED

(U) WikiLeaks relies on hackers, leakers, and other criminal agents to acquire personal, confidential, and classified material for publication.

As part of that dissemination, WikiLeaks sent 118 tweets promoting the hacked material. WikiLeaks messaging was then magnified by 426,000 other users' tweets. According to Twitter, as much as 25% of these tweets could have

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

Case 3:22-cv-01213-TAD-KDM Document 264-3 Filed 05/02/23 Page 207 of 419 PageID #: 18775

TOP SECRET// NOFORN

been the result of automated activity associated with Russia's malign influence campaign.[28]



**UNCLASSIFIED**
**WIKILEAKS DISSEMINATES HACKED**
**MATERIAL**

  

Source: WikiLeaks website
**UNCLASSIFIED**

Finding #9: The Russian government used RT to advance its malign influence campaign during the 2016 U.S. presidential election.

{U} The Committee finds ample evidence that RT is not only a state-enterprise, but is subject to the editorial control of the Russian government. This control allowed the Kremlin to use RT to advance its malign influence efforts during the 2016 U.S. presidential election.

(U) RT, formerly Russia Today, became an international news channel in 2005. It is available in more than 100 countries and has its largest viewer base in Europe. RT's stated goal is to "create news with an edge for viewers who want to question more" and produces content which appeals to skeptics of both the mainstream media and the establishment.[30]

{U} RT is subject to the control of the Russian government. The State Department describes it as a "State-owned international satellite news network broadcasting in multiple languages," which "spreads Russian propaganda tailored to international markets." The IC has identified RT as "the Kremlin's principal international propaganda outlet."[31]



TOP SECRET// NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

31

TOP SECRET// ▬▬▬▬▬▬ /NOFORN ▬▬▬

(U) During the 2016 U.S. presidential elections, RT ran stories consistent with its past editorial bias against the West and suggested that the U.S. electoral process had been corrupted. RT was critical of presidential candidates from both major parties but was consistently critical of candidate Clinton through the election.

(U) RT's attacks against candidate Clinton were wide-ranging, including the insinuation that the Clinton family were criminals. RT also used advertising to promote material leaked by Russian intelligence, which targeted candidate Clinton and the Democratic Party.[32]

(U) Finding #10: Russian intelligence leveraged social media in an attempt to sow social discord and to undermine the U.S. electoral process.



(U) The Internet Research Agency (IRA), a Russia-based "troll farm" with ties to the Kremlin, was responsible for placing ads and maintaining both human operated and automated social media accounts for the malign influence campaign.[34]

(U) Twitter

## UNCLASSIFIED
## RT SPONSORED TWEETS



RT ⊚                                    Follow

5 times when the Clintons escaped federal charges

The couple seem immune to scandal and charges

♡ ⊕

RT ⊚                                    Follow

#Podesta33: WikiLeaks releases latest batch of emails from Clinton campaign chair

#Podesta33: WikiLeaks releases latest batch of emails. WikiLeaks has published 61 33rd tranche of emails from the hacked account of Hilary Clinton's campaign chairman John Podesta



Source: Twitter

## UNCLASSIFIED

(U) The 2016 Russian Twitter operation was coordinated with the use of other social media platforms to undermine the U.S. political process and divide Americans. Both presidential candidates (@HillaryClinton and @realDonaldTrump) were directly engaged through "retweets" and "likes," as were various politically active and divisive

TOP SECRET// ▬▬▬▬ /NOFORN ▬▬▬

TOP SECRET/ /NOFORN

factions of American society.

(U) In total, Twitter identified 36,746 automated Russian accounts which were responsible for producing 1.4 million unique tweets. In addition, Twitter identified 2,752 human-operated accounts. Some of these accounts masqueraded as the news media, activists, and political organizations. One Russian account, @TEN_GOP, successfully impersonated the Tennessee Republican Party and grew to have significantly more followers than the legitimate Twitter account. After tweeting "We Love You, Mr. President" to Donald Trump, @TEN_GOP received a thank you from the presidential candidate.[35]

(U) @TEN_GOP and other Russian-linked accounts incited racial divisions, anti-Muslim, and anti-immigrant messages. They also promoted the dissemination of material stolen from U.S. political organizations by the GRU. The Russian cyber personas DC Leaks and Guccifer 2.0 used Twitter to promote stolen material, as did

WikiLeaks.

### (U) Facebook

(U) Russian operators also used Facebook Pages and advertising to advance their malign influence campaign. The company's internal review found the creation and promotion of 120 unique Facebook Pages by the IRA. These pages generated approximately 80,000 posts over the two year period preceding the election. These posts appeared in 29 million users' Facebook "News Feeds." When Facebook calculated the cumulative impact of "Shares" "Likes" and "Follows," the company estimated that 129 million people may have been served Russia's malign influence content.[36]

(U) According to Facebook, much of the Russian activity was designed to promote divisive social and political messages across the ideological spectrum and that advertising was intended to drive followership of divisive Pages. Four of the top impression-generating (or number of times an ad was on screen) advertisements were from fictitious personas claiming to represent organizations including "Back the Badge," "Blacktivist," "Being Patriotic," and "Woke Blacks."[37]

(U) Russian malign influence activities on Facebook were significant but they were not well-funded or large-scale operations relative to the overall scope of election-related activity on these platforms:

- Prior to the election, Russian operators used paid advertising on Facebook to reach 5 million Americans



UNCLASSIFIED

**RUSSIAN TWEETS USING
@HillaryClinton and
@realDonaldTrump**

32,254 Tweets & 111,326 Likes

416,632 Tweets & 480,346 Likes

Russian Twitter Accounts

Targeting @HillaryClinton followers

Targeting @realDonaldTrump followers

Source: Twitter

TOP SECRET/ ███████████ /NOFORN ████

# UNCLASSIFIED
# RUSSIAN ADS ON FACEBOOK













Source: Facebook

# UNCLASSIFIED

TOP SECRET/ ███████████ /NOFORN ████

34

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//███████████████          ███NOFORN███

(based on impressions). At the same time, 33 trillion stories were served on Facebook Pages and users averaged 220 per day;

- 56% of the 11.4 million impressions associated with Russian Facebook advertising occurred after the election;

- 99% of Russian Facebook ads were funded with less than $1,000 and 25% were never seen.

### (U) Google

(U) Google also was used as a media platform for Russia's malign influence campaign. The company's investigation revealed that $4,700 was spent promoting 18 channels and 1,100 YouTube videos (43 hours of content).

(U) Google describes this as a limited investment compared to overall election-related spending on Google. In total, 0.0002 percent of 2016 U.S. election advertising was found to be associated with Russian malign actors. In addition, Google noted that this Russian-funded media had very low view counts with only 3% reaching views of 5,000 or more.

(U) However, it should be noted that Google and its services have been and continue to be used by Russia for the dissemination of propaganda through RT. This is partly evidenced by RT's 2.2 million subscribers on YouTube, but also by the fact that RT propaganda is served to Americans by Google in the same manner as legitimate news sources.

(U) The Committee's investigation found that Twitter, Facebook, Google, and other social media platforms face significant challenges in their effort to identify and act on malign influence campaigns. Some of those challenges include:

- Sophisticated actors adapt to automated defenses;

- Social media does not require true name usage;

- Users can easily conceal their physical location with virtual private network connections;

- Social media seeks authentic exchanges and does not want to censor speech; and

- Social media platforms do not have access to intelligence reporting.



13. HPSCI, Full Committee Briefing on Russia Cyber Activity (Closed Session), Sept. 6, 2016; HPSCI, Full Committee Briefing on Russia Cyber Activity (Closed Session), Jan. 10, 2016; HPSCI, Full Committee Briefing on Russia Cyber Activity (Closed Session), Dec. 5, 2016; ████████, *Draft Incident Investigation Report for the Democratic National Committee*, Aug. 24, 2016; ████████, *Draft Incident Investigation Report for the Democratic Congressional Campaign Committee*, Aug. 8, 2016.

14. ████████ *Draft Incident Investigation Report for the Democratic National Committee*, Aug. 24, 2016; ████████ *Draft Incident Investigation Report for the Democratic Congressional Campaign Committee*, Aug. 8, 2016.

15. ████████ *Draft Incident Investigation Report for the Democratic National Committee*, Aug. 24, 2016; ████████ *Draft Incident Investigation Report for the Democratic Congressional Campaign Committee*, Aug. 8, 2016; LexisNexis, *Discovery Services Fact Sheet: "How Many Pages in a Gigabyte?"* Dec. 23, 2017.

16. ODNI, *Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent US Elections*, Jan. 5, 2017; HPSCI, Full Committee Briefing on Russian Cyber Activities (Closed Session), Dec. 5, 2016; HPSCI, Full Committee Briefing on Russia Cyber Activity (Closed), Jan. 10, 2016; ████████████; ODNI, *Intelligence Community Assessment: Cyber Threats to the 2016 US Presidential Election (ICA 2016-37HC)*, Sept. 12, 2016.

17. ████████████████████████████████████████████.

18. HPSCI, Full Committee Briefing on Russian Cyber Activities (Closed), Dec. 5, 2016; HPSCI, Full Committee Briefing on Russia Cyber Activity (Closed Session), Jan. 10, 2016; ███████████████, "The definitive Trump-Russia Timeline of Events," *Politico*, Dec. 1, 2017; ██████████████████████████, "Hacking Democracy: The Post's new findings in Russia's bold campaign to influence the U.S. election," *Washington Post*, July 11, 2017; ████████████████████████████████████████████████████████ ODNI, *Growing Risk of Strategic Surprise in Cyberspace Operations (NICM 2017-06)*, Jan. 30, 2017.

19. █████████████████, "Interview with Guccifer 2.0," *VICE*, June 21, 2017.

20. Twitter, @DCLeaks_

21. ████████████████████████████████████████████████████████████████████████████████████████████████████████,

22. █████████████ "Bears in the Midst: Intrusion into the Democratic National Committee," CrowdStrike Blog, June 15, 2016; █████████████, *Inside Story: How Russians Hacked the Democrats' Emails, Associated Press*, Nov. 4, 2017; ███████ "All Signs Point to Russia Being Behind the DNC Hack," *VICE*, July 25, 2016; ███████ "Interview with Guccifer 2.0," *VICE*, June 21, 2017.

23. ████████████████████████████████████████████████████████████████████████████████████████████████████████████ ██;

24. █████████████ "Two Years of Pawn Storm," *Trend Micro*, Apr. 25, 2017; ThreatConnect, "Guccifer 2.0: All Roads Lead Back to Russia," July 26, 2016; ████████████████████████████████████████████████████████████████████████████████████████████████████████

25. █████████████████████, "Interview with Guccifer 2.0," *VICE*, June 21, 2017.

26. ThreatConnect, "Does a BEAR Leak in the Woods? ThreatConnect Identifies DCLeaks as Another Russian-Backed Influence Outlet," Aug. 12, 2016

27. ████████████████████████████████████████████████████████████████████████████████ Joe Becker, Steven Erlanger, and Eric Schmitt, "How Russia Often Benefits When Julian Assange Reveals the West's Secrets," *The New York Times*, Aug. 31, 2016.

28. WikiLeaks.org, *About WikiLeaks (www.wikileaks.org)*, Dec. 22, 2017; Feike Hacquebord, "Two Years of Pawn Storm," *Trend Micro*, Apr. 25, 2017; ThreatConnect, "Guccifer 2.0: All Roads Lead Back to Russia," July 26, 2016; ████████████████████████; HPSCI, Full Committee Briefing on Russia Cyber Activity (Closed Session), Jan. 10, 2016.

29. HPSCI, Full Committee Briefing on Russian Cyber Activities (Closed Session), Dec. 5, 2016; HPSCI, Full Committee Briefing on Russia Cyber Activity (Closed Session), Jan. 10, 2016; Matthew Nussbaum, "The definitive Trump-Russia Timeline of Events," *Politico*, Dec. 1, 2017; ████████████████, "Hacking Democracy: The Post's new findings in Russia's bold campaign to influence the U.S. election," *Washington Post*, July 11, 2017; ████████████████████

30. RT.com, About, Dec. 23, 2017; ████████████████████

31. U.S. Department of State, *Media organizations controlled and funded by the Government of the Russia Federation (Report 002580)*, Nov. 7, 2017.

32. ████████████████████████████████████████████████████████████████████████.

33. ████████████████████████████████████████████████████████████████████████████

34. Written testimony of █████████████ Acting General Counsel of Twitter, Inc., Nov. 1, 2017; HPSCI, "Russia Investigation Task Force Hearing on Social Media," Nov. 1, 2017.

35. Written testimony of █████████████, Acting General Counsel of Twitter, Inc., Nov. 1, 2017.

36. Written testimony of █████████████, General Counsel, Facebook, Nov. 1, 2017.

37. HPSCI, "Russia Investigation Task Force Hearing on Social Media," Nov. 1, 2017.

# (U) Chapter 3 - America Reacts

*Key Question #3: What was the U.S. government response to these Russian active measures and what do we need to do to protect ourselves and our allies in the future?*

(U) As discussed in Chapter 2, the IC was at the tip of the spear of the U.S. government's response to Russia's nefarious cyber activities. While the NSA focused on detection and attribution, the FBI took the lead on victim notification, and the DHS was the primary agency responsible for providing assistance to victims and coordinating with state and local election officials.

(U) The federal government's ability to effectively respond to cyber threats depends on the IC's ability to pass information efficiently to the FBI at the lowest classification level possible. It is also dependent on the sufficiency of the interactions between the federal government and victim, whether that victim is a private organization such as the DNC, or a state or local government entity. Given the response to Russia's malign influence campaign, the Committee believes that FBI and DHS need to improve the processes used to engage with victims and stakeholders, who independently control their respective systems.

(U) The Executive Branch's policy response to Russia's active measures campaign included extensive deliberation, but not significant pre-election action. This is explained by two factors. First, the Executive Branch was justifiably concerned about raising an alarm so close to the election. Second, elections are not run by the federal government. State and local governments

are under no obligation to cooperate with federal officials, nor are political organizations that operate their own networks. In short, the developing intelligence on Russian active measures throughout 2016, the complexity of the political situation, and the lack of federal authority to act limited the options for aggressive pre-election actions. The Executive Branch took some actions, to include a joint DHS and ODNI public statement issued on October 7, 2016.

(U ████████████ , the CIA created a fusion cell on Russian election interference, which was comprised of analysts from the CIA, FBI, and NSA. This fusion cell produced a series of papers for the White House, directors of each of the three agencies, and the DNI. The cell operated through the election, standing down in mid-November.

(U) On December 6, 2016, President Obama directed CIA Director John Brennan to conduct a review of all intelligence relating to Russian involvement in the 2016 elections, and produce a single, comprehensive assessment. The result, an ICA titled *Assessing Russian Activities and Intentions in Recent US Elections*, was drafted by ████ CIA analysts ████████████ and was coordinated with the NSA and the FBI. While most of the analysis contained in the ICA held up to scrutiny, the Committee investigation found that ICA judgments on Putin's strategic ob-

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

jectives failed to meet most of the analytic standards set forth in the primary guiding document for IC analysis, Intelligence Community Directive (ICD) 203, *Analytic Standards.*

(U) Another component of the Executive Branch's response to the Russian government's efforts to interfere in the 2016 presidential campaign was FBI's opening of a counterintelligence investigation into "the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts."[1]

(U) The Committee collected facts related to the FBI's investigation through May 2017, until the appointment of Special Counsel Robert Mueller. The Committee did not examine events that occurred thereafter in order to avoid interfering with Special Counsel Mueller's ongoing investigation. While this chapter addresses the FBI's investigation, facts identified by the Committee relating to Russia contacts with Trump campaign associates, including the individuals under FBI investigation, are addressed in Chapter 4.

(U) **Finding #11: The Federal Bureau of Investigation's notification to numerous Russian hacking victims was largely inadequate.**



(U) The Committee is also concerned that many, perhaps even a majority, of Russia's known victims were never contacted by the FBI. In November 2017, the Associated Press (AP) reported that it contacted approximately 80 people out of a list of approximately 500 victims. Only two who were contacted by the AP "learned of the hacking attempts of their personal Gmail accounts from the FBI."[8] Although the Com-

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// /NOFORN



TOP SECRET// /NOFORN

mittee cannot verify the accuracy of the AP's reporting, Clinton campaign senior policy advisor Jake Sullivan testified to the Committee that, consistent with the AP's analysis, his personal Gmail account was the subject of numerous hacking attempts, but that he never received any sort of notification from FBI.[3]

(U) Interaction with the DNC illustrated that even when the FBI expeditiously made contact with a victim, and conveyed relatively detailed information, the engagement failed to elicit the desired response—namely, the DNC's swift and serious attention. Director Comey testified that, in retrospect, "[w]e would have sent up a much larger flare. Yeah, we would have just kept banging and banging on the door, knowing what I know now. We made extensive efforts to notify. I might have walked over there myself, knowing what I know now."[10] Similarly, former DHS Secretary Jeh Johnson reflected that, "You know, in retrospect, it would be easy for me to say that I should have brought a sleeping bag and camped out in front of the DNC in late summer, with the benefit of hindsight."[11]

(U) **Finding #12: Communication between the Department of Homeland Security and state election officials was impeded by state officials' mistrust of federal government overreach coupled with an unprecedented level of Russian cyber intrusions.**

(U) DHS was the first agency to raise awareness to state election officials and the general public regarding cybersecurity concerns with the 2016 election infrastructure.

In August 2016, Secretary Johnson hosted a conference call with the National Association of Secretaries of State (NASS) and other Chief Election Officials. This call was followed in September and October 2016 by four statements encouraging state and local elections officials to request DHS's cybersecurity assistance.[12]

(U) During the August 2016 phone call, Secretary Johnson offered assistance to state officials in managing risks to voting systems in each state's jurisdiction. He also encouraged state officials to implement recommendations from the Department of Commerce's NIST and the U.S. EAC on securing election infrastructure. At that time, DHS was "not aware of any specific or credible cybersecurity threats relating to the upcoming general election systems," and, on the call with state officials, "Secretary Johnson reiterated that DHS, the Election Assistance Commission, NIST, and DOJ are available to offer support and assistance in protecting against cyber attacks."[13]

(U) On August 18, 2016, the FBI Cyber Division, in an effort to aid cyber security professionals and system administrators to guard against the persistent malicious actions of cyber criminals, issued an alert to states entitled, "Targeting Activity Against State Board of Election Systems."[14] The bulletin warned that in late June 2016, an "unknown actor scanned a state's Board of Election website for vulnerabilities."[15] The FBI recommended that all states search activity logs for any escalation attempts and suggested three recommendations as pre-

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

cautionary measures.[16]

## UNCLASSIFIED

### FBI WARNS STATES OF MALICIOUS CYBER ATTEMPTS



Source: Yahoo

## UNCLASSIFIED

(U) In a September 16, 2016 statement, Secretary Johnson announced "we have seen cyber intrusions involving political institutions and personal communications. We have also seen some efforts at cyber intrusions of voter registration data maintained in state election systems."[17] Secretary Johnson encouraged election officials to reach out to DHS and also offered a variety of cybersecurity services to state and election officials, including:

- Scans on internet-facing systems, including reporting of vulnerabilities and mitigation recommendations;
- Risk and vulnerability assessments;
- Support from the National Cybersecurity and Communications Integration Center (NCCIC) to provide onsite assistance in identifying and remediating a cyber incident;
- Information sharing of relevant

cyber incidents, threats, and vulnerability information;

- Best practices for securing voter registration databases and addressing potential threats; and
- Field-based cybersecurity advisors to assist with planning and incident management.[18]

(U) Also on September 28, 2016, Speaker Ryan and Leaders McConnell, Pelosi, and Reid sent a letter to the National Association of State Election Directors, "urg[ing] states to take full advantage of the robust public and private sector resources available to them..." and informing them that "[i]n addition, the Department of Homeland Security stands ready to provide cybersecurity assistance to those states that choose to request it."[19]

(U) On October 1, 2016, Secretary Johnson expressed gratitude for the letter from congressional leadership, and noted that there were a few cases in which malicious actors gained access to state voting-related systems. He also encouraged state and local election officials to seek DHS' cybersecurity assistance. "So far, 21 states have contacted us about our services. We hope to see more,"\Johnson said at the time.[20]

(U) DHS and ODNI released a joint public statement on October 7, 2016. DHS continued to urge state and local election officials to remain vigilant and seek its assistance with cybersecurity.[21] On October 10, 2016, Secretary Johnson provided an update on DHS election cybersecurity services

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



that "to date, 33 states . . . election agencies have approached the Department of Homeland Security about our Cybersecurity services." Johnson stressed that time was an important factor, with only 29 days until election; it could take up to two weeks for DHS to run scans and identify vulnerabilities, and an additional week for election officials to mitigate any vulnerabilities. This was the Secretary's final public attempt to encourage state and local election officials to reach out to DHS for assistance.[22]

UNCLASSIFIED

Congress of the United States
Washington, DC 20515

[illegible]

Sincerely,

UNCLASSIFIED

(U) Challenges encountered by DHS included the unprecedented size and scope of Russian active measures, lack of public attention, and mistrust from state and local election officials—many of whom lacked access to classified information. Ultimately, 36 states took advantage of DHS's assistance, but many election officials were resistant to the idea of designating election infrastructure as critical infrastructure.[23] As former Secretary Johnson explained to the Committee, "one thing I discovered in this conversation, State election officials are very sensitive about what they perceived to be Federal intrusion into their process. I heard that firsthand over and over: This is our process. It's our sovereign responsibility. We're not interested in the Federal takeover."[24] A clear example of mistrust was a letter sent from Georgia's Secretary of State Brian Kemp to Secretary Johnson on December 8, 2016, which accused DHS of attempting to breach the Georgia Secretary of State's firewall. "I am writing to ask you whether DHS was aware of this attempt and, if so, why DHS was attempting to breach our firewall," Mr. Kemp stated.[25] Nevertheless, on January 6, 2017, DHS designated election infrastructure as a subsector of the existing Government Facilities critical infrastructure sector.[26]

**(U) Finding #13: The joint Office of the Director of National Intelligence and Department of Homeland Security public statement attributing election interference to Russia was ineffective.**

(U) No major public actions were taken

TOP SECRET//████████████████████                          //NOFORN████████

between October 7, 2016 and election day. It is unclear exactly when policymakers began focusing on Russian efforts to influence the election. As further discussed below, Attorney General Loretta Lynch recalls being briefed by FBI senior leadership████

████████████████████████████████ that the Counterintelligence Division had essentially uncovered some information or received information involving Russian intelligence operatives."[27]

{U} On May 18, 2016, speaking at the Bipartisan Policy Center in Washington, D.C., DNI Clapper stated, "we've [the IC] already had some indications of that [attempts of cyberattacks on presidential campaign websites] and the combination of DHS and FBI are doing what they can to educate both campaigns against potential cyber threats."[28]

(U) By summer 2016, CIA Director Brennan had become aware of information about "specific Russian efforts to influence the election,"[79] and the National Security Council (NSC) Principals Committee began discussing actions to take in response to what the Russians had been doing.[30] As Director Brennan continued to brief the Principals Committee on Russia, the CIA—as discussed previously in this report—"pulled together experts from the Central Intelligence Agency (CIA), NSA, and FB████

████ to focus on the issue, drawing in multiple perspectives and subject matter experts with broad expertise to assess Russian attempts to interfere in the U.S. Presidential election."[31]████████

While DHS was providing assistance to states to conduct cyber reviews of their electoral mechanisms, the Principals Committee was awaiting "with urgency whatever the Intelligence Community could provide" that "would illuminate [their] understanding of [Russian interest in the election]."[33]

## UNCLASSIFIED

## IC CONFIDENT OF RUSSIAN PRE-ELECTION HACKING

Joint Statement from the Department Of Homeland Security and Office of the Director of National Intelligence on Election Security



The U.S. Intelligence Community (USIC) is confident that the Russian Government directed the recent compromises of e-mails from US persons and institutions, including from US political organizations. The recent disclosures of alleged hacked e-mails on sites like DCLeaks.com and WikiLeaks and by the Guccifer 2.0 online persona are consistent with the methods and motivations of Russian-directed efforts. These thefts and disclosures are intended to interfere with the US election process. Such activity is not new to Moscow—the Russians have used similar tactics and techniques across Europe and Eurasia, for example, to influence public opinion there. We believe, based on the scope and sensitivity of these efforts, that only Russia's senior-most officials could have authorized these activities.

Source: DHS

## UNCLASSIFIED

{U} On August 4, 2016, Director Brennan, in a scheduled call with Alexander Bortnikov, the head of Russia's Federal Security Bureau (FSB), became the first U.S. official to raise the issue of Moscow's meddling.[34] Brennan told Bortnikov that a campaign against the United States would certainly "backfire" and that all Americans "cherished their ability to elect their own leaders without outside interference or disruption."[35] Additionally, former Attorney General

TOP SECRET//████████████████                          //NOFORN████████

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

Loretta Lynch testified that the decision was made to have "the President of the United States speak directly to President Putin, confront him with knowledge that we were aware of his efforts on a variety of fronts and that it was unacceptable, and that that discussion took place during a pull-aside . . . at one of the G- either 7 or 20 meetings in the early fall."[36] Former National Security Advisor Susan Rice corroborated in testimony before the Committee that President Obama and President Putin discussed Russian meddling in the 2016 election at the end of bilateral discussions during the G20 Summit in China in early September 2016.[37]

(U) The most significant pre-election public action was the October 7, 2016, joint DHS and ODNI statement, indicating in part that the IC "is confident that the Russian Government directed the recent compromises of e-mails from US persons and institutions, including from the US political organizations."[38] The IC assessed that the disclosures of alleged hacks on websites such as DCLeaks.com, WikiLeaks, and by Guccifer 2.0 were consistent with Russian methods and motivations. According to Secretary Johnson, the statement "did not get the public attention that it should have, frankly, because the same day the press was focused on the release of the 'Access Hollywood' video. That's what made our news below-the-fold news that day."[39] Additionally, the public dissemination of Podesta's emails commenced on October 7.[40]

(U) In considering a public response, the Executive Branch was in a unique posi-

tion—it was dealing with extremely sensitive intelligence and had to consider the impacts of jeopardizing sources and methods when declassifying intelligence.[41] Furthermore, in the midst of an ongoing campaign, it had to carefully consider any public statements or actions, as it did not want to be perceived as taking sides and politicizing the election—or, according to former Secretary Johnson fueling claims that the election was "rigged."[42]

(U) Finding #14: The Executive Branch's post-election response was insufficient.

(U) In the weeks following candidate Trump's victory over candidate Clinton in the 2016 U.S. presidential election, Executive Branch officials began brainstorming options for punitive actions against Russian activities. On December 6, 2016, President Obama ordered Director Brennan to conduct a review of all intelligence relating to Russia and the 2016 elections, including a comprehensive assessment that would eventually be made public.[43]

(U) On December 29, 2016, among other measures, President Obama announced the expulsion of 35 Russian intelligence operatives under diplomatic cover, the closure of Russian compounds in Maryland and New York, sanctions against nine entities and individuals associated with Russian intelligence services, and the Treasury Department's designation of two Russian individuals for "using cyber-enabled means to cause misappropriation of funds and personal identifying information."[44] Also on December 29, the FBI and DHS released a Joint

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

Analysis Report of declassified technical information on Russian cyber activity to help network defenders identify and disrupt Russian malicious cyber activity.

(U) On January 6, 2017, DHS designated election infrastructure as a subsector of the existing government facilities critical infrastructure sector.[45] The same day, a declassified version of the ICA was released to the public.[46]

(U) Finding #15: The majority of the Intelligence Community Assessment judgments on Russia's election activities employed proper analytic tradecraft.

(U) The IC produced three versions of the ICA: (1) a highly compartmented document, which included all sources and references to the underlying intelligence, (2) a Top Secret version that omitted details from compartmented reports, and (3) an unclassified version. The full ICA was briefed to President Obama on January 5, 2017 and President-elect Trump on January 6, 2017. The unclassified version of the ICA was also released to the public on January 6, 2017. While the level of detail varies greatly among the three versions, the final conclusions and key judgments of each are the same.

(U) The Committee determined that the majority of the ICA judgments on Russia's election activities employed proper analytic tradecraft. These were mostly well reasoned, consistent with observed Russian actions, properly documented, and—particularly on the cyber intrusion sec-

tions—employed appropriate caveats on sources and identified assumptions. Some of the key ICA judgments that the Committee found credible because they were based on proper analytic tradecraft are summarized below:

- (U) Russian efforts to influence the 2016 U.S. presidential election represent the most recent expression of Moscow's longstanding desire to undermine the U.S.-led liberal democratic order.

- (U) Russian intelligence services, acting on the orders of Russian President Vladimir Putin, launched cyber and conventional influence operations—notably by leaking politically sensitive emails obtained from computer intrusions—during the 2016 election.



(U) Finding #16: The Intelligence Community Assessment judgments on Putin's strategic intentions did not employ proper analytic tradecraft.

(U) While the Committee found that most ICA analysis held-up to scrutiny, the investigation also identified significant intelligence tradecraft failings that undermine confidence in the ICA judgments regarding Russian President Vladimir Putin's strategic objectives for disrupting the U.S. election. Those judgments failed to meet longstand-

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

~~TOP SECRET//~~ //NOFORN

ing standards set forth in the primary guiding document for IC analysis, ICD 203, *Analytic Standards* including:

- {U} "Properly describe quality and credibility of underlying sources."

- {U} "Properly express and explain uncertainties associated with major analytic judgments."

- {U} "Incorporate analysis of alternatives ... [particularly] when major judgments must contend with significant uncertainties or ... high-impact results."

- {U} Base confidence assessments on "the quantity and quality of source material."

- {U} "Be informed by all relevant information available."

- {U} "Be independent of political considerations."[47]

{U} The Committee emphasizes that the tradecraft failures identified in this investigation should not be broadly ascribed to CIA, NSA or FBI analysis, as the shortcomings were confined to select judgments—specifically, a key assessment on Putin's strategic intentions—and not to the entire ICA product. Moreover, the ICA was written ███████ CIA analysts and their draft was subjected to an unusually constrained review and coordination process, which deviated from established CIA practice. The Committee is not aware of these problems being prevalent in other CIA, FBI, or NSA products.

(C/NF)

(U) The Committee's findings on ICA tradecraft focused on the use of sensitive, ███ intelligence ███ cited by the ICA. This presented a significant challenge for classification downgrade. The Committee worked with intelligence officers from the agencies who own the raw reporting cited in the ICA to downgrade the classification of compartmented findings ███████



(U) The Committee is planning additional action regarding this information in early spring 2018.

{U} Finding #17: The Federal Bureau of Investigation opened an enterprise counterintelligence investigation into the Trump campaign after receiving information related to Trump campaign foreign policy advisor George Papadopoulos.

(U) In addition to the other Executive Branch responses described above, in late July 2016, the FBI opened an enterprise CI investigation into the Trump campaign following the receipt of derogatory information about foreign policy advisor George Papadopoulos. The purpose of an enterprise CI investigation is to obtain information of intelligence value, "most times .. . not with any kind of intent or objective of reaching a criminal charge."[48] FBI's enterprise CI investigation into the Trump campaign was led by a small team at FBI headquarters.[49] The timeline of this investigation can be found on the next page.

~~TOP SECRET//~~ //NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

47

(U) The derogatory information resulted from the relationship between Papadopoulos and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ was anonymized in Papadopoulos' charging document as "the Professor").[50] Based on the charging documents, the two first met in Italy on or about March 14, 2016, and "Papadopoulos was interested in ▓▓▓▓ because . . . [he] claimed to have substantial connections with Russian government officials, which Papadopoulos thought could increase his importance as a policy advisor . . ."[51] ▓▓▓▓ was interested in Papadopoulos because of his role in the Trump campaign.[52] The first meeting with ▓▓▓▓ occurred approximately one week prior to candidate Trump publicly naming Papadopoulos as a foreign policy advisor.[53]

(U) In late March, Papadopoulos had a follow-on meeting with ▓▓▓▓ London, where ▓▓▓▓ introduced Papadopoulos to a woman who claimed to be a relative of President Putin "with connections to senior Russian government officials."[54] Papadopoulos informed the campaign about this meeting, with a campaign supervisor proclaiming that Papadopoulos conducted "great work."[55] Papadopoulos continued to correspond with ▓▓▓▓ who connected Papadopoulos with an individual ▓▓▓▓ ▓▓▓▓ claiming to have connections with the Russian Ministry of Foreign Affairs.[56] Papadopoulos communicated with this Russian contact throughout the summer of 2016, attempting to arrange meetings between

the Russian government and campaign officials.[57]

(U) On April 26, 2016, over breakfast at a London hotel, ▓▓▓▓ told Papadopoulos "that he had just returned from a trip to Moscow where he had met with high-level Russian government officials."[58] ▓▓▓▓ further indicated he had learned that the Russians had obtained 'dirt' on candidate Clinton. Specifically that "'the Russians had emails of Clinton,' 'they have thousands of emails.'"[59] However, the Committee was unable to discern if the referenced emails were the missing emails from candidate Clinton's server while she was Secretary of State or the emails that were stolen from the DNC.



PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES.





counterintelligence investigation into the Trump campaign, the Federal Bureau of Investigation opened an individual counterintelligence investigation into Carter Page.

(U) By the time Page was announced as a Trump campaign foreign policy advisor on March 21, 2016, he was already a subject of interest for the FBI. Page previously lived and worked in Russia and maintained contact with known Russian intelligence officers, including ███████—who was described in a 2015 court filing as an SVR officer posted to the Russian Mission to the United Nations. Page previously worked with the FBI in the prosecution of █████ and other Russian intelligence officials.[68]

(U) Finding #18: As part of the enterprise

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

(U) Finding #19: The dossier compiled by Christopher Steele formed an essential part of an application to the Foreign Intelligence Surveillance Court to obtain electronic surveillance on Carter Page.

(U) In late October 2016, DOJ sought from the Foreign Intelligence Surveillance Court (FISC) an order authorizing

and the Committee did not find—any evidence of any cooperation or conspiracy between Page and Papadopoulos. Additionally, the so-called "dossier" compiled by Christopher Steele formed a substantial and essential

(For additional information about the Steele dossier, see Chapter 4.)



(U)

(U) Finding #20: Special Counsel Robert Mueller indicted Paul Manafort on several charges, none of which relate to allega-

tions of collusion, coordination, or conspiracy between the Trump campaign and the Russian government.

(U) Paul Manafort joined the Trump campaign on March 29, 2016, and was elevated to campaign chairman on May 19, 2016. Manafort became campaign manager after the campaign removed on June 20, 2016. The Committee agreed to avoid, to the greatest extent practical, any potential interference with Special Counsel Mueller's investigation. Given the ongoing litigation concerns associated with Manafort, the Committee will only discuss information in this report that has been publicly disseminated by the Special Counsel's office. Although the Committee would have appreciated the opportunity to interview Manafort regarding his role on the Trump campaign, the Committee is limited in this regard due to Special Counsel Mueller's investigation and indictments.

(U) On October 27, 2017, a grand jury indicted Manafort and his associate, fellow lobbyist and deputy Trump campaign manager Rick Gates, for various financial crimes, as well as making false statements.[74] All of the financial crimes took place prior to Manafort serving as Trump campaign manager, and nothing in the indictment relates to any potential collusion, conspiracy, or conspiracy between the Trump campaign and the Russian government.

(U) On February 22, 2017, a grand jury issued a superseding indictment for Manafort and Rick Gates, which included additional allegations of financial crimes, includ-

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET/ /NOFORN

ing bank fraud. Similar to the October 27, 2017, indictment, the superseding indictment does not include any reference to the Trump campaign, including no mention of collusion, coordination, or conspiracy between the Trump campaign and the Russian government.

(U) While the Committee will not go into further detail on the charges against Manafort due to ongoing litigation concerns, Special Counsel Mueller's indictment of Manafort illustrates the necessity for U.S. presidential campaigns to better investigate individuals who serve in senior positions within the campaign. If the accusations against Manafort are true, he should have never served as a senior official with a campaign for the U.S. presidency, much less campaign chairman or manager.



(U) General Flynn began advising the Trump campaign on or before February 2016 and subsequently became a central figure on the campaign trail. He was the former Director of DIA and was one of candidate Trump's closest advisors on national security issues. Following the election, and during the transition period, he was designated as the future National Security Advisor to the President. General Flynn served as President Trump's National Security Advisor for less than a month, resigning on February 13, 2017. According to FBI Director

Comey, General Flynn's resignation occurred after it came to light that he had misled Vice President-Elect Pence about his contacts with Russian Ambassador Sergey Kislyak during the transition period.[78]



(U) Prior to his trip to Moscow, General Flynn and his son met with Russian Ambassador Kislyak at the ambassador's private residence in Washington, D.C. on December 2, 2015. The meeting was later described by General's Flynn's son in an email to the Russian embassy as "very productive."[79] The email indicates that the meeting was arranged at the request of General Flynn or his son.[80] The Committee was unable to interview General Flynn and his son because of their written intent to assert their Fifth Amendment rights against self-incrimination.



PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ /NOFORN

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Director Comey testified that he authorized the closure of the CI investigation into General Flynn by late December 2016; however, the investigation was kept open due to the public discrepancy surrounding General Flynn's communications with Ambassador Kislyak.[82] ▓▓▓▓▓ ▓▓▓▓▓▓▓▓ Deputy Director McCabe stated that, "we really had not substantiated anything particularly significant against General Flynn," but did not recall that a closure of the CI investigation was imminent.[83]

**(U) Finding #22: General Flynn pleaded guilty to making a false statement to the Federal Bureau of Investigation regarding his December 2016 conversations with Ambassador Kislyak, even though the Federal Bureau of Investigation agents did not detect any deception during Flynn's interview.**

(U) According to the charging documents, on or about December 22, 2016, "a very senior member of the Presidential Transition Team" (PTT) directed General Flynn to contact representatives of foreign governments.[84] This request concerned a resolution about Israeli settlements submitted by Egypt to the U.N. Security Council around December 21, 2016.[85] Later, on December 22, General Flynn contacted Ambassador Kislyak and "requested that Russia

vote against or delay the resolution."[86] The next day, Ambassador Kislyak informed General Flynn that Russia would not comply with the request.[87]

(U) On December 29, 2016, President Obama "authorized a number of actions"—including new sanctions—"in response to the Russian government's aggressive harassment of U.S. officials and cyber operations aimed at the U.S. election in 2016."[88] Following this announcement, the charging documents state that General Flynn discussed "what, if anything, to communicate to the Russian Ambassador about the U.S. sanctions," with a senior PTT official.[89]

▓▓▓▓▓ In the call between General Flynn and Ambassador Kislyak, General Flynn "requested that Russia not escalate the situation and only respond to the U.S. sanctions in a reciprocal manner."[90] Russia decided not to reciprocate, which eventually led senior U.S. government officials to try to understand why. ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓ In a subsequent call with General Flynn, Ambassador Kislyak attributed the action to General Flynn's request.[92]

▓▓▓▓▓ On January 24, 2017, following a call from Deputy Director McCabe to General Flynn, made at the direction of Director Comey, General Flynn met alone with two FBI agents at the White House.[93] The Committee received conflicting testimony from Deputy Attorney General (DAG) Yates, Director Comey, Principal Deputy Assistant Attorney General McCord, and Deputy Di-

TOP SECRET// ▅▅▅▅▅▅▅▅▅ //NOFORN

rector McCabe about whether the primary purpose of the interview was investigating potentially misleading statements to the Vice President, which the Vice President echoed publicly about the content of those calls;[94] a possible violation of the Logan Act;[95] or a desire to obtain more information as part of the counterintelligence investigation into General Flynn.[96] Director Comey testified to the Committee that "the agents . . . discerned no physical indications of deception. They didn't see any change in posture, in tone, in inflection, in eye contact. They saw nothing that indicated to them that he knew he was lying to them."[97] Deputy Director McCabe confirmed the interviewing agent's initial impression and stated that the "conundrum that we faced on their return from the interview is that although [the agents] didn't detect deception in the statements that he made in the interview . . . the statements were inconsistent with our understanding of the conversation that he had actually had with the ambassador."[98]

▅▅▅▅▅ Subsequent to General Flynn's meeting with the FBI, two senior DOJ officials visited the White House on January 25 and January 26 to discuss with White House Counsel Don McGahn the discrepancies between the transcripts of General Flynn's calls and his statements to the FBI.[99] General Flynn resigned on February 13, 2017. Although Deputy Director McCabe acknowledged that "the two people who interviewed [Flynn] didn't think he was lying, [which] was not [a] great beginning of a false statement case,"[100] General Flynn pleaded guilty to one count of making false statements on December 1, 2017.[101]

**(U) Finding #23: Executive Branch officials did not notify the Trump campaign that members of the campaign were assessed to be potential counterintelligence concerns.**

(U) The Committee found that the Trump campaign was not notified that members of the campaign were potential counterintelligence concerns. This lack of notification meant that the campaign was unable to address the problems with each campaign member and was ignorant about the potential national security concerns. AG Lynch recalled that, during her first meeting with Director Comey and McCabe about Page, "one of the possibilities the three of us discussed was whether or not to provide what is called a defensive briefing to the campaign, wherein there would be a meeting with a senior person with the Trump campaign to alert them to the fact that . . . there may be efforts to compromise someone with their campaign."[102]

(U) Such a defensive briefing would not have been unusual. According to Lynch, "[i]t is not an uncommon thing to do . . . in intelligence matters."[103] However, the FBI did not provide any such warning about Page, although it was again discussed by the administration's most senior policymakers after Director Comey briefed the National Security Council Principals about the Page information in "late spring" 2016.[104]

TOP SECRET// ▅▅▅▅▅▅▅▅▅ //NOFORN

(U) The Trump campaign did not receive a general counterintelligence briefing until August 2016, and even then, it was never specifically notified about Papadopoulos, Page, Manafort, or General Flynn's Russia ties.[105] Further, the counterintelligence briefing provided to Trump and his top advisors did not identify any individuals by name, but rather focused on the general threat posed by adversaries, including Russia and China.

**(U) Finding #24: The February 2018 indictment of the Internet Research Agency and Russian nationals exposes Russian actors and their intent to spread distrust towards the candidates and the political system in general.**

(U) In mid-February 2018, the Department of Justice charged 12 Russians and the Russia-based Internet Research Agency LLC with interference operations targeting the United States political and electoral processes. The indictment claims that the stated goal of the Russian actors was to "spread distrust towards the candidates and the political system in general" and provides insight into the methods used by the IRA, such as the use of stolen identities, travel to the U.S. for the purpose of collecting intelligence, and the procurement of computer infrastructure to hide the Russian origin of activities.[106] The indictment by Special Counsel Mueller contains assertions that are consistent with information examined by the Committee during its investigation. Specifically, according to an accompanying DOJ announcement, "There is no allegation in

the indictment that any American was a knowing participant in the alleged unlawful activity. There is no allegation in the indictment that the charged conduct altered the outcome of the 2016 election."[107]

TOP SECRET//                                       NOFORN

1.  HPSCI, "Russian Active Measures Investigation", Mar. 20, 2017.
2.  HPSCI, "Russian Active Measures Investigation", Mar. 20, 2017.
3.
4.
5.
6.

7.
8.

9.  HPSCI, Executive Session Interview of Jake Sullivan, Dec. 21, 2017.
10. HPSCI, "Russian Active Measures Investigation", Mar. 20, 2017.
11. HPSCI, "Russia Investigative Task Force Hearing with Former Secretary of Homeland Security Jeh Johnson," June 21, 2017.
12. HPSCI, "Russia Investigative Task Force Hearing with Former Secretary of Homeland Security Jeh Johnson," June 21, 2017.
13. DHS, *Readout of Secretary Johnson's Call With State Election Officials About Cybersecurity*, https://www.dhs.gov/news/2016/08/15/readout-secretary-johnsons-call-state-election-officials-cybersecurity, Aug. 15, 2016.
14. FBI, *FBI Flash: Targeting Activity Against State Board of Election Systems*, Aug. 18, 2016.
15. FBI, *FBI Flash: Targeting Activity Against State Board of Election Systems*, Aug. 18, 2016.
16. FBI, *FBI Flash: Targeting Activity Against State Board of Election Systems*, Aug. 18, 2016.
17. DHS, *Statement by Secretary Johnson Concerning the Cybersecurity of the Nation's Election Systems*, http://www.dhs.gov/news/2016/09/16/statement-secretary-johnson-concerning-cybersecurity-nation's-election-systems, Sept. 16, 2016.
18. DHS, *Statement by Secretary Johnson Concerning the Cybersecurity of the Nation's Election Systems*, http://www.dhs.gov/news/2016/09/16/statement-secretary-johnson-concerning-cybersecurity-nation's-election-systems, Sept. 16, 2016.
19. Paul D. Ryan, Nancy Pelosi, Mitch McConnell, Harry Reid, *Letter to Todd Valentine*, Sept. 28, 2016.
20. DHS, *Statement by Secretary Johnson About Election Systems' Cybersecurity*, http://www.dhs.gov/news/2016/10/01/statement-secretary-johnson-about-election-systems-cybersecurity, Oct. 1, 2016.
21. DHS, *Joint Statement from the Department of Homeland Security and Office of the Director of National Intelligence on Election Security*, https://www.dhs.gov/news/2016/10/07/joint-statement-department-homeland-security-and-office-director-national, Oct. 7, 2016.
22. DHS, *Update by Secretary Johnson On DHS Election Cybersecurity Services*, https://www.dhs.gov/news/2016/10/10/update-secretary-johnson-dhs-election-cybersecurity-services, Oct. 10, 2016.
23. HPSCI, "Russia Investigative Task Force Hearing with Former Secretary of Homeland Security Jeh Johnson," June 21, 2017.
24. HPSCI, "Russia Investigative Task Force Hearing with Former Secretary of Homeland Security Jeh Johnson," June 21, 2017.
25. The Office of Secretary of State of Georgia, Letter to Secretary Jeh Johnson, Dec. 8, 2016.
26. DHS, Statement by Secretary Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector, https://www.dhs.gov/news/2017/01/06/statement-secretary-johnson-designation-election-infrastructure-critical, Jan. 6, 2017.
27. HPSCI, Executive Session Interview of Loretta Lynch, Oct. 20, 2017.
28. "The Global Digital Challenge Initiative – Keynote Address," Bipartisan Policy Center video, 38:29, http://bcove.me/zff9r4pq, May 18, 2016.
29. HPSCI, Executive Session Interview of Loretta Lynch, Oct. 20, 2017.
30. HPSCI, Executive Session Interview of Loretta Lynch, Oct. 20, 2017; The Principals Committee, convened and chaired by the National Security Advisor, is a Cabinet level interagency forum for considering policy issues that affect the national security interests of the United States. Regular attendees of the Principals Committee include: the Secretary of State, the Secretary of the Treasury, the Secretary of Defense, the Attorney General, the Secretary of Energy, the Chief of Staff to the President, the Director of National Intelligence, the Chairman of the Joint Chiefs of Staff, the Director of the Central Intelligence Agency, the National Security Advisor, the Homeland Security Advisor, and the Representative of the United States to the United Nations.
31. HPSCI, "Russian Active Measures During the 2016 Election Campaign," May 23, 2017.
32. The Gang of 8 is comprised of the Speaker of the House of Representatives, the Minority Leader of the House of Representatives, the Chairman and Ranking Member of the Permanent Select Committee on Intelligence of the House of Rep-

TOP SECRET//                              N/NOFORN

Case 3:22-cv-01213-TAD-KDM Document 264-3 Filed 05/02/23 Page 233 of 419 PageID #: 18801

resentatives, the Majority and Minority Leaders of the U.S. Senate, and the Chairman and Vice Chairman of the Select Committee on Intelligence of the U.S. Senate.

33. HPSCI, Executive Session Interview of Susan Rice, Sep. 8, 2017.
34. HPSCI, "Russian Active Measures During the 2016 Election Campaign," May 23, 2017.
35. HPSCI, "Russian Active Measures During the 2016 Election Campaign," May 23, 2017.
36. HPSCI, Executive Session Interview of Loretta Lynch, Oct. 20, 2017.
37. HPSCI, Executive Session Interview of Susan Rice, Sep. 8, 2017.
38. DHS, *Joint Statement from the Department of Homeland Security and Office of the Director of National Intelligence on Election Security*, https://www.dhs.gov/news/2016/10/07/joint-statement-department-homeland-security-and-office-director-national, Oct. 7, 2016.
39. HPSCI, "Russia Investigative Task Force Hearing with Former Secretary of Homeland Security Jeh Johnson," June 21, 2017.
40. HPSCI, Executive Session Interview of John Podesta, June 27, 2017.
41. HPSCI, "Russia Investigative Task Force Hearing with Former Secretary of Homeland Security Jeh Johnson," June 21, 2017.
42. HPSCI, "Russia Investigative Task Force Hearing with Former Secretary of Homeland Security Jeh Johnson," June 21, 2017.
43. ████████████████████████████████████████████████████████████████
   ████████████████████████████████████████████████████████████████
   ████████████████████████████████████████████████████████████████
   ████████████████████████████████████████████████████████████████ in September 2016 ████ shared similar information in a one-on-one meeting with FBI General Counsel James Baker. HPSCI, Executive Session of ████, Dec. 18, 2017. Around the same time as his meeting with FBI, ████ shared the information with journalists, including ████ of Slate, who published an article at the end of October. HPSCI, Executive Session of ████ Dec. 28, 2017; ████ "Was a Trump Service Communicating With Russia?," Slate, Oct. 31, 2016. Candidate Clinton promoted the ████ article to her social media followers the same day it was published. Twitter, @HillaryClinton, Oct. 31, 2016, 4:32 PM.
44. White House, *Statement by the President on Actions in Response to Russian Malicious Cyber Activity and Harassment*, Dec. 29, 2016.
45. DHS, *Statement by Secretary Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector*, https://www.dhs.gov/news/2017/01/06/statement-secretary-johnson-designation-election-infrastructure-critical, Jan. 6, 2017.
46. ODNI, *Assessing Russian Activities and Intentions in Recent US Elections*, Jan. 6, 2017.
47. ODNI, *Intelligence Community Directive 203: Analytic Standards*, Jan. 2, 2015.
48. HPSCI, Executive Session Interview of Mary McCord, Nov. 1, 2017.
49. HPSCI, Executive Session Interview of Andrew McCabe, Dec. 19, 2017.
50. U.S. v. George Papadopoulos (1:17-cr-182, District of Columbia).
51. U.S. v. George Papadopoulos (1:17-cr-182, District of Columbia).
52. U.S. v. George Papadopoulos (1:17-cr-182, District of Columbia).
53. Post Opinions Staff, "A transcript of Donald Trump's meeting with The Washington Post editorial board," *Washington Post*, Mar. 21, 2016.
54. U.S. v. George Papadopoulos (1:17-cr-182, District of Columbia).
55. U.S. v. George Papadopoulos (1:17-cr-182, District of Columbia); Email from George Papadopoulos to ████████. "Re: Meeting with Russian leadership—including Putin," Mar. 24, 2016 [DJTFP00010111].
56. U.S. v. George Papadopoulos (1:17-cr-182, District of Columbia); Email from George Papadopoulos to ████████ Fwd: (Russian Outreach)," May 4, 2016 [DJTFP00011405].
57. U.S. v. George Papadopoulos (1:17-cr-182, District of Columbia).
58. U.S. v. George Papadopoulos (1:17-cr-182, District of Columbia).
59. U.S. v. George Papadopoulos (1:17-cr-182, District of Columbia)
60. ████████████████████████████████████████████████████████████████

61. ████████████████████████████████████████████████████████████████

62. ████████████████████████████████████████████████████████████████

63. ████████████████████████████████████████████████████████████████

TOP SECRET// ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ /NOFORN

64. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

65. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

66. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

67. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓

68. U.S. v. Evgeny Buryakov, a/k/a "Zhenya," ▓▓▓▓▓▓▓▓▓▓, and ▓▓▓▓▓▓▓▓▓▓, U.S. Southern District of New York, January 23, 2015; ▓▓▓▓▓▓▓▓▓▓, "Russian Spies Tried to Recruit Carter Page Before He Advised Trump," *The New York Times*, Apr. 4, 2017; DOJ, Foreign Intelligence Surveillance Court Application, Oct. 21, 2016, which was made available for review by HPSCI members and staff on March 17, October 31, November 2, December 14, December 15, and December 18, 2017.

69. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

70. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

71. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

72. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

73. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

74. U.S. v. Paul J. Manafort, Jr. and Richard W. Gates III (1:17-cr-201, District of Columbia).

75. HPSCI, "FBI Counterintelligence Investigations," Mar. 2, 2017.

76. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

77. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

78. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

79. Michael G. Flynn, Email messages to Russian Embassy in United States, Flynn Intel Group Production, FLYNN_HPSCI_00000500, 00007542.

80. Michael G. Flynn, Email message to Russian Embassy in United States, Flynn Intel Group Production, FLYNN_HPSCI_00000500, 00007542.

81. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

82. HPSCI, "FBI Counterintelligence Investigations," Mar. 2, 2017.

83. HPSCI, Executive Session Interview of Andrew McCabe, Dec. 19, 2017.

84. U.S. v. Michael T. Flynn (1:17-cr-232, District of Columbia).

85. U.S. v. Michael T. Flynn (1:17-cr-232, District of Columbia).

86. U.S. v. Michael T. Flynn (1:17-cr-232, District of Columbia).

87. U.S. v. Michael T. Flynn (1:17-cr-232, District of Columbia).

88. Barack Obama, "FACT SHEET: Actions in Response to Russian Malicious Cyber Activity and Harassment," *The White House*, Dec. 29, 2016.

89. U.S. v. Michael T. Flynn (1:17-cr-232, District of Columbia).

90. U.S. v. Michael T. Flynn (1:17-cr-232, District of Columbia).

91. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

92. U.S. v. Michael T. Flynn (1:17-cr-232, District of Columbia).

93. HPSCI, "FBI Counterintelligence Investigations," Mar. 2, 2017.

94. HPSCI, Executive Session Interview of Sally Yates, Nov. 3, 2017.

95. HPSCI, "FBI Counterintelligence Investigations," Mar. 2, 2017; HPSCI, Executive Session Interview of Sally Yates, Nov. 3, 2017.

TOP SECRET// ~~████████████~~ NOFORN ████

96.  HPSCI, Executive Session Interview of Andrew McCabe, Dec. 19, 2017.
97.  HPSCI, "FBI Counterintelligence Investigations," Mar. 2, 2017.
98.  HPSCI, Executive Session Interview of Andrew McCabe, Dec. 19, 2017.                     99.
HPSCI, Executive Session Interview of Sally Yates, Nov. 3, 2017, p. 57, 71; HPSCI, Executive Session Interview of Mary
     McCord, Nov. 1, 2017.
100. HPSCI, Executive Session Interview of Andrew McCabe, Dec. 19, 2017
101. U.S. v. Michael T. Flynn (1:17-cr-232, District of Columbia).
102. HPSCI, Executive Session Interview of Loretta Lynch, Oct. 20, 2017.
103. HPSCI, Executive Session Interview of Loretta Lynch, Oct. 20, 2017.
104. HPSCI, Executive Session Interview of Loretta Lynch, Oct. 20, 2017.
105. HPSCI, Staff meeting with Bill Priestap, FBI Assistant Director, Head of the Counterintelligence Division, Oct 31, 2017.
106. U.S. v. Internet Research Agency, et al. (1:18-cr-32, District of Columbia).
107. DOJ, "Grand Jury Indicts Thirteen Russian Individuals and Three Russian Companies for Scheme to Interfere in the United
     States Political System," Feb. 16, 2018.

TOP SECRET// ~~████████████~~ NOFORN ████            59

TOP SECRET//                                                    //NOFORN

## (U) Chapter 4 - Campaign Links to Russia

*Key Question #2: Did the Russian active measures include links between Russia and individuals associated with political campaigns or any other U.S. persons?*

(U) A key focus of the Committee's investigation was whether Russian active measures directed at the 2016 U.S. election (see Chapter 3) "include[d] links between Russia and individuals associated with political campaigns or any other U.S. persons."[1] The first part of this chapter reflects the Committee's answer to that question with respect to the Trump campaign. The second part of this chapter addresses the Clinton campaign.

(U) The "links" between individuals associated with the campaigns and Russia have often been publicly described as inquiries into whether there was "collusion" between individuals associated with either candidate Trump or Clinton and the Russian government. One challenge with describing potential "links" with the Russian government as "collusion" is that the term "collusion" may mean different things to different people, as exemplified in witness testimony before the Committee. Particularly in light of Special Counsel Robert Mueller's continuing criminal investigation—which has a different focus and the Committee agreed not to impede—it is important to note that the term "collusion" does not, by itself, describe a criminal offense. Unlike the closely-related concept of "conspiracy," there is no applicable statute that sets out the elements of "collusion." "Collusion" is

therefore an ambiguous term, not a precise legal one.

### Trump Campaign

(U) The Committee cast a wide net, generally asking each witnesses whether they had evidence of any "collusion," "coordination," or "conspiracy" between Russia and candidate Trump or any of his associates. The Committee also investigated potential Trump campaign links with Russia, focusing on credible allegations within the scope of the agreed-upon parameters. Matters investigated by the Committee include allegations pertaining to:

- candidate Trump's business dealings;
- the campaign's policy positions and personnel;
- involvement in or knowledge about the publication of stolen emails; and
- meetings with Russians.

(U) In the course of witness interviews, reviews of document productions, and investigative efforts extending well over a year, the Committee did not find any evidence of collusion, conspiracy, or coordination between the Trump campaign and the Russians. While the Committee found that several of the contacts between Trump associates and Russians—or their proxies, including WikiLeaks—were ill-

TOP SECRET/                                                       NOFORN

advised, the Committee did not determine that Trump or anyone associated with him assisted Russia's active measures campaign.

## DIRECT EVIDENCE OF COLLUSION, CONSPIRACY, OR COORDINATION

(U) Finding #25: When asked directly, none of the interviewed witnesses provided evidence of collusion, coordination, or conspiracy between the Trump campaign and the Russian government.

(U) The Committee interviewed high-ranking current and former government officials, along with numerous Trump campaign members, Trump administration officials, and other Trump associates. None of the witnesses testified they had evidence of collusion between the campaign and anyone affiliated with the Russian government. In most of the Committee's witness interviews, the witness was asked directly for any evidence of "collusion, coordination or conspiracy" with any element of the Russian government to influence the outcome of the 2016 U.S. presidential election. This question was asked with respect to the witness' own actions; the actions of candidate Trump; the actions of anyone officially affiliated with the campaign; or the actions of anyone unofficially affiliated with the campaign, defined as including "wannabes,"[2] "hangers-on,"[3] and "people who represented themselves as being part of the campaign."[4] Each witness was given wide latitude in answering these questions, but none produced any evidence. For example, Trump's son-in-law and senior advisor Jared

Kushner stated categorically that the Trump campaign "did not collude, cooperate, whatever other 'C' words you used, with any foreign governments."[5]

(U) Several former government officials testified that, even though there was no evidence of collusion between Trump campaign associates and the Russian government, they were aware of contacts and interactions of potential concern. For example, former CIA Director John Brennan stated in open session, "I encountered and am aware of information and intelligence that revealed contacts and interactions between Russian officials and U.S. persons involved in the Trump campaign that I was concerned about because of known Russian efforts to suborn such individuals, and it raised questions in my mind. . . whether or not the Russians were able to gain the cooperation of those individuals."[6] Brennan continued, however, "I don't know whether or not such collusion . . . existed."[7]

(U) Similarly, former DNI James Clapper stated that he was aware of the same information to which Brennan referred, "that my dashboard warning lights were on just because of that."[8] However, reaffirming his prior public statements, he told the Committee that, "I didn't have any evidence—I don't care how you want to caveat it—of collusion."[9]

## BUSINESS DEALINGS

(U) Finding #26: The Committee found no evidence that President Trump's pre-campaign business dealings formed the

TOP SECRET//                    NOFORN

basis for collusion during the campaign.

(U) As a political outsider who had never run for office, Donald Trump did not have a political record to analyze, criticize, or rely upon during the 2016 campaign. Therefore, his long and varied business career garnered significant attention from supporters, opponents, and opposition researchers alike. Eventually, as described in the second half of this chapter, candidate Trump's pre-campaign business dealings with Russians became a subject of significant opposition research.

(U) As noted above, the Committee's investigation was focused on the time period of the 2016 election. Trump's pre-campaign dealings were within scope only to the extent they formed the basis for, or were otherwise linked to, improper conduct during the elections. As one of the Committee Members said during an interview, the key question was if any business "relationships, whether directly or indirectly or just by some other means, had the effect that there was a preexisting relationship with Russia, and that that preexisting relationship may have in some way inspired the Trump campaign to have a contact with the Russian Government to coordinate, collude, or conspire to help them win the election over Hillary Clinton."[10]

(U) The Committee focused only on any potential financial improprieties relating to the election. In particular, the Committee examined the Miss Universe pageant in Moscow in 2013; the Trump Organization's

unsuccessful efforts to build a Trump Tower in Moscow in late 2015 and early 2016; and other assorted claims of Russian financial ties to the Trump family. The Committee did not uncover any evidence that any of those matters formed the basis for collusion, coordination, or conspiracy between Trump or his associates and the Russian government during the 2016 U.S. presidential election.

(U) Miss Universe 2013: Before he was a political candidate, Trump owned the Miss Universe Organization. The decision to hold the 2013 Miss Universe annual pageant in Moscow was a unanimous one made by representatives of the Trump Organization and NBC—the event's broadcaster—with approval of the president of the Miss Universe organization.[11] Michael Cohen, an attorney and former Executive Vice President of the Trump Organization, told the Committee 50 percent of the fees earned for the pageant went to NBC.[12] "[O]f the $12.2 million in foreign income that [the Miss Universe pageant] earned [in 2013], a substantial portion of it was attributable to the Moscow event."[13]

(U) The 2013 pageant's hosts were Aras and Emin Agalarov, father and son of a wealthy Azerbaijani-Russian family in Moscow. The Agalarovs' company, Crocus Group, owned the venue where the pageant was held.[14] The Agalarovs and Crocus Group wanted to host the event in Moscow because they wanted to have the pageant in their company's building, Crocus City Hall, and it was a way to promote Emin's music

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// /NOFORN

career, who performed at the pageant.[15] The Agalarovs have connections with senior individuals and elements of the Russian government,[16] and Aras received the Order of Honor from Vladimir Putin.[17] The decision to hold the pageant in Moscow originated from an "off-the-cuff" discussion between Emin Agalarov, his manager, and a representative from the Miss Universe pageant.[18]

### UNCLASSIFIED
### EMIN AGALAROV AT THE 2013 MISS UNIVERSE PAGEANT IN MOSCOW



Source: Ice Markz

### UNCLASSIFIED

(U) The Agalarovs first met Trump in person in 2013 in connection with the Miss USA pageant in Las Vegas.[19] The Agalarovs and Trump signed the contract to hold the pageant in Moscow during the weekend of the Miss USA pageant in January 2013.[20] At the conclusion of the 2013 Miss USA pageant, Trump and the Agalarovs announced on stage that the Miss Universe pageant that year would be held in Moscow.[21] In a June 18, 2013 tweet, Trump publicly asked, "Do you think Putin will be going to The Miss Universe Pageant in November in Moscow – if so, will he

become my new best friend?"[22]

(U) Leading up to the Miss Universe pageant, the issue of President Putin possibly attending came "up a number of times" among those planning the pageant.[23] Emin's manager Robert Goldstone and the head of the pageant organization had "casual" conversations with one another, but every time Goldstone asked Emin about it, Emin replied the pageant would have had to go through "official channels" to make the request, indicating that the event was not officially related to the Russian government.[24] At the time, according to Goldstone, Emin cast doubt on whether President Putin would attend, stating "if this was in America, would Barack Obama attend? Probably not. It's a beauty pageant. But there is a chance, maybe, of some kind of meeting."[25] Before the pageant, however, President Putin's press secretary called and told Trump and others that President Putin would not attend the pageant, and he did not.[26]

(U) While in Moscow, Trump, along with his head of security, attended the pageant and several pageant-related events.[27] For example, Trump attended an event hosted by the Agalarovs at a well-known restaurant with local businessmen.[28]

(U) Although there were allegations in the Steele dossier that Trump engaged in illicit activities with prostitutes in the presidential suite at the Ritz-Carlton hotel, the Committee found no evidence to support these allegations. Trump's former head of security, ████████, testified that

TOP SECRET// /NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

Case 3:22-cv-01213-TAD-KDM Document 264-3 Filed 05/02/23 Page 240 of 419 PageID #: 18808

although somebody during a meeting in Moscow did not know who—"mentioned sending women to [Trump's] room,' responded "absolutely not, we don't do that."[29] told the Committee he advised Trump of the comment, and they both laughed about it. also testified he walked Trump to his room that night, remained for a few minutes, and did not observe anybody enter the room.[30]

(U) Trump Tower Moscow: While in Russia for the Miss Universe pageant, Trump met with the Agalarovs and discussed a possible joint real estate development in Moscow.[31] The proposed project was a Trump Tower in Moscow adjacent to the Agalarov-owned Crocus City Hall; according to Donald Trump Jr., "it fizzled out" after a few months.[32]

(U) Trump Organization lawyer Michael Cohen was not involved in those original discussions regarding Trump Tower Moscow. In approximately September 2015, he received a separate proposal for Trump Tower Moscow from a businessman named .[33] According to Cohen, the concept of the project was that "[t]he Trump Organization would lend its name and management skills, but it was not going to borrow any money and it would not have any resulting debt for the purchase of the land and the building of the facility."[34] Cohen worked on this idea with and his company, the Bayrock Group, a real estate consultancy that had previously worked with the Trump Organization.

has a unique and colorful background, and described for the Committee his path from Wall Street banker to white-collar criminal to government informant.[35]

(U) After signing a letter of intent with a local developer in October 2015,[36] Cohen and exchanged a number of emails and text messages in late 2015 detailing their attempts to move the project forward. For instance, in December 2015, tried to get Cohen and candidate Trump to travel to Russia to work on the project.[37]

(U) Several of communications with Cohen involved an attempt to broker a meeting or other ties between candidate Trump and President Putin, and purported to convey Russian government interest in the project.[38] Perhaps most notably, told Cohen in a November 3, 2015, email, "[b]uddy our boy can become President of the USA and we can engineer it."[39] continued that if "Putin gets on stage with Donald for a ribbon cutting for Trump Moscow, ... Donald owns the republican nomination."[40] This assertion apparently arose from rather grandiose theory that cementing a deal with a hostile U.S. adversary would increase candidate Trump's foreign policy bona fides.[41]

(U) testified that his communications with Cohen regarding President Putin were "mere puffery," designed to elicit a response from the Trump Organization to move the project along.[42] explained that "[u]ntil the bank writes the check, it's all salesmanship and promotion to try to get many, many,

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

64

TOP SECRET// ///NOFORN

many parties towards the center to try to get the deal done."[43] Cohen similarly characterized ▮ as "a salesman" who "uses very colorful language."[44]

(U) When the project started proceeding too slowly for the Trump Organization,[45] Cohen and ▮ began to exchange acrimonious text messages.[46] As part of those text messages ▮ told Cohen that President Putin's people were backing the deal, including "this is thru Putins [sic] administration, and nothing gets done there without approval from the top," as well as meetings in Russia with "Ministers" and "Putins [sic] top administration people."[47] ▮ also mentioned Dmitry Peskov (President Putin's spokesman) would "most likely" be included.[48]

(U) Cohen thus attempted to reach out to members of the Russian government in an attempt to make the project proceed, but apparently did not have any direct points of contact. For example, Cohen sent an email to a general press mailbox at the Kremlin in an effort to reach Peskov.[49] Cohen's message notes that he has been working with a local partner to build a Trump Tower in Moscow and that communications have stalled with the local partner.[50] The email further seeks contact with Peskov so they may "discuss the specifics as well as arrang[e] meetings with the appropriate individuals."[51] Based on the documents produced to the Committee, it does not appear Cohen ever received a response from anyone affiliated with the Russian government.

(U) ▮ testimony likewise made clear that neither President Putin nor any element of the Russian government was actually directly involved in the project. For instance, in one exchange, ▮ testified he was offering the Trump Organization access to one of ▮ acquaintances. This acquaintance was an acquaintance of someone else who is "partners on a real estate development with a friend of Putin's."[52] ▮ testified that he was unaware of "any direct meetings with any [Russian] government officials" in connection with the Trump Tower Moscow project.[53] In addition, neither candidate Trump nor Cohen traveled to Russia in support of the deal.[54]

(U) ▮ was unequivocal in his testimony that none of the Russians affiliated with the Trump Tower Moscow project had any communications with him "in which [he] w[as] asked to do something on behalf of the Russian government that [he] knew was on behalf of the Russian Government" with respect to the U.S. election.[55] None of those communications "were intended for ▮ to take action to have a communication with or take some action to influence the 2016 Presidential election."[56] The Committee therefore assesses that ▮ was attempting to leverage political contacts for business purposes, rather than the other way around.

(U) It appears the Trump Tower Moscow project failed in January 2016.[57]

Trump Jr. testified that, as of early June 2016, he believed the Trump Tower Moscow project was dormant.[58] The project failed because "[t]he due diligence did not come through" and the Trump Organization's representative "lost confidence in the licensee, and [he] abandoned the project."[59] In fact, the Trump Organization did not have a confirmed site, so the deal never reached the point where the company was discussing financing arrangements for the project.[60] The Committee determined that the Trump Tower Moscow project did not progress beyond an early developmental phase, and that this potential licensing deal was not related to the Trump campaign.[61]

(U) Other Alleged Financial Dealings: In addition to the Miss Universe and Trump Tower Moscow projects, a number of witnesses were asked about Trump family financial dealings, sometimes stretching back decades.[62] For example, Trump Jr. was asked about Russians: buying units in Trump Tower in 1984 (when he was seven years old);[63] buying properties in southern Florida for which the Trump brand was a licensor;[64] being involved in the Trump International Hotel in Toronto for which the Trump Organization was the brand and not the developer;[65] and having unspecified involvement in a licensing project for the Trump Ocean Club in Panama.[66] The Committee does not have any evidence that there is a nexus between these activities and the 2016 campaign, or information that contradicts representations made in a

March 8, 2017 letter from Trump's lawyers regarding his Russia-related financial dealings over the previous ten years.[67]

## POLICY POSITIONS

(U) During the campaign, candidate Trump and several of his campaign advisors expressed policy views towards Russia quite different than those espoused by much of the Republican foreign policy establishment, including previous Republican nominee Mitt Romney, who labeled Russia "our number one geopolitical foe" during the 2012 election. In fact, a significant number of Republican foreign policy experts made statements during the campaign that they would not work for the Trump campaign. As a result, the campaign relied on many lesser-known—or in some cases unknown—advisors on foreign policy issues.

(U) Additionally, a plank of the 2016 Republican platform pertaining to the Ukraine has been the subject of substantial controversy. The question for the Committee was whether candidate Trump's policy positions—and the campaign's involvement in the debate over the Ukraine platform plank—reflected legitimate policy positions, or something more nefarious. The Committee found no evidence that the policy positions of the Trump campaign were the result of collusion, coordination, or conspiracy with the Russians. In the words of ███████ Trump campaign policy official involved in the platform issue, "[t]here was no coordination or thought for coordination. The idea to have better relations with Russia was a Mr. Trump idea

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//                    //NOFORN

that I thought was reasonable to support."[68]

{U} Finding #27: The Republican national security establishment's opposition to candidate Trump created opportunities for two less-experienced individuals with pro-Russia views to serve as campaign advisors: George Papadopoulos and Carter Page.

(U) The Republican foreign policy establishment was critical of candidate Trump, who had to turn elsewhere for support. On March 2, 2016, 122 self-described "GOP National Security Leaders" signed an "Open Letter to Donald Trump" refusing to support then-candidate Trump.[69] The next day, Trump announced Senator Jeff Sessions as chairman of his National Security Advisory Committee (NSAC). A few weeks later, following continuing media criticism of his failure to publicly name a foreign policy team,[70] candidate Trump named five foreign policy advisors in a March 21, 2016 meeting with *The Washington Post* editorial board: Walid Phares, Carter Page, George Papadopoulos, Joe Schmitz, and Keith Kellogg.[71]

(U) The opposition to Trump's candidacy by the vast majority of the conservative national security establishment paved the way for lesser-known individuals, such as the then 28-year-old Papadopoulos, to join the Trump campaign. Page was another unknown brought into the periphery of the Trump campaign to fill the vacuum left by more experienced national security specialists who were unwilling to advise candidate

Trump. There is no evidence that anyone on the Trump campaign was aware of Page's past ties to Russian intelligence services—or Papadopoulos' more recent contacts with a Russian-connected professor—when these two individuals were included among the advisors that were publicly announced on March 21. In fact, as Kushner candidly put it, "we put together that list because we were getting a lot of pressure from the media to put out a list of foreign policy advisers."[72]

## UNCLASSIFIED
## GOP National Security Leaders
## Open Letter to Donald Trump

STATEMENT BY FORMER NATIONAL SECURITY OFFICIALS

The undersigned individuals have all served in senior national security and/or foreign policy positions in Republican Administrations, from Richard Nixon to George W. Bush. We have worked directly on national security issues with these Republican Presidents and/or their principal advisers during wartime and other periods of crisis, through successes and failures. We know the personal qualities required of a President of the United States.

None of us will vote for Donald Trump.

Source: The New York Times

## UNCLASSIFIED

(U) These five advisors were subsequently incorporated into the NSAC, which was part of the campaign's D.C.-based policy shop.[73] The NSAC was chaired by Senator Sessions and directed by J.D. Gordon, a retired Navy officer and former Department of Defense spokesman.[74] Some members of the NSAC met with candidate Trump in Washington, D.C. on March 31, 2016. Page did not attend. Each advisor in attendance, including Papadopoulos, briefed the group on a topic of their choice. Papadopoulos spoke about Russia.

TOP SECRET//                    //NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// NOFORN

However, in the opinion of one advisor, Walid Phares, the primary purpose of the meeting was about optics rather than substance: "the meeting was about the picture and to send the message that: I have a foreign policy team."[75]

## UNCLASSIFIED
## NSAC MEETING WITH CANDIATE TRUMP

 

Source: Twitter

### UNCLASSIFIED

(U) Page was, according to NSAC director Gordon, "very loosely affiliated with the campaign and had really no roles or responsibilities."[76] The Committee assesses that Page played no major role in the campaign, and had no meaningful access to senior leadership.

(U) Page did not attend the March 31, 2016, NSAC meeting with then-candidate Trump, and has never met him.[77] Although members of the NSAC occasionally gathered for meals in the Washington, D.C. area, they never again met as a group with candidate Trump.[78] Kushner provided a blunt assessment of the role, or lack thereof, played by the individuals on the initial list of publicly-announced foreign policy advisors: "[T]he amount of interaction they had with

the actual campaign or influence they had on anything that happened in the campaign was virtually nonexistent."[79] Gordon testified to the Committee that he agreed with the assertion that the NSAC was minimally influential in the context of the broader campaign.[80]

(U) Finding #28: The change in the Republican Party platform regarding Ukraine resulted in a stronger position against Russia, not a weaker one, and there is no evidence that Paul Manafort was involved.

(U) It has been widely reported that the 2016 Republican Party platform was weakened with respect to Ukraine, perhaps as a favor to Russia or some other nefarious reason. After reviewing the Republican Party platform amendment process, interviewing those involved, and reviewing document productions, the Committee determined that the original plank was strengthened, rather than weakened—and there is no evidence that language advocating for the provisions of "lethal defensive weapons" was improperly removed.

(U) On July 11, 2016, the Republican National Committee Platform Committee met to discuss and debate amendments to the platform. As drafted, the platform referenced "a resurgent Russia occupying parts of Ukraine," but included no language about support to Kiev (see inset). ███ ███ of Texas, a member of the National Security/Military Platform Subcommittee, offered an amendment that would "support

TOP SECRET// NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET/███████████████████████ //NOFORN█████

maintaining (and, if warranted, increasing) sanctions against Russia until Ukraine's sovereignty and territory integrity are fully restored."[81] ████████proposed amendment further called on the United States to provide "lethal defensive weapons to Ukraine's armed forces and greater coordination with NATO [North Atlantic Treaty Organization] on defense planning."[82]

## UNCLASSIFIED

### Original RNC Plank

(U) In the international arena, weakness invites aggression. The results of the [Obama] Administration's unilateral approach to disarmament are already clear: An emboldened China in the South China Sea, a resurgent Russia occupying parts of Ukraine and threatening neighbors from the Baltic to the Caucasus, an aggressive Islamist terrorist network in Middle East. All our adversaries heard the message in the [Obama] Administration's cutbacks: America is weaker and retreating.

## UNCLASSIFIED

(U) Much of ████████ amendment was adopted, but—following debate among the delegates—the final version called for the United States to provide "appropriate assistance" rather than "lethal defensive weapons."[83] The Committee assesses that "appropriate assistance" provided flexibility, and could encompass lethal defensive weapons as well as humanitarian aid, medical supplies, and meals-ready-to eat. In any event, even without the words "lethal defensive weapons," the final draft of the platform "was tougher against Russia" than the original after incorporating

all but three words of ██████████████ amendment.[84]

## UNCLASSIFIED

### Final RNC Plank

(U) We support maintaining and, if warranted, increasing sanctions, together with our allies, against Russia unless and until Ukraine's sovereignty and territorial integrity are fully restored. We also support providing appropriate assistance to the armed forces of Ukraine and greater coordination with NATO defense planning.

## UNCLASSIFIED

(U) The Committee also investigated what role, if any, Paul Manafort played in the Trump campaign's response to Denman's amendment. Manafort, a veteran of numerous Republican campaigns,[85] had long represented the government of Ukraine, the pro-Russian former president of Ukraine Viktor Yanukovich, and Yanukovich's Party of Regions.[86] In late March 2016, candidate Trump hired Manafort to lead "delegate-corralling efforts at the Republican National Convention."[87] Then-campaign manager ████████████ testified that, when Manafort was hired, ████████████ made no attempt to vet him and was entirely unaware of Manafort's past work in Ukraine.[88] In May 2016, Manafort was promoted to campaign chairman and, after ██████████ was fired the next month, "evolve[d]" into the role of de facto campaign manager.[89]

(U) Manafort left the campaign in August 2016 following news reports that he

had received \$12.7 million in secret payments for his work on behalf of Yanukovich's Party of Regions; news reporting also alleged that Manafort and his aide Rick Gates had "directly orchestrated a covert Washington lobbying operation" on behalf of the party—while failing to register as foreign agents.[90] Campaign press secretary Hope Hicks recalled that, after receiving press inquiries about Manafort's "professional history," a major story broke on the evening of August 14, 2016.[91] According to Hicks, "Trump had made a decision to make a change in leadership on the campaign outside of Paul's issues that were being publicly reported," but those issues "certainly contributed to expediting and intensifying the way in which his role changed, and then ultimately he was fired at the end of that week."[92] Trump directed his son-in-law Jared Kushner to ensure Manafort departed the campaign on August 19, which he did.[93] As Kushner put it, "[t] here was a lot of news that was out there, and the decision was that it was time for

**UNCLASSIFIED**

## PAUL MANAFORT RESIGNS FROM TRUMP CAMPAIGN



The picture of Trump campaign chairman came two days after the various areas up for reelection

Source: Politico

**UNCLASSIFIED**

him to resign."[94]

(U) Given Manafort's past work in Ukraine, if the Ukraine plank change was made as a favor to the Russian government, it seems likely that then-campaign chairman Manafort would have known about it. However, campaign records produced to the Committee show that Manafort had no role in, or contemporaneous knowledge of, the platform change. On July 30, 2016, Manafort sent an email, copying Gates, to Rick Dearborn, then a senior campaign policy official and Sessions' chief of staff: "I gather that there was a change in the platform that removed arming Ukraine. I don't know anything about this change. Who pushed for it and why was it done?"[95]

(U) In response, Dearborn generated a memorandum, dated August 1, 2016, outlining a detailed sequence of events that occurred between July 10 and 12, 2016.[96] As part of that memo, J.D. Gordon created a timeline that noted candidate Trump's policy statements—including at a March 31, 2016, national security meeting—served as the basis for the modification of Denman's amendment.[97] Gordon's timeline made it clear that the change was initiated by campaign staffers at the convention—not by Manafort or senior officials. Although Page expressed support after the fact, the Committee did not find any evidence that he actively participated in the modification of Denman's "red line amendment providing lethal assistance to Ukraine."[98]

**PUBLICATION OF STOLEN EMAILS**

(U) **Finding #29: There is no evidence that Trump associates were involved in the theft or publication of Clinton campaign-related emails, although Trump associates had numerous ill-advised contacts with WikiLeaks.**

(U) There is no evidence that Trump or anyone associated with him played a role in the hacking of emails from the DNC and Clinton campaign chairman John Podesta, among other entities and individuals, detailed in Chapter 2. As also discussed in Chapter 2, the Committee concurs with the IC's assessment that WikiLeaks was one of the vehicles for the public dissemination of emails stolen by Russians. As noted in Chapter 3, on October 7, 2016, the Department of Homeland Security and Office of the Director of National Intelligence released a public statement that "[t]he U.S. Intelligence Community is confident that the Russian Government directed the recent compromises of e-mails from US persons and institutions, including US political organizations."[99] The statement also specifically tied WikiLeaks to the Russian-directed disclosures.

(U) Trump campaign communications made ample use of the publicly available emails, which were reported by virtually all major media outlets. Regarding WikiLeaks, Trump Jr. testified that "[a]t the time, I looked at them as essentially a media outlet" and an "opportunistic organization" that would have also put out negative information on Trump if it had it.[100] For Senator Sessions, reference to WikiLeaks

material in campaign statements was the product of deliberation: "And so, I remember making a decision that it [a trove of hacked emails] was in the public domain, and it would be silly not to use it. So I used it, although I could understand somebody else not wanting to."[101] For campaign press secretary Hope Hicks, use of emails published by WikiLeaks was uncontroversial because such information was available in the public domain.[102]

## UNCLASSIFIED
## WIKILEAKS RELEASES CLINTON EMAILS



Source: Twitter

## UNCLASSIFIED

(U) Similarly, candidate Trump stated at a rally on October 10, 2016—three days after the release of Podesta's emails began and the IC publicly tied WikiLeaks' dissemination to "Russia's senior-most officials"—that "I love WikiLeaks."[103] Trump had earlier encouraged the Russians to "find the 30,000 emails that are missing" from Hillary Clinton's private server.[104] (These emails, which were the frequent subject of campaign talking points, should not be

TOP SECRET// /NOFORN

conflated with the DNC emails. The Committee did not receive evidence that the emails from Clinton's private server were stolen by the Russians—or anyone else.)[105]

(U) Particularly in light of candidate Trump's expressed enthusiasm for WikiLeaks, the Committee examined the relationship between his associates and the stolen emails. The Committee did not find any evidence that Trump associates were involved in the publication of emails by WikiLeaks and other outlets—or had access to such emails or other stolen information prior to their becoming publicly available.[106]

(U) The Committee did find that multiple Trump associates went beyond mere praise and established lines of communication with WikiLeaks during the campaign. Such contacts were imprudent in light of WikiLeaks' role in disseminating stolen emails in line with Russian interests—and CIA Director Mike Pompeo's post-election characterization of WikiLeaks as a hostile non-state intelligence service that "overwhelmingly focuses on the United States, while seeking support from anti -democratic countries and organizations" such as the Russian military intelligence service (GRU).[107]

(U) George Papadopoulos: Foreign policy advisor Papadopoulos was told by Russian-linked academic Joseph Mifsud in April 2016 that the Russians had "dirt" on Clinton in the form of "emails of Clinton."[108] However, the Committee found no evidence that Papadopoulos obtained these emails or that the Trump campaign had a role in facilitating the Russian government's dissemination of

stolen data. Nor did any witness shed light on the provenance of the emails, or clarify that Mifsud was referring to emails actually stolen by the Russians (as opposed to, for example, emails missing from Clinton's private server.) The Committee also found no evidence that Papadopoulos told anyone affiliated with the Trump campaign about Mifsud's claims that the Russians had "dirt" on candidate Clinton.

(U) Michael Flynn: On July 15, 2016, retired Lieutenant General and Trump national security advisor Michael Flynn forwarded an email to communications advisor ▮▮▮▮ in an attempt to connect a friend from the military with the campaign's social media operation. Flynn included the following editorial comment: "There are a number of things happening (and will happen) this election via cyber operations (by both hacktivists, nation-states and the DNC)."[109] This statement does not necessarily indicate non-public knowledge, and could have instead reflected commentary on then-current public events—including the mid-June attribution of the DNC hack to Russia by the security firm CrowdStrike, and the subsequent claim of credit by the then-unknown persona "Guccifer 2.0." (See Chapter 2.)

(U) Donald Trump Jr.: During the course of the Committee's interview with Trump Jr., a news report from CNN appeared online claiming he was given a pre-release notification of a WikiLeaks release of Podesta emails.[110] The article appeared at 1:01 p.m., while Trump Jr. was still being interviewed by the Committee behind closed doors, which concluded at 5:51 p.m.[111] CNN's initial report

TOP SECRET/ ███████████                    █/NOFORN ████

claimed Trump Jr. received an email on September 4, 2016, alerting him to an upcoming release of hacked emails.

(U) The email in question was from an individual named ████████████, who sent a lengthy email to a number of individuals associated with the Trump Organization, including Trump Jr., providing access to hacked DNC emails.[112] The email was actually dated September 14, 2016, the day after WikiLeaks published a tranche of Podesta emails, and thus did not substantiate allegations of prior knowledge of the release.[113] CNN subsequently issued a correction, noting the error.[114]

(U) When asked about the email by the Committee, Trump Jr. testified that he did not have any recollection of the email, stating that he "get[s] stuff from people that – you know, people put my email address online every few months, and I get a bunch of people that do the same thing and then they start bombarding you with stuff."[115] Trump Jr. went further to state that while he may have met a ████████████ at some point in time, he was not sure of the identity of this individual.[116]

(U) At the outset, Trump Jr. told the Committee that, although he was not aware of any coordination "between the Trump campaign and WikiLeaks to disseminate information acquired from the Podesta email or the DNC server,"[117] he did exchange Twitter direct messages with WikiLeaks beginning on September 20, 2016, and October 3, 2016.[118] WikiLeaks initiated both exchanges.[119] Trump Jr.

testified that he was not aware of the reasons why WikiLeaks decided to reach out to him directly, but hypothesized that such direct messaging was likely due to the fact that he "was retweeting a bunch of their stuff. . ." and that he has "a relatively formidable social media platform."[120]

(U) In the first exchange, on September 20, 2016, WikiLeaks sent a direct message to Trump Jr. to alert him to a "PAC run anti-Trump site" that was about to launch. WikiLeaks "guessed the password" and sent it to Trump Jr. and asked for comments.[121] Trump Jr. responded the next day, "[o]ff the record I don't know who that is but I'll ask around."[122] Trump Jr. subsequently logged into the site using the WikiLeaks-supplied password, which had also been made publicly available.[123]

(U) Following that exchange, Trump Jr. emailed some Trump campaign officials, to include Kellyanne Conway, Steve Bannon, and Jared Kushner to advise them of the contact and seek their advice.[124] In a follow-up email, Trump Jr. noted the WikiLeaks message intimated "some connection we [the Trump campaign] should be aware of."[125] The Committee did not receive any documents or information that reflected a response to Trump Jr.'s email, although Hope Hicks recalled that—after being forwarded the email by Kushner—she "might have expressed concern to somebody about putting passwords in unknown websites, just as a general practice, not specific to WikiLeaks."[126]

(U) On October 3, WikiLeaks passed

TOP SECRET/ ███████████          ███████ /NOFORN ████

TOP SECRET//                                                    NOFORN

along a story reporting Clinton's comments about Julian Assange and noted "[i]t'd be great if you guys could comment on/push this story."[127] Trump Jr. responded about 90 minutes later: "Already did that earlier today. It's amazing what she can get away with."[128] Trump Jr. then wrote: "What's behind this Wednesday leak I keep reading about?"[129] Trump Jr. was seeking information on what was purported to be, another future leak of Podesta-related emails.[130] There was no response.

(U) After October 3, 2016, Trump Jr. received numerous messages from WikiLeaks that:

- suggest a website link to use if the campaign refers to WikiLeaks in a tweet and suggests having supporters search through the leaked Podesta emails, noting WikiLeaks "just released" "Part 4" of those emails;[131]

- seek then-candidate Trump's tax returns and suggests leaking them to "improve the perception of [WikiLeaks'] impartiality";[132]

- suggest challenging the results should Trump lose the election;[133]

- describe an election-night message of "[w]ow" and noting Obama administration will delete records as they leave;[134]

- suggest the President-elect push Australia to make Julian Assange that country's ambassador to the United States;[135]

- forward what appears to be a video with the caption "Fake News";[136] and

- on the date the news of the June 9, 2016, Trump Tower meeting broke, seek copies of Trump Jr.'s emails.[137] With respect to the latter, Trump Jr. published those emails himself on his Twitter account.

(U) Trump Jr. testified that he did not reply to any of these messages, nor did he have any communications with WikiLeaks before September 20 or after October 3, 2016.[138] He testified that the direct message exchanges discussed above "is a complete record of any communications [he] had with WikiLeaks."[139]

(U) **Cambridge Analytica:** In addition to Trump Jr.'s communications with WikiLeaks, Cambridge Analytica, a British firm the Trump campaign used for data analytics, reached out to Julian Assange in an effort to confirm whether WikiLeaks possessed the "missing" emails deleted from Clinton's private server.[140] That contact occurred in approximately June 2016,[141] between an employee of Cambridge Analytica and the speaker's bureau (a separate third party) representing Assange.[142] WikiLeaks replied through the bureau that "they did not wish to take a telephone call or otherwise engage with us [Cambridge Analytica]."[143]

(U) Trump campaign digital director ▆▆▆▆▆ testified that he did not participate in, nor was he aware of, Cambridge Analytica's attempted outreach to Assange.[144] The Chief Executive Officer

(CEO) of Cambridge Analytica confirmed in his testimony that he "did not share this with anyone on the Trump campaign."[145] In fact, the CEO testified that the outreach occurred before the company was even retained by the Trump campaign.[146]

(U) Roger Stone: Roger Stone has had a series of business relationships with Donald Trump dating back to at least 1981, and served as a paid campaign advisor for several months in 2015.[147] During testimony to the Committee, Stone addressed three public statements suggesting he might have important information about, and potentially advance knowledge of, disclosures during the 2016 campaign: (1) an August 2016 Twitter message regarding Clinton campaign chairman John Podesta, (2) an August 2016 public speech about purported contacts with Julian Assange, and (3) the March 2017 acknowledgement of pre-election direct communications with Guccifer 2.0.

(U) Stone denied that he "knew in advance about and predicted the hacking of . . . Podesta's email," notwithstanding his cryptic statement in an August 21, 2016, Twitter message—"Trust me, it will soon be Podesta's time in the barrel"—that predated by several weeks the initial public release of Podesta's hacked emails.[148] Stone noted that his Tweet "makes no mention whatsoever of Mr. Podesta's email."[149] Furthermore, it was posted "at a time that my boyhood friend and colleague, Paul Manafort, had just resigned from the Trump campaign over allegations regarding

his business activities in Ukraine. I thought it manifestly unfair that John Podesta not be held to the same standard" regarding his alleged business activities.[150] In October 2017, John Podesta's brother Tony resigned from the lobbying firm the brothers co-founded amid revelations about the Podesta Group's role in pro-Ukraine lobbying efforts that also involved Manafort and his associate Rick Gates.[151]

(U) Stone also addressed his August 2016 public statement that "I've actually communicated with Julian Assange. I believe the next tranche of his documents pertain to the Clinton Foundation, but there's no telling what the October surprise may be."[152] In his testimony to the Committee, Stone sought to "clarify that by saying the communication I refer to is through a journalist who I ask [sic] to confirm what Assange has tweeted, himself, on July 21st, that he has the Clinton emails and that he will publish them."[153] He subsequently identified the intermediary, but denied any access to non-public information.[154] Stone further disputed, under oath, that he "had advance knowledge of the source or actual content of the WikiLeaks disclosures."[155]

(U) In his testimony, Stone described a series of direct messages exchanged with Guccifer 2.0 in August and September 2016—which he first publicly disclosed in March 2017—as "innocuous," and denied taking action in response to Guccifer 2.0's messages.[156] He subsequently provided additional messages with WikiLeaks

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ███████████████████████████ //NOFORN█

extending from October 2016 to August 2017.[157]

(U) Despite these multiple contacts, the Committee did not find any evidence contradicting Stone's claim that "[a]ny information . . . disseminated via social media regarding the timing of the release of the DNC data or others was from publicly available sources" and "he in no way conspired, colluded, or coordinated with any agent of the Russian state."[158]

## MEETINGS WITH RUSSIANS

(U) The Committee examined meetings between Trump campaign associates and Russians, to include both official and unofficial representatives. The Russians found willing interlocutors in foreign policy advisors ███ and Papadopoulos. These advisors, however, were peripheral figures, and neither was in a position to influence Trump or his campaign. The Russians engaged Trump associates via official channels and—more notably—used apparent cut-outs and intermediaries to make contact with senior officials. However, questionable contacts like the Trump Tower meeting resulted in no collusion, conspiracy, or coordination with the Russian government.

(U) Finding #30: ███████ did not travel to Moscow in July 2016 on behalf of the Trump campaign, but the Committee is concerned about his seemingly incomplete accounts of his activity in Moscow.

(U) ███ traveled to Moscow in early July 2016 to deliver a commencement

speech at the New Economic School—the first American to do so since then-President Barack Obama in 2009. At the time, ███ served as a foreign policy advisor for the Trump campaign. The Trump campaign made it clear to ███ that the trip was not on behalf of the Trump campaign, a point ███ acknowledged in his testimony to the Committee.[159] J.D. Gordon, the NSAC director, strongly advised against the trip, calling it "a bad idea."[160] However, Trump campaign manager ████████████ authorized ███ to make the trip "out side of [his] role with the DJT [Donald J. Trump] for President campaign."[161] ████ mentioned the upcoming trip to Sessions at one of the occasional NSAC meals,[162] although Sessions did not recall the interaction.[163]

(U) On July 9, 2016, while in Russia, ███ sent an "executive summary" of "Feedback From Russia" that stated in part "Russian Deputy Prime Minister and NES [New Economic School] Board Member Arkady Dvorkovich also spoke before the event. In a private conversation, Dvorkovich expressed strong support for Mr. Trump and a desire to work together toward devising better solutions in response to the vast range of current international problems. Based on feedback from a diverse array of other sources close to the Russian Presidential Administration, it was readily apparent that this sentiment is widely held at all levels of government."[164]

████ admitted to briefly greeting Dvorkovich before or after one of their

TOP SECRET// ███████████████████ //NOFORN█

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

speeches, but minimized the interaction in testimony before the Committee.[165]

(U) Ultimately, ███ failed to clearly explain whom he meant when he referred to sources close to Russian government in his executive summary. He denied having any private meetings with any senior Russian officials during his July 2016 trip, and stated that he mostly met with "scholars."[166] The Steele dossier, a document compiled by former British intelligence officer Christopher Steele, alleges that while in Moscow in July 2016, Page secretly met with Igor Sechin, CEO of Russian state oil company Rosneft, and Igor Diveykin, a senior Russian intelligence official.[167] Further, the Steele dossier claims that Sechin offered Page a brokerage fee in connection with the sale of 19 percent of Rosneft in exchange for the lifting of sanctions.[168]

## UNCLASSIFIED
## CHRISTOPHER STEELE, THE MAN
## BEHIND THE TRUMP DOSSIER



Source: The New Yorker

## UNCLASSIFIED

(U) Since the allegation of meeting with Sechin and Diveykin was first widely reported in September 2016, ███ has

repeatedly and consistently denied meeting either Sechin or Diveykin, including under oath in testimony to the Committee.[169] The Committee has no information that confirms the Steele dossier's assertions regarding the purported meetings in Moscow, much less an offer by Sechin to ███ for such a role in a potentially lucrative transaction. After returning from Moscow, ███ took a "leave of absence" from the Trump campaign, and played no role in the transition or administration.[170]

(U) Finding #31: George Papadopoulos' attempts to leverage his Russian contacts to facilitate meetings between the Trump campaign and Russians was unsuccessful.

(U) Papadopoulos made minor contributions to the Trump campaign as a foreign policy advisor. He briefly served as a Trump campaign surrogate, a role cut short in May 2016 when he publicly insulted UK Prime Minister David Cameron.[171] He also— in an apparent effort to increase his standing within the Trump campaign—tried to insert himself into any number of international engagements. As described below, his particular focus was trying to broker meetings with foreign officials, but he often acted on his own without the official backing of the Trump campaign.

(U) On March 24, 2016, Papadopoulos sent an email to several members of the policy team pitching a "[m]eeting with Russian leadership—including Putin"—and also volunteered to travel to meet the "next prime minister of Vietnam" alongside Mifsud (whom he had first met just ten days

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET/                                                    /NOFORN

before but nonetheless described as a "good friend of mine").[172] Campaign co-chair and chief policy advisor ███████ responded that "we probably should not go forward with any meetings with the Russians until we have had occasion to sit with our NATO allies, especially France, Germany and Great Britain."[173] In the same exchange, Papadopoulos then immediately switched gears, indicating that "[i]f we need any assistance with setting up meetings here in London or Paris, I have some good contacts that can open doors immediately to the leadership."[174]

(U) During the NSAC meeting with Trump on March 31, 2016—the only time Papadopoulos is known to have engaged directly with the candidate—Senator Sessions told the team that they were not authorized to speak for the campaign.[175] In his words "[t]his committee was not . . . a group of people authorized to speak for [candidate] Trump, and they absolutely weren't authorized to go around the world pretending to represent him."[176] That sentiment was, according to Sessions, "a good statement to make quite clear."[177]

(U) When Papadopoulos offered that he could engage, and possibly travel to, Russia on behalf of the campaign, his suggestion was swiftly rebuffed by Sessions, who testified that "I felt like—and I'm the chairman of this group—I should not do anything that indicated to Mr. Papadopoulos that he was authorized to go to Russia or anyplace else to represent the Trump campaign and do some sort of

negotiations. So I pushed back pretty sharply on that."[178] Sessions' account of his response has been corroborated by another attendee, ███████,[179] ███ also attended and similarly recalled that when Papadopoulos raised the issue of obtaining contacts with the Russian government on behalf of the campaign, Senator Sessions interrupted and began "talking about the Logan Act," which criminalizes unauthorized negotiations with foreign governments.[180]

(U) Although the Committee has no information to indicate that Papadopoulos was successful in setting up any meetings between the Trump campaign and the Russian government, he worked with campaign chief executive Steve Bannon to broker a September 2016 meeting between candidate Trump and Egyptian president Abdel Fatah el-Sisi.[181] Trump was apparently pleased with the meeting, which he described in an interview as "very productive," describing el-Sisi as "a fantastic guy."[182]

(U) While on a trip to Athens, Greece in May 2016, Papadopoulos sent an email to Manafort stating that he expected to soon receive "an official invitation for Mr. Trump to visit Greece sometime this summer should his schedule allow."[183] In the same email to Manafort, Papadopoulos also forwarded a meeting invitation from Ivan Timofeev, Director or Programs for the Russian International Affairs Council, and claimed that "Russia has been eager to meet Mr. Trump for quite sometime and have been reaching out to me to discuss. I

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

thought it would be prudent to send to you."[184]

(U) As of May 2016, Manafort had not yet been elevated to campaign chairman, but had a long track record of work abroad. Manafort forwarded Papadopoulos' email to his business and campaign deputy ▓▓▓ ▓▓▓ noting that "[w]e need someone to communicate that D[onald] T[rump] is not doing these trips."[185] Manafort and ▓▓▓ agreed to assign a response of a "general letter" to "our correspondence coordinator," the person responsible for "responding to all mail of non-importance."[186]

(U) In June 2016, Papadopoulos sought a paid position and reimbursement for expenses from ▓▓▓▓▓▓—a Sessions aide, who along with ▓▓▓▓▓▓, ran the Trump campaign's D.C. policy shop—for an upcoming trip "to DC for a high level meeting [with] the director of the Israel National Security Council" and past trips to "the UK, Israel and Greece over the past month engaging in some senior level meetings . . . ."[187] ▓▓▓▓ forwarded the message to Gordon and ▓▓▓ Mashburn then replied as follows: "He cost us a lot more in having to deal with what he said about [then-UK prime minister David] Cameron 2 months ago. . . he got no approval for the travel and did it on his own in[i]tiative . . . . Let him eat the cost and maybe he will learn to play nice with the team, not go off on his own. ▓▓▓ ▓▓▓▓▓▓ would never have approved his going off on world travels at campaign

expense without asking permission first."[188] ▓▓▓▓▓ replied to ▓▓▓▓ with one word: "agreed."[189]

(U) ▓▓▓▓ responded to Papadopoulos that he could take the meeting, but he "should do that as a private citizen."[190] Making the point explicit, ▓▓▓▓▓ wrote: "You're not authorized to meet with him by [sic] the campaign, nor can you reflect the views of the campaign on security issues in that meeting."[191]

**(U) Finding #32: Donald Trump Jr., Jared Kushner, and Paul Manafort attended a June 9, 2016, meeting at Trump Tower where they expected to receive—but did not ultimately obtain—derogatory information on candidate Clinton from Russian sources.**

(U) In July 2017, the Committee became aware of a June 9, 2016, meeting in Trump Tower, which became a key focus of the investigation. The Committee's findings were informed by interviews with six of the eight participants in the meeting.

(U) Although they did not attend the meeting, the Agalarovs were the driving force to arrange it. As previously noted, the Agalarovs and Goldstone had gotten to know businessman Donald Trump when the Agalarovs worked with Trump to host the Miss Universe pageant at the Agalarovs' building, the Crocus City Hall, in Moscow in 2013.[192] The Agalarovs also had discussions with Donald Trump in 2013 to facilitate the possible development of a Trump Tower in Moscow.[193] The 2013 Miss Universe

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET/ /NOFORN

# UNCLASSIFIED
# PARTICIPANTS OF THE JUNE 9, 2016 MEETING AT TRUMP TOWER



**Paul Manafort**

Longtime Republican campaign advisor and international lobbyist, Manafort served as director of the Trump campaign

Son of candidate Donald Trump, Trump, Jr. served as a senior advisor to the campaign running day-to-day operations from New York

**Donald J. Trump, Jr.**



**Jared Kushner**

Son-in-law to candidate Donald Trump, Kushner served as a senior advisor to the campaign



**Rob Goldstone**

London-based promoter who managed pop star Emin [Agalarov], the Vice President of the Crocus Group.



**Natalia Veselnitskaya**

Russian lawyer, who represented the Prevezon in a civil forfeiture case in the federal court in New York.

**Ike Kaveladze**

California-based manager of the Crocus Group.



**Rinat Akhmetshin**

Russian-American lobbyist.



**Anatoli Samochornov**

Former employee at the U.S. Department of State, Samorchornov translated for Veselnitskaya at the June 9th meeting.

# UNCLASSIFIED

pageant formed the basis of a casual friendship between the Trumps and the Agalarovs.[194] Trump appeared in one of Emin Agalarovs's music videos with the 2013 pageant winner,[195] and Trump maintained a friendly correspondence with Aras Agalarov—including during the busy 2016 campaign.[196]

(U) Events leading to the meeting were set in motion by a June 3, 2016, email from Goldstone to Trump Jr., stating: "Emin just called and asked me to contact you with something very interesting. The Crown prosecutor of Russia [possibly referring to Russian Prosecutor General Yuri Chaika] met with his father Aras this morning and in their meeting offered to provide the Trump

campaign with some official documents and information that would incriminate Hillary and her dealings with Russia and would be very useful to your father. This is obviously very high level and sensitive information but is part of Russia and its government's support for Mr. Trump – helped along by Aras and Emin."[197] Trump Jr. replied to Goldstone's June 3 request by indicating "if it's what you say I love it especially in the summer."[198]

(U) This exchange indicates that Trump Jr. was open to discussing derogatory, information from Russian government sources that could be useful to candidate Trump. Goldstone proposed to deliver information concerning Hillary Clinton via a Russian government attorney.[199] Trump Jr. indicated that he had invited Kushner and Manafort,[200] underscoring his belief in the importance of the information.

▇▇▇▇ with connections to the Agalarov family, was one of the individuals who attended the June 9 meeting at Trump Tower. The Committee discovered that the participants of the June 9 meeting did not all have the same understanding as to the reasons for the meeting, with ▇▇▇▇ testifying that he thought it was odd that all three senior Trump campaign officials would be taking a meeting on the Magnitsky Act, a U.S. human rights law that imposes certain sanctions on Russian interests. Accordingly, ▇▇▇▇ called ▇▇▇▇▇▇▇▇, a close associate of Emin Agalarov based in the United States, to inquire about the purpose

of the meeting. ▇▇▇▇ explained that he believed the scheduled meeting at Trump Tower was about providing negative information on candidate Clinton to the Trump campaign.[201]

(U) Based on Trump Jr.'s testimony and the documentary evidence received by the Committee, there is no evidence to support that there were any prior communications between the Trump campaign and the other attendees: ▇▇▇▇; Russian lawyer Natalia Veselnitskaya; Russian-American lobbyist and former Soviet intelligence officer ▇▇▇▇; or Russian-American ▇▇▇▇ who served as a Russian interpreter. Furthermore, the Committee found no evidence that Trump Jr. knew the identities of these individuals before the meeting,[202] or that he discussed it with candidate Trump beforehand.[203]

(U) The Committee interviewed all attendees other than Manafort, due to the Special Counsel's ongoing investigation, and Veselnitskaya, who is a Russian national located overseas without a valid visa to enter the United States. Despite the pretext for the meeting, every person with direct knowledge of what occurred confirmed that there was no mention of derogatory or incriminating information directly relating to Hillary Clinton during the June 9 meeting. Goldstone testified that he had no evidence that the Russian government supported or favored Donald Trump, and admitted to embellishing the contents of the email solely for the purpose of gaining a response from Trump Jr., namely by using inaccurate

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

information.[204]

(U) Veselnitskaya, Samochornov, Kaveladze, and Akhmetshin met for lunch before the Trump Tower meeting.[205] During lunch, there was a discussion regarding the Trump Tower meeting. Veselnitskaya shared an approximately 10-page document in Russian to provide the lunch attendees with a synopsis of what would be discussed at the meeting, a summary that contained much of the same information as a similar document reportedly shared with Russian prosecutor general Yuri Chaika.[206] Based on this discussion, the lunch attendees believed the Trump Tower meeting was about the Magnitsky Act.[207] The lunch attendees then met Goldstone at Trump Tower shortly before the meeting.[208] They proceeded to the 25th Floor where they met Trump Jr., and he led the group to a conference room.[209]

(U) The June 9 meeting lasted as little as 20 minutes.[210] Kaveladze testified that he believed Trump Jr. started the meeting and then turned it over to Veselnitskaya.[211] Interviewed meeting attendees agreed that Veselnitskaya presented information concerning the Magnitsky Act and the Ziff Brothers, including their alleged role in evading taxes in Russia and political contributions to the DNC and/or Clinton campaign.[212] Several attendees also recalled discussion of Russian adoptions, which the Russian government suspended in retaliation for the Magnitsky Act.[213]

(U) Goldstone further testified that Kushner, Manafort, and Trump Jr. seemed visibly uninterested in the Magnitsky Act briefing provided by Veselnitskaya.[214] Manafort, according to Goldstone, "never looked up from his cell phone from the moment we began the meeting until the moment we ended."[215] Manafort and Kushner complained to one another via text message during the meeting that the meeting was a "waste of time."[216] Kushner asked his assistants to call and give him and excuse to leave, which one of them did shortly after the text.[217] At the end of the meeting, Goldstone apologized to Trump Jr. for the "bait-and-switch talk about something which we knew nothing about, which was, again, Russian adoption and the Magnitsky Act."[218]

(U) Kaveladze testified that he received two calls from Aras Agalarov after the meeting. During the second call, Kaveladze explained that the meeting was a "complete loss of time and about nothing."[219] Aras Agalarov and Kaveladze did not discuss the "dirt" on Hillary Clinton.[220] Kaveladze also sent an email to his daughter after the meeting indicating that the "meeting was boring. The Russians did not have any bad info [o]n Hillary"[221]—a reference back to his conversation with Beniaminov, which he had apparently relayed to his daughter. The Committee received no testimony or documentary evidence indicating that the purpose of the meeting was to discuss WikiLeaks, Julian Assange, the hacking of DNC servers, and/or the John Podesta emails.[222]

(U) No witness, including the attendees,

testified that candidate Trump was aware of the meeting prior to its public exposure in June 2017. Steve Bannon, who had been previously quoted as saying "[t]he chances that Don Jr. did not walk [the meeting participants] up to his father's office is zero," conceded under oath that he had no evidence to support that claim.[223] The Committee also investigated a public statement made by candidate Trump during a speech after the final Republican primary contests on June 7, 2016, the same day as Trump Jr. exchanged emails with Goldstone regarding meeting attendees and logistics.[224] According to campaign press secretary Hope Hicks, Trump's publicly stated intent "to give a major speech . . . next week . . . discussing all of the things that have taken place with the Clintons" did not reflect knowledge about the upcoming meeting; instead, it referred to a planned speech "that was an outline of the book *Clinton Cash*," and was ultimately delivered approximately two weeks later after being delayed by a domestic terrorist attack.[225]

**(U) Finding #33: Donald Trump Jr. briefly met with a Russian government official at the 2016 National Rifle Association annual meeting, but the Committee found no evidence that the two discussed the U.S. presidential election.**

(U) In the weeks leading up to the National Rifle Association's (NRA) 2016 annual meeting, there were a series of emails sent to a member of the campaign discussing Russian interest in the campaign as it related to the NRA meeting. Despite

the emails' rhetoric about setting up a "back channel" between the United States and Russian governments, the relevant testimony obtained in the Committee's interviews showed these email inquiries resulted in a brief meeting between Trump Jr. and a Russian government official that centered on shooting and hunting. It did not focus on the U.S. presidential election.

(U) From May 19-22, 2016, the NRA held its annual meeting and exhibits in Louisville, Kentucky.[226] In an interview with the Committee, Trump Jr. testified he received an invitation from "[v]arious people at the NRA" to attend the 2016 meeting.[227] In addition to Trump Jr.'s invitation, there were several emails sent to ▆▆▆▆ seeking to establish a connection at the NRA meeting between an emissary of the Russian government and candidate Trump.

(U) In the first email, dated May 16, 2016, a business executive emailed ▆▆▆▆▆ with the possibility of candidate Trump meeting with Alexander Torshin, the Deputy Governor of the Bank of Russia, the country's central bank.[228] The email mentions an "overture to Mr. Trump from President Putin."[229] ▆▆▆▆ responds he will be "[w]orking on this first thing in the am."[230]

(U) ▆▆▆▆ forwarded the email to Manafort, Gates, and Kushner, noting the "interesting request."[231] ▆▆▆▆ email highlighted the entrepreneur's request that Torshin "meet with a high level official in our campaign" during the NRA meeting to discuss "an offer he [Torshin] claims to be

carrying from President Putin to meet with DJT." In response to that email, Kushner wrote: "Pass on this. A lot of people come claiming to carry messages. Very few we are able to verify. For now I think we decline such meetings," as well as "[b]e careful."[237] ▮▮▮ replied to the executive seeking the meeting: "I've asked about a mtg but we are not able to accommodate it at that event in KY."[733]

(U) In addition to the emails discussing a possible meeting with Torshin, on May 10, 2016, ▮▮▮▮, who had previously approached ▮▮▮ about advising a prospective Trump transition,[234] sent ▮▮▮ an email about meeting with Russians at the NRA event.[735] The email discusses ▮▮▮ purported "back-channel to President Putin's Kremlin," that "Russia is quietly but actively seeking a dialogue with the U.S. that isn't forthcoming under the current administration," and that "the Kremlin believes that the only possibility of a true re-set in this relationship would be with a new Republican White House."[236]

(U) The email goes on to note that "President Putin's emissary" will be at the NRA convention and hopes to make contact with candidate Trump and present Mrs. Trump with a gift.[737] The email discussed Putin's desire to build a relationship with candidate Trump, to include extending an invitation to the Kremlin. The email also asked ▮▮▮ to "talk through what has transpired and Sen. Sessions' advice on how to proceed."[238] When asked about this

email in his interview before the Committee, Attorney General Sessions testified he was not aware of this email.[239] ▮▮▮ testified that he may have met ▮▮▮ once, and did not remember replying to his email.[740]

(U) Although the campaign declined to hold a meeting, Trump Jr. was introduced to Torshin, at the request of an acquaintance, at a restaurant where they were dining separately.[241] During their brief introduction, they spoke about "stuff as it related to shooting and hunting . . . exchanged casual hellos" but did not exchange contact information.[242] In his brief exchange with Torshin and a subsequent exchange with Torshin's assistant, Maria Batina, Trump Jr. testified he did not recall any discussion of the upcoming U.S. presidential election.[243] No other witness provided a contrary recollection to the Committee.

(U) The Committee reviewed several emails discussing a meeting with Russians at the NRA meeting, an attempt to establish a back channel of communication between the U.S. and Russian governments, and a possible meeting between candidate Trump and President Putin. However, the Committee found that all of those email exchanges resulted in just one, brief meeting between Mr. Torshin and the candidate's son that did not include any discussion related to the U.S. election.[244]

(U) Finding #34: The Committee found no evidence that meetings between Trump associates—including Jeff Sessions—and

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

**official representatives of the Russian government—including Ambassador Kislyak—reflected collusion, coordination, or conspiracy with the Russian government.**

**(U)** Meetings between U.S. senators and foreign government officials are considered a routine part of the job. However, there have been multiple media articles raising concerns about contacts with former Russian Ambassador to the United States Sergey Kislyak, particularly those involving then-Senator Sessions.

**(U) Mayflower Hotel Speech:** In April 2016, Senator Sessions, an early endorser of Trump and later a key figure during the transition, attended a foreign policy speech by Trump at the Mayflower Hotel in Washington, D.C.[245] Kushner also attended and recalled meeting 20 to 25 guests, including Ambassador Kislyak for the first time.[246] Kushner stated that the conversation between him and Ambassador Kislyak mainly consisted of pleasantries, and concluded with an offer for Kushner to visit the Russian Embassy for lunch, which Kushner never attended.[247]

**(U)** Attorney General Sessions similarly described a pre-speech reception of maybe 24 people; immediately following the speech, he went to a media stakeout to answer questions about the speech.[248] Attorney General Sessions recalled "no . . . discussions with the [Russian] Ambassador or any other representative from the Russian Government or their surrogate" at the Mayflower.[249]

**(U) Republican National Convention:** In July 2016, then-Senator Sessions attended the Republican National Convention in Cleveland, Ohio. Because he used his campaign funds to pay for his travel and lodging while in Ohio, his schedule focused primarily on his Senate campaign-related events.[250] For the five days that Sessions was in Cleveland, he attended numerous Trump campaign-related events.[251]

**(U)** Over 50 ambassadors to the United States also attended a reception associated with the 2016 Republican Convention.[252] Sessions addressed this group of ambassadors, as the keynote speaker, at the Heritage Foundation's Embassy Row Ambassador's Buffett Lunch.[253] According to Sessions, his interaction with Ambassador Kislyak following that speech was brief, unexpected, and occurred in the presence of several other people.[254]

**(U)** J.D. Gordon testified about briefly encountering Kislyak twice at convention events in July 2016, including a brief conversation that occurred during a networking event that was also attended by [redacted].[255] [redacted] recalled seeing Gordon and chatting casually with Kislyak at the same event.[256] The Committee found no evidence that these brief public interactions related to the hacking of emails or collusion, coordination, or conspiracy between the Trump campaign and Russia.

**(U) Senate Office Meeting:** On September 8, 2016, Senator Sessions met

TOP SECRET// / NOFORN

Ambassador Kislyak in his Senate office.[257] As a Senator, such meetings in his Capitol Hill office are common. Notes of the meeting taken by Sessions' staff, and provided to the Committee, verified that the approximately 30-minute meeting was official in nature and not related to any role that Senator Sessions held with the Trump campaign.[258] Sessions testified that the conversation mainly revolved around Ukraine, and the two "had a little testy conversation" about Ukraine given Sessions' support for the Ukrainian cause.[259] The Committee's investigation did not uncover anything improper about Senator Sessions' meetings with the Russian ambassador.

**Finding #35: Possible Russian efforts to set up a "back channel" with Trump associates after the election suggest the absence of collusion during the campaign, since the communication associated with collusion would have rendered such a "back channel" unnecessary.**

(U) The Committee investigated meetings during the post-election transition period between Trump associates and Russians—with a focus on individuals who may have been acting as unofficial representatives of Moscow. In December 2016, Kushner met with the head of Russian bank VEB, Sergei Gorkov, at the urging of Russian Ambassador Sergei Kislyak, with whom Kushner and Flynn had met earlier in the month.[260] Kushner took the meeting partly because he had been told Gorkov could provide "insight into what Putin's thoughts were on a potential new

relationship" between Russia and the United States.[261] Kushner testified that the meeting primarily entailed Gorkov telling Kushner about VEB, with which Kushner was entirely unfamiliar, and "that was really the extent of it."[262] Gorkov gave Kushner two gifts, which Kushner registered with the transition.[263]

(U) In January 2017, businessman and former Navy officer ▌ was introduced through Emirati associates to Russian investor Kirill Dmitriev in the Seychelles.[264] ▌ had no official or unofficial role in the transition, but had met twice with Bannon at Trump Tower.[265] ▌ testified that his meeting with Dmitriev lasted 20-30 minutes and focused on "trade matters," and "how the United States and Russia should be working together to defeat Islamic terrorism."[266]

▌ stated that he and Dmitriev did not discuss sanctions, the Russian government's "desire to have a relationship with the Trump administration," or "any channel of communications between the United States and Russia."[267] ▌ further stated that he had had "no communications or dealings with [Dmitriev] or any of his colleagues before or after that encounter last January."[268]

(U) The Committee did not find evidence that Kushner or ▌ did anything inappropriate during or following their meetings with Gorkov and Dmitriev. To the extent that one or both meetings reflected an unsuccessful attempt by intermediaries of the Russian government

TOP SECRET// / NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ██████████ /NOFORN

to set up a "back channel" to the incoming Trump administration, that purpose was not shared with or accepted by Kushner or ███████—and potentially reflected an absence of such channels during the campaign.[269] Kushner, who was connected to Gorkov by Kislyak, asserted that "the fact that we [we]re going through the normal channels during the transition hopefully serves to show that there were no existing channels through the campaign." Similarly, ██████ noted his meeting with Dmitriev "didn't happen until . . . more than 2 months after the election. So if there was all this collusion [before the election], why would there even need to be any other followup meetings?"[270]

### Clinton Campaign

(U) Using a series of intermediaries, the Democratic National Committee (DNC) and Hillary for America (Clinton campaign) paid a research firm to conduct opposition research on candidate Trump and his ties with Russia. As part of this effort, research from numerous purported Russian sources was obtained and provided to the Clinton campaign, thereby constituting indirect, but substantial, links "between Russia and individuals associated with political campaigns" relevant to the 2016 U.S. election.

(U) Fusion GPS (Fusion) is the trade name of a Washington, D.C.-based company, Bean LLC, that conducts research primarily on behalf of corporate clients.[271] According to longtime Wall Street Journal

reporter and Fusion co-founder ██████ ██████ Fusion "specialize[s] in finding records and reading things and digesting large volumes of information."[272] Fusion's general practice is to "do engagements on a 30-day basis, and at the end of the 30 days we write a report about what we found. . . . And if you think what we told you was interesting and you want more, we can sign up again."[273] Founded and led by former journalists,[274] Fusion maintains relationships with numerous reporters, and provides information to news outlets on behalf of clients that include law firms, media organizations, and lobbying organizations.[275]

(U) As described below, Fusion was hired in spring 2016 by ██████████

██████████, who represented the DNC and the Clinton campaign. Fusion was paid to conduct opposition research on candidate Trump. Fusion subsequently hired Christopher Steele as a sub-contractor to obtain information from sources purported to be current and former Russian government officials. The information Steele collected was reported back to the Clinton campaign via Fusion and ██████[276]

(U) **Finding #36: Prior to conducting opposition research targeting candidate Trump's business dealings, Fusion GPS conducted research benefitting Russian interests.**

(U) Prior to conducting opposition research targeting candidate Trump's

TOP SECRET// ██████████ /NOFORN

business dealings, Fusion conducted research benefitting Russian interests.[277] Specifically, in 2013, Fusion was retained by a law firm to assist with representation of a Russian defendant in a civil forfeiture case arising out of alleged money laundering activities uncovered by the late Sergei Magnitsky (whose name was subsequently given to the U.S. human rights law, the Magnitsky Act).[278] ██████ acknowledged that the Kremlin's interests in the case were aligned with his client and against the U.S. government.[279]

(U) Russian lawyer Natalia Veselnitskaya hired the law firm for which Simpson was working, and that firm retained the services of Russian-American lobbyist Rinat Akhmetshin, both of whom attended a meeting at Trump Tower on June 9, 2016, described in the first part of this chapter.[280] During the litigation, Veselnitskaya received, via the law firm, memoranda summarizing ██████ research.[281] Certain topics—including the Ziff Brothers (a venture capital firm specializing in capital investment)—were the subject of both (1) memoranda Veselnitskaya received from ██████ and (2) the presentation Veselnitskaya made to Trump campaign officials.[282] ██████ acknowledged being with Veselnitskaya at a court hearing in New York on the morning of June 9, 2016, prior to her meeting at Trump Tower.[283] He further recalled having drinks and dinner with her and others, including Akhmetshin, in Washington, D.C. a day or two later.[284] However, he denied

discussing the Trump Tower meeting with her before or after it occurred, and claimed not to have learned about it until 2017.[285]

(U) Finding #37: The ██████ hired Fusion GPS on behalf of the Clinton campaign and the Democratic National Committee to research candidate Trump's Russia ties.

(U) ██████ ██████, is longtime counsel to the DNC.[286] ██████ also represented the Clinton campaign, from which it received $5.6 million in 2015 and 2016.[287] Pursuant to that representation, during the 2016 campaign, "[t]here was an expectation that ██████ would hire the consultants, including research consultants, necessary to enable us to provide services to the campaign."[288]

(U) In approximately March or April 2016,[289] Fusion principals ██████ and ██████ approached ██████ "and indicated that they might be a good fit for doing work to support the legal efforts" of ██████ clients.[290] ██████ testified that Fusion "had been retained . . . by a wealthy Republican . . . to do research on then candidate Trump . . . and thought that if I was going to be looking to hire a consultant to help me advise the campaign on issues relating to Trump, that they would be a good fit."[291] ██████ was looking for a consultant to, among other things, sort through the multitude of public records pertaining to Trump's business dealings.[292] Although he had not previously worked with Fusion, he chose to

hire the company based on its familiarity with Trump's dealings, including "his business holdings, his financial holdings, and the kinds of litigation he had been involved in."[293] ██ further testified that "[t]hey were recommended . . . [and] thought highly of in the community."[294]

(U) The Committee determined the "wealthy Republican" who funded Fusion's initial Trump Research was ██████████ ██████████████████████. In September 2015, the *Beacon* retained Fusion to conduct opposition research on Trump.[295] ██████ leadership have publicly stated they "had no knowledge of or connection to the Steele dossier, did not pay for the dossier, and never had contact with, knowledge of, or provided payment for any work performed by Steele."[296] ████████ ███████ testified that—based on a careful review of the relevant documents—he had identified "zero overlap in the work product" between the dossier and what Fusion provided ██████.[297]

(U) ██ sought and received "budget approval to be able to spend money in order for me to retain consultants," from Clinton campaign manager ██████████ but did not specifically identify Fusion to ████████.[298] Fusion's Simpson was "definitely aware that ██████████ represented the DNC and that they were the client in this matter" based on a general understanding that ██████████ represents the DNC.[299] Fusion's expenses, including the hiring of Christopher Steele as a sub-contractor,

were passed on to ██████████,[300] and ultimately to the Clinton campaign and DNC.[301] In total, Fusion paid Steele (and charged ██████████) approximately $160,000; Steele's efforts were part of a larger opposition research project for which ██████████ paid Fusion over $1 million.[302]

(U) ██████████ testified that Fusion began its opposition research work by "review[ing] what we had learned over the previous months," presumably including "information about candidate Trump's business ties in Russia," although ██ had not been aware of Russia-specific research at the time he engaged Fusion.[303] Fusion "began to develop more specific lines of inquiry," and eventually hired Steele, whom ██████ had known since approximately 2009.[304] ██████████████████████, signed off on the decision to hire Steele as a sub-contractor in June 2016—around the same time he learned that Fusion was beginning to focus its opposition research on Trump's ties to Russia—but was not aware of Steele's identity until July 2016.[305]

(U) Finding #38: Christopher Steele claims to have obtained his dossier information second- and third-hand from purported high-placed Russian sources, such as government officials with links to the Kremlin and intelligence services.

(U) Between June and November 2016, Steele produced sixteen reports for Fusion, which comprise what has become known as the Steele dossier, "concerning Russian efforts to influence the US Presidential

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET/█████████████████████                    ████NOFORN████

election and links between Russia and Donald Trump."[306] Steele did not travel to Russia to compile these reports.[307] Instead, Simpson stated that "[Steele] hire[d] people who can travel and talk to people and find out what's going on."[308]

(U) Of the separate claims the Committee identified within the dossier, almost all are attributable to Russian or Russia-based sources, such as: a "senior Russian government figure," a "senior Russian leadership figure," an "official close to [the] Russian Presidential Administration," a "Kremlin insider," a "former top Russian officer," a "senior Russian financial official," a "senior Russian Foreign Ministry figure," a "Kremlin official involved in U.S. relations," and a "former top level Russian intelligence officer still active inside the Kremlin."[309]

(U) The Committee is concerned with the degree to which the Kremlin may have sought to influence information that was ultimately provided to Steele—through the potential provision of disinformation or otherwise—consistent with its ongoing efforts "to undermine public faith in the US democratic process . . . ."[310] In addition, the vast majority of witnesses the Committee interviewed, including ████, did not know the identity of Steele's sources.[311] Steele declined to testify before the Committee, and the two witnesses who claimed to know some of Steele's sources—Simpson and ████████, a former U.S. Department of State official—declined to identify them.[312]

(U) Finding #39: Christopher Steele's information from Russian sources was provided directly to Fusion GPS and ████████ and indirectly to the Clinton campaign.

(U) Fusion began receiving written reports from Steele in June 2016.[313] At the same time, Fusion provided updates—approximately weekly and usually orally—to ████████████████████.[314] ████ recalled receiving some of the information later included in the dossier "maybe late June, early July."[315] ████ exchanges with Fusion were not one-way communications: he specifically recalled directing follow-up work on information gathered by Steele.[316] Elias recalled personally being briefed by Steele on his findings during a late September or early October meeting at ████████████████████ office and formed the impression that "the Fusion folks thought it was important that Mr. Steele hear from me directly that I was aware of his work and was appreciative."[317] The Committee requested ████████ records related to this meeting, but the firm was not able to locate any.[318]

(U) ████ led regular briefings that contained Steele's information for senior Clinton campaign staff, which included Clinton campaign manager ████████ and campaign chairman John Podesta.[319] ████ also began "relaying . . . information received from Fusion GPS to the DNC . . . around . . . convention time."[320]

1.  HPSCI, "Intelligence Committee Chairman, Ranking Member Establish Parameters for Russia Investigation," https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=767, Mar. 11, 2017.
2.  HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
3.  HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017; HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
4.  HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
5.  HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
6.  HPSCI, "Russian Active Measures During the 2016 Election Campaign," May 23, 2017.
7.  HPSCI, "Russian Active Measures During the 2016 Election Campaign," May 23, 2017.
8.  HPSCI, Executive Session Interview of James Clapper, July 17, 2017.
9.  HPSCI, Executive Session Interview of James Clapper, July 17, 2017.
10. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
11. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
12. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
13. Morgan, Lewis & Bockius LLP, Letter from Sheri A. Dillon and William F. Nelson to President Donald J. Trump, Mar. 8, 2017.
14. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
15. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017.
16. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017.
17. HPSCI, Executive Session Interview of Rob Goldstone Dec. 18, 2017.
18. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
19. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017; HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
20. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017.
21. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
22. Twitter, @realDonaldTrump, June 18, 2013, 8:17 PM.
23. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
24. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
25. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
26. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
27. HPSCI, Executive Session Interview of Keith Schiller, Nov. 7, 2017; HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
28. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
29. HPSCI, Executive Session Interview of Keith Schiller, Nov. 7, 2017.
30. HPSCI, Executive Session Interview of Keith Schiller, Nov. 7, 2017.
31. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
32. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
33. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
34. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
35. HPSCI, Executive Session Interview of ████████, Dec. 20, 2017.
36. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
37. HPSCI, Executive Session Interview of Felix Sater, Dec. 20, 2017.
38. Text Message Exchange Between Michael Cohen and Felix Sater, Dec. 29-31, 2015. [FSHR00112-30]
39. Email from Felix Sater to Michael Cohen, "Re:Putin/Trump," Nov. 3, 2015. [MDC-H-000692]
40. Email from Felix Sater to Michael Cohen, "Re:Putin/Trump," Nov. 3, 2015. [MDC-H-000692]
41. HPSCI, Executive Session Interview of ████████, Dec. 20, 2017.
42. HPSCI, Executive Session Interview of ████████ Dec. 20, 2017.
43. HPSCI, Executive Session Interview of ████████, Dec. 20, 2017.
44. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
45. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017 .
46. Text Message Exchange Between Michael Cohen and Felix Sater, Dec. 30-31, 2015. [FSHR00112-30] HPSCI, Executive Session Interview of Felix Sater, Dec. 20, 2017.
47. Text Message from Felix Sater to Michael Cohen, Dec. 30, 2015. [FSHR00124-25]
48. Text Message from Felix Sater to Michael Cohen, Dec. 30, 2015. [FSHR00125]
49. Email from Michael Cohen to info@prpress.gov.ru, "Trump Tower-Moscow," Jan. 14, 2016. [MDC-H-000690]
50. Email from Michael Cohen to info@prpress.gov.ru, "Trump Tower-Moscow," Jan. 14, 2016. [MDC-H-000690]
51. Email from Michael Cohen to info@prpress.gov.ru, "Trump Tower-Moscow," Jan. 14, 2016. [MDC-H-000690]
52. HPSCI, Executive Session Interview of Felix Sater, Dec. 20, 2017.

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//       /NOFORN

53. HPSCI, Executive Session Interview of Felix Sater, Dec. 20, 2017; HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
54. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
55. HPSCI, Executive Session Interview of Felix Sater, Dec. 20, 2017.
56. HPSCI, Executive Session Interview of Felix Sater, Dec. 20, 2017.
57. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
58. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
59. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
60. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
61. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
62. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
63. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
64. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
65. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
66. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
67. Morgan, Lewis & Bockius LLP, Letter from Sheri A. Dillon and William F. Nelson to President Donald J. Trump, Mar. 8, 2017.
68. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
69. Eliot Cohen, Bryan McGrath, et al., "Open Letter On Donald Trump from GOP National Security Leaders," *War on the Rocks*, Mar. 2, 2016.
70. Daniel W. Drezner, "Why can't Donald Trump close the deal with any foreign policy advisers?," *Washington Post*, Mar. 9, 2016.
71. Missy Ryan and Steven Mufson, "One of Trump's foreign policy advisers is a 2009 college grad who lists Model UN as a credential," *Washington Post*, Mar. 22, 2016.
72. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
73. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
74. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
75. HPSCI, Executive Session Interview of Walid Phares, Dec. 8, 2017.
76. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
77. HPSCI, Testimony of Carter Page, Nov. 2, 2017.
78. HPSCI, Testimony of Carter Page, Nov. 2, 2017.
79. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
80. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
81. HPSCI, Executive Session Interview of      , Dec. 5, 2017;      – RNC National Security/Military Platform Sub Committee Proposed Plank on the Ukraine, Undated. [DENMAN 000012]
82.      – RNC National Security/Military Platform Sub Committee Proposed Plank on the Ukraine, Undated.      000012]
83. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
84. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
85. HPSCI, Executive Session Interview of      , Jan. 17, 2018.
86. U.S. v. Paul J. Manafort, Jr., and Richard W. Gates III, "Superseding Indictment" (1:18-cr-83, Eastern District of Virginia), Feb. 22, 2018.
87. HPSCI, Executive Session Interview of      , Jan. 17, 2018; Alexander Burns and Maggie Haberman, "Donald Trump Hires Paul Manafort to Lead Delegate Effort," *The New York Times*, Mar. 28, 2016.
88. HPSCI, Executive Session Interview of      , Jan. 17, 2018.
89. HPSCI, Executive Session Interview of      , Jan. 17, 2018; HPSCI, Executive Session Interview of Hope Hicks, Feb. 27, 2018.
90. Andrew E. Kramer, Mike McIntire, and Barry Meier, "Secret Ledger in Ukraine Lists Cash for Donald Trump's Campaign Chief," *The New York Times*, Aug. 14, 2016; Jeff Horowitz and Chad Day, "Trump advisers waged covert influence campaign," *Associated Press*, Aug. 19, 2016.
91. HPSCI, Executive Session Interview of Hope Hicks, Feb. 27, 2018.
92. HPSCI, Executive Session Interview of Hope Hicks, Feb. 27, 2018.
93. HPSCI, Executive Session Interview of Hope Hicks, Feb. 27, 2018.
94. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
95. Email from Paul Manafort to      , "Arming Ukraine," July 30, 2016. [Sessions production: 2016-07-30—Arming Ukraine]
96. Email from      to Brian Jack, "Fwd: ukraine," Aug. 1, 2016. [Sessions production: 2016-08--01—Fwd: ukraine]; Memorandum from      , "GOP Platform: National Security, Ukraine Amendment—Sequence of Events," Aug.





1, 2016. [Sessions production: 2016-08--01—Fwd: Ukraine—ATTACHMENT MEMO—Ukraine Amendment (1).pdf]

97.  Memo from J.D. Gordon, "GOP Platform: National Security, Ukraine Amendment—Sequence of Events," Aug. 1, 2016. [DJTFP00004693]  Email from John Hemenway to Jeffrey D. Gordon, "Ukraine—Revised Format," Aug. 1, 2016. [DJTFP00004692-93]

98.  HPSCI, Testimony of Carter Page, Nov. 2, 2017.

99.  DHS and ODNI, *Joint Statement from the Department of Homeland Security and Office of the Director of National Intelligence on Election Security,* https://www.dhs.gov/news/2016/10/07/joint-statement-department-homeland-security-and-office-director-national, Oct. 7, 2016.

100.  HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.

101.  HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.

102.  HPSCI, Executive Session Interview of Hope Hicks, Feb. 27, 2018.

103.  Mark Hench, "Trump: 'I love WikiLeaks,'" *The Hill,* Oct. 10, 2016.

104.  Ashley Parker and David E. Sanger, "Donald Trump Calls on Russia to Find Hillary Clinton's Missing Emails," *The New York Times,* July 27, 2016.

105.  HPSCI, Executive Session Interview of Matthew F. Tait, Oct. 6, 2017.

106.  HPSCI, Executive Session Interview of Hope Hicks, Feb. 27, 2018; HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017; HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.

107.  CIA, "Director Pompeo Delivers Remarks at CSIS," http://www.cia.gov/news-information/speeches-testimony/2017-speeches-testimony/pompeo-delivers-remarks-at-csis/html, Apr. 13, 2017.

108.  U.S. v. George Papadopoulos, "Statement of the Offense" (1:17-cr-182, District of Columbia), Oct. 5, 2017.

109.  Email from Michael Flynn to ⬛⬛⬛⬛, July 15, 2016. [FLYNN HPSCI 00002980-81].

110.  Manu Raju and Jeremy Herb, "Email pointed Trump campaign to WikiLeaks documents," CNN, Dec. 8, 2017.

111.  HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.

112.  Email from ⬛⬛⬛⬛⬛⬛ to Donald J. Trump, et al., "Trump: Another WikiLeaks DNC Upload," Sept. 14, 2016. [TRUMP_ORG_13_00001]

113.  Email from ⬛⬛⬛⬛⬛⬛ to Donald J. Trump, et al., "Trump: Another WikiLeaks DNC Upload," Sept. 14, 2016. [TRUMP_ORG_13_00001]

114.  Oliver Darcy, "CNN corrects story on email to Trumps about WikiLeaks," CNN, Dec. 8, 2017.

115.  HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.

116.  HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.

117.  HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.

118.  Direct Message from WikiLeaks to Donald Trump Jr., Sept. 20, 2016, 11:59 PM; Direct Message from Donald Trump Jr. to WikiLeaks, Sept. 21, 2016, 11:50 AM; Direct Message from WikiLeaks to Donald Trump Jr., Oct. 3, 2016, 1:25 PM; Direct Message from Donald Trump Jr. to WikiLeaks, Oct. 3, 2016, 3:01 PM.; Direct Message from Donald Trump Jr. to WikiLeaks, Oct. 3, 2016, 3:03 PM. [DJTJR01265-66]

119.  Direct Message from WikiLeaks to Donald Trump Jr., Sept. 20, 2016, 11:59 PM; Direct Message from WikiLeaks to Donald Trump Jr., Oct. 3, 2016, 1:25 PM.

120.  HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017, p. 107.

121.  Direct Message from WikiLeaks to Donald Trump Jr., Sept. 20, 2016, 11:59 PM. [DJTJR01265]

122.  Direct Message from Donald Trump Jr. to WikiLeaks, Sept. 21, 2016, 11:50 AM. [DJTJR01265]

123.  HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.

124.  Email from Donald Trump Jr. to Kellyanne Conway, et al., "Wikileaks," Sept. 21, 2016. [TRUMPORG_11_0000007]

125.  Email from Donald Trump Jr. to Kellyanne Conway, et al., "Wikileaks," Sept. 21, 2016. [TRUMPORG_11_0000007]

126.  HPSCI, Executive Session Interview of Hope Hicks, Feb. 27, 2018.

127.  Direct Message from WikiLeaks to Donald Trump Jr., Oct. 3, 2016, 1:25 PM. [DJTJR 01265-66]

128.  Direct Message from Donald Trump Jr. to WikiLeaks, Oct. 3, 2016, 3:01 PM. [DJTJR01266]

129.  Direct Message from Donald Trump Jr. to WikiLeaks, Oct. 3, 2016, 3:03 PM. [DJTJR01266]

130.  HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.

131.  Direct Message from WikiLeaks to Donald Trump Jr., Oct. 12, 2016, 8:31 AM. [DJTJR01267]

132.  Direct Message from WikiLeaks to Donald Trump Jr., Oct. 21, 2016, 9:46-9:54 AM. [DJTJR01267-69]

133.  Direct Message from WikiLeaks to Donald Trump Jr., Nov. 8, 2016, 6:35 PM. [DJTJR01269-70]

134.  Direct Message from WikiLeaks to Donald Trump Jr., Nov. 9, 2016, 12:49-12:51 AM. [DJTJR01270]

135.  Direct Message from WikiLeaks to Donald Trump Jr., Dec. 16, 2016, 12:38 PM. [DJTJR01271]

136.  Direct Message from WikiLeaks to Donald Trump Jr., Apr. 26, 2017, 12:01 AM. [DJTJR01272]

137.  Direct Message from WikiLeaks to Donald Trump Jr., July 11, 2017, 9:29 AM. [DJTJR01273-74]

138.  HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.

139.  HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.

140.  HPSCI, Executive Session Interview of Alexander Nix, Dec. 14, 2017.



141. Email from Alexander Nix to Peter Schweizer, et al., "Re: Remember me? I have an idea to win," Aug. 26, 2016. [CA0000077]
142. HPSCI, Executive Session Interview of Alexander Nix, Dec. 14, 2017.
143. HPSCI, Executive Session Interview of Alexander Nix, Dec. 14, 2017.
144. HPSCI, Executive Session Interview of ████, Oct. 24, 2017.
145. HPSCI, Executive Session Interview of Alexander Nix, Dec. 14, 2017.
146. HPSCI, Executive Session Interview of Alexander Nix, Dec. 14, 2017.
147. HPSCI, Executive Session Interview of Roger Stone, Sept. 26, 2017.
148. HPSCI, Executive Session Interview of Roger Stone, Sept. 26, 2017.
149. HPSCI, Executive Session Interview of Roger Stone, Sept. 26, 2017.
150. HPSCI, Executive Session Interview of Roger Stone, Sept. 26, 2017.
151. Kenneth P. Vogel, "Under Mueller Scrutiny, Democratic Donor Tony Podesta Resigns From Lobbying Firm," *The New York Times*, Oct. 30, 2017; HPSCI, Executive Sessions Interview of John Podesta, June 27, 2017; U.S. v. Paul J. Manafort, Jr., and Richard W. Gates III, "Indictment" (1:17-cr-201, District of Columbia), Oct. 30, 2017 (describing role of "Company A" and "Company B").
152. HPSCI, Executive Session Interview of Roger Stone, Sept. 26, 2017.
153. HPSCI, Executive Session Interview of Roger Stone, Sept. 26, 2017.
154. Letter from Robert C. Buschel to The Honorable K. Michael Conaway, "Re: Follow Up to Appearance of Roger Stone on September 26, 2017, and Supplement to May 9, 2017 Request to Produce Documents" Oct. 13, 2017.
155. HPSCI, Executive Session Interview of Roger Stone, Sept. 26, 2017.
156. Andrew Blake, "Roger Stone, Trump confidant, acknowledges 'innocuous' Twitter conversation with DNC hackers," *Washington Times*, Mar. 10, 2017; HPSCI, Executive Session Interview of Roger Stone, Sept. 26, 2017.
157. Letter from Robert C. Buschel to The Honorable K. Michael Conaway "Re: Follow Up to Appearance of Roger Stone on September 26, 2017, and Supplement to May 9, 2017 Request to Produce Documents" Oct. 13, 2017.
158. Letter from Robert C. Buschel to The Honorable K. Michael Conaway "Re: Follow Up to Appearance of Roger Stone on September 26, 2017, and Supplement to May 9, 2017 Request to Produce Documents" Oct. 13, 2017.
159. HPSCI, Testimony of ████ Nov. 2, 2017.
160. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
161. Email from Carter Page to Jeffary D. Gordon et al., "Re: Commencement Address, Class of 2016, New Economic School (NES), July 7, 2016. [DJTFP00003892] HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
162. HPSCI, Testimony of ████ Nov. 2, 2017.
163. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
164. Email from Carter Page to Jeffrey D. Gordon, Tera Dahl, and Walid Phares, "Feedback from Russia -- Executive Summary," July 8, 2016. [DJTFP00004023-24]
165. HPSCI, Testimony of Carter Page, Nov. 2, 2017; Josh Rogin, "Trump's Russia adviser speaks out, calls accusations 'complete garbage,'" *Washington Post*, Sept. 26, 2016.
166. HPSCI, Testimony of Carter Page, Nov. 2, 2017.
167. HPSCI, Russia Active Measures Investigation, Mar. 20, 2017; HPSCI, Testimony of Carter Page, Nov. 2, 2017.
168. HPSCI, "Russia Active Measures Investigation," Mar. 20, 2017.
169. HPSCI, Testimony of Carter Page, Nov. 2, 2017; Josh Rogin, "Trump's Russia adviser speaks out, calls accusations 'complete garbage,'" *Washington Post*, Sep. 26, 2016.
170. HPSCI, Testimony of Carter Page, Nov. 2, 2017.
171. Sharon LaFraniere, Mark Mazzetti, and Matt Apuzzo, "How the Russia Inquiry Began: A Campaign Aide, Drinks and Talk of Political Dirt," *Washington Post*, Dec. 30, 2017; Email from John Mashburn to Rick Dearborn and Jeffrey D. Gordon, "Re: Travel reimbursement (received email from Michael Glassner)," June 24, 2016. [ DJTFP00022914]
172. Email from George Papadopoulos to ████ et al., "Re: Meeting with Russian leadership—including Putin," Mar. 24, 2016. [DJTFP00010111-12]
173. Email from ████ to George Papadopoulos et al., "Re: Meeting with Russian leadership—including Putin," Mar. 24, 2016. [DJTFP00010113]
174. Email from George Papadopoulos to ████ et al., "Re: Meeting with Russian leadership—including Putin," Mar. 24, 2016. [DJTFP00010111]
175. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
176. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
177. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
178. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
179. HPSCI, Executive Session Interview of ████ Dec. 8, 2017.
180. HPSCI, Executive Session Interview of ████ Jr., Dec. 12, 2017.
181. Sharon LaFraniere, Mark Mazzetti, and Matt Apuzzo, "How the Russia Inquiry Began: A Campaign Aide, Drinks and Talk of

Political Dirt," *Washington Post*, Dec. 30, 2017; HPSCI, Executive Session Interview of ██████ Dec. 8, 2017, pp. 79-80; Email from George Papadopoulos to ██████ "Transition," Nov. 11, 2016 ("I made the introduction between Mr Trump [a]nd president Sisi based primarily on the trust the region has on my work etc.") [DJTFP00024754]

182. Lou Dobbs, Interview with Donald Trump, *Fox Business*, Sept. 22, 2016.

183. Email from George Papadopoulos to Paul Manafort, "Fwd," May. 21, 2016. [GAT-HPSCI-00000258]

184. Email from George Papadopoulos to Paul Manafort, "Fwd," May. 21, 2016. [GAT-HPSCI-00000258-59]

185. Email from Paul Manafort to ██████ "Fwd," May. 21, 2016. [GAT-HPSCI-00000258]

186. Email from Paul Manafort to ██████ "Re:" May. 21, 2016. [GAT-HPSCI-00000258]

187. Email from George Papadopoulos to Rick Dearborn, "Travel reimbursement (received email from Michael Glassner)," June 24, 2016 [DJTFP00022915-16]

188. Email from ██████ and Jeffrey D. Gordon, "FWD: Travel reimbursement (received email from Michael Glassner)," June 24, 2016. [DJTFP00022915]

189. Email from ██████ and Jeffrey D. Gordon, "Re: Travel reimbursement (received email from Michael Glassner)," June 24, 2016. [DJTFP00022915]

190. Email from ██████ to George Papadopoulos, "Re: Travel reimbursement (received email from Michael Glassner)," June 24, 2016. [DJTFP00022918]

191. Email from ██████ to George Papadopoulos, "Re: Travel reimbursement (received email from Michael Glassner)," June 24, 2016. [DJTFP00022918]

192. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017; Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017; Email from ██████ to Rob Goldstone, "FW-Message-from '26-Copier-Exec,'" Apr. 25, 2016 (passing along handwritten response from candidate Trump to email from Aras Agalarov) [RG000033]

193. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.

194. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.

195. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.

196. Email from ██████ to [REDACTED], "From the office of Donald J. Trump,'" Mar. 18, 2016 (passing along handwritten response from candidate Trump to typewritten note from Aras Agalarov) [DJTJR00408-09]; Email from Rhona Graff to Rob Goldstone, "FW-Message-from '26-Copier-Exec,'" Apr. 25, 2016 (passing along handwritten response from candidate Trump to email from Aras Agalarov) [RG000033]

197. Email from Rob Goldstone to Donald Trump Jr., "Re: Re: Russia – Clinton – private and confidential," June 3, 2016. [DJTJR00464]

198. Email from Donald Trump Jr to Rob Goldstone, "Re: Russia – Clinton – private and confidential," June 3, 2016. [DJTJR00464]

199. Email from Rob Goldstone to Donald Trump Jr., "Re: Russia – Clinton – private and confidential," June 7, 2016. [DJTJR00467]

200. Email from Donald Trump Jr to Rob Goldstone, "Re: Russia – Clinton – private and confidential," June 7, 2016. [DJTJR00469]

201. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017.

202. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.

203. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.

204. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.

205. HPSCI, Executive Session Interview of Rinat Akhmetshin, Nov. 13, 2017; HPSCI Executive Session Interview of Anatoli Samochornov, Nov. 28, 2017.

206. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017; Sharon La Franiere and Andrew E. Kramer, "Talking Points Brought to Trump Tower Meeting Were Shared With Kremlin," *The New York Times*, Oct. 27, 2017. Based on public reporting, Veselnitskaya previously shared a version of the memo or talking points with Yuri Chaika.

207. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017; HPSCI, Executive Session Interview of Rinat Akhmetshin, Nov. 13, 2017; HPSCI, Executive Session Interview of Anatoli Samochornov, Nov. 28, 2017.

208. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017.

209. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.

210. HPSCI, Executive Session Interview of Anatoli Samochornov, Nov. 28, 2017.

211. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017.

212. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017; HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017; HPSCI, Executive Session Interview of Anatoli Samochornov, Nov. 28, 2017; HPSCI, Executive Session Interview of Rinat Akhmetshin, Nov. 13, 2017; HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017

213. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017; HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017; HPSCI, Executive Session Interview of Anatoli Samochornov, Nov. 28, 2017; HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.

214. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.




215. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
216. Text Message Exchange Between Jared Kushner and Paul Manafort, June 9, 2016. [NHPSCI00000145]
217. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
218. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
219. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017.
220. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017.
221. Email from Ike Kaveladze to A. Kaveladze, "Re: how are you," June 14, 2016. [HIC-KAV_00020]
222. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
223. HPSCI, Executive Session Interview of Stephen Bannon, Jan. 16, 2018.
224. Ryan Teague Beckwith, "Read Donald Trump's Subdued Victory Speech After Winning New Jersey," *TIME*, June 8, 2017; Email from Donald Trump Jr to Rob Goldstone, "Re: Russia – Clinton – private and confidential," June 7, 2016. [DJTJR00469].
225. HPSCI, Executive Session Interview of Hope Hicks, Feb. 27, 2018; "Full transcript: Donald Trump NYC speech on stakes of the election," *POLITICO*, June 22, 2018.
226. NRA, "2016 NRA Annual Meetings & Exhibits Full Event Schedule," https://www.nraam.org/media/1641/daily-event-schedule.pdf, undated.
227. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
228. Email from ███████ to ███ "Russian backdoor overture and dinner invite," May 16, 2016.[Sessions production: 2016-05-16--Re_Russian backdoor overture and dinner invite (36)]
229. Email from ███████ to ███ "Russian backdoor overture and dinner invite," May 16, 2016. [Sessions production: 2016-05-16--Re_Russian backdoor overture and dinner invite (36)]
230. Email from ███████ to ███ "Russian backdoor overture and dinner invite," May 16, 2016. [Sessions production: 2016-05-16--Re_Russian backdoor overture and dinner invite (36)]
231. Email from ███████ to Paul Manafort, et al., "Fwd: Russian backdoor overture and dinner invite," May 17, 2016. [Sessions production: 2016-05-17--Fwd_Russian backdoor overture and dinner invite (28)]
232. Email from Jared Kushner to ███████ "Re: Russian backdoor overture and dinner invite," May 17, 2016. [RD0000091]
233. Email from ███████ to ███ "Re: KY Request," May 18, 2016. [Sessions Production: 2016-05-18--Re_KY Request]
234. HPSCI, Executive Session Interview of ███████ Jan. 17, 2018.
235. Email from ███████ o "Kremlin Connection," May 10, 2016. [RD 000078]
236. Email from ███████ to "Kremlin Connection," May 10, 2016. [RD 000078]
237. Email from ███████ o "Kremlin Connection," May 10, 2016. [RD 000078]
238. Email from ███████ o "Kremlin Connection," May 10, 2016. [RD 000078]
239. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
240. HPSCI, Executive Session Interview of ███████ Jan. 17, 2018.
241. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
242. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
243. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
244. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
245. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
246. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
247. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
248. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
249. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
250. Federal Election Commission, "Hillary for America Disbursements to ███████ from 2015-2016, www.fec.gov; "JBS Schedule," July 16, 2016. [2016-07-16--Untitled (15)--ATTACHMENT JBS Convention Schedule with Drop By (Sessions Production)]
251. "JBS Schedule," July 16, 2016. [Sessions Production: 2016-07-16--Untitled (15)--ATTACHMENT JBS Convention Schedule with Drop By]
252. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017; Courtney Ostrix, "U.S. Senator Bob Corker Speaks at Global Cleveland's Global Partners in Diplomacy Event," Globalcleveland.org, Jan. 31, 2017.
253. "JBS Schedule," July 16, 2016. [Sessions Production: 2016-07-16--Untitled (15)--ATTACHMENT JBS Convention Schedule with Drop By]
254. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017, p. 86 ["I met with him, as I recall, twice. There was an encounter after I made a speech at the Republican Convention. I didn't—didn't know he was going to be there. I spoke to a number of ambassadors and other people and was standing in front of the podium and he and I chatted a bit."].

255. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017..

256. HPSCI, Testimony of ████████ Nov. 2, 2017.

257. "JBS Schedule," July 16, 2016. [Sessions Production: 2016-07-16—Untitled (15)—ATTACHMENT JBS Convention Schedule with Drop By] Calendar invite, "Meeting with Russian Ambassador Kislyak," Sept. 8, 2016. [2016-09-08—Meeting with Russian Ambassador Kislyak]

258. Senator Sessions' Staff Notes, "Russian Ambassador," Sept. 8, 2016 [Sessions Supplemental Production]; Calendar invite, "Meeting with Russian Ambassador Kislyak," Sept. 8, 2016. [Sessions production: 2016-09-08—Meeting with Russian Ambassador Kislyak].

259. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.

260. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.

261. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.

262. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.

263. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.

264. HPSCI, Executive Session Interview of ████████ Nov. 30, 2017.

265. HPSCI, Executive Session Interview of ████████ Nov. 30, 2017.

266. HPSCI, Executive Session Interview of ████████ Nov. 30, 2017.

267. HPSCI, Executive Session Interview of ████████ Nov. 30, 2017.

268. HPSCI, Executive Session Interview of ████████ Nov. 30, 2017.

269. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.

270. HPSCI, Testimony of Erik Prince, Nov. 30, 2017.

271. HPSCI, Executive Session Interview of ████████ Nov. 14, 2017.

272. HPSCI, Executive Session Interview of ████████ Nov. 14, 2017.

273. HPSCI, Executive Session Interview of ████████ Nov. 14, 2017.

274. HPSCI, Executive Session Interview of ████████ Nov. 14, 2017.

275. HPSCI, Executive Session Interview of ████████ Nov. 14, 2017.

276. HPSCI, Executive Session Interview of Jake Sullivan, Dec. 21, 2017 ████████ entral role in the dossier was first revealed in a press article. Adam Entous, Devlin Barrett, and Rosalind S. Helderman, "Clinton campaign, DNC paid for research that led to Russia dossier," *Washington Post*, Oct. 24, 2017. Prior to its publication, Elias elected to represent three witnesses — including former Clinton campaign chairman John Podesta—before the Committee in connection with this investigation. HPSCI, Executive Session Interview of John Podesta, June 27, 2017; HPSCI, Executive Session Interview of ████████ Aug. 30, 2017; HPSCI, Executive Session Interview of Yared Tamene Wolde-Yohannes, Aug. 30, 2017. That decision was questionable, since Elias was himself in possession of facts relevant to the Committee's investigation. HPSCI, Executive Session Interview of Marc Elias, Dec. 13, 2017.

277. HPSCI, Executive Session Interview of ████████ Nov. 14, 2017.

278. HPSCI, Executive Session Interview of ████████ Nov. 14, 2017; HPSCI, Executive Session Interview of Rinat Akmetshin, Nov. 13; Joel Schectman and Nathan Layne, "U.S. settles Russian money laundering case," *Reuters*, May 13, 2017.

279. HPSCI, Executive Session Interview of ████████ Nov. 14, 2017.

280. HPSCI, Executive Session Interview of ████████ Nov. 14, 2017; HPSCI, Executive Session Interview of Rinat Akmetshin, Nov. 13, 2017.

281. HPSCI, Executive Session Interview of ████████ Nov. 14, 2017.

282. HPSCI, Executive Session Interview of ████████ Nov. 14, 2017; HPSCI, Executive Session Interview of Rinat Akhmetshin, Nov. 13, 2017; HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017.

283. HPSCI, Executive Session Interview of ████████ Nov. 14, 2017.

284. HPSCI, Executive Session Interview of ████████ Nov. 14, 2017.

285. HPSCI, Executive Session Interview of ████████ Nov. 14, 2017.

286. HPSCI, Executive Session Interview of ████████ Nov. 14, 2017.

287. Federal Election Commission, "Hillary for America Disbursements to Perkins Coie from 2015 to 2016", www.fec.gov; HPSCI, Executive Session Interview of ████████ Dec. 13, 2017.

288. HPSCI, Executive Session Interview of ████████ Dec. 13, 2017.

289. HPSCI, Executive Session Interview of ████████ Dec. 13, 2017.

290. HPSCI, Executive Session Interview of ████████ Dec. 13, 2017.

291. HPSCI, Executive Session Interview of ████████ Dec. 13, 2017.

292. HPSCI, Executive Session Interview of ████████ Dec. 13, 2017.

293. HPSCI, Executive Session Interview of ████████ Dec. 13, 2017.

294. HPSCI, Executive Session Interview of ████████ Dec. 13, 2017.

295. HPSCI, Executive Session Interview of ████████ Dec. 12, 2017.

296. Matthew Continetti and Michael Goldfarb, "Fusion GPS and the Washington Free Beacon," *Washington Free Beacon*, Oct. 27, 2017.

TOP SECRET// ███████████████ //NOFORN

297. HPSCI, Executive Session Interview of ███████ Dec. 12, 2017.
298. HPSCI, Executive Session Interview of ███████ Dec. 13, 2017.
299. HPSCI, Executive Session Interview of ███████ Nov. 14, 2017.
300. HPSCI, Executive Session Interview of ███████ Nov. 14, 2017.
301. HPSCI, Executive Session Interview of ███████ Dec. 13, 2017.
302. HPSCI, Executive Session Interview of ███████ Nov. 14, 2017; Mark Hosenball, "Ex-British spy $168,000 for Trump dossier, U.S. firm discloses," *Reuters*, Nov. 1, 2017.
303. HPSCI, Executive Session Interview of ███████ Nov. 14, 2017.
304. HPSCI, Executive Session Interview of ███████ Nov. 14, 2017.
305. HPSCI, Executive Session Interview of ███████ Dec. 13, 2017.
306. Gubarev et al. v. Orbis et al., Defense, (Claim No. HQ17D0413, Queen's Bench Division), Apr. 3, 2017.
307. HPSCI, Executive Session Interview of ███████ Nov. 14, 2017 (stating that, as a known "former undercover British Intelligence officer who worked in Moscow," Steele would not have been able to travel to Russia safely).
308. HPSCI, Executive Session Interview of ███████ Nov. 14, 2017.
309. Ken Bensinger, Miriam Elder, Mark Schoofs, "These Reports Allege Trump Has Deep Ties To Russia," *BuzzFeed News*, Jan. 10, 2017; HPSCI, Executive Session Interview of David J. Kramer," Dec. 19, 2017.
310. ODNI, *Assessing Russian Activities in Recent U.S. Elections*, Jan. 6, 2017.
311. HPSCI, Executive Session Interview of ███████ Dec. 13, 2017.
312. Letter from Robert M. Weinberg to K. Michael Conaway and Adam Schiff, Aug. 21, 2017; HPSCI, Executive Session Interview of Glenn Simpson, Nov. 14, 2017; HPSCI, Executive Session Interview of David J. Kramer, Dec. 19, 2017. The Committee issued a subpoena to Kramer, but Kramer still refused to identify Steele's sources. HPSCI, Executive Session Interview of David J. Kramer, Jan. 10, 2018; Letter from Lawrence S. Robbins to Representative Devin Nunes and Representative Adam Schiff, "Re: December 27, 2017, Subpoena Issued to David Kramer," Jan. 10, 2018.
313. HPSCI, Executive Session Interview of Glenn Simpson," Nov. 14, 2017.
314. HPSCI, Executive Session Interview of Marc Elias, Dec. 13, 2017.
315. HPSCI, Executive Session Interview of Marc Elias, Dec. 13, 2017.
316. HPSCI, Executive Session Interview of Marc Elias, Dec. 13, 2017.
317. HPSCI, Executive Session Interview of Marc Elias, Dec. 13, 2017.
318. Email for Katherine Ruemmler to HPSCI Staff, "RE: Production," Jan. 24, 2018.
319. HPSCI, Executive Session Interview of Jake Sullivan, Dec. 21, 2017.
320. HPSCI, Executive Session Interview of Marc Elias, Dec. 13, 2017; HPSCI, Executive Session Interview of Jake Sullivan, Dec. 21, 2017; Jennifer Palmieri, "The Clinton campaign warned you about Russia. But nobody listened to us," *Washington Post*, Mar. 24, 2017.

TOP SECRET// ███████████████ //NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ███████ //NOFORN ███

## (U) Chapter 5 - Intelligence Community Assessment Leaks

*Key Question #4: What possible leaks of classified information took place related to the Intelligence Community's assessment of these matters?*

(U) Leaks of classified information are criminal acts, and have the potential to damage U.S. national security interests, at home and abroad.[1] Even more concerning is that the lives of IC employees or assets may be placed in danger due to unauthorized disclosures of classified information. Finally, when leaks of classified information come from congressional sources, such leaks jeopardize the effective oversight role Congress plays over the IC. Therefore, as part of the Committee's investigation, the Committee reviewed leaks related to the classified ICA on the Russian active measures campaign targeting the 2016 U.S. presidential election, focusing primarily on leaks that occurred between the IC's establishment of the CIA Director's fusion cell ███ ████████ and the publication of the ICA in January 2017.

(U) On January 6, 2017, the DNI released the unclassified ICA. The ICA states that Russia conducted its active measures campaign for the dual purposes of (1) sowing discord in and undermining the U.S. presidential election process, and (2) helping elect Donald J. Trump by denigrating Secretary Hillary Clinton.[2] Unfortunately, the public release of the unclassified version of the ICA was not the first time that the public had seen the IC's various assessments related to the Russian active measures campaign. Although outside the scope of this

chapter, leaks related to the Russian active measures were already happening in 2015 and 2016. For example, there were press reports regarding the hack of the DNC, as well as the potential hacks of pro-Trump and Republican groups.[3] During this time, the Committee carried out a healthy dialogue, which included briefings, with the IC related to these matters as part of its oversight responsibilities.[4]

(U) In addition, this chapter covers leaks of information about IC assessments that were likely classified at the time this information found its way into the press, especially in light of the fact that the leaks reportedly came from government sources. This chapter does not make any determination as to the accuracy or analytic integrity of the information leaked to the press and subsequently produced in the ICA.

(U) **Finding #40: Leaks of classified information regarding Russian intentions to sow discord in the U.S. presidential election began prior to the election day—November 8, 2016.**

(U) The leaks related to Russian intentions to sow discord in the U.S. presidential election took place prior to the November 8, 2016 election, and notably, after the IC's establishment of the fusion cell ██████ ████████████████████████████ ████████████████████████████

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



Almost a week later on October 7, 2016, the U.S. government formally accused Russia of hacking political institutions, but did not attribute a specific hack to the Russians.[11]

(U) At the time of these leaks, the information contained within them was still classified. These leaks of classified information endangered U.S. national security by revealing key information about U.S. intelligence capabilities to its adversaries, including assessments on adversary intentions. The Committee finds the timing of these leaks particularly concerning. These leaks happened during the early stages of the IC's ongoing assessment of Russian active measures, thus permitting adversaries to not only potentially discover U.S. intelligence capabilities, but also provided adver-

saries, including the Russians, the opportunity to thwart or manipulate the IC's on-going assessment.

(U) Finding #41: Leaks of classified information alleging Russian intentions to help elect candidate Trump increased dramatically after the election day—November 8, 2016.



(TS/NF) Further, as of December 5, 2016, the administration had not acknowledged any attempt by Moscow to influence the election in favor of candidate Trump.

(TS/NF) However, four days later on December 9, Adam Entous, Ellen Nakashima, and Greg Miller of *The Washington Post* reported that the CIA concluded a new assessment that Russia intervened in the 2016 U.S. presidential election to help candidate Trump win the presidency, rather than for the sole purpose of undermining confidence in the U.S. electoral system.[16]

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ▓▓▓▓▓▓▓▓▓▓▓▓                                    NOFORN

UNCLASSIFIED

**SECRET CIA ASSESSMENT SAYS RUSSIA WAS TRYING TO HELP TRUMP WIN WHITE HOUSE**



The U.S. has identified individuals and groups who passed Democratic Party material to WikiLeaks

Source: The Washington Post

UNCLASSIFIED

(C/NF) (U) In addition, on December 10, 2016, John Walcott of *Reuters* reported that a U.S. official familiar with the IC's findings stated that as the 2016 U.S. presidential campaign progressed, Russian government officials devoted increasing attention to assisting candidate Trump's efforts to win the election.[21]

TOP SECRET// ▓▓▓▓▓▓▓▓▓▓                                    //NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// /NOFORN



PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

~~TOP SECRET//~~ ~~//NOFORN~~

(U) It is important to note that Evan Perez, Jim Sciutto, Jake Tapper, and Carl Bernstein of CNN reported on January 12, 2016, that President-elect Trump was briefed on classified information indicating that the Russians have compromising personal or financial information that the Russians could use against President-elect Trump.[39] The Committee's investigation revealed that President-elect Trump was indeed briefed on the contents of the Steele dossier and when questioned by the Committee, former Director of National Intelligence James Clapper admitted that he confirmed the existence of the dossier to the media.[40]

(TS/NF)    (U) In reviewing the various leaks both before and after November 8, 2016, a trend becomes evident—prior to the election, leaks of potentially classified information focused on Russia's attempts to sow discord with the U.S. presidential election.



(U) Finding #42: The leaks prior to the classified Intelligence Community Assessment's publication, particularly leaks occurring after the U.S. presidential election, correlate to specific language found in the

Intelligence Community Assessment.

(U) During this review, the Committee found that leaks of potentially classified information permeated throughout the media both before and after the November 8, 2016, U.S. presidential election.



PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET/ ▮▮▮▮▮▮   NOFORN ▮▮

## Pre-Publication Leaks Associated with the ICA

| Article | Quotes in Article that Mirror ICA | Final ICA Findings |
|---|---|---|
| "Secret CIA assessment says Russia was trying to help Trump win White House"<br>• Date: December 9, 2016<br>• Outlet: *The Washington Post* | "The CIA has concluded in a secret assessment that Russia intervened in the 2016 election *to help Donald Trump win the presidency*, rather than just to undermine confidence in the U.S. electoral system, according to officials briefed on the matter." | Page 1: "We further assess Putin and the Russian Government *developed a clear preference for President-Elect Trump*." |
| | "'It is the assessment of the intelligence community that Russia's goal here *was to favor one candidate over the other, to help Trump get elected*,' said a senior U.S. official briefed on an intelligence presentation made to U.S. senators. 'That's the consensus view.'" | Page 1: "Nonetheless, Putin publicly indicated a *preference for President-elect Trump's stated policy to work with Russia*, and pro-Kremlin figures spoke highly about what they saw as his Russia-friendly positions on Syria and Ukraine. Putin publicly *contrasted the President-elect's approach* to Russia *with Secretary Clinton's 'aggressive rhetoric.'*" |
| "Russian Hackers Acted to Aid Trump in Election, U.S. Says"<br>• Date: December 9, 2016<br>• Outlet: *The New York Times* | "'We now have high confidence that they hacked the D.N.C. and the R.N.C., *and conspicuously released no documents' from the Republican organization*, one senior administration official said, referring to the Russians." | Page 3: "Russia collected on some Republican-affiliated targets but *did not conduct a comparable disclosure campaign*." |
| | ▮▮▮▮ or 'A.P.T. 28,' is believed to have created two outlets on the internet, Guccifer 2.0 and DCLeaks, to make Democratic documents public. Many of the documents were also provided to WikiLeaks, which released them over many weeks before the Nov. 8 election." | Page 2: "We assess with high confidence that the ▮▮▮ *DCLeaks.com, and WikiLeaks to release US victim data* obtained in cyber operations publicly and in exclusives to media outlets. |

TOP SECRET/ ▮▮▮▮▮▮   NOFORN ▮▮

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

## Pre-Publication Leaks Associated with the ICA (cont'd)

| Article | Quotes in Article that Mirror ICA | Final ICA Findings |
|---|---|---|
| "U.S. Officials: Putin Personally Involved in U.S. Election Hack"<br>• Date: December 15, 2016<br>• Outlet: NBC News | "Two senior officials with direct access to the information say *new intelligence shows that Putin personally directed* how hacked material from Democrats was leaked and otherwise used. The intelligence came from diplomatic sources and spies working for U.S. allies, the officials said." | Page 1: "We assess with high confidence that *Russian President Vladimir Putin ordered* an influence campaign in 2016 aimed at the US presidential election..." |
| | "Putin's objectives were multifaceted, a high-level intelligence source told NBC News. What began as a *'vendetta' against Hillary Clinton* morphed into an effort to *show corruption in American politics* and to 'split off key American allies by creating the image that [other countries] couldn't depend on the U.S. to be a credible global leader anymore,' the official said." | Page 1: "Putin most likely wanted to discredit Secretary Clinton because *he has publicly blamed her* since 2011 for inciting mass protests against his regime in late 2011 and early 2012, and because *he holds a grudge* for comments *he almost certainly saw as disparaging him.*"<br><br>Page 1: "In trying to influence the US election, we assess the Kremlin sought to advance its longstanding desire to *undermine the US-led liberal democratic order*, the promotion of which Putin and other senior Russian leaders view as a threat to Russia and Putin's regime." |
| "Intel analysis shows Putin approved election hacking"<br>• Date: December 15, 2016<br>• Outlet: CNN | "'The intelligence community has assessed that in order for this operation to have been executed, it could not have been done without the *highest levels of the government, including the President* himself.'" | Page 2: "We assess that influence campaigns are *approved at the highest levels of the Russian Government*—particularly those that would be politically sensitive." |
| "Report: Putin, Russia Tried to Help Trump By 'Discrediting' Clinton"<br>• Date: January 6, 2017<br>• Outlet: NBC News | "The unclassified report does not identify who transmitted the information or how. A senior official with direct knowledge, however, told NBC News Thursday that the U.S. *has identified the Russian actors* who turned over stolen Democratic material *to WikiLeaks.*" | Page 3: "We assess with high confidence that ▮▮▮▮e-*layed material* it acquired from the DNC and senior Democratic officials *to WikiLeaks.*" |



**(U) Finding #43:** Continued leaks of classified information have damaged national security and potentially endangered lives.



(TS//NF)



**(U) Finding #44:** Former Director of National Intelligence James Clapper, now a CNN national security analyst, provided inconsistent testimony to the Committee about his contacts with the media, including CNN.

(U) When initially asked about leaks related to the ICA in July 2017, former DNI Clapper flatly denied "discuss[ing] the dossier [compiled by Steele] or any other intelligence related to Russia hacking of the 2016 election with journalists."[45] Clapper subsequently acknowledged discussing the "dossier with CNN journalist Jake Tapper," and admitted that he might have spoken with other journalists about the same topic.[46] Clapper's discussion with Tapper took place in early January 2017, around the time IC leaders briefed President Obama and President-elect Trump, on "the Christopher Steele information," a two-page summary of which was "enclosed in" the highly-classified version of the ICA."[47]

(U) On January 10, 2017, CNN published an article by Tapper and others, which

claimed that "classified documents present-
ed last week to President Obama and Presi-
dent-elect Trump included allegations . . .
about Mr. Trump" that were (1) "presented
in a two-page synopsis . . . appended to a
report on Russian interference in the 2016
election" and (2) derived from "memos
compiled by a former British intelligence
operative."[48] Those claims were sourced to
"multiple U.S. officials with direct
knowledge of the briefings."[49] The next day,
Clapper issued a statement describing a call
with President-elect Trump in which Clapper
"expressed my profound dismay at the leaks
that have been appearing the in press" and
"emphasized . . . that I do not believe the
leaks came from within the IC."[50]

(U) The Committee assesses that leaks
to CNN about the dossier were especially
significant, since CNN's report "that a two-
page synopsis of the report was given to
President Obama and Trump" was the prox-
imate cause of *BuzzFeed News*' decision to
publish the dossier for the first time just a
few hours later.[51] Until that point, the dos-
sier had been "circulating among elected
official, intelligence agents, and journalists,"
but remained unpublished.[52] As the accom-
panying article explained, "[n]ow BuzzFeed
News is publishing the full document so that
Americans can make up their own minds
about allegations about the president-elect
that have circulated at the highest levels of
government."[53]

(U) In approximately early August 2017,
shortly after his testimony to the Commit-
tee, Clapper joined CNN as a national securi-

ty analyst.[54]



1. Espionage Act of 1917 (codified as amended at 18 U.S.C. §§ 793-798).
2. ODNI, *Assessing Russian Activities and Intentions in Recent US Elections*, Jan. 6, 2017.
3. Ellen Nakashima, "Russian Government Hackers Penetrated DNC, Stole Opposition Research on Trump," *Washington Post*, June 14, 2016; Joseph Menn, Mark Hosenball, and John Walcott, "Hackers Targeted Trump Campaign, Republican Party Groups: Sources," *Reuters*, Aug. 19, 2016.
4. HPSCI, Staff Briefing on Cyber Targeting of Political Parties, June 14, 2016; HPSCI, Staff Briefing on WikiLeaks and Hacking of Campaign Systems, Aug. 3, 2016; HPSCI, Member Briefing on Russian Cyber Activities, Sept. 6, 2016; Gang of 8 Briefing, "Russian Cyber Activities," Sept. 8, 2016.
5.



6.
7.
8.
9.
10.

11. DHS and ODNI, "Joint Statement from the Department of Homeland Security and Office of the Director of National Intelligence on Election Security," Oct. 7, 2016.
12.
13.
14.



15.
16. Adam Entous, Ellen Nakashima, and Greg Miller, "Secret CIA Assessment Says Russia Was Trying to Help Trump Win White House," *Washington Post*, Dec. 9, 2016.
17.



18.
19.
20.

21. John Walcott, "Russia intervened to help Trump win election: intelligence officials," *Reuters*, Dec. 10, 2016.
22.
23.



24.
25.
26.
27.
28.
29.
30.
31.



39. Evan Perez, Jim Sciutto, Jake Tapper, and Carl Bernstein, "Intel chiefs presented Trump with claims of Russian efforts to compromise him," *CNN News*, Jan. 12, 2016.
40. HPSCI, Executive Session Interview of James Clapper, July 17, 2017.
41.
42.
43.
44.
45. HPSCI, Executive Session Interview of James Clapper, July 17, 2017.
46. HPSCI, Executive Session Interview of James Clapper, July 17, 2017.  Regarding his communication with Tapper about the dossier, Clapper stated: "I don't know exactly the sequence there, but it was pretty close to when we briefed it and when it was out all over the place. The media had it by the way. We were kind of behind the power curve, because the media, many media outlets that I understood had that, had the dossier for some time, as did people on the Hill."
47. HPSCI, Executive Session Interview of James Clapper, July 17, 2017. Former CIA Director Brennan testified publicly that the dossier was "not in any way used as a basis for the Intelligence Community Assessment." HPSCI, Russian Active Measures During the 2016 Election Campaign, May 23, 2017.  However, NSA Director Rogers clarified that, in late December 2016, a two-page summary of the Steele dossier was "added" as an "Appendix to the ICA draft," and that his consideration of the Appendix was "part of the overall ICA review/approval Process." Letter from Michael S. Rogers to the Honorable Devin Nunes, Mar. 5, 2018.  *See also* Evan Perez, "Biden confirms Obama, VP were briefed on unsubstantiated claims against Trump," CNN, Jan. 12, 2018.
48. Evan Perez, Jim Sciutto, Jake Tapper, and Carl Bernstein, "Intel chiefs presented Trump with claims of Russian efforts to compromise him," CNN, Jan. 12, 2017; Twitter, @cnnbrk, Jan. 10, 2017, 2:13 PM (reflecting the story's initial publication time).
49. Evan Perez, Jim Sciutto, Jake Tapper, and Carl Bernstein, "Intel chiefs presented Trump with claims of Russian efforts to compromise him," CNN, Jan. 12, 2017.
50. ODNI, "DNI Clapper Statement on Conversation with President-elect Trump," Jan. 11, 2017.
51. Ken Bensinger, Miriam Elder, Mark Schoofs, "These Reports Allege Trump Has Deep Ties To Russia," *BuzzFeed News*, Jan. 10, 2017.
52. Miriam Elder, Mark Schoofs, "These Reports Allege Trump Has Deep Ties To Russia," *BuzzFeed News*, Jan. 10, 2017 ("originally posted . . . at 6:20 p.m.).
53. Ken Bensinger, Miriam Elder, Mark Schoofs, "These Reports Allege Trump Has Deep Ties To Russia," *BuzzFeed News*, Jan. 10, 2017.
54. Transcript, "President Trump Takes Working Vacation; Analysts Examine President's Recent Poll Numbers," CNN, Aug. 7, 2017 ("Joining us now to talk more about this is CNN's new national security analyst, James Clapper.") .



# (U) Chapter 6 - Summary of Related Committee Oversight Efforts

(U) During the course of the Committee's investigation into Russian active measures targeting the 2016 U.S. presidential election, the Committee identified several issues within its jurisdiction that required additional attention and oversight outside of the broader investigation.

## Sufficiency of "Unmasking" Procedures

(U) In March 2017, the Committee became aware of senior Obama Administration officials' requests for U.S. person identities related to President-elect Trump's transition team. These U.S. person identities were previously redacted in IC reporting. The Committee initiated its investigation of the process for requesting identities, colloquially referred to as "unmasking," to determine the sufficiency of existing policies and procedures related to the release of U.S. person identities. As a result, the Committee recognized gaps in the "unmasking" processes, including the lack of IC-wide standards related to the justification for requesting U.S. person identity information. Therefore, the Committee's findings related to these processes necessitated an immediate change in policy.

(U) The Committee believed that the IC should use specific procedures related to the "unmasking" of U.S. person identities in IC reporting, including additional review requirements for "unmasking" presidential transition team officials during a presidential transition.[1] The Committee felt that a

change in policy was necessary for the IC to protect U.S. person privacy and the sanctity of the peaceful transition of presidential administrations, all while resulting in no operational impact. As part of negotiations of the FISA Amendments Act of 2017, DNI Coats and the White House agreed to develop a new IC-wide policy for handling "unmasking" requests. Therefore, on January 11, 2018, DNI Coats signed Intelligence Community Policy Guidance 107.1 (see Appendix D), which includes requirements for:

- IC element heads or designee approval for requests for U.S. person identity information;

- Documentation for names or titles of individuals who will receive the U.S. person identify information;

- A fact-based justification for each U.S. person identity request; and

- IC element General Counsel concurrence for U.S. person identity requests that relate to Presidential transition team members prior to those identities being approved for release.

(U) Using a series of intermediaries, the DNC and Hillary for America (Clinton campaign) paid a research firm to conduct opposition research on candidate Trump and his ties with Russia. Fusion GPS (Fusion) is the trade name of a Washington, D.C.-based company that conducts research primarily

on behalf of corporate clients.[2]  Marc Elias, chair of Perkins Coie's election law practice who represented the DNC and the Clinton campaign, hired Fusion in spring 2016 and paid Fusion $1 million to conduct opposition research on candidate Trump.  Fusion subsequently hired former British Secret Intelligence Service officer Christopher Steele for $160,000 to obtain information on candidate Trump via a Russia-based primary subsource and numerous sub-sub-sources network who were purported to be current and former Russian government officials.  The information Steele collected was reported back through a series of memos to Fusion and Perkins Coie.  Steele produced sixteen memos, which comprise what has become known as the Steele dossier.[3]

(U) By the end of September 2016—in addition to Fusion and Perkins Coie—Steele provided the information in the Steele dossier to the DOJ, Department of State, numerous press outlets, and the FBI.





(U) After uncovering this information, the Committee voted to publicly release two memos, one written by the Majority on January 18, 2018 (see Appendix E) and another written by the Minority on January 29, 2018 (see Appendix F).  In addition to the Committee's oversight of this matter, the Senate Judiciary Committee identified the same issues in a criminal referral sent by Chairman Grassley and Senator Graham to the DOJ on January 4, 2018, describing Christopher Steele's exploits in detail (see Appendix G).

(U) Ongoing lines of effort include (1) continued oversight of DOJ and FBI (see Appendix H for relevant correspondence); (2) inquiries into the State Department's handling of information from Steele, including the dossier;[4] and (3) post-election anti-Trump research by Steele and/or Fusion GPS.[5]

---

1.  H.R. 4478, § 207, 115th Cong.

2.  HPSCI, "Executive Session Interview of Glenn Simpson," Nov. 14, 2017.

3.  The dossier; however, has no fixed composition.  The version published by *BuzzFeed* does not necessarily entirely correspond with documents provided to other parties.

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

4.  Former State Department official ▮▮▮▮ has stated publicly that, over a period of approximately two years, he provided over "100 of Steele's reports with the Russia experts at the State Department," including Assistant Secretary of State Victoria Nuland. In September 2016, Winer was personally briefed by Steele on the dossier, and shared a two-page summary with Nuland, who ensured that Secretary of State John Kerry was made aware of Steele's information. Additionally, ▮▮▮▮ received from Clinton associate ▮▮▮▮ information collected by an individual named ▮▮▮▮ Shearer which "alleged the Russians had compromising information on Trump of a sexual and financial nature." Winer shared with ▮▮▮▮ information with Steele, who provided it to the FBI. ▮▮▮▮ , "Devin Nunes is investigating me. Here's the truth.," *Washington Post*, Feb. 8, 2018; Susan B. Glasser, "Victoria Nuland: The Full Transcript," *POLITICO*, Feb. 5, 2018; Appendix G. The Committee believes that additional State Department officials were aware of Steele's efforts in 2016.

5.  ▮▮▮▮ who currently leads "a research and investigatory advisory" called the Penn Quarter Group (PQG), is a former employee of The Daschle Group, U.S. Senate Select Committee on Intelligence (SSCI), and FBI; while at SSCI, he served as the "chief author" of "The Committee Study of the Central Intelligence Agency's Detention and Interrogation Program." The Penn Quarter Group, "Our Leadership," thepg.com/team/leadership; LinkedIn, ▮▮▮▮ https://www.linkedin.com/in/danielliones. In late March 2017, Jones met with FBI regarding PQG, which he described as "exposing foreign influence in Western elections." ▮▮▮▮ told FBI that PQG was being funded by 7 to 10 wealthy donors located primarily in New York and California, who provided approximately $50 million. ▮▮▮▮ further stated that PQG had secured the services of Steele, his associate ▮▮▮▮ , and Fusion GPS to continue exposing Russian interference in the 2016 U.S. Presidential election. ▮▮▮▮ planned to share the information he obtained with policymakers on Capitol Hill and with the press, and also offered to provide PQG's entire holdings to the FBI. FBI, ▮▮▮▮ FD-302, Mar. 28, 2017.

# {U} Chapter 7 - Conclusions and Recommendations

### Russian Influence Campaigns in Europe

{U} For at least the last decade, Russia has aggressively engaged in an information war against the West. The Kremlin takes advantage of the openness, freedom of expression, and respect for legal norms enjoyed in Western democracies by conducting targeted, multi-faceted influence operations against its adversaries. Each influence campaign is unique to the populace, media environment, and internal dynamic of the country being targeted.

{U} The factors that make Russian operations effective also make them difficult to counter. Nonetheless, countries throughout the West are taking a variety of actions to impede, counter, and where possible, eliminate Russian influence operations.

{U} The vast majority of Russian tactics share a common denominator: proliferation through mass media. Therefore, this chapter's recommendations primarily focus on ways to degrade the impact of nefarious media activities and make them more difficult to conduct.

{U} Recommendation #1: European governments, non-governmental organizations, businesses, think tanks, and academia should strengthen legal and regulatory environments, promote media pluralism, build professional media associations, and improve the financial sustainability of legitimate news outlets.

{U} Russia exploits free media spaces and open democracies through a network of Russian state-owned news outlets and media platforms. Those platforms amplify pro-Russian views in Russian-funded and local media, provoke doubt and disagreement, and propagate false news stories. In many Eastern European and Baltic countries, local, independent media outlets often operate with extremely limited resources, limiting their ability to acquire and produce high-quality content. In contrast, the high production value of Russia-owned content presents an attractive alternative. Russian intelligence services or their agents of influence also purchase, invest in, or partner with existing TV and radio channels, providing editorialized content for redistribution. Furthermore, Russian propaganda is occasionally re-broadcast by legitimate news outlets.

{U} Strengthening legal and regulatory environments, promoting media pluralism, building professional media associations, and improving the financial sustainability of legitimate news outlets will help to: increase access to legitimate news reporting, improve production quality and financial sustainability of local media, and professionalize journalists.

{U} Countries that contain sizable Russian-speaking populations are more vulnerable to the effects of media-enabled Russian information operations. As described

above, for many of these populations, Russian media saturates local markets, providing few alternatives for news and entertainment and non-Russian editorial viewpoints

(U) For countries with large Russian-speaking populations, strengthening legitimate Russian-language broadcasters and independent media outlets that disseminate fact-based content would provide both balance to the media space and more viewing options for residents of those countries.

(U) Recommendation #2: European governments, non-governmental organizations, businesses, think tanks, and academia should implement and encourage multi-pronged, country-wide efforts by both public and private entities to combat Russian propaganda, technical, and cyber operations.

(U) Russia utilizes a whole-of-government approach in its information operations, mobilizing a variety of tools to achieve its goals. From hacking of government networks, think tanks, and universities to spreading propaganda via social media, Russia's tentacles are many and far reaching.

(U) It is therefore imperative that Western nations implement country-wide efforts to educate its populations and inoculate their governments, media outlets, and other organizations from Russian influence campaigns. To do this, Western nations should encourage increased partnership between public and private entities in order to com-

bat Russian information, technical, and cyber operations.

(U) Recommendation #3: European governments, non-governmental organizations, businesses, think tanks, and academia should implement more stringent cyber security practices, such as multifactor authentication and encryption of sensitive data, as well as educating workforces on basic cyber security topics and best practices.

(U) In the last decade, Russian cyber operations have targeted governments, militaries, industrial control systems, businesses, think tanks, and universities worldwide. While Russian intelligence services can employ extremely sophisticated means for gaining access to sensitive data, often simple tactics such as spear phishing can prove just as effective.

(U) Given that cyber operations are relatively low risk/high reward, difficult to attribute, and even harder to consistently combat, it is likely that Russia will continue to utilize this tactic in its influence campaigns. Network defenses have to be right 100% of the time; a cyber intruder only has to be right once. Therefore, it is imperative that governments, NGOs, businesses, think tanks, and academia invest more resources in cyber security defenses, implement more stringent cyber security practices, and conduct regular workforce education and training on these topics.

(U) Recommendation #4: European govern-

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//

ments should look to long-term solutions to lessen economic dependence on Russia.

(U) Russia utilizes economic ties to its advantage. Economic vulnerability – such as reliance on Russia for trade or energy – can be leveraged to change behavior, send a message of displeasure, or inflict punishment. This is especially true for smaller countries within Russia's periphery, such as Moldova, where Russia is among their largest trading partners. Yet even large, economically secure countries like Germany depend on Russia for a large percentage of its energy needs.

(U) The United States should look for opportunities to lessen European countries' economic dependence on Russia. Exploring alternative sources of energy and diversifying trade relationships would diminish one of Russia's tools for imposing influence on its neighbors.

## Russia Attacks the United States & America Reacts

(U) The Committee's findings concerning the Russian government's malign influence campaign during the 2016 U.S. presidential election are largely consistent with the facts outlined in the ICA. The Russian effort was multifaceted, persistent, and effective in sowing division. The effort included cyber operations (hacking), the use of social media, the creation of automated accounts and fake cyber personas, the use of third party intermediaries, and state-run media.



(U) Evidence reviewed by the Committee also shows that the Russian government and its proxies used social media to advance Russia's malign interests. While

TOP SECRET//

The header at top with redactions, page content, footer.

these efforts were limited – some even came after Election Day – they were effective at sowing divisions within American society and promoting false information.

(U) America's reaction to the Russian active measures campaign consisted of a whole of government response, with various activities conducted by the IC, law enforcement, and policy makers. Despite arguably the best of intentions in addressing the Russian cyber menace before and during the 2016 election cycle, the Executive Branch's response fell short of deterring the Russians from conducting such activity in the future.

(U) After analyzing the Executive Branch's responses to the active measure campaign, the Committee identified various gaps in current law and policy that must be addressed in order to help protect U.S. election systems and increase the efficacy of victim notifications in the future. In addition, the Executive Branch must diligently inform U.S. presidential campaigns in the future of counterintelligence threats, to the extent consistent with national security and law enforcement equities.

**(U) Recommendation #5: Congress should identify options available to the private sector and federal government that would address the social media vulnerabilities exploited by the Russian government.**

(U) The exploitation of social media platforms by the Russian government for malign purposes demonstrated a significant vulnerability. The response of social media platforms to this threat should be examined closely and evaluated against ongoing threats. Furthermore, social media platforms should consider implementing methods to help counter malign foreign activity.

**(U) Recommendation #6: Congress should consider updating the Foreign Intelligence Surveillance Act to cover malicious international cyber actors.**

(U) As part of the Committee's initial FISA Amendments Act reauthorization discussions in 2017, the Committee sought to address the changing threat environment as it relates to malicious cyber activity threating the U.S. national security. Given the difficulty in attributing a specific cyber actor, the lines between independent hacker and government cyber operator are often blurred. U.S. adversaries are consistently attempting to obfuscate their identity and location in order to evade detection. Unfortunately, current national security authorities are inadequate to counter the growing cyber threat.



footer

(U) Unfortunately, the proposed addition to the FISA "foreign power" definition did not make it into the final version of the FISA Amendments Act of 2017 given concerns that such a designation would dilute the key distinction between two different legal purposes: intelligence collection and law enforcement. This concern, while understandable, fails to take into account the changing threat environment, as evidenced by Russian cyber actors, such as the Internet Research Agency, that attempted to meddle in the 2016 U.S. presidential elections.

(U) The Committee renews its call for Congress to update the definition of "foreign power" and "agent of foreign power" in FISA to account for entities engaged in international malicious cyber activity that threatens the national defense or security of the United States. Adding this new entity to the definition of "foreign power" would permit the IC to target international cyber groups without having to connect that group to a foreign government or terrorist organization, so long as the cyber entity is threating U.S. national security or defense. Such an addition provides the IC with much

needed flexibility and will help keep the United States ahead of its adversaries.

(U) **Recommendation #7: The Federal Bureau of Investigation should improve cyberattack victim notification.**

(U) When a state-sponsored cyberattack is directed against U.S. critical infrastructure or systems related to national elections, it is essential for the appropriate federal officials to work quickly to both understand the nature of the threat and aid the victim's defense.



(U) Although the FBI maintained an ongoing dialogue with the DNC related to the Russian intrusions, the engagement remained at the working level. These interactions continued for months, despite no signs of effective mediation to the problem. In



Director Comey testified that, had he known at the time the seriousness of the problem, he would have "walked over

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

there" himself.



{U} On the other side of the notification process, the Committee found that cyberattack victim organizations did not always grasp the information conveyed by the FBI, even when that information was reasonably clear. As a result of both government- and private-sector failures, Russian intelligence agencies were afforded critical time on breached systems. During this time, extensive amounts of data were stolen for later use as part of Russia's malign influence campaign.

{U} While the DNC failed to handle the intrusions with the level of seriousness it deserved—given the severity and national security implications of the particular intrusion sets—the FBI should have engaged more vigorously at the senior management level. The FBI cannot, and should not, force a victim of a malicious cyber event to take specific remedial measures. However, the FBI should update its internal processes to make it clear that if a victim is neither willing nor able to take remedial measures in the event of a significant national security cyber event, FBI leadership should contact the victim and engage at the leadership lev-

el.

{U} One way to implement these procedures is to provide specific guidance to FBI agents conducting victim notifications as to the circumstances under which the agent should elevate the situation. Additionally, if the cyber intrusion is attributed to a foreign government entity and the victim is a political party or campaign, FBI senior management should be responsible for victim engagement immediately.

{U} The Committee therefore recommends that notifications associated with state-sponsored cyberattacks should be conducted as soon as possible, and at the highest levels of the victim organization. If intelligence sources and methods are threatened by dissemination of information, the IC should work with the Department of Homeland Security {DHS} to provide specific recommendations on what actions can be taken by system owners to defend their networks from the state-actor. The DHS and IC should designate personnel and resources to carry out this task and should establish a triage system to prioritize tasking during periods of high demand.

(U) Recommendation #8: Threats identified by the Intelligence Community to state and local elections infrastructure should be immediately briefed to appropriate state and local officials. When threats are identified, the federal government should conduct an expedited declassification review to ensure that the threat information can reach all

necessary state and local officials in a timely manner.

(U) The Committee found insufficient information sharing between the federal government and state election officials in 2016 regarding cybersecurity threats to federal elections. The Committee has attempted to address this deficiency in the FY 2018 Intelligence Authorization Act (IAA).

(U) Section 502 of the House-passed IAA would require the Director of National Intelligence (DNI), in coordination with the Undersecretary of Homeland Security for Intelligence and Analysis and the FBI Director, to post on the internet an advisory report on foreign counterintelligence and cybersecurity threats to election campaigns for federal offices.

(U) The provision also allows the FBI and DHS to make available additional information to appropriate representatives of any campaign for federal office if those agencies determine that such campaign is subject to a heightened foreign counterintelligence or cybersecurity threat.

(U) The Committee has seen some recent improvement in this area on a general level. In February 2018, the Office of the Director of National Intelligence, FBI, and DHS held a classified briefing for election officials of all 50 states.

(U) Recommendation #9: The Secretary of Homeland Security should provide certain designated state and local election officials appropriate security clearances to enable

those officials to respond to election-related threats.

(U) Even if all parties recognize the interest in sharing information, the classification—or even the knowledge of the existence—of a threat may impair timely sharing with state and local election officials. Consistent with the need to protect sources and methods, the Secretary of Homeland Security should provide certain state and local election officials with necessary security clearances in order to share information.

(U) The Senate Select Committee on Intelligence-passed FY 2018 IAA also attempted to address this issue. Specifically, Section 402 of the IAA would require the DNI to support the Under Secretary of Homeland Security for Intelligence and Analysis and any other DHS official in sponsoring a security clearance up to the top secret level for each eligible chief election official of a state. In addition, the DNI may issue interim clearances to a chief election official for the purposes of receiving appropriate classified information regarding cybersecurity threats to election systems.

(U) Recommendation #10: Significant threats to U.S. elections identified by the Intelligence Community, including cyberattacks directed at political organizations, should be immediately reported to the congressional intelligence committees.

(U) The House and Senate Intelligence Committees should be informed whenever the IC determines with medium confidence

that a significant cyber intrusion or active measures campaign by foreign actors is intended to influence an upcoming election for any federal office. Accordingly, the Committee recommends that the FBI Director, the DNI, and the Secretary of Homeland Security jointly provide a briefing to the Congressional intelligence committees no later than 14 days after a determination of a significant cyber intrusion.

(U) Recommendation #11: Congress should encourage the adoption of National Institute of Standards and Technology cyber security standards, such as those adopted by the Elections Assistance Commission, by providing federal resources to state and local governments to facilitate such adoption. Funds should be tied to the adoption and certification of elections systems to appropriate standards.

(U) Election systems are owned and operated by state and local governments. Their acquisition and installation is costly and recapitalization is infrequent.

(U) The federal government largely operates within the limits of establishing voluntary standards through NIST, providing technical assistance and sharing threat information.

(U) NIST is working with state and local election officials to develop further enhancements to election agencies' system security.

(U) The adoption of new standards may involve system replacement, particularly for aging systems. To encourage adoption and in recognition of the federal government's responsibility to protect the nation against foreign threats, the Congress should consider providing significantly more resources to state and local governments. These investments could be tied to appropriate enhancements in election system security.

(U) Recommendation #12: Congress should consider additional funding for the National Institute of Standards and Technology to enable better outreach to state and local governments.

(U) With additional resources, NIST could host more frequent engagements around the United States to promote the adoption of new standards and to provide more technical support to state and local officials. Furthermore, separately identifying the budget for this activity within the NIST would further convey the importance of this effort and allow Congress to more closely track progress.

(U) Recommendation #13: Congress should consider a one-time grant to state and local election agencies to conduct a risk assessment of those agencies' computer systems.

(U) Because voting is administered at the state and local level, even for federal candidate elections, there is a patchwork of electronic voting systems. In addition, those varied systems are not subject to consistent maintenance and replacement regimes.

(U) Congress should consider allocating

funds to be transferred to state and local election agencies to conduct a risk assessment of their systems. Doing this would, the Committee believes, further demonstrate the need for the implementation of the NIST cyber security standards for election agencies.

(U) Recommendation #14: Congress should consider strengthening the Help America Vote Act of 2002 to ensure that both statewide voter registration and tabulation systems are better protected from foreign cyber threats.



(U) As noted above, DHS Secretary Jeh Johnson designated U.S. election systems as critical infrastructure on January 6, 2017, which was one day after the release of the classified ICA and the same day as the release of the unclassified version. By labeling election systems as critical infrastructure, DHS can "prioritize cybersecurity assistance" for those who request it, as well as provide election systems the same international legal protections afforded to other critical infrastructure. Implementation of such a designation takes time. As of September 1, 2017, the U.S. Election Assistance Commission reported that the election critical infrastructure subsector plans were progressing, in hopes of finalization in time for the 2018 elections. The Committee applauds this designation because it helps address the threats to the nation's voting infrastructure.

(U) However, as articulated in recent news reports, even with election systems designated as critical infrastructure, the DHS "risk and vulnerability" assessments take time and resources, and there appears to be a lengthy wait list. Therefore, in preparing for the 2018 midterm elections, DHS should continue to work with the states on prioritizing these assessments for election systems – and other stakeholders must do more.

(U) Recommendation #15: The Department

of Homeland Security should provide the owner or operator of any electronic election infrastructure affected by any significant foreign cyber intrusion with a briefing and include steps that may be taken to mitigate such intrusions.

(U) The Committee found that commercial providers of electronic election infrastructure were not informed of foreign cyber intrusions to their systems. While the IC and federal government may be aware of malicious cyber activity targeting election systems, the information is of little value if appropriate threat information cannot be shared with the owners and operators of affected systems. Accordingly, the Committee recommends that DHS provide a briefing and mitigation steps to the owner or operator of election infrastructure systems targeting by a foreign cyber intrusion.

(U) In addition, DHS has offered state and local governments a network monitoring tool that alerts election system operators about known foreign threats using information obtained by the IC. Not all states have adopted this tool.

(U) Recommendation #16: State and local governments should be encouraged to establish redundancies that are not dependent on current elections infrastructure, such as a mechanism that retains individual vote records, ensuring the integrity of the vote in the event of a compromise of voting infrastructure due to a foreign cyberattack. An example of such a redun-

dancy is a contemporaneously created paper record reflecting the voter's selections.

(U) The vulnerability of state and local election infrastructure has been well documented. These systems, which are not frequently updated or replaced, are not developed to defend against state-sponsored cyber threats. The fact that voting machines themselves, as well as tabulation systems, are not directly connected to the internet does not offer adequate security. Rather, it can create a false sense of security.

(U) To help protect the integrity of the process, state and local election authorities should consider building in additional redundancies to ensure an audit trail in the event of a compromise of the electronic voting systems. An example of this is a contemporaneously printed record of votes that is securely stored at the polling place and transported to the relevant election office at the end of Election Day. The Committee is mindful of the reason most jurisdictions replaced the paper ballot, but building in a redundancy using a paper record of a vote will help guard against the potential for manipulation of voting results in the event of a breach of the electronic voting machines.

(U) Recommendation #17: While it is important to implement lessons learned from the Executive Branch's response, Congress should not hamper the Executive Branch's ability to use discretion in responding to a

particular foreign threat.

(U) The Executive Branch's response to the 2016 Russian active measures campaign was neither timely nor effective. As discussed above, the Executive Branch did not publicly attribute Russian attempts to hack into various political institutions or compromise emails of U.S. people until October 7, 2016—roughly one month before the 2016 U.S. presidential election. The Executive Branch also waited to issue sanctions against Russia, expel Russian diplomats, and close Russian diplomatic facilities until December 29, 2016. Further, DHS did not designate U.S. election systems as critical infrastructure until January 6, 2017, which was two months after the 2016 U.S. presidential election. While the previous administration made attempts in diplomatic channels to dissuade Russia from its ongoing activities, such attempts apparently fell on deaf ears.

(U) However, despite the fact that the Executive Branch's remedial actions were arguably too little too late, any efforts by Congress to introduce certain legislative "solutions" are misguided. The President is the primary recipient of the intelligence produced by the IC, as well as the individual constitutionally empowered to command the armed forces of the United States. As such, if a foreign government conducts active measures targeting U.S. elections in the future, the Executive Branch should have the ability to craft a response based on the intelligence known at the time of the interference and, if necessary, the readiness of

U.S. military forces. These are variables that the Congress cannot possibly anticipate in drafting potential legislation. Therefore, despite potential calls from both Democrats and Republicans to legislate the threshold necessary to trigger attribution or reaction by the President in the wake of foreign hostilities, the Committee urges Congress not to hamper the Executive Branch's role in responding to foreign threats.

(U) Recommendation #18: Congress should consider repealing the Logan Act.

(U) Congress passed the Logan Act and President Adams signed it into law on January 30, 1799. Broadly stated, the Logan Act prohibits U.S. citizens to influence any foreign government vis-à-vis any disputes that government may have with the United States. It provides a punishment of a fine and three years' imprisonment.

(U) Over the course of the Act's more-than-200-year history, there has never been a conviction for its violation, and there have only been a handful of indictments that never reached trial.

(U) Despite its demonstrated disuse, the law has gained occasional congressional interest. In 1978, Senator Ted Kennedy unsuccessfully sought to remove the Logan Act. In 1980, Congressman and former House Intelligence Committee Chairman, Anthony Beilenson, introduced legislation to repeal the Logan Act, stating that the primary use of the Logan Act was to provide for "periodic calls for prosecution motivated by

opposition to the cause being expressed instead of actual concern about treason." In 1994, Congress updated the Logan Act by changing the $5,000 fine to "shall be fined under this title."

(U) Due to the lack of prosecutions under the Logan Act and despite the various apparent violations since its passage, Congress should evaluate the law's utility and consider repealing it.

(U) Recommendation #19: All U.S. presidential campaigns should receive unclassified counterintelligence briefings at an appropriate time prior to a nomination convention.

(U) During the 2016 U.S. presidential election campaign, candidate Trump and candidate Clinton did not receive a classified intelligence briefing until after their respective nomination conventions. Since 1952, the sitting President typically offers the U.S. presidential candidates classified briefings as a matter of courtesy, but only after the nomination conventions. However, the Committee's investigation found that a counterintelligence briefing before the nomination convention, even at the unclassified level, would be a significant benefit to the candidates and enhance the integrity of the campaign.

(U) U.S. presidential campaigns are a significant target of interest to America's foreign adversaries. It should be expected that various foreign intelligence services will conduct offensive operations to penetrate

such campaigns in the hopes of influencing U.S. policy and discourse. Therefore, it is critical that the IC educate presidential campaigns on counterintelligence issues as an important protection measure for campaign operations.

(U) For example, at an appropriate time, the IC could host unclassified counterintelligence training sessions for each campaign. Such training would assist the candidates and campaign leadership in understanding the severity of this issue, and should cover a range of topics, including:

- (U) The intelligence collection process;

- (U) Reasons why foreign intelligence services, generally, would want to penetrate a U.S. presidential campaign;

- (U) How to better secure campaign communications and practice good cyber operational security; and

- (U) Hypothetical examples of suspicious behavior that may warrant questioning or the dismissal of campaign staff.

(U) Recommendation #20: When consistent with national security, the Intelligence Community should immediately inform U.S. presidential candidates when it discovers a legitimate counterintelligence threat to the campaign, and promptly notify Congress.

(U) The Committee is not aware of any

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

notification to candidate Trump that the U.S. government conducted counterintelligence investigations of people associated directly or indirectly with the campaign. While the Committee understands and appreciates the IC's reasons for not disclosing such information to protect classified sources and methods, the FBI should have provided candidate Trump some sort of notification, even if it is general and at the unclassified level, that the IC is concerned that a potential counterintelligence threat exists to the campaign.

(U) The DNI should issue an ICD to provide guidance on how and when the IC should notify a U.S. presidential campaign of a legitimate counterintelligence threat. Similar to victim notifications in the cyber context, when the IC has an individual under an active counterintelligence investigation and the IC becomes aware of that individual's affiliation with a U.S. presidential campaign, the IC should have a responsibility to notify the candidate, when consistent with national security. There may be instances where such notifications are not consistent with national security, such as if the candidate himself or herself is under a counterintelligence investigation.

(U) Further, given the sensitivities associated with counterintelligence investigations, if the IC decides that campaign notification is required, the IC should promptly notify Congress of the campaign notification, including the classified details underpinning the counterintelligence threat. De-

pending on the sensitivity, such notifications can be made to the leadership of the House and Senate, as well as the chair and ranking Members of the House and Senate intelligence committees – known as the Gang of 8.

**(U) Recommendation #21: Both houses of Congress should consider requiring all staff to receive an annual counterintelligence awareness briefing.**

(U) As with presidential campaigns, congressional staff members are targets for foreign intelligence collection. The IC should coordinate, and Congress should consider requiring, an annual counterintelligence briefing for staff.

(U) The briefing should be unclassified, cover both physical and cyber threat awareness, and should emphasize that all staff are targets for foreign intelligence services. The Committee's investigation of the 2016 election demonstrated that many campaign staff members were unaware of their status as a potential target for foreign intelligence services. Congressional staff may also be unaware of the counterintelligence risks associated with their positions. Increasing the awareness of staff—even in an unclassified setting—that they are potential targets would enable them to take precautionary measures and be better prepared to counter the threat.

### Campaign Links to Russia

**(U) Recommendation #22: Political campaigns and law enforcement should ensure**

TOP SECRET//                                              //NOFORN

that their counterintelligence defenses appropriately account for the role of cut-outs and intermediaries.

(U) Russian attempts to influence the American political process, including via intermediaries and cut-outs, did not end on Election Day. The universe of pre- and post-election contacts between Russian intermediaries and Trump associates described in Chapter 4 suggest a sophisticated effort to target unwitting Americans by leveraging existing relationships, interests, and opportunities.[3] Therefore, both U.S. government entities and campaigns in particular must strengthen their defenses against such subversive tactics, beginning with expanding counterintelligence education and training.

(U) The IC should work to provide as much information to campaigns and law enforcement agencies about foreign intelligence agencies' efforts to target them. The Committee is mindful that sensitive counterintelligence issues often involve some of the most highly classified secrets the U.S. government has, but the IC should work to provide some basic training at the unclassified level about foreign adversaries' use of intermediaries.

(U) Recommendation #23: Congress should consider amending current campaign finance laws to further increase transparency regarding services provided by foreign persons or entities.

(U) The Committee is concerned that current campaign finance reporting is in-

sufficiently transparent. For example, the DNC and Hillary for America used Perkins Coie, which they billed as "legal services" or "legal and compliance consulting," to finance opposition research by Fusion GPS, which in turn utilized Christopher Steele, a foreign person, to compile the dossier that he created for use against candidate Trump.[4]

(U) Under current federal election law, foreigners are prohibited from making contributions or donations in connection with any campaign in the United States.[5] However, it is not illegal to contract with a foreign person or foreign entity for services, including conducting opposition research on a U.S. campaign, so long as the service was paid for at the market rate.

(U) In light of the use of foreign people and foreign companies for services by the 2016 U.S. presidential election campaigns, the Committee encourages Congress, in consultation with the Federal Election Commission (FEC), to consider whether Congress should amend campaign finance laws to require greater transparency when U.S. campaigns obtain services from foreign persons or entities. Congress should consider whether U.S. campaigns that contract with a foreign person or entity for services should immediately disclose to the FEC a contract with a foreign person or foreign entity, as well as a lengthy summary of the types of services provided by the foreign person or entity.

### Intelligence Community Assessment Leaks

{U} Based on the extraordinary number of leaks of classified information over the past year, it is apparent that government officials are not afraid of the criminal penalties for such unauthorized and illegal conduct.

{U} This leaves the Committee with an impression that criminal statutes related to leaks of classified information are not strong enough to deter potential criminal acts of leaking classified information.

{U} **Recommendation #24: Each component of the Intelligence Community should update its guidance regarding media contacts to ensure the guidance applies to every employee, including senior officials.**

{U} The Committee found significant leaks of classified information around the time of the ICA. The Committee believes many of those leaks were likely from senior officials within the IC. This recommendation is similar to a provision of the FY 2013 Intelligence Authorization Act that expired in early 2014. That provision required a notification to the congressional intelligence committees in the event of an authorized disclosure of classified information to the media or anybody else who had the intent to make the information public.[6] The purpose of the law was to ensure that congressional intelligence committees were informed on a timely basis when there was a disclosure of classified information to the media, and the statute specifically carved

out disclosures made under the Freedom of Information Act, in litigation or administrative proceedings, under executive orders, or to any federal employee with an active security clearance and a need to know.

{U} **Recommendation #25: Congress should consider legislation to increase the penalties for unauthorized disclosures of classified information.**

{U} To date, based on publicly available information, there have not been any prosecutions of leaks pertaining to the Russian active measures campaign. As evidenced by the lack of leak prosecutions, difficulties often arise in finding a culprit behind leaks of classified information. However, when the Executive Branch is successful in identifying an alleged leaker, there should be no bar to prosecuting that individual. While prosecutors may utilize multiple criminal statutes to prosecute individuals who leak or mishandle national defense information, the construct of the Espionage Act does not lend itself in favor of prosecution and as a sufficient deterrent from individuals breaking the law for their own political purposes. Therefore, Congress should consider legislation to clearly articulate stronger penalties for those individuals who make unauthorized disclosures of classified information to the media.

{U} For example, enactment of Congressman Chris Stewart's bill -- H.R. 3448, the Classified Information Protection Act -- would strengthen the Espionage Act. Unlike

128

current unauthorized disclosure statutes which, by virtue of their complexity, create difficulties in building cases, H.R. 3448 clearly prohibits any current or former individual who had lawful access to classified information from knowingly providing such information to a person who is not authorized to access the information. If someone is found guilty under this proposal, the leaker will be fined, imprisoned for up to three years, or both. This legislation originally passed both chambers of Congress in 2000, but President Clinton vetoed the bill. Given the proliferation of leaks, it is essential for Congress to examine amending the Espionage Act to strengthen our laws needed to protect classified information.

(U) Furthermore, given the significant number of leaks and instances of mishandling classified information coming from within the IC in the past several years, Congress should consider ways to strengthen the protection of classified information. This legislation could include requiring the head of a federal agency to suspend the security clearance of an individual who intentionally or recklessly fails to comply with security procedures for handling classified information. The legislation could also provide for the ability of an agency's Inspector General to make recommendations to the President related to potential violations of security procedures by senior agency officials. Finally, the legislation should consider mandating annual training for all individuals with access to classified information on se-

curity procedures for handling classified information.

(U) Recommendation #26: The Executive Branch should consider instituting mandatory polygraphs for all non-confirmed political appointees that have top secret clearances.

(U) Despite employees in the Executive Branch having extraordinary access to a significant amount of highly classified information, there are very few processes in place to ensure that these individuals handle such information appropriately.

(U) The DNI is responsible for policies and procedures governing "eligibility for access to classified information or eligibility to hold a sensitive position made by any agency." However, pursuant to ICD 704, the DNI delegated the authority to grant access to an IC element's Sensitive Compartmented Information (SCI) and other controlled access program information to the heads of such element. As it relates to the administration of polygraphs during personnel security vetting, the DNI issued Intelligence Community Policy Guidance (ICPG) 704.6.

(U) ICPG 704.6 provides basic instruction as to the types of polygraphs and circumstances by which polygraphs should be administered. While IC elements should have discretion in terms of the timing and circumstances by which to conduct SIPs, every employee not subject to Senate-confirmation that is granted access to TOP SECRET classified information should be

subject to at least a counterintelligence
scope polygraph (CSP).  As a result, the DNI
should revise ICD 704 and ICPG 704.6 to
specifically reflect this requirement.

---

1.  50 U.S.C. § 1804.
2.  50 U.S.C. § 1801.
3.  HPSCI, "Russian Active Measures During the 2016 Election Campaign," May 23, 2017, pp. 31-32.
4.  Campaign Legal Center and Catherine Hinckley Kelley v. Democratic National Committee and Hillary for America,
    "Complaint," Federal Election Commission, www.campaignlegalcenter.org/document/fec-complaint-hillary-america-dnc-
    failure-disclose, Oct. 25, 2017.
5.  52 U.S.C. § 30121; 11 CFR 110.20.
6.  Pub. L. No. 112-277, § 504 (2013).

## (U) Appendix A - Scope and Methodology

(U) On January 25, 2017, Chairman Nunes and Ranking Member Schiff released a joint statement detailing the Committee's inquiry into the Russian active measures campaign targeting the 2016 U.S. presidential election.[1] The final parameters of the Russia investigation were agreed to by Chairman Nunes and Ranking Member Schiff on March 1, 2017.[2] The review's key questions were: (1) what Russian cyber activity and other active measures were directed against the United States and its allies; (2) did the Russian active measures include links between Russia and individuals associated with political campaigns or any other U.S. persons; (3) what was the U.S. government response to these Russian active measures and what do we need to do to protect ourselves and our allies in the future; and (4) what possible leaks of classified information took place related to the Intelligence Community's assessment of these matters? The Committee remained focused on investigating the answers to these four questions and designed the investigation's methodology around them.

(U) The Committee interviewed and/or transcribed testimony from 73 witnesses, conducted 9 open and closed hearings and briefings, and issued 20 subpoenas. The Committee identified witnesses to interview by reviewing open source material, including news reports; official U.S. government documents, including classified Intelligence IC source material; IC agency briefings; and

following up on leads acquired from formal transcribed interviews with current and former administration officials, as well as volunteers who offered pertinent testimony or documents to the Committee. In some instances, prospective witnesses were unresponsive or unwilling to be interviewed. When appropriate, Congressman K. Michael Conaway, in consultation with the Ranking Member, made a recommendation to the Committee Chairman Devin Nunes in accordance with *Rules of Procedure for the Permanent Select Committee on Intelligence* to issue a subpoena.[3] Subpoenas were used to compel witnesses to appear as well as to compel the production of pertinent documents in compliance with the Committee's lawful authority. Six of the witnesses the Committee requested to interview invoked their 5th amendment protections from self-incrimination, which resulted in the Committee not being able to obtain pertinent information from those particular individuals.

(U) During the interviews, the Committee Members and staff questioned the witnesses about activities that generally took place between April 2015 and January 2017. If the Committee discovered anything that arose before April 2015 or after January 2017, the Committee made a determination of its relevancy. If it was identified to have an impact on the campaign or election, the Committee defined it as relevant and included it within the scope. However, none of

the witnesses interviewed indicated potential collusion that would have led the Committee to adapt a broader scope. The Committee also collected over 307,900 documents and 230 hours of witness testimony.

**(U) What Russian cyber activity and other active measures were directed against the United States and its allies?**

(C//NF) ~~(U)~~ The Committee collected and analyzed IC products on Russian influence operations and activities from the period beginning with the summer of 2015 and ending in January 2017.[4] The Committee did not examine the motivation of the Russian actors, but instead focused on what it found about the Russian's activities. The Committee also spent approximately 1,200 hours reviewing the classified *Intelligence Community Assessment on Russian Activities and Intentions in Recent Elections* (ICA), █████

███████████████████████████████

███████████████████████████████

██████ In addition, the Committee interviewed the Chief of the CIA Director's fusion cell, which was an interagency analytic group run by the CIA that was stood up █ ██████ to produce products focused on Russian cyber and other influence activities targeting the United States. The Committee also interviewed the FBI's Section Chief for the Bureau's Counterintelligence Analysis Section. In addition, the Committee traveled to Bulgaria, Cypress, Estonia, Germany, Moldova, Ukraine, and the United Kingdom to interview these nation's foreign intelligence

services about the Russian active measures against their governments.

**(U) Did the Russian active measures include links between Russia and individuals associated with political campaigns or any other U.S. persons?**

(U) The Committee investigated facts related to the FBI's investigation through May 2017, until the appointment of Special Counsel Robert Mueller. The Committee avoided examining events thereafter to avoid interfering with the Special Counsel's investigation. The Committee also examined allegations of collusion by investigating the interaction between the political campaigns and Russian agents of influence during the 2016 election cycle. The election cycle was defined as April 12, 2015, when Hillary Clinton launched her campaign for President through November 8, 2016, or election day. To answer this question, the Committee met with the head of Counterintelligence for the DOJ to understand the context and events surrounding the investigation into the Trump campaign. The Committee also interviewed several officials from the FBI and DOJ to collect official testimony about the investigation. In addition, the Committee collected and reviewed pertinent FBI and DOJ documents about the counterintelligence investigation. The Committee also coordinated closely with the Office of Special Counsel. For example, the Committee shared the list of witnesses that the Committee interviewed and kept the Special Counsel's office apprised of any changes or developments on a monthly ba-

sis.

(U) What was the U.S. government response to these Russian active measures and what do we need to do to protect ourselves and our allies in the future?

The Committee interviewed current and former officials at the NSA, FBI, and CIA. The Committee interviewed these witnesses about Russia's active measures, the impact these active measures had on U.S. intelligence relationships and alliances, as well as the agencies' response to these attacks. In addition, the Committee traveled to seven countries in Europe and met with IC, Department of State, and foreign intelligence service representatives to obtain other nations' perspectives about the Russian active measures, the potential impacts of these measures, and the U.S. government and its allies' response.

(U) What possible leaks of classified information took place related to the Intel-

ligence Community's assessment of these matters?

(U) The Committee collected, reviewed, and analyzed open source articles containing leaks that occurred between the IC's establishment of the CIA Director's fusion cell ████████████ and the publication of the classified and declassified version of the ICA in January 2017. In addition, the Committee collected and analyzed laws and policies pertaining to the release or publication of classified information. Finally, the Committee also compared the leaks found in the identified articles to the classified and unclassified Intelligence Community Assessment to determine any similarities.

---

1. HPSCI, "Joint Statement on Progress of Bipartisan HPSCI Inquiry into Russian Active Measures," Press Releases, intelligence.house.gov, Jan. 25, 2017.

2. HPSCI, "Intelligence Committee Chairman, Ranking Member Establish Parameters for Russia Investigation," intelligence.house.gov, Mar. 1, 2017.

3. HPSCI, *Rules of Procedure for the Permanent Select Committee on Intelligence*, United States House of Representatives, 115th Congress.

4. The IC comprises 17 different organizations, or IC elements, to include the Office of the Director of National Intelligence, the Central intelligence Agency, the Federal Bureau of Investigation, the Office of Intelligence and Counterintelligence at the Department of Energy, the Office of National Security Intelligence at the Department of Justice's Drug Enforcement Administration, the Office of Intelligence and Analysis at the Department of Homeland Security, the Bureau of Intelligence and Research at the Department of State, the Office of Intelligence and Analysis at the Department of Treasury, Air Force Intelligence, Army Intelligence, Coast Guard Intelligence, Defense Intelligence Agency, Marine Corps Intelligence, National Geospatial-Intelligence Agency, National Reconnaissance Office, National Security Agency, and Navy Intelligence. For the purposes of this review, the Committee reviewed intelligence products from the Central Intelligence Agency, Federal Bureau of Investigation, and National Security Agency because these agencies were the IC partners for community-wide assessment of Russian active measures.

# (U) Appendix B - Russia Investigation Parameters

HPSCI INQUIRIES AND INVESTIGATIONS

SCOPE OF INVESTIGATION

BI-PARTISAN INQUIRY INTO RUSSIAN ACTIVE MEASURES

**TOPIC**

An examination into Russian cyber activity and other active measures directed at the 2016 U.S. election.

**PURPOSE**

*What problem are you trying to solve?*
One of HPSCI's highest priorities is oversight of the Intelligence Community's activities to counter Russian aggression, including the cyber-attacks directed against the United States in the last year. As part of this oversight responsibility, the Committee is undertaking a bi-partisan investigation into these activities directed at the 2016 election and the underlying intelligence used to draft the Intelligence Community Assessment, "Russian Activities and Intentions in Recent US Elections." The investigation will help us better understand Russian active measures against the United States and our allies and inform efforts to prevent similar episodes in the future, both here and abroad.

*Who is your intended audience?*
The intended audience is the Members of HPSCI and—to the extent permitted by classification and security rules—the broader House of Representatives and the American people.

*What are the key questions you seek to answer?*
- What Russian cyber activity and other active measures were directed against the United States and its allies?
- What counterintelligence concerns exist related to Russia and the 2016 U.S. elections, including any intelligence regarding links between Russia and individuals associated with political campaigns?
- What was the USG response to these Russian active measures and what impact, if any, did the Russian activity have on intelligence relationships and traditional alliances?
- What possible leaks of classified information took place related to the Intelligence Community's assessment of these matters?

*What is your intended outcome product(s)?*
The Committee intends to complete a report at the highest classification necessary to answer the key questions and, where possible, report(s) at lower classification levels releasable to the House of Representatives and the public, as appropriate.

1



*What intended impact will there be for budget, legislation, or press?*
The inquiry and report may uncover vulnerabilities within the Intelligence Community and/or USG agencies or institutions. If so, the Committee may identify avenues of improvement that would be reflected in IAA provisions, stand-alone legislation, IC budget adjustments, and/or further areas to focus HPSCI's oversight efforts.

The Committee also expects that there will be significant interest from the press, given the delicate political issues surrounding the topic. Staff will remain bi-partisan and focus solely on the facts uncovered in our investigation.

*What intended effect do you want those products to have? How does that fit into the Committee's oversight plan?*
The objective is to better understand Russian active measures directed at the 2016 U.S. election, and to better position the IC and the broader USG to respond to and defend against the threat.

### SCOPE

*What are the boundaries of your review? Please consider time, substance, agency, and range of activities.*

**Time:**
The Committee will focus primarily on Russian active measures deployed during the 2015-2017 timeframe, but may pursue activities germane to the investigation that took place outside this window.

**Substance:**
- *What:* The Committee will investigate Russian activities aimed at USG agencies, political parties, NGOs, individuals, and private industry, as appropriate. ███████████

  ███████████ The investigation will also assess whether there is any intelligence that identifies insider threat or CI concerns, including whether Russian activity involved any USPs, including those on or associated with campaigns.
  - o The investigation will also consider what USG officials believe to be the impact to U.S. intelligence of both Russian active measures related to the election and the associated recent disclosures.
- *How:* The Committee will investigate the methods by which Russia targeted the aforementioned groups.
- *Why:* The investigation will consider Russian leadership plans and intentions, including whether and in what ways Russia intended to influence U.S. policy or undermine U.S. political systems and democratic institutions.
- *USG response:* The Committee will examine how the U.S. government responded to Russian active measures. ███████████
  ███████████ It will also include an assessment of the process used to generate the IC's report and any deviations from standard practices in the IC's report. ███████████

2

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

███████████

██████

████ and an accounting of whether a person or persons in the IC or the White House leaked information on the report prior to its dissemination to the Gang of Eight, Congress, or the public.
  o  The report will also assess whether intelligence relating to U.S. persons was collected and disseminated in accordance with applicable laws and policies.
- *Recommendations:* Several recommendations are likely to come out of this investigation.

Agencies:

- The Committee expects to be in contact with CIA, NSA, DHS, FBI, DIA, and ODNI. However, The Committee will pursue all avenues of inquiry, which may include agencies not listed here.
- The Committee will also engage current and former IC and USG personnel, private industry, and any other parties with knowledge relevant to the investigation.
- The Committee will examine the process by which the Intelligence Community Assessment, "Russian Activities and Intentions in Recent US Elections," was created and the intelligence underlying the assessment to determine whether the IC comported with all relevant Intelligence Community Directives and security precautions when researching, writing, analyzing, and releasing their product, and whether the assessments meet a reasonable standard of credibility as determined by the investigatory team. The Committee will focus on evaluating the IC's work on the Assessment with regard to IC rules and procedures, but not create a new or separate assessment of Russian activities.

*Given the above, and competing priorities, when do you expect to complete the project?*
The Committee expects the investigation to take several months, at least, and the drafting of a report and any declassification review to take additional time thereafter. Above all, the investigation will prioritize comprehensiveness over completion by a particular date, while still seeking to move as quickly as possible to ensure the report is timely and useful.

*What if/any political or jurisdictional issues exist?*
The inquiry's subject matter carries political sensitivities. Nevertheless, staff will proceed in a bi-partisan and objective manner, both in conducting the inquiry and in drafting the report.

- The Committee's investigation will not interfere with any ongoing criminal or counterintelligence investigations. Staff will, however, seek relevant law enforcement or counterintelligence information consistent with the Committee's oversight jurisdiction and investigative responsibilities. The objective of seeking such information will be to assess whether any collusion occurred between Russians and USPs, and the leaks of classified information.
- The investigation could implicate the work of the agencies within the jurisdiction of Homeland Security, Judiciary, Oversight, and Foreign Affairs Committees. However, because the investigation will focus on an active measures campaign by a foreign adversary, the investigation clearly lies within the jurisdiction of HPSCI. Additionally, House Rule 10 provides that HPSCI shall study the sources and methods of the IC on an "exclusive basis."

3

TOP SECRET/████████████ /NOFORN██



*What if/any compartmentation issues exist?*
Staff and Members conducting the investigation will need access to Gang of Eight material. This necessitates a small, nimble group, and will require special arrangements for proper storage of compartmented information at HPSCI.

## METHODOLOGY

*Will it be bipartisan? Who will be involved?*
This investigation is bi-partisan. Gang of Eight access will be required for the investigatory team.
- Lead: ▮ (Majority); ▮ (Minority)
- Counsel: ▮ (Majority); ▮ (Minority)
- Investigators: ▮ and ▮ (Majority)
- Advisor ▮ (Minority)
- Technical Advisor: ▮ (Bi-partisan Fellow)

*What information do you anticipate will be necessary to achieve your purpose?*
- Access to and custody of all underlying intelligence used to create the Intelligence Community Assessment, "Russian Activities and Intentions in Recent US Elections." This includes reporting currently only available to the Gang of Eight and their Staff Directors.
- Access to and custody of other relevant reporting on Russian active measures as it relates to the timeframe and topics described in the Scope of Investigation, as needed.
- Interviews with USG and non-USG individuals with knowledge of Russian active measures, including those in the Intelligence Community, private industry, NGOs, political parties, and/or other groups. ▮

  ▮. The Committee may also wish to engage cyber experts from our National Labs, both resident at HPSCI and outside the committee.
- ▮.
- Access to documents and information regarding law enforcement and counterintelligence investigations, consistent with the Committee's oversight jurisdiction and investigative responsibilities, as further described above.

*What roles will Members play? At what points will they be brought in to provide feedback or guide the project? What Committee events may be necessary?*
- The investigation is of highest interest to HPSCI Members. They will need to be updated on the status of the investigation at regular intervals, likely through bi-partisan investigatory team memos and Majority- and Minority-specific channels, as necessary.
- Members may also be interested in joining interviews if they are of high interest.
- As needed, the Committee will hold hearings, both open and closed, on elements of the investigation.

4

*How will you gather information (what types of document requests do you plan to submit; who do you plan to interview; where do you intend to travel)?*

- The Committee has already requested from the ODNI access to and custody of all intelligence reporting included in the Intelligence Community assessment, "Russian Activities and Intentions in Recent US Elections."
- The Committee will submit further requests for documents, and for interviews, as the inquiry proceeds.
- The Committee will interview current and former USG personnel, industry personnel, those who work or worked in NGOs and/or political parties, and others as the Committee deems appropriate.
- The Committee will also seek existing IC information on Russian activity against U.S. allies during their elections.

*How will you file, organize, and retain all of the information received? Have you factored in sufficient time for declassification review, if necessary? How will that occur?*

- The Committee will need to accommodate document review and storage at HPSCI— particularly as it relates to compartmented information. The Committee will also need to factor in the time it may take agencies to respond to document access requests, declassification reviews, and/or making available individuals for interviews with the investigatory team or HPSCI Members.
- The Committee staff have already set-up digital folders on the HPSCI classified system, to hold all relevant non-Gang of Eight planning and scoping documents, with the proper permissions based on responsibilities and Majority/Minority status.

## TIMELINE

*Provide specific intended deadlines for each phase of your review (data gathering, analysis, writing, coordination/editing, publishing...)*

The Committee will pursue a phased, building-blocks approach to the investigation, while prioritizing comprehensiveness above completion by a fixed end date. The structuring of the investigation into Phases, and the consequent prioritization of specifically identified investigative activities or research, will not be construed to limit staff's ability to gather or analyze relevant information.

The Committee expects each phase will take weeks to months to complete.

- Phase 1 will focus on initial, general knowledge acquisition about the Russia active measures campaign, the U.S. response, counterintelligence concerns, and the other key questions identified above.
    - o Phase 1 will include reading and analyzing intelligence reporting relevant to the Russia cyber threat, including all underlying intelligence used to produce the Intelligence Community Assessment, "Russian Activities and Intentions in Recent US Elections."
    - o Phase 1 also will include meetings with USG and industry personnel generally knowledgeable about the threat; meetings with USG personnel knowledgeable about the IC's analytic process; and meetings with former USG experts

5

knowledgeable about USG posture against the Russia target, to include counterintelligence.
o Phase 1 also will include witness testimony, following investigative leads, and document production relative to the IC Assessment, counterintelligence concerns, the USG response, and leak allegations.
o Throughout Phase 1, the Committee will pursue document acquisition and schedule interviews necessary to conduct Phase 2.

■ Phase 2 will build on the baseline knowledge acquired in Phase 1 through a focused and specific investigation.
o Phase 2 will include a detailed analysis of the intelligence production process and conclusions in the Intelligence Community Assessment, "Russian Activities and Intentions in Recent US Elections" to assess whether the IC comported with all relevant Intelligence Community Directives and security precautions when researching, writing, analyzing, and releasing their assessment.
o Phase 2 will include interviews with specific USG and industry personnel knowledgeable about the specific topics discussed in the IC's report and the process used to compile, review, and disseminate the IC's report.
o Phase 2 may include detailed interviews and analysis regarding the Russian active measures campaign; the U.S. response; counterintelligence concerns; the impact of Russian active measures on U.S. allies; and whether the IC or the White House leaked information on the report prior to its dissemination to the Gang of Eight, Congress, or the public.

• Phase 3 will focus on writing, coordinating, editing, transmitting for declassification review (if necessary), and releasing the Committee's reports at appropriate classification levels.

• Throughout all three phases, the Committee will engage Members for any feedback and incorporate that feedback into our process.

\* \* \* \*

Pursuant to Rule 9 of the Committee's Rules of Procedure, 115th Congress, we hereby jointly agree to the scope of investigation described above.

Devin Nunes
Chairman

Adam Schiff
Ranking Member

Date: February 27, 2017

6

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

139

Case 3:22-cv-01213-TAD-KDM  Document 264-3  Filed 05/02/23  Page 316 of 419 PageID #: 18884

# (U) Appendix C - Russia's Media Propaganda Apparatus

## (U) *Rossiya Segodnya*

(U) Created by Putin in 2013, Rossiya Segodnya is Russia's overarching state media company. Rossiya Sogodnya acts as an umbrella for outlets like RT and Sputnik. "Rossiya Segodnya" is translated as "Russia Today," but it is different from the television channel with the same name. According to Russian press reporting, in September 2014, Moscow tripled Rossiya Segodnya's budget to 6.48 billion rubles and increased RT's 2015 budget by 41 percent to 15.38 billion rubles, which is equivalent to roughly $600 million.

## (U) *Russia Today (RT)*

(U) This 24-hour worldwide television (TV) and online network was created in 2005 to promote Russia's image abroad and to show foreigners world events from a Russian perspective. Nominally independent but Kremlin-controlled and funded, Russia

████████████████████████████

████ To deemphasize its Russian origin, Russia Today was rebranded RT in 2008.

(U) RT employs 2,000 staff to provide coverage in Russian, English, Arabic, French, German, and Spanish in 100 countries and on the Internet from its studios in Moscow and Washington DC. RT's central slogan, "Question More," is indicative of its overarching goal to urge viewers to doubt every-

thing they see in Western media and from its leaders.

## (U) *Sputnik*

(U) A Russian state-owned network of media platforms producing radio, social media, and news content, Sputnik was created in 2014 to act as Russia's multimedia hub. Sputnik is based in 28 countries and operates in 33 different languages, broadcasting pro-Russian messaging and disinformation. A recent GAO study found that Sputnik promotes anti-West narratives and undermines support for democracy.███████████████

████████████████████████████

## (U) *Russia Beyond the Headlines*

(U) Less ideologically hostile than RT and Sputnik, Russia Beyond the Headlines (RBTH) pays for printed inserts in many leading European newspapers and targets Bulgaria, Croatia, France, Germany, Greece, Italy, Macedonia, Portugal, Serbia, Spain, and the UK. Comparatively less anti-American in tone, RBTH provides another avenue for Russian propaganda to reach wide audiences in these European countries. ████████████████████████

████████████████████████████

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

~~TOP SECRET/~~ ████████████ ~~/NOFORN/~~ ██

---

1. ████████████████████████████████████████
2. GAO, *Russia: U.S. Government Takes a Country-Specific Approach to Addressing Disinformation Overseas*, May 2017.
3. ████████████████████████████████████████
4. ████████████████████████████████

# (U) Appendix E - HPSCI Majority Memo about FISA Abuses

## UNCLASSIFIED

January 18, 2018

| | |
|---|---|
| To: | HPSCI Majority Members |
| From: | HPSCI Majority Staff |
| Subject: | Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation |

### Purpose

This memorandum provides Members an update on significant facts relating to the Committee's ongoing investigation into the Department of Justice (DOJ) and Federal Bureau of Investigation (FBI) and their use of the Foreign Intelligence Surveillance Act (FISA) during the 2016 presidential election cycle. Our findings, which are detailed below, 1) raise concerns with the legitimacy and legality of certain DOJ and FBI interactions with the Foreign Intelligence Surveillance Court (FISC), and 2) represent a troubling breakdown of legal processes established to protect the American people from abuses related to the FISA process.

### Investigation Update

On October 21, 2016, DOJ and FBI sought and received a FISA probable cause order (not under Title VII) authorizing electronic surveillance on Carter Page from the FISC. Page is a U.S. citizen who served as a volunteer advisor to the Trump presidential campaign. Consistent with requirements under FISA, the application had to be first certified by the Director or Deputy Director of the FBI. It then required the approval of the Attorney General, Deputy Attorney General (DAG), or the Senate-confirmed Assistant Attorney General for the National Security Division.

The FBI and DOJ obtained one initial FISA warrant targeting Carter Page and three FISA renewals from the FISC. As required by statute (50 U.S.C. §1805(d)(1)), a FISA order on an American citizen must be renewed by the FISC every 90 days and each renewal requires a separate finding of probable cause. Then-Director James Comey signed three FISA applications in question on behalf of the FBI, and Deputy Director Andrew McCabe signed one. Then-DAG Sally Yates, then-Acting DAG Dana Boente, and DAG Rod Rosenstein each signed one or more FISA applications on behalf of DOJ.

Due to the sensitive nature of foreign intelligence activity, FISA submissions (including renewals) before the FISC are classified. As such, the public's confidence in the integrity of the FISA process depends on the court's ability to hold the government to the highest standard - particularly as it relates to surveillance of American citizens. However, the FISC's rigor in protecting the rights of Americans, which is reinforced by 90-day renewals of surveillance orders, is necessarily dependent on the government's production to the court of all material and relevant facts. This should include information potentially favorable to the target of the FISA

## UNCLASSIFIED

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎/NOFORN/

UNCLASSIFIED

application that is known by the government. In the case of Carter Page, the government had at least four independent opportunities before the FISC to accurately provide an accounting of the relevant facts. However, our findings indicate that, as described below, material and relevant information was omitted.

1) The "dossier" compiled by Christopher Steele (Steele dossier) on behalf of the Democratic National Committee (DNC) and the Hillary Clinton campaign formed an essential part of the Carter Page FISA application. Steele was a longtime FBI source who was paid over $160,000 by the DNC and Clinton campaign, via the law firm Perkins Coie and research firm Fusion GPS, to obtain derogatory information on Donald Trump's ties to Russia.

   a) Neither the initial application in October 2016, nor any of the renewals, disclose or reference the role of the DNC, Clinton campaign, or any party/campaign in funding Steele's efforts, even though the political origins of the Steele dossier were then known to senior DOJ and FBI officials.

   b) The initial FISA application notes Steele was working for a named U.S. person, but does not name Fusion GPS and principal Glenn Simpson, who was paid by a U.S. law firm (Perkins Coie) representing the DNC (even though it was known by DOJ at the time that political actors were involved with the Steele dossier). The application does not mention Steele was ultimately working on behalf of—and paid by—the DNC and Clinton campaign, or that the FBI had separately authorized payment to Steele for the same information.

2) The Carter Page FISA application also cited extensively a September 23, 2016, *Yahoo News* article by Michael Isikoff, which focuses on Page's July 2016 trip to Moscow. This article does not corroborate the Steele dossier because it is derived from information leaked by Steele himself to *Yahoo News.* The Page FISA application incorrectly assesses that Steele did not directly provide information to *Yahoo News*. Steele has admitted in British court filings that he met with *Yahoo News*—and several other outlets—in September 2016 at the direction of Fusion GPS. Perkins Coie was aware of Steele's initial media contacts because they hosted at least one meeting in Washington D.C. in 2016 with Steele and Fusion GPS where this matter was discussed.

   a) Steele was suspended and then terminated as an FBI source for what the FBI defines as the most serious of violations—an unauthorized disclosure to the media of his relationship with the FBI in an October 30, 2016, *Mother Jones* article by David Corn. Steele should have been terminated for his previous undisclosed contacts with Yahoo and other outlets **in September**—before the Page application was submitted to

UNCLASSIFIED

TOP SECRET// ‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎/NOFORN/

UNCLASSIFIED

the FISC in October—but Steele improperly concealed from and lied to the FBI about those contacts.

b) Steele's numerous encounters with the media violated the cardinal rule of source handling—maintaining confidentiality—and demonstrated that Steele had become a less than reliable source for the FBI.

3) Before and after Steele was terminated as a source, he maintained contact with DOJ via then-Associate Deputy Attorney General Bruce Ohr, a senior DOJ official who worked closely with Deputy Attorneys General Yates and later Rosenstein. Shortly after the election, the FBI began interviewing Ohr, documenting his communications with Steele. For example, in September 2016, Steele admitted to Ohr his feelings against then-candidate Trump when Steele said he **"was desperate that Donald Trump not get elected and was passionate about him not being president."** This clear evidence of Steele's bias was recorded by Ohr at the time and subsequently in official FBI files—but not reflected in any of the Page FISA applications.

a) During this same time period, Ohr's wife was employed by Fusion GPS to assist in the cultivation of opposition research on Trump. Ohr later provided the FBI with all of his wife's opposition research, paid for by the DNC and Clinton campaign via Fusion GPS. The Ohrs' relationship with Steele and Fusion GPS was inexplicably concealed from the FISC.

4) According to the head of the FBI's counterintelligence division, Assistant Director Bill Priestap, corroboration of the Steele dossier was in its "infancy" at the time of the initial Page FISA application. After Steele was terminated, a source validation report conducted by an independent unit within FBI assessed Steele's reporting as only minimally corroborated. Yet, in early January 2017, Director Comey briefed President-elect Trump on a summary of the Steele dossier, even though it was—according to his June 2017 testimony—"salacious and unverified." While the FISA application relied on Steele's past record of credible reporting on other unrelated matters, it ignored or concealed his anti-Trump financial and ideological motivations. Furthermore, Deputy Director McCabe testified before the Committee in December 2017 that no surveillance warrant would have been sought from the FISC without the Steele dossier information.

UNCLASSIFIED

TOP SECRET//                                                      //NOFORN//

UNCLASSIFIED

5) The Page FISA application also mentions information regarding fellow Trump campaign advisor George Papadopoulos, but there is no evidence of any cooperation or conspiracy between Page and Papadopoulos. The Papadopoulos information triggered the opening of an FBI counterintelligence investigation in late July 2016 by FBI agent Pete Strzok. Strzok was reassigned by the Special Counsel's Office to FBI Human Resources for improper text messages with his mistress, FBI Attorney Lisa Page (no known relation to Carter Page), where they both demonstrated a clear bias against Trump and in favor of Clinton, whom Strzok had also investigated. The Strzok/Lisa Page texts also reflect extensive discussions about the investigation, orchestrating leaks to the media, and include a meeting with Deputy Director McCabe to discuss an "insurance" policy against President Trump's election.

UNCLASSIFIED

TOP SECRET//                                                      //NOFORN//

Redactions match
previously released
version--no
additional
redactions taken

# (U) Appendix F - HPSCI Minority Memo about FISA Abuses

TO: All Members of the House of Representatives
FROM: HPSCI Minority
DATE: January 29, 2018
RE: Correcting the Record – The Russia Investigations

The HPSCI Majority's move to release to the House of Representatives its allegations against the Federal Bureau of Investigation (FBI) and the Department of Justice (DOJ) is a transparent effort to undermine those agencies, the Special Counsel, and Congress' investigations. It also risks public exposure of sensitive sources and methods for no legitimate purpose.

FBI and DOJ officials did not "abuse" the Foreign Intelligence Surveillance Act (FISA) process, omit material information, or subvert this vital tool to spy on the Trump campaign.

In fact, DOJ and the FBI would have been remiss in their duty to protect the country had they not sought a FISA warrant and repeated renewals to conduct temporary surveillance of Carter Page, someone the FBI assessed to be an agent of the Russian government. DOJ met the rigor, transparency, and evidentiary basis needed to meet FISA's probable cause requirement, by demonstrating:

- o contemporaneous evidence of Russia's election interference;
- o concerning Russian links and outreach to Trump campaign officials;
- o Page's history with Russian intelligence; and
- o                                Page's suspicious activities in 2016, including in Moscow.

The Committee's Minority has therefore prepared this memorandum to correct the record:

- • **Christopher Steele's raw intelligence reporting did not inform the FBI's decision to initiate its counterintelligence investigation in late July 2016.** In fact, the FBI's closely-held investigative team only received Steele's reporting in mid-September – more than seven weeks later. The FBI – and, subsequently, the Special Counsel's – investigation into links between the Russian government and Trump campaign associates has been based on troubling law enforcement and intelligence information unrelated to the "dossier."

- • **DOJ's October 21, 2016 FISA application and three subsequent renewals carefully outlined for the Court a multi-pronged rationale for surveilling Page, who, at the time of the first application, was no longer with the Trump campaign.** DOJ detailed Page's past relationships with Russian spies and interaction with Russian officials during the 2016 campaign ▓▓▓▓. DOJ cited multiple sources to support the case for surveilling Page — but made only narrow use of information from Steele's sources about Page's specific activities in 2016, chiefly his suspected July 2016 meetings in Moscow with Russian officials. ▓▓▓▓▓▓▓▓. In fact, the FBI interviewed Page in March 2016 about his contact with Russian intelligence, the very month candidate Donald Trump named him a foreign policy advisor.

As DOJ informed the Court in subsequent renewals, ▓▓▓▓▓ Steele's reporting about Page's Moscow meetings ▓▓▓▓▓▓▓▓. DOJ's applications did not otherwise rely on Steele's reporting, including any "salacious" allegations

1

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

~~TOP SECRET//~~ /NOFORN

about Trump, and the FBI never paid Steele for this reporting. While explaining why the FBI viewed Steele's reporting and sources as reliable and credible, DOJ also disclosed:

- o Steele's prior relationship with the FBI;
- o the fact of and reason for his termination as a source; and
- o the assessed political motivation of those who hired him.

• The Committee Majority's memorandum, which draws selectively on highly sensitive classified information, includes other distortions and misrepresentations that are contradicted by the underlying classified documents, which the vast majority of Members of the Committee and the House have not had the opportunity to review – and which Chairman Nunes chose not to read himself.[1]

### Background

On January 18, 2018, the Committee Majority, during an unrelated business meeting, forced a surprise vote to release to the full House a profoundly misleading memorandum alleging serious abuses by the FBI and DOJ. Majority staff drafted the document in secret on behalf of Chairman Devin Nunes (and reportedly with guidance and input from Rep. Trey Gowdy), and then rushed a party-line vote without prior notice.

This was by design. The overwhelming majority of Committee Members never received DOJ authorization to access the underlying classified information, and therefore could not judge the veracity of Chairman Nunes' claims. Due to sensitive sources and methods, DOJ provided access only to the Committee's Chair and Ranking Member (or respective designees), and limited staff, to facilitate the Committee's investigation into Russia's covert campaign to influence the 2016 U.S. elections.[2] As DOJ has confirmed publicly, it did not authorize the broader release of this information within Congress or to the public, and Chairman Nunes refused to allow DOJ and the FBI to review his document until he permitted the FBI Director to see it for the first time in HPSCI's secure spaces late on Sunday, January 28 – 10 days after disclosure to the House.[3]

### FBI's Counterintelligence Investigation

In its October 2016 FISA application and subsequent renewals, DOJ accurately informed the Court that the FBI initiated its counterintelligence investigation on July 31, 2016, after receiving information ████████████. George Papadopoulos revealed ████████ ████ ████ that individuals linked to Russia, who took interest in Papadopoulos as a Trump campaign foreign policy adviser, informed him in late April 2016 that Russia ████████

████████████████████████ [*] Papadopoulos's disclosure, moreover, occurred against the backdrop of Russia's aggressive covert campaign to influence our elections, which the FBI was already monitoring. We would later learn in Papadopoulos's plea that that the information the Russians could assist by anonymously releasing were thousands of Hillary Clinton's emails.[4]

DOJ told the Court the truth. Its representation was consistent with the FBI's underlying investigative record, which current and former senior officials later corroborated in extensive

2

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

Committee testimony. Christopher Steele's reporting, which he began to share with an FBI agent
▉▉▉▉▉▉▉▉▉▉ through the end of October 2016, played no role in launching the
FBI's counterintelligence investigation into Russian interference and links to the Trump
campaign. In fact, Steele's reporting did not reach the counterintelligence team investigating
Russia at FBI headquarters until mid-September 2016, more than seven weeks after the FBI
opened its investigation, because the probe's existence was so closely held within the FBI.[6] By
then, the FBI had already opened sub-inquiries into ▉▉▉ individuals linked to the Trump
campaign ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉, and former campaign foreign policy advisor Carter Page.

As Committee testimony bears out, the FBI would have continued its investigation, including
against ▉▉▉ individuals, even if it had never received information from Steele, never applied
for a FISA warrant against Page, or if the FISC had rejected the application.[7]

### DOJ's FISA Application and Renewals

The initial warrant application and subsequent renewals received independent scrutiny and
approval by four different federal judges, three of whom were appointed by President George W.
Bush and one by President Ronald Reagan. DOJ first applied to the FISC on October 21, 2016
for a warrant to permit the FBI to initiate electronic surveillance and physical search of Page for
90 days, consistent with FISA requirements. The Court approved three renewals – in early
January 2017, early April 2017, and late June 2017 – which authorized the FBI to maintain
surveillance on Page until late September 2017. Senior DOJ and FBI officials appointed by the
Obama and Trump Administrations, including acting Attorney General Dana Boente and Deputy
Attorney General Rod Rosenstein, certified the applications with the Court.

FISA was not used to spy on Trump or his campaign. As the Trump campaign and Page have
acknowledged, Page ended his formal affiliation with the campaign months before DOJ applied
for a warrant. DOJ, moreover, submitted the initial application less than three weeks before the
election, even though the FBI's investigation had been ongoing since the end of July 2016.

DOJ's warrant request was based on compelling evidence and probable cause to believe Page was
knowingly assisting clandestine Russian intelligence activities in the U.S.:

• Page's Connections to Russian Government and Intelligence Officials: The FBI had an
independent basis for investigating Page's motivations and actions during the campaign,
transition, and following the inauguration. As DOJ described in detail to the Court, Page had
an extensive record as ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉[9] prior to joining the Trump campaign. He resided in Moscow from 2004-
2007 and pursued business deals with Russia's state-owned energy company Gazprom—

As early as ▉▉▉, a Russian intelligence officer ▉▉▉▉▉▉▉▉▉▉ targeted Page for
recruitment. Page showed ▉▉▉▉▉▉▉▉▉▉▉▉.

3

TOP SECRET//

Redactions match previously released version--no additional redactions taken

Page remained on the radar of Russian intelligence and the FBI. In 2013, prosecutors indicted three other Russian spies, two of whom targeted Page for recruitment. The FBI also interviewed Page multiple times about his Russian intelligence contacts, including in March 2016.[13] The FBI's concern about and knowledge of Page's activities therefore long predate the FBI's receipt of Steele's information.

• Page's Suspicious Activity During the 2016 Campaign: The FISA applications also detail Page's suspicious activity after joining the Trump campaign in March 2016. Page traveled to Moscow in July 2016, during which he gave a university commencement address – an honor usually reserved for well-known luminaries.

   o It is in this specific sub-section of the applications that DOJ refers to Steele's reporting on Page and his alleged coordination with Russian officials. Steele's information about Page was consistent with the FBI's assessment of Russian intelligence efforts to recruit him and his connections to Russian persons of interest.

   o In particular, Steele's sources reported that Page met separately while in Russia with Igor Sechin, a close associate of Vladimir Putin and executive chairman of Rosneft, Russia's state-owned oil company, and Igor Divyekin, a senior Kremlin official. Sechin allegedly discussed the prospect of future U.S.-Russia energy cooperation and "an associated move to lift Ukraine-related western sanctions against Russia." Divyekin allegedly disclosed to Page that the Kremlin possessed compromising information on Clinton ("kompromat") and noted "the possibility of its being released to Candidate #1's campaign."[11] [*Note:* "Candidate #1" refers to candidate Trump.] This closely tracks what other Russian contacts were informing another Trump foreign policy advisor, George Papadopoulos.

• In subsequent FISA renewals, DOJ provided additional information obtained through multiple independent sources that corroborated Steele's reporting.



   o

   o

   o Page's _____ in Moscow with senior Russian officials— _____ – as well as meetings with Russian officials _____ [15]

This information contradicts Page's November 2, 2017 testimony to the Committee, in which he initially denied any such meetings and then was forced to admit speaking with

4

THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ▬▬▬▬▬▬▬▬ /NOFORN ▬▬▬▬

Dvorkovich and meeting with Rosneft's Sechin-tied investor relations chief, Andrey Baranov.

* The Court-approved surveillance of Page allowed FBI to collect valuable intelligence. The FISA renewals demonstrate that the FBI collected important investigative information and leads by conducting Court-approved surveillance. For instance ▬▬▬▬▬▬▬▬

DOJ also documented evidence that Page ▬▬▬▬▬▬▬▬



Page's efforts to ▬▬▬▬▬▬▬▬ also contradict his sworn testimony to our Committee.

### DOJ's Transparency about Christopher Steele

Far from "omitting" material facts about Steele, as the Majority claims,[20] DOJ repeatedly informed the Court about Steele's background, credibility, and potential bias. DOJ explained in detail Steele's prior relationship with and compensation from the FBI; his credibility, reporting history, and source network; the fact of and reason for his termination as a source in late October 2016; and the likely political motivations of those who hired Steele.

* DOJ was transparent with Court about Steele's sourcing: The Committee Majority, which had earlier accused Obama Administration officials of improper "unmasking," faults DOJ for not revealing the names of specific U.S. persons and entities in the FISA application and subsequent renewals. In fact, DOJ appropriately upheld its longstanding practice of protecting U.S. citizen information by purposefully not "unmasking" U.S. person and entity names, unless they were themselves the subject of a counterintelligence investigation. DOJ instead used generic identifiers that provided the Court with more than sufficient information to understand the political context of Steele's research. In an extensive explanation to the Court, DOJ discloses that Steele

> "was approached by an identified U.S. Person,[21] who indicated to Source #1[Steele][22] that a U.S.-based law firm[23] had hired the identified U.S. Person to conduct research regarding Candidate #1's[24] ties to Russia. (The identified U.S. Person and Source #1 have a long-standing business relationship.) The identified U.S. person hired Source #1 to conduct this research. The identified U.S. Person never advised Source #1 as to the motivation behind the research into Candidate #1's ties to Russia. The FBI speculates that the identified U.S. Person was likely looking for information that could be used to discredit Candidate #1's campaign."[25]

Contrary to the Majority's assertion that DOJ fails to mention that Steele's research was commissioned by "political actors" to "obtain derogatory information on Donald Trump's ties to Russia,"[26] DOJ in fact informed the Court accurately that Steele was hired by

5

▬▬▬▬▬▬▬▬

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



politically-motivated U.S. persons and entities and that his research appeared intended for use "to discredit" Trump's campaign.

*   DOJ explained the FBI's reasonable basis for finding Steele credible: The applications correctly described Steele as                                                . The applications also reviewed Steele's multi-year history of credible reporting on Russia and other matters, including information DOJ used in criminal proceedings.[27] Senior FBI and DOJ officials have repeatedly affirmed to the Committee the reliability and credibility of Steele's reporting, an assessment also reflected in the FBI's underlying source documents.[28] The FBI has undertaken a rigorous process to vet allegations from Steele's reporting, including with regard to Page.[31]

*   The FBI properly notified the FISC after it terminated Steele as a source for making unauthorized disclosures to the media. The Majority cites no evidence that the FBI, prior to filing its initial October 21, 2016 application, actually knew or should have known of any allegedly inappropriate media contacts by Steele. Nor do they cite evidence that Steele disclosed to *Yahoo!* details included in the FISA warrant, since the British Court filings to which they refer do not address what Steele may have said to *Yahoo!*.

    DOJ informed the Court in its renewals that the FBI acted promptly to terminate Steele after learning from him (after DOJ filed the first warrant application) that he had discussed his work with a media outlet in late October. The January 2018 renewal further explained to the Court that Steele told the FBI that he made his unauthorized media disclosure because of his frustration at Director Comey's public announcement shortly before the election that the FBI reopened its investigation into candidate Clinton's email use.

*   DOJ never paid Steele for the "dossier": The Majority asserts that the FBI had "separately authorized payment" to Steele for his research on Trump but neglects to mention that payment was cancelled and never made. As the FBI's records and Committee testimony confirms, although the FBI initially considered compensation                 Steele ultimately never received payment from the FBI for any "dossier"-related information.[32] DOJ accurately informed the Court that Steele had been an FBI confidential human source since       , for which he was "compensated                 by the FBI" – payment for previously-shared information of value unrelated to the FBI's Russia investigation.[33]

### Additional Omissions, Errors, and Distortions in the Majority's Memorandum

*   DOJ appropriately provided the Court with a comprehensive explanation of Russia's election interference, including evidence that Russia courted another Trump campaign advisor, Papadopoulos, and that Russian agents previewed their hack and dissemination of stolen emails. In claiming that there is "no evidence of any cooperation or conspiracy between Page and Papadopoulos,"[34] the Majority misstates the reason why DOJ specifically explained Russia's courting of Papadopoulos. Papadopoulos's interaction with Russian agents, coupled with real-time evidence of Russian election interference, provided the Court with a broader context in which to evaluate Russia's clandestine activities and Page's history and alleged contact with Russian officials. Moreover, since only Page

6

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

, no evidence of a separate conspiracy between him and
Papadopoulos was required. DOJ would have been negligent in omitting vital information
about Papadopoulos and Russia's concerted efforts.

- In its Court filings, DOJ made proper use of news coverage. The Majority falsely claims
  that the FISA materials "relied heavily" on a September 23, 2016 *Yahoo! News* article by
  Michael Isikoff and that this article "does not corroborate the Steele Dossier because it is
  derived from information leaked by Steele himself."[35] In fact, DOJ referenced Isikoff's
  article, alongside another article the Majority fails to mention, not to provide separate
  corroboration for Steele's reporting, but instead to inform the Court of Page's public denial
  of his suspected meetings in Moscow, which Page also echoed in a September 25, 2016 letter
  to FBI Director Comey. [36]

- The Majority's reference to Bruce Ohr is misleading. The Majority mischaracterizes
  Bruce Ohr's role, overstates the significance of his interactions with Steele, and misleads
  about the timeframe of Ohr's communication with the FBI. In late November 2016, Ohr
  informed the FBI of his prior professional relationship with Steele and information that
  Steele shared with him (including Steele's concern about Trump being compromised by
  Russia). He also described his wife's contract work with Fusion GPS, the firm that hired
  Steele separately. This occurred weeks after the election and more than a month after the
  Court approved the initial FISA application. The Majority describes Bruce Ohr as a senior
  DOJ official who "worked closely with the Deputy Attorney General, Yates and later
  Rosenstein," in order to imply that Ohr was somehow involved in the FISA process, but there
  is no indication this is the case.

  Bruce Ohr is a well-respected career professional whose portfolio is drugs and organized
  crime, not counterintelligence. There is no evidence that he would have known about the
  Page FISA applications and their contents. The Majority's assertions, moreover, are
  irrelevant in determining the veracity of Steele's reporting. By the time Ohr debriefs with the
  FBI, it had already terminated Steele as a source and was independently corroborating
  Steele's reporting about Page's activities. Bruce Ohr took the initiative to inform the FBI of
  what he knew, and the Majority does him a grave disservice by suggesting he is part of some
  malign conspiracy.

- Finally, Peter Strzok and Lisa Page's text messages are irrelevant to the FISA
  application. The Majority gratuitously includes reference to Strzok and Page at the end of
  their memorandum, in an effort to imply that political bias infected the FBI's investigation
  and DOJ's FISA applications. In fact, neither Strzok nor Page served as affiants on the
  applications, which were the product of extensive and senior DOJ and FBI review.[37] In
  demonizing both career professionals, the Majority accuses them of "orchestrating leaks to
  the media" – a serious charge; omits inconvenient text messages, in which they critiqued a
  wide range of other officials and candidates from both parties; does not disclose that FBI
  Deputy Director McCabe testified to the Committee that he had no idea what Page and
  Strzok were referring to in their "insurance policy" texts;[38] and ignores Strzok's
  acknowledged role in preparing a public declaration, by then Director Comey, about former
  Secretary Clinton's "extreme carelessness" in handling classified information—which greatly
  damaged Clinton's public reputation in the days just prior to the presidential election.

7

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

152


TOP SECRET/ /NOFORN/



17 _____ the FBI and broader Intelligence Community's high confidence assessment that the Russian government was engaged in a covert interference campaign to influence the 2016 election, including that Russian intelligence actors "compromised the DNC" and WikiLeaks subsequently leaked in July 2016 "a trove" of DNC emails. Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, pp. 6-7. Repeated and updated with new information in subsequent renewal applications. Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, pp. 20-21.

18 Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, pp. 36, 46, 48.

19 Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, p. 56.

20 HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation*, January 18, 2018, pp. 2-3 (enumerating "omissions" of fact regarding Steele and his activities, from the Page FISA applications).

21 Glenn Simpson.

22 Christopher Steele.

23 Perkins Coie LLP.

24 Donald Trump.

25 Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, pp. 15-16, n. 8. Repeated in subsequent renewal applications.

26 HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation*, January 18, 2018, p. 2.

27 Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, p. 15, footnote 8. Repeated in subsequent renewal applications.

28 Interview of Andrew McCabe (FBI Deputy Director), House Permanent Select Committee on Intelligence, December 19, 2017, p. 46, 100; Interview of Sally Yates (former Deputy Attorney General), House Permanent Select Committee on Intelligence, November 3, 2017, p. 16; Interview with John Carlin (former Assistant Attorney General for National Security), House Permanent Select Committee on Intelligence, July, 2017, p. 35.
29 Interview of Andrew McCabe (FBI Deputy Director), House Permanent Select Committee on Intelligence, December 19, 2017, p. 100-101, 115.

32 Interview of FBI Agent, House Permanent Select Committee on Intelligence, December 20, 2017, p. 112.

33 Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, pp. 15-16, n. 8. Repeated in subsequent renewal applications.

34 HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation*, January 18, 2018, p. 4 ("The Page FISA application also mentions information regarding fellow Trump campaign advisor George Papadopoulos, but there is no evidence of any cooperation or conspiracy between Page and Papadopoulos.")

35 HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation*, January 18, 2018, p. 2. Neither Isikoff nor Yahoo! are specifically identified in the FISA Materials, in keeping with the FBI's general practice of not identifying U.S. persons.

36 Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, p. 25; Department of Justice, Foreign Intelligence Surveillance Court Application, January 12, 2017, p. 31; Carter Page, Letter to FBI Director James Comey, September 25, 2016.

9

TOP SECRET/ /NOFORN/

154



TOP SECRET// /NOFORN

[38] Interview of Andrew McCabe (FBI Deputy Director), House Permanent Select Committee on Intelligence, December 19, 2017, p. 157.

10



# (U) Appendix G - Senate Judiciary Memo about Steele Referral

TOP SECRET//NOFORN
(UNCLASSIFIED when separated from attachment)

Unlted States Senate



January 4, 2018

**VIA ELECTRONIC TRANSMISSION**

The Honorable Rod J. Rosenstein
Deputy Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

The Honorable Christopher A. Wray
Director
Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Washington, DC 20535

Dear Deputy Attorney General Rosenstein and Director Wray:

Attached please find a classified memorandum related to certain communications between Christopher Steele and multiple U.S. news outlets regarding the so-called "Trump dossier" that Mr. Steele compiled on behalf of Fusion GPS for the Clinton Campaign and the Democratic National Committee and also provided to the FBI

Based on the information contained therein, we are respectfully referring Mr. Steele to you for investigation of potential violations of 18 U.S.C. § 1001, for statements the Committee has reason to believe Mr. Steele made regarding his distribution of information contained in the dossier.

Thank you for your prompt attention to this important matter. If you have any questions, please contact Patrick Davis or DeLisa Lay of Chairman Grassley's staff at (202) 224-5225.

Sincerely,

Charles E. Grassley
Chairman
Committee on the Judiciary

Lindsey O. Graham
Chairman
Subcommittee on Crime and Terrorism
Committee on the Judiciary

Enclosure: As stated.

TOP SECRET//NOFORN
(UNCLASSIFIED when separated from attachment)

 PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

156

Deputy Attorney General Rosenstein and Director Wray
January 4, 2018
Page 2 of 2

cc:  The Honorable Dianne Feinstein
     Ranking Member
     Committee on the Judiciary

     The Honorable Richard Burr
     Chairman
     Senate Select Committee on Intelligence

     The Honorable Mark Warner
     Vice Chairman
     Senate Select Committee on Intelligence

     The Honorable Devin Nunes
     Chairman
     House Permanent Select Committee on Intelligence

     The Honorable Adam Schiff
     Ranking Member
     House Permanent Select Committee on Intelligence

TOP SECRET//HCS-O-P/SI-G//ORCON/PROP IN/NOFORN/FISA

**MEMORANDUM**

(U)  FROM:  Charles E. Grassley, Chairman, U.S. Senate Committee on the Judiciary
Lindsey O. Graham, Chairman, Subcommittee on Crime and Terrorism,
U.S. Senate Committee on the Judiciary

TO:  The Honorable Rod J. Rosenstein, Deputy Attorney General, U.S.
Department of Justice

The Honorable Christopher A. Wray, Director, Federal Bureau of
Investigation

RE:  Referral of Christopher Steele for Potential Violation of 18 U.S.C. § 1001

(U) As you know, former British Intelligence Officer Christopher Steele was hired by the private firm Fusion GPS in June 2016 to gather information about "links between Russia and [then-presidential candidate] Donald Trump."[1] Pursuant to that business arrangement, Mr. Steele prepared a series of documents styled as intelligence reports, some of which were later compiled into a "dossier" and published by *BuzzFeed* in January 2017.[2] On the face of the dossier, it appears that Mr. Steele gathered much of his information from Russian government sources inside Russia.[3] According to the law firm Perkins Coie, Mr. Steele's dossier-related efforts were funded through Fusion GPS by that law firm on behalf of the Democratic National Committee and the Clinton Campaign.[4]

(U) In response to reporting by the *Washington Post* about Mr. Steele's relationship with the FBI relating to this partisan dossier project, the Judiciary Committee began raising a series of questions to the FBI and the Justice Department about these matters as part of the Committee's constitutional oversight responsibilities.[5]

(U) The FBI has since provided the Committee access to classified documents relevant to the FBI's relationship with Mr. Steele and whether the FBI relied on his dossier work. As explained in greater detail below, when information in those classified documents is evaluated in light of sworn statements by Mr. Steele in British litigation, it appears that either Mr. Steele lied to the FBI or the British court, or that the classified documents reviewed by the Committee contain materially false statements.

[1] (U) Defence, *Gubarev v. al v. Orbis Business Intelligence Limited and Christopher Steele*, Claim No. HQ17D00413, Queen's Bench (Apr. 4, 2017), para. 9 [Hereinafter "Steele Statement 1"] [Attachment A].
[2] (U) Id. at para. 10; Ken Bensinger, Miriam Elder, and Mark Schoofs, *These Reports Allege Trump Has Deep Ties to Russia*, BUZZFEED (Jan. 10, 2017).
[3] (U) Id.
[4] (U) Adam Entous, Devlin Barrett and Rosalind S. Helderman, *Clinton Campaign, DNC Paid for Research that Led to Russia Dossier*, THE WASHINGTON POST (Oct. 24, 2017).
[5] (U) Tom Hamburger and Rosalind S. Helderman, *FBI Once Planned to Pay Former British Spy who Authored Controversial Trump Dossier*, THE WASHINGTON POST (Feb. 28, 2017).

1



(U) In response to the Committee's inquiries, the Chairman and Ranking Member received a briefing on March 15, 2017, from then-Director James B. Comey, Jr.

That briefing addressed the Russia investigation, the FBI's relationship with Mr. Steele, and the FBI's reliance on Mr. Steele's dossier in two applications it filed for surveillance under the Foreign Intelligence Surveillance Act (FISA). Then, on March 17, 2017, the Chairman and Ranking Member were provided copies of the two relevant FISA applications, which requested authority to conduct surveillance of Carter Page. Both relied heavily on Mr. Steele's dossier claims, and both applications were granted by the Foreign Intelligence Surveillance Court (FISC). In December of 2017, the Chairman, Ranking Member, and Subcommittee Chairman Graham were allowed to review a total of four FISA applications relying on the dossier to seek surveillance of Mr. Carter Page, as well as numerous other FBI documents relating to Mr. Steele.

In the March 2017 briefing with then-Director Comey, he stated that



(U) Similarly, in June 2017, former FBI Director Comey testified publicly before the Senate Select Committee on Intelligence that he had briefed President-Elect Trump on the dossier allegations in January 2017, which Mr. Comey described as "salacious" and "unverified."[6]

When asked at the March 2017 briefing why the FBI relied on the dossier in the FISA applications absent meaningful corroboration—and in light of the highly political motives surrounding its creation—then-Director Comey stated that the FBI included the dossier allegations about Carter Page in the FISA applications because Mr. Steele himself was considered reliable due to his past work with the Bureau.

Indeed, the documents we have reviewed show that the FBI took important investigative steps largely based on Mr. Steele's information—and relying heavily on his credibility. Specifically, on October 21, 2016, the FBI filed its first warrant application under FISA for Carter Page. This initial application relies in part on alleged past Russian attempts to recruit Page years ago. That portion is less than five pages. The bulk of the application consists of allegations against Page that were disclosed to the FBI by Mr. Steele and are also outlined in the Steele dossier. The application appears to contain no additional information corroborating the dossier allegations against Mr. Page, although it does cite to a news article that appears to be sourced to Mr. Steele's dossier as well.

---

[6] (U) Statement of James B. Comey, Jr., Hearing of the U.S. Sen. Select Comm. on Intelligence (June 8, 2017).

2

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET/████████████████                     /NOFORN███

████████████

██████ The FBI discussed the reliability of this unverified information provided by Mr. Steele in footnotes 8 and 18 of the FISA warrant application. First, the FBI noted to a vaguely limited extent the political origins of the dossier. In footnote 8 the FBI stated that the dossier information was compiled pursuant to the direction of a law firm who had hired an "identified U.S. person"—now known as Glenn Simpson of Fusion GPS—"to conduct research regarding [Trump's] ties to Russia." The FBI further "speculate[d]" that Mr. Simpson "was likely looking for information that could be used to discredit [Trump's] campaign." The application failed to disclose that the identities of Mr. Simpson's ultimate clients were the Clinton campaign and the DNC.

████ he FBI stated to the FISC that "based on [Steele's] previous reporting history with the FBI, whereby [Steele] provided reliable information to the FBI, the FBI believes [Steele's] reporting to be credible." In short, it appears the FBI relied on admittedly uncorroborated information, funded by and obtained for Secretary Clinton's presidential campaign, in order to conduct surveillance of an associate of the opposing presidential candidate. It did so based on Mr. Steele's personal credibility and presumably having faith in his process of obtaining the information.

(U) But there is substantial evidence suggesting that Mr. Steele materially misled the FBI about a key aspect of his dossier efforts, one which bears on his credibility.

█████ In the October 2016 FISA application, and in each of the three renewals, after relaying Steele's dossier allegations against Carter Page, the FBI states: **"[Steele] told the FBI that he/she only provided this information to the business associate [Fusion GPS] and the FBI."**[7] (emphasis added). Indeed, the FISA renewal application in January 2017 notes that Steele had received ████████████████████████████
████████

████████ Yet the FISA applications note the existence of a news article dated September 23, 2016, which in particular contained some of the same dossier information about Mr. Page compiled by Mr. Steele and on which the FBI relied in its application. While not explicitly stated, this is presumably the article by Michael Isikoff of *Yahoo News*, titled "U.S. Intel Officials Probe Ties Between Trump Adviser and Kremlin." After noting that Mr. Steele had claimed to the FBI he had only provided this information to the FBI and Mr. Simpson, the application attempts to explain away the inconsistency between Mr. Steele's assertion to the FBI and the existence of the article, apparently to shield Mr. Steele's credibility on which it still relied for the renewal request. The application to the FISC said: "Given that the information contained in the September 23rd news article generally matches the information about Page that [Steele] discovered doing his/her research. ████████████ ████

█████ The FBI has failed to provide the Committee the 1023s documenting all of Mr. Steele's statements to the FBI, so the Committee is relying on the accuracy of the FBI's representation to the FISC regarding those statements.

████████

3

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

*The FBI does not believe* that [Steele] directly provided this information to the press" (emphasis added).

In footnote 9 of its January 2017 application to renew the FISA warrant for Mr. Page, the FBI again addressed Mr. Steele's credibility. At that time, the FBI noted that it had suspended its relationship with Mr. Steele in October 2016 because of Steele's "unauthorized disclosure of information to the press." The FBI relayed that Steele had been bothered by the FBI's notification to Congress in October 2016 about the reopening of the Clinton investigation, and as a result "[Steele] independently and against the prior admonishment from the FBI to speak only with the FBI on this matter, released the reporting discussed herein [dossier allegations against Page] to an identified news organization." However, the FBI continued to cite to Mr. Steele's past work as evidence of his reliability, and stated that "the incident that led to the FBI suspending its relationship with [Mr. Steele] occurred after [Mr. Steele] provided" the FBI with the dossier information described in the application. The FBI further asserted in footnote 19 that it did not believe that Steele directly gave information to *Yahoo News* that "published the September 23 News Article."

So, as documented in the FISA renewals, the FBI still seemed to believed Mr. Steele's earlier claim that he had only provided the dossier information to the FBI and Fusion—and not to the media—prior to his October media contact that resulted in the FBI suspending the relationship. Accordingly, the FBI still deemed the information he provided prior to the October disclosure to be reliable. After all, the FBI already believed Mr. Steele was reliable, he had previously told the FBI he had not shared the information with the press – and lying to the FBI is a crime. In defending Mr. Steele's credibility to the FISC, the FBI had posited an innocuous explanation for the September 23 article, based on the assumption that Mr. Steele had told the FBI the truth about his press contacts. The FBI then vouched for him twice more, using the same rationale, in subsequent renewal applications filed with the Foreign Intelligence Surveillance Court in April and June 2017.

(U) However, public reports, court filings, and information obtained by the Committee during witness interviews in the course of its ongoing investigation indicate that Mr. Steele not only provided dossier information to the FBI, but also to numerous media organizations prior to the end of his relationship with the FBI in October 2016.[5]

(U) In Steele's sworn court filings in litigation in London, he admitted that he "gave off the record briefings to a small number of journalists about the pre-election memoranda [i.e., the dossier] in late summer/autumn 2016."[6] In another sworn filing in that case, Mr. Steele further

---

[5] (U) *See* Steele Statement 1; Defendants' Response to Claimants' Request for Further Information Pursuant to CPR Part 18, *Gubarev et. Al v. Orbis Business Intelligence Limited and Christopher Steele*, Claim No. HQ17D00413, Queen's Bench (May 18, 2017), [Hereinafter "Steele Statement 2"] [Attachment B]; Tom Hamburger and Rosalind S. Helderman, *FBI Once Planned to Pay Former British Spy who Authored Controversial Trump Dossier*, THE WASHINGTON POST (Feb. 28, 2017); Simpson Transcript, on File with Sen. Comm. on the Judiciary.
[6] (U) Steele Statement 1 at para. 32.

4

TOP SECRET// //NOFORN

stated that journalists from "the New York Times, the Washington Post, Yahoo News, the New Yorker, and CNN" were "briefed at the end of September 2016 *by [Steele]* and Fusion at Fusion's instruction."[10] The filing further states that Mr. Steele "subsequently participated in further meetings at Fusion's instruction with Fusion and the New York Times, the Washington Post, and Yahoo News, which took place mid-October 2016."[11] According to these court filings, "[t]he briefings involved the disclosure of limited intelligence regarding indications of Russian interference in the US election process and the possible co-ordination of members of Trump's campaign team and Russian government officials."[12] In his interview with the Committee, Glenn Simpson of Fusion GPS confirmed this account by Mr. Steele and his company as filed in the British court.[12]

▇▇▇ he first of these filings was publicly reported in the U.S. media in April of 2017, yet the FBI did not subsequently disclose to the FISC this evidence suggesting that Mr. Steele had lied to the FBI. Instead the application still relied primarily on his credibility prior to the October media incident.

▇▇▇ The FBI received similar information from a Justice Department official, Bruce Ohr, who maintained contacts with Mr. Simpson and Mr. Steele about their dossier work, and whose wife also worked for Fusion GPS on the Russia project. In an interview with the FBI on November 22, 2016, Mr. Ohr stated that Mr. Simpson gave the ▇▇▇



He also noted in the same interview that Mr. Steele was "desperate" to see that Mr. Trump was not elected president.[14] None of the information provided by Mr. Ohr in his interviews with the FBI was included in the FISA renewal applications, despite its relevance to whether Mr. Steele had lied to the FBI about his contacts with the media as well as its broader relevance to his credibility and his stated political motive.

---

[10] (U) Steele Statement 2 at para. 18. (emphasis added).
▇▇▇ *Id.* The filing also apparently described the media contact that resulted in the FBI's suspension of its relationship with Mr. Steele, stating: "In addition, and again at Fusion's instruction, in late October 2016 the Second Defendant briefed a journalist from Mother Jones by Skype."
[12] (U) *Id.*
[13] (U) Simpson Transcript, On File with the Sen. Comm. on the Judiciary at 205-07.
Ohr FD-302 (Nov. 22, 2016).
Ohr FD-302 (Dec. 12, 2016)
Ohr FD-302 (Nov. 22, 2016).

5

TOP SECRET// //NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//███████████                          //NOFORN//███

████████████

██████ Whether Mr. Steele lied to the FBI about his media contacts is relevant for at least two reasons. First, it is relevant to his credibility as a source, particularly given the lack of corroboration for his claims, at least at the time they were included in the FISA applications. Second, it is relevant to the reliability of his information-gathering efforts.

(U) Mr. Steele conducted his work for Fusion GPS compiling the "pre-election memoranda" "[b]etween June and early November 2016."[17] In the British litigation, Mr. Steele acknowledged briefing journalists about the dossier memoranda "in late summer/autumn 2016."[18] Unsurprisingly, during the summer of 2016, reports of at least some of the dossier allegations began circulating among reporters and people involved in Russian issues.[19] Mr. Steele also admitted in the British litigation to briefing journalists from the *Washington Post*, *Yahoo News*, the *New Yorker*, and *CNN* in September of 2016.[20] Simply put, the more people who contemporaneously knew that Mr. Steele was compiling his dossier, the more likely it was vulnerable to manipulation. In fact, in the British litigation, which involves a post-election dossier memorandum, Mr. Steele admitted that he received and included in it *unsolicited*—and unverified—allegations.[21] That filing implies that he similarly received unsolicited intelligence on these matters prior to the election as well, stating that Mr. Steele "*continued to receive unsolicited intelligence* on the matters covered by the pre-election memoranda after the US Presidential election."[22]

████████████                          ██████

(U) One memorandum by Mr. Steele that was not published by *Buzzfeed* is dated October 19, 2016. The report alleges a ██████████████████ as well as ████████ ████████ Mr. Steele's memorandum states that his company "received this report from Jon ██████ US State Department," that the report was the second in a series, and that the report was information that came from a foreign sub-source who "is in touch with ███████ a contact of ████████████ a friend of the Clintons, who passed it to ██████ It is troubling enough that the Clinton Campaign funded Mr. Steele's work, but that these Clinton associates were contemporaneously feeding Mr. Steele allegations raises additional concerns about his credibility.

---

[17] (U) Steele Statement 1 at para. 9.

[18] (U) Steele Statement 1 at para. 32

[19] (U) Ahkmetshin Transcript, On File with the Sen. Comm. on the Judiciary (Mr. Ahkmetshin informed the Committee that he began hearing from journalists about the dossier before it was published, and though it was the summer of 2016).

[20] (U) Steele Statement 2 at para. 18 (emphasis added).

[21] (U) Steele Statement 1 at para. 18 and 20c.

[22] (U) *Id*; *see* Steele Statement 2 at 4 ("Such intelligence was not actively sought, it was merely received.")

████████████

6

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ▮▮▮▮▮▮▮▮▮▮▮▮ /NOFORN

▮▮▮▮▮▮ Mr. Steele then apparently passed this report to the FBI.

▮▮▮▮▮▮ Simply put, Mr. Steele told the FBI he had not shared the Carter Page dossier information beyond his client and the FBI. The Department repeated that claim to the FISC. Yet Mr. Steele acknowledged in sworn filings that he did brief *Yahoo News* and other media organizations about the dossier around the time of the publication of the *Yahoo News* article that seems to be based on the dossier.

(U) On September 23, 2016, *Yahoo News* published its article entitled "U.S. Intel Officials Probe Ties Between Trump Adviser and Kremlin."[23] That article described claims about meetings between Carter Page and Russians, including Igor Sechin. Mr. Sechin is described in the article as "a longtime Putin associate and former Russian deputy prime minister" under sanction by the Treasury Department in response to Russia's actions in the Ukraine.[24] The article attributes the information to "a well-placed Western intelligence source," who reportedly said that "[a]t their alleged meeting, Sechin raised the issue of the lifting of sanctions with Page."[25] This information also appears in multiple "memoranda" that make up the dossier.[26]

(U) In sum, around the same time *Yahoo News* published its article containing dossier information about Carter Page, *Mr. Steele and* Fusion GPS had briefed *Yahoo News* and other news outlets about information contained in the dossier.

▮▮▮▮▮▮ These facts appear to directly contradict the FBI's assertions in its initial application for the Page FISA warrant, as well as subsequent renewal applications. The FBI repeatedly represented to the court that Mr. Steele told the FBI he did *not* have unauthorized contacts with the press about the dossier prior to October 2016. The FISA applications make these claims specifically in the context of the September 2016 *Yahoo News* article. But Mr. Steele has admitted—publicly before a court of law—that he *did* have such contacts with the press at this time, and his former business partner Mr. Simpson has confirmed it to the Committee. Thus, the FISA applications are either materially false in claiming that Mr. Steele said he did not provide dossier information to the press prior to October 2016, or Mr. Steele made materially false statements to the FBI when he claimed he only provided the dossier information to his business partner and the FBI.

▮▮▮▮▮▮ In this case, Mr. Steele's apparent deception seems to have posed significant, material consequences on the FBI's investigative decisions and representations to the court. Mr. Steele's information formed a significant portion of the FBI's warrant application, and the FISA application relied more heavily on Steele's credibility than on any independent verification or corroboration for his claims. Thus the basis for the warrant authorizing surveillance on a U.S. citizen rests largely on Mr. Steele's credibility. The Department of Justice has a responsibility to

[23] (U) Michael Isikoff, *U.S. Intel Officials Probe Ties Between Trump Adviser and Kremlin*, YAHOO NEWS (Sept. 23, 2016).
[24] (U) *Id.*
[25] (U) *Id.*
[26] (U) Bensinger et. al, BUZZFEED.

7

TOP SECRET// ▮▮▮▮▮▮▮▮▮▮ /NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ███████████████ N//NOFORN

███████████████

determine whether Mr. Steele provided false information to the FBI and whether the FBI's representations to the court were in error.

(U) Accordingly, we are referring Christopher Steele to the Department of Justice for investigation of potential violation(s) of 18 U.S.C. § 1001.

███████████████

8

TOP SECRET// ███████████████ //NOFORN ███

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

UNCLASSIFIED ATTACHMENT A

TOP SECRET// ████████                                    //NOFORN█

IN THE HIGH COURT OF JUSTICE                              Claim No. HQ17000413

QUEEN'S BENCH DIVISION
                                                        – 4 APR 2017
BETWEEN:-

                        (1) ALEKSEJ GUBAREV
                         (2) WEBZILLA B.V.
                        (3) WEBZILLA LIMITED
                        (4) XBT HOLDINGS S.A.

                                                            Claimants

                            -and-

                (1) ORBIS BUSINESS INTELLIGENCE LIMITED
                    (2) CHRISTOPHER STEELE

                                                            Defendants

----

### DEFENCE

----

References in this Defence are to paragraphs in the Particulars of Claim unless otherwise stated.

#### Introduction

1. Save that it is admitted that the Second and Third Claimants are hosting infrastructure companies based in the Netherlands and Cyprus respectively, no admissions are made as to paragraphs 1 and 2.

2. Paragraphs 3-5 are admitted.

3. Orbis was founded in 2009 by the Second Defendant and Christopher Burrows.

4. The Second Defendant and Christopher Burrows were formerly senior and experienced Crown servants in the Foreign and Commonwealth Office.

5. Sir Andrew Wood GCMG was the British Ambassador to Moscow between 1995 and 2000. He is an Associate Fellow of the Russia and Eurasia Programme at the Royal Institute for International Affairs at Chatham House. He is also an Associate of Orbis.

1

TOP SECRET// ████████                                    //NOFORN█
PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET/ NOFORN

6. Fusion GPS ("Fusion") is a consultancy based in Washington DC providing research, strategic intelligence and due diligence services to clients.

7. Prior to the events in issue in this case the Defendants had developed a working relationship with Fusion over a number of years.

8. At all material times Fusion was subject to an obligation not to disclose to third parties confidential intelligence material provided to it by the Defendants in the course of that working relationship without the agreement of the Defendants.

The pre-election memoranda

9. Between June and early November 2016 Orbis was engaged by Fusion to prepare a series of confidential memoranda based on intelligence concerning Russian efforts to influence the US Presidential election process and links between Russia and Donald Trump.

10. The Defendants produced sixteen such memoranda. These will be referred to for convenience as "the pre-election memoranda", having been prepared before the 2016 US Presidential election. The last one was produced in the latter part of October 2016. None were produced in November 2016. None of the pre-election memoranda contained any reference to, or intelligence about, the Claimants.

11. As an Associate of Orbis, Sir Andrew Wood was aware of the Second Defendant's intelligence gathering for the pre-election memoranda.

Senator John McCain

12. Senator John McCain is the Chair of the US Senate Armed Services Committee and a member of the US Senate Committee on Homeland Security and Governmental Affairs.

13. David Kramer is a former US State Department civil servant and was US Assistant Secretary of State for Democracy, Human Rights, and Labor from 2008 to 2009. He is the Senior Director for Human Rights and Human Freedoms at Senator McCain's Institute for International Leadership.

14. After the election of Donald Trump as the 45th President of the United States on 8 November 2016, Sir Andrew Wood met Mr Kramer and Senator McCain. As a result of their discussions Sir Andrew arranged for the Second Defendant to meet Mr Kramer, as the representative of Senator McCain, in order to show him the pre-election memoranda on a confidential basis.

2

TOP SECRET/ NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// //NOFORN

15. The meeting between the Second Defendant and Mr Kramer took place on 28 November 2016 in Surrey. Mr Kramer told the Second Defendant that the intelligence he had gathered raised issues of potential national security importance.

16. An arrangement was then made upon Mr Kramer's return to Washington for Fusion to provide Sen. McCain with hard copies of the pre-election memoranda on a confidential basis via Mr Kramer.

17. On behalf of Sen McCain, Mr Kramer requested to be provided with any further intelligence gathered by the Defendants about alleged Russian interference in the US Presidential election.

The confidential December memorandum

18. The Defendants continued to receive unsolicited intelligence on the matters covered by the pre-election memoranda after the US Presidential election and the conclusion of the assignment for Fusion.

19. After receiving some such intelligence the Second Defendant prepared the confidential December memorandum, referred to at paragraph 8.1, on his own initiative on or around 13 December 2016.

20. The Defendants considered, correctly, that the raw intelligence in the December memorandum:

    a. was of considerable importance in relation to alleged Russian interference in the US Presidential election;

    b. had implications for the national security of the US and the UK; and

    c. needed to be analysed and further investigated/verified.

21. Accordingly the Second Defendant provided a copy of the December memorandum to:

    a. A senior UK government national security official acting in his official capacity, on a confidential basis in hard copy form; and

    b. Fusion, by enciphered email with an instruction to Fusion to provide a hard copy to Sen. McCain via Mr Kramer.

Liability for the publication complained of

22. Save that it is admitted that the words complained of and set out therein were contained in the confidential December memorandum, paragraph 8 is denied.

3

TOP SECRET// //NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//                                           NOFORN

23. It is denied that in their natural and ordinary meaning, in their proper context, the words complained of bore or were capable of bearing the meaning pleaded at paragraph 7.

24. Read in context the natural and ordinary meaning of the words complained of was that there were grounds to investigate whether the Claimants had been coerced by Russia into hacking the computers used by the US Democratic Party leadership, transmitting viruses, planting bugs, stealing data and conducting altering operations.

25. Save insofar as it is admitted above paragraph 8.1 is denied.

26. The first sentence of paragraph 8.2 is noted. This is understandable. The contents of the December memorandum were highly sensitive and the Defendants only disseminated copies of it in strict confidence as aforesaid.

27. The remainder of paragraph 8 2 is, in the premises, denied in its entirety.

28. Sub-paragraphs 8.2.1, 8.2.2 and 8.2.4 are admitted.

29. As to sub-paragraph 8.2.3:

    a. In so far as this sub-paragraph refers to the pre-election memoranda:

        i. The first sentence is too vague for the Defendants to plead to in any meaningful way;

        ii. The second sentence is denied;

    b. In so far as it refers to the confidential December memorandum:

        i. The first sentence is again too vague for the Defendants to plead to in any meaningful way. The December memorandum was provided to the recipients identified above so that that the information in it was known to the United States and United Kingdom governments at a high level by persons with responsibility for national security;

        ii. The second sentence is denied.

30. The first sentence of sub-paragraph 8.2.5 is noted. The Defendants did not, however, provide any of the pre-election memoranda to media organizations or journalists. Nor did they authorize anyone to do so. Nor did they provide the confidential December memorandum to media organizations or journalists. Nor did they authorize anyone to do so.

31. The second sentence of sub-paragraph 8.2.5 is denied.

4

TOP SECRET//　　　　　　　　　　　　　　　　　　　/NOFORN/

32. Save that it is admitted that the Second Defendant gave off the record briefings to a small number of journalists about the pre-election memoranda in late summer/autumn 2016, sub-paragraph 8.2.6 is denied.

33. Paragraph 8.3 is admitted but liability for such publication resides with BuzzFeed.

34. No admissions are made as to paragraph 8.4.

35. Paragraph 8.5 is denied. The Defendants are not liable for publication by BuzzFeed.

Qualified privilege

36. Further or in the alternative, the confidential December memorandum was published by the Defendants, as pleaded at paragraph 21 above, in good faith, on an occasion of qualified privilege.

37. In the circumstances set out above the Defendants were under a duty to pass the information in the December memorandum to the senior UK government national security official and Sen. McCain so that it was known to the United Kingdom and United States governments at a high level by persons with responsibility for national security. These recipients had a corresponding duty or interest to receive it in their capacities as senior representatives of those governments with such responsibilities.

38. The incidental publications to Fusion and Mr Kramer were reasonable as a means of bringing this sensitive document securely to the attention of Sen. McCain.

39. The Defendants did not publish the December memorandum to any of the said recipients with the intention it should be republished to the world at large nor did they ask any of them to republish the December memorandum to others. If any of the recipients did so with the result that it was published to the world at large the Defendants, in the circumstances, retain the protection of qualified privilege.

Harm

40. In relation to paragraph 9, it is admitted that publication of the words complained of by BuzzFeed (or any subsequent internet republication of those words by third parties) was likely to cause serious harm to the reputation of the First Claimant. Save as aforesaid, paragraph 9 is not admitted. In particular, it is not admitted that the publication of the words complained of by BuzzFeed (or any such subsequent republication) has caused serious financial loss to any of the Claimants or that it is likely to do so in future. The Claimants are required to prove the existence and extent of any past financial loss and/or any likely future financial loss caused by the publication of the words complained of.

5

41. Paragraph 10 is noted. It is not admitted that the law of each of the jurisdictions in the European Union in which the words complained of were published was and is, so far as material, the same as the law of England and Wales.

42. In relation to paragraph 11:

    a. Paragraphs 23 and 24 above are repeated and sub-paragraph 11.1 is denied;

    b. Sub-paragraph 11.2 is admitted but it is denied that the Defendants published or caused the publication of the words complained of extremely widely;

    c. Sub-paragraph 11.3 is not admitted;

43. The first sentence of paragraph 12 is not admitted.

44. In relation to the second sentence of paragraph 12, it is denied that the Claimants are entitled to claim damages, whether aggravated or otherwise, against the Defendants as opposed to BuzzFeed.

45. In relation to paragraphs 12.1 and 12.2, it is admitted that the Defendants did not contact the Claimants prior to the publication of the words complained of by BuzzFeed. In light of the matters pleaded above the Defendants had no reason to contact the Claimants in relation to the publication of the December memorandum by BuzzFeed.

46. Paragraph 12.3 is denied. The First, Second and Third Claimants sent a letter before action to the Defendants on 23 January 2017. The Defendants acknowledged receipt of the letter before action through a letter from their former solicitors, Schillings, on 30 January 2017. The Defendants then provided a detailed response to the letter before action four days later on 3 February 2017. The Defendants pointed out that the Claimants' letter before action did not meet the requirements contained in the Pre-Action Protocol for Defamation. In particular the letter before action:

    a. stated that McDermott Will & Emery were instructed by "affiliates" of the Second and Third Defendants, but did not provide the names or any details of those "affiliates". Nor did it state whether McDermott Will & Emery were instructed by the Fourth Claimant;

    b. did not identify the particular publication(s) that were the subject of the prospective claim, contrary to paragraph 3.2 of the Pre-Action Protocol for Defamation;

    c. did not identify the meaning that the First to Third Claimants attributed to the words complained of, contrary to paragraph 3.3 of the Pre-Action Protocol for Defamation.

The Defendants therefore requested the Claimants to provide the necessary information in order to enable the Defendants to provide a full response to the

6

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// /NOFORN

proposed claim Notwithstanding the fact that the Defendants provided a detailed response to the Claimants' letter before action within 11 days of that letter being sent, and notwithstanding the numerous deficiencies in the letter before action, on 3 February 2017 the Claimants issued and served proceedings on the Defendants. In the circumstances, the Claimants' decision to issue proceedings less than two weeks after the letter before action was precipitous, incompatible with the overriding objective in the Civil Procedure Rules, and breached the requirements of the Pre-action Protocol for Defamation.

47. It is denied that the Claimants are entitled to an injunction against the Defendants as pleaded in paragraph 13 of the Particulars of Claim or at all.

**GAVIN MILLAR Q.C.**

**EDWARD CRAVEN**

**STATEMENT OF TRUTH**

The Defendants believe that the facts set out in these Particulars of Claim are true.

Signed:

Christopher Steele

Position:     Director, Orbis Business Intelligence Ltd

Date:         03 April 2017

7

TRH23475964 v1

TOP SECRET// /NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// /NOFORN

UNCLASSIFIED ATTACHMENT B

TOP SECRET//                                                    //NOFORN//

IN THE HIGH COURT OF JUSTICE                    Claim no. HQ17D00413
QUEEN'S BENCH DIVISION

BETWEEN

                        (1) ALEKSEJ GUBAREV
                        (2) WEBZILLA B.V.
                        (3) WEBZILLA LIMITED
                        (4) XBT HOLDING S.A
                                                        Claimants

                            and

                (1) ORBIS BUSINESS INTELLIGENCE LIMITED
                    (2) CHRISTOPHER STEELE
                                                        Defendants

         DEFENDANTS' RESPONSE TO CLAIMANTS' REQUEST FOR FURTHER
                INFORMATION PURSUANT TO CPR PART 18

Under paragraphs 7 and 8

Of: "At all material times Fusion was subject to an obligation not to disclose to third
parties confidential intelligence material provided to it by the Defendants in the course
of that working relationship without the agreement of the Defendants."

**REQUESTS**

1. Whether the alleged duty of confidentiality is said to arise by contract or in
   equity.

2. If by contract, state whether the duty arose under (a) a general contract of
   retainer, or (b) specific contracts relating to the specific work.

3. In either event state whether any contract(s) relied on were written or oral; if
   oral, stating when and between whom they were made.

**RESPONSE**

     The duty arose both by contract and in equity. A written non-disclosure
     agreement was concluded between the First Defendant and a representative of
     Fusion in January 2010 in relation to work conducted by Fusion for the First
     Defendant. Furthermore, Fusion was aware of the confidentiality of intelligence
     reports through the course of business with the Defendants and, in relation to
     the disclosure of the memoranda to Mr Kramer, the Second Defendant and
     Fusion had had specific discussions in which the confidentiality of the
     memoranda had been emphasised and Fusion was instructed to inform Mr
     Kramer of their confidentiality.

**REQUEST**

                                - 1 -                            RPC

TOP SECRET//                                                    //NOFORN//

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// /NOFORN

4. State whether the alleged duty not to disclose such intelligence to third parties' without the prior agreement of the Defendants in the course of the working relationship extended to disclosure by Fusion to their own clients (ie the clients who had commissioned the intelligence material: see paragraph 5 of the Defence).

**RESPONSE**

In relation to the pre-election memoranda the duty not to disclose intelligence to third parties without the prior agreement of the Defendants did not extend to disclosure by Fusion to its client(s), although the Defendants understand that copies of the memoranda were not disclosed by Fusion to its client(s).

In relation to the December memorandum, this was not prepared pursuant to any contract as stated at paragraph 13 of the Defence. The duty not to disclose this intelligence report to third parties without the prior agreement of the Defendants therefore did extend to disclosure by Fusion to its client(s).

**REQUEST**

5. State whether the Defendants owed any reciprocal duty of confidence to Fusion and/or Fusion's clients in relation to the intelligence they provided.

**RESPONSE**

Since it was not produced pursuant to the engagement with Fusion described at paragraph 9 of the Defence, the Defendants did not owe any obligation of confidence to Fusion and/or Fusion's client(s) in relation to the intelligence contained in the December memorandum.

**REQUEST**

6. State whether Fusion's clients, insofar as disclosure to them was permitted (see Request 4), were under any duty to the Defendants and/or Fusion not to (a) use and/or (b) disclose the intelligence, and, if so, give like particulars as to how that duty is alleged to arise.

**RESPONSE**

The response to question 4 above is repeated. The Defendants understood that the arrangement between Fusion and its client(s) was that intelligence would not be disclosed. As explained above, the December memorandum was not produced pursuant to the engagement referred to at paragraph 9 of the Defence and therefore disclosure of the December memorandum to their client(s) was not permitted.

**Under paragraphs 9 and 10**

Of "Between June and early November 2016 Orbis was engaged by Fusion to prepare a series of confidential memoranda based on intelligence concerning Russian efforts to influence the US Presidential election process and links between Russia and Donald Trump".

**REQUEST**

- 2 -                                                                                    RPC

TOP SECRET// /NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

7. Please identify (see paragraph 6 of the Defence) Fusion's client(s) in relation to this particular engagement.

## RESPONSE

This request is neither reasonably necessary nor proportionate to enable the Claimants to prepare their own case nor to understand the case they have to meet.

Of *"The Defendants produced sixteen such memoranda. These will be referred to for convenience as 'the pre-election memoranda', having been prepared before the 2016 US Presidential election. The last one was produced in the latter part of October 2016. None were produced in November 2016. None of the pre-election memoranda contained any reference to, or intelligence about, the Claimants".*

## REQUEST

8. In view of the assertion that no memoranda were produced in November 2016, please state the nature of the engagement in early November 2016 as referred to in paragraph 9, and whether this engagement was performed and what intelligence it related to.

## RESPONSE

The nature of the Defendants' engagement by Fusion did not change during the period between the preparation of the last pre-election memorandum on 20 October 2016 and the date of the US Presidential election. However since the Defendants did not receive any relevant intelligence concerning Russian efforts to influence the US Presidential election process and links between Russia and Donald Trump during this period, no memoranda were produced pursuant to the engagement after 20 October 2016.

## Under paragraphs 12 and 13

Of *"Senator John McCain is the Chair of the US Senate Armed Services Committee and a member of the Us Senate Committee on Homeland Security and Governmental Affairs"* and *"David Kramer is a former US State Department civil servant and was US Assistant Secretary of State for Democracy, Human Rights, and Labor from 2008 to 2009. He is the Senior Director for Human Rights and Human Freedoms at Senator McCain's Institute for International Leadership".*

## REQUEST

9. Please confirm (as paragraph 29b(i) of the Defence suggests) that Senator McCain and Mr Kramer are alleged (a) to have been acting in those official capacities; and (b) only in relation to those capacities in the course of the matters pleaded in paragraphs 14 to 17 and 21b; and, if not, identify any other capacity in which they were acting and when and for what purpose(s).

## RESPONSE

· 3 ·                                    RPC

TOP SECRET// NOFORN

The Defendants believed that Senator McCain and Mr Kramer were acting only in their official capacities and were not informed of any other capacity or purpose in which they were acting. There were no grounds that led the Defendants to suspect that Senator McCain and Mr Kramer were not acting in their official capacities at any time up to and including the publication of the December memorandum to Mr Kramer.

### Under paragraph 14

Of "As a result of these discussions Sir Andrew arranged for the Second Defendant to meet Mr Kramer, as the representative of Senator McCain, in order to show him the pre-election memoranda on a confidential basis".

### REQUEST

10. State what is meant by 'on a confidential basis', indicating precisely what use or uses Senator McCain was/were permitted to make of the pre-election memoranda and whether these uses were specified to Senator McCain and Mr Kramer.

### RESPONSE

The Defendants understood that the contents of the memoranda would be treated in the strictest confidence and would only be used by Senator McCain in his official capacity for the sole purpose of analysing, investigating and verifying their contents to enable such action to be taken as necessary for the purposes of protecting US national security. The Second Defendant expressly informed Mr Kramer that the pre-election memoranda were only to be used for this exclusive purpose before he showed Mr Kramer any of the memoranda. Mr Kramer was not at this time provided with copies of the memoranda that had been prepared as at that date, but was shown copies.

### Under paragraph 18

Of "The Defendants continued to receive unsolicited intelligence on the matters covered by the pre-election memoranda after the US Presidential election and the conclusion of the assignment for Fusion".

### REQUEST

11. Please state whether such intelligence was actively sought by the Second Defendant or merely received (as presently pleaded).

### RESPONSE

Such intelligence was not actively sought; it was merely received.

### Under paragraph 19

- 8 -                                                                 RPC

TOP SECRET// NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

178

Of "After receiving some such intelligence the Second Defendant prepared the confidential December memorandum, referred to at paragraph 8.1, on his own initiative on or around 13 December 2016".

### REQUEST

12. Please state whether the words 'on his own initiative' mean that the December memorandum was not (a) created; or (b) provided to Fusion pursuant to any contract. If not, please specify the contract in question.

### RESPONSE

The December memorandum was not created or provided to Fusion pursuant to any contract.

Under paragraph 20

Of "The Defendants considered, correctly, that the raw intelligence in the December memorandum: a. was of considerable importance in relation to alleged Russian interference in the US Presidential election; b. had implications for the national security of the US and the UK; and c. needed to be analysed and further investigated/verified".

### REQUEST

13. Please state whether the Second Defendant only reached this conclusion on behalf of the First Defendant or whether Christopher Burrows and/or Sir Andrew were party to his assessment.

### RESPONSE

The Defendants' assessment that the pre-election memoranda and any subsequent related intelligence which they received should be disclosed to the individuals referred to at paragraph 21 of the Defence was reached following separate discussions between the Second Defendant and (i) Christopher Burrows of the First Defendant; (ii) Sir Andrew Wood (who had spoken with Senator McCain); (iii) David Kramer (who was acting on behalf of Senator McCain) and (iv) the UK national security official referred to at paragraph 21(b) of the Defence. Mr Burrows shared the Second Defendant's assessment at the relevant time. The Defendants considered that the issues were self-evidently relevant to the national security of the US, UK and their allies and that subsequent intelligence relating to these issues ought to be disclosed to the individuals referred to at paragraph 21 of the Defence. Each of the individuals with whom the Second Defendant discussed the issue shared this view at the time and, to the Second Defendant's knowledge and belief, continue to hold that view.

- 3 -

RFC

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// NOFORN

**Under paragraph 20c and 21**

**REQUEST**

14. Please state whether the December memorandum was provided to (a) the UK national security official; and/or (b) Fusion; and/or (c) Mr Kramer and Senator McCain with the source of the allegations against the Claimants redacted or not.

**RESPONSE**

Information pertaining to the status of the source(s) of the intelligence contained within the December memorandum was not redacted when it was provided to either the UK national security official and/or Fusion and/or Mr Kramer and Senator McCain. The information contained within the intelligence reports pertaining to the status of the source(s) was consistent with the Defendants' conscious efforts to protect the identity of the source(s).

**REQUEST**

15. Please state whether the instruction to Fusion contained any express reference to confidentiality (contrast paragraph 21a which expressly refers to 'on a confidential basis').

**RESPONSE**

In the Second Defendant's communications with Fusion surrounding the provision of the instruction by enciphered email, it was explicitly stated that the memoranda were only to be provided to Mr Kramer for the purpose of passing them on to Senator McCain. Substantive conversations between the Second Defendant and Fusion relating to this matter were conducted using secure telephone communications. During those secure communications, the Second Defendant expressly emphasised that the December memorandum was subject to the same strict restrictions on disclosure to third parties as were contained in the written agreement described in the response to requests 1 to 3 above.

**Under paragraph 21a and b**

Of "Accordingly the Second Defendant provided a copy of the December memorandum to: a. a senior UK government national security official acting in his official capacity, on a confidential basis in hard copy form; and b. Fusion, by enciphered email with an instruction to Fusion to provide a hard copy to Sen. McCain via Mr Kramer".

**REQUEST**

16. Please state whether intelligence provided by the Defendants to Fusion was generally provided in enciphered form.

- 8 -                                                                                         FPC

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES
180

TOP SECRET/ ███████████████ /NOFORN ███

## RESPONSE

Intelligence provided by the Defendants to Fusion was provided securelyand where provided electronically it was provided in enciphered form.

### Under paragraphs 23 and 24

Of "it is denied that in their natural and ordinary meaning, in their proper context, the words complained of bore or were capable of bearing the meaning pleaded at paragraph 7" and "Read in context the natural and ordinary meaning of the words complained of was that there were grounds to investigate whether the Claimants had been coerced by Russia into hacking the computers used by the US Democratic Party leadorship, transmitting viruses, planting bugs, stealing data and conducting altering operations".

## REQUEST

17. Please identify the context relied on and the reader(s) to whom it was allegedly known.

## RESPONSE

The readers referred to are the readers of the December memorandum who accessed and read the words complained of via the article that was published on the BuzzFeed website on 10 January 2017.

The December memorandum was a raw intelligence report which contained information gathered from a confidential source(s) about various national security issues that warranted further investigation.

Further, the words complained of were published by BuzzFeed as part of an article which stressed that the contents of the dossier (which included the December memorandum) were "unverified", "unconfirmed" and contained "unverified, and potentially unverifiable allegations". The article added that, "BuzzFeed News reporters in the US and Europe have been investigating the alleged facts in the dossier but have not verified or falsified them." The article reported that the President-elect's attorney, Michael Cohen, had said that allegations in the dossier "were absolutely false".

In these circumstances, readers of the words complained of were therefore aware that (i) the contents of the December memorandum did not represent (and did not purport to represent) verified facts, but were raw intelligence which had identified a range of allegations that warranted investigation given their potential national security implications; (ii) persons mentioned in the December memorandum were unlikely to have been approached for comment, and therefore many of those persons were likely to deny the allegations contained in the raw intelligence; and (iii) while the December memorandum was prepared in good faith, its content must be critically viewed in light of the purpose for and circumstances in which the information was collected.

- 7 -

RPC

TOP SECRET/ ███████████████ /NOFORN ███

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



**Under paragraph 32**

Of "Save that it is admitted that the Second Defendant gave off the record briefings to a small number of journalists about the pre-election memoranda in late summer/autumn 2016, sub-paragraph 8.2.6 is denied".

**REQUEST**

18. Please identify the journalists briefed by the Second Defendant and state when and how the briefing was done in each case and the gist of what was conveyed.

**RESPONSE**

The journalists initially briefed at the end of September 2016 by the Second Defendant and Fusion at Fusion's instruction were from the New York Times, the Washington Post, Yahoo News, the New Yorker and CNN. The Second Defendant subsequently participated in further meetings at Fusion's instruction with Fusion and the New York Times, the Washington Post and Yahoo News, which took place in mid-October 2016. In each of those cases the briefing was conducted verbally in person. In addition, and again at Fusion's instruction, in late October 2016 the Second Defendant briefed a journalist from Mother Jones by Skype. No copies of the pre-election memoranda were ever shown or provided to any journalists by, or with the authorisation of, the Defendants. The briefings involved the disclosure of limited intelligence regarding indications of Russian interference in the US election process and the possible co-ordination of members of Trump's campaign team and Russian government officials.

**REQUEST**

19. Please state what is meant by 'off the record' and, in particular whether it means:

(a) The information provided was not to be published (but might be used);

(b) The information might be published but not attributed to the Defendants in any way;

(c) As (b), but the Defendants could be generically described, but not by name.

**RESPONSE**

The Second Defendant understood that the information provided might be used for the purpose of further research, but would not be published or attributed. The Defendants repeat that no off the record briefing ever took place concerning the December memorandum, and no copies of any of the pre-election memoranda or the December memorandum were ever provided to journalists by, or with the authorisation of, the Defendants.

**REQUEST**

20. Please state whether these terms were agreed to by the journalists concerned.

- 8 -                                                                          RPC

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ████████████ /NOFORN ████

### RESPONSE

The Second Defendant was told by Fusion that the terms had been explained to the relevant journalists in advance by them and the Second Defendant reinforced the basis on which he was speaking to each of the journalists he met in person. None of the journalists raised any objection.

Under paragraphs 38 to 39

### REQUEST

21. Please state whether the defence of qualified privilege is relied on by the Defendants if they are held to be liable for publication to the world at large as distinct from the admitted publication to the individuals identified by the Defendants in the Defence.

### RESPONSE

Yes.

### STATEMENT OF TRUTH

The Defendants believe that the facts stated in this Response are true.

Signed:

Nicola Cain

Position:   Legal Director, RPC; Defendants' legal representative

Date:   18 May 2017

- 9 -

RPC

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// /NOFORN

Claim No. HQ17D00413

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION

BETWEEN

(1) ALEKSEJ GUBAREV

(2) WEBZILLA B.V.

(3) WEBZILLA LIMITED

(4) XBT HOLDING S.A.

Claimants

and

(1) ORBIS BUSINESS INTELLIGENCE
LIMITED

(2) CHRISTOPHER STEELE

Defendants

---

**DEFENDANTS' RESPONSE TO
PART 18 REQUEST**

---

RPC
Tower Bridge House
St Katharine's Way
London
E1W 1AA
T: 020 3060 6000

Reference. ORB4.1

Solicitors for the Defendants

TDP:5.372270*.v1

TOP SECRET// /NOFORN

184

TOP SECRET/███████████████████████/NOFORN███████

# (U) Appendix H - Committee Correspondence about FISA Abuses

## Appendix H Table of Contents

| | |
|---|---|
| (U) Letter to Acting Deputy Attorney General Dana Boente (March 8, 2017) | 187 |
| (U) Letter from Acting Assistant Attorney General Samuel R. Ramer (March 17, 2017) | 188 |
| (U) Letter to FBI Director James Comey et al. (March 15, 2017) | 189 |
| (U) Letter from FBI Assistant Director Gregory A. Brower (April 4, 2017) | 191 |
| (U) Letter to Attorney General Jeff Sessions (May 9, 2017) | 192 |
| (U) Letter to Acting Attorney General Mary McCord (May 9, 2017) | 194 |
| (U) Letter from Acting Assistant Attorney General Samuel R. Ramer (July 7, 2017) | 196 |
| (U) Letter to FBI Acting Director Andrew McCabe (May 16, 2017) | 197 |
| (U) Letter from Acting Assistant Attorney General Samuel R. Ramer (July 27, 2017) | 199 |
| (U) Letter to Special Counsel Mueller and FBI Acting Director McCabe (May 17, 2017) | 200 |
| (U) Letter from FBI Acting Director Gregory A. Brower (July 26, 2017) | 202 |
| (U) Letter to Attorney General Jeff Sessions (Sept. 1, 2017) | 204 |
| (U) Letter to FBI Director Christopher Wray (Sept. 1, 2017) | 206 |
| (U) Letter to Attorney General Jeff Sessions (Sept. 5, 2017) | 208 |
| (U) Letter to FBI Director Christopher Wray (Sept. 5, 2017) | 209 |
| (U) Letter to Attorney General Sessions and FBI Director Wray (Sept. 15, 2017) | 210 |
| (U) Letter from Deputy Attorney General Rod J. Rosenstein (Sept. 22, 2017) | 212 |
| (U) Letter to Deputy Attorney General Rod Rosenstein (Sept. 26, 2017) | 213 |
| (U) Letter to Deputy Attorney General Rod Rosenstein (Nov. 2, 2017) | 215 |
| (U) Letter to Deputy Attorney General Rod Rosenstein (Dec. 28, 2017) | 216 |
| (U) Letter to Deputy Attorney General Rod Rosenstein (Jan. 4, 2018) | 218 |
| (U) Letter to Former FBI Director James Comey (Nov. 8, 2017) | 220 |
| (U) Letter from Former FBI Director James Comey (Feb. 1, 2018) | 222 |
| (U) Letter to Deputy Attorney General Rod Rosenstein (Dec. 6, 2017) | 223 |

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

## (U) Appendix H (Cont.)

(U) Letter from Assistant Attorney General Stephen E. Boyd (March 14, 2018)               225

(U) Letter to Deputy Attorney General Rod Rosenstein (Dec. 12, 2017)                       227

(U) Letter from Assistant Attorney General Stephen E. Boyd (Dec. 12, 2017)                 228

(U) Letter from Assistant Attorney General Stephen E. Boyd (Jan. 19, 2018)                 230

(U) Letter to Deputy Attorney General Rosenstein and FBI Director Wray (Jan. 25, 2018)     233

(U) Letter from FBI Assistant Director Gregory A. Brower (Feb. 2, 2018)                     235

(U) Letter to Assistant Attorney General Stephen E. Boyd (Feb. 16, 2018)                   236

(U) Letter from Assistant Attorney General Stephen E. Boyd (March 7, 2018)                 237

(U) Letter to Former FBI Director James Comey (Feb. 20, 2018)                              238

(U) Letter to FBI Deputy Director Andrew McCabe (Feb. 20, 2018)                            240

(U) Letter to Attorney General Jeff Sessions (March 1, 2018)                               242

TOP SECRET// NOFORN

UNCLASSIFIED

**U.S. HOUSE OF REPRESENTATIVES**
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC 304 The Capitol
Washington, DC 20515
(202) 225-4121

March 8, 2017

The Honorable Dana Boente
Acting Deputy Attorney General
United States Department of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530

Dear Acting Deputy Attorney General Boente,

The House Permanent Select Committee on Intelligence (the Committee) is aware of recent media reports indicating the possible existence of Foreign Intelligence Surveillance Act (FISA) applications submitted by the Department of Justice (DoJ) in 2016, and/or Foreign Intelligence Surveillance Court (FISC) orders or criminal warrants pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 that may have authorized the collection of communications and/or information regarding Presidential candidate Donald J. Trump or his associates in 2016.

For the purposes of this letter, "associates" includes any Trump campaign surrogates, advisors, or employees; any Trump Organization surrogates, advisors, or employees; and family, friends, and business associates of Mr. Trump.

Accordingly, the Committee requests the following information, if it exists:

1. Any and all copies of any FISA applications submitted to the FISC by the DoJ in 2016 regarding then Presidential candidate Donald J. Trump or his associates.

2. Any and all copies of any orders issued by the FISC in 2016 regarding then Presidential candidate Donald J. Trump or his associates.

3. Any and all copies of any warrant issued by a Federal Judge or Magistrate pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 in 2016 regarding then Presidential candidate Donald J. Trump or his associates.

We seek copies of the foregoing documents, if they exist, no later than March 13, 2017.

Sincerely,

Devin Nunes
Chairman

Adam Schiff
Ranking Member

Copy to: The Honorable James Comey, Director, Federal Bureau of Investigation

UNCLASSIFIED

TOP SECRET// NOFORN

▌▌▌▌▌▌ ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌



**U.S. Department of Justice**

Office of Legislative Affairs

---

Office of the Assistant Attorney General                *Washington, D.C. 20530*

March 17, 2017

The Honorable Devin Nunes
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC  20515

The Honorable Adam B. Schiff
Ranking Member
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC  20515

Dear Chairman Nunes and Congressman Schiff:

Enclosed please find classified documents responsive to your request, which we are providing for review only by each of you and for return to us today.  In addition, pursuant to our agreement, one staff member for each of you, who has the requisite clearances, also may review the materials. In the event that either of you is not available today to review these materials, you may designate one staff member with the requisite clearances to review them in your stead.  An attorney from this office will remain with the documents at all times and return with them to the Department today.

We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Samuel R. Ramer
Acting Assistant Attorney General

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//

Devin Nunes, California, Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
Ranking Member

James A. Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

UNCLASSIFIED

## U.S. HOUSE OF REPRESENTATIVES
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Michael Bahar
Minority Staff Director

March 15, 2017

The Honorable Admiral Michael Rogers
Director, National Security Agency
Fort Meade, MD 20755

The Honorable James Comey
Director, Federal Bureau of Investigation
Washington, D.C. 20535

The Honorable Mike Pompeo
Director, Central Intelligence Agency
Washington, D.C. 20505

Dear Directors Rogers, Comey, and Pompeo:

As you know, the Committee has been very concerned regarding the purported unauthorized disclosures of classified information, particularly when they pertain to intelligence collection on, or related to, U.S. persons (USP). To take a prominent example, a January 12, 2017 article in a major newspaper was the first to claim that "Retired Lt. Gen. Michael T. Flynn, [then President-Elect] Trump's choice for national security adviser . . . . phoned Russian Ambassador Sergey Kislyak several times on Dec. 29."

Such stories would appear to contain the unauthorized disclosure of USP identities. This potential misuse is a key reason why the Intelligence Community (IC) has developed robust "minimization procedures" for the protection of USP information, including requiring the "masking" of USP identities in most circumstances.

However, as recent news stories seem to illustrate, individuals talking to the media would appear to have wantonly disregarded these procedures. The Committee is concerned that USP identifiable information may have been mishandled in violation of approved minimization and dissemination procedures pursuant to statute and/or Executive Order 12333, as amended. Therefore, no later than **Friday, March 17, 2017**, each of your agencies should provide the Committee with the following:

UNCLASSIFIED

TOP SECRET//

UNCLASSIFIED

1. All specific policies and/or procedures each agency employs to make a determination to unmask and disseminate the identity of a USP; specifically, the Committee requests the approval process required to authorize such a dissemination within and outside the agency, including the number of individuals who can approve an unmasking in each agency;

2. The total number of disseminations of any unmasked USP identities between June 2016 and January 2017, if they exist;

3. If they exist, the names of any unmasked USPs whose identities were disseminated in response to requests from IC agencies, law enforcement, or senior Executive Branch officials between June 2016 and January 2017, and that relate to Presidential candidates Donald J. Trump and Hillary Rodham Clinton and their associates in 2016;[1]

4. If they exist, the names of any IC agencies, law enforcement agencies, and/or senior Executive Branch officials that requested and/or authorized the unmasking and dissemination of USP information relating to the specific individuals and entities specified in request #3 above, as well as the titles of all specific recipients of that unmasked USP information; and

5. If it exists, the stated reason, pursuant to the relevant minimization procedures, for unmasking each USP identity relating to request #3 above.

We appreciate your prompt attention to this request. If you have any questions regarding the foregoing, please contact the Committee at (202) 225-4121.

Sincerely,

Devin Nunes
Chairman

Adam B. Schiff
Ranking Member

Copy to:
The Honorable Michael Dempsey, Acting Director of National Intelligence

---

[1] For the purposes of this letter, "associates" include any campaign surrogates, advisors, or employees; any Trump Organization or Clinton Foundation surrogates, advisors, or employees; and family, friends, and business associates of Mr. Trump and Mrs. Clinton.

UNCLASSIFIED





**U.S. Department of Justice**

Federal Bureau of Investigation

*Washington, D.C. 20535-0001*

April 4, 2017

Honorable Devin Nunes
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC  20515

Honorable Adam B. Schiff
Ranking Member
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Chairman and Ranking Member:

This responds to your letter dated March 15, 2017 to Admiral Rogers, National Security Agency;  Director Pompeo, Central Intelligence Agency; and Director Comey, Federal Bureau of Investigation (FBI), requesting information concerning each agency's policies and procedures relating to the dissemination of U.S. person information.

As we have discussed with your staffs on several occasions, we welcome an opportunity to brief the Committee concerning the FBI's policies and procedures in order to identify information held by the FBI that is of interest to the Committee.

We appreciate your continued support for the FBI and its mission.  Please contact this office is we can be of further assistance.

Sincerely,

Gregory A. Brower
Assistant Director
Office of Congressional Affairs

TOP SECRET//███████████ ███████/NOFORN/███████

DEVIN NUNES, CALIFORNIA, CHAIRMAN

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
RANKING MEMBER

James A. Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

UNCLASSIFIED//COMMITTEE SENSITIVE

## U.S. HOUSE OF REPRESENTATIVES
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

Damon Nelson
STAFF DIRECTOR

Michael Bahar
MINORITY STAFF DIRECTOR

May 9, 2017

### VIA CERTIFIED U.S. AND ELECTRONIC MAIL

The Honorable Jeff Sessions
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530

Dear General Sessions:

As part of its bipartisan investigation into Russian active measures directed at the 2016 U.S. election, the House Permanent Select Committee on Intelligence requests that you produce certain documents and other materials to the Committee and arrange for your participation in a voluntary, transcribed interview at the Committee's offices.

First we respectfully ask that you produce to the Committee, by no later than the close of business on May 22, the following:

Any documents, records, electronically stored information including e-mail, communication, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles) that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters.

In complying with this request, we ask that you furnish to the Committee, in unredacted form, any and all responsive material in your actual or constructive possession, custody, or control or otherwise available to you, including responsive material possessed by any third party to be transferred to your possession and shared with the Committee. This request is also made on an ongoing basis: if after making an initial production to the Committee you find additional responsive material, you should produce that material to the Committee.

To the extent not encompassed by the above request, this letter also requests preservation of all documents, records, electronically stored information, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles), related to the Committee's investigation, your interview, and any ancillary matters.

TOP SECRET//███████████████████████NOFORN█

TOP SECRET//  /NOFORN

---

UNCLASSIFIED//COMMITTEE SENSITIVE

**Should it become necessary to do so, the Committee may supplement the document request contained in this letter at any time.**

Committee staff will work with you to arrange your interview, at a time and date subsequent to your production of documents to the Committee. The interview may cover any topic within the publicly-announced parameters of the Committee's investigation, including Russian cyber activities directed against the 2016 U.S. election, potential links between Russia and individuals associated with political campaigns, the U.S. government's response to these Russian active measures, and related leaks of classified information.

Should you have any questions at any time, please contact Committee staff at (202) 225-4121. If you are represented by an attorney, please forward this letter to your attorney, and have him or her contact the Committee on your behalf.

Sincerely,

K. Michael Conaway
Member of Congress

Adam Schiff
Ranking Member

Attachment: Parameters for Russia Investigation

2

TOP SECRET// NOFORN

Devin Nunes, California, Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
Ranking Member

James A. Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

UNCLASSIFIED//COMMITTEE SENSITIVE

## U.S. HOUSE OF REPRESENTATIVES
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, The Capitol
Washington, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Michael Bahar
Minority Staff Director

May 9, 2017

### VIA CERTIFIED U.S. AND ELECTRONIC MAIL

Ms. Mary McCord
Acting Assistant Attorney General
U.S. Department of Justice
National Security Division
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530

Dear Ms. McCord:

As part of its bipartisan investigation into Russian active measures directed at the 2016 U.S. election, the House Permanent Select Committee on Intelligence requests that you produce certain documents and other materials to the Committee and participate in a voluntary, transcribed interview at the Committee's offices.

First we respectfully ask that you produce to the Committee, by no later than the close of business on May 22, the following:

Any documents, records, electronically stored information including e-mail, communication, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles) that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters.

In complying with this request, we ask that you furnish to the Committee, in unredacted form, any and all responsive material in your actual or constructive possession, custody, or control or otherwise available to you, including responsive material possessed by any third party to be transferred to your possession and shared with the Committee. This request is also made on an ongoing basis: if after making an initial production to the Committee you find additional responsive material, you should produce that material to the Committee.

To the extent not encompassed by the above request, this letter also requests preservation of all documents, records, electronically stored information, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents)

TOP SECRET// NOFORN

TOP SECRET// ███████████████ //NOFORN ███

UNCLASSIFIED//COMMITTEE SENSITIVE

regardless of form, other than those widely available (e.g., newspaper articles), related to the Committee's investigation, your interview, and any ancillary matters.

Should it become necessary to do so, the Committee may supplement the document request contained in this letter at any time.

Committee staff will work with you to arrange your interview, at a time and date subsequent to your production of documents to the Committee. The interview may cover any topic within the publicly-announced parameters of the Committee's investigation, including Russian cyber activities directed against the 2016 U.S. election, potential links between Russia and individuals associated with political campaigns, the U.S. government's response to these Russian active measures, and related leaks of classified information.

Should you have any questions at any time, please contact Committee staff at (202) 225-4121. If you are represented by an attorney, please forward this letter to your attorney, and have him or her contact the Committee on your behalf.

Sincerely,

K. Michael Conaway
Member of Congress

Adam Schiff
Ranking Member

Attachment: Parameters for Russia Investigation

2

TOP SECRET// ███████████████ //NOFORN ███

TOP SECRET// NOFORN



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General          *Washington, D.C. 20530*

**JUL 0 7 2017**

The Honorable K. Michael Conaway
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

The Honorable Adam Schiff
Ranking Member
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Congressman Conaway and Congressman Schiff:

This responds to your letters to the Attorney General and to then-Acting Assistant
Attorney General Mary McCord of the National Security Division, both dated May 9, 2017,
which requested documents in connection with the Committee's investigation into Russian active
measures directed at the 2016 U.S. election.

As you know, on May 17, 2017, the Department of Justice (Department) announced the
appointment of Robert S. Mueller III to serve as Special Counsel to oversee the previously-
confirmed FBI investigation of Russian government efforts to influence the 2016 presidential
election and related matters. We are advised that the Special Counsel has begun to take steps to
fulfill these responsibilities. Under these circumstances and consistent with the Department's
long-standing policy regarding the confidentiality and sensitivity of information relating to
pending matters, the Department is not prepared to respond further to your requests at this time.

We appreciate the Committee's interests in this matter and hope that this information is
helpful. Please do not hesitate to contact this office if we may provide additional assistance
about any other matter.

Sincerely,

Samuel R. Ramer
Acting Assistant Attorney General

TOP SECRET// NOFORN

TOP SECRET// [REDACTED] /NOFORN

UNCLASSIFIED//COMMITTEE SENSITIVE

## U.S. HOUSE OF REPRESENTATIVES

PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

May 16, 2017

### VIA CERTIFIED U.S. AND ELECTRONIC MAIL

Acting Director Andrew McCabe
FBI Headquarters
935 Pennsylvania Avenue, NW
Washington, D.C. 20535-0001

Dear Acting Director McCabe:

As part of its bipartisan investigation into Russian active measures directed at the 2016 U.S. election, the House Permanent Select Committee on Intelligence requests that you produce certain documents and other materials to the Committee and arrange for your participation in a voluntary, transcribed interview at the Committee's offices.

First we respectfully ask that you produce to the Committee, by no later than the close of business on **May 23**, the following:

> Any documents, records, electronically stored information including e-mail, communication, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles) that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters.

In complying with this request, we ask that you furnish to the Committee, in unredacted form, any and all responsive material in your actual or constructive possession, custody, or control or otherwise available to you, including responsive material possessed by any third party to be transferred to your possession and shared with the Committee. This request is also made on an ongoing basis: if after making an initial production to the Committee you find additional responsive material, you should produce that material to the Committee.

To the extent not encompassed by the above request, this letter also requests preservation of all documents, records, electronically stored information, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles), related to the Committee's investigation, your interview, and any ancillary matters.

TOP SECRET// [REDACTED] /NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

197

UNCLASSIFIED//COMMITTEE SENSITIVE

Should it become necessary to do so, the Committee may supplement the document request contained in this letter at any time.

Committee staff will work with you to arrange your interview, at a time and date subsequent to your production of documents to the Committee. The interview may cover any topic within the publicly-announced parameters of the Committee's investigation, including Russian cyber activities directed against the 2016 U.S. election, potential links between Russia and individuals associated with political campaigns, the U.S. government's response to these Russian active measures, and related leaks of classified information.

Should you have any questions at any time, please contact Committee staff at (202) 225-4121. If you are represented by an attorney, please forward this letter to your attorney, and have him or her contact the Committee on your behalf.

Sincerely,

K. Michael Conaway
Member of Congress

Adam Schiff
Ranking Member

Attachment: Parameters for Russia Investigation

2

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET/



U.S. Department of Justice

Office of Legislative Affairs

Office of the Assistant Attorney General

Washington, D.C. 20530

JUL 2 7 2017

The Honorable K. Michael Conaway
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

The Honorable Adam Schiff
Ranking Member
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Congressman Conaway and Congressman Schiff:

This responds to your letter to Federal Bureau of Investigation (FBI) Acting Director Andrew McCabe, dated May 16, 2017, which requested documents in connection with the Committee's investigation into Russian active measures directed at the 2016 U.S. election.

As you know, on May 17, 2017 the Department of Justice (Department) announced the appointment of Robert S. Mueller III to serve as Special Counsel to oversee the previously-confirmed FBI investigation of Russian government efforts to influence the 2016 presidential election and related matters. We are advised that the Special Counsel has begun to take steps to fulfill these responsibilities. Under these circumstances and consistent with the Department's long-standing policy regarding the confidentiality and sensitivity of information relating to pending matters, the Department is not prepared to respond further to your request at this time.

We appreciate the Committee's interests in this matter and hope that this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance about any other matter.

Sincerely,

Samuel R. Ramer
Acting Assistant Attorney General

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

Devin Nunes, California, Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Eric A. Crawford, Arkansas
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California
Ranking Member

Jim Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

## U.S. HOUSE OF REPRESENTATIVES

PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Michael Bahar
Minority Staff Director

May 17, 2017

Mr. Robert Mueller
Special Counsel
U.S. Department of Justice
Washington, D.C. 20530

Mr. Andrew McCabe
Acting Director
Federal Bureau of Investigation
Washington, D.C. 20535

Dear Mr. Mueller and Acting Director McCabe:

Mr. Mueller's appointment as Special Counsel is a necessary and positive development in the Department of Justice's investigation regarding Russia. As part of its own, bipartisan inquiry into Russian active measures, to include counterintelligence concerns, the Committee will be conducting rigorous oversight to ensure that the Department of Justice's work, to include the ongoing counterintelligence investigation regarding Russia by the Federal Bureau of Investigation, is not impeded or interfered with in any way.

Accordingly the Committee requests that the Department of Justice, including the Federal Bureau of Investigation, preserve and produce to the Committee:

(1) copies of all documents, records, electronically stored information including e-mail, communication, recordings, data and tangible things, regardless of form, other than those widely available (e.g., newspaper articles) that reference Mr. Comey's dismissal as FBI Director, and that are potentially relevant to the Bureau's counterintelligence investigation.

(2) all documents memorializing conversations between the President and Mr. Comey regarding his activities as Director, to include all memoranda, notes, or other documents regarding such conversations, that are potentially relevant to the Bureau's counterintelligence investigation.

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// /NOFORN

We would appreciate your written reply, and the fulfillment of this request, by no later than the close of business on **May 23**.

Should you have any questions at any time, please contact Committee staff at (202) 225-4121.

Sincerely,

K. Michael Conaway
Member of Congress

Adam Schiff
Ranking Member

2

TOP SECRET// /NOFORN
PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET/ /NOFORN



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D.C. 20535-0001

July 26, 2017

Honorable K. Michael Conaway
Member of Congress
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Honorable Adam Schiff
Ranking Member
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Congressman Conaway and Ranking Member Schiff:

This is in response to your letter to Acting Director McCabe and Special Counsel Robert Mueller dated May 17, 2017, seeking all documents, records, and data that reference "Mr. Comey's dismissal as FBI Director" that are "potentially relevant to the FBI's counterintelligence investigation" of Russian interference in the 2016 Presidential election.

As you know, Acting Attorney General Rosenstein announced the appointment of a Special Counsel "to conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017, including: (i) any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and (ii) any matters that arose or may arise directly from the investigation; and (iii) any other matters within the scope of 28 C.F.R. § 600.4(a)." As a result, your request seeks investigative materials related to an ongoing investigation, and, consistent with longstanding Department of Justice policy, we would decline to produce those materials at this time.

In addition, you requested all documents memorializing communications between the President and then FBI Director Comey. We are advised that the Special Counsel's Office and the Department of Justice have provided the Committee with access to the memoranda and documents of former FBI Director Comey. In light of that accommodation, we believe this request has been addressed.

TOP SECRET/ /NOFORN

Honorable K. Michael Conaway and Honorable Adam Schiff

Please contact this office if we can be of assistance concerning other matters. We appreciate your continued support for the FBI and its mission.

Sincerely,

Gregory A. Brower
Assistant Director
Office of Congressional Affairs

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

Devin Nunes, California, Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
Ranking Member

Jim Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

**U.S. HOUSE OF REPRESENTATIVES**
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Timothy S. Bergreen
Minority Staff Director

September 1, 2017

The Honorable Jeff Sessions
Attorney General
United States Department of Justice
950 Pennsylvania Ave, N.W.
Washington, D.C. 20530

Dear Attorney General Sessions:

On August 24, 2017, the House Permanent Select Committee on Intelligence ("Committee") served subpoenas on the Attorney General, in his capacity as head of the Department of Justice ("DOJ"), and the Director of the Federal Bureau of Investigation ("FBI") for production of documents relevant to the Committee's ongoing investigation of Russian interference in the 2016 U.S. presidential election, including allegations of collusion between the Trump campaign and the Russians.

The subpoenas directed DOJ and FBI to produce any and all documents relating to the agencies' relationship with former British Secret Intelligence Service officer Christopher Steele and/or the so-called "Trump Dossier," including those memorializing FBI's relationship with Mr. Steele, any payments made to Mr. Steele, and efforts to corroborate information provided by Mr. Steele and his sub-sources—whether directly or via Fusion GPS. The subpoenas also directed DOJ and FBI to provide copies of any Foreign Intelligence Surveillance Act (FISA) applications submitted to the Foreign Intelligence Surveillance Court (FISC)—whether or not approved by the FISC—incorporating information provided by Mr. Steele, his sub-sources, and/or Fusion GPS.

Resort to compulsory process was necessary because of DOJ's and FBI's insufficient responsiveness to the Committee's numerous Russia-investigation related requests over the past several months. On multiple occasions, through written requests and direct engagements, the Committee has sought but failed to receive responsive testimony or documents from DOJ and FBI. For example, to date the Committee has not received a meaningful response to its May 9, 2017, request to Attorney General Sessions. Additionally, on May 16, 2017, the Committee sent a letter asking then-Acting Director Andrew McCabe to participate in a voluntary interview, and produce relevant documents. The Committee received no reply until July 27—more than two months later—when DOJ declined the interview request and indicated that "the Department is not prepared to respond further to your request at this time."

Previously, on March 8, the Committee sought from DOJ certain documents, including relevant FISA applications and FISC orders, and on March 17 was allotted two billets to review responsive documents on a read-and-return basis. The Committee was not provided a copy of these documents, and the Committee's request to review them again was denied.

The subpoenas issued on August 24 required production no later than 12:00pm on September 1, 2017. Neither DOJ nor FBI provided any documents by the deadline. On the afternoon of August 31, less than 24 hours before the due date, the Committee received an initial response from the DOJ Office of Legislative Affairs requesting—on behalf of both DOJ and FBI—additional time to comply with the subpoenas.

The Committee requires timely production of the subpoenaed documents in order to execute its oversight responsibilities on behalf of the American public and fully evaluate the actions of both DOJ and the FBI. There is no legitimate basis for DOJ's failure to meaningfully engage the Committee until the eve of the deadline or begin production as a show of good faith.

Moreover, there is no legitimate basis for DOJ's request for additional time to comply, because DOJ and the FBI are well aware of the identity of the requested documents. Indeed, as noted above, at least some of them have already been compiled and made temporarily available for the Committee's review, and the remaining requested documents are readily identifiable.

Notwithstanding these concerns, the Committee hereby grants an additional thirteen (13) days for full compliance and production, to occur no later than 9:00 a.m. on September 14, 2017, at the local specified in the original subpoena. This revised deadline will not be extended.

In the alternative, if all responsive documents are not produced by the revised deadline, the Attorney General and the Director of the FBI shall appear before the Committee at 9:00 am on September 14, 2017, in Room HVC-210 of the U.S. Capitol during an open hearing, to explain under oath DOJ's and FBI's unwillingness or inability to comply in full with the subpoenas issued on August 24.

Please be advised that, in the event that DOJ or FBI fails to provide the documents in full or testimony described above, the Committee expressly reserves its right to proceed with any and all available legal options—including reporting to the full House of Representatives a resolution to hold the Attorney General and Director of the FBI in contempt of Congress, pursuant to 2 U.S.C. §§ 192, 194.

Sincerely,

Devin Nunes

Devin Nunes
Chairman

TOP SECRET// █████████████ /NOFORN

Ranking Minority Member

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
Ranking Member

James A. Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

## U.S. HOUSE OF REPRESENTATIVES
### PERMANENT SELECT COMMITTEE
### ON INTELLIGENCE

HVC-304, The Capitol
Washington, DC 20515
(202) 225-4121

Devin Nunes
Staff Director

Thomas E. Bergeson
Minority Staff Director

September 1, 2017

The Honorable Christopher Wray
Director
Federal Bureau of Investigation
935 Pennsylvania Ave, N.W.
Washington, D.C. 20530

Dear Director Wray:

On August 24, 2017, the House Permanent Select Committee on Intelligence ("Committee") served subpoenas on the Attorney General, in his capacity as head of the Department of Justice ("DOJ"), and the Director of the Federal Bureau of Investigation ("FBI") for production of documents relevant to the Committee's ongoing investigation of Russian interference in the 2016 U.S. presidential election, including allegations of collusion between the Trump campaign and the Russians.

The subpoenas directed DOJ and FBI to produce any and all documents relating to the agencies' relationship with former British Secret Intelligence Service officer Christopher Steele and/or the so-called "Trump Dossier," including those memorializing FBI's relationship with Mr. Steele, any payments made to Mr. Steele, and efforts to corroborate information provided by Mr. Steele and his sub-sources—whether directly or via Fusion GPS. The subpoenas also directed DOJ and FBI to provide copies of any Foreign Intelligence Surveillance Act (FISA) applications submitted to the Foreign Intelligence Surveillance Court (FISC)—whether or not approved by the FISC—incorporating information provided by Mr. Steele, his sub-sources, and/or Fusion GPS.

Resort to compulsory process was necessary because of DOJ's and FBI's insufficient responsiveness to the Committee's numerous Russia-investigation related requests over the past several months. On multiple occasions, through written requests and direct engagements, the Committee has sought but failed to receive responsive testimony or documents from DOJ and FBI. For example, to date the Committee has not received a meaningful response to its May 9, 2017, request to Attorney General Sessions. Additionally, on May 16, 2017, the Committee sent a letter asking then-Acting Director Andrew McCabe to participate in a voluntary interview, and produce relevant documents. The Committee received no reply until July 27—more than two months later—when DOJ declined the interview request and indicated that "the Department is not prepared to respond further to your request at this time."

TOP SECRET// █████████████ /NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// █████████████████████ //NOFORN█████

Previously, on March 8, the Committee sought from DOJ certain documents, including relevant FISA applications and FISC orders, and on March 17 was allotted two billets to review responsive documents on a read-and-return basis. The Committee was not provided a copy of these documents, and the Committee's request to review them again was denied.

The subpoenas issued on August 24 required production no later than 12:00pm on September 1, 2017. Neither DOJ nor FBI provided any documents by the deadline. On the afternoon of August 31, less than 24 hours before the due date, the Committee received an initial response from the DOJ Office of Legislative Affairs requesting—on behalf of both DOJ and FBI—additional time to comply with the subpoenas.

The Committee requires timely production of the subpoenaed documents in order to execute its oversight responsibilities on behalf of the American public and fully evaluate the actions of both DOJ and the FBI. There is no legitimate basis for FBI's failure to meaningfully engage the Committee until the eve of the deadline or begin production as a show of good faith.

Moreover, there is no legitimate basis for FBI's request for additional time to comply, because DOJ and the FBI are well aware of the identity of the requested documents. Indeed, as noted above, at least some of them have already been compiled and made temporarily available for the Committee's review, and the remaining requested documents are readily identifiable.

Notwithstanding these concerns, the Committee hereby grants an additional thirteen (13) days for full compliance and production, to occur no later than 9:00 a.m. on September 14, 2017, at the local specified in the original subpoena. This revised deadline will not be extended.

In the alternative, if all responsive documents are not produced by the revised deadline, the Attorney General and the Director of the FBI shall appear before the Committee at 9:00 am on September 14, 2017, in Room HVC-210 of the U.S. Capitol during an open hearing, to explain under oath DOJ's and FBI's unwillingness or inability to comply in full with the subpoenas issued on August 24.

Please be advised that, in the event that DOJ or FBI fails to provide the documents in full or testimony described above, the Committee expressly reserves its right to proceed with any and all available legal options—including reporting to the full House of Representatives a resolution to hold the Attorney General and Director of the FBI in contempt of Congress, pursuant to 2 U.S.C. §§ 192, 194.

Sincerely,

Devin Nunes

Devin Nunes
Chairman

TOP SECRET// █████████████████████ //NOFORN█████

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//                                                                    //NOFORN

Devin Nunes, California, Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Thomas J. Rooney, Florida
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
Ranking Member

James A. Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

## U.S. HOUSE OF REPRESENTATIVES
### PERMANENT SELECT COMMITTEE
### ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Timothy S. Bergreen
Minority Staff Director

September 5, 2017

The Honorable Jeff Sessions
Attorney General
United States Department of Justice
950 Pennsylvania Ave, N.W.
Washington, D.C. 20530

Dear Attorney General Sessions:

As explained in my letter of [September 1, 2017], if the Department of Justice fails to comply in full with the subpoena for production of documents issued by the House Permanent Select Committee on Intelligence (Committee) on August 24, 2017, the Committee requires that Attorney General Jeff Sessions appear before the Committee on September 14, 2017 to explain that failure. The accompanying subpoena, issued today, is intended to ensure compliance with that requirement. Should the Department of Justice comply in full and in a timely manner with the Committee's subpoena of August 24, 2017, then the Attorney General's appearance will not be necessary, and the appearance subpoena dated September 5, 2017, will be withdrawn.

Sincerely,

Devin Nunes
Chairman

TOP SECRET//                                                                    //NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

208



Devin Nunes, California, Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California
Ranking Minority

James A. Himes, Connecticut
Terri A. Sewell, Alabama
Andre Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

## U.S. HOUSE OF REPRESENTATIVES
### PERMANENT SELECT COMMITTEE
### ON INTELLIGENCE

HVC-304, The Capitol
Washington, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Timothy S. Bergreen
Minority Staff Director

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

September 5, 2017

The Honorable Christopher Wray
Director
Federal Bureau of Investigation
935 Pennsylvania Ave, N.W.
Washington, D.C. 20530

Dear Director Wray:

As explained in my letter of [September 1, 2017], if the Federal Bureau of Investigation fails to comply in full with the subpoena for production of documents issued by the House Permanent Select Committee on Intelligence (Committee) on August 24, 2017, the Committee requires that Director Christopher Wray appear before the Committee on September 14, 2017 to explain that failure. The accompanying subpoena, issued today, is intended to ensure compliance with that requirement. Should the Federal Bureau of Investigation comply in full and in a timely manner with the Committee's subpoena of August 24, 2017, then the Director's appearance will not be necessary, and the appearance subpoena dated September 5, 2017, will be withdrawn.

Sincerely,

Devin Nunes
Chairman

Devin Nunes, California, Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Mike R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California
Ranking Member

Jim Himes, Connecticut
Terri A. Sewell, Alabama
Andre Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

**U.S. HOUSE OF REPRESENTATIVES**
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, The Capitol
Washington, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Timothy S. Bergreen
Minority Staff Director

Paul O. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

September 15, 2017

The Honorable Jeff Sessions
Attorney General
United States Department of Justice
950 Pennsylvania Ave, N.W.
Washington, D.C. 20530

The Honorable Christopher Wray
Director
Federal Bureau of Investigation
935 Pennsylvania Ave, N.W.
Washington, D.C. 20530

Dear Attorney General Sessions and Director Wray:

On September 14, 2017, representatives from the Department of Justice ("DOJ") and Federal Bureau of Investigation ("FBI") informed the Committee that they were not prepared to produce *any* documents responsive to the subpoenas issued on August 24—despite a 13-day extension of the original September 1 deadline that was granted at DOJ's request. I was particularly concerned to learn that, in the past three weeks, efforts to assemble such documents had not advanced beyond a preliminary stage.

As noted in my letter of September 1, the Committee continues to seek any documents regarding the extent of your agencies' relationship with former British Secret Intelligence Service officer Christopher Steele and/or the so-called "Trump Dossier" relevant to the Committee's ongoing investigation of Russian interference in the 2016 U.S. presidential election—including allegations of collusion between the Trump campaign and the Russians. The Committee has also sought any Foreign Intelligence Court Surveillance Act (FISA) applications submitted to the Foreign Intelligence Surveillance Court (FISC) – whether or not approved by the FISC – that may have incorporated any information provided by Mr. Steele and/or Fusion GPS. To date, no documents have been provided.

Unfortunately, DOJ's and FBI's last-minute engagement with the Committee regarding subpoena compliance and failure to produce *any* documents—including those previously made available—fits into a continuing pattern of insufficient responsiveness to written Committee requests dating back over 5 months, including for documents and testimony from Attorney

General Sessions, FBI Deputy Director Andrew McCabe, and former Acting Assistant Attorney General Mary McCord.

The Committee remains committed to exercising its constitutional oversight responsibilities, and will continue seeking your cooperation with these efforts. DOJ and FBI are therefore granted an extraordinary extension of an additional seven (7) days for production that satisfies the August 24 subpoena, to occur no later than 9:00 a.m. on September 22, 2017. In the alternative, and pursuant to the testimonial subpoenas issued on September 5, the Attorney General and the Director of the FBI shall appear for an open hearing at 9:00 am on September 28, 2017, in Room HVC-210 of the U.S. Capitol, to testify under oath.

In the event of continued noncompliance, the Committee reserves its right to proceed with any and all available legal options—including reporting to the full House of Representatives a resolution to hold the Attorney General and Director of the FBI in contempt of Congress, pursuant to 2 U.S.C. §§ 192, 194.

Sincerely,

Devin Nunes
Devin Nunes
Chairman

TOP SECRET// ███████ //NOFORN/ ██



Office of the Deputy Attorney General
Washington, D.C. 20530

September 22, 2017

The Honorable Devin Nunes
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Chairman Nunes:

Our Legislative Affairs Office has been consulting with your staff in an effort to arrange for me to meet with you to discuss the Committee's inquiries. I understand that you have been on foreign travel this week. I will be on foreign travel for the next five days. I therefore request that you extend the deadline stated in your September 15 letter to the Attorney General and the FBI Director, so that we can arrange to address your requests without unduly damaging national security and disrupting any ongoing criminal investigation.

I appreciated our brief telephone conversation last week. I know that you understand that the executive branch's obligation to safeguard intelligence sources and methods and protect the integrity of investigations sometimes warrants accommodation.

This is not a novel issue, and it is not a partisan issue. Law enforcement and national security matters are kept confidential for good reasons.

Wise legislative and executive branch officials have worked together for many decades to defend our nation's long-term interests by protecting the confidentiality of Department of Justice investigations and preserving the Department's independence from the political arena.

I hope that longstanding tradition will continue on our watch.

Thank you for your continuing courtesies.

Sincerely,

Rod J. Rosenstein
Deputy Attorney General

TOP SECRET// ███████ //NOFORN/ ██

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ NOFORN

Devin Nunes, California, Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California
Ranking Member

James A. Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

**U.S. HOUSE OF REPRESENTATIVES**
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Michael Bahar
Minority Staff Director

September 26, 2017

The Honorable Rod Rosenstein
Deputy Attorney General
United States Department of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530-0001

Dear Deputy Attorney General Rosenstein:

Thank you for your letter of September 22, 2017. As you are well aware, the House
Permanent Select Committee on Intelligence (the Committee) is uniquely equipped to safeguard
intelligence sources and methods. Other executive branch agencies have provided the
Committee with the documents necessary to conduct its ongoing investigation into the 2016
presidential election, including highly-classified information of extraordinary sensitivity. The
Committee has gone to great lengths to avoid interfering with any ongoing executive branch
investigations, and we stand ready to work with you in this regard. I also take this opportunity to
underscore that our requests for information are likely to be fewer in number and smaller in
scope than the typical questions judges and attorneys would ask in criminal probes.

Furthermore, just as the Department of Justice (DOJ) and Federal Bureau of Investigation
(FBI) have constitutional obligations, so too does Congress, which is responsible for overseeing
both DOJ and FBI. While the Committee has been very patient over these last six months, that
patience is not without limit. To date, meaningful compliance with the Committee's numerous
requests has been minimal, and the Committee has not received any documents pursuant to
subpoenas issued a month ago for which the deadline has been twice extended. The fact that
certain information may be embarrassing or cast DOJ or FBI in a light you prefer to avoid is not
sufficient grounds to deny the Committee access to materials relevant to its oversight
responsibilities. Nor are there any lawful justifications for such a denial to Congress. This
absence of responsiveness from the world's premier law enforcement agency is unacceptable.

For example, on March 17, the Committee was allotted two billets to review documents
responsive to a request for Foreign Intelligence Surveillance Act (FISA) applications and
Foreign Intelligence Surveillance Court (FISC) orders. The documents were provided on a read-
and-return basis, and the Committee's request to review them again was denied. I am
particularly frustrated by DOJ's lack of cooperation in providing documents to which the

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

213

Committee has already been given access, and additionally have reason to believe that responsive documents were improperly withheld from the March 17 production.

With respect to the pending subpoenas, the repeated last-minute responses by DOJ and FBI to generous deadlines have been wholly inadequate. Given the Congress's obligations to the American people, Congress needs answers. Therefore, I look forward to discussing these matters in person with you on Thursday.

Sincerely,

Devin Nunes
Chairman

Copies to: The Honorable Jeff Sessions, Attorney General
The Honorable Christopher Wray, Director, Federal Bureau of Investigation



DEVIN NUNES, CALIFORNIA, CHAIRMAN

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Jeff Miller, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
Ranking Member

Jim Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

## U.S. HOUSE OF REPRESENTATIVES
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

HVC-304, The Capitol
WASHINGTON, DC 20515
(202) 225-4121
Damon Nelson
Staff Director
Andrew S. Donovan
Minority Staff Director

November 2, 2017

Deputy Director Rod Rosenstein
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Deputy Director Rod Rosenstein,

I hereby designate Congressman Trey Gowdy as my proxy for an in camera review of documents made available per the subpoenas issued to Attorney General Sessions and FBI Director Wray dated August 24, 2017. This designation is without prejudice to, and shall not limit or waive the authority of all Members of the House Permanent Select Committee on Intelligence from reviewing the documents at a later date upon request.

It is my request that this review occur by close of business on November 2, 2017.

Best Regards,

Devin Nunes
Chairman

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET/███████████████ /NOFORN

## U.S. HOUSE OF REPRESENTATIVES
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

December 28, 2017

The Honorable Rod Rosenstein
Deputy Attorney General
U.S. Department of Justice
1201 Pennsylvania Ave, NW
Washington, D.C. 20004

Dear Mr. Rosenstein:

The House Permanent Select Committee on Intelligence (the Committee) writes in response to the Department of Justice's (DOJ) and the Federal Bureau of Investigation's (FBI) failure to fully produce responsive documents and provide the requested witnesses in compliance with the subpoenas issued over *four months ago*, on August 24, 2017.

Several weeks ago, DOJ informed the Committee that the basic investigatory documents demanded by the subpoenas, FBI Form FD-302 interview summaries, did not exist. However, shortly before my meeting with you in early December, DOJ subsequently located and produced numerous FD-302s pertaining to the Steele dossier, thereby rendering the initial response disingenuous at best. As it turns out, not only did documents exist that were directly responsive to the Committee's subpoenas, but they involved senior DOJ and FBI officials who were swiftly reassigned when their roles in matters under the Committee's investigation were brought to light. Given the content and impact of these supposedly newly-discovered FD-302s, the Committee is no longer able to accept your purported basis for DOJ's blanket refusal to provide responsive FBI Form FD-1023s—documenting meetings between FBI officials and FBI confidential human sources—or anything less than full and complete compliance with its subpoenas.

As a result of the numerous delays and discrepancies that have hampered the process of subpoena compliance, the Committee no longer credits the representations made by DOJ and/or the FBI regarding these matters. Accordingly, DOJ and the FBI are instructed to promptly produce to the Committee—no later than January 3, 2018—ALL outstanding records identified as responsive to the August 24 subpoenas, including but not limited to:

TOP SECRET/███████████████ /NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ▌▌▌▌▌▌▌▌▌▌ /NOFORN

- All responsive FD-1023s, including all reports that summarize meetings between FBI confidential human sources and FBI officials pertaining to the Steele dossier;
- All responsive FD-302s not previously provided to the Committee; and
- In addition to the FD-302s and FD-1023s, certain responsive analytical and reference documents that were specifically identified and requested by the Committee, and supposedly subject to imminent production, as of December 15.

Should DOJ decide to withhold any responsive records, or portions thereof, from the Committee, it must, consistent with the subpoena instructions, provide a written response, under your signature, detailing the legal justification for failing to comply with valid congressional subpoenas.

Additionally, by the same deadline, please provide—in writing—available dates in January 2018 for interviews with the following officials:

- Former DOJ Associate Deputy Attorney General Bruce Ohr;
- FBI Supervisory Special Agent Peter (SSA) Strzok;
- FBI Attorney James Baker;
- FBI Attorney Lisa Page;
- FBI Attorney Sally Moyer; and
- FBI Assistant Director for Congressional Affairs Greg Brower.

The Committee further reminds you of these other outstanding requests for information:

- Details concerning an apparent April 2017 meeting with the media involving DOJ/FBI personnel, including DOJ Attorney Andrew Weissman (due December 13) and
- The remaining text messages between SSA Strzok and Ms. Page (due December 15).

Unfortunately, DOJ/FBI's intransigence with respect to the August 24 subpoenas is part of a broader pattern of behavior that can no longer be tolerated. As I said in a public statement several weeks ago, when the reason for SSA Strzok's removal from the Special Counsel investigation was leaked to the *Washington Post* before that reason was provided to this Committee, at this point it seems the DOJ and FBI need to be investigating themselves.

I look forward to your timely written response.

Sincerely,

Devin Nunes
Chairman



## U.S. HOUSE OF REPRESENTATIVES
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

January 4, 2018

The Honorable Rod Rosenstein
Deputy Attorney General
U.S. Department of Justice
1201 Pennsylvania Ave, NW
Washington, D.C. 20004

Dear Mr. Rosenstein:

Pursuant to our phone call yesterday evening, I write to memorialize the agreement we reached regarding compliance with the subpoenas issued by the House Permanent Select Committee on Intelligence (the Committee) on August 24, 2017, to the Department of Justice (DOJ) and Federal Bureau of Investigation (FBI), as well as several other outstanding requests by the Committee for information and interviews. It is my hope that this agreement will provide the Committee with all outstanding documents and witnesses necessary to complete its investigations into matters involving DOJ and FBI.

As agreed, designated Committee investigators and staff will be provided access to all remaining investigative documents, in unredacted form, for review at DOJ on Friday, January 5, 2018. The documents to be reviewed will include all FBI Form FD-1023s and all remaining FBI Form FD-302s responsive to the Committee's August 24, 2017 subpoenas. The only agreed-upon exception pertains to a single FD-302, which, due to national security interests, will be shown separately by Director Wray to myself and my senior investigators during the week of January 8, 2018.

You further confirmed that there are no other extant investigative documents that relate to the Committee's investigations into (a) Russian involvement in the 2016 Presidential election or (b) DOJ/FBI's related actions during this time period. This includes FD-302s, FD-1023s, and any other investigatory documents germane to the Committee's investigations, regardless of form and/or title. If, somehow, "new" or "other" responsive documents are discovered, as discussed, you will notify me immediately and allow my senior investigators to review them shortly thereafter.

With respect to the witness interviews requested by the Committee, you have agreed that all such witnesses – namely, former DOJ Associate Deputy Attorney General Bruce Ohr; FBI Supervisory Special Agent Peter Strzok; former FBI General Counsel James Baker; FBI Attorney Lisa Page; FBI Attorney Sally Moyer; FBI Assistant Director Greg Brower; FBI Assistant Director Bill Priestap; and FBI Special Agent James Rybicki – will be made available for interviews to be conducted in January.

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

Lastly, as to the remaining approximately 9,500 text messages between FBI Supervisory Special Agent Peter Strzok and his mistress, FBI Attorney Lisa Page, it is my understanding based on your representations that another search is being conducted and all relevant messages will be provided. Accordingly, the Committee requests production of these messages by no later than close of business, Thursday, January 11, 2018. Similarly, I understand that your office is researching records related to the details of an April 2017 meeting between DOJ Attorney Andrew Weissman (now the senior attorney for Special Counsel Robert Mueller) and the media, which will also be provided to this Committee by close of business on Thursday, January 11, 2018.

It was further agreed that all documents made available to the Committee will also be available for review by the minority Ranking Member and designated staff.

The materials we are requesting are vital to the Committee's investigation of potential abuses into intelligence and law enforcement agencies' handling of the Christopher Steele dossier. The Committee is extremely concerned by indications that top U.S. Government officials who were investigating a presidential campaign relied on unverified information that was funded by the opposing political campaign and was based on Russian sources. Going forward, it's crucial that we memorialize our conversations on this issue, and that we're as transparent as possible with the American people, who deserve answers to the questions the Committee is investigating.

The subpoenas issued August 24, 2017, remain in effect.

Sincerely,

Devin Nunes
Chairman

Copies to:
The Honorable Jeff Sessions, Attorney General
The Honorable Christopher Wray, Director, Federal Bureau of Investigation

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

ᴺᴼᶠᴼᴿᴺ

DEVIN NUNES, CALIFORNIA, CHAIRMAN

K. MICHAEL CONAWAY, TEXAS
PETER T. KING, NEW YORK
FRANK A. LoBIONDO, NEW JERSEY
THOMAS J. ROONEY, FLORIDA
ILEANA ROS-LEHTINEN, FLORIDA
MICHAEL R. TURNER, OHIO
BRAD R. WENSTRUP, OHIO
CHRIS STEWART, UTAH
RICK CRAWFORD, ARKANSAS
TREY GOWDY, SOUTH CAROLINA
ELISE M. STEFANIK, NEW YORK
WILL HURD, TEXAS

ADAM B. SCHIFF, CALIFORNIA,
RANKING MINORITY MEMBER

JAMES A. HIMES, CONNECTICUT
TERRI A. SEWELL, ALABAMA
ANDRÉ CARSON, INDIANA
JACKIE SPEIER, CALIFORNIA
MIKE QUIGLEY, ILLINOIS
ERIC SWALWELL, CALIFORNIA
JOAQUIN CASTRO, TEXAS
DENNY HECK, WASHINGTON

PAUL D. RYAN, SPEAKER OF THE HOUSE
NANCY PELOSI, DEMOCRATIC LEADER

## U.S. HOUSE OF REPRESENTATIVES
### PERMANENT SELECT COMMITTEE
### ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

DAMON NELSON
STAFF DIRECTOR

TIMOTHY S. BERGREEN
MINORITY STAFF DIRECTOR

November 8, 2017

**VIA U.S. MAIL**

The Honorable James B. Comey

■■■■

Dear Mr. Comey:

Thank you for your testimony before the House Permanent Select Committee on Intelligence on March 20, 2017 and May 4, 2017 in the Committee's bipartisan investigation into Russian active measures directed at the 2016 U.S. election. In light of additional facts learned during the investigation, the Committee requests that you participate in a voluntary, transcribed interview at the Committee's offices.

Committee staff will work with you to arrange your interview for either the week of December 4 or December 11. The interview may cover any topic within the publicly-announced parameters of the Committee's investigation (see attached), including Russian cyber activities directed against the 2016 U.S. election, potential links between Russia and individuals associated with political campaigns, the U.S. government's response to these Russian active measures, and related leaks of classified information.

We respectfully ask that you produce to the Committee, by no later than the close of business on November 24, your availability for the interview during the time identified above.

This letter also requests preservation and production of all documents, records, electronically stored information, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles), related to the Committee's investigation, your interview, and any ancillary matters.

Should you have any questions at any time, please contact Committee staff at (202) 225-4121. If you are represented by an attorney, please forward this letter to your attorney, and have him or her contact the Committee on your behalf.

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



Sincerely,

K. Michael Conaway
Member of Congress

Adam Schiff
Ranking Member

Attachment: Parameters for Russia Investigation

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET/ ███████ /NOFORN ██

February 1, 2018

United States House of Representatives
Permanent Select Committee on Intelligence
ATTN: Nick Ciarlante
HVC-304, U.S. Capitol
Washington, D.C. 20515

Dear Mr. Ciarlante:

I received your January 24, 2018 letter, forwarding a November 8, 2017 letter that was sent to an old mailing address of mine.

I respectfully decline the invitation to a voluntary interview. I am confident you can obtain the best information from current FBI employees. Please give my best to Messrs. Conaway and Schiff. I have fond recollections of our past interactions.

Sincerely yours,

James B. Comey

TOP SECRET/ ███████ /NOFORN ██

222

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//

NOFORN

**U.S. HOUSE OF REPRESENTATIVES**
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

December 6, 2017

The Honorable Rod Rosenstein
Deputy Attorney General
United States Department of Justice
1201 Pennsylvania Ave, NW
Washington, D.C. 20004

Dear Mr. Rosenstein:

I am writing you as a follow-up to our recent conversation about the persistent problem of unauthorized leaks of information to the media from executive branch agencies.

In February 2017, I wrote a letter to then-Federal Bureau of Investigation (FBI) Director James Comey expressing my concern regarding the "epidemic of unauthorized disclosures to the press", many of which purported to contain classified information, particularly the alleged leak of Lt. Gen. Michael Flynn's name regarding a conversation that he reportedly had with former Russian Ambassador Sergei Kislyak. In May 2017, I wrote another letter to the Intelligence Community Inspector General and you expressing a grave concern about a pending article based on an improper leak. Unfortunately, it is still not clear to the House Permanent Select Committee on Intelligence (HPSCI) whether the Department of Justice (DOJ) is investigating these matters.

In the past several months, numerous additional leaks, some comprising purportedly classified information, have appeared in the press in connection to the ongoing investigation of Russian interaction with the Trump campaign.

I am particularly concerned about the potential role of DOJ personnel in facilitating such leaks. HPSCI has learned that on or about April 11, 2017, at the behest of a current attorney assigned to Special Counsel Robert Mueller III, Andrew Weissmann, then head of DOJ's Criminal Division's Fraud Section, met, along with FBI agents, with a group of reporters from a major media organization to discuss the ongoing Russia investigation. In light of this information, I request that you provide HPSCI with answers to the following questions:

- Did this meeting between DOJ and/or FBI officials and reporters occur?
- If this meeting occurred:

TOP SECRET//

NOFORN

- Why was it not briefed to HPSCI or other relevant oversight committees?
- Who from the DOJ and/or FBI approved this meeting?
- Which reporters and representatives from DOJ and/or FBI attended the meeting?
- Did the arranging and conduct of the meeting follow all relevant DOJ and/or FBI protocols?
- At the meeting, did any DOJ and/or FBI officials provide any information to the reporters about the FBI investigation or confirm any information provided by the reporters?
- Did anyone from DOJ and/or FBI file a complaint about this meeting?
- Did any DOJ and/or FBI representatives take notes during the meeting?
- Is this meeting the subject of a IG investigation?

Please provide answers to the Committee no later than 5:00 p.m. on December 13, 2017.

Sincerely,

Devin Nunes
Chairman

Copy to: The Honorable Michael E. Horowitz, Inspector General, U.S. Department of Justice

TOP SECRET NOFORN



U.S. Department of Justice

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

MAR 1 4 2018

The Honorable Devin Nunes
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Chairman Nunes:

This responds to your letter to the Deputy Attorney General dated December 6, 2017. Your letter expresses concern about unauthorized disclosures of classified information to the media from executive branch agencies, and notes your particular concern about the potential role of Department of Justice (Department) personnel in facilitating such disclosures. Department policy does not permit confirmation of the existence of ongoing investigations, including investigations of unauthorized disclosures of classified information. However, the Department shares your concerns about unauthorized disclosures of classified information, investigates such disclosures, and prosecutes offenders when appropriate. It certainly would be helpful to any investigation that the Department may be conducting for you to share any information you have about the identity of any individuals in any branch of government who have disclosed classified information to the media or to anyone without a need to know the information. The Department will work with you to receive any such information confidentially at your convenience.

You have also asked whether a meeting occurred among Department personnel and reporters on April 11, 2017 to "discuss the ongoing Russia investigation." The Department is aware of no such meeting at which this was the topic of discussion. On that date, Department officials did meet with reporters from the Associated Press (AP) at the reporters' request. The Department officials included Andrew Weissmann, Chief of the Fraud Section of the Criminal Division; three FBI agents; a Department trial attorney; and an Assistant U.S. Attorney from the Eastern District of Virginia. Four AP reporters attended. An AP reporter contacted Mr. Weissmann to arrange the meeting, and Mr. Weissmann did so.

During the meeting, the AP reporters provided information to the Department that they had learned as a result of their investigation of Paul Manafort. They described activities unrelated to any role Mr. Manafort may have had with the campaign of President Donald J. Trump and focused primarily on his business practices, financial activities, and relationships with foreign individuals or entities. The AP reporters asked questions of the Department officials, who declined to comment on the questions. The Department understands that notes were taken during the meeting. Based on the Department's current understanding, it does not appear that Department officials improperly disclosed any confidential information.

TOP SECRET NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

The Honorable Devin Nunes
Page Two

The Department has referred to the Inspector General your questions as to whether anyone filed a complaint about the meeting and whether the meeting is the subject of an Inspector General investigation.

Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Prim Gscalona / for

Stephen E. Boyd
Assistant Attorney General

cc:    The Honorable Adam B. Schiff
       Ranking Member

TOP SECRET/

NOFORN

DEVIN NUNES, California, Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
Ranking Member

James A. Himes, Connecticut
Terri A. Sewell, Alabama
Andre Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

David Grannis, Staff Director for the Minority

HVC-304, The Capitol
Washington, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Timothy S. Bergreen
Minority Staff Director

## U.S. HOUSE OF REPRESENTATIVES
### PERMANENT SELECT COMMITTEE ON INTELLIGENCE

December 12, 2017

The Honorable Rod Rosenstein
Deputy Attorney General
U.S. Department of Justice
1201 Pennsylvania Ave., NW
Washington, D.C. 20004

Dear Mr. Rosenstein:

This letter shall serve as the Committee's formal request to the Department of Justice (DOJ) and the Federal Bureau of Investigation (FBI) for copies of all communications (to include text messages, emails, and any other captured communications) between FBI Agent Peter Strzok and FBI Attorney Lisa Page. SSA Strzok and Ms. Page have been identified in media reporting as two senior-level FBI employees who both participated in the FBI's counterintelligence investigations concerning the Hillary Clinton e-mails and the 2016 presidential election.

SSA Strzok was the Deputy Director of the FBI's Counterintelligence Division which oversaw both investigations. Ms. Page is a FBI Office of General Counsel attorney, who at the time, was assigned to Deputy Director Andrew McCabe's office and provided legal support to both investigations. Both SSA Strzok and Ms. Page also worked for Special Counsel Robert Mueller earlier this year before being quietly dismissed upon the discovery of their extramarital affair and the exchange of numerous politically charged messages during the course of both investigations that were allegedly anti-Trump and pro-Clinton.

The Committee previously made a written request for these communications on December 2, 2017, and again on December 6, 2017. I also made a request for the communications during my meeting with you on December 6, 2017. The Committee expects to receive un-redacted copies of all requested communications, and will resort to compulsory process if all such documents are not delivered to the Committee before 9:00 AM, December 15, 2017.

Sincerely,

Devin Nunes
Chairman

TOP SECRET//

N/NOFORN





U.S. Department of Justice

Office of Legislative Affairs

Office of the Assistant Attorney General      *Washington, D.C. 20530*

DEC 1 2 2017

The Honorable Devin Nunes
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Chairman Nunes,

This responds to the Committee's request that the Department of Justice (Department) provide the Committee with copies of text message communications between Federal Bureau of Investigation (FBI) employees Peter Strzok and Lisa Page. We are sending letters and identical enclosures to a number of Congressional Committees that have made similar requests.

As you may know, on January 12, 2016, the Department of Justice's Office of Inspector General (OIG) publicly announced that the OIG would review "allegations that Department or FBI policies or procedures were not followed in connection with, or in actions leading up to or related to, the FBI Director's public announcement on July 5, 2016,[1] and the Director's letters to Congress on October 28 and November 6, 2016, and that certain underlying investigative decisions were based on improper considerations.[2]" As part of that review, the OIG obtained, among other things, text messages between Mr. Strzok and Ms. Page.

The Department expected the documents provided herein to be provided as part of a completed OIG report. However, public reporting about the existence of the text messages prompted Congressional Committee requests for the text messages. Please find enclosed an initial disclosure of approximately 375 text message communications, dated August 16, 2015 to December 1, 2016, that have been identified as pertinent to the OIG review referenced above. The enclosed documents contain minimal redactions that protect the privacy interests of third parties and sensitive law enforcement information, and remove irrelevant information. The Department continues to review documents and will provide pertinent documents as they become available.

---

[1] On that date, then-FBI Director James B. Comey announced that the FBI was recommending to the Department of Justice that no charges should be filed relating to former Secretary of State Hillary Clinton's use of a private email server.

[2] DOJ OIG Announces Initiation of Review, January 12, 2017, available at https://oig.justice.gov/press/2017/2017-01-12.pdf

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//     //NOFORN//

The Honorable Devin Nunes
Page Two

As has been publicly reported, Mr. Strzok previously served on the investigative team led by Special Counsel Robert Mueller. The OIG informed the Special Counsel of the existence of the enclosed text messages on or about July 27, 2017. Mr. Mueller immediately concluded that Mr. Strzok could no longer participate in the investigation, and he was removed from the team.

This extraordinary accommodation of providing the enclosed documents is unique to the facts and circumstances of this particular matter. The Department appreciates the work of the OIG on this matter, looks forward to the findings and recommendations arising from that review, and will take appropriate action as warranted.

Sincerely,

Stephen E. Boyd
Assistant Attorney General

cc: The Honorable Adam Schiff
    Ranking Member

Enclosures

TOP SECRET//     //NOFORN//

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET/ ███████████████████████████                    ████ NOFORN ████████████

Rec: 22 JAN 18



U.S. Department of Justice

Office of Legislative Affairs

---

Office of the Assistant Attorney General          *Washington, D.C. 20530*

The Honorable Devin Nunes
Chairman                                          **JAN 1 9 2018**
Permanent Selection Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Chairman Nunes:

This responds to your request to the Department of Justice (Department) to provide the Committee with copies of text message communications between Federal Bureau of Investigation (FBI) employees Peter Strzok and Lisa Page.

As you may know, on January 12, 2016, the Department's Office of Inspector General (OIG) publicly announced that the OIG would review "allegations that Department or FBI policies or procedures were not followed in connection with, or in actions leading up to or related to, the FBI Director's public announcement on July 5, 2016,[1] and the Director's letters to Congress on October 28 and November 6, 2016, and that certain underlying investigative decisions were based on improper considerations.[2]" As part of that review, the OIG obtained, among other things, text messages between Mr. Strzok and Ms. Page.

In December 2017, we provided you with an initial production of approximately 375 text message communications, dated August 16, 2015 to December 1, 2016. In response to the requests for the texts messages, the Department collected all text messages between Mr. Strzok and Ms. Page available from the FBI for the period July 1, 2015 to July 28, 2017,[3] which was the same period requested by the OIG. The Department began reviewing these documents in an effort to provide you those messages that were either work-related or that provided any insight into the political views of the participants.

---

[1] On that date, then-FBI Director James B. Comey announced that the FBI was recommending to the Department of Justice that no charges should be filed relating to former Secretary of State Hillary Clinton's use of a private email server.

[2] DOJ OIG Announces Initiation of Review, January 12, 2017, available at: https://oig.justice.gov/press/2017/2017-01-12.pdf

[3] Although the request included texts through July 28, 2017, there were no text messages between Mr. Strzok and Ms. Page after July 1, 2017, and the messages after June 25, 2017, were personal in nature.

---

TOP SECRET/ ███████████████████████████                    ████ NOFORN ████████████

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES          230

The Honorable Devin Nunes
Page Two

The Department is not providing text messages that were purely personal in nature. Furthermore, the Department has redacted from some work-related text messages portions that were purely personal. The Department's aim in withholding purely personal text messages and redacting personal portions of work-related text messages was primarily to facilitate the Committee's access to potentially relevant text messages without having to cull through large quantities of material unrelated to either the investigation of former Secretary of State Hillary Clinton's use of a personal email server or the investigation into Russian efforts to interfere with the 2016 Presidential election. Also, the withholding of personal information in some instances avoids unnecessary embarrassment or harassment to third parties that could result from public release of such information. The Department redacted the names of employees who are not SES-level employees, and in some instances, redacted SES employees' names to avoid unwarranted attention to those individuals when comments were gratuitous and did not provide relevant information to ongoing Congressional inquiries.

In a few instances, the Department has redacted portions of work-related texts that concern other investigations. Finally, the Department consulted with the Special Counsel's Office (SCO) and made some redactions related to the structure, operation, and substance of the SCO investigation because it is ongoing.

To avoid any concern that the Department has withheld relevant information, if a Committee has specific questions about why a particular text was partially redacted or about the nature of personal text messages withheld, the Department will work with that Committee to either further describe or disclose redacted information in a closed setting. Although the original spreadsheet contained only what the Department believed to be work-related text messages, subsequent reviews identified some additional personal text messages within that document. Therefore, the document produced today contains a small number of fully redacted messages that were determined to be personal messages subsequent to their initial inclusion in the previously provided spreadsheet. The enclosed document also excludes columns of information that contained only technical information such as phone numbers or email addresses in an effort to provide a more readily reviewable set of documents. In the attached, the "Inbox" documents are from Mr. Strzok to Ms. Page, and the "Outbox" documents are from Ms. Page to Mr. Strzok.

. The Department wants to bring to your attention that the FBI's technical system for retaining text messages sent and received on FBI mobile devices failed to preserve text messages for Mr. Strzok and Ms. Page from December 14, 2016 to approximately to May 17, 2017. The FBI has informed us that many FBI-provided Samsung 5 mobile devices did not capture or store text messages due to misconfiguration issues related to rollouts, provisioning, and software upgrades that conflicted with the FBI's collection capabilities. The result was that data that should have been automatically collected and retained for long-term storage and retrieval was not collected. This problem should have been corrected with the rollout of the Samsung 7s in 2017.

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// NOFORN

The Honorable Devin Nunes
Page Three

Mr. Strzok's Samsung 5 phone last connected to the storage system on June 18, 2016. He received his new Samsung 7 phone on or about July 5, 2017. Ms. Page's Samsung 5 phone last connected to the storage system on December 13, 2016. She received her new Samsung 7 phone on or about May 22, 2017.[4]

The Office of Inspector General pieced together the text messages between Mr. Strzok and Ms. Page from June 18, 2016, to December 13, 2016, using the data from Ms. Page's phone until the connection to the storage system stopped on December 13, 2016. On May 17, 2017, Ms. Page's data collection re-initiated when she received her new phone.

Please let this office know if you have any questions regarding this production.

Very truly yours,

Stephen E. Boyd
Assistant Attorney General

cc: The Honorable Adam Schiff
Ranking Member

[4] Although FBI identified May 22, 2017 as the issued date for Ms. Page's phone, collection resumed on May 18, 2017. The FBI has not yet been able to account for this discrepancy.

TOP SECRET// NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

[committee member roster, left column — illegible]

**U.S. HOUSE OF REPRESENTATIVES**

PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, The Capitol
WASHINGTON, DC 20515
(202) 225-4121

January 25, 2018

## VIA ELECTRONIC MAIL

The Honorable Rod J. Rosenstein
Deputy Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

The Honorable Christopher Wray
Director
Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Washington, D.C. 20535

Dear Messrs. Rosenstein and Wray:

For months, the House Permanent Select Committee on Intelligence has been concerned about the Department's and the Federal Bureau of Investigation's actions in a number of cases. Last weekend's revelations that the Department and the FBI failed to preserve — and today's media reporting that the Department's Inspector General has forensically recovered — approximately five months of text message exchanges between Special Agent Peter Strzok and FBI attorney Lisa Page have only amplified those concerns.

To ensure that any Committee inquiry is as thorough and complete as possible, we respectfully request that the Department and the FBI ensure documents and information related to the following issues are preserved for potential production to the Committee:

- Any communications devices issued to Agent Strzok and Ms. Page;

- Any efforts to retrieve information from Agent Strzok's and Ms. Page's government-issued devices;

- Any data on the Samsung 5 phone issued to Agent Strzok until on or about July 5, 2017;

- Any data on the Samsung 5 phone issued to Ms. Page until on or about May 17, 2017;

NOFORN

- Any information about the alleged "misconfiguration issues related to rollouts, provisioning, and software upgrades that conflicted with the FBI's collection capabilities" that caused "many FBI-provided Samsung 5 mobile devices" not to "capture or store text messages"; and[*]

- Any investigation by the Department or the FBI into the circumstances related to the failure to preserve the text messages.

The Department and FBI should interpret "preservation" in the broadest possible manner, including ensuring the discontinuation of any auto-delete or similar functions that erase materials after a certain period of time. This preservation request covers all documents, records, electronically stored information, recordings, data, and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents), regardless of form and medium of storage, from January 1, 2016 – present.

The Committee also requests that you:

1. Exercise reasonable efforts to identify and notify former employees and contractors, subcontractors and consultants wo may have access to such electronic records that they are to be preserved;

2. Exercise reasonable efforts to identify, recover, and preserve any electronic records which have been deleted or marked for deletion but are still recoverable; and

3. If it is the routine practice of any agency employee or contractor to destroy or otherwise alter such electronic records, either halt such practices or arrange for the preservation of complete and accurate duplicates or copies of such records, suitable for production, if requested.

We would appreciate your confirming that all relevant documents and information are being preserved no later than the close of business on **January 29, 2018**.

Should you have any questions at any time, please contact Kash Patel at (202) 225-4121.

Sincerely,

Devin Nunes
Chairman

cc: Michael Horowitz, Inspector General, U.S. Department of Justice

---

[*] Letter from Stephen E. Boyd, Assistant Att'y Gen., Office of Legislative to Rep. Devin Nunes, Chairman, U.S. House Permanent Select Committee on Intelligence, Jan. 19, 2018.

NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

234

TOP SECRET/ /NOFORN

U.S. Department of Justice

Federal Bureau of Investigation

Washington, D.C. 20535-0001

February 2, 2018

The Honorable Devin Nunes
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

I write in response to your letter dated January 25, 2018, regarding FBI retention and preservation obligations. Your request has been forwarded to the FBI's Office of the General Counsel for appropriate action. Please note, however, that preservation requests related to the FBI-issued mobile devices assigned to Ms. Page and Ms. Strzok during the relevant periods should be directed to the DOJ Office of the Inspector General, as those devices are not in the physical custody of the FBI.

Thank you for your continued support of the FBI.

Sincerely,

Gregory A. Brower
Assistant Director
Office of Congressional Affairs

1 - The Honorable Adam Schiff
Ranking Member
Permanent Select Committee on intelligence
U.S. House of Representatives
Washington, DC 20515

TOP SECRET/ /NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

‑‑‑ SECRET//                                                              NOFORN

Devin Nunes, California, Chairman

K. Michael Conaway, Texas
Peter J. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
Ranking Member

Joaquin A. Hayes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Ken R. Ryan, Staff Director
Raj De, Democratic Staff Director

## U.S. HOUSE OF REPRESENTATIVES
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

Devon Frost
Raj Barker

Joseph E. Buckner
Minority Staff Director

February 16, 2018

Stephen E. Boyd
Assistant Attorney General
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530

Dear Mr. Boyd:

On February 7, 2018, I wrote to the Honorable Rosemary M. Collyer, Presiding Judge of the United States Foreign Intelligence Surveillance Court (FISC), requesting that the Court produce transcripts of any relevant FISC hearings associated with the initial FISA application or subsequent renewals related to the electronic surveillance of Carter Page.

In her response to the Committee Judge Collyer wrote, "...you may note that the Department of Justice possesses (or can easily obtain) the same responsive information the Court might possess, and...is better positioned than the Court to respond quickly."

Therefore, in an effort to inform the Committee's ongoing investigation, the Committee seeks the transcripts of any relevant FISC hearings associated with the initial FISA application or subsequent renewals related to electronic surveillance of Carter Page. The Committee respectfully requests that, no later than February 26, 2018, DOJ inform the Committee whether such transcripts exist, and, if so, please provide them.

If you have any questions, please contact Committee staff at (202) 225-4121.

Sincerely,

Devin Nunes
Chairman

Enclosure (1)

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

236

ᴛᴏᴘ ꜱᴇᴄʀᴇᴛ // ꜰNOFORN



U.S. Department of Justice

Office of Legislative Affairs

---

*Office of the Assistant Attorney General*          *Washington, D.C. 20530*

**MAR 0 7 2018**

The Honorable Devin Nunes
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

This responds to your letter dated February 16, 2018, requesting transcripts of any relevant hearings of the Foreign Intelligence Surveillance Court (FISC) associated with the initial FISA application or subsequent renewals related to the electronic surveillance of Carter Page. As is typical in the consideration of warrant applications generally, including applications to the FISC, the FISC considered the applications based upon the written submission, and held no hearings. Accordingly, no responsive transcripts exist. For your reference, we have attached a letter dated July 29, 2013 from FISC Presiding Judge Reggie B. Walton to the Senate Committee on the Judiciary then-Chairman Patrick J. Leahy that outlines the FISC practice when considering FISA applications, which includes consideration of circumstances in which a hearing may be required.

We hope this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Stephen E. Boyd
Assistant Attorney General

Enclosure

ᴛᴏᴘ ꜱᴇᴄʀᴇᴛ // ꜰNOFORN

TOP SECRET// █████████████ //NOFORN █████

Devin Nunes, California, Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California
Ranking Member

James A. Himes, Connecticut
Terri A. Sewell, Alabama
Andre Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Ted D. Hyatt, Republican Staff Director
Michael Bahar, Democratic Director

# U.S. HOUSE OF REPRESENTATIVES
## PERMANENT SELECT COMMITTEE
### ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Thomas E. Souders
Minority Staff Director

February 20, 2018

The Honorable James Comey

Dear Director Comey:

Enclosed please find a series of questions regarding the information contained in the Steele dossier, which was funded by the Democratic National Committee (DNC) and Hillary for America (Clinton campaign) and used in a Foreign Intelligence Surveillance Act (FISA) application targeting Carter Page.

Please provide complete written responses as soon as possible, and no later than Friday, March 2, 2018, to the attention of the Committee's chief clerk, Nick Ciarlante. If you do not provide timely answers on a voluntary basis, the Committee will initiate compulsory process.

Thank you for your prompt attention this matter. If you have any questions, please contact Committee staff at 202-225-4121.

Sincerely,



Devin Nunes
Chairman

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

N/NOFORN

1. When and how did you first become aware of any of the information contained in the Steele dossier?

2. In what form(s) was the information in the Steele dossier presented to you? By whom? (Please describe each instance)

3. Who did you share this information with? When? In what form? (Please describe each instance)

4. What official actions did you take as a result of receiving the information contained in the Steele dossier?

5. Did you convene any meetings with the intelligence community and/or law enforcement communities as a result of the information contained in the Steele dossier?

6. When did you first learn or come to believe that the Steele dossier was funded by a Democrat-aligned entity?

7. When did you first learn or come to believe that the Steele dossier was funded by the Democratic National Committee (DNC) and/or Hillary for America (Clinton campaign)?

8. When did you first become aware that the Steele dossier was used to obtain a FISA order on Carter Page?

9. Was President Obama briefed on any information contained in the dossier prior to January 5, 2017?

10. Did you discuss the information contained in the Steele dossier with any reporters or other representatives of the media? If so, who and when?

TOP SECRET//
NOFORN

Devin Nunes, California, Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
Ranking Member

James A. Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

## U.S. HOUSE OF REPRESENTATIVES
### PERMANENT SELECT COMMITTEE
### ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Thomas B. Eschrich
Minority Staff Director

February 20, 2018

Mr. Andrew McCabe
Federal Bureau of Investigation
935 Pennsylvania Ave, NW
Washington, D.C. 20535

Dear Mr. McCabe:

Enclosed please find a series of questions regarding the information contained in the Steele dossier, which was funded by the Democratic National Committee (DNC) and Hillary for America (Clinton campaign) and used in a Foreign Intelligence Surveillance Act (FISA) application targeting Carter Page.

Please provide complete written responses as soon as possible, and no later than Friday, March 2, 2018, to the attention of the Committee's chief clerk, Nick Ciarlante. If you do not provide timely answers on a voluntary basis, the Committee will initiate compulsory process.

Thank you for your prompt attention this matter. If you have any questions, please contact Committee staff at 202-225-4121.

Sincerely,

Devin Nunes
Chairman

1. When and how did you first become aware of any of the information contained in the Steele dossier?

2. In what form(s) was the information in the Steele dossier presented to you? By whom? (Please describe each instance)

3. Who did you share this information with? When? In what form? (Please describe each instance)

4. What official actions did you take as a result of receiving the information contained in the Steele dossier?

5. Did you convene any meetings with the intelligence community and/or law enforcement communities as a result of the information contained in the Steele dossier?

6. When did you first learn or come to believe that the Steele dossier was funded by a Democrat-aligned entity?

7. When did you first learn or come to believe that the Steele dossier was funded by the Democratic National Committee (DNC) and/or Hillary for America (Clinton campaign)?

8. When did you first become aware that the Steele dossier was used to obtain a FISA order on Carter Page?

9. Was President Obama briefed on any information contained in the dossier prior to January 5, 2017?

10. Did you discuss the information contained in the Steele dossier with any reporters or other representatives of the media? If so, who and when?

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

C von Norma, Carronna, Cannonca

K. Nicholas-Cornenty, Tensor
Piter E. King, New York
Fank A. Lobranto, New Jersey
Thomas J. Rooney, Pa. Da.
Silvio Los Consent, New Ib
Michael R. Turner, Ohio
Brad R. Wenstrop, Ohio
Chris Stewart, Utah
Rick Crawford, Ark. Hai
Trey Gowdy, South Cardina
Hank Strickland, Floor-Year
Will Hund, Texas

Adam E. Schiff, Cadifornia
Ranking Member

James B. Himes, Connecticut
Terri A. Sewell, Alabama
Andre Corpen, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

FacED Platt, Staff of the Right
Morris P. Dial, Democratic Dealer

1-1F-C-204, The Capitol
Washington, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Thomas D. Carsson
Ranking Staff Director

## U.S. HOUSE OF REPRESENTATIVES
### PERMANENT SELECT COMMITTEE
### ON INTELLIGENCE

March 1, 2018

The Honorable Jeff Sessions
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Dear Mr. Attorney General:

The Federal Bureau of Investigation (FBI) is charged with protecting the American people and enforcing our laws in accordance with the U.S. Constitution. To carry out this essential mission, the FBI has a strict set of internal rules and procedures embodied in the Domestic Investigations and Operations Guide (DIOG). The DIOG was created by the Bureau itself and approved by the Department of Justice (DOJ).

The latest unredacted version of the DIOG available to the Committee (dated October 15, 2011) delineates procedures the FBI must follow when submitting applications to the Foreign Intelligence Surveillance Court (FISC) for orders to conduct surveillance through the Foreign Intelligence Surveillance Act (FISA). According to the DOIG:

- FISA surveillance is a very intrusive means of acquiring information that must balance the need to obtain sensitive national security information against civil liberties.
- When striking this balance, a verification process must be conducted for all FISA applications.
  - Under the subsection "FISA Verification of Accuracy Procedures," the FBI itself acknowledges this importance: "The accuracy of information contained within FISA applications is of utmost importance.... Only documented and verified information may be used to support FBI applications [FISA] to the court [FISC]."
- The DIOG provides detailed instructions for the FBI to follow to ensure that information appearing in a FISA application that is presented to the FISC has been thoroughly vetted and confirmed.

Former and current DOJ and FBI leadership have confirmed to the Committee that unverified information from the Steele dossier comprised an essential part of the FISA applications related to Carter Page. These details are outlined in a declassified memorandum released by the Committee on February 2, 2018, a copy of which is attached for your review.

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

242

In light of what appears to be a clear violation of FBI protocols, the Committee directs that DOJ shall, no later than March 8, 2018, provide answers to the following questions:

- Were these protocols changed after the 2011 version to allow for the use of unverified information to support FBI FISA applications to the FISC?
- If not, what steps has the DOJ and/or the FBI taken to hold accountable those officials who violated these protocols?

I will remind you that aside from the violation of these protocols, the presentation of false and/or unverified information to the FISC in connection with the Carter Page warrant applications could entail violations of the following criminal statutes:

- 18 USC 242
- 50 USC 1809
- Conspiracy
- Obstruction of justice
- Contempt of Court

The FBI DIOG provides internal oversight and controls over authorized FBI activities so the American public can be assured the Bureau is conducting its vital mission in accordance with law and established guidelines. However, in this instance, it's clear that basic operating guidance was violated.

Congressional oversight is designed to hold agencies accountable. I trust that you share this view, and will assist the Committee's investigation into violations of DIOG procedures related to the use of the Steele dossier in FISA applications.

Sincerely,

Devin Nunes
Chairman

Enclosure

cc: Michael Horowitz, Inspector General of the Department of Justice
The Honorable Christopher Wray, Director, Federal Bureau of Investigation

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES