# DEFENDANTS' EXHIBIT 8:

 

# Background to "Assessing Russian Activities and Intentions in Recent US Elections": The Analytic Process and Cyber Incident Attribution

**6 January 2017**

## Background to "Assessing Russian Activities and Intentions in Recent US Elections": The Analytic Process and Cyber Incident Attribution

"Assessing Russian Activities and Intentions in Recent US Elections" is a declassified version of a highly classified assessment that has been provided to the President and to recipients approved by the President.

- The Intelligence Community rarely can publicly reveal the full extent of its knowledge or the precise bases for its assessments, as the release of such information would reveal sensitive sources or methods and imperil the ability to collect critical foreign intelligence in the future.

- Thus, while the conclusions in the report are all reflected in the classified assessment, the declassified report does not and cannot include the full supporting information, including specific intelligence and sources and methods.

### The Analytic Process

The mission of the Intelligence Community is to seek to reduce the uncertainty surrounding foreign activities, capabilities, or leaders' intentions. This objective is difficult to achieve when seeking to understand complex issues on which foreign actors go to extraordinary lengths to hide or obfuscate their activities.

- On these issues of great importance to US national security, the goal of intelligence analysis is to provide assessments to decisionmakers that are intellectually rigorous, objective, timely, and useful, and that adhere to tradecraft standards.

- The tradecraft standards for analytic products have been refined over the past ten years. These standards include describing sources (including their reliability and access to the information they provide), clearly expressing uncertainty, distinguishing between underlying information and analysts' judgments and assumptions, exploring alternatives, demonstrating relevance to the customer, using strong and transparent logic, and explaining change or consistency in judgments over time.

- Applying these standards helps ensure that the Intelligence Community provides US policymakers, warfighters, and operators with the best and most accurate insight, warning, and context, as well as potential opportunities to advance US national security.

Intelligence Community analysts integrate information from a wide range of sources, including human sources, technical collection, and open source information, and apply specialized skills and structured analytic tools to draw inferences informed by the data available, relevant past activity, and logic and reasoning to provide insight into what is happening and the prospects for the future.

- A critical part of the analyst's task is to explain uncertainties associated with major judgments based on the quantity and quality of the source material, information gaps, and the complexity of the issue.

- When Intelligence Community analysts use words such as "we assess" or "we judge," they are conveying an analytic assessment or judgment.

- Some analytic judgments are based directly on collected information; others rest on previous judgments, which serve as building blocks in rigorous analysis. In either type of judgment, the tradecraft standards outlined above ensure that analysts have an appropriate basis for the judgment.

1

- Intelligence Community judgments often include two important elements: judgments of how likely it is that something has happened or will happen (using terms such as "likely" or "unlikely") and confidence levels in those judgments (low, moderate, and high) that refer to the evidentiary basis, logic and reasoning, and precedents that underpin the judgments.

**Determining Attribution in Cyber Incidents**

The nature of cyberspace makes attribution of cyber operations difficult but not impossible.  Every kind of cyber operation—malicious or not—leaves a trail.  US Intelligence Community analysts use this information, their constantly growing knowledge base of previous events and known malicious actors, and their knowledge of how these malicious actors work and the tools that they use, to attempt to trace these operations back to their source.  In every case, they apply the same tradecraft standards described in the Analytic Process above.

- Analysts consider a series of questions to assess how the information compares with existing knowledge and adjust their confidence in their judgments as appropriate to account for any alternative hypotheses and ambiguities.

- An assessment of attribution usually is not a simple statement of who conducted an operation, but rather a series of judgments that describe whether it was an isolated incident, who was the likely perpetrator, that perpetrator's possible motivations, and whether a foreign government had a role in ordering or leading the operation.

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.



*ICA*

INTELLIGENCE COMMUNITY ASSESSMENT

# Assessing Russian Activities and Intentions in Recent US Elections



ICA 2017-01D  |  6 January 2017

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

This page intentionally left blank.

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

# Scope and Sourcing

Information available as of 29 December 2016 was used in the preparation of this product.

## Scope

This report includes an analytic assessment drafted and coordinated among The Central Intelligence Agency (CIA), The Federal Bureau of Investigation (FBI), and The National Security Agency (NSA), which draws on intelligence information collected and disseminated by those three agencies. It covers the motivation and scope of Moscow's intentions regarding US elections and Moscow's use of cyber tools and media campaigns to influence US public opinion. The assessment focuses on activities aimed at the 2016 US presidential election and draws on our understanding of previous Russian influence operations. When we use the term "we" it refers to an assessment by all three agencies.

- This report is a declassified version of a highly classified assessment. This document's conclusions are identical to the highly classified assessment, but this document does not include the full supporting information, including specific intelligence on key elements of the influence campaign. Given the redactions, we made minor edits purely for readability and flow.

We did not make an assessment of the impact that Russian activities had on the outcome of the 2016 election. The US Intelligence Community is charged with monitoring and assessing the intentions, capabilities, and actions of foreign actors; it does not analyze US political processes or US public opinion.

- New information continues to emerge, providing increased insight into Russian activities.

## Sourcing

Many of the key judgments in this assessment rely on a body of reporting from multiple sources that are consistent with our understanding of Russian behavior. Insights into Russian efforts—including specific cyber operations—and Russian views of key US players derive from multiple corroborating sources.

Some of our judgments about Kremlin preferences and intent are drawn from the behavior of Kremlin-loyal political figures, state media, and pro-Kremlin social media actors, all of whom the Kremlin either directly uses to convey messages or who are answerable to the Kremlin. The Russian leadership invests significant resources in both foreign and domestic propaganda and places a premium on transmitting what it views as consistent, self-reinforcing narratives regarding its desires and redlines, whether on Ukraine, Syria, or relations with the United States.

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

# Assessing Russian Activities and Intentions in Recent US Elections

ICA 2017-01D
6 January 2017

## Key Judgments

**Russian efforts to influence the 2016 US presidential election represent the most recent expression of Moscow's longstanding desire to undermine the US-led liberal democratic order, but these activities demonstrated a significant escalation in directness, level of activity, and scope of effort compared to previous operations.**

**We assess Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the US presidential election. Russia's goals were to undermine public faith in the US democratic process, denigrate Secretary Clinton, and harm her electability and potential presidency. We further assess Putin and the Russian Government developed a clear preference for President-elect Trump.** We have high confidence in these judgments.

- **We also assess Putin and the Russian Government aspired to help President-elect Trump's election chances when possible by discrediting Secretary Clinton and publicly contrasting her unfavorably to him.** All three agencies agree with this judgment. CIA and FBI have high confidence in this judgment; NSA has moderate confidence.

- Moscow's approach evolved over the course of the campaign based on Russia's understanding of the electoral prospects of the two main candidates. When it appeared to Moscow that Secretary Clinton was likely to win the election, the Russian influence campaign began to focus more on undermining her future presidency.

- Further information has come to light since Election Day that, when combined with Russian behavior since early November 2016, increases our confidence in our assessments of Russian motivations and goals.

**Moscow's influence campaign followed a Russian messaging strategy that blends covert intelligence operations—such as cyber activity—with overt efforts by Russian Government agencies, state-funded media, third-party intermediaries, and paid social media users or "trolls."** Russia, like its Soviet predecessor, has a history of conducting covert influence campaigns focused on US presidential elections that have used intelligence officers and agents and press placements to disparage candidates perceived as hostile to the Kremlin.

- Russia's intelligence services conducted cyber operations against targets associated with the 2016 US presidential election, including targets associated with both major US political parties.

- We assess with high confidence that Russian military intelligence (General Staff Main Intelligence Directorate or GRU) used the Guccifer 2.0 persona and DCLeaks.com to release US victim data

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

obtained in cyber operations publicly and in exclusives to media outlets and relayed material to WikiLeaks.

- Russian intelligence obtained and maintained access to elements of multiple US state or local electoral boards. **DHS assesses that the types of systems Russian actors targeted or compromised were not involved in vote tallying.**

- Russia's state-run propaganda machine contributed to the influence campaign by serving as a platform for Kremlin messaging to Russian and international audiences.

**We assess Moscow will apply lessons learned from its Putin-ordered campaign aimed at the US presidential election to future influence efforts worldwide, including against US allies and their election processes.**

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

# Contents

Scope and Sourcing                                                                    i

Key Judgments                                                                         ii

Contents                                                                              iv

## CIA/FBI/NSA Assessment: Russia's Influence Campaign Targeting the 2016 US Presidential Election

Putin Ordered Campaign To Influence US Election                                      1

Russian Campaign Was Multifaceted                                                    2

Influence Effort Was Boldest Yet in the US                                           5

Election Operation Signals "New Normal" in Russian Influence Efforts                 5

## Annexes

A:  Russia—Kremlin's TV Seeks To Influence Politics, Fuel Discontent in US           6

B:  Estimative Language                                                             13

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

# Russia's Influence Campaign Targeting the 2016 US Presidential Election

  

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

# Russia's Influence Campaign Targeting the 2016 US Presidential Election

## Putin Ordered Campaign To Influence US Election

We assess with high confidence that Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the US presidential election, the consistent goals of which were to undermine public faith in the US democratic process, denigrate Secretary Clinton, and harm her electability and potential presidency. We further assess Putin and the Russian Government developed a clear preference for President-elect Trump. When it appeared to Moscow that Secretary Clinton was likely to win the election, the Russian influence campaign then focused on undermining her expected presidency.

- We also assess Putin and the Russian Government aspired to help President-elect Trump's election chances when possible by discrediting Secretary Clinton and publicly contrasting her unfavorably to him. All three agencies agree with this judgment. CIA and FBI have high confidence in this judgment; NSA has moderate confidence.

- In trying to influence the US election, we assess the Kremlin sought to advance its longstanding desire to undermine the US-led liberal democratic order, the promotion of which Putin and other senior Russian leaders view as a threat to Russia and Putin's regime.

- Putin publicly pointed to the Panama Papers disclosure and the Olympic doping scandal as US-directed efforts to defame Russia, suggesting he sought to use disclosures to discredit the image of the United States and cast it as hypocritical.

- Putin most likely wanted to discredit Secretary Clinton because he has publicly blamed her since 2011 for inciting mass protests against his regime in late 2011 and early 2012, and because he holds a grudge for comments he almost certainly saw as disparaging him.

We assess Putin, his advisers, and the Russian Government developed a clear preference for President-elect Trump over Secretary Clinton.

- Beginning in June, Putin's public comments about the US presidential race avoided directly praising President-elect Trump, probably because Kremlin officials thought that any praise from Putin personally would backfire in the United States. Nonetheless, Putin publicly indicated a preference for President-elect Trump's stated policy to work with Russia, and pro-Kremlin figures spoke highly about what they saw as his Russia-friendly positions on Syria and Ukraine. Putin publicly contrasted the President-elect's approach to Russia with Secretary Clinton's "aggressive rhetoric."

- Moscow also saw the election of President-elect Trump as a way to achieve an international counterterrorism coalition against the Islamic State in Iraq and the Levant (ISIL).

- Putin has had many positive experiences working with Western political leaders whose business interests made them more disposed to deal with Russia, such as former Italian Prime Minister Silvio Berlusconi and former German Chancellor Gerhard Schroeder.

- Putin, Russian officials, and other pro-Kremlin pundits stopped publicly criticizing the US election process as unfair almost immediately

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

after the election because Moscow probably assessed it would be counterproductive to building positive relations.

We assess the influence campaign aspired to help President-elect Trump's chances of victory when possible by discrediting Secretary Clinton and publicly contrasting her unfavorably to the President-elect. When it appeared to Moscow that Secretary Clinton was likely to win the presidency the Russian influence campaign focused more on undercutting Secretary Clinton's legitimacy and crippling her presidency from its start, including by impugning the fairness of the election.

- Before the election, Russian diplomats had publicly denounced the US electoral process and were prepared to publicly call into question the validity of the results. Pro-Kremlin bloggers had prepared a Twitter campaign, #DemocracyRIP, on election night in anticipation of Secretary Clinton's victory, judging from their social media activity.

**Russian Campaign Was Multifaceted**

Moscow's use of disclosures during the US election was unprecedented, but its influence campaign otherwise followed a longstanding Russian messaging strategy that blends covert intelligence operations—such as cyber activity—with overt efforts by Russian Government agencies, state-funded media, third-party intermediaries, and paid social media users or "trolls."

- We assess that influence campaigns are approved at the highest levels of the Russian Government—particularly those that would be politically sensitive.

- Moscow's campaign aimed at the US election reflected years of investment in its capabilities, which Moscow has honed in the former Soviet states.

- By their nature, Russian influence campaigns are multifaceted and designed to be deniable because they use a mix of agents of influence, cutouts, front organizations, and false-flag operations. Moscow demonstrated this during the Ukraine crisis in 2014, when Russia deployed forces and advisers to eastern Ukraine and denied it publicly.

The Kremlin's campaign aimed at the US election featured disclosures of data obtained through Russian cyber operations; intrusions into US state and local electoral boards; and overt propaganda. Russian intelligence collection both informed and enabled the influence campaign.

***Cyber Espionage Against US Political Organizations.*** Russia's intelligence services conducted cyber operations against targets associated with the 2016 US presidential election, including targets associated with both major US political parties.

We assess Russian intelligence services collected against the US primary campaigns, think tanks, and lobbying groups they viewed as likely to shape future US policies. In July 2015, Russian intelligence gained access to Democratic National Committee (DNC) networks and maintained that access until at least June 2016.

- The General Staff Main Intelligence Directorate (GRU) probably began cyber operations aimed at the US election by March 2016. We assess that the GRU operations resulted in the compromise of the personal e-mail accounts of Democratic Party officials and political figures. By May, the GRU had exfiltrated large volumes of data from the DNC.

***Public Disclosures of Russian-Collected Data.*** We assess with high confidence that the GRU used the Guccifer 2.0 persona, DCLeaks.com, and WikiLeaks to release US victim data obtained in

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

cyber operations publicly and in exclusives to media outlets.

- Guccifer 2.0, who claimed to be an independent Romanian hacker, made multiple contradictory statements and false claims about his likely Russian identity throughout the election.  Press reporting suggests more than one person claiming to be Guccifer 2.0 interacted with journalists.

- Content that we assess was taken from e-mail accounts targeted by the GRU in March 2016 appeared on DCLeaks.com starting in June.

We assess with high confidence that the GRU relayed material it acquired from the DNC and senior Democratic officials to WikiLeaks.  Moscow most likely chose WikiLeaks because of its self-proclaimed reputation for authenticity.  Disclosures through WikiLeaks did not contain any evident forgeries.

- In early September, Putin said publicly it was important the DNC data was exposed to WikiLeaks, calling the search for the source of the leaks a distraction and denying Russian "state-level" involvement.

- The Kremlin's principal international propaganda outlet RT (formerly Russia Today) has actively collaborated with WikiLeaks.  RT's editor-in-chief visited WikiLeaks founder Julian Assange at the Ecuadorian Embassy in London in August 2013, where they discussed renewing his broadcast contract with RT, according to Russian and Western media.  Russian media subsequently announced that RT had become "the only Russian media company" to partner with WikiLeaks and had received access to "new leaks of secret information."  RT routinely gives Assange sympathetic coverage and provides him a platform to denounce the United States.

These election-related disclosures reflect a pattern of Russian intelligence using hacked information in targeted influence efforts against targets such as Olympic athletes and other foreign governments.  Such efforts have included releasing or altering personal data, defacing websites, or releasing e-mails.

- A prominent target since the 2016 Summer Olympics has been the World Anti-Doping Agency (WADA), with leaks that we assess to have originated with the GRU and that have involved data on US athletes.

Russia collected on some Republican-affiliated targets but did not conduct a comparable disclosure campaign.

***Russian Cyber Intrusions Into State and Local Electoral Boards.***  Russian intelligence accessed elements of multiple state or local electoral boards.  Since early 2014, Russian intelligence has researched US electoral processes and related technology and equipment.

- DHS assesses that the types of systems we observed Russian actors targeting or compromising are not involved in vote tallying.

***Russian Propaganda Efforts.*** Russia's state-run propaganda machine—comprised of its domestic media apparatus, outlets targeting global audiences such as RT and Sputnik, and a network of quasi-government trolls—contributed to the influence campaign by serving as a platform for Kremlin messaging to Russian and international audiences.  State-owned Russian media made increasingly favorable comments about President-elect Trump as the 2016 US general and primary election campaigns progressed while consistently offering negative coverage of Secretary Clinton.

- Starting in March 2016, Russian Government–linked actors began openly supporting President-elect Trump's candidacy in media

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

aimed at English-speaking audiences.  RT and Sputnik—another government-funded outlet producing pro-Kremlin radio and online content in a variety of languages for international audiences—consistently cast President-elect Trump as the target of unfair coverage from traditional US media outlets that they claimed were subservient to a corrupt political establishment.

- Russian media hailed President-elect Trump's victory as a vindication of Putin's advocacy of global populist movements—the theme of Putin's annual conference for Western academics in October 2016—and the latest example of Western liberalism's collapse.

- Putin's chief propagandist Dmitriy Kiselev used his flagship weekly newsmagazine program this fall to cast President-elect Trump as an outsider victimized by a corrupt political establishment and faulty democratic election process that aimed to prevent his election because of his desire to work with Moscow.

- Pro-Kremlin proxy Vladimir Zhirinovskiy, leader of the nationalist Liberal Democratic Party of Russia, proclaimed just before the election that if President-elect Trump won, Russia would "drink champagne" in anticipation of being able to advance its positions on Syria and Ukraine.

RT's coverage of Secretary Clinton throughout the US presidential campaign was consistently negative and focused on her leaked e-mails and accused her of corruption, poor physical and mental health, and ties to Islamic extremism.  Some Russian officials echoed Russian lines for the influence campaign that Secretary Clinton's election could lead to a war between the United States and Russia.

- In August, Kremlin-linked political analysts suggested avenging negative Western reports

on Putin by airing segments devoted to Secretary Clinton's alleged health problems.

- On 6 August, RT published an English-language video called "Julian Assange Special: Do WikiLeaks Have the E-mail That'll Put Clinton in Prison?" and an exclusive interview with Assange entitled "Clinton and ISIS Funded by the Same Money."  RT's most popular video on Secretary Clinton, "How 100% of the Clintons' 'Charity' Went to...Themselves," had more than 9 million views on social media platforms.  RT's most popular English language video about the President-elect, called "Trump Will Not Be Permitted To Win," featured Assange and had 2.2 million views.

- For more on Russia's past media efforts—including portraying the 2012 US electoral process as undemocratic—please see Annex A: Russia—Kremlin's TV Seeks To Influence Politics, Fuel Discontent in US.

Russia used trolls as well as RT as part of its influence efforts to denigrate Secretary Clinton. This effort amplified stories on scandals about Secretary Clinton and the role of WikiLeaks in the election campaign.

- The likely financier of the so-called Internet Research Agency of professional trolls located in Saint Petersburg is a close Putin ally with ties to Russian intelligence.

- A journalist who is a leading expert on the Internet Research Agency claimed that some social media accounts that appear to be tied to Russia's professional trolls—because they previously were devoted to supporting Russian actions in Ukraine—started to advocate for President-elect Trump as early as December 2015.

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

## Influence Effort Was Boldest Yet in the US

Russia's effort to influence the 2016 US presidential election represented a significant escalation in directness, level of activity, and scope of effort compared to previous operations aimed at US elections.  We assess the 2016 influence campaign reflected the Kremlin's recognition of the worldwide effects that mass disclosures of US Government and other private data—such as those conducted by WikiLeaks and others—have achieved in recent years, and their understanding of the value of orchestrating such disclosures to maximize the impact of compromising information.

- During the Cold War, the Soviet Union used intelligence officers, influence agents, forgeries, and press placements to disparage candidates perceived as hostile to the Kremlin, according to a former KGB archivist.

Since the Cold War, Russian intelligence efforts related to US elections have primarily focused on foreign intelligence collection.  For decades, Russian and Soviet intelligence services have sought to collect insider information from US political parties that could help Russian leaders understand a new US administration's plans and priorities.

- The Russian Foreign Intelligence Service (SVR) Directorate S (Illegals) officers arrested in the United States in 2010 reported to Moscow about the 2008 election.

- In the 1970s, the KGB recruited a Democratic Party activist who reported information about then-presidential hopeful Jimmy Carter's campaign and foreign policy plans, according to a former KGB archivist.

## Election Operation Signals "New Normal" in Russian Influence Efforts

We assess Moscow will apply lessons learned from its campaign aimed at the US presidential election to future influence efforts in the United States and worldwide, including against US allies and their election processes.  We assess the Russian intelligence services would have seen their election influence campaign as at least a qualified success because of their perceived ability to impact public discussion.

- Putin's public views of the disclosures suggest the Kremlin and the intelligence services will continue to consider using cyber-enabled disclosure operations because of their belief that these can accomplish Russian goals relatively easily without significant damage to Russian interests.

- Russia has sought to influence elections across Europe.

We assess Russian intelligence services will continue to develop capabilities to provide Putin with options to use against the United States, judging from past practice and current efforts.  Immediately after Election Day, we assess Russian intelligence began a spearphishing campaign targeting US Government employees and individuals associated with US think tanks and NGOs in national security, defense, and foreign policy fields.  This campaign could provide material for future influence efforts as well as foreign intelligence collection on the incoming administration's goals and plans.

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

# Annex A

**_Russia_ -- Kremlin's TV Seeks To Influence Politics, Fuel Discontent in US**[*]

*RT America TV, a Kremlin-financed channel operated from within the United States, has substantially expanded its repertoire of programming that highlights criticism of alleged US shortcomings in democracy and civil liberties.  The rapid expansion of RT's operations and budget and recent candid statements by RT's leadership point to the channel's importance to the Kremlin as a messaging tool and indicate a Kremlin-directed campaign to undermine faith in the US Government and fuel political protest.  The Kremlin has committed significant resources to expanding the channel's reach, particularly its social media footprint.  A reliable UK report states that RT recently was the most-watched foreign news channel in the UK.  RT America has positioned itself as a domestic US channel and has deliberately sought to obscure any legal ties to the Russian Government.*

In the runup to the 2012 US presidential election in November, English-language channel RT America -- created and financed by the Russian Government and part of Russian Government-sponsored RT TV (see textbox 1) -- intensified its usually critical coverage of the United States.  The channel portrayed the US electoral process as undemocratic and featured calls by US protesters for the public to rise up and "take this government back."

- RT introduced two new shows -- "Breaking the Set" on 4 September and "Truthseeker" on 2 November -- both overwhelmingly focused on criticism of US and Western governments as well as the promotion of radical discontent.

- From August to November 2012, RT ran numerous reports on alleged US election fraud and voting machine vulnerabilities, contending that US election results cannot be trusted and do not reflect the popular will.



*Messaging on RT prior to the US presidential election (RT, 3 November)*

- In an effort to highlight the alleged "lack of democracy" in the United States, RT broadcast, hosted, and advertised third-party candidate debates and ran reporting supportive of the political agenda of these candidates. The RT hosts asserted that the US two-party system does not represent the views of at least one-third of the population and is a "sham."

---

[*] This annex was originally published on 11 December 2012 by the Open Source Center, now the Open Source Enterprise.

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

- RT aired a documentary about the Occupy Wall Street movement on 1, 2, and 4 November.  RT framed the movement as a fight against "the ruling class" and described the current US political system as corrupt and dominated by corporations.  RT advertising for the documentary featured Occupy movement calls to "take back" the government.  The documentary claimed that the US system cannot be changed democratically, but only through "revolution." After the 6 November US presidential election, RT aired a documentary called "Cultures of Protest," about active and often violent political resistance  (RT, 1-10 November).



*RT new show "Truthseeker" (RT, 11 November)*

**RT Conducts Strategic Messaging for Russian Government**

RT's criticism of the US election was the latest facet of its broader and longer-standing anti-US messaging likely aimed at undermining viewers' trust in US democratic procedures and undercutting US criticism of Russia's political system.  RT Editor in Chief Margarita Simonyan recently declared that the United States itself lacks democracy and that it has "no moral right to teach the rest of the world" (*Kommersant*, 6 November).

- Simonyan has characterized RT's coverage of the Occupy Wall Street movement as "information warfare" that is aimed at promoting popular dissatisfaction with the US Government.  RT created a *Facebook* app to connect Occupy Wall Street protesters via social media.  In addition, RT featured its own hosts in Occupy rallies ("Minaev Live," 10 April; RT, 2, 12 June).

- RT's reports often characterize the United States as a "surveillance state" and allege widespread infringements of civil liberties, police brutality, and drone use (RT, 24, 28 October, 1-10 November).



*Simonyan steps over the White House in the introduction from her short-lived domestic show on REN TV (REN TV, 26 December 2011)*

- RT has also focused on criticism of the US economic system, US currency policy, alleged Wall Street greed, and the US national debt.  Some of RT's hosts have compared the United States to Imperial Rome and have predicted that government corruption and "corporate greed" will lead to US financial collapse (RT, 31 October, 4 November).

> This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

RT broadcasts support for other Russian interests in areas such as foreign and energy policy.

- RT runs anti-fracking programming, highlighting environmental issues and the impacts on public health.  This is likely reflective of the Russian Government's concern about the impact of fracking and US natural gas production on the global energy market and the potential challenges to Gazprom's profitability (5 October).



*RT anti-fracking reporting (RT, 5 October)*

- RT is a leading media voice opposing Western intervention in the Syrian conflict and blaming the West for waging "information wars" against the Syrian Government (RT, 10 October-9 November).

- In an earlier example of RT's messaging in support of the Russian Government, during the Georgia-Russia military conflict the channel accused Georgians of killing civilians and organizing a genocide of the Ossetian people.  According to Simonyan, when "the Ministry of Defense was at war with Georgia," RT was "waging an information war against the entire Western world" (*Kommersant*, 11 July).

In recent interviews, RT's leadership has candidly acknowledged its mission to expand its US audience and to expose it to Kremlin messaging.  However, the leadership rejected claims that RT interferes in US domestic affairs.

- Simonyan claimed in popular arts magazine *Afisha* on 3 October: "It is important to have a channel that people get used to, and then, when needed, you show them what you need to show.  In some sense, not having our own foreign broadcasting is the same as not having a ministry of defense.  When there is no war, it looks like we don't need it.  However, when there is a war, it is critical."

- According to Simonyan, "the word 'propaganda' has a very negative connotation, but indeed, there is not a single international foreign TV channel that is doing something other than promotion of the values of the country that it is broadcasting from."  She added that "when Russia is at war, we are, of course, on Russia's side" (*Afisha*, 3 October; *Kommersant*, 4 July).

- TV-Novosti director Nikolov said on 4 October to the Association of Cable Television that RT builds on worldwide demand for "an alternative view of the entire world."  Simonyan asserted on 3 October in *Afisha* that RT's goal is "to make an alternative channel that shares information unavailable elsewhere" in order to "conquer the audience" and expose it to Russian state messaging (*Afisha*, 3 October; *Kommersant*, 4 July).

- On 26 May, Simonyan tweeted with irony:  "Ambassador McFaul hints that our channel is interference with US domestic affairs.  And we, sinful souls, were thinking that it is freedom of speech."

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

**RT Leadership Closely Tied to, Controlled by Kremlin**

RT Editor in Chief Margarita Simonyan has close ties to top Russian Government officials, especially Presidential Administration Deputy Chief of Staff Aleksey Gromov, who reportedly manages political TV coverage in Russia and is one of the founders of RT.

- Simonyan has claimed that Gromov shielded her from other officials and their requests to air certain reports.  Russian media consider Simonyan to be Gromov's protege (*Kommersant*, 4 July; Dozhd TV, 11 July).

- Simonyan replaced Gromov on state-owned Channel One's Board of Directors.  Government officials, including Gromov and Putin's Press Secretary Peskov were involved in creating RT and appointing Simonyan (*Afisha*, 3 October).

- According to Simonyan, Gromov oversees political coverage on TV, and he has periodic meetings with media managers where he shares classified information and discusses their coverage plans.  Some opposition journalists, including Andrey Loshak, claim that he also ordered media attacks on opposition figures (*Kommersant*, 11 July).



*Simonyan shows RT facilities to then Prime Minister Putin.  Simonyan was on Putin's 2012 presidential election campaign staff in Moscow (*Rospress, 22 September 2010,* Ria Novosti, 25 October 2012).*

The Kremlin staffs RT and closely supervises RT's coverage, recruiting people who can convey Russian strategic messaging because of their ideological beliefs.

- The head of RT's Arabic-language service, Aydar Aganin, was rotated from the diplomatic service to manage RT's Arabic-language expansion, suggesting a close relationship between RT and Russia's foreign policy apparatus.  RT's London Bureau is managed by Darya Pushkova, the daughter of Aleksey Pushkov, the current chair of the Duma Russian Foreign Affairs Committee and a former Gorbachev speechwriter (*DXB*, 26 March 2009; *MK.ru*, 13 March 2006).

- According to Simonyan, the Russian Government sets rating and viewership requirements for RT and, "since RT receives budget from the state, it must complete tasks given by the state."  According to Nikolov, RT news stories are written and edited "to become news" exclusively in RT's Moscow office (Dozhd TV, 11 July; *AKT*, 4 October).

- In her interview with pro-Kremlin journalist Sergey Minaev, Simonyan complimented RT staff in the United States for passionately defending Russian positions on the air and in social media.  Simonyan said:  "I wish you could see...how these guys, not just on air, but on their own social networks, *Twitter*, and when giving interviews, how they defend the positions that we stand on!" ("Minaev Live," 10 April).

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

**RT Focuses on Social Media, Building Audience**

RT aggressively advertises its social media accounts and has a significant and fast-growing social media footprint.  In line with its efforts to present itself as anti-mainstream and to provide viewers alternative news content, RT is making its social media operations a top priority, both to avoid broadcast TV regulations and to expand its overall audience.

- According to RT management, RT's website receives at least 500,000 unique viewers every day.  Since its inception in 2005, RT videos received more than 800 million views on *YouTube* (1 million views per day), which is the highest among news outlets (see graphics for comparison with other news channels) (*AKT*, 4 October).

- According to Simonyan, the TV audience worldwide is losing trust in traditional TV broadcasts and stations, while the popularity of "alternative channels" like RT or Al Jazeera grows.  RT markets itself as an "alternative channel" that is available via the Internet everywhere in the world, and it encourages interaction and social networking (*Kommersant*, 29 September).

- According to Simonyan, RT uses social media to expand the reach of its political reporting and uses well-trained people to monitor public opinion in social media commentaries (*Kommersant*, 29 September).

- According to Nikolov, RT requires its hosts to have social media accounts, in part because social media allows the distribution of content that would not be allowed on television (*Newreporter.org*, 11 October).

- Simonyan claimed in her 3 October interview to independent TV channel Dozhd that Occupy Wall Street coverage gave RT a significant audience boost.

The Kremlin spends $190 million a year on the distribution and dissemination of RT programming, focusing on hotels and satellite, terrestrial, and cable broadcasting.  The Kremlin is rapidly expanding RT's availability around the world and giving it a reach comparable to channels such as Al Jazeera English.  According to Simonyan, the United Kingdom and the United States are RT's most successful markets.   RT does not, however, publish audience information.

- According to market research company Nielsen, RT had the most rapid growth (40 percent) among all international news channels in the United States over the past year (2012).  Its audience in New York tripled and in Washington DC grew by 60% (*Kommersant*, 4 July).

- RT claims that it is surpassing Al Jazeera in viewership in New York and Washington DC (*BARB*, 20 November; RT, 21 November).

- RT states on its website that it can reach more than 550 million people worldwide and 85 million people in the United States; however, it does not publicize its actual US audience numbers (RT, 10 December).

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.



This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

**Formal Disassociation From Kremlin Facilitates RT US Messaging**

RT America formally disassociates itself from the Russian Government by using a Moscow-based autonomous nonprofit organization to finance its US operations.  According to RT's leadership, this structure was set up to avoid the Foreign Agents Registration Act and to facilitate licensing abroad.  In addition, RT rebranded itself in 2008 to deemphasize its Russian origin.

- According to Simonyan, RT America differs from other Russian state institutions in terms of ownership, but not in terms of financing.  To disassociate RT from the Russian Government, the federal news agency RIA Novosti established a subsidiary autonomous nonprofit organization, TV-Novosti, using the formal independence of this company to establish and finance RT worldwide (Dozhd TV, 11 July).

- Nikolov claimed that RT is an "autonomous noncommercial entity," which is "well received by foreign regulators" and "simplifies getting a license."  Simonyan said that RT America is not a "foreign agent" according to US law because it uses a US commercial organization for its broadcasts (*AKT,* 4 October; Dozhd TV, 11 July).

- Simonyan observed that RT's original Russia-centric news reporting did not generate sufficient audience, so RT switched to covering international and US domestic affairs and removed the words "Russia Today" from the logo "to stop scaring away the audience" (*Afisha*, 18 October; *Kommersant*, 4 July).

- RT hires or makes contractual agreements with Westerners with views that fit its agenda and airs them on RT.  Simonyan said on the pro-Kremlin show "Minaev Live" on 10 April that RT has enough audience and money to be able to choose its hosts, and it chooses the hosts that "think like us," "are interested in working in the anti-mainstream," and defend RT's beliefs on social media.  Some hosts and journalists do not present themselves as associated with RT when interviewing people, and many of them have affiliations to other media and activist organizations in the United States ("Minaev Live," 10 April).

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

# Annex B

## ESTIMATIVE LANGUAGE

Estimative language consists of two elements: judgments about the likelihood of developments or events occurring and levels of confidence in the sources and analytic reasoning supporting the judgments. Judgments are not intended to imply that we have proof that shows something to be a fact. Assessments are based on collected information, which is often incomplete or fragmentary, as well as logic, argumentation, and precedents.

**Judgments of Likelihood.** The chart below approximates how judgments of likelihood correlate with percentages. Unless otherwise stated, the Intelligence Community's judgments are not derived via statistical analysis. Phrases such as "we judge" and "we assess"—and terms such as "probable" and "likely"—convey analytical assessments.

*Percent*



**Confidence in the Sources Supporting Judgments.** Confidence levels provide assessments of the quality and quantity of the source information that supports judgments. Consequently, we ascribe high, moderate, or low levels of confidence to assessments:

- **High confidence** generally indicates that judgments are based on high-quality information from multiple sources. High confidence in a judgment does not imply that the assessment is a fact or a certainty; such judgments might be wrong.

- **Moderate confidence** generally means that the information is credibly sourced and plausible but not of sufficient quality or corroborated sufficiently to warrant a higher level of confidence.

- **Low confidence** generally means that the information's credibility and/or plausibility is uncertain, that the information is too fragmented or poorly corroborated to make solid analytic inferences, or that reliability of the sources is questionable.

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

This page intentionally left blank.

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.



# DEFENDANTS' EXHIBIT 9:

| 116TH CONGRESS 2d Session | SENATE | REPORT 116–290 |

# RUSSIAN ACTIVE MEASURES CAMPAIGNS AND INTERFERENCE IN THE 2016 U.S. ELECTION

## R E P O R T

## VOLUMES I–V

TOGETHER WITH

## ADDITIONAL VIEWS

———

## SELECT COMMITTEE ON INTELLIGENCE UNITED STATES SENATE



NOVEMBER 10, 2020.—Ordered to be printed

# RUSSIAN ACTIVE MEASURES CAMPAIGNS AND INTERFERENCE IN THE 2016 U.S. ELECTION

## VOLUMES I-V

| 116TH CONGRESS<br>*2d Session* | SENATE | REPORT<br>116–290 |
|---|---|---|

# RUSSIAN ACTIVE MEASURES CAMPAIGNS AND INTERFERENCE IN THE 2016 U.S. ELECTION

## R E P O R T

## VOLUMES I–V

TOGETHER WITH

## ADDITIONAL VIEWS

————

## SELECT COMMITTEE ON INTELLIGENCE UNITED STATES SENATE



NOVEMBER 10, 2020.—Ordered to be printed

————

U.S. GOVERNMENT PUBLISHING OFFICE

42–193                    WASHINGTON : 2020

# VOLUME II

## RUSSIA'S USE OF SOCIAL MEDIA

### WITH ADDITIONAL VIEWS

72

# C O N T E N T S

I. (U) INTRODUCTION ............................................................................................................ 3
II. (U) FINDINGS .................................................................................................................... 4
III. (U) THE REACH OF SOCIAL MEDIA ............................................................................ 8
IV. (U) RUSSIAN USE OF DISINFORMATION .................................................................. 11
   A. (U) Russian Active Measures ...................................................................................... 12
   B. (U) Russia's Military and Information Warfare ......................................................... 13
   C. (U) Russia's Weaponization of Social Media ........................................................... 14
   D. (U) Russian Social Media Tactics .............................................................................. 15
   E. (U) Features of Russian Active Measures .................................................................. 20
V. (U) THE INTERNET RESEARCH AGENCY .................................................................... 22
   A. (U) Yevgeniy Prigozhin and the Kremlin .................................................................. 23
   B. (U) IRA Operations .................................................................................................... 24
   C. (U) The Role of the IRA Troll .................................................................................... 25
   D. (U) Troll Narratives .................................................................................................... 28
VI. (U) IRA ACTIVITIES AGAINST THE UNITED STATES IN 2016 .............................. 29
   A. (U) Origins of IRA Activity in the United States ....................................................... 29
   B. (U) IRA Operations Explicitly Targeting the 2016 U.S. Election .............................. 32
   C. (U) Other IRA Operations Targeting U.S. Politicians and Society ............................ 37
   D. (U) IRA Use of Paid Advertisements ......................................................................... 40
   E. (U) The IRA Information Warfare Campaign ............................................................. 41
   F. (U) Ongoing IRA Activities ........................................................................................ 42
VII. (U) IRA USE OF SOCIAL MEDIA BY PLATFORM ................................................... 43
VIII. (U) OTHER RUSSIAN SOCIAL MEDIA INFORMATION WARFARE EFFORTS .... 63
   A. (U) Main Intelligence Directorate (GRU) .................................................................. 63
   B. ████████████████████████████████████ .............. 69
   C. (U) Other Russian Government Activities ................................................................... 70
IX. (U) U.S. GOVERNMENT RESPONSE ........................................................................... 71
X. (U) THE COMMITTEE'S REVIEW OF RUSSIA'S USE OF SOCIAL MEDIA .............. 76
XI. (U) RECOMMENDATIONS ........................................................................................... 78
   A. (U) Industry Measures ................................................................................................ 78
   B. (U) Congressional Measures ....................................................................................... 80
   C. (U) Executive Branch Measures ................................................................................. 81
   D. (U) Other Measures .................................................................................................... 81
XII. (U) Additional Views of Senator Wyden ....................................................................... 83



2

73

## I. (U) INTRODUCTION



▬▬▬▬▬ In 2016, Russian operatives associated with the St. Petersburg-based Internet Research Agency (IRA) used social media to conduct an information warfare campaign designed to spread disinformation and societal division in the United States.[1] ▬▬▬▬

▬▬▬▬ Masquerading as Americans, these operatives used targeted advertisements, intentionally falsified news articles, self-generated content, and social media platform tools to interact with and attempt to deceive tens of millions of social media users in the United States. This campaign sought to polarize Americans on the basis of societal, ideological, and racial differences, provoked real world events, and was part of a foreign government's covert support of Russia's favored candidate in the U.S. presidential election. ▬▬▬▬

(U) The Senate Select Committee on Intelligence undertook a study of these events, consistent with its congressional mandate to oversee and conduct oversight of the intelligence activities and programs of the United States Government, to include the effectiveness of the Intelligence Community's counterintelligence function. In addition to the work of the professional staff of the Committee, the Committee's findings drew from the input of cybersecurity professionals, social media companies, U.S. law enforcement and intelligence agencies, and researchers and experts in social network analysis, political content, disinformation, hate speech, algorithms, and automation, working under the auspices of the Committee's Technical Advisory Group (TAG).[3] The efforts of these TAG researchers led to the release of two public reports on the IRA's information warfare campaign, based on data provided to the Committee by the social media companies.[4] These reports provided the

---

[1] **(U)** For purposes of this Volume, "information warfare" refers to Russia's strategy for the use and management of information to pursue a competitive advantage. *See* Congressional Research Service, *Defense Primer: Information Operations*, December 18, 2018.

[2] ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

[3] **(U)** The TAG is an external group of experts the Committee consults for substantive technical advice on topics of importance to Committee activities and oversight. In this case, the Committee requested the assistance of two independent working groups, each with the technical capabilities and expertise required to analyze the data. The two working groups were led by three TAG members, with John Kelly, the founder and CEO of the social media analytics firm Graphika, and Phil Howard, an expert academic researcher at the Oxford Internet Institute, leading one working group, and Renee DiResta, the Director of Research at New Knowledge, a cybersecurity company dedicated to protecting the public sphere from disinformation attacks, leading the other.

[4] **(U)** Renee DiResta, Dr. Kris Shaffer, Becky Ruppel, David Sullivan, Robert Matney, Ryan Fox, Dr. Jonathan Albright, and Ben Johnson, "The Tactics and Tropes of the Internet Research Agency," *New Knowledge*, December 17, 2018, https://www.newknowledge.com/articles/the-disinformation-report/; Phil Howard, Bharath Ganesh, Dimitra Liotsiou, John Kelly, and Camille Francois, "The IRA, Social Media and Political Polarization in the United States, 2012-2018," *Computational Propaganda Research Project, Oxford Internet Institute*, December 2018,

74

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

Committee, social media companies, U.S. law enforcement, international partners, fellow researchers and academics, and the American public with an enhanced understanding of how Russia-based actors, at the direction of the Russian government, effectuated a sustained campaign of information warfare against the United States aimed at influencing how this nation's citizens think about themselves, their government, and their fellow Americans. The Committee supports the findings therein.

(U) The Committee also engaged directly with a number of social media companies in the course of this study. The willingness of these companies to meet with Members and staff, share the results of internal investigations, and provide evidence of foreign influence activity collected from their platforms was indispensable to this study. Specifically, the Committee's ability to identify Russian activity on social media platforms was limited. As such, the Committee was largely reliant on social media companies to identify Russian activity and share that information with the Committee or with the broader public. Thus, while the Committee findings describe a substantial amount of Russian activity on social media platforms, the full scope of this activity remains unknown to the Committee, the social media companies, and the broader U.S. Government.

## II. (U) FINDINGS

1. **(U)** The Committee found that the IRA sought to influence the 2016 U.S. presidential election by harming Hillary Clinton's chances of success and supporting Donald Trump at the direction of the Kremlin.

(U) The Committee found that the IRA's information warfare campaign was broad in scope and entailed objectives beyond the result of the 2016 presidential election. Further, the Committee's analysis of the IRA's activities on social media supports the key judgments of the January 6, 2017 Intelligence Community Assessment, "Assessing Russian Activities and Intentions in Recent US Elections," that "Russia's goals were to undermine public faith in the US democratic process, denigrate Secretary Clinton, and harm her electability and potential presidency."[5] However, where the Intelligence Community assessed that the Russian government "aspired to help President-elect Trump's election chances when possible by discrediting Secretary Clinton and publicly contrasting her unfavorably to him," the Committee found that IRA social media activity was overtly and almost invariably supportive of then-candidate Trump, and to the detriment of Secretary Clinton's campaign.[6]

---

https://int.nyt.com/data/documenthelper/534-oxford-russia-internet-research-agency/c6588b4a7b940c551c38/optimized/full.pdf.
[5] **(U)** Office of the Director of National Intelligence (ODNI), "Assessing Russian Activities and Intentions in Recent US Elections," *Intelligence Community Assessment (Unclassified Version)*, January 6, 2017, https://www.dni.gov/files/documents/ICA_2017_01.pdf.
[6] (U) *Ibid.*

4

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

75

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

(U) The Committee found that the Russian government tasked and supported the IRA's interference in the 2016 U.S. election. This finding is consistent with the Committee's understanding of the relationship between IRA owner Yevgeniy Prigozhin and the Kremlin, the aim and scope of the interference by the IRA, and the correlation between the IRA's actions and electoral interference by the Russian government in other contexts and by other means.[7] Despite Moscow's denials, the direction and financial involvement of Russian oligarch Yevgeniy Prigozhin, as well as his close ties to high-level Russian government officials including President Vladimir Putin, point to significant Kremlin support, authorization, and direction of the IRA's operations and goals.

2. (U) The Committee found that Russia's targeting of the 2016 U.S. presidential election was part of a broader, sophisticated, and ongoing information warfare campaign designed to sow discord in American politics and society. Moreover, the IRA conducted a vastly more complex and strategic assault on the United States than was initially understood. The IRA's actions in 2016 represent only the latest installment in an increasingly brazen interference by the Kremlin on the citizens and democratic institutions of the United States.

Russia's history of using social media as a lever for online influence operations predates the 2016 U.S. presidential election and involves more than the IRA. The IRA's operational planning for the 2016 election goes back at least to 2014, when two IRA operatives were sent to the United States to gather intelligence in furtherance of the IRA's objectives.[9]



---

[7] **(U)** Indictment, *United States v. Internet Research Agency*, et al., Case 1:18-cr-00032-DLF (D.D.C. Feb. 16, 2018).

[8]

[9] **(U)** Scott Shane and Mark Mazzetti, "The Plot to Subvert an Election – Unraveling the Russia Story So Far," *The New York Times,* September 20, 2018.

[10]

[11]

[12] **(U)** *Ibid.*

5

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

76

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

(U)  Analysis of the behavior of the IRA-associated social media accounts makes clear that while the Russian information warfare campaign exploited the context of the election and election-related issues in 2016, the preponderance of the operational focus, as reflected repeatedly in content, account names, and audiences targeted, was on socially divisive issues—such as race, immigration, and Second Amendment rights—in an attempt to pit Americans against one another and against their government.  The Committee found that IRA influence operatives consistently used hot-button, societal divisions in the United States as fodder for the content they published through social media in order to stoke anger, provoke outrage and protest, push Americans further away from one another, and foment distrust in government institutions.  The divisive 2016 U.S. presidential election was just an additional feature of a much more expansive, target-rich landscape of potential ideological and societal sensitivities.

3.  (U)  The Committee found that the IRA targeted not only Hillary Clinton, but also Republican candidates during the presidential primaries.  For example, Senators Ted Cruz and Marco Rubio were targeted and denigrated, as was Jeb Bush.[14]  As Clint Watts, a former FBI Agent and expert in social media weaponization, testified to the Committee, "Russia's overt media outlets and covert trolls sought to sideline opponents on both sides of the political spectrum with adversarial views towards the Kremlin."  IRA operators sought to impact primaries for both major parties and "may have helped sink the hopes of candidates more hostile to Russian interests long before the field narrowed."[15]

4.  (U)  The Committee found that no single group of Americans was targeted by IRA information operatives more than African-Americans.  By far, race and related issues were the preferred target of the information warfare campaign designed to divide the country in 2016.  Evidence of the IRA's overwhelming operational emphasis on race is evident in the IRA's Facebook advertisement content (over 66 percent contained a term related to race ) and targeting (locational targeting was principally aimed at African-Americans in key metropolitan areas with), its Facebook pages (one of the IRA's top-performing pages, "Blacktivist," generated 11.2 million engagements with Facebook users), its Instagram content (five of the top 10 Instagram accounts were focused on African-American issues and audiences), its Twitter content (heavily focused on hot-button issues with racial undertones, such as the NFL kneeling protests), and its YouTube

[14] (U) Indictment, *United States v. Internet Research Agency, et al.*, Case 1:18-cr-00032-DLF (D.D.C. Feb. 16, 2018); Renee DiResta, Dr. Kris Shaffer, Becky Ruppel, David Sullivan, Robert Matney, Ryan Fox, Dr. Jonathan Albright, and Ben Johnson, "The Tactics and Tropes of the Internet Research Agency," *New Knowledge*, December 17, 2018.
[15] (U) Clint Watts, Hearing before the Senate Select Committee on Intelligence, March 30, 2017, available at https://www.intelligence.senate.gov/hearings/open.

6

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

77

activity (96 percent of the IRA's YouTube content was targeted at racial issues and police brutality).

5. **(U)** The Committee found that paid advertisements were not key to the IRA's activity, and moreover, are not alone an accurate measure of the IRA's operational scope, scale, or objectives, despite this aspect of social media being a focus of early press reporting and public awareness.[16] An emphasis on the relatively small number of advertisements, and the cost of those advertisements, has detracted focus from the more prevalent use of original, free content via multiple social media platforms. According to Facebook, the IRA spent a total of about $100,000 over two years on advertisements—a minor amount, given the operational costs of the IRA were approximately $1.25 million dollars a month.[17] The nearly 3,400 Facebook and Instagram advertisements the IRA purchased are comparably minor in relation to the over 61,500 Facebook posts, 116,000 Instagram posts, and 10.4 million tweets that were the original creations of IRA influence operatives, disseminated under the guise of authentic user activity.

6. **(U)** The Committee found that the IRA coopted unwitting Americans to engage in offline activities in furtherance of their objectives. The IRA's online influence operations were not constrained to the unilateral dissemination of content in the virtual realm, and its operatives were not just focused on inciting anger and provoking division on the internet. Instead, the IRA also persuaded Americans to deepen their engagement with IRA operatives. For example, the IRA targeted African-Americans over social media and attempted and succeeded in some cases to influence their targets to sign petitions, share personal information, and teach self-defense training courses.[18] In addition, posing as U.S. political activists, the IRA requested—and in some cases obtained—assistance from the Trump Campaign in procuring materials for rallies and in promoting and organizing the rallies.[19]

7. **(U)** The Committee found that the IRA was not Russia's only vector for attempting to influence the United States through social media in 2016. Publicly available information showing additional influence operations emanating from Russia unrelated to IRA activity make clear the Kremlin was not reliant exclusively on the IRA in 2016. Russia's intelligence services, including the Main Directorate of the General Staff of the Armed Forces of the Russian Federation (GRU), also exploited U.S. social media platforms as a

---

[16] **(U)** Dan Keating, Kevin Schaul and Leslie Shapiro, "The Facebook ads Russians targeted at different groups," *Washington Post,* November 1, 2017.
[17] **(U)** Indictment, *United States v. Internet Research Agency, et al.,* Case 1:18-cr-00032-DLF (D.D.C. Feb. 16, 2018).
[18] **(U)** Shelby Holliday and Rob Barry, "Russian Influence Campaign Extracted Americans' Personal Data," *Wall Street Journal,* March 7, 2018.
[19] **(U)** Indictment, *United States v. Internet Research Agency, et al.,* Case 1:18-cr-00032-DLF (D.D.C. Feb. 16, 2018).

7

78

vehicle for influence operations.[20]  Information acquired by the Committee from intelligence oversight, social media companies, the Special Counsel's investigative findings, and research by commercial cybersecurity companies all reflect the Russian government's use of the GRU to carry out another core vector of attack on the 2016 election: the dissemination of hacked materials.

8. **(U)**  The Committee found that IRA activity on social media did not cease, but rather increased after Election Day 2016.  The data reveal increases in IRA activity across multiple social media platforms, post-Election Day 2016: Instagram activity increased 238 percent, Facebook increased 59 percent, Twitter increased 52 percent, and YouTube citations went up by 84 percent.[21]  As John Kelly noted: "After election day, the Russian government stepped on the gas.  Accounts operated by the IRA troll farm became more active after the election, confirming again that the assault on our democratic process is much bigger than the attack on a single election."[22]

**(U)**  Though all of the known IRA-related accounts from the Committee's data set were suspended or taken down in the fall of 2017, outside researchers continue to uncover additional IRA social media accounts dedicated to spreading malicious content.  According to an October 2018 study of more than 6.6 million tweets linking to publishers of intentionally false news and conspiracy stories, in the months before the 2016 U.S. election, "more than 80% of the disinformation accounts in our election maps are still active . . . [and] continue to publish more than a million tweets in a typical day."[23]

## III. (U)  THE REACH OF SOCIAL MEDIA

**(U)**  Social media and its widespread adoption have changed the nature and practice of human interaction for much of the world.  During the 2016 election campaign season, approximately 128 million Facebook users in the United States alone generated nearly nine billion interactions related to the 2016 U.S. presidential election.[24]  In just the last month of the campaign, more than 67 million Facebook users in the United States generated over 1.1 billion likes, posts, comments, and shares related to Donald Trump.  Over 59 million Facebook users in the United States generated over 934 million likes, posts, comments and shares related to Hillary Clinton.  On Election Day, 115.3 million Facebook users in the United States generated 716.3

---

[20] **(U)** Adam Entous, Elizabeth Dwoskin, and Craig Timberg, "Obama tried to give Zuckerberg a wake-up call over fake news on Facebook," *Washington Post,* September 24, 2017.

[21] **(U)** John Kelly, SSCI Transcript of the Closed Briefing on Social Media Manipulation in 2016 and Beyond, July 26, 2018.

[22] **(U)** John Kelly, Hearing before the Senate Select Committee on Intelligence, August 1, 2018, available at https://www.intelligence.senate.gov/hearings/open.

[23] **(U)** Matthew Hindman and Vlad Barash, "Disinformation, 'Fake News' and Influence Campaigns on Twitter," Knight Foundation, October 4, 2018, https://knightfoundation.org/articles/seven-ways-misinformation-spread-during-the-2016-election.

[24] **(U)** Dana Feldman, "Election Day Dominated Facebook With Over 716M Election-Related Interactions," *Forbes,* November 9, 2016.

8

million interactions related to the election and viewed election-related videos over 640 million times.[25]

(U) The Twitter platform also featured prominently across the arc of the 2016 campaign season. Americans sent roughly one billion tweets and retweets about the election between the first primary debates in August 2015 and Election Day 2016.[26] The U.S. Election Day 2016 was the most-Tweeted Election Day ever, with worldwide users generating more than 75 million election-related tweets.[27]

(U) Political campaigns, in the ambition of harvesting this connectivity and speaking "directly" with as many voters as possible, have adapted and attempted to exploit this new media environment. Total digital advertisement spending related to the 2016 election cycle on social media reached $1.4 billion—a 789 percent increase over 2012.[28]

(U) Social media has created new virtual venues for American participation in the national political discourse, and offered a new channel for direct democratic engagement with elected officials, media representatives, and fellow citizens around the world. However, the same system of attributes that empowers these tools and their users to positively increase civic engagement and constructive dialogue lends itself to exploitation, which frequently materializes as the dissemination of intentionally false, misleading, and deliberately polarizing content.[29]

(U) According to one November 2016 analysis, in the final three months leading up to Election Day, calculated by total number of shares, reactions, and comments, the top-performing intentionally false stories on Facebook actually outperformed the top news stories from the nineteen major news outlets.[30] That analysis found that in terms of user engagement, the top two intentionally false election stories on Facebook included articles alleging Pope Francis' endorsement of Donald Trump for President (960,000 shares, reactions, and comments), and WikiLeaks' confirmation of Hillary Clinton's sale of weapons to ISIS (789,000 shares, reactions, and comments).[31]

---

[25] (U) Ivana Kottasova, "Trump's Win Smashes Social Media Records," *CNN*, November 9, 2016.

[26] (U) Bridget Coyne, "How #Election2016 was Tweeted so far," *Twitter Blog*, November 7, 2016.

[27] (U) Twitter, "6.8 Million Viewers Watch Twitter Live Stream of BuzzFeed News' Election Night Special," November 10, 2016, https://www.prnewswire.com/news-releases/68-million-viewers-watch-twitter-live-stream-of-buzzfeed-news-election-night-special-300360415.html.

[28] (U) Kate Kaye, "Data-Driven Targeting Creates Huge 2016 Political Ad Shift: Broadcast TV Down 20%, Cable and Digital Way Up," *AdAge*, January 3, 2017.

[29] (U) The term "fake news" is not a useful construct for understanding the complexity of influence operations on social media in today's online ecosystem. The term's definition has evolved since the 2016 election and today, has been, at times, misappropriated to fit certain political and social perspectives.

[30] (U) Craig Silverman, "This Analysis Shows How Viral Fake Election News Stories Outperformed Real News on Facebook," *Buzzfeed*, November 16, 2016, ("During these critical months of the campaign, 20 top-performing false election stories from hoax sites and hyper-partisan blogs generated 8,7111,000 shares, reactions and comments on Facebook. . . . Within the same time period, the 20 best performing election stories from 19 major news websites generated a total of 7,367,000 shares, reactions and comments on Facebook.")

[31] (U) *Ibid.*

80

█████████ **COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY** █████████

(U)  A September 2017 Oxford Internet Institute study of Twitter users found that, "users got more misinformation, polarizing, and conspiratorial content than professionally produced news."[32] According to the study, in the "swing state" of Michigan, professionally produced news was, by proportion, "consistently smaller than the amount of extremist, sensationalist, conspiratorial, masked commentary, fake news and other forms of junk news," and the ratio was most disproportionate the day before the 2016 U.S. election.[33,34] A National Bureau of Economic Research paper from January 2017 assessed that intentionally false content accounted for 38 million shares on Facebook in the last 3 months leading up to the election, which translates into 760 million clicks—or "about three stories read per American adult."[35]

(U)  In conducting a broader analysis of false information dissemination, in what was described as "the largest ever study of fake news," researchers at MIT tracked over 125,000 news stories on Twitter, which were shared by three million people over the course of 11 years.[36,37] The research found that, "Falsehood diffused significantly farther, faster, deeper, and more broadly than the truth in all categories of information, and the effects were more pronounced for false political news than for false news about terrorism, natural disasters, science, urban legends, or financial information." The study also determined that false news stories were 70 percent more likely to be retweeted than accurate news, and that true stories take about six times as long to reach 1,500 people on Twitter as false stories do. According to the lead researcher in the study, Soroush Vosoughi, "It seems pretty clear that false information outperforms true information."[38]

(U)  The spread of intentionally false information on social media is often exacerbated by automated, or "bot" accounts. The 2016 U.S. election put on full display the impact that more sophisticated automation and the proliferation of bots have had on American political discourse. Researchers at the University of Southern California who evaluated nearly 20 million election-related tweets assessed that about one-fifth of the political discourse around the 2016 election on Twitter may have been automated and the result of bot activity. This research, however, does not make clear what country the bot activity originated from, or whether the activity was

---

[32] (U) Phil Howard, et al., "Social Media, News and Political Information during the U.S. Election: Was Polarizing Content Concentrated in Swing States," Oxford Internet Institute, Project on Computational Propaganda, September 29, 2017, https://arxiv.org/ftp/arxiv/papers/1802/1802.03573.pdf.
[33] (U) A swing state is a U.S. state in which Republican and Democratic candidates have similar levels of support and which is likely to play a key role in the outcome of presidential elections.
[34] (U) Philip Howard, Gillian Bolsover, et al., "Junk News and Bots During the U.S. Election: What Were Michigan Voters Sharing Over Twitter?" Oxford Internet Institute, Project on Computational Propaganda, March 26, 2017, http://comprop.oii.ox.ac.uk/wp-content/uploads/sites/89/2017/03/What-Were-Michigan-Voters-Sharing-Over-Twitter-v2.pdf.
[35] (U) Hunt Allcott and Matthew Gentzkow, "Social Media and Fake News in the 2016 election," *Journal of Economic Perspectives*, Volume 31, Number 2, Spring 2017, 211-236, http://www.nber.org/papers/w23089.
[36] (U) Soroush Vosoughi, et al., "The spread of true and false news online," *Science*, Volume 359, Issue 6380, March 9, 2018, http://ide.mit.edu/sites/default/files/publications/2017%20IDE%20Research%20Brief%20False%20News.pdf.
[37] (U) Robinson Meyer, "The Grim Conclusions of the Largest Ever Study of Fake News," *The Atlantic*, March 8, 2018: https://www.theatlantic.com/technology/archive/2018/03/largest-study-ever-fake-news-mit-twitter/555104/.
[38] (U) *Ibid.*

█████████ **COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY** █████████

81

necessarily malicious in nature. These researchers also concluded that "bots [were] pervasively present and active in the online political discussion about the 2016 U.S. presidential election," adding that "the presence of social media bots can indeed negatively affect democratic political discussion rather than improving it."[39] Arriving at a similar conclusion, an Oxford Internet Institute study of 17 million tweets posted during the 2016 election found that bots "reached positions of measurable influence," and "did infiltrate the upper cores of influence and were thus in a position to significantly influence digital communications during the 2016 U.S. election."[40]

(U) In testimony to the Committee, social media researcher John Kelly suggested that automated accounts focused on fringe political positions are far more active than the voices of actual people holding politically centrist views: "In our estimate, today the automated accounts at the far left and far right extremes of the American political spectrum produce as many as 25 to 30 times the number of messages per day on average as genuine political accounts across the mainstream." In other words, "the extremes are screaming while the majority whispers."[41] Taken as a whole, the attributes of social media platforms render them vulnerable for foreign influence operations intent on sowing discord throughout American society.

## IV. (U) RUSSIAN USE OF DISINFORMATION

(U) Russia's attack on the 2016 election was a calculated and brazen assault on the United States and its democratic institutions, but this was not the Kremlin's first foray into asymmetric warfare against America. Russian interference in 2016 represents the latest and most sophisticated example of Russia's effort to undermine the nation's democracy through targeted operations. As the January 6, 2017, Intelligence Community Assessment states, Moscow's provocations "demonstrated a significant escalation in directness, level of activity, and scope of effort." However, the activities only "represent the most recent expression of Moscow's longstanding desire to undermine the U.S.-led liberal democratic order."[42]

(U) Russia's intelligence services have been focused for decades on conducting foreign influence campaigns, or "active measures," and disinformation.[43,44] The Russian intelligence services "pioneered dezinformatsiya [disinformation] in the early twentieth century," and by the mid-1960's, had significantly invested in disinformation and active measures.[45] According to

---

[39] (U) Alessandro Bessi and Emilio Ferrara, "Social Bots Distort the 2016 US Presidential Election Online Discussion," *First Monday*, Volume 21, Number 11, 7 November 7, 2016, https://ssrn.com/abstract=2982233.
[40] (U) Samuel Woolley and Douglas Guilbeault, "Computational Propaganda in the United States of America: Manufacturing Consensus Online," Oxford Internet Institute Computational Propaganda Research Project, May 2017, http://comprop.oii.ox.ac.uk/wp-content/uploads/sites/89/2017/06/Comprop-USA.pdf.
[41] (U) John Kelly, Hearing before the Senate Select Committee on Intelligence, August 1, 2018, available at https://www.intelligence.senate.gov/hearings/open.
[42] (U) ODNI, "Background to 'Assessing Russian Activities and Intentions in Recent U.S. Elections': The Analytic Process and Cyber Incident Attribution," January 6, 2017, https://www.dni.gov/files/documents/ICA_2017_01.pdf.
[43] (U) "Active measures" is a Soviet-era term now called "measures of support" by the Russian government.
[44] (U) Disinformation is the intentional spread of false information to deceive.
[45] (U) *Dezinformatsiya"* is a Russian word, defined in the 1952 Great Soviet Encyclopedia as the "dissemination (in the press, on the radio, etc.) of false reports intended to mislead public opinion."

11

82

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

testimony Roy Godson and Thomas Rid provided to the Committee, over 10,000 individual disinformation operations were carried out during the Cold War involving approximately 15,000 personnel at its peak.[46,47]

### A. (U)  Russian Active Measures

(U)  For decades, Soviet active measures pushed conspiratorial and disinformation narratives about the United States around the world.  The KGB authored and published false stories and forged letters concerning the Kennedy assassination, including accounts suggesting CIA involvement in the killing.  Martin Luther King, Jr. was the target of manufactured KGB narratives, as was Ronald Reagan.  Russian intelligence officers planted anti-Reagan articles in Denmark, France, and India during his unsuccessful 1976 bid for the Republican presidential nomination.  A declassified U.S. State Department document from 1981 outlines a series of realized Russian active measures operations, including the spread of falsehoods concerning U.S. complicity in the 1979 seizure of the Grand Mosque of Mecca and responsibility for the 1981 death of Panamanian General Omar Torrijos, as well as an elaborate deception involving multiple forgeries and false stories designed to undermine the Camp David peace process and to exacerbate tensions between the United States and Egypt.[48]  Among the most widely known and successful active measures operations conducted during the Cold War centered on a conspiracy that the AIDS virus was manufactured by the United States at a military facility at Fort Detrick in Maryland.  This fictional account of the virus' origin received considerable news coverage, both in the United States and in over forty non-Cold War aligned countries around the world.[49]

(U)  In a 1998 CNN interview, retired KGB Major General Oleg Kalugin described active measures as "the heart and soul of Soviet intelligence":

> *Not intelligence collection, but subversion; active measures to weaken the West, to drive wedges in the Western community alliances of all sorts, particularly NATO; to sow discord among allies, to weaken the United States in the eyes of the people of Europe, Asia, Africa, Latin America, and thus to prepare ground in case the war really occurs.*[50]

(U)  While this history of discrediting the United States with spurious rumors and disinformation is well-chronicled, Russia has continued the practice today.

---

[46] **(U)**  Thomas Rid, Hearing before the Senate Select Committee on Intelligence, March 30, 2017, available at https://www.intelligence.senate.gov/hearings/open.

[47] **(U)**  Roy Godson, Hearing before the Senate Select Committee on Intelligence, March 30, 2017, available at https://www.intelligence.senate.gov/hearings/open.

[48] **(U)**  Department of State, "Soviet Active Measures: Forgery, Disinformation, Political Operations," Special Report No. 88, October 1981, https://www.cia.gov/library/readingroom/docs/CIA-RDP84B00049R001303150031-0.pdf.

[49] **(U)**  Christopher M. Andrew and Vasili Mitrokhin, *The Sword and the Shield: The Mitrokhin Archive & the Secret History of the KGB*, Basic Books, 1985, p. 244.

[50] **(U)**  Oleg Kalugin, "Inside the KGB: An interview with retired KGB Maj. Gen. Oleg Kalugin," *CNN*, January 1998.

12

83

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

(U)  As Sergey Tretyakov, the former SVR (the foreign intelligence service of the Russian Federation, and a successor organization to the KGB) "rezident," or station chief for Russian intelligence in New York, wrote in 2008, "Nothing has changed. . . . Russia is doing everything it can today to embarrass the U.S."[51]

### B.  (U)  Russia's Military and Information Warfare

(U)  While active measures have long been a tool of the Russian intelligence services, a shift toward developing and honing the tools of information warfare represents a more recent development for the Russian conventional military and larger national security establishment.

(U)  The embrace of asymmetric information operations resulted from a number of factors, but chiefly from the Russian national security establishment's belief that these operations are effective.  Pavel Zolotarev, a retired major general in the Russian Army, explained, "We had come to the conclusion . . . that manipulation in the information sphere is a very effective tool."[52] That conclusion was reinforced by the perception that these operations are extremely difficult to defend against, particularly with multinational military alliances like NATO, which is built to deter and if necessary defeat a traditional, conventional military threat.  Information warfare, in addition, is an extremely low-cost alternative to conventional military conflict.

(U)  A lack of alternatives also motivates Russia's reliance on asymmetric tactics. Russia's national security establishment may have had no choice but to increase its asymmetric capabilities given its inability to compete with the West on a more traditional, military hard power basis.  Former National Intelligence Officer for Russia and Eurasia Eugene Rumer stated in 2017 testimony to the Committee that Russia's information warfare toolkit "performs the function of the equalizer that in the eyes of the Kremlin is intended to make up for Russia's weakness vis-à-vis the West."[53]



---

[51] (U)  See Evan Osnos, David Remnick, and Joshua Yaffa, "Trump, Putin, and the new Cold War," *New Yorker*, March 6, 2017.
[52] (U)  *Ibid.*
[53] (U)  Eugene Rumer, Hearing before the Senate Select Committee on Intelligence, March 30, 2017, available at https://www.intelligence.senate.gov/hearings/open.
[54]

13

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

84

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

- ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ██████████████████████████ █

- ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  █████ █

- ████████████████████████████████████████████████████████

- ████████████████████████████████████████████████

- ████████████████████████████████████

- ████████████████████████████████████████████

- ████████████████████████████████████████████

- ████████████████

- █████████████████████████████████████████████

### C. (U) Russia's Weaponization of Social Media

(U) Portending what was to come in 2016, General Philip Breedlove assessed in his September 2014 remarks to the NATO Wales Summit that, regarding Ukraine, "Russia is waging

---

[55] (U) *Ibid.*
[56] (U) *Ibid.*

14

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

85

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

the most amazing information warfare blitzkrieg we have ever seen in the history of information warfare."[57]  Social media platforms enabled Russia's Ukraine campaign, and aided materially in the realization of its military's adoption of information warfare doctrine.

(U)  Compared to more traditional methods for information warfare used in the Cold War, Watts described social media as providing Russia a "cheap, efficient, and highly effective access to foreign audiences with plausible deniability of their influence."[58]

(U)  Russia's aptitude for weaponizing internet-based social media platforms against the United States resulted from Moscow's experience conducting online disinformation campaigns against its own citizens for over a decade.  Russia's online disinformation efforts are rooted in the early and mid-2000s, when the Kremlin sought to suppress opposition in the face of rapidly expanding internet-based communications.[59]

(U)  Studying the technology used by its political opponents, the Kremlin hijacked the capabilities and weaponized their use against Russia's own people.  Russia perfected the use of these tools and methods of information warfare over time, paving the way for its decision to similarly target the citizens of other countries.  Russia has also continued its domestic deployment of these tools.

**D. (U)  Russian Social Media Tactics**

(U)  The Kremlin has honed and refined its social media disinformation tactics over the last decade.  Lessons learned through information warfare campaigns directed both internally

---

[57] **(U)**  *See* John Vandiver, "SACEUR: Allies must prepare for Russia 'hybrid war,'" *Stars and Stripes*, September 4, 2014.
[58] **(U)** Clint Watts, Hearing before the Senate Select Committee on Intelligence, March 30, 2017, available at https://www.intelligence.senate.gov/hearings/open.
[59] **(U)** Michael Connell and Sarah Vogler, "Russia's Approach to Cyber Warfare," CNA Analysis and Solutions, Occasional Paper Series, March 2017.
[60]
[61] **(U)** *Report On The Investigation Into Russian Interference In The 2016 Presidential Election*, Special Counsel Robert S. Mueller, III, March 2019.

15

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

86

████  COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY  ████

and at the populations of regional neighbors provided Moscow valuable insights into how information and social media could be most effectively used against the West.

(U) Although the tactics employed by Russia vary from one campaign to the next, there are several consistent themes in the Russian disinformation playbook.

(U) **High Volume and Multiple Channels.** Russian disinformation efforts tend to be wide-ranging in nature, in that they utilize any available vector for messaging, and when they broadcast their messaging, they do so at an unremitting and constant tempo. Christopher Paul and Miriam Matthews from the RAND Corporation describe the Russian propaganda effort as a "firehose of falsehood," because of its "incredibly large volumes," its "high numbers of channels and messages," and a "rapid, continuous, and repetitive" pace of activity. Russia disseminates the disinformation calculated to achieve its objectives across a wide variety of online vehicles: "text, video, audio, and still imagery propagated via the internet, social media, satellite television and traditional radio and television broadcasting."[62] One expert, Laura Rosenberger of the German Marshall Fund, told the Committee that "[t]he Russian government and its proxies have infiltrated and utilized nearly every social media and online information platform—including Instagram, Reddit, YouTube, Tumblr, 4chan, 9GAG, and Pinterest."[63]

(U) The desired effect behind the high volume and repetition of messaging is a flooding of the information zone that leaves the target audience overwhelmed. Academic research suggests that an individual is more likely to recall and internalize the *initial* information they are exposed to on a divisive topic. As RAND researchers have stated, "First impressions are very resilient."[64] Because first impressions are so durable and resistant to replacement, being first to introduce narrative-shaping content into the information ecosystem is rewarded in the disinformation context.

(U) **Merging Overt and Covert Operations.** The modern Russian disinformation playbook calls for illicitly obtaining information that has been hacked or stolen, and then weaponizing it by disseminating it into the public sphere. The most successful Russian operations blend covert hacking and dissemination operations, social media operations, and fake personas with more overt influence platforms like state-funded online media, including RT and Sputnik.

(U) According to FBI:

████████████████████████████

████████████████████████████

---

[62] **(U)** Christopher Paul and Miriam Matthews, "The Russian 'Firehose of Falsehood,' Propaganda Model," *RAND Corporation,* 2016, https://www.rand.org/content/dam/rand/pubs/perspectives/PE100/PE198/RAND_PE198.pdf.
[63] **(U)** Laura Rosenberger, Written Testimony, Hearing before the Senate Select Committee on Intelligence, August 1, 2018, available at https://www.intelligence.senate.gov/hearings/open.
[64] **(U)** Christopher Paul and Miriam Matthews, "The Russian 'Firehose of Falsehood,' Propaganda Model," *RAND Corporation,* 2016, https://www.rand.org/content/dam/rand/pubs/perspectives/PE100/PE198/RAND_PE198.pdf.

16

████  COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY  ████

87

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

(U)  Another notable example of Russia using social media platforms and news media to advance disinformation objectives occurred in Germany in 2016.  At the center of the operation was a report that falsely accused Arab migrants of sexually assaulting a Russian-German girl. The incident originates with Lisa, a 13-year-old girl from Berlin, who was reported missing by her parents after failing to show up for school.  Initially claiming to have been attacked by men of Middle Eastern or North African appearance, Lisa eventually admitted to having fabricated the entire story.  Despite Lisa's admission to the police that her story was made up, her original account of kidnapping and rape catapulted across social media. While German law enforcement officials formally debunked the initial report, Russian state-controlled news media, including Channel One and later RT, promoted the social media-inspired and ardently anti-migrant fervor among the Russian-German populations, in particular on YouTube.

(U)  Far-right political parties, some of whom are supported by the Kremlin, reacted to these false stories by protesting in Berlin, protests which were covered by RT cameras.  Sputnik then claimed there was a potential police cover-up, citing reporting of its own claim as its only evidence.  A few days later, as protests spread, Russian Foreign Minister Lavrov publicly disputed that Lisa's 30-hour disappearance was voluntary.  Germany, he said, was "covering up reality in a politically correct manner for the sake of domestic politics."[66]  The office of Chancellor Merkel was forced to respond, and the episode added to the confusion and fear surrounding the politically roiling migrant crisis in Germany.

(U)  **Speed.**  Speed is critical to Russia's use of disinformation.  Online, themes and narratives can be adapted and trained toward a target audience very quickly.  This allows Russia

---

[65] **(U)** FBI, Written response to SSCI inquiry of January 3, 2019, March 1, 2019.
[66] **(U)** Jim Rutenberg, "RT, Sputnik and Russia's New Theory of War," *The New York Times Magazine,* September 13, 2017.

17

88

to formulate and execute information operations with a velocity that far outpaces the responsivity of a formal decision-making loop in NATO, the United States, or any other western democracy. For example, within hours of the downing of Malaysian Airlines Flight 17 over Ukraine, Russian media had introduced a menu of conspiracy theories and false narratives to account for the plane's destruction, including an alleged assassination attempt against President Putin, a CIA plot, an onboard explosive, and the presence of a Ukrainian fighter jet in the area.[67,68] Dutch investigators with the Joint Investigation Team determined later the plane was shot down by a surface-to-air missile fired from a Russia-provided weapon system used in separatist-held territory in Ukraine.

(U) **Use of Automated Accounts and Bots.** The use of automated accounts on social media has allowed social media users to artificially amplify and increase the spread, or "virulence," of online content. Russia-backed operatives exploited this automated accounts feature and worked to develop and refine their own bot capabilities for spreading disinformation faster and further across the social media landscape. In January 2018, Twitter disclosed its security personnel assess that over 50,000 automated accounts linked to Russia were tweeting election-related content during the U.S. presidential campaign.[69]

(U) Russian actors are prolific users of automated accounts and bots. Phil Howard, citing the findings of a study done by the Oxford Internet Institute, concluded that Russian Twitter networks "are almost completely bounded by highly automated accounts, with a high degree of overall automation." His study assessed that "some 45 percent of Twitter activity in Russia is managed by highly automated accounts," and that Ukraine remains "the frontline of experimentation in computational propaganda with active campaigns of engagement" between Russian and Ukrainian botnets.[70] Early automation was fairly primitive and easier to detect and disrupt, but malicious bot activity has continued to grow in sophistication.

(U) **Use of Paid Internet "Trolls."** The act of "trolling" online has been a feature of the internet eco-system since the development of online chat rooms, blogs, internet forums, and other early communications platforms. An internet "troll" is a real person sitting behind a keyboard who posts inflammatory, aggressive, harassing, or misleading messages online in an attempt to provoke a response from other users of social media.[71] Kremlin-backed entities have spent years professionalizing a cadre of paid trolls, investing in large-scale, industrialized "troll

---

[67] (U) Joel Gunter and Olga Robinson, "Sergei Skripal and the Russian disinformation game," *BBC News*, September 9, 2018.
[68] (U) Margaret Hartmann, "Russia's 'Conspiracy Theory': MH17 Shot Down by Ukrainian Fighter Jet or Missile," *New York Magazine*, July 22, 2014.
[69] (U) Twitter Public Policy Blog, "Update on Twitter's review of the 2016 US election," January 19, 2018.
[70] (U) Samuel Woolley and Phil Howard, "Computational Propaganda Worldwide: Executive Summary," Computational Propaganda Research Project, Oxford Internet Institute, University of Oxford, November 2017, http://comprop.oii.ox.ac.uk/wp-content/uploads/sites/89/2017/06/Casestudies-ExecutiveSummary.pdf.
[71] (U) The concept of a "troll" online is subjective and can encompass a range of differing motivations, tactics, and objectives. For the purposes of this paper, the Committee is focused on professional "trolls" who are paid to engage in dialogue online and provide commentary and content on various social media and news channels.

18

89

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

farms," in order to obscure Moscow's hand and advance the aims of Russia's information operations both domestically and abroad.

(U)  While Russia's use of trolls has been more widely exposed in recent years, one of the first public exposures came through WikiLeaks in early 2012 and subsequent reporting by *The Guardian.* According to data and documents provided to WikiLeaks by a group operating under the moniker "Anonymous," the Kremlin-backed youth group Nashi was paying a network of bloggers and trolls to support President Putin and undermine his political opposition online. These Putin-supported commentators were paid to comment on articles, "dislike" anti-Putin YouTube videos, and support smear campaigns against opposition leaders.[72]

(U)  In 2015, NATO's Strategic Communications Center of Excellence commissioned research on the use of trolling in hybrid warfare, publishing its conclusions in the spring of 2016. The study, which was largely focused on discussions surrounding the Ukraine-Russia conflict, outlined a variety of influence techniques employed by trolls online, including the aggressive use of offensive slurs and attacks; utilization of irony and sarcasm; peddling conspiracy theories; employing profile pictures of young, attractive men and women; diverting discourse to other problems; posting misleading information on information sources like *Wikipedia*; emphasizing social divisions; and presenting indigestible amounts of data without sources or verification.[73]

(U)  In addition to the aggressive and persistent pushing of Kremlin-narrated themes and content, a principal objective of the Russian internet troll appears to be stifling the democratic debate entirely.

(U)  As journalist Adrian Chen of *The New Yorker* reported, the objectives for Russia's troll army are primarily "to overwhelm social media with a flood of fake content, seeding doubt and paranoia, and destroying the possibility of using the Internet as a democratic space."[74] Leonid Volkov, a Russian politician and supporter of opposition leader Alexei Navalny, told Chen, "The point [of Russian disinformation] is to create the atmosphere of hate, to make it so stinky that normal people won't want to touch it."  He stressed, "Russia's information war might be thought of as the biggest trolling operation in history, and its target is nothing less than the utility of the Internet as a democratic space."[75]  Exemplifying the assertion, a 2015 analysis by the Finnish public broadcasting company concluded that many Finns elect to simply disengage from online discussions due to trolling, as "they did not see the use of fighting with masses of aggressive comments or threatening messages."[76]

---

[72] (U)  Miriam Elder, "Hacked emails allege Russian youth group Nashi paying bloggers," *The Guardian*, February 7, 2012.
[73] (U)  Sanda Svetoka, et al., "Social Media as a Tool of Hybrid Warfare," NATO Strategic Communications Centre of Excellence, May 2016, https://www.stratcomcoe.org/social-media-tool-hybrid-warfare.
[74] (U)  Adrian Chen, "The Real Paranoia-Inducing Purpose of Russian Hacks," *The New Yorker*, July 27, 2016.
[75] (U)  *Ibid.*
[76] (U)  Sanda Svetoka, et al., "Social Media as a Tool of Hybrid Warfare," NATO Strategic Communications Centre of Excellence, May 2016, https://www.stratcomcoe.org/social-media-tool-hybrid-warfare.

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

(U) **Manipulating Real People and Events.** Russian-backed trolls pushing disinformation have also sought to connect with and potentially coopt individuals to take action in the real world. From influencing unwitting Americans to retweet or spread propaganda, to convincing someone to host a real world protest, Russian disinformation agents employ online methods to attract and exploit a wide range of real people.

(U) In testifying to the Committee in 2017, Clint Watts outlined three different types of potential real-world targets for Russian influence operators.[77] A class of "useful idiots" refers to unwitting Americans who are exploited to further amplify Russian propaganda, unbeknownst to them; "fellow travelers" are individuals ideologically sympathetic to Russia's anti-western viewpoints who take action on their own accord; and "agent provocateurs" are individuals who are actively manipulated to commit illegal or clandestine acts on behalf of the Russian government. As Watts explains, "Some people are paid for. Some are coerced. Some are influenced. Some agree. Some don't know what they're doing. . . . Where they fall on that spectrum may not matter ultimately." What matters most, he argues, is the message they are carrying and whether its reach is growing.[78]

### E. (U) Features of Russian Active Measures

(U) Although information warfare can target an opposing government, its officials, or its combat forces, Russian information warfare on social media is often aimed squarely at attacking a society and its relationship to its own democratic institutions.. Modern Russian active measures on social media exhibit several notable features.

(U) **Attacking the Media.** Information warfare, at its core, is a struggle over information and truth. A free and open press—a defining attribute of democratic society—is a principal strategic target for Russian disinformation. As Soviet-born author Peter Pomerantsev notes, "The Kremlin successfully erodes the integrity of investigative and political journalism, producing a lack of faith in traditional media." He concludes, "The aim of this new propaganda is not to convince or persuade, but to keep the viewer hooked and distracted, passive and paranoid, rather than agitated to action."[79]

(U) Jakub Kalensky, a former official with the European Union's rapid response team created to counter Russian disinformation, similarly argues, "It's not the purpose to persuade someone with one version of events. The goal for Russia is to achieve a state in which the

---

[77] (U) Clint Watts, Hearing before the Senate Armed Services Committee, April 27, 2017, available at https://www.fpri.org/wp-content/uploads/2017/04/Watts-Testimony-Senate-Armed-Services-email-distro-Final.pdf.
[78] (U) Denise Clifton, "A Murder Plot, a Twitter Mob and the Strange Unmasking of a Pro-Kremlin Troll," *Mother Jones*, June 5, 2018.
[79] (U) Peter Pomerantsev and Michael Weiss, "The Menace of Unreality: How the Kremlin Weaponizes Information, Culture and Money," *Institute of Modern Russia*, 2014, https://imrussia.org/media/pdf/Research/Michael_Weiss_and_Peter_Pomerantsev__The_Menace_of_Unreality.pdf.

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

91

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

average media consumer says, 'There are too many versions of events, and I'll never know the truth.'"[80]

(U)  **Fluid Ideology.**  Because the Kremlin's information warfare objectives are not necessarily focused on any particular, objective truth, Russian disinformation is unconstrained by support for any specific political viewpoint and continually shifts to serve its own self-interest. Provided the information space is rendered confused and clouded, Russia's information operatives are unencumbered and can support any and all perspectives.

(U)  An August 2018 report on information manipulation commissioned by the French government notes that the Kremlin "can simultaneously support far right and far left movements, so long as they are in competition with one another."  As examples, the report cites the downing of Malaysian Airlines Flight 17, the chemical attacks in the Syrian town of Douma, and the poisoning of Sergei and Yulia Skripal in Salisbury, England, as instances in which Kremlin-backed disinformation amplified far-fetched and mutually exclusive conspiracy theories on both sides of the political spectrum.[81]  This key characteristic distinguishes modern day Russian operations from former Soviet Union-era active measures campaigns.  Speaking to the resultant operational flexibility, Pomerantsev describes the transition: "Unlike in the Cold War, when Soviets largely supported leftist groups, a fluid approach to ideology now allows the Kremlin to simultaneously back far-left and far-right movements, greens, anti-globalists, and financial elites. The aim is to exacerbate divides and create an echo chamber of Kremlin support."[82]

(U)  In sum, the modern-day Russian information warfare campaign combines the advantages of social media information delivery and the operational freedom of being ideologically agnostic.

(U)  **Exploiting Existing Fissures.**  Successful Russian active measures attempt to exploit societal divisions that already exist, rather than attempt to create new ruptures. Alexander Sharavin, the head of a military research institute and a member of the Academy of Military Sciences in Moscow, provides an illustrative example in relation to the Queen's popular appeal in the England: "If you go to Great Britain, for example, and tell them the Queen is bad, nothing will happen, there will be no revolution, because the necessary conditions are absent— there is no existing background for this operation."  As Thomas Rid noted in his 2017 testimony to the Committee, "The tried and tested way of active measures is to use an adversary's existing weaknesses against himself, to drive wedges into pre-existing cracks: the more polarized a

---

[80] **(U)**  *See* Joby Warrick and Anton Troianovski, "Agents of doubt," *Washington Post*, December 10, 2018.
[81] **(U)**  Jean-Baptiste Jeangene Vilmer, et al., "Information Manipulation: A Challenge for our Democracies," Policy Planning Staff (CAPS) of the Ministry for Europe and Foreign Affairs and the Institute for Strategic Research (IRSEM) of the Ministry for the Armed Forces, Paris, August 2018,
https://www.diplomatie.gouv.fr/IMG/pdf/information_manipulation_rvb_cle838736.pdf.
[82] **(U)**  Peter Pomerantsev and Michael Weiss, "The Menace of Unreality: How the Kremlin Weaponizes Information, Culture and Money," *Institute of Modern Russia*, 2014,
https://imrussia.org/media/pdf/Research/Michael_Weiss_and_Peter_Pomerantsev__The_Menace_of_Unreality.pdf.

21

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

92

society, the more vulnerable it is."[83]  Institutions and norms that define western liberal democracies—open and competitive elections, free flow of information, vibrant press freedoms, freedom of speech, and diverse societies—are conducive to exploitation by anti-Western propagandists.

(U)  **Indirect Objectives.**  As western governments grapple with addressing an internet operating environment that at present favors Russia, democratic institutions and constituencies must also weigh the potential indirect objectives of Russian active measures.  As the August 2018 French disinformation report points out, the desired objectives of disinformation on a population can be two-fold.  The direct objective, discussed earlier in this Volume, uses information manipulation to push the target audience in a preferred direction.  The indirect objective entices overreach by the targeted country's government—in essence, baiting governments to respond in a heavy-handed or improper fashion that is irreconcilable with the nation's principles and civil liberties.  The *indirect* objective, is, according to the French report, "not so much to convince a population of this or that story as to lead governments to take measures that are contrary to their democratic, liberal values, which, in turn, will provoke a reaction."[84]

(U)  Similarly, even the fear of active measures being unleashed on a society risks societal damage, whether the foreign capability exists or not.  Democratic governments and populations must balance the need for calling out and shining light on Russian activities with remaining realistic and sober about Moscow's actual capabilities and their effectiveness.

(U)  The public needs to be made aware of the tactics being directed at them, but there also needs to be appreciation for the limitations of those tactics.  As Massimo Calabresi reports in his 2017 *Time* article on Russia's social media war on America, "the fear of Russian influence operations can be more damaging than the operations themselves.  Eager to appear more powerful than they are, the Russians would consider it a success if you questioned the truth of your news sources, knowing that Moscow might be lurking in your Facebook or Twitter feed."[85]

## V.  (U)  THE INTERNET RESEARCH AGENCY

(U)  The IRA is an entity headquartered in St. Petersburg, Russia, which since at least 2013 has undertaken a variety of Russian active measures campaigns at the behest of the Kremlin.  The IRA has conducted virtual and physical influence operations in Russia, the United States, and dozens of other countries.  The IRA conducted a multi-million dollar, coordinated

---

[83] (U) Thomas Rid, Hearing before the Senate Select Committee on Intelligence, March 30, 2017, available at https://www.intelligence.senate.gov/hearings/open.
[84] (U) Jean-Baptiste Jeangene Vilmer, et al., "Information Manipulation: A Challenge for our Democracies," Policy Planning Staff (CAPS) of the Ministry for Europe and Foreign Affairs and the Institute for Strategic Research (IRSEM) of the Ministry for the Armed Forces, Paris, August 2018,
https://www.diplomatie.gouv.fr/IMG/pdf/information_manipulation_rvb_cle838736.pdf.
[85] (U) Massimo Calabresi, "Inside Russia's Social Media War on America," *Time*, May 18, 2017.

22

93

effort to influence the 2016 U.S. election as part of a broader information campaign to harm the United States and fracture its society.[86]

### A. (U) Yevgeniy Prigozhin and the Kremlin

(U)  The IRA is funded and directed by Yevgeniy Prigozhin, a Russia oligarch who works to conduct intelligence operations, military activities, and influence operations globally on behalf of the Kremlin.  The IRA is one of several companies Prigozhin owns.  He has also been linked to the financing and direction of the Wagner Group, a contract security organization that provides unofficial paramilitary support for Russian military operations.



(U)  Prigozhin is a businessman and restauranteur who acquired the nickname "Putin's Chef," in part for the numerous catering contracts his company was awarded by the Russian government, including one for President Putin's 2012 inauguration.  Prigozhin's companies have branched into areas including online propaganda, harassment of opposition leaders, and contracting a privatized military force to fight in Ukraine and Syria.  *Fontanka*, a leading St. Petersburg news website, has also reported that Prigozhin's companies have secured oil revenues from Syrian oil fields in exchange for providing soldiers to protect those fields.[88]



---

[86] **(U)** Indictment, *United States v. Internet Research Agency, et al.*, Case 1:18-cr-00032-DLF (D.D.C. Feb. 16, 2018).

[87]

[88] **(U)** Neil MacFarquhar, "Meet Yevgeny Prigozhin, the Russian Oligarch Indicted in U.S. Election Interference," *New York Times*, February 16, 2018.

[89]

23

94

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

(U)  Prigozhin was publicly exposed as the main financial supporter of the IRA as early as 2014,[90] and his close relationship with Putin has been reported in numerous media sources, with the two appearing together in public photographs."[91]

(U)  Prigozhin and companies he controlled, along with nine other employees, were indicted in the District of Columbia for a number of criminal violations, including acting as unregistered foreign agents inside the United States.[92]  Further, Prigozhin and his companies have been targeted by the U.S. Department of Treasury with sanctions for "interfering with or undermining election processes and institutions," with specific respect to the 2016 U.S. presidential election.[93]  Demonstrating that IRA operations were related to the broader scope of the Kremlin's objectives, these sanctions were announced alongside additional designations against the FSB and the Russian military intelligence organization, the GRU.  Both entities were also designated for their online efforts to target the U.S. Government and undermine the election.

(U)  Despite these public connections to the Russian government, President Putin denies any knowledge of Prigozhin's trolling operation. The Committee finds this denial to be false.



B. (U)  IRA Operations



---

[90] (U)  Max Seddon, "Documents Show How Russia's Troll Army Hit America," *BuzzFeed*, June 2, 2014.
[91] (U)  Neil MacFarquhar, "Yevgeny Prigozhin, Russian Oligarch Indicted by U.S., Is Known as Putin's Cook," New York Times, February 16, 2018.
[92] (U)  Indictment, *United States v. Internet Research Agency, et al.*, Case 1:18-cr-00032-DLF (D.D.C. Feb. 16, 2018).
[93] (U)  Department of Treasury, "Treasury Sanctions Russian Cyber Actors for Interference with the 2016 U.S. Elections and Malicious Cyber-Attacks," March 15, 2018, https://home.treasury.gov/news/press-releases/sm0312.
[94]
[95] (U)  *Ibid.*
[96] (U)  *Ibid.*

24

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

95

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY



(U)  According to the Special Counsel's Office, the IRA was funded as part of a larger interference operation called "Project Lakhta," which was part of a global set of operations undertaken both within Russia and abroad.  The monthly budget for Project Lakhta "exceeded 73 million Russian rubles (over 1,250,000 U.S. dollars), including approximately one million rubles in bonus payments."[103]

### C.  (U)  The Role of the IRA Troll

(U)  A 2015 article by Adrian Chen in *The New York Times Magazine* provides a detailed open source account of the IRA's operations.  According to that article, in 2015 the IRA had an estimated 400 employees who worked 12-hour shifts, divided between numerous departments, filling nearly 40 rooms.  The trolls would create content on nearly every social media network—including LiveJournal, VKontakte (a Russia-based social media platform modeled after Facebook), Facebook, Twitter, and Instagram.  Managers responsible for overseeing the trolls would monitor the workplace by CCTV and were "obsessed with statistics" like page views,



97

98 **(U)** *Ibid.*
99 **(U)** *Ibid.*
100

101 **(U)** *Ibid.*
102 **(U)** *Ibid.*
103 **(U)** Indictment, *United States v.  Internet Research Agency, et al.*, Case 1:18-cr-00032-DLF (D.D.C. Feb. 16, 2018).

25

96

posts, clicks, and traffic. One IRA employee, Ludmila Savchuk, described work shifts during which she was required to meet a quota of five political posts, 10 nonpolitical posts, and 150 to 200 comments on other trolls' postings.[104]

(U) *The first thing employees did upon arriving at their desks was to switch on an Internet proxy service, which hid their I.P. addresses from the places they posted; those digital addresses can sometimes be used to reveal the real identity of the poster. Savchuk would be given a list of the opinions she was responsible for promulgating that day. Workers received a constant stream of 'technical tasks' —point-by-point exegeses of the themes they were to address, all pegged to the latest news.*[105]

(U) Savchuk's description largely matches similar depictions outlined in a series of leaked documents from an unidentified Russian hacker organization in June 2014. The leaked documents, purported to be attached to internal emails from within the IRA, describe the responsibilities of the IRA teams. As reported by *BuzzFeed* at the time:

*On an average working day, the Russians are to post on news articles 50 times. Each blogger is to maintain six Facebook accounts publishing at least three posts a day and discussing the news in groups at least twice a day. By the end of the first month, they are expected to have won 500 subscribers and get at least five posts on each item a day. On Twitter, the bloggers are expected to manage 10 accounts with up to 2,000 followers and tweet 50 times a day.*[106]

(U) As a member of the Special Projects department of the IRA, Savchuk was responsible for creating and maintaining believable, fake personas online that would eventually seed pro-Kremlin narratives into their otherwise normal-looking online activities. One former employee said: "We had to write 'ordinary posts,' about making cakes or music tracks we liked, but then every now and then throw in a political post about how the Kiev government is fascist, or that sort of thing." Instructions for those political posts would come to the bloggers every morning as "technical tasks," which would have a "news line, some information about it, and a 'conclusion' that the commenters should reach."[107] As described by Chen, "The point was to weave propaganda seamlessly into what appeared to be the nonpolitical musings of an everyday person."[108]

(U) According to two former employees who spoke to *The Guardian*, trolls were paid based on their capabilities and the expertise required to maintain their particular fake personas. One employee who signed a non-disclosure agreement was paid around 45,000 rubles a month (roughly $700), while others could make up to 65,000 rubles (roughly $1,000) monthly if they

---

[104] (U) Adrian Chen, "The Agency," *The New York Times Magazine*, June 2, 2015.
[105] (U) *Ibid.*
[106] (U) Max Seddon, "Documents Show How Russia's Troll Army Hit America," *BuzzFeed*, June 2, 2014.
[107] (U) Shaun Walker, "Salutin' Putin: Inside a Russian troll House," *The Guardian*, April 2, 2015.
[108] (U) Adrian Chen, "The Agency," *The New York Times Magazine*, June 2, 2015.

26

97

were able to join the most prestigious wing of the IRA, the English-language trolls. Penalties were instituted for employees who failed to reach their quota or were caught copying previous posts as opposed to creating new content. The trolls worked "round the clock to flood Russian internet forums, social networks and the comments sections of western publications with remarks praising the President, Vladimir Putin, and raging at the depravity and injustice of the west."[109]

(U) One former employee's description of his work at the IRA is notable:

> *I arrived there, and I immediately felt like a character in the book '1984' by George Orwell—a place where you have to write that white is black and black is white. Your first feeling, when you ended up there, was that you were in some kind of factory that turned lying, telling untruths, into an industrial assembly line. The volumes were colossal—there were huge numbers of people, 300 to 400, and they were all writing absolute untruths. It was like being in Orwell's world.[110]*

(U) The Special Counsel's Office description of the IRA's activities is consistent with much of the reporting derived from interviews of former employees. As an example, the IRA indictment alleges in detail how IRA employees, referred to as "specialists," were tasked with creating fake social media accounts that purported to be U.S. citizens engaged on social media:

> *The specialists were divided into day-shift and night-shift hours and instructed to make posts in accordance with the appropriate U.S. time zone. The [IRA] also circulated lists of U.S. holidays so that specialists could develop and post appropriate account activity. Specialists were instructed to write about topics germane to the United States such as U.S. foreign policy and U.S. economic issues. Specialists were directed to create "political intensity through supporting radical groups, users dissatisfied with [the] social and economic situation and oppositional social movements."[111]*

(U) The indictment indicates that IRA management made efforts to monitor and track the impact of its online efforts, through measurables such as comments, likes, reposts, changes in audience size, and other metrics.[112]



---

[109] (U) Shaun Walker, "Salutin' Putin: Inside a Russian troll House," *The Guardian*, April 2, 2015.
[110] (U) Anton Troianovski, "A former Russian troll speaks: 'It was like being in Orwell's world,'" *Washington Post*, February 17, 2018.
[111] (U) Indictment, *United States v. Internet Research Agency, et al.*, Case 1:18-cr-00032-DLF (D.D.C. Feb. 16, 2018).
[112] (U) *Ibid.*

27

98



### D. (U)  Troll Narratives

(U)  The IRA's trolls monitored societal divisions and were poised to pounce when new events provoked societal discord.  For example, a former IRA troll interviewed by the *Guardian* in 2015 described his focus on race-related issues: "When there were black people rioting in the U.S. we had to write that U.S. policy on the black community had failed, Obama's administration couldn't cope with the problem, the situation is getting tenser.  The negroes are rising up."[115]



(U)  Leaked IRA documents from 2014 reveal a sophisticated approach to the various social media platforms aimed at ensuring trolls could evade online monitors.  IRA employees were taught how to comment on each of the different websites so as to avoid being blocked or removed.  As an example, one author outlined how to write for the fringe site WorldNetDaily: "Direct offense of Americans as a race are not published ('Your nation is a nation of complete idiots') . . . nor are vulgar reactions to the political work of Barack Obama."[117]

---

[113] ███████████████████████████████████████████████████

[114] (U)  *Ibid.*

[115] (U)  Shaun Walker, "Salutin' Putin: Inside a Russian troll House," *The Guardian*, April 2, 2015.

[116] ███████████████████████████████████████████████████

[117] (U)  Max Seddon, "Documents Show How Russia's Troll Army Hit America," *BuzzFeed*, June 2, 2014.

28

99

(U) Developing and applying a familiarity with the American political space was also a critical function of the IRA trolling operation. According to a former employee interviewed by the news outlet *Dozhd*, IRA personnel were required to study and monitor tens of thousands of comments in order to better understand the language and trends of internet users in the United States. The ex-troll indicated that they were taught to avoid crude and offensive language that would be off-putting to the typical online reader.[118] According to the former employee, the IRA office dedicated to inflaming sentiments in the United States was prohibited from promoting anything about Russia or President Putin—primarily because, in the IRA's assessment, Americans do not normally talk about Russia. "Our goal wasn't to turn the Americans toward Russia . . . . Our task was to set Americans against their own government: to provoke unrest and discontent, and to lower Obama's support ratings."[119] IRA employees were trained to understand and exploit the nuances of politically sensitive issues in America, including taxes, LGBT rights, and the Second Amendment. Once IRA employees better understood the political fault lines and how Americans naturally argued online, their job was to incite them further and try to "rock the boat."[120]

(U) More recent open source reporting has provided fresh insight into the inner workings and goals of the IRA operation. Marat Mindiyarov, a former IRA troll, outlined for the Washington Post in 2018 how important Facebook became to the IRA. Mindiyarov described how workers in the Facebook Department of the IRA were paid twice as much and included a younger, more pop culturally literate crowd. In order to graduate to the Facebook Department, these trolls had to take a test to prove their English language skills, their ability to comment on American political nuance, and to confirm they had the necessary opposition to the United States.[121]

## VI. (U) IRA ACTIVITIES AGAINST THE UNITED STATES IN 2016

### A. (U) Origins of IRA Activity in the United States

(U) The IRA's foray into influence operations targeting the 2016 election began with a 2014 intelligence-gathering mission to the United States undertaken by two female employees: Anna Bogacheva and Aleksandra Krylova.

(U) Bogacheva worked for the IRA from the spring of 2014 to the fall of 2016.[122] Krylova, who began her employment in St. Petersburg in the fall of 2013 at the latest, rose to

[118] (U) Meduza, "An ex-St. Petersburg 'troll' speaks out," October 15, 2017 (summarizing an interview with "Maxim" by *Dozhd*).
[119] (U) *Ibid.*
[120] (U) *Ibid.*
[121] (U) Anton Troianovski, "A former Russian troll speaks: 'It was like being in Orwell's world,'" *Washington Post*, February 17, 2018.
[122] (U) Scott Shane and Mark Mazzetti, "The Plot to Subvert an Election – Unraveling the Russia Story So Far," *The New York Times*, September 20, 2018: https://www.nytimes.com/interactive/2018/09/20/us/politics/russia-interference-election-trump-clinton.html?rref=collection%2Fsectioncollection%2Fpolitics.

29

100

become the IRA's third-highest ranking employee by the spring of 2014.  Both secured visas to visit the United States in June 2014, and the two made stops in "Nevada, California, New Mexico, Colorado, Illinois, Michigan, Louisiana, Texas, and New York," according to the IRA indictment.[123]

████████████████████████ Operating as a reconnaissance team for the IRA, the two were sent to collect intelligence to be used in the organization's information warfare against the United States.  Prior to the trip, they had worked with their colleagues to plan itineraries and purchase equipment, including "cameras, SIM cards, and drop phones."  They also worked on various "evacuation scenarios" and other security measures for their trip.[124] Their visit likely helped the IRA refine tactics to be used on social media, but the trip represents only a small part of the wider operational effort to track and study Americans' online activities, understand U.S. political and social divisions, impersonate U.S. citizens online, and ultimately engage in information warfare against the United States. ████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

(U)  According to the Special Counsel's Office, by April 2014, the IRA had formed a new department inside the larger organization that was focused solely on the U.S. population. Referred to as the "translator project," and alternately as the "Translator Department," the American department of the operation would grow to over 80 employees by July 2016.[126]  By the summer of 2016, at the height of the U.S. campaign season, the "translator project" employees were posting more than 1,000 pieces of content per week, reaching between 20 and 30 million people in the month of September alone.[127]  In addition, the IRA employees began contacting unwitting U.S. persons to better refine their tactics and targets.  In one communication, an IRA operative posed as an American and spoke with a Texas-based grassroots organization, learning from the conversation that they should focus their activities on "purple states like Colorado, Virginia & Florida."[128]

---

[123] **(U)** Indictment, *United States v. Internet Research Agency, et al.,* Case 1:18-cr-00032-DLF (D.D.C. Feb. 16, 2018).
[124] **(U)** *Ibid.*
[125] ████████████████████████████████████████████████████████
████████████████████
[126] **(U)** Indictment, *United States v. Internet Research Agency, et al.,* Case 1:18-cr-00032-DLF (D.D.C. Feb. 16, 2018); Special Counsel Robert S. Mueller, III, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election,* March 2019, Volume I, p. 26.
[127] **(U)** *See* Hannah Levintova, "Russian Journalists Just Published a Bombshell Investigation About a Kremlin-Linked 'Troll Factory,'" *Mother Jones,* October 18, 2017. Original report in Russian available at https://www.rbc.ru/magazine/2017/11/59e0c17d9a79470e05a9e6c1.
[128] **(U)** Indictment, *United States v. Internet Research Agency, et al.,* Case 1:18-cr-00032-DLF (D.D.C. Feb. 16, 2018).

101

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████

█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████

- ████████████████████████████

- ██████████████████████████████████

- ████████████████████████████████████████
  ████████████████

- ██████████████████████████████████████████

- ████████████████████████████████

129 ██████████████████████████████████████████
130 (U) Ibid.
131 ████████████████████████████████████████
132 (U) Ibid.

31

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

102

(U)  The IRA built a wide-ranging information operation designed to complement these other Russian influence activities directed toward interfering with and undermining U.S. democracy in 2016.  The expanse and depth of this effort would only be understood in the aftermath of that campaign.

### B.  (U)  IRA Operations Explicitly Targeting the 2016 U.S. Election

(U)  At the direction of the Kremlin, the IRA sought to influence the 2016 U.S. presidential election by harming Hillary Clinton's chances of success and supporting Donald Trump.[133]

(U)  The overwhelming majority of the content disseminated by the IRA did not express clear support for one presidential candidate or another.  Instead, and often within the context of the election or in reference to a candidate, most IRA content discreetly messaged narratives of disunity, discontent, hopelessness, and contempt of others, all aimed at sowing societal division.  Nevertheless, a significant body of IRA content dealt with the election, and specifically the Republican and Democrat candidates.  The TAG study led by Renee DiResta concluded that for all data analyzed, which included data captured before and after the 2016 U.S. election, roughly 6 percent of tweets, 18 percent of Instagram posts, and 7 percent of Facebook posts from IRA accounts mentioned Donald Trump or Hillary Clinton by name.  On Facebook, that percentage translated to 1,777 posts that specifically mention Hillary Clinton (or a derivative moniker), which in turn generated over 1.7 million user interactions or engagements.[134]

(U)  Numbers of posts are an imperfect and potentially misleading evidentiary base for drawing conclusions about motivations and objectives.  The relatively low number of IRA Facebook and Twitter account posts that specifically mention either candidate is not dispositive of the IRA's intent to influence voters.  In practice, the IRA's influence operatives dedicated the balance of their effort to establishing the credibility of their online personas, such as by posting innocuous content designed to appeal to like-minded users.  This innocuous content allowed IRA influence operatives to build character details for their fake personas, such as a conservative Southerner or a liberal activist, until the opportune moment arrived when the account was used to deliver tailored "payload content" designed to influence the targeted user.  By this concept of operations, the volume and content of posts can obscure the actual objective behind the influence operation.  "If you're running a propaganda outfit, most of what you publish is factual so that

---

[133] **(U)** ODNI, "Assessing Russian Activities and Intentions in Recent US Elections," Intelligence Community Assessment (Declassified Version), January 6, 2017, https://www.dni.gov/files/documents/ICA_2017_01.pdf.; Report On The Investigation Into Russian Interference In The 2016 Presidential Election, Special Counsel Robert S. Mueller, III, March 2019.
[134] **(U)** Renee DiResta, Dr.  Kris Shaffer, Becky Ruppel, David Sullivan, Robert Matney, Ryan Fox, Dr.  Jonathan Albright, and Ben Johnson, "The Tactics and Tropes of the Internet Research Agency," *New Knowledge*, December 17, 2018, https://www.newknowledge.com/articles/the-disinformation-report/.

32

103

you're taken seriously," Graphika CEO and TAG researcher John Kelly described to the Commttee, "[T]hen you can slip in the wrong thing at exactly the right time."[135]

(U)  The tactic of using select payload messages among a large volume of innocuous content to attract and cultivate an online following is reflected in the posts made to the IRA's "Army of Jesus" Facebook page.  The page, which had attracted over 216,000 followers by the time it was taken down by Facebook for violating the platform's terms of service, purported to be devoted to Christian themes and Bible passages.  The page's content was largely consistent with this façade. The following series of posts from the "Army of Jesus" page illustrates the use of this tactic, with the majority of posts largely consistent with the page's theme, excepting the November 1, 2016 post that represents the IRA's payload content:

- October 26, 2016: "There has never been a day when people did not need to walk with Jesus."

- October 29, 2016: "I've got Jesus in my soul.  It's the only way I know. . . . Watching every move I make, guiding every step I take!"

- October 31, 2016: "Rise and shine—realize His blessing!"

- October 31, 2016: "Jesus will always be by your side.  Just reach out to Him and you'll see!"

- November 1, 2016:  "HILLARY APPROVES REMOVAL OF GOD FROM THE PLEDGE OF ALLEGIANCE."

- November 2, 2016: "Never hold on anything [sic] tighter than you holding unto God!"

(U)  This pattern of character development, followed by confidence building and audience cultivation, punctuated by deployment of payload content is discernable throughout the IRA's content history.

(U)  The IRA's ideologically left-leaning and right-leaning social media accounts posted content that was political in nature and made reference to specific candidates for President. Hillary Clinton, however, was the only candidate for President whose IRA-posted content references were uniformly negative.  Clinton's candidacy was targeted by both the IRA's left and right personas, and both ideological representations were focused on denigrating her.  As Renee DiResta notes, the political content of the IRA, "was unified on both sides in negativity towards Secretary Clinton."[136]  The IRA's left-leaning accounts focused their efforts on denigrating

---

[135] (U)  John Kelly, Hearing before the Senate Select Committee on Intelligence, August 1, 2018, available at https://www.intelligence.senate.gov/hearings/open.

[136] (U)  Renee DiResta, Written Statement, Hearing before the Senate Select Committee on Intelligence, August 1, 2018, available at https://www.intelligence.senate.gov/hearings/open.

33

104

████████    ████████
**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

Clinton and supporting the candidacy of either fellow Democrat candidate Bernie Sanders or Green Party candidate Jill Stein, at the expense of Hillary Clinton. Posts from the IRA's right-leaning accounts were unvaryingly opposed to Clinton's candidacy.

   **(U)**  In contrast to the consistent denigration of Hillary Clinton, Donald Trump's candidacy received mostly positive attention from the IRA's influence operatives, though it is important to note that this assessment specifically applies to pre-election content. The Committee's analysis indicates that post-election IRA activity shifted to emphasize and provoke anti-Trump sentiment on the left. DiResta's team assesses that in relation to pre-election content: "The majority of the political content was anti-Hillary Clinton; there appeared to be a consistent preference for then-candidate Donald Trump, beginning in the early primaries. . . . There was no pro-Clinton content."[137]

   **(U)**  Evidence of an overarching pro-Trump and anti-Clinton bias leading up to Election Day 2016 is also found in information obtained by Special Counsel's Office. For instance, IRA employees were directed to focus on U.S. politics and to "use any opportunity to criticize Hillary and the rest (except Sanders and Trump—we support them)."[138] Another IRA employee was criticized internally for having a "'low number of posts dedicated to criticizing Hillary Clinton' and was told 'it is imperative to intensify criticizing Hillary Clinton' in future posts."[139] Content and hashtags produced by IRA employees included "#Trump2016," "#TrumpTrain," "#MAGA," "#IWontProtectHillary," and "#Hillary4Prison."[140]

   **(U)**  One communication obtained by the Committee details an IRA employee's description of Election Day 2016, from the vantage of an information warfare operative: "On November 9, 2016, a sleepless night was ahead of us. And when around 8 a.m. the most important result of our work arrived, we uncorked a tiny bottle of champagne . . . took one gulp each and looked into each other's eyes. . . . We uttered almost in unison: 'We made America great.'"[141]

   **(U)**  Further, the IRA's attempts to engage political activists by using false U.S. personas to "communicate with unwitting members, volunteers, and supporters of the Trump Campaign involved in local community outreach, as well as grassroots groups that supported then-candidate Trump."[142]

---

[137] **(U)** Rence DiResta, SSCI Transcript of the Closed Briefing on Social Media Manipulation in 2016 and Beyond, July 26, 2018.
[138] **(U)** Indictment, *United States v. Internet Research Agency, et al.*, Case 1:18-cr-00032-DLF (D.D.C. Feb. 16, 2018).
[139] **(U)** *Ibid.*
[140] **(U)** *Ibid.*
[141] ████████████████████████████████████████████
[142] **(U)** Indictment, *United States v. Internet Research Agency, et al.*, Case 1:18-cr-00032-DLF (D.D.C. Feb. 16, 2018).

34

████████    ████████
**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

105

(U) In addition to denigrating Hillary Clinton, voter suppression among left-leaning audiences appears to have been another political goal of the IRA's influence operatives. Young Mie Kim, a digital advertisement research expert from the University of Wisconsin, has closely analyzed the IRA's Facebook advertisements. On the basis of Kim's analysis, three types of voter suppression campaigns on Facebook and Instagram emerge, including: "a) turnout suppression/election boycott; b) third-candidate promotion; and c) candidate attack, all targeting nonwhites or likely Clinton voters."[143] Kim found no evidence of a comparable voter suppression effort that targeted U.S. voters on the ideological right.

(U) Renee DiResta found similar evidence:

> Voter suppression narratives were in [the data], both on Twitter (some of the text-to-vote content) and within Facebook, where it was specifically targeting the Black audiences. So the groups that they made to reach out to Black people were specifically targeted with 'Don't Vote for Hillary Clinton,' 'Don't Vote At All,' 'Why Would We Be Voting,' 'Our Votes Don't Matter,' [and] 'A Vote for Jill Stein is Not a Wasted Vote.'[144]

(U) TAG researcher Phil Howard's findings support DiResta's assessment. Howard found that while both the ideological right and left in America were targeted:

> The main difference is that where Conservative and right-wing voters were actively encouraged to get behind Trump's campaign, other voters were encouraged to boycott the election, vote for someone other than Clinton, and become cynical of the political process in general.[145]

(U) Underscoring the insidiousness of the IRA's information warfare campaign, influence operations were conducted in cognizance of the U.S. political schedule and political events. Modifying their tactics and strategy to reflect real-life occurrences, the IRA's operatives would increase their activity around events relevant to the campaign schedule. This included pre-election events, like "candidate debates, [the] Republican convention, [and] Trump crossing the delegate threshold."[146] For example, "significant bursts of IRA activity" coincided with the third Democratic primary debate in January 2016, the sixth Republican primary debate in January 2016, the presidential debates between Clinton and Trump in the fall of 2016, and on

---

[143] (U) Young Mie Kim, "Uncover: Strategies and Tactics of Russian Interference in US Elections," Project DATA, University of Wisconsin, Madison, September 4, 2018, https://journalism.wisc.edu/wp-content/blogs.dir/41/files/2018/09/Uncover.Kim_.v.5.0905181.pdf.
[144] (U) Renee DiResta, SSCI Transcript of the Closed Briefing on Social Media Manipulation in 2016 and Beyond, July 26, 2018.
[145] (U) Phil Howard, SSCI Transcript of the Closed Briefing on Social Media Manipulation in 2016 and Beyond, July 26, 2018.
[146] (U) Renee DiResta, SSCI Transcript of the Closed Briefing on Social Media Manipulation in 2016 and Beyond, July 26, 2018.

35

106

Election Day 2016.[147]  More broadly, the volume of posts originating from IRA accounts on Facebook and Instagram increased over the period between the national political conventions in July 2016 and Election Day.[148]

(U)  The IRA's information warfare campaign also responded to real-world political events.  For example, the IRA promoted multiple stories and narratives calling into question the state of Hillary Clinton's health after she fell ill at a September 11 memorial service in New York City in September 2016.  IRA influence operatives posted phrased content on Twitter using hashtags that made the content easily discoverable to other Twitter users searching for content related to Clinton's health, including #HillarySickAtGroundZero, #ClintonCollapse, #ZombieHillary, and #SickHillary.  According to researchers at Clemson University, IRA accounts tweeted these hashtags hundreds of times.  As one of those researchers, Darren Linvill, points out:

> You can see the peak times they tweet.  You can see that they shift from hour to hour.  One hour, they'll tweet their left-wing accounts, and the next hour they'll tweet their right-wing accounts. . . . You can see very clearly that it is one organization, and it has applied human capital as is needed, depending on what's happening politically, what current events are.[149]

▬▬▬ A particular spike in IRA activity on October 6, 2016, stands out as an anomaly deserving further scrutiny.  As reported by the *Washington Post* and noted by the Clemson research team, IRA influence operatives posted, at a pace of about a dozen tweets per minute, nearly 18,000 messages from their Twitter accounts on October 6, 2016.  This spike in activity came a day prior to WikiLeaks's publication of emails stolen by the Russian GRU from the account of Hillary Clinton's campaign chairman, John Podesta.  According to the researchers, on October 6 and 7, IRA Twitter accounts—particularly those accounts emulating ideologically left-leaning personas—significantly increased the volume of their content posting, with 93 of the "Left Troll" accounts posting content that could have directly reached other Twitter accounts 20 million times on those two days.[150]  While no clear connection between the spike in IRA Twitter activity and WikiLeaks' release of the emails has been established, the Clemson researchers speculate that the timing was not coincidental: "We think that they [the IRA] were trying to activate and energize the left wing of the Democratic Party, the Bernie wing basically, before the WikiLeaks release that implicated Hillary in stealing the Democratic primary."[151] ▬▬▬▬▬▬

---

[147] **(U)** Phil Howard, Bharath Ganesh, Dimitra Liotsiou, John Kelly, and Camille Francois, "The IRA, Social Media and Political Polarization in the United States, 2012-2018," *Computational Propaganda Research Project, Oxford Internet Institute*, December 2018, https://int.nyt.com/data/documenthelper/534-oxford-russia-internet-research-agency/c6588b4a7b940e551c38/optimized/full.pdf.
[148] **(U)** *Ibid.*
[149] **(U)** Jim Galloway, "Clemson researchers crack open a Russian troll factory," *Associated Press*, August 7, 2018.
[150] **(U)** Craig Timberg and Shane Harris, "Russian operatives blasted 18,000 tweets ahead of a huge news day during the 2016 presidential campaign. Did they know what was coming?" *Washington Post*, July 20, 2018.
[151] **(U)** *Ibid.*

36

107

(U)  As detailed by the Special Counsel's Office, IRA operations to support Trump also involved activities inside the United States.  For example, IRA operatives were able to organize and execute a series of coordinated political rallies titled, "Florida Goes Trump," using the Facebook group "Being Patriotic," the Twitter account @March_for_Trump, and other fabricated social media personas.  Masquerading as Americans, IRA operatives communicated with Trump Campaign staff, purchased advertisements promoting these rallies on Facebook and Instagram, contacted grassroots supporters of then-candidate Trump, solicited U.S. citizens to participate in these events, and even paid select participants to portray Hillary Clinton imprisoned in a cage that had been constructed on a flatbed truck for this purpose.[153]

### C.  (U)  Other IRA Operations Targeting U.S. Politicians and Society

(U)  The IRA targeted not only Hillary Clinton, but also Republican candidates during the presidential primaries.  For example, Senators Ted Cruz and Marco Rubio were targeted and denigrated, as was Jeb Bush.[154]  Even after the 2016 election, Mitt Romney—historically critical of Russia and who memorably characterized the country as the United States' "number one geopolitical foe" during a 2012 presidential debate—was targeted by IRA influence operatives while being considered for Secretary of State in the Trump administration.  Content posted from IRA social media pages and accounts referred to Romney as a "two headed snake" and a "globalist puppet," and IRA operatives posted the hashtag "#NeverRomney," in an effort to undermine his potential nomination.[155]  On November 28, 2016, over 216,000 followers of the IRA's "Being Patriotic" Facebook page received the following post in their News Feed: "Romney was one of the first men who started the NeverTrump movement.  It will be a terrible mistake if Trump sets him as the next secretary of state."

(U)  In addition, the IRA "had a strategic goal to sow discord in the U.S. political system," which included—but was not limited to—targeting the 2016 U.S. presidential election.[156]  John Kelly found that "[i]t's a far more sophisticated an attack than just caring about an election.  And it's not just one election they care about.  They care about the electoral system."[157]  Darren Linvill echoed this point, concluding "[I]n general, there's been too much

---

[153] (U) Indictment, *United States v. Internet Research Agency, et al.*, Case 1:18-cr-00032-DLF (D.D.C. Feb. 16, 2018).
[154] (U) *Ibid*; Renee DiResta, Dr. Kris Shaffer, Becky Ruppel, David Sullivan, Robert Matney, Ryan Fox, Dr. Jonathan Albright, and Ben Johnson, "The Tactics and Tropes of the Internet Research Agency," *New Knowledge*, December 17, 2018: https://www.newknowledge.com/articles/the-disinformation-report/.
[155] (U) Rob Barry and Shelby Holliday, "Russian Trolls Tried to Torpedo Mitt Romney's Shot at Secretary of State," *Wall Street Journal*, March 8, 2018.
[156] (U) Indictment, *United States v. Internet Research Agency, et al.*, Case 1:18-cr-00032-DLF (D.D.C. Feb. 16, 2018).
[157] (U) John Kelly, SSCI Transcript of the Closed Briefing on Social Media Manipulation in 2016 and Beyond, July 26, 2018.

37

108

focus on Russian interference in the election.  It's much more than that.  It's interference in our society, in our culture, in our political conversation."[158]



(U)  No single group of Americans was targeted by IRA information operatives more than African-Americans.  By far, race and related issues were the preferred target of the information warfare campaign designed to divide the country in 2016.  Evidence of the IRA's overwhelming operational emphasis on race is evident in the IRA's Facebook advertisement content (over 66 percent contained a term related to race ) and targeting (locational targeting was principally aimed at "African-Americans in key metropolitan areas with well-established black communities and flashpoints in the Black Lives Matter movement" ), as well as its Facebook pages (one of the IRA's top-performing pages, "Blacktivist," generated 11.2 million engagements with Facebook users), its Instagram content (five of the top 10 Instagram accounts were focused on African-American issues and audiences), its Twitter content (heavily focused on hot-button issues with racial undertones such as the NFL kneeling protests), and its YouTube

---

[158] (U) Jim Galloway, "Clemson researchers crack open a Russian troll factory," *Associated Press,* August 7, 2018.
[159] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[160] (U) *Ibid.*
[161] (U) *Ibid.*
[162] (U) *Ibid.*
[163] (U) *Ibid.*

38

109

activity (96 percent of the IRA's YouTube content was targeted at racial issues and police brutality).

(U)  The IRA's exploitation of racial tensions in an attempt to sow societal discord in the United States is not a new tactic for Russian influence operations.  Rather, it is the latest incarnation of a long-standing Russian focus.  Historically, the KGB's active measures program also made race a central feature of its operational targeting.  As KGB archivist Vasili Mitrokhin noted: "The attempt to stir up racial tensions in the United States remained part of Service A's stock-in-trade for the remainder of the Cold War."  For example, before the Los Angeles Olympics in 1984, KGB officers mailed falsified communications from the Ku Klux Klan to the Olympic committees of African and Asian countries.  KGB officers also forged letters that were "sent to sixty black organizations giving fictitious details of atrocities committed by the [Jewish Defense] League against blacks."[164]

(U)  As the TAG study led by Renee DiResta concluded:

*The most prolific IRA efforts on Facebook and Instagram specifically targeted Black American communities and appear to have been focused on developing Black audiences and recruiting Black Americans as assets. . . . While other distinct ethnic and religious groups were the focus of one or two Facebook Pages or Instagram accounts, the Black community was targeted extensively with dozens; this is why we have elected to assess the messaging directed at Black Americans as a distinct and significant operation.*[165]

(U)  In March 2018, the *Wall Street Journal* was among the first to report on a series of elaborate efforts by IRA operatives to target, coopt, and incite African-Americans to participate in real world activities the IRA promoted online.  African-Americans targeted on social media were asked to deepen their engagement with IRA operatives—from signing petitions to teaching self-defense training courses.  In one instance cited by the *Wall Street Journal*, operatives used the IRA Facebook page, "Black4Black," to solicit from African-American-led businesses in Cleveland, Ohio personal information in exchange for free promotions on social media.[166]  IRA operatives also spearheaded and funded a self-defense program that entailed African-American trainers being paid to teach courses in their communities.  As part of this operation, an African-American activist was paid roughly $700 to teach 12 self-defense classes in a local park under the auspices of the IRA-administered "BlackFist" Facebook page.[167]

---

[164] (U)  Christopher M. Andrew and Vasili Mitrokhin, *The Sword and the Shield: The Mitrokhin Archive & the Secret History of the KGB*, Basic Books, 1985, p. 244.
[165] (U)  Renee DiResta, Dr.  Kris Shaffer, Becky Ruppel, David Sullivan, Robert Matney, Ryan Fox, Dr.  Jonathan Albright, and Ben Johnson, "The Tactics and Tropes of the Internet Research Agency," *New Knowledge*, December 17, 2018, https://www.newknowledge.com/articles/the-disinformation-report/.
[166] (U)  Shelby Holliday and Rob Barry, "Russian Influence Campaign Extracted Americans' Personal Data," *Wall Street Journal*, March 7, 2018.
[167] (U)  *Ibid.*

39

110

█████ **COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY** █████

(U)  Although the specific objectives behind the IRA's efforts to animate American social media users to organize around political and cultural identification is not entirely evident from the available data, the general intent to foment and promote divisiveness and discord amongst the American populace is strongly evidenced, as are the desire and capability of the IRA to effectively coopt unwitting Americans.

### D. (U)  IRA Use of Paid Advertisements

(U)  Paid advertisements were not key to the IRA's activity, and moreover, are not alone an accurate measure of the IRA's operational scope, scale, or objectives, despite this aspect of social media being a focus of early press reporting and public awareness.  According to Facebook, the IRA spent a total of about $100,000 over two years on advertisements—a minor amount, given the operational costs of the IRA are estimated to have been around $1.25 million dollars a month.  The nearly 3,400 Facebook and Instagram advertisements the IRA purchased are comparably minor in relation to the over 61,500 Facebook posts, 116,000 Instagram posts, and 10.4 million tweets that were the original creations of IRA influence operatives, disseminated under the guise of authentic user activity.  Further, numerous high-profile U.S. persons, such as Roger Stone, Michael McFaul, and Sean Hannity, unwittingly spread IRA content by liking IRA tweets or engaging with other IRA social media content, enhancing the potential audience for IRA content by millions of Americans.

(U)  An analysis of the audiences targeted for receipt of those advertisements on Facebook nonetheless indicates that the IRA's use of advertising was consistent with its overall approach to social media.  In particular, the IRA targeted some election swing states with advertisements that leveraged socially incendiary and divisive subjects.  According to the report produced by the TAG working group led by Phil Howard and John Kelly, Facebook users in swing states were targeted 543 times, out of 1,673 instances of location targeting by the IRA.  Additionally, in 342 instances, areas with significant African-American populations were targeted by the IRA with Facebook advertisements.  TAG researchers believe that the targeting had more to do with race than a state's role in the Electoral College or status as a swing state:

> *We found from the data that location targeting of ads was not used extensively by the IRA, with only 1,673 different instances of location targeting, by 760 ads. These ads were usually used to target African Americans in key metropolitan areas with well-established black communities and flashpoints in the Black Lives Matter movement.  Some make reference, for example, to Ferguson, MO, and a smaller group of ads that marketed rallies and demonstrations to users living in particular places.[168]*

---

[168] (U)  Phil Howard, Bharath Ganesh, Dimitra Liotsiou, John Kelly, and Camille Francois, "The IRA, Social Media and Political Polarization in the United States, 2012-2018," *Computational Propaganda Research Project, Oxford Internet Institute,* December 2018: https://int.nyt.com/data/documenthelper/534-oxford-russia-internet-research-agency/c6588b4a7b940c551c38/optimized/full.pdf.

40

█████ **COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY** █████

111

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

(U)  The parameters and key terms the IRA employed in targeting its Facebook advertisements suggests a sophisticated understanding of where the rawest social sensitivities lie beneath the surface of the American political debate.  Darren Linvill noted that the IRA had a "keen understanding of American psychology," they knew "exactly what buttons to press," and operated with "industrial efficiency."[169]  Even so, the IRA failed to take advantage of more sophisticated targeting capabilities available to Facebook advertising customers.  For example, IRA operatives did not utilize the "Custom Audiences" feature which would have allowed them to upload outside data and contact information, and permitted more advanced micro-targeting of their advertisements.[170]



E.  (U)  The IRA Information Warfare Campaign



---

[169] (U)  Scott Shane and Mark Mazzetti, "The Plot to Subvert an Election – Unraveling the Russia Story So Far," *New York Times*, September 20, 2018.
[170] (U)  Colin Stretch, Responses by Facebook to SSCI Questions for the Record from hearing on November 1, 2017, submitted January 8, 2018, available at https://www.intelligence.senate.gov/sites/default/files/documents/Facebook%20Response%20to%20Committee%20QFRs.pdf ("The targeting for the IRA ads that we have identified and provided to the Committee was relatively rudimentary, targeting broad locations and interests, and did not use a tool known as Contact List Custom Audiences.")
[171]
[172] (U)  *Ibid.*
[173]

41

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

112

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

(U)  Disinformation experts agree with Prigozhin's assessment.  Clint Watts, in March 2017 testimony to the Committee:  "Over the past three years, Russia has implemented and run the most effective and efficient influence campaign in world history."[174]

(U)  Eugene Rumer elaborated on Watts' point in offering this summary in March 2017 testimony to the Committee:

> *Russian meddling in the 2016 U.S. Presidential election is likely to be seen by the Kremlin as a major success regardless of whether its initial goal was to help advance the Trump candidacy.  The payoff includes, but is not limited to a major political disruption in the United States, which has been distracted from many strategic pursuits; the standing of the United States and its leadership in the world have been damaged; it has become a common theme in the narrative of many leading commentators that from the pillar of stability of the international liberal order the United States has been transformed into its biggest source of instability; U.S. commitments to key allies in Europe and Asia have been questioned on both sides of the Atlantic and the Pacific.  And last, but not least, the Kremlin has demonstrated what it can do to the world's sole remaining global superpower.[175]*

(U)  Thomas Rid echoed this conclusion before the Committee: "The great Active Measures campaign of 2016 will be studied in intelligence schools for decades to come, not just in Russia of course but in other countries as well."[176]

## F.  (U)  Ongoing IRA Activities

(U)  IRA activity on social media did not cease, but rather increased after Election Day 2016.  Evidence from well-known IRA accounts confirms that Russia-based operatives continued to be actively exploiting divisive social issues in the United States well after the 2016 election.  After Election Day, Left-leaning IRA accounts were promoting hashtags such as "#Impeach45," "#Resist," and "#GunReformNow."  Complementary right-leaning IRA accounts were focused on the NFL kneeling controversy, as well as hashtags critical of the FBI, such as the "#ReleaseTheMemo" meme.  After the election, IRA operatives orchestrated disparate political rallies in the United States both supporting president-elect Trump, and protesting the results of the election.  A mid-November 2016 rally in New York was organized around the theme, "show your support for President-Elect Donald Trump," while a separate rally titled, "Trump is NOT my President," was also held in New York, in roughly the same timeframe.[177]

---

[174] (U) Clint Watts, Hearing before the Senate Select Committee on Intelligence, March 30, 2017, available at https://www.intelligence.senate.gov/hearings/open.
[175] (U) Eugene Rumer, Hearing before the Senate Select Committee on Intelligence, March 30, 2017, available at https://www.intelligence.senate.gov/hearings/open.
[176] (U) *Ibid.*
[177] (U) Indictment, *United States v.  Internet Research Agency, et al.*, Case 1:18-cr-00032-DLF (D.D.C. Feb. 16, 2018).

42

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

113

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

(U)  More recent social media activity attendant to the 2018 midterm elections indicates ongoing influence operations emanating from Russia.  A September 2018 criminal complaint brought by the U.S. Attorney's Office for the Eastern District of Virginia against Elena Alekseevna Khusyaynova, an employee of the IRA who allegedly served as the chief accountant for the IRA, alleges that Khusyaynova sought to "interfere with U.S. political and electoral processes, including the 2018 U.S. elections."[178]



## VII. (U) IRA USE OF SOCIAL MEDIA BY PLATFORM

(U)  **Facebook.**  Russia's influence operatives have found appeal in the cost-effectiveness of Facebook pages as a targeted communications medium.  Data provided to the Committee by Facebook indicates that the IRA used to its advantage many of Facebook's features, beyond purchased advertising and pages, including the "events," messenger," and "stickers" features. The IRA also exploited Instagram—a photo- and video-sharing social networking service owned by Facebook.

(U)  The first specific public warning about Russian activity on the Facebook platform came in September 2017, when Facebook announced the discovery of "approximately $100,000 in ad spending from June 2015 to May of 2017—associated with roughly 3,000 ads—that was

---

[178] (U) Indictment, *United States v. Elena Alekseevna Khusyaynova*, Case 1:18-MJ-464 (E.D. Va. Sept. 28, 2018).

[179]



[180] (U) *Ibid.*

[181]

43

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

114

connected to about 470 inauthentic accounts and pages in violation of [Facebook's] policies."[182] Though not explicitly identified by Facebook at the time, the platform later attributed the subject accounts, pages, and advertisements to the IRA. Ongoing scrutiny of activity on its platform eventually led Facebook to a significantly larger body of non-advertisement content ("organic activity") that originated from these same IRA accounts. This content had been engineered to appear American. Facebook's initial discovery of the IRA-purchased advertisements was an essential first step in uncovering the IRA's 2016 information warfare campaign.

### (U) Facebook Advertisements

(U) The Committee's analysis of the IRA-purchased advertisements indicates that the vast majority neither mention expressly the U.S. presidential election, nor explicitly advocate voting for or against a particular presidential candidate. Roughly five percent of the advertisements viewed prior to the election (77 of 1,519) included text referencing Hillary Clinton or Donald Trump. Forty of the post-election advertisements tied to the IRA referenced one of these candidates. The Committee found the content of these advertisements to be substantially consistent with Facebook's public statements that the advertisements overwhelmingly pertained to divisive and inflammatory U.S. social issues. The subject of these advertisements spanned the ideological and political spectrum, ranging from race, sexuality, and gender identity, to immigration and Second Amendment rights. A number of the advertisements encouraged Facebook users to follow IRA-created pages dedicated to these issues, from which the IRA could manufacture and disseminate organic content on any number of politically charged subjects directly to their page followers. According to Committee analysis of materials provided by Facebook, almost all the advertisements were purchased with Russian rubles.

(U) Facebook estimates that 11.4 million people in the United States saw at least one of the 3,393 advertisements ultimately determined to have been purchased by the IRA.[183] Modelling conducted by Facebook indicates that 44 percent of the total user views of these advertisements ("impressions") occurred before the election on November 8, 2016, with 56 percent of the impressions taking place after the election. Roughly 25 percent of the ads were never seen by anyone.[184]

(U) The IRA used Facebook's geographic targeting feature to channel advertisements to intended audiences in specific U.S. locations. About 25 percent of the advertisements purchased by the IRA were targeted down to the state, city, or in some instances, university level. Specific content narratives emerge in connection with targeted locations. For instance, Michigan and Wisconsin (32 and 55 pre-election advertisements, respectively) were targeted with

---

[182] (U) Alex Stamos, "An Update on Information Operations on Facebook," Facebook, September 6, 2017, https://newsroom.fb.com/news/2017/09/information-operations-update/.
[183] (U) Colin Stretch, Responses by Facebook to SSCI Questions for the Record from hearing on November 1, 2017, submitted January 8, 2018, available at https://www.intelligence.senate.gov/sites/default/files/documents/Facebook%20Response%20to%20Committee%20QFRs.pdf.
[184] (U) *Ibid.*

44

115

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

advertisements overwhelmingly focused on the subject of police brutality. Facebook indicates that the IRA did not leverage the platform's Custom Audiences tool, which would have entailed uploading or importing an externally held list of advertisement targets or contact data, revealing the IRA's efforts were not as sophisticated or potentially effective as they could have been.[185]

### (U) IRA-Generated Facebook Content

(U) While early media reporting on the IRA's Facebook activity focused on purchased advertising, the organic content generated by IRA influence operatives on their Facebook pages far surpassed the volume of targeted advertisements. That IRA organic content reached a significantly larger U.S. audience.

(U) Facebook's initial public disclosures about IRA activity identified 470 pages and accounts as originating with the IRA. The dataset furnished to the Committee includes over 60,000 unique organic posts from 81 of the pages Facebook associated with the IRA. An estimated 3.3 million Facebook users followed IRA-backed pages, and these pages are the predicate for 76.5 million user interactions, or "engagements," including 30.4 million shares, 37.6 million likes, 3.3 million comments, and 5.2 million reactions. Facebook estimates that as many as 126 million Americans on the social media platform came into contact with content manufactured and disseminated by the IRA, via its Facebook pages, at some point between 2015 and 2017. Using contrived personas and organizations, IRA page administrators masqueraded as proponents and advocates for positions on an array of sensitive social issues. The IRA's Facebook effort countenanced the full spectrum of American politics, and included content and pages directed at politically right-leaning perspectives on immigration policy, the Second Amendment, and Southern culture, as well as content and pages directed at left-leaning perspectives on police brutality, race, and sexual identity.

(U) Demonstrative of the range of themes the IRA targeted on its Facebook pages, the 10 most active IRA-administered Facebook pages include: "Stop A.I." (an abbreviation for "Stop All Invaders," the page was focused on illegal immigration); "Being Patriotic" (right-leaning themes, including Second Amendment rights); "Blacktivist" (targeted at African-Americans, and focused on African-American cultural issues and police brutality); "Heart of Texas" (right-leaning themes and Texas secession); "United Muslims of America" (targeted at refugee rights and religious freedom); "Brown Power" (targeted at Latino heritage and immigrant rights); "South United" (focused on Southern culture, conservative issues); "BM" (racial equality and police brutality); "LGBT United" (sexual and gender identity rights); and "Army of Jesus" (conservative, Christian themes). "BM" was a replacement page for the IRA's "Black Matters US" page, which Facebook took down in 2016. The IRA used the BM Facebook page to direct users to the Black Matters US website.[186]

---

[185] (U) *Ibid.*

[186] (U) Craig Timberg and Tony Romm, "New report of Russian disinformation prepared for the Senate, shows the operation's scale and sweep," *Washington Post*, December 17, 2018.

45

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

116

(U)  The IRA influence operatives responsible for these pages created fake online personas with a specific, readily discernible social agendas in order to attract similarly minded Facebook users.  The operatives then used divisive content to anger and enrage the curated audience.  The findings of the TAG study lead by Phil Howard and John Kelly explain the strategy behind the IRA's Facebook pages:

> The IRA messaging [had] two strategies.  The first involved appealing to the narratives common within a specific group, such as supporting veterans and police, or pride in race and heritage, as a clickbait strategy to drive traffic to the Facebook and Instagram pages the IRA set up . . . .  Then the pages posted content that intended to elicit outrage from these groups.[187]

(U)  The IRA's development of Facebook pages and cultivation of followers was painstaking and deliberate.  This resulted in the IRA creating top-performing pages that enabled sustained, long-term interaction with Americans on the very issues that drive Americans apart.  The "Stop A.I." page eventually attracted nearly 12.5 million engagements, while the "Blacktivist" page garnered almost 11.2 million.

(U)  The IRA's Facebook pages were not just channels for disseminating content across the social media platform.  The IRA also used its Facebook presence to provoke real world events, including protests, rallies, and spontaneous public gatherings or "flashmobs."  Facebook identified at least 130 events that were promoted on its platform as a result of IRA activity.  These events were promoted by, and attributed to, 13 of the IRA's Facebook pages.  Approximately 338,300 genuine Facebook user accounts engaged with content promoting these events.  62,500 Facebook users indicated their intention to attend the event, while another 25,800 users evinced interest in the event.[188]

(U)  An early example of the IRA's experimentation with social media and real world events occurred in the spring of 2015, when IRA operatives attempted to induce a mass gathering in New York City by offering free hot dogs.  According to the findings of an investigation into the IRA by Russian media outlet RosBiznesKonsalting (RBC), the success in attracting unwitting Americans to the IRA's promotion of the "event" on Facebook prompted the IRA's operatives to begin using the social media platform's "events" feature much more proactively.  The RBC report concluded, "From this day, almost a year and a half before the election of the

---

[187] (U)  Phil Howard, Bharath Ganesh, Dimitra Liotsiou, John Kelly, and Camille Francois, "The IRA, Social Media and Political Polarization in the United States, 2012-2018," *Computational Propaganda Research Project, Oxford Internet Institute,* December 2018, https://int.nyt.com/data/documenthelper/534-oxford-russia-internet-research-agency/c6588b4a7b940c551c38/optimized/full.pdf.
[188] (U)  Colin Stretch, Responses by Facebook to SSCI Questions for the Record from hearing on November 1, 2017, submitted January 8, 2018, available at https://www.intelligence.senate.gov/sites/default/files/documents/Facebook%20Response%20to%20Committee%20QFRs.pdf.

46

117

US President, the 'trolls' began full-fledged work in American society."[189] The RBC investigation assesses that the IRA eventually spent about $80,000 to support 100 U.S. activists, who organized 40 different protests across the United States.[190]

(U)  Over the course of 2016, IRA influence operatives trained particular focus on agitating political events and protests in the United States.  One August 20, 2016, event promoted by the "Being Patriotic" page (over 216,000 followers) attempted to instigate flashmobs across Florida in support of Republican candidate for president, Donald Trump. Actual events promoted as "Florida Goes Trump" gatherings took place in Ft. Lauderdale and Coral Springs, Florida.[191]

(U)  A May 2016, real world event that took place in Texas illustrates the IRA's ideological flexibility, command of American politics, and willingness to exploit the country's most divisive fault lines.  As publicly detailed by the Committee during a November 1, 2017 hearing, IRA influence operatives used the Facebook page, "Heart of Texas" to promote a protest in opposition to Islam, to occur in front of the Islamic Da'wah Center in Houston, Texas.  "Heart of Texas," which eventually attracted over 250,000 followers, used targeted advertisements to implore its supporters to attend a "Stop Islamization of Texas" event, slated for noon, May 21, 2016.  Simultaneously, IRA operatives used the IRA's "United Muslims for America" Facebook page and its connection to over 325,000 followers to promote a second event, to be held at the same time, at exactly the same Islamic Da'wah Center in Houston.  Again, using purchased advertisements, the IRA influence operatives behind the "United Muslims for America" page beseeched its supporters to demonstrate in front of the Islamic Da'wah Center—this time, in order to "Save Islamic Knowledge."  In neither instance was the existence of a counter-protest mentioned in the content of the purchased advertisement.

(U)  The competing events were covered live by local news agencies, and according to the Texas Tribune, interactions between the two protests escalated into confrontation and verbal attacks.  The total cost for the IRA's campaign to advertise and promote the concomitant events was $200, and the entire operation was conducted from the confines of the IRA's headquarters in Saint Petersburg.  Social media researcher John Kelly characterized the IRA's operational intent as "kind of like arming two sides in a civil war so you can get them to fight themselves before you go and have to worry about them."[192]

(U)  Analysis of the dataset made available to the Committee indicates that IRA operatives also took advantage of the Facebook recommendation algorithm, an assessment

---

[189] (U)  *See* Hannah Levintova, "Russian Journalists Just Published a Bombshell Investigation About a Kremlin-Linked 'Troll Factory,'" *Mother Jones*, October 18, 2017. Original report in Russian available at https://www.rbc.ru/magazine/2017/11/59e0c17d9a79470e05a9e6c1.

[190] (U)  *Ibid.*

[191] (U)  Ben Collins, Gideon Resnick, et al., "Exclusive: Russians Appear to Use Facebook to Push Trump Rallies in 17 U.S. Cities," *The Daily Beast,* September 20, 2017.

[192] (U)  John Kelly, Hearing before the Senate Select Committee on Intelligence, August 1, 2018, available at https://www.intelligence.senate.gov/hearings/open.

47

118

Facebook officials have corroborated.  When asked by Senator Susan Collins whether Facebook's recommendation engine ever suggested content created by IRA operatives to Facebook users, Facebook officials admitted that "This happened in some cases," adding that IRA content was "sometimes recommended when people followed similar pages."[193]

(U)  In order to maximize the speed and scale of Russia's information warfare campaign, IRA operatives utilized the Facebook platform, and almost the entirety of its suite of features and capabilities, exactly as it was engineered to be used.

(U) **Instagram.** The use of Instagram by the IRA, and Instagram's centrality as a channel for disseminating disinformation and societally divisive content, has escaped much of the media and public attention that has focused on other social media platforms.

(U)  IRA influence operatives in St. Petersburg, Russia, first posted on Instagram in January 2015—at the same time as their first posts on Facebook.  Ultimately, IRA activity and engagement with Americans through Instagram accounts dramatically eclipsed the comparable interaction achieved through Facebook pages.[194]

(U)  Data provided to the Committee indicates that the IRA used 133 Instagram accounts to publish over 116,000 posts.  By comparison, the IRA used Facebook pages to publish over 60,000 posts.  Engagement with fellow platform users was also significantly greater on Instagram, where IRA accounts accumulated 3.3 million followers and generated 187 million total engagements.  By comparison, the IRA's Facebook page audience of 3.3 million produced 76 million virtual interactions.  As Renee DiResta assessed in testimony to the Committee, "Instagram dramatically outperformed Facebook in terms of reach and in terms of likes and in terms of engagement, on a per-post [basis]."[195]

(U)  The tactics IRA operatives used on the Instagram platform were consistent with those employed on the Facebook platform.  The IRA's Instagram accounts focused on both the political left and right in America, and exploited the social, political, and cultural issues most likely to incite impassioned response across the ideological spectrum.  Significantly, a discernible emphasis on targeting African-Americans emerges from analysis of the IRA's Instagram activity.[196]

---

[193] (U)  Colin Stretch, Responses by Facebook to SSCI Questions for the Record from hearing on November 1, 2017, submitted January 8, 2018, available at https://www.intelligence.senate.gov/sites/default/files/documents/Facebook%20Response%20to%20Committee%20QFRs.pdf.
[194] (U)  Renee DiResta, Dr.  Kris Shaffer, Becky Ruppel, David Sullivan, Robert Matney, Ryan Fox, Dr.  Jonathan Albright, and Ben Johnson, "The Tactics and Tropes of the Internet Research Agency," *New Knowledge*, December 17, 2018, https://www.newknowledge.com/articles/the-disinformation-report/.
[195] (U)  Renee DiResta, SSCI Transcript of the Closed Briefing on Social Media Manipulation in 2016 and Beyond, July 26, 2018.
[196] (U)  Renee DiResta, Dr.  Kris Shaffer, Becky Ruppel, David Sullivan, Robert Matney, Ryan Fox, Dr.  Jonathan Albright, and Ben Johnson, "The Tactics and Tropes of the Internet Research Agency," *New Knowledge*, December 17, 2018, https://www.newknowledge.com/articles/the-disinformation-report/.

48

119

(U)  The size, scope, and intended U.S. audience of the IRA's Instagram activity is reflected in the account names of the top 10 IRA Instagram accounts by follower numbers:

- "@Blackstagram_" targeted African-American cultural issues, amassed over 300,000 followers, and generated over 28 million interactions on the Instagram platform.

- "@american.veterans" was aimed at patriotic, conservative audiences, collected 215,680 followers, and generated nearly 18.5 million engagements.

- "@sincerely_black_" built a following of 196,754 Instagram users.

- "@rainbow_nation_us" emphasized sexual and gender identity rights and built a following of 156,465 users.

- "@afrokingdom_" had 150,511 followers on Instagram.

- "@_american.made" focused on conservative and politically right-leaning issues, including Second Amendment freedoms, and built a following of 135,008.

- "@pray4police" amassed 127,853 followers.

- "@feminism_tag" had 126,605 followers.

- "@_black_business" built a following of 121,861 Instagram users.

- "@cop_block_us" was followed by 109,648 Instagram users.

(U)  In total, over the course of more than two years spent as an instrument for foreign influence operations, 12 of the IRA's Instagram accounts amassed over 100,000 followers, and nearly half of the IRA's 133 Instagram accounts each had more than 10,000 followers.  On the basis of engagement and audience following measures, the Instagram social media platform was the most effective tool used by the IRA to conduct its information operations campaign.[197]

(U)  Despite the high Instagram engagement numbers reported to the Committee through the TAG social media research effort, in testimony to the Committee, Facebook representatives indicated that Instagram content reached just 20 million users.  In relation to the Facebook estimate, the published findings of the working group led by TAG researcher Renee DiResta contest that "the Instagram number is likely lower than it should be" and advocate for additional

---

[197] (U)  The IRA also purchased targeted advertisements on Instagram.  The data associated with these purchases was included in the total Facebook advertisements production to the Committee in the fall of 2017.  The 3,393 advertisements purchased by the IRA included both Facebook and Instagram buys.  Because the Facebook and Instagram buys were produced together, the Committee's analysis has also grouped them together, and these advertisements are collectively addressed in the above treatment of the IRA's use of Facebook advertisements.

49

120

research on Instagram content and activities.[198] Additional data and analysis concerning IRA activity on Instagram are required to resolve this discrepancy.

(U) **Twitter.** Though Twitter has fewer U.S. users than Facebook (68 million monthly active users on Twitter in the United States compared to 214 million Facebook users), Twitter is an extremely attractive platform for malicious influence operations like those carried out by the IRA due to its speed and reach.  In 2017 testimony to the Committee, disinformation expert Thomas Rid identified Twitter as one of the more influential "unwitting agents" of Russian active measures.[199]  Available data on the IRA's activity on the Twitter platform reinforces this assessment.  As of September 2018, Twitter had uncovered over 3,800 accounts tied to the IRA.[200]  According to data provided to the Committee by Twitter, those accounts generated nearly 8.5 million tweets, resulting in 72 million engagements on the basis of that original content.[201,202]  More than half (57 percent) of the IRA's posts on Twitter were in Russian, while over one-third (36 percent) were in English.[203]  Twitter estimates that in total, 1.4 million users engaged with tweets originating with the IRA.

(U) The activity of IRA influence operatives on Twitter outpaced the IRA's use of Facebook and Instagram.  TAG members Phil Howard and John Kelly noted in their publicly released analysis of IRA activity:

> *The volume of Twitter posts made available to us is much larger than the volume of Facebook ads, Facebook posts, and Instagram posts. The average monthly*

---

[198] (U) Renee DiResta, Dr.  Kris Shaffer, Becky Ruppel, David Sullivan, Robert Matney, Ryan Fox, Dr.  Jonathan Albright, and Ben Johnson, "The Tactics and Tropes of the Internet Research Agency," *New Knowledge*, December 17, 2018, https://www.newknowledge.com/articles/the-disinformation-report/.

[199] (U) Thomas Rid, Hearing before the Senate Select Committee on Intelligence, March 30, 2017, available at https://www.intelligence.senate.gov/hearings/open.

[200] (U) Twitter provided the Committee with a significant amount of data (including tweet content, handle names, engagement activity, and other metadata) for each of the over 3,800 accounts they identified as being linked to the IRA. That unique dataset was provided in installments that began in the fall of 2017.  In October 2018, Twitter published a large archive of this information for the public to examine, including all tweets from the IRA-linked accounts.  The Committee commends Twitter for its decision to publicize the data from these accounts and urges Twitter leadership to continue to make available to the public any future influence operation activities.  The Committee urges other social media companies to take comparable steps to increase transparency and allow the public, outside researchers, investigators, and media to more fully examine the scope and scale of these types of influence operations as a matter of corporate responsibility and public service.

[201] (U) Phil Howard, Bharath Ganesh, Dimitra Liotsiou, John Kelly, and Camille Francois, "The IRA, Social Media and Political Polarization in the United States, 2012-2018," *Computational Propaganda Research Project, Oxford Internet Institute,* December 2018, https://int.nyt.com/data/documenthelper/534-oxford-russia-internet-research-agency/c6588b4a7b940c551c38/optimized/full.pdf.

[202] (U) Renee DiResta, Dr.  Kris Shaffer, Becky Ruppel, David Sullivan, Robert Matney, Ryan Fox, Dr.  Jonathan Albright, and Ben Johnson, "The Tactics and Tropes of the Internet Research Agency," *New Knowledge*, December 17, 2018, https://www.newknowledge.com/articles/the-disinformation-report/.

[203] (U) Phil Howard, Bharath Ganesh, Dimitra Liotsiou, John Kelly, and Camille Francois, "The IRA, Social Media and Political Polarization in the United States, 2012-2018," *Computational Propaganda Research Project, Oxford Internet Institute,* December 2018, https://int.nyt.com/data/documenthelper/534-oxford-russia-internet-research-agency/c6588b4a7b940c551c38/optimized/full.pdf.

121

*Twitter post volume is over fifty thousand tweets per month, while the average monthly volume of Facebook ads, Facebook posts, and Instagram posts is in the hundreds to low thousands, never exceeding the six thousand mark.[204]*

(U)  It appears from the data that the IRA, or a predecessor of the organization, began posting on Twitter in 2009, mostly in the Russian language and with a focus on the domestic Russian audience. These accounts continued to target Russia-internal issues and audiences until they were closed down in 2017.[205]  It wasn't until 2013 that accounts tied to the IRA began to target a U.S. audience with English language tweets.[206]

(U)  According to Phil Howard and John Kelly, the activity on Twitter constitutes the IRA's first use of a social media platform to conduct information warfare against the United States. The IRA effort shortly thereafter incorporated additional social media platforms including YouTube, Instagram, and Facebook:

*It appears that the IRA initially targeted the US public using Twitter, which it had used domestically in Russia for several years. But as the IRA ramped up US operations toward the end of 2014, this dataset suggests that the IRA began leveraging other platforms in sequence: YouTube (here measured via Twitter citations of YouTube content), Instagram, and lastly Facebook.[207]*

(U)  Initially, the IRA's Twitter activity targeting a U.S. audience was constrained to a relatively low operational tempo, approximating an initial test phase. By 2014 and 2015, however, the IRA's U.S.-focused efforts had significantly intensified. The elevated level of activity was sustained all the way through the 2016 presidential election campaign period, and spiked with an anomalous peak in activity immediately following the election, in November 2016. By mid-2017, U.S.-focused IRA activity on Twitter surpassed the IRA's domestic, Russia-focused information operations on the platform.[208]  All Twitter accounts known to be associated with the IRA were suspended by the company by late 2017, and data associated with these accounts was turned over to the Committee.

(U)  The data furnished to the Committee suggests IRA influence operatives probably used automated accounts to amplify payload content by tweeting and retweeting selected Twitter messaging. DiResta elaborated on the IRA's use of automated bots: "In the course of a similarity analysis we discovered still-active bots that were likely part of a commercially acquired or repurposed botnet."[209]

---

[204] (U) *Ibid.*
[205] (U) *Ibid.*
[206] (U) *Ibid.*
[207] (U) *Ibid.*
[208] (U) *Ibid.*
[209] (U) Renee DiResta, Dr. Kris Shaffer, Becky Ruppel, David Sullivan, Robert Matney, Ryan Fox, Dr. Jonathan Albright, and Ben Johnson, "The Tactics and Tropes of the Internet Research Agency," *New Knowledge*, December 17, 2018, https://www.newknowledge.com/articles/the-disinformation-report/.

51

122

(U)  In addition to the Twitter accounts identified by the company as tied to the IRA, Twitter uncovered 50,258 automated accounts that they believe to be tied to Russia.  These bot accounts were issuing tweets containing election-related content during the 2016 U.S. presidential election campaign period.[210]  Although Twitter could not definitively link these bot accounts directly to the IRA, they illustrate the vulnerability of U.S. democratic processes to automated influence attacks, and the scale of the effort emanating from Russia to exploit that vulnerability.  The coordinated activity of multiple bot accounts on social media represents an additional element of the foreign influence threat.  According to platform monitoring reports prepared for officials in the United Kingdom, an estimated 2,800 automated accounts believed linked to Russia posted content concerning the 2018 poison attack on Sergei Skripal and his daughter in Salisbury, England, in an effort to provoke uncertainty over culpability for the attack.[211]

(U)  The IRA's influence operatives dedicated significant effort to repurposing existing fake Twitter accounts, and creating new ones, that appeared to be owned by Americans.  These accounts were used to build American audiences, accrue account followers, and amplify and spread content produced by the IRA.  An analysis of the IRA's Twitter accounts illuminates the strategy and objectives behind its Twitter activity.  Clemson researchers, led by Darren Linvill and Patrick Warren, collected all of the tweets from all the IRA-linked accounts between June 19, 2015, and December 31, 2017.[212]  After removing from the sample all non-English accounts and those that did not tweet at all, the team was left with 1.875 million tweets associated with 1,311 IRA usernames.

(U)  After conducting an analysis of all the content that IRA influence operatives manufactured, the Clemson researchers separated the IRA-affiliated accounts into five categories of social media platform activity.  According to this analysis, "Within each type, accounts were used consistently, but the behavior across types was radically different."  Characterizing the IRA Twitter effort as "industrial," the researchers described the campaign as "mass produced from a system of interchangeable parts, where each class of part fulfilled a specialized function."[213] The researchers named the account types: Right Troll, Left Troll, Newsfeed, Hashtag Gamer, and Fearmonger.

- (U) **Right Troll.** This was the largest and most active group of IRA-affiliated accounts. The 617 Right Troll Twitter accounts tweeted 663,740 times and cultivated nearly a million total followers.  Clemson researchers characterized these accounts as focused on spreading "nativist and right-leaning populist messages."  They strongly supported the

---

[210] (U) Jack Dorsey, Hearing before the Senate Select Committee on Intelligence, September 5, 2018, available at https://www.intelligence.senate.gov/hearings/open.
[211] (U) Deborah Haynes, "Skripal attack: 2,800 Russian bots 'sowed confusion after poison attacks,'" *The Times UK*, March 24, 2018.
[212] (U) Darren Linvill and John Walker, "Troll Factories: The Internet Research Agency and State-Sponsored Agenda Building," Clemson University, https://www.rcmediafreedom.eu/Publications/Academic-sources/Troll-Factories-The-Internet-Research-Agency-and-State-Sponsored-Agenda-Building.
[213] (U) *Ibid.*

52

123

candidacy of Donald Trump, employed the #MAGA hashtag, and attacked Democrats. Although nominally "conservative," Clemson researchers found that the IRA accounts rarely promoted characteristically conservative positions on issues such as taxes, regulation, and abortion, and instead focused on messaging derisive of Republicans deemed "too moderate" (including at the time Senators John McCain and Lindsey Graham).[214] The accounts generally featured very little in the way of identifying information, but frequently used profile pictures of "attractive, young women."

- **(U) Left Troll.** The second largest classification of IRA-affiliated Twitter accounts, consisting of around 230 Twitter profiles that generated 405,549 tweets, was Left Troll. The focus of the Left Troll Twitter accounts was primarily issues relating to cultural identity, including gender, sexual, and religious identity. Left Troll accounts, however, were acutely focused on racial identity and targeting African-Americans with messaging and narratives that mimicked the substance of prominent U.S. activist movements like Black Lives Matter. Left Troll accounts directed derisive content toward moderate Democrat politicians. These accounts targeted Hillary Clinton with content designed to undermine her presidential campaign and erode her support on the U.S. political left.

- **(U) News Feed.** Designed to appear to be local news aggregators in the United States, News Feed Twitter accounts would post links to legitimate news sources and tweet about issues of local interest. Examples of the IRA's news-oriented influence operative accounts on Twitter include @OnlineMemphis and @TodayPittsburgh. About 54 IRA accounts share the characteristics of this classification of Twitter profile, and they were responsible for 567,846 tweets.

- **(U) Hashtag Gamer.** More than 100 of the IRA's Twitter accounts were focused almost exclusively on playing "hashtag games," a word game popular among Twitter users. At times, these games were overtly political and engineered to incite reactions on divisive social issues from both the left and the right ends of the ideological spectrum.

- **(U) Fearmonger.** Finally, the IRA's 122 Fearmonger Twitter accounts were specifically dedicated to furthering the spread of a hoax concerning poisoned turkeys during the Thanksgiving holiday of 2014. The Fearmonger Twitter accounts tweeted over 10,000 times.

(U) The IRA's influence operatives coordinated across these Twitter account classifications to attack and defend both sides of socially divisive issues, particularly with respect to race relations and cultural divisions. An example of the IRA's ability to capitalize on both sides of a public debate can be found in the issue of NFL players kneeling in protest of police brutality and racism. Twitter accounts tied to the IRA from both the left and right side of the ideological spectrum used the topic to channel inflammatory content toward targeted, and ideologically like-minded, audiences. A Left Troll account, @wokeluisa, tweeted in support of

---

[214] **(U)** Jim Galloway, "Clemson researchers crack open a Russian troll factory," *Associated Press,* August 7, 2018.

53

124

Colin Kaepernick and the NFL protests on March 13, 2018, prompting 37,000 forwarded retweets. Simultaneous to this, and in the direction of the ideologically opposite audience, @BarbaraForTrump, a Right Troll account, was tweeting content hostile to the protests.[215]

(U)  The Twitter data provided to the Committee shows that the IRA's influence operatives used multiple false personas to incite division and antipathy along a host of ideological fissures, simultaneously taking and attacking all sides of the arguments, all from the same internet protocol (IP) address. As TAG consultant John Kelly uncovered:

> It was literally the same computer that was registering and operating the America accounts, pretending to be right and pretending to be left. So imagine it's the same guy, and the same people, and they got their two little marionette things with their puppets dancing on either end of a string.  And they are playing them together.  They are inhabiting both sides and figuring out ways to play them off against each other.[216]

(U)  As was the case with IRA activity on Facebook and Instagram, influence operatives based in Russia spent months developing fake Twitter personas and cultivating networks of supporters and followers among sympathetic and agreeable Americans.  For example, 118 accounts secured more than 10,000 followers, and six accounts built followings of over 100,000 Twitter users.

(U)  One of the IRA's most successful fake Twitter profiles was the @TEN_GOP account.  By the time Twitter shut down the @TEN_GOP account in August 2017, it had amassed over 150,000 followers.  By contrast, the legitimate Twitter account for the Tennessee Republican Party (@tngop) had 13,400 followers.  Despite three separate requests by the actual Tennessee Republican Party organization to take down the account, @TEN_GOP was successful in deceptively injecting its inflammatory content into the political mainstream throughout 2016 and 2017.[217]  Quotes and content from IRA influence operatives using the @TEN_GOP Twitter account were widely cited in press articles and mainstream media, and retweeted by celebrities and politicians, including several Trump campaign affiliates, including Donald Trump Jr., Kellyanne Conway, and Lieutenant General Michael Flynn (U.S. Army, retired).[218]

(U)  As Clint Watts has described, influence operations like the @TEN_GOP effort can be extremely successful once the content filters into the mainstream press: "If you can get

[215] (U) Laura Rosenberger, Written Statement, Hearing before the Senate Select Committee on Intelligence, August 1, 2018, available at https://www.intelligence.senate.gov/hearings/open.
[216] (U) John Kelly, SSCI Transcript of the Closed Briefing on Social Media Manipulation in 2016 and Beyond, July 26, 2018.
[217] (U) Kevin Collier, "Twitter Was Warned Repeatedly About This Fake Account Run By a Russian Troll Farm and Refused to Take it Down," *BuzzFeed News*, October 18, 2017.
[218] (U) Philip Bump, "At least five people close to Trump engaged with Russian Twitter trolls from 2015 to 2017," *Washington Post*, November 2, 2017.

54

125

indigenous content, turn that into a conspiracy, and filter that into the mainstream media, that's a textbook case. . . . As an information warfare missile, that was a direct hit."[219]

(U)  Another example of an effective IRA influence operation carried out on Twitter was conducted using the @Jenn_Abrams account.  The persona associated with @Jenn_Abrams had accounts on multiple platforms, but most notably amassed over 80,000 followers on Twitter. This persona would tweet about everything from segregation to the futility of political correctness, and she would eventually be cited by more than 40 U.S. journalists before being taken down by Twitter in late 2017.  John Kelly was among those following @Jenn_Abrams on Twitter.  In testimony during a closed Committee hearing, Kelly described the ability of IRA influence operatives to infiltrate entire swaths of the political ecosystem on Twitter, of either ideological persuasion, using the persona:

> Now . . . we're lighting up Jenn Abrams' account and all of the people following
> her are lit up. . . . So she had almost the entirety of the activist right, a good bit of
> the activist left, because remember the IRA has puppets on both sides – they are
> actually the same people running the machines – building her credibility.  And
> then down below she's managed to make inroads and followership among the
> mainstream conservative part of that network, and she's even got a few of the
> mainstream liberal folks following her.[220]

(U)  The IRA was also successful using Twitter accounts feigning left-leaning ideological sentiment.  An example cited by Laura Rosenberger in testimony to the Committee, @wokeluisa – which was still active in 2018 and had over 50,000 followers – claimed to be an African-American political science major in New York.  Content produced under the guise of this persona would eventually appear "in more than two dozen news stories from outlets such as BBC, USA Today, Time, Wired, Huffington Post, and BET."[221]

(U)  While original content creation was a preoccupation largely reserved for IRA operatives on Facebook and Instagram, the IRA's Twitter accounts were used to amplify events and promote the dissemination of content already existing on social media.  This distinction notwithstanding, the Twitter platform was an integral tool for IRA operatives.  As Renee DiResta detailed in her team's report:

> Our impression of the IRA's Twitter operation is that it was largely opportunistic
> real-time chatter; a collection of accounts, for example, regularly played hashtag
> games.  There was a substantial amount of retweeting.  By contrast, Facebook
> and Instagram were used to develop deeper relationships, to create a collection of

---

[219] (U) Brandy Zadrozny and Ben Collins, "How a right-wing troll and a Russian Twitter account created 2016's biggest voter fraud story," *NBC News,* October 30, 2018.
[220] (U) John Kelly, SSCI Transcript of the Closed Briefing on Social Media Manipulation in 2016 and Beyond, July 26, 2018.
[221] (U) Laura Rosenberger, Written Statement, Hearing before the Senate Select Committee on Intelligence, August 1, 2018, available at https://www.intelligence.senate.gov/hearings/open.

55

126

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

*substantive cultural media pages dedicated to continual reinforcement of in-group and out-group ideals for targeted audiences. Twitter was, however, a part of the cross-platform brand building tactic; several of the Facebook, Instagram, Tumblr, and Reddit pages had associated Twitter accounts.[222]*

(U)  In a similar conclusion outlining the importance of Twitter to the IRA's effort to influence the thinking of Americans, Phil Howard and John Kelly found the following:

*...the IRA Twitter data shows a long and successful campaign that resulted in false accounts being effectively woven into the fabric of online US political conversations right up until their suspension. These embedded assets each targeted specific audiences they sought to manipulate and radicalize, with some gaining meaningful influence in online communities after months of behavior designed to blend their activities with those of authentic and highly engaged US users.[223]*

(U)  **Google.**  To a lesser but still critically important extent, Google and its numerous subsidiary platforms were also utilized and exploited by the IRA to the same end, in distinct ways. According to data provided to the Committee by Google, and additional public disclosures, numerous Google-affiliated platforms were utilized by IRA operatives, including YouTube, Google+, Gmail, Google's various advertisement platforms, Search, and Google Voice.

(U)  There is little evidence that the IRA's operational efforts were as reliant on Google's products as they were on Facebook, Instagram, or Twitter to execute the most outwardly visible aspects of their information warfare campaign. The design, nature, and intended use of most Google products probably lies at the heart of this imbalance. Although Gmail accounts were used by IRA operatives to establish account profiles on other social media platforms, Google's products are generally not conducive to the rapid, expansive public dissemination of content that makes Facebook and Twitter attractive to influence operatives. Google's then-Senior Vice President and General Counsel, Kent Walker, testified to the Committee in November 2017, "Google's products didn't lend themselves to the kind of micro-targeting or viral dissemination that these [IRA] actors seemed to prefer."[224]

---

[222] **(U)** Renee DiResta, Dr. Kris Shaffer, Becky Ruppel, David Sullivan, Robert Matney, Ryan Fox, Dr. Jonathan Albright, and Ben Johnson, "The Tactics and Tropes of the Internet Research Agency," *New Knowledge*, December 17, 2018, https://www.newknowledge.com/articles/the-disinformation-report/.

[223] **(U)** Phil Howard, Bharath Ganesh, Dimitra Liotsiou, John Kelly, and Camille Francois, "The IRA, Social Media and Political Polarization in the United States, 2012-2018," *Computational Propaganda Research Project, Oxford Internet Institute*, December 2018, https://int.nyt.com/data/documenthelper/534-oxford-russia-internet-research-agency/c6588b4a7b940c551c38/optimized/full.pdf.

[224] **(U)** Kent Walker, Hearing before the Senate Select Committee on Intelligence November 1, 2017, available at https://www.intelligence.senate.gov/hearings/open.

56

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

127

(U) IRA operatives were not, however, entirely absent from Google and its subsidiaries. Among the Google products that contributed to the wide-ranging character of the IRA's information warfare campaign, YouTube was by far the most utilized by operatives.  In addition to IRA activity on YouTube, Google also uncovered evidence that Russian operatives utilized some of the company's advertisement products and services during the 2016 election campaign period.  Using Gmail accounts connected to the IRA, influence operatives reportedly purchased $4,700 worth of search advertisements and more traditional display advertisements in relation to the 2016 presidential election.[225]

(U) Americans also engaged with a separate $53,000 worth of politically themed advertisements that either had a connection to a Russian internet or physical building address, or had been purchased with Russian rubles.  It is unclear, however, whether these ads are tied to the Russian government.  The content of these ads spans the political spectrum, and features messages alternately disparaging and supporting candidates from both major political parties, as well as the then incumbent U.S. President.  The total amount of advertisement spending related to the election on Google AdWords was about $270 million, making the Russia-linked purchases on the Google platform miniscule by comparison.  Gmail addresses and other Google applications were also utilized to establish accounts on both Facebook and Twitter.  According to Renee DiResta, "YouTube, G+, and other properties were leveraged to either host content or to support personas."[226]

(U) As a tool of information warfare, the Google "Search" application presents a distinct method for broadly disseminating disinformation.  Google's search engine is by far the most utilized on the internet, however Google has been criticized for its failure to address issues with its PageRank algorithm.  Periodically, particularly in the context of fast breaking news, Google's algorithm can elevate extremist content or disinformation to the top of certain searches.  Days after the 2016 presidential election, a falsified media account of President-elect Donald Trump having won the popular vote briefly ranked higher than stories that accurately reflected the U.S. popular vote result.[227]

(U) Google was quick in responding to and addressing the misleading 2016 popular vote search results, but the example illustrates that the Google platform's search results feature is not impervious to manipulation designed to spread deceptive and misleading information.  Public statements by Google representatives emphasize that the company realizes no business interest or advantage in the selective promotion of falsified news stories, extremist content, and conspiracy theories.

(U) As Laura Rosenberger testified to the Committee, "Another way the Russian government distorts the information space is through manipulating search results.  Just Google

[225] (U) *Ibid.*
[226] (U) Renee DiResta, Written Statement, Hearing before the Senate Select Committee on Intelligence, August 1, 2018, available at https://www.intelligence.senate.gov/hearings/open.
[227] (U) Philip Bump, "Google's top news link for 'final election results' goes to a fake news site with false numbers," *Washington Post*, November 14, 2016.

57

128

any geopolitical issue of significance to Moscow—MH-17, the White Helmets, the Novichok poisonings in the UK—and you will be served up a set of top results consisting of outlandish conspiracy theories emanating from Russia."[228]

(U)  Private sector entities around the world dedicate sustained effort to manipulating the Google Search algorithm for commercial benefit.  "Search-engine optimization," which entails maximizing the likelihood of favored content appearing among the highest ranked query results, is a standard marketing firm capability routinely used in the promotion of businesses and products.  The IRA's 2016 information warfare campaign featured some of the same capabilities.  According to the Department of Justice indictment, the IRA devoted an entire department to search-engine optimization, the objective of which was the elevation of the IRA's content in the search results of Americans, in furtherance of the IRA's 2016 information warfare campaign.[229]

(U)  **YouTube.**  Distinct from Facebook and Twitter, the YouTube platform is not independently conducive to rapid and expansive content sharing.  Achieving the "viral" spread of YouTube videos generally entails capitalizing on the reach and magnitude of Facebook and Twitter networks to spread links to the video hosted on YouTube.

(U)  Data provided to the Committee by YouTube concerning IRA-associated content and accounts indicates that IRA influence operatives began posting videos to YouTube as early as September 2015.  More than 1,100 videos, or 43 hours of content, were eventually posted on 17 YouTube channels the IRA established.  Two of these channels were overtly political in character, and focused on the 2016 U.S. presidential election.[230]

(U)  The overwhelming preponderance of the video content posted to the IRA's YouTube channels was aimed directly at the African-American population.  Most of the videos pertained to police brutality and the activist efforts of the Black Lives Matter organization.  Posted to 10 of the IRA's YouTube channels, were 1,063 videos—or roughly 96 percent of the IRA content—dedicated to issues of race and police brutality.  The names of the IRA's YouTube channels were consistent with the posted video content and included "Black Matters," "BlackToLive," "Cop Block US," "Don't Shoot," and "PoliceState."  The content of the videos posted to those channels exploits issues of extraordinary sensitivity inside the African-American community.  It is difficult to reconcile this fact with public testimony to the Committee by a Google representative that, "The videos were not targeted to any particular sector of the US population as that's not feasible on YouTube."[231]

---

[228] (U)  Laura Rosenberger, Written Statement, Hearing before the Senate Select Committee on Intelligence, August 1, 2018, available at https://www.intelligence.senate.gov/hearings/open.
[229] (U)  Indictment, *United States v. Internet Research Agency, et al.*, Case 1:18-cr-00032-DLF (D.D.C. Feb. 16, 2018).
[230] (U)  Renee DiResta, Dr. Kris Shaffer, Becky Ruppel, David Sullivan, Robert Matney, Ryan Fox, Dr. Jonathan Albright, and Ben Johnson, "The Tactics and Tropes of the Internet Research Agency," *New Knowledge*, December 17, 2018, https://www.newknowledge.com/articles/the-disinformation-report/.
[231] (U)  Kent Walker, Hearing before the Senate Select Committee on Intelligence November 1, 2017, available at https://www.intelligence.senate.gov/hearings/open.

129

(U) Only 25 videos posted to the IRA's YouTube channels featured election-related keywords in the title. All of the IRA's politically-oriented videos were thematically opposed to the Democrat candidate for president, Hillary Clinton. Some of the videos featured expressly voter suppressive content intended to dissuade African-American voters from participating in the 2016 presidential election, while others encouraged African-Americans to vote for Jill Stein.

(U) YouTube continues to be the propaganda vehicle of choice for Russia's state-sponsored news organization, RT (formerly Russia Today). As of February 2019, RT had nearly 3.3 million global subscribers on its YouTube channel. In 2013, RT was the first self-described "news channel" to break 1 billion views on YouTube, and in 2017, RT's YouTube channel accumulated its five billionth view. RT's social media presence and activities were outlined in the January 6, 2017 Intelligence Community Assessment, in an annex to the unclassified version of the report.[232]

(U) **Reddit.** IRA influence operatives were active on the Reddit platform during the 2016 presidential election campaign period, in part it appears, to test audience reaction to disinformation and influence campaign content before its dissemination through other social media platform channels.

(U) Motivated by the fall 2017 revelations of significant IRA activity on the Facebook and Twitter platforms, Reddit conducted an internal investigation into whether IRA activity had taken place on its platform. The results of Reddit's internal investigation, which were shared with the Committee, indicate that IRA influence operatives were active on the platform and attempted to engage with American Reddit users. Internal investigators characterized 944 Reddit accounts as "suspicious," imparting that investigators judged there was a "high probability" that the accounts were linked to the IRA.[233] Analysis of the accounts indicates that nearly three-quarters (662 accounts) achieved zero karma points, indicative of minimal engagement by the broader Reddit user base.

(U) According to Reddit, the 944 evaluated accounts were responsible for around 14,000 posts. Of those posts that contained socially or politically divisive content, most were thematically focused on police brutality, issues of race, and the disparagement of Hillary Clinton. A Reddit account with the username Rubinjer, the most popular of the accounts Reddit investigators assessed as probably linked to the IRA, posted a video that falsely claimed to depict Hillary Clinton engaged in a sex act. The video, which was ultimately posted on a separate website dedicated to pornographic content and viewed more than 250,000 times, was created by the IRA's influence operatives.[234] The same Reddit account was used to promote a videogame titled Hilltendo, in which players maneuver an animated Hillary Clinton as the avatar deletes emails and evades FBI agents. IRA influence operatives attempted to achieve viral

---

[232] (U) ODNI, "Assessing Russian Activities and Intentions in Recent US Elections," *Intelligence Community Assessment (Unclassified Version),* January 6, 2017, https://www.dni.gov/files/documents/ICA_2017_01.pdf.
[233] (U) Reddit, Submission to SSCI, April 10, 2018.
[234] (U) Ben Collins, "Russia-Linked Account Pushed Fake Hillary Clinton Sex Video," *NBC News,* April 10, 2018.

59

130

dissemination of the video game across social media, weeks prior to the 2016 election.[235]  IRA influence operatives also used Reddit as a platform for Russia-friendly narratives. As Laura Rosenberger testified to the Committee: "On Reddit, multiple IRA-generated memes posted to the 'r/funny' sub-reddit were targeted at discouraging United States support for Monteriegrin-accession to NATO, attempting to portray Montenegrins either as free riders or as protestors resisting this move."[236]

(U)  In Reddit's assessment, IRA information warfare activity on its platform was largely "unsuccessful in getting any traction."  The company judges that most Russian-origin disinformation and influence content was either filtered out by the platform's moderators, or met with indifference by the broader Reddit user base.  In an April 2018 statement, Reddit CEO, Steve Huffman, stated that the investigations had "shown that the efforts of [Reddit's] Trust and Safety Team and Anti-Evil teams are working," and that the "work of [Reddit] moderators and the healthy skepticism of [Reddit] communities" made Reddit a "difficult platform to manipulate."[237]  Nevertheless, the largely anonymous and self-regulated nature of the Reddit platform makes it extremely difficult to diagnose and attribute foreign influence operations.  This relative user autonomy and the dearth of information Reddit collects on its users make it probable that Reddit remains a testbed for foreign disinformation and influence campaigns.

(U)  **Tumblr.**  Following Facebook's September 2017 disclosures about IRA activity on the platform, Tumblr conducted an internal investigation to determine whether Russia-based operatives had also been active on Tumblr.[238]  The ensuing investigation uncovered 84 accounts determined to be associated with the IRA.  Most of the accounts were created in 2014 or 2015, and did not exhibit indications of automation.  The IRA-associated Tumblr accounts generated about 100,000 posts, and were engaged significantly with authentic (non-IRA) user accounts on Tumblr.  Tumblr estimates that IRA influence operatives used the platform to interact with 11.7 million unique U.S. users, and nearly 30 million unique users globally.  Tumblr did not find any indication that IRA operatives purchased advertisements through the platform's advertising feature.[239]

(U)  Tumblr's investigative findings indicate that content posted to the IRA's accounts was focused primarily on politics and divisive social issues.  A discernible effort to focus content delivery toward African-Americans is evident in the Tumblr account names the IRA chose, and the content those accounts posted.  Among the IRA's Tumblr profile names were:

---

[235] (U) Jose Pagliery and Donie O'Sullivan, "Russians released anti-Clinton video game weeks before election," *CNN Business*, March 8, 2018.
[236] (U) Laura Rosenberger, Written Statement, Hearing before the Senate Select Committee on Intelligence, August 1, 2018, available at https://www.intelligence.senate.gov/hearings/open.
[237] (U) Steve Huffman, "Reddit's 2017 transparency report and suspect account findings," Reddit, April 10, 2018, https://www.reddit.com/r/announcements/comments/8bb85p/reddits_2017_transparency_report_and_suspect/
[238] (U) Tumblr is a New York-based social networking and micro-blogging site that was created in 2007, and eventually acquired by Verizon and placed under the umbrella subsidiary, Oath, Inc. (later, renamed Verizon Media).
[239] (U) SSCI staff interview with Oath/Tumblr on Russian influence, April 20, 2018.

60

131

"aaddictedtoblackk," "black-to-the-bones," "blackness-by-your-side," "blacknproud," and "bleepthepolice."[240] Jonathan Albright, a researcher at the Tow Center for Digital Journalism at Columbia University, is unequivocal in concluding that on Tumblr, the IRA's influence operatives deliberately focused on messaging young African-American with narratives and payload content: "The evidence we've collected shows a highly engaged and far-reaching Tumblr propaganda-op targeting mostly teenage and twenty-something African-Americans."[241]

(U) As was the case on other social media platforms, IRA influence operatives used Tumblr accounts to build audiences of like-minded Americans, into which they would sow socially and politically divisive content. As reported in *BuzzFeed*, a Tumblr account named "4mysquad," which was later revealed by Tumblr to be operated by the IRA, dealt almost exclusively with issues of sensitivity to the African-American community. On occasion, political content promoting the presidential campaign of Bernie Sanders, or criticizing Hillary Clinton was posted to this account. As an example, "4mysquad" posted a video of Clinton calling young black gang members "superpredators," which generated more 50,000 engagements with authentic Tumblr users.[242] Over time, however, the IRA's influence operatives took the messaging broadcast via the "4mysquad" Tumblr account further than the credulity of some users would allow. As one former follower of the account was quoted, after "4mysquad" began posting content promoting the presidential campaign of Donald Trump, "I unfollowed him and the thing that was a red flag was that it was supposedly a black liberal blog that at some point started rooting for Trump to win."[243]

(U) Tumblr shared the results of the 2017 internal investigation with federal law enforcement. In the fall of 2018, law enforcement reciprocally alerted Tumblr to potential IRA operational activity tied to the U.S. 2018 mid-term elections taking place on the platform. On the basis of this insight, Tumblr identified 112 accounts tied to what was identified as an influence operation, indicating that Russia-based influence operatives continue to exploit the Tumblr platform targeting the United States.[244]

(U) In addition to the internal investigation into IRA activities on Tumblr, Oath's security team also searched the company's other digitally-based platforms, uncovering 484 Yahoo email accounts associated with other publicly identified IRA account information. Most of the Yahoo email accounts were used to establish profiles and enable commenting on other social media platforms.[245] Oath's internal security investigation also uncovered a small number

---

[240] (U) Tumblr, "Public record of usernames linked to state-sponsored disinformation campaigns," March 23, 2018, https://staff.tumblr.com/post/180179385310/keeping-our-promise-to-be-transparent-about.
[241] (U) Craig Silverman, "Russian Trolls Ran Wild on Tumblr and the Company Refuses to Say Anything About It," *BuzzFeed News*, February 6, 2018.
[242] (U) *Ibid.*
[243] (U) *Ibid.*
[244] (U) Tumblr Staff, "Keeping our promise to be transparent about state-sponsored disinformation campaigns," Tumblr, November 16, 2018, https://staff.tumblr.com/post/180179385310/keeping-our-promise-to-be-transparent-about.
[245] (U) SSCI staff interview with Oath/Tumblr on Russian influence, April 20, 2018.

132

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

of accounts with some indications of association with the IRA on Flickr, a photo and video hosting service. Only four of the seven Flickr accounts investigators found associated with the IRA had posted images.[246]

(U)  **LinkedIn.**  LinkedIn discovered that IRA-linked activity occurred on the platform during the period of the 2016 presidential election. In the course of an internal investigation initiated after the fall 2017 Facebook disclosures, LinkedIn uncovered 91 accounts and five fake company pages believed to be tied to the IRA. Most of the accounts were established in 2015. About 24 of the accounts never posted content to the platform. Eighty percent of the content posted from these accounts generated no engagement from any other LinkedIn users. None of the accounts is known to have purchased ads or any promoted content on the platform.[247] However a common IRA approach involved establishing credibility by creating multiple social media accounts across an array of platforms, under the same falsified American persona.

(U)  Though foreign influence operational activity on LinkedIn appears to be limited, the platform and its users are a significant target for foreign intelligence services. LinkedIn users submit, and make publicly accessible, significant personal and professional data in the pursuit of networking opportunities and to attract potential employers. This renders the platform a valuable source of information on an array of sensitive intelligence targets—including the identities of government employees, active duty military personnel, cleared defense contractors, and others. As Director of the U.S. National Counterintelligence and Security Center William Evanina has stated, LinkedIn "makes for a great venue for foreign adversaries to target not only individuals in the government, formers, former CIA folks, but academics, scientists, engineers, anything they want. It's the ultimate playground for (intelligence) collection."[248]

(U)  **Other Platforms.**  Medium, a popular online publishing platform, and Pinterest, a photo- and image-focused social media platform with over 250 million active users, both publicly acknowledged the discovery of IRA influence operative activity on their platforms. The Committee's TAG researchers also discovered IRA activity on other popular internet sites, including Vine, Gab, Meetup, VKontakte, and LiveJournal. Even browser extensions, music applications, and games, like Pokémon Go were incorporated into the IRA's influence operation.[249] As Renee DiResta notes, the widespread use of numerous applications and platforms illustrates "the fluid, evolving, and innovative tactical approach the IRA leveraged to interfere in US politics and culture."[250]

[246] (U) *Ibid.*
[247] (U) Blake Lawit, General Counsel, LinkedIn, *Letter to SSCI,* December 21, 2018.
[248] (U) Jonathan Landay and Warren Strobel, "Exclusive: U.S. Accuses China of 'Super Aggressive' Spy Campaign on LinkedIn," *Reuters,* August 31, 2018.
[249] (U) Renee DiResta, Dr. Kris Shaffer, Becky Ruppel, David Sullivan, Robert Matney, Ryan Fox, Dr. Jonathan Albright, and Ben Johnson, "The Tactics and Tropes of the Internet Research Agency," *New Knowledge,* December 17, 2018, https://www.newknowledge.com/articles/the-disinformation-report/.
[250] (U) *Ibid.*

62

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

133

## VIII. (U) OTHER RUSSIAN SOCIAL MEDIA INFORMATION WARFARE EFFORTS

### A. (U) Main Intelligence Directorate (GRU)

(U) Other Russian government-funded and -directed entities, particularly the Russian intelligence services, also conducted social media efforts directed at the 2016 U.S. election. The Russian GRU conducted a wide variety of activities on social media. In January 2018 written responses to Committee inquiries, Facebook confirmed the presence of activity attributed to the GRU (also known as Fancy Bear or APT28) on its platform: "We have also tracked activity from a cluster of accounts we have assessed to belong to a group, APT28, that the U.S. government has publicly linked to Russian military intelligence services and the 'DCLeaks' organization."[251]

(U) Much of the activity related to APT28 found by Facebook in 2016 appeared to Facebook security experts as consistent with more typical offensive cyber activities, generally attributed to foreign intelligence services, including the targeting and attempted hacking of "employees of major U.S. political campaigns." However, Facebook later detected the APT28 group's engagement in what they described as "a new kind of behavior" later in the summer of 2016. Facebook uncovered GRU attempts to engage in influence activities, namely, "the creation of fake personas that were then used to seed stolen information to journalists." As Facebook notes, "These fake personas were organized under the banner of an organization that called itself 'DCLeaks.'"[252]

(U) The GRU's direct role in the 2016 information warfare campaign was publicly exposed in yet another indictment obtained in July 2018 by the Special Counsel's Office. This indictment against the GRU ("the GRU indictment") outlined very specific details about the GRU's online influence operations.

(U) The GRU indictment charged a number of GRU operatives, including Aleksandr Vladimirovich Osadchuk, a colonel in the Russian military and the commanding officer of the GRU's unit 74455. The Special Counsel's Office described Unit 74455's role in the GRU's influence operation: "Unit 74455 assisted in the release of stolen documents through the DCLeaks and Guccifer 2.0 personas, the promotion of those releases, and the publication of anti-Clinton content on social media accounts operated by the GRU."

(U) The public accounting from the Special Counsel's Office also reveals the cross-platform character of these information operations, which involved several of the social media companies, including Facebook and Twitter.[253]

---

[251] (U) Colin Stretch, Responses by Facebook to SSCI Questions for the Record from hearing on November 1, 2017, submitted January 8, 2018, available at https://www.intelligence.senate.gov/sites/default/files/documents/Facebook%20Response%20to%20Committee%20QFRs.pdf
[252] (U) Ibid.
[253] (U) Indictment, *United States v. Viktor Borisovich Netyksho, et al.*, Case 1:18-cr-00215-ABJ (D.D.C. July 13, 2018).

63

134

(U) On *or about June 8, 2016, and at approximately the same time that the dcleaks.com website was launched, the Conspirators created a DCLeaks Facebook page using a preexisting social media account under the fictitious name "Alice Donovan." In addition to the DCLeaks Facebook page, the Conspirators used other social media accounts in the names of fictitious U.S. persons such as "Jason Scott" and "Richard Gingrey" to promote the DCLeaks website.*[254]

(U) On *or about June 8, 2016, the Conspirators created the Twitter account @dcleaks_.  The Conspirators operated the @dcleaks_ Twitter account from the same computer used for other efforts to interfere with the 2016 U.S. presidential election.  For example, the Conspirators used the same computer to operate the Twitter account @BaltimoreIsWhr, through which they encouraged U.S. audiences to "[j]oin our flash mob" opposing Clinton and to post images with the hashtag #BlacksAgainstHillary.*[255]

---

[254] (U) *Ibid.*
[255] (U) *Ibid.*

64

135

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

- ████████████████████████████████████████
  ██████████████████████

- ████████████████████████████████████████
  ████████████████████

- ████████████████████████████████████████
  ████████████████████

- ████████████████████████████████████████
  ██████████████████████

- ████████████████████████████████████████
  ██████████████████████

- ██████████████████████████████████

- ████████████████████████████████████████
  ████████████

- ██████████████████████████████████████████
  █████████

████████████████████████████████████████████████
██████████████████████████████████

- ████████████████████████████████████████
  ██████████████████████████

- ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████

256 ████████████████████████████████████████
████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

65

████████████████████████████████████████████████

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

136

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

66

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

137



(U) According to FBI:



67

138

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY



(U)  A 2017 analysis by cybersecurity company FireEye outlined additional personas assessed to be associated with Kremlin-linked organizations.  From FireEye's report: "We assess, with varying respective degrees of confidence, that Russian state-sponsored actors leveraged at least six false 'hacktivist' personas over the course of 2016 to conduct a series of information operations designed to further Russian political interests."[258]  Personas attributed to Russian state sponsors included Guccifer 2.0, DCLeaks, @anpoland (Anonymous Poland), Fancy Bears' Hack Team, @pravsector (Pravvy Sektor), and Bozkurt Hackers.[259]

(U)  According to the 2017 analysis by FireEye: "Personas engaged in highly organized, systematized, and in some cases semi-automated social media dissemination campaigns to promote leaks and associated political narratives to media outlets and other influencers, in order to generate mainstream coverage and public attention."  The activities included "cadres of Twitter accounts repetitively publishing identical tweets promoting threat activity.  [The accounts were] [d]esigned to further spread awareness of incidents and boost the credibility of the personas by creating a grassroots impression that more genuine Twitter users are talking about incidents than is accurate."[260]

(U)  Even as late as the fall of 2018, Facebook continued to find activity attributed to the GRU.  In August 2018, Facebook announced additional actions against "Pages, groups and accounts that can be linked to sources the US government has previously identified as Russian military intelligence services."[261]  As detailed by this enforcement of Facebook's terms of service, Russian-backed influence operations did not stop after the 2016 U.S. election.

---

[257] (U) FBI, Written response to SSCI inquiry of January 3, 2019, March 1, 2019.
[258] (U) FireEye, "Anatomy of Russia's 2016 Influence Operations: Hacks, leaks, and the manipulation of political opinion," FireEye, Inc., October 2017.
[259] (U) The New York Times reported in September 2017 about activity sponsored by Anonymous Poland Twitter accounts that were involved in spreading political disinformation during the 2016 U.S. election.  Their article noted "last October [2016], hundreds of Anonymous Poland Twitter accounts posted a forged letter on the stationery of the conservative Bradley Foundation . . . purporting to show that it had donated $150 million to the Clinton campaign.  The foundation denied any such contribution, which would have been illegal and . . . highly unlikely."
[260] (U) FireEye, "Anatomy of Russia's 2016 Influence Operations: Hacks, leaks, and the manipulation of political opinion," FireEye, Inc., October 2017.
[261] (U) Facebook Newsroom, "Taking Down More Coordinated Inauthentic Behavior," Facebook, August 21, 2018, https://newsroom.fb.com/news/2018/08/more-coordinated-inauthentic-behavior/.

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

139



140

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY



### C. (U) Other Russian Government Activities

(U) In fall 2016, an FBI contractor analyzed a pro-Russian network of 13 Twitter accounts.  The account @TeamTrumpRussia was the central node in this network.  According to FBI:

> (U) *@TeamTrumpRussia and the other 12 accounts had a total of 1,504,511 followers at the time the contractor collected its data (17 to 19 October 2016). Four of the 13 accounts had a reciprocal relationship with Sergey Nalobin, an employee of Russia's Ministry of Foreign Affairs (MFA), whose Twitter profile states he is responsible for "digital diplomacy and social media." In August 2015, the United Kingdom refused to extend Nalobin's visa because of his involvement with a UK political group called "Conservative Friends of Russia," according to open source reporting.*

> (U) *The FBI contractor found over 70 percent of the network's Tweets contained links to Websites "outside of the mainstream US press, and are known to be*



268
269
270 (U) *Ibid.*
271
272 (U) *Ibid.*

70

COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY

141

*highly supportive of the Trump campaign. Of those sites, a number are also known to overtly draw content from Russian disinformation sites or are suspected of more covert connections to the Kremlin."*

*A second report produced by the contractor examined the network's efforts to promote allegations of voter fraud in advance of the election.*



## IX. (U) U.S. GOVERNMENT RESPONSE

(U)  Throughout the 2016 U.S. presidential election campaign period, the IRA was a largely obscure entity operating far from America's borders inside a stand-alone building in St. Petersburg, Russia.  Despite the fact that the IRA began planning and implementing its electoral interference as early as 2014, its existence and activities were not well known to the wider American public and the U.S. Government until well after the election had passed.  Even the January 6, 2017 Intelligence Community Assessment, authored as the Intelligence Community's comprehensive account of Russia's attack on the U.S. election, made no more than a passing reference to the cadre of professional trolls housed in the IRA.[275]  In early September 2017, Facebook—under significant pressure from this Committee and the broader United States Congress—disclosed a collection of accounts linked to the IRA, beginning to bring the scope of

---

[273] (U) FBI, Written response to SSCI inquiry of January 3, 2019, March 1, 2019.
[274]
[275]

71

142

the IRA's electoral activities into focus.[276] The criminal nature of the IRA's interference crystallized with the Special Counsel's public indictment in February 2018.[277]

(U)  Some of the starkest early insights into IRA activities for western audiences were reported by *The Guardian*'s Shaun Walker in his April 2015 report, "Salutin' Putin," and by Adrian Chen in *The New York Times Magazine* investigative report on the IRA, "The Agency."[278]  These investigative reports take on new significance in light of the Committee's work.

(U)  The U.S. Intelligence Community's ability to identify and combat foreign influence operations carried out via social media channels has improved since the 2016 U.S. presidential election.  Communication and information sharing between government agencies and the social media companies has been a particular point of emphasis, and the Committee strongly supports these efforts.  Characterizing the company's present relationship with Federal law enforcement, Twitter representatives have informed the Committee, "We now have well-established relationships with law enforcement agencies active in this arena, including the Federal Bureau of Investigation Foreign Influence Task Force and the U.S. Department of Homeland Security's Election Security Task Force."[279]  Facebook has made similar representations to the Committee:

> *After the election, when the public discussion of 'fake news' rapidly accelerated, we continued to investigate and learn more about the new threat of using fake accounts to amplify divisive material and deceptively influence civic discourse. We shared what we learned with government officials and others in the tech industry.  Since then, we also have been coordinating with the FBI's Counterintelligence Division and the DOJ's National Security Division.  We are also actively engaged with the Department of Homeland Security, the FBI's Foreign Influence Task Force, and Secretaries of State across the US on our efforts to detect and stop information operations, including those that target elections.[280]*

(U)  This progress notwithstanding, it is important to memorialize the state of information sharing between law enforcement and the social media companies in fall 2016.  The FBI was examining social media content for its potential as a means of effectuating foreign influence operations in 2016, but mostly through contractors:

---

[276] (U)  Alex Stamos, Facebook, "An Update on Information Operations on Facebook," September 6, 2017: https://newsroom.fb.com/news/2017/09/information-operations-update/.

[277] (U)  The first publicly available insight into the IRA, however, came several years prior as a result of the efforts of a small number of diligent and prescient reporters.  By 2015, Russian reporters, including Andrei Soshnikov who went undercover as a troll in the IRA in 2013, had begun to expose the inner workings of the IRA.

[278] (U)  Shaun Walker, "Salutin' Putin: Inside a Russian troll House," *The Guardian*, April 2, 2015; Adrian Chen, "The Agency," *The New York Times Magazine*, June 2, 2015.

[279] (U)  Sean Edgett, Letter to SSCI Chairman Richard Burr and Vice Chairman Mark Warner, January 25, 2019.

[280] (U)  Facebook, Letter to SSCI Chairman Richard Burr and Vice Chairman Mark Warner, February 26, 2019

143

(U) *In October 2016, the Counterintelligence Division tasked a contractor to identify Russian influence activity on Twitter. The FBI contractor collected and analyzed a sample of Twitter activity conducted by an overtly pro-Russian network of 13 Twitter accounts and their followers, including automated accounts, which promoted US election-related news and leaked Democratic party emails published by WikiLeaks.*[281]

(U) The apparently outsourced nature of this work is troubling: it suggests FBI either lacked resources or viewed work in this vein as not warranting more institutionalized consideration. None of the resulting analysis or even notice of the underlying activity appears to have been communicated to the social media company in question prior to the election. Twitter's General Counsel told the Committee in January 2019: "To the best of our knowledge, Twitter received no information from the U.S. government in advance of the 2016 election about state sponsored information operations."[282]

(U) Facebook, however, had more robust information exchange with law enforcement in 2016: "In several instances before the 2016 U.S. election, our threat intelligence team detected and mitigated threats from actors with ties to Russia and reported them to US law enforcement officials, and they subsequently shared useful feedback with us."[283] Still, it was incumbent on Facebook to initiate the dialogue with law enforcement, and the exchange of information was predicated on Facebook bringing foreign influence activity directed at Americans to the attention of the FBI.



Reflecting on the U.S. Government's handling of social media in the context of Russia's influence operations, former Deputy National Security Advisor for Strategic Communications Ben Rhodes commented

---

[281] (U) FBI, Written response to SSCI inquiry of January 3, 2019, March 1, 2019.
[282] (U) Sean Edgett, Letter to SSCI Chairman Richard Burr and Vice Chairman Mark Warner, January 25, 2019.
[283] (U) Facebook, Letter to SSCI Chairman Richard Burr and Vice Chairman Mark Warner, February 26, 2019
[284] (U          ) Committee transcript of September 15, 2017 interview of                    CIA.

73

144



Commenting on the ██████████████████████ Former Homeland Security Advisor Lisa Monaco offered a ███████

(U)  Further increasing this challenge, detecting foreign influence operations on social media becomes more difficult as enabling technologies improve.  In addition to the growing number of actors engaged in social media-facilitated, online manipulation efforts, the technology that aids in developing more realistic and convincing propaganda material also continues to advance.

(U)  The ongoing development of artificial intelligence and improvements to false video and image "Deepfake" techniques are making it more difficult to spot fake content, manipulated videos, and forged recordings online.  "Deepfakes" entail using artificial intelligence-based technology to create or alter video content so that it appears to present something that did not actually occur.  Although these capabilities are relatively nascent, they are being perfected at a pace that eclipses the effort to create the technology for detecting and mitigating fraudulent media content.

(U)  Advanced micro-targeting in the commercial sector is also rapidly becoming more effective.  Propagandists will be able to continue to utilize increasingly advanced off-the-shelf capabilities to target specific individuals with highly targeted messaging campaigns.

---

[285] (U) SSCI Transcript of the Interview with Benjamin J. Rhodes, Former Deputy National Security Adviser for Strategic Communications, July 25, 2017.
[286] (U) *Ibid.*
[287] (U) SSCI transcript of the Closed Hearing on White House Awareness of and Response to Russian Active Measures, July 17, 2018.
[288] (U) SSCI Transcript of the Interview with John Carlin, Former Assistant Attorney General for National Security, September 25, 2017.

145

(U) Automation is also getting better. Bots—already advanced in sophistication relative to predecessor generations—are becoming harder and harder to detect. Researchers, including Emilio Ferrara and his team from the University of Southern California and the University of Indiana, have studied the increasing sophistication of automated accounts. Their research suggests a detection "arms race," between the purveyors of automated activity and those intent on its reliable identification, similar to the fight against the indiscriminate dissemination of commercial content to vast unsoliciting audiences, or "spam," in the past.[289]

(U) In addition, as the larger social media platforms begin to increase their detection capabilities, disinformation tactics have begun to shift to accommodate those changes. Influence operatives have begun to move away from targeting Facebook and Twitter newsfeeds, transitioning to messaging platforms like WhatsApp, Telegram, and WeChat. These direct interactions are much harder to detect and if these tactics are scaled, they could have a significant effect on target audiences.

(U) The evolution and proliferation of the core influence techniques used by the IRA could jeopardize facets of American society that have yet to be attacked by influence operatives. The same bots, trolls, click-farms, fake pages and groups, advertisements, and algorithm-gaming the IRA used to conduct an information warfare campaign can be repurposed to execute financial fraud, stock-pumping schemes, digital advertising manipulation, industrialized marketing of counterfeit prescription drugs, and scaled deceptions that spread malware.

■■■ Facebook CEO Sheryl Sandberg testified to the Committee in 2018 that, "Our focus is on inauthenticity, so if something is inauthentic, whether it's trying to influence domestically or trying to influence on a foreign basis—and actually a lot more of the activity is domestic—we take it down."[291] But as the IRA's approach suggests, the current constructs for removing influence operation content from social media are being surpassed by foreign influence operatives, who adapt their tactics to either make their inauthenticity indiscernible, their automated propagation too rapid to control, or their operations compliant with terms of service.

(U) An October 2018 report provided to the Committee by social media analytics firm Graphika indicates that Russian disinformation efforts may be focused on gathering information and data points in support of an active measures campaign targeted at the 2020 U.S. presidential

[289] (U) Emilio Ferrara, et al., "The Rise of Social Bots," *Communications of the ACM*, July 2016, Volume 59, Number 7, 96-104, https://cacm.acm.org/magazines/2016/7/204021-the-rise-of-social-bots/fulltext#R22.
[290] ■■■
[291] (U) Sheryl Sandberg, Hearing before the Senate Select Committee on Intelligence, September 5, 2018, available at https://www.intelligence.senate.gov/hearings/open.

75

146

election. The USA Really website and its affiliated social media channels, which have been linked to the IRA on the basis of technical findings, have "engaged in a number of campaigns seemingly focused on gathering personal information (emails, phone numbers, and bank details) of US-based audiences sympathetic to Russian disinformation topics."[292]

## X. (U) THE COMMITTEE'S REVIEW OF RUSSIA'S USE OF SOCIAL MEDIA

(U) Throughout 2017, 2018, and 2019, in addition to its review of classified information on the topic, the Committee worked to elevate public awareness of the threat posed by Russia online, an effort that included applying pressure on social media companies to more fully examine their platforms for suspected Russian government activities.

(U) On March 30, 2017, the Committee held a public hearing for the purpose of discussing Russian malign influence efforts. The hearing, entitled "Disinformation: A Primer in Russian Active Measures and Influence Campaigns," included testimony from a number of expert witnesses who provided insights into the mechanics of Russian influence operations and warned that Russian social media manipulation "has not stopped since the election in November and continues fomenting chaos amongst the American populace."[293] Committee Members joined witnesses in calling on social media companies to do more to uncover the Russian active measures activities occurring on their platforms. In the wake of the hearing, the Committee publicly and privately pressed social media companies to release more information about the activity of Russian actors on social media in the lead-up to the 2016 election.

(U) On April 27, 2017, Facebook released a white paper detailing an array of malicious information operations by organized actors on the Facebook social media platform.[294] Though the paper implicitly attributed the operations to Russian intelligence actors, the company had yet to uncover the substantial operational activity of the IRA.[295] Finally, in late summer 2017, Facebook notified the Committee of its findings from an internal information security investigation which uncovered 470 accounts, groups, and pages linked to the IRA.[296]

---

[292] (U) Graphika Strategic Assessment, *USA Really Shows a New Face of Russian Disinformation Efforts Against the US*, October 10, 2018.

[293] (U) Clint Watts, Written Testimony, Hearing before the Senate Select Committee on Intelligence, March 30, 2017, available at https://www.intelligence.senate.gov/hearings/open.

[294] (U) Jen Weedon, William Nuland, and Alex Stamos, "Information Operations and Facebook," Facebook Newsroom, April 27, 2017, https://fbnewsroomus.files.wordpress.com/2017/04/facebook-and-information-operations-v1.pdf.

[295] (U) The Facebook white paper specifically stated that Facebook was not in a position to make "definitive attribution" to the actors sponsoring this activity. However, it was willing to publicly say that the data it uncovered "does not contradict the attribution provided by the U.S. Director of National Intelligence in the report dated January 6, 2017." This is a clear reference to Russian-linked activity. Alex Stamos, one of the authors of the white paper, also made clear to SSCI staff in a briefing around that time that indicators pointed to Russian-linked intelligence activity.

[296] (U) Facebook briefed Committee staff on its findings on September 6, 2017, and publicized those same findings later that day.

76

147

(U)  The subsequent September 2017 release of IRA-linked account information by Facebook publicly confirmed the existence of IRA-purchased advertisements.  This precipitated audits at Twitter, Google, YouTube, Reddit, and other social media companies, which uncovered additional accounts and activity originating with the IRA.  As more and more information became public, the wide-ranging and cross-platform nature of the attack emerged.  The Committee made formal requests to multiple social media companies for any data associated with these operations, in order to better assess Russia's tactics and objectives.  On the basis of negotiations with the Committee, several companies—including Facebook, Twitter, and Google—furnished varying quantities of data not previously released.

(U)  Beginning with an initial delivery of metadata and content in late 2017, Facebook, Twitter, and Google provided the Committee with information relating to a number of IRA-affiliated social media accounts, including advertisements purchased in connection with those accounts, consisting of:

- Metadata and content associated with 81 Facebook Pages, including approximately 61,500 unique Facebook organic posts and 3,393 paid advertisements;

- Similar information from nearly 116,000 Instagram posts across 133 Instagram accounts;

- Metadata and content of approximately 10.4 million tweets across 3,841 Twitter accounts, as well as unique account information; and,

- Approximately 1,100 YouTube videos (43 hours of video) across 17 account channels.

(U)  Each of these accounts and their associated activities were determined to be connected to the IRA by the social media companies themselves, based on the companies' internal investigations.[297]  This cooperation by the social media companies secured for the Committee a significant and unique dataset on which to base further study into IRA activities.  Much of the analysis in this report derives from that initial dataset.[298]  The datasets provided to the Committee demonstrate the IRA's tactics and capabilities, and add depth to the public's understanding of how the IRA conducted its information warfare campaign against the United States in 2016.

(U)  In order to thoroughly examine this sizeable aggregation of technical data, the Committee sought assistance from the TAG.  At the Committee's request, the two TAG working

---

[297] (U)  The Committee has not attempted to make an independent determination as to the accuracy of the social media companies' internal investigations or the true provenance of the accounts themselves, though the Committee does believe that the data provided is almost certainly not the entirety of the IRA's activity on these platforms.  Subsequent reporting and additional research from outside analysts have corroborated much of the original attribution from the companies.

[298] (U)  Twitter has since published its entire dataset on IRA-linked activity.  On October 17, 2018, Twitter publicly released all the accounts and related content it has identified so far as associated with the activities of the IRA, dating back to 2009.

77

148

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

groups each conducted an independent, expert analysis of the social media company-provided dataset. Combining this dataset with the TAG's own internal research and data analytic capabilities, the TAG working groups studied U.S. social media platforms for indications of additional and undiscovered Russian foreign influence activity. Ultimately, the three TAG working group leads provided their findings and analysis to the Committee in a series of presentations that included staff briefings, a closed Member briefing, and a full Committee public hearing held on August 1, 2018.

(U) The TAG working groups each published their findings in two public reports that were released on December 17, 2018. The efforts of the TAG working groups, and the team leads specifically, resulted in two valuable publications that have significantly informed the Committee's understanding of Russia's social media-predicated attack against our democracy. The Committee supports the general findings of the TAG working groups, and notes that much of this Volume's analysis is derived from their work. The two reports are attached as addendums to this Volume.

## XI. (U) RECOMMENDATIONS

(U) This challenge requires an integrated approach that brings together the public and private sectors. This approach must be rooted in protecting democratic values, including freedom of speech and the right to privacy. The Federal government, civil society, and the private sector, including social media and technology companies, each have an important role to play in deterring and defending against foreign influence operations that target the United States.

### A. (U) Industry Measures

(U) The Committee recommends that social media companies work to facilitate greater information sharing between the public and private sector, and among the social companies themselves about malicious activity and platform vulnerabilities that are exploited to spread disinformation. Formalized mechanisms for collaboration that facilitate content sharing among the social media platforms in order to defend against foreign disinformation, as occurred with violent extremist content online, should be fostered. As researchers have concluded: "Many disinformation campaigns and cyber threats do not just manipulate one platform; the information moves across various platforms or a cyber-attack threatens multiple companies' network security and data integrity. There must be greater cooperation within the tech sector and between the tech sector and other stakeholders to address these issues."[299] The Committee agrees.

(U) This should not be a difficult step. Models for cooperation already exist and can be developed further:

---

[299] (U) *Harmful Content: The Role of Internet Platform Companies in Fighting Terrorist Incitement and Politically Motivated Disinformation*, Stern Center for Business and Human Rights, New York University, November 3, 2017, http://www.stern.nyu.edu/experience-stern/faculty-research/harmful-content-role-internet-platform- companies-fighting-terrorist-incitement-and-politically.

78

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

149

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

- **(U)** Google, Facebook, Twitter, and Microsoft already maintain a common database of digital fingerprints identifying violent extremist videos. These four companies also participate in a Cyberhate Problem-Solving Lab run by the Anti-Defamation League's Center for Technology and Society.

- **(U)** Dozens of tech companies participate in the Global Network Initiative, a tech policy forum devoted to protecting digital rights globally.

- **(U)** Other examples include the Global Internet Forum to Counter Terrorism, whose goal is to substantially disrupt terrorists' ability to disseminate violent extremist propaganda, and glorify real-world acts of violence; and the National Cyber Forensics and Training Alliance, a nonprofit partnership between industry, government, and academia that enables cooperation to disrupt cyber-crime.

- **(U)** Two models from the world of financial intelligence are the UK's Joint Money Laundering Intelligence Taskforce and the United States' Financial Crimes Enforcement Exchange.

    **(U)** At the urging of the Committee, social media companies have begun to share indicators, albeit on an ad hoc basis.

    **(U)** The Committee further recommends that social media companies provide users with:

- **(U)** Greater transparency about activity occurring on their platforms, including disclosure of automated accounts (i.e., bots);

- **(U)** Greater context for users about why they see certain content;

- **(U)** The locational origin of content; and,

- **(U)** Complete and timely public exposure of malign information operations.

    **(U)** Social media platforms are not consistent in proactively, clearly, and conspicuously notifying users that they have been exposed to these efforts, leaving those who have been exposed to the false information or accounts without the knowledge they need to better evaluate future social media content that they encounter. Notifications to individual users should be clearly stated, device neutral, and provide users all the information necessary to understanding the malicious nature of the social media content or accounts they were exposed to.

    **(U)** Finally, the analytic and computational capabilities of outside researchers should be put to greater use by the social media companies. Although social media companies have released some data about the manipulation of their platforms by foreign actors, the Committee recommends that social media companies be more open to facilitating third-party research

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

150

designed to assist them in defending their platforms from disinformation campaigns. The results of collaboration with outside researchers should be shared with users who have been exposed to disinformation.

### B. (U) Congressional Measures

(U) The Committee recommends that Congress consider ways to facilitate productive coordination and cooperation between U.S. social media companies and the pertinent government agencies and departments, with respect to curtailing foreign influence operations that target Americans—to include examining laws that may impede that coordination and cooperation. Information sharing between the social media companies and law enforcement must improve, and in both directions. Data must be shared more quickly and in a more useful manner. This will improve the ability of social media companies to quickly identify and disclose malign foreign influence operations to the appropriate authorities, and it will improve the ability of law enforcement agencies to respond in a timely manner.

(U) Informal channels of communication may not be sufficient to accomplish this goal. As part of its examination, Congress must assess whether formalized information sharing between law enforcement and social media companies is useful and appropriate. Certain statutory models already exist, such as U.S. Code, Title 18, Section 2258A (Reporting requirements of providers). That section requires social media companies to report any apparent violations of laws relating to child sexual exploitation to the National Center for Missing and Exploited Children (NCMEC). NCMEC is a private, non-profit entity that serves a statutorily authorized clearinghouse role: it receives the providers' reports, assesses the reports for criminality and threats to children, and refers them to the appropriate law enforcement authorities for action. Formalizing a relationship between social media companies and the government does present some legal considerations,[300] but these should not be prohibitive.

(U) Further, the Committee recommends that Congress examine legislative approaches to ensuring Americans know the sources of online political advertisements. The Federal Election Campaign Act of 1971 requires political advertisements on television, radio and satellite to disclose the sponsor of the advertisement. The same requirements should apply online. This will also help to ensure that the IRA or any similarly situated actors cannot use paid advertisements for purposes of foreign interference.

(U) Finally, Congress should continue to examine the full panoply of issues surrounding social media, particularly those items that may have some impact on the ability of users to masquerade as others and provide inauthentic content. Issues such as privacy rules, identity

---

[300] (U) For example, courts have considered whether NCMEC and providers should be considered state actors and therefore subject to Constitutional requirements such as the Fourth Amendment when identifying and sharing child exploitation material with law enforcement. *See, e.g.*, *United States v. Reddick*, 900 F.3d 636 (5th Cir. 2018) (holding that provider acted in a private capacity when identifying and reporting child exploitation images to NCMEC); *United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2016) (holding that NCMEC was a state actor when reviewing and reporting child exploitation material to law enforcement).

80

151

validation, transparency in how data is collected and used, and monitoring for inauthentic or malign content, among others, deserve continued examination. In addition, Congress should monitor the extent to which social media companies provide users with the information laid out in section A and, if necessary, take remedial steps.

### C. (U) Executive Branch Measures

(U) The Committee recommends that the Executive Branch should, in the run up to the 2020 election, reinforce with the public the danger of attempted foreign interference in the 2020 election.

(U) Addressing the challenge of disinformation in the long-term will ultimately need to be tackled by an informed and discerning population of citizens who are both alert to the threat and armed with the critical thinking skills necessary to protect against malicious influence. A public initiative—propelled by federal funding but led in large part by state and local education institutions—focused on building media literacy from an early age would help build long-term resilience to foreign manipulation of our democracy. Such an effort could benefit from the resources and knowledge of private sector technology companies.

(U) Additionally, and in concert with initiatives that heighten public awareness about disinformation, media organizations should establish guidelines for using social media accounts as sources, to guard against quoting falsified accounts or state-sponsored disinformation.

(U) The Committee further recommends that the Executive Branch stand up an interagency task force to continually monitor and assess foreign country's use of social media platforms for democratic interference. The task force should periodically advise the public and Congress on its findings and issue annual reports providing recommendations to key actors, including executive branch departments and agencies, industry, and civil society. The task force should also develop a deterrence framework to inform U.S. Government responses to foreign influence efforts using social media.

(U) The Committee further recommends that the Executive Branch develop a clear plan for notifying candidates, parties, or others associated with elections when those individuals or groups have been the victim of a foreign country's use of social media platforms to interfere in an election. The plan should provide standards for deciding who to notify and when, and should clearly delineate which agencies are responsible for making the notifications and to whom.

### D. (U) Other Measures

(U) The Committee recommends that candidates, campaigns, surrogates for campaigns, and other public figures engaged in political discourse on social media be judicious in scrutinizing the sources of information that they choose to share or promote online. Such public figures, precisely because of the reach of their networks, are valuable targets for adversaries, and can quickly be co-opted into inadvertently promoting a foreign influence operation.

81

152

**COMMITTEE SENSITIVE – RUSSIA INVESTIGATION ONLY**

(U) Amplification of foreign content, intentional or otherwise, is celebrated by those like the IRA, who wish to enflame our differences in order to advance their own interests. The Committee recommends that all Americans, and particularly those with a public platform, take on the responsibility of doing due diligence in their use of social media, so as to not give greater reach to those who seek to do our country harm.

(U) The Committee recommends the implementation of a Public Service Announcement (PSA) campaign, potentially by the social media industry or by government actors, that promotes informed social media behavior and raises awareness about various types of foreign influence and interference activity that is targeting American citizens, businesses, and institutions. Foreign influence campaigns that target social media users in the United States should receive similar attention to the dangers of smoking and the environmental risks of pollution. Broader exposure of specific foreign government linkages to social media content and influence activities would handicap the effectiveness of information operations.

82

153

## XII. (U) Additional Views of Senator Wyden

(U)  If American democracy is going to withstand the onslaught of foreign government influence campaigns targeting U.S. elections, our government must address the problem of targeted ads and other content tailored to consumers' demographic and political profiles. Targeted influence campaigns can weaponize personal information about Americans, not just to manipulate how, or whether they vote, but to identify and use real individuals to amplify content and influence like-minded followers.  Targeted influence campaigns are far more effective and cost-efficient than blanket dissemination of propaganda.  They are also more deceptive and substantially harder to identify and expose.

(U)  While the Committee's description of Russia's 2016 influence campaign is deeply troubling, even more sophisticated and effective options are available to adversaries who buy, steal, or otherwise obtain information about the Americans they are seeking to influence.  This threat is increased due to the availability of ad micro-targeting services offered by social media and online advertising companies, particularly those that deliver ads to specific Americans based on a list of email addresses or telephone numbers provided by an advertiser.  Such ad targeting systems are highly prone to abuse when coupled with private information about Americans, which is widely available because of weak corporate data security and privacy practices, the absence of strong privacy laws, and the booming market for commercial data brokers, whose practices are largely unregulated.  Each of these problems demands an effective response.

(U)  The Committee report states that, in 2016, IRA operators did not take advantage of all of Facebook's targeting capabilities, including "Custom Audiences," which would have allowed the Russians to use outside data and contact information to conduct "advanced micro-targeting."[1]  The danger posed by these services is magnified by the ease with which personal data can be purchased or stolen by a foreign adversary with advanced cyber capabilities.  Indeed, as the Department of Justice's indictment against the IRA revealed, the IRA used stolen identities of real Americans to create accounts and post content, purchase advertising on social media sites and finance their influence activities through Pay Pal.[2]

(U)  In the wake of the 2016 influence campaign by Russia, the social media companies announced transparency measures that allow the recipients of targeted ads to understand how they were selected to see the ads.  However, these transparency measures only apply when the tech companies are doing the targeting on behalf of the advertiser, for example when an advertiser asks Facebook to deliver its ads to a particular age and gender demographic.  The companies' ad transparency systems do not apply to services like Custom Audiences through which the platform merely serves as a messenger for ads directed according to a list of targets obtained by the malign influencer from a data broker or a hacked database.  I have already publicly called on the social media platforms to voluntarily suspend the use of Custom Audiences and other micro-targeting services for political and issue ads, and I repeat that call

---

[1]  (U)  Facebook has acknowledged that the IRA used custom audiences based on user engagement with certain IRA pages.  *See* Responses by Facebook to Questions for the Record from Senator Wyden from hearing on September 5, 2018, submitted October 26, 2018, p. 45.

[2]  (U).  Indictment, *United States of America v. Internet Research Agency et al.*, Case 1:18-cr-00032-DLF (D.D.C. February 16, 2018).

154

here.[3]  Until Facebook, Google, and Twitter have developed effective defenses to ensure that their ad micro-targeting systems cannot be exploited by foreign governments to influence American elections, these companies must put the integrity of American democracy over their profits.

(U)  At the Committee's September 5, 2018, hearing, I asked Facebook's Chief Operating Officer Sheryl Sandberg and Twitter's Chief Executive Officer Jack Dorsey whether increased protections and controls to defend personal privacy should be a national security priority.  Both witnesses answered in the affirmative.  Weak data privacy policies increase the ability of foreign adversaries to micro-target Americans for purposes of election interference.  Facebook's total failure to prevent Cambridge Analytica and Aleksandr Kogan from obtaining sensitive personal data about Facebook users, as well as Facebook's troubling data-sharing partnerships with Chinese smart phone manufacturers, demonstrate clear gaps in federal data privacy laws and highlight obvious weaknesses that could be exploited in future influence campaigns.[4]

(U)  Broad, effective data security and privacy policies, implemented across the platforms and enforced by a tough, competent government regulator, are necessary to prevent the loss of consumers' data and the abuse of that data in election influence campaigns.  Congress should pass legislation that addresses this concern in three respects.  First, the Federal Trade Commission must be given the power to set baseline data security and privacy rules for companies that store or share Americans' data, as well as the authority and resources to fine companies that violate those rules.  Second, companies should be obligated to disclose how consumer information is collected and shared and provide consumers the names of every individual or institution with whom their data has been shared.  Third, consumers must be given the ability to easily opt out of commercial data sharing.

(U)  Companies that hold private information on Americans also must do far more to protect that information from hacking.  That includes telecommunications companies that hold information about customers' communications, web browsing, app usage and location.  Too much of this information is held for too long, increasing the risk that it will be hacked.  Besides strengthening their cyber security practices, companies can take steps to delete consumer information as soon as it is not absolutely necessary for business purposes.

(U)  Increased transparency is another critical priority if the United States is to defend itself against foreign election influence campaigns.  A clear lesson from 2016 is that the U.S. public needs information about influence campaigns prior to the election itself.  That includes information about U.S. adversaries' attempts to undermine some candidates while assisting others.  In 2016, the specific intent of the Russians was not made public during the election.  Intelligence related to Russian intent was not even made available to the full Committee until after the election, at which point I and other members called for its declassification.  And it was not until the publication of the Intelligence Community Assessment in January 2017 that the public was finally provided this information.

---

[3] **(U)** Donie O'Sullivan, "Senator calls on Facebook and Google to ban political ad targeting," *CNN*, August 14, 2019.
[4] **(U)** *See* Responses by Facebook to Questions for the Record from Senator Wyden from hearing on September 5, 2018, submitted October 26, 2018, pp. 46-55.

84

155

████████████████

████████████████████████████████████████████

[5] Between now and the 2020 election, the Intelligence Community must find ways to keep the U.S. public informed not only of individual influence operations, but the Community's assessment of the goals and intent of Russia and other foreign adversaries.

[3] National Intelligence Council, Sense of the Community Memorandum, "██████████" September 13, 2019.

████████████████

# DEFENDANTS' EXHIBIT 10:

**Statement of Yoel Roth, PhD**
**Former Head of Trust & Safety**
**Twitter, Inc.**

**Hearing on "Protecting Speech from Government Interference and**
**Social Media Bias, Part 1: Twitter's Role in Suppressing the Biden Laptop Story"**

**Before the House of Representatives Committee on Oversight and Accountability**

**February 8, 2023**

Thank you, Chairman Comer, Ranking Member Raskin, and Members of the Committee, for the opportunity to speak with you here today.

In nearly 8 years at Twitter, I worked in and led a division called Trust & Safety. Trust & Safety's core duty is content moderation: Labeling or removing Tweets that violate Twitter's terms of service, and suspending or banning users who repeatedly break the rules. This work is sometimes dismissed merely as censorship — but it represents a key way that Twitter and other companies live up to their responsibility to keep the users of their products safe.

Much of this work is uncontroversial and obviously good: For example, taking down accounts that engage in child sexual exploitation or promote terrorism. Although this content represents a tiny fraction of the overall volume of conversation on social media, the dangers it poses means platforms like Twitter have a responsibility to find it and remove it promptly. The scale of this work is considerable: In the second half of 2021, Twitter removed over 33,000 accounts for promoting terrorism or violent extremism, more than 100,000 for promoting the sale of illegal goods and services, and nearly 600,000 for engaging in child sexual exploitation.[1]

If all trust and safety work was just about universally abhorrent content, there would be no controversy. We would all agree that content moderation is unambiguously good. The gray area of this work is when trust and safety teams have to make decisions about so-called "lawful but awful" material: Content that may be legal in many jurisdictions, but isn't something most people would want to see or experience.[2] Think of things like posting someone else's home address without their permission; or sharing graphic videos of animal abuse; or bullying someone for a disability or for how they look.

---

[1] "Rules Enforcement, July - December 2021," Twitter Transparency Center, Twitter, last modified July 28, 2022, https://transparency.twitter.com/en/reports/rules-enforcement html#2021-jul-dec.
[2] Daphne Keller, "Lawful but Awful? Control over Legal Speech by Platforms, Governments, and Internet Users," *The University of Chicago Law Review Online*, June 28, 2022. https://lawreviewblog.uchicago.edu/2022/06/28/keller-control-over-speech/.

Statement of Yoel Roth, PhD
February 8, 2023
Committee on Oversight and Accountability
U.S. House of Representatives

A free-speech absolutist might say, "Yes, that kind of content is unpleasant, but it's not against the law. What right do you have to remove it?" The answer is that, as businesses, social media platforms must be appealing to their own users, if they hope to survive.[3] Consistently, in its own research, Twitter found that users were unhappy with the platform's approach to content moderation — and that this dissatisfaction drove away both users and advertisers. In other studies, we found that some portions of Twitter's user base stopped using Twitter for the opposite reason: Because they felt Twitter was too overbearing and censored too much. In short, the company had to look for a middle ground solution that would appeal to both sides of this spectrum, while still addressing the very real harms that can come from social media.

A key harm we talked a lot about on the Trust & Safety team was chilling effects: The idea that one person's unrestricted freedom of speech could have the consequence of stifling someone else's — the proverbial "Heckler's Veto" of First Amendment law. Again and again, we saw the "lawful but awful" speech of a small number of abusive users drive away countless others. Unrestricted free speech, paradoxically, results in less speech, not more.[4] Trust & Safety's job is to try to find a balance between one person's free speech, and the impacts of their free speech on the ability of others to participate. Getting this right is difficult, but essential to the success of a platform like Twitter.

But the importance of trust and safety work goes far beyond whether or not Twitter succeeds as a private business. There are broader national security implications for this work, too. In 2016, we saw significant interference in an American election by the Russian government, through social media platforms such as Twitter.[5] I led the team at Twitter that uncovered that interference.[6] I still remember the rage I felt when I saw accounts with names like "Pamela Moore" and "Crystal Johnson" — accounts purporting to be real Americans, from Wisconsin and New York, but with phone numbers tracing back to St Petersburg, Russia.[7] These accounts were operated by agents of a foreign government, and their mission was to stoke culture war issues on social media to try

---

[3] Yoel Roth, "I Was the Head of Trust and Safety at Twitter. This Is What Could Become of It," *New York Times*, November 18, 2022, https://www.nytimes.com/2022/11/18/opinion/twitter-yoel-roth-elon-musk.html.

[4] Danielle Citron, *Hate crimes in cyberspace* (Harvard University Press, 2014). Mary Anne Franks, "Fearless speech," *First Amendment Law Review* 17 (Symposium, 2018).

[5] Kathleen Hall Jamieson, *Cyberwar: How Russian hackers and trolls helped elect a president: What we don't, can't, and do know* (Oxford University Press, 2018).

[6] Twitter, "Update on Twitter's review of the 2016 US election," *Twitter Blog*, January 19, 2018, https://blog.twitter.com/official/en_us/topics/company/2018/2016-election-update.html

[7] U.S. Department of Justice, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election, Volume I of II*, March 2019, https://s3.documentcloud.org/documents/5955240/Full-Mueller-Report.pdf.

Statement of Yoel Roth, PhD
February 8, 2023
Committee on Oversight and Accountability
U.S. House of Representatives

to further divide Americans.[8] My team and I exposed and banned hundreds of thousands of these accounts, from Russia, but also from Iran, China, and beyond.[9]

And the kinds of attacks that we saw go far beyond fake Americans with Russian phone numbers. The actors targeting American elections are well-funded and increasingly sophisticated, and have continuously gotten better at covering their tracks. In 2016, Russian military intelligence carried out a sophisticated hack and leak campaign targeting the US elections; the details of it weren't declassified until long after election day[10], after the damage had been done. As Congress investigated what happened, a clear finding was that tech platforms and law enforcement had failed to appropriately work together to address these threats.[11] Twitter, and other companies, were widely — and I think rightfully — criticized for their inaction. We were told in no uncertain terms, by the public and by Congress, that we had a responsibility to do a better job protecting future elections.

In an effort to get ahead of these kinds of threats, Twitter and other tech companies worked to build closer information-sharing relationships with law enforcement such as the FBI.[12] In the recent reporting known as the Twitter Files, there was an attempt to portray interactions between Twitter and other social media platforms and the FBI as politically driven interference.[13] My experience of these interactions was different. Across the FBI, DHS, and other agencies, the professionals responsible for combating malign foreign interference in elections did so with integrity, and the utmost care and respect for the laws of this country — including the First Amendment.

Which brings us to Hunter Biden's laptop and the *New York Post*. In 2020, the Trust & Safety team noticed activity related to the laptop popping up on Twitter, and that activity, at first glance, bore a lot of similarities to the 2016 Russian hack and leak operation. Twitter had to decide what to do. The only information we had to go on to make this decision was what had been publicly

[8] Ahmed Al-Rawi and Anis Rahman, "Manufacturing rage: The Russian Internet Research Agency's political astroturfing on social media," *First Monday* 25, no. 9, http://dx.doi.org/10.5210/fm.v25i9.10801.
[9] "Moderation Research," Twitter Transparency Center, Twitter, accessed February 4, 2023, https://transparency.twitter.com/en/reports/moderation-research.html.
[10] U.S. Intelligence Community, *Assessing Russian Activities and Intentions in Recent US Elections*, January 6, 2017, https://www.intelligence.senate.gov/sites/default/files/documents/ICA_2017_01.pdf.
[11] U.S. Congress, Senate, Select Committee on Intelligence, *Russian Active Measures and Interference In the 2016 U.S. Election*, 116th Cong., 2d sess., S. Rep. 116-290, https://www.intelligence.senate.gov/publications/report-select-committee-intelligence-united-states-senate-russian-active-measures.
[12] Salvador Rodriguez, "The FBI visits Facebook to talk about 2020 election security, with Google, Microsoft and Twitter joining," *CNBC*, September 4, 2019, https://www.cnbc.com/2019/09/04/facebook-twitter-google-are-meeting-with-us-officials-to-discuss-2020-election-security.html.
[13] Matt Taibbi, "Capsule Summaries of all Twitter Files Threads to Date, With Links and a Glossary," *Racket*, January 4, 2023, https://www.racket.news/p/capsule-summaries-of-all-twitter.

Statement of Yoel Roth, PhD
February 8, 2023
Committee on Oversight and Accountability
U.S. House of Representatives

reported. And in that moment, with limited information, Twitter made a mistake: Under the Distribution of Hacked Material Policy[14], the company decided to require the *New York Post* to delete several Tweets linking to stories about the laptop, and prevent links to those stories from being shared across the service. This policy was not meant to be a tool to censor news: It was written to prohibit hacking groups from using Twitter to launder stolen documents — the same activity the Russian government had engaged in in 2016. And in this instance, the company's initial assessment was that the activity bore enough similarities to the 2016 hack and leak that it warranted enforcement.

I've been clear that, in my judgment at the time, Twitter should not have taken action to block the *New York Post*'s reporting. I recommended to Twitter leadership that we take a milder step while we tried to learn more: My recommendation was that we prevent the articles from being actively recommended or amplified by Twitter's algorithms, rather than blocking them altogether. However, in an effort to be consistent with the specifics of the Hacked Materials Policy, which didn't provide for the milder step I recommended, Twitter decided to follow a strict interpretation of the policy, and removed the *New York Post*'s Tweets. Just 24 hours after doing so, the company acknowledged its error[15], and ultimately changed its policies as a result.[16] But this isn't a case where I was right, and others were wrong: The decisions here aren't straightforward, and hindsight is 20/20. It isn't obvious what the right response is to a suspected, but not confirmed, cyberattack by another government on a presidential election. Twitter erred in this case because we wanted to avoid repeating the mistakes of 2016.

And so the basic job of trust and safety remains to try to strike this balance: Between the harms of restricting too much speech, and the dangers of doing too little. Some of the decisions we had to make, like taking down images of animal abuse, were obvious; others, like how to address various forms of misinformation about COVID, are less clear. But someone has to make a call. Companies like Twitter — teams like mine — have to exercise judgment about where to draw the line on this content and implement that judgment consistently at the scale of hundreds of millions of unique posts per day.

I'll be the first to admit that we didn't always get it right. Individual content moderation decisions will always be contentious, and reasonable minds can differ about whether a specific choice was right or wrong. I'm sure we'll talk about some of those choices here today. But what

---

[14] "Distribution of Hacked Material Policy," Help Center, Twitter, archived version last modified March 2019, https://web.archive.org/web/20190717143909/https://help.twitter.com/en/rules-and-policies/hacked-materials
[15] Kate Conger and Mike Isaac, "In Reversal, Twitter Is No Longer Blocking New York Post Article," *New York Times*, October 16, 2020, https://www.nytimes.com/2020/10/16/technology/twitter-new-york-post.html.
[16] "Distribution of Hacked Materials Policy," Help Center, Twitter, last modified October 2020, https://help.twitter.com/en/rules-and-policies/hacked-materials.

Statement of Yoel Roth, PhD
February 8, 2023
Committee on Oversight and Accountability
U.S. House of Representatives

we tried to do at Twitter — across every decision — was to create a rules-based system of governance that would make clear what's allowed, or not, on Twitter, and why.

Transparency is at the heart of this work, and it's where I think Twitter — and all of social media — can and must do better.

Trust is built on understanding — and right now, the vast majority of people don't understand how or why content moderation decisions are made. Much of the knowledge about how platforms like Twitter make decisions is known only to the tiny number of people working at the companies themselves. This is particularly problematic for key decisions, like those impacting elections, where a company's actions are of immense public concern to millions of voters.

During my tenure at Twitter, we started down a path of increased transparency by beginning to pull back the curtains on these decisions. In 2018, we took the unprecedented step of publishing comprehensive archives of Russian election interference during and after the 2016 elections.[17] We released similar data about dozens of other campaigns, spanning hundreds of millions of Tweets and terabytes of media, unearthing government-backed troll farms around the world.[18] Through newer programs like the Twitter Moderation Research Consortium, we aimed to expand this even further, sharing data about key policy decisions in areas like misinformation with hundreds of researchers.[19] I'm concerned by recent reports that suggest this program has been canceled, with no staff left at Twitter to oversee it.[20]

Twitter's relationship with government employees would benefit from similar levels of transparency. While the Twitter Files show a lot of discussions between Twitter employees and political staff on both sides of the aisle, some key context is missing: We were careful to keep the teams involved in those interactions cordoned off from the implementation of our rules. Twitter's government relations staff — the people you see in the Twitter Files answering emails from campaign staff and members of Congress — did not have any kind of decision-making authority over policy enforcement. But how would anyone know that, especially when other big

---

[17] Vijaya Gadde and Yoel Roth, "Enabling further research of information operations on Twitter," *Twitter Blog*, October 17, 2018, https://blog.twitter.com/en_us/topics/company/2018/enabling-further-research-of-information-operations-on-twitter.

[18] Twitter, "Disclosing state-linked information operations we've removed," *Twitter Blog*, December 2, 2021, https://blog.twitter.com/en_us/topics/company/2021/disclosing-state-linked-information-operations-we-ve-removed.

[19] Yoel Roth, "The Twitter Moderation Research Consortium is now open to researchers," *Twitter Blog*, September 22, 2022, https://blog.twitter.com/en_us/topics/company/2022/twitter-moderation-research-consortium-open-researchers.

[20] Sheila Dang, "Twitter research group stall complicates compliance with new EU law," *Reuters*, January 28, 2023, https://www.reuters.com/technology/twitter-research-group-stall-complicates-compliance-with-new-eu-law-2023-01-27/.

Statement of Yoel Roth, PhD
February 8, 2023
Committee on Oversight and Accountability
U.S. House of Representatives

companies blur the lines between these functions?[21] Twitter set up its teams to promote impartiality; but in the absence of transparency, people reasonably assume that there's opportunity for abuse.

Legislation and regulation can help here. The bipartisan Platform Accountability and Transparency[22] and Digital Services Oversight and Safety[23] Acts, for example, would require platforms to provide data to independent researchers, and empower the FTC to compel them to do so. And, Chairman Comer, your proposal in the Protecting Speech from Government Interference Act to restrict how government employees may pressure social media companies to moderate content would be an important step forward in establishing clear boundaries between government and the private sector.[24] Understanding what platforms are doing and why — and what the influences on them are — is the cornerstone of reestablishing public trust in social media.

It is often said that humor can be an effective antidote to stress.  On some of the more challenging days, I've joked that, in trust and safety, there are no good options; just a bunch of bad ones, and your job is to try to pick what the least bad one is. While I was Head of Trust & Safety at Twitter, I strove to do this work with impartiality and a commitment to the fair enforcement of Twitter's written rules. Each day at Twitter, my team and I worked to build trust with the platform's millions of users around the world: By proactively addressing the harms that can come from social media; and by doing that work in a principled, consistent, and transparent way. But whether it's me, or Elon Musk, or another future policymaker, *someone* will have to make choices about the governance of online spaces. Those decisions shouldn't be made behind closed doors, or based on personal whims. I hope that we can work together to find ways to bring greater trust and transparency to social media, and I look forward to answering the Committee's questions about any of these topics to the best of my ability.

---

[21] Emily Birnbaum, "Facebook staff complained for years about their lobbyists' power," *Politico*, October 25, 2021, https://www.politico.com/news/2021/10/25/facebook-fatal-flaw-technologists-lobbyists-516927.

[22] Editorial Board, "A small step toward solving our social media woes," *The Washington Post*, January 17, 2022, https://www.washingtonpost.com/opinions/2022/01/17/legislative-step-toward-solving-our-social-media-woes/.

[23] Justin Hendrix, "Reps. Trahan, Schiff, & Casten Introduce Digital Services Oversight and Safety Act," *Tech Policy Press*, February 23, 2022, https://techpolicy.press/reps-trahan-schiff-casten-introduce-digital-services-oversight-and-safety-act/.

[24] Committee on Oversight and Accountability, "Comer, McMorris Rodgers, Jordan Introduce Bill to Stop Biden Administration from Pressuring Social Media Companies to Censor Americans," Press Release, January 12, 2023, https://oversight.house.gov/release/comer-mcmorris-rodgers-jordan-introduce-bill-to-stop-biden-administration-from-pressuring-social-media-companies-to-censor-americans-2/.

# DEFENDANTS' EXHIBIT 11:

 
A lot of you have asked what we're doing about misinformation, so I wanted to give an update.

The bottom line is: we take misinformation seriously. Our goal is to connect people with the stories they find most meaningful, and we know people want accurate information. We've been working on this problem for a long time and we take this responsibility seriously. We've made significant progress, but there is more work to be done.

Historically, we have relied on our community to help us understand what is fake and what is not. Anyone on Facebook can report any link as false, and we use signals from those reports along with a number of others -- like people sharing links to myth-busting sites such as Snopes -- to understand which stories we can confidently classify as misinformation. Similar to clickbait, spam and scams, we penalize this content in News Feed so it's much less likely to spread.

The problems here are complex, both technically and philosophically. We believe in giving people a voice, which means erring on the side of letting people share what they want whenever possible. We need to be careful not to discourage sharing of opinions or to mistakenly restrict accurate content. We do not want to be arbiters of truth ourselves, but instead rely on our community and trusted third parties.

While the percentage of misinformation is relatively small, we have much more work ahead on our roadmap. Normally we wouldn't share specifics about our work in progress, but given the importance of these issues and the amount of interest in this topic, I want to outline some of the projects we already have underway:

- Stronger detection. The most important thing we can do is improve our ability to classify misinformation. This means better technical systems to detect what people will flag as false before they do it themselves.

- Easy reporting. Making it much easier for people to report stories as fake will help us catch more misinformation faster.

- Third party verification. There are many respected fact checking organizations and, while we have reached out to some, we plan to learn from many more.

- Warnings. We are exploring labeling stories that have been flagged as false by third parties or our community, and showing warnings when people read or share them.

- Related articles quality. We are raising the bar for stories that appear in related articles under links in News Feed.

economics with ads policies like the one we announced earlier this week, and better ad farm detection.

- Listening. We will continue to work with journalists and others in the news industry to get their input, in particular, to better understand their fact checking systems and learn from them.

Some of these ideas will work well, and some will not. But I want you to know that we have always taken this seriously, we understand how important the issue is for our community and we are committed to getting this right.

👍 130K                    10K comments   10K shares

---

👍 Like              💬 Comment              ↪ Share

---

Most relevant ▼

Write a comment...                    💬 ☺ 📷 GIF 🥳

📣 Author
**Mark Zuckerberg** ✔
For those asking why I posted this at 9:30pm, that's when I landed and got into in Lima last night. Looking forward to the APEC Summit today.

**Like   Reply**   6y                    👍 3.6K

↳ **524 Replies**

**Benjamin Adamah**
That is a fantastic idea Mark, as this will change the world forever for the good!. According to German politician Andreas von Bulow 95% of a budget of about 33 billion US tax paid dollars are yearly spend on deliberately spreading misinformation via t... **See more**

**Like   Reply**   6y                    👍 7

**Bill Nash**
Dunno that this will ever be seen, but: Something that ad companies like Facebook can do, that government cannot, is require content sources to classify themselves as entertainment, or news, and require that they adhere to specific/accepted standards o... **See more**

**Like   Reply**   6y                    👍 2

**Franny Max**
What are you going to do about all the misinformation being spread about the so-called "benefits" of forced infant circumcision? Why do you censor the truth about

# DEFENDANTS' EXHIBIT 12:

3/27/23, 8:54 AM                                                                         Mark Zuckerberg - Every year I take on a personal challenge to...

Case 3:22-cv-01213-TAD-KDM    Document 264-4    Filed 05/02/23    Page 127 of 506 PageID #:
19114

Email or phone    Password

Sign Up

English (US) · Español ·
Português (Brasil) · Français (France) ·
Deutsch

Privacy · Terms · Advertising · Ad Choices
Cookies · More
Meta © 2023

**Mark Zuckerberg**
January 4, 2018 ·

Every year I take on a personal challenge to learn something new. I've visited every US state, run 365 miles, built an AI for my home, read 25 books, and learned Mandarin.

I started doing these challenges in 2009. That first year the economy was in a deep recession and Facebook was not yet profitable. We needed to get serious about making sure Facebook had a sustainable business model. It was a serious year, and I wore a tie every day as a reminder.

Today feels a lot like that first year. The world feels anxious and divided, and Facebook has a lot of work to do -- whether it's protecting our community from abuse and hate, defending against interference by nation states, or making sure that time spent on Facebook is time well spent.

My personal challenge for 2018 is to focus on fixing these important issues. We won't prevent all mistakes or abuse, but we currently make too many errors enforcing our policies and preventing misuse of our tools. If we're successful this year then we'll end 2018 on a much better trajectory.

This may not seem like a personal challenge on its face, but I think I'll learn more by focusing intensely on these issues than I would by doing something completely separate. These issues touch on questions of history, civics, political philosophy, media, government, and of course technology. I'm looking forward to bringing groups of experts together to discuss and help work through these topics.

For example, one of the most interesting questions in technology right now is about centralization vs decentralization. A lot of us got into technology because we believe it can be a decentralizing force that puts more power in people's hands. (The first four words of Facebook's mission have always been "give people the power".) Back in the 1990s and 2000s, most people believed technology would be a decentralizing force.

But today, many people have lost faith in that promise. With the rise of a small number of big tech companies — and governments using technology to watch their citizens — many people now believe technology only centralizes power rather than decentralizes it.

There are important counter-trends to this --like encryption and cryptocurrency -- that take power from centralized systems and put it back into people's hands. But they come with the risk of being harder to control. I'm interested to go deeper and study the positive and negative aspects of these technologies, and how best to use them in our services.

This will be a serious year of self-improvement and I'm looking forward to learning from working to fix our issues together.

|  | |
| --- | --- |
| 275K | 19K comments  16K shares |

Share

**See more of Mark Zuckerberg on Facebook**

Log In        or        Create new account

# DEFENDANTS' EXHIBIT 13:



Q

Back to Newsroom

## Meta

# Helping to Protect the 2020 US Elections

October 21, 2019

By Guy Rosen, VP of Integrity; Katie Harbath, Public Policy Director, Global Elections; Nathaniel Gleicher, Head of Cybersecurity Policy and Rob Leathern, Director of Product Management



***Update on January 27, 2020 at 1:30PM PT:*** In order to continue running issue, electoral or political ads in the US, advertisers must assign a Page Owner. To help ensure all advertisers have time to complete this, we are extending our deadline to become compliant to February 8, 2020.

***Original post on October 21, 2019:***

We have a responsibility to stop abuse and election interference on our platform. That's why we've made significant investments since 2016 to better identify new threats, close vulnerabilities and reduce the spread of viral misinformation and fake accounts.

Today, almost a year out from the 2020 elections in the US, we're announcing several new measures to help protect the democratic process and providing an update on initiatives already underway:

**Fighting foreign interference**

- Combating inauthentic behavior, including an updated policy

- Protecting the accounts of candidates, elected officials, their teams and others through Facebook Protect

**Increasing transparency**

- Making Pages more transparent, including showing the confirmed owner of a Page

- Labeling state-controlled media on their Page and in our Ad Library

- Making it easier to understand political ads, including a new US presidential candidate spend tracker

**Reducing misinformation**

- Preventing the spread of misinformation, including clearer fact-checking labels

- Fighting voter suppression and interference, including banning paid ads that suggest voting is useless or advise people not to vote

- Helping people better understand the information they see online, including an initial investment of $2 million to support media literacy projects

# Fighting Foreign Interference

**Combating Inauthentic Behavior**

Over the last three years, we've worked to identify new and emerging threats and remove underlined coordinated inauthentic behavior across our apps. In the past year alone, we've taken down over 50 networks worldwide, many ahead of major democratic elections. As part of our effort to counter foreign influence campaigns, this morning we removed four separate networks of accounts, Pages and Groups on Facebook and Instagram for engaging in coordinated inauthentic behavior. Three of them originated in Iran and one in Russia. They targeted the US, North Africa and Latin America. We have identified these manipulation campaigns as part of our internal investigations into suspected Iran-linked inauthentic behavior, as well as ongoing proactive work ahead of the US elections.

We took down these networks based on their behavior, not the content they posted. In each case, the people behind this activity coordinated with one another and used fake accounts to misrepresent themselves, and that was the basis for our action. We have shared our findings with law enforcement and industry partners. More details can be found here.

As we've improved our ability to disrupt these operations, we've also built a deeper understanding of different threats and how best to counter them. We investigate and enforce against any type of inauthentic behavior. However, the most appropriate way to respond to someone boosting the popularity of their posts in their own country may not be the best way to counter foreign interference. That's why we're updating our inauthentic behavior policy to clarify how we deal with the range of deceptive practices we see on our platforms, whether foreign or domestic, state or non-state.

**Protecting the Accounts of Candidates, Elected Officials and Their Teams**

Today, we're launching Facebook Protect to further secure the accounts of elected officials, candidates, their staff and others who may be particularly vulnerable to targeting by hackers and foreign adversaries. As we've seen in past elections, they can

be targets of malicious activity. However, because campaigns are generally run for a short period of time, we don't always know who these campaign-affiliated people are, making it harder to help protect them.

Beginning today, Page admins can enroll their organization's Facebook and Instagram accounts in Facebook Protect and invite members of their organization to participate in the program as well. Participants will be required to turn on two-factor authentication, and their accounts will be monitored for hacking, such as login attempts from unusual locations or unverified devices. And, if we discover an attack against one account, we can review and protect other accounts affiliated with that same organization that are enrolled in our program. Read more about Facebook Protect and enroll here.



# Increasing Transparency

### Making Pages More Transparent

We want to make sure people are using Facebook authentically, and that they understand who is speaking to them. Over the past year, we've taken steps to ensure Pages are authentic and more transparent by showing people the Page's primary country location and whether the Page has merged with other Pages. This gives people more context on the Page and makes it easier to understand who's behind it.

Increasingly, we've seen people failing to disclose the organization behind their Page as a way to make people think that a Page is run independently. To address this, we're adding more information about who is behind a Page, including a new "Organizations That Manage This Page" tab that will feature the Page's "Confirmed Page Owner," including the organization's legal name and verified city, phone number or website.

Initially, this information will only appear on Pages with large US audiences that have gone through Facebook's business verification. In addition, Pages that have gone through the new authorization process to run ads about social issues, elections or politics in the US will also have this tab. And starting in January, these advertisers will be required to show their Confirmed Page Owner.

If we find a Page is concealing its ownership in order to mislead people, we will require it to successfully complete the verification process and show more information in order for the Page to stay up.

Labeling State-Controlled Media

We want to help people better understand the sources of news content they see on Facebook so they can make informed decisions about what they're reading. Next month, we'll begin labeling media outlets that are wholly or partially under the editorial control of their government as state-controlled media. This label will be on both their Page and in our Ad Library.

We will hold these Pages to a higher standard of transparency because they combine the opinion-making influence of a media organization with the strategic backing of a state.

We developed our own definition and standards for state-controlled media organizations with input from more than 40 experts around the world specializing in media, governance, human rights and development. Those consulted represent leading academic institutions, nonprofits and international organizations in this field, including Reporters Without Borders, Center for International Media Assistance, European

Journalism Center, Oxford Internet Institute, Center for Media, Data and Society (CMDS) at the Central European University, the Council of Europe, UNESCO and others.

It's important to note that our policy draws an intentional distinction between state-controlled media and public media, which we define as any entity that is publicly financed, retains a public service mission and can demonstrate its independent editorial control. At this time, we're focusing our labeling efforts only on state-controlled media.

We will update the list of state-controlled media on a rolling basis beginning in November. And, in early 2020, we plan to expand our labeling to specific posts and apply these labels on Instagram as well. For any organization that believes we have applied the label in error, there will be an appeals process.

**Making it Easier to Understand Political Ads**

In addition to making Pages more transparent, we're updating the Ad Library, Ad Library Report and Ad Library API to help journalists, lawmakers, researchers and others learn more about the ads they see. This includes:

- A new US presidential candidate spend tracker, so that people can see how much candidates have spent on ads

- Adding additional spend details at the state or regional level to help people analyze advertiser and candidate efforts to reach voters geographically

- Making it clear if an ad ran on Facebook, Instagram, Messenger or Audience Network

- Adding useful API filters, providing programmatic access to download ad creatives and a repository of frequently used API scripts.

In addition to updates to the Ad Library API, in November, we will begin testing a new database with researchers that will enable them to quickly download the entire Ad Library, pull daily snapshots and track day-to-day changes.

Visit our Help Center to learn more about the changes to Pages and the Ad Library.

# Reducing Misinformation

**Preventing the Spread of Viral Misinformation**

On Facebook and Instagram, we work to keep confirmed misinformation from spreading. For example, we reduce its distribution so fewer people see it — on Instagram, we remove it from Explore and hashtags, and on Facebook, we reduce its distribution in News Feed. On Instagram, we also make content from accounts that repeatedly post misinformation harder to find by filtering content from that account from Explore and hashtag pages for example. And on Facebook, if Pages, domains or Groups repeatedly share misinformation, we'll continue to reduce their overall distribution and we'll place restrictions on the Page's ability to advertise and monetize.

Over the next month, content across Facebook and Instagram that has been rated false or partly false by a third-party fact-checker will start to be more prominently labeled so that people can better decide for themselves what to read, trust and share. The labels below will be shown on top of false and partly false photos and videos, including on top of Stories content on Instagram, and will link out to the assessment from the fact-checker.



Much like we do on Facebook when people try to share known misinformation, we're also introducing a new pop-up that will appear when people attempt to share posts on Instagram that include content that has been debunked by third-party fact-checkers.



In addition to clearer labels, we're also working to take faster action to prevent misinformation from going viral, especially given that quality reporting and fact-checking takes time. In many countries, including in the US, if we have signals that a piece of content is false, we temporarily reduce its distribution pending review by a third-party fact-checker.

**Fighting Voter Suppression and Intimidation**
Attempts to interfere with or suppress voting undermine our core values as a company, and we work proactively to remove this type of harmful content. Ahead of the 2018

midterm elections, we extended our voter suppression and intimidation policies to prohibit:

- Misrepresentation of the dates, locations, times and methods for voting or voter registration (e.g. "Vote by text!");

- Misrepresentation of who can vote, qualifications for voting, whether a vote will be counted and what information and/or materials must be provided in order to vote (e.g. "If you voted in the primary, your vote in the general election won't count."); and

- Threats of violence relating to voting, voter registration or the outcome of an election.

We remove this type of content regardless of who it's coming from, and ahead of the midterm elections, our Elections Operations Center removed more than 45,000 pieces of content that violated these policies — more than 90% of which our systems detected before anyone reported the content to us.

We also recognize that there are certain types of content, such as hate speech, that are equally likely to suppress voting. That's why our hate speech policies ban efforts to exclude people from political participation on the basis of things like race, ethnicity or religion (e.g., telling people not to vote for a candidate because of the candidate's race, or indicating that people of a certain religion should not be allowed to hold office).

In advance of the US 2020 elections, we're implementing additional policies and expanding our technical capabilities on Facebook and Instagram to protect the integrity of the election. Following up on a commitment we made in the civil rights audit report released in June, we have now implemented our policy banning paid advertising that suggests voting is useless or meaningless, or advises people not to vote.

In addition, our systems are now more effective at proactively detecting and removing this harmful content. We use machine learning to help us quickly identify potentially incorrect voting information and remove it.

We are also continuing to expand and develop our partnerships to provide expertise on trends in voter suppression and intimidation, as well as early detection of violating content. This includes working directly with secretaries of state and election directors to address localized voter suppression that may only be occurring in a single state or district. This work will be supported by our Elections Operations Center during both the primary and general elections.

**Helping People Better Understand What They See Online**

Part of our work to stop the spread of misinformation is helping people spot it for themselves. That's why we partner with organizations and experts in media literacy.

Today, we're announcing an initial investment of $2 million to support projects that empower people to determine what to read and share — both on Facebook and elsewhere.

These projects range from training programs to help ensure the largest Instagram accounts have the resources they need to reduce the spread of misinformation, to expanding a pilot program that brings together senior citizens and high school students to learn about online safety and media literacy, to public events in local venues like bookstores, community centers and libraries in cities across the country. We're also supporting a series of training events focused on critical thinking among first-time voters.

In addition, we're including a new series of media literacy lessons in our Digital Literacy Library. These lessons are drawn from the Youth and Media team at the Berkman Klein Center for Internet & Society at Harvard University, which has made them available for free worldwide under a Creative Commons license. The lessons, created for middle and high school educators, are designed to be interactive and cover topics ranging from assessing the quality of the information online to more technical skills like reverse image search.

We'll continue to develop our media literacy efforts in the US and we'll have more to share soon.

Downloads

Press Call Transcript

Categories:
Company News, Election Integrity, Integrity and Security, Meta, Public Policy, Safety and Expression

Tags:
Ads and Pages Transparency, Combating Misinformation, Elections, False News

  

## RELATED NEWS

Meta

### How Meta Is Preparing for Brazil's 2022 Elections

We're sharing our work to protect the integrity of Brazil's presidential elections in October.

August 12, 2022

## Topics

Company News

Technology and Innovation

Data and Privacy

Safety and Expression

Combating Misinformation

Economic Opportunity

Election Integrity

Strengthening Communities

Diversity and Inclusion

## Featured News

## Instagram

**New Features on Instagram Reels: Trends, Editing and Gifts**

April 14, 2023

## Meta Quest

**Peacock on Meta Quest: Stream Current Movies, Hit TV Shows and Live Sports in VR**

April 12, 2023





**Follow Us**

    

## Virtual reality

## Smart glasses

## About us

## Our community

## Our actions

Support

Community Standards | Data Policy | Terms | Cookie policy

United States (English) ▾

# DEFENDANTS' EXHIBIT 14:

Hearing - Hearing Transcripts

Back to Document View Page

## Title Info

| | |
|---|---|
| Title: | Senate Judiciary Committee Holds Hearing on Censorship and the 2020 Election |
| Date: | November 17, 2020 |
| Committee: | Judiciary;SenateCommittee on the Judiciary. Senate |
| Source: | Transcript |
| Permalink: | https://congressional.proquest.com/congressional/docview/t39.d40.tr111701 20.o19?accountid=14740 |

## Body

Senate Judiciary Committee Holds Hearing On Censorship And The 2020 Election

November 17, 2020 10:00 A.M.

SPEAKERS:

SEN. LINDSEY GRAHAM (R-S.C.), CHAIRMAN

SEN. CHARLES E. GRASSLEY (R-IOWA)

SEN. JOHN CORNYN (R-TEXAS)

SEN. MIKE LEE (R-UTAH)

SEN. TED CRUZ (R-TEXAS)

SEN. BEN SASSE (R-NEB.)

SEN. JOSH HAWLEY (R-MO.)

SEN. THOM TILLIS (R-N.C.)

SEN. JONI ERNST (R-IOWA)

SEN. MICHAEL D. CRAPO (R-IDAHO)

SEN. JOHN KENNEDY (R-LA.)

SEN. MARSHA BLACKBURN (R-TENN.)

SEN. DIANNE FEINSTEIN (D-CALIF.), RANKING MEMBER

SEN. PATRICK J. LEAHY (D-VT.)

SEN. RICHARD J. DURBIN (D-ILL.)

SEN. SHELDON WHITEHOUSE (D-R.I.)

SEN. AMY KLOBUCHAR (D-MINN.)

SEN. CHRIS COONS (D-DEL.)

SEN. RICHARD BLUMENTHAL (D-CONN.)

SEN. MAZIE K. HIRONO (D-HAWAII)

SEN. CORY BOOKER (D-N.J.)

SEN. KAMALA HARRIS (D-CALIF.)

[*]GRAHAM: Good morning, everybody. I think we have Senator Blumenthal remotely. Is that correct?

BLUMENTHAL: Mr. Chairman.

GRAHAM: Is it okay, Senator Blumenthal, if we move forward?

BLUMENTHAL: Absolutely. Thanks very much.

GRAHAM: Okay, I'll make a brief opening statement. And this is about censorship, suppression and the 2020 election, sort of a deep dive when it comes to Twitter and Facebook about the platforms and the decisions they make, how they make them, can we do better? Do we need to do better?

So the first thing I want to talk about here is health risk associated with social media. A 2018 Pew Research Center survey of nearly 750 13- to 17-year-olds found that 45 percent are online almost constantly, and 97 percent use social media platforms such as YouTube, Facebook, Instagram or Snapchat. So why are we having this hearing? The products that these two companies offer, people like and they use. So the bottom line is, they've probably been more successful than their wildest dreams, and they're having to make decisions that offend people on the left and the right, and what we're trying to do is look at section 230 and to see if it needs to be modified or changed because section 230 basically allows social media platforms like Twitter and Facebook to pass on information without legal liability.

If a newspaper does something you don't like, you think they've slandered you in a certain way, you can sue them. If a news program does something that you think is out of line, even as a politician with a high bar, you can sue them. These companies have liability protection when it comes to the content that their users engage in. You can sue the person who gave the tweet, but you can't sue Twitter who gave that person access to the world in terms of what they said. And we've got to find a way to make sure that when Twitter and Facebook make a decision about what's reliable and what's not, what to keep up and what to take down, that there is transparency in the system. And I think section 230 has to be changed because we can't get there from here without change.

But in 2019, a study of more than 6,500 12- to 15-year-olds in the U.S. found that those that spent more than three hours a day using social media might be at heightened risk for mental health problems. Another study, 12,000 13 to 16-year-olds in England found that using social media more than three times a day predicated poor mental health--predicted poor mental health and well-being in teens. Other studies also have observed links between high levels of social media use, depression or anxiety. The average millennial checks their phone 157 times daily. I don't know how members of the Senate, I don't know where we fall.

Social media is designed to sustain users' attention with a mix of good user interface design and psychology, creating an addictive mix for users. It's called the slot machine effect, a technique which utilizes a pull to refresh and scrolling mechanisms on newsfeeds similar to a slot machine. The like button, a feature to provide social validation through a positive feedback loop by measuring and comparing the number of likes a user's content obtains.

Gamifying social interactions, employing gamification to engage users and keep them coming back. For example, streaks is the one causing the most concern and using elongating redlines to display the number of days since two users interacted. Guess what these technologies do is try to keep us engaged. The more we engage the technology, the more advertising benefit to the company. Is that a good business practice? Maybe so. Does it create a health hazard over time? Something to look at.

Now the other aspect of this debate is are these companies newspapers? Are they TV stations? Do they have the power of media organizations that have rules and regulations and the current media platforms do not? There are rules about what a television station can do. There are rules about what a newspaper can do. And what I want to try to find out is if you're not a newspaper at Twitter or Facebook, then why do you have editorial control over the New York Post?

They decided--and maybe for a good reason; I don't know--that the New York Post articles about Hunter Biden needed to be flagged, excluded from distribution or made hard to find. That to me seems like you're the ultimate editor. The editorial decision at the New York Post to run the story was overridden by Twitter and Facebook in different fashions to prevent its dissemination. Now if that's not making an editorial decision, I don't know what would be. It's one thing when we do it in our private lives. Nikki Haley made a post about her concerns about mail-in balloting. It was flagged as something--a claim, this hasn't been legitimized. Let me read it to you.

The next question to ask is why is it a crime to raise doubts about the Holocaust? Why should anyone who writes about such doubts be imprisoned while insulting the Prophet is allowed? Now that's the Ayatollah. He's opining that raising doubts about the Holocaust shouldn't be a crime, and he is openly called for the destruction of Israel, his regime has, and his tweet was basically allowed to flourish. Here's what Nikki Haley said. Despite what the media tells us, election fraud does happen, and policies like balloting harvesting and mailing ballots to people who don't request them makes it easier--makes that easier. That needs to stop. This claim about election fraud is disputed.

Well, that's her opinion. She believes, like I do, that mail-in balloting is ripe for fraud if you can't verify the signature and if we just send mail ballots out to the world that are not requested, and you don't have a signature verification system that can be trusted, you have in fact led to harvesting of ballots for nefarious purposes. The question for us as a country, at what point do the decisions by these organizations cross a line? At what point do they have to assume responsibility that section 230 shields them from?

And to the people who are about to testify, I consider your products to have changed the world, mostly for the good. We're able to interact among ourselves. We're able to talk to each other and share life experiences. We're able to in real-time communicate to our neighbors and our friends and those who oppose us what we think with technology that just makes it instantaneous and can literally light up the world.

Section 230 was developed to allow these technologies to flourish. Early on, if you could sue Twitter or Facebook for content on a Facebook posting or a tweet, and they were liable for what somebody else said or what they felt or did, then the company would have probably never been in existence. The companies are trying to help us deal with child pornography. We have the EARN IT Act that to be able to maintain liability protections when it comes to sexual exploitation of media sites, social media sites by sexual predators, this committee has passed a bill saying you can only maintain that liability protection if, in fact, you use best business practices.

And that's where I think we need to be going.

[*]GRAHAM: My hope is that we change section 230 to incentivize social media platforms to come up with standards that are transparent and opaque, that will allow us to make judgments about their judgments, that the fact checkers be known, that the community standards, who sets them, what are their biases, and give some direction to these companies because they have almost an impossible task. They're literally trying to engage in telling us what's reliable and what's not based on cable news commentary or tweets from politicians for average citizens.

Nobody in a free society has ever had that responsibility before, and the question is how do you control that responsibility. I don't want the government to take over the job of telling America what tweets are legitimate and what are not. I don't want the government deciding what content to take up and put down. I think we're all in that category. But when you have companies that have the power of governments, have far more power than traditional media outlets, something has to give.

And I'm hoping in this hearing today that we can find a baseline of agreement that section 230 needs to be changed, that my bias would be to allow the industry itself to develop best business practices to protect the sites against terrorism and child exploitation and other concerns, that we look at the business practices of these companies through a help prism that some of their practices need to be modified because it can become addictive.

You know, we thought tobacco was a good thing for a long time to the point that we send it to our soldiers in combat. The more we realized about the addictive nature of tobacco, the more we changed our mind about telling the public about the product. So, whether or not we do that with social media platforms, that these platforms can be addictive if used too often, I don't know if we need to go there. But I do know that section 230, as it exists today, has got to give.

And I think there's Republican and Democrat concern about the power that's being used by social media outlets to tell us what we can see and what we can't, what's true and what's not, to the extent that section 230, in my view, has to be rewritten. So, that's the purpose of this hearing, is to find a way forward to bring about change. And when it comes to social media platforms and section 230, change is going to come.

With that, Senator Blumenthal?

BLUMENTHAL: Thank you very, very much, Mr. Chairman. And thank you for having this hearing today. And I look forward to cooperating with you not only in this hearing but in the upcoming Congress on our EARN IT bill, and other measures because you're absolutely right. Change must come to social media.

The fact is we meet today in an unprecedented and precarious moment in American history. Daily, the president shocked our conscience and shakes the very foundations of our democracy using a powerful megaphone, social media. The president has used this megaphone to spread vicious falsehoods in an apparent attempt overturn the will of voters.

Every day he posts new threats and conspiracy theories about mail-in ballots and voting machines, lies that contradict his own election security officials and his lawyers. He uses this megaphone potentially to block a peaceful transition of power.

Now, Mr. Zuckerberg and Mr. Dorsey, you have built terrifying tools of persuasion and muniple--manipulation with power far exceeding the robber barons of the last Gilded Age. You have profited usually by strip mining data about our private lives and promoting hate speech and voter suppression. You have an immense civic and moral responsibility to ensure these instruments of influence do not irreparably harm our country.

I recognize the steps, they're really baby steps, that you've taken so far. The destructive incendiary misinformation is still a scourge on both your platforms and on others. In fact, Google has been given a pass from today's hearing. It's been rewarded by this committee for its timidity, doing even less than you have done to live up to its responsibilities.

The recent actions you have taken, in fact, are simply to check the truth of what appears on platforms. Often it is voter suppression and incendiary malicious misinformation, and you've tried to slow its insidious spread. That's not censorship. That's moral and civic responsibility.

Now, I believe, and I hope the chairman agrees, that a series of hearings on big tech is long-overdue on antitrust issues, on privacy concerns, and section 230. I have urged, in fact, a breakup of tech giants because they've misused their bigness and power, breaking off, for example, WhatsApp and Instagram, rigorous privacy protection because consumers should have control over their own data and, indeed, section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court.

But this hearing is certainly not the serious proceeding that we need. It may become a political sideshow, a public tar and feathering. My colleagues seem to want to ignore the foreign disinformation campaigns intended to interfere in our democracy, and calls for murder of FBI Director Wray and Dr. Fauci. We--what we've seen here are fighting words and hate speech that certainly deserve no free expression protection.

The fact is that the purpose of today's hearing seems as much to bully or browbeat you, Mr. Zuckerberg and Mr. Dorsey, from taking even more responsible action by threatening cuts to section 230. Censorship is really a misnomer for this hearing.

What you've done is to label and to fact check to avoid amplifying misinformation and to, in effect, impose those labels to alert people that what they are consuming may misinform them. And Facebook took down ads for Biden in Michigan and the ACLU in Colorado for mistaken information about voting. In short, there was action that affected both sides.

I have fought for section 230 reform for 16 years from my time as Connecticut's attorney general when I took on the scourge of registered sex offenders grooming children on Facebook and MySpace. With Senator Portman, I have led passage of the only successful revision so far to section 230, the Stop Enabling Sex Traffickers Act, known as SESTA. And Chairman Graham and I have authored the only bill to reform Section 230 that has actually moved out of--out of a committee. The section--the EARN IT Act pass this committee unanimously.

Change is going to come, no question. Change is on the way, and I intend to bring aggressive and targeted reform to section 230. But I am not, nor should we be on this committee, interested in being a member of the speech police. There are real harms and real victims here. And in some ways, this hearing is a betrayal of those real harms and the real victims of them. Those harms have been caused by big tech because you have failed your responsibility, as have others in this industry.

I want to see real reform that will enable these abuses to be reformed, because your platforms have embraced abuse and weaponized child predators, violent white supremacists, and human traffickers. And I've heard heart-wrenching stories from the victims.

[*]BLUMENTHAL: You've set back civil rights protections for Muslim Americans who live in fear of armed militias organized by white--by private online groups. You have set back consumers in competition, making that kind of antitrust action very, very important. The American public deserves and demands real reform and accountability, national consumer privacy rules, antitrust principles that curb predatory power and reforms as section 230 that shut--that stopped shutting the courthouse door to victims. I look forward to an opportunity for real change, and I think you can meet this moment by putting your power and your money on the right side of history. Thanks, Mr. Chairman.

GRAHAM: Well, thank you. A lot to unpack there. Senator Blumenthal has been great to work with. I'll continue to work with you. If we keep control of the committee, Senator Grassley would be the chairman next year, and I would encourage him to have the hearings that Senator Blumenthal referenced, that this is an ongoing conversation to get it right to the extent that we can get it right. Mr. Dorsey from Twitter, are you with us, Mr. Dorsey?

DORSEY: I am. Do you hear me?

GRAHAM: Thank you. The floor is yours.

DORSEY: Thank you to the members of the Judiciary Committee for the opportunity to speak with the American people about Twitter and your concerns around censorship and suppression of a specific news article, and generally what we saw in the 2020 U.S. elections conversation.

We were called here today because of an enforcement decision we made against the New York Post based on a policy we created in 2018 to prevent Twitter from being used to spread hacked materials. This resulted in us blocking people from sharing a New York Post article publicly or privately. We made a quick interpretation, using no other evidence, that the materials in the article were obtained through hacking, and according to our policy we blocked them from being spread. Upon further consideration, we admitted this action was wrong and corrected it within 24 hours.

We informed the New York Post of our error and policy update and how to unlock their account by deleting the original violating tweet, which freed them to tweet the exact same content and news article again. They chose not to, instead insisting we reverse our enforcement action. We did not have a practice around retroactively overturning prior enforcements, and in a sense it demonstrated that we needed one, and so we created one we believe is fair and appropriate.

I hope this illustrates the rationale behind our actions and demonstrate our ability to take feedback, admit mistakes and make changes all transparently to the public. We acknowledge there are still concerns around how we moderate content and specifically our use of section 230. Three weeks ago we proposed three solutions to address the concerns raised, and they all focus on services that decide to moderate or remove content. It could be expansions to section 230, new legislative frameworks or commitment to industrywide self-regulation best practices.

Requiring one moderation process and practices to be published; two, a straightforward process to appeal decisions; and three, best efforts around algorithmic choice are suggestions to address the concerns we all have going forward. And they are all achievable in short order.

It's critical, as we consider these solutions, we optimize for new startups and independent developers. Doing so ensures a level playing field that increases the probability of competing ideas to help solve problems going forward. We mustn't entrench the largest companies any further.

Finally, before I close, I wanted to share some reflections on what we saw during the U.S. presidential election. We focused on addressing attempts to undermine civic integrity, providing informative context and product changes to encourage greater conversation. We updated our civic integrity policy to address misleading or disputed information that undermines confidence in the election, causes voter intimidation or suppression or confusion about how to vote or misrepresents affiliation or election outcomes.

More than a year ago, the public asked us to offer additional context to help make potentially misleading information more apparent. We did exactly that, applying labels to over 300,000 tweets from October 27 to November 11, which represented about 2.2 percent of all U.S. election related tweets. We also changed how our product works in order to help increase context and encourage more thoughtful consideration before tweets are shared broadly. We're continuing to assess the impact of these product changes to inform our long-term roadmap. Thank you for the time. I look forward to a productive discussion focused on solutions.

GRAHAM: Thank you, Mr. Dorsey. Mr. Zuckerberg.

ZUCKERBERG: Thank you, Chairman Graham, Ranking Member Blumenthal and members of the committee. At last year's hearing--at last month's hearing I spoke about the role internet platforms play in supporting democracy, keeping people safe and upholding fundamental values like free expression. People have deeply held beliefs about these issues and can reach very different conclusions about the right balance. We try to do what's best for our community and the world, acknowledging that there are difficult trade-offs. I believe that some of these trade-offs and decisions would be better made through a democratic process, and I look forward to discussing that today.

But first, I want to update you on our efforts during the election. At Facebook, we took our responsibility to protect the integrity of this election very seriously. In 2016 we began to face new kinds of threats, and after years of preparation we were ready to defend against them. We built sophisticated systems to protect against election interference that combined artificial intelligence, significant human review and partnerships with the intelligence community, law enforcement and other tech platforms. We've taken down more than 100 networks of bad actors who are trying to coordinate and interfere globally. We established a network of independent fact checkers that covers more than 60 languages. We made political advertising more transparent on Facebook than anywhere else, including TV, radio and email. And we introduced new policies to combat voter suppression and misinformation.

Still, the pandemic created new challenges, how to handle misinformation about COVID and voting by mail, how to prepare people for the reality that results would take time and how to handle if someone prematurely declared victory or refused to accept the result. So in September we updated our policies again to reflect these realities of voting in 2020 and make sure that we were taking precautions given these unique circumstances. We worked with the local election officials to remove false claims about polling conditions that might lead to voter suppression. We partnered with Reuters and the National Election Pool to provide reliable information about results. We attached voting information to posts by candidates on both sides and additional context to posts trying to delegitimize the outcome.

We locked down new political ads in the week before the election to prevent misleading claims from spreading when they couldn't be rebutted. We strengthened our enforcement against malicious and conspiracy networks like QAnon to prevent them from using our platforms to organize violence or civil unrest. Altogether, I believe this was the largest election integrity effort by any private company in recent times. This is what people expect of us. And I'm glad that from what we've seen so far, our systems performed well. But election interference remains an ongoing threat that will never fully be solved. So we continue to improve with each election.

But our integrity work is really only half the story. We also ran an unprecedented civic engagement program to encourage people to take part in our democracy. We ran the largest voter information campaign in history. 140 million people visited our voting information center including more than 33 million on Election Day alone. We estimate that we helped more than 4.5 million people register to vote and helped states recruit 100,000 poll workers. This was done in a transparent and nonpartisan way as part of our ongoing commitment to supporting the civic process.

And on top of these efforts by Facebook, my wife Priscilla and I personally donated $400 million to support election officials around the country in making sure that they have the infrastructure they needed to enable everyone to vote safely during this pandemic. In my last testimony I said that people would judge us by our performance during this election, and I believe that the full story is not only how we handle bad behavior on our platforms, but also how we encouraged civic engagement more broadly. I'm proud of the work we've done to support our democracy, and I look forward to discussing this.

I also welcome the opportunity to discuss internet regulation. I believe we are well overdue to update the rules for the internet around content, elections, privacy and data portability. There are important questions here, including who should be responsible for what people say online. For any system to work, I believe there needs to be a transparent process that people feel they can trust. And this will be difficult, especially since our country is so divided. But I believe it's the only way to address these issues for the long-term. The challenges that we face are deeper than any one platform.

[*]ZUCKERBERG: They're about how we want to balance basic social equity that we all care about like free expression, public safety and privacy. This is why I believe we would benefit from clearer guidance from elected officials and I look forward to discussing this today.

GRAHAM: Well, thank you both. We'll have one round and seven minutes as always; I'll try to be a little bit liberal with the time cause this is very important topic. So let's just get right into it. Mr. Dorsey, you can go first and then Mr. Zuckerberg. When you heard Senator Blumenthal's opening statement and mine, what did you get from it?

DORSEY: Well, I think you--you pointed out that we are facing something that feels impossible. We are--we are required to help increase the health of the public conversation while at the same ensuring that as many people as possible can participate. And in order to do so we need to make policies so that people feel safe and they feel free to express themselves. To minimize the threats of abuse, of harassment, of misleading information, of organized campaigns to artificially amplify or influence a particular conversation.

And that policy creation that enforcement is challenging but also it is more or less opaque to the public and that's where I think we have a gap. We have transparency around our policies. We do not have transparency around how we operate content moderation, the rationale behind it, the reasoning. And as we look forward we have more and more of our decisions of our operations moving to algorithms which have a difficult time explaining whey they make decisions. Bringing transparencies round those decisions. And that is why we believe that we should have more choice in how these algorithms are applied to our content--whether we use them at all so we can turn them on and off. And have clarity around the outcomes that they are projecting and how they affect our experience.

GRAHAM: Thank you. Mr. Zuckerberg, very quickly, please. What did you hear?

ZUCKERBERG: Senator I--I heard that there are issues around content moderation as well as other areas and frankly, I'm optimistic from the statements that we may be able to move forward and hopefully update some of the--the rules from the internet around these areas. I have been encouraging and hoping that we would do this for--for a couple of years. And from your opening statements it sounds like there may be now enough common ground on views that real progress can be made here.

GRAHAM: So from my point of view the question for us is when it comes time to flagged content as being reliable or not reliable do either one of you believe that the government should do that? Is that a solution where the government sets a regulatory scheme that talks about what should be up and what should be down?

DORSEY: I don't believe so. I--I think that would be very challenging.

GRAHAM: OK. Do you agree with that, Mr. Zuckerberg?

ZUCKERBERG: Senator, for certain types of illegal content I think it may be appropriate for--for there to be clear rules around that. But outside of clear harms in--including things like child exploitation and--and areas like that, terrorism I--I would agree with your sentiment that that's not something that government should be siding on a piece of content by piece of content basis.

GRAHAM: So if we take the government out of the picture at least in noncriminal areas--should we leave it up to the industry to come up with best business practices in terms of how to moderate content?

DORSEY: (INAUDIBLE) I think we need to align around the problem that we are trying to solve. And there are many solutions to solving those problems. I think we also have to focus our efforts on what is going to have the greatest impact. And we believe that the greatest impact is going to be found in how we deal with algorithms, how we use those algorithms. Cause they are responsible for showing us what we see or what we don't see. And they need to be--there needs to be more choice in--in their use.

GRAHAM: Do you agree to that, Mr. Zuckerberg?

ZUCKERBERG: Senator, I think that--that there is a role for regulation on the process even if not defining on a piece of content by piece of content basis. One of the areas that I've advocated for is regulation around transparency. That goes beyond just--just about what the policies are and--and what the process is but also goes towards the results. You know, as an example of this every quarter Facebook releases a community standards enforcement report it's basically a transparency report that breaks down each category of harm--potentially harmful content that we track ranging from terrorism to child exploitation content to incitement of violence to pornography (INAUDIBLE)--

GRAHAM: Yes, if I may--I don't mean to interrupt but who sets those community standards? How are they set by the company?

ZUCKERBERG: Senator, we have a policy team that consults with a number of different stakeholders and outside groups to make sure we are getting feedback from broad swaths of our community (INAUDIBLE)--

GRAHAM: Is that--is that publicly known?

ZUCKERBERG: Senator, I believe so and our head of--of content policy has testified publicly multiple times.

GRAHAM: OK. So when it comes to fact checking will you send us a list of people you use to fact check?

ZUCKERBERG: Senator, yes. We work with a number of independent organizations that are accredited by the--the Pointer Institute. And they include Reuters, the Associated Press, Agence France Presse(PH) United States, USA Today, FactCheck.org, Science Feedback, PolitiFact, Check Your Fact, Lead Stories and the Dispatch in the United States.

GRAHAM: OK I think it's important for the public to know who sets community standards, how they're set, who does the fact checking, who you rely upon to do that. I think that would go a long way to people having a better understanding of the decisions you make.

Mr. Zuckerberg, do you believe your product can be addictive?

ZUCKERBERG: Senator, I--we certainly do not design the product in that way. We design the product to be as useful and meaningful as possible. We take steps--

GRAHAM: That's not my question. My question is there seems to be an ample body of growing medical evidence that social media sites have an addictive nature to them. Do you agree with that?

ZUCKERBERG: Senator, I don't think the research has been conclusive but it is an area that we care about and study. We certainly do not want our products to be addictive. We want people to use them because they're meaningful. And we take steps to make sure this is the case. So, for example, we don't give the team that's running newsfeed a goal around how much time people spend on our products which goes counter to a lot of the--the memes and misinformation out there on how we operate.

But my goal is to help people connect and find content and interactions that are going to be meaningful to them on our service. And our view is that if--if that is what we deliver over the long-term and people find our services useful then they'll use them more. But I--I don't think that company should be optimizing to just encourage people to spend as much time as possible on them.

GRAHAM: Time is about up. Have you seen the movie, Social Dilemma?

ZUCKERBERG: Senator, I'm familiar with it.

GRAHAM: OK. Have you seen it, Mr. Dorsey?

DORSEY: No. I have not.

GRAHAM: I would encourage both of you to see it. So here is what we are going to do on the committee over time I hope--is to ask the question more directly, are these social media sites addictive? Do they have a public health component that needs to be addressed? For years, we thought tobacco was a great thing. We found out, tobacco is not such a great thing.

The medical science around these websites are becoming very concerning to me particularly among children and that you can manipulate how many times you watch. And you can set these media sites up so that people will constantly interact. So to both of you, I appreciate you coming before the committee. We got a long way to go. I don't think the government needs to regulate what we think or what we say. But we've got to up our game here and I'll end with this last question-- Did both of you support change to 230 reform to section 230?

ZUCKERBERG: Senator, I do.

GRAHAM: Mr. Dorsey?

DORSEY: Yes.

ZUCKERBERG: Thank you. Senator Blumenthal?

BLUMENTHAL: Thank you, Mr. Chairman.

[*]BLUMENTHAL: Let me bring this down to very practical terms. We're in the middle of another election. This election in Georgia could determine, in fact, which party controls the United States Senate. I'm concerned that both of your companies are in fact backsliding or retrenching, that you are failing to take action against dangerous disinformation, exactly the same kind of voter suppression tactics that existed in the last election, and that you are in fact reducing content modification.

The fighting words and hate speech in the last election could inflame violent and send poll workers into hiding, discourage people from coming to the polls, we have to expect the same kinds of malign tactics. In fact, they are already visible. And I'm going to ask, Mr. Chairman, that these post and tweets be entered into the record, if there's an objection, that are aimed at delegitimizing the election in January.

My question to you is will you commit to the same kind of robust content modification playbook in this coming election including fact checking, labeling, reducing the spread of misinformation, and other steps even for politicians in the runoff elections ahead?

ZUCKERBERG: Senator, our policy is to have a similar approach in the upcoming Georgia special elections that we took during the–the general election.

BLUMENTHAL: Mr. Dorsey?

DORSEY: Yes, we do. We–and we intend to learn from what we experience with the selection and bring all that learning going forward to making it more robust.

BLUMENTHAL: During the past election, there was rampant disinformation on social media in Spanish speaking sites repeating QAnon conspiracies and false claims of election rigging. In my view, you need to do better. Will you commit to taking steps to improve content modification for Spanish-speaking communities before the Georgia runoff?

ZUCKERBERG: Senator, this is something that we are–we are already working on and worked on ahead of the general election. We have multiple fact checkers who focus on the–on Spanish as–as a language. And we made sure that we translated our voter information center into Spanish, which we showed at the top of–of Facebook and–and Instagram to everyone who uses those products in Spanish in–in the U.S. Those are a couple of the steps that we've taken, and we're certainly committed to focusing on this.

DORSEY: And yes, we will, and in partnership with Latinx civil rights groups.

BLUMENTHAL: I'd like to know, and perhaps you could submit to me within one week, what additional steps you're going to take because this Georgia runoff is underway. And as I've indicated, I've seen a backsliding and retrenchment that is very deeply troubling that have enabled the spread of this disinformation, the restarting of certain algorithms, for example, that promote or amplify misinformation is very, very troubling. And I think–I want to know within a week what additional steps you are taking to enhance the efforts to stop this kind of amplification and spread.

Let me ask about Facebook community standards, which banned language that "Incites or facilitates serious violence." As you know, on November 5th, Stephen Bannon in a Facebook Live video, called for beheadings of Dr. Fauci and FBI Director Wray for not acting more favorably toward President Trump. Twitter banned Bannon for these remarks.

You removed the video, Mr. Zuckerberg, but on Thursday you reportedly told Facebook employees that Bannon had not violated enough policies that he should be banned from Facebook. My question to you is how many times is Steve Bannon allowed to call for the murder of government officials before Facebook suspends his account?

ZUCKERBERG: Senator, as you say, the content in question did violate our policies and we took it down. Having a content violation does not automatically mean your content–your–your account gets taken down, and the number of strikes varies depending on the amount–the–the type of offense. So, if people are posting terrorist content or child exploitation content, then the first time that they do it, then we will–we will take down their account.

For other things, it's–it's multiple. I'd be happy to follow up afterwards. We–we try not to disclose–

BLUMENTHAL: –Will you–

ZUCKERBERG: –These–

BLUMENTHAL: –(INAUDIBLE) down his account?

ZUCKERBERG: Sorry, I didn't hear that.

BLUMENTHAL: Will you commit to taking down that account, Stephen Bannon's account?

ZUCKERBERG: Senator, no, it's–that–that's not what our policies would suggest that we should do in–in this case.

BLUMENTHAL: According to the internal records that are on the record now leaked by NBC News, Facebook has removed fact checks and forgiven infractions for conservative pages and pendants such as Breitbart, Donald Trump Junior, Eric Trump, and Gateway pundit-based on a fear of accusations of bias. Has Facebook avoided penalizing or fact checking conservative pages that–that violated its policies based on concerns of political bias and allegations of bias?

ZUCKERBERG: Senator, no, we–we haven't done that. And I think that those reports mischaracterized the actions that we take. I–I'm not aware of any instance where we have overturned a fact check specifically, and certainly no action like that would be taken for the reasons that–that–that you're saying.

What we do sometimes is, if–is apply some judgment on whether the repeat offender policies would–would–would render too harsh of a penalty, but that's different from overturning a–a specific fact check and–and is not done for the reasons that you said.

BLUMENTHAL: Well, I'm very concerned that, in fact, Facebook seems to have a record of making accommodations and caving to conservative pressure. And the president has tried to use an executive order on Section 232, again, bully or browbeat and exert pressure on you and others in this industry. They're, in effect, working the rest and they're winning.

Let me ask you about antitrust issues. In 2013, Facebook bought Onavo, which is a virtual private records network that claimed it to protect users' privacy. In fact, Onavo's access to private information about its users provided Facebook with unparalleled ability to track potential competition. I want to know whether Facebook used data from Onavo when it decided to purchase WhatsApp in 2014.

ZUCKERBERG: Senator, I believe that data from Onavo was one of the sources that the team looked at. But I–I don't think it would have taken using Onavo to understand that WhatsApp was a great product, and I don't think that was determinative in–in my decision to pursue that.

BLUMENTHAL: Well, in fact, the House antitrust report says Onavo data was used to determine whether WhatsApp was "killing Facebook Messenger." My time has almost expired, but let me just say finally that antitrust action by the Federal Trade Commission is long-overdue.

I believe that decisive action is necessary, including very likely breaking up Facebook as a remedy. All options ought to be on the table, including divestment of Instagram and WhatsApp. The FTC ought to impose strict conditions on how Facebook uses consumer data and competes with rivals, because the abuse of competition must end.

[*]BLUMENTHAL: Mr. Chairman, I ask that three letters from civil rights groups regarding disinformation and hate speech on Twitter, Facebook, and YouTube and also a letter from a coalition of children's protection advocates on the EARN IT Act and child sexual abuse material on digital platform be entered into the record. Thank you both for being here today.

GRAHAM: Without objection. Senator Cornyn.

CORNYN: Thank you, Mr. Chairman. Well, I'm glad to hear both of our witnesses today say that section 230, that they are open to reform because I think it's fair to say the internet has outgrown section 230. And while we've made some modifications when it comes to terrorism and when it comes to child exploitation, I think there's more to do.

But I think the question is going to be how this regulation is going to come to pass. I know there's some, including on this committee, who suggest that maybe we ought to create a private right of action so that individuals can sue over claims of violated rights on your platforms. I think that's one form of regulation. It's called regulation by litigation. But it's certainly not my first choice, and it's not optimal. And I don't think it's something we ought to be embracing in the first instance.

But I do think it's critical that each of you and your counterparts work with us to try to come up with something that will address the concerns, and the basic concern I have is it's hard to know exactly how to classify your business model. We have a provision in the Bill of Rights protecting freedom of the press, but yet here, while we would never let the government regulate what the press writes or doesn't write, essentially we are allowing private companies, which are now de facto public forums, to regulate that speech. And I'm no more comfortable delegating those decisions to you than I am delegating to you my vote in the last or upcoming elections.

You know, Louis Brandeis famously said that the solution for bad speech is not less speech; it's more speech. And it seems to me like the practices that you are engaging in to tag, remove and otherwise sensor speech on your platforms violates that principle, and I'd like to know why that shouldn't be a better approach by allowing more speech rather than censoring what is perceived as bad speech.

And then, as I think I've discussed with you, Mr. Zuckerberg, the–I think we're all sort of struggling to come up with what the appropriate analogy here is to your business model. We know as newspapers have become less profitable and many of them gone out of business there's been consolidation in the news media. There is a proliferation of cable TV shows and people being able to get information through a variety of sources. But there's no Walter Cronkite or the big TV networks with the trusted anchor person who people have confidence in who will–that they will shoot with them straight. And so I know it's a very difficult thing to manage, but I would just encourage both of you not to wait for the lawsuits.

We saw what happened to Microsoft. I think Bill Gates said that was one of his biggest mistakes, failing to engage with some of the antitrust concerns when it came to Microsoft, and he learned that the hard way, and I think there is a better way for the American people, and that's if we work on this together.

Mr. Zuckerberg, I believe that Facebook publishes on a quarterly basis a report of its actions in this area. Is that correct?

ZUCKERBERG: Senator, that's correct.

CORNYN: And could you describe that for us and what motivated you to undertake that sort of transparency?

ZUCKERBERG: Yes. Senator, I believe that in order for people to trust that we're doing a good job they have to be able to see the results, and we have to be able to break down content on a kind of category by category basis across all of the different categories of harm, whether it's terrorist content, or child exploitation, or incitement of violence, or pornography or intellectual property violations, how much of the violating content is on our platforms and how effective our systems are at removing it. And what we hold ourselves accountable towards is getting as high a percent of this harmful contents down and addressing it before real people have to experience it and report it to us themselves.

So in categories where we do quite well, for example, in fighting against terrorist content, our AI systems and counterterrorism teams are able to remove 98 or 99 percent of that harmful content before anyone has to report it to us. In other categories it's more challenging and we're still making more progress. But I think that as part of a regulatory framework here it would be good if every company had to issue a transparency report outlining what they're seeing on their platforms and the results and effectiveness of their content moderation system so that way the people who are responsible for holding all of us accountable, whether it's journalists, Congress, academics, could have an apples to apples comparison about how all the different companies are doing and potentially as part of the law, require that companies even maintain a certain level of effectiveness.

CORNYN: Thank you. Mr. Dorsey, when Twitter decided to take down the story, the New York Post story on Hunter Biden's laptop, did you do that under your terms of service, or did you do it under some other claim of authority?

DORSEY: We did it under our terms of service, which as you know everyone agrees to when they sign up for Twitter, and this was a policy around distribution of hacked materials. We did not want to Twitter to be a distribution point for hacked materials.

CORNYN: Well, you do realize that by taking down that story you probably gave it more prominence and more visibility than it ever would have gotten had you left it alone?

DORSEY: We realize that, and we recognize it as a mistake that we made, both in terms of the intention of the policy and also the enforcement action of not allowing people to share it publicly or privately, which is why we corrected it within 24 hours.

CORNYN: And Mr. Dorsey, why isn't Justice Brandeis's formulation in Whitney v. California, why shouldn't that apply to the internet platforms like yours? In other words, the cure for bad speech is not censorship; it's more speech. Why wouldn't that principle apply in to Twitter?

DORSEY: I think it does apply. All of our policies are focused on encouraging more speech. What we saw and what the market told us was that people would not put up with abuse, harassment and misleading information that would cause off-line harm, and they would leave our service because of it. So our intention is to create clear policy, clear enforcement that enables people to feel that they can express themselves on our service and ultimately trust it.

CORNYN: So it was a business decision?

DORSEY: It was a business decision.

CORNYN: Thank you.

GRAHAM: Senator Feinstein.

FEINSTEIN: Thanks very much, Mr. Chairman. Mr. Dorsey, in recent hearings before the Senate Commerce Committee you said, I think, that Twitter has a policy against misinformation relating to civic integrity. President Trump and his allies have tweeted hundreds of false claims about the 2020 election. The pre--Trump has falsely claimed victory and alleged widespread voter fraud. So here's the question. Does misinformation about the results of an election and voter fraud relate to civic integrity? Why or why not?

DORSEY: Yes, it does, and we label those tweets when the election has not been called yet or multiple sources have called it differently.

FEINSTEIN: I'm sorry; I didn't understand that. Did you say you have been able to tweet?

DORSEY: No, we have labeled the tweets that would indicate a different result in the election called by multiple sources.

FEINSTEIN: I see. At what point was that done?

DORSEY: Throughout the period, October 11 up till today.

FEINSTEIN: So when the tweet was initially came in, how long was it before you, quote, updated it?

DORSEY: We didn't update it.

[*]DORSEY: We put a label on it pointing to the broader conversation. Our goal is to connect people with more information around what's happening with the election and--and that occurred anywhere from five minutes to 30 minutes. But as quickly as we--as quickly as we can.

FEINSTEIN: Thank you. Is 30 minutes the maximum time?

DORSEY: I don't know, we can--we can get you that information (INAUDIBLE)--

FEINSTEIN: Would you? I'm--I'm--I'm interested in this. Does misinformation about the results of an election and voter fraud relate to civic integrity, why or why not?

DORSEY: Yes, it does and we also label those tweets that would--that would indicate whether fraud was happening. And again we--we connect those to larger conversations on the platform. We want to provide context here. That is our goal providing more context, providing more information.

FEINSTEIN: OK. Now, a specific question. And I'm not sure actually what the answer to this should be but on November 7, President Trump tweeted and I quote, "I won this election by a lot," end quote. Obviously, that's not true. President Trump lost the election. The warning label that Twitter has applied to the tweet says and I quote, "Official sources may not have called the race when this was tweeted." End quote. Do you believe that label goes far enough to prevent the tweet's harms when the tweet is still visible and not accurate?

DORSEY: I do because it's not just the surface level label. It points to a collection of news articles, of information and conversation that gives you an expansion on what is happening with the election.

FEINSTEIN: My concerns are that these tweets arouse people. And it seems to me that the entity that runs this operation ought to have an understanding that when there is major situation that the tweets can play a unique role in either reassuring or stirring people up to unacceptable levels. Could you comment on that?

DORSEY: Well, I--I agree in spirit. Our policy is focused on misleading information around the election and the civic process to provide greater context, to provide additive information so that people can make decisions around what's happening with the--the election and that is three phases--that is the run up to the election, that is election day. And also the phase we are in right now, post election. So our policies and enforcement are focused on providing more information, more context to people in those three phases.

FEINSTEIN: Well, let me give you a specific on November 7, President Trump tweeted this--"I won this election by a lot." End quote. That's obviously not true. President Trump lost the election. The warning label that Twitter has applied to the tweet says, and I quote, "Official sources may not have called the race when this was tweeted." End quote. Now, here is the question--does that label do enough to prevent the tweet's harms when the tweet is still visible and is not accurate?

DORSEY: I believe it's really important that we show people a broader context and that is the intention of the label. It is not just text below a tweet it is a link to connect to a much larger conversation and news articles across the spectrum.

FEINSTEIN: Well, give me an example. What would have to happen before the situation would warrant a stronger response?

DORSEY: Well, we did have stronger responses during election day and--and the week after where we did put an interstitial meaning that we had to click through to see the content of the tweet and limit its spread for any--anything that went against our civic integrity policy including premature calls to the--to election results.

FEINSTEIN: Well, let me give you one more. On November 12th, President Trump tweeted a conspiracy theory that 2.7 million votes for him were deleted. The warning label that Twitter has applied to that tweet says quote, "This claim about election fraud is disputed." Now, here's the question and--and I think it is a tough issue--do you believe this label does enough to prevent the tweet's harms when the tweet is still visible? It's a highly emotional situation but the tweet has no factual basis?

DORSEY: But the tweet has a link to more information, to more conversation and more context that informs the situation what's--what's happening. So I--I do believe that connecting people to the larger conversation, giving them more context is the right path here.

FEINSTEIN: But they have to move to solicit that contact, right? It's not contained as an addendum to the original tweet.

DORSEY: The label is an addendum to the original tweet and if you tap on it or click it you will go to an expansion of the information.

FEINSTEIN: I see. Can I ask a question of Mr. Zuckerberg?

GRAHAM: Yes, you may. One more if that would be OK.

FEINSTEIN: OK. Mr. Zuckerberg, at the recent hearing before the Senate Commerce Committee, you said that Facebook has a quote, "Policy in place that prevents any candidate," end quote from, quote, "Trying to delegitimize the result of the election," end quote. But the hashtags, stealthevote, and voter fraud garnered more than 300,000 interactions on your platform in the hours after Mr. Trump falsely declared victory. So here's the question--do you

believe Facebook did enough to prevent Trump's efforts to delegitimize the election result? If so, why have you reached that conclusion?

ZUCKERBERG: Senator, I believe that we have—we have taken some very significant steps in this area not just the--the adding additional context to specific posts and making it so that when–when people search for--for different hashtags we show additional information. But we also took the unprecedented step of putting the voter information center at the top of Facebook and Instagram for everyone in the U.S. that showed them reliable information about the election including partnering with organizations like Reuters and the National Election Pool to show them accurate information about the results of the election.

So all taken together I think that we really went quite far in terms of helping to distribute reliable and accurate information about what was going on during this election.

FEINSTEIN: OK. Let me give you one more along this line. After President Trump falsely claimed that the election was being stolen a group called Stop the Steal, was started on Facebook. It grew to more than 300,000 users in less than a day making it one of the fastest growing groups, I understand, in Facebook history. You shut the group down but substantial damage already had been done.

Trump supporters, some of them armed with assault weapons, held Stop the Steal rallies outside of election offices. In Philadelphia, two armed supporters who had traveled from Virginia were arrested on their way to the city's vote counting center. Here's the question, and this is a tough one-- what are your concerns about the spread of misinformation no matter how innocent it is like or it is not innocent like Trump's claims about the election that they may incite violence?

ZUCKERBERG: Senator I'm–I'm very worried about–about this. Especially, any misinformation or content that could incite violence and during such a volatile period like this one of our top priorities is making sure that people don't use our platform to--to organize any violence or civil unrest. And that was the basis under which we took that group because there were a–a number of members who were posting potentially violent or–or encouraging violent comments that violated our--our policies. We also have broader policies in place around trying to slow the spread of misinformation more broadly even when it's not going to lead to some kind of violence or eminent harm.

[*]ZUCKERBERG: And that's why we've created this independent fact checking program where we work with more than 80 partners around the world to help do fact checking because people in our community have told us they don't want to see misinformation, but they also don't want us to be deciding what is true and false. So we–so we've taken the step of building this program, which I believe is more sophisticated than what anyone else in our industry has. So I'm very focused on these issues.

FEINSTEIN: Well, I'm happy to hear that because I'm really struck by it, that people armed with assault weapons as a product of a tweet could rally outside an election office, and I think it's really a serious issue that needs to be considered, and there need to be, once you signal that and people respond to it, it has to be in some way abated or some way pointed out or restructured on the internet itself. Now can you respond to that?

GRAHAM: Senator Feinstein, I—

FEINSTEIN: --and concerns?

GRAHAM: I hate to–we're almost double the time. Could we--

FEINSTEIN: I'm sorry.

GRAHAM: That's all right. We're going to have a vote come up, and I apologize. Senator Lee.

LEE: Thank you, Mr. Chairman. First, I'd like to note that as far as the president's arguments about the election and how they turned out, inciting violence, I'd like to point out that the only violence that I'm aware of has occurred in connection with Antifa, Antifa's response to pro-Trump peaceful rally attenders. So I don't quite understand that. Maybe we'll have a chance to dwell on that more in a minute.

But first I want to talk a little bit about federal law, existing federal law and what it requires. Section 5 of the Federal Trade Commission Act prohibits businesses from engaging in unfair or deceptive trade practices. Compliance with this particular law requires that there be some consistency between what a company represents as their practices and their products and what they actually are. In other words, you can't sell one thing and provide another under the guise of providing something different than what's being sold.

Both Twitter and Facebook represent and have represented for years to their users, their customers, that they take a neutral approach to election content moderation. However, as we've heard today and as we will continue to hear today and into the foreseeable future, there are instances in which your platforms are taking a very distinctively partisan approach and not a neutral one, to election related content moderation.

For example, just days before the election Twitter suspended the account of Mark Morgan. Now Mark Morgan is the commissioner of the U.S. Customs and Border Protection Office, and they suspended Commissioner Morgan's Twitter account specifically for a tweet celebrating the success of the U.S. southern border wall. Apparently Commissioner Morgan's tweet, his comments about the border wall, violated Twitter platform rules governing what it calls hateful conduct.

Now I've read the offending post, and the offending post from Commissioner Mark Morgan reads as follows: As CBP and the Army Corps of Engineers continue to build new wall every day, every mile helps us stop gang members, murderers, sexual predators and drugs from entering our country. It's a fact; walls work. Period, close quote. Mr. Dorsey, can you tell me in one sentence what exactly is hateful about Commissioner Morgan's tweet that I just read?

DORSEY: Well, we evaluated this tweet again, and we found that we were wrong. That was a mistake, and it was due to the fact that we had heightened awareness around government accounts during this time. So that was a mistake. We reverted it.

LEE: Thank you. I appreciate that, and we're going to get back to more of that in a minute and get back to the fact that, you know, I understand that mistakes happen, but what we're going to see today is that mistakes happen a whole lot more, almost entirely on one side of the political aisle rather than the other. Now Commissioner Morgan's statement in that tweet, as was initially taken down, is factual. There's nothing remotely hateful about it, and yet it was taken down.

Now on October 15 Facebook relied on a third-party fact checker's assessment to ban two advertisements from Facebook for, quote, partly false information. Both of these advertisements were factual in nature. They revealed Joe Biden's and Kamala Harris's views on late-term abortion. Joe Biden has stated that he won't accept any restrictions on abortion, and Senator Harris's views are such that she voted against requiring care for a child born alive during a botched abortion.

The very next day the third-party fact checker issued a statement retracting the assessment and re-tracking it as erroneous. However, it stunningly took Facebook almost two more weeks until October 29 when voting had already started in many jurisdictions to lift the ban on these legitimate ads, ads that the fact checker had already declared a couple weeks earlier were erroneously taken down. So Mr. Zuckerberg, why on earth did it take Facebook two weeks to correct this error?

ZUCKERBERG: Senator, I'm not familiar with the details of us re-enabling that ad, so I can follow up with you after. It's possible that this was just a mistake or delay, and unfortunately when we handle millions or billions of pieces of content a day while we strive to do as well as possible and be as precise as possible, we will make some mistakes.

LEE: Thank you. I appreciate your acknowledgment of the fact that there are mistakes. As I've noted previously, those mistakes sure happen a whole lot more on one side of the political spectrum than the other. Now this is understandable. We're humans. But it's also understandable why this might occur. Maybe some of it has to do with your employees. 92.83 percent of Facebook employees who have donated to federal candidates gave to Democrats. At Twitter it's even more stark than that, as if it could get much more stark, but 99.3 percent of Twitter employees who have donated to federal candidates gave to Democrats. And so these mistakes, they may be mistakes, but they are mistakes that rhyme. They may not repeat themselves, but they rhyme, and the consistent theme happens to be Republicans, conservatives and pro-life activists.

Now I'd like to ask both of you, is there a list of every user or every content creator who has been de-platformed or had their contents reach altered or had some other adverse action taken by either Facebook or Twitter altered? Is there some list that identifies each user for which that has happened? Mr. Zuckerberg, let's hear from you, just yes or no question. Does such a list exist?

ZUCKERBERG: Senator, I'm not aware of anything like that existing.

LEE: Mr. Dorsey, how about you?

DORSEY: I'm not exactly sure what you're asking, but we certainly--

LEE: Simple question. Do you have a list of people, your users or content creators who have had some adverse action taken against them, either being de-platformed or having their reach altered or something because of the content of their posts?

DORSEY: Well certainly whenever we take an action it's recorded somewhere in a database, but I'm not sure if that's your intent.

LEE: No, that's helpful. So what I'm hearing from both of you is that while there may not be an actual list, and I'd like you both to check to see if such a list exists--but even if there isn't, there is a de facto list because you have within your databases records of occasions when this has occurred, and so I'd like to ask both of you if such a list exists, please send it to me. I'd like to see it. If such a list does not exist, you certainly do have the data necessary in order to generate some. I request as a member of this committee that you generate such a list and provide it to me.

Thank you very much, Mr. Chairman. Senator Graham, the chairman of the committee, has stepped out momentarily. I've been directed to recess the hearing momentarily so that we can go and vote, and then we will pick up back here in just a few minutes. I would like to, as long as I have the gavel momentarily, I'm going to ask one more question before I leave to go vote, and then we'll recess the hearing after this--

LEAHY: And could I ask when we're coming back? I've been waiting to ask questions for an hour now.

LEE: Yeah, we'll be coming back as soon as Senator Graham returns--he left to vote and--just a moment ago. He'll be back.

Mr. Zuckerberg, in September Facebook tagged an ad run by the American Principles Project in Michigan that criticized Joe Biden and criticized Senator Gary Peters. And the--the--the ad was tagged because it was "missing context." Now, the next day the ad was shut down entirely by Facebook. Facebook relied on a supposed effect track from PolitiFact, which is a nice way for you to avoid taking accountability for the problem, except that the fact checking question literally said that the ad, quote, makes "predictions we can't fact check."

Apparently, this had to do with collecting context. When it did lacking context become a new standard for political ads? I mean, all political ads, all ads in general but certainly all political ads, lack context. Ben Sasse just finished a resounding victory in Nebraska, and I haven't seen his TV ads but I'm sure they're brilliant. Those guy's made for television, he's--with or without the beard.

And I'm sure his ads didn't say Ben Sasse, great senator but not that great of a hockey player or--there is always context that is lacked out--that is lacking, left out, in any advertisement. So, what does that mean? And have you applied the missing context label to any Democratic ads, a single one that you can identify?

ZUCKERBERG: Senator, I'm--I'm not familiar with that specific standard. But as a--as kind of a background on the--the fact checking program, the basis of this is that we have heard resoundingly from our community that people do not want to see this information and believe that it is a problem. But people also believe that they do not want Facebook to be the arbiter of truth in deciding everything that is true and false. And for what it's worth, I strongly agree with that, and--and I do not think it is the right thing for us to assume that role.

So, within those bounds, we've tried to create a fact checking program that works with independent third parties who've been accredited by the--the Poynter Institute for--for Journalism, which I--which I think is widely respected. And we--we give those fact checkers the latitude to determine whether ads or other content on our service is--is accurate. And--and if not, we--we apply some demotions or we prevent them from being run as ads. I can follow up in--in more detail afterwards on--

LEE: --Thank you--

ZUCKERBERG: --On the specifics of--of--of your question, since I'm--I'm not as familiar with them right now.

LEE: I--I would appreciate that very much, if--if you'd be willing to do that because it's--it's not only consistent with--with logic and with what--the standards that apply in every other advertising context that I'm familiar with, it's also inconsistent with what Facebook itself does.

Just to give you some context for that while we're talking about missing context, I recently posted something about the election on Facebook. In my Facebook post was almost immediately tagged with the following. "Election officials say that voter fraud, which is historically rare, has not affected the outcome of--in this election. They have confirmed that mail-in voting was conducted in accordance with state voting rules."

Now, I find this a little disturbing. The town--tag, to me, sounds a whole lot more like state run media announcing the party line rather than a--a neutral company, as it purports to be, running an open online forum. This kind of editorializing insulates people from the truth, and it insinuates that anyone concerned about voter fraud must be crazy. It also states it as if it were an irrefutable, neutral, objective fact.

Now, maybe these kinds of concerns are out of the mainstream in Palo Alto, but they're not out of the mainstream with the rest of America. And I--I--I--I have to reiterate, I--I hope this kind of manipulation wasn't intentional, but it's getting harder and harder for me to accept the premise that it could be anything but intentional. And if it was intentional, it's yet more evidence that Facebook's actions surrounding this election are incongruent with the promises that you've made to your own users, and that the problem.

Consistent with the directions that have been given by Chairman Graham, we're now going to recess. I predict we'll be in recess for no more than 10 or 15 minutes until Chairman Graham returns. We stand in recess.

[*]KENNEDY: The committee will come to order. Senator Leahy.

LEAHY: Thank you. Can you hear me all right?

KENNEDY: Yes, sir.

LEAHY: Good. Well, let me start by–

KENNEDY: We can see you, too, Senator. You look great.

LEAHY: It's my thick head of hair. That's what does it. But I want to say I recognize the challenging position that social media companies are in. Your platforms hosts much of the news that America and actually the world use to stay informed, so you're on the front line of both domestic and foreign disinformation campaigns, and you have to balance American ideals like freedom of speech. You have to limit hate speech. You have to limit dangerous misinformation. That's a significant challenge.

I saw one of the people who came here to demonstrate last weekend in Washington say they're there because they had found out that China had one minute before the polls closed dumped millions of votes for Joe Biden. Somebody said, well, what do you mean? They said, well it was on the internet; it's got to be accurate.

But now your platforms have taken some positive steps. But I mentioned that one thing, and I hear from people all the time who stop me with some of these misinformation, sometimes very dangerous misinformation. They've gotten it from your platforms, and I happen to think you can and must do better. You know, our security, I think even our democracy, our understanding of basic truth depends on you doing a better job.

President Obama described the escalating erosion of the acceptance of facts of science of clear evidence as truth decay. It's a–you know, without facts it's hard to imagine how a government by and for the people can exist, and your platforms can bring together. I think often they act as a form of driving people apart. Now, during this election President Trump has emerged as the most prominent distributor of false and misleading election information. He still does it. It's nothing short of propaganda.

Without evidence, he routinely claims the election was rigged, says the states actually cheated and fixed the results, even claims that millions of Trump votes were deleted. And he's doing that while his own Department of Homeland Security is saying the election was the most secure in American history. And there's no evidence any voting system deleted or lost votes, changed votes or was in any way compromised.

That's what our own U.S. government is saying. Then the head of government, the president is saying just the opposite. So it may make him feel better about the fact that he lost badly, but we shouldn't have to put up with it. So I have a question for both of you. Has Facebook or Twitter conducted an in-depth postmortem review of election misinformation spread onto your platforms, not just what you labeled, but how far the misinformation reached? Have you done that kind of a postmortem?

ZUCKERBERG: Senator, we will do that analysis, and also we are commissioning and working with independent academics to enable them to do the studies themselves and to publish what they find without any intervention or permission required from Facebook.

LEAHY: Thank you, and.

DORSEY: And we are doing the same, including opening up our APIs to researchers to make sure that others are able to see what we may not–we may not see ourselves.

LEAHY: Will that be made available to us? Can other people see that results of that study you're going to do? Both of you, I'd ask.

ZUCKERBERG: Senator, yes, the academic research is going to be public and the academics are going to be able to publish this themselves without even having to get Facebook's approval over what they publish.

LEAHY: Thank you. Mr. Dorsey.

DORSEY: We'll make our reports and findings public, as well, so everyone can learn.

LEAHY: I look forward to reading them. I'm actually one member of the Senate who will actually read them. So thank you. Because you know, you look at some of the things that went on, there was–I know Senator Blumenthal and others have raised this question about the Steve Bannon putting on a video. Think of what it did. It called for the murder, the beheading of Dr. Fauci and the director of the FBI Christopher Wray. Just think what that does. I mean, the FBI director travels with security all the time. Dr. Fauci and his family are private citizens. They're calling for their beheading.

And it was seen by I think 200,000 people on Facebook. Now if you're going to have somebody threatening to murder somebody, what do you do about that? I mean, how do you catch that in a hurry because I mean I was a prosecutor. I prosecuted murderers, and we didn't have to face this kind of threat at that time. But what do you do when hundreds of thousands of people see a threat go murder somebody?

ZUCKERBERG: Senator, in that case that content violated our policies and we took it down, and as has been the subject of some of the other questions, if someone had multiple offenses like that we would remove their whole account.

LEAHY: I'm sure that's a–the threat that do mul–if they multiple times say go out and murder somebody, cut off their head, you know we're going to face a real problem. Facebook will take down our posting. Oh my goodness, what a deterrent.

ZUCKERBERG: Senator, what we try to do is identify content that violates our policy before anyone in the community has to see it or even report it to us. And for some categories like terrorism, which I have cited before, you know, about 98 or 99 percent of the content that we take down, our AI and human systems find before anyone even has to report it to us. On hate speech, we're up to 94 percent of the content that we take down our AI systems and content reviewers find before people have to report it to us. What we try to drive on more effectiveness is basically funding more and more of that harmful content earlier before it is seen broadly across our system.

LEAHY: Let me ask you about that because, you know, we've had these discussions before. I'm deeply concerned about Facebook's role in spreading hate speech in Myanmar, hate speech that helped fuel a genocide against the Muslim Rohingya people, and I mean horrible. I've seen the pictures. I've seen some of the genocide. You've made some progress about this since you and I talked about it last, but my understanding is that Facebook shuts down specific accounts that violates your content related policy, but then the user can of course just create a new account.

In Myanmar, for example, on October 8, Facebook took down 38 inauthentic accounts created and controlled by members of Myanmar military in part to promote anti-Rohingyan content. And I compliment you for doing that. But Myanmar military just turned around and created new accounts that promote the same content. So in some way you've got a whack-a-mole problem here. But is there a way that we can–you can stop these things, not just at the account level, at the user level? And I use that as an example because people are being murdered in a systematic genocide.

GRAHAM: Please answer Senator Leahy's question. Then we'll need to move on. But go ahead.

[*]LEAHY: And I'm sorry to take–but–but the previous questioner took all his time, plus all the time that–

GRAHAM: --No, no, I agree--

LEAHY: --Had been allotted to me.

GRAHAM: Yeah. No, no, we're at 2.5 minutes, and let's just wrap it up. But to go ahead and answer the question.

ZUCKERBERG: Senator, you're correctly pointing out that we did disable certain generals in the--in the Myanmar military as dangerous figures and they are not allowed to sign up. But as you point out, these kind of integrity problems are not ones that there's a silver bullet or where you can never fully solve them. You will--we will always be working to help minimize the prevalence of harm.

In the same way that a city will never eliminate all crime, you try to reduce it and--and get it--and--and have it be as little as possible. And that's what--what we try to do through a combination of building AI systems to identify purple content up front, hiring thousands of people and tens of thousands of people to do content review, and partnering with organizations, whether it's in the intelligence community, law enforcement, election officials, or in Myanmar, local society to help us like things that we should be aware of and--and--and on high alert about.

LEAHY: Thank you. Mr. Chairman, I'll have some questions for the record for both of the witnesses.

GRAHAM: Thank you very much, Senator Leahy. I appreciate that. Senator Cruz?

CRUZ: Thank you, Mr. Chairman. Facebook and Twitter and Google have massive power. They have a monopoly on public discourse in the online arena. I will say it's dismaying listening to the questions from our Democratic colleagues, because consistently the message from Senate Democrats is for Facebook and Twitter and Google to censor more, to abuse their power more, to silence voices that Senate Democrats disagree with more.

That is very dangerous if we want to maintain a free and fair democracy, if we want to maintain free speech. There was a time when Democrats embraced and defended the principles of free speech. There was a time when Democrats embraced and defended the principles of a free press. And yet, there's an absolute silence from Democrats speaking up for the press outlets censored by big tech. There's an absolute silence for Democrats speaking out for the citizens silenced by big tech. Instead, there is a demand, use even more power to silence dissent, and that the totalitarian instinct that I think is very dangerous.

At the same time that big tech exercises massive power; it also enjoys massive corporate welfare. Through the effect of section 230, special immunity from liability that nobody else gets, Congress has given big tech, in effect, a subsidy while they become some of the wealthiest corporations on the face of the planet.

Mr. Dorsey, I want to focus primarily on Twitter and ask you initially is Twitter a publisher?

DORSEY: Is Twitter a publisher?

CRUZ: Yes.

DORSEY: No, we are not. We--we distribute information.

CRUZ: So, what is a publisher?

DORSEY: An entity that is publishing under editorial guidelines and decisions.

CRUZ: Well, your answer happens to be contrary to the text of a federal statute, particular section 230, which defines an in--information content provider as any person or entity that is responsible in whole or in part for the creation or development of information provided through the Internet or any other interactive computer service.

Let me ask you, was Twitter being a publisher when it censored the New York Post?

DORSEY: No. We have very clear policies on the conduct we enable on the platform. And if there's a violation, we take enforcement action. And people choose to commit to those policies and--and to those terms of service.

CRUZ: Except your policies are applied in a partisan and selective manner. You claim it was hacked materials, and yet you didn't block the distribution of the New York Times story that alleged to talk about President Trump's tax returns, even though a federal statute makes it a crime to distribute someone's tax returns without their consent. You didn't block any of that discussion, did you?

DORSEY: Our policy was focused on distribution of the actual hacked materials.

CRUZ: Did--did you block the--

DORSEY: --And in the New York Times--

CRUZ: --Discussion of the president's tax return material?

DORSEY: And in the New York Times case, we interpreted it as reporting about the hacked materials, not distribution of the--

CRUZ: Did--did you block Edward Snowden when he--he illegally released material?

DORSEY: I'm--I--I don't have the answer to that.

CRUZ: The answer is no. You have used this in a selective manner.

Let me ask you, where you being a publisher when you forced Politico, an another journalistic outlet, to take down their tweets on a topic that you had deemed impermissible?

DORSEY: No. We were enforcing our--our policy and our terms of service.

CRUZ: So, on October 15th, Jake Sherman, a reporter at Politico, tweeted the following. I tweeted a link to the New York Post story right after it dropped yesterday morning. I immediately reached out to the Biden campaign to see if they had any answer. I wish I'd given the story a closer read before tweaking it. Twitter suspended me.

So, you actually have a reporter reporting on a story asking the other side for comment. And Twitter says, hi, Jake Sherman, your account, at JakeSherman, has been locked for violating Twitter rules. Now, what did the--what did the Politico reporter do? He immediately tweets after that, "My goal was not to spread information." Well, that's a little worrisome just on an--in and of itself. "My goal was to raise questions about the story."

Oh, my overlords in Silicon Valley, I was attacking the New York Post. You don't understand. I was attacking them as I did in subsequent tweets and see how the Biden campaign was going to respond. They later did respond. And then not long after, Jake Sherman comes back with my account is clearly no longer suspended. I deleted the tweets.

When Twitter is editing and censoring and silencing the New York Post, the--the newspaper with the fourth highest circulation in the country, and Politico, one of the leading newspapers in the country, is Twitter behaving as a publisher when it's deciding what stories reporters are allowed to write and--and publish and what stories they're not?

DORSEY: No, and that account was not suspended. It fell afoul of the hacked materials policy. We realized that there was an error in that policy and the enforcement. We retracted that within--

CRUZ: --Hold--hold on. I'm--I'm literally--

DORSEY: --24 hours--

CRUZ: --Looking at the tweet from Twitter that says your account has been locked. You're--you're telling me that this is not accurate--

DORSEY: --That's a--that's a lock--that's a lock and can be unlocked when you delete the erring tweet.

CRUZ: I understand that you have the Star Chamber power. Your answer is always, well, once we silence you, we can choose to allow you to speak. But you are engaged with publishing decisions.

Let--let me shift to a different topic. Mr. Dorsey, does voter fraud exist?

DORSEY: I--I don't know for certain.

CRUZ: Are--are you an expert in voter fraud?

DORSEY: No, I'm not.

CRUZ: Well, why then is Twitter right now putting purported warnings on virtually any statement about voter fraud?

DORSEY: We are--we're simply linking to a broader conversation so that people have more information.

CRUZ: No--no, you're not. You put up a page that says "Voter fraud of any kind is exceedingly rare in the United States." That's not linking to a broader conversation. That's taking a disputed policy position. And you're a publisher when you're doing that. You're entitled to take a policy position, but you don't get to pretend you're not a publisher and get a special benefit under section 230 as a result.

DORSEY: That link is pointing to a broader conversation with tweets from publishers and--and people all around the country.

CRUZ: Mr. Dorsey, with the following statement violate Twitter's policies? "Absentee ballots remain the largest source of potential voter fraud."

DORSEY: I imagine that we would label it so that people can have more context and read through it.

CRUZ: Okay. How--how about this quote? "Third party organizations, candidates, and political activists--voter fraud is particularly possible where, quote, third party organizations, candidates, and political party activists are involved in "handling absentee ballots." Would you flag that as potentially misleading?

DORSEY: I don't--I don't, you know, know the specifics of how we might enforce that, but I imagine a lot of these would--have a label pointing people to a bigger conversation about our policy.

CRUZ: Well, you're right. You would label them because you taken the political position right now that voter fraud doesn't exist. I would note both of those quotes come from the Carter-Baker Commission on Federal Election Reform. That is Democratic president Jimmy Carter and former Secretary of State James Baker, and Twitter's position is essentially voter fraud does not exist. Are you aware that just two weeks ago in the state of Texas a woman was charged with 134 counts of election fraud? Are you aware that?

DORSEY: I'm not aware of that.

CRUZ: If I tweeted that statement with a link to the indictment, would you put a warning on it that says, well, the Democratic Party position right now is voter fraud doesn't exist?

[*]DORSEY: I--I don't think it's useful to get into hypotheticals but I don't believe so.

CRUZ: You--you don't believe so. Well, we are going to test that because I'm going to tweet that and we will see what you put on it. All right. Yesterday Mr. Dorsey you and I spent a considerable amount of time on the phone and you said that you wanted to embrace transparency so I want to ask you--I've asked twitter, I've asked Facebook multiple times how many times have you blocked Republican candidates for office their--their tweets or their post in 2016 and 2018 and 2020? How many times have you blocked Democratic candidates for office?

How many times have you blocked Republican officeholders? How many times have you blocked Democratic officeholders? Twitter has repeatedly refused to answer that question with specific hard data and--and cataloging the examples in the interest of transparency which you said you want to embrace will you commit in this hearing right now to answer those questions in writing?

GRAHAM: (INAUDIBLE) last question.

CRUZ: I'm sorry Mr. Dorsey I didn't hear you.

DORSEY: That is exactly what we're--we're pushing for as we think about building upon 230 the transparency--

CRUZ: Is that a yes that you will answer those questions in writing?

DORSEY: Transparency not just of outcomes but also a process as well.

CRUZ: Is--is that a yes that you will answer those questions in writing?

DORSEY: We will certainly look into it and see what we can do.

CRUZ: And actually answer them and not give lawyerly doublespeak about why you are not going to give specifics, answer them will you commit to this committee that you will answer those questions?

DORSEY: We are going to work to answering broader transparency around outcomes.

CRUZ: All right, that's a no. Mr. Zuckerberg, how about you? Will you commit that Facebook will answer those specific Russians cataloging the number of instances in which Democrats in 16, 18, and 20 have been silenced versus the number of instances in which Republicans have been silenced on Facebook?

ZUCKERBERG: Senator, I'm not sure if we have that data available but I will follow up with you or your team.

CRUZ: Okay. I'm going to take that as a yes and I'm going to take twitter we will see if it's a yes or transparency is bogus and we don't intend to provide it.

GRAHAM: Senator Durbin?

DURBIN: Thank you, Mr. Chairman. We live in a dangerous world. Issues of national security, the worst pandemic public health crisis in modern times in America, and we are being challenged as to whether there's going to be a peaceful transition of power in America in the presidency.

At that moment in time we decided none of those topics were important and what was important was to determine whether or not social media was discriminating against Republicans. It's an interesting question. I think there are more important and timely questions. We have a recount underway in Georgia, we have allegations made by the election officials there where they the Republican allegations, Republican election officials where they have faced literally death threats. We are trying to determine whether or not the social media instruments of America are fair to the Republican Party.

I am trying to struggle with this issue because I want to put it in a context and maybe I can't, maybe it's this is unique. We certainly know what the Constitution says when it comes to free speech and we know what it meant over the years the New York Times versus Sullivan and others with publications, we certainly didn't just suggest that anyone that use a telephone line for nefarious a legal band activity somehow implicated the telephone company into it by--by its nature.

And then came radio and TV and we had to come up with new rules in terms of that one time equal time fair content and so forth and now we have this new relatively new mechanism of communicating information and we are trying to determine what to do with it, whether to treat it like a newspaper publishing or treat it like some sort of a communications network alone section 230 is an attempt to do that and I am sure everybody finds some fault with it.

I would like to ask the two witnesses if they would comment on the historical aspects of this particular debate, if they have any thoughts. Mr. Zuckerberg?

ZUCKERBERG: Senator, one of the points of the discussion that I find interesting is people asked if the regulatory model should be more like kind of they news industry or more like telcos but from my perspective these platforms are a new industry and should have a different regulatory model that is distinct from either of those other two. I think it is not the case that we are like a telco and that there are clearly some categories of content whether it's terrorism or child exploitation that people will expect us to moderate and address but we are also clearly not like a news publisher in that we don't create the content and we don't choose up front what we publish, we give people a voice to be able to publish things.

So I do think that we have responsibilities and it may make sense for there to be liability for some of the content that is on the platform but I don't think that the analogies to these other industries that have been created previously will ever be kind of fully the right way to look at this. I think it deserves indeed its own regulatory framework to get built here.

DURBIN: Thank you. With the other witness care to respond?

DORSEY: From a historical perspective to 30 has created so much goodness in innovation and you know if we didn't have those protections when we started Twitter 14 years ago we could not start and that is what we are most concerned with is making sure that we continue enable new companies to contribute to the Internet, to contribute to conversation. And we do have to be very careful and thoughtful of about changes to 230 the cause going one direction might box out new competitors and new startups, going another might create a demand for an impossible amount of resources to handle it and going yet another might encourage even more blocking of voices or what is being raised here which is censorship of voices and changing the Internet dramatically so--

DURBIN: Go ahead.

DORSEY: So I--I believe that we can build upon 230. I think that we can make sure that we are earning people's trust by encouraging more transparency around content moderation in our process of it. I think we need much more straightforward appeals and I think the biggest point to really focus on going forward is algorithms and how they are managing and creating these experiences and being able to have choice in how to use those algorithms on platforms like ours.

DURBIN: Let me get into a specific, Mr. Zuckerberg. October 10 Detroit Free Press reported 13 men charged Thursday in a conspiracy to kidnap Michigan Governor Gretchen Witmer used Facebook and secure messaging apps to connect and plot their attack. The groups use of Facebook spans almost a full year. Members began to use the social media platform as a recruitment tool in November 2019 according to an affidavit by Brian Russell Detective Sergeant Michigan State police. Once recruited members communicated via a secured encrypting message platform. According to news reports Facebook alerted the FBI about the Michigan kidnappers online activities several months before the arrest, thank goodness.

However, in August a Facebook page for the Kenosha guard militia which advocated violence in the aftermath of the shooting of Jacob Blake was reportedly flagged over 455 times to Facebook however the page was deemed non-violating and left up. More than 4,000 people responded to that event, hundreds of armed militia members showed up, a member of this group, a teenager from Illinois later shot and killed two people on the streets of Kenosha.

Mr. Zuckerberg, you describe Facebook's handling of this militia page as an operational mistake. Can you explain the exact reason why the Kenosha militia page was not taken down?

ZUCKERBERG: Senator, yes, and first and what happened in Kenosha was obviously terrible. What--what happened here was we rolled out a strengthen policy are round militia pages in general whereas before that we would have allowed a group that was a militia as long as it wasn't planning or organizing violence directly in the lead up to the election, we strengthened the policy to disallow more of those groups because we were on high alert and were treating the situation as very volatile around potential civil unrest around the election.

We just put that policy into place, and for a number of reasons it had not yet been fully rolled out, and all of the content reviewers across the company hadn't been fully trained on that, so we made mistakes in assessing whether that group should be taken down.

But upon appeal, when it was escalated to a more senior level of content review folks who have more specific expertise in these areas, we recognize that it did violate the policy, and we took it down. It was a mistake. It was certainly an issue, and we're--we're debriefing and figuring out how we can do better, although one other piece that I would add is that the person who carried out the shootings was not in any way connected to that page or linked to any of the content there from anything that we or others could tell.

DURBIN: Mr. Chairman, if I may ask one more question. Yesterday, the FBI released its annual hate crime incident report. The report found that more people were killed in hate motivated violence in 2019 than any year since the FBI began collecting hate crime data in 1990. The report also found that race-based hate crimes remain the most common type of hate crimes last year.

And documented increase in religion-based hate crimes, anti-Hispanic hate crimes and hate crimes targeting individuals based on gender identity. Given these statistics, it appears to me that it's more important than ever for social media companies to combat hate on their platforms, and I might add to one of my colleagues who stated earlier this is not Antifa. But these are documented hate crimes from FBI.

Muslim advocates, Muslims reached out to you many times, Mr. Zuckerberg, about this issue relating to published content that reflects on certain religious groups, and you said at a hearing you do not allow Face--hate crimes on Facebook. Yet in May 2020 the Tech Transparency Project found more than 100 American white supremacist groups, many of them explicitly anti-Muslim, active on the platform both in their own group pages, as well as auto generated content. Facebook did nominally alter some of the content, but the hate groups largely remained. Are you looking the other way, Mr. Zuckerberg, at a potentially dangerous situation?

ZUCKERBERG: No, Senator. This is incredibly important, and we take hate speech, as well as incitement of violence, extremely seriously. We banned more than 250 white supremacist organizations and treat them the same as terrorist organizations around the world, and we've ramped up our capacity to identify hate speech incitement of violence before people even see it on the platforms.

Our AI and human review teams, as you can track our results in the transparency reports that we issue, now take down about 94 percent of the hate speech that we find on our platforms before anyone has to even report it to us, which is a dramatic amount of progress from where we were a few years ago where when we were just starting to ramp up on this, were taking about 20 percent of it down before people had to report it to us. So there is still more progress to make. We're very invested in this, and you have my commitment that we view this as an issue of the highest severity and one that we are very focused on.

DURBIN: Thank you very much.

GRAHAM: Senator Sasse.

SASSE: Thank you, Mr. Chairman. Thank you for hosting this hearing. Clearly important topics around content moderation. I'm a skeptic of the content moderation policies that exist both because I don't think the standards are very transparent, and I don't think the execution is very consistent. That said, I'm more skeptical than a lot of my colleagues, I think on both sides of the aisle, about whether or not there is regulatory fix that will make it better instead of worse.

I especially think it's odd that so many in my party are zealous to do this right now when you would have an incoming administration of the other party that would be writing the rules and regulations about it, and I think it's telling that a number of folks on the other side of the dais--think of Senator Blumenthal, a guy I like, but who seem to almost be giddy about the prospect of a new government regulatory agency to police online speech. And I think a lot of people on my side should take pause at the idea that so many on the other side of the aisle are excited about having the next administration get to write these rules and regulations.

But to the broader question, first just to get to kind of a level set--and I want to thank both the witnesses for being here today--but when Senator Lee lays out some of the issues he did about, you know, just the every human community is going to be situated in a different place about policy commitments and priorities and beliefs, but when Senator Lee said that 93 percent of Facebook employees who contribute to politics do so on the left, and 99 percent I think it was, of Twitter employees contribute on the left, I would just be interested to see if either of the two of you think that has implications in the shepherding of your organizations?

Again, I recognize fully that you're private organizations, and so again I'm more skeptical of a governmental fix for a lot of the problems we're talking about here today, but I just am curious as to whether or not Mr. Zuckerberg and Mr. Dorsey--and I guess we'll start with Facebook--I'm curious as to whether or not you think it's likely that there is systemic bias inside your organization in the execution of content moderation policies given that your employee base is so unrepresentative of America in general.

ZUCKERBERG: Senator, I think it's a good question, and certainly I think it means that we have to be more intentional about what we do and thoughtful. Our principle and goal is to give everyone a voice and to be a platform for all ideas. As you mentioned, I do think it's undisputed that our employee base, at least the full-time folks, politically would be somewhat or maybe more than just a little somewhat to the left of where our overall community is where the community basically spends almost--wide varieties of people across society. So I do think that that means that we need to be careful and intentional internally to make sure that bias doesn't seep into decisions that we make.

Although, I'd point out a couple of things. One is that you know people have a lot of different views outside of work, and we expect and I think generally see that they people conduct themselves professionally, and second, the folks who are doing the content review work--we have about 35,000 people doing content review--are typically not based in Silicon Valley. They're based in places all over the country, and all over the world because we serve people in countries all over the world. So I think that the geographic diversity of that is more representative of the community that we serve than just the full-time employee base and our headquarters in the Bay Area.

SASSE: Thanks, Mr. Zuckerberg. Mr. Dorsey.

DORSEY: You know, this is obviously not something we interview for, and even have an understanding of when people are in the company, and with that understanding we intend to make sure that both our policy and our enforcement is objective. And I realize that it looks rather opaque, and certainly the outcomes might not always match up with that intention, with our intention, and the perception of those outcomes would--may not match up, but that's why I think it's so important that we're not just transparent around our policies, but the actual operations of our content moderation. If people don't trust our intent, if people are questioning that, that's a failure. And that is something that we need to fix and intend to fix.

And I think it would benefit the industry, as well. But I do, again, point back to something I said earlier on the testimony, which is a lot of these decisions are not being made by humans anymore. They're being made my algorithms, and that's certainly enforcement decisions, but also decisions around what you see or what you don't see, and to me that is the body of work. That is the conversation that we should be focused on because that is the enduring use case for everyone who interacts with these services.

SASSE: Thank you. And I wish it were true that this would all--that these were all easy, you know, objective questions. The questions were if somebody says is the sky green, that's an objective question than the sky is blue and white, not green. But most of the things we're talking about here and the places where you're applying content moderation labels are not really simply objective questions.

[*]SASSE: They're mostly subjective questions. If--if we talked about Medicare for All being, you know, easily paid for inside a 10 year budget window on assumptions X, Y, and Z that don't raise taxes, that's not true. There isn't any math by which Medicare for All pays for itself in some short-term window, but I don't think any of us really think you're going to slap a label on that saying this is disputed, you know, counting or math or policy projections.

And so, really what's happening is there's a prioritization grid that people are going through as they build even the algorithms, even those that aren't driven by humans, and they're driven by policy priorities of situated individuals. I may be wrong about this, but my suspicion is that your employee base is not actually 99 percent left of center. I bet it's less than that.

And I would speculate that part of the reason less than 1 percent of your employees give money to candidates on the right is because there's a social stigma attached to having conservative views inside your organization. And I would guess that the same sort of internal cultural biases inform the subjectivity of which issues end up labeled.

So, again, this is sort of an odd place to be, in that I am skeptical that the content moderation policies are thought out well. They're not transparent enough for us to really know. But I'm definitely skeptical that they're consistently applied. And yet, I'm not really on the side of thinking there's some easy governmental fix here. There's a lot about section 230 that we could debate.

I think some of the things Senator Durbin said about how, in the era of telephones, nobody blamed the phone company for other people having spread misinformation by the phone; exactly. That's what would be the case if section 230 were actually neutral. But you're applying content moderation policies and seemingly in a way that's not objective.

So, I know that I'm–I'm nearly at the time, but I think it would be useful for us to hear from both of you to give a sort of three or five year window into the future, if there isn't new legislation, what is changing what besides just saying we're moving from humans to more AI? What qualitatively is changing in the way content moderation happens inside your organizations short of a new regulatory scheme? Can you tell us where you think you're actually improving and what problems you're trying to solve? Mr. Zuckerberg, you first, please.

ZUCKERBERG: Senator, one of the areas that we are very focused on is transparency, both in the process and in the results. So, we're already at the point where every quarter we issue a community standards enforcement report that basically details the prevalence of–of each category of harmful content and how effective we are at addressing it before people have to even reported to us.

Over time, we would like to fill that out and have more detail on that and make it more robust. And we've already committed to an independent external audit of those metrics so that people can trust them even more. People have lots of different kinds of requests for where we might go with that in the future, whether that's breaking down the–the stats by–by country or–or language or into more granular buckets, adding more data around precision.

But I think that that would all be very helpful so that people can see and hold us accountable for how we're doing. And for what it's worth, I think that that would be a valuable part of a regulatory framework that would not feel particularly overreaching to me as something that could be put in law that would create an apples to apples framework, that all companies in this space would have to report on the outcomes and effectiveness of their programs in that way so at least we can see how everyone is doing. That seems like a–a sensible step to me.

SASSE: Thank you. Mr. Dorsey.

LEE: Senator Whitehouse?

SASSE: Oh, sorry, Mr. Dorsey is still answering the same question and then I'll–I'll give it back to you in a hurry, Mr. Lee.

LEE: So sorry. I missed that.

SASSE: It's a junior acting chairman. Mr. Dorsey?

DORSEY: Thank you. Well, I mean, if we're–if we're considering 3 to 5 years out, I think the realization that a centralized global content moderation system does not scale, and we need to rethink how we–how we operate these–the services. And I would point to we certainly need transparency around any process that we have an around the practice and the outcomes of those moderations.

But I think having more control so that individuals can moderate themselves, you know, pushing the power of moderation to the edges and to our customers and to the individuals using the service is something we'll see more of. And I also believe that having more choice around how algorithms are altering my experience in creating my experience is important, so being able to turn off ranking algorithms, being able to choose different ranking algorithms that are found–written by third-party developers in somewhat of an algorithmic marketplace I think is important, and a–a future that would excite and–and energize us.

SASSE: Thank you. I've appreciated my interaction with both of your companies in the run up to this, anything both of you said some meaty things that are about ways we can move toward greater transparency. So, I'll–I'll follow up again. Thank you, Mr. Chairman.

GRAHAM: Thank you. Senator Whitehouse?

WHITEHOUSE: Thank you, Chairman. Gentlemen, let me start with just a moment's history to give some context to my questions. When the tobacco industry discovered that its product was deadly, it responded to that news with a systematized program of denying that set of facts. The upshot for the tobacco industry was not great. It was found in federal court to have been engaged in massive fraud and was put under court order to cease its fraudulent behavior.

At around the same time, the fossil fuel industry began to run into a similar problem regarding the effects of its product. And it picked up the tobacco industry's scheme kind of where it left off, including using some of the same individuals, some of the same entities, many of the same methods as the tobacco industry's denial operation.

These are persistent, highly motivated, very well-funded and complex information operations, not unlike an–a hostile intelligence service would run, and they are quite secretive. And we're now seeing a new form, I guess you'd call it election denial, happening around our country right now.

So, that's a background that I come at this from seeing, and I'm wondering if each of you see a difference between individual error and basically mass disinformation. Is there a difference between odd people with fringe views who offer personal opinions and an orchestrated plan of deliberate misinformation or disinformation that is driven by motivated interests, whether foreign or domestic?

ZUCKERBERG: Senator, I absolutely think that there is a difference, and you can see it in the–the patterns of the–of use on the–on the platforms. And in our policies and operations, we view these coordinated inauthentic behavior operations, networks of fake and–and–and sometimes combining with real accounts to push out a message but make it seem like it's coming from a different place that it is, or it might be more popular than it is.

This is what we saw the Internet Research Agency out of Russia do in 2016. And since then, a number of other governments and private organizations, including some–some companies like what you've mentioned, having engaged in this behavior. Now, the–the good news is that I think that the industry has generally gotten its systems to be a lot more sophisticated to defend against that in the–in the last several years.

The combination of AI systems that we've built to find networks of accounts that aren't really behaving quite the way that a normal person would coupled with large numbers of content reviewers, sometimes with expertise in counterterrorism or–or counterintelligence, and in some signal sharing, whether it's with the intelligence community, law enforcement, different groups that have expertise in different areas, and with other tech platforms.

But this is a–a big effort on–on I think all of our sides to make sure that we can defend against this kind of interference. And I think we are–we are getting better and better at it.

WHITEHOUSE: Well, let me encourage you to persist. As you know, the last time you were here, you were asked about advertising paid for on false–Facebook denominated in rubles, which was not a very sophisticated scheme to be able to penetrate, but Facebook was unable to penetrate it. And your upgrade from that original set up was simply to allow a shell corporation to intermediate between the real actor and not. So, I encourage you to continue to try to make sure that real voices are what are heard on Facebook.

Mr. Dorsey, let me turn to you and–and ask you the same question in the context of bots.

[*]WHITEHOUSE: Brown University recently did a study that showed that about 25 percent of all tweets about climate change are generated by bots most of them obviously push out climate denial as I described that operation how is Twitter's capacity to identify a bot as opposed to a real customer?

DORSEY: Well, to build off of your previous question I do think there is a difference as Mark said and I do think there's a many coordinated campaigns to manipulate the public conversation, to divide people all around the world, to confuse and–and generally to distract and we do have policies in enforcement to prevent as much of this is possible. It is a growing threat and it shows no signs of slowing down. Thoughts are one way that in today's do this. Sometimes it may look like a bot that it's actually a human that is organized with other humans for a particular agenda so it is challenging. We are doing work right now to better identify thoughts on our service.

WHITEHOUSE: Let me just interject Mr. Dorsey real quick as a baseline proposition do you agree that a bot does not deserve a voice on your platform, that it should be actual people and organizations?

DORSEY: I don't agree with that as–as a high level. I–I think we should be labeling bots so that people have greater context for what they are interacting with.

WHITEHOUSE: Fair enough.

DORSEY: There are–there are plenty of thoughts on our service that provide a valuable function and I wouldn't want to take that away.

WHITEHOUSE: Let me ask both of you and maybe you can supplement this with an answer in writing for the record because my time is getting short and this is a complicated question but the question is when does it matter to twitter and when does it matter to Facebook to know who the actual entity is that was using your platform? Let me start with you Mr. Dorsey, since Mr. Zuckerberg went first last time and you can defer to a written answer if you would like the cause my time is running very short.

DORSEY: We–we will add to this conversation with a written answer but I–I do believe that pseudonymity is important. We have seen its usefulness with activist and with whistleblowers and I think that is critical but certainly there are times and it is judged by severity of potential outcomes where we need to dig into an entity and take actions.

WHITEHOUSE: We will follow up with that and let me just ask you since my time has expired Mr. Zuckerberg to respond or have your organization respond in writing. Thank you.

GRAHAM: Thank you. Before we–Senator Whitehouse brought up something very important and I want to add this directly as I ask this as directly as I can. To Facebook and twitter do you have any internal research or evidence to suggest that your platforms can be addictive? Mr. Zuckerberg?

ZUCKERBERG: Senator, I think we can follow up with a summary of research that we have but from what I have seen so far it is inconclusive in most of the research suggests that the vast majority of people do not perceive or experience these services as–as addictive or have issues but I do think that there should be controls given to people to help them manage their experience better and this is something that we are very focused on.

GRAHAM: Mr. Dorsey?

DORSEY: I am not aware of internal research but we can follow up but I do think like anything else these tools can be addictive and we should be aware of that, acknowledge it and make sure that we are making our customers so aware of better patterns of usage so that the more information the better here.

GRAHAM: Thank you. Senator Hawley?

HAWLEY: Thank you Mr. Chairman. In the late 19th century the heads of the biggest corporations in America, the robber barons, got together and they set rates, they set prices, they determined how they would control information flow, they determined how they get rid of competition and I will be darned if we aren't right back there again and except for this time you are the robber barons, your companies are the most powerful companies in the world and I want to talk about how you are coordinating together to control information.

In recent days, my office was contacted by a Facebook whistleblower, a former employee of the company with direct knowledge of the companies content moderation practices and I want to start by talking about an internal platform called Task that Facebook uses to coordinate projects including censorship. The Task platform allows Facebook employees to communicate about projects they are working on together. That includes Facebook censorship teams including the so-called community well-being team, the integrity team, and the hate speech engineering team who all use the Task platform to discuss which individuals or hashtags or websites to ban.

Now Mr. Zuckerberg you are familiar with the Task platform aren't you?

ZUCKERBERG: Senator, we use the Task system for I think it is as you say four people coordinating all kinds of work across the company although I'm not sure if I would agree with the characterization specifically around content moderation that you gave.

HAWLEY: Well, let's get into that and let me see if we can refresh your memory and provide folks that home watching with an example. Here over my shoulder as an example, is a screenshot of the Task platform and use. You will notice if the cameras assume in several references to election integrity throughout on these list of Task again this is shared across Ace books sites, company locations by working groups. What particularly intrigued me is that the platform reflects censorship input from Google and Twitter as well.

So Facebook as I understand it Facebook censorship teams communicate with their counterparts at twitter and Google and then enter those companies suggestions or censorship onto the Task platform so that Facebook can then follow up with them and effectively coordinate their censorship efforts. So Mr. Zuckerberg, let me just ask you directly under oath now does Facebook coordinate its content moderation policies or efforts in any way with Google or Twitter?

ZUCKERBERG: Senator, let me be clear about this. We do coordinate on and share signals on security related topics. So for example if there is signal around a terrorist attack or around child exploitation imagery or around a foreign government creating and influence operation that is an area where the company do share signals about what they see but I think it's important to be very clear that this is distinct from the content moderation policies that

we or the other companies have where once we share intelligence or signals between the companies each company makes its own assessment of the right way to address and deal with that information.

HAWLEY: Well, I—I am talking about content moderation, I am talking about individuals, websites, hashtags, phrases to ban. Is it your testimony that you do not communicate with twitter or Google about content moderation, about individuals websites, phrases, hashtags to ban? Just yes or no, do you communicate with twitter or Google about coordinating your policies in this way?

ZUCKERBERG: Senator, we do not coordinate our policies.

HAWLEY: Do your Facebook content moderation teams communicate with their counterparts at Twitter or Google?

ZUCKERBERG: Senator, I'm not aware of anything specific that I think it would be probably pretty normal for people to talk to their peers and colleagues in the industry--

HAWLEY: It would be normal but you don't do it?

ZUCKERBERG: No, I—I am saying that I—I'm not aware of any particular conversation but I would expect that some level of communication probably happens but (INAUDIBLE) different from coordinating what our policies are or our responses in specific instances.

HAWLEY: Well, fortunately I understand that the Task platform is searchable so will you provide a list of every mention of Google or Twitter from the Task platform to this committee?

ZUCKERBERG: Senator, that's something that I can follow up with you and your team after on.

HAWLEY: Well, yes or no I am sure you can follow up with a list but why don't you commit while I've got you here under oath? It's so much better to do this under oath. Will you commit now to providing a list from the Task platform of every mention of Google or Twitter?

ZUCKERBERG: Senator, respectfully I am without having looked into this I'm not aware of any sensitivity that might exist around that so I don't think it would be wise for me to commit to that right now but--

HAWLEY: So that's a no. How many items on the Task platform reflect that Facebook, twitter, and Google are sharing information about websites or hashtags or platforms that they want to suppress?

ZUCKERBERG: Senator, I—I do not know.

[*]HAWLEY: Will you provide a list of every website and hashtag that Facebook content moderation teams have banning on the Task platform?

ZUCKERBERG: Senator, again, I would be happy to follow up with you or your team to discuss further how we might move forward on that, but without understanding (INAUDIBLE)--

HAWLEY: Just will you commit to it here? Senator Cruz and Senator Lee both asked you for lists of individuals, website, entities that have been subject to content moderation. You expressed doubt about whether any such information exists, but you've also now said that the Task website--you've acknowledged the Task platform exists, that it is searchable. So will you commit to providing the information you have logged on the Task website about content moderation that your company has undertaken? Yes or no?

ZUCKERBERG: Senator, I think it would be better to follow up once I've had a chance to discuss with my team what any sensitivity around that would be that might prevent the kind of sharing that you're talking about. But once I've done that, I would be happy to follow up.

HAWLEY: All right. So you won't--you won't commit to do it here. We could, of course, subpoena this information. But I'd much rather get it from you voluntarily. But I think let everybody take note that Mr. Zuckerberg has now repeatedly refused to provide information that he knows that he has and has now acknowledged that he has that Tasks has under oath. Let me--let me switch to a different topic. Mr. Zuckerberg, tell me about CENTRA. What is the Facebook internal tool called CENTRA?

ZUCKERBERG: Senator, I'm not aware of any tool with that name.

HAWLEY: Well, let me see if this refreshes your memory. There is a demonstrative now over my shoulder. CENTRA is a tool that Facebook uses to track its users, not just on Facebook, but across the entire internet. CENTRA tracks different profiles that a user visits, their message recipients, their linked accounts, the pages they visit around the web that have Facebook buttons. CENTRA also uses behavioral data to monitor users' accounts, even if those accounts are registered under a different name, and you can see a shot here, a screenshot provided to us, of the central platform.

We blocked out the user's name in the interest of privacy, although you can see this individual's birthdate and age when they first started using Facebook, their last login, as well as all manner of trackings. How many different devices have they used to access Facebook? How many different accounts are associated with their name? What accounts have they visited? What photos have they tagged, and on and on and on. Mr. Zuckerberg, how many accounts in the United States have been subject to review and shut down through CENTRA?

ZUCKERBERG: Senator, I do not know because I'm not actually familiar with the name of that tool. I'm sure that we have tools that help us with our platform and community integrity work, but I am not familiar with that name.

HAWLEY: Do you have a tool that does exactly what I've described and that you can see here over my shoulder? Or are you saying that that doesn't exist?

ZUCKERBERG: Senator, I am saying that I'm not familiar with it, and that I would be happy to follow up and get you and your team the information that you would like on this. But I'm limited in what I can--what I'm familiar with and can share today.

HAWLEY: It's always amazing to me, Mr. Chairman, how many people before this committee suddenly develop amnesia. Maybe it is something about the air in the room. Let me ask you this. When a Facebook employee accesses a user's private information, like their private messages or their personally identifiable data, is a record made of that, Mr. Zuckerberg?

ZUCKERBERG: Sorry, Senator could you repeat that?

HAWLEY: Is a record made of any time a Facebook employee accesses a user's private information, personal identifiable information, for example messages? Is a record made any time a Facebook employee does that?

ZUCKERBERG: Senator, I believe so.

HAWLEY: Does it trigger an audit?

ZUCKERBERG: Senator, I think sometimes it may.

HAWLEY: How many audits have been conducted?

ZUCKER: Senator, I do not know the exact number of audits on the top of my head.

HAWLEY: Can you get a list?

ZUCKER: Senator, we can follow up on that to see what would be useful here.

HAWLEY: Will you--I'm almost finished, Mr. Chairman--will you commit to giving us a list of the number of times Facebook employees have accessed users' personal account information without their knowledge? Yes or no?

ZUCKERBERG: Senator, we should follow up on what would be useful here. It is of course in the operations of the company if someone reports something, it's sometimes necessary for people at the company to go review and understand the context around what is happening when someone reports something. So this is fairly frequent, and as a matter of course. We do have security systems that can detect anomalous patterns to flag, but we should follow up in more detail on what you're interested in.

HAWLEY: Mr. Chairman, I'll just say, in closing, that what we have here is clear evidence of coordination between Twitter, Google and Facebook. Mr. Zuckerberg knows he has the tools to track this, but he won't–he either doesn't remember or won't commit to letting us see it. We have evidence of Facebook tracking its own users all across the web. Mr. Zuckerberg won't answer questions about it, can't remember the name, isn't sure if a tool was deployed in this way and won't commit to giving us basic information.

I submit to you that this is both totally unacceptable and totally predictable because it is exactly what these tech companies have done to the American people and to Congress for years now, which is why it is time we took action against these modern-day robber barons. Thank you, Mr. Chairman.

GRAHAM: Senator Klobuchar.

KLOBUCHAR: I thank you very much, Mr. Chairman. I'm, as you know, the lead Democrat on the Antitrust Subcommittee, and I'm going to take a little different approach here than Mr. Hawley did when it comes to competition policy because I understand why they might be coordinating when it comes to security. What I want to focus on is what I think we're seeing all over this country, not just in tech. We're seeing a startup slump. We're seeing more and more consolidation. And throughout history we've seen that that is not good for small businesses. It's not good for consumers. And it's not good for capitalism in the end.

Even successful companies, even popular companies, and even innovative companies are subject to the antitrust laws of this country. When I asked Mr. Pichai about this at the Commerce Committee hearing a few weeks ago, he said he told me Google was happy to take feedback, and my response was that the Justice Department already provided feedback in the form of a federal antitrust complaint, and I know there is investigation reportedly going on out of the FTC right now regarding your company, Mr. Zuckerberg.

So I want to start with exclusionary conduct regarding excluding smaller competitors by limiting interoperability with the Facebook platform. The investigation that we saw in the House recently gave us a number of examples of companies, excluded companies including Vine, Stackla, MessageMe and Arc (PH), and my view is this conduct, exclusionary conduct, not only damaged the ability of these smaller businesses to compete, but it deprived customers of convenient access. You're one of the most successful companies, biggest companies in the world, Mr. Zuckerberg, Facebook. Do you think that this is fair competition or not with regard to the interoperability and how you've conducted yourself with these other companies?

ZUCKERBERG: Senator, I'm generally strongly in favor of interoperability and building platform and API access for companies to be able to access. That's why we built the Facebook platform in 2007. Some of the policies that you mentioned, I think came about because what we were seeing was not necessarily startups, but larger competitors like Google and some of our Chinese rivals from trying to access our systems in order to use their scale to compete with us better, and it just felt to us like at the time that that wasn't the intent of what we were trying to enable. It's worth noting--

KLOBUCHAR: Okay, well we may have a non-Chinese example here. I just want to know--I know that the--maybe we could hear from Mr. Dorsey, and I have concerns about Facebook's treatment of Twitter subsidiary, Vine. It's my understanding is that once Facebook recognized Vine as a competitor after Twitter acquired it in 2013, it cut off Vine's ability to interoperate with Facebook so that Vine users couldn't upload their videos to Facebook. And then I think that Twitter shut down Vine in 2016.

Mr. Dorsey, could you tell me about the actual impact of Facebook's actions on Vine's business, on Vine's ability to compete and on your decision to shut down the service? And I know you're not a Chinese company.

DORSEY: Well, I don't know about the intent on the other side, but I know our own experience was we found it extremely challenging to compete with Vine, and ultimately decided that the ball moved past us, and we shut it down. Again, I don't know the specifics and the tactics and what was done, but we did find a very, very challenging market to enter, even though we existed prior to some of our peers doing the same thing.

KLOBUCHAR: Okay, I'm going to move to something else quickly. Instagram and WhatsApp, we have some released internal Facebook emails in which you, Mr. Zuckerberg, wrote that Instagram was nascent and if they grow to a large-scale they could be very disruptive to us. And in a later email, you confirmed that one of the purposes of Facebook acquiring Instagram would be to neutralize a competitor.

[*]KLOBUCHAR: You wrote those emails that were mentioned in that House report, is that right, Mr. Zuckerberg?

ZUCKERBERG: Senator, I--I believe so. And I've always distinguished between two things though. One is that we--we had some competition with Instagram in the--and the growing space of kind of camera apps and photo sharing apps. But at the time I don't think we or anyone else viewed Instagram as a competitor as a kind of large, multipurpose social platform.

In fact, people at the time kind of mocked our acquisition because they thought that we dramatically spent more money than we should have to acquire something that was viewed as a--as--as--as a--primarily a camera and photo sharing app at the time. So, I--

KLOBUCHAR: --Okay. Well, I mean, here's the issue--

ZUCKERBERG: --I think it's important to distinguish--

KLOBUCHAR: --Though. We don't--we don't know how it would've done. And when we look at your emails, a kind of leads us down this road, as well with WhatsApp, that part of the purchase of these nascent competitors is to--I'll use the words of FTC Chairman Joe Simons, who just said last week a monopolist can squash a nascent competitor by buying it, not just by targeting it with anti-competitive activity.

So, I know that this is a subject of investigation. Maybe we'll be hearing something soon. But I think it's something that committee members better be aware of not just with Facebook, but what's been going on with these deals that have gone through and how it has led to more and more consolidation, and how we as the Senate, and I just talked to Chairman Graham about this last week, could actually do something about this by changing some of the standards in our laws to make it easier to bring these cases and not just involving tech.

So, I want to go to something here at the end, the political ad discussion we had in front of the Commerce Committee. Mr. Zuckerberg, I know you said that Facebook had made over $2 billion on political ads over the last few years. You--you said this was your--"relatively small part of your revenue." I know that, but it's kind of a big part of the lives of politics when that much money is being spent on ads.

This is a bill I actually have with Senator Graham. And yet, we have seen these political ads that keep creeping through despite your efforts to police them on your own. And this is why I would so badly like to pass the anise--Honest Ads Act. One ad that went through, it says, and three battleground states, ballots marked for Donald Trump had been discarded. Poll, will voter fraud only increase closer to November?

So, it stated in three battleground states, a paid ad, ballots marked for Donald Trump have been discarded. This played between September 29th and October 7th, 2020, had up to 200,000 impressions. Does this ad violate Facebook's policy?

ZUCKERBERG: Sorry. Can you repeat what the ad was?

KLOBUCHAR: The ad was an American Action news ad. They've advertised a lot on your platform. And it said in three battleground states, ballots marked for Donald Trump had been discarded. This was pre-election.

ZUCKERBERG: Senator, I--I don't know off the top of my head if that specific ad violates our policies. I'd be happy to--to follow up--

KLOBUCHAR: --Okay. Could you--

ZUCKERBERG: --Afterwards on that--

KLOBUCHAR: --Would you commit to a policy where actual people's eyes, people could review these ads instead of just being hit with algorithm review?

ZUCKERBERG: Senator, we--we do have review and verification of political advertisers before they can advertise.

KLOBUCHAR: Okay. So, does every ad to go through a human being, like the--

ZUCKERBERG: --Senator, I don't know if--

KLOBUCHAR: --TVs do and--

ZUCKERBERG: --Every--

KLOBUCHAR: --Hmm?

ZUCKERBERG: I--I think every--every--our policy is that we want to verify the authenticity of anyone who's--who is doing political or social issue advertising. And I think it's worth noting that our people reviewers are not in all cases always more accurate than the--than the technical systems.

KLOBUCHAR: Okay. So, are you saying--

ZUCKERBERG: --So, I agree that there is something that's--

KLOBUCHAR: --That a human being reviews every ad? It's just really yes or no or I don't know. That's--it's--

ZUCKERBERG: --I--I--Senator, I don't know.

KLOBUCHAR: Okay.

ZUCKERBERG: I don't think so.

KLOBUCHAR: Well, we'll follow up then in the written. And then you brought the cease-and-desist order against NYU for publishing a report that--noting over the last two years Facebook had not properly labeled approximately 37 million political ads. Why would you not support this project? Why would you bring a cease-and-desist against them?

ZUCKERBERG: Senator, is that the project that was scraping the data in a way that might have been against the FTC--

KLOBUCHAR: --That's your definition, but it's--

ZUCKERBERG: --FTC consent decree that we--that we have to protect people's privacy?

KLOBUCHAR: The reason is happening is we haven't passed the Honest Ads Act, but--so, they're trying. They're not violating privacy. They're trying to get the ads so people can see the ads, other campaigns, journalists, every one.

ZUCKERBERG: Senator, you know that I support the Honest Ads Act and--and agree that--that we should--that we should have that passed, and even before that that we've implemented it across our systems. But I think in the case that you're referring to, that project was scraping data in a way that we had agreed in our FTC consent decree around privacy that we would not allow. So, we have to follow up on that and--and make sure that we--we take steps to--to stop that violation.

KLOBUCHAR: Okay. Last, Mr. Dorsey, do you think there should be more transparency with algorithms as part of this is not just--and I'm off of the ads now. I'm--I am on just generically.

Part of this is that people don't know how this data is going across the systems and across the platforms. And people basically are buying access, has been my impression, so that even if you say, like, what's the news in the last 24 hours, old stuff comes up. Something's gone awry from the beginnings of this. Would it be helpful, do you think, if there was more transparency with algorithms?

DORSEY: I--I do think it would be helpful, but is technically very, very challenging to enforce that. I think a better option is providing more choice to be able to turn off the algorithms or choose a different algorithm so that people can see how it affects one's experience.

KLOBUCHAR: Okay. Thank you. And I ask that both of you look at the bill that Senator Kennedy and I have, the Journalism Competition and Preservation Act, to help the content providers negotiate with digital platforms. Thank you.

GRAHAM: Thank you. Senator Tillis.

TILLIS: Thank you, Mr. Chairman. Thank you, gentlemen, for joining. Mr. Chairman, I know you've asked the question a couple of times about whether or not these platforms can be addictive. I--I think they probably can be, based on what I've read in--in one of two ways. They could be just the nature of the personality and engagement in a tool that can--that they can somehow relate to. But I also think there is a transactional addiction.

And I think you also mentioned Social Dilemma. I think that's the use of analytics which I don't criticize, among the--the platforms, but it's the use of analytics to addict you to go down a certain path to produce a certain outcome. And that could either be an outcome forming an opinion or an outcome buying something you didn't even think about 30 minutes before you started going down that path. So, I think there are things that we've got to look at, and I do agree with Mr. Zuckerberg and Mr. Dorsey. It's not conclusive, but common sense would tell you it's a--it's a problem already and it could become a bigger problem.

Mr. Zuckerberg, we--I--I'd like to go back to the--the Task platform for a minute. When I looked at the--the screenshot that Senator Hawley put up, it looked a lot like a work management tool. Can you tell me a little bit about that and how many people are actually engaged as users on that platform at Facebook?

ZUCKERBERG: Senator, yes. Thank you. I--I was a bit surprised by Senator Hawley's focus on our Task system, because all this is, it's a--of the basic internal project management tool. It's exactly what--what the name sounds like. It's used by companies--by--by people across a company thousands of times a day to assign projects and--and track them. It's used for all manner of different types of--of Tasks across different people and teams.

TILLIS: And do you know roughly how many Facebook either contractors or--or full-time employees are actually users of the Task platform?

ZUCKERBERG: I think that probably the majority of Facebook employees and people we work with have some interaction with the Task system as--as part of some part of their work. It's--it's basically just a companywide to-do list.

TILLIS: The--the other platform that Senator Hawley mentioned was the CENTRA platform. You said you weren't familiar with that one, but I think that is something that would be helpful, maybe as a follow-up, to really understand the nature of that platform. I won't pressure on it today because you said you weren't specifically familiar with the name of the--the tool, but I would be more interested in how it's used.

But Mr. Dorsey, does Twitter have a platform similar to the Task platform for work management communication among staff?

DORSEY: Absolutely. I mean, a--a--even the smallest companies use these tools. We use a tool called Jira.

TILLIS: Yeah. I was involved in implementing these in--in my time technology sectors, so I could see why you have these platforms.

But Mr. Zuckerberg, you mentioned you didn't think there was a systematic coordination between Google and Twitter but you could conceive of how people in similar professions you know may have a discussion, have a relationship, maybe talk about it over a beer or so could you see why--how the skeptic could see how these platforms could be used across platforms to force certain outcomes?

Let's say you had 100 people at Facebook, 100 people at Twitter and 100 people at Google that all had a political event, they get together, they share notes and then they go back and make decisions that could make it appear like it's a corporate initiative but it could be an initiative by may be some well-intentioned but misguided staff. Could you at least conceive of that being possible?

ZUCKERBERG: Senator, I--I understand the concern and I think that coordination specifically on writing the policies or enforcement decisions could be problematic in the way that you are saying which is why I really wanted to make sure that it was clear that what we do is share signals around potential harms that we are seeing whether it's you know specific content in the aftermath of that terrorist attack that people are trying to share virally so that way if one platform is seeing it another platform can be prepared that they will probably see that content soon, to; you know signals around foreign interference in elections but I think it's quite important that each company deals with those signals in the way that is in line with their own policies and that I think is very different from saying that the companies are kind of coordinating to kind of figure out what the policies should be.

I understand what the concern would be around that and that is why I wanted to be clear about what we do and don't do there.

TILLIS: No, I agree with that I would find it horribly irresponsible to think that this was some sort of a systematic approach across the platforms but just with the sheer numbers of people that you all employ now I could see how some of what has been suggested here in the hearing could actually occur with just small groups of people trying to manipulate certain outcomes. You know I don't want to get into details there except to know that these--the Task platform if it is similar to ones that I have experience with has a lot of logging has a lot of data to where maybe you could do yourself a service by saying you know I hear what has been suggested here but in analyzing the interactions between groups of people and seeing may be some aberration some people being more active and more geared towards one outcome or another it could actually help you a leave some of our concerns with the way these platforms are being manipulated.

I'm not going to have time to drill down into some of the specific questions. I am glad to hear that you all are open on some regulatory outcome. I will tell you if you listen to my colleagues on both sides of the aisle today I fully expect that Congress is going to act in the next Congress, that we are going to produce an outcome and some people think that that's not possible because maybe the Republicans and Democrats are far apart but if you listen to what they are asking you they are concerned with the kind of outcome that they didn't like on social media in equal measure.

So I do believe that you would be well served to come to the table as--as an industry and identify things. Mr. Zuckerberg I like what you have said about transparency and Mr. Dorsey I do think that the algorithms when you talk about the sheer scale are probably the most sustainable way to go but we are still going to have to have some confidence. I like your concept of choice as well but we are going to have to have more visibility into what has occurred and what has produced certain outcomes like a Veterans Day post that I did after the election. It was actually after my opponent had conceded.

I just posted a picture thanking veterans and for a period of time I think it was suspended and directing people towards election results. I would like to think if that was a result of an algorithmic decision that my opponent who almost certainly posted a veterans ad and every other person who was up for election got a similar treatment because if they didn't it would seem to me that there was some other factor in place if these algorithms are being applied to the base of in that case political commentary from elected officials or candidates.

So I--I viewed this hearing as an opportunity to seek your commitment on two things. One I mentioned to you all yesterday. I have got an intellectual property subcommittee hearing in the middle of December. I would like to have a Facebook and Twitter representative there. I know you are very different platforms but I think you play very prominently in a hearing that Senator Coons who is sitting across from me now would like to have you represented it. I think I can speak for Senator Coons that that would be helpful and we would like to get your commitment to have witnesses for that hearing in the middle of December. Mr. Zuckerberg, can I get that commitment?

ZUCKERBERG: Senator, yes, we will make sure that we have the right subject matter expert to join your--your hearing.

TILLIS: Thank you. And, Mr. Dorsey?

DORSEY: We will follow up with determining the best course of action.

TILLIS: Thank you and then we will be following up on a series of questions that I would like to ask that let me get my head around some of the analytics information that I think you almost certainly have and hopefully be willing to share it but we will do that in a collaborative way in my office. Thank you for being here today.

GRAHAM: Thank you. We are going to take a five-minute break. I think our witnesses have requested a break and they certainly have earned it, and if that's okay with you, Senator Coons, we will come back in about five minutes.

[*]GRAHAM: Do we have our witnesses on the other end? Mr. Zuckerberg? Mr. Dorsey?

UNKNOWN: We got both.

GRAHAM: We got both. Thank you. Sorry we went so long with that break. Senator Coons.

COONS: Thank you, Mr. Chairman. In the last four years, we have seen some unprecedented attacks on our Democratic institutions, our social norms, the ways in which we conduct ourselves in this democracy and many would say on--on truth itself. And in today's society, you can't talk about truth without also considering the impact of social media and social media platforms.

So if I might, Mr. Zuckerberg and Mr. Dorsey, free expression and open debate are of course core values of our society, but whether you wished for it or not, the inescapable fact is your algorithms, your policies, and your business decisions shape what billions of people across the world and a working majority of people here in our nation understand to be true. That's the case for election integrity, for potential COVID-19 vaccine, for climate change, for hateful and dangerous stereotypes and many other critical issues.

I also want to recognize that it in no small part was the hard work of many led by your ingenuity and resolve that built these impressive American companies and revolutionized the way the world communicates. We need that same resolve to reckon today with what must be done to win our societies battle for truth.

Mr. Zuckerberg, as you know, yesterday I sent you, along with 15 of my--14 of my colleagues, a total of 15 senators, we sent you a letter urging Facebook to do more to address hate speech and calls to violence from the platform. We focused particularly on anti-Muslim bias--bias on an issue that warned specifically specific attention given the tragic consequences of anti-Muslim hate speech in Myanmar and Sri Lanka and New Zealand and right here in the United States. And I appreciate that Facebook has taken actions in response to these issues, but this--this letter points out why we need better metrics and transparency to actually evaluate your actions.

So my colleagues and I urge better enforcement in particular of your call to arms policy, which could have made a difference in a recent tragedy in Kenosha, Wisconsin. You and I spoke last week. I appreciated our conversation. Can I count on you to provide specific and written responses to each of the questions in this letter and then can we discuss them again?

ZUCKERBERG: Senator, yes. I--I read your letter and I commit to getting back in detail with our team to address the important topics that you've raised and one of your questions that I can actually answer right now, I think it was your second question, about reporting in our--in our quarterly transparency reports about the prevalence of hate speech that we find on our platforms. We will actually be adding that metric into our transparency reports this Thursday when we announce our--our latest round of--our latest transparency report.

COONS: Thank you, Mr. Zuckerberg. Let me--let me just make sure I hear you right about prevalence because that's one of my areas of concern is the absence from the report of the prevalence of hate content. You mean you will be reporting not just what percentage of hate speech on the platform you're identifying, catching, proactively removing, but the total volume?

ZUCKERBERG: Senator, it's my it's my understanding is the, yeah, the prevalence of that content is a percentage of content on the platform. And over time, our goal is going to be to get into more detail, which is the subject of some of the questions that you've asked here as well as we've already committed to an independent audit of the community standards enforcement reports so that way people can have full confidence in all of the numbers that we're putting out. And we've been doing this reports for less than a few years now and will continue to flesh them out and add more details. That way people can--can apply the appropriate oversight and scrutiny to the work.

COONS: Thank you. I want to move on for a moment if I could about your call to arms policy. You said earlier today that Facebook made an operational mistake in not taking down an event page that called for people to bring weapons to a public park in Kenosha. As I think we all know, there was a tragic incident of vigilantism in Kenosha where a young man brought his AR-15 from Illinois to Kenosha and ended up with two protesters dead and one injured.

You indicated this was because this operational mistake was because Facebook had just adopted its militia policy a week earlier and contractors without specialized training didn't pick up the violation. And I appreciate your frankness as to that in your answers to questions earlier today from Senator Durbin.

But your response to Senator Durbin didn't mention that the event page also violated a separate call to arms policy in place for over a year that contractors aren't tasked to enforce. So I just have to ask as a follow up, why didn't you before and also today reference the call to arms policy when reviewing what went wrong in Kenosha?

ZUCKERBERG: Senator, my understanding is that that post did not necessarily violate that call to arms policy at the time. The culture arms policy is not--does not prohibit anyone from saying, you know, let's--let's go get our guns and do something. You know, for example if people are organizing a hunting trip, that's obviously not going to be something that should be against the policies. But what we do on some of these--on some of these policies, which I think it's--I'm glad to get the opportunity to address this.

Some of these are context specific and just require a higher level of context and expertise in the area to enforce. So we don't necessarily have all of the 35,000 reviewers assess every single one of these policies. So I can follow up in more detail if you'd like on the call to arms policy and the nuance there. Specifically, but that's also a bit on how we operationalize these policies.

COONS: Thank you for that answer. I do want to follow up because just facially, it seemed to me that this was a violation of your own call to arms policy, but I look forward to that--to that conversation. Mr. Dorsey, if I might, at a House Energy Committee hearing I think it was two years ago, you committed to something that I was just discussing with Mr. Zuckerberg, an independent civil rights audit, but in your case, of Twitter.

The audit released by Facebook in July has proven invaluable to bringing sunlight to some key areas in which Facebook does need to improve. Will you follow through on your commitment and commission to this independent audit of Twitter?

DORSEY: So we so we work with civil rights groups all over the country and around the world to get feedback. We are in constant conversation with them and we do believe that being more transparent and making our transparency report a lot more robust, which today we still have some gaps is important for any entity to audit independently of us. We believe that's important because an audit like that could take away from the work that we need to do. We'd rather provide the information in a raw format so that people could do that work.

COONS: If I heard you right, you aren't going to pursue an independent civil rights audit, but you are going to continue to release data and to consult with civil rights groups. I'd--I'd welcome a more thorough answer as to in which way having an independent outside audit would actually harm your transparency efforts.

DORSEY: I don't mean it would harm it, I mean that we--we want to provide enough information so that people can do this work independently of us on their own timelines.

[*]DORSEY: And that's where we need to make our transparency report more robust and as I said, we have regular conversations with these groups and take feedback regularly.

COONS: You do, Mr. Dorsey, have policies against deepfakes or manipulated media, against COVID-19 misinformation, against things that violate civic integrity, but you don't have a standalone climate change misinformation policy. Why not?

DORSEY: Well, misleading information, as you are aware, is a--is a large problem. It's hard to define it completely and cohesively. We wanted to scope our approach to start to focus on the highest severity of harm. We focused on three areas, manipulated media, which you mentioned, civic integrity around the election, specifically in public health specifically around COVID.

You know, we wanted to make sure that our resources that we have had the greatest impact on where we believe the greatest severity of harm is going to be. Our policies are living documents. They will evolve. We will add to them. But we thought it important that we focus our energies and prioritize the work as much as we could.

COONS: Well, Mr. Dorsey, and I'll--I'll close with this, I just--I cannot think of a greater harm than climate change, which is transforming literally our planet and causing harm to our entire world. I think we're experiencing significant harm as we speak. I recognize the pandemic and misinformation about COVID-19 and manipulated media also cause harm. But I'd--I'd urge you to reconsider that because helping to disseminate climate denialism in my view further facilitates and accelerates one of the greatest existential threats to our world. So, thank you to both of our witnesses. Thank you, Mr. Chairman.

GRAHAM: Senator Ernst?

ERNST: Thank you, Mr. Chair. And Mr. Zuckerberg and Mr. Dorsey, thank you both for being here with us today virtually and for your commitment to constantly improving the way your platforms are serving people across the country.

There has been a lot of talk today, many of us have been listening from our offices or online, about the censorship of ideas and news on your platforms. And these are the things that have been at the forefront of Americans mind's in the lead up to the election, as well as the weeks since our 2020 general election.

And, you know, the people that--that I hear from, of course, believe that conservatives were wrongfully being silenced while those on the left that--were given basically free reign of your platforms. And one of the points of contention that is often brought up is that you do recruit heavily from California, which leads to your employee base skewing quite heavily to the left.

So, my first question is for both of you. Do you have concerns about your ability to monitor disinformation on both sides of the political aisle equally, given that the majority of your employees typically do lean towards the more progressive side? And again to both of you, have you taken any steps then at all to make your employee base more representative of the country as a whole when it comes to political affiliation? And Mr. Zuckerberg, if we could start with you, please.

ZUCKERBERG: Thank you, Senator. I think that this is a--those are both really important topics. In terms of assessing what is misinformation, I think it's important that we don't become the deciders on everything that is true or false ourselves, which is why we tried to build a--a program of independent fact checkers that we can work with on this.

And those facts checkers are accredited not by us, but by the--the independent Poynter Institute for--for Journalism as--as part of the international fact checking network. And it includes fact checkers that I think span the political spectrum, as well as I think the majority of them who--who call themselves apolitical. So, we've tried to address the--the issue of--of making sure that there isn't a bias in our actions by actually having us not be the deciders on that type of content ourselves.

And to your second question about taking steps to diversify the--the employee base, we--we--we--this is a--a sensitive area and that I don't think it would be appropriate for us to ask people on the way in as they were interviewing what their political affiliation is, which of course makes it hard to know what the actual breakdown of the--the company is on this.

But one of the areas where I'm more optimistic over time is I think we're going to see more people working remotely around the country and--and also around the world, which will mean that fewer people and smaller percent of our employees will have to come to, you know, the--the see these and--in areas like the Bay Area where our headquarters is, and we'll be able to employee an increasing number of people across all the different geographies in the country.

ERNST: Very good. Thank you. And Mr. Dorsey?

DORSEY: First and foremost, the most important thing is that we--we build systems and frameworks independent of any one particular employee or individual in our company. And inclusive in--included in that system are checkpoints, checkpoints to make sure that we are removing any bias that we find, checkpoints to do QA and monitoring of all the decisions that we make, having an appeals process which is an external checkpoint on whether we made the correct enforcement action or not. So, we want to build something that's independent of the people that we hire, and that is our focus building a system.

Second, like Mark, I'm really excited that we are at a stage where we can decentralize our company even more, that we do not need people to move to San Francisco, that we can hire people all over the country. They can stay wherever they want to be, where they--wherever they feel most creative. And that's not just in this country. It's around the world.

And I think the tools are in a state where we can do that more easily. We've obviously been forced to do it with COVID. And I don't think it's a--a state that we will return from. With--the days of having one centralized massive corporate headquarter in any one particular city are certainly over for us at least and I think many other entrepreneurs starting companies today.

ERNST: Yeah, very good. I really appreciate that, and--and I think that COVID has taught us all a very important lesson. And for those to be able to work remotely, I think you will find greater diversity in thought, which is very important, I think, for the types of platforms that you both represent.

Now, I'd like to move on to an entirely different topic. And since I bolt--began my career here in the Senate, I have been committed to of course protecting those who need it most. And--and folks, our--our children are the most in need, and it's our job as lawmakers to respond to the ongoing threats against them.

And social media has created a whole new world for--for all of us, and it can help us share that information and resources with the public about human trafficking and child exploitation, and it can also help us keep track of sexual predators and ensure our children are safe from those known threats. And in fact, I've been working on legislation that would help update what information sexual predators have to provide about their online identities.

And as we all know, however, social media can also be incredibly harmful child sexual abuse material, CSAM, is present on nearly every single social media platform that exists. And in such polarized times, I am grateful that it is this subject that we do find--it doesn't matter if you're on the left or the right. We can come together to find solutions for this issue.

And Mr. Zuckerberg, I know that you and I touched upon this briefly last week will we spoke over the phone. And I do hope, Mr. Dorsey, that you also share Mr. Zuckerberg's commitment to fighting these types of issues on your platforms.

So, just very briefly here as I'm running out of time, but Mr. Zuckerberg, I do understand that Facebook is planning to out foot--outfit Facebook Messenger with end-to-end encryption. And how do you hope to prevent the dissemination of child sexual abuse material if neither law enforcement nor you can access that Messenger data? Is there some sort of apparatus that you will have in--in place that can help law enforcement with those situations? And then Mr. Dorsey, we'll go to you next as well.

ZUCKERBERG: Senator, thank you for this. I think you are--you are right on--on every count of what you just said, both that child sexual exploitation is--is one of the gravest threats that we focused most on, and it is also an area that will face new challenges as we moved to end-to-end encryption across our--our messaging systems.

[*]ZUCKERBERG: Of course the reason why we are moving to encryption is because people want greater privacy and security in their messaging systems and over time we are choosing systems that can provide them more privacy and security and that is something that I think it makes sense for us to offer. I think encryption broadly is good but it is going to mean that we are going to need to find and develop some new tactics.

A lot of what we have found around the best ways to identify bad actors on our system is not actually by looking at the specific content itself but by looking at patterns of activity and where is it that so you can flag and review that and we have grown increasingly sophisticated in that, that goes across the foreign interference prevention work that we do and it also will be a factor here and I would be happy to follow up in more detail on what we have planned but overall I would say that this is something that we are very focused on and I--I agree with your concern.

ERNST: Okay, thank you very much and Mr. Dorsey you as well. So those that are on Twitter making sure that law enforcement would have access if at all possible if you could give me an overview of that please.

DORSEY: Yes, child exploitation is absolutely terrible and we don't tolerate it on our service at all. We regularly work with law enforcement to address anything that we see inclusive of the patterns that Mark has mentioned. The majority of Twitter is public so we don't have as much activity in private channels so it is a different--a different approach but it is still you know we still see the same activity and we--it is one of our highest priorities in terms of severity of harm.

ERNST: Thank you both very much for being accessible to us today. I truly appreciate your input. Mr. Chairman, thank you.

GRAHAM: Thank you and Mr. Zuckerberg I really want to appreciate what Facebook has done in the area of sexual exploitation of children. You all have done a very good job of trying to help law enforcement in that area. Senator Hirono?

HIRONO: Thank you, Mr. Chairman. Mr. Zuckerberg for the second time in three weeks you have been called before the Senate committee so my Republican colleagues can beat you up over claims that your platforms are supposedly biased against conservatives. The fact of the matter is that these allegations are completely baseless.

Everyone who has systematically looked at the content on social media from Media Matters to the Cato Institute to former Republican Senator John Kyl has found absolutely no evidence of anti-conservative bias and data from proud to tangle(SP) showed that far right content from the likes of Fox News, Ben Shapiro, David Bongino dominates the daily top 10 most engaged pages on Facebook so all of these allegations about the fact that you hired or all of your employees are left of center is relevant of nothing, certainly not relevant on some sort of anti-conservative bias in terms of your content moderation.

So the way I see it this hearing is a transparent effort by my Republican colleagues to work the refs and unfortunately in my view it is working. Two weeks ago the Washington Post reported that Facebook has bent over backwards to avoid claims that it was biased against conservatives and it removed a strike against Donald Trump Jr's Instagram account that would have penalized him as a repeat offender. Currently one of several strikes removed from the accounts of Trump family members. For Trump's super PAC, American First Action, was allowed to post material rated false by Facebook's third-party fact checkers without penalty and these are a few examples and they are nothing new.

In 2019 Facebook included Breitbart a website described by its co-founder as a platform for the alt-right as one of its trusted news sources. Early in 2019 Facebook selected the Daily Caller another site with white nationalist ties to being one of its third party fact checkers and the Wall Street Journal has reported how Joel Kaplan(SP) former deputy chief of staff to George W. Bush stopped changes designed to make Facebook's algorithms less divisive because the changes would have disproportionately effected conservative users and publishers according to Kaplan. So Mr. Zuckerberg you founded Facebook, a company with a market capitalization of approximately $80 billion, and you control majority share of the company's voting stock.

Mr. Zuckerberg I am really wondering at what point--at what point you will stop giving into baseless claims of anti-conservative bias and start exercising your control over Facebook to stop driving division and actually build community and bring the world closer together" as you claim is Facebook's mission. My question is to both of you. A recent Harvard study found that President Trump was the single biggest source of voting related misinformation in the run-up to the presidential election. Since the election President Trump has only continued the lies on Twitter and Facebook falsely claiming that he won reelection and that the election is being stolen from him.

But the truth is Joe Biden won the election as major news networks and the Associated Press have confirmed. In response to President Trump's lies you have at most added a warning label while still allowing the presidents misinformation to remain online. In response to questions from Senator Feinstein you defended the labels claiming you appoint people to a broader conversation around the election. I have serious questions about the effectiveness of these labels particularly since President Trump and his allies continue to spread their lies.

For both of you, what evidence do you have that these labels are effective in addressing President Trump's lies? Response please.

DORSEY: So and I think Mark mentioned this as well earlier we are doing a retrospective on the effectiveness of all of our actions through the election. We believe the labels point to as you said a broader conversation that people can see what is happening with the election and with the results. We don't want to put ourselves in a position of calling and election, that is not our job so we are pointing to sources and pillars that have traditionally done this in the past and that is the intention of the policy, that is the intention of the labeling system.

HIRONO: Mr. Zuckerberg?

ZUCKERBERG: Senator, we view the additional context that we put on the post as part of an overall response effort to make sure that people have reliable information about--about the election so we don't expect that it's just going to be when people are seeing a post that may be casting doubt on a legitimate form of voting or may have misinformation that we can correct and help people understand how they could really vote for example so that is

why we put the voter information's enter prominently on the top of Facebook and Instagram four months leading up to the election and kept it up afterwards so people can see reporting on the results.

As I mentioned in my opening statement 140 million Americans visited that and I think this was the largest voting information campaign in the history of our country so I think when taken together these actions were quite strong of an effort to communicate accurate and reliable information to people at the times when they needed it about how they can vote in the election, encouraging them to vote, having confidence in the election system, knowing who and--and when the election had been called. That's just part of an overall picture.

HIRONO: My time is running out and so all of the information, the actual information of voter information you provide that is good but we are talking about all of these misinformation and actually outright lies put out by the President and you have these labels and I really have questions as to whether or not this kind of labeling and I'm glad that at least Mr. Dorsey is determining whether these labels do anything to actually create a larger framework for discussion.

I really seriously consider beyond a doubt whether that is actually happening. Since I am running out of time I just wanted to get to, you know Donald Trump is president do consider post get on (PH) whether they contain misinformation especially whether he won the election and COVID, you name it the fraudulent elections that he alleges. What are both of you prepared to do regarding Donald Trump's use of your platforms after he stops being president? Will he still be deemed knows newsworthy and will he still get to use your platforms to spread this misinformation?

ZUCKERBERG: Senator, let me--let me clarify my last answer we are also having academic study the effect of all of our election measures and they will be publishing those results publicly. In terms of President Trump and moving forward there are a small number of policies where we have exceptions for politicians under the principle that people should give to hear what their elected officials are saying and candidates for office but by and large the vast majority of our policies have no newsworthiness or political exception.

So if the president or anyone else is spreading hate each or inciting violence or posting content that delegitimizes the election or valid forms of voting, those will receive the same treatment as anyone else saying those things. And that will continue to be the case.

[*]HIRONO: Remains to be seen. Mr. Dorsey?

DORSEY: Yeah, so we do have a policy around public interest where are our global leaders we do make exceptions in terms of whether if a tweet violates our terms of service, we leave it up, but we leave it up behind and interstitial and people are not--not allowed to share that more broadly. So a lot of the sharing is disabled with the exception of quoting it so that you can add your own conversation on top of it. So if an account--somebody becomes--is not a world leader anymore, that particular policy goes away.

HIRONO: So I am running out of time, but you know, I have--Mr. Chairman, I'd like to enter into the record a number of studies, particularly on November 1st 2020 article in the Washington Post titled Trump Allies Largely Unconstrained by Facebook's Rules Against Repeated Falsehoods Submit Pre-Election Dominance, a May 26 2020 article in the Wall Street Journal titled Facebook Executive Shut Down Efforts to Make the Site Less Divisive, three studies from Media Matters finding no anti-conservative bias on Facebook and an article by Dr. Francesca Tripodi titled No, Big Tech Isn't Silencing Conservatism. I would like to enter these items into the record.

GRAHAM: Without objection. Senator Kennedy.

KENNEDY: Thank you, Mr. Chairman. Gentlemen, each of you has founded an extraordinarily successful company. And they're both American companies and I think I would be remiss if I didn't say congratulations. I'm very proud of the fact that it was American ingenuity that did this.

I think we can also both agree that both Twitter and Facebook have enormous power as a result of your success. You're not--you're not companies, your countries at least in terms of power. I want to--I want to test a point of view here. I'm unsure I subscribe to it, but I want to get your thoughts on it. Mr. Dorsey, do you believe everything you read?

DORSEY: No.

KENNEDY: Why not?

DORSEY: I think it's healthy to have skepticism about everything and heavy mindset of verifying it and using as much information as possible to do so.

KENNEDY: Do you have somebody on your staff who protects you from reading things that they think you shouldn't?

DORSEY: No.

KENNEDY: Mr. Zuckerberg, do you believe everything you read?

ZUCKERBERG: No, Senator.

KENNEDY: Why not?

ZUCKERBERG: Because a lot of things are incomplete or incorrect.

KENNEDY: So you exercise your own judgment?

ZUCKERBERG: Yes, Senator.

KENNEDY: Okay. Do you have somebody on your staff whose job is to filter things that they think you should not be reading?

ZUCKERBERG: Senator, not--not externally, although I would hope that the teams that I work with internally do their best to make sure that the information that they're presenting me with are always accurate.

KENNEDY: Okay. I want to--here--here is a point of view. I'm not sure I subscribe to it, but it is a legitimate point of view I think. And I'd like to know your thoughts on it. You have both, and this is directed to each of you, you have both Democrats and Republicans upset with you.

The Democrats are upset with you, this point of view holds, because they want you to publish, I'm not using that word as a--as a term of art or science here with any special meanings. The Democrats want you to publish stuff on your platforms that they agree with but they don't want you to publish stuff that they disagree with.

And this point of view also holds that the Republicans are upset with you because they want you to publish things on your platforms that they agree with, but they don't want you to publish stuff on your platforms that they disagree with. What if we had a rule--what if your companies had a rule, this is a question, not a suggestion, what if your companies had a rule that said okay, people aren't morons. I would like to treat people as they treat me. That is that I can read what I want to read and exercise my own good judgment about whether I choose to believe it.

So here's the rule we're adopting. If you go on Twitter or Facebook, you can't bully people, you can't threaten people, maybe this is a subset of both of those, but you can't commit a crime with your words, and you can't incite violence. But other than that, you can print any damn thing you want to and we'll let our users judge. Give me your thoughts on that.

DORSEY: Those are generally the rules we have. I mean, our--our focus on these policies, Senator--

KENNEDY: --No you don't, Mr. Dorsey. Excuse me for interrupting, but you're censoring like right and left trying to make both sides happy and you're making neither side happy.

DORSEY: No, that's not the intention. The intention is to--

KENNEDY: --I know it's not the intention, but it's--the intention, but it's the result.

DORSEY: I can see why you might say that and why you might perceive that, and that's why we--we, you know, we do think it's important that we add more transparency to how we moderate content, that we give more control to individuals to moderate their own content and focus on our rhythms. But a lot of our policies are focused on making sure that people feel that they can express themselves in the first place and not driven away. Everything you mentioned about bullying, about harassment around illegal content or violence, incitement of violence, that is what our policies are and that is our intent--

KENNEDY: --I know. And excuse me for interrupting, but my time is limited because--and I want to hear from Mr. Zuckerberg, but you're not just doing that. You're--you started to censor content. Why not have both Mr. Biden and Mr. Trump able to say whatever they want to on their platform? Mr. Zuck--so long as they don't threaten, bully, incite violence, commit a crime?

I'm not justifying the use of either Twitter or Facebook to--to hurt the Rohingyas. Mr. Zuckerberg, what are your thoughts on--on my suggestion? Get out of the censors that business other than the exceptions I talked about.

ZUCKERBERG: Senator, in principle, I agree with what you're saying, although I think that there are more categories of harm then just the ones that you've mentioned. So--but I think the basic principle behind what you're saying is a--a definition of free expression that says that people should be able to share their opinions broadly except if it's going to cause imminent or irreparable harm to another person, which, now, even the most ardent First Amendment supporters, you know, agree that you shouldn't be able to yell fire in a crowded theater if there's not actually a fire, right, because that could be put people in the risk of imminent harm.

So you mentioned terrorism, you mentioned Child Exploitation and bullying is forms of harm and I think a lot of the debate is around what are other forms of harm. For example, we are in the middle of a pandemic and--and we've assessed that misinformation about COVID and treatments that could put people in additional risk of getting the disease or not seeking the right treatment if they have it that those are also things that could cause imminent harm. We've taken the position that (INAUDIBLE)--

KENNEDY: --Mr. Zuckerberg, let me interrupt you and I really do apologize, but I'm going to be cut off in a second, and appropriately so. I'm not saying you're wrong by doing what you just described, but that makes you a publisher.

[*]KENNEDY: And that--that--that creates problems with section 230. And I--I just think it--one point of view is that at some point we--we've got to trust people to use their own good judgment to decide what they choose to believe and not believe and not--not--not try to assume that we're smart and they're stupid and that we can--we can discern believable information and information that shouldn't be believed, but everybody else is too stupid to do it.

GRAHAM: Okay.

KENNEDY: I'm done. Thank you, Mr. Chairman.

GRAHAM: I think you put your finger on a really--maybe the central issue, Senator Kennedy. It's how do we let people make up their own minds without what they're saying creating violence or threats to others, a very complicated endeavor. Senator Booker? Senator Booker?

BOOKER: Thank you, Chairman. Can you hear me, Chairman?

GRAHAM: Yes. And to our witnesses, we have two more senators and we'll be done, and I appreciate your patience. Senator Booker?

BOOKER: I--I appreciate that, Mr. Chairman and have appreciated listening to this--to this hearing. I really want to bring just focus back to what I think is why we're here, which is the 2020 election. And I've been saying in this committee for many months now about the--the tragic consequences of us normalizing things that should express considerable outrage.

There's not a person on this committee on either side that doesn't know who the next president of the United States will be. President-Elect Joe Biden and Kamala Harris will be the president and vice president of the United States come January 20th. But what is going on right now is dangerous and it is a threat to our democracy.

For the first time in American history, we are seeing a sitting president of the United States make wild and baseless accusations that undermine the democratic process, that don't just delegitimize it. What the president of the United States is doing is trying to thwart our democracy. As we speak, Donald Trump is waging an all-out war on the truth and our democratic systems.

And one of his weapons of choice in this disinformation war is social media and specifically the two gentlemen here, their platforms, Twitter and Facebook. You have the tools to prevent him from weaponizing these platforms to degrade our democracy and our democratic institutions and to cause such damage that, even after January 20th, it could be one of the first times that millions of Americans think and believe that this election was what is baseless--baselessly being charged by Donald Trump.

And so, let's be clear on what's happened. Donald Trump's shameful and shameless lies that are persisting about voter fraud and the outcome of this election were some of the most engaged content on social media in the days after the election. By one measure, during the week after the election, his post on Facebook made up all, every single one, of the topmost--top 10 most engaged post in the United States, and 22 out of 25 of the topmost engaged posts in our country.

And his number one post, the top of them all, was a false declaration of victory. On Twitter, his false--his--his tweet on falsely claiming victory was viewed by millions of users. This was and is not just a disinformation campaign by the president of the United States, but literally the most powerful person in our country doing an all-out assault on the constitutional ideal of a democracy that he was sworn to protect.

So, let's take a step back because I--I--I'd think this would be bipartisan if we look to what was happening in another country, if--if we saw--and I'm on the Foreign Relations committee, and I know how we come together on issues like this. If a strong leader--a strongman leader of a democracy had denied his loss in an election, in a democratic election, made consistent in constant baseless claims about fraud, if he fired military leaders while his foreign

minister talked about a smooth transition of the defeated leader's next term even potentially in jest, any government looking at this situation, including hours, would be putting out statements urging calm and calling for the peaceful transition of power, for the rule of law, for the honoring of democratic norms and traditions.

And so, we're seeing concrete consequences right now of President Trump's rhetoric. We are actually in the midst of the fourth-largest mass casualty event in American history. This is not something that should not be treated with calm and normalcy, but we all, people who believe in this country, should be standing up and talking about the consequences.

We have his political appointee, the general service administrator, refusing to designate Joe Biden as President-elect and provide the transition team the resources mandated by federal law. It wasn't that long ago that the 9/11 commission said that one of the things that undermined our ability to meet the terroristic threats to our country happened because of a transition that was undermined--or, excuse me, the--a transition that did not happen in the normal course.

President Trump's actions since Election Day should shock all of us, all of us who care about the welfare of our democracy, who care about our norms. And I hope the platforms here can maintain the highest levels of vigilance.

And so, to the gentlemen before us today, I'd like to ask specifically have you taken any steps to modify your platform's algorithms to ensure that blatantly false election disinformation posted by election officials and specifically the most powerful person in the United States, Donald Trump, isn't amplified, that his posts that might get a lot of interactions that are dead wrong don't somehow get boosted by your algorithms, if you could both respond to that as quickly as possible?

ZUCKERBERG: Senator, I'll--I'll go first. And--and I share your concern on this and I--I think it's unfortunate that we had to put in place a policy around premature or false declarations of victory. But--but we had to do that, and we--we anticipated this back in September when we put the policy in place.

And a lot of what we're trying to do is help distribute reliable information, which we attach both to posts on the topic by--by President Trump or any of the other candidates for--or elected officials who--who are talking on the subject. But more importantly, we put that reliable information, including about election results, at the top of Facebook and Instagram for everyone to see. And that supersedes, you know, what--what the algorithm or what newsfeeds chooses to show.

BOOKER: Okay, I--I--I appreciate that. I--I'd just like to get Jack's--this is information I know--Jack, if you want to just respond on the algorithm--excuse me, Mr. Dorsey, if you want to respond about the algorithms too, do you have specific measures that you're taking to prevent your algorithms from boosting false content?

DORSEY: Yes, sir. So, many of the labels did change how they algorithms amplify content.

BOOKER: And then, you know, President Trump right now is spreading dangerous misinformation about our electoral process. That's going on right now. And--and maybe if you guys--gentlemen would just cogently--through this process, this ongoing process right now, are there steps you will be taking that--that you have not already delineated as we are going into what could be very dangerous waters, unprecedented waters in this country?

Is there any additional steps that you will be taking right now in the coming days or weeks to stop the further amplification and undermining of our--of our--of our democracy? We are--we are heading potentially--depending upon the behavior of a president who shown himself to be erratic, are there steps that you are prepared to take in the--in the coming days and weeks to address this misinformation that we are seeing as coming in an unrelenting manner? Mr. Zuckerberg?

ZUCKERBERG: Senator, yes, we're--we're--we're--this is unfortunately an eventuality that we--that we planned for. And we've taken a number of steps not just including the fact checking program that--that we have set up broadly, but we've stopped recommending all civic and political groups, as an example, because of the risk of misinformation or--or--or harm growing there. We have temporarily caused a political ads because of a risk of--of potential abuse or kind of inflaming tension or--or potential unrest or--or violence.

And there are number of other steps that we've taken like this as well that we've done in other countries when there are risks of civil unrest and that we've shown--

BOOKER: --Thank you--

ZUCKERBERG: --Have worked. So, I--I'd be happy to follow up in--

BOOKER: --Yes--

ZUCKERBERG: --In some detail on all of the steps--

BOOKER: --I appreciate--

ZUCKERBERG: --That we're taking there.

BOOKER: Thank you. Your team has--has been helpful. Mr. Dorsey, any new steps that you want to give me? And I'm now treading on the indulgence of the chairman, if you could do really cogent new steps?

DORSEY: We are going to continue to remain diligent around our enforcement of civilian integrity. I think it is really important that we stay agile and that we learned. We need to learn about like the effectiveness of this work and how to carry it forward.

BOOKER: Right, and--and if the chairman would indulge me in one more sort of question to Mr. Zuckerberg I was really pleased that the group Stop the Steal, which was a group formed on Facebook with this information trying to delegitimize the election, I was grateful that you all suspended that account after 24 hours but I am concerned about what lessons you have learned because clearly outside groups like the Center for Countering Digital Hate flagged that groups' post containing calls to violence hours before Facebook did.

And I am wondering what--what you all have learned about speed. There's an old saying that a lie can travel halfway around the world while the truth is still putting its pants on. What does Facebook really factor in in terms of speed and trying to combat surges of disinformation about this group and--and maybe another example additional sort of addendum to that question Mr. Zuckerberg you know Mr. Bannon's Twitter for example was permanently suspended Mr. Bannon's Twitter account and suspended his shows Twitter account after he made her rend this steps about acts of violence against Dr.-Dr. Fauci and FBI director Wray.

But not only had I guess I am just simply asking why would Facebook not take similar steps and a similar stand so Mr. Zuckerberg very cogently could you talk about that speed issue and then I--when your platforms diverge I--I am really wondering why one platform in Twitter saw that as a standard to remove but you all have left--did not follow in that decision.

ZUCKERBERG: Thanks, Senator. I am happy to address both of those. On speed you are certainly right that that is important and part of what we focus on is figuring out which types of messages or things that are going to go viral quickest because you--it's not just about trying to get to everything within you know five hours for example it's actually much more important to get to the harms that are going viral quickly within an hour even if some things that are probably not going to get much distribution at all might be de-prioritized for a little bit longer.

So I think making sure that we stay on top of what are the hashtags, what are the groups, what are the messages, who are the bad actors who are trying to spread this content and as we see the thready evolving we are typically able to devolve and move faster as well so we are very focused on that.

GRAHAM: Thank you very much. Anything--

BOOKER: Mr. Chairman if I could ask you I just want to give you an amen Chairman Graham the second part of back question I would love to get on the record but I just want to say to you, you mentioned earlier and I know you said that Chairman Graham will be chairman again but I think you really said something really important earlier about the effects of social media platforms on our kids universally I can cite many studies like the University of Pittsburg we said that kids were on social media at about twice the rates of eating disorders and image concerns.

I just real would really say and I know the two gentlemen there would welcome the opportunity to come and discuss that perhaps with other experts but there is something really going on in terms of the self-esteem and well-being and even flourishing of our children who are deeply affected by these platforms whether you want to use a typical term like addiction or not there is enough evidence that these platforms and the children's engagement on them is causing heightened levels of sort of a deleterious effect on their well-being and I would love it if we could do such a hearing sometime soon.

GRAHAM: We will follow up and to the ever patient Senator Blackburn thank you very much.

BLACKBURN: Thank you Mr. Chairman I--

GRAHAM: Last but certainly not least.

BLACKBURN: That is correct and I appreciate that and even though my colleague from New Jersey went twice his time I am going to--

GRAHAM: These are Senate minutes.

BLACKBURN: Yes they are Senate minutes. I will agree with my colleagues who have talked about the impact on children. The distribution of information that damages women and children that leads to violence against women and children human trafficking, the utilization of these platforms by pedophiles this is something that we are going to continue to work on. When I was in the House we passed legislation to put more tools in the hands of local law enforcement to fight this but you all at these social media platforms are going to have to do your part to work with us on this to protect our children.

I will also say that we are keeping an eye and with each of you yesterday I talked about your financial components where there for Mr. Dorsey and Libra with Mr. Zuckerberg and the application of these components to your sites. We are talking about 2020 elections but we are also looking ahead to how we clean up some of what transpired in the '20 and before the 2022 elections.

I think it's fair to say to that you all probably are now fully aware that there is great frustration with the Americans and with this committee with the way you act invincible, the way that your employees act as if you are the invincible gods of the Silicon Valley Facebook and Twitter don't get to be the last word in what counts as real news in this country even though you are beginning to conduct yourself as news publishers and distributors.

My colleagues and I have ask you all repeatedly through the years for greater transparency and to accept responsibility you have chosen to do neither so it is going to be up to us to change existing law and to hold you to account on behalf of the American people section 230 the reforms that we are going to put in place will take away this liability shield that you have turned into an opaque wall that you and your content moderators whether they are algorithmic or human beings or a combination are hiding behind and the online freedom and viewpoint diversity act I thanked Chairman Graham and Chairman Wicker for working with me on this.

This is set up for a markup in this committee on Thursday and Mr. Zuckerberg you were stating earlier that we needed to put some definition in place. We are going to do that. We are going to take away nebulous language and we are going to be specific unlawful, and citing personal harm, inciting terrorism, we are going to do that in clear that up for you.

Mr. Zuckerberg Facebook is more like a government than a traditional company is a statement that you have made, there's a lot of power in that for you so yes or no on a couple of questions here. Does Facebook routinely censor a user's account at the behest of a foreign government yes or no?

ZUCKERBERG: Senator I am not sure there's anything in particular you are referring too bad in general we--we--

BLACKBURN: Well, there is something in particular that I am referring to and I will answer yes, you have done that. You have 16 million users in Vietnam of course this is a communist regime, under the orders of the Vietnamese government did a's book shut down and ban the account of the Vietnamese dissident because he criticized the government's land policy yes or no?

ZUCKERBERG: Senator, I'm not familiar with all of the details of that but I believe that we may have done that and then in general we try to follow the local law.

BLACKBURN: Yes, you did, and you kept him off for three months. In Turkey, does Facebook have been anti-blasphemy policy where it will take down photos of the prophet Mohammed if the Turkish government orders it to do so?

ZUCKERBERG: Senator, again, we don't have a policy against that but we--

BLACKBURN: Well, the answer is yes.

ZUCKERBERG: Well we--we follow local laws--

BLACKBURN: The answer is yes.

ZUCKERBERG: (INAUDIBLE)

BLACKBURN: In Russia under pressure from the Russian government did Facebook take down a post advertising the rally in support of the dissident Alexei Navaly? And the answer is yes, I will help you with that. Do you believe it is Facebook's duty to comply with state sponsored censorship so it can keep operating doing business and selling ads in that country?

ZUCKERBERG: Senator, in general we tried to comply with the laws in every country where we operate and do business.

BLACKBURN: Okay and I think that you prioritize profit over principle. When you look at these countries and also in communist China which they have banned their citizens from you. You can't operate there. In--in China, Twitter, you have an opponent there. You've got a knock off. Weibo, that is a Chinese Communist party owned company, but your companies, even though they're banned there, you're still trying to do business in those countries. Mr.

Dorsey, does Twitter do business with Huawei?

DORSEY: I don't–I don't believe so, but we can follow up.

BLACKBURN: Oh, I can answer it for you, sir. You helped launch Huawei's Mate 3 Pro 5G and it is featured on Twitter's marketing page website. How about Alibaba? You do business with Jack Ma's company with their links to the Chinese Communist Party?

DORSEY: If–if by business you mean allowing people to advertise on our platform–

BLACKBURN: –Your answer is yes. Mr. Zuckerberg, are you aware that last year, China stopped Internet regulator agreed to spend over $800,000 for the communist mouthpiece, the People's Daily and they did this so that they could advertise and promote China to the American people on Facebook? The point of all of this–and the answer to that, Mr. Zuckerberg, whether you're aware or not is you probably are and you know that what they're doing is gaining access to this market.

This is why we're going to keep it real close watch over what you all are doing with Libra and what you are doing with–with Square because we see what has happened. It's important for us to protect people and to protect human rights. And your election–let me move to election content and that monitoring because we do have concerns about some of the things that happened there. Mr. Zuckerberg, let me ask you this. Have you heard of the Trump Accountability Project?

ZUCKERBERG: Senator, I'm not familiar with that.

BLACKBURN: Okay. That is a project that is an attempt to blacklist Americans who have served in the Trump administration and to prohibit them from gaining future employment. Now, in communist China, in Putin's Russia, in totalitarian states, the government regularly will issue a blacklist on their enemies. Enemies of the state are banned from getting a job. And if their names fall on the blacklist, their out.

Now, this seems disturbing that it would be happening here in this country. So Mr. Zuckerberg, do you agree with me there is seriously something wrong with an un-American blacklist tarring people from future employment simply because they belong to a different political party?

ZUCKERBERG: Senator, I generally agree that people should not be discriminated against because of a political belief.

BLACKBURN: Okay, that is a positive step. Now, on Facebook, I wrote in a post, and I'm quoting, "The Trump Accountability Project is the epitome of the cancel culture. Our nation has long benefited from robust political debate and this effort to silence those who support our president is vile."

As you can tell from this statement, nothing was said about the election or the results either directly or indirectly. But somehow, I got slapped with your elections flag sticker. So what each of you need to realize, and you've heard it time and again today, you say you don't keep lists. Obviously, you have lists because there are some of us who are regularly censored and called down by your content moderators.

Do we want to see these lists? Yes. How have you built these lists? We want to know. I would remind each of you, you are a title one service. You are an information service. You are to be the new public square. But what you are doing with your power that you have derived because federal law gave you the ability to stand up and grow without being hit by lawsuits, you have used this power to run amok.

You have used it to silence conservatives. You have used it to build your lists. You have used this power to act like you hold all the power, that you can make these decisions, you have driven this cancel culture because you have not called to account your moderators. You have refused to take responsibility for your employees and their actions.

So thereby, reining you in on the issues of privacy, data security, content moderation, liability protections, defining who is the publisher in the virtual space. That is up to us because you have proven you do not have the will, the strength, the ability and you will not accept the responsibility to do it for yourselves. I yield my time.

GRAHAM: Thank you very much, Senator Blackburn. To the two witnesses, you made it through. I think you hopefully will understand a little bit better about where the committee is at in our concerns. I want to thank you for appearing. I wish we could do it in person, but I can understand why we had to do it remotely.

We will have more hearings coming up in the next Congress I'm sure to try to find ways to modify 230 to deal with some of the issues that were brought before the committee. I just want to thank you both and just say that you have been hugely successful in ways probably beyond your own imagination–beyond your own imagination and we've got problems around your platforms that have to be dealt with and we will do it hopefully collaboratively.

The bottom line is we want to make these platforms better, we want to continue to grow this part of our society responsibly, and right now, without regulation or without lawsuit is pretty much becoming the wild, wild West and I appreciate both of you for being willing–being willing to try to find ways to come up with a systems that will ensure more transparency, more choice, and more confidence and–

BLUMENTHAL: –Mr. Chairman?

GRAHAM: Yes, sir?

BLUMENTHAL: If I may just add my thanks to the witnesses and also to you for having this hearing. I think there is one certainty here, which is that Mr. Zuckerberg and Mr. Dorsey will be back. They will be back in the next session of Congress. I hope that joining them will be Google and Amazon and others who should be held similarly accountable. And–

GRAHAM: –I agree. And to these two companies, thank you for stepping up to the plate. And to the other companies, you need to be here also.

BLUMENTHAL: And I–I, again, I thank them and we need to have greater accountability by reducing the shield that's now nearly complete. And I want to thank you, senator Graham, for working with me on the EARN IT Act. A number of our colleagues have raised the problem of child sexual abuse material. The best way to counter it is to act.

GRAHAM: Sure.

BLUMENTHAL: When you really are serious about all this rhetoric and the jumble of grievances that we've heard, let's begin the journey with a single step. We can do it through the EARN IT Act. It's on the floor of the United States Senate having been recorded unanimously out of this committee. Let's have a vote.

GRAHAM: Agreed. Change is going to come. Thank you. The hearing is adjourned.

## Copyright

Copyright 2020 CQ-Roll Call, Inc. All Rights Reserved.

# DEFENDANTS' EXHIBIT 15:



Centers for Disease
Control and Prevention

Español (Spanish)

# COVID Data Tracker

Maps, charts, and data provided by CDC, updates Mon-Fri by 8 pm ET

COVID-19 Home ›

CDC recommends use of COVID-19 Community Levels to determine the impact of COVID-19 on communities and to take action. CDC also provides Transmission Levels (also known as Community Transmission) to describe the amount of COVID-19 spread within each county. Healthcare facilities use Transmission Levels to determine infection control interventions.

## Daily Update for the United States



**Cases**

New Cases (Weekly Total)

94,142

Case Trends

Feb 2023 — Apr 2023

**Deaths**

New Deaths (Weekly Total)

1,160

Death Trends

Feb 2023 — Apr 2023

**Hospitalizations**

New Admissions (Daily Avg)

1,540

Admission Trends

Mar 2023 — Apr 2023

**Vaccinations**

% with Updated Booster Dose

16.7%

Total Population

| Total Cases | Total Deaths | Current Hospitalizations | Total Updated Booster Doses |
|---|---|---|---|
| 104,445,294 | 1,129,573 | 7,540 | 55,499,012 |

CDC | Data as of: April 25, 2023 1:47 PM ET. Posted: April 25, 2023 3:17 PM ET

## COVID Data Basics

Stay up to date on the most recent data on vaccinations, cases, and deaths.

# DEFENDANTS' EXHIBIT 16:

 World Health Organization



# COVID-19 pandemic: countries urged to take stronger action to stop spread of harmful information

23 September 2020 | Joint News Release | New York | Reading time: 4 min (1042 words)



العربية | 中文 | Français | Русский | Español

The World Health Organization (WHO) together with the UN, specialised agencies and partners today called on countries to develop and implement action plans to promote the timely dissemination of science-based information and prevent the spread of false information while respecting freedom of expression.

WHO, the UN, UNICEF, UNAIDS, the UN Development Programme (UNDP), UNESCO, the International Telecommunication Union (ITU), the UN Global Pulse initiative and the International Federation of the Red Cross and Red Crescent Societies  (IFRC), together with the governments of Indonesia, Thailand and Uruguay held a webinar on the margins of the 75th UN General Assembly to draw attention to the harm being done by the spread of misinformation and disinformation, the latter being deliberate misinformation to advance an agenda.

"As soon as the virus spread across the globe, inaccurate and even dangerous messages proliferated wildly over social media, leaving people confused, misled and ill-advised", said UN Secretary-General António Guterres. "Our initiative, called "Verified", is fighting misinformation with truth. We work with media partners, individuals, influencers and social media platforms to spread

content that promotes science, offers solutions and inspires solidarity. This will be especially critical as we work to build public confidence in the safety and efficacy of future COVID-19 vaccines. We need a 'people's vaccine' that is affordable and available to all."

"Misinformation and disinformation put health and lives at risk, and undermine trust in science, in institutions and in health systems," said WHO Director-General Dr Tedros Adhanom Ghebreyesus. "To fight the pandemic we need trust and solidarity and when there is mistrust, there is much less solidarity. False information is hindering the response to the pandemic so we must join forces to fight it and to promote science-based public health advice. The same principles that apply to responding to COVID-19 apply to managing the infodemic. We need to prevent, detect and respond to it, together and in solidarity."

"On top of the immediate impact on pandemic responses, disinformation is undermining public trust in democratic processes and institutions and exacerbating social divides", said UNDP Administrator Achim Steiner. "It's one of the most concerning governance challenges of our time. UNDP is actively collaborating with Member States, fellow UN agencies, and other partners to find holistic responses which respect human rights."

"Misinformation is one of the fastest growing challenges facing children today," said Henrietta Fore, UNICEF Executive Director. "It takes advantage of the cracks in trust in societies and institutions and deepens them further, undermines confidence in science and medicine, and divides communities. In its most pernicious forms, such as when it convinces parents not to vaccinate their children, it can even be fatal. Because misinformation is more a symptom than a sickness, countering it requires more than just providing truth. It also requires trust between leaders, communities and individuals."

"We can beat COVID-19 only with facts, science and community solidarity," said Executive Director, Winnie Byanyima. "Misinformation is perpetuating stigma and discrimination and must not come in the way of ensuring that human rights are protected and people at risk and those marginalized have access to health and social protection services."

"Since the start of the pandemic, UNESCO has mobilised its international networks of media partners, journalists, fact-checkers, community radio stations, and experts, to give citizens the means to fight against false information and rumours — phenomena that have been exacerbated by the pandemic," said Audrey Azoulay, the UNESCO Director-General. "Collective mobilisation to promote quality and reliable information, while strictly ensuring respect for freedom of expression, is essential. A free, independent and pluralistic press is more necessary than ever."

"Trust is a cornerstone of our digital world," said Houlin Zhao, Secretary-General of the International Telecommunication Union. "Building on the long-standing WHO-ITU BeHe@lthy BeMobile initiative, ITU has been working with national ministries of telecommunications and health and mobile network operators since the beginning of this crisis to text people who may not have access to the internet, providing them with science- and evidence-based COVID-19 health advice directly on their mobile phones."

WHO and partners urged countries to engage and listen to their communities as they develop their national action plans, and to empower communities to build trust and resilience against false information.

"Engaging communities on how they perceive the disease and response is critical to building trust and ending outbreaks," said Jagan Chapagain, IFRC Secretary General. "If our response does not reflect the communities' concerns and perceptions, we will not be seen as relevant or trusted by affected populations, and the epidemic response risks failure.  More than ever, local responders are at the forefront of this crisis. We need to recognize the incredible role they play in understanding and acting on local knowledge and community feedback."

The co-hosts also called on the media, social media platforms, civil society leaders and influencers to strengthen their actions to disseminate accurate information and prevent the spread of misinformation and disinformation. Access to accurate information and the free exchange of ideas online and offline are key to enabling effective and credible public health responses.

"UN Global Pulse was set up a decade ago inside the UN System to pioneer the use of real-time and predictive insights to protect vulnerable communities in times of crisis", said Robert Kirkpatrick, Director of UN Global Pulse, the United Nations Secretary-General's initiative on big data and artificial intelligence (AI). "During this pandemic we have seen a tremendous increase in requests for advanced analytics from across the UN System and Member States. We will continue to work with WHO and other partners to help identify and combat mis- and disinformation."

**Note to Editors**

WHO defines an infodemic as an overabundance of information, both online and offline. It includes accurate information as well as mis- and disinformation.

In May 2020, WHO Member States passed Resolution WHA73.1 on the COVID-19 response at the World Health Assembly. The Resolution recognises that managing the infodemic is a critical part of controlling the COVID-19 pandemic: it calls on Member States to provide reliable COVID-19 content,

take measures to counter mis- and disinformation and leverage digital technologies across the response. The Resolution also called on international organisations to address mis- and disinformation in the digital sphere, work to prevent harmful cyber activities undermining the health response and support the provision of science-based data to the public.

**Subscribe to our newsletters →**

# DEFENDANTS' EXHIBIT 17:



**United States Mission to
the United Nations**

# Cross-Regional Statement on "Infodemic" in the Context of COVID-19

U.S. Mission to the United Nations
New York, New York
June 12, 2020

### Cross-Regional Statement on "Infodemic" in the Context of COVID-19

Australia, Chile, France, Georgia, India, Indonesia, Latvia, Lebanon, Mauritius, Mexico, Norway, Senegal, and South Africa as the co-authors have the honor to transmit the following statement:

Since the outbreak of the COVID-19 virus and declaration of the pandemic, the UN Secretary-General and other senior leaders of the UN and its institutions have increasingly drawn attention to the challenge of the "infodemic" [1] or misinformation and disinformation pandemic. Quoting the UN Secretary General, "as COVID-19 spreads, a tsunami of misinformation, hate, scapegoating and scare-mongering has been unleashed".

In times of the COVID-19 health crisis, the spread of the "infodemic" can be as dangerous to human health and security as the pandemic itself. Among other negative consequences, COVID-19 has created conditions that enable the spread of disinformation, fake news and doctored videos to foment violence and divide communities. It is critical states counter misinformation as a toxic driver of secondary impacts of the pandemic that can heighten the risk of conflict, violence, human rights violations and mass atrocities.

For these reasons we call on everybody to immediately cease spreading misinformation and to observe UN recommendations to tackle this issue, including the United Nations Guidance Note on Addressing and Countering COVID-19 related Hate Speech (11 May 2020).

The COVID-19 crisis has demonstrated the crucial need for access to free, reliable, trustworthy, factual, multilingual, targeted, accurate, clear and science-based information, as well as for ensuring dialogue and participation of all stakeholders and affected communities during the preparedness, readiness ar response. It also has confirmed the key role of free, independent, responsible and pluralistic medi

enhance transparency, accountability and trust, which is essential to achieving adequate support for and compliance by the general public with collective efforts to curb the spread of the virus. Better international cooperation, based on solidarity and goodwill among countries, can contribute to achieving this goal.

States, regional organizations, the UN system and other stakeholders such as media workers, social media platforms and NGOs have a clear role and responsibility in helping people to deal with the "infodemic'. In this regard, we strongly support the United Nations Communications Response initiative and the "Verified" [2] campaign announced by the UN Secretary General on April 14, 2020 [3].

Many countries, including ours, and international institutions, such as the WHO and UNESCO [4], have worked towards increasing societal resilience against disinformation, which has improved overall preparedness to deal with and better comprehend both the "infodemic" and the COVID-19 pandemic.

We are also concerned about the damage caused by the deliberate creation and circulation of false or manipulated information relating to the pandemic. We call on countries to take steps to counter the spread of such disinformation, in an objective manner and with due respect for citizens' freedom of expression, as well as public order and safety. We reaffirm the importance of ensuring that people are accurately informed from trustworthy sources and are not misled by disinformation about COVID-19.

These efforts are based, inter alia, on freedom of expression, freedom of the press and promotion of highest ethics and standards of the press, the protection of journalists and other media workers, as well as promoting information and media literacy, public trust in science, facts, independent media, state and international institutions. Different initiatives have been launched to provide independent expertise and recommendations for States and private actors to strengthen these efforts.

We call for action by all Member States and all stakeholders to fight the "infodemic" to build, to quote the Secretary General, a "healthier, more equitable, just and resilient world".

We remain committed to creating a healthy information environment at the national, regional and global levels, in which the "infodemic" is countered by scientific, evidenced-based information and facts. By doing this, we will be better prepared for dealing with the next "infodemic".

The following Member States, Non-Member Observer States and Observers endorse this statement:

1. ALBANIA

2. ALGERIA

3. ANDORRA

4. ANGOLA

5. ARGENTINA

6. ARMENIA

7. AUSTRALIA

8. AUSTRIA

9. AZERBAIJAN

10. BANGLADESH

11. BARBADOS

12. BELARUS

13. BELGIUM

14. BHUTAN

15. BOLIVIA

16. BOSNIA AND HERZEGOVINA

17. BULGARIA

18. BURKINA FASO

19. CANADA

20. CHILE

21. COLOMBIA

22. COSTA RICA

23. CÔTE D'IVOIRE

24. CROATIA

25. CYPRUS

26. CZECH REPUBLIC

27. DENMARK

28. DJIBOUTI

29. DOMINICAN REPUBLIC

30. ECUADOR

31. EGYPT

32. EL SALVADOR

33. EQUATORIAL GUINEA

34. ERITREA

35. ESTONIA

36. ETHIOPIA

37. FIJI

38. FINLAND

39. FRANCE

40. GAMBIA

41. GEORGIA

42. GERMANY

43. GREECE

44. GUATEMALA

45. GUINEA

46. HONDURAS

47. HUNGARY

48. ICELAND

49. INDIA

50. INDONESIA

51. IRAQ

52. IRELAND

53. ISRAEL

54. ITALY

55. JAPAN

56. JORDAN

57. KENYA

58. LATVIA

59. LEBANON

60. LESOTHO

61. LIECHTENSTEIN

62. LITHUANIA

63. LUXEMBOURG

64. MADAGASCAR

65. MALAYSIA

66. MALDIVES

67. MALTA

68. MARSHALL ISLANDS

69. MAURITIUS

70. MEXICO

71. MOLDOVA

72. MONACO

73. MONGOLIA

74. MONTENEGRO

75. MOROCCO

76. MOZAMBIQUE

77. MYANMAR

78. NAMIBIA

79. NEPAL

80. NETHERLANDS

81. NEW ZEALAND

82. NIGERIA

83. NORTH MACEDONIA

84. NORWAY

85. PAKISTAN

86. PALAU

87. PANAMA

88. PAPUA NEW GUINEA

89. PARAGUAY

90. PERU

91. POLAND

92. PORTUGAL

93. QATAR

94. REPUBLIC OF KOREA

95. ROMANIA

96. RWANDA

97. SAINT KITTS AND NEVIS

98. SAINT LUCIA

99. SAINT VINCENT AND THE GRENADINES

100. SAN MARINO

101. SAUDI ARABIA

102. SENEGAL

103. SERBIA

104. SEYCHELLES

105. SIERRA LEONE

106. SLOVAKIA

107. SLOVENIA

108. SOUTH AFRICA

109. SOUTH SUDAN

110. SPAIN

111. SRI LANKA

112. SURINAME

113. SWEDEN

114. SWITZERLAND

115. THAILAND

116. TIMOR LESTE

117. TOGO

118. TONGA

119. TUNISIA

120. TURKEY

121. TURKMENISTAN

122. TUVALU

123. UGANDA

124. UKRAINE

125. UNITED KINGDOM

126. UNITED STATES OF AMERICA

127. URUGUAY

128. UZBEKISTAN

129. VENEZUELA (BOLIVARIAN REPUBLIC OF VENEZUELA)

130. YEMEN

131. STATE OF PALESTINE

132. EUROPEAN UNION

[1] The term used by the Secretary General of the United Nations

[2] www.shareverified.com

[3] http://www.unodc.org/unodc/press/releases/2020/April/message-on-covid-19-and-misinformation.html

[4] https://en.unesco.org/covid19/communicationinformationresponse

This is the official website of the U.S. Mission to the United Nations. External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.



# DEFENDANTS' EXHIBIT 18:



Back to Newsroom

Meta

# Combating COVID-19 Misinformation Across Our Apps

March 25, 2020
By Nick Clegg, VP of Global Affairs and Communications



## Connecting People to Reliable Information

   

FACEBOOK          INSTAGRAM          MESSENGER          WHATSAPP

**On Facebook and Instagram:** In January, we started showing educational pop-ups connecting people to information from the WHO, the CDC and regional health authorities toward the top of News Feed in countries with reported person-to-person transmissions and in all countries when people search for COVID-19 related information. We show similar pop-ups at the top of Instagram Feed in the hardest hit countries and when anyone taps on a COVID-19 related hashtag.

Last week, we launched the COVID-19 Information Center, which is now featured at the top of News Feed on Facebook in several countries and includes real-time updates from national health authorities and global organizations, such as the WHO. The COVID-19 Information Center will be available globally soon.

Through these efforts across Facebook and Instagram, we've directed more than 1 billion people to resources from health authorities including the WHO – more than 100 million of whom clicked through to learn more.

We're also giving the WHO as many free ads as they need and millions in ad credits to other health authorities so they can reach people with timely messages.

**On WhatsApp**: People can sign up to receive the <u>WHO Health Alert</u> on WhatsApp, a daily report with the latest numbers of COVID-19 cases. It also includes tips on how to prevent the spread of the disease as well as answers to commonly asked questions that people can easily send to their friends and family. We're also working directly with health ministries in the UK, India, Indonesia, Singapore, Israel, South Africa and other countries to provide similar health updates specific to those nations. In the last week, over 100 million messages have been sent by these organizations to WhatsApp users. In addition, we donated $1 million to the International Fact-Checking Network to expand the presence of <u>fact-checking organizations on WhatsApp</u>, so people can submit rumors they find directly to fact-checkers. More information is available at <u>whatsapp.com/coronavirus</u>.

**On Messenger**: We're connecting government health organizations and UN health agencies with our <u>developer partners</u> who can help them use Messenger most effectively to share timely information with people and speed up their replies to commonly asked questions. Agencies such as <u>UNICEF</u>, <u>Argentina's Ministry of Health</u> and <u>Pakistan's Ministry of National Health Services, Regulations & Coordination</u> are already using Messenger to ensure people have the latest information about COVID-19.

## Limiting the Spread of COVID-19 Hoaxes and Misinformation

**On Facebook and Instagram:** We remove COVID-19 related misinformation that could contribute to imminent physical harm. We've removed harmful misinformation since 2018, including false information about the measles in Samoa where it could have furthered an outbreak and rumors about the polio vaccine in Pakistan where it risked harm to health aid workers. Since January, we've applied this policy to misinformation about COVID-19 to remove posts that make false claims about cures, treatments, the availability of essential services or the location and severity of the outbreak. We regularly update the claims that we remove based on guidance from the WHO and other health authorities. For example, we recently started removing claims that physical distancing doesn't help prevent the spread of the coronavirus. We've also banned ads and commerce listings that imply a product guarantees a cure or prevents people from contracting COVID-19.

For claims that don't directly result in physical harm, like conspiracy theories about the origin of the virus, we continue to work with our network of over 55 fact-checking partners covering over 45 languages to debunk these claims. To support the global fact-checking community's work on COVID-19, we partnered with the Independent Fact-Checking Network to launch a $1 million grant program to increase their capacity during this time.

Once a post is rated false by a fact-checker, we reduce its distribution so fewer people see it, and we show strong warning labels and notifications to people who still come across it, try to share it or already have. This helps give more context when these hoaxes appear elsewhere online, over SMS or offline in conversations with friends and family. On Instagram, we remove COVID-19 accounts from recommendations and we're working to remove some COVID-19 related content from Explore, unless posted by a credible health organization.

**On WhatsApp and Messenger:** We've built clear labels that show people when they have received a forwarded message, or chain message, so they know when they are receiving something that was not written by their immediate contacts. We've also set a limit on the number of times messages can be forwarded on WhatsApp to reduce the spread of viral messages, and we use advanced machine learning to identify and ban accounts engaged in mass messaging. Similarly, we'll soon begin testing stricter limits on Messenger to control the number of chats someone can forward a message to at one time.

This is an evolving crisis, so as world health officials issue new guidance and warnings about COVID-19, we'll continue working with them to ensure people have access to accurate and authoritative information across all of our apps.

Categories: Integrity and Security, Meta

Tags:
Combating Misinformation, COVID-19 Response,
False News

  

### RELATED NEWS

Meta

# DEFENDANTS' EXHIBIT 19:

 Blog

Back

**Company**

# An update on our continuity strategy during COVID-19

By
<u>Vijaya Gadde</u>
and
<u>Matt Derella</u>
Monday, 16 March 2020

*Effective November 23, 2022, Twitter is no longer enforcing the COVID-19 misleading information policy.*

**To see all of the latest steps Twitter is taking in response to COVID-19, visit <u>covid19.twitter.com</u> <u>(https://blog.twitter.com/en_us/topics/company/2020/covid-19.html)</u>.**

*Updated April 1, 2020*

As the entire world faces an unprecedented public health emergency, we want to be open about the challenges we are facing and the contingency measures we're putting in place to serve the public conversation at this critical time. We are regularly working with and looking to trusted partners, including public health authorities, organizations, and governments to inform our approach.

We will keep three blog posts updated on a rolling basis and encourage everyone to consult with them regularly for updates:

- Our contingency strategy to protect the conversation (here)
- Our working guidance (https://blog.twitter.com/en_us/topics/company/2020/keeping-our-employees-and-partners-safe-during-coronavirus.html) to our employees and partners to keep them safe
- Our partnerships (https://blog.twitter.com/en_us/topics/company/2020/stepping-up-our-work-to-protect-the-public-conversation-around-covid-19.html) and public engagement strategies

**Steps we're taking**

As we continue to provide guidance to our employees (https://blog.twitter.com/en_us/topics/company/2020/keeping-our-employees-and-partners-safe-during-coronavirus.html) that they must work from home to support self-distancing efforts to slow the spread of COVID-19, we also need to operationally pivot our core efforts to keep people safe on Twitter.

**Increasing our use of machine learning and automation** to take a wide range of actions on potentially abusive and manipulative content. We want to be clear: while we work to ensure our systems are consistent, they can sometimes lack the context that our teams bring, and this may result in us making mistakes. As a result, we will not permanently suspend any accounts based solely on our automated enforcement systems. Instead, we will continue to look for opportunities to build in human review checks where they will be most impactful. We appreciate your patience as we work to get it right – this is a necessary step to scale our work to protect the conversation on Twitter.

**How are we using automated technology during this time?**

- To help us review reports more efficiently by surfacing content that's most likely to cause harm and should be reviewed first.
- To help us proactively identify rule-breaking content before it's reported. Our systems learn from past decisions by our review teams, so over time, the technology is able to help us rank content or challenge accounts automatically.
- For content that requires additional context, such as misleading information around COVID-19, our teams will continue to review those reports manually.

**What you can expect if you file a report during this time:**

- If you've reported an account or Tweet to us, it will take longer than normal for us to get back to you. We appreciate your patience as we continue to make adjustments.
- Because these automated systems don't have all of the context and insight our team has, we'll make mistakes. If you think we've made a mistake, you can let us know and appeal here (https://help.twitter.com/forms/general).

We appreciate your patience as we work to keep our teams safe, while also making sure we're protecting everyone on Twitter. You can always continue to use hide replies, mute, block, reply filters, and the other tools we offer (https://help.twitter.com/en/a-safer-twitter) you to control conversations on the service.

**Keeping the service running and the Tweets flowing** is one of our top priorities in these difficult times. Our work has never been more critical and our service has never been in higher demand. In the past few weeks, we have seen more and more people turn to Twitter to participate in the public conversation and follow what's happening in real time.

- The global conversation about COVID-19 and ongoing product improvements are driving up total monetizable DAU (mDAU) (https://www.prnewswire.com/news-releases/twitter-withdraws-q1-guidance-due-to-covid-19-impact-301028477.html), with quarter-to-date average total mDAU reaching approximately 164 million, up 23% from 134 million in Q1 2019 and up 8% from 152 million in Q4 2019.
- We've also seen a 45% increase in our curated events page (https://twitter.com/i/events/1219057585707315201?lang=en) usage and a 30% increase in Direct Message (DM) usage since March 6.

While many of our teams are transitioning to working from home (https://blog.twitter.com/en_us/topics/company/2020/keeping-our-employees-and-partners-safe-during-coronavirus.html), some of our infrastructure teams have physical responsibilities that are critical to keeping our data centers, and Twitter, up and running. These teams are operating under the "essential services" provisions dedicated in City, County and State orders to ensure business continuity. We couldn't keep the Tweets flowing without their daily dedication and hard work.

The combination of the new work environment and the increased load on our platform has placed unique stresses on our operations, requiring our engineering teams to work more closely together than ever to respond to new demands, and to

plan for the future. From our IT, Network and Product Engineering teams to our infrastructure and data center teams, we have collectively mobilized to ensure we are able to stay safe and productive under the stress of the new levels of traffic we're seeing on our service.

The effects of COVID-19 on Twitter have already surpassed any event we've seen, and it's possible that as the pandemic continues, we will see additional stress on our service. Beyond Twitter, COVID-19 has also had a far-sweeping impact on our supply chain partners. Whereas normally we'd have months of lead time to add hardware capacity for expected growth, in this case, manufacturing delays in China have compromised the supply chain, resulting in delays in deliveries to our data centers. Our Data Center, SiteOps, Supply Chain, Hardware Engineering and Mission Critical teams continue to manage the physical infrastructure that underlies the service -- expertly innovating to unlock additional capacity in existing supply.

Our teams are actively addressing areas where we need to add capacity to critical services, looking at how we can optimize existing technology to be more performant, and planning for how we might adjust to the way people are using Twitter during this time.

It's critical for Twitter to stay up and running through this global crisis. Our teams are focused, and as we make changes to our systems to meet these new demands, we will communicate openly. We will share what we've done, what we've learned, and if we see incidents, what we will do to recover as quickly as possible. Follow @TwitterEng (http://twitter.com/twittereng) to stay up to date.

**Broadening our definition of harm** to address content that goes directly against guidance from authoritative sources of global and local public health information. Rather than reports, we will enforce this in close coordination with trusted partners, including public health authorities and governments, and continue to use and consult with information from those sources when reviewing content.

- We'll continue to prioritize removing content when it has a clear call to action that could directly pose a risk to people's health or well-being, but we want to make it clear that we will not be able to take enforcement action on every Tweet that contains incomplete or disputed information about COVID-19. This is not meant to limit good faith discussion or expressing hope about ongoing studies related to potential medical interventions that show promise.

- Since introducing these policies on March 18, we have removed more than 1,100 tweets containing misleading and potentially harmful content from Twitter. Additionally, our automated systems have challenged more than 1.5 million accounts which were targeting discussions around COVID-19 with spammy or manipulative behaviors. We will continue to use both technology and our teams to help us identify and stop spammy behavior and accounts.

- We may also apply the public interest notice (https://blog.twitter.com/en_us/topics/company/2019/worldleaders2019.html) in cases where world leaders (https://blog.twitter.com/en_us/topics/company/2019/publicinterest.html) violate the COVID-19 guidelines.

Under this guidance, we will require people to remove tweets that include:

- Denial of global or local health authority recommendations to decrease someone's likelihood of exposure to COVID-19 with the intent to influence people into acting against recommended guidance, such as: "social distancing is not effective", or actively encouraging people to not socially distance themselves in areas known to be impacted by COVID-19 where such measures have been recommended by the relevant authorities.
- Description of alleged cures for. COVID-19, which are not immediately harmful but are known to be ineffective, are not applicable to the COVID-19 context, or are being shared with the intent to mislead others, even if made in jest, such as "coronavirus is not heat-resistant - walking outside is enough to disinfect you" or "use aromatherapy and essential oils to cure COVID-19."
- Description of harmful treatments or protection measures which are known to be ineffective, do not apply to COVID-19, or are being shared out of context to mislead people, even if made in jest, such as "drinking bleach and ingesting colloidal silver will cure COVID-19."
- Denial of established scientific facts about transmission during the incubation period or transmission guidance from global and local health authorities, such as "COVID-19 does not infect children because we haven't seen any cases of children being sick."
- Specific claims around COVID-19 information that intends to manipulate people into certain behavior for the gain of a third party with a call to action within the claim, such as "coronavirus is a fraud and not real - go out and patronize your local bar!!" or "the news about washing your hands is propaganda for soap companies, stop washing your hands".
- Specific and unverified claims that incite people to action and cause widespread panic, social unrest or large-scale disorder, such as "The National Guard just announced that no more shipments of food will be arriving for 2 months - run to the grocery store ASAP and buy everything!"
- Specific and unverified claims made by people impersonating a government or health official or organization such as a parody account of an Italian health official stating that the country's quarantine is over.
- Propagating false or misleading information around COVID-19 diagnostic criteria or procedures such as "if you can hold your breath for 10 seconds, you do not have coronavirus."
- False or misleading claims on how to differentiate between COVID-19 and a different disease, and if that information attempts to definitively diagnose someone, such as "if you have a wet cough, it's not coronavirus - but a dry cough is" or "you'll feel like you're drowning in snot if you have coronavirus - it's not a normal runny nose."

- Claims that specific groups, nationalities are never susceptible to COVID-19, such as "people with dark skin are immune to COVID-19 due to melanin production" or "reading the Quran will make an individual immune to COVID-19."
- Claims that specific groups, nationalities are more susceptible to COVID-19, such as "avoid businesses owned by Chinese people as they are more likely to have COVID-19."

**Building systems that enable our team to continue to enforce our rules remotely around the world.** We're also increasing our employee assistance and wellness support for everyone involved in this critical work, and ensuring people's privacy and security stay a top priority.

**Instituting a global content severity triage system** so we are prioritizing the potential rule violations that present the biggest risk of harm and reducing the burden on people to report them.

**Executing daily quality assurance checks** on our content enforcement processes to ensure we're agile in responding to this rapidly evolving, global disease outbreak.

**Engaging with our partners around the world** to ensure escalation paths remain open and urgent cases can be brought to our attention.

**Continuing to review the Twitter Rules (http://twitter.com/rules) in the context of COVID-19** and considering ways in which they may need to evolve to account for new behaviors.

As we've said on many occasions, our approach to protecting the public conversation is never static. That's particularly relevant in these unprecedented times. We intend to review our thinking daily and will ensure we're sharing updates here on any new clarifications to our rules or major changes to how we're enforcing them.

Finally, we're encouraged that our service is being used around the world to provide free, authoritative health information, and to ensure that everyone has access to the conversations they need to protect themselves and their families. For more, our dedicated COVID-19 Event (https://twitter.com/i/events/1219057585707315201) page has the

latest facts right at the top of your timeline, and we'll continue to share updates

@TwitterSafety (https://twitter.com/TwitterSafety) and @TwitterSupport (http://twitter.com/twittersupport).



(https://www.twitter.com/vijaya)

Vijaya Gadde



(https://www.twitter.com/Derella)

Matt Derella

# DEFENDANTS' EXHIBIT 20:



Back to Newsroom

Meta

# An Update on Our Work to Keep People Informed and Limit Misinformation About COVID-19

April 16, 2020
By Guy Rosen, VP Integrity



In light of ongoing investigations into the origin of COVID-19 and in consultation with public health experts, we will no longer remove the claim that COVID-19 is man-made or manufactured from our apps. We're continuing to work with health experts to keep pace with the evolving nature of the pandemic and regularly update our policies as new facts and trends emerge.

*Update on February 8, 2021 at 10:00AM PT:*

## Removing More False Claims About COVID-19 and Vaccines

Today, we are expanding our efforts to remove false claims on Facebook and Instagram about COVID-19, COVID-19 vaccines and vaccines in general during the pandemic. Since December, we've removed false claims about COVID-19 vaccines that have been debunked by public health experts. Today, following consultations with leading health organizations, including the World Health Organization (WHO), we are expanding the list of false claims we will remove to include additional debunked claims about the coronavirus and vaccines. This includes claims such as:

- COVID-19 is man-made or manufactured

- Vaccines are not effective at preventing the disease they are meant to protect against

- It's safer to get the disease than to get the vaccine

- Vaccines are toxic, dangerous or cause autism

The full list of claims is available here, and we already prohibit these claims in ads. These new policies will help us continue to take aggressive action against misinformation about COVID-19 and vaccines.

We will begin enforcing this policy immediately, with a particular focus on Pages, groups and accounts that violate these rules, and we'll continue to expand our enforcement over the coming weeks. Groups, Pages and accounts on Facebook and Instagram that repeatedly share these debunked claims may be removed altogether. We are also requiring some admins for groups with admins or members who have violated our COVID-19 policies to temporarily approve all posts within their group.

Claims about COVID-19 or vaccines that do not violate these policies will still be eligible for review by our third-party fact-checkers, and if they are rated false, they will be labeled and demoted.

Finally, we are continuing to improve Search results on our platforms. When people search for vaccine or COVID-19 related content on Facebook, we promote relevant, authoritative results and provide third-party resources to connect people to expert information about vaccines. On Instagram, in addition to surfacing authoritative results in Search, in the coming weeks we're making it harder to find accounts in search that discourage people from getting vaccinated.

As we noted last month in response to guidance from the Oversight Board, we are committed to providing more transparency around these policies. You can read the detailed updates in Facebook's Community Standards and in our Help Center. As the situation evolves, we'll continue to review content on our platforms, assess trends in language and engage with experts to provide additional policy guidance to keep people safe during this crisis.

**Update on December 15, 2020 at 7:00PM PT:**

Today, we're updating the messages we send to people who have interacted with misinformation about COVID-19 on Facebook that we've since removed. In April, we started showing these messages in News Feed to people who liked, commented on or reacted to posts with misinformation that we removed for violating our policy. Since then, we've done research to better understand what's most helpful for people, and we've redesigned these as more personalized notifications to more clearly connect people with credible and accurate information about COVID-19.

Now, people will:

- Receive a notification that says we've removed a post they've interacted with for violating our policy against misinformation about COVID-19 that leads to imminent physical harm.

- Once they click on the notification, they will see a thumbnail of the post, and more information about where they saw it and how they engaged with it.

- They will also see why it was false and why we removed it (e.g. the post included the false claim that COVID-19 doesn't exist)

- People will then be able to see more facts about COVID-19 in our Coronavirus Information Center, and take other actions such as unfollowing the Page or Groups that shared this content.



**Update on May 12, 2020 at 9:30AM PT:**

During the month of April, we put warning labels on about 50 million pieces of content related to COVID-19 on Facebook, based on around 7,500 articles by our independent fact-checking partners.

**Originally published April 16, 2020 at 6:00AM PT:**

Ever since COVID-19 was declared a global public health emergency in January, we've been working to connect people to accurate information from health experts and keep harmful misinformation about COVID-19 from spreading on our apps.

We've now directed over 2 billion people to resources from the WHO and other health authorities through our COVID-19 Information Center and pop-ups on Facebook and Instagram with over 350 million people clicking through to learn more.

But connecting people to credible information is only half the challenge. Stopping the spread of misinformation and harmful content about COVID-19 on our apps is also critically important. That's why we work with over 60 fact-checking organizations that review and rate content in more than 50 languages around the world. In the past month, we've continued to grow our program to add more partners and languages. Since the beginning of March, we've added eight new partners and expanded our coverage to more than a dozen new countries. For example, we added MyGoPen in Taiwan, the AFP and dpa in the Netherlands, Reuters in the UK, and others.

To further support the work of our fact-checking partners during this time, we recently announced the first round of recipients of our $1 million grant program in partnership with the International Fact-Checking Network. We've given grants to 13 fact-checking organizations around the world to support projects in Italy, Spain, Colombia, India, the Republic of Congo, and other nations. We will announce additional recipients in the coming weeks.

Once a piece of content is rated false by fact-checkers, we reduce its distribution and show warning labels with more context. Based on one fact-check, we're able to kick off similarity detection methods that identify duplicates of debunked stories. For example, during the month of March, we displayed warnings on about 40 million posts related to COVID-19 on Facebook, based on around 4,000 articles by our independent fact-checking partners. When people saw those warning labels, 95% of the time they did not go on to view the original content. To date, we've also removed hundreds of thousands of pieces of misinformation that could lead to imminent physical harm. Examples of misinformation we've removed include harmful claims like drinking bleach cures the virus and theories like physical distancing is ineffective in preventing the disease from spreading.

Today we're sharing some additional steps we're taking to combat COVID-19 related misinformation and make sure people have the accurate information they need to stay safe.

**Informing People Who Interacted With Harmful COVID-19 Claims**

We're going to start showing messages in News Feed to people who have liked, reacted or commented on harmful misinformation about COVID-19 that we have since removed. These messages will connect people to COVID-19 myths <u>debunked by the WHO</u> including ones we've removed from our platform for leading to imminent physical harm. We want to connect people who may have interacted with harmful misinformation about the virus with the truth from authoritative sources in case they see or hear these claims again off of Facebook. People will start seeing these messages in the coming weeks.



## Making It Easier for People to Get the Facts

To make it easier for people to find accurate information about COVID-19, we recently added a new section to our COVID-19 Information Center called Get the Facts. It includes fact-checked articles from our partners that debunk misinformation about the coronavirus. The fact-check articles are selected by our News curation team and updated every week. This is now available in the US. We will soon add it to <u>Facebook News</u> in the US as well.



As this pandemic evolves, we'll continue focusing on the most effective ways to keep misinformation and dangerous hoaxes about COVID-19 off our apps and ensure people have credible information from health experts to stay safe and informed.

Categories:

Integrity and Security, Meta, Public Policy

Tags:

Combating Misinformation, COVID-19 Response, False News

  

# DEFENDANTS' EXHIBIT 21:



**Help Center**

Using Facebook

Managing Your Account

Privacy, Safety and Security

Policies and Reporting

# How do I mark a Facebook post as false news?

Copy link

**Computer Help**     iPhone App Help     More ▾

To mark a post as false news:

1. Click ••• next to the post you'd like to mark as false.

2. Click **Report post**.

3. Click **False information**, then select the kind of false information.

4. Click **Submit**.

Learn more about why you may be asked to give feedback about something on Facebook.

**Was this helpful?**                                    ✕

☺ Yes              ☻ No



🏠 **Related Articles**

Tips to Spot False News                              ›

Facebook News                                        ›

Why am I seeing Related Articles below a post in Feed on Facebook?                      ›

Who can see what I post on Facebook when I mark myself safe through Safety            ›

 **Help Center**

 

**Report Content on Facebook**

About

Privacy

Terms and Policies

Ad Choices

Careers

Cookies

Create Ad

Create Page

from ∞ Meta                                    © 2023 Meta

# DEFENDANTS' EXHIBIT 22:

 Meta

Language ▼

Home → Features

# Content Borderline to the Community Standards

## Guideline details

Change log ⌄

### Content Borderline to the Community Standards

**What:** Categories developed specifically to capture types of content that are not prohibited by our Community Standards but that come close to the lines drawn by those policies, including but not limited to:

- Borderline Adult Nudity and Sexual Activity: Content, including links to landing pages, that comes close to but does not cross the line of our Adult Nudity or Sexual Activity policies. For example, an image of a person posing in a sexually suggestive way, where the image focuses on the person's butt or cleavage, and the person is wearing minimal clothing, which does not violate our Adult Nudity and Sexual Activity policy.

- Borderline Violence & Graphic Content: Content that comes close to but does not cross the line of our Violence & Graphic Content policies. For example, content that depicts gory or graphic imagery of some kind, for example bloody imagery of humans or animals, fictional violence, or unhealed wounds, which does not violate our Violence and Graphic Content Policies.

- Borderline Bullying & Harassment, Hate Speech, and Violence & Incitement: Content that comes close to but does not cross the line of our Bullying and Harassment, Hate Speech, and Violence and Incitement policies. For example, content that dehumanizes individuals or groups who are not defined by their protected characteristics, praises or mocks past violence and harm, or uses profanity targeted towards a group.

Transparency Center

comes close to but does not cross the line of our Bullying & Harassment, Hate Speech, and Violence & Incitement policies. For example, content that dehumanizes individuals or groups who are not defined by their protected characteristics, praises or mocks past violence and harm, or uses profanity targeted towards a group.

- Content that does not violate our COVID-19 or vaccine policies, but which shares misleading or sensationalized information about vaccines in a way that would be likely to discourage vaccinations.

- ~~Content posted by Groups and Pages associated with (but not representing) Violence-Inducing Conspiracy Networks, like QAnon.~~

- Content posted to Groups where we predict the content is likely to be selling or offering services that are prohibited by our Regulated Goods Community Standards.

**Why:** Some types of content, although they do not violate the letter of our Community Standards, are sensationalist or provocative and can bring down the overall quality of discourse on our platform, especially because people have frequently told us that they do not like encountering these forms of content.

Read less

**NEXT**

Content Likely Violating our
Community Standards |
Transparency Center



**POLICIES**

**ENFORCEMENT**

**SECURITY**

**FEATURES**

**OVERSIGHT**

**DATA**

Data Policy    Terms of Service    Cookies

# DEFENDANTS' EXHIBIT 23:

 A Blueprint for Content Governance and Enforcement



# A Blueprint for Content Governance and Enforcement

 Mark Zuckerberg

---

My focus in 2018 has been addressing the most important issues facing Facebook. As the year wraps up, I'm writing a series of notes about these challenges and the progress we've made. The first note was about Preparing for Elections and this is the second in the series.

...

Many of us got into technology because we believe it can be a democratizing force for putting power in people's hands. I've always cared about this and that's why the first words of our mission have always been "give people the power". I believe the world is better when more people have a voice to share their experiences, and when traditional gatekeepers like governments and media companies don't control what ideas can be expressed.

At the same time, we have a responsibility to keep people safe on our services -- whether from terrorism, bullying, or other threats. We also have a broader social responsibility to help bring people closer together -- against polarization and extremism. The past two years have shown that without sufficient safeguards, people will misuse these tools to interfere in elections, spread misinformation, and incite violence. One of the most painful lessons I've learned is that when you connect two billion people, you will see all the beauty and ugliness of humanity.

An important question we face is how to balance the ideal of giving everyone a voice with

An important question we face is how to balance the ideal of giving everyone a voice with the realities of keeping people safe and bringing people together. What should be the limits to what people can express? What content should be distributed and what should be blocked? Who should decide these policies and make enforcement decisions? Who should hold those people accountable?

As with many of the biggest challenges we face, there isn't broad agreement on the right approach, and thoughtful people come to very different conclusions on what are acceptable tradeoffs. To make this even harder, cultural norms vary widely in different countries, and are shifting rapidly.

I have focused more on these content governance and enforcement issues than any others over the past couple of years. While it has taken time to understand the complexity of the challenges, we have made a lot of progress. Still, we have significant work ahead to get all our systems to the levels people expect, and where we need to be operating.

Even then, there will always be issues. These are not problems you fix, but issues where you continually improve. Just as a free society will always have crime and our expectation of government is not to eliminate all crime but to effectively manage and reduce it, our community will also always face its share of abuse. Our job is to keep the misuse low, consistently improve over time, and stay ahead of new threats.

In this note, I will outline the approach we're taking. A full system requires addressing both governance and enforcement. I will discuss how we're proactively enforcing our policies to remove more harmful content, preventing borderline content from spreading, giving people more control of their experience, and creating independent oversight and transparency into our systems.

## Community Standards

Before getting into what we need to improve, it's important to understand how we've approached these problems until now. Every community has standards, and since our earliest days we've also had our Community Standards -- the rules that determine what content stays up and what comes down on Facebook. Our goal is to err on the side of giving people a voice while preventing real world harm and ensuring that people feel safe in our community. You can read them here: http://www.facebook.com/communitystandards

our community. You can read them here: http://www.facebook.com/communitystandards

In April, we went a step further and published our internal guidelines that our teams use to

enforce these standards. These guidelines are designed to reduce subjectivity and ensure that decisions made by reviewers are as consistent as possible. For example, our Community Standards on violence and graphic content say "we remove content that glorifies violence or celebrates the suffering or humiliation of others". Sometimes there are reasons to share this kind of troubling content, like to draw attention to human rights abuses or as a news organization covering important events. But there have to be limits, and our guidelines include 18 specific types of content we remove, including visible internal organs and charred or burning people.

The team responsible for setting these policies is global -- based in more than 10 offices across six countries to reflect the different cultural norms of our community. Many of them have devoted their careers to issues like child safety, hate speech, and terrorism, including as human rights lawyers or criminal prosecutors.

Our policy process involves regularly getting input from outside experts and organizations to ensure we understand the different perspectives that exist on free expression and safety, as well as the impacts of our policies on different communities globally. Every few weeks, the team runs a meeting to discuss potential changes to our policies based on new research or data. For each change the team gets outside input -- and we've also invited academics and journalists to join this meeting to understand this process. Starting today, we will also publish minutes of these meetings to increase transparency and accountability.

The team responsible for enforcing these policies is made up of around 30,000 people, including content reviewers who speak almost every language widely used in the world. We have offices in many time zones to ensure we can respond to reports quickly. We invest heavily in training and support for every person and team. In total, they review more than two million pieces of content every day. We issue a transparency report with a more detailed breakdown of the content we take down.

For most of our history, the content review process has been very reactive and manual -- with people reporting content they have found problematic, and then our team reviewing that content. This approach has enabled us to remove a lot of harmful content, but it has

major limits in that we can't remove harmful content before people see it, or that people do not report.

Accuracy is also an important issue. Our reviewers work hard to enforce our policies, but many of the judgements require nuance and exceptions. For example, our Community Standards prohibit most nudity, but we make an exception for imagery that is historically significant. We don't allow the sale of regulated goods like firearms, but it can be hard to distinguish those from images of paintball or toy guns. As you get into hate speech and bullying, linguistic nuances get even harder -- like understanding when someone is condemning a racial slur as opposed to using it to attack others. On top of these issues, while computers are consistent at highly repetitive tasks, people are not always as consistent in their judgements.

The vast majority of mistakes we make are due to errors enforcing the nuances of our policies rather than disagreements about what those policies should actually be. Today, depending on the type of content, our review teams make the wrong call in more than 1 out of every 10 cases.

Reducing these errors is one of our most important priorities. To do this, in the last few years we have significantly ramped up our efforts to proactively enforce our policies using a combination of artificial intelligence doing the most repetitive work, and a much larger team of people focused on the more nuanced cases. It's important to remember though that given the size of our community, even if we were able to reduce errors to 1 in 100, that would still be a very large number of mistakes.

## Proactively Identifying Harmful Content

The single most important improvement in enforcing our policies is using artificial intelligence to proactively report potentially problematic content to our team of reviewers, and in some cases to take action on the content automatically as well.

This approach helps us identify and remove a much larger percent of the harmful content -- and we can often remove it faster, before anyone even sees it rather than waiting until it has been reported.

Moving from reactive to proactive handling of content at scale has only started to become possible recently because of advances in artificial intelligence -- and because of the multi-billion dollar annual investments we can now fund. To be clear, the state of the art in AI is still not sufficient to handle these challenges on its own. So we use computers for what they're good at -- making basic judgements on large amounts of content quickly -- and we rely on people for making more complex and nuanced judgements that require deeper expertise.

In training our AI systems, we've generally prioritized proactively detecting content related to the most real world harm. For example, we prioritized removing terrorist content -- and now 99% of the terrorist content we remove is flagged by our systems before anyone on our services reports it to us. We currently have a team of more than 200 people working on counter-terrorism specifically.

Another category we prioritized was self harm. After someone tragically live-streamed their suicide, we trained our systems to flag content that suggested a risk -- in this case so we could get the person help. We built a team of thousands of people around the world so we could respond to these flags usually within minutes. In the last year, we've helped first responders quickly reach around 3,500 people globally who needed help.

Some categories of harmful content are easier for AI to identify, and in others it takes more time to train our systems. For example, visual problems, like identifying nudity, are often easier than nuanced linguistic challenges, like hate speech. Our systems already proactively identify 96% of the nudity we take down, up from just close to zero a few years ago. We are also making progress on hate speech, now with 52% identified proactively. This work will require further advances in technology as well as hiring more language experts to get to the levels we need.

In the past year, we have prioritized identifying people and content related to spreading hate in countries with crises like Myanmar. We were too slow to get started here, but in the third quarter of 2018, we proactively identified about 63% of the hate speech we removed in Myanmar, up from just 13% in the last quarter of 2017. This is the result of investments we've made in both technology and people. By the end of this year, we will have at least 100 Burmese language experts reviewing content.

In my note about our efforts Preparing for Elections, I discussed our work fighting misinformation. This includes proactively identifying fake accounts, which are the source of

much of the spam, misinformation, and coordinated information campaigns. This approach works across all our services, including encrypted services like WhatsApp, because it focuses on patterns of activity rather than the content itself. In the last two quarters, we have removed more than 1.5 billion fake accounts.

Over the course of our three-year roadmap through the end of 2019, we expect to have trained our systems to proactively detect the vast majority of problematic content. And while we will never be perfect, we expect to continue improving and we will report on our progress in our transparency and enforcement reports.

It's important to note that proactive enforcement doesn't change any of the policies around what content should stay up and what should come down. That is still determined by our Community Standards. Proactive enforcement simply helps us remove more harmful content, faster. Some of the other improvements we're making will affect which types of content we take action against, and we'll discuss that next.

## Discouraging Borderline Content

One of the biggest issues social networks face is that, when left unchecked, people will engage disproportionately with more sensationalist and provocative content. This is not a new phenomenon. It is widespread on cable news today and has been a staple of tabloids for more than a century. At scale it can undermine the quality of public discourse and lead to polarization. In our case, it can also degrade the quality of our services.





Our research suggests that no matter where we draw the lines for what is allowed, as a piece of content gets close to that line, people will engage with it more on average -- even when they tell us afterwards they don't like the content.

This is a basic incentive problem that we can address by penalizing borderline content so it gets less distribution and engagement. By making the distribution curve look like the graph below where distribution declines as content gets more sensational, people are disincentivized from creating provocative content that is as close to the line as possible.



This process for adjusting this curve is similar to what I described above for proactively identifying harmful content, but is now focused on identifying borderline content instead. We train AI systems to detect borderline content so we can distribute that content less.

The category we're most focused on is click-bait and misinformation. People consistently tell us these types of content make our services worse -- even though they engage with them. As I mentioned above, the most effective way to stop the spread of misinformation is to remove the fake accounts that generate it. The next most effective strategy is reducing its distribution and virality. (I wrote about these approaches in more detail in my note on Preparing for Elections.)

Interestingly, our research has found that this natural pattern of borderline content getting more engagement applies not only to news but to almost every category of content. For example, photos close to the line of nudity, like with revealing clothing or sexually suggestive positions, got more engagement on average before we changed the distribution curve to discourage this. The same goes for posts that don't come within our definition of hate speech but are still offensive.

This pattern may apply to the groups people join and pages they follow as well. This is especially important to address because while social networks in general expose people to more diverse views, and while groups in general encourage inclusion and acceptance, divisive groups and pages can still fuel polarization. To manage this, we need to apply these distribution changes not only to feed ranking but to all of our recommendation systems for things you should join.

One common reaction is that rather than reducing distribution, we should simply move the line defining what is acceptable. In some cases this is worth considering, but it's important to remember that won't address the underlying incentive problem, which is often the bigger issue. This engagement pattern seems to exist no matter where we draw the lines, so we need to change this incentive and not just remove content.

I believe these efforts on the underlying incentives in our systems are some of the most important work we're doing across the company. We've made significant progress in the last year, but we still have a lot of work ahead.

By fixing this incentive problem in our services, we believe it'll create a virtuous cycle: by reducing sensationalism of all forms, we'll create a healthier, less polarized discourse where

more people feel safe participating.

## Giving People Control and Allowing More Content

Once we have technology that can understand content well enough to proactively remove harmful content and reduce the distribution of borderline content, we can also use it to give people more control of what they see.

The first control we're building is about providing the safer experience described above. It will be on by default and it means you will see less content that is close to the line, even if it doesn't actually violate our standards. For those who want to make these decisions themselves, we believe they should have that choice since this content doesn't violate our standards.

Over time, these controls may also enable us to have more flexible standards in categories like nudity, where cultural norms are very different around the world and personal preferences vary. Of course, we're not going to offer controls to allow any content that could cause real world harm. And we won't be able to consider allowing more content until our artificial intelligence is accurate enough to remove it for everyone else who doesn't want to see it. So we will roll out further controls cautiously.

But by giving people individual control, we can better balance our principles of free expression and safety for everyone.

## Addressing Algorithmic Bias

Everything we've discussed so far depends on building artificial intelligence systems that can proactively identify potentially harmful content so we can act on it more quickly. While I expect this technology to improve significantly, it will never be finished or perfect. With that in mind, I will focus the rest of this note on governance and oversight, including how we handle mistakes, set policies, and most importantly increase transparency and independent review.

A fundamental question is how we can ensure that our systems are not biased in ways that treat people unfairly. There is an emerging academic field on algorithmic fairness at the

intersection of ethics and artificial intelligence, and this year we started a major effort to work on these issues. Our goal is to develop a rigorous analytical framework and computational tools for ensuring that changes we make fit within a clear definition of fairness.

However, this is not simply an AI question because at a philosophical level, people do not broadly agree on how to define fairness. To demonstrate this, consider two common definitions: equality of treatment and equality of impact. Equality of treatment focuses on ensuring the rules are applied equally to everyone, whereas equality of impact focuses on ensuring the rules are defined and applied in a way that produces equal impact. It is often hard, if not impossible, to guarantee both. Focusing on equal treatment often produces disparate outcomes, and focusing on equal impact often requires disparate treatment. Either way a system could be accused of bias. This is not just a computational problem -- it's also an issue of ethics. Overall, this work is important and early, and we will update you as it progresses.

## Building an Appeals Process

Any system that operates at scale will make errors, so how we handle those errors is important. This matters both for ensuring we're not mistakenly stifling people's voices or failing to keep people safe, and also for building a sense of legitimacy in the way we handle enforcement and community governance.

We began rolling out our content appeals process this year. We started by allowing you to appeal decisions that resulted in your content being taken down. Next we're working to expand this so you can appeal any decision on a report you filed as well. We're also working to provide more transparency into how policies were either violated or not.

In practice, one issue we've found is that content that was hard to judge correctly the first time is often also hard to judge correctly the second time as well. Still, this appeals process has already helped us correct a significant number of errors and we will continue to improve its accuracy over time.

## Independent Governance and Oversight

As I've thought about these content issues, I've increasingly come to believe that Facebook should not make so many important decisions about free expression and safety on our own.

In the next year, we're planning to create a new way for people to appeal content decisions to an independent body, whose decisions would be transparent and binding. The purpose of this body would be to uphold the principle of giving people a voice while also recognizing the reality of keeping people safe.

I believe independence is important for a few reasons. First, it will prevent the concentration of too much decision-making within our teams. Second, it will create accountability and oversight. Third, it will provide assurance that these decisions are made in the best interests of our community and not for commercial reasons.

This is an incredibly important undertaking -- and we're still in the early stages of defining how this will work in practice. Starting today, we're beginning a consultation period to address the hardest questions, such as: how are members of the body selected? How do we ensure their independence from Facebook, but also their commitment to the principles they must uphold? How do people petition this body? How does the body pick which cases to hear from potentially millions of requests? As part of this consultation period, we will begin piloting these ideas in different regions of the world in the first half of 2019, with the aim of establishing this independent body by the end of the year.

Over time, I believe this body will play an important role in our overall governance. Just as our board of directors is accountable to our shareholders, this body would be focused only on our community. Both are important, and I believe will help us serve everyone better over the long term.

## Creating Transparency and Enabling Research

Beyond formal oversight, a broader way to create accountability is to provide transparency into how our systems are performing so academics, journalists, and other experts can

review our progress and help us improve. We are focused on two efforts: establishing quarterly transparency and enforcement reports and enabling more academic research.

In order to improve our systems, we've worked hard to measure how common harmful content is on our services and track our effectiveness over time. When we were starting to build and debug our measurement systems, we only used the data internally to focus our work. As we've gained confidence in the measurements of more of our systems, we're publishing these metrics as well so people can hold us accountable for our progress. We released our first transparency and enforcement report earlier this year, and we're releasing the second report today, which you can read here.

These reports focus on three key questions:

1. How prevalent, or common, is content that violates our Community Standards? We think the most important measure of our effectiveness in managing a category of harmful content is how often a person encounters it. For example, we found that in the third quarter of this year between 0.23-0.27% of content viewed violates our policies against violent and graphic content. By focusing on prevalence, we're asserting that it's more important to remove a piece of harmful content that will be seen by many people than it is to quickly remove multiple pieces of content that won't be as widely viewed. We think prevalence should be the industry standard metric for measuring how platforms manage harmful content.

2. How much content do we take action on? While less important than prevalence, this still demonstrates the scale of the challenges we're dealing with. For example, in Q3 we removed more than 1.2 billion pieces of content for violating our spam policies. Even though we typically remove these before many people see them so prevalence is low, this shows the scale of the potential problem if our adversaries evolve faster than our defenses.

3. How much violating content do we find proactively before people report it? This is the clearest measure of our progress in proactively identifying harmful content. Ideally our systems would find all of it before people do, but for nuanced categories we think 90%+ is good. For example, 96% of the content we remove for nudity is identified by our systems before anyone reports it, and that number is 99% for terrorist content. Because these are adversarial systems, these metrics fluctuate depending on whether we're improving faster

than people looking for weaknesses in our systems.

Our priority is getting these measurements stable enough to report for every category of harmful content. After that, we plan to add more metrics as well, including on mistakes we make and the speed of our actions.

By late next year, we expect to have our systems instrumented to release transparency and enforcement reports every quarter. I think it's important to report on these community issues at the same frequency as we report our earnings and business results -- since these issues matter just as much. To emphasize this equivalence further and to create more accountability, we will start doing conference calls just like our earnings calls after we issue each transparency report.

In addition to transparency reports, we're also working with members of the academic community in different ways to study our systems and their impact. This work already focuses on preventing misuse during elections as well as removing bad content from our services. We also plan to expand this work to share more information on our policy-making and appeals processes, as well as working on additional research projects. These partnerships are critical for learning from outside experts on these important challenges.

## Working Together on Regulation

While creating independent oversight and transparency is necessary, I believe the right regulations will also be an important part of a full system of content governance and enforcement. At the end of the day, services must respect local content laws, and I think everyone would benefit from greater clarity on how local governments expect content moderation to work in their countries.

I believe the ideal long term regulatory framework would focus on managing the prevalence of harmful content through proactive enforcement. This would mean defining the acceptable rates of different content types. Without clear definitions, people rely on individual examples of bad content to understand if a service is meeting its overall responsibilities. In reality, there will always be some harmful content, so it's important for society to agree on how to reduce that to a minimum -- and where the lines should be drawn between free expression and safety.

drawn between free expression and safety.

A good starting point would be to require internet companies to report the prevalence of harmful content on their services and then work to reduce that prevalence. Once all major services are reporting these metrics, we'll have a better sense as a society of what thresholds we should all work towards.

To start moving in this direction, we're working with several governments to establish these regulations. For example, as President Macron announced earlier this week, we are working with the French government on a new approach to content regulation. We'll also work with other governments as well, including hopefully with the European Commission to create a framework for Europe in the next couple of years.

Of course, there are clear risks to establishing regulations and many people have warned us against encouraging this. It would be a bad outcome if the regulations end up focusing on metrics other than prevalence that do not help to reduce harmful experiences, or if the regulations end up being overly prescriptive about how we must technically execute our content enforcement in a way that prevents us from doing our most effective work. It is also important that the regulations aren't so difficult to comply with that only incumbents are able to do so.

Despite these risks, I do not believe individual companies can or should be handling so many of these issues of free expression and public safety on their own. This will require working together across industry and governments to find the right balance and solutions together.

## Conclusion

These questions of what we want the internet to be are some of the most important issues facing our society today. On one hand, giving people a voice aligns with our democratic ideals and enlightenment philosophy of free thought and free expression. We've seen many examples where giving people the power to share their experiences has supported important movements and brought people together. But on the other hand, we've also seen that some people will always seek to use this power to subvert these same ideals [to divide us]. We have seen that, left unchecked, they will attempt to interfere in elections, spread

misinformation, and even incite violence.

There is no single solution to these challenges, and these are not problems you ever fully fix. But we can improve our systems over time, as we've shown over the last two years. We will continue making progress as we increase the effectiveness of our proactive enforcement and develop a more open, independent, and rigorous policy-making process. And we will continue working to ensure that our services are a positive force for bringing people closer together.

 **Shivani Singh Neta**

 **Othman Khalid El Sharaa**
مت

 **Akram Al-shlabi**
Othman Khalid Elsharaa
فى طريمه جدده  عمل ام علي

 **Othman Khalid El Sharaa**
Michael Rilling دسا هو دن دسا هو دن جميع الامم اسم لسـ  لكم الحق نحن لا نمول اطمال او هكذا نحن دسا ندعونا ان سعبل و لكن لما اسم حافدون علسا هكذا نحن لا شأن لنا بكم اذهبو

 **Othman Khalid El Sharaa**
أشهد ان لا اله الا الله

 **Deanne DeVlugt**
I'll wait and see. Personally, if conservative posts continue to be banned, I'll be leaving. I believe in being fair, not controlled. I hate being controlled because I'm an older American who recognizes what communism is and see it constantly in the news. We are being forced into it, and I will fight it as long as I can.

 **Georgie Porgie**
Facebook is one of the biggest influence on our elections , people interact and learn all in one session they decide who they do or don't support, if Facebook allows, if someone don't like a post don't read it, but if it's truthful , dont make it disappear because you don't agree with it, like has been happening since this last election.
Facebook is responsible for more interference in our election process than Russia or China both together

 **Howard Miller**
David Land not very smart is he? Lol

 **DLynn Wilson**
I had content removed that only I can see. What the hell!!!!!



# DEFENDANTS' EXHIBIT 24:



☰  ▶️ **Official Blog**                                    🔍

NEWS AND EVENTS

# Continuing our work to improve recommendations on YouTube

By The YouTube Team

**Jan.25.2019**

When recommendations are at their best, they help users find a new song to fall in love with, discover their next favorite creator, or learn that great paella recipe. That's why we update our recommendations system all the time   we want to make sure we're suggesting videos that people actually want to watch.

You might remember that a few years ago, viewers were getting frustrated with clickbaity videos with misleading titles and descriptions ("You won't believe what happens next!"). We responded by updating our system to focus on viewer satisfaction instead of views, including measuring likes, dislikes, surveys, and time well spent, all while recommending clickbait videos less often. More recently, people told us they were getting too many

similar recommendations, like seeing endless cookie videos after watching just one recipe for snickerdoodles. We now pull in recommendations from a wider set of topics   on any given day, more than 200 million videos are recommended on the homepage alone. In fact, in the last year alone, we've made hundreds of changes to improve the quality of recommendations for users on YouTube.

We'll continue that work this year, including taking a closer look at how we can reduce the spread of content that comes close to   but doesn't quite cross the line of   violating our Community Guidelines. To that end, we'll begin reducing recommendations of borderline content and content that could misinform users in harmful ways   such as videos promoting a phony miracle cure for a serious illness, claiming the earth is flat, or making blatantly false claims about historic events like 9/11.

While this shift will apply to less than one percent of the content on YouTube, we believe that limiting the recommendation of these types of videos will mean a better experience for the YouTube community. To be clear, this will only affect recommendations of what videos to watch, not whether a video is available on YouTube. As always, people can still access all videos that comply with our Community Guidelines and, when relevant, these videos may appear in recommendations for channel subscribers and in search results. We think this change strikes a balance between maintaining a platform for free speech and living up to our responsibility to users.

This change relies on a combination of machine learning and real people. We work with human evaluators and experts from all over the United States to help train the machine learning systems that generate recommendations. These evaluators are trained using public guidelines and provide critical

input on the quality of a video.

This will be a gradual change and initially will only affect recommendations of a very small set of videos in the United States. Over time, as our systems become more accurate, we'll roll this change out to more countries. It's just another step in an ongoing process, but it reflects our commitment and sense of responsibility to improve the recommendations experience on YouTube.

**Related Topics**

YOUTUBE NEWS



YouTube Official Blog

Explore the latest company news, creator and artist profiles, culture and trends analyses, and behind-the-scenes insights on the YouTube Official Blog.

Our Channels ⌄

Twitter ⌄



# DEFENDANTS' EXHIBIT 25:

 BuzzFeed News

SIGN IN

**TECH • TWITTER**

# Twitter Is Going To Limit The Visibility Of Tweets From People Behaving Badly

Act like a jerk, and Twitter will start limiting how often your tweets show up.

 **Alex Kantrowitz**
BuzzFeed News Reporter

Posted on May 15, 2018 at 12:00 pm

     Be one of the first to comment



*Leon Neal | Getty Images*

On Tuesday, Twitter announced a massive change to the way its conversations will work, evaluating not just the content of individual tweets, but the way users behave more broadly on the service. Twitter will now use thousands of behavioral signals when filtering search, replies, and algorithmic recommendations. If it believes you are trying to game its system, or simply acting like a jerk, it will push your tweets lower down. It's the biggest update so far in the company's push to create healthier conversations, an initiative <u>announced</u> by its CEO Jack Dorsey in March.

Among the signals Twitter will use: whether you tweet at large numbers of accounts you don't follow, how often you're blocked by people you interact with, whether you created many accounts from a single IP address, and whether your account is closely related to others that have violated its terms of service.

ADVERTISEMENT

"A lot of our past action has been content-based, and we have been shifting more and more toward conduct and behaviors on the system," Dorsey said in a briefing at the company's San Francisco headquarters on Monday.

The push is meant to get out ahead of problems that might normally result in an abuse report under the existing system. In testing, Twitter said the changes led to an 8% drop in abuse reports on conversations (the discussions that happen in the replies to a tweet) and a 4% drop in abuse reports in search. These drops, the company believes, indicate that something is working. Fewer than 1% of total accounts make up the majority of those reported for abuse, Twitter trust and safety VP Del Harvey said in the briefing. The company believes identifying a chunk of them and proactively decreasing their reach could generate big results.

"Directionally, it does point to probably our biggest impact change," Dorsey said. "This is a step, but we can see this going quite far."

Twitter, of course, has promised many fixes to its problems in the past, and delivered mixed results. It's still far from troll-free, regularly used to spread misinformation, and home to legions of identity-stealing crypto-scammers. It spent a good portion of 2017 apologizing for its missteps.



The company believes these changes can be effective, particularly because they can be applied globally, without regard for language, since they are entirely action based. "It's not dependent on hiring more people," Dorsey said. "It's a model built into the network."

Twitter also said more changes along these lines are on the way, but declined to further describe its roadmap.

The company will make the new behavioral filters optional, and they will be on by default. People will be able to turn them on or off with a "show everything" toggle in search. The changes will begin to roll out this week.

Twitter's product tweaks are meant to roll back the reach of everything from abusive tweeters to scammers using fake accounts to boost their presence in search results. Dorsey was also clear that while he's optimistic, he's under no illusion that they'll fix everything.

"This is not an endpoint," he said. "We have to be constantly ten steps ahead. Because even a system like this, a new model, people will figure out how to game it, take advantage of it."

## Sign up for Tech Giant Update — a newsletter on Amazon, Google, Facebook, and Apple.

[                                                                      ]

[ Sign Me Up! ]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## Topics in this article

( Twitter )

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .



**Alex Kantrowitz**
BuzzFeed News Reporter

Contact Alex Kantrowitz at alex.kantrowitz@buzzfeed.com.

Got a confidential tip? 👉 Submit it here

**BE ONE OF THE FIRST TO COMMENT**

## Sections

Arts & Entertainment

Books

Celebrity

Culture & Criticism

Health

Internet Culture

**Company**

Support Us

BuzzFeed.com

Privacy Policy

User Agreement

US residents can opt out of "sales" of personal data.

Do not sell or share my personal information

Investigations

JPG

LGBTQ

Opinion

Politics

Tech

**Follow Us**

(f) Facebook

(y) Twitter

(o) Instagram

**BuzzFeed.News**

a **BuzzFeed** brand.

# DEFENDANTS' EXHIBIT 26:

# Reduction / Borderline content / Shadowbanning

*Tarleton Gillespie*

### introduction

The broader public debate about content moderation has overwhelmingly focused on *removal*: social media platforms deleting content and suspending users—or opting not to. This is not surprising. Debating whether a platform should ban the sitting president of the United States is delicious, and a potent way to ask about the platform's influence. The First Amendment aspect lures journalists, pundits, policymakers, and researchers alike. And cries of "censorship" have the most traction when the content has been completely deleted or a user has been permanently banned.

But while removal may be the most visible response, it is by no means the only remedy available.[1] Many platforms, including Facebook, YouTube, Instagram, Twitter, Tumblr, TikTok, LinkedIn, and Reddit, also identify content that they deem not quite bad enough to remove, but bad enough. As an example, In July 2021, after U.S. President Biden accused Facebook of "killing people"[2] by allowing misinformation about COVID vaccines to proliferate, Facebook pointedly countered:

> …when we see misinformation about COVID-19 vaccines, we take action against it. Since the beginning of the pandemic we have removed over 18 million instances of COVID-19

---

[1] *See* Eric Goldman, *Content Moderation Remedies*, 28 Mich. Tech. L. Rev. 1 (2021).

[2] Eugene Scott & Rachel Lerman, *Biden Clarifies Comments About Facebook "Killing People" with Vaccine Misinformation*, Wash. Post *(*July 19, 2021), https://www.washingtonpost.com/politics/2021/07/19/biden-facebook-misinformation.

1

> misinformation. We have also labeled and <u>reduced the visibility</u> (emphasis mine) of more than 167 million pieces of COVID-19 content debunked by our network of fact-checking partners so fewer people see it...[3]

Reducing the visibility of risky, misleading, or salacious content is becoming a commonplace and large-scale part of platform governance. Using machine learning classifiers, platforms identify content that is misleading enough, risky enough, problematic enough to warrant reducing its visibility by demoting or excluding it from the algorithmic rankings and recommendations. The offending content remains on the site, still available to the user who can find it directly; but the platform limits the conditions under which it circulates: how it is offered up as a recommendation, search result, part of an algorithmically-generated feed, or "up next" in users' queues.

In this essay, I will call these "reduction policies." There are several emergent terms for this practice, as I will discuss, and they are all problematic. But the fact that there is not yet a settled industry term is itself revealing. Understandably, platforms are wary of being scrutinized for these reduction policies. Some platforms have not publicly acknowledged them; those that have are circumspect. It is not that they are hidden entirely, but the major platforms are only just beginning to acknowledge these techniques as a significant element of how they now manage problematic content. Consequently, reduction policies remain largely absent from public, policy, and scholarly conversations about content moderation and platform governance.[4]

## Borderline Content

Let me start with YouTube. The company announced what it calls its "borderline content" policy in January 2019, though the practice had already been in place for a few months or more:

> We'll continue that work this year, including taking a closer look at how we can reduce the spread of content that comes close to— but doesn't quite cross the line of—violating our Community Guidelines. To that end, we'll begin reducing recommendations

---

[3]  Guy Rosen, *Moving Past the Finger Pointing*, Facebook (July 17, 2021), https://about fb.com/news/2021/07/support-for-covid-19-vaccines-is-high-on-facebook-and-growing.

[4]  Tarleton Gillespie, Custodians of the Internet: Platforms, Content Moderation, and the Hidden Decisions That Shape Social Media (2018).

Reduction                    Platform Governance Terminologies Essay Series

of borderline content and content that could misinform users in harmful ways—such as videos promoting a phony miracle cure for a serious illness, claiming the earth is flat, or making blatantly false claims about historic events like 9/11.[5]

Notice that harms are being characterized as on a spectrum: "content that comes close to—but doesn't quite cross the line of—violating our Community Guidelines." YouTube's spatial understanding of harm stakes out a "borderline" just shy of the existing prohibitions.[6]

When Mark Zuckerberg announced a similar policy for Facebook in May 2018,[7] his terminology and justifications were similar to YouTube's: "There are other types of problematic content that, although they don't violate our policies, are still misleading or harmful and that our community has told us they don't want to see on Facebook — things like clickbait or sensationalism. When we find examples of this kind of content, we reduce its spread in News Feed using ranking…"[8] The announcement included two diagrams (that look mathematical but are not) to explain both the problem and the proposed solution.

---

[5] The YouTube Team, *Continuing Our Work to Improve Recommendations on YouTube*, YouTube (Jan. 25, 2019), https://blog.youtube/news-and-events/continuing-our-work-to-improve.

[6] *See* Jessica Maddox & Jennifer Malson, *Guidelines Without Lines, Communities Without Borders: The Marketplace of Ideas and Digital Manifest Destiny in Social Media Platform Policies*, Soc. Media + Soc'y, Apr.-June 2020, at 1, https://journals.sagepub.com/doi/pdf/10.1177/2056305120926622.

[7] Mark Zuckerberg, *Blueprint for Content Governance and Enforcement*, Facebook (Nov. 15, 2018), https://www.facebook.com/notes/751449002072082. Facebook had also made passing references to these techniques as far back as maybe 2015, certainly 2017. *See* Erich Owens & Udi Weinsberg, *Showing Fewer Hoaxes*, Facebook (Jan. 20, 2015), https://about fb.com/news/2015/01/news-feed-fyi-showing-fewer-hoaxes; Adam Mosseri, *Working to Stop Misinformation and False News*, Facebook (Apr. 6, 2017), https://about fb.com/news/2017/04/working-to-stop misinformation-and-false-news; *see also* Robyn Caplan, Lauren Hanson & Joan Donovan, *Dead Reckoning: Navigating Content Moderation After "Fake News,"* Data & Soc'y Rsch. Inst. (Feb. 2018), https://datasociety net/pubs/oh/DataAndSociety_Dead_Reckoning_2018.pdf.

[8] Tessa Lyons, *The Three-Part Recipe for Cleaning Up Your News Feed*, Facebook (May 22, 2018), https://about.fb.com/news/2018/05/inside-feed-reduce-remove-inform. Reporting by *TechCrunch* at the time made clear that Instagram had imposed similar policies. Josh Constine, *Instagram Now Demotes Vaguely "Inappropriate" Content,* TechCrunch (Apr. 10, 2019), https://techcrunch.com/2019/04/10/instagram-borderline.

3



Zuckerberg hoped the reduction policy would not just level out that surge of demand near the borderline, but to reduce it further, to make demand for questionable content approach zero.[9]



---

[9] Blake Hallinan, *Civilizing Infrastructure*, 35 CULTURAL STUD. 707 (2021).

Reduction                    Platform Governance Terminologies Essay Series

Facebook later published an exhaustive "Content Distribution Guidelines," indicating what it now "demotes" in the News Feed.[10] The list reveals how broad this "borderline content" technique has become: Facebook will not recommend "what [users] do and don't like seeing on Facebook" (meaning clickbait, "engagement bait," contest giveaways, and links to deceptive or malicious sites); low-quality and inaccurate content (including misinformation, unoriginal or repurposed content, and news that's unclear about its provenance); and borderline content near to violating any of Facebook's community standards.[11]

Twitter,[12] LinkedIn,[13] and TikTok[14] have similar reduction strategies already in place, though they have been less vocal about them. And depending on how we broaden the definition, other platforms are engaged in strategies that have at least a family resemblance, including Tumblr's hashtag blocking,[15] Instagram's "sensitive content control,"[16] and

---

[10] *Content Distribution Guidelines*, FACEBOOK, https://transparency fb.com/en-gb/features/approach-to ranking/types-of-content-we-demote (last visited Mar. 24, 2022).

[11] *Id.*

[12] *Clarifying how we assess misleading information*, TWITTER (July 14, 2020), https://blog.twitter.com/en_us/topics/company/2020/covid-19 html#protecting.

[13] *LinkedIn Professional Community Policies*, LINKEDIN, https://www.linkedin.com/legal/professional-community-policies (last visited Nov. 23, 2021).

[14] *Community Guidelines*, TIKTOK, https://www.tiktok.com/community-guidelines (last visited Mar. 24, 2022). This language appears to have been added in December 2020.

[15] Before it restricted sexual content in 2018, Tumblr used to limit the circulation of explicit content by refusing to serve up search results to explicit queries. Users could post pornographic images and could even tag them with a term like "#porn"—but if a user searched for "#porn" no results would be returned. *See* Tarleton Gillespie, *Tumblr, NSFW Porn Blogging, and the Challenge of Checkpoints*, CULTURE DIGITALLY (July 26, 2013), https://culturedigitally.org/2013/07/tumblr-nsfw-porn-blogging-and-the-challenge-of-checkpoints. This hashtag-blocking approach, like the borderline content techniques, demarcate between hosting content and offering it up in search results or recommendations, allowing one while restricting the other. *See also* KATRIN TIIDENBERG, ET.AL. TUMBLR (2021).

[16] In July 2021, Instagram introduced "sensitive content control," giving individual users the ability to adjust how much sensitive content should be filtered from the "explore" recommendations the platform offers. While the announcement emphasized the agency users are being offered, the very fact that users can now "allow," "limit (default)," or "limit even more" how much sensitive content is recommended revealed that such content already was being reduced already. *Introducing sensitive content control*, INSTAGRAM (July 20, 2021), https://about.instagram.com/blog/announcements/introducing-sensitive-content-control. The company did not immediately specify what counts as sensitive; Instagram head Adam Mosseri later indicated that the intervention focuses on "sexually suggestive, firearm, and drug-related content"

5

Reddit's quarantine policy.[17]

YouTube and Facebook call these their "borderline content" policies, and the term has begun to circulate more widely in the discussion of platform policies. But I am reluctant to adopt this term. First, the spatial metaphor it implies is misleading; it treats complex sociocultural behavior as if it can be mapped on a single line, from acceptable to unacceptable, and imagines a rule as a singular line cleanly intersecting it. It also plays up the similarity between limiting the visibility of content and removing it, as if what they are doing is "almost" content removal. That is misleading. These policies have much more in common with the array of decisions platforms make about what to emphasize and what to disregard—the "sorting for" rather than the "sorting out."

More importantly, the term "borderline" has connotations I do not particularly want to reify by affirming its use as a pejorative, to describe disputably problematic online content, as deemed so by social media platforms fumbling for their new sense of responsibility amid the misinformation and conspiracy that courses through their systems. First, decades of scholarship examining the complex political and cultural dynamics of state borders remind us that borders are not just territorial edges, or walls to be policed.[18] They are sites at which sovereign power is exercised, and are by no means stable, singular, or clear: "Borders are relational in the sense that they are produced, reproduced, and transformed in diverging

---

and was separate from other efforts to reduce misinformation or self-harm. Adam Mosseri (@mosseri), Twitter (July 21, 2021, 10:25 PM) https://twitter.com/mosseri/status/1417672062110507008.

[17] Reduction is just one part of Reddit's quarantine policy, but the effect is similar. Users who seek out a quarantined subreddit first encounter a warning page, requiring they opt in if they want to continue. The quarantined subreddit can generate no revenue. But also, no posts from within that subreddit will appear on the front page of Reddit unless the user is already a subscriber, and they will not be returned among search or recommendation results. It's worth noting that Reddit is more explicit and transparent about their quarantines, meaning this reduction is much more overt than what YouTube and Facebook are doing – though Reddit users outside the quarantined subreddit may not know why some things aren't bubbling up on their front page anymore. Still, the reasoning behind quarantining a problematic subreddit sounds a lot like Facebook's and YouTube's: "to prevent its content from being accidentally viewed by those who do not knowingly wish to do so or viewed without appropriate context." *Quarantined Communities*, Reddit, https://reddit.zendesk.com/hc/en-us/articles/360043069012-Quarantined-Subreddits (last accessed Nov. 23, 2021); see also Simon Copland, *Reddit Quarantined: Can Changing Platform Affordances Reduce Hateful Material Online?*, 9 Internet Pol'y Rev. (2020), https://policyreview.info/articles/analysis/reddit-quarantined-can-changing-platform-affordances-reduce-hateful-material.

[18] Corey Johnson et al., *Interventions on rethinking "the border" in border studies*, 30 Pol. Geography 61 (2011).

Reduction                              Platform Governance Terminologies Essay Series

social relations and networks."[19] The "borderlands" that emerge around borders are spaces of flow permeable to people, resources, and ideas—places of historical and personal pain[20] and cultural spaces meaningful to the people that struggle to inhabit them.[21] Perhaps the use of the term "borderline content" is in fact more accurate than was intended, by the sovereign powers that are YouTube and Facebook. The casual shorthand use of the term by Facebook and YouTube risks making the same missteps: treating an artificial line as natural, treating the restriction of those near it as politically obvious and unproblematic, and failing to see that these are borderlands in which practices meaningful to those who inhabit it are taking place, despite the exercise of power being imposed.

The term also echoes "borderline" mental health conditions, a characterization that the mental health community has been attempting to move away from. The fields of psychology and psychiatry have begun discarding the term "borderline personality disorder," concerned that its original meaning (displaying aspects of both neurosis and psychosis) is inaccurate, and that the term has a pejorative connotation implying a flaw in the subject's personality ;[22] feminist critics have noted how the vague diagnosis is applied substantially more often to women than men, reminiscent of other discarded diagnoses like "hysteria";[23] critics of its use in common parlance and media representations condemn the stigma it places on neurodiversity.[24] Some worry that the way it implies that someone is "almost" mentally ill may seed doubt about those who suffer from it, and research funding less forthcoming.[25] But the term lingers in popular discourse,

---

[19] Anssi Paasi, Commentary, *Border Studies Reanimated: Going Beyond the Territorial/Relational Divide*, 44 Env't & Plan. A 2303 (2012).

[20] Jason de Leon, The Land of Open Graves: Living and Dying on the Migrant Trail (2015).

[21] José David Saldívar, Border Matters: Remapping American Cultural Studies (1997).

[22] *See* Peter Tyrer, *Why Borderline Personality Disorder Is Neither Borderline nor a Personality Disorder*, 3 Personality & Mental Health 86 (2009).

[23] *See* Janet Wirth-Cauchon, Women and Borderline Personality Disorder: Symptoms and Stories (2000).

[24] *See* Valéry Brousseau, *Why We Need Better Representation of Borderline Personality Disorder*, Nat'l All. on Mental Illness (June 2021), https://www.nami.org/Blogs/NAMI-Blog/June-2021/Why-We-Need-Better-Representation-of-Borderline-Personality-Disorder; Johnson et al., *supra* note 18.

[25] Jayashri Kulkarni, *Borderline Personality Disorder Is a Hurtful Label for Real Suffering –Time We Changed It*, The Conversation (July 20, 2015, 4:11 PM), https://theconversation.com/borderline-personality-disorder-is-a-hurtful-label-for-real-suffering-time-we-changed-it-41760.

retaining both the pejorative that clings to so many mental health terms, and the quiet suggestion that it is not a "real" condition.

## "Shadowbanning"

When a video is removed or a user suspended, traces of that removal remain: the user is alerted; the video is missing; there is a terse explanation where the deleted tweet used to be. For all the concerns about censorship that attend to the removal of content, at least the intervention can be seen, and potentially held accountable. But there is no trace left when a post, tweet, or video simply has not circulated as far as it might have otherwise. The content remains. It can be found, commented on, forwarded, yet it seems to not have earned the audience or reach that it might have otherwise. This uncertainty leaves users grasping for explanations, and it is part of why many users are so suspicious that murky machinations are at work under the hood at these platforms.[26] Some frustrated users, suspicious that platforms are taking invisible action against them, have begun to take note, developing folk theories as to what may be happening and why, implementing homegrown techniques for proving that their content is suppressed, and in some cases attempting to document these interventions. The term critics have most often adopted for such interventions is "shadowbanning." Most vocally, some in the sex work community have accused platforms of shadowbanning.[27] Similar critiques have emerged from other marginalized communities.[28]

---

[26] *See* Robyn Caplan & Tarleton Gillespie, *Tiered Governance and Demonetization: The Shifting Terms of Labor and Compensation in the Platform Economy*, Soc. Media + Soc'y, April-June 2020, at 1, https://journals.sagepub.com/doi/pdf/10.1177/2056305120936636; Emillie de Keulenaar, Anthony Glyn Burton & Ivan Kisjes, *Deplatforming, Demotion and Folk Theories of Big Tech Persecution*, 23 Fronteiras – Estudos Midiáticos 118 (2021); Sarah Myers West, *Censored, Suspended, Shadowbanned: User Interpretations of Content Moderation on Social Media Platforms*, 20 New Media & Soc'y 4366 (2018).

[27] *See* Carolina Are, *The Shadowban Cycle: An Autoethnography of Pole Dancing, Nudity and Censorship on Instagram*, Feminist Media Stud. (forthcoming 2022), https://www.tandfonline.com/doi/full/10.1080/14680777.2021.1928259; Danielle Blunt et al., *Deplatforming Sex: A Roundtable*, 8 Porn Stud. 420 (2021); Danielle Blunt et al., *Posting into the Void: Studying the Impact of Shadowbanning on Sex Workers and Activists*, Hacking//Hustling (2020), https://hackinghustling.org/posting-into-the-void-content-moderation/.

[28] *See* Carolina Are, *How Instagram's Algorithm is Censoring Women and Vulnerable Users but Helping Online Abusers*, 20 Feminist Media Stud. 741 (2020); de Keulenaar et al., *supra* note 22; Oliver L. Haimson et al., *Disproportionate Removals and Different Content Moderation Experiences for Conservative, Transgender, and Black Social Media Users: Marginalization and Moderation Gray Areas*, 5 Proc. of the ACM on Human-Comput. Interaction,

Reduction                     Platform Governance Terminologies Essay Series

Reports like *Posting into the Void* collect evidence from members of the community that their posts are being constrained in some way.[29] But how to prove it? Some evidence offered is anecdotal—users suspicious that their content is not traveling as far as it used to. Sometimes users will point to financial evidence, that revenue from ad-sharing programs like YouTube's has diminished.[30] Some will confirm that their post is being suppressed by asking users to find it and comment on it. All of these are workarounds, attempting to address the fact that it is extremely difficult to document or measure reduction: what is the reduced visibility of a piece of content measured against? Because the circulation and visibility of a piece of content tomorrow depends on who happens to see it today, reduction has a cumulative effect; for the same reason, it is difficult for a user to know how that content would have travelled had it not been reduced. There is no "normal" reach of content; how it *might* have performed, and how it did, depends on its quality, who saw or forwarded it early, whether it got traction and how much, what it was up against on the platform, what news was breaking at the same time, and on and on.

It is clear that these critics are right: whether their particular post was affected, platforms are suppressing the circulation of some content in ways that are difficult to identify. But here too, I have concerns about the term. I agree with Cotter[31] that in using the term "shadowbanning," critics may be inadvertently offering platforms ways of avoiding accountability. The word originated in early online communities and bulletin board systems.[32] It referred to a very specific technique where a moderator could make an offending user invisible to every other user, while to the offender it appeared as everything was functioning normally. The only way the offender might discover they were shadowbanned is if they noticed that they were getting no reactions from anyone else.

The range of "borderline content" interventions on today's platforms

---

No. 466, (2021), https://dl.acm.org/doi/pdf/10.1145/3479610; Shakira Smith et al., *Censorship of Marginalized Communities on Instagram*, SALTY ALGORITHMIC BIAS COLLECTIVE (Oct. 2021), https://saltyworld net/exclusive-report-censorship-of-marginalized-communities-on-instagram-2021-pdf-download/.

[29] Blunt et al., *supra* note 27.

[30] *See* Caplan & Gillespie, *supra* note 26.

[31] Kelley Cotter, *"Shadowbanning Is Not a Thing": Black Box Gaslighting and the Power to Independently Know and Credibly Critique Algorithms*, INFO., COMMC'N & SOC'Y (forthcoming 2022), https://www.tandfonline.com/doi/full/10.1080/1369118X.2021.1994624.

[32] Samantha Cole, *Where Did the Concept of "Shadow Banning" Come From?*, VICE (July 30, 2018), https://www.vice.com/en_us/article/a3q744/where-did-shadow-banning-comefrom-trump-republicans shadowbanned.

are much subtler: a post could be throttled so as to be recommended less; or only to certain kinds of users, such as to followers only; or for a shorter time. When critics lump these under "shadowbanning," it makes semantic sense: they are interventions surreptitiously made by the platform, leaving the user thinking they are participating normally, while other users see less of them. However, because these interventions do not all match the more specific, original meaning of shadowbanning, platforms can answer critics by saying that "we do not shadowban"—as some platforms have[33]—even as they elsewhere admit to having similar policies in place.

## "Reduction"

I prefer the term "reduction" policies. Reduction is a term some platforms user, so it is a good candidate as a term of art. It avoids the baggage of the word "borderline" and includes a wider array of techniques than "shadowbanning." But most importantly, it better captures the fundamental orientation beneath what is being done, how it is being done, and what concerns it is responding to. Reduction policies are the flipside to charges that platforms algorithmically "amplify" problematic content and should bear some responsibility for doing so.[34] The two are conceptual twins; if platforms amplify, perhaps they can or should also reduce. And amplification and reduction work in similar ways, just towards opposite ends.

Recommendation is a central component of social media platforms, but it is driven by a  very different set of concerns and priorities than content moderation: while trust and safety teams  *select out* what is least appealing, the teams that manage recommender systems and newsfeeds *select for* what is most appealing.[35] Their north star is engagement, usually measured by the time users spend on the platform, the number and types of actions taken, and other measures of satisfaction.[36] Their primary

---

[33] *See* Are, *supra* note 27; Cotter, *supra* note 31.

[34] Joe Whittaker et al., *Recommender Systems and the Amplification of Extremist Content*, 10 INTERNET POL'Y REV. (2021), https://policyreview.info/pdf/policyreview-2021-2-1565.pdf.

[35] *See* Tarleton Gillespie, *The Relevance of Algorithms*, *in* MEDIA TECHNOLOGIES: ESSAYS ON COMMUNICATION, MATERIALITY, AND SOCIETY 167 (Tarleton Gillespie, Pablo J. Boczkowski & Kirsten A. Foot eds., 2014); Tarleton Gillespie, *#trendingistrending: When Algorithms Become Culture*, *in* ALGORITHMIC CULTURES: ESSAYS ON MEANING, PERFORMANCE AND NEW TECHNOLOGIES 52 (Robert Seyfert & Jonathan Roberge eds., 2016).

[36] *See* TAINA BUCHER, IF…THEN: ALGORITHMIC POWER AND POLITICS (2018); Sandana Singh, *Rising Through the Ranks: How Algorithms Rank and Curate Content in Search Results and on News Feeds*, NEW AM. (Oct. 21, 2019), https://www.newamerica.org/oti/reports/rising-through-ranks/.

Reduction                          Platform Governance Terminologies Essay Series

technique is to collect signals, both about the user and about all the available content in the corpus, to produce a personalized feed of content that will be maximally appealing. Generally, these signals indicate some aspect of the content understood to be positive, or valuable: is this video recent, is this link recommended by this user's friends or network, is this post often liked by users who share a similar matrix of interests. With reduction techniques, the calculation of what to recommend now includes a negative signal, indicating that a particular piece of content should not be considered relevant to this particular user.

The other half of the challenge, common to all content moderation efforts, is how to identify the problematic content in the first place—and do so quickly, accurately, based on limited information, and at scale. It should surprise no one to discover that, to accomplish this, most platforms turned to a now well-worn Silicon Valley technique: develop a machine learning classifier that can estimate what content is "problematic" by training that classifier on a heap of data that has already been evaluated as problematic by human raters.[37] Ideally, the judgments made by the human raters will be approximated by the machine learning classifier, which can then make the same value judgment over and over on millions of pieces of content. YouTube management has generally framed their reduction policies as an acknowledgement of a growing responsibility.[38] Facebook suggests that it is unavoidable: to the left of every line is a bubble of demand for the sensational and illicit that someone will fulfill.[39] But it is easy to imagine other, less noble reasons for not simply removing this problematic content. First, reduction is less politically risky than removal. Given the recent political climate, platforms fear reprisals from conservative critics who air their outrage whenever their posts are

---

[37] *See* Hamid Ekbia & Bonnie Nardi, *Heteromation and Its (Dis) Contents: The Invisible Division of Labor between Humans and Machines*, 19 First Monday (2014), https://firstmonday.org/article/view/5331/4090; Robert Gorwa, Reuben Binns & Christian Katzenbach, *Algorithmic Content Moderation: Technical and Political Challenges in the Automation of Platform Governance*, Big Data + Soc'y, Jan.-June, at 1 (2020), https://journals.sagepub.com/doi/pdf/10.1177/2053951719897945; Mary L. Gray & Siddharth Suri, Ghost Work: How to Stop Silicon Valley from Building a New Global Underclass (2019); Sarah T. Roberts, Behind the Screen: Content Moderation in the Shadows of Social Media (2019).

[38] Neal Mohan, *Perspective: Tackling Misinformation on YouTube*, YouTube (August 25, 2021), https://blog.youtube/inside-youtube/tackling-misinfo; *see also* Clive Thompson, *YouTube's plot to silence conspiracy theories*," WIRED (Sept. 18, 2020), https://www.wired.com/story/youtube-algorithm-silence-conspiracy-theories.

[39] Zuckerberg, *supra* note 7.

removed.[40] Demoting reprehensible content lets platforms avoid "censoring" it or facing charges of bias that are difficult to refute. Flip this around, and it is not difficult to imagine that reducing problematic content allows platforms to continue to benefit financially from the users who seek it out, whether in the form of advertising revenue or data collection, while still answering public concerns by reducing its reach.[41]

Reduction strategies may also be preferable when the types of problematic content platforms face are difficult to identify, in flux, or difficult to police. Reducing without removing means not having to articulate an explicit policy; this gives platforms the flexibility to intervene around quickly emerging phenomena, go after content designed to elude prohibitions, and curtail content they "know" is bad but have a hard time articulating why. Seen in the best light, this flexibility makes it easier to respond to changing problems, from the many faces of white nationalism to the evasive tactics of pro-ana users, to the constantly evolving QAnon conspiracy.  In a less flattering light, reduction also avoids accountability, as the interventions themselves are hard to spot, and are not—yet—reported as part of the platform's transparency obligations.

If the judgment of what is most worthwhile can serve as a means to reduce what is least worthwhile, then reduction policies are content moderation by other means. And we probably need to expand our definition even further. Reducing news content so as to improve the "organic reach" of posts from your friends and family is a form of moderation.[42] When Mark Zuckerberg, after the January 6 insurrection at the U.S. Capitol, announced that Facebook would begin testing ways to show less political content in the newsfeed,[43] that is moderation, too. Whether a platform intervenes at a single post, or all posts that include a single term, or a machine learning classifier's best guess of which content falls on the wrong side of a rule—or the reduction of an entire category, so as to decrease

---

[40] Jeff Horwitz, *Facebook Says Its Rules Apply to All. Company Documents Reveal a Secret Elite That's*

*Exempt.*, Wall St. J. (Sept. 13, 2021, 10:21 AM), https://www.wsj.com/articles/facebook-files-xcheck-zuckerberg-elite-rules 11631541353.

[41] *See* Ariadna Matamoros-Fernández, *Platformed Racism: The Mediation and Circulation of an Australian Race-Based Controversy on Twitter, Facebook and YouTube*, 20 Info. Commc'n & Soc'y 930 (2017); Eugenia Siapera & Paloma Viejo-Otero, *Governing Hate: Facebook and Digital Racism*, 22 Television & New Media 112 (2021).

[42] Jennifer Cobbe & Jatinder Singh, *Regulating Recommending: Motivations, Considerations, and Principles*, 10 Eur. J.L. & Tech. (2019), https://ssrn.com/abstract=3371830.

[43] Aastha Gupta, *Reducing Political Content in News Feed*, Facebook (Feb. 10, 2021), https://about fb.com/news/2021/02/reducing-political-content-in-news-feed.

Reduction                    Platform Governance Terminologies Essay Series

the likelihood of polarizing, hateful, or misleading content—that is moderation, too.[44] Selecting out and selecting for, through policy and through design, with whatever justification, all of it "moderates" not only what any one user is likely to see, but what society is likely to attend to, take seriously, struggle with, and value.[45]

Platforms intervene in the circulation of information, culture, and political expression by removing, reducing, personalizing, rewarding, and elevating; these are overlapping and cumulative strategies, both in practice and in effect, and they must be examined together. If reduction is a form of content moderation, then it must be included in the ongoing debates about platform responsibility. If platforms are responsible for amplifying problematic content, then reduction may be the most mature response.[46] But does it benefit the public, or undermine it, when platforms regularly and quietly reduce what they deem to be misinformation, conspiracy, and "borderline content" violations? What is the impact of reduction techniques, and does that impact differ when what is being reduced is white nationalism, junk news links, explicit sex work, or users struggling with the impulse to harm themselves?[47] Can we trust platforms to engage in these reduction practices thoughtfully, in ways that produce a robust but fairer public sphere? Who is making these policies and distinctions, and according to what criteria?

To begin to answer these questions, platforms must be more transparent and when and where they reduce content, and specifically how it works in their recommendation algorithms. Independent researchers need access to the platform to study the downstream effects for content that is reduced in various ways. Policymakers need to take into consideration not only what platforms remove, but what they reduce. And both platforms and critics need to be humbler about admitting that, at this point in the concern about online harms, society may be clamoring for gatekeepers

---

[44] Elinor Carmi, *"It's Not You, Juan, It's Us": How Facebook Takes Over Our Experience*, TECH POL'Y PRESS (Jan. 28, 2021), https://techpolicy.press/its-not-you-juan-its-us-how-facebook-takes-over-our-experience.

[45] Caitlin Petre, Brooke Erin Duffy & Emily Hund, *"Gaming the System": Platform Paternalism and the Politics of Algorithmic Visibility*, Soc. Media + Soc'y, Oct.-Dec. 2019, at 1, https://journals.sagepub.com/doi/pdf/10.1177/2056305119879995.

[46] Daphne Keller, *Amplification and Its Discontents*, KNIGHT FIRST AMEND. INST. (June 8, 2021), https://knightcolumbia.org/content/amplification-and-its-discontents.

[47] Ysabel Gerrard, *The COVID-19 Mental Health Content Moderation Conundrum*, SOC. MEDIA + SOC'Y, July-Sept. 2020, at 1, https://journals.sagepub.com/doi/pdf/10.1177/2056305120948186.

Yale-Wikimedia Initiative on Intermediaries & Information          July 20, 2022

again – and, that any new gatekeepers must be interrogated to avoid the sins of the old: who is being excluded and included, who enjoys the largesse and who bears the constraints, which groups are given center stage, and which are further marginalized.

14

# DEFENDANTS' EXHIBIT 27:

 Meta

Back to Newsroom

Meta

# Moving Past the Finger Pointing

July 17, 2021
By Guy Rosen, VP of Integrity

At a time when COVID-19 cases are rising in America, the Biden administration has chosen to blame a handful of American social media companies. While social media plays an important role in society, it is clear that we need a whole of society approach to end this pandemic. And facts — not allegations — should help inform that effort. The fact is that vaccine acceptance among Facebook users in the US has increased. These and other facts tell a very different story to the one promoted by the administration in recent days.

Since April 2020, we've been collaborating with Carnegie Mellon University and University of Maryland on a global survey to gather insights about COVID-19 symptoms, testing, vaccination rates and more. This is the largest survey of its kind, with over 70 million total responses, and more than 170,000 responses daily across more than 200 countries and territories. For people in the US on Facebook, vaccine hesitancy has declined by 50%; and they are becoming more accepting of vaccines every day.

Since January, vaccine acceptance on the part of Facebook users in the US has increased by 10-15 percentage points (70% → 80-85%) and racial and ethnic disparities in acceptance have shrunk considerably (some of the populations that had the lowest acceptance in January had the highest increases since). The results of this survey are public and we've shared them — alongside other data requested by the administration — with the White House, the CDC and other key partners in the federal government.

**The data shows that 85% of Facebook users in the US have been or want to be vaccinated against COVID-19. President Biden's goal was for 70% of Americans to be vaccinated by July 4. Facebook is not the reason this goal was missed.**



**COVID-19 Vaccine Acceptance**
The Delphi Group at Carnegie Mellon University U.S. COVID-19 Trends and Impact Survey, in partnership with Facebook

Data from the U.S. COVID-19 Trends and Impact Study collected by the Delphi Group at Carnegie Mellon University in partnership with Facebook, delphi.cmu.edu/covidcast. Vaccine acceptance prior to the launch of survey wave 11 on May 20, 2021 is defined as the weighted proportion of adults who reported receiving a vaccine or indicated that they would definitely or probably choose to get vaccinated if a vaccine were offered to them today. Vaccine acceptance in survey wave 11 is defined as the weighted proportion of adults who reported receiving a vaccine or indicated that they have an appointment to receive a vaccine or indicated that they would definitely or probably choose to get vaccinated if a vaccine were offered to them today.

In fact, increased vaccine acceptance has been seen on and off Facebook, with many leaders throughout the US working to make that happen. **We employed similar tactics in the UK and Canada, which have similar rates of Facebook usage to the US, and those countries have achieved more than 70% vaccination of eligible populations. This all suggests there's more than Facebook to the outcome in the US.**

Now vaccination efforts are rightly turning to increasing access and availability for harder-to-reach people. That's why we recently expanded our pop-up vaccine clinics in low-income and underserved communities. To help promote reliable vaccine information to communities with lower access to vaccines, we are using the CDC's Social Vulnerability Index. This is a publicly available dataset that crisis and health responders often use to identify communities most likely to need support, as higher vulnerability areas have had lower COVID-19 vaccination coverage.

We have been doing our part in other areas, too:

- Since the pandemic began, more than 2 billion people have viewed authoritative information about COVID-19 and vaccines on Facebook. This includes more than 3.3 million Americans using our vaccine finder tool to find out where to get a COVID-19 vaccine and make an appointment to do so.

- More than 50% of people in the US on Facebook have already seen someone use the COVID-19 vaccine profile frames, which we developed in collaboration with the US Department of Health and Human Services and the CDC. From what we have seen, when people see a friend share they have been vaccinated, it increases their perceptions that vaccines are safe.

- We're continuing to encourage everyone to use these tools to show their friends they've been vaccinated. For those who are hesitant, hearing from a friend who's been vaccinated is undoubtedly more impactful than hearing from a large corporation or the federal government.

And when we see misinformation about COVID-19 vaccines, we take action against it.

- Since the beginning of the pandemic we have removed over 18 million instances of COVID-19 misinformation.

- We have also labeled and reduced the visibility of more than 167 million pieces of COVID-19 content debunked by our network of fact-checking partners so fewer people see it and — when they do — they have the full context.

In fact, we've already taken action on all eight of the Surgeon General's recommendations on what tech companies can do to help. And we are continuing to work with health experts to update the list of false claims we remove from our platform. We publish these rules for everyone to read and scrutinize, and we update them regularly as we see new trends emerge.

The Biden Administration is calling for a whole of society approach to this challenge. We agree. As a company, we have devoted unprecedented resources to the fight against the pandemic, pointing people to reliable information and helping them find and schedule vaccinations. And we will continue to do so.

Category: Meta

Tags:
Combating Misinformation, COVID-19 Response,
Health

  

**RELATED NEWS**

Meta

## What the Research on Social Media's Impact on Democracy and Daily Life Says (and Doesn't Say)

The academic research on social media's impact on democracy and daily life in America paints a far more nuanced picture than The Atlantic article does.

April 22, 2022

## Topics

Company News

Technology and Innovation

Data and Privacy

Safety and Expression

Combating Misinformation

Economic Opportunity

Election Integrity

Strengthening Communities

Diversity and Inclusion

**Featured News**

Instagram

New Features on Instagram Reels: Trends, Editing and Gifts

April 14, 2023

**Meta Quest**

**Peacock on Meta Quest: Stream Current Movies, Hit TV Shows and Live Sports in VR**

April 12, 2023





**Follow Us**

   

## Virtual reality

## Smart glasses

## About us

## Our community ⌄

## Our actions ⌄

## Support ⌄

Community Standards | Data Policy | Terms | Cookie policy

United States (English) ▾

# DEFENDANTS' EXHIBIT 28:



**OUR COMMITMENTS**

# How has YouTube responded to the global COVID-19 crisis?

Since the outbreak of COVID-19, YouTube has remained committed to help people access authoritative health and news information on our platform. We've approached COVID-19 by building on the policies, resources, and products we've invested in over the past few years to live up to our responsibility. We've also launched initiatives across the globe to help users continue to learn and stay connected as we adapt to a changing world.





# Reducing the spread of borderline content

Content that comes close to — but doesn't quite cross the line of — violating our Community Guidelines is a fraction of 1% of what's watched on YouTube in the U.S. In 2019, we began reducing recommendations of borderline content or videos that could misinform users in harmful ways. This work has been foundational in ensuring that we limit the spread of COVID-19 related borderline content on our site.

## Resources

Learn more about How YouTube is helping people get the facts on the COVID-19 vaccine ↗

Check here for regular updates on how YouTube is addressing the situation ↗

Learn more about the COVID-19 Medical Misinformation Policy ↗

# Related articles

## News and information

READ MORE
### Fighting misinformation

READ MORE
Managing harmful content





Connect

YouTube

Policies & Safety    Copyright    Brand Guidelines    Privacy    Terms

Help    English

# DEFENDANTS' EXHIBIT 29:

JOHN THUNE, SOUTH DAKOTA, CHAIRMAN

ROGER WICKER, MISSISSIPPI          BILL NELSON, FLORIDA
ROY BLUNT, MISSOURI                MARIA CANTWELL, WASHINGTON
MARCO RUBIO, FLORIDA               CLAIRE McCASKILL, MISSOURI
KELLY AYOTTE, NEW HAMPSHIRE        AMY KLOBUCHAR, MINNESOTA
TED CRUZ, TEXAS                    RICHARD BLUMENTHAL, CONNECTICUT
DEB FISCHER, NEBRASKA              BRIAN SCHATZ, HAWAII
JERRY MORAN, KANSAS                EDWARD MARKEY, MASSACHUSETTS
DAN SULLIVAN, ALASKA               CORY BOOKER, NEW JERSEY
RON JOHNSON, WISCONSIN             TOM UDALL, NEW MEXICO
DEAN HELLER, NEVADA                JOE MANCHIN III, WEST VIRGINIA
CORY GARDNER, COLORADO             GARY PETERS, MICHIGAN
STEVE DAINES, MONTANA

NICK ROSSI, STAFF DIRECTOR
KIM LIPSKY, DEMOCRATIC STAFF DIRECTOR

# United States Senate

COMMITTEE ON COMMERCE, SCIENCE,
AND TRANSPORTATION

WASHINGTON, DC 20510–6125

WEBSITE: http://commerce.senate.gov

May 10, 2016

Mark Zuckerberg
Chairman and Chief Executive Officer
Facebook, Inc.
1 Hacker Way
Menlo Park, CA 94025

Dear Mr. Zuckerberg:

This week, the press is reporting claims by former Facebook staffers that employees of Facebook routinely suppressed conservative political viewpoints on the social network.[1] Specifically, according to media reports, "news curators" responsible for managing Facebook's "Trending Topics" section frequently targeted news stories on conservative political topics for exclusion.[2] Launched in January 2014, this product purports to list the top news stories Facebook users are currently sharing.[3] In addition to the reported exclusion of conservative viewpoints, news curators also allegedly "injected" stories into the section that were not actually trending in order to raise awareness of issues the curators believed were deserving.[4] If true, these allegations compromise Facebook's "open culture" and mission "to make the world more open and connected."[5]

Social networks such as Facebook are an increasingly important source of news for many Americans and people around the world. The ability to connect with others to discuss and debate the issues of the day that such services offer has created a powerful platform for civic engagement. Indeed, with over a billion daily active users on average, Facebook has enormous influence on users' perceptions of current events, including political perspectives. If Facebook

---

[1] Michael Nunez, *Former Facebook Workers: We Routinely Suppressed Conservative News*, GIZMODO, May 9, 2016, *available at* http://gizmodo.com/former-facebook-workers-we-routinely-suppressed-conser-1775461006?rev=1462799465508; *see also,* Philip Bump, *Did Facebook bury conservative news? Ex-staffers say yes*, WASH. POST, *available at* https://www.washingtonpost.com/news/the-fix/wp/2016/05/09/former-facebook-staff-say-conservative-news-was-buried-raising-questions-about-its-political-influence/.

[2] Facebook, Help Center: How does Facebook determine what topics are trending?, https://www.facebook.com/help/737806312958641 (last visited May 10, 2016).

[3] Chris Struhar, Engineering Manager, *Finding Popular Conversations on Facebook*, http://newsroom.fb.com/news/2014/01/finding-popular-conversations-on-facebook/ (Jan. 16, 2014) ("Today we're announcing Trending, a new product that's designed to surface interesting and relevant conversations in order to help you discover the best content from all across Facebook.").

[4] Nunez, *supra* note 1.

[5] Facebook, Our Mission, http://newsroom.fb.com/company-info/ (last visited May 10, 2016).

Mr. Mark Zuckerberg
May 10, 2016
Page 2

presents its Trending Topics section as the result of a neutral, objective algorithm, but it is in fact subjective and filtered to support or suppress particular political viewpoints, Facebook's assertion that it maintains a "platform for people and perspectives from across the political spectrum" misleads the public.[6]

Pursuant to the Committee's oversight authority, please provide responses to the following:

1)  Please describe Facebook's organizational structure for the Trending Topics feature, and the steps for determining included topics.  Who is ultimately responsible for approving its content?

2)  Have Facebook news curators in fact manipulated the content of the Trending Topics section, either by targeting news stories related to conservative views for exclusion or by injecting non-trending content?

3)  What steps is Facebook taking to investigate claims of politically motivated manipulation of news stories in the Trending Topics section? If such claims are substantiated, what steps will Facebook take to hold the responsible individuals accountable?

4)  In a statement responding to the allegations, Facebook has claimed to have "rigorous guidelines in place for the review team" to prevent "the suppression of political perspectives" or the "prioritization of one viewpoint over another or one news outlet over another."[7]

    a.  When did Facebook first introduce these guidelines?
    b.  Please provide a copy of these guidelines, as well as any changes or amendments since January 2014.
    c.  Does Facebook provide training for its employees related to these guidelines? If so, describe what the training consists of, as well as its frequency.
    d.  How does Facebook determine compliance with these guidelines? Does it conduct audits? If so, how often? What steps are taken when a violation occurs?

5)  Does Facebook maintain a record of curators' decisions to inject a story into the Trending Topics section or target a story for removal? If such a record is not maintained, can such decisions be reconstructed or determined based on an analysis of the Trending Topics product?

---

[6] Josh Constine & Sarah Buhr, *Facebook responds to claims of biased Trends, says it has neutrality guidelines*, TECHCRUNCH, May 9, 2016, http://techcrunch.com/2016/05/09/facebook-workers/.
[7] *Id.*

Mr. Mark Zuckerberg
May 10, 2016
Page 3

     a.  If so, how many stories have curators excluded that represented conservative viewpoints or topics of interest to conservatives? How many stories did curators inject that were not, in fact, trending?

     b.  Please provide a list of all news stories removed from or injected into the Trending Topics section since January 2014.

Please provide the requested information as soon as possible, but by no later than May 24, 2016. In addition, please arrange for your staff, including employees responsible for Trending Topics, to brief Committee staff on this issue. If you have any questions, please have your staff contact Ashok Pinto or David Quinalty of the Commerce Committee's Majority staff at (202) 224-1251. Thank you in advance for your prompt attention to this matter.

Sincerely,

JOHN THUNE
Chairman

cc:    The Honorable Bill Nelson, Ranking Member

# DEFENDANTS' EXHIBIT 30:

Hearing - Hearing Transcripts

## Title Info

| | |
|---|---|
| Title: | Senate Judiciary Subcommittee on the Constitution Holds Hearing on Technological Censorship and the Public Discourse |
| Date: | April 10, 2019 |
| Committee: | Judiciary;SenateSubcommittee on the Constitution. Committee on the Judiciary. Senate |
| Source: | Transcript |
| Permalink: | https://congressional.proquest.com/congressional/docview/t39.d40.tr041001 19.h17?accountid=14740 |

## Body

Senate Judiciary Subcommittee On The Constitution Holds Hearing On Technological Censorship And The Public Discourse

April 10, 2019 02:30 P.M.

SPEAKERS:

SEN. TED CRUZ (R-TEXAS), CHAIRMAN

SEN. JOHN CORNYN (R-TEXAS)

SEN. BEN SASSE (R-NEB.)

SEN. MARSHA BLACKBURN (R-TENN.)

SEN. MIKE LEE (R-UTAH)

SEN. MICHAEL D. CRAPO (R-IDAHO)

SEN. BEN SASSE (R-NEB.)

SEN. JOSH HAWLEY (R-MO.)

SEN. LINDSEY GRAHAM (R-S.C.), EX-OFFICIO

SEN. MAZIE K. HIRONO (D-HAWAII), RANKING MEMBER

SEN. RICHARD J. DURBIN (D-ILL.)

SEN. CHRIS COONS (D-DEL.)

SEN. SHELDON WHITEHOUSE (D-R.I.)

SEN. KAMALA HARRIS (D-CALIF.)

SEN. RICHARD BLUMENTHAL (D-CONN.)

SEN. DIANNE FEINSTEIN (D-CALIF.), EX-OFFICIO

[*]CRUZ: This hearing is called to order. Welcome. Free speech is foundational to our Constitution. The First Amendment and the Bill of Rights begins by protecting our rights to free speech and our democratic processes depend upon robust free speech, speech with which we agree and speech with which we disagree. The marketplace of ideas.

Since the beginning of journalism, there has been bias in the media. From the first journalist carving on stone tablets, media bias and bias of human beings has been a fact of life. But today we face an altogether different threads. The power of big tech is something that William Randolph Hearst at the height of yellow journalism could not have imagined.

In particular what makes the threat of political censorship so problematic is the lack of transparency, the invisibility. The ability for a handful of giant tech companies to decide if a particular speaker is disfavored, that he or she may speak and their words simply fade into the ether, that no one hears what they say and nobody knows that no one hears what they say. Not only does big tech have the power to silence voices with wh--with which they disagree but big tech likewise has the power to collate a person's feed so that they only receive the news that comports with their own political agenda.

Polling shows roughly 70 percent of Americans receive their political news from social media. That power is enormous and I will tell you in traveling the state of Texas and traveling the country over and over again I've heard from Americans concerned about a consistent pattern of political bias and censorship on the part of big tech.

Big tech enjoys a special immunity from liability under what's called Section 230 the Communications Decency Act. Now a great many people agree that the pattern, the anti-conservative bias and the pattern of censorship we are seeing from the tech is concerning. The question of remedy is a more complicated one.

What to do about it is a thorny question. It's a thorny legal question, it's a thorny policy question. Nobody or at least nobody in their right mind wants to see a government speech police. No one wants to see the federal government regulating what is allowed to be said. But there are at least three potential remedies that can be considered either by Congress or the administration or both.

The first I mentioned is Section 230 of the Communications Decency Act that provides a special immunity from liability that big tech enjoys that nobody else gets. The predicate for that immunity from liability is that the social media platforms were understood to be neutral public forum. In other words, they were simply posting what others said; they weren't engaging in their own political advocacy.

And I will note some commentators have misunderstood the argument I am making with this in that they suggested that I'm arguing that Section 230 requires in its statutory text that big tech companies be neutral public forum. That's not my argument.

My argument is that big tech made effectively a bargain with Congress and a bargain with the American people; we will be neutral, we will be there, we won't be biased in exchange for that we will receive what is effectively a federal subsidy of immunity for liability. If big tech wants to be partisan political speakers it has that right but it has no entitlement to a special immunity from liability under Section 230 that the New York Times doesn't enjoy, that the Washington Post doesn't enjoy, that nobody else enjoys other than big tech.

The second potential avenue for remedy is the antitrust laws, applying the antitrust laws in this area is complicated but by almost any measure the giant tech companies today are larger and more powerful than standard oil was when it was broken up. They are larger and more powerful than AT&T was when it was broken up. And if we have tech companies using the powers of monopoly to censor political speech, I think that raises real antitrust issues.

The third potential avenue of remedy is under principles of fraud. Most users of Facebook, Twitter, Google when they use those services, they don't envision that they are participating in a biased forum. They believe that when they speak the people who have chosen to follow them will hear what they say and there are distressing pieces of evidence that suggest that is not the case.

Now I will note much of the argument in this topic is anecdotal. It's based on one example or another example. There is a reason for that because we have no data. There is no transparency. Nobody knows how many speakers Twitter is blocking, how many speakers Facebook is blocking. Nobody knows what the raw data is in terms of bias.

So one of the first things that this hearing seeks to accomplish is simply move us towards transparency to understand what the facts are. Argument by antidote is less than satisfying but it is all that we are left with as long as big tech remains a black box that simply says trust us.

Senator Hirono?

HIRONO: I join the chairman in welcoming our witnesses this afternoon. There are many areas where the Senate should be conducting oversight of the tech industry; baseless allegations of anti-conservative bias is not one of them.

We still need a full accounting of the ways that Russia used Facebook and other forms of social media to influence the 2016 election. YouTube is full of misleading and outright false information about vaccines that has put the public at risk. The alt right continues to use Twitter to organize and spread hate.

Each of the companies that will be testifying here this morning failed to continue contain the spread of the video of the mosque shootings in New Zealand, videos that can still be found on these platforms. These are just a few of the real and serious issues we could investigate about the tech industry. Yet here we are discussing claims of anti-conservative bias that have been disproven time and again. One of our witnesses, Professor Francesca Tripodi studies partisanship on social media and finds that conservative perspectives abound on Facebook, Google, and Twitter.

She describes claims of anti-conservative bias as nothing more than a mix of anecdotal evidence which the chairman has acknowledged and a failure to understand the companies' algorithms and content moderation practices. Professor Tripodi's conclusions are consistent with those of media watchdog Media Matters and others that anti-conservative bias simply does not exist.

So why are we here? If anti-conservative bias by the tech industry has been proven false why in the world are we holding a hearing on it in the United States Senate? The answer is simple. People, it's politics. For decades Republicans have bashed the supposedly liberal mainstream media in an effort to work the reps and gain more favorable coverage and the strategy has worked.

Research shows that major news outlets have overcompensated for their perceived liberal bias by treating Democrats more harshly than Republicans. For example, the Harvard Kennedy School's Shorenstein Center on Media, Politics and Public Policy found that Hillary Clinton received a larger share of negative news coverage over the course of the 2016 election than Donald–Donald Trump did. Now that two-thirds of Americans get their news from social media Republicans have a new bogeyman to target, big tech. And just like traditional media–media, tech companies have responded to false claims of bias by trying to placate the right.

In June 2016 Facebook's chief operating officer, Sheryl Sandberg, went to the conservative American Enterprise Institute to announce that Facebook would offer political bias training to its employees. Over the past two years, Facebook and Twitter have dispatched emissaries to meet with Republican leaders and conservative commentators behind closed doors. Last summer Twitter CEO Jack Dorsey seemingly apologized in response to baseless claims that Twitter engaged in so-called shadow banning of conservatives tweeting we have a lot more work to do to earn people's trust on how we work.

We simply cannot allow the Republican Party to harass tech companies into weakening content moder–moderation policies that already–that already failed to remove hateful, dangerous and misleading content.

Anyone who frequents social media knows that the online world can be a pretty vile place. Unfortunately few people know this better than another one of our witnesses, Robbie Parker. Robbie is the father of Emily Parker, one of the 20 children and six adults murdered at Sandy Hook Elementary School in December 2012.

After suffering through this terrible tragedy Robbie and his family have spent the past 6+ years dealing with online harassment from conspiracy theorists who claim the shooting was a hoax. Think about that. Robbie had his daughter tragically taken from him. While he struggled to cope with that loss, he had to deal with people telling him that his daughter didn't die, that he was a crisis actor paid to stage a shooting as a way for the government to confiscate people's guns. To this day if you Google Robbie's name you are presented with links to conspiracy sites.

And just yesterday I Googled Robbie Parker and this is what I got back. Two of the three videos claim that Sandy Hook was a hoax in the very first webpage returned is called quote if Sandy Hook was not a hoax how do you explain the Robbie Parker video end quote. This is over six years since the shooting at Sandy Hook Elementary School and these lies are still being featured by Google.

I had hoped to discuss this and other concerns I have with Google during today's hearing. Unfortunately, the chairman rejected Google's proposed witness and wouldn't even let him attend at my invitation. So there is an empty seat over there at the witness table.

This is important because Robbie is an example of the real world harm that comes with content posted on the Internet. He is an example of why strong content moderation is necessary.

Now I understand that some conservatives have had content remove based on Facebook's, Google's and Twitter's content moderation policies but let's be clear it's not because they are conservative. After all Google and Facebook are two of the biggest and most profitable companies on the planet acknowledged by the chair, too. They did not reach this level of success by turning away a portion of their potential customers.

If conservatives have had their content removed maybe they should look at the content, at the content that they are posting. Maybe they shouldn't post lies about Planned Parenthood selling baby body parts. Maybe they shouldn't inflame religious tensions by misrepresenting the tenants of one of the world's major religions or maybe they shouldn't use their platform to harass and spread lies about a dad who lost his little girl in the most tragic way possible.

I hope that going forward this subcommittee will focus on the real issues facing America like hate speech, like voter suppression, like looking into the emoluments clause. That's what I'd like this committee to pursue, Mr. Chairman. Thank you.

CRUZ: Thank you, Senator Hirono. And now to address the question of whether or not bias and censorship exist we have a member of this committee who indeed has faced it firsthand, Senator Blackburn.

BLACKBURN: Thank you, Mr. Chairman, and I think it is fair to say I have had a couple of brushes with social media companies in the past couple of years. And I will also say it is indeed a pleasure and an honor to live in a country that values free speech.

We see this as a cherished constitutional right. In authoritarian countries like Russia or China there is no such thing as free speech and if you were to voice any form of dissent or criticism then surprise, a Communist Party official shows up on your doorstep and they take you to prison. Fortunately, we live in America.

I will tell you that I do think it's time for tech companies like Google and Facebook to start embracing the spirit of the First Amendment, not just for their own employees but for all of the Americans who use their platforms. What value is there in platforms that are more concerned with inserting their bias than providing a neutral place for people to discuss their ideas?

Companies like Facebook and Google which have transformed society in revolutionary ways need to recognize that with that power comes great responsibility. Facebook is a corporation, not a state actor. Yet Facebook runs a forum for debate like the town public square except there is no mayor or sheriff that would be allowed to police conversation the way that Facebook sensors conversation online.

Last June I published an op-ed urging Silicon Valley companies to respect a diversity of opinions and to address allegations of conservative bias on their platforms. If they truly were impartial actors encountering a series of unfortunate events, lay their case out for the American public; lay out your case. My suggestions really didn't go over very well in the Silicon Valley. Little has changed since then.

Earlier this month Google bent the knee to employee demands to shut down its external AI Ethics Board because heaven forbid a woman serving on the committee was the president of a respected conservative think tank. For these employees in Silicon Valley, conservative credentials are absolutely a scarlet letter.

Unfortunately, Facebook is no different. By one count Facebook had nearly 2 dozen scandals over privacy violations in 2018 alone. At some point, Facebook will have to atone for these sins. Clearly, GDPR isn't causing the company much pain. If anything it appears to have solidified their dominance in the marketplace while increasing barriers to entry for potential competitors.

I think we should be clear that at least here in the United States Senate Mark Zuckerberg's pivot to privacy isn't fooling anybody. This sudden support for European-style privacy protections is disingenuous by allowing the Europeans to force their hand when it comes to addressing content including political speech Facebook can cloak itself in altruistic cloth while conveniently elevating any constitutional arguments back at home. In order to arrive at consensus on privacy, data security and net neutrality issues we are maintaining a bipartisan posture both on the Commerce and Judiciary committees.

This week Senator Klobuchar and I sent a letter to the FTC urging stronger action for bad actors in the tech sector. Americans are rightly concerned about who owns their virtual you. They want to be certain that their privacy is protected, both in the physical and the virtual space. The FTC has a responsibility to hold tech companies accountable for securing their platforms. Big tech is accustomed to living in a bubble with the same comfortable and progressive ideas.

But let me tell you right now that bubble is bursting. When I voice my concerns about infringements on our freedom of speech a senior Google search engineer called me a terrorist. I was a congressman when I voiced my concerns in 2018 and I sit before you now as a senator and a member of this panel. No matter what I will continue to protect the right of Americans to engage in free speech, even speech I disagree with. I wish big tech would show the same respect.

Whether Californians like it or not they are going to need to work with us and negotiate with us to see how we can bring meaningful privacy reforms to the people of the United States of America. I yield back.

CRUZ: Thank you, Senator Blackburn. I will now introduce each of the two witnesses on our first panel.

The first witness is Carl–Carlos Monje Jr. who is Twitter's director of policy and philanthropy for the United States and Canada. Before joining Twitter Mr. Monje spent over a decade in public service including multiple senior-level positions in the Obama administration.

From 2014 through 2016 he served in the U.S. Department of Transportation rising to acting undersecretary and assistant secretary for transportation policy where he oversaw the implementation of surface transportation programs. Prior to joining the Department of Transportation Mr. Monje served for three years in the White House Domestic Policy Council where he oversaw all aspects of policy, message and event development across a wide spectrum of domestic policy issues. Mr. Monje is from New Orleans, a first-generation American and a graduate of Harvard College.

The second witness is Neil Potts. Neil Potts is the public policy director at Facebook where he currently leads the content policy and strategic response teams. He oversees the development and implementation of Facebook's community standards, the rules for what types of content are allowed on the platform.

Mr. Potts previously spent a decade in Washington, D.C. as a public policy and legislative affairs attorney including five years at the Truman National Security Project. He is a veteran of the United States Marine Corps having served five years as an intelligence officer after graduating with a degree in mathematics from the United States Naval Academy. He is a graduate at University of Virginia School of Law.

Welcome to you both. I would ask that you stand, raise your white–right hand and be sworn in. Do you swear or affirm that the testimony you are about to give before this committee will be the truth, the whole truth and nothing but the truth so help you God?

Mr. Monje, you may go first.

MONJE: Thank you, sir. Chairman Cruz, Ranking Member Hirono, members of the subcommittee thank you for the opportunity to appear today. Twitter is an American company and Twitter's purpose is to serve the public conversation. We welcome perspectives and insights from diverse sources and embrace being a platform where the open and free exchange of ideas can occur.

We put the people who use our service first in every step we take. We have rules in place that are designed to ensure the safety and security of the people who come to our service. Safety and free expression go hand in hand, both online and in the real world. If people don't feel safe to speak, they very often won't.

These two guideposts, free expression for all perspectives and rules of the road to promote safety are not only in our users' interest but also paramount to sustaining our business. Let me be clear about an important and foundational fact. Twitter does not use political viewpoints, perspectives or party affiliation to make any decisions with are related to automatically ranking content or how we enforce our rules.

Every day elected representatives use Twitter to communicate with their constituents, with their peers and international counterparts. In the United States, every single senator, governor and House member has a Twitter account. Millions of people around the globe take to Twitter to engage in conversations on a wide range of issues. The notion that we would silence any political perspective is antithetical to our commitment to free expression.

There has never been a time in history when individuals have had more tools to reach a broad audience. And Twitter continues to be one of the most popular platforms for conservative voices. In preparation for this hearing and to better inform the members of the subcommittee our data scientist analyze tweets sent by all members of the House and Senate for a five-week period from February to March of this year.

After controlling for factors like number of followers we observed that there is no statistically significant difference between the number of times a tweet by a Democrat is viewed versus a tweet by a Republican. Their performance is the same because the Twitter platform does not take sides.

Let me address a few high-profile issues that have led some to question our impartiality. In July of last year, we acknowledged that some accounts including those of Republicans and Democrats were not being auto-suggested when people were searching for a specific name. This means that you had to hit enter before seeing them in the search results. This issue impacted 600,000 accounts across the globe, the vast majority of which were not political and however, 10 accounts of Republican members of Congress were affected.

The auto-suggest issue happened because twitter had tweaked a behavioral-based algorithm designed to reduce abuse. Specifically, we were down-ranking content if a significant number of an account's followers had histories of breaking our rules. Once we identified this issue, we probably resolved it within 24 hours and it is important to note that because Twitter is so transparent follower accounts of those members of Congress spiked following the publicity on the issue.

I would like to discuss another recent issue the account @unplannedmovie. This account was caught in our automated systems used to detect ban evasion. Ban evasion technology is an important tool to reduce the number of repeat offenders on our platform. Specifically, the person who created the movie's account was previously suspended for breaking our rules. We reinstated @unplannedmovie as soon as it was brought to our attention that the account was not being used for similar violative activity and the hashtag unplannedmovie became a trending topic on Twitter.

Many other accusations of bias stem from issues about how our platform organizes information and often very serious violations of our terms of service which are not always visible to the public. I explain these in greater detail in my written testimony.

Every day we see hundreds of millions of tweets and thousands of violations of our policies. We try to get each one of those right but we do make mistakes on all sides of the political spectrum and all around the world. We will consistently work to get better and to be more transparent about our efforts.

Senator Blackburn, we apologized to your Senate office and to the campaign but on behalf of Twitter, I apologize again. We made the wrong call. We develop policies governing advertisements that run on Twitter to try to balance allowing our advertisers to promote messages with protecting individuals who did not ask to see that ad. I am sorry.

Twitter wouldn't be Twitter if everyone had the same viewpoint. We strive to balance safety and freedom of expression every day. We believe strongly in being impartial and we endeavor to enforce our rules dispassionately. We work extremely hard to make sure our algorithms are fair and aim to be transparent and fix issues when we make mistakes in order to maintain the trust of our users, advertisers and the general public.

Thank you and I look forward to your questions.

CRUZ: Thank you. Mr. Potts?

POTTS: Thank you, chairman. Chairman Cruz, Ranking Member Hirono and distinguished members of the subcommittee thank you for the opportunity to appear before you today.

My name is Neil Potts and I am a Director at Facebook with oversight of our community standards. Those are the rules which allow what types of content we have on the platform. I am a graduate of the United States Naval Academy and the University of Virg–Virginia School of Law. Prior to joining Facebook, I served as a ground intelligence officer in the United States Marine Corps where I was deployed in support of Operation Iraqi Freedom and Enduring Freedom.

Facebook's mission is to give people the power to build community and to bring the world closer together. More than 2 billion people come to our platform every month to connect with family, to connect with friends, to find out what is going on in their world, to build their businesses, to volunteer or donate to organizations they care about and to help those in need.

Our users share billions of pictures, stories, and videos about their lives and their beliefs every single day. It is this diversity of viewpoints and expression of experiences that highlights much of what is good about Facebook. But can also mean that it is tough to make decisions about what should be and should not be allowed in the platform.

I would like to make one point clear. Facebook does not favor one political viewpoint over another and we do not suppress conservative speech. We are committed to encouraging dialogue and the free flow of ideas by designing our products to give people a voice by implementing standards and to ensure fair and transparent processes for removing content that does not belong on Facebook.

We created our community standards to standardize our content removal decisions so they can be applied consistently, fairly, neutrally to a community that transcends regions, cultures, religions and languages. And we take that neutrality seriously. Our artificial intelligence algorithms have been designed and our human content reviewers have been trained to ensure that content is reviewed in a neutral unbiased way. And we are really focused on what is needed to keep our users safe.

Our community standards should not prohibit users from discussing controversial topics or supporting a debated point of view nor do they favor opinions on one end of the political spectrum or another. Given the vast amount of content we have on our platform, our reviewers have to respond to millions of reports each week from people all over the world.

We don't always get it right. We know there have been a number of high-profile content removal incidents and we are taking several steps to respond to those concerns raised by the subcommittee and others.

First, we publish a Community Standards Enforcement Report twice a year. That report describes the amount and types of content we have taken action against. We publish comprehensive guidelines to provide more clarity around content moderation decisions.

Second, we have solicited external feedback on our content moderation policies and sources across the political spectrum. For example, former Senator Kyl, he is leading a team gathering insights from members of Congress, a number of conservative groups assessing whether there are any ways in which the company is unintentionally biased against conservative points of view.

Another example is Laura Murphy. She is a national civil liberties and civil rights leader who is guide an independent civil rights audit of our platform. Third, we have created an appeals process for content that has been removed from our platform as hate speech. We are working to extend that process further by creating an independent Oversight Board of experts for on free speech and safety to render binding and transparent decisions on these appeals.

Fourth, we have partnered with over 100 groups across the political spectrum. We are continuing to expand that list of outside partner organizations to ensure we receive feedback on our content policies from a diverse set of viewpoints. And finally, we are continuing our work to refine and enhance the quality of our machine learning. The machine learning which is our first line of defense (INAUDIBLE) content assessment on our platform.

We hope that these improvements and safeguards will help ensure that Facebook remains a platform that enables the broadest spectrum of free expression possible while still keeping our space welcoming and safe for the entire community. There is a lot more to do but we are proud the significant progress we have made over the last few years. Still, we know that people have questions and I appreciate the opportunity to be here today.

CRUZ: Thank you to both of the witnesses and I will note also for the record that originally there was planned to be a third witness from Google as the ranking member observed. However, Google declined to provide a witness of comparable seniority and responsibility in the company as the other two witnesses here. And so accordingly this committee will be conducting a separate and subsequent hearing focused directly on Google and the issues of Google's censorship of speech.

Gentlemen, let me—let me start with a question that I have asked both of your companies more than once which is a—a simple and straightforward question that I would like to get a simple and straightforward answer to which is and let's start with you, Mr. Monje. Does Twitter consider itself a neutral public forum?

MONJE: Twitter strives every day to be an impartial platform where all voices can come and speak.

CRUZ: Mr. Monje you answered this recently in the House and gave an answer that was a long paragraph and—and it didn't answer it. So I'm going to try, I don't actually expect to get an answer because I have asked you this before but are you able to answer yes or no whether you consider yourself a neutral public forum?

MONJE: I didn't testify in the House, sir. I—I will answer the same way which is—

CRUZ: Okay, please—please do that.

MONJE: —which is that Twitter is an open Internet platform where people from all stripes and political affiliations all around the globe come and speak.

CRUZ: Okay. Let me help you recently. Let—let—let me help you. So recently the CEO of—of Twitter Jack Dorsey said quote I don't believe that we can afford to take a neutral stance anymore. I don't believe that we should optimize for neutrality. Does this represent the policy of Twitter?

MONJE: I have not seen that quote, sir.

CRUZ: Do you agree with it?

MONJE: That is not how he is building the platform and how everybody who comes to Twitter every day. I think it's important to note sir that three-quarters of our users are overseas and that we are a global company that is staffed globally.

CRUZ: All right. Mr. Potts, same question for Facebook. Does—does Facebook consider itself a neutral public form?

POTTS: Thank you, chairman. I think first and foremost we consider ourselves our technology company. We are a platform for diversity of viewpoints and we moderate those viewpoints of our community stand—standards.

CRUZ: Okay. I'm going to try one more time to get a yes or a no but—but your company has likewise consistently refused to answer this so I probably can't. Do—do you consider yourself a neutral public—you have a choice you could be yes or no. I am fine either way.

POTTS: Again—again, chairman, we are a technology company. We have a mission to build a community to bring the world closer together. We try to do that through our community standards to ensure that diverse viewpoints are allowed on the platform.

CRUZ: All right let's—let's try a second area of inquiry. The ranking member suggested that there is no censorship and indeed she said there are just a handful of antidotes. You know I will note among other things that Senator Blackburn, her announcement video announcing for the United States Senate was pulled down as Mr. Monje rightly apologized for.

But yet these antidotes all seem to be consistently on one side of the spectrum. So—so let me ask a question, Mr. Monje. In the year 2018, how many tweets from elected officials did Facebook pull down? I'm sorry, Twitter pull out?

MONJE: I—I would have to get back to you on those specific cases. If—if I could follow up though, sir. Every day we see 500 million tweets and we have to action thousands of accounts and those happen literally all across the political spectrum and literally all over the globe. One in a million happens 500 times a day on Twitter and if you are looking for data points to support any narrative you can find it. We do have—

CRUZ: Are you aware—

MONJE: -- we do have a number--

CRUZ: Are you aware of even a single Democratic politician who has had a tweet pulled down? I am not.

MONJE: I—I am.

CRUZ: Could you share that, please?

MONJE: Yes, sir, and I will note that we are as committed to transparency as--as--as you have described and have taken a number of steps to improve transparency. We also have to protect the privacy and security of our users, people who didn't ask to be part of the spotlight. But let me follow up on your question, sir.

CRUZ: Although to be fair someone is tweeting; they are asking the world to see what they are saying I mean that's the essence of a social media post as you are posting it.

MONJE: That's true but our actions on--on those accounts are also matters that are extremely sensitive and--and--but if I could follow up on your--

CRUZ: Please.

MONJE: -- specific question. I am not going to mention specific names in a public forum but very recent examples we recently changed our impersonation policy that allows if--if I could sir you--you asked the question. Our impersonation policy that allows third--third parties to report impersonation and we had two current U.S. sitting senators, a sitting governor, and a sitting state attorney general, all Democrats, who were impacted by the.

Second case, advertising transparency we--we honored the ideas that were part of the Honest Ads Act and agree with the idea that political advertising should be more transparent. In the process of setting that up a number of accounts got caught up in that that include three current Democratic candidates for president and a major national pro-choice group.

Somebody mentioned the general data protection regulations out of Europe--

CRUZ: Okay--okay. The time--

MONJE: --the main--the main purpose being, sir, is that these folks didn't put out a press release about it. They--they called us. We--we do trainings to all members of Congress.

CRUZ: Well, Mr. Monje I appreciate you saying you will answer the questions when we provide them in writing. I would like to get specific answers to the question. Let--let me--let me pose it to Mr. Potts and I--I will point--Mr. Potts in 2018 how many posts from elected officials did Facebook pull down?

POTTS: Chairman, I--I don't have that figure but I'm happy to follow up with you at a later time.

CRUZ: Well, I would ask you to and I would note that when Mr. Zuckerberg testified before this full committee, I submitted that question and a number of other questions in writing to Facebook and you at the time refused to answer it and gave the company instead gave legal boilerplate and refused to answer the question. Nobody here knows, we know that Senator Blackburn's post was pulled down.

Let me--let me ask a comparable question because it's not just political, it's also ideological. There have been multiple instances of a particular pro-life groups being disfavored. For example here is a tweet that says abortion is profoundly anti-women and it is a quote from Mother Teresa and this tweet was blocked. Now it is fairly remarkable that Mother Teresa is now deemed hate speech. Do either of you would agree with the proposition that Mother Teresa is--is issuing hate speech? Is--is this hate speech?

MONJE: If I could take a step back from that I believe that--that account is from the Susan B. Anthony List--

CRUZ: Correct.

MONJE: --and Susan B. Anthony is currently an advertiser in good standing on our platform. Last week--last promoted (INAUDIBLE).

CRUZ: Mr. Monje you are very good at not answering questions. Is this hate speech?

MONJE: I--every--every tweet has context behind it and every decision that is made has context--.

CRUZ: Full tweet. There is no more context.

MONJE: I--I--I can tell you that we have action and accounts on both sides of this debate including tweets by pro--by pro-choice groups who have said that everybody who is pro-life is misogynistic. There are many pro-life groups that advertise on our platforms currently in good standing and advertisers across the board whether they are selling soap or NFL sometimes have advertisements that are caught in our--our systems.

CRUZ: And that is an area we will be following up as well. So I appreciate your saying there groups on the pro-choice side that you have blocked in this committee is going to attempt to understand and quantify if there is a disparate treatment or not. If there is not a disparate treatment that will benefit Twitter to show that you are being evenhanded. The antidotes we are aware of are consistently on one side of the aisle. Mr. Potts do--do you consider this hate speech? Does Facebook consider this hate speech?

POTTS: Chairman, I don't believe this was on our site but looking at that quote right now the lights are a little bright so my eyes are trying to zero in or focus I should say, that would not be in violation of our policies.

CRUZ: And same question that Mr. Monje was asked, are you--has Facebook to your knowledge ever blocked a post from Planned Parenthood?

POTTS: I--I believe that is correct. I believe we have, senator.

CRUZ: Okay. We would be very interested in learning about that. When I ask Facebook that in writing after--after Mr. Zuckerberg's hearing you again refused to answer that question as well. And--and so the basic data if you are not engaged in censorship, releasing the data how many people you are blocking, how many people you are downgrading and what side of the political aisle or ideological aisle they are would go a long way to either clearing it up or to demonstrating there is a persistent pattern of bias. Senator Hirono?

HIRONO: (INAUDIBLE)

CRUZ: Senator, you--you may take the time you like.

HIRONO: But I see there are all of these people so you know I don't want to take up their--let's try to stick with five minutes.

CRUZ: I'll tell you what when you chair the committee you can decide on the time.

HIRONO: I hope that day come soon. We will do our best to be really amicable around here. So Mr. Potts how many postings are on Facebook every day?

POTTS: Thank you ranking member. There are over a billion postings on Facebook every day. That includes images, text post, videos and other types of content.

HIRONO: 1 billion and Twitter, Mr. Monje?

MONJE: It's Monje, thank you so much.

HIRONO: You said 500 million tweets--

MONJE: Yes--yes, ma'am.

HIRONO: --every single day. And I think both of you said you are not perfect in your efforts to try and get rid of some of the dangerous, violent, hateful content. I think both--did both of you say that?

MONJE: Yes, ma'am.

HIRONO: And neither one of you is perfect, your companies?

POTTS: No, ma'am.

HIRONO: Okay. So with 1 billion postings every single day, 500 million every single day would it be accurate for me to say that I could find all kinds of in fact as to one of our other witnesses I found you know just yesterday all kinds of what I would say totally false allegations about that so I probably could find all kinds of things that are on Facebook right now that in my view should be taken down but I don't expect you all to be perfect. So it's in that context.

Let's just make it really plain and clear. Do your platforms discriminate against conservative users? Do your algorithms have something that says these are the kinds of words that conservatives use so we are just going to get rid of those postings? Or tweets?

POTTS: Ranking member, our algorithms, our policies, our enforcement we do not suppress any type of views whether conservative or liberal.

HIRONO: So you don't have any algorithm that says here are the kind of words and the areas that they go to and we are just going to get rid of them? You don't have anything like that?

POTTS: No, senator.

HIRONO: What about you?

MONJE: No, ma'am. Party affiliation and political ideology is never an input.

HIRONO: So do your--do either of your platforms discriminate against conservative content?

POTTS: Senator, we review our content under our community standards. If it violates our community standards, we apply those community standards evenly despite political ideology.

HIRONO: So your community standards, by the way, is a little bit different than when you said that you try to ID and remove violent, hateful or dangerous content but the community standards are a little bit broader or different than those three (INAUDIBLE).

POTTS: I'm sorry. Thank--thank you, senator. They are a bit more broad. They do include those but they cover over 22 sections. They are--we are transparent with their community standards. The same guidelines that our reviewers use to moderate content, those are available at Facebook.com\communitystandards for the public to review so that the public also knows how to regulate their behavior on the platform.

HIRONO: Does Twitter have something that's akin to Facebook's community standards?

MONJE: Yes, ma'am. We call them our terms of service and they are available at help.twitter.com.

HIRONO: Terms of service.

MONJE: Terms of service.

HIRONO: OK. But you also try to ID and remove violent, hateful or dangerous content?

MONJE: That's right. Yes. We have--we have a--a range of rules.

HIRONO: Does a user's political party affiliation play an application of a company's con--content moderation policies? In fact--are your users supposed to identify them their political affiliations before they use your platforms?

MONJE: No, ma'am.

HIRONO: How are you even supposed to know what their political affiliations are? Do you? Certainly, you don't ask for them, right? OK. Now there--there are some things that really--you are huge entities. I agree with the chairman on that. So, after the trag--tragedy at Sandy Hook Elementary School in 2012 the families didn't even have time to buy their chi--bury, sorry, their children before conspiracy theories began to spread around the internet claiming that the shooting was all a hoax. I understand that many of the families reached out to each of your companies to remove these lies, but that most of their requests went unanswered. The content was only removed if it included a photo or a video protected by copyright. Why did your companies allow these lies on your platforms even after they had been identified by the families? You can start, Mr. Potts.

POTTS: Thank you, senator. We now have strong policies to prevent that type of behavior. My--my heart goes out to the--the members here who have a connection to Sandy Hook and o--other violent tragedies. If someone accuses a victim of a violent tragedy as--being a crisis actor or that it never happened--we do remove that content as of today.

HIRONO: You saw my board right there and it's still on there. I don't know if that's Facebook though. I don't want to accuse the wrong company.

POTTS: I believe that is all Google, ma'am.

HIRONO: OK. Who is not here today? OK. I wish they were here. So, why--you say that you now have policies--when did you adopt those policies?

POTTS: I will have to go back to check to confirm, but it was a--about a year maybe a little over a year ago.

HIRONO: It took you quite a while a--after the tragedy 2012. I'd like to have Mr. Monje answer also before we move on.

MONJE: Thank you, senator. It is a terrible tragedy. I just met Mr. Parker and our hearts break for--for his families and those that lost loved ones. We have also updated our internal abusive behavior policy to make clear that targeting other people with content that denies that violent events happened is against--is against our rules.

HIRONO: When did you update your policy?

MONJE: It was last year.

HIRONO: So, it took both of you quite a long time to get to that. I would ask that--that well, now that you have these policies then I guess I--I'm hopeful that these kinds of lies against individuals do not get on your platforms. Thank you.

CRUZ: Would Senator Hirono like any additional time?

HIRONO: Thank you. Actually, yes.

CRUZ: OK.

HIRONO: Google is not here and so, I mentioned in my opening statement that I'm disappointed we don't have a witness from Google. And Google was ready and willing to send its acting director of political and stakeholder outreach, Max Pappas to testify. You rejected Google's offer. And my staff offered to invite Mr. Pappas as a minority witness. They were told by your staff they could not do so because they had been told that no Google witness would be permitted to testify at the hearing. And in fact, Mr. Pappas is at the same level of responsibility as our two other witnesses right now. So, I would like to enter into the record--I would like to ask for unanimous consent to enter into the record the testimony of Mr. Pappas.

CRUZ: Without--without objection.

HIRONO: Thank you.

CRUZ: Senator Lee.

LEE: Thank you, Mr. Chairman. Thanks to both--both of you for being here. This is an important issue and I think it's important to remember that any time we're talking about speech and someone brings up hate speech there is a difference of course, between what could lawfully be prohibited if we were talking about government prohibition on speech on the one hand and speech that someone hates on the other hand. And I'd--I'd like to start with you, Mr. Potts--can you tell me, Facebook has a different standard for content generated by a user who is not a paid advertiser versus paid advertisements. Is that right?

POTTS: That is correct, senator. Content policies apply to all u--user generated content. That's the community standards. That is the baseline. For advertisers, there are more stringent standards that sit on top of that--of those policies.

LEE: OK. And the reason for that is you--you are being paid for that content and you feel a responsibility to moderate that content at a greater degree is that roughly accurate?

POTTS: Yes.

LEE: OK. Are you--you familiar with an instance a few months ago in which Susan B. Anthony Lists topic that came up in a slightly different context a few minutes ago--ran a couple of ads dealing with two prematurely born babies survived--Charlotte Ryan and Micah Pickering.

POTTS: Yes, senator. I am definitely familiar with the Micah Pickering example. Maybe a little less so with the Charlotte Ryan.

LEE: OK. So, let's go with the Micah Pickering example. I met Micah Pickering is a healthy, happy little boy now. His images were featured in an advertisement purchased by the Susan B. Anthony List in order to promote life. In order to promote the idea that children--even children born very prematurely in the range of 20 to 22 gestational weeks can still survive and go on to live as ha--happy, healthy human beings. And as I recall, that advertisements was taken back down by Facebook. Is that right?

POTTS: I believe that's correct. And I believe we reinstated that advertisement within 24 hours.

LEE: OK. At--at the time what was Facebook's explanation for why it was taken down?

POTTS: I--I think it violated one of our advertising policies.

LEE: Which policy would that have been?

POTTS: I believe it was around--we have a policy around somewhat graphic content, and someone viewed that to be graphic. I think that exactly it was the sensationalism policy, senator.

LEE: OK. Graphic content. Perhaps because it involved a medical procedure or perhaps because it depicted an infant in--in a position where an infant had tubes going into it or something like that.

POTTS: It is a medical procedure.

LEE: OK. A medical procedure going on that's depicted and that's regarded as graphic. Does your policy work evenhandedly such that regardless of whether we are talking about prolife versus prochoice what if the same image were depicted in a slightly different context--not advertising perhaps a--a prochoice cause but just another cause unrelated to prolife? For example, what if that same image of Micah Pick--Pickering or series of images had been used in the context of an advertisement designed to focus on the dangers a--associated with drug abuse a by a mother carrying a child?

POTTS: Thank you, senator. It--if it was the same picture, I am assuming that the same policy would have been applied, the--hopefully the same way. We like consistency there. As you know, that if there are different pictures that would perhaps force either the au--excuse me--either the automation or the reviewer to make a--come to a different decisions. So, if a child is viewed that is 20 weeks maybe versus 24 weeks I--I know that's very narrow for the reviewer it may be different, but if the--

LEE: Surely the reviewer is not going to be able to differentiate between--

POTTS: --Right--

LEE: --22 and 24 weeks surely that's not going to make a distinction.

POTTS: I don't want to--I don't want to try to get too nuanced there. But I--depending on if the--the view was this was too graphic, and I think because of the image which I--which I recall that decision was made although hit was made incorrectly to disallowed the--the ad.

LEE: But, in fact, Mr. Potts this is not hypothetical is it? This has happened. We did, in fact, see the Susan B. Anthony List advertisement taken down while we had corresponding--images used in advertisements that have not been taken down is that right?

POTTS: We have, again, I don't think we've had the same image used.

LEE: That's not the same image.

POTTS: Right.

LEE: But a–an image of an infant in a comparably vulnerable position.

POTTS: And I think it alt–and senator, I think it all turns on the word comparably. I think there were similar images, but not the same image. So, it makes the comparison a bit more difficult. But if they were the same image, I would expect them to have both been taken down by that same reviewer with a misapplication of our policies.

LEE: And what explanation can you provide for me as to why one might have been taken down and the other not. Regardless of whether you say they should have been consistent with Facebook's policy what might account for why they might receive differential treatment?

POTTS: Sometimes–senator I–I would like to say that as we mentioned, we review billions of posts and other pieces of content. Sometimes we make mistakes. In this case the reviewer that reviewed that piece of content with Micah he removed it incorrectly or he or she removed it incorrectly. If that's the case, I would expect that reviewer to make the same mistake not–regardless of who shared that image. Now, if we take a different image run by the SBA, run by anyone and place it there and he would–and if that person were to allow it, I would assume they would allow it across the board as well. I don't know if I'm doing a great job explaining that but I'm–

LEE: No, I–I think I understand what you're suggesting, and I–I understand and appreciate the point. Could it not also have to do with other factors including possibly who is more likely to complain about the Susan B. Anthony image? Who is more likely to work at Facebook? Could that have something to do with it?

POTTS: I–I don't believe so, senator. I think to a question of whether someone would try to influence a decision with their bias that's something that we really try to exclude to bring out a process to check any type of bias at the door. We have a very strong managing bias curriculum within the company. It's a rigorous program. I've never been in a position where I've written a policy or made a–an enforcement decision or sat with a product team building an engineering product where someone asked anyone's political affiliation or whether they were prolife or prochoice. Again, this one seems like a mistake I would have expect it to be made no matter who posted it.

LEE: OK. The chair is politely and gently reminded me that I'm over my time limit. I'm going to want to get back to this later. And I got to go cast a vote. I do think it's worth mentioning here it is something I consider a mathematical impossibility that there isn't a subjective component to this that involves who is reviewing it. You can't entirely mechanize this. You can't program it into an AI feature to–to monitor this. It–it seems to me mathematically impossible to suggest there isn't some subjective judgment calling going on and some of that might not be impacted by who works there. Now, Facebook is a private company. I differ from some of my colleagues in the approach I take to this. I don't view you as a public utility. I don't view you as being owned by the government. But some of my colleagues see it differently. And so, that's why it's important for us to flag this. As long as some of my colleagues see it that way I think this is something that your company ought to focus on, ought to try to work to resolve. We'll get back to that later. Thank you, madam chair.

BLACKBURN: Thank you. And before I get to my questions and we do have a vote on the board, Mr. Monje, you mentioned the GDPR. Let me just say privacy as we know it, as the world knows it today primarily is something the U.S. has led the way in creating privacy law. And then when you see this European style privacy that is GDPR you know that Europe doesn't have the most innovative and dynamic economy in the major players in this market are going to be U.S. companies. And needing to have a privacy standard, one set of rules for the entire ecosystem is the reason that I've reintroduced the Browser Act today so that we can do that.

Let me just touching on content for a second and we all I think have hoped that you would have a diversity of opinion in your platforms and that it would be a town square. And I know Facebook has a 27-page memo on censorship. And we would hope that while you are rooting out violence and terrorist propaganda and keeping that off your pages that you also are having your reviewers and your community that sets that–those standards and those that live and work there in California aware that free speech requires that they be respectful of speech with which they do not agree. And we would hope that you all would go back to California focused on exercising that with that respect to the law and respect to individuals. I've got a few questions.

Mr. Potts, should Facebook promote spirited debate on all sides of the political spectrum? And we'll do these as yes or no.

POTTS: Thank you, senator. Yes, we allow spirited debate on all sides (INAUDIBLE).

BLACKBURN: Mr. Monje, same question.

MONJE: Yes, ma'am.

BLACKBURN: OK. Mr. Potts, should Facebook allow ads urging that we save sea turtles or baby seals?

POTTS: I believe that would be fine.

BLACKBURN: OK. Mr. Monje, should Twitter allow ads that denounce Planned Parenthood for selling baby body parts?

MONJE: Ma'am, thank you for that question and I–I'd like to again apologize–

BLACKBURN: Yes or no. Yeah.

MONJE: Every–every ad is–is judged with–

BLACKBURN: Yes or no is good.

MONJE: Then we made a mistake on your ad and I apologize.

BLACKBURN: OK. Mr. Monje, should Twitter allow ads from Starbucks and Patagonia?

MONJE: If they follow our terms of service.

BLACKBURN: And Mr. Potts, should Facebook allow ads from Chic-fil-a and Hobby Lobby?

POTTS: If they follow our ad's policies.

BLACKBURN: OK. And who sets those policies?

POTTS: They are a teammate of mine. We have separate teams that work on ads policies.

BLACKBURN: Are they subjective or objective?

POTTS: They are–they are meant to be objective.

BLACKBURN: They are meant to be objective.

POTTS: They--they are--

BLACKBURN: Do people bring their attitudes to work with them? Their political attitudes to work with them.

POTTS: I--I was incorrect on my statement--they are objective and--

BLACKBURN: OK.

POTTS: --and we--we try to strive for (INAUDIBLE)--

BLACKBURN: OK. Mr. Monje, should Twitter equally provide democrats and republicans in search rankings?

MONJE: Yes. And we strive to.

BLACKBURN: Mr. Potts, same question.

POTTS: I'm sorry. I'm sorry. I'm sorry, senator.

BLACKBURN: Should you e--equally promote democrats and republicans in the search rankings?

POTTS: Yes--yes, senator.

BLACKBURN: OK. And Mr. Potts, should Facebook equally promote articles from all news sources whether they're from the Wall Street Journal or the Washington Post?

POTTS: For those two yes--yes, senator.

BLACKBURN: OK. We've got a presidential year coming up in 2020, so Mr. Monje please tell me what Twitter is doing to prepare its platform for censorship free debate.

MONJE: Thank you so much, senator. We--we--people come to Twitter to figure out what's going on the world and never is that more important than during elections. We spent a great amount of time in the lead up to the mid-term elections, which were the most tweeted about mid-term elections in history. We dramatically improved our ability to find e--efforts of disinformation, improved our partnerships with all the major parties with the government and with NGOs to figure out vectors of threats. And we had, what we believe, was an incredibly clean election. And as the world turns there are additional elections in the EU, Japan, India, in Israel yesterday. And we are going to continue to try to improve our systems to find disinformation, to make sure that there is greater context about who is speaking.

BLACKBURN: Now, I know Facebook has hired a news director. Have you all hired a news director?

MONJE: We are structured differently than Facebook. We do--I--as a platform we are running towards news and work with news publishers of all--all sorts to make sure that they can get their-their products out on our--on our platform.

BLACKBURN: OK. And Mr. Potts, Facebook's plan--their strategy for 2020?

POTTS: Thank you, senator. We've hired over 30,000 people that focus on safety and security. We made significant investments in what we call our election integrity. We have full time standing teams that are now focused on many of the elections in the world whether it be the EU, India, Israel as we mentioned yesterday. But definitely focused on 2020 within the United States to ensure we are out in front and to prevent any abuse that could occur on the platform.

BLACKBURN: Thank you. At this point, I'm going to have the committee stand in recess as we are in the middle of the vote I need to get to the floor and the chairman will return. And we will continue questions with the first panel.

(RECESS)

CRUZ: The hearing is back in order. Senator Hawley.

HAWLEY: Thank you very much, Mr. Chairman and thank you for permitting me to participate in today's--today's hearing. Mr. Monje, let's talk about--first of all, let me just say that I enjoyed your testimony about Mother Teresa and why she was or was not engaging in hate speech. I thought your inability to answer that question was absolutely hilarious and really indicative of the lack of transparency that your company is engaging in. So let me just ask you a few more pointed questions. The account for the movie Unplanned, why was it suspended?

MONJE: Thank you for that question, sir. I'll note that the Mother Teresa quote is currently still on Twitter.

HAWLEY: But you wouldn't say whether or not it was hate speech.

MONJE: If I could--what was your question again, sir?

HAWLEY: Right. The record will reflect that you would not say whether or not it was hate speech. That's what I said I thought was hilarious. My question is why was the movie for the--the account for the movie Unplanned band?

MONJE: Thank you, sir. It was--what we discovered--we have a system that tries to stop people have broken our rules in the past to come--from coming back on. The individual who started the @unplannedmovie account had previously been suspended for breaking our rules. And as a result, our automated systems flagged that account and--and it was taken down for an hour.

HAWLEY: And are all of the--will let me ask you this. I'll come back to that. Why it was the conservative columnist Jesse Kelly banned?

MONJE: We have been in contact with him about what he did and he understands the rules that he's broken. This is a challenge of a platform as broad as Twitter where people are doing things that are not always visible to the public and we can't comment because of his privacy and security, but it was a significant violation and one that we stand by.

HAWLEY: So is it--is it algorithms that are making these decisions about who is--who is de-platformed and when?

MONJE: We use a combination of machine learning and human review.

HAWLEY: Tell me about the human review.

MONJE: We have a team that's global. We are headquartered in San Francisco, but we have offices in Dublin and Singapore and just about every time zone in between. Three quarters of our users are overseas, and we try to have a global workforce that can deal with the fact that cultural context are extremely difficult.

HAWLEY: So the review team is–consists of quite a few people is what you're telling me?

MONJE: We have 4000 people globally.

HAWLEY: 4000 people on the review team globally?

MONJE: 4000 people at twitter.

HAWLEY: But how many people on the review team though?

MONJE: I'd have to get back to you on the specifics

HAWLEY: It's significant though. It's–it's across sites, as not just in San Francisco?

MONJE: Yes, sir.

HAWLEY: What are the protocols that the review team follows question mark is there a protocol that they follow?

MONJE: There are–there are protocols on any number of issues, yes, sir.

HAWLEY: Including about de-platforming?

MONJE: Let me explain–

HAWLEY: –First, just answer that question. Is there protocol?

MONJE: There are many workflows and protocols–and–

HAWLEY: –Will you make those public?

MONJE: We make our terms of service public and we–

HAWLEY: –Will you make the protocols public for the review of when you ban people like the Unplanned movie and Jesse Kelly? Will you make those–those protocols as it relates to the human reviewers, will you make those public?

MONJE: I think you're–you're aiming at a very important question, which is transparency.

HAWLEY: Why don't you just first answer my question? Will you make those public? Will you commit today to me–you said earlier that you are a pro transparency company, that you want to embrace transparency, so you have your chance now. Tell us you'll make the protocols public. Will you make them public?

MONJE: It's not up to me to make them public, sir.

HAWLEY: Will–will you advocate for making them public?

MONJE: We–our team will get back to you, sir.

HAWLEY: So that's a no. You are–you are–you will not commit today to making your protocols public?

MONJE: I–I am a–a senior and an executive–

HAWLEY: –So you won't–you won't say whether–

MONJE: –But I don't have the authority to do that–

HAWLEY: –Or not Mother Teresa's speech is hate speech, you won't tell us really why Unplanned was banned, you won't tell us why Jesse Kelly speech is banned, you say now that you've admitted that there are human–there is human involvement in these decisions but there are in fact numerous people involved, there are protocols but you won't make them public. Have I got that right?

MONJE: I told you why Unplanned movie was–was banned–was–was taken down for an hour and I've told you why Jesse Kelly was kicked off the platform–

HAWLEY: –No you didn't–

MONJE: –And if you want more details you could ask him–

HAWLEY: –You said you couldn't tell me because of privacy concerns. No, no, no, no. You said you couldn't tell me for privacy concerns related to him and now you're saying that you do have protocols, but you won't make those public. Yet you are a transparency company.

MONJE: Can I tell–can I see about some of the steps that we take to do exactly what you're describing? Which is every six months, we put out a report it's called the Twitter transparency report. We report–

HAWLEY: –How about this–

MONJE: –We report across six—

HAWLEY: –How about you submit those for the record? How about this, will you commit to a third-party audit? I've called on Jack to do a third-party audit of potential bias within Twitter. Will you commit to doing that? Will you say yes?

MONJE: I–we take a number of steps to improve transparency–

HAWLEY: –No, will you say yes to a third-party audit? Answer my question.

MONJE: We have a Twitter transparency report every six months.

HAWLEY: That's not a third-party audit.

MONJE: We release–we released to a third party, Lumen, the–

HAWLEY: –Will you commit to having an independent third-party do an audit of Twitter?

MONJE: I will invite you to look at–

HAWLEY: –So that's a no–

MONJE: --transparency.twitter.com and see--

HAWLEY: --You're telling me no. All right, thank you very much--

MONJE: --Where--where we are not--

HAWLEY: --Mr. Potts, limit just ask you, you--Facebook has done internal investigations into political bias and you've done at least one audit related to housing discrimination prompted by Senator Booker. Will you make the results of those investigations public?

POTTS: Senator, that is correct. And to the extent we can, we will make them public. We are undergoing an--an assessment currently by Senator Kyle that you may be familiar with. I don't have the status of that now, but we are happy to get back to you.

HAWLEY: Will--will Facebook commit to doing an unbiased third-party audit on your search and banned practices to determine whether or not there's little bias?

POTTS: I believe that is what Senator Kyle is looking at. He's looking at a number of things that may lead to more information on unconscious bias, unconscious bias against conservatives. I know he has met with over 130 leading conservative voices with some members of Congress at this point as well.

I did not know what the current progress of that report is. I want to give Senator Scott Kyle enough space to carry out his activity. He's very diligent person, as you all know, but we expect that report to be very illuminating and hopefully not showing bias, but we want to give him the space to complete.

HAWLEY: All right, my time has expired and letter--let me just say thanks again to the chair for letting me participate. If--if your companies are truly committed to transparency and you're telling us that they are, and I think the public deserves to have some answers. They deserve to have you be actually transparent. And yet this committee shows--this committee hearing again today shows that you are anything but transparent and you apparently have no interest in becoming more transparent.

This is a huge, huge problem and I would hope, for the sake of the customers that you serve and the values you purport to represent, that you would change your behavior and change your commitments to--to providing a neutral, unbiased platform for all users in this country. Thank you, Mr. Chairman.

CRUZ: Thank you. Senator Sasse.

SASSE: Thank you, Mr. Chairman for hosting this hearing and to the two of you for showing up. And I'm glad that were going to have another one of these with Google. Can we just all agree that this is an incredible only in America conversation, right? I mean, the--the fact that this is happened, they were having this kind of conversation is an American thing. And the fact that your companies exist is because we are a free space--free speech, open society, First Amendment society.

Obviously, the First Amendment has a prohibition on--Congress shall make no law, so not everything about the First Amendment applies exactly to your companies. There are important debates about publishers versus platforms, but do you agree that your companies exist in America for all sorts of reasons about the America ecosystem?

POTTS: We are proud to be an American company.

MONJE: Yes, sir.

SASSE: So your--your company's aren't from Vietnam, they aren't from North Korea, they aren't from China, and the stew that exists in those places wouldn't have created companies like yours. And so the fact that we are having this conversation is an expressly American cultural and economic and atmospherics kind of conversation. Do you relate to why so many Americans are so uncomfortable with the consolidation of power in your company's and with the fact that, even though I appreciate your answer, Mr. Potts and--pronounce your last name for me again.

MONJE: Thank you, sir. Monje.

SASSE: Monje. I've heard it a few different ways today. I wanted to get it right. I appreciate that you both said you are American companies but lots of people in America wonder if you think you're global companies and not American companies and that leaves a lot of people uncomfortable. Do you recognize that problem?

MONJE: That--that is--and you know, three quarters of our users are overseas and we are headquartered in San Francisco and there are values that we've carried out and--and I think for some of the reasons that we are described in the--in the dais earlier, there are places around the globe where criticizing the government is--is against the law. There are places against--and the government--in and around the world where being gay is punishable by death. And these are--these are not values that we share and that we don't carry through around the globe.

But you're 100 percent right. There is a combination of--American ingenuity and education system and the legal system that includes both the First Amendment and CDA 230 that has enabled American leadership around the globe.

SASSE: Mr. Potts.

POTTS: I--I agree with that. As you know, we are based in, excuse me, Menlo Park, California. We are a company with a user base that has--is 87 percent located outside of the United States, so were global in nature. We have policies that apply to the global community, but we are proud, again, to be a--an American company and we recognize the ingenuity, we recognize the--the environment for innovation that exist in America, and we're happy to be here.

SASSE: So I've spent a lot of time with and around both of your companies--and some of your incredible workforce and you have unbelievable talent and--and your boards have gigantic brains, and yet it does feel to many of us like creative destruction is a huge part of how Silicon Valley created all of the stuff that you're talking about and then the--the innovation culture that comes from that is something that seems to also now be--I want to get my verbs right, I don't want to say held captive to certain cultural and--and political views inside your company, but when you--you used the term a little bit ago by--what was it, unconscious bias, what was--what was the term you used?

POTTS: Yes, senator I think I used the term unconscious bias, which I mean to say is bias is really to kind of cultural bias. I think we all come with our different perspectives and it's a--incumbent upon us all to manage that bias and not allow that to influence our decisions.

SASSE: Fair enough and agreed. And so when Senator Cruz opened this hearing and was using some of the abortion debate examples, I think we all know it isn't the case that there sort of an equal number of accidental anecdotes that are on the abortion-rights side of the debate and on the pro-life side of the debate. Inside your company--your companies are not at all representative of America. It isn't your job to be elected officials that represent all of America, but it just isn't the case that you're sort of a neutral form for speech and as you work those things out, pro-life people aren't going to be heard equally insider companies.

And so those messy things require us to have big important conversations and debates about them and--and to Senator Hawley's point, there are times when it sounds just unbelievably opaque. The language of transparency is used, and yet it's almost impossible to get straight answers many times from the companies. Senator Blackburn is no longer here and I was off voting, so maybe she asked some of you some of these questions, but my guess is, and when I called a bunch of people on your boards when the--her campaign video was taken down because it had some pro-life components in it, my guess is she didn't get any real clear explanation of how and why that happened.

I respect your apology, I assume she accepted it, but it didn't happen accidentally. It happened because there are all sorts of assumptions built into your companies that are not at all clear to people who don't know what they are signing up for when they sign up for the platforms.

So I guess the question I would ask is, I don't think the American people have a lot of confidence that the messy problems of principled pluralism are somehow going to be easily solved by an algorithm. I don't think it's true. Quantification is a huge part of why we are living at this economic boom moment in human history. We are all unbelievably blessed because of the powers of big data and big quantification and your companies obviously depend on that. But qualification, quality is ultimately more important than quantity and there is no way that quantity is ultimately going to solve these qualitative debates about pluralism.

So when you all talk about community standards and in the language of hate speech comes up, it--I think I would ask Senator Blackburn, or the way Senator Cruz asked it with the Mother Teresa quote is, do you believe that a pro-life position is tantamount tent amount to hate speech? I know you're both going to say no now, but do you really--tell us what the debate looks like inside your company about hate speech and about extreme viewpoints. Can you define hate speech?

POTTS: I'll--senator, thank you. I'll take a stab at it. I've given you the definition from a first Facebook position, but I--we're also recognizing that there is no uniform definition of hate speech across the globe. So at Facebook, the way we define hate speech is an attack against a person or a group of people based on their protected characteristic like race, gender, religion, nationality, ethnicity, sexual orientation as well as serious disability.

We define attack to mean something like using words that are dehumanizing, calls for violence, contempt or disgust, exclusion or segregation. But I think your point is--is the accurate one is to how do you draw those lines to allow a free flow of ideas, to allow a debate, but also for us to keep the community safe. So we, on my team and the teams that I work with, we really fight the--through that, that struggle of balancing voice versus safety.

So we want to give voice to more people. We err on the side of giving voice. There is a lot of content that I find perhaps offensive, maybe some of you all would also find offensive as well, that we allow on the platform because it doesn't violate our policies. But when we draw the line and we say that this--this type of speech is going to lead to violence, it is dehumanizing, we do remove it under our policies and--

SASSE: --So I don't mean to--

POTTS: --Yeah--

SASSE: --Be rude, I don't want to interrupt you. If we had a lot more time here--

POTTS: --Sure--

SASSE: --But I just want to ask a precise point on that because I--I'm well over my time right now. A lot of the context of this debate is around the pro-life movement. And when you bring up violence, can you--I mean, there's violence in an abortion. It's in the abortion. Can you explain to me how the pro-life position is in any way violent and how any community standards could ever stay say a pro-life person's speech should be shut down because somehow there's a--I just--I don't follow from this how--I can understand how you could--you could say that a whole bunch of positions that are advocating the most extreme abortion laws that exist on earth.

The U.S., China, North Korea and Vietnam are the only nations that allow abortion until moments before delivery. Out of 200 countries, there are four on earth that do that. We are one of those four. There's clearly violence associated with that conversation. It's on the abortion advocate side of the debate. How is the pro-life side ever guilty of something that equates to violence question mark like, how could a pro-life position ever be shut down because of safety?

POTTS: That's a great question, senator And to be clear, a lot of this depends on intent and the context of statements or images or videos that are shared, so it's hard to do the hypothetical. But in general pro-life position would not be violating our community standards for hate speech. I--the Mother Teresa quote did not--would not violate ours and--and to be--just for complete transparency, we consult a range of groups across the spectrum, across all lyrical ideologies to try to help inform our policies.

Now, we own the policies, like, we write them, they are ours. We own them, but we do--we do talk to a lot of groups to make sure that we are landing, not being too aggressive on any area, making sure that we try to strike that right balance between voice and safety.

SASSE: Thanks. Thanks for being here.

CRUZ: Thank you, Senator Sasse I want to turn to the topic of shadow bans. Does Twitter or Facebook engage in shadow bans?

MONJE: No, sir.

POTTS: No, chairman.

CRUZ: So Mr. Monje, and I apologize earlier for mispronounce in your name. Monje, is that correct?

MONJE: Thank you for asking, sir. It's hard. It's Monje.

CRUZ: Monje, okay.

MONJE: Yes, sir.

CRUZ: Thank--thank--thank you for clarifying. Monje. Mr. Monje, you--you testified before that--or you acknowledged that Twitter will downgrade a comment to make it less visible. Does twitter notify a person if their comment has been downgraded?

MONJE: If I could explain and how some of our algorithms work and it's--it's precisely the kind of difficult puts and takes that--that Senator Sasse was--was mentioning earlier.

CRUZ: I'd ask you to do so briefly.

MONJE: Very briefly. What we do, and we are transparent in our rules about--about the fact that we do this, that if we have signals that indicate that a person is being spamming, meaning, they are using multiple accounts to do the same thing, if they are using automated activity but we are not 100 percent sure that they're breaking the rules, if they've been abusive, then what we will do is make it harder for that content to be found in a couple of different places. One is in search results and the other is in--as in conversations, in replies.

CRUZ: Let me ask you the question again. When you downgrade a tweet, do you notify the person that you've downgraded?

MONJE: We--I'd have to get back to you on that, sir.

CRUZ: Okay. I believe the answer is no and--in the if the answer is no and if the answer is no--that, as far as I can tell, is all but indistinguishable from shadow. Now let me--

MONJE: --At no point sir--at no point, sir, is a person's followers unable to find what that person--what that person has tweeted--

CRUZ: --But if it's downgraded so far--so far fewer people see it, that is exactly what is being alleged on shadow banning. Now, let me take a different aspect of it. In the opening round of questions, the ranking member asked both of you, and I tried to write this down as fast as I can, something to the effect of she said do either of you say oh, these are the words conservatives use so we're just going to get rid of those--those positions, and--and both of you said no.

Mr. Monje, I'd like to refer you to a quote from a Twitter employee that was made public on a video this week in which, strikingly, he said almost verbatim what Senator Hirono asked. Mr. Parnay Singh said, who is a Twitter direct messaging engineer said, "You look for Trump or America and you have, like, 5,000 keywords to describe a redneck. The majority of the machine learning algorithm are for Republicans.?

MONJE: Can--can I go back to the last quote that you had? In the break we actually had the opportunity to actually look up what you--the--the reason why is you took that quote out of context. If I could read the end of that quote on the--

CRUZ: --Sure--

MONJE: --At the end of what he said was you were saying neutrality is not what we are aiming for. He said, "I do believe we should optimize for impartiality. You know, there is a difference there. To me, neutrality is a lot more passive, a lot more hands-off." So the end of the quote that you selectively picked was--

CRUZ: --All right, how about this one--

MONJE: --This was the project Veritas video where I'm sure you understand their methods, which we find it to be deplorable, which is they approach people in a social setting. So this person was not representing Twitter, he was speaking in a--in a social situation. Some of these interviews people thought they were on--on dates--

CRUZ: --So is he a Twitter employee?

MONJE: When I was a--when I was a single man, I used to--

CRUZ: --Is he a Twitter employee?

MONJE: If I could finish, I don't know if you is a current or--or past employee when he was in--

CRUZ: --Is what he saying true or false?

MONJE: It's false. That's not--that's not our practices. We never use political ideology or party affiliation in any of our internal processes. That was big talk by some who thought he was on a date.

CRUZ: All right. Your testimony is this Twitter employees' statements were--were false. All right.

MONJE: That is not--that is not our--those aren't our practices.

CRUZ: Let me--Mr. Potts, you had a discussion with--with Senator Sasse about hate speech. I thought it was striking as you listed what you described as--as hate speech, you omitted one of the characteristics that you defined as hate speech, which is gender identity. Does--does Facebook consider the statement there are two genders to be hate speech?

POTTS: Depending on how that was shared, I would have to find out, but I do not believe so, Senator. That--that should be allowable.

CRUZ: Well, we will be interested and--and indeed I asked Facebook a whole series of questions about whether you have blocked posts along those lines--and in the entire debate about--about marriage and same-sex marriage, there are people who have different views of that question. But I asked Facebook in writing if some of the views that--that, if they are deemed hate speech, and--and Facebook refused to answer.

I will say also on the question of safety, you--you did respond to me in writing that, or Facebook did, rather, that people need to feel safe in order to build community. "We are committed to removing content that encourages real-world harm. Including but not limited to," so it might be something else too, "Physical, financial, or emotional injury." Now, I find it quite remarkable that--that Facebook is saying that, in your own words, you are committed to removing content that encourages emotional injury. That is about as nebulous a standard as I can imagine.

Let me give an example. My family--my aunt, my tia, Sonja, was imprisoned and tortured in Cuba by Castro's goons. Terms of emotional injury, I find it offensive people who praised Fidel Castro as a man of the--of the people. And yet, I would wager $1000 that Facebook does not consider language praising Fidel Castro as hate speech, even though for families that have suffered and been tortured at--at his goons' hands, that causes emotional injury. Do you agree with me?

POTTS: Senator, I think you're bringing up an interesting--an interesting point about the how--how things are shared on the platform, the context and intent. And it's often hard for us to understand the context and intent of something shared. Now, if someone was targeting you or targeting your--unfortunately targeting your aunt--your aunt or family member, with that type of language about a violent tragedy, we would actually remove that. But--but--

CRUZ: --Sure, a direct--a direct threat of violence is qualitatively different from--from a policy position or political position that--that someone may be offended or disagree with. None of us have a right to live in a world free of being offended. We do have the ability to argue against it. And so it someone defends Castro as a man of the people, I'm more than happy to have that conversation with them. But silencing voices we disagree with is qualitatively different.

POTTS: I think if we--we are not in the--we do not seek to silence any voice. And I, just to be clear again, if someone was mocking or trying to bully the victim of a violent tragedy, we would remove that. I'm not familiar with the language I think in the question that you may have submitted for the record where we responded with the emotionals. I'm not exactly aware with that--of that language, so it's hard for me to surmise or--or understand exactly what was the intent of that response. But if someone wanted to target one of your family members that was the victim of a violent tragedy directly and mock them, we would remove that.

CRUZ: Have either of your company's done any internal studies to assess the extent of potential bias?

MONJE: Senator, I referenced one of them in my written testimony about the the reach of members of Congress, which found a one to one correlation, the most important factor being the number of followers.

CRUZ: So I'm going to ask both of your companies if you've done any studies to submit those studies to the committee for review.

MONJE: Yes, sir.

CRUZ: Has Facebook done any studies?

POTTS: Senator, we are currently undergoing a study with Senator Kyle. He is--a continuous study. He has met with over 130 conservative voices at this time, some members of Congress, in fact other conservative voices. That study is ongoing. I'm not exactly sure where we are in the--in line with the study. We want to give him enough room to--to do it unimpeded. If it becomes public, we obviously will follow-up.

CRUZ: Have either of your companies or would either of your companies consider a verbatim quote from the Bible to be hate speech?

POTTS: No, senator. Senator, a verbatim quote that is used and cited, so it's a bit easier to understand maybe the context and the intent, we would allow that to remain on our platform. So religious--

CRUZ: --And the Torah and the Koran the same?

POTTS: Religious texts, we would--we would allow.

CRUZ: Twitter?

MONJE: I--I'll have to get back to you on the specifics, but I believe it would be possible to quote any biblical or religious text in a way that is threatening to an individual, may God smite the down or something like that, which would be an attack on an individual. Again, the context really matters.

CRUZ: So absent a direct threat of physical violence?

MONJE: That sounds right, yes sir.

CRUZ: Twitter would not consider a quote from the Bible, the Koran, the Torah as--as hate speech and has not?

MONJE: The context matters and what the relationships and what the purpose of the speeches.

CRUZ: Okay, last--last question. Again, in writing I asked--asked Facebook when Mr. Zuckerberg testified about the ad rates you charge Democrats and Republicans. And in particular if the average ad rate, for example, for the Clinton campaign was comparable to the average add rate for the Trump campaign. Facebook refused to answer.

I also asked Obama versus Romney were the ad rates comparable. Facebook refused to answer. Indeed, Facebook refused to answer for any campaign. Do you know if there is a meaningful differential in the ad rates that Facebook charges Democrats versus Republicans?

POTTS: Senator, I'm here today to speak about our community standards. That's what I focus on. So I work on the development around user generated content. Those policies around user generated content. The ad space is not one that I'm very familiar with and I definitely do not know any of the charging rates.

CRUZ: Well, I would ask you to answer that. Same question for twitter.

MONJE: Thank you, sir. We unveiled last year the ads transparency center that gives people in America a chance to understand who is paying for--for an advertisement, how much money they spent, and what the--what the results of that at work. We're trying to be extremely transparent and we think it's important that people understand who is paying for those ads.

CRUZ: Senator Hirono.

HIRONO: See, the thing is that we are trying to show or at least the chairman is attempting to show that there actually is a conservative bias somehow through your algorithms, whatever, against conservative viewpoints. So do you think you would be a good idea, for example, for your companies to have an algorithm to make sure there are equal number of pro-choice and pro-life posts?

POTTS: No, senator

HIRONO: why not?

POTTS: Senator, I believe our group algorithm is designed to allow the free flow of ideas. If there are more pro-life posts, so be it. If there are more pro-choice posts, so be it. We just want the free flow of ideas to exist on--on the platform.

HIRONO: How about you, Mr. Monje?

MONJE: Yes, ma'am. Similar to what Facebook described, we have certain categories that we don't allow advertisers to touch, that we don't allow data scientists or data partners to touch and their--their political affiliation, things like that are--follow along those lines.

HIRONO: So we know that with 1 billion posts a day for Facebook, 500 million posts, well, tweets every single day, are there going to be some posts or tweets that are taken down that should not have been taken down. So I don't know whether it's the fault with your algorithms or there is a human factor going on, but there are lots and lots of pretty vile things on both of your platforms that I would wish could be taken down very. For example, it took you a long time, I would say both of you, to take down the shootings in New Zealand. It took a lot longer. And once it's out and out there, it can be retrieved. So it's out there.

So short of, in view my view, short of some kind of equivalency of the kind of content, I don't know how we are supposed to be assured that there is no bias. But as you say, the platform is open, you have all these people posting different things and it would seem as though, for example, just to use an example of--of choice, either choice or pro-life, that if you were to limit to an equal number, you're going to be pushing out a lot of posts that don't meet that numerical equivalent. So you know, I think--I think they're just a lot of problems with what we're talking about here.

So when we talk about whether or not there's been any kind of investigation into evidence of systemic political bias, I know that this is for you Mr. Potts, in 2016, the website Gizmodo reported that curators suppressed conservative stories on Facebook's trending news section. In response, Facebook launched an internal investigation.

I understand that the investigation found no evidence of systemic political bias, and that conservative and liberal topics were approved as trending topics at virtually identical rates. Can you provide some details about Facebook's internal review and what it found?

POTTS: Senator, I believe that top line is correct, that we found no--no difference no abuse of it--of that. The product, trending topics, has been discontinued, however. I do not have specifics at this point, but I'm happy to follow up if that's helpful.

HIRONO: So, this internal investigation, was that done by--I don't know what you mean by international investigation. You did it totally in-house?

POTTS: Senator, I will have to go back to my team, and we'll follow up with you.

HIRONO: Again for Mr. Potts, your opening statement, you stated "unequivocally" that Facebook does not favor one political viewpoint over another, nor does Facebook suppress conservative speech. Yet you mention Facebook has brought in former Republican Senator John Kyl to work with conservative groups to suggest improvements to Facebook.

So, despite there being no evidence of anti-conservative bias that I've seen in this hearing, Facebook is bending over backwards to placate conservative complaints about bias. Why is Facebook working so hard to address complaints of bias that it claims doesn't exist, a position supported by the data?

POTTS: Senator, thank you for that question. I think we recognize where our company is located. I know we recognize that--it's located in the heart of Silicon Valley, and some may argue that Silicon Valley tends to be more liberal than not. We do a great job, in my opinion, of trying to manage our bias to ensure that we check your bias at the door.

I mentioned that I've never been asked to write a policy based off of a political ideology, or I've never been asked to make an enforcement decision based off a political ideology or sat on--with the product team as the engineers have developed a product and had that come into play.

That being said, I recognize that there is also the possibility of unconscious bias. And I think, when we try to review and ensure that there is no bias in the system, that you do these measures, that a mature company seeks to find out if they have the perchance unconscious bias in their product. So, both on--with Senator Kyl as well as with Laura Murphy, we have undergone two--Laura Murphy is a civil rights leader, a civil liberties lawyer as well, to ensure that we do not have bias on any side, whether it be civil rights against communities of color, other marginalized groups, whether it be against conservatives, to ensure that those do not get into our system.

HIRONO: So, you have senator--former Senator Kyl I guess representing the conservative perspective, and this civil rights activist representing the--the liberal perspective, so that you have both covered in your efforts to make sure there's no unconscious bias being reflected in your policies or in your algorithms. Is that--is that what you're telling me?

POTTS: We--we have--we have hired and engaged with those two individuals to do an assessment of our--of our policies, of our processes, of our product to ensure that there is no--is no bias, again. I am not of the believe that there is bias. I know the teams that I work with, that diversity of viewpoints that are through leadership, my team, and the teams that we are fortunate enough to share Facebook with at this time. But again, I--I recognize that we are also infallible (SIC), and we're doing our best to ensure that, if there was bias, that we can identify it and then stomp it out.

HIRONO: We've been hearing a lot about Senator Blackburn's advertisement being taken down. Earlier this year, Facebook removed ads posted by a Democratic senator and presidential candidate Elizabeth Warren. And in 2016, Mark Zuckerberg reprimanded Facebook staff for defacing Black Lives Matter postings on the walls of Facebook's campus.

Is this proof that Facebook is biased against liberals? Does Facebook plan to bring former Senator Claire McCaskill to meet with liberal groups, although you do have the civil rights activist, to offer suggestions on how Facebook can be improved, or is this an example of the acknowledgment that it's pretty tough to get it right perfectly? And we, of all people here, should know that, how tough it is to get things perfect around here. So, you took down Elizabeth Warren's ad. Did--are her ads put back up the way you put back up Senator Blackburn's?

POTTS: Yes, ranking member, we did incorrectly remove Senator Warren's ad. Once we recognized that we did and recognizing that, A, Senator Warren, both as a senator and presidential candidate, is much in the public discourse, that her ad also was in the public discourse. We removed it for a--for a trademark reason. But once we recognized that--what was being discussed within the ad, we reinstated it.

HIRONO: Well, here's something that I think really is a concern for--for those of us who care about discrimination on your platform, Mr. Potts. So, let's move from bias to outright discrimination. The U.S. Department of Housing and Urban Development recently announced that it was charging Facebook with violating the Fair Housing Act by encouraging, enabling, and causing housing discrimination through the company's advertising platform.

Facebook is charged with enabling advertisers to exclude people based upon their neighborhood by drawing a red line around those neighborhoods on a map. So, unlike claims of anti-conservative bias, these are serious allegations of conduct that inflicts real harm on Americans. Does Facebook now or did Facebook ever enable advertisers to exclude people based on their neighborhood by drawing a red line around those neighborhoods on a map?

POTTS: Senator, I'm unfamiliar with a red line, but I would like to say that our policies, our advertising policies prevent wrongful discrimination especially in the context of housing or employment or credit around ZIP codes, around age, around gender. In fact, we've reached a historic settlement with a few of the leading civil rights organizations, the National Fair Housing Alliance as well as the ACLU, recently.

The HUD complaint or the HUD investigation and now lawsuit came as a surprise. We had a lot of meaningful conversations, so we thought we were working to work through their issues. And then we were, just frankly, surprised that they went--they moved forward with the suit.

HIRONO: Well, I would think that HUD has, I hope, some kind of a basis for what they charged with--you with. So, you've done what? You've reviewed your platforms, your algorithms, to make sure that discriminatory advertising is not permitted on your platform?

POTTS: That is correct. For wrongful discrimination of advertising, we prohibited--we prohibit our advertisers from engaging in that behavior. And we're--when we are made aware, we do limit or restrict their access to advertising. These are constant conversations. We're continually improving our policies where there may--where they may fall short. But we do prohibit discrimination within the platform.

HIRONO: So, is Facebook engaging in negotiations with the HUD over this allegation, or have they filed a--a lawsuit?

POTTS: Senator, I believe HUD has filed a lawsuit. I am not a lawyer that works on this or a lawyer for the company, for that matter. So, I can't speak to those issues, but happy to find--follow up.

HIRONO: I'd be interested to know if--if Facebook is trying to get the lawsuit dismissed based on what you told us, but we shall see. Thank you.

CRUZ: Thank you, Senator Hirono. And I'll note that Senator Hirono referenced Elizabeth Warren. Senator Warren, I--I invited her to testify at this hearing along with Senator Blackburn. Senator Warren informed us that her schedule did not allow her to do so, but I'll note that Senator Warren tweeted the following.

"Curious why I think Facebook has too much power? Let's start with their ability to shut down debate over whether Facebook has too much power. Thanks for restoring my posts, but I want a social media marketplace that isn't dominated by a single sensor, hashtag break up big tech." And I will tell you, in response to that tweet for the first time ever in my life, I retweeted Senator Elizabeth Warren.

Senator Lee?

LEE: Thank you, Mr. Chairman. I want to respond to a suggestion that was made a moment ago by one of my colleagues to the effect that there is harm on both sides, to the effect that, if I understood the comment correctly, sometimes the discrimination against ideas on social media networks cut one way politically and sometimes they cut the other way politically.

That may be true as far as those words go in and of themselves. But it's a blatant mischaracterization of anyone's perception of the way these social media networks operate. As I understand our two witnesses today, they are not disputing the fact that there is a problem. Now, it may be just a problem of corporate culture within their respective companies, but there is a problem. There is rather blatant bias in one direction politically.

I mean, we saw it just a few minutes ago in my interaction with Mr. Potts. You know, an image of a baby, when used by a Susan B. Anthony advertisement, gets taken down, and it doesn't get taken down when a comparable image of a baby in a hospital, even the baby that's premature and undergoing medical treatment, doesn't get taken down.

It's not lost on any of us that this cuts overwhelmingly one direction and not the other. That doesn't mean we can't identify aberrational examples, examples of where it cuts the other direction. But I—I don't hear either one of you disputing or making any attempt to refute the idea that we do have a political bias issue here.

That doesn't mean necessarily that it's—the government's issued a resolve. It doesn't mean that we own your companies and can tell you what to do. But insofar as you would have your users suggest and believe that you are somehow a politically neutral forum, that's laughable. No one assumes that to be true, and I don't hear you saying that.

Mr. Monje, I'd like to start with you. I'd heard you mention something a few minutes ago in reference to questions from the chairman about the statement by Jack Dorsey. The statement was I don't believe that we can afford to take a natural—a neutral stance anymore. I don't believe we should optimize for neutrality. You gave context for that quote, and I don't have the written version of that in front of me. Can you give me the context for that again?

MONJE: I appreciate it very much, sir. What he was distinguishing was the two words, neutrality versus impartiality, and that we were aiming for impartiality, which is more action focused as opposed to more passive in neutrality.

LEE: Yeah, I'm not sure I understand the distinction for purposes of our discussion today. Can—can you help me understand why that makes any difference for the problem we're—we're identifying?

MONJE: That we work extremely hard and the people that come to Twitter every day work extremely hard to make sure that people on all sides of every debate, and three quarters of our users are overseas, have the opportunity to talk about what it is they care about and not have the platform be the subject of the—of the discussion. That takes a lot of effort, creating a safe environment where people aren't facing threats of violence or threats of rape, child sex exploitation. These are—these are—it takes active effort, and that's what Jack—

LEE: —Yeah—

MONJE: —Was talking about.

LEE: And I understand that. I—I appreciate that. I—I don't hear you refuting the notion that there is some bias within the company politically.

By the way, how would you characterize your corporate culture as it relates to the political world? Would—would you characterize it as particularly conservative?

MONJE: I would politely disagree with the premise of your question and say that I disagree with—with what you're saying. It's that we work every day to make sure that—that our platform is impartial and that everybody can come to it to speak. And people don't come to Twitter to work because of, you know, they're on one side of one issue or the other. Whether we're—

LEE: —Yeah, and I—I haven't suggested that, and I resent your suggestion that I'm suggesting it.

MONJE: Well, I'm sorry.

LEE: Are you suggesting to me, sir, that your—your workforce and the—and the people who monitor the content of what's posted on Twitter—

MONJE: —I'm—

LEE: —Are equally Republican and Democratic? Surely you're not suggesting that.

MONJE: I—I'm sorry if I offended you. I don't understand how I did. I'm—I'm telling you that we have a global audience. We have a global workforce. And they come to Twitter to build a platform where people can find out what's happening in the world and talk about what's happening in the world. And it is in—it is in our interest as a company, it is in our interest as our advertiser, to have eyeballs that—that care about all these issues.

LEE: Yeah, not my question. My—my question, with respect, sir, is about your workforce. Do you think your workforce has the ability to engage in self-reflection, in meaningful self-criticism, with regard to whether or not it's filtering content in a politically neutral manner?

MONJE: I think that is an excellent question. I think Senator Sasse mentioned something earlier that I go back to, which is if we were running a—a—a sandwich shop, it's likening it to have a board—a comment board at the front that allowed anybody to say the ham sandwiches here are terrible. The—the tuna sandwiches are terrible. And that's what Twitter allows, is a platform that not—not only allows people on all sides of the debate, but also to criticize us.

We found out about Senator Hollings letter to us because he tweeted it. That's—that's the kind of open environment that we're trying to build and that every employee comes to Twitter to do.

LEE: What about the kind of environment that allows someone to say abortion is terrible or abortion is a fundamental right? Is that equally important?

MONJE: Those—those conversations happen on Twitter every day.

LEE: They do. And are you suggesting that they are treated in an ambidextrous fashion?

MONJE: We strive to do that every day, yes, sir.

LEE: You strive to do that. What about you, Mr. Potts? How would you describe your corporate culture within Facebook?

POTTS: Thank you, senator. There was one thing that you said that I—I agree that we have political bias. I want to be very clear. I have said a few times in this hearing that I don't think we have political bias. I do not think we have political bias. I do not think we have a strong issue against marginalized communities either.

That–what I did say is that there is the room for unconscious bias that we do not recognize, and that is why we are doing those assessments. But again, I want to just be–for extreme clarity, I do not believe that we have this issue, and so I don't think that that bias exists at Facebook.

Now, to the question of corporate culture, I think within our–within our Bay Area-based office, it probably does–we would probably have more liberal or people who identify as Democrats then we do as Republicans. We are a global company. We have a large presence in–in Texas. We have a large presence here in D.C. as well as New York. We have a large presence in Dublin. We have a large presence in Singapore. So, we are a global company, and I would–I am not the correct person to ask what everyone's political ideology is, because we don't do a survey on that either.

LEE: And–and I don't–I don't mean to suggest that you should, and I would find that thought horrifying, that we as a Congress would ever suggest that you should.

But since we're having a conversation about whether or not you're able to operate a forum that is at least perceived as having a certain degree of objectivity and neutrality, and since we've established, I think, that in many circumstances you end up with disparate treatment of very, very similar images–look, this is unmistakable and it's–insofar as you're suggesting that this doesn't produce very different outcomes on the right from the outcomes that are achieved on the left, that is laughable.

And so, I'm–I'm asking you, are we crazy in perceiving this? Are–are we wrong, or–or is–could there possibly be something about your procedures that are not capable of–of monitoring and maintaining a politically neutral forum for discussion?

POTTS: Senator, again, we are a platform for diversity of viewpoints. Your question about the disparate impact of our policies as they apply to any group, whether that be conservative, whether that be a marginalized group, and how those policies are actually enforced and that it produces a–an outcome that is unintended is something that we take very seriously.

We do some research. We're trying to do more research. But that's also why we have hired, engaged Senator Kyl, Laura Murphy, to see–to collect these anecdotes, to hear these–

LEE: –Well, that's great. But I–but I heard you say a few minutes ago–

POTTS: –Yeah–

LEE: –You're going to have Senator Kyl go and talk to conservative groups. That's great. I–I really don't know what that's supposed to do. Having Senator Kyl interact with other conservatives, I–I don't know what that does for Facebook. I don't know what that should do for anyone who is concerned about whether or not this is able to operate as a platform that presents itself to the world with a degree of neutrality.

POTTS: I–I am not a–a constitutional scholar, so I can't speak–

LEE: –This doesn't require–

POTTS: –Right. Sir–

LEE: –This is not even about the Constitution. I'm just asking about the political neutrality of Facebook as it's perceived by the world. There is no constitutional issue here.

POTTS: That is fair, senator. I was going to–to really try to go back to the disparate impact of rules. And I think part of that, in the study you need to hear those anecdotes to collect the information, the data, to actually see–to find which policies that may be right for review, to see if those are actually violated.

So, I don't know how you get to–you can't really review the policy without hearing where you think it's being misapplied, if that–it makes sense. That's the way I interpret it. Now, I'm not–again, I'm not the one carrying out the review, so I don't know how their methodology is going. But if I was to run the review, I would need to collect the data of where we thought the policy was misapplied, where it is having that impact. Then I would look to the policy to say, okay, how did you write this? What is the intended, and then how is it being enforced? That's–that's how I would go about it.

Now, Senator Kyl, Laura Murphy, they have their own processes. They have their own ways of going about it, so I can't speak to them. But that's kind of the first point where I would start to. So, I would go out and collect those anecdotes, collect where I think, okay, is it the case that we over enforce on pro-choice content, or is it the case that we over enforce on pro-life content, bring that back and see what policies apply, and then work through the process to say you know what? You actually do over enforce in this area. Why is that? And then you can find–I think you'll find answers.

LEE: Yeah. Look, there are no easy solutions here, and I–I don't mean to suggest by any of this that I–that I envy your position or that I think this is an easy thing. But I–I will suggest that if I were to run a social media–a global social media network, we'll call it Cruz Book, from my hometown of Alpine, Utah, and I were to staff it entirely from people–with people from Alpine, Utah who share my political worldview more than people outside of my hometown of Alpine, Utah, it would probably produce a different discussion than what you have with a company that's overwhelmingly run by people with a very different political worldview and political philosophy than I do.

And I would–you didn't ask for it, but I–I would respectfully suggest that that's one of the things you ought to be looking to. It's great that you got Senator Kyl talking to conservative groups. I think that's fantastic. I don't think that's going to change anything as long as your corporate culture remains as it is, overwhelmingly to one side. That is entirely your prerogative as a company if you want to do that. But I don't know that that's necessarily where you want to be or how you're portraying yourself to the world.

Thank you very much, Mr. Chairman.

CRUZ: Well, and I look forward to utilizing Senator Lee's upcoming social media network. I–I will note, by the way, both of y'all pressed back on saying you–you don't know the political leanings of your employees. The Facebook CEO, Mr. Zuckerberg, when he testified here in his own words characterized Silicon Valley as "an extremely left-leaning place." And so, I think anyone is denying reality to–to suggest otherwise.

Senator Blumenthal?

BLUMENTHAL: Thank you, Mr. Chairman. Just for the record, you don't take surveys or polls among your employees as to what they believe about any given political issues, do you?

POTTS: No, senator.

BLUMENTHAL: Mr. Monje?

MONJE: No, sir.

BLUMENTHAL: And so, your views are intuitive guesses. Is that more or less correct?

POTTS: I believe that's correct, senator, just based off our location. But again, we do not take surveys. It's not data accurate. I would not hold it out to be true.

BLUMENTHAL: Same for you, Mr. Monje?

MONJE: Yes, sir. We don't survey people. Most of my--the entire government relations team is--is behind me here. And we've got Republicans and Democrats, and we argue about SEC football more than anything else.

BLUMENTHAL: And--and I think we are experienced enough in the world of media, newspaper, and other kind of coverage to know that bias and leanings are very much in the eye of the beholder. When we see a story that mentions us favorably, we think it's great. When it takes aim at us, many of us take umbrage.

And so, the--the kind of views that have been elicited here, and maybe of Mark Zuckerberg as well, and about Silicon Valley are very much emotional, non-fact-based, nonscientific reactions. And in fact, compared to other parts of the country, Silicon Valley may not be all that left-leaning. Would you agree?

POTTS: That's an interesting question, senator. I--I've--no, I have not done a survey of Silicon Valley. I see a lot of Democrats. I think there are a lot of libertarians as well. And I'm sure there are a lot of--I live much further East Bay than others, and I have a lot of Republican and conservative neighbors.

BLUMENTHAL: A good question to an--a good answer to an unfair question.

So, let me just move on to say--as I ask this question, I should disclose that my son, Matthew Blumenthal, is a trial lawyer in Bridgeport with a firm named Koskoff Koskoff & Bieder that represents Robbie Parker, who also happens to be one of my constituents. He represents Mr. Parker in an action involving threats and harassment against him and others who lost children at Sandy Hook.

Robbie Parker is going to be testifying, assuming we are done with this panel in time. And he, along with many other Sandy Hook families, reported specific harmful content published on Facebook that subjected them to online and off-line harassment. I have no connection other than through my son with that litigation, but I disclose it in the interests of simply indicating what--what personal involvement I may have.

In Mr. Parker's written testimony, he mentions that these families made years of requests of Facebook to remove that harmful content, years of requests. Only recently, once this content became publicized, commonly known, and the subject of press attention, in fact, has Facebook reacted to these reports and begun to remove it. Facebook's delay facilitated the nationwide spread of this threatening and harassing content, which resulted in serious and lasting harm to my constituents. That is a fact that, indeed, will be proven in court at some point.

When I learned about this harassment, which was quite some time ago, my heart broke for these families. This kind of harassment, threats, and other extraordinarily repugnant content had lasting damage for many of these families. We don't know for sure, but it may have also played a part in the suicide most recently of the dad of one of those children, Avielle Richman. Jeremy Richman killed himself just a few weeks ago.

So, this kind of repulsive content has real-life consequences. And I would like to know, Mr. Potts, when someone like Mr. Parker reports that he is being harassed, what steps are taken by Facebook to review that content?

POTTS: Thank you, senator. And again, I'll take a pause. My--my heart goes out to those--the victims. It goes out to Mr. Parker. As a father of three with two school-age children who are roughly the age of the victims in Sandy Hook, as well as a wife who is a schoolteacher, I--it's--it's--it's a bit rough. So, I can only imagine the--the harassment that he felt that--online and experienced. My heart goes out to him.

When someone reports content to us, we do remove it--we do review it under our community standards. We review it for a--all violations, whether they are credible threats of violence, whether they are bullying, whether they are harassment. And if it satisfies those community standards, we remove it.

As you've noted, we have now a policy that prevents the harassment of the survivors of violent tragedies. Comments that would target the victims of violent tragedies, as in the case of the children, if there are comments where someone targets them and calls them a crisis actor or says that the event has not happened, we would remove that content. We remove it swiftly.

To the point, senator, we--we try to move as quickly as possible. And perhaps in this case, we did not move fast enough.

BLUMENTHAL: How long does it generally take now for Facebook to contact that person or that entity to remove the harmful content?

POTTS: Senator, we try to turn that content around. I'd just say our operating time to remove that content is--roughly 24 hours is kind of the expected timeframe, but it's often much, much faster than that.

BLUMENTHAL: And what do you do to stop it from spreading in the meantime?

POTTS: If we find--for that type of content, especially around what you are naming, this type of viral content, if we know of things like hashtags, which are becoming more and more prominent, obviously prominent on Twitter, places like Instagram as well, we do try to limit discoverability, reducing that--those types of comments and hashtags in our search products so you cannot aggregate, especially on Instagram, those types of--that type of content, I should say, that would target somebody on the basis of them being a victim of a violent tragedy.

BLUMENTHAL: And you--you know you have a set of protections under Section 230 that afford you a high degree of in effect immunity or shield from liability for the content that appears on your platforms. But I really think you have a responsibility, it may not be a legal responsibility, but a moral responsibility, to protect people like Mr. Parker. And he's just one example of the Sandy Hook families, and they are just a few examples of the victims--ongoing victims of this kind of harassment.

What can you do to deter this kind of harassing and threatening message that is so disruptive and destructive to people's lives?

POTTS: Senator, thank you. We do have 30,000 people who now focus on safety and security, and many of those focus on this type of behavior. It is doing--it is ensuring that we are responsive to reports. It is when we can proactively surface these things through the use of our artificial intelligence and machine learning, getting it before reviewers so they can remove it before it is even reported by a user. And of course if we have repeated bad actors, to remove not only their content, but if they are egregious we will also remove their profiles. There are a few people who I would say trade in this type of behavior, and we have removed their pages that--for repeated violations of our hate speech policy, the policies that apply to this type of harassment, as well. And we just need to continue to refine our policies, ensure we're faster, ensure the processes are strong, continue to work.

BLUMENTHAL: I understand you have audits underway, both Twitter and Facebook have audits underway, correct?

POTTS: For Facebook that is correct, senator. We have assessments by Senator Kyl, as well as Laura Murphy doing a civil rights assessment.

BLUMENTHAL: And that's true of Twitter, as well, I believe, correct? Mr. Dorsey has (INAUDIBLE) made those audits known?

MONJE: We've done a study to get ready for this hearing and other hearings that talk about the impact of how tweets from members of Congress reach their users.

BLUMENTHAL: Will you commit to making public the audits that you are doing?

MONJE: Yes, sir.

BLUMENTHAL: Mr. Potts?

POTTS: Our civil rights audit is currently public now. We've issued the first--the first report in January. That is ongoing. Senator Kyl's assessment is still ongoing. I'm not sure of the status of that, but if we make it public, we will definitely share with you, sir.

BLUMENTHAL: If you make it public you will definitely share it with us. Will you commit to making it--maybe I misheard you; I'm sorry.

POTTS: No, I think you did hear me correctly. I don't know the status of it in the--whether we were committed to making that public, but I will definitely find out, and I will come back to you.

BLUMENTHAL: If you could let us know, I'd appreciate it.

POTTS: Will do.

BLUMENTHAL: Thank you, Mr. Chairman.

CRUZ: Thank you, and let me emphatically agree with Senator Blumenthal's comments, both that the audits of both companies should be made public, but also that those spreading vile lies about the Sandy Hook families are reprehensible, and I would note that if Congress were to repeal Section 230 of the CDA, that Facebook, and Twitter, and Google would face liability for slander and libel, which would have resulted in those malicious lies being pulled down much, much earlier, just like every other media publication is liable for slander and libel.

With that, we're going to move to the second panel. Before we do that, I do want to enter into the record two different documents. The first is an op-ed by Kay Coles James who is the president of the Heritage Foundation, and that op-ed ran today, in today's Washington Post. Ms. James was named to an ethics advisory council by Google, and some 2,500 employees of Google signed a petition to have her removed from that panel, and indeed those over 2,500 Google employees said about Ms. James, by appointing Kay Cole James to the advisory council. Google elevates and endorses her views, implying that hers is a valid perspective worthy of inclusion in its decision-making. This is unacceptable. Ms. James' op-ed is a powerful response to it that, among other things, observes that she is, a quote, 69-year-old black woman who grew up fighting segregation. And it illustrates a very extreme view to consider the president of the Heritage Foundation someone whose views are--are not--whose perspectives are not worthy of inclusion. So without objection, I want to enter her op-ed into the record. And secondly, is an article today by Brendan Carr in the National Review entitled Facebook Forgets the First Amendment, and it highlights how CEO, Mark Zuckerberg's recent call for more government regulation of speech is a call for a censorship regime that would violate Americans' fundamental rights. And without objection, both will be entered into the record.

Senators, we will keep the record open for two weeks from today. Senators are asked to submit any questions to the witnesses in writing, and the witnesses are asked to respond to those questions as soon as possible. And with that, I will thank both of you for being here at this hearing and would call forward the second panel.

I'll now introduce our witnesses on the second panel. The first witness is Mr. Chuck Konzelman. Chuck Konzelman is a writer and director who is focused on films with a Christian message. Most recently he wrote and directed the movie, Unplanned, the true story of one woman's journey from being one of the youngest Planned Parenthood clinic directors in the nation to becoming a pro-life advocate. And I have to say having seen the film myself, it is extraordinarily powerful. I would encourage everyone, regardless of where you fall on the abortion debate, to watch this film and--and--and confront the powerful and true story that it relays.

Mr. Konzelman has a long and successful career in the secular entertainment industry. He has worked with Warner Bros., Paramount, Sony Columbia and 20th Century Fox and sold original concept TV pilots to CBS, ABC and Fox. In 2008 he and his friend, Cary Solomon, decided to embark on a new path. Moved by their faith, they left the secular entertainment field and began working on films promoting a Christian message, including God's Not Dead, another wonderful film, and Do You Believe. Mr. Konzelman is a graduate of the University of Notre Dame.

Our second witness is Dr. Francesca Tripodi--I hope I pronounced that close to correctly--who is an assistant professor of sociology at James Madison University and an affiliated researcher at Data & Society. Dr. Tripodi's research focuses on how partisan groups interact with media and the role community plays in understanding what constitutes news and information. Dr. Tripodi received her PhD from the University of Virginia. Congratulations on the national championship, however traumatic it was for everyone in Texas. She received her MA in sociology from the University of Virginia, as well, an MA in communications, culture and technology from Georgetown University and her BA in communications from the University of Southern California.

The next witness is the Honorable Marilyn Musgrave. She is a former congresswoman and is vice president of government affairs at the Susan B. Anthony List, an organization that seeks to reduce and ultimately end abortion in the United States. Congresswoman Musgrave joined the Susan B. Anthony List after a distinguished career in public service. She served three terms in the United States House of Representatives, representing Colorado's fourth district, and before that she was a two-term member of the Colorado House of Representatives and a member of the Fort Morgan school board. Before seeking elected office herself, she was a hard-charging volunteer for the campaigns of numerous conservative candidates as well as president of her local Right to Life chapter. She is a graduate of Colorado State University.

Mr. Robbie Parker. Mr. Robbie Parker is the husband of Alissa Parker and the father of three girls, Madeline, Samantha and Emilie. Emilie was one of the young children tragically killed in the shooting at Sandy Hook Elementary school in December 2012. Since the shooting, Mr. Parker and his family have been the targets of online conspiracy theorists who falsely and maliciously assert that he is a crisis actor and that the Sandy shooting was a hoax. Welcome, sir.

Professor Eugene Kontorovich is our final witness. Professor Kontorovich is a professor of law at the Scalia Law School at George Mason University. He is an expert in multiple different fields of law, including constitutional law, universal jurisdiction and international law, and he has written extensively on First Amendment issues in a variety of context. He has published over 30 major scholarly articles and book chapters in leading law reviews and peer-reviewed journals in both the United States and Europe. He has also written numerous essays, op-eds, white papers, reviews and blog posts addressing some of the most complex legal issues of the day. Although Professor Kontorovich began his academic career at George Mason Scalia Law School, is now a full professor there, in between he spent two years at the University of Chicago Law School and over a decade at Northwestern University's Pritzker School of Law. He attended the University of Chicago for college and law school and clerked for Judge Richard Posner on the U.S. Court of Appeals for the Seventh Circuit.

With that, I will ask each of the witnesses to stand and raise your right hand. Do you swear or affirm that the testimony you are about to give before this committee will be the truth, the whole truth and nothing but the truth, so help you God?

UNKNOWN: (OFF-MIC)

Mr. Konzelman, you may begin.

KONZELMAN: Senator Cruz, members of the committee, I appear here today with my lifelong friend and business partner, Cary Solomon, who is my cowriter, codirector, coproducer of the film, Unplanned, which is the true life story of Abby Johnson, a former Planned Parenthood surgical abortion clinic director, who after seeing an abortion take place in real time on a sonogram screen, the image created via the ultrasound probe that Abby herself was holding, turned her entire worldview upside down and became a pro-life advocate. That film is playing in theaters nationwide as we speak.

From the outset making a pro-life film in a pro-choice town, Los Angeles, we knew we would face a number of challenges. Moving past the challenges of production and postproduction and limiting my comments to the marketing campaign, please allow me to highlight some of those. The MPAA saddled us with an R rating, which strongly discourages much of the Christian audience and all of the Church of Latter Day Saints from seeing our film since they have a general prohibition against seeing R-rated films. It also precluded us from using the single most effective form of motion picture advertising, paid placement of our theatrical trailer before other films in theaters. But with an R rating we were prohibited from advertising before anything other than other R-rated films without special permission, which we sought and were denied.

We also looked to advertise on cable television, but with the exception of Fox News and CBN, we were systematically denied access to the outlets where we sought to advertise, among which were Lifetime, UPtv, Hallmark, HGTV, USA Network, Food Network, the Travel Channel, DIY and the Cooking channel. Lifetime, which is owned by A&E Network, a joint venture of Walt Disney and Hearst Communications, told our buyers that they were refusing due to the, quote, sensitive nature of the film, unquote, but it previously promoted an interview with Scarlett Johansson in which she touted the benefits of Planned Parenthood. We consider these blanket refusals highly unusual and highly discriminatory and are formally petitioning the FCC to look further into the matter.

In this environment we rather naturally looked to go to social media with our advertising spend. But once again, we found ourselves stymied. Google Ads, formerly known as Google AdWords, blocked the integrity of the Unplanned pre-release banner ads, which I should probably point out consisted of a woman, half of her face with a tear coming down, and the words saying what she saw changed everything. I don't think they were particularly offensive.

For the effectiveness of Google advertising, we will quote Google itself. When you advertise with--when you advertise on the Google display network, which has over two million sites and reaches over 90 percent of the people on the internet, your ads can appear across a large collection of websites, mobile apps and video content. There the quote ends. We were convinced at the advisability of advertising with Google, but we were blocked from doing so. Google cited a policy regarding abortion-related ads. Just one problem; we weren't doing abortion-related ads. We were marketing a movie. It's important to note that this prohibition was solidly in place for the entire lead up to our theatrical release. Why is this important? Because much like advertising spend in a political campaign, the vast majority of dollars spent in promoting a film are spent to help build up a white-hot intensity and awareness around one particular date, but instead of election night, for films it's Friday night of opening weekend because that all-important opening weekend's results determine the course of the film's theatrical run and even how much it will make in ancillary markets and overseas.

And after the film's release, Google came up with yet another restriction concerning event ticket sales, one which our film's marketers had never come across or even heard of in multiple similar campaigns. In short, we firmly believe that they were sharpshooting us, hiding behind highly selective and discriminatory enforcement of their own guidelines. It's impossible for me to quantify the damage done by Google's refusal, but it's absurd to think that there wasn't damage done. But we weren't finished with social media woes. Within hours of our theatrical debut, in the early morning hours of Saturday, March 30, the film's Twitter account, technically the account owned by the film's single purpose marketing entity, was suspend--suspended. The reason for that suspension has not, to the best of my knowledge, been made clear beyond being accidental or a mistake. However, when such accidents occur within 12 hours of the film's theatrical debut, and after what I understand was nine months of ownership during which time there were zero suspensions, the glitch becomes suspect.

The uproar came quickly and was loud. Apparently a number of media personalities, including Shannon Bream of Fox News, conservative commentator, Dana Loesch, and television personality and pro-life supporter, Patricia Heaton, were aware of the situation and made it known from their own social media platforms. If any progressive or left-leaning pundits or influencers came to our support on the basis of principle, we are unaware of it.

Within two hours after the suspension, service was restored, although it's also my understanding that our posting of a Twitter announcement with words to the effect of we're back, was deleted from the account without explanation. Later on the same day Twitter apparently deleted the vast majority of those listed as followers on our account, reducing the number from something on the order of 200,000 to less than 200, 1000 to 1 reduction in our listed followers, and numerous people, including the subject of our film, Abby Johnson, and the star of our film, Ashley Bratcher, found themselves unable to read or follow their own movie on Twitter. Dana Loesch's tweet of 11:21 p.m. on the same day read, and here I quote, about five minutes ago I was following @unplannedmovie, and then I just checked it after seeing so many say they had trouble even following the account, and somehow I wasn't following them anymore. The quote ends here.

Again, this was during our all-important first weekend of release, begging the question, why does this always seem to happen to conservatives? Or as the overtly satirical website, The Babylon Bee put it, quote, meanwhile, Planned Parenthood, an organization that actually kills babies every single day, still had an active Twitter account in good standing, unquote. Interestingly, on the one social media platform from today's panel where we didn't have any significant problems, on Facebook, our exposure exploded, and I believe the film's Facebook site had something on the order of about 12 million trailer views by the time of our theatrical debut and nearly 18 million to date. We credit this unrestricted access with much of the film's success, only highlighting the importance of access to social media.

For the record, we alleged no collusion between any of the social media or cable entities, at least not in the formal sense. They require no coordinated communication or agreement between them because they are unanimously progressive in their orientation, political beliefs and world view, and likewise strongly predisposed towards stifling conservative thought.

But as evidence that this discrimination is one-sided, I posit this question to the committee. There are a number of pro-choice films currently in development in Hollywood. I will mention two. Let Her Speak, the story of Wendy Davis's pro-choice filibuster on the floor of the Texas Senate, to which Sandra Bullock is attached to star, and This is Jane, being produced by Amazon Prime, which tells the story of an underground abortion provider network in pre-Roe versus Wade Chicago. Is there any member of this committee would like to go on record as saying they honestly expect that either of those films will have trouble in buying advertising on Google or otherwise? I think not because they won't, unless perhaps this committee elects to remember and closely examine whether standards are applied evenly, and lest anyone be tempted to dismiss our film as some sort of right-wing rant or conservative propaganda.

I will quote from the final lines of an article by Marc Thiessen of the Washington Post and reprinted in the New York Post, neither of which are generally regarded as bastions of conservative thought. Here I quote, ultimately the movie is a testament to the power of prayer. Abby's family prays for her to leave Planned Parenthood, but they never reject her. They know she is a good person who does not yet understand the evil of abortion. There are millions like her. The film's goal is to reach them by showing us the humanity of the unborn child. This is why abortion supporters don't want you to see Unplanned. See it anyway. The quote ends here. That is a Washington Post journalist's description of the movie that social media went out of its way to restrict public awareness of.

In closing, if social media is allowed to presumptively and preemptively dismiss conservative thought as controversial, divisive, or too sensitive, then that is what it will continue to do. If they are allowed to apply their own broadly drawn guidelines to dismiss one side of controversial issues, the side they don't agree with and do so with impunity, then they will do so. It's all too easy to label conservative thought as controversial or divisive, dismiss it as contrary to their guidelines or roll out the dreaded phrase, hate speech. But in a digital age, exclusion from the digital arena isn't just discriminatory. It's the most insidiously effective form of censorship available or imaginable. Senator Cruz and the Judiciary Committee members, thank you for your attention. It's been an honor for Cary Solomon and myself to be here, and we hope to be able to answer any questions you may have.

CRUZ: Thank you, Mr. Konzelman. Dr. Tripodi.

TRIPODI: Before I get started, I want to thank everyone for their opportunity to let me speak on my research behalf. I'm a professor of sociology at James Madison University, and for the last decade I have conducted international and domestic research on the interplay between technology and society. In my testimony today I will argue three points. Search engines are primarily shaped by the keywords that we enter. Second, that conservative content creators excel at search engine and social media optimization. And third, that conspiracy theories thrive when legitimate content is absent.

Google, including its subsidiary, YouTube, is the most powerful search engine in the world. It works by scanning the entire internet to find webpages and other content that best match the keywords entered. The system reads in metadata, which is really just a fancy term for tags that are written into the content to help make it searchable. We think of algorithms as magic, but what's happening is very simple. Google transforms our input into a value. Most of the accusations about silencing are focused on output, but what my research reveals is that our results are more likely shaped by input, the keywords that we enter into the search bar. Take for example two very similar searches surrounding an advertisement paid for by Americans for Prosperity during the Virginia governor's race. The ad argued that the Democratic candidate was incompetent because he had approved the spending of $1.4 million in taxpayer money to a fake Chinese company. If you Googled Northam fake Chinese company on January 25, 2018, you were provided with both a conservative take on how Northam was scammed, as well as information from factcheck.org assessing the legitimacy of the claims.

However, focusing on fiscal responsibility, and including the phrase 1.4 million, returned dramatically different exclusively conservative content. This was an opinion piece by the Republican Governors Association, an op-ed by a conservative politician and links directing users back to Americans for Prosperity. This is also true when you consider the phrase, Russia collusion. In May of last year Google actually auto filled the search to include the phrase delusion. And as of this week, when you key in Russian collusion delusion, a majority of the returns support the conservative perspective that allegations against Trump were unsubstantiated. If one were inclined to believe that the assertion of conservatism is being silenced and search for more info about conservative censorship, you will find that Google does not attempt to repress the accusations, but instead returns a series of links and videos that affirm the threat is real.

Marketers use search engine optimization to try and maximize the likelihood that Google will return links back to their cause or company. It is clear that conservative production companies have an acute understanding of how this works. For example, if you analyze the metadata of Prager U videos on YouTube, the company tags just as many of their videos as Democrat as they do Republican. They tag more of their videos with feminism or the women's march than with the word conservative. This strategy increases the likelihood that their videos will appear when people search for or engage with a range of ideological concepts. For example, the top result on YouTube when you search the phrase social justice is a Prager U video that currently has over 1.1 million views. So contrary to the claim that conservatism is being silenced, these marketing tactics amplify conservative positions to audiences who might even be searching for information on more liberal leaning topics.

When there is limited or no metadata matching a particular topic, it is easy to coordinate around keywords to guarantee the kind of information Google will return. This is how conspiracy theorists were able to capitalize on the phrase crisis actor. By producing a plethora of insidious content and maximizing search engine optimization, they filled the data void with their own ideas. Conservative content creators also latch onto data voids in order to optimize their positions. For example, when you search the name Nellie Ohr, the only links returned are from conservative leaning sources. Nellie Ohr on YouTube produces nothing but conservative news content and conspiratorial videos.

As you can see, depending on what you search, conservatism thrives online. The greater problem here is that we live in parallel internets based on our distinct worldviews. We think of Google as a window into the wider world, but it's more like a mirror, reflecting our own interests and biases back to us. To be sure, we must take seriously the fact that YouTube, Facebook and Twitter play an increasingly important role in how our society gains access to news and information. Unfortunately, the opaqueness of their operational tactics allow unsubstantiated conspiracies to hold weight. Thank you very much for your time.

CRUZ: Thank you, Dr. Tripodi. Congresswoman Musgrave.

MUSGRAVE: Good afternoon, Chairman Cruz and Ranking Member Hirono. Thank you very much for the opportunity to testify on this vitally important matter. Susan B. Anthony List is a nationwide network of more than 700,000 Americans. Our mission is to end abortion by electing national leaders and advocating for laws that save lives. We invest heavily in voter education to ensure that pro-life Americans know where their lawmakers stand on protecting the unborn. We engage in issue advocacy, advancing pro-life laws through direct lobbying and grassroots campaigns.

Social media communications are essential to advancing that mission. More than two billion people worldwide and nearly 80 percent of the United States population use social media. If we do not have a strong presence online and the ability to reach our target audience, we might as well be invisible. Susan B. Anthony List has been fighting censorship of our content for more than two years. On March 8, 2017 SBA List promoted four tweets from our president, Marjorie Dannenfelser. One was immediately rejected with Twitter citing violation of their health and pharmaceutical products and services policy, and already, Mr. Chairman, you have put up that tweet by Mother Teresa. Two more tweets were rejected that very same day.

On April 12, 2017 SBA List started a Twitter ad campaign urging constituents to ask legislators to pass a healthcare bill that stopped taxpayer funding of Planned Parenthood, the nation's largest abortion business, which aborts more than 30–332,000 unborn children and receives more than $0.5 billion in taxpayer funding every year. Hours later, Twitter informed us that our account was ineligible to participate in Twitter ads, citing the same policy. No explanation of exactly how SBA List violated the policy was provided even after we inquired. During this same period of time, Planned Parenthood was permitted to run ads very similar to ours.

In September 2017 Twitter blocked an SBA List video ad advocating John Adams for attorney general of Virginia, stating that it was unacceptable to use the phrase, killing babies, in and ad. Our experience on Facebook has been very similar. Between October 9 and November 1, 2018 Facebook banned seven of our paid ads supporting candidates. Brief images of premature babies born at 20 to 24 weeks, when unborn children can be legally aborted, were deemed sensational or graphic content. These ads have also been referred to, I believe, by Senator Lee earlier. They were the Charlotte and Micah ads, images of little miracle babies fighting for their lives. SBA List appealed, and Facebook apologized, saying the ads should have never been disapproved, but less than two hours later another one of our ads were blocked. We'd be blocked in one state, we'd try to run the ad in another state, and it would be blocked. Perhaps most absurd of all, Facebook and Google blocked our research and educational arm, Charlotte Lozier Institute's video ads featuring patients who are helped by ethical, adult stem cell treatment.

Google claimed we were trying to sell pharmaceuticals. Many pro-life groups have had their content arbitrarily blocked. YouTube removed an undercover video by the Center for Medical Progress. Twitter, to this day, refuses to allow ads from Live Action citing a policy against inflammatory or provocative content and expects them to scrub content from their own website. But, Planned Parenthood has recently spent more than $100,000 in Twitter ads.

Twitter blocked a campaign ad from a representative at the time, Marsha Blackburn, discussing her efforts to stop the sale of baby body parts by Planned Parenthood. And they reversed themselves after a firestorm of criticism. And you've heard that from members of the committee and Senator Blackburn herself.

The Twitter account for the movie Unplanned was suspended on opening weekend allegedly for being linked to another account that had violated Twitter's rules, then restored. Once or twice could arguably be written off as a mistake, but as our experience shows, and as one writer for the Wall Street Journal pointed out, it's a mistake that keeps on happening over and over. And it demonstrates a pattern of censorship toward the pro-life views specifically.

Big social media companies wield enormous power to control speech and choose which viewpoints will be favored or disfavored. Facebook's Chief Operating Officer, Sheryl Sandberg, stated in an interview that, quote, "When you cut off speech for one person, you cut off speech for other people." End quote. We are asking for them to live up to their own professional standards and end the discrimination.

Thank you very much, Mr. Parker, for your efforts to hold them accountable.

CRUZ: Thank you. Mr. Parker?

PARKER: Thank you, Mr. Chairman, and people of the committee for allowing me to be here and speak today. My name is Robbie Parker. I am the father of Emilie Parker, one of 20 students tragically murdered at Sandy Hook Elementary School on December 14, 2012. For the last six years I have worked very hard to process the complex emotions that have occupied my heart, mind and soul from the events of that day.

To give her a hug and a kiss before leaving to work, not knowing that would be the last time I would feel her embrace and hear her voice. Emilie has two younger sisters who were only four and three years old when she was killed. My wife and I have labored diligently to support them as best as we can.

For those of you who have not had to explain a loss as sudden and as tragic and as brutal as ours to your small and innocent children, let me leave you with no doubt, it is an excruciating, long and arduous process that will continue for the rest of our lives.

If we had simply lost our daughter due to a disease or a tragic accident that painful process would, perhaps, look very similar. I still would have an experience of her being there in one moment and gone the next. Her sisters would still have to learn to cope with the loss of a beloved sister. My wife and I would still work just as meticulously to help support them on their journey, as well as learn how to grieve as individuals, as a couple and as a family, along with every other unforeseeable hardship that accompanies the dismal abyss of grief.

However, our story is not that simple. Instead of simply being left to grieve in our home, we are exposed to even more sinister people and motives. Within 48 hours of my daughter's murder, jokesters and conspiracy theorists began spewing lies and hurling threats at me and my family on sites like YouTube, Facebook and other platforms.

I began to receive messages, emails, letters to my home and phone calls at my work. In short, these communications told me that I was a liar, that justice was coming, that I was going to burn in hell and to watch my back at all times. They claimed that Emilie was still alive or that she never existed, all while accusing me of being a willing accomplice and conspiring with the government to stage or fake this tragedy.

These people were fueled to act in this way from the information they were consuming on the internet, mainly from content found on social media platforms. Some people even created fake profiles of the shooter with his name and picture and sent me friend requests posing as the shooter himself. I have accepted the fact that I will never know what motivated that individual to enter Sandy Hook that day.

It takes a certain type of person to walk into a school and carry out what he carried out on those teachers and children. However, it takes a very different kind of person to witness that event, then regurgitate, demonstrably and undeniably false information about that event while simultaneously attacking victims' families for profit.

I understand that motivation. And I cannot accept it. We reached out to places like YouTube and Facebook pleading for help and asking that this content be removed from their sites. We either received program responses or cold silence. Eventually we had FBI agents in our home to discuss some of the more credible threats logged at me, as well as at my wife and children.

We've had to consult security experts to help us navigate certain threats and how we should respond appropriately. Ironically, we found that if a post or video displayed a picture YouTube and Facebook would swiftly remove that content for being protected by copyright. However, they were very careful not to infringe on people's freedom of speech. However, in doing so they systematically failed to protect us from harassment and threats and allowed their sites to be used as a genesis and breeding ground for fraudulent and hateful information to be spread, collected and launched, not just at my family, but for the whole world to consume.

Recently many of these companies have changed course and began to remove some of this content. I don't believe this was done because of the years of request, by not just Sandy Hook families, but many other victims of mass tragedies. Instead, they did so because it became more generally known that such abuse was happening and people were shocked and horrified. Only when it became clear to the general public that social media companies' inactivity and failure to protect families was a result of complacency were they then forced to act. In other words, only when they realized it would tarnish their brand and affect them financially did they finally respond appropriately.

I hate to think how much time has been stolen from us because of this issue. Instead of grieving, my family was forced to use what precious energy we had to combat these attacks alone. To protect Emilie's memory, ourselves, instead of focusing on our healing. This ordeal has taught me that time with my family is a precious and limited gift. And I wonder in what ways I've let my family down by not being able to give them 100 percent of my time and energy to support them the way that I knew I needed to support them.

We live in a beautiful country at a beautiful time when we can share our opinions, not just with the people at our dinner table that we know agree with us, but to the whole world. That I can sit on a panel of people who they don't know if agree or disagree with them, but we can have this conversation. Deciding what content is allowed or prohibited on these platforms is paramount in the continuation of our rights to expression. Allowing hateful, false information to proliferate on the internet doesn't just corrupt our national dialogue it has real consequences for real people.

I believe that social media companies have a duty to moderate content, not to limit, but rather to protect the First Amendment in the way in which it was intended. Thank you.

CRUZ: Thank you, Mr. Parker, for that powerful testimony and thank you for your courage to tell your--your horrific story.

Professor Kontorovich?

KONTOROVICH: Chairman Cruz, Ranking Member Hirono, honorable members of the committee, thank you for having me here to testify on the constitutional issues relating to the allege ideological censorship of online content by large internet platforms. I should begin by stating that the extent to which internet platforms engage in politically biased content sorting, the subject of the prior panel, is a factual question in which I can claim no

expertise. I will assume for the purpose of the present analysis that such an issue exists to some extent and consider what approaches Congress might take in responding to it.

So, the first thing to note is that this is not a subject; this is not a First Amendment issue. The First Amendment, of course, applies only to censorship by the government. Indeed, the text of the government speaks only of the federal government. The conduct of private actors is entirely outside the scope of the First Amendment. If anything, ideological content restrictions are editorial decisions that would be protected by the First Amendment.

Nor can one say that the alleged actions of these companies implicate First Amendment values because analogous to the ones that the First Amendment seems to protect against. The First Amendment, like the due process clause of the Fifth and Fourteenth Amendments, does not have a penumbra of values beyond which--beyond its text that it protects. Thus, the values of the First Amendment are nothing more than the prohibition of governmental restraints on speech.

And this point was often obfuscated in a variety of related context. For example, some supporters of net neutrality have recently and incorrectly claimed that net neutrality isn't necessary to protect First Amendment values.

Okay, but the mere fact that ideologically biased content moderation by tech companies does not raise free speech issues, does not mean that it is not a legitimate matter for public concern and concern by this body and discussion of inquiry by this body. It's certainly reasonable for Congress to take ideologically biased practices by a purportedly neutral internet firms into account when considering updating or revising existing legislation.

Current regulation is already, as has been mentioned, not neutral on the subject of internet provider--content providers. The Communications Decency Act of 1996 provides special protections for, quote, "Internet computer--interactive computer services." Such companies, under the law, cannot be treated as publishers of content on their sites created by third parties even if they would otherwise qualify as publishers under common law.

This provision shields the companies from liability for much of the content on their sites on the theory that they are not acting analogous continuous paper editors, that is to say, deciding what to include, what not to include, but rather simply providing a forum or a platform. Now, this blanket presumption, this statutory immunity, is certainly not constitutionally mandated. And it is certainly open to revision in a different environment more than two decades after its passage.

In enacting the immunity provisions, Congress explicitly assumed that--that protected internet services provide a, quote, "A forum for a true diversity of political discourse." To the extent, and that is, of course, a factual question, that assumption is weakened by content monitoring and modulation practices, the assumptions behind that--Section 230 may need to be revisited. That is to say, to the extent that these platforms are substantively monitoring speech, they do become more like publishers. And then a statutory exemption from treating them like publishers should be reexamined.

Now, what that--what the result of that reexamination is is an open question. It could mean nothing. For example, limiting their--limiting the immunity under Section 230 would probably result in more filtering and censorship by these companies rather than less. At the same time, it could be another possible outcome would be to broaden this immunity to treat them equivalent to actual publishers. Why should newspaper publishers not get the same benefit?

A much simpler approach to this solution, which I think avoids lots of--to this problem, which avoids lots of the pitfalls that we have discussed is transparency. And having listened to--to the hearing so far, we've heard that both sides, that is to say, people of all political affiliations, are concerned by content practices and modulation or lack thereof by these companies. It's--the disagreement is in which direction does it cut?

So, one of the greater strengths and attractions of platforms like Facebook, Twitter and Google, is the expectation of users that through the window of their computer they can see or access the vast parade of information out in the world. Users understand the experience of following people as their selection from amongst a myriad of accounts and profiles in the platform what they will follow. Their feed gives them a perspective on outside events. What they may not anticipate is that the online marketplace of ideas that they think they have access to has already been pre-sifted on certain substantive grounds in a way that is not neutral.

Users that turn to a search engine to discover things about the external world will have a poor understanding of how this search may have been pre-filtered or pre-screened. Because these processes are obscure and yet consumers make assumptions about them, it would be well within the scope of normal principals of transparency and consumer regulation, consumer disclosure, to require companies to make clearer, and, again, I think we've been in this hearing for several hours and it's still unclear to us, for companies to make clearer to consumers what exactly these criteria are.

Now, drafting serious disclosure rules is, of course, going to be difficult because it's one--it's one thing to say we modulate or we monitor hateful content, of course, that could mean a wide variety of things, and specifying how that is applied is going to be very difficult and the devil is in the details. But, certainly applying normal consumer protection and transparency principals to this context is entirely consistent with the First Amendment.

CRUZ: Thank you, professor.

Mr. Konzelman, let's--let's start with you. What we have heard asserted in this meeting that--that there is no pattern of discrimination of censorship against conservative views or against pro-life views. That assertion seems manifestly contrary to all the available evidence. Although, I would note that--that the social media companies keep much of the evidence in a black box where we're forced to argue by example rather what would be preferable arguing based on the actual data.

But--but let's focus on your example, because that is one specific and immediate example. The movie Unplanned tells the true story of Abby Johnson. Abby Johnson was the clinic director of the Waco Planned Parenthood Clinic. She was not just briefly a Planned Parenthood employee; she spent, as I understand it, seven years working for Planned Parenthood. She was named employee of the year by Planned Parenthood.

But, then horrified by the practices she saw at Planned Parenthood, by what she saw happening; she left the abortion industry and has become an outspoken pro-life advocate. I will say when I attended a screening and watched the movie, it was one of the most powerful and moving movies I have ever seen. I thought I was prepared to see the movie and I was not.

As I understand it, virtually every TV network refused to carry trailers for the movie. Google repeatedly blocked you from advertising the movie. Twitter took your page down, an undisputed fact for which Twitter apologized here today. And not only that, but both Abby Johnson and Ashley Bratcher, the actress who plays Abby Johnson in the movie were prevented from following the Twitter page for the movie. Is all of that correct? Am I understanding the facts correctly?

KONZELMAN: Yes, so always be the most minor correction, she was actually the clinic director of Bryan, Texas. It was eight years for her whole stint there, from volunteer to clinic director. And I think that's about the only amendments I would--I would make to what you just said.

CRUZ: And what were the consequences, in particular of Google preventing you from advertising. As you noted, Google itself touts that its advertisements are very effective. What consequences did you face from that--that censorship?

KONZELMAN: Well, given that there's blanket and kind of systematic censorship, social media was where we turned to. We assumed that we would be allowed to engage in a commercial transaction. Having the money to buy advertising, we assumed we'd be able to buy advertising. And even though certain news organizations have treated us with tremendous journalistic respect, there's--there's a psychological mechanism in the--in the mind of a movie ticket buyer. Until they see some paid advertising they don't really associate that it's--that it is a real movie, and that it's coming out at a particular date.

And you need to try to create somewhere between--estimates go between eight and 12 impressions. So, we were not able to create those impressions very easily for that market.

CRUZ: And, as I understand it, despite this almost total social media blackout, although you did give credit to Facebook for not engaging in this practice, and despite this almost total media blackout, the film, nonetheless, in its opening weekend became the number five selling movie in the country despite concerted efforts to prevent moviegoers from hearing about it.

KONZELMAN: It was actually number four. And when the numbers finally got finalized we thought it was five, it actually jumped to number four when the numbers were finalized. And just so I can give it a relative measure of what I believe the importance of the film is. Before it aired, Michael Farris is the president of the Alliance Defending Freedom had said I believe this is the cultural event that can overturn Roe. Now, that would thrill some and scare others.

But, I will say that after about 10 days in release, or a couple more now, we have had approaches through Abby Johnson's organization and then there were now. We have--which transitions workers out of the abortion industry. I believe we have something approaching 1 percent of the abortion workers in the United States seeking help to leave the industry. Now, that's based partly on a hard number and partly on an estimate. The number of actual workers who have reached out is 94. I believe there's something on the order of about 700 clinics nationwide. If they all did--had 12 employees, I wasn't a math major, but I think we still get to about one--a little better than 1 percent.

So, I think on the order of 1 percent of the abortion workers in the United States, after getting one look at them being portrayed on a film and it serves, I think, also some evidence that--that they're not being portrayed as monsters, have decided to change their lives and their profession of what they do for a living.

CRUZ: That is truly extraordinary and let me commend you. One of the things that I liked best about the film is that it was not a cartoonish portrayal. That it was compassionate and it was compassionate to workers like Abby who were working for Planned Parenthood, although it displayed the--the practices of Planned Parenthood that pressure women into having abortions and sometimes against what they would otherwise wish for.

KONZELMAN: That was our attempt. Abby was very firm that she wanted this film to be a love letter to those who are still trapped in the industry.

CRUZ: Congresswoman Musgrave, Susan B. Anthony List, what happened to Unplanned is not isolated. As I understand your testimony, the Susan B. Anthony List has faced repeated censorship, over and over and over again for positive, life affirming, pro-life messages such as the message from Mother Teresa. And so, this is not a one-time incident. This is, in fact, a consistent pattern. Is that correct?

MUSGRAVE: It is a consistent pattern. And interestingly enough, you know, we alluded to Mother Teresa's quote on--in other instances we've received an apology. And then try to run the same ad in another state and it's taken down. And the fact of the matter is we have target audiences and even a couple of hours can make a dramatic impact on our ability to reach them. We have had ads that have been down for days. The longest an ad has been down is six weeks. But, you can imagine in the heat of a campaign trying to support an issue, how much time that it--it takes away from our staff's ability to do other work. It--it is blatantly unfair when similar ads, for instance, from Planned Parenthood, who receives a half a billion dollars of taxpayers funding a year, has their ads going at the same time our ads are taken down.

CRUZ: And Congresswoman Musgrave, are you aware of a comparable number of instances or even a single instance of either Planned Parenthood being censored or blocked by Twitter or Facebook or Google or, for that matter, let's take Virginia democratic governor Ralph Northam, who rather horrifically advocated not only late-term abortions, but abortion after birth, truly a horrifying practice, regardless of where one falls on the spectrum of the--the debate on--on abortion. Are you aware of either of them ever having a social media post blocked?

MUSGRAVE: I am not. And it seems rather obvious when we talk about those two instances that the pro-life has community has suffered under this censorship.

CRUZ: Final question, Professor Kontorovich, you talked about--about Section 230. And, indeed, your--your testimony says that--that Section 230 is predicated on the idea that internet companies would provide, quote, "A forum for a true diversity of political discourse." Number one, that language is from the statute. Number two, Congress could change and repeal that special immunity from liability that no other non-tech publisher enjoys. And, number three, if Congress did repeal Section 230 in the entity, Mr. Parker and others facing the horrific slander and liable he faced would have had an immediate remedy to force them to take that slanderous and libelous conduct--content down immediately.

Is all of that correct, Professor Kontorovich?

KONTOROVICH: Yeah, that's all--that's entirely correct. The--the presumption, I would call it a presumption rather than predicate, the obvious statutory presumption defined in Congress was that the immunity is based on the neutrality of the platform. But, I must add that the purpose of the immunity was to encourage companies to filter and moderate content. It was so that they would not be sued for doing so. So, the elimination of that immunity is likely to result in more filtering. But, it could be more ideologically balanced filtering. And whether one wants more net filtering that is overall more neutral rather than less filtering, but more lopsided is, of course, a policy choice for Congress.

CRUZ: Thank you. Senator Hirono?

HIRONO: Thank you. Mr. Parker, I--well, I'm sorry, Senator Blumenthal--.

BLUMENTHAL: --I--I appreciate Senator Hirono because I have a meeting back in the office and I will be very brief. I just want to ask Mr. Parker a couple of questions if I may, sir. First, thank you for being here. Thank you for your courage and strength. You reflect the incredible bravery of the Sandy Hook families and, although you're not longer a resident of Connecticut, you represent them and many, many others by being here today and working through the grief and pain that still haunts you. And that was aggravated needlessly and cruelly by those harassers who, as I understand it, deny that the Sandy Hook tragedy even occurred. Is that right?

PARKER: Correct.

BLUMENTHAL: And the harassment included threats to yourself and your family. You have two young daughters and that created a lot of fear and disruption in your life, did it not?

PARKER: Yeah, it did of course. But, this wasn't just stuff that people were hiding behind computer screens, the majority of it was. But, I've had experiences where people have come to me on the street and--and accosted me and called me out and--and yelled profanities. And in one instances I just barely walked away from my family. I had dropped them off at some place and I went and parked the car and I was walking back. So, my children

were just--I mean minutes away from experiencing that same--that same experience with me.

BLUMENTHAL: And so, the--the impact was not just those harassers and I'm not going to use specific names here, but it had a ripple effect. There were ramifications in real-time and real life of what was happening on the internet.

PARKER: Exactly. And what was frustrating like I--like I tried to say it was--you know, when we--we felt like by going and asking that this content be removed and we felt like, you know, because they were--they were legitimate threats. And there was real fear there. And how--there's no way that I'm gonna be able to quantify those effects in the way and how--I'm gonna have to wait and see how my children live the rest of their lives before I can see how well we did at helping them process their grief and how much distraction this was for us in our ability to do that properly.

And so, I know the effects that it's had on me and what I need to do to heal. And I'm an adult and I can process those things. And knowing how much energy that is for me and what--there isn't a child version of grief. They--they feel the same things and to the same weight that I do. And so, knowing what I felt I can imagine what my children are feeling. And knowing that there were times when I wasn't available to them like I should have been because I was dealing with these things. There's not a price to put on that effect.

BLUMENTHAL: The fact that Facebook failed or refused to take action itself aggravated that pain, did it not?

PARKER: Well, absolutely, I mean because Facebook it likes to share things. And so, you start sharing things and it gets proliferated around and around and around. And one thing that I took out of my testimony that I wasn't getting--just for context and time, but I had some really good friends that--that they set up a memorial page for my daughter and it was a place where people could go and express their condolences and their love and support. And we ended up having to take that page down because of all the inundation of vile videos and comments and attacks at--that wasn't just at me, but it was at other people and friends of mine that were receiving phone calls at their houses because of their support for us.

BLUMENTHAL: In effect, this harassment, permitted by Facebook, censored you.

PARKER: Exactly. The--when--like I said in my testimony, when we--when we tried to get them to respond in any form their--their response was that they couldn't--at that time felt like they couldn't moderate what people were saying and expressing their opinions.

BLUMENTHAL: The pain and anxiety experienced by you was shared by other families as well, was it not?

PARKER: Yeah, it's--it's--when we get together it's definitely something that we talk about.

BLUMENTHAL: And do you know whether victims and survivors of similar kinds of tragedies have seen the same in their own lives?

PARKER: Yeah. So, my approach was--I was taught, you know, how to deal with bullies was to ignore them and they will go away. And that's what I was teaching my children and not exposing them to this. But, as time went on and they weren't going away and it kept being proliferated, I finally realized that my children are gonna get old enough that they're gonna run into this. And what am I gonna do to protect them. They see how hard I worked to protect Emilie's memory. What are my living children gonna wonder about what I'm doing to protect them?

I had a conversation with a family from Parkland whose daughter was murdered. They share the same faith as ours and we were talking and one of the comments that the--the wife made was I don't--she was commenting about videos about her husband because he had made some public comments. And she goes I don't know if you guys ever experienced anything like this. And we just kind of had that black humor laugh like, no, of course we've experienced this. And that was when I realized that I needed to take a more proactive approach in this and proactively try and protect not just my family, but future victims because there are so many. And, unfortunately, we know that there will be others. And I have the energy now to be able to fight that fight when I know that they don't. And so, I stepped in for them.

BLUMENTHAL: Thank you for being here. You and I have never discussed this issue before have we?

PARKER: No.

BLUMENTHAL: But, I'm deeply grateful for you for being here today and I think countless others are as well. Thank you very much Mr. Parker.

PARKER: Thank you, senator.

CRUZ: Thank you. Senator Hirono?

HIRONO: Thank you. Before I begin my questions, I'd like to ask unanimous consent to enter a number of items into the record. The statement of Andy Parker, whose daughter, Alison Parker, was shot and murdered while reporting on live TV in August 25. Like our witness, Robbie Parker, Andy Parker and his family have been the targets of online conspiracy theories, harassment and threats. The statement of Corynne McSherry of Electronic Frontier Foundation, and the statement of Berin Szoka, I hope I'm pronouncing the name right, of TechFreedom. I'd also like to enter into the record with unanimous consent entering Dr. Tripodi's articles relating to--well, a report titled Searching for Alternative Facts, Analyzing Scriptural Inference in Conservative News Practices. And another of her articles entitled No, Big Tech Isn't Silencing Conservatism.

CRUZ: Without objection, all of the referenced materials will be entered into the record.

HIRONO: Thank you. Mr. Parker, I, too, extend to you our--my and our deepest condolences for the tragic loss of your daughter. And I thank you for your courage and that of your entire family. So, I'm wondering whether the tech companies that you contacted ever apologized to you for the--the kind of--of posts that were so hurtful and damaging to your family?

PARKER: This afternoon after the first panel was done the representative from Twitter and Facebook approached me and talked to me and expressed their condolences and apologies.

HIRONO: Obviously, Google, which is not here, they still have posts as I showed in my chart, that they still have posts that has conspiracy theories and attacking you for basically lying. So, there's work to be done with those folks.

I have some questions for Dr. Tripodi. You know, President Trump, this past summer, tweeted that Google rigs its search results in favor of supposedly liberal news quint outlets. Based on your research, does Google rig its search results against conservatives?

TRIPODI: Thank you, senator. Based on my research from what I was arguing in my testimony, the results that we received from Google are more based on what we put into Google then what we get out of it.

HIRONO: I think that's a very--really important point to make because depending on what kinds of words you put in, out will pop different kinds of sites and links.

TRIPODI: Exactly.

HIRONO: And so, if you put in certain things that are viewed--a lot of conservative--of what might be deemed conservative sites and links will pop up and you put something else in you get--you'll get some other kinds of results. So, I think that that is a very important point that you made, thank you very much.

We have heard various anecdotal evidence of bias. There are other examples like Chick-fil-A appreciation--appreciation day page that--where--that was removed from Facebook for approximately 24 hours in 2012 and certain videos produced by (INAUDIBLE) that have either been taken down or demonetized. What leads to a page being taken down by Facebook or a video being demonetized on YouTube, do you know Dr. Tripodi? And do examples like these demonstrate bias on the part of tech and social media companies?

TRIPODI: Thank you so much for this question. I think this is actually a very important point for this hearing. We've been using conversations about censorship and bias to describe actually five to six different things and--as far as what I've been listening to in terms of testimony. So, we've been thinking about advertising. We've been thinking about content moderation. We've been thinking about deplatforming. We've been thinking about restrictions that different sites might put on their videos as to age restrictions. And we've been also talking about demonetization. And I think being very clear about what you're discussing is of upmost importance.

So, in response to some of the conversations that you've been talking about--and I believe this a--this is really what's happening with regard to a lot of the testimony today. Issues of content moderation are very murky. And I think we could bipartisanly agree that there needs to be more transparency regarding how content gets flagged. But, I think it is also really important to understand, based on the conversations that I've been listening to, that content moderation is a kind of a many-step process and that it's quite possible that a lot of the content that's being initially removed from these platforms was not because of any kind of executive, but was because of users tagging that content as inappropriate. And that would be a user censor issue not a platform censor issue. And a lot of the content moderation decisions are often made in non-U.S. countries by people who make very low wages and have about three to five seconds to determine if content should go up or--so, I think understanding how the content moderation process works is very important and needs more transparency.

HIRONO: In your testimony you also discussed the ways that organizations and individuals use certain tactics to gain the algorithms behind Facebook's and Twitter's feeds. Are these tactics only available to liberals or do conservatives also use these tactics?

TRIPODI: Well, as my testimony makes clear, these are tactics that I've observed by studying conservative media. But, absolutely, I would say that search engine optimization is not partisan and is something that all corporations and politicians are using.

HIRONO: I have a question for Professor Kontorovich. You said that--well, if we were to take away the immunity that I think it would lead to more content being deleted or--or whatever the term is. So, you did say that, perhaps, the content could be more ideologically neutral. Do you have evidence, are you citing to something for the proposition that the--these platforms are not ideologically neutral?

KONTOROVICH: As I said in my comments, I am taking as an assumption for purposes of legal analysis that this problem exists. The existence of the problem is an empirical question, not a legal question. And the point is that the publisher protection treating--treating--two third is treating the companies as not being publishers is to make them not liable for any kind of content. And presumably that the lifting of such limitation would result in a general borage of litigation, which would dwarf any kind of ideological effect.

HIRONO: I would say so. But, well, assuming that there is not neutral content, how would we ensure ideological neutrality of these platforms?

KONTOROVICH: I have not suggested that Congress must or should enforce ideological neutrality, actually enforcing ideological neutrality would, itself, raise First Amendment questions. What I have suggested is that Congress is not obligated to provide it special exemptions for these companies as two third it currently does. And, certainly, to the extent that there--to the extent that these companies have substantive content modulation practices disclosing those in a way that consumers of the platform from whom they generate their revenue can understand what they're seeing and understand whether, you know, if they search for something and it doesn't exist is it because it doesn't exist or because it has been screened based on content. And we're never gonna agree what's neutral, but that could be up to consumers to judge and agree.

HIRONO: So, your view that more of transparency would be the way to go?

KONTOROVICH: It would be a way that--so, the market--well, I believe the marketplace of ideas is extremely robust in my view, even if conservatives are being discriminated against by these sites. You know, they can go and start their own platforms, crazy as that may seem. That's the whole point of free speech. But, you have to know what's going on to be able to take that action.

HIRONO: Right.

KONTOROVICH: So, more transparency would be helpful in that way and not constitutionally problematic.

HIRONO: Thank you. Thank you, Mr. Chairman.

CRUZ: Thank you, Senator Hirono. Let me thank each of the witnesses for being here for your testimony. As with the previous panel, the record in this hearing will be kept open for two weeks, two weeks from today. Senators are asked to submit any written questions to any of the witnesses by that date and then each of the witnesses are asked to respond to those questions as promptly as possible.

I thank you, again, for the time and energy and expertise that--that you have shed on this important issue. And with that, this hearing is adjourned.

## Copyright

Copyright 2019 CQ-Roll Call, Inc. All Rights Reserved.

# DEFENDANTS' EXHIBIT 31:



# DEFENDANTS' EXHIBIT 32:

4/24/23, 3:13 PM    Eric Schmitt on Twitter: "Getting rid of section 230 protects free speech and common carriers, bust up #BigTech" / Twitter

Case 8:22-cv-01213-TAD-KDM    Document 264-4    Filed 05/02/23    Page 312 of 506 PageID #: 19299



# DEFENDANTS' EXHIBIT 33:

# Attorney General William P. Barr Delivers Opening Remarks at the DOJ Workshop on Section 230: Nurturing Innovation or Fostering Unaccountability? | OPA

justice.gov/opa/speech/attorney-general-william-p-barr-delivers-opening-remarks-doj-workshop-section-230

February 19, 2020



Attorney General William P. Barr Delivers Opening Remarks at the DOJ Workshop on Section 230: Nurturing Innovation or Fostering Unaccountability?

Washington, DC

United States

~

Wednesday, February 19, 2020

### *Remarks as Prepared for Delivery*

Thank you, Director Wray, for that introduction and thanks for hosting us for today's workshop on Section 230 of the Communications Decency Act.

Section 230 is a topic that has garnered significant attention over the past year, and we are pleased to have so many experts and thought leaders on our panels and in the audience here today.

The Department of Justice's interest in Section 230 arose in the course of our broader review of market-leading online platforms, which we announced last summer.  While our efforts to ensure competitive markets through antitrust enforcement and policy are critical, we recognize that not all the concerns raised about online platforms squarely fall within antitrust.  Because the concerns raised about online platforms are often complex and multi-dimensional, we are taking a holistic approach in considering how the department should act in protecting our citizens and society in this sphere.

A driving motivation behind our broader perspective, including Section 230, is the need for the department's enforcement efforts to keep up with rapidly changing technological landscape around us.  Technological change over the past few decades has led to groundbreaking innovations and tremendous benefits to the economy and to consumers.  At the same time, criminals and bad actors now use technology to facilitate and expand the scope of their wrongdoing and the victimization of our fellow citizens.  The department has a responsibility to keep up with changes in technology to protect citizens from new harms, while at the same time preserving benefits.

The Internet has evolved significantly since Section 230 was enacted in 1996.  At that time, almost 25 years ago, immunity was seen as vital to protecting new technology in its incipiency.  Today, online platforms have become essential to Americans' daily lives, often serving as the primary conduit for how we receive and share information   No longer are tech companies the underdog upstarts; they have become titans of US industry.  Given this changing technological landscape, valid questions have been raised on whether Section 230's broad immunity is still necessary, at least in its current form.

The increased size and power of online platforms has also left consumers with fewer options   The lack of feasible alternatives is relevant in the Section 230 discussion    both for those citizens who want safer online spaces and for those whose speech has been banned or restricted by these platforms.  In enacting Section 230, Congress noted that the Internet offers a "forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity."

Over time, however, the avenues for sharing information and engaging in discourse have concentrated in the hands of a few key players.  Further, the big tech platforms of today often monetize through targeted advertising and related businesses, rather than charging users.  Thus, their financial incentives in content distribution may not always align with what is best for the user.  While the department's antitrust review is looking at these developments from a competition perspective, we must also recognize what this concentration means for Section 230 immunity.

The online platforms have changed not only in size, but also in substance.  The early days of online public bulletin boards, like AOL, have been replaced by platforms with sophisticated content moderation tools, algorithms, recommendation features, and targeting.  With these new tools, the line between passively hosting third party speech and actively curating or promoting speech starts to blur.  What these changes mean for the scope of Section 230 immunity is another important issue to consider.

Technology has changed in ways that no one, including the drafters of Section 230, could have imagined.  These changes have been accompanied by an expansive interpretation of Section 230 by the courts, seemingly stretching beyond the statute's text and original purpose.  For example, defamation is Section 230's paradigmatic application, but Section

230 immunity has been extended to a host of additional conduct — from selling illegal or faulty products to connecting terrorists to facilitating child exploitation   Online services also have invoked immunity even where they solicited or encouraged unlawful conduct, shared in illegal proceeds, or helped perpetrators hide from law enforcement.

The courts' broad interpretation of Section 230 also occurs against the background of the Supreme Court, in 1997, striking down every other provision of the CDA on First Amendment grounds   This left in place an unbalanced statutory regime that preserves technology providers' liability protections, without guaranteeing corresponding protections for minors from harmful material on the Internet.

The Department of Justice is concerned about the expansive reach of Section 230, but we are not here to advocate for a position.  Rather, we are here to convene a discussion to help us examine Section 230 and its impact in further detail   As we consider these issues, however, I would like to make a few preliminary observations.

First, civil tort law can act as an important complement to our law enforcement efforts. Federal criminal prosecution is a powerful, but necessarily limited tool that addresses only the most serious conduct.  The threat of civil liability, however, can create industry-wide pressure and incentives to promote safer environments   In fact, Congress has enacted civil laws specifically to supplement criminal enforcement.  For example, the Anti-Terrorism Act provides civil redress for victims of terrorist attacks on top of the criminal terrorism laws, yet judicial construction of Section 230 has severely diminished the reach of this civil tool.  Civil liability can work hand-in-hand with the department's law enforcement efforts to promote a safer environment, both online and in the physical world

Second, broad Section 230 immunity can pose challenges for the department and other federal agencies in certain civil enforcement matters.  Actions brought in the public interest by the federal government do not raise the same concerns of mass liability for private speech torts that were at the core of Congress's concerns when it enacted Section 230.  It is questionable whether Section 230 was intended to allow companies to invoke the statute's immunity against the federal government acting to protect American citizens.

Finally, and importantly, Section 230 immunity is relevant to our efforts to combat lawless spaces online.  We are concerned that internet services, under the guise of Section 230, can not only block access to law enforcement — even when officials have secured a court-authorized warrant     but also prevent victims from civil recovery   This would leave victims of child exploitation, terrorism, human trafficking, and other predatory conduct without any legal recourse.  Giving broad immunity to platforms that purposefully blind themselves – and law enforcers – to illegal conduct on their services does not create incentives to make the online world safer for children.  In fact, it may do just the opposite.

In addressing the myriad online harms today, we must remember that the goal of firms is to maximize profit, while the mission of government is to protect American citizens and society Sometimes private incentives will create an optimal solution, such as the free market's ability to determine the best price for a given product.  When it comes to issues of public safety, the government is the one who must act on behalf of society at large   Law enforcement cannot delegate our obligations to protect the safety of the American people purely to the judgment of profit seeking private firms   We must shape the incentives for companies to create a safer environment, which is what Section 230 was originally intended to do.  The question for us, and for this Workshop, is whether those incentives are working or whether they need to be recalibrated

These are just a few perspectives as we get started, but the goal for the department today is to listen   The concerns regarding Section 230 are many and not all the same   We must also recognize the benefits that Section 230 and technology have brought to our society, and ensure that the proposed cure is not worse than the disease.  The debate, however, is important.  To that end, we have brought together a diverse set of perspectives in both our panels and in our audience today.  We look forward to the discussion today, and to continuing the conversation

Thank you.

<div align="center">***</div>

The year 2020 marks the 150th anniversary of the Department of Justice.  Learn more about the history of our agency at www.Justice.gov/Celebrating150Years.

# DEFENDANTS' EXHIBIT 34:



🇺🇸 An official website of the United States government
Here's how you know

**THE UNITED STATES**
**DEPARTMENT** *of* **JUSTICE**
TICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                      Wednesday, June 17, 2020

## Justice Department Issues Recommendations for Section 230 Reform

### Reforms Strike Balance of Protecting Citizens While Preserving Online Innovation and Free Speech

The Department of Justice released today a set of reform proposals to update the outdated immunity for online platforms under Section 230 of the Communications Decency Act of 1996.  Responding to bipartisan concerns about the  cope of 230 immunity, the department identified a  et of concrete reform propo al  to provide  tronger incentive for online platforms to address illicit material on their services while continuing to foster innovation and free speech.  The department'  finding  are available here

"When it comes to issues of public safety, the government is the one who must act on behalf of society at large.  Law enforcement cannot delegate our obligations to protect the safety of the American people purely to the judgment of profit  eeking private firm   We mu  t  hape the incentive  for companie  to create a  afer environment, which i  what Section 230 was originally intended to do," said Attorney General William P. Barr.  "Taken together, these reforms will en ure that Section 230 immunity incentivize  online platform  to be re pon ible actor   The e reform  are targeted at platforms to make certain they are appropriately addressing illegal and exploitive content while continuing to preserve a vibrant, open, and competitive internet  The e twin objective  of giving online platform  the freedom to grow and innovate while encouraging them to moderate content responsibly were the core objectives of Section 230 at the outset.  The Department's proposal aims to realize these objectives more fully and clearly in order for Section 230 to better serve the interests of the American people."

The department's review of Section 230 over the last ten months arose in the context of its broader review of market-leading online platform  and their practice , which were announced in July 2019   The department held a large public workshop and expert roundtable in February 2020, as well as dozens of listening sessions with industry, thought leaders, and policy makers, to gain a better understanding of the uses and problems surrounding Section 230.

Section 230 wa  originally enacted to protect developing technology by providing that online platform  were not liable for the third-party content on their services or for their removal of such content in certain circumstances.  This immunity wa  meant to nurture emerging internet bu ine  e  and to overrule a judicial precedent that rendered online platform liable for *all* third-party content on their services if they restricted *some* harmful content.

However, the combination of 25 years of drastic technological changes and an expansive statutory interpretation left online platform  unaccountable for a variety of harm  flowing from content on their platform  and with virtually unfettered discretion to censor third-party content with little transparency or accountability.  Following the completion of it  review, the Department of Ju tice determined that Section 230 i  ripe for reform and identified and developed four categories of wide-ranging recommendations.

**Incentivizing Online Platforms to Address Illicit Content**

The first category of recommendations is aimed at incentivizing platforms to address the growing amount of illicit content online, while preserving the core of Section 230's immunity for defamation claims. These reforms include a carve-out for bad actors who purposefully facilitate or solicit content that violates federal criminal law or are willfully blind to criminal content on their own services. Additionally, the department recommends a case-specific carve out where a platform has actual knowledge that content violated federal criminal law and does not act on it within a reasonable time, or where a platform was provided with a court judgment that the content is unlawful, and does not take appropriate action.

### Promoting Open Discourse and Greater Transparency

A second category of proposed reforms is intended to clarify the text and revive the original purpose of the statute in order to promote free and open discourse online and encourage greater transparency between platforms and users. One of these recommended reforms is to provide a statutory definition of "good faith" to clarify its original purpose. The new statutory definition would limit immunity for content moderation decisions to those done in accordance with plain and particular terms of service and consistent with public representations. These measures would encourage platforms to be more transparent and accountable to their users.

### Clarifying Federal Government Enforcement Capabilities

The third category of recommendations would increase the ability of the government to protect citizens from unlawful conduct, by making it clear that Section 230 does not apply to civil enforcement actions brought by the federal government.

### Promoting Competition

A fourth category of reform is to make clear that federal antitrust claims are not, and were never intended to be, covered by Section 230 immunity. Over time, the avenues for engaging in both online commerce and speech have concentrated in the hands of a few key players. It makes little sense to enable large online platforms (particularly dominant ones) to invoke Section 230 immunity in antitrust cases, where liability is based on harm to competition, not on third-party speech.

For more information about the department's recommendations, please visit https://www.justice.gov/ag/department-justice-s-review-section-230-communications-decency-act-1996.

**Topic(s):**
Antitrust

**Component(s):**
Antitru t Divi ion
Office of the Attorney General

**Press Release Number:**
20 556

*Updated June 17, 2020*

# DEFENDANTS' EXHIBIT 35:

Skip to main content

 Help Center (https://help.twitter.com/)

- Using Twitter (https://help.twitter.com/en/using-twitter)
- Managing your account (https://help.twitter.com/en/managing-your-account)
- Safety and security (https://help.twitter.com/en/safety-and-security)
- Rules and policies (https://help.twitter.com/en/rules-and-policies)
- Resources ⌄
    - New user FAQ (https://help.twitter.com/en/resources/new-user-faq)
    - Glossary (https://help.twitter.com/en/resources/glossary)
    - A safer Twitter (https://help.twitter.com/en/resources/a-safer-twitter)
    - Accessibility (https://help.twitter.com/en/resources/accessibility)

    - Our rules (https://help.twitter.com/en/resources/rules)
    - My privacy (https://help.twitter.com/en/resources/how-you-can-control-your-privacy)
    - How we address misinformation on Twitter (https://help.twitter.com/en/resources/addressing-misleading-info)



Contact Us (https://help.twitter.com/forms.html)



1. Report violations

# Report violations

1. Help Center ⌃ (https://help.twitter.com/)
2. Platform Use Guidelines ⌃ (https://help.twitter.com/en/rules-and-policies#platform-use-guidelines)

# Report violations

This article provides an overview of how to report potential violations of the Twitter Rules and Terms of Service.

How to report directly from a Tweet, List, or profile

How to report specific content in a Moment

How to report a Twitter Space or person in a Space

How to report a product

How to report specific types of violations

How to report directly from a Tweet, List, or profile
You can report directly from an individual Tweet, List, or profile for certain violations, including: spam, abusive or harmful content, inappropriate ads, self-harm and impersonation. For information about reporting other types of violations, see the **How to report specific types of violations** section below.

**How to report individual Tweets for violations:**

Learn how to report Tweets, Lists, or Direct Messages for violations.

**How to report media for violations:**

Learn how to report Tweets for media, and read the Twitter media policy.

**How to report profiles for violations:**

1. Open the profile you'd like to report.

2. Select the **overflow** icon °°°

3. Select **Report** and then select the type of issue you'd like to report.

4. If you select **They're being abusive or harmful**, we'll ask you to provide additional information about the issue you're reporting. We may also ask you to select additional Tweets from the account you're reporting so we have better context to evaluate your report.

5. We will include the text of the Tweets you reported in our follow-up emails and notifications to you. To opt-out of receiving this information, please uncheck the box next to **Updates about this report can show these Tweets**.

6. Once you've submitted your report, we'll provide recommendations for additional actions you can take to improve your Twitter experience.

# How to report specific content in a Moment

**How to report a Tweet in a Moment for violations:**

1. Navigate to the Tweet within the Moment that you'd like to report.

2. Click or tap the °°° icon.

3. Click or tap **Report Tweet**.

4. Choose the type of issue you'd like to report to us.

5. Once you've submitted your report, we'll provide recommendations for actions you can take to improve your Twitter experience.

**How to report Moment for violations:**

Depending on what <u>type of violation</u> you're reporting, there are several ways to report a Moment. Below is a list of the types of violations you might see:

- <u>Violation of posting private information</u> (https://help.twitter.com/en/forms/safety-and-sensitive-content/private-information)
- <u>Abuse</u> (https://help.twitter.com/en/forms/safety-and-sensitive-content/abuse)
- <u>Hateful conduct</u> (https://help.twitter.com/en/forms/safety-and-sensitive-content/hateful-conduct)
- <u>Violent threats</u> (https://help.twitter.com/en/forms/safety-and-sensitive-content/violent-threats)
- <u>Self harm</u> (https://help.twitter.com/en/forms/safety-and-sensitive-content/self-harm)

Once you've identified the type of violation you need to report, follow the instructions below.

1. Chose one of the forms listed above.
2. Enter the Moment URL that you would like to report.
3. Provide us with up to 5 Tweets within the Moment that may be in violation.
4. Once you've submitted your report, we'll provide recommendations for actions you can take to improve your Twitter experience.

# How to report a Twitter Space or person in a Space

If you think a Space or someone in a Space violates the Twitter Rules and policies, you can report them. Speakers and listeners can report a Space and any account in a Space.

**How to report a Space for violations:**

1. While in the Space, tap the overflow icon °°°.
2. Tap **Report this Space**.
3. Select the type of issue you'd like to report to us.
4. Once you've reported the Space, you'll have the option to leave or stay.

**How to report an account for violations:**

1. While in the Space, tap on the account's profile photo.
2. Tap **Report**.
3. Select the type of issue you'd like to report to us.
4. Once you've reported the account, you'll have the option to leave or stay in the Space.

# How to report a product

If you think a product from a merchant on Twitter violates our Shopping Policies, you can report them directly from your Twitter for iOS or Android App.

### How to report a product from a Shop Spotlight (https://blog.twitter.com/en_us/topics/product/2021/twitter-shopping--testing-shoppable-profiles-on-twitter):

1. While on a merchant's profile, find the Shop Spotlight.
2. Select the more icon ●●● on the product you wish to report.
3. Select **Report product.**
4. Select **Intellectual property violation** if you're reporting a product for issues with intellectual property rights. (https://help.twitter.com/en/rules-and-policies#intellectual-property) You'll need to include the product ID. (https://help.twitter.com/en/using-twitter/tweet-and-moment-url#productid) You can also submit an intellectual property violation directly here (https://help.twitter.com/en/forms/ipi).

   Select **Other violation** if you're reporting a product for a different reason.

### How to report a product from a Twitter Shop (https://blog.twitter.com/en_us/topics/product/2022/twitter-shops-more-space-to-shop):

1. From the Twitter Shop, navigate to the product you wish to report.
2. Long-press on the product tile until the report product button appears.
3. Select **Report product.**
4. Select **Intellectual property violation** if you're reporting a product for issues with intellectual property rights. (https://help.twitter.com/en/rules-and-policies#intellectual-property) You'll need to include the product ID. (https://help.twitter.com/en/using-twitter/tweet-and-moment-url#productid) You can also submit an intellectual property violation directly here (https://help.twitter.com/en/forms/ipi).

   Select **Other violation** if you're reporting a product for a different reason.

# How to report specific types of violations

The information below outlines the types of violations you can report to us through our Help Center.

- **Unauthorized trademark use:** Learn more about Twitter's <u>trademark policy</u> and <u>file a report here</u>.
- **Unauthorized use of copyrighted materials:** Learn more about Twitter's <u>copyright policy</u> and <u>file a report here</u>.
- **Sale or promotion of counterfeit goods:** Learn more about Twitter's <u>counterfeit goods policy</u> and <u>file a report here</u>.
- **Privacy policy towards children:** Our Services are not directed to persons under 13. If you become aware that your child has provided us with personal information without your consent, please contact us via our <u>privacy form</u>. Learn more about our policy towards children in our <u>Privacy Policy</u> (https://twitter.com/en/privacy).
- **Child sexual exploitation:** Learn more about our <u>child sexual exploitation policy</u> and <u>file a report here</u>.
- **Pornography:** To report obscene or pornographic images being used in profile photos and/or header photos on Twitter, follow our instructions on <u>reporting sensitive media</u>.
- **Impersonation of an individual or brand:** Learn more about our <u>impersonation policy</u> and <u>file a report here</u>.
- **Private information posted on Twitter:** Learn more about our <u>private information policy</u> and <u>file a report here</u>.
- **Abusive behavior and violent threats:** Learn more about our <u>abusive behavior policy</u> and <u>file a report here</u>.
- **Spam and system abuse:** If you are experiencing a spam or malware issue that's impacting your use of Twitter, <u>file a report here</u>.
- **Violation of Twitter Ads policy:** Learn how to <u>recognize Twitter Ads</u> and the steps you can take to resolve issues without filing a report. <u>Report a Twitter Ad</u> that may be in violation of our policies.

Note: When reporting potential violations of the <u>Twitter Rules</u> and <u>Terms of Service</u> (https://twitter.com/tos) through the Help Center, you may be asked to allow us to share parts of your report with third parties, such as the affected account.

# How to report on behalf of someone else

You can report violations on behalf of another person. Refer to the categories and instructions listed above or contact us to <u>submit your report</u>. You can also report directly from a Tweet or profile (see above section **How to report directly from a Tweet, List, or profile**).

## Share this article



Tweet

## Was this article helpful?<sup>*</sup>

Was this article helpful?<sup>*</sup>

◯ Yes    ◯ No

Submit

© 2023 X Corp.

<u>Cookies</u> (https://help.twitter.com/rules-and-policies/twitter-cookies)

<u>Privacy</u> (https://twitter.com/privacy)

<u>Terms and conditions</u> (https://twitter.com/tos)

English

 <u>Help Center</u> (https://help.twitter.com/)

- English (https://help.twitter.com/en/rules-and-policies/twitter-report-violation)
- Español (https://help.twitter.com/es/rules-and-policies/twitter-report-violation)
- 日本語 (https://help.twitter.com/ja/rules-and-policies/twitter-report-violation)
- 한국어 (https://help.twitter.com/ko/rules-and-policies/twitter-report-violation)
- Português (https://help.twitter.com/pt/rules-and-policies/twitter-report-violation)
- Deutsch (https://help.twitter.com/de/rules-and-policies/twitter-report-violation)
- Türkçe (https://help.twitter.com/tr/rules-and-policies/twitter-report-violation)
- Français (https://help.twitter.com/fr/rules-and-policies/twitter-report-violation)
- Italiano (https://help.twitter.com/it/rules-and-policies/twitter-report-violation)
- العربية (https://help.twitter.com/ar/rules-and-policies/twitter-report-violation)
- Nederlands (https://help.twitter.com/nl/rules-and-policies/twitter-report-violation)
- Bahasa Indonesia (https://help.twitter.com/id/rules-and-policies/twitter-report-violation)
- Русский (https://help.twitter.com/ru/rules-and-policies/twitter-report-violation)
- हिंदी (https://help.twitter.com/hi/rules-and-policies/twitter-report-violation)
- (https://help.twitter.com/ta.html)
- עברית (https://help.twitter.com/he/rules-and-policies/twitter-report-violation)
- 简体中文 (https://help.twitter.com/zh-cn/rules-and-policies/twitter-report-violation)
- 繁體中文 (https://help.twitter.com/zh-tw/rules-and-policies/twitter-report-violation)
- ภาษาไทย (https://help.twitter.com/th/rules-and-policies/twitter-report-violation)
- Tiếng Việt (https://help.twitter.com/vi)
- Melayu (https://help.twitter.com/ms/rules-and-policies/twitter-report-violation)
- Filipino (https://help.twitter.com/fil/rules-and-policies/twitter-report-violation)
- فارسی (https://help.twitter.com/fa/rules-and-policies/twitter-report-violation)
- Dansk (https://help.twitter.com/da/rules-and-policies/twitter-report-violation)
- Suomi (https://help.twitter.com/fi/rules-and-policies/twitter-report-violation)
- Svenska (https://help.twitter.com/sv/rules-and-policies/twitter-report-violation)
- Norsk (https://help.twitter.com/no/rules-and-policies/twitter-report-violation)
- Polski (https://help.twitter.com/pl/rules-and-policies/twitter-report-violation)
- Magyar (https://help.twitter.com/hu/rules-and-policies/twitter-report-violation)
- Română (https://help.twitter.com/ro)
- (https://help.twitter.com/cs.html)
- (https://help.twitter.com/el/rules-and-policies/twitter-report-violation)
- Українська (https://help.twitter.com/uk)
- (https://help.twitter.com/mr.html)
- Български (https://help.twitter.com/bg)
- Català (https://help.twitter.com/ca)
- Hrvatski (https://help.twitter.com/hr)
- Срpски (https://help.twitter.com/sr)
- Slovenčina (https://help.twitter.com/sk)
- (https://help.twitter.com/kn/rules-and-policies/twitter-report-violation)

- <u>پاشتو</u> ([https://help.twitter.com/ps](https://help.twitter.com/ps))
- <u>Dari</u> ([https://help.twitter.com/fa-af/rules-and-policies/twitter-report-violation](https://help.twitter.com/fa-af/rules-and-policies/twitter-report-violation))
- ([https://help.twitter.com/am.html](https://help.twitter.com/am.html))
- <u>Oromo</u> ([https://help.twitter.com/om](https://help.twitter.com/om))
- <u>Tigrinya</u> ([https://help.twitter.com/ti](https://help.twitter.com/ti))
- ([https://help.twitter.com/ha.html](https://help.twitter.com/ha.html))
- ([https://help.twitter.com/ig.html](https://help.twitter.com/ig.html))
- ([https://help.twitter.com/yo.html](https://help.twitter.com/yo.html))
- ([https://help.twitter.com/ha-NG.html](https://help.twitter.com/ha-NG.html))
- <u>Kurdish</u> ([https://help.twitter.com/ckb/rules-and-policies/twitter-report-violation](https://help.twitter.com/ckb/rules-and-policies/twitter-report-violation))
- ([https://help.twitter.com/ur.html](https://help.twitter.com/ur.html))

# DEFENDANTS' EXHIBIT 36:

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **The State of Missouri and the State of Louisiana,** | |
| *Plaintiffs*, | |
| v. | Civil Action No. 22-cv-1213 |
| **President Joseph R. Biden, Jr., in his official capacity as President of the United States of America,** *et al.,* | |
| *Defendants.* | |

**DEFENDANTS' OBJECTIONS AND RESPONSES TO**
**PLAINTIFFS' FIRST SET OF EXPEDITED PRELIMINARY-INJUNCTION RELATED**
**INTERROGATORIES TO ROBERT FLAHERTY**

Pursuant to Federal Rules of Civil Procedure 26 and 33 and the Local Rules of the U.S.

District Court for the Western District of Louisiana, Defendants, by and through counsel, provide

the following objections and responses to Plaintiffs' First Set of Expedited Preliminary-Injunction

Related Interrogatories to Rob Flaherty ("Plaintiffs' First PI Interrogatories to Flaherty" or

"Flaherty Interrogatories") served on December 12, 2022 on Defendants through counsel, after the

Court in its Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia,*

service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty.

ECF No. 148 at 9.

Defendants' objections and responses herein are based on information known to Mr.

Flaherty at this time and are made without prejudice to additional objections or responses should

Defendants subsequently identify additional grounds for objection or additional responsive

information. The objections have been formulated in contemplation of Federal Rule of Civil

Procedure 26(b)(1), which generally permits discovery of matters not privileged that may be relevant to the claims or defenses in a civil action. In presenting the objections and responses herein, Defendants do not waive any further objection in pretrial motions practice or at trial as to the admissibility of evidence on the grounds of relevance, materiality, privilege, competency, or any other appropriate ground.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      Defendants object to the definitions of "Content Modulation," and the related term "Misinformation," including to the extent that Plaintiffs' definition of "Content Modulation" covers actions by Social Media Companies *beyond* those taken against content containing Misinformation and against users posting content containing Misinformation (such as actions taken as to any post on "efficacy of COVID-19 restrictions" or on "security of voting by mail"). For purposes of these Responses and Objections, Defendants generally define "Misinformation" in a manner consistent with Plaintiffs' definition of that term: "any form of speech . . . considered to be potentially or actually incorrect, mistaken, false, misleading, lacking proper context, disfavored, having the tendency to deceive or mislead . . . including but not limited to any content or speech considered by any federal official or employee or Social-Media Platform to be 'misinformation,' 'disinformation,' 'malinformation,' 'MDM,' 'misinfo,' 'disinfo,' or 'malinfo.'" *See* Interrogatories, Definition P.

2.      Defendants object to the definitions of CDC, CISA, DHS, HHS, NIAID, and White House Communications Team to the extent those definitions include "any . . . agent," "contractors" and "any subordinate agency or entity" of those agencies on the ground that those definitions are overbroad, may render Plaintiffs' interrogatories vague and ambiguous, and may include persons and entities that are not under the supervision or control of any Defendant,

including Mr. Flaherty. Defendants also object to the definition of "White House Communications Team" for the additional reason that such a definition is not proportional to the needs of the case, particularly in light of the expedited nature of the discovery now ongoing, to the extent Plaintiffs seek information beyond the possession of Mr. Flaherty.

3.      Defendants object to the definition of "communication" to the extent it is meant to cover anything beyond e-mail exchanges, as overbroad and disproportional to the needs of the case, particularly in light of the expedited nature of the discovery now ongoing.

4.      Defendants object to the definition of "document" to the extent it includes "documents retained on personal devices and/or in personal e-mail accounts or other personal accounts." Documents found on personal devices or within electronic personal accounts would not be in the custody or control of any Defendant, and performing a full and comprehensive search for potentially responsive information on Mr. Flaherty's personal devices would be unduly burdensome.

5.      Defendants object to the definition of "Federal Official" as overbroad, unduly burdensome, and disproportionate to the needs of the case, insofar as it purports to require a response outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in its Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia*, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

6.      Defendants object to the definition of "identify" to the extent it calls for disclosure of information covered by any applicable privilege or protection over, among other elements, a person's "email address, and present or last known address and telephone number."

7.      Defendants object to the use of the undefined term "Meeting" in a manner

incompatible with, and calculated to expand the obligations imposed by, the Government in the Sunshine Act, 5 U.S.C. 552b.

8.      Defendants object to the definition of "Social-Media Platform" as overbroad, because it includes "*any* organization that provides a service for public users to disseminate . . . content . . . to other users or the public," along with any "contractors, or any other person . . . acting on behalf of the Social-Media Platform . . . as well [as] subcontractors or entities used to conduct fact-checking or any other activities relating to Content Modulation." Such a definition is overbroad because the operative Complaint contains no nonconclusory allegation that Defendants communicated with each and every organization that allows users to "disseminate . . . content" to other users, along with any persons or entities affiliated with those organizations. Defendants will construe "Social-Media Platform" to encompass Facebook, Instagram, Twitter, LinkedIn, and YouTube, unless otherwise noted.

9.      Defendants object to the definition of "You" and "Your" in each Interrogatory as overbroad, as it includes "any officers, officials, employees, agents, staff members, contractors, and other(s)" acting at the direction, or on behalf, of Mr. Flaherty. Such a definition also is not proportional to the needs of the case, especially given the expedited, abbreviated discovery process in which Defendants have only a limited amount of time to respond to Plaintiffs' Interrogatories. Defendants interpret any Interrogatory relying on this definition as applying solely to Mr. Flaherty insofar as a response to such Interrogatory by Mr. Flaherty is consistent with Rules 26 and 33. In particular, Plaintiffs' allegations against Mr. Flaherty concern actions taken in his official capacity, and the Court in its Memorandum Order Regarding Depositions of December 7, 2022 ordered service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

10.     Defendants object to Instruction 1 as exceeding the requirements of Federal Rules of Civil Procedure 26, 33, and 34. Plaintiffs cite to no authority requiring a Defendant to "describe the efforts [it has] made to locate . . . document[s]" that are not in its custody and control "and identify who has control of the document and its location."

11.     Defendants object to Instruction 2 to the extent it exceeds the requirements of Federal Rule of Civil Procedure 26(b)(6). Defendants specifically decline to produce privileged information. Defendants further object to any requirement that they produce a privilege log for privileged material not otherwise properly within the scope of discovery or as to which no privilege log would be required under Federal Rule of Civil Procedure 26(b)(5).

12.     Defendants object to Instruction 3 as exceeding the requirements of Federal Rules of Civil Procedure 26, 33, and 34. Plaintiffs cite to no authority indicating that, if Defendants object to an Interrogatory on burden grounds, Defendants must "stat[e] the approximate number of documents to be produced, the approximate number of person-hours to be incurred in the identification, and the estimated cost of responding to the request." Further, it is unclear how Defendants could provide that type of information without conducting certain burdensome searches and reviews that Defendants sought to avoid through their objections.

13.     Defendants object to Instruction 5 to the extent it requires Defendants to respond based on production of electronic documents "with all metadata and delivered in their original format." Plaintiffs may identify the precise categories of metadata they want Defendants' productions to contain, and Defendants can determine whether they can provide those categories of metadata without an undue burden.

14.     Defendants object to Instruction 6 to the extent that it requires Defendants to respond based on production of documents in a format other than the format in which they are

"kept in the usual course of business." Fed R. Civ. P. 34(b)(2)(E). Defendants object to Instruction 6 to the extent that it requests the production of all e-mail "forwards" for e-mails produced to Plaintiffs. That Instruction may call for the production of documents that are not found in the governmental e-mail files of Mr. Flaherty.

15.     Defendants object to Instruction 8, which applies these requests from January 1, 2020, to the present, as unduly broad. Mr. Flaherty began serving as Director of Digital Strategy at the White House on January 20, 2021. Defendants interpret these requests as applying from January 20, 2021, when Mr. Flaherty began serving as Director of Digital Strategy at the White House, through December 7, 2022, the date on which the Court in its Memorandum Order Regarding Depositions ordered service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9. Any broader period would be disproportional to the needs of the case. Such disproportionality is further aggravated by the discovery burden being placed on White House officials. *See Cheney v. U.S. District Court*, 542 U.S. 367, 385 (2004).

**GENERAL OBJECTIONS APPLICABLE TO ALL INTERROGATORIES**

1.     The general objections set forth below apply to each and every Interrogatory discussed below. In asserting Defendants' objections to any particular Interrogatory, Defendants may assert an objection that is the same as, or substantially similar to, one or more of these objections. That Defendants may refer, with particularity, to some, but not all, of the general objections described immediately below in their objections to Plaintiffs' individual Interrogatories does not indicate that Defendants have waived any of these general objections as to any of Plaintiffs' Interrogatories.

2.     Defendants object to any discovery taking place in this case to the extent Plaintiffs

assert cognizable claims seeking review of governmental agency action, including claims under the Administrative Procedure Act, because resolution of any such claims should be based upon the "administrative record" in this case. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). That said, Defendants understand that the Court has allowed limited preliminary-injunction-related expedited discovery to proceed. *See* Order of July 12, 2022, ECF No. 34 at 13 (authorizing discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications"). Thus, while preserving their broad objection to any and all discovery, Defendants make objections stated below in light of the current procedural posture of the case.

3.     Defendants object to each Interrogatory insofar as it is incompatible with *In re Paxton*, 53 F.4th 303 (5th Cir. 2022), where the U.S. Court of Appeals for the Fifth Circuit issued a writ of mandamus and directed quashal of subpoenas seeking testimony from the Texas attorney general, because the district court had "clearly erred by not first ensuring its own jurisdiction" given that "[a] court has a fundamental duty to examine its jurisdiction"—and a duty of "'making further inquiry'" when the court's jurisdiction is challenged. *Id.* at 307 (quoting *In re Gee*, 941 F.3d 153, 159 (5th Cir. 2019) (per curiam)). *Paxton* requires the Court to address the threshold issues raised in Defendants' currently pending motion to dismiss the Second Amended Complaint (which contends that the Court lacks jurisdiction because of an absence of Article III standing and because the Agency Defendants possess sovereign immunity) before proceeding with further discovery in this action. Defendants further object to each Interrogatory insofar as the Court should first resolve Defendants' pending motion to dismiss under Fed. R. Civ. P. 12(b)(6),

because those arguments, if accepted, would also obviate the need (and any justification) for further discovery. *See In re Murthy*, No. 22-30697 (5th Cir. Nov. 21, 2022) (directing the district court to give further consideration to "whether further discovery should be paused until a ruling on a timely filed motion by the Government to dismiss").

4.     Defendants object to each Interrogatory as overbroad, unduly burdensome, and disproportional to the needs of the case, insofar as it purports to require a response concerning any governmental entity whose actions are not challenged in the Second Amended Complaint and whose information is not reasonably available to Mr. Flaherty, consistent with the Court's Memorandum Order Regarding Depositions of December 7, 2022, which ordered service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

5.     Defendants object to the Interrogatories to the extent that they seek (a) attorney work product; (b) communications protected by the attorney-client privilege; (c) information protected by the deliberative process privilege or law enforcement privilege or other similar privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e) information protected by any form of executive privilege; or (f) information covered by any other applicable privilege or protection.

6.     Defendants object to any Interrogatory seeking discovery from the White House as unduly burdensome, and disproportional to the needs of the case. *See generally Cheney*, 542 U.S. at 367. Plaintiffs' Interrogatories create an undue burden, distract White House officials from their critical executive responsibilities, and raise separation of powers concerns. *See id.* at 382 (repeating "the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties"); *see*

*also id.* at 385 (admonishing courts "that the Executive's 'constitutional responsibilities and status [are] factors counseling judicial deference and restraint' in the conduct of litigation against it"). That burden is especially unjustified at this stage of the litigation given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending (with briefing scheduled to close this month). Further, the Interrogatories seeking response from the White House are unduly burdensome and disproportional to the needs of the case when Plaintiffs have not first exhausted all available opportunities to seek related information from other sources. *See* Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring plaintiff to exhaust all discovery on other defendants before considering whether there was "continuing need for discovery sought on the White House"); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019) (vacating "district court's discovery orders because the district court did not fulfill its obligation 'to explore other avenues, short of forcing the Executive to invoke privilege'" (quoting *Cheney*, 542 U.S. at 390)).

7.      Moreover, to the extent any Interrogatory calls for disclosure of internal governmental communications involving White House personnel, it is inappropriate because it may have the effect of revealing information protected by the presidential communications privilege, a "presumptive privilege" "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution" that attaches to presidential communications. *United States v. Nixon*, 418 U.S. 683, 708 (1974); *see In re Sealed Case*, 121 F.3d 729, 743-44 (D.C. Cir. 1997). Although the presidential communications privilege can be overcome by showing a "specific need" in a criminal case, *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1112 (D.C. Cir. 2004), the presumption against disclosure is even higher in a civil case like this one, *Am Historical Ass'n v. Nat'l Archives & Records Admin.*,

402 F. Supp. 2d 171, 181 (D.D.C. 2005). Such discovery violates the separation of powers and creates an undue burden and distraction from those individuals' critical executive responsibilities. *See Cheney*, 542 U.S. at 389; *see also id.* at 371 ("[P]recedents provide no support for the . . . requirement that the Executive Branch bear the burden of invoking executive privilege with sufficient specificity and of making particularized objections [to producing large numbers of individual documents]. Indeed, those precedents suggest just the opposite.").

8.      Defendants object to each Interrogatory as beyond the requirements of the Federal Rules of Civil Procedure and the Court's December 7, 2022 Order to the extent it seeks information or documents that are not in the custody or control of Mr. Flaherty.

9.      Defendants object to each Interrogatory as unduly burdensome to the extent it seeks, without limitation, responses based on all communications and documents in Mr. Flaherty's custody or control relating to the substantive topic identified in the Interrogatory. The parties are currently involved in an expedited, abbreviated discovery process in which Defendants have only a limited amount of time to respond.

10.     Defendants specifically reserve the right to make further objections and responses as necessary to the extent additional issues arise regarding the meaning of or information sought by Plaintiffs' Interrogatories.

### PRELIMINARY STATEMENT REGARDING EXCESSIVELY NUMEROUS INTERROGATORIES

1.      Defendants object to the Flaherty Interrogatories as exceeding the numerical limit of 25 in the aggregate under Fed. R. Civ. P. 33(a) and LR33.1 of the Local Civil Rules.

2.      Contrary to those rules, Plaintiffs erroneously and improperly served on July 18, 2022 First PI Interrogatories totaling 110 enumerated interrogatories as to 10 recipient Defendants. Even excluding duplicative interrogatories served on separate Defendants (at least

in substance, if not form), there would still have been 34 distinct interrogatories served. Either number exceeds the 25 interrogatories permitted. *Global Tubing, LLC v. Tenaris Coiled Tubes, LLC*, No. 17-cv-3299, 2020 WL 12443175 at *2 (S.D. Tex. Nov. 25, 2020) (quoting 8B Charles Alan Wright et al., *Federal Practice & Procedure* § 2168.1 (3d ed. 2020)); *accord Kleiman v. Wright*, No. 18-cv-80176, 2020 WL 1666787 at *1 (S.D. Fla. Apr. 3, 2020); *Vinton v. Adam Aircraft Indus., Inc.*, 232 F.R.D. 650, 664 (D. Colo. 2005); *see also Zito v. Leasecomm Corp.*, 233 F.R.D. 395, 399 (S.D.N.Y. 2006); *see, e.g., Am. Council of Blind of Metro. Chi. v. Chi.*, No. 19-cv-6322, 2021 WL 5140475 at *1-2 (N.D. Ill. Nov. 4, 2021); *Fair Housing Ctr. of Centr. Ind. v. Welton*, No. 18-cv-01098, 2019 WL 2422594 at *5 (S.D. Ind. June 10, 2019). In a similar vein, LR33.1 of the Local Civil Rules, concerning "Number of Interrogatories," provides as follows (emphasis added): "No party shall serve on any other party *more than 25 interrogatories in the aggregate* without leave of court." Adherence to the 25-interrogatory limitation is especially appropriate at this stage of the instant action, where Defendants have already produced voluminous documents ahead of the Rule 26 conference for the limited purpose of providing Plaintiffs with additional information concerning the pending preliminary injunction motion. *Cf. Gray v. Price*, No. 19-cv-10383, 2020 WL 12721645 at *5 (E.D. Mich. Feb. 12, 2020).

3.      After alerting Plaintiffs to the numerical limit issue in an August 1, 2022, letter, and following additional e-mail correspondence with Plaintiffs, the parties agreed on August 11, 2022 to resolve the excessive numerosity problem as follows: Plaintiffs requested that (*a*) each Defendant recipient is to answer Interrogatories 1 through 5 of the First PI Interrogatories directed to CDC, with the reference to the CDC (in Interrogatory 1) to "be adjusted to refer to the recipient of the interrogatory," and (*b*) certain Defendants are to answer additional interrogatories, totaling 20, specified by Plaintiffs, and Plaintiffs did not object to Defendants' proposal that all remaining

interrogatories be deemed withdrawn. Defendants responded to those interrogatories on August 17, 2022, as amended on September 27, 2022, and on December 19, 2022. Accordingly, any interrogatory that is not substantively identical to one served on other Defendants exceeds the numerical limit.

## SIGNATURES FOR RESPONSES

1.      Insofar as an Interrogatory is not objected to through the undersigned counsel, Defendants respond to it below, with the signatures of the following—for Mr. Flaherty: Robert Flaherty, White House Director of the Office of Digital Strategy.

## OBJECTIONS AND RESPONSES TO SPECIFIC INTERROGATORIES

### Flaherty Interrogatory No. 1:

**Identify all Communications with Social-Media Platform(s), and describe in detail the nature and content of each Communication.**

**OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants further object to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case. This Interrogatory calls for information regarding "all Communications with Social-Media Platform[s]," even if the Communications do not concern Misinformation as described in the Court's July 12, 2022 order authorizing expedited discovery (*see* ECF No. 34 at 13 (authorizing discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications")), and even as to platforms not at issue in the operative Complaint, and including each platform's "officers, agents, employees, contractors, or any other person employed by or acting on behalf of [such] Social-Media Platform."

Defendants cannot conduct an exhaustive search to uncover "all" possible responsive

information under the current, abbreviated expedited discovery schedule. Such expedited discovery is especially burdensome given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Further, given the expedited nature of the discovery, it would not be reasonable for Mr. Flaherty to attempt to ascertain every communication or meeting with social media platforms that are not documented in the extensive emails being produced in this litigation. To the extent an interrogatory asks about specific communications or meetings with social media platforms, or specific topics discussed with social media platforms, Mr. Flaherty responded to that interrogatory to the best of his recollection.

Defendants also understand this Interrogatory to seek only a response based on communications between Defendants and third parties outside the government. To the extent that this Interrogatory seeks internal information referring to such communications, Defendants object to the Interrogatory as not proportional to the needs of the case, as it would require an extensive search of internal records that would not be possible to complete in the expedited period provided for current discovery and would be unnecessary in light of Defendants' agreement to produce the external communications themselves. Defendants also object to the Interrogatory to the extent a response requires review of internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to agency communications. Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, national security privileges, presidential communications privilege, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is

overbroad, unduly burdensome, and disproportional to the needs of the case, insofar as it requires a response outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia*, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Further, Defendants object to this Interrogatory on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportional to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials creates an undue burden, distracts them from their critical executive responsibilities, and raises separation of powers concerns. *See Cheney*, 542 U.S. at 385. That burden is especially unjustified at this stage of the litigation given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Additionally, Defendants object to this Interrogatory to the extent a response requires review of information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

Defendants further object to this Interrogatory as unreasonably cumulative and duplicative of Plaintiffs' Requests for Production of Documents served on Mr. Flaherty in his official capacity, in response to which Defendants are producing documents within a review population that contains

14

(i) non-privileged e-mail communications between Mr. Flaherty and email addresses with domain names of the Social-Media Platforms defined above and (ii) which are collected from Mr. Flaherty's governmental account. Defendants are producing e-mails within the aforementioned review population that contain one or more of the search terms identified by Plaintiffs, or that were otherwise identified by Defendants as being potentially responsive, and that concern misinformation, content modulation, or content on social media platforms about COVID-19. Defendants have included e-mails with social media platforms about COVID-19 regardless of whether those e-mails are related to misinformation or content modulation—notwithstanding that many of those e-mails would otherwise go beyond the scope of discovery authorized by the Court's July 12, 2022, discovery order—given the expedited, abbreviated discovery process in which Defendants have only a limited amount of time to respond to Plaintiffs' requests, and out of a desire to be transparent and responsive to the Court's supplemental discovery order. Additionally, Defendants are producing emails contained within the aforementioned review population that reflect a meeting invitation or a response to such an invitation between any White House official and any employee of any social-media platform (hereinafter "meeting invites"), regardless of whether a meeting invite includes one of Plaintiffs' search terms, and regardless of whether a meeting invite indicates that the topic of the meeting was misinformation or content modulation. The Requests for Production provide a more expeditious and significantly less burdensome method for Plaintiffs to obtain the information sought, considering the expedited nature of the discovery here and the broad scope of this Interrogatory.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following response: Defendants refer Plaintiffs to the documents being produced in response to Plaintiffs' First Set of Expedited Preliminary-Injunction Related Requests For Production to

Rob Flaherty and other documents produced in this litigation. Further, Defendants refer Plaintiffs to the response below to Interrogatory No. 2 regarding meetings with social media platforms.

**Flaherty Interrogatory No. 2:**

**Identify and describe in detail all Meetings with Social-Media Platform(s), including the time, date, place, all participant(s), everyone who spoke at the meeting, and the nature and content of all Communications at each Meeting.**

**OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants further object to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case. This Interrogatory calls for information regarding "all Meetings with Social-Media Platform[s]," even if the Meetings do not concern Misinformation as described in the Court's July 12, 2022 order authorizing expedited discovery (*see* ECF No. 34 at 13 (authorizing discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications")), and even as to platforms not at issue in the operative Complaint, and including each platform's "officers, agents, employees, contractors, or any other person employed by or acting on behalf of [such] Social-Media Platform."

Defendants cannot conduct an exhaustive search to uncover all possible responsive information under the current, abbreviated expedited discovery schedule. Such expedited discovery is especially burdensome given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Further, given the expedited nature of the discovery, it would not be reasonable for Mr. Flaherty to attempt to ascertain every communication or meeting with social media platforms that are not documented in the extensive emails being produced in this litigation. To the extent an interrogatory

16

asks about specific communications or meetings with social media platforms, or specific topics discussed with social media platforms, Mr. Flaherty responded to that interrogatory to the best of his recollection.

Defendants also understand this Interrogatory to seek only a response based on meetings between Defendants and third parties outside the government. To the extent that this Interrogatory seeks internal information referring to such meetings, Defendants object to the Interrogatory as not proportional to the needs of the case, as it would require an extensive search of internal records that would not be possible to complete in the expedited period provided for current discovery and would be unnecessary in light of Defendants' agreement to produce information concerning the external meetings themselves. Defendants also object to the Interrogatory to the extent a response requires review of internal, deliberative documents discussing such meetings, attorney client documents, or other privileged materials. Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, national security privileges, presidential communications privilege, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportional to the needs of the case, insofar as it requires a response outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia*, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Further, Defendants object to this Interrogatory on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportional to the needs

of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials creates an undue burden, distracts them from their critical executive responsibilities, and raises separation of powers concerns. *See Cheney*, 542 U.S. at 385. That burden is especially unjustified at this stage of the litigation given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Additionally, Defendants object to this Interrogatory to the extent a response requires review of information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

Additionally, Defendants object to this Interrogatory as overbroad and disproportional to the needs of the case, particularly in light of the expedited nature of the discovery, to the extent it demands—in vague and ambiguous terms—descriptions of "all meetings" "in detail" beyond the descriptions set forth in e-mails or meeting invites reflecting that a meeting was held or email exchanges describing such meetings.

Defendants further object to this Interrogatory as unreasonably cumulative and duplicative of Plaintiffs' Requests for Production of Documents served on Mr. Flaherty in his official capacity, in response to which Defendants are producing documents within a review population that contains (i) non-privileged e-mail communications between Mr. Flaherty and email addresses with domain names of the Social-Media Platforms defined above and (ii) which are collected from Mr.

Flaherty's governmental account. Defendants are producing e-mails within the aforementioned review population that contain one or more of the search terms identified by Plaintiffs, or that were otherwise identified by Defendants as being potentially responsive, and that concern misinformation, content modulation, or content on social media platforms about COVID-19. Additionally, Defendants are producing meeting invites. The Requests for Production provide a more expeditious and significantly less burdensome method for Plaintiffs to obtain the information sought, considering the expedited nature of the discovery here and the broad scope of this Interrogatory.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following response: Defendants refer Plaintiffs to the documents being produced in response to Plaintiffs' First Set of Expedited Preliminary-Injunction Related Requests For Production to Rob Flaherty and other documents produced in this litigation.

Additionally, although Mr. Flaherty cannot recall the exact nature and content of each meeting, Mr. Flaherty avers that he has had numerous meetings with social media companies in his role as the Director of the Office of Digital Strategy, which requires him to oversee the President's engagements on social media and outreach to digital creators, among other responsibilities. Some of those meetings Mr. Flaherty had with social media companies concerned misinformation or disinformation. These meetings Mr. Flaherty had with social media companies concerning misinformation or disinformation largely, if not entirely, focused on misinformation and disinformation as it relates to COVID-19 and the safety and efficacy of COVID-19 vaccines. That focus was consistent with the current Administration's concern that misinformation and disinformation related to COVID-19 vaccines poses a critical threat to public health and contributes to preventable hospitalizations and deaths. In these meetings, Mr. Flaherty generally

sought to better understand the companies' existing policies to address the spread of misinformation or disinformation on their platforms, what the companies were doing to enforce those policies, and what the government could do to assist social media companies in their efforts to address the spread of misinformation or disinformation on their platforms. Mr. Flaherty avers that he has also encouraged social media companies to be transparent and share data concerning the prevalence of misinformation and disinformation on their platforms. At times he expressed frustration when he perceived platforms to be applying their policies inconsistently or to not be forthcoming in their assessment of the problems with misinformation and disinformation on their platforms.

**Flaherty Interrogatory No. 3:**

**Identify every Federal Official for whom you have any reason to believe is or has been involved in any Communication(s) and/or Meeting(s) with any Social-Media Platform(s), and describe in detail the nature and content of the Communication(s) and Meeting(s).**

**OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants further object to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case. This Interrogatory calls for a response based on "Communication(s) and/or Meeting(s)" in which "every Federal Official" is "involved," even if the "Communication(s) and/or Meeting(s)" do not concern Misinformation as described in the Court's July 12, 2022 order authorizing expedited discovery (*see* ECF No. 34 at 13 (authorizing discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications")), and "with" any and all Social-Media Platforms, even if those platforms are not at issue in the operative Complaint, and including each platform's "officers, agents, employees, contractors, or any other person employed by or acting on

behalf of [such] Social-Media Platform."

Defendants cannot conduct an exhaustive search to uncover all possible responsive information under the current, abbreviated expedited discovery schedule. Such expedited discovery is especially burdensome given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is pending. Further, given the expedited nature of the discovery, it would not be reasonable for Mr. Flaherty to attempt to ascertain every communication or meeting with social media platforms that are not documented in the extensive emails being produced in this litigation. To the extent an interrogatory asks about specific communications or meetings with social media platforms, or specific topics discussed with social media platforms, Mr. Flaherty responded to that interrogatory to the best of his recollection.

Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, national security privileges, presidential communications privilege, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportional to the needs of the case, insofar as it purports, via the definition of "Federal Official" and the phrase "any reason to believe," to require a response outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia*, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Further, Defendants object to this Interrogatory on the ground that any discovery on the

White House at this stage of the litigation is unduly burdensome and disproportional to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials creates an undue burden, distracts them from their critical executive responsibilities, and raises separation of powers concerns. *See Cheney*, 542 U.S. at 385. That burden is especially unjustified at this stage of the litigation given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Additionally, Defendants object to this Interrogatory to the extent a response requires review of information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

Additionally, Defendants object to this Interrogatory as overbroad and disproportional to the needs of the case, particularly in light of the expedited nature of the discovery, to the extent it demands—in vague and ambiguous terms—descriptions of "communications" and "all meetings" "in detail" beyond the descriptions set forth in e-mails or meeting invites reflecting that a communication occurred or a meeting was held or email exchanges describing such meetings or communications.

Defendants further object to this Interrogatory as unreasonably cumulative and duplicative of Plaintiffs' Requests for Production of Documents served on Mr. Flaherty in his official capacity, in response to which Defendants are producing documents within a review population that contains

22

(i) non-privileged e-mail communications between Mr. Flaherty and email addresses with domain names of the Social-Media Platforms defined above and (ii) which are collected from Mr. Flaherty's governmental account. Defendants are producing e-mails within the aforementioned review population that contain one or more of the search terms identified by Plaintiffs, or that were otherwise identified by Defendants as being potentially responsive, and that concern misinformation, content modulation, or content on social media platforms about COVID-19. Additionally, Defendants are producing meeting invites. The Requests for Production provide a more expeditious and significantly less burdensome method for Plaintiffs to obtain the information sought, considering the expedited nature of the discovery here and the broad scope of this Interrogatory.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following response: Defendants refer Plaintiffs to the documents being produced in response to Plaintiffs' First Set of Expedited Preliminary-Injunction Related Requests For Production to Rob Flaherty and other documents produced in this litigation.

**Flaherty Interrogatory No. 4:**

Identify all Communication(s) and Meeting(s) involving any of the following people that refer or relate in any way to Content Modulation, Misinformation, and/or any Social-Media Platform(s). For each such Meeting or Communication, in response to this interrogatory, identify the time, date, place, method of communication (phone, email, videoconference, etc.), duration, participants, and general topic of the Meeting or Communication: Dr. Anthony Fauci, Francis Collins, Clifford Lane, Vivek Murthy, Eric Waldo, Max Lesko, Deborah Birx, Rochelle Walensky, Richard Hatchett, Jen Psaki, Karine Jean-Pierre, Brian Scully, Andy Slavitt, Matthew Masterson, Jen Easterly, Christopher C. Krebs, Carol Crawford, Alex Stamos, Renee DiResta, Kate Starbird, Elvis Chan, Laura Dehmlow, Leah Bray, Nina Jankowicz, Lea Gabrielle, Jiore Craig, Theo LeCompte, Joshua Peck, Alejandro Mayorkas, Robert Silvers, Samantha Vinograd, Nina Jankowicz, Kyla Fullenwider, Courtney Billet, Samaruddin Stewart, Daniel Kimmage.

**OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants

further object that the Interrogatory is vague and ambiguous, including through the use of the term "refer or relate in any way to Content Modulation, Misinformation, and/or any Social-Media Platform(s)," where, among other defects, the ambiguous term "and/or" could be construed to extend even to those "Communication(s) and/or Meeting(s)" that do not concern Misinformation as described in the Court's July 12, 2022 order authorizing expedited discovery (*see* ECF No. 34 at 13 (authorizing discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications")).

Defendants further object to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case. This Interrogatory calls for a response based on "Communication(s) and/or Meeting(s)" in which each named individual—including not only current Federal Government officials but also former Federal Government officials and individuals *not* alleged to have been employed by the Federal Government—is "involv[ed]," and "with" any and all Social-Media Platforms, even if those platforms are not at issue in the operative Complaint, and including each platform's "officers, agents, employees, contractors, or any other person employed by or acting on behalf of [such] Social-Media Platform."

Defendants cannot conduct an exhaustive search to uncover all possible responsive information under the current, abbreviated expedited discovery schedule. Such expedited discovery is especially burdensome given that Defendants' motion to dismiss the Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Further, given the expedited nature of the discovery, it would not be reasonable for Mr. Flaherty to attempt to ascertain every communication or meeting with social media platforms that are not

documented in the extensive emails being produced in this litigation. To the extent an interrogatory asks about specific communications or meetings with social media platforms, or specific topics discussed with social media platforms, Mr. Flaherty responded to that interrogatory to the best of his recollection.

Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, national security privileges, presidential communications privilege, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportional to the needs of the case, insofar as it purports to require a response outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia*, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Further, Defendants object to this Interrogatory on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportional to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials creates an undue burden, distracts them from their critical

executive responsibilities, and raises separation of powers concerns. *See Cheney*, 542 U.S. at 385. That burden is especially unjustified at this stage of the litigation given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Additionally, Defendants object to this Interrogatory to the extent a response requires review of information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

Additionally, Defendants object to this Interrogatory as overbroad and disproportional to the needs of the case, particularly in light of the expedited nature of the discovery, to the extent it demands—in vague and ambiguous terms—descriptions of "communications" and "all meetings" "in detail" beyond the descriptions set forth in e-mails or meeting invites reflecting that a communication occurred or a meeting was held or email exchanges describing such meetings or communications.

Defendants further object to this Interrogatory as unreasonably cumulative and duplicative of Plaintiffs' Requests for Production of Documents served on Mr. Flaherty in his official capacity, in response to which Defendants are producing documents within a review population that contains (i) non-privileged e-mail communications between Mr. Flaherty and email addresses with domain names of the Social-Media Platforms defined above and (ii) which are collected from Mr. Flaherty's governmental account. Defendants are producing e-mails within the aforementioned review population that contain one or more of the search terms identified by Plaintiffs, or that were otherwise identified by Defendants as being potentially responsive, and that concern

26

misinformation, content modulation, or content on social media platforms about COVID-19. Additionally, Defendants are producing meeting invites. The Requests for Production provide a more expeditious and significantly less burdensome method for Plaintiffs to obtain the information sought, considering the expedited nature of the discovery here and the broad scope of this Interrogatory.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following response: Defendants refer Plaintiffs to the documents produced in this litigation. Further, Defendants refer Plaintiffs to responses below to Interrogatories Nos. 6 and 8.

**Flaherty Interrogatory No. 5:**

For each Meeting and Communication identified in the previous Interrogatory, identify and describe in detail the nature and content of every Communication involved in the Meeting or Communication.

**OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants further object that the Interrogatory is vague and ambiguous, including through the use of the term "refer or relate in any way to Content Modulation, Misinformation, and/or any Social-Media Platform(s)," where, among other defects, the ambiguous term "and/or" could be construed to extend even to those "Communication(s) and/or Meeting(s)" that do not concern Misinformation as described in the Court's July 12, 2022 order authorizing expedited discovery (*see* ECF No. 34 at 13 (authorizing discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications")).

Defendants further object to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case. This Interrogatory calls for a response based on

"Communication(s) and/or Meeting(s)" in which each named individual—including not only current Federal Government officials but also former Federal Government officials and individuals *not* alleged to have been employed by the Federal Government—is "involv[ed]," and "with" any and all Social-Media Platforms, even if those platforms are not at issue in the operative Complaint, and including each platform's "officers, agents, employees, contractors, or any other person employed by or acting on behalf of [such] Social-Media Platform."

Defendants cannot conduct an exhaustive search to uncover all possible responsive information under the current, abbreviated expedited discovery schedule. Such expedited discovery is especially burdensome given that Defendants' motion to dismiss the Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Further, given the expedited nature of the discovery, it would not be reasonable for Mr. Flaherty to attempt to ascertain every communication or meeting with social media platforms that are not documented in the extensive emails being produced in this litigation. To the extent an interrogatory asks about specific communications or meetings with social media platforms, or specific topics discussed with social media platforms, Mr. Flaherty responded to that interrogatory to the best of his recollection.

Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, national security privileges, presidential communications privilege, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportional to the needs of the case, insofar as it purports to require a response outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is

the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia*, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Further, Defendants object to this Interrogatory on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportional to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials creates an undue burden, distracts them from their critical executive responsibilities, and raises separation of powers concerns. *See Cheney*, 542 U.S. at 385. That burden is especially unjustified at this stage of the litigation given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Additionally, Defendants object to this Interrogatory to the extent a response requires review of information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

Defendants further object to this Interrogatory as unreasonably cumulative and duplicative of Plaintiffs' Requests for Production of Documents served on Mr. Flaherty in his official capacity, in response to which Defendants are producing documents within a review population that contains (i) non-privileged e-mail communications between Mr. Flaherty and email addresses with domain names of the Social-Media Platforms defined above and (ii) which are collected from Mr.

Flaherty's governmental account. Defendants are producing e-mails within the aforementioned review population that contain one or more of the search terms identified by Plaintiffs, or that were otherwise identified by Defendants as being potentially responsive, and that concern misinformation, content modulation, or content on social media platforms about COVID-19. Additionally, Defendants are producing meeting invites. The Requests for Production provide a more expeditious and significantly less burdensome method for Plaintiffs to obtain the information sought, considering the expedited nature of the discovery here and the broad scope of this Interrogatory.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following response: Defendants refer Plaintiffs to the documents produced in this litigation. Further, Defendants refer Plaintiffs to responses below to Interrogatories Nos. 6 and 8.


**Flaherty Interrogatory No. 6:**

**Identify and describe in detail the involvement of any Federal Official and/or federal agency in the Election Integrity Partnership and/or the Virality Project.**

**OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants further object that the Interrogatory is vague and ambiguous, including through the use of the term "the involvement of any Federal Official and/or federal agency" where, among other defects, the ambiguous term "involvement" could be construed to include communications that do not concern Misinformation as described in the Court's July 12, 2022 order authorizing expedited discovery (*see* ECF No. 34 at 13 (authorizing discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications")).

Defendants cannot conduct an exhaustive search to uncover all possible responsive information under the current, abbreviated expedited discovery schedule. Such expedited discovery is especially burdensome given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is pending. Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, national security privileges, presidential communications privilege, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportional to the needs of the case, insofar as it purports, via the definition of "Federal Official," to require a response outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia*, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Further, Defendants object to this Interrogatory on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportional to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials creates an undue burden, distracts them from their critical executive responsibilities, and raises separation of powers concerns. *See Cheney*, 542 U.S. at 385. That burden is especially unjustified at this stage of the litigation given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter

31

jurisdiction and other deficiencies is currently pending. Additionally, Defendants object to this Interrogatory to the extent a response requires review of information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

Additionally, Defendants object to this Interrogatory as overbroad and disproportional to the needs of the case, particularly in light of the expedited nature of the discovery, given that this Interrogatory demands, in vague and ambiguous terms, a description "in detail" of the communications at issue.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following responses: Mr. Flaherty is not aware of any direct involvement by federal agencies or employees in either the Election Integrity Partnership or the Virality Project. Mr. Flaherty, however, recalls meeting with Ms. DiResta, in or around March 2021, to talk about her research on misinformation and disinformation, including the work of the Virality Project to address COVID-19-related misinformation and disinformation. It is Mr. Flaherty's understanding that Renée DiResta is or was involved with the Virality Project, which was associated with Stanford University, where Ms. DiResta works. Mr. Flaherty specifically recalls one initial meeting and a follow up conversation. In Ms. DiResta's communications, Mr. Flaherty recalls Ms. DiResta suggesting that the federal government should create a "Mythbusters" webpage as part of a strategy to address misinformation and disinformation before it had a large impact. More generally, Mr. Flaherty recalls Ms. DiResta suggesting that the primary role of the federal government in combating misinformation and disinformation related to the COVID-19 vaccines was to provide

expert information.

**Flaherty Interrogatory No. 7:**

Identify every action to change policies and/or increase enforcement of existing policies relating to Misinformation and/or Content Modulation that any Social-Media Platform has reported to You or to any other Federal Official.

**OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants further object that the Interrogatory is vague and ambiguous, including through the use of the terms "action to change policies," "and/or increase enforcement," and "relating to Misinformation and/or Content Modulation."

Defendants cannot conduct an exhaustive search to uncover all possible responsive information under the current, abbreviated expedited discovery schedule. Such expedited discovery is especially burdensome given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is pending. Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, national security privileges, presidential communications privilege, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportional to the needs of the case, insofar as it purports, via the definition of "Federal Official," to require a response outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia*, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Further, Defendants object to this Interrogatory on the ground that any discovery on the

White House at this stage of the litigation is unduly burdensome and disproportional to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials creates an undue burden, distracts them from their critical executive responsibilities, and raises separation of powers concerns. *See Cheney*, 542 U.S. at 385. That burden is especially unjustified at this stage of the litigation given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Additionally, Defendants object to this Interrogatory to the extent a response requires review of information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following response: Defendants refer Plaintiffs to the documents being produced in response to Plaintiffs' First Set of Expedited Preliminary-Injunction Related Requests For Production to Rob Flaherty and other documents produced in this litigation.

Additionally, Mr. Flaherty avers that he cannot recall every specific communication from a social media platform on the subject of this interrogatory. Mr. Flaherty, however, specifically recalls that he has received notifications from social media companies, such as Facebook, when they were preparing to make a public announcement about enforcement of or changes to their content policies relating to misinformation or disinformation. Mr. Flaherty generally recalls that

he received such notifications shortly before or shortly after the public announcement.

**Flaherty Interrogatory No. 8:**

Identify and describe in detail all Communications relating to Your action in connecting Vivek Murthy and Eric Waldo with Jiore Craig, as reflected in Bates page MOLA_DEFSPROD_00007437, including an explanation of what Ms. Craig does and/or did to "help[] [You] think through mis/dis on the COVID side."

**OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants further object that the Interrogatory is vague and ambiguous, including through the use of the terms "relating to Your action in connecting," and "explanation."

Defendants cannot conduct an exhaustive search to uncover all possible responsive information under the current, abbreviated expedited discovery schedule. Such expedited discovery is especially burdensome given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is pending. Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, national security privileges, presidential communications privilege, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportional to the needs of the case, insofar as it purports to require a response outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia*, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Further, Defendants object to this Interrogatory on the ground that any discovery on the

White House at this stage of the litigation is unduly burdensome and disproportional to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order*, Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials creates an undue burden, distracts them from their critical executive responsibilities, and raises separation of powers concerns. *See Cheney*, 542 U.S. at 385. That burden is especially unjustified at this stage of the litigation given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Additionally, Defendants object to this Interrogatory to the extent a response requires review of information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

Additionally, Defendants object to this Interrogatory as overbroad and disproportional to the needs of the case, particularly in light of the expedited nature of the discovery, given that this Interrogatory demands, in vague and ambiguous terms, a description "in detail" "all" of the communications at issue.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following responses: Mr. Flaherty understands Ms. Craig to be a researcher who has studied misinformation and disinformation. Mr. Flaherty avers that he has had conversations with Ms. Craig to understand what her research showed about vaccine hesitancy and how such hesitancy could best be addressed by the government. Mr. Flaherty recalls Ms. Craig organizing a meeting

in or around the Spring of 2021 on this topic in which Mr. Flaherty recalls attending with Andrew Slavitt and possibly others, and in which several misinformation-and-disinformation researchers outside of government also attended.  Ms. Craig expressed an interest in meeting with Vivek Murthy.   In light of that interest and her expertise in understanding misinformation and disinformation, as well as Dr. Murthy's work on the same topic, Mr. Flaherty recalls introducing Dr. Murthy to Ms. Craig.  Mr. Flaherty does not recall taking any other action in connecting Vivek Murthy or Eric Waldo to Ms. Craig.

**Flaherty Interrogatory No. 9:**

**Identify all Social-Media Platforms, including any of their officers, agents, or employees, with which You have communicated or are communicating relating to Content Modulation and/or Misinformation, or any other topic.**

**OBJECTIONS:** Defendants incorporate by reference the above objections. This Interrogatory calls for information regarding "Communication(s)" with "all Social-Media Platforms," even if the Communications do not concern Misinformation as described in the Court's July 12, 2022 order authorizing expedited discovery (*see* ECF No. 34 at 13 (authorizing discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications")), and even as to platforms not at issue in the operative Complaint, and including each platform's "officers, agents, employees, contractors, or any other person employed by or acting on behalf of [such] Social-Media Platform." Defendants further object that the Interrogatory is vague and ambiguous, including through the use of the terms "relating to" and "any other topic."

Defendants further object to this Interrogatory as unduly burdensome and not proportional to the needs of the case. Defendants cannot conduct an exhaustive search to uncover all possible

responsive information under the current, abbreviated expedited discovery schedule. Such expedited discovery is especially burdensome given that Defendants' motion to dismiss the Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending.

Defendants also object to the Interrogatory to the extent a response requires review of internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials. Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, national security privileges, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportionate to the needs of the case, insofar as it purports to require a response outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia*, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Additionally, Defendants object to this Interrogatory as overbroad and disproportional to the needs of the case, particularly in light of the expedited nature of the discovery, to the extent "communication" is meant to cover anything beyond e-mail exchanges.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following response: Defendants refer Plaintiffs to the documents being produced in response to Plaintiffs' First Set of Expedited Preliminary-Injunction Related Requests For Production to Rob Flaherty and other documents produced in this litigation.  Mr. Flaherty further provides that

he recalls primarily discussing misinformation with Meta, Google, and Twitter.  In addition, Mr. Flaherty recalls having conversations concerning misinformation with Pinterest and Snapchat. Mr. Flaherty recalls the primary points of contact from these companies being:  Brian Rice and Carrie Adams from Facebook; Todd O'Boyle, Lauren Culbertson, and Caroline Strom from Twitter; Kevin Kane, Jan Antonaros, Brandon Feldman, and John Ruxton from Google; Charlie Hale from Pinterest; and Sofia Gross, Ben Schwerin, and possibly Rebecca Vangelos from Snapchat.

**Flaherty Interrogatory No. 10:**

Identify all "**members of our senior staff**" and/or "**members of our COVID-19 team**" who are "**in regular touch with … social media platforms,**" as stated at a White House press briefing on or around July 15, 2021, including the nature of the communication and/or coordination.

**OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants further object to this Interrogatory on the ground that it is vague because it relies on a characterization of a statement made by an individual no longer in government, and the statement does not specify the individuals at issue or the specific communications to which it refers. Defendants further object to this Interrogatory as unduly burdensome and not proportional to the needs of the case. This Interrogatory calls for a response based on all specified "communications" from Defendants or any employees or subordinates of Defendants. Defendants cannot conduct an exhaustive search to uncover all possible responsive information under the current, abbreviated expedited discovery schedule. Defendants also object to this Interrogatory as overbroad insofar as it is construed to include communications that do not concern Misinformation as described in the Court's July 12, 2022 order authorizing expedited discovery (*see* ECF No. 34 at 13 (authorizing discovery requests concerning "the identity of federal officials who have been and are

39

communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications")). This Interrogatory appears to call for a response based on communications with Social-Media Platforms regardless of whether they pertain to content modulation with respect to misinformation.

Defendants also object to this Interrogatory to the extent it seeks internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to such communications. Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, national security privileges, presidential communications privilege, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportionate to the needs of the case, insofar as it purports to require a response concerning the public statements of the former White House Press Secretary, and hence outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, inter alia, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Further, Defendants object to this Interrogatory on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportionate to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order*, Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally,

discovery propounded on White House officials creates an undue burden, distracts them from their critical executive responsibilities, and raises separation of powers concerns. *See Cheney*, 542 U.S. at 385. That burden is especially unjustified at this stage of the litigation given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Additionally, Defendants object to this request to the extent it is directed to information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

Further, Defendants object to this Interrogatory as unreasonably cumulative and duplicative of Plaintiffs' previous Interrogatories to Defendants, to which Defendants responded on August 17, 2022, as amended on September 27, 2022, and on December 19, 2022

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following responses: Defendants refer Plaintiffs to the public transcripts of the White House press briefings cited previously by Defendants in response to substantially similar interrogatories. Mr. Flaherty, however, understands these statements quoted in this interrogatory to include himself and Andrew Slavitt.

**Flaherty Interrogatory No. 11:**

**Identify all Documents and Communications relating to "12 people who are producing 65 percent of the anti-vaccine misinformation on social-media platforms," as stated at a White House press briefing on or around July 15, 2021.**

**OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants further object to this Interrogatory as vague because it relies on a characterization of a statement

made by an individual no longer in government, and the statement does not specify the individuals at issue or the specific communications to which it refers.

Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, national security privileges, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportionate to the needs of the case, insofar as it purports to require a response concerning the public statements of the former White House Press Secretary, and hence outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, inter alia, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportionate to the needs of the case, insofar as it purports to require a response outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia*, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Additionally, Defendants object to this Interrogatory as overbroad and disproportional to the needs of the case, particularly in light of the expedited nature of the discovery, to the extent "communication" is meant to cover anything beyond e-mail exchanges.

Further, Defendants object to this Interrogatory as unreasonably cumulative and

duplicative of Plaintiffs' previous Interrogatories to Defendants, to which certain Defendants responded on August 17, 2022, as amended on September 27, 2022, and on December 19, 2022.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following response: Defendants refer Plaintiffs to the documents being produced in response to Plaintiffs' First Set of Expedited Preliminary-Injunction Related Requests For Production to Rob Flaherty and other documents produced in this litigation.


**Flaherty Interrogatory No. 12:**

**On or around July 15, 2021, the White House Press Secretary stated that "we engage with them [i.e., Social-Media Platforms] regularly and they certainly understand what our asks are." Identify what Social-Media Platform(s) are included in any such engagement(s), and identify "what our asks are," including all Communication(s) relating to such engagement(s) and ask(s).**

**OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants further object to this Interrogatory on the ground that it is vague because it relies on a characterization of a statement made by an individual no longer in government, and the statement does not specify the individuals at issue or the specific communications to which it refers. Defendants further object to this Interrogatory as unduly burdensome and not proportional to the needs of the case. This Interrogatory calls for a response based on any and all specified documents from Defendants or any employee or subordinate of Defendants, whereas the knowledge of Mr. Flaherty is the only appropriate basis for a response. Defendants cannot conduct an exhaustive search to uncover all possible responsive information under the current, abbreviated expedited discovery schedule. Such expedited discovery is especially burdensome given that Defendants' motion to dismiss the Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending.

Defendants also object to this Interrogatory as overbroad in that it appears to call for a response based on communications with Social-Media Platforms regardless of whether those communications pertain to Misinformation as described in the Court's July 12, 2022 order authorizing expedited discovery. *See* ECF No. 34 at 13 (authorizing discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications")).

Defendants also object to the Interrogatory to the extent a response requires review of internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to agency communications. Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, national security privileges, presidential communications privilege, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportionate to the needs of the case, insofar as it purports to require a response concerning the public statements of the former White House Press Secretary, and hence outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, inter alia, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Further, Defendants object to this Interrogatory on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportionate to the needs

of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials creates an undue burden, distracts them from their critical executive responsibilities, and raises separation of powers concerns. *See Cheney*, 542 U.S. at 385. That burden is especially unjustified at this stage of the litigation given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Additionally, Defendants object to this Interrogatory to the extent it is directed to information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendants disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

Further, Defendants object to this Interrogatory as unreasonably cumulative and duplicative of Plaintiffs' previous Interrogatories to Defendants, to which certain Defendants responded on August 17, 2022, as amended on September 27, 2022, and on December 19, 2022.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following responses: Defendants refer Plaintiffs to the documents being produced in response to Plaintiffs' First Set of Expedited Preliminary-Injunction Related Requests For Production to Rob Flaherty and other documents produced in this litigation, including to the public transcripts of the White House press briefings cited previously by Defendants in response to substantially similar interrogatories. Mr. Flaherty, however, understands these statements quoted in this interrogatory to include the discussions he and Andrew Slavitt have had with social media

companies regarding the scope of the problem with misinformation and disinformation on social media platforms, what social media platforms are doing to enforce their content policies, and what role government could play to assist in minimizing the negative impact of misinformation and disinformation.

**Flaherty Interrogatory No. 13:**

Identify all "government experts" who have partnered with Facebook or any Social-Media Platform(s) to address Misinformation and/or Content Modulation, including the nature of the partnership and any Communication(s) involved therein.

**OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants further object to this Interrogatory as vague because it relies on a characterization of a statement attributed to a third-party Facebook employee, as reported in a July 15, 2021 *Reuters.com* article quoted at Compl. ¶ 163, and the statement does not sufficiently specify the individuals at issue or the specific communications to which it refers. Defendants lack information sufficient to establish the meaning of that third party's statement, including terms such as "partnered with." Defendants further object to this Interrogatory as unduly burdensome and not proportional to the needs of the case. Defendants cannot conduct an exhaustive search to uncover all possible responsive information under the current, abbreviated expedited discovery schedule. Such expedited discovery is especially burdensome given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Defendants also object to the Interrogatory to the extent a response requires review of internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to agency communications. Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, national security privileges, or any other

applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportionate to the needs of the case, insofar as it purports to require a response outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia*, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Additionally, Defendants object to this Interrogatory as overbroad and disproportional to the needs of the case, particularly in light of the expedited nature of the discovery, to the extent "communication" is meant to cover anything beyond e-mail exchanges.

Further, Defendants object to this Interrogatory as unreasonably cumulative and duplicative of Plaintiffs' previous Interrogatories to Defendants, to which certain Defendants responded on August 17, 2022, as amended on September 27, 2022, and on December 19, 2022.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following responses: Defendants refer Plaintiffs to the documents produced in this litigation.

**Flaherty Interrogatory No. 14:**

**Identify all person(s) who "engage[s] regularly with all social media platforms about steps that can be taken" to address Misinformation on social media, which engagement "has continued, and … will continue," as stated at the April 25, 2022 White House press briefing, including all Communications with any Social-Media Platform involved in such engagement.**

**OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants further object to this Interrogatory on the ground that it is vague because it relies on a characterization of a statement made by an individual no longer in government, and the statement

47

does not specify the individuals at issue or the specific communications to which it refers. Defendants further object to this Interrogatory as unduly burdensome and not proportional to the needs of the case. This Interrogatory calls for a response based on any and all specified documents from Defendants or any employees or subordinates of Defendants, whereas the knowledge of Mr. Flaherty is the only appropriate basis for a response. Defendants cannot conduct an exhaustive search to uncover all possible responsive information under the current, abbreviated expedited discovery schedule. Such expedited discovery is especially burdensome given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending.

Defendants also object to this Interrogatory as overbroad in that it appears to call for a response based on communications with Social-Media Platforms regardless of whether those communications pertain to Misinformation as described in the Court's July 12, 2022 order authorizing expedited discovery. *See* ECF No. 34 at 13 (authorizing discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications")).

Defendants also object to the Interrogatory to the extent a response requires review of internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to agency communications. Defendants also object to this Request to the extent it seeks internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to such communications. Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, national

48

security privileges, presidential communications privilege, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportionate to the needs of the case, insofar as it purports to require a response concerning the public statements of the former White House Press Secretary, and hence outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, inter alia, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Further, Defendants object to this Interrogatory on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportionate to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials creates an undue burden, distracts them from their critical executive responsibilities, and raises separation of powers concerns. *See Cheney*, 542 U.S. at 385. That burden is especially unjustified at this stage of the litigation given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Additionally, Defendants object to this Interrogatory to the extent it is directed to information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendants

disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

Further, Defendants object to this Interrogatory as unreasonably cumulative and duplicative of Plaintiffs' previous Interrogatories to Defendants, to which certain Defendants responded on August 17, 2022, as amended on September 27, 2022, and on December 19, 2022.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following responses: Defendants refer Plaintiffs to documents produced in this litigation as well as to the public transcripts of the White House press briefings cited previously by Defendants in response to substantially similar interrogatories. Mr. Flaherty avers that he is unaware of whom Ms. Psaki was specifically referring to at the time of the press briefing.

**Flaherty Interrogatory No. 15:**

Identify all Documents and Communications that contain any of the Search Terms.

**OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants further object to this Interrogatory as unduly burdensome, overbroad, and not proportional to the needs of this case. This Interrogatory calls for a response based on any and all specified documents from any Defendant or any employee or subordinate of any Defendant, whereas the knowledge of Mr. Flaherty is the only appropriate basis for a response. Defendants cannot conduct an exhaustive search to uncover all possible responsive information under the current, abbreviated expedited discovery schedule. Such expedited discovery is especially burdensome given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending.

Defendants also object to this Interrogatory as overbroad in that it appears to call for a response based on communications with Social-Media Platforms regardless of whether those

communications pertain to Misinformation as described in the Court's July 12, 2022 order authorizing expedited discovery. *See* ECF No. 34 at 13 (authorizing discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications")). In that regard, Plaintiffs' Search Terms include many broad terms that could be found in e-mails that have nothing to do with misinformation—such as "mask," "election," "antitrust," "globalization," and "Federalist."

Defendants also understand this Interrogatory to seeks a response based on only communications between Defendants and third parties outside the government. To the extent that this Interrogatory seeks internal information referring to such communications, Defendants object to the Interrogatory as not proportional to the needs of the case, as it would require an extensive search of internal records that would not be possible to complete in the expedited period provided for current discovery and would be unnecessary in light of Defendants' agreement to produce the external communications themselves.

Defendants also object to the Interrogatory to the extent a response requires review of internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to agency communications. Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, national security privileges presidential communications privilege, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportional to the needs of the case, insofar as it purports to require a response outside the

knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia*, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Further, Defendants object to this Interrogatory on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportional to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials creates an undue burden, distracts them from their critical executive responsibilities, and raises separation of powers concerns. *See Cheney*, 542 U.S. at 385. That burden is especially unjustified at this stage of the litigation given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Additionally, Defendants object to this Interrogatory to the extent a response requires review of information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

Additionally, Defendants object to this Interrogatory as overbroad and disproportional to the needs of the case, particularly in light of the expedited nature of the discovery, to the extent "communication" is meant to cover anything beyond e-mail exchanges.

Defendants further object to this Interrogatory as unreasonably cumulative and duplicative

of Plaintiffs' Requests for Production of Documents served on Mr. Flaherty in his official capacity, in response to which Defendants are producing documents within a review population that contains (i) non-privileged e-mail communications between Mr. Flaherty and email addresses with domain names of the Social-Media Platforms defined above and (ii) which are collected from Mr. Flaherty's governmental account. Defendants are producing e-mails within the aforementioned review population that contain one or more of the search terms identified by Plaintiffs, or that were otherwise identified by Defendants as being potentially responsive, and that concern misinformation, content modulation, or content on social media platforms about COVID-19. Additionally, Defendants are producing meeting invites. Thee Requests for Production provide a more expeditious and significantly less burdensome method for Plaintiffs to obtain the information sought, considering the expedited nature of the discovery here and the broad scope of this Interrogatory.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following response: Defendants refer Plaintiffs to the documents being produced in response to Plaintiffs' First Set of Expedited Preliminary-Injunction Related Requests For Production to Rob Flaherty and other documents produced in this litigation.

**Flaherty Interrogatory No. 16:**

Identify and describe in detail all "concern[s] about mis-and-disinformation on feeds and in groups," as stated in Bates page MOLA_DEFSPROD_00007250.

**OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants also object because the undefined instruction to describe "in detail" as used in this Interrogatory is vague and ambiguous.

Defendants further object to this Interrogatory as unduly burdensome and not proportional to the needs of the case. Defendants cannot conduct an exhaustive search to uncover "all" possible

responsive information under the current, abbreviated expedited discovery schedule. Such expedited discovery is especially burdensome given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending.

Defendants also object to the Interrogatory to the extent a response requires review of internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to agency communications. Defendants also object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, national security privileges, or any other applicable privilege. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportional to the needs of the case, insofar as it purports to require a response outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia*, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Further, Defendants object to this Interrogatory on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportional to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials creates an undue burden, distracts them from their critical executive responsibilities, and raises separation of powers concerns. *See Cheney*, 542 U.S. at 385. That burden is especially unjustified at this stage of the litigation given

that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Additionally, Defendants object to this Interrogatory to the extent a response requires review of information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following response: Mr. Flaherty recalls that, at the time this email was sent, it was his understanding that misinformation and disinformation about COVID-19 vaccines was circulating on feeds and groups on Facebook in violation of Facebook policy. Mr. Flaherty recalls being concerned that such misinformation and disinformation could negatively impact the rollout of vaccines for children aged 5-11, and that he wanted to understand whether those concerns were accurate.

**Flaherty Interrogatory No. 17:**

Identify and describe in detail everything that was stated by any and all participant(s) in the April 21, 2021 Meeting in which You participated with Twitter officials at which Alex Berenson was discussed.

**OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants also object because the undefined instruction to describe "in detail everything that was stated" as used in this Interrogatory is vague and ambiguous.

Defendants further object to this Interrogatory as unduly burdensome and not proportional to the needs of the case. Defendants cannot conduct an exhaustive search to uncover all possible responsive information under the current, abbreviated expedited discovery schedule. Such expedited

discovery is especially burdensome given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportional to the needs of the case, insofar as it purports to require a response outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia*, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Further, Defendants object to this Interrogatory on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportional to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order*, Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials creates an undue burden, distracts them from their critical executive responsibilities, and raises separation of powers concerns. *See Cheney*, 542 U.S. at 385. That burden is especially unjustified at this stage of the litigation given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Additionally, Defendants object to this Interrogatory to the extent a response requires review of information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of

responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

Moreover, this Interrogatory is especially untimely within the expedited discovery context, given that the Amended Complaint filed August 2, 2022 included allegations regarding Alex Berenson's alleged "deplatforming" in 2021 (ECF No. 45, ¶¶ 187, 309), which was publicly known in 2021, but Plaintiffs omitted any interrogatory regarding Berenson from prior interrogatories to Defendants.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following responses: Mr. Flaherty recalls participating in a meeting with Twitter employees on Zoom, in or around the Spring of 2021, at which Alex Berenson was mentioned. Mr. Flaherty recalls Andrew Slavitt also attending that meeting and he believes, but is not sure, that Lauren Culbertson from Twitter attended the meeting. Mr. Flaherty further recalls the meeting was about vaccine hesitancy and Twitter's efforts to combat disinformation and misinformation on the platform.  As the meeting was ending, Mr. Flaherty recalls Mr. Slavitt expressing his view that Twitter was not enforcing its content guidelines with respect to Alex Berenson's tweets, and that employees from Twitter disagreed with that view. Mr. Flaherty also recalls that Mr. Slavitt suggested at the end of the meeting that Mr. Flaherty would follow up with Twitter employees about that subject.  Mr. Flaherty does not recall following up with Twitter on the subject of Mr. Berenson, but he does recall being later called within probably a week or two by a Twitter employee, who Mr. Flaherty thinks was Todd O'Boyle, who indicated that Twitter would not be removing Mr. Berenson because Mr. Berenson had not violated Twitter policies at that time. That is the last time that Mr. Flaherty recalls discussing Mr. Berenson with employees from Twitter.

**Flaherty Interrogatory No. 18:**

     **Identify every alternative channel of communication used by any Federal Official(s) for communication with any Social-Media Platform(s) other than telephone, email, or videoconference, including but not limited to any online channel(s) for reporting misinformation, "trusted flagger" portal(s), self-deleting messaging app(s), text messaging, and/or encrypted messaging program(s), among others.**

     **OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants also object because the undefined terms "every" and "alternative channel" are vague and ambiguous.

     Defendants also object to this Interrogatory as overbroad in that it appears to call for a response based on communications with Social-Media Platforms regardless of whether those communications pertain to Misinformation as described in the Court's July 12, 2022 order authorizing expedited discovery. *See* ECF No. 34 at 13 (authorizing discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications")). Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportional to the needs of the case, insofar as it purports to require a response outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia*, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

     Further, Defendants object to this Interrogatory on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportional to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15,

2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials creates an undue burden, distracts them from their critical executive responsibilities, and raises separation of powers concerns. *See Cheney*, 542 U.S. at 385. That burden is especially unjustified at this stage of the litigation given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Additionally, Defendants object to this Interrogatory to the extent a response requires review of information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportional to the needs of the case, insofar as it purports, via the definition of "Federal Official," to require a response outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia*, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Additionally, Defendants object to this Interrogatory as overbroad and disproportional to the needs of the case, particularly in light of the expedited nature of the discovery, to the extent "communication" is meant to cover anything beyond e-mail exchanges.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide the following responses: Defendants refer Plaintiffs to the documents being produced in response to Plaintiffs' First Set of Expedited Preliminary-Injunction Related Requests For Production to

Rob Flaherty and other documents produced in this litigation.

Mr. Flaherty further avers that, aside from telephone, email, and videoconference, he does not recall personally using alternative channels of communications to discuss misinformation with social media platforms while in government service.  It is Mr. Flaherty's understanding, however, that Twitter has a Partner Support Portal that the company operates to allow certain users to raise issues with their accounts and that members of his White House staff have used the Portal to report issues such as imposter accounts or problems accessing accounts. While Twitter has sent Mr. Flaherty a link to the Portal, Mr. Flaherty does not recall using the Portal himself or using any similar tool operated by other social media platforms.

**Flaherty Interrogatory No. 19:**

**Identify every Communication and Document referring or relating to the Washington Post article that You sent to a Facebook official by email on October 28, 2021, with the subject line "not even sure what to say any more," and describe in detail what You meant in sending that message and what follow-up, if any, resulted from that message.**

**OBJECTIONS:** Defendants incorporate by reference the above objections. Defendants also object because the undefined terms "referring or relating to," "describe in detail," and "follow-up" are vague and ambiguous.

Defendants also object to this Interrogatory as overbroad in that it appears to call for a response based on communications with Social-Media Platforms regardless of whether those communications pertain to Misinformation as described in the Court's July 12, 2022 order authorizing expedited discovery. *See* ECF No. 34 at 13 (authorizing discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications")). Additionally, challenges to

administrative agency action are ordinarily not subject to discovery outside the administrative record. *Lorion*, 470 U.S. at 743-44. Moreover, this Interrogatory is overbroad, unduly burdensome, and disproportional to the needs of the case, insofar as it purports to require a response outside the knowledge of Mr. Flaherty, where Mr. Flaherty's knowledge is the only appropriate basis for any response, given that the Court in the Memorandum Order Regarding Depositions of December 7, 2022 ordered, *inter alia*, service "upon" Mr. Flaherty of "written discovery," "in lieu of the deposition of" Mr. Flaherty. ECF No. 148 at 9.

Further, Defendants object to this Interrogatory on the ground that any discovery on the White House at this stage of the litigation is unduly burdensome and disproportional to the needs of the case. Plaintiffs have not exhausted all other avenues of discovery before seeking discovery on the White House. *See, e.g.*, Order*, Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019); *Cheney*, 542 U.S. at 390. Additionally, discovery propounded on White House officials creates an undue burden, distracts them from their critical executive responsibilities, and raises separation of powers concerns. *See Cheney*, 542 U.S. at 385. That burden is especially unjustified at this stage of the litigation given that Defendants' motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and other deficiencies is currently pending. Additionally, Defendants object to this Interrogatory to the extent a response requires review of information protected by the presidential communications privilege or other executive privileges. *See Nixon*, 418 U.S. at 708. Because Plaintiffs are not entitled to such information, the request imposes a burden on Defendant disproportionate to the minimal benefit (if any) that Plaintiffs might derive from the possibility of responsive, non-privileged information. *See Cheney*, 542 U.S. at 389.

**RESPONSE:** Subject to and without waiving the above objections, Defendants provide

the following responses: Defendants refer Plaintiffs to the documents being produced in response to Plaintiffs' First Set of Expedited Preliminary-Injunction Related Requests For Production to Rob Flaherty and other documents produced in this litigation.

Mr. Flaherty further avers that prior to the email referenced in this interrogatory he had engaged with Facebook employees to understand their policies concerning misinformation and disinformation and how those policies are enforced on the platform. Mr. Flaherty recalls that, prior to this referenced email, he had been asking Facebook employees for more transparent information about their algorithms and how they were promoting misinformation or disinformation and had raised questions about research from the Center for Countering Digital Hate (CCDH) indicating that a small number of users were responsible for a significant percentage of COVID-19 vaccine-related misinformation spreading on certain social media platforms, including Facebook. In response to those inquiries, Mr. Flaherty recalls Facebook employees had informed him that, while misinformation and disinformation was a problem they were taking proactive steps to address, Facebook did not share Mr. Flaherty's concerns about the scope of the problem on Facebook, and they disputed the CCDH research.  Mr. Flaherty understood the referenced article to indicate that Facebook was doing more intensive internal research into the problem of misinformation and disinformation than they had revealed in their conversations with him, and that this research confirmed that a small number of users were responsible for a significant percentage of COVID-19 vaccine-related misinformation spreading on Facebook. Mr. Flaherty recalls his October 28, 2021, email as intending to convey his frustration that Facebook employees had reportedly been less than transparent with him and the broader public about their full understanding of the problem with misinformation and disinformation on the platform.

Dated: January 5, 2023

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

JAMES J. GILLIGAN
*Special Litigation Counsel, Federal Programs Branch*

*/s/ Adam D. Kirschner*
ADAM D. KIRSCHNER (IL Bar No. 6286601)
*Senior Trial Counsel*
KYLA SNOW (OH Bar No. 96662)
INDRANEEL SUR (D.C. Bar No. 978017)
AMANDA K. CHUZI (D.C. Bar No. 1738545)
*Trial Attorneys*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 598-3846
Adam.Kirschner@usdoj.gov

*Attorneys for Defendants*

## VERIFICATION

I, Robert R. Flaherty, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the responses to Plaintiffs' First Set of Expedited Preliminary-Injunction Related Interrogatories to Robert Flaherty served on December 12, 2022, contained in Defendants' Objections and Responses to Plaintiffs' First Set of Expedited Preliminary-Injunction Related Interrogatories to Robert Flaherty, are true and correct, to the best of my knowledge.

Dated: January 5, 2023

Robert R. Flaherty
Director, Office of Digital Strategy

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 5, 2023, a true and correct copy of the foregoing was served by email to counsel of record for Plaintiffs.

*/s/ Adam D. Kirschner*

# DEFENDANTS' EXHIBIT 37:

# Press Briefing by Press Secretary Jen Psaki, July 16, 2021

James S. Brady Press Briefing Room

1:20 P.M. EDT

MS. PSAKI:  Hi, everyone.

Q    Hello.

MS. PSAKI:  Happy Friday.

Q    Happy Friday.

MS. PSAKI:  Brian Karem has got some sunglasses on.  Everybody is ready for the weekend.

Okay, I have a couple of items for all of you at the top.

Last week, we launched the Supply Chain Disruption Task Force to monitor, engage, and act on current and emerging supply chain disruptions and bottlenecks.

This afternoon, the White House is hosting a convening of the Supply Chain Disruptions Task Force with Secretary of Commerce Gina Raimondo, Secretary of Housing and Urban Development Marcia Fudge, Director of the National Economic Council Brian Deese, Domestic Policy Advisor Susan Rice, Council of Economic Advisers Chair Cecilia Rouse, and groups representing the full range of the homebuilding supply chain, from loggers and log- — and lumber contractors, labor leaders, realtors, and affordable housing advocates.

At this convening, these administration officials and key stakeholders will discuss strategies to address short-term supply chain disruptions in the homebuilding sector and how they can work together to address them.

I also wanted to note that yesterday, senior White House officials, led by Susan Rice and Julie Rodriguez, launched the Community Violence Intervention Collaborative announced by the President on June 23rd as part of his comprehensive plan to reduce gun crime.

The Community Violence Intervention is an evidence-based approach that's been shown to reduce violence by as much as 60 percent.  CVI prevents gun violence and crime in communities around the country before it happens by intervening in disputes early, and connecting potential perpetrators and victims with services and support to divert them — to divert them away from crime.  It's an approach that's been embraced by an increasing number of law enforcement leaders nationally, as well as by mayors of both parties in cities around America.  So this will be an ongoing initiative.

Also want to give you an update: I noted earlier this week that there have been 2 million people who now have access to affordable healthcare, thanks to the reopening of the — of the enrollment — special enrollment period.

Yesterday, we launched a "Summer Sprint to Coverage" campaign, leveraging robust paid media, increased community outreach, and more to get Americans signed up.  This President Biden is urging Americans who need health insurance to visit HealthCare.gov or to call 1-800-318-2596, if they would prefer, to enroll today.  We'll keep talking about this quite a bit until August 15th, which is the end of the timeline.

I also have promised you that I would give you updates on interesting initiatives we're taking to reach people, meet people where they are, as it relates to getting vaccinated.  So, on Saturday, NASCAR will host the Get Vaccinated 200.  They'll have vaccines on site and will be encouraging vaccinations.  This is the type of whole-of-country approach that is reaching people in convenient locations with messengers they trust.

Finally, a quick week ahead:

On Monday, the President and the First Lady will welcome Their Majesties King Abdullah II and Queen Rania of Jordan, and His Royal Highness Crown Prince Hussein, to the White House.  Their Majesties' visit will highlight the enduring and strategic partnership between the United States and Jordan, a key security partner and ally of the United States.  It will be an opportunity to discuss the many challenges facing the Middle East and showcase Jordan's leadership role in promoting peace and stability in the region.

On Monday, the President will also deliver remarks on the economic recovery and the progress made under his administration — taking the country from 60,000 new jobs per month to 600,000 new jobs per month, and from 1 percent of Americans vaccinated to more than two thirds of adults with at least one shot.

He'll explain why his Rescue Plan has helped us get here and will continue supporting Americans throughout the year, and why we need the infrastructure agreement and his Build Back Better plan to sustain that growth in the years to come while keeping inflation in check for the long term.

On Tuesday, the President will hold his second Cabinet meeting of his administration — his first in the Cabinet Room — get excited, everyone — and he looks forward to that.

And on Wednesday, the President will travel to Cincinnati, Ohio, to participate in a CNN townhall.

With that, Alex, why don't you kick us off?

Q    Thanks.  I have a few questions on China and then one on the BIF.  Can you talk —

MS. PSAKI:  I love that "BIF" is happening, just to note that.

Q    Yeah, you made it happen.  Can you talk a little bit more about the Hong Kong business advisory, and the latest sanctions and what triggered those?

And also, there have been reports that Wendy Sherman may tack a China visit onto the end of her Asia visit.  Can you talk about what her goal might be with something like that?

And does this mean that we're moving closer to — I know last month there was talk of a potential Biden/President Xi summit.  Are we moving closer to that?

MS. PSAKI:  Sure, well, first, as the President said yesterday, the situation in Hong Kong is continuing to deteriorate, and we continue to see Beijing assault Hong Kong's autonomy and democratic institutions.  We've seen authorities use the National Security Law to make politically motivated arrests.  And we've seen a general deterioration of fundamental freedoms, which were guaranteed by an international agreement.

So that's why the United States — we announced steps we're taking today to promote accountability and transparency.  On the accountability front, the State Department announced earlier today seven officials who were sanctioned for their actions — threatening the peace, stability, security, and autonomy of Hong Kong.

On the transparency front, today, the U.S. government issued a business advisory — as you noted, Alex, I just wanted to give the full context — for Hong Kong, which is intended to inform businesses and highlight the growing risk for those operating in Hong Kong.

The bottom line is that businesses should be aware that the risks faced in mainland China are now increasingly present in Hong Kong.  And as the President said last month, of course, we will not waver in our support for Hong Kong and all those who stand up for the basic freedoms.

But as businesses are making decisions — and obviously they're making decisions themselves — we want them to be aware of the use of data — accessing of data inappropriately, of the restriction of information.  And they should be aware of that happening on — in Hong Kong, as well as in mainland China.

Q   And then Wendy Sherman and President Xi?

MS. PSAKI:  Got it.  In terms of Wendy Sherman's trip, we — I don't have an update on travel.  We, of course, have been and continue to explore opportunities to engage with PRC officials.  We've been clear we will engage in conversations at the appropriate level when there's an opportunity for them to be substantive and, hopefully, consequential.

So I don't have an update on intended travel.  Obviously, they are quite adept over there at the State Department of adding things as needed.

And as it relates to plans for the President: As we've said, he will look for opportunities to engage with President Xi going forward.  He — we don't have any particular plans at this moment, so no decisions have been made.  But we'll continue to evaluate what's appropriate and what would be constructive in the relationship moving forward.

Q   And then, just on the BIF, there are reports that it could be financed in part by tariffs on carbon-heavy imports, which could end up rising — hiking prices on goods for American families.  Is the White House open to that?  Or would that be a concern similar to the gas tax increase?

MS. PSAKI:  There are ongoing discussions about the final components, of course, as we look to — and I know you are all eager to see bill language and legislative language and, of course, having discussions about the payfors are part of that.

The President's bottom lines have not changed about the fact that that any payfors cannot raise taxes on individuals making less than $400,000 a year, and anything that would impact that would not be something he would support.

Go ahead.

Q   Follow-up on — I can't believe we're calling it the "BIF" —

MS. PSAKI:  (Laughs.)

Q   You note that —

MS. PSAKI:  Those of us old enough think of "Back to the Future"; those who were younger — I don't know what they think of.  But —

Q   I'm in the "Back to the Future" category.  Given the fact that discussions are ongoing, if the discussions are still ongoing come Wednesday, does the President believe that the Senate should vote to take the procedural vote to move forward if there's no bill text or a deal in hand?

MS. PSAKI:  Well, I think, one, Leader Schumer, of course, will be running point and leading the effort to determine and making the determination about the timeline, the process, and the sequencing of votes in the Senate.  And we certainly work closely with him, and — but we certainly trust his — his path that he is mapping out for the legislative process.

We have several days, I would note, before Monday for more information to become available.  We'll see what is known.

I will note that the President is quite familiar with the rollercoaster and ups and downs of legislating, having spent 36 years there and even having had some successes over the last few months in working with legislators.  He — we had a productive meeting — members of our team had a constructive, productive meeting yesterday.  And I'd also note that there are a number of Republicans and Democrats who feel the same in terms of the path forward.

Senator Portman said, "We're going to get it done, and we'll end up with a good package."  Senator Cassidy said he did not feel squeezed by the timing.  Senator Romney affirmed there were going — things were going in a good direction.

We certainly understand the ups and downs — no one better than the President.  That's the period of time we're in at this point.

Q   And just — you went through kind of the topline details of this yesterday, but can you elaborate a little bit on the Facebook —

MS. PSAKI:  Sure.

Q   — the administration to Facebook flagging of disinformation.  And there's also some reporting that we've had that Facebook maybe hasn't been as proactive as the White House

would like it to be in response to some of the flagging.  So, the process of how the flagging works, and then whether Facebook has been amenable to those requests.

MS. PSAKI:  Sure.  Well, I would say first, it shouldn't come as any surprise that we're in regular touch with social media platforms — just like we're in regular touch with all of you and your media outlets — about areas where we have concern, information that might be useful, information that may or may not be interesting to your viewers.

You all make decisions, just like the social media platforms make decisions, even though they're a private-sector company and different, but just as an example.

So we are ma- — regularly making sure social media platforms are aware of the latest narratives dangerous to public health that we and many other Americans seeing — are seeing across all of social and traditional media.  And we work to engage with them to better understand the enforcement of social media platform policies.

So let me give you an example, just to illustrate it a little bit.  The false narrative that remains active out there about COVID-19 vaccines causing infertility — something we've seen out there, flowing on the internet quite a bit, in other places as well — which has been disproven time and time again.  This is troubling, but a persistent narrative that we and many have seen, and we want to know that the social media platforms are taking steps to address it.  That is inaccurate, false information.

If you are a parent, you would look at that information and then that would naturally raise concerns, but it's inaccurate.  And that is an example of the kind of information that we are flagging or raising.

Q    And then has Facebook been as proactive as the White House would like in terms of its response to those flags?

MS. PSAKI:  Well, I think, as I noted yesterday, Phil, there is more — there are more steps that everyone can take.  And I would just note, again, this is a responsibility of officials speaking, of course, on behalf of the government; it's the responsibility of members of the media; it's the responsibility of citizens and civic leaders and people who are trusted voices in communities around the country.  That has a broad definition.  Social media platforms is one of them.

And as we know, it is also — there are also areas where a lot of people get news and information.  Sometimes those are accurate news items reported by some of your outlets or accurate information shared by a neighbor.

Sometimes there is information that is not.  It is hard to discriminate, as we know.  This is not a new issue, but it is an issue that is impacting people's lives.

So a couple of the steps that we have — you know, that could be constructive for the public health of the country are providing for — for Facebook or other platforms to measure and publicly share the impact of misinformation on their platform and the audience it's reaching, also with the public, with all of you to create robust enforcement strategies that bridge their properties and provide transparency about rules.

You shouldn't be banned from one platform and not others if you — for providing misinformation out there.

Taking faster action against harmful posts.  As you all know, information travels quite quickly.  If it's up there for days and days and days when people see it, you know, there's — it's hard to put that back in a box.

And, of course, promoting quality information algorithms.  I don't know how they work, but they all do know how they work.

So those are some of the steps that we think could be constructive for public health, for public information, for public — and, you know, the right of the public to know.

Go ahead.

Q   Just to quickly follow up on the Facebook aspect of this: You said yesterday that 12 people were producing 65 percent of the misinformation on vaccines on social media platforms.  Do you have a sense of who those people are?  Are they bad actors like Russia?

And Facebook responded yesterday after the press briefing.  They say that they removed 18 million pieces of COVID misinformation; they've connected more than 2 billion people to reliable information.  So does the White House find that sufficient?

MS. PSAKI:  Clearly not, because we're talking about additional steps that should be taken.  And frankly, information that media organizations could detr- — could decide whether you're going to report on or not.  I'm not talking just about the misinformation storyline; I'm talking about these individuals.  I'm talking about, you know, how prevalent the spreading of this information is.

The public has a right to know.  That's the point that we're making.  And we're dealing with a life-or-death issue here, and so everybody has a role to play in making sure there's accurate

information.

Obviously, those are steps they have taken.  They're a private-sector company.  They're going to make decisions about additional steps they can take.  It's clear there are more that can be taken.

And I'll actually on — can I just — on the foreign government piece, because I think that's an important point, or an important, interesting question.  The State Department's Global Engagement Center has found that Russia and China have promoted their own vaccines through messaging that undermines Western origin vaccine development programs.

So, you know, that is more than just competition about vaccines.  The risk and impact there is that this type of information magnifies, you know, the risk of potential side effects associated with Western vaccines.  This is what they're — what the information — some of this misinformation is doing — and misleads the public by falsely alleging that mRNA vaccines are untested and, thus, risky, even though many of them are approved and have gone through the gold standard of the FDA approval process.

So, the PRC, for example, has also suggested that the United States hoards COVID-19 treatments and prevents other countries from acquiring vaccines, despite evidence to the contrary.

But, certainly, pushing information out there that these tested, approved vaccines are ineffective and unhelpful — a lot of people on these platforms, they're not discriminating, as you all know, between the source of the information.  And that is damaging as well.  So we've seen that trend.

Q   And one more, if I could, just on Afghanistan.  Thank you, Jen.

As we look at the withdrawal in Afghanistan, what is your assessment of the Taliban's advancements?  We heard from the President; he said the likelihood that there was going to be the Taliban overrunning everything and owning the whole country is "highly unlikely."  Does the administration still believe that the Afghan government can maintain control of the region?

MS. PSAKI:  I think that what the President was conveying is that it is not inevitable.  And we have provided a range of — a great deal of support, supplies, training.  We're continuing to do that.  We will continue to provide security assistance in the coming months to the Afghan National Forces.  But it is up to them to determine: Are they going to unite as a country?  Are they going to stand up and fight against the Taliban?

And that is — it's really in their hands at this — it will be in their hands, moving forward.

So his point is that it is not inevitable.  There has been no intelligence assessment that has said it is inevitable, even as they — we are assessing what the consequences could be.

Go ahead.

Q    Thanks, Jen.  When you talk about misinformation, it seems like one of the best ways to counteract some of the vaccine misinformation that's out there would be for the FDA to fully authorize these vaccines with the full weight of government approval behind the vaccines.  But now we're hearing that may not happen until January 2022 or even later.  Is the President comfortable with that timeline?

MS. PSAKI:  The President is comfortable with scientists and data experts moving on the timeline that that — they see is appropriate.  And I don't know that we know that to be factually true, to that — that to be the main driver.  I haven't seen data to suggest that, that the main driver of it is if it's formally approved or not.

A lot of the misinformation that is traveling out there is about the consequences and the impact of the vaccine.  It's not always tied to or necessarily tied to whether it's been formally approved or not.

Obviously, that may give medical experts or others some greater level of confidence.  We will see.  But the President is going to leave it to the FDA to determine the timeline.

Q    So the President doesn't have any concerns about the length of time that the approval process takes currently at the FDA?

MS. PSAKI:  He's going to allow them to move at the pace of science.

Q    Okay.  And then I want to ask you about the new reporting about Joint Chiefs Chairman General Milley, who had, apparently, some very serious national security concerns just before President Biden took office.  Did he brief then President-elect Biden about his fears about a strike on Iran or about the possibility of an attempted coup?

MS. PSAKI:  I'm not going to speak to private national security consequ- — or conversations, I should say.  Obviously, the President had many conversations with General Milley — Miller during his time in his role, and most of those — or none of those — do we read out.

I will say that he strongly respects General Miller. As you know, he had the opportunity to sit down with him on Wednesday, thank him for his outstanding leadership of the Resolute Support Mission, including overseeing the vast majority of our drawdown from Afghanistan, which is a particular vulnerable period — during a particularly vulnerable period for our troops.

Q   How close does the President think we came to a possible war with Iran or an attempted coup here at home?

MS. PSAKI:  I'm just not going to speak to intelligence matters from here.

Go ahead.

Q   Thanks, Jen.  First on COVID origins: Is the White House worried that China continues stonewalling the World Health Organization investigators and now is saying things like they think maybe COVID-19 got into China through frozen food?

MS. PSAKI:  We are certainly remain- — continue to be concerned, Peter, about misinformation coming from voices in China about, certainly, the origins, their lack of participation in the process, their lack of willingness to provide data and information to the World Health Organization.

As you know, we're — are undergoing our own process here, our 90-day review here.  But certainly, the Chinese providing information, being in — a participant in the process, would aid — aid the effort.

Q   And then speaking of misinformation and the announcement from yesterday: For how long has the administration been spying on people's Facebook profiles looking for vaccine misinformation?

MS. PSAKI:  Well, that was quite a loaded and inaccurate question, which I would refute.

Q   Inaccurate how?

MS. PSAKI:  Well, Peter, first of all, as you know, we're in — we're in a regular touch with — with a range of media outlets —

Q   And we expect that the White House —

MS. PSAKI:  — as —

Q   — is watching Fox —

MS. PSAKI:  Let me finish —

Q   — but I don't think —

MS. PSAKI:  — as we are —

Q   — people posting on Facebook expect that —

MS. PSAKI:  — as we are in regular touch with social media platforms.  This is publicly open information — people sharing information online — just as you are all reporting information on your news stations.

Q   But — okay, so these 12 people who you have on a list — 12 individuals — do they know that somebody at the Surgeon General's office is going through their profile?

MS. PSAKI:  I'm happy to get you the citation of where that comes from.  There's no secret list. I will tell you that these are people who are sharing information on public platforms — on Facebook — information that is traveling, is inaccurate.

Our biggest concern here — and I, frankly, think it should be your biggest concern — is the number of people who are dying around the country because they're getting misinformation that is leading them to not take a vaccine —

Q   But —

MS. PSAKI:  Young people, old people, kids, children — this is all being — a lot of them are being impacted by misinformation.

Q   The big concern though, I think, for a lot of people on Facebook is that now this is Big Brother watching you.

MS. PSAKI:  They're more concerned about that than people dying across the country because of a pandemic where misinformation is traveling on social media platforms?  That feels unlikely to me.  If you have the data to back that up, I'm happy to discuss it.

Q   Okay, and just about things that are on Facebook: I looked this morning, there are videos of Dr. Fauci from 2020, before anybody had a vaccine, and he's out there saying there's no reason to be walking around with a mask.  So, is the administration going to contact Facebook and ask them to take that down?

MS. PSAKI:  Well, first, I think what Dr. Fauci has said himself — who's been quite public out there — is that science evolves, information evolves, and we make that available in a public way to the American people.

Q   Exactly —

MS. PSAKI:  I have never seen any data to suggest that — that the vaccines cause infertility. That is information that is irresponsibly traveling.  Okay.

Q   But — I just —

Q   (Cross-talk.)

Q   — just one more — sorry —

Q   (Cross-talk.)

Q   — excuse me, just one more — okay, about —

Q   (Cross-talk.)

Q   About the science — about the science evolving: Facebook used to post — used to block people from posting that COVID may have originated for a lab.  That is something this President now admits is a possibility.  So is there any concern that the things you're trying to block or have taken down might someday turn out to be —

MS. PSAKI:  We don't take anything down.  We don't block anything.  Facebook and any private-sector company makes decisions about what information should be on their platform. Our point is that there is information that is leading to people not taking the vaccine, and people are dying as a result.  And we have a responsibility, as a public health matter, to raise that issue.  The responsibility we all have — the government, media platforms, public messengers — to give accurate information.

Go ahead.

Q   About the 12 individuals that are on that separate site — it's not from the White House; I don't have the source in front of me, but we've read it as well.  Can you give us a sense of who those individuals are, as was asked before?

And what specifically — you've given a tough message to the social platforms that they should do more — the social media platforms.  What, from this podium, is the message to those

individuals — the 12 of them — who are responsible for 65 percent of the misinformation that's out there?

MS. PSAKI:  The message is the same message as it is to every person out there who has a platform, whether that is an elected official or that is a person who is a civic leader: The vaccines are safe.  They're effective.  If people take them, they will save their life, in many cases.

And so our message to everyone who is sharing misinformation is that your — the steps you're taking are irresponsible, they could lead to people's — people getting very sick, and people ultimately losing their lives.  Why don't we all participate in a process that will help provide accurate information out there?

Q    Has the White House participated in any direct contact with these individuals, given the impact they're having, through any avenue to try to say, "Knock it off"?

MS. PSAKI:  No.  And I'm happy to get you guys the — the data on where we got that information —

Q    It's public.

MS. PSAKI:  Yeah, this a publicly available data — we'll get you the citation, is what I mean.

Q    Let me ask you, if I can, then about some of the other numbers as they relate to COVID. Right now, obviously, due to the Delta variant, COVID cases are up sharply right now.  Testing is down right now.  How concerned is the White House that this variant, COVID, in general, is much more widespread than we're aware of publicly at this time?

MS. PSAKI:  You know, it's a great question.  I don't want to speak out of turn here, because it's really a question for the health and medical experts on how they're tracking it and how concerned they are.

We certainly know, on transmissibility — and based on the CDC data — that the Delta variant is the — is impacting the majority of people who are getting sick with COVID now.  We also know that 99.5 percent of people who are in the hospital are people who are unvaccinated, and people who are dying of COVID — unvaccinated.  The data is very clear.

As Dr. Walensky said on an earlier — an earlier briefing today, this is really becoming a pandemic of the unvaccinated, and that means getting vaccinated, you can save yourself.

Q   Is there anything that the White House is doing differently?  We saw the President, proudly, in Philadelphia, shaking hands with a lot of folks when he was there for his voting rights speech earlier this week.  We saw something similar last week when he was in Illinois.

Given the reporting about some breakthrough cases right now, are there any things that the White House is doing differently as it relates to your own staffing or the President's handling of his, sort of, activities due to those new numbers?

MS. PSAKI:  No, we are vaccinated.  The President is vaccinated.  You are all vaccinated.

Q   Okay, so breakthrough cases are not something that you — that you or Americans —

MS. PSAKI:  We get test- —

Q   — should worry about?

MS. PSAKI:  We still have a testing protocol and process in place for White House staff.  So that — that has continued.

Q   And for those individuals that he would be shaking hands with, there's not any — basically, shaking hands is good if you're vaccinated?

MS. PSAKI:  We have — we abide by public health guidelines as it relates to the President's engagements.  And if public health guidelines changed, which I'm not predicting, we would continue to abide by them.

Go ahead.

Q   Voting rights, Jen?  Voting rights?

MS. PSAKI:  I'll come to you next, April.

Q   Thank you, Jen.  Just a question on the meeting that you're having with the housing industry —

MS. PSAKI:  Yeah.

Q   — today at the White House.  How concerned is the White House about the supply shortage in the industry leading to inflationary pressures?  Is that a serious concern?  Is that why this meeting is being held?

MS. PSAKI:  The — the meeting is being held as part of our effort to connect suppliers who have said, in the past, to our economic experts, they don't always have the opportunity to talk to one another.

We know for — because of the pandemic, there have been supply shortages in areas that have led to a reduction of new building and construction, which has led to also an increase in housing prices, because there are just — certainly just not enough houses on the market.

So that's what it's related to, is an opportunity to discuss with them, bring them all together in a room.  And it's part of our multifaceted effort to address issues in the supply chain.

Q    And one on Cuba.  The President did say yesterday that the United States is trying to reinstate Internet access —

MS. PSAKI:  Yeah.

Q    — for Cubans.  And I was wondering if — if the White House or the administration has reached out to U.S. tech companies — I mean the Googles of the world — to help with that effort.

MS. PSAKI:  So it would really be led — that effort would really be led by the State Department and other appropriate entities within the federal government.

As the President noted yesterday, returning Internet access to Cuba would certainly be something we'd love to be a part of.  It is — we're looking at what our capacities and what our tools are we have.  In terms of more specific — the specifics, the State Department would be the best entity to talk to about it.

Q    Jen, you said I was next.

MS. PSAKI:  Go ahead.  Oh, sorry, April.  Go ahead.  And then I'll come to you.

Q    On voting rights —

MS. PSAKI:  Yeah.

Q    On Tuesday, President Biden said — he called for activists to act on the issue of voting rights.  What did he mean by that?  Is that to escalate it higher to Republicans so that they can change their minds and maybe stop using the filibuster?

And also, what does he think about what happened yesterday with the arrest of the congresswoman and nine other Black women who peacefully walked through the Senate halls in the Hart building, chanting and singing and were arrested — not taken to a holding cell — holding area, but taken to a jail cell?

MS. PSAKI:  Well, April, first, he — what he meant by speaking out or having your voice heard, or the range of ways he said it, is that in order to make change happen in Washington, often you need to create a grassroots movement that's led by the American people.  And it's not just about whether we can — whether the minds of 10 Republicans can be changed directly by a phone call from a President.  It often requires activism, engagement of vocal opposition or — or excitement from — from members of the public.

That's going to take a lot of different forms — right? — and formats.  It can take letter writing, phone calling.  There's peaceful protesting.  There are a range of mechanisms for that.  And certainly, our country, even in recent years, has a great history of that.

And these — these members who were — some of them were members, I should say —

Q   One member.

MS. PSAKI:  One member who was arrested yesterday — they were peacefully protesting.  I would note that our support for the right to peacefully protest and to voice support for moving forward on voting rights is exemplified by the fact that the Vice President is currently meeting right now with a number of members — they're here, a number of them are at the White House discussing exactly this issue, because we want to be standing by their side in this effort.

Q   So the — some of the civil rights leaders are here, as you said.  But last week, when the civil rights leaders were here, they said, "This is a summer of action."  They're expecting more protests.  Reverend Barber says he's going to have a bunch of women out on Monday.  There's going to be more protests on Wednesday.  More arrests — they're anticipating arrest to bring more attention to this.  Does the White House support that civil disobedience for arrests?

MS. PSAKI:  We support the right to peacefully protest.  We support people having their voices heard.  And certainly, there are a few issues that are more fundamental to our rights in this country than the right to vote.

Go ahead.

Q   So, thank you —

Q   For Africa, please.

MS. PSAKI:  I'll go to you right next, if that's okay. Go ahead.

Q   Just a clarifying question —

MS. PSAKI:  Sure.

Q   — and then a follow-up on Afghanistan.

MS. PSAKI:  Yeah.

Q   Yesterday, you said that 10,000 SIV applicants — or, excuse me, 20,000 Afghans have applied and that about half of that have completed necessary paperwork to move forward in the process.  Just what's "move forward in the process"?  Does that mean 10,000 SIV applicants will be evacuated?

MS. PSAKI:  No, that's not what it means.  It just means that they're in a later stage of the process.

Q   Right.

MS. PSAKI:  So, it just — it — just giving an update kind of on the (inaudible).  And as I said yesterday, that doesn't include family members; that includes individual interpreters or translators.  So it just means they're farther forward in the process.

There's another step in the process, which is security vetting, which would need to be completed before any individual is relocated to a base in the United States.  Individuals could be relocated to third countries before that process is completed.  So it was just an update kind of on where people stand in the process.

Q   And then just to take a step back, too — why did the administration wait until June 24th to commit to the evacuation? Why not have this be one of the early steps, right when the President announced this in April, I believe, while American troops were still on the ground?  I mean, announcing this just days before the combat mission is essentially over would seem to complicate the mission.

MS. PSAKI:  Well, I would say, first, there's always ongoing discussions, both with our partners in the region and others, before an announcement is made.  And sometimes it requires a process to get to the point where you are making an announcement about the relocation of thousands of individuals out of a country.

Second, I would say: We've also committed to not only relocating these individuals in advance of our men and wo- — servicemen and women coming out of Afghanistan. We have quite a capable Department of Defense and diplomatic apparatus in Afghanistan and around the world to implement this.

But we've also committed to continuing this process from there and having a diplomatic presence on the ground from there. So, this is not a process that will end, but this is a process that we announced at a time when a final decision was made, based on a range of factors internally.

Q   And have third countries outside of U.S. territories given the U.S. commitment — the administration commitment that they will house SIV applicants while they're still having their applications processed?

MS. PSAKI:  We're having a range of discussions, as you know. When we're at the point where we have final agreements, and we don't — and we're — we're confident that it won't impact the security of individuals who are being relocated, we'll share all of that information with you as well.

Q   But there's no commitments as of today?

MS. PSAKI:  I don't have any updates to provide to you today.

Q   Jen —

MS. PSAKI:  Oh, I'm sorry. Go ahead.

Q   Yes. What can Africa expect from this administration in terms of its engagement in helping solving some problems that we are having right now? For example, Angola is fighting corruption. And also, can we expect some revision in the sanctions in Zimbabwe?

MS. PSAKI:  I don't have any update for you on considerations around sanctions. I'd point you to the Department of Treasury or the Department of State on that.

We, of course, will remain deeply engaged with our African partners on a range of issues — whether it's corruption, or facing and fighting the COVID pandemic, or economic opportunity and development.

And I would note that we have a number of leaders high up in the government, including our U.N. ambassador, Linda Thomas-Greenfield, who has spent quite a bit of time of working with

leaders in the region and playing a front-and-center role for the United States government. But in terms of specifics on Zimbabwe or Angola, I would point you to the State Department.

Q   Regarding misinformation, do you have any data that shows that children have been affected by misinformation?  And how do you see if we should educate children about these issues?  Because I'm working on a show that will inform little kids about many different things, and I'm also concerned about misinformation.  So, in your research about misinformation, is there any misinformation affecting children as well?

MS. PSAKI:  That's a really interesting question.  I don't have any data at my fingertips.  I will reiterate that, of course, children are not eligible — under the age of 12 — yet for vaccines in the United States.  And health — and health infor- — or decisions about the health of children — as a parent myself — would obviously be made by the parents in — in coordination with doctors.

But I would say there's no question that when there's information — the example I gave earlier about the impact on fertility of — which is inaccurate and false; which is still traveling around the Internet.  If you're a parent, that would give you pause, if you think that is accurate information, about your child and about your child getting vaccinated.

So that's an example.  I don't have data, but just an example that could be applicable.

Go ahead.

Q   Yeah, thank you, Jen.  I had a question about the direct funding to states and cities from the American Rescue Plan —

MS. PSAKI:  Sure.

Q   — the $350 mil- — billion.  I was talking to the Treasury Department; about $200 billion has gone out, and several cities and states have been quick to allocate that money.  But there's other mayors and governors who I've talked to who have spent very little of that funding so far — in some cases, none of it — either because of battles with their state legislatures over the funds, their late budget cycles, lengthy public input processes, or they're simply doing better than expected, revenue wise, and so there hasn't been a sense of urgency for them.

And so, my questions are: You know, does it concern the White House that some places haven't gotten their money out quicker?  And does the White House have a message to governors and mayors that don't have any plans yet to spend their funds?  And finally, does that signal — the situation I described of not — of some folks not spending their money quickly — does that signal that the money wasn't urgently needed?

MS. PSAKI:  Well, I would say, first, the — in the — ensuring that states and local governments had the funding they needed to keep employees on the job, to keep cops on the beat, to rehire them, in many cases, was a priority when we were negotiating the American Rescue Plan for a range of elected officials, including mayors and governors across the country, for good reason.

It sounds like there's some different case-by-case scenarios that have made it more challenging in certain governments and localities.  We have an entire team here and at the Treasury Department that works closely with them.  It may be most constructive for you to talk directly to them — either Gene Sperling or Jacob Leibenluft — about different issues that are having — happening in different cities or states.

Q    But you have confidence that money is being well spent and that, you know, they're going to get it out to address what you identified as a problem for cities and states?

MS. PSAKI:  Absolutely.  And there is, of course, a range of options that cities and localities have for using the funding.  And we wanted to provide that flexibility on purpose because one city or town or state does not fit all.  One size doesn't fit all, I should say, for cities, towns, and localities.  That was important — that flexibility.

There are still restrictions on how it can be used and how it's implemented.  We, obviously, also — which is not what you're asking, but I'm just going to reiterate —

Q    Yeah.

MS. PSAKI:  — take waste, fraud, and abuse incredibly seriously.  The President is "Sheriff Joe" in his heart and forever.  So that's something we watch, but I would — I would say it might be constructive for you to talk to them directly about the implementation piece, and I'm happy to connect you directly.

Q    Thanks, Jen.  Jen, vaccination rates are actually going up in the five states that have the highest —

MS. PSAKI:  Yeah.

Q    — case rates right now.  What does the White House think is driving that?  And what is being done there that the administration could apply to other hotspots?

MS. PSAKI:  Yeah.  Karen — and I know this was announced on our COVID briefing, for those of you who were not on it — in the past week, the five states with the highest case rates — Arkansas, Florida, Louisiana, Missouri, and Nevada — had a significantly higher rate of people

getting newly vaccinated compared to the national average, which we obviously see is a good sign.  And in the last 10 days, 5 million shots have been administered and millions got their first shots.

It's hard to pinpoint one particular piece.  But what I would say is that we're continuing to work to apply the lessons we've learned over the last few months.  The biggest issue far and away is access, and that means something different in different communities.

In some communities, it is ensuring that people know that they can take time off of work — because of the kind of jobs they're working.  In some communities, it is meeting people where they are: in places of worship; mobile clinics, which is something we're doing a lot in rural communities; walk-up pharmacy appointments; at their workplace or in schools.

We are also continuing to fund, support trusted messengers because we have seen, time and time again, that it is more effective.  And many of you have covered political campaigns; this is not a surprise to most people who have covered a ca- — political campaigns.  Trusted messengers are people in communities — they are neighbors, they are civic leaders, they are clergy.  They're not always the President of the Uni- — sometimes it is, but — and they are medical experts.

And so, we are continuing to support those efforts.  We think that all of those have been effective.  There's still — still more work to be done, but certainly, that's encouraging — those trends that we've seen.

Q    Jen, how concerned are you, though, that things have to get worse in these hotspots before they get better; that fear is driving the vaccination rate?  How concerning is that to the White House?

MS. PSAKI:  Well, that is not our preference.  You know, that is why we have made vaccines so readily available for months now.  That's why we have employed these tactics for months now — making vaccines readily available, accessible, working with trusted messengers and partners.

We also, though, have seen — in some communities where local news stations are covering young people, unfortunately, who are getting sick — some being put on ventilators.  I don't know — I can't tell you from data what impact that is having, but we are seeing, in areas where there are lower vaccination rates, some — some positive signs over the last week.  We'll see if that continues.

Go ahead.

Q    Jen, thank you.  I have two COVID questions and one voting rights question.

MS. PSAKI:  Okay.

Q    I'll try to make it fast.  On COVID, you and Dr. Walensky have used this phrase: "the pandemic of the unvaccinated."  And I am wondering if any part of that is the administration distancing itself from responsibility for the pandemic, because you've been trying to get people vaccinated, or if it's a scare tactic.

MS. PSAKI:  Well, I would say, first, the data speaks for itself, which 99.5 percent of people who are in hospitals because of COVID are unvaccinated.  What it is our responsibility to do is provide accurate public health information to the public.  It is also our responsibility to stay at it and continue to communicate, to fund programs, to support trusted messengers, to get out into local communities, to use what we see as creative partnerships, to meet people where they are.

We haven't stopped that.  We haven't halted it.  We haven't even slowed it down.  But certainly, from the public health experts, et cetera — and I repeated what Dr. Walensky said, because she is, of course, a doctor and I am not — it is important for people to understand that the vaccine is safe.  It will keep — it will protect them.  And it is as simple as that sometimes.

Q    On Olivia Rodrigo, was this sort of a one-off thing?  I know that you had worked with other celebrities before and you announced the NASCAR thing, but is there more work with young celebrities or country stars or anything else that's coming?  Or was that more of — part of the month of action that's behind us?

MS. PSAKI:  Wouldn't it be great if this was the cue for like Blake Shelton and Gwen Stefani to come out — (laughter) — from — that would be awesome.  I wish that was happening today.

It is — it is a part of an ongoing effort.  And we want to partner with trusted voices and individuals in communities — many of whom you will never have heard of, and they may have five Twitter followers — if they're on Twitter, which they probably are not if they're not on the coast and not liberal.  (Laughter.)

But we will also use — we'll also work with celebrities.

Q    Slipped that one in, didn't you?

MS. PSAKI:  And we will work — we will also work with individuals like Olivia Rodrigo.  I know I said this the other day, but obviously she's a very well-known pop star.  She's 18 years

old.  She doesn't have to use her time to do this.  She is speaking to a broad swath of an audience that I bet you is not watching the White House briefing and is probably not watching the President of the United States.  And we recognize that we need to meet people where they are, including as we use partnerships and medi- — and engage with media as well.

Go ahead.

Q   And I'm very sorry to have one more.  But on voting rights, you know, the President, on Tuesday, called on Congress to pass federal voting legislation.  He spoke about the urgency of it.  The question is: What comes next?  Is he going to travel around the country and make this case?  Is he going to go up to the Hill and have meetings specifically about voting rights?  I know that he has talked about, you know, activist need to build the grassroots.  But some activists are sort of pushing back on that idea, saying like, "We can't always be the ones that are asked to do the work."

MS. PSAKI:  He's not saying to do it alone.  He's saying, "I will be with you."  But he's also saying that grassroots activism is what is going to move and change the country for the better.  That's always been the case throughout history.  In terms of what he will say and do, I don't have any scheduling announcements for you at this point in time, but he has said this would be a cause of his presidency.  That means he will use his time, use the plat- — his platform to make sure he's speaking about elevating it, engaging in it.

And, as you know, the Vice President — this will be a top priority for her.  She will be front and center for the administration on this issue moving forward.

Go ahead.

Q   Thanks, Jen.  Just given the Wednesday timeline that Senator Schumer has laid out, what will the President be doing over the weekend to help things move along?  Will he be making calls all weekend?  And then what's his response as well to Republicans who are concerned that tougher enforcement in the IRS won't be enough to generate enough revenue?

MS. PSAKI:  Well, first, I would say: The President has proposed a number of ways to pay for these proposals that have — have been out there in the public and has been a part of these ongoing discussions, which are continuing.  And those proposals — he has a number of proposals out there that would more than cover the cost of this — of this infrastructure agreement that do not violate what the Republicans have said is their red line in this case, which is the 2017 tax cuts, regardless of his point of view on that; we'll take that on in the Build Back Better reconciliation package.

In terms of what he will be doing, the President is ready, willing, able, looking forward to playing any constructive role he can play in getting these pieces of legislation across the finish line. Will that mean phone calls? Sure. Will it mean bringing more people to the White House? It probably will. But I don't have anything to, kind of, lay out for you here.

Q   And separately, has the intelligence community attributed the Kaseya ransomware attack to the Russian government? And has it been concluded that the RNC was indeed hacked?

MS. PSAKI: Well, first, I would say: The RNC put out a statement, when that news came out, saying it was a third party that had their information accessed, not the RNC — a vendor of the RNC's. I'm not aware of the information there changing. I would point you to them on that. The FBI is, of course, doing an investigation and in touch with them. I don't think they've put out any new information since then.

In terms of the Kaseya attack, we have pointed to the fact that REvil has — many cyber experts have — have attributed — have assessed their engagement here. We have not attributed the Russian government's involvement in this case. It's an ongoing — an ongoing review, but we have not — we don't have any new information on that front.

Q   Jen —

Go ahead.

Q   Hi, Jen. I'm curious if the uptick in the Delta variant, if that is playing any part in where the President is leaning in terms of extending that federal mask policy on public transportation? I know it's set to expire in September. Is he leaning towards extending that even more? We're seeing some health officials say that they want to extend it even now.

MS. PSAKI: Well, he's going to lean into the advice of his health and medical experts and teams on any steps that need to be taken to keep the American people safe. Given we're talking about September, I know that feels like a short period of time away. It is actually some time away. But he'll continue to receive updates from them on a range of issues as it relates to COVID. I'm sure they'll discuss this and their views.

Q   And on that same note, he said yesterday that he's going to take into consideration some factors before he talks about what will happen with the European travel ban. Is that going to play a part into that with the Delta variant coming up?

MS. PSAKI: Well, as it relates to the travel ban, we certainly know we've made important progress in the pandemic. We'll continue to put public health first.

The President — all decisions about reopening international travel will be guided by our public health and medical experts.  There are ongoing working groups that are having these discussions to keep open lines of communication.  He will be receiving an update soon, I believe — if not today, then in the coming days — on where things stand.

But we must be vigilant, particularly about the spread of variants.  We'll reopen when health and medical experts expect it is safe to do so.

Go ahead.

Q    Thanks, Jen.  Does the President plan to reappoint the Fed Chairman to another term?

MS. PSAKI:  I have no announcements or pronouncements on the Federal Reserve Chair or any other personnel to convey to you today.

Q    Is there a timeline for that decision?

MS. PSAKI:  I don't have a timeline to project.  I know that there's a timeline for when the — when his — his service is — will need to be reviewed or determined.

Q    Can I do a quick follow-up on that?

MS. PSAKI:  Go ahead.  Let me just get around.  Let me just get around.  Let me just get around.

Go ahead.

Q    I had a question about the Belarus, if I may —

MS. PSAKI:  Sure.

Q    The Belarusian opposition leader, Sviatlana Tsikhanouskaya, will be in Washington next week.  And she said she would meet high-ranking officials.  I was wondering whether you have details about that.

MS. PSAKI:  I don't with me. Let us get it to you after the briefing.  Members of the national security team or the State Department — was she more specific — or just people from the U.S. government?

Q    She just said "high-ranking officials."

MS. PSAKI:  Okay.  Let us get you more information after the briefing.

Reese, who is our special guest from — tell us where you're from.

Q   Oklahoma.

MS. PSAKI:  Who's not been — have you been here before?

Q   I've never been here before.

MS. PSAKI:  Okay.

Q   Dun-dun-dun.  (Laughter.)

MS. PSAKI:  Welcome.

Q   Thank you.  So I — my question is really just about what we kind of touched on — the vaccination rates in like rural country — rural counties.  Especially in Oklahoma, we're seeing a significant rise in COVID cases.  Is there any specific plans that the administration has to help increase vaccination rates in these rural counties that — really, these people don't have any intentions of even getting the vaccine?

MS. PSAKI:  Well, we've talked about this a little bit.  But what we're doing in rural communities is employing a number of the tactics that we've seen work around the country.  So, we also — we know access is a huge issue in rural communities, because people may not le- — live near a pharmacy.  They may not know, still, where to get a vaccine.  We certainly understand that.

So, part of what we're trying to do is deploy and make sure we're expediting our deployment of mobile vaccine units to rural communities to bring the vaccine to people where they are and where they live to make it as easy as possible.  And so, this work is going to continue person to person, community to community.

We're also working with a range of trusted part- — partners, locally, you may — people may not have heard of —  those are also very important trusted voices — but also groups like the National Rural Health Association to make sure that we're deploying effective tactics that they think will work to get vaccines out to communities and meet people where they are.  We've talked about it a little bit here.

And obviously, these states have a combination of rural and city communities, but there are states — states like Arkansas, Louisiana, Missouri — where there are large, rural communities

where we have seen an uptick, which is a po- — in terms of vacci- — getting vaccinated, higher than the na- — national average.  That's a positive sign.

We'll look at that and apply those tactics other places — in Oklahoma — to make sure we're continuing to go community by community to meet people where they are.

Go ahead.

Q    And following up on that: I know the administration has said they're not interested in any sort of federal mandate.  Do you encourage, though, employers to require the vaccine for their employees?  Or state and local — I know there's a little bit of discussion about local governments.  Is the White House encouraging others to require the vaccine of their employees or their residents?

MS. PSAKI:  We know that some employers, hospitals, health systems, colleges, universities, local leaders have chosen to take this step.  And we expect others to do so as well.  But our role we're playing from here is continuing to go community by community, person to person, making sure we are meeting people where they are to get the vaccine out.

We believe that local communities, entities, organizations are going to make decisions about what they need to do to keep their community safe.

Q    And what about for federal workers or members of the military?

MS. PSAKI:  I don't have anything new to report on that.

Go ahead.

Q    Question.  The Justice Department Inspector General's report on the FBI handling the Nassar case — that's the latest embarrassment in a string of embarrassments for the FBI this summer.  Does the President have complete confidence in Christopher Wray?  And what is the administration's message to people who see this bungling and want to know if the FBI is up to task with ransomware, domestic terrorism, and other threats?

MS. PSAKI:  Well, first, I would — I would point you all to the expansive statement that was put out by the FBI in response to the Inspector General's report.  Second, yes, he has confidence in Christopher Wray.  Third, as it relates to ransomware, this is an across-government interagency effort, one that we have not seen done in the past.

I gave a little bit of an update in a readout of it yesterday, where we're tapping into all of the resources and expertise across the federal government.  The FBI has been a key partner in that, as have another — number of entities in our national security team who can play a role in fighting against ransomware.

Go ahead.

Q    (Inaudible.)

MS. PSAKI:  Oh, go ahead.

Q    So —

MS. PSAKI:  And then we'll go — oh, I'm sorry.  Go ahead.  We'll go to you in the back.

Q    Thanks.

MS. PSAKI:  Go ahead.  Go ahead.  Sorry.

Q    Okay.  So, you haven't talked about APEC.  This was a —

MS. PSAKI:  Yeah.

Q    — conversation that the President had this morning.

MS. PSAKI:  No one has asked about it.  Now is the moment.  (Laughter.)

Q    I'm asking right now.  And so there seems to be a convergence between President Biden, President Xi, and also President Putin in terms of making and sharing and distributing vaccines.

My question is the mechanism of it.  We know that APEC supports the TRIPS waiver, as does President Biden.  Was there pressure from APEC member countries to have the U.S. put more diplomatic pressures on WTO countries to pass the patent waivers?

MS. PSAKI:  Well, first, I would say the President's view continues to be exactly as you laid it out there.  This is a long-going — ongoing process.  And Ambassador Tai is our lead representative in these discussions and negotiations.  The APEC summit, for any of you who watched parts of it, was virtual and was individuals delivering sets of remarks.

It wasn't an interactive opportunity, I would say, and President Xi actually delivered prerecorded remarks, so he wasn't even there participating in person.

Q   And just to follow up on the health misinformation —

MS. PSAKI:  Or on virtually live, I should say.  Yes.

Q   Following up on the health misinformation, do you consider claims by some in the conservative circles that ivermectin — am I pronouncing that right? — as a promising treatment for COVID as misinformation?  I know that the FDA has weighed in on this — I believe in March — but I just wanted the administration's latest position on the drug.

MS. PSAKI:  Information that's inaccurate we consider misinformation.  So I don't think it's more complicated than that.

Go ahead.

Q   (Cross-talk.)

MS. PSAKI:  Go — oh, oh.  Let Ebony go.

Q   (Cross-talk.)

Q   Did you all delay the departure?

Q   (Cross-talk.)

MS. PSAKI:  Did we what?

Q   Have you all delayed the departure?

Q   Yeah, we were supposed to gather at 2:10, but I was told hard out at 2:15.

Q   Yeah, we were supposed to gather.  I'm just making sure that —

MS. PSAKI:  Oh, okay.

Q   Yeah.

MS. PSAKI:  Brian, thank you.  You get an internship or something, I don't know.

We — we have four more minutes left.  So we'll get to as many as we can.

Q   (Cross-talk.)

MS. PSAKI:  Go ahead, Ebony.  Go ahead.  And then we'll go —

Q   (Cross-talk.)

Q   The women that are meeting with the Vice President today, most of which have basically said that they want the President to really talk about the filibuster — removing it or reforming the filibuster.  And so, with each of the meetings that they're having, still coming out wondering, what is the hope that's going to happen?  Because just about every single woman that is in that room has spoken about it.  That's my first — my first question.

And even though you also said that there isn't a plan right now for the President to go to Arizona or to go to other states,  why isn't there, right now, that kind of plan?  Because they have come out and said that they put — the administration has put a lot on them, but they're waiting to see something back.

MS. PSAKI:  Well, I've laid out for you what we know about our schedule, which is through next Wednesday.  So it doesn't mean that he's not going to go out in the country and talk about a range of important priorities in the future.  And I don't want you to take it that way.  That was not what I was implying.

But we're — we're about — we have about four days out here, in terms of our scheduling, that I can provide to all of you.

As it relates to the women who are in this room, let's see; maybe they'll go to the stakeout and they'll talk about their meeting and their engagement.  And the message that the President is sending, the Vice President is sending is that we're absolutely committed to getting the For the People Act signed into law; that we're committed to advocating for, to elevating voting rights — is an important issue for people across this country.  And I think our actions clearly exemplify that.

Go ahead.

Q   Quickly, a clarifying question —

MS. PSAKI:  Yeah.

Q   — on how you identify this misinformation.  I'm wondering if you could tell us specifically how the administration identifies what is misinformation and how you flag it to Facebook?

That's one.

Two is: How many times had the administration flagged this kind of information?

And then three, how long has this been going?

And then, finally, I know that you are deadly serious about this conversation.  You talked about how this is life and death.  But are there any types of safeguards that the administration is putting in place to make certain that they do not chill free speech while they are going after this kind of misinformation?

MS. PSAKI:  First of all, to be crystal clear: Any decision about platform usage and who should be on the platform is orchestrated and determined by private-sector companies.  Facebook is one of them, right?  And there are a range of media who are — also have their own criteria and rules in place, and they implement them.  And that's their decision to do.  That is not the federal government doing that.

It is life and death.  It is a public health issue in the country.  That's why the Surgeon General was here talking about it yesterday.

There are trends, we can see, any — you can all probably see on Facebook and other social media platforms.  And so what we raise are issues like: there is a lot of information out there about — about the false claim that COVID-19 causes infertility.  Everyone in this room knows that's factually inaccurate.  We raised for them, in our direct channels — of which every administration has always had with every social media platform — that we are seeing this trend.  It's troubling.  That information is inaccurate.

Q   But specifically, so you're not going after — you're saying these are general areas of misinformation that you should take a look at —

MS. PSAKI:  Yeah.

Q   — and not specific posts.

MS. PSAKI:  Yes, it is also publicly available who the individuals are who have — who have spread most of the information.  It wasn't publicly available by the United States government.  It's publicly available information.  So that's how it works.

Q   (Cross-talk.)

MS. PSAKI:  Okay, thank you, everyone.  I've got to wrap it up.  I'm sorry.

2:17 P.M. EDT

# DEFENDANTS' EXHIBIT 38:

 Centers for Disease Control and Prevention

Español (Spanish)

## COVID Data Tracker

Maps, charts, and data provided by CDC, updates Mon-Fri by 8 pm ET

COVID-19 Home ›

 As of April 1st, 2023, the state of Iowa no longer reports aggregate COVID-19 case or death data to CDC. As a result, aggregate counts from Iowa will no longer be reported at the national, regional, state or county-levels on COVID Data Tracker or data.cdc.gov. For additional information, please see the press release published by the Iowa Department of Health and Human Services.

 CDC recommends use of COVID-19 Community Levels to determine the impact of COVID-19 on communities and to take action. CDC also provides Transmission Levels (also known as Community Transmission) to describe the amount of COVID-19 spread within each county. Healthcare facilities use Transmission Levels to determine infection control interventions.

### United States at a Glance

Collapse —

**United States**
At a Glance

**Cases** Total        104,538,730

Case Trends

**Deaths** Total       1,130,662

Death Trends

**Current Hosp.**      9,167

Admission Trends

**16.8% of People with**
Updated Booster Dose

---

< Back to Cases, Deaths, & Testing

## Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory

Reported to the CDC by State or Territory; Maps, charts, and data provided by CDC, updates Mon-Fri by 8 pm ET[†]

View Footnotes and Download Data

Data Tracker Home

Cases, Deaths, & Testing

Case & Death Demographic Trends

Vaccination Distribution & Coverage

Vaccine Effectiveness & Breakthrough Surveillance

Health Equity

Pediatric

Pregnancy

People at Increased Risk

Wastewater Surveillance

**Select a state or territory:**          **View (left axis):**

The United States ⌄                       Weekly Deaths ⌄

**View (right axis):**

select one ⌄

The blue bars show weekly deaths.

Weekly Trends in Number of COVID-19 Deaths in The United States Reported to CDC

Health Care Settings

Social Impact & Prevention

Variants & Genomic Surveillance

Antibody Seroprevalence

Post-COVID Conditions

Traveler-Based Genomic Surveillance

Other COVID-19 Data

Communications Resources

COVID-19 Home

✉ Get Email Updates

Sign up to receive the COVID Data Tracker Weekly Review.

Email Address:

Email Address

What's this?        Submit



Download Chart

## Data Downloads and Footnotes

Expand each accordion to view data table and download data

Data Table for Weekly Death Trends - The United States                    −

CDC | Data as of  Friday April 28  2023 3 04 PM ET. Posted  Friday April 28  2023 4 28 PM ET

Download Data ⬇

| Geography ⇅ | Date ⇅ | Weekly Deaths ⇅ | New Historic Deaths ⇅ |
|---|---|---|---|
| United States | Apr 26, 2023 | 1,052 | 0 |
| United States | Apr 19, 2023 | 1,246 | 0 |
| United States | Apr 12, 2023 | 1,307 | 0 |
| United States | Apr 5, 2023 | 1,761 | 0 |
| United States | Mar 29, 2023 | 1,520 | 0 |
| United States | Mar 22, 2023 | 2,238 | 0 |
| United States | Mar 15, 2023 | 1,815 | 0 |
| United States | Mar 8, 2023 | 2,083 | 0 |
| United States | Mar 1, 2023 | 2,198 | 0 |
| United States | Feb 22, 2023 | 2,317 | 0 |
| United States | Feb 15, 2023 | 2,763 | 62 |
| United States | Feb 8, 2023 | 3,066 | 299 |
| United States | Feb 1, 2023 | 3,480 | -17 |
| United States | Jan 25, 2023 | 3,766 | 0 |
| United States | Jan 18, 2023 | 3,857 | 0 |
| United States | Jan 11, 2023 | 4,109 | 0 |
| United States | Jan 4, 2023 | 2,845 | 0 |
| United States | Dec 28, 2022 | 2,537 | 0 |
| United States | Dec 21, 2022 | 3,069 | 0 |
| United States | Dec 14, 2022 | 2,698 | 0 |
| United States | Dec 7, 2022 | 2,813 | 273 |
| United States | Nov 30, 2022 | 1,814 | 0 |
| United States | Nov 23, 2022 | 2,657 | 0 |
| United States | Nov 16, 2022 | 2,223 | 0 |
| United States | Nov 9, 2022 | 2,298 | 5 |
| United States | Nov 2, 2022 | 2,482 | 6 |
| United States | Oct 26, 2022 | 2,561 | 557 |
| United States | Oct 19, 2022 | 2,528 | 0 |
| United States | Oct 12, 2022 | 2,503 | 0 |
| United States | Oct 5, 2022 | 2,999 | 0 |

| Geography | Date | Weekly Deaths | New Historic Deaths |
|---|---|---|---|
| United States | Sep 28, 2022 | 2,881 | 469 |
| United States | Sep 21, 2022 | 3,158 | 0 |
| United States | Sep 14, 2022 | 3,157 | 0 |
| United States | Sep 7, 2022 | 2,885 | 0 |
| United States | Aug 31, 2022 | 3,791 | 0 |
| United States | Aug 24, 2022 | 3,126 | 0 |
| United States | Aug 17, 2022 | 3,261 | 0 |
| United States | Aug 10, 2022 | 3,377 | 0 |
| United States | Aug 3, 2022 | 3,369 | 0 |
| United States | Jul 27, 2022 | 3,082 | 0 |
| United States | Jul 20, 2022 | 2,924 | 0 |
| United States | Jul 13, 2022 | 2,755 | 0 |
| United States | Jul 6, 2022 | 2,405 | 0 |
| United States | Jun 29, 2022 | 2,648 | 0 |
| United States | Jun 22, 2022 | 2,075 | 0 |
| United States | Jun 15, 2022 | 2,187 | 0 |
| United States | Jun 8, 2022 | 2,216 | 0 |
| United States | Jun 1, 2022 | 1,896 | 0 |
| United States | May 25, 2022 | 2,511 | 0 |
| United States | May 18, 2022 | 2,122 | 0 |
| United States | May 11, 2022 | 2,157 | 0 |
| United States | May 4, 2022 | 2,427 | 0 |
| United States | Apr 27, 2022 | 2,676 | 0 |
| United States | Apr 20, 2022 | 2,716 | 0 |
| United States | Apr 13, 2022 | 3,452 | 0 |
| United States | Apr 6, 2022 | 3,709 | 0 |
| United States | Mar 30, 2022 | 4,641 | 0 |
| United States | Mar 23, 2022 | 5,727 | 0 |
| United States | Mar 16, 2022 | 7,821 | 0 |
| United States | Mar 9, 2022 | 9,092 | 0 |
| United States | Mar 2, 2022 | 10,423 | 0 |
| United States | Feb 23, 2022 | 12,817 | 0 |
| United States | Feb 16, 2022 | 15,209 | 0 |
| United States | Feb 9, 2022 | 16,412 | 0 |
| United States | Feb 2, 2022 | 17,480 | 0 |
| United States | Jan 26, 2022 | 17,405 | 0 |
| United States | Jan 19, 2022 | 14,431 | 0 |
| United States | Jan 12, 2022 | 13,227 | 0 |
| United States | Jan 5, 2022 | 9,446 | 0 |
| United States | Dec 29, 2021 | 9,916 | 0 |
| United States | Dec 22, 2021 | 11,651 | 0 |
| United States | Dec 15, 2021 | 9,565 | 0 |
| United States | Dec 8, 2021 | 8,816 | 0 |
| United States | Dec 1, 2021 | 7,250 | 0 |
| United States | Nov 24, 2021 | 8,089 | 0 |
| United States | Nov 17, 2021 | 7,498 | 0 |
| United States | Nov 10, 2021 | 8,254 | 0 |
| United States | Nov 3, 2021 | 8,569 | 0 |
| United States | Oct 27, 2021 | 9,693 | 0 |
| United States | Oct 20, 2021 | 12,055 | 0 |
| United States | Oct 13, 2021 | 11,415 | 0 |
| United States | Oct 6, 2021 | 12,846 | 0 |
| United States | Sep 29, 2021 | 14,199 | 0 |
| United States | Sep 22, 2021 | 14,577 | 0 |
| United States | Sep 15, 2021 | 14,085 | 0 |

| Geography | Date | Weekly Deaths | New Historic Deaths |
|---|---|---|---|
| United States | Sep 8, 2021 | 11,124 | 0 |
| United States | Sep 1, 2021 | 10,386 | 0 |
| United States | Aug 25, 2021 | 8,030 | 0 |
| United States | Aug 18, 2021 | 6,359 | 0 |
| United States | Aug 11, 2021 | 4,975 | 0 |
| United States | Aug 4, 2021 | 3,136 | 0 |
| United States | Jul 28, 2021 | 2,428 | 0 |
| United States | Jul 21, 2021 | 2,051 | 0 |
| United States | Jul 14, 2021 | 1,948 | 0 |
| United States | Jul 7, 2021 | 1,699 | 0 |
| United States | Jun 30, 2021 | 1,942 | 0 |
| United States | Jun 23, 2021 | 2,095 | 0 |
| United States | Jun 16, 2021 | 2,359 | 0 |
| United States | Jun 9, 2021 | 2,745 | 0 |
| United States | Jun 2, 2021 | 3,633 | 0 |
| United States | May 26, 2021 | 3,899 | 0 |
| United States | May 19, 2021 | 3,907 | 0 |
| United States | May 12, 2021 | 4,281 | 0 |
| United States | May 5, 2021 | 4,837 | 0 |
| United States | Apr 28, 2021 | 4,877 | 0 |
| United States | Apr 21, 2021 | 4,933 | 0 |
| United States | Apr 14, 2021 | 5,057 | 0 |
| United States | Apr 7, 2021 | 6,997 | 0 |
| United States | Mar 31, 2021 | 6,144 | 0 |
| United States | Mar 24, 2021 | 7,027 | 0 |
| United States | Mar 17, 2021 | 7,486 | 0 |
| United States | Mar 10, 2021 | 9,668 | 0 |
| United States | Mar 3, 2021 | 13,538 | 0 |
| United States | Feb 24, 2021 | 13,689 | 0 |
| United States | Feb 17, 2021 | 14,326 | 0 |
| United States | Feb 10, 2021 | 19,375 | 0 |
| United States | Feb 3, 2021 | 21,207 | 0 |
| United States | Jan 27, 2021 | 22,777 | 0 |
| United States | Jan 20, 2021 | 21,675 | 0 |
| United States | Jan 13, 2021 | 23,629 | 0 |
| United States | Jan 6, 2021 | 19,611 | 0 |
| United States | Dec 30, 2020 | 17,454 | 0 |
| United States | Dec 23, 2020 | 19,631 | 0 |
| United States | Dec 16, 2020 | 18,853 | 0 |
| United States | Dec 9, 2020 | 16,879 | 0 |
| United States | Dec 2, 2020 | 12,952 | 0 |
| United States | Nov 25, 2020 | 12,895 | 0 |
| United States | Nov 18, 2020 | 9,886 | 0 |
| United States | Nov 11, 2020 | 8,444 | 0 |
| United States | Nov 4, 2020 | 7,220 | 0 |
| United States | Oct 28, 2020 | 6,166 | 0 |
| United States | Oct 21, 2020 | 5,886 | 0 |
| United States | Oct 14, 2020 | 5,260 | 0 |
| United States | Oct 7, 2020 | 5,085 | 0 |
| United States | Sep 30, 2020 | 5,212 | 0 |
| United States | Sep 23, 2020 | 5,424 | 0 |
| United States | Sep 16, 2020 | 5,882 | 0 |
| United States | Sep 9, 2020 | 5,219 | 0 |
| United States | Sep 2, 2020 | 6,134 | 0 |
| United States | Aug 26, 2020 | 6,649 | 0 |

| Geography | Date | Weekly Deaths | New Historic Deaths |
|---|---|---|---|
| United States | Aug 19, 2020 | 7,096 | 0 |
| United States | Aug 12, 2020 | 7,406 | 0 |
| United States | Aug 5, 2020 | 7,471 | 0 |
| United States | Jul 29, 2020 | 7,541 | 0 |
| United States | Jul 22, 2020 | 6,130 | 0 |
| United States | Jul 15, 2020 | 5,386 | 0 |
| United States | Jul 8, 2020 | 4,389 | 0 |
| United States | Jul 1, 2020 | 3,797 | 0 |
| United States | Jun 24, 2020 | 3,872 | 0 |
| United States | Jun 17, 2020 | 4,598 | 0 |
| United States | Jun 10, 2020 | 5,143 | 0 |
| United States | Jun 3, 2020 | 6,575 | 0 |
| United States | May 27, 2020 | 6,922 | 0 |
| United States | May 20, 2020 | 9,561 | 0 |
| United States | May 13, 2020 | 10,488 | 0 |
| United States | May 6, 2020 | 12,888 | 0 |
| United States | Apr 29, 2020 | 13,986 | 0 |
| United States | Apr 22, 2020 | 15,563 | 0 |
| United States | Apr 15, 2020 | 16,850 | 0 |
| United States | Apr 8, 2020 | 12,724 | 0 |
| United States | Apr 1, 2020 | 5,277 | 0 |
| United States | Mar 25, 2020 | 1,185 | 0 |
| United States | Mar 18, 2020 | 269 | 0 |
| United States | Mar 11, 2020 | 22 | 0 |
| United States | Mar 4, 2020 | 9 | 0 |
| United States | Feb 26, 2020 | 0 | 0 |
| United States | Feb 19, 2020 | 0 | 0 |
| United States | Feb 12, 2020 | 0 | 0 |
| United States | Feb 5, 2020 | 0 | 0 |
| United States | Jan 29, 2020 | 0 | 0 |

The CDC's new COVID Data Tracker Weekly Review helps you stay up-to-date on the pandemic with weekly visualizations, analyses, and interpretations of key data and trends.

## Where can I see the number of deaths from death certificate

Death certificate data are reported directly to CDC's National Center for Health Statistics by state vital record offices as part of the National Vital Statistics System (NVSS). You can use NVSS data to look at trends in total deaths, COVID-19

## How many COVID-19 cases are there in your county?

View and Download COVID-19 Case Surveillance Public Use Data with Geography

### Cite COVID Data Tracker

Centers for Disease Control and Prevention. COVID Data Tracker. Atlanta, GA: US Department of Health and Human Services, CDC; 2023, April 30. https://covid.cdc.gov/covid-data-tracker

### COVID-19 Home >

All COVID-19 topics including prevention, travel, work, and school

HAVE QUESTIONS?

Visit CDC-INFO

Call 800-232-4636

Email CDC-INFO

Open 24/7

CDC INFORMATION
About CDC

Jobs
Funding
Policies
File Viewers & Players

Privacy
FOIA
No Fear Act
OIG
Nondiscrimination
Accessibility

**CONNECT WITH CDC**

     

U.S. Department of Health & Human Services
USA.gov
CDC Website Exit Disclaimer

# DEFENDANTS' EXHIBIT 39:

POLITICO

**WHITE HOUSE**

## Andy Slavitt stepping down from White House Covid-19 response role

Slavitt announced Tuesday that Wednesday would be his last day.



Salvitt's tenure with the Biden administration was planned as short-term. | Andrew Harnik/AP Photo

By MAEVE SHEEHEY
06/09/2021 01:14 PM EDT

   

Andy Slavitt stepped down from President Joe Biden's Covid-19 response team on Wednesday, ending his run as a senior adviser to the White House's pandemic response team amid a vaccination campaign that has slowed in recent weeks.

Salvitt's tenure with the Biden administration was planned as short-term. The senior adviser announced on Tuesday that Wednesday would be his last day at the White House.

Advertisement

"It has been an honor to serve the public as part of President Biden's COVID response team these past 4 months," Slavitt said in a Tweet on Wednesday. "As planned, I'm returning to my family today. The nation is in great hands to meet the challenges ahead," he added.

Biden assumed office last January amid surging Covid numbers nationwide, taking over the country's pandemic response from President Donald Trump, whose handling of the coronavirus was rocky and veered often into the dangerous and bizarre. But while Biden's presidential campaign and administration have been generally critical of Trump's pandemic response, Slavitt credited the former president's team earlier this year for its quick work on vaccine development.

There were over 185,000 new Covid-19 cases reported in the U.S. on Biden's first day in office, on Jan. 20. This Tuesday, those figures were closer to 15,000. Biden's Covid-19 response has focused on getting Americans vaccinated, with a goal for 70 percent of adults in the country to be vaccinated by July 4. The Biden administration also emphasized mask-wearing early in his term, a sharp break with Trump, who rarely wore a mask in public and was uneven in his promotion of them as a mitigation tool.

Before serving on the Biden Covid-19 response team, Slavitt spent time as the acting administrator of the Centers for Medicare and Medicaid Services from 2015 to 2017.

**FILED UNDER:** JOE BIDEN, JOE BIDEN 2020, CORONAVIRUS

📢 We have a new app. Download the upgraded version for **iOS** or **Android**.

**MOST READ**



**1  MEDIA**

**Broadcast bloodbath: Tucker Carlson, Don Lemon are out in major media shake-up**



**2  MEDIA**

**Lawmakers are worked up about Tucker Carlson's exit from Fox News**



**3  CONGRESS**

**Debt-limit plan won't be changed, House GOP leaders tell holdouts**

‹       ›

## Playbook

The unofficial guide to official Washington.

**EMAIL**

Your Email

**INDUSTRY**

Select Industry ▾

SIGN UP

By signing up you agree to allow POLITICO to collect your user information and use it to better recommend content to you, send you email newsletters or updates from POLITICO, and share insights based on aggregated user information. You further agree to our **privacy policy** and **terms of service.** You can unsubscribe at any time and can **contact us here.** This site is protected by reCAPTCHA and the Google **Privacy Policy** and **Terms of Service** apply.

Advertisement

⭕ **NEWS ABOUT PRESIDENT BIDEN**



**How Biden's campaign video triggered the timeline**



**5 things to know about Biden campaign manager Julie Chávez Rodríguez**



**This is who's running Joe Biden's campaign**



**Biden dives back in, announces reelection bid**

Advertisement

SPONSORED CONTENT

Recommended by Outbrain

**7 of the Worst Retirement Mistakes You Can Make**
SmartAsset

**Thousands of Americans are ditching gmail for this new…**
Proton Mail

**Google Chrome Users Can Now Block All Ads (Do it Now For Free!)**
Safe Tech Tips

**[Gallery] It's No Secret Why Melania Trump Isn't Around Anymore**
DailyChoices

**Join the thousands of other humans quitting kibble**
The Farmer's Dog





© 2023 POLITICO LLC

# DEFENDANTS' EXHIBIT 40:

# Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy, July 15, 2021

James S. Brady Press Briefing Room

1:05 P.M. EDT

MS. PSAKI: Hi, everyone. We have another special guest today. Doesn't sing as well as our guest from yesterday — (laughter) — but very knowledgeable.

SURGEON GENERAL MURTHY: Definitely don't ask me to sing.

MS. PSAKI: (Laughs.) Today, we have a special guest, Surgeon General Vivek Murthy. The Surgeon General has been one of our leading voices on public health in the administration, in particular around the COVID-19 response.

Today, he published an advisory on health misinformation as an urgent public health crisis, and he is here to talk more about this issue and take a few of your questions.

With that, I will turn it over.

SURGEON GENERAL MURTHY: Hello, everyone. How are you?

Q  Good, thank you.

SURGEON GENERAL MURTHY: It's nice to see you all today. And thank you, Jen, for that very kind introduction.

As all of you know, we've come a long way in our fight against COVID-19, and we've come a long way thanks to the efforts of many, many people across communities in the United States.

But right now, we are seeing COVID deaths markedly down from their peak in January. We have 160 million people who have been fully vaccinated. And hundreds of thousands of people

each day are choosing to get vaccinated. That is all good news.

But we are not out of the woods yet. Millions of Americans are still not protected against COVID-19, and we are seeing more infections among those who are unvaccinated. And that's why I want to talk to you today about one of the biggest obstacles that's preventing us from ending this pandemic.

Today, I issued a Surgeon General's Advisory on the dangers of health misinformation. Surgeon General Advisories are reserved for urgent public health threats. And while those threats have often been related to what we eat, drink, and smoke, today we live in a world where misinformation poses an imminent and insidious threat to our nation's health.

Health misinformation is false, inaccurate, or misleading information about health, according to the best evidence at the time. And while it often appears innocuous on social media apps and retail sites or search engines, the truth is that misinformation takes away our freedom to make informed decisions about our health and the health of our loved ones.

During the COVID-19 pandemic, health misinformation has led people to resist wearing masks in high-risk settings. It's led them to turn down proven treatments and to choose not to get vaccinated. This has led to avoidable illnesses and death. Simply put, health [mis]information has cost us lives.

Now, health misinformation didn't start with COVID-19. What's different now though is the speed and scale at which health misinformation is spreading. Modern technology companies have enabled misinformation to poison our information environment with little accountability to their users. They've allowed people who intentionally spread misinformation — what we call "disinformation" — to have extraordinary reach.

They've designed product features, such as "Like" buttons, that reward us for sharing emotionally-charged content, not accurate content. And their algorithms tend to give us more of what we click on, pulling us deeper and deeper into a well of misinformation.

Now, we need an all-of-society approach to fight misinformation. And that's why this advisory that I issued today has recommendations for everyone.

First, we include recommendations for individuals and families. We ask people to raise the bar for sharing health information by checking sources before they share, to ensure that information is backed by credible, scientific sources. As we say in the advisory, "If you're not

sure, don't share."

Second, we're asking health organizations to proactively address misinformation with their patients. Today, the American Academy of Pediatrics is announcing an educational campaign to help parents navigate online health information. I'm encouraged to see this commitment. And, again, this is just the beginning.

Third, we're asking educational institutions to help improve health information literacy.

We're asking researchers and foundations as well to help us learn more about how health [mis]information spreads and how to stop it.

Today, the Rockefeller Foundation is announcing a $13.5 million commitment to counter health misinformation. The Digital Public Library of America is announcing that they will convene a set of librarians, scholars, journalists, and civic leaders to confront health misinformation together.

Fourth, we're saying we expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms.

Fifth, we're also asking news organizations to proactively address the public's questions without inadvertently giving a platform to health misinformation that can harm their audiences.

And sixth, we know that government can play an important role too by investing in research, by bringing individuals and organizations together to address misinformation, and by supporting groups that are working on this issue.

On a personal note, it's painful for me to know that nearly every death we are seeing now from COVID-19 could have been prevented. I say that as someone who has lost 10 family members to COVID and who wishes each and every day that they had had the opportunity to get vaccinated.

I say that also as a concerned father of two young children who aren't yet eligible for the vaccine, but I know that our kids are depending on all of us to get vaccinated to shield them from this virus.

Every week, I talk to doctors and nurses across our country who are burning out as they care for more and more patients with COVID-19 who never got vaccinated — all too often because they were misled by misinformation.

We must confront misinformation as a nation. Every one of us has the power and the responsibility to make a difference in this fight. Lives are depending on it.

You can read the full advisory at SurgeonGeneral.gov/HealthMisinformation.

And I hope that you will see it as I do — as a starting point from which we can build a healthier information environment, safeguard our nation against future threats, and ultimately, empower people to lead healthier lives.

Thanks so much for your time. And I'll turn it to Jen.

MS. PSAKI: Andrea.

Q  Andrea Shalal with Reuters. I wanted to ask you whether you see any evidence at all that the misinformation or disinformation that you're seeing comes from any nefarious sources. Are you seeing some structures behind the scenes that point to who or what might be behind them? We've seen Russian disinformation in the past. We've seen, kind of, that hybrid warfare. Are you seeing any indication that there could be nation states behind this disinformation?

SURGEON GENERAL MURTHY: Well, Andrea, thank you for the question. The misinformation that we're seeing comes from multiple sources. Yes, there is disinformation that is coming from bad actors. But what is also important to point out is that much of the misinformation that is circulating online is often coming from individuals who don't have bad intentions, but who are unintentionally sharing information that they think might be helpful.

And that's why, in this advisory, we make it very clear that among the things we're asking individuals to do is to pause before they share, to check sources. And if they're not sure if a source is credible, to not share. You know, one of the things we have said, again, is that when it comes to misinformation, not sharing is caring — unlike what many of our moms taught us earlier in life. (Laughter.)

MS. PSAKI: Go ahead, Kaitlan.

Q  Thank you very much. Surgeon General, is misinformation the number one reason why people are not getting vaccinated?

SURGEON GENERAL MURTHY: Well, Kaitlan, it's one of several reasons why people are not getting vaccinated, but it's a very important one because what we know from polls, Kaitlan, is that two thirds of people who are not vaccinated either believe common myths about the COVID-19 vaccine or think some of those myths might be true. Myths like, "You can get COVID from the vaccine," which is absolutely not true. So we know that it's not the only driver that's leading people not to be vaccinated, but it is a very important one.

Q  And do you personally believe that public figures and public companies that are helping spread misinformation about the vaccine should be held accountable?

SURGEON GENERAL MURTHY: Well, I think in a moment like this when we see misinformation literally costing us our loved ones, costing us lives, all of us have to ask: How we can be more accountable and responsible for the information that we share?

And those of us who may have larger platforms, I think bear a greater responsibility to think about that. But the bottom line is all of us have an important role here to play, and technology companies have a particularly important role.

We know that the dramatic increase in the speed — speed and scale of spreading misinformation has, in part, been enabled by these platforms. So that's why in this advisory today, we are asking them to step up. We know they have taken some steps to address misinformation, but much, much more has to be done. And we can't wait longer for them to take aggressive action because it's costing people their lives.

MS. PSAKI: Go ahead in the middle, and then Rachel. And then, unfortunately, he has to go. Go ahead.

Q  So, the reality is a lot of the health misinformation you were citing came from this lectern last year. I mean, what do you think the best approach is to counter or deal with misinformation that comes from public officials — people in position of authority?

SURGEON GENERAL MURTHY: Well, what I would say is that when it comes to determining what is accurate, in terms of health information, science has to guide us. And the good news is that we have credible science individuals in our country. We have doctors and nurses in communities. We have public health departments and the CDC. We have medical schools,

nursing schools, and healthcare institutions.

These should be our sources of credibility when it comes to evaluating whether information is true or not. I think one of the greatest roles that public leaders can play is to point to scientists and to credible sources and have them speak directly to the public.

I'll note for you that that's one thing that this administration has done is work hard to put science, scientists, and healthcare professionals in front of cameras to — having to speak directly to the public. That's what we have to do more of.

The problem right now is that the voices of these credible health professionals are getting drowned out, and that's one of the reasons we are asking technology companies to help lift up the voices of credible health authorities. It's also why they have to do more to reduce the misinformation that's out there so that the true voices of experts can shine through.

MS. PSAKI: Go ahead, Rachel.

Q  Thank you so much for taking my question. So are there specific elected leaders that you believe are part of the problem with pushing this misinformation?

And we had an ABC News-Washington Post poll that showed that 93 percent of Democrats say they're vaccinated or will be vaccinated, but only 49 percent of Republicans say the same. So, how do you break through to the people who may be trusting some of these elected leaders that are pushing, maybe, some of this misinformation more than they actually trust members of your administration?

SURGEON GENERAL MURTHY: Well, thanks, Rachel. You know, I think about this as I — as I think about doctoring, and as I think about my approach to patients, which is: I recognize that each patient that I was blessed to care for is an individual, you know, regardless of what their political affiliation or their past may be. They're an individual and I — my goal was to understand what their needs and desires were, what their values were, and then to help them improve their health.

We have to take a similar approach here when it comes to reaching people with information about COVID-19 and the vaccine. We've got to recognize that sometimes the most trusted voices are not the ones that had the most followers on social media or are the ones that have the most, you know, name recognition. Sometimes the most trusted sources are a mother or father or a faith leader or a local doctor or a nurse, and that's why, to reach people with

accurate information, what we have to do is partner with those local trusted voices.

That's why, in this advisory, one of the things that we point out an important role for government is to support local organizations, including healthcare professionals, so that they can get out there and speak directly to people and share that information.

These public health efforts move at the speed of trust, and we have to recognize where trust is — you know, where those relationships are — invest in them, support them, so that people can ultimately get the information they need to improve their health.

MS. PSAKI: Thank you so much for joining us.

Q  Jen, I have a follow-up for —

MS. PSAKI: Thank you.

Q  — the Surgeon General on —

MS. PSAKI: I think he has to go, unfortunately. Thank you so much.

SURGEON GENERAL MURTHY: Thank you so much, Jen. Thanks, everyone.

MS. PSAKI: Okay, I think we're getting ready to start the briefing. I think everybody has a lot of questions. So why don't you —

Q  (Inaudible.) You never —

MS. PSAKI: We — we are going to proceed with the briefing, and then we're happy to take lots of questions in the room.

Okay. So, unemployment claims, which you all saw the data come out this morning — today's data on new unemployment claims is further proof that the President's economic plan is working.

Today marked another new pandemic low in initial unemployment claims — the lowest level since March of 2020. And the four-week average of new claims continued to decline, dropping to its lowest level in 16 months — down 55 percent since when President Biden took office.

This is evidence of the strengthening labor market we're seeing across the economy: Unemployment is down, wages are up, and three million new jobs have been created in five months — the fastest rate in U.S. history.

We just gave you a few headlines over here, just in case you haven't read all of your own coverage. (Laughter.)

And because of the President's Rescue Plan and his work curbing the pandemic, the United States is expected to return to full employment by next year instead of 2024, which was the projection when the President first took office.

Another piece of news today: We heard the President, of course, announce today that $15 billion in Child Tax Credit payments were distributed to tens of millions of families, covering 60 million children. Working families will receive these payments on the 15th of every single month for the next year thanks to the American Rescue Plan.

Eighty-six percent of American families will receive their payment by direct deposit. It will show up in their bank accounts as "Child CTC." Others will receive their check in the mail today or in the next few days.

And just as a reminder: The American Rescue Plan is providing the largest-ever Child Tax Credit. And this is a historic increase that will provide middle-class families with critical tax relief. And many project it will help cut the child poverty rate in half.

I have a little update for all of you on ransomware, as well as vaccines. And then we'll get to your questions.

In April, the President directed agencies to take aggressive action to counter the ransomware threat at home and abroad. We have coordinated these efforts, regularly convening an interagency task force that drives coordinated whole-of-government action to counter ransomware. Participation spans the whole government including law enforcement, the intelligence community, center risk management agencies, regulators, and other national security agencies.

Today, as a part of our ongoing ransomware efforts, the Department of Homeland Security, Department of Justice, Treasury, and State announced new resources and initiatives to protect American businesses and communities from ransomware attacks.

Those include: The Department of Homeland Security and the Department of Justice launched StopRansomware.gov, a coordinated, federal government, one-stop resource for public- and private-sector organizations to reduce their risk of ransomware attacks.

The Department of Treasury announced a FinCEN exchange on ransomware to discuss efforts by the public and private sectors to increase targeted information sharing and analysis, and pursue criminal actors and networks that engage in such attacks.

And the Department of State announced it will offer up to $10 million in rewards for information leading to the identification or location of any person engaged in state-sponsored, malicious cyber activities.

This is a part of our ongoing efforts and our ongoing work of our interagency process that is a new — a newer initiative in this administration.

Finally, last night, Haiti received 500,000 doses of COVID-19 Moderna vaccines donated by the United States through the COVAX facility. And we will send a significant amount of additional doses to Haiti soon, in consultation with local health authorities.

The embassy in Haiti has worked closely with Haitian health — the heal- — Haitian Health Ministry, Pan American Health Organization, and UNICEF to ensure that these vaccines arrive safely and securely, and that they are also distributed equitably and without interference to the people who need them most.

We remain, of course, a partner of the Haitian people in building a more stable and secure Haiti, including in its fight against COVID-19.

Go ahead, Alex.

Q  Thanks, Jen. Can you talk a little bit more about this request for tech companies to be more aggressive in policing misinformation? Has the administration been in touch with any of these companies and are there any actions that the federal government can take to ensure their cooperation, because we've seen, from the start, there's not a lot of action on some of these platforms.

MS. PSAKI: Sure. Well, first, we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team, given, as Dr. Murthy conveyed, this is a big issue of misinformation,

specifically on the pandemic.

In terms of actions, Alex, that we have taken — or we're working to take, I should say — from the federal government: We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation. We're working with doctors and medical professionals to connect — to connect medical experts with popular — with popular — who are popular with their audiences with — with accurate information and boost trusted content. So we're helping get trusted content out there.

We also created the COVID-19 — the COVID Community Corps to get factual information into the hands of local messengers, and we're also investing, as you all have seen in the President's, the Vice President's, and Dr. Fauci's time in meeting with influencers who also have large reaches to a lot of these target audiences who can spread and share accurate information.

You saw an example of that yesterday. I believe that video will be out Fri- — tomorrow. I think that was your question, Steve, yesterday; I did a full follow-up there.

There are also proposed changes that we have made to social media platforms, including Facebook, and those specifically are four key steps.

One, that they measure and publicly share the impact of misinformation on their platform. Facebook should provide, publicly and transparently, data on the reach of COVID-19 — COVID vaccine misinformation. Not just engagement, but the reach of the misinformation and the audience that it's reaching.

That will help us ensure we're getting accurate information to people. This should be provided not just to researchers, but to the public so that the public knows and understands what is accurate and inaccurate.

Second, that we have recommended — proposed that they create a robust enforcement strategy that bridges their properties and provides transparency about the rules. So, about — I think this was a question asked before — there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms. All of them remain active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns.

Third, it's important to take faster action against harmful posts. As you all know, information

travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly.

Finally, we have proposed they promote quality information sources in their feed algorithm. Facebook has repeatedly shown that they have the levers to promote quality information. We've seen them effectively do this in their algorithm over low-quality information and they've chosen not to use it in this case. And that's certainly an area that would have an impact.

So, these are certainly the proposals. We engage with them regularly and they certainly understand what our asks are.

Q  And then, one of the problems with vaccines right now is that they become politicized. You guys — the White House has obviously made the calculation that it's important to be more aggressive in confronting this information, but is there at all a concern that that could backfire and further contribute to politicization? And is there anything that you can do to prevent that at this point?

MS. PSAKI: Well, you're abs- — you're absolutely right, I should say, Alex, in that we have to be very careful and we are mindful of being quite careful of not politicizing the effectiveness of vaccines, the fact that they can save lives — young people, old people, middle-of-the-road people.

It's important for us — we've made a calculation to push back on misinformation. You're right. But that's one of the reasons, as Dr. Murthy was conveying, we have empowered, engaged, funded local voices, because they are often the most trusted voices — doctors, medical experts, clergy — you know, people who are members of — civic leaders in communities.

That's where we are putting most of our resources, even as we are working to combat misinformation that's traveling online or traveling, unfortunately, out of the mouth of elected officials from time to time.

Go ahead.

Q  Just want to follow up on the ransomware —

MS. PSAKI: Sure.

Q  — questions. So the President told us last week that there's this meeting tomorrow of the U.S.-Russian working group on ransomware. Can you say a little bit more about that meeting?

MS. PSAKI: I think it was actually yesterday.

Q  It was? Okay. And can you give us any kind of a further readout of what decisions were made, if any? Last week, the President also said that it made sense to potentially go after servers that were being used in these ransomware attacks. Has the administration made any decisions about whether to proceed with that kind of action?

MS. PSAKI: So I would say that the meeting, which I believe was yesterday — I will double confirm for you, Andrea, and for others — but, is part of ongoing engagement that has been occurring at the expert level since the President met with President Putin.

So it's been ongoing. No one meeting is necessarily decisive; it's about having a continued discussion about our expectations and steps that need to be taken to address ransomware attacks, cyberattacks, and what the capacities are on information of course that we have.

In terms of specific actions, the President, of course, reserves the right and the option to respond in a time and a manner of his choosing should he believe actions warrant. But I'm not going to preview that from the podium today or probably any day.

Go ahead.

Q  So a senior administration official had told us in the aftermath of that conversation that we should expect action within days and weeks, and some of it would be visible, some of it would not be visible. I understand you can't share a lot of information, but can you say whether any action has in fact been taken that perhaps is not visible to us?

MS. PSAKI: There's nothing more I can preview or detail for you from here. I certainly understand the interest.

Go ahead.

Q  The President has designated $10 billion for testing in schools, but we've seen some states, like Idaho and Iowa — they say they don't even want the money. So is that a mistake? And who should be held responsible if children in those schools get sick?

MS. PSAKI: Well, certainly, we've always said from the beginning that local school districts are going to make decisions about how to use the funding and resources available, but also how they're going to apply the mitigation measures that have been laid out by the CDC. And certainly we would expect that members of their local community, parents, others who care about the health and wellbeing of their children would voice their concern if they have it. But it's always worked that way in terms of local school districts implementing policies.

The role of the CDC is to provide public health information. Our role from the federal government was to secure funding to ensure schools that need resources — they don't all need resources — but have access to those funds should they need it. Many have used it, many have applied it, and many schools will be opening as a result of that funding.

Q  Is there a concern, though, about not being able to even track an outbreak if there is one because of the lack of testing, possibly?

MS. PSAKI: Well, we certainly — the CDC certainly does track where there is a rise in cases. As you see, they put out publicly available data. I expect they would continue to do that. But I would point you to them for more information on how they would track.

Q  Can I just ask one quick follow-up on inflation: We heard from the Fed Chair, Jerome Powell; he's testifying on Capitol Hill this week. He noted that inflation has notably increased but he believes that it will remain elevated in the coming months before moderating.

We've heard from Republicans who say the administration is sort of flooding the economy with cash. Even Democrats like Senator Joe Manchin — I talked to him yesterday — he says that he has concerns about inflation. Is the White House underestimating the impact of all of this government spending that it will have on inflation?

MS. PSAKI: Well, our experts believe — and the data shows and the Federal Reserve Chair, who operates independently, conveyed, yesterday — that most of the price increases we are seeing are expected to be temporary due to the consequences of restarting an economy shut down during the pandemic. And we're seeing that in certain industries more than others as prices go back to where they were pre-pandemic. And that certainly was an ex- — we had an expectation that would be an impact.

So areas like spike in car prices due to supply chain challenges on the — on the restart or a spike in hotel room costs as the hospitality industry gets going — these are — a number of these

are transitory or they're impacted by other factors, including supply chain issues, which we're working with Democrats and Republicans to help address through the CHIPS legislation.

But I want to be clear: We take — we understand the threat that inflation poses. We will be vigilant as responses are needed — are needed.

As it relates to legislation: We're continuing to advocate for the way to keep prices in our economy down is to increase the supply of goods that consumers want to buy and keep the costs of producing and getting them to market lower. That's exactly what the President's Bipartisan Infrastructure Framework and the Build Back Better plans will do.

And I would also remind you all, it's an eight-year investment in better roads, bridges, and transit systems. So this is not an immediate influx in the next few months of funding; it's over the course of several years because this is a long-term issue.

And it will also — if, as we — as we work to pass the Build Back Better reconciliation package, increase the availability of childcare, more workers will enter the workforce, increasing our output, and helping to keep prices down.

So we are quite mindful of it. We do monitor it. I would also note the Federal Reserve, who's independent, has also projected that the inflation numbers will come down to about 2.2 next year from where they're projecting for this year, which is something we also watch closely.

Q  Can I follow up on that, Jen?

MS. PSAKI: Go ahead, Kaitlan.

Q  Is the —

MS. PSAKI: Go ahead, Kaitlan.

Q  Are you confident that the government is going to be able to find the parents who qualify for the Child Tax Credit but are outside of the tax system?

MS. PSAKI: Well, we have a — as you've seen as we've implemented a number of our programs to date, we have a means — a number of means of trying to identify individuals who are eligible for these programs. Some of it is by promotion in communities for individuals who may not have had to pay taxes or may not be in the system.

And certainly we will be vigilant and do everything we can to reach every single person who's eligible, get out the word to communities that they are — that they are maybe people who are eligible, even if they don't make enough money to pay taxes.

Q  So what are the other avenues, specifically, that you're using to find these parents?

MS. PSAKI: Well, I think you've seen us use a number of avenues in the past few months where there were not individuals — as it related to our $1,400 checks that we put out just a few months ago. We put out a website where people could go if they had not paid taxes because they did not make enough money to pay taxes.

We also, of course, work with local communities to get out and make sure — get the word out and make sure people know they are eligible. Again, I would think — I think that, starting today, the vast majority — vast, vast majority of people who are eligible, of course, will get their checks direct — through direct deposit and through direct checks. So, we're talking about a small percentage of individuals who we would be looking to find. And, of course, we will be vigilant about doing everything we can to find them.

Q  And one follow-up on that: Will the President accept a spending bill that does not extend the tax credit for four years like he wants?

MS. PSAKI: Well, there's —

Q  (Inaudible.)

MS. PSAKI: There are a range of details I know you are all eager to see and to have, and there's been reporting about it. We will certainly leave it to Leader Schumer and Democrats on the Hill to put out all of the specific details.

But the President certainly understands that there could be changes, even to his original proposal and even from here as the final negotiations continue.

Q  So, he would accept that? Sorry.

MS. PSAKI: I'm not going to negotiate from here, Kaitlan, but we'll look to see what the final package looks like.

The President has advocated for an extension of the Child Tax Credit because he thinks it is a benefit that helps working families. That's why he's proposed it in multiple packages, and we'll look to see the final details.

Go ahead, Weijia.

Q  Thank you, Jen. I know you said this is moving, but some Democrats have expressed they believe the Child Tax Credit should be permanent. Does President Biden agree with that or does he think the four-year extension is adequate?

MS. PSAKI: Well, as you know, Weijia, he put in his proposal a five-year extension. He certainly understands that there was going to be — and there was — a range of views. Some wanted it shorter. Some wanted it longer. Some didn't want it at all. That's part of the negotiations and the discussion.

I think one of the calculations here that senators and Congress have to work through is what components can be worked through that you can pay for in the package. That's a factor as it relates to — certainly to the Child Tax Credit, which, as I understand, costs about a billion dollars a year.

So, we'll let them work out the length of it, and we look forward to seeing the de- — the final details made public in the coming days.

Q  On the bipartisan bills —

MS. PSAKI: Yeah.

Q  Some Republicans have just said that — that they're not prepared to vote on something that is not written yet. They just expressed this on the Hill. As Senator Romney said, it would be a dereliction of duty to vote, even procedurally, on something that has not been written. Does the President agree with Senator Schumer's timeline to hold a vote before all the language is finalized?

MS. PSAKI: Well, first, I think it's important to remember that there was an agreement that many senators were a part of — Democrat and Republican — on the framework that is the basis of this piece of legislation — right? — that they agreed to. The President certainly expects that everyone will stay true to their commitment, as — as he will.

Of course, the President believes that his most important role he can play is to continue to advocate for the key components of what's in this package, why it's important for people to support it in Congress, and why the American people should be excited about investments in roads and railways and bridges and investments in making sure we're addressing our climate crisis.

He will leave the mechanics and the timeline up to Leader Schumer.

Go ahead.

Q  Thank you, Jen. Now that you've had a few days to think about it, does this White House still think the protests in Cuba are happening because people are upset about a rise in COVID cases there or is there some thought, maybe, given to the possibility that they're protesting because they are sick of communism?

MS. PSAKI: Well, Peter, first, I would say: Communism is a failed ideology, and we certainly believe that. It has failed the people of Cuba. They deserve freedom. They deserve a government that supports them, whether that is making sure they have health and medical supplies, access to vaccines, or whether they have economic opportunity and prosperity.

And instead, this has been a government — an authoritarian communist regime — that has repressed its people and has failed the people of Cuba. Hence, we're seeing them in the streets.

But I would note that the ideology of the government, which has failed, has led to a fail- — a lack of access to economic opportunity, to medical supplies, to COVID vaccines. So all of those pieces are true.

Q  And there are protesters now in this country who are chanting, as these protests in Cuba are going on, "Where is Biden?" So, where is he? What is he doing to protect these people who are rising up against the leaders of this failed experiment?

MS. PSAKI: Well, first, he is certainly advocating for and speaking out, as we put out a statement — multiple statements — maybe one of you will ask him a question about Cuba today. I will — I will leave it to all of you to determine that.

But, one, he has made clear that he stands with the Cuban people and their call for freedom from both the pandemic and from decades of repression and economic suffering to which they've been subjected by Cuba's authoritarian regime.

There's an ongoing review of our own policies. And as we look at those policies, one of the big factors is ensuring we are not doing anything to pad the pockets of a corrupt authoritarian regime. And that is certainly a factor as he's considering, but we're looking closely at how we can help in a humanitarian way, how we can help support the voices of the Cuban people, and there's an ongoing policy review in that regard.

Q  We'd be happy to ask him about it later if he calls on us. (Laughter.) But one more —

MS. PSAKI: Anyone can ask anything they want. But go ahead.

Q  One more for you: Why is the Secretary of State Blinken trying to address human rights in the U.S. by inviting experts — U.N. experts from Cuba and China here?

MS. PSAKI: Well, first, I would say that the Secretary put out an extensive statement on why he is holding — why he believes that we need to play a role in lifting up and pushing countries to do better on human rights, on ending systemic racism in their countries. Certainly, human rights is always going to be a priority for the Biden administration and for this State Department.

As the Secretary said in his statement, he believes responsible nations must not shrink from scrutiny of their human rights record. Rather, they should acknowledge it with the intent to improve it, and also push and lift up and put a — shine a light on other countries that need to do better. And that is the role we're playing here from the United States.

Q  But you just rattled off all these problems with Cuba. They've got dissenters disappearing down there. In China, they've got a million religious minorities in internment camps. Why are they going to come here and tell us how to improve our country?

MS. PSAKI: I certainly don't think that's the format of the event. But lifting up and elevating human rights; systemic racism; the — the steps that have been taken — the poor treatment of Uyghurs, as I think you're referencing here — in China; and pushing other countries with a spotlight on them to do better is certainly a role we can play from the United States.

Go ahead.

Q  Can I ask about South Africa very quickly?

MS. PSAKI: Sure.

Q  There have been days of looting and unrest there in South Africa. They've now destroyed hundreds of businesses. At least 117 people there have been killed. Does the White House have any reaction to what's taking place there? And what, if any, role does the U.S. government have here to help try to quell the situation?

MS. PSAKI: We certainly track and watch closely and certainly have concerns about unrest that we see in the streets in South Africa.

In terms of the specific actions, I think the State Department is probably best equipped, but I'm happy to talk to our national security team if there's anything specifically we can convey from here.

Q  Let me follow up. Yesterday, I asked you about Afghanistan. Is there anything more you can tell us about those Special Immigrant Visas as they relate to the Afghan interpreters, translators, engineers, and others?

MS. PSAKI: Sure. Let me try to provide a little bit more detail on how the process works, which I — you have all understandably been asking about.

So, as I've noted in the past, our immediate focus is on interested and eligible Afghan nationals and their families who have supported the United States and our partners in Afghanistan and are in the application pipeline — so translators, interpreters, others, their family members who are in the process.

There are approximately 20,000 Afghans who have applied. So, those are the individual interpreters or translators; that does not include their family members. And about half that have completed the necessary paperwork to move forward in the process.

I believe, also, the State Department is going to do a more thorough briefing, but I'll just go through as many details as I can from here.

Once individuals — this is how the process works — once individuals are approved through the security vetting process — which their paperwork conclusion does not conclude it; there's another vetting process they would conclude — they may be eligible under humanitarian parole.

Under that parole, a lot — a large portion of that group could be relocated directly to a military base in the United States where they would receive medical checkups.

Those who have not yet completed their background checks would first be relocated from Afghanistan to either a U.S. military base overseas or to third countries, where they will be safely housed until their visa processing is complete and they can be transferred to the United States.

I would also note we are not considering any location or place for the third-party countries that would not be safe, would not treat them with respect, and not — would not ensure that they are treated humanely through the journey of their process.

Also, on our vetting process — this is a thorough process. There are some of these individuals who have completed their paperwork and are in through the vetting process. Their family members may not be in the same stage of the vetting process, so that may have an impact too of the timeline and how — not the timeline, but of, kind of, how they're moved and where they are moved to.

So — and the third par- — the third-country move would be temporary until they finalize their paperwork and security vetting process is complete.

So that is a little bit more detail on the process. Hopefully, that helps.

Go ahead, Alex.

Q  President — former-President Bush yesterday, in an interview, criticized the withdrawal, and he said he's very concerned about the Afghan women. So what is the U.S. going to do to ensure the safety of those women in Afghanistan after we leave?

MS. PSAKI: Well, first, I would say that the President agrees that we need to ensure we are continuing to support — through humanitarian programs, through security programs — the women of Afghanistan. And we certainly respect the right of the former President to voice his view on — on Afghanistan and the President's decision.

It's not a secret that President Biden and President Bush haven't seen eye to eye on matters relating to the use of military force. So, we respect his right to voice his opinion; we just disagree.

I would also note that while we continue to provide security and humanitarian assistance, we also intend to have a diplomatic presence on the ground to continue to be a source and resource for individuals in Afghanistan.

Q  And, just secondly, Senator Manchin is quite upset about some of the climate provisions in the 3.5 trillion package. Is the White House reaching out to him? Is it — is the White House prepared to move off of some of that — lessen the — some of the provisions?

MS. PSAKI: Well, we, of course, are in touch with Senator Manchin, I can assure you, as we are in touch with a number of senators who will be — who have been pivotal partners and will continue to be moving forward.

I think there was — one of the concerns I think I saw expressed — but tell me if this is what you were asking about — is fossil fuels. Is that the specific piece?

Q  Right.

MS. PSAKI: So, while of course the pa- — the plan and the package will go a long way in addressing the climate crisis — and that is a huge priority to the President, ensuring that these tax credits are in the reconciliation bill, which is something that did not make it into the bipartisan deal, is something the President has advocated for. And we're eager, of course, to pivot to a clean energy future.

We don't intend to do so just by — just by banning fossil fuels or leaving any working community behind. And what we'd certainly convey to any concerned individuals is that President Biden has formed an interagency working group to mobilize federal investments to support hard-hit coal, oil, and gas, and power plant communities across the country. That working group has already identified 30 billion in existing federal resources that could be accessed by communities.

We don't want to lose — leave communities behind. We still think we can move forward in addressing our climate crisis.

Go ahead, Steve.

Q  A follow-up to that —

MS. PSAKI: First day of your presidency. Congratulations, I think?

Q  Thank you very much. No, it's —

MS. PSAKI: I don't know if it's "congratulations"; it seems hard to make. Go ahead.

Q  — "Thank you" when it's over. (Laughter.)

I wanted to ask a follow-up to Alex's question, and that is: How does the President see his role in the negotiation on the reconciliation bill? Is he an intermediary between some of the more liberal elements of his party and Senator Manchin? Is he a closer? Is he directly involved in this? He went up to Capitol Hill yesterday. What's he going to be doing in the weeks ahead?

MS. PSAKI: He's going to be available for whatever is needed to get these bills across the finish line. And a lot of the discussions are happening, certainly, at a staff level. As you all know, we have a number of very experienced individuals here who have gotten a lot of bills across the finish line: Steve Ricchetti, Ron Klain, Louisa Terrell, and many beyond them. They are playing a big role — Brian Deese — in discussing and having conversations with members.

A lot of the discussions, though, are primarily between the Democratic members themselves about what the final package and the final details look like. Leader Schumer and his team will put out the final details on — on the timeline that works for them.

But I will tell you: The President is available. He's ready. He'll pick up the phone. He'll host people. He'll have snacks, drinks — whatever is needed in order to get these bills across the finish line. And I think leaders in Congress certainly know that.

Oh, go ahead, Brian.

Q  Thanks. Thank you very much. Two questions. One, to follow up on inflation. Inflation surged to 5.4 percent in June — its largest jump since 2008. You all say it's temporary, but today Axios is reporting the JPMorgan Chase CEO is saying, "I don't think it's only temporary," and that it's a little worse than the Fed predicts. Now, there's a disparity there. How are you going to address what they think may be permanent?

MS. PSAKI: Well, I would say, first, that many outside experts, including the Federal Reserve — even if JPMorgan or Jamie Dimon or whomever it is disagrees — have projected that the — that the rise of inflation is transitory and have projected a lowering of inflation next year.

We also have seen in the data that some of the issues — and I outlined this a little bit earlier, like the spike in car prices, which we know has a bigger issue — has another issue involved in it, which is the supply chain issues which we're trying to separately address — or hotels and some of the — of the industries that — related to travel that have seen increases because the economy is turning back on.

So we certainly will refer to economic experts out there, the Federal Reserve, and many others who have projected the transitory nature of this, as well as what we see as a number of the factors that are leading to the impact currently.

Q  The second question is about Jeff Flake. Earlier this week, he was nominated to the President to go to Turkey as our envoy. That ambassadorship is — that's a problematic area. What is it exactly in the former senator's background that gives this administration confidence that he can carry out his task there?

MS. PSAKI: Well, he's a former member of the Senate Foreign Relations Committee — someone who played an important role in discussing, debating, and — and working on a range of foreign policy issues as — in his role as a former U.S. senator. So that is a pretty good basis.

Okay. Francesca, go ahead.

Q  Thanks, Jen. I have a foreign policy question.

MS. PSAKI: Sure.

Q  Just to stay on inflation for a moment: What is the White House's message to average Americans, including those who are limited income, though, who are experiencing higher prices right now for food and clothing and other goods and services. You mentioned that it's expected to die down next year, but what is your message to them in the meantime? Is it simply just to wait it out?

MS. PSAKI: That's certainly not what I've ever said, but I will say our message is that we understand the threat that inflation poses. We will be vigilant about any responses needed.

It's important for Americans to know and understand that these impacts are temporary and some of these price increases are a result of the economy turning back on. And experts will tell you that — whether it's the hotel industry or the airline industry going back to pre-pandemic prices.

I'll also note that the President has taken a number of steps, including ensuring that the vast majority of the American people were getting $1,400 checks, getting the Child Tax Credit out to people's bank accounts today, because he knows that Americans need a little extra help — still need a little extra help as the economy turns back on. So he's committed to helping working people, and it's also important for people understand the transitory nature of inflation.

Q  And can you provide a status update on investigative assistance for Haiti? And also, when can the public expect the administration to make a determination on whether it's changing its policy towards Cuba?

MS. PSAKI: Sure. I don't have anything for you on the timeline on Cuba policy. I will note that we certainly look at the policy through the prism of how we can most help the Cuban people — the people who have been out in the streets looking to have their voices heard in these protests.

And even as we look at individual components of policies that would be under consideration — including, say, remittances — there are a range of factors. There are a number, of course, of people who have called for a return for allowing remit- — remittances to go from family members to individuals in Cuba.

On the flip side of that, or one of the challenges is: the prevention or our desire to prevent remittances or any funding going in the hands or the pockets of leaders in Cuba.

So, these are challenging issues. There's an ongoing review. I don't have a timeline to preview for you.

In terms of Haiti — let me see. I do think I have a little bit of an update for you. Let me see what I have for you.

So we've — we've provided a couple of updates of what we've provided. So, I — just in case you don't have this. The FBI is providing investigative assistance to the Haitian authorities at the request of the government of Haiti. They remain committed to working alongside our international partners to administer justice. That was a specific ask.

We're also continuing to provide ongoing security assistance and — and consultations, as they have also requested. We're still working with leaders in Haiti to refine their requests, and that

review is ongoing. We're in regular touch. And as we have additional components to provide, we'll share that with all of you.

Q  I think we have to wrap.

MS. PSAKI: Okay. Let's — go ahead. One more. One more.

Q  Thanks, Jen. I — two quick ones. So, first —

MS. PSAKI: Uh — yeah, I know. I — we're wrapping. It's like a last one.

Q  — Senate and House — Senate and House Democrats say that they want to put citizenship halfway into the reconciliation package. Is the White House supportive of that strategy?

MS. PSAKI: Yep.

Q  Okay. And then — can I squeeze in my last one — (laughter) — since that was so fast?

MS. PSAKI: Sure. That was an easy one. Go ahead.

Q  Okay, so the — Florida's governor and some FEC commissioner in Miami, representatives are calling on Biden to greenlight a plan that would allow the deployment of higher altitude communication balloons to beam Internet into Cuba. Is this something the administration plans to do? And if not, why not?

MS. PSAKI: Well, the lack of Internet access, as you know, which is why you're asking, is a huge issue in Cuba and one that is very challenging for the people of Cuba so they can gain access to accurate information, they can correspond with family members and others.

We are certainly looking at that to see what can be done to address, but in terms of that specific proposal, I don't have an assessment of that. I can see if there's more specifics on it.

Q  Thank you.

MS. PSAKI: Okay. Thanks, everyone. Thanks, everyone.

1:53 P.M. EDT

# DEFENDANTS' EXHIBIT 41:

# Report inappropriate videos, channels, and other content on YouTube

We rely on YouTube community members to report or flag content that they find inappropriate. Reporting content is anonymous, so other users can't tell who made the report.

## What happens after I report content?

When content is reported, it's not automatically taken down. Reported content is reviewed along these guidelines:

• Content that violates our Community Guidelines ☒ is removed from YouTube.
• Content that may not be appropriate for younger audiences may be age-restricted.

To check if a video that you reported has been removed, you can view your Report history ☒ .



## How to report content

**Android**    Computer    iPhone & iPad

Report a video                                                            ⌄

Report a Short                                                            ⌄

Report a channel                                                          ⌄

Report a playlist ⌄

Report a thumbnail ⌄

Report a comment ⌄

Report a live chat message ⌄

Report an ad ⌄

## Report content on YouTube from your TV

You can report a video directly from the YouTube TV app.

1. Open the YouTube app ▶.
2. Go to the video that you want to report.
3. Go to Settings ⚙ ❯ **Report**.
4. Select the reason that you want to report the video.
5. After you select the reason, a confirmation message shows.

## Other reporting options

If the reporting process doesn't accurately capture your issue, we have other reporting mechanisms you can use.

Privacy reporting ⌄

Legal reporting ⌄

# DEFENDANTS' EXHIBIT 42:

# Press Briefing by Press Secretary Jen Psaki, April 25, 2022

James S. Brady Press Briefing Room

3:20 P.M. EDT

MS. PSAKI:  Hi, everyone.  Okay.  There's nothing happening in the world today, I hear — (laughter) — so this should be a quick one.

I have a couple of items for you at the top, as usual.

Over the past year, businesses have been dealing with frequent freight delay — rail delays and poor service, which has stranded shipments of grain, fertilizer, ethanol, and other critical commodities across the country.  This breakdown in service has also forced grain shippers to pay thousands of extra dollars to guarantee service.

So, on Friday, our administration took emergency action to get goods moving faster and lower shipping costs.  The Surface Transportation Board, which regulates railroads, acted on a bipartisan basis to help bring relief to American businesses that ship their goods by freight rail.

Basically, what they did is: This emergency rule would allow it to address situations where a monopolu- — monopoly railroad isn't providing adequate service and show an alternative railroad to step in.  So if a business wants to move their goods and the railroad that they are contracted with isn't allowing them to move them quickly, this will allow them to have some flexibility, hopefully allowing the movement of more goods, getting them on shelves, lowering costs.

I also wanted to note that while the President is doing everything in his power to lower prices for American families, the Federal Reserve plays an important role, as you all know, in fighting inflation, which is why it's so important that we have all of the seats filled on the Federal Reserve's Board of Governors.

Today and this week, as Congress returns, we're taking a big step forward toward filling these seats with the nominations of Lael Brainard and Lisa Cook making their way to the Senate

floor.

We call on the Senate to confirm Dr. Brainard and Dr. Cook. And we also call on the Senate to swiftly take up Jerome Powell and Philip Jefferson's nominations this week as well.

These nominees are eminently qualified, ready to get to work, and deserve bipartisan support. They also will make history.  Lisa Cook would become the first Black woman to ever serve on the Board of Governors, and Philip Jefferson will be only the fourth Black man to serve on the Board of Governors.

Finally, the VA announced today new actions to expand disability and health bene- — benefits to veterans suffering from nine rare respiratory cancers.  Supporting our veterans is a critical part of the President's Unity Agenda.  And with this step, the President is continuing to deliver on the sacred obligation we have to our nation's veterans.

The President urges congress to pass bipartisan legislation to comprehensively address toxic exposures and further ~~delay~~ [deliver] the vital benefits our veterans have earned.

Andrea, welcome back.  Peter, welcome from book leave.  Now they're going to ask me especially hard questions.

Zeke, go ahead.

Q   Thanks, Jen.  Secretary Austin, I believe, said earlier this morning that the U.S. wants to, quote, "see Russia weakened to the degree that it can't do the kinds things that it has done in invading Ukraine."  He said that in regards to Russian military losses, quote, "We want to see them not have the capability to very quickly reproduce that capability."  Is it U.S. policy now to permanently degrade the Russian military?

MS. PSAKI:  Well, I think what Secretary Austin in his press conference was referring to is the fact that if you go back about two months ago, remember President Putin gave a speech where he talked about the aspirations — his aspirations, the aspirations he had for the Russian military — which were to degrade Ukraine, of course; to subsume Ukraine, to take over their sovereignty, their territorial integrity.  Of course, they haven't succeeded at that, but to go beyond that.

So what Secretary Austin was talking about is our objective to prevent that from happening. Obviously, right now, the war is in Ukraine.  They are — we're proud of the Ukrainians' success; their efforts to fight back, to push back on the Russian military, thanks to their bravery but also to our support.

But, yes, we are — we are also — we are also looking to prevent them from expanding their efforts and President Putin's objectives beyond that, too.

Q   Is there any concern in the White House that that sort of rhetoric plays into their domestic message to their audience about "the West is out trying to get us and contain us," that — by saying you're trying to weaken the Russian military and weaken — it's essentially strengthening Putin's hand at home?

MS. PSAKI:  No.  I would say it's consistent with our view and the President's view and Secretary Austin's view that we are going to do everything we can to push back on President Putin's aspirations to subsume Ukraine, to take over their territorial integrity and their sovereignty, and aspirations he had as of two months ago to go beyond that.

Q   Okay.  And Congress is back in town today.  The President last week said he's going to go back to Congress looking for additional —

MS. PSAKI:  Yeah.

Q   — supplemental Ukraine funding.  Do you have a dollar figure for how much the President need — is going to go ask for and how long that money would last?

MS. PSAKI:  Sure.  Not quite yet.  He is — expect he'll have consultations and conversations with military leadership and, of course, leadership from the State Department over the course of the coming days.  I expect it'll be something later in the week, and expect it'll be a longer-term package or proposal.

Go ahead.

Q   And just a quick one on the breaking news: Twitter agreeing to let Elon Musk purchase — make his — go through with this purchase.  Do you have a response to that?  And does the White House have any concern that this new agreement might have President Trump back on the platform?

MS. PSAKI:  Well, I'm not going to comment on a specific transaction.  What I can tell you as a general matter: No matter who owns or runs Twitter, the President has long been concerned about the power of large social media platforms, what they ha- — the power they have over our everyday lives; has long argued that tech platforms must be held accountable for the harms they cause.  He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more.  And he's encouraged that there's bipartisan interest in Congress.

In terms of what hypothetical policies might happen, I'm just not going to speak to that at this point in time.

Q    Okay.  On the situation at the border and Title 42, Congressman McCaul said this weekend that Secretary Mayorkas has expressed some frustration directly to him about how the administration is ending Title 42.  He says the Secretary is saying that the Border Patrol, Catholic Charities are already overwhelmed.  So, has the Secretary raised these concerns with President Biden?  And are these concerns that the White House shares?

MS. PSAKI:  Well, I think it's important to remember that Title 42 is not an immigration policy or an immigration authority.  It's a health authority.  So, yes, it was coordinated with the Secretary of Homeland Security and through an interagency process, and there's been planning in the works for months for this possibility that the CDC — to take this action.

Secretary Mayorkas is going to be testifying later this week, multiple times.  I'm sure he will answer that question and multiple other questions, and I will let him speak for himself.

But I would just note that we're continuing to prepare for March — May 23rd and the im- — May 23rd and the implementation, and there is a multipart strategy that Secretary Mayorkas has been leading and overseeing for the past several months.

Q    But has he raised these concerns with the President?

MS. PSAKI:  I'm not going to get into private conversations.  But I think, again, it's important to note this is a CDC decision and authority about when we were — had the health conditions to lift Title 42.  It wasn't an indication of an immigration policy.

Q    Do you not believe that there will not be a surge as a result of Title 42 being lifted come May 23rd?

MS. PSAKI:  Well, the Department of Homeland Security has projected that there could be an increase in people coming to the border, and that's why they've had a six-part, multipart plan and proposal and policy they've been implementing for months now to prepare for that.

Q    Is Title 42 — the potential end to it — the reason that the Congressional Hispanic Caucus is meeting with the President today?

MS. PSAKI:  No.  Actually, if you may remember, the President has been meeting with a number of the caucuses from Congress — from the Congressional Black Caucus; he met with CAPAC.

He's been meeting with all of the caucuses, as he did last year.  So, this has been a meeting that's been in the works for some time.

Immigration, certainly we expect to be a part of it, but we expect it to be an expansive meeting.  And I would note the CHC has a stated view and policy on Title 42.

Go ahead.

Q    One of the members of the CHC is Senator Catherine Cortez Masto.  And she said of the Title 42 decision that "This is the wrong way to do this and it will leave the administration unprepared for a surge at the border."  Obviously, this is a subject that's likely to come up in this meeting today.  What is the President's message, primarily especially to these western and border-state Democrats who are concerned about both the impact on immigration as a policy matter but also the political fallout as well?

MS. PSAKI:  I think his — our view and the President's view is that we have a broken immigration system that's been long overdue to be fixed.  He agrees with that, and he's certainly happy to discuss that during this meeting or any other meeting has with members of Congress.

But this is not an immigration policy.  This — Title 42 is a health authority that's determined by the CDC.  And we — we need to have a conversation about immigration reform, and that's vital.  And maybe this is a reminder of that.

Q    Whenever the administration has been asked about immigration reform, the answer seems to be the President introduced the bill in the first week in office, but there's not much more than that more.  Is this an opportunity for the administration to try to move something forward this year?  Or do you believe that campaign politics will just preclude the likelihood of getting it through?

MS. PSAKI:  Well, we welcome that opportunity.  But I'd also remind you that we were supportive of efforts to include some components of immigration reform in the reconciliation packages, and we've been looking for avenues to move it forward and have been supportive of efforts by Democratic senators to do exactly that.

Q    Is there a specific ask of Congress related to Title 42?  That was the position that was articulated last week — that this is not a decision for the President to make but for Congress to make.  What is the decision that Congress should be making?

MS. PSAKI:  That is a discussion we'll have with members of Congress.  We are continuing to prepare to implement the lifting of Title 42, a decision that was made by the CDC.

I would note that there are a range of views on Title 42.  There are some, you noted, who are very vocal about how they would like to see it extended.  There are some who are very vocal about how they would not like to see that happen.

So that's an important discussion that will be happening over the coming days and weeks.

Go ahead, Jacqui.

Q    Thank you, Jen.  I don't believe the White House so far has commented on the death of Bishop Evans, the 22-year-old National Guard Specialist who drowned trying to save two migrants.  I wanted to give you the opportunity to say some words on that.

MS. PSAKI:  Yes.  Thank you for that, Jacqui.  And the news of the confirmation that his body had been found was confirmed just a couple of hours ago.  I would note that, of course, our heart goes out to his family and to his loved ones.

To confirm all the specific details, he went missing on Friday, following his selfless efforts to rescue two migrants who appeared to be drowning who were trying to cross a river in Mexico that went to the United States — went into the U.S., of course.

We know that National Guard personnel, including — including him, risk their lives every day to serve and protect others.  And again, our hearts go out to his family.

I don't have any — in case you may ask, I don't have any updates at this moment in terms of the President's outreach, but if — if that is something I can update you on this afternoon, I will let you know.

Q    Does the White House feel any responsibility for his death, given that there's reporting that he lost his life allegedly trying to save two migrants who were smuggling drugs?  This is a problem that, you know, the administration has been facing for some time and is obviously, as we've been discussing, getting some criticism on.  Is — does the White House feel at all responsible?  And what — what more can you offer to people who, you know, are on the border, in border communities, who are experiencing loss and trials like this?

MS. PSAKI:  Well, of course, we are mourning the loss of his life and we are grateful for the work of every National Guardsman.  I would note that the National Guard worked for the states, and so he is an employee of the Tex- — Texas National Guard, and his efforts and his

operation were directed by there, not by the federal government, in this — in this effort, in this apparatus.

We've — we've long stated that our immigration system is broken.  There needs to be more done to invest in smarter security, to have a more effective asylum processing system.  And we would welcome any efforts to — for any elected officials to work with us on that.

Q   A lot of the border communities often, you know, say that they have requested more from — from the federal government — more manpower to help manage these kinds of — these kinds of issues.  Is that being looked at?  Is that being — is that being —

MS. PSAKI:  Can you give me a more specific request or a specific person or —

Q   Well, you mentioned that, you know, this — this Specialist was a National Guard.  Obviously, you know, the state is in charge of that.  States are in charge of that.  But there have been requests from the Texas governor, from — you know, to send more — you know, to help people who are in this position at the border, who are now trying to deal with an influx of migrants that they know is going to only increase, as you just mentioned, after Title 42 is lifted.

You talked about having a humanitarian, you know, sort of, system in place to deal with people coming across and increase vaccinations and that kind of thing.  But in terms of, you know, law enforcement presence at the border.

MS. PSAKI:  Well, I would just say — if we just dial it back a few years to, kind of, what we inherited here — the former President invested billions of dollars in a border wall that was never going to work or be effective, instead of working towards comprehensive immigration reform.

As part of the President's proposal he put forward on his first day in office, he proposed investing in smarter security at the border — something he'd be happy to work with governors on.  And — and certainly we're open to having that conversation whenever they're ready to do that.

Go ahead, Weijia.

Q   Thanks, Jen.  Just more broadly on the Ukrainian aid.

MS. PSAKI:  Sure.

Q   Since the Russian invasion started, the U.S. has provided more than $5 billion total when you factor in military, economic, humanitarian aid.  Is there a figure that is a cap for what the U.S. is willing and able to provide Ukraine?

MS. PSAKI:  Well, I would say that the range of military assistance that we've provided to date was meant to be frontloaded because of our expectation or anticipation, led by our Department of Defense and military leaders, about the nature of the fight and how it has evolved, right?  That because they're on a terrain now that — where they're in need of long-range military capacity, we've tried to expedite the assistance over the past couple of weeks that they're receiving.

So it might not be, over the next couple of weeks, the same size of assistance week by week.  But in terms of what the next package will look like and what will be passed, I mean, those are discussions and recommendations that the President will get from his military leaders.  We'll have those discussions with Congress.  I'm not in a position to put a cap on it at this point in time.

Q   Okay, got it.  And then just switching over to COVID.  The administration is planning to take new actions to expand Paxlovid.

MS. PSAKI:  Yeah.

Q   Is there anything you can share about how you plan to do that and who might be eligible, since right now it's only for people who are at higher risk?

MS. PSAKI:  Sure.  Well, part of it is even people who are eligible are not taking advantage of the fact that they're eligible.  So, part of our effort is to share more information publicly about who can get access, who can call their doctor and get access to it.

I will tell you, Dr. Jha is going to make his debut in the briefing room tomorrow.  So, he will lay out for you and others more specifically all the steps we're taking to increase knowledge of Paxlovid, who can benefit from it.

I don't think we're intending to — and I'll let him speak to this — say there's going to be an expansion of who's eligible, as much as we're — and I will, obviously, leave that to the health experts to determine — but more we need to focus on making sure that everybody who is eligible knows they're eligible and they can get access to it, because it is very effective in treating COVID.

Q   Thank you, Jen.

MS. PSAKI:  Go ahead.

Q    Yeah.  Just a couple on Twitter.  I wanted to go back and try again.  Are you concerned about the kind of purveyors of election misinformation, disinformation, health falsehoods, sort of, having more of an opportunity to speak there on Twitter?

Is there, you know, any message that you would convey to Elon Musk as the new owner?

MS. PSAKI:  Well, I would just —

Q    And, you know, I would maybe just add to it that, you know, public — publicly traded companies have different levels of — there's different levels of scrutiny that are possible of publicly traded companies.  So, are you concerned about, you know, a billionaire taking control of a company that — where there's already a lot of concentration of power?

MS. PSAKI:  I would say that our concerns are not new.  We've long talked about and the President has long talked about his concerns about the power of social media platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable.

While I know you tried again — I appreciate that — I still don't have a specific comment on this specific transaction.  And at this point, we don't have any sense of what the policies will look like.

Q    Okay.  And then, last week, Daleep Singh made some very strong comments and also Treasury Secretary Yellen made some comments about the positive impact on inflation of lowering tariffs on certain Chinese goods — bicycles, underwear, apparel.  So —

MS. PSAKI:  It's quite a list.

Q    Yeah, it was quite a list.  Is there something cooking?  Can you tell us something?  And do you notice the White House embracing that?  Is that something we could see happen soon?

MS. PSAKI:  So, from the beginning of the administration, we talked about how some of the tariffs implemented by the previous administration were not strategic and instead raised costs on Americans.  And our effort — which has been ongoing, of course — has been to ensure current Section 301 tariffs align appropriately with our economic and trade priorities.

And you mentioned, you know, different goods that are sold.  But, of course, on wages and job opportunities; critical supply chains, where we see critic- — impacts on critical supply chains;

our ability to sustain our technological edge — this is an ongoing process.

And we're certainly looking at where we see costs being raised at a time where we're seeing heightened inflation; certainly, that's on our minds.  It's also about addressing the core issues we have with how China has approached, you know, their engagement around economic issues as well.

So, it's both.

Q    So, can we look for some tariff reductions in some relatively short period of time?

MS. PSAKI:  We're continuing to review it.  I don't have anything at this moment to preview for you, but our focus is on those same categories and areas: where we can impact — where we think they're impacting wages and job opportunities, our technological edge.  That's the prism through which our economic team — Ambassador Tai is, of course, leading this effort, is — is reviewing these sanctions.

Q    And then, just a real quick one on Putin.  So, the sanctions that have been imposed — and I realize they're quite sweeping and large, but on — especially on oligarchs and other people close to Putin — have thus far excluded his girlfriend, whose name I can't quite pronounce — *Kayova*?  *Kayeva*?  Do you have any comment on why you would refrain from sanctioning someone arguably close to Putin?

MS. PSAKI:  Well, I would remind you we're continuing to review sanctions.  No one is safe from our sanctions.  We've already, of course, sanctioned President Putin, but also his daughter, his closest cronies, and we'll continue to review more.

So, I wouldn't — I don't have an analysis at this point because we're still reviewing.  There's more we will likely do.

Go ahead.

Q    Jen, on just the broader strategy of helping Ukraine, there's obviously hurting Russia economically, hurting Russia militarily.  Given that the U.S. has rolled out so many sanc- — economic sanctions already against Russia, and the heavy fighting that we're seeing now, should we expect that the help that the U.S. offers Ukraine, going forward, would be more heavily, like, militarily focused as opposed to economic?  Or is that the wrong way of looking at it, as it's sort of all of the above?

MS. PSAKI:  No, I understand your question.  I think these are all discussions that we're having through the interagency, and there'll be a recommendation made to the President.

I mean, there's no question they need additional military assistance.  As part of Secretary Austin's follow-up to his trip to Ukraine, he was in Germany today meeting to discuss kind of the next steps and what their needs are as the — as the — as the battle and the war continues to evolve.

But they are also going to have significant humanitarian and economic needs as well.  So I would expect that all of them will continue to be touched on.  But these are the discussions that are happening in the interagency process now.

Q    And is there any new, updated U.S. assessment on any discontent or disagreement within Putin's top advisors or inner circle about the direction of the war?

MS. PSAKI:  I don't have any assessment I can read out from here — or any new assessment.

Q    And just one more on a different topic — just on inflation, given that it continues to be such a big concern for so many people.  The President obviously doesn't have the luxury of wandering outside the White House.  He can't, you know, go fill up this car or go to the grocery store.  Can you give us a sense of how he sort of is updated every day, or how he gets a sense of how much does milk cost more today than a week ago?  Just how does he sort of keep up to date on how much more expensive things are for the average American?

MS. PSAKI:  I can assure you that the President sees himself as the kid from Scranton, more than many people who work in his administration, and he is often the person who reminds people and members of his policy team in meetings what the impacts of rising food costs or gasoline costs or other issues are.  He does request and receive regular updates from his economic team.

And often, when he returns from weekends at home in Delaware, he comes back with conversations he had with people as he came out of church or, you know, as he — people he's known for a long time in his community, and they often tell him about how these — how the rising costs impact his life.

So I would say that he stays abreast of these changes and of these increases in costs and the impacts through economic data and briefings, but also through his own conversations whenever he can have them.

Q    Jen?  Jen?

MS. PSAKI:  Go ahead.

Q   I have — I have a question here about — following the recent Palestinian terror attacks from the Temple Mount and previous week of attacks that have killed many Israelis and wounded more, is the Biden administration reconsidering its support of the Palestinian Authority's two-state solution dividing Israel or stopping the welfare payments sent to the Palestinian Authority, who use the money for their pay-to-slay reward system?  And I have a follow-up question.

MS. PSAKI:  Okay.  Well, I would just note that I spoke to this last week, on Wednesday, where I noted that the United States is deeply concerned by the recent violence in Jerusalem and the Temple Mount and across the We- — West Bank.  And we also strongly condemn the recent rocket attack on Israel.

You may or may not have seen also that the President conducted a call with Prime Minister Bennett on Sunday morning.  He accepted an invitation by Prime Minister Bennett — Bennett to visit Israel in the coming months.  No specific date yet.  He took note of the ongoing efforts between Israeli and Palestinian officials to lower tensions and ensure a peaceful conclusion to the holy season of Ramadan.

And he also affirmed our unwavering support for Israel and its defense needs and welcomed the historic $1 billion allocation to replenish Israel's Iron Dome system.

Q   Okay.  The follow-up is: In view of continued Palestinian violence against innocent civilians, is the Biden administration willing to stop payments to the anti-semitic U.N. agency, UNRWA, and support restoring the Jewish cemetery in Vilnius, Lithuania, to its former glory?

MS. PSAKI:  Again, I think — I don't have any changes to announce to our policy.  I spoke to our condemnation of the violence just now as last — and last week as well, and noted also our call to the Prime Minister.

Go ahead.

Q   Thank you.

Q   Jen, a point of clarification on the aid that the U.S. has already allocated to Ukraine.

MS. PSAKI:  Sure.

Q   The President said last week that he had "almost exhausted" his drawdown ability.  So how much, after that announcement of the $800 million on Thursday, does the U.S. have left to provide Ukraine?

MS. PSAKI:  I'm sure I can get you this specific, exact number.  It was almost about $3.5 billion total of drawdown authority, I believe.  I will double-check that number for you.

So what he was referring to is: Because of how quickly we've been moving the military assistance to the Ukrainians on the ground, we anticipated being almost at a near end of that drawdown authority.  So that's why he's going to put forward a new package this week.

Q   And on student debt cancellation: Yesterday, Senator Elizabeth Warren said that the White House has essentially already canceled some student debt by waiving interest on that student debt, and it could use that same exact authority to cancel student debt permanently.  Does the White House agree with that view?  This is about the authority, not whether you will but that you can derive the authority in the same exact way.

MS. PSAKI:  I don't have anything to preview for you in terms of any authority and how — or how it would work.  What I would tell you is that not a single person in this country has paid a dime on student — federal student loans since the President took office.  And what we have said is that he would make a decision about any cancellation of student debt before the conclusion of that pause on student loans, but I don't have anything to preview for you at this point in time.

Q   And a quick follow-up on that.  She said that it was "an issue of racial equity."  Does the White House view this as a racial equity issue?

MS. PSAKI:  Well, again, I think the President views student loan relief, debt relief as something that impacts — yes, it is a racial equity issue, but it is also an issue that impacts many individuals — young people, middle-aged people — of all races.  It is something that he has — he has played — it has been a vital priority to the President, which again is why not a single person has played — paid a penny, a dime — a dime or a penny in student loans since he took office.

Go — go — go ahead, JJ.  I don't want to forget you.  Go ahead.

Q   Oh, thanks.  Two questions on the supplemental funding —

MS. PSAKI:  Yeah.

Q    — and then one Cedric Richmond.

MS. PSAKI:  Yeah.

Q    On the supplemental, has the administration decided to definitely combine the COVID funding with the aid for Ukraine?

MS. PSAKI:  We don't have the mechanism yet.  There's — these are conversations that we'll have with Congress.

Obviously, prior to the recess, there was the proposal that did combine, but — but not — don't have a — don't have a sense yet.

Q    Not quite yet.

And then, is the White House considering extending the Title 42 immigration restrictions as part of a deal with Congress?  Are you considering it?

MS. PSAKI:  Again, this would be Congress having the discussion.  We're continuing to prepare for a May 23rd implementation.  There'll be a range of conversations about this over the coming days.

Q    And then, the New York Times is reporting that Cedric Richmond is leaving.  Is he?  And just last week, he said publicly that he wouldn't leave unless the President asked him to.  So, has something changed there?

MS. PSAKI:  Yes.  Okay.  Well, let me first say that Cedric Richmond has been, continues to be a vital, essential advisor to the President — was on the campaign, continues to be in the White House.  I have been in many meetings with Cedric Richmond, where the President goes to him and looks to him for his political sense, his assessment of Congress.  He trusts him implicitly.

I have nothing to announce at this point, but I can assure you when we have something to announce, it will involve a new important role to — for Cedric Richmond and something the President is excited about and has asked him to do.

Go ahead.

Q    Jen, we saw the readout — we saw the readout from the call with the French President. Did the President see any larger meaning in the French elections in terms of the support of the Allied effort against Russia?

MS. PSAKI:  I don't have any assessment of that.  Can I — I'll leave that to others to do analysis.  The President was pleased with the — with the outcome.

As you know, he spoke with President Macron this morning, and he's looking forward to continuing to work with him in standing up against Russian aggression and standing with the Ukrainian people.

Q    And Ron — just along those lines, Ron Klain tweeted, "An interesting observation…[that] President Macron…secured a double-digit victory…at a time when his approval rating is 36%."  Was there anything he was suggesting with that?

MS. PSAKI:  I don't have any more analysis to provide on that front, though I appreciate the question.

Go ahead.

Q    On NATO, reports in Finland and Sweden say that the country — the two countries are preparing to apply to join NATO as early as next month.  Is the White House supportive of that effort?

MS. PSAKI:  Well, those are decisions for these countries to make and for the NATO Alliance to make.  And so we'll leave it to those entities.

Q    And then, just on gun violence.  We learned more about Friday's shooter today from D.C. police, who say he had hundreds of rounds of unspent ammo inside his Connecticut Avenue apartment.  And then, today, the D.C. mayor announced a new police initiative to target violent crime.

Does the President believe he's done all he can do to fight violent crime, gun issues around this country without the intervention of Congress?

MS. PSAKI:  Well, he will continue to look for every authority he has to take steps to address gun violence — violent crimes across the country.

The last time we had data was in 2020, I believe.  And at that time, about 77 percent of homicides were done with a firearm.  And you saw him talk two weeks ago now — it's all running together — but two weeks ago now, I believe, about ghost guns and the steps that he is going to continue to take to address ghost guns, which we have seen have a rising role in — in gun — in gun deaths and gun targeting over the past several months.

I would also note that then, when he was doing that event, he highlighted that two LA sheriff's deputies who have been wounded by a shooter using a ghost gun.  So that's just even an example of how even they're using — these ghost guns are being used to target police as well, which is also a problem.

So, I would say, of course, there are significant steps that Congress can take that would make these laws permanent — that is the President's first preference — whether it's background checks, banning assault weapons.  These are laws that he has led the effort to pass throughout his career, many decades.

But he will continue to look for any steps he can take using his own authorities, as he has done several times since taking office.  I think he's done more than any other president using executive authority.

Go ahead.

Q    Thanks, Jen.  Two questions for you.  President Biden made his first endorsement of the midterm election cycle on Saturday, endorsing Congressman Kurt Schrader.  Why did he decide to weigh in on this race first?  And what would he say to some progressives who are frustrated that he endorsed Schrader over his opponent?

MS. PSAKI:  I certainly understand your question.  I don't make the rules, but the rules are I can't speak a lot about politics from here.  So I would point you to the DNC, and I would point you to Congressman Schrader's office.

Q    Second question for you: There's been a fair bit of speculation about Vladimir Putin's health based on recent videos of him.  Has the White House made an assessment on this matter?  And have concerns been raised internally at all about this topic?

MS. PSAKI:  I don't have any assessment for — to offer from here or any particular comment on the mental health of President Putin.

Go ahead.

Q    Jen, back to Title 42 quickly.

MS. PSAKI:  Yeah.

Q   I want to make sure I'm understanding what you're saying today.  I hear you talking about discussions going forward, the debate that's happening, all of that.  Are you saying that Title 42 — I know you're prepared to lift the current policy on May 23rd.  Are you saying that will happen unless Congress acts?  Or are you saying the White House might do something else?

MS. PSAKI:  Congress would have to take action in order for the date not to be May 23rd.

Q   Okay.  On Hunter Biden: The New York Post is reporting — looking at White House visitor logs, there were 19 visits to the White House while the President was Vice President by Hunter Biden's business partner, including one with the Vice President.  Could you help us understand why that business partner had access and what those meetings were about?

MS. PSAKI:  I don't have any information on that.  I'm happy to check and see if we have any more comment.

Q   And then, former Senator David Perdue, last night, hoping to be a senator again, opened his debate by saying that the election — 2020 election was rigged and stolen.  We know that every court — most courts — courts have ruled that it was fair, there's no evidence of fraud.  But I wonder what you make of those comments.  And has the White House done enough to push back and to make it clear that the election was not stolen?

MS. PSAKI:  I think that speaks to the former President's hold over factions of the Republican Party, not facts.

Go ahead.

Q   Thank you so much, Jen.  Two questions on Brazil.  First, last Friday, President Biden said the United States and rich countries should be paying Brazil to protect the Amazon.  And he said he's trying to get this done.

MS. PSAKI:  Mm-hmm.

Q   So what exactly is he trying to do?  Is he trying to work with other rich countries, negotiating with Brazil?  Is he ready to provide financial support to Brazil?  And how much would that be?

MS. PSAKI:  So the science — in the President's view, and the reason he made these comments, is that the science has only become more clear that the world needs to both strengthen and accelerate emissions reductions.  And part of that goal is conser- — includes conserving global

forest ecosystems that remove carbon from the atmosphere and store more carbon than they emit in a year, serving as carbon sinks.

So President Biden recognized the necessity of mobilizing funding from the whole go- — from world governments and the private sector.  And the Plan to Conserve Global Forest: the Critical Carbon Sinks launched at COP26 aims to mobilize finance from the public and private sector, with a strong focus on ~~levering~~ [leveraging] private-sector finance through market mechanisms.  So that's what he was speaking to and certainly an effort he continues to support.

Q   And there is a delegation today from the State Department in Brazil.  I wonder if this trip has anything to do with the war in Ukraine and perhaps the United States seeking or interested in working with Brazil food and energy security?

MS. PSAKI:  I would really point you to the State Department.  We are working with a range of countries, obviously, on addressing where we see any food shortages around the world.  And, obviously, Ukraine is front and center on the minds of most global leaders.

Q   And just a quick one: Why President Biden has declined to talk with President Bolsonaro?  We know that the Brazilian government its trying — been trying — try more than once.  So why is he declining to —

MS. PSAKI:  I don't have any update.  The President obviously has a busy schedule.  He has spoken with a range of global leaders but not every single one, and you just noted the State Department is in Brazil for a visit.  So I would note we have an ongoing dialogue at a high level.

Go ahead.

Q   Yes, Jen — oh.

MS. PSAKI:  Oh, go ahead.

(Cross-talk by reporters.)

MS. PSAKI:  Oh, okay.  Either one.  Okay.  You're kind of matching today, I'll note.   Yeah, there you go.  In your suits —

Q   We got the memo.  (Laughter.)

MS. PSAKI:  — in blue.

Q   Yeah, so, more people are starting to talk about recession.  Goldman Sachs and Bank of America alluded to it.  You — because of inflation.  The steps that have been taken so far haven't seemed to work to get inflation to come back down.  What additional steps are you guys looking at to curb inflation as well as the feeling that the economy is headed in the wrong direction?

MS. PSAKI:  Well, I would say, first, there are a number of strong economic indicators that we would point to.  We created more jobs last year than any year in American history.  The unemployment rate is at 3.6 percent.

We know that costs are too high.  Inflation, which the Federal Reserve has purview over, still projects that it will moderate by the end of the year.  There are a number of steps they have and they have indicated they have in — the plans to recalibrate.  We support that effort.  They have a lot of power here, in terms of taking steps to address inflation.

We are not — the President is not waiting for that to happen, and he is taking steps to address where we see costs increasing in different areas that impact the American people's pocketbooks.  Whether it's gas prices — obviously, he made an announcement to tap the Strategic Petroleum Reserve; led the global release — led an effort to release from the — globally to bring down gas prices.

We've also taken steps to fix issues with our supply chain to make sure goods are moving as quickly as possible.  And there's a lot of interest — continues to be in Congress — to take steps to lower costs on prescription drugs, healthcare, eldercare, childcare.  Those are all steps that are based on the President's proposals.

Q   (Inaudible) the President has pushed those spending proposals.  The San Francisco Federal Reserve released a report —

MS. PSAKI:  They'd be fully paid for, so they're not actually spending proposals; they're proposals to lower costs that are fully paid for.

Q   The San Francisco Federal Reserve released a report saying that government spending accounted for 3 percent of the inflation that we're seeing now.  So is spending more really the way to go?

MS. PSAKI:  Well, again, I think if you look back at where we were a year and a half ago, we were at the point where there was a significant economic downturn; where people were really suffering, struggling to put food on the table; strug- — people were out of work.  And what we've done — what we did at that time is take steps to help stem that economic downturn.  And that was a decision made that the President continues to believe was in the interest of the American people.

Q   One last quick one on China — the — looking at more lockdowns.  Now Beijing may be involved in that.  Is there anything that the administration is looking at doing to help the supply chains if this clogs up again?

MS. PSAKI:  Yeah.  So, we're — we're — we're following this very closely.  And as you know, there are a couple of different issues at play here.  There's obviously Shenzhen, which has kind of reopened, and they had moved around where their goods were being produced and moved around which ports they were going through.  Shanghai, obviously.  And there were a couple of industries that were being impacted.

We haven't seen, at this point, a decrease in ships coming to our ports in California from Asia.  We obviously are continuing to monitor that.  And Beijing is — has increased their testing, which could be a precursor to a lockdown, but we don't — we don't know at this point.

So what we're doing right now is we're closely monitoring — the State Department is, our economic team is.  And — but we haven't seen a slowdown in ships coming to our ports in California.

If there is an increase as lockdowns decrease in some parts of China, we'll also be prepared for that, because we've been able to take steps to reduce the number of cargo ships there.

Go ahead.

Q   Just one question, Jen.  There's been — there's been a lot of explosions and strange fires at quite significant places in Russia over the last couple of weeks, just most recently in the city of Bryansk.  Its oil containers blew up.  There's a lot of speculation over what's causing it.  And, obviously, one of the theories would be that Ukraine somehow doing it.

What is the U.S. position on Ukraine attacking inside Russian territory?  Is this something that U.S. is encour- — would encourage them to do and try and help them do it — you know, in terms of weapons?  Or is it something maybe where you'd advise the Ukrainians not to go there?

MS. PSAKI:  I don't — we don't have any confirmation of that.  Ukraine is defending their own country, so I'm just not going to speak to a hypothetical.

Q    Yeah, no, I'm not asking for confirmation on things that have happened.  It's just there's obviously a lot of speculation.  And it's kind of an obvious point, right?  Like, they're fighting the Russians tooth and nail inside their own country, quite often near the borders, and the Russians are inside their country.  So, is there a U.S. position on — on whether the Ukrainians should have the right or maybe even be encouraged to take their fight beyond their border?

MS. PSAKI:  Again, that is a hypothetical, so I'm not going to speak to it.  Ukraine's country is being invaded.  Russia is invading their country.  That's what we're supporting them for.  And there's been no confirmation of what you're detailing.  So I'm just not going to speak to it.

Go ahead.

Q    If I may, just — we know that Congressional Hispanic Caucus members are here meeting with the President.  I wonder if immigration and also Title 42 is being discussed.  And I don't know how much you can reveal about that meeting that is taking place this afternoon.

MS. PSAKI:  So I don't have a readout of the meeting at this point in time.  I would note that this is part of the series of meetings, as I noted earlier, that the President is doing with a range of the caucuses in Congress.  He did the Congressional Black Caucus, he did CAPAC, and he did these last year as well.

So we certainly expect immigration to be a topic of discussion, but I would note that the CHC also has a stated position on Title 42 as a caucus, which is that they oppose any change to the decisions that been — that has been made.  So anything could be discussed, but I wouldn't anticipate that being a topic — a major topic.

Q    If I may on Transdniestria —

MS. PSAKI:  Sorry, Matt.  I'll come to you next.  Go ahead.

Q    If I may, on Transdniestria —

MS. PSAKI:  Yeah.

Q   — there appears to have been some kind of attack on the ministry of state security.  We know that Moscow has been talking about this area possibly entering the conflict.  It seemed — it happened on a holiday when there wouldn't have been people in the building.  Does this bear the hallmarks of a false-flag operation of the sort that you've been warning us about?

MS. PSAKI:  Yeah, I've seen the reports.  I don't — obviously we have, of course — but I have — I don't have any confirmation of the specifics or the details at this point in time from here.

Go ahead, Matt.  Matt, did you have a question?

Q   Yeah. I just have two.  The first is: With the CHC coming —

MS. PSAKI:  Yeah.

Q   — some have wanted Biden — the administration to do more on executive actions related to immigration.  And, I guess, just philosophically, does the President believe that he's exhausted most of the things that he can do through executive power?  You had alluded earlier about the legislative push —

MS. PSAKI:  Sure.

Q   — but are there things that he feels like he could still do it through executive actions related to immigration?

MS. PSAKI:   I mean, I think his view is that taking steps and working with Congress to pass comprehensive immigration reform that has smarter security, that does put in place an asylum processing system that works is the best step that will have a lasting impact.

Obviously, we're continuing to assess any executive actions we can take, but he'll, I think, continue to discuss legislative actions as well.

Q   And then, secondly, you had mentioned this at the top — about the toxic exposures and that the President wants comprehensive — for the comprehensive legislation to be passed.  The House has passed a version related to this; the Senate has passed a version.

MS. PSAKI:  Yeah.

Q   The Senate version is sometimes criticized by advocates as not going far enough.  So, does the President have a stance on which piece of legislation he views as addressing this issue comprehensively?  Is he getting involved in that? There's other legislation that's — that hasn't been passed in the Senate that also grapples with this issue.

MS. PSAKI:  Sure.  I mean, obviously, as you know, now the next step is for both bodies of Congress to work together and figure out the path forward.  We did issue a SAP on the PACT Act.  So beyond that, I don't think I have anything more to update you on, on the position.

Go ahead.

Q   Thanks, Jen.  I had a question on Title 42.  At the risk of this being a dumb question: So if the CDC is able to extend Title 42, why is it up to Congress?  Can you just help people understand why it's on Congress to extend it and how (inaudible)?

MS. PSAKI:  Sure.  Congress gave the CDC authority to determine when the conditions would be met to lift Title 42, which again, has never been an immigration authority or an immigration policy; it's always been a health authority.

So when they determined we no longer had the conditions where we had to take action to quickly deport people who came to the country, they made that health decision based on data and science and the CDC decision-making.  Congress would need to make any decision about a change to the authority they gave the CDC.

Q   So the CDC doesn't have the authority to just say, "Things have changed –"?

MS. PSAKI:  If the health and data conditions change, they could certainly make a different decision, I supp- — sure.  But they make decisions based on health and data, not based on politics or where members of Congress sit.

Q   Another coronavirus —

MS. PSAKI:  (Inaudible.)

Q   And, actually, a follow-up on that question and something that was asked earlier.  Does the — is the President willing to sign something if it comes to his desk as part of a legislative package that would change the rules for how Title 42 is administered?  Because if it is, in fact — it is up to Congress ultimately, that would get to the President's desk and he would ultimately have to either sign it or veto it.  Is —

MS. PSAKI:  There's a lot of steps between now and then.  So, at this point, that's very premature.  There are many members who strongly would like to see Title 42 extended.  There are many who strongly have the other point of view.  So, we are not anywhere near that point in time.

Go ahead.

Q    Jen, the Surgeon General has said that misinformation about COVID amounts to a public health crisis.

MS. PSAKI:  Yeah.

Q    I'm wondering: Regardless of ownership, would the White House be interested in working with Twitter like it has in the past to continue to combat this kind of misinformation?  Or are we in a different part of the pandemic where that kind of partnership is no longer necessary?

MS. PSAKI:  Well, I think we engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue.  But there are also reforms that we think Congress could take and we would support taking, including reforming Section 230, enacting antitrust reforms, requiring more transparency.  And the President is encouraged by the bipartisan support for — or engagement in those efforts.

Q    Jen, on the U.S. and its allies in the Pacific: They're clearly being blindsided by China's security pact with the Solomon Islands, a very strategic location in the Pacific.  Kurt Campbell was down there only last week, and he announced some initiatives on, you know, speeding up the embassy there —

MS. PSAKI:  Yeah.

Q    — and they're sending a hospital boat, that sort of thing.  The question is: Why wouldn't you — why wouldn't the U.S. commit to far more significant security/military initiatives in such a strategic place like that?

And also, I wonder what would the Biden administration want from other countries.  Australia hasn't exactly been very well prepared for this Chinese-Solomon agreement either.

MS. PSAKI:  Yeah, it's a great group of questions.  I have not talked to Kurt Campbell about this since he returned.  I'm not sure if the President has.  I can — I can see if there's anything more we can update you on, on our policies.

Q    Thank you.

Q    Thank you, Jen.  I wanted to —

Q    The President has issued a statement on malaria.  Do you — the President just issued a statement on malaria today.  Since the time you started speaking, almost a hundred children

have died of malaria.  It said two — children — a child dies every two minutes of malaria.  Is the President prepared to increase funding, maybe fight malaria the same way the U.S. has been fighting COVID?

MS. PSAKI:  It's obviously something the President cares deeply about, as we do as an administration.  I don't have anything for you in terms of predictions of additional funding.  I can see if there's anything more from USAID.

Go ahead.

Q   On the coronavirus —

Q   On the TPS, I know the administration has just granted TPS to Cameroonian living in the U.S.  Why not extend it Ethiopia and Nigeria, other African countries that are also in crisis?

MS. PSAKI:  Yeah, I know you've asked me a similar question before.  It's an effort or a process led by the Department of Homeland Security to make a determination about conditions on the ground and an interagency process.  I don't — I don't have anything to predict at this point.  Obviously, they're continuing to assess.

Q   I wanted to ask about your announcement from last week on refugees from Ukraine.

MS. PSAKI:  Yeah.

Q   I know you're supposed to open the portal for applications today from DHS.

MS. PSAKI:  Yep.

Q   Can you talk about how you're preparing the resources to be able to accept what I'm sure is going to be a big influx of applications as soon as that portal opens?

MS. PSAKI:  So the Department of Homeland Security is going to do a briefing this afternoon for more — with more details to provide to you.  And, obviously, they will oversee the process.  And you're right, we certainly anticipate lots of interest on both sides.

Q   Thanks, Jen.

Q   Will there be someone in the White House — I know when you were working on Operation Afghans [sic] Welcome —

MS. PSAKI:  Yeah.

Q   — there was someone in charge of it from this end.  Is there going to be someone over here that's working on it?

MS. PSAKI:  Sure.  Obviously, Russia and Ukraine, and implementing all of our programs, is a top priority for the national security team.  I'll see if there is one individual who will be responsible.

Thanks so much.

4:08 P.M. EDT

# DEFENDANTS' EXHIBIT 43:

1

1  ----------------------------------------

2

3

4         *** AUDIO TRANSCRIPTION ***

5

6

7      Associated Press, Biden Clarifies:

8     "Facebook isn't killing people," YouTube

9              (July 19, 2021)

10

11                    ***

12  ----------------------------------------

13

14

15

16

17

18

19

20

21

22

23  Transcribed Stenographically

24  By:  Jaclyn Urzia, CSR

25  Job No. 2023-893844

Missouri et al., vs
Biden et al., No. 3:22-cv-1213 (W.D. La.)

AP PRESIDENT BIDEN  CLIP (YOUTUBE) July 19, 2021

2

```
1         REPORTER 1:  You said last week
2    that companies and platforms like
3    Facebook are killing people by letting
4    them --
5         JOE BIDEN:  Let me just --
6    precisely what I said.  I'm glad you
7    asked me that question.
8         One, I had just read that on the
9    Facebook -- Facebook pointed out -- it
10   was pointed out that Facebook, of all
11   the misinformation, 60 percent of the
12   misinformation came from 12
13   individuals.  That's what the article
14   said.  So I was asked that question
15   about what do I think is happening...
16        Facebook isn't killing people.
17   These 12 people are out there giving
18   misinformation.  Anyone listening to
19   it is getting hurt by it.  It's
20   killing people.  It's bad information.
21        My hope is that Facebook,
22   instead of taking it personally that
23   somehow I'm saying Facebook is killing
24   people, that they would do something
25   about the misinformation.  The -- the
```

Case 3:22-cv-01213-TAD-KDM  Document 264-4  Filed 05/02/23  Page 503 of 506 PageID #:
19436

Missouri et al., vs                    AP PRESIDENT BIDEN  CLIP (YOUTUBE) July 19, 2021
Biden et al., No. 3:22-cv-1213 (W.D. La.)

3

1   outrageous misinformation about the

2   vaccine.  That's what I meant.

3       REPORTER 1:  Have they done

4   enough, in your opinion, to stop the

5   spread --

6       JOE BIDEN:  I haven't -- to be

7   completely honest with you, I don't

8   know if they did anything today.  Up

9   to over the weekend, I don't think

10  they had, but I don't know.  I don't

11  know the answer to that question.

12      REPORTER 1:  Will you hold them

13  accountable if they don't do more to

14  stop the spread?

15      JOE BIDEN:  When you say hold

16  accountable, I just want to -- I'm not

17  trying to hold people accountable.

18  I'm trying to make people look at

19  themselves, look in the mirror, think

20  about that misinformation going to

21  your son, your daughter, your

22  relatives, someone you love.  That's

23  all I'm asking.

24      All the way in the back...

25              * * *

4

1              C E R T I F I C A T E

2

3        I, Jaclyn Urzia, a Notary Public within

4    and for the State of New York, do hereby

5    certify that the within is a true and

6    accurate transcription of the audio

7    proceedings entitled "Associated Press,

8    Biden Clarifies:  "Facebook isn't killing

9    people," YouTube (July 19, 2021.)"

10       I further certify that I am not related

11   to any of the parties to this action by

12   blood or marriage, and that I am in no way

13   interested in the outcome of this

14   matter.

15       IN WITNESS WHEREOF, I have hereunto set

16   my hand this 18th day of April, 2023.

17

18                   _____

19                   JACLYN URZIA

20

21

22

23

24

25